# EXHIBIT B

Scott Serels, M.D.

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                   CHARLESTON DIVISION
 3
 4
    IN RE:  ETHICON, INC.,      )     Master File No.
 5  PELVIC REPAIR SYSTEM        )       2:12-MD-02327
    PRODUCTS LIABILITY          )     MDL No. 2327
 6  LITIGATION                  )
    * * * * * * * * * * * * *
 7  MELISSA RIDGLEY and         )
    ERIC RIDGLEY,               )   Case No.
 8                              )  2:12-cv-01311
              Plaintiffs,       )
 9  Vs.                         )
                                ) JOSEPH R. GOODWIN
10  ETHICON, INC., ETHICON      ) US DISTRICT JUDGE
    WOMEN'S HEALTH AND          )
11  UROLOGY, a Division of      )
    Ethicon, Inc., GYNECARE,    )
12  and JOHNSON & JOHNSON,      )
    Defendants.                 )
13
14
15
            DEPOSITION OF:  Scott Serels, M.D.
16          DATE:           April 7, 2016
            HELD AT:        Courtyard Norwalk
17                          474 Main Avenue
                            Norwalk, Connecticut
18
19
20   Reporter:  Robin Balletto, RMR, LSR #230
21
22
23            GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph | 917.591.5672 fax
24              deps@golkow.com
```

Scott Serels, M.D.

1

    APPEARANCES:

2

3          Representing the Plaintiffs:
4                  Wagstaff & Cartmell, LLP
                   4740 Grand Avenue, Suite 300
5                  Kansas City, Missouri  64112
                   By:  Andrew N. Faes, Esq.
6                  afaes@wcllp.com
                   816.701.1100

7

8

9

10         Representing the Defendants:
11                 Butler Snow LLP
                   1020 Highland Colony Parkway
12                 Suite 1400
                   Ridgeland, Mississippi  39157
13                 By:  Douglas J. DiPaola, MD, JD
                   douglas.dipaola@butlersnow.com
14                 856.912.3296

15

16

17

18

19

20

21

22

23

24

Scott Serels, M.D.

```
 1                    I N D E X
 2
 3   Examinations                                    Page
 4   Scott Serels, M.D.,
 5       Direct Examination By Mr. Faes                 5
 6       Cross-Examination By Mr. DiPaola             152
 7       Redirect Examination By Mr. Faes            161
 8
 9
10                    E X H I B I T S
11
     No.           Description                       Page
12   Exhibit 1     Notice of Deposition                7
     Exhibit 2     Placeholder for Invoices           12
13   Exhibit 3     CV                                 13
     Exhibit 4     CV attached to Expert Report       13
14   Exhibit 5     CV from Ethicon's production Bates 16
                   19361638 though 645
15   Exhibit 6     Expert Report                      21
     Exhibit 7     Reliance List                      22
16   Exhibit 8     Thumb Drive                        24
     Exhibit 9     E-mail dated 7/7/04 Bates 638006   57
17                 through 008
     Exhibit 10    Consulting Agreement Bates 16261092 60
18                 through 1096
     Exhibit 11    Letter dated 2/06 Bates 888751     62
19                 through 756
     Exhibit 12    Master Consulting Agreement dated  64
20                 8/20/07 Bates 02245633 through 643
     Exhibit 13    Master Consulting Agreement dated  66
21                 3/1/08 Bates 00369005 through 9015
     Exhibit 14    Master Consulting Agreement dated  68
22                 3/1/09 Bates 369362 through 370
     Exhibit 15    Consulting Agreement Requisition   70
23                 Form Bates 08706296 through 306
     Exhibit 16    E-mail dated 7/1/10 Bates 08956995 80
24                 through 996
```

Scott Serels, M.D.

```
1    INDEX Cont.

2    Exhibit 17    E-mail dated 8/30/06 Bates 03013633      82
                   through 634

3    Exhibit 18    Letter dated 6/29/06 Bates 03005774      82
                   through 775

4    Exhibit 19    E-mail dated 3/16/08 Bates 00064050      88

     Exhibit 20    Project Mint Document Bates              90
5                  12922252

     Exhibit 21    E-mail dated 5/27/09 Bates 07633427      95
6                  through 430

     Exhibit 22    Article by Dr. Serels Bates             145
7                  09125791 and 792

     Exhibit 23    Article by Dr. Serels Bates             150
8                  02602980 through 984

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Scott Serels, M.D.

```
 1                (Deposition commenced at 4:35 p.m.)

 2

 3              Scott Serels, M.D., Witness, having been first

 4              duly sworn by Robin Balletto, RMR, a Notary

 5              Public in and for the State of Connecticut,

 6              was examined and testified as follows:

 7

 8                   DIRECT EXAMINATION BY MR. FAES

 9

10      Q    Good afternoon, Doctor.  My name is Andy

11   Faes, and I represent the Plaintiffs in this

12   litigation, and I'm here now to take your deposition

13   regarding your TVT general report.  Do you understand

14   that?

15      A    I do.

16      Q    You understand that you're under oath and

17   sworn to tell the truth, correct?

18      A    I do.

19      Q    And if I ask you a question that for any

20   reason you don't understand, or it doesn't make sense

21   to you, please just let me know and I'll try to

22   rephrase the question, okay?

23      A    Okay.

24      Q    Have you ever been deposed before?
```

Scott Serels, M.D.

```
 1        A     I have.

 2        Q     How many times?

 3        A     I would say maybe four times in the last

 4   year.

 5        Q     And were those for mesh cases?

 6        A     There was some mesh cases involved.

 7        Q     What mesh cases were you deposed on?

 8        A     They were all medical malpractice cases.

 9   They weren't specifically for a specific type of mesh.

10        Q     And what was your role in those cases?

11        A     I played -- I helped the defendants and I

12   helped the plaintiffs.

13        Q     So you testified as an expert for the

14   plaintiffs in one case and an expert for the defendants

15   in one case?

16        A     Correct, different cases.

17        Q     And what were the other two depositions that

18   you testified in the last year that were not medical

19   malpractice?

20        A     They dealt with copyright of pharmaceuticals.

21        Q     And what was your role in that case?

22        A     Expert.

23        Q     So I'll assume you understand the rules of

24   the deposition, that any time I ask you a question, you
```

Scott Serels, M.D.

```
 1   try to answer it yes or no, not uh-huh or uh-uh, please

 2   answer verbally.

 3        A    Yes.

 4        Q    So that the court reporter can make a clean

 5   record.

 6                    (Plaintiff's Exhibit 1, Notice of

 7   Deposition:  Marked for Identification.)

 8   BY MR. FAES:

 9        Q    Doctor, I'm going to hand you what's been

10   marked as Exhibit number 1 to your deposition and ask

11   you, have you seen that document before?

12        A    I have.

13        Q    And you've reviewed the list of document

14   requests that are attached to your notice of

15   deposition?

16        A    I did.

17        Q    Have you brought any documents with you today

18   that are responsive to that notice?

19        A    I did.  I had my expert report and my

20   curriculum vitae.

21        Q    And those are the same that were served

22   originally, correct?  There haven't been any changes or

23   updates to that since they were served, correct?

24        A    There may have been an update to the CV.  I'm
```

Scott Serels, M.D.

1    not sure you have the most recent copy of it.

2        Q    We may mark that in a minute.  Have you sent

3    a bill for any of your work in this case to Ethicon and

4    Johnson & Johnson or their attorneys?

5        A    I did.

6        Q    And how many hours have you billed so far in

7    this case?

8             MR. DIPAOLA:  Object to form.

9             THE WITNESS:  Three or four hours.

10   BY MR. FAES:

11       Q    So you've only billed three to four hours for

12   preparing your general TVT report in this case?

13       A    Yes.

14       Q    And that includes all the time you spent

15   reviewing materials as well as drafting the report?

16       A    Correct.

17       Q    And how many hours have you spent on the one

18   case specific, the report that you prepared in this

19   litigation?

20       A    Probably two hours or so.  Two or three

21   hours.

22       Q    And what was your hourly rate for preparing

23   those expert reports?

24       A    $450 an hour.

Scott Serels, M.D.

1      Q      Is there an agreement that you have with

2   Ethicon or Johnson & Johnson and their counsel that

3   sets forth your hourly billing rates for various types

4   of activities?

5      A      Yes.

6      Q      Have you brought that with you here today?

7      A      I have not.

8                MR. FAES:  We request that we get a copy

9   of that agreement.

10   BY MR. FAES:

11      Q      Doctor, is your billable rate different for

12   deposition testimony?

13      A      For a full deposition it would be, yes.

14      Q      And what is that rate?

15      A      Usually it's $5,000 a day.

16      Q      And will you be charging $5,000 a day for

17   your deposition testimony given today?

18      A      Probably not.

19      Q      What do you anticipate you'll bill for your

20   deposition testimony today?

21      A      Probably be an hourly rate.

22                MR. DIPAOLA:  Object to form.

23   BY MR. FAES:

24      Q      Do you have a set rate for your testimony at

Scott Serels, M.D.

1    trial if you were to give testimony at trial?

2        A    It would probably be similar to the

3    deposition rate per day.

4        Q    Doctor, you mentioned earlier that you've

5    testified in two medical malpractice cases in the last

6    year, once for the plaintiff and once for the

7    defendant?

8        A    Correct.

9        Q    How long have you been doing expert

10   litigation consulting work?

11       A    I would say the past eight years.

12       Q    How many times would you say you've testified

13   in court?

14       A    Four.

15       Q    Four times.  Do you remember offhand what

16   those instances were?

17       A    What they were.  Not completely, but the more

18   recent ones I remember more completely.

19       Q    Do you recall if any of those four instances

20   involved the use of surgical mesh?

21       A    Yes.

22       Q    Do you remember how many of those four times

23   were involving the use of surgical mesh?  Was it once

24   or twice or three times if you recall?

Scott Serels, M.D.

```
 1       A    If I had to say for certain -- well,

 2   certainly I couldn't say, but I would say at least one

 3   had a patient that involved mesh.

 4       Q    Do you recall the name of the person involved

 5   in that or any of the attorneys involved?

 6       A    No.

 7       Q    Doctor, do you keep time sheets or

 8   itemizations of the work you've done on your TVT report

 9   in this case?

10       A    Yes.

11       Q    And have you brought those with you here

12   today?

13       A    I have not.

14            MR. FAES:  Again, we would ask that

15   those be produced.

16            What I'm going to go ahead and do is I'm

17   going to mark as Exhibit 2 a placeholder document for

18   all of the invoices that you've submitted to Ethicon

19   and Johnson & Johnson and/or their attorneys in this

20   case.

21            Can I get an agreement from counsel that

22   we'll get those invoices to the court reporter to make

23   them a part of the official record of this deposition,

24   all the invoices that have been billed thus far as of
```

Scott Serels, M.D.

1    today's date.

2                    MR. DIPAOLA:  Invoices, no problem.

3                    (Plaintiff's Exhibit 2, Placeholder for

4    Invoices:  Marked for Identification.)

5    BY MR. FAES:

6         Q    So Doctor, you stated that you estimate that

7    you spent three to four hours preparing your TVT

8    general report in this case?

9         A    Yes.

10        Q    How many of those three to four hours do you

11   estimate was spent in actually drafting your report?

12                   MR. DIPAOLA:  Object to form.

13                   THE WITNESS:  I would say the majority

14   was probably spent drafting the report, 80 percent of

15   the three to four hours.

16   BY MR. FAES:

17        Q    So the remaining time you believe

18   approximately one to two hours was spent in reviewing

19   materials that went into your report?

20        A    Yes, maybe perhaps looking over some articles

21   that I was less familiar with.

22        Q    And how much time did you spent with defense

23   counsel preparing for your deposition today?

24        A    Approximately two hours.

Scott Serels, M.D.

1        Q     Do you intend to bill that at your $450 an

2    hour rate?

3        A     Yes.

4        Q     Did you have any other meetings with defense

5    counsel preparing for your deposition other than today?

6        A     No.

7        Q     No meetings over the phone or anything like

8    that leading up to this deposition?

9        A     No.

10        Q     Doctor, I'm going to mark a couple of things

11    here, because I'm limited in time, and I don't know

12    if the -- I'm not sure if the version of the CV you

13    brought today is different from the one that was served

14    or not.  So I'm going to mark as Exhibit 3 the CV that

15    you brought with you today and the CV that was produced

16    earlier with your expert report as Exhibit 4.

17                    (Plaintiff's Exhibit 3, CV:  Marked for

18    Identification.)

19                    (Plaintiff's Exhibit 4, CV attached to

20    Expert Report:  Marked for Identification.)

21    BY MR. FAES:

22        Q     And I'll actually have you look at Exhibit 3.

23    Doctor, what is Exhibit 3?

24        A     Exhibit 3 is my CV.

Scott Serels, M.D.

```
1        Q    And is that your current and updated CV?

2        A    That is.

3        Q    When was this CV last updated?

4        A    I would say October of 2015.

5        Q    Now, Doctor, on the third page of your CV

6   there's a section entitled pelvic prolapse and

7   incontinence courses.

8        A    Yes.

9        Q    Do you see that?

10       A    I do.

11       Q    Do you recall when you added this particular

12   section to your CV?

13       A    I would say four or five years ago.

14       Q    So you believe it was added some time in

15   2011?

16       A    Yes, somewhere around there.

17       Q    And I notice that you list a number of

18   different products that you've given lectures on either

19   throughout the country or internationally.  I don't see

20   the TVT product listed as one of the products that

21   you've given a lecture before.

22            MR. DIPAOLA:  Objection.  Misrepresents.

23   BY MR. FAES:

24       Q    First of all, is TVT on this list of products
```

Scott Serels, M.D.

1    that you've given lectures on throughout the country or

2    internationally?

3         A    It's not on this list, no.

4         Q    Is there any particular reason why?

5         A    Yes.

6         Q    Why is that?

7         A    These are more of the current or cutting edge

8    therapies that were being offered at the time.  TVT

9    retropubic was really the gold standard that had

10   been -- that predated a lot of the more recent courses.

11   So it wasn't something that was commonly taught as a

12   primary course within the last say ten years.

13        Q    So I take it, have you given lectures on the

14   TVT?

15        A    Absolutely.  Yes, absolutely.

16        Q    Let me finish my question, sorry.

17        A    My apologies.

18        Q    Is it true that you've given lectures on the

19   TVT for Ethicon both throughout the country and

20   internationally?

21        A    Throughout the country and internationally,

22   yes, that's correct.

23        Q    Is it true that you've given lectures on the

24   TVT-O for Ethicon throughout the country and

Scott Serels, M.D.

```
 1   internationally?

 2       A    That is correct as well.

 3       Q    I also don't see the Solyx sling listed on

 4   here.  The Solyx, you've published three articles

 5   regarding the Solyx sling; is that correct?

 6       A    Correct.

 7       Q    Is there any particular reason why that's not

 8   listed on the section of your CV that lists lectures

 9   that you've given throughout the U.S. and Europe?

10       A    Maybe we have different copies, but the

11   second line down on page three says, Lecture for Solyx

12   throughout U.S. and Europe.  So maybe you don't have

13   that.

14       Q    Let me take a look at that if you don't mind.

15       A    That I didn't think changed, but who knows.

16            MR. FAES:  It's in bold that's why I

17   missed it.

18            (Plaintiff's Exhibit 5, CV from

19   Ethicon's production Bates 19361638 though 645:  Marked

20   for Identification.)

21   BY MR. FAES:

22       Q    Doctor, I'm going to hand you what's been

23   marked as Exhibit 5 to your deposition, and I'll

24   represent that this is a CV of yours that we found in
```

Scott Serels, M.D.

1    Ethicon's production.  If you want to go ahead and take

2    a look at that.  My best guess based on your list of

3    publications is that this was prepared some time around

4    2005.  If you look at the top of the publication list,

5    the most recent publication is listed as 2005 and in

6    press.  Do you see that?

7          A    I do see that, yes, correct.

8          Q    Do you have any reason to disagree with the

9    fact that this is probably your CV as of some time in

10   2005?

11         A    Correct.  I would agree that that probably is

12   true.

13         Q    Now, on this particular CV you don't have a

14   list of the pelvic prolapse and incontinence courses

15   that is listed on your current CV.  Do you see that?

16         A    I do.

17         Q    Is there any particular reason why you didn't

18   include those on your CV in 2005?

19         A    I just didn't think it relevant at the time.

20         Q    Is there any particular reason why you chose

21   to add those items in 2011?

22         A    At the time I thought it was an interesting

23   find that I had taught on so many different alternative

24   procedures, and I thought that might be interesting for

Scott Serels, M.D.

1    someone who is looking at my CV.

2        Q    Now, you also are a lecturer for

3    pharmaceutical products as well, right, not just pelvic

4    prolapse and incontinence products?

5        A    Correct.

6        Q    Is there any particular reason why you chose

7    to list your products that you've lectured for on

8    pelvic organ prolapse and SUI, and not on

9    pharmaceutical products that you've lectured on?

10       A    No particular reason.

11       Q    For example, and I'm going to butcher the

12   pronunciation on this, you've given lectures on the

13   drug Myrbetriq.  Maybe you can pronounce it, and the

14   court reporter might appreciate you spelling it for me.

15       A    I think you're referring to Myrbetriq,

16   M-Y-R-B-E-T-R-I-Q.

17       Q    And you have given lectures on that product

18   as well, right?

19       A    I have.

20       Q    In fact, you've done at least seven speaking

21   events on Myrbetriq for Astellas Pharmaceuticals in

22   2014 alone, correct?

23       A    That's probably correct.  I don't have the

24   exact numbers.

Scott Serels, M.D.

```
 1      Q    Is it correct that you were paid at least

 2   $2,700 by Astellas for each one of those lectures?

 3      A    I don't recall the exact amount.  It sounds

 4   high, but I don't know for sure.

 5      Q    Sitting here today do you have any reason to

 6   dispute that amount of $2,700?

 7      A    I just don't know.

 8               MR. DIPAOLA:  Object to form.

 9   BY MR. FAES:

10      Q    Now, you've done both -- strike that.

11           You've done expert work for both plaintiffs

12   and defendants, correct?

13      A    Correct.

14      Q    Do you have an kind of an estimation of what

15   percentage of the time you've served as an expert for

16   plaintiffs as opposed to the defendants?

17      A    I don't know exactly, but it probably is a

18   little bit more heavy toward the defendants.

19      Q    Can you estimate a percentage of the time

20   that you do work for the defendants as opposed to the

21   plaintiffs?

22      A    If I had to guess, I couldn't tell you

23   exactly, but probably 70 percent was defendant cases

24   versus 30 percent for the plaintiffs.
```

Scott Serels, M.D.

1    Q    Now, you're a urologist, so do you treat men

2    as well as women?

3    A    I do.

4    Q    What percentage of your practice would you

5    say is treating men as opposed to women?

6    A    I would say 15 to 20 percent men versus 80 to

7    75 percent women.  Eighty to 85 percent women.

8    Q    Now, I just wanted to ask you about one other

9    thing on your CV.  On the front page I note that you

10   did a rotation in female urology with Dr. Shlomo Raz in

11   1997?

12   A    I did, that's correct.

13   Q    Do you know Dr. Raz pretty well?

14   A    Pretty well.

15   Q    Would you agree that Dr. Raz is one of the

16   most respected pelvic floor surgeons in the country?

17   A    I agree.

18   Q    Would you agree that Dr. Raz is an expert in

19   treating complications from pelvic mesh?

20             MR. DIPAOLA:  Object to form.

21             THE WITNESS:  I agree.

22   BY MR. FAES:

23   Q    Doctor, would you agree that you've been an

24   advocate for certain pelvic mesh products manufactured

Scott Serels, M.D.

```
 1   by American Medical Systems?

 2                   MR. DIPAOLA:  Object to form.

 3                   THE WITNESS:  I advocate the products

 4   that I think are good products and useful for the way I

 5   treat patients.

 6   BY MR. FAES:

 7       Q    Does that include products that are

 8   manufactured by AMS?

 9                   MR. DIPAOLA:  Object to form.

10                   THE WITNESS:  It did.

11   BY MR. FAES:

12       Q    But it doesn't any longer?

13       A    It does.  AMS has certainly morphed into

14   other companies.

15       Q    Would you agree that you've been an advocate

16   for products manufactured by Boston Scientific?

17       A    I would.

18                   (Plaintiff's Exhibit 6, Expert Report:

19   Marked for Identification.)

20   BY MR. FAES:

21       Q    Doctor, I'm going to mark Exhibit Number 6 to

22   your deposition.  Doctor, can you tell me what that is?

23       A    That's my expert report.

24       Q    Doctor, does this report contain all of the
```

Scott Serels, M.D.

```
 1    opinions you intend to offer in this case regarding the

 2    TVT product?

 3        A    Yes.

 4        Q    Now, Doctor, in this report you discuss

 5    various facts and cite various facts.  Did you discuss

 6    the facts in your report that you felt were most

 7    important to rendering your opinions in this case?

 8        A    Yes.

 9        Q    You also cite a number of articles and

10    materials in your report.  Is there any particular

11    reason why you chose to cite the materials you did

12    within your expert report?

13        A    I thought they were most applicable to my

14    expertise.

15                  (Plaintiff's Exhibit 7, Reliance List:

16    Marked for Identification.)

17    BY MR. FAES:

18        Q    Doctor, I'm going to mark Exhibit number 7 to

19    your deposition.  Can you tell me what that is?

20        A    It's a reliance list of additional materials

21    referenced in the report.

22        Q    Between this and the articles that --

23    articles and items that are cited specifically in your

24    general report, is this a list of all the materials
```

Scott Serels, M.D.

```
1    that you intend to rely upon in -- strike that.

2            Doctor, between this reliance list marked as

3    Exhibit number 7 and the materials specifically cited

4    in your expert report, do those contain all of the

5    materials that you've reviewed and relied upon in

6    forming your opinions in this case?

7        A    Yes.

8                MR. DIPAOLA:  Doctor, did you bring the

9    thumb drive?

10               THE WITNESS:  I did.

11               MR. DIPAOLA:  There is an amended

12   reliance list that I told you about prior to the

13   deposition starting that has the reliance list on it,

14   the amended reliance list.

15               MR. FAES:  So there's a reliance list on

16   the thumb drive that I haven't seen yet?

17               MR. DIPAOLA:  There is, but it's a

18   portion of that.  This is over-inclusive, the thumb

19   drive is under-inclusive.

20               MR. FAES:  Where is the thumb drive?

21   Can we get it out.

22               MR. DIPAOLA:  Sure.  That's the one that

23   has the password that I explained to you before.

24
```

Scott Serels, M.D.

```
 1                    (Plaintiff's Exhibit 8, Thumb Drive:

 2      Marked for Identification.)

 3      BY MR. FAES:

 4          Q    Doctor, I'm going to mark the flash drive

 5      that you've just handed to me as Exhibit number 8 to

 6      your deposition.  Can you explain to me what that is?

 7          A    Again, as stated by my counsel, or the

 8      counsel, that it's just a list of the references that's

 9      in slight abbreviated form to the list that you handed

10      me for Exhibit 7.

11          Q    Is there anything contained on the flash

12      drive marked as Exhibit number 8 that is not already

13      listed in your reliance list marked as Exhibit number

14      7?

15          A    Not that I'm aware of.

16          Q    Doctor, who prepared your reliance list which

17      has been marked as Exhibit number 7?

18          A    The reliance list was prepared in combination

19      with the law firm representing the defendant.

20          Q    So who would you say prepared it?  Would you

21      say that you prepared it --

22          A    It was in combination.  Sorry to interrupt

23      you.  Yes, it's a combination of some of the references

24      I was looking for, I asked them to look up some things,
```

Scott Serels, M.D.

1    and we compiled the two.

2        Q    Doctor, I just want to ask you a few

3    questions about the products that you're currently

4    using in clinical practice.  Can you tell me what

5    products -- let me rephrase it.

6             Can you tell me what polypropylene sling

7    products you currently use for the treatment of stress

8    urinary incontinence?

9        A    Meaning the manufacturers of the products, or

10   just the types of products.

11       Q    The manufacturers and the type.  For example,

12   I know that Monarc is made by AMS, so I don't

13   necessarily need you to tell me the Monarc by AMS.  I'm

14   just more looking for the name of the product if you

15   know.

16       A    Okay.  So I use a variety of midurethral

17   slings, some of which are put into a single incision,

18   some of which are put into an obturator placement, and

19   some of which are put in retropubically.  The various

20   names of the slings, in short, the manufacturer of the

21   slings are Boston Scientific, American Medical System,

22   Caldera, and Gynecare.

23       Q    Which midurethral polypropylene sling would

24   you say you use the most often?

Scott Serels, M.D.

```
 1              MR. DIPAOLA:  Object to form.

 2              THE WITNESS:  Quite honestly, I could

 3    put in any of these slings accurately, so I use a

 4    variety depending on what the hospital has, or what the

 5    surgery center has, and that does seem to change more

 6    often.  So currently probably more Caldera and Boston

 7    Scientific.

 8    BY MR. FAES:

 9         Q    Doctor, what synthetic mesh products do you

10    currently use for the treatment of pelvic organ

11    prolapse?

12              MR. DIPAOLA:  Objection.  Beyond the

13    scope.

14              THE WITNESS:  For the most part I do not

15    use products unless I'm doing an abdominal approach.

16    BY MR. FAES:

17         Q    And what products do you use for the

18    abdominal approach?

19              MR. DIPAOLA:  Same objection.

20              THE WITNESS:  It would be a

21    polypropylene mesh.  Where it comes from, who

22    manufacturers it, it could vary depending, again, on

23    what the hospital has, could be Caldera, could be Bard,

24    could be Gynecare, could be Boston Scientific.
```

Scott Serels, M.D.

1    BY MR. FAES:

2        Q    So is it fair that you don't have a

3    particular product that you reach for if you're doing

4    abdominal repair for pelvic organ prolapse?  There's

5    not one that you --

6        A    Correct.  They're fairly interchangeable.

7        Q    And is the same true of polypropylene slings,

8    there isn't one that you have a particular preference

9    for?

10       A    Not out of the ones that I've mentioned.

11       Q    Doctor, have you ever performed a Burch

12   procedure?

13       A    I have.

14       Q    And when was the last -- strike that.  Was

15   the first time you performed a Burch procedure?

16       A    The first Burch probably '97.

17       Q    And when was the last time you believe you

18   performed a Burch procedure?

19       A    2015.

20       Q    So you performed a Burch procedure within the

21   last six months?

22       A    In the last year.

23       Q    When is the last time you've performed a

24   biologic tissue sling procedure?

Scott Serels, M.D.

1        A     Again, probably within the last year.

2        Q     Doctor, would you agree that you don't hold

3    yourself out as an academic physician?

4                    MR. DIPAOLA:  Object to form.

5                    THE WITNESS:  I have several academic

6    appointments, so I'm not sure how you qualify an

7    academic physician, but I am a clinician who has

8    academic appointments.

9    BY MR. FAES:

10       Q     Would you agree that you don't hold yourself

11   out as an expert in chemical engineering?

12       A     That I would agree on.

13       Q     Would you agree that you don't hold yourself

14   out as an expert in surgical pathology?

15       A     I agree with you on that.

16       Q     Would you agree that you don't hold yourself

17   out as an expert in polymer chemistry?

18       A     Yes.  I agree I'm not an expert in polymer

19   chemistry.

20       Q     Would you agree that you have no background

21   in polymer chemistry?

22       A     Yes, I would agree with that.

23       Q     Have you ever done bench testing research on

24   any polypropylene surgical mesh?

Scott Serels, M.D.

```
1        A    No.

2        Q    Have you ever done any lab research on

3   polypropylene surgical mesh?

4        A    No.

5        Q    Have you ever done any type of pathological

6   analysis on explanted polypropylene mesh?

7        A    No.

8        Q    Would you agree that you don't hold yourself

9   out as a biomaterials specialist?

10       A    I would agree.

11       Q    Would you agree that you've never published

12  opinions that polypropylene does not degrade in the

13  human body?

14       A    I would agree.

15       Q    Would you agree that you've never studied

16  polypropylene under a microscope to see if it degrades?

17                 MR. DIPAOLA:  Object to form.

18                 THE WITNESS:  I would agree.

19  BY MR. FAES:

20       Q    Would you agree that you've never done a

21  chemical analysis of polypropylene to see whether or

22  not it degrades?

23                 MR. DIPAOLA:  Same objection.

24                 THE WITNESS:  I have not studied that,
```

Scott Serels, M.D.

1    correct.

2    BY MR. FAES:

3        Q    Would you agree that you don't hold yourself

4    out as an expert on warnings as it relates to medical

5    devices?

6                    MR. DIPAOLA:  Object to form.

7                    THE WITNESS:  I would agree on that

8    general statement.

9    BY MR. FAES:

10       Q    Do you know what standards govern the risk

11   information that medical device companies are required

12   to put in their IFUs or instructions for use?

13       A    I am not sure.

14       Q    Do you know what industry standards govern

15   warnings on medical devices?

16       A    Again, I'm not sure of the exact guidelines.

17       Q    Do you know what departments of a medical

18   device company are involved in creating warnings for

19   medical devices?

20                   MR. DIPAOLA:  Object to form.

21                   THE WITNESS:  Again, I'm not sure.

22   BY MR. FAES:

23       Q    Do you know what the FDA's requirements are

24   regarding warnings for medical devices?

Scott Serels, M.D.

1      A    I do not know.

2                MR. DIPAOLA:  Same objection.

3    BY MR. FAES:

4      Q    Have you ever drafted or been involved in

5    drafting an IFU or instructions for use for a medical

6    device?

7      A    I've helped with the steps for -- procedural

8    steps in an IFU for a device.

9      Q    Have you ever drafted or been involved in

10   drafting the warnings and precautions section or the

11   adverse reactions section of the IFU for a medical

12   device?

13     A    No.

14     Q    Have you ever been involved in drafting an

15   IFU for a prescription drug?

16                MR. DIPAOLA:  Object to form.

17                THE WITNESS:  No.

18   BY MR. FAES:

19     Q    Would you agree or disagree that physicians

20   should be made aware of all the significant safety

21   risks associated with a medical device in the IFU or

22   instructions for use?

23                MR. DIPAOLA:  Object to form.  Vague.

24                THE WITNESS:  I agree that people should

Scott Serels, M.D.

1   be made aware of any possible complications.

2   BY MR. FAES:

3       Q    Would you agree or disagree that the

4   manufacturer of a medical device that will be implanted

5   in a woman's body is required to disclose all

6   significant risks to doctors that come with the use of

7   that device?

8               MR. DIPAOLA:  Objection.  Assumes facts

9   not in evidence.

10              THE WITNESS:  The way you stated it, I

11  would agree.

12  BY MR. FAES:

13      Q    Doctor, would you agree that you don't hold

14  yourself out as a biomedical engineer?

15      A    I agree with that.

16      Q    Do you know what standards or operating

17  procedures manufacturers must follow in designing mesh

18  products?

19              MR. DIPAOLA:  Objection.  Asked and

20  answered.

21              THE WITNESS:  No.

22  BY MR. FAES:

23      Q    Do you know what responsibilities the

24  manufacturer holds in designing mesh products?

Scott Serels, M.D.

```
 1                    MR. DIPAOLA:  Same objection.

 2                    THE WITNESS:  No.

 3    BY MR. FAES:

 4         Q    Doctor, do you know what a design and failure

 5    modes effects analysis is?

 6         A    No.

 7         Q    So I would assume since you don't know what a

 8    design failure modes effects analysis is, I wouldn't

 9    expect you to offer any opinions in this case regarding

10    how that analysis should be done, or what should or

11    should not be included in that analysis, correct?

12                    MR. DIPAOLA:  Object to form.

13                    THE WITNESS:  When you say explained, I

14    could always raise an opinion.

15    BY MR. FAES:

16         Q    But sitting here today --

17         A    Yes.

18         Q    -- you don't know what a design failure modes

19    effects analysis is, correct?

20         A    Correct.

21         Q    Doctor, do you know what a process failure

22    modes effects analysis is?

23         A    No.

24         Q    And again, since you don't know what a
```

Scott Serels, M.D.

1    process failure modes effects analysis is, can I assume

2    that at this time you don't intend to offer any

3    opinions on this regarding how that analysis should be

4    done or what should be included in that analysis,

5    correct?

6         A    Correct.

7         Q    Doctor, do you know what an application

8    failure modes effect analysis is?

9         A    No.

10        Q    And again, since you don't know what an

11   applications failure modes effects analysis is, at this

12   time you don't intend to offer any opinions regarding

13   what that analysis should involve or what should or

14   should not be in that analysis, correct?

15        A    Correct.

16        Q    Doctor, do you know if you've reviewed the

17   design history file for the TVT product?

18             MR. DIPAOLA:  Object to form.

19             THE WITNESS:  No.  I have not seen it.

20   BY MR. FAES:

21        Q    Doctor, do you know what ISO testing is, or

22   ISO standards?

23        A    No.

24        Q    Doctor, have you ever reviewed any of

Scott Serels, M.D.

1    Ethicon's internal standard operating procedures

2    related to the design of medical devices?

3                    MR. DIPAOLA:  Object to form.  Asked and

4    answered.

5                    THE WITNESS:  No.

6    BY MR. FAES:

7        Q    Do you have an understanding of how long it

8    takes a medical device to get to market?

9        A    I have some understanding.

10       Q    And what's your understanding of how long

11   that typically takes?

12       A    Well, I would say at least five to ten years.

13       Q    Would you agree that if a device took less

14   than five years to get to market, that would be fairly

15   rapid compared with your understanding of how long it

16   typically takes?

17                   MR. DIPAOLA:  Objection to form.

18   Misstates facts.

19                   THE WITNESS:  No.

20   BY MR. FAES:

21       Q    Doctor, do you own any patents for the design

22   of medical devices?

23       A    No.

24       Q    Doctor, do you know what a clinical expert

Scott Serels, M.D.

```
1    report is?

2        A    I do.

3        Q    Can you explain to me what you believe a

4    clinical expert report is, at least as it relates to

5    the TVT?

6        A    I think it would represent a report given by

7    an expert who would establish their credentials in the

8    field in terms of their use of various products in

9    their practice as well as throughout their peer

10   network, and in so doing that report it would

11   incorporate some of the other findings that other

12   physicians have used to study those devices in their

13   clinical practice.

14       Q    Do you recall sitting here today if you've

15   reviewed the clinical expert report for the TVT

16   product?

17                  MR. DIPAOLA:  Object to form.

18                  THE WITNESS:  Whose expert report?

19   BY MR. FAES:

20       Q    Any of the clinical expert reports produced

21   by Ethicon?

22       A    I would say yes.

23       Q    Do you recall which versions you reviewed?

24                  MR. DIPAOLA:  Object to form.
```

Scott Serels, M.D.

```
 1                    THE WITNESS:  No.

 2   BY MR. FAES:

 3        Q    Do you recall if you've reviewed the clinical

 4   expert report for the laser cut mesh product?

 5                    MR. DIPAOLA:  Object to form.

 6                    THE WITNESS:  I do not recall seeing

 7   that.

 8   BY MR. FAES:

 9        Q    Doctor, have you ever explanted a mesh

10   product before?

11        A    I have.

12        Q    How many times during the course of your

13   career would you say you've explanted a mesh product?

14        A    Many.

15        Q    Do you have any kind of a number?

16        A    I would say in a given year could be 20.

17        Q    So you believe you average about 20 a year?

18        A    Probably.

19        Q    When do you believe you first started

20   explanting mesh products?

21                    MR. DIPAOLA:  Object to form.

22                    THE WITNESS:  Since they've been used.

23   BY MR. FAES:

24        Q    Would it be fair to estimate that you've
```

Scott Serels, M.D.

1   explanted at least 200 mesh products during the course

2   of your career?

3                    MR. DIPAOLA:  Object to form.

4                    THE WITNESS:  Yes, I would say that's

5   probably accurate, but you have to realize that my

6   practice is different than the average.  People are

7   sent to me specifically to have their complications

8   remedied, such as erosion or a problem with mesh.

9   BY MR. FAES:

10       Q    How many days of the week would you say you

11   operate, Doctor?

12       A    Two.

13       Q    And what percentage of your practice is

14   related to the treatment of stress urinary incontinence

15   in women, do you believe?

16       A    Say 25 percent.

17       Q    And what percent of your practice is related

18   to treating complications from pelvic mesh?

19                    MR. DIPAOLA:  Objection to form.

20                    THE WITNESS:  Five percent.

21   BY MR. FAES:

22       Q    Have you ever explanted a TVT product?

23       A    I have.

24       Q    How many times do you believe you've

Scott Serels, M.D.

1    explanted a TVT product?

2        A    It's hard to give an absolute number, but --

3    it's hard to give you a number.  A lot of times I may

4    see someone who has some kind of mesh complication, but

5    I really don't even know what product it was, so there

6    are times where I may not even know what I'm taking

7    out.

8                MR. FAES:  Do you need to check that,

9    Doctor?  We can go off the record if you do.

10               THE WITNESS:  I'm fine.

11   BY MR. FAES:

12       Q    Have you ever explanted a TVT-O product?

13       A    I have.

14       Q    Have you explanted a TVT Secure product?

15       A    I have.

16       Q    Have you explanted a TVT Abbrevo product?

17       A    Not that I know of.

18       Q    Have you explanted a TVT Exact product?

19       A    Yes.

20       Q    Have you implanted -- I know for -- sorry,

21   this is tedious, I'll have to go through the list.

22               You've obviously implanted personally the

23   TVT, the TVT-O, and the TVT Secure products before,

24   correct?

Scott Serels, M.D.

```
 1       A    Correct.

 2       Q    Have you implanted the TVT Abbrevo products

 3   before?

 4       A    I have.

 5       Q    How many of those would you say you've

 6   implanted during the course of your career?

 7       A    It wasn't one of my main products that I

 8   would use, but have I done 20 of them, probably.

 9       Q    Have you implanted the TVT Exact product

10   during the course of your career?

11       A    Again, it probably was somewhere around 20 or

12   30.

13       Q    How many TVT products, and by that I mean the

14   TVT retropubic product that was --

15       A    In total?

16       Q    Do you believe that you've implanted in the

17   course of your career?

18            MR. DIPAOLA:  You mean separate from the

19   modifications?  Vague?  I'm sorry, object to form.

20   Vague.

21   BY MR. FAES:

22       Q    So let me just rephrase it.  Let me try to

23   get the whole question out.

24            How many TVT products, and by TVT products I
```

Scott Serels, M.D.

1    mean the TVT retropubic product that first came out in

2    1998 do you believe you've implanted during the course

3    of your career?

4         A    Yes.  I mean, I've implanted hundreds of TVT

5    products in the TVT family.

6         Q    But specifically with regard to the TVT

7    retropubic classic product, do you know how many of

8    those you've implanted?

9         A    Probably hundreds of the TVT retropubics

10   throughout the year.

11        Q    What about the TVT-O?

12        A    Again, hundreds.

13        Q    And the TVT Secure?

14        A    Hundreds.

15        Q    Doctor, do you have surgical days that you

16   set aside each week for removals or treatment of mesh

17   complications?

18        A    No.

19        Q    When you have removed -- actually, first of

20   all, let me ask you this.  Have you ever removed an

21   entire midurethral sling?

22             MR. DIPAOLA:  Object to form.

23             THE WITNESS:  Yes.

24

Scott Serels, M.D.

1   BY MR. FAES:

2       Q    How many times do you think you've done that?

3       A    Dozens.

4       Q    And what were the indications for the

5   removals of those slings?

6       A    A variety of indications.  Could be an

7   erosion, could be discomfort, could be retention.

8   Those are probably the top three.

9       Q    Was pain ever an indication for some of those

10  removals?

11      A    Yes.

12      Q    Dyspareunia or painful sexual intercourse?

13      A    Yes.

14      Q    I take it in addition to the dozens or so of

15  slings that you've completely removed, there's been at

16  least 100 of meshes that you've treated by trimming or

17  revising the surgery; is that correct?

18              MR. DIPAOLA:  Object to form.

19              THE WITNESS:  I wouldn't say hundreds,

20  but there have been others.  But a lot of times if

21  we're going in, we'll take out most of the mesh, if not

22  all.

23  BY MR. FAES:

24      Q    And what are the indications for when you

Scott Serels, M.D.

1  have to do a surgical revision of a prior mesh repair,

2  are they the same as when you do removals?

3      A    Yes.  Similar.

4      Q    Have you ever had one of your patients with a

5  TVT device report chronic pain to you?

6      A    Yes.

7      Q    And you would agree that -- strike that.

8          Have you ever had one of your patients with a

9  TVT report painful sexual intercourse or dyspareunia to

10  you?

11      A    Yes.

12      Q    Have you ever seen one of your patients with

13  mesh that is roped or curled?

14              MR. DIPAOLA:  Object to form.

15              THE WITNESS:  I've seen a patient with a

16  roped sling, yes.

17  BY MR. FAES:

18      Q    Was it a TVT sling?

19      A    I can't be sure.

20      Q    Was it just one patient, or have you seen it

21  on more than one indication?

22      A    I've seen it on more than one patient.

23      Q    Do you recall how you typically treat a

24  patient with a roped or curled string?

Scott Serels, M.D.

1      A     I would remove the majority of that sling

2    that was curled.

3      Q     Have you ever seen one of your patients with

4    a polypropylene sling that is frayed?

5                    MR. DIPAOLA:  Object to form.

6                    THE WITNESS:  Frayed?

7    BY MR. FAES:

8      Q     Yes.

9      A     It's tough to answer.  The short answer would

10   probably be no.

11     Q     So you've never seen a patient with pieces of

12   frayed mesh that are protruding out through the vagina?

13                   MR. DIPAOLA:  Object to form.  Asked and

14   answered.

15                   THE WITNESS:  Yes, I have, but I don't

16   know if I would describe those as frayed.

17   BY MR. FAES:

18     Q     How would you describe it?

19     A     Just as you did the second time around, a

20   piece of mesh that's being exposed to the vaginal wall.

21     Q     Have you ever seen one of your patients with

22   mesh that was folded or wrinkled.

23     A     I kind of put that into that curling

24   category.  Whether it's curling or folded, it's hard to

Scott Serels, M.D.

```
 1    distinguish, but yes, in essence I have seen patients
 2    like that.
 3         Q    And when you've seen patients like that
 4    you've treated them the same way as you did with a
 5    sling that was roped or curled, correct?
 6         A    Correct.
 7         Q    And I think I forgot to ask, how do you
 8    typically treat a patient who comes in with frayed mesh
 9    as you defined it, mesh edges protruding out through
10    the vagina?
11                   MR. DIPAOLA:  Again, object to form.
12                   THE WITNESS:  I personally would take
13    them to the operating room, get a better look at the
14    situation, and probably not only excise the part that's
15    coming through, but also any edges of the sling that
16    were adjacent, and then reconstruct the vaginal wall.
17    BY MR. FAES:
18         Q    Doctor, in your experience can surgical mesh
19    shrink or contract and cause pain for a woman?
20                   MR. DIPAOLA:  Object to form.
21                   THE WITNESS:  I believe that ones
22    tissues can shrink and contract as part of the healing
23    process.  I'm not convinced that polypropylene or
24    slings can shrink and contract.
```

Scott Serels, M.D.

```
 1   BY MR. FAES:

 2        Q    I think we're getting into semantics, but you

 3   would agree that when the tissue contracts as part of

 4   the healing process, it can encapsulate the mesh, and

 5   the mesh can be shrunk along with the scar tissue,

 6   correct?

 7                    MR. DIPAOLA:  Object to form.

 8                    THE WITNESS:  I guess it's just hard to

 9   define if the mesh is shrinking.  The tissues are

10   contracting, because that's sort of a dynamic state.

11   I'm not sure the mesh is changing.

12   BY MR. FAES:

13        Q    So you've never heard anything described in

14   the medical literature regarding mesh becoming

15   contracted or shrinking and entrapping nerves within

16   the interceeds of the mesh?

17                    MR. DIPAOLA:  I'll object to form, asked

18   and answered, vague, assumes facts.

19                    THE WITNESS:  To your point it's just

20   hard to know whether it's the tissue around the mesh or

21   the mesh itself that's changing.  I think it's more the

22   tissue.

23   BY MR. FAES:

24        Q    Doctor, you testified earlier that you
```

Scott Serels, M.D.

1   believe you do about 20 surgical revisions or -- strike

2   that.

3          I think you testified earlier that you do

4   approximately 20 revisions of surgical mesh a year; is

5   that right?

6      A    Correct.

7      Q    Have you ever reported any of those revisions

8   or problems to Ethicon?

9      A    Yes.  I'm sure I have.

10     Q    Have you ever reported any of those problems

11  to any of the other manufacturers, if it's a different

12  manufacturer?

13     A    Yes.

14     Q    Would you say it's your standard practice to

15  report those problems, or do you only do it on a

16  sporadic basis?

17             MR. DIPAOLA:  Object to form.

18             THE WITNESS:  If I could identify which

19  sling it was, or product it was that was being used,

20  usually I would convey the information to the company

21  via my rep in most cases.

22  BY MR. FAES:

23     Q    And how would you typically do that?  Via

24  e-mail, or would you tell the rep verbally?

Scott Serels, M.D.

```
1        A     Could be any one of the above.

2        Q     Doctor, have you ever reported an adverse

3    event from a medical device to the FDA?

4        A     No.

5        Q     Doctor, in your experience completely

6    removing midurethral sling products, were you able to

7    completely remove all the mesh?

8                    MR. DIPAOLA:  Object to form.

9                    THE WITNESS:  In some cases, yes.

10   BY MR. FAES:

11       Q     Would you agree that there are cases where

12   it's impossible for the surgeon to be unable to remove

13   the entirety of the mesh safely?

14                   MR. DIPAOLA:  Object to form.

15                   THE WITNESS:  There are some cases you

16   would be unable to remove the mesh entirely.

17   BY MR. FAES:

18       Q     So you would agree that there are some cases

19   where the mesh will remain within the patient's body

20   forever?

21       A     Part of it, yes.

22       Q     Doctor, would you agree that it's challenging

23   to remove all of the mesh from a woman?

24                   MR. DIPAOLA:  Object to form.
```

Scott Serels, M.D.

```
1                    THE WITNESS:  It certainly can be
2    challenging, yes.
3    BY MR. FAES:
4        Q    Doctor, would you agree that the TVT mesh
5    produces a chronic inflammatory response that will
6    continue for as long as the mesh is within the
7    patient's body?
8                    MR. DIPAOLA:  Object to form.  Assumes
9    facts not in evidence.  Hypothetical.
10                   THE WITNESS:  I can't say I agree with
11   that statement.
12   BY MR. FAES:
13       Q    So you believe that the inflammatory response
14   stops at some point after the mesh is placed within the
15   body?
16       A    Yes.
17       Q    At what point do you believe that the
18   inflammatory response stops after the TVT mesh is
19   placed in the patient's body?
20                   MR. DIPAOLA:  Form, vague.
21                   THE WITNESS:  I think it's hard to
22   answer specifically.  I think it differs with different
23   individuals in different circumstances depending on how
24   much material was used.  So I would say within the
```

Scott Serels, M.D.

1    first year.

2    BY MR. FAES:

3        Q    Doctor, do you typically perform the --

4    strike that.  I don't think I've asked this yet.

5            When is the last time that you recall

6    performing a TVT retropubic, and again, by that I mean

7    the TVT Classic device, when is the last time you

8    recall putting one of those in?

9        A    Probably in the last year.

10       Q    When you put the TVT retropubic device in, do

11   you typically do that under local or general

12   anesthesia?

13       A    Usually it's either a spinal or general.  In

14   my case not local.

15       Q    Do you know which is more common for

16   physicians to put it in under local or general

17   anesthesia?

18               MR. DIPAOLA:  Object to the form.

19               THE WITNESS:  I think it depends on the

20   individual's practice.  I can only speak for myself.

21   BY MR. FAES:

22       Q    Doctor, do you know what the pore size is of

23   the Prolene mesh in the TVT product?

24       A    I don't know off the top of my head, no.

Scott Serels, M.D.

1      Q     Have you ever heard that the pores -- strike

2   that.

3            Have you ever heard that if the pores in the

4   TVT mesh collapse, it can increase the risk of erosion

5   or bridging fibrosis?

6                 MR. DIPAOLA:  Object to form.  Assumes

7   facts not in evidence.

8                 THE WITNESS:  The idea of them

9   collapsing, I wouldn't say I've heard of that.

10  BY MR. FAES:

11     Q     Do you know as you sit here today whether or

12  not the pores in the TVT mesh can collapse?

13                MR. DIPAOLA:  Same objection.  Asked and

14  answered.

15                THE WITNESS:  I do not believe they

16  collapse.

17  BY MR. FAES:

18     Q     Would you agree that if the pores in a

19  surgical mesh are not large enough, there can be a risk

20  of increased infection?

21     A     Yes.

22     Q     Would you agree that if the pores in a

23  surgical mesh are not large enough, it can increase the

24  risk of erosion for the patient?

Scott Serels, M.D.

1      A    Yes.

2      Q    Would you agree that if the pores in a

3    surgical mesh are not large enough, there can be poor

4    tissue integration which can cause a wound healing

5    defect?

6              MR. DIPAOLA:  Object to form.  Assumes

7    facts not in evidence.

8              THE WITNESS:  Yes.

9    BY MR. FAES:

10     Q    Doctor, do you know what the weight of the

11   mesh in the TVT is?

12     A    No.

13     Q    Do you know what purpose the Prolene mesh

14   that's used in the TVT was originally developed or used

15   for?

16     A    No.

17              MR. DIPAOLA:  Objection to form.

18   BY MR. FAES:

19     Q    Doctor, have you ever been employed by a

20   medical device company?

21     A    No.

22     Q    Now, I take it you have acted as a consultant

23   to various medical device and pharmaceutical companies,

24   correct?

Scott Serels, M.D.

```
 1      A    Correct.

 2      Q    You've been a consultant for American Medical

 3   Systems?

 4      A    Yes.

 5      Q    Have you been a consultant for Astoria

 6   Health, which is what American Medical Systems is

 7   called now?

 8      A    Yes.

 9      Q    Have you been a consultant for Boston

10   Scientific, correct?

11      A    Yes.

12      Q    You've been a consultant for CR Bard?

13      A    Yes.

14      Q    You've been a consultant for Cook?

15      A    Not that I recall.

16      Q    You've been a consultant for Caldera?

17      A    Not that I can -- no.

18      Q    And you have been a consultant for Ethicon,

19   correct?

20      A    Correct.

21      Q    Do you recall when your consulting agreement

22   with Ethicon first began?

23      A    I would have to guess.  It's somewhere around

24   2003 or so, but I'm really not sure.  Could be 2005.
```

Scott Serels, M.D.

1      Q    Do you agree that you've been an advocate of

2   Ethicon mesh products?

3                MR. DIPAOLA:  Object to form.

4                THE WITNESS:  Yes.

5   BY MR. FAES:

6      Q    And you've consulted for a number of

7   pharmaceutical companies as well, right?

8      A    Yes.

9      Q    You've consulted for Allergan?

10     A    Yes.

11     Q    You've consulted for Astrellas

12  Pharmaceuticals?

13     A    Astrellas?  Astellas.

14     Q    Astellas, yes.  The aforementioned overactive

15  bladder drug that I can't pronounce.

16     A    Yes.

17     Q    You've acted as a consultant for Bayer?

18     A    Yes, probably in the past.

19     Q    You've acted as a consultant for, which

20  actually isn't a pharmaceutical company, but Medtronic

21  in the past?

22     A    I'm not sure.  I do not think I have.

23     Q    Do you recall if you've ever received any

24  payments from Medtronic for attending any events?

Scott Serels, M.D.

```
1                    MR. DIPAOLA:  Objection to form.  Beyond

2    the scope.

3    BY MR. FAES:

4         Q    Or anything like that for them?

5         A    I do not believe so.  And if it was, it was a

6    long time in the past.

7         Q    So you don't believe you've received any

8    payments from Medtronic as recently as 2014?

9         A    No.

10        Q    Have you been a consultant for Neotract in

11   the past?

12        A    Neotract.  There again, I don't believe so.

13        Q    Novartis?

14        A    Yes.

15        Q    Uroplasty?

16        A    I don't think I've done any consulting work

17   for them, no.

18        Q    Covidien?

19        A    Maybe.  If I did, it was a long time ago.

20        Q    Intuitive Surgical?

21        A    No.

22        Q    Is there any other medical device or

23   pharmaceutical companies that you've done consulting

24   work for in the past that you can think of as you sit
```

Scott Serels, M.D.

```
 1    here today?

 2         A    Sure.

 3         Q    And what are those?

 4         A    Pfizer, Allergan.  I'm sure there are others.

 5         Q    Do you know what pharmaceutical and medical

 6    device companies you're currently consulting for?

 7         A    Currently?  I would just say Boston

 8    Scientific.

 9         Q    Just Boston Scientific?

10         A    Correct.

11         Q    And Ethicon as a litigation consultant,

12    correct?

13         A    Correct.

14         Q    When did your relationship with Astellas

15    Pharmaceuticals end?

16         A    Oh, I'm sorry.  I still have a relationship

17    with them.  I thought you meant did I -- yes, I still

18    have a relationship with Astellas.

19         Q    Let me reask the question, because I'm not

20    sure you understood the last question.

21              Are there any other pharmaceutical companies

22    that you're currently consulting for?

23         A    Astellas.

24         Q    Just Astellas?
```

Scott Serels, M.D.

```
 1        A     Correct.

 2        Q     Doctor, would you agree that you first became

 3    a paid consultant for Ethicon in 2005?

 4                    MR. DIPAOLA:  Objection to form.  Asked

 5    and answered.

 6                    THE WITNESS:  I think that was the time

 7    frame, but I'm not sure.

 8    BY MR. FAES:

 9        Q     When were you first contacted to give your

10    opinions in this case?

11        A      In this case, I would say in the last six

12    months.

13        Q     And prior to that do you recall when the last

14    time was that you had a consulting relationship with

15    Ethicon?

16        A      I would say probably some time around the

17    last five years, maybe.  Five years ago, put it that

18    way.

19                    (Plaintiff's Exhibit 9, E-mail dated

20    7/7/04 Bates 638006 through 008:  Marked for

21    Identification.)

22    BY MR. FAES:

23        Q     Doctor, I'm going to hand you what's been

24    marked as Exhibit number 9.
```

Scott Serels, M.D.

1              MR. DIPAOLA:  You don't have any copies

2    of these, do you?

3              MR. FAES:  I don't on this one.

4    BY MR. FAES:

5       Q    And I'm actually going to ask you questions

6    about the second page.  This is an e-mail dated

7    July 2004.  Do you see that?

8       A    Yes.

9       Q    And if you go to the second page it's an

10   e-mail to you from Ettore Carino at Ethicon.  Do you

11   see that?

12      A    Sure.

13      Q    I want to have you go down to, I think it's

14   the sixth paragraph starting with, Third, do you see

15   that where it says, Third, armed with the context of

16   what Gynecare is doing and why sponsor you to visit

17   with Dr. De Laval in Belgium.  We are sending a handful

18   of surgeons to spend time with Dr. De Laval to learn,

19   challenge, brainstorm on how what's been uncovered, and

20   the mechanisms of action, and where we can take it to

21   the next level.  Do you see that?

22      A    I do.

23      Q    Do you recall that in July of 2004 Ethicon

24   offered to send you to Belgium all expenses paid to

Scott Serels, M.D.

1    train with Dr. De Laval on the TVT-O device?

2                    MR. DIPAOLA:  Object to form.  Assumes

3    facts.

4                    THE WITNESS:  I do.  I do remember

5    meeting with Dr. De Laval right around that time, yes.

6    BY MR. FAES:

7        Q    So you did actually make this trip to Belgium

8    to see Dr. De Laval?

9        A    I did.

10       Q    And Ethicon, I take it, paid for your flight,

11   and your travel expenses, and your hotel while you were

12   there, correct?

13       A    Correct.

14       Q    Do you recall any other instances where

15   Ethicon paid for your travel internationally to either

16   train or be a trainer or speaker for them?

17       A    I'm sure there are other occasions, yes.

18       Q    Do you recall if you were sent to Paris for a

19   TVT Secure meeting?

20       A    May have been.  It's a long time ago.  I

21   don't remember specifics.  I did a lot of meetings,

22   hard to know.

23       Q    Do you recall if Ethicon sent you to New

24   Zealand to do lectures or talks on the TVT Secure

Scott Serels, M.D.

```
 1   product?

 2                   MR. DIPAOLA:  Object to form.

 3                   THE WITNESS:  There again, it's a long

 4   time ago, but I've definitely been to New Zealand for a

 5   meeting, so I wouldn't be surprised if I was there for

 6   them as well.

 7   BY MR. FAES:

 8       Q    Do you recall how many time you've been to

 9   New Zealand?  Has it been more than once?  I would

10   expect New Zealand to be a pretty memorable experience.

11       A    There have been a couple meetings in

12   Australia.  So when you're in Australia, you tend to go

13   to New Zealand.  So, yes, I've been there before, and I

14   would not be surprised if I've done something with

15   Gynecare while I was there.

16       Q    So I take it you wouldn't be surprised if

17   Ethicon paid for your travel and expenses while you

18   went to New Zealand and/or Australia to give talks or

19   lectures or training regarding their products, correct?

20       A    Correct.

21                   (Plaintiff's Exhibit 10, Consulting

22   Agreement Bates 16261092 through 1096:  Marked for

23   Identification.)

24
```

Scott Serels, M.D.

```
 1   BY MR. FAES:

 2       Q    Doctor, I'm going to hand you what's been

 3   marked as Exhibit number 10 to your deposition.  I'm

 4   really only going to ask you about the date on the

 5   front and something that's on page 2.

 6       A    Yes.

 7       Q    This appears to be a contract between you and

 8   Ethicon dated January 18, 2005.  Do you see that?

 9       A    I do.

10       Q    If you look on page 2, item number 7, it

11   says, Ethicon hereby invites and Consultant accepts

12   invitation by Ethicon for participation in the 2005

13   Incontinence and Pelvic Floor Summit in Salt Lake City,

14   Utah.  Do you see that?

15       A    Yes.

16       Q    And it states under Section 8 that $500 will

17   be paid for consultant's participation.

18       A    Yes.

19       Q    So you would agree that at least as of 2005

20   you were first approached by Ethicon to be a consultant

21   for one of their products, correct?

22       A    Yes.

23

24
```

Scott Serels, M.D.

```
1                    (Plaintiff's Exhibit 11, Letter dated

2      2/06 Bates 888751 through 756:  Marked for

3      Identification.)

4      BY MR. FAES:

5          Q    I'm going to hand you what's been marked as

6      Exhibit Number 11 to your deposition.  And this is a

7      contract between you and Ethicon dated February

8      of 2006.  Do you see that?

9          A    I do.

10         Q    If you turn to page 2 under section C, you

11     see it states, Any work performed in connection with

12     his consultancy will not be published in written or

13     oral form without the permission of Ethicon.  When

14     publication of results is agreed to by Ethicon,

15     consultant agrees to submit to Ethicon the material

16     sought to be published or a draft proposal oral

17     presentations disclosing or discussing the results of

18     work performed under the agreement at least four months

19     prior to the submission of material from publication or

20     oral presentation.  Do you see that?

21         A    I do.

22         Q    Do you recall at this time you were an

23     investigator for Ethicon for a TVT-O clinical study?

24         A    I've done a lot of studies for different
```

Scott Serels, M.D.

1    products, so that certainly could have been the reason

2    for this contract.

3        Q    Would it appear that according to this

4    contract prior to publishing any work from any studies

5    it would have to be approved by Ethicon prior to being

6    published?

7                    MR. DIPAOLA:  Object.

8    BY MR. FAES:

9        Q    Is that your understanding of this agreement?

10                   MR. DIPAOLA:  Misstates.

11                   THE WITNESS:  It's pretty standard

12   language to most studies that you do where they want to

13   see the data before it's published.

14   BY MR. FAES:

15       Q    So under the terms of this agreement, if

16   there was data that was not favorable to a product that

17   you were working on, Ethicon could tell you that, no,

18   we don't want you to publish that data; is that

19   correct?

20                   MR. DIPAOLA:  Objection.  Totally

21   misstates facts.

22                   THE WITNESS:  Yes, I don't have that.

23   BY MR. FAES:

24       Q    You don't have that?

Scott Serels, M.D.

1       A    It never came up, never became an issue.  If

2    we ever had data we wanted to publish, it wasn't as if

3    anybody restricted us from publishing it.

4       Q    If you turn to page 3 of the agreement under

5    Section 8, it states that in consideration of your

6    acceptance of this consulting agreement, you'll be paid

7    $3,000 a day; is that correct?

8       A    It says that, yes.

9       Q    And it also says that under no circumstances

10   will their total obligations under this agreement

11   exceed $15,000 without express written approval,

12   correct?

13      A    It says that, yes.

14      Q    So this particular contract is for up to

15   $15,000; is that correct?

16      A    Correct.

17              (Plaintiff's Exhibit 12, Master

18   Consulting Agreement dated 8/20/07 Bates 02245633

19   through 643:  Marked for Identification.)

20   BY MR. FAES:

21      Q    Doctor, I'm going to hand you what's been

22   marked as Exhibit number 12 to your deposition.

23              I'm just going to hand you that, and this is

24   a consulting agreement between you and Ethicon dated

Scott Serels, M.D.

```
 1   August 20, 2007.

 2        A    Okay.

 3        Q    Do you see that?

 4        A    I do.

 5        Q    If you turn to the third page under paragraph

 6   12, you see where it says in about the middle of the

 7   paragraph, You shall not make any representation

 8   relating to company's products or to company's clinical

 9   outcomes unless such representations have been reviewed

10   and approved in advance by the company.  Do you see

11   that?

12        A    I do see that.

13        Q    Is that your understanding of one of the

14   terms and conditions that you agreed to when you became

15   a consultant for Ethicon?

16        A    It never came up during the consultantship.

17   I never specifically remember this phrasing of this

18   issue.

19        Q    But you would agree that at least according

20   to this contract that you were not supposed to make any

21   representation relating to the company's products or

22   clinical outcomes unless they had been reviewed and

23   approved in advance by the company?

24        A    Well, it says that they need to be discussed
```

Scott Serels, M.D.

1   with the company.

2        Q    You believe that this says they have to be

3   discussed, not that they have to be reviewed and

4   approved in advance by the company?

5        A    Again, it never really became an issue with

6   anything we worked on, so I never really scrutinized

7   it.  So I guess it's subject to your interpretation.

8        Q    So is it your testimony that you didn't have

9   an understanding while you were a consultant for

10  Ethicon that any materials that you used during

11  lectures or presentations or physician talks or dinners

12  didn't need to be reviewed and approved in advance by

13  the company?

14                 MR. DIPAOLA:  Object to form.

15                 THE WITNESS:  There were plenty of

16  things we used that weren't approved or they didn't see

17  ahead of time in lectures or in different

18  presentations.

19                 (Plaintiff's Exhibit 13, Master

20  Consulting Agreement dated 3/1/08 Bates 00369005

21  through 9015:  Marked for Identification.)

22  BY MR. FAES:

23       Q    Doctor, I'm going to hand you what's been

24  marked as Exhibit number 13 to your deposition, and

Scott Serels, M.D.

```
 1    this is a contract between you and Ethicon dated

 2    March 1st of 2008.  Do you see that?

 3         A    I do.

 4         Q    I just want to direct your attention to --

 5    unfortunately there's no page number, but the Bates

 6    number at the bottom is ending in 9011, and it's listed

 7    as Exhibit A, services and fees.

 8         A    Okay.  Got it.

 9         Q    You see there under section 3 it states that

10    you're to be paid $375 an hour and up to $3,000 per

11    eight-hour day.  Do you see that?

12         A    I do.

13         Q    Plus reasonable out-of-pocket expenses?

14         A    Yes.

15         Q    Is that your understanding of what your

16    agreement was regarding fees with Ethicon at this time

17    in 2008?

18         A    Yes.

19         Q    If you turn to the following page under

20    Section B.  Did you find it, Doctor?  It says that the

21    parties agree that compensation paid to the consultant

22    shall not exceed 72,000 per year except has to be

23    mutually agreed in writing by the parties.  Do you see

24    that?
```

Scott Serels, M.D.

```
 1        A     That's on which page?

 2        Q     It's ending in 9012.  It is the very last

 3   paragraph.

 4        A     Yes, I do see that now.

 5        Q     So can you agree that this contract dated as

 6   of March 2008 is for up to $72,000 a year?

 7        A     They seem to have a cap, yes, on the actual

 8   maximum compensation.

 9                   (Plaintiff's Exhibit 14, Master

10   Consulting Agreement dated 3/1/09 Bates 369362 through

11   370:  Marked for Identification.)

12   BY MR. FAES:

13        Q     Doctor, I'm going to hand you what's been

14   marked as Exhibit 14 to your deposition.  I'm really

15   only going to ask you about one thing on it.  I'm going

16   to turn back the corner here just to save time since

17   I've only got three hours to talk to you here.

18        A     Okay.

19        Q     This is a contract dated March 1, 2009,

20   between you and Ethicon.  Do you see that?

21        A     I do.

22        Q     If you turn to the page that I tabbed for you

23   ending in 9369 at the very bottom, it states that the

24   compensation on this contract shall not exceed $78,000
```

Scott Serels, M.D.

```
 1   per year.

 2        A    Yes.

 3        Q    Do you see that?

 4        A    I do see that.

 5        Q    So again, you would agree that the maximum

 6   amount on this contract in 2009 was $78,000, correct?

 7        A    Yes.

 8        Q    Do you recall how much you were paid by

 9   Ethicon in 2010 for consulting work?

10        A    I do not recall.

11        Q    Do you recall if it was in excess of $104,000

12   a year?

13        A    I don't recall.

14        Q    But as you sit here today, do you have

15   anything to offer one way or the other to dispute the

16   fact that you were paid $104,000?

17        A    I really have no idea.

18        Q    Do you recall how much you were paid by

19   Ethicon in 2011 as a consultant?

20        A    There again, I really don't know.

21        Q    Do you know if it was in excess of $105,000

22   that year as a consultant for Ethicon?

23        A    I have no idea.

24        Q    Do you recall if you were a consultant for
```

Scott Serels, M.D.

1    Ethicon in 2011?

2        A    I may have been.

3        Q    Do you recall if you were a consultant for

4    Ethicon in 2010?

5        A    There again, most likely, yes.

6        Q    Can we agree that based on the documents that

7    we've gone through today you've been a consultant for

8    Ethicon at least from 2005 through 2011?

9        A    I've seen documents through 2009.  So I can

10   agree with 2005 to 2009.

11               MR. FAES:  Is it okay if we take a quick

12   break?  We've been going about an hour and a half.

13               (Recess:  5:51 p.m. to 5:56 p.m.)

14   BY MR. FAES:

15       Q    Doctor, we're back on the record after a

16   short break.  Are you ready to proceed?

17       A    I am.

18               (Plaintiff's Exhibit 15, Consulting

19   Agreement Requisition Form Bates 08706296 through 306:

20   Marked for Identification.)

21   BY MR. FAES:

22       Q    Doctor, I'm going to hand you Exhibit 15 to

23   your deposition.  Do you recognize this?

24       A    I do.

Scott Serels, M.D.

1        Q     This appears to be a consulting agreement

2   requisition form dated between May 20 of 2010 and

3   April 19 of 2011.  Do you see that?

4        A     I do.

5        Q     And actually attached to that, if you go two

6   pages in, is the agreement dated May 20, 2010?  Do you

7   see that?

8        A     I do.

9        Q     Now, based on all the documents that we've

10   gone through today, would you agree that you've been a

11   consultant for Ethicon from at least 2005 through 2011?

12        A     Yes.

13        Q     Doctor, would you agree that during the at

14   least seven years that you've been a paid consultant

15   for Ethicon your contract amounts, or at least the

16   amount that you could be paid, have been in excess of

17   $350,000?

18                  MR. DIPAOLA:  Object to form.

19                  THE WITNESS:  That seems to be the

20   maximum that they would pay, but the maximums are

21   usually never reached.  That does seem like a very high

22   number, but I don't remember exactly how much I

23   received each year.

24

Scott Serels, M.D.

```
 1   BY MR. FAES:

 2        Q    Do you recall if your maximum was not only

 3   reached but exceeded in 2010?

 4        A    I don't recall that.

 5        Q    Is it possible that there were years where

 6   your maximum contract amount was actually exceeded by

 7   written agreement?

 8        A    I don't recall.

 9        Q    Do you recall if your maximum contract amount

10   was exceeded in 2011?

11        A    I don't recall.

12        Q    Do you recall as you sit here today how much

13   money you've been paid as a consultant for Ethicon

14   prior to being retained in this litigation?

15        A    I just don't recall.

16        Q    Do you know if it's more or less than a half

17   million dollars?

18        A    I would consider it to be less.

19        Q    Do you know if it's more or less than a

20   quarter million dollars?

21        A    I would consider it to be less, but I don't

22   really recall.

23        Q    If you go back to Exhibit number 1 to your

24   deposition, which is the notice of deposition in the
```

Scott Serels, M.D.

1    case.  Did you know that there was a section in that

2    notice that specifically asked you to produce 1099s

3    from Ethicon for the prior five years?

4        A    I don't have those.

5        Q    Did you look for those at all?

6        A    I did not.

7        Q    Did you look for or do you have any of your

8    prior 1099s from Ethicon during your time as working as

9    a consultant for them?

10               MR. DIPAOLA:  Objection to form.

11               THE WITNESS:  I have to look.

12   BY MR. FAES:

13       Q    Would you agree that if you had those 1099s

14   and brought them with you here today we could confirm

15   the amounts that you were actually paid by Ethicon for

16   the years 2005 through 2011?

17               MR. DIPAOLA:  Object to form.

18   Argumentative.

19               THE WITNESS:  If I had them, yes.  Yes,

20   if I had them you would be able to confirm it.

21   BY MR. FAES:

22       Q    Doctor, have you promoted the Abbrevo product

23   for Ethicon before?

24       A    I'm sure I did.

Scott Serels, M.D.

1        Q    Have you promoted the Exact product for

2    Ethicon before?

3        A    I'm sure, yes.

4        Q    Have you promoted the TVT and TVT-O product

5    for Ethicon before?

6        A    Yes.

7        Q    TVT Secure?

8        A    Yes.

9        Q    Prosima?

10       A    No.

11       Q    You've never promoted the Prosima product

12   before Ethicon before?

13       A    No.

14            MR. DIPAOLA:   Objection.

15   BY MR. FAES:

16       Q    The Prolift?

17       A    Yes.

18       Q    Prolift+M?

19       A    Yes.

20       Q    Gynemesh PS?

21       A    Not that I recall.

22       Q    What about the Ethicon Artisyn Mesh?

23       A    Not that I recall.

24       Q    Have you ever worked on -- strike that.

Scott Serels, M.D.

1              Have you ever promoted the Ethicon Dermabond

2    product before?

3        A    No.

4        Q    What about the Ethicon Monitor?

5        A    No.  Not that I recall.

6        Q    Would you agree that you've traveled to Miami

7    before for Ethicon to promote one or more of their

8    pelvic mesh products?

9                 MR. DIPAOLA:  Object to form.

10                THE WITNESS:  I can't say I recall

11   specifically doing that.

12   BY MR. FAES:

13       Q    Do you have any reason to dispute it one way

14   or the other, or you just don't recall?

15       A    I don't recall.  I definitely traveled for

16   Ethicon.  Was it Miami, I don't know.

17       Q    Do you recall if you've ever traveled to

18   San Francisco for Ethicon to promote pelvic mesh

19   products?

20       A    Don't recall.

21       Q    Pittsburgh?

22       A    Again, I don't recall specifically.

23       Q    Salt Lake City?

24       A    That one you showed me a paper on Salt Lake,

Scott Serels, M.D.

1   so I do remember that.

2        Q    Have you ever traveled to Short Hills, New

3   Jersey as part of your consulting work with Ethicon?

4        A    I'm sure I did.

5        Q    Have you ever traveled to Baltimore as part

6   of your consulting work with Ethicon?

7        A    Probably, yes.

8        Q    Have you ever traveled to Buffalo, New York

9   as part of your consulting work with Ethicon?

10       A    I don't specifically remember, but probably.

11       Q    Have you ever traveled to Sonoma, California

12   as part of your consulting work with Ethicon?

13       A    Yes.

14       Q    Dallas, Texas?

15       A    Yes.

16       Q    Chicago?

17       A    Don't recall.

18       Q    Nashville?

19       A    I don't recall.

20            MR. DIPAOLA:  Are you going to name

21   every city in the country?

22            MR. FAES:  No, just certain ones.

23   BY MR. FAES:

24       Q    How about Pittsburgh, do you recall that?  I

Scott Serels, M.D.

```
1    may have already asked that.

2        A    I'm not sure.

3        Q    Do you know how much you've been paid as a

4    consultant by American Medical Systems during the

5    course of your consulting contract with them?

6        A    There again, I'm not sure.

7        Q    What about Boston Scientific?

8        A    Not sure.

9        Q    Would it be fair to say that over the course

10   of your entire medical career you've been paid at least

11   half a million dollars in consulting fees by

12   pharmaceutical and medical device companies?

13                  MR. DIPAOLA:  Object to form.

14                  THE WITNESS:  Sounds high.  I'm not

15   sure.

16   BY MR. FAES:

17       Q    You're not sure?

18       A    Not sure.

19       Q    Would it be fair to say that you've been paid

20   more than a million dollars by pharmaceutical and

21   medical device companies for consulting work during the

22   course of your medical career?

23       A    Sounds extremely high, and there again, I

24   just don't know the numbers.
```

Scott Serels, M.D.

```
 1        Q    Would you agree that you are still a paid

 2   consultant for Ethicon today?

 3        A    In this type of setting, yes.

 4        Q    So outside of litigation you're not a paid

 5   consultant for Ethicon?

 6        A    Correct.

 7        Q    But you would consider the work that you're

 8   doing for Ethicon today as paid consulting work,

 9   correct?

10        A    I wouldn't necessarily, but I thought you

11   referenced that it was.

12        Q    Now, the contracts that you've had in the

13   past with Ethicon you were considered a preceptor for

14   Ethicon; is that correct?

15        A    Correct, I've been a preceptor.

16        Q    What is your understanding of what a

17   preceptor is?

18        A    Someone who has knowledge of a certain

19   surgical procedure and can share that knowledge with

20   those who do not have that knowledge.

21        Q    As part of your duties as a preceptor one of

22   your roles was to give lectures to doctors regarding

23   the products manufactured by Ethicon, correct?

24        A    Correct.
```

Scott Serels, M.D.

```
 1        Q    Can we agree that during the years between

 2   2005 and 2011 your responsibilities to Ethicon and

 3   travel around the nation and internationally increased

 4   over the years?

 5                 MR. DIPAOLA:  Object to form.

 6                 THE WITNESS:  I think it just depended

 7   on the year and what was being used.  I don't think

 8   that chronology necessarily actually increased over

 9   time.

10   BY MR. FAES:

11        Q    Well, we saw that in 2005, your first

12   contract with Ethicon was for $500 for a pelvic floor

13   summit in Salt Lake City, right?

14        A    Well, that was one particular day, I think.

15   If I remember that conference, I gave a lecture at it,

16   it was a pelvic floor summit, different than a

17   consultantship that would go on to teach products, or

18   teach the different --

19        Q    And then the following year in 2006 you had a

20   contract worth $15,000?

21                 MR. DIPAOLA:  Objection to form.

22   Mischaracterizes.

23                 THE WITNESS:  I think the last contract

24   had a maximum of 10,000 on it.  The one you showed me
```

Scott Serels, M.D.

1   from 2010, so that seems to be less.

2   BY MR. FAES:

3        Q     Would you agree that between 2006 and 2008

4   your contract went from a maximum of 15,000 to 72,000,

5   correct?

6        A     Those numbers are correct.

7        Q     And then from 2008 to 2009 your contract went

8   from 72,000 to 78,000, correct?

9        A     Correct.

10       Q     And as you sit here today, you don't recall

11   how much you were paid in 2010 by Ethicon as a

12   consultant, correct?

13                    MR. DIPAOLA:  Asked and answered.

14                    THE WITNESS:  Correct.

15   BY MR. FAES:

16       Q     Doctor, do you have a copy of all your

17   consulting agreements with Ethicon somewhere?

18       A     Probably not.

19                    (Plaintiff's Exhibit 16, E-mail dated

20   7/1/10 Bates 08956995 through 996:  Marked for

21   Identification.)

22   BY MR. FAES:

23       Q     Doctor, I'm going to hand you what's been

24   marked as Exhibit number 16 to your deposition, and

Scott Serels, M.D.

```
 1    this is an e-mail dated July 1st of 2010, and the part

 2    I want to ask you about is down at the bottom on the

 3    first page where it says, Hi all.  I spoke with Matt

 4    earlier, and I have great news.  We are good to go with

 5    inviting two surgeons to the Competitive War Games

 6    meeting on July 27th.  Here is the list in rank order

 7    of surgeons we would look to invite.

 8            And it looks like you're the second one down,

 9    Scott Serels, although your name is spelled

10    incorrectly.  Do you see that?

11        A    I do.

12        Q    Do you recall being invited to this

13    Competitive War Games around this time?

14        A    I don't remember the exact name, but I do

15    remember going to something with that group of people.

16        Q    Do you recall what the Competitive War Games

17    entailed?

18        A    Not 100 percent, no.  I don't remember it

19    being referred to as that topic, but I think there were

20    times where we would discuss what products we use, and

21    why we believe in them, and where the benefits and the

22    flaws were on certain things, but I don't remember this

23    exact meeting.

24        Q    Do you recall if at this time in 2010 you
```

Scott Serels, M.D.

```
1    were still acting as a consultant to Boston Scientific?

2         A    Well, I'm not sure, but I may have been.

3         Q    Do you recall at this time in 2010 if you

4    were still acting as the consultant to American Medical

5    Systems?

6         A    I may have been.

7         Q    Do you recall if one of the purposes of this

8    meeting was to discuss strategies to distinguish

9    Ethicon's products from their competitors products,

10   such as AMS and Boston Scientific?

11                 MR. DIPAOLA:  Object to form.  Assumes

12   facts not in evidence.

13                 THE WITNESS:  I don't really recall this

14   meeting in that kind of detail.

15                 (Plaintiff's Exhibit 17, E-mail dated

16   8/30/06 Bates 03013633 through 634:  Marked for

17   Identification.)

18                 (Plaintiff's Exhibit 18, Letter dated

19   6/29/06 Bates 03005774 through 775:  Marked for

20   Identification.)

21   BY MR. FAES:

22        Q    Doctor, I'm going to hand you two exhibits

23   what's been marked as Exhibits 17 and 18 to your

24   deposition, and I'm going to ask you about Exhibit
```

Scott Serels, M.D.

```
 1    number 17 first.

 2              If you can turn to the second page.  These

 3    are kind of in reverse order where the first e-mail

 4    starts on the second page, and it appears to be a draft

 5    e-mail to you that was not sent to you from a Judy

 6    Gauld at Ethicon, and it says, Dear Dr. Serels,

 7    following the recent monitoring visits performed at

 8    your site for the above study, I understand there are a

 9    number of areas of concern regarding the consenting

10    process, documentation of patient visits, device

11    accountability, and patient follow-up.  As you will

12    appreciate, we must ensure that all aspects of our

13    studies are run to the highest professional standards

14    in order to protect patient welfare, rights and safety.

15    I would therefore be grateful if you could ensure that

16    all necessary corrective actions are put in place to

17    address those protocol deviations already identified

18    and minimize the risk of any repetition.  Do you see

19    that?

20         A    Uh-huh.

21         Q    And you see the subject line is Gynecare TVT

22    obturator protocol 300-04-004?

23         A    Uh-huh.

24         Q    Was this a TVT-O study that you were involved
```

Scott Serels, M.D.

1   in as a clinical investigator for Ethicon?

2        A    Yes.

3        Q    Do you recall if you were being reimbursed

4   either in the form of a grant or other payment for this

5   study?

6        A    I don't recall the specific financials.

7        Q    Is it typical for someone like yourself who

8   participates as an investigator in a clinical study to

9   be reimbursed for their expenses and time in conducting

10  such a study?

11            MR. DIPAOLA:  Objection to form.

12            THE WITNESS:  Yes.

13  BY MR. FAES:

14       Q    Do you recall at this time in 2006 that there

15  were protocol deviations in this study from your

16  particular site?

17       A    I don't recall, but it's certainly possible.

18  Little things come up with studies that need to be fine

19  tuned.

20       Q    Would you agree that it's important to ensure

21  that all aspects of studies are run to the highest

22  professional standards in order to protect patient

23  welfare, rights and safety?

24       A    A hundred percent I agree with that.

Scott Serels, M.D.

```
 1        Q    If you turn to the first page, again, going

 2   in reverse order, this is actually an e-mail from Judy

 3   Gauld to David Robinson, and you know David Robinson,

 4   correct?

 5        A    I do.

 6        Q    And it explains the passage we just read

 7   earlier, it says, Dave, here is some suggested wording

 8   for Dr. Serels, Re, issues that we have had with him

 9   for the TVT-O study.  This letter can either come from

10   you, or if it would be easier from a relationship

11   management point of view, I'm happy to send from here.

12   Do you see that?

13        A    I do.

14        Q    And further up it seems to indicate from

15   David Robinson, I think the letter is fine, but since

16   he is a personal friend, it would be a great help if it

17   was signed by you instead of me.  We can play good cop

18   bad cop, but this time you have to be the bad cop.  Do

19   you see that?

20        A    I do, yes.

21        Q    And then if you look at Exhibit number 18,

22   this is a letter dated June 29, 2005, addressed to you?

23        A    Yes.

24        Q    Regarding the TVT obturator protocol?
```

Scott Serels, M.D.

1     A    Yes.

2     Q    Do you recall if you received this document?

3     A    Do I recall receiving it back in 2005?

4     Q    Yes.

5     A    Oh, I don't remember.

6     Q    Do you have any reason to dispute, as you sit

7    here today, that you received this document?

8     A    No.

9          MR. DIPAOLA:  Object to form.

10   BY MR. FAES:

11    Q    If you look down at the bottom of the first

12   page it states, The following items were discussed with

13   you and Teri Jacoby regarding your site's continued

14   participation in the study, and the second bullet point

15   says, You or Lori will need to answer all medical

16   questions the patient has regarding the procedures.  Do

17   you see that?

18    A    I do.

19    Q    Do you recall who Lori is?  Was that someone

20   in your office in 2005?

21    A    Yes.

22    Q    Do you recall there being an issue that the

23   auditor found that either you or your staff was not

24   answering all the medical questions the patient had

Scott Serels, M.D.

1    regarding the study procedures?

2         A    I don't recall.

3         Q    If you turn to the second page, do you see

4    where it says, Please follow up on the action items

5    listed below.

6         A    Uh-huh.

7         Q    And there's a fourth bullet point that says,

8    A note to file will be signed documenting the

9    consenting process for the five patients enrolled into

10   the study, and also noting that you signed the IC on a

11   later date, not the date that the IC was obtained.  Do

12   you see that?

13        A    Okay.

14        Q    And IC, I assume, stands for informed

15   consent?

16        A    Yes.

17        Q    Do you recall there being an issue with the

18   study where informed consents were signed on a later

19   date and not the date that the informed consent was

20   actually received?

21        A    I don't recall.

22        Q    Do you recall if that was considered a

23   protocol deviation?

24        A    I don't recall.

Scott Serels, M.D.

1      Q      Do you recall how many patients you

2   ultimately enrolled for this particular study?

3      A      I really don't recall.

4      Q      Do you recall whether or not you ever

5   actually treated patients as a part of this study, or

6   whether they became part of the final study report?

7      A      It's a long time ago.  I don't remember.

8      Q      Do you remember whether or not all of your

9   patients decided to quit the study and decided not to

10  go forward with it before any of the surgeries were

11  actually performed?

12     A      No idea.

13            (Plaintiff's Exhibit 19, E-mail dated

14  3/16/08 Bates 00064050:  Marked for Identification.)

15  BY MR. FAES:

16     Q      I'm going to hand you what's been marked as

17  Exhibit number 19, and this is an e-mail dated

18  March 16, 2008, and I really only have one question

19  about this.  If you look at the second to last sentence

20  it says, In fact, Pat Nevar has told me that Scott

21  Serels is not the easiest to work with in regards to

22  collection of critical data, so we may need to look

23  into adding another doctor from your region.  Do you

24  see that?

Scott Serels, M.D.

```
 1       A    I do.

 2       Q    Do you ever recall being told by anyone at

 3  Ethicon that you are not the easiest to work with in

 4  regards to collection of clinical data?

 5       A    I don't recall.

 6       Q    Do you know if the fact that Ethicon believed

 7  that you were not the easiest to work with in regards

 8  to collection of clinical data was in part due to the

 9  difficulties you experienced during the TVT-O study

10  that we discussed earlier?

11            MR. DIPAOLA:  Objection to form.

12            THE WITNESS:  I don't recall.  It was a

13  long time ago.

14  BY MR. FAES:

15       Q    This e-mail here is actually discussing

16  potentially using you as a clinical investigator for

17  the Prosima device.  Do you see that?

18       A    Yes, I never used the Prosima device.

19       Q    Do you recall ever being approached by

20  Ethicon regarding whether you wanted to be a clinical

21  investigator regarding the Prosima device?

22       A    Don't recall.  I never used the device.

23       Q    Do you recall ever being asked for feedback

24  on the Prosima device or its prototype?
```

Scott Serels, M.D.

```
 1        A    Yes.

 2                (Plaintiff's Exhibit 20, Project Mint

 3   Document Bates 12922252:  Marked for Identification.)

 4   BY MR. FAES:

 5        Q    I'm going to hand you what's been marked as

 6   Exhibit Number 20 to your deposition.  Do you see at

 7   the top this appears to be a fax from you dated July 6

 8   of 2006?

 9        A    Yes.

10        Q    And you see that you actually signed and

11   dated this at the bottom dated July 6 of 2006.  Do you

12   see that?

13        A    I do.

14        Q    Do you recall that Project Mint is actually

15   discussing the Prosima device?

16        A    I don't remember Mint being -- I don't

17   remember that specifically.

18        Q    I'll represent to you that the Mint is the

19   development name for what ultimately became the Prosima

20   device, okay, so assume that to be true for the

21   purposes of the question.

22        A    Okay.

23        Q    Now, this appears to be a form that Ethicon

24   asked you for feedback on regarding the Prosima
```

Scott Serels, M.D.

```
1    product, and asked you to rank user needs on a scale

2    from zero to five, five being the highest importance

3    and zero being not needed.  Do you see that?

4         A    I do.

5         Q    Do you agree with that?

6         A    Yes.

7         Q    Do you recall that the Prosima device

8    actually uses polypropylene mesh?

9         A    I do.

10        Q    Do you know that the Prosima device actually

11   uses the same polypropylene raw material that's used in

12   the TVT?

13                   MR. DIPAOLA:  Object to form.

14                   THE WITNESS:  Sure.  I know it's

15   polypropylene mesh, yes.

16   BY MR. FAES:

17        Q    Now, you rated a repair system that enables a

18   standardized procedure to be of the highest importance

19   for the Prosima device, correct?

20        A    Yes.

21        Q    Would you agree that having a repair system

22   that enables a standardized procedure would also be of

23   the highest importance for the TVT product?

24        A    Yes.
```

Scott Serels, M.D.

1      Q     You rated, System components should be easily

2   placed and removed, as being of the highest importance

3   for the Prosima.  Do you see that?

4      A     I do.

5      Q     Would you agree that having system components

6   that are easily placed and removed would also be of the

7   highest importance for the TVT product?

8      A     Yes.

9      Q     You rated that system components of the

10  Prosima should be well tolerated by the patient to be

11  of the highest importance.  Do you see that?

12     A     Yes.

13     Q     Would you agree that having system components

14  that are well tolerated by the patient are also the

15  highest importance for the TVT product?

16     A     Yes.

17     Q     You stated that having a procedure that is

18  designed to avoid unintended trauma to be of the

19  highest importance for the Prosima product.  Do you see

20  that?

21     A     I do.

22     Q     Would you also agree that that is of the

23  highest importance for the TVT product?

24     A     Yes.

Scott Serels, M.D.

1      Q     Now, I also note that you actually wrote in

2  three things yourself here under other.  Do you see

3  that?

4      A     Yes.

5      Q     And one of the things that you wrote in was

6  that there should be a system with a minimal

7  recurrence.  I assume you mean recurrence rate,

8  correct?

9      A     Uh-huh.

10     Q     And you rated that to be of the highest

11 importance, correct?

12     A     Correct.

13     Q     Would that also be true for the TVT system,

14 that it would be important to design it with a -- a

15 system for the TVT that has a minimal chance of

16 recurrence?

17     A     Yes.

18     Q     Do you know whether that was a user need that

19 was assessed when the TVT device was originally

20 designed in 1997?

21             MR. DIPAOLA:  Object to form.

22             THE WITNESS:  I don't know that.

23 BY MR. FAES:

24     Q     You also wrote in that the Prosima device

Scott Serels, M.D.

```
 1   should be a system with minimal chance for

 2   complications, and you rated that of the highest

 3   importance.  Do you see that?

 4        A    I do.

 5        Q    Would you agree that that is also a user need

 6   for the TVT?

 7        A    Yes.

 8        Q    And that that is of the highest importance?

 9        A    Yes.

10        Q    Do you know whether that particular user need

11   was assessed when the TVT device was originally

12   designed in 1997?

13               MR. DIPAOLA:  Object to form.

14               THE WITNESS:  I'm not sure.

15   BY MR. FAES:

16        Q    The two user needs that we discussed that you

17   just wrote in on this form, did you find it odd at all

18   that Ethicon didn't already have those as user needs

19   when they were asking you questions about needs for the

20   Prosima device?

21               MR. DIPAOLA:  Object to form.

22               THE WITNESS:  No.

23   BY MR. FAES:

24        Q    Would you agree that those are user needs
```

Scott Serels, M.D.

1    that should be assessed when designing a new medical

2    device?

3                    MR. DIPAOLA:  Same objection.

4                    THE WITNESS:  Yes, I would agree with

5    that.

6                    (Plaintiff's Exhibit 21, E-mail dated

7    5/27/09 Bates 07633427 through 430:  Marked for

8    Identification.)

9    BY MR. FAES:

10        Q    Doctor, I'm going to hand you what's been

11    marked as Exhibit Number 21 to your deposition.  I'll

12    give you a second to review that.  This is an e-mail

13    dated May 27th of 2009.

14        A    Okay.

15        Q    And actually, I'm only going to ask you about

16    the very last page of the document, which is the first

17    e-mail in the chain, and that's dated May 26th of 2009.

18        A    What page is that?

19        Q    It's the second to the last page.  And you

20    see it's an e-mail dated May 26, 2009, and it states,

21    Pelvic floor marketing team.  For a call Thursday the

22    following has been identified by the PEMs for each

23    region for executing the Prolift+M forms.  They avoided

24    some of the usual lead faculty as we discussed last

Scott Serels, M.D.

```
1    week.  On the call we can discuss the list and the

2    steps to prepare each of them to present as faculty.

3    Do you see that?

4         A    Yes.

5         Q    And under the northeast it has your name, and

6    by that it says, Lack of case experience, but has done

7    +M lectures and is credible with urologists.  Do you

8    see that?

9         A    I do.

10        Q    So would you agree that you were -- you

11   actually gave lectures on the Prolift+M?

12        A    I did.

13        Q    Do you believe that you had a lack of case

14   experience when you were giving lectures on the

15   Prolift+M?

16        A    No.

17        Q    Did you know that Ethicon believed that you

18   had a lack of case experience to be giving lectures on

19   the Prolift+M when they asked you to give those

20   lectures?

21             MR. DIPAOLA:  Objection to form.

22   Mischaracterizes.

23             THE WITNESS:  +M was just a difference

24   in the type of mesh they were using, not the
```

Scott Serels, M.D.

```
1    application of the mesh.  So perhaps I didn't use as

2    much of that type of mesh before, but the procedure I

3    was quite familiar with.

4    BY MR. FAES:

5        Q    Well, my question was actually a little

6    different than that.

7        A    Yes.

8        Q    My question was, did you know at the time

9    that you were giving +M lectures that Ethicon believed

10   that you lacked case experience with the +M, but

11   decided to have you do them anyway because you were

12   credible with urologists?

13                   MR. DIPAOLA:  Object to form.

14                   THE WITNESS:  I wasn't aware of that.

15   BY MR. FAES:

16       Q    Do you recall how many +M procedures you had

17   actually performed prior to giving lectures for the

18   Prolift+M?

19       A    I do not recall.

20       Q    Do you recall if you did anything to confirm

21   that the +M, the Prolift+M was safe and effective prior

22   to giving lectures to other doctors about the product?

23                   MR. DIPAOLA:  Object to form.

24                   THE WITNESS:  I'm sorry, repeat that.
```

Scott Serels, M.D.

1   BY MR. FAES:

2       Q     Sure.  Did you do anything to confirm that

3   the Prolift+M was safe and effective prior to giving

4   lectures to other doctors about the product?

5       A     Yes.

6       Q     What did you do?

7       A     I've used hundreds of products that were the

8   similar application, just had a different mesh

9   material.  The +M was just a lighter mesh material.

10  Variation of a theme.

11      Q     Do you know whether the weight and pore size

12  of a mesh used in a product can have clinical effects

13  to the patient?

14                  MR. DIPAOLA:  Object to form.

15  Applicable to Prolift, or applicable to all mesh?

16  BY MR. FAES:

17      Q     Do you understand the question, Doctor?

18      A     I do.

19      Q     Let him answer then.

20                  MR. DIPAOLA:  Object to form.

21                  THE WITNESS:  There is some

22  consideration that using less mesh at the time was

23  better than using more mesh, and that was the attempt

24  with the +M.

Scott Serels, M.D.

1    BY MR. FAES:

2        Q    My question is actually a little bit

3    different than that, so I'm going to go ahead and reask

4    it.

5            Doctor, do you know whether or not there is a

6    difference in clinical impact to patients between a

7    lighter weight larger pore mesh and a heavier weight

8    smaller pore mesh, such as the mesh that was used in

9    the Prolift, versus the mesh that was used in the

10   Prolift+M?

11               MR. DIPAOLA:  Object to form.  Beyond

12   the scope.

13               THE WITNESS:  I'm not aware of any

14   clinical difference between those two materials.

15   BY MR. FAES:

16       Q    Did you do anything to confirm that there was

17   indeed no clinical difference between the Prolift+M and

18   the other devices that you've implanted prior to giving

19   lectures to other doctors about the Prolift+M product?

20               MR. DIPAOLA:  Objection.  Beyond scope.

21               THE WITNESS:  Did I do anything

22   clinically to determine that, is that what you're

23   asking?

24

Scott Serels, M.D.

```
1    BY MR. FAES:

2        Q    Let me see if I can reask it a different way,

3    because I'm not sure I was clear.

4             Doctor, prior to giving lectures about the

5    Prolift+M product, did you do anything to confirm that

6    the lighter weight larger pore mesh in the Prolift+M

7    didn't have any effect on clinical impact to women

8    versus the other products that you had had experience

9    with?

10            MR. DIPAOLA:  I object to this whole

11   line of questioning as this is not a Prolift

12   deposition.  This is way beyond scope of the TVT

13   general deposition.

14            THE WITNESS:  So in theory there's a

15   difference.  There wasn't any clinical proof of it.

16   BY MR. FAES:

17       Q    My question was did you do anything to

18   confirm before you went out and gave lectures to

19   physicians about the Prolift+M product that there was

20   indeed no difference between the mesh that was used in

21   the Prolift+M and the mesh that was used in the

22   Prolift?

23            MR. DIPAOLA:  Same objection.

24            THE WITNESS:  It's hard to recall
```

Scott Serels, M.D.

```
1    exactly what we spoke about at the time, or how many

2    lectures I actually gave on the Prolift+M, but really

3    my role in discussing these things was to talk about

4    the use of products in the pelvic area with

5    polypropylene mesh, not so much the M versus the

6    regular, from my take.

7                 MR. FAES:  So I'm going to have to

8    object and move to strike that as nonresponsive.

9    BY MR. FAES:

10   Q    My question is actually a little bit

11   different, and if you could, I'm going to have the

12   court reporter read it back, and if you could please

13   try to answer the question either yes or no.  It's a

14   yes or no question, either yes or no, or if you can't

15   answer the question yes or no one way or the another,

16   or you don't know, you can answer that as well, and

17   then if you need to add an explanation, please do so.

18                 (Record read by the court reporter.)

19                 MR. DIPAOLA:  Same objection.  Way

20   beyond scope.

21                 THE WITNESS:  So in evaluating the

22   Prolift+M product versus the regular Prolift product I

23   read the information on the two materials, I worked

24   with them in a cadaveric lab, and I had used them
```

Scott Serels, M.D.

```
1    clinically in a clinical setting to become familiar

2    with them and to notice the differences of one versus

3    the other.

4    BY MR. FAES:

5        Q    Do you recall how many Prolift+Ms you used in

6    a clinical setting prior to giving lectures about the

7    Prolift+M product to other doctors?

8                    MR. DIPAOLA:  Same objection.  This is

9    not a Prolift+M deposition.

10                    THE WITNESS:  I do not recall.

11   BY MR. FAES:

12       Q    Doctor, have you ever given a lecture or done

13   a speaking event about a product that you haven't used?

14       A    No.

15       Q    On the products that you have used, did you

16   ever do anything to confirm that the products were safe

17   and effective prior to giving lectures to other doctors

18   about those products?

19                    MR. DIPAOLA:  Objection.

20                    THE WITNESS:  Yes.

21   BY MR. FAES:

22       Q    What kind of things did you do before to

23   ensure that those devices were safe and effective prior

24   to giving lectures to other doctors?
```

Scott Serels, M.D.

 1      A    In most cases, aside from laboratory use,

 2   cadaveric use, they were also preceded by some type of

 3   clinical study.

 4      Q    So is it your testimony that you reviewed

 5   clinical studies prior to giving lectures to other

 6   doctors about every product that you've ever given

 7   lectures on?

 8            MR. DIPAOLA:  Objection.

 9   Mischaracterizes.

10            THE WITNESS:  Either I reviewed studies

11   or was involved with studies prior to somebody who

12   would advocate using a procedure.

13   BY MR. FAES:

14      Q    Doctor, do you know the difference between a

15   laser cut and mechanical cut TVT product?

16      A    To some extent, yes.

17      Q    Explain that for me.  What do you mean by to

18   some extent?

19      A    Well, I'm not an expert on making mesh

20   materials, but I think as it applies, if you cut a

21   piece of mesh with a laser, it's known as laser cut,

22   and if you cut a piece of mesh with some kind of a

23   different cutting device, more of a mechanic device,

24   it's a mechanical cut material.

Scott Serels, M.D.

1      Q    Do you know how to tell the difference

2   looking at the box between a mechanically cut TVT

3   retropubic product and a laser cut TVT product?

4      A    No.  Unless I was told, I wouldn't know.

5      Q    So I would take it, then, that you don't keep

6   track of how many mechanical cut TVTs you've placed

7   versus laser cut?

8      A    No.

9      Q    And I would also take it that you have no

10  preference between a TVT -- strike that.

11         I would take it that you have no preference

12  between a TVT mesh that was laser cut or one that was

13  mechanically cut, you just take whatever the hospital

14  had on the shelf; is that fair?

15              MR. DIPAOLA:  Objection to form.

16  Mischaracterizes.

17              THE WITNESS:  I would use a TVT device,

18  yes.  Whether that's mechanically cut or not, it's of

19  no consequence.  I would use a device.

20  BY MR. FAES:

21     Q    Do you know whether the TVT Secure device

22  that you've used in the past is laser cut or

23  mechanically cut?

24     A    I believe it was laser cut.

Scott Serels, M.D.

```
 1      Q    Do you know whether the TVT Abbrevo product

 2  that you've used in the past is laser cut or

 3  mechanically cut?

 4      A    I'm not sure.

 5      Q    Do you know whether the TVT Exact product

 6  that you've used in the past is laser cut or

 7  mechanically cut?

 8      A    I'm not sure.

 9      Q    So I take it because you don't even know the

10  difference between looking at the box between a

11  mechanically cut TVT retropubic product and a laser cut

12  TVT product, you've never tracked the difference -- how

13  that difference impacts your complication rates in your

14  practice, correct?

15      A    Correct.

16      Q    Have you ever tracked or looked at complaint

17  analysis or trends for mechanically cut mesh versus

18  laser cut mesh products?

19      A    No.

20      Q    Can we agree that you have a conflict of

21  interest in this litigation because of your

22  longstanding consulting relationship with Ethicon?

23              MR. DIPAOLA:  Object to form.

24  Mischaracterizes.
```

Scott Serels, M.D.

```
1                    THE WITNESS:  No.  We cannot agree on

2    that.

3    BY MR. FAES:

4        Q    Can we agree that you have a conflict of

5    interest in this litigation because of your

6    longstanding consultant -- strike that.

7             Can we agree that you have a conflict of

8    interest in this litigation because of your

9    longstanding consulting relationships with multiple

10   mesh manufacturers, including AMS, Boston Scientific,

11   and Bard?

12       A    No.  Can't agree on that.

13       Q    So you don't agree that you're potentially

14   biased in favor of Ethicon; is that fair?

15       A    Yeah, I think I've used all products, and

16   that's what makes me an expert in this area without

17   really any bias.

18       Q    Would you agree that being paid the sum of

19   money that you've been paid by Ethicon could influence

20   your opinion?

21       A    No.

22       Q    Would you consider yourself an advocate of

23   mesh products?

24       A    Yes.
```

Scott Serels, M.D.

```
1        Q     Would you agree that you're not completely

2   objective in this case because you are an advocate of

3   mesh products?

4                    MR. DIPAOLA:  Objection to form.

5   Argumentative.

6                    THE WITNESS:  No, I wouldn't agree with

7   that statement.

8   BY MR. FAES:

9        Q     Would you agree that you have a financial

10  stake in the outcome of the mesh cases?

11                   MR. DIPAOLA:  Object to form.

12                   THE WITNESS:  No.  I have no financial

13  stake in the outcome of mesh cases.

14  BY MR. FAES:

15       Q     So you don't believe that your practice could

16  be affected and you could be affected financially if

17  mesh products were no longer available for the

18  treatment of stress urinary incontinence or pelvic

19  organ prolapse?

20                   MR. DIPAOLA:  Object to form.

21                   THE WITNESS:  I think it would be a

22  detriment to the women who have these problems if they

23  weren't available, but as far as my financial impact,

24  no, I do not feel it would be a financial hardship for
```

Scott Serels, M.D.

```
 1    me if that were to happen.

 2    BY MR. FAES:

 3         Q    Do you know when laser cut mesh was first

 4    sold in the Ethicon TVT product?

 5         A    I have no idea.

 6         Q    When did you first learn about the fact that

 7    there were two different types of TVT meshes, one that

 8    was laser cut, and one that was mechanically cut?

 9         A    I think I became aware of it some time around

10    the introduction of TVT-S.

11         Q    So you believe you first became aware of it

12    somewhere around 2006?

13         A    Probably.

14         Q    And did Ethicon make you aware of it because

15    you were a preceptor and lecturer for them on the TVT

16    Secure?

17               MR. DIPAOLA:  Object to form.

18               THE WITNESS:  I really think it came

19    about just to find out how they made the products.  I

20    don't think there was necessarily any thought process

21    that it would be better or worse than what they had

22    previously.

23    BY MR. FAES:

24         Q    So you were never told by Ethicon that there
```

Scott Serels, M.D.

```
 1   were potential benefits to laser cut mesh over

 2   mechanically cut mesh in the fact that it may not fray

 3   or fall apart?

 4              MR. DIPAOLA:  Object to form.

 5              THE WITNESS:  I don't remember any clear

 6   advantages being described, no.

 7   BY MR. FAES:

 8      Q    Do you know who invented the TVT product?

 9      A    The retropubic?

10      Q    Yes.

11      A    I'm aware of Ulf Ulmsten and Peter Petros

12   working together on it.

13      Q    Are you aware of how much money Dr. Ulmsten

14   was paid by Ethicon for the TVT product?

15      A    No idea.

16      Q    Are you aware of whether or not Dr. Ulmsten

17   was paid for the results of his clinical studies that

18   he published regarding the TVT product?

19      A    No idea.

20      Q    Doctor, do you think that inventors should be

21   allowed to participate in studies attempting to

22   establish the safety of a device on a product that they

23   invented?

24      A    Yes.
```

Scott Serels, M.D.

```
1        Q     Do you agree that allowing inventors to
2   participate in studies attempting to establish the
3   safety of a device on a product that they invented
4   introduces potential bias?
5                    MR. DIPAOLA:  Object to form.
6                    THE WITNESS:  Anything can potentially
7   introduce a bias, but I would like to think that that
8   would not be the cause of the bias.
9   BY MR. FAES:
10       Q     Doctor, I take it that you -- have you ever
11  met Dr. Ulf Ulmsten?
12       A     He passed away a while ago.  I think I met
13  him once indirectly.
14       Q     Do you recall where that was?
15       A     I do not.
16       Q     Do you recall whether or not it was in the
17  United States or if it was in Sweden?
18       A     It was not in Sweden.
19       Q     Have you ever met Dr. Cosson?
20       A     Not that I recall.
21       Q     Do you know who Dr. Cosson is?
22       A     No.
23       Q     So I take it that you did not go to France to
24  train with Dr. Cosson on the Prolift product?
```

Scott Serels, M.D.

```
 1      A    Correct.

 2      Q    Are you aware that there hasn't been a single

 3  transvaginal product launched by Ethicon since the

 4  TVT-O was launched in January of 2004 that has used

 5  mechanically cut mesh?

 6                 MR. DIPAOLA:  Object to form.

 7                 THE WITNESS:  Not aware of that.

 8                 (Pause.)

 9  BY MR. FAES:

10      Q    Doctor, would you agree with me that when you

11  give your opinions in this case you want your opinions

12  to be as accurate as possible?

13      A    Yes.

14      Q    Would you agree that you would want to be as

15  thorough in your review of the available information,

16  documents, and literature as possible?

17      A    Yes.

18      Q    And you wanted to make sure that you got all

19  of the information on the pertinent issues in the case

20  before giving your opinions, correct?

21      A    Correct.

22      Q    Would you agree that you want to get both

23  sides of the story before issuing your opinions as an

24  expert in any case?
```

Scott Serels, M.D.

1       A    Yes.

2       Q    Would you agree that that's important to you

3    as an expert in giving your opinions?

4       A    Yes.

5       Q    Doctor, I'm going to have you look again at

6    your reliance list.  I think it's marked as Exhibit 3.

7    Tell me if I'm wrong.

8       A    Reliance list, 7.

9       Q    Seven, my apologies.  So looking at your

10   reliance list marked as Exhibit number 7.  Is it your

11   testimony that you only spent one to two hours

12   reviewing all the materials in this lengthy document?

13              MR. DIPAOLA:  Object to form.

14              THE WITNESS:  Well, as I stated before,

15   a lot of these had been read before, and some of these

16   were added to after discussion by some of the

17   assistants in the law firm, so I didn't necessarily

18   read over each and every one of these articles in one

19   or two hours, if that's what you're thinking, but these

20   are articles that came to mind when considering these

21   types of cases.

22   BY MR. FAES:

23       Q    Well, if you look at the portion after the

24   literature section, you can see that there are four

Scott Serels, M.D.

1    pages of internal documents, plus an additional page of

2    publicly available materials.  Do you see that?

3          A    I do.

4          Q    So I just want to be clear for the record,

5    it's your testimony that in addition to the literature

6    materials, some of which you may have reviewed before,

7    you were able to review all the materials on those

8    additional five pages within one to two hours?

9          A    Those were materials that were discussed, and

10   as I said, I didn't miss -- I read over each and every

11   one of them, but we discussed some, and I was aware

12   that they were including them in the reference list.

13         Q    Have you reviewed any deposition testimony of

14   any Ethicon corporate employees such as medical

15   directors or scientists or any of those people who have

16   developed the TVT product?

17         A    I have not read any specific depositions.

18         Q    Well, if you look at the last page of your

19   expert report -- strike that.

20              If you look at the last page of your reliance

21   material you have three expert reports cited.  Do you

22   see that?

23         A    I do.

24         Q    It's Dr. Blaivas's, Dr. Elliot's and

Scott Serels, M.D.

1    Dr. Rosenzweig's reports, right?

2        A    Yes.

3        Q    And you also state that you've reviewed and

4    relied upon the materials cited in their reports?

5            MR. DIPAOLA:  As per the updated amended

6    reliance list those reports have been deleted.

7            THE WITNESS:  I have to clarify that.  I

8    didn't understand your initial question.  You made it

9    sound as if there were depositions from employees at

10   Gynecare.  These depositions I did actually read

11   through with Dr. Blaivas specifically.

12   BY MR. FAES:

13       Q    Oh, so you're saying that you read

14   Dr. Blaivas's deposition?

15       A    I definitely read Dr. Blaivas's, and I think

16   some of the other individuals as well.  I thought you

17   meant they're employees of Gynecare.

18       Q    That was actually not my question, but I

19   appreciate you offering that.  So I'll be clear on what

20   my question is.

21           Are you aware that Dr. Blaivas, Elliot, and

22   Dr. Rosenzweig have cited dozens of depositions of

23   Ethicon corporate employees within their reports?

24       A    If they were in there, then I must have seen

Scott Serels, M.D.

1    them.

2        Q    So it's your testimony that you reviewed

3    dozens of Ethicon employee transcripts in the one to

4    two hours that you spent --

5              MR. DIPAOLA:  Objection.  This totally

6    mischaracterizes.

7              THE WITNESS:  I stated that I read --

8    BY MR. FAES:

9        Q    I'll restate it.  Doctor, is it your

10   testimony that you've reviewed the dozens of Ethicon

11   corporate deposition employees cited in

12   Dr. Rosenzweig's, Elliot's, and Blaivas's reports in

13   one to two hours?

14       A    No.

15       Q    Have you reviewed those reports?

16       A    I've stated that I reviewed Dr. Blaivas's

17   report.  I did not state I reviewed dozens of other

18   employee depositions.

19       Q    Well, it also states that you reviewed the

20   materials cited in Dr. Blaivas's report, is that true

21   or not true?

22       A    I reviewed his report, but not necessarily

23   each and every reference that he listed.

24       Q    Is there a listing of the references he cited

Scott Serels, M.D.

1    that you did review somewhere that could be made

2    available?

3         A    Not that I know of.

4         Q    So you would agree with me that you haven't

5    reviewed all the materials cited in Dr. Blaivas's

6    expert report, correct?

7                   MR. DIPAOLA:  Object to form.

8                   THE WITNESS:  No, I have not looked at

9    each and every reference that he cited individually,

10   no.

11   BY MR. FAES:

12        Q    And you would agree with me that you haven't

13   reviewed all the materials cited in Dr. Elliot's expert

14   report?

15        A    In a similar way, yes, you're correct.

16        Q    And you would agree with me that you haven't

17   reviewed all the materials cited in Dr. Rosenzweig's

18   expert report?

19        A    Correct.

20        Q    Would you agree with me if there are

21   documents that you haven't reviewed, you can't be

22   relying on them?

23        A    There could have been documents in those

24   discussed, so I'm familiar with them, but I haven't

Scott Serels, M.D.

1    read the individual document.

2        Q    My question is actually a little different

3    than that.  Would you agree with me that if you haven't

4    reviewed, actually reviewed a document, you can't be

5    relying on it for the opinions that you intend to

6    express in this case?

7                    MR. DIPAOLA:  Object to form.

8    Mischaracterizes.

9                    THE WITNESS:  I think the difference

10   we're having is in the description of reviewed.  If you

11   mean read every word, then that's different than had a

12   discussion or looked at someone's referencing of that

13   particular article.

14   BY MR. FAES:

15       Q    So you don't think it's important to read

16   every word of a document before relying on it for the

17   opinions that you intend to offer in this case?

18                    MR. DIPAOLA:  Object to form.

19                    THE WITNESS:  I think to read every word

20   of every referenced document might be challenging.  I

21   think you can give an opinion without necessarily

22   having read every word.  I'm giving my opinion.  Not

23   necessarily their opinion.

24

Scott Serels, M.D.

```
 1   BY MR. FAES:

 2       Q    Would you agree that if you don't read every

 3   word on a document that you're relying on for your

 4   opinions in the case, it's possible that you may miss

 5   vital information that may change the opinions in this

 6   case?

 7                    MR. DIPAOLA:  Object to form.

 8                    THE WITNESS:  Again, I can only speak to

 9   in accordance with my opinion versus someone else's.

10   BY MR. FAES:

11       Q    And what is your opinion on that question?

12       A    My opinion is that I'm an expert in this

13   area, and I can give an opinion on this topic of

14   discussion even if I haven't read every word of someone

15   else's opinion.

16       Q    Would you agree that there could be

17   information out there either in published literature or

18   in the form of internal documents that you haven't seen

19   that could change your opinion in this case?

20       A    I suppose anything is possible, but I think

21   my expert opinion is pretty unwavering based on my

22   expertise.

23       Q    Are you aware that there was an update to the

24   TVT IFU in 2015 of this year?
```

Scott Serels, M.D.

1        A    I'm not specifically aware of that update.

2        Q    Doctor, do you intend to offer an opinion in

3    this case that warnings in the TVT IFU were sufficient

4    to warn physicians about the risks of the device?

5                    MR. DIPAOLA:  Object to form.

6                    THE WITNESS:  I think as a physician

7    what's written in the IFU is not necessarily as

8    important as what one's peers do and what's published

9    in the literature.

10   BY MR. FAES:

11       Q    That was not my question.  My question is, do

12   you intend to offer an opinion in this case that the

13   adverse events and risks listed in the TVT IFU were

14   sufficient to warn physicians of the risks of the

15   device?

16                   MR. DIPAOLA:  Same objection.

17                   THE WITNESS:  I could offer an opinion

18   on that.

19   BY MR. FAES:

20       Q    So you do intend to offer an opinion in that

21   regard?

22       A    I would offer an opinion in that regard.

23       Q    Don't you think it would be important prior

24   to offering an opinion on that topic to know that there

Scott Serels, M.D.

1    was a significant update to the TVT IFU in April of

2    this year?

3        A    Well, yes, but my opinion still stands that

4    the IFU isn't really what's relied upon by physicians

5    to look for adverse events.  Most physicians probably

6    don't even read the IFUs.

7        Q    Let me ask you this, Doctor, in practice do

8    you read the IFU for each mesh kit before using it?

9                MR. DIPAOLA:  Object to form.

10                THE WITNESS:  No.

11   BY MR. FAES:

12       Q    Do you assume that the IFU is disclosing to

13   you each of the risks and complications the company

14   knew could occur with the device or kit that you're

15   using?

16       A    I rely more upon surgeons and my colleagues

17   in the community and the medical societies than I do on

18   a paper written by a company.

19       Q    That's actually not my question.  I'm not

20   asking what you rely more or less on.  What I'm asking

21   you is, do you assume that when you read an IFU from a

22   company regarding a mesh kit, that the company is

23   disclosing to you those complications and risks that

24   could be significant for the patient that were known to

Scott Serels, M.D.

```
 1    the company?

 2                    MR. DIPAOLA:  Objection to form.

 3                    THE WITNESS:  Yes.

 4    BY MR. FAES:

 5       Q    Do you assume that when you read an IFU for a

 6    medical device that the company is disclosing any risks

 7    and complications that would be inherent to the mesh

 8    material so you would know what those risks are?

 9                    MR. DIPAOLA:  Object to form.

10                    THE WITNESS:  I mean, again, as a

11    surgeon, the IFU really is of secondary importance to

12    what's happening in the medical community, so I would

13    use that as a starting point, perhaps, but I would rely

14    more on other individuals.

15    BY MR. FAES:

16       Q    Would you agree that the company that

17    manufactures the particular mesh material is in the

18    best position to know any specific risks or

19    complications that are inherent to that specific mesh

20    material?

21       A    I think it's a complicated question, because

22    what mesh looks like on a bench or in an animal could

23    be different than what happens clinically.  So I think

24    we've learned to rely more on what we see in the
```

Scott Serels, M.D.

```
 1   clinical setting than on the bench setting.

 2               MR. FAES:  I'm going to object and move

 3   to strike, and I'm going to have the court reporter

 4   read back the question, because my question was fairly

 5   specific, and I think it's a yes or no answer.  If you

 6   can answer it yes or no, or if you can't answer it yes

 7   or no, please let me know one way or the other.

 8               MR. DIPAOLA:  He's free to answer it any

 9   way he wants.  Please read it back.

10               (Record read by the court reporter.)

11               THE WITNESS:  No.

12   BY MR. FAES:

13       Q    Who do you think is in the best position to

14   know the specific risks of a specific mesh material,

15   keeping in mind that the polypropylene in the TVT is

16   different from the polypropylene in the AMS product

17   than the polypropylene in the Boston Scientific

18   product.

19               MR. DIPAOLA:  Object to the form of the

20   question.

21               THE WITNESS:  I think that material

22   that's produced, if it's a type one mesh, which all the

23   ones that you mentioned were, that they're all fairly

24   similar.  How they're going to react in an inpatient or
```

Scott Serels, M.D.

```
 1    in a clinical setting is different than what might be

 2    predicted in a laboratory or in an animal setting, so I

 3    think it's hard to know how that material is going to

 4    be until you have some clinical application.

 5    BY MR. FAES:

 6         Q     Doctor, as you sit here today, do you have

 7    any understanding of any standard whatsoever as to what

 8    risks and complications are supposed to be disclosed in

 9    an IFU?

10         A     No.

11         Q     So you're not relying on any objective

12    standard from any source?

13         A     Correct.

14         Q     Have you made any effort before today to find

15    out what FDA regulations require a medical device

16    company to disclose in an IFU?

17                    MR. DIPAOLA:  Object to form.

18                    THE WITNESS:  No.

19    BY MR. FAES:

20         Q     Would you agree that your background and

21    experience is not necessarily the same as all other

22    doctors who use medical devices?

23         A     Yes.

24         Q     Would you agree that your background and
```

Scott Serels, M.D.

```
 1   experience is not necessarily the same as all other

 2   doctors who might use the TVT?

 3        A    Yes.

 4              MR. DIPAOLA:  Object to form.

 5              THE WITNESS:  Yes.

 6   BY MR. FAES:

 7        Q    Doctor, unfortunately your expert report

 8   doesn't have numbers, but under your conclusion section

 9   you state that you have an intimate understanding of

10   what the reasonably prudent pelvic floor surgeon should

11   know about the risks and benefits of pelvic floor

12   procedures, the adequacy of the warnings in the IFUs,

13   the management of mesh complications, and the well

14   known risks that are associated with any pelvic floor

15   surgery.  Do you see that?

16        A    I do.

17        Q    Is that an opinion you intend to offer in

18   this case?

19        A    Yes.

20        Q    Now, I notice your language here is talking

21   about a pelvic floor surgeon and pelvic floor surgery.

22   Do you consider the TVT device to be a pelvic floor

23   surgery?

24        A    Yes.
```

Scott Serels, M.D.

```
1        Q     What are you relying on for your

2   understanding of what a reasonably prudent pelvic floor

3   surgeon should know about the risks and benefits of

4   pelvic floor procedures and the adequacy of warnings in

5   IFUs?

6                    MR. DIPAOLA:  Object to form.

7                    THE WITNESS:  I think the pelvic floor

8   surgeon should be someone who is either trained in

9   urology or gynecology and has experience with operating

10  in the vaginal area.  I think they've had to go through

11  a residency program, perhaps a fellowship training

12  program so that they are familiar with how to operate

13  and do dissections in this area, and then I think they

14  need to understand the complications and pitfalls that

15  could be present in the pelvic floor, or in the vaginal

16  area, such as bleeding, nerve complications, bowel,

17  bladder, and muscular complications.

18  BY MR. FAES:

19       Q     My question is actually a little different.

20  What I'm asking is, what are you relying on for what a

21  reasonably prudent pelvic surgeon should or shouldn't

22  know about the risks and benefits of pelvic floor

23  procedures?

24                   MR. DIPAOLA:  Object to form.
```

Scott Serels, M.D.

```
 1   BY MR. FAES:

 2       Q    Have you done any kind of study in that

 3   regard, any kind of formal study?

 4       A    No.

 5       Q    Have you done any kind of survey of pelvic

 6   floor surgeons to say what are the risks you know about

 7   of this procedure or that procedure or anything like

 8   that?

 9       A    No surveys, no.

10       Q    So would it be fair to say that you're

11   primarily relying on your personal experience as a

12   pelvic floor surgeon for those opinions?

13               MR. DIPAOLA:  Object to form.

14               THE WITNESS:  It is my expert opinion,

15   yes, you are correct.  It's my opinion.

16   BY MR. FAES:

17       Q    Doctor, have you ever known about a

18   complication from your own experience that another

19   doctor might not know about?

20               MR. DIPAOLA:  Object to form.

21               THE WITNESS:  Wow, that's a tough

22   question to answer.

23   BY MR. FAES:

24       Q    Let me see if I can narrow it for you.  I'll
```

Scott Serels, M.D.

1  withdraw it and ask another question, because I think

2  it's vague.

3              MR. DIPAOLA:  A little strange.

4  BY MR. FAES:

5      Q    Would you agree that you might know about a

6  complication from the TVT device or procedure from your

7  own experience that another doctor might not know

8  about?

9      A    Again, it's somewhat broad.  It depends on

10 what type of doctor.  Pediatrician certainly wouldn't.

11 Another person who operates in this area and has gone

12 to lectures on it, I think we try to expose them to all

13 the complications that exist if they're going to choose

14 to do the procedure.

15     Q    Let me reask it and I'll see if I can narrow

16 it a little bit more.

17              Doctor, would you agree that you might know

18 about a complication with the TVT device or procedure

19 from your own experience that another pelvic floor

20 surgeon might not know about?

21              MR. DIPAOLA:  Object to form.

22              THE WITNESS:  I guess I would have to

23 say yes.

24

Scott Serels, M.D.

```
 1   BY MR. FAES:

 2        Q    Have you ever studied the question of what

 3   information needs to be in a pelvic mesh IFU.  Have you

 4   ever engaged in the study of that question?

 5        A    No.

 6        Q    Have you ever made any effort to confirm that

 7   your understanding for what needs to be in an IFU is

 8   consistent with what other doctors believe should be in

 9   an IFU?

10              MR. DIPAOLA:  Object to form.

11              THE WITNESS:  No.

12   BY MR. FAES:

13        Q    In doing your work on this case, were you

14   ever curious as to what the regulatory affairs

15   professionals department at Ethicon, who are the

16   professionals who are required to make sure that the

17   TVT IFU complies with FDA regulations, are you curious

18   about what they thought needed to be included in the

19   IFU?

20              MR. DIPAOLA:  Object to form.  Vague,

21   overbroad.

22              THE WITNESS:  Curious, yes.

23   BY MR. FAES:

24        Q    Doctor, would you agree that one of the risks
```

Scott Serels, M.D.

```
1    of the TVT procedure is acute and/or chronic pain?

2        A    Yes.

3        Q    Would you agree that one of the risks of the

4    TVT procedure is voiding dysfunction?

5        A    Yes.

6        Q    Would you agree that one of the risks of the

7    TVT procedure is pain with intercourse which in some

8    patients may not resolve?

9        A    Yes.

10       Q    Would you agree that one of the risks of the

11   TVT procedure is neuromuscular problems including acute

12   and/or chronic pain in the groin, thigh, leg, pelvic,

13   and/or abdominal area?

14               MR. DIPAOLA:  Object to form.

15   Overbroad.

16               THE WITNESS:  Yes.

17   BY MR. FAES:

18       Q    Do you agree that one of the risks of the TVT

19   procedure is recurrence of incontinence?

20       A    Yes.

21       Q    Would you agree that one of the risks of the

22   TVT procedure is bleeding including hemorrhage or

23   hematoma?

24       A    Yes.
```

Scott Serels, M.D.

```
1       Q     Would you agree that one of the risks of the

2   TVT procedure is that one or more surgeries may be

3   necessary to treat those adverse reactions?

4       A     Yes.

5       Q     Would you agree that one of the risks of the

6   TVT procedure is seroma?

7       A     Yes.

8       Q     Urge incontinence?

9       A     Yes.

10       Q     Urinary frequency?

11       A     Yes.

12       Q     Urinary retention?

13       A     Yes.

14       Q     Adhesion formation?

15       A     Yes.

16       Q     Atypical vaginal discharge?

17       A     Yes.

18       Q     Exposed mesh that may cause pain or

19   discomfort to the patient's partner during intercourse?

20       A     Yes.

21       Q     Death?

22       A     Yes.

23       Q     Do you believe it would be reasonable to

24   include those risks in the adverse events section of
```

Scott Serels, M.D.

1    the TVT IFU?

2                      MR. DIPAOLA:  Object to form.

3                      THE WITNESS:  Yes, it would be

4    reasonable.

5    BY MR. FAES:

6         Q    Do you believe that those risks that I just

7    read to you should be included in the TVT IFU?

8         A    Yes.

9         Q    Do you know whether or not those risks were

10   in the IFU prior to May of 2005?

11        A    Not sure.

12        Q    But you don't believe it would be unnecessary

13   to have any of those adverse reactions in the TVT IFU?

14        A    I think it's reasonable to have those in

15   there.  I just stated before I don't think physicians

16   rely on the IFU.

17        Q    Doctor, if Ethicon medical affairs believe

18   that a caution needed to be taken by a doctor before

19   using a TVT in a particular woman, do you believe that

20   caution should be put in the IFU?

21                     MR. DIPAOLA:  Object to form.  Vague.

22                     THE WITNESS:  I think it's reasonable to

23   put it in there.

24                     MR. FAES:  Do you mind if we take a

Scott Serels, M.D.

```
 1    quick break.  I think I've got a half hour left.  I'll

 2    get organized and we'll cruise on through.

 3                  (Recess:  7:15 p.m. to 7:21 p.m.)

 4    BY MR. FAES:

 5        Q    Doctor, we're back on the record after a

 6    short break.  Are you ready to proceed?

 7        A    Yes.

 8        Q    Doctor, would you agree that if Ethicon or

 9    Johnson & Johnson said something in the TVT IFU that

10    they knew not to be true, would you agree that that

11    would be wrongful?

12                  MR. DIPAOLA:  Object to form.

13                  THE WITNESS:  Yes.

14    BY MR. FAES:

15        Q    If Ethicon or Johnson & Johnson made claims

16    about the mesh in the TVT that they had no data to

17    support, would you agree that that would be wrongful?

18                  MR. DIPAOLA:  Object to form.

19    Hypothetical.

20                  THE WITNESS:  Yes.

21    BY MR. FAES:

22        Q    Are you aware of anything in the TVT IFU as

23    to which anyone at Ethicon has admitted there was not

24    data to support the claim about the mesh?
```

Scott Serels, M.D.

1      A    No.

2      Q    Are you aware of anything in the TVT IFU as

3   to which someone at Ethicon has admitted there was a

4   claim in the IFU about the mesh that was misleading?

5      A    No.

6      Q    If that occurred, would you agree that that

7   would be a failure to provide adequate and appropriate

8   warnings about TVT?

9             MR. DIPAOLA:  Objection to form.

10            THE WITNESS:  Yes.

11   BY MR. FAES:

12      Q    Are there any specific risks and

13   complications that you believe need to be in the TVT

14   IFU?

15            MR. DIPAOLA:  Object to form.

16            THE WITNESS:  Well, again, I don't think

17   it's something that's solely relied upon by the

18   surgeon, but I think anybody using the device should be

19   aware of certain complications.  Do they need to find

20   that out from the IFU, probably not, but they should be

21   aware of what they're using and what the potential

22   complications are.

23   BY MR. FAES:

24      Q    What complications do you believe those are?

Scott Serels, M.D.

1    Do you have a list?

2        A    Well, I think a lot of them were things that

3    you had mentioned previously.  I think that was a

4    pretty comprehensive list that you mentioned.

5        Q    Doctor, once an IFU is out there, if Ethicon

6    learned of a risk or complication that was not

7    previously warned about in the IFU, and it was a

8    significant risk or complication in terms of the harm

9    it could cause to a woman, do you know whether or not

10   Ethicon had any obligation to get that information out

11   to doctors?

12       A    Well, when you say they had an obligation,

13   had a legal obligation, or just a moral obligation?

14   I'm not sure what you mean by am I aware that they had

15   an obligation to.

16       Q    Well, let's address it both ways.  First of

17   all, do you believe they have a moral obligation?

18       A    Well, yes, I personally believe that if there

19   is something that could potentially benefit the

20   physician to know about a product that's being on the

21   market, then they should have that information.

22       Q    Do you know whether -- do you have an opinion

23   of whether they're legally required to get that

24   information out?

Scott Serels, M.D.

```
 1                    MR. DIPAOLA:  Object to form.

 2                    THE WITNESS:  That I do not know.

 3    BY MR. FAES:

 4         Q    Would you agree that for a mesh to be

 5    successfully used in pelvic floor surgery it should be

 6    soft and compliant with a woman's vaginal tissues?

 7                    MR. DIPAOLA:  Object to form.

 8                    THE WITNESS:  I'm not sure that that

 9    specifically qualifies as a mesh that needs to be used

10    or should be used for pelvic floor surgery.

11    BY MR. FAES:

12         Q    So you don't believe it's possible for a mesh

13    to be too stiff or not soft and compliant enough to be

14    successfully used in the pelvic floor?

15                    MR. DIPAOLA:  Object to form.

16                    THE WITNESS:  I'm just not sure how you

17    define soft and compliant.

18    BY MR. FAES:

19         Q    Let me ask it a different way.  Would you

20    agree that there could be a mesh that could be too

21    stiff to be used successfully in a woman's vaginal

22    tissues?

23                    MR. DIPAOLA:  Object to form.

24    Hypothetical.
```

Scott Serels, M.D.

```
 1                    THE WITNESS:  Yes, there could be.
 2    BY MR. FAES:
 3        Q    Would you agree that there could be a mesh
 4    that could be too stiff to use in a midurethral
 5    polypropylene sling for the treatment of stress urinary
 6    incontinence?
 7        A    Sure.  There could be.
 8        Q    I take it, Doctor, you're familiar with the
 9    Gynemesh PS product which is the product that's used in
10    the Prolift and Prosima device?
11                    MR. DIPAOLA:  Again, object to form.
12    This is not a Gynemesh or Prolift deposition.
13                    THE WITNESS:  Familiar in what way?  I'm
14    just not sure what you mean by familiar.
15    BY MR. FAES:
16        Q    Well, you're familiar that it's a different
17    mesh than what's used in the TVT, correct?
18        A    I'm not familiar with the differences in the
19    mesh.
20        Q    I'll take it then that you're not familiar
21    with the fact that the Gynemesh PS mesh is less stiff
22    than the mesh that's used in the TVT?
23                    MR. DIPAOLA:  Object to form.  Way out
24    of the scope.
```

Scott Serels, M.D.

1                    THE WITNESS:  I'm not really familiar

with the differences in the different meshes.

3   BY MR. FAES:

4        Q    Would you ever consider using the Gynemesh PS

5   material as a -- strike that.

6                    Would you ever consider using the Gynemesh PS

7   material as a mesh material in a sling for the

8   treatment of stress urinary incontinence?

9                    MR. DIPAOLA:  Object to form.

10  Hypothetical, out of the scope.

11                   THE WITNESS:  No.

12  BY MR. FAES:

13       Q    Why is that?

14       A    Because it's not meant to be used for that.

15       Q    Do you know whether or not there are doctors

16  that have in fact used it for the treatment of stress

17  urinary incontinence?

18                   MR. DIPAOLA:  Object to the form.

19  Hypothetical.  Assumes.

20                   THE WITNESS:  Not aware.

21  BY MR. FAES:

22       Q    Would you ever consider using the Ultrapro

23  mesh, which is the mesh that's used in the Prolift+M

24   for the treatment of stress urinary incontinence in a

Scott Serels, M.D.

```
 1   sling?

 2              MR. DIPAOLA:  Same objection to any

 3   question that refers to Prolift or pelvic organ

 4   prolapse devices.  This is not that deposition.

 5              MR. FAES:  I'm not asking about pelvic

 6   organ prolapse devices.  I'm asking about mesh.  But go

 7   ahead.

 8              THE WITNESS:  I would not use those

 9   meshes, no.

10   BY MR. FAES:

11        Q    Why is that?

12        A    They're not intended for that use.

13        Q    Do you know whether or not other surgeons

14   have in fact used that material in slings for the

15   treatment of stress urinary incontinence?

16              MR. DIPAOLA:  Objection to form.

17              THE WITNESS:  I'm not aware of it, no.

18   BY MR. FAES:

19        Q    Do you know whether or not there are in fact

20   clinical studies that have been published utilizing

21   that mesh for the treatment of stress urinary

22   incontinence in women?

23        A    I couldn't quote the exact study, no.  I'm

24   not aware of a study.
```

Scott Serels, M.D.

1     Q     Would you agree that clinically there may be

2  an impact of increased rigidity with any given mesh as

3  it may increase vaginal stiffness postoperatively with

4  the potential to impair sexual dysfunction?

5                    MR. DIPAOLA:  Object to form.  Vague.

6                    THE WITNESS:  I'm sure it's possible.

7  BY MR. FAES:

8     Q     Would you agree that any future meshes

9  developed by Ethicon for use in the pelvic floor should

10  be less rigid than the mesh that's used in the TVT?

11                    MR. DIPAOLA:  Totally hypothetical.

12  Object to form.

13                    THE WITNESS:  I wouldn't necessarily

14  agree with that.

15  BY MR. FAES:

16     Q     So if Ethicon medical's directors believe

17  that that was an appropriate goal in 2009, you would

18  disagree with that?

19     A     What was the goal in 2009?

20     Q     If Ethicon's medical directors believed that

21  that was an appropriate goal in 2009, you would

22  disagree with that?

23     A     What was the goal?  The goal of developing --

24     Q     I'll restate the entire question.

Scott Serels, M.D.

1      A    Yes.

2      Q    If Ethicon's medical directors believed in

3   2009 that was an appropriate goal for all future meshes

4   used in pelvic surgery to be less rigid than the mesh

5   in the TVT, you would disagree with that?

6              MR. DIPAOLA:  Again, object to form.

7              THE WITNESS:  I don't know if I disagree

8   with that statement.  You would have to put it into

9   context.  I think there are certain circumstances where

10  I would agree with it.

11  BY MR. FAES:

12     Q    Would you agree or disagree that clinical

13  trials show that large pore meshes provide better

14  patient comfort than standard meshes?

15             MR. DIPAOLA:  Object to form.  Vague.

16             THE WITNESS:  I would not necessarily

17  agree with that, no.

18  BY MR. FAES:

19     Q    So I would take it that you would also

20  disagree that the clinical trials show that large pore

21  meshes provide better patient comfort than standard

22  meshes because there's lower scar tissue formation and

23  lower stiffness, correct?

24     A    I guess it all depends on where you're

Scott Serels, M.D.

1    putting the mesh in, and what you're trying to achieve

2    with it.  For a larger piece of material, perhaps for

3    prolapse, maybe you would want to use a larger pore

4    material.

5        Q    So you believe the location in the body that

6    the mesh is placed has an impact on whether or not

7    large pore meshes provide better patient comfort than

8    standard meshes?

9        A    I think it's location and amount of material

10   with length.  I think it all plays a role.

11       Q    So I'm just trying to understand your

12   opinions, Doctor.  Do you agree or disagree in general

13   that clinical trials show that large pore meshes

14   provide better patient comfort than standard meshes,

15   and that the reason for that is due to lower scar

16   tissue formation and lower stiffness?

17       A    I think I would agree with that, but the

18   caveat to that would be depending on where it's used as

19   to the applicability of that statement.  I think if you

20   have a smaller piece of material in a different

21   location, that maybe that would not play as much of a

22   role, and it may in some ways affect the strength in

23   what you're trying to achieve with a certain piece of

24   material.

Scott Serels, M.D.

1      Q      Doctor, would you agree that the Burch

2   procedure is within the standard of care for the

3   treatment of stress urinary incontinence?

4      A      Yes.

5      Q      Would you agree that the native tissue sling

6   is within the standard of care for the treatment of

7   stress urinary incontinence?

8      A      Yes.

9      Q      Would you agree that the pubovaginal sling is

10   within the standard of care for the treatment of stress

11   urinary incontinence?

12      A      Yes.

13      Q      Do you know whether or not the TVT mesh is

14   manufactured from the same material as the Prolene

15   suture?

16      A      I have no idea.

17      Q      You don't know one way or the other?

18      A      I know it's polypropylene, it's the same

19   material.  I don't know the details.  I don't

20   manufacturer mesh.  I don't know.  I don't know the

21   subtleties in how to manufacture mesh.

22      Q      Would you agree that a polypropylene suture

23   has a different safety and efficacy profile than a TVT

24   device?

Scott Serels, M.D.

```
 1                  MR. DIPAOLA:  Object to form.

 2                  THE WITNESS:  I'm not sure how to answer

 3      that.  I mean, it's -- in terms of the material, it may

 4      be similar material.  It's all about how you use the

 5      material you have, more so than the material that

 6      exists.

 7      BY MR. FAES:

 8          Q    Let me ask you this, do you know how many

 9      more times -- strike that.

10               Do you know how many more times material

11      there is in a TVT mesh than there is in a polypropylene

12      suture?

13          A    No.

14          Q    But you would agree that there is

15      significantly more polypropylene material in a TVT

16      sling than there is in a polypropylene suture, correct?

17          A    Theoretically, yes.

18          Q    I'm going to have to reask that, because I

19      said polypropylene suture, and I meant Prolene suture.

20               You would agree that there are many times

21      more material in a TVT mesh than there is in a Prolene

22      suture, correct?

23          A    Yes.

24          Q    Would you agree that the amount -- strike
```

Scott Serels, M.D.

1    that.

2            Would you agree that this additional amount

3    of material in the TVT mesh could lead to more foreign

4    body reactions?

5                    MR. DIPAOLA:  Object to form.

6                    THE WITNESS:  Sure, yes.

7    BY MR. FAES:

8        Q    Would you agree that the additional amount of

9    material in the TVT mesh could lead to a greater

10   infection risk?

11                   MR. DIPAOLA:  Object to form.

12                   THE WITNESS:  It's hard to say with

13   certainty whether that's true or not.

14   BY MR. FAES:

15       Q    Is there a risk of infection from mesh with

16   the TVT?

17       A    Yes.

18       Q    Doctor, what is the proper way to tension the

19   TVT device?

20       A    That's a tough question.  There is no

21   quote/unquote proper way to tension the TVT device,

22   there are many different ways to do it, and I think it

23   relies on the surgeon's experience as to what works for

24   them on how best to tension it.

Scott Serels, M.D.

```
 1                   (Plaintiff's Exhibit 22, Article by

 2      Dr.  Serels Bates 09125791 and 792:  Marked for

 3      Identification.)

 4      BY MR. FAES:

 5          Q    Doctor, I'm going to hand you what's been

 6      marked as Exhibit 22 to your deposition, and this

 7      appears to be an article or a piece written by you

 8      titled, Are All Slings Created Equal.  Do you see that?

 9          A    I do.

10          Q    Do you recall writing this piece?

11          A    I do.

12          Q    Do you recall when you wrote this particular

13      piece?

14          A    Not exactly, but several years ago.

15          Q    What I specifically want to ask you a

16      question about, Doctor, is paragraph four where it

17      states, One of the biggest concerns in all

18      procedures -- strike that.

19               It says, One of the biggest concerns in all

20      sling procedures is how to tension the sling.  Most

21      people use a spacing device and insert it between the

22      urethra and the sling as they pull up to set the

23      tension, or a cough test for use with the retropubic

24      and obturator slings.  Do you see that?
```

Scott Serels, M.D.

1     A     Yes.

2     Q     Do you agree that one of the biggest concerns

3  in all sling procedures is how to tension the sling?

4     A     Yes.

5     Q     Do you believe that the company that

6  manufacturers the device is responsible to tell

7  physicians how to properly tension and place the

8  device?

9                    MR. DIPAOLA:  Object to form.

10                    THE WITNESS:  Those are two different

11  things.  To properly place the device or properly

12  tension the device.

13  BY MR. FAES:

14     Q     Fair point.  I'll withdraw that question and

15  ask another one.

16          Do you believe that Ethicon is responsible to

17  tell physicians how to properly tension the device?

18     A     No.

19     Q     So even though as we saw earlier with your

20  Prosima questionnaire that you filled out that you

21  think it's important to have a standardized procedure,

22  you don't think it's the company's responsibility to

23  properly and adequately describe how to tension the TVT

24  device in the instructions for use?

Scott Serels, M.D.

1        A     No.

2        Q     Do you have an opinion in this case as to

3    whether or not Ethicon does or does not properly

4    instruct physicians on how to tension the TVT device?

5        A     I'm sorry, repeat the question one more time.

6        Q     Do you have an opinion in this case regarding

7    whether or not Ethicon does or does not properly

8    instruct physicians on how to tension the TVT device?

9              MR. DIPAOLA:  Objection to form.

10             THE WITNESS:  My opinion is that I don't

11   think it's the device company's responsibility to teach

12   someone how to tension the sling.  I mean, slings have

13   been around long before the TVT product came out.

14   BY MR. FAES:

15       Q     Would you agree that Ethicon does describe

16   how to tension the TVT device in its instructions for

17   use?

18       A     I think it's -- there are vague suggestions

19   on how to tension a sling of any sort, but it's really

20   up to the discretion of the surgeon on how they want to

21   perform the procedure.

22       Q     Do you know whether or not there are

23   differences between the different TVT products, the

24   TVT, TVT-O, or the TVT Abbrevo with regard to how the

Scott Serels, M.D.

1    instructions for use instructs the physicians how to

2    tension that device?

3         A    I'm not familiar with the differences in the

4    IFUs.

5         Q    Do you know whether or not the TVT IFU

6    directs physicians to place the TVT without tension?

7                      MR. DIPAOLA:  Object to form.

8                      THE WITNESS:  I'm not sure, but

9    certainly it's been described as a tension free device,

10   but that's always been somewhat of a misnomer amongst

11   surgeons.

12   BY MR. FAES:

13        Q    Do you know whether or not the TVT IFU

14   directs the physician to place the TVT device with

15   minimal tension?

16                     MR. DIPAOLA:  Object to form.

17                     THE WITNESS:  I don't know specifically

18   if it says that.

19   BY MR. FAES:

20        Q    Do you know whether the TVT device actually

21   says both things.  In one spot it tells the physician

22   to place it with tension, and in another spot it tells

23   them to place it with minimal tension?

24        A    I'm not familiar with those IFUs to the

Scott Serels, M.D.

1    extent that I remember seeing either of those terms.

2        Q    Would you agree that describing tensioning of

3    the device of the TVT with tension is different from

4    describing it with minimal tension?

5                    MR. DIPAOLA:  Object to form.

6                    THE WITNESS:  I think with or without

7    tension to different surgeons means different things,

8    and I think as a surgeon, you need to realize how best

9    to use a product in your own hands based on your

10   experience and the experience of your peers, and I

11   really don't think many people rely upon an IFU to make

12   that determination.  I certainly don't.

13   BY MR. FAES:

14       Q    Do you know whether or not physicians were

15   asking Ethicon medical affairs for instructions on how

16   to properly tension the TVT IFU?

17       A    I do not know if they were asking that

18   question.

19       Q    Would you agree that the strongest unmet need

20   with the TVT is the ability to adjust tension both

21   intraoperatively and postoperatively?

22                   MR. DIPAOLA:  Object to form.

23                   THE WITNESS:  I would not agree with

24   that.

Scott Serels, M.D.

```
 1                    (Plaintiff's Exhibit 23, Article by

 2      Dr. Serels Bates 02602980 through 984:  Marked for

 3      Identification.)

 4      BY MR. FAES:

 5           Q    I'm going to hand you, Doctor, what's been

 6      marked as Exhibit 23 to your deposition.

 7           A    Sure.

 8           Q    And this is an article by you titled,

 9      Thoughts on Midurethral Synthetic Slings.  Do you see

10      that?

11           A    I do.

12           Q    And this was written in 2007?

13           A    Okay.

14           Q    I really only want to ask you about one

15      thing.  Starting at the bottom of the second page and

16      continuing on to the third, it states, Perhaps in the

17      future we will have other sling materials that have the

18      strength of a synthetic that are even more inert in the

19      vaginal environment.  Do you see that?

20           A    I do.

21           Q    Would you agree that this statement that you

22      made in this article would seem to indicate that the

23      current mesh synthetic mesh materials utilized in the

24      pelvic floor environment are not completely inert?
```

Scott Serels, M.D.

```
 1                    MR. DIPAOLA:  Object to form.

 2                    THE WITNESS:  I think the statement I

 3   was suggesting here was really to make the medical

 4   community realize that we shouldn't be complacent with

 5   what we have, even though it's very very good, that

 6   perhaps one day there will be something even better,

 7   and that was really the only intention of that

 8   statement.  Not really to show that the material we're

 9   using now is substandard.

10   BY MR. FAES:

11        Q    Do you have an opinion in this case as to

12   whether or not the Prolene material in the TVT is

13   completely inert or not?

14                    MR. DIPAOLA:  Object to form.

15                    THE WITNESS:  I think the obvious is

16   that anything that's synthetic can't be completely

17   inert, and that was, again, I think the intention of

18   that phrase.

19   BY MR. FAES:

20        Q    So you would agree, then, that it would be a

21   positive thing if medical device companies could

22   develop a mesh material that would be more inert than

23   what is on the market currently?

24        A    I think we always have to keep pushing the
```

Scott Serels, M.D.

```
1    envelope to try to figure out new materials that would

2    be less reactive in a human setting.  Is there such a

3    material, I don't know.

4             MR. FAES:  I think I'm out of time,

5    unless you really want to give me a long leash.  I may

6    want to redirect.

7             Doctor, I could go on, but I think I'm

8    out of time.

9

10            CROSS-EXAMINATION BY MR. DIPAOLA

11

12   Q    Just a few follow-up questions, Dr. Serels.

13   A    Sure.

14   Q    In no particular order I'm going to address

15   some of the points that Plaintiff counsel made to you

16   in the last three hours.  Are you aware that both laser

17   cut and mechanically cut mesh are still available on

18   the market?

19   A    Yes.

20   Q    In your 16 years plus of implanting

21   midurethral slings, are you aware of any clinical

22   difference in outcome between mechanically cut mesh and

23   laser cut mesh?

24   A    No.
```

Scott Serels, M.D.

```
 1        Q     Is there any level one literature evidence

 2   that there's any difference in outcome or complication

 3   rate between laser cut mesh and mechanically cut mesh?

 4        A     No.

 5        Q     Do you recall when Plaintiff's counsel was

 6   asking you about pore size?

 7        A     Yes.

 8        Q     Do you know if the current form of the

 9   Ethicon product, how the pore size of that product

10   relates to all other mesh pore size products?

11        A     It's similar to the other pore sizes, and it

12   fulfills a criteria to make those pores large enough to

13   avoid infections, which would be caused by the lack of

14   one's own body, specifically macrophages getting to the

15   area where the mesh is.

16        Q     So is it your understanding, would you agree

17   with me that all the current meshes on the market --

18   strike that.

19              That the Ethicon product mesh is considered a

20   macroporous mesh?

21        A     Correct.

22        Q     And that by all clinical studies is the mesh

23   that is used to minimize any complication rate?

24        A     Correct.
```

Scott Serels, M.D.

```
1        Q     Do you recall when Plaintiff's counsel asked

2   you about whether you had any complications in your

3   dealings?

4        A     Yes.

5        Q     Are the complications that you've had in your

6   experience, are they similar to what's been reported in

7   the literature over time?

8        A     Specifically relating to slings?

9        Q     Yes.  I'm sorry, this is all purely related

10  to slings.

11       A     Well, we spent a lot of time describing mesh

12  exposures and pain with mesh, that's something I really

13  don't see in my practice.  I've always thought that

14  that was due to the placement of the mesh, and the

15  coverage I got, and the dissection planes.  As far as

16  voiding dysfunction, urinary tension, that certainly

17  can occur in any situation.  I think my rates are lower

18  than the published rates, but they can happen.

19       Q     Is it a fair statement to say -- strike that.

20             Do you recall when Plaintiff's counsel gave

21  you a litany of complications that he was associating

22  with mesh?

23       A     Correct.

24       Q     With the exception of the exposure
```

Scott Serels, M.D.

1   complication, are all of those risks that Plaintiff

2   counsel mentioned, are they also risks of any surgery

3   that was performed prior to the invention of mesh as a

4   midurethral sling?

5       A   That's a great point.  The majority if not

6   all with the exception of the exposure are things that

7   you're subjected to with other procedures that are done

8   in the same area even if they're not using material.

9       Q   And are all of those complications or

10  untoward events, are all of those itemized untoward

11  events, are they all known events that can happen to

12  not only any pelvic floor surgery, but known to any

13  pelvic floor surgeon?

14      A   Yes.

15      Q   To that point, do you remember when

16  Plaintiff's counsel asked you about what should and

17  should not be included in the IFU?

18      A   Right.

19      Q   Is it your opinion that it may be reasonable,

20  but is it necessary for every possible untoward event

21  to be listed in an IFU?

22              MR. FAES:  Object to form.

23              THE WITNESS:  I do not think it's

24  necessary to have those listed.

Scott Serels, M.D.

1   BY MR. DIPAOLA:

2       Q    It is necessary?

3       A    I do not think it's necessary.

4       Q    And why don't you think it's necessary?

5       A    This sort of echoes back to what we had

6   spoken about that as a surgeon, you don't really rely

7   on the IFU to understand and to learn and operate.

8   Could you refer to it if you're trying something new,

9   perhaps, but there's many other aspects that go into

10  your training and your ability to do surgery in an IFU.

11      Q    Do you discuss complications with your

12  colleagues?

13      A    Absolutely.

14      Q    Has anyone ever come to you in the last ten

15  years and say, Scott, I found this new complication

16  that I've never heard of before from a midurethral

17  sling placement?

18              MR. FAES:  Object to form.

19              THE WITNESS:  Sure, yes, it could come

20  up.

21  BY MR. DIPAOLA:

22      Q    And what would that have been?

23              MR. FAES:  Object to form.

24              THE WITNESS:  Well, there will be, to

Scott Serels, M.D.

```
 1   your point, certain times you'll have a discussion with

 2   another surgeon, and they'll say, oh, my patient got a

 3   rash on their face after I put in a polypropylene mesh

 4   sling, have you seen that, and could that be related.

 5   I mean, there will be all sorts of circumstances that

 6   come up, not necessarily as a result of the sling, or

 7   what they're doing, but they may want to know if

 8   there's a cause and effect.  Most of the established

 9   complications have, since we've been doing these slings

10   for such a long time, have already been discussed.

11   BY MR. DIPAOLA:

12        Q    And you personally, you've been implanting

13   slings since, I believe you said, 1998?

14                  MR. FAES:  Object to form.

15                  THE WITNESS:  Well, polypropylene mesh

16   slings.

17   BY MR. DIPAOLA:

18        Q    Let me ask you.  When did you start

19   implanting Ethicon's midurethral sling device?

20        A    Yes, that was probably '98, '99.

21        Q    And since that time how many of these devices

22   would you say that you've implanted in your career?

23        A    Polypropylene mesh sling devices?

24        Q    Yes.
```

Scott Serels, M.D.

```
 1      A      Thousands.

 2      Q      Do you remember when plaintiff's counsel was

 3   making a litany of what you were not an expert in?

 4                   MR. FAES:  Object to form.

 5                   THE WITNESS:  Yes.

 6   BY MR. DIPAOLA:

 7      Q      Let me ask you potentially, after you've

 8   implanted a thousand of these midurethral slings, is it

 9   fair to say that you are an expert in how a woman's

10   body reacts to the implantation of mesh devices?

11                   MR. FAES:  Object to form.

12                   THE WITNESS:  Yes.

13   BY MR. DIPAOLA:

14      Q      Do you remember when Plaintiff's counsel

15   showed you Exhibit 20?

16      A      Yes.

17      Q      Which was the Project Mint, which he

18   represented was the unrelated Prosima developmental

19   project.

20                   MR. FAES:  Objection.

21   BY MR. DIPAOLA:

22      Q      But he compared that to the TVT device.  Do

23   you recall that line of questions?

24                   MR. FAES:  Object to form.
```

Scott Serels, M.D.

```
1                     THE WITNESS:  Yes.

2    BY MR. DIPAOLA:

3         Q    Do you recall that you ranked highest, A

4    repair system that enables a standardized procedure.

5    Do you recall that?

6         A    Yes.

7         Q    Do you believe as you sit here today that the

8    TVT devices do indeed have a standardized procedure?

9                     MR. FAES:  Object to form.

10                    THE WITNESS:  Yes.

11   BY MR. DIPAOLA:

12        Q    Do you recall that you also ranked as high

13   as, Requires minimal dissection.  Do you, as you sit

14   here today, believe that the TVT product and line of

15   products have the most minimal dissection possible for

16   their installation?

17                    MR. FAES:  Object to form.

18                    THE WITNESS:  Yes.

19   BY MR. DIPAOLA:

20        Q    As you sit here today, and you ranked

21   previously as high, System components designed to

22   maintain correct anatomic position, and that was ranked

23   five out of five.  As you sit here today, do you

24   believe that that is also applicable to the current
```

Scott Serels, M.D.

1   device that is the TVT device?

2                    MR. FAES:  Object to form.

3                    THE WITNESS:  Yes.

4   BY MR. DIPAOLA:

5       Q    Also, you rank, Procedure that is designed to

6   avoid unintended trauma.  You ranked that high, five

7   out of five again.  Again, as you sit here today as an

8   expert in implanting over 2,000 of these devices, do

9   you sit here and can you say that the TVT device also

10  is designed to avoid unintended trauma?

11                   MR. FAES:  Object to form.

12                   THE WITNESS:  Yes.

13  BY MR. DIPAOLA:

14      Q    Again, ranking high, A system with minimal

15  chance for complications.  Do you believe that the TVT

16  system, as you sit here today as an expert, has been

17  designed for a minimal chance of complications?

18                   MR. FAES:  Object to form.

19                   THE WITNESS:  Yes.  I mean, that was the

20  intention.

21                   MR. DIPAOLA:  I have nothing else.

22                   MR. FAES:  I have like five questions.

23

24

Scott Serels, M.D.

```
 1                 REDIRECT EXAMINATION BY MR. FAES

 2

 3       Q     Doctor, are you aware of any clinical study

 4   that has specifically compared the safety and

 5   complication rates of the mechanically cut TVT

 6   retropubic device versus the laser cut mesh TVT

 7   retropubic device?

 8       A     Not off the top of my head, no.

 9       Q     Are you relying on the Amid standard for your

10   opinion that the TVT mesh is a type one macroporous

11   mesh?

12       A     Yes.

13       Q     You know that that standard was developed in

14   1998 originally for hernia meshes, correct?

15       A     Yes.

16       Q     Do you know whether or not Amid thinks that

17   that standard doesn't apply to the type of mesh in

18   TVT?

19                 MR. DIPAOLA:  Object to the form.

20                 THE WITNESS:  I'm not familiar with his

21   opinion on the TVT device, no.

22   BY MR. FAES:

23       Q     Have you ever seen anything from Ethicon

24   scientists and engineers stating that the Amid standard
```

Scott Serels, M.D.

1    is outdated as of 2005?

2                    MR. DIPAOLA:  Object to form.

3                    THE WITNESS:  No.

4    BY MR. FAES:

5        Q    Is it fair to say that if you did see

6    statements from Ethicon scientists and engineers who

7    are designing mesh products that stated that the Amid

8    standard was outdated, you would disagree with that?

9                    MR. DIPAOLA:  Object to form.

10                   THE WITNESS:  I'm not sure I can answer

11   that as yes/no.  I would have to hear what their

12   thought process was.

13   BY MR. FAES:

14       Q    Doctor, you talked a lot today about your

15   experience with polypropylene mesh devices and

16   midurethral slings, you understand that you are here

17   today to give an expert opinion specific to just the

18   TVT device, correct?

19       A    Yes.

20       Q    And you would agree that the polypropylene

21   mesh that's in the TVT is different than the mesh

22   that's used in many competitor devices that you've used

23   such as AMS's, Caldera's, or Boston Scientific slings,

24   correct?

Scott Serels, M.D.

```
 1                    MR. DIPAOLA:  Object to form.

 2                    THE WITNESS:  I think they're similar

 3      enough.

 4      BY MR. FAES:

 5          Q    But you understand that there are basic

 6      differences in the type of raw material that's used,

 7      correct?

 8          A    I'm not an expert on raw materials.

 9          Q    So you don't know one way or the other --

10          A    Correct.

11          Q    -- if the raw material that's used in the TVT

12      is different from the material that's used in say

13      Boston Scientific, or AMS's, or Caldera's slings?

14          A    Correct.

15                    MR. DIPAOLA:  Object to the form.

16      BY MR. FAES:

17          Q    Have you done any kind of study into whether

18      or not the differences in raw material would make a

19      difference in the clinical effects of the sling?

20                    MR. DIPAOLA:  Object to form.

21                    THE WITNESS:  I have not.

22                    MR. FAES:  That's all the questions I

23      have.  Thank you for your time, Doctor.

24                    (Deposition concluded at 8:00 p.m.)
```

Scott Serels, M.D.

```
  1            -  -  -  -  -  -

                 E R R A T A

  2            -  -  -  -  -  -

  3

  4   PAGE  LINE  CHANGE

  5   _____ _____  _____

  6      REASON: _____

  7   _____ _____  _____

  8      REASON: _____

  9   _____ _____  _____

 10      REASON: _____

 11   _____ _____  _____

 12      REASON: _____

 13   _____ _____  _____

 14      REASON: _____

 15   _____ _____  _____

 16      REASON: _____

 17   _____ _____  _____

 18      REASON: _____

 19   _____ _____  _____

 20      REASON: _____

 21   _____ _____  _____

 22      REASON: _____

 23   _____ _____  _____

 24      REASON: _____
```

Scott Serels, M.D.

```
 1

 2            ACKNOWLEDGMENT OF DEPONENT

 3

 4            I,_____, do

 5    hereby certify that I have read the

 6    foregoing pages, and that the same is

 7    a correct transcription of the answers

 8    given by me to the questions therein

 9    propounded, except for the corrections or

10    changes in form or substance, if any,

11    noted in the attached Errata Sheet.

12

13

14    _____

15     SCOTT SERELS, M.D.                DATE

16

17

18    Subscribed and sworn

      to before me this

19    _____ day of _____, 20____.

20    My commission expires:_____

21

      _____

22    Notary Public

23

24
```

Scott Serels, M.D.

```
 1              CERTIFICATE OF REPORTER

 2        I, Robin Balletto, a Registered Professional

 3   Reporter/Notary Public within and for the State of

 4   Connecticut, do hereby certify there came before me, on

 5   the 7th day of April, 2016, the following named person,

 6   to wit:  SCOTT SERELS, M.D., who was by me duly sworn

 7   to testify to the truth and nothing but the truth; that

 8   he was thereupon carefully examined upon his oath and

 9   his examination reduced to writing under my

10   supervision; that this deposition is a true record of

11   the testimony given by the witness.

12        I further certify that I am neither counsel for,

13   related to, nor employed by any of the parties to the

14   action in which this deposition is taken; and further,

15   that I am not a relative or employee of any attorney or

16   counsel employed by the parties hereto, nor financially

17   or otherwise interested in the outcome of the action.

          WITNESS my hand and affixed my seal this 8th day

18   of April, 2016.

19

20        _____

                     Robin Balletto, RMR

21

22   My commission expires:  October 31, 2018

23

24
```