# EXHIBIT D

Robert D. Moore, D.O.

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

| | |
|---|---|
| IN RE: ETHICON, INC., ) | Master File No. |
| PELVIC REPAIR SYSTEM ) | 2:12-MD-02327 |
| PRODUCTS LIABILITY ) | MDL 2327 |
| LITIGATION ) | |
| ) | |
| ) | JOSEPH R. GOODWIN |
| ) | U.S. DISTRICT JUDGE |
| ) | |
| THIS DOCUMENT RELATES TO ) | |
| THE FOLLOWING CASES IN ) | |
| WAVE 1 OF MDL 200: ) | |
| ) | |
| ) | |
| Angela Coleman, et al. v. ) | |
| Ethicon, Inc., et al. ) | |
| Civil Action No. ) | |
| 2:12-cv-01267 ) | |
| ) | |
| Mary F. Cone v. ) | |
| Ethicon, Inc., et al. ) | DEPOSITION OF |
| Civil Action No. ) | ROBERT D. MOORE, D.O. |
| 2:12-cv-00261 ) | |
| ) | |
| Teresa Georgilakis, et al. ) | |
| v. Ethicon, Inc., et al. ) | |
| Civil Action No. ) | |
| 2:12-cv-00829 ) | April 15, 2016 |
| ) | |
| Dawna Hankins v. Ethicon, ) | |
| Inc., et al. ) | |
| Civil Action No. ) | |
| 2:12-cv-00369 ) | |
| ) | |
| Margaret Kirkpatrick v. ) | |
| Ethicon, Inc., et al. ) | |
| Civil Action No. ) | |
| 2:12-cv-00746 ) | |
| ) | |
| Carrie Smith v. Ethicon, ) | |
| Inc., et al. ) | |
| Civil Action No. ) | |
| 2:12-cv-00258 ) | |

Robert D. Moore, D.O.

Page 2

1    Isabel Swint v. Ethicon,    )
     Inc., et al.                )
2    Civil Action No.            )
     2:12-cv-00786               )
3                                )
4
5
6
          DEPOSITION OF ROBERT D. MOORE, D.O.
7
8
9                    April 15, 2016
10
                      9:42 a.m.
11
12
13
14
15
16                    Suite 1560
              3575 Piedmont Road, N.E.
17               15 Piedmont Center
                 Atlanta, Georgia
18
19
20
21
22
23
     Reported by:   F. Renee Finkley, RPR, RMR, CRR, CLR,
24   CCR-B-2289

Robert D. Moore, D.O.

```
 1                    APPEARANCES OF COUNSEL
 2
 3   On behalf of the Defendants
     Ethicon, Inc. and Johnson & Johnson:
 4        RITA A. MAIMBOURG, ESQ.
          Tucker Ellis, LLP
 5        Suite 1100
          950 Main Avenue
 6        Cleveland, Ohio  44113
          (216) 592-5000
 7        rita.maimbourg@tuckerellis.com
 8
 9   On behalf of the Plaintiffs:
          BRITTANY T. MARIGLIANO, ESQ.
10        Blasingame, Burch, Garrard & Ashley, P.C.
          440 College Avenue
11        Suite 320
          Athens, Georgia  30601
12        (706) 354-4000
          btm@bbgbalaw.com
13
14
15
16
17
18
19
20
21
22
23
24
```

Robert D. Moore, D.O.

Page 50

1        Q.    (By Ms. Maimbourg)  Doctor, I've handed

2    you what has been marked as Exhibit 9, and it's

3    entitled Potential Risks of Non-Mesh and Mesh SUI

4    Surgeries.  Just take a look at it and let me know

5    when you're done.

6        A.    Okay.

7        Q.    So just with respect to the column on the

8    right that's entitled Mesh, do you agree that the

9    right -- that this column lists the risks of mesh

10   surgeries?

11            MS. MARIGLIANO:  Object to the form.

12            THE WITNESS:  Yes, I do.

13       Q.    (By Ms. Maimbourg)  And do you agree that

14   any -- if any of these risks develop, that the effect

15   on the patient could be temporary or chronic?

16       A.    Yes.

17       Q.    And do you agree that if any of these

18   risks developed, the effect on the patient could be

19   mild, moderate, or severe?

20       A.    Yes, I do.  Relative risks aren't listed

21   certainly here on this chart, so that would be one

22   issue that I'd have with the chart, just listing out

23   complications without putting down actually the

24   relative risks of the different complications.

Robert D. Moore, D.O.

Page 51

1      Q.    Okay.  If we have time, we'll go back over

2   that.  You know what?  Before we move on, I do want

3   to mark three articles that you brought with you

4   today, and I'm just going to have you identify them

5   for the record.  What is Exhibit 10, Doctor?

6              (Exhibit 10 was marked for

7         identification.)

8              THE WITNESS:  This is an abstract that we

9         presented at the American Urogynecology Society

10        meeting in 2014 on Indication of Surgical

11        Treatment of Midurethral Sling Complications, a

12        Multicenter Study.

13     Q.    (By Ms. Maimbourg)  Is that -- was that

14   mentioned in your report?

15     A.    Yes.

16     Q.    And then Exhibit 11 is also the same data

17   presented at a different time?

18             (Exhibit 11 was marked for

19        identification.)

20             THE WITNESS:  No, it's basically just a

21        sub-analysis of the data that this first one

22        that we talked about, Exhibit 10, is just about

23        slings.  This one is talking about specifically

24        either slings or pelvic organ prolapse

Robert D. Moore, D.O.

Page 52

1          indications for removal, and then --

2               (Exhibit 12 was marked for

3          identification.)

4          Q.    (By Ms. Maimbourg)   And then Exhibit 12,

5     you also brought this?

6          A.    Exhibit 12 is kind of the main study that

7     actually classifies every patient that came in with a

8     mesh complication, utilizing the IUGA/ICS

9     classification of synthetic mesh complications of all

10    of these patients.  So the first one is just

11    classifying the different complications via the

12    official IUGA/ICS classification system.

13         Q.    When you said the first one, you were

14    actually holding Exhibit 12?

15         A.    Exhibit 12, yes.

16         Q.    Right.  So are all of these -- and I

17    apologize, 'cause I didn't have those first two

18    abstracts before today.  Is the data in 10 and 11

19    also in 12?  No, is that -- partially?

20         A.    Yes, I would say all of the patients --

21    it's the same patient population from three centers,

22    our center, Emory University, and Cleveland Clinic,

23    Florida.  All the patients, all the mesh

24    complications are the same in each of these papers.

Robert D. Moore, D.O.

Page 53

1    However, 12, which is really the main paper -- 10 and

2    11, Exhibit 10 and 11 are sub-analysis of this data.

3        Q.    That helps a lot.   Keep those there,

4    because I will ask some questions about 12.   Just

5    stick them up there.   All right.

6                (Exhibit 13 was marked for

7        identification.)

8        Q.    (By Ms. Maimbourg)   I'm going to mark as

9    Exhibit 13 --

10               (Discussion off the record.)

11       Q.    (By Ms. Maimbourg)   Doctor, this was

12   printed on April 12th of 2016, if you could see that

13   date on the top left of this document.   Could you

14   identify what this is?

15       A.    This looks like a page from one of our

16   websites.

17       Q.    And actually, it's the International

18   Center For Laparoscopic Urogynecology, right?

19       A.    Yes.

20       Q.    And that is one of the names of your

21   practice?

22       A.    Yes.

23       Q.    So in this section on TVT sling

24   complications, the first sentence says, Although the

Robert D. Moore, D.O.

Page 54

1    TVT sling is considered the standard of care,

2    complications can still occur.  That's what it says,

3    right?

4         A.    Yes.

5         Q.    And are you referring to any particular

6    type of sling in that sentence that you say TVT?

7         A.    I mean, we're using it more generically as

8    a retropubic midurethral sling.

9         Q.    Would a standard -- strike that.

10             The second sentence says, It is very

11   important to note that it may not be the mesh itself

12   or the procedure that is the cause of the

13   complication.  It may be how the mesh is placed or

14   how the body heals around the mesh that may be part

15   of the underlying cause.  That's on the -- your

16   website page today, right?

17        A.    This is actually -- I guess it's still

18   available.  I mean, this is an older version of our

19   website, but if you just printed it April 12th, I

20   guess it's still out there and available, so --

21        Q.    Well, is this still your opinion today?

22        A.    Yes, I think we've updated it on our new

23   website as well to say as well, that it certainly

24   depends not only on those factors, but also the

Robert D. Moore, D.O.

Page 57

1    portion of that website, but this -- our new website

2    has been in the makings for at least a year.

3         Q.    In terms of mesh removal, which you

4    describe on page 6 of your report, you have a couple

5    different numbers there, and I just wanted to clarify

6    in my own mind.

7              MS. MARIGLIANO:  I'm sorry, what page?

8              MS. MAIMBOURG:   Six.

9         Q.    (By Ms. Maimbourg)  Are you there?

10        A.    Yes.

11        Q.    So if you go down to the bottom, it says,

12   My partner and I have explanted more than 700 mesh

13   devices, with more than 500 since 2010?

14        A.    Uh-huh.

15        Q.    And then up above, on the very first part,

16   you said, More than 500 pieces in the last four

17   years.  And since four years would actually be 2011

18   through 2015, I just wanted to clarify what the

19   accurate numbers are.

20        A.    I would say the accurate numbers are this

21   down here below, because we know -- you know,

22   basically, we've got very good numbers based from the

23   study from the years 2011 to 2013, in which there was

24   500 pieces of meshes explanted in this trial.  We did

Robert D. Moore, D.O.

Page 58

1    75 percent of those from the three centers, so that

2    was over 300, we've explanted in the last two years.

3    Approximately about a hundred to 120 each year.  And

4    so then, prior to 2010, from 2002 through 2010, you

5    know, there was least 200.  I don't have those exact

6    numbers.

7         Q.    Of the ones that you've removed, you list

8    here that they've included Gynecare Prolift, Prolift

9    Plus M, Prosima, TVT retropubic, TVT-O, and TVT-Secur

10   slings.  I just want to make sure that you are not

11   saying the only mesh devices you've removed are those

12   products; is that true?

13        A.    That is true.

14        Q.    So you've just listed the Ethicon

15   products, but you've also removed products of other

16   manufacturers, true?

17        A.    Yes.

18              MS. MARIGLIANO:  Can we take a break, if

19        you're at a good stopping point?

20              MS. MAIMBOURG:  Sure.  Yeah, let's take a

21        break.  We've been going about an hour.

22              (A recess was taken.)

23        Q.    (By Ms. Maimbourg)  Doctor, we're back on

24   the record.  I've asked you to look at your

Robert D. Moore, D.O.

Page 59

1    Exhibit 12, which is the data you were referring to,

2    I think, in one of your last answers.  So this

3    multi-center study, you already identified the three

4    institutions.  You and your partner removed 373

5    slings, right?

6        A.    Yes.

7        Q.    And that's actually on page 2, you have

8    that data.  And in this article, you do not breakdown

9    the type of slings by number, correct?

10        A.    Correct.

11        Q.    And I take that that you removed

12    retropubic single incision TOT inside-out and TOT

13    outside-in?

14        A.    Correct.

15        Q.    Do you have that data somewhere?

16        A.    It's actually in that -- one of those

17    abstracts that we talked about earlier, that's

18    specifically on mesh itself.  I believe if you take a

19    break at it, what we've broken down --

20        Q.    Let me ask you this.  Does it include a

21    breakdown of how many TOT slings were inside-out

22    versus outside-in in this study?

23        A.    It does not.

24        Q.    Is that data somewhere back at Atlanta

Robert D. Moore, D.O.

Page 60

1    Research, Inc.?

2         A.    If it's available, yes.

3         Q.    Do you believe it's available?

4         A.    I don't know how many numbers of patients

5    that we actually have identified inside-out versus

6    outside-in.

7         Q.    In this article, you do not draw any

8    conclusions about pain being worse in the patients

9    with TOT inside-out compared to any other sling, do

10   you?

11        A.    No, we do not.

12        Q.    You also do not reach any conclusion to a

13   reasonable degree of certainty as to how the mesh was

14   causing pain, correct?

15        A.    In this particular study?

16        Q.    Yes.

17        A.    No.

18        Q.    In terms of conflict of interest

19   information on the last page, you say, none, right?

20        A.    Correct.

21        Q.    What is the purpose of the conflict of

22   interest provision in medical literature?

23        A.    To provide readers any potential bias that

24   may be involved.

Robert D. Moore, D.O.

Page 61

1    Q.    Did you disclose here that you had

2   testified at least nine times for plaintiffs alleging

3   injuries from pelvic mesh, including slings?

4    A.    No.

5    Q.    Do you believe that a reader of this

6   article is entitled to know that you have been and

7   are continuing to be an expert for the plaintiffs

8   suing mesh manufacturers?

9          MS. MARIGLIANO:  Object to the form.

10         THE WITNESS:  It's not part of the

11         requirements as far as they bring you through a

12         very stringent bias -- or not bias, but

13         disclosure and conflict of interest form.  And

14         it's not part of the disclosure process of this

15         journal, or any other journal that I know of

16         right now.

17    Q.    (By Ms. Maimbourg)  So you don't believe

18   that it would be important, regardless of the process

19   you went through with this journal, you don't believe

20   it's important for readers of this article to know

21   that you're testifying on behalf of plaintiffs in

22   pelvic mesh litigation involving the very products

23   you are studying?

24         MS. MARIGLIANO:  Object to the form.

Robert D. Moore, D.O.

Page 73

1   page 9, which you have labeled number 1, design

2   defects.  The first thing you say in your heading is,

3   Tendency to cause pain, and bladder, bowel, and

4   sexual dysfunction secondary to location of mesh.

5           What is it about the location of the mesh

6   that creates this tendency?  And if you could be

7   brief, I would appreciate it.

8           MS. MARIGLIANO:  Object to the form.

9           Answer as completely as you need to.

10          THE WITNESS:  Well, as briefly as, or as

11          elongated as it may be, specifically, with the

12          transobturator sling or location of the mesh in

13          the periurethral tissues extending out through

14          the obturator muscles, the adductor longus

15          muscles themselves, specifically with the TVT-O

16          having more mesh in the adductor muscles

17          themselves, with that type of placement of the

18          mesh, it's been noted over time that with

19          contraction -- with contraction, ultimately,

20          that can cause pain.

21          It then causes pelvic floor dysfunction,

22          because of dyssynergia and spasms throughout the

23          muscles that can affect bowel, bladder function,

24          and sexual function throughout the vagina and

Robert D. Moore, D.O.

Page 74

1     the pelvis.

2         Q.    (By Ms. Maimbourg)  So my question was

3     only about the location.  So you told me your whole

4     opinion, right?

5              MS. MARIGLIANO:  Object to the form.

6              THE WITNESS:  Yes, but the location of the

7         mesh in the periurethral tissues, as well

8         extending out into specifically with the TOT and

9         TVT-O, obturator internus, externus adductor

10        muscles.

11        Q.    (By Ms. Maimbourg)  So in other words, as

12    I understand that, it's where the mesh is lying, and

13    it's the technique of getting it there that you are

14    calling here as a defect?

15        A.    Yes, it's not only where the mesh is

16    lying, but also how it's placed specifically with the

17    TVT-O device, which includes the needles and the mesh

18    itself.

19        Q.    In these two pages, and I'm basically

20    going through this the way you have set it up.

21        A.    Okay.

22        Q.    So in these two pages, subsection A, am I

23    correct that you cite nothing for the proposition

24    that the location of the mesh has a tendency to cause

Robert D. Moore, D.O.

Page 75

1   pain, bladder, bowel and sexual dysfunction?

2             MS. MARIGLIANO:  You're just saying in

3        subsection A, you're asking if he said that or

4        if he --

5             MS. MAIMBOURG:  Correct.

6             MS. MARIGLIANO:  -- didn't include that?

7             MS. MAIMBOURG:  That's exactly what I'm

8        asking, in these two pages.

9             MS. MARIGLIANO:  I'm just going to object

10       to the form.

11            THE WITNESS:  What I'm describing is

12       the -- in those two pages, and it gets into

13       specifics as far as where the mesh is implanted

14       and how it causes complications at the bottom of

15       page 10, and subset of B.  In A itself, it's

16       just describing the placement of the initial

17       TOT, and then the subsequent development of the

18       TVT-O, and how that is placed itself.

19       Q.   (By Ms. Maimbourg)  So in these two pages

20   under subsection A, you don't cite any medical

21   literature for the proposition.  You cite that in

22   other parts of your report?

23       A.   Yes.

24            MS. MARIGLIANO:  Well --

Robert D. Moore, D.O.

Page 76

1          Q.     (By Ms. Maimbourg)   So B --

2                 MS. MARIGLIANO:   Object to the form.

3          Q.     (By Ms. Maimbourg)   B is entitled, Mesh

4    Implanted in Groin Muscles Causes Complications, and

5    it's essentially one paragraph, right?

6          A.     Yes.

7          Q.     And you say here that the mesh -- bottom

8    of 10 -- these transverse mesh arms damage the

9    levator and obturator and adductor muscles.   And so

10   I'm going to stop there, and ask you, what is your

11   support for that statement that the arms damage those

12   muscles?

13         A.     The subsequent papers and literature that

14   have been -- that have described patients that have

15   prolonged groin pain, thigh pain, vaginal pain,

16   dyspareunia from the mesh arms lying within these

17   muscle groups themselves.

18         Q.     Can you identify those articles?

19         A.     Sure.   I mean, as far as if we want to

20   take a look at long-term complications, meaning at

21   least pain of any kind of subsequent nature, or

22   having pain, then we can start with some of the

23   initial trials, the de Leval initial trials that

24   basically they relied upon, who's the inventor of the

Robert D. Moore, D.O.

Page 77

1    product, 26 percent groin pain.  They didn't really

2    track that out.

3              And then as the papers started coming out

4    in the literature, including Laurikainen's original

5    paper, I think was 2007 in the Green Journal of

6    OB/GYN, groin pains of 16 percent at a year,

7    5 percent persistent groin pain, which is still

8    significantly impacting women at that point in time.

9    And then we can list Yik Lim and Marcus Carey, the

10   same amount -- actually, 24 percent short-term pain,

11   4 percent long-term pain.

12        Q.    You know what?  We'll get into -- are

13   these all cited in your report, 'cause --

14        A.    They are.

15        Q.    -- we'll probably get into some of them.

16        A.    They are.

17        Q.    Do you mind if I move on, and we can talk

18   about them as they come up?

19        A.    Sure.

20        Q.    All right.  I wanted to ask you, though,

21   with respect to the definition of prolonged pain,

22   which that's the term you used in your answer, could

23   you tell me your understanding of what that is versus

24   what is postoperative pain?  And in your mind, is

Robert D. Moore, D.O.

Page 78

1   there a difference in this analysis?

2       A.    Yes, I mean, I think really any type of

3   postoperative pain should be resolved by six weeks

4   and 12 weeks, probably at the latest.  Anything that

5   is beyond that, I believe becomes more of a prolonged

6   pain issue.  And certainly something that's going

7   beyond six months to one year is more of a persistent

8   type of pain issue.

9       Q.    So at the top of page 11, you say, If pain

10  results in the levator ani region secondary to the

11  mesh -- what did you mean, secondary to the mesh?

12      A.    Specifically, if there's a mesh arm in

13  that muscle creating contraction, creating fibrosis,

14  a chronic inflammatory reaction, that creates

15  shrinkage of the mesh in the surrounding tissues that

16  creates nerve entrapment or pain for any of those

17  reasons, then that's going to ultimately affect the

18  muscles throughout the pelvic floor.

19      Q.    Now, in this paragraph, same paragraph

20  where we're talking, you do cite the Cochrane review

21  showing -- you say, overall rates of groin pain

22  higher in the TOT group, right?

23      A.    Yes.

24      Q.    You cite the Cochrane review.  Now, does

Robert D. Moore, D.O.

Page 79

1    the Cochrane review give a probable explanation or

2    reason for this, or is it just reporting the

3    statistics?

4         A.    The Cochrane review is considered probably

5    the kind of leading authority on data analysis from

6    high level studies, evaluating all of the literature

7    that's been reported.

8         Q.    So is it just reporting the statistics or

9    is it giving a probable explanation?

10        A.    It reports the statistics.

11        Q.    So can you cite to me any article -- and

12   again, we can maybe get into this, but as you sit

13   here right now, in this part of the deposition, can

14   you cite to me any article that has verified, through

15   a scientific process, your previous answer about how

16   the mesh arms in the muscle cause pain through

17   various mechanisms, where that has been proven?

18        A.    I mean, there's many, many articles that

19   describe chronic pain in this region secondary to

20   TVT-O slings, and many come up with scientific

21   reasoning behind it.  So I'm not sure really what

22   your -- what your question is, as far as to how you

23   can specifically state the kind of scientific

24   reasoning behind that.

Robert D. Moore, D.O.

Page 80

1          Q.    Well, I'll explain to you what I mean.

2    Many of the articles you cite here, which I've read,

3    refer to possibilities.  They use the word "may,"

4    they use the word "can," and I have not found in any

5    of the articles on your reliance list that you cite,

6    where an author in a scientific publication has said,

7    to a reasonable degree of medical probability, or

8    similar words, that the mesh arms in the muscles are

9    causing the type of contraction and scarring that you

10   believe, in your opinion, causes the pain.  Have I

11   missed something, is there an article that does that?

12              MS. MARIGLIANO:  Object to the form.

13              THE WITNESS:  Well, I think that basically

14          journal articles, and journals themselves, the

15          verbiage that is required is different.  That is

16          what that particular author is stating.  They

17          also would state that if the mesh wasn't there,

18          certainly the patient wouldn't have pain in that

19          specific location.

20              So there's been multiple studies that have

21          looked at anatomical directions of this mesh,

22          where it's going, the TVT-O in relationship to

23          the obturator nerves.  Also saying why are these

24          patients in the TVT-Os having more groin pain

Robert D. Moore, D.O.

Page 81

1    than those that don't have mesh in that specific

2    area.

3         And so although they may say "may" or

4    "perhaps" or "theoretically," which is verbiage

5    that journals, medical journals require, it's in

6    my opinion, to a medical degree of certainty,

7    that this is what's causing these complications.

8    Q.    (By Ms. Maimbourg)   And what is your

9  personal opinion based on?

10   A.    My personal opinion is based on the -- my

11  medical training, my experience, my taking care of

12  patients with these type of complications, implanting

13  and doing research trials on every type of avenue

14  that you can with midurethral slings.  And knowing

15  that we don't see groin pain in patients that have a

16  retropubic sling that is similar to this type of a

17  pain, when the mesh is in the muscle or irritating

18  the nerve directly.

19   Q.    Doctor, on page 12 of your report, when

20  we're talking about pain syndromes, one of the

21  articles you cite several times in your report is

22  Teo.  Did I say that right?  Is it -- it's T-E-O?

23   A.    Correct.  I'm not sure of the

24  pronunciation.

Robert D. Moore, D.O.

Page 82

1      Q.    I was wondering if we could go off the

2    record for a minute, so you could locate that in your

3    binder?

4             MS. MARIGLIANO:  We can -- it's -- oh,

5        it's in there.

6             THE WITNESS:  No, it's right here.

7             MS. MAIMBOURG:  I don't how long it's

8        going to take.

9             (Discussion off the record.)

10     Q.    (By Ms. Maimbourg)  What is the

11   publication date on the bottom, to the right?

12     A.    2011.

13     Q.    No, the month?

14     A.    April.

15     Q.    All right, so -- 'cause you have February

16   cited here, and I wanted to make sure that I have the

17   same article.  Let me see yours, just to make sure

18   it's the same as mine.  Yes, it is.  Okay.  Doctor,

19   I'm actually going to mark my copy, so you can put

20   yours back in your notebook?

21             (Exhibit 17 was marked for

22        identification.)

23     Q.    (By Ms. Maimbourg)  And you describe on

24   page 12 of your report that this trial by Teo -- do

Robert D. Moore, D.O.

Page 83

1    you think that's how he pronounces it?  T-E-O?  How

2    would you pronounce that?  You don't know?

3        A.    I would have say Teo.

4        Q.    Teo.  All right.  So you say in your

5    report on page 12, This trial -- I believe you're

6    talking about this trial, Teo -- was perhaps the

7    clearest example of the clinical and scientific

8    impact of pain syndromes caused by the TVT-O, and

9    comes from the results of an independent study that

10   was performed by several of Ethicon's KOLs.  So

11   that's what you're referring to, Teo, right?

12       A.    Yes.

13       Q.    Now, you say in your report that the

14   investigators stopped the trial, because of excess

15   pain reports in the TVT-O arm, and you put in

16   parentheses, 26.4 percent pain reported at six

17   months, right?

18       A.    Yes.

19       Q.    And I think you actually referred to that

20   in one of your previous answers.  So I'd like you to

21   go to page 1351 of the article, under the section

22   that's entitled, Results.  Are you there?  Results,

23   1351?

24       A.    Yes.

Robert D. Moore, D.O.

Page 84

1    Q.    The second paragraph that says, during

2    recruitment?  Are you there?

3    A.    Uh-huh.

4    Q.    This paragraph says, During recruitment, a

5    few studies were published showing similar cure rates

6    for the two procedures, meaning obturator and

7    retropubic, but a high incidence of leg pain in

8    patients after receiving a transobturator tape.

9    After discussing these data at an investigator

10   meeting, we decided to stop recruitment before the

11   full calculated sample was recruited, since it was

12   deemed that clinical equipoise had been lost?

13   A.    Correct.

14   Q.    So the study was not stopped, as you

15   state, because of excess pain reports in the TVT-O

16   arm; is that true?

17   A.    I believe it was due to the pain that they

18   were seeing as well as the discussion they had based

19   on that, and the literature that was in the -- that

20   had been being published.

21   Q.    Well, in fact, that's not what that

22   paragraph says under Results, does it?

23   A.    No, but I believe in the discussion, they

24   talk about that as well.

Robert D. Moore, D.O.

Page 85

1    Q.    And then you say in your report that the

2  authors concluded it was no longer ethical to use the

3  TVT-O device, given the clear negative impact on

4  patient health.  And if you look at the Results

5  section, where we just were a minute ago -- you're

6  there, you're on the right page.

7    A.    Okay.

8    Q.    It says, We believed it was no longer

9  ethical to randomize women to the TVT-O arm, in light

10  of these published studies --

11    A.    Correct.

12    Q.    -- but data on women already recruited

13  would be of value, right?  Those two sentences are

14  different, are they not?

15    A.    They're saying that those -- that it would

16  still be of value, that they were already -- that

17  those patients were already implanted and

18  certainly -- but they're not going to implant

19  anymore, they're not going to recruit anymore.  So I

20  don't know whether or not these patients had already

21  been implanted or not.

22    Q.    I guess it would be an unfair reading of

23  your report for anyone to believe that you were

24  saying here that the authors of this article believed

Robert D. Moore, D.O.

Page 86

1    it was unethical to use the TVT-O device, that would

2    be an unfair reading of your statement.

3              MS. MARIGLIANO:  Object to the form.

4         Q.    (By Ms. Maimbourg)  Right?

5         A.    I think that what the authors are saying

6    is that they believe that it's unethical to implant

7    and/or recruit any more patients to continue this

8    patient trial, and implant anymore TVT-Os.  And that

9    based on their review of the literature and their

10   initial findings of a very high amount of groin pain

11   in those patients.

12        Q.    All right.  In the conclusion of the

13   article, on page 1355, the authors state, Short-term

14   cure rates at six months are similar for the two

15   procedures.  TVT-O results in a higher level of

16   postoperative and leg pain, although these problems

17   are transient.  And then it says, The two procedures

18   have a high cure rate with a low rate of

19   complications, right?  Right?

20        A.    Yes, that's what it states.

21        Q.    All right.  So you, in your report,

22   several times quote a concluding message that I

23   cannot find in this article.  And that concluding

24   message says, in your report, page 12, Given the

Robert D. Moore, D.O.

Page 87

1    comparable efficacy of the procedures, it seems

2    preferable to recommend retropubic tape placement to

3    avoid a high incidence of leg pain.  Can you tell me

4    where in the article it says that?

5              MS. MARIGLIANO:  I'm going to object.

6        He's not saying he's quoting that.

7        Q.    (By Ms. Maimbourg)  Well, can you tell me,

8    even if you're not quoting it, can you tell me where

9    in the article, the authors state, it seems

10   preferable to recommend retropubic tape placement, or

11   is that your conclusion, your own concluding message?

12       A.    I mean, I'd have to go through this, you

13   know, kind of line by line to take a look at

14   the -- the last paragraph -- to take a look at, you

15   know, their exact verbiage throughout the thing.  I

16   don't know if I'm quoting them, if you're saying you

17   don't see those exact words throughout there, I'll

18   take your word on that.  But if -- that was my

19   conclusion as well as their summaries of their

20   discussion and their results.

21       Q.    (By Ms. Maimbourg)  So if you quote

22   something usually in your report, you would have it

23   as a single-spaced indented quote, right?

24             MS. MARIGLIANO:  Object to the form.

Robert D. Moore, D.O.

Page 88

1           THE WITNESS:  It may be, or it's in

2      quotations.

3           Q.    (By Ms. Maimbourg)  Well, take a look at

4   page 40 of your report, where you also quote this

5   article by Teo, the concluding message?

6           A.    Okay.

7           Q.    Are you on page 40 looking at it?

8           A.    Uh-huh.

9           Q.    Does that look like a quote to you?  The

10  way it's set off, single-spaced indented?

11          A.    Again, I don't know specifically if this

12  paragraph was supposed to be a quote directly from

13  the article.

14          Q.    In terms of the leg pain, you say here,

15  this -- we're on page 13 in your report, This article

16  was not the first to show that TVT-O caused leg,

17  groin, thigh pain in more than one in four women who

18  were implanted, right?

19          A.    Yes.

20          Q.    And this study that we've been talking

21  about, the Teo study, involved 127 women.  And, in

22  fact, if you look at the page 1354, they do say that

23  leg pain was experienced by 26.4 percent of women in

24  the TVT-O group, right?

Robert D. Moore, D.O.

Page 89

1      A.    Yes.

2      Q.    And the article also says, The problem

3  resolves spontaneously within three months, right?

4      A.    Correct.

5      Q.    And that would be within the postoperative

6  period that you previously defined?

7      A.    Yes, in their particular study.

8      Q.    So this study, in particular, does not

9  support your statement, or your claim that this leg

10 and groin pain can be severe, chronic, life-long, and

11 debilitating, does it?

12          MS. MARIGLIANO:  Object to the form.

13          THE WITNESS:  Not the particular study,

14      but if you continue on in the discussion, they

15      do have verbiage that does talk about those

16      concerns.  And actually, a couple of the papers

17      we just talked about, including Laurikainen, as

18      well as Yik Lim, as well as the Latthe meta

19      analysis as well.

20      Q.    (By Ms. Maimbourg)  This study does not

21 give any support for your claim that it's the

22 proximity of the sling to nerves that is responsible

23 for causing the pain, does it?

24          MS. MARIGLIANO:  Object to the form.

Robert D. Moore, D.O.

Page 90

1          THE WITNESS:  This study basically shows
2      that when you place mesh tape into the groin
3      muscles, it can cause a significant amount of
4      albeit postoperative pain in this particular
5      patient population, but also lead to longer
6      periods of pain that's been shown in other
7      studies.
8      Q.   (By Ms. Maimbourg)  The purpose of this
9  study was not to prove that, and it doesn't show it,
10  right?
11          MS. MARIGLIANO:  Object to the form.
12          THE WITNESS:  Well, the purpose of this
13      study may have been to prove it, and take a
14      look, but they stopped the study, and didn't
15      look at patients beyond six months.
16      Q.   (By Ms. Maimbourg)  I'm not talking -- my
17  last question, I apologize if it was not clear, but I
18  really wasn't talking about longevity.  I was talking
19  about mechanism.
20      A.   Okay.
21      Q.   And, you know, the authors of this article
22  talk about possibilities, and they don't talk
23  about -- they don't give an opinion in this article,
24  and they don't prove an opinion as to what is causing

Robert D. Moore, D.O.

Page 91

1    this postoperative pain, is that true?

2              MS. MARIGLIANO:   Object to the form.

3         Q.    (By Ms. Maimbourg)   The only statements

4    are on page -- at the top of 1355, talk -- talks in

5    terms of possibilities?

6         A.     Yeah, and they -- but they do go on to say

7    that cadaveric studies have revealed that the tape

8    passes much closer to the obturator nerve using the

9    inside-out than the outside technique.   This could

10   possibly cause the obturator nerve to be more

11   susceptible to damage, inflammation and edema,

12   resulting in pain.   Neuropathy resulting in gait

13   abnormality and numbness has also been reported, and

14   seems to be associated more with the inside-out

15   technique.

16             So I think they are giving their opinions

17   as to what the cause of pain is in this TVT-O

18   procedure.

19        Q.    So they're talking about possibilities

20   here, correct?   That's the word they use?

21        A.     They are certainly talking about

22   possibilities and utilizing their expertise in being

23   researchers, clinicians, experts in urogynecology to

24   say what is the potential cause of this pain.

Robert D. Moore, D.O.

Page 92

1        Q.      So researcher -- researchers are

2    fundamentally scientists, right?

3        A.      Yes.

4        Q.      And they deal in possibilities and

5    probabilities?

6        A.      They do.  And when they're writing for --

7        Q.      I didn't have a question.

8        A.      Okay.

9        Q.      And, in fact, in your report, you say your

10   opinions you hold to a reasonable degree of medical

11   certainty, I think you used the term, right?

12       A.      Yes.

13       Q.      And you're not giving opinions to

14   possibilities, right?

15       A.      I'm giving opinions, based on a reasonable

16   degree of medical certainty, which in this instance,

17   we're taking a look at risk versus benefits, and

18   risks outweighing benefits with the TVT-O procedure.

19   And some of these journals hold a higher degree of

20   probability and require that to be able to say

21   certain verbiage.  So this is why investigators will

22   say these types of -- utilize this type of language

23   in their studies.

24       Q.      So maybe if these authors had put in the

Robert D. Moore, D.O.

Page 93

1    word probable, their article may not have been

2    accepted, because it would not have passed the

3    peer-review process, because it's bad science, right?

4              MS. MARIGLIANO:  I'm going to object to

5         the form.  You're confusing legal verbiage with

6         verbiage that's using medical in articles.

7              MS. MAIMBOURG:  You're not allowed to make

8         speaking objections, I'm sorry.

9              MS. MARIGLIANO:  So that's my objection.

10             THE WITNESS:  Well, we don't know that.

11        Q.   (By Ms. Maimbourg)  We don't know that.

12   We would be speculating, right?

13        A.   Yes.

14        Q.   So let's move on to page 13 through 24 of

15   your report, which is the next section, quite long.

16   And it's entitled, Inside-Out Technique of TVT-O

17   Increases Risk of Nerve Injury/Pain.  So when I look

18   at this section, particularly page 14, and I'm

19   looking kind of down here at the bottom, I think what

20   you're saying here is that the technique of inserting

21   the TVT-O puts it too close to certain nerves, which

22   could actually damage the nerve at implantation or be

23   close enough, so that fibrosis around the mesh could

24   very easily cause nerve damage and pain.  Does that

Robert D. Moore, D.O.

Page 94

1    sort of summarize what you're saying about this

2    inside-out technique?

3            MS. MARIGLIANO:  I'm just going to object

4        to the form.

5            THE WITNESS:  It's -- yes, it's talking

6        about one aspect of the -- of the pain.

7        Q.    (By Ms. Maimbourg)  And this defect has to

8    do with the technique of implanting the product.  And

9    in this particular part of your opinion, you're not

10   talking about the product itself, you're talking

11   about the technique of implanting?

12       A.    Well, I'm talking about the product,

13   because the product involves the implantation process

14   of going from the inside-out.  It's part of the

15   product, it's part of the device as all -- all of the

16   different components of it are.

17       Q.    So you're defining the technique as the

18   same as the product?

19       A.    The technique is part of the product.

20   This particular product was the only one that was

21   developed to go from inside to outside.  And

22   specifically, the way that it's placed, including all

23   of the components of the product, including the metal

24   wing tip guide, the needles, the mesh, the sheath are

Robert D. Moore, D.O.

Page 95

1    all part of the procedure.

2         Q.    Right, but you're -- the title of this

3    section of your report is, The Technique of TVT-O

4    Increases Risk of Nerve Injury/Pain, right?  That's

5    how you titled it?

6         A.    Correct.

7         Q.    All right.  And in part of this section,

8    you quote an article by Piet Hinoul, and I believe

9    you say on page 15 -- well, take a look at what you

10   say there.  Are you there in the report?

11        A.    Yes.

12             MS. MARIGLIANO:  I'm not there.  Oh,

13        you're talking about on page 15, okay, I see.

14        Q.    (By Ms. Maimbourg)  So you quote him

15   to -- that he states that, The suspicion that the

16   inside-out procedure is linked to more neurological

17   injuries was already raised in de Leval's original

18   article.  A recent review of the data collected by

19   the MAUDE database also implies more pain, et cetera,

20   et cetera, right?

21        A.    Yes.

22             (Exhibit 18 was marked for

23        identification.)

24        Q.    (By Ms. Maimbourg)  I'm handing you that

Robert D. Moore, D.O.

Page 96

1   article that you've quoted, and I'd like you to go to

2   page 1205, so we can read the rest of the quote.

3   Could you go to page 1205, I'm sorry.

4        A.    1205 is the first page.

5             MS. MARIGLIANO:  Look up here

6        (indicating).

7             THE WITNESS:  Okay.  Got it.  Okay.

8        Q.    (By Ms. Maimbourg)  The column on the

9   left, I'm going to show you mine.  See this green,

10  that's where you quoted?

11       A.    Okay.

12       Q.    Okay.  And I'm going go to after that

13  quote.  After the quote about the MAUDE database,

14  Dr. Hinoul says that the MAUDE database needs to be

15  interpreted cautiously, as no incidence rate can be

16  derived from them, and reporting bias cannot be

17  accounted for.

18            Do you agree with that, with respect to

19  the MAUDE database?

20       A.    I would agree that incident rate cannot be

21  derived from them, and reporting bias also cannot be

22  accounted for.

23       Q.    And then he goes on to cite an article by

24  Debodinance that was a non-randomized prospective

Robert D. Moore, D.O.

Page 97

1    study compared outside-in Monarc to inside-out TVT-O,

2    and found no difference in thigh pain between both

3    groups, right?

4        A.    He did.

5        Q.    And that -- and that article would be

6    contrary to your opinions in this case that the

7    inside-out approach causes an increase of pain over

8    the outside-in, right?

9            MS. MARIGLIANO:   Object to the form.

10           THE WITNESS:   Not necessarily.   I mean,

11       there's one study that he quotes, and there's

12       probably a couple more that show the same amount

13       of groin pain in the inside-out versus the

14       outside-in.   However, there's multiple -- more

15       studies that also show an increased amount of

16       pain with the inside-out versus the outside-in.

17           So he's quoting one particular study and

18       there may be a couple more, but I can probably

19       quote more studies overall that show a higher

20       rate of pain with inside-out TVT-O versus

21       outside-in approach.

22       Q.    (By Ms. Maimbourg)   You did not choose to

23   put the Debodinance article in your report, because

24   it doesn't support your opinions, right?

Robert D. Moore, D.O.

Page 98

1          MS. MARIGLIANO:  Object to the form.

2          THE WITNESS:  The Debodinance article is

3     part of the list of papers that's in

4     my -- that's in -- that's in my reliance list.

5          Q.    (By Ms. Maimbourg)  Was that one that you

6     put there, or did the plaintiffs give it to you?

7          A.    The Debodinance?  I don't know.

8          Q.    You also talk about the Haddad article on

9     page 15 and 16?

10         A.    Yes.

11         Q.    You have a lot of quotes from there.  I'll

12    pull it out and mark it, but -- if you want.  It

13    seems to me that all the quotes that you have here

14    are merely the author's regurgitation of certain

15    articles, and do not scientifically establish the

16    truth of anything they're saying.

17         MS. MARIGLIANO:  Object to the form.

18         THE WITNESS:  Well, I wouldn't say --

19    again, I mean, we're getting into these

20    discussions about what's science and what's

21    truth, and what's a reasonable degree of

22    certainty.  That's the verbiage that's used in

23    literature and journals versus the degree of

24    certainty of what they -- they might have

Robert D. Moore, D.O.

Page 99

1       opinions on.  What they're doing here is showing
2       all of the different literature supporting their
3       findings and their views as well, and discussing
4       these issues and complications.
5       Q.    (By Ms. Maimbourg)  Doctor, that article
6   had to do with BMI, and it didn't even reach
7   statistical significance, right?
8       A.    I don't know that per se, as far as the
9   statistical significance.
10      Q.    And all of these statements actually had
11  nothing to do with their -- the purpose of their
12  study, they were just giving background right?
13              MS. MARIGLIANO:  Object to the form.
14              THE WITNESS:  Again, correct, they were
15      talking about -- you said they were just
16      regurgitating other papers, but not saying
17      anything scientifically.  I think that they're
18      supporting -- when one writes a discussion to a
19      paper, they're supporting either their theories
20      or other theories with different papers in the
21      literature.
22      Q.    (By Ms. Maimbourg)  So on the next page,
23  when you talk about -- well, we're on 16 and 17.  I
24  didn't mean it skip too far ahead.  You cite two

Robert D. Moore, D.O.

Page 100

1   articles, Collinet and Lim, L-I-M, in support of your

2   statement that a number of studies have suggested a

3   high-risk of postoperative groin pain with the

4   inside-out treatment.

5            When you use the term, postoperative groin

6   pain here, are you referring to that six to 12-week

7   period after implant?

8       A.    I am here, but these particular papers

9   also are ones that show a higher rate of long-term

10  groin pain up to a year.

11      Q.    So the Collinet paper only went through 12

12  weeks, right?

13      A.    No, the Collinet paper is the French

14  registry of, I think, 985 patients that reported on

15  one-year pain rates of 3 percent.  Actually, this is

16  wrong, it's 4.7.  That should be 2.7, which I

17  think --

18      Q.    It should be 2.7, right?

19      A.    It's 2.7 percent, right.  Yeah, and that's

20  quoted later, so that's a typo there.

21      Q.    And when you're saying there, what page

22  are you referring to?

23      A.    Page 17, about halfway down, residual rate

24  of pain of 2.7 percent.

Robert D. Moore, D.O.

Page 101

1          (Exhibit 19 was marked for

2      identification.)

3      Q.    (By Ms. Maimbourg)  So if we look at the

4  Collinet article, which I've placed before you as

5  Exhibit 19, this study did not look at long-term

6  pain, as far as I know, because if you look on page

7  713, they're talking about four to 12 weeks.  Maybe I

8  missed something, but this does not appear to be a

9  long-term pain article.

10      A.    Residual pain of 2.7 percent.

11      Q.    It says, up above, postoperative

12  complications occurring immediately after surgery, or

13  by the first follow-up visit, four to 12 weeks, are

14  shown in table 3.  And table 3, residual pain,

15  2.7 percent.  So the Collinet article is not about

16  long-term pain.

17      A.    Right, they quote residual pain at 12

18  weeks, yes.

19      Q.    On page 18, of your report -- are you

20  there?

21      A.    Yes.

22      Q.    Right about here (indicating), Ethicon

23  should never have released an inside-out technique?

24      A.    Okay.

Robert D. Moore, D.O.

Page 102

1      Q.    Do you see that?  That that's your

2    opinion, right?

3      A.    Yes.

4      Q.    And this is what we've been talking about

5    here, they should never have released a -- this

6    technique, right?

7      A.    The inside-out technique is the TVT-O, so

8    that's what I'm referring to.

9      Q.    Now, you cite to Doctor -- or Professor

10   de Leval's supposed statements on page 18.  And just

11   to be clear, you're citing an internal report, where

12   someone is reporting what Dr. de Leval said, right?

13     A.    Yes.

14     Q.    Is that what it appears to be?

15     A.    Yes.

16     Q.    And you have this in single-spaced

17   paragraph indented, which would imply it's a quote.

18   Did you mean to imply it was a quote?

19     A.    Yes.

20     Q.    And do you practice evidence-based

21   medicine in your job as a urogynecologist and

22   surgeon?

23     A.    Yes, I try to.

24     Q.    Do you consider internal company documents

Robert D. Moore, D.O.

Page 103

1    and e-mails to be a part of evidence-based machine?

2         A.    I think that it's a part of good medicine

3    to know all the information that you can know, so it

4    may ultimately become part of evidence-base medicine.

5         Q.    You've implanted devices, other than

6    pelvic mesh?

7         A.    Yes.

8         Q.    Can you give me an example?

9         A.    The InterStim device.

10        Q.    Okay, that's a good one.  Let's talk about

11   InterStim.  Either before implanting your first one,

12   or at any time in your practice, have you ever asked

13   the manufacturer the InterStim to give you their

14   internal memos and e-mails regarding the development

15   of the product?

16        A.    No, but we expect the representatives of

17   that company to be forthright and forthcoming with

18   any and all information that they may have about

19   their product, pluses or minuses, negatives or

20   positives.

21        Q.    When you were a consultant to AMS

22   regarding Monarc, did you ever tell the people you

23   were working with that they should distribute their

24   internal company e-mails and their internal

Robert D. Moore, D.O.

Page 110

1    type of different slings.  So basically, my clinical

2    background, as well as studies in the literature, as

3    well as Ethicon's own internal documents, basically

4    confirming that there's less risk of groin pain and

5    issues with the sling that does not go all the way

6    through the groin muscles.

7         Q.    The studies in the literature, would those

8    be studies that show what -- what particular studies

9    in the literature?  Are they all cited here in your

10   report?

11        A.    They should be.  I mean, specifically,

12   there's been several studies that have been

13   comparative trials with Abbrevo versus TVT-O.  And

14   all showing various amounts of decreased risk of

15   groin pain, both in short-term and some in the

16   long-term.  Specifically, the paper from Brown, and

17   Shaw and Rardin showing the fact that you have 9

18   percent rate of groin pain with the TVT-O versus

19   1 percent in Abbrevo.  And 25 percent of those

20   patients that had groin pain in the TVT-O required a

21   groin dissection.  So I mean, you weigh those

22   risk/benefits and clearly the TVT-O -- Abbrevo looks

23   like that it's a much safer alternative.

24        Q.    From your extensive review of the Ethicon

Robert D. Moore, D.O.

Page 111

1    documents provided to you, do you know when the

2    product went into development?

3         A.    The product initially was basically

4    Professor de Leval --

5         Q.    I'm looking for a date.

6         A.    The first time that it was brought up was

7    2004.

8         Q.    When was it cleared by the FDA?

9         A.    I believe 2009.

10        Q.    The date I have is July 1st, 2010?

11        A.    Okay.

12        Q.    Would you perhaps accept my

13   representation?

14        A.    Sure.

15        Q.    Do you agree that Abbrevo could not have

16   been implanted before it was cleared by FDA?

17        A.    I do.  I believe as well, though, that it

18   could have been developed and approved a whole lot

19   before 2009.

20        Q.    Do you agree that -- understanding what

21   you're saying, you're saying that Ethicon should have

22   put it into development sooner, but would you agree

23   that if one of these plaintiffs in a case in which

24   you've been identified as a general expert was

Robert D. Moore, D.O.

Page 112

1    implanted before July 1 of 2010, that Abbrevo was not

2    a safer option for her because the product was not

3    cleared?

4        A.    Correct.

5        Q.    Since it's your opinion that Abbrevo is a

6    safer option than TVT-O, I would assume that you have

7    no criticism of its design; is that true?

8        A.    I still am critical of passing needles

9    through the groin.  I still believe that a Mini sling

10   that does not have to be passed -- anything passed

11   through the groin, including needles, would be a

12   safer alternative, as long as the clinical efficacy

13   and the safety is there as well with that procedure.

14   So I'm not sure if I would go as far as I don't have

15   any criticisms of the design of the Abbrevo.

16       Q.    Well, might you show up in a case

17   criticizing Abbrevo, where a plaintiff is claiming

18   injuries?  I mean, would it go that far?

19            MS. MARIGLIANO:  Object to the form.  Go

20       ahead.

21            THE WITNESS:  At this point in time, no, I

22       don't believe that would be the case.

23       Q.    (By Ms. Maimbourg)  Do you have any

24   criticisms of the polypropylene mesh that is used in

Robert D. Moore, D.O.

Page 113

1    the Abbrevo?

2              MS. MARIGLIANO:   Object to the form.

3              THE WITNESS:   I believe any criticism that

4         I have of the mesh of TVT-O would be the same

5         criticisms that I would have of it for the

6         Abbrevo.   I believe that since it's not as long,

7         that there's a potential for less contraction

8         and less kind of stretching out and curling and

9         roping of the sling, which would be a positive

10        for Abbrevo.

11        Q.    (By Ms. Maimbourg)   So when you were

12   implanting the AMS devices, before they were removed

13   from the market, they are polypropylene mesh slings,

14   right?

15        A.    Correct.

16        Q.    And you didn't have any safety concerns

17   about implanting that polypropylene mesh, did you?

18        A.    No.

19        Q.    Do you know anything about the difference

20   between the polypropylene in -- in that Sparc sling

21   and the polypropylene in any of the Ethicon products?

22        A.    No.

23        Q.    Now, in terms of the Abbrevo being a safer

24   option, I know you relied on certain company

Robert D. Moore, D.O.

Page 132

1    Q.    Do you agree that a manufacturer does not

2    need to tell a surgeon about the basics of sterile

3    technique when doing surgery?

4    A.    No, that would be inherent to their

5    training.

6    Q.    So we don't -- and Ethicon doesn't have to

7    tell surgeons to wash their hands, because if they

8    don't, it could cause a fatal infection, right?

9    A.    Correct.

10    Q.    And manufacturers don't have to tell

11    surgeons that they need to consider the type of

12    anesthesia that the patient has to have before

13    surgery?

14    A.    Correct.

15    Q.    And a manufacturer doesn't have to tell a

16    surgeon about the different risks of different

17    surgical positions a patient could be put in?

18    A.    No, I disagree with that one, because

19    specifically if the position is critical for

20    placement of that product or procedure that is going

21    to make it safer or decrease risk of complications,

22    then yes, they are -- they should be responsible for

23    relaying that information to physicians.

24    Q.    You state in your report that a physician

Robert D. Moore, D.O.

Page 133

1    must be warned of a frequent -- of the frequency,

2    severity, duration, and potential permanence of

3    adverse events by a manufacturer.  That is your

4    opinion, correct?

5         A.    Yes.

6         Q.    What is the basis for your opinion that a

7    manufacturer should warn of frequency, severity,

8    duration, and potential permanence?

9         A.    I think it's the surgeon's right to have

10   that information at their hands, to be able to offer

11   treatments and be forthcoming and forthright to their

12   own patients, so that the patients can understand the

13   risks and complications of any procedure they may be

14   undergoing.  So if that information is available to a

15   manufacturer, then certainly it needs to be relayed

16   to the physician and patients.

17        Q.    When you were a consultant for AMS, did

18   you advocate that position to them?

19        A.    Yes.

20        Q.    And did they put frequency, severity,

21   duration, and potential permanence into their IFU?

22              MS. MARIGLIANO:  Object to the form.

23              THE WITNESS:  I don't know about that.  I

24       know during any type of professional education

Robert D. Moore, D.O.

Page 134

1          training that I did for them, we certainly

2          relayed all of that information to the

3          physicians.

4          Q.    (By Ms. Maimbourg)  Right, so a

5     manufacturer can pass on information in ways other

6     than in the IFU, right?

7          A.    Sure, but you weren't asking me initially

8     whether it was just in the IFU.  You said, should

9     they give this information.

10         Q.    Okay.  My fault.  So just so I'm clear

11    you're not saying that the IFU, to be adequate, must

12    include frequency, severity, duration, and potential

13    permanence of adverse events?

14         A.    I am saying, yes, it should be included in

15    the IFU.

16         Q.    All right.  And my question to you, then,

17    is, when you were at -- when you were assisting AMS

18    as a consultant, are you aware of whether AMS ever

19    included that type of this information in the IFUs

20    for its sling products?

21         A.    I'm not aware specifically.  I don't

22    recall the IFU details specifically.

23         Q.    And since you've read all the literature

24    in that big binder before you, what should those

Robert D. Moore, D.O.

Page 135

1   numbers in the IFU be today for, let's say, the TVT

2   retropubic as to the frequency of anything you want

3   to pick right now, any adverse event?

4            MS. MARIGLIANO:  Object to the form.

5            THE WITNESS:  I think that it needs to be

6        basically consistent with what's in the

7        literature, what's in -- within the Cochrane

8        reviews, the meta analysis, their own internal

9        studies, their own documents.  They've got

10       internal studies that haven't been published

11       before.

12            So whatever information they have, they

13       should produce that, risk of mesh extrusion for

14       the retropubic TVT seems to be generally in the

15       range of 1 to 2.5 percent.  That should be

16       listed.  So any of that information that's

17       there, it should be in there.

18       Q.   (By Ms. Maimbourg)  You would agree,

19   though, that the literature is quite varied as to

20   how -- strike that.

21            You would agree with me that if you were

22   going to go look for the frequency of a particular

23   adverse event in the medical literature, you would

24   find a variety of numbers?

Robert D. Moore, D.O.

Page 136

1    A.    Sure.  So they probably should include a

2  variety of numbers, from 1 percent to 30 percent.

3    Q.    That's your opinion?

4    A.    Yes.

5    Q.    Is it your opinion that the Instructions

6  For Use should include a statement about mesh

7  degradation?

8         MS. MARIGLIANO:  Object to the form.

9         MS. MAIMBOURG:  Can you tell me how I can

10        cure that objection?

11        MS. MARIGLIANO:  You said how -- number

12        one, I don't think he's offering any opinions

13        about degradation.

14        MS. MAIMBOURG:  Okay.  If he's not, then

15        that's swell.

16    Q.    (By Ms. Maimbourg)  Are you offering any

17  opinions about degradation?

18    A.    No.

19    Q.    Are you offering any opinions about

20  excessive and chronic foreign body reaction?

21    A.    Where are we looking at right now, or are

22  we?

23    Q.    I'm just asking, in general, are you going

24  to give expert opinions about polypropylene mesh used

Robert D. Moore, D.O.

Page 137

1    in TVT-O, causing excessive and chronic foreign body

2    reaction?

3         A.    Only in relation to any type of chronic

4    inflammatory effects, scarring, that occurs that

5    would ultimately create pain from nerve or muscle

6    damage.

7         Q.    Are you saying that should be in the IFU?

8         A.    I think if they have evidence of a chronic

9    inflammatory response, and not a transitory

10   inflammatory response, then that should be included

11   in the IFU, yes.

12        Q.    And based on everything you've reviewed,

13   did Ethicon have that evidence?

14        A.    Yes.

15        Q.    And is what -- the evidence they had, is

16   it included in your report at page 30?

17        A.    Yes.  Or actually, probably, I think it's

18   on the next page as well.

19        Q.    So you're quoting testimony from Piet

20   Hinoul and Charlotte Owens.  Is there anything else

21   that you're relying on for your opinion?

22        A.    I think that if you get to like tab number

23   20, on page 33, it gets into more of some of the

24   different studies that were both in their internal

Robert D. Moore, D.O.

Page 138

1   documents, as well as meetings with Klosterhalfen,

2   who Professor Klosterhalfen was one of their

3   consultants, but did a lot of publishing in the

4   literature about chronic inflammatory reactions, mesh

5   contraction, and subsequent issues with pain and

6   nerve entrapment.

7        Q.    On page 32, you talking about the 2015

8   Instructions For Use?

9        A.    Yes.

10       Q.    With respect to TVT-O, correct?  And you

11  say, all of these risks were known to Ethicon before

12  2015?

13       A.    Uh-huh.

14       Q.    Is that a yes?

15       A.    I'm sorry, yes.

16       Q.    Can you say that these risks were not

17  known to doctors before 2015, can you say that?

18             MS. MARIGLIANO:  Object to the form.

19             THE WITNESS:  I can say that some of these

20        risks were probably not known to some or many

21        doctors.

22       Q.    (By Ms. Maimbourg)  Some doctors knew them

23  all, right?

24             MS. MARIGLIANO:  Object to the form.

Robert D. Moore, D.O.

Page 139

1          THE WITNESS:  Yes.

2          Q.    (By Ms. Maimbourg)  You knew them all

3    before they were put in the IFU, right?

4          A.    Yes.

5          Q.    Have you done any surveys of doctors, or

6    do you have any kind of base of knowledge to know

7    what doctors who are implanting slings know or don't

8    know?

9          A.    Only based upon my experience of training

10   and professional education of hundreds of doctors at

11   various levels, in talking with them, and figuring

12   out what they know and don't know, but no formal

13   surveys, no.

14         Q.    Is the 2015 IFU for TVT-O adequate, in

15   your opinion?

16         A.    I think the only thing that I would add to

17   this would be the fact that it talks about needing

18   multiple surgeries to remove the mesh, but it doesn't

19   talk about the fact that it could be impossible to

20   remove all the mesh, and that should be noted.

21         Q.    Anything else to make it adequate?

22         A.    I would also say the mesh is a permanent

23   implant, significant dissection may be -- as a

24   continuation of the -- the line that says, the mesh

Robert D. Moore, D.O.

Page 140

1    is a permanent implant, and significant dissection

2    may be required if the mesh needs to be removed.

3    That could cause -- that this could cause, you know,

4    permanent -- even more permanent, more pain, and more

5    nerve damage that's permanent to the leg.   In

6    addition, saying that there's no guarantee that all

7    the mesh can be removed, or any of the complications

8    caused by the mesh would be reversed by some -- a

9    major operation like that.

10         Q.    Anything else?

11         A.    I don't believe so.

12         Q.    So in this section of the report, you have

13   many things that -- and I don't have the time to

14   actually go through every one of them, that Ethicon

15   should have warned about.   And I want to be clear,

16   are you saying that warning should have come in the

17   Instructions For Use?

18         A.    Yes.

19         Q.    And if a doctor had gone through Ethicon

20   training, and had learned it in training, but it was

21   not in the IFU, would you feel that Ethicon had met

22   its duty to warn?

23              MS. MARIGLIANO:   Object to the form.

24              THE WITNESS:   No, because not all

CERTIFICATE

STATE OF GEORGIA:

COUNTY OF CLAYTON:

I, F. Renee Finkley, a Certified Court Reporter in and for the State of Georgia, do hereby Certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth.

That said deposition was taken before me at the time and place set forth and was taken down by me in shorthand and thereafter reduced to computerized transcription under my direction and supervision, and I hereby certify the foregoing deposition is a full, true and correct transcript of my shorthand notes so taken.

I further certify that I am not of kin or counsel to the parties in the case, and I am not in the regular employ of counsel for any of the said parties, nor am I in any way financially interested in the result of said case.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 18 day of April, 2016.

_____

F. Renee Finkley, RPR, RMR, CRR, CLR
Georgia CCR-B-2289