# EXHIBIT G

Brian J. Flynn, M.D.

1                IN THE UNITED STATES DISTRICT COURT

2               FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                        CHARLESTON DIVISION

4        _____

5        IN RE:  ETHICON, INC. PELVIC REPAIR SYSTEMS PRODUCTS

6        LIABILITY LITIGATION

7        _____

8        MASTER FILE NO. 2:12-MD-02327        JOSEPH R. GOODWIN

                                             U.S. DISTRICT JUDGE

9        MDL NO. 2327

10       _____

11       GENERAL CAUSATION RE:  TVT-RETROPUBIC

12       _____

13

14

15               PURSUANT TO NOTICE, the deposition of BRIAN

16       J. FLYNN, M.D. was taken on behalf of the Plaintiffs

17       at Denver Marriott West, 1717 Denver West Boulevard,

18       Golden, Colorado on April 19, 2016, commencing at

19       1:08 p.m., before Melanie L. Giamarco, Registered

20       Merit Reporter, Certified Realtime Reporter, and

21       Notary Public within Colorado.

22

23

24                    GOLKOW TECHNOLOGIES, INC.

                 877.370.3377 ph | 917.591.5672 fax

25                        deps@golkow.com

Brian J. Flynn, M.D.

|  | Page 2 |
| --- | --- |
| 1 | A P P E A R A N C E S |
| 2 | |
| | For the Plaintiffs: |
| 3 | JOSEPH ZONIES, ESQ. |
| | GREG BENTLEY, ESQ. |
| 4 | ZONIES LAW, LLC |
| | 1900 Wazee Street, Suite 203 |
| 5 | Denver, Colorado 80202 |
| | Jzonies@zonieslaw.com |
| 6 | |
| 7 | For the Defendants Ethicon and Johnson & Johnson: |
| | KIM M. SCHMID, ESQ. |
| 8 | JENNY A. COVINGTON, ESQ. |
| | BOWMAN AND BROOKE, LLP |
| 9 | 150 South Fifth Street |
| | Suite 3000 |
| 10 | Minneapolis, Minnesota 55402 |
| | kim.schmid@bowmanandbrooke.com |
| 11 | jenny.covington@bowmanandbrooke.com |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | Page 3 |
| --- | --- |
| 1 | I N D E X |
| 2 | EXAMINATION OF BRIAN FLYNN, M.D.      PAGE |
| | April 19, 2016 |
| 3 | |
| | By Mr. Zonies                        6, 134 |
| 4 | By Ms. Schmid                        124 |
| 5 | EXHIBITS |
| | INITIAL |
| 6 | NUMBER      DESCRIPTION      REFERENCE |
| 7 | Exhibit 1   Amended Notice to Take      6 |
| | Deposition of Brian Flynn, M.D. |
| 8 | |
| 9 | Exhibit 2   Invoice for 1/1/15 through      9 |
| | 8/31/15 indicating hours worked |
| | preparing TVT-Retropubic report |
| 10 | by Dr. Flynn |
| 11 | Exhibit 3   Invoice for 9/1/15 through      10 |
| | 9/30/15 indicating hours worked |
| 12 | preparing TVT-Retropubic report |
| | by Dr. Flynn |
| 13 | |
| | Exhibit 4   Expert report prepared by Dr.      11 |
| 14 | Flynn entitled: Expert Overview |
| | of TVT |
| 15 | |
| | Exhibit 5   USB drive labeled "TVT"      12 |
| 16 | |
| | Exhibit 6   E-mail chain ending 12/19/11      21 |
| 17 | from Dr. Flynn to Jonathan |
| | Fernandez |
| 18 | ETH.MESH08005683 - |
| | ETH.MESH08005684 |
| 19 | |
| | Exhibit 7   E-mail string ending 3/5/4 from      45 |
| 20 | Brian Luscombe to Lori Campbell, |
| | et al., one page, subject: |
| 21 | Dr. Brian Flynn |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | Page 4 |
| --- | --- |
| 1 | EXHIBITS (Continued) |
| | INITIAL |
| 2 | NUMBER      DESCRIPTION      REFERENCE |
| 3 | Exhibit 8   University of Colorado Denver      51 |
| | Schools of Dental Medicine, |
| 4 | Medicine, Nursing, Public Health |
| | and Pharmacy and the Health |
| 5 | Sciences Library Policy to Limit |
| | Conflicts of Interest Between |
| 6 | Health Care Professionals and |
| | Industry Representatives, May |
| 7 | 27, 2008 |
| 8 | Exhibit 9   Article titled: Degradation of      74 |
| | polypropylene in vivo: A |
| 9 | microscopic analysis of meshes |
| | explanted from patients |
| 10 | |
| | Exhibit 10  Abstract prepared by Dr. Flynn,      81 |
| 11 | et al., titled: Bacteriological |
| | Analysis of Explanted |
| 12 | Transvaginal Meshes |
| 13 | Exhibit 11  Study prepared by K. Tzartzeva,      84 |
| | et al., titled In-Depth |
| 14 | Nano-Investigation of Vaginal |
| | Mesh and Tape Fiber Explants in |
| 15 | Women |
| 16 | Exhibit 12  Article published in      87 |
| | International Urogynecology |
| 17 | Journal by P. Moalli, et al., |
| | titled: Tensile properties of |
| 18 | five commonly used midurethral |
| | slings relative to the TVT |
| 19 | |
| 20 | Exhibit 13  Article published in      101 |
| | International Urogynecological |
| 21 | Journal by Dr. Flynn titled: |
| | Surgical management of lower |
| 22 | urine mesh perforation after |
| | midurethral polypropylene mesh |
| 23 | sling: Mesh excision, urinary |
| | tract reconstruction and |
| 24 | concomitant pubovaginal sling |
| | with autologous rectus fascia |
| 25 | |

|  | Page 5 |
| --- | --- |
| 1 | EXHIBITS (Continued) |
| | INITIAL |
| 2 | NUMBER      DESCRIPTION      REFERENCE |
| 3 | Exhibit 14  TVT-Retropubic instructions for      113 |
| | use, dated 1/15 |
| 4 | |
| | Exhibit 15  Internal Ethicon document      119 |
| 5 | titled: Things to consider as |
| | we assess next steps for a next |
| 6 | generation sling |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Brian J. Flynn, M.D.

Page 6

1     P R O C E E D I N G S
2          BRIAN J. FLYNN, M.D.,
3    after having been duly sworn, was examined and
4    testified as follows:
5               EXAMINATION
6    BY MR. ZONIES:
7          Q. Good afternoon, Dr. Flynn. How are you
8    today?
9          A. Very good, Mr. Zonies.
10         Q. As you know, Dr. Flynn, I represent
11   plaintiffs in this litigation, and we're here today
12   to take your deposition primarily about the
13   TVT-Retropubic sling; is that your understanding?
14         A. That is.
15         MR. ZONIES: And I'll go ahead and mark as
16   Exhibit 1 the notice of deposition as amended to
17   show today's date.
18         (Exhibit 1 was marked for identification.)
19         Q. (By Mr. Zonies) Have you seen that
20   notice of deposition before?
21         A. I have.
22         Q. And attached to that notice is a request
23   for certain documents that might be in your
24   possession, custody or control.
25         Did you bring any documents in response to

Page 7

1    that subpoena today?
2          A. Yes, I have.
3          Q. And what did you bring with you?
4          A. Okay. So I brought some e-mails that
5    I've had in communication with Ethicon, J&J.
6          Q. And are these e-mails e-mails that we
7    have previously marked in your earlier depositions?
8          A. That's correct. There is nothing new or
9    different from the TVT-Secur or TVT-Obturator.
10         Q. Okay. And what else did you bring?
11         A. This is a contract that you've seen
12   previously.
13         Q. Okay. Thank you. Anything else?
14         A. This is a fee schedule.
15         Q. Is this the same fee schedule we've
16   previously marked as well?
17         A. Correct.
18         Q. All right.
19         A. This is my CV. And that hasn't been
20   changed.
21         Q. So the same CV that we marked in your
22   prior depositions?
23         A. Yes. This is trial and deposition
24   history up until -- not including this recent
25   round, so that hasn't been updated or changed since

Page 8

1    the last time I submitted it.
2          Q. Right. So the last testimony on here is
3    the Perry case in --
4          A. That's correct.
5          Q. -- California, correct?
6          A. Yes. This is the notice of deposition,
7    what you've just shown me as Exhibit 1.
8          Q. Okay.
9          A. Would you like that?
10         Q. Sure. I'll just keep a stack here.
11         A. Then this is new. These are my invoices
12   on TVT. So there's two invoices here.
13         Q. Before we get to that, then, Doctor,
14   everything you've just handed me prior to your
15   invoices on TVT-Retropubic, we have previously
16   marked in your earlier depositions.
17         MR. ZONIES: And Counsel, I will just say
18   we'll incorporate those exhibits from those
19   depositions rather than remark them all, if that's
20   okay?
21         MS. SCHMID: Certainly. To the extent
22   they've been previously marked, that's no problem.
23         MR. ZONIES: Okay. Great.
24         Q. (By Mr. Zonies) And you said you have
25   something new, Doc?

Page 9

1          A. So these two binders in front of me are
2    new. They contain articles that I've used in
3    formulating my opinions. They contain my reliance
4    list. They contain my TVT report, so similar to
5    the other depositions. And I have, you know, a
6    bibliography of my report and reliance list here
7    that I use for convenience.
8          Q. Okay. So could I see the invoices,
9    please?
10         MR. ZONIES: And we'll go ahead and mark
11   these invoices Exhibit 2 and 3.
12         (Exhibits 2 and 3 were marked for
13   identification.)
14         Q. (By Mr. Zonies) Doctor, I'm going to
15   hand you what's been marked as Exhibit 2. Could
16   you describe what that is, please?
17         A. This is Exhibit 2. It says "TVT
18   Report." It has hours worked on this report which
19   includes 15 hours to prepare the report at $500 an
20   hour, and then there's a total of $7,500.
21         Q. And Doctor, does that represent all of
22   the work that you did in the preparation of your
23   TVT-Retropubic report for this case?
24         A. No, this was just for a two-month
25   period, July and August of 2015.

Brian J. Flynn, M.D.

Page 10

1    Q. Did you perform any work related to your
2    TVT-Retropubic report prior to August of 2015?
3        A. No, I did not.
4        Q. And I'm going to hand you Exhibit 3.
5    This appears to be an invoice subsequent to
6    Exhibit 2 for the September time frame; is that
7    right?
8        A. Yes. It's for the month of September
9    2015, 19 hours times $500 for a total of $9,500.
10       Q. So between those two invoices, there are
11   24 hours total for preparation of your report; is
12   that correct?
13       A. Thirty-four.
14       Q. Thank you. Thirty-four. Told you,
15   math -- I object when people try to do math.
16   That's why.
17       So between those two invoices, Doctor, are
18   34 total hours for the preparation of your report
19   in this case, correct?
20       A. That's correct.
21       Q. Other than those 34 hours, is there any
22   other time that you spent on preparation of your
23   report, your TVT-R report?
24       A. Of the report, no.
25       Q. And then your report was -- let me go

Page 11

1    ahead and mark your report.
2        (Exhibit 4 was marked for identification.)
3        Q. (By Mr. Zonies) I'm handing you what's
4    being marked as Exhibit 4. Can you confirm for me,
5    please, Doctor, that that's the report that you
6    issued in this case concerning the TVT-Retropubic
7    device?
8        A. This looks like a 46-page report, and it
9    was signed by me on February 26. And it looks to
10   be the same report. Without going through every
11   page, it would be hard to say, but I got to believe
12   it's the same report here.
13       Q. Okay. And if you see something that's
14   different, let me know. But it's my understanding
15   that this is what was issued as your report in
16   February of 2016, okay?
17       A. Okay.
18       Q. The last time --
19       A. I do have one other thing to submit.
20       Q. Oh, sure.
21       A. Is a USB thumb drive. And this is
22   labeled "TVT." What's on here would be things that
23   aren't in these binders. So I try to do the best I
24   can to avoid duplication. So there's some Ethicon
25   documents on this USB, including IFUs. There are

Page 12

1    some PowerPoint presentations on TVT that have been
2    shared with me or that I have given on behalf of
3    Ethicon.
4        Q. Okay. Why don't we go ahead and mark
5    that, then, Doctor, as Exhibit 5.
6        (Exhibit 5 was marked for identification.)
7        Q. (By Mr. Zonies) Anything else that you
8    brought with you today, Doctor?
9        A. That's all I have.
10       Q. And in the binder that you have in front
11   of you, Doctor, you said that there are -- how
12   would you describe what's in the binder? Your
13   report, and what else?
14       A. Okay. So starting at the beginning is
15   the report, then there's a reliance list. It's
16   labeled "MDL Wave 1," and that was printed
17   March 2nd, 2016. And there's a list of expert
18   reports at the end of that. Then there is a total
19   of 74 tabs that have articles that I referenced in
20   my report, so that's these two binders.
21       In addition to that, there's two
22   bibliographies, one for the TVT general report
23   that's listed in numeric order, and then the same
24   list is there in alphabetical order.
25       Q. Anywhere in that binder, Doctor, are

Page 13

1    there materials that are not on your reliance list?
2        A. I don't believe so.
3        Q. So each of those tabs represents the
4    footnote in your report and the materials that you
5    referenced in that footnote in your report?
6        A. That's correct.
7        Q. Is it complete? In other words, does
8    that have all of the material that would be
9    referenced in a footnote in your report?
10       A. Yes. It has the first author's name.
11   It has the title. It has the year and the page
12   number.
13       Q. And for each of the tabs, if I asked you
14   to turn to -- if tab 10, for example, or footnote
15   10 had three references, and you turned to footnote
16   10, would all three of those references necessarily
17   be in those binders?
18       A. Well, each tab only has one reference,
19   so we didn't put multiple references under one tab.
20       Q. Gotcha. So the tabs are just the items
21   that you referenced in your report, but not
22   multiple references for a single footnote, for
23   example?
24       A. So if there was a single footnote, there
25   may be a blank tab. So for example, 17 and 21 is

Brian J. Flynn, M.D.

Page 14

1   the Ulmsteen reference, so it would only be in here
2   once. It would be here under 17, but then when I
3   hit the 21 tab, you know, that's blank.
4       Q. So for example, what is under tab 23?
5   Or what would you have -- for footnote 23, how
6   would you find those materials in those binders?
7       A. I see. So if I went to my report and my
8   report says footnote 23, that's an Ethicon
9   document, which is Bates number ETH-MESH9275943-45,
10  then I go to my tab number 23, it has the same
11  Bates number. And, you know, the article or the
12  e-mail or the internal document, however you want
13  to describe it, is there.
14      Q. And what do you have -- you see footnote
15  23 has a semicolon and then says "Axel Arnault
16  deposition testimony"?
17      A. So that's what it says here under my
18  reference. So in the body of the report, it says
19  "TVT offered laser cut or mechanical cut, reference
20  Number 23." You look down on the bottom of page
21  13, "Axel Arnault deposition," so when I go to 23,
22  there's an e-mail there with respect to some
23  internal communication.
24      Q. But there's nothing there that is Axel
25  Arnault deposition testimony, correct?

Page 15

1       A. That's correct.
2       Q. And, in fact, you've never read Axel
3   Arnault's deposition, have you?
4       A. I've never read it.
5       Q. So that citation in footnote 23 in your
6   report where you're citing to Axel Arnault's
7   deposition testimony, you've never actually red
8   Axel Arnault's deposition testimony, correct?
9       A. That's correct.
10      Q. And so that's incorrect. You would
11  change that in your report now?
12      A. Yeah, that could have been done better.
13      Q. Well, it could have been done
14  truthfully, right? You've never read it.
15      MS. SCHMID: Objection; form, argumentative.
16      A. I've never read it.
17      Q. (By Mr. Zonies) Right. So in reality,
18  that citation's incorrect, and you've never read
19  that testimony, so that should be stricken from
20  your report, correct?
21      MS. SCHMID: Objection; form, argumentative.
22      A. I've never read the report. I don't
23  know the realities of whether it should be stricken
24  or not stricken.
25      Q. (By Mr. Zonies) Well, did you actually

Page 16

1   cite to it? I don't know how it got in there if
2   you've never read it.
3       A. I may have had some confusion when I was
4   preparing the report, but as I mentioned earlier in
5   the deposition, I have not read the report.
6       Q. And it's not on your reliance materials
7   either, is it?
8       A. Well, the reliance list and the report
9   may have some overlap, but I didn't take all the
10  articles on the report and then duplicate them in
11  the reliance list. The reliance list has articles
12  that maybe weren't cited in the report.
13      Q. Now, according to your invoices, Doctor,
14  you were finished with your -- this report,
15  Exhibit 4, by the end of September of 2015,
16  correct?
17      A. Correct.
18      Q. Did you make any modifications to that
19  report between September of 2015 and February of
20  2016 when it was issued?
21      A. No substantive changes. So there may
22  have been some grammatical errors or typographical
23  errors that may have been changed, some formatting,
24  but nothing regarding to the content.
25      Q. Subsequent to September of 2015 and

Page 17

1   before issuance of your report, did you come into
2   possession of any new materials that would have
3   impacted your report in any way, shape or form?
4       A. I don't believe so.
5       Q. You gave us a thumb drive which has been
6   marked as Exhibit 5. On that thumb drive, you say
7   there are additional Ethicon internal documents and
8   some PowerPoints provided to you and copies of
9   PowerPoints of presentations that you've given as
10  well; is that correct?
11      A. Correct.
12      Q. Did you receive those materials
13  subsequent to completing your report?
14      A. I don't believe so. I'd have to go back
15  and take a look at that, but certainly, everything
16  on there I've seen many times. The PowerPoints are
17  quite old PowerPoints. And the IFU, certainly I've
18  seen the IFU. You know, for more than ten years,
19  I've read that, you know, as part of my practice,
20  similar to the PowerPoints. Those are ones that I
21  have given personally, many of them. So I'm very
22  familiar with them. When I put them on the USB, or
23  maybe I received a copy for convenience more
24  recently, but these are things that I've received
25  before.

Brian J. Flynn, M.D.

Page 18

1    Q.  Okay.  The presentations that you've
2  given that are on the thumb drive, do some of those
3  presentations have to do with the TVT-Retropubic?
4    A.  Yeah, I only put ones that were
5  TVT-Retropubic.  And the other depositions I try to
6  separate the PowerPoints based on the product.
7    Q.  You've had the opportunity to -- you
8  were on the Ethicon speaker bureau; is that
9  right?
10    A.  I was part of the speaking bureau,
11  however you want to describe that.  I was a
12  consultant for Ethicon from 2004 to around 2011.
13    Q.  And during that period of time, from
14  2004 to 2011, as a member of the speaker's bureau
15  for Ethicon, you had the opportunity to give a
16  number of talks about Ethicon's devices, correct?
17    A.  Correct.
18    Q.  And in giving those talks, sometimes you
19  were provided the slide decks or the materials for
20  the talk by Ethicon, correct?
21    A.  Correct.
22    Q.  And when Ethicon gave you those
23  materials, generally, you were not permitted to
24  alter those materials in any way, correct?
25    A.  Correct.

Page 19

1    Q.  And if you did make an alteration, it
2  had to be approved by Ethicon, correct?
3    A.  If it was going to be used at an Ethicon
4  event.
5    Q.  And do you believe that you gave any of
6  those talks in 2011 using Ethicon's slide decks?
7    A.  Not on that USB.  That USB pertains to
8  TVT-Retropubic.  In 2011, any talks I would have
9  given or projects I was involved in pertained to
10  TVT-Exact and TVT-Abbrevo.
11    Q.  When do you think, without -- I can open
12  up the thumb drive.  I'll do that on a break.
13    But do you have a sense of when the last
14  time it was that you gave a talk using an Ethicon
15  slide deck related to the TVT-Retropubic device?
16    A.  Specific to the device, it would have
17  been much earlier than that, probably around 2004
18  or 2005, but realizing as the new products came
19  out, the TVT was always the predicate device, so
20  many of the later talks, say, were on TVT-Exact,
21  but there was a lot of slides that overlapped,
22  slides that I had seen before.  So we can answer
23  that question a couple different ways.
24    In a 2011 presentation, there may have been
25  a few slides that were used in earlier TVT-specific

Page 20

1  presentations, but now they're included in a
2  TVT-Exact or TVT-Abbrevo, especially with regards
3  to the mesh and the materials science.  If it was
4  the same mesh, then a lot of the slides were very
5  similar.
6    Q.  So certainly, in the time frame -- well,
7  strike that.
8    When did you first start to use TVT-Exact?
9    A.  TVT-Exact I started to use probably when
10  it was launched, which I believe was around 2010 or
11  2011.  I was part of the launch.  I did go to
12  Baltimore for the launch.  There was a cadaver lab
13  there, and then I did the first TVT-Exact case in
14  Colorado.
15    Q.  So in the 2010-2011 time frame, you had
16  the opportunity to -- as a member of the Ethicon
17  speaker's bureau, to give talks to physicians about
18  the TVT-Exact device, and those talks would have
19  included information about the TVT-Retropubic as
20  well, correct?
21    A.  That's correct.
22    Q.  And you would have given those talks
23  using Ethicon's preapproved slide deck; is that
24  correct?
25    A.  At Ethicon-approved events, yes.

Page 21

1    Q.  And in addition to being on the
2  speaker's bureau, you are acting today in a
3  capacity as an expert witness for Ethicon; is that
4  correct?
5    A.  That's correct.
6    Q.  And you have been acting as an expert
7  witness for Ethicon in either a disclosed or a
8  consulting capacity since when?
9    A.  Probably sometime in around 2012.
10    Q.  So since -- Doctor, I'll go ahead and
11  hand you what I'm marking as Exhibit 6.
12    (Exhibit 6 was marked for identification.)
13    Q.  (By Mr. Zonies)  Doctor, Exhibit 6 is an
14  e-mail from Brian Flynn to Jonathan Fernandez,
15  dated December 19th, 2011; is that right?
16    A.  Yes.
17    Q.  This is an e-mail that you sent to an
18  Ethicon employee in December of 2011, correct?
19    A.  That's correct.
20    Q.  Who is Jonathan Fernandez?
21    A.  He was the professional education
22  manager in the western United States.  And he also
23  was a former representative for Ethicon locally.
24  So he -- I knew him in a number of different
25  capacities.

Brian J. Flynn, M.D.

Page 22

1    Q.  You knew Mr. Fernandez first as your
2   sales rep.  He would come to your offices as a
3   sales representative, correct?
4    A.  That's correct.
5    Q.  And then he moved his way into
6   professional education at Ethicon, correct?
7    A.  That's correct.
8    Q.  And you continued to have a relationship
9   with him in that capacity because he would work
10  with you on professional education events, correct?
11   A.  Correct.
12   Q.  And in this e-mail to Mr. Fernandez, you
13  write, "As of December 2011, all is well with me,
14  although my practice is really changing from mesh
15  kits to Biologicals, ASC and spending time trying
16  to help defend J&J in a class action lawsuit versus
17  Prolift PS."  Did I read that correctly?
18   A.  Yes.
19   Q.  And is that what you were spending time
20  doing in December of 2011?
21   A.  Yes.  I was getting -- at that point, I
22  was having conversations with them in regards to
23  these items.
24   Q.  And so you testified that you believe
25  you were first consulting as an expert sometime in

Page 23

1   2012.  This seems fairly consistent with that, is
2   that right, that in the end of 2011, beginning of
3   2012, you were consulting for Ethicon can as an
4   expert?
5    A.  That's correct.
6    Q.  Did you think you started consulting
7   with Ethicon as an expert shortly after or
8   overlapping with when the last time that you acted
9   as a consultant or a speaker on the speaker's
10  bureau?
11   MS. SCHMID:  Objection; form, vague.
12   A.  I'm not certain, but pretty close in and
13  around those dates.
14   Q.  (By Mr. Zonies)  You have testified
15  previously that you were a consultant for Ethicon
16  pretty much from 2004 through 2012, I think you've
17  said before -- well, strike that.
18   So would it be fair to say that you first
19  started consulting with Ethicon in or around 2004?
20   A.  Yes.
21   Q.  And that you consulted or worked on the
22  speaker's bureau and also on the launch of a number
23  of devices up and through sometime in 2011,
24  correct?
25   A.  Correct.

Page 24

1    Q.  And then in 2011, you started working
2   with Ethicon as a consultant on the litigations,
3   correct?
4    A.  Correct.
5    Q.  And you continue to do that to this day,
6   correct?
7    A.  Correct.
8    Q.  So you've effectively been a consultant
9   working with Ethicon from 2004 all the way through
10  today; is that fair?
11   MS. SCHMID:  Objection; vague, compound.
12  Go ahead.
13   A.  Like I mentioned, I think 2004 to 2011,
14  my consulting was directly with Ethicon as a
15  speaker's bureau person and other capacities, and
16  after '11 it was more surrounding the litigation.
17   Q.  (By Mr. Zonies)  In the next sentence
18  you say, "Ultimately I suspect J&J will pay out
19  millions."  Is that what you wrote?
20   A.  Yes, that's what I wrote.
21   Q.  Was that your opinion at the time in
22  2011?
23   A.  It may have been.
24   Q.  Do you have a sense of why that was your
25  opinion?

Page 25

1    A.  When I was in New York City, I did a
2   course there at NY University.  I was asked to give
3   a number of talks.  And it just seemed like the
4   medical-legal climate that was in New York was
5   going to possibly spread to other parts of the
6   country.  And so this was after the FDA Public
7   Health Notification, after the second one, and so
8   certainly, there was a lot of talk that I would
9   hear at meetings and other places about lawsuits
10  and the potential for class-action lawsuits.
11   Q.  Can you help us out and get them to do
12  that, by the way?
13   A.  Do what?
14   Q.  Pay out millions.
15   A.  That's not my role here.
16   MS. SCHMID:  Objection; form.
17  Go ahead.  Next question.
18   MR. ZONIES:  I thought I'd try, though.
19   Q.  (By Mr. Zonies)  When the Exact
20  launched, the Exact allows a retropubic approach,
21  correct?
22   A.  Correct.
23   Q.  Did you favor the Exact over the
24  TVT-Retropubic?
25   A.  Yes.

Brian J. Flynn, M.D.

Page 26

1    Q. Why?
2    A. Mostly for ease of use.  It allowed only
3  one cystoscopy as opposed to two, so because of the
4  new design with the plastic cannula, you were able
5  to pass the trocar on both sides and then perform a
6  single cystoscopy, where with the retropubic kit,
7  you weren't able to do that because there was no
8  cannula.  There was just a metal trocar, and then
9  there was a permanent device called the TVT
10  Introducer that would get attached to the
11  cannula -- to the trocar, and that could only be
12  used on one side at a time.
13    So it was mostly because of that reason that
14  I was able to do the case with performing one
15  cystoscopy instead of two.  Also, the TVT
16  Introducer that was used to hold the trocar on the
17  original kit, you know, sometimes was hard to
18  locate.  It wasn't something that J&J offered.  It
19  was a permanent tool that the hospitals would have,
20  and operating out of a number of different ORs, I
21  always felt more confident when I had everything in
22  the kit compared to having to rely on some reusable
23  instruments.  So most surgeons for that reason
24  preferred the TVT-Exact product.
25    Q. Did you find that because you only had

Page 27

1  to do one cystoscopy that your surgeries were
2  shorter?
3    A. It would save approximately five to ten
4  minutes.
5    Q. And that's a benefit to the patients,
6  correct?
7    A. Yes.
8    Q. Did you have concerns when you had to
9  use a reusable introducer that there would be
10  sterility issues?
11    A. No.  No, it's the same as what you would
12  experience with any reusable instrument or scissors
13  or forceps, hemostats.  We reuse overwhelmingly the
14  majority of instruments we do in an operation.
15    Q. When you switched over to the TVT --
16  well, I guess my question is, did you -- when the
17  Exact came out, did you switch over almost
18  exclusively to the Exact as compared to the TVT-R?
19    A. For my retropubic cases, yes.
20    Q. So probably the last time you put in a
21  TVT-R would be sometime in 2009 or 2010, whenever
22  the Exact came to market?
23    A. Correct.
24    Q. So the last time that you've actually
25  used the TVT-Retropubic device is approximately six

Page 28

1  years ago?
2    A. Sometime around 2010 or 2011 I think is
3  when TVT-Exact came out, so whenever that date was.
4    Q. Is cystoscopy required when using the
5  TVT-Retropubic?
6    A. It is.
7    Q. Are two cystoscopies required, in your
8  opinion, when using the TVT-Retropubic device?
9    A. As many as you need to.  Any time you
10  have to repass the trocar or pass the trocar for
11  the first time, what it recommends in the IFU is
12  that a cystoscopy be performed.
13    Q. But in your opinion, it's not just a
14  recommendation, it's necessary.  It should be done,
15  correct?
16    A. In my opinion, yes.  And that's what I
17  teach to my residents.  That's what I do in my own
18  practice.
19    Q. That's what should be in the IFU, right?
20  It should say "cystoscopy is required"?
21    MS. SCHMID:  Objection; form, argumentative,
22  scope.
23    Go ahead.
24    A. I think that that is just part of basic
25  fundamental surgical knowledge.  With any

Page 29

1  antiincontinence procedure, once I'm done placing
2  my sutures or my trocars, I perform cystoscopy.
3  That's something that was taught to me as a
4  resident, as a fellow, something I teach my
5  students and residents.
6    Q. (By Mr. Zonies)  And that's what should
7  be in the IFU, that cystoscopy is required,
8  correct?
9    MS. SCHMID:  Objection; form, argumentative,
10  scope.
11    A. I believe what the IFU recommends in
12  regards to cystoscopy is adequate.
13    Q. (By Mr. Zonies)  What does it recommend?
14    A. It recommends on the retropubic
15  procedures that cystoscopy performed.  On the
16  obturator procedures, I believe that is listed as
17  the discretion of the physician, so it's a stronger
18  statement.
19    Q. And so my question is simply, Doctor,
20  the IFU -- it sounds like you agree that the IFU
21  should say, for TVT-Retropubic, cystoscopy is
22  recommended or required, correct?
23    MS. SCHMID:  Objection; form, argumentative,
24  misstates prior testimony.
25    Go ahead.

Brian J. Flynn, M.D.

Page 30

1    A. Yeah, I believe it misstates what I
2  said. I said that that's part of the basic
3  fundamental knowledge. I don't think you need the
4  IFU to tell you that. After doing an
5  antiincontinence procedure, I usually perform
6  cystoscopy. Any time you're passing instruments
7  next to the bladder, that's common knowledge.
8  That's something that we do every day in our
9  practice.
10    Q. (By Mr. Zonies) And you think that
11  certainly Ethicon would understand that's common
12  knowledge when they're selling a TVT-R, right?
13  That cystoscopy should be done after the procedure,
14  correct?
15    MS. SCHMID: Objection; form, foundation.
16    A. No, that's not correct. I think Ethicon
17  has to assume that physicians are using reasonable
18  judgment and care when using their products, but
19  they're not going to tell the physician what
20  antibiotic to use, how long to keep the Foley in,
21  what kind of anesthesia they should use, what kind
22  of dressing they should put on. So there's a lot
23  of things in that procedure that Ethicon doesn't
24  make recommendations on because that's part of our
25  basic fundamental knowledge.

Page 31

1    Q. (By Mr. Zonies) So Doctor, if Ethicon
2  knew that some physicians that it was selling the
3  TVT-R to, if Ethicon knew that those physicians
4  couldn't actually do a cystoscopy, or suspected it,
5  and intentionally wrote the IFU such that
6  cystoscopy was not required so that they could sell
7  to those physicians, would that be okay in your
8  mind?
9    MS. SCHMID: Objection; form, improper
10  hypothetical, compound.
11    A. I can't answer that question the way
12  that's stated.
13    Q. (By Mr. Zonies) Okay. Were you aware
14  that Ethicon knew that some of the physicians to
15  whom it was selling the device couldn't actually
16  perform cystoscopy?
17    MS. SCHMID: Objection; foundation.
18    A. I'm not aware of that.
19    Q. (By Mr. Zonies) You've never seen any
20  internal Ethicon documents discussing the concern
21  that gynecologists don't know how to do
22  cystoscopies?
23    MS. SCHMID: Same objection.
24    A. I'm not aware of that document. All of
25  the gynecologists that I work with that perform

Page 32

1  antiincontinence surgeries know how to perform
2  cystoscopy, so I'd be surprised that anybody would
3  be doing antiincontinence surgery and do not know
4  how to perform cystoscopy.
5    Q. (By Mr. Zonies) And if Ethicon knew
6  that there were physicians who couldn't perform
7  cystoscopy, and yet they sold a device to those
8  physicians, is that okay, in your mind?
9    MS. SCHMID: Objection; form, vague.
10    A. I don't believe Ethicon sells the
11  product to the physician. They sell it to the
12  hospital, and then the hospital credentials the
13  physician. The physician has to make a decision
14  based on the privileges they request whether or not
15  they're competent to do the procedure. So that's
16  not really something that Ethicon is directly
17  involved in. They sell it to the hospital, the
18  hospital decides who's going to use it based on the
19  credentials they provide.
20    Q. (By Mr. Zonies) Do you believe that
21  Ethicon has any obligation whatsoever to include
22  cystoscopy in the IFU?
23    MS. SCHMID: Objection; form, scope.
24    A. As I stated earlier, I don't believe
25  that that's Ethicon's position.

Page 33

1    Q. (By Mr. Zonies) You don't think they
2  have any responsibility to put that in?
3    A. I don't believe they have that
4  responsibility.
5    Q. And as we discussed before, you don't
6  know the FDA regulations that govern what should be
7  in an IFU, correct?
8    MS. SCHMID: Objection; form, scope.
9  Go ahead.
10    A. In earlier depositions, and as I'll
11  state now, I'm familiar with FDA requirements. I
12  am by no means an expert in FDA regulatory, but I
13  have reviewed documents, as I've cited earlier,
14  about what is reasonable and what some expectations
15  the FDA has when companies are creating IFUs, and
16  then, you know, what the industry standards are for
17  creating an IFU.
18    Q. (By Mr. Zonies) And what would you
19  point to as your reliance for what the industry
20  standards are when creating an IFU?
21    A. I would go back to the FDA documents.
22  There's a blue book from, I think, 1993 where the
23  FDA had come up with some recommendations. There's
24  some other documents, I'm blanking on the author's
25  name or the year, but FDA documents that I've

Brian J. Flynn, M.D.

Page 34

1  reviewed most recently that I've mentioned in other
2  testimonies that do give some recommendations on
3  what should be included in the IFU.
4      Q.  And have you ever reviewed Ethicon's
5  internal standard operating procedures about what
6  Ethicon believes should or should not be in an IFU?
7      A.  I don't believe so.
8      Q.  And Doctor, in your reliance materials,
9  can you point me to the FDA materials that you're
10 relying upon?
11     A.  The FDA material that I'm relying on I
12 believe I reviewed in preparation of another
13 deposition, so I don't believe it's on the reliance
14 list for this particular report.
15     Q.  So Doctor, when do you believe you first
16 started to use the TVT-Retropubic device?
17     A.  Specific to the Ethicon product?
18     Q.  Yes.
19     A.  Sometime around 2004 or 2005 I started
20 using the Ethicon products.  The first product I
21 used was TVT-Obturator.  That was in 2004.
22 Sometime after that I used the TVT classic device.
23 And that's specific to my own practice.  I started
24 my practice in 2002 at the University of Colorado
25 where I've practiced continuously since that time.

Page 35

1  I may have used the product earlier during my
2  fellowship or residency, but I wasn't making the
3  decisions about what products I was selecting.  So
4  I know, especially during my fellowship year, I had
5  used a variety of products as my mentor at the
6  time, George Webster, was trying various products
7  to decide what he wanted to use in his practice.
8      Q.  In your report, you recognize that you
9  say that you first used the TVT-Retropubic in 1999.
10 That's likely incorrect, isn't it?
11     A.  Well, it would be incorrect if I
12 included my residency.  But if I include my own
13 practice, then it would be incorrect.  But I think
14 when I wrote that report, it was in the context of
15 part of my training.
16     Q.  You don't have any specific recollection
17 of using a TVT-Retropubic until 2005; is that fair?
18     A.  No, that's not fair.  What I had
19 mentioned was -- the way I answered that question
20 was, in my own practice, it started in 2002.  In
21 1995, I started my residency.  I started my urology
22 years in 1997, so in 1998, I would have been a
23 second-year resident.  One of my mentors, Wen Yap,
24 did a number of incontinence procedures, and I had
25 used a variety of kits with him, biological

Page 36

1  products, autologous material, TVT, bone-anchored
2  slings, biological slings.  So I gained a lot of
3  experience as a resident and a fellow, but when I
4  wrote the report, I believe the way I wrote that
5  was with respect to my own practice, so maybe
6  that's why there's some discrepancy in the years.
7      Q.  Because in your other reports, your
8  TVT-Obturator report and the TVT-S report, you
9  actually say that the first time you used a TVT-R
10 was in 2001.  Are you aware of that?
11     A.  I'm not aware of that.  What is
12 confusing sometimes is the word "TVT" is often used
13 interchangeably with "midurethral sling," so the
14 TVT may have been stated, but it was really a Sparc
15 or some other product.  So I started using
16 trocar-based polypropylene mesh slings as a
17 resident.  I didn't keep very close records as a
18 resident and a fellow what products I used since I
19 wasn't making the decision.  You know, that wasn't
20 something that was important to me then.
21     Q.  So if you turn to page 22 of your
22 report, Doctor, that's where it discusses when you
23 began using these devices.  Let me know when you're
24 at page 22.
25     A.  Yes.

Page 37

1      Q.  You got that?  Okay.  And you say, "I
2  had been using both the TVT-Obturator since 2004
3  and retropubic kits since 1999."  That's what you
4  wrote, correct?
5      A.  Yes.  And that's correct.  So
6  "retropubic kits" is just a generic term.  That
7  could include Sparc.  That could include TVT.  That
8  could include Boston Scientific products.  So
9  that's any retropubic kit.
10     Q.  And if I recall correctly from your
11 earlier testimony, you know for sure that you
12 started using TVT products in 2004 when you started
13 to use the TVT-Obturator, correct?
14     MS. SCHMID:  Objection; misstates prior
15 testimony.
16     Go ahead.
17     A.  What I know is that when I started in my
18 practice, I used the American Medical Systems
19 products from 2002 to 2004 at the University of
20 Colorado and affiliated hospitals.  And then in
21 2004 I switched from the American Medical Systems
22 products to the Ethicon products, for the most
23 part.  There was exceptions based on what hospitals
24 I practiced at, but that was a big switch.  When
25 TVT-Obturator became available, I was immediately

Brian J. Flynn, M.D.

Page 38

1 attracted to that product.
2 Q. (By Mr. Zonies) Is it fair to say that
3 from 2004 you had a preference for the obturator
4 approach?
5 A. I had a preference for the obturator
6 approach from 2004 to probably around 2008 or '9.
7 Q. And so why did you have a preference for
8 the obturator approach as compared to the
9 TVT-Retropubic?
10 A. A few reasons. One, there was less
11 voiding dysfunction, so less urinary retention or
12 bladder incomplete emptying. There was a lower
13 risk of trocar injury to the bladder when placing
14 the device. The procedure, at least in my hands,
15 was slightly easier to perform as an outpatient
16 with minimal anesthetic requirements. So those
17 were the main reasons.
18 Q. So would it be fair to say that in that
19 time frame, from 2004 until 2000 I think you said,
20 '8 or '9, that the majority of your procedures were
21 either using the TVT-Obturator device or, in those
22 later years, the TVT-Secur?
23 A. I've always performed a variety of
24 midurethral slings, but I always have had a
25 preference. In addition to performing midurethral

Page 39

1 slings, I've always performed biological slings at
2 the same time in my practice on different patients
3 as well as bulking agents, artificial urinary
4 sphincter. I tend to perform four or five
5 different types of procedures for incontinence, but
6 I always had a preference. And there was always
7 one procedure that I would say that I did most
8 frequently. So that was TVT-Obturator from 2004
9 'til TVT-Secur became available around 2008 or '9.
10 Then I did mostly TVT-Secur. And then I switched
11 doing mostly TVT-Abbrevo. And then at a later
12 date, I migrated back to doing mostly retropubic.
13 Q. Using the TVT-Exact?
14 A. Correct.
15 Q. There was a certain period of time where
16 you actually tracked the devices that you were
17 using; is that right?
18 A. Yes.
19 Q. What was that period of time?
20 A. Since 2004, I've been tracking which
21 devices I've been using until current.
22 Q. And do you have a sense from your data
23 how many TVT-Retropubic devices you implanted
24 between 2004 and today?
25 A. Just of the classic product?

Page 40

1 Q. Yes.
2 A. Somewhere around 75.
3 Q. And do you have a sense of, from the --
4 well, since you've been tracking which devices
5 you've been using, is that spread pretty evenly
6 over the years, or was there one or two years where
7 you did most of those?
8 A. TVT classic was never the procedure I
9 did most frequently. I generally reserved that for
10 patients with more severe incontinence due to
11 intrinsic sphincter deficiency. If you look at the
12 medical literature and the Cochrane reviews, the
13 Schmipff study, the TOMUS trial, there is a slight
14 preference towards improved efficacy in patients
15 with intrinsic sphincter deficiency with the
16 retropubic approach when opposed to the
17 transobturator approach. So there is slightly more
18 risk with the retropubic approach in terms of
19 voiding dysfunction and bladder perforation, so I
20 tried to justify that risk when I had patients that
21 had had more severe incontinence, maybe a prior
22 failed procedure, et cetera.
23 Q. So the typical patient for whom you
24 would have used a TVT-Retropubic device wouldn't
25 have been the index patient. It would have been a

Page 41

1 patient with certain characteristics, such as ISD
2 or a prior failed sling of some sort; is that fair?
3 A. For the most part. There were some
4 exceptions where patients who were index patients
5 that would receive the retropubic procedure, but
6 that was unusual.
7 Q. Where did you and how did you come to
8 the knowledge that the O had fewer risks than the
9 R?
10 MS. SCHMID: Objection; foundation.
11 Go ahead.
12 A. That was based on some preliminary data
13 that I had seen from Dr. De Leval's publications,
14 and then from Dr. DeLorme, the outside-to-in
15 approach. Generally, when you look at those
16 obturator approaches, what we generically sometimes
17 call TOTs, which include inside-out and
18 outside-to-in procedures, it just seems obvious
19 that you're going to be less likely to hit the
20 bladder. I don't see any possibility where you
21 would hit the intestine, less risk of major
22 bleeding. So some of that was based on what the
23 medical literature showed. Others was based on my
24 medical training and education from doing
25 dissections in cadaver labs. It's just a simpler

Brian J. Flynn, M.D.

Page 42

1    space, the obturator space, than the retropubic
2    space.
3         Q. So you said that you don't see any
4    possibility where you would hit the intestine.
5         A. On a transobturator procedure.
6         Q. So one of the benefits of an obturator
7    approach as compared to the TVT-Retropubic would be
8    less risk of intestinal perforation and injury?
9         A. That's correct.
10        Q. And you also said less risk of major
11   bleeding with the TVT-Obturator approach as
12   compared to the retropubic, correct?
13        A. That's what I stated, yes.
14        Q. Bowel perforation is a very serious
15   complication associated with the TVT-Retropubic; is
16   that true?
17        MS. SCHMID: Objection; form, foundation.
18        A. Well, there's two statements there. I
19   agree it is a serious complication, but it's rarely
20   associated with a retropubic procedure. I think it
21   would probably happen in less than 1/100th of the
22   procedures. So I wouldn't say it's associated with
23   the retropubic procedure.
24        Q. (By Mr. Zonies) And, I'm sorry, maybe
25   I'm getting it wrong.

Page 43

1         When you said that one of the benefits of
2    the TVT-Obturator as compared to the TVT-Retropubic
3    is less risk of an intestinal injury, did you mean
4    a bowel perforation?
5         A. Correct.
6         Q. Over the period of time where you did 75
7    total TVT-Retropubic surgeries, how many total
8    surgeries did you do? In other words, what's the
9    percentage?
10        A. Of -- percentage of what?
11        Q. Excellent question.
12        What's the percentage of midurethral slings
13   that the TVT-Retropubic makes up? About one in
14   ten, or fewer than that?
15        A. Well, as I've stated in my reports and
16   other depositions, I've done 800 or so midurethral
17   slings, of which 500 are Ethicon products. And in
18   preparation of this deposition, I've looked at this
19   recently, so I've done, I think, around 180 to 200
20   or so, hard to remember the exact number,
21   TVT-Securs. That's the most common product I've
22   used. I've done 140 or so obturator procedures,
23   that would include TVT-O and TVT-Abbrevo as a
24   group. I've done 75 of the TVT classic. I've done
25   approximately 100 TVT-Exacts. And then there's

Page 44

1    other products that aren't TVTs that I've done,
2    such as the Boston Scientific Advantage Fit, AMS
3    Sparc, AMS BioArc, MiniArc.
4         So there's quite a few products there. But
5    if you just look at the retropubic procedures
6    alone, I've done over 200 retropubic procedures.
7    So I don't know the exact breakdown of what that
8    amounts to, Joe. I'd say at least 25 percent of my
9    procedures have been retropubic procedures if you
10   add up all the different products for retropubic
11   products.
12        Q. And of those, it looks like about a
13   quarter of those would have been TVT-Retropubic; is
14   that fair?
15        A. A quarter?
16        Q. A quarter of your retropubic surgeries.
17        A. Well, if you just look at the Ethicon
18   products, I've done 100 TVT-Exact and 75 TVT
19   classic, so that's 175. The denominator of, say,
20   if I did 800 slings, then that would be roughly a
21   quarter of all midurethral slings.
22        Q. And if we take 75 TVT-Rs of your total
23   of 800 procedures, it's less than 10 percent --
24   fewer than 10 percent of the surgeries that you've
25   done with midurethral slings are TVT-Retropubic; is

Page 45

1    that fair?
2         A. Well, 80 into 800 would be 110, so less
3    than one tenth.
4         Q. I can do that math.
5         A. Yeah, your math is getting better.
6         Q. And when do you think was the last time
7    you used a TVT-Retropubic?
8         A. When TVT-Exact became available, so I
9    think I stated earlier around 2011 or so.
10        Q. I'm going to mark Exhibit 7, Dr. Flynn.
11        (Exhibit 7 was marked for identification.)
12        Q. (By Mr. Zonies) Exhibit 7 is an e-mail
13   from -- well, the first e-mail in the series is
14   from Lori Campbell to Scott Jones, March 5th, 2004;
15   do you see that?
16        A. Yes.
17        Q. And the subject is you, Dr. Brian Flynn,
18   correct?
19        A. That's correct.
20        Q. In that e-mail -- who is Lori Campbell,
21   first of all?
22        A. She is Scott Jones' boss.
23        Q. And Scott Jones is who?
24        A. He was a regional professional education
25   manager in the western United States before John

Brian J. Flynn, M.D.

Page 46

1   Fernandez and Lori Campbell was both of their
2   bosses at different time points.
3       Q. And Ms. Campbell writes in the second
4   paragraph -- well, first, Ms. Campbell writes,
5   "Scott, we would like to expedite an offer to
6   Dr. Flynn to become a local preceptor for
7   Gynecare"; is that right?
8       A. Correct.
9       Q. And this is about when you first became
10  a preceptor and started consulting with Ethicon in
11  March of 2004; is that right?
12      A. That's right.
13      Q. And she writes in the second paragraph,
14  "I am attaching the TVT Preceptor Recommendation
15  Form. I understand you've observed his first TVT
16  Gynemesh case this week and he is ready to convert
17  the business. Congratulations." Is that what she
18  wrote there?
19      A. Yes.
20      Q. And is that fairly consistent with your
21  recollection that in your practice, the first time
22  you used a TVT-Retropubic was around 2004?
23      A. As the attending physician, yes.
24      Q. And do you understand what it means when
25  Ms. Campbell writes, "He is ready to convert the

Page 47

1   business"?
2       A. No, I am not --
3       MS. SCHMID: Objection; foundation.
4       A. It sounds like she's happy that I'm
5   going to use her products, but I don't -- I can't
6   say anything beyond that.
7       Q. (By Mr. Zonies) And she writes in the
8   last sentence, "It sounds like he will be a
9   wonderful asset to Gynecare and the Western
10  region." Do you know what she means when she
11  writes that?
12      MS. SCHMID: Objection; form, foundation.
13      A. I do.
14      Q. (By Mr. Zonies) What does she mean?
15      A. Well, I've largely been considered the
16  key opinion leader in the western United States
17  with reference to incontinence since the first day
18  of my practice. One of the reasons I moved west is
19  there wasn't a lot of experts in incontinence,
20  especially in the state of Colorado. I was
21  recruited here to start a practice in female pelvic
22  medicine and reconstructive surgery. She knew I
23  was a thought leader, that I educated residents and
24  fellows. And a lot of other people in the state
25  would be influenced based on what I did and what

Page 48

1   products I used. And I think because of my
2   tremendous teaching skills, that she knew that I
3   would be able to help educate physicians on their
4   products.
5       Q. (By Mr. Zonies) And, in fact, that came
6   true, right? You became a wonderful asset to
7   Gynecare, correct?
8       A. I believe I provided a good service to
9   Ethicon and Gynecare, and value to the company and
10  their customers.
11      MS. SCHMID: Joe, when there's a time within
12  the next couple of minutes, if we could take a
13  quick break?
14      MR. ZONIES: Yeah, we can do it now.
15      MS. SCHMID: Is that okay?
16      MR. ZONIES: Sure.
17      MS. SCHMID: All right. Thank you.
18      THE WITNESS: Can we just finish this
19  e-mail?
20      MS. SCHMID: Oh, my gosh, yes.
21      THE WITNESS: Let's just finish this thing.
22      Q. (By Mr. Zonies) You have more to say?
23      A. I don't, but I thought you probably did.
24      Q. No, I'm finished with the e-mail.
25      A. Okay. Very good.

Page 49

1       (Recess taken from 2:09 p.m. until
2   2:25 p.m.)
3       Q. (By Mr. Zonies) Doctor, are you ready
4   to go after a break?
5       A. Yes, I am.
6       Q. Earlier, Doctor, we were talking about
7   your speaker's bureau work with Ethicon. Do you
8   remember those conversations?
9       A. Yes, I do.
10      Q. And that at some period of time, you
11  were on the speaker's bureau for Ethicon, from
12  roughly 2004 through 2011, correct?
13      A. Correct.
14      Q. And that during that period of time,
15  you -- when you were asked to give a talk, would
16  Ethicon compensate you for those talks?
17      A. Yes, they would.
18      Q. And would Ethicon sometimes pay for your
19  travel to give those talks?
20      A. Yes. If I was already not there, if it
21  was a meeting maybe I was attending, they would
22  not, but if it was the only reason why I went
23  there, then yes.
24      Q. And Ethicon would also pay for your
25  meals during those trips; is that correct?

Brian J. Flynn, M.D.

1    A.  That's correct.
2        Q.  And you discussed that in some of those
3    talks that you gave on the speaker's bureau that
4    the materials would be provided to you by Ethicon,
5    correct?
6        A.  Correct.
7        Q.  And that you weren't permitted to change
8    those materials, correct?
9        A.  Correct.
10       Q.  Now, Doctor, you have been at the
11   University of Colorado for most of your career; is
12   that correct?
13       A.  Yes.
14       Q.  And at the University of Colorado, there
15   are conflicts policies for physicians in your
16   position, correct?
17       A.  Correct.
18       Q.  And were you aware that when you were
19   giving these talks for Ethicon as part of the
20   speaker's bureau that it violated the University of
21   Colorado's conflicts policies?
22       MS. SCHMID:  Objection; form, assuming facts
23   not in evidence.
24       A.  I was not aware of that.
25       Q.  (By Mr. Zonies)  So I'll mark what's

1    Exhibit 8, which is entitled "A Policy to Limit
2    Conflicts of Interest Between Healthcare
3    Professionals and Industry Representatives for the
4    University of Colorado."
5        (Exhibit 8 was marked for identification.)
6        Q.  (By Mr. Zonies)  Have you seen that
7    policy before?
8        A.  Yes, I have.
9        Q.  And is this a policy that would have
10   applied to you from 2008 forward?
11       A.  I believe the policy went into effect
12   around 2011.
13       Q.  And there is, indeed, a 2012 policy, I
14   think, that updates this policy.  Were you aware
15   that this 2008 policy existed prior to that?
16       MS. SCHMID:  Objection; vague, foundation.
17   Go ahead.
18       A.  I was aware that the school was in the
19   process of developing a policy that had gone
20   through the faculty senate, and so it had gone
21   through a number of iterations, and so I don't
22   believe anything was set in stone until 2011.
23       Q.  (By Mr. Zonies)  The speaker's bureau
24   that you were doing for Ethicon from 2004 through
25   2011, under the policy that you're speaking of, the

1    2011 or 2012 policy, those speaker's bureau talks
2    would have violated the new policy, correct?
3        MS. SCHMID:  Objection; vague, compound.
4        A.  I'm not going to agree to that, no.
5        Q.  (By Mr. Zonies)  And if you take a look
6    at Exhibit 8, Doctor, and you turn to page 6,
7    there's a section called "Participation on speakers
8    bureaus"; do you see that?
9        A.  I do.
10       Q.  And it says, "Speakers bureaus, which
11   are often 'little more than extensions of a
12   company's marketing department' may pose real or
13   perceived conflicts of interest."  Do you agree
14   with that statement?
15       A.  No, I do not.
16       Q.  And "HSC," it says.  And that's your
17   employer, correct, HSC?
18       A.  "Health science centers" is a generic
19   term.  This contract's one that all the schools
20   have.  So this contract I don't believe is written
21   specific for the University of Colorado, so when
22   they say HSC, health science center, that's not
23   University of Colorado, that's not University
24   Physicians, Inc.  HSC is health science center.
25       Q.  But this policy would apply to you,

1    correct?
2        A.  I don't believe this policy applied to
3    me, no.
4        Q.  And let me clarify that.  That's because
5    you didn't think that this was a -- you don't
6    believe, as you sit here today, that this policy
7    was in effect as of 2008; is that correct?
8        A.  There's a variety of reasons why I
9    didn't think it was applicable, and so I believe
10   that this was written primarily as it pertains to
11   relationships with pharma, and not medical device
12   companies.  Speaking bureau, I don't think that's
13   an accurate description on what I was doing for
14   Ethicon.  That's not what I considered my role
15   there.  So there's a lot of exceptions to this
16   policy.
17       Q.  Okay.  And so if you turn to page 2,
18   where it says "Background," do you have that
19   section?
20       A.  Yes.
21       Q.  And the third sentence, it says -- it's
22   discussing use of drugs and medical devices, right?
23   So this clearly applies to medical devices,
24   correct?  Third line down.
25       A.  Yeah, I see that.  It's not saying it

Brian J. Flynn, M.D.

Page 54

1  applies to them. This is just background
2  information, an introduction paragraph.
3      Q. And then if you look at "Scope of
4  Policy," it says, "This policy applies" -- on the
5  bottom of that page, "This policy applies to all
6  health sciences students, residents and other
7  trainees, and to all regular faculty members at the
8  University of Colorado Denver Schools of Dental
9  Medicine, Medicine, Nursing, public Health and
10  Pharmacy. Health sciences library faculty are also
11  covered by this policy. The term 'health science
12  students, residents and faculty' is used to
13  describe all these parties in an inclusive manner."
14  Would that include you?
15      A. Well, I am a faculty member, so . . .
16      Q. So yes, that would include you?
17      A. Yes.
18      Q. If you turn to where we were, page 6,
19  about participation on speakers' bureaus, the
20  second sentence says, "HSC students, residents and
21  faculty," we've determined that includes you,
22  correct?
23      A. Correct.
24      Q. "HSC faculty may not participate in or
25  receive compensation for talks through a speakers

Page 55

1  bureau if, A, the content of the lectures, slides,
2  references or educational handouts is subject to
3  approval by industry representatives."
4      First, did I read that correctly?
5      A. Yes, you read it correctly.
6      Q. And you've testified that the content of
7  the slides that you presented on as a member of
8  Ethicon's speaker's bureau, that the content of
9  those slides was written by Ethicon and you weren't
10  permitted to change it, correct?
11      A. Correct.
12      Q. So if this policy were in place, you
13  violated this policy, correct?
14      MS. SCHMID: Objection; form, assuming facts
15  not in evidence, calls for a legal conclusion.
16      A. First of all, it was not in place.
17  Second of all, I don't believe I violated it.
18      Q. (By Mr. Zonies) And which portion -- I
19  understand you don't believe this was in place, so
20  my questions will be based on an assumption that it
21  was in place.
22      So assuming this were in place, where do you
23  think you didn't violate this section I just read?
24      MS. SCHMID: Same objections.
25      Go ahead.

Page 56

1      A. A speaker's bureau is a commonly
2  recognized term that is related to pharmaceutical
3  industry where you go out and give dinner talks, et
4  cetera, on behalf of the company and you use the
5  company slides. What I did is very different than
6  that. My primary role in the consulting with
7  Ethicon was being part of the innovation council,
8  doing cadaver labs, doing preceptorships and
9  proctorships. Those were the roles. The slide
10  deck and the talks, that really wasn't my role.
11  That was something that was generally performed by
12  other consultants more senior than me. So
13  typically, when I attended a course or when I
14  participated in a course, I was the person doing
15  more the instruction during the cadaver lab portion
16  and then doing the preceptorships and proctorships.
17      The dinner talks and the prof ed -- you
18  know, the dinner programs as you're referring to, I
19  think that's what this policy is referring to.
20  That really was not what I did.
21      Q. But we've established that you used
22  their slide decks to give talks, correct? It may
23  not have been most of what you did, but you have
24  done that, correct?
25      A. I've used them as part of preceptorships

Page 57

1  and proctorships. You know, I've had them in my
2  possession. I've used them to educate myself and
3  residents, but no, I wasn't -- I wasn't part of the
4  speaker's bureau. There was no speaker's bureau
5  that really existed. That's not -- you can read
6  that e-mail that we looked at earlier. And I don't
7  think the word "speaker's bureau" is ever even
8  mentioned in Exhibit 7. It says, "Dr. Flynn to
9  become a local preceptor for Gynecare." It doesn't
10  say Dr. Flynn's going to enter our speaker bureau.
11  "In addition, we'd like to invite him to the
12  preceptor summit." So the whole idea of being a
13  preceptor or being a proctor was try to help
14  educate people on the surgical procedures. As a
15  surgeon, that's what I did.
16      Q. So earlier -- and just to be clear,
17  earlier you testified you were on the speaker's
18  bureau for Ethicon and your testimony now is that
19  you were not on the speaker's bureau for Ethicon?
20      A. What my testimony was earlier and now is
21  that I was a consultant from 2004 to 2011. That's
22  what I've stated multiple times. And you
23  characterized me as being on the speaker's bureau.
24  That's not a characterization that I've used or
25  that I've seen Ethicon use in any of their e-mails

Brian J. Flynn, M.D.

Page 58

1   or in the consulting agreement that I submitted
2   earlier.  We can go back and look at the consulting
3   agreement and see what terms are on there, but I
4   don't believe the word "speaker's bureau" is on the
5   title of that contract.
6       Q.  Do you think "speaker's bureau" is in
7   the contract?
8       A.  It may be in there, but it itemizes all
9   the different activities a consultant can do.  And
10  what I mentioned is my activities were preceptoring
11  and proctoring, developing videos and content.
12  That's primarily what my role was.
13      Q.  The next paragraph down says, "All
14  speaking relationships and contracts are subject to
15  review and approval by the university."
16      Did you ever submit your contracts to the
17  university for their approval and review?
18      A.  Yes.
19      Q.  When did you do that?
20      A.  I don't recall.
21      Q.  Did you ever accept pens, note pads,
22  mugs, pen lights, calipers, textbooks, free or
23  discounted tickets to sporting events from Ethicon?
24      A.  No.
25      Q.  You never took an Ethicon pen?

Page 59

1       A.  No.
2       Q.  Did you ever -- we've discussed that
3   you -- Ethicon would sometimes purchase meals for
4   you when you were traveling; is that right?
5       A.  Yes.
6       Q.  And some of these were for Ethicon, I
7   think you described them as Ethicon talks; is that
8   right?  Not professional-society talks.
9       A.  These were industry sponsored events
10  that Ethicon was the sponsor primarily.  There were
11  sometimes joint events, but for the most part, they
12  were the only sponsor.
13      Q.  They weren't, for example -- you gave
14  these talks sometimes at an Ethicon-sponsored event
15  that wasn't tied to AUGS or SUFU or some
16  professional society, correct?
17      A.  Correct.
18      Q.  So if you turn to page 4 of the policy,
19  you'll see "Gifts and Meals"; do you see that?
20      A.  I do.
21      Q.  And it says that, number 3, "Meals,
22  beverages, snacks or other hospitality paid for by
23  industry or industry representatives shall not be
24  provided to or accepted by HSC students, residents
25  or faculty."

Page 60

1   First, did I read that correctly?
2       A.  Yes.
3       Q.  And that policy, if it were in effect,
4   would apply to you, correct?
5       MS. SCHMID:  Objection; foundation, assumes
6   facts not in evidence.
7       A.  Yes.
8       Q.  (By Mr. Zonies)  And so by accepting
9   meals, beverages and other hospitality, for
10  example, Ethicon would pay for your hotel rooms and
11  travel, correct?
12      A.  Correct.
13      Q.  You would have violated this policy if
14  it were in effect, correct?
15      A.  Not correct.
16      Q.  Why not?
17      A.  I can't violate a policy that's not in
18  effect.  I mean, that's -- it's completely
19  hypothetical.  And this policy was not approved by
20  the faculty senate.  This is a policy that was
21  proposed.  What you put in front of me in 2008 was
22  never approved.  So of course nobody adhered to
23  rules that didn't exist.  This is completely
24  hypothetical.  And so, I mean, this whole line of
25  questioning is really ridiculous.

Page 61

1       Q.  So when this policy was proposed, were
2   you part of working on this policy?
3       A.  No, I wasn't on the faculty senate.
4       Q.  Did you attend any of the discussions
5   about what should or shouldn't be in the policy?
6       A.  I provided feedback to my
7   representative, but I wasn't at the actual meetings
8   or any of the votes.
9       Q.  And who was your representative?
10      A.  One of my partners.
11      Q.  Who was that?
12      A.  Shandra Wilson.
13      Q.  And you provided feedback on -- do you
14  recall what type of feedback you provided?
15      A.  Just that I disagreed with a number of
16  the items in this policy.  I thought it was
17  overreaching and was not legally valid.  You can't
18  prohibit someone from doing what they want to do on
19  their free time as their employer.  And I think
20  that's been adjudicated in different venues.  But
21  if someone's on their free time, if it's the
22  weekend, the employer has no right to dictate what
23  the employee should do with their free time.  So
24  all of these things that I did were on my own time,
25  either on vacation time, at night, or on the

Brian J. Flynn, M.D.

Page 62

1  weekends.  And for that reason, that's why this
2  policy didn't get approved in this form, because
3  the overwhelming majority of the faculty did not
4  agree or wanted to abide by something that, you
5  know, was so overreaching.
6      Q.  And do you feel that it's important for
7  you when you publish a paper to disclose that you
8  were or are a consultant for a medical device
9  company?
10     MS. SCHMID:  Objection; vague.
11     Go ahead.
12     A.  I adhere to what the publication
13 requests.  So what most publications ask is that if
14 the publication pertains to a particular product
15 that you're writing about, and you're a consultant
16 that's active at the time, then yes.  So there's a
17 lot of caveats to that statement.  But I'm familiar
18 with the various, you know, requests from the
19 various journals.
20     Q.  (By Mr. Zonies)  So you published a
21 paper in 2013 in the International Urogynecology
22 Journal, correct?
23     A.  Correct.
24     Q.  And in that 2013 publication, during the
25 time when this paper was written and then

Page 63

1  published, you were acting as an expert consultant
2  for Ethicon in this litigation, correct?
3      A.  I wouldn't agree with that, no.
4      Q.  You weren't acting as an expert for
5  Ethicon in 2013?
6      A.  I was doing consulting work at the
7  request of Butler and Snow.  I wasn't employed by
8  Ethicon.  I wasn't directly paid by Ethicon, so
9  that's one reason why I didn't disclose that.
10     Number two, I don't believe the article
11 really had anything to do specific to a product.
12 That article pertains to a number of products that
13 we listed.  And, in fact, I'm not aware of any
14 other article that had listed all of the products
15 the way I did in Table 2 or 3 in that article.
16 When you compare that to other articles, I think
17 that we were transparent in which products were
18 removed.
19     Q.  Correct.  And in this article, in fact,
20 Table 2, good memory, you specifically list
21 Ethicon's TVT as one of the devices that you are
22 writing about in this article, correct?
23     A.  Correct.
24     Q.  And at this time, you were engaged as an
25 expert witness by Ethicon's lawyers to testify and

Page 64

1  be an expert in Ethicon TVT litigation, correct?
2      A.  I don't agree with that, no.
3      Q.  And you certainly didn't disclose that
4  you were an expert witness in the Ethicon TVT
5  litigation in this article, did you?
6      A.  What I'll say is I'm not aware of a
7  single author ever that's ever disclosed in any
8  article expert witness work, not Dr. Ostergard, not
9  Dr. Elliot, not Jerry Blaivas, not Dr. Rosenzweig,
10 not Dr. Margolis.  So that's not a standard that
11 anybody adheres to.  The consulting relationships
12 and what's offered in the disclosures are related
13 to pharma and medical device companies.  No one
14 that I'm aware of -- maybe you can show me an
15 article where someone's ever disclosed
16 medical-legal consulting work as a conflict of
17 interest, even in articles that pertain to
18 medical-legal work.
19     Q.  So is it your testimony, as you sit here
20 today, that if you publish an article in a
21 peer-reviewed paper about the TVT-Retropubic
22 device, you would not disclose that you're an
23 expert witness working on the Ethicon litigation?
24     A.  That's correct.
25     Q.  One of your opinions about the TVT mesh

Page 65

1  that's used in the TVT and the TVT-O and S and
2  Exact and Abbrevo is that you don't believe that it
3  degrades; is that correct?
4      A.  That's correct.
5      Q.  And first of all, what does "degrade"
6  mean to you, in your expert opinion?
7      A.  Well, usually, when I think of
8  degradation, I think of it often at a macroscopic
9  level, so seeing gross breaks or cracks,
10 fragmentation of a product.
11     Q.  And it's page 27 in your report if you
12 wanted to turn to it.  I'm sorry to interrupt.  Go
13 ahead.
14     A.  So that's what I consider for gross or
15 macroscopic degradation.  There are papers in the
16 literature that cite to SEM, which is electron
17 microscopy showing microscopic cracking, and so
18 people think of it both grossly and
19 microscopically.
20     Q.  And is it your expert opinion that
21 there's no evidence of degradation grossly?
22     A.  To the patients that I've operated on
23 for, say, recurrent incontinence or for other
24 indications, I haven't seen gross evidence of
25 degradation on my reoperations.

Brian J. Flynn, M.D.

Page 66

1    Q.  So is it fair to say that your opinion
2  that there is no degradation associated with
3  polypropylene is limited to grossly?
4    A.  In my own clinical practice, yes,
5  because I have not looked at any of these specimens
6  personally under electron microscopy of explants
7  that I've performed, but I am familiar with
8  Dr. Clave's article and Dr. Costello's article and
9  other articles that reference degradation, so I
10  have read those articles as part of my practice, in
11  journal clubs, et cetera.  I've seen those articles
12  be brought up at meetings.  Recently I had attended
13  a meeting of IUGA, International Urogynecologic
14  Association, I saw Dr. Ostergard present what he
15  considered evidence of degradation at this mock
16  trial that occurred at the IUGA meeting.
17    Q.  A mock trial occurred?
18    A.  A mock trial, yes.  And so --
19    Q.  Who was the lawyer?
20    A.  I think Ostergard was the expert and the
21  attorney.  So nonetheless, there's articles that
22  I'm familiar with and I am confident in my opinions
23  that degradation does not occur with polypropylene
24  mesh, either microscopic or macroscopic.
25    Q.  Okay.  So let's talk about the -- I

Page 67

1  think we've concluded that you believe -- it's your
2  expert opinion that degradation of polypropylene
3  mesh does not occur macroscopically, correct?
4    A.  Correct.
5    Q.  And that is based on your personal
6  clinical experience; is that correct?
7    A.  My own experience, that of others, and
8  that's what's reported in the medical literature,
9  in the Cochrane reviews, the systematic reviews by
10  Schmipff and by others over 20 years of TVT
11  implants.  I believe that we would have more
12  evidence that would exist of degradation if it
13  truly, in fact, did exist when you consider the
14  large number of patients that have been implanted
15  over the last 20 years.
16    Q.  So let me test that.  I want to make
17  sure I understand all the bases for your opinion.
18    So your opinion is that you do not believe
19  that polypropylene mesh, as used in the Ethicon
20  devices, degrades over time when it's in the body.
21  And your support for that is your own personal
22  practice, and also the systematic reviews, such as
23  Cochrane.  Anything else.
24    MS. SCHMID:  Objection; misstates prior
25  testimony.

Page 68

1  Go ahead.
2    A.  And also my review of the Clave paper
3  and the Costello paper.  And there's other papers
4  like that that are more editorials on these two
5  papers.  So I didn't cite them separately, but
6  Dr. Ostergard has written commentary on the Clave
7  paper.  Howard Goldman has written commentary on
8  the Costello paper and the Clave paper.  So I feel
9  comfortable with my opinions based on reviewing the
10  figures in those papers and the examples of the
11  electron microscopy, and then my own clinical
12  experience and my review of the medical literature.
13    Q.  Okay.  So let's talk about microscopic
14  degradation, okay?
15    A.  Yes.
16    Q.  What do you rely upon for your opinion
17  that polypropylene mesh as used in Ethicon's
18  devices does not degrade at the microscopic level?
19    A.  What do I rely on?
20    Q.  Yes.
21    A.  Well, I believe, like you would see,
22  say, for instance, a bacterial infection, so though
23  we don't see the bacteria and we don't see the
24  macrophages, we see the effects that they cause,
25  like purulence or pus.  If you were having

Page 69

1  microscopic degradation, you would expect to have
2  some consequences of that, for instance, like free
3  radicals, peroxides and other things being released
4  into your system, and there's no evidence to
5  support that.  So when people look at peroxide
6  levels and other toxic metabolites that would
7  result from degradation or from oxidation, there's
8  nothing to report that in any of the medical
9  literature.  I've never witnessed that in any of my
10  patients.  If microscopic degradation continued to
11  exist, you'd expect to eventually see gross
12  evidence of that.
13    So there's a lot of things that we can't see
14  on the microscopic level because it's hard to
15  detect, but once it reaches the gross level, you
16  should be able to see that.  And you should be able
17  to understand that it began at a microscopic level,
18  and now you're just seeing the gross evidence of
19  that.
20    So I think I could infer from my gross
21  observations of what's happening microscopically
22  and then based on the reports and these articles
23  that I've reviewed.  I just don't see the evidence.
24    Q.  So you understand that the reports that
25  you cite, Clave and Costello and others, actually

Brian J. Flynn, M.D.

Page 70

1   using SEM demonstrate degradation, correct?
2       MS. SCHMID:  Objection; foundation.
3       A.  I believe that's what they report in
4   their conclusions, but I have problems with their
5   methods.  And I think that their products in their
6   papers include Bard products.  They include
7   heavyweight meshes.  They include patients that
8   have had multiple meshes inserted.  The Costello
9   paper's about hernia literature.  It doesn't even
10  pertain to transvaginal mesh explants.
11      The Clave paper takes about six different
12  subgroups and lumps them all into one big group and
13  then asks you to make conclusions.  So they have
14  some patients in that study that didn't even have
15  polypropylene inserted; they had polyester and
16  other products.  And so it's very difficult to
17  understand their conclusions.
18      And, to me, it almost seems like an
19  intentional attempt at confusing the reader when
20  you have so many products and then you draw
21  conclusions based on all of these products in their
22  summary statements.  So I don't believe that the
23  evidence exists in those papers.
24      Q.  And if a paper were published that
25  solved some of those concerns of yours about the

Page 71

1   methods, is that something that you'd want to
2   review and include in your expert opinion?
3       A.  I'd be happy to review the paper if I
4   thought that the paper was valuable or something
5   that I should include in my report, I would, but I
6   can't say that without looking at the particular
7   paper.
8       Q.  Now, you have a list of depositions at
9   the end of your reliance materials, and I noted
10  that -- I'm sorry, a list of expert reports that
11  you reviewed at the end of your reliance materials,
12  correct?
13      A.  Yeah, there is a list of a number of
14  expert reports.
15      Q.  And I notice that, for example,
16  plaintiffs' experts who are the pathologists that
17  discuss degradation, you didn't review any of those
18  expert reports, did you?
19      A.  Not in very much detail, so for that
20  reason, I didn't put them on my reliance list.
21      Q.  You've never reviewed any deposition
22  testimony or expert reports of Dr. Klinge, for
23  example?
24      A.  Yeah, I've read a number of his papers,
25  but I don't believe I've ever read his expert

Page 72

1   report.
2       Q.  Or Dr. Klosterhalfen?
3       A.  Similarly.  I think he's on some of the
4   same publications with Dr. Klinge supporting a PVDF
5   product, which I believe they endorse over
6   polypropylene, but I don't believe I reviewed their
7   expert reports.
8       Q.  Or Dr. Jordi Muehl?
9       A.  I am not familiar with that doctor's
10  publications or expert opinions.
11      Q.  And you've never yourself performed any
12  analysis of explanted meshes to determine whether
13  or not there was degradation, have you?
14      A.  I've looked at my explants grossly.
15  I've taken measurements.  The pathology department
16  at university takes pictures.  They preserve the
17  specimens at the request of the plaintiffs'
18  attorneys, but I have not personally done any SEM
19  or chemical analysis or FTIR analysis of the
20  meshes.
21      Q.  And you know, or I think you've
22  testified before, that your pathology department
23  doesn't even look for degradation, so you wouldn't
24  know if it exists or not on your explanted meshes,
25  correct?

Page 73

1       A.  They do report if there would be gross
2   degradation, so on their gross report, they'll make
3   measurements, and they'll provide information on
4   what the explant looked like.  So if there was
5   cracking or breaking or fragmentation, I would
6   expect to see that in the report.
7       Q.  Have you ever reviewed any of
8   Dr. Iakovlev's articles?
9       A.  I am familiar with the name, but I can't
10  cite to their reference or his expert reports, but
11  I know that he's either a materials scientist or a
12  pathologist.
13      Q.  Would you defer to his analysis of the
14  explanted meshes when he's discussing the
15  microscopic evidence of degradation?
16      MS. SCHMID:  Objection; foundation.
17      A.  No, I would not.
18      Q.  (By Mr. Zonies)  Do you think you're
19  better qualified than he?
20      A.  No, but he has been hired by plaintiffs'
21  experts to be an expert.  Similarly, Ethicon has
22  pathologists and materials scientists that are
23  their experts, so in my testimony, I'm prepared to
24  make comments on what I see clinically.  I'm
25  prepared to comment on these papers that I had

Brian J. Flynn, M.D.

Page 74

1  mentioned. I'm prepared to comment what systematic
2  reviews report, but I'm not going to make comments
3  or opinions on SEMs or how they're performed or my
4  own personal experience in performing SEMs.
5       Q. So I notice Dr. Iakovlev's -- none of
6  his papers are on your reliance materials, correct?
7       A. Correct.
8       Q. I'm going to hand you what's been marked
9  as Exhibit 9, a paper from Dr. Iakovlev entitled
10 "Degradation of polypropylene in vivo: A
11 microscopic analysis of meshes explanted from
12 patients."
13      (Exhibit 9 was marked for identification.)
14      Q. (By Mr. Zonies) You've never seen this
15 article before, correct?
16      A. I don't believe so.
17      Q. And we can start, Doctor, if you'd like,
18 by looking on page 11 where the authors actually do
19 a disclosure. You asked for evidence that anyone
20 would do this, and I'll turn your attention to page
21 11. Are you with me?
22      A. Yes.
23      Q. Do you see where it says
24 "Acknowledgements"?
25      A. I do.

Page 75

1       Q. And can you read that sentence out loud
2  to me?
3       A. It says, "Authors provide expert
4  opinions for medical-legal cases on matters related
5  to polypropylene mesh."
6       Q. Is that something you think you should
7  now do when you publish articles, is disclose your
8  conflict?
9       A. I think it would, again, depend on the
10 standards of the journal. So I've never published
11 in this journal, Biomaterials and Research. It's
12 not a journal that I subscribe to or read. This
13 looks like this is an engineering journal, so their
14 requirements may be different than what's in the
15 medical journals.
16      Q. On page 27 of your report, you say, and
17 I'm quoting, "Moreover" --
18      MS. SCHMID: I'm sorry. Let me just -- one
19 moment, please.
20      MR. ZONIES: Sure. Page 27.
21      MS. SCHMID: Thank you.
22      Q. (By Mr. Zonies) Let me know when you're
23 there, Doc.
24      A. Yes.
25      Q. On page 27, the last sentence,

Page 76

1  "Moreover, I have never read or seen a single
2  peer-reviewed published article or seen any cited
3  by plaintiffs' experts that showed any clinical
4  effect of degradation."
5       If such an article existed, you'd like to
6  see that, right?
7       A. I would read that article, sure.
8       Q. Okay. So I've handed you Exhibit 9,
9  Doctor. And if you turn to Dr. Iakovlev's article
10 entitled "Degradation of polypropylene in vivo" and
11 you look at the abstract on the first page -- are
12 you with me?
13      A. Yes.
14      Q. And he says in the second column here,
15 "Several features indicated that the degradation
16 layer formed in vivo: inflammatory cells trapped
17 within fissures, melting caused by cautery of
18 excision surgery, and gradual but progressive
19 growth of the degradation layer while in the body";
20 do you see that?
21      A. I do.
22      Q. Do you have any evidence whatsoever that
23 this is incorrect, wrong, unreliable or in any way
24 wrong?
25      MS. SCHMID: Objection; form, foundation.

Page 77

1  This witness was just handed a 12-page paper that
2  he's already testified he's never seen before,
3  so . . .
4       Q. (By Mr. Zonies) Well, the next sentence
5  says, Doctor, "Cracking of the degraded material
6  contributed to a clinically important mesh
7  stiffening and deformation." Is that what they
8  concluded there?
9       MS. SCHMID: Same objections.
10      A. I can't comment on what their
11 conclusions are. I can immediately point out that
12 it says "melting caused by cautery of the excision
13 surgery." So what that suggests to me is that the
14 excision surgery caused cracking and fissures and
15 melting of the mesh, so I'm not sure why that would
16 be evidence of degradation if your cautery injured
17 the mesh.
18      Q. (By Mr. Zonies) The conclusion, Doctor,
19 is "Cracking of the degraded material indicated a
20 contribution to clinically important mesh
21 stiffening and deformation."
22      And my question is, if that's what this
23 paper demonstrates, wouldn't that be pretty
24 important for you to know before you gave your
25 expert opinion in this case?

Brian J. Flynn, M.D.

Page 78

1      MS. SCHMID: Objection; foundation, assuming
2  facts not in evidence.
3      A. My answer to that would be no.
4      Q. (By Mr. Zonies) You wouldn't want to
5  read this before giving your expert opinion?
6      A. I believe I've read enough articles on
7  degradation. I've read enough systematic reviews
8  and meta-analyses to feel confident in my opinions.
9      Q. Can you tell me one systematic review or
10  meta-analysis that discusses the degradation of
11  polypropylene?
12      A. I think the systematic reviews and
13  meta-analyses do a good job in reviewing and
14  recording and tabulating complications. So if
15  you're considering degradation a complication, I
16  would expect to see that in the systematic review.
17      Q. You believe that the systematic review
18  of -- for example, the Cochrane review, do you
19  believe that was a review of whether or not
20  polypropylene mesh degrades?
21      A. It's a review of the outcomes of
22  polypropylene mesh. And if degradation is a
23  potential outcome that you're citing, then I would
24  expect to see that in the review, yes.
25      Q. If you turn to page 4 -- well, you've

Page 79

1  never read this study before; is that right,
2  Doctor?
3      A. That's correct.
4      Q. All right. So I'm not going to take you
5  through this study and point out things that you
6  haven't read. I do think that that wouldn't be a
7  good use of our time here.
8      Would you agree, Doctor, that if
9  polypropylene mesh degraded even at the microscopic
10  level, that it would increase the potential for
11  bacterial colonization in the mesh?
12      MS. SCHMID: Objection; foundation, vague,
13  improper hypothetical.
14      A. I'm uncertain on what the implications
15  of the cracking would be.
16      Q. (By Mr. Zonies) You don't know one way
17  or the other?
18      A. I don't know one way or another. I
19  haven't read any reports on what the implications
20  of cracking would be, or I'm not aware of any
21  papers that show bacteria inside these cracks,
22  but . . .
23      Q. And again, you've never read this paper?
24      A. I have not read this paper.
25      Q. And you've actually done some work on

Page 80

1  bacterial -- bacteria and meshes, correct?
2      A. Correct.
3      Q. Can you describe that work for me,
4  please?
5      A. We had a paper at the American Urologic
6  Association meeting, in the abstract and poster
7  form, looking at bacterial analysis of explanted
8  meshes. We looked at a number of groups, including
9  patients that had what we considered painful mesh,
10  which is an IUGA Type I, pain without any exposure
11  or perforation. Then we looked at patients that
12  had IUGA II and III as a group, that would be
13  people that had exposed mesh, also known as
14  extruded mesh, and then another group of patients
15  that had mesh perforated into the lower urinary
16  tract, that would be IUGA IV. And then we also had
17  what we would consider our control group which were
18  people that were having revisions more for
19  recurrent incontinence or for other indications
20  unrelated to pain, exposure or perforation.
21      Q. And what was the conclusion of your
22  study?
23      A. I would have to look at the study again,
24  if you want to read the exact conclusion. We never
25  published the study. The paper received a lot of

Page 81

1  criticism because of the methods, and so it wasn't
2  something that we pursued.
3      Q. Wasn't one of the conclusions that in 80
4  percent of the explanted meshes where it was
5  explanted for pain, exposure or perforation, that
6  there was bacterial pathogens?
7      MS. SCHMID: Objection; form.
8      A. I would have to look at the abstract
9  again. The goal of the paper was to try to help
10  identify, you know, why patients might have pain
11  unrelated to exposure or perforation.
12      Q. (By Mr. Zonies) And you've described
13  that before. You've expressed that you have a
14  particular interest or a theory that you were
15  working on related to infection, mesh infections
16  and pain; is that right?
17      A. I think that overstates what the work
18  was. Dr. Shaw, who was my fellow, was curious
19  about this, and it was something that we had worked
20  on together.
21      Q. I'll go ahead and mark as Exhibit 10
22  your abstract.
23      (Exhibit 10 was marked for identification.)
24      Q. (By Mr. Zonies) Is Exhibit 10, entitled
25  "Bacteriological Analysis of Explanted Transvaginal

Brian J. Flynn, M.D.

| Page 82 |
| --- |

1  Meshes," the abstract we were just talking about?

2     A. Yes.

3     Q. And your conclusion that you reached in

4  this abstract is, "Colonization of vaginally

5  implanted mesh occurs frequently, and bacterial

6  infection may account for pelvic pain in patients

7  with painful mesh and dyspareunia." Is that what

8  you concluded in this abstract?

9     A. That's what we concluded in the

10  abstract.

11     Q. And you also, in your chart, you

12  actually reflect that in those patients where what

13  you called your control patients, that none of them

14  had pathogenic organisms; is that correct?

15     A. That's correct, but we only had four

16  patients in that group, so there's no P values in

17  any of these charts. We couldn't reach statistical

18  significance because the numbers were so small in

19  this study.

20     Q. And you also find there that 83 percent

21  of those women who had a urinary tract erosion had

22  pathogenic organisms, correct?

23     A. Correct.

24     Q. And your conclusion right above that was

25  that the bacterial infection that you found in

| Page 83 |
| --- |

1  these explanted meshes may account for pelvic pain

2  in patients with painful mesh and dyspareunia,

3  correct?

4     A. And what we said is it may account. It

5  didn't say it did account. What was probably most

6  surprising, if you look at our vaginal erosion

7  patients, I think that there's a thought that a

8  hundred percent of those patients have mesh that's

9  colonized with bacteria and only 20 percent of the

10  patients had pathologic organisms in that exposed

11  mesh, so 80 percent did not. And so this was sort

12  of a pilot study. The results weren't really what

13  we expected. And so we're still working through

14  how to interpret this data.

15     Q. So tell me how you're doing that work.

16     A. We continue to send culture information

17  on our explants for microbiologic analysis both for

18  aerobic and anaerobic cultures. We send for

19  pathological analysis, as we mentioned earlier. I

20  haven't collected the data in an organized form

21  since this abstract, but if I get that report back

22  from the pathology lab, and I'll have to sign off

23  on all those reports, on all the outcomes, so I

24  look at those reports as they come to me.

25     Q. So you have that data available to you?

| Page 84 |
| --- |

1     A. I don't have it collected. You know, I

2  mentioned in this group of 50 patients, we had that

3  data available to us in 2013. But since that time,

4  I'm only looking at it on a case-by-case as I get

5  reports from my microbiology lab, but I haven't

6  tabulated it since 2013.

7     Q. So we have no way to see what your

8  current data shows?

9     A. We don't.

10     MR. ZONIES: Why don't we go ahead and take

11  a break.

12     MS. SCHMID: Sure.

13     (Recess taken from 3:14 p.m. until

14  3:38 p.m.)

15     Q. (By Mr. Zonies) Doctor, we're back from

16  a break. Are you ready to go?

17     A. Yes, I'm ready to go.

18     (Exhibit 11 was marked for identification.)

19     Q. I'm going to hand you what's been marked

20  as Exhibit 11. Exhibit 11 is a study by Tzartzeva

21  entitled "In-Depth Nano-Investigation of Vaginal

22  Mesh and Tape Fiber Explants in Women."

23     I notice this abstract was not on your

24  reliance materials, correct?

25     A. Correct.

| Page 85 |
| --- |

1     Q. You've never reviewed that paper before

2  either, have you?

3     A. I don't believe so.

4     Q. In fact, Doctor, these studies that I

5  think you mentioned, studies that do these SEM

6  images from explant samples, you don't find those

7  studies particularly informative; is that right?

8     A. That's not what I stated. I did cite to

9  the Clave paper which has plenty of SEM samples in

10  it.

11     Q. And do you have any -- if you see in the

12  middle of this Exhibit 11 that I just handed to you

13  in the "Results" section -- are you with me? It's

14  the sentence that starts with "Comparison."

15     A. Yes.

16     Q. "Comparison of the SEM images from

17  explant samples with controlled pristine samples

18  revealed extensive surface degradation with

19  formation of microscopic surface cracks of several

20  microns in length and depth."

21     Is that what this study found in the

22  results?

23     A. That's what you just read to me. That's

24  what's written here. I can't comment beyond that.

25  I'm not familiar with this study, and I don't know

Brian J. Flynn, M.D.

Page 86

1    what the pristine control group is comprised of. I
2    don't even know what the explant is, what kind of
3    polypropylene mesh explant this was.
4        Q. And if you flip it over on the back of
5    it, it actually shows you that this is comparing a
6    Gynemesh, and Figure 3 is TVT mesh, correct?
7        MS. SCHMID: Objection; foundation.
8        A. TVT and Sparc.
9        Q. (By Mr. Zonies) Right. And it says
10   "TVT" -- or pictures A and B comparing the
11   explanted mesh in A to B, the pristine mesh. Do
12   you -- just grossly looking at those pictures, do
13   you notice a difference?
14       MS. SCHMID: Objection; foundation, scope.
15       A. Well, these are microscopic images, so
16   it's hard for me to comment grossly on a
17   microscopic image, but I'm not going to comment
18   because I just don't know enough about this
19   photograph to make an intelligent comment about it.
20       Q. (By Mr. Zonies) And that's because
21   you've never reviewed that paper, correct?
22       A. Correct.
23       Q. One of the papers you did review in
24   your -- I believe is on your reliance, is a paper
25   by Moalli. Do you recall that paper?

Page 87

1        A. I've reviewed a number of her papers.
2        (Exhibit 12 was marked for identification.)
3        Q. (By Mr. Zonies) And I'm going to hand
4    you what's been marked as Exhibit 12. Do you have
5    any criticisms of Exhibit 12, the Moalli paper
6    entitled "Tensile properties of five commonly used
7    mid-urethral slings relative to the TVT"?
8        A. The paper is well done, for the most
9    part, but there are some limitations of the paper.
10   I wouldn't necessarily call them criticisms, but
11   there are limitations to studies that are done ex
12   vivo, what we call a dry lab, you know, on a
13   stretch rack. I don't know if these studies are
14   necessarily representative of what occurs in vivo.
15       Also, I have concerns when the entire 45
16   centimeters of the mesh is not tested. Oftentimes,
17   these meshes, for instance in this study, were cut
18   in 8-centimeter samples, so how a mesh that's 8
19   centimeters behaves, you know, doesn't necessarily
20   represent the 45-centimeter mesh that is TVT or
21   maybe what ordinarily ends up in the body, probably
22   around 20 to 25 centimeters. So those are some
23   obvious limitations.
24       Also, they don't account for tissue ingrowth
25   and how tissue ingrowth may resist some of the

Page 88

1    effects of stretching and cycling of the meshes.
2    But I am happy to comment on this paper. I am
3    familiar with this paper. It is in my reliance
4    list.
5        Q. You mentioned cycling. Can you explain
6    to me what you meant when you said that?
7        A. Cycle, at least in terms of
8    biomechanical terms, is stretching the mesh and
9    then relaxing the mesh, stretching the mesh then
10   relaxing the mesh. So if you look at Figure 1, it
11   shows how that's done in Dr. Moalli's laboratory.
12   And then if you look at Figure 2, it shows some of
13   the meshes after they've undergone cycling. And
14   then in Figure 3 and especially Figure 5, Figure 5
15   shows probably the best example of cycling of a
16   mesh ex vivo.
17       Q. And do you believe that in vivo mesh
18   is -- goes through cycles?
19       A. Yeah, I think that's one of the ideal
20   characteristics of the TVT mesh, is that it bends,
21   but it doesn't break, and so you want a mesh that's
22   going to be elongated or be elastic when undergoing
23   effort stresses.
24       Q. And when you said Figure 5 showing the
25   cycling, do you have any reason to dispute the

Page 89

1    conclusions that are reached in Figure 5?
2        A. It says, "With each cycle, the peaks and
3    valleys of the curve move progressively to the
4    right of the graft indicating permanent
5    (nonreversible) elongation." I agree with that
6    conclusion with respect to the dry-lab testing.
7    And I think that that's something that Dr. Moalli's
8    reported on. Whether or not this is what occurs in
9    vivo after tissue ingrowth, if they're speculating
10   that that occurs, then I think that would be an
11   overreach on their conclusion.
12       Q. Do you believe that a 20 percent
13   elongation is an approximation of how meshes react
14   that you have implanted?
15       MS. SCHMID: Objection; foundation, scope.
16   Go ahead.
17       A. I think typical elongations that I'm
18   more familiar with, for instance what's reported in
19   other papers, is around 3 to 5 percent, not the 20
20   to 60 percent relative elongation. So elongation's
21   going to depend a lot on how many cycles. It's
22   going to depend on tissue ingrowth. It's going to
23   depend on what the load is. So when you're looking
24   here at 6 newtons, 6 newtons is, you know, about 12
25   times the typical load that would occur in the

Brian J. Flynn, M.D.

Page 90

1  human body.  If you look at a cough, for instance,
2  that's about .5 newtons.  So 6 newtons is a pretty
3  heavy load.
4      When you look at the ideal designs of
5  meshes, ordinarily, meshes are designed to
6  withstand, you know, ideally 2 newtons.  I think 6
7  newtons is not a physiologic load.  So I'm not sure
8  why they felt the need to apply that much force.
9      And in the second curve, they did as much as
10  14 newtons, which would be 28 times, you know, what
11  you would see with normal everyday activity.
12      Q.  (By Mr. Zonies)  Do you see on -- just
13  above the graphs you're looking at in Figure 5, the
14  last sentence in the first column says, "The
15  permanent elongation after C1, 10 cycles between .5
16  and 5 newtons, or roughly .1 and 1.1 pounds, of the
17  Gynecare mesh was different from that of all the
18  other samples tested.  Gynecare samples permanently
19  elongated by 17.5 plus or minus 4.2 percent
20  indicating that although very little force applied,
21  there is irreversible deformation of the TVT." Do
22  you agree or disagree with that conclusion?
23      MS. SCHMID:  Objection; foundation.
24      A.  Gynecare provides samples, so these are
25  the 8-centimeter samples, not 45 centimeters.  So

Page 91

1  you got an 8-centimeter sample that's permanently
2  elongated by 42 percent, which is basically the
3  same as what the AMS mesh did, "and the tanged,
4  nonheated portion of Boston Sci, 40 percent, Bard
5  samples, again, displayed significantly less
6  permanent elongation followed by Caldera and
7  Mentor."
8      (Reviewing document.)  So what the
9  conclusion is is that the less-stiff meshes -- I'm
10  sorry, the stiffer meshes are not going to elongate
11  as much.  I would agree with that conclusion.  If
12  the mesh is very stiff, you're not going to have as
13  much elongation.
14      Q.  And I'm particularly focused on the
15  sentence, or the sentence that I read, which is
16  concerning the very low load.  So "The permanent
17  elongation after C1, 10 cycles between .5 and 5
18  newtons, the Gynecare mesh was different from that
19  of all the other samples tested.  Gynecare samples
20  permanently elongated by 17.5, plus or minus 4.2
21  percent, indicating that although very little force
22  applied, there is irreversible deformation of the
23  TVT."  Do you agree or disagree with that
24  statement?
25      MS. SCHMID:  Objection; form, foundation.

Page 92

1      A.  I thought I heard you say "very low
2  loads." I'm not sure where it says that in that
3  statement.
4      Q.  (By Mr. Zonies)  It says, "very little
5  force applied"; do you see that?
6      A.  I do see that, yes.
7      Q.  So with very little force applied, there
8  is irreversible deformation of the TVT.  Do you
9  agree or disagree with that statement?
10      MS. SCHMID:  Objection; form, foundation.
11      A.  I disagree with that statement.
12      Q.  (By Mr. Zonies)  Based upon what?
13      A.  Based upon other papers that would not
14  cite that this is a very low load.  This is an
15  everyday physiologic load, so I disagree that
16  that's a very low load.  There's a paper by
17  Dr. Lynn, and there's other papers that -- the
18  Dietz paper, for instance, that go over loads and
19  the stress-strain curve.  And I think the .5
20  newtons to 5 newtons is something that I see in the
21  Dietz data and other papers, so I would disagree
22  that .5 to 5 newtons is very little force.  It
23  might be in the grand scheme of things, but these
24  are the forces that occur in the human body, so I
25  think that they're not very low forces with respect

Page 93

1  to what the body's used to observing.
2      Q.  So the .5 to 5 newtons are the forces
3  that you would see in the human body?
4      A.  That's correct.
5      Q.  Those are the forces you would expect to
6  see on a transvaginal mesh such as TVT-R, correct?
7      A.  Well, it's a big range.  I mean, you're
8  talking about a tenfold range.  So what I see
9  typically is, you know, somewhere between .1 and .5
10  newtons.  I would consider 5 newtons a huge amount
11  of force.  It says "very little force." 5 newtons
12  is not very little force.  5 newtons is a very big
13  force.
14      Q.  You said, what you see.  What do you
15  mean when you say, from what you see, .1 and .5
16  newtons is what's typical?
17      A.  That's based on my review of what's
18  reported in other papers and in the medical
19  literature.  So I would disagree that 5 newtons is
20  little force.  5 newtons is a big force.
21      Q.  But you would agree that .5 to 5 newtons
22  is what one would experience in the human body,
23  correct?
24      A.  .5, yes.  5, no.  I'm not aware of what
25  5 -- what would constitute 5 newtons.

Brian J. Flynn, M.D.

Page 94

1    Q. Okay. And but --
2    A. So what I mentioned earlier is .5 to
3  maybe as much as 2 newtons, that's how the meshes
4  are designed. Ideally, the meshes are designed --
5  if you look at the width of the urethra, it's 1
6  centimeter. And you can look at the width of the
7  mesh being 1 centimeter, so you have to also
8  account for the forces being distributed over that
9  1 centimeter. And when you take a mesh that can,
10  say, withstand 8 newtons, and then you divide it by
11  the 1-centimeter width, it's typically designed to
12  withstand around 2 newtons. So I'm not surprised
13  that they permanently elongated it when they
14  stretched it to 5 newtons, which is much more than
15  what the mesh is really designed to withstand.
16    So, you know, that's one of the limitations
17  in dry-lab testing. But what I can say, if you go
18  to the other figures, for instance, like Figure 3,
19  you can see that the Gynecare mesh behaves very
20  similar to the other meshes, especially the AMS
21  mesh. And, you know, it's a mesh that has very
22  little stiffness where when you compare it to some
23  of the other products, like the Bard product, for
24  instance, it's not nearly as stiff. The Caldera,
25  the Mentor product, they had to put out a separate

Page 95

1  curve because they're so much stiffer than the
2  other five products that are mentioned.
3    Q. And what does that mean to you
4  clinically, that they're so much stiffer?
5    A. Well, there's a balance in surgery that
6  you're going to look for when you're designing
7  meshes. So you want something that's going to
8  bend, but not break. So the fact that the Gynecare
9  mesh can elongate underneath the urethra during
10  physiologic loads, I feel that's a good thing. So
11  as the woman is walking or jumping up and down or
12  running, you want the urethra to descend, and you
13  want the urethra to be mobile. If the mesh is too
14  stiff, then that urethra is not going to move, and
15  then you do worry about that causing complications.
16  And so you want to have the optimal balance of
17  stiffness.
18    And if you look at that physiologic range,
19  you know, even going up as much as 10 newtons,
20  there's a very linear response in terms of the
21  elongation. It's not until you get to the
22  nonlinear portions of the curve that the mesh
23  starts to become stiff. So really up to 10
24  newtons, the mesh is not stiff at all. It's once
25  it gets beyond 10 newtons that you'll start

Page 96

1  exhibiting some stiffness.
2    Q. So on the second page, the last -- on
3  the first page of the Moalli study, the last two
4  words are "for example"; do you see that?
5    A. Page 1?
6    Q. Yes.
7    A. Yes.
8    Q. "For example, one of the primary
9  problems in using the TVT is that as a result of
10  its low stiffness, the mesh easily deforms when
11  tensioning under the urethra. Specifically pulling
12  a sling gently results in thinning of the mesh,
13  permanent deformation and fraying at the tanged
14  edges"; did I read that correctly?
15    A. Yes, you did.
16    Q. And do you have any reason to disagree
17  with that conclusion by Moalli, et al.?
18    MS. SCHMID: Objection; form, foundation.
19    A. Well, there's no reference to it, number
20  one, so this is her thoughts on that. She says
21  that it's a primary problem, but she doesn't cite
22  what the problem is. I would say it's one of the
23  primary advantages of the TVT, not that it's a
24  problem, but that's an advantage. That's why it's,
25  you know, the most commonly utilized product ever

Page 97

1  in the history of stress urinary incontinence
2  surgery, more commonly used than any of the
3  competitor meshes.
4    And I personally have pulled on these
5  meshes, and you would have to pull quite hard to
6  deform the mesh. So when she says "pulling on the
7  sling gently results in thinning," that might occur
8  if you take a 45-centimeter mesh and cut it into 8
9  centimeters and already start to mechanically alter
10  it, but that's not my own personal experience when
11  implanting the mesh.
12    Also, the mesh has a plastic sheath over it
13  which protects it. But there's really no reason to
14  pull on the mesh. When you place the mesh, your
15  load from the bottom to top approach, it lies flat
16  below the midurethra, you put your number -- Hegar
17  dilator in there, you take the plastic sheath off,
18  and you cut it at the skin. There's no reason to
19  be pulling or deforming the mesh.
20    So I mean, what she's doing in this paper is
21  interesting, and I think it helps sort of compare
22  and contrast products, but meshes, in my practice,
23  don't deform, so I don't know why we're
24  intentionally trying to deform a mesh and then
25  measure the biomechanical properties of a deformed

Brian J. Flynn, M.D.

Page 98

1  mesh. Why not measure the biomechanical properties
2  of a mesh that's not deformed.
3       Q. Doctor, do you know what DDSA stands
4  for?
5       A. DDSA?
6       Q. Yes.
7       A. Is that in this paper?
8       Q. No.
9       A. I'm not immediately familiar with that
10  DDSA.
11      Q. How about DFMEA?
12      A. I mean, I could -- it may be related to
13  deformation, but I'm not familiar with the
14  abbreviations. I'm probably familiar with the
15  terminology, but not the abbreviation.
16      Q. Have you read any of the design files
17  associated with the TVT-Retropubic?
18      A. Design files?
19      Q. Yes.
20      A. I read a number of Dr. Ulmsteen's
21  original papers on TVT.
22      Q. Have you read any of Ethicon's design
23  files on the TVT mesh?
24      A. I don't know if that is including
25  Ulmsteen's data, but I've read Ulmsteen's original

Page 99

1  papers, the paper from '95, '98, the personal
2  history he wrote about the tape and its
3  developments. I'm familiar with the history of the
4  mesh, but these design files, it sounds like you're
5  referencing to a particular document that I'm not
6  familiar with.
7       Q. Okay. What is a mesh fragment?
8       A. A mesh fragment I believe would be
9  referring to a portion of the mesh that's not
10  contiguous with the body of the mesh.
11      Q. And is it important to ensure that there
12  are not mesh fragments in the vaginal space?
13      MS. SCHMID: Objection; form, vague.
14      A. I think whether the mesh is contiguous
15  or not contiguous is -- it's still polypropylene,
16  and it's going to perform similarly, whether it's
17  in contact with the body or not in contact with the
18  body, the mesh. So I don't have any concerns about
19  fragments or fraying of the mesh.
20      Q. (By Mr. Zonies) So have you ever
21  removed a mesh where -- a sling where there was
22  encapsulation?
23      A. Certain slings, yes. If you looked at
24  the ObTape product, which would be, really, a Type
25  IV mesh similar to particle board, similar to

Page 100

1  Gor-Tex, a microporous mesh, and then certainly
2  silicone products encapsulate, but I have not
3  witnessed that with TVT mesh or Type I
4  polypropylene mesh.
5       Q. What is a pseudocapsule?
6       MS. SCHMID: I'm sorry. Can you say that
7  again?
8       MR. ZONIES: Pseudocapsule,
9  p-s-e-u-d-o-c-a-p-s-u-l-e.
10      MS. SCHMID: Thank you.
11      A. So I think everyone's familiar with the
12  term "capsule." When you put the word "pseudo" in
13  front of it, it would mean that it kind of looks
14  and behaves like a capsule, but anatomically it's
15  not a true capsule. So people often use that term
16  to describe the capsule around an implant,
17  "pseudocapsule." Others would just use the word
18  "capsule."
19      Q. (By Mr. Zonies) Would others use
20  "encapsulated"?
21      A. Yeah, I think those words can be used
22  interchangeably. So it's referring to some sort of
23  capsule.
24      Q. In your article in 2013, you wrote that
25  you encountered meshes that had pseudocapsule's,

Page 101

1  correct?
2       A. I have to look at the article.
3       (Exhibit 13 was marked for identification.)
4       Q. (By Mr. Zonies) I'll mark Exhibit 13,
5  your article entitled "Surgical management of lower
6  urine mesh perforation after midurethral
7  polypropylene mesh sling." Do you have that in
8  front of you, Doctor?
9       A. I do.
10      Q. This is an article you wrote discussing
11  your treatment of a number of women who experienced
12  severe complications associated with mesh slings,
13  correct?
14      A. Correct.
15      Q. And you wrote in this article on page
16  2113, "In the past six years"; do you see that
17  paragraph?
18      A. I do.
19      Q. You wrote, "In the past six years we
20  have seen an increase in the overall number of
21  transvaginal mesh complication cases referred to
22  our center. This alarming increase prompted us to
23  review our experience with transvaginal
24  polypropylene mesh"; did I read that correctly?
25      A. Yes.

Brian J. Flynn, M.D.

Page 102

1    Q. And you actually did have an alarming
2  increase in the number of mesh complications during
3  that period of time, correct?
4    A. Not me personally. I think what I
5  stated was the cases that were referred to our
6  center that I was asked to manage. So because of
7  that, I wanted to go back and review my own
8  experience. So I did that. If you read the next
9  sentence, "Since 2006, midurethral sling placement
10  by senior author BJF," which is me, University of
11  Colorado Hospital, I have had three lower urinary
12  tract perforations out of 600 cases. So that would
13  be -- if it was 6 into 600, that would be 1
14  percent, so about 25 percent. So I was alarmed by
15  what was being referred to me, but after I reviewed
16  my own personal data, it was consistent with the
17  medical literature and what other people were
18  reporting.
19    Q. What was your loss to follow-up in those
20  603 cases?
21    A. I don't believe we lost any to
22  follow-up. We reviewed all 600 cases. All these
23  patients were, you know, followed for a year. We
24  didn't call all 600 patients, but my practice, in
25  general, patients will return to me.

Page 103

1    Q. What are your statistics on how many of
2  your patients return to you? What are your actual
3  statistics?
4    A. What I can state from other studies I've
5  done on male urethral stricture disease, ureteral
6  stricture disease, it's unusual that we would lose
7  more than 5 percent of patients to follow-up.
8    Q. But do you know what your loss to
9  follow-up was in these 600 patients that you're
10  talking about in your paper?
11    A. So probably less than 5 percent.
12    Q. And you base that upon what statistics?
13    A. That's based on my review of other
14  patient cohorts in my practice and patients
15  behaving similarly, so, you know, we spent a lot of
16  time in these depositions reviewing studies that
17  I've published on various surgical procedures,
18  whether that's male urethral stricture disease,
19  ureteral stricture disease, mesh complications,
20  pubovaginal sling, Prolift, artificial urinary
21  sphincter. So that's been my experience in any of
22  those studies. And I think that is consistent with
23  this group of patients.
24    Q. How many of those 603 women did you call
25  at one year?

Page 104

1    A. We saw them personally face-to-face, so
2  we see them at two weeks, six weeks, three months
3  and one year.
4    Q. How many of those 603 women did you see
5  at two years?
6    A. The only patients that we were following
7  after the one-year period would be patients that
8  had other complaints and other reasons to be
9  followed. The rest of them would be returned to
10  follow-up with their local provider.
11    Q. How many of those 603 women did you see
12  at two years?
13    A. I don't have that number.
14    Q. How many of those 603 women did you see
15  at one year?
16    A. I would say close to probably 95 percent
17  or maybe even greater.
18    Q. Where is that data?
19    A. Where is that data? That's my own
20  personal review and my experience with other
21  patients in my practices.
22    Q. Of those 603 women, it's your testimony
23  here today that you saw 90-some percent of those
24  women at one year?
25    A. That's an approximation, Mr. Zonies, but

Page 105

1  that's based on my experience with other cohorts.
2    Q. That's not based upon these 603 women,
3  correct?
4    A. I'd have to go back and look at that,
5  but I believe that number is representative.
6    Q. Why didn't you say that 5 percent of
7  these women were lost to follow-up?
8    A. Again, those are estimations. You know,
9  I'd have to go back and look at the review of those
10  600 patients.
11    Q. If it were 5 percent that were lost to
12  follow-up, that'd be up to 30 women, and they all
13  could have had an erosion, correct?
14    MS. SCHMID: Objection; form, calls for
15  speculation.
16    A. No, that's not correct. I don't see any
17  reason to believe why, you know, 30 out of 30
18  patients would have a .5 percent complication.
19    Q. (By Mr. Zonies) But you don't know?
20    MS. SCHMID: Same objection --
21    A. I'm confident --
22    MS. SCHMID: -- argumentative.
23    A. -- in saying that there's no possible
24  way that all 30 of those patients had mesh
25  perforation.

Brian J. Flynn, M.D.

Page 106

1    Q. (By Mr. Zonies)  You admit in this paper
2 that "the original implanter may not have knowledge
3 of the complex mesh complication that occurred in
4 their patient."
5         And you agree with that, right?  The
6 original implanter may not know.
7    A. It depends on who the original implanter
8 is.  If the original implanter is not me, you know,
9 I can't speak for how they follow their patients.
10 I can just speak for how I follow my patients and
11 what the FDA Public Health Notification
12 recommended, that you do diligence in following
13 your patients, and that's what I've done.  I have
14 all my cases recorded.  I have my own registry.  We
15 don't go out and contact those patients, but if we
16 needed to, we could.
17    Q. And in this paper, you say that there
18 are complications that the meantime from initial
19 placement of the mesh until removal was 15.5 months
20 with a range from 1 month to 60 months, or five
21 years, correct?
22    MS. SCHMID:  I'm sorry.  Where are you
23 reading from, Counsel?
24    Q. (By Mr. Zonies)  Next paragraph down, it
25 says "The mean time."  Do you have that, Doctor?

Page 107

1    A. Yeah, I do.
2    Q. So isn't it true, Doctor, that -- and
3 you've testified before, I believe, that a mesh
4 complication can occur at any time from the moment
5 it's put in until the end of the woman's life,
6 essentially, as long as the mesh is implanted,
7 correct?
8    A. Yes, there's no finite range.
9    Q. And, in fact, you had at least one woman
10 in this paper that had a complication after five
11 years, correct?
12    A. Yeah.  And if you look at statistics,
13 some prefer to report the median rather than the
14 mean.  So when you look at the mean, we had someone
15 at 60 months.  That's going to drag that average up
16 to 15 months.  But what I've seen most consistently
17 is patients presenting before one year.  So the
18 median may have been a better number to report.
19 Median is the most common time where people report,
20 so that's most common month, where mean just
21 averages the entire range.  So if you have one
22 outlier, then that could really skew your data.
23    Q. But you agree that you've seen mesh
24 complications in patients well beyond 15 and a half
25 months, correct?

Page 108

1    A. Correct.
2    Q. And this alarming increase that you saw
3 at your center of mesh complications, these were
4 women where you actually treated them for a mesh
5 complication.  It was a real complication, correct?
6    MS. SCHMID:  Object to form; compound.
7    A. However you want to describe it.
8 There's 21 patients that we treated with lower
9 urinary tract mesh perforation of which three of
10 them were my patients, 18 were referred to me.
11    Q. (By Mr. Zonies)  In other words, these
12 are -- you wouldn't treat a woman who didn't have a
13 true complication from her mesh.  You wouldn't
14 excise a mesh if a woman didn't actually have a
15 complication, correct?
16    A. Are you asking me if I would excise an
17 asymptomatic patient?
18    Q. Yes.
19    A. It would be very unlikely.  There may be
20 a scenario where someone doesn't have any symptoms,
21 but if the mesh is in the lower urinary tract, and
22 when you look at the table, you know, in the study,
23 all of these patients that we excised were, in
24 fact, having symptoms.  That's reflected in Table 1
25 with the common symptoms that patient's presented

Page 109

1 with.
2    Q. And the most common being pain and
3 dyspareunia, correct?
4    A. I don't believe we separated the -- so
5 pain was the most common, and then, this is in
6 Table 1, pain was most common followed by urinary
7 incontinence, number 2.  Urethral obstruction was
8 number 3.  Dyspareunia was probably 4 or 5, but
9 pain was number one.
10    Q. And you write in your paper on the last
11 page -- or, I'm sorry, on page 2116 that "A review
12 of the contemporary literature on the surgical
13 management of LUT mesh perforation did not reveal
14 any consensus on how to effectively manage mesh
15 complications."  That's what you wrote, correct?
16    A. And it's in Table 4.  And what that is
17 reflective of is that there's quite a bit of
18 heterogeneity in how these complications were being
19 managed across various centers.
20    Q. And that's as of 2013 that there was no
21 real consensus on how to manage them.  In fact,
22 that's, in part, why you wrote this paper, correct?
23    A. I agree with the first part of the
24 statement, that there's no consensus.  The reason I
25 wrote the paper is just to tell people what we did,

Brian J. Flynn, M.D.

Page 110

1  how we managed it.
2       Q. And as you sit here today, there still
3  is no real consensus on how to manage mesh
4  complications, correct?
5       MS. SCHMID: Objection; form, vague.
6       Go ahead.
7       A. I've been involved in two recent panels,
8  one at SUFU and one at the AUA with other experts,
9  and I believe that what we're doing now does have
10 some consensus. That would consist of removing the
11 mesh from the urethra, repairing the defect in the
12 urethra. Those two procedures are consistent
13 across a number of practices. Most experts on the
14 panel do not recommend removing the entire mesh.
15 Where the variability and technique would be is
16 whether or not you need to place a flap or a new
17 biological sling at the same time of the mesh
18 removal. That's where there's variation in the
19 procedures, so under the column "Additional
20 Procedures" versus primary procedure.
21      Q. Have you personally ever reported a mesh
22 complication into the FDA's database?
23      A. I don't believe so.
24      Q. And how many mesh complications have you
25 handled?

Page 111

1       MS. SCHMID: Objection; form, vague.
2       A. Over 200.
3       Q. (By Mr. Zonies) So that database is
4  short 200?
5       MS. SCHMID: Objection; form, argumentative.
6       Q. (By Mr. Zonies) Just from your
7  practice?
8       MS. SCHMID: Sorry about that.
9       MR. ZONIES: That's okay.
10      MS. SCHMID: Objection; form, argumentative,
11 assumes facts not in evidence.
12      A. Not necessarily. Since you could see in
13 that paper the overwhelming majority of the
14 patients are referred to me. The original
15 implanter may have reported the complication to the
16 databank. So that's making an assumption that I
17 didn't report it and the original implanter didn't
18 report it or anybody else who maybe have been
19 involved in the care.
20      Q. (By Mr. Zonies) One of your opinions is
21 that the IFU adequately warned physicians of the
22 relevant adverse effects, correct?
23      A. Correct.
24      Q. Which IFU did you look at for that? Did
25 you know?

Page 112

1       A. I believe I looked at both of them. I
2  think there's one from 2005 and then 2008. I'd
3  have to get them in front of me, but I feel both
4  IFUs were adequate.
5       Q. And your reliance list actually
6  identifies those IFUs that you just discussed.
7       Are you aware, Doctor, that in 2015, Ethicon
8  came out with a new IFU for the TVT-Retropubic?
9       MS. SCHMID: Objection; form.
10      Go ahead.
11      A. I'm unsure.
12      Q. (By Mr. Zonies) Nobody ever gave you
13 the 2015 IFU to review?
14      A. Well, they don't have to give it to me.
15 It's included in the package.
16      Q. But you haven't used the TVT-R in six
17 years, right?
18      A. I use the TVT-Exact. That's what I
19 mentioned earlier. So when you say the IFUs
20 changed, are you referring to TVT-Exact or TVT
21 classic?
22      Q. Yes, the one we're talking about today,
23 the TVT-Retropubic device.
24      A. Then no, I haven't seen it.
25 //

Page 113

1       (Exhibit 14 was marked for identification.)
2       Q. (By Mr. Zonies) I'm going to hand you
3  Exhibit 14. And you'll see on that first page on
4  the left-hand side at the bottom, it says the date
5  is 01/2015. Do you see that date?
6       A. Yes.
7       Q. And this is the TVT-Retropubic
8  instructions for use that if you go on the Web you
9  can actually pull these down.
10      A. Okay.
11      Q. And Doctor, you're now reviewing
12 Exhibit 14, the 2015 IFU. Can you confirm that
13 you've never seen that IFU before?
14      A. I can't confirm either way. I've looked
15 at a number of IFUs. I've included them on the USB
16 and on my reliance list.
17      Q. And if it's not on the USB or your
18 reliance list, you haven't reviewed it, correct?
19      A. I'm unsure, is what I mentioned.
20      Q. Doctor, do you know if you ever used the
21 TVT-Retropubic laser-cut device?
22      A. Yes, I have.
23      Q. How do you know that?
24      A. Because when you look at the history of
25 mechanical cut versus later cut, the mesh was

Brian J. Flynn, M.D.

Page 114

1    mechanical cut up until around 2006.  And as I
2    mentioned earlier in the deposition, I didn't start
3    using the TVT-Exact until around '11, so probably
4    from around 2006 to '11 I was using the laser-cut
5    mesh.
6         Also, as I mentioned earlier in other
7    depositions, they would mark the box with an L, and
8    they did that for TVT-O as well as retropubic TVT.
9    And I believe that's what was offered to my
10   hospital.  But I'm confident that when the laser
11   cut came out, that's when the hospital switched
12   over from mechanical to laser.
13        Q.  So do you believe that if I find the
14   hospital's records for its purchasing of
15   TVT-Retropubic devices, that in or around 2006, all
16   of the TVT-Retropubic devices that the hospital
17   purchased will have been laser cut?
18        MS. SCHMID:  Objection; misstates prior
19   testimony.
20        Go ahead.
21        A.  Working at a number of different
22   hospitals, so it would probably be particular to
23   that hospital, but I believe that's in and around
24   the time when we switched to laser cut.
25        And also, with the Gynecare TVT-Secur and

Page 115

1    TVT-Abbrevo, TVT-Exact, they're all laser-cut
2    products, so certainly I've used laser cut.
3         Q.  (By Mr. Zonies)  Was there a problem
4    with the mechanically cut mesh that made you want
5    to switch to the laser-cut mesh?
6         A.  I wouldn't use the word that there was a
7    problem.  I think that there were some distinct
8    advantages offered with laser cut that were
9    attractive and seemed intuitive to offer an
10   advantage.  And if you looked at what some of the
11   competitors were doing with their products, they
12   were using the laser cut or what's also known as
13   the nontangled edges, and so they were looking to
14   heat-seal the edges.  Boston Scientific did that,
15   and some of the other companies did that.  And what
16   that led to was easier deployment of the mesh, so
17   when you placed the mesh, it was less likely -- I
18   mean, I should just say it was easier to deploy the
19   mesh to get it to lie flat.  And it just seemed to
20   be easier to handle.
21        Q.  Were you aware, Doctor, that as late as
22   2008, 90 percent of TVT sales were actually
23   mechanically cut mesh, not laser cut?
24        MS. SCHMID:  Objection; form, assuming facts
25   not in evidence.

Page 116

1         A.  I never really kept track of what the
2    sales data was.  I paid attention to what I used in
3    my practice.  Again, around 2008 or '9, I went to
4    TVT-Secur, and that was accounting for, like, 80,
5    90 percent of the midurethral slings that I
6    implanted, so overwhelmingly, the majority of
7    meshes that I was implanting after 2008 were
8    laser-cut meshes.
9         Q.  (By Mr. Zonies)  But I'm talking
10   specifically about the TVT-Retropubic.
11        Is it your testimony that you actually have
12   a recollection of using a TVT-Retropubic that had
13   an L on the end of the number?
14        A.  I know certainly for TVT-O that we saw
15   that.  I mentioned I did 75 of the TVT classic, so
16   it was never my most common procedure.
17        Q.  Okay.  So you're not sure if you ever
18   used a laser cut for the TVT-Retropubic?
19        A.  I can't say for a hundred percent
20   certainty.
21        Q.  And you likewise can't say for certain
22   what other doctors used, whether it was laser cut
23   or mechanically cut, correct?
24        MS. SCHMID:  Objection; form, vague.
25        A.  Conversations I had with colleagues,

Page 117

1    both at prof ed events and at meetings, it seemed
2    to me that most of the midurethral sling surgeons,
3    people were transitioning to laser cut, especially
4    friends that I had that were using the Boston
5    Scientific product.
6         Q.  (By Mr. Zonies)  You've never seen a
7    clinical study assessing TVT-Retropubic
8    mechanically cut mesh as compared to TVT-Retropubic
9    laser-cut mesh, correct?
10        A.  A head-to-head?
11        Q.  Yes.
12        A.  Not a head-to-head.  But what I have
13   seen is systematic reviews that include patients
14   from the earlier years versus reviews that have
15   been compiled from patients that have been
16   implanted more recently.  When you look at the
17   Cochrane review, the Schmipff review, those
18   studies, you know, you have a mix of laser cut and
19   mechanical cut.  When you look at Tommaselli, you
20   have TVT-O versus TVT-Secur, a mechanical cut
21   versus a laser cut.  They're not true head-to-head,
22   you know, TVT-R mechanical cut to TVT-R laser cut,
23   but I think you can infer from the literature and
24   the systematic reviews, you can look at the
25   complication rates and the efficacies of the

Brian J. Flynn, M.D.

Page 118

1  products.
2  Q. Well, and even Tommaselli, using TVT-S
3  laser cut, has much lower efficacy than does the
4  TVT-Retropubic, correct?
5  MS. SCHMID: Objection; form, foundation.
6  A. I would disagree with that. Again, it
7  comes back to what the outcome measures are, if
8  they're looking at just subjective outcome measures
9  versus objective outcome measures versus you got to
10  be two for two to be considered cured. So if the
11  objective measures are more rigorous, you're going
12  to have a lower efficacy rate reported.
13  Q. (By Mr. Zonies) You have no idea in any
14  of the studies in the Cochrane review which of the
15  TVT-Retropubics in those studies was laser cut and
16  which of the TVT-Retropubics was mechanically cut;
17  isn't that true?
18  A. What my testimony was that you can look
19  at the years that the patients were implanted, and
20  you could understand what products were used based
21  on the years. Studies that were before 2006, then
22  all of those patients were mechanical cut. Then
23  there's a transition period. And then in more
24  recent studies, then laser cut.
25  Q. How do you know that?

Page 119

1  A. Based on what was available to surgeons
2  and based on conversation with colleagues and
3  people in prof ed. And it really seemed to me that
4  when laser cut came out, that was because there was
5  interest in that, and there was a need, and that's
6  what implanters desired. So, you know, that's what
7  Ethicon TVT users desired. So I got to believe
8  that they went ahead and used the laser-cut mesh.
9  Q. Okay. But you have no actual support
10  for that other than you got to believe, correct?
11  MS. SCHMID: Objection; form, misstates
12  prior testimony.
13  A. Again, what I stated earlier was
14  conversation with colleagues at meetings, at prof
15  ed events, within my hospital. If I talked to my
16  partners, I asked them what they're using. And it
17  seemed overwhelmingly that people were switching to
18  laser cut.
19  (Exhibit 15 was marked for identification.)
20  Q. (By Mr. Zonies) I'm going to hand you
21  Exhibit 15, Dr. Flynn. This is an internal Ethicon
22  document. Have you ever seen this document before?
23  A. It looks familiar to me. I believe I
24  probably have seen some of this. Some of the
25  comments in here look familiar, but I don't see a

Page 120

1  title on this document, really, unless the title's
2  "Things to Consider." Who wrote this document?
3  Dan Smith?
4  Q. You know Dan Smith, right?
5  A. I know the name. I don't know him
6  personally.
7  Q. So as of the end of 2008, if you look at
8  the tenth bullet point down in Ethicon's internal
9  document, what does that say?
10  MS. SCHMID: What? I'm sorry. What page
11  are we on, Counsel?
12  Q. (By Mr. Zonies) First page, tenth
13  bullet down, it starts with "Most surgeons who use
14  TVT"; do you see that?
15  A. "Most surgeons who use TVT products do
16  not know if what they use contains mechanical-cut
17  or laser-cut mesh. Additionally, they don't know
18  we have laser-cut TVT and TVT-O products on the
19  market. 90/10 versus MC versus LC sales," so this
20  is an article, or this is data from 2008. So this
21  would be, I guess, one to two years after laser cut
22  became available.
23  Q. (By Mr. Zonies) Right. So two years
24  after laser cut becomes available, Ethicon's own
25  internal document says that most doctors don't know

Page 121

1  which one they're using, and, in fact, 90 percent
2  of them are using mechanically cut. Isn't that
3  what it says?
4  MS. SCHMID: Objection; foundation.
5  A. That's what it says, and that may be
6  true, because most doctors don't care, because
7  mechanical cut and laser cut are essentially the
8  same. So doctors are very comfortable either way,
9  whether it was mechanical cut or laser cut.
10  Q. (By Mr. Zonies) So we do know, then,
11  that of the studies that were done up and through
12  patients in 2008, 90 percent of those were
13  mechanically cut, right?
14  MS. SCHMID: Objection.
15  A. It looks like --
16  MS. SCHMID: Objection; form, misstates
17  prior testimony.
18  A. So this is Dan Smith's approximation.
19  Dan Smith's an engineer. I don't believe Dan Smith
20  works in sales and marketing, so this is an
21  engineer's approximation of what the market is.
22  Q. (By Mr. Zonies) Based on sales.
23  A. I'd be interested to see where he got
24  the data.
25  Q. Have you ever asked Ethicon for that, or

Brian J. Flynn, M.D.

Page 122

1  have they ever shared it with you?
2      A.  What was shared with me at the prof ed
3  events and courses were that most surgeons were
4  interested in laser cut.  That's what was shared.
5      Q.  Will you ask Ethicon for that sales
6  data, Doctor, so you can take a look at it?  And
7  that might impact your opinion, right?
8      MS. SCHMID:  Objection; form, argumentative.
9      A.  I think what my opinion is in the
10  report, and what's been consistent, is that
11  mechanical cut and laser cut behave similarly.  And
12  so I don't feel a need to spend a lot of time
13  teasing out what the sales data was in 2008,
14  because what the literature shows is that the
15  products have behaved similarly based on efficacy
16  and safety.
17      Q.  (By Mr. Zonies)  But you don't have a
18  single piece of literature that you can cite to,
19  Doctor, where the only difference between the two
20  devices being compared is whether it's mechanically
21  cut or laser cut, right?  There's not one study
22  that does that, is there?
23      A.  I think if you look at the literature
24  based on products that came only as laser cut, for
25  instance, TVT-Secur, TVT-Abbrevo, TVT-Exact, and

Page 123

1  you compare those to the TVT studies that were
2  published before 2006, you've just created a
3  comparison.  And at least with respect to safety,
4  meaning vaginal exposures, lower urinary tract
5  perforations, dyspareunia and pain, they performed
6  very similarly.  If you look at dyspareunia, for
7  instance, the incidence of dyspareunia after
8  midurethral sling is .5 percent, and that number
9  resonates whether that is a laser-cut mesh or a
10  mechanical-cut mesh.
11      MR. ZONIES:  Move to strike as
12  nonresponsive.
13      Q.  (By Mr. Zonies)  Doctor, can you
14  identify a single study where the only difference
15  between the two devices being compared is whether
16  it's laser cut or mechanically cut?  One study.
17      A.  One study that has both cohorts head to
18  head in the same paper?  I'm not aware of that
19  study.
20      MR. ZONIES:  I'll reserve the remaining time
21  for recross.
22      MS. SCHMID:  What time is left?
23      MS. COVINGTON:  I have 17 minutes.
24      MS. SCHMID:  Let's go ahead and take a
25  break.

Page 124

1      (Recess taken from 4:31 p.m. until
2  4:50 p.m.)
3          EXAMINATION
4  BY MS. SCHMID:
5      Q.  All right.  Good afternoon, Dr. Flynn.
6      A.  Good afternoon.
7      Q.  You'll recall you were asked a couple of
8  questions about an abstract that you had prepared
9  which was marked as Exhibit Number 10.  And was
10  this abstract ever then published in a
11  peer-reviewed journal, Dr. Flynn?
12      A.  The abstract was published in the
13  journal Urology, but there was no manuscript that
14  was later published that accompanied this abstract.
15  So what the AUA does is all of their abstracts that
16  are accepted to their meeting are published in
17  their journal, which is a supplement, so you can
18  see on the top of this exhibit, it says "Volume
19  189, Supplement."  So they have a supplement to
20  their journal where all these abstracts exist.
21      Q.  And did this abstract -- and I
22  apologize, my question was not clear, so let me
23  start again.
24      Did this abstract, which was marked as
25  Exhibit Number 10, ever then become published?

Page 125

1      A.  No, it did not.
2      Q.  And why not?
3      A.  Well, because there was no statistical
4  significance with these conclusions.  So when we
5  prepare a paper in an abstract, sometimes we'll
6  publish something just to report some results, and
7  other times, like you can see, you know, in an
8  abstract right next to it on the same page where
9  there's P values and standard deviations and more
10  rigorous statistical analysis, and we didn't have
11  that in our paper.  Our paper wasn't properly
12  powered.  It was only 50 mesh revision surgery
13  cases, and so because of that, it wouldn't have met
14  the standards of a peer-reviewed journal.  So it
15  wouldn't have been publishable.  So generally, we
16  don't attempt to publish things that we don't think
17  are going to get published.
18      Q.  Can you, Dr. Flynn, pull up in front of
19  you Exhibit Number 12, please?  And that was the
20  Pam Moalli article.
21      A.  Yes.  So this is Exhibit 13, and here's
22  Exhibit 12.
23      Q.  Okay.  So just on Exhibit Number 12, my
24  next questions.
25      A.  Yes.

Brian J. Flynn, M.D.

Page 126

1    Q.  Okay.  You recall you were asked a
2  series of questions about the Moalli paper,
3  correct?
4    A.  Correct.
5    Q.  And did the authors identify what they
6  considered in this paper to be the gold standard
7  for midurethral slings?
8    MR. ZONIES:  Object to the form.
9    A.  They did.
10   Q.  (By Ms. Schmid)  And what product did
11 they identify as the gold standard for midurethral
12 slings?
13   MR. ZONIES:  Same objection.
14   A.  Well, if you go to page 656, the second
15 paragraph in the right column, it says, "For
16 simplicity of data presentation, we used the
17 Gynecare TVT as the gold standard and defined the
18 behavior of 5 newer versions of the midurethral
19 sling relative to it."
20   Q.  (By Ms. Schmid)  Okay.  So in the Moalli
21 paper, they refer to the Gynecare TVT midurethral
22 sling as the gold standard, correct?
23   MR. ZONIES:  Object to the form.
24   A.  They did.  And then if you look at the
25 tables and figures throughout the paper and all of

Page 127

1  the P values and comparisons they make,
2  everything's compared to the Gynecare TVT device.
3    Q.  (By Ms. Schmid)  All right.  And
4  Dr. Flynn, you were asked a series of questions
5  this afternoon about the differences between
6  mechanically cut mesh and laser-cut mesh; do you
7  recall those questions?
8    A.  I do.
9    Q.  And specifically you were asked whether
10 there was ever a head-to-head comparison in a
11 single paper of the performance from a safety and
12 efficacy standpoint of mechanically cut mesh versus
13 laser-cut mesh.  Do you recall those questions?
14   A.  I do.
15   Q.  Okay.  And there is no such paper that
16 makes that head-to-head comparison; is that
17 correct?
18   A.  That's correct.
19   Q.  So how do you, then, Dr. Flynn, have
20 confidence in your opinion that the laser-cut and
21 mechanical-cut mesh are both safe and effective
22 meshes?
23   MR. ZONIES:  Object to the form.
24   A.  Well, I've implanted over 800
25 midurethral slings.  And I've been using

Page 128

1  midurethral slings since 2004.  So I've used both
2  mechanical-cut and laser-cut mesh.  That's what was
3  taught to me as a resident and fellow and what I
4  incorporated in my practice.  So from my own
5  clinical experience from 2004 to 2006, maybe even
6  later, 2008, when using mechanical-cut mesh, I got
7  excellent results.  I had over 90 percent success
8  with a complication rate of somewhere around 2 to 2
9  and a half percent.
10      Later in my practice I switched over to
11 laser-cut mesh both in the TVT-Obturator form and
12 TVT-Exact, TVT-Abbrevo, TVT-Secur.  I mentioned I
13 used the Boston Scientific Advantage Fit, and all
14 of these products performed quite similarly in
15 terms of having efficacy and safety that was very
16 similar to the mechanical-cut.
17      So after doing 800 cases, I'm very
18 comfortable commenting on both of the meshes.  I
19 found the way they resulted in my patients and the
20 outcomes I got were quite similar.
21      My review of the medical literature,
22 including systematic reviews, meta-analyses, more
23 recent publications, for instance, like the
24 Tommaselli paper or papers that are more specific
25 reflecting later products on the results again, are

Page 129

1  similar to what was reported in some of Ulmsteen's
2  original papers.  Conversations with colleagues at
3  my hospital, in my group, going to meetings, prof
4  ed events, those are the similar responses and
5  feedbacks that I've received.
6      So there's been over three million TVT
7  products implanted in patients over a 20-year
8  period, and many of those were mechanical cut, many
9  of them were laser cut.  But, you know, there's no
10 data to support one product works better than the
11 other, or one product is inferior than the other.
12 So I got to believe there would be a paper
13 somewhere that would show some really unusual
14 results with laser cut or with mechanical cut if
15 there was some outlier.  And I'm not aware of such
16 a paper.
17      Q.  (By Ms. Schmid)  You have been asked
18 today in your deposition to provide your expert
19 opinions on the TVT classic, correct?
20      A.  Correct.
21      Q.  And your opinions are all set forth in
22 your expert report which was marked earlier today
23 as Exhibit Number 4, correct?
24      A.  Correct.
25      Q.  And can you tell the jury what you have

Brian J. Flynn, M.D.

Page 130

1  relied upon as the bases for your expert opinions
2  regarding the TVT classic or the TVT-Retropubic
3  mesh?
4      MR. ZONIES:  Object to the form.
5      A.  So what I outlined in my report and on
6  my reliance list is over 100 different publications
7  that pertain to mesh and stress urinary
8  incontinence.  My report starts out with my
9  background and qualifications.  It mentions, you
10  know, my titles as an expert in female pelvic
11  medicine and reconstructive surgery.  I'm Board
12  certified in that area.  And I'm an associate
13  professor at University of Colorado.
14      As the report goes through, I overview the
15  beginnings of the TVT product as developed by
16  Dr. Ulmsteen.  I think those are the important
17  papers that help you understand the development of
18  the product.
19      If you look at TVT, it was really a product
20  that was first done by a very esteemed, skilled
21  professor that then brought the product to six
22  ordinary Scandinavian units, and they essentially
23  got the same results in terms of efficacy and
24  safety.  So those earlier papers I think were very
25  supportive of the device.  The product then came to

Page 131

1  the United States and performed equally well.
2      Later, you know, five, ten, fifteen years
3  later, we now have over 100 RCTs.  We have over
4  1,000 publications.  We have systematic reviews.
5  We have meta-analyses.  So we have Level I evidence
6  supporting the use of the TVT product.  So those
7  are the studies that I relied on in preparing my
8  report.
9      Q.  Is there anything else that you have
10  relied on as a basis for your opinions other than
11  what you just described?
12      MR. ZONIES:  Object to the form.
13      A.  Well, certainly I rely on my own
14  clinical experience.  I'm a high-volume surgeon.  I
15  do four to five hundred operation as year.  I've
16  been doing that for the last 15 years.  85 percent
17  of my job is clinical, meaning taking care of
18  patients, talking to women with incontinence and
19  prolapse, and performing surgery.  So I feel that
20  I'm, you know, well-positioned to make statements
21  in regards to these products because I've been
22  using midurethral slings for almost 15 years now in
23  my practice.
24      I've been teaching residents and fellows and
25  medical students about the value of the midurethral

Page 132

1  sling.  I participate in scientific meetings.  I go
2  to more than five or six meetings a year where I
3  commonly hear about incontinence procedures.  I
4  listen to experts.  I participate in panel
5  discussions.  You can see that on my CV.  My CV is
6  more than 50 pages long, and that itemizes all the
7  abstracts, all the publications, all the
8  presentations, textbook chapters I've written,
9  videos and other forms of multimedia.
10      So it really comes down to my review of the
11  literature, my personal experience with the device,
12  and just feeling very well-connected with
13  colleagues and experts, both at the AUA and at
14  SUFU, at the AUGS.  Reviewing those professional
15  statements are very powerful.  We review those
16  commonly in our journal clubs, and those statements
17  are ones that I use in my practice when talking
18  about these products with patients.
19      And, you know, just to quote the American
20  Urologic Association the full-length retropubic or
21  transobturator midurethral sling Type I
22  polypropylene mesh is the gold standard.  And the
23  TVT classic meets all those criteria.  It's a
24  Type I mesh.  It has large pores.  It has the
25  optimal amount of elasticity.  It's the right

Page 133

1  width.  It's a full-length sling.  So it has all
2  those characteristics that I look for and that
3  others have reported on when reporting on
4  midurethral slings.  It meets the criteria that the
5  professional societies mention in terms of, you
6  know, products that we -- that they endorse and
7  that they support.
8      Q.  (By Ms. Schmid)  Did you bring with you
9  your resume to today's deposition?
10      A.  I did.
11      Q.  And did you bring with you your reliance
12  list to today's deposition?
13      A.  I did.  And the resume or CV has been
14  marked as an exhibit.  And I believe that was
15  Exhibit 1 or 2.
16      Q.  All right.
17      A.  And then my reliance list is just after
18  my report in this first binder.  And that was
19  printed on March 2nd.  And I don't have the exact
20  number of pages, but it's probably at least 30 to
21  40 pages of the reliance list.
22      MS. SCHMID:  I have no further questions for
23  you.  Thank you, Dr. Flynn.
24      THE WITNESS:  Thank you.
25      MR. ZONIES:  Just a few follow-ups,

Brian J. Flynn, M.D.

Page 134

```
1    Dr. Flynn.
2
3              EXAMINATION
4    BY MR. ZONIES:
5         Q.  The abstract that you were discussing,
6    your abstract, was it -- did you ever submit it to
7    any journals for publication?
8         A.  Well, just to be clear, again, the
9    abstract was submitted to the American Urologic
10   Association.  It was accepted at that meeting, and
11   they published those abstracts, so however you'd
12   want to characterize that.  Did I ever submit a
13   full manuscript to any journal that accompanied
14   that abstract?  The answer would be no.
15        Q.  That paper was never rejected for
16   publication, or --
17        A.  The paper was never written.
18        Q.  You said that that paper was criticized
19   by some.  Who criticized the paper, the abstract?
20        A.  Anthony Schaeffer, who is a urologist at
21   Northwestern University.  He is probably the most
22   critical of the scientific method.  Dr. Schaeffer
23   has expertise in infectious-disease issues in
24   urology.  There was two moderators, I can't
25   remember who the moderators were that day, but they
```

Page 135

```
1    both had some concerns about the methods, but I
2    would have to go back and look at who moderated
3    that session.  I don't remember the names, but
4    usually there's only opportunity for a few people
5    to make comments, and if one person makes a lot of
6    comments, then that prevents other people from
7    having the time to make comments, so Dr. Schaeffer
8    made the majority of the comments.
9         Q.  And, in particular, the criticisms were
10   that the methods were not reliable methods,
11   correct?
12        A.  He was concerned that we didn't do
13   vaginal swabs at the same time to try to correlate
14   what the vaginal swabs showed in relation to what
15   the mesh culture showed.  And Patrick Culligan and
16   others have done similar papers, so he asked me to
17   consider the shortcomings of those papers if we
18   were going to pursue this paper further.  So he had
19   proposed a number of ideas to me that would have
20   allowed me to maybe answer some of the questions
21   that he felt were not answered by the abstract.
22        Q.  And are you doing vaginal swabs now as
23   you're testing explants?
24        A.  No, that was just a recommendation
25   specific to this paper.
```

Page 136

```
1         Q.  You were asked questions about
2    mechanically cut versus laser cut.  Do you recall
3    those questions?
4         A.  I do.
5         Q.  Of the 75 TVT-Retropubic devices that
6    you've implanted, how many were laser cut?
7         A.  Doing a calculation, rough calculation
8    in my mind, probably close to half and half.  I
9    used the mechanical-cut product -- I used the
10   retropubic product from 2004 to '11, so that's a
11   seven-year period, so let's say there's ten a year.
12   And then in 2006, when laser cut, we switched over
13   maybe 2007, so that was probably 20 to 30
14   mechanical cut and that many laser cut with respect
15   to the retropubic product.
16        Q.  But that's just based upon which years
17   you used the devices, correct?
18        A.  Yeah, and similar with TVT-O, that was
19   the product I was using more commonly earlier in my
20   practice from 2004 to 2008 or '9, so I had used
21   quite a bit of mechanical-cut mesh, but it was
22   mostly in the TVT-O product.
23        Q.  And do you have a case -- does your case
24   log identify whether or not it was laser cut or
25   mechanically cut mesh that you implanted?
```

Page 137

```
1         A.  It does not.
2         Q.  So you have no way to know for
3    certain -- isn't it true, Doctor, that all of those
4    TVT-Retropubics could have been mechanically cut?
5         MS. SCHMID:  Objection; form.
6         Q.  (By Mr. Zonies)  Isn't that possible?
7         MS. SCHMID:  Misstates prior testimony.
8         A.  I don't think it's possible, because
9    from what I recall, and my conversations with
10   Ethicon and the local rep, I believe they had
11   switched over the stock at the hospitals I operated
12   at to laser cut.
13        MR. ZONIES:  Thank you, Doctor.  I have
14   nothing further.  I appreciate your time.
15        THE WITNESS:  Thank you.
16        MS. SCHMID:  We'll read and sign.  Thank
17   you.
18        MR. ZONIES:  We'll take a rough.
19        (Whereupon, the deposition was concluded at
20   5:08 p.m. on April 19, 2016.)
21
22
23
24
25
```

Page 138

E R R A T A

- - - - - -

PAGE  LINE  CHANGE

\_\_\_\_ \_\_\_\_ _____

REASON: _____

\_\_\_\_ \_\_\_\_ _____

REASON: _____

\_\_\_\_ \_\_\_\_ _____

REASON: _____

\_\_\_\_ \_\_\_\_ _____

REASON: _____

\_\_\_\_ \_\_\_\_ _____

REASON: _____

\_\_\_\_ \_\_\_\_ _____

REASON: _____

\_\_\_\_ \_\_\_\_ _____

REASON: _____

\_\_\_\_ \_\_\_\_ _____

REASON: _____

Page 140

REPORTER'S CERTIFICATE

STATE OF COLORADO           )

                            ) ss.

COUNTY OF DENVER           )

        I, MELANIE L. GIAMARCO, do hereby certify that I am

a Registered Professional Reporter and Notary Public within

the State of Colorado; that previous to the commencement of

the examination, the deponent was duly sworn by me.

        I further certify that this deposition was taken in

machine shorthand by me at the time and place herein set

forth, that it was thereafter reduced to typewritten form, and

that the foregoing constitutes a true and correct transcript

of the proceedings had.

        I further certify that I am not employed by, related

to, nor of counsel for any of the parties herein, nor

otherwise interested in the result of the within litigation.

        In witness whereof, I have affixed my signature and

seal this 22nd day of April, 2016.


                Melanie L. Giamarco

                Registered Professional Reporter

                Registered Merit Reporter

                Certified Realtime Reporter

My commission expires:  August 25, 2017.

Page 139

ACKNOWLEDGMENT OF DEPONENT

        I,_____, do

hereby certify that I have read the

foregoing pages, and that the same is

a correct transcription of the answers

given by me to the questions therein

propounded, except for the corrections or

changes in form or substance, if any,

noted in the attached Errata Sheet.


_____

  BRIAN J. FLYNN, M.D.           DATE


Subscribed and sworn

to before me this

\_\_\_\_\_ day of _____, 20\_\_\_\_.

My commission expires:_____

_____

Notary Public