# EXHIBIT I

Brian Flynn, M.D.

1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                      CHARLESTON DIVISION

4      _____

5      IN RE:  ETHICON, INC. PELVIC REPAIR    MDL 2327

       SYSTEMS PRODUCTS LIABILITY LITIGATION

6

7      _____

8      MASTER FILE NO. 2:12-MD-02327

9      _____

10     THIS DOCUMENT RELATES TO:

11     JO'ANN LEHMAN v. ETHICON, INC., et al.

12     Case No. 2:12-cv-517

13     _____

14

15

16              PURSUANT TO NOTICE, the deposition of BRIAN

17     FLYNN, M.D. was taken on behalf of the Plaintiff at

18     Denver Marriott West, 1717 Denver West Boulevard,

19     Boulder, Colorado on March 24, 2016, at 10:29 a.m.,

20     before Melanie L. Giamarco, Registered Merit Reporter,

21     Certified Realtime Reporter, and Notary Public within

22     Colorado.

23

                        GOLKOW TECHNOLOGIES

24            877.370.3377 ph|917.591.5672 fax

                        deps@golkow.com

25

Brian Flynn, M.D.

Page 2

1      A P P E A R A N C E S
2  For the Plaintiff Patricia Ruiz:
3      JOSEPH ZONIES, ESQ.
       GREG BENTLEY, ESQ.
       ZONIES LAW, LLC
4      1900 Wazee Street
5      Suite 203
       Denver, Colorado 80202
6
       -and-
7
       MARY LIU, ESQ.
8      AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
       248 Third Street
9      Suite 715
       Oakland, California 94607
10
       -and-
11
      D. RENEE BAGGETT, ESQ. (Present via telephone)
12    AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
       17 East Main Street
13    Suite 200
       Pensacola, Florida 32502
14
      For the Defendants Johnson & Johnson and Ethicon:
15
      KIM M. SCHMID, ESQ.
16    JENNY A. COVINGTON, ESQ.
       BOWMAN AND BROOKE, LLP
17    150 South Fifth Street
       Suite 3000
18    Minneapolis, Minnesota 55402
19
20
21
22
23
24
25

Page 3

1        I N D E X
2  EXAMINATION OF BRIAN FLYNN, M.D.      PAGE
   March 24, 2016
3
   By Mr. Zonies             4, 100
4  By Ms. Schmid             88
5       EXHIBITS
6  NUMBER   DESCRIPTION         PAGE
7  Exhibit 1  Amended Notice to Take Deposition    4
        of Brian Flynn, M.D.
8
9  Exhibit 2  Flash drive          6
10 Exhibit 3  Expert Overview of TVT-Secur    6
11 Exhibit 4  CV of Dr. Flynn        45
12 Exhibit 5  Updated testimony list of Dr. Flynn  46
13 Exhibit 6  Compilation of e-mails between Dr.  47
        Flynn and Ethicon
14 Exhibit 7  Master Consulting Agreement    47
15 Exhibit 8  Compilation of cover letters    50
        addressed to Dr. Flynn from Butler
16     Snow, 8 pages
17 Exhibit 9  Invoice for TVT-S report of Dr.  50
        Flynn
18
19 Exhibit 10 JAMA scientific article entitled  55
        "Removal or revision of vaginal
20     mesh used for the treatment of
        stress urinary incontinence."
21 Exhibit 11 Cochrane collaboration paper    70
        entitled "Single incision sling
22     operations for urinary incontinence
        in women (Review)"
23
   Exhibit 12 Study: TVT-Secur (Hammock) versus  84
24     TVT-Obturator: A Randomized Trial
        of Suburethral Sling Operative
25     Procedures

Page 4

1       P R O C E E D I N G S
2   (Exhibit 1 was marked for identification.)
3      BRIAN FLYNN, M.D.,
4  after having been duly sworn, was examined and
5  testified as follows:
6       EXAMINATION
7  BY MR. ZONIES:
8    Q.  Good morning, Dr. Flynn. My name's Joe
9  Zonies. How are you this morning?
10    A.  Very good.
11    Q.  Good. Dr. Flynn, I've had marked
12  Exhibit 1, and it's in front of you. And it's
13  entitled "Amended Notice to Take Deposition of
14  Brian Flynn, M.D."; do you see that?
15    A.  I do.
16    Q.  Have you seen that document before?
17    A.  I have.
18    Q.  And when did you see that?
19    A.  Approximately one to two weeks ago.
20    Q.  Okay. And attached to this on page 6 is
21  something -- on page, actually, 8 is Schedule A; do
22  you see that?
23    A.  Yes.
24    Q.  And have you reviewed Schedule A before?
25    A.  I have.

Page 5

1    Q.  And when did you review that?
2    A.  When I received it two weeks ago. And
3  I've looked at it a number of times since then.
4    Q.  And have you done anything to collect
5  the items that are requested in Exhibit A?
6    A.  I have.
7    Q.  Or Schedule A? Sorry.
8    A.  Yes.
9    Q.  Tell me what you collected.
10    A.  I have a USB drive here that has some
11  presentations I've given on the TVT-Secur product.
12  There is some Ethicon company documents on there,
13  so it says the information for users. There is the
14  patient brochures. There's a video, two different
15  videos, one that was made by Ethicon, one that was
16  made by me, so there's two videos on that USB.
17  There's some pictures of the TVT-Secur product that
18  were given to me by Ethicon. There are some
19  Ethicon-prepared PowerPoints in regards to
20  TVT-Secur on there. So that's what's on the USB.
21  I may be missing a few items, but I think that's
22  the majority.
23    I've also brought my CV, my fee schedule, my
24  deposition and trial history, my invoice on
25  TVT-Secur. I have my expert report, and I have my

Brian Flynn, M.D.

Page 6

1  reliance list and some supporting documents here.
2      Q.  Great.  Now, have you updated your CV
3  recently?
4      A.  I have.  And it's -- the date is on the
5  CV of when it was updated.
6      MS. SCHMID:  And I'm sorry to interrupt, but
7  I don't think we got counsel's appearance on the
8  record.  Did we?  I'd like to do that.
9      MR. ZONIES:  Joe Zonies and Greg Bentley on
10  behalf of plaintiffs.
11      MS. LIU:  Mary Liu on behalf of Ms. Ruiz.
12      MS. SCHMID:  Kim Schmid from Bowman and
13  Brooke in Minneapolis on behalf of the defendants
14  Johnson & Johnson and Ethicon.
15      Q.  (By Mr. Zonies)  And, Doctor, could I
16  get the flash drive, please?  Thank you.
17      MR. ZONIES:  Go ahead and mark this as
18  Exhibit 2.
19      (Exhibit Number 2 was marked for
20  identification.)
21      Q.  (By Mr. Zonies)  Doctor, I'm handing you
22  what's going to be marked as Exhibit 3.
23      (Exhibit Number 3 was marked for
24  identification.)
25      Q.  (By Mr. Zonies)  Doctor, this was

Page 7

1  provided to us as your report, your expert report
2  and opinions for TVT-Secur.  Does this appear to be
3  your report?
4      A.  (Reviewed document.)  Yes, it does.
5      Q.  And it says it was dated February 26,
6  2016.  Is that when you executed or signed this
7  report?
8      A.  Correct.
9      Q.  Do you have any updates to this report
10  since you wrote it and submitted it?
11      A.  I do not.
12      Q.  Do you stand by what's in the report
13  today?
14      A.  I do.
15      Q.  Do you understand, Doctor, that you're
16  here today to testify -- well, can you tell me why
17  you believe you're here today?
18      A.  I received this notice to take my
19  deposition in regards to the TVT-Secur product.
20      Q.  And you are designated as an expert
21  witness on behalf of Ethicon and J&J for purposes
22  of opining about the TVT-Secur; is that right?
23      A.  That's correct.
24      Q.  You personally have used the TVT-Secur?
25      A.  I have.

Page 8

1      Q.  How many times have you implanted a
2  TVT-Secur?
3      A.  Probably 175 times.
4      Q.  And how do you know that?
5      A.  I keep a case log of all implants that I
6  do, both in men and women, and I have looked at
7  that a number of times.  I've prepared an abstract
8  and a poster in the past on TVT-Secur, so certainly
9  I reviewed my case log when I presented that
10  abstract at a national meeting and when I prepared
11  a video on TVT-Secur.  So it's a log that the FDA
12  also had recommended that physicians keep track of
13  their implants, and so that's why I have that list.
14      Q.  And can you describe that log to me?  Is
15  it an Excel spreadsheet?  How do you keep it?
16      A.  It's an Excel spreadsheet.  It doesn't
17  have just my TVT procedures.  It's a list of all my
18  patients.  And so I do approximately 400 operations
19  a year, and I've been keeping this log since 2004.
20  It's also something that the American Board of
21  Urology asks urologists to maintain a case log when
22  we apply for board certification and
23  recertification, so it's a running log that I've
24  kept since I've been in practice.
25      Q.  And when's the last time you reviewed

Page 9

1  that log?
2      A.  I review it weekly, so last week.
3      Q.  And can you describe for me the cells in
4  the Excel spreadsheet?
5      A.  Okay.  Column 1 would have the patient's
6  name.  Column two would have medical record number,
7  three would have the indication for the procedure,
8  four would have the type of procedure.  For
9  practice-management standpoint, I usually keep
10  track of who referred the patient to me and what
11  town they're from.  There probably is a few other
12  columns on there, but it's just very basic
13  information.
14      I have other spreadsheets that I use for
15  research purposes that would have more cells, you
16  know, when I'm preparing a retrospective review
17  that I might have other information on there in
18  terms of the outcomes.
19      Q.  And where do you maintain these logs,
20  spreadsheets?
21      A.  We have a server at the university, so I
22  maintain them on the university server, which is
23  protected and encrypted.
24      Q.  And do you also have copies of those on
25  your local laptop?

Brian Flynn, M.D.

Page 10

1    A. No.

2    Q. Would it be difficult for you to produce

3  those logs if we asked?

4    MS. SCHMID: Objection; form.

5    A. Yes, it's all HIPAA protected with

6  private information, so I wouldn't be able to

7  produce that.

8    Q. (By Mr. Zonies)  And it sounded to me

9  like column A was the patient name, for example.

10   Are there any other patient identifiers

11  within those logs?

12   A. The medical record number.  I think

13  their hometown, to some extent, identifies them and

14  who their primary care physician is.

15   Q. So if we requested that information

16  absent patient-specific identifying

17  characteristics, that's something that you

18  effectively could just provide us a printout of,

19  correct?

20   MS. SCHMID: Objection; form.

21   A. Not very --

22   MS. SCHMID: Calls for -- excuse me.

23   THE WITNESS: Sorry.

24   MS. SCHMID: Calls for potentially

25  confidential and privileged patient information.

Page 11

1    Q. (By Mr. Zonies)  Go ahead.

2    A. It'd be very difficult.

3    Q. Why is that?

4    A. I think for the reasons that Kim just

5  cited, because it's -- it's protected information.

6  It would require a lot of editing of the

7  spreadsheets to clean information off of those

8  spreadsheets.  All it would end up being is just a

9  list of cases.  It would be 175 cells that have

10  TVT-Secur listed on it.  I don't know what kind of

11  value that would provide, but . . .

12   Q. But, for example, that's something, if

13  we said, provide us a spreadsheet with how many TVT

14  products you've put in, that's -- you could run

15  that out of that spreadsheet?

16   MS. SCHMID: Objection; form.

17   A. Not easily.

18   Q. (By Mr. Zonies)  Doctor, do you track

19  your revision surgeries in a similar fashion?

20   A. I do.

21   Q. Is that a different spreadsheet?

22   A. It's just one spreadsheet of all the

23  cases, everything from kidney stones to

24  incontinence surgery to kidney surgery.  It's just

25  one giant spreadsheet.

Page 12

1    Q. So it has -- that spreadsheet has

2  implantations as well as revisions or explants?

3    A. It has any surgical case I did.

4    Q. Your 175 TVT-S procedures, are those

5  implants?

6    A. They had a mesh implant, yeah, the

7  TVT-Secur.

8    Q. And do you also know, as you sit here

9  today, how many TVT-S products you've explanted, or

10  revised?

11   A. No.  In terms of revisions I do, I

12  mention the type of revision, but I don't keep

13  track of what the product was necessarily.  If I

14  know what it is, I might record that, but most of

15  the time, we don't know.

16   Q. Do you undertake any steps prior to

17  doing a revision or an explant to determine what

18  device was originally implanted?

19   A. Yes.  I make all attempts to try to get

20  the original operative report.  That is relatively

21  straightforward in getting.  I'm probably able to

22  get that about 75 percent of the time.

23  Unfortunately, in the operative report, a lot of

24  times they'll just say midurethral sling, or

25  retropubic sling, or transobturator sling.  So it

Page 13

1  doesn't necessarily identify the product and

2  certainly doesn't have the product sticker or

3  anything that one could be a hundred percent

4  confident on what the product was.

5    Q. And when you do get that information, do

6  you include that in your spreadsheet?

7    A. I include it in the operative report.

8  So in the operative report, it'll say -- if I knew

9  it was a TVT-Secur, it would be listed in my

10  operative report.

11   Q. And do you have a sense, as you sit here

12  today, of how many Securs you have either revised

13  or explanted?

14   A. No.

15   Q. Do you -- more than ten?  Or you just

16  don't know at all?

17   A. I would be guessing.

18   Q. And is that something that if you went

19  to your spreadsheets and you looked it up you might

20  be able to give a better informed estimate rather

21  than just a guess?

22   A. Probably not.

23   Q. Why not?

24   A. Because the spreadsheet usually just

25  lists the type of case.  It'll say, for instance,

Brian Flynn, M.D.

Page 14

1    "partial mesh removal," you know, so it doesn't
2    necessarily say "partial removal of TVT-Secur."  So
3    the idea of the case log is something that just
4    describes what the procedure was.  If I was
5    preparing a study, then I might get more
6    information, more detail.  But the case log, in
7    order to keep it up to date and timely, I try to
8    have a minimal amount of information in there, just
9    what I feel is necessary information.
10       Q.  What was the time frame that you were
11   using TVT-S?
12       A.  From 2007 to 2010.
13       Q.  Why did you stop?
14       A.  I switched to TVT-Abbrevo.
15       Q.  Why did you switch to TVT-Abbrevo?
16       A.  I was very interested in the product.  I
17   like trying new products.  I tend to be the first
18   person at my hospital or my community to use new
19   products.  And I liked the advantages of the
20   TVT-Abbrevo over the TVT-Secur.
21       Q.  And what would those advantages be?
22       A.  The TVT-Abbrevo is a longer sling.  I
23   think it was an easier procedure to perform, to
24   teach.  And I think that the data is more
25   supportive of a full-length sling, transobturator

Page 15

1    retropubic, so higher continence rates.
2        Q.  Of the 175 TVT implants that you
3    performed, what kind of follow-up did you have on
4    those patients?
5        A.  Typically I follow patients for one year
6    after any implant.  I usually see them at two
7    weeks, six weeks, three months, and then at one
8    year.  And if at one year they're doing well and
9    there's no other reason to follow them, then I
10   usually discharge them from my practice at that
11   point and tell them to come back as needed as long
12   as they have someone else who can follow them in
13   their community, their ob/gyn, their local
14   urologist, their primary care physician.
15       So I'll mention to them that they need an
16   annual exam, and as part of the annual exam, they
17   have should examine the prior surgical site, but I
18   don't do that personally beyond one year.
19       Q.  You mentioned that you presented some of
20   your TVT-S implant data at a meeting; is that
21   right?
22       A.  That's correct.
23       Q.  And at that time, the data you presented
24   was short-term follow-up; is that right?
25       A.  Correct.

Page 16

1        Q.  What was the average follow-up in that?
2        A.  Less than one year.
3        Q.  Have you ever done an analysis of those
4    same patients in a midterm, say, two to three
5    years?
6        A.  I have not done that personally in my
7    patients, no.
8        Q.  Have any -- has anybody done that on
9    your data?
10       A.  No.
11       Q.  You've never looked at the -- how many
12   patients did you present in that paper?
13       A.  I believe that was the first 55, maybe
14   60 patients that I did.  It was a consecutive
15   series, so those were the first 60 cases that I
16   did.
17       Q.  Do you have any data on their one-year
18   to two-year to three-year follow-up?
19       A.  Median follow-up in the study, as I
20   mentioned, was less than one year, so there were
21   some patients that were followed longer than one
22   year, so for a few of those patients, I would have
23   longer than one-year follow-up, but the average was
24   one year.
25       Q.  And as you sit here today, do you have

Page 17

1    any sense of the follow-up on those patients longer
2    term?
3        A.  I have some sense.  Many of those
4    patients I've continued to follow for other
5    indications, a prolapse, for instance, and they're
6    patients that are in my practice.  So of the 175
7    patients probably in the last year, I've seen no
8    more than 25 of them.
9        Q.  Have you ever performed any revisions on
10   the TVT-S and any of those patients?
11       A.  Yes.
12       Q.  Do you have a sense of how many?
13       A.  I would say approximately ten.
14       Q.  And that's ten of the 175?
15       A.  Correct.
16       Q.  And what was the primary indication for
17   which you revised those women?
18       A.  Recurring incontinence.
19       Q.  Would you agree that that means that the
20   sling failed?
21       MS. SCHMID:  Objection; form, calls for a
22   legal conclusion.
23       A.  No, I'd disagree.
24       Q.  (By Mr. Zonies)  How would you describe
25   recurrent incontinence?

Brian Flynn, M.D.

Page 18

1    A. That the patient is now having leakage
2  again of urine that is bothersome for them and that
3  it is stress urinary incontinence. I usually will
4  evaluate the patient with a history, physical,
5  urodynamic evaluation. And if I can determine that
6  it's urinary stress incontinence and it's
7  bothersome to the patient, usually I'll institute
8  some nonsurgical therapy, and if that doesn't work,
9  then I'll discuss surgical therapy with them.
10    Q. Well the purpose of the TVT-S in the
11  first instance was to treat the stress urinary
12  incontinence, correct?
13    A. Correct.
14    Q. And you had to revise these ten TVT-S's
15  because they were not sufficiently treating this
16  stress urinary incontinence, correct?
17    MS. SCHMID: Objection; form, speculation.
18    A. That's not correct.
19    Q. (By Mr. Zonies) The ten --
20  approximately ten women for whom you had to revise
21  their TVT-S, is that a subgroup of the 25 women
22  that you said you continue to follow?
23    A. They would be included in the 25. Well,
24  that's hard to say. I mentioned earlier there's 25
25  patients that I've probably seen recently. Some of

Page 19

1  these patients I treated as early as 2007. If they
2  had recurring incontinence, say, in 2008, I may
3  have treated that and then followed them to 2009,
4  and they might not be in that 25. So it would just
5  depend on when the recurrence was.
6    Q. Is it that data that you have available
7  to you which patients and how many and when you had
8  to do a revision?
9    A. Of that original 60 patients or so that
10  I mentioned in the abstract, there's a few patients
11  in there that were included, but beyond that cohort
12  that I followed for that study, no.
13    Q. Do you know how many of the 60 in your
14  original cohort you needed to do a revision surgery
15  on?
16    A. I believe there was approximately five
17  or six patients. I would have to look at the
18  abstract again for the exact number.
19    Q. Is it fair to say roughly 10 percent of
20  your TVT-S patients in that original cohort needed
21  a revision surgery for recurrent incontinence?
22    A. No, there was nobody who had revisions
23  for recurrent incontinence. Those were revisions
24  for urinary retention and bladder incomplete
25  emptying.

Page 20

1    Q. Okay. Maybe I misheard you, and that
2  was a whole line of questioning that we need to go
3  back and revisit, which is, you said that of the
4  original 60 women in your cohort, between five and
5  six of those women you needed to do a revision
6  surgery on, correct?
7    A. Correct.
8    Q. And what was the indication for the
9  revision surgery in those five to six women?
10    A. Either bladder incomplete emptying or
11  urinary retention, so the sling was too tight. I
12  had to go back and loosen it.
13    Q. Do you have a sense as of today in that
14  original cohort how many failures of the TVT-S you
15  had?
16    MS. SCHMID: Objection; form, calls for a
17  legal conclusion.
18    Go ahead.
19    A. You would have to be more specific on
20  what you would define as "failure."
21    Q. (By Mr. Zonies) Okay. So of those 60
22  women, how many of those women did you have to
23  perform a subsequent surgery on for -- related to
24  their TVT-S?
25    A. Well, in the time period that I followed

Page 21

1  those patients for that study, I had five
2  revisions. They were for all the -- either
3  incomplete emptying or retention. The success rate
4  that I reported in that study was around 85
5  percent. So that would imply that about seven
6  patients had recurrent incontinence, but at least
7  at the time of that study, I hadn't re-operated on
8  those patients, those seven that had recurrent
9  incontinence. I may have at future dates, but that
10  wasn't part of that study.
11    Q. And have you ever done any analysis of
12  these -- this cohort more recently than when you
13  did your presentation?
14    A. No.
15    Q. Why not?
16    A. I do 500 surgeries a year. I've been
17  doing that for 15 years. There's no possible way I
18  could do a study on every single patient I operate
19  on. There's just too many patients. So
20  periodically, I'll look at my case log. If I
21  notice any trends or anything that seems to be
22  concerning to me, I may look at that more closely,
23  but if I have to re-operate on ten people out of
24  175 for incontinence, I'm very happy with that. I
25  think that's a great result, and so I don't see a

Brian Flynn, M.D.

Page 22

1 need to look at those patients.

2    Q.  But as you're sitting here today, you

3 can't tell me how many of those 60 women you have

4 ever re-operated on, correct?

5    A.  I think what I mentioned, of those 60,

6 and for the time period that I studied them, I

7 re-operated on five.  Beyond the time period for

8 that study, I can't give you an exact number.

9    Q.  Can you give me an estimate?

10    A.  I would say the estimate is probably

11 somewhere around 5 percent.  You know, we did -- I

12 mentioned earlier about ten of the 175 patients I

13 may have to have re-operated or for incontinence.

14 Of that ten, some of them might have been the five

15 that I had to go and loosen the sling up.  I don't

16 know.  There's some overlap.  The numbers aren't

17 necessarily additive.  But I would say my revision

18 rate for TVT-Secur was maybe only slightly higher

19 than what it was for full-length slings.

20    Q.  And what about other adverse outcomes?

21    MS. SCHMID:  Objection; form.

22    A.  Can you give me an example of what you

23 mean by "other adverse outcomes"?

24    Q.  (By Mr. Zonies)  What about exposures?

25    A.  In that original cohort of 60 patients,

Page 23

1 we didn't have a single exposure.

2    Q.  Ever?  Even up to today?

3    A.  Just for the time period that we studied

4 those patients.

5    Q.  And do you have any data on whether or

6 not there was an exposure subsequent to that time

7 frame?

8    A.  Of the 175 patients, I could think of

9 possibly one exposure.  It was very rare that

10 TVT-Secur ever became exposed in the patients I

11 treated.  The most common reason for revision was

12 reoccurring incontinence.  That was the ten

13 patients that I mentioned.  And these are

14 approximate numbers.

15    Q.  So let's talk -- I want to talk about

16 the 60 -- your original cohort of 60, not the 175

17 for a minute, okay?

18    A.  Okay.

19    Q.  Of the 60 women that you originally

20 operated on with TVT-S and that you reported on at

21 a conference, how many of those women ever had an

22 exposure?

23    A.  Of the 60, zero.  There was not a single

24 exposure in that study.

25    Q.  What --

Page 24

1    A.  If we're going to spend a lot of time on

2 this, I'd like to have the study in front of me.

3    MS. SCHMID:  Go ahead and find it.

4    THE WITNESS:  Okay.

5    Q.  (By Mr. Zonies)  But my question,

6 Doctor, is, subsequent --

7    MS. SCHMID:  Just a minute.  Dr. Flynn is

8 looking for the study.

9    MR. ZONIES:  No, no, no, my -- I'm going to

10 clarify something.

11    Q.  (By Mr. Zonies)  Doctor, my question is,

12 subsequent to the study -- I understand what the

13 study says.  I'm asking, subsequent to the study,

14 how many exposures did those 60 women have?

15    A.  Yeah, I think, as I mentioned, about one

16 patient that I can think of.  One patient.

17    Q.  And --

18    MS. SCHMID:  And, Dr. Flynn, if you would

19 like to pull up your study so you've got the

20 numbers in front of you, please go ahead and do so.

21    Q.  (By Mr. Zonies)  And how do you know

22 just one patient subsequent to the study?

23    A.  That's based on recall.  That's based on

24 me following my patients, so that's -- that's how I

25 base it on.

Page 25

1    Q.  And of those 60 women in your original

2 cohort subsequent to your reporting on the study,

3 how many of them needed a revision to their TVT-S

4 sling?

5    A.  Are you asking me what the overall

6 revision rate I had in the 175 patients?  Is that

7 the question?

8    Q.  I'm asking about the 60 women in your

9 original cohort that you reported on subsequent to

10 your study.  How many of those 60 women needed a

11 revision to their TVT-S?

12    A.  I don't know the answer to that.

13    Q.  Dr. Flynn, what's your current position

14 at the University of Colorado?

15    A.  I'm an associate professor of surgery

16 and urology.  I am the co-practice director of the

17 Women's Pelvic Health and Surgery Clinic.  I'm a

18 fellowship director in reconstructive urology.  So

19 those are my titles.

20    Q.  How long have you been an associate

21 professor?

22    A.  Since 2008.  And I'm up for promotion

23 this year.  And I hope to be promoted to full

24 professor in July of this year.

25    Q.  Have you ever been up for a promotion to

Brian Flynn, M.D.

Page 26

1  full professor before?
2      A.  No.  This is the first time.
3      Q.  In your report, Dr. Flynn, on page 21,
4  if you could turn to that, please.
5      A.  Okay.
6      MR. BENTLEY:  Sorry to interrupt.  I don't
7  think the phone --
8      MR. ZONIES:  Why don't we take a break.
9      (A recess was taken from 10:59 a.m. until
10  11:01 a.m.)
11      MS. SCHMID:  Can we note for the record
12  appearance by telephone by counsel?
13      MS. BAGGETT:  Sure.  Renee Baggett.
14      MR. ZONIES:  Anybody other than Renee?
15      (No audible response.)
16      Q.  (By Mr. Zonies)  So Dr. Flynn, just -- I
17  just want to be clear on this.  Subsequent to
18  presenting your TVT-S paper, you have not
19  undertaken any formal efforts or analysis of those
20  60 patients to see how they're doing today or in
21  any time since presentation of that paper, correct?
22      A.  Not a formal analysis, correct.
23      Q.  Have you done any informal analysis of
24  those 60 patients?
25      A.  Yeah, I think the informal analysis, as

Page 27

1  I mentioned, were the ten or so patients that I had
2  to re-operate on for recurrent incontinence that
3  came back to me.  But there's patients, of course,
4  that -- you know, that I haven't seen in many
5  years, so I mentioned the patients that are doing
6  well, I just follow for one year.
7      Q.  So there's -- you don't know, for
8  example, of the 50 women that you haven't had back
9  for a revision, how many of those women needed
10  revision or subsequently suffered from an exposure
11  or needed some other operation.  You just don't
12  know that, correct?
13      MS. SCHMID:  Objection; form, foundation,
14  argumentative.
15      Go ahead.
16      A.  Like I mentioned earlier, there's
17  patients that I haven't followed beyond one year.
18  That's the majority of patients I have not followed
19  beyond one year.
20      Q.  (By Mr. Zonies)  Okay.  So the majority
21  of the women in that cohort of 60 women you have
22  not followed beyond one year, correct?
23      A.  Correct.
24      Q.  You started to use the TVT-S, you said,
25  in 2007; is that right?

Page 28

1      A.  That's the approximate date.  I believe
2  that's close, 2007.
3      Q.  And when you first started to use the
4  TVT-S, what were you using prior to that?
5      A.  TVT and TVT Obturator.
6      Q.  Did you stop using TVT and TVT Obturator
7  when you switched to TVT-S?
8      A.  No.
9      Q.  How would you choose which device to
10  use?
11      A.  Any time I'm using a new device, I'm
12  very selective in who I offer that to.  Gradually,
13  as I gain confidence in the procedure, I tend to
14  use it more commonly in my practice, so there's
15  always a transition period between a new product
16  and a previous product.  And if you find that
17  there's patients that you can't treat effectively
18  with the new product you're using but there's
19  advantages to that new product for most patients,
20  then I would continue to perform the procedures I
21  was doing before that.
22      So for instance, patients with recurring
23  incontinence, patients with intrinsic sphincter
24  deficiency, patients that I felt needed a greater
25  degree of support, then I prefer today, and then,

Page 29

1  and I've always preferred the retropubic TVT.
2      Q.  So I want to -- I appreciate that.
3      I want to talk specifically about this time
4  frame, in 2007, to the best of your recollection,
5  when you started to use the TVT-S.
6      How were you making your decisions whether
7  or not to use a TVT-S versus a TVT or a TVT-O?
8      A.  So during 2007, I was using all three
9  products.  By 2008, TVT-S became the predominant
10  product that I was using in my practice as I gained
11  a better understanding of who it was effective on
12  and I gained confidence from seeing patients coming
13  back to me that were doing well, having no
14  complications, having good bladder control, and
15  enjoying the benefits of a minimally invasive
16  procedure.
17      So once I gained confidence that this
18  procedure was going to perform well, I noticed
19  immediately that patients were having minimal
20  recovery and returning to work within a week, I
21  began to offer it to a wider variety of patients.
22  Between 2008 and 2010, there were select patients
23  that I continued to do the retropubic or the
24  Obturator procedure on.
25      Q.  And what was the -- what was different

Brian Flynn, M.D.

Page 30

1  with the patients where you decided to use TVT or
2  TVT Obturator?
3     A. If someone came to me who had a prior
4  failed incontinence procedure, I was more inclined
5  to offer them the retropubic procedure or the
6  transobturator procedure just because there's more
7  data on that procedure and longer follow-up, so I
8  tended to go with a more time-tested procedure as
9  long as the patient was willing. I mentioned to
10 them that there was greater risk with those
11 procedures and greater recovery.
12    So, as I do with all my patients, I have an
13 informed discussion about the risks and benefits of
14 the procedure. I discuss alternatives, and we make
15 a mutual decision with the patient.
16    There are certain patients that prefer to
17 have the most efficacious procedure regardless of
18 risk. They have more risk tolerance. Others are
19 more driven by data. They've gone through the
20 medical literature themselves on websites or things
21 that I've provided to them, and they selected the
22 retropubic procedure or the transobturator
23 procedure, for instance.
24    I would say, overwhelmingly, the patients
25 tend to go with what my recommendation was. And so

Page 31

1  if I identified someone that I felt needed more
2  support, for instance, they've had a prior failed
3  incontinence procedure, they had intrinsic
4  sphincter deficiency, I would be more inclined to
5  go with the full-length sling, either retropubic or
6  transobturator.
7     The difference between retropubic and
8  transobturator, if I felt that placing the
9  retropubic sling was going to be difficult because
10 of prior surgeries, then I would select the
11 transobturator procedure. But, you know, during
12 that time period, most of the cases were TVT-Secur,
13 and then there was a smaller percentage for
14 retropubic and obturator, that was about equal.
15    Q. So when you were having a discussion
16 with a patient in that time frame, was your
17 discussion -- or did -- strike that.
18    When you were having a discussion with a
19 patient in that time frame, it sounds like you
20 differentiated between devices for -- to help the
21 patient understand the devices; is that fair?
22    A. Correct.
23    Q. And so some of the differences that you
24 would discuss with the patients, it sounds like,
25 were the different risks associated with the TVT,

Page 32

1  the TVT-O and the TVT-S; is that fair?
2     A. That was part of the discussion. I
3  mentioned the benefits as well.
4     Q. Right. And another one was the
5  difference in benefits between the three devices,
6  correct?
7     A. Correct.
8     Q. So -- and it sounds like you would also
9  have a discussion with the patient about the
10 differences in how the three devices would treat
11 specific types of stress urinary incontinence,
12 correct?
13    A. Correct.
14    Q. So for example, one of the differences
15 between the three devices that you would discuss
16 was the -- if you felt that the patient needed more
17 support, you would not necessarily recommend the
18 TVT-Secur, correct?
19    A. I would still discuss the TVT-Secur as
20 an option, but I would encourage them, if the level
21 of risk was acceptable, to choose the full-length
22 procedure.
23    Q. And I understand -- well, was there ever
24 a time in this -- let me start that again.
25    Do you recall whether you would have

Page 33

1  discussions with patients in this time frame where
2  you would specifically not recommend one of the
3  three devices?
4     MS. SCHMID: Objection; form.
5     Go ahead.
6     A. There may be a rare patient that I would
7  have objected for one of those. I try to present
8  all three devices and the risks and benefits of
9  each. If they chose an option that I didn't feel
10 strongly about, then I would heavily discourage
11 them from choosing that option. And usually they
12 would, you know, accept my opinion, my
13 recommendation.
14    Q. So can you give me a general idea of
15 what your discussion was with patients about the
16 differences between the TVT-Secur and the other two
17 choices, the TVT and the TVT-O?
18    A. So what I would mention to them is that
19 the TVT device is the device that was the original
20 device. It came to the United States in around
21 1998. It was the most widely studied device for
22 stress urinary incontinence ever. And so there was
23 a wealth of data behind that device. It was a very
24 time-tested procedure with a predictable outcome
25 and known complications.

Brian Flynn, M.D.

Page 34

1    The TVT-Secur device was a newer device,
2    more recently FDA approved. I mentioned to the
3    patients that there was less data on the device,
4    but at least my preliminary results in that 60
5    patients or so I was following prospectively were
6    doing well, and they were able to have surgery
7    without having a general anesthesia. They were
8    able to go home the same day. They didn't require
9    a Foley catheter. Usually they can go back to work
10   within a week. And I hadn't noticed any
11   significant complications, except the few patients
12   I mentioned with urinary retention.
13       So it was performing very well. And so --
14   but I did mention that these were early results. I
15   try to help patients understand the difference
16   between early, midterm and long-term results, and
17   then, you know, ultimately, let them decide at that
18   time point.
19       Q. So one of the differences that you would
20   discuss with your patients between the TVT-S and
21   the TVT device was that there was less data
22   available for the TVT-S, correct?
23       A. Correct.
24       Q. And that the results that you had on
25   your -- on the TVT-S were early results as compared

Page 35

1    to the TVT, which had, at that point, years of
2    results available, correct?
3        A. Correct.
4        Q. Would you also discuss with your
5    patients the differences between the TVT-Secur and
6    the TVT Obturator?
7        A. I tended to discuss the full-length
8    slings together as a group since they performed
9    very similarly, and then the TVT-Secur. It's
10   difficult when you're discussing too many options
11   with the patients. I think it becomes overwhelming
12   and hard to make a decision. So if you have
13   options that are similar, I tend to present them
14   together. So I would present the conversation as a
15   full-length sling versus a mini sling. If they
16   choose the full-length sling, then I might go into
17   the nuances of the differences between those two
18   products.
19       Q. And so prior to 2007 when you started to
20   use a TVT-Secur, for example, your conversations
21   may actually be more focused on the differences
22   between the TVT and the TVT Obturator; is that
23   fair?
24       A. Correct. I started doing the TVT
25   Obturator later in my practice, but before Secur,

Page 36

1    after the retropubic. But once I started doing
2    both procedures, I did discuss them together.
3        Q. Why did you think it was important to
4    tell your patients that there was a difference in
5    the available data between the TVT and the TVT-S?
6        A. Because that's part of the informed
7    consent. That's what we're taught in residency and
8    in medical school, that when you're going to obtain
9    an informed consent from the patient, your job is
10   to try to educate them on what the literature shows
11   and what your own personal experience has been with
12   the device.
13       Q. I asked you to turn to page, I think, 21
14   of your report. Do you have that before you?
15       MS. SCHMID: Sorry, Joe, which page?
16       MR. ZONIES: 21 of Exhibit 3.
17       MS. SCHMID: Thank you.
18       A. Yes, I see the picture of the TVT-Secur
19   device. Is that the page?
20       Q. (By Mr. Zonies) Correct.
21       A. Yes.
22       Q. When you would have discussions with
23   your patients, would you show them photos of the
24   different devices?
25       A. Yes.

Page 37

1        Q. Would you describe the device using the
2    photograph for your patients?
3        A. That was part of the conversation. Not
4    all patients wanted to see that, but patients asked
5    and said, "Do you have a picture of this," or "Do
6    you have the actual device with you, can I see it?"
7    So for some patients, I would just show them a
8    photo of the device in the brochure, for instance.
9    And for others, if they wanted to feel it, touch
10   it, I had a sample of the TVT-Secur, of all the
11   meshes, and I would put the device right in their
12   hand so they can touch it.
13       Q. The picture of the TVT-Secur that's on
14   page 21 of your report, where did you get that
15   picture for your report? Do you know?
16       A. That's a picture from the brochure. So
17   you can see in the corner there, I think it was a
18   picture that I just cropped out of the patient
19   brochure.
20       Q. And --
21       A. Or, I'm sorry, either out of that or
22   maybe out of the IFU, but somewhere from the
23   Ethicon literature that was provided to me, maybe a
24   PowerPoint presentation.
25       Q. Looking at this device and with your

Brian Flynn, M.D.

Page 38

1    experience with the TVT and TVT Obturator -- well,
2    let's start with the TVT.
3        So looking at the photograph on page 21, and
4    based on your experience using the TVT-Secur and
5    the TVT, how would you describe the differences
6    between the TVT-Secur and the TVT?
7        MS. SCHMID:  Objection; form.
8        Go ahead.
9        A.  The primary difference is the length of
10   the sling and the inserter.  Those were the primary
11   differences, and then the fleece at the tips.  So
12   those were the three big differences, the length of
13   the mesh, the PDS Vicryl fleece at the tip, and
14   then the difference in the inserter.
15       Q.  (By Mr. Zonies)  And when you say "the
16   difference in the inserter," what do you mean?
17       A.  So with TVT and TVT Obturator, we use
18   the word "trocar."  There's a trocar that's used to
19   tunnel the device.  With the Secur, there's no
20   actual trocar.  There's no exit point.  This is a
21   single-incision sling procedure, and so the
22   inserter is -- the majority of what you see in the
23   picture, it's the metal device with the plastic
24   tab, the finger pad, so the majority of what you're
25   seeing there, there's two inserters, one for the

Page 39

1    right, one for the left, and then the mesh is in
2    the middle with the PDS Vicryl fleece at the tip.
3        Q.  And what difference, to you clinically,
4    did the fleece make?
5        A.  Difference with respect to other
6    products or . . .
7        Q.  Comparing the -- again, I'm still stuck
8    on comparing the TVT-Secur to the TVT.
9        The TVT-Secur, as you point out, has fleece
10   on the tips of the mesh, correct?
11       A.  Correct.
12       Q.  And you said that that's a Vicryl
13   fleece?
14       A.  It's a mixture of Vicryl and PDS.
15       Q.  And what was your understanding of why
16   that was on the TVT-Secur, and how did it impact
17   your clinical approach to the TVT-Secur?
18       MS. SCHMID:  Objection; foundation.
19       Go ahead.
20       A.  So any of the midurethral slings are
21   going to have various ways of having fixation.  So
22   you need to have a way of fixating the mesh.
23       With the full-length sling, the fixation is
24   the mesh.  The mesh will grab onto all of the
25   surrounding tissue so there's no anchor or fixation

Page 40

1    point.
2        With mini slings, TVT-Secur included
3    American Medical Systems' MiniArc, Boston
4    Scientific Solyx.  There's some sort of anchor at
5    the tip that will create fixation.  So the
6    difference between mini slings and the full-length
7    slings is not only the length, it's the way they're
8    fixated.
9        Over time, the PDS and Vicryl will go away,
10   so the fixation mechanism is really the mesh just
11   like it is with the full-length sling, but at least
12   short-term, the fixation -- the fleece and the PDS
13   is like cotton.  It's sticky, and so it allows the
14   mesh to fixate to the surrounding tissue.
15       Q.  And with your experience with TVT-S --
16   let me ask this, Doctor:  Did you experience a
17   difference in outcomes associated with the
18   difference in fixation between the TVT and the
19   TVT-S?
20       MS. SCHMID:  Objection; form.
21       Go ahead.
22       A.  There was a difference in outcomes
23   between the full-length slings and the mini slings.
24   Why there was a difference?  Was that the length of
25   the sling or the fixation mechanism?  I don't know

Page 41

1    the answer to the second part of your question, but
2    the first part is, yeah, clinically, I did see a
3    difference in terms of the continence outcome.
4        Q.  And is that something you would discuss
5    with your patients?
6        A.  Yeah.  Getting back to what I said
7    earlier, part of the informed consent is what the
8    available literature shows, what your personal
9    experience is.  So when I started with the device,
10   I told the patients, I don't have a lot of personal
11   experience with the device, and so we really don't
12   know how this is going to perform in my hands, but
13   I can tell you how it's performed in other people's
14   hands.  And then as you gain experience with a
15   device, you start to share your own results with
16   your patients.  And I did mention to them that it
17   was a less-robust procedure when compared to the
18   full-length slings.
19       Q.  And what did you mean when you described
20   to them that it was a less-robust procedure?
21       A.  That the continence outcomes were
22   inferior.
23       Q.  And the continence outcomes were
24   inferior as compared to the TVT and the TVT-O?
25       A.  Correct.

Brian Flynn, M.D.

Page 42

1    Q.   When you were looking at the picture of
2    the TVT-Secur on page 21, you also discussed one of
3    the differences between the TVT-S and the TVT and
4    TVT-O is that the TVT-S has the inserters you
5    described as most of what we're seeing in the
6    picture; is that right?
7    A.   Yes.
8    Q.   And what would you discuss with the
9    patient between 2007 and 2010 about the impact of
10   the inserters on the surgery?
11   MS. SCHMID:   Objection; form.
12   Go ahead.
13   A.   At that point, that's getting a little
14   too specific with what I'm doing in surgery.  I
15   don't mention to them what type of suture I use to
16   close their wound, what kind of dressing I'm going
17   to use, what kind of catheter I'm going to use.
18   There's only a finite amount of time you can spend
19   with the patient.
20   So I would share with them what I felt were
21   the important differences, which was the length of
22   the sling and the cotton fleece at the tip, and
23   that it wasn't as a well-studied device as the
24   full-length sling.  Those were the things that I
25   felt were important in the conversation, in

Page 43

1    addition to the procedure being less invasive, less
2    recovery, less convalescence, the ability to do it
3    under a local anesthesia, IV sedation.
4    So I generally talked to them about what the
5    recovery would be like, how long their surgery
6    would be, what the risks and benefits were, and
7    what the expected outcome, but I wouldn't get into
8    too much detail on how the device was placed inside
9    their body, whether it was a mini sling or a
10   retropubic or obturator.  The inserter part, I
11   think, is less important to the patient.
12   Q.   For you clinically, did the inserter
13   impact your outcomes, either efficacy or risk?
14   A.   No.
15   Q.   What about the release wire and the
16   release mechanism in the TVT-S, did you find that
17   that impacted your clinical outcomes or risk?
18   A.   No.
19   Q.   What about the fact that it was a single
20   incision as compared to a multiple-incision device,
21   did you feel that that impacted your clinical
22   outcomes or clinical risks?
23   Let me ask it this way:  Did you find the
24   fact that it was a single-incision sling as
25   compared to the multi-incision slings -- did that

Page 44

1    impact your clinical outcome's efficacy or risks?
2    A.   No.
3    Q.   You didn't believe there was any benefit
4    being derived from it being a single incision?
5    MS. SCHMID:   Objection; form.
6    Go ahead.
7    A.   I do believe there was benefits from the
8    single incision, yes.
9    Q.   (By Mr. Zonies) What would you describe
10   to your patients as the benefits associated with a
11   single incision?
12   A.   Primarily that it's a less invasive
13   procedure, so you have one incision instead of one
14   incision and two punctures.  There's less
15   dissection, less anesthetic requirements, less
16   recovery, less convalescence, less chance of
17   injuring surrounding structures such as the bladder
18   or bowel or major vascular structures or nerves,
19   and so overall, because it was small, it was mini,
20   and there was less tunnelling, that it was a safer
21   procedure.
22   Q.   And you told your patients that it was a
23   safer procedure, that there were -- you had
24   beneficial risk profiles associated with the TVT-S
25   than with the TVT or TVT-O?

Page 45

1    A.   Correct.
2    Q.   So I don't want -- let me ask it this
3    way, Doctor:  Would it be fair to say that you
4    believe that the TVT-S as compared to the TVT, that
5    the TVT-S was less efficacious but provided some
6    benefits on the risk side of the equation?
7    MS. SCHMID:   Objection; form.
8    Go ahead.
9    A.   Yes, as I mentioned earlier, that it was
10   a less well-studied device, less-robust device in
11   terms of its incontinence outcomes, but a minimally
12   invasive procedure with less tunnelling, a single
13   incision, less risk of damaging surrounding
14   structures.
15   MR. ZONIES:   Why don't we go ahead and take
16   a break. It's been an hour.  Is that all right?
17   MS. SCHMID:   Absolutely.  You were maybe
18   reading my mind.
19   (A recess was taken from 11:29 a.m. until
20   11:40 a.m.)
21   (Exhibit Number 4 was marked for
22   identification.)
23   Q.   (By Mr. Zonies)  And what else did you
24   say you brought with you today, Doctor?
25   A.   I have my fee schedule.  I have my trial

Brian Flynn, M.D.

Page 46

1    and testimony history.  I have the notice that has
2    already been marked as Exhibit 1, but I brought my
3    notice.  I brought e-mails of communications I've
4    had with Johnson & Johnson when I was a preceptor.
5    I've been able to locate one contract that I had
6    with Johnson & Johnson Ethicon in 2011.  I have
7    some written communications between myself and
8    Butler Snow.  And then I have my invoice for the
9    TVT-Secur report that I prepared.  And then there
10   was one article that I wasn't certain if it was on
11   the reliance list or in any of the binders, so I
12   decided to bring this article in case it's not
13   included in my binders.
14       Q.  Okay.  Could I get that stack?  And
15   we'll go ahead and get it marked.
16       So we've marked as Exhibit 4 your updated
17   CV.  Is there anything on your updated CV, Doctor,
18   that would be specific to TVT-S?
19       A.  You mean since the last update?
20       Q.  Yes.
21       A.  No.
22       Q.  And then this is -- we'll mark as
23   Exhibit 5 your updated testimony list.
24       (Exhibit Number 5 was marked for
25   identification.)

Page 47

1        Q.  (By Mr. Zonies)  And this has as your
2    last testimony the Perry case; is that right?
3    That's the last time you testified?
4        A.  That's correct, yes.
5        (Exhibit Number 6 was marked for
6    identification.)
7        Q.  (By Mr. Zonies)  And as Exhibit 6, we'll
8    mark -- can you describe what that is, Doctor?
9        A.  That is a -- it's about ten e-mails
10   between myself and Ethicon, because I was asked to
11   bring communications, e-mail communications that
12   I've had.
13       Q.  And on Exhibit 6, these e-mail
14   communications use a Gmail e-mail address for you,
15   correct?
16       A.  Correct.
17       Q.  You also have communications with
18   Ethicon using a Hotmail account, correct?
19       A.  I did, but I haven't had the Hotmail
20   since I went to Gmail.
21       Q.  And so you don't have copies anymore of
22   the Hotmail account?
23       A.  Correct.
24       (Exhibit Number 7 was marked for
25   identification.)

Page 48

1        Q.  (By Mr. Zonies)  And Exhibit 7 is your
2    consulting agreement with Ethicon for 2011 through
3    2012, correct?
4        A.  Correct.
5        Q.  Is that your last consulting agreement
6    you had with Ethicon J&J?
7        A.  Correct.
8        Q.  And you have testified previously that
9    you had one of these for every year when you were
10   consulting for Ethicon, correct?
11       A.  Correct.
12       Q.  And when did you start consulting for
13   Ethicon?
14       A.  From the years 2004 to 2012.
15       Q.  And these -- this Exhibit 7, your
16   consulting agreement, has in it dollar amounts that
17   you will be paid; is that right?
18       A.  It's a contract.  I think it mentions
19   what you get paid for which particular activities
20   that you participated in, and then it mentions what
21   the maximum contract would be for the calendar
22   year.
23       Q.  Right.  So if you look on Exhibit 7, for
24   example, on -- I don't know if there's a page
25   number there, but it talks about a compensation --

Page 49

1    annual compensation amount of $94,000, or
2    something; do you see that at the bottom?
3        A.  It says, "The parties agree that the
4    compensation paid to consultants shall not exceed
5    $94,500 per contract term except as may be mutually
6    agreed in writing by the parties."
7        Q.  Okay.  And each of the contracts that
8    you had with Ethicon had some sort of a maximum
9    compensation per annum, correct?
10       A.  Correct.
11       Q.  And, Doctor, I have -- I believe it's
12   eight documents there from Butler Snow to you; is
13   that right?
14       A.  Yes.
15       Q.  And could you please describe those?
16       A.  These are cover letters from Butler and
17   Snow paralegals that are usually accompanying any
18   kind of material that they sent me in regards to
19   preparing a report.  So the materials that were
20   sent with this on the USB or have been submitted at
21   other time points, but these are just cover
22   letters.
23       MR. ZONIES:  And we'll mark that as
24   Exhibit 8 as a group.
25       MS. SCHMID:  Retro.

Page 50

```
 1        (Exhibit Number 8 was marked for
 2   identification.)
 3        Q.  (By Mr. Zonies)  And, Doctor, Exhibit 8,
 4   are these specific to TVT-S, these cover letters
 5   you received from Butler Snow?
 6        A.  Not necessarily.  There's very little
 7   detail on what was included in there, so I -- some
 8   of them may have been, but they may be related to
 9   other products.
10        Q.  And then we have Exhibit 9 is your -- I
11   believe your invoice for TVT-S report, is what it
12   says, correct?
13        A.  That's correct.
14        (Exhibit Number 9 was marked for
15   identification.)
16        Q.  (By Mr. Zonies)  So on Exhibit 9,
17   Doctor, it has a date.  Can you tell me the
18   importance or significance of the date
19   November through December, and what the date says?
20        A.  So it says "Date:  November 1 through
21   December 6," so it's just a time period.  So I
22   don't know what the actual date was of when the 14
23   hours of preparation were, but it was sometime
24   between those two dates.  And then it shows my
25   hourly rate for the different types of activities.
```

Page 51

```
 1   The only activity was preparation of the report.
 2   There was no record review of individual
 3   plaintiffs.  There was no -- obviously no IME for
 4   this product.  We didn't have any face-to-face
 5   conferences or phone conferences, so it says
 6   "Preparation of report, 14 hours, hourly rate $500,
 7   total charge $7,000."
 8        Q.  And is that the only invoice you've ever
 9   created for TVT-S?
10        A.  Correct.
11        Q.  Between the dates of November 1st and
12   December 6th of 2015, you have 14 hours on this
13   invoice for preparation of your TVT-S report,
14   correct?
15        A.  Correct.
16        Q.  And when you say preparation of your
17   TVT-S report, you're speaking of the report that
18   has been marked as Exhibit 3 in this deposition,
19   correct?
20        A.  Correct.
21        Q.  And is it your testimony that the sum
22   total of time that you spent on researching and
23   drafting Exhibit 3 is 14 hours?
24        A.  Correct.
25        Q.  And that would include all the time you
```

Page 52

```
 1   spent reviewing the scientific articles that are
 2   mentioned either in the report or attached as your
 3   reliance materials, correct?
 4        MS. SCHMID:  Objection; form.
 5        A.  Yeah, a lot of these articles I have
 6   reviewed previously outside of preparation for this
 7   report, so the 14 hours primarily was looking at
 8   some of the larger reports, but a lot of these
 9   reports and studies I've looked at previously, and
10   so certainly I didn't charge for that time.
11        Q.  (By Mr. Zonies)  But for drafting your
12   TVT-S report specifically, can you tell me what --
13   in as much detail as you can, what the 14 hours was
14   made up of?
15        A.  Okay.  So the 14 hours was made up of
16   compiling my background and qualifications, an
17   overview of the spectrum of urinary incontinence, a
18   description of treatment options for urinary
19   incontinence, a discussion of the development of
20   the TVT device, starting with the TVT Classic
21   device, and then later in the report, more
22   specifically, to TVT-Secur, then a compilation of
23   my own personal experience with the device,
24   discussion of the benefits of the device,
25   discussion of the randomized controlled trials,
```

Page 53

```
 1   discussion of polypropylene mesh characteristics,
 2   discussion of potential complications or complaints
 3   against the device, other claims that have been
 4   made against the device, discussion of the
 5   information for users, patient brochures,
 6   professional education program, credentialing.  And
 7   then at the very end is my summary of opinions.  So
 8   that's what the 14 hours were about in terms of
 9   preparing all of that.  That includes me personally
10   typing this report, doing the editing, the
11   formatting.  And I don't have a secretary or a
12   personal assistant or anybody that helped me with
13   this report.  I do it myself.
14        Q.  So you reviewed some of the plaintiff's
15   experts' TVT-S reports prior to drafting this
16   report; is that correct?
17        A.  I have looked at plaintiff experts'
18   reports, maybe not specific to the TVT-Secur
19   product, but some of that overlapped with the Perry
20   case when I had been an expert on behalf of Ethicon
21   in that case.  That case involved TVT-Abbrevo, but
22   a lot of the general arguments that are made
23   against polypropylene mesh from the plaintiff
24   experts I've reviewed, yes.
25        Q.  And so in your report starting at page
```

Brian Flynn, M.D.

Page 54

1  21 where we were looking, there's a picture of the
2  TVT-Secur and a description of the procedure; is
3  that right?
4     A.  That's right.
5     Q.  And if you look at the next eight or
6  nine pages or so, there's -- you discuss the
7  various studies that have specifically studied the
8  TVT-S, correct?
9     A.  That's correct.
10    Q.  Was your review and drafting of this
11 portion of the report about the TVT-S studies,
12 that's within the 14 hours; is that correct?
13    A.  That's correct.
14    Q.  Many of the studies you discuss in here,
15 for example, are not studies that you would have
16 normally seen in your practice.  You specifically
17 got those studies and read them and put them into
18 this report; is that fair?
19    MS. SCHMID:  Objection; form.
20    A.  No, that's not correct.
21    Q.  (By Mr. Zonies)  What publications do
22 you normally subscribe to?
23    A.  Journal of Urology, Urology,
24 International Urogynecology, International Urology
25 and Nephrology, Neurology, and Urodynamics.  Those

Page 55

1  are the main journals that I review for and that I
2  read.
3     Q.  Do you subscribe to Menopause?
4     A.  Menopause, no.
5     Q.  Do you subscribe to Nature?
6     A.  I have access to Nature.  Being at the
7  university, I need a subscription for very little
8  of these journals since the library there allows
9  anybody who's a faculty member to have access to
10 the journals.  They have a group rate, you know,
11 for the faculty, so I don't have to subscribe to
12 many of these journals.  The ones I mentioned are
13 ones that I review for and I actively read, but
14 it's different, maybe, than what a private
15 practitioner would have.
16    (Exhibit Number 10 was marked for
17 identification.)
18    Q.  (By Mr. Zonies)  Exhibit 10 is a
19 scientific article that you brought with you today
20 entitled "Removal or revision of vaginal mesh used
21 for the treatment of stress urinary incontinence."
22 The first author is Welk, W-e-l-k; is that right?
23    A.  That's correct.
24    Q.  And this is a 2015 publication in JAMA;
25 is that right?

Page 56

1     A.  Yes.
2     Q.  Why did you bring this?
3     A.  It was an article that I had come across
4  recently.  It's an article that I reviewed with my
5  residents.  We have journal clubs, and it was an
6  article that I thought might come up that I wanted
7  to have in these binders, but when I prepared the
8  reliance list, you know, we prepared that weeks
9  ago, this is something I had read only recently, so
10 I thought it was one that I wanted to have
11 available to me.
12    Q.  And what did you find instructive in
13 this article?
14    A.  I thought it was very telling how the
15 revision rate on patients that had polypropylene
16 mesh was quite low.  Only one in 30 patients had a
17 revision in Canada.  And then they also looked to
18 see if there were any trends or factors that they
19 could identify on who would be more likely to have
20 a revision.
21    So when teaching residents and students,
22 fellows, I try to help them understand how to use
23 products in their practice and what risk factors
24 they can obviate in order to lessen complications
25 for their patients.

Page 57

1     Q.  And what were some of the risk factors
2  identified in there that you discussed with some of
3  your residents and fellows?
4     A.  Well, surprisingly, the traditional risk
5  factors, such as diabetes, did not make a
6  difference in outcome.  It didn't reach statistical
7  significance in terms of patients that had a
8  complication.  You would expect the diabetic to
9  have poor wound-healing, and so you would expect
10 them to have a higher incidence of wound-related
11 complications, and they did not.
12    Surgeon experience didn't matter, to some
13 extent.  Surgeon specialty did not matter.  So
14 whether you were a urologist or a gynecologist, the
15 chance of having a complication was about the same.
16    The type of practice setting had a small
17 difference in terms of risk.  There seemed to be
18 less complications in the academic practice, but
19 that's a very common bias that you see in papers
20 that are written by academics, that academic
21 centers -- we do more cases, and we're smarter than
22 other people, so we get better results.  So I'm
23 always cautious about that result when it comes to
24 an academic institution.
25    Concomitant hysterectomy did show maybe a

Brian Flynn, M.D.

Page 58

1    slight increase in having more complications.
2    Also, if patients were seen frequently in the
3    previous year, for whatever reason, they tended to
4    have a greater risk of having a complication than
5    patients that were seen less frequently.  The way I
6    would explain that is probably patients that are
7    referred to experts, you know, are not seen by that
8    expert multiple times before they operate on them.
9        Q.  Between your invoice that we went over
10   in December, is it -- strike that.
11       Doctor, your invoice runs from
12   November through December of 2015 where you spent
13   that 14 hours, correct?
14       A.  Correct.
15       Q.  Was your report completed by December of
16   2016 in the form that we're looking at it in
17   Exhibit 3 -- I'm sorry.  Strike that.
18       Was your report completed in its entirety in
19   the form that we're looking at in Exhibit 3 by
20   December of 2015?
21       A.  It was 99 percent completed.
22       Q.  Do you recall any changes you made to
23   the report subsequent to December of 2015?
24       A.  There had maybe some typos, some
25   grammatical errors, formatting, very minor stuff,

Page 59

1    but no changes with respect to the content.
2        Q.  With the exception of the Welk article
3    that we were just looking at, Exhibit 10, were
4    there any materials that you reviewed specific to
5    TVT-S between December of 2015 and today that have
6    informed your opinions that you're giving in this
7    case?
8        MS. SCHMID:  Objection; form.  You mean
9    other than -- do you want him to go through the
10   four binders?
11       MR. ZONIES:  Thank you.
12       Q.  (By Mr. Zonies)  Let me put it this way:
13   Doctor, aside from your report and the reliance
14   materials that are attached to your report,
15   Exhibit 3, were there any other materials that you
16   have reviewed since December of 2015 that informed
17   your opinion regarding the TVT-S?
18       A.  Yes.  There is one other article that is
19   on the USB, by Cornau.  I'm not sure if I'm
20   pronouncing that right.  I believe the first author
21   is C-o-r-n-a-u.  It's from the European Urology
22   Journal, which is a journal I read commonly.  I
23   should have mentioned that one.  But it's a French
24   study looking at midterm results with TVT-Secur.
25       Q.  And when do you believe you reviewed

Page 60

1    that document?
2        A.  Probably in the last month.
3        Q.  How did you happen to come across it, or
4    what brought it to your attention?
5        A.  When I was asked to prepare the USB
6    after I was served the notice of deposition in
7    order to collect anything that I had on the device,
8    I went through my notebook, and it was an article
9    that I had downloaded previously in my own personal
10   interest in TVT-Secur.
11       TVT-Secur I've been reading about for a long
12   time.  I have more experience with this device than
13   any of the TVT products virtually that I've done.
14   And I taught on the device.  It was a big part of
15   my practice.  So I knew a lot about this device.
16   And I was very up to date on the medical
17   literature, you know, contemporarily as the
18   articles were published and became available.
19       Even after I stopped using the device, you
20   know, commonly, and when it was no longer
21   available, I still was interested in how it
22   performed.
23       Q.  Were you upset that Ethicon pulled the
24   TVT-S off the market?
25       A.  I was disappointed, yes.

Page 61

1        Q.  Did you use it right up until the time
2    that it was pulled from the market?
3        MS. SCHMID:  Objection; form.
4        A.  Well, as I mentioned earlier, you know,
5    the dates that I used it commonly when I
6    transitioned to TVT-Abbrevo, I still used the Secur
7    occasionally, but not as often.  And that's what I
8    did up until the time it was no longer being
9    offered.
10       Q.  And when it was pulled off the market,
11   did you actually have to return the TVT-Securs that
12   you had?  Or did you get a chance to implant those
13   after you were told that it was no longer going to
14   be offered?
15       A.  When I transitioned to TVT-Abbrevo, that
16   was what I was doing primarily, and that's what the
17   hospital would have on the shelf for me.  Products
18   that I used less commonly, we would just order them
19   on a case-by-case basis, so that way we didn't have
20   too much inventory.
21       The hospitals are very careful about not
22   having too much inventory, and so they go to the
23   surgeons and say, "What are you using commonly, you
24   know, and what should we be stocking for you?"  And
25   so products that you didn't use commonly, then you

Brian Flynn, M.D.

Page 62

1    wouldn't have them on the shelf.
2        So the answer is no, we didn't have to hurry
3    up and use them up or send anything back. You
4    couldn't send the device back. It was never
5    recalled. So if a product's no longer being
6    offered, that's very different than recall.
7        In a recall, the device would be sent back.
8    TVT-Secur was never recalled.
9        Q. When TVT-Secur was no longer being
10   offered, did you implant TVT-Securs after you were
11   informed it was no longer being offered?
12       A. I don't believe so.
13       Q. The Cornau article that you're
14   discussing, that demonstrates that there's a very
15   precipitous fall-off in efficacy over time with the
16   TVT-Secur; is that correct?
17       MS. SCHMID: Objection; form.
18       A. It showed that the midterm results
19   weren't as good as the short-term results. How
20   that happened or at what time point that happened,
21   I'd have to go back and look at the article again.
22       Q. (By Mr. Zonies) And is it your
23   testimony that you had reviewed the Cornau article
24   before you wrote your report, but simply forgot to
25   include it on the reliance? Or did you review the

Page 63

1    Cornau article after you wrote your report?
2        A. I had read it years ago, probably when
3    it became available, but I didn't read it in
4    preparation of my report. It wasn't an article
5    that I was relying on at the time.
6        Q. It wasn't an article that you relied on
7    in your report, correct?
8        A. Correct.
9        Q. It wasn't -- the Cornau article is an
10   article that shows that the TVT-Secur loses
11   efficacy over time, correct?
12       MS. SCHMID: Objection; form, argumentative.
13       A. It showed that the midterm results were
14   not as good as the short-term results. But there's
15   other articles in my report that I quote that show
16   inferior results with TVT-Secur maybe compared to
17   full-length slings, so that was just one article.
18   There's other articles that show, you know, less
19   results in the midterm than the short-term that
20   I've quoted. So I think there's other articles
21   that represent that outcome.
22       Q. (By Mr. Zonies) Yeah. And if I
23   understand correctly, first of all, you would agree
24   that the TVT-Secur, even in the short-term, was not
25   as efficacious as the TVT or the TVT-O, correct?

Page 64

1        MS. SCHMID: Objection; form.
2        A. I would say there's a very small
3    difference in the efficacy, maybe 5 percentage
4    points. So I think it was -- it had a very good
5    short-term efficacy, certainly in my hands it did,
6    and my study. It was performing almost as well as
7    the results I was getting with full-length slings.
8    I believe I recorded 85 percent success in my
9    short-term study, so that was not very different
10   than what I was getting with full-length slings.
11       Q. Well, you actually reported 82 percent,
12   didn't you?
13       A. Excuse me. 82 percent.
14       Q. And with your TVT and TVT-O, you
15   actually have reported 85 to 90 percent, correct?
16       A. I would have to look at what you're
17   quoting. I have had a previous abstract on TVT-O.
18   I don't believe I've ever had an abstract on TVT
19   full or retropubic TVT.
20       Q. So my question, Doctor, is, you would
21   agree that, even in your hands, that the TVT-Secur
22   in short-term results did not perform as well as
23   the TVT and TVT-O, correct?
24       MS. SCHMID: Objection; form.
25       A. I wouldn't agree with that.

Page 65

1        Q. (By Mr. Zonies) The 5 percent
2    difference, you just don't think that that matters,
3    the 5 percent difference?
4        A. I think you would have to do a
5    head-to-head trial between the Secur and the
6    Obturator and do that prospectively and
7    consecutively to really be confident, because
8    there's a lot of other factors that go into that.
9        Q. So you would look for a randomized
10   control trial comparing TVT-Secur to TVT-O, for
11   example, correct?
12       MS. SCHMID: Had you finished your prior
13   response, Dr. Flynn?
14       THE WITNESS: No, I didn't.
15       MS. SCHMID: Okay. Why don't you go ahead
16   and finish your prior response.
17       Q. (By Mr. Zonies) I'm sorry. I didn't
18   mean to cut you off, Doctor.
19       A. That's okay. What I was going to finish
20   saying was that as I had been in practice for
21   longer and this continues to happen in my practice,
22   I tend to see more and more complex patients. My
23   practice initially was that of what we'd call
24   primary incontinence where you would see what the
25   AUA would describe as index cases, and then over

Brian Flynn, M.D.

Page 66

1    time, the practice became more tertiary, which is
2    something you'd expect at a tertiary institution
3    and academic teaching center.
4        So when I was doing TVT-Secur, I was
5    already, you know, four or five years into
6    practice, and so I was starting to see more and
7    more difficult patients.  So the only way to really
8    correct for that is doing the cases consecutively.
9    Do one TVT-Secur, then the next patient that you
10   see, do the TVT Obturator, and then collect the
11   results.
12       So if you're comparing nonconsecutive
13   series, even within the same surgeon's hands,
14   there's potentially some differences in the cohort.
15   Also, when you compare studies across the
16   literature, you can see something similar.
17       In order to correct for that, people would
18   then try to put together a systematic review, or
19   meta-analysis, which is the highest level of data,
20   and then look at what the meta-analysis of the
21   systematic reviews show in order to see the true
22   differences between the products.
23       Q.  Okay.  So a couple of questions.
24       Is it your testimony that a meta-analysis is
25   the highest level of data?  Yes or no?

Page 67

1        MS. SCHMID:  Objection; form.
2        Go ahead.
3        A.  It's one of the things.  There's others
4    that have the same level of evidence, so there's a
5    tie, you know, up there at the top.
6        Q.  (By Mr. Zonies)  And a tie between a
7    meta-analysis and what?
8        A.  A systematic review.  Those are
9    different.
10       Q.  And is it your belief that at the top of
11   the evidence pyramid, the best evidence one can get
12   on any scientific question about TVT slings is a
13   systematic review or a meta-analysis?
14       MS. SCHMID:  I'm sorry.  Madam Court
15   Reporter, can you just read that back to me?
16       MR. ZONIES:  I'll ask it again.
17       MS. SCHMID:  Okay.  Thank you.
18       Q.  (By Mr. Zonies)  Is it your testimony,
19   Doctor, that at the top of the evidence pyramid,
20   the best evidence one can get on any scientific
21   question about the TVT slings is a systematic
22   review or a meta-analysis?
23       MS. SCHMID:  Objection; form.
24       Go ahead.
25       A.  I would say for the most part.  There

Page 68

1    has to be enough studies to make the systematic
2    review and meta-analysis valuable, so if there's
3    four or five studies that have been published to
4    date, the meta-analysis and systematic review is
5    not going to be very accurate.  The more studies
6    that are collected, the greater degree of accuracy
7    that the meta-analysis or systematic review are
8    capable of.
9        Q.  (By Mr. Zonies)  Is it important,
10   Doctor, that the studies included within the
11   systematic review and/or meta-analysis be
12   randomized controlled clinical trials?
13       A.  No.  That's the beauty of the systematic
14   review and the meta-analysis, is that it can
15   correct for that to some extent.
16       Q.  In your report, Doctor, on page 22, you
17   discuss a Cochrane review of midurethral slings; do
18   you see that in the middle of the page 22,
19   Exhibit 3?
20       A.  Starting with "In 2015, a Cochrane
21   review"?
22       Q.  Yes.
23       A.  Yes.
24       Q.  The Cochrane review that you're
25   discussing there, which is the -- cited as the Ford

Page 69

1    paper in 2015, you believe that to be the highest
2    level of evidence because it's a systematic review,
3    correct?
4        MS. SCHMID:  Objection; form.
5        A.  I think the Cochrane reviews, systematic
6    reviews are very powerful, so it's level-one
7    evidence, yes.
8        Q.  (By Mr. Zonies)  And it says, "While
9    not" -- you say in your report, "While not
10   specifically applicable to single-incision slings
11   like the TVT-Secur," and you go on to discuss how
12   it's actually talking about multi-incision slings,
13   correct?
14       A.  Correct.
15       Q.  My question, Doctor, is, in your
16   TVT-Secur report, why didn't you cite to the
17   Cochrane review done in 2015 on single-incision
18   slings?
19       A.  I would have to see which review you're
20   talking about.
21       Q.  Actually, Doctor, it's the 2014 review
22   by Nambiar, N-a-m-b-i-a-r, entitled "Single
23   incision sling operations for urinary incontinence
24   in women," a review.  Have you ever reviewed that
25   paper?

Brian Flynn, M.D.

Page 70

1     A.  I would have to look at it to be
2  confident one way or the other.
3     (Exhibit Number 11 was marked for
4  identification.)
5     Q.  (By Mr. Zonies)  Doctor, I'm handing you
6  Exhibit 11.  Have you got that in front of you?
7     A.  I do.
8     Q.  Have you ever seen this Cochrane
9  collaboration paper entitled "Single incision sling
10 operations for urinary incontinence in women"?
11    A.  I don't believe so.
12    Q.  And the first author is Nambiar,
13 N-a-m-b-i-a-r; is that right?
14    A.  Correct.
15    Q.  Doctor, this is a 2014 Cochrane review
16 on single-incision slings.  You would agree that
17 the TVT-Secur is a single-incision sling, correct?
18    A.  Correct.
19    Q.  And the paper you cited to is discussing
20 multi-incision slings, correct?
21    A.  The Cochrane review from 2015?
22    Q.  Yes.
23    A.  Yes.
24    Q.  And you would agree that when analyzing
25 the question of single-incision slings and their

Page 71

1  safety and efficacy, it would be much more reliable
2  to review the Cochrane paper on single-incision
3  slings than the Cochrane paper on multi-incision
4  slings, correct?
5     A.  No, I wouldn't agree to that.
6     Q.  You think that the paper on
7  multi-incision slings is more informative than the
8  paper on single-incision slings when looking at the
9  safety and efficacy of a single-incision sling?
10    A.  I think they're both important studies.
11 I'm not going to value one over the other.
12    Q.  If you take a look at the Nambiar,
13 Doctor, the Cochrane review from 2014, and you look
14 at page 1 --
15    MS. SCHMID:  Are you on Exhibit 11 right
16 now, right?
17    MR. ZONIES:  Yes.
18    Q.  (By Mr. Zonies)  And you actually have
19 it open, I think, to page 1, the abstract; do you
20 see that?
21    A.  Yeah.
22    Q.  And the abstract says, "It should be
23 noted" -- I'm sorry, in the "Background" section,
24 second paragraph, do you have that?
25    A.  Which page?

Page 72

1     Q.  Right where you are, page 1, in the
2  abstract.
3     A.  Okay.
4     Q.  "Background," the second paragraph, "It
5  should be noted," do you see that?
6     A.  I do.
7     Q.  "It should be noted that TVT-Secur is
8  one type of single-incision sling.  It has been
9  withdrawn from the market because of poor results."
10 Did I read that correctly?
11    A.  Yes.
12    Q.  And this -- the next page discusses the
13 main results; do you see that?
14    A.  Yes.
15    Q.  If you look at the fourth paragraph
16 down, it starts with "Women were"; do you see that
17 paragraph?
18    A.  I do.
19    Q.  "Women were more likely to remain
20 incontinent after surgery with single-incision
21 slings than with retropubic slings, such as
22 tension-free vaginal tape (TVT) with a risk ratio
23 of more than two"; is that right?
24    A.  Correct.
25    Q.  Do you agree with that?

Page 73

1     MS. SCHMID:  Objection; foundation.
2     A.  I would agree with part of it.
3     Q.  (By Mr. Zonies)  Which part?
4     A.  The statement that says "more likely to
5  remain incontinent."  I would characterize it as
6  more likely to have recurrent incontinence.  But
7  the risk ratio, that seems to be quite high to me.
8  I -- at least in my own personal experience, it
9  wouldn't be 2.08.
10    Q.  And, Doctor, just to be clear, your
11 report -- your expert report in this case, is it
12 based solely on your personal experience?  Or did
13 you actually review scientific studies on these
14 issues?
15    A.  It's based on both.
16    Q.  And so you've testified that the
17 Cochrane reviews, systematic reviews are level-one
18 evidence, in your opinion, correct?
19    A.  Correct.
20    Q.  And would you agree with this level-one
21 evidence that there is, as it says in the next
22 sentence, "a higher risk of de novo urgency" with
23 single-incision slings such as the TVT-Secur?
24    MS. SCHMID:  Sorry, where were you reading
25 that from?

Brian Flynn, M.D.

Page 74

1    MR. ZONIES:  The next sentence, "Duration of
2  the operation was slightly shorter for
3  single-incision slings but with higher risk of de
4  novo urgency," again, more than a two-time relative
5  risk.
6    Q.  (By Mr. Zonies)  Do you agree or
7  disagree with that statement?
8    MS. SCHMID:  Objection; foundation.
9    A.  I'm not sure if that relative risk is
10  talking about shorter operation or higher risk of
11  de novo urgency.  It's a little bit confusing to me
12  the way that was written.
13    Q.  (By Mr. Zonies)  Do you agree that
14  there's a higher risk of de novo urgency with the
15  TVT-Secur than the TVT retropubic?
16    MS. SCHMID:  Objection; form, vague.
17    A.  I've never seen that reported.  I don't
18  remember reading that in any other review or my own
19  personal experience with the device.
20    Q.  (By Mr. Zonies)  You've never read that
21  in any of the papers that you reviewed?
22    A.  I would have to go back and look at all
23  of them, but that stands out, to me, as being
24  something that I'm surprised to hear.  I don't --
25  that's not what most physicians would believe.

Page 75

1    Q.  Well, you certainly don't believe it,
2  right?
3    A.  I have a tough time believing that.  I
4  would have to go back and look at that and other
5  papers, but I'm surprised to hear that.
6    Q.  And the next paragraph discusses a
7  comparison of the TVT-Secur to the TVT Obturator,
8  correct?
9    A.  Yes.
10    Q.  And it says in that paragraph that the
11  single-incision slings resulted in higher
12  incontinence rates compared to the obturator sling,
13  correct?
14    A.  Correct.
15    Q.  Do you agree or disagree with that?
16    MS. SCHMID:  Objection; form, foundation.
17    A.  I could agree with that.  I think I
18  mentioned earlier that the full-length slings were
19  a more robust procedure, in my opinion.
20    Q.  (By Mr. Zonies)  And then it goes on to
21  say, "The adverse event profile was significantly
22  worse, specifically consisting of higher risks of
23  vaginal mesh exposure, bladder/urethral erosion and
24  operative blood loss" with the TVT-Secur as
25  compared to the obturator.

Page 76

1    Do you agree or disagree with that
2  statement?
3    MS. SCHMID:  Objection; form, foundation.
4    A.  I disagree with that statement.
5    Q.  (By Mr. Zonies)  You disagree with this
6  Cochrane collaboration in a number of ways, don't
7  you, Doctor?
8    A.  I disagree with some of the conclusions.
9  I think there's other systematic reviews, for
10  instance, Walsh or Tomaselli, Tincello, Tang.
11  There's other reports that say something very
12  different, that report, the procedure being less
13  invasive and having similar outcomes and similar
14  risk profile.
15    Q.  Well, Doctor, you chose to cite on page
16  22 of your report -- and, in fact, it's the first
17  scientific article you cite in your report, in this
18  section of your report, you chose to cite to the
19  Cochrane review, but the Cochrane was looking at
20  TVT and TVT-O, right?  You chose that?
21    A.  I had --
22    MS. SCHMID:  Let me object to the form.
23  Misstatement.  Also, I mean -- just be careful --
24  just be careful, because the reliance --
25    MR. ZONIES:  I'm being careful.

Page 77

1    MS. SCHMID:  -- does, in fact, include
2  Exhibit Number 11.
3    MR. ZONIES:  Do you want to go under oath
4  now or are you going to keep doing that?  Do not do
5  that during my deposition, please.
6    MS. SCHMID:  Keep doing what?
7    MR. ZONIES:  Do not coach your witness
8  during my deposition.  If you want to ask him
9  questions later, you're more than welcome to.
10    MS. SCHMID:  Okay.
11    A.  What I'd like to go on the record is I
12  misspoke earlier that this article that you
13  presented to me is, in fact, on the reliance list.
14  I looked at the reliance list quickly.  There's
15  over 200 articles on this list.  I'm sorry if I
16  don't remember every single article on the list,
17  but this Nambiar article is on my reliance list.
18    Q.  (By Mr. Zonies)  So my question, then,
19  Doctor, is why, on page 22 of your report, am I not
20  reading about the Nambiar article?  Instead, you've
21  chosen to discuss the Ford article that has nothing
22  to do with this device.
23    MS. SCHMID:  Objection; form, argumentative.
24    A.  If you look at the way this report is
25  prepared, it walks you through the history of TVT.

Brian Flynn, M.D.

Page 78

1  And so there's a transition point.  Up until page
2  22, the majority of what is in the report is about
3  the history of incontinence and the TVT device.
4  And then as we go further in the report, starting
5  on page 23, that's when we start to specifically
6  talk about TVT-Secur.
7      Q.  (By Mr. Zonies)  Doctor, did you choose
8  not to mention this Cochrane review because you
9  didn't read it before, as you earlier testified, or
10  because you didn't like what it said?
11      MS. SCHMID:  Objection; argumentative.
12  Go ahead.
13      A.  Of the articles on my reliance list, I
14  haven't read all of those as comprehensively as
15  others, so there are some articles that I'm more
16  familiar with that I've relied on for many years.
17  And so I chose articles in my report that I'm more
18  familiar with.  I think that that's what any expert
19  would do.  The articles that you're most familiar
20  with that you have the greatest degree of
21  confidence in that are similar to your own personal
22  experience with the device, those are the ones you
23  tend to cite and talk about.
24      Q.  So Doctor, I want to be sure we get this
25  right.

Page 79

1      You earlier testified that systematic
2  review, to you, is the top level of evidence
3  available on a scientific question, correct?
4      MS. SCHMID:  Objection; form, misstates
5  testimony.
6      Go ahead.
7      A.  That's incorrect.
8      Q.  (By Mr. Zonies)  That a systematic
9  review and/or a meta-analysis are, for you, the top
10  level of evidence on a scientific question,
11  correct?
12      A.  Yes.
13      Q.  And this Cochrane review that we're
14  looking at now from 2014 concerning single-incision
15  slings is, indeed, a systematic review, correct?
16      A.  Correct.
17      Q.  So in your mind, this would be the top
18  level of evidence to look at to determine the
19  scientific question of the safety and efficacy of a
20  single-incision sling like TVT-Secur, correct?
21      MS. SCHMID:  Objection; form.
22      A.  This and other systematic reviews.  It's
23  not the only systematic review on TVT-Secur.  And
24  this systematic review is on mini slings.  It's not
25  just on TVT-Secur.  So for instance, the Wall study

Page 80

1  in 2011 is another systematic review and
2  meta-analysis of over a thousand patients that had
3  a mesh exposure rate of 2.4.  Tomaselli, 2013, RCT.
4  RCTs are a very high level of evidence as well, and
5  didn't show a high exposure rate any different than
6  TVT-O.
7      So you have to look at a number of studies.
8  I think there's always going to be one study, even
9  possibly a systematic review that might report
10  something different than other systematic reviews.
11  So there's multiple systematic reviews on mini
12  slings.  I chose to cite the Wall study, and that's
13  what I have in my report.  So I did choose one of
14  the systematic reviews.  It was one that was -- one
15  that I was more familiar with.
16      Q.  (By Mr. Zonies)  And it was the one that
17  supports your opinion, not the one that is contrary
18  to your opinion, correct?
19      MS. SCHMID:  Objection; form, argumentative.
20  Go ahead.
21      A.  It supports my experience and my
22  opinions in regards to TVT-Secur.
23      Q.  (By Mr. Zonies)  You picked the one that
24  supports your opinions, not this one that we're
25  looking at that is clearly contrary to your

Page 81

1  opinions, correct?
2      MS. SCHMID:  Objection; form, argumentative,
3  misstates the document.
4      A.  I chose the one that I think most
5  represents TVT-Secur.
6      Q.  (By Mr. Zonies)  So one of the concerns
7  that you just raised is that this is about mini
8  slings, but you see the author's conclusions,
9  Doctor, where it says, "TVT-Secur is inferior to
10  standard midurethral slings for the treatment of
11  women with stress incontinence and has already been
12  withdrawn from clinical use"; did I read that
13  correctly?
14      A.  You read it correctly, but the
15  statement's incorrect.
16      Q.  And two paragraphs above that, "Overall
17  results show the TVT-Secur is considerably inferior
18  to retropubic and inside-out transobturator
19  slings"; do you agree or disagree with that
20  statement?
21      MS. SCHMID:  I'm going to object to form.
22  It's an incomplete recitation of the sentence.
23      A.  Can I read the rest of the sentence?
24      Q.  (By Mr. Zonies)  Sure.
25      A.  Okay.  "But additional evidence is

Brian Flynn, M.D.

Page 82

1  required to allow any reasonable comparison of
2  other single-incision slings versus transobturator
3  slings."
4      What this report says to me is that the mini
5  slings are inferior to the full-length retropubic
6  and transobturator slings. And I think that's
7  something we've stated multiple times already in
8  this deposition, that the full-length slings, I've
9  said earlier, are a more robust procedure with
10 better incontinence outcomes.
11     The mini slings have a more attractive
12 convalescence and recovery for the patient, in my
13 hands, less complications, so it gets back to the
14 risks-and-benefit discussion you have with your
15 patients.
16     MR. ZONIES: Move to strike as
17 nonresponsive.
18     Q. (By Mr. Zonies) Doctor, do you see in
19 the paragraph discussing the comparison to
20 transobturator slings, do you see that paragraph?
21 We were looking at that earlier. It starts with
22 "Single-incision slings resulted in a higher
23 incontinence rate compared with inside-out
24 transobturator slings."
25     A. Yes.

Page 83

1      Q. All right. In that paragraph, it says:
2  The adverse event profile was significantly worse,
3  specifically consisting of higher risks of vaginal
4  mesh exposure with a 3.75 relative risk,
5  bladder/urethral erosion with a 17.79 statistically
6  significant relative risk, and operative blood
7  loss, 18.79 statistically significant relative
8  risk.
9      That's what that states, correct?
10     MS. SCHMID: Objection; form, incomplete.
11 Go ahead.
12     A. There's a lot there. I think we've read
13 that paragraph a few times. This systematic review
14 is very different than what other systematic
15 reviews report.
16     Q. (By Mr. Zonies) And the last sentence
17 says, "Most of these findings were derived from the
18 trials involving TVT-Secur: Excluding the other
19 trials showed that the high risk of incontinence
20 was principally associated with the use of this
21 device. It has been withdrawn from clinical use."
22     That's what that says, right?
23     A. That's what it says, but it was never
24 withdrawn. It was no longer offered. Those are
25 very different.

Page 84

1      Q. And this is a paper you either didn't
2  see or you certainly didn't discuss in your report,
3  correct?
4      A. It's listed on my reliance list, but
5  it's not specifically discussed in the report.
6      Q. Now, you said that randomized control
7  trials are also good evidence; is that right?
8      A. That's correct.
9      Q. I'm going to hand you what's being
10 marked as Exhibit 12.
11     (Exhibit Number 12 was marked for
12 identification.)
13     Q. (By Mr. Zonies) I'm handing you what's
14 been marked as Exhibit 12, a study by Hota,
15 H-o-t-a, at the Harvard Medical Center. Have you
16 ever seen that study before?
17     A. Yes, I've seen this before.
18     Q. You do not discuss this study in the
19 body of your report, Doctor. I was wondering if
20 there's a reason for that.
21     A. The report's 50 pages long. The
22 majority of articles listed on the reliance list
23 are not specifically discussed in the report. When
24 preparing the report, I selected the articles that
25 I thought were most representative of TVT-Secur and

Page 85

1  the outcomes that I've experienced with my
2  patients.
3      Q. You selected the articles that are most
4  consistent with your belief of the safety and
5  efficacy of the TVT-S, correct?
6      MS. SCHMID: Objection; form, misstates
7  testimony.
8      A. That's not what I said, so no, that's
9  not correct.
10     Q. (By Mr. Zonies) You'll see that this
11 Hota study comes out of Harvard. It's a randomized
12 control trial that had to be stopped because they
13 found that the TVT-Secur was not efficacious and
14 too risky as compared to the Obturator --
15     MS. SCHMID: Objection; form --
16     Q. (By Mr. Zonies) -- is that right?
17     MS. SCHMID: I'm so sorry.
18     MR. ZONIES: That's all right.
19     MS. SCHMID: Objection; form, foundation,
20 argumentative.
21     A. I would need a little bit more time to
22 look at the study. I'll just read the conclusion.
23 It says, "The TVT-S seems to have a higher risk of
24 positive postoperative cough stress test result,"
25 meaning incontinence, "however, the procedure

Brian Flynn, M.D.

Page 86

1  resulted in similar improvements in quality of
2  life." I'm not seeing where it had to be stopped.
3  I could go on and spend time reading the whole
4  paper.
5      Q. (By Mr. Zonies) I'll just help you,
6  Doctor. If you turn to the next page, under
7  "Results," the first sentence, "The study was
8  terminated early because of the interim analysis
9  results"; do you see that?
10     A. I do.
11     Q. And the last paragraph on the column
12  next to that begins with, "An interim analysis"; do
13  you see that, the last paragraph in the left-hand
14  column?
15     A. On which page?
16     MS. SCHMID: Where are you?
17     Q. (By Mr. Zonies) Same page, just right
18  here (indicating).
19     A. Okay.
20     Q. It says, "An interim analysis was not
21  initially planned as part of the study; however,
22  several investigators voiced concerns about noting
23  an increasing number of positive postoperative
24  CTSs" -- that's a cough stress test, correct?
25     A. Correct.

Page 87

1      Q. -- "in women who had undergone a TVT-S,"
2  and that's why the study was stopped.
3      A. Okay.
4      Q. You don't discuss this paper in your
5  expert report from Harvard, correct?
6      A. That's correct.
7      Q. That's not the only -- you actually do
8  discuss the Hamer, H-a-m-e-r, paper -- well, strike
9  that.
10     MR. ZONIES: Could we take a break for a
11  second?
12     MS. SCHMID: Absolutely.
13     MR. ZONIES: How much time do we have left?
14  What do you have, five minutes?
15     MS. COVINGTON: Three.
16     (A recess was taken from 12:37 p.m. until
17  12:41 p.m.)
18     MR. ZONIES: That's all the questions I have
19  for now. I'll reserve my three minutes for any
20  rebuttal questions.
21     And also, to the extent that any of these
22  new documents that the Doctor brought with him
23  today present information we need to talk to him
24  about, I'll reserve my right to ask for some more
25  time on that. I don't expect to, but . . .

Page 88

1              EXAMINATION
2  BY MS. SCHMID:
3      Q. Dr. Flynn, you were asked a number of
4  questions about an article with the author of
5  Cornau or Cornau; is that correct?
6      A. That's correct.
7      Q. And if I could just refer you to page 34
8  of your expert report in this case, Dr. Flynn, did
9  you, in fact, discuss and cite to the Cornau
10  article in your expert report?
11     A. I did.
12     Q. All right. Earlier today in some
13  questions from Plaintiff's counsel, you stated that
14  continence outcomes from the TVT-Secur were
15  "inferior"; do you recall that testimony?
16     A. I do.
17     Q. And what did you mean by that?
18     MR. ZONIES: Object to the form.
19     A. I meant that I truly believe that the
20  full-length slings have better continence outcomes
21  than the mini slings. It's not to say that the
22  mini slings are not effective. They have reports
23  of efficacy in the low 80s in many studies,
24  including systematic reviews, and in my own
25  experience. As it was pointed out, that the

Page 89

1  full-length slings tend to report outcomes in the
2  high 80s even into the 90s, so there's a slight
3  difference there that's balanced against the
4  decreased morbidity of the TVT-Secur procedure.
5      So I think these are all good procedures,
6  the full-length slings and the mini slings. And
7  it's nice having options as a surgeon. There are
8  certain patients that you would prefer to do a less
9  invasive procedure on. That's why I mentioned
10 earlier that it would have been nice if TVT-Secur
11 was still on the market, because that was a viable
12 option in my practice, and in many people's
13 practices. It was a commonly performed procedure.
14 Did it perform as well as the full-length slings
15 over time? The answer is no, but you can say that
16 about a lot of incontinence procedures, like the
17 Burch procedure, for instance. That tends to fail
18 over time. The pubovaginal sling with autologous
19 fascia, that can degrade and fail over time. If
20 you look at the study by Michael Albo, he reported
21 long-term success rates with Burch and pubovaginal
22 sling to be both less than 50 percent.
23     And so there's plenty of evidence in the
24 medical literature to show that incontinence is a
25 degenerative condition and that outcomes can

Brian Flynn, M.D.

Page 90

1  decrease over time. And so TVT-Secur is no
2  different, really, than any other incontinence
3  procedure that has been reported to date.
4      MR. ZONIES: Move to strike.
5      Q. (By Ms. Schmid) Dr. Flynn, you also, in
6  response to counsel's questions earlier this
7  morning, you described the TVT-Secur as a "safer"
8  procedure than the TVT-O; do you recall that
9  testimony, Dr. Flynn?
10     A. I do.
11     Q. And can you tell the jury why you
12  believe the TVT-S is a safer surgical procedure
13  than the TVT-O?
14     A. Well, I'll start out just by saying that
15  there's less tunnelling required with the
16  TVT-Secur. There's less dissection. There's never
17  been any reports of bowel or any kind of intestinal
18  injury with a mini sling, so that's one reason why
19  I would mention that.
20     In my own personal experience, I had very
21  few complications with this device. I had
22  mentioned one mesh exposure and a few cases of
23  bladder incomplete emptying.
24     I do want to correct what I said earlier
25  about five patients that I had to revise. It was

Page 91

1  only two. There was five patients in my study that
2  had bladder incomplete emptying of which three of
3  them had resolved spontaneously, two required
4  loosening of the sling, what we call sling lysis.
5  None of the patients in the cohort required any
6  mesh removal or mesh explantation.
7      So I think my own experience with the
8  device, the medical literature, the picture that we
9  showed earlier looking at the mere size of the
10  device I think is very logical why you'd have less
11  complications with the device.
12     Q. Dr. Flynn, what did you look at to help
13  you with your recollection regarding the number of
14  sling loosening, or lysis, procedures that you had
15  to do on that series of cohorts?
16     MR. ZONIES: Object to the form.
17     A. During the break, I took the opportunity
18  to look at Exhibit 55, which is in my binder, and I
19  spent more time looking at the results more
20  carefully, so I was speaking purely from memory
21  when I was asked about that study. I didn't have
22  the study in front of me, so over the break, I went
23  back and looked at that number, because it didn't
24  sound exactly right to me.
25     Q. (By Ms. Schmid) All right. And for the

Page 92

1  record today, Dr. Flynn, you brought with you
2  four -- four notebooks to the deposition today,
3  correct?
4      A. Four notebooks, then there are some
5  items that we brought that aren't in the notebook,
6  and the USB.
7      Q. Okay. What is it that is in the four
8  notebooks that you brought with you to today's
9  deposition?
10     A. Well, starting with notebook one is my
11  report, that's an over 50-page document with over a
12  hundred references that I spent 14 hours preparing.
13  In addition to that, the referenced articles along
14  with my reliance list are in these four binders.
15  So we got the medical literature, including
16  systematic reviews, meta-analyses,
17  random-controlled trials, my abstract that I had
18  with TVT-Secur, so quite a bit of information.
19     Q. Have you, Dr. Flynn, actually read
20  yourself all of the articles that are in the
21  binders marked 1 through 4 at the deposition today?
22     A. I've either read them or have at least
23  read the abstract or skimmed these articles at some
24  point.
25     Q. I'm looking for, now, Dr. Flynn, the

Page 93

1  contract that was marked as an exhibit where there
2  was a maximum annual sum of $94,000. Here it is,
3  Exhibit Number 7. Do you recall being shown this
4  exhibit by Plaintiff's counsel during your
5  deposition, Dr. Flynn?
6      A. I do.
7      Q. And do you recall being asked a question
8  about -- bear with me a moment -- at the bottom,
9  and there are no page numbers, as far as I could
10  see, but that there was a figure of $94,500 at the
11  bottom of this contract with Ethicon and Johnson &
12  Johnson; is that correct?
13     A. That's the maximum amount that we agreed
14  on to be paid in a single year.
15     Q. And did Johnson & Johnson and/or Ethicon
16  pay you $94,500 the year that this contract
17  pertains to in 2011?
18     A. No, not in that year and not in any
19  year.
20     Q. All right. And do you know, Dr. Flynn,
21  how much money you received under the terms of the
22  contract that's been marked as Deposition Exhibit 7
23  today?
24     A. In that particular year?
25     Q. Yes, sir.

Brian Flynn, M.D.

Page 94

1    A.  No.
2    Q.  All right.  Was it something less than
3  $94,500?
4    A.  Significantly less.  I know how much I
5  was paid between 2004 and 2012 over an eight-year
6  time frame, but I don't know, as a breakdown, per
7  year.
8    Q.  Okay.  And how much were you paid by
9  Ethicon and Johnson & Johnson under consulting
10  agreements over an eight-year time period between
11  2004 and 2012?
12    MR. ZONIES:  Object to the form.
13    A.  So those years are inclusive, so over an
14  eight-year period, I was paid $160,000, so
15  approximately $20,000 a year.  I don't remember if
16  each year was equal, or how that would spread out,
17  but the last time I looked at that, I looked at
18  that in preparation for the Perry case, and that
19  was the amount that I was able to figure out by
20  going through my records, and so it was $160,000
21  over an eight-year period.
22    Q.  (By Ms. Schmid)  All right.  Dr. Flynn,
23  has the TVT-Secur been studied in
24  level-one-evidence randomized control trials?
25    A.  Yes.

Page 95

1    Q.  And have you read those level-one RCTs
2  regarding the TVT-Secur?
3    A.  I have.
4    Q.  And are those studies cited in your
5  expert report and/or contained within your reliance
6  list?
7    MR. ZONIES:  Object to the form.
8    A.  They are.  I've cited the Wall study,
9  Tomaselli, the Tang and Tincello are just studies
10  that immediately come to mind as being either RCTs
11  or systematic reviews that I cite in my study -- my
12  report.  Excuse me.
13    Q.  (By Ms. Schmid)  I apologize.  Were you
14  finished?
15    A.  Yes.
16    Q.  Okay.  Do you practice evidence-based
17  medicine, Dr. Flynn?
18    MR. ZONIES:  Object to the form.
19    A.  I do.
20    Q.  (By Ms. Schmid)  And what's that mean?
21    A.  It means, when possible, if you can make
22  a decision based on evidence, that is going to
23  guide your practice.  There will always be
24  exceptions where evidence is not available, or the
25  evidence has failed you and you need to try

Page 96

1  something new, something innovative.  That's how
2  medicine advances.
3    So we practice evidence-based when possible.
4  When not possible, or when the evidence is weak, or
5  the outcomes are mixed, then that's when we look to
6  other products and try to advance the science.
7    Q.  Do the level-one studies that you
8  discuss in your expert report or that you had
9  produced today, either on the thumb drive or in
10  these four notebooks, do they form the basis for
11  your opinions provided in the deposition today and
12  in your expert report regarding the safety and
13  efficacy of the TVT-Secur?
14    MR. ZONIES:  Object to the form.
15    A.  They are part of how I form that
16  opinion.  The other part is based on my education,
17  my training, and my own clinical practice as a
18  urologist for 15 years at an academic center.  I
19  rely on all of those things when formulating
20  opinions.
21    Q.  (By Ms. Schmid)  Have you, Dr. Flynn,
22  personally conducted research into the TVT-Secur?
23    A.  As we mentioned earlier, I did perform a
24  retrospective study of 60 or so patients that we
25  reported on in 2009 at the AUGS scientific meeting.

Page 97

1    Q.  And were the results of your research
2  ever published?
3    A.  The abstract is published.  We did not
4  publish a formal manuscript, just the abstract.
5    Q.  And is the data that you arrived at from
6  your own personal research into the TVT-Secur part
7  of the bases of the opinions that you've expressed
8  here today at the deposition as well as those
9  expressed in your report?
10    MR. ZONIES:  Object to the form.
11    A.  Yes, that's correct.
12    Q.  (By Ms. Schmid)  Have you -- Dr. Flynn,
13  have you published any papers in peer-reviewed
14  articles regarding the type of mesh that is used in
15  the TVT-Secur?
16    MR. ZONIES:  Object to the form.
17    A.  I have publications pertaining to TVT
18  products, yes.  And the most recent article was one
19  that we published in an obstetrics journal looking
20  at the location of the TVT-O device.  That's a mesh
21  that is the same mesh that's used in the TVT-Secur
22  device.
23    Q.  (By Ms. Schmid)  And is that -- was your
24  paper published in a peer-reviewed journal?
25    MR. ZONIES:  Object to the form.

Brian Flynn, M.D.

Page 98

1    A. Yes, it's a peer-reviewed journal. It's
2  available on PubMed, Index Medicus.
3    Q. (By Ms. Schmid) And do you --
4  Dr. Flynn, do you serve as a reviewer for medical
5  and scientific-based peer-reviewed journals?
6    A. Yes. I've done that since the very
7  early point in my practice. And I think it's part
8  of my role and obligation at a teaching center. I
9  served as a reviewer for the Journal of Urology;
10  Urology, which is a different journal;
11  International Urology and Nephrology; International
12  Urogynecology; Neurology and Urodynamics; Canadian
13  Journal of Urology. I'm sure there's a few other
14  ones I'm missing, but I'm also a content reviewer
15  for a number of scientific meetings. So I review
16  abstracts, videos and other things that are
17  presented at meetings both for the Society of
18  Urodynamics and Female Urology for the American
19  Urologic Association, for the sectional meetings of
20  the AUA.
21    I serve as program chair on a number of
22  scientific meetings. Currently I'm the program
23  chair for two meetings, the Rocky Mountain Urologic
24  Society and the South Central Section of the
25  American Urological Association. So I was program

Page 99

1  chair. This weekend coming up, I'll look at 200
2  abstracts that were recently submitted to our
3  meeting. So I'm very familiar with reviewing
4  scientific articles and abstracts.
5    Q. Have you relied upon your own research
6  and your own peer-reviewed articles regarding
7  polypropylene mesh of the type that is used in the
8  TVT-Secur in stating your opinions today and those
9  provided in your expert report for the TVT-Secur?
10    MR. ZONIES: Object to the form.
11    A. Yes.
12    Q. (By Ms. Schmid) Are all of the opinions
13  that you express today, Dr. Flynn, based on a
14  reasonable degree of medical and scientific
15  certainty?
16    A. Yes.
17    Q. Are the TVT line of products the most
18  studied stress urinary incontinence medical device
19  that's ever been sold?
20    MR. ZONIES: Object to the form.
21    A. That's correct. This is the most widely
22  studied device for stress urinary incontinence and
23  probably for any disease.
24    Q. (By Ms. Schmid) And have you also,
25  Dr. Flynn, relied upon your own specialized medical

Page 100

1  training and education in the area of treating
2  female stress urinary incontinence as a basis for
3  the opinions that you have provided today and those
4  opinions you've expressed in your expert
5  report on the TVT-Secur?
6    MR. ZONIES: Object to form.
7    A. That's correct.
8    MS. SCHMID: No further questions. Thank
9  you, Dr. Flynn.
10    THE WITNESS: Thank you.
11    EXAMINATION
12  BY MR. ZONIES:
13    Q. Dr. Flynn, the TVT-S is not the most
14  well-studied device, correct?
15    A. The TVT mesh is. The device is not.
16    Q. That wasn't my question, Doctor. Listen
17  to my question.
18    A. Okay.
19    Q. The TVT-Secur is not well-studied, is
20  it?
21    MS. SCHMID: I'm going to move to strike
22  colloquy --
23    A. I'm going to --
24    MS. SCHMID: Just a minute.
25    -- colloquy of counsel as argumentative.

Page 101

1  Object to form.
2    Go ahead.
3    Q. (By Mr. Zonies) Doctor, the TVT-Secur
4  device is not the most well-studied incontinence
5  device, correct?
6    A. The most well-studied?
7    Q. Correct.
8    A. All right. So it's not the most
9  well-studied device.
10    Q. The Walsh systematic review that you
11  discuss, Doctor, in your report and you mentioned a
12  few times today was done in 2011, three years
13  before the Cochrane review, correct?
14    A. I've got the exact year.
15    (Reviewed document.) Okay. Yeah, 2011.
16    Q. And that involved one third of the
17  number of patients that are reviewed in the
18  Cochrane review by Nambiar, correct?
19    A. I can't agree to the question the way
20  it's stated.
21    Q. The Cochrane review was over 3,000
22  patients, correct?
23    A. 3,000 mini-sling patients, so there's
24  multiple slings in that review.
25    Q. Are there multiple slings in the Walsh

Page 102

1  review? Do you know?
2      A. I'll have to go back and look at the
3  study.
4      MR. ZONIES: I have no further questions.
5  Thank you.
6      MS. SCHMID: Do you want him to finish -- do
7  you want him to provide a response to that last
8  question?
9      MR. ZONIES: He did. He said he didn't
10  know. That's enough. Thanks.
11      MS. SCHMID: Well, that's not exactly what
12  he said.
13      A. (Reviewed document.) Reading from my
14  report, the Walsh study, 2011, a thousand patients,
15  reference 68, "TVT-Secur mini-sling for stress
16  urinary incontinence: a review of outcomes," so I
17  believe that that is specific to TVT-Secur.
18      Q. (By Mr. Zonies) Were any of the studies
19  that are reviewed in Walsh head-to-head studies
20  between TVT-Secur and --
21      MS. COVINGTON: I think you've used your
22  time, because I hit the . . .
23      MS. SCHMID: Are we up -- is the two-hour
24  time period up?
25      MS. COVINGTON: Mm-hmm.

Page 103

1      MS. SCHMID: Okay. Counsel, we're over the
2  two-hour time period.
3      MR. ZONIES: Okay.
4      THE REPORTER: Off the record?
5      MR. ZONIES: Yep. Thanks.
6      (The deposition was concluded at 1:02 p.m.,
7  on Thursday, March 24, 2016.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 104

1      I, BRIAN FLYNN, M.D., do hereby certify that
2  I have read the foregoing transcript and that the
3  same and accompanying amendment sheets, if any,
4  constitute a true and complete record of my
5  testimony.
6
7
8
9      _____
10          Signature of Deponent
11      ( ) No Amendments
        ( ) Amendments Attached
12      Subscribed and sworn to before me
13  this _____ day of _____, 2016.
14
15      Notary Public: _____
16      Address: _____
17      _____
18      My commission expires: _____
19      Seal:
20
21
22
23          MLG
24
25

Page 105

1      REPORTER'S CERTIFICATE
2  STATE OF COLORADO        )
                           ) ss.
3  COUNTY OF DENVER        )
4
5      I, MELANIE L. GIAMARCO, do hereby certify
6  that I am a Registered Professional Reporter and
7  Notary Public within the State of Colorado; that
8  previous to the commencement of the examination, the
9  deponent was duly sworn by me.
10      I further certify that this deposition was
11  taken in machine shorthand by me at the time and place
12  herein set forth, that it was thereafter reduced to
13  typewritten form, and that the foregoing constitutes a
14  true and correct transcript of the proceedings had.
15      I further certify that I am not employed by,
16  related to, nor of counsel for any of the parties
17  herein, nor otherwise interested in the result of the
18  within litigation.
19      In witness whereof, I have affixed my
20  signature and seal this 29th day of March, 2016.
21
22          Melanie L. Giamarco
            Registered Professional Reporter
23          Registered Merit Reporter
            Certified Realtime Reporter
24
25  My commission expires: August 25, 2017.

Brian Flynn, M.D.

Page 106

```
1           - - - - - -
              E R R A T A
2           - - - - - -
3  PAGE  LINE  CHANGE
4  ____  ____  _____
5        REASON: _____
6  ____  ____  _____
7        REASON: _____
8  ____  ____  _____
9        REASON: _____
10 ____  ____  _____
11       REASON: _____
12 ____  ____  _____
13       REASON: _____
14 ____  ____  _____
15       REASON: _____
16 ____  ____  _____
17       REASON: _____
18 ____  ____  _____
19       REASON: _____
20 ____  ____  _____
21       REASON: _____
22 ____  ____  _____
23       REASON: _____
24 ____  ____  _____
25       REASON: _____
```