Exhibit C

Timothy A. Ulatowski

```
 1      IN THE CIRCUIT COURT OF JASPER COUNTY, MISSOURI
 2                      AT JOPLIN
 3                      -  -  -
 4      CONNIE SCHUBERT and KEVIN   :
        SCHUBERT,                   :
 5                   Plaintiffs,    :
                                    : Case No.
 6         v.                       : 10-A0-CC00219
                                    :
 7      CHRISTOPHER H. ROBERTS,     :
        M.D., FREEMAN HEALTH        :
 8      SYSTEM d/b/a SOUTHWEST      :
        WOMEN'S CENTER, FREEMAN     :
 9      HEALTH SYSTEMS, ETHICON,    :
        INC., ETHICON WOMEN'S       :
10      HEALTH AND UROLOGY, a       :
        Division of Ethicon, Inc.,  :
11      GYNECARE, and JOHNSON &     :
        JOHNSON,                    :
12                   Defendants.    :
13
                        -  -  -
14                 August 12, 2013
15
                        -  -  -
16
                   Videotaped expert deposition of
17      TIMOTHY A. ULATOWSKI, taken pursuant to notice, was
        held at the law offices of O'Melveny & Myers LLP,
18      1625 Eye St, NW, Washington, DC, commencing at 10:39
        a.m., on the above date, before Kimberly A. Cahill,
19      a Federally Approved Registered Merit Reporter and
        Notary Public.
20
21
22                      -  -  -
23
                   GOLKOW TECHNOLOGIES, INC.
24          877.370.3377 ph| 917.591.5672 fax
                   deps@golkow.com
25
```

Timothy A. Ulatowski

---

Page 2

1  APPEARANCES:
2
3      MAZIE SLATER KATZ & FREEMAN, LLC
       BY:  ADAM M. SLATER, ESQUIRE
4      BY:  CHERYLL A. CALDERON, ESQUIRE
       (via videoconference)
5      103 Eisenhower Parkway, 2nd Floor
       Roseland, New Jersey 07068
6      (973) 228-9898
       aslater@mskf.net
7      ccalderon@mskf.net
       Representing the Plaintiffs
8
9      ASHCRAFT & GEREL, LLP
       BY:  SUSAN C. MINKIN, ESQUIRE
10     Suite 650
       4900 Seminary Road
11     Alexandria, Virginia 22311
       (703) 931-5500
12     sminkin@ashcraftlaw.com
       Representing the Plaintiffs
13
14     RIKER DANZIG SCHERER HYLAND PERRETTI LLP
       BY:  MAHA M. KABBASH, ESQUIRE
15     Headquarters Plaza
       One Speedwell Avenue
16     Morristown, New Jersey  07962-1981
       (973) 538-0800
17     mkabbash@riker.com
       Representing the Ethicon, Inc. Defendants
18
19     HYDE, LOVE & OVERBY, LLP
       BY:  ANDREW DONELAN, ESQUIRE
20     (via videoconference)
       1121 South Glenstone
21     Springfield, Missouri  65804
       (417) 831-4046
22     ajdonelan@att.net
       Representing the Defendants, Christopher H.
23     Roberts, M.D. and Freeman Health System
24
25

---

Page 3

1
                VIDEOTAPE TECHNICIAN:
2                  Michael Gay
3
4                    - - -
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

1                  - - -
2               I N D E X
3                  - - -
4
5  Testimony of:  TIMOTHY A. ULATOWSKI
6      By Mr. Slater            10
       By Ms. Kabbash           216
7      By Mr. Slater            221
       By Ms. Kabbash           237
8
9                  - - -
10            E X H I B I T S
11                 - - -
12

13     NO.        DESCRIPTION              PAGE
14  Ulatowski-1   8/5/13 E-Mail from Slater to   7
               Kabbash Enclosing Notice to
15             Take Videotaped Deposition
               Duces Tecum of Timothy A.
16             Ulatowski
17  Ulatowski-2   Defendants Ethicon, Inc.,      7
               Ethicon Women's Health and
18             Urology, Gynecare & Johnson &
               Johnson's Disclosure of
19             Expert Testimony
20  Ulatowski-3   (Exhibit 3) Curriculum Vitae   7
               of Timothy A. Ulatowski
21
       Ulatowski-4   (Appendix A) Curriculum Vitae   7
22             for Timothy A. Ulatowski
23  Ulatowski-5   Ethicon Expert Report of       7
               Timothy A. Ulatowski, M.S.,
24             In re: Pelvic Mesh/Gynecare
               Litigation, Case No. 291 CT,
25             Master Case 6341-10

---

Page 5

1  Ulatowski-6   Supplemental Ethicon Expert    8
               Report of Timothy A.
2              Ulatowski, M.S., In re:
               Pelvic Mesh/Gynecare
3              Litigation, Case No. 291 CT,
               Master Case 6341-10
4
       Ulatowski-7   "Appendix B, Materials         8
5              Reviewed and Public Sources
               of References"
6
       Ulatowski-8   4/1/11 Letter from Gage to     8
7              Ulatowski
8  Ulatowski-9   Two-Page Document Labeled      8
               "Prior Testimony"
9
       Ulatowski-10  Various Invoices from          9
10             Ulatowski to Butler Snow
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Timothy A. Ulatowski

Page 6

1           - - -
2       DEPOSITION SUPPORT INDEX
3           - - -
4
5    Direction to Witness Not to Answer
6    Page Line   Page Line        Page Line
7
8    Request for Production of Documents
9    Page Line   Page Line        Page Line
10   229  8
11
     Stipulations
12
     Page Line   Page Line        Page Line
13
14
15   Question Marked
16   Page Line   Page Line        Page Line
17
18
19
20
21
22
23
24
25

Page 7

1              - - -
2          (Deposition Exhibit No. Ulatowski-1,
3    8/5/13 E-Mail from Slater to Kabbash
4    Enclosing Notice to Take Videotaped
5    Deposition Duces Tecum of Timothy A.
6    Ulatowski, was marked for identification.)
7              - - -
8          (Deposition Exhibit No. Ulatowski-2,
9    Defendants Ethicon, Inc., Ethicon Women's
10   Health and Urology, Gynecare & Johnson &
11   Johnson's Disclosure of Expert Testimony,
12   was marked for identification.)
13              - - -
14          (Deposition Exhibit No. Ulatowski-3,
15   (Exhibit 3) Curriculum Vitae of Timothy A.
16   Ulatowski, was marked for identification.)
17              - - -
18          (Deposition Exhibit No. Ulatowski-4,
19   (Appendix A) Curriculum Vitae for Timothy
20   A. Ulatowski, was marked for
21   identification.)
22              - - -
23          (Deposition Exhibit No. Ulatowski-5,
24   Ethicon Expert Report of Timothy A.
25   Ulatowski, M.S., In re: Pelvic

Page 8

1    Mesh/Gynecare Litigation, Case No. 291 CT,
2    Master Case 6341-10, was marked for
3    identification.)
4              - - -
5          (Deposition Exhibit No. Ulatowski-6,
6    Supplemental Ethicon Expert Report of
7    Timothy A. Ulatowski, M.S., In re: Pelvic
8    Mesh/Gynecare Litigation, Case No. 291 CT,
9    Master Case 6341-10, was marked for
10   identification.)
11              - - -
12          (Deposition Exhibit No. Ulatowski-7,
13   "Appendix B, Materials Reviewed and Public
14   Sources of References", was marked for
15   identification.)
16              - - -
17          (Deposition Exhibit No. Ulatowski-8,
18   4/1/11 Letter from Gage to Ulatowski, was
19   marked for identification.)
20              - - -
21          (Deposition Exhibit No. Ulatowski-9,
22   Two-Page Document Labeled "Prior
23   Testimony", was marked for
24   identification.)
25              - - -

Page 9

1          (Deposition Exhibit No. Ulatowski-10,
2    Various Invoices from Ulatowski to Butler
3    Snow, were marked for identification.)
4              - - -
5          THE VIDEO TECHNICIAN:  We are on the
6    record.  The time now is 10:35.  This marks the
7    beginning of disc number one for the videotape
8    deposition testimony of Timothy A. Utalowski in the
9    matter of Schubert versus Ethicon, et al.
10          This case is pending in the Circuit
11   Court of Jasper County, Missouri at Joplin, Case No.
12   10AO-CC00219.
13          Today's date is August the 12th,
14   2013.  This deposition is being conducted at 1625
15   Eye Street, Northwest, Washington, D.C.
16          Will all attorneys present please
17   identify themselves and who they represent?
18          MR. SLATER:  Adam Slater on behalf of
19   the plaintiffs.
20          MR. DONELAN:  Andrew Donelan on
21   behalf of Freeman Health System.
22          MS. MINKIN:  Susan Minkin on behalf
23   of plaintiffs, but here merely for taking care of
24   the exhibits and so on.
25          MS. KABBASH:  Maha Kabbash from Riker

3 (Pages 6 to 9)

Timothy A. Ulatowski

Page 10

1  Danzig on behalf of Defendants J & J and Ethicon.
2       THE VIDEO TECHNICIAN:  My name is
3  Michael Gay.  I'm with Golkow Technologies.  Our
4  court reporter today is Kim Cahill, also with Golkow
5  Technologies, and we'll now swear in our witness.
6            -  -  -
7       TIMOTHY A. ULATOWSKI, after having
8       been duly sworn, was examined and
9       testified as follows:
10           -  -  -
11      THE VIDEO TECHNICIAN:  You may
12  proceed.
13           -  -  -
14      EXAMINATION
15           -  -  -
16  BY MR. SLATER:
17      Q.    Good morning, Mr. Utalowski.
18      A.    Morning.  Can I tell you that there's
19  some background talking or whatever that probably
20  should be reduced, if possible, either your location
21  or --
22      Q.    I don't know what you're talking --
23  certainly not from my location.  I'm the only person
24  speaking in here.
25      A.    Perhaps --

Page 11

1       Q.    If there's someone in a different
2  location, maybe they can -- let me speak.  Maybe if
3  anyone is in a different location on this
4  conference, they can mute their mic, please, unless
5  they need to object or something.  It will probably
6  make it a clearer sound.
7       Is that better?
8       MS. MINKIN:  I don't have a mic.
9       MR. SLATER:  Are you still hearing
10  the sound, sir?  Did that solve our problem?
11      THE WITNESS:  I think that did it.
12      MS. KABBASH:  Actually, it sounds
13  like it did.
14      THE WITNESS:  Yeah.
15      MS. KABBASH:  Yeah.
16      THE WITNESS:  Yes.
17      MR. SLATER:  Okay.  Terrific.
18  BY MR. SLATER:
19      Q.    Okay, Mr. Utalowski.  I'm here to
20  take your deposition in this lawsuit.  You
21  understand that.  Right?
22      A.    Yes.
23      Q.    You understand you must tell the
24  truth in response to each one of my questions.
25  Right?

Page 12

1       A.    Yes.
2       Q.    If my question is unclear to you for
3  some reason, please explain to me what's unclear and
4  we'll clarify what the question is.  Okay?
5       A.    Okay.
6       Q.    Now, I've marked as Exhibit 1 the
7  deposition notice.  Did you see this deposition
8  notice --
9       A.    Yes.
10      Q.    -- before now?
11      A.    Yes.
12      Q.    Did you -- did you bring the
13  documents that were requested to be produced?
14      A.    I brought --
15      Q.    Or at least identify them -- or at
16  least identify them on the disclosures?
17      A.    I brought what Ms. Kabbash didn't
18  have in her possession, so, yes, I think all the
19  documents are there.
20      Q.    What did you bring with you?
21      A.    I brought invoices.  I brought the
22  deposition testimony PDF.  I think that's about it;
23  otherwise, she had my C.V., whatever else.
24      Q.    When you say you brought the
25  deposition testimony, what deposition testimony are

Page 13

1  you referring to?
2       A.    Well, that's a two-page PDF of my
3  prior testimony.
4       Q.    You're talking about the list.  You
5  didn't bring the actual transcripts.
6       A.    No, no, no, just the list.
7       Q.    Okay.  We'll come back to that.
8       Exhibit 2 is the disclosures that
9  were made by Ethicon and Johnson & Johnson and on
10  page 3 are disclosures with regard to you.  Please
11  turn to page 3.
12      A.    (Witness complies.)  Okay.
13      Q.    Have you seen this document?
14      A.    Yes.
15      Q.    Did you see the document before it
16  was served?
17      A.    "Before it was served."
18      Q.    Sure.  There's a stamp on the front,
19  sir, that says July 15th, 2013.  Did you see it
20  before that date?
21      A.    I don't think so.
22      Q.    The content of point number 3 in this
23  document that spans pages 3 and 4, had you seen that
24  content before July 15th, 2013?
25      A.    In this specific document?

Timothy A. Ulatowski

Page 14

1    Q.    Whether in this document or in
2  another form.
3    A.    Well, I've seen similar language in
4  prior disclosures.
5    Q.    Did you see this language at any
6  point before July 15, 2013?
7    A.    I don't recall.  I may have received
8  an e-mail with this disclosure and I looked at it.
9  I just don't recall.
10    Q.    So as you sit here now, you don't
11  recall seeing the language that's set forth in item
12  number 3 regarding your testimony before July 15th,
13  2013; correct?
14    A.    Not that I can recall.
15    Q.    When do you recall first seeing this
16  document?
17    A.    Well, as I said, I think I received
18  an e-mail with it and I looked at it, but I
19  certainly also saw it this morning.
20    Q.    When you received the e-mail, when
21  was that?
22    A.    I don't recall.  I'd have to check my
23  records.
24    Q.    Now, Exhibit 3, it's my
25  understanding, is your up-to-date C.V.; is that

Page 15

1  correct?
2    A.    Yes.
3    Q.    You have a section on the first page
4  of your C.V. titled "Selection of Notable
5  Accomplishments," and it talks about you being a
6  regulatory expert in litigation for either defendant
7  or plaintiff.
8        Do you see that?
9    A.    Yes.
10    Q.    Have you been an expert for a
11  plaintiff in litigation?
12    A.    Yes.
13    Q.    When?
14    A.    Well, we can go through my PDF of the
15  prior testimony, for example.
16    Q.    Fine.  That's Exhibit 9; correct?
17    A.    You tell me.
18        MS. KABBASH:  Let's see.
19        MR. SLATER:  It's marked as Exhibit
20  9.
21        MS. KABBASH:  Yes, it is.
22        THE WITNESS:  Yes.
23  BY MR. SLATER:
24    Q.    Exhibit 9 is a list of all the
25  deposition testimony you've given and the court

Page 16

1  testimony you've given; correct?
2    A.    Correct.
3    Q.    Tell me, in the depositions, which
4  were on behalf of the plaintiff.
5    A.    Okay.  I will do that.
6        Number 1, number 11.  That's on
7  deposition testimony, there are two.  And none on
8  court testimony.
9    Q.    So you've been an expert for a
10  plaintiff on two occasions; correct?
11    A.    Yes, so far in deposition testimony,
12  yes.
13    Q.    The first -- well, in cases -- in all
14  cases, how many times have you been an expert for
15  the plaintiff?
16    A.    Well, there's -- I haven't provided
17  deposition testimony in -- in one additional case.
18    Q.    What case is that?
19    A.    That's similar to number 11, but it's
20  a different plaintiff.  The plaintiff in that case
21  is Center City Periodontists versus Dentsply
22  International.
23    Q.    What's the subject matter of those
24  lawsuits that you're opining on?  What's the issue?
25    A.    Well, number 1 was concerning --

Page 17

1    Q.    Let me -- let me stop you.  Time-out,
2  sir.  Let me stop you, because my question wasn't
3  clear.  I want to make sure it's very clear.
4        What is the subject matter of the
5  litigation listed as number 1 on your prior
6  testimony?
7    A.    Okay.  Number 1, oh, it had aspects
8  of contracts, 510(k) changes, whether or not a
9  510(k) submission was required, labeling issues.  So
10  that's -- that's basically number 1.
11    Q.    Was it with regard -- well, rephrase.
12        What was the device or drug that's at
13  issue in the litigation listed in number 1 that
14  starts "University of Pittsburgh"?
15    A.    It's a medical device, first of all.
16  Secondly --
17    Q.    What type?
18    A.    That's what I was going to just tell
19  you -- number 2, it was a diagnostic device, a
20  device used in radiology.
21    Q.    Number 2?
22    A.    Oh, number 2 --
23    Q.    Did you say number 2?
24    A.    I thought you -- I thought you said
25  number 1.

Timothy A. Ulatowski

Page 18

1      Q.     I'm not asking you about number 2.
2  I'm only asking you about number 1.
3      A.     That's what I'm saying.
4      Q.     Number 1, it was a medical -- let me
5  finish my question.
6             Number 1 relates to a medical device
7  used for diagnostic radiology?
8      A.     That's correct.
9      Q.     What's the name of the device?
10     A.     I don't recall the trade name right
11  now.
12     Q.     And you're an expert for the
13  plaintiff.  Who's the plaintiff in that case?
14     A.     It's Pittsburgh, U of Pittsburgh is
15  one of the plaintiffs.
16     Q.     And what is their claim in that case?
17     A.     Well, I mentioned the element -- the
18  regulatory elements that I testified to.  Of course,
19  the complaint had various aspects that were both
20  regulatory and nonregulatory.  One of the aspects
21  that I opined on was regarding 510(k) submissions
22  and labeling aspects.
23     Q.     Did you have the opinion in that case
24  that a device required a 510(k) and it wasn't
25  obtained?

Page 19

1      A.     I believe so, yes.
2      Q.     Who retained you in that case?  Who's
3  the lawyers that retained you?
4      A.     I don't recall right now.
5      Q.     The item that's listed as number 11,
6  Weinstat versus Dentsply International, you're the
7  expert for the plaintiff in that case?
8      A.     Yes.  And number 1, I think, was
9  Patton Boggs, but I may be wrong on number 1.
10            Okay.  Now your question on the later
11  one?
12     Q.     Yeah, now on number 11, you're the
13  expert for the plaintiff in the Weinstat case?
14     A.     Yes.
15     Q.     What's the issue in that case?
16     A.     Well, it was primarily labeling
17  regarding 510(k)s submitted by Dentsply,
18  specifically regarding infection control issues.
19     Q.     Did you opine that there were
20  deficiencies in the 510(k) submission?
21     A.     I opined that there were deficiencies
22  in the labeling for the product in terms of
23  infection control practices.
24     Q.     Infection control practices with the
25  device at issue?

Page 20

1      A.     Yes.
2      Q.     And what's the device?
3      A.     Ultrasonic scalers.
4      Q.     And then there's a second case for a
5  different plaintiff, but the same issue, against the
6  same defendant, in which you're the expert as well?
7      A.     Well, somewhat the same issue.
8  There's -- there's primarily two elements in the
9  Weinstat case, and there's only one of the elements
10  in the Center City case.
11     Q.     The plaintiff is Center City in that
12  case?
13     A.     Yes, Center City Periodontists is the
14  -- is the name of the plaintiffs.
15     Q.     Okay.
16            In your time at the FDA, did you ever
17  oversee any issues with regard to a pelvic mesh
18  device or product?
19     A.     In my capacity as Director of
20  Compliance, generally I had oversight on all medical
21  devices in regard to enforcement and compliance.
22     Q.     Did you ever have any direct
23  oversight of a labeling issue with regard to a
24  pelvic mesh device where you actually had
25  involvement?

Page 21

1      A.     None that comes to mind.
2      Q.     Did you ever have direct involvement
3  with any 510(k) issue with regard to any pelvic mesh
4  device while you were at the FDA?
5      A.     None that comes to mind.
6      Q.     Did you ever have any direct
7  involvement with any labeling or 510(k) issue with
8  regard to any hernia mesh product or device when you
9  were with the FDA?
10     A.     Not that I can recall.
11     Q.     Did you have any direct involvement
12  with the labeling or 510(k) or any other issue when
13  you were at the FDA with regard to any surgical mesh
14  product or device?
15     A.     Not that I can recall, but let me
16  just add that one of my responsibilities was
17  overseeing the recall program, so if there were any
18  recalls, for example, that would have been generally
19  under the purview of my office.
20            But I don't recollect any specific
21  actions or activities related to mesh.
22     Q.     As you sit here now, you don't recall
23  any instance in which you had any direct involvement
24  with labeling, 510(k), or any other issue with
25  regard to any surgical mesh device or product;

Timothy A. Ulatowski

Page 22

1  correct?
2      A.     I don't recall any specific activity,
3  action, or otherwise specifically on those items.
4      Q.     You have in front of you Exhibits 4
5  and 5, which are reports that you authored and
6  served in a different litigation in the State of New
7  Jersey.
8            Do you have those in front of you?
9      A.   Yes, I do.
10     Q.     Do you have any additional opinions
11 in this case other than those that are set forth in
12 those reports?
13     A.    Well, I guess that would depend upon
14 any positions plaintiff may bring forward.  Of
15 course, my -- the exhibit we've already gone over in
16 terms of the disclosure outlines the scope of my
17 testimony.
18     Q.     Well, let me explain to you what I'm
19 driving at here.  A disclosure is a broadly worded
20 document that lawyers write to try to generally
21 encompass almost everything under the sun, so my
22 opportunity today is to find out what opinions
23 you've actually formed and to talk directly to you,
24 rather than just taking a lawyer's word for it.
25            So with that preface, let me now get

Page 23

1  to the question I want to ask you:  In your reports
2  that are marked as Exhibits 4 and 5, you set forth
3  certain specific opinions you had reached; correct?
4      A.    At that point in time, yes.
5      Q.     And as you sit here right now, have
6  you reached additional opinions that are not set
7  forth in those reports that you intend to give in
8  this trial of this case?
9      A.    Well, I can't foresee what issues may
10 be brought up during trial testimony or whatever,
11 but -- that would elicit an opinion, so with that
12 caveat -- that's the only caveat I have.
13     Q.     As you sit here now, you have no
14 additional opinions beyond those opinions set forth
15 in Exhibits 4 and 5; correct?
16     A.    As I sit here right now, yes.
17     Q.     You were deposed in the New Jersey
18 litigation for two days; correct?
19     A.    Yes.
20     Q.     Did you read those deposition
21 transcripts?
22     A.    Yes.
23     Q.     As you sit here now, is there
24 anything that you testified to in those depositions
25 of those two days that you would correct if you

Page 24

1  could right now or do you stand behind all that
2  testimony?
3      A.    I --
4            MS. KABBASH:  Objection.
5            You can answer.
6            THE WITNESS:  I didn't see any issue
7  with what I stated in the deposition testimony.
8  BY MR. SLATER:
9      Q.     Exhibit 6 is the list of materials
10 you had reviewed in connection with the report that
11 you wrote that's marked as Exhibit 4 and I believe
12 potentially Exhibit 5 as well.
13            Those where the materials you had
14 reviewed at that point in time and when you were
15 deposed in that New Jersey litigation; correct?
16     A.    Yes.
17     Q.     There's -- now -- rephrase.
18            Exhibit 7 is what we were given
19 today, which I was told is an updated list of
20 materials that you have reviewed in connection with
21 this litigation; correct?
22     A.     Not entirely in regard to this
23 litigation, but these are additional materials I've
24 been provided in regard generally to the issue of
25 mesh.

Page 25

1      Q.     The materials that are on Exhibit 7
2  obviously are -- well, rephrase.
3            To the extent that there are
4  materials listed in Exhibit 7, which is your updated
5  list of materials reviewed -- rephrase.
6            To the extent there are additional
7  materials listed on Exhibit 7, your updated list of
8  what you reviewed, as compared to your prior list,
9  those new materials that you've reviewed -- I'm
10 calling them new because you hadn't reviewed them
11 when you wrote your first report -- has not altered
12 or expanded or changed your opinions in this
13 litigation; correct?
14     A.    I don't believe so.  I think
15 primarily the additional materials concern TVT since
16 the last deposition testimony.  There's a couple
17 additional mesh documents, but -- but generally I
18 don't -- I don't think the additional documents
19 change my opinions in regard to my prior report or
20 add to.
21     Q.     As you sit here now -- I'm sorry.  I
22 didn't mean to interrupt you.
23     A.    I said or add to.
24     Q.    Okay.  There's a little delay, so we
25 may talk over each other once in a while.  I'm sure

Timothy A. Ulatowski

Page 26

1  it will be unintentional.
2        So to the extent additional materials
3  are listed on Exhibit 7 as compared to Exhibit 6,
4  the review of those materials did not change the
5  opinions that you hold in this litigation; correct?
6        A.    That's correct.
7        Q.    There's a list of deposition
8  transcripts on -- and we'll go from Exhibit 7 at
9  this point because that's your updated list.
10        Did you read each one of those
11  deposition transcripts completely?
12        A.    Yes, uh-hum.  Yes.
13        Q.    And did you read all of the exhibits
14  that were -- that were provided with each of the
15  transcripts?
16        A.    Yes, I -- I coursed through them as I
17  -- after I reviewed the depositions.  Now, not all
18  depositions necessarily had exhibits attached to
19  them.  I think most of them had, but -- but, yes, I
20  do course through the exhibits.
21        Q.    When you say you course through the
22  exhibits, does that mean that you skim through them,
23  but you don't read them all in their entirety?
24        A.    Well, it may be an exhibit I've seen
25  before in a prior deposition.  It may be not

Page 27

1  specifically related to a regulatory matter, so it
2  varies depending on the exhibit.
3        Q.    To the extent that you were provided
4  exhibits for the various depositions as set forth in
5  Exhibit 7, is it fair to say you did not read every
6  single one of those exhibits in their entirety?
7        A.    Well, I'm a quick reader, so I look
8  through them to determine their content, relevance,
9  whether I've seen them before, as I just mentioned.
10  So have I read them through, yes --
11        Q.    Sir -- sir, I'm going to interrupt
12  you now, because I didn't ask you -- and with all
13  due respect, I didn't ask you if you're a quick
14  reader and I didn't ask you anything else other than
15  one specific pointed question, so I'm going to ask
16  the question again and ask you for a direct answer.
17        Am I correct that with regard to the
18  exhibits for the deposition transcripts listed here
19  on Exhibit 7, you did not read each and every
20  exhibit in its entirety?
21        A.    And the answer is no if it was a
22  duplicate of -- if it was the same document in a
23  prior deposition or something else I've seen
24  already.
25        Q.    With that caveat, with that

Page 28

1  exception, you're saying you read every document
2  that was an exhibit to a deposition that was
3  provided to you.
4        A.    Yes.
5        Q.    And if I wanted to know what exhibits
6  those were that were provided to you, are they
7  listed within this list of materials reviewed
8  separately?
9        A.    I don't think so necessarily.  We'd
10  have to look at this.  It just says exhibits.
11        Q.    You understand what I'm getting at?
12        A.    No.  If you could be more clear.
13        Q.    Here's what I want to know -- well,
14  here's what I want to know:  If I wanted to know
15  what exhibits you saw, for example, Jennifer Paine's
16  deposition transcript, how would I find that out?
17        A.    Well, I'm sure Ms. Kabbash could
18  provide additional listing or I could construct one
19  given time.
20        Q.    Well, here's what I want to know,
21  because if you were provided exhibits from
22  deposition transcripts, you don't know if it was all
23  the exhibits or not.  You just know, these are
24  exhibits I was provided; correct?
25        A.    That's correct.  And I think in one

Page 29

1  or two situations, based on the numbering of the
2  exhibits, there appeared to be missing exhibits that
3  were, in a couple cases, subsequently provided, so
4  -- that's my answer.
5        Q.    Okay.
6        As you sit here now, you don't know
7  if you were provided every exhibit from every one of
8  the depositions listed here; correct?
9        MS. KABBASH:  Objection.
10        THE WITNESS:  I can't attest to that
11  right now.
12        MR. SLATER:  You just don't know.
13        THE WITNESS:  I don't know right now.
14        MR. SLATER:  Okay.
15  BY MR. SLATER:
16        Q.    And if I wanted to know what exhibits
17  you reviewed from each of the depositions, for
18  example, the first one listed, Jennifer Paine, would
19  you be able to tell me that as you sit here now?
20        A.    Oh, no.  It was a long list.  No, I
21  couldn't tell you offhand.
22        Q.    Let's look a little further down on
23  the list of transcripts.  There's David Robinson.
24  It says, "deposition transcript with exhibits."
25        Do you see that?

Timothy A. Ulatowski

Page 30

1    A.    Hang on just a moment.  Where are
2  you?  First page?
3    Q.    First page of Exhibit 7.
4    A.    Okay.
5    Q.    Yep.  It says deposition transcripts
6  -- well, it says "transcript," actually, and it says
7  David Robinson --
8    A.    Yes.
9    Q.    -- "deposition transcript with
10  exhibits."
11        Do you see that?
12    A.    Yes.
13    Q.    What day deposition transcript of
14  David Robinson were you provided and did you read as
15  listed here?
16    A.    Well, I think I'd probably turn to my
17  report, where I do list dates of the deposition
18  testimony.  So, for example, that's what I would do
19  to try and correlate what's stated here to the exact
20  date.
21    Q.    When you say that the dates of the
22  deposition testimony are listed, do you mean when
23  you make a direct citation to testimony and you said
24  in the citation that you're citing to the --
25  whatever date it was, transcript of a certain

Page 31

1  witness?
2    A.    That's my style to indicate the date
3  of the --
4    Q.    Okay.
5    A.    -- deposition testimony.
6    Q.    Beyond what's actually cited in your
7  report, are you able to tell me what specific date
8  or dates of deposition transcripts you were provided
9  for each of these witnesses?
10    A.    Not without looking at my report.
11    Q.    Well, let's, for example, take David
12  Robinson.  From looking at your report, would you be
13  able to tell me what date or dates of deposition
14  transcripts you were provided from his deposition?
15    A.    I believe so.  If you want me to do
16  that, I can do that right now.
17    Q.    Well, we're going to make a note and
18  later on, I'll -- well, actually, let me ask you,
19  how would you do it?  You would just flip through
20  the report and have to read every page and look for
21  his name and see what you cited?
22    A.    That would be basically what I would
23  do.
24    Q.    So if I were to read your report, if
25  I want to know what dates of deposition transcripts

Page 32

1  you reviewed, I would just look to see what is cited
2  in the report and that tells me what you saw;
3  correct?
4    A.    I believe that's the case.
5    Q.    Okay.
6        Why did you cite to -- well,
7  rephrase.
8        You looked at various documents
9  regarding the TVT devices; correct?
10    A.    Yes.
11    Q.    Are those of significance to you in
12  forming your opinions in this case?
13    A.    In this particular case, somewhat
14  related, but not specifically in regard to pelvic
15  mesh, but I was provided those documents generally
16  as a -- as an expert.
17        And of course, TVT is still
18  unfolding as far as cases that may present, so I
19  have those documents.  They were listed as reliance
20  documents and it is what it is.
21    Q.    In this trial, which is going to
22  involve the Prolift and Prolift+M, you would not
23  expect that you would be referring to or relying on
24  TVT documents; correct?
25    A.    Well, I can't say with certainty

Page 33

1  regarding that, because there's some -- there's some
2  relevance -- regulatory relevance here and there, so
3  I guess it depends.
4    Q.    Well, tell me right now what TVT
5  document you would be relying on at the trial of
6  this case with regard to the Prolift and Prolift+M
7  and how you would rely on it.
8    A.    Okay.  I'll give you an example that
9  just comes to mind.  I think in evaluating
10  TVT-Secur, as I recall -- I'm still looking at
11  documents, but -- Dr. Herrara at FDA who had been
12  evaluating the 510(k) for that product was
13  commenting on the bidirectional elasticity claim
14  that he saw in TVT and, at that point in time, made
15  a comment, but did not appear to explore it further,
16  noting that it had been in labeling, noting the
17  claim, and then not asking Ethicon to delete the
18  claim.
19        So -- and then the claim comes up
20  later on in Prolift and Prolift+M, and this is
21  already what FDA's seen, this claim, in a prior
22  submission.
23    Q.    Well, with regard to the
24  bidirectional elasticity claim, you're talking about
25  the claim that was found in the Prolift IFU

Timothy A. Ulatowski

Page 34

1  originally that said the bidirectional elasticity of
2  the Prolift allows adaptation to the stresses or
3  physiologic stresses in the body; correct?
4       A.    Yes.
5       Q.    And you know that Ethicon eventually
6  had to admit to the FDA they did not have data to
7  support that statement and removed it from the IFU
8  as a result; correct?
9            MS. KABBASH:  Objection.
10           THE WITNESS:  Well, as you've
11  characterized it, I'm not quite sure that's the
12  case.  I think they certainly deleted the claim, but
13  whether they, in quotes, out of quotes, admitted to
14  not having the data, I think they acquiesced to
15  FDA's request.
16 BY MR. SLATER:
17      Q.    Well, you know that the FDA told
18  Ethicon that unless they could provide data to
19  support the claim, they needed to remove the
20  statement.  And Ethicon went back to the FDA and
21  said, we don't have data to support the statement
22  and we're removing the claim.
23           That is what factually occurred;
24  correct?
25           MS. KABBASH:  Objection.

Page 35

1            THE WITNESS:  Well, we'd have to --
2  we'd have to refer to documents.  I -- I know that
3  Ethicon acquiesced to the request.  Whether or not
4  they had data or not, I think there's some testimony
5  that goes beyond what you've stated, but that's my
6  understanding in terms of their acquiescence to the
7  request.
8  BY MR. SLATER:
9       Q.    As you sit here right now, do you
10  know whether or not Ethicon was able to produce data
11  to support the bidirectional elasticity claim to the
12  FDA?
13      A.    I don't believe in the final step
14  before removing the claim Ethicon chose to provide
15  data to support the claim.  Whether or not they had
16  data, I think I've seen some conflicting testimony
17  regarding that, but they did not supply that
18  information and pursue the claim.
19      Q.    When the FDA asked Ethicon to produce
20  data to support the bidirectional elasticity claim,
21  Ethicon was unable to produce such data to the FDA;
22  correct?
23      A.    Well, I -- I'm -- I'm recollecting
24  deposition testimony that internal discussions about
25  that and information that -- that Ethicon had, in

Page 36

1  the final result, they decided not to pursue the
2  claim and deleted it.
3       Q.    Well, in the documents you've seen,
4  have you ever seen a document where people within
5  Ethicon during the back-and-forth with the FDA in
6  2000 and 2008 internally said they did have data to
7  support the bidirectional elasticity claim?  Is that
8  your testimony?
9       A.    I'm just recollecting deposition
10  testimony in regard to that.  I think that --
11      Q.    Whose testimony?
12      A.    I don't recall offhand right now, but
13  --
14      Q.    Are you -- are you testifying that
15  there's a witness who testified in their deposition
16  that Ethicon had data to support the bidirectional
17  elasticity claim and chose not to give that data to
18  the FDA?  Is that your testimony?
19      A.    Well --
20           MS. KABBASH:  Objection.
21           THE WITNESS:  Excuse me.  I think
22  that they had a -- they had an explanation for the
23  claim.  They had data -- they had information to
24  respond, an explanation.  They chose not to pursue
25  the claim and deleted the claim.

Page 37

1  BY MR. SLATER:
2       Q.    Why are you talking about
3  explanations, with all due respect?  It's a very
4  direct question that you fully understand, so I'm
5  going to ask it one last time.
6            Is it your testimony that you saw
7  documents or deposition testimony indicating that
8  Ethicon internally had data to support the
9  bidirectional elasticity claim and chose not to give
10  it to the FDA?  Is that your testimony?
11           MS. KABBASH:  Objection.
12           THE WITNESS:  I can't recall with
13  certainty --
14           MR. SLATER:  It's a simple yes or no
15  question.
16           THE WITNESS:  And I was just in the
17  process of answering you and I -- I'm recollecting
18  deposition testimony.  Whether -- I don't recall
19  seeing a report or a test necessarily, but I just
20  recall generally the deposition testimony and the --
21  and how this all ended up.
22           And I recall that, in looking at the
23  TVT data, that FDA had seen the claim before.
24           MR. SLATER:  Okay.
25           I'm going to move to strike the

Timothy A. Ulatowski

Page 38

1  answer.
2  BY MR. SLATER:
3       Q.    Is the answer to my question that I
4  just asked you a moment ago "yes" or is the answer
5  "no"?
6            MS. KABBASH:  Objection.
7            THE WITNESS:  I'm not sure I can
8  answer "yes" or "no," because I -- I just don't
9  recollect the foundation for Ethicon's position; but
10  as far as I do recall, they had been constructing a
11  response in regard to that question.
12            I don't recall, sir, what the data
13  set was, if there was any, to support the claim.
14  BY MR. SLATER:
15       Q.    I'd like you to assume the following
16  hypothetical facts:  I'd like you to assume that
17  during the time the Prolift IFU made the claim that
18  the bidirectional elastic property allows adaptation
19  to various stresses encountered in the body, during
20  the time that was in the Prolift IFU, Ethicon did
21  not have data to support that statement.  I'd like
22  you to assume that fact.
23            Okay?
24       A.    Okay.
25       Q.    If that is the fact, then the

Page 39

1  inclusion of that statement in the Prolift IFU would
2  be misbranding; correct?
3       A.    Well, I -- I would say -- I would go
4  as far as saying it probably would be something to
5  pull from the labeling.  Whether it's misbranding or
6  not, you know, that -- that determination requires
7  some analysis.
8       Q.    Did you ever perform that analysis up
9  till this moment?
10       A.    In regard to the specific claim?
11       Q.    Yes.
12       A.    No, I have not.
13       Q.    You would agree with me that if my
14  hypothetical is correct, that claim should not have
15  been made in the Prolift IFU; correct?
16       A.    I think the answer is yes.  There has
17  to be a foundation for the claim.
18       Q.    You testified that you saw some
19  documents regarding the TVT-Secur regarding a
20  bidirectional elasticity claim regarding that
21  device; correct?
22       A.    As far as I recall, yes; but, again,
23  I'm still coursing through TVT documents and
24  evaluating a lot of information there.
25       Q.    And I think what you testified to is

Page 40

1  that someone named Dr. Herrara at the FDA looked at
2  the 510(k) submission for the TVT-Secur, saw that
3  claim, made some sort of a comment on it, but did
4  not ask to have that claim deleted or further
5  explore that claim.
6            Do I understand that correctly?
7       A.    Yes, that's correct.
8       Q.    Did Ethicon -- well, rephrase.
9            Did that take place before or after
10  -- well, rephrase.
11            That would have taken place before
12  the 510(k) process for the Prolift and Prolift+M;
13  correct?  That would have been --
14       A.    Yes.
15       Q.    -- before that time period; correct?
16       A.    Yes.
17       Q.    If Ethicon knew that it -- rephrase.
18  I'm going to ask you a hypothetical question:  If
19  Ethicon knew during the 510(k) process for the
20  TVT-Secur that it did not have data to support a
21  claim that the TVT-Secur device had a bidirectional
22  elastic property and it was a claim they were going
23  to make in their IFU, they needed to tell that
24  affirmatively to the FDA so the FDA would know that
25  during the process; correct?

Page 41

1            MS. KABBASH:  Objection.
2            THE WITNESS:  Interesting question.
3  I think that they had the claim in the labeling.
4  What was in the TVT-Secur 510(k) in the background
5  there, I can't yet attest to because I'm still
6  looking at documents, but, again, you have to have a
7  foundation somewhere for a claim.
8  BY MR. SLATER:
9       Q.    It's not acceptable for a medical
10  device manufacturer like Ethicon to show its
11  labeling to the FDA as part of a 510(k) process and
12  to the extent the manufacturer knows that certain
13  claims or statements made are not supported by any
14  data, it's not acceptable to use those statements or
15  include those statements; correct?
16       A.    Well, I would say that -- that claims
17  require a foundation, so anything stated in the
18  labeling requires a foundation as far as statements
19  made.
20       Q.    Anything that is stated in any
21  labeling for any medical device by a medical device
22  manufacturer must have a foundation to support that
23  statement; correct?
24       A.    Yes, and that foundation can vary
25  depending on what the claim is.  It may be -- a

Timothy A. Ulatowski

Page 42

1  claim may be self-apparent on the -- because of the
2  nature of the product, and I can describe a couple
3  examples.
4        MR. SLATER:  Move to strike after the
5  word "yes."
6  BY MR. SLATER:
7        Q.    The simple answer to my question is
8  "yes"; correct?
9        MS. KABBASH:  Objection.
10       THE WITNESS:  Yes, there needs to be
11 a foundation if -- I forget exactly your question,
12 but, again, there needs to be a foundation.
13 BY MR. SLATER:
14       Q.    With regard to the disclosure of
15 risks in the IFU for the Prolift and Prolift+M, what
16 is the standard for what risks need to be included?
17 I don't want the specifics.  We'll talk about
18 specifics later, but what is the standard for what
19 must be included?
20       A.    Well, in terms -- the regulatory
21 standard would be, first of all, from the statute in
22 regard to adult -- misbranding; secondly, from the
23 regulation in regard to labeling requirements for
24 medical devices; and any guidance that may be
25 helpful -- of course, guidance is not regulation.

Page 43

1  That's not mandatory, but it may be helpful.
2        Q.    In layman's terms, what is the
3  standard that applied to the Prolift and Prolift+M
4  IFUs in terms of what risks needed to be included in
5  the IFUs?  In layman's terms, how would you describe
6  that simply to me?
7        A.    Well, I would say that from the
8  regulations, what the regulations call for is -- are
9  in-prescription labeling, a description of intended
10 -- of indications for use, precautions,
11 contraindications, warnings, adverse effects.
12 That's what's described in regulations.
13       So that's kind of the sum total of
14 the regulatory description of what's required in
15 labeling.
16       Q.    Here's what I want to understand:  If
17 a regulatory professional at Ethicon is making a
18 decision as to whether a risk needed to be included
19 or not included in the IFU for the Prolift or
20 Prolift+M, in simple terms, what should that
21 regulatory professional have been trying to
22 determine?
23       And I don't want you to just say he
24 should have read the regs.  I want to know, boiling
25 it down, what is the question that that professional

Page 44

1  had to answer in his or her own mind?
2        A.    Well, I -- it depends on what
3  professional you're talking about.  In regard to --
4        Q.    The -- I'll tell you who it is then,
5  if you ask me that question.
6        I'm talking about the Ethicon
7  Regulatory Affairs person whose job it was to decide
8  whether or not the risks listed in the IFU was the
9  proper list of risks, that person who had to make
10 that decision.
11       A.    Well, I think that the regulatory
12 person at Ethicon would be following a procedure,
13 first of all, in regard to developing --
14       Q.    What is the question -- I want a very
15 simple answer, sir.  I'm not asking about the
16 process.  I'm asking a direct question:  What is the
17 question that person would need to answer in his or
18 her own mind as to whether or not a risk needed to
19 be included in the IFU?
20       A.    Well, I was getting to there, sir, if
21 you gave me -- give me about ten more seconds.
22       Q.    Let's just get an answer to that,
23 without background.
24       MS. KABBASH:  Adam, I'm just going to
25 ask you, and it may be because there's a video

Page 45

1  delay, but sometimes you're clipping the beginning
2  of his response.
3        So if you could just let a second
4  pass to let him commence answering the question,
5  just so that everything is a little cleaner.  It
6  might be that you don't realize that we have a bit
7  of a delay.
8        MR. SLATER:  Okay --
9        THE WITNESS:  Well --
10       MR. SLATER:  -- fair enough.
11       So can you give me a direct answer to
12 that question, please?
13       THE WITNESS:  The -- please repeat
14 the question.
15 BY MR. SLATER:
16       Q.    What is the question that the
17 Regulatory Affairs person at Ethicon needed to
18 answer in his or her own mind when deciding whether
19 or not a risk needed to be disclosed in the Prolift
20 or Prolift+M IFU?
21       A.    It would be the questions posed in
22 the procedure regarding construction of labeling.
23       Q.    And with regard to a risk, of whether
24 or not a risk needed to be included or not, in
25 simple terms, what is the question that person was

Timothy A. Ulatowski

Page 46

1  seeking to answer?
2      A.     I believe that the regulatory
3  personnel would be turning to the medical personnel
4  in regard to development of several portions of the
5  labeling in regard to adverse effects, warnings, for
6  example, and that's probably how their procedure is
7  laid out.
8      Q.     And what would be the question that
9  the Medical Affairs professional would be posing to
10 Medical Affairs or seeking to answer through an
11 interaction with Medical Affairs to determine what
12 risks needed to be included in the Prolift or
13 Prolift+M IFU?
14     A.     Well, part of that incurs medical
15 decision making and I'm not a clinician, so -- so
16 any ingredients in regard to labeling would be
17 subject to medical interpretation.
18            They would be asking questions on
19 what are the risks, the probability, severity of the
20 risks, the knowledge of the physician regarding
21 those risks.
22            I'm sure there's a number of
23 questions that probably would be posed.
24     Q.     Well, as you sit here right now --
25 well, let me ask you this:  With regard to whether

Page 47

1  or not the Prolift IFU adequately discloses the
2  risks and adverse events with regard to the Prolift,
3  from a regulatory perspective, am I accurate that
4  you are -- you do not have an opinion on that
5  subject because you do not have the medical
6  background to answer that question?
7      A.     From a -- from a medical position,
8  what risks should be in there versus not in there,
9  that's a medical -- in my mind, a medical analysis.
10 What needs to be generally in labeling is a -- is a
11 regulatory issue.
12     Q.     And this is getting back to my
13 original question, which we're not -- I'm not able
14 to get a direct answer to, but maybe we'll get to
15 now because I think we've gotten down to the point
16 where there's very little room on either side, so
17 let's try it one last time.
18            When the regulatory professional
19 responsible to list the risks in the Prolift IFU
20 interacted with Medical Affairs and got information
21 from Medical Affairs, what is the decision that the
22 regulatory professional was making with regard to
23 whether or not risks needed to be included?
24     A.     Whether those risks that Medical
25 Affairs proposed for labeling needed to be included?

Page 48

1      Q.     Yes, let's go to that question.
2      A.     I think that Regulatory Affairs
3  people generally rely upon the Medical Affairs
4  people to identify the risks regarding the
5  particular product, so they would pass that through,
6  in a sense, generally, to the labeling.
7      Q.     So if Medical Affairs at Ethicon
8  communicated to Regulatory Affairs that a specific
9  warning needed to be provided in the IFU, Regulatory
10 Affairs would need to make sure that that warning
11 would be included; correct?
12     A.     I think eventually --
13            MS. KABBASH:  Objection.
14            THE WITNESS:  -- yes.
15 BY MR. SLATER:
16     Q.     Well, when you say eventually, let me
17 ask the question this way:  If, hypothetically, two
18 months before the Prolift even went on the market,
19 someone in Medical Affairs drafted a specific
20 warning and said, this warning should be included in
21 the Prolift IFU, the Regulatory Affairs person would
22 be responsible to make sure that that warning would
23 be included before the device would be marketed;
24 correct?
25     A.     Well, I think, generally, that would

Page 49

1  be important, yes.  As far as -- as far as the
2  development of the IFU and wherewithal getting the
3  IFU printed and whatnot -- the IFU could have been
4  already final printed.  There may be situations
5  where you might have to wait until next edition to
6  get it in, for example.
7      Q.     Let me ask you this:  Do you think
8  it's acceptable if Ethicon knew two months before
9  the Prolift even went on the market that a warning
10 had been recommended by Medical Affairs to be
11 included -- rephrase.  I'm going to ask the question
12 differently.  Let me ask you a hypothetical.
13            I'd like you to assume that two
14 months before the Prolift began to be marketed in
15 2005, someone in Medical Affairs prepared a specific
16 warning and said, this needs to be included in the
17 Prolift IFU.
18            I'd like you to assume that the
19 Research and Development project leader and the
20 Regulatory Affairs project leader for the Prolift
21 device saw the warning and that the project leader
22 made the decision, I'm not going to include this
23 warning because I don't want to reprint the Prolift
24 IFUs which have already been printed.
25            You think it's acceptable from a

13 (Pages 46 to 49)

Timothy A. Ulatowski

Page 50

1 regulatory perspective for that Prolift to go on the
2 market with that IFU without that warning; is that
3 your testimony?
4          MS. KABBASH:  Objection.
5          THE WITNESS:  I think -- given my
6 druthers, I think I'd try to understand what was
7 going on specifically at that point in time, what --
8 what were the limitations presented to Regulatory
9 Affairs.
10          You try and get information in the
11 final printed labeling.  I've seen many times when
12 people have to wait till next edition to get stuff
13 in, because at the last moment, it's very difficult
14 to stop the train.  Everything's in motion and
15 packages are in boxes and things are moving.
16          So it's difficult to do some things
17 sometimes.
18 BY MR. SLATER:
19     Q.     Coming back to my question, in simple
20 terms, based on the specific hypothetical I gave
21 you, you would agree with me that from a regulatory
22 perspective, the right thing to do would be to
23 include the warning and print new IFUs so that from
24 day one, doctors would know that information;
25 correct?

Page 51

1          MS. KABBASH:  Objection.
2          THE WITNESS:  You'd -- you'd want to
3 reprint IFUs as quickly as possible considering all
4 the wherewithal to get that done in a company; and
5 there's other ways, also, to get information like
6 that out to professionals in the interim.
7 BY MR. SLATER:
8     Q.     From a regulatory perspective -- the
9 fact that from a business perspective, the company
10 may move slowly when they need to make changes to
11 documents and the fact that the company may want to
12 save money and not have to reprint IFUs and throw
13 away IFUs, that should not matter to the regulatory
14 professional, because the regulatory professional's
15 job is to make sure that if Medical Affairs says a
16 warning needs to be in the IFU, the warning needs to
17 be there.  That's a correct statement.  Right?
18          MS. KABBASH:  Objection.
19          THE WITNESS:  Well, I think if the
20 warning needs to be in there, it needs to be in
21 there.  How quickly it needs to be in there, how
22 expeditiously, well, that brings in all the other
23 wherewithal in getting IFUs out there.
24          And you have to understand, sir, that
25 certain IFUs are already printed, they're in boxes,

Page 52

1 the product's sterilized.  It's -- it's not as easy
2 as you might think.
3 BY MR. SLATER:
4     Q.     Well, regardless of the fact that it
5 may be easy or not easy and it may be expensive to
6 reprint the IFUs, the regulatory professional's job
7 is to make sure that the necessary warning goes out
8 with that device from day one so that there aren't
9 any doctors who don't have that information when
10 they make decisions on whether or not they're going
11 to put a Prolift in a woman's body.  That's a true
12 statement; correct?
13     A.     I -- I think, yes, generally, if the
14 -- if there is a medical concern, you want to get
15 that information out.  If you can't get it in the
16 IFU, what alternatives exist to get that information
17 out, during training, during other vehicles, to get
18 that information to doctors who will be using your
19 product, dear doctor letters, whatever the case is.
20     Q.     The federal -- I'm sorry.
21          The federal regulations that apply to
22 the Prolift required that if Ethicon was aware --
23 rephrase.
24          The FDA regulations that apply to the
25 Prolift required that, under my hypothetical, that

Page 53

1 IFU include that warning that a Medical Affairs
2 person said needed to be included in that IFU.  And
3 even if it would have been time consuming and may
4 have delayed the launch of the device and even if it
5 may have been expensive and required some packaging
6 and some labels to be thrown away, the company
7 needed to take the necessary time; the company
8 needed to pay the necessary dollars to make sure
9 that IFU disclosed that risk; correct?
10          MS. KABBASH:  Objection.
11          THE WITNESS:  Well, I agree with your
12 final part, which is, you need to disclose the risk.
13 I think that the process of doing that can be
14 problematic depending on what's happening in the
15 plant, and there's other means to disclose
16 information beyond the IFUs.
17          Does it have to get in there
18 ultimately?  Yes, I think so, as -- as new editions
19 come along, because during the course of three to
20 six months, other issues may come up.  You can't be
21 reprinting IFUs every two weeks and trying to get
22 those things out there.  That's just -- it's just
23 nonsense.
24          You've got to -- you've gotta have a
25 system, a process, that's orderly to try to get

Timothy A. Ulatowski

Page 54

1  these things out.
2  BY MR. SLATER:
3       Q.    Is there an FDA regulation that says
4  that if the company is aware of a risk that its
5  Medical Affairs Department wants included in an IFU,
6  that it's acceptable to not include that risk and to
7  provide that information to doctors in another way?
8  Is there a regulation that actually says that?
9       A.    The labeling regulations are -- are
10 extremely brief, so the answer is, no --
11      Q.    Is there a regulation that says what
12 I just said?
13             MS. KABBASH:  Objection; asked and
14 answered.
15             THE WITNESS:  I just answered no,
16 sir.
17 BY MR. SLATER:
18      Q.    Going back again to my hypothetical,
19 if that occurred and Ethicon failed to include that
20 warning in the IFU, either at launch or in the next
21 three years after launch, you would agree with me
22 that Ethicon violated its regulatory obligations
23 with regard to that warning that was not provided;
24 correct?
25      A.    Well, first of all, the regulatory

Page 55

1  obligations in the labeling regulations simply says
2  you have to include adverse effects.  That's all it
3  says.
4            Now, another part of your question --
5  it was a multiple-part question, I think.  Another
6  part of your question is --
7       Q.    Let me reask it then.
8       A.    Okay.
9       Q.    I'm going to reask the question then.
10      A.    Okay.
11      Q.    I don't want to have -- I honestly --
12 I don't want to go into tangents.  I want to ask you
13 a specific question.
14            With regard to my hypothetical, if
15 the warning was not included at launch of the
16 Prolift and was not ever included in the IFU for the
17 Prolift at any time, you would agree with me that
18 that would be a regulatory violation by Ethicon;
19 correct?
20      A.    Well, if it was never in the labeling
21 and should have been in the labeling, I think that's
22 an issue, yes.  There may be --
23      Q.    That's my question.
24      A.    Well, there may be reasons why that's
25 the case, without knowing the background there.  But

Page 56

1  assuming that it's medically important, it should be
2  in the labeling at some point and it never got in
3  the labeling, that could be a problem.
4            Is it a violation?  Well -- well, I
5  guess that's subject to some assessment in regard to
6  what violation I would append to that.
7       Q.    It would clearly be a regulatory
8  violation; correct?
9            MS. KABBASH:  Objection.
10            THE WITNESS:  You're saying would it
11 be a misbranding?
12            MR. SLATER:  Sure, if that's the
13 definition.  That would be misbranding; correct?
14            THE WITNESS:  I think that requires
15 some analysis before I would say that, but the --
16 the premise of your question --
17            MR. SLATER:  As --
18            THE WITNESS:  Let me finish.
19            MR. SLATER:  Let me ask you this --
20 go ahead, sorry.
21            THE WITNESS:  The premise of your
22 question was, I think, that it should be in there
23 and I -- I'm agreeing with you, if medically it's
24 important, Medical Affairs thinks it should be in
25 there, there's nothing that's changed in regard to

Page 57

1  that adverse effect or the need for that adverse
2  effect, it's not been encompassed by other language,
3  for example, or whatever else I might conjure up, if
4  it still needs to be in there three years later, I
5  think three years later is -- can be problematic,
6  yes.
7  BY MR. SLATER:
8       Q.    When you say problematic, you mean it
9  would be a regulatory violation; correct?
10      A.    It could be, yes.
11      Q.    It would be; correct?  Not could be;
12 it would be; correct?
13      A.    Well, that incurs medical assessment
14 whether it would -- FDA would take regulatory action
15 on that, so it -- I can't say with certainty, but it
16 could be.
17      Q.    In this case, you said you would need
18 some analysis on such a question; correct?
19      A.    Yes.
20      Q.    Okay.
21            You have not performed such an
22 analysis as you sit here now with regard to any of
23 the warnings or proposed warnings for the Prolift or
24 the Prolift+M; correct?
25      A.    From a -- from a regulatory point of

Timothy A. Ulatowski

Page 58

1   view, I've -- from documents, I've identified
2   regulatory issues in terms of labeling, but that's
3   -- that's the extent of my testimony, regulatory
4   issues regarding labeling.
5       Q.      The analysis that you would need to
6   perform in order to determine -- well, rephrase.
7           With regard to my hypothetical again,
8   you testified it would take you some analysis to
9   determine what regulatory issues and violations
10  would be encompassed by that hypothetical.
11          Am I accurate that as you sit here
12  now, you have not performed such an analysis with
13  regard to any issues with regard to the Prolift or
14  Prolift+M?
15      MS. KABBASH:  Objection.
16  BY MR. SLATER:
17      Q.      Correct?
18      A.      Well, in regard to the specific
19  instance we began with, no, I have not.  In regard
20  to other labeling aspects, I've seen documents where
21  we can talk about regulatory issues regarding
22  labeling.
23      Q.      As you sit here now, did you see any
24  instances -- well, rephrase.
25          Based on all the information you read

Page 59

1   -- well, let me take a step back.
2           You said something earlier that if a
3   risk was deemed by Medical Affairs to be a medically
4   important risk, it would need to be in IFU;
5   correct?
6       A.      I think so.  There might be
7   justification that I'm just not aware of or -- that
8   -- that may counter that, but generally, yes.
9       Q.      You would agree with me that if
10  Medical Affairs at Ethicon deemed a risk to be a,
11  quote, unquote, medically important risk, that it
12  would need to be included in the IFU; correct?
13      A.      Okay.  We're kind of coming full
14  circle and I said, yes, ultimately.
15      Q.      The answer to my question is "yes";
16  correct?
17      A.      At some point in time, yes.
18      Q.      When you say "at some point in time,"
19  as quickly as feasible, that warning would need to
20  be given in the IFU; correct?
21      A.      I think that's the case, yes.
22      Q.      So to the extent that the jury in
23  this case would determine that Ethicon Medical
24  Affairs was aware of a risk that the jury would
25  believe would be medically important, because

Page 60

1   they're the ultimate fact-finders in this case, if
2   that risk were not included in the IFU at any time,
3   you, as a regulatory expert, would say, well, then
4   that's misbranding; correct?
5       MS. KABBASH:  Objection; calls for a
6   legal conclusion regarding the jury's finding.
7       THE WITNESS:  Well --
8       MR. SLATER:  The answer to my
9   question is "yes."  Right?
10      THE WITNESS:  If, again, the -- your
11  criteria were, is it medically necessary as a
12  decision of Medical Affairs, it should be in the
13  labeling at some point in time, I've -- I've already
14  said yes.
15  BY MR. SLATER:
16      Q.      Well, again, the standard for what
17  gets included in the labeling for a medical device
18  is not does Medical Affairs think that the risk
19  should be disclosed; the standard is, from a
20  regulatory perspective, if Medical Affairs
21  recognizes a risk to be what you would call, quote,
22  unquote, medically important, then Regulatory
23  Affairs has to make sure that risk is disclosed;
24  correct?
25      A.      I believe that's --

Page 61

1       MS. KABBASH:  Objection.
2       THE WITNESS:  -- also probably part
3   of Ethicon's process, so, yes, ultimately.
4   BY MR. SLATER:
5       Q.      Just without the lead-in to the
6   answer, the answer to my question is "yes"; correct?
7       A.      Yes, ultimately.
8       Q.      Did you in your review of the
9   materials attempt to identify medically important
10  risks that were known to Ethicon Medical Affairs
11  that were not disclosed in the Prolift or Prolift+M
12  IFUs?  Did you make an effort to determine that
13  question?
14      A.      I -- I haven't -- that raises medical
15  opinion issues.  I've identified -- read deposition
16  testimony about medical opinions on what's in the
17  labeling versus what's not in the labeling, but
18  those are primarily medical opinions, so I don't
19  opine on those specifically.
20      Q.      You drew no opinion and did not
21  analyze that specific question; correct?
22      A.      That's correct.
23      Q.      I've asked you a bunch of questions
24  about the IFU.  With regard to the patient brochure,
25  the same standard would apply.  If a risk is a

Timothy A. Ulatowski

Page 62

1 medically important risk, it should be disclosed
2 from a regulatory perspective in the patient
3 brochure; correct?
4     A.    Well, you're saying "should."
5     Q.    It's required by the regulations;
6 correct?
7     A.    Well, there's nothing in the labeling
8 regulation for medical devices that even talks about
9 patient brochures, so --
10    Q.    But if a company decides to put a
11 patient brochure out, those standards would apply;
12 correct?
13    A.    Anything a company does is entirely
14 voluntary in regard to the regulations.  There's no
15 regulation regarding patient brochures for medical
16 devices.
17    Q.    Here's my question -- well, let's
18 take a step back.
19        A company is not required to issue a
20 patient brochure based on the FDA regulations;
21 correct?
22    A.    Correct.
23    Q.    However, if a company decides to
24 issue a patient brochure, for example, the patient
25 brochure for the Prolift, then the standards that we

Page 63

1 discussed with regard to the IFU and the disclosure
2 of risks would apply to the patient brochure,
3 because now the company has affirmatively put out
4 that patient brochure to give information directly
5 to patients, so it must adhere to that standard;
6 correct?
7     A.    I wouldn't say that's the case.
8     Q.    So you think that if the Prolift IFU
9 fails to disclose a medically important risk to a
10 patient -- rephrase.
11        Is it your testimony that -- that if
12 the Prolift patient brochure fails to disclose a,
13 quote, unquote, medically important risk, you think
14 that's acceptable from a medical -- from a
15 regulatory perspective?
16    MS. KABBASH:  Objection.
17    THE WITNESS:  What I'm saying is, the
18 regulations don't speak to patient brochures and
19 there's no regulatory requirements listed for
20 patient brochures.  I think where patient brochures
21 come into play is -- in FDA's mind is, they're an
22 element in the informed consent process.
23 BY MR. SLATER:
24    Q.    Well, you know for a fact that the
25 FDA considers patient brochures to be labeling.

Page 64

1 You've testified to that effect in prior deposition
2 testimony; correct?
3     A.    Yes.
4     Q.    And, therefore, the labeling
5 requirements of the FDA regulations apply to a
6 patient brochure if a company like Ethicon decides
7 to issue a patient brochure; correct?
8     A.    No.  The labeling requirements speak
9 to prescription use labeling, labeling for doctors
10 in this case.  The labeling regulation doesn't speak
11 to patient brochures.
12    MS. KABBASH:  Adam, could we plan on
13 --
14 BY MR. SLATER:
15    Q.    Are you -- is it your --
16    MS. KABBASH:  Adam, I'm sorry to
17 interrupt you.
18    MR. SLATER:  I'm sorry?
19    MS. KABBASH:  Could we plan on a
20 break in the next couple of minutes?  Because we've
21 been going somewhere between --
22    MR. SLATER:  Sure.
23    MS. KABBASH:  -- an hour and 15
24 minutes and an hour and a half, so I would
25 appreciate that.

Page 65

1     MR. SLATER:  All right.  I'll try to
2 ask a couple more questions and then we'll take a
3 break.
4     MS. KABBASH:  Okay.
5 BY MR. SLATER:
6     Q.    It is not acceptable for Ethicon to
7 mislead a patient about any medically important
8 information in a patient brochure.  You would agree
9 with that from a regulatory perspective; correct?
10    A.    I think that's the case, yes.
11    Q.    If, in fact, the Prolift patient
12 brochure was misleading with regard to any medically
13 important risks, that would be improper from a
14 regulatory perspective; correct?
15    A.    Yes.
16    Q.    If information was provided in the
17 Prolift patient brochure that was unsupported by any
18 foundational data -- and I'm talking about claims
19 with regard to the attributes of the device -- that
20 would be improper from a regulatory perspective;
21 correct?
22    A.    And your premise was lack of
23 foundation for the claim or --
24    Q.    Yes.
25    A.    Well, I think generally lack of

17 (Pages 62 to 65)

Golkow Technologies, Inc. - 1.877.370.DEPS

Timothy A. Ulatowski

Page 66

1  foundation is a problem in any statement, in any
2  form of labeling.
3      Q.    And with regard to my question
4  regarding a patient brochure, the answer's "yes,"
5  correct, it would be improper?
6      MS. KABBASH:  Objection.
7      THE WITNESS:  Well, improper versus
8  is it a violation.  Are you asking my mindset
9  regarding whether it's proper or improper or are you
10  asking a regulatory question here?
11  BY MR. SLATER:
12      Q.    From a regulatory perspective, it
13  would be improper to do so; correct?
14      A.    Well, you'd have to connect it to --
15  to a violation.  You have to have a hook there; in
16  other words, companies can -- can do what they care
17  to unless there's a -- there's some limitation in
18  regulation.
19      Q.    Well, a company like Ethicon cannot
20  make a claim in a patient brochure that it cannot
21  support with any foundational data; correct?
22      MS. KABBASH:  Objection.
23      THE WITNESS:  I think -- I think that
24  would be a problem.  Now what violation I would
25  attach to that, I'd have to think about that, how

Page 67

1  I'd construct a violation.
2  BY MR. SLATER:
3      Q.    You have not done that analysis with
4  regard to any of the Prolift or Prolift+M patient
5  brochures; correct?  You haven't conducted that
6  analysis as you sit here now; correct?
7      MS. KABBASH:  Objection.
8      THE WITNESS:  "That analysis,"
9  specifically what?
10      MR. SLATER:  You have not analyzed
11  whether any of the claims made in any of the Prolift
12  or Prolift+M patient brochures lacked foundation and
13  therefore were inappropriate from a regulatory
14  perspective.  You haven't analyzed that question;
15  correct?
16      MS. KABBASH:  Objection.
17      THE WITNESS:  Well, I just want to
18  make sure we're talking about statements in labeling
19  versus claims, so I guess you'd have to tell me a
20  couple items that -- that you're talking about so
21  we're on the same page.
22  BY MR. SLATER:
23      Q.    If a claim was made -- well,
24  rephrase.
25      Is there any claim or statement that

Page 68

1  was made in either -- well, rephrase.
2      Q.    Was there any claim or statement made
3  in any of the Prolift or Prolift+M patient brochures
4  that you analyzed to determine whether or not there
5  was a foundation for that statement or claim?
6      A.    Only in the regulatory sense that it
7  may have been in prior -- in predicate labeling or
8  submitted in the 510(k)s or something of that sort.
9  That would be the only assessment --
10      Q.    But you did no analysis as to the --
11  but you did no analysis as to the validity or
12  truthfulness of any of the statements or claims in
13  any of those patient brochures; correct?
14      A.    Inasmuch as it would require a
15  technical/engineering/medical assessment, no.
16      Q.    So it's something you did not analyze
17  or opine on; correct?
18      A.    Not in regard to those aspects, no.
19      MR. SLATER:  Okay.  Why don't we take
20  a break.
21      MS. KABBASH:  Okay.
22      THE VIDEO TECHNICIAN:  The time now
23  is 11:47 --
24      MR. SLATER:  Come back in about ten
25  minutes?

Page 69

1      MS. KABBASH:  Yep.
2      THE VIDEO TECHNICIAN:  -- we are
3  going off the record.
4      (A recess was taken from 11:47 a.m.
5      to 12:06 p.m.)
6      THE VIDEO TECHNICIAN:  The time now
7  is 12:06.  We are back on the record.
8  BY MR. SLATER:
9      Q.    Okay.
10      With regard to what Ethicon
11  Regulatory Affairs did in making decisions as to
12  what would be in the labeling for the Prolift and
13  Prolift+M, did you actually analyze that process of
14  what the regulatory professionals actually did to
15  make their decisions and what information they
16  considered?
17      A.    I didn't separately analyze.
18  Certainly evaluated -- I saw, rather, read
19  deposition testimony on what they -- what they had
20  done, what they had considered, interactions with
21  Medical Affairs, so I read that testimony.
22      Q.    Am I correct that you did not form
23  any opinions with regard to whether or not the
24  decisions made by the regulatory professionals as to
25  what was included in the labeling for the Prolift

Timothy A. Ulatowski

1  and Prolift+M were correct or incorrect decisions;
2  you didn't analyze that or opine on that; correct?
3      A.    I don't think I have any opinions
4  like that, no.
5      Q.    You're familiar with the design
6  control process also known as the risk management
7  process; correct?
8      A.    Well, it's actually -- you actually
9  just talked about two different things that are
10  different but related.
11     Q.    Okay.
12          There's something known as design
13  control and something known as risk management, and
14  these are processes that a company is required to go
15  through before marketing a medical device; correct?
16     A.    Design controls, yes.  Risk
17  management, generally no, not a requirement.  The
18  only requirement in regulation concerns the need for
19  a risk analysis.
20     Q.    Okay.
21          Prior to the marketing of a medical
22  device, a company like Ethicon must go through --
23  well, rephrase.
24          Prior to marketing a medical device,
25  the manufacturer must go through a process of design

1  control and risk analysis; correct?
2      A.    Yes.  A risk analysis is actually
3  part of design control.
4      Q.    The regulations do not specifically
5  set forth what the design control procedures and
6  risk analysis procedures must be.  It just tells the
7  manufacturer, you need to implement these
8  regulations by going through a process that will
9  answer certain questions so that you can determine
10  these answers and then be able to market your
11  device; correct?
12     A.    I think generally yes --
13          MS. KABBASH:  Objection.
14          THE WITNESS:  -- the regulations
15  outline elements of the design control process and
16  then the company implements those regulations with
17  -- with processes, procedures, SOPs.
18  BY MR. SLATER:
19     Q.    Once a company puts in place
20  processes, procedures, standard operating
21  procedures, those sorts of things, to implement
22  design control and risk analysis, the company needs
23  to adhere to those processes and procedures;
24  correct?
25     A.    Yes.

1      Q.    You did not analyze or form any
2  opinions as to whether or not Ethicon actually
3  implemented all of the processes and procedures that
4  were put in place with regard to the Prolift and
5  Prolift+M; correct?
6      A.    Well, I didn't receive all processes
7  and procedures.  I did receive a number of processes
8  and procedures which I did review.  You do see
9  elements of how those are implemented to the extent
10  possible.
11          So to that extent, I did assess the
12  processes and their implementation.
13     Q.    Your assessment included noting that
14  certain processes and procedures were put in place
15  and that documentation of those processes and
16  procedures being applied existed.  You noted that in
17  your review; correct?
18     A.    Yes.
19     Q.    What you did not evaluate, if I
20  understand correctly, is whether or not Ethicon
21  fully implemented those processes and procedures in
22  the sense of actually doing all of the work
23  necessary to properly go through each step; is that
24  a fair statement?
25     A.    Yeah, I think that's a fair

1  statement.  That would probably -- probably require
2  an inspection of the facility and evaluation of all
3  the documents.
4      Q.    And that's something you did not do;
5  correct?
6      A.    That's correct.
7      Q.    One aspect of the design control and
8  risk analysis process before the Prolift was
9  marketed was the DDSA and FMEA process; correct?
10     A.    Yes.
11     Q.    You did not analyze the question of
12  whether or not Ethicon adequately analyzed all of
13  the risks known to Medical Affairs with regard to
14  the Prolift as part of the DDSA and FMEA process;
15  correct?  It's not something you analyzed or opined
16  on; correct?
17     A.    Not from a technical/engineering
18  perspective, no; but from a regulatory perspective,
19  I evaluated those processes, evaluated the output of
20  those processes, determined that they applied those
21  processes; but as far as any specific
22  engineering/medical assessment, I didn't do that
23  sort of assessment.
24     Q.    You noted that the DDSA and FMEA
25  processes were applied, but you did not form any

Timothy A. Ulatowski

Page 74

1  opinions as to whether or not they were applied in
2  such a way that all of the risks that needed to be
3  evaluated actually got evaluated.  True statement?
4       A.     I'd have to turn to my report to see
5  with precision exactly what I've said about that.
6       Q.     Well, as you sit here right now, you
7  do not have any opinion one way or the other as to
8  whether or not the DDSA and FMEA processes for the
9  Prolift or Prolift+M evaluated each of the
10 medical risks that needed to be evaluated; correct?
11      A.     Well, if you're asking if me -- did
12 I do a medical assessment of the DDSA or FMEA, no, I
13 didn't do that.  That's the answer to your --
14      Q.     That's what I'm asking.
15      A.     And I just said, no, I didn't do
16 that.
17      Q.     And -- okay.
18             And, in fact, the only way to answer
19 my question would be to do a medical assessment of
20 what information was available to Medical Affairs
21 and then match that up against what was evaluated in
22 the DDSA and FMEA processes to see if the risks were
23 adequately evaluated in that process; correct?
24      A.     You'd have to evaluate it, yes, from
25 a medical and an engineering aspect to fully

Page 75

1  determine the technical sufficiency of the DDSA and
2  that -- of course, that's based on --
3       Q.     And that's not --
4       A.     That's based on information also that
5  would have been available to Ethicon at that point
6  in time when they were constructed.
7       Q.     And that's not something you did,
8  obviously; correct?
9       A.     No, I did not.
10      Q.     If there was a, quote, unquote,
11 medically important risk known to Medical Affairs
12 and Medical Affairs did not make sure that that risk
13 was assessed as part of the design control and risk
14 analysis process before the Prolift was marketed,
15 that would be a violation of the design control
16 regulation; correct?
17      A.     Well, I guess I'd have to see how
18 that particular risk -- whether it was considered or
19 considered tangentially or in some other way.
20             Risk analyses sometimes don't exactly
21 line up as you look back at risk analyses, but the
22 considerations going -- moving forward when they're
23 originated can have broad considerations that may
24 encompass what you're talking about.
25             So I -- I just can't say.

Page 76

1       Q.     You don't form an opinion one way or
2  the other on that?
3       A.     No, not -- you know, if you have a
4  specific situation, but I -- no.  I think what it
5  requires is a medical assessment/engineering
6  assessment of the DDSA or FMEA to see what was
7  listed, what was considered, why it was considered,
8  those aspects, for example.
9       Q.     And that's not an analysis you
10 performed with regard to the Prolift or Prolift+M;
11 correct?
12      A.     That's correct.
13      Q.     One of the things that is done in the
14 DDSA -- well, let me ask you a question just so
15 we're on the same page.
16             When you talk about the DDSA, you
17 include within that the FMEAs; correct?
18      A.     It's an element, typically an element
19 of that, yes.  And there's different FMEAs.  There's
20 design application, manufacturing, or process FMEAs.
21      Q.     As part of the DDSA/FMEA process,
22 there are lists made on tables of each of the risks
23 that were actually evaluated, and they're denoted as
24 hazards and harms; correct?
25      A.     Yeah, at the front end usually

Page 77

1  there's a description of discussion of hazards, and
2  later on those hazards are evaluated in the FMEA as
3  far as mitigations.
4       Q.     The reason that the hazards and harms
5  are listed is so that if one wants to know what was
6  evaluated, one can look at those lists and confirm
7  exactly what was evaluated.  That's one of the
8  reasons to list them; correct?
9       A.     Yes, information that's considered at
10 that point in time when it's constructed.
11      Q.     If there was a, quote, unquote,
12 medically important risk that was known to Medical
13 Affairs and Medical Affairs knew that this would
14 happen to some women due to the Prolift and knew
15 that if it happened to a woman, it would cause very
16 severe permanent damage to her vagina and pelvis and
17 that risk was not evaluated as part of the FMEA/DDSA
18 process, that -- if that hypothetical is accurate,
19 that would be a violation of the design control
20 regulations; correct?
21      A.     Well, I think -- difficult to say yes
22 or no.  I think, again, the medical, engineering,
23 technical assessment of that, the DDSA/FMEA may have
24 incorporated some of that in a broader sense.  I
25 just can't say specifically.

Timothy A. Ulatowski

Page 78

1    Q.    If based on the way Ethicon set up
2  its design control process, if my hypothetical is
3  accurate and that risk is not specifically described
4  in the DDSA or FMEA documents, it's not listed, it's
5  not specifically described, would -- that would mean
6  that it was not evaluated based on the literal terms
7  of that process; correct?
8    A.    Well, I think you're expecting more
9  than what many, many DDSAs/FMEAs incorporate.  DDSAs
10 and --
11   Q.    I'm only asking about this process --
12 hang on.  I'm only asking about this process for the
13 Prolift device and the Prolift+M device.
14         The answer to my question would be
15 yes, if it's not listed, it wasn't evaluated, based
16 on the technical terms of how that process is
17 supposed to be implemented; correct?
18   A.    I can't say with certainty.  I think
19 part of that requires a medical/engineering
20 assessment of what was evaluated and what is
21 encompassed within those hazards that are discussed
22 in the DDSA/FMEA.
23         And so many things --
24   Q.    You're not, again -- and I --
25         MS. KABBASH:  Adam, I think you --

Page 79

1         MR. SLATER:  I'm sorry.  I didn't
2  mean to interrupt you.
3         MS. KABBASH:  -- were cutting off his
4  answer.  Just let him finish.
5         THE WITNESS:  So many things may be
6  --
7         MR. SLATER:  Yeah, I didn't mean to
8  do that.  I apologize.
9         THE WITNESS:  Yeah, so many things
10 may be generally considered under DDSAs/FMEAs.  As
11 products are marketed and the company comes back to
12 the FMEAs, things -- things may get more refined,
13 more detailed, but, typically, original DDSAs/FMEAs
14 are not extremely detailed in regard to hazards in
15 all respects.
16 BY MR. SLATER:
17   Q.    To the extent a medically important
18 risk was actually known to Medical Affairs at
19 Ethicon, Ethicon was required to evaluate that risk
20 through the DDSA/FMEA process before marketing the
21 Prolift; correct?
22   A.    What -- not precisely.  What they're
23 required to conduct is a risk analysis.  Then it
24 becomes a --
25   Q.    And that risk has to be evaluated.

Page 80

1  Right?
2    A.    Well, that's --
3    Q.    That's the way the process was set
4  up.  If the medically important risk was known to
5  Medical Affairs, it needed to be evaluated; correct?
6    A.    Well, what I said is what the
7  regulation calls for.  Now, as far as any specific
8  hazard/risk, then you get into technical assessments
9  and deliberations of whether the DDSA/FMEA should
10 have included this, would have included this.  So
11 that that -- that's -- you're starting to get into
12 the weeds of differing opinions.
13   Q.    If there was a medically important
14 risk known to Medical Affairs before the Prolift was
15 even marketed and it's a risk that they knew was
16 going to occur to some women and cause severe
17 permanent harm to women when it occurred, if that's
18 the fact, then it was required that that risk would
19 be evaluated in the design control/risk analysis
20 process; correct?
21   A.    I would -- I would say generally a
22 hazard of that type either generally -- probably
23 more generally would be an ingredient of a
24 DDSA/FMEA.
25         So I -- I think that's about as far

Page 81

1  as I can go with that, so -- the regulations don't
2  -- don't get specific about that and assessments of
3  risk analyses, you get differing opinions from
4  experts, clinical/engineering experts, on whether
5  the DDSA/FMEAs were adequate or not adequate at a
6  point in time.
7    Q.    Well, the design control regulation
8  sets forth certain issues that have to be addressed
9  and then tells the company you have to put in place
10 a process to evaluate these issues; and the
11 regulation says, if you don't do that, you don't
12 implement procedures that are adequate to answer
13 these questions and you don't, for example, evaluate
14 known medically important risks that can result from
15 the use of this medical device, that would then be a
16 violation of the design control regulation; correct?
17   A.    I'd have to think about that,
18 because, again, the regulation just talks about risk
19 analysis and goes no further.  So typically the
20 violations that are assessed based on that provision
21 is the presence or absence of a risk analysis.
22         Once you get into the weeds as far as
23 the ingredients of the risk analysis, it gets more
24 muddled, because then you get into
25 medical/engineering differences of opinion.

21 (Pages 78 to 81)

Timothy A. Ulatowski

Page 82

1    FDA typically didn't get into the
2  weeds on that.
3    Q.    When you talk about getting into the
4  weeds, with regard to the Prolift and Prolift+M, you
5  did not, quote, unquote, get into the weeds of the
6  questions regarding these devices; correct?
7    MS. KABBASH:  Objection.
8    THE WITNESS:  In regard to the
9  DDSAs/FMEAs, no, not from a medical/engineering
10  perspective, no.  I viewed them, evaluated that the
11  procedures were there, that in my expertise, they
12  appeared to be generally consistent with industry
13  standards and FDA's expectations, and found them
14  substantially compliant.
15  BY MR. SLATER:
16    Q.    You found that the procedures that
17  Ethicon put in place were compliant with what
18  procedures were supposed to be put in place, but you
19  offer no opinions with regard to the actual
20  application or conclusions drawn through those
21  processes; correct?
22    A.    That's correct.  My report doesn't go
23  into detail on the FMEAs -- or DDSAs/FMEAs.
24    Q.    In your report, you talk about
25  something called an unacceptable risk in the context

Page 83

1  of risk management.  What is an unacceptable risk?
2    A.    Well, now we're talking about risk
3  management and risk management is a -- is a broader
4  process.  That actually -- one part of it is risk
5  analysis, but it's only one part.
6    Risk management -- sorry for the
7  long-winded response, but risk management and the
8  standard upon which it's based talks about the
9  various elements of risk management.  One part talks
10  about assessment of risks, unacceptable risk, and
11  what you do about them.
12    Q.    How do you define an unacceptable
13  risk?
14    A.    Well, I think I've referred to the
15  risk management standard.  It's -- I'll just say
16  that generally it's a -- it would be a risk that
17  cannot be tolerated in the final product, but should
18  be mitigated or should be -- if cannot -- if it
19  cannot be eliminated, is it acceptable from a
20  benefit/risk point of view.
21    Q.    Wouldn't an unacceptable risk be a
22  risk that cannot be mitigated; due to the fact it
23  cannot be mitigated, that risk is deemed to outweigh
24  the benefit and, thus, the device should not be sold
25  with that risk existing; correct?

Page 84

1    A.    Well, I think I'd like to turn to my
2  report to see the context of that statement.
3    MS. KABBASH:  You can do that you if
4  need to.
5    THE WITNESS:  Just to make sure --
6    MR. SLATER:  Page 12.
7    THE WITNESS:  Okay.
8    (Pause.)
9    THE WITNESS:  Yes, that -- I was
10  talking about risk analysis in regard to
11  unacceptable risk.  And so your question, again,
12  sir, was?
13    MR. SLATER:  I'll ask the court
14  reporter just to read it again, because I tried to
15  specifically define an unacceptable risk; and then
16  after she reads it again, tell me if you agree with
17  that definition.
18    - - -
19    (The court reporter read the
20    pertinent part of the record.)
21    - - -
22    THE WITNESS:  Well, I think in regard
23  to risk analysis, the answer is, yes, that if a risk
24  is unacceptable and you've applied risk mitigation
25  factors, still unacceptable in terms of after risk

Page 85

1  mitigation, and then the risk/benefit -- the
2  benefit/risk analysis demonstrates that it is still
3  unacceptable, then it's unacceptable.
4  BY MR. SLATER:
5    Q.    And in that circumstance, that
6  medical device should not be sold; correct?
7    A.    Probably should not be sold.
8    Q.    If, in fact, there were any
9  unacceptable risks, as we've just defined it, with
10  regard to the Prolift, the Prolift never should have
11  been marketed; correct?
12    A.    No.  What I'm saying is, after the
13  benefit/risk decision making has been accomplished
14  where you -- the company weighs the residual risk of
15  the product against a potential benefit of the
16  product, if the decision is made, yes, we think this
17  should move forward, then the product moves forward.
18    Q.    Well, here's what I'm asking you:  If
19  objectively viewed, the information available to
20  Medical Affairs would have led to a finding that
21  there was one or more unacceptable risks with the
22  Prolift, as you've defined an unacceptable risk that
23  would require a device not to be marketed, then the
24  Prolift should not have been marketed; correct?
25    MS. KABBASH:  Objection.

22 (Pages 82 to 85)

Timothy A. Ulatowski

Page 86

1    THE WITNESS:  Well, this is after the
2  benefit/risk decision making of the company, because
3  there may still be --
4  BY MR. SLATER:
5    Q.    Well, here's what I'm asking.  I'm
6  not deferring -- I don't want to defer to what the
7  company -- we know the company made a decision to
8  sell the Prolift.  Okay?  But as you know, I think
9  that decision was the wrong decision.  That's one of
10  the reasons we're here, and that's why I'm going to
11  try cases against Ethicon with regard to the Prolift
12  and Prolift+M.
13    So deferring to the decision made by
14  Medical Affairs, you understand one of the things
15  I'm going to tell the jury and try to prove to the
16  jury is that they made the wrong decision.  So I'm
17  asking you an objective question as opposed to just
18  deferring to the decision they made.
19    I just wanted to explain that to you
20  so you understand the context in which I'm going to
21  now ask this question.
22    So here's my question:  If
23  objectively viewed, there were one or more
24  unacceptable risks with the Prolift, as you've
25  defined an unacceptable risk, following the entire

Page 87

1  risk/benefit analysis, the risk was -- if there was
2  still a risk that, objectively viewed, would be
3  deemed an unacceptable risk, then the Prolift should
4  not have been marketed; correct?
5    A.    Hang on just a moment.
6    (Pause.)
7    THE WITNESS:  I think that in the --
8  in the final analysis, after a benefit/risk decision
9  process is conducted, that the final decision of the
10  manufacturer is, any residual risks are acceptable
11  and we're going to move the product forward.
12  BY MR. SLATER:
13    Q.    But if objectively -- if an objective
14  analysis of the information available to Ethicon
15  would lead to the conclusion that there were one or
16  more unacceptable risks, after mitigation, after
17  risk/benefit analysis, there was still one or more
18  unacceptable risks, then the Prolift should not have
19  been marketed; correct?
20    MS. KABBASH:  Objection.
21    THE WITNESS:  I -- I guess I'm
22  getting a mental disconnect here, because the -- the
23  result of the benefit/risk decision is to assess any
24  residual risks and determine whether or not to move
25  the product forward, meaning we think this product

Page 88

1  is acceptable to move forward; that the residual
2  risks are acceptable, albeit they're there, but
3  they're acceptable because the benefit outweighs the
4  risk.
5    So they may begin as unacceptable
6  risks.  They're mitigated, and then the final
7  decision is they're -- the product's acceptable on a
8  benefit/risk decision making.
9    So if -- it just -- there seems to be
10  a disconnect that there would be residual
11  unacceptable risks after a benefit/risk decision.
12  BY MR. SLATER:
13    Q.    There are manufacturers who will go
14  through this analysis to determine if there is a
15  unacceptable risk or risks with a device; and
16  sometimes they will determine, you know what,
17  there's a risk that we can't mitigate by
18  redesigning, we can't mitigate with warnings; and
19  with this risk present, the risk outweighs the
20  benefit and we're not going to market this device.
21  That occurs.  Right?
22    A.    Yes.
23    Q.    Okay.
24    If, in fact, an objective person or
25  persons were to analyze the information that was

Page 89

1  available to Ethicon before the launch of the
2  Prolift and if that objective analysis determined
3  that there were unacceptable risk or risks with the
4  Prolift that could not be mitigated by redesign,
5  could not be mitigated by warning, and that the
6  presence of this residual risk tipped the balance
7  such that the risk outweighed the benefit with the
8  Prolift, if that was the analysis and if that's the
9  proper analysis objectively viewed, then the Prolift
10  should not have been marketed.  Based on that
11  hypothetical, you would agree; correct?
12    MS. KABBASH:  Objection.
13    THE WITNESS:  The responsible party
14  to make this decision is Ethicon, so who's this
15  objective party you're talking about?
16    MR. SLATER:  Well, I'm asking you
17  from a regulatory perspective what their obligation
18  was.  And you agree with me the obligation
19  objectively viewed from a regulatory perspective
20  would be that if that was the final conclusion, then
21  the Prolift should not be marketed; correct?
22    THE WITNESS:  If the responsible
23  party at Ethicon in regard to marketing the product,
24  after a risk assessment is conducted and the finding
25  -- and the finding is -- the benefit/risk decision

23 (Pages 86 to 89)

Timothy A. Ulatowski

Page 90

1  is, this product is unacceptable, and that's the
2  party that has control at Ethicon over that decision
3  making, it doesn't -- it doesn't connect with me
4  that they would market it in that case.  The
5  decision needs to be, this is an acceptable product
6  from a benefit/risk decision.
7  BY MR. SLATER:
8      Q.     If the risk -- well, rephrase.
9             The answer would hold the same for
10 the Prolift+M; correct?
11     A.     Yes.
12     Q.     The answer would hold the same for
13 any medical device; correct?
14     A.     Yes.
15     Q.     If at the end of the risk analysis,
16 it is determined as a matter of fact that the risk
17 of a medical device outweighs the potential benefit
18 of the medical device, that medical device should
19 not be marketed; correct?
20     A.     Are you talking about information
21 that comes to bear afterwards or what?
22     Q.     I'm talking about information that's
23 available before the product even goes on the
24 market.
25     A.     Well, again, the process is as I've

Page 91

1  stated:  Decision of the responsible party at
2  Ethicon to make that decision based upon a
3  benefit/risk analysis.
4             Now, are you saying that additional
5  information comes to bear or -- or what?
6      Q.     No, it's a very simple question.  I'm
7  not even asking specific to Ethicon.
8             With regard to any medical device
9  manufacturer, if an objective analysis of the
10 available information indicates that the risk
11 outweighs the benefit, that medical device should
12 not be marketed.  You'll agree with that
13 proposition; correct?
14     A.     Yeah, in any company, if the
15 responsible party makes the decision that the risk
16 outweighs the benefit, that's -- that's the outcome,
17 output of the benefit/risk decision-making process
18 -- that's one of the outcomes.
19     Q.     If -- I apologize.  If after a --
20 rephrase.
21             If after a medical device goes on the
22 market, the information becomes available to the
23 manufacturer indicating that the risk outweighs the
24 benefit, the manufacturer should withdraw that
25 medical device from the market; correct?

Page 92

1      A.     Well, again, you're talking about a
2  process, so they'd have to go through this process
3  to make that decision, and the responsible party --
4      Q.     And once they went through that
5  process -- and once they went through that process,
6  if it was deemed objectively that the risk
7  outweighed the benefit, the device should be
8  withdrawn from the market; correct?
9      A.     I think that's the case, because risk
10 management is an iterative process.
11     Q.     Risk management, is that -- well,
12 rephrase.
13             The process I just described to you
14 is the risk management process or at least part of
15 it, and that's something that goes on every day
16 after a device is put on the market; correct?
17     A.     Right, manufacturers receive new
18 information.  They have to digest it and consider it
19 in terms of the product, whether it's every day or
20 periodically, whatever the process is.
21     Q.     You've listed Anne Weber's report as
22 one of the things you reviewed.  Did you read her
23 entire report?
24     A.     All 500-some pages?
25     Q.     Yeah.

Page 93

1      A.     Yes.
2      Q.     You read her trial testimony as well,
3  I see, on this updated list of materials; correct?
4      A.     Yes.
5      Q.     You understand that Dr. Weber has
6  offered the opinion that when the entire analysis is
7  performed of the information that was available to
8  Ethicon, in her opinion, the risk of the Prolift
9  outweighed the benefit and it should not have been
10 marketed.
11             You know she holds that opinion;
12 correct?
13     A.     Yes.
14     Q.     If, in fact, the jury agrees with Dr.
15 Weber and they make that factual finding that she's
16 correct, you as a regulatory expert would say -- if
17 that's the fact, if we hypothetically assume that
18 Dr. Weber is correct, then you would say, based on
19 that fact, the Prolift should not have been
20 marketed; correct?
21             MS. KABBASH:  Objection; calls for
22 legal conclusion as to the implications of what a
23 jury finding may be.
24             MR. SLATER:  That would be your
25 opinion.  Right?

Timothy A. Ulatowski

Page 94

1    THE WITNESS:  That's the opinion of
2  the jury.  Whether or not I agree with Dr. Weber --
3    MR. SLATER:  That's not what I'm
4  asking you.  I haven't asked you that yet, so I'll
5  ask you it again.
6  BY MR. SLATER:
7    Q.    Coming back to my question, if the
8  jury agrees with Dr. Weber -- that's the foundation.
9  That's my hypothetical for you -- if the jury agrees
10  with Dr. Weber that the risk of the Prolift
11  outweighed the benefit, then you as a regulatory
12  expert, based on that factual foundation, would say,
13  well, if that's the fact, then the Prolift should
14  not have been marketed; correct?
15    MS. KABBASH:  Same objection.
16    THE WITNESS:  No, I -- I'd make --
17  probably make my own assessment of the facts.  If I
18  was still at FDA, that would be an independent
19  finding by the jury and by Dr. Weber.  They would
20  assess the facts themselves.
21  BY MR. SLATER:
22    Q.    As you sit here right now, under oath
23  as an expert in the -- in this lawsuit, if, based on
24  my hypothetical, the jury finds that Dr. Weber's
25  opinion is correct and the risk outweighed

Page 95

1  benefit, you as an expert in this case, based on
2  that hypothetical, would agree that if that's the
3  fact, then the Prolift should not have been
4  marketed; correct?
5    MS. KABBASH:  Same objection and
6  asked and answered.
7    THE WITNESS:  I mean, I respect the
8  jury's opinion.  I have a separate opinion in regard
9  to those facts.
10  BY MR. SLATER:
11    Q.    You have not offered an opinion one
12  way or the other as to whether or not the risk of
13  the Prolift was outweighed by the benefit or not.
14  That's not something you've opined on in this case;
15  correct?
16    A.    I've not done a medical assessment of
17  that benefit/risk decision process.
18    Q.    So you're not -- you have no opinion
19  on that issue.  Right?
20    A.    I think I just said no.  Okay.
21    Q.    Okay.
22    If at the trial of this case, the
23  jury agrees with my expert that the risk of this
24  medical device outweighed the benefit before it even
25  went to market, if that's the fact -- I'm asking you

Page 96

1  to assume that fact -- then you would say, well, if
2  that's the fact, this medical device should not have
3  been marketed; correct?
4    MS. KABBASH:  Objection as to legal
5  conclusion, asked and answered.
6    THE WITNESS:  I can't agree to that.
7  I -- in all due respect to juries, I understand
8  their -- their role.  As an expert, just like Dr.
9  Weber, we have our roles, too.  So I can't say I
10  would agree -- I -- I don't agree with her based
11  upon what I've reviewed, notwithstanding what the
12  jury may decide.
13  BY MR. SLATER:
14    Q.    Let me explain to you how this works,
15  and with all due respect to counsel, the question
16  has not been asked and answered and it -- whether it
17  calls for a conclusion or not that the jury's going
18  to have to make a finding on does not preclude me
19  from asking this question, okay, so let me -- let me
20  try one more time with you.
21    If at the trial of this case, the
22  jury finds that the risk of the Prolift outweighed
23  the benefit, before the Prolift was ever launched --
24  I'm asking you to hypothetically assume, in fact,
25  that the risk outweighed the benefit.  You have to

Page 97

1  draw that assumption to answer this question -- if
2  that's the fact that you assume, then the Prolift
3  should not have been marketed; correct?
4    MS. KABBASH:  Same objections.
5    THE WITNESS:  I guess we're going to
6  have a continuing disconnect here, because I think
7  the jury's opinions and their basis for their
8  decision don't necessarily impact my opinions
9  regarding the product.
10    My opinions are what they are.
11  BY MR. SLATER:
12    Q.    All right.
13    You've already told me you did not
14  form an opinion based on the medical assessment of
15  whether or not the risks outweighed the benefit or
16  vice versa.  Right?
17    A.    That's correct.
18    Q.    I'd like you to assume the following
19  facts:  I'd like you to assume that based upon a
20  thorough and objective assessment of the information
21  available to Ethicon Medical Affairs, an objective
22  and reasonable Medical Affairs director would have
23  concluded that the risk of the Prolift outweighed
24  the benefit.  I'd like you to assume that fact.
25    If that is the fact, the Prolift

Timothy A. Ulatowski

Page 98

1  should not have been marketed; correct?
2      A.     You -- I'll have to hear that
3  question again.  Sorry.  If you could repeat that,
4  somebody.
5           MR. SLATER:  Sure.  Read it back to
6  him.  No problem.
7                  - - -
8           (The court reporter read the
9        pertinent part of the record.)
10                 - - -
11          THE WITNESS:  Well, those aren't the
12 facts of the situation.  I think a reasonable
13 Medical Affairs --
14          MR. SLATER:  Move to strike.  Move to
15 strike.  You're wasting my time, with all due
16 respect.  Please answer the question "yes" or "no."
17          THE WITNESS:  I don't think I can
18 answer "yes" or "no."
19 BY MR. SLATER:
20     Q.     You're saying under oath that you
21 can't answer that question "yes" or "no"?
22     A.     That's what I'm saying, sir.
23     Q.     Is it that you can't or that you're
24 refusing to?
25          MS. KABBASH:  Objection.

Page 99

1           MR. SLATER:  Because you know that
2  the answer to the question has to be "yes," so you
3  just don't want to say it; and if that's the truth,
4  you're obstructing this deposition, with all due
5  respect, and not providing truthful testimony.  I
6  just want you to know that.
7           MS. KABBASH:  Adam, are you done?
8           MR. SLATER:  So I'm going to give you
9  one last chance.
10          MS. KABBASH:  No, no, no, before --
11          MR. SLATER:  Can you answer my
12 question, please?  "Yes" or "no."
13          MS. KABBASH:  Hang on, Mr. Utalowski.
14 Adam, I'm going to strike the last statement of
15 counsel.  It is argumentative, harassing, and you
16 don't have the right to tell the witness whether or
17 not he's telling the truth.  That is ultimately up
18 to the jury, so I'm going to ask you to tone down
19 your tone.
20          Feel free to answer the question.
21          MR. SLATER:  Please answer my
22 question "yes" or "no."
23          THE WITNESS:  Please repeat the
24 question.
25                 - - -

Page 100

1           (The court reporter read the
2        pertinent part of the record.)
3                  - - -
4           THE WITNESS:  I think that gets back
5  to one of your other questions, which is, if the
6  outcome of the decision process, benefit/risk
7  decision is, the product is unacceptable, then the
8  product shouldn't be marketed, and I already said
9  yes.
10 BY MR. SLATER:
11     Q.     Okay.
12          You did not evaluate whether or not
13 the author of the clinical expert report for the
14 Prolift did a thorough job in preparing that report,
15 did you?
16     A.     I don't think I opined that.  I
17 certainly reviewed -- looked at the report as a
18 foundation regarding benefit/risk, but, no, I didn't
19 -- I'm not a medical officer, so I didn't evaluate
20 the sufficiency from a medical point of view of that
21 report.
22     Q.     I just want to come back, if I could,
23 to the prior question before that about my
24 hypothetical.
25          The same would hold true for the

Page 101

1  Prolift+M; correct?
2      A.     Yes.
3      Q.     The same would hold true for any
4  medical device; correct?
5      A.     Assuming I understand what "the same"
6  means.  Yeah, if the outcome of the benefit/risk
7  decision by the responsible party at the company is,
8  the product is unacceptable, then it's unacceptable
9  and shouldn't be marketed.
10     Q.     When the Prolift and Prolift+M went
11 through the 510(k) process, the FDA relied on
12 Ethicon to provide information; correct?
13     A.     Well, that's partially true.  I think
14 in a broader sense, if you understand FDA, that,
15 yes, the company submits an application.  FDA brings
16 to the table their experience and training and
17 knowledge, also.
18     Q.     As part of the 510(k) process for the
19 Prolift and Prolift+M, the FDA relied on Ethicon to
20 provide certain information; correct?
21     A.     Yes.
22     Q.     The FDA relied on Ethicon to provide
23 truthful information; correct?
24     A.     Yes.
25     Q.     The -- rephrase.

26 (Pages 98 to 101)

Timothy A. Ulatowski

1       The FDA relied on Ethicon not to omit
2   to provide any material information that was known
3   to Ethicon that was relevant to the questions being
4   asked by the FDA; correct?
5       A.    You got words of "material" and
6   "omitted."  I think as a general statement, yes,
7   that's the case.  As --
8       Q.    As far as --
9       A.    Excuse me -- excuse me --
10          MS. KABBASH:  He just wants to
11  complete his answer.
12          THE WITNESS:  As far as the
13  information may be relevant, I -- you know, I think
14  generally the question -- FDA poses questions.  The
15  company responds.
16          Whether that response is a paragraph,
17  a page, or a textbook, I mean, that -- what is
18  omitted, I think you'd have to look at each question
19  and answer to kind of gauge whether something's
20  material if it was not included.
21  BY MR. SLATER:
22      Q.    To the extent that the FDA asked
23  Ethicon for information and to the extent that
24  Ethicon responded, the FDA was assuming that Ethicon
25  would not omit to provide material information

1   necessary to fully answer the questions with a
2   request for information; correct?  You'd agree with
3   that general statement.  Right?
4       A.    As a general statement.  Materiality
5   has fuzzy parameters, but, yes, as a general
6   statement.
7       Q.    As part of the interaction between
8   the FDA and Ethicon, the FDA assumed that Ethicon
9   would disclose any problems or problematic issues
10  that Ethicon knew about the Prolift or Prolift+M as
11  opposed to waiting to see if the FDA would figure
12  out to ask about those things; correct?
13      A.    Well, I -- difficult question.  I
14  guess you're getting back to the point of
15  materiality, how significant that might be, what
16  impact it might have on the whole process, so I mean
17  there's lots of --
18      Q.    If the material --
19      A.    Excuse me.  I didn't finish -- so
20  there's lots of things that a company has in its
21  files regarding a product.
22          The FDA does not want to see all that
23  dumped on it, so a company has to be somewhat
24  judicious and selective in regard to what material
25  it provides.

1       Q.    To the extent Ethicon had information
2   in its possession that it knew the FDA did not know
3   about and it knew that the FDA would likely place
4   some emphasis on in evaluating the 510(k)
5   submission, Ethicon was duty bound to provide that
6   information to the FDA; correct?
7           MS. KABBASH:  Objection.
8           THE WITNESS:  You got a lot of parts
9   to that one.  Again, I -- I guess all I can say is
10  that a company considers what information to submit
11  from their complete files, considering what points
12  they want to make to FDA, what data they think are
13  going to be relevant to the decision-making process,
14  and then they wait to see whether FDA believes
15  that's satisfactory or whether FDA wants to see
16  additional information.
17          So there may be additional
18  information in their files that would not have been
19  submitted.  I -- I wouldn't be surprised one bit
20  about that.
21  BY MR. SLATER:
22      Q.    Well, you would not condone it if
23  there was information in Ethicon's files that
24  Ethicon knew could have a serious impact on whether
25  or not the FDA would take certain action in response

1   to the 510(k) and for Ethicon to hold that
2   information in its file because it's afraid of a bad
3   result.  Right?  You wouldn't condone that.
4       A.    Again, it's materiality, how
5   significant the information is, so it's kind of a,
6   it depends, depending on what information you're
7   talking about.
8       Q.    Okay.
9           If Ethicon had in its possession
10  information which you would define as material,
11  significant information that would cast significant
12  doubt on whether or not the 510(k) was the
13  appropriate regulatory pathway for the Prolift, it
14  was not acceptable -- if that existed, if that was
15  the facts -- it would not be acceptable for Ethicon
16  to not provide that information to the FDA; correct?
17          MS. KABBASH:  Objection.
18          THE WITNESS:  Well, if I thought it
19  was material.  Of course, the company isn't capable
20  of reading my mind if I were at FDA, so, I mean,
21  they're trying to identify what they think is
22  material and to submit that information; and then
23  FDA evaluates and then will ask questions, if
24  necessary, to get to the points of materiality, that
25  FDA thinks is material.

Timothy A. Ulatowski

Page 106

BY MR. SLATER:
1  Q.    With all due respect, I'm asking you
2  the question as an expert in this case.  You've put
3  yourself on stage as an expert now.  And you would
4  agree with me that if there was information Ethicon
5  had which you as an expert would define as material
6  and significant information and that if that
7  information was given to the FDA, would have had the
8  very real possibility of causing the FDA to reject
9  the 510(k) and forcing Ethicon to go to a PMA
10  process, if that's the fact, you as an expert
11  sitting here right now under oath would say, well,
12  if that's the fact and Ethicon held that information
13  back, that is completely unacceptable; correct?
14     MS. KABBASH:  Objection.
15     THE WITNESS:  I think the answer --
16  the answer is, yes.  Let me just break it down a
17  little bit.  Would I, first -- it's a multipart
18  question.  The first part is what I think is
19  material.
20     Of course, I'm not a clinician.  I'm
21  not a mesh biomedical engineer, so I'm not sure --
22  you know, my view what would be material might be
23  rather limited, so -- but assuming something I
24  thought was material was not provided, I guess I'd

Page 107

1  have a problem with that in regard to the
2  submission.
3     MR. SLATER:  Move to strike after the
4  word "yes."
5  BY MR. SLATER:
6  Q.    Are you aware that there are people
7  who have serious concerns about the fact that people
8  work at the FDA, interacting with manufacturers of
9  medical devices and prescription drugs every day,
10  and then people from the FDA who have done -- let me
11  start over.  I garbled the question.
12     Are you aware that there are people
13  who are critical of the fact that people who work at
14  the FDA for some number of years, making important
15  decisions on whether or not medical devices and
16  prescription drugs can be sold or what warnings are
17  provided or other really important decisions with
18  regard to patient safety, and then those people
19  after they leave the FDA go to work for those very
20  same manufacturers?  Are you aware there are people
21  that are concerned about that?
22     MS. KABBASH:  Objection.
23     THE WITNESS:  I've never spoken to
24  any person like that, but I can't -- I imagine there
25  may be some people like that.

Page 108

BY MR. SLATER:
1  Q.    It's a legitimate concern, isn't it,
2  that the people who are supposed to be safeguarding
3  the public health for the FDA are interacting with
4  large medical device and prescription drug
5  manufacturers, making decisions that impact on the
6  public health, and then turn around when they leave
7  the FDA and go to work for these very same
8  manufacturers?  That -- you can understand that
9  people would be concerned about that.  Right?
10     MS. KABBASH:  Objection.
11     THE WITNESS:  Well, the Congress in
12  its wisdom has identified statute.  FDA's created
13  regulations to control post-employment of people who
14  worked at FDA; and as long as you comply with those
15  requirements, then you can do what -- whatever
16  consulting you want to do.
17  BY MR. SLATER:
18  Q.    Well, you understand that there's
19  some people who think that those protections are not
20  substantial enough and that the public safety is
21  being jeopardized by the fact that people can leave
22  the FDA and go to work for the very companies that
23  are submitting these drugs and devices for review to
24  the FDA.

Page 109

1     MS. KABBASH:  Objection.
2     THE WITNESS:  Well, that's fine.  I'd
3  say, first of all, talk to the Congress because they
4  created the ability for people to do that.
5     And, secondly, who better is able to
6  provide information to manufacturers on how to work
7  your way through the process in order to obtain
8  approval for devices?
9     80-some or more percent of device
10  manufacturers are small manufacturers, 50 or fewer
11  employees, and they don't have a clue how to get a
12  product to market.
13  BY MR. SLATER:
14  Q.    Wouldn't the best person or entity
15  for those companies to ask for help -- wouldn't the
16  best source of information be the FDA itself?
17  A.    There -- there are resources for
18  small manufacturers, but FDA's not there as a
19  consultant.  They take you only as far as they can
20  and then rely upon consultants and others to help
21  the companies along.
22  Q.    There's something known as a
23  Regulatory Affairs professional.  There are some of
24  the people like that who work in Ethicon who never
25  worked for the FDA.  You're not telling me that the

28 (Pages 106 to 109)

Timothy A. Ulatowski

Page 110

1  only people who can understand the process are
2  people who used to work in the FDA, are you?
3  A.  No, I'm not saying that. Everyone
4  brings their particular expertise, backgrounds to
5  the table to help expedite products to the
6  marketplace.
7  Q.  If one or more of the labels for
8  these devices was false or misleading in any
9  particular, that would be misbranding; correct?
10  A.  If that was the final decision by
11  assessment of the facts, yes, that would be a
12  misbranding. That's what misbranding is, in part.
13  Q.  The final -- well, rephrase. Do you
14  know -- well, rephrase.
15  It was Regulatory Affairs that had
16  the ultimate decision making as to whether or not
17  the disclosure of risks with the Prolift and
18  Prolift+M was sufficient in the IFU, for example;
19  correct?
20  A.  While I think Medical Affairs had
21  provided input, who the responsible party for the
22  IFU generally probably was Regulatory Affairs, as it
23  is in most companies, but they do not act alone in
24  regard to the content of IFUs.
25  Q.  Regulatory Affairs relied heavily on

Page 111

1  Medical Affairs at Ethicon in deciding what risks
2  and other important information was provided to
3  doctors and patients in the labeling for the Prolift
4  and Prolift+M; correct?
5  A.  That's my understanding, yes.
6  Q.  Therefore, if Medical Affairs failed
7  to disclose to Regulatory Affairs important medical
8  risks such that they did not get into the labeling,
9  that is a failing by Medical Affairs which could
10  have significant impact on patients; correct?
11  A.  Well, the only thing Regulatory
12  Affairs knows is what they know. Regulatory Affairs
13  does rely on Medical Affairs, and what Regulatory
14  Affairs usually does -- what people usually do is
15  also look at predicate labeling, other products, to
16  get a sense of IFUs for similar products.
17  So they rely upon Medical Affairs
18  primarily, but it's not their only source of
19  information.
20  Q.  With regard to the Prolift and
21  Prolift+M, Regulatory Affairs relied heavily on
22  Medical Affairs for medical information so that
23  determinations could be made as to what would be
24  disclosed in the labeling; correct?
25  A.  I've seen deposition testimony to

Page 112

1  that effect, yes. "Heavily," I guess, is a -- you
2  know, interpretable.
3  Q.  You're familiar with the 522 orders
4  that were provided to Ethicon by the FDA; correct?
5  A.  Yes.
6  Q.  Those were issued on January 3, 2012;
7  correct?
8  A.  Thereabouts. I don't recall the
9  exact date. I have to look at my report, but
10  thereabouts.
11  MS. KABBASH: Wait. I'm sorry.
12  Adam, what date did you just say? Can you read back
13  what he just said?
14  MR. SLATER: I thought I said January
15  3, 2012.
16  THE COURT REPORTER: (Court reporter
17  nods head.)
18  MS. KABBASH: He did? Okay. Sorry.
19  I misheard you. Go ahead.
20  MR. SLATER: I may have said the
21  wrong date. If I did, let me know.
22  BY MR. SLATER:
23  Q.  The 522 orders issued by the FDA are
24  important statements by the FDA that the FDA had
25  concern about the safety and effectiveness of the

Page 113

1  devices that those orders covered; correct?
2  A.  Well, the genesis resides -- the
3  foundation for the letters is an underlying concern,
4  yes, but whether or not that concern is borne out
5  depends on the results of the study.
6  Q.  The 522 studies that were ordered
7  with regard to the Prolift and Prolift+M were never
8  performed; correct?
9  A.  That's correct.
10  Q.  Do you know how soon after the 522
11  orders were issued there was internal discussion
12  within Ethicon about whether or not they could avoid
13  doing the 522 studies by withdrawing the Prolift and
14  Prolift+M from the market?
15  A.  I don't recall -- it may be in my
16  report, references to some e-mails or something, but
17  there was discussion of the impact of the 522
18  orders, yes.
19  Q.  As you sit here now, do you know how
20  soon after the 522 orders were issued it was that
21  Ethicon internally began to discuss the possibility
22  of avoiding the 522 studies by withdrawing the
23  Prolift and Prolift+M from the market?
24  A.  I don't know exactly. I don't know
25  if my report talks about that specifically. I could

Golkow Technologies, Inc. - 1.877.370.DEPS

Timothy A. Ulatowski

Page 114

1   turn to it, but I don't recall specifically.
2         Q.      Do you have any information as to why
3   it was that Ethicon changed the indications for
4   Gynemesh PS to indicate that it should only be
5   placed abdominally and no longer should be placed
6   through the vagina?
7               MS. KABBASH:  Objection.
8               THE WITNESS:  I seem to recall that
9   was the case.  I don't recall the wherewithal or the
10  foundation for that.
11  BY MR. SLATER:
12        Q.      You certainly offered no opinions
13  with regard to that subject; correct?
14        A.      I don't believe so.
15        Q.      You certainly don't hold any opinions
16  with regard to what the results would have been if
17  the 522 studies had actually been performed for the
18  devices; correct?
19        A.      No, I don't, nor -- I'm not sure how
20  I could in any -- or anyone could, for that matter,
21  talk about those.
22        Q.      You don't hold any opinion on that
23  subject; correct?
24        A.      No, I do not.
25        Q.      When Ethicon was granted 510(k)

Page 115

1   clearance for the Prolift, was that clearance
2   contingent on Ethicon issuing a revised IFU and a
3   patient brochure in compliance with the dialogue
4   that had occurred prior to clearance?
5         A.      Part of the process was -- were
6   changes to the IFU.  Ethicon already had some stuff
7   in the IFU that FDA had requested, but Ethicon had
8   to amend the IFU and the patient brochure, yes.
9   That's part of the FDA's expectation as far as the
10  clearance is concerned, the formal clearance.
11        Q.      The review of the Prolift and
12  Prolift+M that actually took place as part of the
13  510(k) process was not as robust or detailed as what
14  information would have been generated if the -- if a
15  premarket approval process had taken place; correct?
16        A.      Could you repeat the question?
17        Q.      Sure.
18              The process that took place with the
19  510(k) for the Prolift and Prolift+M, the review by
20  the FDA was not as robust or detailed or extensive
21  as what would have occurred if it had been a PMA, a
22  premarket approval, process; correct?
23        A.      Well, there's some elements of the
24  PMA process that aren't involved in the 510(k)
25  process; but as far as the rigor of

Page 116

1   scientific/medical review, I think it was probably,
2   in my estimation, based upon my review of the
3   documents, I think every bit as robust as a PMA
4   review.
5         Q.      What elements were not included in
6   the 510(k) process that would have been part of a
7   PMA?
8         A.      Well, one thing, there's a review by
9   a panel of all PMAs, virtually all PMAs.  That
10  occurs after FDA's substantive review, so FDA's --
11  of a PMA.
12              So FDA's substantive review of a PMA
13  takes about -- takes about 90 days, 80, 90 days --
14  not totally 90 days, but the timeframe is the same
15  timeframe as a 510(k).  So FDA's reviews both ways
16  are virtually equivalent, PMA/510(k).
17              Now, there's some more information in
18  a PMA that's submitted than a 510(k), increases the
19  PMA review time a little bit, all the manufacturing
20  information, for example.
21              PMA may include prospective clinical
22  studies that 510(k)s may not include.  This
23  submission had reference to clinical data which was
24  evaluated.  So I think for a 510(k), this is --
25

Page 117

1   this is a pretty thorough, robust 510(k) and review
2   process.
3         Q.      Okay.  Here's my question.  It's very
4   simple:  If a PMA process had been followed for the
5   Prolift and Prolift+M, additional information would
6   have been reviewed and additional steps would have
7   been taken; correct?
8         A.      Yes.
9         Q.      One of the additional steps would
10  have been review by a panel; correct?
11        A.      Yes.
12        Q.      More information would have been
13  included in the PMA application than was included in
14  the 510(k); correct?
15        A.      Yes, such as the manufacturing volume
16  that's submitted.
17        Q.      There would have been additional
18  information with regard to clinical studies as part
19  of a PMA process as compared to a 510(k); correct?
20        A.      There's typically need for clinical
21  data in a PMA.  In many cases, it's prospective
22  clinical trials.  In some cases, it's published
23  studies with the device from foreign locations or
24  other clinical information.
25        Q.      Ethicon as part of the 510(k) process

30 (Pages 114 to 117)

Timothy A. Ulatowski

Page 118

1  gave some clinical data to the FDA regarding the
2  Prolift; correct?
3        A.     Yes.
4        Q.     If that data was false or misleading
5  in any way, that would be highly inappropriate;
6  correct?
7        A.     "False or misleading in any way." I
8  -- it would have to be material, I think.  We get
9  back to that issue of materiality.
10       Q.     Okay.
11              If any of the clinical data that
12 Ethicon provided the FDA as part of the 510(k)
13 process was materially false or materially
14 misleading, that would be highly inappropriate;
15 correct?
16       A.     Yes, subject to a medical opinion, I
17 think, or statistical opinion, whatever expertise
18 needs to come to bear to determine materiality.  Not
19 my purview, but just saying what you'd need to
20 establish materiality.
21       Q.     If the clinical data provided by
22 Ethicon to the FDA as part of the 510(k) process was
23 materially misleading or materially false from the
24 standpoint of either medical expertise or
25 statistical expertise, objectively viewed, that

Page 119

1  would be highly inappropriate; correct?
2        A.     If that's the finding by FDA, upon
3  becoming aware of that information, that it was
4  material.  But, you know, that would be the decision
5  -- sometimes information that's omitted and later
6  becomes known, FDA has not considered it to be
7  material themselves.
8        Q.     You, sitting here as an expert in
9  this case, would agree with me that if objectively
10 viewed, from a medical or a statistical viewpoint,
11 the clinical data provided by Ethicon to the FDA was
12 materially misleading or materially false in any
13 way, that would be highly inappropriate; you would
14 give that opinion right now; correct?
15       A.     Well, I -- I guess me, I wouldn't be
16 evaluating the materiality from a statistical or
17 medical point of view.  If I were the Director of
18 Compliance and it was the opinion of the Office of
19 Device Evaluation that, in their view, this
20 information was material to the PMA finding, I'd
21 have a -- I would think -- yes, I would -- I would
22 think that would be important and a problem.
23              So who's making that decision, who's
24 the responsible party for making that determination
25 and, you know, is it material.

Page 120

1        Q.     I would like you to assume that
2  information provided by Ethicon to the FDA as part
3  -- rephrase.
4               I would like you to assume that
5  clinical data provided by Ethicon to the FDA was
6  materially misleading and materially false in
7  certain significant respects.  I'd like you to
8  assume that, that whatever -- however you design
9  those terms, it would meet all of those definitions.
10              You would agree with me as an expert
11 in this case that that would be highly
12 inappropriate; correct?
13       A.     Based on your assumptions and FDA's
14 conclusions that -- by the responsible parties at
15 FDA that it was material, then that would be a
16 problem.
17       Q.     It would be highly inappropriate;
18 correct?
19       A.     If it -- yes, if it was material in
20 their final conclusions.
21       Q.     If Ethicon provided clinical data --
22 well, rephrase.
23              We know that Ethicon provided some
24 clinical data to the FDA regarding the Prolift and
25 Prolift+M.

Page 121

1               If Ethicon had additional clinical
2  data that it knew would cast serious doubt on the
3  safety and/or effectiveness of the Prolift and
4  failed to provide that information to the FDA, that
5  would be highly inappropriate; correct?
6        MS. KABBASH:  Objection.
7        THE WITNESS:  I don't know.  That
8  gets again to the point of materiality and a medical
9  sort of opinion.
10 BY MR. SLATER:
11       Q.     And if it meets that definition in my
12 hypothetical, you would agree that would be highly
13 inappropriate; correct?
14       A.     If FDA's --
15       MS. KABBASH:  Objection.
16       THE WITNESS:  -- conclusion is it was
17 material and important and all the provisos you've
18 provided, I think that would be an issue.
19 BY MR. SLATER:
20       Q.     Do you have any information as to
21 when the new Prolift patient brochure actually went
22 into use, not when it was copy approved, but when it
23 actually began to be provided to physicians and
24 patients after 510(k) clearance?
25       A.     I think, in my report, I talk about

31 (Pages 118 to 121)

Timothy A. Ulatowski

Page 122

1  that episode and have an opinion on that, so --
2      Q.      I'm talking about the patient
3  brochure here --
4      A.      The patient brochure, is that what
5  you said?
6      Q.      Yes.  Do you know when it actually
7  began to be provided to physicians and patients
8  after 510(k) clearance, the new one, the one that
9  was changed after the clearance process?
10     A.      Yeah, sorry.  I was thinking about
11  the IFU.  Patient brochure, I'm thinking four to six
12  months afterwards.
13     Q.      Here's my question -- we know the
14  copy approval date.  That's not what I'm asking you
15  for, though -- I'm asking, do you know when it
16  actually went into circulation, when Ethicon
17  actually started providing it to physicians and
18  patients?
19     A.      The only thing that comes to mind is
20  four- to six-month timeframe for getting the
21  brochures out.  I don't know when it hit the
22  streets.  I thought that was the timeframe.
23     Q.      What do you base your assumption on?
24     A.      The documents I've reviewed,
25  testimony, as far as I recall.

Page 123

1      Q.      Let me tell you why I'm asking the
2  question.  I've been asking a lot of questions in
3  this case of a lot of other people and trying to
4  find out when the patient brochure, the revised
5  patient brochure, actually began to be used, when it
6  actually got circulated to patients and physicians,
7  and no one's been able to tell me.
8             I've been told by the company the
9  best they can tell me is, it was copy approved in
10  October of 2008, but nobody knows when it actually
11  started to get used.
12            I'm asking you, do you have any
13  information beyond that to tell me when it actually
14  went into use?
15     A.      Well, actually, I think what I'm
16  thinking of is, I don't think Prolift+M hit the
17  streets until the following year.
18     Q.      I'm asking about the Prolift patient
19  brochure.
20     A.      Okay.  The Prolift patient brochure,
21  I can't say with certainty.  I know when --
22  Prolift+M took some time before it was actually
23  marketed.  It was the following year when it
24  actually was marketed, was launched, so to speak.
25            As far as when the Prolift brochure,

Page 124

1  I don't know.
2      Q.      Okay.
3             So just to be clear, with regard to
4  my question with regard to the Prolift brochure, you
5  don't know; correct?
6      A.      No, I don't know specifically.
7      Q.      Do you know what patient brochure was
8  used with the Prolift+M when it began to be
9  marketed?
10     A.      What specific edition, version --
11     Q.      Yes.
12     A.      -- is that what you're asking me?
13     Q.      Yes.
14     A.      I don't recall.  I had a listing of
15  -- of labels and edition dates at one time.  I just
16  don't recall what version --
17     Q.      Do you know which Prolift -- I'm
18  sorry.  Do you know which IFU was used with the
19  Prolift+M when it was put on the market?
20     A.      I can't speak to you about specific
21  versions, whatnot.  I'd have to look at a couple
22  records that were provided to me, if that's
23  revealing, in regard to the version and the dates of
24  distribution.
25     Q.      One of the items listed on your list

Page 125

1  of materials is Prolift+M IFU, Plaintiffs' Exhibit
2  14.  Now, that is on the -- I think the fifth page
3  of your materials list -- it is.  It's at the top of
4  the fifth page, second item.
5      A.      And that's Exhibit --
6      Q.      Exhibit 7.
7      A.      7.
8      Q.      7.
9      A.      And the top of page -- I don't think
10  there's numbers on them.
11     Q.      It's about the sixth page in?
12     A.      Okay.
13     Q.      I counted the pages.
14     A.      Okay.  And you're referring to what
15  now?
16     Q.      The second item on the -- well,
17  rephrase.  In Exhibit 7, the second item on the
18  sixth page, it says 5/15 Prolift+M IFU, Plaintiffs'
19  Exhibit 14.  Do you see that?
20            Second item on the page?
21     A.      Yeah, hang on a second.  Two, three,
22  four, five, page six -- the second item.
23     Q.      You know what?  It's the fifth page.
24  I apologize.
25     A.      Okay.  Okay.  I'm with you now.  Yes,

Timothy A. Ulatowski

Page 126

1    I see that.
2        Q.    Okay.
3              Here on the fifth page of Exhibit 7
4    at the top, the second item, it says, 5/15, that's
5    5/15, Prolift+M IFU, Plaintiffs' Exhibit 14.
6              First of all, what's the 5/15 mean?
7        A.    I'd have to look at Exhibit 14.
8    Maybe the date of that exhibit.  I'm not sure
9    offhand.
10       Q.    I have the document in front of me
11   and it has a date of June 11, 2008 in the
12   bottom-right corner so -- you can't tell me what the
13   5/15 means?
14       A.    It may have been a date when I was
15   provided the document.  I can't say with certainty.
16       Q.    And this Prolift+M IFU, was this a
17   document that was of significance to you, the
18   document listed here on this list?
19       A.    I'm sure I considered it in regard to
20   my report.
21       Q.    And did you assume this was the form
22   of the Prolift+M IFU that was used with the
23   Prolift+M when it went on the market?
24       A.    I don't recall.  I'd have to see if I
25   -- how and where I referenced this exhibit.

Page 127

1        Q.    It's the only Prolift+M IFU listed on
2    what you reviewed, so this would be the only one you
3    looked at.  Right?
4        A.    Well, it may be -- there may be other
5    IFUs in exhibits, depositions, so I can't say it's
6    necessarily the only IFU I saw.
7        Q.    As you sit here now, can you tell me
8    if you saw any other Prolift+M IFU?
9        A.    Oh, I'm sure I've seen others,
10   probably in exhibits.
11       Q.    Which ones?
12       A.    Oh, I can't say with certainty.
13       MS. KABBASH:  Hey, Adam, our
14   videographer says that we have five minutes left on
15   the tape.  Can we plan to take a lunch at that point
16   in time?
17       MR. SLATER:  Sure.  I'll ask just a
18   couple more minutes of questions and then...
19   BY MR. SLATER:
20       Q.    If you go back a couple of pages to
21   the third page of this exhibit, your list of
22   materials, about two-thirds of the way down the
23   page, it says, the Prolift IFU --
24       A.    Okay.
25       Q.    -- and then some Bates numbers?

Page 128

1        A.    Yes.
2        Q.    Why did you list that IFU?
3        A.    It probably was provided to me as a
4    separate document along the way.
5        Q.    Did you assume that was the IFU that
6    was actually in use for some period of time?
7        A.    I'd have to see how and where I
8    referenced it in my report.
9        Q.    Did Ethicon make any effort to your
10   knowledge to tell physicians and patients that the
11   Prolift IFU and patient brochure that was in effect
12   as of May 15, 2008 were both going to be changed in
13   material respects?
14       A.    I don't think I've seen records to
15   that effect.
16       Q.    So, therefore, after May 15, 2008,
17   doctors and patients were still being provided and
18   relying on the Prolift IFU and patient brochure that
19   the FDA had told Ethicon they needed to change in
20   certain material respects; correct?
21       MS. KABBASH:  Objection.
22       THE WITNESS:  Well, whatever was
23   being provided was -- was the document that was
24   being provided, so if -- you know, that's what
25   you're asking, I think.

Page 129

1        MR. SLATER:  Why don't we break for
2    lunch now.
3        MS. KABBASH:  Okay.
4        MR. SLATER:  And how long do you guys
5    -- let's get off the video first.  Then we can talk.
6        THE VIDEO TECHNICIAN:  The time now
7    is 1:26.  We are going off the record.  This is the
8    end of disc number one.
9              - - -
10             (A discussion off the record
11             occurred.)
12             - - -
13             (A luncheon recess was taken from
14             1:28 p.m. to 2:23 p.m.)
15       THE VIDEO TECHNICIAN:  The time now
16   is 2:23.  We are back on the record.  This is the
17   beginning of disc number two.
18   BY MR. SLATER:
19       Q.    Mr. Utalowski, on the second page of
20   Exhibit 7, you have a section that says "Other."
21   And right under that, you say you looked at the
22   510(k) notification for Prolene hernia repair mesh
23   and the FDA clearance letter for Prolene mesh.
24             Do you see that?
25       A.    Yes.  Yes.

33 (Pages 126 to 129)

Timothy A. Ulatowski

Page 130

1    Q.    Were those documents of any
2 particular significance to you in forming your
3 opinions in this case?
4    A.    Other than being background for the
5 development of the Prolift, of course, they're
6 important there, but other than that, no.
7    Q.    Okay.
8        You ultimately do not have any
9 opinions as to whether or not the labeling for the
10 Prolift and Prolift+M was adequate or not; correct?
11       In the sense of whether or not risks
12 and other information that needed to be included was
13 included, you're not forming opinions on that
14 question.  Right?
15    A.    I think generally I do have an
16 opinion regarding labeling in terms of meeting
17 regulatory requirements generally.  As far as any
18 specific element that requires a medical assessment,
19 no.
20    Q.    So your opinion essentially is,
21 Ethicon had labeling as required, but you're not
22 forming an opinion as to the actual completeness of
23 the warnings or accuracy of the warnings or anything
24 of that nature which would require medical
25 expertise; correct?

Page 131

1    A.    With that last part of what you said,
2 yes.
3        MR. SLATER:  Just so you know, I'm
4 flipping through some of my notes and trying to cut
5 through some of the questions I might have had to
6 ask.
7        MS. KABBASH:  Okay.
8 BY MR. SLATER:
9    Q.    Okay.
10       Would you agree with me that if a
11 serious adverse event was disclosed to Ethicon, for
12 example, a doctor told somebody in the Marketing
13 Department that he was treating a patient with a
14 significant Prolift complication, that that
15 information needed to be passed on to the FDA by
16 Ethicon?
17    A.    Well, first of all, it has aspects of
18 whether -- first of all, it's a complaint and
19 whether the complaint is reportable to FDA, if
20 that's the point of your question.
21    Q.    Well, take, for example, the
22 following hypothetical scenario:  A doctor tells a
23 marketing executive with a title of product director
24 at Ethicon that he is treating a patient who has a
25 severe adverse event due to a Prolift and that the

Page 132

1 patient has suffered severe injury as a result.
2        Under that circumstance, Ethicon is
3 required by FDA regulations to get that information
4 to the FDA; correct?
5        MS. KABBASH:  Objection.
6        THE WITNESS:  Not -- not completely.
7 First of all, I believe that -- and who is the
8 person at Ethicon you just mentioned was in that
9 conversation?
10       MR. SLATER:  A product -- it's a
11 product director in the Marketing Department.
12       THE WITNESS:  Okay.
13       MR. SLATER:  Overseeing the Prolift.
14       THE WITNESS:  I understand.  Well, I
15 think that interaction would have to be controlled
16 as a complaint, first of all, in Ethicon's complaint
17 system.
18       And then that complaint would have to
19 be evaluated and investigated to obtain more
20 information on that complaint, to document the
21 circumstances, and then a decision rendered whether
22 that complaint was a reportable event as a medical
23 device report to FDA.
24 BY MR. SLATER:
25    Q.    Tell me if I understand correctly.

Page 133

1 If a doctor reported a serious adverse event that
2 resulted from a Prolift to a marketing executive
3 with the title of product director within Ethicon,
4 that -- that would have to be addressed as a
5 complaint in the internal complaint system within
6 Ethicon; it would have to be investigated, and then
7 a decision would have to be made whether this was
8 reportable to the FDA; correct?
9    A.    That's correct.
10    Q.    And the decision as to whether or not
11 it would be reportable, what would be the criteria?
12    A.    The criteria are, is it -- does it
13 meet the -- the definition of a serious injury
14 according to the MDR regulation.  Relatedness has an
15 aspect, as long as it may be related, then that
16 criterion is met; and any interventions that were
17 taken; any outcomes of the patient would be a
18 determining factor whether it was reportable.
19       Any aspect of a malfunction related
20 to the device would be another aspect related to the
21 reportability.
22    Q.    In deciding whether or not a
23 complaint is reportable, the medical device
24 manufacturer has to determine, first, is this a
25 serious injury per the MDL regulation; two, does it

34 (Pages 130 to 133)

Timothy A. Ulatowski

Page 134

1  meet the criteria of, quote, unquote, it may be
2  related to the Prolift -- in this case, that's the
3  device -- three, were any interventions undertaken
4  and what were the outcomes; and then, four, is there
5  any aspect of a malfunction implicated.
6          Those would be the criteria for
7  whether or not it's reportable; correct?
8      A.    Yes.  Primarily, yes.
9      Q.    In my hypothetical scenario, if --
10  well, rephrase.  Let me ask a different question.
11          What's the criteria for whether or
12  not something is a serious injury under the MDR reg?
13      A.    Well, what is a -- what is a serious
14  injury is defined in the regulation, basically
15  affecting structure or function, permanent
16  impairment, an event requiring intervention to
17  prevent a permanent impairment.
18      Q.    If, in my hypothetical scenario,
19  surgery had to be performed on this woman to attempt
20  to treat the injuries that she suffered due to the
21  complications from the Prolift, this would qualify
22  as a serious injury requiring report; correct?
23      A.    Well, in terms of that aspect of it,
24  that certainly is an intervention, I agree with you
25  there.

Page 135

1      Q.    And if an objective view -- if an
2  objective observer looked at this and said it,
3  quote, unquote, may be related to the Prolift, this
4  would need to be reported to the FDA; correct?
5      A.    Yes, I think that speaks to a
6  reportable event.
7      Q.    You said something earlier.  You said
8  if there's any aspect of a malfunction, that would
9  be something to look at.  Is a malfunction defined,
10  in simple terms, as the failure to operate or
11  perform as intended?
12      A.    That's basically it.  It -- does it
13  perform as intended, does it meet its
14  specifications, yes.
15      Q.    The Prolift is not intended to erode
16  through the vaginal wall into the vagina, is it?
17          MS. KABBASH:  Objection.
18          THE WITNESS:  We're talking about
19  intended use, and that is, does it serve as a
20  support -- organ support in terms of pelvic organ
21  prolapse.
22          Now, there are adverse events that
23  are attendant to the product, so specifications,
24  problems would be, did it tear, did it fail in some
25  form, in some untoward means.

Page 136

1          Erosion, I don't know if that would
2  be a malfunction, per se.
3  BY MR. SLATER:
4      Q.    The Prolift is intended to provide
5  support for prolapsed pelvic organs; correct?
6      A.    Yes, correct.
7      Q.    If after the placement of a Prolift a
8  recurrence happens and the woman's prolapse returns,
9  that would be the failure of the device to operate
10  as intended; correct?
11          MS. KABBASH:  Objection.
12          THE WITNESS:  I think that would have
13  to be evaluated to determine the causation, so some
14  medical opinion, medical assessment of that.
15          It could have -- the failure could be
16  caused by issues not related to the -- to the mesh.
17  It could be -- well, I don't even want to speculate.
18  That's a medical assessment.
19  BY MR. SLATER:
20      Q.    If a recurrence of prolapse were to
21  result from something inherent to the mesh itself,
22  for example, that due to scar tissue formation,
23  there was contraction of the mesh, which led to
24  inadequate coverage of the defect and thus a
25  re-prolapse occurred, that would be a failure of the

Page 137

1  Prolift to perform as intended; correct?
2      A.    Well, one thing that has to be
3  connected to the malfunction is serious injury,
4  again, or the potential for serious injury, so it
5  has --
6      Q.    I'm not asking about reportability
7  here.
8      A.    No --
9      Q.    Wait.  I'm not asking about
10  reportability here.  I'm just asking the definition
11  of malfunction.
12      A.    Yes, and I'm getting to that point.
13  The definition of malfunction has an element of
14  serious injury or death, the probability of serious
15  injury or death, a connection to serious injury or
16  death.  A malfunction is not reportable otherwise.
17          So the point I was going to make --
18      Q.    I'm not asking you about
19  reportability, though.
20      A.    I understand you're talking about
21  malfunction -- oh, okay.
22      Q.    So why do you -- so then here's my
23  point.  Let me try to get this cleaned up.
24          As I just posed that question to you
25  a moment ago, that would be a malfunction of the

Timothy A. Ulatowski

Page 138

1  Prolift; correct?
2      A.     Well, and the point I'm making is,
3  are we talking about malfunction as defined in the
4  medical device report -- reporting regulation?
5  Because in that regulation, malfunction is defined
6  as well, and malfunction is defined also in
7  connection to serious injury or death related to the
8  malfunction.
9          So it's -- it's -- there's a
10 connection there.
11     Q.     So is malfunction defined in
12 different ways under different circumstances, for
13 example, whether or not you're considering
14 reportability?
15     A.     Yeah, there has to be potential for
16 death or serious injury should the malfunction
17 recur, so you have to have some assessment, some
18 connection, to a, for example, serious injury
19 related to that episode.
20     Q.     For the malfunction to be reportable.
21     A.     That's correct.
22     Q.     Is there another definition of a
23 malfunction that does not include the serious injury
24 or death language, where you're just tying to define
25 whether or not a malfunction occurred?

Page 139

1      A.     Oh --
2      Q.     Let me ask it differently.  You can
3  have a malfunction without, quote, unquote, serious
4  injury or death; correct?
5      A.     Yes.
6      Q.     The question of whether or not the
7  malfunction needs to be reported, you'd have to
8  determine whether there was serious injury or death
9  or the potential for serious injury or death;
10 correct?
11     A.     Correct.
12     Q.     So in the example I gave you a few
13 moments ago, just in terms of whether or not a
14 malfunction occurred, that would be a malfunction;
15 correct?
16     A.     What was your example again?  Let's
17 go back to that.
18     Q.     Okay.
19          I gave you an example a moment ago of
20 a recurrence that occurred where there was
21 contraction of the mesh which led to inadequate
22 coverage of the defect -- let me rephrase it.
23          I gave you the example -- one second.
24          (Pause.)
25 BY MR. SLATER:

Page 140

1      Q.     I gave you the example a moment ago
2  of contraction of the Prolift mesh leading to a lack
3  of coverage of the prolapsed organ -- the organ that
4  had been prolapsed before, leading to a recurrence
5  of the prolapse.
6          If that were to occur, that would
7  meet the definition of a malfunction; correct?
8      A.     Well, you're saying the definition of
9  a malfunction.  What definition are we using now?
10 It would meet the --
11     Q.     The product did not perform as
12 intended.
13     A.     It would meet the definition of
14 malfunction under the medical device reporting.  I'm
15 also thinking of the quality system regulation as a
16 -- there's probably some aspect of malfunction there
17 related -- or lack of performance as intended.
18          But -- but generally -- is it a
19 malfunction?  You know, I don't know.  That might
20 require medical assessment, I think, whether that
21 really is a malfunction of the device or -- or some
22 other characteristic of how the device performs in
23 the body.  I just can't say.
24     Q.     No opinion one way or the other.
25     A.     No, no, I think that incurs some

Page 141

1  medical assessment in my mind.
2      Q.     In the definition of a reportable
3  malfunction, there's the term serious injury or
4  death whether it actually occurred or potentially
5  could occur.
6          How -- is serious injury defined --
7  how is that defined --
8      A.     I think we went over --
9      Q.     -- in that context?
10     A.     Well, I think we went over that.
11 There's only one definition of serious injury in the
12 medical device reporting regulation.
13     Q.     Okay.  It's the definition you gave
14 me a few moments ago?
15     A.     Yeah, that's permanent impairment,
16 interventions to require -- to -- to prevent
17 permanent impairment.
18     Q.     So if, in fact, a Prolift was put
19 into a woman, contraction of the mesh occurred, and
20 that led to recurrence of prolapse and the patient
21 then needed additional surgery to both remove the
22 contracted mesh and to treat the re-prolapsed organ,
23 that would be a reportable malfunction; correct?
24          MS. KABBASH:  Objection.
25          THE WITNESS:  I -- I think there's

36 (Pages 138 to 141)

Timothy A. Ulatowski

Page 142

1  still that -- I -- I wouldn't want to opine on the
2  malfunction aspect of the retraction, because I
3  think that -- it's my understanding, lay person's
4  understanding, that retraction, tissue ingrowth, is
5  an element of a lot of mesh surgery, so I'd leave
6  that up to the medical people to consider that
7  aspect of it.
8  BY MR. SLATER:
9        Q.    All right.  You won't be forming any
10  opinion on that one way or the other.
11       A.    No.
12       Q.    If a woman had a Prolift put in her
13  body and the Prolift mesh eroded through her vagina
14  and, in addition, as a result of the erosion of the
15  mesh, there was a lack of support for the prolapsed
16  organ and a recurrence of prolapse occurred, would
17  that be a reportable malfunction or do you have no
18  opinion on that?
19       A.    I think that incurs the need for a
20  medical opinion.
21       Q.    What would be the information you
22  would need from a medical standpoint to be able to
23  answer that question?
24       A.    I think you'd have to ask the medical
25  person assessing as far as what he or she would

Page 143

1  need.
2        Q.    Well, what would be the criteria that
3  you would need to have answered to determine whether
4  it's reportable or not?  What would you need from
5  the medical people information-wise to be able to
6  answer that question?
7        A.    Well, that it was -- it -- there was
8  a serious injury involved, it was -- it may have
9  been --
10       Q.    I just gave you surgery, so -- I just
11  gave you that this patient had to go through
12  surgery.  So we satisfy that element.  Right?
13       A.    Well, that's not the whole definition
14  of a serious injury under the medical device
15  reporting regulation.  Okay?  Serious injury has the
16  element of not only impact.  It also has the element
17  of permanence and intervention, so you have to
18  consider all those aspects.
19       Q.    Wait.  Are you telling me that if a
20  patient suffers an injury due to a medical device
21  like the Prolift, she undergoes surgery, but in the
22  end of the process doesn't have a, quote, unquote,
23  permanent injury, that's not reportable?
24       A.    Well, the point is, surgery to
25  prevent permanent impairment, so that -- those are

Page 144

1  medical opinions.
2        Q.    Okay.  So let's -- so here's what I
3  want -- so I'm learning from you.
4              So you need to know was there surgery
5  performed to prevent permanent impairment or did
6  permanent impairment -- permanent impairment occur.
7  Those are aspects of information you would need.
8  Right?
9        A.    Yes.
10       Q.    What else would you need to know for
11  whether or not this was a malfunction that needed to
12  be reported?
13       A.    Well, you'd have to have some
14  information related to what is the defect that's in
15  regard to the product, that's related to this event,
16  so that would be both medical and perhaps
17  engineering assessment.
18       Q.    And I've told you now that the mesh
19  -- take an example where the mesh eroded through the
20  vaginal wall into the vagina.  So we understand what
21  happened now, so that would lead towards a
22  reportable malfunction; correct?
23       A.    Well, I just -- you're -- you're
24  testing the limits of my medical understanding.  I
25  think erosion -- I don't know if FDA would consider

Page 145

1  erosion in the bin of -- and it was -- and there was
2  intervention, whether they'd consider that in the
3  bin of a serious injury or within the bin of a
4  serious injury and a malfunction.  I don't know how
5  they would categorize that generally.
6        Q.    Well, you do know that the FDA
7  considers erosion of mesh through the vaginal wall
8  to be a serious injury; correct?
9              MS. KABBASH:  Objection.
10             THE WITNESS:  Well, it -- it's -- by
11  the definition of the medical device reporting
12  regulation -- you may be thinking of the term more
13  generally, but I'm talking about the term as it's
14  defined in the medical device reporting regulation,
15  so in what instance are you --
16  BY MR. SLATER:
17       Q.    As the term is defined by the --
18  right, as the term is defined by the FDA, they
19  consider erosion of the mesh through the vaginal
20  wall into the vagina to be a serious injury; or if
21  you want to call it a serious adverse event, either
22  way, the FDA considers it to meet those criteria.
23  Right?
24             MS. KABBASH:  Objection.
25             THE WITNESS:  I'm not so sure about

37 (Pages 142 to 145)

Timothy A. Ulatowski

Page 146

1    that.
2    BY MR. SLATER:
3        Q.    You don't know.
4        A.    I don't know -- I know that --
5        Q.    That's my question, do you know or
6    not?
7        A.    And I was answering your question.
8    The point is, for example, medical --
9        Q.    No, there's really no example.  The
10   question is, do you know the answer or not?  It's a
11   "yes" or "no."  Do you know whether the FDA
12   considers erosion of the mesh through the vaginal
13   wall into the vagina to be a serious injury or a
14   serious adverse event?
15           MS. KABBASH:  Objection.
16           THE WITNESS:  I don't know.
17           (Pause.)
18           THE WITNESS:  I mean, that's a
19   standing question, so let me just add that, if
20   there's no intervention and there's spontaneous
21   healing, it's not a serious injury.
22           If there's cream applied, that's not
23   considered a -- by FDA an intervention, then there's
24   no serious injury.  So those are the provisos.
25   BY MR. SLATER:

Page 147

1        Q.    If there is surgery performed to
2    treat this eroding mesh through the vaginal wall,
3    then it is serious.  It's a serious injury and it's
4    a serious adverse event; correct?
5        A.    It -- I think it could be, yes.
6        Q.    Well, it actually would be; correct?
7    Not could be, but would be.
8        A.    Well, there's certainly an
9    intervention and was the intervention to deter
10   permanent impairment, I mean, that's a -- we're
11   getting to a medical conclusion.
12       Q.    If the answer to -- if the answer to
13   that is yes, then it's a serious injury and a
14   serious adverse event; correct?
15           MS. KABBASH:  Objection.
16           THE WITNESS:  If that's the opinion
17   of the company and/or the FDA, then it would be.
18   BY MR. SLATER:
19       Q.    Just so I don't forget, we had been
20   going through the exhibits a little earlier and I --
21   I want to pick up now with Exhibit 8, if you could.
22   I just want to make sure I cover the last three
23   exhibits before I do some cleanup questions with
24   you.
25       A.    Okay.

Page 148

1        Q.    All right.  What is Exhibit 8?
2        A.    It looks like the contract on this
3    particular litigation, that being POP mesh.
4        Q.    This was your engagement letter?
5        A.    Yes.
6        Q.    And if I understand correctly from
7    your prior testimony, you are currently reviewing
8    the TVT devices --
9        A.    Yes.
10       Q.    -- and analyzing regulatory issues in
11   connection with those devices?
12       A.    Yes.
13       Q.    The testimony you've provided to me
14   in terms of definitions and process and procedure
15   and how those things would apply to the Prolift in
16   general, that would also apply to the TVT devices;
17   correct?
18           MS. KABBASH:  Objection.
19           THE WITNESS:  Generally, yes.
20   BY MR. SLATER:
21       Q.    Okay.  Let's look at Exhibit 9 now,
22   if you could tell me what Exhibit 9 is, please?
23           MS. KABBASH:  They might be out of
24   order.  There you go.
25           THE WITNESS:  9 is the two-page PDF

Page 149

1    on my prior testimony, deposition and court
2    testimony.
3    BY MR. SLATER:
4        Q.    On the second page, there's two
5    trials listed.  One is the Strum versus DePuy
6    Orthopaedics case.  That just happened this --
7    earlier this year in Illinois; correct?
8        A.    Correct.
9        Q.    And DePuy is the party that you
10   testified for in that case --
11       A.    Yes.
12       Q.    -- correct?  And you understand that
13   DePuy is a company that's owned by Johnson &
14   Johnson.  Right?
15       A.    Yes.
16       Q.    The second case is Brenda F.
17   Kitrosser versus Nuvasive, Inc.  When did that
18   testimony take place?
19       A.    I think last year sometime, if I'm
20   not mistaken.
21       Q.    What's the issue in that case --
22   sure.  What was the issue in that case?
23       A.    I testified as expert for Nuvasive
24   and Nuvasive's product -- they make several
25   products, but product litigation regarding a spinal

Timothy A. Ulatowski

Page 150

1  device.
2      Q.      Were you giving labeling opinions in
3  that case?
4      A.      Labeling, 510(k), yes, FDA's process.
5      Q.      Tell me if I understand your overall
6  testimony.  I think your overall testimony focuses
7  on whether or not there were processes in place that
8  were followed -- well, rephrase.  Let me ask the
9  question differently.
10         If I understand your overall
11  testimony, it's that certain processes were in place
12  and Ethicon took steps to implement or comply with
13  those processes.  That's -- that's your general gist
14  of your testimony in this case; correct?
15         MS. KABBASH:  Objection.
16         THE WITNESS:  No, I have several
17  opinions -- you mean what we talked about today or
18  what?
19  BY MR. SLATER:
20      Q.      Well, I'm talking about overall --
21  let me ask it more specifically.
22         To the extent that you have opinions
23  that there were processes that were in place,
24  ultimately, you're not offering any specific
25  opinions that would rely in any way on medical

Page 151

1  knowledge or medical expertise.  That's a true
2  statement; correct?
3      A.      That's correct.
4      Q.      Let me ask you a question about the
5  FDA 510(k) process for the Prolift and Prolift+M.
6         Ultimately, the FDA made whatever
7  decisions it made based on the information available
8  to it.  That's a true statement.  Right?
9      A.      You're referring to the 510(k)
10  clearance or what are you referring to?
11      Q.      Yes, 510(k) clearance.
12      A.      It made its decision based upon, as I
13  said before earlier in the day, what's -- as it does
14  for all 510(k)s, it renders a decision based upon
15  what's submitted to it, as well as the information
16  it brings to bear in the particular review process
17  internally, the expertise, the knowledge, the
18  background it has.
19      Q.      You did not offer any opinions to the
20  effect that if there was information that was not
21  provided to the FDA as part of that process, that if
22  that information had been provided, how that would
23  have impacted on the FDA's decision making.  You
24  didn't address any questions on that subject;
25  correct?

Page 152

1      A.      I don't believe I have an opinion in
2  regard to that.
3      Q.      Okay.
4         You offered no opinions, if I
5  understand correctly, that if a PMA process had been
6  initiated for the Prolift and Prolift+M, as to what
7  clinical studies the FDA may or may not have
8  required if that occurred, you didn't offer any
9  opinions on that subject; correct?
10      A.      Not directly.  I opined regarding the
11  rigor and thoroughness of the 510(k) review.
12      Q.      But you did not offer any opinions
13  one way or another as to what clinical studies the
14  FDA may or may not have required if, in fact, a PMA
15  process had initiated with the Prolift and
16  Prolift+M; correct?
17      A.      Well, I didn't go down that
18  theoretical, hypothetical pathway because it didn't
19  occur.
20      Q.      Okay.  So it's not something you
21  opined on; correct?
22      A.      That's correct.
23      Q.      If Ethicon had information in its
24  files which would have indicated that there were new
25  issues of safety and effectiveness for the Prolift

Page 153

1  systems -- I'd like you to assume for this
2  hypothetical that that information existed, but was
3  not provided to the FDA -- you did not offer any
4  opinions with regard to that scenario; correct?
5         MS. KABBASH:  Objection.
6         THE WITNESS:  The only related
7  opinion was in regard to FDA's assessment of the
8  issues in their determination that -- that there
9  were no new issues.
10  BY MR. SLATER:
11      Q.      You would agree with me Ethicon had
12  far more knowledge about the safety and
13  effectiveness of the Prolift than the FDA did;
14  correct?
15      A.      Well, you used the term "far."  I
16  think that companies will have information in its
17  records that go beyond what's submitted to FDA.  As
18  far as far more information, I don't know how to
19  characterize -- how to consider that, I guess.
20      Q.      You did not offer any opinions to the
21  effect that if certain information which was not
22  provided to the FDA had been provided -- how the FDA
23  would have ruled if that information was provided,
24  you did not address that type of scenario in your
25  opinions; correct?

Timothy A. Ulatowski

Page 154

1      A.      No, not directly.  I think that, you
2  know, we're -- at the point when the product was
3  cleared, that FDA was making public health
4  notifications and later had a panel meeting where it
5  became aware of or there was discussion of basically
6  all the information on the table regarding meshes.
7  And they didn't take any regulatory action against
8  any of the meshes, except for the 522 orders,
9  ultimately.
10       So it's an indicator that whatever
11  additional Ethicon had or the industry
12  generally had, it didn't impact the regulatory
13  status of the meshes, per se, as far as their
14  ability to be marketed.
15       MR. SLATER:  Move to strike.
16  BY MR. SLATER:
17      Q.      You did not offer any specific
18  opinions with regard to any particular information
19  -- for example, information that Dr. Weber raised in
20  her report and said, look, this is information that
21  was not provided to the FDA that I think was
22  material.
23       You didn't address anything like that
24  and say, well, in my opinion, it wouldn't have had
25  an impact; you didn't offer such an opinion;

Page 155

1  correct?
2      A.      Well, let me go through my opinions
3  for a moment just to make sure, to be precise.
4       (Pause.)
5       THE WITNESS:  Well, in FDA's review
6  of the 510(k), I think that several of Dr. Weber's
7  points were brought up by FDA even during their
8  review.
9       And I think with the rest, as far as
10  FDA's conclusions were concerned -- for example, FDA
11  themselves raised the issue of, this looks to us
12  like a complex procedure, this looks to us like you
13  need specific training, this looks to us like this
14  and that.
15       So FDA themselves were raising points
16  that Dr. Weber raised; and with their eyes wide open
17  and in view of what Ethicon provided, they decided
18  to clear the product.
19       MR. SLATER:  Move to strike.
20  BY MR. SLATER:
21      Q.      Now, if you could, please, because
22  I'm really trying to wrap this up with you, but I'll
23  go until, you know, midnight if I have to with you,
24  I'd just like you to focus on my question:  You did
25  not offer any opinions with regard to what the FDA

Page 156

1  would or would not have done if additional
2  information that was in FDA -- in Ethicon's files
3  with regard to safety and effectiveness, but that
4  was not provided to the FDA, had been provided;
5  that's just not something you addressed; correct?
6      A.      Well, I guess we'd have to get
7  specific about that.  I mean, what issues, for
8  example?
9      Q.      Well, how about any; you offered no
10  opinion on that subject; correct?
11      A.      I offered an opinion that there were
12  no new issues of safety and effectiveness and FDA --
13      Q.      Well, you said that that's what the
14  FDA decided, but you didn't offer the opinion there
15  was no issues of safety and effectiveness because
16  you're not qualified to offer that opinion; correct?
17      A.      Well, I --
18      Q.      That's a medical opinion.  Right?
19      A.      Well, I assessed what FDA evaluated,
20  what information was provided, how they assessed
21  that; and I think some plaintiffs' expert or experts
22  opined that there were new issues.  Well, FDA's
23  making a determination there are no new issues.
24      Q.      Well, you know what, Mr. Utalowski?
25  You know very well that the FDA didn't have all the

Page 157

1  information available to it that Ethicon had
2  available with regard to safety and effectiveness.
3  You know that.  Right?
4      A.      I think I've already stated that a
5  company doesn't drive the truck up to FDA with all
6  its files and dump them off at FDA.  They have to be
7  selective and judicious, as I mentioned, in regard
8  to what --
9      Q.      Well, selective and judicious does
10  not include -- hang on.
11       Selective and judicious does not
12  include withholding material information, does it?
13      A.      Well, we already talked about that
14  kind of ad nauseam, yeah, what is material --
15      Q.      Well, I'm sorry if I'm boring you,
16  but I'm going to continue my deposition --
17       MS. KABBASH:  Move to strike.
18       MR. SLATER:  -- ad nauseam.
19       THE WITNESS:  We've talked about
20  materiality.  We've talked about in whose opinion is
21  it material.  So, you know, what is material?
22  BY MR. SLATER:
23      Q.      If in fact -- well, rephrase.
24       The bottom line is, there's no
25  opinion you've ever drawn, and it's not an opinion

40 (Pages 154 to 157)

Timothy A. Ulatowski

Page 158

1  you're drawing now, that if a specific piece of
2  information that was not provided to the FDA as part
3  of the 510(k) process had been provided, how that
4  would have or would not have impacted the FDA's
5  decision on 510(k).  That's not something you've
6  addressed; correct?
7      A.    I don't have a specific opinion that
8  goes into that degree of detail, if that's what
9  you're asking.
10      Q.    That's what I'm asking.
11      A.    I have a general opinion that FDA
12  asked questions about new types of issues that Dr.
13  Weber and others raised that FDA also raised and put
14  to rest.
15          MR. SLATER:  Move to strike.
16  BY MR. SLATER:
17      Q.    With regard to my question, you have
18  no opinions on that specific question; correct?
19      A.    No, I just opine that FDA found no
20  new issues.
21          MR. SLATER:  Move to strike after
22  "No."
23  BY MR. SLATER:
24      Q.    The FDA's decision as to whether
25  there were new issues of safety and effectiveness

Page 159

1  could have been -- I'm not asking you whether it
2  would have or not, but it could have been impacted
3  if additional information had been provided by
4  Ethicon on that subject.
5          You don't know one way or the other,
6  but it's theoretically possible.  Right?
7          MS. KABBASH:  Objection; calls for
8  speculation.
9          THE WITNESS:  I can't say.  I -- you
10  know, part of that's a medical/engineering
11  assessment, I suppose.
12  BY MR. SLATER:
13      Q.    Not something you're opining on;
14  correct?
15      A.    Not engineering or medical/technical
16  aspects, no.
17      Q.    If Ethicon -- well, rephrase.
18          If new issues of safety and
19  effectiveness existed with the Prolift as compared
20  to Gynemesh PS, then a PMA would have been required;
21  correct?
22      A.    If -- I think this answers your
23  question.  If -- the answer is yes.  Short answer is
24  yes.  If new issues -- if there are new types of
25  issues and that's the conclusion of FDA, then you're

Page 160

1  not equivalent.
2      Q.    And if it's a matter of fact -- well,
3  rephrase.  I'll ask you a hypothetical.
4          I'd like you to assume that when one
5  compares Gynemesh PS, as it was marketed at the time
6  the Prolift 510(k) process took place, and you
7  compare that to the Prolift and Prolift+M in terms
8  of how that was ultimately marketed, if there were
9  new issues of safety and effectiveness with regard
10  to the Prolift and Prolift+M as compared to Gynemesh
11  PS, if that was the fact, a PMA was required;
12  correct?
13      A.    If that was the conclusion of FDA,
14  then a -- it would -- the 510(k) will be not
15  equivalent, then the company had their options.
16      Q.    Well, based on the standards and the
17  regulations, if that was the fact, then a PMA would
18  be required; correct?
19      A.    Well, a company can try and remedy
20  the finding by FDA.  They can submit a
21  reclassification petition.  There's a couple of
22  options.  They can appeal the decision.
23          So there's several options --
24      Q.    This is what I'm asking you:
25  Objectively, if my hypothetical is correct and there

Page 161

1  were new issues of safety and effectiveness with
2  regard to the Prolift and Prolift+M versus Gynemesh
3  PS, if that was the fact, objectively speaking,
4  applying the regulations, a new -- a PMA would be
5  required; correct?
6      A.    Maybe we're on the same page.  What
7  I'm saying is, yes, if FDA -- let me say, if FDA
8  makes the determination that there's new types of
9  questions with the new product compared to the
10  predicate or predicates, then you're not equivalent,
11  the product is not equivalent.  That's the FDA's --
12      Q.    You keep saying if the F --
13      A.    That's the FDA's determination.
14      Q.    You keep saying if the FDA decides
15  this -- you keep saying if FDA decides this.  I'm
16  not asking you that question.  You -- I'm speaking
17  to you as the expert Ethicon's put up in this case.
18  If.
19          My hypothetical is accurate, by
20  virtue of the regulations, that would require a PMA
21  for the Prolift and Prolift+M; correct?
22      A.    Well, FDA's the final arbiter here.
23  People may think there's new --
24      Q.    Well, I'm asking you as the expert --
25  but I'm asking you as the expert or are you saying

41 (Pages 158 to 161)

Timothy A. Ulatowski

Page 162

1  you don't have an opinion one way or the other?
2      A.    Well, some of the aspects require
3  medical/engineering assessment.  For example --
4      Q.    Wait.  Hang on.  I don't want
5  examples.  Hang on.  I don't want examples.
6          If, based on all the medical
7  assessments, there were new issues of safety and
8  effectiveness for the Prolift and Prolift+M versus
9  Gynemesh PS, if that was the fact, then you can tell
10  me as the expert for Ethicon that, based on the
11  FDA's regulations, a PMA would have been required
12  for Prolift and Prolift+M; correct?
13          MS. KABBASH:  Objection.
14          THE WITNESS:  I guess we're going to
15  agree to disagree, because that's FDA's
16  determination in the final --
17  BY MR. SLATER:
18      Q.    So you can't form the opinion one way
19  or the other.
20          MS. KABBASH:  Objection.
21          THE WITNESS:  Well, I can tell you
22  that FDA raised issues about potential new issues
23  and put them to rest.
24          MR. SLATER:  Move to strike.
25  BY MR. SLATER:

Page 163

1      Q.    Can you answer my question?  Or can't
2  you answer my question?
3      A.    Your question as posed is -- is not
4  appropriate in the regulatory sense, because it's
5  not for me to determine --
6      Q.    Well, I don't think you understand --
7  I don't think you understand.  I'm questioning you
8  as an expert.
9          You've put yourself up as an expert
10  in this litigation and said, here, I am Mr.
11  Utalowski.  I'm an expert on the FDA regulatory
12  process.
13          So you're supposed to be competent to
14  understand what the regulations would require, so
15  under that circumstance, you should be able to
16  answer this question with a simple "yes" or "no."
17          If, based on medical assessment, it
18  was proven that there were new issues of safety and
19  effectiveness for the Prolift and Prolift+M versus
20  Gynemesh PS as those devices were marketed, a PMA
21  would be required; correct?
22          MS. KABBASH:  Objection and move to
23  strike statement of counsel.
24          THE WITNESS:  And whose medical
25  opinion are we using here?

Page 164

1          MR. SLATER:  A medical opinion that
2  is objectively accurate.  Part of my hypothetical,
3  it's a credible, objective medical opinion.
4          THE WITNESS:  People may opine that
5  there's new issues.  The ultimate arbiter is FDA.
6  BY MR. SLATER:
7      Q.    Well, if, in fact, there were new
8  issues, the regulations would require the filing of
9  a PMA; correct?
10      A.    Well, your point is, if, in fact,
11  there were new issues.  That's for FDA's final
12  determination as the final arbiter.
13      Q.    And you're not able to say to me that
14  if new issues are shown, that a PMA would be
15  required based on what the regulations say?
16      A.    If FDA identified new issues -- and
17  that's part of the decision process, the regulatory
18  decision process -- they make that determination --
19      Q.    So you can't answer the question.
20          MS. KABBASH:  Objection.
21          MR. SLATER:  So you can't answer the
22  question.
23          MS. KABBASH:  Objection.
24          MR. SLATER:  You don't have an
25  opinion one way or the other.  Is that what you're

Page 165

1  telling me?
2          MS. KABBASH:  Objection.
3          MR. SLATER:  You'd have to know what
4  the FDA was going to do in order to answer that
5  question; is that what you're telling me?
6          THE WITNESS:  Well, I observed that
7  FDA raised questions about potential new issues and
8  put them to rest.
9          MR. SLATER:  Move to strike.
10  BY MR. SLATER:
11      Q.    You keep saying that.  I keep
12  striking it because it's completely nonresponsive.
13  I don't appreciate it.  Please endeavor to answer my
14  questions directly.  It will -- everything will go
15  much more smoothly and we'll get done soon, so I'm
16  going to ask my question one more time in hope that
17  at this point we can break the logjam.
18          Take my hypothetical.  If you were
19  satisfied as the expert in this case that from a
20  medical standpoint, there were new issues of safety
21  and effectiveness for the Prolift and Prolift+M as
22  compared to Gynemesh PS, if you were satisfied of
23  that, you would say, as an expert on the FDA
24  regulations, that the regulations would require a
25  PMA; correct?

42 (Pages 162 to 165)

Timothy A. Ulatowski

Page 166

1     A.    If I had opined -- assessed the
2  information and opined that there were new issues,
3  in my report, if I opined that, that I believed
4  there were new issues, then I would probably
5  indicate that perhaps FDA would have found the
6  product not equivalent, which they didn't do.
7         MR. SLATER:  Move to strike.
8         I'm sorry, but is there a reason why
9  you won't just give me a direct answer to the
10  question?  Because I'm, actually, with all due
11  respect, getting kind of tired of this.
12        And I'll tell you why:  Because you
13  keep telling me what decision FDA made and you
14  understand one of the claims in this case, if it
15  ever comes up, if you're -- if Ethicon ever tries to
16  parade the clearance out, is to point out to the
17  jury all the important information Ethicon hid
18  behind its doors and didn't tell the FDA about how
19  dangerous they knew the Prolift was.  Okay?  So you
20  know that that's part of the case.
21        And you keep parading, though,
22  despite that, that the FDA didn't think there were
23  big -- any issues, when you know for a fact that my
24  position is that they didn't tell the FDA the truth
25  and they withheld a lot of really important

Page 167

1  information.
2         So please stop going back to what the
3  FDA did on what I am going to prove to the jury, if
4  put in the position of having to prove it, was a
5  false presentation and what I would call fraudulent
6  presentation to the FDA.  Okay?
7         So let's -- that's why I keep
8  striking your answer, so please stop telling me what
9  you wrote in your report.
10        We're going to try it one more time.
11  I'm going to ask the question again.
12  BY MR. SLATER:
13     Q.    If you as the -- you call --
14  rephrase.
15        You, if you were satisfied, based on
16  medical evidence, that there were new issues of
17  safety and effectiveness for the Prolift and
18  Prolift+M as compared to Gynemesh PS, you would tell
19  me as an expert that, under the FDA regulation, a
20  PMA would be required; correct?
21     A.    Well, first of all, based upon
22  medical evidence, I'm not a clinician, so I wouldn't
23  be in a position to assess medical evidence to
24  render a decision that there's a new issue.
25     Q.    If somebody that -- if you --

Page 168

1  rephrase.
2         If as a matter of -- I'm going to ask
3  you the hypothetical differently:  If as a matter of
4  fact there were new issues of safety and
5  effectiveness for the Prolift and Prolift+M versus
6  Gynemesh PS -- I'm asking you to assume that fact --
7  you would tell me as an expert, if that's the fact,
8  the accepted fact, then the FDA regulations would
9  have required a PMA for Prolift and Prolift+M;
10  correct?
11     A.    I -- I'll take it as far as, I may
12  consider there to be new issues.  But, I mean, the
13  regulations clearly indicate that that's FDA's
14  determination, not mine, not Dr. Weber's, or
15  anyone's, to determine what they consider to be new
16  types of issues, and only FDA makes that decision,
17  so -- and they did not decide that.
18     Q.    So that's not an opinion -- oh, my
19  gosh.  Move to strike.
20        That's not an issue you're going to
21  offer an opinion on one way or the other; correct?
22     A.    No, only to the effect that FDA made
23  the determination there were no new types of issues,
24  which I have in my report.
25        MR. SLATER:  Move to strike -- yeah,

Page 169

1  move to strike.
2         Did you not hear what I just said to
3  you three minutes ago?  I tried to be pretty
4  emphatic about it, so I'm not really sure what
5  you're trying to accomplish by continually talking
6  about what the FDA decided based upon what I would
7  tell you is a fraudulent presentation of information
8  to the FDA --
9         MS. KABBASH:  Adam --
10        MR. SLATER:  So do me a favor, don't
11  -- Maha, you know, with all due respect, do me a
12  favor, Mr. Utalowski, please don't refer to that
13  again unless I ask you about it, because I'm not
14  asking you about what information was provided to
15  the FDA in the actual 510(k).  I'm not asking you
16  that.
17        MS. KABBASH:  Adam, can I ask you --
18        MR. SLATER:  But you keep talking
19  about it.
20        MS. KABBASH:  I have a request for
21  you:  Could you just state for Mr. Utalowski again
22  precisely the issue that you're asking whether or
23  not he expects to have an opinion for at trial one
24  way or the other?
25        MR. SLATER:  Sure.

43 (Pages 166 to 169)

Timothy A. Ulatowski

Page 170

1        MS. KABBASH:  Can you restate that?
2        MR. SLATER:  Sure.
3        MS. KABBASH:  Because I would benefit
4  from hearing that again.
5  BY MR. SLATER:
6        Q.    I'm going to offer you a hypothetical
7  and ask you to answer it "yes" or "no" or "I have no
8  opinion":  If, in fact, based on medical evidence,
9  it was proven that there were new issues of safety
10 and effectiveness for the Prolift and Prolift+M as
11 compared to Gynemesh PS, if that was the fact -- and
12 I'm asking you to accept it and assume that to be
13 true -- would you agree with me that FDA regulations
14 would have required a PMA to be filed for the
15 Prolift and Prolift+M?
16       Three answers you can give me, "yes,"
17 "no," or "I have no opinion."
18       A.    I don't think I can answer "yes" or
19 "no."  It's the way you're asking your question.
20 You're asking if a medical -- there's a medical --
21 well, whose medical opinion?  Your expert's opinion?
22       Q.    A medical opinion that everybody in
23 the world would believe to be accurate, objectively
24 viewed.
25       A.    And there's no opposing opinion?

Page 171

1        Q.    No, there's no opposing opinion
2  that's credible.
3        A.    Well, I think that's where we have
4  the impasse, because there -- there are differences
5  of --
6        Q.    It's a hypothetical.  I can set the
7  rule -- no, no, no.  This is what you gotta
8  understand about the litigation process:  I make my
9  hypothetical.  You're stuck with it and you have to
10 answer the question in the context of the
11 hypothetical.
12       A.    Then I can't answer your question.
13       Q.    So based on my hypothetical -- you
14 can?
15       A.    I cannot answer your question then.
16       Q.    So you have no opinion to answer that
17 question; correct?
18       A.    I have no opinion in regard to that
19 question as it's been phrased, no.
20       Q.    If Ethicon deliberately withheld
21 material information regarding the safety and
22 effectiveness of the Prolift and the Prolift+M that
23 would have likely caused the FDA to determine that
24 there were new issues of safety and effectiveness
25 with the Prolift and Prolift+M, that would be a

Page 172

1  violation of FDA law; correct?
2        MS. KABBASH:  Objection.
3        THE WITNESS:  Well, I like that
4  question better, because you're putting the onus on
5  FDA to make a final determination; and I think
6  inasmuch as they make that determination of
7  materiality and the lack of information, then I
8  would -- I would tend to agree with you, yes.
9  BY MR. SLATER:
10       Q.    You referred to the public health
11 notifications and the panel meeting that took place
12 with the FDA.  You referenced that a little bit ago;
13 correct?
14       A.    Yes.
15       Q.    Is it your assumption as an expert in
16 this case that as of the time of the public health
17 notifications and the panel meeting, the FDA was
18 aware of all of the material risks connected to the
19 Prolift and Prolift+M?
20       A.    Well, just my understanding of panel
21 meetings and the expertise on those panels and also
22 FDA's contributing and there's outside --
23 opportunity for outside input at the panel meeting,
24 be it industry, be it patients, be it whoever, that
25 there's a lot of information disclosed at that point

Page 173

1  in time about what's going on with mesh --
2        MR. SLATER:  Move to strike.  Move to
3  strike.
4  BY MR. SLATER:
5        Q.    Is your answer "yes" or "no" to my
6  question as to whether or not you drew that
7  assumption?
8        A.    You have to repeat the question, I
9  guess.  Sorry.
10       MR. SLATER:  All right.  I'm going to
11 ask the court reporter to repeat it to you and
12 listen carefully.  It's a "yes" or "no" question.
13 I'm not asking you why you're giving me the answer.
14 Just give me a "yes" or "no," if you could, please.
15                - - -
16       (The court reporter read the
17       pertinent part of the record.)
18                - - -
19       THE WITNESS:  Well, "all" is pretty
20 inclusive.  I generally say yes, as a general
21 statement.
22 BY MR. SLATER:
23       Q.    You are not offering any opinions in
24 this case as to whether or not the warnings and
25 information about the risks with regard to the

44 (Pages 170 to 173)

Timothy A. Ulatowski

Page 174

1 Prolift or Prolift+M were adequate; correct?
2     A.    At what point --
3           MS. KABBASH:  Objection.
4           THE WITNESS:  At what point in time?
5           MR. SLATER:  At any point in time.
6           THE WITNESS:  Well, after the product
7 was cleared, you had cleared labeling.  That
8 included whatever information was brought to bear
9 during the review process, so -- and that's
10 Prolift+M.
11           Now, Prolift, which was based upon
12 Gynemesh PS labeling, I don't -- I don't think I
13 made an opinion, rendered an opinion, regarding the
14 adequacy of all the ingredients of that labeling.
15 BY MR. SLATER:
16     Q.    And this is what I'm getting at:
17 With regard to whether or not the warnings provided
18 with regard to the risks and adverse events for the
19 Prolift and Prolift+M in its labeling, whether or
20 not that adequately disclosed all of the risks that
21 Medical Affairs in Ethicon knew of, you haven't
22 offered an opinion as to whether or not that
23 labeling with regards to the warnings was adequate
24 or not.  Right?
25     A.    I don't -- because it -- some of that

Page 175

1 incurs a medical position/opinion, no, I don't
2 render a specific opinion regarding that.
3           I do render opinion regarding
4 generally the regulatory elements of labeling and
5 the compliance of the labeling generally with the
6 regulations.
7     Q.    When you offer an -- well, rephrase.
8           Can I just have the beginning of his
9 answer read back, please?
10                     - - -
11           (The court reporter read the
12           pertinent part of the record.)
13                     - - -
14           MR. SLATER:  Okay.  Move to strike
15 from that point forward after the word "that," right
16 after the part that you read back to me.
17           (Pause.)
18 BY MR. SLATER:
19     Q.    You would agree with me that the
20 patient brochure contained promotional information;
21 correct?
22           MS. KABBASH:  Objection.
23           THE WITNESS:  I think we'll have to
24 --
25           MR. SLATER:  Obviously, I'm talking

Page 176

1 about the Prolift and Prolift+M patient brochures.
2 They're promotional in nature to some extent;
3 correct?
4           THE WITNESS:  I don't believe so, not
5 generally as patient brochures, no.
6 BY MR. SLATER:
7     Q.    Did you read the letters and e-mails
8 between the FDA and Ethicon during the 510(k)
9 process carefully?
10     A.    Yes.
11     Q.    Did you read where Ethicon told the
12 FDA that a brochure for Gynecare Prolift+M systems
13 will also be utilized for education and promotion of
14 this device in comparing it to the patient brochure
15 for the Prolift?  Did you read that sentence?
16     A.    I didn't recall that, but,
17 fundamentally, patient brochures are not promotional
18 documents.  They're information provided to patients
19 as part of the process, informed consent process,
20 with the doctor.
21     Q.    Patient brochures are not supposed to
22 be promotional.  Right?
23           MS. KABBASH:  Objection.
24           THE WITNESS:  I guess I'd have to
25 think about that a little bit.  Are they -- are they

Page 177

1 prevented from being promotional?
2           Well, in one sense, I guess they
3 include language regarding options and things like
4 that, so there probably is an aspect of promotion
5 there, but, I mean, it's very subtle.
6 BY MR. SLATER:
7     Q.    Patient brochures are not supposed to
8 be promotional; correct?
9     A.    Informational -- more informational
10 than promotional, not promotional in my experience.
11 I mean, these are documents --
12     Q.    In your --
13     A.    These are documents at the doctor's
14 office to be used in the conversation with the
15 doctor and to select the most appropriate therapy
16 with that patient.
17     Q.    Really?  Do you know that the patient
18 brochure for the Prolift was on the Internet?
19     A.    That's fine.
20     Q.    It's a simple "yes" or "no."
21     A.    I didn't recall that.  It doesn't
22 change what I just said.
23     Q.    Why did you tell me it didn't change
24 what you just said?  Why can't you just answer a
25 question in a direct way, sir?  It's a simple

45 (Pages 174 to 177)

Timothy A. Ulatowski

Page 178

1  question: Did you know before right now that the
2  Prolift patient brochure was on the Internet, that
3  Ethicon put it on the Internet? Did you know that?
4      A.    I don't recall that. I may have
5  known that.
6      Q.    Are you aware that there are times
7  where patients read the Prolift patient brochure not
8  in the context of an informed consent discussion
9  with their doctor? Do you know that that happened
10 at times?
11     A.    I'm not aware of that and I've seen
12 no testimony on that, that I can recall.
13     Q.    Did you know that Ethicon Medical
14 Affairs knew that, in some cases, patients would
15 read the patient brochure, but would not go through
16 every aspect of it with the doctor?
17           It's a simple "yes" or "no." Did you
18 know that or not?
19     A.    I was -- I don't recall any testimony
20 in regard to that.
21     Q.    And all the testimony that you said
22 that you read, did you read it carefully?
23     A.    Did I read what carefully?
24     Q.    The testimony that you read, the
25 testimony you listed in your materials.

Page 179

1      A.    Yes, I did, sir.
2      Q.    You missed the part where the Medical
3  Affairs people said that they knew that patients
4  would, in some instances, read the patient brochure
5  in the context of a discussion with their doctor?
6  You just missed that?
7           MS. KABBASH: Objection.
8           THE WITNESS: I think I said, sir,
9  that I don't recall. It doesn't mean I didn't read
10 it.
11 BY MR. SLATER:
12     Q.    If you selectively cited information
13 in your report so that you would cite only
14 information you thought was favorable to your
15 opinions, as opposed to information that was
16 contrary to your opinions, if the jury makes that
17 finding, should they put any validity into your
18 testimony at all?
19           MS. KABBASH: Objection; calls for a
20 legal conclusion and calls for the expert to form
21 some opinion on what jury instructions should be.
22           MR. SLATER: You can answer the
23 question.
24           THE WITNESS: Repeat the question.
25           MR. SLATER: I'll ask the court

Page 180

1  reporter to read it back.
2             - - -
3           (The court reporter read the
4       pertinent part of the record.)
5             - - -
6           THE WITNESS: I don't know what to
7  make of that question.
8           MS. KABBASH: That makes two of us.
9           MR. SLATER: That's fine -- really?
10 I'll ask it more specifically to you.
11 BY MR. SLATER:
12     Q.    Do you think that you should cite and
13 rely on information selectively just so that you can
14 find -- rephrase.
15           Do you think it's appropriate for you
16 as an expert to just selectively cite information so
17 that you're only citing the information that
18 supports your opinions as opposed to, in a fair and
19 balanced way, evaluating all the information?
20     A.    Well, sir, I don't do that. As you
21 note, for example, I talk about the FDA panel
22 meeting with extractions of their opinions pro and
23 con, so I -- I try and be as balanced as I can.
24 Certainly I don't extract and cut and paste
25 everything in what I've evaluated.

Page 181

1      Q.    You know, do you not, that the IFU
2  for the Prolift was changed over the course of time
3  to include additional risks. You know that. Right?
4      A.    Yes.
5      Q.    If the risks that were added in later
6  years were known in the very beginning, those risks
7  should have been in the IFU from the very beginning.
8  Right?
9      A.    I think that's part of a medical
10 opinion on the basis for their inclusion or
11 exclusion.
12     Q.    Well, if Medical Affairs made the
13 decision to put a risk into the IFU in subsequent
14 years and had exactly the same information available
15 to it before the Prolift ever went on the market,
16 then that information should have been in the
17 Prolift IFU from the very beginning. Right?
18     A.    No, I can't say that. I think
19 there's reasons why information's in the IFUs.
20 There are reasons why information's added to IFUs,
21 so it changes over time.
22     Q.    I need to understand this one. Okay?
23 Even -- that one, I can't understand. Okay? So
24 we're going to have to go through it a little bit.
25           Ethicon added language to the IFU for

Timothy A. Ulatowski

Page 182

1  the Prolift to the effect that one of the risks was
2  pain with intercourse.
3          If the nature, severity of that risk
4  was equally known to Ethicon before the Prolift ever
5  went on the market, it should have been warned about
6  in the IFU from the very beginning.  Right?
7      A.    Well, I examined deposition testimony
8  regarding that item, for example, when there was
9  testimony about what the Medical Affairs staff
10  believed to be the case in regard to that, why or
11  why that information -- why or why not that
12  information was in labeling, so -- and I reference
13  that in my report.
14          Dr. Hinoul, Dr. Robinson --
15          MR. SLATER:  Can you answer my
16  question now -- now I'll move to -- I'm going to
17  strike that.  Now can you just answer my question
18  simply?  It's a "yes" or "no" question.
19          THE WITNESS:  Now repeat the
20  question, please.
21          MR. SLATER:  You can read it back,
22  please.
23              - - -
24          (The court reporter read the
25      pertinent part of the record.)

Page 183

1              - - -
2          THE WITNESS:  That's a medical
3  opinion regarding whether it should have been there
4  originally, why it wasn't there, so that was founded
5  on medical opinion at that time, why it wasn't in
6  there originally.
7  BY MR. SLATER:
8      Q.    So you can't offer an opinion on that
9  question; correct?
10     A.    No, and my report speaks to Medical
11  Affairs' decision making in regard to what was in
12  the original IFU, what was in there, what wasn't in
13  there.
14     Q.    So you have no opinion on that --
15  it's very simple.  So am I correct that you have no
16  opinion on that?
17     A.    I don't have a medical opinion on
18  that, no.
19     Q.    Well, you don't have a regulatory
20  opinion on it either, apparently, because you're not
21  giving me one.  So am I accurate you have no opinion
22  on that issue?
23     A.    Well, the regulatory opinion is
24  somewhat contingent upon the medical assessment of
25  that.

Page 184

1      Q.    So, therefore, you have no opinion;
2  correct?
3      A.    I have no opinion about that.
4      Q.    And, similarly, you have no opinion
5  with regard to any of the risks that were added to
6  any of the labeling for the Prolift or Prolift+M
7  over the course of time as to whether or not those
8  risks needed to be in the original versions of those
9  documents; correct?
10     A.    I don't have an opinion about --
11     Q.    This is basically the catchall
12  question -- this is basically the catchall question
13  on the specific one we just went through.
14          Your answer would be the same for
15  every single one of those things I would show you
16  that were added later to those labeling documents;
17  correct?
18     A.    That's basically the case, yes.
19          (Pause.)
20  BY MR. SLATER:
21     Q.    You offered an opinion that Ethicon's
22  distribution of amended Prolift labeling after
23  clearance was as timely as possible.  That's one of
24  the opinions you offered.  Right?
25     A.    Yes.

Page 185

1      Q.    Now, when you say it was as timely as
2  possible, are you saying the company did everything
3  it possibly could to get that labeling revised and
4  out to doctors and patients as fast as possible; is
5  that your understanding?
6      A.    Yeah, I think everything
7  considered -- I think Ethicon understood that -- I
8  mean, all this was unexpected and certainly
9  unintentional, so -- it wasn't their intention from
10  what I saw that there be this delay, but factors
11  came into play that kind of drew things out.
12     Q.    To be fair, the factors that came
13  into play that you just talked about was one
14  screw-up after another in the process of developing
15  those new IFUs and the timetables they set and then
16  reset and then reset again; it was -- it's all --
17  it's practically a comedy of errors what went on
18  before that IFU finally came out, isn't it?
19          MS. KABBASH:  Objection.
20          THE WITNESS:  Well, in my 38 years of
21  experience at FDA and now working with companies,
22  there's a bureaucracy in companies that has to be
23  dealt with and a process; and things that you think,
24  sir, might take a day or two, in fact, there's --
25  you gotta get the lawyers involved and you gotta do

47 (Pages 182 to 185)

Timothy A. Ulatowski

Page 186

1  all that.  It takes -- it takes an amount of time.
2  BY MR. SLATER:
3       Q.     If Ethicon knew that it was going to
4  take time -- well, rephrase.
5            To the extent that Ethicon knew that
6  there was important information that it was going to
7  add or change from its IFU and patient brochure,
8  while those documents were being revised and
9  prepared, Ethicon had the means to get that
10  important information to doctors, correct, and to
11  patients; correct?
12       A.     Yes, I think, for example, they -- in
13  training, they were talking about these things.
14       Q.     Well, the training wouldn't get to a
15  doctor that had already been trained and had been
16  relying on the Prolift IFU and patient brochure for
17  over three years in all cases.  Right?  There's a
18  lot of doctors that would not hear the new training.
19  Right?
20       A.     I just gave you one example.  There's
21  other means through the sales staff and others to
22  get information out.  So there's vehicles to do it.
23       Q.     Ethicon had the ability, if it so
24  chose, to get the important information about what
25  was being changed in the IFU and patient brochure

Page 187

1  out to doctors right away if it wanted to.
2            It could have done a dear doctor
3  letter.  It could have had its sales representatives
4  pass this information on.  It could have been done
5  immediately and quickly.  Right?
6       MS. KABBASH:  Objection.
7            THE WITNESS:  I'm not so sure it
8  would have been immediate or quick.  I think there's
9  -- no matter what gets issued by a company, be it
10  training, be it dear doctors, be it whatever, that
11  companies have a process for evaluating that
12  information, for getting medical and legal opinion,
13  and that's just the way the process worked, so -- I
14  don't know how long it would have taken.
15  BY MR. SLATER:
16       Q.     When there's -- when there is
17  important medical information about the risks of a
18  procedure or a device like the Prolift and the
19  company knows that the IFU and the patient brochure
20  in circulation are not accurate in some material
21  respects, the company has an obligation to move as
22  quickly as possible, as fast as possible, to get
23  that information to doctors and patients right away,
24  because patient safety can be jeopardized by any
25  unreasonable delay; correct?

Page 188

1       MS. KABBASH:  Objection.
2            THE WITNESS:  I think the process
3  should be moved along.  I think -- if I'm not
4  mistaken, I think even Ethicon informed FDA that
5  there would be some delay here, and FDA didn't
6  express any problem.
7  BY MR. SLATER:
8       Q.     This was a -- this was a 510(k)
9  process the Prolift and Prolift+M went through, not
10  a PMA process; correct?
11       A.     Yes.
12       Q.     If Ethicon left a patient brochure in
13  circulation -- rephrase.
14            As this process unfolded with the FDA
15  in 2007 and 2008, Ethicon recognized that the
16  patient brochure for the Prolift was going to have
17  to be changed in some material respects; correct?
18       A.     Yes, at some point in time in the
19  discussions with FDA.
20       Q.     At that point, there was no
21  requirement that the patient brochure be provided to
22  doctors and patients.  Right?  Ethicon could have
23  stopped printing it and stopped circulating it;
24  correct?
25       A.     Well, I think you want to wait

Page 189

1  certainly till the very, very end of the process
2  with FDA to make sure that, at the last moment, FDA
3  doesn't call you up on the phone and say, wait a
4  minute, you know, in addition, add this or that.
5            So you want to, first of all, make --
6       Q.     That's not what I asked you.  My
7  question was -- move to strike.
8            My question was very simple:  Ethicon
9  could have stopped circulating the patient brochure
10  at the snap of a finger once it recognized that
11  information in that patient brochure had to be
12  changed.  Right?
13       MS. KABBASH:  Objection.
14            MR. SLATER:  They could have stopped
15  --
16            THE WITNESS:  Well, a company could
17  stop --
18  BY MR. SLATER:
19       Q.     -- sending it out to the doctors.
20  Right?
21       A.     A company could stop selling a
22  product, yes.
23       Q.     I didn't say stop selling the
24  product.  I said the company could have stopped
25  circulating the patient brochure at the snap of a

Timothy A. Ulatowski

Page 190

1  finger; correct?
2      A.    Well, the patient brochure goes with
3  the product.
4          MS. KABBASH:  The patient brochure.
5          THE WITNESS:  Oh, the patient
6  brochure, rather.
7          MR. SLATER:  Didn't you tell me that
8  -- sorry.
9          THE WITNESS:  Okay.  Patient -- okay.
10 Patient brochure.
11         MS. KABBASH:  Sorry.  We had a
12 disconnect.
13         THE WITNESS:  Sorry.  A disconnect --
14 the patient brochure could be stopped, yes.
15         But again --
16         MR. SLATER:  You also --
17         THE WITNESS:  Sorry.  I didn't
18 finish -- but the patient brochure was also being
19 assessed by FDA; and until the very last moment of
20 FDA's review, I think, as a company, you probably
21 want to keep moving the current patient brochure
22 until all is said and done by FDA on that brochure.
23 BY MR. SLATER:
24     Q.    If at any point Ethicon knew that any
25 statement in the patient brochure was false or

Page 191

1  misleading in any material way, Ethicon had an
2  obligation not to use that patient brochure;
3  correct?
4      A.    If -- if Ethicon believed any
5  information was false and misleading?
6      Q.    Yes.
7      A.    If that's --
8      Q.    Yes.
9      A.    -- the determination by the
10 responsible party that it's false and misleading,
11 yes, I think that's a problem.
12     Q.    And needs to be not utilized at all;
13 correct?
14     A.    Well, you -- I guess you don't want
15 to keep the patients in the lurch, so -- I'm just
16 thinking of the logistics there.
17         Well, sir, you've got product in the
18 marketplace that's being implanted.  You have to
19 provide them some information.
20     Q.    Well, the product didn't need to be
21 on the marketplace, did it?
22     A.    No, there was no obligation by
23 Ethicon to market the product.  That was their
24 decision.
25     Q.    And if Ethicon had a question about

Page 192

1  whether or not it could -- well, rephrase.
2          And to the extent that Ethicon could
3  not provide an IFU and a patient brochure that was
4  accurate in all respects and was not false or
5  misleading in any respect, they shouldn't have sold
6  the device during a time period when they couldn't
7  do so.  Right?
8          MS. KABBASH:  Objection.
9          THE WITNESS:  That's a lot of "ifs"
10 there.
11         MR. SLATER:  Yeah, let me ask the
12 question differently because it's a convoluted
13 question.
14 BY MR. SLATER:
15     Q.    If Ethicon did not have a patient
16 brochure or an IFU for the Prolift, other than a
17 version that it knew and believed was false or
18 misleading in some material respects, Ethicon should
19 have not sold that device during that time period
20 until it could put out the device with a truthful
21 IFU and a truthful patient brochure; correct?
22     A.    An interesting question.  That's --
23 if -- if Ethicon thought the labeling was false and
24 misleading.
25     Q.    Right.

Page 193

1      A.    You know, a company decision could
2  be, let's get the new IFU and patient brochure out
3  as quickly as possible, we've got product in the
4  doctors' hands, on the shelves, you know, there's a
5  logistics issue there.
6      Q.    Which could be easily solved by
7  sending a dear doctor letter immediately and having
8  the sales representatives tell the doctors
9  immediately, stop using the Prolift until we get you
10 accurate labeling.  Right?
11     A.    Well, sir, then you have to assess
12 the medical impact of that.  Doctors have the mesh
13 on their shelves.  They don't -- they don't have
14 other product, perhaps.
15         So are you going to put a patient at
16 risk, even more risk, than having labeling that may
17 have a statement in there you don't like?
18         I don't know if you're understanding
19 what I'm saying.  Obviously you don't understand
20 patient risk --
21     Q.    No, I don't understand.  Are you
22 telling me that would be the decision the company
23 should actually legitimately make, well, you know
24 what?  It's better to put the Prolift out there on
25 the market and leave it on the market even though we

49 (Pages 190 to 193)

Timothy A. Ulatowski

Page 194

1  know that our labeling is false and misleading in
2  some material ways?
3          You think that that's acceptable for
4  the company to say, that's okay because we want to
5  make sure that people can use Prolifts if they want
6  to put them in their patients?  You think that's the
7  right decision?
8      A.    I think, sir, it's a more complex
9  decision than you're making it out to be, so,
10  medical/legal --
11     Q.    Really?
12     A.    Yes, I think so, sir.
13     Q.    Well, how about this?  See, what
14  you're worried about is the company making money and
15  so let's put that aside for a second.
16     A.    No, no, sir.
17     Q.    No, you are.  Let me go ahead.
18         MS. KABBASH:  Move to strike the
19  statement.
20  BY MR. SLATER:
21     Q.    If the Prolift wasn't on the market,
22  every woman that got a Prolift could have been
23  treated by an alternative procedure; correct?
24     A.    That's a medical decision, sir,
25  between the doctor and the patient.

Page 195

1      Q.    You don't know, as you sit here as a
2  professed expert in this case, that there were
3  alternative procedures to the Prolift; you think
4  that was the only way a woman's prolapse could be
5  treated, with a Prolift, is the only way in the
6  world?
7          MS. KABBASH:  Objection.
8          MR. SLATER:  Is that what you're
9  telling me?
10         THE WITNESS:  No, sir, what I'm
11  saying is, the decision to use a product or not to
12  use a product is a decision between a doctor and a
13  patient.  It's not between her lawyer and the
14  patient.
15         MR. SLATER:  That's not what I asked
16  you about, though -- see, why -- but I never asked
17  you about that, so let's stick with my question.
18  Okay?
19         MS. KABBASH:  Adam, you have five
20  minutes left on the tape.
21         MR. SLATER:  Okay.  Thanks.
22  BY MR. SLATER:
23     Q.    One of the things Ethicon could have
24  done was send out a letter to every doctor and have
25  the sales representatives copy every doctor within

Page 196

1  24 hours, saying, just so you know, that IFU and
2  that patient brochure for the Prolift that you have
3  and that you've been relying on is false and
4  misleading in certain material respects; it's going
5  to take time to get the new ones out, so until then,
6  we're just telling you, there are some aspects of
7  this that you cannot rely on.
8          That could have been done within 24
9  hours and then doctors could have made the decision
10  do I want to still use this device or not.  That was
11  an option that Ethicon had; correct?
12         MS. KABBASH:  Objection.
13         MR. SLATER:  Or -- or -- well,
14  actually, answer that question.  Go ahead.  Stick to
15  that question first.
16         THE WITNESS:  I think it's an option.
17  Was it a feasible option?  Was it justified?  You
18  know, that's another question.
19  BY MR. SLATER:
20     Q.    And, in fact, if Ethicon had taken
21  that option, then the doctors could have made the
22  decision to say, I don't care or to say, you know
23  what, let me find out what this information is
24  that's being changed, because it may impact on the
25  next patient I think about giving a Prolift.

Page 197

1          Maybe there's something in that IFU
2  that I think is true and it turns out it's not or
3  there's some risk that hasn't been disclosed yet
4  that I'm about to learn about that may make an
5  impact on patient care.
6          Then you put the decision in the
7  doctors' hands of what to do.  Right?  That's the
8  best way to handle it.  Right?
9          MS. KABBASH:  Objection.
10         THE WITNESS:  Well, I'll agree with
11  you that the decision to use a product is between a
12  doctor and the patient.  So I agree with you there.
13         As far as the other aspects of your
14  question, we're getting pretty far down the road of
15  getting into the mindset of a doctor and what they
16  believe, don't -- don't know, what they know, so,
17  you know, it's getting somewhat -- maybe too
18  hypothetical here.
19  BY MR. SLATER:
20     Q.    Is it acceptable for a medical device
21  manufacturer to sell a device, accompanied by an IFU
22  that the company knows to be false or misleading in
23  certain material ways, and to also put out a patient
24  brochure at the same time that the company knows to
25  be false or misleading in certain material ways?  Is

Timothy A. Ulatowski

Page 198

1  that acceptable?
2      A.     If the company's made that
3  determination, the responsible party at the company,
4  that it's false and misleading, I think that's a
5  problem.
6      Q.     It's completely unacceptable.  Right?
7      A.     It's not something when I was at FDA
8  that I'd want a company to be doing, if that's their
9  decision, their conclusion regarding their own
10  labeling.
11      Q.     If a company knew its own labeling to
12  be false and misleading in certain material ways,
13  yet used that labeling and continued to sell the
14  device with that labeling, that's an outright
15  violation of federal law.  Right?
16      A.     Well, I guess the premise for your
17  question is, is it false and misleading, has the
18  company determined that, have they made a conscious
19  decision to move that labeling, I think that's a
20  problem.
21          Would it be a violation of law?  FDA
22  will take its own determination as I would -- I
23  would, too, in assessing the labeling, trying to
24  render an opinion whether it was false and
25  misleading, whether I can do that, whether it's a

Page 199

1  medical opinion.
2          So I don't know.  You know, that --
3  that kind of incurs a lot of different
4  considerations there.
5      Q.     Well, if after all that analysis, it
6  was clear in my hypothetical that the company was
7  right, that its labeling was false and misleading in
8  certain material ways, then it's a violation of
9  federal law to sell that device with that labeling.
10  Right?
11      A.     I think it could be.
12      Q.     Well, it would be.  Right?
13      A.     Could be.  I mean, you're talking
14  about materiality, false and misleading.  You know,
15  those are final conclusions.  I don't know what to
16  make of that, really.  If you want to talk about
17  examples maybe --
18      Q.     Well, this is -- this is what I want
19  you to make of it:  Assume that the labeling for the
20  Prolift, the IFU and the patient brochure, was false
21  and misleading in multiple material ways and omitted
22  to provide material information that should have
23  been included.  I'd like you to assume that.
24          And I'd also like you to assume that
25  the information -- that this information was known

Page 200

1  to Ethicon Medical Affairs.
2          Under those circumstances, the
3  Prolift should not have been marketed with that
4  labeling; correct?
5      A.     You know, perhaps.  Some of this
6  information is information that becomes known by the
7  company and they then want to get it into the
8  labeling at the next revision, so, you know, the
9  company tries to cure --
10      Q.     No, no, no, we're not going to go
11  down that road.  Whoa, whoa, whoa, we're not going
12  to go down that road.  We don't have a lot of time
13  here.  Please answer -- I move to strike.  Please
14  answer my question.
15      A.     Well, companies -- companies are
16  trying to improve labeling all the time, so, I mean,
17  what is false and misleading, what needs to be
18  amended or corrected or clarified in labeling -- you
19  know, is it false and misleading?  I mean, those are
20  strong words.
21      Q.     Okay.  I move to strike.  I just gave
22  you a hypothetical.
23          Under the hypothetical, based on your
24  own definitions, the labeling was false and
25  misleading; in certain respects, it omitted to

Page 201

1  provide important material information about risks,
2  which you would define to meet those terms, all that
3  falls in place, so there's no interpretation in this
4  answer.
5          Based on that hypothetical, the
6  Prolift should not have been marketed; correct?  Not
7  with that labeling.  Right?
8      A.     If it's the conclusion of the company
9  that their labeling is false and misleading, by the
10  most responsible party, and the product's not been
11  marketed yet, the labeling shouldn't be sent.
12          If the labeling's out there, they
13  find an issue, there -- an area for improvement, an
14  area for correction, that's usually done in the
15  course of labeling modifications.
16      Q.     If it was known before the Prolift
17  was even launched, then the Prolift should not have
18  been marketed with that labeling; correct?
19      MS. KABBASH:  Objection.
20      THE WITNESS:  Well, what was the
21  conclusion by Ethicon, the most responsible party?
22  Was it that their labeling is false and misleading
23  --
24      MR. SLATER:  I just told you my
25  hypothetical.  Wait.  Sir, I told you, the

51 (Pages 198 to 201)

Timothy A. Ulatowski

Page 202

1  hypothetical remains.
2          The most responsible party, the
3  Medical Affairs director of Ethicon, Women's Health
4  & Urology, the person responsible to know all the
5  important medical information and to sign off on it,
6  knew that the labeling was false and misleading and
7  omitted to provide material information, under that
8  scenario, the Prolift should not have been sold with
9  that labeling; correct?
10          THE WITNESS:  Well, I think we're
11  coming full circle with where you started today, and
12  that's that business about maybe about -- in regards
13  to the business regarding, well, IFUs are in the
14  box, here, there's some statement that this should
15  be in labeling, it didn't get into labeling until
16  two, three years later maybe.  I think that's the
17  angle you're going here.
18          I -- I think if there's a decision by
19  a company that labeling's false and misleading, the
20  product's not been marketed yet, there's an
21  opportunity to make -- to correct that labeling, the
22  feasibility, the logistics, then you do it.
23          If the -- if the truck's left and the
24  product's distributed, then you gotta take a
25  different tact.

Page 203

1          MS. KABBASH:  Adam, the tape's
2  running out.
3          MR. SLATER:  Okay.  You can change
4  the tape.  And I'll be done soon.
5          MS. KABBASH:  Okay.
6          THE VIDEO TECHNICIAN:  Time now is
7  3:50 -- 2:55.  We are going off the record --
8  actually, 3:55.  We are going off the record.  This
9  is the end of disc number two.
10          (A recess was taken from 3:55 p.m. to
11          4:07 p.m.)
12          THE VIDEO TECHNICIAN:  The time now
13  is 4:07.  We are back on the record.  This is the
14  beginning of disc number three.
15  BY MR. SLATER:
16          Q.   I'd like to pose a hypothetical to
17  you:  In December 2008, a woman goes to a doctor,
18  has her prolapse evaluated and the doctor says, "I'm
19  recommending the Prolift to you," and she has a
20  Prolift put into her body in December of 2008.
21          However, at that time, both the
22  doctor and the patient were relying on the IFU and
23  the patient brochure that Ethicon had already
24  acknowledged needed to be changed in certain
25  material ways, and they didn't know that these

Page 204

1  documents were going to be changed; and if they had
2  known that, they would not have gone forward with
3  Prolift surgery unless and until they saw the
4  updated labeling.
5          The woman then went on to suffer
6  severe complications of multiple erosions and
7  re-prolapse of her organs and had to undergo at
8  least four more operations to treat not only the
9  eroding mesh, but also to remove mesh and to try to
10  fix her vaginal cavity, which had become distorted
11  and abnormally small as a result of these
12  complications.
13          Taking that hypothetical situation as
14  truthful, what do you say on behalf of Ethicon, for
15  whom you're the expert in this case, to that woman
16  who would not have had this Prolift put in her body
17  if the company had just told her doctor that the
18  labeling was being updated?
19          MS. KABBASH:  Objection.  Objection;
20  and beyond the scope of Mr. Utalowski's testimony as
21  a regulatory expert in this case.
22          THE WITNESS:  It's not really a
23  regulatory response.  I -- I understand the
24  situation.  I'm not the spokesperson for Ethicon.
25  I'm their regulatory expert.

Page 205

1  BY MR. SLATER:
2          Q.    What do you say to that woman as an
3  expert in this case, based on the fact that her and
4  her doctor relied on labeling the company was in the
5  process of changing and the company didn't tell
6  them, and the doctor would not have used the Prolift
7  with her if he had known the labeling was being
8  changed?  What do you say to her?
9          MS. KABBASH:  Objection.  Same
10  objection.
11          THE WITNESS:  Sir, I'm the regulatory
12  expert in regard to this particular product.  I'm
13  not Ethicon's spokesperson involved in the
14  particular episode you've identified.
15  BY MR. SLATER:
16          Q.    Well, you -- this is within your --
17  rephrase.
18          This does come directly within your
19  expertise, because the doctor and patient were
20  relying on labeling the company knew to be false and
21  misleading in certain material ways, but they didn't
22  know that because the company didn't tell them.
23          What do you tell that patient?  What
24  do you tell her?
25          MS. KABBASH:  Objection; outside the

52 (Pages 202 to 205)

Timothy A. Ulatowski

Page 206

1  scope of Mr. Utalowski's role as a regulatory expert
2  in this case.
3          MR. SLATER:  Please stop saying that.
4  It's not true.  Please answer the question.
5          MS. KABBASH:  It is true.
6          THE WITNESS:  I'm not the
7  spokesperson for Ethicon.  I'll -- I'll -- I speak
8  to the regulatory aspects regarding the particular
9  litigation, but I'm not one to interact with the
10  patient or speak to the patient directly.
11  BY MR. SLATER:
12          Q.     Well, obviously, I'm not going to
13  present you to this patient, so don't worry.  She's
14  not going to come walking into the room with you
15  right now.
16          My question is this:  As an expert,
17  what do you think would be the appropriate thing for
18  Ethicon to say to that patient who got a Prolift put
19  in her body because the company didn't tell her
20  doctor that the false and misleading labeling that
21  he was relying on was being changed?
22          MS. KABBASH:  Objection.
23          THE WITNESS:  Sir, you're asking me
24  to articulate a response that a company would make
25  to a patient in regard to her particular condition.

Page 207

1  That's not my role as I sit here.
2  BY MR. SLATER:
3          Q.     Well, you're an expert, so I'm asking
4  you, what should the company say to the patient?
5          MS. KABBASH:  Objection.
6          THE WITNESS:  I'm not a regulatory
7  expert in -- I'm a regulatory expert in regard to --
8  to a particular product.  I'm not their
9  communications person or articulating a statement to
10  a doctor or patient.
11  BY MR. SLATER:
12          Q.     Well, you realize that -- you realize
13  that the things you're offering opinions on, this
14  Prolift and Prolift+M, you realize there's women who
15  suffered catastrophic permanent injuries as a result
16  of complications from those devices.  You know that.
17  Right?
18          A.     Women have had complications, and
19  many women who have probably went -- gone on to have
20  satisfactory outcomes, so -- I understand that.
21  That's with every device.
22          MR. SLATER:  Move to strike from "and
23  many" forward.
24          I'm not sure why you're telling me
25  about things I'm not asking about, so let's just try

Page 208

1  to stay really focused here.
2  BY MR. SLATER:
3          Q.     You understand, as a regulatory
4  expert offering opinions with regard to the Prolift
5  and Prolift+M, that the range of risks with those
6  devices from the first day they were marketed
7  included catastrophic injuries to women of a
8  permanent and enduring nature for the rest of their
9  lives.  You know that's part of the risk profile for
10  those devices; correct?
11          A.     I understand there were risks with
12  the product, as there are with other devices, yes.
13          MR. SLATER:  Move to strike from "as
14  are" forward.
15  BY MR. SLATER:
16          Q.     Can I ask you a question?  Why did
17  you add on the thing at the end when you know I'm
18  not asking about other devices?  Tell me why you
19  just did that.
20          A.     Just placing it in proper context.
21          Q.     Why did you -- why did you do it --
22  when you know that I'm asking you for an answer to
23  one specific question, why did you throw in
24  information that had nothing to do with my question?
25          A.     Well, that's your opinion, has

Page 209

1  nothing to do.  It's my opinion it does.
2          Q.     Did you think it was helpful for your
3  client if you added on the talking point that you
4  thought might be favorable to their litigation
5  position?
6          MS. KABBASH:  Objection; move to
7  strike his question and his editorial statement.
8  Adam, if you want to ask him a question with regard
9  to regulatory --
10          MR. SLATER:  I just did.  Answer the
11  question.
12          MS. KABBASH:  I beg to differ.
13          MR. SLATER:  This is -- hang on.
14  This is a seasoned expert -- hang on.  This is a
15  seasoned expert who's being paid a lot of money by
16  your clients to be an expert --
17          MS. KABBASH:  He is --
18          MR. SLATER:  -- so I'm going to ask
19  him why he did what he did.
20          MS. KABBASH:  He's a --
21  BY MR. SLATER:
22          Q.     Did you think that was a good thing
23  from a litigation perspective to try to help your
24  client out to throw in the part that you knew wasn't
25  responsive, the little talking point at the end?

53 (Pages 206 to 209)

Timothy A. Ulatowski

Page 210

1       MS. KABBASH:  Objection;
2    argumentative.
3       MR. SLATER:  Is that why you did it?
4       THE WITNESS:  I think it's
5    appropriate to put labeling and experience with a
6    product in context to -- as people try to understand
7    risks with products, that every product presents
8    risks.
9    BY MR. SLATER:
10      Q.    Now, we're going to try this one more
11   time and what I'm going to ask you to do, in my
12   politest voice, is to please answer my question
13   directly, limited only to the question.  Okay?
14         You know that the risks of the
15   Prolift and Prolift+M include catastrophic vaginal
16   and pelvic injury to a patient; correct?  You know
17   that that can occur as a direct result of the
18   Prolift and Prolift+M; correct?
19      A.    Well, I don't think the adverse
20   effect is stated quite that way, if we look at the
21   labeling.
22      Q.    I'm not asking you about the
23   labeling.
24      A.    Well, sir --
25      Q.    So I move to strike.

Page 211

1       A.    Well, sir, you're characterizing the
2    adverse effect.  I'm saying, let's look at the
3    labeling and see what it says.
4       Q.    But you understand that one of the
5    claims in this case is the labeling is wholly
6    inadequate because it doesn't reflect the full scope
7    of serious risks that were known to the company.  So
8    why would I defer to labeling that I know is
9    completely inadequate?
10         So let's stick to my question and let
11   me take a step back.  You read the testimony, you
12   claim, of Pete Hinoul and David Robinson and other
13   Medical Affairs people.  Right?
14      A.    Yes.
15      Q.    Based on that testimony, you
16   understand that the risks to women from the Prolift
17   and Prolift+M include catastrophic vaginal and
18   pelvic injury; correct?
19      A.    Well, I don't recall specific
20   testimony using the term "catastrophic."  It's not
21   that I deny that would be the case.  I just don't
22   recall the labeling nor the testimony referring to
23   that.  If you could direct me further, I'd be happy
24   to look at that.
25         I don't deny the fact that there's

Page 212

1    adverse effects.
2       Q.    You don't deny that there's adverse
3    events that cause what a layman would cause --
4    rephrase.
5          You don't deny that those adverse
6    events include injuries that a lay person could
7    reasonably characterize as catastrophic; correct?
8       MS. KABBASH:  Objection.
9       THE WITNESS:  All I would opine on is
10   regarding whatever testimony was or medical opinion.
11   I wouldn't render a medical opinion on that or
12   hazard a guess on what I would call catastrophic in
13   this instance.  That's a medical opinion.
14   BY MR. SLATER:
15      Q.    Did you make any effort to learn the
16   scope of risks that Ethicon Medical Affairs actually
17   knew existed with the Prolift and Prolift+M?
18      A.    I've seen the deposition testimony as
19   to what was known, what was testified as to what
20   they knew.
21      Q.    And you understand from reading that
22   testimony that women could suffer from catastrophic
23   injuries to their vagina and pelvis due to the
24   Prolift and Prolift+M.  You understand that;
25   correct?

Page 213

1       A.    If that's testimony that I've seen --
2    I don't recall, but if that's testimony by the
3    medical staff of Ethicon, I'm not going to argue it.
4       Q.    If for some reason Ethicon could not
5    produce labeling for the Prolift or Prolift+M which
6    was not false and misleading in material respects,
7    during that time period when they couldn't do that,
8    they should not have been selling the Prolift;
9    correct?
10      MS. KABBASH:  Objection.
11      THE WITNESS:  Well, I -- I agree that
12   if Ethicon and/or FDA determined the labeling was
13   false and misleading, that they needed to remedy
14   that.
15         Now, the method of doing that, I
16   don't know if I can opine on every -- any method --
17   any and every method.  We've talked about a couple.
18   BY MR. SLATER:
19      Q.    If for some reason Ethicon could not
20   remedy this false and misleading information,
21   couldn't get all the doctors and patients to know
22   the truth, then Ethicon should not have been selling
23   the Prolift during that time period.  Right?
24      MS. KABBASH:  Objection.
25      THE WITNESS:  They would have to

Timothy A. Ulatowski

Page 214

1  remedy the labeling.  I mean, that's what -- that's
2  what I can say.  Did they need to stop selling the
3  product while they're remedying?  I wouldn't go so
4  far as to say that.
5  BY MR. SLATER:
6      Q.     It's one option.  Right?
7      A.     It's one option, yes.
8      Q.     Let's look at Exhibit 10.
9      A.     Okay.
10     Q.     Tell me what Exhibit 10 is.
11     A.     Well, I requested from Becker &
12 Associates, where I work, all the invoices related
13 to Butler Snow and this is what I received.  So I
14 note most of it's my time, but there is other
15 additional charges for one of my associates.
16     Q.     That's Meaghan Bailey?
17     A.     Correct.
18     Q.     So other than the little bit that's
19 attributed to Meaghan Bailey, all of the other
20 billings are your total billings with regard to the
21 work you've done with regard to the Ethicon pelvic
22 mesh devices?
23     A.     That's correct.
24     Q.     When did you start reviewing TVT
25 information?

Page 215

1      A.     Well, actually, I received TVT
2  information early on after being engaged, but I
3  think it mainly served as background information for
4  the mesh, and more recently, additional information
5  has been forthcoming on TVT.
6      Q.     Most of the billing reflected in
7  Exhibit 10 would relate to the Prolift and
8  Prolift+M?
9      A.     I'd say that's the case, yes.
10     Q.     And do you intend to act as an expert
11 with regard to the TVT devices in litigation?
12     MS. KABBASH:  Objection.
13     THE WITNESS:  Well, I don't know.
14 That's Butler Snow's decision.
15 BY MR. SLATER:
16     Q.     I'm asking what you intend to do.
17     A.     If asked --
18     MS. KABBASH:  Objection.
19     THE WITNESS:  -- I'll consider it.  I
20 haven't formulated any opinions or anything in
21 regard to the material.
22     MR. SLATER:  I don't have any other
23 questions.
24     MS. KABBASH:  Okay.  I just have two
25 or three questions.

Page 216

1              - - -
2          EXAMINATION
3              - - -
4  BY MS. KABBASH:
5      Q.     Mr. Utalowski, you were asked by
6  plaintiffs' counsel some questions regarding what
7  the obligations of a Regulatory Affairs associate
8  within the company is when he or she is provided
9  with suggested warnings by a Medical Affairs
10 associate.
11             Do you recall that line of
12 questioning?
13     A.     Yes.
14     Q.     Is there a regulatory requirement
15 that would govern the regulatory associate's
16 obligations under those circumstances?
17     A.     Not specifically and directly.
18     Q.     Is that a matter of internal company
19 policy?
20     A.     That's policy --
21     MR. SLATER:  Move -- objection.
22     THE WITNESS:  That's -- relates to
23 policy and procedure that the company creates, that
24 a Regulatory Affairs person would then follow.
25 BY MS. KABBASH:

Page 217

1      Q.     But there's not a regulatory
2  requirement that governs that.
3      A.     No, not specifically.
4      MR. SLATER:  Objection.
5  BY MS. KABBASH:
6      Q.     Can you pull out your report, which
7  is, I believe, Exhibit U-4?
8              Now, you've stated several times
9  today that you are not holding opinions that would
10 require a medical analysis; correct?
11     A.     Yes.
12     Q.     If you can look on page 67 of your
13 report and specifically look at opinion number 5,
14 plaintiffs' counsel asked you whether you held any
15 opinions with regards to the adequacy of labeling
16 and I just want to ask you one thing.
17             Here, you state the opinion on page
18 67 of your report that Prolift instructions for use
19 labeling, prior to implementation of FDA-requested
20 changes, was in compliance with prescription device
21 regulatory requirements.  The labeling was not
22 misbranded.
23             And then you include underneath that
24 four bullet points setting forth examples of what
25 you mean.

Page 218

1        Do you still stand by the opinions as
2   stated in point number 5 on page 67 of your expert
3   report?
4        A.   Yes.
5        Q.   Are there any questioning that you
6   received by plaintiffs' counsel today that alters
7   opinions set forth in section 5 on page 67 of your
8   report?
9        A.   No.
10       Q.   Okay.
11       You were asked several questions
12  today about patient brochures.  If a patient were to
13  read a patient brochure outside of a doctor's office
14  or access that patient brochure on a website, would
15  that change any of your opinions in your report with
16  regard to the adequacy of the labeling?
17       A.   No.
18       Q.   Would it change any of your opinions
19  regarding whether or not those patient brochures --
20  strike that.
21       Would it change your opinion that the
22  patient brochures for Prolift were not misbranded?
23       MR. SLATER:  Objection.
24       THE WITNESS:  It wouldn't change the
25  opinion.

Page 219

1   BY MS. KABBASH:
2        Q.   If you could turn to the next page,
3   page 68 --
4        A.   Okay.
5        Q.   -- opinion 6 of your report states --
6        MR. SLATER:  Wait.  One second.  One
7   second.  Maha, one second.  What's this music I'm
8   hearing?  Are you guys hearing that, too?
9        MS. KABBASH:  Yeah, we are.  I
10  thought that was on your end.
11       THE WITNESS:  It's at the alternate
12  site.
13       MR. SLATER:  No, it must be coming
14  through the other --
15       MS. KABBASH:  Hey, Andrew?
16       MR. DONELAN:  Yeah?
17       MS. KABBASH:  Do you have any music
18  at your site?
19       MR. SLATER:  Can you mute your phone
20  again?
21       MR. DONELAN:  Yeah, there's no music
22  in here.
23       MS. KABBASH:  You know what?  Can you
24  -- so were you -- you were muted all that time.
25  Right?

Page 220

1        MR. DONELAN:  Yeah, I was muted.
2   I'll mute it again, but there's nothing going on in
3   here, so --
4        MS. KABBASH:  Okay.  Yeah.  It's
5   weird.
6        Oh, it seems like it just stopped.
7        THE WITNESS:  Okay.
8        MS. KABBASH:  All right.
9        MR. SLATER:  Okay.
10       THE WITNESS:  Where are we at now
11  again?
12  BY MS. KABBASH:
13       Q.   Mr. Utalowski, if you'll look at page
14  68, number 6 --
15       A.   Uh-hum.
16       Q.   -- your opinion there states,
17  "PROLIFT patient brochures labeling and help-seeking
18  communication, prior to FDA review were in
19  compliance with regulatory requirements.  The
20  brochures labeling and the help-seeking
21  communication were not misbranded."
22       And then below that, you set forth
23  five bullet points providing further detail on your
24  opinion.
25       Is anything in section 6 in your

Page 221

1   opinion altered -- or does your opinion change in
2   any way because of the possibility that a patient
3   may -- may read a patient brochure outside of her
4   doctor's office or access it on the Internet?
5        A.   It doesn't change my opinion.
6        MS. KABBASH:  Okay.  No more
7   questions.
8        MR. SLATER:  Let me just follow up on
9   the last couple of questions.
10                  -  -  -
11              EXAMINATION
12                  -  -  -
13  BY MR. SLATER:
14       Q.   With regard to whether or not the
15  labeling for the Prolift or Prolift+M was adequate,
16  if we focus on the disclosure of -- or discussion of
17  medical information in those documents, you're not
18  in a position to offer an opinion as to the adequacy
19  or inadequacy of that medical information, because
20  you're not forming any opinions that would require
21  medical knowledge; correct?
22       A.   No, for example, on number 5, I refer
23  to the medical rationale for statements made or
24  statements not made, so that's one of my foundations
25  for my opinion.  But I have not directly assessed

Timothy A. Ulatowski

Page 222

1  those statements.
2      Q.     Well, actually, what you say is,
3  "Ethicon had a regulatory and medical rationale for
4  the statements in the IFUs."  You make that
5  statement.  Right?
6      A.     Correct.
7      Q.     In your report?
8      A.     Yes.
9      Q.     The fact that there may have been a
10 rationale for the statements doesn't mean that
11 they're not false and they're not misleading.
12 Right?  The rationale could have been wrong;
13 correct?
14     A.     Well, that's subject to medical
15 opinion.  Is it possible?  That's subject to medical
16 opinion.
17     Q.     So whether or not the medical
18 rationale for the statements made in the IFUs or the
19 patient brochures or any other labeling, whether or
20 not that rationale was adequate, whether or not it
21 was complete, whether or not it was truthful or
22 false, that's not something you're going to form an
23 opinion on; correct?
24     A.     Not if it requires a medical
25 assessment.

Page 223

1      Q.     You have no experience working
2  internally within a medical device manufacturer;
3  correct?
4      A.     Well, yes, as a consultant, but you
5  mean as an employee of a medical device
6  manufacturer?  How do you mean, sir?
7      Q.     Well, let me clarify.
8             You have never worked as an employee
9  at a medical device manufacturer; correct?
10     A.     No, only as a consultant to
11 manufacturers.
12     MR. SLATER:  Move to strike after
13 "No."
14 BY MR. SLATER:
15     Q.     Well, actually, let me ask it again
16 because it's a double negative.
17             Am I correct that you have not worked
18 directly for a medical device manufacturer or
19 prescription drug manufacturer as an employee?
20     A.     Correct.
21     Q.     I saw some reference in your prior
22 deposition to the fact that a Johnson & Johnson
23 company that you consult for, you handled a matter
24 having to do with lack of compliance with FDA
25 regulations?  Which company is that?

Page 224

1      A.     Advanced Sterilization Products.
2      Q.     What's the name of the company?
3      A.     Advanced Sterilization Products, ASP.
4      Q.     Oh, got it.  Advanced Sterile -- what
5  was the -- what's the compliance problem?
6      A.     I don't think I can get into it
7  directly because it incurs the need for me to talk
8  about trade secret and confidential commercial
9  information.
10     Q.     Tell me in a general sense what's the
11 issue.
12     MS. KABBASH:  Mr. Utalowski, if
13 there's a general way that you feel like you can
14 answer the question, answer it.
15     THE WITNESS:  Well --
16     MS. KABBASH:  And if you can't, you
17 can't.
18     MR. SLATER:  Let me make it clear.  I
19 frankly don't care whether it's confidential or not.
20 I'm going to get answers to my questions.  I want to
21 understand the situation where he's working as a
22 consultant for a J & J company.
23 BY MR. SLATER:
24     Q.     Let's start with the general:  Can
25 you tell me what the general regulatory issue is?

Page 225

1      MS. KABBASH:  That's fine, Adam, but
2  he cares and he has a right to care, and I care.  So
3  if he can answer your question --
4      MR. SLATER:  Yeah, well, it's
5  litigation and he's under oath, so I'm going to need
6  answers to my questions.
7      MS. KABBASH:  That's fine.  If he can
8  answer it in a way that does not infringe on trade
9  secrets, then by all means, he should do so.
10     THE WITNESS:  It concerns good
11 manufacturing practice issues generally, not
12 litigation.
13 BY MR. SLATER:
14     Q.     And you advised this company that you
15 believed that they were in violation of FDA
16 regulations; correct?
17     MS. KABBASH:  Objection.
18     THE WITNESS:  I was assisting them in
19 regard to their response to FDA in regard to
20 violations.
21 BY MR. SLATER:
22     Q.     And you felt in that situation that
23 there were violations of FDA regulations; correct?
24     MS. KABBASH:  Objection.
25     THE WITNESS:  Well, FDA made that

57 (Pages 222 to 225)

Timothy A. Ulatowski

Page 226

1  determination already, so I was helping them respond
2  to those.
3  BY MR. SLATER:
4      Q.      You were -- you agreed with the FDA
5  that there were violations of FDA regulations;
6  correct?
7          MS. KABBASH:  Objection.
8          THE WITNESS:  I didn't -- didn't do
9  an independent -- well, actually, at FDA, I was
10 involved in -- in regulatory actions concerning the
11 company.  So I was involved in determining the
12 violations at the outset.
13 BY MR. SLATER:
14     Q.      So the violations, you determined
15 while you were working at the FDA; and then when you
16 left the FDA and became a consultant, you're now
17 consulting for that company to help them to comply
18 with the regulations that you found they were in
19 violation of when you worked for the FDA.
20         Do I have that right?
21     A.      Yes, I think so.
22     Q.      So you have worked for the FDA on a
23 specific regulatory compliance matter involving
24 Advanced Sterilization Products, a company owned by
25 Johnson & Johnson; correct?

Page 227

1      A.      Yes.
2      Q.      You made a finding that this company
3  was in violation of FDA regulations; correct?
4      A.      As an FDA Director of Compliance,
5  yes.
6      Q.      Then you left the FDA, went into
7  private practice as a consultant, and you were hired
8  by the same Johnson & Johnson company to consult
9  with them on how to deal with the regulatory
10 violations that you had found when you were working
11 at the FDA; correct?
12     A.      Yes.  And so?
13     Q.      Is your involvement with this matter
14 disclosed to the FDA?
15     A.      It doesn't have to be.
16     Q.      Is it?
17     A.      No.  There's no requirement that it
18 be disclosed.
19     Q.      The answer is, it has not been
20 disclosed to the FDA that you are working as a
21 consultant with Advanced Sterilization Products on
22 this matter; correct?
23         MS. KABBASH:  Objection.
24         THE WITNESS:  That's correct, and
25 there's no requirement for that.

Page 228

1          MR. SLATER:  Move to strike from
2  "and" forward.
3  BY MR. SLATER:
4      Q.      How much money have you been paid in
5  connection with that matter?
6      A.      Actually, very little.  My
7  involvement was limited --
8      Q.      I asked you for a number, sir.  Can
9  you just tell me the number?
10         MS. KABBASH:  Adam, calm down.  He's
11 getting to it.
12         THE WITNESS:  I can't say.  I --
13         MR. SLATER:  I'm pretty calm.  I just
14 want to know the number.
15         THE WITNESS:  I can't recall --
16         MR. SLATER:  I want to know how much
17 you've been paid in connection with that matter.
18         THE WITNESS:  I can't recall.  I'd
19 say around or less than $5,000.
20 BY MR. SLATER:
21     Q.      Now, is the money -- well, rephrase.
22         Are your services being billed
23 through you personally or through a consulting
24 company?
25     A.      It depends on when I was working on

Page 229

1  the issue.  It may have been -- oh, it would have
2  been billed through a consulting company, yes, I
3  believe.
4      Q.      Which company?
5      A.      Either the current company I'm with,
6  consulting group, or the prior consulting group I
7  worked with.
8          MR. SLATER:  All right.  We're going
9  to make a request for all those billing invoices
10 that have been served on Johnson & Johnson and proof
11 of payment.  Cheryll's going to send an e-mail today
12 to confirm the request.
13         MS. KABBASH:  We will respond to that
14 request when we receive it in writing.
15 BY MR. SLATER:
16     Q.      Now, are there any conflict of
17 interest rules that you're aware of that could
18 potentially be implicated by your side-switching
19 from the FDA to then be a consultant for Advanced
20 Sterilization Products in this situation?
21     A.      No, none whatsoever.
22         MS. KABBASH:  Objection.
23 BY MR. SLATER:
24     Q.      Did you study the question before you
25 took on this assignment?

58 (Pages 226 to 229)

Timothy A. Ulatowski

Page 230

1    A.    I'm familiar with the post-employment
2  restrictions.  It didn't meet the criteria.
3    Q.    So the FDA conflict of interest rules
4  let someone like you work at the FDA, find
5  violations against a company, then leave the FDA and
6  then go to work for the same company to help them to
7  address the violations that you found.  That's --
8  that's correct?  That's what you understand with
9  regard to the conflict of interest rules at the FDA?
10    MS. KABBASH:  Objection.
11    THE WITNESS:  Yes, and my role is to
12  help them make the best product they can.
13    MR. SLATER:  That's all I asked you.
14  It's a "yes" or "no" question.
15    THE WITNESS:  Yes, the --
16    MR. SLATER:  What's that?
17    THE WITNESS:  -- the post-employment
18  restrictions enable me to do that.
19  BY MR. SLATER:
20    Q.    If I suggested to you that the
21  post-employment restrictions at the FDA are far from
22  rigorous, you wouldn't disagree with that, would
23  you?
24    MS. KABBASH:  Objection.
25    THE WITNESS:  Oh, I think they are,

Page 231

1  sir.  There are a number of post-employment
2  restrictions, and I pay attention to each and every
3  one of them.
4  BY MR. SLATER:
5    Q.    Are you permitted to disclose to
6  Advanced Sterilization Products anything that you
7  know about the internal deliberations at the FDA
8  with regard to the regulations that you found
9  existed while you were still working there at the
10  FDA?
11    A.    In regard to an open enforcement
12  action, that would be a problem, but I have not done
13  that.
14    Q.    When you say it would be a problem
15  with regard to open enforcement action, what do you
16  mean by that?
17    A.    If FDA's taken a process to seize or
18  to enjoin a company and that process is still in
19  effect.
20    Q.    If there's a potential for an open
21  enforcement action, those rules would be implicated;
22  correct?
23    A.    Well, inasmuch as I was involved with
24  that action, that specific action.
25    Q.    If, in fact, you have disclosed

Page 232

1  anything about the internal deliberation process,
2  anything that would not be public, outside the FDA
3  -- when I say public, meaning outside the FDA -- if
4  you've disclosed any sort of that information to
5  Advanced Sterilization Products or their attorneys
6  or anybody else with regard to that matter, you
7  violated FDA post-employment practices rules;
8  correct?
9    MS. KABBASH:  Objection.
10    THE WITNESS:  You got a lot of "ifs"
11  there.  If it's an open enforcement --
12    MR. SLATER:  If they're all correct,
13  then it's a violation.  Right?
14    THE WITNESS:  If it's an open
15  enforcement action, if I've disclosed internal
16  deliberations -- I think they have to be material,
17  that's how FDA's interpreted that -- then that could
18  be a problem, yes.
19  BY MR. SLATER:
20    Q.    Before you went to work on behalf of
21  Advanced Sterilization Products in this nondisclosed
22  consulting role, don't you think the right thing to
23  do would have been to disclose to the FDA that you
24  were considering consulting for this company and
25  then ask the FDA if they would permit it?

Page 233

1    MS. KABBASH:  Objection.
2    THE WITNESS:  There's no requirement
3  for that and there's no requirement for FDA to
4  permit anything from a former employee.
5  BY MR. SLATER:
6    Q.    So the reason, basically, that the
7  FDA has these rules that allow you to do this
8  consulting work for Advanced Sterilization Products
9  is basically because the rules are not designed to
10  block people from leaving the FDA and going to work
11  in industry; you want to make it as easy as possible
12  so that when you all leave the FDA, you can make a
13  lot of money getting paid by the companies you are
14  supposed to be regulating.  Right?
15    MS. KABBASH:  Objection.
16    THE WITNESS:  That's a ridiculous
17  statement, sir, and I think -- you ever to
18  understand all the post-employment restrictions.
19    Most of the post-employment
20  restrictions have to deal with representing the
21  company before the agency, so I could not attend any
22  meetings, could not speak to FDA employees, could
23  not interact with anyone at FDA regarding this
24  particular company for a period of actually two
25  years --

59 (Pages 230 to 233)

Timothy A. Ulatowski

Page 234

1   BY MR. SLATER:
2       Q.    Do you still -- I'm sorry.
3       A.    -- two years.
4       Q.    Do you still talk to people at the
5   FDA?
6       A.    I do now after my post-employment
7   restrictions have expired in terms of the two-year
8   restriction.
9       Q.    Do you still talk to people at the
10  FDA who were involved in the Advanced Sterilization
11  Products matter at any point?
12      A.    No, I have not.
13      Q.    Did you tell anyone at the FDA that
14  you were working on behalf of Advanced Sterilization
15  Products?
16      A.    No, I have not.
17          MS. KABBASH:  Objection.
18  BY MR. SLATER:
19      Q.    Do you think that Congress perhaps
20  might be a little concerned if they heard about this
21  situation where you actually brought the enforcement
22  action and then jumped to the other side and are now
23  consulting for the company that you brought the
24  action against?
25      A.    Sir, they'd be concerned --

Page 235

1           MS. KABBASH:  Objection.
2           THE WITNESS:  -- about me complying
3   with the post-employment restrictions, which they
4   created and which I have complied with.
5           MR. SLATER:  Maybe they'd be -- and
6   maybe they'd be concerned that those restrictions
7   aren't tight enough and maybe they need to be
8   tightened up?
9           MS. KABBASH:  Objection.
10          MR. SLATER:  What do you think?
11          MS. KABBASH:  Objection;
12  argumentative, harassing.
13          THE WITNESS:  I think they have
14  better things to do, sir.
15          MR. SLATER:  Well, I don't know that
16  it's argumentative, harassing, and I'm sorry if I'm
17  -- if you feel like I'm belaboring the point, but I
18  think this is directly relevant to certain factors
19  that a jury may consider about this witness in any
20  trial he testifies in with regard to any device or
21  product anywhere in the United States, including,
22  but not limited to, for Johnson & Johnson and its
23  affiliates.
24  BY MR. SLATER:
25      Q.    Have you consulted for any -- for

Page 236

1   Johnson & Johnson or any of its other companies
2   outside of a -- outside of the context of pelvic
3   mesh or DePuy?
4           Other than this Advanced
5   Sterilization Products matter, are there any others?
6       A.    No.
7       Q.    Have there been any others?
8       A.    I don't think so.
9       Q.    You saw no reason to doubt the
10  qualifications or competence of the Ethicon
11  Regulatory Affairs people that worked on the Prolift
12  and Prolift+M projects; correct?
13      A.    I had no reason to doubt their --
14  competence, I think you said -- that's correct.
15      Q.    Yep.
16          For example, you saw how they defined
17  regulatory terminology in their depositions and
18  talked about what their obligations were.  There was
19  nothing you saw that you disagreed with.  Right?
20      A.    No, they seemed to understand the
21  rules, regulations, policy, procedures.
22          MR. SLATER:  I don't have any other
23  questions.
24          MS. KABBASH:  I just have a couple.
25

Page 237

1                   - - -
2               EXAMINATION
3                   - - -
4   BY MS. KABBASH:
5       Q.    Mr. Utalowski, after you left the
6   FDA, did you take seriously the obligations imposed
7   on you with regard to post-FDA employment
8   restrictions?
9       A.    Absolutely.
10      Q.    Did you make efforts to learn what
11  those restrictions were?
12      A.    Well, you're -- you're briefed on
13  those restrictions on the final days of your
14  employment at FDA.
15          And then I took the initiative to
16  voluntarily interact with the Office of Integrity at
17  FDA to further discuss and explore those
18  restrictions in regard to consulting activities.
19      Q.    And in your discussions with them,
20  did you have all of your concerns or questions
21  answered?
22      A.    Yes, and there was no limitations
23  imposed on what I had discussed with them about my
24  consulting activities.
25      Q.    Are you -- have you been committed

60 (Pages 234 to 237)

Timothy A. Ulatowski

Page 238

```
1   since you left the FDA to comply with those
2   post-employment restrictions?
3        A.    Yes, absolutely.
4        Q.    And do you believe that you have?
5             MR. SLATER:  Objection.
6             THE WITNESS:  Yes, I do.
7             MR. SLATER:  Objection.
8   BY MS. KABBASH:
9        Q.    Is there any law or rule of ethics
10  that you can point to that bars you from acting as a
11  consultant for ASP now that you've left FDA?
12       A.    None whatsoever.
13            MR. SLATER:  Objection.
14  BY MS. KABBASH:
15       Q.    Is there any law or rule that you are
16  aware of that requires you to disclose at this time
17  your consulting -- to FDA your consulting role with
18  ASP?
19       A.    No, none whatsoever.
20            MR. SLATER:  Objection.
21            MS. KABBASH:  That's all I have.
22            MR. DONELAN:  No questions.
23            MR. SLATER:  Thank you very much.
24            MS. KABBASH:  Thank you.
25            THE VIDEO TECHNICIAN:  Time now is
```

Page 239

```
1   4:41.  This deposition has concluded.
2             (Witness excused.)
3             (Deposition concluded at
4        approximately 4:41 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 240

```
1              CERTIFICATE
2
3
4        I HEREBY CERTIFY that the witness was
5   duly sworn by me and that the deposition is a true
6   record of the testimony given by the witness.
7
8
9   _____
10
    KIMBERLY A. CAHILL, a Federally Approved Registered
11  Merit Reporter and Notary Public
    Dated:  August 20, 2013
12
13
14
             (The foregoing certification of this
15  transcript does not apply to any reproduction of the
    same by any means, unless under the direct control
16  and/or supervision of the certifying reporter.)
17
18
19
20
21
22
23
24
25
```

Page 241

```
1           INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over
4   carefully and make any necessary corrections.  You
5   should state the reason in the appropriate space on
6   the errata sheet for any corrections that are made.
7        After doing so, please sign the
8   errata sheet and date it.
9        You are signing same subject to the
10  changes you have noted on the errata sheet, which
11  will be attached to your deposition.
12       It is imperative that you return the
13  original errata sheet to the deposing attorney
14  within thirty (30) days of receipt of the deposition
15  transcript by you.  If you fail to do so, the
16  deposition transcript may be deemed to be accurate
17  and may be used in court.
18
19
20
21
22
23
24
25
```

61 (Pages 238 to 241)

Timothy A. Ulatowski

Page 242

1
- - - - - -
E R R A T A
2
- - - - - -
3   PAGE  LINE  CHANGE/REASON
4   ___  ___  _____
5   ___  ___  _____
6   ___  ___  _____
7   ___  ___  _____
8   ___  ___  _____
9   ___  ___  _____
10  ___  ___  _____
11  ___  ___  _____
12  ___  ___  _____
13  ___  ___  _____
14  ___  ___  _____
15  ___  ___  _____
16  ___  ___  _____
17  ___  ___  _____
18  ___  ___  _____
19  ___  ___  _____
20  ___  ___  _____
21  ___  ___  _____
22  ___  ___  _____
23  ___  ___  _____
24  ___  ___  _____
25  ___  ___  _____

Page 244

1          LAWYER'S NOTES
2   PAGE  LINE
3   ___  ___  _____
4   ___  ___  _____
5   ___  ___  _____
6   ___  ___  _____
7   ___  ___  _____
8   ___  ___  _____
9   ___  ___  _____
10  ___  ___  _____
11  ___  ___  _____
12  ___  ___  _____
13  ___  ___  _____
14  ___  ___  _____
15  ___  ___  _____
16  ___  ___  _____
17  ___  ___  _____
18  ___  ___  _____
19  ___  ___  _____
20  ___  ___  _____
21  ___  ___  _____
22  ___  ___  _____
23  ___  ___  _____
24  ___  ___  _____
25  ___  ___  _____

Page 243

1
2          ACKNOWLEDGMENT OF DEPONENT
3
4      I,_____, do hereby
   certify that I have read the foregoing pages, 1-244,
5   and that the same is a correct transcription of the
   answers given by me to the questions therein
6   propounded, except for the corrections or changes in
   form or substance, if any, noted in the attached
7   Errata Sheet.
8
   _____
9   TIMOTHY A. ULATOWSKI          DATE
10
11  Subscribed and sworn
   to before me this
12  _____ day of _____, 20____.
13  My commission expires:_____
14
   _____
15  Notary Public
16
17
18
19
20
21
22
23
24
25

Golkow Technologies, Inc. - 1.877.370.DEPS