# Exhibit D

Page 1

1           SUPERIOR COURT OF NEW JERSEY

2            LAW DIVISION - ATLANTIC COUNTY

3              Civil Action Case No. 291 CT

4            Honorable Carol E. Higbee, P.J. Cv.

5   - - - - - - - - - - - - - - x

6   IN RE:                      :

7   PELVIC MESH/GYNECARE         :

8   LITIGATION                  :   Master Case No.

9                               :   L-6341-10

10  (GENERAL, GROSS, WICKER)    :

11  - - - - - - - - - - - - - - X

12          CONFIDENTIAL - ATTORNEYS' EYES ONLY

13   Videotaped Deposition of TIMOTHY A. ULATOWSKI, M.S.

14              Washington, DC

15           Thursday, November 29, 2012

16                9:36 a.m.

17

18                VOLUME 1

19

20

21

22

23

24

25   Reported by:  Debra A. Whitehead

Confidential - Attorneys' Eyes Only

Page 2

1    Videotaped Deposition of TIMOTHY A. ULATOWSKI, M.S.,
2    held at the offices of:
3
4
5
6    O'MELVENY & MYERS, LLP
7    1625 Eye Street, NW
8    10th Floor
9    Washington, DC  20006
10   (202) 383-5300
11
12
13
14
15
16   Pursuant to Notice, before Debra A. Whitehead, an
17   Approved Reporter of the United States District Court
18   and Notary Public.
19
20
21
22
23
24
25

Page 3

1         A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFFS:
3         DAVID A. MAZIE, ESQUIRE
4         MAZIE SLATER KATZ & FREEMAN
5         103 Eisenhower Parkway, 2nd Floor
6         Roseland, New Jersey  07068
7         (973) 228-9898
8
9    ON BEHALF OF PLAINTIFFS:
10        JEFFREY S. GRAND, ESQUIRE
11        BERNSTEIN LIEBHARD, LLP
12        10 East 40th Street, 22nd Floor
13        New York, New York  10016
14        (212) 779-1414
15
16   ON BEHALF OF DEFENDANTS JOHNSON & JOHNSON, INC.,
17   and ETHICON, INC.:
18        WILLIAM M. GAGE, ESQUIRE
19        BUTLER, SNOW, O'MARA,
20        STEVENS & CANNADA, PLLC
21        Renaissance at Colony Park
22        1020 Highland Colony Parkway
23        Suite 1400
24        Ridgeland, Mississippi  39157
25        (601) 948-5711

Page 4

1    A P P E A R A N C E S   C O N T I N U E D
2    ON BEHALF OF DEFENDANTS JOHNSON & JOHNSON, INC.,
3    and ETHICON, INC.:
4         MAHA M. KABBASH, ESQUIRE
5         RIKER DANZIG SCHERER HYLAND & PERRETTI, LLP
6         Headquarters Plaza
7         One Speedwell Avenue
8         Morristown, New Jersey  07962
9         (973) 538-0800
10
11   ON BEHALF OF DEFENDANT CALDERA MEDICAL:
12        WILLIAM R. STUART, III., ESQUIRE
13        SILLS CUMMIS & GROSS, PC
14        The Legal Center, One Riverfront Plaza
15        Newark, New Jersey  07102
16        (973) 643-7000
17
18   ALSO PRESENT:
19        Michael Gay, Videographer
20
21
22
23
24
25

Page 5

1         C O N T E N T S
2    EXAMINATION OF TIMOTHY A. ULATOWSKI, M.S.      PAGE
3    By Mr. Mazie                    11
4
5         E X H I B I T S
6         (Attached to the Transcript)
7    ULATOWSKI DEPOSITION EXHIBIT              PAGE
8    Exhibit 1  Appendix A, CV for Timothy Ulatowski  10
9    Exhibit 2  Ethicon Expert Report of        10
10        Timothy A. Ulatowski, M.S.
11   Exhibit 3  Supplemental Ethicon Expert Report   10
12       Of Timothy A. Ulatowski, M.S.
13   Exhibit 4  Appendix B, Materials Reviewed and   10
14       Public Sources of References
15   Exhibit 5  ICMJE Form for Disclosure of      10
16       Potential Conflicts of Interest
17   Exhibit 6  Summary of Post-Employment        85
18       Restriction, Department of Health
19       And Human Services
20   Exhibit 7  Department of Health and Human     91
21       Services, Food and Drug
22       Administration, Dental Products
23       Panel of the Medical Device
24       Advisory Committee, Open Session,
25       10/6/00

2 (Pages 2 to 5)

Confidential - Attorneys' Eyes Only

Page 6

1       E X H I B I T S   C O N T I N U E D
2    ULATOWSKI DEPOSITION EXHIBIT              PAGE
3    Exhibit 8   Quality and Design Controls; Renewed  99
4             FDA Emphasis, Timothy A. Ulatowski
5    Exhibit 9   United States Government        111
6             Accountability Office, Report to
7             Congressional Requesters, FDA Faces
8             Challenges Meeting Its Growing
9             Medical Product Responsibilities and
10            Should Develop Complete Estimates of
11            Its Resource Needs
12   Exhibit 10  CFR Code of Federal Regulations     161
13            Title 21
14   Exhibit 11  Memorandum from Director, Office of  161
15            Device Evaluation, to ODE Review
16            Staff, 1/10/97
17   Exhibit 12  Presentation, Anterior TVM       161
18            (Porthos), 6/27/03
19   Exhibit 13  05 Final DDSA                161
20   Exhibit 14  Design Validation Report, Gynecare  161
21            Prolift Pelvic Floor Repair System
22   Exhibit 15  E-mail                   185
23   Exhibit 16  Transcript Excerpt, Dr. Axel Arnaud, 191
24            11/15/12
25

Page 8

1    Reserved for Confidential Designation Index as
2         Pursuant to the Protective Order
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1       E X H I B I T S   C O N T I N U E D
2    ULATOWSKI DEPOSITION EXHIBIT              PAGE
3    Exhibit 17  Transcript Excerpt, Dr. Vincent    211
4             Lucente
5    Exhibit 18  Transcript Excerpt, Catherine V.    224
6             Beath, 3/26/12
7    Exhibit 19  05 Final DDSA                234
8    Exhibit 20  CFR Code of Federal Regulations     253
9             Title 21
10   Exhibit 21  Memorandum from Director, Office of  253
11            Device Evaluation, to ODE Review
12            Staff, 1/10/97
13   Exhibit 22  Transcript Excerpt, Sean M.       290
14            O'Bryan, 5/18/12
15
16
17
18
19
20
21
22
23
24
25

Page 9

1    Reserved for Confidential Designation Index as
2         Pursuant to the Protective Order
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Confidential - Attorneys' Eyes Only

Page 10

1            P R O C E E D I N G S
2           (Ulatowski Exhibits 1 through 5 marked for
3    identification, to be attached to the transcript.)
4           VIDEO SPECIALIST:  We are on the record.
5    The time now is 9:36.
6           This marks the beginning of Disk Number 1
7    for the videotaped deposition testimony of Tim
8    Ulatowski in the matter of In Re Pelvic Mesh
9    Litigation.  This case is pending in the Superior
10   Court of New Jersey, Law Division, Atlantic County,
11   Civil Action Number 291 CT.
12          Today's date is November the 29th, 2012.
13   This deposition is being conducted at 1625 Eye Street,
14   Northwest, Washington, D.C.
15          Will all attorneys present please identify
16   themselves and who they represent.
17          MR. MAZIE:  David Mazie; Mazie, Slater,
18   Katz & Freeman, on behalf of plaintiff.
19          MR. GRAND:  Jeff Grand; Bernstein,
20   Liebhard, on behalf of plaintiffs.
21          MR. STUART:  William Stuart; Sills,
22   Cummis & Gross, on behalf of Caldera Medical.
23          MS. KABBASH:  Maha Kabbash from Riker,
24   Danzig, on behalf of defendants J&J and Ethicon.
25          MR. GAGE:  William Gage; Butler, Snow;

Page 11

1    defendants J&J and Ethicon.
2           VIDEO SPECIALIST:  My name is Michael Gay,
3    I am with Golkow Technologies.  Our court reporter
4    today is Debbie Whitehead, also with Golkow
5    Technologies, who will now swear in our witness.
6           TIMOTHY A. ULATOWSKI, M.S.,
7    having been duly sworn, testified as follows:
8           VIDEO SPECIALIST:  You may proceed.
9    EXAMINATION BY COUNSEL FOR PLAINTIFFS
10   BY MR. MAZIE:
11       Q   Mr. Ulatowski, my name is David Mazie, and
12   I represent the plaintiff in a case in which you've
13   been named as an expert witness.
14          How many times have you been deposed
15   before?
16       A   It's six times now.
17       Q   Okay.  And when was the first time you were
18   ever deposed?
19       A   The first one may have been -- as far as
20   date is concerned?
21       Q   Yeah.
22       A   Probably the fall of -- of last year.
23       Q   Okay.  Can you give me the names of the
24   cases in which you were deposed and who you were
25   testifying on behalf of, what party?

Page 12

1       A   Yeah, let me turn to my report, which has a
2    listing.
3           Okay first --
4       Q   Why don't we step back.  Is it listed in
5    your report?
6       A   Yes, it is.
7       Q   Okay.  What page?
8       A   Page 74.  One is not listed because it just
9    occurred last week.
10      Q   So -- why don't we do this.  I have marked
11   as -- we'll do it this way.
12          Ulatowski 1 is your CV.  Is that your
13   current CV?
14      A   Let me examine it.
15          Not quite.
16      Q   Okay.  What's missing from that CV?
17      A   Well, my current title at Becker &
18   Associates Consulting has changed.  I've become an
19   employee of Becker & Associates Consulting.
20      Q   And what is the --
21      A   And my current title is director of the
22   medical device practice at Becker & Associates
23   Consulting.
24      Q   Anything else on your CV that I have marked
25   as Ulatowski 1 that's inaccurate?

Page 13

1       A   That's probably -- that's probably it.
2       Q   When did you become an employee?
3       A   July-ish.
4       Q   Okay.
5       A   July this year.
6       Q   Let me show you Ulatowski 2.  This is your
7    main report in this case?
8       A   Yes.  Uh-huh.
9       Q   Okay.  On the last page there's a listing
10   of depositions where you've been deposed?
11      A   Yes.
12      Q   Okay.  And you said there was one
13   additional deposition you've given?
14      A   Yes.
15      Q   What case was that in?
16      A   It was -- it was a product liability case.
17   I testified for a defendant.  ASR, hip, for DePuy.
18      Q   Okay.  And you were an expert on behalf of
19   DePuy?
20      A   Yes.
21      Q   Okay.  Where is that case pending?
22      A   Yes.
23      Q   Where is that case pending?
24      A   Oh, where is that case pending.
25          In the -- in the midwest.  I don't recall

Confidential - Attorneys' Eyes Only

Page 14

1  exactly the state.  I'll have to check my records.
2      Q    Okay.  And this is a complete list, then,
3  these five plus that one occasion are the six times
4  you've been deposed?
5      A    That's correct.
6      Q    Okay.  Have you ever testified in a civil
7  litigation?  And I mean in court.
8      A    In court?  No, I haven't testified in court
9  in a civil litigation.
10     Q    Okay.  Have you ever testified in court in
11 a criminal litigation?
12     A    Yes.
13     Q    Okay.  On how many occasions?
14     A    Once.
15     Q    When was that?
16     A    As an employee of the Food and Drug
17 Administration, I testified for the government in that
18 case.  It was a case in Chicago, district court,
19 federal court.  It was a criminal case.  The company
20 was Abtox.  The litigants on the other side, Ross
21 Caputo was one name.
22     Q    Okay.  What was the issue in that case?
23     A    Well, the criminal charges were -- were
24 various.  I know the postal service was part of the
25 case, another agency, maybe SEC, was part of the case.

Page 15

1  And as well as FDA.
2          There were -- there were many different
3  aspects of -- of the case, so -- wire fraud and things
4  like that.
5      Q    You also issued a supplemental report,
6  which I've marked as Ulatowski 3.  Is that correct?
7      A    Yes, that's correct.
8      Q    Is that your only supplemental report in
9  this case?
10     A    Yes.
11     Q    Is it fair to say that your initial report
12 which is Ulatowski 2, and your supplemental report
13 which is Ulatowski 3 contain all of your opinions in
14 this case?
15     A    Yes.
16     Q    Okay.  Ulatowski 4 is an Appendix B, or an
17 updated Appendix B, we received the other day.  Is
18 that the most current Appendix B?
19     A    And this was received by -- from, rather,
20 from counsel?
21     Q    Yes.
22     A    Well, I'd have to compare line by line, but
23 I assume that to be the case.
24     Q    Okay.  Does Appendix B list all the
25 materials and references that you've reviewed or

Page 16

1  relied on in this -- in arriving at your opinions in
2  this case?
3      A    If it's the same list that's in my report,
4  the answer would be yes.
5      Q    Okay.
6          MR. MAZIE:  Well, I'll ask counsel.  You
7  gave us a revised Appendix B I think about two days
8  ago.  That's the one that I have marked.  Is that the
9  most current?
10         MS. KABBASH:  Yes, my understanding is that
11 is the most current.  We have not served -- we have
12 not attempted to serve on you anything more recently
13 than that.
14         MR. MAZIE:  Okay.
15 BY MR. MAZIE:
16     Q    So the Appendix B that is before you that
17 was served on us two days ago, does that contain all
18 the materials and sources that you've reviewed or
19 relied on in arriving at your opinions in this case?
20     A    I believe that would be the case, if -- it
21 accurately represents all the material provided.  I'd
22 have to compare what I have in my original report
23 against this just to be sure what -- what was added.
24         I did receive additional material after
25 this report in terms of the supplemental.

Page 17

1      Q    Well, do whatever you need to do.  All I
2  want to make sure is that that contains all the
3  information you reviewed or relied on in arriving at
4  your opinions in this case.
5      A    I would believe that to be the case.
6      Q    Okay.  I'm just going to give you a couple
7  of ground rules of the deposition.  First of all, do
8  you understand that you're under oath?
9      A    Yes.
10     Q    You understand that your testimony has the
11 same force and effect as if you were sitting before a
12 judge and a jury in a courtroom at this time?
13     A    I do.
14     Q    If you answer a question, I'm going to
15 presume you understood that question.  If you don't
16 understand the question or any portion of the
17 question, let me know, and I'll rephrase it.  But if
18 you answer it, I'll presume you understand it.  Okay?
19     A    Understood.
20     Q    Okay.  We don't want you to speculate.  We
21 don't want you to guess.  If you remember something or
22 you know something, you let us know that.  But please
23 don't speculate or guess.  Okay?
24     A    Okay.
25     Q    We received a few days ago what's been

Confidential - Attorneys' Eyes Only

Page 18

1  marked as Ulatowski 5, which is the ICMJE form for
2  disclosure of potential conflicts of interest, is one
3  of the documents that you reviewed. I'm going to show
4  that to you.
5       Is that something that you reviewed in
6  arriving at your opinions in this case?
7       A  Let me examine it.
8       Yes, I recall seeing this.
9       Q  Okay.  Why did you review this document?
10      A  I was -- received it, and I examined it in
11  relation to a particular journal article that's part
12  of -- referenced in my reports.  I think that was a
13  connection.
14      Q  Okay.  And you're talking about the Altman
15  article?
16      A  Yes.
17      Q  Okay.  What was particularly relevant about
18  the ICMJE form?
19      A  Well, any interest in regard to allegations
20  regarding bias or interactions between Altman and
21  others.  And then I wanted to see what sorts of
22  agreements there were, related documents regarding
23  that, that particular type of issue.
24      Q  Did you arrive at any conclusions
25  concerning this ICMJE disclosure form concerning

Page 19

1  potential conflicts of interest?
2       A  Well, conclusions to the effect that I
3  reviewed it, examined, see what was said, what was
4  attested to in the documents.
5       Q  I understand you reviewed it, and that's
6  one thing.  Did you arrive at any conclusions after
7  reviewing this document?
8       A  Well, I didn't express any opinions
9  specifically in regard to this particular document --
10      Q  Okay.
11      A  -- if that's what you are asking.
12      Q  All right.  So this is just one -- one
13  additional piece of information you reviewed.
14      A  Yes.
15      Q  And you haven't arrived at any opinions
16  after reviewing this document, additional opinions.
17      A  Well, I have beliefs regarding the Altman
18  article after I reviewed the Altman article, in the
19  general sense of issues regarding any bias that may
20  have come up or been alleged.
21      Q  Okay.  What are those opinions or beliefs?
22      A  Well, I think that there may have been --
23  or there may be an allegation that a party or parties
24  may have had certain inputs into the Altman article,
25  which may have biased the conclusions of the article,

Page 20

1  the contents of the article.  So I wanted to see what
2  was disclosed, what -- what concerned that issue.
3       Q  Okay.  After reviewing this document and
4  after being made aware of the allegations, did you
5  arrive at any opinions concerning the propriety of
6  those allegations, or is that something you're leaving
7  for somebody else in this case?
8       A  Well, I did -- if what you're getting at is
9  did I review the Altman article, did I review inputs,
10  comments, potential edits from others to gauge, to the
11  extent I could, their impact on the Altman article,
12  the final product, I did -- I did look at those
13  things, and -- if you want to ask questions about
14  that.
15      Q  My question simply is did you arrive at any
16  conclusions that you're going to express in this case
17  concerning the allegations involving the Altman
18  article.
19      A  Well, from all the information I was
20  provided and from my assessment of all that
21  information, to the extent I could assess the
22  information based upon my expertise, my knowledge, I
23  didn't believe that those inputs provided by others,
24  be it edits or comments, had any significant impact on
25  the Altman paper.

Page 21

1       Q  Okay.  Have you ever submitted an article
2  to a journal for publication?
3       A  Not directly.
4       Q  Okay.  Have you ever indirectly submitted
5  an article to a journal for publication?
6       A  Well, I've been part of publications in
7  texts, perhaps in journals.  I don't -- I've had a
8  long career.  I probably participated in some
9  contributions to articles along the way.
10      Q  Okay.  Do you have expertise in determining
11  when it is appropriate or inappropriate to make
12  disclosures concerning individuals who have added
13  input to articles being submitted to journals?
14      A  Well, that's the reason I wanted to
15  evaluate whatever information was pertinent to that
16  particular issue.
17          MR. MAZIE:  I object and move to strike as
18  nonresponsive.
19  BY MR. MAZIE:
20      Q  My question is, do you have expertise, do
21  you claim to have expertise in the ethics rules
22  regarding what is appropriate or inappropriate by way
23  of disclosure of individuals involved in contributing
24  to articles being submitted to journals for potential
25  publication?

Confidential - Attorneys' Eyes Only

Page 22

1     A   Well, expertise in regard to being
2  knowledgeable about every journal's requirements for
3  disclosure, statements made in the articles,
4  information provided to the editorial board, those
5  vary from journal to journal.
6         I don't have specific -- specific expertise
7  in -- in those journal procedures.  That's why I
8  wanted to see this information.
9     Q   Okay.  You're not an expert in the ethics
10  of what should and should not be done when submitting
11  an article to a journal, are you?
12     A   Only in the broadest sense that certain
13  connections, associations, should be disclosed in
14  articles.  And so I'm used to seeing that, I expect to
15  see that.  I've examined that over the course of my
16  career.
17     Q   Okay.  And have you ever been a primary
18  author on any article?
19     A   Well, as I said, I've contributed to text,
20  so I've been the primary author on chapters in
21  textbooks --
22     Q   Okay.
23     A   -- for example.
24         Journal articles, you're testing my memory
25  now, and I don't recall.

Page 23

1     Q   As you sit here today, you don't recall
2  ever being the primary author on a journal article.
3     Correct?
4     A   I don't recall.  I'm not saying that I
5  haven't been; just I don't recall.
6     Q   Okay.  And you say that you've been the
7  primary author on articles that have been published in
8  textbooks?
9     A   Yes.
10     Q   Okay.  On how many occasions, or for how
11  many articles?
12     A   It would be a guess.  I would -- I would
13  think two, three texts.
14     Q   Okay.  And those are in textbooks?
15     A   Well, texts that may be otherwise
16  characterized as -- well, texts, yes, in one instance.
17  Proceedings of conferences, those sorts of things.
18     Q   I'm trying to get an understanding of when
19  you've been the primary author on -- on an article or
20  text.  How many --
21         MR. MAZIE:  Strike that.
22  BY MR. MAZIE:
23     Q   You've said that there's been three times
24  that you've been the primary author of -- of material
25  that's been published?

Page 24

1     A   I was -- I was guessing at two or three.
2     Q   Okay.
3     A   I don't recall specifically.
4     Q   And how many of those were associated with
5  a conference where a presentation was given?
6     A   Well, at least one, maybe more than one.
7     Q   Okay.  Putting aside a conference, how many
8  times have you been involved in -- as a primary or
9  even a secondary author on materials that have been
10  published in a magazine, a journal, a textbook,
11  something that has been actually printed up and
12  circulated en masse, as opposed to just in a
13  conference?
14     A   I -- I don't recall.  It's been quite a
15  number of years since I've done that.
16     Q   As you sit here today, you can't give us
17  any instances where you have been the primary or
18  secondary author on a -- an article submitted to a
19  journal or that's part of a textbook or any other type
20  of publication that's been circulated en masse, aside
21  from a conference.  Correct?
22     A   Well, I don't recall.  It wasn't my style
23  to -- in CVs, as others will do, to list every
24  contribution, every paper, every speech, every --
25  every public participation.  I just haven't done that

Page 25

1  over the years.
2     Q   You can't give us any.  Correct?  As you
3  sit here today, you can't give us any examples.
4     A   Well, I will say that during the course of
5  my career, at particular points in my career I've been
6  considered an expert in certain technology areas, and
7  I've contributed to articles with others either at the
8  FDA or the Centers for Disease Control and Prevention,
9  Environmental Protection Agency.  So I just haven't
10  categorized that and listed those things.
11     Q   Okay.  Just so we're clear and the jury is
12  clear, Mr. Ulatowski, as you sit here today at your
13  deposition, you can't name one article or one chapter
14  or one text that you were the primary or secondary
15  author on that was published en masse, aside from
16  participating at a conference.  Correct?
17     A   Yeah, I can't.  I haven't looked at those
18  in years and years.
19     Q   So you can't.
20     A   That's correct, I can't give you the
21  journal or the date or anything of that sort.
22     Q   Okay.
23     A   It's not in my CV.
24     Q   Okay.  Have you ever been a peer reviewer
25  for a medical journal?

Confidential - Attorneys' Eyes Only

Page 26

1      A   No.
2      Q   Have you ever served as an editor for a
3  medical journal?
4      A   No.
5      Q   Have you ever had any conversations with
6  anyone at the New England Journal of Medicine about
7  any topic?
8      A   Regarding any topic?
9      Q   Yeah.
10     A   Perhaps.
11     Q   As you sit here today, can you tell us when
12  and to whom you spoke to at the New England Journal of
13  Medicine?
14     A   I don't recall over the course of 40 years
15  at FDA, and participating in conferences and
16  associations.  In the New England area, Boston area,
17  you run into many people, have conversations about
18  many things.
19     Q   All right.
20     A   I don't specifically recall.
21     Q   Have you ever spoken to any of the
22  witnesses in this case?
23     A   No.
24     Q   You obviously never spoke to any of the
25  authors of any articles, including but not limited to

Page 27

1  Dr. Altman.  Correct?
2      A   That's correct.
3      Q   Okay.  Let's turn for a second to your CV.
4         You currently work for how many companies?
5      A   One.
6      Q   Becker?
7      A   Becker & Associates Consulting.
8      Q   Okay.
9      A   Who is owned by NSF International.
10     Q   Owned by whom?
11     A   NSF International.
12     Q   What is NSF International?
13     A   It's a company based in Michigan that
14  concentrates in the healthcare area as far as testing,
15  auditing, across many types of product lines.
16     Q   Okay.  And at some point you had another
17  consulting company, Ulatowski Consulting?
18     A   When I first left the government, I -- I
19  began Ulatowski Consulting, LLC, because some clients
20  initially approached me directly as far as particular
21  tasks they wanted me to do.  So I billed them
22  directly, contracted with them directly, through
23  Ulatowski Consulting, LLC.
24     Q   And you left the government in January of
25  2011?

Page 28

1      A   Yes.
2      Q   So you've been in the private sphere for
3  almost two years?
4      A   Almost two years.
5      Q   Okay.  And how long were you working at
6  Ulatowski Consulting?
7      A   Well, the entity still exists, but I
8  haven't contracted with anyone under that -- under
9  Ulatowski Consulting for many, many months.
10     Q   Okay.  How many clients did you have while
11  you were at Ulatowski Consulting?
12     A   I don't recall a specific number.  I'll
13  just speculate it's six.
14     Q   Okay.  And what type of consulting did you
15  do at Ulatowski Consulting?
16     A   A couple -- my -- what I do is primarily in
17  two areas.  One is -- is regulatory support for
18  medical device and drug companies, quality systems,
19  manufacturing, premarket tasks.  The other side --
20  generally, just to lump them into two categories --
21  is -- is litigation support.
22         I think the first client I had was for
23  plaintiff against a medical device company.  I was on
24  the plaintiff's side.  I still am on the plaintiff's
25  side.

Page 29

1      Q   Okay.  What case is that?
2      A   It's a -- it's a Florida employees' union
3  against Baxter International.
4      Q   Is that listed in your CV?
5      A   No.  I haven't been deposed.
6      Q   What's the allegation in that litigation?
7      A   Well, the employees union is -- is alleging
8  that Baxter International -- I'll try and boil this
9  down -- withheld certain information regarding some of
10  its products, the status of interactions with FDA; and
11  the employees' union, who had invested in Baxter, by
12  the lack of full disclosure, suffered in the market,
13  stock market.
14     Q   Any issues of 510-K approval in that
15  litigation?
16     A   No.  Well, broadly it concerns 510-Ks, but
17  I mean, it's not -- not primarily an issue of a 510-K
18  decision or change or something like that.
19     Q   Okay.  Is that the only plaintiff's case
20  you've ever worked as -- on on behalf of plaintiff?
21     A   No.
22     Q   Okay.  What other cases have you had in
23  which you've been an expert witness in which you've
24  been named on behalf of the plaintiff?
25     A   I'm not sure I can disclose a couple of

Confidential - Attorneys' Eyes Only

Page 30

1  them because they -- they settled, and the court -- I
2  was under a court order as far as withholding
3  information.  In fact, I had to destroy documents
4  after the settlement.  So I will probably just -- but
5  generally, a couple plaintiff's issues against a
6  company.
7        A wrongful termination suit, I was on
8  plaintiff's side a couple of times.
9     Q   Mr. Ulatowski, the fact that you were an
10  expert witness in a litigation, and the existence of
11  litigation is not privileged.  The documents that you
12  were provided may have been designated as
13  confidential, and some of the testimony may have been
14  designated confidential.  But certainly not the -- the
15  existence of the litigation or the fact that you were
16  actually named as an expert witness would not be
17  confidential.
18        So all I am asking you right now is, on
19  what cases were you named as an expert on behalf of
20  the plaintiff, and generally what did the cases
21  involve?
22        MR. GAGE:  Objection to the portion of the
23  question that -- that -- well, David, here's the deal:
24  If he was disclosed as an expert, I agree with you.
25  If he was publicly disclosed, but there are cases

Page 31

1  where he might not have been disclosed as an expert,
2  and so, therefore, his involvement would have been --
3  would not have been known, would have been
4  confidential.
5        So I don't know.  I hadn't talked to him
6  about this specific case.  But I did want to draw that
7  distinction, because I think that -- that possibly is
8  what he's talking about.
9        MR. MAZIE:  Why would -- why would the fact
10  that he was a consulting expert be precluded from
11  discovery?
12        MR. GAGE:  Because a lot of times you have
13  agreements or contracts with the party that says I'm
14  going to be retained as a consulting expert, and your
15  identity and retention will be kept confidential
16  unless and until counsel makes the decision to
17  disclose you as a -- as a testifying expert.
18        MR. MAZIE:  We don't know that, though.
19        MR. GAGE:  But, I mean, go ahead and ask
20  him if he knows.  I'm not trying to -- I'm just trying
21  to make sure there's a distinction there.
22  BY MR. MAZIE:
23     Q   All right.  First of all, on how many
24  occasions have you been disclosed as an expert on
25  behalf of a plaintiff in a litigation?

Page 32

1     A   I guess there's the rub.  I don't know
2  that.  I don't know how far it advanced before there
3  was settlement.  And so I just -- I don't know.
4     Q   All right.  Let me ask you this:  On how
5  many occasions have you issued an expert report on
6  behalf of a plaintiff in a litigation?
7     A   I'll have to examine my reports I'm
8  thinking of just to be certain about the plaintiff's
9  identity and disclosure.  Not that I'm trying to avoid
10  the answer, but I don't want to misspeak.
11     Q   Okay.  Is that something you'll be able to
12  do on a break or contact somebody at your office?
13     A   No.  I -- all those records I have at home.
14     Q   Okay.  Something we can deal with tomorrow?
15     A   Perhaps, yes.
16     Q   Well, are all the records we're talking
17  about at your house?
18     A   Probably, but I can't say with certainty.
19     Q   Okay.  Is there someone at your office --
20  if they're at your office, is there someone at your
21  office that can help you get copies of what you need?
22     A   I will -- I'll explore that during a break.
23     Q   What I'm going to ask you to do is to
24  produce to us -- at a minimum identify, but certainly
25  have copies so we can at least have them marked, and

Page 33

1  if somehow it's confidential -- you deem it
2  confidential, you'll give that to counsel, defense
3  counsel, and he'll take that.  And then if we have to,
4  we'll fight over it later on.
5        But I do need you to bring with you
6  tomorrow morning any depositions and expert reports in
7  any case in which you were an expert, whether it be
8  the plaintiff or the defense.
9     A   I want to be clear on this.  You want all
10  my reports?
11     Q   I want all your reports.  I want all your
12  depositions in any case.  You've only been doing this
13  for about two years.
14     A   Yeah, I understand that.
15     Q   There shouldn't be too many.
16        But, yes, that's what I want.
17        And then if there's an issue as to any of
18  them, you'll give that to counsel, and we'll deal with
19  it ourselves.  But at a minimum, we need you to
20  produce those to at least counsel, and then he'll give
21  me what he thinks is appropriate.  And if there are
22  any that we need to fight over, we'll fight over.  But
23  at least he'll have possession of it.
24     A   I understand.  I -- I just -- you know,
25  after signing court orders about disclosures and

Confidential - Attorneys' Eyes Only

Page 34

1  whatnot, I'm a little cautious about these things.
2       MR. GAGE:  Well, we'll -- we'll work off
3  this.
4  BY MR. MAZIE:
5       Q   Yeah, I just -- I just need you to bring
6  it.  And you're not going to violate anything.  You're
7  going to give it to counsel.  You're not going to --
8  he's not going to produce it to me unless it's
9  appropriate to produce it to me --
10      A   Uh-huh.  Okay.
11      Q   -- from his perspective.
12      A   Uh-huh.
13      Q   Okay?
14          You've got to answer verbally.
15      A   I understand.
16      Q   Okay?  I just want to give you -- I should
17  probably give you this, even though you're probably
18  aware of this.  Please make sure that all your answers
19  are verbal in nature.  Don't nod your hear or say
20  uh-huh or unh-unh, otherwise, the court reporter won't
21  be able to take that down.
22      A   I understand.
23      Q   Okay.  And can you estimate for me on how
24  many occasions you have issued expert reports in a
25  litigation?

Page 35

1       A   It would be a guess.  I would say a couple
2  dozen, over a couple dozen, perhaps.
3       Q   So somewhere in the mid-20s?
4       A   Yes.  But some of those have been reports
5  under a single type of litigation, a single type of
6  issue.
7       Q   Okay.
8       A   For example, I -- I-Flow.  I've been an
9  expert in I-Flow cases, and there's -- there's a
10  number of, you know, cases going on there.  So if you
11  lump it all under I-Flow, you know, that's one thing.
12  If I break that out, then there's a number of reports
13  there.
14      Q   On how many occasions have you actually
15  issued an expert report on behalf of a plaintiff in a
16  litigation?
17      A   Well, I think I'll examine that tonight,
18  just to -- it wasn't anything I prepared for.  But
19  I'll take a look at that.
20      Q   Give me your best guess, estimate.
21      A   Well, with the caveat that I'm not sure
22  what happened with the report and whether he was
23  even -- it was even submitted to opposing counsel or
24  even to the -- to the court, a couple.
25      Q   Okay.  Any of the plaintiffs' cases in

Page 36

1  which you've issued a report involve -- did any of
2  those involve allegations concerning 510-Ks?
3       A   They may have concern -- they may have
4  involved 510-Ks, but whether there was a primary
5  issue, I'm thinking of one.  I don't think it was the
6  primary issue.
7       Q   In any of the cases in which you acted as a
8  plaintiff's expert and issued a report, was there any
9  issue or allegation concerning material misstatements
10  or omissions from an IFU, a patient brochure, or any
11  advertising materials or labeling?
12      A   Could you say that again, please?
13      Q   Sure.
14          MR. MAZIE:  Could you repeat that?
15          (The reporter read the record as follows:
16      "QUESTION:  In any of the cases in which
17  you acted as a plaintiff's expert and issued a report,
18  was there any issue or allegation concerning material
19  misstatements or omissions from an IFU, a patient
20  brochure, or any advertising materials or labeling?")
21      A   I seem to be focused on this one report in
22  my mind.  There were -- there were issues of
23  advertisements and labeling.
24      Q   Is that case still ongoing?
25      A   No.  It's been settled.

Page 37

1       Q   Okay.  Let's make sure that you look for
2  that, that report in particular.
3          Did you get deposed in that case?
4       A   No, I was not.
5       Q   Okay.  Have you ever been deposed in any
6  case in which you were named as an expert on behalf of
7  a plaintiff?
8       A   Of the six, no.
9       Q   Okay.  And again, those are the -- those
10  six times are the only times you've ever been deposed
11  in a litigation, civil litigation.  Correct?
12      A   That's correct.
13      Q   Okay.  What percentage of your time over
14  the past two years has been devoted to litigate --
15  acting as an expert in litigation?
16      A   Well, I'd like to think I split my time
17  50/50 between litigation and -- and regulatory
18  support.
19      Q   I know you say you'd "like" to say that.
20  I'm asking you, what is the actual split?
21      A   Well, I don't know.  I don't know
22  specifically.  I'd have to add up the hours and kind
23  of see what exactly it is.
24      Q   What's your best estimate as to what
25  percentage of your time is devoted to acting as an

10 (Pages 34 to 37)

Confidential - Attorneys' Eyes Only

Page 38

1  expert in litigation?
2      A   Fifty percent.
3      Q   Okay.  And what percentage of the time are
4  you acting as an expert in a litigation on behalf of a
5  defendant pharmaceutical manufacturer?
6      A   A pharmaceutical manufacturer specifically?
7      Q   Well, medical device or pharmaceutical.
8      A   Okay.
9      Q   Big pharma, if you will.
10         MR. GAGE:  Objection.
11     A   Well, I think that all six depositions
12  include testimony on behalf of a medical device
13  company, if that's what your question is.
14     Q   No.  I'm asking, you said that you've been
15  retained as an expert in approximately two dozen
16  litigations.  Correct?
17     A   Yes.
18     Q   Okay.  What percentage of those litigations
19  in which you've been retained as an expert have been
20  on the plaintiff versus the defendant?
21     A   Where I've been retained?
22     Q   Yes.
23     A   Mostly on the defendant side, being a
24  medical device company.
25     Q   All right.  Can you estimate for us what

Page 39

1  percentage of the time where you've acted as an expert
2  or been retained as an expert in a litigation where
3  you've been retained on behalf of the defendant, what
4  percentage?
5      A   Oh.  I couldn't say with certainty how much
6  actual time has been spent on defendant work versus
7  plaintiff work.  But -- but the predominant percentage
8  would be for defendant, defendant being a medical
9  device company.
10     Q   90 percent?
11     A   Well, it would start at 80 percent, just --
12  that could be the case.  Could be 90 percent.
13     Q   Okay.  Fair to say your best estimate is
14  that when you've been retained as an expert in a
15  litigation, 80 to 90 percent of the time it's been on
16  behalf of the defendant manufacturer?
17     A   I could look at my depositions, but three
18  of my depositions actually have been one company --
19  two companies, actually, being the litigants.  So even
20  if I'm on plaintiff's side, it's been a medical device
21  company.
22     Q   Okay.  Let's talk about -- let's do it this
23  way:  On how many occasions have you represented the
24  plaintiff where there's been an allegation that a
25  medical device or a -- any type of medical product or

Page 40

1  drug caused injury to the plaintiff?
2      A   I don't think there's any like that.
3      Q   Okay.  So it's fair to say that --
4          MR. MAZIE:  Strike that.
5  BY MR. MAZIE:
6      Q   On how many occasions have you acted as an
7  expert on behalf of a defendant manufacturer in
8  litigation involving allegations that an individual
9  was injured by a medical device, a drug, or other
10  medical product?
11     A   That would be I believe three of the
12  depositions.  And as far as what's pending out there,
13  I'd have to look at the other expert reports to regain
14  a sense of exactly what the issues were.
15     Q   Fair to say that a hundred percent of the
16  time in which you've acted as an --
17         MR. MAZIE:  Strike that.
18  BY MR. MAZIE:
19     Q   Fair to say that in those cases in which
20  you've acted as an expert in which there was an
21  allegation that an individual was injured by a drug, a
22  medical device, or other medical product, you've in
23  every instance acted as an expert on behalf of a
24  defendant pharmaceutical manufacturer.  Correct?
25     A   Please repeat that.

Page 41

1      Q   Sure.  Fair to say that in every litigation
2  in which you've been involved where there's been an
3  allegation that an individual's been injured by a
4  medical device, a drug, or other medical product,
5  you've acted as the expert on behalf of the defendant
6  pharmaceutical manufacturer.  Correct?
7      A   I -- I can't say with certainty, but I
8  believe that to be the case.
9      Q   Okay.  You've had Ulatowski Consulting,
10  you've had Becker & Associates, and I think there's a
11  third company you've been associated with?
12         Is that correct?
13     A   Yes.
14     Q   What company is that?
15     A   NDA Partners, LLC.
16     Q   Are you still affiliated with NDA Partners?
17     A   Oh, very loosely.  I'm still in the process
18  of transferring maybe one or two contracts where I was
19  engaged under -- by them, and they're being
20  transferred to Becker & Associates.
21     Q   Okay.  So it's a wind-down?
22     A   It's a wind-down.
23     Q   Okay.  And what was your relationship with
24  NDA Partners?
25     A   I was termed a principal, not a partner.

Confidential - Attorneys' Eyes Only

Page 42

1    Q   What's the difference?
2    A   Well, a partner has part ownership through
3  shares or whatever the mechanism is by NDA Partners.
4  Whereas a principal is -- I was a 1099 associate of
5  NDA Partners that -- I guess the term identifies some
6  significance as far as expertise or -- or whatever the
7  case may be.  I'm sure there's a -- there's a term
8  there, some definition somewhere.
9    Q   For what period of time did you work for or
10 with NDA Partners?
11   A   Well, I have it in my CV, just to --
12 probably not that much longer after leaving government
13 until -- until I became an employee of Becker &
14 Associates.
15   Q   Okay.  What type of work did you do with
16 NDA Partners?
17   A   Regulatory work.  I was engaged in
18 litigation under their auspices.  I did some training,
19 speeches, various things.
20   Q   Has anyone ever advertised your services as
21 an expert witness?
22   A   NDA Partners on their website had me
23 listed, I believe, with those terms, Becker &
24 Associates.  My CV is posted, so I'm sure the term's
25 used.

Page 43

1    Q   As a litigation expert?
2    A   I don't -- I don't recall the exact terms,
3  but it probably has expert witness or something in
4  regard to that.
5    Q   Did you at Ulatowski Consulting advertise
6  your services as an expert witness for litigation?
7    A   Well, the only place I advertised, if you
8  want to call it advertising, is probably on LinkedIn,
9  where I posted myself.  But, you know, to that extent.
10 I don't recall, actually.  I haven't looked at my
11 LinkedIn site for some time.
12   Q   Have you ever advertised or promoted
13 yourself as an expert witness for hire for litigation
14 on behalf of defendant pharmaceutical manufacturers?
15   A   I don't believe that's been any limitation
16 in that regard.
17   Q   Okay.  So how have you advertised yourself,
18 or held yourself out as an expert?
19   A   By that you mean exactly what; held myself
20 out as?
21   Q   What you're available to do in litigation.
22   A   Well, the only -- it's been broadly stated,
23 expert witness in litigations.  So I've been
24 approached by attorneys for plaintiff, I was
25 approached by Mr. Aylstock in this case to -- to work

Page 44

1  for plaintiff.  But I was already engaged, conflicted.
2  I had been engaged, called many times by plaintiff
3  attorneys.
4        There's been conflicts, there's been
5  issues.  So I -- I will entertain any -- anybody as
6  far as at least a first contact.
7    Q   You've never accepted an assignment from a
8  plaintiff lawyer in a case in which there's been an
9  allegation that an individual has been injured by
10 virtue of a medical product, a medical device, or
11 drug.  Correct?
12   A   I believe that to be the case.  It doesn't
13 mean that someone hasn't approached me to -- for me to
14 consider that.
15   Q   You've never accepted any assignment to act
16 as an expert on behalf of a plaintiff in a litigation
17 in which somebody has been injured and the allegation
18 is that there was a defect or a failure to warn with
19 regard to a medical device, medical product, or drug.
20 Correct?
21   A   I believe that to be the case.
22   Q   Okay.  Now, have you ever submitted a 510-K
23 to the FDA on behalf of a medical device manufacturer?
24   A   Yes.
25   Q   Okay.  On how many occasions have you done

Page 45

1  that?
2    A   I have to check my records at primarily
3  Becker & Associates.  That's part of what we do at
4  Becker & Associates.
5        I'd say two, three times, perhaps.
6    Q   Okay.  So far to say that your entire
7  experience in your career in submitting a 510-K is --
8  you've done it approximately two to three times?
9    A   It's -- it's a guess, but I -- it's not
10 been a -- a large number so far.  I've only been
11 working with them for a few months.
12   Q   How many people -- how many other people
13 were involved in preparing those 510-Ks?
14   A   There's a -- there's staff of assistants,
15 associates, that assist me in preparation of portions
16 of the 510-K.
17   Q   On the two or three occasions in which you
18 were involved in submitting a 510-K, were you the
19 primary or lead person associated with the submission
20 of the 510-K?
21   A   I may not have been identified in the 510-K
22 as the primary contact, if that's your question.
23   Q   No.  My question is, from your perspective,
24 were you the senior person, the person who was the
25 most involved and in charge of making the decisions

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Attorneys' Eyes Only

Page 46

1  for the 510-Ks that were actually submitted?
2      A   I would be the primary person at Becker &
3  Associates, yes.
4      Q   Okay.  As opposed to the primary person at
5  the client?
6      A   I guess I don't understand your --
7      Q   Who actually submitted -- let me ask you
8  this:  Were those 510-Ks actually submitted to the
9  FDA?
10     A   Yes.
11     Q   Okay.  Who submitted the 510-Ks?  Was it
12  the client, manufacturer, or was it Becker &
13  Associates?
14     A   I -- I believe Becker & Associates filed on
15  behalf of the client.
16     Q   Okay.  And those submissions have been
17  made?
18     A   Yes.
19     Q   Okay.  And were they cleared by the FDA?
20     A   It's relatively recent.  Because I -- as I
21  said, I've just been with Becker just a few months, a
22  few weeks.  So I think they're still under review.
23     Q   Okay.  Fair to say you've never had a 510-K
24  that you've submitted to the FDA cleared by the FDA.
25      Correct?

Page 47

1      A   Not to my knowledge.  Although I could
2  check up on the status of the ones submitted to see
3  exactly what their situation is.
4      Q   As you sit here today, you've never
5  submitted a 510-K to the FDA that's been cleared by
6  the FDA.  Correct?  To your knowledge.
7      A   To my knowledge, yes.
8      Q   Now, you worked at the FDA for how many
9  years?
10     A   Almost 37.
11     Q   Okay.  During those 37 years did you ever
12  seek to leave the FDA and go to the private sector?
13     A   Yes.
14     Q   Okay.  When was that, first?
15     A   Well, I think one primarily sticks in my
16  head, to where -- I don't even recall how long ago it
17  was, maybe 15 years ago or so, I engaged in
18  discussions with a consulting firm.  Reached the stage
19  of contract, but I decided to stay with the agency.
20     Q   Okay.  You can't estimate for me when that
21  was, what decade?
22     A   I was with device evaluation at the time,
23  so in the '90s, perhaps; early '90s, mid '90s.
24     Q   Okay.  Did they approach you or you
25  approached them?

Page 48

1      A   I don't recall.
2      Q   Okay.  Aside from that one instance in the
3  '90s, when did you next seek to leave the FDA
4  potentially, or explore the possibility?
5      A   Well, I would -- I would be approached by
6  people from time to time, but as far as me responding
7  and engaging in any discussion, it didn't occur until
8  actually after I left the agency.  I think I may have
9  contacted NDA Partners, an associate there, just to
10  generally talk about consulting.  But we didn't engage
11  in any negotiations.  And, in fact, when I even
12  contacted NDA Partners, I excluded myself from any
13  dealings regarding drugs and devices at that time,
14  market submissions or -- or anything.  So just a, you
15  know, stay divorced from any possibility of an ethical
16  issue.
17     Q   Okay.  Aside from NDA Partners, did you
18  contact or speak with any other company in the private
19  sphere while you were at the FDA about potentially
20  leaving and going to work for them?
21     A   No.  I don't recall.  You know, you engage
22  in discussions about leaving the agency, but that's
23  not the same thing as engaging in conversation about
24  future employment at a particular company with a
25  particular person in a conversation.  I don't think

Page 49

1  I've done that.
2      Q   So is it your testimony that the only
3  company you spoke with about the potential of joining
4  them while you were at the FDA was NDA Partners?
5      A   As far as I recall.  Not to say there
6  wasn't, but I just -- I can't think of anything,
7  anybody else.
8      Q   Mr. Ulatowski, have you ever been involved
9  in drafting an IFU?
10     A   At Becker & Associates Consulting.
11     Q   Okay.  You've been at Becker & Associates
12  consulting for how long?
13     A   Well, I was a 1099 for Becker actually for
14  a few months longer than -- than being an employee.
15  But in constructing the 510-Ks, for example, you know,
16  that's one very important element of the -- of the
17  510-K.
18     Q   Okay.  So how -- let me ask you this:  How
19  long have you been at Becker?
20     A   As an employee since -- it's in my CV.
21  Maybe July.
22     Q   Okay.  And prior to July were you
23  affiliated with Becker?
24     A   As a 1099 consultant on occasion.
25     Q   Okay.  What percentage of your time --

Confidential - Attorneys' Eyes Only

Page 50

1    MR. MAZIE:  Strike that.
2  BY MR. MAZIE:
3    Q   When was the first time you did any work
4  for Becker?
5    A   I'd have to look at my records.  I can't
6  tell you offhand.
7    Q   Let me ask you this:  Prior to becoming
8  a --
9    MR. MAZIE:  Strike that.
10  BY MR. MAZIE:
11    Q   When is the first time you were ever
12  involved in preparing a 510-K for submission to the
13  FDA?
14    A   It was probably with Becker & Associates
15  after I became an employee, as far as I would think.
16    Q   All right.  Well, this is obviously very
17  recent, because you only became an employee in July,
18  which is just a few months ago.  So let me ask you
19  this:  When --
20    A   I may have been engaged because -- I'd have
21  to look at my records, because some things might have
22  transitioned as I -- when I was a 1099, and then now
23  as an employee.  But I just don't recollect offhand.
24    Q   Okay.  All we're looking for is your best
25  recollection.  A lot of these events we're talking

Page 51

1  about happened only -- in the last few months.
2    So you've already testified that you think
3  that you've been involved on two, maybe three
4  occasions in which you were involved in preparing and
5  submitting a 510-K to the FDA.  Correct?
6    A   Yes.
7    Q   And my question is, when did you first
8  start working on any 510-K for submission to the FDA
9  in your entire career?  When is the first time you
10  ever did that?
11    A   It may have been before I became an
12  employee of Becker & Associates as a 1099 consultant
13  for Becker.  I have to look at my records and billing
14  records just to see when those first hours were
15  accounted for.
16    Q   Fair to say that the first time you ever
17  worked on any --
18    MR. MAZIE:  Strike that.
19  BY MR. MAZIE:
20    Q   It's fair to say that the first time in
21  your career that you worked on any 510-K in any
22  fashion for submission to the FDA was within the past
23  six months.
24    A   Well, with the caveat I just mentioned,
25  that, you know, there may have been a portion as a

Page 52

1  1099 where I initiated that sort of work.  But as far
2  as exact dates, no.  You know, I have to look at my
3  records again.
4    Q   Well, is it possible that you worked on any
5  510-Ks prior to 2012?
6    A   It's possible.
7    Q   Okay.  You don't know, though, as you sit
8  here today.
9    A   Well, I -- I've had a lot of clients, a lot
10  of different work.  So I don't try to memorize my --
11  my billing records.
12    Q   As you sit here today, you can't tell us
13  the first time you worked on any 510-K submission.
14  Correct?
15    A   Not a specific date.
16    Q   You know, though, that it was certainly in
17  the past year and a half or so?
18    A   It would have to be.
19    Q   Okay.  Have you ever been involved in
20  drafting a patient brochure for any medical device or
21  drug?
22    A   Yes.
23    Q   Okay.  On how many occasions?
24    A   I think the -- I think maybe once, maybe
25  twice.  So of the -- of the few 510-Ks I've worked on,

Page 53

1  I think one or two of those actually had a -- were
2  over-the-counter sorts of -- or prescription with
3  patient information, so ...
4    Q   Okay.  So you think that in your career
5  you've actually worked on a patient brochure one or
6  two times.  Correct?
7    A   I believe that to be the case.  I'll have
8  to review my records again.
9    Q   And that was certainly within the last year
10  and a half or so.
11    A   Yes.
12    Q   Okay.  Have you ever worked as a litigation
13  expert or consultant for Ethicon or Johnson & Johnson
14  outside of this case?
15    A   Not in litigation but otherwise?
16    Q   Either.
17    A   Yes.
18    Q   Okay.  Why don't you tell us on what -- how
19  many occasions.
20    A   Well, of course this -- this litigation is
21  self-apparent.  I mentioned DePuy, the deposition last
22  week.  And I provided regulatory support for J&J, a
23  couple of J&J companies along the way --
24    Q   Okay.
25    A   -- in the past two years since I've been a

14 (Pages 50 to 53)

Confidential - Attorneys' Eyes Only

Page 54

1  consultant.
2      Q   Okay.  In the past six months, what
3  percentage of your income --
4      MR. MAZIE:  Strike that.
5  BY MR. MAZIE:
6      Q   In the past six months, what percentage of
7  your billings have been associated with J&J
8  litigations?  And when I say "J&J litigations," I'm
9  referring to Ethicon or any other J&J affiliated
10  entity, whether it be DePuy or otherwise.
11      A   Oh, that's a -- that's difficult for me to
12  answer without looking at my records.
13      Q   Can you estimate for us what percentage of
14  your billings in the past six months have been as a
15  result of your litigation consulting with DePuy,
16  Ethicon, or any other J&J entity?
17      A   I couldn't hazard a guess.  I don't do the
18  billing at Becker & Associates, you know, someone else
19  does that.  I transfer my hours from my spreadsheet.
20      I don't know.  I'd have to study my
21  spreadsheet to see, make a -- a reasonable answer to
22  that question.
23      Q   Okay.  Since January 1st, 2012, can you
24  estimate for this jury the percentage -- your
25  percentage -- the percentage of time that you've spent

Page 55

1  as an expert witness on behalf of a litigation in
2  which --
3      MR. MAZIE:  Strike that.
4  BY MR. MAZIE:
5      Q   Can you estimate for this jury the amount
6  of time you've spent since January 1st, 2012, acting
7  as a litigation expert or consultant on behalf of
8  Ethicon, DePuy, or any other Johnson & Johnson entity?
9      A   I -- I would be speculating.  I don't -- I
10  don't know offhand.
11      Q   You can't give a -- an estimate to this
12  jury as to how much time you spent for litigation
13  consulting for J&J, DePuy, or Ethicon since January
14  1st?
15      A   No.  I have a lot of clients.  My
16  spreadsheet has a lot of names on it.  So I -- I
17  couldn't tell you that with any certainty.
18      Q   How much money did you bill for -- have you
19  billed to date for this case, for Ethicon?
20      A   I was informed by counsel that -- unless
21  I'm mistaken, it was something like $60,000.
22      Q   Okay.  How much do you bill per hour?
23      A   400 per hour.
24      Q   Okay.  And the total billings in this, case
25  it's your testimony, are $60,000?

Page 56

1      A   That was my understanding.  I -- I never
2  added up the hours.  But I think that's what counsel
3  stated to me at one point.
4      Q   At what point?
5      A   Recently.  A couple -- three days ago.  I
6  think when all the records were provided, billing
7  records by Becker & Associates, we -- somebody added
8  it up.
9      Q   On how many occasions have you actually
10  testified in court in any matter, whether it be the
11  FDA or otherwise?
12      A   Just the one time.
13      Q   Just the one time?
14      A   As an FDA employee.
15      Q   Have you ever represented in any materials
16  that you were one of the primary witnesses for the FDA
17  while you were at the FDA?
18      A   That was probably the one case, in Chicago,
19  where I testified.
20      Q   Where did you make that representation?
21      A   Oh, probably one of my CVs along the way,
22  in the first -- probably on the first page.  I don't
23  recall specifically.
24      Q   In your CV you said that you were the FDA
25  key witness in federal court in the U.S. versus Abtox

Page 57

1  case, you were a contributor to many court cases,
2  advisor to the DOJ, and FDA criminal investigations
3  office.  Is that correct?
4      A   That's correct.
5      Q   All right.  On how many occasions were you
6  a contributor to many court cases?
7      A   Well, none as a witness, not testifying in
8  court.  But providing background, behind-the-scenes
9  information, advice, counsel.
10      Q   What does that mean?
11      A   Well, when -- when you're working up a case
12  that moves forward through the Department of Justice,
13  the director of compliance has a key role in
14  presenting the case to the government, to the U.S.
15  Attorney, the facts of the case -- in addition to the
16  general counsel of FDA.  The facts of the case, the
17  evidence.
18      You're asked questions, you're asked about
19  key elements of the case, how -- how to present
20  certain portions of the case, perhaps, by DOJ
21  attorneys.  So in that sense, contribution.
22      Q   So they asked you for information and you
23  provided it, essentially?
24      A   Opinions, recommendations from time to
25  time.

15 (Pages 54 to 57)

Confidential - Attorneys' Eyes Only

Page 58

1    Q   And again, the only time you testified in
2  court was in the U.S. versus Abtox case?
3    A   Yeah.  I don't think it was called U.S.
4  versus -- I think it was probably U.S. versus Caputo
5  was the exact title.
6    Q   And when was that testimony, approximately?
7    A   Four, 2004 or '5.
8    Q   How many days did you testify for?
9    A   At least a day and a half.
10   Q   Have you ever been a party to a litigation,
11  either as a plaintiff or a defendant?
12   A   No.
13   Q   Have you ever been formally or informally
14  criticized by anyone at the FDA or outside the FDA for
15  your work there?
16   A   Can you repeat that?
17   Q   Sure.  Have you ever been formally or
18  informally criticized by anyone at the FDA or outside
19  the FDA for your work at the FDA?
20   A   Well, that covers a lot of ground.
21       Criticized by whom?
22   Q   Anyone.
23   A   I'm sure I was criticized by some of my
24  employees, criticized for voicing opinions, you know,
25  criticism -- if you could define criticism.

Page 59

1    Q   Have you ever had any type of formal
2  criticism regarding your work while at the FDA?
3    A   "Formal criticism" being?
4    Q   By any body.  By any body, B-O-D-Y.  Not
5  anybody, but any body, B-O-D-Y, internally at the FDA
6  or Congress or any organization?
7    A   Any government organization?
8    Q   Sure.
9    A   Formally, whatever that means.
10       Not that I can -- I can ever recall.
11   Q   Have you ever evaluated adverse events
12  reported during premarket clinical investigations and
13  determined if these events required expedited
14  reporting?
15   A   Yes.
16   Q   When?
17   A   During my -- my tenure in device
18  evaluation, there was a period of time when a lot of
19  the reports, there was interaction on reporting and
20  identification of the need for expedited reporting for
21  deaths, certain deaths, certain serious injuries.
22       That role transitioned to the Office of
23  Surveillance and Biometrics.  So, you know, I mean,
24  during the course of my tenure at FDA.
25       But the primary responsibility now for

Page 60

1  doing that is in the Office of Surveillance and
2  Biometrics.
3    Q   When was the -- when did you actually
4  evaluate adverse events; what years?
5    A   Probably when I first became a branch chief
6  in device evaluation -- in my CV I indicate the
7  dates -- up through almost the end of my career.
8    Q   And on how many occasions did you actually
9  evaluate adverse events?
10   A   On how many days?
11   Q   How many occasions?
12   A   How many occasions?  Innumerable.
13   Q   Have you ever designed a regulatory
14  strategy for a medical device?
15   A   Yes.
16   Q   When?
17   A   As an employee of Becker & Associates, as a
18  principal for NDA Partners.
19   Q   Okay.  On how many occasions have you
20  designed a regulatory strategy for a medical device?
21   A   Half a dozen times.
22   Q   When is the first time you ever designed a
23  regulatory strategy for a medical device?
24   A   Probably NDA Partners, discussions
25  regarding a combination product, how to approach

Page 61

1  design, how to approach the regulatory process for
2  them, a particular combination product.  I think
3  that's -- that comes to mind as being the first time.
4    Q   When was that?
5    A   After I left the agency, maybe mid summer
6  last year.
7    Q   So sometime in the past 12 to 15 months is
8  the first time that you designed a regulatory strategy
9  for a medical device.  Correct?
10   A   Thereabouts.
11   Q   Okay.  Have you ever designed a clinical
12  trial or written a clinical trial protocol?
13   A   No.
14   Q   Have you ever evaluated and assessed
15  clinical trial data to determine product safety?
16   A   Yes.
17   Q   When?
18   A   During my tenure in the investigational
19  device office as an employee and then as director.
20  During my tenure in device evaluation, evaluating
21  products over the course of my tenure, primarily in
22  those areas.
23   Q   Have you ever evaluated and assessed
24  clinical trial data to determine product
25  defectiveness?

16 (Pages 58 to 61)

Confidential - Attorneys' Eyes Only

Page 62

1      A   Yes.
2      Q   Same answer?
3      A   Same answer.
4      Q   Have you ever written medical device
5  labeling for a medical device company?
6      A   Well, I think you already asked that.  I --
7  yes, I've constructed IFUs.
8      Q   Okay.
9      A   We talked about patient labeling.  Those
10  are forms of labeling.
11      Q   Have you ever participated on a medical
12  device product development team at a company?
13      A   Yes.
14      Q   When?
15      A   Well, fresh in my mind, I'm on a team that
16  started on Monday with a new product.
17      Q   Okay.  Aside from the team you started with
18  a few days ago, when else have you ever participated
19  on a medical device product development team at a
20  company, or for a company?
21      A   Well, in the broadest sense, as -- as
22  you're part of the formulation of testing and design
23  control related activities, we talked about 510-Ks,
24  but really the discussion regarding the products
25  precedes the 510-K submission.

Page 63

1          You are part of the team and conversation
2  regarding -- and decision-making regarding what sorts
3  of tests need to be accomplished and other aspects of
4  the development program.
5          So when we talk about 510-K submissions,
6  that's part of the whole process.
7      Q   All right.  So your -- your -- it's your
8  testimony that your participation on a medical device
9  product development team is limited to those two or
10  three occasions in which you have been involved in the
11  submission of a 510-K over the past year and a half.
12          Correct?
13      A   And -- and the most recent activity.
14      Q   Which is you just got named three days ago
15  to a team?
16      A   That's correct.
17      Q   Have you ever done bench testing for a
18  medical device?
19      A   Not -- not as a consultant or employee of
20  Becker & Associates.
21      Q   I'm asking ever in your career, have you
22  ever done bench testing for a medical device?
23      A   I participated in some evaluations in our
24  science and engineering -- in FDA's science and
25  engineering laboratories, evaluating some issues

Page 64

1  regarding devices; forensic sorts of studies.
2      Q   On how many occasions?
3      A   I can't tell you specifically.  A few
4  times.
5      Q   Okay.  Have you ever done any type of
6  performance testing for any medical device?
7      A   Not as a -- as a consultant or employee of
8  Becker & Associates.
9      Q   I'm not limiting my questions to Becker &
10  Associates.  I'm asking you, in your career have you
11  ever done any type of performance testing for a
12  medical device?
13      A   Well, I think some of those laboratory
14  exercises were related to performance, safety and
15  performance.
16      Q   And you're talking about the couple of
17  times that you might have done it at the -- over your
18  37 -- 37-year career at the FDA.  Correct?
19      A   For medical devices, yes.
20      Q   All right.  And again, you weren't the
21  primary person doing the performance testing.
22      A   No, I was not the primary laboratory.
23      Q   Have you ever developed a standard
24  operating procedure for a medical device company?
25      A   Yes.

Page 65

1      Q   When was that?
2      A   More than half a dozen times.  It's
3  probably now getting to a dozen times, probably.
4      Q   Okay.  Have you ever performed an FMEA?
5      A   Only in coursework in college.
6          I've -- well, actually, I did -- I did a
7  large risk-management work task for -- for a large
8  pharmaceutical/medical device company.  So that took a
9  great deal of time.  And part of that involves FMEAs,
10  risk reports, related issues.
11          So, I mean, that's a long answer.  The
12  short answer is yes.
13      Q   Okay.  Outside of college, have you ever
14  been involved in performing an FMEA?
15      A   Well, what I did is -- I guess the short
16  answer is yes.  I'll explain.
17          I -- as I said, I constructed and
18  participated with a large pharmaceutical/medical
19  device company in -- in creating their risk-management
20  program.  And part of that included formatting and
21  creation of their risk-management documentation, which
22  included FMEAs.
23      Q   And when was that?
24      A   Last year.
25      Q   Okay.  That's the only time you've been

Confidential - Attorneys' Eyes Only

Page 66

1  involved with an FMEA?
2      A   No.  It -- in examining design control
3  information, commenting, critiquing for companies, the
4  issue comes up from time to time, FMEAs; their
5  construction, their adequacy, their usage in the
6  company.  The SOPs surrounding FMEAs.
7      Q   Have you ever done any type of consulting
8  for tobacco companies?
9      A   Yes.
10     Q   When?
11     A   Last year.
12     Q   Which company were you affiliated with at
13 that time?
14     A   Altria.
15     Q   What's Altria?
16     A   It owns Philip Morris and other companies.
17     Q   No, I was asking which company you were
18 affiliated with, yourself; Ulatowski Partners --
19     A   Oh.  Ulatowski Consulting, LLC.
20     Q   Ulatowski.  Okay.
21         What type of consulting did you do for
22 tobacco companies?
23     A   Well, it's very little, actually.  Just
24 introductory sorts of conversations.  I think there
25 was a training program I participated in.  That's been

Page 67

1  about it.
2      Q   Fair to say you were doing about 15 hours a
3  month for the tobacco companies?
4      A   It wasn't very much.  It was not many
5  hours.
6      Q   Have you ever testified that you were
7  performing about 15 hours per month of work for
8  tobacco companies?
9      A   I may have.  There weren't many hours.  And
10 there haven't been many hours for many months.
11     Q   At Becker Consulting have you done any work
12 for tobacco companies?
13     A   No.
14     Q   At NDA Consulting did you do any work for
15 tobacco companies?
16     A   No.
17     Q   Did NDA Consulting tell you they did not
18 want to be involved with any type of consulting for
19 tobacco companies?
20     A   Yes.
21     Q   And because of that, you did the consulting
22 on your own through Ulatowski Consulting?
23     A   Yes.
24     Q   Okay.  You say in your CV that you were at
25 some point a primary reviewer of 510-Ks?

Page 68

1      A   Yes.
2      Q   Okay.  When was the last time you were a
3  primary reviewer of 510-Ks?
4      A   Probably when I became director of
5  compliance.
6      Q   When is that?
7      A   2003.
8      Q   For what period of time were you the
9  primary reviewer of 510-K submissions?
10     A   When I first became branch chief within
11 device evaluation until I became director of
12 compliance.
13     Q   What's the time period?
14     A   I could look at my CV.  I would say 15, 16
15 years.
16     Q   Okay.  And how many 510-Ks -- can you
17 estimate for me how many 510-K applications you
18 reviewed?
19     A   Impossible to say.  Innumerable.
20     Q   Okay.  What percentage of the time did you
21 clear 510-Ks, approximately, as opposed to not
22 clearing them?
23     A   I would say the majority were of the
24 results of the review, formal results of the review,
25 were substantial equivalence.  But I might add that

Page 69

1  during the course of review of the 510-K, many
2  submissions fall away for one reason or another.  And
3  so if you're asking how many were submitted for review
4  and how many were then cleared, you know, that would
5  maybe be another answer.
6      Q   Well, that's my question.  My question is,
7  what percentage of the time 510-Ks were submitted for
8  your review while you were at the FDA where you did
9  not ultimately clear the product, or the application?
10     A   Did not ultimately clear.
11     Q   Yep.  Percentagewise.
12     A   A third to maybe more.
13     Q   Okay.  So your best estimate is that
14 approximately a third to, say, 40 percent of the time,
15 say 30 to 40 percent of the time, where you were the
16 primary reviewer of a 510-K, the product ultimately
17 was not cleared by the FDA.  Is that fair to say?
18     A   It varied from point to point, from type of
19 device to type of device.  To aggregate it, you know,
20 there would be an error bar in that number.
21         Thirty, forty.
22     Q   Percent?
23     A   Yes.
24     Q   Were not cleared?
25     A   Were not ultimately cleared by the agency.

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Attorneys' Eyes Only

Page 70

1    Q   Okay.  Have you ever found a company to be
2  in noncompliance in marketing and misbranded an
3  adulterated product because of failure to obtain a
4  510 -- 510-K clearance?
5    A   I've been the signatory on warning letters
6  where that was a charge.
7    Q   How many occasions?
8    A   I -- I have no way of guessing on that.
9  Several.
10   Q   Several or numerous?
11   A   Whatever the definition of numerous is.
12 Perhaps.
13   Q   More than 20?
14   A   Over the course of eight years, perhaps.
15   Q   Have you ever found a company to be in
16 noncompliance due to NDR reporting issues?
17   A   Yes.
18   Q   How many occasions?
19   A   Likewise, numerous.
20   Q   Okay.  Have you ever written or presented
21 on the subject of whether -- whether to submit a 510-K
22 is a good-faith standard?
23   A   Well, I guess you'd have to clarify for me.
24 I mean, first of all, re -- restate it.
25   Q   Sure.  Let me back up.

Page 71

1        Is it your position that whether or not to
2  submit a 510-K is a good-faith standard on the part of
3  the manufacturer or is it a strict liability standard?
4    A   Well, I'm not a lawyer.  So let me just
5  answer you this way:  I think that when I assess how
6  one comes to conclusions regarding whether to submit a
7  510-K, I'll look at the process that they engaged in
8  in making that decision.  And seeing what -- based on
9  the evidence, the testimony, documents, exactly what
10 they did.
11       Now, if you want to characterize that as
12 good faith, that's up to you.  But, I mean, that's --
13 that's what I do.
14   Q   If the FDA determines that a product was
15 not substantially equivalent, but the manufacturer did
16 not submit a 510-K, do you agree it doesn't matter
17 whether or not the manufacturer was acting in good
18 faith, the manufacturer is in violation of the
19 regulations.  Correct?
20       MR. GAGE:  Objection.
21   A   Please -- please repeat that.
22   Q   Sure.  Do you agree that if the FDA
23 determines that a product which has been marketed
24 without a 510-K is not substantially equivalent to
25 another product, predicate product, that in that

Page 72

1  instance the manufacturer has been marketing and
2  selling a misbranded and adulterated product,
3  regardless of whether or not the manufacturer acted in
4  good faith in its determination of whether or not a
5  510-K should be submitted?
6        MR. GAGE:  Objection.
7    A   Well, if you -- you preface by FDA.  FDA
8  determines through a 510-K submission, because that's
9  the only way they would determine it being
10 substantially equivalent or not substantially
11 equivalent, determines a product to being not
12 substantially equivalent, then the product has to
13 be -- cannot be marketed.
14   Q   Okay.  And if the product was marketed
15 before that determination, and before the submission
16 of the 510-K, then that marketing of the product would
17 be illegal.  Correct?
18       MR. GAGE:  Objection.
19   A   FDA's determination of nonequivalence is an
20 agency determination.  And at that point FDA may
21 instruct, through the office of compliance in all
22 likelihood, that the product needs to be removed from
23 the marketplace.
24       But one caveat is is that a finding of not
25 substantial equivalence is not -- can be appealed.  A

Page 73

1  company can proceed to various levels within the
2  agency to appeal the decision, and FDA could
3  conceivably continue to allow enforcement discretion.
4        MR. MAZIE:  I'm going to object and move to
5  strike as nonresponsive.
6  BY MR. MAZIE:
7    Q   My question is, if you have a situation
8  where a manufacturer elects not to submit a 510-K,
9  markets a product, ultimately decides to submit a
10 510-K, and then there's a finding of nonsubstantial
11 equivalence as determined by the FDA, is it fair to
12 say that the product before the submission of the
13 510-K was being illegally marketed?
14       MR. GAGE:  Objection.
15   A   I think that would probably incur the need
16 for a process to establish the charge, and to then
17 have the product removed through a process.
18   Q   Do you agree that the product as it was
19 marketed before 510-K clearance was misbranded and
20 adulterated?
21       MR. MAZIE:  Strike that.
22 BY MR. MAZIE:
23   Q   Do you agree that the product before
24 submission of the 510-K --
25       MR. MAZIE:  Strike that.

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Attorneys' Eyes Only

Page 74

BY MR. MAZIE:
1  Q   Do you agree that under the scenario I just
2  gave you, where a manufacturer submits a 510-K after
3  marketing a product for three years, and then there's
4  a determination by the FDA that the product is not
5  substantially equivalent, that prior to that
6  determination of nonsubstantial equivalence, that the
7  product was misbranded and adulterated by definition?
8     MR. GAGE:  Objection.
9     A   I think there would -- I don't think it's
10  an automatic designation.  I think there would have to
11  be a process of -- then determination and charge
12  against the product.
13     Q   Why is that?
14     A   Well, it's just because of the fact that
15  the process of -- of finding a not substantial
16  equivalence may have so many twists and turns to it.
17  I mentioned the appeal process.  I mentioned the --
18  the finding -- the -- the technical and scientific
19  basis for the finding of not substantial equivalence.
20  Is it valid, is it appropriate?  What is the reason
21  for nonequivalence, can it be remedied -- easily
22  remedied?
23     I don't -- I think it would -- how this
24  would unfold, depending on the circumstances, each

Page 75

1  case being its own circumstance, it would probably
2  incur a process of evaluation, whether the agency
3  would declare the product adulterated and misbranded
4  and to move to have the product removed from the
5  marketplace.
6     MR. MAZIE:  Okay.  We have to change the
7  tape.
8     VIDEO SPECIALIST:  The time now is 11:02.
9  We are going off the record.  This is the end of Disk
10  Number 1.
11     (Short recess.)
12     VIDEO SPECIALIST:  The time now is 11:11.
13  We are back on the record.  This is the beginning of
14  Disk Number 2.
15  BY MR. MAZIE:
16     Q   Mr. Ulatowski, what I'm trying to get at
17  is, I know you talked about the fact that under the
18  scenario I gave you there can be an appeal process,
19  there can be a, you know, examination on a technical
20  and scientific basis.  My question is, if it is
21  ultimately determined, after appeals, after whatever,
22  that a product which was marketed prior to submission
23  of a 510-K, that the product was not substantially
24  equivalent to a predicate product, under that scenario
25  will you agree that the product was adult --

Page 76

1  adulterated, misbranded, and illegally marketed?
2     MR. GAGE:  Objection.
3     A   Well, again, I think, in my experience,
4  that charges are levied after a process of evaluation
5  by the office of compliance, taking facts into
6  consideration, and then formally rendering charges.
7     Q   I'm not talking about criminal charges.
8     A   No, I'm not talking about -- violations of
9  law.
10     Q   And what goes into that analysis of whether
11  or not to led -- levy charges?
12     A   Evaluation of the evidence, evaluation of
13  the -- the record, evaluation of the statements of
14  knowledgeable people within the agency or connected to
15  the agency.
16     Office of compliance doesn't automatically
17  do anything; it -- to be fair and provide for due
18  process for the parties, knowing that anything and
19  everything could end up in court, that there's always
20  a process incurred, as far as evaluating the facts.
21     Q   Is it your testimony that in order for
22  there to be a determination that something is
23  adulterated or misbranded while being marketed that
24  there needs to actually be charges levied?
25     A   There has to be a determination through a

Page 77

1  process that the violations exist, that the violations
2  are appropriate, are supportable, based upon the
3  evidence.
4     Because, as I said, whenever the office of
5  compliance states a violation of law, be it in a
6  warning letter or injunction or whatever the case may
7  be, you've got to have your ducks in order.
8     Q   Let me ask you this:  If Ethicon in this
9  instance created a new product that clearly, even in
10  its own opinion, was not based on a predicate at all,
11  any predicate product, and decided just to sell it
12  without submission of any type of clearance or
13  approval by the FDA, would that product be legally
14  marketed?
15     MR. GAGE:  Objection.
16     A   Well, I think, again, the process would
17  occur.  Evaluation -- obtaining and evaluating the
18  evidence, discussing the issues internally.  Because
19  again, you've got -- you've -- everything and anything
20  can end up in federal court, where the company or
21  whoever sues the government to say you acted
22  arbitrarily and capricious, or whatever the case may
23  be.  You've got to have your ducks in order in every
24  single instance.
25     So it's an evaluation of evidence, expert

Confidential - Attorneys' Eyes Only

Page 78

1    opinion, so on and so forth, before you put pen to
2    paper to say adulteration and misbranding.
3        Q   All right.  So you think that it's not
4    something automatic in the law, whether something is
5    adulterated or misbranded?
6        A   That's --
7        MR. GAGE:  Objection.
8        A   Well, I think what I'm saying is is not
9    automatic in terms of there is a process that ensues
10   in order to -- the end result being whether or not a
11   violation is -- is stated.
12       Q   All right.  So if I go out, I create my own
13   company and I start selling a product, a medical
14   device that I create in my garage, and I don't make
15   any submissions to the FDA, and the FDA learns about
16   it three years after I'm selling this medical device,
17   for those -- even before FDA takes any action, are you
18   telling me that by definition my sale of that medical
19   device is not adulterated or misbranded?
20       MR. GAGE:  Objection.
21       A   It may be.  I'd have to know the facts,
22   the evidence, the circumstances.  That's what I did in
23   compliance.  We -- before we rendered any violations,
24   you had to have the evidence, the data, the
25   information, the package.  Because the next step was

Page 79

1    the court.  And, you know, you don't want to get
2    thrown out.
3        Q   Right.  Let's then take my scenario
4    further.  I create this medical device in my garage,
5    it's not based on any other product, and I sell it for
6    three years.  The FDA finds out about it, makes a
7    determination that the product is adulterated and
8    misbranded and being illegally sold, there are no
9    appeals, and there are -- is no further legal action
10   taken in the courts by me.
11           Under that scenario, is the product
12   misbranded and adulterated and illegally marketed?
13       MR. GAGE:  Objection.
14       A   Well, what you -- I mean, that's -- you had
15   a lot of ands and alsos in there.  But as far as what
16   I heard, the elements of FDA has made the
17   determination, I believe, based on evidence, the
18   facts, whatever needs to be brought to bear in order
19   to construct the basis for the charge, the violation,
20   the violation then being confirmed and concurred by
21   compliance, confirmed and concurred by the general
22   counsel of FDA, and then you move to take enforcement
23   action.
24       Q   Under that scenario, is the product
25   adulterated, misbranded, and illegally marketed by me?

Page 80

1        MR. GAGE:  Objection.
2        A   If there's going to be an enforcement
3    action, yes; there's been a determination at that
4    point in time, if FDA has formally gone through that
5    process, formally made a statement, a decision,
6    through the appropriate channels and course of review
7    and evaluation, decision being formally made by the
8    appropriately designated people that this product is
9    adulterated and/or misbranded, then you move to
10   enforcement.
11       Q   Okay.  And enforcement would include
12   ensuring that I take the market off the -- the product
13   off the market?
14       A   Well, you're -- depending on what the
15   situation is.  There's -- there's several remedies;
16   injunction or seizure, for example.
17       Q   Okay.  Let's assume that I make this
18   product, this medical device, out of my own garage,
19   it's not based on any other product, FDA finds out
20   about it and makes a determination that the product is
21   adulterated and misbranded and illegally sold, but it
22   determines that I just didn't know what I was doing
23   and I was acting in good faith.
24           Does that change the fact that the product
25   is adulterated and misbranded and illegally sold?

Page 81

1        MR. GAGE:  Objection.
2        A   Well, I don't -- I don't know what to make
3    of the statement "good faith."
4            What FDA would do, in my role as compliance
5    director, for example, would be to evaluate the facts.
6    What are the facts?  What's the evidence that's
7    brought to bear?  What's the testimony of --
8    statements of the appropriate people in regard to this
9    particular case?  What's the inspection findings?
10           So what's on the table, what can I conclude
11   based upon everything before me in order to make --
12   render a conclusion that there's -- there is a
13   violation?  What is the proper violation?
14       Q   What -- what's --
15       A   Regardless, I think perhaps of -- of what
16   the manufacturer may have thought at that point in
17   time, the evidence being brought to bear, decision by
18   compliance being rendered, finding of adulteration and
19   misbranding.
20       Q   What's on the table is that I was stupid
21   and I thought I didn't need to get approval from the
22   FDA.  Okay?
23           So let me just give you this scenario:  Out
24   of my garage I create a medical device, because I
25   don't think -- I'm acting in good faith, but I don't

Confidential - Attorneys' Eyes Only

Page 82

1  know or think that I need to get approval from the
2  FDA.  The FDA finds out about this six months later,
3  and immediately says, You need to stop selling it,
4  which I do.  And that the product when it was sold was
5  misbranded and adulterated.
6          Under that scenario do you agree,
7  regardless of whether or not I acted in good faith,
8  that the product as it -- when it was sold was
9  adulterated and misbranded?  That's my simple question
10 to you.
11         MR. GAGE:  Objection.
12     A  Well, it's a simple question, but -- but
13 the answer is, you know, I'll bring to the table,
14 again, this process, a determination.
15     Q  Determination is made, in my scenario.  FDA
16 makes the determination.
17     A  If FDA has rendered, through appropriate
18 process, based upon appropriate evidence, the product
19 is adulterated and misbranded, and then it moves to
20 take an enforcement action, the manufacturer says,
21 Okay, well, I was wrong, stop selling.  Those are
22 scenarios that occur.
23     Q  My question is --
24         MR. MAZIE:  I'll object and move to strike.
25 BY MR. MAZIE:

Page 83

1      Q  My question is, and what I'm focusing on,
2  it doesn't matter whether I'm acting in good faith or
3  not in the end as to whether or not a product is
4  adulterated or misbranded and illegally sold.
5          Correct?
6          MR. GAGE:  Objection.
7      A  Well, you used the term "good faith."  I
8  mean, in what -- in what sense of good faith?
9      Q  I thought that I didn't need to go to the
10 FDA and get clearance for the product.  I didn't think
11 I needed any type of approval to sell the product.  I
12 created it in my garage, and I went out and I sold it.
13 When I found out by the FDA that I had to have
14 clearance or approval, I stopped selling it.
15         The determination by the FDA that the
16 product was adulterated and misbranded stands,
17 regardless of whether or not I was stupid enough to
18 think I didn't need FDA clearance or approval even
19 though I was acting in good faith.  Correct?
20         MR. GAGE:  Objection.
21     A  Well, part of the evidence would be --
22 based upon evidence collected during perhaps
23 inspection, would be what was the process this person
24 used; what did -- why did they rely on -- what
25 reliance did they use to make them believe they could

Page 84

1  go to market?  What is their -- what is their process?
2  What's their documentation?  What's their thinking
3  before they went to market.
4      Q  Why does that matter?
5      A  It has everything to do with the issue.
6  Because FDA is evaluating -- first of all, wants to be
7  fair.  Wants to understand the parameters of the
8  situation.  Wants to understand the thinking of the
9  submitter.
10         Because, again, any case can end up in
11 court before a judge.  And you've got to have all the
12 bases covered and ducks in order.  You've got to
13 understand their thinking, their reasoning, their
14 documentation, based upon evidence collected through
15 inspection or otherwise.
16     Q  So you can't answer the question as to
17 whether or not somebody who is marketing a product
18 which is determined to be adulterated and misbranded
19 by the FDA, whether or not the product doesn't
20 become -- that's --
21         MR. MAZIE:  Strike that.
22 BY MR. MAZIE:
23     Q  You can't give us an opinion as to whether
24 or not, if the FDA issues a decision that a product
25 that was being sold was adulterated or misbranded,

Page 85

1  whether or not that becomes reversed in -- somehow or
2  mitigated if the manufacturer of that product was
3  acting in good faith.
4          MR. GAGE:  Objection.
5      A  Well, I -- I mean, I'm not -- I mean, good
6  faith, the term "good faith" sort of is undefined.
7          I think they -- FDA has, again, collected
8  the evidence, regardless of whether the manufacturer
9  calls it good faith or whatever they call it, what
10 does the evidence show; what did they believe, what's
11 the basis for their belief?  Basis based upon
12 regulation and law, and process and procedure.
13         And then FDA, collecting that, assessing
14 that, making a decision, the appropriate people making
15 the decision at FDA that, well, there's no
16 adulteration and/or misbranding.
17         MR. MAZIE:  Object and move to strike.
18         All right.  Why don't we mark this as the
19 next exhibit.
20         (Ulatowski Exhibit 6 marked for
21 identification, to be attached to the transcript.)
22 BY MR. MAZIE:
23     Q  I show you what's been marked as Ulatowski
24 6.  Do you know what this is?
25     A  Yes.

22 (Pages 82 to 85)

Confidential - Attorneys' Eyes Only

Page 86

1    Q   What is this?
2    A   This is what every employee who leaves the
3 agency is given upon the completion of their service.
4    Q   Okay.  And does it apply to you?
5    A   Yes.
6    Q   Okay.
7    A   Portions of it apply to me.
8    Q   Okay.  Which portions?
9    A   Might be easier to ask me which portions do
10 not.
11    Q   All right.  Which portions of this document
12 don't apply to you?
13    A   The ban on -- well, they all I guess
14 fundamentally apply.  But real -- realistically what
15 applies -- what doesn't apply is the ban on trade or
16 treaty negotiation activities.  That's just not what I
17 do.
18    Q   Okay.
19    A   And the compensation limitation, that's not
20 what I do.  Disclosure of procurement information,
21 again, that's not what I do.
22        Because of the amounts, the one-year ban on
23 contractor compensation doesn't -- doesn't apply.  And
24 in the lower part, the one-year foreign entity
25 provision, that's not -- that's not what I do.

Page 87

1        So those elements.  So it looks like 50/50
2 I guess, once we look at it.
3    Q   Forty-five CFR Part 2 applies to you.
4        Correct?
5    A   The testimony and production of documents,
6 so on and so forth?
7    Q   Yes.
8    A   Yes.
9    Q   All right.  And what is your understanding
10 of that provision?
11    A   This is -- it's my belief, as instructed by
12 the ethics office, that this concerns disclosure of
13 confidential and trade secret information, specific
14 deliberations that are not in the public realm in
15 doing consulting work or -- or whatever the case may
16 be.
17    Q   It's fair to say that you're not entitled
18 in this or any other case to provide testimony
19 concerning information acquired during the course of
20 your official duties or because of your former
21 position with the FDA?
22    A   Yes, and --
23        MR. GAGE:  Objection.
24    A   -- and that concerns confidential trade
25 secret information, other deliberations that is not

Page 88

1 public information.
2        But any information gathered from documents
3 applied in litigation is -- is not subject to that.
4    Q   Any deliberative process within the FDA is
5 covered by this.  Correct?
6    A   Until such time that that deliberative
7 process ends.
8    Q   Okay.  So it's your understanding that if
9 you worked on a evaluation of a product at the FDA,
10 and then you left the FDA, you were -- you're entitled
11 to provide testimony or produce documents concerning
12 that deliberative process at the FDA?
13    A   If that -- if that issue has closed, I
14 think I probably would be able to.
15    Q   Have you ever done that in any case?
16    A   No.  When I've talked about FDA, I've
17 talked about generally known or understood policies,
18 procedures, public documents, things of that sort.
19    Q   Were you involved in any way, shape, or
20 form in the evaluation of the Prolift, or the
21 Prolift +M?
22    A   Not in device evaluation.
23    Q   At any time while you were at the FDA were
24 you involved in the evaluation or interaction with
25 Ethicon concerning the Prolift?

Page 89

1    A   I don't believe so.  There -- it may have
2 occurred in terms of any inspection that might have
3 occurred of the facility.  But that's kind of a
4 indirect connection.  But not directly, as -- as I
5 recall.
6    Q   As you sit here today, do you have any
7 knowledge of any of the deliberations at the FDA or
8 reviews or interactions between the FDA and Ethicon
9 concerning the -- the Prolift outside of what you've
10 read in this litigation?
11    A   No, I don't think I had any connection in
12 the Prolift.  It was a -- in device evaluation.  It
13 was a different division where I worked.  In
14 compliance there was never any enforcement action or
15 anything of that sort.
16        So short answer is, I don't think I've --
17 nothing came -- comes to mind of any connection,
18 discussion, interaction.
19    Q   And you have no special knowledge of
20 anything that occurred at the FDA, while you were at
21 the FDA, concerning the Prolift?
22    A   I don't believe so.
23    Q   Have you ever spoken to anyone at the FDA
24 concerning their interaction with Ethicon concerning
25 the Prolift?

23 (Pages 86 to 89)

Confidential - Attorneys' Eyes Only

Page 90

1    A   I don't think so.
2    Q   What's the purpose of the FDA?
3    A   To help protect the public health, ensure
4   the public health.
5    Q   Is one of the FDA's mandates to prevent the
6   marketing of misbranded or adulterated medical
7   devices?
8    A   Well, specifically as you bore down under
9   ensuring compliance with laws and regulations.  I
10  mean, that is a prohibition.
11   Q   My question to you is, is one of the FDA's
12  mandates to prevent the marketing of misbranded or
13  adulterated medical devices?
14   A   That's an element of their mandate, of
15  their responsibilities.
16   Q   Do you agree that the FDA seeks
17  accountability and a voluntary commitment to
18  compliance but stands ready to enforce the law?
19   A   Yes.  Voluntary compliance is -- is
20  discussed in the quality system regulation, for
21  example.  And it will enforce a law when necessary.
22   Q   Do you agree that the FDA should use the
23  enforcement at its disposal to help protect the public
24  health from medical devices violating the law?
25   A   Can you say that again, please?

Page 91

1    Q   Sure.  Do you agree that the FDA should use
2   the enforcement at its disposal to help protect the
3   public health from medical devices which violate the
4   law?
5    A   When necessary, yes.  And upon
6   determination that there's a violation.
7    Q   Do you agree that if -- even if a
8   manufacturer of medical device maintains compliance
9   with FDA regulations, it doesn't ensure quality of the
10  device?
11   A   You'll have to say that over again, please.
12   Q   Sure.  Do you agree that even if a
13  manufacturer of a medical device maintains compliance
14  with FDA regulations, that doesn't necessarily ensure
15  that the device is a quality device?
16       MR. GAGE:  Objection.
17   A   Well, I think, for example, the compliance
18  with the quality system regulation helps to ensure the
19  quality of the product.
20       MR. MAZIE:  Why don't we mark this.
21       (Ulatowski Exhibit 7 marked for
22  identification, to be attached to the transcript.)
23  BY MR. MAZIE:
24   Q   Have you seen this document before?
25   A   Perhaps.  I would -- I don't know.  I would

Page 92

1   have to look at this a little further.
2    Q   Take a look at it.  Tell me if you're
3   quoted in it.
4    A   I see my name referenced in it.  It refers
5   to a panel meeting.
6    Q   Where you actually speak.  Correct?
7    A   I haven't gone through the entire --
8    Q   Okay.
9    A   I see -- I see where I spoke.
10   Q   Okay.  Do you recall when you gave this --
11       MR. MAZIE:  Strike that.
12  BY MR. MAZIE:
13   Q   Do you recall giving this presentation?
14   A   I'd have to look through it just to
15  recollect.
16       Okay.  I see.  We're talking about just the
17  first document.
18   Q   Do you recall this?
19   A   Well, I see it.  You know, it comes to
20  mind, I suppose, but.
21   Q   Okay.  All right.  Why don't you turn to
22  the -- let's see, one, two, three, four, five, six --
23  seventh page.
24   A   Beginning with?
25   Q   In the bottom, it says Mr. Ulatowski,

Page 93

1   second sentence:  Once is product is approved, made
2   commercially available, there are physician and
3   healthcare facility reporting requirements that are in
4   place.  Do those requirements play out in terms of
5   types of reports we ought to be seeing?  No.  The
6   reporting system is that we don't -- I'm sorry.  The
7   reporting system is there, but we don't often see all
8   the reports that should have been submitted.  That is
9   a recurring deficiency with manufacturers and with the
10  physicians.
11       Did I read that correctly?
12   A   Yes.
13       MR. GAGE:  Objection.
14  BY MR. MAZIE:
15   Q   Do you agree with that, that the FDA, in
16  your opinion, was seeing a recurring deficiency with
17  manufacturers and others that they weren't reporting
18  all adverse events?
19       MR. GAGE:  Objection.
20   A   Well, based upon a couple of studies,
21  the -- in terms of MDR reports, for example,
22  underreporting is a phenomenon.
23       So as far as recurring deficiency, and with
24  physicians not reporting certain events, that is the
25  case in terms of underreporting.

Confidential - Attorneys' Eyes Only

Page 94

1      Q   Okay.  So just so we're clear, it's been
2  studied and it's been accepted by the FDA that
3  manufacturers underreport their adverse events for
4  their medical devices and other products.  Correct?
5         MR. GAGE:  Objection.
6      A   There have been report studies and
7  conclusions that there is underreporting.  The studies
8  are somewhat dated, so the degree of underreporting
9  can be argued.
10     Q   You've held that opinion, that
11 manufacturers underreport the adverse events they have
12 for their products.  Correct?
13        MR. GAGE:  Objection.
14     A   As a -- as a general population, meaning
15 manufacturers, there's underreporting.
16     Q   All right.  Device manufacturers we're
17 referring to.  Correct?
18     A   Yes.
19     Q   Yeah.  Do you agree that the violations of
20 FDA laws and regulations, whether they be intentional
21 or unintentional, are unacceptable?
22     A   Are we reading from somewhere here?
23     Q   I'm asking if you agree with that
24 proposition.
25     A   Can you say it again, please?

Page 95

1      Q   Sure.  Do you agree that violations of
2  the -- of FDA laws and regulations, whether
3  intentional or unintentional, are unacceptable?
4      A   Assuming that the violations have been
5  determined through the process I've been talking
6  about.  Violations should be reduced.  So the short
7  answer is yes, with that caveat.
8      Q   All right.  So even if there's an
9  unintentional violation of an FDA law or regulation,
10 that's still unacceptable and a violation of law?
11        MR. MAZIE:  Strike that.
12 BY MR. MAZIE:
13     Q   Even if a device manufacturer
14 unintentionally violates FDA laws and regulation,
15 that's something that's unacceptable to the FDA.
16 Correct?
17     A   It's something that needs to be addressed.
18 Now, what's the reason for that?  How can that be
19 mitigated?  Maybe it's caused by FDA through some
20 means.
21     Q   All right.  Let's go to -- there's a letter
22 in here, Food and Drug Administration Enforcement
23 Strategy, about a third of the way through?
24        Do you see it?
25     A   Uh-huh.

Page 96

1      Q   You're one of the signatories to this?
2      A   Yes.
3      Q   And the last sentence says as follows:
4  "Violations of FDA laws and regulations, whether
5  intentional or unintentional, are unacceptable and may
6  be addressed civilly and with criminal sanctions."
7         Do you agree with that statement?
8      A   I signed off on that.  And I think that
9  whether or not those violations result in enforcement
10 action, that process has to be incurred as far as the
11 evidence brought forth.
12     Q   Mr. Ulatowski, do you agree with the
13 statement you made in this presentation that
14 violations of FDA laws and regulations, whether they
15 be intentional or unintentional, are unacceptable?
16     A   Short --
17        MR. GAGE:  Objection.
18     A   Short answer is yes.  I was a signatory to
19 this document.  But with the caveats I mentioned.
20        MR. MAZIE:  I'm going to move to strike as
21 unresponsive as to the caveats you mentioned.
22 BY MR. MAZIE:
23     Q   Again, do you agree with the statement that
24 you stated here, that violations of FDA laws and
25 regulations, whether they be intentional or

Page 97

1  unintentional, meaning by mistake, are unacceptable?
2         Do you agree with that?
3         MR. GAGE:  Objection.
4      A   I think I said yes already.
5      Q   I'm going to ask you to turn to -- let's
6  see, one, two -- another couple of pages to the page
7  where it says Compliance.
8      A   Where are we at now?
9      Q   Compliance.
10     A   Yeah.  Got it.
11     Q   Do you agree that the FDA seeks
12 accountability of voluntary commitment to compliance,
13 but stands ready to enforce the law when necessary?
14     A   Yes.
15     Q   Okay.  I'm going to ask you to look,
16 there's an article attached at the end of this
17 document, seven-page article.  I ask if you're
18 familiar with this article?
19     A   This James Dickinson one?
20     Q   Yes.
21     A   Okay.
22     Q   Do you recall that article?
23     A   No, not -- I'll have to read through it.
24 Let me ...
25        Okay.

25 (Pages 94 to 97)

Confidential - Attorneys' Eyes Only

Page 98

1    Q   Do you recall the -- a Steris System issue
2 back in 2008?
3    A   Generally.
4    Q   Do you recall that there was a
5 determination in May of 2008 that the SS1, which is a
6 device, had been so significantly modified from the
7 predicate product that it was adulterated and
8 misbranded and, therefore, illegal?
9    A   Oh, I have to review the record to see if
10 that was a warning letter or something in that -- to
11 that effect.  Probably was.
12    Q   Okay.
13       THE WITNESS:  I think I'm trapped here, by
14 the way.  Okay.
15 BY MR. MAZIE:
16    Q   Do you have any recollection of the -- of
17 the SS1, Steris System 1?
18    A   Not in any detail, but generally.
19    Q   Okay.  You can put that away.
20       Have you ever taken the position at a
21 presentation that there's an amazing lack of
22 appreciation of the value of design controls and risk
23 management at device manufacturers?
24    A   Is it -- is it possible?  Yes, it's
25 possible.

Page 99

1    Q   Oh.  Have you ever had that opinion, that
2 there's been an amazing lack of appreciation of the
3 value of design controls and risk management at device
4 manufacturers?
5       MR. GAGE:  Objection.
6    A   I'd have to see the context of that
7 statement.
8    Q   Okay.
9       MR. MAZIE:  Let's mark this.
10       (Ulatowski Exhibit 8 marked for
11 identification, to be attached to the transcript.)
12 BY MR. MAZIE:
13    Q   Are you familiar with this document?
14    A   I don't see where I gave this.
15       I don't recall where I gave this, but I see
16 it.
17    Q   Well, you gave this within the last two
18 years.  Correct?
19    A   Evidently, yes.
20    Q   And you don't -- as you sit here today,
21 telling this jury, you don't recall giving this
22 presentation in the past two years?
23    A   Well, I -- I give many training programs,
24 discussions, talks.
25    Q   Let's look at the second-to-last page.

Page 100

1 First bullet.
2       Have you, in this presentation --
3    A   Where are we, on the same page?
4       Okay.
5    Q   Have you taken the position that there is
6 an amazing lack of appreciation of the value of design
7 controls and risk management at device manufacturers?
8       MR. GAGE:  Objection.
9    A   I see the statement.  But I think you have
10 to understand the context of this.  The context is,
11 I'm a consultant who works for a consulting firm,
12 speaking to potential clients regarding their beliefs
13 in regard to their own procedures, and trying --
14 trying to instill in them the need for support and
15 collaboration with our consulting firm.
16       So I wasn't there to say everything's fine,
17 you don't need us; I was there to identify that these
18 things are not simple, in all likelihood need some
19 help.
20    Q   I'm not asking you what your motivation
21 was.  I'm asking -- you weren't lying in this
22 presentation, were you?
23       MR. GAGE:  Objection.
24    A   No, I don't think I was lying.  But I think
25 I was making a point related to what I just stated.

Page 101

1    Q   Have you taken the position in a
2 presentation to clients that there's an amazing lack
3 of appreciation of the value of design controls and
4 risk management at device manufacturers?
5       MR. GAGE:  Objection.
6 BY MR. MAZIE:
7    Q   True or false?
8       MR. GAGE:  Objection.
9    A   Well, it doesn't quite say -- I made the
10 statement.  But what are the parameters of that
11 statement, how many manufacturers, what type of
12 manufacturers, what -- so -- I made the statement.
13    Q   You -- okay.  You've taken the position in
14 presentations to clients that there is an amazing lack
15 of appreciation of the value of design controls and
16 risk management at device manufacturers.  Correct?
17       MR. GAGE:  Objection.
18 BY MR. MAZIE:
19    Q   You've taken that position.  Correct?
20    A   That -- in regard to the context of the
21 discussion after being a consultant for a few months,
22 working with clients who come to you because they're
23 in trouble.
24       And so the people I interact with are not
25 people who are fine with the agency, great

26 (Pages 98 to 101)

Confidential - Attorneys' Eyes Only

Page 102

1    inspections, wonderful procedures.  The people I deal
2    with, in terms of regulatory support, are people who
3    are in trouble.
4         Q    Always?
5         A    Pretty much.
6         Q    Okay.  And you consult for J&J.  Correct?
7         A    Regulatory, just one company.
8         Q    So that company I guess is having some
9    problems with the FDA not doing things correctly?
10        A    That's correct.
11        Q    Which company is that?
12        A    Well, I'm just thinking whether I can
13   disclose that.
14            MR. GAGE:  Let me just say, if that's the
15   issue, then I would ask you to make sure of that
16   determination before you disclose it.  In other words,
17   don't guess as to whether you can disclose that.  If
18   that's something that you believe may be confidential,
19   we can go research it, investigate it, and come back
20   and let David know.
21            THE WITNESS:  I'd -- I'd rather research
22   it, because these contracts are very -- you know, I'm
23   not a lawyer.  But if something's in the contract
24   where -- you know, I don't want to violate that.
25   BY MR. MAZIE:

Page 103

1         Q    All right.  Nevertheless, nevertheless, you
2    are a consultant for one of the J&J companies who has
3    had a history of -- of not doing things correctly
4    vis-à-vis the FDA and its -- its compliance with FDA
5    regulations.  Correct?
6            MR. GAGE:  Objection.
7         A    Yes, based upon warning letters.
8         Q    And at least as to that J&J company, and
9    other companies that you represent, you found that
10   there's an amazing lack of an appreciation of the
11   value of design controls and risk management.
12            Correct?
13            MR. GAGE:  Objection.
14        A    Within the context of the people I work
15   with are in trouble to begin with.
16        Q    Okay.  You can put that away.
17            Have you ever taken a position that the FDA
18   during your tenure was understaffed?
19        A    Did I ever make a public pronouncement
20   about that?
21        Q    Did you ever have the opinion.  Did you
22   ever have the opinion that the FDA, while you were
23   there, was understaffed and undermanned?
24        A    Did I ever have a belief of that?
25        Q    Yeah.

Page 104

1         A    In my tenure at FDA?
2         Q    Yeah.
3         A    Well, I don't know any manager who
4    doesn't -- doesn't want more people.  That's kind of,
5    you know, a given.  And just every year we would have
6    opportunity to negotiate within the center for devices
7    the allocation of resources.
8            And so it was never to your benefit to be
9    arguing that you're just fine, you don't need
10   anybody -- anybody.  You wanted to be staffed up as
11   much as you can be.
12        Q    I'm not asking about what positions you
13   take -- took vis-à-vis negotiations.  I'm asking you
14   in the past -- in the ten years leading up to your
15   leaving the FDA, did you have the opinion that the FDA
16   was undermanned and understaffed?
17        A    FDA as a whole?  I don't know if I ever
18   stated that opinion to anyone as a whole.  I was
19   concerned with my office, my operations, or other
20   offices that assisted me in my operations.  More is
21   better.
22        Q    Fair to say on any given day a quarter of
23   the people at the FDA were either on leave or in
24   training or traveling?
25        A    That's part of the life in any

Page 105

1    organization, that those employee statuses exist.
2         Q    Answer my question.  My question is, is it
3    fair to say that on any given day, 25 percent of the
4    people at the FDA were either on leave or in training
5    or traveling.  Correct?
6         A    I may have made that statement based upon
7    whatever the basis was.  The context being ever
8    changing as far as resources and allocation of
9    resources and time reporting, it was probably -- if I
10   made the statement, it's probably based on some time
11   reporting report that -- within FDA.  It was --
12        Q    It's an accurate statement.  Correct?
13        A    Well, I don't know if it's still accurate.
14   Was it accurate on that date when I wrote that, based
15   upon time reporting?  Probably was.
16        Q    Okay.  So at least as of last year, it was
17   your opinion that on any given day, 25 percent of the
18   people at the FDA were not working on FDA matters;
19   they instead were on leave, in training, or traveling.
20            Correct?
21            MR. GAGE:  Objection.
22        A    Well, in training certainly is extremely
23   important for federal employees.  On travel?  On
24   travel in respect to you're traveling to an
25   inspection, you know?  Understanding the context and

27 (Pages 102 to 105)

Confidential - Attorneys' Eyes Only

Page 106

1  the depth and breadth of that statement, you have to
2  take all those things into account.
3      Q  You've taken the position that on any given
4  day 25 percent of the people at the FDA were either on
5  leave, in training, or traveling.  Correct?
6      A  If I made that statement, the statement is
7  as it is.
8      Q  Okay.  And you also have taken the position
9  and made the statement that half of the most -- half
10  of most centers at the FDA do work on a daily basis
11  unrelated to product approval or clearance.  Correct?
12      A  Well, looking at -- at the total number of
13  employees in a center, the numerator then being how
14  many people are in device evaluation, you can come up
15  with a ratio.
16      Q  I'm asking, have you taken that, have you
17  made that statement?
18      A  I may have made that statement.
19      Q  And the statement is that half of most of
20  the centers at the FDA do work on a daily basis that's
21  unrelated to product approval or clearance.  Correct?
22  You've made that statement at a presentation?
23      MR. GAGE:  Objection.
24      A  Based upon the not understanding, knowing
25  the context, and based upon the simple derivation of

Page 107

1  that sort of number, that may well be the case.
2      Q  Mr. Ulatowski, can we agree that it's been
3  documented --
4      MR. MAZIE:  Strike that.
5  BY MR. MAZIE:
6      Q  Has it been documented by the FDA that over
7  the past ten years the CDRH received 4,000 device
8  applications per year?
9      A  Repeat that, please.
10      Q  Sure.  Has it been documented by the FDA
11  that over the past ten years CDRH received 4,000
12  device applications each year?
13      A  Well, it sounds like an average, because
14  the numbers go up and down.  It includes 510-Ks, PMAs,
15  PMA supplements.  I don't know.  It depends on the
16  source of the information.
17      Q  Does it sound correct to you?
18      A  If we're talking 510-Ks and new PMAs per
19  year as an average over ten years, I probably have to
20  look at some device evaluation reports.  It may be
21  accurate.
22      Q  In your opinion, in the five years leading
23  up to your retirement from the FDA, was there enough
24  staffing to examine and review all the 510-K
25  applications that were received by the FDA?

Page 108

1      A  Well, in the last five years I wasn't in
2  device evaluation, so you would probably have to ask
3  the device evaluation director that question.
4      Q  Okay.  When was the last time -- the last
5  time you were involved in 510-K review was in 2003?
6      A  Yes.
7      Q  Okay.  So you have no opinion as to whether
8  or not the FDA was properly staffed from 2003 onward
9  in the evaluation of 510-K submissions.  Correct?
10      A  I don't have an opinion on it, no.  You
11  would have to ask the device evaluation director
12  whether she had enough people.
13      Q  Okay.  And you were not --
14      A  He and she, actually.
15      Q  Okay.  And so from 2003 on, you have no
16  opinion --
17      MR. MAZIE:  Strike that.
18  BY MR. MAZIE:
19      Q  From 2003 on, you have no understanding of
20  what specifically occurred within the division that
21  dealt with 510-K clearance.
22      A  Oh, I -- I knew what was going on in the
23  office of device evaluate -- evaluation as far as
24  things that will be brought to my attention during
25  meetings and whatever, in regard to cases.

Page 109

1      I knew what their staffing level was in any
2  given year.  I think I'll tell you that their staffing
3  level increased dramatically over those years.  And
4  their usage of outside experts, fellows, panel
5  members, became a very well-formed group of resources
6  to evaluate premarket submissions.
7      Q  Are you --
8      MR. MAZIE:  Strike that.
9  BY MR. MAZIE:
10      Q  Do you have an opinion as to whether or not
11  from 2003 onward, whether or not the FDA -- the
12  portion of the FDA that would review 510-K
13  applications or submissions, whether or not they were
14  properly staffed or not?
15      A  Well, I -- I think I answered you in one
16  respect, is that I said their resources increased
17  dramatically, and the resources they could pull in
18  externally increased dramatically compared to when I
19  was in device evaluation.
20      I -- I never -- never heard particular
21  complaints from Dan Schultz, who was the director of
22  device evaluation, Donna Bea-Tillman, particularly
23  about their staffing levels being too low to do the
24  core work that they were asked to do.
25      Q  All right.  As you sit here today, you

28 (Pages 106 to 109)

Confidential - Attorneys' Eyes Only

Page 110

1  don't know one way or the other whether or not that
2  portion of the FDA that dealt with 510-Ks from 2003
3  onward was properly staffed.
4      A  I think you'd have to, again, ask the
5  device evaluation director, who dealt with those
6  issues on a day-to-day basis.
7      Q  Right.  Right.  So you don't have an
8  opinion one way or the other.
9      A  I don't have an informed opinion --
10     Q  Okay.
11     A  -- because that was not my office.
12     Q  Okay.  Have you ever taken the position
13  that the FDA, with regard to 510-Ks, takes an
14  expansive view on what constitutes a major change in a
15  device?
16     A  You'll have to say that again, please.
17     Q  Sure.  Have you ever taken the position in
18  a presentation that the FDA takes an expansive view of
19  what constitutes a major change when determining or
20  evaluating a 510-K application?
21     A  Well, I guess I'd have to understand the
22  context of that statement.  Expansive?  Everything
23  that's changed has to be evaluated for significance.
24  So in that sense, you know, the -- the front end of
25  that deliberative process is broad.

Page 111

1      Q  Okay.  So when you made that statement,
2  expansive view of what constitutes a major change,
3  what did you mean by that?
4          MR. GAGE:  Objection.
5      A  Well, there's -- in guidance descriptions
6  of -- of various types of issues that are brought to
7  bear when assessing a change to a device.  And it
8  covers virtually every type of change that may occur.
9  Whether or not the change may be significant in final
10  analysis is another story.
11         MR. MAZIE:  Mark that.
12         (Ulatowski Exhibit 9 marked for
13  identification, to be attached to the transcript.)
14  BY MR. MAZIE:
15     Q  Have you ever seen -- sorry.  Have you ever
16  seen this document before, Ulatowski 9?
17     A  I don't -- I don't think I've read this
18  document.
19     Q  Okay.  You know what the GAO is.  Right?
20     A  Yes.
21     Q  What is it?
22     A  The Government Accountability Office.
23     Q  Okay.  And you were at the FDA when this
24  report to Congress came out.  Correct?
25     A  Yes.

Page 112

1      Q  And if you look at the bottom of the second
2  page?  Last sentence says, "Furthermore" --
3      A  The second page physically or Page 2 at the
4  bottom?
5      Q  Physically.
6      A  Oh, okay.
7      Q  The last sentence says, "Furthermore,
8  officials said that the agency faces significant
9  challenges fulfilling its mission to oversee the
10  safety and effectiveness of medical products."
11         Do you see that?
12     A  Yes.
13     Q  Do you agree with that, that during your
14  last five years or six years at the FDA, that the
15  agency faced significant challenges fulfilling its
16  mission to oversee the safety and effectiveness of
17  medical products?
18     A  I have to understand the context and
19  derivation of that sentence.
20     Q  Okay.
21     A  In the office of compliance we were doing
22  pretty well.
23     Q  Well, why don't you read that paragraph --
24     A  Okay.
25     Q  -- and we can talk about it.

Page 113

1      A  Okay, I've read it.
2      Q  All right.  According to the General
3  Accounting Office, the FDA between 1999 and 2008 faced
4  challenges fulfilling and managing its growing medical
5  product oversight responsibilities as a result to --
6  of not having enough resources.  Correct?
7      A  That's the conclusion by the GAO.
8      Q  Did you ever agree with that, or disagree
9  with that, that there wasn't enough resources and
10  staffing at the FDA to fulfill and manage its
11  oversight responsibilities of medical devices between
12  the years '99 and 2008?
13     A  Well, I -- I accepted the resources I had
14  and through careful management tried to do the best I
15  could with those resources.  If I was fortunate enough
16  to obtain more resources, great.  But, nevertheless, I
17  focused in, based upon the resources I had, using a
18  risk-based decision process, to do the work where the
19  work was best put to.
20     Q  Do you agree with the General Accounting
21  Office in its presentation to Congress that the --
22  between 1999 and 2008 that the FDA faced challenges in
23  fulfilling and managing its oversight of medical
24  devices as a result of being undermanned?
25     A  Well, I agree with the first part.  FDA is

Confidential - Attorneys' Eyes Only

Page 114

1  always faced with challenges and issues that it has to
2  react to.  That's the nature of ensuring the public
3  health.
4        In terms of resources, we -- we managed our
5  resources effectively.  And should additional
6  resources come forward from Congress, through Congress
7  appropriation, through Congressional appropriation,
8  through the President's budget, that was fine.  And we
9  managed those resources, too.
10     Q   Let's turn to the two, three, four --
11 seventh page.
12     A   And this is Page 7 on the bottom?
13     Q   No.
14     A   It is not.
15     Q   Seventh physical page.  Page 1 at the
16 bottom.
17     A   Okay.  Page 1 at the bottom.  That helps.
18     Q   It's a letter to Congress.
19     A   Okay.  I don't think I'm on the same page.
20 Maybe we are.  June 15?  Okay.
21     Q   June 19.
22     A   Okay.
23     Q   Last sentence of the first paragraph says,
24 "On several occasions since then, senior FDA officials
25 have testified before Congress and the agency issued a

Page 115

1  report noting that the agency's funding and staffing
2  resources do not enable it to meet its growing
3  oversight responsibilities."
4        Do you see that?
5     A   I see that sentence.
6     Q   Okay.  As of June of 2009, did you agree
7  that for the prior ten years that the FDA did not have
8  enough funding or staffing to enable it to meet its
9  growing oversight of medical device manufacturers?
10     A   If the FDA commissioner made that
11 statement, Michael Friedman, then I'll have to rely on
12 their statement.  My own opinion is I dealt with the
13 resources I had.
14     Q   Well, when you say you dealt with the
15 resources you had, that doesn't mean that you had
16 adequate resources to oversee what you were doing.
17     A   Well, again, a manager who thinks, when
18 asked, Could you use ten more people, who says, No,
19 I'm fine, you probably should have a head check on
20 that manager.
21     Q   Well, you also don't want to waste, either.
22     A   Well, but more is better, believe me.
23     Q   And again, it says -- do you know what the
24 FDA's science board is?
25     A   Yes.

Page 116

1     Q   Were you ever on the FDA's science board?
2     A   No.
3     Q   Okay.  Are you aware of the fact that in
4  November of 2007 the FDA's science board said that the
5  agency could not fulfill its growing responsibilities
6  because it did not have sufficient resources?
7        Are you aware of that?
8        MR. GAGE:  Objection.
9     A   You're looking at something?
10     Q   I'm asking you if --
11     A   Oh, I'm not aware of that, but --
12     Q   Okay.
13     A   -- you can direct me to something.
14     Q   Sure.  You look at the last sentence of
15 that page, which says, "FDA's science board"?
16        Do you see that?
17     A   Uh-huh.
18     Q   Do you disagree with the FDA's science
19 board when it reported in November of 2007 that the
20 FDA could not fulfill its growing responsibilities
21 because it did not have sufficient resources?
22     A   I can't agree or disagree.  I don't know
23 what the basis for their statement is.
24     Q   Okay.  As you sit here today, you don't
25 know whether or not those involved in evaluating

Page 117

1  510-Ks had enough resources.  Correct?  We've already
2  established that.
3        MR. GAGE:  Objection.
4     A   Well, what I said is, I think your question
5  being, you know, did they have adequate resources,
6  you'd have to ask the manager of that program.
7        My view from the outside in was, after
8  working in device evaluation for many years, the size
9  at our office doubled.  The resources from externally
10 into the office doubled or tripled; yet the 510-K
11 numbers didn't increase.  The PMA numbers didn't
12 increase.
13        So the upshot is, you know, I think they
14 were probably doing pretty well.  But again, ask the
15 device evaluation director whether she thought she had
16 adequate resources.
17     Q   You don't have an opinion?  You have --
18 you're just based on -- on speculation?
19        MR. GAGE:  Objection.
20     A   Observations.
21     Q   But at the end of the day, you don't know
22 how undermanned or properly manned or overmanned they
23 were.
24     A   Well, if -- if in 2005 you got 600 people,
25 and in 2002 when I left you got 300 people, well,

Confidential - Attorneys' Eyes Only

Page 118

1  something good's happening there.  But, you know, I'm
2  just observing events.
3       Q   You don't know one way or the other because
4  you weren't working in that department or division.
5       Correct?
6       A   I'm -- I'm coming to a conclusion based
7  upon the observations.
8       Q   Without working in that department?
9       A   Without working in the device evaluation.
10      Q   And without speaking to the people who were
11  in charge as to whether or not they were properly
12  sourced.
13          MR. GAGE:  Objection.
14      A   That wouldn't be my decision.
15      Q   Okay.  And nevertheless, based on the
16  General Accounting Office and their presentation to
17  Congress, the FDA's science board reported in November
18  of 2007 that the agency could not fulfill its growing
19  responsibilities because it did not have sufficient
20  resources.  Correct?
21      A   Well, if that's a statement by senior FDA
22  staff, you know, it is what it is.
23      Q   Okay.  Let's go to Page 31.  Actually, it
24  says 31 on the bottom.  It's about halfway through.
25          First sentence:  "The General Accounting

Page 119

1  Office reported to Congress that FDA officials told
2  them that resource constraints hindered the agency's
3  ability to fulfill all of its medical product
4  oversight responsibilities between Fiscal Years 2004
5  and 2008."
6       Is that correct?
7       A   That's what it says.
8       Q   Do you have any reason to disagree with
9  that?
10      A   Well, not understanding the information,
11  who said what, I think -- I think you also have to
12  understand -- and I'll just reflect on this from
13  working for the agency for -- for so many years.
14          The agency is asked to do a lot of things.
15  But what the agency understands within the centers,
16  like the device center, is -- is just like when you
17  have hypothermia.  Your body concentrates its heat in
18  the major organs.
19          And when there's resource issues, the
20  resources go to the core operations.  They go to
21  device evaluation, and they go to compliance.
22          So, yeah, FDA people might not be going out
23  on training excursions or might not be doing newscasts
24  or something.  Are they reducing their obligations in
25  terms of product review and compliance?  No way.

Page 120

1          MR. MAZIE:  I'm going to object and move to
2  strike.
3  BY MR. MAZIE:
4       Q   My question is simply, do you have any
5  reason to disagree with FDA officials told the General
6  Accounting Office that resource constraints hindered
7  the FDA's ability to fulfill all of its medical
8  product oversight responsibilities between 2004 and
9  2008?
10      A   Well, and that's what I was answering.
11  FDA's asked to do a lot of things.  And FDA, if and
12  when, just assuming there are resource implications,
13  concentrates those resources in the core operations.
14          So someone in some area may not be doing
15  what Congress thought they ought to be doing, in God
16  knows what.  But are they doing product reviews, are
17  they -- are we still enforcing the law?  We sure are.
18          MR. MAZIE:  Object again and move to strike
19  as nonresponsive.
20  BY MR. MAZIE:
21      Q   I'm asking simply, do you have any reason
22  to disagree with the following statement by senior FDA
23  officials to Congress:  That resource constraints
24  between 2004 and 2008 hindered the FDA's ability to
25  fulfill all of its medical product oversight

Page 121

1  responsibilities?
2          MR. GAGE:  Objection.
3  BY MR. MAZIE:
4       Q   Do you have any reason to disagree with
5  that statement by FDA officials to Congress?
6          MR. GAGE:  Objection.
7       A   Well, the term "all of its
8  responsibilities."  It -- it probably couldn't do all
9  of the things, but it did the things that were
10  important.
11      Q   And those oversight responsibilities were
12  hindered by the lack of resources.  Correct?
13          MR. GAGE:  Objection.
14      A   All the things that FDA was asked to do,
15  based on this statement, not understanding the basis,
16  I'll take it as a fact, if someone said that at FDA in
17  a senior position.
18      Q   Okay.  I'm going to ask you, in your report
19  you have Footnote 4 on Page 8.
20      A   Okay.
21      Q   In that footnote you say, "I disagree with
22  the experts' opinions as set out in my report.  Some
23  of my disagreements may not be explicitly listed in my
24  report.  I will be prepared to discuss at my
25  deposition where I take exception to expert opinions

31 (Pages 118 to 121)

Confidential - Attorneys' Eyes Only

Page 122

1  and alleged facts."
2        Can you tell me all of your opinions and
3  criticisms that are not contained within your expert
4  report.
5     A   In a -- in a broad category of -- of
6  opinions, I enumerated a number of things, excluded
7  specifics from my report.  There's element -- there's
8  several elements.
9        Expert's opinion regarding application of
10 regulation and law that has no relevance to medical
11 devices.  Expert's opinions regarding medical aspects
12 of which she didn't have experience or training.
13 Expert's opinions regarding allegations of perhaps
14 fraud, withholding documents, intentional actions to
15 prevent FDA from being aware of certain documents.
16       Those sorts of things.
17    Q   Well, those things are discussed.  Those
18 opinions are discussed in the report you issued, or
19 reports you issued.  Correct?
20    A   Not -- not directly or specifically in --
21 in each case, or each instance.
22    Q   Do you understand that under New Jersey
23 court rules you have a requirement to give me notice
24 of the opinions that you have so that I can discover
25 those opinions and test those opinions?

Page 123

1        So my question is, you have a very lengthy
2  report here, single spaced, and it's 74 pages long.
3  Is there anything that's not addressed or discussed in
4  this report and in your supplemental report that I
5  need to be aware of?
6     A   Well, let me answer it this way:  I went
7  through the Pence report, made comments, observations,
8  reflections on the report.  Those specific and
9  itemized items are not in my report.
10    Q   Okay.  Do you have that handy?
11    A   I don't have it with me.  I just have the
12 edition that was provided to counsel.
13    Q   What do you mean, "the edition"?
14    A   Well, the -- whatever was provided through
15 counsel to you and others.
16    Q   Okay.  Did you actually take notes on the
17 Pence report?
18    A   Did I take notes on the Pence report?
19    Q   Yeah.
20    A   Yes, I took notes on the Pence report.  I
21 made a compilation of observations.
22    Q   Okay.  And when -- when did you do that?
23    A   During the course of my review of the Pence
24 report.
25    Q   Okay.  And you didn't use those comments to

Page 124

1  prepare any report.  In other words, your report was
2  already given.  Correct?
3     A   Uh-huh.
4     Q   You've got to answer verbally.
5         MR. GAGE:  You need to say yes or no.
6     A   Oh, yes.  Sorry.  Well, I mean, explain
7  that, please.
8     Q   Well, this is what I want.  You prepared
9  your report.  And then after preparing your report, at
10 some point you reviewed the Pence report and made
11 comments on it?
12    A   No, I -- in the course of preparing my
13 report, I reviewed the Pence report, made comments,
14 observations, actually included in a -- in a prior
15 draft, and -- and in the final draft excluded those
16 comments from the final report.
17    Q   Okay.  So that's -- essentially what you're
18 telling me is, the comments you made on the Pence
19 report are -- that's a draft of this report.  And you
20 included what you felt you needed to include, and you
21 excluded whatever you felt you needed to exclude.
22    A   Well, I think I set it aside as -- as a
23 record to support, you know, the statement, if
24 necessary.  If you'd like to see that, that's fine.
25    Q   Well, this is my point.  I need to know all

Page 125

1  of your opinions.  And I have this report, and I have
2  a very brief supplemental report.
3         If there's anything else that you have by
4  way of opinions, I need to know that, whether it's in
5  writing or verbally.  So this is your opportunity.
6     A   Well, if you provide me the Pence report,
7  we can spend the rest of the day going through it and
8  I'll provide my observations and opinions.
9     Q   That's not what I'm asking you.  I'm asking
10 you -- I'm entitled to have a written opinion from you
11 that sets forth the parameters, a summary of your
12 opinions.  I'm not going to waste my time or your time
13 having you go through the Pence report, because you
14 essentially have done that anyway in your 74-page
15 single-spaced report.
16       I want to know, sitting here today, do you
17 have another report, A, which you've already told me
18 no; and, B, whether there's anything I'm missing based
19 on this Footnote 4?
20    A   Well, what I painted for you is, in broad
21 stokes, are the sorts of observations, comments I had
22 on the Pence report.
23       As far as specific, what I did is itemized
24 on a page -- pages, lines where those instances
25 occurred, my objection to certain statements.

Confidential - Attorneys' Eyes Only

Page 126

1  That's -- that constituted, at least in the prior
2  draft.
3       Now, as far as what I've just told you,
4  those in broad strokes are issues within the Pence
5  report.  If you provide me the Pence report, I'll --
6  I'm sure I'll have recollections of additional
7  comments I had.
8       MR. MAZIE:  Bill, what's your position on
9  this document?  I quite honestly don't have -- you
10  know, I need to know from your perspective.
11       MR. GAGE:  Well, you know, this came up
12  somewhat with Dr. Pence as well.  And I know that I've
13  made requests for certain things that she was unable
14  to specifically itemize at her deposition.
15       So I think, David, you and I probably ought
16  to talk at a break, and let's decide how we want to --
17  how we want to handle this, because it goes both ways.
18       MR. MAZIE:  I agree.
19       MR. GAGE:  And I don't want to burn up your
20  time with him.  And I fully recognize your concern, as
21  I had the similar concern with Dr. Pence.
22       So let's you and I talk and see if we can't
23  figure out a solution.
24       MR. MAZIE:  My proposed solution is that
25  this -- this isn't as though we have a three-page

Page 127

1  report from each of them.  We have massive reports.
2  And I think that any notes that they've taken should
3  just be kept with each of them.
4       I think that these more than cover all of
5  the issues to death.  And there's no reason to open
6  doors from both sides at this point.  I think that,
7  you know -- everything's here.
8       MR. GAGE:  Well, let me say this.  And --
9  and don't -- I'm not trying to coach the witness.  If
10  you would prefer for him to step out, that's fine with
11  me.
12       But I do know that if you were, for
13  example, to -- I know he said there were some broad
14  strokes, he gave you some broad strokes.  And I know,
15  for example, there are certain statements in Pence's
16  report that he would disagree with.  Okay?  Like
17  perhaps it was not of such a significant nature that
18  it warranted putting a separate paragraph in the
19  report.
20       I think probably what would -- what would
21  be good is to ask him what he specifically recalls in
22  terms of his disagreements with Pence's report.  And
23  then let's see what he can give you in that regard,
24  and then you'll be able to make an evaluation of what
25  he's giving you, and that may help inform your

Page 128

1  discussion and my discussion about how we handle it.
2       MR. MAZIE:  I don't know if that's fair to
3  me.  I'm entitled to a report.  He put in -- he
4  decided to put in -- because he had her report in
5  advance, he had for months.  He put in what he put in.
6  I don't need to waste anybody's time giving him her
7  lengthy report to have him go line by line.  And I
8  don't think it's fair for him to say this is
9  everything anyway.
10       So I think that he's followed the rules, he
11  has two reports, he had months to prepare it, just
12  like she did.  These are their opinions.
13       MR. GAGE:  I mean, and it's -- it's back
14  and forth, I mean.
15       MR. MAZIE:  But it's good for the goose is
16  good for the gander.  And I think we're both stuck
17  with it.  And I think that it's not as though they
18  rushed the reports, and it's not as though these are
19  short reports.  They are very well thought out and
20  very well written from both sides, so.
21       MR. GAGE:  Well, I mean, part of it is I'd
22  like to -- I mean, I think we would be better served
23  by having that conversation off the record where we
24  can talk about the specifics in terms of Pence and
25  Ulatowski, and let's see if we can't come to some sort

Page 129

1  of an understanding that I could run by my client and
2  say, Is this where we are on this issue.
3       MR. GRAND:  The one thing the record needs
4  to reflect, I mean, you keep saying it goes both ways.
5  Dr. Pence doesn't have a footnote in her expert report
6  saying, I have other opinions that I haven't disclosed
7  in the report but which I'm prepared to discuss at my
8  deposition.
9       He needs to be able to discuss them and
10  identify them at his deposition, and under the New
11  Jersey rules.
12       MR. GAGE:  Well, I mean --
13       MR. MAZIE:  It was actually before that.
14  I'm entitled to have -- if he does have opinions that
15  aren't in his reports, it's very clear from New Jersey
16  case law and the court rules that he's not entitled to
17  have those opinions.  There's no element -- there's an
18  element of surprise there, and that's what we're
19  trying to avoid.
20       MR. GAGE:  Right.
21       MR. MAZIE:  All I wanted to know is, what
22  do you have -- first of all, I am objecting to the
23  extent he has any opinions beyond this report.  Then I
24  asked him what do you have, and he just gave me some
25  broad statements that really don't mean much.

33 (Pages 126 to 129)

Confidential - Attorneys' Eyes Only

Page 130

1    MR. GAGE:  Well, and -- and Jeff, in
2  response to your point, this is -- we had this exact
3  situation with Dr. Pence at her deposition.  She had
4  additional opinions that were not reflected in her
5  report, which I asked her about during her deposition.
6  And she said, I can't give them to you at the
7  deposition, I've got to go get some additional
8  information and look at stuff.
9    So, David and I have got to work through
10  that issue.  It is somewhat similar to what is on the
11  table here with regard to Dr. Ulatowski -- or with
12  Mr. Ulatowski.  But I -- I -- but I do think -- I do
13  think that he is -- I think he can, to the extent he
14  can give you the specific criticisms that he -- he
15  recalls, I'd like him to do that.  And then you can
16  proceed accordingly.
17    I'm not -- I'm not saying you've got to go
18  burn up seven hours of deposition time asking him on
19  that.  But I think it would be worthwhile to ask the
20  witness what specifically he is talking about.  Beyond
21  the broad -- you know, what are the three broad
22  brushes, and what are the -- what are the issues
23  underneath each of the three broad brushes, that sort
24  of thing.
25    MR. MAZIE:  All right.  I'll spend a little

Page 131

1  time on this, but I -- I don't think it's fair to me
2  to ask questions in a vacuum where I have not been
3  given notice of what those issues are in advance and
4  had the time to prep for that, which is what we're --
5  I'm entitled to.
6  BY MR. MAZIE:
7    Q   So I will ask you, Mr. Ulatowski, do you
8  have specific, specific opinions that are not
9  addressed in your expert reports?
10    A   What I need to do is have the Pence report
11  in front of me.  Because my specific opinions were in
12  reference to specific pages and lines.  Of course I
13  didn't memorize everything.  So I would have to do
14  that.
15    Q   You don't have that right now, do you?
16    A   I don't have that list, reference, line,
17  pages, in front of me, no.
18    Q   That's back at your house or your office?
19    A   Yes.
20    Q   All right.  So you're not prepared to
21  discuss those opinions right now?
22    A   Well, in general terms, yes.
23    Q   Okay.  Well, you just told us generally
24  what it was.
25    A   Yes.

Page 132

1    Q   You disagree with her on various things,
2  and she doesn't -- you don't think that she has
3  certain expertise.  Correct?
4    A   Background expertise, foundation for
5  statements in regard to various aspects of the -- of
6  her -- regarding her opinions.
7    Q   Okay.  Can you give me specifics as to what
8  you're talking about?
9    A   As she courses through her discussion of
10  background, I took issue with her interpretation of
11  law and regulations, prohibitions, penalties, certain
12  regulatory aspects related to MDR reporting, to -- to
13  quality system, to aspects of FMEAs, statements made
14  in F -- FMEAs, process.  Companies should do this,
15  should do that in terms of modifying risk-management
16  documents, when they should do that.  And her
17  interpretation of the risk-management process.
18    You know, I could drill down in any number
19  of areas.  I did translate some of those points into
20  observations or opinions in my report, but -- but not
21  all of them.
22    Q   All right.  You can't tell me specifically
23  which of those points aren't included in your report
24  and give me the specific criticisms you have?
25    A   Because they're line items, they're page

Page 133

1  numbers, they're -- they're quotations.  So -- so, no,
2  not in that detail.
3    Q   Okay.  All right.
4    What's a 510-K?
5    A   A 510-K is a -- otherwise called a
6  premarket notification, is a submission process made
7  to FDA to -- at least one form of submission process
8  made to FDA to enable a product to come to the market.
9    Q   If a 510-K is deemed necessary but the
10  medical device manufacturer does not submit one before
11  marketing it, is the product legally deemed misbranded
12  and adulterated?
13    MR. GAGE:  Objection.
14    A   Well, we'll have to go through that one
15  again.  And -- that's -- that's quite -- quite wordy.
16  So let's walk through it again.
17    Q   Sure.
18    A   And I'll try and break it down in my mind
19  here.
20    Q   If a 510-K is deemed necessary but the
21  medical device manufacturer does not submit a 510-K --
22  510-K before marketing the product, is the product
23  deemed to be misbranded and adulterated as a matter of
24  law?
25    MR. GAGE:  Objection.

Confidential - Attorneys' Eyes Only

Page 134

1    A   You've got a lot of "deemed" in there.  If
2  a 510-K is deemed necessary.  In what sense?
3    Q   By the FDA.
4    A   Necessary informally or recommendation, a
5  formal statement --
6    Q   Formally.
7    A   -- of a violation, I mean?
8    Q   If the FDA makes a formal edict that the
9  manufacturer needed to submit a 510-K, does that mean
10 that the product, if it was sold before the clearance
11 of the 510-K, was misbranded and adulterated?
12       MR. GAGE:  Objection.
13    A   That's where we get back to process issue.
14 That nothing is -- nothing is automatic in this sense.
15 The factors have to be evaluated, the appeal processes
16 considered.  You know, everything I spoke of before.
17    Q   Let me ask you the -- when were you first
18 retained on this case?
19    A   Last year, earlier in the year last year.
20    Q   2011, 2012?
21    A   '11.
22    Q   Okay.  First half of 2011 or second half?
23    A   I would say first half.
24    Q   Okay.
25    A   I think.

Page 135

1    Q   When were you first retained on the DePuy
2  case?
3    A   That was under the auspices of Becker &
4  Associates, so maybe the -- the end of last year, when
5  I was still a 1099.  It may have been earlier this
6  year.
7    Q   Okay.  Were you retained on this case by
8  Ethicon before you were retained on the DePuy matter?
9    A   Yes.
10    Q   Okay.  Were you already performing -- when
11 did you first start performing any type of regulatory
12 consulting for any J&J entity?
13    A   I'd have to look at my billing records.
14 Probably last year.
15    Q   Okay.  Were you retained by a J&J entity
16 for regulatory consulting before or after you were
17 retained on this case as a litigation expert?
18    A   After.
19    Q   So the first time you were ever retained by
20 a J&J entity was on this case?
21    A   I believe so.
22    Q   Okay.
23    A   If my memory serves me well.
24    Q   And when you performed your analysis of
25 this case, did you do it with an open mind?

Page 136

1    A   Of course.
2    Q   In your analysis of this case, did you have
3  a motivation to come to a conclusion which would
4  support Ethicon's position?
5    A   Not initially.
6       When I -- when I am asked by someone to
7  engage in a discussion of retention, I -- I almost
8  always, if not always, tell the potential client,
9  Look, when I get the information, the data, whatever
10 records you're going to give me, I'm going to tell you
11 what I think.  And if what I say you don't like what
12 I -- what you're hearing, well, I mean, that's too
13 bad.
14       I lost a client last week because of that.
15 The guy says, Well, here's the records.  Well, here's
16 what I think.  Well, you would be a better expert for
17 the plaintiff, and they fired me.
18       So, I mean, that's -- I just -- I try to be
19 honest with the records.
20       MR. MAZIE:  Okay.  We have to change the
21 tape.
22       VIDEO SPECIALIST:  The time now is 12:36.
23 We are going off the record.  This is the end of Disk
24 Number 2.
25       (Luncheon recess.)

Page 137

1       VIDEO SPECIALIST:  The time now is 1:18.
2  We are back on the record.  This is the beginning of
3  Disk Number 3.
4  BY MR. MAZIE:
5    Q   Mr. Ulatowski, what percentage of your
6  income over the past two years has been as a result of
7  litigation consultant -- consulting on behalf of
8  medical device and medical product and drug
9  manufacturers?
10    A   Just -- I'm not precise.  Could you --
11 could you repeat the question.
12    Q   I'll give it to you again.
13    A   Okay.
14    Q   What percentage of your income over the
15 past two years has been as a result of you acting as
16 an expert on behalf of a pharmaceutical manufacturer
17 being sued in court?
18    A   Estimate, 50 percent.
19    Q   Okay.  Let me ask you, when is a medical
20 device manufacturer required to submit a 510-K?
21    A   The regulation specifies when those
22 conditions exist, government regulation being 21 Code
23 of Federal Regulations 807.
24       The regulation speaks to introducing a -- a
25 new device fundamentally, making a significant change

35 (Pages 134 to 137)

Confidential - Attorneys' Eyes Only

Page 138

1  to an existing device.
2      Q   And is it fair to say from your report that
3  substantial equivalence to the predicate device is the
4  key issue?
5      A   That's the key factor in determination of
6  substantial equivalence.  The comparison to the
7  predicate or predicates based upon descriptive and --
8  and other information provided in the 510-K.
9      Q   And what does substantial equivalence mean?
10     A   It means the device has the same -- is as
11 safe and effective as the predicate device, has the
12 same intended use as the product, has fundamentally
13 the same technological characteristics.  If it
14 doesn't, then the data show that the differences are
15 not substantial and there's no new issues of safety
16 and effectiveness presented by the device.
17     Q   If the determination leads to the
18 conclusion that the new device is not substantially
19 equivalent by way of intended use or by way of
20 technical -- same technological characteristics as the
21 predicate or prior device, is it fair to say that a
22 510-K is required?
23     A   Can you repeat that question?
24     Q   Sure.  If the evidence establishes that the
25 new device does not have the same intended use or the

Page 139

1  same technological characteristics or the same safety
2  and effectiveness as the predicate or prior device, is
3  it fair to say that a 510-K is required for the new
4  device?
5          MR. GAGE:  Objection.
6      A   What I was speaking to was the process of
7  determination of substantial equivalence by FDA.  The
8  determination of whether to submit a 510-K is
9  fundamentally a basis of, as I said, entirely new
10 device or a marketed device that's been significantly
11 changed -- changed, excuse me.
12         So those -- those are the criteria for
13 submission.  The criteria for substantial equivalence
14 are those factors I mentioned.
15     Q   And the key issue in determining whether or
16 not the manufacturer needs to submit a 510-K is
17 whether or not the new device and the predicate device
18 are substantially equivalent.  Is that correct?
19     A   Well, the determination of substantial
20 equivalence is an end result of the review process.
21 The determination of whether or not the predicate
22 device, in what manner it compares to the device
23 you're comparing it to, whether there's significant
24 differences, that's a process one has to go through to
25 assess those differences.

Page 140

1      Q   And ultimately the manufacturer needs to
2  make a determination as to whether or not the new
3  device is substantially equivalent to the predicate
4  device.  Correct?
5          MR. GAGE:  Objection.
6      A   Well, I think that, again, the
7  determination of substantial equivalence is a finding
8  by FDA upon submission by the applicant.  The
9  determination of whether a change is significant,
10 speaking about products that are modifying, is a
11 determination made by the manufacturer.
12     Q   All right.
13     A   And by doing so, there is connection to the
14 predicate in terms of the predicate's 510-K.
15     Q   All right.  What does the manufacturer have
16 to do to determine whether or not it needs to submit a
17 510-K?
18     A   It assesses each change that it has made,
19 with the subject device, against a predicate or
20 predicates of their choosing, in terms of various
21 characteristics of the devices.  And then the
22 manufacturer makes a decision whether or not any one
23 of those changes singly or in total are significant.
24     Q   Significant how?
25     A   Well, there's the rub.  And the rub is, the

Page 141

1  regulation speaks of significant change.  It doesn't
2  further define what is a significant change.  And so
3  FDA, recognizing that the regulation really didn't
4  further specify, except later in -- as directed by a
5  determination of substantial equivalence by FDA, came
6  out with a guidance to assist manufacturers in -- in
7  helping to determine whether or not the changes were
8  significant or not.
9      Q   All right.  So what -- how has the FDA
10 provided guidance to manufacturers as to how they're
11 to determine whether there's been a significant change
12 in the product from the predicate product, and whether
13 or not they need to submit a 510-K?
14         MR. GAGE:  Objection.
15     A   Well, the -- there's a guidance document
16 that provides information to assist a manufacturer in
17 making that determination.  Elements of that guidance
18 include evaluation of intended use, technological
19 characteristics, materials, and other factors in
20 helping the manufacturer make that determination.
21     Q   What's the definition of same intended use?
22     A   The same intended use, it has the same
23 indications for use, has the same purpose to which it
24 is claimed, fundamentally the same medical purpose.
25         There can be changes, differences in

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Attorneys' Eyes Only

Page 142

1  indications, but does it fundamentally perform the
2  same function.
3       Q   Is there any consideration of whether or
4  not it performs the same function and is as safe and
5  effective as the prior device?
6       A   Well, there's a determination expectation
7  in the documentation that's maintained by the
8  manufacturer that they have demonstrated, through
9  testing, design verification, design validation, that
10 the modified device is as safe and effective as the
11 predicate device, if that's your question.
12      Q   Does it have to be as safe and effective?
13         MR. MAZIE:  Strike that.  Let me ask you a
14 better question.
15 BY MR. MAZIE:
16      Q   In order for there to be a determination by
17 the manufacturer that a 510-K is not necessary, does
18 there have to be a conclusion by the manufacturer
19 after their testing and research that the new product
20 is as safe and effective as the prior device?
21      A   Well, there's a determination that the
22 differences are not significant.  And in doing so,
23 issues of safety and effectiveness are explored.  And
24 so fundamentally the new product needs to be
25 determined by the manufacturer to be safe and

Page 143

1  effective for marketing, as safe and effective, if you
2  will.
3       Q   Okay.  So if the new product has additional
4  new risks that the old product did not have, do they
5  have to then submit a 510-K?
6       A   Not necessarily.
7       Q   Okay.  When do they have to do that, and
8  when don't they have to do it?
9       A   As outlined in the guidance document,
10 primarily the factors that are explored are explained
11 therein.
12      Q   What's your interpretation of that?
13      A   Well, what I do even now with clients is,
14 we walk through the changes, explore whether or not --
15 how they compare to the predicate; are there any
16 particular issues presented by the differences; are
17 those important technically, scientifically; are these
18 the types of issues that FDA and manufacturers have
19 looked at in prior products, factors such as those.
20      Q   When you say that the -- in order to not
21 have to submit a 510-K, the new product has to have
22 the same technological characteristics as the prior
23 product -- is that correct?
24      A   No.  Not completely.  The -- there can be
25 differences.  But there needs to be an assessment of

Page 144

1  those differences and whether they create -- may
2  create concerns in regard to science, engineering.
3       Q   And what's the definition of technological
4  characteristics?
5       A   Oh, it can be the particular engineering
6  design.  I mean, these -- this is the broad stroke.
7  Whether or not changes are significant is another
8  story.  But the broad stroke are -- is the form of
9  engineering of the product, the information how it
10 performs its function physically.  Depending on the
11 device, what kind of electrical factors, power
12 sources, material effects.  Various aspects that may
13 come into play.
14      Q   With regard to the Prolift, what are the
15 technological characteristics of the Prolift?
16      A   Well, in Prolift there's material
17 characteristics, there's -- there's physical
18 characteristics of the product.  There is -- there's
19 toxicological aspects related to the product,
20 particular -- all these things may play out.  There's
21 particular shapes and designs.
22         I mean, these are features of the product,
23 the features of the technology.  You can get down into
24 the weeds on the material and whatnot, but as a broad
25 stroke.

Page 145

1       Q   Were the -- the tools of the Prolift system
2  considered a new technological characteristic?
3       A   Well, I think the tools needed to be
4  assessed, just like any other part of the product.
5       Q   Okay.
6       A   Were they new or not, that was for the
7  manufacturer to assess in the process of determining
8  significance.
9       Q   What about the actual surgical procedure
10 with the utilization of those tools; was that a
11 technological characteristic that needed to be
12 evaluated by Ethicon in determining whether a 510-K
13 would be appropriate?
14      A   Well, I think in a broad sense the method
15 of usage of the product is not specifically a
16 technological characteristic; it's a use, condition of
17 use, process of use of the product.
18      Q   So you think that goes to the intended use
19 as opposed to technological characteristic?
20      A   It can have tentacles in intended use,
21 performance issues.
22      Q   Okay.  Fair to say that Ethicon was
23 required to compare the Prolift to the predicate
24 device or devices, and in doing so needed to look at
25 how the Prolift procedure affected safety and

37 (Pages 142 to 145)

Confidential - Attorneys' Eyes Only

Page 146

1 effectiveness and how it compared to the predicate
2 devices?
3        MR. GAGE:  Objection.
4     A  Well, it was up to the manufacturer to
5 assess the changes in regard to the guidance document.
6        And in evaluating the records, I saw the
7 process they went through, how they applied the
8 guidance, the flow charts in the guidance, and saw
9 that they -- they did apply the guidance in terms of
10 all the aspects of the guidance.
11     Q  I understand they applied the guidance; the
12 question is whether they did it appropriately.
13        Let's turn to Page 24 of your report.
14     A  Uh-huh.
15     Q  Page 24 you have a portion of a decision
16 tree.  Correct?
17     A  Yes.
18     Q  All right.  And that's -- that's a portion
19 of what Ethicon was required to do to evaluate whether
20 or not it needed to submit a 510-K to the FDA for the
21 Prolift.  Correct?
22     A  Well, this process is actually embedded
23 in -- and it's been updated -- embedded in the five --
24 in the FDA review process, actually, in determination
25 of substantial equivalence.

Page 147

1        Now, many of these same features are in the
2 guidance document on determining when a 510-K needs to
3 be submitted or not.
4     Q  Right.  And so just so we're clear, the FDA
5 expected that Ethicon would perform this decision tree
6 analysis, which is shown on Page 24 of your report, in
7 determining whether or not it needed to submit a 510-K
8 for the Prolift.  Correct?
9        MR. GAGE:  Objection.
10     A  It needed to perform an analysis -- well,
11 in fact, it -- the guidance is guidance; it's not a
12 requirement.
13        The only thing that's required is -- is
14 that if a manufacturer determines significance of a
15 change, you have to submit.  The guidance attempts to
16 further explain and explore that those simple words of
17 significance, word of significance, and to -- and to
18 color that as best as possible.  But still it's only
19 guidance.  And it's constructive, it's useful.
20        And as you walk through the guidance, the
21 manufacturer should look at the elements of the
22 guidance and try -- and think through the guidance in
23 regard to the flow charts.
24     Q  Just so we're clear, the law absolutely
25 requires that a manufacturer such as Ethicon would

Page 148

1 have to submit a 510-K if the Prolift represented a
2 significant change from the Gynemesh PS product.
3 Correct?
4        MR. GAGE:  Objection.
5     A  If the manufacturer, through its process of
6 evaluation of the change, made that determination,
7 then they should submit.  If -- as the regulation
8 points out, the manufacturer is charged with making
9 that determination.  It's not FDA's role in the first
10 instance to do that evaluation.
11        And if the manufacturer makes the
12 determination that the change is not significant, no
13 submission is made.  If they consider it significant,
14 submission made.
15     Q  Okay.  And what -- so just so I'm clear, if
16 Ethicon determined that the Prolift system was a
17 significant change from Gynemesh PS, it had an
18 obligation to, a legal obligation to file a 510-K.
19 Correct?
20        MR. GAGE:  Objection.
21     A  If they followed the procedure, a logical
22 procedure, instruct -- informed by FDA's guidance,
23 that whatever they were doing with the new device
24 compared to the predicate, in their analysis, was a
25 significant change, then they should submit.

Page 149

1     Q  And they were legally required under --
2 under such a scenario, if they came to the conclusion
3 that there was significant change, they were legally
4 required to file a 510-K.  Correct?
5        MR. GAGE:  Objection.
6     A  The regulation says if you have a
7 significant change as determined by the manufacturer,
8 you submit.
9     Q  All right.  And if Ethicon internally
10 determined that the Prolift was a significant change
11 from any prior product, but nevertheless decided not
12 to submit a 510-K, then it would be illegally
13 marketing and selling the Prolift.  Correct?
14        MR. GAGE:  Objection.
15     A  It's not my understanding they did that,
16 based upon my review of the records.
17     Q  Okay.  Hypothetically, I want you to assume
18 that Ethicon came to the conclusion that the Prolift
19 was a significant change from prior products.  Under
20 that scenario, if they did not obtain a 510-K but
21 nevertheless sold and marketed the Prolift, they would
22 be illegally marketing the product.  Correct?
23        MR. GAGE:  Objection.
24     A  Well, I would say that who's the
25 responsible party in the company to render that

38 (Pages 146 to 149)

Confidential - Attorneys' Eyes Only

Page 150

1  decision?  Who's the signatory, the person that is
2  responsible for making that determination?  What did
3  they do, what process did they follow, what
4  conclusions did they reach and decisions made.
5      So based upon my review of the records,
6  they followed the process as outlined in the guidance
7  document.
8      MR. MAZIE:  Objection.
9      A  They made a decision, it was not
10  significant.
11      MR. MAZIE:  Objection.  Move to strike as
12  nonresponsive.
13  BY MR. MAZIE:
14      Q  I'm asking it -- please listen to my
15  question.
16      My question is, I want you to assume that
17  the powers that be, people at Ethicon, came to the
18  conclusion that the Prolift was a significant change
19  from any prior products.  If that were the case, and
20  Ethicon did not submit a 510-K but nevertheless sold
21  the Prolift, do you agree with me that the Prolift
22  would be illegally sold?
23      MR. GAGE:  Objection.
24  BY MR. MAZIE:
25      Q  Under that scenario?

Page 151

1      A  Well, two aspects.
2      One is, in restating the question, you
3  added the -- "the powers that be," implying the
4  appropriate people within the company responsible for
5  making that decision, that determination, made the
6  determination that there was a significant change,
7  compared to the predicate or predicates.  I mean,
8  that's how you modified the second time around.
9      And -- and choose -- chose not to submit.
10  Well, then that would kick in at the back end, FDA's
11  process of determining whether, in fact, there was a
12  violation.
13      Q  Let me ask you this:  Who -- who should --
14  based -- you've reviewed the -- reams of materials,
15  depositions, and documents in this case in coming to
16  your conclusions.  Correct?
17      A  Yes.
18      Q  Okay.
19      A  Uh-huh.
20      Q  And you reviewed anything that you thought
21  was pertinent in any way so that you could arrive at
22  the appropriate and honest conclusions in this case.
23      Correct?
24      A  Yes.
25      Q  Okay.  Do you know who Dr. Arnaud is?

Page 152

1      A  The name is familiar to me, yes.  I -- I
2  don't recall his exact -- the exact title.
3      Q  He's one of the French doctors who invented
4  the --
5      A  Yes, that's right.
6      Q  -- the Prolift procedure.
7      A  Right.
8      Q  Correct?
9      MR. GAGE:  Objection.
10      A  I believe so.
11      Q  Okay.  If Dr. Arnaud --
12      A  Prolift, I mean, but used a certain similar
13  design and -- yes.
14      Q  Okay.  And if Dr. Arnaud had come to the
15  conclusion that the Prolift was a significant change
16  from any prior product, would you believe that that
17  would be binding on the company?
18      MR. GAGE:  Objection.
19      A  I -- short answer, no.  Longer answer is,
20  he's -- he's probably not in the chain of
21  decision-making to render the final company decision
22  on that matter.
23      And during the course of evaluation,
24  assessment of a product, lots of things are said
25  during the course of design reviews and construction.

Page 153

1  What ultimately is the case is, and it's usually the
2  responsibility of the regulatory people in the
3  organization, to consider the facts, to apply in this
4  case the guidance by FDA, and to render a decision.
5      Q  Well, who are the regulatory people in this
6  case?
7      A  Well, Catherine Beath is -- is at the top.
8  There were other people involved in the Project D'Art
9  documentation and discussions.
10      Q  And are you aware of the fact that
11  Catherine Beath deferred to the people in medical
12  affairs as to whether or not the Prolift was a
13  significant change from Gynemesh or any other device?
14      MR. GAGE:  Objection.
15      A  Well, regulatory is responsible for making
16  the decision.  They may be informed by others.  I'm
17  just speaking in general as I know organizations to be
18  constructed.
19      Q  Mr. Ulatowski, do you know whether or not
20  Ms. Beath, Catherine Beath, deferred to people in
21  medical affairs as to whether or not the Prolift
22  device was a significant change?  Do you know that one
23  way or the other?
24      MR. GAGE:  Objection.
25      A  I know that she did -- she understood her

Page 154

1  limitations in regard to medical knowledge and
2  experience.  So on certain labeling issues, medical
3  issues, she did defer to the medical staff.
4        But upon reaching their recommendations
5  input, I think the burden ultimately -- and I'll speak
6  in general as I understand medical device companies --
7  is the regulatory group makes a regulatory decision in
8  terms of filing.
9        Q   Who made the decision at Ethicon that the
10  Prolift was not a significant change and that,
11  therefore, no 510-K was necessary?
12       A  I'll refer to my report.
13          MR. GAGE:  Objection.
14  BY MR. MAZIE:
15       Q  Sure.
16       A  I'll have to look at the table of contents.
17  I'm probably looking right over.
18          Sean O'Bryan was in the mix, probably
19  worked for Catherine Beath.  Bryan Lisa also in
20  regulatory.  I mean, those are names that just -- not
21  spending all day on this.  And Catherine Beath is at
22  the top of the org chart there in regard to --
23       Q  As you sit here today after creating the
24  74-page, single-spaced report after reviewing reams of
25  documents after earning tens of thousands of dollars,

Page 155

1  can you tell this jury who at Ethicon made the final
2  decision that the Prolift was not a significant
3  change, and that, therefore, no 510-K was necessary to
4  be filed with the FDA?
5          MR. GAGE:  Objection.  Objection.
6       A  Well, I'll read further.
7          I think it was in the regulatory strategies
8  that the Project D'Art, 2004, it looks like a critical
9  point in time.
10       Q  You're not answering my question.
11          I'm asking you who; what person or persons
12  made the decision at Ethicon that the Prolift was not
13  a significant change from any other product, and that,
14  therefore, no 510-K need be filed with the FDA.
15          Who made that decision?
16          MR. GAGE:  Objection.
17       A  That decision was ultimately regulatory.
18  The head of regulatory is Catherine Beath.  She was
19  ultimately responsible for that decision.
20       Q  So if Catherine Beef --
21          MR. MAZIE:  Strike that.
22  BY MR. MAZIE:
23       Q   If Catherine Beath came to the conclusion
24  that there was a significant change in the -- from
25  the -- between the Prolift and any other device or

Page 156

1  product, then a 510-K should have been filed with the
2  FDA.  Correct?
3       A  If it was documented based upon a review of
4  the FDA guidance -- guidance document, that the
5  Prolift presented a significant change, after
6  evaluating the flow charts, then there was an
7  expectation there was a significant change according
8  to regulations and there should be a submission.
9       Q  All right.  And if Catherine Beath came to
10  the conclusion that there was significant change by --
11  by virtue of the Prolift as compared to other
12  products, and nevertheless the product, the Prolift
13  product, was sold and marketed without a 510-K, then
14  that product, the Prolift, would be illegally
15  marketed.  Correct?
16          MR. GAGE:  Objection.
17       A  If she -- well, first of all, I'll have
18  to -- assuming -- I'll have to take a look further.
19  Assuming she was there at the time of the launch of
20  the Prolift, and she was the responsible party at the
21  time, being the regulatory head, or if she was not
22  there at the time, whoever was the regulatory chief
23  signed off on the significance, the end result being
24  significance, there would be an expectation that there
25  would be a submission.

Page 157

1       Q   And if there was no submission but the
2  Prolift was sold, it would be illegally marketed and
3  sold.  Correct?
4          MR. GAGE:  Objection.
5       A  Well, that determination is a
6  determination, getting back to misbranding and
7  adulteration.  And I've talked about the process of
8  FDA evaluating the evidence in order to render a
9  finding that there's a violation.
10       Q  Well, we've just talked about.  The law
11  absolutely requires that there's a significant change
12  that a product can't be sold unless a five -- there is
13  510-K clearance.  Correct?
14          MR. GAGE:  Objection.
15       A  There would be an expectation of
16  submission.  As far as a finding of misbranding or
17  adulteration, that's another process.
18       Q  Is it fair to say that the law requires
19  that if there's a significant change, that a 510-K be
20  cleared by the FDA before the product is sold.
21          Correct?
22       A  If there is a significant change to a
23  marketed product, there is -- regulation says submit.
24       Q  And if you don't submit but you sell it,
25  you're selling illegally.  Correct?

Confidential - Attorneys' Eyes Only

Page 158

1        MR. GAGE:  Objection.
2        A   Again, that's a finding by FDA based upon
3   evidence and a charge.
4        Q   You think that only FDA can make that
5   determination.
6        MR. GAGE:  Objection.
7        A   Well, I -- I imagine people can in a
8   cavalier way throw those terms out.  But ultimately
9   it's -- it's a finding based upon evaluation of
10  evidence, just like somebody shoots somebody outside,
11  you don't immediately charge them with murder.  You
12  evaluate the evidence, the facts of the issue.
13       Q   Mr. Ulatowski, if Catherine Beath testified
14  that she relied on medical affairs and other medical
15  experts in arriving at her conclusions, would you
16  disagree with that testimony?
17       A   If in fact that --
18       MR. GAGE:  Objection.
19       THE WITNESS:  Excuse me.
20       MR. MAZIE:  Let me withdraw the question.
21  BY MR. MAZIE:
22       Q   Do you know whether or not Catherine Beath
23  testified that she relied on medical affairs and the
24  medical experts in arriving at her decision and her
25  group's decision as to whether or not there was a

Page 159

1   significant change?
2        A   Well, there was certainly input from
3   medical folks about the fundamental basis, support --
4   supporting evidence, data, information, in order to
5   move forward to launch the product.  But, you know,
6   relying on that, reliance is one thing; making a
7   decision is another.
8        Q   Who did the people in regulatory, including
9   but not limited to Catherine Beath, rely on in
10  determining medically whether or not the Prolift was a
11  significant change from another product?
12       A   Well, first of all, I don't think that
13  Catherine Beath relied solely upon medical affairs in
14  regard to significance of certain aspects.  The
15  medical affairs people, for example, weren't the
16  engineers.  Medical affairs people didn't necessarily
17  do the engineering analysis.
18       So regulatory will -- in this case
19  Catherine Beath, would consider the input from the
20  various staff members, including medical affairs, and
21  render a decision.
22       Q   Who specifically did Catherine Beath rely
23  on in arriving at the decision that there was no
24  significant change between the Prolift and any other
25  product, including but not limited to Gynemesh?

Page 160

1        A   Well, the decision tree in the -- the
2   marketing strategies documented in every variation of
3   the Project D'Art strategies, documented the -- the
4   logic, the decision-making process, in order to
5   determine whether or not a submission needed to be --
6   needed to be made.  And I mentioned a couple of folks
7   who contributed to those -- those strategies.  And in
8   those strategies, also, is input from other folks.
9        Q   Who were the people?
10       A   Well, you may need to pull out the
11  strategies.
12       I do have reference to opinions by medical
13  staff.  But the Project D'Art strategies, I'd have to
14  go to the source documents, because I don't -- haven't
15  cut and pasted those strategy documents into my
16  report.
17       Q   Was Dr. Arnaud part of that evaluation as
18  to whether or not there was a significant change in
19  the Prolift as compared to other predicate devices?
20       A   I'd have to look at the source documents
21  and the strategy documents to see who is mentioned
22  participated.  What I have is the regulatory staff's
23  conclusions, opinions, regarding the outcome of that
24  assessment.
25       Q   Have you seen the source documents?

Page 161

1        A   Oh, sure.
2        (Ulatowski Exhibits 10 through 14 marked
3   for identification, to be attached to the transcript.)
4   BY MR. MAZIE:
5        Q   All right.  I'm going to show you -- let me
6   put these in order.
7        A   There's a number of them, various dates.
8        Q   Just hold on.
9        I'm going to show you what's been marked as
10  Ulatowski 12.  Is that one of the documents you were
11  referring to?
12       A   No, I didn't pick it up at this point.  The
13  earliest Project D'Art memo I have, at least from what
14  I can see, is from September of 20 -- 2003.  I
15  remember this.
16       Q   You remember this document?  You've seen
17  this?
18       A   I think I -- I remember this document.  Let
19  me just look at it.
20       I think I recall this document.  But I
21  didn't reference it.  When I --
22       Q   What is this document?
23       A   -- when I picked up the train of
24  decision-making.
25       Q   What is this document?

Confidential - Attorneys' Eyes Only

Page 162

1        A  It looks like a presentation.
2        Q  This is one of the documents that makes up
3   the regulatory strategy.  Correct?
4        A  Well, it's a document that's in a chain of
5   events regarding the design history of the product.
6        Q  If you look at Page 3 of this document, it
7   talks about a working group of highly skilled and
8   innovated pelvic surgeons is initiated, and it lists
9   Dr. Arnaud as one of them.  Correct?
10       A  Yes.  Uh-huh.
11       Q  Dr. Arnaud is one of the people that led
12  the development of the Prolift.  Correct?
13       A  The -- the type of product, procedure.
14       Q  Is that correct?
15       A  The type of product and procedure.
16       Q  What do you mean by that?
17       A  Yes.
18       Q  I mean, what do you mean by that,
19  Mr. Ulatowski?
20       A  Well, evaluating the -- the particular
21  vaginal approach to implantation of this type of mesh
22  procedure, mesh into the -- in the pelvic space.
23       Q  What was Dr. Arnaud's involvement with
24  regard to the development of the Prolift?
25       A  Well, he certainly informed Ethicon in

Page 163

1   regard to performance of the product by the approach,
2   vaginal approach, using similar, very similar types of
3   designs.  So instructive all the way through the
4   process, a source of information, probably.
5        Q  Dr. Arnaud was a representative of Ethicon.
6   Correct?
7        A  I don't recall his exact title.  I could
8   probably -- I probably have it in my report, but I
9   don't recall his exact title.
10       Q  But you know that he was -- he was an
11  employee of Ethicon.  Correct?
12       A  I think -- I think so.
13       Q  Okay.  And you know that Dr. Arnaud was one
14  of the people that was involved from the beginning in
15  developing the Prolift until launch.  Correct?
16       A  I recall his name early on, yes.
17       Q  And through -- through launch.  Correct?
18       A  He was -- he may have been there.  I don't
19  recall specifically, but ...
20       Q  And Dr. Arnaud is one of the people that
21  the people in regulatory ended up asking questions of
22  and relying on in determining whether or not there
23  were significant changes and what risks were
24  associated with this new Prolift procedure.  Correct?
25       MR. GAGE:  Objection.

Page 164

1        A  Well, as any employee, you have input into
2   a process.  So, you know, I would expect that.
3        Q  Are you aware of the fact that initially,
4   at least, Ethicon came to the conclusion that 510-K
5   clearance would be required?
6        MR. GAGE:  Objection.
7        A  I think I've seen a document along the way,
8   whether it's in here or elsewhere.
9        Q  Okay.  Let's go to Page --
10       A  Where there's a statement to that effect.
11       Q  Let's go to Page 10.
12       Under the Key Assumptions for the Prolift,
13  it was assumed that the Prolift would require 510-K
14  approval -- sorry, clearance.  Correct?
15       MR. GAGE:  Objection.
16       A  What it states here is regulatory
17  clearance, 510-K.
18       Q  Right.  So as of June of 2003, people in
19  regulatory at Ethicon were of the belief that they
20  needed 510-K clearance for the Prolift before
21  marketing it.  Correct?
22       MR. GAGE:  Objection.
23       A  Well, people identified here had that
24  belief at least.
25       Q  And the people that were identified here

Page 165

1   were Reinhard Juraschek, Scott Ciarrocca, Bob Roda,
2   and Celine Buard.  Correct?
3        A  Yes.  Uh-huh.
4        Q  If you look at Page 13?
5        A  Uh-huh.
6        Q  Never mind that page.  That's not the page
7   I wanted.
8        Okay.  Go to Page 17, I'm sorry.
9        A  Okay.
10       Q  They have a regulatory strategy as of June
11  of 2003 that in the U.S. they're going to submit a
12  510-K to the FDA to the Prolift.  Correct?
13       A  It says U.S. --
14       MR. GAGE:  Objection.
15       A  -- FDA with 510-K.
16       Q  Next page, 18.  They have the project
17  schedule.  And included in that project schedule is
18  the fact that they need to submit a 510-K for the
19  Prolift to the FDA.  Correct?
20       MR. GAGE:  Objection.
21       A  Well, what's stated is U.S. regulatory
22  approval, U.S. 510-K, 510-K, FDA review of 510-K.
23       Q  Right.  So clearly, according to this
24  document, as of June of 2003, Ethicon -- the people in
25  regulatory at Ethicon were of the opinion, based on

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Attorneys' Eyes Only

Page 166

1  the project schedule, that they needed to submit a
2  510-K to the FDA for the Prolift.  Correct?
3        MR. GAGE:  Objection.
4        A   From what I see, some people believed that
5  to be the case.
6        Q   Okay.
7        A   But, of course, this is in --
8        Q   Excuse me?
9        A   This is in 2003.  I've got lots of clients
10 who approach me and say, Well, we're going to need a
11 510-K.  And I instruct them it's not the case.
12       MR. MAZIE:  Objection. Move to strike as
13 nonresponsive -- nonresponsive.
14 BY MR. MAZIE:
15       Q   Let's go back again.
16           As of June of 2003, the people who prepared
17 this regulatory document, meaning Mr. Juraschek,
18 Mr. Ciarrocca, Mr. Roda, Ms. Buard, people at
19 regulatory at Ethicon, were of the belief that they
20 needed to submit a 510-K for the Prolift.  Correct?
21       MR. GAGE:  Objection.
22       A   It's stated as is.  But that's not where
23 you start out; it's where you end up in the analysis.
24       MR. MAZIE:  I again object and move to
25 strike.

Page 167

1  BY MR. MAZIE:
2        Q   And I'll ask you the question again.
3            As of June of 2003, people in regulatory at
4  Ethicon prepared documents that included a project
5  schedule that required them to submit a 510-K for the
6  Prolift before selling it.  Correct?
7        MR. GAGE:  Objection.
8        A   Well, people who constructed these slides
9  have this in their timelines.  I mean, that's what I
10 see.
11       Q   And one of those people was Scott
12 Ciarrocca.  Correct?
13       A   That's right.
14       Q   Do you know who Scott Ciarrocca is?
15       A   I remember the name.  I don't recall his
16 title.
17       Q   All right.  Put that away.
18       A   If -- if I can add to how that --
19       Q   There's no pending question.
20           Let me show you what's been marked as
21 Ulatowski 14.  Have you seen this document before?
22       A   I believe so.
23       Q   What's a -- what's this document?
24       MR. GAGE:  David, do you have another copy
25 of this?

Page 168

1        MR. MAZIE:  Sure.
2        A   Well, as part of a design review process,
3  validation is one element of that design process.
4        Q   If the Prolift was a completely new
5  procedure from what doctors were used to doing or
6  performing, that would constitute a significant
7  change.  Correct?
8        A   Well, I probably would refer to medical
9  expertise on that to render a conclusion whether that
10 was a fact or not.
11       Q   I'm asking you this question.  I want you
12 to assume that doctors as a whole --
13       MR. MAZIE:  Strike that.
14 BY MR. MAZIE:
15       Q   I want you to assume that doctors would
16 generally believe this procedure, the Prolift
17 procedure, to be a wholly new procedure.  If that were
18 the case, that would render the Prolift a significant
19 change from any prior product.  Correct?
20       MR. GAGE:  Objection.
21       A   I don't -- I don't know.  What doctors?
22 What opinions?  I'd have to have more information
23 there, I think, to understand the parameters of that.
24       Q   Okay.  Let's look at this document.  Let's
25 look on Page 6 of 15.

Page 169

1            Are you there?
2        A   On what page?
3        Q   Six.
4        A   Oh, 6.  Okay.
5        Q   Are you there?
6        A   Okay.  Yeah.
7        Q   This is a -- this is the design validation
8  report for the Prolift.  Correct?
9        A   Yes.
10       Q   This is one of the required regulatory
11 pathways.  Correct?
12       A   Design validation is -- is a requirement to
13 the quality system, yes.
14       Q   And this is dated February 7, 2005.
15 Correct?
16       A   Yes.
17       Q   This is weeks before the launch of the
18 Prolift.  Correct?
19       A   I believe so.
20       Q   If you look at the last sentence in the
21 response box, it says, "Clearly, for most physicians
22 the Prolift procedure will be a deviation from what
23 they are currently doing."
24           Do you see that?
25       A   I see that.

Confidential - Attorneys' Eyes Only

Page 170

1      Q   Okay.  So as of February 7, 2005, a mere
2  few weeks before the launch of the Prolift, the people
3  at regulatory at Ethicon were of the opinion that for
4  most physicians, the Prolift procedure will be a
5  deviation from what they are currently doing.
6          Correct?
7          MR. GAGE:  Objection.
8      A   I'll have to see whose responses these are
9  again, just to refresh my memory, who actually made
10  those responses.
11         I mean, the only signatory on this document
12  is from marketing.  Let me look further.
13         Well, I don't know who made the comment,
14  that would be helpful.
15     Q   I'm asking you to assume -- first of all,
16  do you know who Giselle Bonet is?
17     A   Giselle Bonet?
18     Q   Yeah.
19     A   She's indicated as product director,
20  Gynecare, marketing.
21     Q   Okay.  And she's signing off on this design
22  validation report for the Gynecare Prolift system a
23  few weeks before its launch.  Correct?
24     A   Yes.
25     Q   And according to this design validation

Page 171

1  report, most physicians doing the Prolift procedure
2  will deem this as a complete deviation from what
3  they're currently doing.  Correct?
4          MR. GAGE:  Objection.
5      A   That's a response comment.
6      Q   Correct?
7      A   That's what it states.
8          MR. GAGE:  Objection.
9  BY MR. MAZIE:
10     Q   And again, if in fact -- I want you to
11  assume, I want you to assume for this hypothetical
12  that the Prolift procedure is completely, is a
13  completely new procedure and completely different from
14  what doctors were used to doing.  If that were the
15  case, that would be a significant change, requiring a
16  510-K.  Correct?
17         MR. GAGE:  Objection.
18     A   No, I can't conclude that.
19     Q   Why not?
20     A   I think, first of all, what I would do is,
21  I'd solicit the input of -- of medical experts to give
22  me some input on that, to assess that.
23         I'm not going -- I'm not a urogynecologist,
24  I'm not going to assess on my own significance of
25  a medical procedure versus another.

Page 172

1  So that's kind of the long and short of it.
2      Q   Okay.  So you're not a medical expert.  But
3  you don't know who the people at regulatory at Ethicon
4  consulted with in arriving at the conclusion that for
5  most physicians the Prolift procedure is a deviation
6  from what they're currently doing.  Correct?
7          MR. GAGE:  Objection.
8      A   Well, all I see is what's stated here.  I
9  don't know who wrote it, I don't know based on what --
10  you know, what their assessment was, basis for
11  assessment.
12     Q   All right.  Let me ask you this:  I want
13  you to assume hypothetically that after speaking to
14  all the medical experts, and doing their analysis,
15  that the people at Ethicon came to the conclusion that
16  the Prolift procedure for most physicians is a
17  deviation from what they're currently doing.  I want
18  you to assume that's the case, that's the conclusion
19  they reached.
20         If that were true, that would constitute a
21  significant change, which would require a 510-K for
22  the Prolift.  Correct?
23         MR. GAGE:  Objection.
24     A   I'd say it would be an issue that would
25  have to be assessed clinically.  I'm -- I'm just

Page 173

1  thinking back in other situations where I've been
2  presented the same sort of situation.  I -- I haven't
3  made that determination independently in -- in past --
4  past times.
5      Q   So right now, sitting before this jury on
6  video, you can't reach a conclusion, even if I tell
7  you to assume that the people at regulatory affairs,
8  in their -- in their design validation report, came to
9  the conclusion after speaking to medical experts that
10  most physicians performing the Prolift procedure would
11  find it to be a deviation from what they're currently
12  doing, you can't come to the conclusion one way or the
13  other as to whether or not that represents a
14  significant change which requires a 510-K.
15         Is that what you're telling this jury?
16         MR. GAGE:  Objection.
17     A   Well, a deviation, how significant is a
18  deviation?  How different is it from other procedures?
19  I'd have to get some input on that to understand
20  the -- the importance of that.
21     Q   And, again, you'd have to get input, if you
22  were sitting in their shoes, from the medical experts?
23     A   Well, the statement is, it would be a
24  deviation.  Okay.  It's a deviation.  Well, lots of
25  changed products, there's some change in process or

Confidential - Attorneys' Eyes Only

Page 174

1  procedure using the product, but it doesn't require a
2  510-K.
3       So, you know, I'll -- what have people been
4  doing, how does this deviate from that.
5       Q   Who -- who would you have to --
6       MR. MAZIE:  Strike that.
7  BY MR. MAZIE:
8       Q   Who should they speak to --
9       MR. MAZIE:  Strike that.
10 BY MR. MAZIE:
11      Q   Do you know who the -- who was on their
12 medical affairs as a consultant, or within the
13 company?
14      A   Robinson, Hinoul, others.
15      Q   Okay.  Dr. Vincent Lucente?
16      A   There was a -- there was a design group, a
17 medical group.  I read their depositions.  So that was
18 separate from the medical affairs staff --
19      Q   Fair to say that --
20      A   -- somewhat.
21      Q   -- two of the primary people who were --
22 who were leading the inquiry and evaluation concerning
23 the Prolift were Dr. Vincent Lucente in the United
24 States and Dr. Axel Arnaud in France?
25      A   Those were people involved --

Page 175

1       Q   Okay.
2       A   -- in the process.
3       Q   Dr. Lucente was involved in the American
4  TVM study, and Dr. Arnaud was involved in the French
5  TVM study.  Correct?
6       A   Yes.
7       Q   And both studies were done to evaluate
8  whether or not the Prolift was safe and effective.
9       Correct?
10      MR. GAGE:  Objection.
11      A   That -- to evaluate the procedure, to
12 evaluate the vaginal approach in pelvic order, pelvic
13 prolapse, yes.
14      Q   Okay.  And both TVMs, the French and the
15 U.S., led by Dr. Arnaud and Dr. Lucente, was to
16 determine the safety and effectiveness of the Prolift
17 procedure.
18      MR. GAGE:  Objection.
19      A   Yes, it was useful and referred to by
20 Ethicon.
21      Q   And they were also, both TVM studies, both
22 in France and in the U.S. by Dr. Arnaud and
23 Dr. Lucente amongst others, was to determine whether
24 or not the procedure itself was a significant change.
25      Correct?

Page 176

1       MR. GAGE:  Objection.
2  BY MR. MAZIE:
3       Q   From prior procedures.
4       A   Well --
5       MR. GAGE:  Objection.
6       A   -- I mean, they -- I'm not a
7  urogynecologist, so you're going to test the limits of
8  my expertise here.
9       But, you know, they provided input.  There
10 were other medical staff in the company that also
11 provided medical input, knowing full well what those
12 individuals thought.  Charlotte Owens, Robinson,
13 Hinoul.  They knew all that same information, and they
14 moved forward on the product, saying, no, these are --
15 people are used to operating in this space, this is
16 nothing unusual.
17      So, you know, there's opinions, there's
18 opinions.
19      Q   People make mistakes, don't they?
20      A   Sure.
21      Q   Okay.  And sometimes people look the other
22 way even though they know it's wrong.  Correct?
23      MR. GAGE:  Objection.
24      A   Well, I'm sure that occurs.
25      Q   You've seen that.  You've -- as -- sitting

Page 177

1  in your chair as an FDA regulator, you've seen many
2  companies do the wrong thing.
3       MR. GAGE:  Objection.
4  BY MR. MAZIE:
5       Q   Correct?
6       MR. GAGE:  Objection.
7       A   From time to time companies will not
8  comply.
9       Q   And sometimes it's by mistake.  Correct?
10      A   Yes.
11      Q   And sometimes it's intentional.  Correct?
12      A   Unfortunately, yes.
13      Q   Here the brochure for the Prolift said that
14 the product, the Prolift, is revolutionary.  Correct?
15      A   I think that term was used at one point in
16 time.
17      Q   The word "revolutionary" means
18 significantly new, does it not?
19      MR. GAGE:  Objection.
20      A   Well, I've -- I reviewed marketing and
21 advertising and labeling for many years.  And
22 companies will -- the marketing people will say things
23 that have no real bearing on the evaluation of
24 significance and -- and determination of equivalence.
25 I mean, these are marketing people who will try and --

45 (Pages 174 to 177)

Confidential - Attorneys' Eyes Only

Page 178

1  you're in a bit of a contradiction here with 510-Ks.
2  The contradiction is, the 510-K process you're trying
3  to establish equivalence.  And the marketing people
4  are trying to get some spread of product
5  differentiation with their customers.
6      Q   Let me ask you this:  If the Prolift was
7  truly revolutionary, that would constitute a
8  significant change for which a 510-K would be required
9  before Ethicon sold the product.  Correct?
10      MR. GAGE:  Objection.
11      A   I'd have to see the wherewithal under --
12  supporting the term "revolutionary."  And I think the
13  company did look at those elements and made a decision
14  that it wasn't.
15      MR. MAZIE:  Objection.  Move to strike.
16      A   That it was substantially -- well, was not
17  a significant change.
18      MR. MAZIE:  Objection.  Move to strike as
19  nonresponsive.
20  BY MR. MAZIE:
21      Q   I'm asking you to tell this jury -- first
22  let me ask you it this way:  I'm asking you to assume
23  that the Prolift procedure was truly revolutionary,
24  meaning a completely new procedure that doctors had
25  not done before.

Page 179

1          If that's the fact, if you accept that as a
2  fact, that it's a revolutionary new procedure, do you
3  agree with me that constitutes a significant change
4  which would have required Ethicon to have filed and
5  got clearance for a 510-K before selling the Prolift?
6      MR. GAGE:  Objection.
7      A   And I can't agree with that.
8      Q   Why not?
9      A   Well, I -- I harken back to my experience.
10  And FDA's determined in conversation with companies
11  some -- some things not significant or have not --
12  even though somebody might think they're revolutionary
13  or a big deal, FDA's not expected a 510-K or found
14  a -- or has found a 510-K equivalent, even though the
15  change might be a big deal.
16      MR. MAZIE:  Objection.  Move to strike.
17  BY MR. MAZIE:
18      Q   You have to listen to my questions.
19      A   Right.
20      Q   My question is, I want you to assume, I
21  want you to assume that the Prolift was a
22  revolutionary, new procedure.  I want you to assume
23  that as fact.
24          If that were the case, that would
25  constitute a significant change which would have

Page 180

1  required Ethicon to have submitted a 510-K and
2  received clearance from the FDA before selling the
3  product.  Correct?
4      MR. GAGE:  Objection.
5  BY MR. MAZIE:
6      Q   Under that hypothetical.
7      MR. GAGE:  Objection.
8      A   Well, the hypothetical is -- is formed in
9  my mind with an expectation what you -- what one
10  considers to be revolutionary, which every person has
11  a different idea of what's revolutionary.  Marketing
12  people sometimes call minor things revolutionary just
13  to get market spread.
14          So I don't take revolutionary -- FDA
15  doesn't consider the word "revolutionary."  It looks
16  at the data, it looks at the changes, the technology,
17  and renders its opinion.  The regulations expect the
18  companies to take a look at those changes, compare it
19  to the predicate, and render a decision on whether
20  these things are significant.
21      Q   Well, is it appropriate for Ethicon to say
22  that its product, the Prolift, is revolutionary, if
23  that's not true?
24      A   Well, I guess what I'm saying is,
25  revolutionary is in the eye of the beholder.  And how

Page 181

1  one considers, you know, what is revolutionary.
2      Q   I'm asking you a question.  Is it
3  appropriate or was it appropriate for Ethicon to state
4  in its materials that the Prolift is a
5  revolutionary -- revolutionary procedure, if that
6  weren't true?  Would that be appropriate?
7      MR. GAGE:  Objection.
8      A   By whatever definition they used for
9  revolutionary.  Didn't necessarily mean it required
10  submission.
11      Q   What's your definition, what was your
12  definition at the FDA as to what revolutionary meant?
13      A   Well, I think that that's really a
14  case-by-case situation or a
15  product-type-by-product-type definition, or
16  application.
17          FDA was, for example, at one time
18  considering scalpels in the same ballpark as lasers.
19  I mean, so it's a -- you know, what is revolutionary?
20  Does it dramatically change medical practice?  I -- I
21  don't know.  I -- I just didn't rely upon terms
22  revolutionary, because they're ill defined, they're
23  subjective almost.
24      Q   You don't know what the term
25  "revolutionary" means?

46 (Pages 178 to 181)

Confidential - Attorneys' Eyes Only

Page 182

1    A   Well, there's probably a dictionary
2  definition of some remarkably huge change or
3  something, but that's not -- in marketing literature
4  that's -- I mean, that's not tightly held to the
5  definition, probably.
6    Q   Mr. Ulatowski, what is your understanding
7  of what revolutionary means?
8    A   Well, I guess a common definition, just as
9  I construct one here, would be a -- a substantial
10  change that -- that has significant impact on whatever
11  the revolution is.
12      So it -- I mean, you know, you asked me a
13  term.  I answer with some other terms that probably
14  require a definition.  But again, FDA -- and even now
15  I don't -- I don't put much stock in the term
16  "revolutionary."  I don't think -- I don't recall an
17  instance where that changed my mind about a product
18  one way or the other.
19      I looked at the data and information.
20    Q   So it's okay if a manufacturer, while you
21  were at the FDA, it was okay if a manufacturer said
22  that their product was revolutionary or there was a
23  revolutionary new procedure, even if that weren't the
24  case?
25    A   I don't recall ever taking an action

Page 183

1  against someone who made that -- who stated the term
2  "revolutionary."  I guess I would have to consider its
3  importance, how -- its impact.  I don't know exactly
4  how I would approach it.
5    Q   Let me ask you, if a manufacturer was of
6  the opinion that there -- that the Prolift --
7      MR. MAZIE:  Strike that.
8  BY MR. MAZIE:
9    Q   If Ethicon was of the opinion that the
10  Prolift is a novel surgical protocol and that there
11  needed to be special skill or training to perform the
12  procedure, would that be a significant change
13  requiring a 510-K?
14    A   Well, I know that there were statements
15  made by people along the way, be it novel,
16  revolutionary, whatever.  What I was interested in
17  was, how did Ethicon make their decision on
18  significance?  What -- what decision did they make,
19  what did -- what did they support it with?  So what
20  was the process they went through.
21      There's lots of things that -- in there
22  that, for example, in the Pence report that, well, you
23  know, lots of things are said when in a company.  It's
24  what -- when you boil it down to what's the regulatory
25  process to determine significance.

Page 184

1      MR. MAZIE:  I object and move to strike as
2  completely nonresponsive.
3  BY MR. MAZIE:
4    Q   Are you hearing my questions?
5      MR. GAGE:  Objection.
6    A   I am.
7    Q   You seem to be -- I ask you a question, and
8  you seem to answer something completely different.  I
9  don't -- I don't understand.  You understand you're
10  being videotaped and you're under oath.  Right?
11      MR. GAGE:  Objection.
12    A   I understand.
13    Q   All right.  I'm going to ask you again.  If
14  medical affairs --
15      MR. MAZIE:  Strike that.
16  BY MR. MAZIE:
17    Q   If Piet Hinoul -- let's do it this way:  If
18  Piet Hinoul relied on medical affairs and his medical
19  experts told him this was a completely new procedure,
20  would that constitute a significant change for which a
21  510-K would be necessary and cleared by the FDA before
22  Ethicon could legally sell the product?
23      MR. GAGE:  Objection.
24    A   That would have to be assessed according to
25  the guidance, decision made, move on.

Page 185

1    Q   What does that mean?
2    A   That's what the -- well, Piet Hinoul says
3  it's significant.  I mean, that's -- that's an
4  element.  That's considered.  You know, the -- lots of
5  things are said during the course of design and review
6  of a product.  When push comes to shove, what's --
7  who's the responsible party, what decision did they
8  make, and on what basis.
9    Q   Again, you don't know who the responsible
10  is as you sit here today.  Correct?
11    A   No, I think I --
12      MR. GAGE:  Objection.
13    A   I think I proffered Catherine Beath as the
14  most senior regulatory person.
15    Q   Not Piet Hinoul?
16    A   Not Piet Hinoul.
17    Q   Okay.
18      MR. MAZIE:  Mark this.
19      (Ulatowski Exhibit 15 marked for
20  identification, to be attached to the transcript.)
21  BY MR. MAZIE:
22    Q   Have you ever seen this document before,
23  this e-mail?
24    A   Hang on just a second here.
25      MS. KABBASH:  I'm sorry, what's the number?

47 (Pages 182 to 185)

Confidential - Attorneys' Eyes Only

Page 186

1  The exhibit number?
2        THE WITNESS:  Fifteen.
3        MS. KABBASH:  Thank you.
4        THE WITNESS:  Is that right?  Yeah.
5    A   Okay.  Let me take a look at this.
6        I've seen this.
7    Q   You have?
8    A   I've seen this in Pence's report.
9    Q   Okay.
10   A   Cut and paste.
11   Q   And again, the legal determination of
12  whether a 510-K is necessary is if there's a
13  significant difference or a substantial change; which
14  is it?
15       MR. GAGE:  Objection.
16   A   A significant change.
17   Q   Significant change.
18   A   Right.
19   Q   Okay.  I want to look at this document --
20  first of all, do you know who Steve Bell is?
21   A   I see his -- his title here, director of
22  marketing, Europe.
23   Q   For Gynecare?
24   A   Gynecare.
25   Q   Okay.  And he said that, "As agreed, the

Page 187

1  top ten key learnings from the first TVM training
2  course in Lilly," do you see that?
3    A   Yes.
4    Q   And if you look down at four -- the third
5  bullet, it says, "The TVM" -- referring to the Prolift
6  procedure -- "represents a major" -- the words are all
7  capitalized -- "mind shift on several key aspects of
8  prolapse surgery that may require a greater shift in
9  thinking."
10       Do you see that?
11   A   Yes.
12   Q   He was of the opinion that the -- one of
13  the key learnings from the training course in Lilly
14  for the Prolift was that there's a major mind shift on
15  several key aspects of the Prolift surgery.  Correct?
16   A   Well, he says what you first said.  I mean,
17  you don't need to paraphrase it.
18   Q   In the fourth bullet he states, "The
19  dissection of posterior compartment for this procedure
20  is significantly different" -- and I want you to focus
21  on significantly different -- "to that of either
22  standard sacrospinous fixation procedures, (Richter)
23  or even posterior IVS."
24       Do you see that?
25   A   Yes.

Page 188

1    Q   Okay.  So one of the key learnings from the
2  French TVM was that the Prolift procedure is
3  significantly different from any other prolapse
4  surgery.  Correct?
5        MR. GAGE:  Objection.
6    A   Well, it is as stated here, as you've read
7  it.
8    Q   Do you understand that to be the case,
9  based on this internal e-mail, that one of the key
10  learnings from the TVM training course in Lilly,
11  France, was that the Prolift procedure is
12  significantly different than other Prolift -- prolapse
13  repair surgeries?
14       MR. GAGE:  Objection.
15   A   It doesn't quite say that, but -- it says
16  significantly different to that for either standard
17  sacrospinous fixation procedures or even for posterior
18  IVS.
19       It's one of the characterizations by Steve
20  Bell of the key findings.
21   Q   Okay.
22   A   Key learnings.
23   Q   And people that are cc'd on this are Scott
24  Ciarrocca, Giselle Bonet, Ophelie Berthier, K.
25  Munchel -- I'm sorry, Kendra Munchel, and Kevin Mahar,

Page 189

1  all of regulatory affairs or medical affairs at
2  Ethicon.  Correct?
3        MR. GAGE:  Objection.
4    A   I recall some of the names.
5    Q   Okay.  Well, you knew who Scott Ciarrocca
6  was?
7    A   Yeah.  I forget his title.  But, yeah, I --
8  he's in a number of documents.
9    Q   Okay.  And so these various individuals in
10  regulatory and medical affairs at Ethicon were in
11  agreement that the Prolift procedure was significantly
12  different to that of other prolapse repair surgeries.
13       Correct?
14       MR. GAGE:  Objection.
15   A   Well, I don't know if you can conclude
16  that.  I mean, it's a e-mail from Steve Bell to -- to
17  people.  I don't know what their beliefs were.
18   Q   All right.  Let's assume these people,
19  Scott Ciarrocca and some of these other people, agreed
20  that the Prolift surgery was a significant difference
21  in procedure from any of the other existing prolapse
22  repair surgeries.  Do you agree with me that a 510-K
23  would have been required before they could sell the
24  Prolift?
25       MR. GAGE:  Objection.

48 (Pages 186 to 189)

Confidential - Attorneys' Eyes Only

Page 190

1      A   I don't think I can really answer that.  I
2  think you're testing the limits of my expertise here.
3          What I would typically do would be to
4  solicit the assessment, opinion by -- by a
5  urogynecologist, probably.
6      Q   Okay.  Such as Dr. Lucente or Dr. Arnaud.
7          Correct?
8          MR. GAGE:  Objection.
9  BY MR. MAZIE:
10     Q   Two people that were leading these TVM
11 studies in France and the United States.  Correct?
12     A   Well, and there were other medical staff.
13 So, I mean, these are statements made, but my opinion
14 was that they followed the right procedure.
15         MR. MAZIE:  Move to strike as unresponsive.
16 BY MR. MAZIE:
17     Q   That's not what I asked you.
18         I asked you whether or not if the people in
19 regulatory affairs believed that the -- that one of
20 the top ten learnings from the TVM training was that
21 the Prolift procedure was significantly different from
22 other types of prolapse repair, that that would
23 require them to have a 510-K before selling the
24 Prolift.  Correct?
25         MR. GAGE:  Objection.

Page 191

1      A   I -- I can't conclude that.  I would
2  require further input.  And it wasn't the nature of my
3  opinion in regard to the -- the topic which you're
4  discussing, which is significance of the change, and
5  the decision made by the company.
6      Q   That was not part of your -- your opinion.
7      A   It was.
8      Q   Okay.  My question to you is, you would
9  have to -- and I think you said this earlier.  You
10 would have to hear from urogynecologists who were
11 familiar with the procedure.  Correct?
12     A   I would solicit input.  I wouldn't -- I'd
13 select that input based upon my requirements, and then
14 maybe formulate an opinion if I could still make an
15 opinion.
16     Q   Okay.
17         MR. MAZIE:  Let's mark this.
18         (Ulatowski Exhibit 16 marked for
19 identification, to be attached to the transcript.)
20 BY MR. MAZIE:
21     Q   Dr. Arnaud is one of the creators of the
22 Prolift procedure and one of the people who ran the
23 TVM study in France.  Correct?
24         MR. GAGE:  Objection.
25     A   Yes.

Page 192

1      Q   And have you seen his deposition, his sworn
2  testimony?  Because it's not listed on your supplement
3  anywhere.
4      A   I don't recall Arnaud's deposition.  I have
5  to look at my reliance list.
6      Q   Why don't you look on your reliance list,
7  because I don't see it.
8      A   I don't see it on Page 80, and the rest are
9  I think individual documents.  So I think the short
10 answer is I don't think I saw his deposition.
11     Q   You rendered an opinion in this case
12 without reviewing the sworn testimony of Dr. Axel
13 Arnaud?  Is that what you're telling this jury?
14         MR. GAGE:  Objection.
15     A   I didn't review the deposition.  It doesn't
16 mean I couldn't render the opinion.
17     Q   Well, you knew that Dr. Arnaud was deposed
18 in this case.  Correct?
19         MR. GAGE:  Objection.
20     A   I don't know if I knew that or not.  I
21 don't recall.
22     Q   If you knew -- okay.  If you knew that
23 Dr. Arnaud, who's one of the inventors of the Prolift
24 procedure and one of the people who led the TVM study,
25 had been deposed, you would have wanted to read that

Page 193

1  before rendering your opinions.  Correct?
2          MR. GAGE:  Objection.
3      A   I don't know.  My -- my opinion is one of
4  process.  I'm not a urogynecologist.  I'm not going to
5  sit here and opine on medical procedures, importance,
6  differences.  That's not my bag.  My bag is the
7  regulatory process that they used, the basis, the
8  foundation for the decision in a regulatory sense, and
9  the outcome of that.
10     Q   So it wouldn't matter to you -- you're
11 telling this jury that it would not matter to you if
12 Dr. Arnaud, who is one of the people who was
13 shepherding the Prolift procedure from its infancy to
14 the time it was marketed or through the time it was
15 marketed, what his opinions were?
16         MR. GAGE:  Objection.
17     A   What I did find in depositions --
18     Q   Please answer my question.
19     A   I -- I don't know.
20     Q   You don't know whether you would be
21 interested in what Dr. Arnaud had to say about the
22 product?
23     A   Until I -- if I read it and there was
24 nothing substantial in terms of the regulatory
25 decision process.

Confidential - Attorneys' Eyes Only

Page 194

1    Q   Well, you didn't read Dr. Arnaud's
2  deposition?
3    A   No, I didn't read it.
4    Q   So you don't know what it says.  Right?
5    A   He's not in the regulatory department.  My
6  opinion was based primarily upon the regulatory
7  process.
8        I did look for supporting evidence in terms
9  of marketing of the product, the medical staff at
10 Ethicon, Charlotte Owens and others in terms of
11 their -- in terms of the support for the decision to
12 go to market.
13   Q   So let me ask you this:  So if -- if the
14 doctors and the people in medical affairs are telling
15 the people in regulatory that this is a significant
16 change, the Prolift is a significant change from any
17 other prolapse surgery, and the people in regulatory
18 decide to ignore that and not file a 510-K, that's
19 okay?
20      MR. GAGE:  Objection.
21 BY MR. MAZIE:
22   Q   Is that what you're telling this jury?
23      MR. GAGE:  Objection.
24   A   Well, first of all, that's not the case.
25 There was -- and I document deposition testimony

Page 195

1  referring to support and justification for the
2  marketing.
3        So, I mean, your -- I don't know if it's a
4  hypothetical you're presenting, but it's not factual.
5    Q   I'm asking you to assume that the people in
6  regulatory affairs ignored people in medical affairs
7  and other consultants and ignored the fact that they
8  were told that the Prolift procedure was a completely
9  new procedure.
10       If that were the case, and based upon that
11 they decided to ignore that advice and not file a
12 510-K, that would be okay with you.
13      MR. GAGE:  Objection.
14   A   What I -- what I see is that they did
15 consider the medical opinion.
16   Q   Let me ask you, what was the predicate
17 device that Prolift -- I'm sorry.  What is the
18 predicate device that Ethicon compared the Prolift to
19 in determining whether or not a 510-K was appropriate
20 or necessary?
21   A   Originally?
22   Q   Yeah.
23   A   Primarily the Gynemesh PS device that was
24 previously marketed.
25   Q   Well, only the Gynemesh -- Gynemesh PS.

Page 196

1  Correct?  Initially.
2    A   Well, there were other meshes on the
3  market.  There's other -- there's literature on other
4  meshes, supportive evidence that was used as well.
5  But the predicate was Gynemesh PS.
6    Q   So fair to say that when it initially
7  launched the product, Ethicon was comparing Prolift to
8  Gynemesh PS.  Correct?
9    A   That was the predicate --
10   Q   And --
11   A   -- at the time.
12   Q   And Ethicon came to the conclusion that
13 there was no significant difference between the
14 Prolift and Gynemesh PS.
15   A   That's correct.
16   Q   And because of that, it determined that a
17 510-K was not necessary.
18   A   That's correct.
19   Q   And if there was a significant difference
20 in -- I'm sorry, between the Prolift as a procedure,
21 as compared to the Gynemesh PS, that would have
22 required a 510-K to be filed before the Prolift could
23 be sold.  Correct?
24      MR. GAGE:  Objection.
25   A   Can you repeat the question?

Page 197

1    Q   Sure.  If, in fact, there was a significant
2  difference between the Prolift as a procedure, as
3  compared to Gynemesh PS, that would have required
4  Ethicon to have filed and obtained clearance through a
5  510-K before selling the Prolift.  Correct?
6      MR. GAGE:  Objection.
7    A   Well, I think it would have been
8  considered.  Whether or not it would have resulted in
9  a decision that it was significant enough, I mean, is
10 another story.
11       In fact, I think that -- I mean, testimony
12 shows, records show that -- that pelvic surgery using
13 fashioned Gynemesh PS was -- was kind of the way
14 people were doing things at the time, that
15 urogynecologists were familiar with vaginal placement
16 of the mesh, that they were using instruments to place
17 the mesh.
18       So I -- you know, it's -- I mean, I guess
19 you're -- if it's hypothetical, is a little bit of a
20 stretch.
21      MR. MAZIE:  Objection.  Move to strike as
22 nonresponsive.
23 BY MR. MAZIE:
24   Q   I'm going to ask you again.  I want you to
25 assume that --

Confidential - Attorneys' Eyes Only

Page 198

1        MR. MAZIE:  Strike that.
2    BY MR. MAZIE:
3        Q   I want you to assume that the Prolift as a
4    procedure, as compared to the Gynemesh PS, was a
5    significant change.  If that were the case, then
6    Ethicon was required to submit a 510-K and obtain
7    clearance from the FDA before selling the product.
8        Correct?
9        MR. GAGE:  Objection.
10       A   I -- I think that stretches the limit of my
11   expertise, and I would probably expect to get some
12   input on that in order to fully gauge that.
13       Q   I'll ask you one other way, and then we'll
14   stop because we have a tape and we'll take a break.
15       If the technique between the Prolift and
16   the -- and Gynemesh was completely different, do you
17   agree with me that a 510-K would have been required
18   before Ethicon could legally sell the Prolift?
19       MR. GAGE:  Objection.
20       A   And repeat the question, please.
21       Q   Sure.
22       A   Yes.
23       Q   If it was known to Ethicon that the Prolift
24   procedure was completely different than that of
25   Gynemesh PS, Ethicon would have been legally required

Page 199

1    to obtain 510-K clearance before legally selling the
2    Prolift.  Correct?
3        MR. GAGE:  Objection.
4        A   I don't think it's a -- it's a yes/no.  I
5    think they would have to assess that.  Even if it was
6    different, assess it, evaluate the significance of
7    that difference, determine if it was significant
8    according to the guidance, and then render a decision.
9        Q   If it was completely different.
10       A   I understand what you're saying.
11       Q   Even if it was completely different
12   procedure, you still think that they wouldn't need --
13   necessarily need a 510-K?
14       MR. GAGE:  Objection.
15       A   Well, what is completely different?
16       Q   A revolutionary new procedure.
17       A   What is revolutionary?  It's in the eye of
18   the beholder.  Revolutionary procedure to one
19   physician isn't a big deal to others, so ...
20       Q   Let me ask you this:  Have you reached a
21   conclusion in this case as to whether the Prolift
22   procedure represents a significant or substantial
23   difference from that of the Gynemesh PS predicate?
24       MR. GAGE:  Objection.
25       A   Well, I didn't formulate an opinion

Page 200

1    specifically directed to that point.  What I opined on
2    was the process that Ethicon engaged in to render a
3    decision that a submission was not necessary.
4        Q   So just so we're clear and the jury is
5    clear and the court is clear, you have not rendered in
6    this case an opinion as to whether or not the Prolift
7    procedure was -- I'm sorry, what was the term,
8    significantly or substantially different?  What's the
9    legal --
10       A   Well --
11       MR. GAGE:  Objection.
12   BY MR. MAZIE:
13       Q   What is the legal --
14       A   Whether the new product was significantly
15   different than the predicate.
16       Q   Okay.  You have not rendered -- just so the
17   jury is clear and the court is clear, you have not
18   rendered any opinion in this case as to whether or not
19   the Prolift procedure is significantly different from
20   that of the Gynemesh PS, the predicate device.
21       Correct?
22       MR. GAGE:  Objection.
23       A   I'll refer to my opinions.  I don't believe
24   that was one of my opinions.
25       Q   Okay.

Page 201

1        MR. MAZIE:  We'll take a break, and you can
2    let us know if you have that opinion.
3        THE WITNESS:  Okay.
4        VIDEO SPECIALIST:  The time now is 2:46.
5    We are going off the record.  This is the end of Disk
6    Number 3.
7        (Short recess.)
8        VIDEO SPECIALIST:  The time now is 3:06.
9    We are back on the record.  This is the beginning of
10   Disk Number 4.
11   BY MR. MAZIE:
12       Q   Okay.  Mr. Ulatowski, before we broke I
13   asked you a question, and I ask you it again.  Are you
14   rendering any opinion in this case as to whether or
15   not the Prolift procedure represents a significant
16   difference, as that term is defined in the
17   regulations, from any -- the Gynemesh procedure or any
18   other procedure?
19       MR. GAGE:  Objection.
20       A   I looked at my opinions during the break,
21   and the most relevant opinion speaks to the process
22   of -- that Ethicon followed regarding rendering the
23   decision whether or not there was a significant
24   change.
25       I didn't get into medical aspects of

Confidential - Attorneys' Eyes Only

Page 202

1  interpretation of medical-related issues.
2      Q   Would it matter to you if the Prolift
3  procedure represented a significant difference from
4  the Gynemesh or any other procedure?
5          MR. GAGE:  Objection.
6      A   Significant difference how?
7      Q   Completely new procedure.  Completely
8  different procedure that requires special skill or
9  training by a physician before performing it.
10         MR. GAGE:  Objection.
11     A   Well, I -- I stayed away from any
12 assessment of medical procedure because I thought it
13 was extending the limits of my expertise.
14     Q   Isn't that a clinical determination as to
15 whether or not the Prolift requires a 510-K clearance,
16 as to whether or not the procedure is completely
17 different from any other procedure?
18         MR. GAGE:  Objection.
19     A   Well, in my opinion I reflect upon what
20 steps Ethicon took, how they filled out the flow
21 charts, addressed the issues in the guidance, and
22 rendered a decision.
23         They -- there was certainly information
24 before the parties of the various things you've talked
25 about, and the decision was what it was.

Page 203

1      Q   The decision by Ethicon was that this was
2  not a completely new procedure with -- which required
3  a 510-K clearance before selling the product.
4          Correct?
5          MR. GAGE:  Objection.
6      A   The decision was that there was not a
7  significant change between the predicate Gynemesh PS
8  and the Prolift device.
9      Q   And if there was a completely new procedure
10 as part of the Prolift as compared to the Gynemesh,
11 that would be a significant difference in accordance
12 with the regulations, which would have required a
13 510-K clearance before Ethicon could sell the product.
14         Correct?
15         MR. GAGE:  Objection.
16     A   I didn't opine on that because that's
17 something I would typically try to obtain some -- some
18 clinical input on my own choosing to -- to assist
19 me in forming that opinion, if I -- if I wanted to
20 form that opinion.
21     Q   And if the clinical input -- if you went to
22 the experts and they told you that the Prolift was a
23 completely new procedure in which the surgeon would
24 require special skill or training as compared to the
25 Gynemesh PS predicate device, then that would lead you

Page 204

1  to the opinion that a 510-K would be necessary before
2  Ethicon could sell the Prolift.  Correct?
3          MR. GAGE:  Objection.
4      A   I -- I would stay away from that, as to
5  limit my opinions in regard -- I would stay away from
6  medical opinions.
7          I know that Gynemesh was -- Prolift was
8  found equivalent to Gynemesh PS.  Evidently there
9  wasn't, according to FDA, a belief that things were
10 all that different.
11     Q   Do you know what the FDA actually looked at
12 in making that determination?
13     A   I've -- I've read the 510-K, the -- the
14 amendments, all the information.
15     Q   I want you to go back to Ulatowski 15,
16 which is before you to your right.  Your right there.
17     A   Okay.
18     Q   Which is the ten -- top ten learnings from
19 the TVM.  And I want you to look at the last bullet on
20 the second page.  It says, The TVM procedure was seen
21 unanimously as a very innovative and novel way to do
22 pelvic -- pelvic -- POP, which stands for pelvic organ
23 prolapse surgery.
24         Do you see that?
25     A   I see the sentence.

Page 205

1      Q   If the Prolift was a very innovative and
2  novel way to do the prolapse surgery as compared to
3  the Gynemesh predicate, that would be a significant
4  difference which would require a 510-K clearance
5  before Prolift could be sold.  Correct?
6          MR. GAGE:  Objection.
7      A   I just didn't formulate an opinion.  I
8  think I need various input in order to render an
9  opinion on that.
10     Q   All right.  Let me give you some more
11 input.  I'm going to show you -- did we mark this?  We
12 marked this.  Okay.  I want you to look at -- this is
13 deposition, portions of the deposition of Dr. Axel
14 Arnaud.  And I'm going to ask you to look on Page 75,
15 Line 2.
16     A   This one you gave me before?
17     Q   Yes.
18     A   Okay.
19     Q   It's Page 76, Line 4.  I'm going to read
20 this to you.  I'm going to ask you to read along.
21     A   When was this deposition, by the way?
22     Q   You can look on the front.  This was taken
23 on November 15th, two weeks ago.
24     A   Oh, okay.  That's why I didn't review it.
25 Yeah.  Okay.

52 (Pages 202 to 205)

Confidential - Attorneys' Eyes Only

Page 206

1    And what page is that?
2    Q   Seventy-five.
3    A   Okay.
4    Q   Line 2.
5    A   It came after my report.
6    Q   Well, you were supplementing your report.
7   Correct?  After your initial report.  Right?
8    A   And I probably will do again, perhaps.
9    Q   Well, that -- that remains to be seen as to
10  whether you can do that under the court rules.
11      But you've -- you've given us updated
12  materials as of two days ago.  Right?
13      MR. GAGE:  Objection.
14   A   I don't know what counsel has provided you.
15   Q   Well, I gave you that.  We marked that
16  earlier in the deposition.
17   A   Oh, the supplement?  Okay.
18   Q   Right?
19   A   If that's what you're talking about.
20   Q   As you reviewed stuff you provided us an
21  updated Exhibit B.  Correct?
22   A   Yes.
23   Q   Okay.
24   A   Right.
25   Q   And this certainly was something that, it

Page 207

1   was taken two weeks ago, you certainly could have
2   commented on this if you wanted to, correct,
3   Dr. Arnaud's deposition?
4    A   Well, if I had it and there was sufficient
5   time, perhaps.
6    Q   Now, Page 75, Line 2.  Are you there?
7    A   Yes.
8    Q   This is Dr. Arnaud, who is one of the
9   innovators of the Prolift procedure.  Correct?
10      MR. GAGE:  Objection.
11   A   If you -- I mean, I'm assuming so, based on
12  your statement, but -- you know.
13   Q   "QUESTION:  So if somebody were to suggest
14  to you that the Prolift was not significantly
15  different in any way from Gynemesh, you would strongly
16  disagree with that?
17      "ANSWER:  Well, it depends what you mean by
18  Prolift, because Prolift is both procedure and
19  product.  So --
20      "QUESTION:  I'll answer your question, make
21  it clearer.  If somebody were to say the Prolift, the
22  entire system, including the procedure, the mesh and
23  the instruments as it was sold, as compared to
24  Gynemesh as it was sold, if someone were to say that
25  Prolift did not have any significant differences from

Page 208

1   Gynemesh, you would disagree with that statement?
2    "ANSWER:  Well, there are aspects that are
3   similar.  The material's the same.  So the tolerance
4   is likely to be the same.  Now, the size is completely
5   different.  The aim of the Prolift was to create a
6   barrier to all the potential defects in the pelvic
7   floor, a whole barrier.  So that was not all the case
8   with the Gynemesh.  So in some way the mesh is the
9   same.  But the technique is completely different."
10      Do you see that?
11      MR. GAGE:  Objection.
12   A   I see -- I see what it says.
13   Q   And do you see that Dr. Arnaud, one of
14  the -- the top minds at Ethicon with regard to the
15  development of the Prolift, testified under oath that
16  the Prolift procedure is completely different from
17  Gynemesh.  Do you see that?
18      MR. GAGE:  Objection.
19   A   I see it.
20   Q   Do you have any reason to disagree with
21  Dr. Arnaud that the Prolift procedure is completely
22  different?
23      MR. GAGE:  Objection.
24   A   I'm not a physician.  I've -- I don't know
25  on what basis I would disagree with a clinical

Page 209

1   statement.
2    Q   Do you know if special skill or training is
3   required in order for a physician to safely and
4   effectively perform the Prolift procedure?
5    A   Well, I know what the labeling states.  And
6   it speaks of training, there's a training program.  Of
7   course those people using it are board-certified
8   urogynecologists with years of training.  So in that
9   sense, there's skill and training.
10   Q   This is my question:  Do you know -- well,
11  first of all, you understand that the labeling says
12  the training is available.  Right?
13      MR. GAGE:  Objection.
14  BY MR. MAZIE:
15   Q   That's what it says.
16   A   In what -- in which particular IFU?
17   Q   In any of the IFUs that talk about
18  training.  They say training is available and
19  recommended.  Corrected?
20      MR. GAGE:  Objection.
21   A   I understand it's in at least one.  I
22  recall the statement, yes.
23   Q   Okay.  If it was necessary, if Ethicon
24  knew --
25      MR. MAZIE:  Strike that.

53 (Pages 206 to 209)

Confidential - Attorneys' Eyes Only

Page 210

BY MR. MAZIE:
2    Q   If Ethicon knew that training of the
3  surgeon was necessary in order for the surgeon to
4  safely and effectively perform the Prolift procedure,
5  that would be a significant difference that would
6  require 510-K clearance.  Correct?
7        MR. GAGE:  Objection.
8    A   The reason I pause is, is I've been
9  confronted with the same sort of question in other
10  510-Ks.  And sometimes the answer is yes, sometimes
11  the answer is no.  It -- it's based on medical input,
12  clinical input I receive on assessing that training,
13  assessing the fundamental skills of the surgeons.
14        So I can't say with certainty exactly that
15  to be the case.
16    Q   I want you to assume that the people in
17  medical affairs as well as the medical consultants
18  told Ethicon that in order for the Prolift procedure
19  to be safely and effectively performed, the surgeon
20  has to have training, special training, in the
21  Prolift.  I want you to assume that.
22        If that were the case, and then Ethicon was
23  told that by its medical consultants, that would have
24  required them to submit a 510-K for clearance before
25  selling the Prolift.  Correct?

Page 211

1        MR. GAGE:  Objection.
2    A   I -- I need some medical input on that.
3  May be the case, may not be the case.  I can't -- I
4  can't concede.
5    Q   Let me give you the medical -- fine.  I'll
6  give you the medical input.
7        MR. MAZIE:  Mark this.
8        (Ulatowski Exhibit 17 marked for
9  identification, to be attached to the transcript.)
10        (Discussion off the record.)
11  BY MR. MAZIE:
12    Q   This is the deposition of Dr. Lucente.
13  Okay?  You understand Dr. Lucente to be one of the top
14  consultants of Ethicon prior to the launch through
15  the -- through the time that Ethicon stopped selling
16  the Prolift.  Correct?
17        MR. GAGE:  Objection.
18    A   Well, I know he's been involved with
19  Ethicon.  I don't know his status as far as top
20  whatever.  He's certainly a consulting person.
21    Q   Do you understand that Dr. Lucente was
22  involved in the American TVM study?
23    A   I believe so, but I'd have to see my
24  records in regard to that.  But I'll take what you're
25  saying on its face.

Page 212

1    Q   And do you know that representatives of
2  Ethicon described Dr. Lucente as one of their top
3  medical consultants concerning the Prolift?
4        MR. GAGE:  Objection.
5    A   I -- I don't recall that testimony, but I
6  hear you.
7    Q   All right.  I'm going to ask you to turn
8  to -- by the way, did you ever see this deposition
9  before?
10    A   Lucente, yes.  I -- yeah, I remember
11  Lucente.  But let me just refer to my list just to
12  make sure.
13    Q   It's not on your list, Doctor.  I mean --
14  I'm calling you doctor.  It's not on your list,
15  Mr. Ulatowski.
16    A   I guess it's the records that I reviewed.
17  I don't have my list in this document here.
18    Q   Why don't you take a look at your updated
19  Exhibit B, because it's not on there.  I want to make
20  sure that you haven't seen it.
21    A   Yeah.  Well, there's certainly testimony --
22  reference to him and testimony and whatnot.  That's
23  probably what I'm recalling.
24        No, I haven't reviewed the deposition.
25  But, you know, it's as I said.

Page 213

1        (Discussion off the record.)
2  BY MR. MAZIE:
3    Q   So you never saw the deposition of
4  Dr. Vincent Lucente.  Correct?
5    A   Evidently not.
6    Q   Okay.  I want to ask you to turn to Page
7  252 of the deposition.  And I'll read to you from 252,
8  Lines 4 to 12.
9    A   Okay.
10    Q   "QUESTION:  Just so I'm clear, you would
11  discuss with Ethicon prior to the launch of the
12  Prolift in February of 2005 that surgeons as a whole,
13  unless they were world-renowned top surgeons with
14  special expertise, putting them aside, surgeons as a
15  whole would have to have special training in order to
16  safely perform the Prolift procedure.  Correct?
17        "ANSWER:  Yes."
18        Do you see that?
19    A   Yes, I see that.
20        MR. GAGE:  Objection.
21  BY MR. MAZIE:
22    Q   Okay.  So Dr. Lucente, one of Prolift's
23  medical consultants, told Ethicon that surgeons would
24  have to have special expertise to safely perform the
25  Prolift procedure prior to the launch of the Prolift.

54 (Pages 210 to 213)

Confidential - Attorneys' Eyes Only

Page 214

1        Correct?
2        MR. GAGE:  Objection.
3     A  Well, it's -- it's what you stated.
4     Q  That's what Dr. Lucente testified to under
5  oath.
6     A  That's what was stated in the deposition.
7     Q  Correct?
8     A  Whatever the exact words.  I closed up the
9  page.
10     Q  If Ethicon agreed with that fact, do you
11  agree with me that a 510-K would be necessary before
12  Ethicon could legally sell Prolift?  Correct?
13        MR. GAGE:  Objection.
14     A  Well, first of all, take me back to that
15  page.
16     Q  252, Lines 4 to 12.
17     A  Okay.
18        I would probably get some medical input.
19  But training, the need for training and whatnot, is --
20  is almost an element of every device.
21     Q  Let me ask you this:  If the -- if the
22  Prolift procedure was so novel that Ethicon itself,
23  prior to launch, was of the opinion that in order for
24  a physician to safely and effectively perform the
25  Prolift procedure, that they had to have special

Page 215

1  training, you agree that a 510-K would have been
2  required before Ethicon could sell the Prolift.
3        Correct?
4        MR. GAGE:  Objection.
5     A  I think, again, based on opinion
6  conversation with medical input, it -- the answer may
7  be no.
8     Q  What if Ethicon came to that conclusion
9  itself?  Forget you and your forensics, which you
10  haven't done here.  I'm asking you, if Ethicon came to
11  the conclusion that in order for a physician to safely
12  and effectively perform the Prolift procedure, you
13  have to have special skill and training, if that's the
14  scenario, then they had to have a 510-K in order to
15  sell the Prolift.  Correct?
16        MR. GAGE:  Objection.
17  BY MR. MAZIE:
18     Q  If you assume that.
19        MR. GAGE:  Objection.
20     A  I -- I don't agree with that.  It would --
21  I mean, it wasn't something I rendered an opinion on.
22  I would probably need some medical input on that.
23     Q  Let me give you more medical input.  Turn
24  to Page 254 of Dr. Lucente's deposition.
25     A  254?

Page 216

1     Q  254.  Let's read Lines 12 to 19.
2     "QUESTION:  Doctor, you agree that you had
3  conversations with the leadership at Ethicon prior to
4  February of 2005 wherein the leadership of Ethicon and
5  you agreed that surgeons had to have special training
6  in the Prolift procedure in order to safely and
7  effectively perform the procedure?
8     "ANSWER:  Yes."
9     Did I read that correctly?
10        MR. GAGE:  Objection.
11     A  I believe so.
12     Q  So we know that according to Dr. Lucente's
13  sworn testimony, the leadership at Ethicon was of the
14  opinion before the launch of the Prolift that in order
15  for surgeons to safely and effectively perform the
16  procedure, that they had to have special training.
17  Correct?
18        MR. GAGE:  Objection.
19     A  That was the statement.
20     Q  And if that's the case, and we accept
21  Dr. Lucente's testimony as true, that would require a
22  510-K clearance by the FDA before Ethicon could sell
23  the Prolift.  Correct?
24        MR. GAGE:  Objection.
25     A  Ethicon considered all this input.  They

Page 217

1  rendered a decision 510-K was not necessary.
2     Q  Well, I understand.  But we've already gone
3  over that they can intentionally ignore or they can
4  make mistakes.
5        I'm asking you, if they were -- if they
6  were of the opinion, the leadership at Ethicon were of
7  the opinion that here we have this new device known as
8  the Prolift, and you need special skill and training
9  in order to safely and effectively perform the
10  procedure, if that's what they -- their conclusion
11  was, then they had to have a 510-K in order to say --
12  to sell the product.  Right?
13        MR. GAGE:  Objection.
14     A  They knew this information.  They rendered
15  a decision with their eyes wide open as far as
16  submission, as far as what I can tell from the
17  records.
18     Q  So they knew and they made a decision that
19  there was no 510-K necessary, they knew at Ethicon
20  that you needed special skill and training to safely
21  and effectively perform the procedure.  Correct?
22        MR. GAGE:  Objection.
23     A  Well, that they -- you needed?  The
24  labeling says you -- it isn't imperative.  It says, I
25  think, training is available.  You, yourself, pointed

Confidential - Attorneys' Eyes Only

Page 218

1  that out to me.
2      Q   Right.  And the labeling contradicts the
3  sworn testimony of Dr. Lucente, does it not?
4          MR. GAGE:  Objection.
5      A   Well, training -- the labeling is what it
6  is.  I don't know if it contradicts it.  Because
7  training is available to whom, under what conditions,
8  based on what expertise.  You know, board-certified
9  urogynecologist, do they get the same training as one
10  who is not board -- you know, I -- I need -- I would
11  probably explore that with medical personnel.
12          I understand what these people are saying
13  as -- as -- as medical staff, but I didn't -- I didn't
14  digest this and formulate an opinion on it in my
15  report.
16      Q   Well, again, Dr. Lucente said -- testified
17  under oath that Ethicon agreed that surgeons had, used
18  the word "had," to have special training, regardless
19  of who you were, to safely and effectively perform the
20  Prolift procedure.  That contradicts the labeling,
21  does it not?
22          MR. GAGE:  Objection.
23      A   Well, this is an input from an individual
24  who is in the process.  Ultimately the -- as the
25  process unfolds, decisions are made, inputs

Page 219

1  considered.  Process ensues, 510-K or no 510-K.
2      Q   Well, I'm not talking about an individual;
3  I'm not talking about Dr. Lucente's opinion.  I'm
4  telling you that according to Dr. Lucente under oath,
5  it's the leadership of Ethicon that was of the opinion
6  that surgeons had to have special training in the
7  Prolift procedure in order to safely and effectively
8  perform the procedure.  Right?
9          MR. GAGE:  Objection.
10      A   That's his impressions and opinions and
11  recollections, I suppose.
12      Q   And if he's correct that the leadership of
13  Ethicon agreed and was of the opinion that surgeons
14  had to have special training in the Prolift procedure
15  in order to safely and effectively perform the
16  procedure, then a 510-K would have been required, if
17  Ethicon was of that opinion.  Correct?
18          MR. GAGE:  Objection.
19      A   No, the process was considered and decision
20  made.  I -- I've -- in my experience have seen special
21  training and whatnot for lots of products come along
22  where there's been no 510-K.
23      Q   Does that mean it's the right decision?
24      A   Very much so.
25      Q   So in this instance, even if there's a

Page 220

1  substantial -- I'm sorry.  If the Prolift procedure is
2  significantly different from Gynemesh, even if -- even
3  if that's the case, it's okay not to get a 510-K as
4  long as Ethicon comes to the conclusion they don't
5  need it.  Is that what you're telling this jury?
6          MR. GAGE:  Objection.
7      A   What -- what I'm telling the jury is, I
8  would need to assess this based upon medical opinion
9  to determine, based upon my own evaluation, the import
10  of it.
11          I think you're showing me deposition
12  testimony.  These aren't things that I take lightly.
13  I would evaluate these things over days at FDA, with
14  back and forth with the people making the opinions.
15  These -- sometimes these things have to be challenged,
16  they're considered.
17          I'm -- I'm not going to be contesting what
18  medical officers are saying.  I'm not a
19  urogynecologist.  But, you know, on the flip side, I'm
20  not going to be making a -- a final medical opinion
21  about novelty or uniqueness or special training.
22          My opinions were, I saw the process, I saw
23  the basis for the process, I saw the decision made.
24      Q   I understand that your testimony is that
25  the process they performed at Ethicon was appropriate.

Page 221

1          Is that correct?
2      A   Yes.
3      Q   Okay.  My question is, are you rendering an
4  opinion as to whether the decision that was made by
5  Ethicon, taking into consideration all variables,
6  including medical consultants, whether that was a
7  proper decision not to submit a 510-K?
8          MR. GAGE:  Objection.
9      A   Well, let me turn to my opinion, and I'll
10  tell you exactly what I said.
11      Q   Well, do you really need to read your own
12  opinion to tell you that?
13          MR. GAGE:  Objection.
14      A   Well, I don't know about you, but I can't
15  memorize 74 pages.  And I want to be as accurate as
16  possible as well.
17      Q   You want to be as accurate as possible in
18  your -- in your answers.  Correct?
19      A   Yes.
20      Q   And that would mean taking into
21  consideration all evidence that you become aware of.
22  Correct?
23      A   As much as I can consider it within the
24  limits of my expertise.
25      Q   Okay.  Let me know what your opinion is.

Confidential - Attorneys' Eyes Only

Page 222

1      A   My opinion was Ethicon legally marketed
2  Prolift from March '05 to August '07.
3      Q   Okay.  Now can you answer my question?  My
4  question was, we know that you've given an opinion --
5      A   Yes.
6      Q   I'm sorry.  Are you done?
7      A   Can I go further?
8      Q   Sure.
9      A   Thank you.
10         As evidenced by the following.  The
11  manufacturer makes the decision.  If the manufacturer
12  determines that change is not significant, 510-K is
13  not required.  I concurred with FDA's opinion
14  regarding the process of -- that Ethicon used.
15         Ethicon documented the rationale.  Ethicon
16  was not required to contact FDA to obtain their
17  opinion.
18         So I was -- I was speaking to process,
19  documentation.  I didn't say, Well, medically, putting
20  trocars in here or doing this or that is different
21  than doing this or that otherwise in the vagina or
22  outside the vagina.  That's not my expertise area.
23      Q   Let me ask you this:  I understand that you
24  rendered an opinion that the process followed by
25  Ethicon was -- was proper.  Right?

Page 223

1         That's one of your opinions?
2      A   Yes.
3      Q   Okay.  My question is, are you rendering an
4  opinion in this case as to whether or not the
5  decision, the ultimate decision made by Ethicon not to
6  submit a 510-K, was appropriate?
7      A   I didn't render an opinion there.
8      Q   Okay.
9      A   Except, you know, in terms of process, just
10  that.
11      Q   Again, I want to have clean answers from
12  both of our perspectives.
13         I know you rendered an opinion that the
14  process that was followed by Ethicon was appropriate.
15  Correct?
16      A   Yes.
17      Q   Okay.  You have not rendered an opinion in
18  this case as to whether or not the decision, ultimate
19  decision as to whether or not to submit a 510-K by
20  Ethicon, was proper or not.  Correct?
21      A   I didn't technically and medically
22  scientifically dissect the underlying elements of that
23  decision process.
24      Q   And you didn't reach a conclusion as to
25  whether they made a proper decision or not.

Page 224

1      A   I -- I don't --
2         MR. GAGE:  Objection.
3      A   Well, let me read again my -- just to be
4  exactly sure and accurate.
5         That's not an element to my first opinion,
6  the decision of -- yeah.
7      Q   Okay.  Or any opinion.  You say your first
8  opinion.  It's not an element of your opinion.  You're
9  not rendering such an opinion in this case.  Correct?
10      A   I don't believe so.
11      Q   Okay.  All right.
12         (Discussion off the record.)
13  BY MR. MAZIE:
14      Q   Do you know if Catherine Beath, the head of
15  regulatory, knew whether or not special training was
16  necessary to safely and effectively perform the
17  Prolift procedure?
18         MR. GAGE:  Objection.
19      A   I'd have to review my report to -- to look
20  at --
21      Q   All right.  Why don't you take a look at
22  your report.
23      A   -- testimony that might be relevant.
24         (Ulatowski Exhibit 18 marked for
25  identification, to be attached to the transcript.)

Page 225

1      A   Well, the only -- well, one quote I have on
2  Page 52 is, Ethicon followed the guidelines, circled
3  the right areas, and came up with the decision and
4  conclusion that no 510-K was required.
5         That's one quote I have.
6         I don't see, I mean, with a quick look, any
7  other quotes directly to Catherine.
8      Q   Why don't you take a look at Ulatowski,
9  what number is that, 16?
10      A   Eighteen.
11      Q   Eighteen.
12         Have you seen this testimony before by
13  Ms. Beath?
14      A   Let me see.  March 26?  Yeah, I believe so.
15  I believe I received all her deposition testimony.
16      Q   Okay.  Let's look at Page 501.  I'm going
17  to read it to you.  Lines 2 to 20 --
18         MR. GAGE:  Do you have another copy?
19  BY MR. MAZIE:
20      Q   -- of Catherine Beath's sworn testimony.
21         MR. GAGE:  Would you give me those pages
22  and line again?
23         MR. MAZIE:  501.
24  BY MR. MAZIE:
25      Q   "QUESTION:  The form for Gynemesh says

Confidential - Attorneys' Eyes Only

Page 226

1    special training is not needed for safe and effective
2    use of the device.  Correct?
3           "ANSWER:  That's what it says.
4           "QUESTION:  Okay.  And you would expect
5    that to be accurate.  Right?
6           "ANSWER:  This one looks like a complete
7    file.  I think there might be even -- there might even
8    be a signature.  It's the second one.  I don't know
9    what it is or where it came from.
10          "QUESTION:  Okay.  So for Gynemesh, you
11   know that Question 7 is answered appropriately, that
12   special training isn't needed for safe and effective
13   use of the device.  Correct?
14          "ANSWER:  Yeah.  I know from the risk
15   assessment that they did with the medical and quality
16   engineers that the -- that's the conclusion they came
17   to."
18          Do you see that?
19      A   Yes.
20      Q   Do you have any reason to disagree with the
21   sworn testimony of Catherine Beath, the regulatory
22   head at Ethicon, that special training was not
23   required of Gynemesh?
24          MR. GAGE:  Objection.
25      A   Yeah, I was just puzzled by, you know, this

Page 227

1    reference to Question 7 and whatnot, trying to
2    understand the context, where she's coming from.  I
3    mean, she's saying in the last past, I know from the
4    risk assessment that certain people came to that
5    conclusion.  Quality -- medical and quality engineers.
6           And so your question was, again?
7      Q   My question is, regulatory -- regulatory at
8    Ethicon came to the conclusion that special training
9    was not necessary to safely and effectively utilize
10   Gynemesh PS.  Correct?
11          MR. GAGE:  Objection.
12     A   I guess in this one instance with this one
13   file.  I guess I'm having trouble taking this out of
14   context to understand what she's saying here.
15     Q   Well, do you know whether or not you need
16   special skill or training to safely use Gynemesh
17   outside of the Prolift procedure?
18          MR. GAGE:  Objection.
19     A   Well, I know that there was -- there was
20   training provided for people.
21     Q   For Gynemesh or for --
22     A   No.
23     Q   -- Prolift?
24     A   For Prolift.
25     Q   I'm asking you about Gynemesh.  Aside --

Page 228

1    putting Prolift aside, do you have any reason to
2    dispute the sworn testimony of Catherine Beath that if
3    you're using Gynemesh outside of the Prolift
4    procedure, you don't need special skill or training?
5           MR. GAGE:  Objection.
6      A   Reflecting on what she's saying here, if
7    I'm understanding her correctly, she's responding in
8    the affirmative that it's not in the labeling for
9    Gynemesh.
10     Q   Do you have any reason to dispute that you
11   don't need special skill or training to utilize
12   Gynemesh outside of the Prolift procedure?
13     A   I mean, based on this, that seems to be the
14   case.
15     Q   Okay.  And if you don't need special skill
16   or training to use Gynemesh but you need special
17   skill --
18          MR. MAZIE:  Strike that.
19   BY MR. MAZIE:
20     Q   If you don't need special skill or training
21   to use Gynemesh but you need special skill or training
22   to safely and effectively perform the Prolift
23   procedure, that would be a significant difference
24   between the two products.  Correct?
25          MR. GAGE:  Objection.

Page 229

1      A   That would be a difference.  It would be
2    assessed in the 510-K decision tree process, and the
3    decision made whether to submit or not submit.
4      Q   And if it's a significant difference, that
5    would lead to the conclusion, by using the decision
6    tree, that a 510-K is necessary before the Prolift can
7    be sold.  Correct?
8           MR. GAGE:  Objection.
9      A   Just talking a process.  If the -- there's
10   a decision by regulatory that a change is significant,
11   according to the regulations, as further discovered,
12   assessed by the guidance, so if it's significant per
13   the regulations, then an application is required.
14     Q   And if an application is not made, it's
15   illegal to sell the Prolift.
16          MR. GAGE:  Objection.
17     A   Well, first of all, regulatory made the
18   decision.  And based on the information it had, it
19   followed -- it brought to bear a decision made not to
20   submit.
21          And, again, at the back end, you know,
22   again talking to process.  Nothing is automatically
23   identified as misbranded or adulterated.  That's
24   subject to FDA assessment.
25     Q   Can I ask you, the instruments themselves,

58 (Pages 226 to 229)

Confidential - Attorneys' Eyes Only

Page 230

1  they're all part of the procedure.  Correct?
2      MR. GAGE:  Objection.
3      A  Well, the instruments are part of the kit
4  which are used in the procedure.
5      Q  And they're specially designed for the
6  procedure.  Correct?
7      A  They were included in the kit to be used in
8  the procedure.  Specially designed?  I don't know.
9  I'd need an engineering assessment of that.
10     Q  Did Dr. Arnaud help you with that?
11     A  No, an engineering assessment.
12     Q  You need an engineering assessment as
13  opposed to one of the -- the people who were the
14  creators of the Prolift procedure?
15     MR. GAGE:  Objection.
16     A  Well, you used the term "specially
17  designed."  I mean, when products are created, they're
18  in the broadest sense specially designed to meet a --
19  to meet the design requirements.
20     So were they so different from other
21  devices?  Evidently Ethicon thought they were -- they
22  were -- there were similarities.
23     So were they specially designed?  You know,
24  it's -- it's how you want to characterize it.
25     Q  Where did Ethicon think -- where did --

Page 231

1  where do you get that from, that Ethicon thought that
2  the procedure between Prolift and Gynemesh or any
3  other procedure were similar?  Where is that from?
4      MR. GAGE:  Objection.
5      A  You know, what I was reflecting upon was --
6  were the Project D'Art strategy documents where the
7  instruments were discussed and characterized.  So
8  that's what I'm referring to.
9      Q  When you're evaluating whether or not to
10  submit a 510-K for the Prolift, you look at the entire
11  procedure as a whole?
12     A  Say that again, please.
13     Q  Do you look at the entire procedure as a
14  whole when you're evaluating whether or not to
15  perform -- to submit a 510-K for the Prolift?
16     A  Now you're putting me in the shoes of
17  Ethicon, basically?
18     Q  Yes.
19     A  Well, I didn't render an opinion on exactly
20  what they considered; I opined on the process they
21  used to render an opinion.
22     Q  Okay.  So so you have no opinion on -- as to
23  what Ethicon did or did not consider in arriving at
24  its decision not to submit a 510-K.
25     A  I looked at the flow charts that they

Page 232

1  filled out, the decisions made according to the
2  guidance, and conclusions they made based upon that
3  assessment.
4      Q  I understand that.  My question is -- let
5  me go back.
6      (Discussion off the record.)
7  BY MR. MAZIE:
8      Q  Is it fair to say you did not render an
9  opinion on what Ethicon did and did not consider in
10  performing its 510-K evaluation?
11     MR. GAGE:  Objection.
12     A  Well, you can't divorce -- if one fills out
13  the flow chart, you see what they were thinking in
14  regard to the assessment of -- of differences of the
15  predicate to the new device, the Prolift device.
16  Technological characteristics, labeling.  So they were
17  considering technological characteristics.
18     (Discussion off the record.)
19  BY MR. MAZIE:
20     Q  When you were performing your expert work,
21  did you look at the entire procedure as a whole that
22  was performed by Ethicon in determining whether or not
23  a 510-K should be submitted --
24     MR. GAGE:  Objection.
25  BY MR. MAZIE:

Page 233

1      Q  -- or is required to be submitted?
2      A  I think I've stated, you know, how I formed
3  my opinion and what my opinion is based upon.
4      I certainly looked at labeling, the
5  procedure, all that information.  But as far as
6  assessing the procedure, I'm not a urogynecologist;
7  I'm not going to render a medical opinion on this
8  procedure versus that procedure or changes in
9  procedure.
10     I saw deposition testimony.  I've seen the
11  testimony today.  I saw testimony from the medical
12  staff saying, you know, we've been in the pelvic
13  space, we've been using instruments, we've been
14  cutting Gynemesh all kinds of shapes, sticking it into
15  the vagina.  FDA took a look at this eventually.
16  There's no new issue here, they said.
17     So, you know, it is what it is.  I guess
18  from -- from that point of view.
19     Q  And you're not rendering any opinion as to
20  whether or not it is a new issue in the Prolift
21  procedure.  Correct?  You're only --
22     MR. GAGE:  Objection.
23     A  I know that FDA did not consider there to
24  be new issues.
25     Q  I'm not asking about the FDA.  We'll ask

Confidential - Attorneys' Eyes Only

Page 234

1  about the FDA either later or tomorrow.
2       You're not rendering any opinions here as
3  to whether anything was new vis-à-vis the comparison
4  between the Prolift and Gynemesh.  Correct?
5       A  Well, within the context of their decision
6  process.  Again, looking at what they did, how they
7  filled out that chart, what did -- that chart tells
8  you what they were thinking of, what they considered.
9       Now, behind that is all of that
10 documentation, all that testimony, all that
11 engineering and science.  Which is summarized in those
12 flow charts, basically.
13      I didn't go back to all that stuff to
14 assess that.  I looked at the chart.
15      MR. MAZIE:  Let me mark that.
16      (Ulatowski Exhibit 19 marked for
17 identification, to be attached to the transcript.)
18 BY MR. MAZIE:
19      Q  Do you know what this is?
20      A  It is a Project D'Art document.
21      Q  Is this one of the documents that you
22 reviewed and relied upon in coming to your opinions in
23 this case?
24      A  Let me examine my report.
25      Q  Sure.

Page 235

1       A  This is what date?  February 28 of '05.
2       I don't see it in one section.  Let me turn
3  to my reliance list, see if it's on there.  This looks
4  familiar, but -- but let me turn to that.
5       You know, I don't -- hang on a second.
6       Yes, I did see this.
7       Q  Yes.  This is the final DDSA.  Correct?
8       A  Yes.  Uh-huh.
9       Q  And it's dated February 28, 2005.  Correct?
10 Look at the second page.
11      A  Yes.
12      Q  And you reviewed and relied upon this
13 document in arriving at your opinions.  Correct?
14      A  I -- I think I reviewed it and commented on
15 it.  As far as referring to it in my opinions, I
16 did -- well, is it -- it's in my report.  I formulated
17 my opinions based upon -- partially by evaluation of
18 this.
19      Q  And one of the things that you did is rely
20 on this document, because this is an important
21 regulatory pathway document.  Correct?
22      A  DDSAs --
23      MR. GAGE:  Objection.
24      A  -- are important.
25      Q  And critical?

Page 236

1       MR. GAGE:  Objection.
2  BY MR. MAZIE:
3       Q  To the process, the regulatory process.
4       Correct?
5       A  Well, lots of things are -- are -- I call
6  it important.  Whether it's a critical document,
7  there's lots of -- I wouldn't want to raise it to that
8  level.
9       Q  If the regulatory process that you opined
10 on at Ethicon, if they came to the conclusion that
11 there were no predicate devices to the Prolift, that
12 in and of itself would require them, under the
13 decision trees, to submit a 510-K before selling
14 Prolift.  Correct?
15      MR. GAGE:  Objection.
16      A  If the regulatory group under Catherine
17 Beath decided it could not identify a predicate, that
18 would be a problem.
19      Q  And it would be such a problem that that
20 would have required them to have submitted a 510-K
21 before selling the Prolift.  Correct?
22      A  You'd have to have a predicate in order to
23 attach the new product to.
24      Q  And if you didn't have a predicate product,
25 then you couldn't legally sell and market the Prolift

Page 237

1  to doctors for implantation in women.  Correct?
2       MR. GAGE:  Objection.
3       A  Well, it's all theoretical, because
4  Gynemesh PS was the predicate.
5       Q  I'm asking you if the determination through
6  the process at Ethicon was that there was no predicate
7  device for Prolift, if that were the case -- I want
8  you to assume that -- and Ethicon nevertheless did not
9  submit a 510-K and went ahead and sold the Prolift to
10 physicians for implantation in women, that would be an
11 illegal marketing of the Prolift.  Correct?
12      MR. GAGE:  Objection.
13      A  If Gynemesh PS didn't exist and there was
14 no other reasonable predicate that regulatory group
15 could identify and did not identify, that would be a
16 problem.
17      Q  That would be an illegal marketing of the
18 Prolift.  Correct?
19      MR. GAGE:  Objection.
20      A  Well, FDA would assess that and render a
21 charge, if necessary.
22      Q  Let me ask you this:  If Gynemesh existed
23 but hypothetically Ethicon came to the conclusion that
24 Prolift -- I'm sorry, if gyn -- let's assume Gynemesh
25 exists.  Okay?

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Attorneys' Eyes Only

Page 238

1    A   It does.
2    Q   Right.  So I want you to -- this is the
3  question.
4    A   Okay.
5    Q   If -- I want you to assume hypothetically
6  that Ethicon came to the conclusion that there was no
7  predicate device to Prolift, that Gynemesh was not a
8  predicate device.  Okay?  Under that scenario, they
9  could not legally market and sell the Prolift without
10  getting clearance from the FDA.  Correct?
11       MR. GAGE:  Objection.
12    A   Ultimately that responsibility was
13  Catherine Beath's group.  Did they make that
14  determination, Catherine Beath's group?  No, they
15  didn't.
16    Q   I'm --
17    A   So, I mean, you're saying if Ethicon
18  made -- well, some engineer somewhere in the
19  organization says there's no predicate.  Well, that's
20  nice to say that, but ultimately the regulatory group
21  makes that determination, upon assessment of their
22  products and everyone else product -- else's products
23  on the marketplace.
24       I've -- again, I've had customers come to
25  me and say, Well, we have no predicate.  Well, I'm --

Page 239

1  you'll be delighted to hear there's lots of predicates
2  out there --
3    Q   Okay.
4    A   -- so ...
5    Q   Well, let me ask you this:  If in the DDSA
6  the regulatory group came to the conclusion that there
7  was no predicate device, do you agree with me that
8  Ethicon could not legally market and sell the Prolift
9  for implantation into women without first obtaining
10  FDA clearance?  Correct?
11       MR. GAGE:  Objection.
12    A   Well, it's not where you start; it's where
13  you end up.  What was the -- what was the -- prior to
14  marketing, what was the final decision?  And
15  documented decision?  When FDA comes in and looks at
16  the documentation of the decision, what was the
17  decision, how was it documented, was it valid
18  documentation.
19    Q   Is this --
20    A   Documentation is, there's Gynemesh PS out
21  there.
22    Q   Is this the final DDSA?  Doesn't it say
23  that?
24    A   Well --
25       MR. GAGE:  Objection.

Page 240

1    A   This is a document.
2    Q   Does it say it's the final DDSA?  Look on
3  the first page.  First page.
4       No.  First page.  Look on the side.  It
5  says 05 Final DDSA.
6    A   Yes.
7    Q   Do you see that?
8    A   Uh-huh.
9    Q   And then the -- correct?
10    A   That's what it says.
11    Q   And on the second page, it's dated February
12  28, 2005.  Correct?
13    A   Yes.
14    Q   This is the DDSA within a week of the
15  launch of the Prolift.  This is the final one.
16       Correct?
17       MR. GAGE:  Objection.
18    A   It may well be.  By those dates I would
19  think it would be.
20    Q   Okay.  And if in this DDSA it says that
21  there are no predicate devices, because this is a
22  regulatory document from Catherine Beath's own
23  division, if this says there's no predicate device,
24  then Ethicon should not have sold the Prolift without
25  first obtaining FDA clearance.  Correct?

Page 241

1       MR. GAGE:  Objection.
2    A   Well, who's -- who's Jeffrey Everett, first
3  of all?
4    Q   Do you know who Scott Ciarrocca is?
5    A   I don't recall his title.  I mean, I told
6  you people I knew.
7    Q   Let's do this.
8    A   O'Bryan, Beath.
9    Q   Fine.  Let's go to page -- let's go to the
10  third page of this document.  Okay?
11    A   Okay.
12    Q   The people involved here -- first of all,
13  the Prolift project leader, Scott Ciarrocca, right,
14  he's listed on this document.  Right?
15    A   Yes.
16    Q   Okay.  You have the manufacturing technical
17  services engineer, Sunny Rha.  She's on here.
18       Correct?
19    A   Yes.  Uh-huh.
20    Q   Okay.  You've got the development engineer
21  and scientist of Prolift, Rod Simpson.
22       He's listed on here.  Correct?
23    A   Uh-huh.
24    Q   Correct?
25    A   Yes.

Confidential - Attorneys' Eyes Only

Page 242

```
1        Q   You've got the quality assurance engineer,
2   Jeffrey Everett, from Prolift, listed on here.
3        Correct?
4    A   Uh-huh.
5        Q   You've got to answer verbally, sir.
6    A   Yes.  Sorry.
7        Q   You've got Sean O'Bryan of regulatory
8   affairs on this document.  Correct?
9    A   His name is here, yes.
10       Q   Okay.  This is the final
11  DDSA which has been signed off on a week before the
12  launch of the Prolift.  Correct?
13       MR. GAGE:  Objection.
14    A   Hang on a second.
15       The reason I paused is, I see an analysis
16  team and the associate name.  I don't see any
17  sign-offs, though.
18       Q   Do you see the memo?
19    A   I mean, you can direct me further.
20       Q   The second page.  The summary memo that's
21  sent by Jeffrey Everett.  This is the final product
22  DDSA.  It's the first sentence.
23       You haven't seen this before?
24    A   No, I've seen it before.
25       MR. GAGE:  Objection.
```

Page 243

```
1    A   Okay.  Electronically approved.
2        Q   Right?  So let's go back.
3    A   Okay.
4        Q   This is the final DDSA from Catherine
5   Beath's group.  Correct?
6        MR. GAGE:  Objection.
7   BY MR. MAZIE:
8        Q   At Ethicon for the Prolift.  Yes?
9        MR. GAGE:  Objection.
10    A   I assume that to be the case, just based
11  upon the date and when marketing began.
12       Q   Okay.  And if this document, which was
13  signed off on a week prior to the Prolift launch, said
14  there is no predicate device to Prolift, then it would
15  be illegal for Ethicon to sell the Prolift without FDA
16  clearance.  Correct?
17       MR. GAGE:  Objection.
18    A   Well, it's -- it's clearly in contradiction
19  to other documentation by the regulatory group.
20       Q   I'm asking you a question.  If Catherine
21  Beath's group came to the conclusion that there is no
22  predicate device to Prolift, they could not legally
23  market and sell Prolift for implantation into women's
24  bodies without FDA clearance.  Correct?
25       MR. GAGE:  Objection.
```

Page 244

```
1    A   They did make the determination there was a
2   predicate, notwithstanding this document.
3        Q   Did you hear what I said, though?  I want
4   you to assume that Catherine Beath's group came to the
5   conclusion that there is no predicate device to the
6   Prolift.  I want you to assume that.
7        If that were the case, it would be illegal
8   for Ethicon to market the Prolift before obtaining FDA
9   clearance.  Correct?
10       MR. GAGE:  Objection.
11    A   Catherine Beath's group determined there
12  was a predicate.
13       Q   I want you to assume -- you're refusing to
14  answer my question?
15    A   I see this document.
16       MR. GAGE:  Objection.
17    A   I see this other document.
18       Q   I want --
19    A   Your assumption is --
20       Q   I want you to assume -- I'm asking you to
21  assume a hypothetical.  That's what I'm asking you to
22  assume.  Okay?
23    A   It's --
24       Q   It's a hypothetical.
25    A   It's kind of incomplete to me, I suppose.
```

Page 245

```
1        Q   I'm asking you to assume a fact.  I want
2   you to assume that Catherine Beath's regulatory group
3   at Ethicon came to the conclusion that there was no
4   predicate device to Prolift.  If that were the case,
5   Ethicon would be illegally marketing the Prolift if it
6   did not first obtain FDA 510-K clearance.  Correct?
7        MR. GAGE:  Objection.
8    A   Well, I think underlying your -- your
9   hypothetical is that there's some document that says
10  one thing, and you're going to hang your hat on it.
11       I'm hanging my hat on the regulatory
12  documentation that they had under Project D'Art that
13  there was a predicate, they followed the flow chart,
14  and they made the decision not to file.
15       Q   I'm going to get the judge on the phone.
16  Are you refusing to answer this question?
17    A   I'm not.  I'm just --
18       MR. GAGE:  Objection.
19    A   You're arguing with me.  I've asked you the
20  same question five times.  All I want you to do is
21  make an assumption.  I understand you disagree with
22  that assumption.  That's clear in the record.
23       You're refusing to answer a question.  I'm
24  asking you to assume that Catherine Beath and her
25  regulatory group at Ethicon came to the conclusion
```

62 (Pages 242 to 245)

Confidential - Attorneys' Eyes Only

Page 246

1 that there was no predicate device to Prolift.
2        If you make that assumption, it would have
3 been illegal for Ethicon to market and sell the
4 Prolift device without first obtaining 510-K clearance
5 from the FDA.  Isn't that correct?
6        MR. GAGE:  Objection.
7    A  Well, on the front end, the regulatory
8 group would have to document in their history file,
9 without contradiction, uniformly, consistently, as a
10 final document to support marketing, from regulatory
11 group, under the process that I opine on, first
12 identifying the predicate, first -- then going through
13 the process.  If they can't get past the predicate,
14 there's a problem.
15        So, I mean, that's my answer.  The -- the
16 fact of the matter is, there was a predicate.
17        MR. MAZIE:  Objection.  Move to strike.
18 BY MR. MAZIE:
19    Q  I'll do it again.
20        I want you to assume after performing their
21 entire process, regulatory process, that Catherine
22 Beath's group came to the conclusion that there was no
23 predicate product for the Prolift.  Can you make that
24 assumption for me, even though you disagree with it?
25        MR. GAGE:  Objection.

Page 247

1    A  The reason I -- I -- I'm struggling with
2 that is because you have one document here that --
3 that says one thing.  Show me the documents from
4 Project D'Art and the decision tree where they
5 concluded there was a predicate.
6    Q  We'll get there.  I'm asking you to assume
7 after performing all their analysis --
8    A  So if you erase all that other
9 documentation.
10    Q  I'm asking --
11    A  That goes away?
12    Q  I'm asking you, after performing the
13 decision tree, after doing the DDSA, after doing the
14 FMEA, everything, their conclusion at the time of
15 launch is that there is no predicate product.  I want
16 you to assume that.  Okay?
17        With that assumption, do you agree with me
18 that if that was the case, that they assumed that
19 there was no -- they came to the conclusion that there
20 was no predicate product for the Prolift, that it
21 would have been -- would have been illegal for Ethicon
22 to sell the Prolift without first obtaining FDA
23 clearance?
24        MR. GAGE:  Objection.
25    A  That's kind of the -- an aspect of my first

Page 248

1 opinion.  My opinion being, they went through the
2 process, made the right -- had the right
3 documentation, had the predicate.
4        The flip side is if you can't do that, then
5 there's a problem.  So I'm answering your question by
6 saying, well, yeah, if you can't document it, if you
7 can't do what I just said, you've got a problem.
8    Q  Let's turn to Page 3550 of the DDSA, final
9 DDSA.
10        Are you there?
11    A  Yes.
12    Q  This is the use-related hazard worksheet.
13        Do you see that?
14    A  Yes.
15    Q  It says, "Have safety or efficacy issues
16 occurred in the use of predicate or other similar
17 devices."
18        Do you see that?
19    A  Yes.
20    Q  And it says to the right, "No known
21 predicate/similar devices."
22        Do you see that?
23    A  Yes.
24    Q  That was a conclusion of the DDSA and the
25 regulatory group at Ethicon.  Correct?

Page 249

1        MR. GAGE:  Objection.
2 BY MR. MAZIE:
3    Q  The week before launch.  Right?
4        MR. GAGE:  Objection.
5    A  I see that.  I guess I'm -- you know, I've
6 seen this before.  I -- I don't understand the context
7 of this.  I don't understand how they came to this,
8 because Gynemesh PS was out there.
9    Q  They came to the conclusion --
10    A  Somebody came to --
11    Q  -- that Gynemesh PS -- no.  This is signed
12 off by the entire regulatory group, is it not?  This
13 is a DDSA.
14        MR. GAGE:  Objection.
15    A  Do people make mistakes?
16    Q  Well, the question is, what's the mistake.
17 Right?
18    A  That there was a predicate.
19        MR. GAGE:  Objection.
20 BY MR. MAZIE:
21    Q  Or maybe there wasn't a predicate, and
22 that's the mistake.  Right?
23    A  Well, I think FDA agreed there was a
24 predicate, Gynemesh PS.
25    Q  Well, we'll get to that.

63 (Pages 246 to 249)

Confidential - Attorneys' Eyes Only

Page 250

1    But the question here is, we don't know
2  who -- what mistake was made and by whom at Ethicon,
3  do we?
4        MR. GAGE:  Objection.
5  BY MR. MAZIE:
6     Q   Because this says there was no predicate.
7        Right?
8        MR. GAGE:  Objection.
9     A  It says what it says.
10    Q   Let's go now to Page 3565.
11        Third column under Comments.  It says,
12  "Currently there is no equivalent product indicated
13  for this procedure."
14        Do you see that?
15    A   Let me just read -- I see that.  But let me
16  just see the context here.
17        I see that.
18    Q   And they're referencing Gynemesh and
19  Prolift.  Correct?  Right next to it?
20    A   They have Gynemesh there listed.
21    Q   And Prolift.  Correct?
22    A   And Prolift, yes.
23    Q   And they came to --
24    A   And the other studies.
25    Q   And they came to this conclusion days

Page 251

1  before the launch of the Prolift, that currently there
2  is no equivalent product indicated for the Prolift
3  procedure.  Correct?
4        MR. GAGE:  Objection.
5     A   Well, I see what's stated.
6     Q   And you have no explanation as to why in
7  the DDSA Catherine Beath's regulatory group came to
8  the conclusion that there is no predicate device for
9  the Prolift procedure.  Correct?
10        MR. GAGE:  Objection.
11    A   I see what's written here.  And I -- I know
12  what ultimate outcome was of their decision process.
13    Q   You don't have an explanation as to why
14  they came to the conclusion in the DDSA, days before
15  launch, that there was no predicate device to the
16  Prolift.  Correct?
17        MR. GAGE:  Objection.
18  BY MR. MAZIE:
19    Q   You don't know why.
20    A   Well, I can't determine from this.
21    Q   And you think it could be a mistake?
22    A   It could very well be.
23    Q   Do you have any other explanations, besides
24  a mistake?
25    A   You know, you kind of have to be in the

Page 252

1  discussion to see how things went and what the basis
2  for statements were sometimes to understand the
3  context.
4     Q   In all of the information, all of the
5  depositions and the mounds of documents you reviewed,
6  you never saw an explanation anywhere as to why in the
7  DDSA in two places the regulatory group at Ethicon
8  came to the conclusion that there was no predicate
9  device to Prolift.  Right?
10        MR. GAGE:  Objection.
11    A   Well -- well, what's the Ethicon regulatory
12  group?  The ultimate decision is Catherine Beath's.
13  She's testified they went through the process, they
14  followed the procedure, they made the decision, and
15  they marketed the product.
16        It doesn't seem to -- to mesh with this, so
17  to speak, sorry to use the word.  But, you know, I see
18  that testimony.
19    Q   This document, this DDSA, which is a final
20  document from Catherine Beath's group, doesn't make
21  sense, does it?
22        MR. GAGE:  Objection.
23    A   It doesn't coincide with the final
24  decision.
25    Q   It contradicts it.  Correct?

Page 253

1        MR. GAGE:  Objection.
2     A   Well, I'd have to understand the context of
3  this thing, whether it really does or not.  You know,
4  it's a statement here.  I don't know, it deserves
5  further exploration, I suppose, with the person who
6  wrote it.  Have you deposed that person?  I don't
7  know.
8        MR. MAZIE:  I want to mark these.  Here's
9  one, and here's another.
10        (Ulatowski Exhibits 20 and 21 marked for
11  identification, to be attached to the transcript.)
12  BY MR. MAZIE:
13    Q   Let me show you what's been marked as
14  Ulatowski 20.
15        Have you seen this before?
16    A   Sure.
17    Q   This is a part of the Code of Federal
18  Regulations, Title 21.  Correct?
19    A   Yes.
20    Q   And this talks to when premarket
21  notification submission is required.  Correct?
22    A   Yes.
23    Q   And it says that a 510-K is required if a
24  change or modification in the device that could
25  significantly affect the safety or effectiveness of

64 (Pages 250 to 253)

Confidential - Attorneys' Eyes Only

Page 254

1  the design exists.  Correct?
2      A  Well, it says --
3          MR. GAGE:  Objection.
4      A  It doesn't quite say that.
5      Q  What does it say?  How am I incorrect?
6      A  Are you looking at 3 I?
7      Q  Yeah.
8      A  The change of modification that could
9  significantly affect the safety or effectiveness of
10  the device.  You said design.
11      Q  Okay.
12      A  Significant change and modification in
13  design, material, chemical composition, so on and so
14  forth.
15      Q  Fair to say that if the Prolift represented
16  a change or modification from that of Gynemesh PS that
17  could significantly affect the safety or effectiveness
18  of the Prolift procedure or device, that would require
19  a 510-K, according to law?
20          MR. GAGE:  Objection.
21      A  Well, the setup is, the -- under 3, the
22  device is in commercial distribution, but is about to
23  be significantly changed or modified.  Okay.
24          So that's the -- that's the Gynemesh
25  device.  That's the predicate is going to be changed

Page 255

1  or modified.
2      Q  Okay.
3      A  Okay?  In -- in design, whatever, as stated
4  here, energy source, chemical composition.  And then
5  that's assessed to determine whether it's significant.
6      Q  Okay.
7      A  The changes are significant.
8      Q  So if --
9          MR. MAZIE:  Strike that.
10  BY MR. MAZIE:
11      Q  According to Ethicon, the Prolift procedure
12  and system is based on the Gynemesh.  Correct?
13          MR. GAGE:  Objection.
14      A  Well, I -- I guess one thing to point out
15  is that FDA doesn't regulate procedures, per se; it
16  regulates devices.
17          Procedures may raise issues that have to be
18  considered, but FDA doesn't regulate a procedure.
19      Q  Well, here you have special instruments
20  that are used in a special way.  Correct?
21      A  There's instruments that are used in the
22  process of implanting the Prolift device --
23      Q  And the whole --
24      A  -- whatever form is used.
25      Q  And the whole Prolift procedure and system

Page 256

1  is Class III device.  Correct?
2          MR. GAGE:  Objection.
3      A  The whole Prolift and procedure is Class
4  III?
5      Q  The Prolift system -- let's do it this way:
6  The Prolift system is a Class III device.  Correct?
7          MR. GAGE:  Objection.
8      A  I don't think so.
9      Q  You don't think that the Prolift system is
10  a Class III device?
11      A  I don't think so.  Let me just -- you know,
12  I should have this in my brain, but I don't think so.
13          I don't think so.  No.  Part of the panel
14  review there was a consideration whether to up
15  classify, but I don't think it was classified
16  substantially as a Class III device.
17      Q  What do you think that the Prolift is?
18  What's the proper classification of it?  Or don't you
19  have an opinion?
20      A  Well, unless I'm mistaken, I think it's
21  Class II.
22      Q  Based on what?  What makes it Class II?
23  Or, I mean, I'm asking -- let me ask you this:  Do you
24  have an opinion as to what the appropriate
25  classification is for the Prolift system?

Page 257

1      A  As found ultimately by FDA of the 510-K
2  review is found equivalent to Gynemesh, Apogee,
3  Perigee ultimately, and then the new device, the
4  Prolift, has -- then has the same classification as
5  the predicate devices.
6          And in the regulations under 21 CFR, Code
7  of Federal Regulations, the type of device is -- is
8  specified and the classification of that type of
9  device.  I don't think it's Class III.  If it were
10  Class III, a 510-K would not be appropriate.
11      Q  Is that your testimony?
12      A  That's a fact.
13      Q  Is that your opinion, that it -- if a --
14  something is a Class III device, a 510-K is not
15  appropriate?
16      A  Unless it's a so-called preamendment to
17  Class III device, and that's not the case here.
18      Q  So what classes require a 510-K?
19      A  Class I, Class II, and the preamendments
20  Class III device under special circumstances.
21      Q  The -- if the -- if there's a major
22  change --
23      A  Class I.  Excuse me, Class I nonexempt
24  device, a Class II nonexempt device, and a
25  preamendments Class III.

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Attorneys' Eyes Only

Page 258

1    Q   If the Prolift constitutes a major change
2 or modification in the intended use of Gynemesh, that
3 would require Ethicon to submit a 510-K for clearance
4 prior to selling the product legally.  Correct?
5    A   If in evaluating the indications for use,
6 primarily looking at the proposed labeling, if
7 there's -- you examine the labeling, see if there's
8 any differences, and you assess those differences to
9 see if there is any change that amounts to a change in
10 intended use.
11       Let me just add a caveat that change in
12 intended use was a very rare finding in a 510-K
13 process.
14    Q   Okay.  Can you answer my question?
15       MR. MAZIE:  I'll move to strike that as
16 nonresponsive.
17    A   Yeah.  Okay.
18    Q   If it was determined --
19       MR. MAZIE:  Strike that.
20 BY MR. MAZIE:
21    Q   If Prolift constituted a major change or
22 modification in the intended use of Gynemesh, that
23 would require or have required Ethicon to have
24 submitted a 510-K for clearance prior to legally
25 selling Prolift.  Correct?

Page 259

1       MR. GAGE:  Objection.
2    A   If in the manufacturer's assessment of the
3 Prolift labeling compared to the Gynemesh labeling the
4 manufacturer -- or any -- just any, generically, if
5 you look at the new device compared to the predicate
6 device, if the manufacturer concludes that the new
7 device has a new intended use, you need to submit.
8    Q   And that's a matter of law.  Correct?
9       MR. GAGE:  Objection.
10    A   Well, it's probably -- let me see what you
11 put in front of me here.
12    Q   Second page.
13    A   Yeah, that -- yeah, I knew it was here.
14 Yeah.
15    Q   Prior to Prolift, was Gynemesh ever used in
16 a transvaginal approach?
17    A   Say that again, please.
18    Q   Prior to Prolift, was Gynemesh ever used in
19 a transvaginal approach, or method?
20       Let me do it this way:  Prior to Prolift,
21 was Gynemesh ever used transvaginally?
22    A   I believe that was the case.
23    Q   Was?
24    A   I believe it was the case.
25    Q   Who used -- who used the Gynemesh

Page 260

1 transvaginally before the advent of Prolift?
2    A   Well, I think -- are you talking about
3 labeling or are you talking about how physicians might
4 have used the product from time to time?
5    Q   Not from time to time.  Was it a regular --
6 was it a regular and accepted use of Gynemesh to use
7 it transvaginally prior to the advent of Prolift?
8       MR. GAGE:  Objection.
9    A   Was it accepted, was it regular?  I
10 don't -- those are -- I probably need to -- I think
11 there's testimony to the effect that, you know, this
12 occurred.
13    Q   Well, I understand there's outliers.  I
14 want you to put outliers aside.  Experimental,
15 outliers, things like that.
16       Did -- let me ask it this way:  Did Ethicon
17 ever promote or list as acceptable the use of Gynemesh
18 transvaginally prior to the selling the Prolift?
19       MR. GAGE:  Objection.
20    A   Promote?  I don't think I received any and
21 all advertising or promotional material regarding
22 Gynemesh, and so I can't say with certainty.  As far
23 as did they have it in the labeling?  I would have to
24 look at the Gynemesh labeling again.  If it's not
25 there, it's not there.

Page 261

1    Q   Have you looked at it?  Let me know.  Do
2 you have your report there?
3    A   I don't have the labeling embedded in my
4 report.
5    Q   All right.  Let's assume that nowhere in
6 the Gynemesh labeling or brochure or IFU or any other
7 advertising or promotional materials it says that
8 Gynemesh can be used transvaginally.  If that's the
9 case -- I want you to assume that.  If that's the
10 case, then the Prolift system would be a major
11 modification in the intended use of Gynemesh.
12       Correct?
13       MR. GAGE:  Objection.
14    A   Well, probably extends the area of my
15 expertise in regard to that finding.  I know
16 physicians did cut the Gynemesh to form it, did use it
17 off label, if you will, if that was the case,
18 transvaginally.  The TVM studies were underway using
19 Gynemesh.
20       There was that -- that basis for
21 information that formed the opinions of Ethicon
22 regarding supporting the marketing of Prolift.
23    Q   Now can you answer my question.
24       MR. MAZIE:  I move to strike that as
25 nonresponsive.

66 (Pages 258 to 261)

Confidential - Attorneys' Eyes Only

Page 262

BY MR. MAZIE:
2    Q   I'm not asking you about outliers.  I'm
3  asking you --
4    A   Well --
5    Q   -- based on the promotional materials, the
6  IFU, and the intended use of Gynemesh as sold by
7  Ethicon, okay?  I want you to assume that Ethicon
8  never promoted or sold or told anyone in their
9  materials that Gynemesh was appropriate for
10  transvaginal use.  If you can assume that to be the
11  case, you agree with me that the Prolift system, as
12  compared to Gynemesh, constituted a major change or
13  modification in the intended use of Gynemesh.
14       Correct?
15       MR. GAGE:  Objection.
16    A   No, that's not a change in intended use.
17    Q   It's not.  Why not?
18    A   Intended use is -- is a broad application
19  of a term.  Intended use -- is it used in
20  urogynecological surgery?  Yes.  Same intended use.
21  That's -- FDA interprets intended use rather broadly
22  in many cases.
23       I would -- I would have to see what the
24  gynecology group at FDA would consider.  But I know
25  I've applied that -- that definition very broadly in

Page 263

determining substantial equivalence or the need to
2  submit a 510-K.
3    Q   As you sit here today you don't have an
4  opinion as to whether or not the Prolift, as compared
5  to the Gynemesh PS predicate device, constitutes a
6  major change or modification in the intended use of
7  Gynemesh.  Correct?  You haven't rendered that
8  opinion?
9    A   I didn't render that opinion.  I think it
10  probably wouldn't be considered -- I don't think FDA
11  considered that when they contacted Ethicon about the
12  need to submit the ADVA (phonetic) file or in talking
13  about the 510-K process, they -- they didn't use the
14  term "intended use changes."  That wasn't their core
15  concern.
16    Q   I'm asking you whether you have such an
17  opinion.  You've said no.  Correct?
18    A   I just gave you an opinion.  You asked me,
19  I answered, and now you're --
20    Q   Well, no.  The first part of it was I don't
21  have an opinion.  And then you went on, I don't think
22  the FDA looked at it.
23       I'm asking you whether you have an opinion,
24  as you sit here today, as to whether or not Gynemesh,
25  as compared to the Prolift -- I'm sorry.  As to

Page 264

whether Prolift, as compared to the Gynemesh PS
2  system, constitutes a major change or modification in
3  the intended use of the device.
4       MR. GAGE:  Objection.
5    A   That opinion is not in my report as one of
6  my opinions, if that's what your question is.
7    Q   Right.
8    A   Can I give you an opinion at this point in
9  time and -- as evidenced by criteria?  And I can.
10    Q   Are you rendering an opinion in this case?
11  We'll get into that.  But we'll have to --
12    A   Well, based upon my years of experience at
13  FDA, intended use would not be the limiting factor for
14  this device.
15    Q   Okay.  You haven't reviewed and you don't
16  have before you the Gynemesh documents.  Correct?
17    A   Not in front of me, but I did review the
18  Gynemesh documents.
19    Q   Okay.  And you understand that nowhere in
20  the Gynemesh documents, promotional materials, the
21  brochure, the IFU, none of that, does it say that it
22  can and should be used transvaginally.  Correct?
23       MR. GAGE:  Objection.
24    A   I'd have to see the document.  I'll just
25  take your statement on its face.

Page 265

Q   Okay.  Prolift, on the other hand, is
2  intended to be used transvaginally.  Correct?
3    A   Yes.
4    Q   Okay.  Do you have an opinion as to whether
5  or not that transvaginal use, the Prolift system, and
6  all the tools and the procedure itself, constitutes a
7  major change or modification in the intended use of
8  Gynemesh?
9       MR. GAGE:  Objection.
10    A   It's very similar to your last question.
11       And, you know, again I'll answer it this
12  way, that intended use is -- is considered very
13  broadly.  Such that it can be -- and you're asking my
14  opinion -- it can be considered are you implanting a
15  mesh in the -- in the pelvic space?  Answer is yes.
16  You're in the same ballpark, you're in the same
17  intended use ballpark.
18       Intended use was -- again, was rarely used
19  by FDA as a -- as a foundation for nonsignificant --
20  not substantial equivalence.
21    Q   And sometimes it was used.  Correct?
22    A   Rarely.
23    Q   FDA by law was required, by law, to require
24  a 510-K where there's a major change or modification
25  in the intended use of the predicate device.  Correct?

67 (Pages 262 to 265)

Confidential - Attorneys' Eyes Only

Page 266

1          MR. GAGE:  Objection.
2      A   The regulation says if there's a new
3  intended use, you need -- that's a significant change.
4      Q   You haven't rendered an opinion in this
5  case that -- as to whether or not there is a major
6  change or modification in the intended use of Gynemesh
7  as per the Prolift system.  Correct?
8          MR. GAGE:  Objection.
9      A   Well, I said in my report I don't have a
10  specific opinion regarding that.  Then you asked for
11  my opinion and I give you my opinion.  So I don't --
12  which way do you want it?
13      Q   Are you rendering an opinion in this
14  case -- because then we'll get into the medicine
15  again.  Are you rendering an opinion in this case as
16  to whether or not Prolift as compared to Gynemesh
17  constitutes a major change or modification in the
18  intended use of Gynemesh?
19          MR. GAGE:  Objection.
20      A   I didn't spell it out in that -- those
21  specifics.  I think my Opinion 1, though, covers a lot
22  of ground.  Intended use is part of that process of
23  evaluation.  Ethicon followed that process.  They
24  determined there was not a new intended use.  They
25  determined that there were no significant changes.

Page 267

1  And they made a decision to market.  So that topic
2  was -- was considered by Ethicon.
3      Q   Okay.  You went again back to process.
4  You're not familiar with the -- the actual science and
5  the urogynecologic issues, as we've already discussed
6  numerous times.  Correct?
7          MR. GAGE:  Objection.
8      A   I'm not a urogynecologist, but I reflect
9  upon FDA's opinions in rendering a substantial
10  equivalence decision.  They sped right past I think
11  the intended use aspect.
12      Q   I'm asking you as to your opinion.  I'm not
13  talking about FDA.  I'm asking you, after evaluating
14  all the medical information, all the documents, do you
15  have an opinion outside of process, the process that
16  was used, as to whether or not Prolift as a system
17  represents a major change or modification in the
18  intended use of Gynemesh?
19          MR. GAGE:  Objection.
20  BY MR. MAZIE:
21      Q   And if you do, then we'll get to the
22  science.
23          MR. GAGE:  Objection.
24      A   I didn't render an opinion specifically on
25  intended use, in my opinions.

Page 268

1      Q   Okay.  And you're not rendering an opinion,
2  otherwise we'll get into the science.  I need to know
3  that.
4      A   Well, but then you say "and you're not
5  rendering an opinion."  Well, I'm -- and then I
6  provide you a response.
7          I -- it's not in my report.
8      Q   Okay.  And you're not rendering nor
9  intending to render such an opinion.  Correct?
10      A   If it's not in my report.
11      Q   Fine.  Then we can move on.
12          I want you to look at the next one.
13          MR. MAZIE:  Is it 21?
14          Why don't we switch out.
15          VIDEO SPECIALIST:  The time now is 4:30.
16  We are going off the record.  This is the end of Disk
17  Number 4.
18          (Short recess.)
19          MR. MAZIE:  You know we want a rough.
20          VIDEO SPECIALIST:  The time now is 4:45.
21  We are back on the record.  This is the beginning of
22  Disk Number 5.
23  BY MR. MAZIE:
24      Q   Mr. Ulatowski, I'm going to show you what's
25  been marked as Ulatowski 21.  Is this the guidance for

Page 269

1  when to submit a 510-K that's been in effect since
2  1997?
3      A   When to submit a 510-K when there's a
4  change to an existing device, yes.
5      Q   Okay.  And this was the -- the current
6  guidance during the time that the Prolift was being
7  considered and sold.  Correct?
8      A   Yes.
9      Q   Okay.  And let's go to Page 28, which is
10  the main flowchart.
11          You cite to this flowchart and this
12  document in your report.  Correct?
13      A   I cite to the document, and I cite to
14  Ethicon's use of -- well, at least the relevant
15  flowcharts that they filled out.
16      Q   Does this flowchart --
17          MR. MAZIE:  Strike that.
18  BY MR. MAZIE:
19      Q   Was this -- should --
20          MR. MAZIE:  Strike that.
21  BY MR. MAZIE:
22      Q   Should this flowchart have been used by
23  Ethicon in determining whether or not to submit a
24  510-K for the Prolift?
25      A   Well, this is the main flowchart, so this

68 (Pages 266 to 269)

Confidential - Attorneys' Eyes Only

Page 270

1  is kind of the beginning of it.
2      Q  Well, let me ask it.  Which -- there's that
3  flowchart, there's a flowchart next to it, then
4  there's a flowchart next to that.  So there's the main
5  flowchart, Flowchart A?
6      A  Right.
7      Q  Flowchart B.
8      A  Right.
9      Q  Okay?  And I don't think the other ones
10  apply.
11      Which of these flowcharts applied and
12  should have been used by Ethicon in determining
13  whether to submit a 510-K for Prolift?
14      A  Well, if I can turn to my report, hopefully
15  I can identify the flowcharts they used, which I'd
16  like to do.
17      Q  Okay.  While you're doing --
18      A  For starters.
19      Q  While you're doing that, can I ask you a
20  question?  Can you multitask?
21      A  At this time of day, I don't know.  But go
22  ahead.
23      Q  Okay.  I'll wait.
24      My question is this.  Why don't you think
25  on it while you're looking.  My question is this:  Are

Page 271

1  these flowcharts that Ethicon used, or are those
2  flowcharts that Ethicon should have used?
3      A  And that's the reason I want to --
4      Q  You're trying to find out.
5      A  Yeah.
6      Q  Okay.
7      A  Yeah.
8      But I didn't embed the flowcharts in my
9  report, so I'd have to go back to the source
10  documents.
11      Q  Okay.  Which you don't have with you?
12      A  Which I don't -- it was in those -- a
13  Project D'Art document.
14      Q  Which particular document are you referring
15  to?
16      A  I have the Bates numbers.
17      Q  Why don't we do this:  Tomorrow can you
18  bring that Project D'Art document you've been
19  referring to?  I'm sure I have it here somewhere, but
20  I --
21      A  Yeah, I can.  It's a -- it's a small volume
22  thing.
23      Q  Can you bring that?
24      A  Sure.
25      Q  And you're also tomorrow, just so we're

Page 272

1  clear, you're going to be bringing all the other
2  expert reports and depositions we discussed, to the
3  extent you can find them at your home or office.
4      A  I'm going to bring them to him and have a
5  discussion.
6      Q  Right.  I understand.  Okay.
7      MR. GAGE:  "Him" being William Gage, for
8  the record.
9      THE WITNESS:  Yeah.
10      A  Just for clarity, am I supposed to bring
11  the full report or just titles of a report or -- you
12  know, I mean, I can bring my PC that hopefully has all
13  the reports on it.
14      MR. GAGE:  Let's -- let's remember to talk
15  about that as soon as we finish here.
16      THE WITNESS:  Okay.
17  BY MR. MAZIE:
18      Q  So going back to it, do you have an opinion
19  as you sit here today as to whether these flowcharts
20  should have been -- which flowcharts should have been
21  used by Ethicon during their regulatory process in
22  determining whether to submit a 510-K for the Prolift?
23      A  What I'd like to do is refer to what they
24  did for starters.
25      Q  Okay.

Page 273

1      A  And then I'll reflect upon --
2      Q  Okay.
3      A  -- what's here.
4      Because they did follow -- well, they did
5  use A and B, I think.
6      Q  Can you do that today?
7      A  Well, I can -- I can identify them from my
8  report, I think.  I think I did see it.  I think it
9  was A and B they used.
10      I think it was A and B they used, according
11  to my report.
12      Q  So Ethicon used Flowchart A and Flowchart B
13  in its determination of whether or not to submit a
14  510-K for the Prolift?
15      A  That's what I have in my report.
16      Q  Okay.  Was it appropriate for Ethicon to
17  use Flowchart A or B -- I'm sorry, Flowchart A and B
18  in determining whether to submit a 510-K for Prolift?
19      A  I think so.
20      Q  Okay.
21      A  Yes.
22      Q  If we look at Flowchart A, it says, "Does
23  the change affect the indications for use."
24      Do you see that?
25      A  Yes.

Confidential - Attorneys' Eyes Only

Page 274

1  Q   And what this is -- correct me if I'm
2  wrong.  This says if -- does the change between the
3  predicate device and the current device affect the
4  IFU.  Is that correct?  Is that what that's asking?
5  A   Yes.  Yes.
6  Q   Okay.  And if there is a change in the IFU
7  for the Prolift as compared to the -- to Gynemesh,
8  that would require, according to this flowchart, a
9  510-K submission before marketing the Prolift.
10  Correct?
11  A   Well, it says does the change affect the
12  indications for use.  And -- and that's -- that's
13  further explained in the document, and in other FDA
14  guidance, as a matter of fact.
15  Q   What does that mean?
16  A   Well, I'm just saying that this is a
17  flowchart.  The document itself goes into greater
18  detail, explaining each of the decision points.  So a
19  little more detail.
20  Q   Let's go to Page 24.
21  A   And there's another FDA document that
22  actually goes into changes in indications for use and
23  whether they affect the indications.
24  Q   Let's go to Page 24.
25  A   Okay.

Page 275

1  Q   Keep your finger on the flowchart.
2  A   I've got it.
3  Q   Okay.  On Page 24 at the bottom it says
4  Indications For Use, and then it discusses what
5  constitutes indications for use.
6  A   Uh-huh.
7  Q   And the changes.
8  A   Yes.
9  Q   Correct?
10  A   Yes.
11  Q   And it says that the indications -- "The
12  indications include all the label patient uses for the
13  device, and for example," and it gives some examples.
14  Correct?
15  A   Yes.
16  Q   And it says, "Part of the body or type of
17  tissue applied to or interacted with."
18  Do you see that?
19  A   Yes.
20  Q   Okay.  And Gynemesh, as sold and promoted
21  by Ethicon, was not for use transvaginally in the
22  pelvic area, was it?
23  MR. GAGE:  Objection.
24  A   Well, we discussed this before.  I -- I
25  probably want to look at the Gynemesh labeling again,

Page 276

1  PS labeling again.  It's whether you interpret this
2  broadly or narrowly, which FDA will do.  Is this used
3  in -- is the mesh applied, for example -- as an
4  example, is the mesh applied in -- in pelvic organ
5  surgery, in the pelvic tissues.  It can be generally
6  applied.  That's how FDA considers products, case by
7  case, broadly or narrowly.
8  Q   Do you medically know -- do you know
9  where --
10  MR. MAZIE:  Strike that.
11  BY MR. MAZIE:
12  Q   Do you know how Gynemesh was primarily
13  intended for use, what part of the body?
14  A   Well, there was a -- a pelvic floor --
15  pelvic surgery indication.  In fact, I think I have it
16  in my report, the exact indication.
17  Q   Okay.  How much --
18  A   If I can refer to it.
19  Q   Sure.
20  A   I think it was -- that was very important.
21  It was a change.  Let me see here what I've got.
22  I have Gynemesh on Page 38 of my report,
23  "tissue reinforcement and long-lasting stabilization
24  of fascial structures of the pelvic floor and vaginal
25  wall prolapse where surgical treatment is intended

Page 277

1  either as mechanical support or bridging material for
2  the fascial defect."
3  And I have in my report indicated that the
4  Prolift was essentially the same indication.
5  Q   Okay.  And if we look at the -- go back to
6  Flowchart A.
7  A   Took my finger off.  Okay.
8  Q   It's on Page 29.
9  A   Okay.
10  Q   Do you know if indications for use relate
11  to the procedure?
12  A   I -- the reason I pause is, I -- I think
13  FDA didn't consider the procedure so much in this
14  part.
15  Q   I'm asking you; I'm not asking about FDA.
16  I'm asking you, is the Prolift procedure
17  considered -- you may not have an opinion.  I'm asking
18  you whether you have an opinion as to whether or not
19  the Prolift procedure constitutes a change affecting
20  the indications for use of Gynemesh.
21  MR. GAGE:  Objection.
22  BY MR. MAZIE:
23  Q   As per this flowchart.
24  MR. GAGE:  Objection.
25  A   The reason I refer to FDA is because those

Confidential - Attorneys' Eyes Only

Page 278

1  are the folks in that particular branch who would
2  assess the particular changes, the labeling, the
3  procedure.  The FDA folks did believe that the
4  procedure and the change in the shapes may raise
5  issues.  But that -- that's not on -- that's not on
6  this part of the flowchart.
7       Q   Where is it?  Where does that appear?
8       A   In the document here, in discussion of
9  clinical aspects, new issues and clinical aspects.
10      Q   Which flowchart does that apply to?
11      A   Let me just take you down here to this one.
12          Bear with me here.
13          Oops.  Excuse me.  Well, that -- that
14  part's actually if we look at Flowchart B, B8.3,
15  that's what I was talking about.  So not A, but B.
16      Q   BA.33?
17      A   B8.3, in Flowchart B.
18      Q   Oh, okay.  "Do results of design validation
19  raise new issues of safety and effectiveness."
20          Is that what you're referring to?
21      A   Yeah.  And if you look at the explanation
22  of B8.3 in the document, which I didn't keep my finger
23  on, Issues of safety and effectiveness.  Question
24  safety effectiveness may be associated with the design
25  change.

Page 279

1       Q   What --
2       A   There's another part, too, as well.  Some
3  relevance to B8.2.  So in any case, we're kind of
4  resident in B more than A.
5       Q   Okay.  And do you agree that if --
6       A   But that's, you know -- I would look at
7  Ethicon, how they filled this out, to see the path
8  that they reached.  They went through the process and
9  made some determinations here.
10      Q   Do you agree that if the results of design
11  validation process raise new issues of safety and
12  effectiveness, that a 510-K would be required before
13  selling Prolift?
14      A   I've -- I've talked to people about this.
15  Maybe a little bit long answer, but let me explain,
16  and you'll understand.
17          In -- in a regulation, 510-K regulation
18  says, is there a significant change.  And so you go
19  through the document.  And then in 510-K review
20  process, there's a determination whether there are new
21  issues, new types of issues related to the changes.
22  And if there are, you're not equivalent.
23          So it's -- when this document was created,
24  you know, I actually raised the issue along the way at
25  FDA, but the essence of the decision in this document

Page 280

1  is, is there a significant change.  The essence -- one
2  of the parts of the 510-K review is, are there new
3  issues.
4           In fact, the 510-K reviewer said, Well, we
5  think you've got a significant change, and you may
6  have new issues, and we're going to explore those new
7  issues, potential new issues, and see if there are new
8  issues, and render a decision.  And then they finally
9  decided there were no new issues.
10          So I'd rather that -- for clarity's sake, I
11  would rather this document say, are there significant
12  issues, are there significant things, you know, to
13  kind of tie it to the regulation.
14      Q   Is it fair to say if there are new
15  significant issues regarding safety and effectiveness
16  for the Prolift as compared to Gynemesh, a 510-K is
17  required before Prolift can be sold legally?
18      A   If there's --
19          MR. GAGE:  Objection.
20      A   If there's significant -- I'll just use the
21  term.  If there's significant issues according to the
22  flowchart, decision flowchart, you come out, in terms
23  of Flowchart B, just to turn to it, you end up at need
24  510-K.
25          If -- if you've -- you end up new issues in

Page 281

1  a 510-K review, new types of issues, you end up on the
2  510-K decision tree as not substantially equivalent.
3  So it's kind of catch-22.  Do you see where I'm
4  getting?
5           So that's why, if there's new issues.  So
6  are there significant issue -- significant factors
7  going on here?  Yes, 510-K.  By the company's
8  estimation, evaluation.
9           And then FDA -- if there is, then the FDA
10  evaluates the new issue, new types of issues, whether
11  there are any.
12      Q   All right.  So just so I understand you and
13  the jury understands you, if there are or were new
14  significant issues when comparing Prolift to Gynemesh,
15  if that were the case, that would have required a
16  510-K, as per FDA guidance.  Correct?
17      A   If Ethicon went through the flowchart, came
18  up with new 510-K, it would be self-evident.
19      Q   Okay.  And going through this Flowchart B,
20  which is the one you say applies.  Right?
21      A   Well, they looked at A and B.
22      Q   Okay.  But you --
23      A   I don't recall exactly the path they took
24  on A, but.
25      Q   You think Flowchart B is the one that --

71 (Pages 278 to 281)

Confidential - Attorneys' Eyes Only

Page 282

1  that really applies here.
2      A   Well, they used Flowchart A and B, and you
3  asked me a question about one thing or another, and I
4  took you to B.  It doesn't mean A is irrelevant.
5      Q   Okay.  If the change from Prolift to
6  Gynemesh affected the indications for use, that --
7  that would require a new 510-K before Prolift could be
8  sold.  Correct?
9      A   If in the company's evaluation and
10  conclusion, as documented, they came to the
11  conclusion, the regulatory group, Catherine Beath came
12  to the conclusion there was a change affected
13  indications for use, the path is clear, as far as the
14  510-K.
15      Q   Okay.  If Ethicon's regulatory group came
16  to the conclusion that clinical data, clinical data
17  was necessary to establish safety and effectiveness
18  for purposes of substantial equivalence between
19  Prolift and Gynemesh, that would have required a 510-K
20  before selling Prolift.  Correct?
21      A   Well, let me preface my response by saying,
22  I always -- in reviewing 510-Ks, I always consider
23  that to be, I'll call it, de novo clinical experience.
24  By that I mean in the design controls process, the
25  design validation was a clinical study.  Meaning be it

Page 283

1  a controlled study, uncontrolled, the case study,
2  whatever the case was.
3          They had clinical information in the 510-K,
4  but it wasn't of the type envisioned here in this
5  flowchart, as far as the decision tree is concerned.
6      Q   Now can you answer my question?  My
7  question is, if Ethicon's regulatory department came
8  to the conclusion that clinical data was necessary to
9  establish safety and effectiveness for purposes of
10  substantial equivalence between Prolift and Gynemesh,
11  a 510-K would have been required before legally
12  selling Prolift.  Correct?
13          MR. GAGE:  Objection.
14      A   Well, I don't think -- as I recall, that
15  clinical -- the need for clinical data, per se, is --
16  is evidence of -- takes you to a 510-K in all
17  instances.
18          I think the document itself states that it
19  may be the case, it may frequently be the case that if
20  you need clinical data -- I forget the words they
21  used.  That may be the case.  But it leaves the door
22  open on whether it's always the case.
23      Q   So you don't have an opinion one way or the
24  other whether or not if clinical data is necessary to
25  establish safety and effectiveness for the purpose of

Page 284

1  substantial equivalence, whether or not that would
2  require in all instances a new 510-K.
3      A   It wouldn't.
4      Q   Okay.  And in this instance, if Ethicon
5  came to the conclusion that clinical data was
6  necessary to establish safety and effectiveness for
7  purposes of substantial equivalence between Prolift
8  and Gynemesh, would that have required a 510-K, if
9  they came to that conclusion?
10      A   If they came to the -- well, not
11  necessarily.  If they came to the conclusion that in
12  our design and review process -- again, I explained
13  this, I guess.  In the design and review process we
14  need a clinical study for validation of this product,
15  that -- that probably would have been a strong
16  consideration for a 510-K.
17          But what they did is they relied upon
18  clinical information already underway.  They leveraged
19  information, which companies will do.  They'll take
20  whatever information is out there and determine
21  whether it's relevant, and to use it as a basis for --
22  for their product.
23      Q   Let me ask you, if the people at Ethicon,
24  the results -- they saw that the results of the design
25  validation raised new issues of safety and

Page 285

1  effectiveness between Prolift as compared to Gynemesh,
2  that would have required them to submit a new 510-K
3  before legally selling Prolift.  Correct?
4          MR. GAGE:  Objection.
5      A   Well, the validations would -- would be
6  assessed to determine, in fact, if that was the case.
7  If that was a finding, if that was a statement, it
8  would probably be subject to further review, whether
9  from a regulatory point of view, looking at this
10  document, whether it would require a 510-K.
11      Q   So you can't tell us whether that would
12  require a 510-K or not?
13      A   It would require further assessment.  So it
14  wouldn't necessarily require a 510-K.
15      Q   But it would lean towards having a 510-K?
16      A   It would be something that would have to be
17  considered.
18      Q   Strongly considered, because that's what
19  the flowchart says.  Correct?
20          MR. GAGE:  Objection.
21      A   I haven't memorized this thing, even though
22  I used it for years and years.  Let me see.
23          Well, yeah, it has to be considered,
24  other -- you know, if the answer is yes, then it takes
25  you to 510-K.  That's what the flowchart tells you.

72 (Pages 282 to 285)

Confidential - Attorneys' Eyes Only

Page 286

1    Q   Right.  So just so we're clear, if Ethicon
2  determined that the results of the design validation
3  raised new issues of safety and effectiveness as
4  between Prolift as compared to Gynemesh, that would
5  have required them to strongly consider a -- filing a
6  new 510-K.  Correct?
7        MR. GAGE:  Objection.
8    A   Yeah.  It -- you know, as I said, my belief
9  about new issues, because that's kind of a catch-22.
10  Does it raise significant aspects that have to be
11  assessed, and whether they're so significant that it
12  requires a 510-K.
13    Q   If the issues are significant for safety
14  and effectiveness when you look at Prolift versus
15  Gynemesh, according to this decision tree, and all
16  guidance, that would require a 510-K before Prolift
17  could be legally sold.  Correct?
18        MR. GAGE:  Objection.
19    A   If that was the final determination by
20  Ethicon, its regulatory staff and its decision process
21  as documented, that would be the process.  It -- the
22  flowchart's clear on that fact.
23    Q   510-K?
24    A   If that's the finding, according to the
25  flowchart.

Page 287

1    Q   Okay.  All right.  Put that away.
2        You say that in your experience FDA does
3  not enforce advertising claims?
4    A   Advertising is -- what FDA concentrates on
5  is -- is other forms of misbranding.  Because
6  advertising, direct-to-consumer advertising is only
7  for certain devices, for starters.  It's limited to
8  restricted devices, and -- and Gynemesh isn't a
9  restricted device.
10        If the advertising relates to a new claim,
11  new intended use that might have implications for a
12  510-K, yes, perhaps.  If the advertising has
13  implications for whether potentially the product
14  requires a 510-K itself, that's being advertised, yes.
15  And those -- those considerations occur.
16        It's -- it's not -- FDA's advertising staff
17  is -- has been gearing up to do other things.  I see
18  they -- they just reorganized.  So I'm not sure what
19  they're going to be doing now.  But what we did is we
20  focused in on products, based on advertising, products
21  that may have required a 510-K or a PMA that were
22  advertised.
23    Q   If there was a misstatement in the patient
24  brochure, that would be within the jurisdiction of FDA
25  to enforce.  Correct?

Page 288

1    A   Well, that would be considered by FDA, if
2  it was brought to our attention, if it was
3  significant.  There's a lot of assessment there that
4  would have to take place.
5    Q   If there was a significant misstatement --
6        MR. MAZIE:  Or strike that.
7  BY MR. MAZIE:
8    Q   If there was a material misstatement or
9  omission in the patient brochure, that's something
10  that FDA would look at and, if appropriate, enforce.
11  Correct?
12        MR. GAGE:  Objection.
13  BY MR. MAZIE:
14    Q   Or take action?
15    A   May look at.  It depends whether it would
16  be brought to our attention.
17        You know, looking at the evidence,
18  understanding the context, probably doing an
19  inspection, talking with the company, and then taking
20  that all into account, talking with the experts and
21  deciding whether it was material, whether it was
22  important.  And then moving forward, if necessary.
23    Q   You said, though -- and I want to get back
24  to it -- FDA does not enforce advertising claims.
25        That's not always the case.  Right?

Page 289

1    A   Typically FDA, as I said, in terms of
2  claims, in terms of advertising, we look primarily at
3  whether this product was legally marketed or not.
4        The claims, you know all claims mostly came
5  to FDA's attention is through manufacturers'
6  complaints.  One manufacturer against another, saying,
7  Well, this manufacturer is saying this or that.  You
8  know, the marketing kind of angle.  And quite often we
9  didn't want to get into tit for tat between two
10  companies.
11    Q   FDA itself doesn't consider patient
12  brochures advertising, does it?
13    A   No.
14    Q   And if FDA -- FDA wanted to enforce against
15  advertising claims, it could; it's within its
16  regulatory jurisdiction.  Correct?
17        MR. GAGE:  Objection.
18    A   Yes, I think we'd make an effort, if
19  necessary, to try and proceed with an action, if
20  necessary and warranted, based on the evidence.
21    Q   Okay.  It's a case-by-case basis.  Correct?
22    A   Case by case.
23    Q   Okay.
24    A   I don't recall ever taking an action
25  against a patient brochure.

Confidential - Attorneys' Eyes Only

Page 290

1      MR. MAZIE:  Objection.  Move to strike from
2  "I don't recall" on.
3  BY MR. MAZIE:
4      Q   Did you read testimony that Ethicon
5  regulatory affairs relied on medical affairs to
6  identify each of the risks of Prolift?
7      MR. GAGE:  Objection.
8      A   Can you please say that again.
9      Q   Sure.  Is it your understanding that
10  Ethicon regulatory affairs relied on medical affairs
11  at Ethicon, as well as its outside consultants, to
12  identify each of the risks of Prolift?
13      A   Well, I know that they -- that they did
14  rely on medical affairs in regard to medical issues.
15      Q   Okay.  And that's appropriate, to do that?
16      A   I would say so.
17      Q   Okay.  Let me show you this.
18      MR. MAZIE:  We'll mark this.
19      (Ulatowski Exhibit 22 marked for
20  identification, to be attached to the transcript.)
21      MR. GAGE:  Do you have an extra copy?
22      MR. MAZIE:  Yeah.  Hold on a second.
23      Here you go.
24  BY MR. MAZIE:
25      Q   This is a portion of the testimony of Sean

Page 291

1  O'Bryan.  You know who he is, in regulatory affairs.
2  Correct?
3      A   Yes.
4      Q   Okay.  Look at Page 107, Lines 3 to 13.
5  Tell me if you have seen this before.
6      "QUESTION:  And to the extent you had input
7  into the Prolift IFU drafting process, you certainly
8  wanted to make sure that any warnings of any
9  significant potential risks would be explicitly
10  communicated to the intended or foreseeable users of
11  the Prolift.  Correct?
12      "ANSWER:  Sure.  I rely on the medical team
13  to tell me what is significant and what is important
14  to convey into the instructions for use, package
15  insert."
16      Have you seen that before?
17      A   I read the deposition.  I see that, yes.
18      Q   And from your perspective, that's what
19  regulatory -- regulatory affairs did at Ethicon; they
20  relied on the medical team, meaning medical affairs
21  and outside medical consultants, in determining what
22  were the risks of the use of Prolift.  Correct?
23      A   Well, I think that they're talking directly
24  about the IFU here, what's stated in the IFU --
25      Q   Okay.

Page 292

1      A   -- in regard to those factors.
2      Q   And the IFU has to list all the risks and
3  contraindications, does it not?
4      MR. GAGE:  Objection.
5      A   It has to list warnings, precautions,
6  contraindications, adverse effects.
7      Q   Okay.
8      A   And I opined on that.
9      Q   Okay.  And we'll get to that tomorrow, but
10  we'll get to that.
11      But -- so from the perspective of listing
12  all of the warnings and contraindications and adverse
13  events for the Prolift, regulatory affairs at Ethicon
14  relied on their medical team, meaning medical affairs
15  and outside medical consultants.  Correct?
16      A   Well, he just refers to the medical team in
17  this deposition here, page.
18      Q   Okay.  Do you know who the medical team
19  was?
20      A   Well, that was probably Robinson and his --
21  his staff.
22      Q   Okay.  Medical affairs?
23      A   Medical affairs.
24      Q   And did you read Robinson's deposition
25  where he testified that he had outside people that

Page 293

1  also he relied on?
2      MR. GAGE:  Objection.
3      A   I'd have to review that again, but I'll
4  take it on face what you said.
5      Q   Okay.  So just so we're clear, I'm just
6  trying to -- there's no tricks here.
7      Sean O'Bryan testified then when they were
8  evaluating and considering all of the adverse events,
9  the contraindications, and the potential risks of
10  undergoing a Prolift procedure, that they relied on
11  their medical team.  Correct?
12      A   Yes, that was a key input.
13      Q   And that's appropriate to do that, correct,
14  for regulatory affairs, because they're not usually
15  physicians or have the type of specialized medical
16  training, to rely on their medical affairs people and
17  other medical individuals -- medical consultants.
18  Correct?
19      MR. GAGE:  Objection.
20      A   They rely on them.  The regulatory staff
21  may edit or tweak, have conversations to clarify
22  labeling, things like that.
23      Q   But as to the science, it's appropriate to
24  rely on medical specialists.  Correct?
25      A   Yes.

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Attorneys' Eyes Only

Page 294

1    Q   Okay.  All right.  Put that away.
2    A   Medical specialists on staff.
3    Q   On staff or, as appropriate, outside of
4  staff, as special consultants.  Correct?
5    A   Whatever they call upon specifically to
6  provide opinions.
7    Q   Okay.  Do you agree that the instruments,
8  the special instruments that were created for Prolift,
9  are considered components or accessories to the
10  Prolift system?
11   A   Well, they're part of the kit, a kit.  I --
12  I didn't opine on that aspect.
13   Q   Okay.  If you have no opinion, you let me
14  know that.
15   A   I didn't express any opinion in my report.
16   Q   All right.  And you have no opinion that
17  you're rendering in this case as to whether or not the
18  instruments that are part of the Prolift system are
19  components or accessories to the Prolift system.
20   A   I don't think I rendered an opinion.  If
21  I'm in error, then I -- I don't recall.  I reflected
22  on, in the Project D'Art how they approached the
23  instruments.  That's the extent of it.
24   Q   If you -- if tonight when you go home and
25  you look at your report, and you're in error and you

Page 295

1  think you did render an opinion on that, you'll let us
2  know tomorrow.  Otherwise I'll assume you have no such
3  opinion.  Okay?  Is that fair?
4    A   I understand.
5    Q   Okay.
6    MR. GAGE:  If you choose to terminate
7  before 6:00 p.m., I will not argue or state or imply
8  to any court that you had available time this evening
9  and you wasted it.
10   MR. MAZIE:  Well, what time are you going
11  to give me until tomorrow?
12   MR. GAGE:  I've -- let me check, see what
13  time my flight leaves.
14   MR. MAZIE:  It's all about Bill.
15   MR. GAGE:  It's about you.  I want you to
16  get home and see your family, you know.  Because
17  you've been traveling a lot.
18   MR. MAZIE:  Yeah, I travel none.  First
19  time in a year I've traveled, except on vacation,
20  which I do quite often.
21   (Discussion off the record.)
22   MR. GAGE:  My flight leaves at 7:55 out
23  of -- so I think 6:00 is just my absolute cutoff.
24   MR. MAZIE:  That's fine.  And I'm hoping to
25  be done because I have a 4-something train which I

Page 296

1  don't know what's going to happen.
2    MR. GAGE:  But I mean that seriously.  I'm
3  not going to -- if you want to --
4    MR. MAZIE:  I just picked that.
5    MR. GAGE:  I mean, I know it's late, and
6  you've been going and going.  I mean it seriously.  If
7  you want to terminate tonight, I'm not going to come
8  back tomorrow and say --
9    MR. MAZIE:  Well, you said you're giving me
10  until 6.
11   MR. GAGE:  I'm giving you until 6.  But I'm
12  not going to raise that and say, On Thursday evening
13  you had an additional 30 minutes and you chose not to
14  take it.  I'm not going to do that.
15   MR. MAZIE:  I appreciate it.  But I want to
16  finish him tomorrow, and that's the most important
17  thing.  So let me just -- give me a second to figure
18  this out.
19  BY MR. MAZIE:
20   Q   Let me ask you this:  I think we're all in
21  agreement on this.  Initially Ethicon never -- did
22  not --
23   MR. MAZIE:  Strike that.
24  BY MR. MAZIE:
25   Q   Initially Ethicon did not submit a 510-K.

Page 297

1    Correct?
2    MR. GAGE:  Objection.
3    A   For Prolift.
4    Q   Correct.  For Prolift.
5    A   In 2005, yes, they did not.
6    Q   And it sold Prolift for a number of years
7  before it was notified by the FDA that it needed to
8  have a 510-K for Prolift.  Correct?
9    A   Well, how it unfolded is after a couple of
10  years, upon submission of Prolift +M, FDA made a
11  recommendation which Ethicon voluntarily responded to.
12   Q   And Ethicon came back, and it did
13  ultimately submit a 510-K.  Correct?
14   A   There was transformation of information to
15  a 510-K.  There was information -- yes.  Yeah.
16  Ultimately it was absorbed into the Prolift +M 510-K.
17   Q   And Ethicon told, Ethicon told the FDA that
18  Gynemesh was no longer the predicate device; it was
19  now the Apogee and the Perigee systems.  Correct?
20   MR. GAGE:  Objection.
21   A   No, Gynemesh was still in there, but they
22  added Apogee and Perigee --
23   Q   Okay.
24   A   -- for Prolift.
25   Q   Okay.

Confidential - Attorneys' Eyes Only

Page 298

1    A   They added UltraPro.  They had UltraPro +M,
2    also.
3        Q   Have you ever evaluated whether or not
4    Apogee and Perigee are appropriate predicate devices
5    for Prolift, or is that beyond your opinion?
6        A   I don't have an expressed opinion specific
7    to Apogee and Perigee in one of my opinions.
8        I did review the Perigee 510-K to see -- I,
9    first of all, identified Apogee and Perigee as
10   predicates identified by Ethicon.  And then I looked
11   at the -- and then I looked at the Perigee 510-K to
12   see what that was all about.  I looked at the 510-K
13   review process to see what FDA thought about those
14   predicates.  It all seemed to be appropriate, if
15   that's your question.
16       Q   Are you rendering an opinion in this case
17   as to whether or not Apogee and Perigee are
18   appropriate predicate devices for Prolift?
19       A   I don't have a -- well, let me see.  Let me
20   see if it's embodied in an opinion here.
21       I don't have a specific opinion regarding
22   the appropriateness of using Apogee and Perigee.  In
23   my report I note those were predicates, in part of the
24   submission process.
25       Q   Right.  So you have no opinion as you sit

Page 299

1    here today, nor are you offering one, as to whether or
2    not Apogee and Perigee were appropriate predicate
3    devices for Prolift.  Correct?
4        A   There's no opinion in my report
5    specifically.
6        Q   And you're not rendering any such opinion?
7        A   It's my understanding I cannot add one now,
8    then the answer is no.
9        Q   And are you aware of the fact that
10   Dr. Arnaud testified under oath that Apogee and
11   Perigee were significantly different devices than
12   Prolift?
13       MR. GAGE:  Objection.
14       A   If that's a deposition that I haven't read,
15   well, I haven't read that.
16       Q   Okay.  Is that type of information that
17   should have been provided to FDA with the 510-K, that
18   one of the creators of the Prolift system believes
19   that Apogee and Perigee are significantly different
20   than Prolift?
21       MR. GAGE:  Objection.
22       A   Just as a general sense, after reviewing
23   innumerable 510-Ks, what is appropriate to indicate as
24   a -- as a predicate, companies more often than not
25   take a very broad view.

Page 300

1        So Arnaud thinking one way is interesting.
2    The regulatory people have a different mindset, see
3    the world a little differently in terms of -- of the
4    regulatory process, and provided them as predicates.
5    And FDA didn't -- I guess didn't blink an eye when
6    they saw it.
7        Q   Well, you don't know what FDA looked at
8    specifically internally?
9        A   I don't see a comment, I think, related to
10   that.  So I'll have to review again what they said
11   about Apogee and Perigee.  But I don't recollect any
12   big brouhaha about Ethicon listing Apogee and Perigee.
13       Q   As you sit here today, do you know
14   specifically who worked on the Prolift 510-K issue and
15   Prolift +M 510-K issue at FDA?
16       A   Well, Dr. Dang I think, was mentioned.  Of
17   course Dr. Corrado would have been in the mix, Dave
18   Krause as the branch chief would have been in the mix.
19   Probably others behind the scenes whose names weren't
20   mentioned.
21       There was a meeting where people were
22   identified, so those people were obviously in the mix
23   on the FDA side.
24       Q   Sitting here today, you don't know
25   specifically who was involved, every single person

Page 301

1    that was involved in the determination of the Prolift
2    510-K at the FDA.  Correct?
3        A   Well, there -- there are some people
4    identified in the record.  It doesn't mean that other
5    people weren't brought to the table or consulted on
6    the submissions.  That --
7        Q   Well, you have no facts that you know as to
8    specifically who was involved --
9        A   Well, Dr. Dang, obviously.
10       Q   -- other than the few people who were
11   listed?
12       A   Yes.  Yes.
13       Q   Okay.  And you don't know how many
14   man-hours each person put in on the Ethicon Prolift
15   510-K.  Correct?  At the FDA?
16       A   No, I wouldn't know that specifically.
17   Looking at the letters and the reviews, and 37 years
18   of experience in writing reviews, it wasn't a trivial
19   amount of time.
20       Q   Okay.  You don't know as you sit here today
21   how many hours were put by anyone at the FDA
22   specifically in reviewing the Prolift 510-K.  Correct?
23       A   Other than to say it was a -- I believe
24   a probably considerable amount of time, based on my
25   experience.

76 (Pages 298 to 301)

Confidential - Attorneys' Eyes Only

Page 302

1      Q   But you don't know specifically.
2      A   No.  I wouldn't -- I would have no
3   knowledge of their timecards.
4      Q   And you've never spoken to anyone at FDA
5   concerning their interaction with Ethicon or review of
6   the 510-K involving Prolift.  Correct?
7      A   Not to my knowledge, as I stated earlier.
8      Q   And it would be inappropriate for you to
9   actually, if you had knowledge, to actually testify
10  regarding it.  Correct?
11      MR. GAGE:  Objection.
12      A   No, I wouldn't say that would be the case.
13      Q   Why not?
14      A   If what I'm basing my opinions are -- are
15  the records before me provided by counsel through
16  discovery or whatever, I can opine all day on those
17  things.
18      Q   You gave an opinion that the total
19  processing time for the Prolift 510-K was 446 days
20  when the average is 109 days.  Correct?
21      A   Yes.
22      Q   You don't know whether anybody just put
23  aside the entire project for months on end, do you?
24      MR. GAGE:  Objection.
25      A   Well, in my experience in OD, which is

Page 303

1   considerable, managing 510-K reviews, looking at the
2   letters, the thoroughness of the letters, the
3   meetings, the -- there was a considerable amount of
4   time.
5      So, again, how much time, specifically how
6   many hours, I couldn't tell.  I can tell that it's a
7   considerable amount of time.
8      Q   All right.  Do you know whether or not it
9   could have been done in 100 days?
10      A   Total time of review from submission to --
11      Q   Sure.
12      A   -- final decision?
13      Q   Sure.  If they wanted to put enough people
14  on it.
15      MR. GAGE:  Objection.
16      A   Well, that means that the company has to
17  respond quickly, too.  The company has to provide a
18  response in a timely way, too.
19      Q   My point is, you don't know in the 446 days
20  what specific days they were working on the 510-K at
21  FDA, what days they weren't working on it, how many
22  hours they put in, and how many people actually worked
23  on it.  Correct?
24      A   Well, Dr. Dang, Dr. Corrado, Dr. Krause, I
25  mean, those are people who would work on it.  The

Page 304

1   number of hours they spent on it, I wouldn't know the
2   specific number of hours.  I know in the review
3   process, when you pick up a 510-K, you try to stick
4   with it until you're done with it as far as the -- the
5   review process.  You try not to divert your attention
6   until you've completed that review.
7      So you can kind of -- when something was
8   submitted, time it out to when Dr. Dang responded,
9   submission, response.  During -- when the company is
10  doing their thing, Dr. Dang may have picked something
11  else up to fill his time.  That happens,
12  that's the way it works.  But while he was working on
13  it, submission to response, he was probably working on
14  it.
15      Q   But you don't know that, do you,
16  specifically?
17      A   Well, I do know that after 37 years of
18  experience at FDA and how people do the 510-K reviews.
19      Q   How long was Dr. Dang's -- how much
20  vacation did he take during that year?
21      A   I don't -- I wouldn't know.
22      Q   Do you know if he was on medical leave?
23      A   I wouldn't know that.
24      Q   Do you know if he went to Asia for three
25  weeks?

Page 305

1      A   I wouldn't know that.
2      Q   Specifically you don't know what was done
3   on a daily basis by anyone in the 510-K review at FDA
4   for Prolift.  Correct?
5      A   Not specifically in this instance.  But as
6   a general course of how 510-K reviews, I can -- I can
7   provide you with probability that were focused on
8   it.
9      Q   You don't know specifically; you're
10  speculating.  Isn't that correct?
11      A   Based upon 37 years of experience, is that
12  speculation?  I don't know.  You tell me.
13      Q   Okay.  Let me just see what we've got.  You
14  may be done for today, but let's just look.
15      MR. MAZIE:  Okay.  We can break here until
16  tomorrow.
17      VIDEO SPECIALIST:  The time now is 5:37 --
18  5:38, excuse me.  We are going off the record.  This
19  is the end of Disk Number 5.
20      MR. GAGE:  David, you had asked
21  Mr. Ulatowski about the amount of money he had earned
22  to date, and I can't remember what he told you.  But
23  we sent some e-mails around, and it looks like his
24  last invoice was dated 11/1/2012.  And when you
25  include that invoice, the total amount that he has

77 (Pages 302 to 305)

Confidential - Attorneys' Eyes Only

Page 306

1   billed to the litigation that he's being deposed in
2   today was $93,362.50.
3        MR. MAZIE:  Okay.
4        (Signature having been not waived, the
5   deposition of TIMOTHY A. ULATOWSKI, M.S., was adjourned at
6   5:39 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 307

1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2        I, Debra Ann Whitehead, the officer before whom the
3   foregoing proceedings were taken, do hereby certify
4   that the foregoing transcript is a true and correct
5   record of the proceedings; that said proceedings were
6   taken by me stenographically and thereafter reduced to
7   typewriting under my supervision; and that I am
8   neither counsel for, related to, nor employed by any
9   of the parties to this case and have no interest,
10  financial or otherwise, in its outcome.
11       IN WITNESS WHEREOF, I have hereunto set my hand and
12  affixed my notarial seal this 7th day of December,
13  2012.
14
15  My commission expires:
16  September 14, 2013
17
18
19
20
21
22  ----------------------------
23  NOTARY PUBLIC IN AND FOR THE
24  DISTRICT OF COLUMBIA
25

Page 308

1        INSTRUCTIONS TO WITNESS
2
3        Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8        After doing so, please sign
9   the errata sheet and date it.  It will be
10  attached to your deposition.
11       It is imperative that you
12  return the original errata sheet to the
13  deposing attorney within thirty (30) days
14  of receipt of the deposition transcript
15  by you.  If you fail to do so, the
16  deposition transcript may be deemed to be
17  accurate and may be used in court.
18
19
20
21
22
23
24
25

Page 309

1            - - - - - -
              E R R A T A
2            - - - - - -
3   PAGE  LINE  CHANGE
4   ____  ____  _____
5        REASON:  _____
6   ____  ____  _____
7        REASON:  _____
8   ____  ____  _____
9        REASON:  _____
10  ____  ____  _____
11       REASON:  _____
12  ____  ____  _____
13       REASON:  _____
14  ____  ____  _____
15       REASON:  _____
16  ____  ____  _____
17       REASON:  _____
18  ____  ____  _____
19       REASON:  _____
20  ____  ____  _____
21       REASON:  _____
22  ____  ____  _____
23       REASON:  _____
24  ____  ____  _____
25       REASON:  _____

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Attorneys' Eyes Only

Page 310

1    ACKNOWLEDGMENT OF DEPONENT
2
3         I,_____, do
     hereby certify that I have read the
     foregoing pages, and that the same
4    is a correct transcription of the answers
     given by me to the questions therein
5    propounded, except for the corrections or
     changes in form or substance, if any,
6    noted in the attached Errata Sheet.
7

8    _____
     TIMOTHY A. ULATOWSKI, M.S.     DATE
9
10
11
12
13
14
     Subscribed and sworn
15   to before me this
     _____ day of _____, 20____.
16
     My commission expires:_____
17
18   _____
     Notary Public
19
20
21
22
23
24
25

Page 311

1         LAWYER'S NOTES
2    PAGE  LINE
3    _____  _____  _____
4    _____  _____  _____
5    _____  _____  _____
6    _____  _____  _____
7    _____  _____  _____
8    _____  _____  _____
9    _____  _____  _____
10   _____  _____  _____
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18   _____  _____  _____
19   _____  _____  _____
20   _____  _____  _____
21   _____  _____  _____
22   _____  _____  _____
23   _____  _____  _____
24   _____  _____  _____
25   _____  _____  _____

Golkow Technologies, Inc. - 1.877.370.DEPS