Exhibit G

Timothy A. Ulatowski, M.S.

```
1               CAUSE NO. 2013-DCL-3511-D

2

   SANDRA GARCIA,              §           IN THE DISTRICT COURT
3                              §
        Plaintiff,            §
4                              §
   v.                          §
5                              §
   RODOLFO J. WALSS, M.D.,     §        103rd JUDICIAL DISTRICT
6   RODOLFO J. WALSS, M.D.,     §
   P.A., JOHNSON & JOHNSON,     §
7   INC. and ETHICON, INC.,     §
                               §
8        Defendants.           §
                               §           CAMERON COUNTY, TEXAS
9

10

11      ORAL DEPOSITION OF TIMOTHY A. ULATOWSKI, M.S.,
12   a witness herein, called by the Plaintiff for
13   examination, taken by and before Ann Medis,
14   Registered Professional Reporter and Notary
15   Public, at the offices of Drinker Biddle & Reath,
16   LLP, 1500 K Street, N.W., Washington, D.C.
17   20005-1209, on Tuesday, June 2, 2015, commencing
18   at 9:19 a.m.

19

20

21

22

23

24

25
```

Timothy A. Ulatowski, M.S.

Page 2

1  APPEARANCES:
2     CLARK LOVE HUTSON, GP
3     BY:  WILLIAM W. LUNDQUIST, ESQUIRE
4     440 Louisiana Street, Site 1600
      Houston, Texas  77002
5     713.757.1400
      wlundquist@triallawfirm.com
6        Counsel for the Plaintiff
7
      (By phone)
8     SHEPHERD SCOTT CLAWATER & HOUSTON LLP
      BY:  CYNTHIA L. FREEMAN, ESQUIRE
9     2777 Allen Parkway, 7th Floor
      Houston, Texas 77019
10    713.650.6600
      cfreeman@sschlaw.com
11       Counsel for Defendants Rodolfo J.
         Walss, M.D., and
12       Rodolfo J. Walss, M.D., P.A.
13
      BUTLER SNOW LLP
14    BY:  CHAD R. HUTCHINSON, ESQUIRE
      Renaissance at Colony Park
15    1020 Highland Colony Parkway, Suite 1400
      Ridgeland, Mississippi 39157
16    601.985.4401
      chad.hutchinson@butlersnow.com
17
      BUTLER SNOW LLP
18    BY:  KERI I. SUTHERLAND, ESQUIRE
      1200 Jefferson Avenue, Suite 205
19    Oxford, Mississippi  38655
      662.513.8000
20    kari.sutherland@butlersnow.com
21    ROERIG OLIVEIRA & FISHER
      BY:  DAVID G. OLIVEIRA, ESQUIRE
22    10225 North 10th Street
      McAllen, Texas  78504
23    956.393.6300
      doliveira@roflip.com
24       Counsel for the Defendant Ethicon,
         Inc.
25

Page 3

1            * I N D E X *
2  TIMOTHY ULATOWSKI, M.S.              PAGE
3     EXAMINATION BY MR. LUNDQUIST        4
      EXAMINATION BY MR. HUTCHINSON     126
4
5        * INDEX OF EXHIBITS *
6  NO.        DESCRIPTION            PAGE
7
8
9     (No Deposition Exhibits were marked.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1            TIMOTHY A. ULATOWSKI, M.S.
2      having been first duly sworn, was examined
3            and testified as follows:
4                  EXAMINATION
5  BY MR. LUNDQUIST:
6      Q.  Sir, can you state and spell your name
7  for the record, please.
8      A.  Timothy, T-I-M-O-T-H-Y, Ulatowski,
9  U-L-A-T-O-W-S-K-I.
10     Q.  Am I correct, sir, you're serving as a
11 regulatory expert for defendants Ethicon and
12 Johnson & Johnson in the Sandra Garcia case?
13     A.  That's correct.
14     Q.  Roughly how many times have you been
15 deposed, sir?
16     A.  It's getting up around a couple dozen, I
17 think.
18     Q.  How many depositions have you given in
19 transvaginal mesh cases?
20     A.  A couple, two or three.
21     Q.  My understanding is you've never
22 testified as an expert witness on behalf of anyone
23 other than industry; is that true?
24     A.  Deposition, no.  I've represented
25 plaintiffs.  In court, let me think about that.

Page 5

1  I've represented plaintiffs in court.
2      Q.  In an expert witness capacity?
3      A.  As an expert witness.
4      Q.  Tell me about that.
5      A.  Well, a couple times where actually the
6  plaintiff was a company, so it would be a contract
7  dispute or something of that sort, issues like
8  that.
9      Q.  Let me try it a little differently.
10 That's a fair point.  Have you ever served as an
11 expert witness for an individual?
12     A.  Yes.
13     Q.  What individual?
14     A.  Well, I think they settled.  I don't
15 know if I was disclosed.  I think I've been
16 disclosed in one, maybe two cases.  One is a
17 pension fund.  The other one where I've been
18 disclosed is a number of patients, and GranuFlo is
19 the product.
20     Q.  And you're representing an individual
21 plaintiff in those cases?  Let me restate that.
22 That was a bad question.
23     You were the expert witness on behalf of the
24 individual plaintiffs in those cases?
25     A.  That's correct.

Timothy A. Ulatowski, M.S.

Page 6

1      Q.   Again, were you testifying -- when I say
2  industry, do you know what I mean?
3      A.   Yes.
4      Q.   Were you testifying against industry in
5  those cases?
6      A.   Against the particular manufacturer,
7  yes.
8      Q.   What was the general basis -- what was
9  the general crux of your opinions in those cases?
10      A.   Regarding the conduct of the
11  manufacturer in regard to its performance over
12  time with respect to that GranuFlo product, what
13  they knew and how they conducted business over the
14  years, their reporting of complaints.
15      Q.   Was it your opinion that they fell
16  below -- your opinion was that the manufacturer --
17  tell me what your opinion was in that case.
18      A.   My opinions typically are regulatory
19  based.  Their conduct did not meet regulatory
20  requirements and industry standards, industry
21  practices for the particular area of my comment.
22      Q.   The last time you were deposed in a
23  transvaginal mesh case, was it December of 2013,
24  or was it more recent?
25      A.   It's been a while.  I can't tell you

Page 7

1  exactly when.
2      Q.   Over a year?
3      A.   Oh, yes.
4      Q.   What did you do to prepare for your
5  deposition today, sir?
6      A.   Read material, had a meeting with
7  counsel yesterday, very, very, very brief.
8      Q.   How long was that meeting?
9      A.   Yesterday?
10      Q.   Yes, sir.
11      A.   About three, three and a half hours.
12      Q.   What material did you review?
13      A.   Well, we basically went over the
14  reference material.  Certain reference material
15  was provided to me, and I reviewed that reference
16  material.
17      Q.   Are you talking about the reference
18  material listed on your reliance list?
19      A.   Correct.
20      Q.   Specifically what do you have a
21  recollection of going over?
22      A.   The history of products.
23      Q.   When you say the history of products,
24  what do you mean?
25      A.   The history of Prolene, of TVT devices,

Page 8

1  of related mesh.
2      Q.   What did you look at specifically
3  related to TVT-Secur?
4      A.   Yesterday or at any point?
5      Q.   Yesterday.
6      A.   Well, I did some refreshing of my memory
7  myself on various documents provided to me
8  previously.  So I looked at a number of documents
9  regarding TVT.
10      Q.   Sure.  What did you look at?
11      A.   The labeling, the submission, certain
12  design history file records, certain issue
13  reports, information, that sort of information.
14      (There was a recess in the proceedings.)
15  BY MR. LUNDQUIST:
16      Q.   We were talking about some of the things
17  you reviewed in preparation for today's deposition
18  specifically related to the TVT-Secur.  One of
19  them you mentioned is the labeling.  I assume
20  that's the IFU?
21      A.   Right.
22      Q.   What were some of the other things that
23  you reviewed specifically related to the
24  TVT-Secur?
25      A.   Well, the information I personally

Page 9

1  reviewed not with counsel, prior to the meeting
2  with counsel was, as I said, the labeling,
3  submission for TVT-Secur.
4      Q.   And by that you mean?
5      A.   Submission to FDA, risk management
6  reports, FMEAs, other design history type
7  documents, clinical expert reports, that sort of
8  information.  And then I reviewed a lot of the
9  same stuff, the history, rather, yesterday with
10  counsel.
11      Q.   Did you look at the entire design
12  history file of the TVT-Secur?
13      A.   No.
14      Q.   Have you at any point?
15      A.   I don't believe so.
16      Q.   What portions of the design history
17  file -- you mentioned a few of them.  What other
18  portions of the design history file have you
19  reviewed?
20      A.   There were a number of documents.  Like
21  I said, there were FMEAs, risk management
22  documents, design input documents,
23  verification/validation tests, information about
24  the sheep study, the cadaver studies.  I have to
25  look to see exactly.

3 (Pages 6 to 9)

Timothy A. Ulatowski, M.S.

Page 10

1    Q.   Just curious, was there a reason why you
2  reviewed certain portions of the design history
3  file and not the rest?
4    A.   I reviewed what I had.
5    Q.   You never reached out to Ethicon and
6  asked, hey, I'd like to see the remaining portion
7  of the design history file?
8    A.   Yes, I have.
9    Q.   And that's not yet been provided to you?
10   A.   No.
11   Q.   Have you ever given prior depositions?
12   A.   Not for this litigation.  Any prior
13 depositions of?
14   Q.   Of yourself.
15   A.   Of myself, no. Now that you tweaked my
16 memory, I did review some depositions related to
17 this litigation.
18   Q.   Was that in your meeting with counsel?
19   A.   No, prior to meeting.
20   Q.   When were you first retained by Johnson
21 & Johnson/Ethicon in this case?
22   A.   In this litigation?  That's a good
23 question.  Probably last year sometime I would
24 expect.
25   Q.   Who were you retained by?

Page 11

1    A.   Butler Snow.
2    Q.   Who particularly at Butler Snow?
3    A.   Ms. Sutherland was my connection.
4    Q.   What were you asked to do?
5    A.   To evaluate records and to formulate
6  opinions for the purpose of the statement
7  regarding the litigation that I was provided.  And
8  fundamentally that's it.
9    Q.   You say regarding the purpose of the
10 statement regarding litigation you were provided.
11 What were you provided?
12   A.   Well, counsel provided a declaration,
13 whatever is the term, in regard to this litigation
14 concerning my background, basically what I would
15 be contributing to this litigation.
16   Q.   Are you talking about the designation of
17 experts?
18   A.   Yes; correct.
19   Q.   So the designation of experts was
20 prepared by counsel for Ethicon and given to you
21 as an outline of what you would be expected to
22 testify in this litigation?
23   A.   No.  It's quite the opposite.  That
24 document is created under my supervision.  I
25 elaborate to them what I think is appropriate for

Page 12

1  them to state, and then they provided me it
2  without typos and things like that.
3    Q.   Maybe I misunderstood.  I think you
4  testified you were asked to evaluate records and
5  asked to formulate opinions for purposes of the
6  statement regarding litigation that you were
7  provided.  That indicates to me that you were
8  actually provided with an outline of what you were
9  expected to testify.
10   A.   That's incorrect.
11   Q.   Tell me what it is -- maybe I'm confused
12 here.  What did you do?
13   A.   Well, with every litigation I enter the
14 litigation with a blank check -- with a blank mind
15 on my opinions and beliefs regarding that
16 litigation.  I receive documents concerning that
17 litigation.  I evaluate those documents.  And then
18 at a point in time, when I've looked at those
19 documents, then a statement is constructed under
20 my supervision.
21   Q.   Are you saying you prepared the
22 statement set forth in the defendant's expert
23 designation?
24   A.   I provided the construction of and
25 elements of that document.  The background

Page 13

1  information, all that is cut and pasted from my
2  CV, for the most part.
3    Q.   The sum total of your substantive
4  opinions are about a paragraph?
5    A.   Right.
6    Q.   Now, obviously you incorporate some of
7  the testimony that we're not really going to talk
8  about hopefully today from your previous cases.  I
9  assume today's testimony would be in line with
10 that?
11   A.   Yes.
12   Q.   How much time have you spent working on
13 this case?
14   A.   I really haven't added up my hours.  I'd
15 be speculating.
16   Q.   You have no idea?  More than five hours?
17   A.   Oh, certainly.
18   Q.   More than ten?
19   A.   Well, I'd hazard -- I know it's not
20 appropriate to guess in all cases, but I'd hazard
21 a guess between 30 and 50 hours, maybe more.
22   Q.   Have you submitted any bills for that
23 time?
24   A.   Yes.
25   Q.   Did you help any of Ethicon's attorneys

Timothy A. Ulatowski, M.S.

Page 14

1    secure any other experts in this litigation?
2        A.   I don't believe so.
3        Q.   Have you ever spoken with any Ethicon
4    employees?
5        A.   I don't believe so.
6        Q.   I want to clarify this.  To the extent
7    that you know that you've been designated as an
8    expert by Ethicon, how many other current cases or
9    past have you acted as an expert witness on behalf
10   of the defendants in this case?
11       A.   Well, there's various litigations over
12   the four plus years that I left FDA.  Individual
13   litigations, I'd say between five and ten on TVT
14   or gynecological mesh in general.
15       Q.   What about taking transvaginal mesh out,
16   how many other times have you acted as an expert?
17       A.   I think the sum and substance has been
18   regarding OB-GYN devices, TVTs, pelvic meshes.
19   And in addition, hernia mesh has been another
20   area.  There's been a few litigations there.
21       Q.   If you're talking five to ten on
22   gynecological mesh, how many are we talking hernia
23   mesh, any other type of testimony you want to talk
24   about, sir?
25       A.   Well, some of them were nonstarters

Page 15

1    because they settled.  So I'd say actually went to
2    a report, three to five maybe.
3        Q.   I'm not so concerned if a lot of cases
4    settled.  I'm just asking if you know you've been
5    designated as an expert on any other cases outside
6    of these five or ten gynecological mesh cases we're
7    talking about regardless of whether they settled.
8        A.   Well, I'm not a lawyer, but if it never
9    got to a report submission and it settled, I guess
10   I was never designated at a point in time.  I just
11   don't know.  All I can say is I've submitted
12   reports three to five times.
13       Q.   Outside of these five or ten we're
14   talking about on TVT-related mesh?
15       A.   Right.
16       Q.   How much have you been paid as an expert
17   by Ethicon, best guesstimation?
18       A.   I couldn't hazard a guess.
19       Q.   Over a hundred thousand?
20       A.   I would say so.
21       Q.   Have you talked to any of Ethicon's
22   other experts in this litigation?
23       A.   No.
24       Q.   How were the documents that are listed
25   in your reliance list selected, do you have any

Page 16

1    idea?
2        A.   Some were provided by counsel at the
3    outset.  Some I request over time based upon what
4    I've been evaluating.  So it's a mix.
5        Q.   What are the types of documents you
6    request over time?
7        A.   Documents that may be in plaintiff's
8    experts' reports, documents I come across that are
9    referenced in other documents, deposition exhibits
10   that I may not have that I need, things like that.
11       Q.   So you looked at -- let's take
12   Dr. Parisian, for example.  You looked at her
13   transcript in the case?
14       A.   Yes, I did.
15       Q.   You looked at the whole deposition?
16       A.   Yes.
17       Q.   Were there any documents that she
18   discussed or were exhibits to her deposition that
19   you said, hey, I'd like to see what she's talking
20   about?
21       A.   I don't recall.  I've seen, you know --
22   I've had prior litigation.  So I'm not sure
23   there's anything new in her deposition.
24       Q.   So the issue she was talking about
25   specific to TVT-S, you didn't think there was

Page 17

1    anything new that you hadn't heard of before?
2        A.   I've been provided a great deal of TVT-S
3    data.  I've seen prior depositions.  I don't think
4    there's anything particularly, in addition, that I
5    saw being discussed in her deposition I hadn't
6    already seen in some way, shape or form already.
7        Q.   Nothing that concerned you about what
8    she was testifying related to the documents that
9    she was talking about?
10       A.   Not that I can recall.  I may be in
11   error, but not that I can recall.
12       Q.   And I appreciate you can't recall.  You
13   understand that one of the purposes for today's
14   deposition is understanding everything you know
15   before trial.  You didn't prepare an expert report
16   in this case.  This is really my only opportunity
17   to talk to you.  You understand that?
18       A.   I understand that.
19       Q.   And certainly you understood in meeting
20   with counsel yesterday that part of what you would
21   be expected to talk about today is the basis for
22   your opinions?
23       A.   Yes.
24       Q.   I'm not going to expect that you have a
25   perfect memory about every document you reviewed,

5 (Pages 14 to 17)

Timothy A. Ulatowski, M.S.

Page 18

1  sir, but to the extent -- I am expecting you today
2  to the extent that you do have any basis, we talk
3  about your specific opinions and the basis for
4  those opinions, that you are going to be in a
5  position to articulate those.
6      Do you feel comfortable that you're going to
7  be in that position today?
8      A.  I probably need the support of certain
9  documents to refresh my memory, because, of
10  course, I haven't produced a list of opinions that
11  I can relate to you specifically, and make sure
12  that they are all the types of opinions I would
13  express.
14     Q.  Do you intend to offer any opinions on
15  any of the plaintiff experts' reports or
16  testimony?
17     A.  Could you repeat that?
18     Q.  That was not a great question.  Do you
19  have any opinions that come to mind about
20  Dr. Parisian's transcript, her designation or the
21  transcript?
22     A.  Well, it's quite a lengthy transcript.
23  I think I have to have that transcript in front of
24  me to page through it to identify the areas where
25  I may have some impressions, comments.

Page 19

1      Q.  I'm still going to ask you every opinion
2  that you have today related to Dr. Parisian's
3  testimony.  So tell me what those are.
4      A.  I think to be fair to myself, I would
5  need to have that transcript in front of me and go
6  through it because I have no notes here.
7      Q.  So what you're telling me sitting here
8  today, you have no ability to tell me any opinions
9  you have one way or the other about Dr. Parisian's
10  transcript?
11         MR. HUTCHINSON:  Object to form.
12     A.  Not with great clarity because, again, I
13  haven't produced an opinions list.  I haven't
14  referenced her transcript.  I know that she covers
15  ground that plaintiff's experts cover in regard to
16  labeling, in regard to submission, in regard to
17  reports to FDA.
18  BY MR. LUNDQUIST:
19     Q.  You mentioned two or three of those.
20  Tell me, do you agree or disagree with any of her
21  opinions on the labeling front?
22     A.  Well, I think in addition to
23  Dr. Parisian, I think plaintiff's experts -- I
24  have a very narrow view of the relevance of
25  labeling to what a physician knows regarding a

Page 20

1  product.
2      Q.  What other depositions did you review
3  besides Dr. Parisian and Dr. Walss and Ms. Garcia?
4      A.  Those are the depositions that refer to
5  this litigation.
6      Q.  Sure.  What are you talking about?
7      A.  I'm talking about other plaintiff's
8  experts.  They're very similar to Dr. Parisian
9  when they're plaintiff's experts on TVT cases.
10     Q.  Are you talking about Dr. Klosterhalfen?
11     A.  No.
12     Q.  Who are you talking about?
13     A.  I think Dr. Pence has probably opined
14  about the same sorts of issues that Dr. Parisian
15  has opined about.
16     Q.  Dr. Pence wasn't retained by Ms. Garcia
17  in this case.  Dr. Parisian is.  I understand you
18  read her expert report, presumably not in
19  connection with this litigation, but I'm just
20  trying to understand any and all thoughts you have
21  on Dr. Parisian's opinions, whether or not you
22  agree with them, you disagree with all of them,
23  any and everything.
24     A.  Well, I think you have to hear the
25  preface to my comment where I said that

Page 21

1  Dr. Parisian has comments similar to others.  So
2  let me talk about Dr. Parisian, at least to the
3  extent I can, but knowing full well that these may
4  not be the extent of my opinions because I don't
5  have the transcript in front of me.  But let me
6  talk about labeling just for a moment.  Labeling
7  serves a purpose.
8      Q.  Doctor, I'm asking you concerns with
9  Dr. Parisian's transcript.  We're going to talk
10  about your opinions in a moment.  I just want to
11  see if you have any agreements or disagreements
12  with Dr. Parisian, generally speaking.  I'm not
13  telling you to list a hundred disagreements you've
14  got.  I want to understand conceptually what your
15  agreements or disagreements are.  Fair?
16     A.  That's exactly what I was doing.
17     Q.  I'm sorry to interrupt you.  Please
18  continue.
19     A.  Dr. Parisian makes several comments
20  about labeling.  Labeling is an instrument that is
21  required by FDA regulations.  It has ingredients
22  that are required by regulation.  The labeling
23  that Ethicon has for TVT-Secur meets those
24  regulations.
25         Labeling alone -- labeling is not the only

Timothy A. Ulatowski, M.S.

Page 22

1  source of information to a physician, which I
2  think is downplayed by Dr. Parisian.  In fact,
3  Dr. Walss testified to this, that labeling is one
4  source of information for a doctor.
5      Training, experience, the literature, other
6  sources of information are in many ways just as
7  valuable as labeling.  In fact, Dr. Walss
8  testified that he read the literature.  He learned
9  a lot from the literature, kept up to date on the
10  literature on what were the current clinical
11  experience, risks and benefits of TVT-S.  I think
12  that was an important point.
13      So is labeling the sum and substance of
14  information for a doctor on the risks and benefits
15  of a product?  Then the answer is no.
16      Q.  So you disagree with Dr. Parisian's
17  opinion that the labeling was inadequate?
18      A.  No, I do not.  I'm not a doctor, so I
19  cannot put my views in terms of how a physician
20  may view the labeling.  But, for example,
21  experience plays a large part in what a doctor
22  understands about risks and benefits.
23      TVT devices generally, like TVT-Secur, its
24  risks are not unlike other procedures, non-TVT
25  procedures.  The only difference is mainly things

Page 23

1  like erosion.  So he certainly was experienced in
2  Burch and other procedures where they have the
3  very same types of risks.
4      Speaking of erosion, he certainly wasn't
5  taught by Ethicon on how to deal with erosion, as
6  he testified.  Pain, I'm not a physician, but to
7  understand that all surgery incurs some degree of
8  pain, post-surgical pain, in fact, the good
9  doctor prescribed analgesics for pain.  So if he
10  didn't believe there was post-surgical pain, why
11  were those prescribed.
12      I mean, there's lots of things a doctor
13  understands in my experience in working with
14  doctors over 40 years on many products, what a
15  doctor understands, where a doctor gets his or her
16  knowledge about a product.  So to think that
17  labeling has to be a medical textbook on its face
18  is absurd.  But to be inclusive of every bit of
19  information is not realistic.  A lot of
20  information -- actually the literature is more up
21  to date than IFUs in many, many cases.
22      So the issue reports and MDRs, I looked at
23  issue reports submitted on TVT-Secur.  I looked at
24  the MDR submitted for TVT-Secur.  It was evident
25  to me that Ethicon was being very responsive to

Page 24

1  their obligations to receive and analyze
2  complaints, to track complaints, to submit MDRs as
3  required, and there were numerous MDRs that
4  Ethicon submitted for TVT-Secur and for other TVT
5  devices.
6      Q.  Doctor, with all due respect, I'm going
7  to object.  It's not responsive after "No, I do
8  not."
9      I wanted -- one thing your previous testimony
10  makes clear.  I noticed you weren't provided with
11  any medical records in this case, true?
12      A.  I don't believe so.
13      Q.  And presumably because you're not a
14  medical doctor; right?
15      A.  I did have some medical records,
16  operative reports, I believe.
17      Q.  I'll represent to you that they're not
18  listed in your reliance list, but that aside --
19      A.  I may be in error, but I think I did
20  have an operative report.
21      Q.  But you're not a medical doctor; right?
22      A.  That's right.
23      Q.  You have no medical training, true?
24      A.  I do have a master's in physiology from
25  Georgetown Medical School.  So it's a

Page 25

1  medically-oriented course and an
2  engineering-oriented course as well.
3      Q.  Sir, you previously testified you can't
4  render any opinions as to whether or not Ethicon
5  acted reasonably in what they did or did not
6  disclose in their IFUs, patient brochures or
7  marketing materials because that would necessarily
8  require medical opinions; is that true?
9          MR. HUTCHINSON:  Object to form.
10      A.  I think in regard to how a doctor
11  interprets that label, that's certainly the case.
12  BY MR. LUNDQUIST:
13      Q.  You're standing by previous testimony,
14  true?
15          MR. HUTCHINSON:  Object to form.
16      A.  Yes.  I'm not a doctor, so I can't get
17  into a doctor's head on how they interpret certain
18  terms.
19  BY MR. LUNDQUIST:
20      Q.  And you don't intend to offer any
21  clinical or medical causation opinions in this
22  case, true?
23      A.  True.
24      Q.  So where your designation says you're
25  going to talk about medical device labeling,

Golkow Technologies, Inc. - 1.877.370.DEPS

Timothy A. Ulatowski, M.S.

Page 26

1  regulations and industry standards related to
2  TVT-Secur, I'm guessing that one of your opinions
3  is that the TVT-Secur IFUs or instructions for use
4  inform, met the FDA's regulatory requirements for
5  prescription labeling; is that true?
6      A.   That's correct.
7      Q.   And that's similar to opinions you've
8  given in the past on other Ethicon IFUs?
9      A.   Yes.
10     Q.   Again, based on your previous testimony,
11 you don't have an opinion in this case on the
12 accuracy or completeness of, let's say, the
13 adverse reaction section of the TVT-Secur IFU
14 because that would necessarily require a medical
15 opinion, true?
16     MR. HUTCHINSON:  Objection.
17     A.   I think you just heard what I think
18 about labeling and how in my experience doctors
19 are advised about information.  I certainly had
20 that role and function and expertise in my 40
21 years so far dealing with medical devices and
22 labeling issues over those years.  So I'm not
23 interpreting the labeling as a doctor would.
24     I'm just indicating to you the context of
25 labeling within the totality of information that a

Page 27

1  doctor is provided on a product.
2  BY MR. LUNDQUIST:
3      Q.   With respect, Doctor, I'll object.
4  Mr. Ulatowski, I'll object as nonresponsive.
5      I just want you to agree with me that you
6  don't have an opinion on the accuracy or
7  completeness of the adverse reaction section of
8  the TVT-Secur IFU.
9      MR. HUTCHINSON:  Object to form.
10     A.   To the extent it meets regulatory
11 requirements, I certainly do.  But as far as
12 specifics and how a doctor would interpret the
13 terms, no, I don't interpret the labeling in terms
14 of a doctor.
15     BY MR. LUNDQUIST:
16     Q.   That would require a medical opinion as
17 you previously testified, true?
18     A.   I think it made to fully elaborate on
19 the labeling.  I think I would add that more
20 specifically, I think an OB-GYN,
21 gastroenterologist -- OB-GYN, rather, would be
22 best oriented to comment on that particular --
23     Q.   Further, based on your previous
24 testimony, you don't have an opinion or the
25 expertise frankly to opine as to whether the

Page 28

1  TVT-Secur IFU adequately disclosed the risks that
2  were known to medical affairs, true?
3      MR. HUTCHINSON:  Object to form.
4      A.   To the extent it met regulatory
5  requirements and FDA cleared the product including
6  the labeling and the submission, I think on that
7  basis certainly met FDA's expectations regarding
8  adequate prescription labeling.
9  BY MR. LUNDQUIST:
10     Q.   Again with respect, sir, nonresponsive.
11     I understand what your opinions are on hey,
12 it met the regulatory requirements, it checked the
13 box.  I agree it passes muster on the regulatory
14 requirements.
15     I want to make clear you don't have the
16 expertise to opine as to whether the TVT-Secur
17 instructions for use adequately disclosed the
18 risks that were known to medical affairs.  Is that
19 a true statement?
20     MR. HUTCHINSON:  Object to form.
21     A.   Well, let me play off your comment of
22 checking the box.  FDA's review is more than
23 checking a box.  Let me explain to you what I did
24 virtually every day for 25 years in device
25 evaluation, in evaluating devices.

Page 29

1      You look at the labeling.  You evaluate the
2  labeling.  You look at the indications, the
3  precautions, the warnings.  You get clinical input
4  from your co-reviewers on the labeling.  There's
5  an evaluation label.  It's trivializing FDA review
6  to say check the box.  It met regulatory
7  requirements, and it met it because it had an
8  adverse reaction section that met FDA's
9  expectations.
10     MR. HUTCHINSON:  Objection.
11 Nonresponsive.
12     Can you please read back my question?
13     (The record was read back.)
14     MR. HUTCHINSON:  Object to the extent
15 it's been asked and answered.
16 BY MR. LUNDQUIST:
17     Q.   You can answer.
18     A.   I think I made it clear as to --
19     Q.   I assure you you did not.  You
20 previously testified.  You just answered "Yes."
21 I'm just trying to understand if your opinion on
22 the TVT-Secur IFUs can be different than on the
23 TVT IFU.  I assume it's not.  That's all I'm
24 getting at.
25     MR. HUTCHINSON:  That's a different

8 (Pages 26 to 29)

Timothy A. Ulatowski, M.S.

Page 30

1  question, with all due respect.
2       MR. LUNDQUIST:  Read him the question
3  back, please.
4       (The record was read back.)
5       MR. HUTCHINSON:  Same objection.  It's
6  been asked and answered.
7       A.  I already explained that I'm not a
8  doctor and I would not view the labeling with the
9  orientation of a physician, particularly an
10  OB-GYN.
11       What I was additionally commenting on, that
12  based on my experience on how this labeling gets
13  reviewed, that it would have been evaluated
14  clinically and to the satisfaction of FDA.  So
15  that clinical evaluation would have occurred, not
16  by me but through the process.
17  BY MR. LUNDQUIST:
18       Q.  You talked about your review of the FMEA
19  that was part of the design history file part of
20  the TVT-Secur.  And you previously testified
21  concerning other medical devices including the
22  510(k) process.  Do you have an opinion -- strike
23  that.
24       You have no opinion sitting here today, sir,
25  whether Ethicon's internal DDSA or FMEA process is

Page 31

1  evaluating each of the medical risks associated
2  with the TVT-Secur device, true?
3       A.  Not being a doctor, I think typically
4  FMEAs, DDSAs, whatever term you might use, and
5  there's various types of FMEAs, require a team
6  effort to identify hazards.  So inasmuch as my
7  expertise takes me, I could evaluate what was
8  submitted in those FMEAs in terms of thoroughness,
9  in terms of structure, in terms of how they
10  analyze the hazard.
11       But to say what a doctor brought to the table
12  of additional hazards, I'm not a doctor, so I
13  can't say.  I know that Ethicon in these FMEAs and
14  risk documents are not static.  They get
15  reevaluated from time to time, as Ethicon did
16  which I saw in the clinical expert report.
17       Q.  Maybe we're having trouble
18  communicating, sir.  I'm going to talk to you
19  about the basis for your opinions and your
20  opinions in a little bit.  I'm trying to get a
21  general framework here.
22       You previously testified you would have to do
23  a medical assessment necessarily to evaluate the
24  DDSA and the FMEA processes.  I want to make sure
25  your testimony is consistent with previous

Page 32

1  testimony, sir.  So I'm going to ask the question
2  again.  I'm not interested in what Ethicon did.
3  I'm not interested in the regulatory process right
4  now.  I'm interested in whether or not you agree
5  with me on an issue that you previously testified
6  on another device.
7       And that is:  You do not have an opinion
8  whether Ethicon's DDSA or FMEA processes evaluated
9  each of the medical risks associated with the
10  TVT-Secur device.  Is that a true statement or
11  not?
12       MR. HUTCHINSON:  Object to form.
13       A.  I think you asked that question, and I
14  believe I answered it to the best of my ability in
15  saying -- prefacing, again, that I think there's
16  a -- it's a team effort where there is a medical
17  input.  I'm not a physician.  So to analyze the
18  entirety of the FMEA from a clinical perspective,
19  I don't think I could do that in total.  So that's
20  consistent with my prior testimony.
21  BY MR. LUNDQUIST:
22       Q.  I agree.  I think what you're saying --
23  correct me if I'm wrong -- you're saying that
24  Ethicon was compliant in these procedures that
25  were supposed to be in place, like the DDSA and

Page 33

1  the FMEA, but you're not offering opinions with
2  regard to the actual application or conclusions
3  drawn through those processes, true?
4       A.  It's more of a process, regulatory
5  process, standards process, industry practice
6  process.  Creating the FMEA, identifying all the
7  hazards, mitigating those hazards, reviewing those
8  hazards from time to time, that's the process, and
9  that's a process Ethicon did.
10       Q.  Again, sir, I agree.  You're talking
11  about the process, the procedures.  My question is
12  far more specific.  I'm going to try it one more
13  time.  I've tried a few times here.
14       You're saying Ethicon was compliant with
15  these procedures.  I'll give you that.  That's
16  consistent with your previous testimony.  I want
17  to make clear in this case that you're not
18  offering any opinions with regard to the actual
19  application or conclusions that were drawn through
20  those processes.  Is that a true statement?
21       MR. HUTCHINSON:  Object to form.
22       A.  I think in regard to the specific FMEA,
23  specific hazards, not having expertise in all the
24  areas of FMEA, that would be true.  On the other
25  hand, as a basis of the purpose of the FMEA and

9 (Pages 30 to 33)

Timothy A. Ulatowski, M.S.

Page 34

1   how it's utilized in the process of bringing a
2   product to market, it certainly was complied with
3   by Ethicon.
4       MR. LUNDQUIST:  I'll object as
5   nonresponsive after "that would be true."
6   BY MR. LUNDQUIST:
7       Q.   Doctor, I gave you purpose and procedure
8   and all that.  I'm trying to move through this
9   deposition as quickly as I can.
10      You're saying they were compliant.  What were
11  they compliant with?
12      A.   Well, everyone pretty much in the
13  industry follows the risk management standard and
14  the tools outlined in that standard in regard to
15  evaluating hazards and mitigating hazards, and the
16  standard is not prescriptive.  The standard
17  doesn't say you have to have the following
18  hazards.  You have to have all this thorough and
19  complete, because it's an iterative process.
20      The standard lays it out there generally, and
21  the companies as an industry practice take up that
22  standard and apply it in their case.  So I don't
23  think there's any FMEA that I've ever viewed, just
24  as a general rule in my experience, that ever had
25  all the hazards ultimately encountered with a

Page 35

1   device in all the initial FMEAs because it's an
2   reiterative process.
3       You come back to the FMEA.  You consider
4   hazards.  You add hazards.  So it's a process
5   issue. So inasmuch as it touches on your point, so
6   be it, but again, it's a process issue.
7       MR. LUNDQUIST:  Objection.
8   Nonresponsive.
9   BY MR. LUNDQUIST:
10      Q.   My understanding, sir, is that as the
11  former head of the Office of Compliance at the
12  FDA, you relied on others at the Center for
13  Devices and Radiological Health that had training
14  to look at corporate documents like the FMEA,
15  true?
16      A.   It's always a team effort, yes, at FDA.
17      Q.   The answer to my question is "Yes"?
18      A.   Yes, but not always.
19      Q.   Did you ever personally look at
20  corporate documents to determine compliance with
21  FDA's regulations?
22      A.   Of course.
23      Q.   Tell me any instance you can recall
24  where you personally, sir, looked at corporate
25  documents to determine compliance with

Page 36

1   regulations.
2       A.   Well, just a point.  Director of
3   Compliance is the final authorizing person on any
4   enforcement action by FDA for medical devices.  I
5   saw every enforcement action related to every
6   medical device company.  I had to review the
7   entire file.  I had to review all the procedures
8   and policies.  I had to confirm that any
9   observations identified, any charges levied were
10  appropriate.  I was the final signatory.
11      Q.   Right.  But you acted as the officer of
12  compliance based on the recommendations of others
13  within the FDA?
14      A.   Of course, there were recommendations,
15  but they didn't hire me as a history major.  I was
16  a biomedical engineer and a microbiologist trained
17  in the quality system process.  So I was fully
18  capable and authorized and responsible for
19  evaluating those same documents.  I trained people
20  on the quality system, on procedures and policies,
21  on FMEAs, on risk management documents.  For FDA
22  I've trained them.
23      MR. LUNDQUIST:  Nonresponsive after
24  "recommendations."
25

Page 37

1   BY MR. LUNDQUIST:
2       Q.   I want to go back to your point, your
3   testimony -- you appreciate you're under oath
4   today just as if you were sitting in front of a
5   jury today?
6       A.   Sure.
7       Q.   You're saying that you personally looked
8   at corporate documents to determine whether or not
9   there was compliance with FDA regulations.
10      A.   I did that all the time.  I still do as
11  a consultant.
12      Q.   Give me an example of what you did when
13  you were at the FDA when you actually looked the
14  corporate documents themselves.
15      A.   Well, when evidence is provided to
16  attempt to support an advisory action which are
17  called warning letters or title letters, or when
18  an enforcement action is coming down the pike,
19  enforcement action, seizure, injunction, civil
20  money penalty, those documents are indeed
21  evaluated by lower level staff because, of course,
22  how can one person evaluate all those various
23  documents that come into FDA.
24      But during the course of those evaluations
25  and at the end of that chain was me to accept or

Timothy A. Ulatowski, M.S.

Page 38

1  reject any recommendations, any evidence, any
2  charges before letters would issue, or whether the
3  case would proceed to the Department of Justice.
4  So I necessarily had to have expertise.  I did,
5  and I applied it.
6      Q.  I'm still looking for an example, sir.
7  Any time you can recall specifically looking at
8  the corporate documents themselves in your role?
9         MR. HUTCHINSON:  Excuse me.  Can we go
10 off the record for just a second.
11     (There was a discussion off the record.)
12 BY MR. LUNDQUIST:
13     Q.   Mr. Ulatowski, I'm still looking for
14 just an example.  I appreciate you may have some
15 confidentiality issues, but I'm just trying to
16 understand a little bit more in depth what it is
17 you did while you were -- in your role as the --
18     A.  Director of the Office of Compliance.
19     Q.   And when you individually would have
20 actually looked at corporate documents.
21     A.  Again, for every warning letter that
22 issued under my signature, for every enforcement
23 action that issued under my signature, before it
24 advanced to general counsel and to Department of
25 Justice, those would have been under my direct

Page 39

1  evaluation of corporate documents.
2        Procedures, policies, evidence, samples,
3  affidavits, every piece of evidence according to
4  the particular case I would have to evaluate and
5  sign off on before I allowed that document to
6  proceed to final, my final signature in many
7  cases, or to proceed onward for further
8  litigation.
9      Q.   Your testimony, as I understand it, you
10 had to sign off on that to move forward.  I get
11 all that.  Your testimony is you physically looked
12 at these internal corporate documents to determine
13 whether or not there had been compliance with FDA
14 regulations?
15     A.  Absolutely.
16     Q.   Did you ever find any that had not
17 complied?
18     A.  I guess I don't understand your
19 question.
20     Q.   Upon your review of these corporate
21 documents, when you were determining whether or
22 not whatever company had complied with FDA's
23 regulations, did you ever reach the decision that,
24 in fact, they had not -- any company had not
25 complied with FDA's regulations?

Page 40

1      A.  I was the director of compliance.  What
2  was coming to my desk always were companies that
3  were out of compliance in one way, shape or form.
4  So I may have rejected a charge based upon my
5  review of the evidence.  I may have added a
6  charge, and I did, based upon my review of the
7  evidence.  So that's typically what happened.
8      Q.   I forgot to mention earlier, sir -- we
9  were talking about some of the documents you
10 looked at.  I noticed you reviewed some Ethicon
11 employee testimony as well.
12     A.  Along the way, yes.
13     Q.   Any in preparing for this deposition?
14     A.  I didn't go back to refresh my memory
15 about it, but, yes, I've certainly seen a whole
16 lot of depositions of Ethicon employees.
17     Q.   Did you rely on any of these Ethicon
18 corporate witness depositions to support any of
19 your opinions in this case?
20     A.  Well, it's hard to segregate one's views
21 and position when you have the totality of
22 information you've looked at for the same types of
23 devices in your brain.
24     Q.   Give me any testimony you relied on in
25 forming the basis of your opinions in this case,

Page 41

1  sir.
2      A.  I think what's very important is the
3  testimony of the medical directors when they
4  evaluated labeling, when they constructed
5  labeling, what their views were.  I'm not a
6  doctor.  Interesting to see how they viewed the
7  labeling and what they believed to be the case
8  with labeling through their eyes.
9      Q.   So you're talking about Charlotte Owens,
10 David Robinson and Peter Newell?
11     A.  I think Weisberg is in there.
12     Q.   Marty Weisberg?
13     A.  Yeah.
14     Q.   That testimony stood out as important to
15 you because what they had to say with regard the
16 TVT-Secur was important to you?
17     A.  In regard to TVT-Secur in general and
18 the labeling because the labeling for the TVT
19 devices in many respects -- of course, there are
20 differences, but in some respects they're very
21 similar.  But understanding their opinions on the
22 labeling and construction of labeling is very
23 important.  That's one segment.
24        Of course, the other segment are the quality
25 people, the manufacturing people.  It depends on

Timothy A. Ulatowski, M.S.

Page 42

1   what the opinion was that I was -- or the
2   regulatory people.  It depends what my opinion was
3   related to.
4       Q.   You keep going back to the TVT devices,
5   and really my question -- I know you've been
6   questioned thoroughly about your opinions on the
7   TVT-O, TVT, all the predecessor devices.  We'll
8   talk about those briefly in a moment.
9       But is it a true statement when I asked you
10  their testimony, again, Owens, Robinson, Newell,
11  Weisberg, their testimony stood out as important
12  to you on the TVT-Secur labeling?
13      A.   Yes, in general, and specifically
14  Weisberg did the initial CER.  Robinson did some
15  CERs later on TVT-Secur.  And Newell did a CER on
16  Secur.  They had deposition testimony all along
17  the line of production of TVTs from even before
18  '98 when the TVT classic came out.  So their
19  perspective I think is important, their views.
20      Q.   What was your takeaway on their
21  perspective on the TVT-Secur?
22      A.   I think that the risks were adequately
23  identified in the labeling, that they were
24  consistent in their belief regarding -- as I spoke
25  to earlier, that labeling is but one element of

Page 43

1   the knowledge base of doctors and how they
2   interpret certain terms in labeling.  So that's
3   consistent with TVT-Secur and their deposition
4   testimony, as I recall.
5       Q.   So your recollection is that they
6   believe the risks were adequately identified on
7   the labeling in the TVT-Secur?
8       A.   I believe so, yes.
9       Q.   Any other testimony that you would have
10  relied on in forming your opinions in this case?
11      A.   Well, as I said, there's other groups of
12  people that are of interest to me as I evaluate
13  documents, the regulatory people, the quality
14  staff that are engaged in the history files.
15      Q.   What did they say that was important to
16  you?
17      A.   The regulatory people are concerned with
18  the submission process, what needs to be in the
19  submission, what's taken from the history file and
20  other records to form the submission that's
21  provided to FDA, what's the strategy for
22  providing -- I'm not finished -- what's the
23  strategy for bringing this product to the
24  marketplace, is that consistent with regulations
25  and practices in the industry.

Page 44

1       Q.   Do you have an understanding of what
2   their strategy was in bringing the TVT-Secur to
3   the market?
4       A.   Well, fundamentally it's here we have a
5   modification of existing TVT devices.  This
6   particular device has particularly unique benefits
7   in their mind regarding -- compared to the other
8   devices, and that formed the basis of proceeding
9   with the particular product.
10      Q.   Did it have unique risks as well in
11  their mind based on your review of the testimony?
12      A.   I think the risks, as I recall
13  testimony, of TVT devices in general are very,
14  very similar.
15      Q.   Not my question, doctor.  Did the
16  TVT-Secur have unique risks based on your review
17  of their testimony?
18      A.   I don't believe so.
19      Q.   Which regulatory employees stood out
20  most to you?
21      A.   Well, I was interested in Hojnoski, of
22  course, because she was connected to this.  But
23  along the chain, there were other people that came
24  in and out in the deposition testimony on TVT
25  devices.  She kind of stands out in my brain for

Page 45

1   the moment, emails or whatever was associated with
2   it.
3       Q.   You're not going to be offering opinions
4   on any medical malpractice issues in this case,
5   true?
6       A.   True.
7       Q.   Not an expert on polypropylene?
8       A.   No.  I'm not a materials engineer.
9       Q.   Not going to be talking about pathology
10  issues?
11      A.   Not a pathologist.
12      Q.   If something is not on your reliance
13  list, can I assume that you did not rely on it in
14  forming your opinions?
15      A.   That would be a fair statement.
16      Q.   You do consider yourself an expert
17  in the 510(k) clearance process?
18          MR. HUTCHINSON:  I'm going to object.  I
19  don't know exactly what reliance list you're
20  reviewing.  So I just want to object.
21          MR. LUNDQUIST:  This is what was
22  produced.
23      A.   Yes.
24  BY MR. LUNDQUIST:
25      Q.   Tell me what your opinions are in this

12 (Pages 42 to 45)

Timothy A. Ulatowski, M.S.

Page 46

1  case, Doctor.
2     A.   Well, again, it would be difficult for
3  me to enumerate all of them, maybe even most of
4  them because I don't have particular notes.  I
5  certainly opined in previous reports on TVT
6  devices, but, of course, this is TVT-Secur.  It's
7  a different device.
8     This device was brought to the marketplace
9  through a 510(k).  510(k) itself, traditional
10  510(k), so-called traditional 510(k), this
11  traditional 510(k) was complete.  It was thorough,
12  met all FDA expectations, regulatory requirements
13  for a 510(k).  It included the type of comparison
14  information, the predicate information, the sort
15  of test data that FDA expected in a 510(k) of this
16  type, descriptive information as I said, the
17  labeling.  The surgical technique certainly was
18  appropriate, and FDA cleared it, I think,
19  appropriately based upon that information in my
20  experience.
21     Related to that, I was interested to see that
22  FDA did a thorough review of the 510(k) as
23  evidenced by the interaction of the evaluators of
24  the company, Dr. Herrera, Dr. Lerner, in
25  evaluating the technique, the information that was

Page 47

1  submitted.  FDA sent an additional information
2  letter to Ethicon asking for more detail,
3  clinical, engineering data, additional engineering
4  data.  Certainly not a rubber stamp, this is a
5  highly technical clinical review process.
6     Ethicon submitted that information at a
7  meeting with Ethicon in between.  FDA evaluated
8  that information and cleared the device.  At all
9  points in time during the 510(k) review process,
10  FDA is in charge.  FDA is the gatekeeper on the
11  submission.  What information it needs it will
12  get.  In fact, it asked for information.  It
13  received information.
14     FDA is the final arbiter.  It made the
15  decision to clear and make the product legally
16  available to be marketed at the end of '05.
17     Q.   No. 2?
18     A.   And that's premarket.  And that
19  information included, for example -- and all this
20  is kind of related.  Sometimes I break these into
21  separate opinions.
22     Q.   You can keep talking, sir, but I
23  understand.  You've talked a lot about the 510(k)
24  process and what has been submitted.  So I
25  appreciate your opinion is they met, that the --

Page 48

1  help me I understand if I'm stating your opinion
2  correctly, that Ethicon's 510(k) submission
3  on the TVT-Secur was properly cleared by the
4  FDA.
5     A.   There was an appropriate and thorough
6  submission.  It was thoroughly reviewed by FDA on
7  a technical and clinical basis and they cleared it.
8     Q.   Okay.
9     A.   In addition, related to that, the type
10  of verification/validation data submitted in that
11  510(k) is consistent with industry practices for
12  not just these types of devices, but medical
13  devices in general, for example, preclinical
14  animal studies called the sheep studies to
15  evaluate insertion, retention, strength, for
16  example, the cadaver studies.  These are industry
17  standard practices.  There's nothing extraordinary
18  here.
19     In fact, it's commonplace and FDA recognizes
20  that, and it's consistent with the quality system
21  regulation.
22     Q.   What's the basis of that opinion, sir,
23  when your testimony -- I believe your opinion is
24  that the validation and verification data that was
25  submitted to the FDA is consistent with industry

Page 49

1  practices for these types of devices?
2     A.   Well, after 40 years of evaluating
3  submissions, evaluating verification and
4  validation data, I can tell you with great
5  assurance that this is the sort of common approach
6  to evaluating devices, engineering data,
7  evaluating the material properties of the product,
8  the biocompatibility of the product based upon its
9  longstanding performance, the animal data,
10  evaluating the specific aspects of TVT-S which had
11  a different manner of surgical approach.
12     I'm not a doctor, but certainly the inserters
13  and the attachment was different as Dr. Herrera
14  pointed out. Validation under the quality system
15  regulation, all the information submitted in the
16  510(k) actually is derived from, for the most
17  part, from the design history file.
18     The design history file is a quality system
19  requirement, and the design history file
20  requirements are enumerated in the quality system
21  regulation.  So if I change hats a little bit
22  between premarket and quality systems compliance,
23  it's because the quality system regulation really
24  drives all the data that's developed and submitted
25  in the 510(k).  So getting back, validation,

Timothy A. Ulatowski, M.S.

Page 50

1  what's the requirement for validation?
2      Q.   That's what I'm looking for, is the
3  basis of your opinion.
4      A.   The requirement is a simulated or actual
5  use condition test.  Are cadaver tests simulated
6  tests?  Of course, they are.
7      Q.   What are you relying on for that, sir?
8  You just told me your 40 years of experience, this
9  is the type of thing that you would expect.  I'm
10  just trying to understand is there a statute that
11  I could look to that says, yeah, hey, this
12  verification, these validation testing meets
13  muster?
14      What would you look to if you were someone
15  like myself that had no experience at the FDA?
16          MR. HUTCHINSON:  Object to form.
17      A.   First of all, you'd have to look at the
18  regulation itself, what does the regulation call
19  for.
20  BY MR. LUNDQUIST:
21      Q.   What regulation is that?
22      A.   Quality system regulation that I've been
23  talking about.  Quality system regulation speaks
24  to verification tests, speaks to validation tests.
25  What is an appropriate validation test?  It

Page 51

1  defines what it is.  What are verification tests?
2  Verification tests evaluate whether the product
3  meets particular design input requirements.  What
4  are design input requirements, what are design
5  outputs, those are all identified in the quality
6  system regulation.
7      Those aspects are further defined in industry
8  practices for a type of product, in this case for
9  meshes, for OB-GYN meshes, tapes.  As I viewed
10  submissions and documents over the years, these
11  are the sorts of tests that are conducted.  The
12  same sort of tests are conducted on other types of
13  devices, very similar tests.
14          MR. HUTCHINSON:  Objection,
15  nonresponsive.
16  BY MR. LUNDQUIST:
17      Q.   I'm trying to be a little bit more
18  specific.  You talked about the quality system
19  regulation.  Is there a specific statute?  Is this
20  CFR?  Is this a subset of the FDA guidelines?
21  What are you talking about?
22      A.   Quality system regulations in 21 Code of
23  Federal Regulations, Part 820.
24      Q.   21 CFR 820?
25      A.   Yeah.  Therein you'll find the

Page 52

1  requirements for design history files.  Therein
2  you'll find the requirements for verification and
3  validation tests.  Those requirements are further
4  elaborated -- may be further elaborated in
5  guidance documents FDA produces.
6      For example, there's a guidance document for
7  surgical sutures, polypropylene sutures that
8  further defines the sort of engineering tests and
9  other data that needs to be submitted in a 510(k).
10      There's not a similar document for TVT
11  devices, but, again, falling back on industry
12  practices, over the years the particular industry
13  comes to know the types of engineering tests,
14  preclinical tests and clinical type data that FDA
15  wants to see in a 510(k).
16      Q.   I understand 21 CFR A20.  I think I
17  understand the guidance documents you've been
18  referencing that may provide some understanding.
19  If I was to look at one of these guidance
20  documents, you're telling me it would support your
21  position that the validation and verification data
22  was sufficient; right?
23      A.   Yes.
24      Q.   You mentioned industry practices.  What
25  are you talking about there?

Page 53

1      A.   Well, the regulation goes so far.  How
2  do you understand what verification test to do,
3  what validation test to do.  Then you rely upon
4  what's been the norm in that particular industry
5  to provide that evidence.
6      Now, there's further standards, international
7  standards that support particular types of testing
8  that are submitted, ISO 10993 for
9  biocompatibility, various ASTM tests for tensile
10  strength, material strength tests.  These are
11  commonly applied standards for medical devices in
12  general.
13      Q.   Again, industry practices, like you did
14  with the CFR, I'm just trying to understand if I
15  was to talk to the Google gods and ask them what
16  industry practices do I need to be made aware of
17  so I can look at what Mr. Ulatowski is talking
18  about when he says Ethicon's verification/
19  validation data met muster or was sufficient in
20  this case, I should say, what would you direct me
21  to?
22          MR. HUTCHINSON:  Object to form.
23      A.   I think I mentioned standards.  I
24  mentioned regulations.  I mentioned guidance.  I
25  mentioned what FDA has generally requested and

Timothy A. Ulatowski, M.S.

Page 54

1 accepted in the past. TVT-S is not the first TVT
2 device on the market. There's a long history here
3 of back and forth between Ethicon and FDA on the
4 sort of information FDA expects to see in
5 submissions for TVT devices, for mesh devices.
6     Q.   So these industry standards are these
7 regulations that you've been talking about?
8     A.   Right. And FDA applies those uniformly
9 and fairly across the particular industry. Take
10 cadaver studies, for example, these are sorts of
11 studies that early on in the development process
12 are identified by the manufacturer as the sorts of
13 validation that may be appropriate for a device.
14     These tests are vetted with FDA over time.
15 FDA has seen cadaver tests before for TVT devices.
16 You get into a rhythm with FDA on the certain
17 types of data that FDA typically likes to see.
18     Q.   Then the ISO 10993 I have written down.
19 What is that?
20     A.   That's a biocompatibility study.
21     Q.   What requirement does Ethicon have to
22 comply with ISO 10993?
23     A.   There's various tests that are expected
24 under 10993 depending on the contact conditions of
25 the material.

Page 55

1     Q.   I don't want to talk about the type of
2 testing. I know about the touching the rabbits on
3 the ears and all that stuff, and that's way off.
4 Strike that.
5     My question focuses on what requires Ethicon
6 to comply with ISO 10993.
7     MR. HUTCHINSON: Object to form.
8     A.   The fundamental aspect is safety. Is
9 this device safe? What are the risks that may
10 occur with the device? How do you evaluate those
11 risks? Biocompatibility testing is evaluating
12 certain aspects of risk of the material of a
13 product and of actually pieces of the final
14 product in implantation tests and other tests.
15 BY MR. LUNDQUIST:
16     Q.   You're telling me they're not required
17 to do it; they just do it just because?
18     A.   They do it because it's an industry norm
19 to do it, industry practice. Over time FDA has
20 found that to be a basis for meeting certain
21 expectations on establishing safety of the
22 particular product.
23     Q.   I see. ISO is a -- what would you call
24 it -- a regulation? Guidance document?
25     A.   It's a standard, international standard.

Page 56

1     Q.   So it would be a standard set forth by
2 FDA for a manufacturer to show safety?
3     A.   Yes. It's a safety evaluation series of
4 tests. FDA has recognized the standard, and FDA
5 has a process of recognizing standards that are --
6 and FDA identifies on their standards recognition
7 website what sorts of requirements or
8 recommendation may be met by that standard. So
9 that's another source of information on particular
10 standards.
11     Q.   Does the fact that TVT-Secur was cleared
12 signify to you, sir, that it is safe and effective
13 for permanent implantation?
14     A.   Yes.
15     Q.   Part of what Ethicon has to do in the
16 510(k) process is demonstrate a substantial
17 equivalent to predecessor devices, true?
18     A.   Yes, it's as safe and effective as a
19 predicate device. And if it is, then it's meeting
20 the standard of reasonable assurance of safety and
21 effectiveness.
22     Q.   Let me make sure I understand. They
23 have to show substantial equivalence to a
24 predicate device, and separately they have to show
25 it is at least as safe or effective as one of

Page 57

1 these cleared devices, true?
2     A.   Yes. There has to be a predicate or
3 predicates identified and comparisons made to that
4 predicate or predicates. In doing so, once your
5 510(k) is cleared, then you've met one of the
6 statutory requirements on determining reasonable
7 assurance of safety and effectiveness.
8     Q.   So your understanding is that once it's
9 cleared by the FDA, that means that it's safe and
10 effective. But Ethicon does not have to show that
11 it is as safe or as effective as a cleared device?
12     MR. HUTCHINSON: Object to form.
13     A.   That's the regulatory standard, as safe
14 and effective as.
15 BY MR. LUNDQUIST:
16     Q.   So that's something that you believe
17 Ethicon also has to demonstrate with respect to
18 the TVT-Secur?
19     A.   Yes.
20     Q.   What were the predicate devices that
21 were used by Ethicon in this 510(k) submission on
22 the TVT-Secur?
23     A.   It was the prior Ethicon TVT devices.
24     Q.   Which ones?
25     A.   TVT classic and O.

Timothy A. Ulatowski, M.S.

Page 58

1    Q.   Is it your opinion that the TVT-Secur
2 was substantially equivalent to the TVT and the
3 TVT-O?
4    A.   Yes.  Ethicon also provided information
5 on another predicate in a response back to FDA.
6 So there actually was I would call it three
7 predicates at the end of the evaluation process.
8    Q.   You're talking about when they had that
9 interchange with Dr. Herrera and they found
10 something from 20 years ago and said it was
11 substantially equivalent?
12      MR. HUTCHINSON:  Object to form.
13    A.   They identified another predicate.
14 BY MR. LUNDQUIST:
15    Q.   Do you remember when that device had
16 been cleared?  I shouldn't even call it a device.
17 Do you remember when that product had been
18 cleared?
19      MR. HUTCHINSON:  Same objection.
20    A.   It was around TVT-O time, I think back
21 then.
22 BY MR. LUNDQUIST:
23    Q.   So within the last 15 years do you
24 think?
25    A.   Oh, yeah.

Page 59

1    Q.   What's the basis for your opinion the
2 TVT and TVT-O were substantially equivalent to the
3 TVT-Secur?
4    A.   Well, when one evaluates the 510(k), you
5 evaluate, first of all, the intended use of the
6 products.  Does this device, this new device have
7 the same intended use as the other devices, the
8 predicates?  The answer to that is yes.  It's for
9 the same clinical purpose.
10    Q.   Is it your opinion that the TVT-Secur
11 was as safe and effective as the TVT and the
12 TVT-O?
13    A.   It's my opinion based upon the
14 submission that I would have signed off on that
15 product as cleared.  And, of course, FDA did.  So
16 the answer is yes.  It was as safe and effective
17 as TVT and TVT-O.
18    Q.   And the basis for that opinion is the
19 clearance itself?
20    A.   No.  I never take clearance letters on
21 their face as the basis.  I always look at the
22 submission.
23    Q.   What's the basis for that opinion then?
24    A.   The information provided, the
25 engineering, the preclinical, the cadaver studies

Page 60

1 submitted, characteristics of the predicates that
2 were used.  That information forms the basis for
3 my opinion.
4    Q.   So your opinion that the mesh, the
5 transvaginal mesh itself in the TVT and the TVT-O
6 is the same as the mesh used in the TVT-Secur?
7    A.   Well, the mesh -- the fundamental
8 characteristics of the material is the same.  Of
9 course, the mesh dimensions, the final
10 configuration of the device is different, somewhat
11 different.  That's why it was a traditional 510(k)
12 and not a special 510(k).
13    Q.   What is your understanding of the
14 differences between the mesh used -- not talking
15 about the size -- the mesh used between the TVT
16 and the TVT-O and then comparing it with the
17 TVT-Secur?
18    A.   Repeat your question so I can understand
19 it.
20    Q.   You said the fundamental characteristics
21 of the material is the same related to mesh.  I'm
22 trying to appreciate -- I'm trying to gain an
23 appreciation for what your understanding is
24 between the mesh that was used in the TVT-Secur
25 and the mesh that's used in the TVT and the TVT-O,

Page 61

1 if any.
2    A.   Well, you're still talking about Prolene
3 mesh that's used in the prior devices for which --
4 by that time, you're looking at years of
5 experience with that particular Prolene mesh.  Of
6 course, there's a colorant in there.
7    Q.   Were you finished?
8    A.   No.  So as far as the mesh itself, of
9 course, there's different -- the TVT-S had the
10 Vicryl PDS -- they call it fleece -- components at
11 the end of the mesh.  That was different because
12 of the nature of the insertion into the muscles,
13 into the structures.
14    Q.   I understand insertion mechanism is
15 different and the Ethisorb component was
16 different.  My question relates to the mesh
17 itself.  Is it your opinion that the mesh was the
18 same?
19    A.   I think it was fundamentally the same,
20 yes.
21    Q.   Is it your opinion the tensile strength
22 of the mesh between the TVT and TVT-O versus the
23 TVT-Secur was the same, or do you have an opinion?
24    A.   I'd have to look at the engineering data
25 again to see.  On any given day you can have a

16 (Pages 58 to 61)

Timothy A. Ulatowski, M.S.

Page 62

1 little variation.  To say it was exactly the same
2 in the test, I'm not certain.  But it certainly
3 would have been in the range because we're still
4 taking about the same pore size, as I recall.
5      Q.  I want you to tell me any differences
6 you're aware of between the TVT and the TVT-O
7 versus the TVT-Secur that you're aware of sitting
8 here today.
9      A.  We're talking, first of all, about the
10 material itself.
11      Q.  Any difference you'd like to identify,
12 sir.
13      MR. HUTCHINSON:  Are you talking about
14 the material?
15      MR. LUNDQUIST:  Any difference.
16 BY MR. LUNDQUIST:
17      Q.  We've talked about the Ethisorb.
18      A.  There are other differences.
19      Q.  I'll give you the Ethisorb.
20      MR. HUTCHINSON:  You're talking about
21 other than the ones he's already described;
22 correct?
23      MR. LUNDQUIST:  Yes.
24      A.  You have different lengths, different
25 dimensions, different accessory devices.  I'm not

Page 63

1 a doctor, but there was a different surgical
2 technique.
3 BY MR. LUNDQUIST:
4      Q.  I appreciate you're not a medical
5 doctor.  In your role at the FDA, you wouldn't
6 make a determination whether a 510(k) product
7 raised new issues of safety or effectiveness from
8 a medical standpoint, true?
9      A.  Not as a doctor, no.  But certainly we
10 get input from the many physicians, like
11 Dr. Herrera and Dr. Lerner, for opinion on that if
12 they were on my staff.  I always got medical
13 opinion on 510(k) when there was a clinical issue.
14      MR. HUTCHINSON:  We've been going about
15 an hour.
16      MR. LUNDQUIST:  Nonresponsive after
17 "no."
18      MR. HUTCHINSON:  Are you at a good spot?
19      MR. LUNDQUIST:  Now is just as fine as
20 any.
21      (Recess from 10:43 a.m. to 10:57 a.m.)
22 BY MR. LUNDQUIST:
23      Q.  We were just talking about the clearance
24 process related to issues of safety and
25 effectiveness from a medical standpoint, sir.  And

Page 64

1 I want to make something else clear.  Providing
2 any sort of medical assessment of the literature,
3 the medical literature would be beyond your
4 expertise, true?
5      A.  I think to give it a full treatment,
6 yes.  Now, when I say full treatment, certainly I
7 can look at -- correlate certain literature
8 aspects to labeling or to considerations by the
9 medical directors, what did they evaluate, was
10 this an appropriate clinical expert report, did
11 they look at current literature, did they look at
12 all available literature, things of that sort, was
13 there literature pro and con.
14      Q.  Fair point, sir.  That gets into your
15 previous testimony that you can say there are some
16 articles that would have supported clearance, but
17 in terms of getting into the medical assessment of
18 the literature, that's not your area of expertise,
19 true?
20      A.  I'm not a doctor.  In addition, of
21 course, any impact on the risk management
22 assessment, I'd be very interested in that, which
23 I did see.
24      Q.  You're not planning on interpreting any
25 clinical data on the TVT-Secur to opine from a

Page 65

1 medical standpoint if the data was adequate for a
2 completely new type of TVT device in this case?
3      MR. HUTCHINSON:  Object to form.
4      A.  Well, your setup there was from a
5 medical point of view.
6 BY MR. LUNDQUIST:
7      Q.  Yes, sir.
8      A.  I'm not a doctor, so I wouldn't be
9 evaluating it from a medical doctor point of view.
10 I would evaluate it, for example, on those areas
11 where I have expertise.  Is this a randomized
12 controlled trial?  Is this the sort of setup for
13 an appropriate study?
14      You know I was the director of the
15 investigational device staff for a time and a
16 staff member where I did evaluate clinical studies
17 for a number of years.  And even in device
18 evaluation, that was one of my obligations as a
19 premarket evaluator.
20      Q.  So the interpretation of clinical data
21 is something you would have relied on other
22 doctors within the FDA to do, true?
23      A.  I always relied on physicians when it
24 came to clinical information.  But as I said, I
25 certainly had the expertise to evaluate the

Timothy A. Ulatowski, M.S.

Page 66

1  construction of clinical studies, the sort of
2  analyses that might be derived from the studies
3  based on my own expertise.
4      Q.   Are you talking about just the input
5  into what studies could be performed?
6      A.   Well, was the construction of the study
7  appropriate to support the type of conclusions
8  that were being sought, what was the primary
9  endpoint, what were the secondary endpoints, was
10  the study appropriately powered to evaluate those
11  endpoints. Are the conclusions supported by the
12  data to the extent that I could determine when I
13  felt it went beyond my expertise, I would seek
14  medical.
15      Q.   What study are you aware of conducted by
16  Ethicon with safety as an endpoint on the
17  TVT-Secur prior to launching the product?
18          MR. HUTCHINSON:  Object to form.
19      A.   Prior to launch?
20  BY MR. LUNDQUIST:
21      Q.   Yes, sir.
22      A.   It was cleaned in '05 but it didn't get
23  launched until the end of '06. In that intervening
24  period, there was some clinical experience at that
25  point in time by the time it did get launched.

Page 67

1      Q.   What are you talking about?
2      A.   What am I talking about?
3      Q.   Yes, sir.  You're saying there was some
4  clinical experience with safety as an endpoint.
5  I'd just like to know what you're referring to.
6      A.   It was reported later and summarized in
7  the clinical expert reports. I think at the point
8  in time of launch, I think that data was ongoing.
9      Q.   My question was: Are you aware of a
10  study that was conducted by Ethicon with safety as
11  an endpoint on the TVT-Secur prior to launch of
12  TVT-Secur?
13          MR. HUTCHINSON:  Same objection.
14      A.   I think I just answered that. Studies
15  were ongoing, but they weren't published, I think,
16  until later.
17  BY MR. LUNDQUIST:
18      Q.   What are you talking about?
19      A.   What am I talking about?
20      Q.   Basis for your opinion.
21      A.   I'd have to look at the clinical expert
22  reports. I know that Weisberg's initial
23  evaluation referenced the past history of TVT
24  devices. I don't think he referenced any specific
25  studies of TVT-Secur at that point in time, but

Page 68

1  then subsequent clinical expert reports did
2  describe randomized controlled studies where those
3  studies would have necessarily had to have been
4  considered, organized and initiated during that
5  period of time between clearance and launch.
6  That's all I'm saying.
7      Q.   I'm still trying to understand what
8  studies you are talking about prelaunch of the
9  TVT-Secur that had safety as an endpoint. I'm not
10  interested in TVT products. I'm talking
11  specifically on the TVT-Secur.
12          MR. HUTCHINSON:  Same objections. Asked
13  and answered also.
14      A.   I'd have to look back at the clinical
15  expert reports to look at those specific studies
16  or publication dates and then work back from there
17  because these studies don't get done overnight.
18  The protocols don't cleared by the institutions,
19  and the patients aren't enrolled given the amount
20  of follow-up that's published in reports.
21      All I'm saying is that those studies were at
22  least initiated during that point in time.
23  BY MR. LUNDQUIST:
24      Q.   What were the results -- so the results
25  of that -- so your testimony, let me understand,

Page 69

1  is that a study with the endpoint -- with safety
2  as an endpoint had, in fact, been initiated by
3  Ethicon prior to launch of the product?
4      A.   I believe so.
5      Q.   Again, you're talking about the
6  five-week study?
7      A.   Well, I'd have to look at the data
8  again. There's a number of randomized controlled
9  studies. Some of them are stretching into 2010
10  and '11. But safety certainly was an aspect of
11  evaluation in those studies. It may not be the
12  primary endpoint. Certainly it can be a secondary
13  endpoint.
14      Q.   You keep talking about randomized
15  controlled trials. I understand there were RCTs
16  eventually conducted on this device. I'm talking
17  prior to launch. Are you aware of any sitting
18  here today?
19          MR. HUTCHINSON:  Objection.
20      A.   I think I've answered that question.
21  BY MR. LUNDQUIST:
22      Q.   Well, your answer was I'd have to look
23  at the data again. I'm just trying to understand
24  if you can cite to a single one of them prelaunch
25  that was conducted on the TVT-Secur.

18 (Pages 66 to 69)

Timothy A. Ulatowski, M.S.

Page 70

1    MR. HUTCHINSON:  He's already answered
2  that question.  I'll object to the extent it's
3  been asked and answered.  He said he'd have to
4  refer to the clinical expert report.
5  BY MR. LUNDQUIST:
6    Q.  In a randomized controlled trial, pretty
7  fundamental that some of the opinions you're
8  talking about here are premarket?
9    MR. HUTCHINSON:  Object to form.
10   A.  No, not necessarily.  I think that -- to
11 their credit, researchers and Ethicon were
12 evaluating the product all through those years,
13 evaluating the clinical data.  FDA evaluated the
14 data in hand at that point in time when they
15 submitted the TVT-Secur.
16   Now, the TVT-Secur is not entirely a new
17 device.  This is -- TVT-Secur is predicated upon
18 the long history of Prolene, the long history from
19 '98 at least of TVT classic.  So this is not
20 something new fresh out of the gate as a new
21 therapy for women.
22   Q.  What evidence in hand did the FDA have
23 when they cleared the TVT-Secur specifically
24 related to any type of randomized controlled
25 trial?

Page 71

1    A.  I don't think there was any randomized
2  controlled study referenced in the 510(k).
3    Q.  Are you aware of any?
4    A.  At that point in time, no.  But again,
5  that wasn't your question a couple minutes ago.
6    Q.  I assure you it was.  I was asking any
7  randomized controlled trial that had been
8  conducted prelaunch of the product.
9    MR. HUTCHINSON:  Object to form.  Asked
10 and answered.
11   A.  I did answer that, yes.
12 BY MR. LUNDQUIST:
13   Q.  So you believe you have expertise in --
14 is it the creation of randomized controlled
15 trials?  What is it you believe you have expertise
16 in, sir, related to the RCTs?
17   MR. HUTCHINSON:  Object to form.
18   A.  In regard to clinical studies, I was the
19 director of the Investigational Device Office for
20 medical devices at FDA.  What's the responsibility
21 of that office?  To evaluate submissions for
22 clinical studies for new medical devices.  What
23 did that evaluation entail?  My evaluation of the
24 protocols, the design of studies, the types of
25 data that would be collected, the statistics of

Page 72

1  the studies, the primary endpoint, secondary
2  endpoints, any other evaluation aspects, the forms
3  that would be utilized to collect safety and
4  effectiveness data, quality of life data, whatever
5  the parameters that were assessed.  That was my
6  job.
7  BY MR. LUNDQUIST:
8    Q.  So you would put these parameters in
9  place, but you were never interpreting any
10 clinical or medical data associated with these
11 submissions, you personally?
12   A.  Yes, I did actually, yes.  In my 25
13 years in device evaluation as the branch chief for
14 general hospital devices and then the director of
15 the division in device evaluation, it's my
16 responsibility to evaluate premarket approval
17 applications on any 510(k)s that included clinical
18 data.  To the extent I could review that clinical
19 data without clinical input, I would do so.  And
20 that's based upon my expertise and knowledge of
21 clinical studies.
22   Q.  So you're telling me today you believe
23 you have expertise in evaluating clinical data?
24   A.  To a certain extent, yes.  You say
25 clinical data.  I'm talking about as a person who

Page 73

1  evaluates the structure and content of protocols
2  to begin to evaluate whether that data, that study
3  may have the opportunity to produce the data that
4  may be expected by the applicant.
5    From time to time I would need clinical input
6  to evaluate the parameters, to evaluate the
7  endpoints.  From time to time I would need an
8  additional statistician to look at the statistical
9  techniques.  So it depended to what extent I would
10 evaluate that data.
11   Q.  I'm talking about interpreting clinical
12 data from a medical standpoint to determine
13 whether or not that data is adequate for a new
14 device.  You're now saying you believe you have
15 the expertise to do that.
16   MR. HUTCHINSON:  Objection.  Been asked
17 and answered.
18   A.  I evaluated premarket approval
19 applications that always contained clinical data.
20 I evaluated 510(k)s that include clinical data to
21 the extent I could evaluate data based upon my
22 experience and training, in evaluating protocols,
23 in evaluating the reporting aspects of studies.
24   Where my expertise was limited was in regard
25 to certain clinical aspects that required further

Timothy A. Ulatowski, M.S.

Page 74

1  clinical expertise. What was the clinical
2  significance of certain data, did the conclusions
3  support -- did the data support the conclusions
4  from a clinical standpoint, were the clinical
5  findings significant from a clinician's point of
6  view. So it depended on what I would evaluate.
7      For example, looking at adverse event
8  reporting from clinical studies, what adverse
9  events were reported, were those adverse events
10  reported consistently and accurately in the
11  conclusions of the report. That doesn't take a
12  clinician in all cases to evaluate.
13  BY MR. LUNDQUIST:
14      Q.  So if you previously testified that the
15  interpretation of clinical data necessarily
16  required a medical evaluation, you're now
17  saying -- I want to make sure I understand what
18  you're saying, sir. I appreciate the process.
19  You've talked about the basis for the fundamental
20  process where you sign off on the device being
21  cleared. I get that. I want to make sure I
22  understand you because I think you're mixing words
23  a little bit, with all due respect.
24      I want to talk about the medical aspect
25  itself, the interpretation of clinical data

Page 75

1  itself. That is not something you would have done
2  while at the FDA, true?
3          MR. HUTCHINSON:  Object to form.
4      A.  I wouldn't evaluate what's required for
5  a clinician to evaluate.
6  BY MR. LUNDQUIST:
7      Q.  So a medical assessment of the
8  literature on a particular device post-market,
9  that would be something you would have relied on
10  the doctors within the FDA to perform, true?
11      A.  To a certain extent, inasmuch as a
12  doctor's expertise comes into play as Dr. Herrera
13  did, for example, where he understood what he
14  believed to be insertion techniques, for example,
15  of TVT devices, his knowledge of risks and
16  benefits and through his clinical experience he
17  identified a slightly different insertion,
18  technique of implantation.
19      Not being a doctor, I would not have
20  necessarily had the expertise to appreciate that,
21  as an example.
22      Q.  Have you ever come across a product that
23  was cleared by 510(k) that was ultimately
24  determined not to be safe?
25      A.  Sure.

Page 76

1      Q.  Give me an example.
2      A.  Well, I dealt a lot, for example with --
3  well, I could pick any number. Let me just give
4  you one. Infusion devices, needles. I was
5  involved as the lead in requiring the needle stick
6  injury prevention components to syringes. There
7  were a lot of needle stick injuries. We were in
8  the midst of -- the beginning of the AIDS crisis,
9  hepatitis. Nurses were being stuck. Doctors were
10  being stuck.
11      So at the point in time, I insisted that
12  these devices -- and OSHA as well, I worked with
13  OSHA on this -- that for worker safety purposes,
14  these devices have anti-stick components to them.
15  Well, we received about -- I'll just pick a number
16  out just to give you perspective -- maybe 300, 400
17  different devices of which for safety purposes FDA
18  rejected 300 of them.
19      I mean, there's more.
20      Q.  You mentioned earlier the method of
21  insertion. Is it your opinion that the method of
22  insertion would have changed the safety profile of
23  the TVT-Secur?
24      A.  Well, it wouldn't -- it wasn't a new
25  type of question because insertion techniques,

Page 77

1  aspects of application of these TVT devices is a
2  question that's asked for every TVT device. It's
3  not a new type of question. It's not a new risk
4  aspect.
5      Q.  You're talking about intended use?
6      A.  No. Intended use is the first thing you
7  address. The second question you come to in a
8  510(k) evaluation is comparing devices. Is there
9  anything in that comparison that raises a new type
10  of question.
11      Q.  And your opinion in this case is going
12  to be there was not?
13      A.  There was not, no.
14      Q.  And that's based on what?
15      A.  Based on how I would evaluate the
16  510(k), and I think Dr. Herrera went down that
17  path of thinking as I've just done. Not to say he
18  wouldn't ask questions about that, not to say I
19  wouldn't ask questions about it, but it's not a
20  new type of question. Where it comes down to is
21  if you have the data, does the performance look
22  the same as the other products. So it comes down
23  to performance comparison, not a new type of
24  question issue.
25      Q.  What data did they have to compare

Timothy A. Ulatowski, M.S.

Page 78

1  performance?
2      A.  Well, they had the sheep data.  They had
3  the other predicate which had been on the market
4  with the same sort of insertion technique as far
5  as my understanding and review of the document was
6  concerned.  And so there was not a new type of
7  question.
8      Q.  Same hypothetical.  What if different
9  materials had been used, would that change the
10  safety profile of the TVT-Secur?
11      A.  Well, it can be a safety issue.  Would
12  it have raised a new type of question?  Not
13  necessarily.
14      Q.  Not necessarily.  When would it?
15      A.  When would a material?
16      Q.  When would a change in material modify
17  the safety profile as you view it --
18      A.  To become a new type of question?
19      Q.  Yes, sir.
20      A.  Let me just preface by saying the avenue
21  for questioning that leads one down a new type of
22  question avenue, very, very rare you're
23  encountering that in a 510(k), very rare. Less
24  than one percent of all 510(k)s, less than
25  .05 percent.  Material is looked at in comparison

Page 79

1  to other materials, previous materials, predicate
2  materials in terms of engineering tests, in terms
3  of biocompatibility.
4      It would have to be an entirely new material
5  not seen before where FDA didn't have some
6  experience, where there wasn't a general
7  experience.  Of course, we're talking about
8  Prolene here which had been NDA approved, found
9  safe and effective by FDA, had been in TVT-Secur,
10  TVT classic, TVT-O. So you've got that almost now
11  becoming ancient history on Prolene.
12      Q.  What about Ethisorb?  That was new,
13  wasn't it?
14      A.  Well, Ethisorb had characteristics of a
15  different type of material.  Ethisorb itself,
16  Vicryl PDS, that had been used also in other
17  products.  So it wasn't entirely a new product.
18      Q.  What's your understanding of the
19  intended use of the Ethisorb as it had been
20  previously cleared?
21      A.  It had characteristics where it
22  wasn't -- it didn't have the same chronic
23  retention characteristics, chronic -- I call it
24  retention -- characteristics as Prolene.  It
25  started to dissolve.  There's a little bit of

Page 80

1  absorption of the product.
2      Q.  Do you know what the intended use of the
3  Ethisorb was as cleared by the FDA?
4      A.  FDA doesn't clear Ethisorb, per se.
5      Q.  So Ethisorb wasn't cleared is your
6  understanding?
7      A.  No.  FDA doesn't clear materials.  FDA
8  clears products made of materials.
9      Q.  What had the Ethisorb been used for?
10      A.  I'd have to review the files.  I know
11  I've run across it before, even before.
12      Q.  Well, the Google gods told me that
13  Ethisorb was used for brains, brain patching.  I'm
14  curious what your understanding is of what
15  Ethisorb is supposed to be used for or if you have
16  an opinion.
17      MR. HUTCHINSON:  Object to form.
18      A.  What it can be used for is what is found
19  to be safe and appropriate for the particular
20  clinical application.
21  BY MR. LUNDQUIST:
22      Q.  Do you have any idea what it had been
23  used for in the past, prior to this fastener
24  mechanism on the TVT-Secur, any idea?
25      A.  I've seen the term before.  It wasn't a

Page 81

1  new term for me.  But I'd have to look back at my
2  history and recollection of the material.
3      Q.  Can you name any instance where Ethisorb
4  had been used in a urogynecological setting?
5      MR. HUTCHINSON:  Objection.  Been asked
6  and answered, counsel.
7      A.  Again, I'd have to review.
8  BY MR. LUNDQUIST:
9      Q.  What would you need to review?
10      A.  Well, I'd have to -- I've got files.
11  I've got access to FDA records.  I'd have to --
12      Q.  What were you given on Ethisorb from
13  counsel for Ethicon?
14      A.  I don't recall.
15      Q.  Did you do any independent research on
16  Ethisorb?
17      A.  I've seen the material before.  That's
18  all I can say as I recall.
19      Q.  Your opinion is that despite not knowing
20  anything about Ethisorb in the past, you're saying
21  the use of that would not have changed the safety
22  profile of the TVT-Secur?
23      MR. HUTCHINSON:  Object to form.
24      A.  That material would have had to have
25  been identified and would have had to have been

Timothy A. Ulatowski, M.S.

Page 82

1  characterized by Ethicon to FDA and statements
2  made regarding that particular material, either in
3  prior products or the profile of that material.
4      So you don't just make statements about
5  materials without providing some basis for that
6  material in terms of safety and performance in one
7  way or another.
8  BY MR. LUNDQUIST:
9      Q.  So as a regulatory expert for Ethicon in
10 this litigation, what basis did Ethicon provide to
11 the FDA to substantiate the safety profile of
12 Ethisorb?
13     A.  I'd have to look at the file.  I know
14 this isn't a memory test.  So I'd have to look at
15 that material.
16     Q.  It's not a memory test, but, again,
17 understanding that today was the only instance I'm
18 going to have to talk to you about the basis for
19 your opinion.  You do appreciate that?
20     A.  Sure.
21     Q.  We've been talking a while about your
22 opinions on the traditional 510(k), that it met
23 all regulations; No. 2, the validation and
24 verification data was sufficient.
25     Any other opinions in this case, sir?

Page 83

1      MR. HUTCHINSON:  Object to form.
2      A.  Well, just to note again, these things
3  are off the top of my head and may not express all
4  my opinions, especially after I review
5  Dr. Parisian's transcript in detail.  I may have
6  more opinions about what she has stated.
7      I think it's important to explain to the jury
8  the history of Prolene, the acceptance of Prolene
9  as a material being evaluated by FDA initially as
10 an NDA.  And that's no simple task to get an NDA
11 approved.  It certainly has to include all the
12 information required.  Even at that point in time,
13 I evaluated NDAs in the drug evaluation group.
14 And that carried over into being transitioned
15 ultimately to a premarket approval application and
16 then being reclassified, of course.
17     But the point is this long history of
18 evaluation, the long history of FDA contributing
19 its comments to that evaluation, but also to what
20 labeling requirements FDA found necessary for
21 Prolene and those aspects being carried through
22 even into the TVT products.
23     And, of course, there's the mesh that came
24 along in '76, there again, being classified as
25 Class II, that it didn't get a free ride into the

Page 84

1  marketplace in that, ultimately, that group of
2  products had to be evaluated by an expert panel of
3  doctors and classified, which it was.
4      And the doctors I know because I ran
5  classification panels.  They receive a wealth of
6  information on the safety and effectiveness of
7  products in order to base their recommendations
8  for classification.  And they had that information
9  and rendered their recommendation it should be
10 Class II and not Class III.
11     So we have this history.  We have this now
12 product line of TVT devices being constructed of
13 that material, and I think that's a very important
14 prologue to the TVT devices.  That even continues
15 now.  The sutures are still out there, still safe
16 and effective.  TVT, TVT-O still out there, still
17 being used, being called the gold standard by
18 professional organizations.  So I think there's a
19 good track record.
20 BY MR. LUNDQUIST:
21     Q.  I'm sorry.  You said the TVT-O has been
22 called the gold standard.  I've got polypropylene
23 has been used for years.  And to some extent,
24 Mr. Hutchinson did a fine job with Dr. Parisian of
25 walking her through basically the history of

Page 85

1  polypropylene from clearance to present day.  I
2  assume you read that portion of her transcript.
3      MR. HUTCHINSON:  Object to form.
4      A.  I'd have to read it again; not in
5  detail.
6  BY MR. LUNDQUIST:
7      Q.  Polypropylene has been used for years.
8  You said it was a Class II device.  Are you saying
9  it was appropriately characterized as a Class II
10 device and that it met regulatory clearance?
11     MR. HUTCHINSON:  Object to form.
12 Mischaracterizes testimony.
13     A.  No.  Prolene initially was NDA approved
14 as safe and effective.  Then it transitioned over
15 to devices, became a premarket approval
16 application, and then was reclassified, reclassed.
17 BY MR. LUNDQUIST:
18     Q.  I think you threw in there that TVT is
19 the gold standard.  You're not intending on
20 offering any testimony about the TVT being a gold
21 standard in this case, are you?
22     MR. HUTCHINSON:  Object to form.
23     A.  You mean TVT-Secur?
24 BY MR. LUNDQUIST:
25     Q.  Are you going to testify that TVT-Secur

Timothy A. Ulatowski, M.S.

Page 86

1  is the gold standard?
2      A.  I'm just reflecting upon professional
3  organization comment.  One thing I do remember
4  about Dr. Parisian, she doesn't pull in FDA's
5  evaluation of SUI devices.  She doesn't reference
6  professional organization evaluations of TVT
7  devices, which I think is very important.
8      This is the clinical community and the
9  regulatory community supported by an expert panel
10  of physicians commenting upon TVT devices.
11      Q.  Is it your opinion in this case that
12  TVT-Secur is the gold standard?
13      A.  I don't think TVT-Secur was
14  characterized as the gold standard.  But,
15  nevertheless, after all that review and
16  evaluation, FDA took no action to remove
17  TVT-Secur, took no action to seize or enjoin the
18  manufacturer of TVT-Secur, took no action to
19  change the labeling for TVT-Secur.
20          MR. HUTCHINSON:  Objection.
21  Nonresponsive after "gold standard."
22  BY MR. LUNDQUIST:
23      Q.  I'll strike off TVT-Secur as the gold
24  standard as an opinion.
25      Any other opinions?

Page 87

1          MR. HUTCHINSON:  Object to form.
2      A.  Well, there's post-market activity.  I
3  haven't studied Dr. Parisian's transcript in
4  detail.  I'm not sure what she says in there all
5  about --
6      Q.  Let me -- I'm sorry.  We previously
7  talked about Dr. Parisian.  I'm talking about your
8  opinions now, sir.  Do you have any other opinions
9  in this case?
10          MR. HUTCHINSON:  Same objection.
11      A.  All I'm saying is I may object to what
12  Dr. Parisian says about post-market activity.
13  BY MR. LUNDQUIST:
14      Q.  What might you say?
15      A.  Well, I'd have to study her transcript,
16  but I think it was appropriate that TVT-Secur was
17  not recalled.  TVT-Secur was not removed on the
18  basis of a safety issue, TVT-Secur.  There was a
19  marketing decision made, and the product was
20  withdrawn from the market.
21      Q.  So your opinion is that -- let me
22  understand because it sounds like you're kind of
23  going back to Dr. Parisian -- that the TVT-Secur
24  was not removed from the market?
25          MR. HUTCHINSON:  Object to form.

Page 88

1  BY MR. LUNDQUIST:
2      Q.  That is a poor question I'll admit.
3      Your testimony is that the TVT-Secur was not
4  recalled?
5      A.  It was not recalled.
6      Q.  That it was not removed on the basis of
7  a safety issue?
8          MR. HUTCHINSON:  Object to form.
9      A.  That's correct.
10  BY MR. LUNDQUIST:
11      Q.  And that the decision to remove the
12  TVT-Secur was a marketing decision?
13          MR. HUTCHINSON:  Object to form.
14      A.  It was a voluntary decision on the part
15  of Ethicon based upon the factors they described
16  to their clients -- to their customers.
17  BY MR. LUNDQUIST:
18      Q.  Did you look at any of the
19  decommercialization emails or memos to Ethicon
20  employees?
21      A.  I have a number of emails.  I'd have to
22  see what you're talking about specifically.  I
23  probably have, yes.
24      Q.  Next opinion?
25      A.  I probably covered a lot of ground

Page 89

1  there.  I may have additional opinions.
2      Q.  I want all of them.
3      A.  I know that the patient labeling doesn't
4  come into play here because the plaintiff did not
5  see patient labeling.  So any comments
6  Dr. Parisian has on that I wouldn't spend my time
7  on because it's not an element in this litigation,
8  as far as I recall.
9      Q.  Let me understand that.  When you talk
10  about patient labeling, are you talking about
11  brochures?
12      A.  Brochures.
13      Q.  And your belief is that Ms. Garcia did
14  not look at any brochures in this case?
15      A.  I read her deposition.  I don't see
16  where she -- I think she made an affirmative
17  statement she didn't read any.
18      Q.  What about Dr. Walss?
19      A.  I think he made a statement as well.
20      Q.  Your belief is that Dr. Walss never
21  reviewed any brochures?
22      A.  No, no; provided the plaintiff.  I think
23  he might have provided her something on
24  hysterectomy maybe.  I'm not sure.
25      Q.  Tell me what your opinions are on the

23 (Pages 86 to 89)

Timothy A. Ulatowski, M.S.

Page 90

1  adequacy on the patient brochures.
2      A.  Well, I just said it's not an element
3  here, so I didn't spend a lot of thought and time
4  on that for this litigation.
5      Q.  You're not prepared to render any
6  opinions on the adequacy or inadequacy, for that
7  matter, of the brochures?
8      A.  Well, if it comes to light that
9  plaintiff did read a brochure, I think it's going
10  to be relevant, but as far as I understand, and I
11  may be incorrect, plaintiff didn't.
12      Q.  With respect, sir, why don't we let the
13  judge decide what's relevant and what's not. What
14  I am concerned with is do you have any opinions on
15  the patient brochures at all?
16          MR. HUTCHINSON:  Object to form.
17      A.  I probably would if I re-review the
18  material because I've had in the past.  But again,
19  I'll have to look at what Dr. Parisian also says
20  to see if I agree or disagree with her on her
21  opinions.
22  BY MR. LUNDQUIST:
23      Q.  I'm interested in what your opinions
24  are.  I'm guessing you're going to disagree with
25  the majority of Dr. Parisian's opinions.  I'm

Page 91

1  trying to understand what Mr. Ulatowski's opinions
2  are on the adequacy or inadequacy of patient
3  labeling.
4      A.  I'd have to look again at the brochures
5  again to see what my opinions would be.
6      Q.  Sitting here today, you can't tell me
7  one way or the other any types of concerns or
8  opinions you have on the adequacy of the labeling?
9          MR. HUTCHINSON:  Object to form.
10  BY MR. LUNDQUIST:
11      Q.  I'm sorry.  The adequacy of the
12  marketing brochures.
13          MR. HUTCHINSON:  Object to form.
14      A.  Well, I can tell you one thing, which is
15  it's my belief that the informed consent process
16  is, in fact, a process that people on the
17  plaintiff's side seem to neglect.  Being a
18  process, that means the patient and doctor
19  relationship and communication is of utmost
20  importance, that exchange of information between
21  doctor and patient, explanations, Q and As back
22  and forth.  And the brochure, it's not the sum
23  total of information a patient should have or does
24  have ever regarding a device.
25          What's the basis for my expertise?  Well,

Page 92

1  again, I was the director of the investigational
2  device staff.  I implemented the informed consent
3  regulations regarding clinical studies with
4  medical devices and Institutional Review Board
5  approvals of clinical studies.  I gave speeches
6  and talks around the country on the informed
7  consent process and informed consent.  So fully
8  understood and generally in agreement by everyone
9  and even FDA.
10          In prior reports I have quotes from the
11  government that says this is a process.  And
12  information is just one piece of that that's
13  provided to the patient.  So never look at the
14  brochure as a standalone document, as the sum
15  total of information on benefits and risks that a
16  patient is provided.
17  BY MR. LUNDQUIST:
18      Q.  Aside from your background and your
19  history with these patient brochures, I'm trying
20  to understand if you have any opinion one way or
21  the other as to whether or not the patient
22  brochures of the TVT-Secur were adequate.
23          MR. HUTCHINSON:  Objection.
24  BY MR. LUNDQUIST:
25      Q.  Either you do or you don't.

Page 93

1          MR. HUTCHINSON:  Objection.  Asked and
2  answered.
3      A.  I'd have to look again at the TVT-S
4  brochures specifically to see what they say.
5  BY MR. LUNDQUIST:
6      Q.  So at trial you may be talking about
7  whether or not the brochure is adequate.  Sitting
8  here today you can't tell me; is that true?
9          MR. HUTCHINSON:  Same objection.
10      A.  I have to base my opinion on the
11  evidence and what I've reviewed.
12  BY MR. LUNDQUIST:
13      Q.  That's all I'm asking you.  What's your
14  opinion?  Do you have one?
15      A.  I'm saying I have to review that
16  material.  I have to review Dr. Parisian's
17  comments on any of that.
18      Q.  Taking Dr. Parisian out of it, sitting
19  here today, you have to review it before you weigh
20  in one way or the other?
21          MR. HUTCHINSON:  That's what the
22  testimony has been.  Object.  Been asked and
23  answered.
24  BY MR. LUNDQUIST:
25      Q.  I'm not sure that was actually an

Golkow Technologies, Inc. - 1.877.370.DEPS

Timothy A. Ulatowski, M.S.

Page 94

1  opinion.  Let me just ask you:  Do you have any
2  other opinions?
3          MR. HUTCHINSON:  Other than the ones he
4  already discussed?
5          MR. LUNDQUIST:  Of course.
6      A.   I may have other opinions once I look
7  further at Dr. Parisian's report and as I consider
8  the evidence.
9  BY MR. LUNDQUIST:
10     Q.   Your opinions.
11     A.   My opinions, yes, yes, and opinions
12  regarding her report.
13     Q.   I appreciate that you're probably going,
14  again, to disagree with some of the things you
15  said.  I'm not asking you for everything you may
16  disagree with her on.  What I am asking you and
17  what my expectation is under the Texas rules, sir,
18  is that you give me all your opinions sitting here
19  today.
20         Have we talked about all of your opinions in
21  this case?
22     A.   Not all of my opinions.  I would make
23  certain that -- be sure that there's probably an
24  aspect lurking out there that I've considered in
25  prior reports or as I, again, look at the evidence

Page 95

1  that I may want to get more granular on an opinion
2  or separate out as a separate opinion or identify
3  a different train of thought on an opinion.
4      Q.   When do you think you're going to be
5  able to flush these out, sir?
6      A.   By trial time I'm sure.
7      Q.   Sitting here today though, you've given
8  me all the opinions that you intend to offer, at
9  least, that you can recall in this case?
10         MR. HUTCHINSON:  Object to form and
11  asked and answered.
12         Counsel, you're talking about outside of the
13  ones he disagrees with Parisian; correct?
14         MR. LUNDQUIST:  I'm talking about his
15  opinions.
16     A.   Well, my opinions are -- we have a
17  different thought process here, but what I think
18  about Dr. Parisian are also my opinions.  But,
19  yeah, I may have additional opinions once I
20  further evaluate.  I haven't seen the entire VHF,
21  for example.  If I receive that and evaluate that,
22  I may have additional opinions.
23  BY MR. LUNDQUIST:
24     Q.   Let me tell you a little piece of
25  information you may not be aware of.  Our

Page 96

1  discovery deadline ended yesterday in our case.
2  So they can give you whatever else they want to,
3  but that's not necessarily going to bother me at
4  all.
5         What I'm interested in sitting here today
6  after the close of discovery is:  Do you have any
7  other opinions, not related to Dr. Parisian, but
8  does Mr. Ulatowski have any other opinions that
9  have not been expressed either today or in any of
10  your previous depositions relative to the
11  regulatory process?
12         MR. HUTCHINSON:  Same objection.
13     A.   I would think there are, but that's
14  going to depend upon my evaluation of the
15  previously provided material and then any comment
16  I may have on Dr. Parisian in addition to those.
17  BY MR. LUNDQUIST:
18     Q.   I've not seen you discuss in your
19  previous depositions the 522 orders.  And to be
20  fair, since that is in your designation or that is
21  in the defendants' designation of expert, I do
22  want to talk to you briefly about that.
23         Do you have any opinions relative to the 522
24  order Ethicon received on the TVT-Secur?
25     A.   Well, first of all, you have to

Page 97

1  understand the 522 orders are orders for the
2  generic type of device.  It's not directed
3  specifically to TVT-Secur, Ethicon, for example.
4  It's for that group of devices.
5         So anything FDA believes to be of concern
6  regarding that group of devices, whether or not
7  Ethicon has more information to offer or not,
8  really makes no difference when generating the 522
9  order.  It makes no difference to FDA at the
10  initial stage.  Do you understand what I'm saying?
11     Q.   I do.  I'm just trying to understand
12  what your opinions are.
13     A.   It's a group order.  I'll call it class
14  action.  And did Ethicon respond thoroughly to the
15  call, 522 call?  Yes.  They provided a response to
16  FDA within the time required by the order,
17  information to address the questions in the order.
18  There was back and forth between Ethicon and FDA.
19         Ultimately, it was Ethicon's decision not to
20  pursue the 522 study.  I think they had valid
21  reasons.  I've seen those reasons before in 522
22  studies.
23         I've been the initiator of 522 orders that
24  have issued for devices.  Like TMJ implants was a
25  522 order device, which I regulated.  So Ethicon

Timothy A. Ulatowski, M.S.

Page 98

1  responded adequately, decided not to pursue the
2  study for good reasons, and ultimately made the
3  voluntary decision to withdraw the product.  522
4  order essentially canceled.
5       Q.  What were their reasons?
6       A.  If you look at the notice to their
7  customers, they had -- with any manufacturer, of
8  course, they're going to have -- be interested in
9  the viability of the product as a marketable
10  product, are you selling enough product, where is
11  the market going in sales.  I think, from what I
12  can gather from emails and from that notice, that
13  the market wasn't favorable.
14       Now, I'm not a person that deals with the
15  money side, but I can understand that as being a
16  valid reason, where there's a sufficient return on
17  investment.
18       Now, the 522 studies, I think, are quite --
19  the order was quite complex.  The follow-up and
20  the expected data collection, quite complex.  That
21  had to play into the ROI as well.
22       MR. HUTCHINSON:  I didn't understand
23  that.
24       THE WITNESS:  ROI, return on investment.
25       A.  And thirdly, they spoke to the litigious

Page 99

1  atmosphere with their products.  And, yeah, that's
2  got to play into considerations as well.  So I
3  thought those were all valid reasons as well.  If
4  FDA thought given those reasons, which they were,
5  that besides that, the order should persist, the
6  company should be driven to do the study, then FDA
7  would have followed through with that.  FDA did
8  not do that.
9  BY MR. LUNDQUIST:
10       Q.  What about the 522 orders Ethicon
11  received on other products, do you have any
12  understanding as to whether or not they elected to
13  conduct 522 studies on other devices?
14       A.  I don't think they did decide to
15  continue.  They voluntarily decided not to pursue
16  those.
17       Q.  Every device they received a 522 on,
18  they voluntarily decided not to continue selling
19  those?
20       A.  Not unusual.  Again, I'm not the money
21  guy, but I know how the market waxes and wanes.
22  In the medical device area, there's a very short
23  life cycle on most devices, meaning when a product
24  is developed and when it's marketed, how long it's
25  marketable.  I know TVT classic and O have enjoyed

Page 100

1  a somewhat unusual market life actually.  But most
2  devices, the best you get out of them is two or
3  three years or four years at most.
4       Q.  I guess inherent in your previous
5  answer, you're obviously aware that Ethicon chose
6  not to perform any studies on the TVT-Secur in
7  response to the 522 order?
8       A.  I think I said that they didn't pursue
9  those studies, yes, ultimately.
10       Q.  Who's ultimately responsible for
11  assuring a product is safe?
12       MR. HUTCHINSON:  Object to form.
13       A.  What's your definition of safe?
14  BY MR. LUNDQUIST:
15       Q.  What's your definition of safe?
16       A.  My definition is FDA's definition.
17       Q.  So you're telling me that the FDA is
18  ultimately responsible for ensuring a product is
19  safe?
20       A.  No, no, that's not what I said.  I was
21  questioning what do you mean by safe.  I told you
22  I'm using the FDA's definition of what is safe.
23  Now, given that, who's ultimately responsible?
24  The manufacturer is responsible for demonstrating
25  through data and information that their product is

Page 101

1  safe when it's marketed and that it continues to
2  be safe and effective while it's marketed.
3       Q.  That's not a shared responsibility with
4  anybody including the FDA, true?
5       MR. HUTCHINSON:  Object to form.
6       A.  FDA has a role.  FDA is the overseer.
7  FDA is the evaluator of the data to provide that
8  marketing entree of the product.  FDA oversees the
9  life cycle of the device through inspections,
10  through post-market MDR reports.  FDA is not a
11  bystander.  FDA is there actively engaged.
12  BY MR. LUNDQUIST:
13       Q.  You're telling me, Mr. Ulatowski, that
14  the FDA is responsible in some shape or form for
15  the safety of products that are cleared?
16       MR. HUTCHINSON:  Object to form.
17       A.  FDA has been given the responsibility to
18  help ensure the safety and effectiveness of
19  devices.  That's a statutory obligation on the
20  part of the FDA.
21  BY MR. LUNDQUIST:
22       Q.  It's not just Ethicon that's responsible
23  for ensuring the device is safe.  You're telling
24  me FDA also is ensuring that the device is safe.
25       MR. HUTCHINSON:  Object to form.

26 (Pages 98 to 101)

Timothy A. Ulatowski, M.S.

Page 102

1    A.   Your initial question, sir, was who is
2 primarily responsible I think was your question.
3 I think the manufacturer has primary
4 responsibility for providing, assembling and
5 providing evidence, having evidence on the safety
6 and effectiveness of their product.  But FDA is,
7 by no means, a bystander in that process.
8    Q.   By signing off -- the FDA doesn't do
9 testing itself on these devices, does it?
10    A.   FDA does have a laboratory that does
11 forensic testing of devices.
12    Q.   What testing did they do on the
13 TVT-Secur?
14    A.   I'm not sure if they did any testing.  I
15 just don't know.
16    Q.   I want to make sure I understand because
17 this is the first time I've heard this.  You're
18 telling me that FDA has a shared responsibility
19 with Ethicon to ensure that a device like the
20 TVT-Secur is safe?
21          MR. HUTCHINSON:  Object to form.
22    A.   Look at the mission of FDA.  The mission
23 of FDA is to help ensure the safety and
24 effectiveness of products on the market.  They're
25 fulfilling their mission.  How do they do that?

Page 103

1 Well, they have -- I mentioned some things.
2 BY MR. LUNDQUIST:
3    Q.   Right.  But in the TVT-Secur's example,
4 they only relied on the information provided by
5 Ethicon to them; right?
6          MR. LUNDQUIST:  Object to form.
7    A.   FDA doesn't rely on what they're given.
8 Otherwise, I don't know why we did thousands of
9 inspections every year.  We go out there.  Ethicon
10 was inspected.
11  BY MR. LUNDQUIST:
12    Q.   TVT-Secur.
13    A.   You go out.
14          MR. HUTCHINSON:  I'm sorry.  I don't
15 know if that's a question pending or not.
16    Mr. Ulatowski, you can finish your answer.
17    A.   One of FDA's means of ensuring the safety
18 and effectiveness of products is by inspection of
19 facilities.  What do those inspections involve?
20 The evaluation of design history records,
21 post-market reporting, manufacturing records.  I
22 believe Ethicon was inspected.
23 BY MR. LUNDQUIST:
24    Q.   Did they do that in the TVT-Secur
25 instance, sir?

Page 104

1    A.   You don't necessarily have to say it's
2 specific to TVT-S because when you look at
3 procedures and policies regarding design history,
4 regarding post-market surveillance, those same
5 policies and procedures relate to every product
6 manufactured in that facility.
7          MR. LUNDQUIST:  Nonresponsive.
8 BY MR. LUNDQUIST:
9    Q.   Did they inspect any facilities in the
10 TVT-Secur instance, sir?
11          MR. HUTCHINSON:  Objection.  Been asked
12 and answered.
13    A.   I'd have to look again at that
14 inspection history, but I know Ethicon has been
15 inspected.  In fact, I initiated inspection of
16 Ethicon as director of compliance.
17 BY MR. LUNDQUIST:
18    Q.   So you don't know if they initiated any
19 of these inspections you've been talking about?
20          MR. HUTCHINSON:  Objection.  Been asked
21 and answered twice, counsel.  Let's move on.
22 BY MR. LUNDQUIST:
23    Q.   Again, sir, you keep saying you got to
24 look at things.  I want to make sure -- I want the
25 record to fully appreciate that today is your day.

Page 105

1 Today is my day to find out everything you know.
2 Today is your day to try to explain it to me.
3 I've read your previous transcripts.
4    I want to understand everything you're going
5 to be opining about the Secur.  Again, with that
6 predicate, I'm going to go back to the 522 you're
7 talking about here.
8    Was it scientifically feasible for Ethicon to
9 conduct a randomized controlled trial prior to
10 marketing the TVT-Secur?
11          MR. HUTCHINSON:  Object to form.
12    A.   Well, inasmuch as that incurs a lot of
13 different aspects on feasibility, I can't say for
14 sure one way or the other.  I think there's many
15 different aspects to that question.
16 BY MR. LUNDQUIST:
17    Q.   What do you consider a long-term study,
18 sir?
19    A.   Well, that varies based upon I'll call
20 it industry practice or past history with FDA
21 submissions.  Long-term can be as short as one
22 year.  It can be longer depending on the
23 clinical -- what's clinically important for a
24 particular type of study. So it's an "it depends"
25 kind of answer.

27 (Pages 102 to 105)

Timothy A. Ulatowski, M.S.

Page 106

1    Q.   You mentioned some of the reasons why
2 their rationale for adequately and timely
3 responding to the 522 or ultimately making a
4 decision to decommercialize it.
5    From your review of the internal Ethicon
6 documents, are you aware of any safety or efficacy
7 concerns expressed about the TVT-Secur?
8    A.   Safety concerns?
9    Q.   Expressed by Ethicon employees
10 internally based on your review of the documents.
11    MR. HUTCHINSON:  Object to form.
12    A.   I think there's commentary in the emails
13 regarding characteristics of the TVT-Secur, the
14 performance and aspects of how to address ongoing
15 information that's being collected by Ethicon.
16 This is kind of the normal way products unfold and
17 the sorts of information one gets and how one
18 reacts to that information that you see in
19 virtually every product.
20 BY MR. LUNDQUIST:
21    Q.   I'm just trying to understand.  In 2012
22 are you aware of any internal documents from
23 Ethicon that reflect any safety or efficacy
24 concerns with respect to the TVT-Secur?
25    MR. HUTCHINSON:  Object to form.

Page 107

1    A.   When you say safety or efficacy
2 concerns, a company like Ethicon, to their credit,
3 was monitoring the performance of their product in
4 the marketplace as they should, identifying areas
5 where performance was excellent, identifying areas
6 where performance was less than desirable and
7 identifying measures to improve performance and
8 safety, to the extent possible, which is how a
9 company should react to information.
10    So the answer is yes, as far as obtaining
11 clinical information and responding to that
12 information.
13 BY MR. LUNDQUIST:
14    Q.   What measures were identified to improve
15 performance and safety on the TVT-Secur?
16    A.   Well, I think part of it is going to
17 require clinician input because it concerns
18 technique, concerns knowledge of the physicians
19 and training of the physicians.  So I'm
20 knowledgeable about those efforts.  I think the
21 full evaluation of that would probably require a
22 physician's treatment evaluation.
23    Q.   Let me ask you a slightly different
24 question, sir.  Are you aware that one of the
25 concerns expressed -- strike that.

Page 108

1    Are you aware based on your view of the
2 Ethicon internal documents that one of the
3 concerns expressed by Ethicon employees with
4 respect to the TVT-Secur was that it had a higher
5 incidence of failure rates and mesh-related
6 complications as compared to the TVT and the
7 TVT-O?
8    MR. HUTCHINSON:  Object to form.
9    A.   I don't recall specific emails regarding
10 that.  I think that clinical data, clinical
11 studies, published studies will have various
12 outcomes.  Some studies were very supportive in
13 comparisons.  Some studies were not as supportive.
14 That's kind of the waxing and waning of published
15 studies on new devices such as this.  And the
16 company was assessing that, analyzing and
17 responding.
18    MR. LUNDQUIST:  Nonresponsive after "I
19 don't recall."
20 BY MR. LUNDQUIST:
21    Q.   I want you to assume with me that
22 internally Ethicon had expressed those concerns
23 that we talked about a moment ago.  Wouldn't that
24 have been important for your opinions in this
25 case?

Page 109

1    A.   Well, after 40 years of looking at
2 documents, manufacturers and how they conduct
3 their business when they market a product, this is
4 sort of the flow and evolution of how things work
5 post-market.
6    You obtain clinical information.  You see
7 some things that are working well.  You see some
8 things that are not working well.  Is it a certain
9 area that's not working well?  Is it a certain
10 type of doctor?  Who trained the doctor?
11    The important point is getting that
12 information, assessing it, reacting to that
13 information, which Ethicon did.  Were there
14 concerns about particular areas not having
15 performance that was as desirable as expected?
16 Yes.  But not unusual in my experience over the
17 years.
18    Q.   So if internally they were saying that
19 the TVT-Secur was associated with higher
20 complication rates, to you that would not be
21 important in rendering your opinions in this case?
22    A.   No.  First of all, you say it too
23 generically.  I think what I'm saying in response
24 to that is that you look at all the data.  You
25 assess it.  You try and do an analysis, call it

Timothy A. Ulatowski, M.S.

Page 110

1 root cause analysis, what's going on, what is the
2 problem, how do we react to that problem, is there
3 fundamentally an issue with our product where the
4 benefit/risk profile has now changed, and that's
5 what Ethicon was doing.
6      And in my view based upon the data that I
7 evaluated, Ethicon was doing what it was supposed
8 to be doing in analyzing that data and reacting to
9 that data.
10     Q.   What do you mean they were -- let me
11 back it up.  Based on your experience with the FDA
12 and in industry, if a manufacturer of a medical
13 device undertook a duty to perform a premarket
14 randomized control trial, is it your belief they
15 should have done so?
16          MR. HUTCHINSON:  Object to form.
17     A.   Can you give me that question again?
18 BY MR. LUNDQUIST:
19     Q.   Sure.  Based on your experience with the
20 FDA, if a manufacturer of a medical device
21 undertook a duty to perform a randomized control
22 trial, is it your belief they should have done
23 so?
24          MR. HUTCHINSON:  Same objection.
25     A.   I guess I'm not understanding.

Page 111

2      Q.   Based on your experience with the FDA,
3 if a manufacturer of a medical device undertook a
4 duty to perform a premarket randomized controlled
5 trial, is it your belief they should have done so?
6          MR. HUTCHINSON:  Object to form.
7     A.   Again, I'm not understanding the
8 question.
9 BY MR. LUNDQUIST:
10     Q.   The manufacturer starts to --
11     A.   Restate.
12     Q.   If they tell somebody they're going to
13 undertake or start a randomized control trial, do
14 you think they should do it?
15     A.   Not necessarily.
16     Q.   Why not?
17     A.   Depends on -- it's a case-by-case thing.
18 Why do you want to do the study?  Is the study
19 feasible?  Can it be funded?  Is it feasible from
20 collecting a sufficient number of investigators,
21 enough patients in both randomized groups.
22 There's lots of issues there that may come into
23 play.  There's probably double or triple the
24 issues once I put my mind to it.  Do we want to
25 conduct it?  Why do we want to conduct it?  What

Page 112

1 additional information is it going to provide?  Is
2 it better to -- are there already studies ongoing
3 with investigators in the field?  There's lots of
4 issues going on.
5          MR. HUTCHINSON:  We've been going about
6 another hour.
7          MR. LUNDQUIST:  I'm almost done.
8 BY MR. LUNDQUIST:
9     Q.   You said would it have been economically
10 feasible.  Strike that.
11     Would it have been scientifically possible
12 for Ethicon to conduct a randomized control trial
13 on the TVT-Secur prior to launch?
14          MR. HUTCHINSON:  Object to form.  Been
15 asked and answered.
16     A.   I don't know because I'm not privy to
17 all the variables that come into play.
18 BY MR. LUNDQUIST:
19     Q.   You're not going to offer any opinions
20 one way or the other on that?
21     A.   Not without knowledge of all the
22 variables that come into play.  And I know a
23 lot of variables come into play because I was
24 asked that of probably hundreds of manufacturers
25 regarding studies when I demanded they do those

Page 113

1 studies or whatever.
2     Q.   If Ethicon told some of its key opinion
3 leaders that it was going to conduct a randomized
4 controlled trial in this case on the TVT-Secur and
5 they didn't do so, you don't have an opinion on
6 that for trial.
7     A.   I'd have to know the context of that,
8 why they didn't do it.  Certainly there were a
9 number of randomized controlled studies conducted.
10     Q.   I'm just trying to understand if you're
11 offering an opinion or not.  If you're telling me
12 you need to review more documents, we'll leave it
13 alone, and that will be the record.  But I'm just
14 trying to understand if you have an opinion one
15 way or the other.
16     A.   I'd have to know the specifics of that
17 particular incidence.  I, again, use the word
18 launch.  It was cleared, but it wasn't launched
19 until almost a year later.
20     Q.   Would you agree that the 522 was issued
21 by the FDA because the FDA had concerns about the
22 safety and efficacy of the TVT-Secur?
23          MR. HUTCHINSON:  Object to form.
24     A.   I disagree with that.
25

29 (Pages 110 to 113)

Timothy A. Ulatowski, M.S.

Page 114

1 BY MR. LUNDQUIST:
2     Q.   Why?
3     A.   It was a generic concern regarding the
4 mini tapes.  It wasn't directed necessarily to
5 TVT-Secur.  It was directed to that group of
6 products.  So the panel -- if you look at the
7 panel recommendations, they don't say TVT-Secur we
8 need a 522.  You'll never find that.
9     Q.   So that group of products then, would
10 you agree the 522 was issued by the FDA because
11 the FDA had concerns about a group of products
12 which included the TVT-Secur relative to the
13 safety and efficacy?
14         MR. HUTCHINSON:  Same objection.
15     A.   They had a concern that they wanted to
16 see additional data on those products.  But again,
17 what data did Ethicon have itself on its product.
18 You kind of get thrown into that hopper with
19 everyone else when it comes to a 522 order.
20 BY MR. LUNDQUIST:
21     Q.   Again, one of the concerns when you get
22 a 522 is because the FDA, regardless of whether
23 it's 1 or 20 devices, they had concerns with the
24 safety and efficacy of those devices that were
25 subject to the 522.  Is that a true statement?

Page 115

1         MR. HUTCHINSON:  Been asked and
2 answered.  Objection.
3     A.   I think their concern as expressed in
4 the minutes was they wanted to see some
5 longer-term data.
6 BY MR. LUNDQUIST:
7     Q.   Nothing to do with the safety and
8 efficacy then, that's your opinion?
9         MR. HUTCHINSON:  Same objection.
10     A.   I think it was mainly the longer-term
11 data issue.
12 BY MR. LUNDQUIST:
13     Q.   My question was:  It had nothing to do
14 with the safety and efficacy?
15         MR. HUTCHINSON:  Counsel, that's been
16 asked and answered.
17     A.   Well, longer-term data, you get more
18 information on safety and effectiveness, but
19 that's any relationship.
20 BY MR. LUNDQUIST:
21     Q.   Well, one purpose of the 522 that was
22 issued in 2012 was that they were trying to
23 collect long-term data on the safety of a group of
24 devices which included the TVT-Secur; right?
25     A.   Collect additional data on that type of

Page 116

1 device.
2     Q.   Which included long-term safety and
3 efficacy data, true or not?
4     A.   The type of data collected would have
5 been quality of life data, other adverse event
6 data, yes.
7     Q.   Which includes safety and efficacy?
8     A.   Those are safety parameters.
9     Q.   And there's a reason why they're seeking
10 this information; right?  They're not just doing
11 it for fun.
12         MR. HUTCHINSON:  Objection.  Form.
13 BY MR. LUNDQUIST:
14     Q.   They had a concern with this group of
15 devices, true?
16         MR. HUTCHINSON:  Same objection.
17     A.   Well, their expression was that unlike
18 the multi-incisional slings, they didn't have
19 quite enough data on the mini slings, the
20 single-incision slings.  So they wanted more data
21 on them.
22 BY MR. LUNDQUIST:
23     Q.   So the data that would have been
24 collected -- that the FDA was attempting to
25 collect on this long-term information, long-term

Page 117

1 safety and efficacy data that you agree was being
2 sought, that's the same data that Ethicon could
3 have conducted or could have done premarket on the
4 TVT-Secur, true?
5         MR. HUTCHINSON:  Object to form.  Also
6 been asked and answered several times by counsel.
7     A.   I think a manufacturer looks at what
8 they need to do very early on, and it's documented
9 in the design history file, what's the regulatory
10 strategy here, what's our basis of safety and
11 performance of this new device, which is TVT,
12 TVT-O, and what's new here and what kind of
13 studies do we have to do to evaluate this new
14 configuration.  The animal studies, the cadaver
15 studies.
16         So they looked at the difference.  They
17 evaluated what data do we need, and they performed
18 those studies.
19 BY MR. LUNDQUIST:
20     Q.   What long-term safety and efficacy data
21 was available prior to the launch of the
22 TVT-Secur?
23     A.   I think you asked that before.  I don't
24 think there was any clinical study data submitted
25 at the point prior to the clearance of the product

30 (Pages 114 to 117)

Timothy A. Ulatowski, M.S.

Page 118

1  for TVT-Secur.
2      Q.   So Ethicon was ordered by the FDA in
3  2012 to conduct long-term -- to conduct clinical
4  trials, to gather long-term data on the safety and
5  efficacy of the TVT-Secur that they could have
6  conducted prior to ever selling the device; is
7  that a true statement?
8          MR. HUTCHINSON:  Objection.  Counsel,
9  that's been asked and answered now at least three
10  or four times.
11         MR. LUNDQUIST:  I promise you when the
12  judge looks at this transcript, she'll see it has.
13  I'd just like a short answer to my question.
14         MR. HUTCHINSON:  I know you do, but the
15  that question has already been asked and answered
16  several times now.  So we can take a break.  We'll
17  do that.  But that question has been asked and
18  answered.
19  BY MR. LUNDQUIST:
20     Q.   Is that a true statement, sir?
21     A.   I don't think there was any motivation
22  for that prior to clearance of the product and
23  submission to the FDA.
24     Q.   You mentioned MAUDE reporting.  What is
25  that?  You mentioned that at the very beginning of

Page 119

1  your deposition.
2      A.   Maude is the database.  MDR reporting is
3  the reporting.
4      Q.   My apologies.  You said you had looked
5  through some MDRs in this case with respect to the
6  TVT-Secur.
7      A.   Correct.  I had been provided a lot of
8  data on so-called issue reports that either were
9  submitted as MDRs or were not submitted as MDRs.
10     Q.   Are you going to be rendering any
11  opinions in this case of how many MDR reports that
12  were reportable but never actually reported with
13  respect to the TVT-Secur based on your review?
14     A.   I think I have some notes on that.  So I
15  may.
16     Q.   What are you going to say?
17     A.   Typically in my review of those reports,
18  if I look back in my notes, the sorts of issue
19  reports that do not end up as reportable are the
20  sorts of events where medical intervention is not
21  required, where there's a bladder nick, where
22  there's some self-correcting adverse event,
23  something resolves over time, where there's no
24  long-term or medical intervention required or
25  there's some breakage of the inserter or something

Page 120

1  of that sort, some doctor sees something that's
2  reported in the history report, package broken,
3  and things like that.
4      So there's always a number of issue reports
5  that relate to things that are out-of-box issues
6  or are accessory issues that are identified by the
7  doctor or there's outcomes of the patient where
8  there's resolution of the issue that is typically
9  not a reportable event.
10     Q.   Why are MDRs required?
11     A.   To provide FDA information on the
12  performance of products in the marketplace.
13     Q.   In your role at the FDA, you relied on
14  the clinical knowledge of medical officers and the
15  M.D. center director to interpret MDRs for trends;
16  is that true?
17         MR. HUTCHINSON:  Object to form.
18     A.   No, not necessarily.  In my 25 years in
19  device evaluation, actually one of the jobs of the
20  branch chief was to receive and evaluate the MDR
21  reports for that week for their products.
22     So I would go through all the MDR reports
23  submitted for the products that I evaluated to
24  understand what sorts of events were occurring so
25  that then I could consider those events in my

Page 121

1  evaluation of new products.
2  BY MR. LUNDQUIST:
3      Q.   Are you telling me you personally looked
4  at MDRs for trends?
5      A.   Sure.
6      Q.   And you didn't need to rely on the
7  clinical knowledge of medical officers and the MDR
8  center director to interpret the MDRs for trends
9  is what you're saying.  You could have done that
10  independently?
11     A.   I could have done that independently
12  because -- well, sometimes.  Depending on the
13  issue, you may need a medical opinion on how
14  something was characterized or reported or whether
15  it was, as I said, medically resolved, some
16  clinical issue that I didn't have expertise on.
17     But as far as reporting of an event, those
18  events are characterized in the reports.  You can
19  do trending on those reports.  In fact, the
20  manufacturer when inspections occurred or when PMA
21  supplements were submitted, those sorts of
22  follow-ups and histories were submitted to FDA.
23     Q.   I think I appreciate where you're coming
24  from.  You would agree that you don't have the
25  background to discuss health risk assessments or

31 (Pages 118 to 121)

Timothy A. Ulatowski, M.S.

Page 122

1  the relevance of certain information and
2  complaints as it relates to patient risks or
3  impacts on patients, true?
4        MR. HUTCHINSON:  Object to form.
5        A.   No.  I participated in hundreds of
6  health risk assessments.  It's a team effort where
7  you have a clinician, an engineer and others
8  involved in the particular product area that
9  together -- come together to discuss the
10  performance of a product for whatever reason.
11       I know Dr. Parisian speaks to health risk
12  concerns and things she participated in.  I guess
13  she worked at FDA for four years or something.
14  BY MR. LUNDQUIST:
15       Q.   Sure.
16       A.   Imagine what I did in 25 years working
17  in device evaluation.
18       Q.   Dr. Parisian is a medical doctor.  You
19  understand that, sir?
20       A.   Yes.
21       Q.   In fact, Dr. Parisian is the precise
22  type of person that you would have had to rely on
23  to conduct any type of medical assessment of these
24  health risk assessments that were done, true?
25       MR. HUTCHINSON:  Object to form.

Page 123

1        A.   The clinician had certainly an input in
2  those health risk assessments, but they weren't
3  the only input.  There was always an engineering
4  analysis.  There was MDR analysis.  There was
5  premarket analysis of information submitted.
6  There was inspectional analysis.
7  BY MR. LUNDQUIST:
8        Q.   When it came to the impact, the analysis
9  of a medical risk impact on patients, you're not
10  going to disagree that the clinician was the
11  primary individual that would have had, as you put
12  it, input in these situations, true?
13       MR. HUTCHINSON:  Form.
14       A.   Clinician had the important role, yes.
15  BY MR. LUNDQUIST:
16       Q.   They were the primary import of these
17  things, weren't they?
18       MR. HUTCHINSON:  Same objection.
19       A.   It would depend on the risk assessment
20  on who was primary, what was the issue involved.
21  It may have been a manufacturing or an engineering
22  issue that was a primary issue at hand.
23  BY MR. LUNDQUIST:
24       Q.   What's your basis of opining that --
25  what experience, background, what's your basis for

Page 124

1  suggesting that you were able to interpret the
2  relevance of clinical information in health risk
3  assessments?
4        A.   Well, it's as done in a company.  There
5  may be a clinical outcome, some clinical aspect,
6  but ultimately the root cause relates to an
7  engineering or design or some aspect that goes
8  beyond or that's really behind all the clinical
9  outcome aspects.
10       So you may have a clinician evaluating the
11  effect to the patient, but then you have to bore
12  in and go back to ultimately the design,
13  engineering, production of the product to fully
14  appreciate what's going on.
15       Q.   But in order to ever be able to evaluate
16  what the possible harm might be by these root
17  causes that are identified by the engineers, you
18  necessarily have to have medical input into that?
19       A.   There's always a physician or quite
20  often some clinical person.
21       Q.   The answer to my question is "Yes"; is
22  it not, sir?
23       MR. HUTCHINSON:  Objection.
24       A.   Yes.  There's always some clinical
25  person that's available, if not at the table.

Page 125

1  BY MR. LUNDQUIST:
2        Q.   Any other opinions we haven't talked
3  about today?
4        A.   I'm sure there will be, but, again, that
5  takes my evaluation of the data and information
6  and Dr. Parisian's comments.
7        Q.   Any other opinions that you intend to
8  offer at trial sitting here today that you can
9  give me that we haven't already talked about or
10  that aren't expressed in your previous
11  depositions?
12       A.   We talked a lot.  Off the top of my
13  head, I'm sure there's other information as I look
14  at the data.
15       Q.   Sitting here today, but you can't give
16  me any more opinions?
17       A.   No, not to be fair to myself for sure.
18       Q.   What else do you intend to do before
19  trial?
20       A.   As always, I prepare myself by looking
21  at the data and the information that I've been
22  provided, that list that you've been looking at.
23  I'm sure there will be meetings with counsel to go
24  over them.
25       Q.   You don't intend to offer any new

32 (Pages 122 to 125)

Timothy A. Ulatowski, M.S.

Page 126

1  opinions prior to trial, do you?
2      A.   Well, based upon that review, I may have
3  overlooked some area that actually deserves an
4  opinion.  I'm harkening back to my other reports
5  and things.  There may be additional areas that are
6  relevant to the regulatory expertise I possess.
7      Q.   Well, there won't be any more
8  depositions in this case, sir, I assure you, with
9  one exception.  I assume you're not going to
10 render any opinions on Dr. Trepeta, are you?
11     A.   No.
12     Q.   Sitting here today, you intend to meet
13 with counsel you intend to re-review the documents
14 on your reliance list.  Anything else?
15     A.   I think that that's probably the sum
16 total.  I have what I have.
17     Q.   That is true.
18         MR. LUNDQUIST:  I'll pass the witness.
19              EXAMINATION
20 BY MR. HUTCHINSON:
21     Q.   Mr. Ulatowski, let's talk about the IFU
22 for a minute.
23     My name is Chad Hutchinson, and I have the
24 privilege of representing Ethicon in this case.
25     I want to ask this from a regulatory

Page 127

1  perspective.  Do you believe the IFU for TVT-Secur
2  is adequate?
3      A.   Yes.
4      Q.   Why?
5      A.   The regulation is precisely in regard to
6  what an IFU must contain.  The IFU does contain
7  that information.  I've reviewed hundreds of IFUs
8  over my time at FDA, 25 years in device evaluation
9  prior to reviewing NDAs and after that in
10 compliance doing labeling compliance for eight
11 years and now as a consultant for clients as I
12 would at FDA.  So I believe that IFU was adequate.
13     Q.   If Dr. Parisian, who is the plaintiff's
14 regulatory expert in this case, believes that the
15 IFU was inadequate, would you disagree with her?
16     A.   Yes.
17     Q.   That's all the questions I have.  Thank
18 you.
19         MR. LUNDQUIST:  Thank you for your time,
20 sir.
21         MR. HUTCHINSON:  Cynthia, do you have
22 any questions?
23         MS. FREEMAN:  I don't have any
24 questions.  We'll reserve.
25         (Whereupon, at 12:15 p.m., the taking of

Page 128

1  the instant deposition ceased.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 129

1           C E R T I F I C A T E
2  DISTRICT OF COLUMBIA:
3
4      I, Ann Medis, Registered Professional
5  Reporter and Notary Public, hereby certify the
6  witness, TIMOTHY ULATOWSKI, M.S., was by me first
7  duly sworn to testify to the truth, that the
8  foregoing deposition was taken at the time and
9  place stated herein, and that the said deposition
10 was recorded stenographically by me and then
11 reduced to printing under my direction, and
12 constitutes a true record of the testimony given
13 by said witness.
14     I certify the inspection, reading and signing
15 of said deposition were NOT waived by counsel for
16 the respective parties and by the witness.
17     I certify I am not a relative or employee of
18 any of the parties, or a relative or employee of
19 either counsel, and I am in no way interested
20 directly or indirectly in this action.
21     IN WITNESS WHEREOF, I have hereunto set my
22 hand and affixed my seal of office this 10th day
23 of June, 2015.
24     _____
                    Notary Public
25

Timothy A. Ulatowski, M.S.

Page 130

```
 1          - - - - - -
 2        E R R A T A
 3          - - - - - -
 4   PAGE  LINE  CHANGE
 5   ____  ____  _____
 6        REASON:  _____
 7   ____  ____  _____
 8        REASON:  _____
 9   ____  ____  _____
10        REASON:  _____
11   ____  ____  _____
12        REASON:  _____
13   ____  ____  _____
14        REASON:  _____
15   ____  ____  _____
16        REASON:  _____
17   ____  ____  _____
18        REASON:  _____
19   ____  ____  _____
20        REASON:  _____
21   ____  ____  _____
22        REASON:  _____
23   ____  ____  _____
24        REASON:  _____
25   ____  ____  _____
```

Page 131

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2
 3          I,_____, do
 4   hereby certify that I have read the
 5   foregoing pages, and that the same
 6   is a correct transcription of the answers
 7   given by me to the questions therein
 8   propounded, except for the corrections or
 9   changes in form or substance, if any,
10   noted in the attached Errata Sheet.
11
12   _____
13   TIMOTHY A. ULATOWSKI, M.S.       DATE
14
15
16
17
18
19
     Subscribed and sworn
20   to before me this
     _____ day of _____, 20____.
21
     My commission expires:_____
22
23   _____
     Notary Public
24
25
```