# EXHIBIT C

Marc Toglia, M.D.

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE:  ETHICON, INC.          : Master File No.
PELVIC REPAIR SYSTEM          : 2:12-MD-
PRODUCTS LIABILITY LITIGATION : MDL 2327
                              :
                              : JOSEPH R.
THIS DOCUMENT RELATES TO      : GOODWIN
THE CASES LISTED BELOW        : US DISTRICT
                                JUDGE

_____

Mullins, et al. v. Ethicon, Inc., et al.
2:12-cv-02952
Sprout, et al. v. Ethicon, Inc., et al.
2:12-cv-07924
Iquinto v. Ethicon, Inc., et al.
2:12-cv-09765
Daniel, et al. v. Ethicon, Inc., et al.
2:13-cv-02565
Dillon, et al. v. Ethicon, Inc., et al.
2:13-cv-02919
Webb, et al. v. Ethicon, Inc., et al.
2:13-cv-04517
Martinez v. Ethicon, Inc., et al.
2:13-cv-04730
McIntyre, et al. v. Ethicon, Inc., et al.
2:13-cv-07283
Oxley v. Ethicon, Inc., et al.
2:13-cv-10150
Atkins, et al. v. Ethicon, Inc., et al.
2:13-cv-11022
Garcia v. Ethicon, Inc., et al.
2:13-cv-14355
(Caption Continued on Next Page)
- - -
October 2, 2015
VIDEOTAPED DEPOSITION MARC TOGLIA, M.D.

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph| 917.591.5672 fax
deps@golkow.com

Marc Toglia, M.D.

```
 1   CAPTION CONTINUED:
 2
     Lowe v. Ethicon, Inc., et al.
 3   2:13-cv-14718
     Dameron, et al. v. Ethicon, Inc., et al.
 4   2:13-cv-14799
     Vanbuskirk, et al. v. Ethicon, Inc., et al.
 5   2:13-cv-16183
     Mullens, et al. v. Ethicon, Inc., et al.
 6   2:13-cv-16564
     Shears, et al. v. Ethicon, Inc., et al.
 7   2:13-cv-17012
     Javins, et al. v. Ethicon, Inc., et al.
 8   2:13-cv-18479
     Barr, et al. v. Ethicon, Inc., et al.
 9   2:13-cv-22606
     Lambert v. Ethicon, Inc., et al.
10   2:13-cv-24393
     Cook v. Ethicon, Inc., et al.
11   2:13-cv-29260
     Stevens v. Ethicon, Inc., et al.
12   2:13-cv-29918
     Harmon v. Ethicon, Inc., et al.
13   2:13-cv-31818
     Snodgrass v. Ethicon, Inc., et al.
14   2:13-cv-31881
     Miller v. Ethicon, Inc., et al.
15   2:13-cv-32627
     Matney, et al. v. Ethicon, Inc., et al.
16   2:14-cv-09195
     Jones, et al. v. Ethicon, Inc., et al.
17   2:14-cv-09517
     Humbert v. Ethicon, Inc., et al.
18   2:14-cv-10640
     Gillum, et al. v. Ethicon, Inc., et al.
19   2:14-cv-12756
     Whisner, et al. v. Ethicon, Inc., et al.
20   2:14-cv-13023
     Tomblin v. Ethicon, Inc., et al.
21   2:14-cv-14664
     Schepleng v. Ethicon, Inc., et al.
22   2:14-cv-16061
     Tyler, et al. v. Ethicon, Inc., et al.
23   2:14-cv-19110
24       (Caption Continued on Next Page)
```

Marc Toglia, M.D.

```
                                                    Page 3
 1   CAPTION CONTINUED:
 2
     Kelly, et al. v. Ethicon, Inc., et al.
 3   2:14-cv-22079
     Lundell v. Ethicon, Inc., et al.
 4   2:14-cv-24911
     Cheshire, et al. v. Ethicon, Inc., et al.
 5   2:14-cv-24999
     Burgoyne, et al. v. Ethicon, Inc., et al.
 6   2:14-cv-28620
     Bennett, et al. v. Ethicon, Inc., et al.
 7   2:14-cv-29624
 8
                        -  -  -
 9               OCTOBER 2, 2015
                        -  -  -
10
11               Videotape deposition of
12   MARC TOGLIA, M.D., taken pursuant to
13   notice, was held at the law offices of
14   Drinker Biddle and Reath, LLP, One Logan
15   Square, 18th and Cherry Streets, Suite 2000,
16   Philadelphia, Pennsylvania 19103,
17   commencing at 1:26 p.m., on the above
18   date, before Amanda Dee Maslynsky-Miller,
19   a Certified Realtime Reporter and Notary
20   Public in and for the State of
21   Pennsylvania.
22
23
24
```

Marc Toglia, M.D.

Page 4

```
 1   APPEARANCES:
 2
 3          MOTLEY RICE LLC
            BY: MARGARET M. THOMPSON, MD, JD, ESQUIRE
 4          BY:  BREANNE V. COPE, ESQUIRE
            28 Bridgeside Boulevard
 5          Mount Pleasant, South Carolina 29464
            (843) 216-9000
 6          Mthompsonmd@gmail.com
            Bcope@motleyrice.com
 7          Representing the Plaintiffs
 8
 9
10          BUTLER SNOW, LLP
            BY: NILS B. (BURT) SNELL, ESQUIRE
11          500 Office Center Drive
            Suite 400
12          Fort Washington, Pennsylvania 19034
            (215) 513-1885
13          Burt.snell@butlersnow.com
            Representing the Defendant
14
15
16   ALSO PRESENT: Gregory Fields, Videographer
17
                        -  -  -
18
19
20
21
22
23
24
```

Marc Toglia, M.D.

Page 5

```
 1                    -  -  -
 2                I N D E X
 3                    -  -  -
 4
    Testimony of:  MARC TOGLIA, M.D.
 5
 6      By Ms. Thompson            10. 393
        By Mr. Snell               322
 7
 8
                    -  -  -
 9
                E X H I B I T S
10
                    -  -  -
11
12   NO.          DESCRIPTION              PAGE
13   Toglia-1     Notice of Videotaped
                  Deposition Pursuant to
14                Rule 30 and Document
                  Requests Pursuant to
15                Rule 34 of Marc
                  Toglia, M.D.             20
16
     Toglia-2     Expert Report of
17                Marc R. Toglia, M.D.     26
18   Toglia-3     Invoices                 27
19   Toglia-4     3/19/09 E-mail from
                  Marc Toglia to
20                Kathleen Feeney;
                  Subject: Re: These events
21                Were approved 3.25
                  Proctorship and 4.21
22                Preceptorship            87
23
24
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Marc Toglia, M.D.

```
                                                        Page 6
  1                          -  -  -
  2                   E X H I B I T S
  3                          -  -  -
  4
     NO.              DESCRIPTION              PAGE
  5
     Toglia-5        10/23/08 E-mail from
  6                  Kathleen Toglia to
                     Cindy Pypcznski; Subject:
  7                  FDA Toglia                 99
  8   Toglia-6      4/27/09 E-mail from
                     Marc Toglia to Kathleen
  9                  Feeney; Subject: RE:
                     Itinerary for TVT
 10                  Proctorship              108
 11   Toglia-7      Bates ETH.MESH 05225354
                     05225380-384; TVT
 12                  Instructions for Use      228
 13   Toglia-8      ETH.MESH 08696131-132
                     Exhibit C - Clinical
 14                  Trials                    239
 15   Toglia-9      ETH.MESH 02026591-595
                     Material Safety Data Sheet 279
 16
     Toglia-10       Three Thumb drives produced
 17                  By Marc Toglia, M.D.       279
 18   Toglia-11     Selection of Materials
                     Produced by Marc
 19                  Toglia, M.D.              281
 20   Toglia-12     ETH.MESH 11843352-364
                     Consulting Agreement
 21                  Requisition Form          296
 22   Toglia-13     Spreadsheet                298
 23
 24
```

Marc Toglia, M.D.

```
                                                          Page 7
  1                         -  -  -
  2                    E X H I B I T S
  3                         -  -  -
  4
     NO.              DESCRIPTION              PAGE
  5
     Toglia-14       ETH.MESH 03617772
  6                  Consultant Invoice
                     Dated 5/28/09              303
  7
     Toglia-15       ETH.MESH 10399348
  8                  4/29/09 E-mail from
                     Patricia Beach to Judi
  9                  Gauld; Subject: FW:
                     PROSIMATM Registry         314
 10
     Toglia-16       ETH.MESH 11838868-869
 11                  5/30/07 E-mail from
                     Kathleen Feeney to Cindy
 12                  Pypcznski; Subject: FW:
                     Surgery at Lankenau        320
 13
     Toglia-17       Level of Evidence Chart    326
 14
     Toglia-18       Level of Evidence Pyramid  327
 15
     Toglia-19       NICE Urinary Incontinence:
 16                  The Management of Urinary
                     Incontinence in Women      380
 17
     Toglia-20       Hernia Repair Surgery,
 18                  Volker Schumpelick,
                     Robert J. Fitzgibbons,
 19                  Editors                    383
 20  Toglia-21       The Cochrane Collaboration;
                     Mid-Urethral Sling
 21                  Operations for Stress Urinary
                     Incontinence in
 22                  Women (Review)             383
 23
 24
```

Marc Toglia, M.D.

Page 8

1                          - - -

2              DEPOSITION SUPPORT INDEX

3                          - - -

4

5   Direction to Witness Not to Answer

6   Page    Line    Page Line        Page Line

7   17      22

8

9

10  Request for Production of Documents

11  Page    Line    Page    Line    Page Line

12  53      4       110     17

13  53      8

14

15  Stipulations

16  Page Line    Page Line       Page Line8

17  7       1

18

19  Question Marked

20  Page Line    Page Line      Page Line

21  None

22

23

24

Marc Toglia, M.D.

Page 9

```
 1                    -  -  -
 2              (It is hereby stipulated and
 3         agreed by and among counsel that
 4         sealing, filing and certification
 5         are waived; and that all
 6         objections, except as to the form
 7         of the question, will be reserved
 8         until the time of trial.)
 9                    -  -  -
10              THE VIDEOGRAPHER:  We are
11         now on the record.  My name is
12         Gregory Fields.  I'm a
13         videographer for Golkow
14         Technologies.  Today's date is
15         October 2nd, 2015, and the time is
16         1:26 p.m.  This video deposition
17         is being held in Philadelphia,
18         Pennsylvania, in the matter of In
19         Re:  Ethicon, U.S. District Court,
20         Southern District of West
21         Virginia.  The deponent is Marc
22         Toglia.  Counsel will be noted on
23         the stenographic record.  The
24         court reporter is Amanda Miller
```

Marc Toglia, M.D.

1           and will now swear in the witness.

2                   -  -  -

3               MARC TOGLIA, M.D., after

4           having been duly sworn, was

5           examined and testified as follows:

6                   -  -  -

7                   EXAMINATION

8                   -  -  -

9   BY MS. THOMPSON:

10          **Q.**    Dr. Toglia, I'm Margaret

11   Thompson, I represent the plaintiffs in

12   their case against Ethicon.

13              And you understood that --

14   you understand that that's why you're

15   here today?

16          **A.**    Yes, I do.

17          **Q.**    Could you please state your

18   name for the record?

19          **A.**    Yes.  Marc Richard Toglia.

20          **Q.**    And what is your occupation,

21   Dr. Toglia?

22          **A.**    I'm a physician.

23          **Q.**    Do you have a specialty?

24          **A.**    Yes.  I'm board certified in

Marc Toglia, M.D.

1    female pelvic medicine and reconstructive

2    surgery.

3          Q.    Are you also board certified

4    in OB/GYN?

5          A.    That is correct.  I'm double

6    board certified.

7          Q.    What is your office address

8    currently?

9          A.    It's 1098 West Baltimore

10   Pike, Media, Pennsylvania, Healthcare

11   Center 3, Suite 3404.

12         Q.    And who is your employer?

13         A.    I'm employed by Main Line

14   Healthcare.

15         Q.    Do you have an academic

16   appointment as well?

17         A.    I have several.  I'm an

18   associate professor of obstetrics and

19   gynecology at what we formerly called

20   Thomas Jefferson School of Medicine, is

21   now the Sidney Kimmel School of Medicine.

22              And I'm also an associate

23   professor, clinical associate professor

24   at the Lankenau Institute of Medical

Marc Toglia, M.D.

Page 12

1    Research.

2         **Q.**    So am I understanding

3    correctly that you have a private

4    practice as well as your academic

5    appointment?

6         **A.**    Yes.

7         **Q.**    So you're paid by the

8    academic institutions and then you also

9    have -- receive income from your private

10   practice; is that correct?

11        **A.**    There's no financial

12   compensation for the academic

13   appointments.

14        **Q.**    For either --

15        **A.**    For the --

16        **Q.**    -- one of the academic

17   appointments?

18             Okay.  So your income, then,

19   is derived strictly from your private

20   practice of urogynecology?

21        **A.**    That is correct.

22        **Q.**    And would you consider that

23   a specialty practice?

24        **A.**    It's a subspecialty

Marc Toglia, M.D.

Page 13

1    practice.

2         Q.    A subspecialty practice.

3               So you are a referral

4    practice, so to speak?

5         A.    Yes.  I exclusively take

6    care of women that have urinary

7    incontinence and pelvic floor disorders.

8         Q.    And are those patients

9    typically referred to you by other

10   physicians?

11        A.    My patients may come from

12   sisters, mothers, former patients, other

13   physicians.  The bulk of my practice

14   probably comes from other physicians.

15        Q.    And do you do, as part of

16   that subspecialty practice, general GYN

17   as well or restrict it completely to

18   urogynecology?

19        A.    I don't consider my practice

20   general gynecology.  I mean, occasionally

21   a gynecologist may send me a patient for

22   an opinion that might have a general

23   gynecology, but that's not what I hold

24   myself out as.

Marc Toglia, M.D.

Page 14

1          Q.    So, typically, you would not

2    be doing annual checkups, Pap smears,

3    mammograms, birth control, that sort of

4    thing that a general gynecologist might

5    do?

6               MR. SNELL:  Hold on.

7          Objection.  Compound.  Overbroad.

8               Go ahead.

9               THE WITNESS:  No.

10   BY MS. THOMPSON:

11         Q.    And when you're treating a

12   patient for a urogynecological condition,

13   we'll get to what those are a little bit

14   later, and that condition is resolved, do

15   you then send that patient back to their

16   general gynecologist or primary care

17   physician?

18         A.    Yes.

19         Q.    And that would be because,

20   one of the reasons, at least, is that

21   physicians don't want to send their

22   patients to a subspecialty and then lose

23   their patients to their care; is that

24   right?

Marc Toglia, M.D.

Page 15

1          **A.**    I don't know that I would

2     agree with that statement.  Let me

3     clarify that.  I take care of chronic

4     disease.

5               So it's not unusual for us

6     to maintain a lifetime relationship with

7     these patients.  But if I understand you

8     correctly, if I were to take care of a

9     specific pelvic floor disorder and that

10    person was to need, say, a mammogram, a

11    Pap smear or some other kind of primary

12    care service, we are not the ones

13    primarily responsible for that, and they

14    would go back to their referring doctor

15    or the doctor of their choosing.

16         **Q.**    Understood.  And what if the

17    patient's pelvic floor disorder is cured,

18    same thing?

19         **A.**    Yes.

20         **Q.**    What hospitals do you

21    currently have privileges at?

22         **A.**    Currently, I'm privileged at

23    all four of Main Line Healthcare

24    hospitals.  The Main Line Healthcare

Marc Toglia, M.D.

Page 16

1   hospital system is located in suburban

2   Philadelphia; it consists of Lankenau

3   Medical Center, Bryn Mawr Hospital, Paoli

4   Hospital and Riddle Hospital.

5        Q.    And do you do surgeries at

6   all four of those facilities as well?

7        A.    No.

8        Q.    Which ones do you perform

9   surgeries at?

10       A.    I will operate at Riddle

11  Hospital, Paoli Hospital and Lankenau

12  Medical Center.  My schedule does not

13  allow me to operate at, say, Bryn Mawr

14  Hospital.  Although I have, from time to

15  time, gone through; but I don't consider

16  that to be a hospital that I would use

17  for surgical procedures.

18       Q.    Do you have privileges or do

19  surgery at any type of surgical center,

20  freestanding surgical center?

21       A.    I do not.

22       Q.    So minor surgeries or those

23  that would be output surgeries are done

24  in the hospital as well?

Marc Toglia, M.D.

Page 17

1          **A.**    I think, technically, the

2     outpatient surgical surgeries are on

3     hospital property, but I think that they

4     are designated as -- you know, there's

5     ambulatory surgery.

6          **Q.**    Are they on a different

7     floor --

8          **A.**    No.

9          **Q.**    -- from the main operating

10    room?

11         **A.**    It's all -- it's the same.

12    I mean, patients are classified by their

13    status not by physical location.

14         **Q.**    Okay.  Are you married, Dr.

15    Toglia?

16         **A.**    I am.

17         **Q.**    Children?

18         **A.**    Yes.

19         **Q.**    How many?

20         **A.**    I have two children.

21         **Q.**    What are their ages?

22              MR. SNELL:  Not relevant.

23         Don't answer that question.

24              MS. THOMPSON:  You're

Marc Toglia, M.D.

Page 18

1          instructing him not to answer?

2                MR. SNELL:  Yes.  That's

3          private.  About his children?  He

4          came here to give opinions on the

5          defect and the question that, that

6          the judge posed about TVT, not to

7          tell you about his children.

8                MS. THOMPSON:  I'm just

9          getting to know him.

10               MR. SNELL:  No, that's not

11         appropriate.  I don't ask your

12         experts about who their children

13         are and their ages and stuff.

14         That is totally inappropriate.

15    BY MS. THOMPSON:

16         Q.    You can go ahead and answer.

17               MS. THOMPSON:  Unless you're

18         instructing him not to answer?

19               MR. SNELL:  Yes, I'm

20         instructing him not to answer.  I

21         think that violates his privacy,

22         is totally outside the scope, is

23         not relevant.

24               MS. THOMPSON:  Okay.  Object

Marc Toglia, M.D.

Page 19

```
 1          to form is sufficient.
 2               THE WITNESS:  Thank you.  I
 3          appreciate that.  And I agree.
 4   BY MS. THOMPSON:
 5          Q.    Have you given previous
 6   depositions?
 7          A.    Yes.
 8          Q.    How many?
 9          A.    I honestly couldn't tell you
10   off the top of my head.  Probably no more
11   than a dozen.  I don't think I've given a
12   deposition in over ten years, to the best
13   of my -- my knowledge.
14          Q.    So somewhere in the range of
15   five to twelve, would you ballpark it?
16          A.    Yes.
17          Q.    And what types of cases were
18   those depositions given in?
19          A.    The vast majority of them,
20   if not all of them, were within the realm
21   of female pelvic floor disorders, areas
22   of my expertise, which oftentimes extends
23   into the obstetrical world.
24          Q.    So am I correct those would
```

Marc Toglia, M.D.

Page 20

1    be medical malpractice cases?

2         **A.**    Most of them are medical

3    malpractice cases.

4              My reason for pausing, I

5    think one actually involved a piercing or

6    tattoo parlor that was involved.  And I

7    don't think that's medical malpractice,

8    but there were medical claims.

9         **Q.**    And did you testify for the

10   defense or the plaintiffs or a mix in

11   those cases?

12        **A.**    I've done a mix.

13        **Q.**    Did any of those cases that

14   you have given depositions in relate to

15   mesh products?

16        **A.**    To the best of my knowledge,

17   no.

18        **Q.**    Dr. Toglia, did you --

19              -  -  -

20              (Whereupon, Exhibit

21         Toglia-1, Notice of Videotaped

22         Deposition Pursuant to Rule 30 and

23         Document Requests Pursuant to Rule

24         34 of Marc Toglia, M.D., was

Marc Toglia, M.D.

Page 21

1          marked for identification.)

2                    -   -   -

3          MS. THOMPSON:  We've marked

4      as Exhibit-1 the notice for your

5      deposition today.

6          MR. SNELL:  Thank you.

7  BY MS. THOMPSON:

8      Q.    Have you had a chance to --

9          MR. SNELL:  Let me -- I just

10     want to give him the original,

11     that way the ones don't get mixed

12     up.

13         MS. THOMPSON:  Sure.  Thank

14     you.

15  BY MS. THOMPSON:

16     Q.    Have you had a chance to see

17  this document prior to just now?

18     A.    I have.

19     Q.    When did you first see this?

20     A.    I was given this document,

21  probably, near the end of last week, to

22  the best of my knowledge.

23     Q.    And did you see Schedule A,

24  which is attached to the notice of

Marc Toglia, M.D.

Page 22

1    deposition?

2          **A.**    Yes.

3          **Q.**    And it asked you to bring,

4    oh, a whole bunch of documents.  And I'm

5    not going to go through these

6    individually.

7                But can you just tell me

8    what you brought with you today?

9          **A.**    Yes.  To the best of my

10   knowledge, I have brought, as you put it,

11   as a whole bunch of documents, as they

12   relate to Schedule A.

13         **Q.**    And those are contained in

14   the -- some boxes that you brought to the

15   conference room?

16         **A.**    Yes.  Some are electronic,

17   the majority of them are copied on paper.

18         **Q.**    And I think Mr. Snell

19   provided me a flash drive with everything

20   that's in the boxes, correct?

21               MR. SNELL:  As far as I

22         know.  Although, he's brought

23         thumb drives, too.

24               MS. THOMPSON:  Okay.

Marc Toglia, M.D.

Page 23

1                    MR. SNELL:  So, I mean --

2              and also, I mean, you may want to

3              ask him, but he's done his own

4              research.  So he may have stuff

5              that I don't even have.

6                    MS. THOMPSON:  I think I

7              should do that.

8       BY MS. THOMPSON:

9          Q.    Dr. Toglia, could you just

10      go through what you brought here and

11      describe what you have?  Not document by

12      document, but generally speaking.

13         A.    Generally speaking, I have

14      brought the relevant clinical studies and

15      other published research, as well as the

16      legal documents, including the expert

17      reports and depositions.

18         Q.    Did you bring anything with

19      you that is not included on your -- the

20      reliance list that's attached to your

21      report?

22         A.    Obviously, I can't claim to

23      have an independent knowledge of every

24      specific element on that list, but to the

Marc Toglia, M.D.

Page 24

1    best of my knowledge, I have done my best

2    to comply and everything is -- is as it

3    is listed.

4                    MR. SNELL:  I will make one

5             note, just for a clean record,

6             too, as he did say, since the time

7             he published his report and his

8             reliance materials list, there

9             have been depositions of your

10            experts.  He, obviously, has those

11            and I think he might have even

12            said that.

13                   But when she asks you a

14            question you are allowed to take

15            them and look at them and tell her

16            what you reviewed.

17                   THE WITNESS:  Understood.

18                   MS. THOMPSON:  And we'll

19            maybe take a brief look at it at

20            the break.

21                   MR. SNELL:  That's fine.  He

22            brought it here, it's up to you.

23            You can look at it, copy it, do

24            whatever you want.

Marc Toglia, M.D.

Page 25

1              MS. THOMPSON:  I appreciate

2       that.

3  BY MS. THOMPSON:

4       Q.    Did you bring any billing

5  records with you today?

6              MR. SNELL:  I have those.  I

7       have them somewhere.

8              Let's go off the record for

9       a second.

10             VIDEO TECHNICIAN:  We are

11       off the record.  The time is 1:38

12       p.m.

13             -  -  -

14       (Whereupon, a discussion off

15       the record occurred.)

16             -  -  -

17             VIDEO TECHNICIAN:  We are

18       back on the video record.

19  BY MS. THOMPSON:

20       Q.    Dr. Toglia, I think you

21  brought your report that you prepared in

22  this case --

23       A.    Yes.

24       Q.    -- is that correct?

Marc Toglia, M.D.

Page 26

```
 1                    -  -  -
 2                (Whereupon, Exhibit
 3         Toglia-2, Expert Report of Marc R.
 4         Toglia, M.D., was marked for
 5         identification.)
 6                    -  -  -
 7   BY MS. THOMPSON:
 8         Q.    And we have marked that as
 9   Exhibit Number 2.
10                I believe you have your own
11   copy as well?
12         A.    I do.
13         Q.    Do you have any notes on
14   your copy that you brought with you?
15         A.    I mean, I've got some
16   underlines in pencil.  I may have made a
17   spelling correction.  I don't have any
18   prose of any kind in there.
19         Q.    There's a curriculum vitae
20   attached to that report --
21         A.    Yes.
22         Q.    -- as you recall.
23                Is that a current C.V.?
24         A.    It is.
```

Marc Toglia, M.D.

Page 27

1      **Q.**     Are there any additions that

2   you would make to that, sitting here

3   today --

4      **A.**     No.

5      **Q.**     -- that you can think of?

6             MS. THOMPSON:  So Exhibit-2

7             will be the report and the -- with

8             the C.V.

9                    -  -  -

10            (Whereupon, Exhibit

11            Toglia-3, Invoices, was marked for

12            identification.)

13                   -  -  -

14   BY MS. THOMPSON:

15      **Q.**     And it looks like you also

16   brought, today, two bills or invoices for

17   your work in this case, and we've marked

18   that as Exhibit Number 3.

19      **A.**     Thank you.

20      **Q.**     Do those look familiar?

21      **A.**     Yes.

22      **Q.**     And the last date on the

23   invoice is September 24th.

24            Can you approximate how many

Marc Toglia, M.D.

Page 28

1    hours you have worked on this case since

2    September 24th?  That would be in the

3    last week or so.

4          **A.**    Would it be sufficient if I

5    told you that I've probably done -- used

6    a total of about 50 hours in total?

7          **Q.**    So 50 hours total on this

8    case to date?

9          **A.**    50 hours --

10         **Q.**    Approximately?

11         **A.**    Approximately 50 hours of

12   work on this case.

13         **Q.**    How many hours did you spend

14   preparing your report, approximately?

15         **A.**    Approximately 23 years and

16   50 hours.

17               And the reason why I say

18   that, counselor, is that most of the

19   material that I have reviewed, I have

20   reviewed over the span of my career.  And

21   that would include, perhaps, reviewing it

22   prior to being published, watching it be

23   presented at meetings, having read it

24   over and over for my own personal, you

Marc Toglia, M.D.

Page 29

1    know, knowledge and interest.

2                    And, certainly, many of

3    these articles relate to the subspecialty

4    board certification.

5         Q.    But you haven't billed

6    Ethicon for 23 years, correct?

7         A.    I've told you that I've

8    billed them for 50 hours, counselor,

9    right.  In formulating my opinion.

10        Q.    I'm just trying to break --

11   break it down a little bit --

12        A.    Sure.

13        Q.    -- and try to understand how

14   much of that 50 hours was actually

15   preparing your report.

16                   And if you can't -- if

17   you're not -- unable to do that, that's

18   fine.

19        A.    In preparing the report, it

20   probably is, both of these, 10 hours plus

21   33 hours, 43 hours; and the difference is

22   probably split between preparing for the

23   deposition and additional work finalizing

24   the report.

Marc Toglia, M.D.

Page 30

1      Q.    So that would include review

2  of literature, for instance?

3      A.    Correct.

4      Q.    When were you first

5  contacted to serve as an expert in this

6  case?

7      A.    If memory serves me right,

8  it was some time in August.

9      Q.    And do you have any

10  correspondence regarding that initial

11  contact?

12      A.    I do not.

13      Q.    Was it a phone call?

14      A.    Correct.

15      Q.    From Mr. Snell or another

16  attorney?

17      A.    From Mr. Snell.

18      Q.    And what did Mr. Snell ask

19  you to do?

20      A.    Mr. Snell apprised me to the

21  existence of the case and that he needed

22  to retain an expert to specifically

23  comment on the claims as they relate to

24  the safety, the design of the TVT

Marc Toglia, M.D.

Page 31

1    product.

2         **Q.**    Did he provide you with

3    materials to review?

4         **A.**    Mr. Snell provided me with,

5    I believe, the original complaint and, of

6    course, my access to the internal

7    documents from the company and from the

8    plaintiffs' experts and the exhibits.

9         **Q.**    Did he also provide you with

10   literature?

11        **A.**    Yes.

12        **Q.**    And so on your reliance list

13   that's attached to your report, does that

14   include the literature that Mr. Snell

15   provided you?

16        **A.**    To be completely honest with

17   you, there was very little on that list

18   that I was not already familiar with.

19        **Q.**    So you were familiar with

20   the majority of the articles on the list.

21             But the list was provided by

22   counsel; is that correct?

23             MR. SNELL:  Correct, yes.

24             THE WITNESS:  Yes.

Marc Toglia, M.D.

Page 32

```
 1                   MR. SNELL:  I will say that

 2          I -- I provided this list.

 3                   MS. THOMPSON:  Fair enough.

 4   BY MS. THOMPSON:

 5          Q.    And these were the articles

 6   that Mr. Snell provided you with as well?

 7          A.    Yes.

 8                   MR. SNELL:  I will make one

 9          note for the record.  He sent

10          articles and things to me that I

11          told paralegals to put on this

12          list, okay?

13                   MS. THOMPSON:  Fair enough.

14                   MR. SNELL:  So I tried to

15          capture whatever he went out and

16          found, just so you would have it.

17   BY MS. THOMPSON:

18          Q.    So the list would include

19   articles that Mr. Snell provided you,

20   articles that you thought were relevant

21   that you sent back to him, and those were

22   just --

23          A.    Right.  And to be clear,

24   there was a large degree of duplication
```

Marc Toglia, M.D.

Page 33

1    between things that I had already had in

2    my possession and things that were on his

3    list.

4           Q.    And I actually noticed that

5    there were some duplications on the list

6    itself, because of minor variations in

7    the citation or whatever.

8                  And, I guess, that might

9    have been the case on some of those,

10   correct?

11          A.    Counselor, I'm sorry, I'm

12   not -- I'm not familiar with what,

13   specifically, you're referring to or what

14   you're --

15          Q.    Okay.  Are all the opinions

16   that you intend to provide at trial

17   contained in this report?

18          A.    Yes.  With the exception of

19   anything that I might discover, you know,

20   between now and then that might be of

21   relevance.

22          Q.    Okay.  And you mentioned

23   depositions that you reviewed.  And some

24   of those are listed on the reliance list,

Marc Toglia, M.D.

Page 34

1   if you look on the last page.

2               Are there any that come to

3   mind that you've reviewed in addition to

4   these?

5       **A.**    I'm not sure that I have

6   what you're referring to as a reliance

7   page.

8       **Q.**    Attached to your report.

9       **A.**    Oh, I'm sorry.

10              Yes, I would say the ones

11  that come to mind would be the

12  deposition -- the recent depositions of

13  the plaintiffs' experts, which would

14  include Dr. Blaivas, Dr. Rosenzweig and

15  Dr. Elliott.

16      **Q.**    So the depositions of Drs.

17  Blaivas, Rosenzweig and Elliott are in

18  addition to the reports listed here?

19      **A.**    Correct.

20              MR. SNELL:  I'll make a

21          note, for the record, that he may

22          have opinions regarding those

23          expert depositions.

24  BY MS. THOMPSON:

Marc Toglia, M.D.

Page 35

1        **Q.**    Do you have any opinions

2   related to the expert depositions that

3   you reviewed that you can relate to me at

4   this time?

5        **A.**    I do.

6        **Q.**    Why don't you go ahead --

7   that are different from what you have in

8   your report?

9        **A.**    I don't know that I would

10  say different.  They would be, maybe,

11  perhaps, in addition.  That I might have

12  opinions in addition to what I may have

13  expressed in the report, if that makes

14  sense to you.

15       **Q.**    Sure.  Why don't you go

16  ahead and, to the best of your ability,

17  give me those additional opinions now?

18       **A.**    Where would you like me to

19  start?

20       **Q.**    Wherever you want to start.

21             MR. SNELL:  You can -- do

22        you want the depositions?

23             THE WITNESS:  Would it be

24        helpful for you, counselor, if,

Marc Toglia, M.D.

Page 36

1          perhaps, I explain to you my

2          methodology, as far as what --

3          what I did in terms of formulating

4          the opinion and what I found, what

5          I -- what I was told was sort of

6          my charge, so to speak?

7    BY MS. THOMPSON:

8          Q.    Sure.

9          A.    I think that will just make

10   what I'm about to say more -- sort of

11   more relevant.

12              So it was my understanding

13   that I was to formulate an opinion

14   whether or not the design of the TVT was

15   reasonably safe for its intended use for

16   the treatment of stress incontinence in

17   women versus whether or not it was

18   defective in its design.

19              In formulating my opinion, I

20   looked at the high-quality studies.  By

21   that I mean those that we would consider

22   to be Level 1 evidence, things such as

23   randomized control trials, systematic

24   reviews, the prospective longitudinal

Marc Toglia, M.D.

Page 37

1    registry trials.  All of these would

2    constitute what we would consider to be

3    Level 1 scientific evidence.

4              From there, I reviewed the

5    published position statements from the

6    relevant specialty societies.  And those

7    would be sort of the high-quality data

8    that I used to formulate my opinion.

9              There were additional pieces

10   of works, such as those exhibits -- I

11   don't always know the legal term for

12   these things -- that were provided by

13   your experts, by the plaintiffs' experts

14   that, of course, I would have looked at

15   and considered, because, obviously, they

16   were relevant in that regard.

17              I will tell you, just to be

18   clear, that, in general, things like

19   bench research, in vitro studies, case

20   series, we consider those to be Level

21   5 -- expert opinion, Level 5 studies.

22   And those, typically, are not very

23   relevant or scientifically meaningful,

24   especially when Level 1 evidence exists.

Marc Toglia, M.D.

Page 38

1              And so those things, because

2    of their severe limitations, you can

3    never derive clinical inference or

4    medical conclusions, because the evidence

5    is so weak.

6              So while I am familiar and

7    have reviewed those studies and

8    documentations, typically, they don't

9    factor into the formulation of an

10   opinion.

11             In that regard, I would say,

12   as a general statement, I was struck by

13   the fact that all three of the expert

14   reports that I reviewed, and I'm

15   specifically referring to those by Dr.

16   Rosenzweig, Blaivas and Elliott, that

17   they were significantly devoid of similar

18   high-quality Level 1 evidence studies and

19   seemed to spend the majority of their

20   time looking at far less clinically

21   relevant Level 5 studies, such as animal

22   studies, bench research, in vitro

23   studies, unpublished observations, as

24   well as personal experience and expert

Marc Toglia, M.D.

Page 39

1    opinion.

2              So as a general statement,

3    my additional opinion is that, you know,

4    the majority of what I've read from these

5    individuals is not of very high

6    scientific quality.

7              And I think that they have,

8    if I can be completely honest,

9    misrepresented data from levels of

10   evidence that do not allow you to make

11   clinical inference or draw conclusions

12   specifically as it would relate to the

13   design and safety of the TVT device and

14   specifically to its intended use for the

15   treatment of female stress incontinence.

16        **Q.**    Let's go ahead and get to

17   the additional opinions that you have,

18   with that background.

19        **A.**    Yes.

20        **Q.**    What are those additional

21   opinions?

22        **A.**    I think I've given you

23   what -- what those opinions are.  I mean,

24   if you have specific questions, I'm more

Marc Toglia, M.D.

Page 40

1    than happy to discuss those with you.

2         Q.    All right.  So it sounds

3    like the additional opinion that you're

4    giving are that the plaintiff experts'

5    reports are devoid of high-quality

6    studies?

7              MR. SNELL:  Objection.  He

8         told you a lot more than that.

9              THE WITNESS:  Yes.  I don't

10        think --

11   BY MS. THOMPSON:

12        Q.    I think that's --

13        A.    -- I can simplify it into a

14   single sentence.

15        Q.    Now, you'll agree with me

16   that a position statement is not a

17   scientific study, correct?

18        A.    A scientific -- I would not

19   agree with that statement.  And let me

20   clarify.

21              A position statement is a

22   summary statement typically based upon a

23   systematic review or independent analysis

24   of Level 1 data.

Marc Toglia, M.D.

Page 41

1          **Q.**    But it's not a scientific

2     piece of literature?  It's not peer

3     reviewed, is it?

4                    MR. SNELL:  Objection.

5               Asked and answered.

6                    THE WITNESS:  I disagree.

7               They -- they are peer reviewed.

8               All position statements are

9               formulated and then reviewed prior

10              to publication.  In fact, the

11              majority of them, for example,

12              you'll see, are published in

13              peer-reviewed journals.  You

14              cannot be published in a

15              peer-reviewed journal unless you

16              are peer reviewed.

17    BY MS. THOMPSON:

18         **Q.**    Okay.  Well, let's just

19    consider the AUGS position statement on

20    midurethral slings.

21                    You're familiar with that

22    document, correct?

23         **A.**    Yes.  I have that document

24    here in my possession.

Marc Toglia, M.D.

Page 42

1          Q.     Do you know why that was

2     prepared?

3          A.     Do I know why?  Can you --

4     I'm not sure if I understand what

5     you're -- what you're meaning.

6          Q.     What was the purpose for the

7     preparation of that position statement by

8     AUGS?

9          A.     The AUGS position statement

10    was -- was created to, as I stated, to

11    provide a summary statement based upon

12    high-quality scientific evidence in light

13    of -- I'm sorry for putting this,

14    unfounded claims regarding the design

15    defects and similar type statements.

16         Q.     So if I told you that the

17    purpose, the reason that the AUGS

18    position statement was written was to use

19    in courtrooms, in litigation, would you

20    have any reason to doubt that?

21         A.     Yes.

22              MR. SNELL:  Hold on.  Let

23         me -- let me -- you have to give

24         me a chance to object.

Marc Toglia, M.D.

Page 43

1              THE WITNESS:  Sorry.

2              MR. SNELL:  Objection.

3         Lacks foundation.

4              Go ahead.

5              THE WITNESS:  That

6         absolutely was not the reason.

7    BY MS. THOMPSON:

8         Q.    And you're confident of

9    that?

10        A.    I am confident of that, yes.

11        Q.    Okay.  And are you familiar

12   with the authors of that position

13   statement?

14        A.    Yes.

15        Q.    Are you familiar with the

16   authors' industry ties?

17        A.    I can't tell you that I know

18   in any great detail what their ties are.

19        Q.    If I told you that they all

20   have conflicts of interest regarding

21   their financial relationship with

22   industry, would you have any reason to

23   doubt that?

24        A.    Yes.

Marc Toglia, M.D.

Page 44

1           MR. SNELL:  Hold on.  Let

2      me -- you have to give me -- these

3      are totally without -- objection.

4      Lacks foundation.  Misstates

5      evidence.

6           Go ahead.

7           THE WITNESS:  I would not

8      believe what you're saying.  Or I

9      don't believe what you're saying.

10  BY MS. THOMPSON:

11      **Q.**   Is there anywhere in that

12  two-page position statement that mentions

13  complications or risks associated with

14  midurethral slings?

15      **A.**   May I refer to it?

16           MR. SNELL:  Of course.

17           MS. THOMPSON:  Sure.

18           MR. SNELL:  You can always

19      get it out.

20           That goes for any document

21      she asks you about.

22           THE WITNESS:  Of course, it

23      has to be the one that's all the

24      way at the back.

Marc Toglia, M.D.

Page 45

1              MR. SNELL:  Just so I'm

2        clear on the record, which one are

3        you talking about?

4              MS. THOMPSON:  The AUGS

5        position statement on midurethral

6        slings.

7              MR. SNELL:  There's a

8        couple.

9              THE WITNESS:  There's one.

10       There's --

11             MS. THOMPSON:  I'm only

12       familiar with one position

13       statement.

14                  -  -  -

15             (Whereupon, a discussion off

16       the record occurred.)

17                  -  -  -

18             THE WITNESS:  Counselor,

19       thank you for waiting.

20             I have in front of me the

21       AUGS/SUFU position statement on

22       mesh midurethral slings.  I would

23       ask that you repeat the question

24       to me, please.

Marc Toglia, M.D.

Page 46

1    BY MS. THOMPSON:

2        Q.    The question is, in this,

3    actually, three-page position statement,

4    is there any mention of complications or

5    risks associated with midurethral slings?

6        A.    I believe that the purpose

7    of the position statement was to

8    acknowledge the fact that the midurethral

9    sling was recognized as the worldwide

10   standard of care and that the procedure

11   was felt to be safe and effective.

12              I don't believe that this

13   was a document that was intended to

14   address the question that you're asking

15   me.

16       Q.    So the answer is no?

17             MR. SNELL:  Objection.

18         Misstates.

19             MS. THOMPSON:  Well, it's a

20         yes-or-no question.

21   BY MS. THOMPSON:

22       Q.    Is there any mention of

23   complications or risks in this three-page

24   document?

Marc Toglia, M.D.

Page 47

1              MR. SNELL:  He just told you

2         it discussed the safety.

3              MS. THOMPSON:  He said --

4         okay.

5    BY MS. THOMPSON:

6         Q.    Let's -- show me where it

7    discusses the safety.

8         A.    Counselor, on Page 2, under

9    Number 4, The FDA has clearly stated that

10   polypropylene midurethral sling is safe

11   and effective in the treatment of stress

12   urinary incontinence.

13             In this document it is

14   explicitly stated, That the FDA -- and

15   I'll just paraphrase, The safety and

16   effectiveness of multi-incision slings is

17   well established in clinical trials.

18        Q.    It still doesn't -- it says

19   it's safe.

20             Does it discuss

21   complications?

22        A.    Counselor, the question that

23   you asked me is whether or not it was

24   safe.  I answered the question.

Marc Toglia, M.D.

Page 48

1        Q.    I said -- there's a

2   discussion of safety.  That, to me, is

3   not a discussion of safety.

4              MR. SNELL:  Objection.  That

5         is not a question.  Move to strike

6         the attorney comment.

7   BY MS. THOMPSON:

8        Q.    Are there any complications

9   of midurethral slings discussed in this

10  position paper?

11       A.    Again, that was not the

12  purpose of the paper.  So I am not

13  surprised that there would not be a

14  specific discussion of that in that

15  particular paper.

16              But, again, that was one of

17  a series of papers that AUGS published on

18  that.

19       Q.    So your position is that the

20  purpose of this position statement by

21  AUGS and SUFU was to report on the

22  clinical studies related to midurethral

23  slings, but it was not necessary to

24  comment on any complications or risks

Marc Toglia, M.D.

Page 49

1   associated; is that your testimony?

2              MR. SNELL:  Objection.

3              THE WITNESS:  That's

4         not what I --

5              MR. SNELL:  Hold on.

6         Objection.  Misstates testimony.

7              MS. THOMPSON:  I'm asking if

8         that's his testimony.  If it's

9         not, he can tell me it's not.

10             THE WITNESS:  It is not my

11        testimony, counselor.

12             Again, to be clear, a

13        position statement is exactly

14        that, it's a statement on a

15        position.  And the position taken

16        here was specifically and simply,

17        midurethral slings are recognized

18        as the worldwide standard of care

19        for the treatment of stress

20        urinary incontinence.

21             The statement is that the

22        procedure is safe, effective and

23        has improved the quality of life

24        for millions of women.

Marc Toglia, M.D.

Page 50

1    BY MS. THOMPSON:

2         **Q.**    So, then, a position

3    statement is an opinion, correct?

4         **A.**    A position statement is an

5    opinion.

6         **Q.**    And I don't think we ever

7    answered my question if there were any

8    complications discussed, but I'd like for

9    you to answer that yes or no.

10               Were -- are any

11   complications discussed in the position

12   statement?

13               MR. SNELL:  Objection.

14         Asked and answered.

15               MS. THOMPSON:  He has not

16         answered it.

17               THE WITNESS:  That wasn't

18         the purpose of the -- of the

19         position statement.

20   BY MS. THOMPSON:

21         **Q.**    I didn't ask about the

22   purpose.

23               I asked you, are

24   complications or risks discussed in this

Marc Toglia, M.D.

Page 51

1   position statement?

2          **A.**     They are not discussed in

3   the position statement.

4          **Q.**     Thank you.

5                 Let's go back to the

6   Schedule A on the notice of deposition.

7   I want to ask you just about a handful of

8   items to see if you brought them or had

9   them in your possession.

10                 Number 13, do you -- did you

11   bring any Ethicon products in your

12   possession?

13          **A.**     I have no Ethicon products

14   in my possession.

15          **Q.**     The documents or

16   communications relating to presentations

17   or lectures given to you concerning

18   pelvic mesh, pelvic organ prolapse or

19   stress urinary incontinence, did you

20   bring those items with you?

21          **A.**     I'm sorry, I'm not -- I'm

22   not --

23          **Q.**     Number 16.  Sorry.

24          **A.**     Okay.  I'm sorry.  The

Marc Toglia, M.D.

Page 52

1    reason I was confused, you didn't -- you

2    didn't say that I used.

3              You want -- are you -- are

4    you asking about any presentation that is

5    about pelvic mesh or are you specifically

6    saying presentations that I contributed

7    or I presented?

8         Q.    Given or contributed to by

9    you.

10        A.    And the question was, I'm

11   sorry, did I bring?

12        Q.    Did you bring any of those

13   documents relating to presentations or

14   lectures given or contributed to by you?

15        A.    I don't -- I don't -- I

16   don't recall that I have those in my -- I

17   don't have an independent recollection of

18   those being in my possession.

19        Q.    Do you have PowerPoints

20   relating to stress incontinence or mesh

21   products?

22        A.    In general or with me?

23        Q.    In general first.

24        A.    Yes.  I have PowerPoint -- I

Marc Toglia, M.D.

Page 53

1    have given PowerPoint presentations in

2    the past.  I do not have any with me.

3         Q.    Could you get those for us

4    and provide those to Mr. Snell?

5         A.    I don't -- I don't know that

6    I have all presentations that I've ever

7    given.

8         Q.    Could you provide to Mr.

9    Snell everything that you have relating

10   to these three areas?

11        A.    I'm sorry, can you -- let me

12   just -- I just want to make sure that I'm

13   clear as far as what three areas.

14        Q.    Pelvic mesh, pelvic organ

15   prolapse and stress urinary incontinence.

16        A.    Counselor, I'm sorry, can

17   you tell me why pelvic mesh is relevant

18   to an analysis of the -- of the TVT

19   design?  Because that's a completely

20   different disease state.

21        Q.    I'm not talking about the

22   disease state.  And I ask the questions.

23   But I'm happy to answer that.

24        A.    Yes.

Marc Toglia, M.D.

Page 54

1          **Q.**    The TVT uses the same

2    material that's used in other pelvic mesh

3    products, correct?

4                    MR. SNELL:  Objection.

5          Overbroad.

6                    THE WITNESS:  That was not

7          part of my analysis.  My analysis

8          was on the TVT design and safety.

9    BY MS. THOMPSON:

10          **Q.**    But I'm asking the

11    questions.  And I'm asking you the

12    question.

13                    Does the TVT use the same

14    material that's used in other pelvic mesh

15    devices?

16          **A.**    The base --

17                    MR. SNELL:  Same objection.

18                    THE WITNESS:  The base

19          material, they're both based upon

20          macroporous polypropylene mesh.

21          I'm not sure I would -- and

22          there's a wide variety of

23          fabrication and materials used.

24                    I don't want you to think

Marc Toglia, M.D.

Page 55

```
1            that I think that, say, the mesh
2            that we use for pelvic organ
3            prolapse is simply the exact TVT
4            material expanded to a larger
5            size.
6    BY MS. THOMPSON:
7            Q.    Well, let me ask you this:
8    What is the TVT material?
9            A.    The Gynecare TVTTM is a Amid
10   Type I macroporous polypropylene mesh
11   that is of a knitted design.
12           Q.    Is it lightweight or
13   heavyweight?
14           A.    In my opinion, it is a
15   lightweight mesh.
16               Although I would say this,
17   weight of mesh is dependent upon the
18   volume or surface area.  And I don't
19   really think that anybody -- excuse me, I
20   don't think that I could classify it
21   based on weight, given the fact that it's
22   a 1.1 centimeter strip of material.
23               So the short answer is that
24   it's lightweight.  I am -- I am
```

Marc Toglia, M.D.

Page 56

1    clarifying that to say that, you know,

2    weight is a descriptor that's really

3    based upon surface area or volume.  And

4    there's such a small volume of material

5    that we're talking about that I don't

6    know that anybody would specifically

7    state that that material was of a

8    specific weight.

9        Q.    So it's your opinion that

10   you can't determine whether the mesh used

11   in the Gynecare TVTTM is heavyweight or

12   lightweight?

13              MR. SNELL:  Objection.

14         Misstates.

15              THE WITNESS:  That's not

16         what I said.

17   BY MS. THOMPSON:

18       Q.    Then -- so someone can do it

19   but you can't, is that the answer?

20              MR. SNELL:  Same objection.

21              THE WITNESS:  I didn't say

22         that either.

23   BY MS. THOMPSON:

24       Q.    Okay.  My question, then,

Marc Toglia, M.D.

Page 57

1    is, is the mesh used in the Gynecare

2    TVTTM lightweight or heavyweight; choose

3    one of the two, or can't be determined?

4         **A.**    The TVT -- the TVT device, I

5    would consider to be a lightweight

6    macroporous polypropylene mesh, with the

7    understanding that mesh weight,

8    technically, you have to consider the

9    volume of the material.

10         **Q.**    Did Ethicon show you any

11   documents that described the TVT mesh as

12   not being macroporous and lightweight?

13         **A.**    The documentation that I am

14   familiar with would support the -- what I

15   have said, TVT is a lightweight

16   macroporous mesh.

17         **Q.**    And what are the documents

18   that you're using to base that opinion

19   on?

20         **A.**    Everything that we are

21   referencing in the report, the materials

22   that we have included here today.

23         **Q.**    Can you be more specific

24   than that?

Marc Toglia, M.D.

Page 58

1          **A.**     It would take -- it would
2     take hours to go over all of those
3     things.
4          **Q.**     Have you seen any Ethicon
5     documents stating that the Gynecare TVTTM
6     is large pore lightweight?
7          **A.**     I -- the TVT is lightweight
8     and large pore.
9          **Q.**     And you're confident about
10    that position?
11         **A.**     Counselor, I'm extremely
12    confident in that statement.
13         **Q.**     I want to talk a little bit
14    about your use of mesh products,
15    including Ethicon products.
16               I believe in your report you
17    stated that you began using the TVT in
18    1999; is that correct?
19         **A.**     Yes.
20         **Q.**     And were you trained by
21    Ethicon in the use of that device?
22         **A.**     I was.
23         **Q.**     Do you remember who you were
24    trained by?

Marc Toglia, M.D.

Page 59

1        **A.**    I do.

2        **Q.**    Who is that?

3        **A.**    Dr. Vince Lucente, one of my

4    colleagues.

5        **Q.**    And that training took place

6    in early 1999; is that correct?

7        **A.**    I would be guessing, but I

8    believe it might have been in May of

9    1999.  But I honestly can't tell you

10   when -- when within the year it was.

11       **Q.**    And was that training done

12   formally through Ethicon or did Dr.

13   Lucente provide a more informal

14   preceptorship to you?

15            MR. SNELL:  Objection.

16       Vague.

17            THE WITNESS:  Dr. Lucente

18       and I are close colleagues.  It is

19       not unusual for us to communicate

20       and get together and work

21       together.

22            So, to be honest, it's --

23       Ethicon did not come to me and

24       say, we want you to go work with

Marc Toglia, M.D.

Page 60

```
1            Dr. Lucente.  Dr. Lucente and I
2            were having a conversation about
3            things that he was working on.  I
4            asked if I could come up and
5            become involved.
6                 I'm sure that there may or
7            may not have been a relationship,
8            at that time, between Ethicon and
9            Dr. Lucente regarding my training.
10           I certainly was not aware of that
11           directly.  This is something that
12           Dr. Lucente and I, and other
13           colleagues, would do for each
14           other routinely.
15   BY MS. THOMPSON:
16           Q.   Sure.  So you didn't attend
17   an Ethicon sponsored training session; is
18   that what you're saying?
19                MR. SNELL:  Objection to
20           form.
21                THE WITNESS:  To the best of
22           my recollection, there may or may
23           not have been a presentation
24           given.  My independent
```

Marc Toglia, M.D.

Page 61

```
 1            recollection is that he and I
 2            performed maybe four or five cases
 3            together.
 4                   But I honestly can't -- I
 5            can't tell you whether there was a
 6            formal or informal -- to be honest
 7            with you, given our relationships,
 8            those lines are blurred.
 9   BY MS. THOMPSON:
10        Q.    Sure.  And I understand.
11        A.    Yes.
12        Q.    I'm just trying to find out
13   whether you were given the Ethicon oral
14   presentation, for example, on the new
15   device --
16            MR. SNELL:  Objection.
17   BY MS. THOMPSON:
18        Q.    -- by an Ethicon
19   representative.
20            MR. SNELL:  Objection.
21            Vague.
22            THE WITNESS:  Not to my
23            knowledge.
24   BY MS. THOMPSON:
```

Marc Toglia, M.D.

Page 62

1        **Q.**    And did you participate in

2   cadaver labs sponsored by Ethicon?

3        **A.**    Note, in the next ten years,

4   I did a tremendous amount, or a variety

5   of different things.  I'm just not clear

6   if we're referring to that one incidence

7   or -- I mean, this was not a one-time

8   experience.

9        **Q.**    Understood.  I'm referring

10  now to your training and I think we'll

11  get, later, the training that you gave

12  other doctors.

13       **A.**    Right.

14       **Q.**    But it sounds like, to me,

15  and correct me if I'm wrong, you at least

16  don't recall attending a formal training

17  program sponsored by Ethicon --

18       **A.**    No, no.

19            MR. SNELL:  Objection.

20       Overbroad.

21  BY MS. THOMPSON:

22       **Q.**    -- prior to using the TVT.

23            MR. SNELL:  Same objection.

24            THE WITNESS:  Maybe I

Marc Toglia, M.D.

Page 63

1              didn't -- maybe I wasn't clear.

2                   I thought we were talking

3              about what my first exposure was.

4              But, of course, I had formal

5              training from Ethicon prior to me

6              independently performing the

7              procedure in my practice.

8                   What I don't recall, and I'm

9              really don't mean to be vague, is

10             whether I did that training first

11             and then worked with Dr. Lucente,

12             whether they may have -- may have

13             simultaneously occurred, or

14             whether I first looked at the

15             procedure with Dr. Lucente and

16             then had the formal training.

17                  I do know that prior to

18             doing the training with Dr.

19             Lucente, I did consult with the

20             company prior to the procedure's

21             launch and received education at

22             that level.

23     BY MS. THOMPSON:

24             Q.    Okay.  Fair enough.  So

Marc Toglia, M.D.

Page 64

1    sounds like you had both, formal training

2    from the company --

3         **A.**     Yes.

4         **Q.**     -- and a preceptorship or

5    whatever you want to call --

6         **A.**     I wouldn't call it a

7    preceptorship, but I had -- I mean,

8    surgeons learn procedures from other

9    surgeons.

10        **Q.**     Sure.

11        **A.**     Right.

12        **Q.**     And do you still use the

13   Retropubic TVT device in your practice?

14        **A.**     Yes, I do.

15        **Q.**     Do you use other retropubic

16   sling products?

17        **A.**     I do not.

18        **Q.**     So exclusive to TVT is what

19   you're using now for a retropubic am

20   synthetic sling?

21        **A.**     I have experience with a

22   wide variety of devices.  But if you were

23   to come to me as a patient and we had

24   determined that an anti-incontinence

Marc Toglia, M.D.

Page 65

1    procedure was appropriate, then the

2    retropubic TVT is, 95 percent of the

3    times, the retropubic procedure or

4    midurethral-sling-based procedure that I

5    would use.

6          Q.    Are you doing, currently,

7    any transobturator slings?

8          A.    I do do transobturator

9    slings.

10         Q.    What percentage of your

11   practice, currently, is retropubic and

12   what percentage transobturator?

13         A.    It's probably 95 percent

14   retropubic and about 5 percent at the

15   present time.  It has varied over time.

16         Q.    And over the years, how many

17   TVT or TVT Exact® products have you used?

18         A.    By my best estimates, I

19   would say 2,500 TVT procedures, give me a

20   wide margin of error of probably 300 in

21   either direction, perhaps.

22         Q.    How do you keep track of

23   which products you use?

24         A.    I have a very good memory.

Marc Toglia, M.D.

Page 66

1        **Q.**    So if I wanted to ask you

2    exactly how many of a given product you

3    have used, could you tell me?

4        **A.**    I could give you an

5    approximate ballpark.

6        **Q.**    And how would you do that?

7        **A.**    Through a variety of

8    methods.  But, as I said, I've got a

9    pretty good idea mentally.  If you ask me

10   how many TVT-Securs I did, I would tell

11   you 60.

12       **Q.**    And that would come from

13   your memory, correct?

14       **A.**    My memory.  I'd have to go

15   through some office records, some

16   documentation elsewhere.

17       **Q.**    So what office records would

18   you go through?

19       **A.**    We have billing data.  You

20   know, I am not telling you that these are

21   things that are readily available to me,

22   if you asked me, can I see this in the

23   next, you know, hour or day.

24                But, certainly, there are --

Marc Toglia, M.D.

Page 67

1    there are internal things that we

2    could -- you know, databases that would

3    contain such records.

4         Q.    So you could go to your

5    billing records and tell me whether a TVT

6    or TVT Exact® was used?

7         A.    No, I don't think I could do

8    it through billing records, obviously.

9    Billing records wouldn't tell me that.

10        Q.    What other records would you

11   use?

12        A.    We would have to pull the

13   charts on every patient.  And every --

14   very procedure that's done carries an

15   implant record.  And so someone would sit

16   there with approximately 2,500 charts and

17   go through the implant records.

18             And by looking at the lot

19   number or model number, we would be able

20   to tell -- I mean, obviously, the Exacts®

21   would all be labeled as such and the TVTs

22   and the Obturator would be labeled as

23   such.

24        Q.    And is that what we would

Marc Toglia, M.D.

Page 68

1    have to do to determine which -- what

2    complications experienced as well?

3         **A.**    No.

4         **Q.**    How would we be able to

5    determine what complications patients

6    have experienced?

7              MR. SNELL:  Objection.

8         Overbroad.  Are you talking about

9         his patients?

10             MS. THOMPSON:  Yes.

11             THE WITNESS:  I'm sorry,

12        what was your question?  I'm not

13        sure I understood it.

14   BY MS. THOMPSON:

15        **Q.**    How would we determine --

16        **A.**    You seem -- you seemed to

17   have switched gears.

18        **Q.**    Well, I was just interested

19   in determining how you figured out what

20   product was used.  And I'm also

21   interested in how you figure out what

22   complications patients experienced.

23             And I'm asking you, how

24   would we determine that?

Marc Toglia, M.D.

Page 69

1        **A.**    I'm sorry, that's not what

2    you asked me originally.  That's a

3    whole -- I would have to start from

4    scratch to --

5        **Q.**    Okay.

6        **A.**    You've asked me how -- you

7    asked me what products have I used and

8    what percentage of products that I've

9    used and how it would be that I would

10   determine that number of products.

11       **Q.**    Yes.

12             Now I'm asking you, how

13   would you determine which complications

14   occurred with various products?

15       **A.**    I would have to sit down and

16   try and figure that out, counselor.  I

17   can't tell you off the top of my head

18   that I have an accurate way of -- I mean,

19   there may be ways, through the billing

20   system, to capture certain complications

21   based upon -- by diagnosis codes.

22       **Q.**    Let's go through other

23   Ethicon products.

24             Did you use the TVT-O at

Marc Toglia, M.D.

Page 70

1    some point?

2            **A.**    I did.

3            **Q.**    About how many TVT-Os did

4    you place?

5            **A.**    Approximately 2 to 300.

6            **Q.**    And when did you start using

7    the TVT-O?

8            **A.**    To the best of my knowledge,

9    I can't remember when -- the product

10   launch was in 2005 or 2002?  Whenever the

11   product was launched, roughly about when

12   I had used the TVT-O.

13           **Q.**    And how did you learn about

14   the TVT-O?

15           **A.**    By that point in time, I

16   was -- you know, we -- we attend certain

17   scientific meetings, publications, the

18   usual things that we do in the course of

19   our -- of our practice, my role reviewing

20   manuscripts for publications, my role as

21   an editor of journals.

22               I mean, there's a wide range

23   of ways that topics like this were

24   introduced to us.

Marc Toglia, M.D.

Page 71

1        Q.    Did you get information from
2    sales reps?
3        A.    On the TVT-O?  Eventually.
4    I can't tell you that that was maybe
5    my -- if that was my first exposure or
6    not.  To be completely frank, at my level
7    of involvement with the company, sales
8    reps are not a -- that's not a source
9    that I would utilize a high degree.  I
10   usually find out -- I'm educated on stuff
11   before a sales rep is probably aware of
12   it.
13              And, of course, I don't --
14   I'm not at liberty to discuss that with
15   sales reps.
16       Q.    What -- what are you not at
17   liberty to discuss with sales reps?
18       A.    Well, for example, if I'm
19   involved in the -- if I've been consulted
20   upon the design of a new product, you
21   know, sales reps are not well versed or
22   maybe not aware of what things are in
23   development.
24              I'm just saying that most of

Marc Toglia, M.D.

Page 72

1    the times, I'm a bit further along in

2    that regard, and my -- you know, my -- I

3    don't rely upon that relationship for

4    that kind of information.

5          Q.    What Ethicon products were

6    you involved in the design, as you've

7    been referring to?

8          A.    Well, I was -- as I

9    mentioned earlier, I was consulted on the

10   original TVT Retropubic.  I offered

11   opinions on the Obturator product at some

12   point in time, the TVT-Secur.  I had

13   significant involvement in the design of

14   the TVT EXACT® product.

15         Q.    And would these have all

16   been prior to the devices going to

17   market?

18         A.    A combination.  Not

19   necessarily the same for each product.

20         Q.    But at least for the

21   original TVT, you were consulted before

22   the product was marketed, I believe you

23   said; is that correct?

24         A.    I recall being a part of

Marc Toglia, M.D.

Page 73

1    expert focus groups that discussed the

2    concept that would look at towards am

3    what was the utility, the market need,

4    the viability.

5              Because I'm an educator,

6    it's likely that I was asked questions

7    regarding about -- about that.

8         Q.    So at least for the sling

9    products, you were involved in the design

10   of the original TVT, the TVT-O, TVT-Secur

11   and TVT EXACT®; is that correct?

12        A.    I don't -- I don't know that

13   I would say design in those.  I was

14   involved in the design for the TVT

15   EXACT®.

16             The TVT product was already

17   set to be launched, so, clearly, it had

18   already been designed.  I'm just saying

19   that I had input and my opinion was

20   sought out prior to the product being

21   launched.

22        Q.    For which of those products

23   were you actually paid by Ethicon to give

24   your opinions as to the devices?

Marc Toglia, M.D.

Page 74

1          **A.**     To the best of my knowledge,

2     I provided paid consultant services on

3     all those products.

4          **Q.**     And what about Ethicon's

5     prolapse products, were you involved in

6     the design of any of those?

7          **A.**     I mean, I had involvement in

8     many products, some of which never saw

9     the light of day, as well as the TVT

10    Prolift family of products.

11         **Q.**     So the PROLIFT® Anterior?

12         **A.**     Correct.

13         **Q.**     PROLIFT® Posterior?

14         **A.**     Correct.

15         **Q.**     PROLIFT® Total?

16         **A.**     Yes.

17         **Q.**     Do you remember the names of

18    any of the other devices that you

19    consulted on?

20         **A.**     I could probably dredge that

21    from my memory, yes.

22         **Q.**     All right.  I'll take it.

23         **A.**     I believe there was a

24    product called the V-Tac product.  I

Marc Toglia, M.D.

Page 75

1    believe there was a product called

2    PROSIMATM product.  Obviously, the

3    PROLIFT® +M was simply a modification of

4    the original PROLIFT® procedure.

5                    There was a product that I

6    was the originator of the concept, the

7    proof of concept, the initial engineering

8    that had to do with a post anal sling for

9    treatment of a different pelvic floor

10   disorder known as anal incontinence.

11        Q.    Did that product ever have a

12   name?

13        A.    You know, it had a name in

14   development.  The product never came to

15   market.

16        Q.    What was the name in

17   development?

18        A.    In development, we would

19   refer to that product as the Post-Anal

20   Sling Surgery or PAS.

21        Q.    And to the best of your

22   recollection, were you a paid consultant

23   for your involvement in each of those

24   products as well?

Marc Toglia, M.D.

Page 76

1          **A.**    To the best of my knowledge,

2     yes.

3          **Q.**    Are you the type of doctor

4     that likes to see data before using a

5     product?

6                    MR. SNELL:  Objection.

7                    Vague.

8                    THE WITNESS:  I would

9               characterize myself as somebody

10              who puts a great deal of

11              importance on sound scientific

12              principles.  Certainly, when

13              high-quality data is available, it

14              is given the weight that it

15              deserves.

16                   At different -- you know,

17              the area of urogynecology has

18              evolved tremendously in the past

19              20 years.  I was very fortunate to

20              be within this field at very

21              early -- at a very early phase.

22              So there are certainly procedures,

23              techniques, theories that I was

24              involved with very early on, and,

Marc Toglia, M.D.

Page 77

1          obviously, data comes a little bit

2          later.

3     BY MS. THOMPSON:

4          **Q.**     And you actually were part

5     of a study comparing the retropubic TVT

6     to TVT-Secur; is that correct?

7          **A.**     That is correct.

8          **Q.**     Before beginning that study,

9     did you have any data on the TVT-Secur?

10         **A.**     Yes.

11         **Q.**     What was that data?

12         **A.**     So there was the -- as is

13    typical, there are always safety and

14    efficacy studies that are put before --

15    I'm sorry, let me rephrase that.

16              There was preliminary

17    published data, I believe, from the UK or

18    Europe about the initial design and

19    development for the TVT-Secur.  And that

20    would have been some of the data that we

21    were considering.

22              The reason for doing the

23    trial, of course, is that we already had

24    a procedure that was widely practiced and

Marc Toglia, M.D.

Page 78

1    widely accepted that had a tremendous

2    amount of data supporting its long-term

3    safety and effectiveness.

4            And with a new product

5    available, we want to specifically

6    compare apples to apples.

7        Q.    So it's your position that

8    there was published literature on the

9    safety and efficacy of the TVT-Secur

10   before it was launched in the U.S.?

11       A.    I don't believe that's what

12   I said.

13       Q.    Okay.  Was there safety and

14   efficacy -- published safety and efficacy

15   studies on the TVT-Secur before it was

16   launched in the U.S.?

17       A.    I don't have independent

18   recollection, as I sit here now, as far

19   as the timing of one versus the other.

20       Q.    So you don't know, one way

21   or the other, whether there were any

22   published data on the TVT-Secur --

23       A.    I'm not saying --

24       Q.    -- before it was launched?

Marc Toglia, M.D.

Page 79

1        **A.**     I'm not saying that I don't

2    know.  I'm just saying that as I sit here

3    in conversing with you now, I cannot, in

4    my mind, say, okay, the TVT-Secur was

5    launched on this particular date and the

6    safety -- excuse me, a clinical trial was

7    published before or after.

8        **Q.**     What did you tell the

9    patients that enrolled in that study

10   about the safety and effectiveness of the

11   TVT-Secur?

12       **A.**     Well, I mean, the patients

13   underwent standardized and uniform

14   informed consent that was the same across

15   the entire -- the entire study.  This

16   consent was, of course, approved -- at

17   our -- at our institution it was approved

18   by our own internal -- our IRB.

19             As far as the exact language

20   of that, I can't tell you.  But, you

21   know, essentially, we would explain to a

22   patient that there was an established

23   procedure that was widely practiced and

24   was an accepted first-line therapy for

Marc Toglia, M.D.

Page 80

1    stress incontinence and that there was a

2    newer procedure that was FDA approved and

3    that it was our interest in comparing the

4    two products, looking at safety,

5    effectiveness, differences in recovery,

6    everything from activity, the amount of

7    pain medication someone was to take,

8    because we wanted to be able to

9    independently compare the two procedures

10   side by side in a scientific manner that

11   would attempt to minimize bias.

12        **Q.**    Did you tell patients that

13   the TVT-Secur had never been used in a

14   woman, prior to launching?

15             MR. SNELL:  Objection.

16             Foundation.

17             THE WITNESS:  I don't

18             recall.  I don't recall that I --

19             that I said that, no.

20   BY MS. THOMPSON:

21        **Q.**    Was the TVT-Secur FDA

22   approved?

23        **A.**    Yes.  To the best of my

24   knowledge, the TVT-Secur was FDA

Marc Toglia, M.D.

Page 81

1    approved.

2         Q.    I want to go back to your

3    relationship with the Ethicon sales reps.

4               Do you recall who the sales

5    rep was that called on you here in

6    Philadelphia when you first began using

7    the TVT?

8         A.    There were several.  I don't

9    know who came first.

10        Q.    Do you remember any of the

11   sales reps that have called on you here

12   in Philadelphia for Ethicon?

13        A.    Yes.

14        Q.    Which ones?

15        A.    There was a woman, Eileen

16   Ghenn.  There was --

17        Q.    I'm sorry, how do you

18   spell Ghenn?

19        A.    Ghenn?  G-H-E-N-N, and

20   that's a guess.

21              I believe there was a

22   Marty -- I can't remember his last name.

23   There was another gentleman whose first

24   name was Tom.  There was a woman by the

Marc Toglia, M.D.

Page 82

1    name of Kathleen Feeney.  There was, more

2    recently, a gentleman whose name escapes

3    me.

4              There were -- there were

5    half a dozen or more.  I'm sorry.

6         Q.    And of the ones that you

7    remember their names, can you tell me,

8    for example, Ms. Ghenn, when did she call

9    on you for Ethicon?

10        A.    I honestly couldn't tell you

11   the dates.

12        Q.    Is she still an Ethicon

13   sales rep and still calling on you?

14        A.    No.

15        Q.    And how about Marty, do you

16   recall the time frame where he called on

17   you as an Ethicon sales rep?

18        A.    He was in -- he would have

19   been in the beginning.  I can't tell you

20   that he was 1999, 2000, 2001.  My

21   recollection was within the first three

22   or four years, I seemed to have a

23   different rep every year.

24              There's another woman by the

Marc Toglia, M.D.

Page 83

1    name of Kathy, I believe.

2              I'm sorry.

3        Q.    That's okay.

4              And Tom, do you remember

5    when Tom was a sales rep?

6        A.    Counselor, I'm sorry, let

7    me -- I can't give you specifics on any

8    of these people.

9        Q.    And that's fine.  It's fine

10   to say --

11       A.    Right.  I don't recall.

12       Q.    -- I don't recall, no, or I

13   don't remember.

14             And how about Ms. Feeney, do

15   you remember when she was a sales rep?

16       A.    To the best of my

17   recollection, Ms. Feeney was my rep for

18   the longest period of time.  Time frame

19   wise, it would -- I would be guessing.  I

20   would say 2005 to 2009, for example.  It

21   might have been a period of two to four

22   years.  I honestly don't know.

23       Q.    How about currently, is

24   there a sales rep that you're familiar

Marc Toglia, M.D.

Page 84

1   with?

2          **A.**     No, there is not.

3          **Q.**     And Ms. Feeney is no longer

4   working for Ethicon; is that correct?

5          **A.**     That's correct.

6          **Q.**     And Kathy, do you remember

7   when Kathy --

8          **A.**     No.

9          **Q.**     -- was a sales rep?

10                     Generally, did you have a

11   good relationship with the sales --

12   Ethicon sales reps, including the ones

13   that you mentioned?

14         **A.**     Some better than others.

15         **Q.**     Which ones were they better

16   with?

17         **A.**     Again, these are transient

18   people in my life.  I mean, Kathleen

19   Feeney and I had a reasonable

20   relationship.  Eileen Ghenn and I, not so

21   much, that I recall.

22                     I mean, there's really

23   nothing of any great meaning to these

24   relationships either way.

Marc Toglia, M.D.

Page 85

1         **Q.**    Did you have loyalty to the

2    sales reps?

3         **A.**    No, not at all.

4              MR. SNELL:  If you're going

5         to move to a different topic, can

6         we take a break?

7              MS. THOMPSON:  Yeah, this is

8         a good time for a break.

9              MR. SNELL:  We've been going

10        about an hour and-a-half.

11             MS. THOMPSON:  Yes.

12             VIDEO TECHNICIAN:  We are

13        off the record.  The time is 2:41

14        p.m.

15                  -  -  -

16             (Whereupon, a brief recess

17        was taken.)

18                  -  -  -

19             VIDEO TECHNICIAN:  This

20        marks the beginning of Video

21        Number 2.  We are back on the

22        record.  The time is 3:00 p.m.

23   BY MS. THOMPSON:

24        **Q.**   Dr. Toglia, I do have a few

Marc Toglia, M.D.

Page 86

1   more questions about sales reps.

2          **A.**     Yes.

3          **Q.**     How did you typically

4   contact the sales rep?

5          **A.**     I would say most frequently

6   they came to my office, and we would have

7   a face-to-face discussion.  I'm sure that

8   we had e-mail contact.  There was

9   probably cell phone contact with some,

10  when cell phones were, you know, in

11  existence and sort of widely used to for

12  that reason.

13         **Q.**     Did you ever use sales reps'

14  personal e-mails?

15         **A.**     I used whatever e-mails they

16  gave me.  So, yes, I'm -- it's -- if

17  they -- maybe if they e-mailed me from

18  their personal e-mail, my reply would

19  simply be back to them.  I can't tell you

20  that I would distinguish between the two.

21         **Q.**     And what about personal cell

22  phone numbers?

23         **A.**     I honestly can't tell you

24  whether they had company cell phones,

Marc Toglia, M.D.

Page 87

1    personal cell phones.  I gave -- again,

2    whatever contact information might have

3    been presented to me on a business card,

4    I would -- I would assume -- I mean, I

5    was assuming I was calling a business

6    cell.

7         **Q.**    Did you consider your

8    relationship with the sales rep

9    professional?

10        **A.**    Yes.

11        **Q.**    Was the relationship always

12   appropriate with the sales reps, in your

13   opinion?

14        **A.**    Yes.

15                  -  -  -

16             (Whereupon, Exhibit

17        Toglia-4, 3/19/09 E-mail from

18        Marc Toglia to Kathleen Feeney;

19        Subject: Re: These events were

20        approved 3.25 proctorship and 4.21

21        preceptorship, was marked for

22        identification.)

23                  -  -  -

24   BY MS. THOMPSON:

Marc Toglia, M.D.

Page 88

1       **Q.**    I'm going to hand you
2   Exhibit Number 4.  I'll give you a minute
3   to look at that.
4       **A.**    Okay.
5            MR. SNELL:  What number are
6        we on?
7            MS. THOMPSON:  4.
8   BY MS. THOMPSON:
9       **Q.**    Can you describe this e-mail
10  chain with Kathleen Feeney, one of the
11  sales reps that you told us about
12  earlier?
13      **A.**    Uh-huh.  I don't -- I can't
14  tell you that I have -- it seems to me
15  like there is a variety of different
16  things being discussed over here.
17      **Q.**    What were the dates of these
18  e-mails?
19      **A.**    2009.
20      **Q.**    March of 2009?
21      **A.**    Yes.
22      **Q.**    Beginning at the bottom of
23  the first page?
24      **A.**    Yes.

Marc Toglia, M.D.

Page 89

1        Q.    Could you just read what is

2   contained in these e-mails between you

3   and Ms. Feeney?

4        A.    I'm -- she says, I am so --

5   and then she uses a word that I'm just

6   not going to mention out loud -- He's

7   nowhere from being done and wants no

8   help.

9              I think she's referring to

10  another surgeon that she was probably in

11  a case with.  I mean, there's just no

12  context here.  I'm sorry.

13       Q.    Well, this e-mail is from

14  you.

15       A.    I'm sorry?

16       Q.    This e-mail is from you on

17  Thursday, March 19th, 10:46.

18       A.    Okay.

19             I don't know -- I don't know

20  what -- I mean, it sounds like I was -- I

21  was scrubbed in with somebody else.  I

22  honestly couldn't tell you what this --

23  what the context of that was.

24       Q.    So would you read that

Marc Toglia, M.D.

Page 90

 1  again, knowing that that's you writing

 2  the e-mail.

 3      **A.**    Yes.  So, apparently, this

 4  says, I am so f'ed, he's nowhere being

 5  done and wants no help.  You and I will

 6  be having a lunch before my case.

 7      **Q.**    So you're comfortable

 8  putting that word in an e-mail to the

 9  sales rep, although you're not

10  comfortable stating the word here in this

11  deposition; is that correct?

12      **A.**    That is correct.

13          MR. SNELL:  Objection.

14      Argumentative.

15          Go ahead.

16  BY MS. THOMPSON:

17      **Q.**    Okay.  Go ahead and read the

18  next e-mail up.

19      **A.**    Call me.  Pulling up now.

20  Do you want to meet me outside in front?

21      **Q.**    That's from Ms. Feeney to

22  you?

23      **A.**    Yes.

24      **Q.**    And then the next one?

Marc Toglia, M.D.

Page 91

1        **A.**     Still have not started.

2        **Q.**     And then the one after that,

3    from Ms. Feeney?

4        **A.**     Can you do her downstairs?

5        **Q.**     And then the last one from

6    you to Ms. Feeney?

7        **A.**     On top?

8        **Q.**     Yes.

9        **A.**     The first one?

10       **Q.**     Yes.

11       **A.**     No, maybe, though.  Your

12   girlfriend Christine is here and won't

13   leave.  I think she liked her last

14   suggestion too much.

15       **Q.**     I don't think you read the

16   first sentence correctly.

17            MR. SNELL:  I'm going to

18        object.  He did read it.

19            MS. THOMPSON:  Could you --

20        no.  He read, no, maybe, though,

21        your girlfriend Christine.

22            And it actually reads, the

23        response to, Can you do her

24        downstairs, is, No, maybe you,

Marc Toglia, M.D.

Page 92

1          though.

2    BY MS. THOMPSON:

3          Q.    Am I reading that correctly?

4          A.    I don't think so.  I dont

5    know -- no.  I don't -- I don't

6    appreciate what you're implying.  And I

7    can tell you for sure that this has

8    nothing to do with -- with that.

9          Q.    Well, tell -- give me

10   another explanation for why it would be

11   No, maybe you, though, in response to,

12   Can you do her downstairs?

13         A.    Well --

14              MR. SNELL:  Objection.

15              Argumentative.

16              THE WITNESS:  -- "do her"

17              has nothing to do -- has nothing

18              to do with sex, I can guarantee

19              you that, on any level.

20   BY MS. THOMPSON:

21         Q.    All right.  Provide me the

22   alternative explanation.

23         A.    I don't have the context of

24   what this is.

Marc Toglia, M.D.

Page 93

1          Q.    Well, these are your e-mails
2     with Ms. Feeney.
3                What context do you need?
4          A.    I don't know what she's -- I
5     don't know what -- I mean, obviously,
6     there was a -- there's a conversation
7     going on that is not captured in the bulk
8     of this -- of this discussion.
9                I mean, there's hours and
10    hours that go -- they may not even be
11    related.  I mean, there's hours that are
12    between the two.
13         Q.    Was there other
14    correspondence during that hours -- those
15    hours?
16         A.    I would have no idea.
17         Q.    And who is Christine?
18         A.    I think it's another -- I
19    think it's a sales rep for -- like, a
20    pharmaceutical sales rep or a different
21    sales rep.  I have no idea who it is.
22         Q.    Do you think these e-mails
23    with Ms. Feeney are appropriate?
24         A.    I can't tell you that I

Marc Toglia, M.D.

Page 94

1    recall -- I don't know the context.  And

2    I don't know that these are related.  And

3    I don't think that they're strung in the

4    manner that you're insinuating.

5         Q.    Do you think these e-mails

6    are professional?

7         A.    I don't think, in this line

8    of conversation, we were discussing

9    anything related to her -- to anything

10   that -- I don't know.  I don't know what

11   these were referring to, to be honest

12   with you.

13        Q.    Did you have any personal

14   phone calls with Ms. Feeney?

15        A.    Yes.  I mean, I'm sure that

16   I spoke with Ms. Feeney on a variety of

17   things.  She may have told me things

18   about her kids, she may have had ideas

19   about job opportunities that she was

20   interviewing for.  I'm sure she asked me

21   about friends, in terms of their health

22   or, you know, she had a sick grandmother

23   or something.

24                I mean, you know, people

Marc Toglia, M.D.

Page 95

1   will -- as a physician, people will ask

2   you, you know, personal questions.  And,

3   certainly, as a gynecologist, I suspect

4   that I'm probably asked more personal

5   questions, you know.

6           **Q.**   Why did you misread that

7   sentence when I asked you to read it?

8           **A.**   Counselor, I did not misread

9   that.

10          MR. SNELL:  Objection.  Hold

11          on.  Hold on.  That's

12          argumentative.

13          MS. THOMPSON:  I'm just

14          curious --

15          MR. SNELL:  That's

16          argumentative.

17          MS. THOMPSON:  -- about a

18          question.

19          MR. SNELL:  That's

20          argumentative.

21          THE WITNESS:  To the best --

22          MR. SNELL:  And your -- he's

23          already told your insinuation is

24          not whole --

Marc Toglia, M.D.

Page 96

1           THE WITNESS:  Right.  And I
2       don't appreciate it either.
3           MR. SNELL:  If you're here
4       to ask him about his opinions, why
5       don't you do that?  Unless you're
6       trying to, like, just be totally
7       argumentative --
8           MS. THOMPSON:  And I
9       didn't --
10          MR. SNELL:  -- that's what
11      you're doing.
12          MS. THOMPSON:  -- insinuate
13      anything --
14          MR. SNELL:  Yes, you did.
15          MS. THOMPSON:  -- or even
16      mention sex.  He did.
17          MR. SNELL:  Yes, you did.
18          MS. THOMPSON:  Did I
19      anything about sex?  I wanted him
20      to read the sentence, and he left
21      out -- it's the only thing he's
22      misread today.  I was just curious
23      if he knew why he did that.
24          MR. SNELL:  To the best of

Marc Toglia, M.D.

Page 97

```
 1         my knowledge, I read that sentence
 2         exactly.
 3  BY MS. THOMPSON:
 4         Q.    Well, you know that you did
 5  not read it exactly, right?
 6              MR. SNELL:  Objection.
 7  BY MS. THOMPSON:
 8         Q.    Because we read it back to
 9  you from the transcript.
10              MR. SNELL:  Argumentative.
11              THE WITNESS:  Counselor, let
12         me state this clearly.  I read
13         that sentence exactly.  Maybe you
14         did not hear me read that exactly.
15              MS. THOMPSON:  Okay.  I can
16         pursue that.
17              Court reporter, could you
18         please read back Dr. Toglia's
19         answer when I asked the question
20         to read the e-mail from himself to
21         Ms. Feeney at the top of the page?
22              MR. SNELL:  I'm going to
23         object.  This is all asked and
24         answered and covered.  I'm sorry.
```

Marc Toglia, M.D.

Page 98

```
1              MS. THOMPSON:  Are you going
2         to instruct him not to answer?  He
3         said he --
4              MR. SNELL:  I'm not
5         instructing him not to answer.
6         He's told you three times.
7              MS. THOMPSON:  Then he can
8         answer my question that I just
9         asked.
10             Amanda, if you could go
11        ahead and read the question and
12        answer, please.
13                  -  -  -
14             (Whereupon, the court
15        reporter read the following part
16        of the record:
17             "Question:  And then the
18        last one from you to Ms. Feeney?
19             "Answer:  On top?
20             "Question:  Yes.
21             "Answer:  The first one?
22             "Question:  Yes.
23             "Answer:  No, maybe, though.
24        Your girlfriend Christine is here
```

Marc Toglia, M.D.

Page 99

1           and won't leave.  I think she

2           liked your last suggestion too

3           much.")

4                        -   -   -

5    BY MS. THOMPSON:

6           Q.    Is it still your position

7    that you read that sentence -- that

8    e-mail correctly?

9           A.    To the best of my knowledge,

10   I think I answered that.

11          Q.    Okay.

12          A.    Again, I would point out

13   that there is -- one of these -- the

14   initial one is 13:24 and the one above it

15   is 19:19.

16          Q.    Okay.  You answered my

17   question.

18                        -   -   -

19               (Whereupon, Exhibit

20           Toglia-5, 10/23/08 E-mail from

21           Kathleen Toglia to Cindy

22           Pypcznski; Subject: FDA Toglia,

23           was marked for identification.)

24                        -   -   -

Marc Toglia, M.D.

Page 100

1   BY MS. THOMPSON:

2        Q.    I'm going to hand you

3   another e-mail, also with Ms. Feeney.

4              Can you identify this

5   e-mail?

6        A.    This appears to be an e-mail

7   from Kathleen Feeney to Cindy Pypcznski.

8        Q.    Would you go ahead and read

9   that, please?

10       A.    Cin, notice the totally

11  different tone.  Also note the timing of

12  this e-mail after I had it out with him

13  on the phone.  Not regarding this, of

14  course, as you saw.  Again, please don't

15  share this with anyone, as he is a great

16  guy, friend and surgeon.

17       Q.    Who is she referring to when

18  she states that she had it out with him

19  on the phone?

20       A.    I don't know.

21       Q.    But it follows an e-mail

22  that you sent to her, correct?

23       A.    I don't know if there was

24  anything in between.  Again, the

Golkow Technologies, Inc. - 1.877.370.DEPS

Marc Toglia, M.D.

Page 101

1  difference in times is dramatic.

2        Q.    My question is just this

3  was --

4        A.    It's a different date, as a

5  matter of fact.

6        Q.    This was provided to us as

7  an e-mail chain.

8              So it does follow an e-mail

9  that you sent to Ms. Feeney, correct?

10       A.    I don't know.

11       Q.    Would you please read --

12  what's the subject of the e-mail from Ms.

13  Feeney to Cindy?

14       A.    It says, FDA, Toglia.

15       Q.    Now, if you would look at

16  the e-mail from you to Ms. Feeney, and

17  the subject is, Stuff.

18       A.    Correct.

19       Q.    And it discusses the FDA,

20  correct?

21       A.    Yes.

22       Q.    And this e-mail was provided

23  as an e-mail chain.

24              Would it be a reasonable

Marc Toglia, M.D.

Page 102

1    assumption to make that it was referring

2    to your e-mail below?

3              MR. SNELL:  Objection.

4         Calls for speculation.  Lacks

5         foundation.  Calls for a

6         state-of-mind opinion.

7              MS. THOMPSON:  Are you

8         suggesting that Ethicon produced

9         two unrelated e-mails on the

10        same --

11             MR. SNELL:  No.  You're

12        asking him to speculate about what

13        Kathleen Feeney did, sending

14        something to somebody else with a

15        different subject line, a whole

16        different day later, and you're

17        asking him to speculate that one

18        is connected to the other; when

19        he's already testified, asked and

20        answered, that he can't make that

21        connection.

22             MS. THOMPSON:  Okay.

23   BY MS. THOMPSON:

24        Q.   So you sent an e-mail to Ms.

Marc Toglia, M.D.

Page 103

1    Feeney that was --

2                    MS. THOMPSON:  And please

3           object to form only.

4    BY MS. THOMPSON:

5           Q.    You sent an e-mail to Ms.

6    Feeney that was -- that concerned the

7    FDA, and Ethicon has produced an e-mail

8    that is in the same e-mail chain that's

9    from Ms. Feeney to Cindy, that's

10   entitled -- it's titled, FDA Toglia.

11                   And she says, Also note the

12   timing of this e-mail after I had it out

13   with him on the phone.  Not regarding

14   this, of course, as you saw.  Again,

15   please don't share with anyone, as he is

16   a great guy friend and surgeon.

17                   Why don't you go ahead and

18   read the e-mail that you sent to Ms.

19   Feeney?

20                   MR. SNELL:  I'm going to

21          object.  And move to strike what

22          she just did.  There's not even a

23          question there.

24                   THE WITNESS:  To the best of

Marc Toglia, M.D.

Page 104

1          my knowledge, this has absolutely

2          nothing to do with TVT or --

3     BY MS. THOMPSON:

4          **Q.**     I just asked you to read --

5     read --

6          **A.**     -- or the design of TVT.

7          **Q.**     Excuse me.  Dr. Toglia, I

8     just asked you --

9          **A.**     Yes.

10         **Q.**     -- to read your e-mail from

11    you to Ms. Feeney.

12              MR. SNELL:  You can read it.

13              THE WITNESS:  Thanks for the

14         referral.  Sorry you have had such

15         a tough week.  You know I always

16         have your back.  The FDA warning

17         is a big bummer, but I don't think

18         it will affect you much.  We will

19         make some mild changes in how we

20         counsel folks.  It would be good

21         if we could figure out how much of

22         this is apogee versus other stuff.

23         Could use it as a spin versus -- I

24         don't know what -- gurt, or as an

Marc Toglia, M.D.

Page 105

```
 1          excuse to do a few informal
 2          dinners with key clients to help
 3          diffuse.  I do think there is some
 4          room -- some -- there are some
 5          folks who are at higher risk for
 6          pain that it is best to avoid,
 7          hence the small drop off in our
 8          numbers.  Hopefully, your company
 9          will lower your projections.  I
10          think I may blow off Chicago and
11          just relax.
12  BY MS. THOMPSON:
13          Q.    What was the FDA warning
14  that you were referring to in this
15  e-mail?
16          A.    Well, it's dated 2008, so I
17  am -- I am guessing, and it would be a
18  pure guess that it was an FDA warning --
19  the first FDA safety letter that spoke
20  about vaginal mesh kits.
21          Q.    And in this e-mail, you felt
22  that some mild changes in how you
23  counseled folks would be the way to
24  address that FDA warning?
```

Marc Toglia, M.D.

Page 106

1          **A.**     No.  Because we were already

2    addressing the FDA warning, the mild

3    change was the fact that we would include

4    the words, "the FDA has issued."

5               But we had always been, with

6    these kits, very up front with our

7    patients and would say, this is a newer

8    procedure, it represents only one --

9    basically, everything that the FDA stated

10   in there, we were independently doing

11   prior to the FDA's recommendations.

12              The minor change would have

13   been that we would now say that there was

14   an FDA and we were provided that

15   reference.

16         **Q.**    Okay.  And then you mention

17   that there are some folks at higher risk

18   for pain that's best to avoid.

19              Did Ethicon ever tell you

20   that there were patients who would be

21   high risk for pain that you should avoid

22   the use of mesh kits?

23         **A.**    I would not rely upon

24   Ethicon to tell me that kind of stuff.

Marc Toglia, M.D.

Page 107

1                    We were -- as we sort of

2     developed through the procedure, we

3     both -- we both -- we both became more

4     aware of groups of patients in whom the

5     product was appropriate, groups of

6     patients in whom we thought the procedure

7     was not ideal.

8                    And we -- you know, all

9     surgical procedures have elemental

10    risks --

11         Q.    Excuse me, if you can just

12    ask my -- answer my question, we'll move

13    along a lot faster.

14         A.    I'm sorry?

15         Q.    The question was, did

16    Ethicon tell you that there were patients

17    at high risk for pain that should not use

18    the kits?

19         A.    No.

20         Q.    Thanks.

21                    Do you know when Ms. Feeney

22    left Ethicon?

23         A.    I don't know.  2009.  I'm

24    just guessing.  2011.  I don't know.

Marc Toglia, M.D.

Page 108

1          **Q.**    Was she fired?

2          **A.**    I was never told the reason

3     why she stopped working for the company.

4          **Q.**    If I told you it was in

5     2009, would you have any reason to

6     disagree with that?

7               MR. SNELL:  Objection.

8          Foundation.

9               THE WITNESS:  No.

10    BY MS. THOMPSON:

11         **Q.**    I'll give you another e-mail

12    with Ms. Feeney.

13               -  -  -

14               (Whereupon, Exhibit

15          Toglia-6, 4/27/09 E-mail from

16          Marc Toglia to Kathleen Feeney;

17          Subject: RE: Itinerary for TVT

18          Proctorship, was marked for

19          identification.)

20               -  -  -

21               MR. SNELL:  Is this 6?

22               MS. THOMPSON:  I believe so.

23               THE WITNESS:  Yes.

24    BY MS. THOMPSON:

Marc Toglia, M.D.

Page 109

1          Q.     Would you just read the top

2     e-mail that's from you to Ms. Feeney in

3     April of 2009?

4          A.     I found the name for 5/28.

5     It is Finkelstein.  Sorry for this.  I

6     know it seems unimportant.  I guess I'm

7     just trying to keep myself distracted.

8     Good luck.  Regardless of what happens,

9     you know that I think you're the best and

10    have no questions regarding your moral

11    integrity.  Please call me afterwards.

12         Q.     Can you tell us about the

13    context of this e-mail?

14         A.     I honestly have no idea what

15    any of this refers to.

16         Q.     So you sent Ms. Feeney an

17    e-mail about not having questions about

18    her moral integrity, but you can't

19    remember what that could have referred

20    to?

21         A.     It's dated in 2009.  She may

22    have left the company, was leaving the

23    company, was concerned she was leaving

24    the company.  I was just offering some --

Marc Toglia, M.D.

Page 110

1    some support.

2           **Q.**    But you don't remember

3    anything --

4           **A.**    I mean --

5           **Q.**    -- more than that?

6           **A.**    She could have -- she could

7    have questioned herself or said -- you

8    know, this may not have even been work

9    related.  She could have been having

10   problems at home, and I was just trying

11   to -- to reassure her.

12                  I honestly don't.  I

13   honestly don't.  I don't know who

14   Finkelstein is.  I don't know what the

15   name applies to.  I don't know what any

16   of this is in the context of, I'm sorry.

17                  MS. THOMPSON:  We'll request

18          any e-mails between you and Ms.

19          Feeney on her personal e-mail.

20   BY MS. THOMPSON:

21          **Q.**    And if Ms. Feeney gives an

22   explanation for this e-mail, would you

23   have any reason to -- or basis to

24   disagree with her interpretation?

Marc Toglia, M.D.

Page 111

1              MR. SNELL:  Objection.  Hold

2         on.  Calls for speculation.  Lacks

3         foundation.

4              MS. THOMPSON:  Form is fine.

5              MR. SNELL:  No, but I'm

6         articulating the form, that's what

7         it is.  There's no problem with

8         that.

9              MS. THOMPSON:  I don't

10        believe -- I don't think that's

11        the case.

12             Yes.

13   BY MS. THOMPSON:

14        Q.    Would you have any reason to

15   disagree?

16        A.    I -- I might.  I don't -- I

17   honestly don't know what -- what we were

18   referring to here.  These are -- these

19   are random snippets, you know.  There's

20   no context.

21        Q.    Well, if -- if you don't

22   recall, then you would not be able --

23   have any basis to disagree with her

24   recollection, then?

Marc Toglia, M.D.

Page 112

1             MR. SNELL:  Objection.

2         Calls for speculation.

3             THE WITNESS:  It's possible

4         that her recollection may give me

5         further information.  I don't

6         know.

7    BY MS. THOMPSON:

8         Q.    When you began using the TVT

9    in 1999, what did you provide patients,

10   when you were getting informed consent

11   for the use of the product, regarding

12   risks?

13        A.    So we were very -- I was

14   very clear with my patients, at the time,

15   what the traditional therapies, surgeries

16   were, what the elemental risks were, the

17   fact that -- that in the previous ten

18   years there was a paradigm shift in the

19   understanding of what caused stress

20   incontinence, how stress incontinence

21   might be treated differently --

22        Q.    Dr. Toglia, I'm sorry to

23   interrupt, but I'm just asking you what

24   you told patients about the risks

Marc Toglia, M.D.

Page 113

1    associated with TVT?

2            **A.**    I'm telling you.

3            MR. SNELL:  Objection.  He's

4        being responsive.

5            THE WITNESS:  I'm telling

6        you what that -- what that answer

7        is.

8    BY MS. THOMPSON:

9            **Q.**    If that's responsive, okay.

10           **A.**    Okay.  So in that context,

11   we would have gone over the current --

12   the current available choices, we would

13   talk, of course, first, about what was

14   established and what was commonplace and,

15   certainly, what my experience had been.

16                We would talk about the

17   newer procedure, the preliminary

18   experience, the theoretical benefits that

19   might come from the newer procedure.

20                And I would have been very

21   specific with them, as far as what my

22   specific experience was, i.e., this is

23   the third one I've done, this is the

24   fifth one I've done.

Marc Toglia, M.D.

Page 114

1                   And also within that

2       context, we would have said, thus far in

3       this experience, we have seen the

4       following outcomes.

5           Q.    What risks did you tell the

6       patient were associated with the TVT --

7           A.    Sure.  I'm sorry.

8           Q.    -- device when you counseled

9       her?

10          A.    Sure.  It's the same

11      elemental risks.  We would have talked

12      about the risks of voiding dysfunction,

13      the risk of possible injury to the

14      vagina, to the bladder, to blood vessels

15      or nerves.  The theoretical risk as it

16      relates to infection.  Any risk that

17      might be unique to the placement of -- of

18      mesh material.

19                  It's the same -- it's the

20      same discussion that we had with all of

21      the procedures that we do.

22          Q.    What were the risks that you

23      would have told your patient that are

24      unique to the mesh material?

Marc Toglia, M.D.

Page 115

1           **A.**     In all honesty, and I'm not

2    trying to be difficult, I can't tell you

3    that the risks are unique.   They all

4    carry a risk of bladder injury.   They all

5    carry a risk of urethral injury.

6                     Autologous fascial slings

7    can erode, can have wound disruptions,

8    which is a similar risk that, say, a

9    midurethral sling could have.

10          **Q.**     So is it your opinion that

11   there are no risks that are unique to the

12   mesh material contained in the TVT

13   device?

14          **A.**     I mean, obviously, exposure

15   of synthetic mesh material, you know, as

16   opposed to exposure of permanent suture

17   material with the Burch, per se, as

18   opposed to, say, exposure of the fascial

19   slings.

20          **Q.**     So the exposure is the same

21   in all three procedures, it's just the

22   material that's being exposed is the only

23   difference that you can identify?

24          **A.**     Say that again, please.

Marc Toglia, M.D.

Page 116

1          Q.    Is it only the difference in

2     the material that is exposed in the

3     vagina, not the actual fact that TVT can

4     become exposed in the vagina?

5          A.    Well, I think -- I think,

6     you know, again, it's -- what we always

7     do is we will compare one procedure to

8     the next procedure.

9               So, for example, you know, a

10    Burch procedure is done with a

11    laparotomy, okay?  There are certain

12    risks that are more common with a

13    laparotomy, wound infection, wound

14    breakdown, bleeding.

15              There may be other risks

16    that are a little less common with that

17    Burch procedure.

18              At the time I would say,

19    probably bladder injury was a risk that

20    we -- in our experience, was maybe a

21    little less common, although I think

22    Level 1 evidence really suggests that all

23    the risks are within in the same

24    ballpark.

Marc Toglia, M.D.

Page 117

1      **Q.**    Do you get exposure of
2  permanent suture in the vagina with a
3  Burch procedure?
4      **A.**    Yes.  It's actually one of
5  the more common things that we see.
6      **Q.**    Do you get bladder erosion
7  with a Burch procedure?
8      **A.**    Yes.  It's one of the more
9  common things that we see.
10     **Q.**    How common are bladder
11  erosions with a Burch?
12     **A.**    Can I refer to one of the
13  systematic review studies?
14     **Q.**    Sure.
15     **A.**    So I was hoping to find a
16  more specific -- specific number to give
17  you, but I would say, in general, it's
18  probably in the 3 to 4 percent range that
19  we would see a PROLENE® suture erode into
20  the bladder.
21     **Q.**    Are PROLENE® sutures used
22  commonly for Burch procedures?
23     **A.**    Permanent sutures are used
24  commonly --

Marc Toglia, M.D.

Page 118

1         Q.    My question is --

2         A.    -- for Burch procedures.

3         Q.    -- are PROLENE® suture used

4    commonly for Burch procedures?

5         A.    PROLENE® sutures is -- is a

6    common choice of a suture for it, yes.

7         Q.    Is that what you use if

8    you're doing a Burch procedure?

9         A.    We would either use PROLENE®

10   or we would use ETHIBOND.  We probably

11   use them equally.

12        Q.    And while you're at it, why

13   don't you look for the incidence of

14   vaginal exposure of suture with a Burch

15   procedure?

16        A.    To answer that question, I

17   think I have to refer to my expert

18   report.

19        Q.    While you're doing that, how

20   about urethral exposure --

21        A.    Counselor, I'm sorry --

22        Q.    -- with a Burch procedure.

23        A.    -- being your typical male,

24   I don't multitask very well.  However, I

Marc Toglia, M.D.

Page 119

1   guarantee you --

2        **Q.**    All right.  I will wait.

3        **A.**    -- I can do two serial tasks

4   very, very, quickly.

5        **Q.**    Okay.  I'm just trying to

6   get you out of here earlier.

7        **A.**    Counselor, I am -- I am at

8   your disposal.  I'm here as long as you

9   would like me to be here.

10       **Q.**    All right.  That's great to

11  hear.

12            MR. SNELL:  She gets seven

13        hours on the record.

14            THE WITNESS:  You've got six

15        hours, 15 minutes left.

16            Can you read me back the

17        question again, please?

18                 -  -  -

19            (Whereupon, the court

20        reporter read the following part

21        of the record:

22            "Question:  And while you're

23        at it, why don't you look for the

24        incidence of vaginal exposure of

Marc Toglia, M.D.

                                                    Page 120

1          suture with a Burch procedure?")

2                    -   -   -

3          THE WITNESS:  I recall that

4     there was one trial where, I

5     believe, approximately 5

6     percent -- I might have to find

7     the Novara study.

8          MS. THOMPSON:  Let's just go

9     off the record, Greg, if you don't

10    mind, while he looks for the

11    studies.

12         VIDEO TECHNICIAN:  We are

13    off the record.  The time is 3:32

14    p.m.

15                  -   -   -

16         (Whereupon, a discussion off

17    the record occurred.)

18                  -   -   -

19         VIDEO TECHNICIAN:  We are

20    back on the video record.  The

21    time is 3:41 p.m.

22         THE WITNESS:  Thank you.  I

23    apologize it's taking me so long.

24         So the first study that I

Marc Toglia, M.D.

Page 121

1          want to reference with regard to

2          the question of the suture erosion

3          to the bladder is going to be the

4          Cochrane review.  This would be

5          the Lapitan and Cody study, 2012

6          Cochrane review.

7               Data from -- and they're

8          referencing the Albo trial.

9               Data from this trial showed

10         a fivefold higher risk of having

11         sutures pass through the bladder

12         with open colposuspension compared

13         to doing a pubovaginal sling

14         procedure; perforation rate, 3

15         percent.

16               And if you'd like to go off

17         the record again, I'm happy to

18         find the second paper.

19    BY MS. THOMPSON:

20         Q.    That's talking about

21    intraoperative risk, correct, not

22    erosion?

23               Dr. Toglia --

24         A.    Yes?  I'm sorry.

Marc Toglia, M.D.

Page 122

1          Q.    -- the passage you just read
2     to me is talking about an intraoperative
3     risk of passing suture through the
4     bladder, correct?
5          A.    Sutures passed through the
6     bladder during open colposuspension.
7          Q.    That's not referring to
8     erosion into the bladder, is it?
9          A.    No, it's not.  I'm sorry.
10               So it wasn't suture -- it
11          wasn't suture exposure in the
12          bladder, was that -- was that not
13          the question?
14          Q.    The question was bladder
15     erosion of suture with a Burch
16     colposuspension.
17               So you'll agree that the
18     sentence you just read doesn't have
19     anything to do with bladder erosion?
20          A.    Counselor, I will agree that
21     the sentence I just read you talked about
22     the passage of suture into the bladder.
23               I'm sorry if I --
24          Q.    And that's not erosion,

Marc Toglia, M.D.

Page 123

1    correct?

2           **A.**    I'm sorry if I misunderstood

3    your question.

4                MS. THOMPSON:  I guess we'll

5           go off the record again.

6                THE WITNESS:  Thank you.

7                VIDEO TECHNICIAN:  We are

8           off the record.  The time is 3:44

9           p.m.

10                    -   -   -

11                (Whereupon, a discussion off

12           the record occurred.)

13                    -   -   -

14                VIDEO TECHNICIAN:  We are

15           back on the record.

16                THE WITNESS:  Thank you.  So

17           with regard to the question of the

18           rate of suture erosion into the

19           bladder, it's my general

20           recollection that there's about a

21           3 to 5 percent risk of suture

22           erosion with the traditional Burch

23           procedure when performed with

24           PROLENE® sutures.

Marc Toglia, M.D.

Page 124

1   BY MS. THOMPSON:

2          Q.     And what about the risk of

3   suture erosion into the vagina with a

4   Burch?

5          A.     I would say it's probably in

6   the -- in the same ballpark.

7          Q.     And what about suture

8   erosion into the urethra with a Burch?

9          A.     That should really not

10  occur, because the Burch suspension is

11  not placed at the level of the urethra.

12         Q.     And it's your testimony --

13  but, at least as you're sitting here

14  today, you can't give me a reference for

15  those numbers?

16         A.     Yes.

17         Q.     Yes, you cannot?

18         A.     Yes, I cannot give you a

19  reference for those numbers.  Yes.

20         Q.     Thank you.

21                And is your testimony, then,

22  that there's really no complications that

23  are unique to the -- to a synthetic

24  midurethral sling?

Marc Toglia, M.D.

Page 125

1           MR. SNELL:  Objection.

2       Asked and answered.

3           THE WITNESS:  Each procedure

4       has risks.  The majority of those

5       risks, I would say are elemental,

6       are common to the group.  However,

7       each procedures do have risks that

8       are more common, perhaps, and

9       possibly could be unique.

10          For example, with the

11      poly-tetrafluoride sling, there

12      was -- or the Ob Tape sling --

13  BY MS. THOMPSON:

14      Q.   Let me clarify my question

15  and just limit it to synthetic

16  polypropylene slings.

17      A.   Okay.  Thank you.

18          So with -- with reference to

19  the TVT Type I polypropylene sling -- I'm

20  sorry, but I can't think of a risk that's

21  unique to that -- to that compared to the

22  other procedures that we do.

23      Q.   And you'll agree with me

24  that, in terms of significance, the

Marc Toglia, M.D.

Page 126

1   severity of a complication is important,

2   correct?

3        **A.**    I'm not sure that I

4   understand your question.

5        **Q.**    When you're considering

6   risks associated with a procedure, the

7   severity of that complication is

8   important to you as a physician, correct?

9        **A.**    Can you tell me what you

10  mean by "severity"?

11       **Q.**    Well, there are minor

12  complications and there are severe

13  complications, right?

14       **A.**    But one person's minor

15  complication is a severe complication,

16  and vice versa.

17              Could you be --

18       **Q.**    Well, there are actually

19  some definitions of the severity of

20  complications.

21              But you'll agree with me

22  that -- are you just really telling me --

23       **A.**    No, counselor --

24       **Q.**    -- that you don't understand

Marc Toglia, M.D.

Page 127

1    what I mean by the severity of a

2    complication is important?

3            **A.**    I'm just not sure of the

4    context.

5                    So, first of all, I will

6    agree with you that there are less severe

7    complications and there are more severe

8    complications with each of these

9    anti-incontinence procedures.

10           **Q.**    That was all I'm asking.

11           **A.**    I'm sorry.

12           **Q.**    And I wasn't even specific

13   to --

14           **A.**    Okay.

15           **Q.**    -- to a device.

16                    I was just saying, there are

17   minor complications and severe

18   complications, right?

19           **A.**    Yes.

20           **Q.**    And that makes a difference

21   whether you're talking about a rate of

22   minor complications or you're rating --

23   talking about a rate of severe

24   complications?

Marc Toglia, M.D.

Page 128

1          **A.**    I'm sorry.  I understand you
2     now.
3          **Q.**    Okay.
4          **A.**    Yes.
5          **Q.**    All right.
6          **A.**    So, for example, urinary
7     tract infection is oftentimes cited as a
8     complication.  One can argue that a
9     urinary tract infection would be a less
10    severe type of a complication.
11         **Q.**    But a urinary tract
12    infection with sepsis and intensive care
13    could be a serious complication?
14         **A.**    That's a good point,
15    counselor.
16         **Q.**    Thank you.
17              MR. SNELL:  Can we take a
18         break whenever you get right a
19         stopping point?  Because I need to
20         use the restroom.
21              MS. THOMPSON:  Maybe five
22         minutes.
23              MR. SNELL:  That's fine.
24    BY MS. THOMPSON:

Marc Toglia, M.D.

Page 129

1        Q.    Now, when we started this

2    line of questioning, it's been a while,

3    but I think we were talking about what

4    you told your patients in 1999 --

5        A.    Yes.

6        Q.    -- when you first started --

7        A.    I'm sorry, yes.

8        Q.    -- using the TVT.

9              I have a little bit

10   different question and that is now, in

11   2015, when you are using a retropubic TVT

12   device, are there any additional risks or

13   complications that you discuss with your

14   patients, as opposed to what you did in

15   the early years of using the device?

16       A.    Well, now that I'm 17 years

17   into this experience and now that I've

18   done, let's say, well over 2,000 cases,

19   again, I like to talk to my patients

20   about things that might go wrong during

21   the procedure, things that possibly could

22   complicate their postoperative course,

23   things that might occur during the life

24   of that procedure.

Marc Toglia, M.D.

Page 130

1              So to speak backwards, what

2    we typically tell our patients these days

3    is that, you know, over the ten-year

4    period, subsequent to, say, having a

5    midurethral sling -- and when I say

6    "midurethral sling," I am referring

7    specifically to the TVT, since that's

8    what I perform, there's about a 3

9    and-a-half percent risk of having to

10   return to the OR for something; that

11   might include failure, that could include

12   difficulty voiding, et cetera.

13              Overall, the risk that we

14   talk to people about, in our hands, are

15   sort of the risk of bladder injuries,

16   about 1 percent; our mesh exposure rate

17   is under 1 percent; our risk of voiding

18   dysfunction is well under 1 percent; our

19   rate of infection has been zero percent

20   over -- over the 17-year experience; the

21   rates of urethral injury, well under 1

22   percent.

23              And I make it a point of

24   saying, look, just because something

Marc Toglia, M.D.

Page 131

1    occurs very infrequently, doesn't

2    necessarily mean that when it does occur

3    it's not a significant complication.

4         **Q.**   Are synthetic sling

5    complications underreported in the

6    literature, in your opinion?

7         **A.**   Absolutely not.  Again, we

8    have -- we have more than 20 -- excuse

9    me, we have at least, you know, eight to

10   ten long-term registry studies that have

11   followed people for at least five years.

12   Some studies have gone out to ten years.

13   And these are high quality, high level of

14   evidence, of scientific papers.

15            And I would say, you know,

16   ballpark figure, long-term complications

17   are all sub 3 percent.

18        **Q.**   How many deaths are reported

19   in the literature from the TVT retropubic

20   device?

21        **A.**   And, again, I don't think

22   that you can derive incidence or

23   prevalence because, you know --

24        **Q.**   I'm not asking for incidence

Marc Toglia, M.D.

Page 132

1    or prevalence.  I'm asking how many are

2    reported?

3            **A.**    I don't know.  I would -- I

4    would venture -- I don't know.

5            **Q.**    Are you aware of any --

6            **A.**    I --

7            **Q.**    -- reported?

8            **A.**    I'm aware of, I'm going to

9    say, five to seven deaths.

10           **Q.**    Reported in the literature,

11   is my question?

12           **A.**    Oh, reported in the

13   literature -- I don't know how many have

14   been reported in the literature.

15           **Q.**    Are you aware of any deaths

16   reported in the literature from the TVT

17   device?

18           **A.**    You know, when I --

19           **Q.**    The question is, are you

20   aware of any?

21           **A.**    I'm just trying to explain

22   to you, if I'm aware of five to seven I

23   wouldn't be --

24           **Q.**    I'm not asking you how many

Marc Toglia, M.D.

Page 133

1   you think have occurred --

2          A.     Right.

3          Q.     -- I'm asking you how many

4   have been reported in the literature?

5          A.     In my reading of the

6   literature, I'm saying that I am aware of

7   about five to seven.  I'm just saying

8   that I cannot produce to you what -- in

9   what form or publication they would have

10  been.

11         Q.     And how many do you think

12  have actually occurred?

13         A.     I don't know, counselor.

14         Q.     So you think there are five

15  to seven deaths reported in the

16  literature from TVT?

17         A.     That's the best of my

18  recollection.  But I will tell you that

19  I'm not aware of any personally.

20         Q.     Do you tell your patients

21  that polypropylene degrades in the human

22  body?

23         A.     There is no high-quality

24  evidence that suggests that polypropylene

Marc Toglia, M.D.

Page 134

1  degrades in the body.

2      **Q.**   What does degradation mean

3  to you?

4      **A.**   Well, again, and I looked

5  this up.  It just -- it depends.  And the

6  definition varies.

7            Degradation is -- to me,

8  means a loss of structural integrity, a

9  loss of function.

10           You can certainly degrade

11  one's morality, that's a different

12  mention, that's obviously not applicable

13  within the setting of the mesh.

14     **Q.**   Okay.  And it's your opinion

15  that there's no high-quality study that

16  shows -- that mesh degrades?

17     **A.**   I'm quite certain that there

18  is no high-quality studies that would

19  suggest that the mesh degrades.  It is

20  certainly inconsistent with the body of

21  Level 1 evidence and the long-term

22  registration studies.

23     **Q.**   Is there high-quality

24  evidence, in your opinion, that states

Marc Toglia, M.D.

Page 135

1    that mesh does not degrade?

2         **A.**    Well, I don't know how we

3    would know that, counselor, because we

4    don't routinely explant mesh that is

5    behaving properly in the body.

6         **Q.**    Does mesh that's not

7    behaving properly in the body degrade?

8         **A.**    Again, I'm not aware of any

9    high-quality data.  I can tell you

10   that -- the data is very, very clear and

11   very reassuring that there are no

12   clinical concerns that that phenomenon

13   exists.

14        **Q.**    That's not my question.  I'm

15   not talking clinically.

16        **A.**    Yes.

17        **Q.**    I'm talking about, and I

18   would --

19        **A.**    Degrading in the body is a

20   clinically-based question.

21        **Q.**    No.  I'm talking about

22   degradation, not clinical.

23        **A.**    Okay.

24        **Q.**    But you mentioned the

Marc Toglia, M.D.

Page 136

1    structural composition of the

2    polypropylene.

3              MR. SNELL:  I'm going to

4         object.  That misstates.  He said

5         structural -- well, the record

6         will be clear what he said.  And I

7         think he was responsive with

8         regard to how he defines

9         degradation.

10   BY MS. THOMPSON:

11        Q.    Okay.  I'm going to -- I'm

12   going to define degradation in the

13   chemical sense, and that is a change in

14   the chemical structure of the compound.

15        A.    Okay.

16        Q.    Are there any studies in the

17   literature that tell you that that does

18   not happen with the TVT mesh when placed

19   in a woman's body?

20        A.    Can I ask you to restate

21   that without the double negative, please?

22        Q.    Well, you told me there are

23   no high-quality studies that state that

24   it degrades.  I don't know how to do that

Marc Toglia, M.D.

Page 137

1    without the negative.

2                    Are there any studies that

3    show you that it does not degrade?

4         **A.**    The study by Falconer, which

5    I believe was published in 2001, where

6    they did, in fact, go back and take site

7    specific biopsies showed no degradation

8    in the material.

9         **Q.**    Now, were they looking at

10   that from a chemical composition

11   standpoint?

12        **A.**    Again, if you would like to

13   give me a minute to locate that study.

14                MS. THOMPSON:   Okay.  We'll

15           go off the record.

16                VIDEO TECHNICIAN:  We are

17           off the record.  The time is 3:58

18           p.m.

19                     -  -  -

20                (Whereupon, a discussion off

21           the record occurred.)

22                     -  -  -

23                VIDEO TECHNICIAN:  We are

24           back on the video record.

Marc Toglia, M.D.

Page 138

1            THE WITNESS:  Read me the

2       question one more time, please?

3                 -  -  -

4            (Whereupon, the court

5       reporter read the following part

6       of the record:

7            "Question:  Now, were they

8       looking at that from a chemical

9       composition standpoint?")

10                -  -  -

11           THE WITNESS:  So, no.  The

12      Falconer study was looking at it

13       from a histologic standpoint.  I'm

14      not aware of any concerns that

15       there might be degradation that

16      would prompt one to do those kinds

17       of studies.

18 BY MS. THOMPSON:

19      Q.    And that study also was

20 biopsying the tissue around the mesh

21 product, not the mesh itself, correct?

22      A.    You are correct, counselor.

23      Q.    So you're not aware of any

24 studies, then, that demonstrates that

Marc Toglia, M.D.

Page 139

1    polypropylene mesh does -- or TVT mesh

2    does not degrade in the female body?

3                MR. SNELL:  Objection.

4           Asked and answered.

5                MS. THOMPSON:  Well, he said

6           he would look and he found

7           Falconer, which doesn't apply, so

8           I'm asking if he has any others.

9                MR. SNELL:  I'm going to

10          object.  That's also vague.  You

11          asked him specifically, in the

12          last question, about chemical

13          degradation.  And now you said

14          degradation.  He already said he

15          doesn't think degradation occurs,

16          and he's told you all the reasons

17          why.

18               MS. THOMPSON:  All right.

19          Fair enough.  I'll ask it -- I'll

20          ask again with chemical

21          degradation.

22   BY MS. THOMPSON:

23          Q.    Are you aware of any

24   studies, then, that demonstrate that

Marc Toglia, M.D.

Page 140

1    chemical degradation does not occur with

2    polypropylene mesh implanted in the body?

3         **A.**     I think that the long-term

4    registry trials and the significant lack

5    of chronic problems suggests that there

6    is no chemical degradation of the

7    material.

8              I'm also -- I'm a little

9    bit -- what does it matter if the

10   material degrades if the person is still

11   continent?  You know, it's not that

12   are -- we're suspending somebody from a

13   bridge from this material and that loss

14   of the material would compromise that

15   person's position.

16             The procedure is designed to

17   reestablish urethral stability, and it

18   does so effectively in studies that have

19   gone up to 17 years.

20        **Q.**    So is it your opinion that

21   degradation -- chemical degradation of

22   the material doesn't matter if the woman

23   is still continent?

24        **A.**    Well, and, again, I'm

Marc Toglia, M.D.

Page 141

1   certainly not trying to be difficult, but

2   I'm not certain what you mean by

3   "chemical degradation," what

4   specifically, what we're looking at,

5   we're changing in, we're talking about

6   isomeric change in the compound?  We're

7   talking about racemic change in the

8   compound?  We're talking about

9   nephelation of the compound?  What --

10  what specifically is implied with the

11  term "chemical degradation"?

12        Q.    You're not a chemist, right?

13        A.    I have a degree in

14  biochemistry.  I have done chemical

15  research.

16        Q.    But you don't consider

17  yourself a chemist?

18             MR. SNELL:  Objection.

19             THE WITNESS:  I think I just

20        told you what my --

21  BY MS. THOMPSON:

22        Q.    So you are a chemist?

23        A.    What's that?  I --

24        Q.    You do consider yourself an

Marc Toglia, M.D.

Page 142

1    expert in chemistry?

2         **A.**    Those are different

3    questions.

4         **Q.**    Do you consider yourself an

5    expert in chemistry?

6         **A.**    I would consider myself an

7    expert in chemistry, yes.

8         **Q.**    And -- but you're not

9    familiar -- are you familiar with the

10   term "oxidation"?

11        **A.**    Of course.

12        **Q.**    Are you familiar with the

13   term "oxidative degradation"?

14        **A.**    Yes.

15        **Q.**    Let's just use oxidative

16   degradation, then, maybe we can --

17        **A.**    Fair enough.

18        **Q.**    -- get on the same page

19   here.

20        **A.**    Sure.

21        **Q.**    Are you aware of any studies

22   that show that oxidative degradation does

23   not occur with polypropylene mesh placed

24   in the body?

Marc Toglia, M.D.

Page 143

1          **A.**    There are no high-quality

2    evidence studies that suggest that it

3    does occur.  Therefore, my inference

4    would be that it does not occur.

5          **Q.**    What does oxidative

6    degradation mean to you?

7          **A.**    Oxidative degradation is the

8    process in which oxygen comes in and will

9    alter the composition; so, you know,

10   you've got nitrous oxide it becomes

11   nitric oxide.

12         **Q.**    What happens when

13   polypropylene undergoes oxidative

14   degradation?

15              MR. SNELL:  Objection.  It

16         lacks foundation.  He's told you

17         he doesn't believe it does.

18   BY MS. THOMPSON:

19         **Q.**    So is it your opinion that

20   polypropylene does not undergo oxidative

21   degradation in vitro or in vivo?

22         **A.**    I'm speaking in vivo; I'm

23   not aware of any high-quality evidence

24   that would suggest that polypropylene

Marc Toglia, M.D.

Page 144

1    mesh, within the context of the TVT

2    device and its intended use to treat

3    stress incontinence in women, which was

4    the subject that I was asked to research

5    and form an opinion, undergoes oxidative

6    degradation.

7            Q.    Are you a materials expert?

8            A.    I certainly am a materials

9    expert, yes.  At least --

10           Q.    Are you a polymer expert?

11           A.    I have a better than

12   average, and some would consider to be an

13   expert understanding, of polymer medicine

14   as it relates to my subspecialty field,

15   yes.

16           Q.    Is it your opinion -- well,

17   let me ask you this: What additives go

18   into the mesh that the TVT is comprised

19   of?

20           A.    Can you be more specific?

21           Q.    What additives are added to

22   the polypropylene resin that makes up the

23   TVT?

24           A.    I mean, there's an enormous

Marc Toglia, M.D.

Page 145

1    amount --

2           **Q.**    If you don't know, it's

3    fine.  Just say you don't know.

4                    What additives go into the

5    mesh -- to the resin that forms the TVT

6    mesh?

7           **A.**    I'm not sure I know what

8    you're referring to, in terms of adding

9    oxygen goes into it.

10          **Q.**    Is the polypropylene that's

11   used in the TVT mesh pure polypropylene?

12          **A.**    Well, no.  Polypropylene

13   itself is not a pure molecule.  I mean,

14   there are --

15          **Q.**    What is added to the

16   polypropylene or is nothing added or do

17   you not know?

18          **A.**    I can't tell you off the top

19   of my head all of the different compounds

20   that would go into the -- you know, the

21   creation and the extrusion of

22   polypropylene.

23          **Q.**    Did you ever ask anyone at

24   Ethicon what was in the polypropylene?

Marc Toglia, M.D.

Page 146

1         **A.**    I did not ask anybody at

2    Ethicon what was in polypropylene.

3                   But that shouldn't imply

4    that I did not read about polypropylene

5    mesh or the base PROLENE® material.

6    These are materials that we have used

7    extensively in the last 40 to 50 years in

8    the area of surgery.

9         **Q.**    Did Ethicon tell you that

10   its own studies on PROLENE® suture shows

11   that it degrades?

12                  MR. SNELL:  Objection.

13              Misstates.  Lacks foundation.

14                  THE WITNESS:  I would not

15              rely upon Ethicon to tell me such

16              things.

17                  And, again, this is within

18              the context of the TVT design, I'm

19              not aware of -- you know, the

20              animal studies really are not

21              relevant.  We have Level 1

22              evidence to support the long-term

23              safety of these things --

24   BY MS. THOMPSON:

Marc Toglia, M.D.

Page 147

```
 1          Q.    I'm not talking about -- if
 2    we can get away from the long-term
 3    safety.  I'm not discussing the long-term
 4    safety.  I'm discussing the material
 5    itself.
 6          A.    Yes.
 7          Q.    If Ethicon has information
 8    that the material degrades in the human
 9    body, is that something that you, as a
10    doctor, would want to know about?
11              MR. SNELL:  Objection.
12          Lacks foundation.
13              Go ahead.
14              THE WITNESS:  I would not be
15          dependent upon Ethicon --
16    BY MS. THOMPSON:
17          Q.    I didn't ask you --
18          A.    -- for that information.
19          Q.    -- if you depended on it.
20              Is that something that you
21    would like to know, if Ethicon has
22    information that their product degrades,
23    is that something you would want to know,
24    as a physician?
```

Marc Toglia, M.D.

Page 148

1              MR. SNELL:  Objection.

2          Lacks foundation.  Misstates

3          evidence.

4              THE WITNESS:  No, it is not.

5     BY MS. THOMPSON:

6          Q.    It's not something that you

7     would want to know?

8          A.    I would not want to know it

9     from Ethicon, no.

10         Q.    Who would you know it from?

11         A.    Would I know what from?

12         Q.    Who is going to tell you

13    that Ethicon mesh degrades if it's not

14    Ethicon?

15             MR. SNELL:  Objection.

16         Hypothetical.  Calls for

17         speculation.

18             MS. THOMPSON:  Well, he

19         brought it up.  He didn't want to

20         hear it from Ethicon.

21    BY MS. THOMPSON:

22         Q.    I'm asking you, who else

23    would you want to hear it from?

24             MR. SNELL:  You asked him

Marc Toglia, M.D.

Page 149

1              the question.  He's already told
2              you he doesn't think it degrades.
3              I don't know -- I don't understand
4              what you're doing.
5    BY MS. THOMPSON:
6              Q.    I'm saying if Ethicon has
7    knowledge that it degrades, is that
8    something you want to know?
9                   MR. SNELL:  He's already --
10             objection.  Asked and answered
11             three times.
12                  MS. THOMPSON:  Okay.  I
13             thought maybe he would change his
14             opinion on that.
15   BY MS. THOMPSON:
16             Q.    Would patients want to know
17   if the material, the plastic that they're
18   putting in their bodies, degrades?
19                  MR. SNELL:  Objection.
20             Calls for speculation.
21                  THE WITNESS:  I think the
22             only thing the patients would want
23             to know is whether or not the
24             procedure worked long-term for

Marc Toglia, M.D.

Page 150

1          them.

2   BY MS. THOMPSON:

3          **Q.**    Okay.  So, to you, if the

4   procedure works, it doesn't really matter

5   whether that material degrades or not?

6          **A.**    Absolutely.

7          **Q.**    All right.

8          **A.**    It does not matter to me.

9          **Q.**    Thank you.

10             MS. THOMPSON:  We'll take a

11          break.

12             VIDEO TECHNICIAN:  We are

13          off the record.  The time is 4:11

14          p.m.

15                  -  -  -

16             (Whereupon, a brief recess

17          was taken.)

18                  -  -  -

19             VIDEO TECHNICIAN:  This

20          marks the beginning of Video

21          Number 3.  We are back on the

22          record.  The time is 4:38 p.m.

23   BY MS. THOMPSON:

24          **Q.**    Dr. Toglia, when we went on

Marc Toglia, M.D.

Page 151

1    our break, I was asking you about what

2    you tell your patients now about

3    polypropylene mesh and the TVT device.

4                    Do you remember that?

5         **A.**    Yes.

6         **Q.**    Do you tell your patients

7    that polypropylene mesh creates a chronic

8    foreign body reaction in the body?

9         **A.**    I don't tell them that,

10   because there is no evidence that it

11   causes a chronic foreign body -- counsel,

12   I'm sorry, it's staring right in front of

13   me here.  I did address your question

14   about oxidation --

15        **Q.**    I didn't ask you any other

16   questions, so Mr. Snell can ask you about

17   that later.

18        **A.**    Okay.  Thank you.

19        **Q.**    So it's your opinion that

20   polypropylene mesh does not create a

21   foreign body reaction in the body?

22        **A.**    My experience, in using

23   polypropylene over the last 17 years, I

24   have never seen an incidence -- an

Marc Toglia, M.D.

Page 152

1    instance in which polypropylene mesh

2    caused a chronic foreign body reaction.

3                I feel that that is very

4    consistent with the long-term registries

5    trials --

6         Q.    Okay.

7         A.    -- that it focused on the

8    safety and looked specifically for that

9    kind of problem.

10        Q.    Do you -- if Ethicon had

11   information that the mesh used in the TVT

12   creates a chronic ongoing foreign body

13   reaction, is that information that you

14   would want to know?

15               MR. SNELL:  Objection.

16          Lacks foundation.

17               THE WITNESS:  As a general

18          rule of thumb, I am not dependent

19          upon Ethicon to provide me with

20          any such information.

21   BY MS. THOMPSON:

22        Q.    Is it information that your

23   patients would want to know?

24        A.    I honestly don't believe

Marc Toglia, M.D.

Page 153

1   that they would care to know.

2        **Q.**    Do you tell your patients

3   that polypropylene mesh shrinks up to 30

4   percent?

5        **A.**    I believe -- well, the

6   discussion is that -- and, again, within

7   the context of the TVT sling, as it was

8   used for stress incontinence, I don't

9   believe that would -- that small amount

10  of lightweight macroporous material, that

11  clinically there is a relevant amount of

12  shrinkage.

13            In the context of other

14  discussions with other base procedures,

15  there is a discussion that has to do with

16  changes in the mesh, as you stated, but

17  not for TVT sling, no.

18       **Q.**    So the answer is, no, that

19  you don't tell your patients about

20  shrinkage of the TVT sling?

21            MR. SNELL:  Objection.

22       Misstates.

23            MS. THOMPSON:  Will you stop

24       the speaking objections?  Just say

Marc Toglia, M.D.

Page 154

```
 1          object, and without --
 2                    MR. SNELL:  No.  No.  I'm
 3          allowed to state the objection to
 4          form.  That is a form objection.
 5          Misstates.
 6                    MS. THOMPSON:  Objection to
 7          form.  You can't go into all the
 8          other stuff that you've been
 9          doing.
10   BY MS. THOMPSON:
11          Q.    Go ahead and answer the
12   question, Dr. Toglia.
13          A.    It's my -- it's my expert
14   opinion that the TVT mesh does not, in
15   fact, shrink in vivo.
16          Q.    Do you tell your patients
17   about the possibility of chronic pain
18   syndromes?
19                    MR. SNELL:  Hold on.
20          Objection.  Form.
21                    MS. THOMPSON:  You can
22          answer, though.
23                    MR. SNELL:  Go ahead.
24                    THE WITNESS:  In the 17
```

Marc Toglia, M.D.

Page 155

```
 1         years that I have been implanting
 2         the TVT mesh for the indication of
 3         stress incontinence, in over 2,500
 4         patients, let's say, I have never
 5         once seen chronic pain syndrome
 6         arise from the retropubic TVT
 7         sling that we are discussing
 8         today.
 9    BY MS. THOMPSON:
10         Q.    So you're saying you have
11    never, not one single patient, have you
12    seen a chronic pain syndrome related to
13    the retropubic TVT?
14         A.    That's what I said.
15         Q.    And how would you know?
16         A.    We -- now, my practice is in
17    suburban Philadelphia, we have very high
18    rates of follow-up.  Patients are seen on
19    a regular basis.  They are -- they will
20    contact us with problems.  We tend to see
21    the problems.
22         Q.    When do you see your patient
23    for a postoperative checkup after a TVT?
24         A.    Well, there are a series of
```

Marc Toglia, M.D.

Page 156

1    evaluations that we'll see them for.  The

2    first one is always within the first four

3    months or so -- excuse me, within the

4    first four weeks or so.

5              Usually, there's a second

6    follow-up within three months or so.

7              Subsequent to that, it may

8    be six or 12 months.

9              Again, you know, stress

10   incontinence, unfortunately, rarely

11   happens in isolation.  These are patients

12   that have chronic pelvic floor disorders.

13   I would say, in a large number of our

14   cases, we continue to see those patients

15   annually.

16             Those patients that, at some

17   point -- or, let's say, as you said

18   earlier, were cured of their problem are

19   told that they are welcome to come back

20   with any concern that they might have.

21        Q.    What is your rate of

22   follow-up with patients who receive a TVT

23   sling.

24        A.    Our rate of follow-up is

Marc Toglia, M.D.

Page 157

1    above the 90 percentile.

2          Q.    What do you mean by "90

3    percentile"?

4          A.    Excuse me, I apologize.  90

5    percent or higher.

6          Q.    And how is that determined?

7          A.    Because we have records and

8    we follow-up with patients after surgery

9    to make sure that they come in for their

10   scheduled visits.

11              And the ones that don't,

12   that fall through, typically are

13   contacted.

14         Q.    At what point?

15         A.    As I mentioned to you, I

16   think I described for you the parameters

17   for our follow-up.

18              So if somebody -- I mean,

19   obviously, there are -- you know, people

20   go on vacation, have to take care of a

21   loved one.  So if they are not seen, say,

22   at that four-week mark, they're asked to

23   follow up with -- they are scheduled for

24   an appointment, say, within that

Marc Toglia, M.D.

Page 158

1    three-month period of time.

2         **Q.**    So if I requested

3    documentation of your rate of follow-up

4    on your patients who receive TVT devices,

5    could you provide that to me?

6              MR. SNELL:  Objection.  We

7         are not producing any of his

8         clinical records or charts, nor

9         have you produced any such thing

10        like that.

11             Your experts --

12             MS. THOMPSON:  I didn't ask

13        for clinical records and charts.

14        I asked him, could he provide it.

15             And you can answer the

16        question.

17             And that's a speaking

18        objection.

19   BY MS. THOMPSON:

20        **Q.**    Go ahead, Dr. Toglia.

21        **A.**    I personally --

22             MR. SNELL:  Actually, I'm

23        objecting and saying that will not

24        be produced.  I'm putting that on

Marc Toglia, M.D.

Page 159

1           the record.

2                   MS. THOMPSON:  I didn't ask

3           for production, did I?

4    BY MS. THOMPSON:

5           Q.    Go ahead and answer, Dr.

6    Toglia.

7                   Could you provide it if I

8    ask for it?

9           A.    I would not provide that.

10          Q.    That wasn't my question.

11                  Could it be provided?

12   You've already testified that you don't

13   even know how to keep track of what

14   procedures are done --

15          A.    I disagree with you,

16   counselor.  I told you -- I gave you

17   specific examples --

18          Q.    The record speaks for

19   itself.

20          A.    -- of how --

21                  MR. SNELL:  Don't cut him

22           off.  He's telling you -- because

23           you just -- you just threw an

24           insult at him.

Marc Toglia, M.D.

Page 160

1            Go ahead and finish telling

2        her.

3            THE WITNESS:  Counselor, you

4        asked --

5            MS. THOMPSON:  And that's a

6        speaking objection.

7            THE WITNESS:  Counselor, you

8        asked me the type of follow-up we

9        have and you specifically asked me

10        what do we do in the situation if

11        someone were to not follow up.

12            And I gave you a very

13        specific answer that the patients

14        are contacted.  And, oftentimes,

15        they are contacted by myself.

16  BY MS. THOMPSON:

17      Q.   Dr. Toglia, if you would try

18  to listen closely to my question, because

19  a lot of your answers, I'm -- I'm sorry

20  I'm losing my patience, are not the

21  answer to the question that I'm asking.

22  So if you just try to listen, we'll get

23  out a lot quicker, okay?

24      A.   I don't always understand

Marc Toglia, M.D.

Page 161

1   what it is that you're asking.

2        Q.    Let's make it clear from

3   this point forward, if you don't

4   understand my question, will you ask me

5   to repeat it or rephrase, but not answer

6   a different question, okay?

7              MR. SNELL:  And I'm going to

8         object to counsel's statement.  I

9         think the witness has been

10        responsive.  She just doesn't like

11        his answers.  That's my position.

12             MS. THOMPSON:  I'm loving

13        his answers.  That's fine.

14   BY MS. THOMPSON:

15        Q.    My question is, I asked you

16   about your rate of follow-up --

17        A.    Correct.

18        Q.    -- and you said it was above

19   the 90 percent mark.

20             And I'm asking you, is that

21   something that could be provided, if I

22   requested it?

23        A.    It is probably something

24   that could be provided.

Marc Toglia, M.D.

Page 162

1        Q.    And what records would you

2   rely on to produce that?

3        A.    We have medical records

4   within the practice on all of our

5   patients.

6        Q.    So someone would have to go

7   through each record to determine when the

8   patient last saw you, when she was

9   contacted, what problems she was having,

10  correct?

11       A.    That is correct.

12       Q.    Okay.  And are you aware of

13  literature that shows that most patients

14  with mesh complications do not return to

15  the original doctor who implanted the

16  mesh product?

17            MR. SNELL:  Objection.

18       Form.  Foundation.

19            THE WITNESS:  I'm aware of

20       literature that would speak to the

21       opposite.

22  BY MS. THOMPSON:

23       Q.    And what is that literature?

24  If you could tell me, please.

Marc Toglia, M.D.

Page 163

1        **A.**     Well, the first study, off

2    the top of my head, I believe was the

3    Abbott study, in which they commented, in

4    the conclusions, that most people did

5    return to their -- to their original

6    provider initially.

7                    And I would say that,

8    regardless, that would be highly atypical

9    for my practice.

10       **Q.**     How do you know that?

11       **A.**     Because we have a rate of

12   follow-up that is over 90 percent.

13       **Q.**     That if you went back and

14   looked at every chart of every patient

15   you've seen, you could determine whether

16   that's true or not?

17               MR. SNELL:  Objection.

18           Misstates.

19   BY MS. THOMPSON:

20       **Q.**     You can answer it.

21       **A.**     I thought that I already

22   answered the question, I'm sorry.

23               MR. SNELL:  You did.

24   BY MS. THOMPSON:

Marc Toglia, M.D.

Page 164

1    Q.    You can answer it again.

2          MR. SNELL:  Objection.

3    Asked and answered.

4          THE WITNESS:  Can I ask that

5    they simply read my answer back?

6          MR. SNELL:  Yes, you may.

7                - - -

8          (Whereupon, the court

9    reporter read the following part

10   of the record:

11         "Question:  And what records

12   would you rely on to produce that?

13         "Answer:  We have medical

14   records within the practice on all

15   of our patients.

16         "Question:  So someone would

17   have to go through each record to

18   determine when the patient last

19   saw you, when she was contacted,

20   what problems she was having,

21   correct?

22         "Answer:  That is correct.")

23               - - -

24   BY MS. THOMPSON:

Marc Toglia, M.D.

Page 165

1        **Q.**    Do you continue to follow up
2    on patients who have left your practice,
3    one, two, three, four, five, six, seven,
4    eight, nine, ten years after the
5    procedure?
6        **A.**    If they've left our
7    practice, we would have no access to
8    that.
9             But, as I've stated
10   earlier --
11       **Q.**    You don't need to state
12   things that you've said earlier.
13            So if a patient has left
14   your practice because, say, they were
15   cured of their stress incontinence at
16   their follow-up visit, that's not a
17   patient that you would continue to
18   contact on a regular basis, is it?
19            MR. SNELL:  Form.
20            THE WITNESS:  So at the
21        point of time, let's say that a
22        patient was cured, I always offer
23        to the patient that since we've
24        done a surgical procedure that

Marc Toglia, M.D.

Page 166

```
 1          involves a permanent implant, that
 2          it is my advice that they continue
 3          to follow-up with us annually or
 4          whether they -- any time that they
 5          have a concern.
 6               I also let them know that
 7          I'm not going to harass them into
 8          follow-up if they feel that they
 9          are doing well.
10               Initially, we saw all of our
11          patients annually.  And after
12          about five, six, seven years,
13          patients would literally say,
14          Doctor, can I say something to
15          you?  I don't know why I have to
16          continue to come, I'm fine, it
17          costs me a co-pay to get here, I
18          have to take time off work.
19     BY MS. THOMPSON:
20          Q.   So the answer to my
21     question, again --
22          A.   Yes.
23          Q.   -- is that you don't contact
24     patients after they've left your
```

Marc Toglia, M.D.

Page 167

1  practice, correct?

2              MR. SNELL:  Objection to

3         form.  Asked and answered.

4              MS. THOMPSON:  He didn't

5         answer my question, Burt.

6              MR. SNELL:  You're asking

7         the same question ten times.  He's

8         already told you all the different

9         things that can happen.

10  BY MS. THOMPSON:

11         Q.   Do you contact your patients

12  after they've left your practice or not?

13              MR. SNELL:  Same objections.

14              THE WITNESS:  I'll say the

15         same thing I said previously.

16              If a patient leaves our

17         practice, and by "leaves our

18         practice," means she informs us

19         that she is no longer requiring

20         our services, it would not be

21         appropriate for us to contact that

22         patient.

23  BY MS. THOMPSON:

24         Q.   All right.  Could you pull

Marc Toglia, M.D.

Page 168

1    the Abbott study that you referred to

2    that said strictly the opposite of what I

3    said, that most patients don't return to

4    their original implanting surgeon and

5    show me in that article what you're

6    referring to?

7         **A.**    I don't think I used the

8    word "strictly."

9              MS. THOMPSON:  We can go off

10         the record, please.

11             VIDEO TECHNICIAN:  We are

12         off the record.  The time is 4:51

13         p.m.

14                  -  -  -

15             (Whereupon, a discussion off

16         the record occurred.)

17                  -  -  -

18             VIDEO TECHNICIAN:  We are

19         back on the video record.  The

20         time is 4:54 p.m.

21             THE WITNESS:  So I just want

22         to clarify if I understand you

23         correctly.

24             So what you asked me was

Marc Toglia, M.D.

Page 169

```
 1          whether or not -- you asked me

 2          whether there was evidence that

 3          patients that had a mesh

 4          complication were unlikely to

 5          return to their original provider?

 6   BY MS. THOMPSON:

 7          Q.    I think what I said was the

 8   majority of patients with mesh

 9   complications do not return to their

10   original implanting doctor.

11          A.    Okay.  So I will correct

12   myself.

13                The Abbott study is not the

14   correct study to look at.  I mis --

15   misremembered, if that's a word, that the

16   Abbott study, the majority -- or half the

17   patients have come from an outside

18   system.

19                I will -- I will now refer

20   to the registry trials, if you'll -- and

21   there are several --

22          Q.    I'm not talking about a

23   patient that's in a trial.

24          A.    No.  Excuse me.  Excuse me.
```

Marc Toglia, M.D.

Page 170

1   I will -- when I say trial --

2              MR. SNELL:  Don't interrupt

3         him when he's answering.

4              THE WITNESS:  -- I mean

5         study.

6              So there are -- there are --

7         within the close -- excuse me.

8              Within closed healthcare

9         systems, an example would be

10        Kaiser, and the other would be the

11        healthcare systems of, say,

12        Finland and Austria, within those

13        closed systems, they would be able

14        to capture -- and Canada would

15        be -- would be another example,

16        they would be able to capture that

17        patient in the system no matter

18        where they ended up within the

19        system.

20   BY MS. THOMPSON:

21        Q.   Are you in Kaiser?

22        A.   I am not a Kaiser physician.

23        Q.   Are you in Finland?

24        A.   No, I'm not in Finland.

Marc Toglia, M.D.

Page 171

1      Q.    Are you in Austria?

2      A.    No.

3      Q.    Are you in Canada?

4      A.    No.

5      Q.    Thank you.

6      A.    But that's not the question

7   that you asked me.

8      Q.    You've answered my question.

9      A.    I'm trying to answer the

10  question, and you're trying to prevent me

11  from answering.

12     Q.    What question is on the

13  table?

14     A.    You asked me whether or not

15  it is true that most patients who

16  experience a complication are not then

17  seen within the same system.  And I'm

18  telling you that in those circumstances,

19  of which there is abundant data, some

20  data that goes out to ten years, that

21  that is not a correct statement.  Those

22  patients are captured.

23          So, for example, if you're

24  in Finland or Austria and you had a sling

Marc Toglia, M.D.

Page 172

1    complication, that -- and you sought

2    medical treatment, those are captured to

3    a high degree of specificity.

4         Q.    And that's not responsive to

5    any question I asked.  So we'll move on.

6              MR. SNELL:  Move to strike.

7         I think it was totally responsive

8         to the question.

9    BY MS. THOMPSON:

10        Q.    Do you tell your patients

11   that if they have complications that

12   require a removal of the sling, that

13   there may be multiple surgeries to

14   correct that?

15             MR. SNELL:  I'm sorry, can

16        you repeat that back?

17   BY MS. THOMPSON:

18        Q.    Do you tell your patients

19   that removal -- if they have

20   complications that require removal of the

21   device, it may take multiple surgeries to

22   correct it?

23        A.    That is -- that is such a

24   highly -- in my practice and experience,

Marc Toglia, M.D.

Page 173

1  that is such a highly unlikely

2  occurrence, that that would not -- I

3  would not speak to something that has

4  that low of an occurrence.

5           I would have difficulty

6  thinking of a patient that underwent a

7  TVT sling for the intended purpose of

8  stress incontinence that would have

9  required multiple procedures for that one

10  sole thing.

11          And in that regard, I would

12  speak to the Abbott study, in which they

13  acknowledge that for just sling-related

14  procedures, typical management of medical

15  complications were medical and not

16  surgical and that, in general, were more

17  easily -- easier resolved.

18     Q.    Easier -- more easily

19  resolved than POP mesh?

20     A.    Correct.  But --

21     Q.    Can you show me where in

22  Abbott it tells it -- tells you that most

23  of them are medically managed?

24     A.    Okay.  Back to the Abbott

Marc Toglia, M.D.

Page 174

1    study, on Page 163, last couple column.

2    Additionally, those women with

3    complications after sling-only procedures

4    were treated more often with medical

5    management and rarely required surgical

6    re-intervention.

7              Going --

8        Q.    That's comparing --

9        A.    Going --

10       Q.    That's comparing to the

11   prolapse mesh patients?

12       A.    That was the objective of

13   the Abbott trial.

14             Second point, at the top of

15   that page.  The treatment of stress

16   incontinence has a more predictable and

17   less severe course of complications

18   compared with that of synthetic mesh that

19   is used in the management of pelvic organ

20   prolapse.

21       Q.    Correct, comparatively

22   speaking.

23             And the conclusion of the

24   study, just to clarify is, Most of the

Marc Toglia, M.D.

Page 175

1   women who seek management of synthetic

2   mesh complication after POP or SUI

3   surgery have severe complications that

4   require surgical intervention.  A

5   significant proportion require greater

6   than one surgical procedure.

7               Did I read the conclusions

8   to that study correctly?

9       **A.**   My apologies, I wasn't

10  following you.  Where -- can you tell me

11  what page you're speaking to?

12      **Q.**   The first page, the

13  conclusions of the study.  Did I read it

14  correctly?  That's the only question I

15  have for you.

16      **A.**   The comment?

17      **Q.**   The first page of the study,

18  under conclusions, did I read that

19  correctly?

20      **A.**   Counselor, I'm trying not to

21  be difficult, but there's not a --

22  there's not a subtitle that starts with

23  conclusions.

24      **Q.**   In the abstract, it has,

Marc Toglia, M.D.

Page 176

1    objectives, study design, results and

2    conclusion on the first page.

3           A.    The pattern of complaints

4    differed by the index of procedure.

5                 I mean, I think, you know,

6    you're taking --

7           Q.    Most of the women --

8           A.    You're taking it out of --

9           Q.    Did I read it correctly?

10   Did I read the conclusions correctly?

11   That's the only question on the table.

12          A.    The conclusions --

13                MR. SNELL:  I'm going to

14          object to the form.

15                THE WITNESS:  The

16          conclusions are what are listed

17          under the comment, that's the

18          conclusion.

19   BY MS. THOMPSON:

20          Q.    I didn't ask you --  I asked

21   you, did I read --

22          A.    You're reading the abstract.

23   You're reading an abstracted sentence.

24          Q.    So you cannot answer the

Marc Toglia, M.D.

Page 177

1    question --

2            **A.**    I did answer the question.

3            **Q.**    -- whether I read it

4    correctly or not?

5            **A.**    I'm reading it under the

6    conclusion of the paper, okay?  It's

7    right here.  Additionally, those women

8    with complications after sling-only.  We

9    are talking --

10           **Q.**    Okay.  Let's move --

11           **A.**    -- about standalone sling

12   procedures --

13           **Q.**    Let's move on.

14           **A.**    -- correct?

15           **Q.**    Let's move on.

16                    Do you tell your patients

17   that the polypropylene mesh and TVT

18   device creates chronic inflammation?

19                    MR. SNELL:  Objection.

20           Asked and answered.

21                    MS. THOMPSON:  No, I asked

22           about chronic foreign body

23           reaction.  Those are two different

24           things.

Marc Toglia, M.D.

Page 178

```
 1              MR. SNELL:  I stand
 2         corrected.  I thought you said
 3         that.
 4              THE WITNESS:  Based upon our
 5         experience in the last 17 years,
 6         with nearly 2,500 procedures, we
 7         have not observed any chronic
 8         inflammation as it relates to the
 9         retropubic TVT, and, therefore, we
10         don't speak to them about
11         something that we have not seen.
12    BY MS. THOMPSON:
13         Q.   If Ethicon had information
14    about chronic inflammation, is that
15    something that you, as a doctor, would
16    want to know?
17         A.   As an expert in this field,
18    I would not rely upon Ethicon for that
19    information.  I seek that information
20    myself, formulating that opinion from
21    high-quality studies.
22         Q.   Is that information patients
23    would want to know?
24         A.   I think patients would --
```

Marc Toglia, M.D.

Page 179

1   would love to know that I spend the time

2   seeking out high-quality data and look at

3   long-term studies and rely upon those

4   type of systematic review groups when I

5   present the safety profile of that

6   procedure.

7        Q.   Do any of your patients have

8   complications after a TVT procedure?

9        A.   Patients can have

10  complications after any surgical

11  procedure.

12       Q.   That wasn't my question.

13            Have any of your patients

14  had complications after a TVT procedure

15  that you've performed?

16       A.   Yes.  As I've stated in

17  my --

18       Q.   Okay.  That's -- that's all

19  I need.

20            And what are those

21  complications?

22       A.   The most common complication

23  that we see would be injury of the

24  bladder, which, in our hands, is about 1

Marc Toglia, M.D.

Page 180

1   percent.

2          **Q.**    What else?

3          **A.**    I believe that we did

4   discuss this earlier on, but it was

5   specific to myself.

6               There's always a risk of

7   bleeding, that is something that is

8   discussed with all patients.  We tell

9   them about our experience with bleeding,

10  that we see it a little more commonly in

11  the younger patients.

12              We talk about the potential

13  risk that, maybe, the symptom improvement

14  may not be as much as they want and that

15  there are occasions where a second

16  procedure might need to be performed.

17              Conversely, we tell people

18  that there is a small risk for voiding

19  dysfunction and that, at times, that will

20  require re-intervention for that reason.

21              There is a risk for vaginal

22  perforation, urethral perforation, nerve

23  injury, bowel injury.  And those are all

24  discussed with the patients.

Marc Toglia, M.D.

Page 181

1               We speak about other risks

2       such as pain with sexual intercourse,

3       more specifically, relative to the other

4       procedures, and that in our experience,

5       and according to high-quality data, the

6       rate of dyspareunia is exceedingly low

7       with the retropubic TVT sling.

8               **Q.**    Is it your opinion that when

9       complications occur it's because the

10      surgeon placed the device improperly?

11              **A.**    I would say, in most cases,

12      it is a direct result of -- it's user

13      dependent, and I make that point in my

14      paper, in my --

15              **Q.**    And that would include the

16      complications that you've had with your

17      procedures?

18              **A.**    Correct.

19              **Q.**    And how many TVT devices

20      have you removed or performed some kind

21      of revision surgery on?

22              **A.**    I think it's best to answer

23      that sort of on an annual basis.  Again,

24      understanding that I've been performing

Marc Toglia, M.D.

Page 182

```
 1   this procedure over a 17-year period of

 2   time.

 3              I would say, in the average

 4   year, that probably ranges from zero to

 5   one.

 6        Q.   So only zero to one time per

 7   year are you doing any corrective surgery

 8   on a TVT device?

 9              MR. SNELL:  Objection.

10         Misstates.

11   BY MS. THOMPSON:

12        Q.   Zero to one per year --

13              MR. SNELL:  You're changing

14         your question.  You're asking

15         about TVT Retropubic and then the

16         next question is a TVT device,

17         which can be --

18              MS. THOMPSON:  Sorry.  I'll

19         rephrase it.

20              And, again, if you'll just

21         ask me if you don't understand a

22         question.

23              THE WITNESS:  I understand.

24              MS. THOMPSON:  Then you can
```

Marc Toglia, M.D.

Page 183

1          object to form.  He can ask me if

2          he doesn't understand it.

3                  THE WITNESS:  I'm listening

4          to what you're asking.

5                  MS. THOMPSON:  Because I

6          think you knew -- I think you knew

7          what I meant when I said that.

8    BY MS. THOMPSON:

9          Q.    So zero to one TVT

10   Retropubic devices are how many you are

11   removing in a typical year; is that

12   correct?

13         A.    Well, I don't think that

14   you're accurate, the word "removal."

15   It's removal or revision.

16                I would say that probably

17   once a year, or so, are we having to

18   surgically revise a TVT device -- excuse

19   me, a TVT procedure.

20                And I'm -- again, for the I

21   remember sake of argument, I'm speaking

22   about the retropubic TVT procedure that

23   we are doing for stress incontinence.

24         Q.    In your report, you said

Marc Toglia, M.D.

Page 184

1    that you are considered one of the

2    leading experts in the Greater

3    Philadelphia region on surgical revision

4    of complications related to vaginal mesh

5    procedures.

6              Is that a true -- true

7    statement?

8         **A.**    That is a true statement.

9         **Q.**    And why is there a need for

10   experts on surgical revision of

11   complications related to vaginal mesh

12   procedures?

13        **A.**    I think there are experts

14   required for the management of any kind

15   of surgical revision of problems that can

16   occur.

17        **Q.**    Now, I've never seen someone

18   say that they are an expert in the

19   surgical management of complications

20   related to a Burch or to autologous

21   fascial sling or to native tissue

22   repairs.

23              Explain to me why an expert

24   is needed for the management of vaginal

Marc Toglia, M.D.

Page 185

1    mesh complications.

2                    MR. SNELL:  Objection.

3            Form.

4                    THE WITNESS:  In that

5            context, I would hold myself out

6            in those fields.  The -- the need

7            to re-intervene is identical,

8            practically speaking, amongst the

9            three most common

10           anti-incontinence procedure,

11           whether that be a Burch -- I

12           probably revise more Burches,

13           fascial slings, bladder neck

14           slings than I do midurethral

15           slings.

16   BY MS. THOMPSON:

17           Q.    So what you intended to say

18   is that you're one of the leading experts

19   on surgical revisions of complications

20   for any pelvic procedures, not vaginal

21   mesh procedures?

22           A.    I don't -- pelvic procedures

23   is a little bit too broad.

24                    With regard to prior

Marc Toglia, M.D.

Page 186

1   surgical intervention for pelvic floor --

2   surgery for pelvic floor dysfunction, I

3   probably have as much experience as

4   anyone else in the area.  And that is a

5   frequent source for referral.

6          Q.    You, I believe, said in your

7   report that you had done 3,000 patients

8   with TVT, but that may have been all

9   urethral slings, it doesn't make too

10  much --

11         A.    I think --

12         Q.    -- difference for my

13  question.

14         A.    Well, I think 3,000 may

15  refer to everything, including

16  sacrocolpopexy performed with mesh.  I

17  think it's 3,000 mesh related procedures.

18  That would include the entire scope.

19         Q.    Okay.

20         A.    If you just want to accept

21  me at my word, I think that's -- I'm

22  pretty --

23         Q.    We'll go ahead and find it.

24         A.    That one I'm pretty sure of,

Marc Toglia, M.D.

Page 187

1   because I said it.

2          Q.    Well, whatever it is, it's

3   in your report.  We can look it up later.

4                 You said in those 3,000

5   patients --

6                 MR. SNELL:  Where are you

7          at, counsel?  Just so --

8                 MS. THOMPSON:  Okay.  I'll

9          have to find it.  I thought I had

10         it underlined.

11                THE WITNESS:  I don't think

12         I said anything beyond the fact

13         that I had experience in 3,000

14         patients.  I don't think I went --

15         I did not go on.

16  BY MS. THOMPSON:

17         Q.    On Page 9, the last

18  sentence.  I have personally used it --

19  and I think that's referring to

20  polypropylene mesh, I guess?

21         A.    That would be correct.

22         Q.    -- as my primary implant

23  material in my patients for over 15 years

24  in more than 3,000 patients --

Marc Toglia, M.D.

Page 188

 1      **A.**     That is correct.

 2      **Q.**     -- and have yet to observe a

 3   single case -- now I want to go through

 4   some of these.

 5              How do you define -- define

 6   "mesh rejection"?

 7      **A.**     Since I haven't seen a case

 8   of that, a case in which there was overt

 9   expulsion of the mesh, in which there was

10   complete failure of primary healing, in

11   which there was systemic response of an

12   inflammatory reaction.

13      **Q.**     So your definition of

14   rejection, then, is overt expulsion and

15   not -- that would not include erosion

16   into any organ, correct?

17      **A.**     My definition is just,

18   succinctly, would be evidence of overt

19   graft versus host disease.

20      **Q.**     And what symptoms would the

21   patient present with --

22      **A.**     Excuse me, host versus

23   graft.

24      **Q.**     I knew what you meant.

Marc Toglia, M.D.

Page 189

1                 What symptoms would the

2    patient present with, in your opinion?

3         **A.**     There could be expulsion of

4    the material, there could be complete

5    failure of primary healing, recurrent --

6    or some kind of systemic response,

7    anaphylaxis.

8         **Q.**     And by "overt expulsion" you

9    are not referring to erosion into the

10   vagina, the urethra or bladder?

11        **A.**     Thank you for clarifying

12   that.

13                So rejection is rejection,

14   exposure is a different phenomenon,

15   correct.

16        **Q.**     And what testing did you do

17   on those 3,000 patients to determine

18   there wasn't a host versus graft

19   condition?

20        **A.**     I don't think it would be

21   ethical, counselor, for me to test --

22   test -- somehow subject a test on an

23   asymptomatic patient.  And I think that a

24   large body of the literature cited by

Marc Toglia, M.D.

Page 190

1   your experts speak to the fact that they

2   were unable to do that kind of testing

3   because of ethical considerations.

4         Q.    You would agree with me,

5   though, that rejection is an immunologic

6   response to a foreign body?

7         A.    I think --

8               MR. SNELL:  Objection to

9          form.

10              Go ahead.

11              THE WITNESS:  I think that's

12         one -- one type of rejection might

13         be immunologic, yes.

14  BY MS. THOMPSON:

15        Q.    And are you aware of

16  literature that tested, immunologically

17  and/or histologically, for a rejection

18  condition?

19              MR. SNELL:  Objection to

20         form.

21              THE WITNESS:  There is no

22         high-quality literature or data

23         that suggests that that phenomena

24         occurs with the TVT device when

Marc Toglia, M.D.

Page 191

```
 1          used for the indication of stress
 2          incontinence.
 3              The long-term registry
 4          trials, which have followed out to
 5          ten years, as well as the
 6          additional data out to 17 years,
 7          do not raise any concern,
 8          clinically, that those -- that
 9          that phenomena exists.
10              Now, I have reviewed the
11          information provided by your
12          experts, in which they were to
13          hypothesize that.  That
14          information is Level 5 evidence.
15              Now, let me just show you
16          that.
17   BY MS. THOMPSON:
18          Q.   I don't need you to show me.
19          A.   No, no --
20          Q.   I didn't ask --
21          A.   -- I do.
22          Q.   -- any question about the
23   level of evidence.
24          A.   But I have to explain to
```

Marc Toglia, M.D.

Page 192

1   you --

2          Q.    Mr. Snell can ask you that

3   question, if you he wants to, at the end.

4          A.    So when you have Level 1 --

5          Q.    I have not asked you that

6   question.

7          A.    Please allow me to finish my

8   answer, counselor.

9                When you have -- because

10  this is -- this is paramount to my

11  methodology.

12               When you have Level 1 data,

13  Level 5 data doesn't count, okay?

14               Additionally, you can never

15  derive clinical implications or draw

16  clinical conclusions from Level 5 data.

17  That is implicit in the weak design of

18  that study.  Every author of those papers

19  makes that disclosure, as far as the --

20  as far as the ramifications.

21               In fact, I will point to

22  Clave, which I cited in my --

23               MS. THOMPSON:  This is

24        really all nonresponsive.  So

Marc Toglia, M.D.

Page 193

```
 1        if --
 2              MR. SNELL:  No, you asked
 3        him do you know of literature.
 4        And he's telling you about
 5        literature.
 6              THE WITNESS:  Yes.
 7              MR. SNELL:  And he's
 8        saying --
 9              MS. THOMPSON:  I'm asked him
10        about literature about immune
11        response to foreign body.
12              MR. SNELL:  He's telling
13        you.  He saw what your experts
14        have pointed to --
15              MS. COPE:  Should I start
16        talking, too?  You seem to speak
17        freely for him.
18              MR. SNELL:  I'm not speaking
19        for him.  You asked me a question,
20        Margaret, I'm going to give you an
21        answer.  Don't ask me a question,
22        then.
23              MS. THOMPSON:  Okay.  I'm
24        going to request more time if he
```

Marc Toglia, M.D.

Page 194

1          is going to continue to not answer

2          my question.

3               THE WITNESS:  Counselor, I

4          am --

5               MS. THOMPSON:  We'll go off

6          the record, and he can look up his

7          literature that he wants to talk

8          about.

9               VIDEO TECHNICIAN:  We are

10         off the record.  The time is 5:15

11         p.m.

12                    -  -  -

13              (Whereupon, a discussion off

14         the record occurred.)

15                    -  -  -

16              VIDEO TECHNICIAN:  We are

17         back on the video record.

18              THE WITNESS:  The literature

19         that we are discussing here is not

20         applicable to TVT, okay?

21    BY MS. THOMPSON:

22         Q.    Okay.  All right.

23         A.    And it does not have

24    sufficient weight or evidence that you

Marc Toglia, M.D.

Page 195

1    can draw those conclusions.

2            **Q.**    Is your opinion that Level 5

3    evidence regarding safety issues is also

4    worthless?

5                    MR. SNELL:  Form.

6            Objection.

7                    THE WITNESS:  When you have

8            Level 1 evidence on safety, then

9            the Level 5 evidence is not

10           considered to be important.

11   BY MS. THOMPSON:

12           **Q.**    Do you believe that we have

13   Level 1 evidence on the safety of the

14   TVT --

15           **A.**    Absolutely.

16           **Q.**    -- yes or no?

17           **A.**    Absolutely.

18           **Q.**    Okay.  There's an article,

19   Wang, I believe it's on your reliance

20   list.

21           **A.**    Yes.

22           **Q.**    Do you believe that's not a

23   quality study?

24           **A.**    That is an extremely

Marc Toglia, M.D.

Page 196

1    poor-quality study.

2         **Q.**    And is there evidence to the

3    contrary, that there is no immune --

4    significant immune response to the

5    polypropylene mesh in the TVT that you

6    are aware of?

7         **A.**    Can I speak to --

8              MR. SNELL:  Object to form.

9              THE WITNESS:  Can I speak to

10         the Wang study, please?

11   BY MS. THOMPSON:

12        **Q.**    No, I -- just answer my

13   question, please.

14             And the question is, is

15   there--

16        **A.**    Hold on.  I'm sorry, I'm

17   going to ask you to pause.

18             You did ask me about the

19   Wang study, I want to make sure --

20        **Q.**    I asked you if you were

21   aware of it.  I have not asked you any

22   questions about the Wang study, other

23   than, are you aware of it?

24             MR. SNELL:  Actually, no.

Marc Toglia, M.D.

Page 197

```
 1          You --
 2               THE WITNESS:  You asked me
 3          about the quality of the evidence.
 4          I'm going to tell you the answer,
 5          and I'm going to tell you what I'm
 6          basing my answer on.
 7   BY MS. THOMPSON:
 8          Q.    I asked you -- I'm asking
 9   you about the evidence that shows that
10   there is no immune response to the
11   foreign body.  That's what I would like
12   for you to answer, the question, and tell
13   me if you have evidence that there is no
14   immune response to the foreign material
15   in the TVT.
16          A.    The long-term safety
17   studies -- excuse me.  The long-term
18   Level 1 evidence studies speak to the
19   lack of a significant immune response.
20               In addition --
21          Q.    Okay.  Can you --
22          A.    In addition --
23               MR. SNELL:  Don't stop him.
24               THE WITNESS:  -- the
```

Marc Toglia, M.D.

Page 198

```
1            systematic reviews speak to the

2            fact, and this includes -- and

3            this is consistent with what is

4            stated by the FDA, what is stated

5            by NICE, what is stated by AUA,

6            AUGS, and SUFU, that there is --

7            that polypropylene mesh,

8            macroporous, as used with the TVT

9            device for its intended purpose,

10           is the most biomechanic --

11           biocompatible material.

12                By definition, biocompatible

13           speaks to host tolerance and the

14           lack of immunologic response.

15   BY MS. THOMPSON:

16           Q.   Can you show me, in any of

17   those things that you just rattled off,

18   where it states that there is no

19   immunologic response to polypropylene

20   mesh in the TVT device?

21                MR. SNELL:  Objection to

22           form.

23   BY MS. THOMPSON:

24           Q.   I'm looking for immunologic
```

Marc Toglia, M.D.

Page 199

1    response, which is what rejection or

2    graft versus -- versus host versus graft

3    response is.

4                    MR. SNELL:  Objection to

5            form.

6                    THE WITNESS:  Can we go off

7            record?

8                    MS. THOMPSON:  Off the

9            record, please.

10                   VIDEO TECHNICIAN:  We are

11           off the record.  The time is 5:19

12           p.m.

13                        -  -  -

14                   (Whereupon, a discussion off

15           the record occurred.)

16                        -  -  -

17                   VIDEO TECHNICIAN:  We are

18           back on the video record.

19                   THE WITNESS:  Yes.  Again, I

20           am -- I am trying to be extremely

21           respectful of everybody's time,

22           and acknowledge that this is

23           Friday.

24                   Unfortunately, the volume of

Marc Toglia, M.D.

Page 200

```
 1        material as relates to the TVT

 2        device, which has been in

 3        development over 20 years, is

 4        broad and extensive and worldwide.

 5        And, you know, unfortunately,

 6        there is a lot of material.

 7             And while I'm well versed in

 8        it, it still takes me a while to

 9        figure out exactly the location of

10        the statements that I have in

11        mind.

12             Why don't you go back off

13        the record?

14             MS. THOMPSON:  I should be

15        the one who directs the

16        videographer, if you don't mind.

17             THE WITNESS:  I'm sorry.

18        I'm just trying -- I'm just trying

19        to be respectful of people's time,

20        and I'm apologizing for the amount

21        of time it's taking.  I'm just --

22        I want you to know I'm not doing

23        this to be obstructive.

24   BY MS. THOMPSON:
```

Marc Toglia, M.D.

Page 201

1          Q.    And, I mean, we can just
2   concede that you have not been able to
3   find anything on that particular issue in
4   the time allotted.
5          A.    If I can -- if I cannot
6   produce this within the next several
7   minutes, I'm happy to move on, again, out
8   of respect for everybody's time.
9                Why don't you go ahead and
10  ask me the question, counselor?
11         Q.    The next question?
12         A.    No.
13         Q.    The previous question that
14  we've been -- are we on the record?
15               MS. THOMPSON:  Are we on the
16          record, Greg?
17               VIDEO TECHNICIAN:  We're on
18          the record.
19               THE WITNESS:  I'm sorry.
20  BY MS. THOMPSON:
21         Q.    Are you ready to move to the
22  next question?
23         A.    Yes.
24         Q.    Hopefully, we won't spend as

Marc Toglia, M.D.

Page 202

1    much time on the other things that you've

2    said you've not seen one single patient

3    out of your 3,000 that have had these

4    particular conditions, you said that you

5    have yet to observe a single case of

6    chronic foreign body reaction.

7              How did you determine that

8    you have not had a single patient, out of

9    3,000, that has had a chronic foreign

10   body reaction to mesh?

11        A.    So clinical suspicions that

12   one might be experiencing a reaction that

13   would be classified as a chronic foreign

14   body reaction would be things like

15   chronic nonhealing of a wound, persistent

16   erythema, fluctuance, pain, chronic

17   drainage.

18        Q.    But you would agree with me

19   that chronic foreign body reaction is a

20   histologic diagnosis, would you not?

21              MR. SNELL:  Form.

22         Objection.

23              THE WITNESS:  I would say

24         that it is -- it is something that

Marc Toglia, M.D.

Page 203

```
 1         always has a clinical presentation
 2         and then would be confirmed on it.
 3              Now, in contrast, we have
 4         seen this with other implanted
 5         material.  So I am very familiar
 6         with the presentation.  In fact,
 7         I've published on the
 8         presentations within the pelvic
 9         floor, in the vaginal space, as it
10         relates to what we referred to, at
11         the time, was chronic
12         granulomatous response to a
13         foreign body within the context of
14         reconstructive pelvic surgery.
15    BY MS. THOMPSON:
16         Q.    I don't think you answered
17    my question.
18              Foreign body reaction is a
19    histologic pathologic diagnosis, correct?
20              MR. SNELL:  Asked and
21         answered.
22              MS. THOMPSON:  If you got
23         the answer, I sure didn't.
24              THE WITNESS:  It is both.
```

Marc Toglia, M.D.

Page 204

```
 1          It is both.
 2                  MR. SNELL:  Would you read
 3          it --
 4                  THE WITNESS:  It is
 5          clinical --
 6                  MR. SNELL:  Would you read
 7          it back?
 8                  MS. THOMPSON:  No.
 9                  MR. SNELL:  Go ahead and --
10          go ahead and answer it again.
11   BY MS. THOMPSON:
12          Q.   Okay.  All right.  So of
13   these 3,000 patients that you've never
14   seen a chronic foreign body reaction, are
15   you aware that there's literature that
16   states that 100 percent of women with
17   pelvic mesh in their bodies have a
18   chronic foreign body reaction?
19                  MR. SNELL:  Objection.
20   BY MS. THOMPSON:
21          Q.   100 percent?
22                  Are you aware of that
23   literature?
24                  MR. SNELL:  Objection.  Form
```

Marc Toglia, M.D.

Page 205

1          and foundation.

2               THE WITNESS:  Rephrase your

3          question, please.

4    BY MS. THOMPSON:

5          Q.    Are you aware -- are you

6    aware of literature that states that 100

7    percent of women with pelvic mesh have a

8    chronic foreign body reaction to the

9    mesh?

10              MR. SNELL:  Same objection

11         to form and foundation.

12              THE WITNESS:  If you have a

13         foreign body implanted in your

14         body, chronically, there will

15         always be histologic evidence of

16         the body's reaction surrounding

17         the mesh or the material.

18   BY MS. THOMPSON:

19         Q.    So that's really --

20         A.    That -- that is not germane

21   or related clinically, nor can you take

22   inflammation that just randomly produces

23   that kind of in vitro, again, Level 5

24   evidence, you cannot make clinical

Marc Toglia, M.D.

Page 206

1  inference.  There's not enough power to

2  that study.

3           The only way that you could

4  make that is by examining Level 1

5  evidence and deriving that.

6     Q.    Is there Level 1 evidence

7  that states that there is not a chronic

8  foreign body reaction to mesh; yes or no?

9     A.    There is -- there is a

10 chronic -- excuse me.

11          There is -- the body does

12 respond, in 100 percent of patients, but

13 there's no negative clinical sequelae.

14    Q.    So your statement that you

15 have not had a single case of chronic

16 foreign body reaction, that's not really

17 what you mean, right?

18    A.    No, clinically based.  I'm

19 speaking to clinical medicine, clinical

20 problems.

21    Q.    And you know that for a

22 fact, out of your 3,000 patients?

23    A.    To the best of my knowledge,

24 a patient has never presented to me with

Marc Toglia, M.D.

Page 207

1    a chronic or acute medical syndrome in

2    which we could identify, as the source, a

3    chronic inflammatory reaction.

4            Q.    And I think that's a little

5    different from what you stated here --

6            A.    No, counselor.

7            Q.    -- so I appreciate that.

8            A.    No.  My -- my -- if I speak

9    to my clinical experience, it's clinical.

10   It's not stuff that I'm doing in a lab.

11   I think that's quite clear.

12           Q.    Is less than Level 1

13   evidence important if you're reporting a

14   death from a minor procedure like the

15   TVT?

16                 MR. SNELL:  Objection to

17           form.

18                 THE WITNESS:  Well, I

19           think -- I think you're using -- I

20           think you're using the -- I think

21           that you're using the clinical --

22           clinical evidence pyramid out of

23           context here.

24                 All deaths are important.

Marc Toglia, M.D.

Page 208

```
1            There is no non-important death.

2            You don't -- you don't need Level

3            1 evidence to tell you that a

4            death has occurred.

5    BY MS. THOMPSON:

6            Q.    And that's something that

7    you would want to know, correct?

8                 MR. SNELL:  Objection.

9    BY MS. THOMPSON:

10           Q.    As a doctor and a patient?

11                MR. SNELL:  Objection.

12           Form.

13                THE WITNESS:  If a patient

14           of mine were to die as a result of

15           one of my procedures, I would

16           absolutely want to know about the

17           occurrence of the death and the

18           cause of death.

19   BY MS. THOMPSON:

20           Q.    I'm talking about published

21   in the literature.

22                Would you want to know other

23   doctors' patients who have died as a

24   result of a TVT or another mesh
```

Marc Toglia, M.D.

Page 209

1   procedure?

2               MR. SNELL:  Object to form.

3               THE WITNESS:  You know, I

4          think that I would be aware of

5          that, yes.

6   BY MS. THOMPSON:

7        Q.    That wasn't my question,

8   would you be aware of it.

9               Is it something that you

10  would want to know and see published?

11              MR. SNELL:  Same objection.

12              THE WITNESS:  I don't

13         necessarily think it needs to be

14         published.  If someone dies at the

15         hospital next to me, I'm not going

16         to wait until it's published

17         before I think about what had

18         occurred.

19  BY MS. THOMPSON:

20       Q.    Well, what if a patient dies

21  in Atlanta, Georgia, which happened a

22  little while ago, is that something that

23  you would want to know about?

24              MR. SNELL:  Objection.

Marc Toglia, M.D.

Page 210

1           Form.  Vague.  Lacks foundation.

2                 THE WITNESS:  I don't --

3    BY MS. THOMPSON:

4           Q.     From a TVT.

5           A.     I don't know -- I mean, that

6    an isolated case that happened

7    elsewhere -- I mean, would I want to

8    know?  I mean, I wouldn't close my ears

9    if someone told me about the problem.

10                But had I not heard about

11   it, I wouldn't say that a foul was

12   committed.

13          Q.     Do you routinely send the

14   specimens that you remove when you -- of

15   mesh for histologic exam?

16          A.     We do routinely send -- send

17   specimens to the lab for identification.

18          Q.     Have you ever looked at the

19   slides?

20          A.     I have not looked at the

21   slides.

22          Q.     You've never looked at an

23   explanted mesh under the microscope?

24          A.     I have never looked at an

Marc Toglia, M.D.

Page 211

1    explanted mesh under the microscope.

2          Q.    So you really don't know

3    what they look like, do you, under the

4    microscope?

5          A.    Yes, I do.  They are in all

6    these articles.  There are clear

7    photomicrographs on there with accurate

8    pathologic descriptions.  That's not what

9    you asked me.

10         Q.    But you disagree with the

11   pathological descriptions in the

12   literature?

13         A.    You and I are talking about

14   different things.

15              I have already told you that

16   a foreign material in the body, you will

17   see evidence of that response.  You have

18   to see evidence.  There -- it's a foreign

19   body and there is -- and there is a

20   thing.

21              But it's not a clinically

22   significant observation.

23         Q.    All right.  You agree with

24   me that there are alternatives to

Marc Toglia, M.D.

Page 212

1    midurethral slings?

2                    MR. SNELL:  Form.

3                    THE WITNESS:  In what

4            context?  In the treatment of

5            stress urinary incontinence in

6            women?

7    BY MS. THOMPSON:

8            Q.    In the treatment of stress

9    urinary incontinence?

10           A.    TVT is only one of several

11   procedures that is effective for the

12   treatment of female stress incontinence.

13           Q.    Okay.  The Burch procedure

14   would be one of those, correct?

15           A.    That is correct.

16           Q.    And an autologous sling

17   would be one of those, correct?

18           A.    That is correct.

19           Q.    And there are actually

20   nonsurgical treatments for stress urinary

21   incontinence as well, correct?

22           A.    That's correct.

23           Q.    And can we agree that they

24   have equivalent efficacy?

Marc Toglia, M.D.

Page 213

1          **A.**     Across the board, efficacy

2      is similar.  Again, you do a

3      meta-analysis, you overweight

4      higher-quality data, you'll get -- you'll

5      get recommendations that say, I favor one

6      or the other.

7                    But I think it's a

8      reasonable statement, as presented in the

9      short-term, that the effectiveness, in

10     the short-term across the procedures

11     are -- demonstrate similar efficacy.

12         **Q.**     Do you know Mickey Curran?

13         **A.**     Yes.

14         **Q.**     I believe you've published

15     with him on one of your papers; is that

16     correct?

17         **A.**     I've published with Mickey

18     on several papers, correct.

19         **Q.**     I want to read you and

20     statement and I want you to tell me

21     whether you agree with it or not, okay?

22         **A.**     May I ask who is making the

23     statement?

24         **Q.**     Well, Dr. Curran is making

Marc Toglia, M.D.

Page 214

1    the statement.

2         **A.**    Thank you.  I just want to

3    make sure it wasn't me making the

4    statement.

5         **Q.**    But it wouldn't matter, I

6    guess, for the purpose of whether you

7    agree with it or not.

8                   In our opinion, the

9    autologous pubovaginal sling is

10   appropriate for patients with stress

11   urinary incontinence who declined to have

12   synthetic material implanted because of

13   concerns related to long-term placement

14   of synthetic mesh.

15                  Would you agree with that

16   statement?

17                  MR. SNELL:  Objection to the

18         form.

19                  Go ahead.

20                  THE WITNESS:  Can you tell

21         me the year that that was

22         published?

23                  MS. THOMPSON:  2012, I

24         believe.

Marc Toglia, M.D.

Page 215

1            THE WITNESS:  I think that's
2        a relatively reasonable statement.
3  BY MS. THOMPSON:
4        Q.    Reasonable?
5        A.    Yes.
6        Q.    Okay.  Thank you.  I'll just
7  check on that date for you real quick.
8            2012.
9        A.    Okay.  Thank you.
10        Q.    How much are you paid for
11  placing a TVT on average?
12        A.    The reimbursement for the
13  TVT -- there is no -- there is no
14  specific procedure of TVT.  So it's a
15  pubovaginal sling procedure.
16            So if I place an autologous
17  fascial sling or if I do a synthetic
18  midurethral sling, the reimbursement is
19  about the same.  You know, Medicare data,
20  with geographic area factors factored in,
21  in this region, I would say probably the
22  range is $800 to, maybe, $1,200 a
23  procedure.
24        Q.    And how much would you be

Marc Toglia, M.D.

Page 216

1    paid for a Burch?

2         **A.**    I would suspect that the

3    reimbursement for the Burch is likely to

4    be a little bit higher.

5              But I do want to -- I do

6    want to clarify something.  And I suspect

7    that with your background, you would

8    understand what I'm about to say.

9              We're not paid for the

10   procedure.  The reimbursement for, say,

11   the surgery encompasses all services that

12   we provide, 24 hours prior to the

13   procedure for the actual procedure,

14   whatever amount of postoperative care is

15   deemed necessary and pretty much all care

16   out to about 90 days.

17             So the percentage of what I

18   just mentioned that's specific for

19   placing the procedure, it's probably half

20   that, if you're looking for that specific

21   of information.

22        **Q.**    And how long did it take you

23   to place a TVT?

24        **A.**    In my hands, a TVT can be

Marc Toglia, M.D.

Page 217

1    placed in about 20 minutes.

2         **Q.**    And how about an autologous

3    sling -- well, let me ask you this first:

4    Are you performing any autologous sling

5    procedures?

6         **A.**    In our practice, we don't

7    currently perform autologous fascial

8    slings in the last several years, because

9    we reserve those for a certain subset of

10   patients.  And, fortunately, we've not

11   had to go that far down the algorithm.

12        **Q.**    So it's been several years

13   since you've placed an autologous -- or

14   since you've performed an autologous --

15        **A.**    That's correct.

16        **Q.**    -- sling procedure?

17              How about the last time you

18   were -- performed a Burch procedure.

19        **A.**    The last time I performed a

20   Burch procedure might be 2002.

21        **Q.**    But you were trained on both

22   of those procedures, correct?

23        **A.**    Of course.

24        **Q.**    Do you teach residents and

Marc Toglia, M.D.

Page 218

1    fellows?

2          **A.**     I do.  I don't teach

3    fellows, excuse me.

4          **Q.**     You teach residents?

5          **A.**     Correct.

6          **Q.**     At Thomas Jefferson?

7          **A.**     No.  Lankenau Medical Center

8    has an independent residency.

9          **Q.**     And I presume, since you're

10   not performing a Burch or autologous

11   sling, you're probably not teaching those

12   to the residents currently?

13         **A.**     To be honest with you,

14   excuse me, I'm sorry.  I may have

15   misspoke, as far as the last time I

16   performed a Burch.

17                When we're having this

18   conversation, I'm thinking of standalone

19   procedures.  There may be combination

20   procedures that we're doing it.

21                I'll be very honest with

22   you, I don't train -- the residents come

23   to me for, really, basic training.  We

24   don't really train them to go on and

Marc Toglia, M.D.

Page 219

1  independently perform a procedure like an

2  autologous fascial sling or a Burch.

3  They -- their role, in that kind of a

4  setting, would be more observation or

5  assistance.

6         Q.    Thanks.  I know we talked a

7  lot about studies, and I have a few

8  questions that I want to ask you that I

9  think will be relatively simple.

10              And I know, from talking

11  with you today, that you feel like

12  clinical studies are important, correct?

13         A.    I think that levels of

14  evidence are important.

15         Q.    And you've actually

16  performed and published, including some

17  randomized control trials, correct?

18         A.    That's correct.

19         Q.    And they're -- you would

20  agree with me that they are important so

21  that doctors can make responsible

22  treatment decisions, right?

23         A.    I think that, again, the

24  levels of evidence provided by clinical

Marc Toglia, M.D.

Page 220

1    studies are important, yes, in how we

2    practice medicine and how we -- how we

3    make clinical decisions.

4         **Q.**    And it's important for

5    patients so that they can give informed

6    consent, correct?

7         **A.**    Yes.

8         **Q.**    Some noncontroversial

9    questions.

10             And when you're looking at

11   clinical studies, you want to see safety,

12   correct?

13        **A.**    It depends upon the context

14   of the study.

15        **Q.**    But in general, as a -- you

16   know, broadly speaking you want to know

17   the product is effective, correct?

18        **A.**    You know, again, within the

19   context of that part of medicine that I

20   practice as it pertains to surgery, we

21   would phrase it, it's the balance between

22   risk and benefit.

23        **Q.**    Okay.  So you want

24   studies --

Marc Toglia, M.D.

Page 221

1        **A.**     Surgery -- and safety, of

2    course, would straddle risk and benefit.

3        **Q.**     I agree.  And that's fine.

4        **A.**     And it's relative.

5        **Q.**     And I'm -- I'm happy to talk

6    about to it -- talk it in terms of risk

7    or complications and benefit or --

8        **A.**     Yes.

9        **Q.**     -- treatment success.

10            And when you're looking at a

11   study, regardless of the level, you want

12   it to provide accurate information,

13   correct?

14       **A.**     I'm not sure I understand

15   what you're implying by the term

16   "accurate."

17       **Q.**     You want the data that's

18   presented to be correct?  You want it to

19   be -- what the study actually found is

20   what you want to read when you're reading

21   the publication, correct?

22            MR. SNELL:  Form.

23            THE WITNESS:  And I

24       apologize, you know, I am an

Marc Toglia, M.D.

Page 222

1          editor within this sphere, so --
2     BY MS. THOMPSON:
3          Q.     So you're an editor of IUJ?
4          A.     Correct.
5          Q.     And also Female Pelvic
6     Medicine; is that correct?
7          A.     And Reconstructive Surgery,
8     it's one journal.
9          Q.     I just didn't want to say
10     the whole thing, I'm getting tired.
11          A.     It took several decades to
12     come up with that, so I do appreciate if
13     you do say it.
14          Q.     Okay, I will --
15          A.     You can say FMPRS.
16          Q.     I will from now on.
17          A.     Thank you.  I worked very
18     hard for that, as you can imagine.
19          Q.     When did you last review an
20     article or IUJ?
21          A.     It's within the last few
22     weeks.
23          Q.     Was that a mesh article?
24          A.     The one in the last couple

Marc Toglia, M.D.

Page 223

1   of weeks, I do not -- I know I've

2   reviewed some mesh related articles

3   within the past month, but the one in the

4   last couple of weeks -- sometimes there's

5   mesh involved, but that's not the primary

6   objection, so --

7           Q.   Well, you would agree with

8   me, as an editor --

9           A.   Excuse me.  I'm sorry.  I

10   would say within the last three weeks,

11   yes, I have reviewed an article primarily

12   on mesh related procedures in this

13   sphere.

14           Q.   And what was -- what was the

15   gist of that article, if you can divulge

16   it?

17           A.   So as you're well aware, the

18   International Journal is an international

19   journal, and so many of the submissions

20   come from other countries.  Many of the

21   ones that I look at come either from the

22   Middle East or China or one of the

23   southeast, you know, Asian companies.

24               Oftentimes we get

Marc Toglia, M.D.

Page 224

1    manuscripts that relate to a particular

2    center or individual's experience with a

3    procedure.  Oftentimes it's some variant

4    of a procedure.  And so, typically, it's

5    looking at -- it's looking at that.

6         Q.    And you can't give -- be any

7    more --

8         A.    Anti-incontinence procedure

9    that involved some kind of mesh related

10   material.

11              And, again, I'm not giving

12   you the name because it doesn't really

13   have a name, it's something that they

14   came up with themselves as an

15   alternative.

16        Q.    Okay.  And you want the

17   studies that you look at to be objective,

18   right?

19        A.    You and I can spend hours

20   talking about whether anything is ever

21   objective in this sphere.  What we hope

22   is that the studies are well defined,

23   such that biases are apparent and that

24   you minimize the unrecognized biases.

Marc Toglia, M.D.

Page 225

1    So, yes, we look at that.

2         **Q.**    So as objective as it can be

3    under the constraints that it might have?

4         **A.**    And what goes along with

5    that is that the -- that the endpoints,

6    for example, are objective.  You know,

7    that these are not studies, say, for

8    example, somebody picked up a telephone

9    four years or five years later, called up

10   patients and asked them a series of

11   simple questions and then determined

12   that -- determined the rate of success or

13   not success based on that.

14                 You would prefer to have

15   objective data.

16        **Q.**    Okay.  So objective data, to

17   the extent possible, you want to minimize

18   bias or disclose bias, if it exists,

19   correct?

20        **A.**    Correct.

21        **Q.**    And you shouldn't decide

22   what the results are going to be before

23   you get the results, correct?

24        **A.**    You shouldn't, but that's

Marc Toglia, M.D.

Page 226

1    often the case.

2         **Q.**    Would that cause you some

3    concern if you reviewed a study, as an

4    editor of one of those journals, that the

5    results were predetermined?

6         **A.**    I think that's a

7    different --

8              MR. SNELL:  Form.

9              THE WITNESS:  I'm sorry.

10             I think that's different

11        than what I just interpreted.

12             I don't think -- no, I don't

13        agree -- I don't agree that

14        results are predetermined in the

15        stuff that we look at.  I think

16        that there's always, you know --

17        there's always a bias of what the

18        results mean or what -- you know,

19        what the results mean.

20             So, yes, I mean, my -- my

21        job, as an editor, is to read a

22        study and to determine, did the

23        study have a primary objective,

24        did -- was the design sufficient

Marc Toglia, M.D.

Page 227

```
1        that they could comment on that

2        objective; and, more importantly,

3        when looking at the results, do

4        they accurately interpret the

5        significance of those results.

6   BY MS. THOMPSON:

7        Q.    What would you do if you

8   were an editor and received a paper where

9   the results were predetermined?

10        MR. SNELL:  Form.

11        Incomplete --

12        THE WITNESS:  I don't

13        know -- I don't understand --

14        MR. SNELL:  -- hypothetical.

15        MS. THOMPSON:  Sorry?

16        THE WITNESS:  -- how I would

17        know they were predetermined.

18        MR. SNELL:  Incomplete

19        hypothetical.

20        MS. THOMPSON:  I'm going to

21        give you -- --

22        THE WITNESS:  If the results

23        are predetermined, you wouldn't

24        need a study.
```

Marc Toglia, M.D.

Page 228

```
 1                    -  -  -
 2              (Whereupon, Exhibit
 3         Toglia-7, Bates ETH.MESH 05225354,
 4         05225380-384; TVT Instructions for
 5         Use, was marked for
 6         identification.)
 7                    -  -  -
 8   BY MS. THOMPSON:
 9         Q.    Dr. Toglia, have you seen
10   this document from Ethicon before?
11              MR. SNELL:  I'm going to
12         object.  This is part of a larger
13         document that has been provided.
14         You're just cutting two pages.
15              MS. THOMPSON:  And we can
16         get the larger document, if you
17         want him to have it for this
18         purpose.
19              MR. SNELL:  I'm sure it's
20         here somewhere in the files.
21              MS. THOMPSON:  Okay.  If you
22         want him to see it, you're welcome
23         to pull it out.
24              THE WITNESS:  Again, I mean,
```

Marc Toglia, M.D.

Page 229

1              I'm not -- I don't know --

2              understand the context of what

3              this is describing.  I'm familiar

4              with the --

5       BY MS. THOMPSON:

6              **Q.**    Well, let me ask you this:

7       Dr. Toglia --

8              **A.**    Yes.

9              **Q.**    -- did you see the contract

10      with -- between Ethicon and Drs. Olmstead

11      and Nielsen?

12                  MR. SNELL:  Hold on.

13             Objection.  Foundation and form.

14             And that actually misstates the

15             evidence.

16                  Go ahead.

17                  THE WITNESS:  I believe that

18             that's outside the sphere of the

19             task that I was given to look at

20             the design and the safety of the

21             TVT device.

22      BY MS. THOMPSON:

23             **Q.**    I believe Dr. -- Mr. Snell

24      said that you had this -- the contract

Marc Toglia, M.D.

Page 230

1    that this is the attachment to.

2         **A.**    I'm not -- I'm not telling

3    you that I'm not familiar with this

4    document or that I may not have perused

5    this document.

6              However, I may not have -- I

7    may not have committed to memory, you

8    know, the details of these things.

9              I mean, I've looked at

10   thousands of things.

11        **Q.**    Let's read through it.

12        **A.**    But for intents and

13   purposes, you know, I would not say that

14   I could speak to the details of what you

15   presented to me.

16        **Q.**    So you're not giving

17   opinions as to the Olmstead studies

18   regarding TVT?

19              MR. SNELL:  Actually,

20         objection.

21              THE WITNESS:  I think I've

22         given opinions within my expert

23         reports.  I'd be happy to pause

24         and point them out to you, if

Marc Toglia, M.D.

Page 231

1          you'd like, counselor.

2    BY MS. THOMPSON:

3          **Q.**    I guess I just misunderstood

4    your answer.

5          **A.**    Yes.

6          **Q.**    Let me -- let me just -- so

7    this exhibit states, The results of the

8    clinical trials will be considered

9    acceptable if, first, they do not differ

10   significantly from the results published

11   in the original article.

12             To you, is that an

13   appropriate study design?

14             MR. SNELL:  Objection.

15             Misstates.  Form.

16             THE WITNESS:  This doesn't

17             refer to that, counselor.  This is

18             not -- I mean, this is not saying

19             that it's acceptable to -- for

20             publication, that -- this

21             doesn't -- I mean, the fact that

22             it speaks to the results has

23             nothing to do with the design.

24             I -- may I give you my

Marc Toglia, M.D.

Page 232

```
 1          interpretation of what we're
 2          looking at here?
 3  BY MS. THOMPSON:
 4          Q.    No, you don't need to give
 5  me your interpretation.  I'll ask you --
 6          A.    You've asked me about this
 7  document.
 8          Q.    -- you a question and you
 9  can answer it.
10                So if the investigators were
11  only paid if these objectives were met,
12  would that be an appropriate design for a
13  clinical study?
14                MR. SNELL:  Objection to
15          form.
16                MS. THOMPSON:  That's a
17          hypothetical.
18                THE WITNESS:  Yes, I
19          understand.  My -- let's make sure
20          we're talking about the same
21          studies.
22                My understanding is that
23          this is referring to the
24          multicenter studies on the TVT
```

Marc Toglia, M.D.

Page 233

1           device and that Olmstead did

2           not -- was not a participating

3           site in the multicenter study.

4           But Olmstead was the individual

5           becoming -- who was being paid.

6                Am I correct?

7    BY MS. THOMPSON:

8         Q.    Who told you that?  Or where

9    did you come up with that?

10        A.    Nobody told me that.  That

11   was just -- I'm just asking you, that was

12   kind of my -- that's kind of where I'm

13   coming from.

14               Can you show me the specific

15   study that we're referring to here?

16        Q.    Mr. Snell -- I'm just asking

17   you about this contract.

18        A.    I'm asking you whether you

19   can show me -- I don't know what this is

20   connected to, what study this is

21   connected to.

22        Q.    There have been multiple

23   studies that have been published --

24        A.    Right.

Marc Toglia, M.D.

Page 234

1         Q.     -- from the original

2    cohort --

3         A.     Right.

4         Q.     -- correct?

5              MR. SNELL:  Objection.

6         Form.  Vague.

7              THE WITNESS:  I will answer

8         that question.

9              The original -- I don't

10        know -- the original Olmstead

11        study involved, I think, roughly

12        about 50 patients.  I don't -- I'm

13        aware of the longitudinal studies

14        where Nielsen published on the

15        same cohort of patients at a year,

16        two years, five years, seven

17        years, you know, ten years, et

18        cetera, twelve years, et cetera,

19        et cetera, so on, 11.5 years, 17

20        years.

21             That's not -- I'm just

22        clarifying.  That's not the same

23        as Olmstead.  Olmstead's original

24        report was a series of, I think,

Marc Toglia, M.D.

Page 235

1           roughly 50 patients that he

2           himself operated on.

3                And I don't believe that

4           this document refers back to that

5           original study.

6    BY MS. THOMPSON:

7           Q.    Is this -- is it an

8    appropriate study design where the

9    investigator is paid if certain criteria

10   are met when the results are published?

11                MR. SNELL:  Objection to

12          form.  Misstates the evidence.

13                THE WITNESS:  I don't --

14                MR. SNELL:  Asked and

15          answered.

16                THE WITNESS:  I don't know

17          how to answer that.  I'm sorry.

18   BY MS. THOMPSON:

19          Q.    So you don't know how to

20   answer a question about you're only going

21   to get paid if you get these results?

22                MR. SNELL:  Hold on.

23          Objection.  Argumentative.

24                MS. THOMPSON:  I'm just

Marc Toglia, M.D.

Page 236

1          trying to understand his answer.
2                THE WITNESS:  No, no, I
3          understand.
4                And, counselor, I understand
5          that you are -- here is my problem
6          and my confusion, okay?  You are,
7          at the same time, asking me a very
8          general question about things I do
9          as an editor in science in
10         general.
11               At the same time, you're
12         putting a very specific document,
13         in isolation, and not providing me
14         with the reference study and
15         you're asking me to make a comment
16         in the middle that seems to link
17         one with the other.
18               And I'm telling you, I'm not
19         able to -- I don't know how -- not
20         that I'm -- not that I'm will --
21         I'm not willing to, I don't know
22         how to make an answer about a
23         study that I don't know -- don't
24         know anything about.

Marc Toglia, M.D.

Page 237

1    BY MS. THOMPSON:

2          Q.    I'm only talking about the

3    design of a study.

4                Is this an appropriate

5    design of a study?

6                MR. SNELL:  Objection to

7          form.

8                THE WITNESS:  This paper

9          does not address a design of the

10         study.  This paper does not

11         stipulate if the study is not

12         designed to our satisfaction,

13         they'll be no reimbursement.  This

14         study speaks to results.

15   BY MS. THOMPSON:

16         Q.    Okay.  We'll move on.

17         A.    And the results have nothing

18   to do with the design.  Nor do I see a

19   phrase that says, the study has to be

20   designed such that these results must

21   be --

22         Q.    No.  It's just the

23   investigator wasn't paid if the results

24   weren't -- weren't met.

Marc Toglia, M.D.

Page 238

1              MR. SNELL:  Objection.  Move

2         to strike.

3    BY MS. THOMPSON:

4         Q.    Were you shown -- prior to

5    working in this lawsuit, were you shown

6    the material safety data sheet related to

7    the polypropylene used in Ethicon mesh

8    devices?  And you're a chemist, you know

9    what a material safety data sheet is --

10        A.    I do.

11        Q.    -- correct?

12        A.    I do.

13              No.  I did not -- I did not

14   previously look at that material.

15                   -  -  -

16              (Whereupon, Exhibit

17         Toglia-8, ETH.MESH 08696131-132,

18         Exhibit C - Clinical Trials, was

19         marked for identification.)

20                   -  -  -

21              THE WITNESS:  We're talking

22         specifically about regulatory

23         paperwork.  This is non-clinical

24         regulatory type stuff.

Marc Toglia, M.D.

Page 239

1          MS. THOMPSON:  I don't think

2        there was a question pending, but

3        I don't think -- sorry.  I don't

4        think the material safety data

5        sheet is a regulatory document.

6   BY MS. THOMPSON:

7        Q.    Okay.  Have you seen the

8   material safety data sheet now, since

9   you've been working on this lawsuit?

10        A.    Yes.  This was part of

11   the -- this was part of the materials

12   provided to me.

13        Q.    And I'll direct your

14   attention to Number 10 in the material

15   safety data sheet regarding stability and

16   reactivity.

17        A.    Yes.

18        Q.    Could you read the sentences

19   under incompatibility?

20        A.    The following materials are

21   incompatible with this product.  Strong

22   oxidizers, such as chlorine, peroxides,

23   chromates, nitric acid, perchlorates,

24   concentrated oxygen, sodium hypochlorite,

Marc Toglia, M.D.

Page 240

1    calcium hypochlorite, permanganates,

2    chlorine and nitric acid.

3         **Q.**    And are those compounds

4    found in the human body?

5         **A.**    Within the context of this

6    type of testing, I would say they are

7    probably not.  And I don't see -- I don't

8    see anything that says that -- that

9    references in concentrations normally

10   found within human tissue.

11        **Q.**    And under Number 15, other

12   information --

13        **A.**    Yes.

14        **Q.**    -- component toxicity, could

15   you read the sentences after that?

16        **A.**    Sure.  Polypropylene has

17   been tested in laboratory rats by

18   subcutaneous implants of disc or powder.

19   Local sarcomas were induced at the site

20   of implantation.  No epidemiologic

21   studies or case reports suggest any

22   serious chronic health hazards from

23   long-term exposure to polypropylene

24   decomposition products below the

Marc Toglia, M.D.

Page 241

1    irritation level.

2         **Q.**    Did Ethicon perform any

3    studies to determine whether or not the

4    polypropylene used in their mesh devices

5    causes sarcoma in humans?

6         **A.**    I don't see that -- that

7    discs of polypropylene or powders of

8    polypropylene have anything to do with

9    the TVT device when used for its proper

10   indication of stress incontinence in

11   women.

12              I think that the science in

13   this area, it is well known that the

14   formation of sarcoma is related to form,

15   form material, and that you can't

16   extrapolate from laboratory rats to

17   humans.

18        **Q.**    So the answer is you're not

19   aware of any studies that Ethicon did to

20   determine whether a TVT mesh could lead

21   to sarcoma?

22        **A.**    Let me just refer to my

23   report for a second.

24              I think it's fair to say

Marc Toglia, M.D.

Page 242

1   that they did not, but I don't see -- I

2   wouldn't understand why that would be --

3   why that would be relevant.

4          Q.    Is this information

5   something you would want to know, as a

6   physician?

7                MR. SNELL:  Objection to

8          form.

9                THE WITNESS:  Maybe if I was

10         a veterinarian caring for rats and

11         I was implanting discs or powders.

12               But this information is not

13         pertinent or clinically relevant.

14   BY MS. THOMPSON:

15         Q.    Is this information about

16   the polypropylene used in the Ethicon

17   pelvic mesh products something that

18   patients should be informed of?

19               MR. SNELL:  Same objection.

20               THE WITNESS:  To the best of

21         my knowledge, polypropylene discs

22         or powders are not used in the TVT

23         product.  And at the same time,

24         the TVT product is not used in

Marc Toglia, M.D.

Page 243

1        rats.

2    BY MS. THOMPSON:

3        **Q.**    But the fact that the disc

4    and powder in rats may cause cancer is

5    irrelevant, in your opinion?

6        **A.**    I think animal studies have

7    established that -- that it's related to

8    both the -- the animal and the form and

9    that it is not transferable to humans.

10       **Q.**    Are you familiar with the

11   term "latency period"?

12       **A.**    Yes.

13       **Q.**    Do you know what the latency

14   period for exposure and development of

15   sarcoma is thought to be in humans?

16       **A.**    No, I'm not.

17       **Q.**    Would it surprise you if

18   it's 30 years?

19            MR. SNELL:  Form.  Vague.

20       Lacks foundation.

21            THE WITNESS:  It probably

22       would surprise me, yes.

23   BY MS. THOMPSON:

24       **Q.**    Has a TVT been implanted in

Marc Toglia, M.D.

Page 244

1    a human for 30 years?

2         **A.**    If the first clinical trials

3    of a TVT were published somewhere around

4    '96, we would be 20 years.  Did I do that

5    wrong?  I was thinking '86.

6              We are probably a few --

7    we're probably a few years shy of that.

8         **Q.**    All right.  I'm going to ask

9    you about whether or not you had seen any

10   documents or whether Ethicon had told you

11   about certain things prior to your

12   involvement in this lawsuit, okay?

13        **A.**    Okay.

14        **Q.**    Is that -- do you

15   understand?

16              MR. SNELL:  Can I say one

17        thing?  Off the record.

18              VIDEO TECHNICIAN:  We are

19        off the record.  The time is 6:04

20        p.m.

21                    -   -   -

22              (Whereupon, a brief recess

23        was taken.)

24                    -   -   -

Marc Toglia, M.D.

Page 245

1                VIDEO TECHNICIAN:  This

2           marks the beginning of Video

3           Number 4.  We are back on the

4           record.  The time is 6:06 p.m.

5    BY MS. THOMPSON:

6           Q.    So, Dr. Toglia, I'm going to

7    ask you some questions about whether you

8    either saw documents or Ethicon told you

9    about certain things.  And this would all

10   be prior to your involvement in this

11   lawsuit.

12          A.    Yes.

13          Q.    Did Ethicon tell you that

14   mechanically cut mesh thins or stretches

15   when it's placed under tension?

16               MR. SNELL:  Form.

17               THE WITNESS:  I don't need

18          Ethicon to tell me about the

19          properties of the material, given

20          that I handle it on a frequent

21          basis.

22   BY MS. THOMPSON:

23          Q.    And other doctors don't need

24   that information either?

Marc Toglia, M.D.

Page 246

1         **A.**     I'm sorry, I don't see the
2    relationship to that -- the question.
3         **Q.**     Is it your opinion that
4    doctors generally don't need the
5    information that Ethicon has about the
6    mechanically cut mesh thinning --
7         **A.**     All right.
8         **Q.**     -- and stretching on
9    tension?
10        **A.**     So we're no longer talking
11   about what you said that we're going to
12   talk about, which was Ethicon's
13   communication with me on this material?
14   Are we done with that?
15        **Q.**     Well, on this particular
16   item, I want to know whether you think --
17   you said it's not -- you don't need to
18   hear it from Ethicon.
19        **A.**     Correct.
20        **Q.**     I'm asking you, do other
21   doctors need to hear it or would want to
22   hear it from Ethicon?
23              MR. SNELL:  Form.
24              THE WITNESS:  I don't

Marc Toglia, M.D.

Page 247

1          know -- I don't know what other

2          doctors would need or want to

3          hear.  I think that, you know, in

4          the -- prior to my involvement in

5          this matter, there were

6          discussions amongst physicians and

7          Ethicon engineers, and other

8          people, where we discussed the

9          properties of mechanically cut

10         mesh and how it behaves under both

11         physiologic and nonphysiologic,

12         you know, circumstances.

13             I would say, again, as a

14         surgeon, the nonphysiologic stuff

15         really is of no clinical meaning,

16         nor do I think that you can infer

17         any kind of clinical importance to

18         that information.

19    BY MS. THOMPSON:

20         Q.   Okay.  And even if Ethicon

21    thought it was clinically important, you

22    didn't feel like you needed to have that

23    information?

24             MR. SNELL:  Form.

Marc Toglia, M.D.

Page 248

```
 1              THE WITNESS:  Again, I don't
 2          rely upon Ethicon to tell -- to
 3          provide me with information as it
 4          relates to how I manage patients
 5          or the materials that I use.
 6   BY MS. THOMPSON:
 7      Q.    And you're not -- you do not
 8   feel like you can give an opinion as to
 9   whether other doctors would want to or
10   need that information?
11      A.    I think that's beyond the
12   scope of what I've prepared, yes.
13      Q.    Okay.  Did Ethicon, and
14   there are going to be a whole bunch of
15   these, so if your answer is the same we
16   can kind of go with that.
17      A.    I don't know what you're
18   going to ask me.
19      Q.    Did Ethicon tell you or show
20   you documents showing fraying of
21   mechanically cut mesh?
22              MR. SNELL:  Form.
23              Go ahead.
24              THE WITNESS:  I've seen
```

Marc Toglia, M.D.

Page 249

1              documents that -- I don't know

2              that I would use the word

3              "fraying," per se.  I think you're

4              implying, you know -- or labeling,

5              per se.

6    BY MS. THOMPSON:

7         Q.    You've never seen documents

8    that use the word "fraying"?

9         A.    No, there are documents that

10   use the word "fraying."

11        Q.    Ethicon documents?

12        A.    There are Ethicon documents

13   that use the word "fraying."  I have seen

14   those documents.

15        Q.    So, at least, people at

16   Ethicon called it fraying?

17        A.    Yeah.  I just -- I just --

18   what's the working definition of fraying?

19   Is your definition of fraying the same as

20   mine?  The same as theirs?

21        Q.    But is that the same, in

22   your opinion, that that -- that

23   information is irrelevant to you in your

24   practice?

Marc Toglia, M.D.

Page 250

1        **A.**    No.  I don't think that's

2    what I'm speaking to.  Information is

3    relevant.  Whether it's relevant that

4    Ethicon absolutely had to communicate

5    one-on-one with me on that particular

6    issue is what I'm speaking about.

7        **Q.**    I don't -- I don't think I

8    asked about one-on-one.

9            I'm just asking you, is that

10   information that you would have liked to

11   have known, if Ethicon had that

12   information?

13       **A.**    I did know about that

14   information, and I did receive that

15   information from Ethicon.

16       **Q.**    Okay.  And did other doctors

17   receive that information --

18       **A.**    Yes.

19       **Q.**    -- that mechanically cut

20   mesh frayed?

21       **A.**    Yes.

22       **Q.**    Did you teach about that

23   when you were doing your courses or doing

24   your preceptor training?

Marc Toglia, M.D.

Page 251

1          **A.**    Well, again, the fraying

2    occurred at nonphysiologic, you know,

3    forces.  And so, yes, I think that we did

4    talk about mesh, its properties, its

5    behavior, how the -- how -- why it was

6    important to adhere to the well-described

7    steps of the procedure in order for the

8    mesh to perform with -- under the normal

9    physiologic load, under the normal

10   physiologic capacity, and in that

11   capacity, fraying was not a clinical

12   concern.

13         **Q.**    Who told you that these were

14   nonphysiologic forces?

15         **A.**    Based upon, you know, my

16   body of knowledge, reading the material,

17   discussing with other experts, you know,

18   having to do a little bit of reading

19   about physiologic forces.

20              I mean, physiologic forces

21   within the pelvic floor, obviously, is

22   somewhat unique to our subspecialty.  I

23   don't expect that people are taught that

24   in medical school, for example.

Marc Toglia, M.D.

Page 252

1      **Q.**    So if Ethicon thought --

2   Ethicon thought they were using

3   physiologically forces, you would

4   disagree with them?

5      **A.**    I'm sorry?

6      **Q.**    If Ethicon, when they did

7   their testing, stated that they were

8   using physiologic circumstances, you

9   would disagree with them?

10          MR. SNELL:  Objection to

11       form.  Vague.

12          THE WITNESS:  I would

13       disagree that they were using

14       phys --

15   BY MS. THOMPSON:

16      **Q.**    The amount of stretch, for

17   example?  The tension applied, for

18   example?

19      **A.**    I mean, the only --

20          MR. SNELL:  Same objection.

21          THE WITNESS:  I can answer

22       it like this:  I am aware that

23       Ethicon conducted testing looking

24       at the mechanical properties of

Marc Toglia, M.D.

Page 253

```
 1          the mesh and that that testing

 2          started from no -- you know, no

 3          tension through the physiologic

 4          range to supraphysiologic range.

 5               It was looked -- it was

 6          looked upon -- and this is all

 7          kind of -- how the material

 8          behaves in that regard, to be

 9          honest with you, has very little

10          to do with how the material

11          behaves once it's incorporated or

12          placed within the body.

13               But I know that -- I know

14          that they did perform those tests.

15          I've seen the results of those

16          tests.  We have probably, in the

17          past, spoken about data that talks

18          about the different meshes, are

19          they similar -- are they

20          different, similar, physiologic

21          load, supraphysiologic load.

22          Those were all fairly freely

23          discussed.

24     BY MS. THOMPSON:
```

Marc Toglia, M.D.

Page 254

1        Q.    What about roping or curling

2    of the TVT mesh, was that something that

3    was discussed with you prior to your

4    involvement in this lawsuit?

5        A.    Well, I can -- again, I can

6    tell you, from using that mechanically --

7    mesh for an extended period of time, you

8    know, the mesh does not rope or curl when

9    it's -- when -- you know, in the context

10   that it has a -- the protective sheath

11   over it.  And we don't place the mesh

12   without the protective sheath.

13           When the meth -- so when

14   you're delivering the mesh in the TVT

15   procedure, the sheath is carrying the

16   mesh.  The mesh is passive.  The mesh is

17   not exposed to the those forces.  It's

18   only after the sheath is positioned that

19   you pull the mesh off.  Somewhat like the

20   magic trick where you kind of -- not that

21   it's a magic trick, where you pull the

22   table cloth and the stack of cups goes

23   undisturbed.

24           The mesh is never, in the

Marc Toglia, M.D.

Page 255

1    clinical application of the TVT, as we

2    use it, as I use it for stress

3    incontinence, we don't apply any

4    physiologic force.

5              The only -- the only thing

6    that I would say is that you've got

7    minimal static and rolling friction that

8    does occur as you remove the sheath and

9    the mesh is left behind.

10        Q.    So your -- your testimony is

11   that the mesh, if it is placed flat,

12   remains flat?

13        A.    Correct.

14        Q.    And if Ethicon had evidence

15   to the contrary, is that something that

16   you would like to know about?

17              MR. SNELL:  Form.

18              Go ahead.

19              THE WITNESS:  It wouldn't

20        hurt my feelings if I was not

21        aware of that information.  I

22        don't see how that information is

23        clinically relevant in my world.

24   BY MS. THOMPSON:

Marc Toglia, M.D.

Page 256

1          Q.    And would that be the same

2     for other physicians as well?

3          A.    I can't speak to what other

4     physicians might consider to be relevant.

5          Q.    If Ethicon had information

6     that the fraying, roping and curling

7     actually increased the risk of retention,

8     is that information that you would like

9     to have?

10         A.    I -- I would --

11              MR. SNELL:  Form.

12         Foundation.

13              THE WITNESS:  -- say that I

14         know that information independent

15         of that -- I don't need that

16         information -- okay, Ethicon does

17         not implant these meshes in women.

18         I implant these meshes in women.

19         I implant these meshes in over 100

20         women a year for the past 17

21         years.  I am well aware of how

22         this particular material behaves

23         within the body, and I can tell

24         you, when it is done properly,

Marc Toglia, M.D.

Page 257

1          there is no roping, there is no

2          curling.

3    BY MS. THOMPSON:

4          Q.    And is that information that

5    other physicians would -- would want to

6    know or need to know from Ethicon?

7                MR. SNELL:  Form.

8                THE WITNESS:  I would say

9          within the context of the

10         instructions for use, which

11         outlined, in great detail, the

12         very specific steps that are to be

13         taken, when performed in that

14         manner, there is no roping or

15         curling of the material.

16              And keep in mind, we're

17         talking about the tension-free

18         placement of the mesh.  So that

19         excludes --

20   BY MS. THOMPSON:

21         Q.    And you'll agree --

22         A.    So that excludes all of the

23   testing that you are referring to,

24   because all those testing refer to

Marc Toglia, M.D.

Page 258

1    tension, whether it's physiologic or

2    nonphysiologic.

3           Q.    You'll agree with me that

4    the mesh shrinks, contracts?

5                 MR. SNELL:  Form.

6           Overbroad.

7                 THE WITNESS:  As a general

8           sense, a hernia mesh, there is

9           shrinkage.  Whether there is

10          shrinkage in a TVT mesh, I don't

11          believe that there is clinically

12          significant shrinkage.

13                Now, of course, because this

14          is the most highly biocompatible

15          mesh there is, it allows for the

16          ingrowth of fibroblasts and

17          reticulocytes.  It allows for the

18          infiltration of white cells and

19          angiogenesis.

20                As the tissue heals against

21          the mesh, the mesh is going to

22          change, and that is expected.  And

23          that was actually the -- the

24          original design of the TVT

Marc Toglia, M.D.

Page 259

1          specifically spoke to the fact

2          that the mesh would -- the mesh

3          would induce collagen formation

4          and other structural changes in

5          the area around the mesh.  And

6          that was considered to be an

7          important part of the clinical

8          effect.

9     BY MS. THOMPSON:

10          Q.    What's your basis for saying

11    TVT is the most highly biocompatible mesh

12    there is?

13          A.    I'm sorry.  Macroporous

14    polypropylene mesh that is classified as

15    Type I by the Amid classification.  Of

16    which --

17          Q.    And that's what --

18          A.    -- of which --

19          Q.    -- you believe TVT is?

20          A.    Of which TVT has been the

21    most extensively studied.

22          Q.    And you believe that it is?

23          A.    I know it is, yes.

24          Q.    Despite Ethicon documents

Marc Toglia, M.D.

Page 260

```
 1   stating otherwise?
 2                   MR. SNELL:  Objection to
 3           form.  Misstates the evidence.
 4                   THE WITNESS:  My opinion, as
 5           an expert, the TVT mesh is Type I,
 6           regardless of Ethicon were to tell
 7           me yes or no.
 8   BY MS. THOMPSON:
 9       Q.    Okay.  If Ethicon had
10   information that showed that the fraying,
11   roping and curling causes the pores to
12   collapse or close and render the mesh no
13   longer macroporous, is that information
14   that you would like to know about?
15                   MR. SNELL:  Form.
16           Foundation.
17                   THE WITNESS:  I don't see
18           how it's relevant, counselor,
19           okay?
20   BY MS. THOMPSON:
21       Q.    That's -- that's a perfectly
22   acceptable answer.
23       A.    As a surgeon, is it -- is it
24   effective.
```

Marc Toglia, M.D.

Page 261

1      **Q.**    If Ethicon -- and that goes

2    the same for other doctors as well?

3      **A.**    I can't speak to what other

4    doctors might hold to be important or

5    what they might comment.

6      **Q.**    If Ethicon has information

7    that fraying, roping and curling of their

8    mesh leads to an increased risk of

9    erosion, is that information that you

10   would like to have?

11             MR. SNELL:  Form.

12        Foundation.

13             THE WITNESS:  I can tell you

14        I have an independent opinion

15        that, yes, if the mesh were to

16        curl, that there might be an

17        increased risk of erosion relative

18        to a mesh that has not curled.

19             Now, the risk of exposure

20        might go from, say, .6 to .7

21        percent, which is what it has been

22        in most clinical trials; maybe

23        that might go up to, say, 1.2, 3

24        percent, 3.2 percent.

Marc Toglia, M.D.

Page 262

1                    But I would agree -- I mean,
2            I would say I have had the same
3            observation, and I don't need to
4            hear that from Ethicon, that if
5            the mesh is not placed in a
6            tension-free manner -- the mesh is
7            not going to rope or curl if it's
8            tension free.  Because in it's
9            native state, the mesh is not
10           roped or curled.
11   BY MS. THOMPSON:
12           Q.    And I think you've already
13   stated that if it's placed flat, in your
14   opinion, it remains flat?
15           A.    That's correct.
16           Q.    If Ethicon had information
17   that fraying and roping and curling of
18   mechanically cut mesh leads to an
19   increased risk of bridging fibrosis, is
20   that information you would want to have?
21                    MR. SNELL:  Form.
22                    THE WITNESS:  I would --
23           again, bridging fibrosis, in my
24           opinion, is likely to be a natural

Marc Toglia, M.D.

Page 263

1          or an expected outcome.  It's,

2          again, speaking to what the

3          original design -- it was hoped

4          that there would be the induction

5          of collagen, mature collagen

6          formation.

7                And that, yes, I mean, all

8          of these procedures, in the -- in

9          the world of prolapse

10         incontinence, you're kind of

11         hoping that there's a certain

12         degree, again, within a

13         physiologic range, that there's

14         fibrosis, that occurs, absolutely.

15   BY MS. THOMPSON:

16         Q.    In other words, replace with

17   scar?

18                MR. SNELL:  Form.

19                THE WITNESS:  I don't know

20         how it is that you're interpreting

21         scar.  I'm talking about the --

22         you want it to induce a certain

23         amount of collagen formation; in a

24         very loose sense scarring, sure.

Marc Toglia, M.D.

Page 264

```
1          All surgical procedures result
2          some scarring.
3              Now, whether those -- that
4          scarring occurs from the incision
5          that I've made, whether it occurs
6          from the suture that I've placed,
7          whether it occurs based upon
8          something else I may do, I don't
9          know how I would separate, you
10         know, one from the other.
11             You can -- you will never
12         have no scarring, despite what the
13         TV ads will say.  There's no
14         scarless surgery.
15     BY MS. THOMPSON:
16         Q.    Do you use polypropylene
17     suture in the vagina?
18         A.    Yes.
19         Q.    For what procedure?
20         A.    Again, the vast majority of
21     what I do in the reconstructive world
22     involves some -- some formulation of
23     polypropylene.  Polypropylene sutures are
24     commonly used in all of urogynecology for
```

Marc Toglia, M.D.

Page 265

1    apical vaginal suspensions.

2           Q.    When you place a

3    polypropylene suture, how much suture is

4    left in the body?  What's the length of

5    suture?

6           A.    I would say that the length

7    of suture left behind, understanding

8    that, obviously, we've tied a series of

9    knots, I don't know if you're -- you just

10   want -- I mean, the whole thing, in

11   aggregate, is less than a centimeter.

12                If I were to unwind or untie

13   it and stretch it out, that could be,

14   maybe, 3 centimeters.  But I don't think

15   that's an accurate -- accurate

16   description.  I would say, in general,

17   it's half a centimeter to a centimeter.

18          Q.    And do you have any idea how

19   much -- what the length of suture with

20   filaments would be if you stretched out

21   all the polypropylene in a TVT?

22                MR. SNELL:  Objection to

23       form.

24                THE WITNESS:  I don't have

Marc Toglia, M.D.

Page 266

```
 1          any -- but, again, keep in mind,
 2          all the procedures I'm describing,
 3          if I'm doing autologous fascial
 4          sling, I'm using very long
 5          polypropylene sutures.  If I'm
 6          doing a Burch suspension, I am
 7          using 4 to 6 polypropylene
 8          sutures.
 9             It's the same.
10   BY MS. THOMPSON:
11       Q.   So it's your opinion that
12   mesh devices like the TVT and sutures are
13   essentially the same?
14       A.   No, that's not what I said.
15   I said the polypropylene material is
16   commonly used in urogynecologic surgery.
17   It is the same -- it is the same
18   material -- it's based upon the same base
19   material whether I'm doing an autologous
20   fascial sling, whether I'm doing a Burch
21   suspension, whether I'm doing an vaginal
22   apical suspension, whether I'm doing a
23   synthetic midurethral sling;
24   understanding that when I say synthetic
```

Marc Toglia, M.D.

Page 267

1    midurethral sling I am specifically

2    referring to the Retropubic TVT device.

3         Q.    Where is the suture placed

4    with an autologous sling?

5         A.    Well, the -- there is an

6    autologous -- excuse me, there is a

7    polypropylene suture typically attached

8    at either end of the sling.  It is

9    passed, in a similar manner, through a

10   vaginal incision, up through the space of

11   Retzius, up through the rectus fascia

12   into the subcutaneous space, analogous to

13   a TVT procedure.  The difference is, it's

14   tied with tension across itself in that

15   manner.

16        Q.    But there's no polypropylene

17   underneath the urethra when you do an

18   autologous sling procedure, is there?

19        A.    Under the urethra?  Well,

20   it's -- unless someone uses a smaller

21   piece of polypropylene to stabilize the

22   mesh under the urethra.  And I have seen

23   that.

24              But I would say, you know,

Marc Toglia, M.D.

Page 268

1   the intended procedure, it's the fascia

2   that is below it.

3        Q.    And there's no suture when

4   you are doing a Burch procedure that's

5   placed underneath the urethra, is there?

6        A.    Well, the Burch procedure,

7   as I commented earlier, has nothing to do

8   with the urethra.  It's a procedure that

9   stabilizes the bladder neck.

10               Now, you know, I -- it just

11   occurred to me that, you know, we have

12   used the material of the sling in the

13   field of urogynecology for probably

14   between 30 and 50 years.  You know, it's

15   surprising to me that if the latency for

16   sarcoma is 30 years, we should be seeing

17   those patients.  In fact, we should be

18   seeing those patients now.

19               MS. THOMPSON:  I don't think

20          there was a question about that,

21          so I'll move to strike that answer

22          as nonresponsive.

23   BY MS. THOMPSON:

24        Q.    If Ethicon had information

Marc Toglia, M.D.

Page 269

1   that the fraying, roping and curling led

2   to a diminished tissue integration, is

3   that information you would want to know?

4                MR. SNELL:  Form.

5           Foundation.

6                THE WITNESS:  Again, I don't

7           rely upon Ethicon to communicate

8           that information.  But I have had

9           discussions with them.  I'm

10          aware -- they did communicate that

11          information to myself.

12   BY MS. THOMPSON:

13       Q.    And is that information

14   other doctors should or would want to

15   know?

16       A.    I can't speak to what other

17   doctors should or would want to know.

18       Q.    If Ethicon had information

19   that the fraying, roping and curling of

20   mechanically cut mesh led to an increased

21   risk of infection, is that information

22   you would want to know from Ethicon?

23                MR. SNELL:  Form and

24          foundation.

Marc Toglia, M.D.

Page 270

```
 1              THE WITNESS:  Again, I would
 2         want to know that information from
 3         well-designed, high-level studies,
 4         especially -- you know, that's
 5         where I would seek that
 6         information.
 7              I'm sorry, if you're
 8         satisfied with that answer, may I
 9         take a break to go to the
10         bathroom?
11              MS. THOMPSON:  Let me
12         just -- I have about, like, one
13         more question in this section.
14              THE WITNESS:  May I be a
15         little more insistent that I be --
16              MS. THOMPSON:  Yeah, sure.
17              THE WITNESS:  -- allowed to
18         take a break to go to the
19         bathroom?
20              MS. THOMPSON:  Yes, sir.
21              VIDEO TECHNICIAN:  We are
22         off the record.  The time is 6:27
23         p.m.
24                   -  -  -
```

Marc Toglia, M.D.

Page 271

1                    (Whereupon, a brief recess

2              was taken.)

3                        -   -   -

4                    VIDEO TECHNICIAN:  We are

5              back on the record.  The time is

6              6:40 p.m.

7    BY MS. THOMPSON:

8         Q.    Dr. Toglia, had you reviewed

9    the instructions for use for the TVT when

10   you started using the device?

11        A.    Yes, absolutely.

12        Q.    And did you periodically

13   review the instructions for use as you

14   were teaching courses and acting as a

15   preceptor for Ethicon?

16        A.    I did, yes.

17        Q.    Do you know whether the

18   instructions for use changed over the

19   time period between 1998 and 2015?

20        A.    Yes.  My recollection is

21   that part of the work that I did with

22   them, particularly on the TVT EXACT®

23   product, we re-looked at the instructions

24   for use.  Certain points were felt that

Marc Toglia, M.D.

Page 272

1    needed a little bit more emphasis or

2    clarity.  There was, maybe, a little bit

3    more specificity in some areas, a little

4    less specificity in other areas.

5         Q.    Did the adverse reactions

6    section change at all during that time

7    period?

8         A.    I'm not -- I can't give you

9    an independent recollection of that, as

10   we speak.  To me, the instructions for

11   use, I focused on, you know, my -- my

12   focus is actually the instructions on

13   using the device.

14        Q.    But this -- this document

15   would have been provided to physicians at

16   your training courses, correct?

17        A.    I believe so, yes.

18        Q.    In your report, I believe,

19   you stated that, IFU is clear, useful and

20   adequate to describe the procedure and

21   potential risks.

22              Does that sound right?

23              MR. SNELL:  What page are

24        you on?

Marc Toglia, M.D.

Page 273

1              MS. THOMPSON:  Page 17, at

2         the top of the page.

3              MR. SNELL:  Thank you.

4    BY MS. THOMPSON:

5         Q.    The IFU and professional

6    education for the TVT are clear, useful

7    and adequate to describe the procedure

8    and potential risks.

9              I'm just reading that from

10   your report.

11        A.    I'm sorry, as usual, I'm a

12   little slower than -- than you all.

13             You're saying it's on Page

14   15?

15        Q.    I think I said 17.

16        A.    Yes.

17        Q.    And then -- and you go on to

18   say that, Risks of SUI surgery are

19   obvious to surgeons and as surgeons, we

20   are expected to be aware of the risk in

21   light of our education, training and

22   experience.

23        A.    Yes.

24        Q.    Do you believe that a

Marc Toglia, M.D.

Page 274

1    company --

2                    MR. SNELL:  Let's go off the

3          record.

4                    VIDEO TECHNICIAN:  We're off

5          the record at 6:43 p.m.

6                         -  -  -

7                    (Whereupon, a discussion off

8          the record occurred.)

9                         -  -  -

10                   VIDEO TECHNICIAN:  We are

11         back on the record.

12   BY MS. THOMPSON:

13         Q.    Do you believe, Dr. Toglia,

14   that a company can assume that doctors

15   know certain risks and avoid warning of

16   the risks as a result?  That's a

17   yes-or-no question.

18                   MR. SNELL:  Form.  He

19         doesn't have to answer yes or no,

20         he can answer how he sees fit.

21   BY MS. THOMPSON:

22         Q.    Do you want me to repeat it?

23         A.    Well, I know that -- that

24   this is one of -- you know, as a surgeon

Marc Toglia, M.D.

Page 275

1    that does anti-incontinence procedure,

2    I'm doing all the other procedures, this

3    is an additional procedure that I'm

4    doing, this procedure is based upon

5    foundation principles that are somewhat

6    common to the other procedures.

7              And so, naturally, it

8    follows that a risk of, say, bladder

9    injury or a risk of bleeding, the risk of

10   infections -- again, these are -- these

11   are inherent risk and elemental risks of

12   all surgical procedures.

13             We're not teaching these

14   procedures to non-surgeons to do.  It's

15   not that I'm picking a family practice

16   doctor and saying, here, why don't you do

17   this, you've got some patients.

18             So it's -- I think it's

19   predicated that, you know, a surgeon, you

20   know, that was interested in using a TVT

21   device in lieu of a different procedure

22   that they were presently performing

23   understands the general risks of surgery.

24   I think that's what that statement speaks

Marc Toglia, M.D.

Page 276

1    to.  That was my intention in making that

2    statement.

3        Q.    So you're -- you're speaking

4    of the general risk of surgery, not those

5    that are specific to the TVT device?

6        A.    I'm talking about the risks

7    that are specific to anti-incontinence

8    procedures in women.

9              MS. THOMPSON:  We can stop

10         there.

11             THE WITNESS:  No, keep

12         going.  That's fine.  If you like.

13             MR. SNELL:  I'm hungry.

14             MS. THOMPSON:  We'll stop.

15             VIDEO TECHNICIAN:  We are

16         off the record.  The time is --

17             THE WITNESS:  That's fine.

18             VIDEO TECHNICIAN:  We are

19         off the record at 6:47.

20                   -  -  -

21             (Whereupon, a dinner recess

22         was taken.)

23                   -  -  -

24             VIDEO TECHNICIAN:  We are

Marc Toglia, M.D.

Page 277

1          back on the record.  The time is

2          7:24 p.m.

3     BY MS. THOMPSON:

4          **Q.**     Before we get started with

5     the rest of the questions, Dr. Toglia,

6     I've looked through the materials that

7     you've brought.

8          **A.**     Yes.

9          **Q.**     And it looks to me like that

10    top cardboard box has the materials that

11    were not the ones related to your report

12    and the materials that Mr. Snell provided

13    you.

14          MS. THOMPSON:  So if we

15          could just mark that box -- the

16          contents of that box as an exhibit

17          for the deposition.

18          MR. SNELL:  I don't know if

19          that's accurate, but you can mark

20          whatever you want to.

21          MS. THOMPSON:  That was what

22          I kind of determined.  Everything

23          else looked like it was either

24          depositions or documents or

Marc Toglia, M.D.

Page 278

1          literature related to the report.
2          So we'll just do that.
3               MR. SNELL:  Well, I did -- I
4          mean, we sent him the depositions
5          after his report and all the
6          exhibits and stuff.
7               MS. THOMPSON:  Yeah, but I
8          don't need to mark those.
9               And then did you say that
10         you brought some thumb drives
11         also?  I didn't see those.
12              THE WITNESS:  It's
13         essentially this -- this material
14         here.
15              MS. THOMPSON:  It's
16         basically this stuff, too?
17              THE WITNESS:  I can
18         guarantee you it's no different.
19              MS. THOMPSON:  Let's mark
20         these.
21              THE WITNESS:  One of them is
22         simply -- one of them is simply
23         the expert reports.
24              MS. THOMPSON:  So the box

Marc Toglia, M.D.

Page 279

```
1            and the two thumb drives.
2                      -  -  -
3            (Whereupon, Exhibit
4            Toglia-9, ETH.MESH 02026591-595,
5            Material Safety Data Sheet, was
6            marked for identification.)
7                      -  -  -
8            (Whereupon, Exhibit
9            Toglia-10, Three Thumb drives
10           produced by Marc Toglia, M.D., was
11           marked for identification.)
12                     -  -  -
13   BY MS. THOMPSON:
14        Q.    Dr. Toglia, I think before
15   the break, we were just beginning to talk
16   about the instructions for use.
17        A.    Yes.
18        Q.    And I believe you said that
19   you reviewed them throughout the time
20   period and up to the present day that
21   you've been using TVT on a -- on some
22   kind of regular basis or --
23        A.    TVT and TVT EXACT®.
24        Q.    TVT and TVT EXACT®, thank
```

Marc Toglia, M.D.

Page 280

1   you.

2           Do you believe that the

3   instructions for use are complete?

4       **A.**    I believe that the

5   instructions for use do exactly that,

6   they -- they accurately describe the

7   instructions on how the product is to be

8   used.  They provide the step-by-step

9   mechanics of the procedure.

10      **Q.**    And complete and accurate in

11  terms of the listing of potential risks

12  as well?

13      **A.**    I'm not sure what you mean

14  by "complete."  I mean, I think it would

15  be impractical to reissue the instruction

16  for use every week or two.  Those are

17  provided inside the box.

18          I don't -- I don't know what

19  form -- you know, what program is used to

20  determine how often to update those.

21      **Q.**    Do you know if -- I believe

22  I already asked you the question about

23  how often they were updated.  But I can't

24  remember the answer.

Marc Toglia, M.D.

Page 281

1          **A.**     No, you didn't ask me that
2    question.
3               To the best of my knowledge,
4    I'm aware of the initial and then the
5    update that occurred roughly around the
6    time the EXACT® was introduced, I
7    believe.
8          **Q.**     And are you aware of an
9    update that occurred some time this year?
10         **A.**     I am aware, yes, I did see
11   that.  There was an update.
12                    -   -   -
13               (Whereupon, Exhibit
14          Toglia-11, Selection of Materials
15          produced by Marc Toglia, M.D., was
16          marked for identification.)
17                    -   -   -
18   BY MS. THOMPSON:
19         **Q.**     I have marked the TVT
20   instructions for use as Exhibit Number 7.
21   And I just have a few questions for you.
22         **A.**     This is the original?
23         **Q.**     This, I believe, is from --
24   from 2000.

Marc Toglia, M.D.

Page 282

```
 1        A.    Please, do not ask me to

 2   read anything from this.

 3        Q.    Oh, yeah, I'm sorry about

 4   that.

 5        A.    Yeah, in Spanish.

 6        Q.    Let me read -- sorry this

 7   the smallness of that print.

 8        A.    I think this is Turkish.

 9        Q.    We're not going to read the

10   Turkish.

11             MR. SNELL:  I have 7 marked

12        as the Olmstead clinical thing.

13        And I think you just said this was

14        7.

15             MS. THOMPSON:  You know

16        what, we had marked this earlier

17        as 7 and then --

18             MS. COPE:  What's the

19        sticker say on it?

20             MS. THOMPSON:  The sticker

21        says -- Dr. Toglia, what does the

22        sticker say?

23             THE WITNESS:  Mine says 7.

24             MS. THOMPSON:  Yeah, we put
```

Marc Toglia, M.D.

Page 283

1          a 7 instead, so let's change it to

2          8.

3                    -   -   -

4                    (Whereupon, a discussion off

5          the record occurred.)

6                    -   -   -

7                    MS. THOMPSON:  Off the

8          record till we get our exhibit

9          straight.

10                   VIDEO TECHNICIAN:  We are

11         off the record.  It's 7:30 p.m.

12                   -   -   -

13                   (Whereupon, a discussion off

14         the record occurred.)

15                   -   -   -

16                   VIDEO TECHNICIAN:  We are

17         back on the record.

18    BY MS. THOMPSON:

19         Q.    Dr. Toglia, these were how

20    the instructions for use were produced to

21    us, and I apologize for the small print.

22                   But I'll read you what I

23    want to ask you about, and if you -- if

24    you can tell at least that it's kind of

Marc Toglia, M.D.

Page 284

1    close.  And we will not be reading the

2    Turkish or Spanish or any other language.

3              On the --

4         **A.**    There's Italian.

5         **Q.**    And Italian.  Do you know

6    Italian?

7         **A.**    No.

8         **Q.**    On the second page, Bates

9    number 380, under TVT device, it states,

10   This bidirectional elastic property

11   allows adaptation to various stresses

12   encountered in the body.

13        **A.**    Where do you see that?

14        **Q.**    Under TVT device, the second

15   paragraph, the last sentence.

16        **A.**    And, I'm sorry, this is from

17   when?

18        **Q.**    2000.

19        **A.**    Okay.  I'll accept that.

20        **Q.**    The bidirectional elastic

21   property allows adaptation to various

22   stresses encountered in the body.

23              Do you know what the basis

24   for that statement is?

Marc Toglia, M.D.

```
                                        Page 285
 1              MR. SNELL:  Objection.
 2         Completeness.
 3              Go ahead.
 4              THE WITNESS:  I don't know
 5         the direct -- what the direct
 6         basis is.
 7  BY MS. THOMPSON:
 8         Q.    Would you agree that the
 9  bidirectional elastic property allows
10  adaptation to various stresses
11  encountered in the body with the TVT
12  device?
13         A.    I would assume that it
14  allows adaptations within two directions,
15  bidirectional.
16         Q.    And is it your understanding
17  that that's what the TVT does, how the
18  TVT behaves?
19              MR. SNELL:  Form.
20              THE WITNESS:  Again, I'm not
21         familiar with the context, so I
22         don't -- can't answer that
23         question, sorry.
24  BY MS. THOMPSON:
```

Marc Toglia, M.D.

Page 286

1          Q.     Did you ever ask Ethicon,

2     during the time that you were serving as

3     a preceptor, what was meant by that

4     statement?

5          A.     I don't believe I ever asked

6     them what was meant by that statement.

7          Q.     On the next page, under

8     instructions for use, the first sentence,

9     The procedure can be carried out under

10    local anesthesia, but it can also be

11    performed using regional or general

12    anesthesia.

13               Do you perform most of your

14    TVTs under local or general?

15         A.     The majority of our

16    procedures, the vast majority, are

17    performed with -- not with general

18    anesthesia.  It's local anesthesia with

19    monitored anesthesia care, which is

20    intravenous sedation.

21               There are times, of course,

22    the patient may request general

23    anesthesia.  There are times that the

24    anesthesiologist might be insistent on

Marc Toglia, M.D.

Page 287

1    general anesthesia.

2            I present it as a procedure

3    that we advocate for local with monitored

4    anesthesia care.

5        Q.    And with the MAC anesthesia,

6    the patient is asleep, although not under

7    a full general anesthesia, correct?

8        A.    As you know, sleep is not a

9    medical term.  I would say the patient is

10   not conscious.

11       Q.    If Ethicon had information

12   that the success rate was higher if a

13   local anesthesia was used, is that

14   information that you, as a physician,

15   would like to have?

16            MR. SNELL:  Form.

17            Foundation.

18            THE WITNESS:  I've got to be

19            honest with you, I would not allow

20            Ethicon to -- I mean, I'm the

21            surgeon, I do the procedures, they

22            don't.  I don't think the form of

23            anesthesia has any influence.

24            I think that early on we

Marc Toglia, M.D.

Page 288

1          would talk about whether -- how do

2          you -- how do you set the mesh in

3          its final position, whether you

4          use a, quote/unquote, cough test,

5          which, obviously, you couldn't do

6          with general anesthesia, do you

7          simply eyeball it, use a spacer.

8                I think, really, the

9          underlying message was always that

10         you don't tension -- you don't put

11         tension on the mesh or position

12         the mesh in an obstructive manner.

13               I don't believe, nor am I

14         aware, that the success rates are

15         higher.  I don't believe that

16         there are any high-quality studies

17         that randomize people to one or

18         the other.

19    BY MS. THOMPSON:

20         Q.    Is that information that

21    other physicians would like to have, do

22    you believe?

23         A.    I know that in the course of

24    training, when I would train a physician,

Marc Toglia, M.D.

Page 289

1    it's something that we would discuss, you

2    know, as -- as an option.

3         **Q.**    Under adverse reactions,

4    Bates Number 3883 --

5         **A.**    Yes.

6         **Q.**    -- the IFU states,

7    Transitory local irritation at the wound

8    site and a transitory foreign body

9    response may occur.  This response could

10   result in extrusion, erosion, fistula

11   formation and inflammation.

12              Is that a correct statement?

13        **A.**    I would assume if it was

14   included in here, that they believe that

15   that was a correct statement.

16              I can't tell you that I

17   personally have ever witnessed any of

18   that.

19        **Q.**    And that's because, of your

20   3,000 patients with pelvic mesh, you've

21   never observed a foreign body response,

22   correct?

23              MR. SNELL:  Objection.

24         Misstates.

Marc Toglia, M.D.

Page 290

1          THE WITNESS:  I'm speaking,

2      in this case, specific to the --

3      to the TVT procedure.

4          Again, it's at the wound

5      site, so result of the suture

6      material, cautery, how rough you

7      are with the tissue.

8          I don't -- I don't interpret

9      this as having anything to do with

10      the mesh, per se.  I read it

11      literally, which is that there may

12      be local irritation at the wound

13      site and that it is a transient

14      phenomenon.

15  BY MS. THOMPSON:

16      Q.    Under actions, the IFU

17  states, Animal studies show that

18  implantation of PROLENE® mesh elicits a

19  minimal inflammatory reaction in tissues,

20  which is transient and is followed by the

21  deposition of a thin fibrous layer of

22  tissue which can grow through the

23  interstices of the mesh, thus

24  incorporating the mesh into adjacent

Marc Toglia, M.D.

Page 291

1    tissue.  The material is not absorbed nor

2    is it subject to degradation or the

3    weakening by the action of tissue

4    enzymes.

5         **A.**    I believe that's an accurate

6    statement, yes.

7         **Q.**    I believe that's all the

8    questions I have on the IFU.

9              MS. THOMPSON:  Off the

10             record for a couple minutes,

11             please.

12             VIDEO TECHNICIAN:  We are

13             off the record.  The time is 7:39

14             p.m.

15                  -  -  -

16             (Whereupon, a discussion off

17             the record occurred.)

18                  -  -  -

19             VIDEO TECHNICIAN:  We are

20             back on the record.

21   BY MS. THOMPSON:

22        **Q.**    Dr. Toglia, I'm going to ask

23   you some questions about your work with

24   Ethicon.

Marc Toglia, M.D.

Page 292

1              Do you remember when you

2    first became a paid consultant for

3    Ethicon?

4         **A.**    As I stated earlier, I do

5    recall, prior to the launch of the

6    product, being part of a focus group in

7    which I was asked to give an opinion on

8    the feasibility of this as a new

9    procedure, and I was paid for that.

10        **Q.**    And we're talking about the

11   TVT in 1998 or 1999, roughly?

12        **A.**    To be honest with you, if I

13   had to give you a guess, this was '96,

14   '97.  I'm pretty sure it was '96.

15        **Q.**    And do you recall when you

16   became a proctor for Ethicon?

17        **A.**    I'm going to say 2002,

18   perhaps.

19        **Q.**    And did you have a contract

20   for either of those positions, that

21   you're aware of?

22        **A.**    Well, the focus group, of

23   course, was a single event.  The -- at

24   some point in time, there would be a --

Marc Toglia, M.D.

Page 293

1    there was probably a contract regarding

2    proctoring.  And I recall every year

3    that -- that would be a new and usually

4    different terms.

5         **Q.**    Do you recall how you were

6    compensated for being a proctor for

7    Ethicon?

8         **A.**    Yes.

9         **Q.**    How much were you paid?

10        **A.**    It depended upon the

11   situation, if I was doing a procedure

12   within my institution, did I have to

13   drive 60 miles, did I get on an airplane.

14   So it would vary.

15               I would -- I would

16   guesstimate maybe $1,500 at the lower

17   end, $2,500, maybe $3,000.  You know,

18   sometimes there would be one person, it

19   might be up to three people.  There was

20   probably a factor for that.

21        **Q.**    So that was per preceptee or

22   group of preceptees that you were paid

23   between $1,500 and $5,000?

24        **A.**    No $5,000; $2,500, $3,000.

Marc Toglia, M.D.

Page 294

1      **Q.**    $2,500, I mean.

2      **A.**    Again, I think the higher

3  end would speak to more than one.  The

4  lower end would speak to location and

5  maybe one.  There wasn't that significant

6  of a difference, I don't recall.  I mean,

7  the highest might have been $3,000.

8            They would classify you.

9  Maybe, in the beginning they would call

10  me a local proctor.  At some point, I was

11  a national proctor.  Physicians might fly

12  in from other locations.  I would -- I'm

13  assuming that the reimbursement may have

14  been a little higher.  I never did a

15  large volume --

16      **Q.**    Do you know --

17      **A.**    -- proctoring.

18      **Q.**    -- offhand how many doctors

19  that you proctored over the years with

20  Ethicon?

21      **A.**    I don't know offhand the

22  number of doctors I proctored.  If I were

23  to throw out a term, like, fifteen,

24  twenty over a -- over a ten-year period

Marc Toglia, M.D.

Page 295

1    of time.

2              And the -- in the context of

3    proctor, I'm talking about a physician

4    that was in the operating room with a

5    patient, not necessarily a lab -- you

6    know, a lab situation, a dry lab

7    situation or anything like that.

8         Q.    We have a contract from 2006

9    that says you would be paid a maximum of

10   $100,000 for the year.

11             Do you recall how much you

12   were actually paid --

13        A.    In 2006?

14        Q.    -- in 2006?

15        A.    In general, it would

16   probably be something like $12,000, maybe

17   $15,000.

18             I would say -- I think the

19   highest I had gotten -- and, again, I

20   mean, a total number and this goes

21   beyond -- was maybe $30,000.  But I have

22   to tell you, that probably includes more

23   of the design work that I may have done.

24        Q.    So in 2006, your estimation

Marc Toglia, M.D.

Page 296

1  would be between $12,000 and $30,000 that

2  you were paid by Ethicon?

3         A.   I would say it's probably

4  between $6,000 and $20,000.  I don't know

5  for sure.  It was not, in my estimation,

6  substantial.

7                    -  -  -

8              (Whereupon, Exhibit

9         Toglia-12, ETH.MESH 11843352-364,

10        Consulting Agreement Requisition

11        Form, was marked for

12        identification.)

13                   -  -  -

14             MS. THOMPSON:  We have this

15        marked as an exhibit.  I only have

16        one copy of the contract.  I'm not

17        going to ask any more questions

18        about it, but if you want to look

19        at that, that's fine.

20  BY MS. THOMPSON:

21        Q.   Do you have records of the

22  money that you received from Ethicon for

23  payment for your services?

24        A.   As in payment stubs or -- I

Page 297

1  haven't done anything with them recently.

2  I mean -- I mean, there may have been one

3  case in 2013.  There may have been none

4  for the preceding several years.

5              So, certainly, as we go back

6  five or six years, I don't think I would

7  have -- you know, I would have the

8  original invoices or records, no.

9        Q.    When was the last time you

10 proctored a physician for Ethicon?

11       A.    To the best of my knowledge,

12 there was one physician that I proctored

13 who was within my system, and I want to

14 say that was maybe 2013.  I couldn't -- I

15 mean, to my mind, it seems like it was

16 longer ago than that.

17       Q.    Between 2006 and 2013, did

18 you believe that you had a contract each

19 year with Ethicon for various services?

20       A.    I believe so.  Again, my

21 role with Ethicon changed with time as I

22 looked at different projects or worked on

23 different projects.

24       Q.    We have an Excel spreadsheet

Marc Toglia, M.D.

Page 298

1    that shows $30,000 in 2011, $6,000 in

2    2010 and $15,000 in 2013.

3                    Does that sound about right?

4                    MR. SNELL:  Object to the

5            form.  Foundation.

6                    THE WITNESS:  I believe that

7            that's in the range of the numbers

8            that I had -- that I had

9            recollected.

10                   MS. THOMPSON:  And we marked

11           that spreadsheet as Exhibit 13, if

12           you want to look at that.

13                   THE WITNESS:  Sure.

14                       -   -   -

15                   (Whereupon, Exhibit

16           Toglia-13, Spreadsheet, was marked

17           for identification.)

18                       -   -   -

19                   MR. SNELL:  This doesn't

20           have a Bates number on it.  Where

21           is it from?

22                   MS. COPE:  I can get you the

23           number when we print them out.

24           They're not produced, in Excel

Marc Toglia, M.D.

Page 299

```
 1          format, with a Bates number.
 2               MR. SNELL:  But it has a
 3          Bates number, a document number
 4          attached to any native file if
 5          it's a produced document --
 6               MS. COPE:  And what I'm
 7          saying is I can get that --
 8               MR. SNELL:  Oh, you can get
 9          that?
10               MS. COPE:  -- to you.  But
11          when we print it out --
12               MR. SNELL:  I got you.
13               THE WITNESS:  I'll be honest
14          with you, I can't read any of
15          this.  But I'm happy to accept the
16          figures you threw out.  But please
17          don't ask me to read the details.
18               I can read my -- I can read
19          my name, I see that, I recognize
20          that.
21     BY MS. THOMPSON:
22          Q.   So we don't have time to
23     have you try to read that, correct?
24               Did you ever receive any
```

Marc Toglia, M.D.

Page 300

1    gifts from Ethicon or employees of

2    Ethicon?

3          **A.**    Not that I'm aware of, no.

4          **Q.**    Did Ethicon reimburse your

5    travel expenses and travel time while you

6    were working as a consultant for them?

7          **A.**    Yes.

8          **Q.**    And were there times that

9    you also gave presentations at dinner

10   meetings for doctors for Ethicon?

11         **A.**    There might have been.  I

12   don't recall that being a common

13   scenario.  But I would -- I would

14   venture, yes, there probably were

15   meetings that a presentation -- and,

16   again, I would have trouble separating

17   the TVT stuff from something else.

18         **Q.**    And I believe we have an

19   invoice in 2009 for a $3,000 speaking

20   stipend for dinner meeting and in 2008,

21   $3,095.95 for a dinner speaking meeting.

22             Does that sound like that

23   probably happened?

24         **A.**    I'm a pretty cheap date, so

Marc Toglia, M.D.

Page 301

1    it kind of sounds like something that we

2    might have done.

3         Q.    $3,000 for a dinner

4    presentation doesn't sound that cheap to

5    me.

6         A.    No?

7         Q.    Does it to you?

8         A.    Time away from one's family

9    after one has already worked a ten- or

10   twelve-hour day?  I'd say that's pretty

11   cheap, but that's just my personal

12   opinion.

13        Q.    And at those presentations,

14   you would typically show a PowerPoint?

15        A.    We may have shown a

16   PowerPoint.  It could have been more of

17   an informal discussion.  I mean,

18   PowerPoints are usually one of my

19   preferred methods to lead a discussion.

20        Q.    But you don't remember

21   specifically at the dinner meetings that

22   you did for Ethicon whether there was a

23   PowerPoint involved?

24        A.    I mean, recognizing that

Marc Toglia, M.D.

Page 302

1   we're in a public restaurant somewhere in

2   Philadelphia, I could see it going either

3   way, based upon the venue.

4          Q.    Do you remember preparing

5   slide presentations for any talks at

6   Ethicon?

7          A.    I'm sure that I have

8   prepared talks.  I don't -- I don't

9   recall.

10         Q.    And Ethicon would pay for

11  your travel and meals for those meetings

12  as well?

13         A.    They would pay for travel.

14  I'll be very honest with you, I don't

15  usually bill for meals.  I have to eat

16  anyhow, that's not usually something I

17  would bill myself.

18         Q.    I think we already talked

19  about the clinical study agreements that

20  you had with Ethicon for the TVT.

21                Was there also an agreement

22  for --

23         A.    So, I'm sorry, I didn't -- I

24  don't recall I had a study agreement with

Marc Toglia, M.D.

Page 303

1    Ethicon.

2                    What are you referring to?

3                        -   -   -

4                    (Whereupon, Exhibit

5             Toglia-14, ETH.MESH 03617772,

6             Consultant Invoice Dated 5/28/09,

7             was marked for identification.)

8                        -   -   -

9                    MR. SNELL:   What number is

10            this?

11                   THE WITNESS:   15.

12   BY MS. THOMPSON:

13            Q.    Do you remember an agreement

14   to provide services relating to the

15   PROSIMATM registry?

16            A.    This was not a study

17   agreement.  I think I -- I just simply

18   read material.

19                   PROSIMATM was not a

20   procedure I ever performed or performed

21   clinically.  I -- it's a secrecy

22   agreement, which means, I think, they

23   basically talk to me about the procedure.

24   Maybe they had results from a registry

Marc Toglia, M.D.

Page 304

1    and I was simply reviewing those results.

2              But I did not participate in

3    a PROSIMATM study.

4         Q.    Do you remember whether you

5    were paid for whatever service you

6    provided for the PROSIMATM registry?

7              MR. SNELL:  Form.

8              THE WITNESS:  I'll be very

9         honest with you, I don't recall

10        really having any involvement with

11        PROSIMATM.

12   BY MS. THOMPSON:

13        Q.    Why not?

14        A.    I don't know.  I don't know

15   whether -- whether I was -- it was

16   something that didn't meet my clinical

17   interest, whether they decided that they

18   were not in need of my services.

19              I remember PROSIMATM as a

20   concept.  I know there was a clinical

21   trial done.  This was not a project that

22   I was active on.

23        Q.    And I can't remember from

24   earlier, did you use the PROSIMATM at

Marc Toglia, M.D.

Page 305

1    all?

2         **A.**     No.   That's what I'm

3    speaking to.

4         **Q.**     In the TVT versus TVT-S

5    study that you participated in --

6         **A.**     Yes.

7         **Q.**     -- were you paid by

8    Ethicon --

9         **A.**     No.

10        **Q.**     -- for your participation in

11    that study?

12        **A.**     No.

13        **Q.**     I believe the disclosure on

14    that article was that you were

15    preceptor -- preceptor for Ethicon at the

16    time the paper was published?

17        **A.**     Yes, that would be a

18    separate.

19        **Q.**     Was that the full extent of

20    your employment with Ethicon?

21                   MR. SNELL:  Objection.

22         Form.  He wasn't employed by

23         Ethicon.

24                   MS. THOMPSON:  Sorry, my

Marc Toglia, M.D.

Page 306

1          fault.

2     BY MS. THOMPSON:

3          **Q.**     Your financial arrangement

4     with Ethicon?

5          **A.**     I'm sure you understand that

6     the publication occurred years after the

7     actual study was completed.  I would

8     think that the disclosure came at the

9     time of submission of the manuscript for

10    publication.  So it wasn't during the

11    study.

12               I mean, I think that my

13    relationship with Ethicon was fairly

14    consistent over those -- over that

15    ten-year period of time.

16               So I have no reason to -- I

17    hope you understand the differential I'm

18    trying to make, because I'm trying to be

19    accurate.

20               I assume that I was -- I was

21    a preceptor at the same time -- I mean, I

22    trained some of the -- I trained some of

23    the other investigators in the trial.

24    I'm -- I pretty strongly don't think

Page 307

1    there was -- I charged -- Ethicon did not

2    pay me for any of that nor did they

3    reimburse me for travel.  That's just

4    something that I did because these were

5    my colleagues, if that makes sense to

6    you.

7         Q.    Sure.  And how many times

8    did you do cadaver labs for Ethicon,

9    ballpark?

10        A.    It could be four.  It could

11   be eight.  I would say maybe closer to

12   the four.

13        Q.    For what products did you do

14   cadaver labs?

15        A.    You know, oftentimes,

16   because cadaver labs are so expensive to

17   obtain the materials, it certainly was

18   typical that on one day we might have

19   been working with TVT-Secur, we might

20   have been working with PROLIFT®, we might

21   have been -- I'm sure that we worked with

22   Retropubic and Obturator.

23        Q.    Did I ask you how many

24   PROLIFT® devices you actually placed?

Marc Toglia, M.D.

Page 308

1       **A.**     You have not asked me that.

2       **Q.**     I didn't think so.

3                  Could I ask you that

4    question, how many PROLIFT® devices did

5    you actually place?

6       **A.**     You know, according to the

7    information that I just sort of tracked

8    upstairs here, it was probably in the

9    vicinity of about 400.

10      **Q.**     And when did you stop using

11   PROLIFT®?

12      **A.**     Once it was removed from the

13   market.

14      **Q.**     Are you aware that your

15   website still includes PROLIFT® as an

16   option for women who have prolapse?

17      **A.**     I am aware.  And if I had

18   the time or the knowledge to remove it, I

19   certainly would.  But thank you for

20   reminding me of that outdated

21   information.

22      **Q.**     You're welcome.

23                 Did Ethicon also help you

24   advertise your practice?

Marc Toglia, M.D.

Page 309

1          **A.**    There was a brief window of

2    time that Ethicon, in professional

3    education, was interested in helping to

4    raise awareness of pelvic floor

5    dysfunction and the treatments for that.

6               My -- I only -- I only

7    remember one situation in which we placed

8    an ad in a magazine.  I think it

9    corresponded to when I had hired a new

10   partner, and I just was interested in

11   letting people know that our practice had

12   these two physicians.

13              I don't think that that ran

14   for more than three months.  That's my

15   only recollection.  It was kind of a, you

16   know, what do you think of this idea, you

17   know.  I think we just -- we did it on a

18   one-time basis.

19         **Q.**    But in addition to the money

20   that you were paid by Ethicon for various

21   preceptor trips, dinner presentations, et

22   cetera, they did provide advertisement

23   for your practice?

24              MR. SNELL:  Objection to

Marc Toglia, M.D.

Page 310

```
 1          form.
 2                    THE WITNESS:  In a sense.  I
 3          mean, it's not that they paid me
 4          and I paid for the ad.  Like, with
 5          the clinical trials, I didn't get
 6          the money, the money was -- would
 7          have been -- would go through our
 8          channels, that's what the Lankenau
 9          Institute of Medical Research
10          does; I believe that they may have
11          been involved with the clinical.
12                    So the money went somewhere.
13          It's not -- not money that I
14          touched, so to speak.
15     BY MS. THOMPSON:
16          Q.    Going back to something you
17     mentioned a minute ago.
18                    What information did you
19     just check upstairs?
20          A.    I checked in with my wife
21     upstairs, and I looked over my report.
22          Q.    You mentioned that you,
23     after checking the information upstairs,
24     you thought that you had done about 400
```

Marc Toglia, M.D.

Page 311

1    PROLIFT® procedures, that's what I was

2    asking about.

3           A.    Oh, excuse me --

4                 MR. SNELL:  That's in his

5           head.

6                 THE WITNESS:  It's just --

7                 MS. THOMPSON:  Oh, I took

8           it --

9                 THE WITNESS:  No, no.  I'm

10          so sorry.

11                MS. THOMPSON:  Oh, I took it

12          literally.

13                THE WITNESS:  No, no.

14                MS. THOMPSON:  I'm glad we

15          clarified that.

16                MR. SNELL:  That was taken

17          out of context.

18                THE WITNESS:  My apologies.

19   BY MS. THOMPSON:

20          Q.    Dr. Toglia, did you ever

21   complain to Ethicon that its business

22   practices affected the income received by

23   your practice?

24          A.    Oh, I'm sure that I may

Marc Toglia, M.D.

Page 312

1    have, in frustration, made comments.

2    I've got to be honest with you, I don't

3    think it helped or hurt in a significant

4    sense.

5              But, occasionally, I

6    might -- might have gotten my feelings,

7    you know, hurt.

8         Q.    Do you remember sending an

9    e-mail to someone at Ethicon about lost

10   business as a result of some of the sales

11   reps activities, Eileen's specifically?

12        A.    I don't.  I'm aware of an

13   e-mail, I don't -- can't tell you that I

14   remember, at the time, again, sort of the

15   context.

16             But, yeah, there was --

17   there was a point that I was a little

18   grumpy about things.  Although I may have

19   been simply misdirecting my frustration

20   in the wrong direction, more than likely.

21        Q.    And was that because they

22   had trained one of your referral

23   physicians who then became a competing

24   physician?

Marc Toglia, M.D.

Page 313

1          **A.**    I mean, this is referring to

2     Dr. Finnegan.  Dr. Finnegan is a

3     colleague of mine.

4                    I don't -- I see the

5     statement.  I understand what that seems

6     to be.  I can't tell you that I ever felt

7     like that that hurt my business.  I

8     think, really, what I -- the message that

9     I was trying to do here -- the message I

10    was trying to get across here, which I

11    will tell you, at this point, I was

12    completely ineffective, I was simply

13    trying to say, look, if we're going to

14    train physicians, you know, within my

15    department, I would like to be the

16    trainer, in that I would like to have a

17    relationship with people, so if they're

18    doing these procedures and they want

19    advice, I would like to be viewed as --

20    as someone they could speak to.

21                    And I think that's really

22    what I was trying to get at, although, I

23    admit, I did not state it -- I did not

24    state it well.

Page 314

1            And, to be honest with you,

2    I was being a bit dramatic here.  I have

3    a very cordial relationship with

4    Finnegan.  I don't think he's had any

5    effect on my business whatsoever.

6                    -  -  -

7            (Whereupon, Exhibit

8            Toglia-15, ETH.MESH 10399348,

9            4/29/09 E-mail from Patricia Beach

10           to Judi Gauld; Subject: FW:

11           PROSIMA™ Registry, was marked for

12           identification.)

13                   -  -  -

14   BY MS. THOMPSON:

15       Q.    Did Ethicon pay for

16   community education or other events that

17   may have resulted in increased patients

18   or business for you?

19       A.    It was not uncommon -- when

20   you say "paid for," let me, please, just

21   sort of qualify that.

22            So we would -- from time to

23   time, we would give community education

24   events on the hospital campus.  The

Marc Toglia, M.D.

Page 315

1    company would provide snacks and

2    refreshments.  I don't think that there

3    was ever a situation where I was paid to

4    give that presentation.  The

5    presentations, typically, were general

6    presentations; I'm going to talk to you

7    about incontinence, whether that be urge

8    incontinent, whether that be stress

9    incontinence; I'm going to talk to you

10   about prolapse.

11            Does that make sense?  But I

12   don't think I was ever paid -- I was

13   never financially rewarded for that.

14   They simply provided snacks and

15   refreshments in that regard.

16        Q.    Are there -- are any of the

17   awards or recognitions that you received

18   the result of nominations from Ethicon?

19        A.    No, not that I'm -- no.  I

20   was never a high priority for them, to be

21   honest with you, given that, you know, we

22   had very well known -- other consultants,

23   I'm sure you must be aware, within a

24   short distance from here.  I was kind of

Marc Toglia, M.D.

Page 316

1    like -- in that regard, no.

2            Q.    Do any of the committees or

3    organizations or employers have policies

4    regarding conflict of interest or

5    accepting money from industry sources?

6            A.    You're talking --

7                  MR. SNELL:  Form.

8                  THE WITNESS:  You're talking

9           about my employment?

10   BY MS. THOMPSON:

11           Q.    Yes.

12           A.    So my employment contracts

13   do have language that allows me to

14   function as a consultant to industry, to

15   publish articles, books, where I might

16   get a royalty.

17           Q.    And the academic

18   institutions with which you're affiliated

19   don't have policies regarding accepting

20   payments from industry?

21           A.    Not as they affect me, since

22   I'm not -- you know, that's usually the

23   case if that's the person who is paying

24   your salary.

Marc Toglia, M.D.

Page 317

1                    I think it really -- those

2      kind of relationships say, look, you

3      can't sort of double dip.  You can't

4      be -- you can't be getting paid as a

5      physician and, simultaneously, at that

6      same time.

7           Q.    Have you disclosed your

8      financial relationship with Ethicon to

9      committees that you've served on, for

10     example, AUGS?

11          A.    Of course.  We're very

12     transparent.  I mean, the public is

13     aware.  I mean, you've got The Sunshine

14     Act.  There are -- there -- certainly

15     it's public knowledge.

16                    It's also public knowledge

17     what, you know, CMS has paid me, which is

18     Medicare.

19          Q.    And you've disclosed your

20     conflict of interest with Ethicon on all

21     your publications since the time that you

22     began working for Ethicon?

23                    MR. SNELL:  Form.

24                    THE WITNESS:  I don't work

Marc Toglia, M.D.

Page 318

```
 1            for -- I never worked for Ethicon.
 2            I don't --
 3   BY MS. THOMPSON:
 4            Q.    Doing work for Ethicon?
 5                  MR. SNELL:  Same objection.
 6                  THE WITNESS:  I have done --
 7            I have done contractual work with
 8            Ethicon.  I don't know what I -- I
 9            don't have any responsibility to
10            report to them what I publish or
11            what else that I do.
12   BY MS. THOMPSON:
13            Q.    Do you disclose the work
14   that you do with Ethicon to residents
15   that you're teaching?
16            A.    Yes.
17            Q.    Has Ethicon ever asked you
18   to attend society meetings and give
19   presentations or be represented at
20   exhibitions at the society meeting?
21            A.    I don't believe I've ever
22   done anything like that for Ethicon.
23            Q.    Dr. Toglia, did you have a
24   sexual relationship with Kathleen Feeney?
```

Marc Toglia, M.D.

Page 319

```
 1          A.      No.

 2                  MR. SNELL:  Objection.

 3     BY MS. THOMPSON:

 4          Q.      Did you have an affair with

 5     Kathleen Feeney?

 6                  MR. SNELL:  Same objection.

 7                  THE WITNESS:  I don't know

 8          what you're referring to.

 9     BY MS. THOMPSON:

10          Q.      Did you have anything other

11     than a professional relationship with

12     her?

13                  MR. SNELL:  Same objection.

14          Argumentative.

15                  THE WITNESS:  You know, I

16          mean -- you know, we were friends,

17          in a sense, although it's not a

18          friendship that extended beyond,

19          like, when she left the company.

20          It quickly, you know -- I don't

21          know where you're coming from.

22          This -- Kathleen Feeney is --

23                      -  -  -

24                  (Whereupon, Exhibit
```

Marc Toglia, M.D.

Page 320

1          Toglia-16, ETH.MESH 11838868-869,

2          5/30/07 E-mail from Kathleen

3          Feeney to Cindy Pypcznski;

4          Subject: FW:  Surgery at Lankenau,

5          was marked for identification.)

6                    -  -  -

7    BY MS. THOMPSON:

8          Q.    Did you -- did you -- do you

9    recall an e-mail when she was leaving the

10   company in which she provided you with

11   her personal e-mail address?

12         A.    I know that Kathleen Feeney

13   was interested in me, perhaps, writing a

14   letter of recommendation.  I know that

15   she had asked me could she have -- could

16   I be a reference, and in that context

17   there may have been.

18         Q.    Do you remember asking her

19   what she would use as her name when she

20   left Ethicon.  And she said -- replied

21   Kath Toglia?

22         A.    I -- Kathleen would make

23   offhanded comments from time to time.  I

24   can't say I can't remember her ever

Marc Toglia, M.D.

Page 321

1    saying that.  But I wouldn't be

2    surprised.  She was teasing me at the

3    time, of course.

4                    MS. THOMPSON:  I think

5            that's all the questions I have

6            for you.  Thank you, Dr. Toglia,

7            for your time.

8                    MS. COPE:  Sorry, just

9            wanted to clarify.  That one

10           document that didn't have the

11           Bates number, I got the Bates

12           number, if you want to stick that

13           on the exhibit.

14                   MR. SNELL:  Let's go off the

15           record.

16                   VIDEO TECHNICIAN:  We are

17           off the record.  The time is 8:10

18           p.m.

19                       -   -   -

20                   (Whereupon, a brief recess

21           was taken.)

22                       -   -   -

23                   VIDEO TECHNICIAN:  This

24           marks the beginning of Video

Marc Toglia, M.D.

Page 322

```
1          Number 5.  We are back on the
2          record.  The time is 8:17 p.m.
3                    -  -  -
4               EXAMINATION
5                    -  -  -
6    BY MR. SNELL:
7          Q.   Dr. Toglia, we're back.  I
8    just have a few follow-up questions,
9    following up on plaintiffs' counsel's
10   questions to you.
11              First of all, I believe you
12   were trying to explain your methodology
13   to plaintiffs' counsel.
14              Can you state your
15   methodology that you utilized in
16   assessing the utility and the safety of
17   the TVT device for its intended use to
18   treat stress urinary incontinence?
19         A.   Yes.  So the question that
20   was put before me is whether or not the
21   TVT was well suited for its intended
22   purpose, which was the treatment of
23   stress urinary incontinence in women,
24   whether or not that -- it achieved that
```

Marc Toglia, M.D.

Page 323

1    intended use, whether or not that was --

2    the device was safe for that use.

3                In order to formulate that

4    opinion, I reviewed the highest levels of

5    evidence that I could find.  As I stated

6    earlier, the highest levels of evidence

7    would include things like randomized

8    control trials, systematic reviews or

9    meta-analysis and, fortunately, there was

10   a tremendous amount of data.

11               Just right behind that would

12   be things like long-term registry

13   studies, the data that came from closed

14   health systems and the like.

15               I would add that the

16   societal guidelines position statements,

17   which are -- in essence, is a different

18   type of a committee that would have done

19   their own systematic review and then

20   formulated an opinion in the same manner.

21   Those are the type of things that I would

22   look at myself.

23               In addition, I looked at the

24   documents provided to me concerning the

Marc Toglia, M.D.

Page 324

1    internal Ethicon communications.  I

2    looked at some of the -- the expert

3    opinions provided by the plaintiffs'

4    side.  We looked at, you know, animal

5    studies, in vitro studies.  Although,

6    again, recognizing that those are really

7    Level 5 evidence data, that you really

8    can't draw any clinical inference or --

9    or application directly to the TVT

10   device.  Those were looked at as well.

11        Q.    You saw that plaintiffs'

12   experts cited to a bunch of hernia

13   documents, prolapse documents, animal

14   studies in their reports?

15        A.    Yes, I saw that.  Yes.

16        Q.    And I believe you earlier

17   told plaintiffs' counsel you were shocked

18   at their methodology; is that accurate?

19        A.    I would -- I would --

20             MS. THOMPSON:  Object to

21        form.

22             THE WITNESS:  I was -- I did

23        not find their methodology to be

24        scientifically rigorous.  They did

Marc Toglia, M.D.

Page 325

```
1         not seem to include the Level 1
2         studies, randomized control
3         trials.  They did not refer to the
4         systematic reviews.
5              Their focus seemed to be
6         largely on very low-level, almost
7         insignificant things that really
8         had no direct application to the
9         TVT design, safety or the device
10        when it's used in its intended
11        manner to treat stress urinary
12        incontinence.
13   BY MR. SNELL:
14        Q.    So for these hernia
15   documents or hernia studies that the
16   plaintiffs' experts, like Dr. Elliott,
17   seem to cite on every page of his report,
18   would those even fit on the evidence
19   pyramid, if one was to do a proper
20   methodologic scientific review to assess
21   the safety of TVT for its intended use to
22   treat stress urinary incontinence?
23             MS. THOMPSON:  Object to
24        form.
```

Marc Toglia, M.D.

Page 326

```
 1              THE WITNESS:  Within the --
 2         within the context, those would
 3         not figure as well.  Those would
 4         usually be discarded as being not
 5         relevant to the TVT sling, the
 6         device or its design.
 7    BY MR. SNELL:
 8         Q.    You brought these evidence
 9    pyramids.
10              MR. SNELL:  I'd like to mark
11         them as exhibits.
12                   -  -  -
13              (Whereupon, Exhibit
14         Toglia-17, Level of Evidence
15         Chart, was marked for
16         identification.)
17                   -  -  -
18              (Whereupon, Exhibit
19         Toglia-18, Level of Evidence
20         Pyramid, was marked for
21         identification.)
22                   -  -  -
23    BY MR. SNELL:
24         Q.    Doctor, Exhibits 17 and 18,
```

Marc Toglia, M.D.

Page 327

1    are those the level of evidence pyramids

2    you brought?

3         **A.**    Yes.

4         **Q.**    Are those important in

5    conducting a proper -- strike that.

6                   Is utilizing the highest

7    levels of evidence important in assessing

8    the question, is the TVT reasonably safe

9    for its intended use to treat stress

10   urinary incontinence, in your opinion?

11        **A.**    Absolutely.  I mean, the

12   foundation of any systematic review is to

13   start with your highest level of

14   evidence.  If you have the highest level

15   of evidence, then the lower levels of

16   evidence typically are not given weight.

17                  Certainly if they are

18   incongruent -- if the lower evidence --

19   levels of evidence are incongruent with

20   the higher levels of evidence, it just

21   simply validates and verifies the

22   uselessness of those articles.

23        **Q.**    And I believe you testified

24   your methodology was to look at the

Marc Toglia, M.D.

Page 328

1    highest levels of evidence --

2            **A.**    Of course.

3            **Q.**    -- and not just one

4    document -- strike that.

5                 Not just one guideline or

6    randomized control trial but numerous

7    ones?

8            **A.**    We looked for consistency of

9    the levels of evidence -- excuse me, we

10   looked for consistency of the independent

11   analyses that had similar levels of

12   evidence.

13           **Q.**    And did you find consistency

14   in the systematic reviews and

15   meta-analyses that were Level 1 evidence,

16   such as the shunt 2014 SGS study or paper

17   and the AUA guidelines that did a

18   systematic review?

19           **A.**    They're all very consistent

20   speaking to the safety -- long-term

21   safety, long-term effectiveness of that

22   device.

23           **Q.**    On Page 18 of your report,

24   you talk about the safety and surgical

Marc Toglia, M.D.

Page 329

1  re-intervention being well studied,

2  utilizing national and regional closed

3  systems.

4           Do you see that at the top?

5     A.    Yes, I do.

6     Q.    That's something you were

7  talking to the plaintiffs' counsel about,

8  the significance of the closed systems.

9           Do you recall that?

10    A.    Yes, I -- I started to

11 discuss that.  And the point I was trying

12 to make is that the advantage of the --

13 you know, certainly one of the concerns

14 about following patients or looking for

15 complications is, what's your degree of

16 follow-up and whether or not those

17 patients are somehow excluded.  That's

18 where concerns that relate to things like

19 selection bias could come from.

20           The advantage of looking at

21 data, whether it's Medicare data, like

22 the Thomson Reuters MarketScan data,

23 Kaiser, Canada, some of the other

24 countries, is that people, you know,

Marc Toglia, M.D.

Page 330

1   don't drop out of the system and they are

2   able to capture, with a high degree of

3   accuracy, what happens to these

4   individuals over time.

5         Q.    And in Pages 17 through 21,

6   do you identify some of those studies

7   that you reviewed and found to be

8   scientifically reliable and high levels

9   of evidence?

10        A.    Yes, they are -- and they

11  are consistent with the Level 1 data and

12  the systematic reviews.

13        Q.    Earlier, plaintiffs' counsel

14  asked you some questions about the AUGS

15  position statement.

16              Do you recall that in

17  general?

18        A.    Yes.

19        Q.    Can you turn to that?  I

20  just have a few follow-up questions.  I

21  believe it was in one of these multiple

22  binders.

23        A.    Less than one minute, sir, I

24  have it right in front of me.

Marc Toglia, M.D.

Page 331

1          Oh, I have to apologize.

2     Okay.

3          **Q.**     Remember plaintiffs' counsel

4     asked you some questions about the

5     AUGS/SUFU position statement and whether

6     it had any discussion about safety or

7     complications?

8          **A.**     Yes.

9          **Q.**     Take a look at Paragraph

10    Number 2.

11          Does the AUGS/SUFU statement

12    have any discussion about an assessment

13    of whether the TVT or midurethral sling

14    is safe?

15          Sorry, numbered Paragraph 2,

16    unless I'm --

17          **A.**     Numbered paragraph.  Oh, I'm

18    sorry.

19          Number 2 which starts, The

20    monofilament polypropylene mesh is the

21    most extensively studied

22    anti-incontinence procedure in history.

23          So, yes, this particular

24    paragraph -- and the references are

Marc Toglia, M.D.

Page 332

1    provided, and I would point out that the

2    references cited do consist of

3    high-quality levels of evidence, which

4    talks about the fact that -- that this

5    particular procedure had been studied as

6    long in follow up than any other

7    procedure and seems to demonstrate

8    superior safety and efficacy.

9            Q.    If you look at Reference

10   Number 8, under Paragraph 1, where it

11   talks about the lightweight monofilament

12   polypropylene sling has demonstrated

13   long-term durability, safety and efficacy

14   for up to 17 years, are they referring to

15   the Ethicon TVT Retropubic sling that

16   assessed?

17           A.    Yes.  That refers to the

18   Nielsen long-term prospective cohort

19   that, I believe, looked at, over a

20   17-year period of time, a group of

21   approximately 90 individuals.

22           Q.    Does that AUGS/SUFU position

23   statement, is it reliant upon Level 1

24   evidence like Cochrane reviews or

Marc Toglia, M.D.

Page 333

1    randomized control trials?

2            **A.**    Yes, it is.

3            **Q.**    One of the end notes in the

4    overall assessment of the slings is

5    Cochrane review by Ogah, et al.

6            **A.**    Yes.

7            **Q.**    Is that a study that you're

8    familiar with?

9            **A.**    It is.  But that's a

10   meta-analysis.

11           **Q.**    And what is the significance

12   of that type of meta-analysis and being a

13   Cochrane review, if anything?

14           **A.**    Sure.  So a meta-analysis

15   seeks to look at as much of the relevant

16   literature.  As well, it will -- it will

17   take all of the randomized control

18   trials, it will sort of combine the data,

19   in a sense, for analysis.  It will draw

20   comparisons to the other procedures or

21   the other approaches.

22           **Q.**    Okay.  And do those

23   references that the AUGS/SUFU position

24   statement rely upon for the statements in

Marc Toglia, M.D.

Page 334

1    that assess the complications with TVT?

2         A.    Yes.

3         Q.    Such that -- and I believe

4    you talk about, in the Ogah study, in

5    your report, you discuss that that

6    Cochrane review discusses multiple

7    complications?

8         A.    It does.

9         Q.    Including that the

10   monofilament and macroporous mesh, like

11   TVT Retropubic, in the treatment of

12   stress urinary incontinence has a lower

13   rate of exposure than the multifilament

14   meshes.

15               Do you recall that from the

16   Ogah Cochrane review?

17        A.    Yes.  And I believe that the

18   majority of the studies that were

19   included in that analyses would have been

20   specifically with the Retropubic TVT

21   device.

22               Although, there was another

23   part of the analysis that would have

24   looked at the Obturator approach as

Marc Toglia, M.D.

Page 335

1   compared to the Retropubic approach.

2            Q.     Considering that this

3   AUGS/SUFU position statement, as you have

4   testified, relies on Level 1 systematic

5   reviews and other data, do you believe it

6   is reliable?

7            A.     Absolutely.

8            Q.     Some questions were asked to

9   you -- strike that.

10           And do you believe that the

11  other position statements and the stress

12  urinary incontinence systematic reviews

13  and guidelines by SGS, the American

14  Urologic Association, IUGA, and others,

15  are also reliable?

16           A.     They are -- they are

17  reliable and they're incredibly

18  consistent with each other.

19           Q.     You were asked some

20  questions about complications your

21  patients may have had and how plaintiffs'

22  counsel, what documents she would go

23  to --

24           A.     Sure.

Marc Toglia, M.D.

Page 336

1      Q.      -- to look for that.

2              My question to you is this:

3    Did you track your patients' complication

4    rates over time with the TVT Retropubic

5    device?

6      A.      Yes, we did.

7      Q.      How did you do that?

8      A.      We kept notes on the

9    patients.  I mean, most -- you know, when

10   you're dealing with a procedure that, in

11   our hands, had complication rates in the

12   single digits, it's not that hard to make

13   the mental note, you know, that, you

14   know, we saw two episodes of bleeding

15   that required observation.

16     Q.      Did you counsel your

17   patients on your rates of complications

18   you had with the TVT Retropubic device

19   over time as you gained experience?

20     A.      Yes.  I felt an obligation,

21   certainly, as somebody that was well

22   respected in this field and somebody that

23   was able to offer several different

24   options to my patients in this, that we

Marc Toglia, M.D.

Page 337

1    would talk to them, again, sort of about

2    our personal experience.

3                You know, when you -- when

4    you work out in the community and you

5    take care of women in the community and

6    you're not necessarily at a university

7    hospital, I have found that women are

8    very much interested in what your

9    personal experience was.

10               Obviously, we were very

11   fortunate to have a high volume of cases.

12   And within that context, I could say to

13   them, you know, regularly, look, I've

14   done 500 of these and, you know, the

15   complications that we have seen are --

16   you know, there have been occasional

17   episodes of bleeding from time to time,

18   either during or after the procedure,

19   things of that nature.

20       Q.    And so when you put in your

21   report, for example, your complication

22   rates, in your hands and -- for example,

23   that your rate of bladder perforation

24   with the TVT Retropubic decreased over

Marc Toglia, M.D.

Page 338

1    time as you became more experienced, are

2    those reliable rates?

3           **A.**    Yes.

4           **Q.**    Are those based on your

5    firsthand observations and tracking of

6    your complication rates over time with

7    the TVT Retropubic device?

8           **A.**    They are.

9           **Q.**    You talked to plaintiffs'

10   counsel about your various different

11   design expertise and work you did with

12   Ethicon on many different products.

13              Do you recall that?

14          **A.**    I do.

15          **Q.**    One thing I want to ask you

16   about, I didn't recall if you said it or

17   not, but do you recall the GYNEMESH® M,

18   the ULTRAPROTM mesh product that was used

19   in PROLIFT®?

20          **A.**    I do.

21          **Q.**    Do you recall --

22          **A.**    That was used, excuse me, in

23   PROLIFT® +M.

24          **Q.**    PROLIFT® +M.  Thank you for

Marc Toglia, M.D.

Page 339

1    your correction.

2          **A.**    Sure.

3          **Q.**    Do you recall that you were

4    actually one of the surgeons that did the

5    design validation of the GYNEMESH® M

6    mesh, assessing the suitability, safety

7    and efficacy and adequacy of that design?

8          **A.**    I did participate in some

9    kind of a design validation study, yes.

10         **Q.**    Do you recall assessing the

11   IFU for that device during the design

12   validation?

13         **A.**    Yes, I do.

14         **Q.**    And whether you were asked,

15   is the IFU, clear, cohesive, accurate, do

16   you recall that?

17         **A.**    Yes.

18         **Q.**    And did you give opinions to

19   Ethicon in that design validation for the

20   GYNEMESH® M device?

21         **A.**    I provided them with, you

22   know, constructive feedback.

23         **Q.**    Some questions were asked of

24   you, I think, about pubovaginal sling

Marc Toglia, M.D.

Page 340

1    exposures or wound complications with the

2    Burch.

3              I want to hand you the

4    Schimpf paper.

5              And, actually, first of all,

6    do you have your report handy?

7         **A.**    I do.

8         **Q.**    Turn to Page 19, on the

9    second paragraph, where you discuss wound

10   complications occurring with the Burch

11   and autologous fascial sling.

12             Do you see that?

13        **A.**    The -- you're referring to

14   Novara, et al.?

15        **Q.**    I'm right here on Page 19?

16        **A.**    I'm sorry.  Yes.

17        **Q.**    So in the Schimpf -- I put

18   before you the Schimpf SGS systematic

19   review and meta-analysis.

20             Is that a document you're

21   familiar with?

22        **A.**    Yes, it is.

23        **Q.**    Is that a document you

24   reviewed and rely upon?

Marc Toglia, M.D.

Page 341

1        **A.**    Yes, it is.

2        **Q.**    Is that a document that's

3    reliable, in your opinion, to

4    scientifically assess the safety and

5    utility of the design of the TVT

6    Retropubic device?

7        **A.**    It's a very reliable

8    device -- very reliable document.

9             This is what -- this is what

10   we were speaking to Level 1 evidence.

11   This is a systematic review -- an

12   independent systematic review.

13       **Q.**    And the Society of

14   Gynecologic Surgeons, do they have a good

15   reputation within the field of female

16   pelvic medicine?

17       **A.**    Absolutely.

18       **Q.**    Do you actually belong to

19   that society?

20       **A.**    I serve a leadership role.

21   I serve on the executive committee for

22   that society.

23       **Q.**    And in your role and

24   participation with the society -- let me

Marc Toglia, M.D.

Page 342

1    ask you this:  Before I contacted you and

2    asked you to analyze the data, had you

3    already been reviewing and analyzing data

4    on the TVT Retropubic device?

5         A.    Yes.

6         Q.    Had you been reviewing data

7    and analyzing data, the different levels

8    of data, on the TVT Retropubic device

9    going back all the way to when you began

10   considering to use it?

11        A.    Yes.  Absolutely.

12        Q.    So let's look at the Schimpf

13   systematic review and meta-analysis.

14             Does that study -- strike

15   that.

16             Looking at the Schimpf

17   systematic review -- review and

18   meta-analysis, does that Level 1

19   systematic review inform you of wound

20   complications and other problems that can

21   occur with the Burch and the pubovaginal

22   sling?

23        A.    It does.

24        Q.    In the table in the Schimpf

Marc Toglia, M.D.

Page 343

1    paper, does it identify whether patients

2    with pubovaginal sling or Burch have

3    wound infections, exposure and return to

4    the operating room for erosions?

5         **A.**    Yes.   Table 3, specifically,

6    addresses the analysis that would look

7    at -- and, again, this was exclusive

8    of -- excuse me, this was inclusive of

9    randomized control trials.

10                So this is a -- this is a

11   summary of the analysis of Level 1 data.

12        **Q.**    And did the Schimpf

13   systematic review, the summary of Level 1

14   data, identify that the Burch and the

15   pubovaginal sling had exposures or return

16   to the operating room for erosion?

17        **A.**    Yes.

18        **Q.**    Did -- go ahead.  I'm sorry.

19        **A.**    So, specifically, it

20   analyzed the number of studies and the

21   incidence of, say, exposure between three

22   different types of midurethral slings,

23   the traditional, pubovaginal vaginal and

24   the Burch.

Marc Toglia, M.D.

Page 344

1              It also looked at return to

2     the operating room specifically to

3     treat -- to treat erosions as well.  It

4     looked at wound infections, hematoma,

5     dyspareunia, various organ injuries.

6         **Q.**    Did -- did that inform your

7     opinions on the safety of the TVT device

8     for the intended use of the treatment of

9     stress urinary incontinence?

10        **A.**    Yes.  And, obviously, as you

11    can imagine, I was very reassured by the

12    fact that it was both consistent with my

13    experience, having performed, you know,

14    each of these procedures, and also

15    confirmed my experience and my own review

16    of the literature of the safety and

17    long-term efficacy of this procedure.

18        **Q.**    You mentioned earlier that

19    there was consistency in the Level 1 data

20    and the longer-term studies, the

21    prospective database studies.

22              Why is that important in

23    conducting a proper scientific

24    methodologic analysis of the question, is

Marc Toglia, M.D.

Page 345

1    the TVT safe for its intended use to

2    treat stress urinary incontinence?

3          **A.**     Well, objectivity.  You

4    know, the reasons why one designs a

5    randomized control trial is that we're

6    trying to eliminate everything from

7    selection bias, having patients that

8    might be sicker in one arm versus the

9    other, more comorbid conditions,

10   variations that might relate individually

11   to a certain -- a particular surgeon or

12   institution.

13         **Q.**     Plaintiffs' counsel asked

14   you about degradation, and I believe you

15   told her, numerous times, that you didn't

16   believe that the TVT degraded; is that

17   correct or not?

18         **A.**     Within the clinical use of

19   the TVT for the treatment of stress

20   urinary incontinence, there -- I'm not

21   aware of any reliable data suggesting

22   that there is degradation.

23         **Q.**     The plaintiffs' counsel

24   asked you a question about were there any

Marc Toglia, M.D.

Page 346

1    studies that -- I think the question was,

2    and it may have been a double negative --

3    that did not show oxidative degradation.

4                Do you recall questioning on

5    that?

6         **A.**    I do.  And the more that I

7    thought about it, I realized that I did

8    address that in my report.

9         **Q.**    Can you turn to Page 26 of

10   your report?

11        **A.**    Yes.

12        **Q.**    There was a paper that the

13   plaintiffs' experts pointed to by Clave.

14                Do you -- have you read that

15   paper?

16        **A.**    I'm familiar with that

17   study.

18        **Q.**    And, first of all, is that

19   study a reliable study to assess,

20   scientifically, the TVT and, in

21   particular, for its intended use to treat

22   stress urinary incontinence?

23        **A.**    I mean, I don't believe that

24   the Clave study looked specifically at

Marc Toglia, M.D.

Page 347

1    the TVT device, per se.  So it was a

2    low-level observational study, in vitro,

3    in a sense, in that the -- in that the

4    material was analyzed under a scanning

5    electron microgram and some chemical

6    analysis.

7         Q.    And I believe you earlier

8    testified, for the intended use of

9    treating stress urinary incontinence, is

10   Clave one of the studies that wouldn't

11   even make it onto the level of evidence

12   pyramid because it doesn't specifically

13   focus on the intended treatment of stress

14   incontinence?

15        A.    I don't believe that Clave

16   would be considered in that kind of

17   high-level evidence analysis, in terms of

18   the clinical utility, safety or design of

19   that device.

20        Q.    So back to my earlier -- the

21   reason why I brought you to this study or

22   asked you about it, plaintiffs' counsel

23   asked you about direct oxidation.

24                  Even with all the

Marc Toglia, M.D.

Page 348

1    limitations and the poor methodology in

2    the Clave study, did they document that

3    they can show oxidation of the

4    polypropylene?

5         **A.**     They comment directly upon

6    that.  Again, you know, oxidative

7    degradation is a chemical reaction

8    typically reserved for enzymatic changes

9    to, say, amino acids.

10              Again, as I think I stated

11   earlier, it simply involves the insertion

12   of oxygen between carbon -- you know,

13   between carbon molecules within a

14   compound.  In that concept, you know,

15   polypropylene is not an amino acid or an

16   organic compound.

17              But the authors do very

18   specifically state that they were very

19   limited in how they could respond to

20   here -- they say -- they say here that,

21   you know, look, we have to acknowledge

22   that while we offer an opinion -- we

23   offer hypotheses that, maybe, what we're

24   seeing in terms of changes could be the

Marc Toglia, M.D.

Page 349

1    result of oxidation.  They said, look, we

2    can't confirm this hypothesis, based upon

3    our methodology or our analysis, whether

4    or not direct oxidation would actually

5    have occurred in vivo.

6              Q.    So you saw they did some

7    analytical chemistry testing on a limited

8    number of samples in the Clave paper, and

9    even with that methodology, they were

10   unable to confirm their hypothesis; is

11   that right?

12              MS. THOMPSON:  Object to

13         form.

14              THE WITNESS:  Again, you

15         know, they -- the way that Clave

16         was set up is they looked under --

17         under a scanning electron

18         microscope, very, very high power.

19         You know, here is the pristine

20         material, here are these -- these

21         expanded small fragments of

22         material.

23              In that paper, if I'm -- if

24         I'm correct, their only definition

Marc Toglia, M.D.

Page 350

1          of degradation is this doesn't

2          look like this.

3               And, you know -- and they

4          did not see changes in all

5          specimens.  In fact, they saw

6          changes only in a minority of

7          those implants analyzed.  And, you

8          know, again, you know, they said,

9          look, we acknowledge that we

10         cannot determine whether what we

11         observed somehow altered

12         mechanical properties.  They

13         acknowledge that they could not

14         analyze implants that were in

15         women that had not gone back to

16         the operating room to have a

17         portion removed for some clinical

18         indication.

19              And, certainly, my opinion

20         would follow that as well, simply

21         the observation of surface crack,

22         the minority of specimen does not

23         establish that degradation does

24         occur.

Marc Toglia, M.D.

Page 351

1                    And, again, as I've stated

2            over and over, you know, that it's

3            unlikely that this could have any

4            kind of mechanical or functional

5            outcome.  But, more importantly

6            is, again, you simply can't infer.

7            You can't clinically infer from a

8            paper such as this, which is just

9            sort of an observation to any kind

10           of effect that it might have when

11           it's used for its typical

12           indication.

13    BY MR. SNELL:

14           Q.    And with regard to the

15    oxidation question, looking at the

16    article, at the bottom of Page 266, it

17    states, Several hypotheses concerning

18    degradation of polypropylene are

19    described below.  None of these --

20           A.    Counselor, I'm sorry, I'd

21    like to follow along with you.

22           Q.    I'm sorry.

23           A.    I'm sorry.  Go ahead.

24           Q.    You can just take it.

Marc Toglia, M.D.

Page 352

1            I guess my question for you
2    is, at Page 266, you had mentioned that
3    the authors acknowledged that what they
4    were doing was basically hypothesizing;
5    is that correct?
6        **A.**    Well, I mean, you know, the
7    authors did make an observation that the
8    material had a different external
9    appearance, albeit under only, you know,
10   very high powered scanning electron
11   microscopy.  And then they start to come
12   up with some ideas that might potentially
13   explain it.
14           And they said, look, you
15   know, we've talked about several
16   hypotheses concerning whether or not, you
17   know, this represents degradation.
18   Again, their definition of degradation
19   is, this doesn't look exactly the same as
20   the pristine state.
21           And they say, you know, none
22   of these hypotheses, particularly they
23   point out the hypotheses of oxidation,
24   could possibly be confirmed in this

Marc Toglia, M.D.

Page 353

1    study.

2          Q.    You were asked some

3    questions about whether there is an

4    immunologic reaction, whether there's

5    severe chronic inflammation -- you were

6    asked some questions, Doctor, about

7    whether there was immunologic reaction to

8    the TVT polypropylene mesh device.

9                And I believe one of the

10   things you stated was that the randomized

11   control trials, the Level 1 evidence, the

12   long-term data do not show any type of

13   immunologic response in your opinion.

14               Is that correct or did I

15   misstate that?

16         A.    No, the majority of the

17   studies, the five-year data and ten-year

18   data, you know, where they said, look, we

19   did not observe one instance of clinical

20   inflammation, chronic inflammation,

21   erosion, you know, that speaks to the

22   safety and the lack of a significant

23   adverse immunologic reaction.

24               And, again, I think just --

Marc Toglia, M.D.

Page 354

1   as a scientist, as a surgeon, what I

2   would speak to distinguish between are,

3   you know, reactions that the body has

4   that are of no clinical consequence,

5   reactions that the body has that could

6   result in an adverse clinical outcome.

7        **Q.**   Do you have Dr. Rosenzweig's

8   binder over there somewhere?

9        **A.**   In my left hand, I have his

10  expert report.  Below me, we have a

11  binder labeled, Company Documents,

12  Rosenzweig.

13       **Q.**   Let me -- Doctor, if you go

14  back to the middle of -- I know you have

15  a lot of materials in front of you.  But

16  go back to the pile.  Under -- I think

17  it's under your report, where you were

18  looking at the Schimpf paper as one of

19  the exhibits.  Here.

20             Can I take a look at that,

21  Doctor?

22             Let me ask you this: Do you

23  remember, you were asked a question about

24  the Wang study by the plaintiffs'

Marc Toglia, M.D.

Page 355

1    counsel, if you read it and its

2    methodology.

3              Do you recall that?

4         **A.**    I have the Wang study here.

5         **Q.**    Okay.  And you were going to

6    try to answer plaintiffs' counsel's --

7    strike that.

8              You wanted to make a

9    statement or give your impression of the

10   methodology of the Wang paper; is that

11   correct?

12        **A.**    Yes.  I offered an opinion,

13   and I wanted to explain my methodology.

14        **Q.**    Please go ahead and do that.

15        **A.**    Wang published a -- we would

16   consider -- I mean, he calls this a

17   prospective case-controlled pilot study.

18              Now, you know, within the

19   world of study design, you know, case

20   controlled studies are, by definition,

21   retrospective, not prospective.  Again,

22   case controlled studies are a much lower

23   level of evidence.  If we look at the

24   information that I provided here, a

Marc Toglia, M.D.

Page 356

1  typical case controlled study is a Level

2  3.

3              Now, what's incumbent upon a

4  case controlled study is that you have a

5  very appropriate control group for that

6  study.  And the reason for that is that

7  you're trying to minimize selection bias

8  and other forms of bias that could be

9  introduced.  And so, as an investigator,

10 you have to be sure that you're picking a

11 group that is representative of your

12 control.

13             If one group has a certain

14 outcome and you're trying to look at the

15 cause for that outcome, the other group

16 needs to have similar exposure but not

17 the outcome.

18             So, for example, everyone

19 has a sling, the control group has a

20 sling with -- but lacks the particular

21 adverse outcome you're looking for,

22 whereas the affected group has that

23 outcome, itching, let's say, okay?

24             Unfortunately, for some

Marc Toglia, M.D.

Page 357

1    reason, the investigators chose a control

2    group that consisted of only about seven

3    women.  And, again, this was a study of

4    700 women that had undergone a procedure.

5    And these were not -- these were not

6    control women, these were women that did

7    have a clinical problem that would

8    involve a removal of the portion of the

9    mesh so it could be compared.  But that's

10   not an appropriate control group.

11              So I look at this study and

12   say, you know, in all fairness, this is a

13   case series as opposed to a case

14   controlled.  And, you know, that does

15   knock down the level of evidence from a 3

16   to, actually, now a Case 4.

17              And, again, the reason why I

18   make that determination is that, you

19   know, we're trying to determine whether

20   or not we can infer clinical outcome,

21   clinical importance.  And, again, as we

22   go down on the scale of evidence, you

23   cannot make that inference.

24        Q.    And in that study, because

Marc Toglia, M.D.

Page 358

1    of the limitations of that study, can you

2    make that inference with the Wang study?

3          A.    No.  You can't make that

4    inference with the Wang study.

5          Q.    Does a study like the Wang

6    study provide scientifically reliable

7    information on the rate of the

8    complication -- I'm sorry, the incidence

9    of complication?

10         A.    Sure.  So that's the other

11   thing that -- that, you know, a

12   well-schooled academician would tell you,

13   is that you don't calculate prevalence or

14   incidence based upon a case-controlled

15   study.

16         Q.    And for the case series,

17   like the Abbott paper that plaintiffs'

18   counsel asked you about earlier, do those

19   also allow someone to scientifically

20   reliably speak to what the incidence of a

21   complication is?

22         A.    In the Abbott trial, I think

23   the authors correctly pointed out that,

24   because they could not place a

Marc Toglia, M.D.

Page 359

1    denominator, that you could not really

2    speak to incidence.

3          **Q.**    Do the systematic reviews,

4    meta-analyses, numerous five-plus year

5    data that you referenced show consistency

6    in the overall safety and efficacy of

7    TVT?

8          **A.**    They do.

9          **Q.**    You earlier mentioned that

10   all of -- all of that data, and you cited

11   hundreds of different papers, I believe,

12   in your report, shows that the PROLENE®

13   polypropylene Type I macroporous mesh in

14   TVT for the intended use to treat stress

15   incontinence is the most biocompatible.

16             What did you mean by that?

17         **A.**    Biocompatible, you know,

18   sort of a synonym for that, you would say

19   it shows good host tolerability.  That it

20   was capability of existing within host

21   tissue with minimal to no adverse

22   reaction.

23         **Q.**    You were asked questions

24   about the Burch and the autologous

Marc Toglia, M.D.

Page 360

1    fascial sling.

2                    Are either one of those

3    medical devices?

4         **A.**    They are not medical

5    devices, they are surgical techniques.

6         **Q.**    So the Burch and autologous

7    fascial sling are not alternative devices

8    to the TVT, which is a device?

9         **A.**    They are not alternative

10   devices to the TVT.

11        **Q.**    You were asked questions and

12   shown an MSDS, material safety data

13   sheet, on bulk polypropylene.

14        **A.**    Yes.

15        **Q.**    Is that MSDS sheet relevant

16   or clinically scientifically reliable to

17   assess whether the TVT Retropubic device

18   is reasonably safe for its intended use

19   to treat stress urinary incontinence?

20        **A.**    No.  That would be a

21   conclusion that you would get based

22   solely on your Level 1 levels of

23   evidence.

24        **Q.**    Would the MSDS sheet even be

Marc Toglia, M.D.

Page 361

1    on the levels of evidence?

2         **A.**    They would not.

3         **Q.**    You made -- you were asked

4    questions about cancer, sarcoma.

5              Do you recall that?

6         **A.**    I do recall that.  I do

7    believe that I addressed that in my

8    report.

9         **Q.**    At Pages 25 and 26, it looks

10   like you addressed those issues; is that

11   correct?  At the bottom of 25?

12        **A.**    Yes.

13        **Q.**    And in the MSDS sheet, it

14   talked about sarcomas in rats where the

15   polypropylene was in disc or powder form.

16             Do you recall that?

17        **A.**    Yes, I do.

18        **Q.**    And you made a statement

19   about how those data are not pertinent or

20   relevant to the TVT in its configuration

21   to treat stress urinary incontinence as a

22   knitted macroporous mesh?

23        **A.**    Yeah.  The point that I was

24   trying to make, and I don't think I

Marc Toglia, M.D.

Page 362

1    stated it very eloquently, is that the

2    investigations that have looked into such

3    claims had focused on the fact that it's

4    really the material composition, it's not

5    polypropylene, per se, but the composite

6    material.

7                    And additional studies were

8    done, following those initial ones, that

9    showed, really, no risk of sarcoma

10   formation.

11                   I mean, again, as a

12   physician and scientist, these concerns

13   have been addressed by my peers.

14   There's -- number one, to the best of my

15   knowledge, there's never been a reported

16   case of a sarcoma occurring in a patient

17   with a TVT.

18                   As I stated that, you know,

19   polypropylene has been a material of

20   choice for 40 to 50 years.  And in that

21   context, there are no cases in women.

22   And my opinion was that, you know,

23   concerns about potential carcinogenesis

24   in women really are not substantiated,

Marc Toglia, M.D.

Page 363

1  based upon this clinical experience and
2  the established literature.
3      Q.    And you cite to a paper by
4  King and Goldman, where they did an
5  analysis of the Cleveland Clinic's use of
6  thousands of slings over a long period of
7  time.
8          Do you recall that?
9      A.    I recall that paper.
10     Q.    Was that one of the papers
11  you relied upon for your conclusion that
12  the TVT PROLENE® polypropylene
13  macroporous Type I mesh does not cause
14  cancer or sarcoma in its intended use to
15  treat stress urinary incontinence?
16     A.    That's correct.
17     Q.    Plaintiffs' counsel asked
18  you questions about roping and curling
19  and the mechanical testing of the mesh.
20          Let me ask you, you -- I
21  think you told plaintiffs' counsel this,
22  you've seen the testing where they put
23  the TVT -- or they put some kind of mesh
24  on a bench machine and stretched it?

Marc Toglia, M.D.

Page 364

1             MS. THOMPSON:  Object to

2        form.

3             THE WITNESS:  Yes.

4  BY MR. SNELL:

5        Q.    Doctor, have you seen

6  that -- have you seen testing like that?

7        A.    I've seen the reports on the

8  testing like that.

9        Q.    And photographs like the

10 photographs in Dr. Elliott or

11 Rosenzweig's report, where he put in

12 there a piece of mesh that was clamped

13 and it didn't have a sheath or any

14 instruments.

15             Do you recall that?

16       A.    Yes.

17       Q.    All right.  My question to

18 you is, is that photo and the testing of

19 the mesh in that manner scientifically

20 reliably pertinent to the use of TVT and,

21 in particular, its safety in the intended

22 treatment --

23       A.    It's out --

24       Q.    -- of stress urinary

Marc Toglia, M.D.

Page 365

1    incontinence?

2          **A.**    I mean, it's outside the

3    intended use.  So, no, it's not relevant.

4               And, as I stated, you know,

5    the mesh is delivered protected beneath

6    the -- a sheath.  Those forces are not

7    directly exerted on the mesh itself.

8          **Q.**    And is that --

9          **A.**    But it's specific to the

10   tension-free design, which is where the

11   name TVT comes from, tension-free vaginal

12   tape.  And that speaks to the design and

13   the method in which it's placed.

14         **Q.**    And in your report, I

15   believe you talk about the importance in

16   the design characteristics of the sheath

17   and what it does?

18         **A.**    Sure.  I mean, that was very

19   important in the design.

20              And I would point out

21   that's, you know, -- subsequent

22   developments along the area of

23   anti-incontinence procedures all pretty

24   much kept that element of the design

Marc Toglia, M.D.

Page 366

1    intact.

2         **Q.**    And you had mentioned the

3    sheath was important, very important, in

4    your opinion to plaintiffs' counsel; is

5    that correct?

6         **A.**    Yes.

7         **Q.**    Why -- so is the sheath a

8    very important design element of the TVT

9    for its intended use to treat stress

10   urinary incontinence?

11        **A.**    It's elemental in the

12   design.  Without the sheath, you would

13   not have a TVT device.

14        **Q.**    Okay.  And having placed,

15   you know, well over 1,000 TVT Retropubic

16   devices, did you find the sheath to be

17   integral or elemental in the use of that

18   device to treat stress incontinence as

19   you were utilizing it?

20        **A.**    Yes.  You know, again, the

21   sheath provided several key elements.

22   One is that it protected the sheath from

23   exposure to the surrounding tissue, to

24   bacteria.

Marc Toglia, M.D.

Page 367

1           But I think that, you know,

2    certainly, its greatest utility was to

3    prevent the sheath from changing its

4    configuration.

5         Q.    Plaintiffs' counsel asked

6    you a bunch of hypothetical questions

7    about pore were collapse and curling and

8    fraying and things like that.

9           You recall seeing those

10   terms mentioned in the plaintiffs' expert

11   reports?

12              MS. THOMPSON:  Object to

13        form.

14              THE WITNESS:  Yes, I do.

15   BY MR. SNELL:

16        Q.    You saw where Dr. Elliott,

17   and others, would cite to some paper by

18   Dr. Klinge in a hernia application or a

19   rabbit or a mouse study, different data

20   for those theories they were espousing,

21   correct?

22              MS. THOMPSON:  Object to

23        form.

24              THE WITNESS:  I'm familiar

Marc Toglia, M.D.

Page 368

```
 1          with the articles in which
 2          portions of mesh, we'll call them
 3          sheathless mesh, mesh without
 4          sheath, were applied in those
 5          applications.
 6   BY MR. SNELL:
 7          Q.    Those types of documents and
 8   that -- I'll call it data or information
 9   the plaintiffs' experts relied on, do you
10   find that information scientifically
11   reliable for assessing the question, is
12   the TVT suitable or reasonably safe for
13   its intended use --
14          A.    It's certainly
15   not clinically relevant --
16          Q.    -- to treat stress urinary
17   incontinence?
18          A.    -- to the design of the TVT
19   as it's used for its intended use, no.
20               MR. SNELL:  Let's go off the
21          record.  Let me see.  I think I
22          may be done.
23               VIDEO TECHNICIAN:  We are
24          off the record.  The time is 9:05
```

Marc Toglia, M.D.

Page 369

1        p.m.

2                    -   -   -

3              (Whereupon, a discussion off

4        the record occurred.)

5                    -   -   -

6              VIDEO TECHNICIAN:  We are

7        back on the record.

8  BY MR. SNELL:

9        Q.    And I believe, per your

10  earlier testimony, Doctor, those animal

11  studies or hernia studies, or documents,

12  are not even on the level of evidence if

13  we were trying to look to scientifically

14  reliable relevant evidence to the

15  application of treating stress

16  incontinence; is that correct?

17        A.    They are -- you are correct.

18  And they certainly don't speak to the

19  safety of the procedure.

20        Q.    Last question.

21              Do you have Exhibit 4?

22  Plaintiffs' counsel asked you some

23  questions about this e-mail with Kathleen

24  Feeney, and she insinuated that there

Marc Toglia, M.D.

Page 370

1    was -- the statement -- here I'll give it

2    to you.

3            **A.**    Thank you.

4            **Q.**    -- "can you do her

5    downstairs" had to do with some type of

6    sexual interaction.

7                  MS. THOMPSON:  Object to

8            form.  That's not what I

9            insinuated.

10   BY MR. SNELL:

11           **Q.**    Can you tell, having had

12   time to look and think about this --

13           **A.**    Sure.

14           **Q.**    Tell us what, if anything,

15   you believe this pertains to.

16           **A.**    So Kathleen Feeney had

17   referred either friends of hers, or

18   someone, when they found out what they

19   did for a living, might say, you know,

20   I'm a woman who suffers with stress

21   incontinence, I know you're in this

22   field, what -- which of your doctors

23   would you recommend that I see.  She

24   would -- she would give my name and

Marc Toglia, M.D.

Page 371

1    number to them.  These people would come
2    to see me as a patient.
3              And oftentimes I'll say,
4    look, I'd say, how did you come to find
5    me.  And they would say, you know, my
6    friend, Kathleen, referred me to you
7    because I have stress incontinence and
8    she says that you're somebody that I
9    would feel comfortable doing my surgery.
10             So in that context, the more
11   that I think about it, a friend of hers,
12   Christine, saw me, and it was a patient
13   that I was going to do her sling for her.
14   My office is on the fourth floor.  OR is
15   downstairs.  Obviously, I operate at two
16   different hospitals.  My recollection is
17   that the friend was closest to that
18   office.
19             So the comment there,
20   clearly, to me, was, you know -- you
21   know, I talked to her about options, and
22   she kept saying, yeah, I want -- I want
23   that procedure that my friend, Kathleen,
24   has mentioned to me.  And so she just

Marc Toglia, M.D.

Page 372

1   might have responded, I can do you

2   downstairs.

3           Now, to the best of my

4   recollection, Kathleen Feeney had two

5   children of her own.  I may have teased

6   her from time to time, that, so, hey, you

7   know you're going to need a sling, right?

8   So who are you going to have, you know,

9   do your sling?  And she would say, gee, I

10  don't know, Dr. Toglia, I might have you

11  do me, or I might have Dr. So-and-so do

12  me, again, in references to doing her

13  sling.

14          Q.   Did you feel harassed when

15  you were asked those questions by

16  plaintiffs' counsel?

17          A.   I was very much harassed.

18  And I tried to do my best to stay as

19  professional as possible in that regard.

20          Q.   The Ogah -- I want to switch

21  gears, and just, actually, get back to

22  the data.

23          A.   I'm starting to feel like

24  Hillary Clinton here.  But go ahead.

Marc Toglia, M.D.

Page 373

1          Q.     I want to go back to what

2     you did, reliably assessing the data.

3              The Ogah Cochrane review

4     that was marked, and I'm just referencing

5     Exhibit-5 to Dr. Blaivas's deposition,

6     does that study -- strike that -- does

7     that Cochrane review support your

8     opinions?

9          A.     It certainly does.

10         Q.     Does that study speak to and

11    document, in a reliable scientific Level

12    1 evidence method, of the lower morbidity

13    and the high safety to the TVT?

14         A.     Again, The Cochrane Group,

15    which is an independent group of

16    researchers, physicians, scientists,

17    people with interest in this area, they

18    conduct independent -- it's an

19    international group of individuals.  It's

20    not like there's, like, an office that

21    you would go to and this is the Cochrane

22    office.  There's -- it's sort of a group

23    of individuals with common interests and

24    they perform very high -- high-level,

Marc Toglia, M.D.

Page 374

1    high-quality levels of work.  They are

2    widely regarded as one of the reliable

3    sources for this type of Level 1 data.

4                    And, exactly, their -- their

5    conclusion is that the minimally invasive

6    synthetic slings, and, again,

7    specifically, they looked at TVT data,

8    does appear to be as effective as the

9    other procedures currently being

10   practiced.

11                   Their observation was that

12   there seems to be fewer perioperative

13   complications.  And they went on to list

14   specifically which ones, as well.

15        Q.    Is there a more recent

16   Cochrane review that assesses the

17   usefulness, utility, efficacy and safety

18   of the TVT?

19        A.    I believe earlier this year,

20   led by a gentleman by the name of Ford.

21   In 2015, they updated this, I believe,

22   that -- one of the reasons for this is at

23   the time of the original evaluation,

24   there weren't -- there wasn't a lot of

Marc Toglia, M.D.

Page 375

1    good quality data on, say, laparoscopic

2    Burches.  You know, again, the thing that

3    was unique about the TVT, it was

4    minimally invasive.

5               They really were hoping to

6    compare it to a more similar minimally

7    invasive.  It was felt that the tradition

8    pubovaginal sling, Burch procedures were

9    more invasive.

10              So as they gathered more

11   data, they were able to compare the

12   retropubic TVT to the laparoscopic Burch.

13   At the same time, there was better

14   quality data being generated with regard

15   to transobturator approach and the mini

16   sling as well.

17              So, again, they drew a

18   comparison between the retropubic

19   midurethral sling, specifically TVT, and

20   the other two approaches.

21        Q.    You mentioned, I think you

22   said, the NICE guidelines, a little

23   earlier in your testimony?

24        A.    NICE, I would pronounce it

Marc Toglia, M.D.

Page 376

1    NICE.  It stands for the National

2    Institutes of Clinical Excellence.  That,

3    actually, I believe, is a government

4    organization in the UK, a group of

5    epidemiologists and other experts that

6    seek to independently evaluate everything

7    from medication to behavioral therapies

8    across the field of medicine, as well as

9    surgical interventions.

10                   And those recommendations

11   are typically conveyed to the physicians

12   that are within the UK system.

13        Q.    Is that a document that you

14   reviewed and considered in formulating

15   your opinions?

16        A.    I did.  I mean, I hold that

17   document in the same light as I do the

18   other systematic reviews.

19        Q.    I'm going to hand it to you.

20   And I want to mark it for the record.

21                   But the -- you said NICE or

22   is it NICE?  I'm sorry?

23        A.    I'm going to call it NICE.

24        Q.    The NICE guidelines says,

Marc Toglia, M.D.

Page 377

1   Use procedures and devices for which

2   there is current high-quality evidence

3   for efficacy and safety.

4              And it's got a Footnote 11.

5   And it says, The guideline only

6   recommends the use of tapes with proven

7   efficacy based on robust RCT evidence.

8              What does that mean?

9      **A.**    That's what I've been

10  speaking to, that, you know -- once you

11  have high-quality, high-level of

12  evidence, you can pretty much draw your

13  conclusions based on that.

14             You know, if there are no

15  Level 1 studies, you know, then you base

16  recommendations on, say, Level 2.  I

17  guess for extremely rare interventions,

18  it can go lower than that.

19             But the goal is always to

20  sort of sort out the Level 1 evidence,

21  lower level evidence studies will be

22  looked at mostly to see whether or not

23  they -- they agree or are consistent.

24  But they're usually not used in the

Marc Toglia, M.D.

Page 378

 1   formulation of an -- of an inference.

 2          **Q.**    And they say, At the time of

 3   this publication, September 2013, the

 4   following met the guideline criteria.

 5                And it lists TVT.  I'll just

 6   hand it to you.

 7          **A.**    Yes.

 8          **Q.**    Do you believe that that is

 9   an accurate statement, based on your own

10   independent scientific analysis of the

11   data, with regard to the safety of the

12   TVT for its intended use to treat stress

13   urinary incontinence?

14          **A.**    Yes.  I mean, I agree with

15   the statement that, you know, they only

16   recommend the use of tapes that have had

17   proven efficacy.

18                As, I'm sure, everyone is

19   well aware, there are approximately 49

20   different mesh products available, some

21   have been very well studied, others less

22   so, some hardly at all.

23                And I think they were -- you

24   know, again, they were trying to say, we

Marc Toglia, M.D.

Page 379

1    are -- we are specifically saying that

2    our recommendations and our clinical

3    recommendations should be to those that

4    have robust randomized control trial

5    Level 1 data.

6          Q.    And for the TVT Retropubic

7    device, has any other device to treat

8    stress incontinence been studied as much,

9    as long and as broadly?

10         A.    No.  No.  It is the most --

11   the retropubic TVT device is the most

12   studied anti-incontinence procedure in

13   our history.

14               I mean, obviously, it's the

15   one that I do most commonly.  And that is

16   certainly based upon, you know, the

17   quality of that data.

18         Q.    That NICE guideline also

19   says to use only a Type I macroporous

20   mesh?

21         A.    Yes, it does.

22         Q.    Is that something you

23   believe is a proper statement, based on

24   the reliable scientific evidence you

Marc Toglia, M.D.

Page 380

1   agreed -- reviewed?

2          **A.**     Yes, it is.

3          **Q.**     Is that an opinion you

4   share?

5          **A.**     I share that opinion.

6                MR. SNELL:  Let's mark that.

7                     -  -  -

8                (Whereupon, Exhibit

9          Toglia-19, NICE Urinary

10         Incontinence: The Management of

11         Urinary Incontinence in Women, was

12         marked for identification.)

13                    -  -  -

14  BY MR. SNELL:

15         **Q.**     Did you see in the

16  plaintiffs' experts' depositions where it

17  was observed and noted that even one of

18  the plaintiffs' experts, when he finally

19  decided to discuss TVT in the application

20  to treat stress incontinence, Dr. Klinge

21  noted, At present, the gold standard in

22  SUI surgery is the suburethral sling,

23  using either the tension-free vaginal

24  tape, TVT, or the transobturator tape.

Marc Toglia, M.D.

Page 381

1              Did you see that when you

2    reviewed the deposition?

3        A.    I did -- I did note that Dr.

4    Klinge did make that statement.

5        Q.    And he also referenced Amid

6    Type I versus Type III in the Meshia

7    study, where there was a 9 percent rate

8    of erosion with the intravaginal

9    slingplasty, compared to the zero percent

10   with the classical TVT which he referred

11   to as a Type I macroporous monofilament

12   polypropylene mesh.

13             Do you recall that?

14       A.    Yes.

15       Q.    And you believe that the

16   TVT, the retropubic TVT, is the gold

17   standard for the treatment of stress

18   urinary incontinence?

19       A.    I think that the -- yes.  I

20   mean, I think that -- that synthetic

21   midurethral slings are currently the most

22   commonly practiced anti-incontinence

23   procedure.

24             I believe that the AGS

Marc Toglia, M.D.

Page 382

```
 1    membership, 95 or higher, 99 percent,
 2    have done that procedure.  I believe
 3    within the SUFU, or maybe it's the AUA,
 4    which is sort of our colleagues on the
 5    urology side, it's in the mid to high
 6    80s.
 7                   The procedure is -- is the
 8    most common performed worldwide, and
 9    seems to have the highest quality of
10    evidence.
11                   MR. SNELL:  Let's mark this
12             as an exhibit, this being the
13             statement by Dr. Klinge
14             acknowledging for the application
15             of stress urinary incontinence
16             treatment, TVT is the gold
17             standard in the macroporous
18             monofilament Amid Type I mesh.
19                      -  -  -
20             (Whereupon, Exhibit
21             Toglia-20, Hernia Repair Surgery,
22             Volker Schumpelick, Robert J.
23             Fitzgibbons, Editors, was marked
24             for identification.)
```

Marc Toglia, M.D.

Page 383

```
 1                  -  -  -
 2                  THE WITNESS:  If I might be
 3          allowed to go off the record to
 4          get a glass of water, please?
 5                  MR. SNELL:  Sure.
 6                  VIDEO TECHNICIAN:  We are
 7          off the record.  The time is 9:20
 8          p.m.
 9                  -  -  -
10                  (Whereupon, Exhibit
11          Toglia-21, The Cochrane
12          Collaboration; Mid-Urethral Sling
13          Operations for Stress Urinary
14          Incontinence in Women (Review),
15          was marked for identification.)
16                  -  -  -
17                  (Whereupon, a discussion off
18          the record occurred.)
19                  -  -  -
20                  VIDEO TECHNICIAN:  We are
21          back on the video record.
22  BY MR. SNELL:
23          Q.    Doctor, I've put before you
24  Exhibit 21.
```

Marc Toglia, M.D.

Page 384

1                    Just if you can confirm, is

2       that the Cochrane review that came out

3       this year that you testified earlier

4       about?

5              A.     This is the 2015 Cochrane

6       review on midurethral sling operations

7       that was authored by Ford and colleagues.

8              Q.     And is that a scientifically

9       reliable Level 1 analysis?

10             A.     The Cochrane review in front

11      of me is thought -- is Level 1

12      meta-analysis, or, in other words, it's a

13      systematic review.

14             Q.     And in that systematic

15      review, did they look at multiple

16      randomized control trials?

17             A.     Yes.  They would look at

18      Obturator versus Retropubic.  They would

19      look at whether you -- devices that were,

20      quote/unquote, bottom to top versus top

21      to bottom.  Obturator, left to right,

22      right to left, or, more accurately, in to

23      out, out to in.

24                    And I do believe there was

Marc Toglia, M.D.

Page 385

1    some comparison that looked at types of

2    materials as it relates to cure and time,

3    hospital stay, complications, voiding

4    dysfunctions.

5         Q.    As you -- strike that.

6               As you do your analysis in

7    the body of your report and you comment

8    on the high degree of efficacy that's

9    maintained with the TVT device in the

10   intended treatment of stress

11   incontinence, as well as the low

12   complication rates and the lack of many

13   late complications, even out to 17 years,

14   is that of significance to you in your

15   overall assessment as to whether the TVT

16   is safe for the intended use of treating

17   stress urinary incontinence?

18        A.    Absolutely.

19        Q.    Is that data inconsistent

20   with plaintiffs' experts' theories of

21   degradation, cytoxicity and other claims

22   that there is a high rate of long-term

23   complications?

24               MS. THOMPSON:  Object to

Marc Toglia, M.D.

Page 386

```
 1          form.
 2                 THE WITNESS:  It's not
 3          consistent.  I'm not aware, again,
 4          of any high-quality long-term
 5          studies that suggest that there is
 6          a significant -- any significant
 7          rate -- clinical significant rate
 8          of long-term complications or
 9          harm, again, consistently on
10          individual bases, perioperative
11          risks, roughly in the 2 percent
12          range for each individual thing.
13                 Long-term, you know, what
14          I -- what I usually sort of
15          summarize to my patients, look,
16          over the next ten years, the
17          likelihood that you might have to
18          have a re-intervention is 3
19          and-a-half percent.
20                 Now, in -- if it's a
21          prolapse patient, we say to them,
22          look, you know, sometimes there's
23          a 15 to 40 percent chance of
24          reoperation for prolapse after an
```

Marc Toglia, M.D.

Page 387

1          initial prolapse procedure.

2                These are chronic, you know,

3          conditions, as I mentioned several

4          times.

5     BY MR. SNELL:

6          Q.     And in your report where you

7     analyze the literature and you state, The

8     rates of complications requiring surgery

9     are consistently less than 5 percent

10    across the TVT studies.  Overall, the

11    data from these high-quality long-term

12    studies do not support the claims that

13    TVT places a woman at a significant risk

14    of long-term chronic complications or the

15    need for reoperation as plaintiffs'

16    expert suggest.

17         A.     Yes.

18         Q.     What did you mean by that?

19         A.     Were you reading that from

20    my report?

21         Q.     Yes.  That was at Page 30.

22    I'm sorry, I should have told you where I

23    was reading from.

24         A.     You know, again, I was

Marc Toglia, M.D.

Page 388

1    trying to highlight the fact that, you

2    know, we're not -- we're not -- I wasn't

3    asked to do an analysis for nonsurgical

4    treatment to surgical treatment.  We were

5    looking at comparable surgical

6    procedures.

7                   So it's important to say,

8    what's the baseline?  All these

9    procedures operate in the same

10   neighborhood, and, roughly speaking, they

11   have -- not only do they have similar

12   rates of effectiveness, but, overall, the

13   rates of complications are elemental.

14   They can occur with any of them.

15                   Bleeding with any surgery,

16   obviously; when comparing the different

17   techniques, the risks of bleeding are

18   somewhat -- are somewhat similar.

19   Although, I think the -- the Schimpf --

20   excuse me, the Schimpf paper suggested

21   that, perhaps, the risk was a little

22   lower -- excuse me, the risk was

23   significantly lower, say, with a

24   midurethral sling compared to a Burch.

Marc Toglia, M.D.

Page 389

1           Bowel and bladder injuries,

2   again, these all hovers in that sort of 2

3   to 3 percent range.

4           You know, longer -- you

5   know -- and similar things have been seen

6   with other procedures; the needle

7   suspension procedures, the autologous

8   fascial sling, what we traditionally call

9   pubovaginal slings.

10          And, again, as I read

11  through the literature and tried to come

12  up with a number, less than 5 percent

13  seemed, to me, to be a very conservative

14  number that I would feel comfortable

15  discussing with anybody with this

16  procedure.

17      Q.   And did you see, in some of

18  the systematic reviews and guidelines,

19  where the Retropubic TVT midurethral

20  sling had better efficacy or subjective

21  improvement than a Burch or a

22  pubovaginal, such as Schimpf where they

23  saw higher rates of subjective

24  improvement so SGS actually recommends

Marc Toglia, M.D.

Page 390

1    midurethral sling over pubovaginal sling?

2         **A.**     Yes.  And if I can sort of

3    qualify that.

4              So in my world, we're not

5    curing cancer, okay?  We are -- we are

6    intervening in hopes of improving one's

7    quality of life.  There are two ways you

8    can -- you can assess that result.  You

9    know, you can simply say to the patient,

10   you know, how do you feel?  Do you feel

11   like you have a substantial improvement?

12   Has this resulted in a better quality of

13   life?  And that's what we would call a

14   subjective improvement.

15             Stress incontinence is a

16   complaint, it's a symptom, it's something

17   that someone complains about.  That's

18   speaks to the subjective nature of

19   things.

20             It is also a condition that

21   can be demonstrated on testing; sometimes

22   as simple as saying to a woman, go ahead

23   and cough and I see if urine comes out.

24   That's done in -- a provocative stress

Marc Toglia, M.D.

Page 391

1  test is done in a variety of situations,

2  sometimes with formal testing, oftentimes

3  without formal testing.

4              Or you might put a pad on a

5  woman and say, okay, you know, give me

6  100 jumping jacks.  That's objective.

7              So they do tend to look at

8  both subjective and objective.  We argue

9  back and forth with each other, what's

10 more important.  Again, being practically

11 minded, oftentimes we'll say, you know,

12 the patient is happy subjectively, we

13 would give quite a bit of weight to that.

14 So we do break them out separately.

15 Sometimes they'll come up with a

16 composite score.

17             So, fortunately, these

18 trials were well designed and approached

19 the -- they objectively approached both

20 subjective measures and objective

21 measures in both groups.

22    Q.    And you found -- did you

23 find those data reliable in order to

24 be --

Marc Toglia, M.D.

Page 392

1          **A.**    Well, the -- I mean, yes.

2     Many of them used the same methodologies

3     that we use in our own randomized control

4     trial.

5               MR. SNELL:  No more

6          questions.  Thank you.

7               MS. THOMPSON:  I have some

8          follow-up questions.

9                    -  -  -

10                   EXAMINATION

11                   -  -  -

12    BY MS. THOMPSON:

13         **Q.**    First of all, in some of the

14    articles that counsel chose to ask you

15    about, I'm looking at the Ogah 2011

16    Cochrane review.

17               And that's one that you

18    relied on heavily, correct?

19         **A.**    Well, it's one -- yes, it's

20    one of the studies that's -- that was

21    part of the very large pile of Level 1

22    studies.

23         **Q.**    And I think we're both

24    looking at the Neurourology and

Marc Toglia, M.D.

Page 393

1   Urodynamics summary of the Cochrane

2   study, correct?

3          **A.**    Yes.  Given this is not 900

4   pages, I'm going to say this is the

5   summary.

6          **Q.**    Right.  Could you turn to

7   Page 289?  And I'm going to read the

8   paragraph under quality of evidence.

9                The quality of evidence for

10  the majority of trials was moderate, with

11  a minority having low to moderate levels

12  of evidence.  However, the total number

13  of trials, 61, including 7,021 women was

14  high and it was possible to explore the

15  effects of different routes of insertion

16  of the tapes and different tape

17  materials.

18                On the other hand, very few

19  trials reported outcomes after one year

20  and the long-term efficacy and adverse

21  events have yet to be determined.

22                Would you agree that, at

23  least according to the Cochrane review of

24  19 -- of 2011, adverse events were yet to

Marc Toglia, M.D.

Page 394

1    be determined?

2                    MR. SNELL:  Objection.

3            Misstates the document.

4    BY MS. THOMPSON:

5            **Q.**    Did I not read that

6    correctly, the document?

7            **A.**    Um --

8            **Q.**    No.  First of all -- first

9    of all, did I read that paragraph

10   correctly?

11           **A.**    You read the paragraph

12   correctly.

13                   And I just want -- in

14   forming my answer, we're talking

15   specifically about comparative trials.

16   We're not talking about long-term trials,

17   we're talking about, specifically, trials

18   that randomized women to one approach,

19   Retropubic, versus a different approach,

20   Obturator, and the duration that the

21   trial went on for.

22                   This is -- this is an

23   internal comparison between different

24   types of midurethral slings.

Marc Toglia, M.D.

Page 395

1      **Q.**    But the report does say that

2   very few trials reported outcomes after

3   one year and the long-term efficacy and

4   adverse events have yet to be determined,

5   correct?

6      **A.**    Very few studies that have

7   compared one method to the other.

8      **Q.**    Okay.  That's what the

9   article states, what I just read,

10  correct?

11             MR. SNELL:  Objection.

12        Asked and answered.

13             MS. THOMPSON:  No.  It's a

14        simple question.

15             THE WITNESS:  Again, the

16        comparative analysis was limited

17        to Retropubic, bottom to top

18        versus top to bottom; Obturator,

19        medial to lateral versus lateral

20        to medial; monofilament versus

21        multifilament; Transobturator

22        versus Retropubic.

23  BY MS. THOMPSON:

24      **Q.**    That's all true --

Marc Toglia, M.D.

Page 396

1       **A.**    Yes.

2       **Q.**    -- but Ogah determined that

3    the adverse events have yet to be

4    determined.

5              Reading further in that --

6    in the section that says, Conclusions,

7    implications for practice, the last

8    paragraph states, However, there is

9    little evidence about the long-term

10   effectiveness or the chance of adverse

11   events, such as tape erosions nor is it

12   clear how to treat women after a tape

13   procedure fails.

14             You would agree with me that

15   that was a conclusion that Ogah made in

16   the 2011 Cochrane review?  I'm just

17   reading it.

18      **A.**    That's fine.  Point to it

19   again.

20      **Q.**    The last paragraph under,

21   Conclusions, implications for practice.

22      **A.**    Right.  The last sentence

23   speaks to, you know, should you undergo a

24   midurethral sling, that these particular

Marc Toglia, M.D.

Page 397

1    studies analyze -- do not answer the

2    question of what you would do subsequent.

3         Q.    But I did read that

4    paragraph correctly as a conclusion of

5    Ogah in this study?

6         A.    You did.

7         Q.    And then in the next

8    section, Implications for research.

9    There is a need to address some of the

10   limitations of a number of the trials

11   contributed -- contributing to the

12   synthesis, particularly in improving the

13   methodology of the trials or their

14   reporting.  It is highly recommended that

15   clinical trials should be reported

16   following the CONSORT guidelines.

17               Did I read that paragraph

18   correctly?

19        A.    Yes.

20        Q.    So Ogah, at least, states

21   that there is -- that there are

22   limitations to a number of these trials,

23   and that -- particularly, improving the

24   methodology of the trials and the

Marc Toglia, M.D.

Page 398

1    reporting, correct?

2                   MR. SNELL:  Objection.

3          Form.

4                   THE WITNESS:  That's their

5          recommendations.  That their --

6          they would like to see additional

7          trials that would conform to the

8          criteria that they use.

9                   And, again, their primary

10         objective is that they want to

11         compare apples with apples.

12   BY MS. THOMPSON:

13         Q.    And the next paragraph, in

14   implications for research, There is a

15   need for more robustly designed, good

16   quality and adequately powered randomized

17   controlled trials with standardized

18   objectives and validated subjective

19   outcomes.  These trials need to have

20   long-term follow-up and adequate

21   reporting of adverse events.

22                   Is that one of the

23   implications for research that Ogah lists

24   in the 2011 Cochrane review that you're

Marc Toglia, M.D.

Page 399

1  relying on?

2          **A.**     It's a suggestion.

3          **Q.**     You'll agree with me that

4  case series can be quite significant if

5  they're reporting a new complication,

6  correct?

7                  MR. SNELL:  Objection.

8                  THE WITNESS:  I would not

9          agree with that, counselor, no.

10  BY MS. THOMPSON:

11         **Q.**     So a new complication never

12  reported about, that's published in a

13  case series, you'll agree that those are

14  seen frequently in prestigious journals

15  and considered to be important?

16                 MR. SNELL:  Objection.

17         Foundation.  Compound.

18                 THE WITNESS:  I mean, I

19         think -- I can tell you that in

20         the journals that I work for, they

21         are no longer interested in

22         publishing those with any great

23         frequency because they don't

24         consider them to be high

Marc Toglia, M.D.

Page 400

1          quality --

2     BY MS. THOMPSON:

3          Q.    Of a new complication, never

4     reported before?

5          A.    Case series in general.

6          Q.    I'm talking about case

7     series of a new complication that has not

8     previously been reported?

9               MR. SNELL:  Objection.

10              THE WITNESS:  Sure.

11              MR. SNELL:  He's already

12         answered this and said no.

13              MS. THOMPSON:  He said he

14         misunderstood my question.  He

15         thought he -- I was talking about

16         case specific -- case series in

17         general, and I'm talking about

18         case series reporting a new

19         complication.

20              THE WITNESS:  I'm sorry.

21              MS. THOMPSON:  Those are two

22         different things.

23              THE WITNESS:  I'm talking

24         about all case series, which would

Marc Toglia, M.D.

Page 401

1           include the type of case series

2           that you're referring to.

3    BY MS. THOMPSON:

4           **Q.**    Okay.  And just

5    specifically, case series reporting a new

6    complication are deemed important

7    frequently, correct?

8                  MR.  SNELL:  Objection.

9           Asked and answered.

10                 THE  WITNESS:  Are deemed

11          important frequently?

12   BY MS. THOMPSON:

13          **Q.**    Are frequently deemed

14   important in journals?

15                 MR.  SNELL:  Same objection.

16          Asked and answered.

17   BY MS. THOMPSON:

18          **Q.**    If you disagree with it,

19   just say you disagree with it.

20          **A.**    I disagree.

21                 I mean, just, again, I -- I

22   serve on the editorial board and those

23   are not manuscripts that we frequently

24   review.

Marc Toglia, M.D.

Page 402

1          Q.     Okay.  Let's look at

2    Schimpf, another one of the articles that

3    counsel chose to ask you about and that

4    you relied on for your opinions, correct?

5          A.     That is correct.

6          Q.     Let's go to the -- to Page

7    71.E18.

8          A.     I'm sorry, obviously, I'm

9    not able to predict what you're going to

10   ask me next, so I don't have it.

11         Q.     I'm going to ask you about

12   the articles that --

13         A.     No, I'm just asking for

14   permission to go off record so I find

15   that article.

16         Q.     It shouldn't take you that

17   long.

18         A.     No, I don't -- I'm just

19   trying to be respectful of everybody's

20   time on a Friday evening.

21         Q.     Do you have Schimpf in front

22   of you?

23         A.     I do.

24         Q.     Okay.  If you could turn to

Marc Toglia, M.D.

Page 403

1    Page 71.E18?

2         **A.**    Counselor, I'm not sure that

3    we're back on record.

4         **Q.**    We never went off the

5    record.

6         **A.**    My apologies.

7         **Q.**    And I'm reading --

8         **A.**    I was waiting to hear that.

9    So I did not focus on your question.

10   Could you repeat that, please?

11        **Q.**    71.E18.  And I'm reading

12   from the paragraph that begins there,

13   Limitations to the study.

14             And Schimpf states here,

15   There was also high variability in

16   reporting of numbers and types of

17   complications in trials, making analysis

18   of AE outcomes challenging.

19             And AE stands for adverse

20   events, correct?

21        **A.**    I would agree that

22   adverse -- AE stands for adverse events.

23        **Q.**    While many surgeons and

24   patients are interested in information

Marc Toglia, M.D.

Page 404

1   about postoperative symptoms, such as

2   urgency and de novo urgency, these

3   symptoms were inconsistently reported,

4   thus limiting their analysis.

5           Additionally, data

6   concerning need for re-treatment were

7   sparse and inconsistent, limiting our

8   ability to draw any conclusions on this

9   important question.  Complications were

10  assessed at different time intervals

11  among different trials, and sometimes

12  later trials reporting secondary analysis

13  did not update longer-term AEs.  The vast

14  majority did not use a standard

15  classification for complications, such as

16  the classification system of Dindo, et

17  al.

18          Did I read that correctly

19  about Schimpf's conclusions regarding the

20  reporting of AEs?

21              MR. SNELL:  Objection.

22        Misstates.

23          Go ahead.

24              MS. THOMPSON:  I just asked

Marc Toglia, M.D.

Page 405

1          if I read it correctly.

2    BY MS. THOMPSON:

3          Q.    Did I read it correctly,

4    Doctor?

5          A.    You did, counselor.

6                MR. SNELL:  You said

7          conclusion.  So I'm going to

8          object.  That's my objection.

9    BY MS. THOMPSON:

10         Q.    Are you familiar with the

11   Brubaker paper that was published

12   recently that was critical of two of the

13   randomized surgical trails for urinary

14   incontinence?

15               MR. SNELL:  Form.  Vague.

16               THE WITNESS:  Dr. Brubaker

17         is so prolific, I don't know which

18         one you're talking about.

19   BY MS. THOMPSON:

20         Q.    The title is, Missing Data

21   Frequency and Correlates in Two

22   Randomized Surgical Trials for Urinary

23   Incontinence in Women.

24         A.    I'm not familiar with that,

Marc Toglia, M.D.

Page 406

1    no.

2         Q.    So you -- and it's in the

3    IUJ, do you read that journal that you're

4    the editor of?

5         A.    I read that journal.  I

6    can't tell you I read everything that's

7    published within that journal.

8         Q.    Would that have been

9    something interesting to you, to

10   determine that two randomized surgical

11   trials had missing visits and data

12   increasing with time?

13              MR. SNELL:  Objection.

14        Calls for speculation.

15              THE WITNESS:  All -- all

16        clinical trials suffer from that

17        occurrence.

18   BY MS. THOMPSON:

19        Q.    At least somebody at the IUJ

20   thought that was significant enough to be

21   published, correct?

22              MR. SNELL:  You're asking

23        him to comment on something that

24        he doesn't recall seeing?  If

Marc Toglia, M.D.

Page 407

1            you've got it --

2     BY MS. THOMPSON:

3            **Q.**    You can answer.

4                 MR. SNELL:  If you've got

5            it, print it out and put it on the

6            record.  I don't care.  But don't

7            ask him to speculate.

8     BY MS. THOMPSON:

9            **Q.**    You can -- you can answer

10    the question.

11           **A.**    It was published, so an

12    editor felt that it was worthy of

13    publication.

14           **Q.**    Are you aware of

15    publications reporting inflammatory

16    tumors associated with the TVT?

17                MR. SNELL:  Objection.

18           Form.  Foundation.  Associated.

19                THE WITNESS:  I'm sorry, I'm

20           not familiar -- I'm not aware of a

21           publication that makes -- makes

22           that claim, no.

23    BY MS. THOMPSON:

24           **Q.**    Have you ever researched to

Marc Toglia, M.D.

Page 408

1   see if there are benign inflammatory

2   tumors associated with TVT?

3                   MR. SNELL:   Objection.

4           Relevance.

5                   THE WITNESS:   In the

6           research that I did in formulating

7           my opinion, I did not come across

8           such an article.

9   BY MS. THOMPSON:

10          Q.     What is your definition of a

11  medical device?

12          A.     A medical device, I would

13  consider to be -- I think in the United

14  States devices need to be approved by the

15  FDA and the -- excuse me, the specific

16  indication for that device needs to be

17  stated.

18          Q.     You've used the word

19  "approved" several times today.

20                  Do you mean cleared?

21          A.     I suspect that I mean

22  cleared.  To me, approved, cleared.

23          Q.     And so you're not claiming

24  to be a regulatory expert, correct?

Marc Toglia, M.D.

Page 409

1          **A.**     I'm familiar with the
2   regulatory process, probably more so than
3   the average citizen.
4          **Q.**     And, yet, you don't know the
5   difference between cleared and approved?
6          **A.**     I'm saying that I use both
7   terms interchangeably.
8          **Q.**     So those two terms are
9   interchangeable in your mind?
10         **A.**     I mean, approved, to me,
11  means it's approved for use.
12         **Q.**     Is the answer yes?
13         **A.**     I consider them in the
14  same -- in the same light.
15         **Q.**     I'm going to read you the
16  World Health Organization definition of
17  medical device and ask you if you would
18  agree with that definition, okay?
19         **A.**     Okay.
20         **Q.**     Medical device means any
21  instrument, apparatus, implement,
22  machine, appliance, implant, reagent for
23  in vitro use, software, material or other
24  similar or related article intended by

Marc Toglia, M.D.

Page 410

1   the manufacturer to be used alone or in

2   combination for human beings for one or

3   more of the specific medical purposes

4   of...

5             Does that sound like a

6   definition of medical device -- device

7   that you would agree with?

8             MR. SNELL:  Objection.

9        Foundation.

10            THE WITNESS:  I'll take what

11        you say at face value, counselor.

12        That sounds like a reasonable

13        definition.

14  BY MS. THOMPSON:

15       Q.   Were PROLENE® sutures

16  cleared by the FDA?

17       A.   I don't believe that

18  PROLENE® sutures, per se, are considered

19  a medical device.

20       Q.   That wasn't my question.

21            My question was, were

22  PROLENE® sutures cleared by the FDA as a

23  medical device?

24       A.   I thought that's what I just

Marc Toglia, M.D.

Page 411

1    said.  I mean, I don't know.  I'm not

2    aware that they are, A, categorized by a

3    medical device.  If they were categorized

4    by a medical device, I would assume they

5    were cleared.  But I don't know what

6    category sutures fall into.

7         Q.    I'll represent to you that

8    sutures -- PROLENE® suture was cleared by

9    the FDA as a --

10                MR. SNELL:  That is a total

11        misrepresentation.

12   BY MS. THOMPSON:

13        Q.    -- approved by the FDA as a

14   medical device.

15                MR. SNELL:  It was approved

16        as a drug by the FDA, found to be

17        safe and effective.  You know

18        that's a blunt misrepresentation

19        to the witness.  And then

20        re-categorized as a device.

21                MS. THOMPSON:  Forgive me.

22        It was re-categorized as a device.

23   BY MS. THOMPSON:

24        Q.    Would a suture fit the

Marc Toglia, M.D.

Page 412

1    medical device that I -- definition that

2    I just read to you from the World Health

3    Organization?

4              MR. SNELL:  Form.

5              THE WITNESS:  I don't -- I'd

6         have to see it again, sort of --

7         in writing, counselor.  That a

8         rather complicated --

9    BY MS. THOMPSON:

10        **Q.**    Is it a material?

11        **A.**    A suture is a material.

12        **Q.**    Does a suture usually come

13   with a needle attached?

14        **A.**    It may or may not have a

15   needle attached.

16        **Q.**    If it does have a needle

17   attached, is that an apparatus?

18        **A.**    I would assume that it could

19   be considered an apparatus.

20        **Q.**    Is it used for human beings?

21        **A.**    Yes.

22        **Q.**    Is it used for a medical

23   purpose?

24        **A.**    Yes.

Marc Toglia, M.D.

Page 413

1    **Q.**    Wouldn't you agree that that

2    fits the definition of the World Health

3    Organization of a medical device?

4            MR. SNELL:  Objection to

5            form.

6            THE WITNESS:  The way that

7            you described it to me, I would

8            take your word that that's how it

9            is classified.

10   BY MS. THOMPSON:

11   **Q.**    Okay.  Thank you.

12           Did I hear you correctly

13   that you track your complications in your

14   practice using mental notes?

15           MR. SNELL:  Misstates.

16           Go ahead.

17           THE WITNESS:  We track our

18           complications on -- on

19           spreadsheets, on paper.

20   BY MS. THOMPSON:

21   **Q.**    And we could request those

22   spreadsheets and papers that track your

23   complications?

24   **A.**    I don't know that those

Marc Toglia, M.D.

Page 414

1    exist beyond a certain period of time.

2    They're not published.

3         Q.    And you don't have those in

4    your office that we can look at?

5         A.    I'm sorry, I do not.

6              MS. THOMPSON:  I have --

7    BY MS. THOMPSON:

8         Q.    Oh, I have another question.

9              If I were to show you

10   internal Ethicon documents that show

11   degradation, show surface cracking, show

12   the clinical significance and show the

13   histological diagnosis of degradation,

14   would you still hold on to your opinion

15   that polypropylene does not degrade?

16             MR. SNELL:  Objection.

17             Foundation.  Form.

18             THE WITNESS:  I would.

19             Because, again, the Level 1

20             evidence on safety would trump

21             lower levels of evidence, which

22             would include in vitro studies

23             that you're referring to or even

24             animal studies.

Marc Toglia, M.D.

Page 415

1          MS. THOMPSON:  No further

2     questions.

3          MR. SNELL:  No questions.

4          VIDEO TECHNICIAN:  This

5     concludes the deposition.  We are

6     off the record.  The time is 9:50

7     p.m.

8               -  -  -

9          (Whereupon, the deposition

10     concluded at 9:50 p.m.)

11               -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

Marc Toglia, M.D.

Page 416

```
 1                    CERTIFICATE

 2

 3

 4            I HEREBY CERTIFY that the

 5   witness was duly sworn by me and that the

 6   deposition is a true record of the

 7   testimony given by the witness.

 8

 9

10

             Amanda Maslynsky-Miller
11           Certified Realtime Reporter
             Dated:  October 5, 2015
12

13

14

15

16

17            (The foregoing certification

18   of this transcript does not apply to any

19   reproduction of the same by any means,

20   unless under the direct control and/or

21   supervision of the certifying reporter.)

22

23

24
```

Marc Toglia, M.D.

Page 417

1                    INSTRUCTIONS TO WITNESS

2

3                    Please read your deposition

4      over carefully and make any necessary

5      corrections.  You should state the reason

6      in the appropriate space on the errata

7      sheet for any corrections that are made.

8                    After doing so, please sign

9      the errata sheet and date it.

10                    You are signing same subject

11      to the changes you have noted on the

12      errata sheet, which will be attached to

13      your deposition.

14                    It is imperative that you

15      return the original errata sheet to the

16      deposing attorney within thirty (30) days

17      of receipt of the deposition transcript

18      by you.  If you fail to do so, the

19      deposition transcript may be deemed to be

20      accurate and may be used in court.

21

22

23

24

Marc Toglia, M.D.

Page 418

```
1                - - - - - -

                 E  R  R  A  T  A

2                - - - - - -

3    PAGE   LINE   CHANGE/REASON

4    _____  _____  _____

5    _____  _____  _____

6    _____  _____  _____

7    _____  _____  _____

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24   _____  _____  _____
```

Marc Toglia, M.D.

Page 419

1        ACKNOWLEDGMENT OF DEPONENT

2

        I,_____, do
3  hereby certify that I have read the
   foregoing pages,  1 - 415, and that the
4  same is a correct transcription of the
   answers given by me to the questions
5  therein propounded, except for the
   corrections or changes in form or
6  substance, if any, noted in the attached
   Errata Sheet.

7

8  _____
    MARC TOGLIA, M.D.                DATE

9

10

   Subscribed and sworn
11 to before me this
   _____ day of _____, 20_____.

12

   My commission expires:_____

13

14 _____
   Notary Public

15

16

17

18

19

20

21

22

23

24

Marc Toglia, M.D.

Page 420

```
 1                    LAWYER'S NOTES

 2     PAGE  LINE

 3     _____ _____   _____

 4     _____ _____   _____

 5     _____ _____   _____

 6     _____ _____   _____

 7     _____ _____   _____

 8     _____ _____   _____

 9     _____ _____   _____

10     _____ _____   _____

11     _____ _____   _____

12     _____ _____   _____

13     _____ _____   _____

14     _____ _____   _____

15     _____ _____   _____

16     _____ _____   _____

17     _____ _____   _____

18     _____ _____   _____

19     _____ _____   _____

20     _____ _____   _____

21     _____ _____   _____

22     _____ _____   _____

23     _____ _____   _____

24     _____ _____   _____
```