# Exhibit "1"

John R. Miklos, M.D.

```
 1                UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF WEST VIRGINIA

 3                       AT CHARLESTON

 4

 5   IN RE: ETHICON, INC., PELVIC      MASTER FILE NO.

 6   REPAIR SYSTEM PRODUCTS            2:12-MD-02327

 7   LIABILITY LITIGATION              MDL 2327

 8

 9   THIS DOCUMENT RELATES TO THE      JOSEPH R. GOODWIN

10   FOLLOWING CASES IN WAVE 1 OF MDL  U.S. DISTRICT JUDGE

11   200:

12

13   ALFREDA LEE, et al., V. ETHICON, INC., et al.

14   CIVIL ACTION NO. 2:12-cv-01013

15

16   SUSAN THAMAN V. ETHICON, INC., et al.,

17   CIVIL ACTION NO. 2:12-cv-00279

18   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

19                      DEPOSITION OF

                      JOHN R. MIKLOS, MD

20

                       April 8, 2016
21                       10:52 a.m.

22                   3575 Piedmont Road, NE

                       Atlanta, Georgia
23

24                    Heather Brown, RPR

                   CCR-4759-4284-5258-1376

25
```

```
                                    Page 2                                                    Page 4
 1           APPEARANCES OF COUNSEL                   1      Deposition of John Miklos, M.D.
 2                                                    2           April 8, 2016
 3   On behalf of the Plaintiff(s):                   3
 4   JAMES B. MATTHEWS, ESQUIRE                       4         JOHN R. MIKLOS, M.D.,
     BLASINGAME BURCH GARRARAD ASHLEY, P.C.           5   having been first duly sworn, was examined and testified as
 5      440 College Avenue                            6   follows:
        Suite 320                                     7             EXAMINATION
 6      Athens, Georgia  30601                        8   BY MR. SNELL:
        (706) 354-4000                                9      Q.  Good morning, Dr. Miklos, my name is Burt Snell.  We
 7      jbm@bbgbalaw.com                             10   met off the record a little while ago.  I'm here to take your
 8                                                   11   deposition particularly regarding your TVT-Secur expert report
 9                                                   12   and the multi-district Ethicon litigation.  You understand
10   On behalf of the Defendant(s):                  13   that?
11   NILS B. SNELL, ESQUIRE                          14      A.  Yes.
     BUTLER SNOW LLP                                 15      Q.  Can you just tell us your full name and where you're
12      1020 Highland Colony Parkway                 16   current business address is, please, doctor?
        Suite 1400                                   17      A.  Yes.  My name is John Robert Miklos.  My -- I have an
13      Ridgeland, Mississippi 39157                 18   office here in Atlanta at 3400 Old Milton Parkway, Suite C330,
        (601) 985-4523                               19   Alpharetta, Georgia 30005, and I have an office also in Beverly
14      burt.snell@butlersnow.com                    20   Hills at 9201 Sunset -- West Sunset Boulevard, and that's West
15                                                   21   Hollywood or Beverly Hills and that's suite 402.  And I have a
16                                                   22   new office in Dubai but I don't know the address.
17                                                   23      Q.  Okay.  I'm going to hand you what has been marked as
18                                                   24   Exhibit No. 1.  I'll represent that that is the notice to your
19                                                   25   deposition, and my simple question is have you seen this
20
21
22
23
24
25

                                    Page 3                                                    Page 5
 1           INDEX OF EXHIBITS                        1   document before?
 2   Defendant's                                      2         (Whereupon Exhibit Miklos 1 was marked for
 3   Exhibit     Description        Page              3          identification.)
 4                                                    4      A.  Yes.
 5   Miklos 1    Document..................5          5      Q.  Have you brought any materials here with you in
 6   Miklos 2    Document..................6          6   response to the document request that's attached to the
 7   Miklos 3    Document..................7          7   deposition exhibit?
 8   Miklos 4    Document..................Not Referenced   8      A.  Yes.  Actually Jim and I spoke about this document --
 9   Miklos 5    Document..................Not Referenced   9   I saw this on Wednesday -- and basically, Jim has coalesced
10   Miklos 6    Document..................Not Referenced  10   everything and brought everything with him.
11   Miklos 7    Document..................38        11      Q.  Right.  So you have a couple of binders here, there's
12   Miklos 8    Document..................48        12   a CD down there.  Counsel, is that yours or is that the
13   Miklos 9a   Document..................Not Referenced  13   doctor's?
14   Exhibit 9b  Document..................Not Referenced  14         MR. MATTHEWS:  I'll just tell you what we've
15   Miklos 10   CD...(Admitted by Agreement after conclusion.)  15   got.
16   Miklos 11   Thumb Drive...(Admitted by Agreement after  16         MR. SNELL:  Okay.  That's fine.
17               conclusion.)                        17         MR. MATTHEWS:  The binders are his report and
18                                                   18   the documents that represent the footnotes in his report.
19            INDEX OF EXAMINATION                   19         MR. SNELL:  Okay.
20   Description                        Page         20         MR. MATTHEWS:  The CD is the same thing.  So
21                                                   21   that you can have it, if you want it.
22   Examination By Mr. Snell...................4    22         MR. SNELL:  Okay.
23                                                   23         MR. MATTHEWS:  Do you want it?
24                                                   24         MR. SNELL:  Yeah.  I think I'll mark that.
25                                                   25         MR. MATTHEWS:  The -- his file, to the extent
```

Page 6

1  that we hadn't objected to it, and actually, I think this is
2  everything that is on this thumb drive.
3      MR. SNELL: Okay.
4      MR. MATTHEWS: So this would include everything
5  that he was sent to review and reviewed that's listed on his
6  exhibit list. That's yours, too.
7      MR. SNELL: Okay. Perfect.
8      MR. MATTHEWS: And I don't remember what else is
9  on -- there are invoices, right?
10     MR. SNELL: Yeah, there was a request for
11 invoices if he's generated those at this point.
12     MR. MATTHEWS: There's the invoices to this
13 point I think.
14     MR. SNELL: Okay.
15     MR. MATTHEWS: Let's see. The rest of this I
16 don't think is responsive in this stack here.
17     MR. SNELL: Okay.
18     MR. MATTHEWS: So that's it.
19     MR. SNELL: Perfect.
20  Q. (By Mr. Snell) So, Doctor, thank you for bringing
21 those materials, as well.
22     I'm handing you Exhibit No. 2. This is a
23 formality, I know you have a copy of your expert report there
24 in your binder. Can you just confirm for us that Exhibit 2 is
25 a copy of your export report on the TVT-Secur?

Page 7

1      (Whereupon Exhibit Miklos 2 was marked for
2         identification.)
3  A. Yes.
4  Q. What I did is I took apart the package the lawyers
5  filed that included the report, the CD, materials list, just so
6  we can separately mark them.
7      Exhibit No. 3 to your deposition appears to be
8  your curriculum vitae. Can you confirm if that's correct?
9      (Whereupon Exhibit Miklos 3 was marked for
10        identification.)
11 A. Yes.
12 Q. Is that current or current as of a certain date?
13 A. Yes. It is current as of December 2015.
14 Q. Since December of 2015, have you drafted or prepared
15 an updated CV?
16 A. I -- we haven't updated the CV since that time. If
17 it is, it would be minor. But there's -- my career continues
18 to -- there's things every month or so that we have to add to
19 it, so it hasn't been updated that I'm aware of.
20 Q. Can you think of anything significant that you've
21 done, written, published, that would be reflected on the
22 updated CV that pertains to TVT-Secur or your opinions in this
23 case?
24 A. Yeah. In particular, even though they're written in
25 my expert report, that we created three abstracts for the

Page 8

1  International Urogynecological association meeting on mesh
2  removal.
3  Q. I'm familiar with those.
4  A. We've actually taken -- the process is taking each
5  abstract and creating a paper out of it. So Abstract No. 1 is
6  now accepted for publication in the International Urogyne
7  Journal and it's on MEDLINE, but it's not formally published
8  yet, so pending publication. And then two other papers, the
9  next two, one has been submitted -- or they're both getting
10 ready to be submitted for publication.
11 Q. Okay.
12 A. That's the one thing. The next thing is that I did a
13 mini fellowship in chronic pelvic pain and am going back to do
14 another 5 to 6 weeks of chronic pelvic pain in Zurich,
15 Switzerland --
16 Q. Okay.
17 A. -- and this particularly relates to the concept of
18 patients that are permanently damaged due to pelvic surgery.
19 Q. So if I understand you correctly -- I am familiar
20 with the abstracts published on mesh removal and mesh
21 complications, but I've only seen them in abstract form. Am I
22 correct that those have not been peer reviewed and published
23 externally by the International Urogyne Journal, so that I
24 could pull down a copy off PubMed if I wanted it?
25 A. On PubMed, the only thing that you would see -- I

Page 9

1  don't -- the abstract is up, but unless you purchased it from
2  International Journal, it should be available.
3  Q. Okay.
4  A. But we can get you a copy. I didn't bring it with
5  us.
6  Q. Yeah, I'm not asking for a copy from you.
7  A. Okay.
8  Q. I was just -- because I tried to get a hold of it and
9  look at it but, at least according to the search I did, I could
10 not get access to it. That's neither here nor there.
11 A. Okay.
12 Q. I won't bother your time with that.
13     The mini fellowship in pelvic pain that you did,
14 was that in Switzerland as well --
15 A. Yeah.
16 Q. -- or somewhere here in the States?
17 A. No. It's in Zurich.
18 Q. How long was that mini fellowship?
19 A. Well, I've already spent basically two weeks, but I'm
20 going back now for another six weeks, maybe ten weeks, so it
21 ends up being two to three months total.
22 Q. I'm pretty familiar with your background. I know
23 your education, training, I'm not going to go through any of
24 that stuff but, at least as I have seen, it looks like you were
25 one of the early surgeons in this country, at least, who began

Page 10

1  doing, what I will call more minimally invasive procedures,
2  beginning in the 90s with regard to laparoscopic procedures; is
3  that true?
4      A. Yes. I would say that's true.
5      Q. Can you tell me -- just give me an overview of what
6  your current practice is like. Are you straight female pelvic
7  medicine or are you doing other things like, you know,
8  laparoscopic procedures, vaginal rejuvenation, whatever it is?
9      A. Yes. Well, I'm a urological gynecologist. Which --
10 and I'm board certified in female pelvic medicine and
11 reconstructive surgery. I did a two-year fellowship in that,
12 so that is my specialty, but I also did two years of minimally
13 invasive -- same concept -- reconstructive pelvic surgery. On
14 top of that, I spent a couple months learning cosmetic vaginal
15 surgery.
16         So my practice is dedicated to the
17 reconstruction of female pelvises. Dedicated to women, only
18 urogynecologic and gynecologic cosmetic surgical procedures.
19 So it's strictly dedicated to that, and it's been that way
20 since 1995. No obstetrics, no routine OB/GYN, no pap smears --
21 maybe one or two pap smears a year.
22         Most patients are either referred to me -- they
23 find me, and they're not permanent patients. They come usually
24 for an evaluation, diagnostic, treatment, if necessary, and
25 then hopefully they move on.

Page 11

1      Q. Do you still do a fair amount of laparoscopic
2  procedures?
3      A. Absolutely.
4      Q. Would it be fair to say that the most influential
5  variable in outcomes is the skill set of the surgeon?
6      A. Repeat the question, please.
7      Q. Sure. Would it be fair to say that the most
8  influential variable affecting patient outcomes following
9  surgery is the skill set of the surgeon?
10     A. I've never looked at that scientifically, but I
11 believe that the skill of the surgeon plays one of the most
12 important roles, yes.
13     Q. For instance, I know you are well-published and have
14 a good reputation -- a very good reputation in laparoscopic
15 surgical procedures. There are other surgeons who have access
16 to those same laparoscopic trocars, you know OR set up, et
17 cetera, but who do not have results as good as yours as
18 published. What would you attribute that to, if anything,
19 beyond the skill set of the surgeon?
20     A. Oh, multiple things. It's obviously education,
21 training, commonsense, pragmatism, logic doing surgery. I can
22 even equate it back to just how I was raised. But that being
23 said, it also requires that -- well, let me put it this way: I
24 have the great fortune of operating all over the world, and
25 having the appropriate equipment is extremely important, too.

Page 12

1         So it's a combination of things; skills,
2  training, education, knowledge, and good equipment, and the
3  appropriate patients, too. It's a lot -- you'll have better
4  success usually in patients that are maybe healthier, not --
5  have a lower body mass index --
6      Q. Right.
7      A. -- and not as many previous surgeries.
8      Q. Okay. Can you tell, me what's your current treatment
9  modalities you use for the surgical treatment of female stress
10 urinary incontinence?
11     A. Sure. If I'm going to isolate it a little bit,
12 because it changes and it is a dynamic situation, currently I
13 use primarily three different modalities: Laparoscopic Burch;
14 Johnson & Johnson Gynecare TVT Exact, or the retropubic sling;
15 and a minimally invasive single-incision sling on occasion --
16 which is made by Coloplast -- it's called an Altis, A-l-t-i-s.
17 And the general makeup has changed dramatically over the last
18 three years. Dr. Moore, my partner, has recently gone through
19 our cases with one of our research assistants and found that we
20 were approximately 75 to 80 percent synthetic slings three
21 years ago and currently, last year, we were at 77 percent
22 Laparoscopic Burch again.
23     Q. Okay. The Coloplast Altis, I'm not familiar with
24 that sling. I know you had done, in the past, the MINI ARC,
25 true?

Page 13

1      A. Yes, MINI ARC.
2      Q. Coloplast Altis, is that a polypropylene sling or is
3  it made of some other material?
4      A. Polypropylene.
5      Q. Is that a Type One macroporous polypropylene mesh,
6  monofilament?
7      A. Yes.
8      Q. When you do your Lap Burch, do you use permanent
9  sutures?
10     A. Yes.
11     Q. What type?
12     A. Cortex.
13     Q. How many?
14     A. I do a Tanaga Modification, and that's four sutures.
15     Q. The Coloplast Altis, of those three procedures, is
16 that the one you do the least by volume?
17     A. Yes.
18     Q. Are there certain patient cohorts or categories you
19 reserve that Mini-Sling for or stay away from? Such that,
20 obviously I'm not going to do that on a recurrent patient or an
21 ISD patient?
22     A. Very good. I tend to shy away if they have -- the
23 word Intrinsic Sphincter Deficiency or ISD, depending on who
24 you talked to, encompasses -- it can encompass every patient.
25 Urologists will tell you every patient has some ISD, it's a

John R. Miklos, M.D.

Page 14

1  matter of how much they have. And, right, the more ISD they
2  have, the more likely I'm going to go to the retropubic sling.
3  If they've had multiple surgical procedures, the more likely
4  I'm going to use a retropubic TVT Gynecare sling. If they've
5  had a frozen pelvis or they've had a lot of scar tissue in the
6  area, I'm more likely to go to a TVT.
7           Oh, and one last thing: It's becoming patient
8  choice -- it's always patient choice.
9       Q.  Right.
10      A.  Sometimes we don't use it based on patient choice.
11      Q.  That was going to be a question. You mentioned the
12 difference in your volume of, let's say, using the TVT
13 retropubic or Exact sling a couple years back versus what
14 you're doing more currently now, with it now being more heavily
15 weighted towards the Lap Burch, correct?
16      A.  Yes.
17      Q.  Is that more function of patient choice?
18      A.  It's multifactorial. I try to actually learn from my
19 patients and learn from other individuals. Hence going to
20 Zurich, Switzerland at age 55 to do my -- basically a fourth
21 fellowship.
22          What am I trying to say? What I'm trying to say
23 is that I learn and I continue to learn by experiencing, by
24 listening to my patients. But one thing I've learned over the
25 last 15 to 20 years of using synthetic mesh is that quite

Page 15

1  often, mesh complications go unnoticed. They're underreported,
2  they're undiagnosed, doctors don't listen to their patients, or
3  they don't understand how to identify the complications
4  associated with mesh. So I personally am more hesitant in
5  utilizing synthetic slings. It's not to say that I don't think
6  they're good -- and I personally am more aware when my patient
7  speaks to me if she has any hesitation at all, whatever the
8  reason may be, then we are more prone to do a Burch.
9           That being said, it's not that we talk the
10 patients into certain surgeries. In my practice, a woman makes
11 her decision, because in each patient I spend somewhere between
12 an hour to two hours -- I only see four patients a day -- and I
13 try to do the best I can to make them an informed consumer and
14 discuss the medical procedure, the risk, the complications, et
15 cetera.
16      Q.  Okay. You mentioned you see about four patients day?
17      A.  On the average four. Yesterday was three.
18      Q.  How many surgeries do you do a week?
19      A.  On the average Dr. Moore and I coalesce -- it's
20 slower this year because of the way people can't meet their
21 deductibles, deductibles have gone up. So usually we do 400 to
22 500 surgeries a year. Right now, we're on pace to do probably
23 about 350.
24      Q.  Do you practice evidence-based medicine?
25      A.  I think everybody -- well, do I practice

Page 16

1  evidence-based medicine? I attempt to practice evidence-based
2  medicine, yes.
3       Q.  From your perspective as a scientist and a doctor and
4  a surgeon, what is evidence-based medicine?
5       A.  Well, evidence-based medicine is that you're going to
6  attempt to practice according to the scientific literature
7  based on good, quality science that has been presented in a
8  literature and at meetings that's to the benefit of the patient
9  with the highest cure rates and the lowest complication rates.
10      Q.  Are there certain patient cohorts that you focus on
11 or offer the Laparoscopic Burch procedure to?
12      A.  Repeat the question.
13      Q.  Sure. One of the surgical options you present to
14 your patients is the Laparoscopic Burch, as you've testified.
15      A.  Yes.
16      Q.  Are there certain patient characteristics or cohorts
17 for whom you offer that or is that an across-the-board offering
18 to the patients who you find are suitable candidates for the
19 surgical management of female stress urinary incontinence?
20      A.  The one place I'm extremely -- I offer -- it's an
21 offer to most patients. I get extremely hesitant in what's
22 called a fixed urethra, there's no mobility of the urethra.
23 Some people say they won't use it on repeat surgery. I wrote a
24 paper in 1999 and I proved in my hands, that a repeat
25 Laparoscopic Burch 19.7 months after surgery was 91, 92 percent

Page 17

1  successful. Usually a secondary surgery is not as successful.
2  It's the -- again, it's the art of the surgery. So, for most
3  patients I offer them a Laparoscopic Burch, especially if we're
4  going in laparoscopically already.
5       Q.  Right.
6       A.  We don't have many patients that only get
7  incontinence and that's it.
8       Q.  Right. So if you're going in and you're doing a
9  laparoscopic hysterectomy and the patient needs the stress
10 incontinence procedure, or if you're doing a laparoscopic
11 procedure to treat something that is concerning to you or the
12 patient, would you tend to offer the Laparoscopic Burch as a
13 concomitant procedure?
14      A.  Yes, but there's caveats. One caveat would be,
15 listen, I've already had five surgical procedures for
16 incontinence, I have a fixed urethra. The right operation is
17 probably not going in and doing a Laparoscopic Burch. The risk
18 knowing the spetsaracious with five surgical procedures, an
19 injury to the bowel, the bladder, the operating neurovascular
20 bundle, and blood loss, as well as the attempt at cure is going
21 to be extremely low. I believe she'll have a better success
22 with a retropubic sling, and I will tell her we're going this
23 laparoscopically, with the right operation from my point of
24 view is doing a retropubic sling.
25          At that point, I'll explain this to her, but

John R. Miklos, M.D.

Page 18

1 she still makes the decision.
2 Q. Okay. You're familiar with the Cochrane Reviews, I
3 take it, on the various conditions for which you provide
4 treatment and care to women?
5 A. Yes.
6 Q. In the most recent Cochrane Review I saw on the
7 treatment of stress urinary incontinence, as between the Open
8 Burch and the Laparoscopic Burch, Cochrane reported that there
9 was no significant benefit in efficacy or complications with
10 the laparoscopic approach. Are you familiar with that?
11 A. I'd have to see the Cochrane Review. I haven't read
12 that one.
13 Q. Let me ask you this: Do you still do Open Burches or
14 are you -- do you steer away from them for some reason or
15 another?
16 A. I haven't made an open abdominal incision in 11
17 years.
18 Q. Okay.
19 A. It doesn't mean it can't happen tomorrow.
20 Q. Right.
21 A. So the reason why I steer away from it is because I'm
22 in there laparoscopically. Now, if a doctor makes an incision
23 and calls me and says listen, I have a big incision, can you do
24 an Open Burch, yeah, I would do an Open Burch.
25 Q. But you have a preference of being more minimally

Page 19

1 invasive in your operative technique?
2 A. Right. The reason -- again, most of our patients are
3 getting full reconstructions; sacrocolpopexies, paravag
4 repairs, hysterectomies. If a woman came in and she only
5 needs a continence procedure, I'd offer her both: Laparoscopic
6 Burch versus a sling.
7 Q. Have you tracked your outcomes with regard to your
8 efficacy and complication rates with the TVT retropubic and TVT
9 Exact devices?
10 A. We have not. We haven't gotten around to doing that
11 study, we do so many other studies. So, we have relied on our
12 colleagues, our cohorts, the people that we deal with, the
13 people that I've taught with. I brought TVT to this country in
14 1998 with Dr. Lucente, Ixodberger, Carl Clukey, Mickey Karram,
15 I went to Sweden to learn it.
16 Q. Right.
17 A. And listening to Rezapour and Olf Holmstead, and
18 Christian Falconer, who I trained with at the Carolina Clinic
19 in Uppsala, we brought that procedure back and it stood the
20 test of time and most people did studies and, as you know, it's
21 the most well studied anti-incontinence procedure in the world.
22 Q. Right.
23 A. So I personally have not done mine.
24 Q. Okay. I was just asking because, obviously, I kind
25 of tried to study up on you and I hadn't seen a publication in

Page 20

1 that regard but I didn't want to miss one. If there was one
2 out there, I would be interested to read it.
3 A. Yeah. There's just so much other stuff to study.
4 That's one I haven't written about yet.
5 Q. Okay. Have you notice any differences between the
6 TVT retropubic that you began doing -- one of the first
7 surgeons in this country -- and the TVT Exact that you perform
8 now?
9 A. I think it's an easier delivery of passage of the
10 needle. But I don't consider -- anecdotally, I don't see
11 where the cure rates are any different or the complication
12 rates are any different in our hands. I will tell you that the
13 sling is easier to remove versus the original slings that we
14 used way back in 1998, '99, for whatever the reason may be. It
15 doesn't seem like it ingrains as much.
16 Q. So it's not the color, it's not the fact that the
17 original TVT you would have been doing back when it first came
18 to this country was just a straight clear as opposed to now
19 there's the blue lines?
20 A. Correct.
21 Q. Okay. I know in your report you outline -- page 4
22 and 5 -- your experience with the TVT-Secur device -- and let
23 me back up.
24         So you mentioned Vince Lucente. When did you
25 first begin working with him?

Page 21

1 A. Vince?
2 Q. Yes.
3 A. I've known Vince since -- I've known Vince since
4 1994. The Society of Gynecologic Surgery meeting in Nashville,
5 Tennessee at the Grand Ole Opry, we shared a room. We're
6 comrades, we're colleagues, I've operated in his hospital in
7 Lehigh Valley when we was there versus Bethlehem Hospital more
8 than once to show him my style and technique of things.
9 Q. Okay.
10 A. We've traveled and taught together, we hunt together,
11 we're friends, but we don't always agree.
12 Q. Right. So when you're talking about -- obviously you
13 and Dr. Lucente were some of the early surgeons involved in
14 TVT-Secur and its clinical application for the treatment of
15 stress incontinence, true?
16 A. Yes.
17 Q. You mentioned that you went to a cadaveric training
18 session in Orlando, Florida with regard to TVT-Secur where
19 Dr. Lucente, I guess, was the lead proctor?
20 A. Yes. If I remember correctly it was Dr. Lucente and
21 possibly Eimy Sepulveda and, yes, I was -- actually Vince
22 encouraged Gynecare to invite me.
23 Q. Okay. You stated that -- I'm looking at page 5, just
24 in case you want to follow along, where you're talking about
25 the lack of conformity to dissection technique as discussed

Page 22

1  during a proceeding lecture -- and you stated I recommended
2  putting one's finger into the incision to touch the ischiopubic
3  rami to determine adequate insertion width and depth for mesh
4  placement.
5      A.  Yes.
6      Q.  Can you explain -- explain that recommendation?
7      A.  Yes.  Well, this actually occurred -- I can still
8  remember being in the room, far part of the room, right-hand
9  side -- and Dr. Lucente was there and there were two people on
10 one cadaver and I watched them before I walked over to my
11 cadaver, and they were having trouble with insertion of the
12 device and they perforated the urethra and they perforated the
13 vaginal epithelium.  And my question was after seeing videos
14 and watching them, that they didn't even know where the
15 anatomy -- you don't know where the implantation of the
16 insertion tip is going.  So when I went to my cadaver, it was
17 suggested that, initially, that you make a centimeter incision,
18 and I just watched two people screw up.  This is the very
19 beginning.  I mean, Vince may have done, I think at that time,
20 maybe 20 cases or so.  I said well, the only way to ascertain
21 and to assure ourselves that we're getting into the correct
22 plane is to actually place your finger and then withdraw your
23 finger to make sure that you have adequate dissection to get to
24 the obturator internus muscle.
25     Q.  Okay.

Page 23

1      A.  That was the theory and the concept behind it.  Thus,
2  reducing the chance of vaginal epithelial perforation, urethral
3  perforation, and tissue dragging.
4      Q.  That would be for the hammock approach?
5      A.  Yes.  Yes, it was for the hammock approach.  The
6  interesting thing is that when I watch other people in the
7  room -- that's what I do, I watch other people and I formulate
8  opinions -- the average doctor didn't have a clue the
9  difference between the U approach and the hammock approach.
10 They don't have a clue nor did they have -- most people didn't
11 even understand the anatomy because often people being taught
12 didn't have a good fund of knowledge at that point -- at some
13 times.
14     Q.  Let me take a step back.  So obviously, you were one
15 of the first surgeons to do the retropubic TVT and you
16 recognized the benefits of that procedure as you used it over
17 the years -- I'm going to chronologically go through the late
18 90s, 2000s -- correct?
19     A.  Yes.
20     Q.  And then, as you know, Delorme, DeLaval, now comes
21 the transobturator approach.  Is that an approach that you
22 used?  I know you only tried TVT-O one time, but is that an
23 approach that you used in your practice in the mid- to latter
24 part of the 2000s with any volume?
25     A.  The TVT-O?  Is that what you're asking?

Page 24

1      Q.  Or the TOT.
2      A.  Yes.  I used the TOT, too.
3      Q.  So you prefer the outside-in approach to the
4  inside-out approach?
5      A.  I prefer the outside-in approach based on the fact
6  that I was asked to go to see Delorme when I was in Paris to go
7  to Belgium, I believe is where he was at the time, to watch him
8  do surgery.  Vince went, I couldn't make it.  I said well, I'll
9  catch you back at the lab in New Jersey.  So it was probably 5,
10 I don't know, maybe 8 weeks later I went to the lab -- or maybe
11 12 weeks later -- and we worked on cadavers and I put the first
12 one in and I told Gynecare to their faces, I will never do your
13 procedure.  It's too dangerous.  Well, quote unquote, Dr.
14 Lucente doesn't have any problems, he's been doing it.  I said
15 that's Vince, but for the average doctor I think it's going to
16 be problematic, and for certain patients it's going to be
17 problematic because you're crossing a mobile joint.  Whereas
18 with an outside-in approach, you hug the ischiopubic rami on
19 the distal aspect of the obturator fossa.  And in the
20 inside-out approach it's hard to control where that needle
21 exits.  So I just couldn't bring myself to actually want to do
22 the surgery.  And they were expecting me to be a preceptor, and
23 I said there's no way I can do this and teach people.  And they
24 said well, you won't make any money from us, you'll lose all
25 your preceptorships.  I said I don't care about money, it's

Page 25

1  about patient care.  That's an actual discussion we had in the
2  cadaveric lab.
3          So later on, Brian Waskom said John, would you
4  at least try one, you know you're capable.  I said listen,
5  bring it down, let me look at it, and I did it on one case.
6  The patient did well.  Just sometimes you have to go with your
7  gut feeling, and I just said I just don't feel comfortable
8  doing this operation.  So that was the last one I ever did.
9  One and only one.
10     Q.  How many outside-in transobturator slings have you
11 placed in your career?
12     A.  Probably well over 150, 200.  It would be tough to
13 guesstimate.
14     Q.  Okay.  Is that something you do currently,
15 transobturator full-length slings?
16     A.  No.  I stopped, I believe, about four years ago.
17     Q.  So then after the transobturator slings, then the
18 Mini-Slings come on the market, correct?
19     A.  2008, 2000 -- well, this Mini-Sling came out in 2006.
20 The MINI ARC about 2008, I think it was.
21     Q.  All right.
22     A.  2006 in The States, I should say.
23     Q.  Did you recognize whether or not there was a desire
24 in your field to attempt, through each generation of surgical
25 technique or approach, to move towards more minimally invasive

Page 26

1 technique?
2  A. Can you repeat the question?
3  Q. Sure.
4  A. You mean from me or was the company?
5  Q. No, no, no. Really, I'm talking about you and your
6 art, your field.
7  A. Oh, I see.
8  Q. In your art, in your field, did you -- was there a
9 movement by surgeons in general towards more and more minimally
10 invasive procedures to treat these conditions, such that there
11 was a trans -- a retropubic approach, then it moved to the
12 transobturator, and then it ultimately went to Mini-Slings?
13  A. I think historically and retrospectively that's
14 pretty self-evident. And, yeah, I think most companies were
15 attempting that with the idea that TVT, transobturator, now
16 single-incision slings, and even at the same -- simultaneously
17 open incisions versus transvaginal and laparoscopic for
18 prolapse and -- yeah, that was the attempt. The balance is
19 success, morbidity, and are they equally effective and less
20 morbid than the predecessor, or are they more effective and
21 less morbid? You can't have same effect -- efficaciousness and
22 have the same morbidity and expect it to be a great operation,
23 because you're not achieving anything other than it's a smaller
24 incision.
25  Q. Right. Did it make sense to you to go towards a more

Page 27

1 minimally invasive insertion technique by way of Mini-Sling
2 approach based upon your experience and knowledge of your art
3 over two decades?
4  A. The concept made sense. Thus, the reason that I did
5 28 TVT-Securs.
6  Q. Twenty-eight?
7  A. Yeah. But that was also based on trusting people
8 that I knew, my contemporaries, my colleagues, and some of
9 these people are the leaders in the world that we communicate
10 just -- Michele Cosson, Vince Lucente, Dennis Miller, so these
11 are people that we talk to routinely. And when Vince told me,
12 John, I'm getting great results, I mean, I had nothing else to
13 believe but he was getting great results. And the concept is
14 right; smaller incision, if I can get the same results, what's
15 the downside for the patient? And that was the goal.
16  Q. Okay. Obviously, by reading your report, you're of
17 the opinion that overall, the TVT-Secur is not as effective as
18 the TVT retropubic device or the TVT-O full-length slings; is
19 that a fair statement?
20  A. That's an absolutely fair statement, and I think
21 that's proven from day one. Including Dr. Lucente, who does 77
22 patients, I do 28, we combine our data, he has a 68.5 percent
23 cure rate, I have a 79 percent cure rate at good ol' 6 weeks,
24 which is nothing in the world of surgery. At that point,
25 realizing a TVT is 90 to 95 percent successful at one year and

Page 28

1 I'm getting an 80 percent cure rate at 6 weeks -- that cure
2 rate never gets better, it only goes down -- I had to stop
3 because it wasn't the right thing for my patients. It wasn't
4 beneficial, it wasn't efficacious, and it wasn't the right
5 thing to do. Now, Vince still believed -- and it's his right
6 to believe what he wants and he's a good surgeon -- he told me,
7 he said nope, John, I'm telling you it's a great operation. So
8 he continued down that path.
9  Q. So you've obviously read studies on the TVT-Secur
10 reporting its clinical effectiveness and safety in women for
11 the treatment of stress incontinence, true?
12  A. Yes.
13  Q. And there are studies that report satisfactory
14 efficacy with TVT-Secur, even level one data, correct?
15  A. Yes, but they're few and far between. There's not a
16 ton of studies that say that the cure rate is over 90 percent.
17 I mean, we can sit there and basically say, study number one,
18 Mauro Cervigni and Burscони, 24 months out, 89.5 percent cure
19 rate. Okay, that's a decent study. I know Mauro Cervigni,
20 I've operated with him in Rome. I like him, he's a good guy,
21 he's pretty honest. Not a bad study.
22      Study number 2, we can then look at the Neuman
23 study. I don't know Dr. Neuman from Israel, but he has a 91
24 percent cure rate at three years out, so those are your two
25 best at this point. Except for Luo, who's from China.

Page 29

1      Now, Luo and his multi-prospective randomized
2 chemical trial of three different studies, he has a 100 percent
3 cure rate, 99.5 percent cure rate, 98.5 percent cure rate. I'm
4 not saying it's not possible, but it gives me a little angst
5 when anybody has a 100 percent cure rate on an operation 12
6 months out of surgery. I mean, it's a little hard to believe
7 for me. So we still have a couple other studies in the 80 to
8 90 percent range and that would be -- that I'm aware of and
9 that is Kim from Korea, who sits out at 88 and 89 percent using
10 the UNH technique and then you also have Kandawalla, who has an
11 84 percent cure rate at 14 months out.
12      Now, the majority of these studies are still not
13 in the ballpark of the TVT and we're talking about five
14 studies, there may be others. What's important is the longest
15 term studies, Tomaselli at five years out, shows a cure rate of
16 TVT-Secur sitting down the 67 percent range and then Masada
17 study, five years out. Those are the two longest studies that
18 I can remember right now and they're sitting out at 65 percent
19 cure rate. And then when you do the prospective randomized
20 chemical trials, you do the metaanalysis, you do the Cochrane
21 Reviews, you have somebody like Navarre and Steven Jeffries
22 from South Africa looking at all these studies, specifically
23 the randomized chemical trials pulling out the TVT-Securs and
24 saying overall, the mass majority of the highest form of
25 scientific evaluation, that the TVT-Secur is not as effective

|  | Page 30 |  | Page 32 |
|---|---|---|---|
| 1 | as the TVT-O, inside-out or the TVT -- TOT -- or a TVT-O | 1 | results with TVT-Secur, correct? |
| 2 | inside-out, TOT outside-in, and the retropubic slings. | 2 | A. Yeah. What's interesting -- |
| 3 | So, again, you're always going to have studies | 3 | Q. Is that a yes? |
| 4 | that show great cure rates. What I find hard to believe is | 4 | A. Yes. |
| 5 | that I'm sitting with Vince Lucente, who's the leader in the | 5 | Q. Okay. |
| 6 | world, in the world, and his cure rates are 69 percent after 77 | 6 | A. What's interesting, though, they're not the surgeons |
| 7 | patients -- | 7 | that I would think that would be getting the great results |
| 8 | Q. Right. | 8 | because they're not the true key opinion leaders and the |
| 9 | A. I mean, this is somebody well respected and was the | 9 | leaders throughout the world. How is it it's fly-by-nights, |
| 10 | number one leader, the key opinion leader, with maybe the | 10 | they wouldn't like that, but they're not the people that led |
| 11 | exception of Carl Gustav Nilsson from Finland and Walter | 11 | the way or the true pioneers or the true pioneers of minimally |
| 12 | Artibani from Verona, Italy, and even those two guys stopped | 12 | invasive surgery and sling surgeries? |
| 13 | doing the procedure. I've never figured out the reason why, | 13 | Q. Well, you mentioned about this surgeon, Luo, I think |
| 14 | even though they were the first to do the studies in their | 14 | in Korea? |
| 15 | respective country, because I don't find it in the internal | 15 | A. No. Not Luo, Kim. |
| 16 | documents, but it sure is crazy -- then we go over to | 16 | Q. Kim, sorry. Oh, Kim. |
| 17 | Australia, I know Malcolm Frazer, I know Bruce Farnsworth, I | 17 | Dr. Kim who has success rates, I think you |
| 18 | know Marcus Carey, there again Bruce Farnsworth -- I'm sorry, | 18 | mentioned of around 100 percent -- |
| 19 | Malcolm Frazer is getting a cure rate of 35 percent. There's a | 19 | A. No, no. Luo, L-u-o, in China. |
| 20 | problem with the procedure. | 20 | Q. Okay. Luo in China. All right. So I was -- |
| 21 | In maybe a few doctor's hands they can get | 21 | A. I don't know if that's how you pronounce it, but it's |
| 22 | decent surgery, decent cure rates, but for the mass majority | 22 | L-u-o. |
| 23 | based on the literature, based on the internal documentation, | 23 | Q. You're fine. So Luo, let me rephrase. So you |
| 24 | based on depositions, based on the prospective randomized | 24 | mentioned the surgeon Luo, a surgeon in China who reported very |
| 25 | chemical trials, based on the metaanalysis, Cochrane Reviews, | 25 | good rates with TVT-Secur, right? |

|  | Page 31 |  | Page 33 |
|---|---|---|---|
| 1 | it's not there. | 1 | A. Yeah, that's what he reported. |
| 2 | Q. You mentioned a paper by Tomaselli, and I think | 2 | Q. Have you ever operated with Dr. Luo? |
| 3 | that's the one you were referencing. | 3 | A. No, I have not. |
| 4 | A. Yeah. Wait a second. Is this the 2015 or the 2011? | 4 | Q. So other than just the fact that his rates are |
| 5 | Q. This is the '15. You mentioned a five-year follow | 5 | basically almost 100 percent or 100 percent, you don't have |
| 6 | up. | 6 | any, I would say, personal or first-hand knowledge as to that |
| 7 | A. Yeah. | 7 | surgeon producing false data? |
| 8 | Q. So I was just making sure you had that. | 8 | A. Absolutely not. And he may truly have a 100 percent |
| 9 | A. Yeah. 2015, five-year. | 9 | cure rate. But it's hard for me to believe that a company like |
| 10 | Q. So in this study, this was one where statistically | 10 | Johnson & Johnson, Gynecare, Ethicon would promote a product |
| 11 | there wasn't a difference in the efficacy between the | 11 | that they didn't have any studies before they released it. |
| 12 | full-length and the TVT-Secur? | 12 | This stuff came out later and this is a study that's much later |
| 13 | A. You are absolutely right. Statistically, it was not | 13 | than when they released their product, and their key opinion |
| 14 | different and I believe it was 65 versus 82, let me just see | 14 | leaders can't get that type of result. I'm not saying Dr. Luo |
| 15 | where it is here. With objective cure rate, 82 versus 68. | 15 | can't get that result, but I'm saying it's the few and far |
| 16 | Absolutely statistical analysis, it is not statistically | 16 | between that can. |
| 17 | significant, but he makes sure that he well mentions that it's | 17 | Q. Who is the professor in Italy who had good results? |
| 18 | the downward trend. It's lower-end. What's really amazing, if | 18 | Who was the first study that you mentioned? |
| 19 | you look at the long-term follow-up studies, if you hit five | 19 | A. Mauro Cervigni |
| 20 | years, both of them are in the 60 percent range. Most studies | 20 | Q. How do you spell that? |
| 21 | for TVT retropubic, you hit five years, it's 83, 84, 85 and | 21 | A. C-e-r-v-i-g-n-i, I believe. And actually it was |
| 22 | above. So I'm not saying -- and I think even Tomaselli is sort | 22 | his -- he's the senior author, it's a last name on the list. |
| 23 | of hitting on here, saying it's not significant but, boy, it's | 23 | The first name would be Bersconi, B-e-r-s-c-o-n-i, I believe. |
| 24 | not what we expected. It's a good study. | 24 | Q. Are they good surgeons according to your knowledge of |
| 25 | Q. Yeah. So there are surgeons, though, who got good | 25 | them or reputation? |

A. I've operated with Mauro, he's a good surgeon. I've actually operated for him in Rome and I've operated with him in Avellino.
Q. And his success rates with Secur you said were around 85 --
A. 89.5 percent at around 24 months, two years.
Q. And that's an acceptable cure rate in your opinion?
A. Yeah. That's a very good -- that's a good, acceptable cure rate.
Q. Is that a peer reviewed or published study?
A. Yes.
Q. Okay. You mentioned Malcolm Frazer in Australia, who reported that he had a high rate of failures with TVT-Secur, correct?
A. Yes.
Q. And he had been doing TVT retropubics before that, correct?
A. According to the internal documents, 6- to 800.
Q. Right. By reputation, have you operated with him?
A. Not with Malcolm Frazer, no. But I know him.
Q. Do you know if he has a good reputation or a reputation as having good hands, being a good surgeon?
A. I understand that he's a good surgeon, yes.
Q. I understand that there's surgeons who have published a lot and write a lot, but they might not have the

best hands. I'm really interested in is he a surgeon who has good hands, good technique? Is he known for that, to the extent that you know that?
A. To the extent that I know that he's considered to have good hands, I would assume that Gynecare would choose the surgeons that are going to be -- best fit their need and give them the highest cure rate. They're not going to just turn their procedures over to anybody to do, so there's a certain obligation there. I hope that they thought that he was a good surgeon, too.
Q. So as between the success rates by -- I'm going to butcher his name -- Cervigini --
A. Cervigni.
Q. Cervigni, I'm terrible with that. So Cervigini has got roughly 90 percent success at two years, on one hand, good surgeon.
A. Yeah.
Q. Malcolm Frazer has got a 70 or 65 percent failure rate in short-term, good surgeon?
A. Yes. In six weeks.
Q. Obviously, it's not -- and they're both using the same device, correct?
A. From what I understand they are, yes.
Q. All right. So obviously the difference is either one of two things; it's technique and/or patient selection, right?

A. No. It could also be the device itself. This is the defective design of the device. Listen, Gynecare has a history of producing a good device, i.e., retropubic TVT sling. Essentially, that's what I use today. If they have that history of understanding that device, and even though I don't totally agree with their TVT-O technique, it is proven -- even though I don't agree with it -- it has been proven through the test of time that it has good results, too, equivalent to the TVTs and statistical significance.
Q. Right.
A. They've been able to produce two products for sure that are reproducible products because the design of those products, I don't necessarily would say that they are defective. Now, TVT-O, I think there is a defective design to it, but it still gives you the efficaciousness, not the morbidity side. That being said, they certainly didn't hit the mark with TVT-Secur. This design is defective, it's not -- because the surgeon cannot reproduce the surgical results across the board. You have chosen and, you know, I get accused of this cherry picking I'm sure along the way, but you have cherry picked the top five papers. That's what they are. And I've cherry picked them for you, too, because they are the best results. But there are literally dozens of papers that don't say that it's as effective. And remember, the other thing that you have going on here, you're looking at two-year follow up.

Q. Right.
A. We saw what happened with Cornu. At 84 percent, 83.5 percent success rate at 6 to 8 weeks after surgery. By 30 months, Cornu is looking at a 60 percent failure. They don't have that problem with TVT and TVT-O.
Q. Right. But the point I'm trying to understand and make -- I'm not cherry picking the data, because I know the data just like you do. There are TVT-Secur studies that show good efficacy?
A. Few and far between.
Q. But there are those studies?
A. Yes, there are. Absolutely.
Q. And there are studies that show efficacy that's not as good in your opinion, correct?
A. Right. And every once in a while a blind squirrel gets a nut.
Q. But -- so one of the things you cited in your report was the Quality Board and Quality Board minutes regarding the Australian -- when the issue arose in Australia you thought Ethicon instituted a Quality Board began analyzing the data to see what's happening here?
A. Yes. Which reference is this?
Q. I don't know the reference off the top of my head, but I saw that you only had one of the Quality Boards, so there were two. And there's something in here I want to ask you

|  | Page 38 |  | Page 40 |
|---|---|---|---|
| 1 | about. Let's see if I can get to it. Let me ask you this | 1 | A. Seems like a nice person. No? |
| 2 | while I'm looking for it: Do you recall in the early year | 2 | Q. No, yeah. |
| 3 | after TVT-Secur IUGA, there was multiple, multiple abstracts | 3 | A. Okay. |
| 4 | published on the Secur device? | 4 | Q. Nice guy. |
| 5 | A. Fiesta Americana, June 6th, 2007, in Cancun, Mexico. | 5 | So if we turn and we look at some of the early |
| 6 | Yes, I was there. | 6 | experience, the results from the early experience, is this the |
| 7 | Q. All right. | 7 | Dr. Neuman you were referencing earlier? |
| 8 | A. I had a nice chuckle. | 8 | A. Yeah. Neuman or Neuman, yes. I believe it to be the |
| 9 | Q. I know I saw this earlier. | 9 | same person from Israel. I've seen internal documentation on |
| 10 | Did you read the deposition of Aran Maree, the | 10 | him, yes. |
| 11 | Australian Medical Director? | 11 | Q. So this was from 2007. Did you -- were you ever |
| 12 | A. Yes. Well, I assume there's just one deposition. | 12 | provided this information in the context of your assessment of |
| 13 | Maybe there's more, I can't remember. I did read one for sure. | 13 | TVT-Secur back when you were doing it or considering doing it? |
| 14 | Q. Okay. We're on number 7. So this is Miklos 7. | 14 | A. Not this. But when I was in Mexico, I made sure that |
| 15 | Did you get the defense exhibits that were | 15 | I saw all of the TVT-Secur presentations. |
| 16 | marked at that deposition? I saw that you had the plaintiff's | 16 | Q. Right. It's your understanding that a lot of these |
| 17 | exhibits? | 17 | are from the IUGA presentations? |
| 18 | (Whereupon Exhibit Miklos 7 was marked for | 18 | A. Not Porta, not Pournaropoulo, not Botha not |
| 19 | identification.) | 19 | Alperstein, not Styn, not Spreafico, maybe Neuman was there, I |
| 20 | A. I'm sorry, one more time? | 20 | can't remember now. Not Vervest -- no, none of these are that |
| 21 | Q. Sure. I saw that you had the plaintiff's exhibits | 21 | I'm aware of. I'd have to look at the list specifically. If I |
| 22 | from the deposition of Dr. Maree, did you also see that there | 22 | remember correctly, it would be Karram, Albrick, Saltz, that's |
| 23 | were defense exhibits marked? Because I didn't see those on | 23 | three of seven, maybe Meschia -- it's hard. I'd have to look |
| 24 | your list. | 24 | at it. So no, these don't look like they're from Mexico. |
| 25 | A. I gotta be honest, I wouldn't know the difference. I | 25 | What's interesting -- so here we are, we're |

|  | Page 39 |  | Page 41 |
|---|---|---|---|
| 1 | just know an exhibit as an exhibit. I've seen this before if | 1 | looking at these results and you have some good ones and bad |
| 2 | this is what you're talking about. | 2 | ones, but this is in -- what is this? What date is this, 2007? |
| 3 | Q. Would it have been your pattern of practice to ask | 3 | Q. 2007. |
| 4 | for all of the exhibits from that deposition of Dr. Maree or | 4 | A. What month? Three months after -- |
| 5 | were you just interested in looking at the plaintiff's | 5 | Q. May. |
| 6 | exhibits? | 6 | A. So before the IUGA meeting. |
| 7 | A. No. I would expect -- I've worked with the BBGA firm | 7 | Q. Okay. |
| 8 | before and they are very forward about giving me every aspect | 8 | A. Yeah. So these are very -- |
| 9 | of everything. I mean, they want me to see the good and the | 9 | Q. Yeah, May 15th. I wouldn't tell you something |
| 10 | bad, and they want me to come up with my own opinion. | 10 | incorrect. |
| 11 | Q. Okay. | 11 | A. So these are very early results. |
| 12 | A. And before we ever went down this path, they said | 12 | Q. Right. And even if we -- so if we look at the |
| 13 | what do you think. I said well, I know what my personal | 13 | numbers on the first page, it's obviously got patients whose |
| 14 | experience is, but let me take a look at all the information I | 14 | success is 85 percent or greater, correct? |
| 15 | can come up with and they give me everything. So, I saw this | 15 | A. Yes. |
| 16 | before this was the -- | 16 | Q. On the second page, you've got patients whose success |
| 17 | Q. This was an exhibit in the deposition. | 17 | rates are basically 50 to 77 percent, correct? |
| 18 | A. It was or it wasn't? | 18 | A. Yes. |
| 19 | Q. It was. | 19 | Q. And just numerically, there's obviously more patients |
| 20 | A. Yeah, because I saw this. | 20 | who had success rates of 87 percent or higher than those whose |
| 21 | Q. Right. There's other defense exhibits that I haven't | 21 | success was lower than 87 percent? |
| 22 | seen that you've apparently looked at. The reason I'm asking | 22 | A. Yes. |
| 23 | is because I was the one who was at Dr. Maree's deposition. | 23 | Q. By a factor of about 5 to 1, right? |
| 24 | A. Oh, really? | 24 | A. Yeah. The problem is, once again, nobody's given me |
| 25 | Q. Yeah. | 25 | the mien follow-up here. With my assumption based on the |

Page 42

1 product release in 2006, this can't be over a year data.
2  Q. Right.
3  A. As you already know from other people's studies,
4 success rates with this product go dramatically down. Even as
5 high as 95 percent to 40 percent within two-and-a-half years.
6  Q. What -- from a complication perspective, did you find
7 any benefit to TVT-Secur in reducing, you know, postoperative
8 pain or any other complication risk that you observed?
9  A. That I observed with my surgery or --
10  Q. With your surgery first, and then in your analysis.
11  A. It is difficult for me to remember 28 patients from
12 back in 2006, exactly the situation. The thing that I do
13 remember was there was a fair amount of bleeding because of the
14 razor blade device. Number two, the high failure rate. High
15 failure rate means that that patient is subjected to another
16 potential surgery if she agrees to it at a higher rate than the
17 average person with a TVT or TOT. Number three, is that I do
18 believe there was less pain for the surgery versus a TVT or a
19 TOT or TVT-O, there's obviously less leg pain. I don't
20 remember what my extrusion rate was back then, for some reason
21 it's not documented -- then again it was only a six-week follow
22 up. The only thing we were interested in was primary objective
23 outcome, which was stress incontinence. So that was my
24 experience. When I look at the literature, and if we work our
25 way from retrospectively -- no, let's work our way

Page 43

1 prospectively -- without looking at the randomized clinical
2 trials yet, we know that even Piet Hinoul, when he wrote his
3 paper, when Piet Hinoul in 2010 wrote his paper on a
4 prospective randomized chemical trial with Vervest, with
5 Milani, and Jean-Paul Roupher from the Netherlands, and they
6 came right out and said listen, it's not as effective as we
7 thought. It's not as good as TVT-O. And on top of that, we
8 have an injury -- we have a mesh exposure rate of about 7
9 percent. We have Hoda in 2012 with Rosenbaugh with an exposure
10 rate of 19 percent. We have Masada with an exposure rate of
11 7.3 percent. We also have Rousey, who was with Michele Cosson,
12 and Michele Cosson was one of the biggest players in the world
13 for Gynecare with their TVM at the time -- a couple years
14 later, a year later, they were already producing it and their
15 erosion rate was 14 percent. Then you look retrospectively and
16 you look at the Cochrane Review and what we see is when you
17 compare the TVT-Secur to TVT-O or TOT or retropubic sling,
18 there's a higher rate of vaginal mesh extrusion, a higher rate
19 of bleeding, a higher rate of urethral and bladder perforation,
20 and a lower rate of pain.
21  Q. You said extrusion, bleeding, what was the third one?
22 Oh, urethral perf --
23  A. Urethral and bladder damage.
24    You know, it's funny when you look at, I think
25 it's Hoda's study, she talks about perf, but she also talks

Page 44

1 about erosion into. Sometimes that's very difficult to
2 determine whether somebody perfs it or they eroded into the
3 urethral bladder.
4  Q. Do you do any autologous pubovaginal slings either
5 harvested from the rectus fascia or the fascia lata?
6  A. Yes.
7  Q. You currently do those?
8  A. I do them if it's warranted, yes. It's rare.
9  Q. Is that because of their higher morbidity or voiding
10 dysfunction or both?
11  A. I've not seen it to be as problematic with voiding
12 dysfunction. I stopped doing fascia lata -- tensor fascia lata
13 slings because the increase rate of about 8 to 10 percent
14 herniation of the quadricep muscle through the lateral aspect
15 of the thigh. So on rare occasion, we do harvest from both.
16 It is a -- one of the problems is even though cure rates are
17 considered just as efficacious, if there is a problem, they're
18 harder to remove, they're harder to adjust, and some patients
19 just eat up the material. They make an enzyme that can
20 actually destroy their own tissue that doesn't have a good
21 blood supply because you've harvested and retransplanted it.
22 We just don't find that they work as well, at least not in my
23 hands.
24  Q. Right. When you say -- so for mesh extrusion, mesh
25 exposure, you're talking about the visibility of the mesh in

Page 45

1 the vagina, not an erosion into the bladder or urethra?
2  A. Yes. That's all I --
3  Q. Just so you and I are on the same page and I know
4 what you're talking about.
5    What data shows the statistically significant
6 increased risk of mesh extrusion exposure with Secur compared
7 to the other stuff?
8  A. The Piet Hinoul and the Masada study.
9  Q. The Piet Hinoul study, the data was not statistically
10 significant, I'll represent that to you. I'll ask you to
11 assume that is true.
12  A. Okay.
13  Q. All right. That's more hypothetical, we'll set that
14 one to the side. What's the other study you said?
15  A. Masada.
16  Q. Masada. Masada was the metaanalysis, correct? Or am
17 I thinking about -- are we talking about different studies?
18  A. Wait a second. No. It's the -- I'm sorry, wait a
19 second. Just let me think for a second. Repeat your question.
20  Q. Sure. The Masada study you referenced, what is that
21 study?
22  A. Let's back up for a second. What was the original
23 question? We were talking about --
24  Q. Mesh exposure, extrusion, and which data, if any,
25 show a statistically significant increased risk with TVT-Secur?

Page 46

1   A.   That was the Masada, I believe.
2   Q.   Do you know offhand, was that an individual study or
3   a systematic review or --
4   A.   Gosh, I believe it was a systematic review.  We can
5   look it up, though.  Do you have a copy here?
6   Q.   I don't think I have the Masada to be honest with
7   you.  I don't want to get you bogged down because I only have
8   limited time.
9   A.   Okay.
10  Q.   But if Masada is the one you're relying on, that's
11  fine.  I'll go figure it out.  I'll find it.
12  A.   Also looking at the Cochrane Review by Steven
13  Jeffries and his team where basically they say at the end
14  there's an increased rate of --
15  Q.   Did you look to see whether that was statistically
16  significant?
17  A.   No.
18  Q.   And numerically how much of a different rate?
19  A.   Yeah, that's one of the problems.  The incidents of
20  these complications are so low and most studies actually didn't
21  look at the difference and one of the down sides of this study,
22  and this is from years of experience looking at the erosion
23  rate --
24  Q.   Right.
25  A.   -- is the erosion rate, from my perspective, my

Page 47

1   experience, my knowledge, my expertise in taking out over 800
2   to 1,000 pieces of mesh, is that it goes undiagnosed.  Because
3   even if you look at Piet Hinoul's study, they talk about
4   adverse events.  But in the primary, secondary endpoint, it
5   doesn't say we're going to look for mesh extrusion, it doesn't
6   say that.  You gotta delineate, not just an adverse event.  So
7   often when people are getting examined -- a lot of these times
8   when you're examining a patient, it's not just visualization,
9   it's palpation.
10  Q.   Right.
11  A.   Because of the ruga of the vagina, the waves, a lot
12  of times you don't see it.  Every patient that I took out who
13  had mesh extrusion, had a previous surgeon that told them
14  there's nothing wrong with you.  So it is dramatically and
15  drastically underreported.
16  Q.   Was that number 7, Doc?
17  A.   Yes, it is.
18  Q.   You would agree that there are numerous studies
19  including high level randomized control trials that do not show
20  a statistically significant increased risk of mesh extrusion or
21  exposure with the TVT-Secur, correct?
22  A.   Yes, I do agree.  But also, I want to state that most
23  studies actually didn't clarify to the primary, secondary
24  endpoint in their study.  It's an incidental finding.  And
25  number 2, it goes undiagnosed over and over again.  I know that

Page 48

1   personally from my practice and having the largest paper in the
2   world on removing mesh.
3   Q.   So this is a paper I assume you're familiar with.
4   This is the SGS, who did their systematic review and
5   metaanalysis on the various surgical options to treat
6   incontinence.  Are you familiar with this paper?
7   A.   It's been a while since I've read this.
8   Q.   I just have a couple questions.  Let's -- do you put
9   more weight into systematic reviews and metaanalysis than an
10  individual RCT?  I'll ask you -- this is where I'm going --
11  A.   Yeah.
12  Q.   I'm sure you've heard Doctors of the Oxford Levels
13  Evidence Pyramid.
14  A.   Yes.
15  Q.   Something you were probably taught in -- actually I
16  saw you did an undergrad in the sciences so you probably knew
17  about this even in your college sciences.
18  A.   Probably not.
19  Q.   Okay.  What number are we up to?
20  A.   This is 8.
21  Q.   Okay.  So this is the Oxford Levels of Evidence and
22  you see at the top they have systematic reviews.  Metaanalysis
23  has a  higher quality of evidence before individual RCTs and
24  things of that nature.
25       (Whereupon Exhibit Miklos 8 was marked for

Page 49

1       identification.)
2   A.   Yes.
3   Q.   Is that something you agree or disagree with?
4   A.   Generally, I agree with it.
5   Q.   Okay.
6   A.   I mean, I'm sure there's always exceptions to the
7   rules and you have to take in your own personal experiences and
8   your own education and knowledge but, generally, I agree with
9   it.  Generally.
10  Q.   Yeah.  For the application -- that's not the right
11  word.  Obviously, you're always going to bring into bear your
12  personal experience, knowledge, and training, correct?
13  A.   Yeah.  It's a little more complicated than that,
14  though, sometimes.  You can tell me laparoscopic
15  sacrocolpopexies are not efficient, but you haven't been in my
16  OR.  And that's not being arrogant, it's being honest.  And
17  people will look at me, and they'll say, just like the Neuman
18  study or something, well, your cure rates are a little higher
19  than most or your experience, you have less complications so I
20  can't fully -- but this is the general, I would say, with the
21  quality of evidence, I agree the metaanalysis sits at the top.
22  Q.   Individual opinion is anecdotal according to the
23  levels of evidence, true?
24  A.   Yes.
25  Q.   If you look at Table 1, it's got all the different

Page 50

1  RCTs included in this systematic review, and then if you go to
2  the last page of the table, just where they get to Mini-Slings,
3  do you see that?
4      A.  Yeah, let me just clarify that statement; an
5  individual's opinion is anecdotical.  No, wrong.  It all
6  depends on the amount of experience, knowledge, and expertise.
7  Perhaps you're the only person in the world who has any
8  experience, knowledge, and expertise in a certain subject.  So
9  my opinion is based on information of years, and sometimes it's
10 not just anecdotical.  It holds a lot of weight.  And that's
11 why companies like Gynecare, Barb, will pull us in to act as
12 consultants.  There's no metaanalysis.  That's all I'm saying.
13 I just don't want to put myself in a corner.
14     Q.  Yeah, I gotcha.  But for the scientific projection of
15 population-based treatment, what you can expect from surgeries,
16 systematic reviews and metaanalysis are at the top of the
17 pyramid --
18     A.  Yes.
19     Q.  -- because those are the ones you can most reliably
20 project out into a large population?
21     A.  Yes.
22     Q.  As opposed to, even great surgeons like yourself,
23 your own cohort series or personal experience with a technique
24 is deemed anecdotal for the projection out onto the masses
25 because they're not John Miklos.

Page 51

1      A.  Okay.  I agree with that, yes.
2      Q.  That's what I was getting at.
3      A.  We're on the same page.
4      Q.  So at the last part of Table 1, it's got all the
5  Mini-Slings --
6      A.  This is --
7      Q.  Yep.  We're on the same page.
8      A.  Okay.
9      Q.  Andrada is the first one I show.
10     A.  Yes.
11     Q.  And you see, it looks like virtually every Mini-Sling
12 study that made the criteria for the systematic review included
13 the TVT-Secur except for Oliveira, that used MINI ARC, correct?
14     A.  So the comparison is Secur versus the TVT-O most of
15 the time, yes.
16     Q.  Yeah.  And it's in every study except for Oliveira,
17 which used the MINI ARC?
18     A.  Yes.
19     Q.  And of all the Mini-Slings, I think we can agree that
20 TVT-Secur has been studied the most, correct?
21     A.  Yes.
22     Q.  So the rates of adverse events if you look at Table
23 3 --
24     A.  Okay.
25     Q.  Exposure has got Mini-Slings at two percent -- just

Page 52

1  that way we can look at it together.
2      A.  Oh, I'm sorry.
3      Q.  Did I look at the wrong one?
4      A.  Yes.
5      Q.  Actually, I remember you mentioned Hoda, Hinoul's
6  papers --
7      A.  Yes.
8      Q.  -- a bunch of papers on TVT-Secur with regard to
9  exposures.
10     A.  Yes.
11     Q.  This metaanalysis takes into account those studies,
12 correct?
13     A.  Hoda -- yes.
14     Q.  So the rate of exposure of two percent with the
15 Mini-Sling for which TVT-Secur is representative of every study
16 except for one, do you believe that's an accurate rate?
17     A.  I believe that's what they calculated here and, yeah,
18 that's what they calculated is that the Mini-Sling is
19 responsible for two percent.
20     Q.  Is that consistent or inconsistent with your overall
21 review of the literature?
22     A.  It's very difficult to say because when you -- again,
23 when I talk about this and we review various papers, they don't
24 even mention mesh extrusion.  Again, it wasn't a point, a
25 primary endpoint or a secondary endpoint in most papers.  There

Page 53

1  are some that are higher, there are some that are zero, so it's
2  across the board.  So I would look at this metaanalysis and
3  say, yeah, two percent is probably right based on what they've
4  told me here.  The problem is you're talking about one
5  complication in a product that is not efficacious.
6          Listen, if I have a sling and the cure rate is 5
7  percent and I have zero erosion rate, what good is the sling?
8  You have a procedure here that has a cure rate at 3 and 4 years
9  out and 5 years out of less than 68 percent, 65 percent, 55
10 percent.  Versus 5 years out going at 90 percent for other
11 slings.  Not only do you have a failure in a lack of efficacy,
12 but that lack of efficacy pushes these patients back into the
13 operating room.  So you can tell me that the erosion rate is
14 similar, that's nice.  But why even go to the operating room in
15 the first place?  Get the right sling.  Get the TVT, don't
16 waste your time on this.  I'm happy the erosion rate is roughly
17 the same, but I still wouldn't want the operation.  And most
18 patients wouldn't if they were given the choice.
19         MR. MATTHEWS:  Don't pause too long or I may go
20 to the bathroom.
21         MR. SNELL:  If you need to, we can take a quick
22 break.
23         (Whereupon a brief break was taken.)
24     Q.  (By Mr. Snell)  Just so I understand where you're
25 coming from in your opinion that TVT-Secur is defective, we can

Page 54

1  agree obviously that it wasn't defective in some surgeons
2  hands, true?
3      A.  No.  I won't agree to that.  Defective design entails
4  that you're not going to get -- defective design to me means
5  that your risk outweighs the benefit with the product that's in
6  your hands.  I personally used it on a cadaver and on the first
7  cadaver I used it on, I knew it was defective.  Number 1, the
8  razor blade, exactly what it is, the insertion tip, is
9  unprecedented.  I have been around in courses, in operating
10 rooms, and have used all other types -- many other types -- of
11 TVTs, TOTs,TVT-Os and they're all the same.  They're long,
12 narrow tubes that are cylindrical, cylindrical with a conical
13 tip usually.  Now all of a sudden, you have a new device that
14 has a razor blade on it and you're asked to make a 1 centimeter
15 incision and you're delivered this razor blade device that cuts
16 through tissue, including urethra potentially, bladder
17 potentially, and periurethral tissue.
18          Not only is it unprecedented and it destroys
19 tissue and increases -- we know with that type of trauma it's
20 going to increase scar tissue.  Now, the actual release of the
21 device, the releasing mechanism was horrendous and this is
22 documented in the internal documents.  It was said that day in
23 the operating room on the cadaver.  Vince Lucente agreed with
24 me.  He said, yeah, they need to redo it, but there's secrets
25 of doing it.  You gotta jiggle it.  If you jiggle it -- and we

Page 55

1  see this even -- Hinoul even says it.  Hinoul was their
2  employee and he's writing this stuff in his paper.  He's saying
3  well, yeah, it could dislodge.  Yeah, you jiggle it, you're
4  dislodging the insertion tip.
5      Q.  Right.
6      A.  That's the next problem, the insertion tip has never
7  been proven.  Then you have this polysorb which is vicryl -- is
8  poly-p-dioxanone, basically it's an absorbable material that
9  has never been utilized before in the pelvic floor.
10         And finally, the device itself, when you get
11 that device it was unlike any other device.  When you got a
12 TVT, they gave you everything you needed almost.  Everything
13 that you can use to apply the mesh.  This, you actually had to
14 attach a straight hemostat to it or a needle driver.
15     Q.  Needle driver.
16     A.  Which was ridiculous because people were actually --
17 you can't control the trajectory of where this needle tip is
18 going and then trying to get the release and insert and stay.
19 And then the last thing is because you're pushing it in, you're
20 not pulling it through like the TVT or TOT or the Abbrevo, you
21 have difficulty adjusting the tension because you're just
22 pushing.  How tight is tight?  So it's a completely defective
23 design.
24     Q.  So it's your opinion that it's defective because of
25 those attributes, but we can agree that even with those

Page 56

1  attributes to which you find objectionable or defective,
2  surgeons still can get good results with TVT-Secur as evidenced
3  by peer reviewed public literature you are aware of, correct?
4      A.  Absolutely.  You can kill a rabbit with a stone, too,
5  but not too many people can do it.
6          I mean, the bottom line is when you produce a
7  product, you need a product that is reproducible -- gives you
8  reproducible efficacious results with minimal morbidity that
9  you can put in your surgeons' hands.  Here we see a product
10 that was not -- they couldn't reproduce the results.  So
11 there's some people that can do it, but this is not to the
12 benefit of the patient.  If we go and look at J & J's credo,
13 which I haven't looked at in a while, patient care and the
14 responsibility to the patient is first and foremost.  This
15 is -- I've got to be honest with you, honestly, if this is your
16 mom, you wouldn't give her a TVT-Secur.  You would not.
17     Q.  So you're aware that they received complaints from
18 some surgeons on Secur and they did various investigations and
19 did -- came out with key technical points on TVT-Secur?
20     A.  Yes.  They received some complaints from some
21 surgeons, yes.
22     Q.  I mean it's in the Quality Board minutes that you've
23 looked at and that I've looked at, correct?
24     A.  The problem is -- here's what's amazing to me:  I
25 never knew -- I was a leader for TVT, I never knew there was a

Page 57

1  place I could complain to in the United States.  I used
2  TVT-Secur, nobody ever took my complaints.  So why is it that
3  only some people got to complain and I never got to complain?
4      Q.  Are you telling me you weren't aware that you could
5  make complaints to Ethicon or the FDA under the Maude Database
6  for untoward outcomes you deemed to be potentially from a
7  device?
8      A.  I did not know, and I was a preceptor for Gynecare,
9  that you could actually make a complaint -- I mean, I knew I
10 could complain to the rep or the next time I saw him at a
11 meeting, but I didn't know that you actually wrote it out and
12 logged it out.  I swear to God, I didn't know.  It blows my
13 mind because if I'm a leader in their field at the time TVT and
14 potentially TVT-Secur -- if I would have liked the product, if
15 I would have believed in it and I had good success, I would
16 have been a preceptor for it.  I never knew that I could
17 complain.  I just quit -- stopped using it at that point.
18     Q.  You saw that they came out with these key technical
19 points to try to make sure surgeons were using the correct
20 pathways, using the correct insertion techniques, dealing with
21 fixation and proper removal --
22     A.  Yeah, I've seen this --
23     Q.  -- without having the device back back out on you?
24     A.  Yeah.  I never understood when this was produced
25 because I never saw a copy of this, so --

Page 58

1  Q. This was produced in 2007. You're familiar with the
2  TVT-Secur DVD-ROMs that used to be out?
3  A. Yes.
4  Q. It starts with the presentation of the hand and
5  there's a Secur in it and there's the IFU, hammock video, U
6  video. There's various different files and animations that one
7  could see and this was one of the files for both the U and the
8  hammock approach. I'll represent to you, this was in the DVD I
9  pulled down the other night from May 2007.
10  A. Okay.
11  Q. Honest.
12  A. I believe you.
13  Q. It was cleared and approved by, internally, in I
14  think March -- late March of 2007. That's another
15  representation I'll make to you.
16  A. Okay.
17      MR. MATTHEWS: By Ethicon?
18      MR. SNELL: By Ethicon, exactly. A copy review
19  is what that --
20      MR. MATTHEWS: When you start throwing words
21  around like cleared and approved --
22      MR. SNELL: Right.
23      MR. MATTHEWS: -- you know my antenna goes up.
24      MR. SNELL: That's fine.
25  A. What I don't understand --

Page 59

1  Q. (By Mr. Snell) Well, my question is, have you
2  reviewed this document forming your opinions?
3  A. No, I haven't. If I have, I don't recall it, and I
4  started reviewing the documents back in October, a lot of this
5  stuff. So, is there a specific area? I just don't remember
6  this specifically.
7  Q. Okay. I was going to ask you about it if you had
8  reviewed it but if you haven't, then I'm not going to waste
9  your time because we've only got a couple more minutes.
10  A. Okay.
11  Q. How about this: Hypothetically, if Ethicon put this
12  out to surgeons, key technical points trying to help them
13  understand proper placement, fixation, you know, withdrawal of
14  the device so it doesn't back out and get loose, was that
15  something you would approve of as being a good step towards
16  mitigating a problem that they've seen?
17  A. I think it's the first step. But if this was so darn
18  important, why didn't they change your IFU? You have Dave
19  Robbins saying the most important part of this surgical
20  technique is that everybody should adhere to the IFU. He makes
21  that statement in the internal documents. And then you have
22  Ramy Mahmoud who sits there and says, who's the ex-CMO of
23  Ethicon, he's sitting there saying the same thing, the training
24  is so important. And Mark Gill saying the same thing, that
25  we're having problems with our training. If it were so

Page 60

1  important, they should have retrained everybody. But we saw
2  that they didn't retrain people because there was cost
3  constraints.
4      If they really believed in patient care, and if
5  they really believed in the quality of surgery for the
6  patient -- I still can't get why Vince Lucente, here's your
7  leader in the world and he can't get these great cure rates.
8  And he came up with all different ideas. Where's his malleable
9  device? I remember him talking to me about this at the SGS
10  meeting, he goes well you gotta put a malleable. I said
11  where's this in IFU? Where's the literature -- where is it
12  from the company saying we should use the malleable device?
13  Well, it's my trick and technique. If it was so important,
14  then why wasn't it general common knowledge.
15      Listen, when there's a bad drug on the market,
16  I get a letter in the mail. I don't even use these drugs and I
17  get letters in the mail. I never remember getting anything
18  that told me how from a mailer and I saw nothing in internal
19  review because I was very interested, did Gynecare ever send
20  out to their surgeons or all surgeons this change of technique.
21  Q. So based on the investigation you did -- I want to
22  make sure I understand this. It's your understanding that
23  Ethicon did not invest in retraining surgeons after these
24  issues arose with regard to TVT and its efficacy or the device
25  backing out?

Page 61

1  A. There were minor issues where they would -- they sent
2  to the engineer like -- I mean if it was a major issue, they
3  wanted to send Dan Smith, the engineer that actually produced
4  TVT-Secur, they sent him to Germany to train the doctors, which
5  is sort of inappropriate. You're an engineer, you don't really
6  do the surgery on live patients, and you better not be. Then
7  they offered to send him to Australia, which was nice of them,
8  but by then they'd already taken it off of the regulatory list,
9  they put a block on it. So I don't ever remember anybody ever
10  coming back to me and saying hey, let's retrain you and let's
11  show you how it's done. One cadaver lab and boom, you're on
12  your way. I never even got to go to somebody's operating room.
13  Q. Did anyone ever turn you down for training at Ethicon
14  or did you ask for training and they wouldn't allow you to do
15  it?
16  A. No, because I didn't know at the time that this
17  existed.
18  Q. Oh, no. I'm saying was there ever an occasion where
19  you wanted to be retrained on something and you expressed that
20  to someone at Ethicon and they said no?
21  A. No, because that's the 28 cases -- when I get an 80
22  percent cure rate, and Vince, the leader in the world, gets a
23  69 percent, I can't possibly believe that you guys -- he's the
24  leader, he's the man. He taught Australia. I mean, the only
25  person above him would have been Carl Gustav from Finland and

Page 62

1 maybe Artibani from Verona, Italy. That would have been it.
2 And if he can't get it down right, why should I even -- let me
3 go back to what's true and tried. At that point, ten years of
4 TVT that was known to be effective and safe in most doctor's
5 hands.
6    Q. You mentioned urethral and bladder perforation with
7 TVT-Secur. Are there any studies or data that you're aware of
8 that show a statistically significant increased risk of those
9 complications with Secur?
10   A. Maybe I misunderstood when I read but, again, it
11 would have been the Masada study.
12   Q. Okay.
13   A. Again, mostly it was the prospect of the metaanalysis
14 done by Jeffries that says there's increased risk.
15   Q. Okay. You are aware that there are level 1 studies
16 that don't show a significant increased risk for TVT-Secur on
17 those complications?
18   A. Absolutely.
19   Q. Have you done an evaluation to see whether the
20 majority of studies show no difference or the majority of
21 studies do show a significant difference?
22       MR. MATTHEWS: Which complications?
23       MR. SNELL: The urethral and bladder perforation
24 injury.
25   A. The problem with doing a study of this nature is it's

Page 63

1 almost impossible because overall, the injury rates are so low.
2    Q. (By Mr. Snell) Right.
3    A. But what they were able to do was do comparison
4 against TVT-O and say there's a preponderance of the evidence
5 that shows there's a greater risk with TVT-Secur of injuring
6 the urethra and the bladder, but I doubt there was the power
7 analysis there.
8    Q. Okay. Do you rely on statistical significance to
9 inform you on what are real scientific findings as opposed to
10 something that may be a trend or hypothesis generated?
11   A. I use statistical significance, I use biostatistics,
12 I use my expertise, my knowledge, my own training, and my own
13 awareness of what I've been exposed to in this world. And I
14 also taught the individuals who have more experience than
15 myself, so it's a combination of a lot of things. But I
16 certainly use statistics, too.
17   Q. Does TVT-Secur, in your opinion, have a significantly
18 higher risk of urinary retention? And if so, what's the data
19 that supports that?
20   A. No. I don't believe it has a higher rate of urethral
21 obstruction and high urinary retention.
22   Q. You mentioned because of the cutting blade, and the
23 fact that you're going to have a little more scar tissue than
24 the scar tissue that will be formed with TVT, correct?
25   A. Yes.

Page 64

1    Q. So that scar tissue that would form after the
2 TVT-Secur, has that translated into a complication that has
3 been reflected in the reliable scientific literature to be
4 higher than whatever comparative you want to compare it to?
5    A. Well, the problem is we can't -- here's what we do
6 know: If you create more trauma, you have increased
7 inflammation. Increased inflammation can actually cause
8 problems with the lodging of the mesh. So, therefore, you're
9 reducing the chance of cure rates. Reducing the chance of cure
10 rate, you're predisposing this individual to an increased
11 chance of another surgical procedure. I think I did mention
12 about the device, too, that nobody has ever tested at that
13 point an 8 centimeter piece of mesh going from sidewall to
14 sidewall into a point of lodging or stabilization with
15 polysorb. So that in and of itself has never been studied.
16   Q. Did you have a problem, though, with MINI ARC that
17 went 8.5 centimeters and lodged into the muscle with the barb?
18   A. No, but I do believe that MINI ARC can potentially
19 have its problems, too. That's why we continue to investigate.
20 I've taken out a fair number of MINI ARC for pain, too.
21   Q. I know you were involved in one of the early cohort
22 studies on MINI ARC, you and Dr. Moore published in 2008 or
23 2009 --
24   A. Yes. Our primary endpoint was -- this is the way
25 most studies are -- when you first start off with a new study,

Page 65

1 we sort of gloss over complications unless they're
2 intraoperatively because you don't have the time to explore it
3 yet. The primary endpoint is usually intraoperative
4 complications, blood loss, damage, and then objective or
5 subjective cure rate 6 weeks, 6 months, a year out. Hopefully
6 a year out.
7    Q. Right.
8    A. So I think the problem with a lot of these
9 complications -- I've had women that were my patients with
10 certain types of products that are coming back 5 and 6 years
11 later with complications of pain.
12   Q. You've seen in some of the reliable randomized trials
13 that MINI ARC is not as effective as the TVT or the TVT-O?
14   A. Yes, but most of them don't have any long-term follow
15 up.
16   Q. Right. Any other complication you believe has a
17 statistically significant increase risk or rate for TVT-Secur
18 other than the ones we've talked about? I've got a list, you
19 know, fistulas, de novo urge, but if there's none that you're
20 aware of, then I don't need to waste time.
21   A. Not other than what's on my list.
22       THE WITNESS: It's 12:25.
23       MR. SNELL: I know you've got to roll. All
24 right. Thank you.
25       (Deposition concluded at 12:25 p.m.)

Page 66

1  (Pursuant to Rule 30(e) of the Federal Rules
2  Of Civil Procedure and/or O.C.G.A. 9-11-30(e),
3  Signature of the witness has been reserved.)

Page 67

1  STATE OF GEORGIA:
2  COUNTY OF GWINNETT:
3
4      I hereby certify that the foregoing transcript was
5  reported, as stated in the caption, and the questions and
6  answers thereto were reduced to typewriting under my direction;
7  that the foregoing pages represent a true, complete and correct
8  transcript of the evidence given upon said hearing, and I
9  further certify that I am not of kin or counsel to the parties
10 in the case; am not in the employ of counsel for any of said
11 parties; nor am I in any way interested in the result of said
12 case.
13
14           _____
              Heather Brown, RPR
15           CCR 4756-4284-5258-1376

Page 68

1               DISCLOSURE OF NO CONTRACT
2
3      I, Heather N. Brown, Certified Court Reporter, do hereby
4  disclose, pursuant to Article 10.B. of the Rules and
5  Regulations of the Board of Court Reporting of the Judicial
6  Council of Georgia, that I am a Georgia Certified Court
7  Reporter; I was contacted by the party taking the deposition to
8  provide court reporting services for this deposition; I will
9  not be taking this deposition under any contract that is
10 prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of
11 the Rules and Regulations of the Board; and I am not
12 disqualified for a relationship of interest under O.C.G.A.
13 9-11-28(c).
14
15     There is no contract to provide reporting services between
16 myself or any person with whom I have a principal and agency
17 relationship nor any attorney at law in this action, party to
18 this action, party having a financial interest in this action,
19 or agent for an attorney at law in this action, party to this
20 action, or party having a financial interest in this action.
21 Any and all financial arrangements beyond my usual and
22 customary rates have been disclosed and offered to all parties.

Page 69

1         - - - - - -
              E R R A T A
2         - - - - - -
3
4  PAGE  LINE  CHANGE
5  ____  ____  _____
6       REASON: _____
7  ____  ____  _____
8       REASON: _____
9  ____  ____  _____
10      REASON: _____
11 ____  ____  _____
12      REASON: _____
13 ____  ____  _____
14      REASON: _____
15 ____  ____  _____
16      REASON: _____
17 ____  ____  _____
18      REASON: _____
19 ____  ____  _____
20      REASON: _____
21 ____  ____  _____
22      REASON: _____
23 ____  ____  _____
24      REASON: _____

Page 70

1
2        ACKNOWLEDGMENT OF DEPONENT
3
4        I,_____, do
5   hereby certify that I have read the
6   foregoing pages, and that the same is
7   a correct transcription of the answers
8   given by me to the questions therein
9   propounded, except for the corrections or
10  changes in form or substance, if any,
11  noted in the attached Errata Sheet.
12
13
14  _____
15   JOHN R. MIKLOS, MD          DATE
16
17
18  Subscribed and sworn
    to before me this
19  _____ day of _____, 20____.
20  My commission expires:_____
21
    _____
22  Notary Public
23
24
25

Page 71

1        LAWYER'S NOTES
2   PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25  ____  ____  _____