# EXHIBIT 1

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

DEBORAH A. BARBA and
THOMAS D. BARBA, her husband,

      Plaintiffs,

v.                         C.A. No. N11C-08-050 MMJ

BOSTON SCIENTIFIC CORPORATION,
a Delaware Corporation,

      Defendant.


BEFORE:  HONORABLE MARY M. JOHNSTON, J. AND JURY

APPEARANCES:

           PHILIP T. EDWARDS, ESQ.
           Murphy & Landon
             and
           FRED THOMPSON, III, ESQ.
           FIDELMA L. FITZPATRICK, ESQ.
           BREANNE V. COPE, ESQ.
           Motley Rice LLC
             for the Plaintiffs

           COLLEEN SHIELDS, ESQ.
           Eckert, Seamans, Cherin & Mellott, LLC
             and
           MATTHEW D. KEENAN, ESQ.
           Shook, Hardy & Bacon LLP
             for the Defendant


               TRIAL TRANSCRIPT
                May 18, 2015

            DOMENIC M. VERECHIA, RPR
         SUPERIOR COURT OFFICIAL REPORTERS
      500 N. King Street, Suite 2609, 2nd Floor
         Wilmington, Delaware  19801-3725
             (302) 255-0710

```
1                                    May 18, 2015
                                     Courtroom No. 8C
2                                    9:30  a.m.

3       PRESENT:

4              As noted.

5                          - - - - -

6

7                          - - - - -

8

9              THE COURT:  I received the two motions in

10      limine and the two responses and I have reviewed them

11      and I have a few questions.

12             And I guess since this is Boston Scientific's

13      motion.  I'll hear from them first.

14             MR. KEENAN:  Thank you, Your Honor I will be

15      brief since the Court has -- and we filed these because

16      we thought it would avoid sidebars and get some clarity

17      before we begin.  We now have the luxury of having the

18      case larger than submitted by plaintiffs so we know what

19      evidence the jury has heard and has not and will not

20      hear.  As the Court certainly aware, there's been a lot

21      of discussion about the label of DFU, Dr. Galloway

22      talked about it.  The law requires proximate cause and

23      the nexus with the prescriber to whom the directions for
```

-02:-04:-35 1     use are directed, and Dr. Carlson was not shown the DFU,
-02:-04:-30 2     did not comment on it, did not say that it was
-02:-04:-27 3     inadequate, and did not say it was adequate for that
-02:-04:-23 4     matter, but its plaintiff's burden.  They've lost that
-02:-04:-20 5     nexus with the directions for use in this case.
-02:-04:-18 6          Because the law is clear that unless and until
-02:-04:-13 7     he has read reviewed and prepared to comment on it in a
-02:-04:-08 8     negative way adverse to the defendants, there's no
-02:-04:-06 9     evidence that it's inadequate in this case.  There's no
-02:-04:-03 10    nexus to this case.
-02:-04:-01 11         THE COURT:  Even though he was not provided, or
-02:-03:-59 12    he didn't review that particular document, wasn't there
-02:-03:-55 13    testimony that he said if he had had certain information
-02:-03:-51 14    he would have considered it?
-02:-03:-49 15         MR. KEENAN:  You anticipated my next point and
-02:-03:-46 16    I've got to transcript right here with the Court's
-02:-03:-43 17    permission I'll show it to the Court.
-02:-03:-41 18         THE COURT:  Yes.
-02:-03:-34 19         (Pause.)
-02:-03:-31 20         MR. KEENAN:  On page 28, Your Honor, it begins
-02:-03:-14 21    on 27, is a series of questions about would you have
-02:-03:-07 22    known, or would this had made a difference.  And these
-02:-03:-05 23    are questions that do put into evidence certain issues

-02:-03:00 1    that are separate and apart from the directions for use.

-02:-02:-57 2    And these are in the case, and we're -- we will deal

-02:-02:-52 3    with these throughout the case, but these are different

-02:-02:-49 4    than the directions for use.  He's talking about, in

-02:-02:-46 5    particular, rates of complication, expected complication

-02:-02:-42 6    would you have -- he says would you have used that

-02:-02:-37 7    information to make further inquiry and the safety and

-02:-02:-33 8    efficacy of the Pinnacle.  He says yes.  Did Dr. Lee

-02:-02:-29 9    ever advise you that there were higher than expected

-02:-02:-25 10   incident rates with Pinnacle products?  Not that I

-02:-02:-23 11   remember.  He asked about the FDA, PHN, doesn't recall.

-02:-02:-19 12       He says if you had that information would have

-02:-02:-16 13   incorporated it?  Yes.  He doesn't ask would it have

-02:-02:-12 14   changed your prescribing decision, would it made a

-02:-02:-10 15   material difference in how approach this case had you

-02:-02:-05 16   had that information, would you have not used the

-02:-02:-03 17   Pinnacle?  Those questions weren't asked.

-02:-02:-01 18       I'm not here to argue whether or not they made

-02:-01:-58 19   a threshold on those questions.  The point I went to

-02:-01:-55 20   make Your Honor, if they raised issues on those topics

-02:-01:-50 21   they have not raised an issue of for directions for use

-02:-01:-46 22   and that is a essential part of the plaintiff's case at

-02:-01:-44 23   this point, and in absence of that nexus they should not

-02:-01:-41
-02:-01:-38
-02:-01:-34
-02:-01:-30
-02:-01:-27
-02:-01:-22
-02:-01:-18
-02:-01:-15
-02:-01:-12
-02:-01:-10
-02:-01:-07
-02:-01:-03
-02:-01:-01
-02:00:-58
-02:00:-55
-02:00:-52
-02:00:-49
-02:00:-45
-02:00:-43
-02:00:-40
-02:00:-36
-02:00:-32
-02:00:-29

1    allow Dr. Parisian to comment on the directions for use

2    because they can't make the case the directions for use

3    played any role in prescribing decisions of Dr. Carlson.

4         I want to raise another issue they've raised

5    with regard to this is the training.  Their reply belief

6    and now their effort to identify some deposition

7    transcripts of training with Carlson with a doctor would

8    helped train and him and sales represent that helped in

9    training.  Training is out.  There is multiple

10   admissions on the record that there's no claim

11   Dr. Carlson was improperly trained.  So that's not a

12   consideration for the Court.

13        If what they want to say and prove is that

14   something was said for training that was false that

15   something was said at the training that was misleading,

16   that Dr. Carlson was handed something that said zero

17   complication rates of the Pinnacle, it's safe, and we

18   have clinical trials, then they need to make that

19   showing.  They need to make a showing of something, a

20   statement that was false, it was material, that would

21   have impacted his course of conduct had it turned out to

22   be false.  We don't have anything from the training.

23        What we have is what I've shown you.  And

-02:00:-26 1    there's nothing specific from Boston Scientific relative

-02:00:-22 2    to training.  There's no specific statement that Boston

-02:00:-19 3    Scientific made to him that they've been able to prove

-02:00:-14 4    as false and would have changed his conduct.

-02:00:-12 5         So I am not -- don't intend to raise broader

-02:00:-07 6    issues here about what Dr. Carlson would or would not

-02:00:-02 7    have done with regard to any issues other than

-01:-59:-59 8   directions for use and training.  They haven't made that

-01:-59:-56 9   burden.  That door is now closed.  So Dr. Parisian

-01:-59:-52 10  should not be allowed to offer opinions on training or

-01:-59:-48 11  the DFU because the requisite foundation hasn't been

-01:-59:-44 12  shown.

-01:-59:-44 13        THE COURT:  Now, I want to see if I understand

-01:-59:-41 14  you.  So you are not objecting to Dr. Parisian

-01:-59:-20 15  testifying that there should have been a warning about

-01:-59:-17 16  the difficulty or impossibility of removal.

-01:-59:-13 17        MR. KEENAN:  No, I'm objecting to that because

-01:-59:-10 18  that would be in the DFU.

-01:-59:-08 19        THE COURT:  So what is left of her testimony

-01:-58:-52 20  based on your motions?

-01:-58:-51 21        MR. KEENAN:  A lot.  She's going to talk about,

-01:-58:-48 22  I don't know exactly, I'm sure she'll talk about the

-01:-58:-45 23  clearance process.  She'll educate the jury about

1    regulatory framework, how it doesn't equate with safety

2    some of those issues.  There's still an abundance of

3    things I expect she's going to comment on.  She's going

4    to comment on the field assessment that represents those

5    complaints that Mr. Thompson asked Dr. Carlson about.

6    So there's still an abundance of opinions that she has.

7    She has a very, very long report, and if the Court is

8    concerned we're going to be gutting substantial parts of

9    her opinions, I don't think that's the case at all.

10        The DFU, you know, Your Honor we had a sidebar

11    during Dr. Galloway's testimony which counsel wanted to

12    use the MSDS with him.  They can't use those things

13    because they didn't show it with Dr. Carlson.  They

14    didn't show him the MSDS, they didn't ask is this

15    something you should have know, those kinds of opinions

16    were not solicited.  There's no nexus, no fit for this

17    case now for those issues, for Dr. Parisian be allowed

18    to talk about first of all prejudicial us, it's going to

19    also mislead the jury because they haven't made the

20    burden to show them that they will need to do.

21        THE COURT:  What if she opines that a

22    reasonable physician would have these things and that be

23    that's the appropriate standard?

-01:-57:-19  1          MR. KEENAN:  That's not in her designation.

-01:-57:-17  2   She doesn't -- she's not offered any opinions about

-01:-57:-14  3   Dr. Carlson, physician care and treatment.  She only

-01:-57:-10  4   talks about the company, the company, what companies

-01:-57:-06  5   should do, not physicians what physicians should do.

-01:-57:-03  6   Besides that it would be -- that would be -- that

-01:-57:00  7   couldn't be relevant testimony when they've already

-01:-56:-55  8   heard from Carlson and he didn't offer those opinions.

-01:-56:-53  9          THE COURT:  Can't you testify if it is the case

-01:-56:-51 10   that the FDA, and federal regulations and the standards

-01:-56:-46 11   underlying those regulations require that certain

-01:-56:-43 12   information be placed in the DFU?

-01:-56:-39 13          MR. KEENAN:  Yes.  Yes.  For example, the mesh

-01:-56:-32 14   surgical guides document is what we have affirmatively

-01:-56:-28 15   put into evidence that that is standard, what should be

-01:-56:-25 16   in the directions for use.  So that would certainly be

-01:-56:-23 17   appropriate, yes.  But she does not say anywhere in her

-01:-56:-19 18   report that the MSDS should have been in the DFU.

-01:-56:-15 19   That's not an opinion she's ever had.

-01:-56:-12 20          THE COURT:  So you are not -- the purposes of

-01:-56:-10 21   this motion you are not objecting to Dr. Parisian saying

-01:-56:-07 22   that information on removal and rates of occurrence and

-01:-55:-59 23   permanency should have been in the MSDS?

-01:-55:-52 1          MR. KEENAN:  You mean the DFU?

-01:-55:-49 2          THE COURT:  Yes.

-01:-55:-48 3          MR. KEENAN:  No, because all those bear on

-01:-55:-46 4    directions for uses.  Those are all directions for use

-01:-55:-42 5    opinions.  And Dr. Carlson did not testify that that

-01:-55:-40 6    information was missing, or if he would liked to have

-01:-55:-36 7    known that.  In fact, to the contrary Dr. Carlson said

-01:-55:-34 8    he understood and knew that removal of mesh can be

-01:-55:-31 9    difficulty and it's difficult to get all of it.  So just

-01:-55:-28 10   the opposite.  The directions for use, I submit

-01:-55:-25 11   respectfully is a very clean shot for this Court because

-01:-55:-21 12   of what the evidence is to this point.  If Dr. Parisian

-01:-55:-18 13   was testifying before we heard Carlson it would be a

-01:-55:-15 14   different matter.  Now that Carlson has testified and

-01:-55:-13 15   this foundation wasn't laid, it's wholly inappropriate

-01:-55:-07 16   for Dr. Parisian to talk about a document that Carlson

-01:-55:-03 17   testified he reviewed, read, relied upon, was misled by.

-01:-54:-59 18          And that that adversely effected how he cared

-01:-54:-55 19   for Ms. Barba.  Those are very -- the instructions the

-01:-54:-50 20   Court will give to the jury we're going to talk about

-01:-54:-47 21   cause, that the negligence of Boston Scientific must

-01:-54:-45 22   cause injury, and the cause component is now missing

-01:-54:-41 23   from this case on the directions for use.

-01:-54:-39 1   THE COURT:  What about the clinical testing

-01:-54:-35 2 motion?

-01:-54:-34 3   MR. KEENAN:  That, respectfully, is a little

-01:-54:-32 4 bit more nuanced, because I don't think it's necessarily

-01:-54:-25 5 white and black.  I would just simply go back to what

-01:-54:-22 6 the Court has commented and opined on in previous

-01:-54:-18 7 hearings here, that there has to be a foundation laid

-01:-54:-15 8 for a duty to perform these clinical trials.  And we're

-01:-54:-13 9 talking about a device that's rated by federal law.  I

-01:-54:-08 10 believe Dr. Parisian needs to point to a rule, a

-01:-54:-06 11 regulation, or a guidance document that would obligate

-01:-54:-01 12 Boston Scientific to conduct clinical trials.

-01:-53:-58 13   Her own opinion about what she thinks we should

-01:-53:-55 14 do is not, in itself, admissible and I think that's

-01:-53:-51 15 particularly when we're talking about federally

-01:-53:-46 16 regulated device here.  If she wants to point to a rule

-01:-53:-43 17 or regulation something that gives her a platform to

-01:-53:-40 18 express that opinion, that's different.  Simply, this is

-01:-53:-37 19 what I think they should do is not sufficient basis for

-01:-53:-32 20 her to express that opinion.

-01:-53:-30 21   THE COURT:  All right.  I'd like to address

-01:-53:-28 22 that second issue first.  I had interpreted Boston

-01:-53:-21 23 Scientific's argument with regard to clinical testing as

being a foundational argument.  Is there going to be a
foundation laid?

MR. THOMPSON:  Yes, Your Honor.  Judge, we're
going to go through the 510k process as set out, we are
going to show the methods by which Boston Scientific
tries to show substantial similarity, tries to show the
predicate device, tries to show that there are no new,
or novel technological instances.  There's actually a
flow chart in the 510k that shows it, it goes yes, yes,
yes, that's what they did.

However, when there is a new or novel use, the
chart makes a left turn and goes over and it invokes and
requires heightened scrutiny, and that heightened
scrutiny can involve, under the statutes and
regulations, it's not simply a common law duty, although
we assert that it is an obligation of a reasonable
medical device manufacturer, but Dr. Parisian is going
to talk in terms of a requirement by the examiner to
require additional data, which can involve additional
testing and clinical trials.

As a matter of fact, here again, we look behind
the curtain, we know that's exactly what they did do in
this case.  That they did require 522 clinical trials in

order to keep these devices on the market.  So that's within the federal regulatory scheme, and we think that Dr. Parisian is perfectly within the realm of reliable information to make those statements to the jury.  So that's our position.

THE COURT:  What about the foundation with regard to the labeling issue that Dr. Carlson was not --

MR. THOMPSON:  Judge, I'm going to fight this more than I should, because, in fact, this is a precursor to the directed verdict motion on the issue of failure to warn.  So I treat this very seriously.  It doesn't break Dr. Parisian's back not to testify on these particular issues, but the record with Dr. Carlson is not quite what Mr. Keenan says.  If I read -- and we've actually cited to the Court three occasions in which Dr. Carlson alluded to information which was not known to him, but if he had known it, he would have taken it into consideration, and he would have altered his decision making with regard to application of the Pinnacle and the Advantage mesh.

THE COURT:  That is of what at rate of occurrence and the permanency issues?  I don't recall him testifying that it would have made any difference

1    with regard to removal.  And this is just my

2    recollection of his testimony was that he knew that

3    complete removal would probably not be possible.

4            MR. THOMPSON:  My memory was that he said he

5    knew about problems, difficulty of removal.  However,

6    that is inextricably twined with the rate.  If it's a

7    you one in one thousand chance of removal and it's

8    difficult to remove, that's one thing.  If the rate is

9    30 percent, if you remember that was testimony that was

10   out there that was not brought in before the Court, but

11   if the rate is 30 percent, that rate coupled with the

12   difficulty of removal because a true reason not to do

13   the surgery.

14           What we did, there's a straw horse aspect to

15   Mr. Keenan's aspect.  And that is, he's saying that the

16   law requires me to stand up here hand him the DFU and go

17   through item by item by item, and if I happen to miss

18   one item, well, I've waived that item.  I don't believe

19   that that's the case.  I think that where we have

20   confronted Dr. Carlson with instances of information

21   that would have changed his decision making, changed his

22   advice to Ms. Barba, that that is a broad enough

23   assertion by the doctor that we can continue and we

-01:-48:-55 1    canning assert our failure to warn.

-01:-48:-53 2         There are two other instances in this

-01:-48:-50 3    Dr. Carlson testimony.  One of which was the elicited by

-01:-48:-42 4    Ms. Shields on cross-examination, she asked if you had

-01:-48:-40 5    known that the Capio device had a high rate of failure,

-01:-48:-36 6    would that have impacted your thought process.  He said

-01:-48:-31 7    well, I wouldn't have used a Capio then.  Which, of

-01:-48:-28 8    course, that's the key ingredient to a Pinnacle kit.

-01:-48:-24 9         The third allusion to it is with regard to

-01:-48:-21 10   Advantage and the TVT and the difference in stiffness.

-01:-48:-17 11   That was elicited directly of Dr. Carlson that he did

-01:-48:-12 12   not -- he was, as a matter of fact, he thought the two

-01:-48:-10 13   were identical.  He was unaware of the stiffness and he

-01:-48:-07 14   alluded that if that he would have had to take that into

-01:-48:-03 15   consideration.  We believe that on three instances

-01:-48:00 16   Dr. Carlson said if I had had information that was not

-01:-47:-56 17   available to me, I would have considered it.  And we

-01:-47:-53 18   think that that's plenty enough to allow the failure to

-01:-47:-49 19   warn claim to go forward.

-01:-47:-42 20        You know, like I say, my obligation was to put

-01:-47:-42 21   that DFU in front of Carlson and go down line by line at

-01:-47:-38 22   the risk of waiving each bullet point, then we didn't do

-01:-47:-32 23   that.  But I don't believe we're required to do that for

-01:-47:-28 1    our failure to warn.  And I think that the warning label

-01:-47:-25 2    needs to be adequate in order to invoke intermediary and

-01:-47:-18 3    I think we're entitled to put in evidence that the

-01:-47:-16 4    warning label is not adequate.

-01:-47:-14 5            THE COURT:  What about the training issue?

-01:-47:-12 6            MR. THOMPSON:  I should have thought of that.

-01:-47:-09 7    He, in his testimony, alludes to sources of information

-01:-47:-02 8    that he would like to have or not have.  He alludes, he

-01:-46:-58 9    says I don't recall if Mr. Lee would be the source.  I

-01:-46:-55 10   don't recall if the training course would be the source

-01:-46:-52 11   of his information about the safety and efficacy of the

-01:-46:-48 12   product.  But he's identifying that he did look to

-01:-46:-43 13   various sources that originated with Boston Scientific.

-01:-46:-39 14   The training is not that the he was properly trained.

-01:-46:-36 15   The training is that at the training course, an integral

-01:-46:-32 16   part of the training is the DFU.  An integral part is

-01:-46:-28 17   the submission, you know, if these doctors were telling

-01:-46:-23 18   the truth, the training course is probably the only time

-01:-46:-21 19   that they actually are instructed on the DFU itself.

-01:-46:-17 20           And that is in this record that he looked to,

-01:-46:-13 21   without distinction, possibly Mr. Lee's information,

-01:-46:-08 22   possibly the information he gained at the training

-01:-46:-06 23   course.  Those are sources of information about the risk

-01:-46:-01 1    and the adequacies of the warning.  And we think that

-01:-45:-58 2    all of that is certainly a basis for Dr. Parisian, in

-01:-45:-52 3    the first instance, to address it.  And in the second

-01:-45:-49 4    instance, for us to put that to the jury as a failure to

-01:-45:-45 5    warn count.  So thank you, Your Honor.

-01:-45:-39 6        MR. KEENAN:  Three brief points, Your Honor.

-01:-45:-36 7    Last week, two weeks ago, we will not claim he was

-01:-45:-30 8    inadequately trained.  As a matter of fact, we will

-01:-45:-27 9    stipulate that Dr. Carlson was quail trained.  So if he

-01:-45:-24 10   was adequately trained, I'm a little confused how

-01:-45:-20 11   counsel will be able to see that he was told something

-01:-45:-17 12   that was misleading at the training, that somehow

-01:-45:-14 13   impacted Ms. Barba's care.

-01:-45:-12 14       Second point, the transcript is very clear

-01:-45:-10 15   about what testimony Dr. Carlson did or didn't give.

-01:-45:-07 16   The complication rate is fair game, and we will fight

-01:-45:-04 17   that.  It was asked.  I don't think he gave an answer

-01:-45:-01 18   that was totally keep it in play, he didn't say it would

-01:-44:-57 19   have changed my behavior.  He said I would investigated

-01:-44:-54 20   more and had there been a follow-up question, had he

-01:-44:-51 21   investigated more an found it was an unacceptable risk

-01:-44:-48 22   benefit, would you have then stopped using it?  That's

-01:-44:-45 23   the question that's not asked.

-01:-44:-44 1    But the transcript of Carlson is very clear and

-01:-44:-40 2    I think it gives the Court great guidance about whether

-01:-44:-35 3    or not directions for use has been raised and put in as

-01:-44:-32 4    a foundation for Dr. Parisian's opinions.

-01:-44:-30 5        THE COURT:  If it weren't in the directions for

-01:-44:-27 6    use, how else could Dr. Carlson received the information

-01:-44:-22 7    about complication rates?

-01:-44:-17 8        MR. KEENAN:  Dr. Carlson could have engaged

-01:-44:-14 9    Boston Scientific.  He could have affirmatively asked

-01:-44:-11 10   what the field assessment reflected.  Simple truth is

-01:-44:-06 11   here, you'll hear it from regulatory complaint

-01:-44:-03 12   information any company has is not something that can be

-01:-44:00 13    shared with clinicians, it's highly unreliable and very

-01:-43:-51 14   misleading.  Because generally companies will only share

-01:-43:-51 15   those when they think it's very favorable.

-01:-43:-50 16       If the argument is he should have gotten it, or

-01:-43:-47 17   received it in the some other way like John Lee the

-01:-43:-44 18   sales rep should have told him that, we can fight that.

-01:-43:-40 19   That's a different issues entirely different issues than

-01:-43:-36 20   directions for use.  Directions for use out of the case.

-01:-43:-33 21   Even, Your Honor, the TVT, the question was asked of

-01:-43:-29 22   Dr. Carlson page 77, Were you aware of Boston

-01:-43:-29 23   Scientific's Advantage Fit mesh was twice as stiff as at

TVT product?  No.  Question if you would have known that would have advised Ms. Barba of that?  Answer:  I'm not sure if the stiffness would play a role.  I'm not sure if I would have or not.

So TVT, plainly predicate hasn't been laid for the TVT at all.  The Pinnacle, he may have raised it on a few issues that I'm not here to argue about now, but the directions for use, unless the testimony is I find it misleading or inadequate, or I'd wish I would have known more, Dr. Parisian should not be wasting our time or confusing the jury by opining on a document that has no place in how the evidence is going in with respect to Dr. Carlson and his care of Ms. Barba.

THE COURT:  Go ahead.

MR. THOMPSON:  Your Honor, I believe in our brief, not to belabor the point further, as well, but I believe in our brief we address the standard.  And I believe that, in fact, the term is a reasonable learned intermediary.  So I do believe there is a function and a requirement that a reasonable learned intermediary would be on notice of either the warning, or not and abide by it, or require additional information.

Also, we've cited to the Court cases in which

-01:-41:-53 1    the DFU is not the only source of expert information to

-01:-41:-49 2    the physician, but it comes from whatever source.  And

-01:-41:-44 3    so, Your Honor, we believe that Dr. Parisian certainly

-01:-41:-40 4    can opine on the adequacy of the DFU.  But beyond that,

-01:-41:-33 5    like I say, we're foreshadowing the failure to warn

-01:-41:-29 6    argument that will be coming in a day or two.  And we

-01:-41:-25 7    simply believe that we have enough information for the

-01:-41:-22 8    jury to consider this issue.

-01:-41:-14 9         MR. KEENAN:  One final thing.  If the evidence

-01:-41:-11 10    was Lee walked into Dr. Carlson's office and said we

-01:-41:-09 11    have a great product.  There's no complication.  We've

-01:-41:-06 12    had clinical trials, it's great and he used it and those

-01:-41:-03 13    were all you will false statements, then we will then --

-01:-41:00 14    we would have affirmatively created duty on the

-01:-40:-57 15    misrepresentation that would be an independent basis for

-01:-40:-52 16    a claim against Boston Scientific.  But we don't have

-01:-40:-48 17    that.  And they have put all of their eggs on the DFU,

-01:-40:-43 18    and you heard Dr. Galloway talk extensively about the

-01:-40:-40 19    DFU and at that point that wasn't objectionable because

-01:-40:-35 20    they still had a chance to call Carlson, but when they

-01:-40:-31 21    didn't use Carlson to draw specific nexus to the DFU,

-01:-40:-27 22    then the DFU became no longer relevant for this case,

-01:-40:-24 23    maybe for another case, but not this case and there's an

abundance -- I mean, an abundance of case law.  In fact, Your Honor, had Dr. Carlson testified in advance of this that he reviewed the DFU, in fact, Dr. Carlson testified he didn't review the DFU and we sought summary judgement on that.

They came forth but he had other training material that he may have relied upon and the Court denied summary judgment motion on that basis.  Now we know that the DFU is out, and have they raised other fact issues for other things, I'm not here to argue that.  I'm simply here to argue that with respect to the DFU, that burden has not been met, and we should not have to listen to Dr. Parisian talk at length about the DFU and how inadequate it is.  The jury doesn't have an appreciation because they haven't heard my closing argument, that the DFU was not shown to Dr. Carlson.  He didn't review it.  He didn't comment on it.  So, therefore, there's no connection to this case.  Without that, Dr. Parisian should not be allowed to speak to that.

THE COURT:  Let me address the motion about clinical trials first.

I am satisfied with the proffer that foundation

-01:-39:-04 1    is going to be laid for Dr. Parisian to testify on this

-01:-39:00 2     issue.  I will, however, be listening very carefully to

-01:-38:-55 3     whether or not that proper foundation is, indeed, going

-01:-38:-52 4     to be laid.  And I want to again emphasize that

-01:-38:-48 5     Dr. Parisian has been permitted to testify as an expert

-01:-38:-43 6     on FDA and federal regulations.

-01:-38:-39 7          Now, I have some indication from counsel that

-01:-38:-33 8     this witness tends to go far afield.  And we need to

-01:-38:-29 9     make sure and corral this witness that instead of

-01:-38:-24 10    expressing generalized opinions that her opinions be

-01:-38:-21 11    based again on her expertise with FDA approval processes

-01:-38:-13 12    and federal regulations.  So that is the first thing.

-01:-38:-08 13         The second thing is with regard to the labeling

-01:-38:-03 14    motion.  I am going to limit any training testimony to

-01:-37:-51 15    whether or not that is information that should have been

-01:-37:-49 16    provided to the physician.  I'm not going to let

-01:-37:-43 17    Dr. Parisian talk about the type of training, whether

-01:-37:-39 18    training was adequate, I don't know whether she wants to

-01:-37:-35 19    get into that or not.  That issue is only peripherally

-01:-37:-29 20    relevant to specific information.

-01:-37:-28 21         I believe that there has been sufficient

-01:-37:-25 22    testimony by Dr. Carlson, and also as the parties have

-01:-37:-16 23    been placed on notice in the expert report to talk about

1    rates of occurrence, and whether that information should

2    have been provided to Dr. Carlson.  And it goes to his

3    choice of products.  It goes to failure rate.  It goes

4    to stiffness.  That information is a proper subject of

5    Dr. Parisian's testimony.

6            Now, it gets a little bit nuanced because it is

7    clear that it is a valid argument by plaintiff, and a

8    valid subject of evidence that certain information,

9    including rates of occurrence, and permanency, and

10   removal issues should have been given to the physician.

11   So while I am cognizant of Boston Scientific's argument,

12   I don't know how else the information could have been

13   provided to the physician except through a DFU or the

14   equivalent.  And I do think that because of that, I am

15   going to permit Dr. Parisian to say that the DFU should

16   have included this type of information, but I'm also

17   going to allow Boston Scientific to explore whether that

18   information could have been provided in another manner.

19   And, certainly, Boston Scientific can make the argument

20   that it wasn't necessary that this particular

21   information be provided in a DFU, but could have been

22   provided in another manner, or wasn't necessary to be

23   provided.  I think it's a question of fact for the jury

-01:-35:-30 1    as to whether or not this specific information could or

-01:-35:-25 2    should have been provided in the DFU.

-01:-35:-23 3            Now, it is entirely possible in theory that

-01:-35:-14 4    upon examination and cross-examination the jury will

-01:-35:-10 5    find that this witness is just opining that this is

-01:-35:-05 6    information that should have been in the DFU and doesn't

-01:-35:-03 7    really have a basis for that in FDA regulations or law.

-01:-34:-58 8    That's entirely possible, could go either way.  But I

-01:-34:-54 9    think it's a hotly disputed issue of fact as to whether

-01:-34:-51 10   or not this information should have been provided in

-01:-34:-49 11   this document and in this format.  I'm going to let

-01:-34:-46 12   Dr. Parisian opine on that without going too far afield.

-01:-34:-38 13           MR. KEENAN:  There's two other quick issues,

-01:-34:-35 14   Your Honor.

-01:-34:-34 15           THE COURT:  All right.

-01:-34:-33 16           MR. KEENAN:  There is a document that counsel

-01:-34:-31 17   identified last night that he intends to use with

-01:-34:-29 18   Dr. Parisian.  And it is on an issue that she's not

-01:-34:-24 19   disclosed on her reliance list.  It wasn't subject of

-01:-34:-19 20   our deposition that we had with her.  And in the most

-01:-34:-15 21   recent updated, truncated disclosure that we got about a

-01:-34:-11 22   month ago it's not identified in it either.  And it is

-01:-34:-08 23   this question of sensitization.  I objected to this last

-01:-34:-02 1    night with Mr. Thompson, told him she shouldn't be

-01:-34:-00 2    allowed to talk about it.  And I don't think she should

-01:-33:-56 3    be, because it is not an opinion she's ever expressed

-01:-33:-52 4    before.

-01:-33:-49 5            THE COURT:  What is your response?

-01:-33:-47 6            MR. THOMPSON:  Your Honor, I don't intend to

-01:-33:-45 7    elicit an opinion from her.  She is going to give a

-01:-33:-41 8    laundry list of problems and deficiencies in the 510k

-01:-33:-34 9    submission by Boston Scientific.  One of those laundry

-01:-33:-30 10   list of deficiencies is that they used inaccurate and

-01:-33:-25 11   the wrong ISO10993 tests.  That's actually already in

-01:-33:-17 12   evidence, and I think it's been talked about by two

-01:-33:-15 13   different people.  That's simply one more of a list of

-01:-33:-10 14   deficiencies.  And it would be -- it would make her

-01:-33:-06 15   testimony incomplete to somehow not let her put that on

-01:-33:-02 16   the list.

-01:-33:-02 17           THE COURT:  Incomplete or not, has that ever

-01:-32:-59 18   been on any list provided in a prior opinion?

-01:-32:-55 19           MR. THOMPSON:  No, Your Honor, no.

-01:-32:-54 20           THE COURT:  Then I'm not going to permit that.

-01:-32:-50 21   Is that it?

-01:-32:-48 22           MR. KEENAN:  I believe it is, Your Honor.

-01:-32:-46 23           MR. ANIELAK:  Your Honor, one quick thing.

-01:-32:-44 1          THE COURT:  Yes.

-01:-32:-43 2          MR. ANIELAK:  In terms of invoking the rule

-01:-32:-41 3    providing trial transcripts to our experts, I wanted to

-01:-32:-36 4    make sure we weren't running afoul, we would like to

-01:-32:-32 5    provide trial transcripts to our experts that will be

-01:-32:-28 6    coming to testify.

-01:-32:-27 7          THE COURT:  Assume there's no objection.

-01:-32:-25 8          MR. THOMPSON:  Since we're out of experts,

-01:-32:-23 9    they're going to get an advantage at our expense, but I

-01:-32:-19 10   don't object to it.

-01:-32:-18 11         THE COURT:  Experts can sit in on all the trial

-01:-32:-14 12   they want so there's no problem with providing them with

-01:-32:-10 13   the transcript.

-01:-32:-08 14         MR. ANIELAK:  Thank you, Your Honor.

-01:-31:-34 15         (Pause.)

-01:-31:-33 16         THE COURT:  We have a problem with one of the

-01:-31:-31 17   jurors.

-01:-31:-30 18         (Pause.)

-01:-31:-03 19         THE COURT:  We have received information from

-01:-30:-58 20   jury services that juror No. 12 Emma Tomlinson has

-01:-30:-48 21   fallen down the stairs and is not going to be able to

-01:-30:-44 22   continue as a juror.  So that means that we will put the

-01:-30:-41 23   next alternate in juror 12's spot which is Daniel

-01:-30:-32 1    Kelleher, I mean Stacey Davis.  That means we have one

-01:-30:-24 2    alternate left, Daniel Kelleher.

-01:-30:-19 3             Are we ready for the jury or do we need a

-01:-30:-15 4    break?

-01:-30:-15 5             MR. THOMPSON:  Your Honor, we're ready to go.

-01:-30:-10 6             THE COURT:  All right.

-01:-30:-09 7             (Pause.)

-01:-28:-06 8             (The jury entered the courtroom at 10:28 a.m.)

-01:-27:-38 9             THE COURT:  Good morning, everyone.

-01:-27:-35 10            The plaintiffs may present their next witness.

-01:-27:-30 11            MR. THOMPSON:  Your Honor, we'd like to call

-01:-27:-27 12   Dr. Susan Parisian to the stand, please.

-01:-27:-27 13                       SUZANNE PARISIAN,

-01:-27:-27 14      having been first called by the Plaintiff was sworn

-01:-26:-33 15   on oath, was examined and testified as follows:

-01:-26:-33 16            MR. THOMPSON:  Good morning Dr. Parisian.

-01:-26:-31 17            THE WITNESS:  Good morning Mr. Thompson.

-01:-26:-29 18                  DIRECT EXAMINATION

-01:-26:-29 19   BY MR. THOMPSON:

-01:-26:-26 20       Q.  Dr. Parisian -- judge, may I approach?

-01:-26:-27 21            THE COURT:  Certainly.

-01:-26:-25 22   BY MR. THOMPSON:

-01:-26:-23 23       Q.  Dr. Parisian, I'm going to hand you a document

-01:-26:-20 1    that's entitled curriculum vitae?

-01:-26:-13 2        A.   Yes, sir.

-01:-26:-13 3        Q.   Can you identify that for me please?

-01:-26:-11 4        A.   Yes, sir.  It's my curriculum vitae.

-01:-26:-08 5        Q.   And look through it and see if it's up to date?

-01:-26:-03 6        A.   Yes, sir, and it's also my legal history, my

-01:-26:00 7    legal testimony history is included here and that would

-01:-25:-57 8    probably be not up to date but the CV is.

-01:-25:-54 9        Q.   All right.  I'd like to mark that as the next

-01:-25:-51 10   consecutive Plaintiff's Exhibit.  Your Honor, I think we

-01:-25:-47 11   have a an ongoing question as to ultimate use of that

-01:-25:-42 12   exhibit but I did want go ahead and put it in at that

-01:-25:-37 13   time?

-01:-25:-37 14            THE COURT:  Let's mark that.

-01:-25:-32 15            MR. THOMPSON:  Why don't you hand it to me.

-01:-25:-28 16   Let me get it marked.  29.  All right.

-01:-25:-14 17   BY MR. THOMPSON:

-01:-25:-13 18       Q.   Now, let me hand you Plaintiff's Exhibit 29?

-01:-25:-10 19       A.   Thank you.

-01:-25:-07 20       Q.   Dr. Parisian just very briefly I want to go

-01:-25:-04 21   over your background and qualifications.  What is your

-01:-25:00 22   education?

-01:-24:-59 23       A.   I'm a physician an MD.  That would be part of

-01:-24:-55 1    my education.

-01:-24:-54 2        Q.   And where did you receive your medical degree

-01:-24:-51 3    from?

-01:-24:-51 4        A.   University of South Florida in Tampa.

-01:-24:-48 5        Q.   And where did you receive your PHD from?

-01:-24:-45 6        A.   I don't have a PHD.  I have a bachelor degree

-01:-24:-42 7    and a master's degree from University of Central

-01:-24:-38 8    Florida.

-01:-24:-38 9        Q.   All right.  Doctor after receiving your MD

-01:-24:-33 10   degree, were you licensed to practice medicine in any

-01:-24:-29 11   state?

-01:-24:-29 12       A.   Yes, sir.

-01:-24:-28 13       Q.   Where was that?

-01:-24:-27 14       A.   I practiced and licensed in many states.  I

-01:-24:-24 15   originally when I got my MD I went and practiced in the

-01:-24:-21 16   State of South Carolina.  And I practiced in North

-01:-24:-17 17   Carolina, South Carolina, California, Michigan.  I

-01:-24:-12 18   currently have a license in Arizona and Virginia.  So I

-01:-24:-04 19   have licenses in many states.

-01:-24:-03 20       Q.   Doctor, I want to look at your career after

-01:-23:-58 21   graduating from medical school and obtaining a medical

-01:-23:-56 22   license, if it's not delicate what year was that?

-01:-23:-51 23       A.   Oh, it was 1978 a long time ago.

BY MR. THOMPSON:

Q.   And tell me your career after 1978?

A.   My career is going to sound like I've been many places, but my husband also is a physician so we were trying to put two careers together.  After I graduated medical school, I did a flexible internship in Greenville, South Carolina, which is basically general doctor taking care of all kinds of patients.  Then I went to North Carolina and was a healthcare doctor, a family practitioner, general practitioner type doctor with the health departments.  And after that I worked in an emergency room.  I was president of a company called mountain emergencies in Durham, North Carolina.  Then I went back to do training in pathology.  So I'm board certified in anatomic and clinical pathology.  So there's been periods of time when I have been doing general practice, and periods of time when I've been doing pathology.  Eventually and the reason I'm sitting here today is because I went to work for the FDA.

Q.   In your tenure at FDA, did you have opportunity to consider applications or submissions from corporate sponsors of new medications or devices?

A.   Yes.  That was what I did there I was looking

-01:-22:-28 1    at both premarket, which would market applications and

-01:-22:-25 2    post market issues that would occur after products were

-01:-22:-22 3    marketed.  So I was what they called a medical officer.

-01:-22:-18 4    I was in the center for devices radiological health,

-01:-22:-12 5    CDRH at the FDA that oversees medical devices.  So I

-01:-22:-08 6    looked at pre-market applications post-market issues,

-01:-22:-04 7    yes, I did.

-01:-22:-04 8        Q.   Doctor, after leaving the FDA, did you continue

-01:-21:-57 9    in your career as a medical device evaluator or

-01:-21:-55 10   examiner?

-01:-21:-55 11       A.   Well, not after leaving the FDA, but I worked

-01:-21:-48 12   for industry to develop product applications to get

-01:-21:-45 13   cleared by, or approved by the FDA.  So for the last

-01:-21:-40 14   20-years -- I left the FDA in 1995.  So for the last

-01:-21:-37 15   20 years I've been involved with FDA related issues for

-01:-21:-33 16   manufacturers to get new products, and looking at

-01:-21:-29 17   applications.

-01:-21:-29 18       Q.   All right.  Certainly here today, you're acting

-01:-21:-24 19   as an expert witness in a products liability trial.

-01:-21:-20 20   That's one of the things you do, as well; is that right?

-01:-21:-18 21       A.   Yes, sir.

-01:-21:-18 22       Q.   Now, Doctor, am I correct in saying that you

-01:-21:-12 23   are in the twilight years of your practice; is that

-01:-21:-09 1    right?

-01:-21:-09 2        A.   I'm getting pretty gray yeah.  Hopefully I'm

-01:-21:-05 3    going to be cutting this down, yes, sir hopefully it's

-01:-21:-01 4    not the twilight of my life.

-01:-20:-59 5        Q.   I didn't mean, if I said that I sure apologize.

-01:-20:-55 6    I didn't mean it?

-01:-20:-55 7        A.   No.

-01:-20:-54 8        Q.   But you are winding down your career?

-01:-20:-51 9            THE WITNESS:  I'm trying to.  Yes, sir.

-01:-20:-50 10   BY MR. THOMPSON:

-01:-20:-48 11       Q.   Doctor, in your experience, and in the things

-01:-20:-41 12   you've done, are you familiar with the organizing

-01:-20:-37 13   statutes and regulations which govern the submission of

-01:-20:-30 14   new product devices to the FDA?

-01:-20:-25 15       A.   Yes, sir.  I was required at the FDA to learn

-01:-20:-21 16   about regulations, the food and drug and cosmetic act

-01:-20:-16 17   and what is required for a manufacturer.  In fact, I

-01:-20:-14 18   actually had to teach it to other people at the FDA.

-01:-20:-11 19       Q.   Doctor, and does your training and your

-01:-20:-08 20   background give you expertise in reviewing and

-01:-20:00 21    evaluating submissions by new drug or device applicants?

-01:-19:-55 22       A.   Yes, sir.  And particularly as a medical

-01:-19:-51 23   officer, would review them as a physician.

-01:-19:-49  1        Q.   Dr. Parisian, in this case, which is what we're

-01:-19:-44  2    here for on behalf of Ms. Barba, as you know there are

-01:-19:-39  3    two devices that were implanted in Ms. Barba, a device

-01:-19:-35  4    called an Advantage Fit, and a Pinnacle pelvic floor

-01:-19:-29  5    product both manufactured by Boston Scientific.  You're

-01:-19:-26  6    aware of that, aren't you?

-01:-19:-25  7        A.   Yes, sir.

-01:-19:-25  8        Q.   And in your review, did you review the various

-01:-19:-19  9    submission documents both for the Advantage Fit and for

-01:-19:-16 10    the Pinnacle?

-01:-19:-15 11        A.   Yes, sir.

-01:-19:-14 12        Q.   And have you -- did you review associated

-01:-19:-08 13    documents and associated information that gives you

-01:-19:-03 14    insight to and allows you to analyze those submissions?

-01:-19:00  15        A.   Yes, sir.

-01:-18:-59 16        Q.   Doctor, I want to talk just for a minute about

-01:-18:-54 17    the 510k process at the FDA.  First question:  Does a

-01:-18:-48 18    clearance letter issued by the FDA to a 510k submitter,

-01:-18:-41 19    does a clearance letter mean that the FDA approves of

-01:-18:-35 20    the device?

-01:-18:-34 21        A.   No.

-01:-18:-34 22        Q.   What does it mean?

-01:-18:-33 23        A.   It means it clears the device to begin

-01:-18:-29 1  marketing.  It means that the company has submitted an

-01:-18:-26 2  application to the FDA that has supported, that they are

-01:-18:-20 3  substantially equivalent just like somebody else that's

-01:-18:-17 4  already being marketed for the same intended uses.  And

-01:-18:-14 5  so that there has been a product already marketed for

-01:-18:-09 6  that intended use, is used by the FDA then to look at

-01:-18:-05 7  the next product and say well, this is just like that.

-01:-18:-02 8  There aren't new issues of safety and

-01:-17:-59 9  effectiveness, so you can begin marketing.  510k are

-01:-17:-55 10  submitted when products haven't even been made yet.  So

-01:-17:-51 11  the company is saying we're making this product and it's

-01:-17:-48 12  going to be just like the other guy's that's already

-01:-17:-45 13  been marketed for the same use.

-01:-17:-43 14  Q.  Is there any requirement that the product be a

-01:-17:-40 15  better product than anything on the market?

-01:-17:-38 16  A.  It has to be at least equal.  It can't worse,

-01:-17:-35 17  it can't be inferior, it can be better.  The FDA is not

-01:-17:-31 18  going to prevent something from being better or it

-01:-17:-27 19  cannot be worse or new risks that haven't been addressed

-01:-17:-23 20  by the company.

-01:-17:-22 21  Q.  When the submission is made by an applicant

-01:-17:-18 22  under a 510k, does the FDA test that product?

-01:-17:-14 23  A.  No.  It's a paper application.  When I first

-01:-17:-11 1   went to the FDA, I'm going to see devices.  So you're

-01:-17:-05 2   looking at paper.  It's basically a paper document that

-01:-17:-02 3   the company tells you this is how this is going to

-01:-16:-59 4   perform, this is the type of product it's going to be.

-01:-16:-56 5   So you're looking at only the paper.  There's no

-01:-16:-54 6   clinical trials or testing done by the FDA.

-01:-16:-52 7       Q.   All right.  Now, with regard to the submission,

-01:-16:-45 8   what information, or what data is relied upon by the FDA

-01:-16:-39 9   in evaluating that submission?

-01:-16:-38 10      A.   It's all the data.  In terms of the company has

-01:-16:-32 11  to say that they are being truthful and accurate and

-01:-16:-27 12  giving everything that the FDA needs to put this product

-01:-16:-24 13  on the market.  So the FDA is relying on the value of

-01:-16:-20 14  the document and the information that's in it.

-01:-16:-18 15      Q.   Is there any requirement under the regulations

-01:-16:-16 16  that the company disclose material facts known to it

-01:-16:-12 17  with regard to safety and efficacy?

-01:-16:-09 18      A.   Yes.  The regulation for 510k, 21 CFR 807

-01:-15:-59 19  provides manufacturer provide that information, plus the

-01:-15:-56 20  manufacturer has to sign a statement called a truthful

-01:-15:-53 21  and accurate statement saying they're providing all the

-01:-15:-50 22  material facts in this document that the FDA needs to

-01:-15:-47 23  have to make the determination whether a product can

-01:-15:-44 1    start being marketed.

-01:-15:-42 2        Q.   And does the clearance by the FDA, under a 510k

-01:-15:-35 3    submission process, study all the obligations of a

-01:-15:-28 4    medical device company to provide a safe and effective

-01:-15:-25 5    product to the physicians and the to the public?

-01:-15:-22 6        A.   Can you repeat that?

-01:-15:-20 7        Q.   Does the clearance meant that the FDA that a

-01:-15:-17 8    company has satisfied all its obligations to provide a

-01:-15:-14 9    safe and effective product to physicians and the public?

-01:-15:-11 10       A.   No.   All it means is that they have

-01:-15:-09 11   satisfactorily put in an application that allows them to

-01:-15:-06 12   be able to market it.   There's a lot of things that the

-01:-15:-04 13   FDA doesn't look at when they look at the application.

-01:-15:-01 14   One would be manufacturing documents, can the company

-01:-14:-57 15   actually make that product?   They don't look at the

-01:-14:-54 16   labeling for a 510k, that's the responsibility of the

-01:-14:-52 17   manufacturer, the prescription labeling.   So no, it's

-01:-14:-49 18   just a clearance that you as a manufacturer can start

-01:-14:-46 19   marketing the product, but you have to, as a

-01:-14:-43 20   manufacturer, make sure your product that you sell meets

-01:-14:-38 21   a lot of other requirements for manufacturers to sell a

-01:-14:-35 22   product in other states.   So it's just a door that

-01:-14:-31 23   allows you to start marketing something.   The life of

-01:-14:-28 1    the product the FDA is not looking at, it's just okay

-01:-14:-25 2    you said you want to market this, okay you can start.

-01:-14:-22 3    You as a manufacturer have all these other duties.

-01:-14:-17 4        Q.   Does anything in a 510k clearance have anything

-01:-14:-14 5    to say about the design, or the installation, or the use

-01:-14:-06 6    the cleared product?

-01:-14:-04 7        A.   Well, it can, if the company provided that

-01:-13:-59 8    information.  But the FDA is not looking at those things

-01:-13:-56 9    are well talking about this particular 510k?

-01:-13:-52 10       Q.   Yes, ma'am, I'm talking about the Advantage or

-01:-13:-50 11   the Pinnacle?

-01:-13:-50 12       A.   No, not in terms of the Advantage that was not

-01:-13:-47 13   described in terms of clinical risks for the patient

-01:-13:-44 14   that wasn't described, and the design actually would be

-01:-13:-40 15   under something different than the 510k, it's under 21

-01:-13:-35 16   CFR 820 under good manufacturing process.  So no, it

-01:-13:-30 17   didn't have that information.

-01:-13:-29 18       Q.   Does anything in a 510k clearance relieve

-01:-13:-26 19   Boston Scientific of its obligation to Ms. Barba, for

-01:-13:-23 20   example, to supply a safe and efficacious and

-01:-13:-18 21   nondefective product for her?

-01:-13:-17 22       A.   No, no.  It's the 510k clearance is a

-01:-13:-12 23   prohibited act for any manufacturer, 21 USC 331, for a

-01:-13:-06 1    manufacturer to sell a product in the United States

-01:-13:-04 2    that's not safe and effective.  It doesn't matter how it

-01:-13:-01 3    even got on the market, you can't sell a product like

-01:-12:-58 4    that.  Whether it's a food, whether it's a drug, whether

-01:-12:-54 5    it's a device.

-01:-12:-53 6          So the 510k is just to let you market

-01:-12:-50 7    something.  But the Act requires that you sell a safe

-01:-12:-47 8    and effective product for patients that are adequately

-01:-12:-43 9    labeled.  That's the company's job.

-01:-12:-40 10         Q.  Does a 510k clearance satisfy the obligation of

-01:-12:-34 11   a company to design and make a safe nondefective

-01:-12:-30 12   product?

-01:-12:-29 13         A.  No.

-01:-12:-28 14         Q.  Who exactly is the examiner on a 510k

-01:-12:-24 15   submission for the FDA?

-01:-12:-22 16         A.  The typical 510k examiner and the ones that

-01:-12:-18 17   were involved in these 510ks are usually engineers,

-01:-12:-15 18   chemists, they are not doctors.  So therefore the expert

-01:-12:-08 19   in the product is the company, not the FDA.

-01:-11:-58 20         (Pause.)

-01:-11:-57 21         MR. THOMPSON:  Your Honor, may I approach the

-01:-11:-40 22   witness.

-01:-11:-39 23         THE COURT:  Certainly.

-01:-11:-38 1          MR. THOMPSON:  I'm going to go ahead and mark

-01:-11:-36 2     as Plaintiff's Exhibit 30 a 510k submission for the

-01:-11:-30 3     advantage.

-01:-11:-28 4          THE WITNESS:  Okay.

-01:-11:-27 5     BY MR. THOMPSON:

-01:-11:-27 6          Q.   I'm also going to put in front of you at the

-01:-11:-24 7     same time Plaintiff's Exhibit 31, which is a 510k for

-01:-11:-21 8     the Pinnacle product?

-01:-11:-19 9          A.   Okay.  One has a clip and one doesn't.

-01:-11:-09 10         Q.   Be careful with the one with no clip.  We'll

-01:-11:-07 11    get you a clip at the next break.

-01:-11:-05 12         A.   Or rubber band.

-01:-11:-02 13         Q.   Or let's be specific about these two.  Do you

-01:-10:-58 14    know who was the reviewer, or who signed off on the

-01:-10:-55 15    clearance letters?

-01:-10:-54 16         A.   The clearance letter for the Advantage was

-01:-10:-52 17    signed off by Mariam Provost, I know Mariam.  She's a

-01:-10:-45 18    chemical engineer.  The other one was signed off there's

-01:-10:-42 19    been various letters but eventually Mark Melberson who

-01:-10:-37 20    is director of that division and he's also an engineer.

-01:-10:-35 21         Q.   Is either one of them a medical doctor?

-01:-10:-33 22         A.   No.

-01:-10:-33 23         Q.   Dr. Parisian, what is an abbreviated 510k

clearance?

A.   An abbreviated 510k was alternative type of 510k submission that was supposed to cut down the review time for the FDA reviewers, to try to streamline the process so the FDA reviewers didn't have to use as much time.  It was based on certain changes, in terms of the requirements for manufacturers that manufacturers just provided saying that we met certain guidances, and the review is abbreviated, that's why it's called it an abbreviated 510k.

Q.   Is there a time limitation on the FDA for considering a 510k submission?

A.   For a traditional 510k is a mandatory 90 days. FDA tries to get through this type of an application in 90 days to decide whether you're going to clear it or not.  There's no significant difference for a abbreviated, it's theoretical it's going to take less time, but 90 days is the working time that the reviewer has to get the application done by.

Q.   Let's go to page 47 of the Advantage 510k submission.  Michael, if you could post that for us so we can have a look at it.  We need to blow that up a little bit so we can see it a little bit better.  Little

-01:-08:-53 1    bit more than that.  All right.

-01:-08:-51 2            Doctor, is this -- this is a document that is a

-01:-08:-44 3    flow sheet for the process by which a 510k submission is

-01:-08:-36 4    performed by the examiner; is that right?

-01:-08:-34 5        A.  Correct.  A flow sheet would kind of reflect

-01:-08:-31 6    the engineering concept of the FDA, flow sheet.  So this

-01:-08:-27 7    is traditional flow sheet that FDA reviewers have to use

-01:-08:-22 8    in order to determine whether to clear something as a

-01:-08:-20 9    510k, or to ask for additional information, or not to

-01:-08:-17 10   clear it.  So this is the process.  Every 510k has one

-01:-08:-13 11   of these sheets in the chart.  Manufacturers usually

-01:-08:-09 12   provide them, tell the FDA what they think the flow

-01:-08:-06 13   should be.  So this is key to the FDA mindset.

-01:-08:-03 14       Q.  All right.  Now, Doctor, this is the Advantage

-01:-07:-58 15   510k submission.  And it's dated in 2002; is that right?

-01:-07:-52 16       A.  Yes, sir.

-01:-07:-51 17       Q.  Is there a 510k for the Advantage Fit?

-01:-07:-44 18       A.  No.

-01:-07:-43 19       Q.  Why not?

-01:-07:-42 20       A.  The company made a determination that they

-01:-07:-38 21   didn't need a new 510k for the Advantage Fit.

-01:-07:-36 22       Q.  So from the time that this 510k -- do we know

-01:-07:-32 23   if it was an abbreviated 510k for the Advantage?

-01:-07:-28 1      A.   It originally was yes, sir.

-01:-07:-25 2      Q.   Do we know from 2002, until Ms. Barba in May of

-01:-07:-21 3   2009 was there any submission with regard to the

-01:-07:-17 4   Advantage or Advantage Fit with regard to clinical

-01:-07:-11 5   information about the Advantage?

-01:-07:-09 6      A.   No.

-01:-07:-09 7      Q.   Now, I've circled, if you noticed I can

-01:-07:-01 8   actually make a mark on this.  I've circled the vertical

-01:-06:-57 9   line and I want to go through this just briefly it says

-01:-06:-52 10   the name of this graph is "substantial equivalence."

-01:-06:-48 11   We've already talked about substantial equivalence.

-01:-06:-45 12   That means that -- well, don't worry what I mean.  What

-01:-06:-40 13   does it mean?

-01:-06:-39 14      A.   It means that you are the same intended use as

-01:-06:-35 15   some product that's already on the market and you don't

-01:-06:-32 16   raise any new issues of safety and effectiveness that

-01:-06:-29 17   haven't been addressed.  So you're substantially

-01:-06:-27 18   equivalent, just like the other guy that's already being

-01:-06:-22 19   marketed.  So because you're just like the prior product

-01:-06:-19 20   you can claim all their history of use as support that

-01:-06:-16 21   you should be marketed.

-01:-06:-15 22          So the opposite in terms of marketing, you're

-01:-06:-11 23   like be everybody else.  There's no reason I'm

-01:-06:-09 1    different.  That's what they're trying to say to the FDA

-01:-06:-04 2    in terms of getting clearance.  That's the key.

-01:-06:-02 3        Q.   Let's go to the top of this, it says new

-01:-05:-59 4    devices compared to marketed device.  That's what you

-01:-05:-56 5    just said?

-01:-05:-56 6        A.   Right.  The marketed device would be predicate

-01:-05:-52 7    device the word the FDA would use.  So that's the

-01:-05:-49 8    already being sold product.

-01:-05:-48 9        Q.   Do you remember the predicate devices for the

-01:-05:-44 10   Advantage mesh?

-01:-05:-44 11       A.   The Trelex mesh, which was made by Boston

-01:-05:-39 12   Scientific, which is a polypropylene mesh.  Biosling.

-01:-05:-33 13   The suspend sling, and the TVT Ethicon TVT tape, which

-01:-05:-25 14   is used for stress urinary incontinence.  So those were

-01:-05:-23 15   the predicates that were cited by the company, and they

-01:-05:-19 16   were cited on the cover sheet.  So that's what FDA is

-01:-05:-16 17   told.  Those are the marketed devices that this new

-01:-05:-13 18   product is like.

-01:-05:-11 19       Q.   Michael, let's go quickly to 34.  Keep that one

-01:-05:-0? 20   in abeyance and we'll come right back to it.  Let's see

-01:-05:-0? 21   34.

-01:-04:-5? 22       A.   Okay.

-01:-04:-5? 23       Q.   That's what we're looking at?

-01:-04:-53 1        A.   Yes, sir.

-01:-04:-39 2             MR. KEENAN:   Touch the screen.

-01:-04:-35 3    BY MR. THOMPSON:

-01:-04:-34 4        Q.   These are the predicate device for Advantage as

-01:-04:-32 5    appears if their submission; is that right?

-01:-04:-31 6        A.   No.   These are the predicate devices that's on

-01:-04:-28 7    this table.   When you look at their submission, these

-01:-04:-25 8    are not all referenced to the FDA, only the ones that I

-01:-04:-21 9    said, but these are the ones that are on a table.   You

-01:-04:-18 10   have to have a table like this, so they added more

-01:-04:-15 11   predicates on the table.

-01:-04:-14 12       Q.   All right.   So we're looking, there is a Trelex

-01:-04:-10 13   that we talked about?

-01:-04:-08 14       A.   Right that's Boston Scientific's mesh.

-01:-04:-06 15       Q.   There's something called Insling which is

-01:-04:-01 16   actually a polyester; is that right?

-01:-03:-58 17       A.   Yes, sir.

-01:-03:-58 18       Q.   Then there's the TVT?

-01:-03:-56 19       A.   Right here.

-01:-03:-52 20       Q.   There's something called a Suspend, which is a

-01:-03:-50 21   polyether urea urethane elastomer?

-01:-03:-42 22       A.   Right, so it's not polypropylene.

-01:-03:-42 23       Q.   Then there's something called the IVS tunneler?

-01:-03:-37 1          A.   Which is polypropylene.

-01:-03:-36 2          Q.   And the Biosling bioabsorbable polymer sling

-01:-03:-30 3    which is a bioabsorbable polyester?

-01:-03:-29 4          A.   Correct.

-01:-03:-28 5          Q.   Then that looks like the Spark and the Uretex?

-01:-03:-24 6          A.   Right.

-01:-03:-24 7          Q.   So what they've done is they've pulled out

-01:-03:-19 8    other mesh types that are on the market to be look at?

-01:-03:-16 9          A.   Right, but they didn't discuss all those in

-01:-03:-12 10   their 510k, they only discussed the TVT and the Biosling

-01:-03:-08 11   and the Suspend and the Trelex.  There's other ones

-01:-03:-04 12   here, but they are not all discussed.

-01:-03:-03 13         Q.   In fact, there's some problems with these other

-01:-02:-58 14   products, isn't there?

-01:-02:-56 15         A.   Yes.

-01:-02:-56 16         Q.   There are problems that arose and called the

-01:-02:-51 17   suspension of those sales; right?

-01:-02:-49 18         A.   Yes.

-01:-02:-49 19         Q.   Let's look at the Trelex mesh.  Was that a mesh

-01:-02:-45 20   that was used for pelvic repairs in women's bodies?

-01:-02:-39 21         A.   No.  And though give what the intended use is

-01:-02:-36 22   over that column.  This is what it's cleared for.  This

-01:-02:-33 23   is what a manufacturer can market it for, the intended

-01:-02:-30 1    use.  That's what FDA has cleared it to be sold for.  So

-01:-02:-27 2    that's the only clearance for Trelex mesh and its

-01:-02:-21 3    basically a general surgical mesh.

-01:-02:-19 4        Q.   For hernias and chest walls?

-01:-02:-17 5        A.   Right.

-01:-02:-16 6        Q.   But it's being cited as a predicate device for

-01:-02:-13 7    an Advantage which is going to be used in the women's

-01:-02:-08 8    pelvis?

-01:-02:-08 9        A.   Well, it's being cited as a predicate for a

-01:-02:-03 10   surgical mesh that's what the FDA is reviewing here.

-01:-02:-01 11   One of the indications would be for the pelvis.

-01:-01:-59 12       Q.   What you're saying is the Advantage was put to

-01:-01:-56 13   the FDA as the substantially equivalent of Trelex?

-01:-01:-50 14       A.   Right.

-01:-01:-50 15       Q.   That's what the examiner saw?

-01:-01:-48 16       A.   Right.  It's a surgical mesh.  The 510k was

-01:-01:-45 17   called in the application was called a modified Trelex

-01:-01:-41 18   mesh and the cover letter.  So the Trelex is a surgical

-01:-01:-36 19   mesh which is already cleared.  So that's a predicate.

-01:-01:-32 20       Q.   Let's go down to the TVT, one real quick.  Now,

-01:-01:-26 21   that's TVT is actually a brand name; is that right?

-01:-01:-22 22       A.   Right.  That's the Ethicon tension free vaginal

-01:-01:-16 23   tape.

-01:-01:-16 1          Q.   And it is also a polypropylene mesh; is that

-01:-01:-12 2     right?

-01:-01:-12 3          A.   Yes.  And they didn't include the clearance for

-01:-01:-09 4     the TVT here, they have part of it, but they don't have

-01:-01:-04 5     the essential part of the TVT, which also includes the

-01:-01:-01 6     clearance of the components that's not listed here.  If

-01:00:-58 7     you looked at the approved indication for use the TVT is

-01:00:-54 8     not written correctly in terms of the way it's actually

-01:00:-51 9     cleared.

-01:00:-51 10          Q.   One of the things about the TVT mesh is that it

-01:00:-46 11    actually has predicate devices that support its

-01:00:-42 12    clearance, as well?

-01:00:-41 13          A.   Yes, right, it does.

-01:00:-40 14          Q.   And one of the predicate devices for the TVT is

-01:00:-36 15    what?

-01:00:-36 16          A.   It's Protegen, which is Boston Scientific.

-01:00:-31 17          Q.   What was the recent history of Protegen?

-01:00:-27 18          A.   The company withdrew in 1999 from the market.

-01:00:-24 19          Q.   The reason?

-01:00:-23 20          A.   Because the be variability of performance, it

-01:00:-20 21    wasn't living up to Boston Scientific's standards for a

-01:00:-18 22    sling.

-01:00:-18 23          Q.   So what we're seeing with the 510k process is

-01:00:-13  1    that you can have a predicate device that's a defective

-01:00:-08  2    device, but once you get cleared, you're cleared?

-01:00:-04  3        A.    You're clear.

-01:00:-03  4        Q.    Is that right?

-01:00:-01  5        A.    You're cleared.

-01:00:00   6            MR. KEENAN:   Your Honor, objection, leading.

00:-59:-58  7            THE COURT:   Sustained.

00:-59:-57  8    BY MR. THOMPSON:

00:-59:-56  9        Q.    Is there a requirement that a predicate device

00:-59:-52 10    be looked back to with subsequent devices on 510ks?

00:-59:-47 11        A.    No.   Once you're cleared, you're cleared.

00:-59:-44 12    You're on the market.   There isn't a process for FDA to

00:-59:-41 13    remove the clearance.

00:-59:-37 14        Q.    Let's go back to the flow chart.

00:-59:-21 15            So we've got the new device as compared to a

00:-59:-18 16    marketed device?

00:-59:-17 17        A.    Right.

00:-59:-17 18        Q.    We compare this to the Marlex and to the TVT,

00:-59:-11 19    if we're talking about Advantage?

00:-59:-10 20        A.    Trelex.   Trelex and TVT.   Yes, sir.

00:-59:-06 21        Q.    And then the next question; does the new device

00:-59:-02 22    have the same indication statements?

00:-58:-58 23        A.    And that's why there's a composite of predicate

00:-58:-55 1    devices with different indication statements, because

00:-58:-52 2    the indication statement that they are requesting is

00:-58:-48 3    actually more like Biosling's intended use, not TVT.

00:-58:-42 4        Q.   That's fine.   That's my question.   In fact, the

00:-58:-39 5    Advantage indication statement is not quite the same as

00:-58:-35 6    TVT, is it?

00:-58:-33 7        A.   No, it's not.

00:-58:-33 8        Q.   Why does not invoke a no, and push it out?

00:-58:-27 9        A.   It's because they gave other predicates.

00:-58:-23 10   Biosling has an intended use similar to what they are

00:-58:-20 11   requesting.

00:-58:-19 12       Q.   Biosling is made out of biologic material?

00:-58:-13 13       A.   Yes, it's a different type of material.   Yes,

00:-58:-10 14   sir.

00:-58:-10 15       Q.   So let's assume that the answer is yes.   So it

00:-58:-07 16   goes down to what's the next step?

00:-58:00 17       A.   The new device may have same intended use and

00:-57:-57 18   may be substantially equivalent.

00:-57:-55 19       Q.   And then the next one down?

00:-57:-53 20       A.   Does the device have the same technological

00:-57:-49 21   characteristics, design, materials etc.   This would also

00:-57:-46 22   bring in the clinical use, are there new issues in terms

00:-57:-42 23   of how it's going to be used.   That would be in

00:-57:-38 1    technology.

00:-57:-37 2       Q.   The next one down would be what?

00:-57:-35 3       A.   Are the descriptive characteristics precise

00:-57:-29 4    enough to insure equivalence, that's for the FDA, has

00:-57:-27 5    the application been precise enough so the reviewer can

00:-57:-21 6    make a decision.

00:-57:-21 7       Q.   Then the answer to that whole column is yes

00:-57:-17 8    then you get down to approval, or not approval,

00:-57:-14 9    clearance?

00:-57:-14 10       A.   Clearance with a 510k right.

00:-57:-12 11       Q.   Okay.  Now, let's go back up.  Let's talk a

00:-57:-05 12    little bit about the Advantage.  We talked about the

00:-57:00 13    ProteGen that the predicate for the TVT was a polyester

00:-56:-54 14    product called ProteGen, correct?

00:-56:-52 15       A.   It was a colligens injected polyester.

00:-56:-47 16       Q.   And the device for which the TVT is used to the

00:-56:-38 17    device that is approved to install a TVT is what?

00:-56:-32 18       A.   Pardon?

00:-56:-28 19       Q.   Is there an insertion device?

00:-56:-25 20       A.   When the TVT application 510k came to the FDA,

00:-56:-21 21    they actually had a clinical study to look at the

00:-56:-19 22    devices that are used, the accessories to make sure you

00:-56:-13 23    can actually install the tape into the woman's pelvis.

00:-56:-09 1    So the TVT, when you look at the clearance, it's not

00:-56:-06 2    listed correctly on that one sheet.  But it includes not

00:-56:-01 3    as much the emphasis on the tape because the tape it was

00:-55:-57 4    Prolene which was a mesh and had been used for years it

00:-55:-54 5    was putting into the woman's pelvis the equipment, the

00:-55:-51 6    accessories.  So the TVT was different.  It wasn't the

00:-55:-46 7    focus of the TVT wasn't the mesh.

00:-55:-44 8        Q.   Let's look at the Advantage, was there an

00:-55:-41 9    inserter device for the Advantage?

00:-55:-37 10       A.   There wasn't a kit.  They basically told the

00:-55:-32 11   FDA that the physician could use available tools.  They

00:-55:-27 12   didn't describe delivery system.  There were things

00:-55:-22 13   there may be delivery tools, there may not, they don't

00:-55:-17 14   need to be reviewed they are Class I, they are exempt.

00:-55:-14 15       Q.   If, in fact, there was an intention to use the

00:-55:-11 16   Advantage as part of the kit and to include an inserter

00:-55:-07 17   device, is it your opinion that that should have been

00:-55:-04 18   included in the 510k submission?

00:-55:00 19        A.   Right.  That should have been stated in the

00:-54:-58 20   very first cover letter to the FDA.  Instead of saying

00:-54:-53 21   it was a surgical mesh, they should said it was a kit.

00:-54:-50 22   There should have been discussion, there should have

00:-54:-48 23   been photographs of the components what was going to be

00:-54:-46 1  used.  There are no photographs.  It's really getting

00:-54:-43 2  cleared as a surgical mesh, and the predicates they're

00:-54:-39 3  citing in the clearance is that it's a surgical mesh.

00:-54:-36 4      Q.   Now, Dr. Parisian, we've actually heard

00:-54:-33 5  testimony in this courtroom earlier about the

00:-54:-31 6  differences between the Prolene mesh of the TVT and the

00:-54:-25 7  Advantage mesh.  Are you familiar the statement or

00:-54:-21 8  description of the Boston Scientific mesh as being

00:-54:-15 9  de-tanged?

00:-54:-15 10     A.   Yes, sir.

00:-54:-15 11     Q.   What is that?

00:-54:-14 12     A.   That means that there was, according to the

00:-54:-11 13  510k, it was FDA was told it was thermal treatment right

00:-54:-05 14  at the urethra for their mesh.

00:-54:-03 15     Q.   And was there any description or disclosure to

00:-53:-58 16  the FDA that the de- tanged Boston Scientific mesh was

00:-53:-51 17  twice as stiff, or twice as stiff as the TVT Prolene

00:-53:-45 18  mesh?

00:-53:-45 19     A.   No discussion.  Because that would have been

00:-53:-41 20  significant.  That would be the change in technological

00:-53:-36 21  characteristics.

00:-53:-36 22     Q.   You've anticipated my next question.  On this

00:-53:-32 23  flow chart, if the delivery system that had been

00:-53:-29 1    disclosed as part of the kit, and if the stiffness had

00:-53:-25 2    been disclosed in its submission to the examiner, who is

00:-53:-21 3    the chemical engineer, would this have entailed

00:-53:-16 4    additional scrutiny by the FDA?

00:-53:-13 5         MR. KEENAN:  Objection may we approach Your

00:-53:-11 6    Honor.

00:-53:-11 7         THE COURT:  Yes.

00:-51:-04 8         (The following sidebar conference was held.)

00:-51:-04 9         MR. KEENAN:  Well, we're starting to see

00:-51:-04 10   Dr. Parisian work her magic.  She's going to speculate

00:-51:-04 11   about what the FDA would or wouldn't have done with

00:-51:-04 12   information and she's going to continue to opine that

00:-51:-04 13   the FDA will have taken a certain course of action and

00:-51:-04 14   this device rules product misleading the FDA and she

00:-51:-04 15   never been cleared on the market etc., etc., etc., if

00:-51:-04 16   Mr. Thompson's question was asking about what the FDA

00:-51:-04 17   would do, can or would likely have done we're seeing her

00:-51:-04 18   at her best, which is speculating about not talking

00:-51:-04 19   about what happened, in fact, happened but talking about

00:-51:-04 20   what she thinks would possibly happen had certain facts

00:-51:-04 21   been disclosed in a different way.

00:-51:-04 22        MR. THOMPSON:  Judge, I think it's clearly

00:-51:-04 23   within her expertise and it's within the expertise of an

00:-51:-04 1     expert to say if there is a matrix that is used to make

00:-51:-04 2     decision and if, in fact, there were be additional facts

00:-51:-04 3     adduced would it have triggered a left turn on the

00:-51:-04 4     matrix and required that activity by the FDA.  We're not

00:-51:-04 5     insulating.  That's simply that's what additional

00:-51:-03 6     information would cause in the examiner.

00:-51:-03 7          MR. KEENAN:  If she wants to opine about what

00:-51:-03 8     she would do when she worked, tell FDA how she would

00:-51:-03 9     interpret it that's different, that's different, but her

00:-51:-03 10    talking about what the FDA would have done is completely

00:-51:-03 11    improper.

00:-51:-03 12         MR. THOMPSON:  I will restate my question.

00:-51:-03 13         THE COURT:  Very well.

00:-50:-59 14         (Sidebar conference concluded.)

00:-50:-59 15    BY MR. THOMPSON:

00:-50:-58 16        Q.   Dr. Parisian, if the additional stiffness and

00:-50:-55 17    if the delivery system had been disclosed within the

00:-50:-50 18    body of the 510k submission, if you were the examiner

00:-50:-43 19    what would you have done?

00:-50:-41 20        A.   If I was the examiner, I'd ask for information

00:-50:-38 21    about the potential risk of having something thickened

00:-50:-33 22    right at the urethral support.  So I would have asked

00:-50:-30 23    for additional information, which is what the FDA can do

00:-50:-27 1    if there's a potential new issue of safety and

00:-50:-24 2    effectiveness, that allows the FDA then to ask for

00:-50:-21 3    additional information.  Particularly, we know with the

00:-50:-17 4    TVT, when they were told about the equipment, the tools

00:-50:-13 5    that the FDA was then able to ask for data to support

00:-50:-06 6    that you could actually use it the way you were

00:-50:-05 7    intending to use it.  Without that information the FDA

00:-50:-03 8    can't ask that.  They're basing what they can do on what

00:-50:-00 9    the company is telling them they are going to be

00:-49:-57 10   marketing.

00:-49:-56 11        Q.   All right.  Doctor, let me turn from the

00:-49:-52 12   Advantage -- and here again, let me sum up just one

00:-49:-49 13   time.  We're talking about the Advantage 510k; is that

00:-49:-46 14   correct?

00:-49:-46 15        A.   Yes, sir.

00:-49:-45 16        Q.   We're not talking about the Advantage Fit sling

00:-49:-41 17   as we sit here, are we?

00:-49:-39 18        A.   Right.  Now, the FDA didn't have the Advantage

00:-49:-36 19   name all they had was modified Trelex.  There wasn't any

00:-49:-31 20   name given to the FDA for what this mesh what is going

00:-49:-28 21   to be sold as.  That's okay.  It said to be determined

00:-49:-23 22   or the Trelex mesh modified Trelex mesh which is a

00:-49:-17 23   surgical mesh when they are looking at the 510k.

00:-49:-15   1       Q.   Let's turn our attention to the Pinnacle 510k

00:-49:-11   2   now.  And I want to put that flow sheet back up again

00:-49:-01   3   please, the same one we just had.

00:-48:-56   4           Now, between 2002 and 2007, was there any

00:-48:-52   5   change in the way that the examiner was required to look

00:-48:-48   6   at the 510k submission?

00:-48:-45   7       A.   No.  That flow chart that we looked at still

00:-48:-41   8   applies, still applies today.

00:-48:-40   9       Q.   So now we're back with a new flow sheet.  In

00:-48:-22   10  fact, having done that, let's go to page 444, please.

00:-48:-09   11  This is going to be a little bit hard to read because

00:-48:-06   12  it's light print.  But can we blow this up so we can

00:-48:00   13  get -- there we go.

00:-47:-58   14          Dr. Parisian, what is this?

00:-47:-55   15      A.   This is a 510k -- let's see I think -- this is

00:-47:-47   16  for the Pinnacle 510k and I think this is the 510k

00:-47:-40   17  clearance letter if we can move it up.

00:-47:-38   18      Q.   No, ma'am, this is a submission letter, I'm

00:-47:-35   19  sorry, I should have just said that?

00:-47:-33   20      A.   Yes, sir.  This is the submission letter to the

00:-47:-31   21  FDA.

00:-47:-31   22      Q.   I want to start out with, does this letter form

00:-47:-26   23  a substantive part of the submission?

00:-47:-23 1        A.   This is the first thing the reviewer looks at.

00:-47:-20 2   So it really sets, after having been a reviewer, it sets

00:-47:-15 3   what you are going to be looking at in terms of the

00:-47:-12 4   application.

00:-47:-12 5        Q.   Let's look, first of all, to the second

00:-47:-10 6   paragraph.   Read that for me?

00:-47:-08 7        A.   The proposed mesh is manufactured by Proxy

00:-47:-03 8   Medical and is identical in terms of mesh

00:-47:00 9   characteristics to their previously cleared mesh K

00:-46:-56 10  051245.   Everything at FDA in terms of devices is set by

00:-46:-50 11  that identifier number, K for 510k.   The only difference

00:-46:-43 12  between their previously cleared mesh and the BSC

00:-46:-39 13  proposed mesh are --

00:-46:-37 14       Q.   Let's go to the first bullet point?

00:-46:-35 15       A.   The dimensional shape and size of the mesh, the

00:-46:-32 16  predicate mesh is a rectangular sheet ten cm by 15 cm,

00:-46:-25 17  that is cut to size by the physician.   The physician

00:-46:-23 18  would use scissors to cut what they want.   The proposed

00:-46:-18 19  mesh is offered in three configuration, anterior,

00:-46:-13 20  posterior and total.

00:-46:-13 21       Q.   Your Honor, may I approach the witness for a

00:-46:-10 22  second?

00:-46:-10 23            THE COURT:   Certainly, you may move freely

00:-46:-08  1    throughout the courtroom.

00:-46:-06  2    BY MR. THOMPSON:

00:-46:-05  3        Q.   Dr. Parisian, I've actually tried my hand on

00:-46:-02  4    drawn something, check behind me and tell me if that's a

00:-45:-57  5    ten by 15-centimeter rectangle?

00:-45:-50  6        A.   Yes, sir.

00:-45:-50  7        Q.   All right.  It's at least close enough for

00:-45:-45  8    government work?

00:-45:-44  9        A.   For government work it is, yes.

00:-45:-42 10        Q.   Let's put this on here like this.

00:-45:-23 11             (Pause.)

00:-45:-07 12    BY MR. THOMPSON:

00:-45:-06 13        Q.   Let's get this Pinnacle device.  Doctor, help

00:-45:-01 14    me out.  Put that in there.  Spread that out for me?

00:-44:-54 15        A.   Yes, sir.

00:-44:-53 16        Q.   Let's show this to the jury.  Doctor, is there

00:-44:-50 17    anywhere in the world you could take a 10 by 15

00:-44:-46 18    centimeter rectangle or square Proxy Polyform mesh and

00:-44:-41 19    cut a Pinnacle device out of it?

00:-44:-39 20        A.   No.

00:-44:-38 21        Q.   All right.  As a matter of fact, you and I

00:-44:-35 22    yesterday I showed you if well actually go to the

00:-44:-31 23    diagram in the back, it would take a 27 by 21-centimeter

00:-44:-27 1    square, or rectangle to be able to cut that out of; is

00:-44:-23 2    that right?

00:-44:-23 3        A.   Yes, sir.

00:-44:-22 4        Q.   Here let me -- everybody okay with that?

00:-44:-15 5             So would you use the term identical to describe

00:-44:-03 6    the new use with the old approved use?

00:-43:-57 7        A.   No.

00:-43:-55 8        Q.   Would you believe that the Pinnacle intended

00:-43:-31 9    use is the same as the Polyform intended use?

00:-43:-25 10       A.   No.

00:-43:-22 11       Q.   And would you say that the opening, the size of

00:-43:-18 12   the device is the same?

00:-43:-16 13       A.   No.  And also you've increased the exposure of

00:-43:-12 14   the woman to more mesh.  So that was a new issue of

00:-43:-08 15   safety and effectiveness.

00:-43:-06 16       Q.   Doctor, let's look into the body of the 510k

00:-42:-58 17   submission.  Let's put up 465, Michael.

00:-42:-19 18            That is actually included in the 510k

00:-42:-13 19   submission?

00:-42:-11 20       A.   Yes, sir.

00:-42:-11 21       Q.   Now, is there any comment by the examiner on

00:-42:-08 22   this MSDS, within the Pinnacle clearance process?

00:-42:-04 23       A.   Not in the clinical.

00:-42:-02 1      Q.   The following year in 2008, when the Pinnacle

00:-41:-55 2   two or the uphold is being submitted to the FDA, the

00:-41:-50 3   examiner does talk about the MSDS; is that right?

00:-41:-47 4      A.   Yes, sir.

00:-41:-47 5      Q.   We'll talk about that in a minute, but with

00:-41:-44 6   regard to Pinnacle submission, the examiner makes no

00:-41:-42 7   comment on this; correct?

00:-41:-40 8      A.   Correct.

00:-41:-40 9      Q.   And Boston Scientific makes no disclosure that

00:-41:-35 10   the MSDS for Marlex, in fact, contained a prohibition on

00:-41:-27 11   impermanent implantation in persons; is that right?

00:-41:-24 12          MR. KEENAN:   Objection, leading.

00:-41:-22 13          THE COURT:   Can you rephrase?

00:-41:-21 14   BY MR. THOMPSON:

00:-41:-20 15      Q.   Does Boston Scientific make any reference to

00:-41:-17 16   any restrictions or prohibitions placed on this product

00:-41:-13 17   by the component manufacturer?

00:-41:-11 18      A.   No.

00:-41:-11 19      Q.   Let's look at the Capio tool.  And here again,

00:-40:-57 20   we're talking about the insertion tool (indicating).

00:-40:-40 21          Dr. Parisian, this is the Capio instrument; is

00:-40:-37 22   that right?

00:-40:-37 23      A.   Yes, sir.

00:-40:-36 1      Q.   Now, Doctor, this is described by the Boston

00:-40:-31 2  Scientific as a needle holder; is that right?

00:-40:-29 3      A.   Yes, sir.

00:-40:-29 4      Q.   If I looked to the 510k submission, the very

00:-40:-15 5  beginning there is a requirement that the submission,

00:-40:-11 6  the submitting party provide a listing of all 510k

00:-39:-59 7  submissions that have been put in with regard to any

00:-39:-53 8  item in the proposed device.  Is that right?

00:-39:-48 9      A.   That are relevant to that 510k, yes.

00:-39:-46 10      Q.   Let's look at that real quickly.  Let's look at

00:-39:-30 11  437.  Is this the page?

00:-39:-25 12      A.   I believe so.  Let me see.  It's hard to -- I

00:-39:-17 13  think it is right above where you can't read it.

00:-39:-05 14          (Pause.)

00:-38:-58 15  BY MR. THOMPSON:

00:-38:-57 16      Q.   Doctor, what are the two that they refer to --

00:-38:-52 17  move it down.  What are the two 510ks that Boston

00:-38:-44 18  Scientific referred the examiner to?

00:-38:-42 19      A.   The Polyform predicate, which was the one that

00:-38:-36 20  was already cleared by Proxy.

00:-38:-33 21      Q.   That's the identical product?

00:-38:-31 22      A.   Right, that's the KO 51243.  So the FDA knows

00:-38:-25 23  same mesh is being used for this product.  Then the next

00:-38:-21 1    one they have is the Prolift, that's the Ethicon 510k

00:-38:-13 2    which is pelvic floor repair mesh.

00:-38:-11 3        Q.   Is there any 510k disclosure for the Capio

00:-38:-07 4    tool?

00:-38:-07 5        A.   No.

00:-38:-06 6        Q.   Is there any way for this examiner, based on

00:-38:-03 7    this filing, to know that the Capio has been the subject

00:-37:-58 8    of multiple 510k filings before this?

00:-37:-55 9        A.   No.

00:-37:-55 10        Q.   Are you aware that in, I believe, 2002, Boston

00:-37:-49 11    Scientific went to the FDA and got the Capio tool

00:-37:-44 12    reclassified as a Class I device as a needle holder.

00:-37:-38 13    Are you familiar with that?

00:-37:-37 14        A.   Well, we know there's a 510k.  I'm not sure if

00:-37:-33 15    it's exactly the Capio device, there's a 510k that's

00:-37:-29 16    cleared as a needle holder.

00:-37:-27 17        Q.   In any event, the 510k -- the device that's

00:-37:-24 18    included in the Pinnacle kit is the subject of an

00:-37:-21 19    earlier 510k submission; is that right?

00:-37:-17 20        A.   Three, three earlier ones.  Yes, sir.

00:-37:-14 21        Q.   Was the proposed use for the Capio device open

00:-37:-09 22    surgery supported by an endoscope?

00:-37:-06 23        A.   Yes, it was an endoscope accessory.

00:-37:-02 1          Q.   What is an endoscope?

00:-37:-01 2          A.   An endoscope would be considered a big long

00:-36:-57 3    black tube that's got a camera at the end so you can see

00:-36:-54 4    what's going on where you're working.

00:-36:-51 5          Q.   Is the approved use for the Capio that it would

00:-36:-48 6    be used in abdominal or -- well, used in surgery where

00:-36:-44 7    the device could be visually controlled?

00:-36:-40 8          A.   Right.  There would be some visibility.

00:-36:-37 9          Q.   Are you aware that the Pinnacle device

00:-36:-33 10   contemplated that the Capio would be used blindly by the

00:-36:-28 11   inserting physician?

00:-36:-26 12        A.   Yes, without a trocar.  Yes, sir.

00:-36:-24 13        Q.   And the inserting physician would be expected

00:-36:-21 14   to find the appropriate place of attachment using

00:-36:-13 15   anatomical landmarks; is that correct?

00:-36:-11 16        A.   Yes, sir.

00:-36:-10 17        Q.   There's not a little camera on the end of the

00:-36:-03 18   Capio.  We just looked at it?

00:-36:00 19         A.   That is correct.

00:-35:-59 20        Q.   Is this a different use for the Capio tool?

00:-35:-57 21        A.   Then when it was originally cleared for?  Yes,

00:-35:-52 22   sirs.

00:-35:-51 23        Q.   Is this the first time in the history of the

00:-35:-50 1    world that the Capio is being contemplated to use in a

00:-35:-44 2    woman's pelvis for insertion of a pelvic floor device?

00:-35:-37 3        A.   Yes, sir.

00:-35:-36 4        Q.   Now, is the point of insertion of the Capio

00:-35:-30 5    device, the point of attachment, is that the

00:-35:-21 6    sacrospinous ligament?

00:-35:-20 7        A.   Yes, sir.

00:-35:-19 8        Q.   Is the attachment of an anterior Pinnacle and,

00:-35:-15 9    here again, you're going to have to bare with me,

00:-35:-11 10   anterior means front?

00:-35:-10 11       A.   Right.

00:-35:-09 12       Q.   Are you familiar with any other device that

00:-35:-05 13   uses the sacrospinous ligament to attach any sort of

00:-34:-57 14   hard-point attachment of a device to the sacrospinous

00:-34:-53 15   ligament from an anterior approach?

00:-34:-51 16       A.   Not from an anterior.

00:-34:-48 17       Q.   Is this, in fact, a new and novel use of the

00:-34:-44 18   Capio?

00:-34:-43 19       A.   Yes.  And it also becomes new and novel based

00:-34:-40 20   on their marketing, too, what their claims are what it

00:-34:-35 21   will do.  That wasn't what was cleared in terms of a

00:-34:-31 22   general surgical instrument.

00:-34:-30 23       Q.   Were there any animal, or clinical testing

00:-34:-22 1    provided to the FDA examiner for this 510k proposal?

00:-34:-18 2        A.   For the Pinnacle?

00:-34:-16 3        Q.   Yes, ma'am.

00:-34:-15 4        A.   No, sir.

00:-34:-14 5        Q.   Okay.  Are there new and unknown risks entailed

00:-34:-04 6    with the method of insertion of the Pinnacle?

00:-34:00 7        A.   Yes.

00:-34:00 8        Q.   Is the technique for insertion of the Pinnacle

00:-33:-53 9    novel and unique?

00:-33:-50 10       A.   In terms of the risks, yes, sir.

00:-33:-48 11       Q.   Let's go back to the flow chart.

00:-33:-27 12            Dr. Parisian, if you were the examiner and you

00:-33:-22 13   became aware of the prior classification and the prior

00:-33:-14 14   use of the Capio, you became aware of the intended use

00:-33:-10 15   of the Capio, the intended attachment points, would you

00:-33:-03 16   view that as new or novel issues?

00:-32:-53 17       A.   Yes.  They would raise new issues with safety

00:-32:-50 18   and effectiveness.  So that would then open up FDA to

00:-32:-46 19   ask for additional information.

00:-32:-45 20       Q.   Let's guide our way down.  If you are the

00:-32:-41 21   examiner, you get the new device --

00:-32:-39 22       A.   Remember, I would be clinical.  The person who

00:-32:-37 23   is the examiner is an engineer.  And so they're relying

00:-32:-33  1    on the company to have provided them the safety issues.

00:-32:-30  2    So they don't have the luxury of having knowledge of

00:-32:-27  3    this anatomy and the potential risks.  That's why they

00:-32:-23  4    look to the company to provide that information to them.

00:-32:-20  5         Q.   Where we would make a left turn would be here

00:-32:-15  6    (indicating)?

00:-32:-15  7         A.   Right.

00:-32:-14  8         Q.   Now, in fact, the Pinnacle submission the

00:-32:-10  9    examiner did have some questions, didn't he?

00:-32:-08  10        A.   Yes, he did.

00:-32:-07  11        Q.   And one of the questions he had involved the

00:-32:-03  12   indications for use?

00:-32:-02  13        A.   Right.

00:-32:-01  14        Q.   Is that right?  Can we go to 605.

00:-31:-49  15             What is -- describe for me what we're looking

00:-31:-27  16   at?

00:-31:-27  17        A.   The FDA sends out what they call a request for

00:-31:-23  18   additional information.  So they're allowed to ask some

00:-31:-20  19   questions because they can't complete their review.  So

00:-31:-16  20   they're asking Boston Scientific for some information

00:-31:-14  21   about what they're looking at in terms of marketing

00:-31:-12  22   application.

00:-31:-11  23        Q.   Now --

00:-31:-09  1    A.    What I mean, specifically question three that

00:-31:-05  2    would be the FDA's question and bottom would be the

00:-31:-01  3    Boston Scientific's response.  And I believe -- I don't

00:-30:-58  4    know if this was sent, or it's a draft letter.

00:-30:-56  5    Q.    Well, let's just -- whatever it is it's Boston

00:-30:-50  6    Scientific's responses.  The FDA says that the

00:-30:-45  7    application suggests proposed and predicate devices have

00:-30:-41  8    the same indications, but we note that your proposed

00:-30:-37  9    device has an additional sentence, this includes but is

00:-30:-34 10    not limited to enterocele, rectocele, and cystocele, and

00:-30:-29 11    vaginal vault prolapse repair?

00:-30:-26 12    A.    Yes.

00:-30:-25 13    Q.    And the FDA asked to provide information about

00:-30:-22 14    that use, those uses; right?

00:-30:-19 15    A.    Right.  They're saying please provide

00:-30:-16 16    information that identifies the legally marketed device

00:-30:-13 17    indicated for and those indications.  That means you

00:-30:-09 18    can't 510k it unless there's a device that has that

00:-30:-05 19    similar indication.  You can ask for additional

00:-30:-03 20    information, you can consider other ways to get this

00:-30:00 21    product approved, but you can't use the 510k if you

00:-29:-57 22    don't have a predicate.

00:-29:-55 23    Q.    Now, in fact, the anticipated use of the

00:-29:-51  1      Pinnacle was to repair enteroceles, rectoceles,

00:-29:-44  2      cystoceles, and vaginal vault prolapse repair; isn't

00:-29:-40  3      that right?

00:-29:-40  4            A.   In terms of the marketing.  Yes, sir.

00:-29:-39  5            Q.   In terms of Ms. Barba?

00:-29:-37  6            A.   Yes.

00:-29:-37  7            Q.   The intended use of the Pinnacle was to repair

00:-29:-34  8      a cystocele?

00:-29:-33  9            A.   Correct.  And there is no surgical mesh that's

00:-29:-30 10      approved or cleared for that indication.

00:-29:-27 11            Q.   Well, when we get down to BSC response is what?

00:-29:-21 12            A.   They delete the indication.  They don't tell

00:-29:-14 13      the FDA that they are planning to market it for it, but

00:-29:-11 14      we're going to delete the indication.

00:-29:-10 15            Q.   Did they, in fact, market it for exactly that?

00:-29:-07 16            A.   Yes.

00:-29:-07 17            Q.   Okay.  Now, the other devices that they

00:-29:-03 18      referred to are what?

00:-29:-01 19            A.   What do you mean "the other devices," the

00:-28:-57 20      predicates?

00:-28:-56 21            Q.   Let me ask you a couple more questions.

00:-28:-51 22            A.   Well, the first submission was the Ethicon

00:-28:-44 23      prolene soft, the Proxy Polyform.

00:-28:-39 1         Q.   Let's go to Bates 602, please.

00:-28:-28 2              Do you recall, this is, I think, this is

00:-28:-18 3    continuing the FDA examiner's questions about the

00:-28:-14 4    Pinnacle; correct?

00:-28:-13 5         A.   Right.

00:-28:-13 6         Q.   Read me the question?

00:-28:-07 7         A.   Recently CDRH has received several hundred

00:-28:-01 8    complaints including five deaths, related to surgical

00:-27:-58 9    meshes used in gynecological surgery.  These reports

00:-27:-53 10   included patients experiencing adverse events such as

00:-27:-50 11   mesh erosion, and extrusion, infection, abscess

00:-27:-45 12   formation, sepsis, as well as organ and vessel

00:-27:-40 13   perforations, post-operative bleeding, hematoma and

00:-27:-36 14   incontinence.  Many of these patients required

00:-27:-33 15   additional surgery to remove a portion of the mesh,

00:-27:-28 16   adhesions, provide antibiotic therapy, blood

00:-27:-23 17   transfusions and/or repair injuries related to the

00:-27:-20 18   initial surgery.

00:-27:-19 19             Because you proposed a device with a novel

00:-27:-16 20   design in which physicians may not directly observe

00:-27:-12 21   device placement, please provide information that

00:-27:-09 22   addresses the following concerns.

00:-27:-05 23        Q.   Keep going.

00:-27:-04 1          A.    Please provide information that support your

00:-26:-51 2     hypothesis that the Pinnacle pelvic floor repair kit

00:-26:-47 3     will be a safe and effective active device that avoids

00:-26:-44 4     the adverse events cited above.  Given the novel design

00:-26:-40 5     of your product, the blinded manner of its implantation,

00:-26:-36 6     the significance of the adverse events cited above, and

00:-26:-31 7     the possibility that animal models may not accurately

00:-26:-27 8     reflect the mechanical forces and stresses in humans

00:-26:-23 9     implanted with your device, such safety and

00:-26:-20 10    effectiveness information may include a clinical

00:-26:-17 11    evaluation of your device.

00:-26:-15 12         If you would like guidance on the design of

00:-26:-13 13    such a study, or submission of an investigational device

00:-26:-06 14    exempt application, please contact Colin Pollard chief

00:-26:-01 15    of the obstetrics and gynecology devices branch at and

00:-25:-58 16    that's his e-mail.

00:-25:-57 17         Q.    Let's go down to their response.  This is

00:-25:-53 18    Boston Scientific's response.  Okay.  What's the first

00:-25:-49 19    thing they say?

00:-25:-48 20         A.    As discussed previously, in response to

00:-25:-46 21    question one, the proposed shapes and sizes of the

00:-25:-42 22    Pinnacle pelvic floor repair kits are not unique and not

00:-25:-38 23    of novel design.  Currently available rectangular

00:-25:-34 1    meshes, such as Polyform are cut to size by the

00:-25:-30 2    physicians prior to placement, and often the physicians

00:-25:-27 3    may place more than one mesh per patient. Additionally,

00:-25:-22 4    there are several preshaped products commercially

00:-25:-19 5    available for the treatment of pelvic organ prolapse

00:-25:-15 6    that have similar dimensions, shape and size, as the

00:-25:-11 7    Pinnacle mesh configurations. The placement of the

00:-25:-07 8    Pinnacle pelvic floor repair kits uses the same

00:-25:-04 9    anatomical landmarks as the predicate devices.

00:-25:00 10        Q.   Scroll that up a little bit for me to the end.

00:-24:-54 11        The next paragraph, please?

00:-24:-45 12        A.   Also, as detailed in the response to question

00:-24:-41 13    one, all of the predicate devices' meshes are delivered

00:-24:-37 14    to the anatomy using trocar type device, those would be

00:-24:-33 15    the things so you can see. The predicate device trocars

00:-24:-29 16    are placed from outside the body, through an incision in

00:-24:-26 17    the patient's skin, puncturing through bodily tissue,

00:-24:-21 18    trans cutaneous. The trocar is advanced blindly in the

00:-24:-16 19    direction of the desired anatomical landmark that is

00:-24:-12 20    identified through palpation by the physician's fingers

00:-24:-09 21    from within the vaginal incision. The physician aims

00:-24:-04 22    and advances the trocar towards his or her finger to

00:-24:00 23    create the needed path for mesh delivery.

00:-23:-58  1        Q.   Now, does the response from Boston Scientific

00:-23:-54  2    recognize that their design is new and novel?

00:-23:-49  3        A.   No.

00:-23:-49  4        Q.   In fact, what do they say?

00:-23:-47  5        A.   They're saying it's not.  They're saying it's

00:-23:-44  6    not unique and not novel.

00:-23:-42  7        Q.   Do they volunteer to address the safety and

00:-23:-36  8    efficacy concerns of the examiner?

00:-23:-34  9        A.   No.

00:-23:-34 10        Q.   Are they forthcoming with the examiner?

00:-23:-31 11        A.   No.

00:-23:-30 12        Q.   Now, let's go back to the flow chart.  Let's

00:-23:-13 13    look at 488, please.

00:-23:-07 14             As a result of the examiner's questions they

00:-23:-03 15    actually followed an amended question for the Pinnacle;

00:-22:-59 16    is that right?

00:-22:-59 17        A.   Yes, an amended.

00:-22:-57 18        Q.   They added a bunch the additional predicate

00:-22:-54 19    devices; is that right?

00:-22:-53 20        A.   Yes, sir.

00:-22:-53 21        Q.   In fact they added every major manufacturer of

00:-22:-49 22    every major pelvic product; is that right?

00:-22:-46 23        A.   Yes, sir.

00:-22:-46  1     Q.   Is there any indication that you have that

00:-22:-40  2     Boston Scientific sought to have these devices not

00:-22:-31  3     treated on their own device, but to have them treated as

00:-22:-26  4     a member of an entire class of devices?

00:-22:-19  5     A.   Yes, sir.

00:-22:-18  6     Q.   I forgot to ask you a summary question.

00:-22:-05  7     Doctor, based on the information with regard to the

00:-22:-02  8     Capio, with regard to the attachment of the anterior to

00:-21:-52  9     the sacrospinous ligaments, with regard to the size of

00:-21:-50  10    the coverage of the shape, based on those factors, if

00:-21:-46  11    you were the examiner, would you have viewed this as a

00:-21:-43  12    new and novel design that required further inquiry?

00:-21:-39  13    A.   I would have.  I would have asked for

00:-21:-37  14    additional information.  The FDA was suggesting that

00:-21:-34  15    when they recommended getting clinical data.

00:-21:-30  16    Q.   Look at this letter dated November 6, 2007.

00:-21:-23  17    And that is -- it's to Dr. Charles Durfor; is that

00:-21:-17  18    right?

00:-21:-17  19    A.   Yes, sir.

00:-21:-17  20    Q.   From who?

00:-21:-16  21    A.   From Boston Scientific.

00:-21:-15  22    Q.   Scroll down.  Let's look at the third

00:-21:-06  23    paragraph; "as discussed," read that had for me?

00:-21:-01 1        A.   As discussed during our telephone call, we

00:-20:-57 2   realized that FDA is evolving its direction on labeling

00:-20:-53 3   requirements for surgical meshes used in pelvic floor

00:-20:-50 4   repair.  We understand and appreciate FDA's desire to

00:-20:-44 5   ensure that the physician and the patient are provided

00:-20:-41 6   appropriate and current information.  We believe that

00:-20:-37 7   the intent of several of the recommended changes have

00:-20:-34 8   been met.  FDA was asking for a series of changes to the

00:-20:-30 9   label.

00:-20:-30 10       Q.   And let's go to the next paragraph.  Read that

00:-20:-26 11  for me?

00:-20:-26 12       A.   Since we have not found language similar to

00:-20:-23 13  these recommendations in the labeling of the predicate

00:-20:-19 14  devices identified in 510k, not in FDA's guidance

00:-20:-16 15  document for surgical meshes, we are perplexed by FDA's

00:-20:-11 16  approach to have these modifications implemented only in

00:-20:-08 17  this submission.  We strongly believe that it would be

00:-20:-05 18  more appropriate and effective for all parties involved

00:-20:-01 19  in the manufacture and use of surgical meshes for FDA to

00:-19:-56 20  request that these labeling changes be embraced by the

00:-19:-53 21  entire surgical mesh industry, not just pelvic, but all

00:-19:-47 22  surgical mesh.  We believe that having similar products

00:-19:-45 23  in the marketplace with different FDA mandated labeling

00:-19:-41 1    will cause confusion among physicians and patients.

00:-19:-38 2        Q.   All right.  Now, let me understand what we're

00:-19:-35 3    saying here.  The FDA is evolving its position; is that

00:-19:-28 4    right?

00:-19:-28 5        A.   Yes, sir.

00:-19:-28 6        Q.   And we've seen the examiner talk about reports

00:-19:-24 7    of serious adverse events; is that right?

00:-19:-20 8        A.   Right, evolution, that would be post marked

00:-19:-15 9    issues, ODE people looking alternative these

00:-19:-12 10   applications are premarket.  So somehow they become

00:-19:-10 11   aware of these products being used and the post market

00:-19:-07 12   part of FDA has brought this to their attention.  So

00:-19:-03 13   it's helping to evolve as what's being described here.

00:-19:00 14       Q.   You don't what May 12, 2009, is do you?

00:-18:-56 15      A.   That's Mrs. Barba's surgery.

00:-18:-53 16      Q.   You do know that.  All right May 12, 2009.  As

00:-18:-49 17   of November of 2007, did Boston Scientific embrace the

00:-18:-43 18   FDA's concern for safety and efficacy of these pelvic

00:-18:-37 19   floor products and seek additional information to

00:-18:-34 20   provide safety to Ms. Barba?

00:-18:-31 21      A.   No.

00:-18:-31 22      Q.   In fact, what did they propose?

00:-18:-28 23      A.   They wanted it to be all surgical meshes had to

00:-18:-23 1    have the same types of information.

00:-18:-22 2        Q.   Now, surgical mesh is different than surgical

00:-18:-17 3    mesh implanted into the pelvic region by pelvic floor

00:-18:-11 4    kits?

00:-18:-10 5        A.   That's correct.

00:-18:-10 6        Q.   How long does it take to get a class-wide label

00:-18:-04 7    change?

00:-18:-04 8        A.   It can take at least a year, closer to

00:-18:00 9     two years because you're going to have to get all kind

00:-17:-56 10   of comments periods.  FDA has certain requirements in

00:-17:-52 11   terms of trying to get class label.  If they can

00:-17:-49 12   negotiate it voluntarily, that's much better than having

00:-17:-46 13   to go through the process of taking an entire class,

00:-17:-44 14   going through the type of class or type of product

00:-17:-41 15   change.

00:-17:-41 16       Q.   The FDA regulations, the prevailing statutes

00:-17:-38 17   require a medical device company that becomes aware of a

00:-17:-34 18   safety issue to communicate that; is that right?

00:-17:-30 19       A.   Yes.

00:-17:-30 20       Q.   Do they have to wait on the FDA?

00:-17:-28 21       A.   No.  No, the manufacturer can immediately

00:-17:-24 22   update their labeling, their sales reps.  They're

00:-17:-19 23   required to update their prescription label.  They can

00:-17:-16 1    communicate at all times with doctors and through their

00:-17:-13 2    only sales reps and that's usually what they do.

00:-17:-10 3            THE COURT:  We need to take a break at some

00:-17:-07 4    point.

00:-17:-07 5            MR. THOMPSON:  Your Honor, this is fine.  I've

00:-17:-04 6    probably got 20 more minutes on direct.

00:-17:00 7             THE COURT:  Let's take a break.

00:-16:-55 8            (The jury left the courtroom at 11:38 a.m.)

00:-16:-27 9            THE COURT:  Dr. Parisian, you've probably been

00:-16:-25 10   told you cannot discuss your testimony with anyone when

00:-16:-21 11   you're on a break.

00:-16:-20 12           THE WITNESS:  Yes, Your Honor.

00:-16:-15 13           (A short recess was taken.)

00:-02:-21 14           THE COURT:  Bring in the jury.

00:-01:-39 15           (Pause.)

00:-01:-38 16           (The jury entered the courtroom at 11:54 a.m.)

00:-01:-02 17           MR. THOMPSON:  May it please the Court?

00:00:-58 18    BY MR. THOMPSON:

00:00:-57 19       Q.   Dr. Parisian, let me get back to what we were

00:00:-54 20    talking about.  The FDA issued a clearance letter to

00:00:-49 21    Boston Scientific for the Pinnacle?

00:00:-47 22       A.   Yes, sir.

00:00:-46 23       Q.   And did that clearance letter approve the

00:00:-43 1    Pinnacle?

00:00:-42 2        A.   No.

00:00:-42 3        Q.   Did it relieve Boston Scientific of any

00:00:-37 4    obligation it had to comply with and conform to all

00:00:-32 5    regulations?

00:00:-32 6        A.   No, it did not.

00:00:-31 7        Q.   Did it relieve Boston Scientific of any

00:00:-27 8    obligation to provide a safe and nondefective product to

00:00:-22 9    the consuming public?

00:00:-21 10       A.   No, it did not.

00:00:-20 11       Q.   All of those obligations remain with Boston

00:00:-16 12    Scientific; right?

00:00:-15 13       A.   Correct.

00:00:-15 14       Q.   Now, post clearance, is there a branch of FDA

00:00:-09 15    that follows and tracks the public health?

00:00:-04 16       A.   Yes.

00:00:-03 17       Q.   Now, in fact, we saw with the FDA examiner

00:00:01 18    saying we've had several hundred reports?

00:00:03 19       A.   Yes.

00:00:03 20       Q.   What would be the source of those reports?

00:00:05 21       A.   That would be the post-market branch which

00:00:08 22    would be office of surveillance and biometrics more

00:00:13 23    compliance arm they're the ones that look at that type

00:00:16   1    of stuff, ODE wouldn't.

00:00:19   2         Q.   All right.  My efficient staff has picked it up

00:00:30   3    before I'm aware.  Is this a copy of the clearance

00:00:33   4    letter?

00:00:33   5         A.   Yes.

00:00:34   6         Q.   And that's included within the package of the

00:00:38   7    510k that we've already gotten.  So we don't need to

00:00:42   8    mark it separately.  But is this a clearance letter?

00:00:45   9         A.   Yes, sir.  This allows the company to begin

00:00:47   10   marketing the product.

00:00:48   11        Q.   Within the body of the letter, is there a

00:00:51   12   statement that sums up what we were just talking about

00:00:55   13   with regard to the company's continuing obligations?

00:00:58   14        A.   Yes.  That's the third paragraph.

00:01:04   15        Q.   Let's highlight the third paragraph.  All

00:01:07   16   right.  Read that for me?

00:01:10   17        A.   Please be advised that FDA's issuance of a

00:01:15   18   substantial equivalence determination does not mean that

00:01:17   19   FDA has made a determination that your device complies

00:01:22   20   with other requirements of the Act or any federal

00:01:26   21   statutes and regulations administered by other federal

00:01:29   22   agencies.  You must comply with all the Act's

00:01:33   23   requirement, that's a food and drug and cosmetic act,

00:01:37  1      including but not limited to registration and listing

00:01:40  2      which is 21 CFR part 807, labeling means they have to

00:01:46  3      create a label.  21 CFR part 801, good manufacturing

00:01:51  4      practice requirements as set forth in the quality

00:01:55  5      systems QS regulation 21 CFR part 820.  That's the

00:02:01  6      product in terms of manufacturing where a manufacturer

00:02:04  7      has to do in terms of marketing a product and selling it

00:02:07  8      and making it, and if applicable, it's not here, it's

00:02:10  9      not an electronic device.

00:02:12  10             So these are the requirements.  In the very

00:02:15  11     first paragraph it says we've shown that you're

00:02:17  12     substantially equivalent, that's what you're cleared

00:02:20  13     for.  But you describe something, you filled in an

00:02:23  14     application now you can start marketing.  Now is the

00:02:27  15     real life of the product is once it gets cleared the

00:02:30  16     manufacturer now has to make sure the product is safe

00:02:33  17     and effective when it's used in patients.

00:02:35  18        Q.   Let's go to July of 2008.  This is after the

00:02:44  19     Pinnacle has been cleared.  Is there a device that

00:02:47  20     Boston Scientific has submitted called Pinnacle II?

00:02:51  21        A.   Yes.  It's the modified Pinnacle, yes, sir.

00:02:54  22        Q.   And, in fact, were there examiner questions

00:02:58  23     with regard to the modified Pinnacle?

00:03:02  1          A.   Yes.

00:03:02  2          Q.   Would you pull that up for me.

00:03:22  3               (Pause.)

00:03:22  4     BY MR. THOMPSON:

00:03:31  5          Q.   Let's highlight what the FDA examiner's

00:03:34  6     question is.

00:03:44  7               Dr. Parisian, can you identify this document?

00:03:46  8          A.   This is Boston Scientific's responses for the

00:03:51  9     FDA's questions for additional information for the 510k

00:03:55  10    which marketed the Uphold device.  I'm not sure if this

00:04:01  11    is the draft there's draft ones.  I'm not sure if this

00:04:05  12    is actual submitted once.

00:04:06  13         Q.   There's a thing that K 081048?

00:04:12  14         A.   That's 510k model for modified Pinnacle II

00:04:16  15    which is eventually sold for the Uphold.

00:04:19  16              MR. THOMPSON:  Your Honor, I'm not sure if this

00:04:22  17    group was previously offered in this action but we would

00:04:27  18    like to offer it.

00:04:29  19              MR. KEENAN:  No objection.

00:04:33  20              MR. THOMPSON:  Certainly I want to offer into

00:04:36  21    the evidence the two 510ks that were previously

00:04:40  22    identified.

00:04:40  23              MR. KEENAN:  No objection.

00:04:41  1               THE COURT:  Very well.

00:04:42  2    BY MR. THOMPSON:

00:04:49  3          Q.  Dr. Parisian, I'm going to hand you Plaintiff's

00:04:53  4    Exhibit 32, which is hard copy version of what you're

00:04:55  5    looking at on the screen, okay?

00:04:57  6          A.  Yes, sir.

00:04:58  7          Q.  What is the examiner asking about?

00:05:02  8          A.  This particular case question is about the

00:05:05  9    Capio.  The Capio's suture capturing device.  Saying

00:05:11  10   that there's a large number of adverse events reported

00:05:14  11   to the FDA regarding tip breakage of the Capio suture

00:05:19  12   capturing device.  Please include instructions on how to

00:05:23  13   manage such an adverse event during surgery.

00:05:26  14         Q.  And their response is what?

00:05:29  15         A.  The company says we disagree that the number of

00:05:32  16   adverse events reported to the FDA regarding tip

00:05:36  17   breakage of the Capio suture capturing device is large.

00:05:40  18   Our records indicate that there were only 7 MDRs for the

00:05:46  19   Capio suture capturing device to be packaged within the

00:05:50  20   pelvic floor repair kits from January 2006 through

00:05:54  21   May 2008.  Over the this same period of time 53 thousand

00:06:00  22   five hundred Capio suture capturing devices were sold.

00:06:04  23   Therefore, the average MDR rate is 0.013 percent.

00:06:16  1        Q.   All right.  Dr. Parisian, I'm going to put on

00:06:25  2   the board something entitled the Field Assessment Plan,

00:06:28  3   which has already been put into evidence as Plaintiff's

00:06:31  4   Exhibit 18.

00:06:36  5            Let's turn to page 3 of 34.  This is a field

00:06:49  6   assessment of the Pinnacle Anterior Apical PFR kit, do

00:06:57  7   you see that?

00:06:57  8        A.   Yes, sir.

00:06:58  9        Q.   It assesses the performance of the Pinnacle

00:07:01  10  Anterior Apical PFR critic from December '08 -- well,

00:07:08  11  January '08, through December '08; is that correct?

00:07:11  12       A.   Yes, sir.

00:07:12  13       Q.   And it uses a baseline failure rate of

00:07:16  14  6500 parts per million; is that right?

00:07:20  15       A.   Yes, sir.

00:07:20  16       Q.   Is that an FDA standard?

00:07:22  17       A.   No.

00:07:23  18       Q.   Is that an industry standard?

00:07:25  19       A.   No.

00:07:26  20       Q.   Is that an ISO standard?

00:07:29  21       A.   No.

00:07:29  22       Q.   Is that a ATSM standard?

00:07:35  23       A.   No.

00:07:36   1        Q.   Who made that standard?

00:07:37   2        A.   Boston Scientific.  They set that as their

00:07:41   3    acceptable limit for a number of reports.

00:07:44   4        Q.   And what is the result of the -- before I ask

00:07:49   5    you that, do they actually have complaints for mesh

00:07:55   6    suture and Capio?

00:07:57   7        A.   Yes.

00:07:58   8        Q.   And then if you put those together, what is the

00:08:02   9    complaint rate for --

00:08:05   10        A.   It's much higher than -- yeah, there you go,

00:08:09   11    complaint rate.  So the Capio even exceeds the 65

00:08:14   12    hundred.  But you can look at the mesh complaints and

00:08:17   13    suture complaints.

00:08:17   14        Q.   If I turn the page to 434, in fact, the average

00:08:23   15    for the year is 38,250 parts per million?

00:08:27   16        A.   Correct.  So that's not acceptable in terms of

00:08:30   17    65 hundred.

00:08:30   18        Q.   In fact, that's six times the maximum failure

00:08:35   19    rate or the maximum complication rate?

00:08:38   20        A.   As set by Boston Scientific.  Yes, sir.

00:08:40   21        Q.   All right.  So let's go back to their response

00:08:43   22    to the FDA.

00:09:01   23             It says, we disagree that the number of adverse

00:09:05   1   events reported to FDA regarding tip breakage of Capio

00:09:09   2   suture capturing device is large.  Our records indicated

00:09:12   3   that there were only 7 MDRs for the Capio suture

00:09:18   4   capturing device to be packaged within the pelvic floor

00:09:22   5   repair kits from January 2006 to May 2008.  First of

00:09:28   6   all, what is an MDR.

00:09:30   7       A.   That's a Medical Device Report, it's described

00:09:33   8   in 21 CFR 803, and it's a mandatory report filed by

00:09:38   9   industry, or it can be voluntary reports.  It's in the

00:09:42  10   FDA's database.  It's what the FDA has received.  It's

00:09:46  11   not complaints that Boston Scientific has.  It's what

00:09:48  12   the FDA has managed to get in their database.

00:09:52  13       Q.   So would we be justified in assuming that

00:09:55  14   although the FDA did not ask for the number of MDRs,

00:10:01  15   that's what Boston Scientific provided as their response

00:10:05  16   to the FDA; is that right?

00:10:06  17       A.   Yeah, the FDA has the MDRs and FDA is saying

00:10:10  18   that it's a large number for the Capio.  And the company

00:10:14  19   is saying no, it's not in terms of the reply, and what

00:10:18  20   the FDA is really asking is what is the company

00:10:20  21   receiving for the Capio device because the FDA doesn't

00:10:24  22   have the company's complaint file.

00:10:26  23       Q.   If the field assessment plan is correct, did

00:10:31  1    the company have information exclusive to itself that

00:10:35  2    was not available to the FDA?

00:10:37  3        A.   Yes.

00:10:37  4        Q.   If in fact, the company is under an obligation

00:10:42  5    of being truthful and forthcoming, looking at these two

00:10:47  6    documents juxtaposed, were they satisfying that

00:10:50  7    obligation?

00:10:50  8        A.   No, they weren't providing accurate reports to

00:10:55  9    the FDA.

00:10:55  10       Q.   Now, in this same inquiry of July 17th, 2008,

00:11:04  11   did the FDA request information about the manufacturer

00:11:10  12   safety data sheet?

00:11:11  13       A.   Yes.

00:11:11  14       Q.   Now, this is not the Pinnacle request, is it?

00:11:15  15       A.   No.   This is later Uphold.

00:11:18  16       Q.   This is a device that became known commercially

00:11:22  17   as the Uphold; is that right?

00:11:24  18       A.   Yes.

00:11:24  19       Q.   In that request it looks like the examiner

00:11:28  20   checked the Uphold more closely than he checked the

00:11:34  21   Pinnacle?

00:11:34  22            MR. KEENAN:   Objection, Your Honor, can we

00:11:36  23   approach?

00:11:36  1          THE COURT:  Yes.

00:11:44  2          MR. THOMPSON:  Why don't I withdraw that

00:11:46  3  question, if that's okay.

00:11:47  4          MR. KEENAN:  Subject to the Court's previous

00:11:50  5  instruction, yes.

00:11:51  6          MR. THOMPSON:  All right.

00:11:52  7  BY MR. THOMPSON:

00:11:53  8      Q.   Dr. Parisian was the MSDS, the Manufacturer

00:11:56  9  Safety Data Sheet included in the Pinnacle 510k?

00:12:00  10      A.   Yes.

00:12:00  11      Q.   Was the Manufacturer Safety Data Sheet included

00:12:05  12  in the Uphold or the modified Pinnacle?

00:12:08  13      A.   Yes, same sheet.

00:12:10  14      Q.   Did the examiner in the Pinnacle make any

00:12:13  15  inquiry about the MSDS?

00:12:16  16      A.   No.

00:12:16  17      Q.   Did the examiner in the Uphold make any inquiry

00:12:21  18  about the MSDS?

00:12:23  19      A.   Yes, it did.

00:12:24  20      Q.   In response to the question from the examiner,

00:12:28  21  did Boston Scientific recite prior experience with the

00:12:35  22  Marlex polypropylene resin?

00:12:41  23      A.   Yes.

00:12:42  1      Q.   And did they recite the study, the rabbit study

00:12:51  2   that was conducted on the Advantage mesh?

00:12:53  3      A.   Yes.

00:12:55  4      Q.   Is, in fact, the Advantage mesh the same as the

00:13:05  5   Polyform mesh?

00:13:06  6      A.   The resin is, but there's difference in terms

00:13:09  7   of the final production of the proxy mesh in terms of

00:13:12  8   trying to make it softer, there's extra steps put into

00:13:16  9   it.

00:13:16  10      Q.   Did Boston Scientific conduct any additional

00:13:20  11   testing on the Polyform mesh in response to the

00:13:22  12   examiner's question about the MSDS sheet?

00:13:26  13      A.   No.

00:13:26  14      Q.   One final thing about the 510k for the

00:13:48  15   Pinnacle.  Let's go to page 464, please.

00:14:17  16           How about making that bigger.  Appendix 9A MSDS

00:14:34  17   for Marlex HGX 30001?

00:14:39  18      A.   Yes, sir.

00:14:39  19      Q.   In fact is that a truthful and correct

00:14:41  20   statement?

00:14:41  21      A.   No.

00:14:42  22      Q.   Why not?

00:14:42  23      A.   Because that's not the Marlex mesh.  It was

00:14:46  1   Marlex HGX 0303-01.  It's the same Marlex resin used in

00:14:54  2   the Advantage and the same Marlex resin that was used

00:14:57  3   for biocompatibility testing.  So that's not the correct

00:15:01  4   resin.

00:15:02  5       Q.  So this is a paragraph and I believe later on

00:15:04  6   in this document it's referred to as a Marlex HGX

00:15:09  7   300-01?

00:15:11  8       A.  Yes, it doesn't exist, as far as I can find.

00:15:14  9       Q.  And does this speak to the proof reading and

00:15:18  10  care with which this document was assembled?

00:15:21  11      A.  Yes, it's incorrect.  It's a major error and

00:15:25  12  it's continues -- but it's not just on this page, it's

00:15:29  13  continuous for --

00:15:31  14          MR. KEENAN:  Objection, Your Honor.  Your Honor

00:15:34  15  that's --

00:15:34  16          THE COURT:  Right.

00:15:37  17  BY MR. THOMPSON:

00:15:38  18      Q.  Doctor, did the FDA, not the part that's

00:15:46  19  looking at clearance.  We've talked about that probably

00:15:50  20  more at length than anybody wants to hear about.  I'm

00:15:54  21  talking now about the surveillance part.  Did there come

00:15:58  22  a time when the FDA surveillance folks ascertained a

00:16:07  23  public health risk from the surgical mesh that was used

| 00:16:09 | 1 | in these pelvic products? |
| 00:16:12 | 2 | A.   Yes. |
| 00:16:12 | 3 | Q.   And did they, in fact, advise the manufacturers |
| 00:16:16 | 4 | that they intended to issue a public health notice? |
| 00:16:20 | 5 | A.   Yes. |
| 00:16:20 | 6 | Q.   And did they receive a response from industry |
| 00:16:26 | 7 | prior to the public health notice? |
| 00:16:30 | 8 | A.   Industry and physicians.  It was -- yes. |
| 00:16:35 | 9 | Q.   Dr. Parisian, I want to hand you Plaintiff's |
| 00:16:55 | 10 | Exhibit 33, please? |
| 00:16:56 | 11 | MR. KEENAN:  Mr. Thompson, can we approach |
| 00:16:59 | 12 | briefly. |
| 00:17:00 | 13 | MR. THOMPSON:  Please. |
| 00:18:51 | 14 | (The following sidebar conference was held.) |
| 00:18:51 | 15 | MR. KEENAN:  This is not an objection, per se. |
| 00:18:51 | 16 | But it is a request for original, actually she used this |
| 00:18:51 | 17 | document because this is not a Boston Scientific |
| 00:18:51 | 18 | document, it's not an industry document.  Boston |
| 00:18:51 | 19 | Scientific isn't anywhere on this but I will guarantee |
| 00:18:51 | 20 | you see it's by physicians Pelvic Health Coalition. |
| 00:18:51 | 21 | She's going to jump from this to Boston Scientific. |
| 00:18:51 | 22 | This is Dennis miller, who is a physician who happened |
| 00:18:51 | 23 | to be for Pinnacle.  He's not an employee, he is a |

00:18:51 1    consultant for Boston Scientific.  Boston Scientific is

00:18:51 2    nowhere to be found on this cease, going to use this and

00:18:51 3    talk about Boston Scientific and I'm going to be

00:18:51 4    objecting like crazy.  All I'm doing I'll let you lead

00:18:51 5    but this is not a Boston Scientific document and it's an

00:18:51 6    industry document, it's a physician document that if she

00:18:52 7    speculates anything about this I'm going to be on my

00:18:52 8    feet.  Fair enough?

00:18:52 9              MR. THOMPSON:  Sure.

00:18:52 10              THE COURT:  Also while we're here I assume

00:18:52 11    since there's been no objection everyone is comfortable

00:18:52 12    with the fact that this witness knows the relative time

00:18:52 13    period she's talking about?

00:18:52 14              MR. THOMPSON:  Your Honor, we are abiding by

00:18:52 15    your ruling.

00:18:52 16              THE COURT:  I knew that you were.  I wanted to

00:18:52 17    make sure the witness new.

00:18:52 18              MR. THOMPSON:  Yes, she's not going to

00:18:52 19    volunteer any after 2009.

00:18:52 20              THE COURT:  Very well.

00:18:55 21              (Sidebar conference concluded.)

00:18:55 22    BY MR. THOMPSON:

00:18:57 23        Q.   Doctor, I've been will told by my competent

00:18:59  1    staff that I've given you a bum copy.  Let me substitute

00:19:04  2    Plaintiff's Exhibit 32 from that.  This is a document

00:19:08  3    from the Pelvic Health Coalition?

00:19:11  4         A.   Yes, sir.

00:19:11  5         Q.   You've had an opportunity to review that

00:19:13  6    document; is that right?

00:19:14  7         A.   Yes, sir.

00:19:14  8         Q.   One of the executive board members is a Dennis

00:19:17  9    Miller, MD.  Do you see that?

00:19:19  10        A.   Yes, sir.

00:19:19  11        Q.   Are you aware that Dennis Miller is the

00:19:22  12   inventor and patent holder for the Pinnacle?

00:19:27  13        A.   Yes, sir.

00:19:27  14        Q.   Are you aware that Dr. Miller is a consultant

00:19:34  15   with Boston Scientific?

00:19:36  16        A.   Yes, sir.

00:19:37  17        Q.   Are you aware that Dr. Miller is in fact Boston

00:19:39  18   Scientific's representative on the Pelvic Health

00:19:43  19   Coalition?

00:19:45  20        A.   Yes, sir.

00:19:47  21             MR. KEENAN:  Objection, speculation.

00:19:49  22             THE COURT:  Is that not accurate?  Or it's

00:19:54  23   based on the witness's knowledge.

00:19:57　1　　　　　　　　MR. THOMPSON:  Your Honor, she's reviewed

00:19:59　2　documents that -- well, I'm talking too much in front of

00:20:03　3　the jury but --

00:20:05　4　　　　　　　　THE COURT:  Try to lay a foundation for her

00:20:07　5　knowledge on that issue.

00:20:09　6　　　　　　　　MR. THOMPSON:  Let me withdraw that question

00:20:11　7　and we'll move on.

00:20:12　8　BY MR. THOMPSON:

00:20:13　9　　　　Q.　Doctor, is this a communication to the FDA?

00:20:16　10　　　　A.　Yes, sir.

00:20:17　11　　　　Q.　And is this a document that seeks to have the

00:20:22　12　FDA not issue a public health notice regarding safety

00:20:28　13　issues of pelvic mesh?

00:20:32　14　　　　A.　Yes.

00:20:32　15　　　　Q.　Now, if I could put up -- let me hand you

00:20:54　16　Plaintiff's Exhibit 34.  This is a document entitled FDA

00:21:07　17　Medical Devices FDA, Public Health Notification Serious

00:21:16　18　Complications Associated with Transvaginal Placement of

00:21:18　19　Surgical Mesh and Repair of Pelvic Organ Prolapse and

00:21:23　20　Stress Urinary Incontinence?

00:21:23　21　　　　A.　Yes, sir.

00:21:23　22　　　　Q.　Can we figure out the date of this from the

00:21:27　23　date of the document itself?

00:21:28   1          A.   October 20, 2008.

00:21:29   2          Q.   So if we look at the Pelvic Health Coalition

00:21:35   3   letter, that's this days before; correct?

00:21:38   4          A.   Yes, sir.

00:21:38   5          Q.   Doctor, this public health notice is advice

00:21:44   6   that the FDA has received over a thousand complaints of

00:21:49   7   serious injury; is that right?

00:21:51   8          A.   Yes, sir.

00:21:52   9          Q.   Is the MAUDE reporting system a voluntary

00:22:03   10  system?

00:22:03   11         A.   Yes, sir.  Well, not for industry it's

00:22:07   12  mandatory, for physicians and anyone else you can

00:22:10   13  report.

00:22:11   14         Q.   Say for example Ms. Barba had a bad outcome

00:22:14   15  from a Pinnacle surgery, is Dr. Carlson under a mandate

00:22:18   16  to report that to the FDA?

00:22:21   17         A.   No.  He can.  Same with Ms. Barba, she can.

00:22:25   18         Q.   In your body of knowledge and within your

00:22:31   19  expertise as a regulatory expert, is there, in fact, a

00:22:35   20  rule of thumb as to the expected number of, or

00:22:40   21  percentage of serious injuries that actually get

00:22:43   22  reported?

00:22:43   23         A.   Yes in terms of working with this you the FDA

00:22:48  1    would think of maybe one to 10 percent max is actually

00:22:53  2    getting reported to the FDA.  There's numbers to support

00:22:56  3    that.  If there's a delay involved like something that's

00:23:00  4    implanted, you would think that your reporting is even

00:23:03  5    less because people just don't associate with the

00:23:06  6    product with the complaint.  So FDA looks at reporting,

00:23:11  7    when I was at the FDA looking at MDRs as just a tip of

00:23:17  8    an iceberg.  So they're saying there's a thousand --

00:23:20  9    which is a large number, the FDA is concerned about a

00:23:24  10   thousand reports it has received in its database.

00:23:26  11        Q.   Let's actually scroll down a little bit and put

00:23:29  12   up the nature of the problem, if you could highlight

00:23:32  13   that.  Of course, everybody in the regulatory industry

00:23:36  14   knows about this under reporting; is that right?

00:23:40  15        A.   Yes, Congress has been trying to come up with

00:23:43  16   alternative types reporting mechanisms.

00:23:46  17        Q.   If they are reporting on a thousand complaints

00:23:50  18   there's expectation that the actual number of injuries

00:23:53  19   is greatly higher than that; isn't that right?

00:23:55  20        A.   Yes.  By the FDA.  Yes, sir.

00:23:58  21        Q.   I'm not sure we need to read this exactly.

00:24:07  22   It's now in evidence.  But it does report to over the

00:24:11  23   last three years FDA has received over a thousand

00:24:14  1     reports from nine surgical mesh manufacturers from

00:24:17  2     complications that were associated with surgical mesh

00:24:19  3     devices used to repair POP and SUI.  These mesh devices

00:24:24  4     are usually placed transvaginally utilizing tools for

00:24:28  5     minimally invasive placement; right?

00:24:31  6         A.   Yes, sir.

00:24:31  7         Q.   And that's as of October 20, 2008?

00:24:35  8         A.   Yes.

00:24:36  9         Q.   Now, did the FDA continue to seek information

00:24:42  10    regarding complications, and regarding the public safety

00:24:45  11    issues involving these transvaginal replaced pelvic

00:24:55  12    devices?

00:24:56  13        A.   Yes.

00:24:56  14        Q.   Ms. Barba's device was placed on May 12, 2009;

00:25:01  15    correct?

00:25:01  16        A.   Yes, sir.

00:25:01  17        Q.   Are you aware of any communication from Boston

00:25:05  18    Scientific to treating physicians alerting them of the

00:25:14  19    complications that were being seen and were being

00:25:17  20    reported by the FDA?

00:25:19  21        A.   Not alerting them, no, sir.

00:25:21  22        Q.   You've had an opportunity to look at the

00:25:24  23    directions for use of the Pinnacle and the Advantage; is

00:25:28  1    that correct?

00:25:28  2         A.   Yes, sir.

00:25:28  3         Q.   Do you have any criticisms of the directions

00:25:34  4    for use?

00:25:34  5         A.   Yes.

00:25:34  6         Q.   And what specifically do you think should be

00:25:39  7    placed in those directions to make them more -- to

00:25:45  8    satisfy your concerns?

00:25:46  9         A.   Well, one of the issues is that when a product

00:25:52  10   comes out it's to have a label that is updated with

00:25:55  11   information that's about that product.  And so the

00:25:58  12   information has not been updated to include what the

00:26:01  13   risk is for failure, or complications like revision

00:26:05  14   surgery, difficulties with the product, reoccurrence of

00:26:09  15   symptoms.  That information has not been added by Boston

00:26:13  16   Scientific for their product.  It's a very generic kind

00:26:17  17   of a label that doesn't specifically say what's

00:26:19  18   occurring.  There's nothing really alerting physicians

00:26:24  19   about what is happening with Pinnacle as opposed to just

00:26:27  20   a label.

00:26:28  21              And the DFU, they call it Directions For Use is

00:26:33  22   one document but usually the sales people are updated to

00:26:37  23   also tell the doctor what is the new information that's

00:26:40   1    now being added to the label.  So it's not just the

00:26:42   2    label, that's the label, but labeling is everything the

00:26:46   3    company communities to a doctor, whether through doctor

00:26:49   4    letters, through its sale reps, through patient

00:26:52   5    brochures, that information is not being updated with

00:26:55   6    what's occurring with Pinnacle.

00:26:57   7         Q.   All right.  Doctor, let me go back just one

00:27:02   8    last time to the Pinnacle premarket notification.  Let's

00:27:11   9    go to 453.

00:27:17   10        Doctor, we've talked a little bit about how the

00:27:39   11   FDA relies on the truthfulness and accuracy on the

00:27:43   12   applicant who is submitting the request for premarket

00:27:47   13   clearance; correct?

00:27:48   14        A.   Yes.

00:27:48   15        Q.   In fact, that's actually a page in every 510k;

00:27:52   16   isn't that right?

00:27:52   17        A.   It's required that this page be signed and

00:27:56   18   present, otherwise the 510k won't be accepted.  Though

00:28:01   19   it is a requirement for the 510k.  And it says as

00:28:04   20   required by, and then it has 21 CFR 8097, so it's

00:28:11   21   required.

00:28:11   22        Q.   So Boston Scientific, through its

00:28:13   23   representatives, certifies to the FDA that the

00:28:17  1   information contained is truthful and accurate.  And I

00:28:22  2   guess I want to ask you one additional thing, and that

00:28:25  3   no material information has been withheld; is that

00:28:28  4   right?

00:28:28  5        A.   Correct.

00:28:28  6        Q.   And is there a continuing obligation in Boston

00:28:33  7   Scientific to forward information that impacts the

00:28:38  8   safety of its product to the FDA under that requirement?

00:28:42  9        A.   Yes.

00:28:43  10       Q.   Doctor, in your opinion, did Boston Scientific

00:28:54  11  satisfy the regulations and satisfy its obligations to

00:29:02  12  Ms. Barba, and to the women of the consuming public to

00:29:06  13  provide a safe and nondefective product for permanent

00:29:17  14  implantation into her body?

00:29:19  15       A.   No, it did the not.

00:29:23  16            MR. THOMPSON:  Your Honor, that's all the

00:29:24  17  questions I've got.  Thank you.

00:29:52  18            (Pause.)

00:29:55  19                 CROSS EXAMINATION

00:29:55  20  BY MR. KEENAN:

00:30:06  21       Q.   Dr. Parisian, I have to strike a balance here

00:30:09  22  to make certainly the jury can see this and you can?

00:30:13  23       A.   Do you want me to move over some?

00:30:15   1          Q.   Sure.  If you don't mind.  Great.  Okay.

00:30:24   2          Dr. Parisian, what percentages of your time in

00:30:34   3   your consulting business do you spend consulting in

00:30:37   4   litigation?

00:30:37   5          A.   Right now as I'm getting ready to retire, it

00:30:41   6   would be probably 100 percent.

00:30:43   7          Q.   And you have, in every case that you have

00:30:47   8   testified in court, you have testified for plaintiffs;

00:30:52   9   right?

00:30:52  10          A.   That I've gone to court for, yes, sir.

00:30:55  11          Q.   And in every case that you've testified in

00:30:57  12   court, a component of the opinions that you express in

00:31:02  13   every case includes an opinion that the label or the

00:31:05  14   warnings was deficient; true?

00:31:08  15          A.   Not necessarily.  There's different issues.

00:31:10  16          Q.   My question is:  Is inadequate warnings one of

00:31:14  17   the opinions that you've expressed in each one of your

00:31:16  18   cases that you've testified in trial?

00:31:18  19          A.   And I think I've said that I don't remember

00:31:22  20   every one.  I'll give you the majority of the time, but

00:31:25  21   I don't know if every single case was involved in that.

00:31:27  22          Q.   Well, can we agree that it may be it would be a

00:31:30  23   component, but it may not be the main component?

00:31:33   1        A.    I think that's what I just said.  Yes, sir.

00:31:35   2        Q.    So we talk about how many times you've

00:31:38   3   testified at trials in 2011.  I think you have a list

00:31:48   4   there, it's in your curriculum vitae; right?

00:31:50   5        A.    I think so.  I've given you a list of

00:31:54   6   everything that I have.

00:31:54   7        Q.    In 2010, I have that you've testified in 17

00:31:57   8   trials.  You'll give me that?

00:32:02   9        A.    I'll give you that.  This is a 20-year career,

00:32:05  10   yes, sir.

00:32:05  11        Q.    In 2011, you testified in 11 trials.  Sound

00:32:13  12   about right?

00:32:14  13        A.    I'll accept it.

00:32:16  14        Q.    Okay.  In 2012, you testified in 16 trials;

00:32:23  15   right?

00:32:23  16        A.    I believe so.

00:32:24  17        Q.    I'm going off of your documents.

00:32:27  18        A.    Yeah.  I trust you.

00:32:29  19        Q.    Okay.  Well, I appreciate that.

00:32:31  20        In 2013, the statistics I had was only part of

00:32:36  21   the year for 2013.  So in 2013, in nine months you

00:32:43  22   testified in nine trials probably isn't a fair question

00:32:47  23   but do you know whether there was more than nine trials

00:32:49  1    in be 2013?

00:32:50  2        A.   Probably not.  I'm starting to retire around

00:32:53  3    here, we're coming down.

00:32:54  4        Q.   In 2014, last year, do you know how many trials

00:32:59  5    you've testified in?

00:33:00  6        A.   Off the top of my head about four.  This year I

00:33:07  7    think I've done two, two or three.

00:33:08  8        Q.   Including today?

00:33:09  9        A.   Yes.  That's why I'm retiring.

00:33:13  10       Q.   Well, 17 trials, eleven trials, 16 trials, nine

00:33:19  11   trials, four trials, you are slowing down a little bit?

00:33:22  12       A.   Yes, sir and some of them were the same issue

00:33:25  13   in different trials.

00:33:26  14       Q.   But for every time you testify, again, in a

00:33:29  15   trial you testified for the plaintiff, and you have an

00:33:31  16   opinion that includes inadequacy of the warning?

00:33:36  17       A.   Yes, as an FDA expert that would make sense and

00:33:40  18   those are the cases I chose.  Yes, sir.

00:33:42  19       Q.   So when we talk about the warning, just so

00:33:45  20   we're on the same page, if it's a medical device we're

00:33:49  21   talking about the directions for use, right?

00:33:53  22       A.   For the DFE.  Yes, sir.

00:33:56  23       Q.   In your opinion every case that involves a

00:33:56  1    medical device, you're coming in part of your opinion is

00:33:59  2    that this document they should have done more?

00:34:01  3        A.   Not necessarily.  Because I also was talking

00:34:04  4    about labeling.  And some of the questions about

00:34:06  5    labeling are marketing questions, and information that's

00:34:10  6    given out, off-label use so those would all be included

00:34:15  7    under labeling.

00:34:16  8        Q.   Okay.  I'll take that.  But your opinion

00:34:18  9    includes in part boy, drug company or device company,

00:34:22  10   you should have done more?

00:34:23  11       A.   In the cases I've chosen, yes, sir.  I wouldn't

00:34:26  12   take the case if I didn't think that.

00:34:29  13       Q.   And how much do you -- how much are you paid

00:34:32  14   for your trial testimony today?

00:34:34  15       A.   I'm being paid $600 an hour.  I have a minimum

00:34:39  16   10 hours, it's a going rate of what I do.  And $400 an

00:34:43  17   hour for study back in my office.

00:34:46  18       Q.   So today you're making $6,000?

00:34:48  19       A.   Yes, sir.

00:34:49  20       Q.   And that's no matter, that's the minimum,

00:34:52  21   that's a flat rate, six thousand?

00:34:55  22       A.   It's a flats rate.  Nobody has me testify in

00:34:59  23   court longer than 10 hours.

00:35:01  1          Q.   Each of one of these trials, that's per day, if

00:35:05  2    you go to a second day, that's another $6,000?

00:35:08  3          A.   Yes, sir, and as I said, that's the rate.

00:35:13  4          Q.   You've also given sworn testimony in

00:35:16  5    depositions; right?

00:35:17  6          A.   Yes, sir.

00:35:17  7          Q.   And you've given many depositions over the last

00:35:22  8    five years; correct?

00:35:22  9          A.   Well, I know for 20 years, it's 192

00:35:29  10   depositions, usually 7 hours in length.

00:35:31  11         Q.   So for 20 years, you've had how many

00:35:35  12   depositions?

00:35:36  13         A.   192, and some of them are multiple times for

00:35:39  14   the same issue.

00:35:40  15         Q.   And what's your rate for per day for

00:35:45  16   deposition?

00:35:45  17         A.   That would be a $600 an hour to get to a

00:35:50  18   deposition because I'm out of my office.

00:35:52  19         Q.   Is there a minimum you charge for that?

00:35:54  20         A.   I believe six hours.

00:35:57  21         Q.   Okay.  And so some of the products that you

00:36:15  22   have given testimony in, those are also listed, at least

00:36:20  23   the lawsuits are listed on your curriculum vitae; right?

00:36:22   1          A.   Yes, sir.

00:36:23   2          Q.   So it includes such things as you've given

00:36:25   3    expert testimony involving hormone drugs, right?

00:36:28   4          A.   In the FDA issues every, one of these is FDA

00:36:32   5    issues.

00:36:32   6          Q.   We're all on the same page.  You've given

00:36:35   7    testimony or osteoporosis drugs; right?

00:36:38   8          A.   Yes.

00:36:38   9          Q.   You're given testimony regarding bypass surgery

00:36:42   10   devices?

00:36:42   11         A.   That was investigational use on that one.

00:36:45   12         Q.   Without regard to the use, a bypass surgery

00:36:49   13   devices you've gave testimony on?

00:36:52   14         A.   Hernia mesh are you talking about inguinal, or

00:36:56   15   other types of mesh?

00:36:56   16         Q.   You testified in the Kugel mesh?

00:36:59   17         A.   Rights, that's abdominal hernia.  I wanted to

00:37:02   18   be clear on which one you meant.

00:37:04   19         Q.   You've testified in cases of individuals that

00:37:06   20   took antidepressant drugs; right?

00:37:07   21         A.   Yes, birth defects.  Yes, sir.

00:37:08   22         Q.   You've testified in anti- blood clot drugs;

00:37:12   23   right?

00:37:12  1          A.   Yes, sir, bleeding issues.  Yes, sir.

00:37:14  2          Q.   You've testified in diabetes drugs?

00:37:16  3          A.   Heart disease.  Yes, sir.  Yes, it's 20 years.

00:37:19  4          Q.   You testified in robotic surgery cases; right?

00:37:22  5          A.   Yes, sir.

00:37:23  6          Q.   You testified in a pacemaker case; right?

00:37:25  7          A.   I don't remember if I testified in it.

00:37:27  8          Q.   That was the case we had?

00:37:29  9          A.   Our case, yes.  You're right.  Yes, we did do

00:37:32  10    that.

00:37:33  11         Q.   You testified in a seizure case?

00:37:35  12         A.   A seizure case?  Are you talking about.

00:37:38  13         Q.   Antiseizure drug?

00:37:40  14         A.   I know what seizures are.  I don't remember if

00:37:43  15    I testified in any.

00:37:43  16         Q.   We'll put a question mark by that.  You've

00:37:48  17    testified in cases involving dietary supplements; right?

00:37:52  18         A.   Yes, ephedrine cases.  Yes, sir.

00:37:55  19         Q.   You testified in a heart monitor case?

00:37:58  20         A.   There are multiple ones for that.  Yes, sir.

00:38:00  21         Q.   You've testified in some contraceptive cases?

00:38:02  22         A.   Yeah, but those are the some of the hormone

00:38:05  23    ones.

00:38:05  1          Q.   You testified in a case involving Zimmer in a

00:38:09  2   hip replacement?

00:38:10  3          A.   Yes, sir.  These are all FDA products.

00:38:12  4          Q.   You testified in a case involving alcohol prep

00:38:17  5   pads?

00:38:17  6          A.   I did.

00:38:18  7          Q.   On your list.  We're going to break for lunch

00:38:21  8   in a about 30 minutes, you're happy to consult your

00:38:25  9   list.  I'm just talking about cases in the last 5 years?

00:38:27  10         A.   Okay.

00:38:27  11         Q.   Pain pump case?

00:38:30  12         A.   Yes, we've done a lot of those.

00:38:32  13         Q.   A contact lens case?

00:38:34  14         A.   I don't remember going to court.  Go ahead.

00:38:35  15         Q.   I'm not talking about court, I'm talking sworn

00:38:39  16   deposition testimony?

00:38:40  17         A.   Yes.  Okay.

00:38:40  18         Q.   Involved in a contact lens solution case?

00:38:44  19         A.   Yes, sir.

00:38:45  20         Q.   You've been involved in absorbable sutures

00:38:49  21   case?

00:38:49  22         A.   Infections.  Yes, sir.

00:38:51  23         Q.   Some physicians like absorbable sutures?

| | | |
|---|---|---|
| 00:38:54 | 1 | A.   I like them.  I've used them.  This was an |
| 00:38:56 | 2 | infection case. |
| 00:38:57 | 3 | Q.   That was a case you testified he against the |
| 00:39:00 | 4 | manufacturer of absorbable sutures? |
| 00:39:02 | 5 | A.   For infection, good manufacturing.  Had nothing |
| 00:39:05 | 6 | to do with the labeling. |
| 00:39:07 | 7 | Q.   You testified in a highly cholesterol involving |
| 00:39:10 | 8 | Crestor? |
| 00:39:10 | 9 | A.   Yes, sir. |
| 00:39:10 | 10 | Q.   You have testified in a case involving prostate |
| 00:39:15 | 11 | cancer drugs? |
| 00:39:15 | 12 | A.   No, devices. |
| 00:39:16 | 13 | Q.   It wasn't a case involving Lupron? |
| 00:39:19 | 14 | A.   No.  That was for in vitro fertilization.  I |
| 00:39:24 | 15 | was in prostate treatment devices. |
| 00:39:28 | 16 | Q.   You were involved in vaccine cases? |
| 00:39:30 | 17 | A.   Yes, sir, issues involving mercury. |
| 00:39:32 | 18 | Q.   And you were involved in a Tylenol case? |
| 00:39:35 | 19 | A.   I don't believe I was involved in a Tylenol |
| 00:39:37 | 20 | case. |
| 00:39:37 | 21 | Q.   If it's on your list, it's fair to say you were |
| 00:39:40 | 22 | involved in it? |
| 00:39:40 | 23 | A.   I don't remember being involved -- it doesn't |

00:39:43  1    matter.  No, they are all related to how they got on the

00:39:47  2    market in terms of the FDA.

00:39:49  3         Q.   Counsel asked you questions about what you

00:39:52  4    would do with respect to some aspects of the Boston

00:39:55  5    Scientific materials; right, how you would handle them;

00:39:58  6    right?

00:39:58  7         A.   That's what I qualified that as a physician, I

00:40:00  8    would be different than an engineer.

00:40:02  9         Q.   But you obviously had no involvement whatsoever

00:40:05  10   in the Boston Scientific submissions; right, you had

00:40:07  11   long since left the FDA?

00:40:09  12        A.   I left in '95, that's correct.

00:40:10  13        Q.   You haven't-any contact with these individuals

00:40:13  14   about the Boston Scientific submissions, fair?

00:40:14  15        A.   That's correct, and I would be precluded, I

00:40:17  16   believe.

00:40:17  17        Q.   Okay.  I'm going to move on.  I do want to

00:40:25  18   cover one more thing.  If you look at the states,

00:40:28  19   Doctor, you've testified in again that you are reflected

00:40:31  20   in your curriculum vitae.  I've made a map here of all

00:40:36  21   the states you've given testimony in at trials.  So if I

00:40:46  22   used your list and identified the states where you've

00:40:50  23   given trial testimony, it would be reflected in this

00:40:54  1    list, fair?

00:40:56  2        A.   I guess so.  I haven't seen this picture for a

00:41:00  3    while, hopefully kept it, but I haven't seen it.   Are

00:41:03  4    these testimony or things have been filed.

00:41:05  5        Q.   Trial testimony?

00:41:06  6        A.   Okay.  Got it.

00:41:07  7        Q.   We can add and Delaware on this list, as well;

00:41:12  8    right?

00:41:12  9        A.   Yes, sir.

00:41:12  10       Q.   Now, I want to shift gears a little bit and

00:41:19  11   talk about sources of information for doctors, okay?

00:41:22  12       A.   Yes, sir.

00:41:23  13       Q.   So when we talk about physicians like

00:41:25  14   Dr. Carlson, he's evaluating whether or not to use a

00:41:32  15   surgical mesh device, whether it's Polyform, or Pinnacle

00:41:37  16   or Advantage, are you with me?

00:41:40  17       A.   Yes, sir.

00:41:40  18       Q.   Doctor have available to them information about

00:41:43  19   risks an benefits of the devices and drugs that they are

00:41:46  20   considering using for their patients.   Fair?

00:41:48  21       A.   Where are you talking about?

00:41:49  22       Q.   I'm talking -- doctors have available to them

00:41:53  23   lots of sources of information about the risks and

00:41:57  1    benefits of a empirical drugs?

00:41:59  2         A.   Specific information.

00:42:01  3         Q.   Surely?

00:42:01  4         A.   Specific information would come primarily from

00:42:04  5    the manufacturer.

00:42:05  6         Q.   If a doctor, for example, is considering using

00:42:10  7    the Advantage or using the TVT, for example, there's

00:42:15  8    going to be a lot of medical literature for them to

00:42:19  9    review, fair?

00:42:19  10        A.   The word lot, there is going to be some,

00:42:22  11   perhaps maybe for a new product there may be, there may

00:42:27  12   not.

00:42:27  13        Q.   But doctors are going to have available to them

00:42:30  14   to Internet to do pub med searches on literature?

00:42:35  15        A.   They do, you're limited to what what's in

00:42:38  16   public.

00:42:39  17        Q.   In the world of transvaginal mesh so slings to

00:42:43  18   street stress urinary incontinence, and products for

00:42:46  19   pelvic organ prolapse there have been hundreds if not

00:42:49  20   thousands of articles published between the early

00:42:52  21   Fifties, Sixties, up through 2008, on that topic, fair?

00:42:57  22        A.   On that topic.  Yes, sir.

00:42:59  23        Q.   And you're going to find clinician also that

00:43:01  1    are going to be finding certain things negative or

00:43:04  2    unfavorable, and you may also find physicians that are

00:43:07  3    partial to this type of therapy through 2009, fair?

00:43:11  4         A.   Yes.

00:43:11  5         Q.   So if a doctor like Dr. Carlson wanted to

00:43:15  6    access that to see what's been published recently, he

00:43:18  7    would have that as a source of information for

00:43:20  8    evaluating a particular risk and benefits for a medical

00:43:23  9    device.  Fair?

00:43:24  10        A.   The computer is a source.  I don't know what

00:43:27  11   his familiarity is at the time but it is for a physician

00:43:31  12   in general, yes, it would be one source.

00:43:34  13        Q.   It's a wonderful resource, is it not?

00:43:36  14        A.   Well, it's limited in what's in there, but it

00:43:39  15   is a resource.

00:43:40  16        Q.   And the FDA is another resource to physicians;

00:43:43  17   right?

00:43:43  18        A.   Correct.  FDA website about this.

00:43:46  19        Q.   You were talking about the complaint database

00:43:48  20   that companies are obligated to report to the FDA.  Do

00:43:53  21   you recall that testimony?

00:43:53  22        A.   Yes, sir.  MAUDE.

00:43:55  23        Q.   The MAUDE database is accessible online, is it

00:43:58   1     knit?

00:43:58   2          A.   Well, if you know how to use it.  Yes, sir.

00:44:01   3          Q.   And you use it when up prepare your reports,

00:44:03   4     don't you?

00:44:03   5          A.   Yes, sir, but I got trained how to use it when

00:44:08   6     I was at the FDA.

00:44:09   7          Q.   Doctors have access to the FDA website for

00:44:14   8     updates and bulletins and important information about

00:44:17   9     devices, or conditions that involve patients that

00:44:20   10    they're treating.  Fair?

00:44:22   11         A.   Yes, anyone does.  Yes, sir.

00:44:23   12         Q.   But that's a source of information.  So

00:44:26   13    Dr. Carlson, or any doctor for that are matter is going

00:44:28   14    to have the directions for use that comes in the

00:44:31   15    packaging, right?

00:44:32   16         A.   Yes, sir.

00:44:32   17         Q.   He's also going to have the internet and go to

00:44:36   18    pub med and identify recent articles or recent studies

00:44:40   19    or literature that has been published through 2008.

00:44:43   20    Fair?

00:44:44   21         A.   He can.

00:44:44   22         Q.   And he's going to have availability of the FDA

00:44:48   23    and the FDA's website is certainly a lot more user

00:44:51  1    friendly than it was ever before; right?

00:44:53  2         A.   Yes.

00:44:54  3         Q.   Okay.  He's going to have his residency and

00:45:00  4    fellowships, if he's board certified he may have had a

00:45:04  5    fellowship or a additional training beyond his

00:45:08  6    residency; that would be a source of information, would

00:45:10  7    it not?

00:45:10  8         A.   For any hypothetical physician.  Yes, sir.

00:45:15  9         Q.   If the physician goes to training courses and

00:45:18  10   training was typically recommended for physicians that

00:45:21  11   were using transvaginal mesh products; right?

00:45:25  12        A.   Yes, sir.

00:45:25  13        Q.   That's a source of information; right?

00:45:27  14        A.   Yes, sir.

00:45:27  15        Q.   We have the conditions or use, directions for

00:45:33  16   use as one source of information; right?

00:45:35  17        A.   Yes, sir.

00:45:35  18        Q.   If they go to medical conferences like the

00:45:41  19   American Urogynecologic Society meeting, there's going

00:45:43  20   to be continuing medical education seminars there, they

00:45:47  21   can go generally and attend to find out about new

00:45:51  22   therapies and devices, those kinds of things.  Fair?

00:45:54  23        A.   Yes.

00:45:54  1      Q.   And you would expect that physicians would stay

00:45:59  2  current on such things as important information that may

00:46:04  3  be available to them about the risks or benefits of

00:46:07  4  devices, or drugs that they may be prescribing to their

00:46:11  5  patients.  Fair?

00:46:11  6      A.   You mean the physician and regular day practice

00:46:14  7  would I expect them to do all this?

00:46:16  8      Q.   Would you expect that the physicians will be --

00:46:22  9  should remain current on what's going on with the

00:46:25  10  conditions that they are treating their patients for?

00:46:30  11      A.   They should.  And they also rely on the sales

00:46:32  12  rep.

00:46:32  13      Q.   Okay.  So bringing it back to Dr. Carlson,

00:46:38  14  these are all things that are available to him if he

00:46:42  15  wants to avail himself of them.  Fair?

00:46:45  16      A.   Those would be tools.  Yes, sir.

00:46:46  17      Q.   Okay.  All right.  Now, we were -- in your

00:46:56  18  discussion with Mr. Thompson, he talked about a number

00:46:59  19  of things.  One of the things I want to go to is the

00:47:03  20  surgical mesh guidance document.  And the surgical mesh

00:47:12  21  guidance document, if you could pull that up.  You're

00:47:18  22  familiar with this document; right?

00:47:19  23      A.   Yes, sir, I am.

00:47:20  1        Q.   This is the guidance document for manufacturers

00:47:23  2   like Boston Scientific that are developing the Pinnacle

00:47:28  3   and the Advantage.  Fair?

00:47:30  4        A.   Well, it's not a guidance for developing the

00:47:33  5   product.  It's a guidance for submitting the 510k to the

00:47:37  6   FDA.  That's what it says, premarket notification

00:47:41  7   application.  That would be the 510k.

00:47:42  8        Q.   All right.  And between the time in 1999, when

00:47:47  9   this was introduced, and let's just take when the

00:47:50  10  Pinnacle was introduced in 2008, there were a number of

00:47:54  11  manufacturers who received clearance from the FDA

00:47:59  12  following this guidance document; right?

00:48:01  13       A.   Well, all the surgical mesh manufacturers.

00:48:04  14  Yes, sir.

00:48:04  15       Q.   And, in fact, there were more than 50 products

00:48:10  16  that had been cleared by the FDA prior to 2008 when this

00:48:14  17  device -- when this -- when Boston Scientific introduced

00:48:18  18  the Pinnacle.  Fair?

00:48:19  19       A.   You mean for pelvic organ prolapse?

00:48:22  20       Q.   And stress urinary incontinence?

00:48:24  21       A.   Yes, sir.

00:48:24  22       Q.   Over 50.  So if what you say is true that the

00:48:27  23  FDA is reviewing these submissions, and clearing them,

00:48:31   1   then the FDA is also monitoring their performance in the

00:48:35   2   field through these medical device reports.   Fair?

00:48:38   3        A.   Well, they are different people.   This is only

00:48:41   4   for premarket group, and you're talking about a

00:48:44   5   post-market group, which is compliance.   It would be

00:48:47   6   expected under 21 CFR 807, that the post-market

00:48:52   7   information would be given to the premarket information

00:48:54   8   people, but it's not.   So there are different parts of

00:48:58   9   the FDA.

00:48:58   10        Q.   Fair enough.   But nowhere in this document does

00:49:02   11   it require clinical trials; right; we can agree on that?

00:49:05   12        A.   No, if there are new issues of safety and

00:49:08   13   effectiveness, I believe there is a discussion you may

00:49:10   14   need to get clinical data.   This is for the standard

00:49:14   15   510k substantially equivalent surgical mesh, but the

00:49:16   16   guidance is a minimum, and I believe there's a section

00:49:19   17   about new issues.

00:49:20   18        Q.   Well, Boston Scientific followed this is in

00:49:23   19   it's submission of then Pinnacle and Advantage Fit;

00:49:26   20   right?

00:49:26   21        A.   What's they stated to the FDA.

00:49:27   22        Q.   And the FDA did not require Boston Scientific

00:49:30   23   to do any clinics of either the Advantage Fit or the

00:49:33   1      Pinnacle; right?

00:49:34   2           A.   Based on their use of the surgical mesh

00:49:37   3      guidance.  Yes, sir.

00:49:38   4           Q.   And this document also includes a discussion

00:49:43   5      about labeling, does it not?

00:49:46   6           A.   For surgical mesh, yes.

00:49:48   7           Q.   Yes.

00:49:49   8           A.   And this is just general mesh, it's not for

00:49:52   9      urological use.

00:49:52  10           Q.   And the discussion of the labeling --

00:49:59  11           A.   Can I see the document you're looking at?  I

00:50:02  12      haven't seen it for a while.

00:50:04  13           Q.   Okay.  Let me find my page here.

00:50:11  14                MR. KEENAN:  Permission to approach, Your

00:50:14  15      Honor?

00:50:14  16                THE COURT:  Certainly.

00:50:15  17                THE WITNESS:  Thank you.  You need it back.

00:50:19  18      BY MR. KEENAN:

00:50:20  19           Q.   No, you can keep it.

00:50:23  20           A.   Thank you.

00:50:24  21           Q.   Ms. Roberts, if you can go to page 5?

00:50:32  22           A.   Page 5.  Yes, sir.

00:50:33  23           Q.   And this is the specific section that discusses

00:50:44  1    the labeling; right?

00:50:45  2        A.   Yes, sir.

00:50:46  3        Q.   So it says all labeling information for

00:50:48  4    surgical mesh should be supplied, including individual

00:50:51  5    package labeling, package inserts, and available

00:50:54  6    promotional literature.   Did I read that correctly?

00:50:56  7        A.   Yes.

00:50:57  8        Q.   The labeling should specify the intended use of

00:51:00  9    the device, contraindications, warnings, precautions,

00:51:03  10   directions for use if applicable, and product claims.

00:51:06  11   Did I read that correctly?

00:51:07  12       A.   Right, that would be the clinical application

00:51:10  13   information.

00:51:10  14       Q.   So this is what the FDA is telling Boston

00:51:13  15   Scientific is part of their surgical mesh guidance

00:51:16  16   document on labeling, true?

00:51:17  17       A.   This is what FDA is telling industry in general

00:51:20  18   if you're going to submit a 510k, you need to have that

00:51:23  19   section.

00:51:24  20       Q.   Okay.   I want to talk a little bit about the

00:51:27  21   Advantage submission because counsel asked you some

00:51:31  22   questions about the Advantage and Advantage Fit?

00:51:34  23       A.   Okay.

00:51:34  1      Q.   You're familiar with the submission of the 510k

00:51:41  2   submission of the Advantage fair to say?

00:51:43  3      A.   Yes, sir.

00:51:43  4      Q.   And you have a copy up there, do you?

00:51:46  5      A.   Yes, sir.

00:51:47  6      Q.   Ms. Roberts, if you could go to the Bates No.

00:52:03  7   23.  If you could pull it up the predicate device.

00:52:22  8           (Pause.)

00:52:24  9   BY MR. KEENAN:

00:52:25 10      Q.   And the jury has heard about the TVT just to

00:52:38 11   refresh everyone the TVT was a Ethicon Johnson and

00:52:45 12   Johnson product; right?

00:52:45 13      A.   Yes, sir, and it uses prolene mesh.

00:52:48 14      Q.   And it was the very first product to use

00:52:52 15   polypropylene in a sling-like formation; right?

00:52:55 16      A.   In a tape.  Yes, sir.

00:52:56 17      Q.   In a tape.  And this was a treatment modality

00:53:02 18   that was really new, for lack of any better word, it was

00:53:09 19   a clinical application that was never really -- using

00:53:13 20   the polypropylene never been tried before.  Fair?

00:53:16 21      A.   Well, the polypropylene there was a ProteGen

00:53:20 22   before it, but that wasn't polypropylene.

00:53:22 23      Q.   I'm talking about Johnson and Johnson?

00:53:24  1      A.   Right.   And FDA asked about how it was

00:53:27  2    inserted.

00:53:27  3      Q.   All right.   Now, the submission that Boston

00:53:33  4    Scientific made referencing the TVT, with me here?

00:53:38  5      A.   Yes, sir.

00:53:39  6      Q.   Boston Scientific's submission included

00:53:43  7    published studies of the TVT as part of its submission

00:53:47  8    for the Advantage.   True?

00:53:50  9      A.   There were five, I think you're talking about

00:53:53  10   Appendix C with there are five references and I believe

00:53:57  11   there were two that they talk about TVT.

00:54:07  12     Q.   Let's go to -- you have the 510k submission

00:54:10  13   there for the Advantage?

00:54:11  14     A.   Right.   The articles are in Appendix C.

00:54:14  15     Q.   Why don't you go to Bates 163?

00:54:19  16     A.   Okay.   At the end.

00:54:21  17     Q.   Yeah.

00:54:31  18     A.   Yes, sir.

00:54:32  19     Q.   With me?

00:54:33  20     A.   Yes, sir.

00:54:33  21     Q.   So this is 2001 and I think to orient the jury,

00:54:41  22   the Advantage was in 2002; right?

00:54:45  23     A.   Yes, sir.

00:54:46  1      Q.   So 2002 is the Advantage.  And here is a study
00:54:50  2   in 2001 using with the Johnson and Johnson TVT; right?
00:54:56  3      A.   Yes, sir.
00:54:57  4      Q.   And these clinicians report their clinical
00:55:04  5   findings using the TVT in their patients; right?
00:55:08  6      A.   Yes, sir.
00:55:08  7      Q.   Ms. Roberts, if you could drop down to go to
00:55:16  8   materials and methods, if you would.
00:55:18  9           Materials and methods and results and
00:55:27  10  conclusions.  So follow with me here.  These urologists
00:55:34  11  are reporting their clinical findings of the TVT in
00:55:39  12  2001, and this is part of the submission Boston
00:55:41  13  Scientific made to the FDA as part of the Advantage
00:55:43  14  submission; right?
00:55:43  15     A.   Well, yes.  This is in Appendix C where
00:55:47  16  references are given to the FDA it's not every specific
00:55:52  17  reference, but it's in the reference section.
00:55:54  18     Q.   But these researchers, using the TVT, which was
00:55:58  19  other predicate for Advantage; right?
00:56:00  20     A.   It was one of the predicates cited.
00:56:02  21     Q.   One of them.  It stays, these researchers
00:56:05  22  report 146 consecutive patients evaluated, all patients
00:56:09  23  had clinical evidence of SUI.  Patients underwent

00:56:13   1    preoperative evaluation with video urodynamics, symptom

00:56:17   2    questionnaire, and cystoscopy.  Postoperatively the

00:56:21   3    patient were evaluated at 3-month intervals by symptom

00:56:26   4    questionnaire, physical examination and post void

00:56:29   5    residuals.

00:56:31   6            Go down to the results.  Average intraoperative

00:56:34   7    time was 27 minutes for sling procedure.  There were no

00:56:37   8    intraoperative complications and one major

00:56:40   9    post-operative complication.  There was no permanent

00:56:43   10   retention and no erosions.  92 percent of the patients

00:56:47   11   had either no or rare stress incontinence.

00:56:51   12   Postoperatively 7 percent of patients developed de novo

00:56:56   13   urge incontinence.  And their conclusion is:  We

00:56:59   14   describe excellent results with this new simple, quick,

00:57:03   15   and inexpensive method to correct SUI by placing a

00:57:09   16   proper mesh under the distal urethra.  That was their

00:57:13   17   conclusion; right?

00:57:14   18        A.   For the TVT.

00:57:15   19        Q.   That's right.  And there was another study that

00:57:18   20   was given to the FDA and it's on the next study, page

00:57:26   21   168.  If you could go to the results.  Go up to purpose.

00:57:40   22   And the date of this Dr. Parisian is 2001, right?

00:57:46   23        A.   Yes, sir.

00:57:47    1          Q.    So this is another 2001 study of the TVT made

00:57:55    2    by Johnson and Johnson that was one of our predicates

00:57:58    3    for the Advantage; right?

00:57:58    4          A.    One of several that was cited.  Yes, sir.

00:58:00    5          Q.    And this clinical study describes that

00:58:11    6    mid-urethral synthetic sling procedures, that's what the

00:58:12    7    TVT is, and that's what the Advantage is right?

00:58:14    8          A.    That wasn't what it was cleared as, it was

00:58:18    9    cleared that it was going to be a surgical mesh.  This

00:58:21   10    is not the TVT, the TVT has differences -- go ahead ask

00:58:24   11    your question.

00:58:24   12          Q.    My question is:  Is the Advantage a

00:58:28   13    mid-urethral sling?

00:58:29   14          A.    It eventually was when it was marketed by the

00:58:34   15    company, not in the 510k.

00:58:36   16          Q.    Okay.  Mid-urethral sling.  So let's go on to

00:58:41   17    what these clinicians says.  They say mid-urethral sling

00:58:47   18    procedures for treatment of stress urinary incontinence,

00:58:49   19    paren, SUI, are gaining accessing attention from

00:58:53   20    surgeons be specializing in female pelvic reconstructive

00:58:57   21    techniques seeking successful patient outcomes through

00:59:01   22    reproducible simplicity.  Did I read that correctly?

00:59:06   23          A.    Yes, sir.

00:59:07  1        Q.   Their conclusion from this paper is that the

00:59:09  2    experience with TVT for the last 5 years is encouraging.

00:59:13  3    At 3-year follow-up for TVT reported cure rates for SUI

00:59:18  4    range from 80 to 95 percent.  Did I read that correctly?

00:59:21  5        A.   Yes, sir.

00:59:22  6        Q.   Okay.  A multitude of worldwide reports on PVT

00:59:28  7    with shorter follow-up support the findings of the TVT

00:59:34  8    experience.  Did I read that correctly?

00:59:35  9        A.   Yes, sir.

00:59:36  10       Q.   Then, Ms. Roberts, if you go down to

00:59:38  11   conclusions.

00:59:39  12            The conclusions of these researchers in 2001

00:59:45  13   talking about clinical studies of the TVT, which was one

00:59:48  14   of the predicates for the Advantage, with me so far?

00:59:51  15       A.   Yes, as a predicate.

00:59:54  16       Q.   Their conclusion of the TVT is that the

00:59:56  17   preliminary reports, and the experience at our

00:59:59  18   institution suggest that the techniques of mid-urethral

01:00:03  19   synthetic sling placement of TVT and PVT are

01:00:09  20   reproducible easy to master and minimally invasive with

01:00:12  21   respect to tissue handling.  Goes on to state:

01:00:14  22   Although, complications with all antiincontinence

01:00:18  23   procedures exist, understanding the anatomical

01:00:20   1    considerations and methodology of these unique

01:00:23   2    procedures should minimize patient morbidity and avoid

01:00:28   3    patient mortality, and produce a high rate of durable

01:00:32   4    success.   Did I read that correctly?

01:00:34   5        A.   You read it correctly.

01:00:35   6        Q.   Okay.   Now, Your Honor I can either jump into

01:00:43   7    another topic or take a break?

01:00:45   8             THE COURT:   Let's stop here.

01:00:48   9             All right.   We'll take an hour for lunch.

01:00:52   10            (The jury left the courtroom at 12:57 p.m.)

01:01:23   11            THE COURT:   Anything we need to take up?

01:01:28   12            MR. ANIELAK:   There are some issues on Dr. Dunn

01:01:33   13   but we can do it when we come back from lunch.

01:01:41   14            THE COURT:   Very well.

01:01:45   15            (A short recess was taken.)

02:12:41   16            THE COURT:   Please bring in the jury.

02:12:50   17            (Pause.)

02:12:57   18            THE COURT:   The issues on Dunn that we're going

02:13:01   19   to discuss later, I have notes here that I've already

02:13:04   20   resolved main topic areas.   Is it something different

02:13:08   21   than that.

02:13:09   22            MR. ANIELAK:   Sure.   Yes, Your Honor.

02:13:12   23            THE COURT:   Okay.

02:13:13  1          (Pause.)

02:13:38  2          (The jury entered the courtroom at 2:10 p.m.)

02:14:04  3          THE COURT:  You may continue.

02:14:07  4   BY MR. KEENAN:

02:14:08  5      Q.   Dr. Parisian, I want to spend about five,

02:14:12  6   10 minutes on the 510k submission for the Advantage Fit

02:14:16  7   and then I want to transition to the Pinnacle and I'll

02:14:19  8   conclude.

02:14:19  9          So just a few other questions, Dr. Parisian,

02:14:23  10  about the 510k submission for the Advantage.  Are you

02:14:26  11  with me?

02:14:27  12     A.   Yes, sir.

02:14:27  13     Q.   The FDA did determine that the Advantage was

02:14:30  14  substantially equivalent to a TVT; correct?

02:14:32  15     A.   Well, they -- that would be one of the

02:14:35  16  predicates, also to the Trelex mesh they have a biosling

02:14:40  17  indication.

02:14:40  18     Q.   Right but the FDA did ultimately determine it

02:14:45  19  was substantial equivalent?

02:14:46  20     A.   Well, they cleared it.

02:14:49  21     Q.   Which required them to determine it was

02:14:51  22  substantial equivalent?

02:14:52  23     A.   With the surgical mesh what the company

02:14:55  1    requested not to the surgical kit.

02:14:58  2        Q.   A couple of other questions I want to ask you

02:15:00  3    about the submission to the FDA 2002 for the Advantage

02:15:03  4    Fit and, Dr. Parisian, if you can go to Bates number

02:15:07  5    074.  Ms. Roberts, will you pull out table 11 V1?

02:15:13  6        A.   This is a Advantage 510k, there is no Advantage

02:15:19  7    Fit 510k.

02:15:19  8        Q.   Did I say Advantage Fit?

02:15:21  9        A.   Yes.

02:15:21  10       Q.   This is a Advantage 510k which is in 2002?

02:15:24  11       A.   This was the modified Trelex that the company

02:15:27  12   marketed the Advantage off of.  Yes, sir.

02:15:29  13       Q.   In any event, this is a table that identifies

02:15:31  14   some of the testing that Boston Scientific did to

02:15:33  15   compare its proposed Advantage mesh to the predicate

02:15:37  16   mesh TVT?

02:15:38  17       A.   To the mesh, yes, sir.

02:15:39  18       Q.   It includes test on tanged an un- tanged areas

02:15:44  19   correct?

02:15:44  20       A.   Yes, sir.

02:15:44  21       Q.   There's also testing that was done as part of

02:15:47  22   the submission on stiffness; correct?

02:15:48  23       A.   There is a stiffness area there.  Yes, sir.

02:15:51  1      Q.   Ms. Roberts, would you go to -- so we have

02:15:57  2   device stiffness and measure bent length; correct?

02:16:01  3      A.   Yes, sir.

02:16:02  4      Q.   And there's another section, Ms. Roberts, if

02:16:05  5   you could go to Bates 114.   114, Dr. Parisian, is some

02:16:23  6   additional testing that was done with respect to tanged

02:16:27  7   and de- tanged areas.   Would you go to those places,

02:16:31  8   please.

02:16:32  9      A.   Yes, sir.   Okay.

02:16:33  10     Q.   With me?

02:16:34  11     A.   Yes, sir.   This is Appendix A.

02:16:36  12     Q.   And I don't want to get into this into too much

02:16:48  13  detail, but obviously they're identifying various tests

02:16:51  14  that were done on the tanged and de- tanged edges;

02:16:55  15  right?

02:16:55  16     A.   Yes, sir.

02:16:56  17     Q.   And, Ms. Roberts, if you could go to page A9 of

02:17:01  18  this document and, Dr. Parisian, if you can go, as well

02:17:06  19  it identifies some stiffness testing, as well.

02:17:09  20  Stiffness was one of the issues you were discussing

02:17:11  21  earlier; right?

02:17:11  22     A.   It was one of the issues that was mentioned.   I

02:17:14  23  haven't discussed it specifically.

02:17:24  1        Q.   It's Bates stamped 120.  There we go.

02:17:33  2   Stiffness testing.  To test stiffness of proposed mesh

02:17:39  3   and compare the values of the predicate mesh TVT, right?

02:17:43  4        A.   Yes, sir.

02:17:43  5        Q.   The conclusion on the next page is as follows:

02:17:46  6   The measured bent length, bending length and fluctuate

02:17:54  7   rigidity of the proposed mesh and predicate mesh are

02:17:57  8   substantially equivalent.  That's what's we concluded

02:17:59  9   from the testing?

02:18:00 10        A.   Yes, sir.

02:18:01 11        Q.   Very good.  You spoke about something called a

02:18:04 12   field assessment.  Do you recall that with counsel?

02:18:06 13        A.   I was asked about it.  Yes, sir.

02:18:08 14        Q.   Okay.  And a field assessment, there's a field

02:18:12 15   assessment for the Advantage Fit; right?

02:18:13 16        A.   Yes, sir.

02:18:14 17        Q.   You discussed it in your report.  We talked

02:18:16 18   about it at your deposition; do you remember?

02:18:19 19        A.   Yes, sir.

02:18:19 20        Q.   I'll hand you Defense Exhibit 43.  And

02:18:31 21   permission to approach Your Honor?

02:18:32 22             THE COURT:  Certainly.

02:18:34 23   BY MR. KEENAN:

02:18:35  1          Q.   Now, a field assessment is an effort by a

02:18:45  2     company to see how a product is doing.  Fair?

02:18:49  3          A.   Yes, sir.  It's kind post-market guide.

02:18:52  4          Q.   It's on the market a way of kind metaphorically

02:18:56  5     putting their ear to the ground and learning,

02:18:59  6     identifying other issues going on, right?

02:19:01  7          A.   Yes, sir.

02:19:01  8          Q.   That's a good thing; right?

02:19:03  9          A.   Yes, sir.  I agree.

02:19:04  10         Q.   So if you look at the field assessment for the

02:19:08  11    Advantage Fit --

02:19:09  12         A.   It's required, too, besides being a good thing.

02:19:14  13         Q.   Required.  I'll take that.  Ms. Roberts, could

02:19:19  14    you pull up the date Exhibit 473.

02:19:26  15              So to orient the jury then 2008 is when the

02:19:31  16    Advantage Fit was introduced; right?

02:19:33  17         A.   Yes, launched.

02:19:34  18         Q.   Yes.  Launched.  And this identifies the sales

02:19:40  19    and it identifies the complaints; right?

02:19:43  20         A.   Yes, sir.

02:19:44  21         Q.   Page 3 of 8?

02:19:47  22         A.   Yes, sir.

02:19:47  23         Q.   If you could blow up the sales there.

02:19:53  1          So this tells us that the Advantage Fit in the

02:20:01  2   first six months had 5437 units sold.  And it has 11

02:20:16  3   complaints; right?

02:20:17  4          A.   On this table, yes, sir.

02:20:19  5          Q.   Yes.  And that's less than 1 percent, isn't it?

02:20:29  6          A.   Based on sales, yes, sir, but that's not always

02:20:32  7   the best way to measure that.

02:20:35  8          Q.   All right.  And the threshold that you were

02:20:42  9   describing earlier with counsel there was a threshold

02:20:45  10  here he have 5000 parts per million; right?

02:20:47  11         A.   Yes.

02:20:47  12         Q.   We were substantially below that; right?

02:20:49  13         A.   I believe so, yes, sir.

02:20:50  14         Q.   The conclusion of this field assessment for the

02:20:52  15  Advantage Fit is -- let's go to the top, evaluation of

02:21:01  16  possible relevance to safety.  So the conclusion of this

02:21:04  17  field assessment is stated here, among other things the

02:21:08  18  Advantage Fit products have consistently maintained a

02:21:10  19  low complaint rate.  I read that correctly; right?

02:21:12  20         A.   Yes, sir.

02:21:13  21         Q.   And go to conclusion, if you would,

02:21:20  22  Ms. Roberts.  The conclusion here from this field

02:21:23  23  assessment of the Advantage Fit, Advantage Fit family of

02:21:27  1    products have met the PPM requirement of less than

02:21:30  2    5000 parts per million total.   The complaints were

02:21:34  3    independently reviewed to assure the events were

02:21:37  4    independent and no single failure mode to was dominant

02:21:39  5    or trending upward.   The product continues to perform

02:21:42  6    safely as expected.   I read that correctly?

02:21:44  7         A.   Yes.

02:21:45  8         Q.   So that's what the field assessment was of the

02:21:48  9    Advantage Fit?

02:21:48  10        A.   Yes, sir.

02:21:49  11        Q.   Now, I want to talk about and I will offer at

02:21:53  12   this time, Your Honor, Exhibit 473?

02:21:56  13             THE COURT:   I assume there's no objection?

02:21:58  14             MR. THOMPSON:   No objection, Your Honor.

02:22:00  15             THE COURT:   All right.

02:22:01  16   BY MR. KEENAN:

02:22:03  17        Q.   I want to ask you about the field assessment

02:22:05  18   for the Polyform, Dr. Parisian, permission to approach.

02:22:11  19   Exhibit 1317, there was a field assessment for Polyform,

02:22:15  20   as well; right?

02:22:16  21        A.   Yes, sir.   This was 2006.

02:22:18  22        Q.   Yes.   So this is a field assessment for the

02:22:22  23   Polyform and the Polyform was the mesh be used in the

02:22:26  1      Pinnacle; right?

02:22:26  2           A.   Yes.

02:22:26  3           Q.   And this field assessment reflects that there

02:22:33  4      were, in this time period of August 22nd, to April 10th,

02:22:39  5      approximately 6 months, there were 921 units sold and

02:22:49  6      how many complaints, Doctor?

02:22:50  7           A.   22.

02:22:51  8           Q.   Well, I have zero on mine?

02:22:59  9           A.   I'm looking at the -- that's the Advantage,

02:23:02  10     yes, sir, where are you?

02:23:04  11          Q.   Complaint total?

02:23:06  12          A.   Complaint total.  It says zero there.  Yes,

02:23:13  13     sir.

02:23:13  14          Q.   So 920 units sold, complaints zero.

02:23:25  15               Go to, Ms. Roberts, go to the bottom of page 4

02:23:31  16     of five.

02:23:40  17               So defendants would offer Exhibit 1317?

02:23:49  18               THE COURT:  If there is no objection they're

02:23:52  19     admitted.

02:23:53  20               MR. THOMPSON:  No, Your Honor.

02:23:56  21     BY MR. KEENAN:

02:23:57  22          Q.   Can't be better than zero, can you,

02:23:59  23     Dr. Parisian?

02:24:00   1        A.   Well, that's the number.  It depends in terms

02:24:03   2    of how you're actually gathering that information and

02:24:09   3    what the Polyform is being used for.  So it really was a

02:24:14   4    major use of it.  So zero, rare events are not going to

02:24:19   5    occur in that sales.

02:24:20   6        Q.   Let's talk a little bit about the Pinnacle 510k

02:24:26   7    submission.

02:24:28   8        A.   Yes, sir.

02:24:29   9        Q.   You have that in front of you; right?

02:24:31  10        A.   Yes, sir.

02:24:31  11        Q.   Now, Doctor, the Pinnacle included the Polyform

02:24:43  12    mesh and the Capio; right?

02:24:45  13        A.   It wasn't asking clearance for the Capio, so

02:24:49  14    can you restate your question?  I'm not sure -- the

02:24:52  15    Pinnacle was for the mesh -- the Pinnacle was for the

02:24:56  16    Pinnacle mesh and there was a discussion of Capio in the

02:24:59  17    510k.

02:25:00  18        Q.   Let's go to the very -- let's go to the third

02:25:06  19    page of this document here, Doctor.  Go to device

02:25:12  20    description.

02:25:13  21             I heard you discuss with counsel the Capio, and

02:25:16  22    whether the Capio was appropriately described in

02:25:19  23    these -- in this submission.  With me so far?

02:25:23   1        A.   I'm not sure where your third page is.   Do you

02:25:26   2   have a Bates number?

02:25:27   3        Q.   Yes 56?

02:25:30   4        A.   456.

02:25:32   5        Q.   Yes?

02:25:33   6        A.   All right.

02:25:34   7        Q.   With me?

02:25:35   8        A.   You're in section nine, is that where you are?

02:25:41   9   456 page 29.

02:25:43   10        Q.   Page 56?

02:25:45   11        A.   Just 56.

02:25:47   12        Q.   Yeah?

02:25:49   13        A.   I'm not quite sure where you are:   I'm not sure

02:25:55   14   where you are want to put it up.

02:25:58   15        Q.   Is the screen on be in front of you Doctor?

02:26:01   16        A.   Yes, sir, your numbers are different that's the

02:26:04   17   issue, you're on page 23 of 49.   That's where I was.

02:26:11   18   Our Bates numbers are not the same.   Okay.   Being I'm on

02:26:14   19   23 of 49, which is my 450.

02:26:17   20        Q.   It describes device description, with me?

02:26:20   21             THE WITNESS:   Yes, sir.

02:26:20   22   BY MR. KEENAN:

02:26:21   23        Q.   It describes the currently legally market Capio

02:26:24   1    open access suture capturing device; right?

02:26:28   2        A.   Yes, sir.

02:26:29   3        Q.   This is obviously the Capio; right?

02:26:32   4        A.   That's statement of Capio.  Yes, sir.

02:26:34   5        Q.   This is the Capio.  The Capio was a cleared

02:26:36   6    device by the FDA?

02:26:37   7        A.   It is a cleared device by the FDA.

02:26:40   8        Q.   Your criticism this wasn't properly described

02:26:43   9    in our documentation; right?

02:26:44   10       A.   Yes.  And there wasn't a picture to show people

02:26:47   11   how they were going to be used.  There were pictures,

02:26:49   12   but it wasn't described in terms of the history, the

02:26:53   13   regulatory history and the FDA had to come back and ask

02:26:55   14   the regulatory history.  So when you make out a 510k,

02:26:59   15   you include the regulatory history which would be all

02:27:01   16   the 510ks so that the reviewer can go back and pull them

02:27:05   17   up.

02:27:05   18       Q.   But I counted the word Capio used 84 times in

02:27:09   19   this 510k submission.  You wouldn't disagree with that?

02:27:12   20       A.   I would not disagree with it, the word Capio is

02:27:15   21   there, the FDA is being told, as an exempt manual

02:27:18   22   instrument.

02:27:19   23       Q.   If you want to just turn Dr. Parisian page 50

02:27:23  1    of 149, Ms. Roberts page 188, delivery device.  This is

02:27:35  2    another place where the documentation is expressly

02:27:41  3    describing the role of the Capio with respect to the

02:27:45  4    placement of the mesh; right?

02:27:46  5        A.   I wouldn't say it's precisely describing it.

02:27:52  6    It does say the word Capio, but in terms of marketing

02:27:55  7    claims that it was going to increased safety and it was

02:27:59  8    going to be a trochanter implantation, that information

02:28:04  9    is not being given to the FDA.

02:28:06  10       Q.   And indeed, Doctor, if you could go to page 69

02:28:11  11   of 149, or also Bates 106.  There's, as part of our

02:28:21  12   submission, there's a diagram of the Capio; right?

02:28:23  13       A.   In this submission.  Yes, sir.

02:28:25  14       Q.   Okay.  And we could go find lots of other

02:28:35  15   places where the Capio is ostensibly described defined

02:28:38  16   in here, illustrated; right?

02:28:40  17       A.   I wouldn't use ostensibly.  The word Capio and

02:28:44  18   Capio does exist.  The FDA questioned where Capio came

02:28:47  19   from in subsequent 510ks.  So it isn't clearly placed in

02:28:53  20   there.

02:28:53  21       Q.   You don't think this is clear?

02:28:55  22       A.   No.

02:28:55  23       Q.   Go to Bates No. 75, which is page No. 38 of one

02:29:03  1    49.

02:29:19  2            A.   You mean the MS -- the material safety -- yes.

02:29:24  3            Q.   So the MSDS were obviously submitted to the

02:29:27  4    FDA; right?

02:29:28  5            A.   Yes, sir.

02:29:28  6            Q.   The MSDS was the medical caution statement;

02:29:32  7    right?

02:29:32  8            A.   Yes, sir.

02:29:32  9            Q.   And that's required because the surgical mesh

02:29:36  10   guidance document says manufacturers have to do that;

02:29:39  11   right?

02:29:39  12           A.   Not necessarily.  They have to provide the FDA

02:29:42  13   a history of where the resin came from, the materials

02:29:45  14   that are used for the proposed mesh.

02:29:48  15           Q.   Okay.

02:30:13  16                (Pause.)

02:30:14  17   BY MR. KEENAN:

02:30:16  18           Q.   So I know the jury has seen this a lot.  But

02:30:20  19   this is a Material Safety Data Sheet that was submitted

02:30:23  20   as part of the Pinnacle; right?

02:30:24  21           A.   Yes, sir.

02:30:24  22           Q.   Now, there was a Material Safety Data Sheet

02:30:33  23   that was also submitted as part of the Advantage

02:30:36  1    submission; right?

02:30:37  2            A.   Yes, sir.

02:30:37  3            Q.   The MSDS that was submitted with the Advantage

02:30:51  4    did not contain the medical caution language; right?

02:30:54  5            A.   That's correct.  It was an older -- it was an

02:30:57  6    older version.

02:30:57  7            Q.   Right.  So the version that was submitted with

02:31:01  8    the Advantage did not have the medical caution

02:31:04  9    statement.  The Material Safety Data Sheet that was

02:31:08  10   submitted with the Pinnacle did?

02:31:09  11           A.   It didn't have a caution statement, but it said

02:31:11  12   what it was intended for the Advantage and it said

02:31:14  13   nothing about a medical device.  It actually had similar

02:31:17  14   information.  These are both already cleared meshes, so

02:31:20  15   the FDA reviewer is not, by having a history, this is

02:31:25  16   not really the schedule part of the 510k.

02:31:27  17           Q.   The MSDS is the same for the Advantage and the

02:31:31  18   Pinnacle?

02:31:32  19           A.   Yes, sir.

02:31:33  20           Q.   I mean the Marlex; right?

02:31:36  21           A.   Marlex mesh is the same for both, but they are

02:31:40  22   both cleared.  So the company can cite already cleared

02:31:45  23   product.  So the MSDS isn't the essential part of the

02:31:49  1    510k review.  It's basically a manufacturing issue under

02:31:53  2    21 CRF 820 that the materials are suitable for what the

02:31:57  3    intended use is.  This isn't part of a 510k review.

02:32:00  4         Q.   In any event, the same Marlex provider, the

02:32:02  5    language changed between them, Advantage submission and

02:32:05  6    the Pinnacle submission; right?

02:32:06  7         A.   In that caution that caution was added.  The

02:32:11  8    difference between with the two is that the Advantage

02:32:13  9    actually had an MSDS sheet that was for the Marlex

02:32:17 10    resin, which is HDX 030-01.  This says all polypropylene

02:32:23 11    mesh caution.

02:32:24 12         Q.   This is the caution statement that was part of

02:32:27 13    the submission for the Advantage I wanted to show to

02:32:31 14    you; right?

02:32:31 15         A.   Right.  And this is 1997.

02:32:33 16         Q.   Now, I want to talk a little bit about the

02:32:39 17    exchange between the FDA and Boston Scientific with

02:32:42 18    respect to the Pinnacle.  Okay, with me?

02:32:44 19         A.   Yes, sir.

02:32:45 20         Q.   So the FDA had questions about the 510k

02:32:51 21    submission that Boston Scientific submitted for the

02:32:53 22    Pinnacle, didn't it?

02:32:54 23         A.   Yes, sir.

02:32:55  1      Q.   Okay.  And there were letters written in the

02:32:59  2  Fall of 2007 about Boston Scientific's submission;

02:33:03  3  right?

02:33:03  4      A.   Yes, sir.

02:33:04  5      Q.   And, Ms. Roberts, if you could pull up

02:33:18  6  September 5, 2007, letter from the FDA, and you went

02:33:27  7  over this briefly with Mr. Thompson.  But the FDA

02:33:35  8  described that they had concerns about the safety of the

02:33:39  9  Pinnacle; right?

02:33:39  10      A.   Well, they wanted additional information, yes.

02:33:45  11      Q.   Why don't you right here, Ms. Roberts.

02:33:57  12           So the FDA is writing Boston Scientific and

02:34:00  13  saying we have -- these new shapes have the potential to

02:34:06  14  raise new questions of safety and effectiveness given

02:34:09  15  that the surgical procedure for implanted pelvic floor

02:34:13  16  may not be equivalent for surgical procedures used for

02:34:16  17  placement of Pinnacle devices; right?

02:34:18  18      A.   Yes, sir.

02:34:18  19      Q.   This was not a FDA asleep at the switch rubber

02:34:23  20  stamping our submission?

02:34:24  21      A.   I have never said it was FDA asleep.

02:34:28  22      Q.   You said these are typically engineers, not

02:34:30  23  doctors; right?

02:34:31  1          A.   That is true.

02:34:32  2          Q.   These are medical questions that the FDA is

02:34:34  3   raising; right?

02:34:34  4          A.   Not necessarily.  That's an engineering type

02:34:39  5   question, mechanics were putting something in.  There

02:34:41  6   are doctors that they could ask a question about.  I was

02:34:45  7   one of those types of doctors that they would ask

02:34:49  8   consulting.  That's not necessarily a medical question.

02:34:51  9          Q.   In any event, we can agree that the FDA is

02:34:54  10  raising new questions of safety and effectiveness;

02:34:58  11  right?

02:34:58  12         A.   Or asking the company, have they considered

02:35:00  13  that.

02:35:00  14         Q.   Okay.  Ms. Roberts, go to the next paragraph.

02:35:06  15         So the next paragraph goes on:  The FDA has

02:35:15  16  received several hundred complaints, including five

02:35:18  17  deaths related to surgical meshes used had in

02:35:21  18  gynecological surgery, these reports include patients

02:35:24  19  experiencing that adverse events such as mesh erosion,

02:35:28  20  intrusion, infection, abscess formation, sepsis, as well

02:35:32  21  as organ and vessel perforations and post-operative

02:35:36  22  relief, hematoma and incontinence.  It goes on.

02:35:40  23         And they tell Boston Scientific, please provide

02:35:47  1    information that support your hypothesis that the

02:35:55  2    Pinnacle pelvic floor repair kit will be a safe and

02:35:59  3    effective device that avoids the adverse events cited

02:36:02  4    above.  That's what they ask Boston Scientific to do;

02:36:05  5    right?

02:36:05  6         A.  Yes.

02:36:05  7         Q.  At this time in September of 2007, Boston

02:36:09  8    Scientific did not have a pelvic floor kit on the

02:36:12  9    market; right?

02:36:12  10        A.  A that's right.

02:36:13  11        Q.  Johnson and Johnson had a kit on the market;

02:36:20  12    right?  Ethicon?

02:36:20  13        A.  I know AMS did.

02:36:22  14        Q.  AMS, other manufacturers had a device on the

02:36:26  15    market.  Boston Scientific did not; right?

02:36:27  16        A.  That's correct.

02:36:27  17        Q.  These adverse events that the FDA is writing us

02:36:30  18    about are not Boston Scientific devices; right?

02:36:32  19        A.  That's correct.

02:36:33  20        Q.  All right.  Now, this is the FDA doing its job;

02:36:37  21    right?

02:36:37  22        A.  Yes.

02:36:38  23        Q.  They are the protecters of public health;

02:36:41  1    right?

02:36:41  2         A.   Yes.

02:36:42  3         Q.   And so they are raising questions and they're

02:36:45  4    putting the obligation of Boston Scientific, you need to

02:36:48  5    show us that you -- we will have a safe and effective

02:36:53  6    device that avoids the adverse events cited above;

02:36:56  7    right?

02:36:56  8         A.   Right.   They were relying on Boston Scientific

02:36:59  9    to be the expert to have done development of such a

02:37:03  10   product.

02:37:03  11        Q.   And they are telling Boston Scientific that

02:37:08  12   that --

02:37:12  13        A.   They're saying what the risks are.

02:37:13  14        Q.   Just a minute.   Such safety and effectiveness

02:37:16  15   may include a clinical evaluation of your device; right?

02:37:18  16        A.   Yes.

02:37:19  17        Q.   Now, Boston Scientific replied to this, didn't

02:37:24  18   they?

02:37:24  19        A.   Yes, sir, they did.

02:37:25  20        Q.   Boston Scientific sent a reply and had

02:37:28  21   information about the Pinnacle and the Capio; right?

02:37:33  22        A.   Well, let's see what you have.

02:37:35  23        Q.   Okay.   Let's go to the October 3rd, 2007,

02:37:40   1     letter.  And let's orient the jury here.  So we have the

02:37:50   2     FDA on September 5, 2007, says please provide

02:37:55   3     information that sports your hypothesis that the

02:37:59   4     Pinnacle pelvic floor repair exit that will be safe and

02:38:02   5     effective that avoids the adverse events cited above;

02:38:06   6     right?

02:38:06   7          A.   Right.

02:38:06   8          Q.   And Boston Scientific replied and, Ms. Roberts,

02:38:11   9     I would say let's go to --

02:38:17  10          A.   They also included they wanted a clinical

02:38:19  11     trial, or they suggested a clinical trial.

02:38:24  12          Q.   There's no question pending.

02:38:25  13          A.   Okay.

02:38:26  14          Q.   Why don't you go to page 8 of this letter.

02:38:34  15     And, Dr. Parisian, this is Bates No. 233, which I

02:38:39  16     believe is part of the Pinnacle submission?

02:38:41  17          A.   Your Bates change.  What page?

02:38:54  18               (Pause.)

02:38:58  19     BY MR. KEENAN:

02:38:59  20          Q.   So October 3rd, we respond and let's -- Bates

02:39:07  21     No. 233?

02:39:09  22          A.   Your numbers are not the same as my Bates

02:39:14  23     numbers are the issue.

02:39:16   1          Q.   Go ahead and take a minute.  That's fine.

02:39:21   2               (Pause.)

02:39:29   3               THE WITNESS:  I don't know that the amendment

02:39:30   4     is in this packet.  It might be.

02:39:42   5     BY MR. KEENAN:

02:39:43   6          Q.   Doctor, if you would like, you can look at the

02:39:46   7     screen in front of you.  That has the document there.

02:39:49   8     So are you ready?

02:39:50   9          A.   Okay.

02:39:50   10         Q.   So what the Boston Scientific does, they repeat

02:39:53   11    the FDA question; right?

02:39:54   12         A.   Right.  This is what we looked at earlier this

02:39:57   13    morning.

02:39:57   14         Q.   Well, you didn't look at all of the document.

02:39:59   15    Let's go through all of it?

02:40:01   16         A.   Okay.

02:40:01   17         Q.   So Boston Scientific repeats the question.

02:40:06   18    We've been over it.  Let's go to Boston Scientific's

02:40:09   19    response.  Ms. Roberts, go to the second paragraph here.

02:40:16   20              Now, one of the things that Boston Scientific

02:40:19   21    points out is that the predicate devices used different

02:40:24   22    types of delivery devices; right?

02:40:25   23         A.   Yes, sir, trocars.

02:40:31  1        Q.   Trocars, the jury may not appreciate what a

02:40:35  2   trocar is, but I have an example.  A trocar is something

02:40:39  3   that looks like this; right?

02:40:42  4        A.   That's one type of a trocar.

02:40:45  5        Q.   This is the Prolift; right?

02:40:47  6        A.   Right, a trocar in general can have different

02:40:51  7   structures.

02:40:51  8        Q.   Just generic trocar?

02:40:55  9        A.   A trocar is a tube that you would used to

02:40:59  10  insert something into the belly, then you have a trocar

02:41:02  11  and feed something through it.

02:41:03  12       Q.   Yes.  This trocar, this is one of the predicate

02:41:07  13  devices the Prolift right?

02:41:09  14       A.   Yeah.

02:41:10  15       Q.   This is not a Boston Scientific device; right?

02:41:12  16       A.   That's correct.

02:41:13  17       Q.   So the trocar involved the doctor sticking this

02:41:20  18  device through various parts of the body to delivery the

02:41:24  19  mesh, the pelvic organ prolapse mesh; right?

02:41:29  20       A.   Yes, but the FDA they're talking about trocars

02:41:33  21  in general.  Some trocars you can actually see, cameras

02:41:37  22  they can put through.  You're telling the FDA trocars,

02:41:40  23  trocars could be a lot of different things.

02:41:42  1        Q.   I'm just talking about this one, there's no

02:41:46  2   camera on this?

02:41:47  3        A.   The response to the FDA reviewer trocar would

02:41:51  4   have different meaning.

02:41:51  5        Q.   Dr. Parisian, it's true that the FDA identified

02:41:54  6   certain risks with are the trocar and blind passages

02:41:59  7   through the body; right?

02:42:00  8        A.   Right, and there are certain risks.

02:42:02  9        Q.   Okay.  And indeed, Ms. Roberts, if you could,

02:42:06  10   the trocar it notes here, this is what we're responding

02:42:10  11   to the FDA is advanced blindly in the direction of the

02:42:14  12   desired anatomical landmark.  That is identified through

02:42:17  13   palpation by the physician's finger from within the

02:42:22  14   vaginal incision, right?

02:42:24  15        A.   That's what it states.

02:42:25  16        Q.   Furthermore, it states that the physician aims

02:42:33  17   and advances the trocar towards his/her finger to create

02:42:37  18   the needed path for mesh delivery; correct?

02:42:39  19        A.   Yes, sir.

02:42:40  20        Q.   I have an illustration here and I want to ask

02:42:49  21   if you were to agree with me that this illustration

02:42:56  22   shows delivery routes for a trocar based system versus

02:43:02  23   Capio.  Would you agree this is accurate question of

02:43:06  1      incision points for a trocar based system like the

02:43:09  2      Gynecare Prolift?

02:43:11  3          A.   You're talking about multiple places where

02:43:15  4      trocars are being put in.  You've taken all of them and

02:43:17  5      put them on one picture.

02:43:19  6               MR. THOMPSON:  Your Honor, could I inquire that

02:43:22  7      is not part of the filing, this is a prepared slide; is

02:43:25  8      that right?

02:43:25  9               MR. KEENAN:  Yeah, I prepared it.

02:43:28  10              THE WITNESS:  This isn't in the --

02:43:34  11     BY MR. KEENAN:

02:43:35  12         Q.   Does this reflect the number of passages that a

02:43:37  13     trocar would use like the Gynecare Prolift?

02:43:41  14         A.   It's a lot of -- they don't have that many

02:43:45  15     incisions in a delivery but, yes.

02:43:49  16         Q.   Do you know how many incisions are used with a

02:43:53  17     Gynecare Prolift?

02:43:54  18         A.   Well, it depends you have the anterior, the

02:43:58  19     posterior the total.  You can include all those.  Just

02:44:01  20     because the number doesn't mean it's safer to have only

02:44:05  21     one in the central, because you're going to be plucking

02:44:08  22     around.  No.  In terms of an incision, that doesn't mean

02:44:12  23     that it's less safe with trocars.

02:44:15  1          Q.   Do you know how many incisions are made with a

02:44:20  2     Prolift -- a Gynecare Prolift delivery system?

02:44:27  3          A.   It depends on which ones is going to be

02:44:30  4     implanted, anterior, posterior, total.

02:44:32  5          Q.   Could be as many as six incisions, right?

02:44:36  6          A.   Right, the trocar makes it more controlled than

02:44:40  7     the Capio.

02:44:40  8          Q.   The Capio, in contrast to that, has one

02:44:43  9     incision; right, one?

02:44:45  10         A.   That doesn't make it safer.

02:44:46  11         Q.   I'm just asking you does it have one incision?

02:44:49  12         A.   What you draw on here.  Yes, sir.

02:44:51  13         Q.   So one versus as many as six?

02:44:54  14         A.   That's just a number, but there's reasons why

02:44:57  15     you would use the other trocar.  I'm not the surgeon to

02:45:00  16     talk about this, I don't think.

02:45:01  17         Q.   I appreciate you're not a surgeon?

02:45:03  18         A.   Yeah.

02:45:04  19         Q.   Let's go to the next page.  I really want to

02:45:07  20     move on and get past this.  Our response to the FDA on

02:45:11  21     the next page, if you could go there, Ms. Roberts, notes

02:45:25  22     the difference to the FDA of the incision sites between

02:45:29  23     our predicate devices and the Capio; right.  So it says

02:45:35  1    in contrast, the Pinnacle pelvic floor repair kit uses

02:45:39  2    Capio to deliver the mesh to desired anatomy.  The

02:45:43  3    physician can avoid any blind passage through the pelvic

02:45:47  4    floor anatomy with the use of a Capio device.  The risks

02:45:50  5    of organ vessel perforation, as well as hamartoma and

02:45:54  6    post operative bleeding increases with each additional

02:45:58  7    blind passage through the skin and anatomy in predicate

02:46:03  8    procedures.  What they're saying the predicate devices

02:46:06  9    have a different tool that actually insert the mesh than

02:46:09  10   the Boston Scientific device?

02:46:10  11        A.   That's what you're telling engineers, yes, sir.

02:46:12  12        Q.   The risk due to these blind passages is

02:46:15  13   eliminated in the Pinnacle pelvic floor repair kit

02:46:19  14   because of the absence of such blind trocar passages;

02:46:24  15   right?

02:46:24  16        A.   That's what they stated.

02:46:25  17        Q.   Additionally, no skin incision is required to

02:46:27  18   deliver the device, only the vaginal incision the

02:46:30  19   absence of a skin incision is expected to reduce the

02:46:34  20   risk and sepsis to the.  Patient that's what we told the

02:46:36  21   FDA; right?

02:46:37  22        A.   They told the FDA that, but there's no data to

02:46:40  23   support any of that.

02:46:41  1        Q.   And the FDA cleared the Pinnacle a month later?

02:46:44  2        A.   Yes, they did.  Because they expect you, as the

02:46:47  3   company, to be the expert in this product and that

02:46:50  4   information has no support at all.

02:46:51  5        Q.   The FDA determined that our device was

02:46:55  6   substantially equivalent to the existing devices on the

02:46:58  7   market; right?

02:46:58  8        A.   Based on what your representation was that

02:47:00  9   there was nothing novel or new about the product.  And

02:47:03  10   that's not correct.

02:47:04  11        Q.   Okay.  And the FDA's questions to us that were

02:47:08  12   raised in the September 5, 2007, letter about the

02:47:11  13   hundreds of complaints in asking us please provide

02:47:15  14   information to support your hypothesis that the Pinnacle

02:47:19  15   pelvic floor repair kit will be a safe and effective

02:47:22  16   device that avoids these adverse events cited above, the

02:47:26  17   FDA cleared the device; right?

02:47:27  18        A.   Based on Boston Scientific's hypothesis.  That

02:47:35  19   means it's not been shown.

02:47:37  20        Q.   All right.  Let's talk about the field

02:47:48  21   assessment of the Pinnacle.  We've already discussed the

02:47:56  22   field assessment of Advantage Fit; right?

02:47:58  23        A.   Yes, sir.

02:47:58  1         Q.   We discussed the field assessment of the

02:48:02  2    Polyform; right?

02:48:03  3         A.   Yes, sir.

02:48:04  4         Q.   Let's talk about -- and we replied on

02:48:09  5    October 3rd and it was cleared; right?

02:48:10  6         A.   It was cleared.

02:48:12  7         Q.   Now, let's talk about the field assessment.

02:48:17  8    Ms. Roberts if you could pull that up, please.

02:48:21  9              Now, you spent quite a bit of time talking

02:48:29 10    about this, or sometime talking about this with

02:48:32 11    Mr. Thompson?

02:48:33 12         A.   Some time, not quite a lot.

02:48:34 13         Q.   Fair enough.  But this document tells us quite

02:48:38 14    a bit of information about how the Pinnacle was

02:48:41 15    performing in the first year; right?

02:48:43 16         A.   Yes, sir.

02:48:43 17         Q.   Okay.

02:48:44 18         A.   Or what Boston Scientific knew.

02:48:48 19         Q.   We know from this document, Ms. Roberts, if you

02:48:53 20    could pull up the total sales.

02:48:56 21              We know from this document that the total sales

02:49:05 22    of the Pinnacle in the first year was 5409; right?

02:49:13 23         A.   Right.  Which isn't really that much.

02:49:16    1      Q.   We also have total complaints, according to

02:49:20    2   this, were 191; right?

02:49:22    3      A.   Yes, sir.

02:49:22    4      Q.   So the percentages, just doing a rough

02:49:26    5   calculation the percentages of complaints over sales is

02:49:29    6   3.5 percent; right?

02:49:31    7      A.   If you calculate on sales as opposed to used,

02:49:34    8   yes, sir.

02:49:34    9      Q.   If an attorney told this jury that are there

02:49:39   10   were 34 thousand adverse events during this reporting

02:49:42   11   period, that wouldn't be correct, would it?

02:49:44   12      A.   I don't believe that's what they would have got

02:49:47   13   from this document.  It's parts per million.  It's the

02:49:50   14   company's calculation.

02:49:51   15      Q.   And parts per million, we'll talk about that in

02:49:56   16   just a minute.  Without getting into the math, just the

02:50:00   17   basic numbers we knew from the field assessment, 5409

02:50:05   18   sales and 191 complaints?

02:50:07   19      A.   Those were the sales yes, we don't know how

02:50:10   20   many were actually implanted.

02:50:11   21      Q.   That number can actually be too high if you

02:50:11   22   take the number of complaints it might be lower than

02:50:14   23   that?

02:50:14  1        A.   Well, for the denominator it actually may be

02:50:18  2   high, that's why that time of a number is used because

02:50:21  3   it will reduce the calculation.

02:50:22  4        Q.   Let's spend about 5 minutes going through this

02:50:26  5   document.  All right?

02:50:28  6        A.   Um-hmm.

02:50:29  7        Q.   So this document broke out, Ms. Roberts, if you

02:50:33  8   could go to the next page, page 3 of 34.  Blow up this

02:50:47  9   part right here.

02:50:48  10        Doctor, Boston Scientific broke out these

02:50:52  11   complaints into three categories; right?

02:50:54  12        A.   Yes, sir.

02:50:55  13        Q.   They broke out mesh complaints, suture

02:51:02  14   complaints, Capio complaints; right?

02:51:04  15        A.   Right, and those are acute complaints, yes,

02:51:08  16   sir.

02:51:08  17        Q.   Now, the jury has heard this ad nauseam.  This

02:51:13  18   is a Capio complaint; right?

02:51:14  19        A.   Well, it could be, in terms of when you look at

02:51:17  20   the document only one complaint as was assigned to a

02:51:20  21   category.  So there could be multiple complaints for one

02:51:22  22   report, but one category was assigned.

02:51:25  23        Q.   All right.  And the suture complaint would be

02:51:33   1   way down here at the end; right?

02:51:35   2        A.   In terms of a physician complaining about the

02:51:37   3   suture, yes, sir.

02:51:38   4        Q.   Yes.  So we've got the Capio.  And we have the

02:51:43   5   suture; right down here; right?

02:51:44   6        A.   Right.

02:51:45   7        Q.   And both are important, I'm not trying to

02:51:47   8   minimize them.  But neither of those two categories

02:51:50   9   involves the mesh; right?

02:51:51   10        A.   Correct.  None of these categories are long

02:51:54   11   term, in terms of the woman's risk.

02:51:57   12        Q.   Okay.  So if you look, break out the categories

02:52:00   13   and you accept Boston Scientific's numbers here at face

02:52:03   14   value.  You have suture complaints, and you have Capio

02:52:06   15   complaints equals 107 of the total complaints numbers or

02:52:11   16   1.9 percent; right?

02:52:13   17        A.   Yes, sir.

02:52:14   18        Q.   The Capio, they had some difficulties with the

02:52:17   19   Capio; right?

02:52:17   20        A.   Yeah.

02:52:18   21        Q.   Won't catch suture, carrier break, won't load.

02:52:21   22   The suture had dark separation and suture breaks; right?

02:52:25   23        A.   Right.  In the middle of a surgical procedure

02:52:28  1   are significant.

02:52:30  2        Q.   I'm not trying to minimize them.  Neither had

02:52:35  3   to do with mesh, per se; right?

02:52:37  4        A.   The way it is categorized by Boston Scientific.

02:52:39  5        Q.   We know, don't we, Doctor, because we discussed

02:52:42  6   this that Boston Scientific did a design change to the

02:52:45  7   suture and how it inter faces with the Capio in March of

02:52:50  8   2008 to address this; right?

02:52:52  9        A.   Yes.

02:52:52  10       Q.   And they addressed this for dark separation,

02:52:56  11  suture breaks, and dilator bunching; right?

02:52:58  12       A.   That was part of a Capio action.  I think the

02:53:04  13  Capio was independent.  They had two different Capio,

02:53:10  14  didn't they.

02:53:10  15       Q.   In fact, the Capa, which was a change in

02:53:14  16  manufacturing was successful, was it not, in fixing this

02:53:19  17  problem; right?

02:53:20  18       A.   That particular problem.

02:53:21  19       Q.   Yes.  I'm going to show you Defense

02:53:35  20  Exhibit 363.  Permission to approach?

02:53:38  21            THE COURT:  Certainly.

02:53:40  22  BY MR. KEENAN:

02:53:43  23       Q.   Ms. Roberts, if you could pull up Exhibit 363

02:53:49    1    at the top here right here.

02:53:53    2            So this reflects a Capa in March of 2008, for

02:54:02    3    complaints have been received for dart separation

02:54:04    4    resulting in this Capa and there were changes made to

02:54:09    5    the Capio and the suture to address this, and it was

02:54:15    6    successful, wasn't it?

02:54:15    7        A.   Yes.  And those are immediate problems that

02:54:18    8    could be identified in the OR.

02:54:25    9            MR. KEENAN:  I would offer at this time

02:54:29   10    Exhibit 363.

02:54:31   11            THE COURT:  Admitted.

02:54:33   12    BY MR. KEENAN:

02:54:34   13        Q.   Doctor, then if we go to now focus on the

02:54:40   14    complaints for mesh in this document, the mesh

02:54:45   15    complaints were 84; right?

02:54:46   16        A.   Yes, sir.

02:54:46   17        Q.   And that would be 84 out of 5409.  And in the

02:55:08   18    field assessment it has factual summaries of each

02:55:11   19    complaint; right?

02:55:12   20        A.   It does if they are different ones.

02:55:14   21        Q.   Did you see in all of the field assessments a

02:55:20   22    single complaint for folded mesh?

02:55:23   23        A.   For folded mesh, I don't recall.  Do I have

02:55:25  1    that document?  Is it here?

02:55:27  2        Q.   No.  It's in the field assessment.  Did you see

02:55:31  3    any complaints for folded mesh?

02:55:33  4        A.   I think there were folded mesh because the

02:55:36  5    physician was upset about the folded mesh, not for

02:55:39  6    folded mesh in patients.

02:55:42  7        Q.   Did you see any complaints for folded mesh in

02:55:45  8    patients?

02:55:45  9        A.   In the field report?

02:55:46  10        Q.   Yes.

02:55:47  11        A.   I need to pull that up.  I don't remember.

02:55:52  12        Q.   If you'd like to take some time you're

02:55:55  13    certainly welcome.  I've been through it, I didn't see

02:56:00  14    any.  Now, I'm an advocate for Boston Scientific?

02:56:02  15        A.   I don't recall what meshes were.

02:56:06  16        Q.   Just to move things along.  No recollection.

02:56:09  17    What about bunched mesh.  Did you see any complaints by

02:56:13  18    physicians by bunched mesh?

02:56:16  19        A.   I know the dilator issue was a issue with

02:56:20  20    bunched mesh and bunching of the dilator.

02:56:22  21        Q.   Do you know what the dilator is?

02:56:24  22        A.   Yes, that.

02:56:25  23        Q.   It's this?

02:56:26  1          A.   Right.

02:56:27  2          Q.   This was getting bunched, right?

02:56:29  3          A.   Right.

02:56:30  4          Q.   Not this?

02:56:31  5          A.   Right.

02:56:31  6          Q.   My question is bunched mesh?

02:56:33  7          A.   I'm not sure where you're talking about in the

02:56:36  8    field report, where you're asking me these questions.

02:56:39  9    That's why I wanted the document.  Do I have that

02:56:43  10   document?  Is it from this morning?

02:56:56  11              (Pause.)

02:56:56  12   BY MR. KEENAN:

02:56:59  13         Q.   Here's a copy of mine.

02:57:00  14         A.   Okay, thank you.  All right.  Now I'm better.

02:57:14  15              (Pause.)

02:57:15  16   BY MR. KEENAN:

02:57:19  17         Q.   This field assessment has very quick summaries

02:57:24  18   of each complaint; right?

02:57:25  19         A.   Yes.

02:57:26  20         Q.   And recognizing that they're not lengthy, it

02:57:31  21   does have descriptions of what the doctor called in of

02:57:34  22   what they complained about; right?

02:57:36  23         A.   Right.

02:57:37    1      Q.   And so an example would be it was reported to

02:57:43    2    Boston Scientific that during an anterior repair using

02:57:46    3    the Pinnacle, the bullet broke off from the mesh leg and

02:57:49    4    was had was fired through the patient's left arcus

02:57:54    5    tendineus and was later located.  That's the kind of

02:57:56    6    thing that might be included here in this summary?

02:57:59    7      A.   Yes, that's awful to have happen in the OR.

02:58:02    8      Q.   My question:  Did you see anything when you

02:58:05    9    look through this with bunch mesh --

02:58:07   10      A.   Okay.  Well, let me look there's a whole list

02:58:11   11    here.  Bunched mesh...

02:58:20   12        (Pause.)

02:58:28   13        THE WITNESS:  I don't recall bunched mesh.  I

02:58:31   14    see a lot of the other things worse than bunched mesh.

02:58:35   15    BY MR. KEENAN:

02:58:36   16      Q.   I'm focussing on bunched mesh.  No.  What about

02:58:39   17    wadded mesh?

02:58:40   18      A.   I see a lot of injuries.  I don't see that

02:58:42   19    they've broken the mesh injuries down to those.  They're

02:58:46   20    using the physician's complaint, which is not those

02:58:49   21    words.  They're using other words that would be types of

02:58:52   22    complaints you'd get if you get bunched and wadded mesh,

02:58:57   23    erosion, they're using words like adhesions, clinical

02:59:04  1    dysphrenia, infection, erosion they are not using folded

02:59:04  2    and bunched.

02:59:04  3         Q.   My question, did you see the word folded

02:59:08  4    bunched mesh?

02:59:09  5         A.   No, I see patient injury.

02:59:10  6         Q.   Did you count how much erosions there were?

02:59:13  7         A.   No, I didn't specifically.

02:59:14  8         Q.   I did.  And there's ten.

02:59:17  9         A.   This is only in one year of use.  That's

02:59:21  10   significant.

02:59:21  11        Q.   Let's see.  Outside of the Capio issues which

02:59:30  12   we've talked about after July of 2008 when a Capio fix

02:59:34  13   was instituted, you did not see the same type of

02:59:37  14   trending with regard to the Pinnacle, that's true, isn't

02:59:39  15   it?

02:59:40  16        A.   With the Uphold?

02:59:43  17        Q.   No, the Pinnacle?

02:59:44  18        A.   What when are you talking about.

02:59:46  19        Q.   Outside of the Capio issues after July 2008,

02:59:49  20   when those were fixed you did not see the same kind of

02:59:53  21   trending going forward with the Pinnacle, did you?

02:59:55  22        A.   No.

02:59:56  23        Q.   All right.  Let's shift gears.  I'm winding

03:00:01   1   down here.  I've got a few other things I'm going to

03:00:08   2   talk to you about.

03:00:14   3        MR. KEENAN:  Just a minute, Your Honor, to get

03:00:18   4   organized.

03:00:19   5        (Pause.)

03:00:20   6   BY MR. KEENAN:

03:00:33   7        Q.   There was a time after the Pinnacle had been

03:00:36   8   cleared where the FDA exchanged correspondence with

03:00:42   9   Boston Scientific about the material safety data sheet;

03:00:47  10   right?

03:00:47  11        A.   You mean for the Uphold, when they were getting

03:00:50  12   the Uphold cleared.

03:00:53  13        Q.   That's right.  And this was in July of 2008;

03:01:01  14   right?

03:01:01  15        A.   Yes, sir.

03:01:02  16        Q.   So the Pinnacle had been cleared.  It had been

03:01:07  17   introduced about January 2008; right, thereabouts?

03:01:10  18        A.   Yes, sir.

03:01:10  19        Q.   So the FDA identified the caution statement of

03:01:15  20   the Material Safety Data Sheet, the same data sheet we

03:01:19  21   submitted with the Pinnacle; right?

03:01:20  22        A.   Yes, sir.

03:01:21  23        Q.   And the FDA wrote Boston Scientific and said?

03:01:28  1          A.    What about this.

03:01:29  2          Q.    What about this, right?

03:01:30  3          A.    Because the FDA couldn't do anything about it.

03:01:32  4          Q.    Another example the FDA reading the

03:01:35  5    submissions, identifying language that it was new, and

03:01:39  6    engaging Boston Scientific; right?

03:01:40  7          A.    Right.  Trying to ask what the company had done

03:01:42  8    about it.

03:01:43  9          Q.    Okay.  And your testimony is that Boston

03:01:47  10   Scientific handled those inquiries appropriately; right?

03:01:50  11         A.    Well, the FDA wasn't able to do anything when

03:01:53  12   the company came back and said it has been historically

03:01:57  13   used with the same indications in the Nineties.  So the

03:02:00  14   FDA can't do anything.

03:02:02  15         Q.    Let me try this again.

03:02:03  16               You agree that Boston Scientific handled the

03:02:07  17   exchange with the FDA appropriately on the MSDS; right?

03:02:10  18         A.    Yeah, I didn't say anything about Boston

03:02:15  19   Scientific other than the Boston Scientific should have

03:02:16  20   been aware of the risks.  The FDA's hands were tied for

03:02:20  21   a mesh that had been used since the Nineties.

03:02:22  22         Q.    Okay.  So let's go through these real quickly,

03:02:31  23   this exchange, okay.  Do you have it there, Doctor, do

03:02:35  1    you have the exchange?

03:02:37  2         A.   I don't know if I do.  Is it the July 17th,

03:02:43  3    2008, response, is that it?

03:02:44  4         Q.   It's July 18th we're going to talk about your

03:02:47  5    July 17th document in just a minute.  Yes?

03:02:51  6         A.   I don't have that.

03:02:52  7         Q.   Let me lay the foundation here, Doctor.  You're

03:02:56  8    looking at the July 18th letter from Boston Scientific

03:02:59  9    to the FDA; right?

03:03:00  10        A.   Yes, sir.

03:03:00  11        Q.   Okay.  This, Your Honor, is actually its own

03:03:04  12   exhibit number, it's Exhibit 68.  So I would offer this

03:03:08  13   at this time Exhibit 68?

03:03:14  14             THE COURT:  Hearing no objection, it's

03:03:17  15   admitted.

03:03:17  16   BY MR. KEENAN:

03:03:19  17        Q.   Let's go, Ms. Roberts, to page 22 of this

03:03:22  18   document.  Do you need a copy, Doctor?

03:03:25  19        A.   If it's going to be longer than this, yes, I'd

03:03:29  20   like a copy.

03:03:40  21        Q.   Ms. Roberts, if you could go to page 22.

03:03:54  22             Here we go, Doctor?

03:03:57  23        A.   Thank you.

03:03:59  1       Q.   Go to the top of the question.

03:04:07  2            So the FDA, July 2008 is asking the question of

03:04:13  3       Boston Scientific about the medical application caution

03:04:17  4       statement; right?

03:04:17  5       A.   Yes.

03:04:18  6       Q.   And they're quoting it expressly here; right?

03:04:21  7       A.   Yes, sir.

03:04:21  8       Q.   Please provide a rationale why you're mesh

03:04:24  9       material is safe for use as a permanent implant contrary

03:04:29  10      to what is listed in the MSDS provided for the Marlex

03:04:35  11      material; right?

03:04:35  12      A.   Yes.

03:04:35  13      Q.   And Boston Scientific replies for

03:04:38  14      two-and-a-half pages; right?

03:04:40  15      A.   Right.

03:04:40  16      Q.   And included in the response is a copy of the

03:04:48  17      contract where Chevron is agreeing to sell us this with

03:04:55  18      the express understanding that we're using it for an

03:05:00  19      implantable device; right?

03:05:01  20      A.   Yes, but that's not the key paragraph.  If I

03:05:04  21      was an FDA reviewer --

03:05:05  22      Q.   Doctor, I'm just asking if the document says

03:05:11  23      that?

03:05:12   1          A.   Yes.

03:05:12   2          Q.   Furthermore, we have identified safety testing;

03:05:16   3    right, bottom of that page?  And we also describe a

03:05:24   4    rabbit implantation study, the next page, and go to the

03:05:31   5    last page, if you would.  And the Marlex -- you were

03:05:47   6    saying something about the typo of the Marlex type.

03:05:50   7    This is the right number; right.

03:05:51   8          A.   Yes, sir.  This is same mesh that was in Trelex

03:05:56   9    and Advantage.

03:05:57   10         Q.   Right.  Right.  And would it be fair to say

03:06:00   11   that in 2008 the that the FDA would have quite a bit of

03:06:04   12   knowledge about the use of Marlex mesh as an implantable

03:06:09   13   device?

03:06:10   14         A.   Well, I can't say what the FDA thinks or knows,

03:06:14   15   but the issue is that's why I referred you back to the

03:06:17   16   first paragraph.  And this all goes back to the 1992

03:06:21   17   Trelex mesh 510k which has been the basis for all the

03:06:24   18   biocompatibility testing for the mesh after 1992 by the

03:06:29   19   company.  So they had the 1992 data, and everybody has

03:06:33   20   been able to reference that since 1992.  The issue is

03:06:37   21   that this product has been marketed since 1992.  So FDA

03:06:41   22   can't do anything.

03:06:41   23         Q.   Well, the FDA certainly has knowledge and

03:06:43  1    information from the medical device reports you were

03:06:46  2    describe for us earlier about how Marlex is performing

03:06:49  3    in patient populations, fair?

03:06:52  4        A.   No.   The FDA legally cannot take any action

03:06:55  5    when the company comes in that very first paragraph and

03:06:58  6    says it's been used for an implant since, you know, long

03:07:02  7    history.   That means FDA hey, keep your hands off it.

03:07:07  8    Then FDA would have to go back and look at everybody

03:07:10  9    else's mesh.   So FDA is going to have to back off.   Use

03:07:15  10   as an implant can be referenced by a company and they're

03:07:18  11   saying we've had a long history of use.   So that's what

03:07:21  12   the bulk of this document is about.

03:07:22  13       Q.   I don't want to revisit old topics, but we know

03:07:26  14   for a fact the FDA wrote us in 2007, and they were

03:07:31  15   expressing concerns about safety issues with the

03:07:37  16   predicated devices; right?

03:07:37  17       A.   Yes, sir.   No, not with all predicate devices

03:07:40  18   with the Pinnacle and with the -- the Pinnacle device

03:07:44  19   because if you use TVT and Prolene, they actually had

03:07:49  20   been approved products.   They have a totally different

03:07:51  21   history.

03:07:51  22       Q.   The FDA obviously had information about other

03:07:53  23   products, not Boston Scientific products, in September

03:07:56    1    of 2007; right?

03:07:58    2        A.   There are other products that are cleared, but

03:08:00    3    they really can't do anything to a product that's been

03:08:04    4    on the market for years.

03:08:05    5        Q.   Okay.  In any event, Doctor, the FDA got this

03:08:10    6    information and this product was cleared; right?

03:08:11    7        A.   Yeah.  There was nothing the FDA could do about

03:08:14    8    the Marlex.  So they cleared it.

03:08:15    9        Q.   And they the Uphold was cleared with FDA's full

03:08:19   10    knowledge and information of the medical safety data

03:08:23   11    sheet process there; right?

03:08:24   12        A.   Yes, sir.

03:08:25   13        Q.   Couple of things and then I'll be done.

03:08:28   14             In this time period of July 2008, the FDA was,

03:08:34   15    in fact, talking to Boston Scientific a fair amount

03:08:38   16    about this Uphold submission; right?

03:08:42   17        A.   They weren't talking.  All we have are the

03:08:47   18    letters, there were some e-mails.  There was a meeting,

03:08:56   19    I believe, November 6th, that was of the Pinnacle.  I

03:09:01   20    don't know if they were talking.

03:09:02   21        Q.   Let's go to Exhibit 665.  No.  I'm sorry.  I

03:09:11   22    want 1316.

03:09:13   23             Doctor, in your review of the documents as part

03:09:22  1    of the regulatory exchange between Boston Scientific and

03:09:26  2    the FDA, you'd want to know all the correspondence and

03:09:30  3    whatnot between the two companies; right?

03:09:32  4        A.   Yes, sir.  And that would come from your

03:09:34  5    company.

03:09:35  6        Q.   And so I'm going to offer at this time

03:09:37  7    Exhibit 1316, which is a July 8, 2008, e-mail from the

03:09:45  8    FDA?

03:09:48  9        A.   From Jiyoung Dang, PHD, biomedical engineer.

03:09:53  10       Q.   Okay.  So this would be -- could you pull that

03:10:01  11   up there.  So this would be within 2 weeks of the

03:10:05  12   exchange that we've already marked and talked about

03:10:08  13   regarding the questions FDA had with regard to the up

03:10:12  14   hold; right?  Those were July 18th and this is July 8th;

03:10:22  15   right?

03:10:22  16       A.   Yes, sir.

03:10:23  17       Q.   And for the jury's orientation KO -- KO 81048,

03:10:48  18   that's a term that references a particular filing

03:10:52  19   number; right?

03:10:52  20       A.   Yes, 510k.

03:10:54  21       Q.   That's a 510k and I'll ask you to assume that

03:10:58  22   number is the up hold that we've been talking about;

03:11:00  23   right?

03:11:00  1      A.   Yes, sir.

03:11:01  2      Q.   So to reflects a call with the FDA for -- to

03:11:05  3   request additional information on that submission;

03:11:09  4   right?

03:11:09  5      A.   Well, a call with one reviewer.

03:11:13  6      Q.   Okay.  But he's a biomedical engineer; right?

03:11:17  7      A.   Well, he's a reviewer.

03:11:19  8      Q.   Okay.  Is he not capable by himself of

03:11:23  9   reviewing this?

03:11:24  10     A.   I don't know, this is one call with one

03:11:27  11  engineer.

03:11:27  12     Q.   Okay.  And I will also ask you about a

03:11:33  13  different communication.  If you could pull up Defense

03:11:41  14  Exhibit 665.

03:11:44  15          In this same time period, in fact, the day

03:11:47  16  before this meeting with the FDA --

03:11:49  17     A.   No, don't call it a meeting.  They're going to

03:11:52  18  have a call with a group of people from the company and

03:11:57  19  one engineer.

03:11:58  20     Q.   A meeting, a call.  They exchanged information,

03:12:04  21  fair enough, Doctor?

03:12:05  22     A.   Well, this is the day before.

03:12:09  23     Q.   Right.  Let's pull this up.  Day before the

03:12:13  1    call with the FDA this is Exhibit 665 and I will offer

03:12:20  2    it at this time?

03:12:21  3              MR. THOMPSON:  Your Honor, this is obviously

03:12:23  4    hearsay and I don't want to slow everybody down, he's

03:12:26  5    already displayed it.  I don't want to slow it down.

03:12:29  6    This is really not a proper document to put in front of

03:12:32  7    Dr. Parisian.

03:12:33  8              MR. KEENAN:  It's a notice to the company.  Do

03:12:36  9    you want a sidebar?

03:12:37  10             THE COURT:  Are you --

03:12:40  11             MR. THOMPSON:  That's all I wanted to say,

03:12:42  12    Judge.

03:12:43  13             THE COURT:  You're not pursuing your objection.

03:12:45  14             MR. THOMPSON:  Yes, Your Honor.

03:12:47  15             THE COURT:  All right.  Why don't we take our

03:12:59  16    afternoon recess at this time.

03:13:01  17             (The jury left the courtroom at 3:09 p.m.)

03:18:11  18             (The following sidebar conference was held.)

03:18:11  19             THE COURT:  So the objection is hearsay.

03:18:11  20    What's the exception, or is it not hearsay?

03:18:11  21             MR. KEENAN:  It is noticed to Boston Scientific

03:18:11  22    consistent with the testimony of this Doreen Rao that

03:18:11  23    the medical caution statement had nothing to do with any

03:18:11  1    health or safety issues, but it rather was a

03:18:11  2    precautionary matter and the that the alternative

03:18:11  3    responsibility is in Boston Scientific's hands.  This is

03:18:12  4    notice to Boston Scientific in terms of their good faith

03:18:12  5    in proceeding ahead with the Marlex resin.  There has

03:18:12  6    been ample testimony by plaintiffs that it represented

03:18:12  7    some safety issue that we need to do follow-up, we

03:18:12  8    needed to do further investigation and this is just

03:18:12  9    additional information, right the critical time in July

03:18:12  10   of 2008 with the FDA it was reviewing a document they

03:18:12  11   put into evidence with the Uphold that the MSDS did not

03:18:12  12   raise any issues of safety and Boston Scientific's

03:18:12  13   information about the biocompatibility testing was

03:18:12  14   sufficient.

03:18:12  15         THE COURT:  Is there going to be any witness

03:18:12  16   that can authenticate this document so that it's not

03:18:12  17   hearsay within hearsay?

03:18:12  18         MR. KEENAN:  It's been on our exhibit list.

03:18:12  19   They didn't object to it on any basis.  Not that they

03:18:12  20   would waive it, but there's no objection to being

03:18:12  21   authentic for sure.  We can have a limiting instruction

03:18:12  22   to the jury this can only be considered for the purposes

03:18:12  23   of notice to Boston Scientific, but this goes to the

03:18:12   1   core of the case.

03:18:12   2            MR. THOMPSON:  Judge, Mr. Keenan, every bit of

03:18:12   3   his argument is that it's not notice, it's being offered

03:18:12   4   for the truth of the matter that they were reassured by

03:18:13   5   some statement from FDA some type and there's no witness

03:18:13   6   to put this in.  I mean, I lived with the -- with the

03:18:13   7   e-mail that talked about a meeting in the future because

03:18:13   8   it seems irrelevant and harmless but this is actually

03:18:13   9   this is offered for the truth of the matter the idea

03:18:13   10  that Boston Scientific needs notice of anything is kind

03:18:13   11  of silly.  This is offered for the truth of the matter.

03:18:13   12  It's a hearsay, it meets no exception.  Certainly the

03:18:13   13  interaction with the FDA we've agreed that they have a

03:18:13   14  right to put that in, that's what we're wrestling with

03:18:13   15  this sort of effort to bolster using inadmissible

03:18:13   16  testimony is just incorrect.  We object to it.

03:18:13   17            MR. KEENAN:  He raised in opening that this

03:18:13   18  represented some sort of red flag that we didn't

03:18:13   19  investigate, we didn't do anything we just kept our head

03:18:13   20  in the sand and this is good faith on the part of Boston

03:18:13   21  Scientific employees of reaching out and soliciting

03:18:13   22  information right at the critical time of when the FDA

03:18:13   23  was meeting and discussing with this, and this -- it

03:18:13  1      shows Boston Scientific's state of mind which is very

03:18:14  2      much within put in doubt about whether or not we were

03:18:14  3      using due care in acting as a reasonable company.

03:18:14  4      That's exactly what this goes to.

03:18:14  5              THE COURT:  What I'm going to allow you to do

03:18:14  6      is not put this document itself into evidence.  The

03:18:14  7      document does contain hearsay.  Bum I am going to let

03:18:14  8      you ask an appropriate witness, I don't know whether

03:18:14  9      this witness is appropriate or whether it would be more

03:18:14  10     appropriate for a Boston Scientific whether or not they

03:18:14  11     received information from FDA of some type and they need

03:18:14  12     to talk about how this even this correspondence was

03:18:14  13     engaged and whether they said that you didn't need to do

03:18:14  14     anything else.  But the document itself goes beyond

03:18:14  15     notice.  The document itself goes to whether or not

03:18:14  16     Boston Scientific should have done something additional,

03:18:14  17     which is relevant and it would be admissible if you had

03:18:14  18     a sponsoring witness.

03:18:14  19             MR. KEENAN:  I'll use it with my FDA witness

03:18:14  20     then.  I'm almost done, by the way, I only have about

03:18:14  21     3 minutes left.

03:18:14  22             MR. THOMPSON:  Great.

03:18:14  23             THE COURT:  We're in recess.

03:25:32  1          (Sidebar conference concluded.)

03:25:32  2          (A short recess was taken.)

03:27:57  3          THE COURT:  Is there a chance we're going to

03:28:00  4     get Dr. Dunn on the stand today.

03:28:03  5          MS. FITZPATRICK:  There's a chance, Your Honor

03:28:05  6     I don't know about the documents -- I'm happy to deal

03:28:11  7     with them at sidebar.  I think once the foundation is

03:28:14  8     laid it's going to be much more obvious what's going on

03:28:17  9     I'm not even sure you're going to have objections to

03:28:20  10    them.

03:28:21  11         MR. ANIELAK:  Can I alert the Court what my

03:28:23  12    objection are?  I object to the use of the term -- can

03:28:27  13    we do it at sidebar because the witness is in the

03:28:30  14    courtroom.

03:28:31  15         THE COURT:  Yes.

03:33:16  16         (The following sidebar conference was held.)

03:33:16  17         MR. ANIELAK:  Dr. Dunn is an engineer.  This is

03:33:16  18    a nonmedical person, who is a nonmedical person thousand

03:33:16  19    times.  I object to the uses of the term sharp to

03:33:16  20    describe the edges of the mesh.  It doesn't apply that

03:33:16  21    there are somehow going to be injuries by the plaintiff.

03:33:16  22    He didn't feel the edges of the mesh using that term is

03:33:16  23    prejudicial, that's my first issue.  We object to the

03:33:17  1    term sharp or using the term sharp to describe the

03:33:17  2    edges.  It does connote a medical condition, gives a

03:33:17  3    presentation to the jury that somehow she was injured by

03:33:17  4    the edges of the mesh.  That's our first objection.

03:33:17  5         The seconds issue goes back to the MSDS, again

03:33:17  6    at this point this is cumulative in terms of what the

03:33:17  7    MSDS says.  Dr. Guelcher went through the whole thing on

03:33:17  8    oxidation and the third one is it's also cumulative and

03:33:17  9    outside this expertise in terms of analyzing the medical

03:33:17  10   issues.

03:33:17  11        MS. FITZPATRICK:  On the use of the term sharp,

03:33:17  12   that is based on directly his expert report that he got

03:33:17  13   deposed on.  It says oxidation not about the clinical

03:33:17  14   implications about that for what he's going to say that

03:33:17  15   the device does have regular jagged sharp edges and that

03:33:18  16   is something that Boston Scientific was required to

03:33:18  17   consider under appropriate design theories, but he's not

03:33:18  18   going to make any clinical correlation to any injury to

03:33:18  19   Ms. Barba, or any other woman with that, and it is

03:33:18  20   specifically disclosed with that specific description.

03:33:18  21        The second was MSDS, we're not going back to

03:33:18  22   oxidation, but we are going to go to what a reasonable

03:33:18  23   manufacturer in using a proper design process have

03:33:18   1    considered the medical application caution cleared on

03:33:18   2    it's risk analysis, and taken action on it and Boston

03:33:18   3    Scientific did not, which again goes square to his

03:33:18   4    design process, but I'm certainly not repeating what it

03:33:18   5    is that Dr. Guelcher had said on oxidation.  The third

03:33:18   6    is the product field assessment which was disclosed.

03:33:18   7    Once again, in his expert report, he was also disclosed

03:33:18   8    in his expert report as saying that the sixth concept of

03:33:18   9    a product design is to do product field assessments and

03:33:18   10   to be monitoring them and that Boston Scientific did not

03:33:18   11   do a proper field assessment and than they did not take

03:33:18   12   the information that they knew of and gathered

03:33:18   13   post-marketing and post-sale and incorporate that into

03:33:18   14   the risk analysis document which is supposed to be a

03:33:18   15   living document that exists and exchanged based on new

03:33:18   16   information for the entire lifetime of the product.  So

03:33:18   17   all of them were disclosed, none of them were inclusive.

03:33:18   18        THE COURT:  First of all, I'm finding that the

03:33:18   19   term sharp is not a medical term, but I think you need

03:33:18   20   to make that very clear with your witness, that he is

03:33:19   21   not opining as to whether that property would effect the

03:33:19   22   body in one way or another.  You can simply describe it

03:33:19   23   using a lay term.  And if I recall, the main objection

03:33:19  1      to the other two topics was on the basis of cumulative

03:33:19  2      evidence.

03:33:19  3              MR. ANIELAK:  Partially yes, Your Honor and

03:33:19  4      detail getting into the medical aspects of a medical

03:33:19  5      device.  You made it very clear last week that he's not

03:33:19  6      an expert on medical devices, and I don't want to

03:33:19  7      venture what a medical device company should, or should

03:33:19  8      not be doing with regard to monitoring medical devices.

03:33:19  9              THE COURT:  So he can testify then from an

03:33:19  10     engineering standpoint as to product design, and testing

03:33:19  11     but should not be opining specifically with regard to

03:33:19  12     medical devices.

03:33:19  13             MS. FITZPATRICK:  That's correct.

03:33:19  14             THE COURT:  As we go along with this, if it

03:33:19  15     looks likes the testimony is getting unduly cumulative,

03:33:19  16     there's undoubtedly going to be some overlap, but if it

03:33:19  17     becomes unduly cumulative, then you may assert your

03:33:19  18     objection.

03:33:19  19             MR. ANIELAK:  Thank you, Your Honor.

03:33:19  20             MS. FITZPATRICK:  Thank you, Your Honor you.

03:33:25  21             (Sidebar conference concluded.)

03:33:25  22     BY MR. KEENAN:

03:33:26  23         Q.   I only have a few questions left Doctor, I want

03:33:30  1     to go back to a doctor that you used with Mr. Thompson,

03:33:33  2     and that is July 17, 2008, document which represented

03:33:41  3     some questions from the FDA.  And on the Uphold and in

03:33:48  4     particular, Doctor, I want to direct your attention to

03:33:52  5     the questions that Mr. Thompson had for you about the

03:33:53  6     Capio, do you remember those?

03:33:55  7         A.  Yes, sir.

03:33:55  8         Q.  All right.  So you and Mr. Thompson were

03:33:59  9     talking about this document and you were describing some

03:34:05  10    of the MDRs for the Capio; do you recall that?

03:34:08  11        A.  Yes, sir.  I think I questioned whether this

03:34:10  12    was a draft document or the final.

03:34:13  13        Q.  Yeah.  That's what my question is.  You don't

03:34:18  14    know whether or not this was a draft or the final

03:34:20  15    version.  Fair?

03:34:21  16        A.  I think this one that you gave me was the final

03:34:24  17    version, Exhibit 68.  This is the draft.

03:34:27  18        Q.  Thank you.  And because, among other things,

03:34:31  19    the date on this July 17th, 2008, is 11 days before the

03:34:38  20    actual letter that was sent to the FDA July 18th; right?

03:34:43  21        A.  Yes.

03:34:45  22        Q.  And this letter includes the same question but

03:34:50  23    a different shorter answer; right?

03:34:54  1      A.   Well -- yeah, it's a different answer.

03:34:58  2      Q.   Okay.  But this Exhibit No. 68 would appear to

03:35:03  3  be the actual response to the FDA; right?

03:35:06  4      A.   Yes, sir.

03:35:08  5      Q.   And while we're looking at this, you will

03:35:11  6  admit, won't you, that the time period where they are

03:35:16  7  looking at the Capio MDRs is a time period that

03:35:21  8  really doesn't, it overlaps some, but not entirely with

03:35:27  9  the time period for the field assessment; right?

03:35:28  10     A.   Yes, sir.

03:35:29  11     Q.   This is a two-year period, this is a January

03:35:32  12  through May 2008.  And the field assessment was the

03:35:36  13  entire calendar year 2008; right?

03:35:38  14     A.   Yes, sir.

03:35:38  15     Q.   A few other things, and I'll be done.

03:35:47  16          Mr. Thompson asked you about a letter from some

03:35:57  17  surgeons that you were discussing, and I believe you

03:36:05  18  were describing how this group of physicians was

03:36:09  19  attempting to delay the public health notice; right?

03:36:13  20     A.   No.  Their recommendation was that the FDA

03:36:16  21  delay sending it out and hold a meeting instead with the

03:36:20  22  people on the council.

03:36:25  23     Q.   They didn't delay the public health notice;

03:36:29  1      right?

03:36:29  2          A.  The FDA, no.

03:36:30  3          Q.  It came out after this.  And my final document

03:36:35  4      is actually this document, the public health notice.

03:36:38  5              Now, this is directed to doctors; right?

03:36:44  6          A.  Yes, sir.

03:36:45  7          Q.  Not to companies, but to doctors; right?

03:36:48  8          A.  Yes.

03:36:48  9          Q.  No. 1.  No. 2, this is a good thing, is it not,

03:36:52  10     because it wants to make certain that if a doctor is out

03:36:57  11     there using these products and thinks that there's no

03:37:00  12     risk whatsoever, it's telling him, hey, proceed with

03:37:04  13     caution.  Fair?

03:37:05  14         A.  It's getting the information out, that's what

03:37:08  15     the FDA is trying to do.  I think there's a patient one,

03:37:11  16     too.

03:37:11  17         Q.  That's a good thing?

03:37:13  18         A.  For the FDA to do that?  Yes, sir.

03:37:15  19         Q.  And for physicians, too, to get to information;

03:37:18  20     right?

03:37:18  21         A.  Yes, to try to protect public health.

03:37:22  22         Q.  They describe one thousand reports from nine

03:37:25  23     surgical mesh manufacturers; right?

03:37:26  1          A.   Right.

03:37:27  2          Q.   You and I were talking about number of

03:37:29  3    manufacturers that made transvaginal products and there

03:37:34  4    was at least nine?

03:37:35  5          A.   Yes.

03:37:35  6          Q.   And one of them is Boston Scientific; right?

03:37:37  7          A.   Right.

03:37:38  8          Q.   At this time October of 2008, Boston

03:37:41  9    Scientific's first pelvic organ prolapse device the

03:37:45  10   Pinnacle had only been on the market less than a year;

03:37:48  11   right?

03:37:48  12         A.   It began in January, yes.

03:37:50  13         Q.   The FDA notes here that these as of

03:37:53  14   October 2008, were described to the FDA as rare; right?

03:37:57  15         A.   Well, no, the FDA is saying that.

03:37:59  16         Q.   Yeah.  The FDA is saying although rare, these

03:38:06  17   can have serious consequences be; right?

03:38:06  18         A.   That's based on the FDA has received.  And than

03:38:09  19   one thousand would be from their MDRs.

03:38:13  20         Q.   We don't know what the denominator is, we know

03:38:16  21   it's a thousand complaints, but we don't total number of

03:38:21  22   sales or manufacturer --

03:38:22  23         A.   There's nine manufacturers.  We don't know what

03:38:24  1    the reporting factors are.  The FDA is looking for a

03:38:27  2    trend, only the companies would know what the

03:38:29  3    denominators are and with the real complaint numbers

03:38:33  4    are.

03:38:33  5         Q.   And the FDA is telling physicians that among

03:38:38  6    other things, they should be trained; right?

03:38:40  7         A.   Yes.

03:38:40  8         Q.   Be vigilant for potential adverse events from

03:38:44  9    the mesh; right?

03:38:45  10        A.   Yes, sir.

03:38:45  11        Q.   They should watch for complications; right?

03:38:47  12        A.   Yes, sir.

03:38:48  13        Q.   They should inform patients that it's

03:38:51  14   permanent; right?

03:38:52  15        A.   Yes.

03:38:52  16        Q.   And that some complications assertion may

03:38:55  17   require additional surgery; right?

03:38:57  18        A.   Yes.

03:38:57  19        Q.   They're telling the doctors inform your

03:39:01  20   patients about the potential for series complications

03:39:03  21   and be their affect on quality of life, including pain

03:39:07  22   during intercourse, scarring, and narrowing of the

03:39:11  23   vaginal wall; right?

03:39:13  1        A.   Yes, the FDA is telling them.

03:39:14  2        Q.   It says provide patients with the a written

03:39:17  3   copy of the patient labeling from surgical mesh

03:39:21  4   manufacturer if available; right?

03:39:22  5        A.   Yes, sir.

03:39:22  6        Q.   When you and I were talking earlier about

03:39:24  7   sources of information, this is an example of

03:39:27  8   information coming to the doctors about risks and

03:39:30  9   benefits of the transvaginal mesh products they may be

03:39:34  10  using, that has nothing to do with the companies; right?

03:39:36  11       A.   This is outside of the companies.  This is FDA

03:39:39  12  has become aware of a safety issue.

03:39:42  13       Q.   Right.  So a physician who may be dealing with

03:39:44  14  a company, this is an independent basis of information

03:39:47  15  about risks and benefits that he can factor into his

03:39:51  16  clinical evaluation of a particular patient who may be a

03:39:55  17  candidate for these products; right?

03:39:56  18       A.   If he's aware of that.

03:39:58  19       Q.   Right.  Well, this is going to the doctors;

03:40:02  20  right?

03:40:02  21       A.   No, it's on the FDA's website saying dear

03:40:07  22  healthcare providers.

03:40:08  23       Q.   This public health notice did generate quite a

03:40:11   1   bit of publicity, didn't it?

03:40:13   2       A.   It did.  I don't know what physicians are in

03:40:16   3   terms of your daily care, often times something like

03:40:19   4   that is brought to the physician by the sales rep.  That

03:40:22   5   would be a normal thing to have happen.

03:40:24   6       Q.   But this obviously was from the FDA to

03:40:27   7   physicians, and physicians who are using these products

03:40:31   8   it's something that they should endeavor to be aware of.

03:40:36   9   Fair?

03:40:36  10       A.   This is what the FDA is saying based on what

03:40:39  11   they received in their reports.

03:40:41  12       Q.   All right.  Thank you.

03:40:44  13       A.   You're welcome.

03:40:48  14            (Pause.)

03:40:49  15                    REDIRECT EXAMINATION

03:40:49  16   BY MR. THOMPSON:

03:41:25  17       Q.   Doctor, sometimes something happens that you

03:41:28  18   really didn't anticipate.  I didn't really anticipate

03:41:30  19   that there would be a field assessment on the Polyform

03:41:36  20   mesh.  Do you remember that?

03:41:37  21       A.   Yes, sir.

03:41:37  22       Q.   You actually saw that the Polyform mesh was in

03:41:44  23   2006, you saw you that it had, like, zero?

03:41:47  1          A.    Right, but it had only 921 units.

03:41:50  2          Q.    Zero.  The Polyform mesh is that 15-by-10

03:41:57  3    centimeter square; is that right?

03:41:58  4          A.    Right.

03:41:58  5          Q.    The Capio, I think they showed a field

03:42:05  6    assessment on that.  And it seemed to be kind of low or

03:42:08  7    very low?

03:42:08  8          A.    Yes, sir.

03:42:09  9          Q.    Now, the field assessment that showed the

03:42:13  10   Capio, the suture, and the mesh together, was the

03:42:19  11   Pinnacle device?

03:42:20  12         A.    Yes, sir.

03:42:20  13         Q.    Okay.  So the individual components, if the

03:42:25  14   Capio was being used as cleared for which was, as I

03:42:36  15   recall, open surgical with endoscopy, do I remember that

03:42:41  16   right?

03:42:41  17         A.    Yes, sir.

03:42:42  18         Q.    If it was being used for what it's cleared for,

03:42:45  19   apparently it didn't have many problems; is that right?

03:42:47  20         A.    Yes.

03:42:48  21         Q.    Apparently if you used the Polyform in a

03:42:51  22   reasonable size, it didn't seem to have many complaints

03:42:55  23   either?

03:42:56  1          A.   Correct, it's a surgical mesh, yeah.

03:42:58  2          Q.   If you take and you get a very large piece of

03:43:04  3      the Polyform mesh, and you cut it into a special shape,

03:43:08  4      and you put four arms and you implant two arms into the

03:43:17  5      arcus ligamentous and two into the sacrospinous

03:43:22  6      ligament, apparently you get a result that shows six

03:43:26  7      times the expected complaint rate?

03:43:30  8          A.   Right.

03:43:32  9              MR. KEENAN:   Objection.   Leading, Your Honor.

03:43:34  10             MR. THOMPSON:   I will not lead, Your Honor.

03:43:38  11     BY MR. THOMPSON:

03:43:40  12         Q.   Doctor, is that a red flag to a medical device

03:43:43  13     company that they have a serious problem with combining

03:43:47  14     and designing the Pinnacle kit?

03:43:50  15         A.   Yes.   It's the design issue, in terms of your

03:43:53  16     21 CFR 820.   That is what the components together are

03:43:59  17     what makes the difficulty and where you're placing it.

03:44:02  18         Q.   And, in fact, the low complaint rates of the

03:44:07  19     individual components, as compared to the very high

03:44:10  20     complaint rate of the kit, doesn't excuse the kit.   It

03:44:16  21     should give rise to a higher scrutiny as to safety and

03:44:23  22     efficacy, isn't it?

03:44:23  23         A.   Right.   And to try to determine what's the

03:44:26  1    problem in terms of your design of these products being

03:44:29  2    used together.

03:44:29  3          Q.   Doctor, I think you recall in the MSDS

03:44:34  4    discussion we've kept talking about the -- we talked

03:44:39  5    back and forth about this MSDS disclosure and the Boston

03:44:46  6    Scientific response to the FDA in the Uphold discussion.

03:44:50  7    And we talked about, and here again I'm thankful that

03:44:54  8    the defendant has actually provided me with a real copy

03:44:57  9    instead of that draft copy that we had handed up, okay?

03:45:01  10         A.   Yes, sir.

03:45:01  11         Q.   So we're looking at Defendant's Exhibit 68 now.

03:45:05  12   And we're looking at FDA question No. 8 at page 22 going

03:45:14  13   onto 23.

03:45:18  14         A.   All right.

03:45:19  15         Q.   Have it?

03:45:20  16         A.   I should.  Yes, I have it right here.

03:45:23  17         Q.   Go to 22, onto 23.  Let me just alert

03:45:30  18   Mr. Keenan, it's my intention to confront her with

03:45:42  19   Goddard 15.  Your Honor we need to approach the bench,

03:45:49  20   if that's okay?

03:45:50  21              THE COURT:  Okay.

03:53:07  22              (The following sidebar conference was held.)

03:53:07  23              MR. THOMPSON:  Your Honor Goddard 15 is the

1    ISO10993 document which refers to the fact that the

2    improper testing was performed on the guinea pigs.  And

3    part of the response to the FDA that was included in the

4    MSDS discussion on this July 18th letter is an assertion

5    that they have done proper testing and that they have

6    done proper testing, and it's proper for the last

7    10 years.  We think the door has been opened to permit

8    Dr. Parisian to see, and to note for this jury that, in

9    fact, that statement is not correct.

10           MR. KEENAN:  I did not mention the word bio

11   capability.  I did not mention the word sensitization.

12   The fact that the FDA cleared the device, does not open

13   the door.  We heard that it's not on the exhibit list,

14   not on the guidance list not previously disclosed,

15   completely outside anything she talked about she opened

16   the door.  She talked about it before.  She opened the

17   door about the FDA not knowing, you know, all of the

18   various opinions.  I have to challenge that.  I didn't

19   open the door to it.  This is sensitization of mice, of

20   mice I did not talk about biocompatibility.  I didn't

21   raise any of those issues.  I didn't raise the word

22   desensitization.  So no door has been opened.  This if

23   opening a door is challenging an FDA's opinion that we

03:53:08  1    in fact got clearance and I'll plead guilty to that, but

03:53:08  2    that's the core of the case has nothing to do with this

03:53:08  3    document.

03:53:08  4            THE COURT:  Seems to me you can use this with

03:53:08  5    one of the Boston Scientific witnesses, can you not.

03:53:08  6            MR. THOMPSON:  If one comes, I certainly could.

03:53:08  7            MR. KEENAN:  It was used extensively with Jim

03:53:08  8    Goddard to testified about this document by video.  This

03:53:08  9    was the very document --

03:53:08  10           THE COURT:  Again, I think Boston Scientific

03:53:08  11   was pretty scrupulous in limiting the cross and I don't

03:53:08  12   think it opened the door to this exact document.

03:53:08  13           MR. KEENAN:  He wants to use this Canadian

03:53:08  14   Regulatory document and this has been the subject

03:53:08  15   pretrial motions noise and be sustained this is Canada

03:53:08  16   not allowing the clearance of the Pinnacle on May 13th

03:53:08  17   1 day after Ms. Barba's implantation.  So I didn't open

03:53:08  18   this door either.  I didn't talk about international or

03:53:08  19   anything.  It's outside the scope.  It's been previously

03:53:08  20   sustained and day after implantation.  We would have to

03:53:08  21   respond to this with post date evidence because it was

03:53:09  22   ultimately cleared by Canada.  So this is a can of worms

03:53:09  23   that makes our lives a lot more complicated and I didn't

03:53:09    1    mention Canada in our regulatory issues.

03:53:09    2             THE COURT:  What's the basis?

03:53:09    3             MR. THOMPSON:  Your Honor, this is redirected

03:53:09    4    responding to new material that was elicited on

03:53:09    5    cross-examination with regard to the fact that they

03:53:09    6    were, quote, resolving the difficulties that they had as

03:53:09    7    of July of 2008, and that their experience it was

03:53:09    8    actually improving, and this is simply evidence to show

03:53:09    9    that the complaint rate and failure rate was continued

03:53:09   10    to be unacceptable.

03:53:09   11             THE COURT:  Let me see what this will document

03:53:09   12    says.

03:53:09   13             (Pause.)

03:53:09   14             THE COURT:  Well, this certainly could be used

03:53:09   15    to impeach a witness who said that these reported

03:53:09   16    adverse incident rates were stable or declining.  But

03:53:09   17    this is not the witness to do this with.  So as you

03:53:09   18    probably -- you don't have a witness to do this with?

03:53:09   19             MR. THOMPSON:  Your Honor, certainly if the

03:53:09   20    witness said it, that's one thing.  In fact, Mr. Keenan

03:53:09   21    elicited that.  He elicited that oh, the complaint rate,

03:53:09   22    the failure rate, the complication rate of the Pinnacle

03:53:10   23    was declining and that they had, quote, solved the

problem with it.

MR. KEENAN:  That was for the with regard to the Capio, that was the Capio problem.  That was the Capio problem.  She spoke about extensively.  That's a totally different issue than this.

THE COURT:  Are you going to have any Boston Scientific representative testify?

MR. KEENAN:  We haven't decided yet.  John Sherry has been on our will call list.  We haven't decided that yet.  We want to try to get the case submitted by Thursday at five, and we're going to cut our case back so we can make that happen.  This exam has gone much longer I expected, and if this is used it's going to go a lot longer.  Those Canada --

THE COURT:  Is this a higher rate reported in Canada or in the United States?

MR. KEENAN:  United States.  But again, Your Honor, this is -- I mean, Canada has entirely different regulatory rules about whether or not devices should be cleared.

THE COURT:  Well, this is evidence that there's a higher rate of reported adverse events compared to the predicate Polyform mesh, and there was, unless I'm

03:53:10  1    misremembering, I believe there was testimony talking

03:53:10  2    about the reported adverse events with regard to this

03:53:10  3    product.

03:53:10  4            MR. KEENAN:  The field assessment.  He spent

03:53:10  5    30, 40 minutes on the field assessment that showed high

03:53:10  6    rates of performance that is in the case.  We're not

03:53:10  7    denying that.

03:53:10  8            THE COURT:  What about the fact that there are

03:53:10  9    higher reported adverse events compared to the predicate

03:53:11 10    Polyform mesh.

03:53:11 11            MR. KEENAN:  That's in the case the.  Polyform

03:53:11 12    we said had zero and the combination has, what, 175.  So

03:53:11 13    that's already in the case.  This doesn't add anything

03:53:11 14    beyond that.

03:53:11 15            THE COURT:  Has this witness already testified

03:53:11 16    to do this.  Who testified to that?

03:53:11 17            MR. THOMPSON, judge we just went over the

03:53:11 18    Polyform was low and the Pinnacle was kit was high.

03:53:11 19    That's not a reason to keep it out.  That's a reason to

03:53:11 20    support the credibility of the document.

03:53:11 21            MR. KEENAN:  He's bolstering the witness, his

03:53:11 22    own witness.  If he wants to use it with our regulatory

03:53:11 23    witness, we can do that tomorrow.

03:53:11   1                    THE COURT:   I will, in all probability, let you

03:53:11   2        use it with Boston Scientific's witness, but not with

03:53:11   3        this one.

03:53:11   4                    MR. THOMPSON:   All right.   Thank you, Your

03:53:11   5        Honor.

03:53:22   6                    (Sidebar conference concluded.)

03:53:22   7                    (Pause.)

03:53:22   8        BY MR. THOMPSON:

03:53:42   9             Q.   Dr. Parisian, let me do one more thing real

03:53:47   10       quickly.   Do you recall that in the amended abbreviated

03:53:52   11       510k that Boston Scientific provided to the FDA and we

03:53:57   12       can either pull this out and go over it in laborious

03:54:01   13       terms, or we can just remember that Boston Scientific

03:54:04   14       took the position that the Capio device and its method

03:54:09   15       of insertion presented no new or novel techniques --

03:54:15   16            A.   Right.

03:54:15   17            Q.   -- that required further exploitation; do you

03:54:20   18       remember that?

03:54:21   19            A.   Right.

03:54:22   20            Q.   I think that Mr. Keenan has taken back his

03:54:36   21       Prolift, is that going to be in evidence or is that --

03:54:38   22                    MR. KEENAN:   If you want it, I'll get it.

03:54:44   23                    MR. THOMPSON:   Yes.

03:54:47  1                    MR. KEENAN:  It's not my Prolift.

03:54:53  2                    (Pause.)

03:54:54  3                    MR. THOMPSON:  Thank you.

03:54:57  4       BY MR. THOMPSON:

03:54:57  5            Q.   And he talked about the trocars or the entry

03:55:05  6       devices; do you remember that?

03:55:06  7            A.   Yes, sir.

03:55:06  8            Q.   These were these, and he pointed to those six

03:55:09  9       or seven different entry points, do you remember that?

03:55:14  10           A.   Yes, sir.

03:55:14  11           Q.   And then he contrasted it with this Harry

03:55:18  12      Potter looking device, the Capio, and he said that you

03:55:24  13      see, this presents no new or novel differences or

03:55:31  14      changes from these trocars?

03:55:34  15           A.   Right.

03:55:34  16           Q.   Now, Dr. Parisian, in your role as a highly

03:55:38  17      educated and experienced regulatory expert with a fine

03:55:45  18      eye, does this look different than this?

03:55:48  19           A.   Yes.

03:55:49  20           Q.   Does this present a different entry angle than

03:55:56  21      this?

03:55:56  22           A.   Yes.

03:55:57  23           Q.   The representation was made that this was going

03:55:59  1    to cause less disruption than this with no supporting

03:56:03  2    data?

03:56:04  3        A.   Yeah.

03:56:05  4        Q.   Would that be something that should be relied

03:56:09  5    upon by a medical device company?

03:56:12  6        A.   You mean the company should have gotten data

03:56:17  7    'cause you're basically putting like a crochet hook in,

03:56:20  8    just poking it around in one incision.  If you're going

03:56:23  9    to say it's safer, you need to get data, particularly if

03:56:26  10   you're going to say it in your marketing, which

03:56:30  11   subsequently they did.  You need data to support that

03:56:32  12   claim.

03:56:32  13       Q.   I hate to say it, but does it look safer than

03:56:36  14   this?

03:56:36  15       A.   No.

03:56:37  16       Q.   Is it safer because I said it is?

03:56:39  17       A.   No.

03:56:39  18       Q.   How do you know it is safer?

03:56:41  19       A.   I don't know.

03:56:41  20       Q.   How could you tell if it was safer?

03:56:43  21       A.   You can have it used.  You can begin by doing

03:56:46  22   the studies looking at cadavers comparing types of

03:56:51  23   injury routes you have by putting that hard ridged thing

03:56:56  1   into a incision.  You can do study with cadavers where

03:57:01  2   you start.  You can also do clinical studies, FDA

03:57:04  3   suggested to look at women in a fashion where they have

03:57:07  4   an informed content, and then you follow-up on them.  So

03:57:10  5   there are ways to look at that.

03:57:11  6       Q.   The FDA recommended clinical studies; is that

03:57:15  7   right?

03:57:15  8       A.   Yes.

03:57:16  9            MR. KEENAN:  Objection.

03:57:17  10            THE WITNESS:  Well, they didn't recommend.

03:57:20  11            THE COURT:  All right.

03:57:23  12            MR. THOMPSON:  I'll withdraw the question.

03:57:26  13   BY MR. THOMPSON:

03:57:27  14       Q.   Did the FDA suggest that clinical studies was

03:57:30  15   one way they could address the unknown?

03:57:32  16       A.   Yes, it is.

03:57:33  17       Q.   Did Boston Scientific take them up on their

03:57:35  18   suggestion?

03:57:35  19       A.   No.

03:57:36  20       Q.   Instead, did Boston Scientific make a position

03:57:41  21   to the FDA that this was not new, or novel, and in fact

03:57:46  22   presented the same known risk?

03:57:50  23       A.   Yes.  As the expert in the product and the

03:57:54   1   design, they said to the FDA that there was less risk.

03:57:57   2         Q.   One last couple of questions.   This, can we

03:58:02   3   agree, that this is the first time that we've ever used

03:58:07   4   a Capio to insert a Pinnacle pelvic device blindly into

03:58:15   5   the pelvis of a woman?

03:58:18   6         A.   Yes.

03:58:19   7         Q.   And is this the only device that uses the

03:58:27   8   sacrospinous ligament to make an attachment in an Apical

03:58:30   9   device?

03:58:30   10         A.   An anterior device.   Yes, sir.

03:58:33   11         Q.   I'm sorry, an anterior device.

03:58:53   12         Would you pick up the Pinnacle device and go to

03:58:58   13   00600.   Can you do that for me Mike.

03:59:08   14         Pick up the second paragraph, please?

03:59:21   15         A.   Do you want me to read it.

03:59:23   16         Q.   Let me read it I can go faster.   Through the

03:59:26   17   use of the Capio device, the physician avoids blind

03:59:30   18   passages through the pelvic floor anatomy, risk of organ

03:59:30   19   and vessel perforation, as well as hematoma and

03:59:36   20   post-operative bleeding increases with each additional

03:59:38   21   blind passage through the skin and anatomy.   The risks

03:59:41   22   due to blind passages are eliminated with the Pinnacle

03:59:44   23   system because of the absence of such blind trocar

03:59:48  1    passages.

03:59:49  2              Additionally, no skin incision is required to

03:59:52  3    deliver the Pinnacle device, only the vaginal incision.

03:59:55  4    The absence of the skin incision has the potential to

03:59:58  5    reduce the risk of infection and sepsis to the patient.

04:00:04  6    See that?

04:00:04  7        A.   Yes, sir.

04:00:05  8        Q.   Is there any clinical data to support that

04:00:08  9    assertion?

04:00:08  10       A.   No.

04:00:09  11       Q.   Is it a correct statement to say that the

04:00:15  12   physician avoids blind passages through the pelvic floor

04:00:18  13   anatomy?

04:00:19  14       A.   No.  'Cause you're using a ridged device and

04:00:25  15   sticking it into the pelvis.

04:00:26  16       Q.   The physician doesn't use an endoscope as the

04:00:29  17   prior approval, not approval, the prior clearance of the

04:00:33  18   Capio called for, does it?

04:00:35  19       A.   That's correct.  So there's no visualization.

04:00:38  20       Q.   So even in this letter, July 18th -- I'm sorry,

04:00:45  21   this is the amended abbreviated 510k even in that, do

04:00:55  22   you find fault with the description of the process?

04:00:59  23       A.   Yes.  And the potential risk for patients.

04:01:01  1          Q.   And do you believe, or is it your opinion to a

04:01:04  2   reasonable scientific certainty that Boston Scientific

04:01:08  3   was on notice of a responsibility to do further inquiry

04:01:15  4   to assure the safety and non-defectiveness of Pinnacle

04:01:21  5   product?

04:01:21  6          A.   Yes, they were.

04:01:23  7               MR. THOMPSON:  Your Honor, that's all the

04:01:24  8   questions I've got.   Thank you.

04:01:26  9               MR. KEENAN:  No more questions.

04:01:28  10              THE COURT:  You may step down.   Thank you.

04:01:32  11  You're excused.

04:01:33  12              THE WITNESS:  Thank you, Your Honor.

04:01:41  13              THE COURT:  And who is your next witness?

04:02:02  14              (Pause.)

04:02:11  15              MR. THOMPSON:  Your Honor, I'd like to call

04:02:14  16  Thomas Barba, please.

04:02:14  17                         THOMAS BARBA,

04:02:14  18    having been first called by the State was sworn on

04:03:05  19  oath, was examined and testified as follows:

04:03:05  20                    DIRECT EXAMINATION

04:03:05  21  BY MR. THOMPSON:

04:03:09  22         Q.   Mr. Barba, how do you do this afternoon?

04:03:13  23         A.   Tired.

04:03:14    1      Q.   All right.  Mr. Barba, I will notice that

04:03:17    2    Ms. Barba has stepped out of the courtroom; is that

04:03:20    3    right?

04:03:20    4      A.   Yes.

04:03:20    5      Q.   Now, Mr. Barba, did we talk about this and

04:03:24    6    decide while you were testifying she would not be

04:03:26    7    present and while she's testifying you're going to wait

04:03:29    8    outside?

04:03:29    9      A.   Yes, sir.

04:03:30   10      Q.   And the reason for that is why?

04:03:32   11      A.   It's too emotional.

04:03:36   12      Q.   How old are you?

04:03:39   13      A.   I'm 52.

04:03:40   14      Q.   And you are a resident of where?

04:03:44   15      A.   Newark, Delaware.

04:03:47   16      Q.   How far away from the courthouse is that?

04:03:49   17      A.   Probably 15 miles, maybe.

04:03:53   18      Q.   What is your line of work?

04:03:55   19      A.   I'm assist manager of a roofing and siding

04:03:59   20    distributorship.

04:04:01   21      Q.   Does that keep you outside or are you an inside

04:04:03   22    guy?

04:04:04   23      A.   I'm inside.  I can go in or out as I please.

04:04:07  1       Q.   As the assistant manager, do you visit job

04:04:12  2   sites, as well as work in the --

04:04:14  3       A.   No, sir.

04:04:14  4       Q.   Tell me where you work?

04:04:16  5       A.   I work in Newark in Ogletown, Newark Delaware.

04:04:21  6       Q.   How do you spend your days?

04:04:23  7       A.   I sit at a desk most of the day.

04:04:26  8       Q.   Okay.  Mr. Barba, how many times have you been

04:04:30  9   married in your life?

04:04:31  10       A.   Once.

04:04:31  11       Q.   And who are you married to?

04:04:33  12       A.   My beautiful wife Deborah.

04:04:36  13       Q.   How long have you and Ms. Barba been married?

04:04:41  14       A.   It will be 27 years this November.

04:04:43  15       Q.   Has she worked outside the home during your

04:04:50  16   marriage?

04:04:51  17       A.   Yes.  Yes, sir.

04:04:53  18       Q.   And what is her profession, what is her job?

04:04:57  19       A.   She's been in the banking industry most of her

04:05:00  20   life.

04:05:00  21       Q.   When you say banks industry, is she a bank

04:05:03  22   teller?

04:05:04  23       A.   She worked for JP Morgan Chase, Bank of New

04:05:08    1    York, they all got a acquired Bank of New York, they got

04:05:12    2    acquired by chase and then they got banks kept getting

04:05:17    3    acquired.  She got laid off from there after 17 years

04:05:21    4    and she went into a banking tellership after that.

04:05:24    5        Q.   I see, and how long was she in the banking

04:05:27    6    tellership?

04:05:27    7        A.   She worked for Citizens I believe for 7 years

04:05:30    8    before she got laid off, and then she started with M and

04:05:35    9    T Bank.  I think she was there not quite a year, maybe a

04:05:39   10    little over a year until she lost her job.

04:05:43   11        Q.   And that was just recently?

04:05:44   12        A.   In December.

04:05:45   13        Q.   All right.  In her job, does she -- sounds like

04:05:51   14    it's a -- there's some responsibility.  Does she have to

04:05:55   15    be bonded?

04:05:56   16        A.   I don't believe so, no, sir.

04:05:57   17        Q.   Does she -- is she accountable for handling

04:06:02   18    sums of money and accounting for it accurately?

04:06:05   19        A.   Yes, sir.

04:06:06   20        Q.   How does she take her job?  Is it a lark, or is

04:06:10   21    it just something to put groceries on the table, or how

04:06:15   22    is she about her career?

04:06:16   23        A.   She takes her career seriously as she does

04:06:19   1    everything.

04:06:19   2        Q.   What do you enjoy, and actually let me split

04:06:24   3    this into three distinct time periods, if that's okay.

04:06:29   4    I'm going to pick days that you sat here for a week now

04:06:34   5    so you'll understand the dates I pick.  The first one

04:06:37   6    I'm going to pick is a time before about 2007/2008 I

04:06:46   7    want to talk about that time period, if I can.  Okay?

04:06:49   8        A.   I'll try to remember.

04:06:52   9        Q.   Around 2007, 2008 what did you do and Ms. Barba

04:06:58   10   enjoy, what kind of activities?

04:07:00   11       A.   We used to go to Chincoteague.  We used to go

04:07:05   12   down to the beach once in a while.  We used to go to

04:07:09   13   parks all the time walking.  I like the beach, she likes

04:07:13   14   the mountains.  So we try do a little bit for each of

04:07:17   15   us.

04:07:17   16       Q.   Who does the, before 2007, who did the cooking

04:07:21   17   in the house and that sort of --

04:07:24   18       A.   My wife did.

04:07:24   19       Q.   Keeping the place clean?

04:07:26   20       A.   My wife did.  I did the outside, and she did

04:07:30   21   the inside.

04:07:30   22       Q.   And you fulfill your job of messing it up, I

04:07:33   23   assume?

04:07:34  1        A.   I try not to.  I don't want to get in trouble.

04:07:36  2        Q.   All right.

04:07:39  3        A.   Happy wife, happy life.

04:07:40  4        Q.   Mr. Barba, would you describe your married life

04:07:47  5   idyllic or a fantasy land of joy?

04:07:49  6        A.   No, far from it.

04:07:51  7        Q.   Tell me your relationship with Ms. Barba for

04:07:54  8   your married life?

04:07:54  9        A.   Today?

04:07:55  10       Q.   No.  Before 2007?

04:07:57  11       A.   Like any couple, we, you know, we have our

04:08:01  12  problems.  We might not talk for a couple days, but then

04:08:06  13  it comes back.  That's how we try and stay married, we

04:08:11  14  took vows that we'll try to stay together forever.

04:08:16  15  That's what we -- so we have our arguments.

04:08:19  16       Q.   Do you view your marriage as a life-long bond?

04:08:24  17       A.   That's what my vow was 26 years ago.

04:08:28  18       Q.   Let me direct your attention now to around 2008

04:08:34  19  into 2009.  Did there come a time when Ms. Barba needed

04:08:40  20  to be seen for a stress incontinence?

04:08:53  21       A.   She had to go to the doctor because after we

04:08:57  22  had intercourse, she was having problems, and she didn't

04:09:00  23  know what -- she noticed a bulge down there she would

04:09:04  1    complain about.  So she made an appointment with

04:09:07  2    Dr. Carlson, I believe it was.  I don't know if she went

04:09:10  3    to her family doctor first, or if she went straight to

04:09:14  4    Dr. Carlson.

04:09:14  5        Q.   Let me ask you this straight up because we sort

04:09:19  6    of approach this subject, looking at 2007/2008, did you

04:09:26  7    and Ms. Barba enjoy a strong and active intimate life

04:09:33  8    together as husband and wife?

04:09:34  9        A.   Yeah.  'Cause we have to -- we plan date nights

04:09:38  10   because we didn't want our, you know, most marriages

04:09:42  11   split up as they go on.  So to keep -- we did our

04:09:48  12   Wednesdays and Saturday nights.  We tried to do that

04:09:50  13   every week.  And it was well.  Unless we were fighting

04:09:54  14   then, of course, naturally I try to make up before, if

04:09:59  15   it didn't happen I'm not saying we did it every

04:10:02  16   Wednesday and Saturday because there were times we were

04:10:04  17   not getting along.

04:10:05  18       Q.   But you did your best to make up before

04:10:09  19   Wednesday and Saturday?

04:10:10  20       A.   I tried.  She's a smart woman.  She knew what I

04:10:15  21   was doing.

04:10:15  22       Q.   She questioned your motives, I'm sure.  She's

04:10:20  23   gone to see Dr. Carlson.  Do you recall her having the

04:10:23   1   operation and you have sitting here for a week so we can

04:10:27   2   actually just say the Advantage Fit SUI device and

04:10:35   3   Pinnacle pelvic floor device.  Do you remember her

04:10:37   4   having that operation?

04:10:38   5       A.   Yes, sir.

04:10:39   6       Q.   Now, did you sit in on the discussions with

04:10:42   7   Dr. Carlson?

04:10:43   8       A.   Not the original visit, but when they started

04:10:46   9   discussing what he wanted to do to my wife, I took off

04:10:50   10  work to go with her to go over the procedure.

04:10:52   11      Q.   And did you go and did you sit with him?

04:10:55   12      A.   Yes, sir.

04:10:55   13      Q.   In your discussions or in talking with

04:10:59   14  Dr. Carlson, did he describe to you that this procedure

04:11:03   15  was going to be permanent?

04:11:08   16      A.   I don't recall it being permanent.  I don't

04:11:11   17  recall that, no.

04:11:11   18      Q.   Did he describe for you what, if anything, he

04:11:16   19  could do if the operation, or if the procedures failed

04:11:21   20  and had to be undone?

04:11:25   21      A.   We never went over that.  I don't recall him

04:11:28   22  talking about having -- whatever having to come out.  I

04:11:38   23  recalled him saying it was going to fix her problem and

04:11:40   1    that he had very good success rates with it.  That's the

04:11:44   2    extent of it.  I really don't believe he ever discussed

04:11:47   3    about failure.

04:11:47   4         Q.   Now, we've seen, and you've actually sat here

04:11:51   5    and seen it that Dr. Carlson had Ms. Barba sign several

04:11:56   6    consents to surgery.  Did you sign anything?

04:11:59   7         A.   No, sir.

04:11:59   8         Q.   That was she signed those?

04:12:01   9         A.   Yeah.  We believed it was for the surgical

04:12:04   10   procedure, like all operations you have to sign

04:12:08   11   paperwork to have surgeries.

04:12:09   12        Q.   After that operation, do you remember her

04:12:14   13   recovery period?

04:12:14   14        A.   Yeah.

04:12:15   15        Q.   And what was it like?

04:12:16   16        A.   Well, she had to have a catheter in her for a

04:12:23   17   week.  I knew when Dr. Carlson told her after surgery

04:12:27   18   she wasn't going to be happy because that's a fear of

04:12:30   19   hers.  And that was not good, but then we came out and

04:12:35   20   she started to progressively get better.

04:12:42   21        Q.   Do you know whether or not she had recurrent

04:12:47   22   urinary tract infections over that summer?

04:12:49   23        A.   I believe she did.  It was so long ago, so I

04:12:55  1    don't -- I know she had some problems, I don't know the

04:13:01  2    extent of her UTIs.

04:13:07  3        Q.   Do you recall whether or not she was suffering

04:13:09  4    from any pain during that period of time, post operation

04:13:13  5    and into the summer and into the Fall?

04:13:16  6        A.   Just from the surgery.  There's always pain

04:13:20  7    after that, especially what she went through.

04:13:22  8        Q.   Was she put under some sorts of restrictions in

04:13:27  9    terms of her level of activity in the things she was

04:13:32  10   supposed to do?

04:13:33  11       A.   Yes, she got spoiled by me.  I had to do

04:13:36  12   everything.

04:13:36  13       Q.   Who was doing the cooking and the cleaning

04:13:39  14   around the house?

04:13:39  15       A.   I was, or we were going out more to eat.  And I

04:13:45  16   cleaned the best I could.  It was never good enough.

04:13:47  17       Q.   Were you -- would you describe Ms. Barba as a

04:13:52  18   compliant patient?

04:13:54  19       A.   Yes.

04:13:54  20       Q.   Did she do her best to follow the doctor's

04:13:59  21   instructions?

04:13:59  22       A.   Oh, yes.  In everything she does she follows

04:14:02  23   the letter of the law.

04:14:03  1        Q.   When you were -- I'm going to direct your

04:14:06  2    attention to June 16th.  Were you at home when Ms. Barba

04:14:10  3    had the workman over to the house?

04:14:13  4        A.   No, sir.

04:14:13  5        Q.   And that was the day that the vicious dog

04:14:17  6    attacked and bit the workman and she violently had to

04:14:21  7    pick him up and it was terrible.  Do you remember that

04:14:23  8    incident?

04:14:24  9        A.   Yeah, but my dog never bit nobody.

04:14:26  10        Q.   Do you recall what your dog's name?

04:14:30  11        A.   Mickey, my boy.

04:14:49  12             (Pause.)

04:14:58  13    BY MR. THOMPSON:

04:14:58  14        Q.   All right.  Make that bigger.

04:15:08  15             Mr. Barba, is this the dog we've been talking

04:15:11  16    about for the last week?

04:15:12  17        A.   Yes, it's a little hyper.

04:15:15  18        Q.   This is Mickey?

04:15:17  19        A.   That's my boy.

04:15:18  20        Q.   You did not see the events of June 16th you

04:15:23  21    were at work?

04:15:23  22        A.   Yes, sir.

04:15:24  23        Q.   When you got home, did you know that your wife

04:15:28  1    had gone to see the doctor?

04:15:29  2         A.   Yes, she had called and told me she was going

04:15:33  3    to go to be on the safe side.

04:15:35  4         Q.   When you got home and you had your evening

04:15:38  5    routine, and into the next day and into the next week,

04:15:42  6    did Ms. Barba suffer any adverse effects, or any

04:15:48  7    problems from the events of the day of June 16, 2009?

04:15:56  8         A.   No.  We didn't even remember June 16th of 2009,

04:16:00  9    because it was never an issue.

04:16:02  10        Q.   All right.  And from that day forward she --

04:16:09  11   this was not an incident, and this was nothing that you

04:16:11  12   guys worried about?

04:16:12  13        A.   No.

04:16:13  14        Q.   Now, she was having trouble regaining the use

04:16:19  15   of her bladder, though wasn't she?

04:16:26  16        A.   As I recall, she wasn't voiding all the way

04:16:29  17   properly.

04:16:30  18        Q.   This is not something that she shared with you,

04:16:32  19   I bet?

04:16:33  20        A.   My wife doesn't complain to me at all.

04:16:36  21        Q.   Were you aware that she was having to squat to

04:16:39  22   get a flow, or to finish voiding?

04:16:42  23        A.   I don't recall back in 2009.  She might have

04:16:47  1      said something to me.

04:16:49  2          Q.   Do you recall that over the period of time from

04:16:53  3      July, August, September into the following year, do you

04:17:00  4      recall her having urinary tract infections and having

04:17:03  5      trouble with her urine?

04:17:04  6          A.   Yeah, because the UTIs got involved in our date

04:17:10  7      nights.

04:17:10  8          Q.   Just explain what that means?

04:17:11  9          A.   They're painful, they're not -- so if you had

04:17:16  10     an infection down there, she wasn't in the mood.

04:17:18  11         Q.   So that meant that the date nights were

04:17:23  12     suspended?

04:17:23  13         A.   It didn't happen that day.

04:17:24  14         Q.   Can I safely say you entered into a new phase

04:17:28  15     with your wife?

04:17:28  16         A.   Since the first surgery of 2009, my life has

04:17:35  17     changed with my wife.

04:17:36  18         Q.   Tell me how your lifer has changed?

04:17:38  19         A.   She's not the same woman, especially now.  She

04:17:42  20     has no energy.  She has no drive.  She don't want to do

04:17:48  21     nothing.  She's -- she's fed up.

04:17:54  22         Q.   And is she anxious?

04:17:57  23         A.   She very, very upset and don't know what the

04:18:02  1    future is going to hold.  She knows she's going to have

04:18:06  2    another surgery, she's afraid, and because she doesn't

04:18:10  3    know what the outcome is going to be.

04:18:12  4        Q.   Do you recall her seeing Dr. Vakili?

04:18:18  5        A.   Yes.

04:18:19  6        Q.   And do you recall him performing surgery on

04:18:21  7    her?

04:18:21  8        A.   She went to Dr. Vakili on her own the first

04:18:21  9    time I don't know how many visits she went before I

04:18:24  10   went, when it got to the point we were discussing the

04:18:26  11   surgical procedure, I took off work to go with her so I

04:18:31  12   can be there for her if she wants me to understand

04:18:34  13   what's going to happen to her.

04:18:36  14       Q.   Did Dr. Vakili perform a revision where he took

04:18:40  15   out the Pinnacle?

04:18:41  16       A.   The mesh?

04:18:42  17       Q.   Yes.

04:18:43  18       A.   Wadded up mesh, yes.

04:18:44  19       Q.   Do you know whether or not any was left in her?

04:18:48  20       A.   We were told he got the entire -- we're finding

04:18:52  21   out here that she has stuff left in her.

04:18:54  22       Q.   I see.  Following that surgery, did she have

04:18:58  23   trouble with going to the bathroom with pain -- how was

04:19:03  1    she?

04:19:03  2        A.   There again, she woke up and Dr. Vakili told me

04:19:07  3    she was going to have to go home with the catheter and

04:19:10  4    there again, not happy.  So we knew and, of course, when

04:19:13  5    she woke up and found out she was very not happy.  But

04:19:20  6    then it never came out.  She was stuck with it for, I

04:19:24  7    don't know how long it was, 7 months maybe.

04:19:26  8        Q.   Are you aware that she kept a diary or a record

04:19:31  9    of her catheterization?

04:19:39  10       A.   Yes.

04:19:40  11       Q.   Was she trying to do exactly what the doctor

04:19:43  12   told her to do?

04:19:44  13       A.   Yes.

04:19:44  14       Q.   You again, this is very private, were you aware

04:19:49  15   that she was self-catheterizing?

04:19:52  16       A.   Yes, sir.

04:19:52  17       Q.   Did she ever -- did she do it out of your

04:19:56  18   presence?

04:19:56  19       A.   She never done it in front of me.

04:19:59  20       Q.   She was continuing to go to work, though,

04:20:01  21   wasn't she?

04:20:02  22       A.   Yes, she had to or she would have lost her job.

04:20:05  23       Q.   And if she's self-catheterizing a number of

04:20:10  1    times a day was she catheterizing at work, as well?

04:20:12  2         A.   Yeah, she would come home stressed out because

04:20:16  3    she was taking longer in the bathroom than she was

04:20:20  4    supposed to.  She would get talked to by her manager.

04:20:29  5         Q.   Did there come a time when you went to see or

04:20:32  6    she went to see Dr. Wright?

04:20:33  7         A.   Yes, sir.

04:20:33  8         Q.   Did you go along with her, you met Dr. Wright?

04:20:36  9         A.   I had to take off to take her down there.  She

04:20:40  10   doesn't like to drive 95 and, of course, Baltimore is

04:20:44  11   not around the corner.  I had to take her down there.

04:20:46  12        Q.   Do you recall that trip down there?

04:20:48  13        A.   Yes.

04:20:48  14        Q.   After that surgery, was she in pain from the

04:20:51  15   surgery?

04:20:52  16        A.   Yeah.  Like all surgeries she'll have her pain.

04:20:56  17        Q.   Did she have a recovery period after that

04:20:59  18   surgery?

04:20:59  19        A.   Yes, sir.

04:21:00  20        Q.   And was she limited in her activities for a

04:21:04  21   period of time?

04:21:05  22        A.   Not as much as the first two, 'cause it wasn't

04:21:08  23   as intrusive.  From what I understand they just went in

04:21:12  1    there and cut the sling.

04:21:15  2         Q.   Mr. Barba, I want to now go to the third period

04:21:20  3    of time in your testimony.  And that is the period of

04:21:24  4    time following Dr. Wright and following her immediate

04:21:27  5    recovery and up to the present and into the future.

04:21:32  6    Mr. Barba, how would you describe Ms. Barba presently?

04:21:35  7         A.   She's not the same woman I married.  And

04:21:39  8    she's -- she tells us that we're roommates now.  She's

04:21:44  9    not husband and wife.  She says.

04:21:48  10              (Pause.)

04:21:53  11   BY MR. THOMPSON:

04:21:54  12        Q.   And what is your vision, or what is your

04:21:57  13   thoughts about the future?

04:21:58  14        A.   Don't know.

04:22:02  15        Q.   Mr. Barba, do you still love your wife?

04:22:08  16        A.   Very much.

04:22:09  17        Q.   And, Mr. Barba, when you see her in this

04:22:13  18   condition, how do you feel and what is your response?

04:22:19  19        A.   It breaks my heart.  I hate to see her go

04:22:22  20   through it.

04:22:31  21              MR. THOMPSON:  Your Honor, I have no more

04:22:32  22   questions.  I would like to make the photograph and

04:22:35  23   exhibit please, Plaintiff's 35 if that's okay.

04:22:44  1     Mr. Barba answer any questions Ms. Shields has.

04:22:55  2          (Pause.)

04:23:02  3          MR. THOMPSON:  Your Honor, could we approach

04:23:04  4     just for a second.

04:23:05  5          THE COURT:  Yes.

04:23:59  6          (The following sidebar conference was held.)

04:23:59  7          MR. THOMPSON:  Your Honor, I doubt Ms. Shields

04:23:59  8     is going to go there, but if you remember after opening

04:23:59  9     statements well talked about this incident back in 2002

04:23:59 10     or so about the dog bite.  And I would like to object

04:23:59 11     and ask that that not be a matter of cross-examination.

04:23:59 12          MS. SHIELDS:  I won't ask about that.

04:23:59 13          THE COURT:  All right.

04:23:59 14          MR. THOMPSON:  Thank you.

04:24:06 15          (Pause.)

04:24:07 16          (Sidebar conference concluded.)

04:24:07 17     BY MS. SHIELDS:

04:24:11 18          Q.  Good afternoon, Mr. Barba.

04:24:12 19          A.  Good afternoon.

04:24:13 20          Q.  When you're testifying and you're testifying

04:24:25 21     about date night, I know it's a difficult subject for

04:24:29 22     you, but you're talking about the inability or strain on

04:24:33 23     the ability to have sexual intercourse with your wife;

04:24:37  1    is that right?

04:24:37  2        A.   Current?   There is no sexual intercourse with

04:24:41  3    my wife currently.

04:24:42  4        Q.   But when you talked about date night, are you

04:24:44  5    referring just solely to the ability to engage in the

04:24:48  6    acts of sexual intercourse?

04:24:49  7        A.   Yes, ma'am.

04:24:50  8        Q.   Because there's nothing else that is preventing

04:24:53  9    you from being able, you having a date night with your

04:24:58  10   wife?

04:24:59  11       A.   We do that every other night.

04:25:01  12       Q.   Okay.   Back before Ms. Barba went to see

04:25:06  13   Dr. Carlson to get some evaluation of the problems that

04:25:13  14   she was having, your ability to engage in sexual

04:25:19  15   activity with your wife was being affected by the

04:25:23  16   prolapse condition, and by the vaginal atrophy that she

04:25:28  17   had at that time, isn't it right?

04:25:30  18       A.   With the prolapse, that's what was causing her

04:25:34  19   to bulge that bulge being down there is what was

04:25:38  20   bothering her.

04:25:38  21       Q.   And bothering her, it was causing pain during

04:25:43  22   intercourse; right?

04:25:43  23       A.   It was a discomfort, not a pain she was -- we

04:25:48  1   were able to have sexual intercourse.

04:25:50  2       Q.   And she was not just talking about pain during

04:25:53  3   intercourse, but she was telling you that she was having

04:25:57  4   pain the next day after an evening where you two had

04:26:01  5   date night; correct?

04:26:04  6       A.   Not prior to May 2009, she didn't have pain.

04:26:08  7   She had discomfortable with sex.  Prior, before the

04:26:11  8   surgery, she did not have pain during sex, she had

04:26:15  9   discomfort during sex.  If it was painful, she wouldn't

04:26:20  10  be able to enjoy sex.

04:26:22  11      Q.   I mean -- let me do this, Your Honor may I

04:26:30  12  approach the witness with a copy of his deposition?

04:26:33  13           THE COURT:  Yes.

04:26:36  14  BY MS. SHIELDS:

04:26:36  15      Q.   Mr. Barba back on November 21st, 2012, you and

04:26:42  16  I sat down in a room and I asked you some questions

04:26:46  17  under oath?

04:26:47  18      A.   Correct.

04:26:48  19      Q.   And I'm going to ask you to --

04:26:59  20           MR. THOMPSON:  Your Honor, I believe Mr. Barba

04:27:02  21  wants a pair of reading glasses.

04:27:09  22           THE WITNESS:  Yes.  I think they are in my

04:27:11  23  wife's pocketbook.  I'm sorry.

04:27:18  1             THE COURT:  That's all right.

04:27:19  2             (Pause.)

04:27:52  3             MS. SHIELDS:  Your Honor, may I.

04:27:56  4             THE COURT:  Certainly.

04:27:58  5             THE WITNESS:  Thank you.

04:28:01  6      BY MS. SHIELDS:

04:28:06  7          Q.   Mr. Barba, I'm going to ask you to take a look

04:28:09  8      on the bottom of page nine and I asked you the question

04:28:15  9      how frequently would she have the pain complaint, was it

04:28:19  10     every time you had intercourse?  And your response was

04:28:21  11     the next day?

04:28:23  12         A.   Yeah, that was my response.

04:28:25  13         Q.   And to be fair to you if we go to the next page

04:28:30  14     you did talk about discomfort, but the question I have

04:28:35  15     really is whether we characterize it as pain, hurting,

04:28:38  16     or discomfort.  If problems she was experiencing during

04:28:44  17     intercourse weren't just during the actual act of

04:28:47  18     intercourse but they continued into the following day;

04:28:50  19     right?

04:28:50  20         A.   Yeah I'm assuming it was because of the

04:28:53  21     prolapsed bladder you know sex is the bulge is there so

04:28:58  22     I can say it's like being punched in the arm a couple

04:29:03  23     times.

04:29:03  1      Q.   So this discomfort and bleeding, right, she

04:29:07  2  also had some bleeding?

04:29:08  3      A.   I only recall that once.  She's never -- I only

04:29:12  4  recall her bleeding once.

04:29:13  5      Q.   Okay.  But in that time frame, it was to the

04:29:18  6  point where it was beginning to have an impact on your

04:29:24  7  ability to engage in relations with your wife and that

04:29:28  8  was one of the reasons why she went to see Dr. Carlson

04:29:32  9  to get some attention; right?

04:29:33  10      A.   We still had our date nights and if it was that

04:29:36  11  painful, we wouldn't have had our date nights.  It was

04:29:40  12  discomforting to her, but she we still had our date

04:29:44  13  nights yes, it was more uncomfortable that's why she

04:29:47  14  found out something was wrong.  That's why she went to a

04:29:50  15  doctor to find out if it could be fixed.

04:29:53  16      Q.   And your wife asked you to come with her to the

04:29:56  17  second visit with Dr. Carlson where surgical options

04:29:59  18  would be discussed?

04:30:00  19      A.   Every doctor she's ever had surgical options

04:30:05  20  I'm at.

04:30:05  21      Q.   And you were there, and you had an opportunity

04:30:07  22  to ask Dr. Carlson some questions about the surgical

04:30:11  23  procedure that your wife was going to undergo; isn't

04:30:14  1    that right?

04:30:14  2         A.   I had the opportunity, yes, ma'am.

04:30:16  3         Q.   And the only question that you asked

04:30:19  4    Dr. Carlson was about sexual intercourse, and whether

04:30:23  5    having the surgery was going to make it normal again,

04:30:26  6    whether it was going to fix her; isn't that right?

04:30:29  7         A.   I hate to be selfish, but that's true.

04:30:33  8         Q.   Now, after the surgery, the hope was that

04:30:43  9    things were going to get better, and your wife was going

04:30:46  10   to be able to resume sexual intercourse without

04:30:52  11   discomfort, and that her bladder function would be

04:30:57  12   normal, but that didn't happen, did it?

04:30:59  13        A.   Yeah, but she got better.  She got better.  We

04:31:04  14   were able to have sex for a time being there.  Then it

04:31:07  15   started getting worse.  So yeah, she was able -- we were

04:31:10  16   able to resume our sexual activity.

04:31:12  17        Q.   During what period were you able to resume

04:31:15  18   sexual activity?

04:31:16  19        A.   I don't know exact dates.  I know she had a

04:31:19  20   recovery time.  I think six to eight weeks.  So we did

04:31:23  21   nothing for six to eight weeks.  I'm assuming when she

04:31:27  22   felt better and got the clearance, we would start and we

04:31:31  23   went on our old merry way, we had a fight, date nights

04:31:37  1    didn't happen, life happens, and then towards another

04:31:40  2    time when she decided to go to Dr. Vakili, she was

04:31:44  3    gutting UTIs, it was getting more difficult with

04:31:48  4    intercourse that's why she decided to go to Dr. Vakili.

04:31:51  5         Q.   You were here the other day when Dr. Carlson

04:31:54  6    testified; right?

04:31:54  7         A.   Yes.

04:31:55  8         Q.   And we walked Dr. Carlson through his record.

04:32:00  9    And, in fact, according to Dr. Carlson's record, your

04:32:05  10   wife never regained normal voiding function following

04:32:09  11   the surgery with Dr. Carlson; isn't that right?

04:32:11  12        A.   She had to stand up to finish, but that didn't

04:32:18  13   effect the ability of her having sex.

04:32:20  14        Q.   Okay.  You said that UTI effected the ability

04:32:25  15   for having sex, and by the time she got to Dr. Vakili

04:32:29  16   she had told Dr. Vakili she had been having problems

04:32:32  17   with voiding, being able to void her bladder entirely,

04:32:35  18   all the way back to the time of Dr. Carlson, and that

04:32:39  19   she was having six to eight UTIs a year; is that right?

04:32:43  20        A.   Yes.  I don't know how many there were per

04:32:47  21   year, but when she he will a UTI, we didn't have sex.

04:32:54  22   When she didn't have a UTI we did have sex.

04:32:57  23        Q.   What you're telling us there was a period of

04:33:00   1   time after the surgery with Dr. Carlson when you were

04:33:02   2   able to engage with sexual activity with your wife, she

04:33:05   3   had no pain and discomfort?

04:33:07   4        A.   I'm not a saying there was no discomfort.  The

04:33:11   5   pain was nothing like it was after the second surgery.

04:33:14   6   If she started getting discomfort up to the -- where she

04:33:19   7   decided to go to Dr. Vakili, pain was getting -- the

04:33:22   8   pain was getting worse between the first surgery.  She

04:33:26   9   got better, time went on, she was getting UTIs, no sex,

04:33:34  10   very painful.  When there was no UTIs and no fighting,

04:33:38  11   we tried to get in our date nights.  Close to when it

04:33:42  12   was October 2009 or '10, 3 months before that she

04:33:48  13   couldn't get an appointment for 3 months, that takes you

04:33:52  14   back to, what, July or August.  So July, June, July,

04:33:56  15   August of that year, I think she started having problems

04:34:00  16   feeling more pain with sex and getting UTIs.  That's why

04:34:05  17   she had called Dr. Vakili.  I think she went to

04:34:08  18   Dr. Ting, her family doctor complaining first.  She's

04:34:13  19   the one that recommended Dr. Vakili.

04:34:14  20        Q.   Right.  So for months after Dr. Carlson

04:34:17  21   performed surgery, your wife had UTIs repeatedly and she

04:34:23  22   had to stand to urinate.  And Dr. Carlson kept telling

04:34:26  23   her it was normal, it was the healing process, right, do

04:34:28  1    you remember that?

04:34:29  2         A.   I remember him saying that.

04:34:30  3         Q.   And you didn't think that was right; right?

04:34:34  4         A.   She didn't have to stand she had to squat,

04:34:38  5    standing pee, standing to pee, woman don't stand to pee.

04:34:44  6         Q.   They are not supposed to, right?

04:34:46  7         A.   Right my wife didn't stand to pee, she had to

04:34:50  8    squat to finish peeing.

04:34:51  9         Q.   You actually told your wife she should get a

04:34:55  10   second opinion because you were dissatisfied with the

04:34:58  11   fact that she wasn't getting to regain normal bladder

04:35:02  12   function after Dr. Carlson's surgery; right?

04:35:05  13        A.   I believe Dr. Ting told her that and she

04:35:10  14   discussed it with me.  Yes, we were frustrated.  She

04:35:12  15   opted to go to see Dr. Vakili on the reference of

04:35:16  16   Dr. Ting.

04:35:17  17        Q.   Okay.  And now, if your wife testified that

04:35:22  18   sexual activity got less painful after Vakili and even

04:35:26  19   less painful after Wright, would you disagree with that?

04:35:29  20        A.   Well, my wife was catheterizing herself for

04:35:35  21   7 months.  So there wasn't too much sex involved between

04:35:40  22   Dr. Vakili and Dr. Wright.  Things changed dramatically

04:35:46  23   after the second surgery.

04:35:47  1        Q.   Let me ask you -- well, let me ask you this:

04:35:50  2   When you got to Dr. Wright, and you said your wife is

04:35:53  3   doing better now than she was doing before she had the

04:36:00  4   surgery with Dr. Wright; isn't that right?  You'd agree

04:36:05  5   with that?

04:36:05  6        A.   She's not doing better.  In the sense she can

04:36:08  7   urinate on her own, yes, she's doing great.  But that's

04:36:12  8   the better sense from not being able to urinate to being

04:36:17  9   able to urinate, that's better.

04:36:18  10       Q.   In some respects she's doing better?

04:36:23  11       A.   She can urinate on her own, she does not have

04:36:29  12  to self-catheterize.  I would consider that better.

04:36:31  13       Q.   What did Dr. Wright tell you about what was

04:36:34  14  causing your wife's problems when she got to see him?

04:36:37  15       A.   The first visit?

04:36:40  16       Q.   At any time did he explain to you what he

04:36:44  17  thought was the problem?

04:36:45  18       A.   He thought the sling was put in or was under

04:36:49  19  tension.

04:36:49  20       Q.   He thought it was under tension meaning too

04:36:53  21  tight from the beginning?

04:36:53  22       A.   I don't know if he said from the beginning.  I

04:36:55  23  might have put that in my words, but it was under

04:36:59  1    tension.

04:36:59  2        Q.   And you're saying you might have put that in

04:37:03  3    your words, that's actually what you said at your

04:37:05  4    deposition?

04:37:05  5        A.   Yeah.  But I'm going off from a memory

04:37:08  6    two years ago or maybe three years ago.

04:37:11  7        Q.   Your dog Mickey looks like a cute dog and he

04:37:15  8    may be a very friendly dog.  He weighs more than

04:37:19  9    10 pounds correct?

04:37:21  10       A.   Correct.

04:37:24  11            MS. SHIELDS:  Thank you, Mr. Barba.

04:37:26  12            MR. THOMPSON:  Your Honor, no redirect, please.

04:37:32  13            THE COURT:  Is that it for today?  Is there

04:37:37  14   anything we can --

04:37:39  15            MR. THOMPSON:  Your Honor, I don't believe we

04:37:42  16   can finish anybody today.

04:37:44  17            THE COURT:  I think this is good place to stop

04:37:46  18   for the time being.  We will reconvene tomorrow morning

04:37:52  19   at 10 o'clock.  Have a safe trip home.

04:37:57  20            (The jury left the courtroom at 4:34 p.m.)

04:38:21  21            THE COURT:  Is there anything we need to

04:38:23  22   discuss at this point.

04:38:24  23            MR. KEENAN:  Not on the record.

04:38:27  1                    THE COURT:  All right.  We'll go off the

04:38:29  2      record.

          3                    (Whereupon the proceedings were adjourned.)

          4

          5

          6

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

## CERTIFICATE OF COURT REPORTER

I, John P. Donnelly, RPR, Chief Court Reporter of the Superior Court, State of Delaware, do hereby certify that the foregoing is an accurate transcript of the proceedings had, as reported by me, in the Superior Court of the State of Delaware, in and for New Castle County, in the case herein stated, as the same remains of record in the Office of the Prothonotary at Wilmington, Delaware.  This certification shall be considered null and void if this transcript is disassembled in any manner by any party without authorization of the signatory below.

WITNESS my hand this 18th day of MAY, 2015.
Cert. # 161-PS

_____
/s/ John P. Donnelly, RPR
Chief Court Reporter