# EXHIBIT 4

Bobby Lewis Shull, M.D.

1      UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT
            OF WEST VIRGINIA AT CHARLESTON

2

    _____

3

    IN RE:  ETHICON, INC.,      )  Master File
4    PELVIC REPAIR SYSTEM       )  2:12-MD-0237
    PRODUCTS LIABILITY         )  MDL 2327
5    LITIGATION                )
    _____ )  Joseph R. Goodwin,
6                           )  U.S. District Judge
    CAROL JEAN DIMOCK         )
7                            )  Case No.
      Plaintiff,           )  2:12-cv-00401
8                            )
      vs.                   )  Videotaped
9                            )  Deposition of:
    ETHICON, INC., et al.,     )
10                          )  BOBBY LEWIS SHULL, M.D.
      Defendant.         )
11    _____

12

13                 March 15, 2016

14                  9:02 a.m.

15

16           Location:  Beck Redden, LLP

17         515 Congress Avenue, Suite 1900

18            Austin, Texas 78701

19

20         Reporter:  Steven Stogel

21      Certified LiveNote Reporter, Texas CSR

22

23

24

25

Bobby Lewis Shull, M.D.

```
 1              A P P E A R A N C E S

 2

 3         MOTLEY RICE, LLC

 4         By Margaret Thompson, Esq.

 5         10 Hale Street, Suite 403

 6         Charleston, West Virginia 25301

 7         (304) 344-1100

 8         mthompsonmd@gmail.com

 9         For the Plaintiff.

10

11         BECK REDDEN, LLP

12         By W. Curt Webb, Esq.

13         1221 McKinney Street, Suite 4500

14         Houston, Texas 77010

15         (713) 951-6206

16         cwebb@beckredden.com

17         For Defendants, Johnson & Johnson and Ethicon.

18

19         ALSO PRESENT:  MR. PETER ZIERLEIN, Videographer

20

21

22

23

24

25
```

Bobby Lewis Shull, M.D.

```
 1                    I N D E X

 2  Deposition of:                    Examination

 3  BOBBY LEWIS SHULL, M.D.

 4  By Mr. Webb                              4

 5  By Ms. Thompson                        168

 6  By Mr. Webb                            176

 7

 8

 9                  E X H I B I T S

10  No.                                   Page

11  1   Notice of Deposition                4

12  2   Curriculum Vitae of Bobby Lewis
        Shull, M.D.                          5
13
        3   Check Stub and Invoices from Dr. Shull    6
14
        4   Article Entitled "Tension-free Vaginal
15          Tape Bowel Perforation"            37

16  5   Rule 26 Expert Report of Bob Shull, M.D.   100

17  6   Check Stub and Invoices from Dr. Shull   101

18

19

20

21

22

23

24

25
```

Bobby Lewis Shull, M.D.

```
1                P R O C E E D I N G S

2                (Exhibit No. 1 marked)

3                THE VIDEOGRAPHER:  We are now on the

4    record.  My name is Peter Zierlein.  I'm a videographer

5    for Golkow Technologies.

6                Today's date is March 15th, 2016, and the

7    time is 9:02 a.m.  This video deposition is being held

8    in Austin, Texas, in the matter of Carol Jean Dimock

9    versus Ethicon, Inc., for the United States District

10   Court, Southern District of West Virginia at Charleston.

11               The deponent is Dr. Shull.  Will counsel

12   please identify yourselves for the record?

13               MS. THOMPSON:  Margaret Thompson for the

14   MDL plaintiffs.

15               MR. WEBB:  Curt Webb for Ethicon.

16               THE VIDEOGRAPHER:  The court reporter is

17   Steve Stogel and will now swear in the witness.

18                    BOBBY LEWIS SHULL,

19   having been first duly sworn, testified as follows:

20                      EXAMINATION

21   BY MR. WEBB:

22       Q.   Would you state your full name for the record,

23   please?

24       A.   Bobby Lewis Shull.

25       Q.   Dr. Shull, my name is Curt Webb.  We've met
```

Bobby Lewis Shull, M.D.

1   before.  Correct?

2       A.   Yes, we have.

3       Q.   And I'm here to take your deposition today in

4   regard to, this morning, two products, Prolift and

5   Prolift+M.  Do you understand that?

6       A.   Yes, I do.

7       Q.   Okay.  I'm going to show you what's been

8   marked as Exhibit No. 1, which is the notice of your

9   deposition.  And once again, you can ignore the Robert

10  on there.  But other than that, have you seen this

11  notice before?

12      A.   Yes, sir.

13      Q.   Okay.  Dr. Shull, have you brought any

14  documents today responsive to the subpoena duces

15  tecum that's attached to the notice of deposition?

16      A.   Yes, sir.

17              MS. THOMPSON:  And just for the record,

18  we filed objections to the duces tecum request.

19      A.   Yes, sir.  I have an updated curriculum vitae.

20  The one which, I believe, was appended to the record you

21  received did not have a list of all my publications, and

22  this one has corrected that omission.

23              (Exhibit No. 2 marked)

24      Q.   (BY MR. WEBB)  So this is an updated current

25  CV that you've given me which I've marked as Exhibit

Bobby Lewis Shull, M.D.

```
 1    No. 2 to your deposition.  Is that correct?

 2         A.   Yes, sir.

 3         Q.   All right.

 4         A.   I have the general report for Prolift and

 5    Prolift+M, and I have a copy of the invoice submitted

 6    for the work in preparation for Prolift and Prolift+M.

 7         Q.   The Rule 26 expert report that you gave me

 8    related to Prolift and Prolift+M, has it changed any

 9    since the one that was filed with the Court?

10         A.   No, sir, I don't think it has.

11         Q.   Okay.  You've handed me what I'm going to mark

12    as Exhibit No. 3 to your deposition.

13              (Exhibit No. 3 marked)

14         Q.   (BY MR. WEBB) And this is a three-page

15    document.  It looks like the top is a check stub.  The

16    second is an invoice.  The third is some handwritten

17    notes related to the billing that you've done for the

18    Prolift and Prolift+M general report.  Is that correct,

19    sir?

20         A.   Yes, sir.

21         Q.   Would it be fair to state, according to this

22    invoice and the handwritten notes, you had worked a

23    total of just a little bit under nine hours at $650 an

24    hour for a total of 5,740?

25         A.   Yes, sir.
```

Bobby Lewis Shull, M.D.

1      Q.   Okay.  This invoice runs through January 23rd,

2  2016.  Have you done any work since then?

3      A.   Yes, sir.

4      Q.   How much?

5      A.   I don't know the exact time, but I had

6  preparation for today's deposition, and that required

7  reading my general report again to be familiar with the

8  content and references, and I spoke with Dr. Thompson

9  yesterday about my preparation for today's presentation.

10      Q.   All right.  Let's go through that.  First off,

11  you read -- in preparation for today's deposition, you

12  read through your general report and just

13  re-familiarized yourself.  Is that correct?

14      A.   Yes, sir.

15      Q.   Did you go through any of the medical

16  literature, articles that were referenced in your

17  report?

18      A.   Yes, sir.

19      Q.   And did you read all the ones that are

20  referenced in your report, or did you just read the

21  abstracts, or what did you do?

22      A.   I have a folder that has the information which

23  has been referenced with articles, and I have reviewed

24  each of those articles again, and I have a box to my

25  left which has other documents which were provided to me

Bobby Lewis Shull, M.D.

1   with correspondences and with information about Prolift

2   in general, and many, if not all of those, are

3   referenced in the general report.

4        Q.   So you have a binder --

5             MR. WEBB:  And has this information been

6   provided to us by the --

7             MS. THOMPSON:  Yes.  And I also have, on

8   a thumb drive, documents provided to Dr. Shull.

9             MR. WEBB:  And does the thumb drive have

10  everything that he's referenced here?

11            MS. THOMPSON:  I believe so.

12            MR. WEBB:  Okay.  Well, we'll run --

13            MS. THOMPSON:  Certainly with regard to

14  Ethicon documents it does.  He may have some literature

15  of his own.  I'm not sure.

16       Q.   (BY MR. WEBB)  So you've got a binder that has

17  medical literature?

18       A.   Yes, sir.

19       Q.   Would that be correct?

20       A.   Yes, sir.

21       Q.   And then you have a box of documents --

22       A.   Yes, sir.

23       Q.   -- that were provided to you regarding -- that

24  were Ethicon documents?

25       A.   Yes, sir.  And they're here if you would like

Bobby Lewis Shull, M.D.

```
 1    to see those.

 2         Q.    I'll look at them at the first break.

 3         A.    Okay.

 4         Q.    Did you meet with anyone in preparation for

 5    this deposition today?

 6         A.    Yes, sir.  I met with Dr. Thompson yesterday

 7    afternoon in my home, and I met with her briefly this

 8    morning before we arrived for the deposition.

 9         Q.    Tell me how long you spent with Dr. Thompson

10    yesterday.

11         A.    Approximately two hours.

12         Q.    And what did you go over?

13         A.    We discussed the format.  She wanted to be

14    comfortable that I was prepared and I was knowledgeable

15    about the subject matter to be covered, so we discussed

16    that.  We looked at my general report again to confirm

17    that it was accurate.

18         Q.    Anything else in those two hours?

19         A.    Only that we were going to meet here this

20    morning if possible and have breakfast before we came

21    for the deposition.

22         Q.    And did you do that?

23         A.    Yes, sir.

24         Q.    What time did you meet this morning?

25         A.    Probably just a few minutes before 8:00.
```

Bobby Lewis Shull, M.D.

1      Q.   All right.  Did you discuss anything this

2   morning of a substantive matter?

3      A.   No, sir.  Only that we should be here in a

4   timely fashion, and I should have the information that I

5   have supplied to you.  She wanted to confirm that I

6   brought that with me.

7      Q.   Anything else that you've done since the

8   invoicing that you've been -- let me just run through

9   this.  Exhibit No. 3 has -- it looks to be a check stub.

10  Have you been paid for the $5,740 that you had

11  invoiced -- well, the invoice just says to Margaret.

12     A.   It should have said to Margaret Thompson, and

13  it comes from -- I believe that it states that it was

14  for work done for Prolift.  I think it does, but I'm not

15  sure that it does.  The stub, I'm talking about.

16     Q.   Well, let me run through them.  Exhibit No. 3,

17  you've got a check stub that talks about -- a check stub

18  for 5,740, and there's an invoice dated February 7th,

19  2016.  It says, "Prolift and Prolift+M general report."

20             The first entry is, "Read draft."

21             Explain to me why your first entry would

22  be "read draft."

23     A.   I think it must have been -- oh, to read,

24  you're talking about -- I believe the reason it says

25  that is because I had drafted a general report for her

Bobby Lewis Shull, M.D.

```
 1   regarding another product in the past, and I wanted to

 2   familiarized myself with the format for what was

 3   required to put into a draft.

 4        Q.   And what product had you prepared a draft

 5   report for her -- or had prepared a general report for

 6   her in the past?

 7        A.   You know, I don't have the exact product name,

 8   but I believe it was one for Boston Scientific.  But I

 9   don't remember the exact product name presently.

10        Q.   I'm just going to read into the record what

11   the invoice says.  It says, "January 18, 2016:  Read

12   draft, 50 minutes.  January 21st:  Made corrections, 65

13   minutes.  January 21st:  Read reference articles, 190

14   minutes.  January 22nd:  Revise general report to

15   reflect supporting articles, 90 minutes.  January 22nd:

16   Phone call with Margaret and Meghan, 45 minutes.

17   January 23rd:  Confirm accuracy of cited articles and

18   final draft, 90 minutes."

19             It's a total of 530 minutes, eight hours

20   50 minutes, a total due -- fee, $650 an hour.  Total

21   due, $5,740.

22             Does that summarize the work that you

23   were doing in regard to preparing a general report for

24   Prolift and Prolift+M?

25        A.   Yes, sir.
```

Bobby Lewis Shull, M.D.

1      Q.   Tell me, if you will, how many general reports

2  on how many different products have you prepared in

3  regard to this mesh litigation?

4      A.   I will tell you that I don't know that for

5  certain, but I think there have been two previous

6  general reports, if I'm not mistaken, one on a Boston

7  Scientific product -- and forgive me if I don't remember

8  exactly who made the product, because I may have this

9  incorrectly stated.  And I believe that I have done

10 one -- I've done one on Avaulta.  Now, I'm trying to

11 remember who the manufacturer for Avaulta is, quite

12 honestly.

13     Q.   So prior to preparing a general report for the

14 Prolift and Prolift+M, you had prepared, you think, two

15 previous general reports?

16     A.   I think that's correct.  I know I did Avaulta.

17     Q.   And --

18     A.   I may have done another.

19     Q.   Okay.  Who else did you -- who did you work

20 with in preparing those general reports for the two --

21 the two previous general reports that you think that you

22 prepared?

23     A.   Dr. Thompson, primarily.

24     Q.   We're here today to talk about, in this

25 deposition, the -- your opinions with respect to Prolift

Bobby Lewis Shull, M.D.

1    and Prolift+M.  Correct?

2        A.   Yes, sir.

3        Q.   You've given opinions in the past with respect

4    to Prolift and Prolift+M, haven't you?

5             MS. THOMPSON:  Object to form.

6        A.   In a general report?  Are you asking me about

7    that?

8        Q.   (BY MR. WEBB)  In depositions for these

9    products.

10            MS. THOMPSON:  Same objection.

11       A.   I gave depositions last week with you for two

12   women who had had Prolift products.

13       Q.   (BY MR. WEBB)  Okay.  Is there anything about

14   the prior testimony, after reviewing the report and

15   reviewing the literature, that you want to correct for

16   the depositions that we gave regarding Prolift and

17   Prolift+M?

18       A.   No, sir, I can't think of any.

19       Q.   You also have prepared a general report on

20   another product -- Ethicon product, Prosima?

21       A.   Yes, sir.

22       Q.   And as we walk through these reports today,

23   your opinions are mostly identical for each of these

24   products -- Prolift, Prolift+M, and Prosima -- except

25   that where you characterized them differently in the

Bobby Lewis Shull, M.D.

1    report.  For example, there will be paragraphs that are

2    identical as we walk through these reports.  Is that

3    correct?

4         A.   Some things will be similar and some will vary

5    depending on -- excuse me -- the scientific literature.

6    Some of the internal documents will be the same, and

7    some of the descriptions of my concerns will be the

8    same.

9         Q.   Okay.  Do you have any kind of a written

10   agreement between Ms. Thompson and yourself about -- or

11   the law firm that she represents or the various law

12   firms about what you will do as far as the work that

13   you'll be doing in this mesh litigation?

14        A.   No, sir.  Everything has been oral.

15        Q.   Are you required to bill anyone else for

16   general work that you do on these products other than

17   Ms. Thompson?

18        A.   No, sir.

19        Q.   Is the totality of the universe of which

20   you've reviewed the medical literature that you have in

21   front of you and the box of documents -- the Ethicon

22   documents that you have?

23             MS. THOMPSON:  Object to form.

24        A.   These articles that I have in my own

25   possession that I've used previously for work, for

Bobby Lewis Shull, M.D.

```
1    journal club, and for teaching and whatnot may not be in

2    this binder.  And I have read those in preparation for

3    today, not specifically for one deposition or the other,

4    but I read them in general.  So here are three articles

5    which I brought.

6              And I'm not sure -- one of them may

7    already be in the binder.  I'm not positive that all

8    three are.

9    Q.   (BY MR. WEBB)  The material in the binder, did

10   you locate this material yourself, these medical

11   articles, or were they given to you?

12   A.   It was a -- this binder was given to me, but

13   of these things that are in the binder, I would say the

14   vast majority I was familiar with already in my role as

15   a teacher and participant in various things.  So this

16   was organized and sent to me.

17   Q.   Okay.  And it was sent to you by plaintiffs'

18   counsel?

19   A.   Yes, sir.

20   Q.   All right.  So you've given me three articles,

21   the top one labeled "Functional and anatomical outcome

22   of anterior and posterior vaginal prolapse repair with

23   Prolene mesh," which was in "BJOG" -- "BJOG:  An

24   International Journal of Obstetrics & Gynaecology" dated

25   January of 2005.  And it's marked up and has handwritten
```

Bobby Lewis Shull, M.D.

1    notes on those.

2              Are those your notes?

3         A.   Yes, sir.

4         Q.   Okay.  The second one is "Defining success

5    after surgery for pelvic organ prolapse," and it's in

6    "Obstetrics and Gynecology," Volume 114, No. 3,

7    September of 2009, and once again has handwritten notes

8    and markups on it.

9              Are those your handwritten notes and

10   markups?

11        A.   Yes, sir.

12        Q.   The final is an article titled "Host response

13   after reconstruction of abdominal wall defects with

14   porcine dermal collagen in a rat model", American

15   Journal of Obstetrics and Gynecologist," 2004.  And once

16   again, it has highlighting and markups on the document.

17             Are those your highlighting and markups?

18        A.   Yes, sir.

19        Q.   And these are articles that generally you had

20   in your possession that you used for your own education

21   or for -- to teach.  Is that correct?

22        A.   Yes, sir.

23             MR. WEBB:  Let's go off the record for a

24   minute.

25             THE VIDEOGRAPHER:  Going off the record,

Bobby Lewis Shull, M.D.

```
1    the time is 9:22.

2                    (Recess from 9:22 a.m. to 9:34 a.m.)

3                    THE VIDEOGRAPHER:  Back on the record,

4    the time is 9:34.

5         Q.   (BY MR. WEBB)  Dr. Shull, you told me you've

6    got a binder that's in front of you.

7         A.   Yes, sir.

8         Q.   If you could hold that up just so it will be

9    on the screen.

10                   That's a binder that was provided to you

11   that has the articles -- the medical articles that were

12   sent to you by plaintiffs' counsel for you to review in

13   preparation for making your general report for the

14   Prolift and the Prolift+M, correct?

15                   MS. THOMPSON:  Object to form.

16        A.   Yes, I used these articles in the preparation.

17        Q.   (BY MR. WEBB)  And to your left there's a box

18   that has a number of folders in it that contain

19   documents that were produced by Ethicon.  Do you

20   understand that to be what those are?

21        A.   Yes, sir.

22        Q.   And in that box, there is everything from

23   medical articles to email correspondence to marketing

24   materials, just a variety of different materials.  Is

25   that correct?
```

Bobby Lewis Shull, M.D.

```
 1        A.   Yes, sir.

 2        Q.   And I would say it's not quite a box full,

 3   maybe about half a box.  Would you say that's about --

 4        A.   Yes.

 5        Q.   -- right?

 6        A.   Yes, sir.

 7        Q.   A banker's box.  If I look at your bill -- and

 8   this is the only bill that you submitted for Prolift and

 9   Prolift+M in preparation of your general report.  Is

10   that correct?

11        A.   Yes, sir.

12        Q.   And so it would basically entail all the time

13   you spent reading all the articles, going through all

14   the documents, and preparing your general report and

15   working with plaintiffs' counsel in order to finalize

16   that general report?

17        A.   Yes, sir.

18        Q.   Okay.  So the first entry, 50 minutes of

19   reading draft, you think that may be a prior general

20   report that you did just to get the format down?

21        A.   I think that's part -- excuse me.  I'm losing

22   my voice.  It's part of it, to get my thoughts organized

23   about what is expected in a report by looking at

24   something that had been done previously and organizing

25   my notes on what I could do on this particular report.
```

Bobby Lewis Shull, M.D.

```
1        Q.    There is an entry for read referenced

2   articles, 190 minutes.  Does that entail both the binder

3   full of medical literature that's in front of you and

4   the box of Ethicon documents?

5        A.    I would have to look at that and see if there

6   was anything else mentioned.  I actually didn't commit

7   this to memory.  Yes, sir, I think so.

8        Q.    Tell me how many medical articles are in that

9   binder that are in front of you.

10       A.    I didn't count them, but I can do that.

11       Q.    Just a rough estimate, as you look at them.

12       A.    20 or 25.

13       Q.    As I went through the box with the Ethicon

14   documents in them, those are not documents you

15   requested.  Those are documents that were forwarded to

16   you that plaintiffs' counsel thought might be helpful in

17   preparing your general report.  Would that be a fair

18   statement?

19       A.    Yes, sir.

20       Q.    Did you go through those documents and request

21   other documents based upon what you saw in the documents

22   that had been sent to you?

23       A.    I don't recall requesting another document.

24       Q.    As I went through, for example, I noticed that

25   there were some handwritten notes in pen and there was
```

Bobby Lewis Shull, M.D.

1    some highlighting.  Did you go through and make those

2    handwritten notes and highlighting as you looked through

3    the documents?

4        A.   Yes, sir.

5        Q.   There were at least four folders that had

6    portions of deposition transcripts.  Did you request

7    those deposition transcripts, or were they sent to you

8    by plaintiffs' counsel?

9        A.   They were sent to me by plaintiffs' counsel.

10       Q.   For example, I have one here that's the

11   transcript of deposition of Giselle -- is it Bonet,

12   B-O-N-E-T?

13       A.   Yes, sir, that may be the way you pronounce

14   it.  I don't know that.

15       Q.   All right.  Taken March 5th, 2012, and

16   there's -- that's the cover page.  There's one other

17   page here in this, and it's Page 102.  Was that -- for

18   the portions of depositions that were given to you, was

19   that all that was given was just selected portions of

20   those depositions?

21       A.   Yes, sir.

22       Q.   Did you ask for the full transcript of the

23   deposition in order to put them in context?

24       A.   No, sir.

25       Q.   So, for example, in this deposition, for

Bobby Lewis Shull, M.D.

```
 1   whatever reason, you were given one page, Page 102, out

 2   of however many pages were in this deposition?

 3        A.   Yes, sir.

 4        Q.   And the reason that you have it marked is

 5   there's a handwritten note that said, "Kit not studied."

 6   What does that mean?

 7        A.   May I see it?

 8        Q.   Sure.

 9        A.   And I'll tell you.

10             At the top of Page 102 in the deposition,

11   Giselle Bonet, the question was, "At the time the

12   Prolift, which is trademarked, was launched, the Prolift

13   itself had not been studied in clinical studies,

14   correct, meaning the actual packaged product with the

15   preformed mesh and the instruments had not been studied

16   clinically?"

17             So the person doing the deposition asked

18   that question of Giselle Bonet, and her response was,

19   "That's correct.  The kit had not been studied."

20             So the reason I made this note is to

21   remind me that Prolift was marketed without any clinical

22   testing.

23        Q.   Do you know whether or not there was any

24   discussion of any other clinical testing anywhere in

25   this deposition?  Do you have any idea?
```

Bobby Lewis Shull, M.D.

```
 1        A.   No, sir.

 2        Q.   So all you know is based upon the one page

 3   that you were provided out of whatever number of pages

 4   that was in that transcript?

 5        A.   For that particular folder, that's correct.

 6        Q.   The next folder we're going to look at is a

 7   folder marked "Kirkemo, Aaron," of a deposition taken

 8   April 18th, 2012, and it entails one, two -- six pages

 9   of a deposition, and it's highlighted.

10             Did you look at this deposition and make

11   the highlighting that's on the deposition portions of

12   the deposition that were provided to you?

13        A.   Yes, sir, I did.

14        Q.   Okay.  Once again, did you ask for these

15   portions to be sent to you, or was that just sent to you

16   by plaintiffs' counsel?

17        A.   This was sent to me by plaintiffs' counsel.

18        Q.   Did you request the entire deposition so you

19   could read it all and put it in context?

20        A.   No, sir, I did not.

21        Q.   Page 1 is the cover page.  The next labeled

22   page is 135, 136, 137, 138, and then it skips to 150.

23             Do you have any idea how long this

24   deposition was?

25        A.   No, sir.
```

Bobby Lewis Shull, M.D.

```
 1        Q.    The next deposition, the name on it is Hinoul,

 2  H-I-N-O-U-L, P-I-E-T, dated April 6, 2012.

 3              Once again, was this portion of a

 4  deposition transcript provided to you by plaintiffs'

 5  counsel?

 6        A.    Yes, sir.

 7        Q.    Did you ask for the entire deposition so you

 8  could put it into context?

 9        A.    No, sir.

10        Q.    It has two pages, the first page is

11  Volume 2 -- or it's a cover page for Volume 2, which is

12  marked Page 351, and the one page actually has four

13  pages from the deposition on this one-page transcript --

14  from the transcript.  Those are labeled Page 504, 505,

15  506, and 507.

16              Did you ask for the entire deposition in

17  order to put this in context?

18        A.    No, sir.

19        Q.    And the final one that I found in the box that

20  you had that had been provided by plaintiffs' counsel is

21  a deposition taken of Scott Hamilton Jones dated

22  January 25th, 2012.  This is Volume 3, Page 654, and

23  there are three actual pages of deposition testimony

24  from Page 727, 728, and 729.

25              Did you request these pages specifically?
```

Bobby Lewis Shull, M.D.

```
 1        A.   No, sir.

 2        Q.   Did you ask for the entire deposition so you

 3   could put it into context and see if there was anything

 4   else that was significant?

 5        A.   No, sir.

 6        Q.   Were you given any complete transcript of any

 7   deposition that's been taken in any of the mesh

 8   litigation by plaintiffs' counsel in preparation for

 9   doing your general report for Prolift and Prolift+M?

10        A.   No, sir.

11        Q.   Have you ever made any request for any Ethicon

12   documents that have not been provided to you?

13        A.   No, sir.

14        Q.   One of the things that we asked in the

15   subpoena duces tecum was a list of the cases.  Have you

16   provided a list of all the cases that you have --

17        A.   Yes, sir.  I thought that was appended.  If it

18   isn't appended to that --

19        Q.   Appended to your general report?

20        A.   Yes, sir.  If it isn't appended to that --

21   this is for later when you ask me about Prosima.  I

22   actually thought both of them had something, but maybe

23   that one doesn't have it.  It wouldn't be behind my

24   curriculum vitae.  It would be behind the general

25   report.  But this would be the one that would be similar
```

Bobby Lewis Shull, M.D.

1    for both of them.  Yes, sir.

2        Q.   Okay.  And the request -- what I have for you,

3    other than the depositions that were taken last week in

4    case-specific matters, does this list that's appended to

5    your expert report, your general report, is it a

6    complete list other than the ones we had last week?

7        A.   The only thing I see differently, now that

8    you've asked me specifically about it, is last week when

9    you deposed me, I told you there was one person's name

10   on the list, Mrs. Rabiola, R-A-B-I-O-L-A, and I was

11   deposed because I was a treating physician for her.  I

12   wasn't deposed --

13       Q.   As an expert?

14       A.   No, sir.

15       Q.   Testifying expert?

16       A.   No, sir.  Josephine Rabiola.  And I just see

17   that this isn't on this, and I'm not certain why.  But

18   you and I talked about that last week, that I was a

19   treating physician for her.

20       Q.   When were you first contacted by anyone in

21   regard to giving expert testimony in regard to Prolift

22   and Prolift+M products?

23       A.   I don't have the exact date, but it would have

24   been sometime in the last quarter of 2015.  I believe

25   that would be correct.  I was asked if I would do it,

Bobby Lewis Shull, M.D.

1    and I was given a potential window of time that the work

2    would need to be performed, but it wasn't immediate at

3    the time that I discussed it with Dr. Thompson.

4         Q.   Was she the individual that contacted you?

5         A.   Yes, sir.

6         Q.   And when you say Dr. Thompson, are you

7    referring also to the lawyer that is presenting you for

8    deposition today?

9         A.   Yes, sir, Dr. Margaret Thompson, who is also

10   an attorney.

11        Q.   What did she ask you to do?

12        A.   She asked me to work with her on preparing a

13   general report about the products Prolift and Prosima.

14        Q.   Any other work that she asked you to do?

15        A.   Not specifically at that time, no, sir.

16        Q.   Okay.  Give me a ballpark, if you will, on how

17   much you've earned in this litigation since you were

18   first contacted by Dr. Thompson up to the current -- and

19   I understand you haven't invoiced for everything.  You

20   invoiced for individual cases.  But just generally give

21   me an idea if you can, Doctor.

22        A.   Well, I think -- yes, sir.

23             MS. THOMPSON:  Object to form.

24        A.   Yes, sir.  I think last week on the

25   case-specific report, I submitted the invoices to you.

Bobby Lewis Shull, M.D.

```
 1   Honestly, I don't know the exact amount, but I would say

 2   it was approximately -- it may have been 26 or $28,000.

 3   I don't know that.  Maybe that's high.  I don't remember

 4   that exactly, to be quite honest with you.  There were

 5   three cases -- that's not correct.  It probably was 15

 6   or $20,000, actually.

 7                    What I told you was incorrect because

 8   there were three case specifics.  And I think each was

 9   five or so thousand dollars, so it was probably 15 or so

10   thousand dollars.

11        Q.    (BY MR. WEBB)  So would you say -- if we tried

12   to approximate not only the case-specific work that

13   you've done, but also the work on Prolift and Prosima,

14   that -- generally we could say it's under $50,000,

15   roughly?

16        A.    Yes, sir.

17        Q.    Okay.

18        A.    At this point, it's probably closer to 25 or

19   $30,000.

20        Q.    Okay.  So 25 or 30 would be a better estimate

21   in your mind --

22        A.    That would be the two general reports and the

23   three case-specific reports.

24        Q.    And does not include the time that you spent

25   that you didn't invoice for for last week for the
```

Bobby Lewis Shull, M.D.

1   depositions and the preparation and deposition time

2   today?

3        A.   Yes, sir, that's correct.

4        Q.   When you have a patient that comes in that has

5   a mesh product already implanted in that patient, do you

6   inform them that you are a plaintiff -- that you're an

7   expert for the plaintiffs in this mesh litigation?

8        A.   I don't think that's ever come up, no, sir.

9        Q.   When you draft these reports, were you given a

10  template to go by in order to lay out the format that

11  you should prepare your expert report in?

12            MS. THOMPSON:  Objection to questions

13  about the drafting of the reports.

14       A.   Well, I have to --

15            MS. THOMPSON:  And anything that goes too

16  much beyond this, I'm going to instruct him not to

17  answer.

18       A.   I have to have some idea about what is

19  reasonable from a legal standpoint, because that's not

20  in my normal area of knowledge, so I have to have some

21  guidance about how to construct a report, if that's what

22  you're asking me.  I've spoken with Dr. Thompson about

23  what would be a reasonable format to present that is a

24  fair assessment of my own observations and is something

25  that would be expected in a legal proceeding.

Bobby Lewis Shull, M.D.

```
1        Q.   (BY MR. WEBB)  Prior to getting involved in

2    this mesh litigation, had you ever prepared an expert

3    report for any expert testimony that you had given in

4    any litigation?

5        A.   No, sir.

6        Q.   As we go through your expert report, which we

7    will do, there are medical literature that are

8    summarized -- would that be a fair statement -- in your

9    expert report?

10       A.   Yes, sir.

11       Q.   Do all of these articles that are listed in

12   your expert report for Prolift and Prolift+M, did they

13   come out of that binder that was provided to you by

14   plaintiffs' counsel?

15            MS. THOMPSON:  Object to form.

16       A.   I believe that's correct.

17       Q.   (BY MR. WEBB)  Did --

18       A.   I believe that's accurate.

19       Q.   Okay.  Did you put in any article or any

20   abstract that you found on your own that was not

21   provided to you by plaintiffs' counsel?

22            MS. THOMPSON:  Object to form.

23       A.   That is referenced in the general report?  Is

24   that what you're asking?

25       Q.   (BY MR. WEBB)  Correct.
```

Bobby Lewis Shull, M.D.

1      A.   To the best of my knowledge, I did not.

2      Q.   Did you go do a review of the medical

3  literature to see if there were articles that showed

4  different results from the articles that you -- were

5  given to you by plaintiffs' counsel?

6           MS. THOMPSON:  Object to form.

7      A.   Well, if you're asking me is this the only

8  literature I'm familiar with, the answer is, no, it

9  isn't.

10          And are there articles that I have read

11  that aren't in this?  And there are.

12          My -- part of my responsibility in

13  reviewing the available articles is to look at the

14  scientific approach that was taken and then review the

15  conclusions because, in many articles, there are --

16  there would be more than one way to interpret the

17  outcome.

18          So my job is to look at that and try to

19  determine is there some other message in these articles

20  that might be helpful in reaching a decision about

21  the -- in this case, the products which are being

22  reviewed, Prolift and Prolift+M.

23          MR. WEBB:  Object to responsiveness of

24  the answer.

25      Q.   (BY MR. WEBB)  The question I asked:  Did you

Bobby Lewis Shull, M.D.

1  do any independent research and go find any other

2  medical articles other than the ones that were provided

3  to you by plaintiffs' counsel?

4      A.   Yes.

5           MS. THOMPSON:  Object to form.

6      A.   Yes, sir.  I subscribe to multiple journals

7  and review them on a regular basis, and not everything I

8  reviewed is in here.

9      Q.   (BY MR. WEBB)  No.  The question is:  Did you

10 go do -- when you were preparing your general report for

11 Prolift and Prolift+M, did you go find any article and

12 use that article and abstract it or summarize it in your

13 general report other than the ones that were provided to

14 you in that binder?

15          MS. THOMPSON:  Object to form.

16     A.   I don't think I found any different than what

17 I have.  I think everything I have is here.

18     Q.   (BY MR. WEBB)  Dr. Shull, the question is:

19 Did you go do any independent research and pull any

20 other article other than the ones that had been provided

21 to you for use in preparing your general report?

22          MS. THOMPSON:  Object to form.

23     A.   Well, I think what was provided is what I

24 asked for.  So part of what I asked for would be in

25 here.  I don't know how to answer that any more clearly.

Bobby Lewis Shull, M.D.

 1      Q.   (BY MR. WEBB)  Listen to the question, then.

 2  My question is:  Did you go and do some independent

 3  research and pull an article from a medical journal and

 4  use it in your general report other than the articles

 5  that were prepared and sent to you by plaintiffs'

 6  counsel?

 7              MS. THOMPSON:  Object to form, now asked

 8  and answered.

 9      A.   Well, I will answer that.  These came partly

10  from my request and partly what was given, so I asked

11  for part of these.  So the answer is I didn't have

12  anything that isn't in here, but these weren't all

13  spontaneously given to me.  I requested some of these.

14  And I gave you copies of a couple of things otherwise

15  that aren't in here that specifically I did look for.  I

16  mean, at the beginning, I gave you those, for example.

17      Q.   (BY MR. WEBB)  The three articles that you

18  gave me before, are any of those three articles

19  summarized in your general report on Prolift or

20  Prolift+M?

21      A.   No, sir.  The background knowledge of it is,

22  though.  The concepts are.  For example, what is a

23  successful outcome of surgery, which is one of the ones

24  I think that's on the top -- or is in that stack of

25  three, how do you assess the outcomes of surgery.

Bobby Lewis Shull, M.D.

```
 1        Q.    And that's fair for your general background
 2   knowledge that you used to develop an expert opinion,
 3   but you actually went through and abstracted or
 4   summarized articles in --
 5        A.    Yes, sir.
 6        Q.    -- your general report.  Are any of these
 7   three articles abstracted or summarized in your general
 8   report?
 9        A.    No, sir.
10        Q.    You state in your expert report on Prolift and
11   Prolift+M that you have seen -- you have personally
12   examined, diagnosed, and treated approximately 100
13   patients with mesh complications and removed some mesh
14   from at least 70 women.  Is that correct?
15        A.    Yes, sir.
16        Q.    Have you prepared any type of formal report or
17   summary of the complications you have seen?  Have you
18   submitted it to any peer-reviewed medical journal for
19   publication?
20              MS. THOMPSON:  Object to form.
21        A.    The one that's --
22              MR. WEBB:  Wait a minute.  What's the
23   problem with that?
24              MS. THOMPSON:  It was compound.
25              MR. WEBB:  Read the question.
```

Bobby Lewis Shull, M.D.

```
 1                    MS. THOMPSON:  "Have you prepared any

 2    type of formal report or summary of the complications

 3    that you've seen?  Have you submitted it to any

 4    peer-reviewed medical journal for publication?"

 5                    MR. WEBB:  You think that's compound?

 6                    MS. THOMPSON:  Well, I think there are

 7    three questions in there.

 8                    MR. WEBB:  All right.  Let's break it

 9    down.

10        Q.   (BY MR. WEBB)  Have you prepared any kind of

11    formal report based upon the summary -- based upon your

12    examination and treatment of these 100 patients?

13        A.   I have one case report.  I don't have a

14    summary of all of them.

15        Q.   Okay.  Have you prepared any kind of article

16    and submitted it to any medical journal summarizing the

17    treatment of these patients that you've seen?

18        A.   No, sir.  Only the one that was a case report.

19        Q.   And have you submitted any complaints or made

20    any complaints to the FDA about any of the products that

21    you saw in these patients who you have treated?

22        A.   We have a fellowship program, so we educate

23    other people who are going to have skills in the subset

24    of female pelvic medicine, reconstructive surgery.  So

25    our fellows have reported a few of these, but certainly
```

Bobby Lewis Shull, M.D.

1    not all of them.  But I personally have not done that.

2    They've done it at my request.

3         Q.   You've reported complications that you've seen

4    in patients to the FDA not personally, but you've had

5    some of your fellows make those reports?

6         A.   Yes, sir.

7         Q.   Okay.  Have you -- were those reports made

8    prior to you signing on as an expert for the plaintiffs

9    in this mesh litigation or after?

10        A.   It was before.  This was early on -- excuse

11   me.  This was early in our experience.

12        Q.   When did you first start seeing patients that

13   had complications with mesh?  You said you've seen about

14   100?

15        A.   Yes, sir.

16        Q.   When would have been the first one?

17        A.   You know, I don't know the exact date, but I'm

18   going to say in the neighborhood of 2004 or '5.

19        Q.   Okay.

20        A.   Because when I say I've seen complications, it

21   has meant suburethral slings, it has meant mesh

22   implanted for prolapse, it has meant abdominal

23   sacrocolpopexy.  So it's all of those things, including

24   mesh for transvaginal reconstructive surgery.  So

25   somewhere in the range of 2004, 2005.

Bobby Lewis Shull, M.D.

```
1        Q.   And what you're telling me is this is a range

2   of all mesh products over a period of -- when is the

3   last time you saw someone that had a problem?

4        A.   You know, probably in the end of calendar year

5   2015.

6        Q.   So roughly, you would say, a ten-year period?

7        A.   Yes, sir, more or less.

8        Q.   And in that ten-year period, you've seen

9   approximately 100 women who you say had a variety of

10  different products across the spectrum of the surgeries

11  that use gynecological mesh for repair of various

12  problems?

13       A.   Yes, sir.

14       Q.   Okay.  How many of that 100 were either

15  Prolift or Prolift+M?

16       A.   You know, I don't know the exact answer to

17  that because some patients don't know for certain which

18  product was used, and we don't have the operative note.

19  In some of them I did know that for a fact.

20                 So some of them, including the case

21  report we gave, which is in my bibliography, is

22  specifically Prolift.  Yes, sir.  And this would be the

23  tension-free vaginal tape, the article you've referenced

24  here.

25       Q.   Is that the case report you're talking about?
```

Bobby Lewis Shull, M.D.

```
 1        A.   Yes, sir.  There is -- no, sir.  This is not

 2   the one I was referring to.  This is one using

 3   tension-free vaginal tape for urinary incontinence.

 4             The article I was referencing is one on

 5   erosion of a Prolift into the rectum, and one of our

 6   fellows reported on one other patient -- Dr. Chris Chung

 7   reported on a patient, and I'm not sure if that's in my

 8   bibliography or not, because some of the things the

 9   fellows do I would have participated in the publication,

10   and some of them I wouldn't have.

11             (Exhibit No. 4 marked)

12        Q.   (BY MR. WEBB)  I've marked as Exhibit No. 4 a

13   case report titled "Tension-free vaginal tape bowel

14   perforation."

15        A.   Yes, sir.

16        Q.   And this is in the International

17   Urogynecological Journal of 2010.  Is that right?

18        A.   Yes, sir.

19        Q.   And you were one of the authors on this case

20   report?

21        A.   Yes, sir, that's correct.

22        Q.   This case report has nothing to do with either

23   Prolift or Prolift+M, does it?

24             MS. THOMPSON:  Object to form.

25        A.   It does not.
```

Bobby Lewis Shull, M.D.

```
1          Q.   (BY MR. WEBB)  And, in fact, in this case

2     report what you're actually reporting on is a problem

3     where there was a perforation of the bowel due to the

4     technique of the physician?

5               MS. THOMPSON:  Object to form.

6          A.   This article on tension-free vaginal tape

7     bowel perforation refers to a technical issue with

8     placement of a retropubic tension-free vaginal tape, and

9     the bowel was perforated by the trocar.

10         Q.   (BY MR. WEBB)  And actually the tape was

11    actually placed through the bowel.  Is that correct?

12         A.   Yes, sir, that's correct.

13         Q.   You told me that you think that some of the

14    100 women that you saw had Prolift or Prolift+M.  Can

15    you give me an approximation of how many of those

16    patients had Prolift or Prolift+M?

17         A.   I can --

18              MS. THOMPSON:  Objection; asked and

19    answered.

20         A.   Yes, sir, I could do that, but I can't

21    validate it.

22              I know there have been -- I know for a

23    fact there have been at least two patients -- because I

24    remember them -- who knew the product, and it was

25    Prolift.  There may be others, but I didn't go back in
```

Bobby Lewis Shull, M.D.

1   preparation for today to look at that and try to

2   abstract that information from the records.

3       Q.   (BY MR. WEBB)  Did you do a specific

4   literature search -- medical literature search for

5   either complications related to Prolift or complications

6   related to Prolift+M products?

7       A.   In preparation for this general report, you're

8   asking?

9       Q.   For any reason at all, but especially in

10  representation for this general report?

11      A.   Well, not specifically in preparation for this

12  report.  I've looked at that previously, but, no, I

13  didn't for this.

14      Q.   When did you look at it?

15      A.   Oh, I can't give you a specific date.  Again,

16  in the education of other people, it's a part of what we

17  do is to review literature and discuss it.  So I don't

18  have the exact date for that.

19      Q.   Have you ever personally used either Prolift

20  or Prolift+M in any type of surgery?

21      A.   No, sir.

22      Q.   Have any of your people that work in your

23  practice, the other physicians that are in your

24  practice, do they either use Prolift or Prolift+M for

25  surgery?

Bobby Lewis Shull, M.D.

1          A.    There are four of us -- excuse me -- in our

2    department who see women with disorders of the pelvic

3    floor.  Two of us, I feel certain, have not used Prolift

4    products.  I know that I haven't, and I believe that

5    Dr. Paul Yandell has not.

6                We have two other colleagues who received

7    as part of their education and/or practiced elsewhere

8    before they came to work for us, and these two

9    individuals, I could not tell you whether or not they've

10   ever used Prolift or Prolift+M elsewhere.

11               To the best of my knowledge, they have

12   not used it while working in our department.

13        Q.    When you do training, do you -- have you ever

14   done any training with Prolift or Prolift+M products?

15        A.    You mean in being taught myself or in teaching

16   someone else?

17        Q.    Both.

18        A.    No, sir.

19        Q.    Have you ever involve -- been involved in any

20   clinical study involving pelvic mesh products in

21   general?

22               MS. THOMPSON:   Object to form.

23        A.    No clinic study.  Our research group studied

24   Pelvicol in an animal model, but we haven't had a

25   clinical study of any product.

Bobby Lewis Shull, M.D.

1          Q.    (BY MR. WEBB)   If we go through your

2    bibliography, have you written articles on urinary

3    incontinence?

4          A.    Yes, sir.

5          Q.    And pelvic organ prolapse?

6          A.    Yes, sir.

7          Q.    Any articles on surgical mesh?

8          A.    Only these case reports and an editorial.  But

9    I didn't do a scientific report on mesh, but there's an

10   editorial with Dr. Linda Brubaker.  I believe it was

11   published in either 2011 or 2012.

12         Q.    Have you ever written any kind of scientific

13   report or medical article in the peer-reviewed

14   literature related -- about how to remove pelvic mesh

15   products?

16         A.    No, sir.

17         Q.    When you did any explantation of any mesh

18   product, have you done -- has all the mesh product that

19   you have had explanted been sent to pathologists for

20   review?

21         A.    Yes, sir, to the best of my knowledge, it has

22   been.  I mean, it's entirely possible that I removed --

23   let's use, for an example, a piece of a midurethral

24   sling that was visible and I could measure it and

25   comment on it, and there was no gross evidence of

Bobby Lewis Shull, M.D.

1    anything other than it was exposed, I may not have sent

2    that to pathology, but I wouldn't know how to go back

3    and learn exactly how often that would have happened.

4         Q.   Has there been any evidence in any of the

5    pathology reports that you received that indicated any

6    type of degradation or breakdown of any of the surgical

7    mesh?

8         A.   In our particular organization, what we would

9    normally receive as a report is a confirmation that a

10   sample had been submitted.  Usually the dimensions would

11   be included in number of centimeters in length and

12   width.  Sometimes it's just a gross description that the

13   pathologist confirmed that we submitted something that

14   was a particular size and it had other tissue attached

15   to it.

16              Sometimes it would be a microscopic

17   evaluation, but not always.  And the microscopic

18   examinations, I think it would be exceptional that I

19   would have received a report that commented on

20   degradation.

21        Q.   Can you remember, as you sit here today, ever

22   receiving a report that commented on degradation?

23        A.   I'm not sure that I have.  If I had to guess,

24   I would say I probably have not.

25        Q.   Do you believe it's below the standard of care

Bobby Lewis Shull, M.D.

```
 1    to use transvaginal mesh implants?

 2              MS. THOMPSON:  Object to form.

 3      A.    Surgery is a job, and it is like, I think,

 4    practically every job else, there are more -- there is

 5    more than one way to accomplish what you are going to

 6    do.  I personally have chosen not to use mesh products

 7    for transvaginal repair for prolapse.  Other people do,

 8    and I'm not suggesting that's below the standard of

 9    care, but it's an option.  It's an option that I haven't

10    chosen.

11      Q.    (BY MR. WEBB)  You've done some rabbit

12    studies?

13      A.    Yes, sir, the people in my research group.  I

14    don't think my name was on the article, but they

15    implanted Pelvicol in the vaginal canal of rabbits and

16    reported on the response to the Pelvicol.

17      Q.    Does it have anything to do -- that bears

18    directly on this litigation?

19      A.    No --

20              MS. THOMPSON:  Object to form.

21      A.    There was no comparison with Prolene, for

22    example, so we did not use a Prolene product.

23              THE REPORTER:  A Prolene what?

24              THE WITNESS:  A Prolene product.

25              THE REPORTER:  Thank you.
```

Bobby Lewis Shull, M.D.

1    Q.   (BY MR. WEBB)  From your review of the Ethicon

2    literature, what stages of pelvic organ prolapse would

3    Prolift and Prolift+M be used to treat?

4              MS. THOMPSON:  Object to form.

5    A.   When I --

6              MR. WEBB:  On what basis?

7              MS. THOMPSON:  "Ethicon literature."

8    Does that mean Ethicon sponsored?  Ethicon published?

9              MR. WEBB:  Forget it.

10   Q.   (BY MR. WEBB)  Go ahead.

11             MS. THOMPSON:  I just don't understand --

12             MR. WEBB:  Forget it.

13             MS. THOMPSON:  -- "Ethicon literature,"

14   what that means.

15   Q.   (BY MR. WEBB)  Do you understand what "Ethicon

16   literature" means?

17   A.   If you mean the information for users, for

18   example, I think I can comment on that.

19   Q.   Can you also comment on all the Ethicon

20   documents that you were provided in the emails -- the

21   general -- any question about any Ethicon document or

22   literature that you reviewed, can you tell me, based

23   upon that, what stages of POP would use either Prolift

24   or Prolift+M to treat?

25   A.   I would say, in general, what I think I can

Bobby Lewis Shull, M.D.

1    glean from that is if the patient were symptomatic, and

2    that then doesn't lend itself to a quantification of any

3    kind, but if a woman has symptomatic -- excuse me --

4    pelvic organ prolapse, they may be a candidate.

5                    But in terms of assigning that to a

6    particular stage or grade or degree of prolapse, I don't

7    believe that I have seen that in any of the literature.

8        Q.   Based upon prior depositions and your opinions

9    that you provided, you prefer the use of native tissue

10   in your surgeries for prolapse.  Is that correct?

11       A.   Yes, sir.

12       Q.   You belong to a number of different

13   professional societies that specialize in this area.

14   Would that be a fair statement?

15       A.   Yes, sir.

16       Q.   And as any specialist, there's a limited

17   horizon of people that both have the experience and

18   belong to those professional societies.  Would you agree

19   with that?

20       A.   Yes, sir.

21       Q.   Is there any consensus among the specialists

22   in these gynecological societies that you belong to, or

23   urogynecological societies that you belong to, about

24   whether there are benefits that outweigh the risks or

25   risks that outweigh the benefits of the use of

Bobby Lewis Shull, M.D.

1    transvaginal mesh?

2                MS. THOMPSON:  Object to form.

3        A.    When I -- excuse me -- referred to the article

4    that I handed you by Dr. Barber and his associates about

5    assessing the outcomes of surgery, in -- I want to apply

6    it to these groups.

7                So the groups that I belong to who are

8    interested in caring for women with pelvic organ

9    prolapse have been looking primarily for an improvement

10   in the anatomical outcomes of surgery for poor support.

11               And as I understand it, I believe there

12   is a consensus that surgery of any kind doesn't work for

13   all people all the time.  And if we could do something

14   to reduce the failure with anatomical outcomes, that

15   would be desirable.

16               And one of the thoughts about using any

17   product, whether it's biological or synthetic or

18   autologous or xenograft is to try to improve on those

19   anatomical outcomes.

20               So in that broad context, I think people

21   agree that that's a laudable goal.  And then the

22   question where their ideas diverge is how do you go

23   about learning about that.

24               So once -- I think under ideal

25   circumstances, most people would say, "We would like to

Bobby Lewis Shull, M.D.

1    have as much scientific information as we can that

2    something is not only effective but that we know about

3    the other parameters, including possible injuries or

4    side effects associated with it."

5                    And so that's what people would like to

6    know.  I think everyone would like to know those things.

7                    In terms of which method of approach for

8    surgery, as I alluded to earlier, surgery is a job, and

9    not everyone is going to choose to do the same thing.

10   For example, some people are very technically skilled

11   with abdominal sacrocolpopexy, and that may be their

12   operation of choice.  Other people may be very skilled

13   vaginally, and that may be their operation of choice.

14                   And there's another group of people who

15   may be skilled in either one of those who feels that

16   maybe using a mesh -- synthetic mesh complement to their

17   surgery would be beneficial.  So we certainly fall into

18   those different groups.  And once we get to there, I

19   don't think there's a consensus.

20       Q.   (BY MR. WEBB)  Okay.  You will agree that

21   there are good doctors on both sides of this debate --

22   or all sides of this debate?

23                   MS. THOMPSON:  Object to form.

24       A.   I believe that there are honest people raising

25   these questions and wanting to do what's best for the

Bobby Lewis Shull, M.D.

 1   patient.

 2        Q.   (BY MR. WEBB)  In your report on Prolift

 3   products, you cite a recent report by Stanford stating

 4   that most studies shows an anatomic success rate of

 5   about 92 percent for mesh.  Do you remember that --

 6        A.   Yes, sir.

 7        Q.   -- statement?

 8        A.   Yes, sir.

 9        Q.   Do you agree with that statistic you cited?

10        A.   Well, I have the article here referenced in

11   front of me, and I believe in his assessment of the

12   literature that there are varying reports on the

13   anatomical outcome.

14             So when anatomy is the primary endpoint

15   of the outcome, that's a fairly well defined issue.

16   The -- I'll just say in general, the area of confusion

17   about anatomy is not that it's evaluated, but we don't

18   know what is a reasonable anatomical outcome to expect

19   in a woman of various ages.

20             For example, women who are 18 or 20 who

21   have never had a baby or have never been traumatized in

22   any way may have one set of physical exams which we

23   could describe, and under ideal circumstances, maybe we

24   could recreate that with surgery, but that isn't what

25   most people have.  So that may not be a realistic

Bobby Lewis Shull, M.D.

1   anatomic outcome.

2              What is -- I believe most doctors have

3   now come to a consensus about is a good anatomical

4   outcome is one in which no compartment of the vaginal

5   canal, either anterior or posterior, prolapses outside

6   the hymen, the opening to the vaginal canal.  When we

7   use that as an endpoint, all of the surgical outcomes

8   appear to be better.

9              When we're more rigid -- whether it's

10  mesh or not mesh, when we're more rigid, the

11  unsatisfactory outcomes from the standpoint of just

12  looking at the anatomy are greater.

13             What Dr. Barber's article points out is

14  it isn't only anatomy.  It's also the patient's

15  perception of what's going on, and it's did they require

16  more intervention.  So he has those three parameters.

17             And when you look at all three of those

18  parameters, each of these authors, I believe, would

19  report that the outcomes of surgery are better than when

20  you have rigid anatomic outcomes.  That's been an

21  evolution in our reporting system -- actually, a good

22  evolution.

23     Q.   Are you personally critical of all uses of a

24  polypropylene mesh for pelvic reconstruction?

25     A.   I haven't chosen to use it.  If you're asking

Bobby Lewis Shull, M.D.

1    me am I critical of using it for everybody under every

2    circumstance, that's an individual decision for each

3    doctor and patient to make.

4              In my own personal experience, I am not

5    convinced that given my ability to accomplish what I

6    want to accomplish technically, that the benefits of

7    adding a polypropylene mesh is greater than the side

8    effect.  So in my own hands, I have chosen not to do

9    that.

10    Q.   You have associates in your own practice,

11    though, who perform sacrocolpopexy using polypropylene

12    mesh.  Right?

13    A.   Yes, sir.  Through the abdomen, they do.  And

14    we use it in the suburethral slings.  So each of us have

15    used these midurethral slings, which are made of

16    polypropylene.

17              The area where I think we are less likely

18    and perhaps haven't used mesh in our institution is for

19    transvaginal repair of prolapse.

20    Q.   And the product that your associates use and

21    the product that you use for the suburethral slings is

22    usually an Ethicon product?

23    A.   Yes, sir.  And some of that depends on what

24    the organizational purchase is, because all

25    organizations now are trying to bring standardization to

Bobby Lewis Shull, M.D.

```
 1    the purchases.  So we have used some other products, but

 2    I would say the preponderance of what we use has been

 3    from Gynecare, J&J.  I'm sorry.  My voice is --

 4                    MR. WEBB:  Let's take a little break,

 5    give you a chance to get some water.

 6                    MS. THOMPSON:  I was just --

 7                    THE VIDEOGRAPHER:  Going off the

 8    record --

 9                    THE WITNESS:  Thank you.

10                    THE VIDEOGRAPHER:  Going off the record,

11    the time is 10:26.

12                    (Recess from 10:26 a.m. to 10:43 a.m.)

13                    THE VIDEOGRAPHER:  Back on the record.

14    This marks the beginning of Disc No. 2.  The time is

15    10:43.

16        Q.   (BY MR. WEBB)  I'm going to walk through some

17    of the opinions that you expressed related to the

18    Prolift and Prolift+M devices --

19        A.   Yes, sir.

20        Q.   -- for pelvic organ prolapse.

21                    Your first opinion is, "At the time of

22    introduction, there was insufficient scientific evidence

23    supporting the implantation of the Prolift and Prolift+M

24    devices for pelvic organ prolapse."

25                    What type of scientific evidence are you
```

Bobby Lewis Shull, M.D.

1  referring to here?

2      A.   I found no evidence that the product

3  consisting of the mesh with the attached trocars had

4  been used in women in a systematic fashion with

5  information collected about the morbidity, the anatomic

6  outcomes, and the potential for risk associated with

7  this specific kit of the Gynecare mesh, Gynemesh, and

8  the trocars, which is how Prolift was marketed.

9      Q.   The individual mesh had been on the market for

10 other uses for a number of years.  Would you agree with

11 that?

12     A.   Yes, sir.

13     Q.   The trocars, were there anything unique or

14 special or brand new about those?

15          MS. THOMPSON:  Object to form.

16     A.   The trocars in and of themselves, to the best

17 of my knowledge, are not unique.  The use of the trocars

18 to penetrate spaces in the pelvis and then to deploy the

19 mesh arms into those spaces, in fact, was a new concept.

20     Q.   (BY MR. WEBB)  So it's not the complaint about

21 the kit being unique or special.  It's the technique

22 that was used to place the mesh in the woman's body.  Is

23 that correct?

24          MS. THOMPSON:  Object to form.

25     A.   As I understand it, from my review of the

Bobby Lewis Shull, M.D.

1    literature, Prolift used the Gynemesh, which you

2    indicated had been on the market previously.  What was

3    new was the concept of a product using the trocars and

4    deploying the mesh arms into muscle, connective tissue,

5    through the skin of the vagina and the external skin in

6    living people.  That was a new concept.  And I could not

7    find any information that there had been an objective

8    trial of that before the product was actually used.

9         Q.   (BY MR. WEBB)  Do you know whether or not --

10   when you say an objective trial, do you know what the

11   company had done as far as working with surgeons,

12   working with providing -- learning the techniques that

13   need to be used and teaching those techniques to

14   physicians prior to it being implemented for commercial

15   use?

16              MS. THOMPSON:  Object to form.

17        A.   What I understand or what I glean from the

18   literature is Dr. Jacquetin in France and Dr. Cossan,

19   C-O-S-S-A-N, and a group of French surgeons worked to

20   develop the concept of an American product being

21   deployed into the pelvis, and a lot of the original

22   observations were made with that French total vaginal

23   mesh group.  So I did see that.

24        Q.   (BY MR. WEBB)  Well, do you know what kind of

25   protocols or what kind of scientific basis that the

Bobby Lewis Shull, M.D.

1    initial users of the product had or put in place before

2    they started using this product in patients?

3                    MS. THOMPSON:  Object to form.

4         A.   What I know is they evaluate the patients for

5    prolapse in advance of surgery, what site in the pelvis

6    had poor support, and what degree of poor support that

7    those sites had.  And they then looked at the technical

8    feasibility of placing the trocars into the pelvis and

9    deploying the mesh, and subsequently followed some of

10   the patients for a period of time to look at the

11   anatomic outcomes.

12                   They then solicited opinions,

13   observations from clinicians on concerns about the

14   technical aspects of using the product, unknown concerns

15   that these physicians had heard from their patients

16   regarding either favorable or unfavorable outcomes from

17   the use of the product.

18        Q.   (BY MR. WEBB)  And is this, in your opinion, a

19   deviation from the norms in how you develop a new

20   product for use in patients?

21                   MS. THOMPSON:  Object to form.

22        A.   Well, in this particular circumstance,

23   counseling a group of patients to participate in a

24   scientific trial and informing them of the risks and

25   benefits would be a helpful thing to do, understanding

Bobby Lewis Shull, M.D.

1    that it's not possible to give full disclosure because

2    the trial is intended to learn about the potential

3    benefits and risks of the surgery.

4               So that would have been a helpful thing

5    to do.  And then limiting the use of this product to a

6    defined group of people until there was adequate

7    information to make, if necessary, modifications in the

8    indications and use of the product to learn how to avoid

9    complications when possible and to learn how to manage

10   them if and when complications occur.

11              So that would have been an ideal set of

12   circumstances in a defined group of physicians and

13   surgeons and a defined group of patients, followed by a

14   long enough time period to be able to provide that

15   information.

16   Q.    (BY MR. WEBB)  Do you know whether or not the

17   patients in this initial group that were -- the French

18   surgeons used were provided -- what kind of informed

19   consent they were provided?

20   A.    Some of them -- I don't know all of them.

21   Some of them actually were provided information that

22   they were collecting data on the -- on this technique.

23   Q.    Do you know whether or not those physicians

24   followed these patients long term?

25   A.    Well, initially they could only have followed

Bobby Lewis Shull, M.D.

1   them for -- in some cases, some of the earlier reports

2   were a matter of three to six months.  Some were

3   perioperative injuries, some were one-year outcomes,

4   some were three-year outcomes.  It's variable depending

5   on -- there were various stages of reporting.

6        Q.   Do you know whether or not those patients have

7   been followed longer than that even though you haven't

8   seen any reports about it?

9        A.   I'm not aware of it.  By the time that the

10  product was available to be marketed, I'm not aware they

11  had been followed for a long enough time to provide

12  information so the surgeons and the patients could be

13  well informed about what to expect.

14       Q.   You have an opinion that Prolift and Prolift+M

15  devices represent a significant departure from

16  traditional surgical procedures.  What traditional

17  surgical procedures are you saying they are a

18  significant departure from?

19       A.   Primarily various types of native tissue

20  repair.  In some cases there had been reports on the use

21  of mesh in reconstructive surgery transvaginally, but

22  the early reports on mesh with transvaginal surgery did

23  not involve the use of a trocar.

24            The mesh either would have been placed

25  without a trocar, it may have been sutured in place --

Bobby Lewis Shull, M.D.

1  those are for the synthetic meshes.  For the -- for the

2  synthetic permanent meshes.

3            For the absorbable meshes, those were

4  almost always applied as an applique.  So the

5  traditional surgery -- excuse me -- was performed and

6  then, for lack of a better term, a patch of a synthetic

7  product was placed over that, and then the skin was

8  closed.  But none of those required the use of trocars

9  to deploy the product.

10      Q.   So the most significant departure that you're

11  identified for me is the use of a trocar?

12            MS. THOMPSON:  Object to form.

13      Q.   (BY MR. WEBB)  Or use of trocars?

14            MS. THOMPSON:  Object to form.

15      A.   The significant deviation from what we were

16  accustomed to previously is deploying these arms into

17  muscle, connective tissue, and through the skin, and as

18  it turns out, really the only reasonable way to do that

19  is to use a trocar.

20            So the real deviation was having the mesh

21  arms through these tissue structures, and in order to

22  put them in those places, it was necessary to use a

23  trocar.

24      Q.   (BY MR. WEBB)  You say, "The vagina is a

25  different environment from the abdominal wall.

Bobby Lewis Shull, M.D.

1    Maintenance of vaginal compliance and distensibility is

2    essential for bowel, bladder, and sexual function."

3              Had there been a transvaginal surgery to

4    repair pelvic organ prolapse prior to the introduction

5    of Prolift and Prolift+M devices?

6        A.    Excuse me.  Historically, the most common way

7    to repair prolapse fell into two categories; one,

8    obliterate the vaginal canal; or, one -- or, two,

9    reconstruct the vaginal canal, ideally with a goal of

10   having some degree of normal size of the vaginal canal

11   and normal function of the bowel, bladder, and the

12   vagina as a sexual organ.

13             So obliteration of the vaginal canal is

14   an option in a very select subgroup of women, usually

15   not very many of them, but for some.  And that normally

16   would only use suture materials, and that has been

17   described as long ago as approximately 1850.

18             Reconstructing the vaginal canal to try

19   to be more normal required a different level of

20   anesthesia, and surgery -- general anesthesia only

21   became safe in the mid to late 1800s.  So reconstructive

22   surgery is limited by the ability to have safe either

23   regional or general anesthesia.  So that began in the

24   late 1800s.

25             And for all practical purposes, that was

Bobby Lewis Shull, M.D.

1    what was used unless a doctor took the patient's own

2    tissue, called fascia, to reinforce the repair.  That

3    would be called an autologous repair.  So that happened

4    in the early 1900s and later on during that century.

5             The concept of using mesh didn't really

6    take hold until -- in gynecology, for example, until

7    about the time a doctor in Wisconsin began -- he

8    reported on using mesh for the anterior compartment

9    without the use of trocars.  Dr. Tom Julian did that,

10   and he noticed that in his evaluation of these women,

11   that anatomically they had improvement, but he also

12   noticed that there was an issue about erosion or

13   exposure of the vaginal mesh.

14        Q.   You say that insertion of the mesh device

15   containing arms and involving the blind passage of

16   trocars presents specific risk and is inconsistent with

17   sound pelvic reconstructive surgical principles.  Is

18   that correct?

19        A.   Yes, sir.

20        Q.   Is it -- if a surgeon chooses to use the

21   Prolift or Prolift+M in using blind passage of trocars,

22   is that below the standard of care if a surgeon chooses

23   to do that?

24             MS. THOMPSON:  Object to form.

25        A.   When a surgeon chooses to use the blind

Bobby Lewis Shull, M.D.

1    passage of trocars in deployment of a mesh arm, what

2    happens in this specific case is the trocars are passed

3    through tissue planes through which we normally never do

4    surgery, and those tissue planes of connective tissue

5    and muscle, primarily, have a vascular supply and a

6    nerve supply which is variable.

7              All anatomy is variable from one

8    individual to another, and when we pass these

9    instruments without being able to see where they are

10   going, we are using what we presume would be safe spots

11   to place the product, place the trocar.

12             And the potential dilemma with that is

13   that, in fact, for some people that may be a safe space

14   to put something.  Surgery is very operator dependent.

15   And when I say "operator," I don't really mean surgeon.

16   I'm talking about whoever's doing it.  It is very -- the

17   execution and the outcomes of surgery are dependent on

18   the technical execution of an operation.

19             So let's use a trocar, for example.  I

20   don't have one here, but I have a pen.  So when I'm

21   using something like this to either sew with or to put

22   into a tissue plane, I have the best control where I can

23   begin the use of the instrument and see it.  If I'm

24   using a needle, for example, I have good control of

25   where that needle goes in, but where the needle comes

Bobby Lewis Shull, M.D.

1    out, the control isn't as predictable.

2                    On a bigger scale, when you have

3    instruments that are curved, what happens is when you

4    think you are going into a particular plane, all the

5    movement out here exaggerates the movement at the end of

6    that instrument.  So it's magnified.

7                    So I think something is going in a

8    particular spot, but depending on how I manage this part

9    out here, that can deviate up or down or front or back,

10   and I don't have that good of control over it.  So

11   that's one issue.

12                    The second issue, the anatomy is

13   variable.  So even if I go where I think a place is

14   safe, I can't see it, in fact.  And you might ask,

15   "Well, how is that different than, let's say, a

16   suburethral sling, a midurethral sling, which uses a

17   trocar," which is a reasonable question.

18                    With midurethral slings, we're operating

19   in spaces that surgeons, urologists, and gynecologists

20   have operated on for hundreds of years.  And if you need

21   to see exactly what happened, you can make an incision

22   in the abdomen or use a kind of instrument and see

23   specifically where the trocar went or where the mesh

24   went.

25                    You can't do that with these products

Bobby Lewis Shull, M.D.

```
 1   that go through the muscles of the pelvis.  Technically
 2   it isn't possible to do that, so that's a big departure.
 3              MR. WEBB:  Objection, nonresponsive.
 4        Q.   (BY MR. WEBB) I was asking:  Is it below the
 5   standard of care for a surgeon to use Prolift or
 6   Prolift+M with a procedure that is recommended for the
 7   use of those products?
 8              MS. THOMPSON:  Object to form.
 9        A.   I don't think I said that in my general
10   report.  I don't believe I indicated that.  So the
11   answer is --
12        Q.   (BY MR. WEBB) So what you said in your
13   general report is insertion of a mesh device containing
14   arms involving the blind passage of trocars present
15   specific risk and is inconsistent with sound pelvic
16   reconstructive surgical principals.  And if it's
17   inconsistent with sound pelvic reconstructive surgical
18   principals, is it below the standard of care for a
19   physician to do it?
20        A.   I didn't say that.  I said exactly what's
21   there.  And in my opinion, I would not use these
22   products.  Other people feel differently, that they can
23   safely use them, and the risks are less than the
24   benefit.
25        Q.   Have you actually developed a medical device
```

Bobby Lewis Shull, M.D.

```
 1   yourself and presented it to a company or developed it

 2   yourself?

 3        A.   No, sir.

 4        Q.   Okay.  Do you consider yourself an expert in

 5   biomaterials?

 6        A.   From a -- excuse me.  I'm losing my voice.

 7             From a clinical standpoint, I feel I'm an

 8   expert on evaluating people who have had biomaterials

 9   put in.  From a laboratory standpoint, have I looked at

10   these products under laboratory experimental conditions?

11   I haven't done that.

12        Q.   Do you have any experience in the

13   manufacturing process of medical devices?

14        A.   No, sir.

15        Q.   Do you consider yourself an expert in

16   toxicology?

17        A.   No, sir.

18        Q.   Do you consider yourself an expert in

19   regulatory affairs or the FDA regulatory process

20   considering medical devices?

21        A.   I consider myself knowledgeable about what we

22   are provided that meets the letter of the law, so I do

23   consider myself knowledgeable about that.

24             Now, whether I agree that that's all the

25   information we ought to have is a different issue, and I
```

Bobby Lewis Shull, M.D.

1   don't agree with that, but I haven't submitted anything

2   for approval by a government agency.

3        Q.   Do you know the process that any medical

4   device manufacturer goes through in order to get

5   approval, whether it be by the 510(k), or whether it be

6   by any other method to have a product approved?

7        A.   I think I'm --

8                  MS. THOMPSON:  Object to form.

9        A.   I think I'm familiar with the 510(k) in that

10  the individual or the company who wants approval or

11  clearance through the 510(k) process is required to

12  provide certain documents, including is there a

13  predicate device, and was a predicate device cleared

14  before, and is the product that is being requested to

15  receive clearance similar to the predicate device.

16                 And then there's a governmental agency

17  that makes a decision on that, yes or no.  So I know

18  that part of the mechanism.

19       Q.   (BY MR. WEBB)  Do you consider yourself an

20  expert in that process?

21                 MS. THOMPSON:  Object to form, asked and

22  answered.

23       A.   I'm conversant with it.  I don't know what it

24  requires to be an expert about it.

25       Q.   (BY MR. WEBB)  Well, whether you're conversant

Bobby Lewis Shull, M.D.

1    or not, do you consider yourself an expert in that?

2              MS. THOMPSON:  Object to form, asked and

3    answered.

4         A.   Well, I don't know what you're asking me about

5    being an expert.  I'm knowledgeable enough to know that

6    there is a process that has to take place and companies

7    are -- companies actually make their own decisions about

8    asking for 510(k) approval, if I'm not mistaken.  And

9    then once they get in the system, there are parameters

10   that have to be provided, and then there is a government

11   agency group that either asks for clarification on the

12   information that's been requested, which has happened

13   with Ethicon and J&J, and then the company has an

14   opportunity to respond to that and can -- they come to a

15   consensus on what is the adequate amount of information

16   that's necessary before approval is given.

17             So I know those aspects of how --

18        Q.   (BY MR. WEBB)  Have you ever served on an FDA

19   approval panel?

20        A.   No, sir.

21        Q.   Have you ever testified or been asked to give

22   expert testimony in front of an FDA panel?

23        A.   No, sir.  Excuse me.  No, sir.

24        Q.   Do you know what the standard is by which the

25   FDA will either approve or disapprove of any medical

Bobby Lewis Shull, M.D.

```
 1   device that's submitted for approval?

 2              MS. THOMPSON:  Object to form.

 3       A.   Well, in the case of a new product, they would

 4   require information about the technical -- let's use

 5   something in the pelvis, for example -- about the

 6   technical qualities, the description of what it is, what

 7   its intended purposes are, and if it -- if we have

 8   information about how this, in this case, product

 9   behaves in the laboratory, for example.

10              If they're -- if you're requesting based

11   on similarity to a predicate product, then the person

12   requesting clearance has to say that their newer product

13   is substantially equivalent from the predicate device

14   that was previously approved and provide the information

15   to document that.

16       Q.   (BY MR. WEBB)  You talked a little bit about

17   the process.  You didn't tell me what the standard is

18   that the FDA looks at.

19              MS. THOMPSON:  Object to form.

20       A.   I don't know that I can articulate the

21   standard.

22       Q.   (BY MR. WEBB)  Have you ever studied the

23   properties of polypropylene mesh in the laboratory?

24       A.   No, sir.

25       Q.   Have you ever looked at any mesh, Prolift or
```

Bobby Lewis Shull, M.D.

1    Prolift+M, under a microscope, even?

2         A.   No, sir.

3         Q.   Ever done any degradation testing on

4    polypropylene mesh?

5         A.   Excuse me.  No, sir.

6         Q.   Any elasticity studies?

7         A.   In that standpoint, only in the clinical

8    aspects of palpating products that have been placed in

9    someone in making my own clinical assessment of whether

10   or not those tissues are tightly stretched out or not.

11   So from a clinical standpoint, I've done that.

12        Q.   Have you ever quantified that, or is that a

13   subjective test according to your --

14        A.   I'm not aware there's a -- with the exception

15   of looking at ultrasound, which, actually, I don't think

16   measures elasticity anyway, there is not an objective

17   way -- all the other reports I'm familiar with are a

18   clinical assessment.

19        Q.   Have you ever done any shrinkage studies to

20   see -- personally done any shrinkage studies to see if

21   there's any shrinkage of polypropylene mesh?

22        A.   Not in the laboratory.  Again, I would rely on

23   my clinical observations.  And one of the ways that I

24   have observed clinically about shrinkage is in the case

25   of midurethral slings where I, in fact, have placed the

Bobby Lewis Shull, M.D.

1   sling myself and I may later operate on the woman

2   because she has a reason for reoperation.  Excuse me.

3            In identifying the sling product, I can,

4   in that circumstance, make the observation that that

5   sling is more tightly applied than it was when I did the

6   surgery previously, if that surgery was a week ago or

7   years ago, which could have been the case, that it

8   doesn't have the same freedom of lack of tension that it

9   had when it was originally placed.

10           And then the presumption would be that

11  that is -- that the mesh is -- the dimensions are

12  getting smaller through the wound healing, scar

13  formation, or some intrinsic product -- some intrinsic

14  characteristic of the product itself.

15       Q.   Do you --

16       A.   So I have seen that in my own patients.

17       Q.   Using a -- what is generally considered to be

18  a cure rate of -- for surgeons in your practice, what

19  would you say the cure rate is, roughly, for the

20  patients that you have used polypropylene mesh in for

21  the years that you've been practicing and using that

22  mesh?

23           MS. THOMPSON:  Object to form.

24       A.   For the treat -- excuse me.  For the treatment

25  of urinary incontinence?

Bobby Lewis Shull, M.D.

```
1        Q.   (BY MR. WEBB)  Yes, sir.

2        A.   Yes, sir.  My observation is from the time I

3   began my work in 1975 where I am right now, until about

4   2001 or '2, so that would have been 25 years, more or

5   less, I did surgery for urinary incontinence using

6   native tissue only.

7             And the clinical outcomes of the patients

8   that I used native tissue for compared to the women in

9   whom I used the midurethral sling following 2000 and

10  2001 -- that became my operation I did more

11  frequently -- I would say the absence of symptoms of

12  incontinence were similar with both of those, so -- in

13  everybody who's tested it.

14            So I haven't reported on that.  But the

15  people who do report on it, the conclusions are that the

16  outcomes of cure of incontinence are very similar with

17  the synthetic midurethral sling as with the previous

18  operations which didn't require sling material.  So I

19  think there is a consensus about that.

20       Q.   And what is the percentage that you would say?

21       A.   It's -- it's time related.  So the earlier

22  after the procedure the patient is evaluated, the more

23  likely they're to be cured.  And the cure rate is a

24  function of time, so the longer you follow someone, the

25  cure rate has a certain deterioration every year.
```

Bobby Lewis Shull, M.D.

1              But in the first year or so, the patients

2    are counseled that approximately 80 percent are going to

3    be satisfied with bladder control, coughing, laughing,

4    straining, and sneezing.

5              Depending on how stringent the

6    requirements are for objective proof, the cure rate

7    isn't that high.  But practically speaking, most doctors

8    are going to use the patient satisfaction issue, and

9    about 80 or 85 percent are going satisfied.

10   Q.   Have you ever followed a patient who had a

11   Prolift product in order to quantify any shrinkage or

12   degradation or anything that you would follow over a

13   long period of time?

14   A.   I think there are several groups of patients.

15   I have seen some patients, and I believe they've had

16   Prolift, but if you ask me to prove that, I don't --

17   can't prove it today.  But I have seen patients who had,

18   for example, posterior Prolift, who have come to me for

19   concerns about pain in the vaginal canal or pain with

20   bowel function because the mesh itself isn't

21   distensible, and when their bowel works, the mesh can

22   create a delay in bowel emptying.

23              So in some of those women, I've examined

24   them and said, yes, I think this product has more

25   tension on it than was ever intended, but I didn't put

Bobby Lewis Shull, M.D.

1    it in, and I suspect it's tighter than it was before.

2    And the patient may choose not to have anything done,

3    and I may see her back for evaluation later, and she

4    still may not have symptoms for her that warrant another

5    operation.  So I've seen people like that.

6                  I've seen some people who have had

7    anterior Prolift, and they don't have a complaint about

8    anything.  They want to be seen, frankly, because

9    they're curious, is there something the matter with me

10   because I've had this product.  And I may examine them,

11   and I may say, "No.  I think presently you're okay," and

12   I wouldn't do anything, and I would -- just be followed

13   periodically.

14                 So there's a subset of people who, for

15   all practical purposes, when I've seen them are

16   clinically doing well, and there's no reason to

17   recommend doing anything.

18        Q.   Have you ever personally observed any

19   degradation of any Prolift product?

20        A.   Well, that's a microscopic diagnosis, and the

21   answer is no.

22        Q.   Has anybody ever reported to you when you sent

23   something to a pathologist of any degradation of any

24   Prolift product?

25        A.   You know, on my specific patients, our

Bobby Lewis Shull, M.D.

1   pathologists haven't.  Now, it's possible that some of

2   the patients that I've operated on have had specimens

3   sent elsewhere for evaluation.

4              Because periodically what will happen,

5   I'll operate on someone to revise or explant graft

6   material, and the request from the patient and her legal

7   counsel is to forward that tissue on to someone else, in

8   which case I don't think I ever received a report on

9   that.  We follow their request and submit it to someone,

10  but I'm not in the loop where I would get a report back

11  to observe that.

12       Q.   Are you aware of any studies in the medical

13  literature in the 2000 to 2005 timeframe that found good

14  results with the use of transvaginal mesh kits?

15       A.   I'll have to look specifically about -- about

16  the year.  Just a moment.

17              The -- did you ask me mesh kit?  Is that

18  what you asked me, or mesh?

19       Q.   Mesh kits.

20       A.   Mesh kit.  I don't remember what -- excuse

21  me -- in that timeframe, and when I look -- excuse me.

22              When I look in the bibliography of an

23  article by a Dr. Jacquetin, who developed Prolift -- and

24  this is a report in 2009 on the total vaginal mesh

25  technique.  When I look at his bibliography, I don't see

Bobby Lewis Shull, M.D.

1    any reference to something published using a mesh kit

2    during that time period from 2000 to 2005.  He

3    referenced Dr. Julian, whom I spoke about earlier, and

4    that article was -- was reported in 1996, and it was a

5    mesh applique.

6              So I don't know about reports on the mesh

7    kit before 2005.

8        Q.   How did you reach the conclusion that Ethicon

9    did not provide doctors and patients with complete and

10   accurate information regarding the complications

11   associated with Prolift and Prolift+M devices and their

12   management?

13       A.   Because some of the information we only learn

14   as time goes by about long-term outcomes.  That's a

15   variety of things that we do.  And I'll use abdominal

16   sacrocolpopexy, which has been an operation around since

17   1950 or so.

18             Some of the concerns about abdominal

19   sacrocolpopexy in terms of mesh erosion or exposure only

20   are evident years after the original repair or some of

21   the other complications regarding adhesion and bowel

22   perforation.  So we know from another pelvic

23   reconstructive procedure that the true story unfolds

24   over a time period.

25             And the reason I don't think people were

Bobby Lewis Shull, M.D.

1    provided adequate information is, one, there wasn't

2    enough time to go by to find out have we seen the bulk

3    of these issues or what is the natural history of these

4    women?  That's one thing.

5                    And then the second thing is it isn't

6    clear that that objective of some of these early studies

7    was really to look at, for example, quality of life or

8    effects on pain or sexual function.  The early studies

9    were primarily on anatomical outcomes and the

10   perioperative morbidity.  And that's why I think it

11   would be hard for me to counsel someone based on the

12   information that was available in 2004 or '5 or '6 or

13   '7.  The information just wasn't available.

14        Q.   Well, it's not that Ethicon held it back.

15   It's just that it wasn't available.  Is that what you're

16   saying?

17        A.   Well --

18                    MS. THOMPSON:  Object to form.

19        A.   Well, certain information clearly wasn't

20   available, and then whether or not there was

21   knowledge -- and there was knowledge about some of the

22   things regarding exposure rate and pain, for example.

23   It's hard -- you can say that someone has pain, for

24   example, and that can be disclosed in the information

25   for use document, but it doesn't necessarily go into

Bobby Lewis Shull, M.D.

```
1    detail about the severity of the pain, how frequently it

2    occurs, and how long it occurs.

3              So I could say that, well, I knew there

4    could be pain associated with it, and maybe the patient

5    knew there was pain, but in my opinion, that isn't the

6    full extent of what someone would want to know about the

7    outcome of surgery.  I don't think we had all the

8    information.

9        Q.   You don't think Ethicon had all that

10   information?

11       A.   I don't think that --

12              MS. THOMPSON:  Object to form.

13       A.   I don't think they had all of it, because not

14   all of the trials were designed to collect that

15   information.  Plus not enough time had gone by.

16       Q.   (BY MR. WEBB)  You say Ethicon failed to

17   disclose the lack of benefit of pelvic organ prolapse

18   surgery using Prolift and Prolift+M devices to

19   physicians and patients.

20              What do you base that opinion on?

21       A.   Well -- excuse me.  Again, it's a question of

22   time and how you report the information.

23              I'll give you an example.  This article

24   by Dr. Jacquetin published in 2010 was called, "Total

25   transvaginal mesh technique for treatment of pelvic
```

Bobby Lewis Shull, M.D.

 1    organ prolapse, a three-year prospective follow-up

 2    study."

 3                    Dr. Jacquetin and his colleagues were and

 4    are the most knowledgeable about the technical aspects

 5    of the procedure, and I would presume they are very

 6    knowledgeable about patient selection.

 7                    So this is the group who conceived of the

 8    idea, who have the most skill associated with it, and at

 9    three years after surgery, one out of five women had an

10    anatomical failure rate, and one out of seven had mesh

11    exposure.

12                    So when I say "benefit," the benefit is

13    80 percent of people got better, 20 percent had an

14    anatomical failure.  That's not appreciably different

15    than someone who had native tissue surgery.

16                    I reported on my own experience

17    previously, ten years before that, using native tissue,

18    and there's no appreciable benefit to -- in my patients

19    to using the product when you look at anatomical

20    outcomes, for example.  And I didn't have one out of

21    seven patients with mesh exposure.

22                    So that's what I mean when I say I don't

23    think patients were fully informed of the benefit.  So

24    you might -- if you ask me specific benefits, besides

25    anatomy, then I'll try to respond to that.  But in the

Bobby Lewis Shull, M.D.

1   absence of that, these trials, these reports are based

2   primarily on anatomy.

3           And that was the concept to begin with.

4   Surgery doesn't have as good an anatomic outcome as it

5   should; i.e., we need to do something different to try

6   to improve it.

7       Q.   Your opinion that removal of mesh is always a

8   complex surgery, is it your personal experience that

9   every removal surgery is complex?

10      A.   It can be.  I think you have to be aware of

11  that.  Now, again, I'll say surgery is like every job.

12  Sometimes you start the job, and technically it's easier

13  than what you anticipate, but sometimes the converse of

14  that is true.  You think this will be not particularly

15  difficult, and it actually is.

16          So you have to be prepared that it can be

17  difficult, and, in fact, some of the explant procedures

18  are technically very challenging.  Not all of them are.

19      Q.   What's your basis for saying that Ethicon

20  lacks scientific rigor in testing and reporting of its

21  pelvic floor products?

22      A.   I think I've alluded to it before.  Under a

23  circumstance which would have been better is there would

24  have been, sequentially, the concept of what ought to be

25  done, and after the concept, then is it practical to do

Bobby Lewis Shull, M.D.

1    what conceptually you have in mind to do.

2              And if what you want to do has a proposed

3    benefit, you have to be very clear about what that

4    benefit is as well as articulating what the possible

5    risk could be.  So if you do this, whatever it is, have

6    in mind what -- the possible adverse events that could

7    occur, and we need to monitor those.

8              And then in order to say, "I'll use this

9    group of Dr. Jacquetin" -- and I'm using him because

10   he's knowledgeable about this.  So if Dr. Jacquetin has

11   worked on a way to have better outcomes from surgery,

12   the real way to know that is he would have to compare

13   this innovation to what he was previously doing in a

14   fashion that is ideally not biased, and then in a period

15   of time he could look at that and say they're equal or

16   they aren't equal, and they're not equal for whatever

17   the reasons are.  I don't see that as having transpired.

18             I see it as having recruited a number of

19   women to undergo a procedure and then make longitudinal

20   observations about them as opposed to comparing it with

21   something done, which under ideal circumstances is how

22   it would work.

23        Q.   So this is another one of your opinions that

24   criticizes the lack of a clinical study with the

25   parameters that you would expect to have in a clinical

Bobby Lewis Shull, M.D.

1   study.  And because of the critique that you have, you

2   feel that Ethicon failed to do proper studies to show

3   the safety and the effect -- the efficiency or the

4   efficacy of this product?

5       A.   Yes, sir.

6       Q.   Have you personally ever put together a

7   scientific clinical study that has been used for any

8   medical device or any drug?

9       A.   The one -- excuse me.  We have done two

10  relating to the Gynecare TVT.  And one of them was in an

11  effort to minimize the likelihood of getting a bladder

12  infection following the procedure.  We had a randomized

13  trial where women who were going to undergo a TVT were

14  either given an antibiotic for a defined time period or

15  not.

16              And then we had another with a retropubic

17  sling, looking at injecting the retropubic space with

18  what's called hydrodissection -- that's part of the

19  IFU -- with hydrodissection with the use of saline

20  versus the use of a local anesthetic agent to see if

21  that affected the amount of pain medication that a

22  patient would need in the recovery period.

23              So we didn't design a product.  We did

24  look at two randomized trials where patients were

25  approved -- the Institutional Review Board approved the

Bobby Lewis Shull, M.D.

1    protocol, and patients were informed they were in a

2    trial to try to learn the best way to effect the

3    procedure, to minimize pain, and minimize urinary

4    leak -- urinary infections.

5         Q.   So they were approved by your Institutional

6    Review Board?

7         A.   Yes, sir.

8         Q.   Were they approved by the FDA?

9         A.   No, sir.

10             MS. THOMPSON:  Object to form.

11        A.   No, sir.

12        Q.   (BY MR. WEBB)  Were they ever submitted to the

13   FDA?

14        A.   No, sir.  It wasn't required.

15        Q.   Did you ever -- do you know whether or not any

16   of the testing done by any of the doctors using Prolift

17   or Prolift+M was approved by Institutional Review

18   Boards?

19        A.   Yes, sir, I do.  In France, I believe that

20   some of those were approved.  And some of those that

21   were multicenter.  I'm not sure that every center in

22   every country required that, but, yes, I know for a fact

23   some of them were.

24        Q.   Do you know whether or not they were approved

25   by the regulatory bodies in the individual countries?

Bobby Lewis Shull, M.D.

```
1              MS. THOMPSON:  Object to form.
2         A.   No, sir, I don't know that.
3         Q.   (BY MR. WEBB)  The two randomized studies that
4    you -- or trials that you worked on, did you publish the
5    results of those trials?
6         A.   Yes, sir.
7         Q.   And were they submitted to a scientific
8    journal or a medical literature journal?
9         A.   Yes, sir.  They were presented in a scientific
10   meeting, and the authors were fellows of ours, and the
11   one on antibiotics was a multicenter one with a group
12   from the University of Missouri, as well as from us, and
13   the one on the local anesthetic was in our organization
14   only.
15        Q.   Was it a poster presentation?  Was it an
16   abstract?  Was it actually an article submitted to
17   peer-reviewed literature and published?
18        A.   I know for a fact one of them was an oral
19   presentation.  The one that had the primary author from
20   the University of Missouri, I don't know if that was
21   oral, but it's been published.  And the one that
22   Dr. Jessica Bracken did, who works in our organization,
23   presented it, and to the best of my knowledge it's
24   published, but I can confirm that if you give me -- at
25   least -- it may not be in my CV, but she's the primary
```

Bobby Lewis Shull, M.D.

1   author for it.

2       Q.   You have some criticism in Opinion No. 13 that

3   Ethicon did not exercise due diligence in the design and

4   development of Prolift and Prolift+M devices.

5              Have you ever designed or developed any

6   medical device yourself?

7       A.   Excuse me.  No, sir.

8       Q.   Did you ask for and receive all the Ethicon

9   documents that referred to the design and development of

10  the Prolift and Prolift+M devices?

11      A.   I didn't ask for them.  I doubt seriously I

12  received all of them.

13      Q.   In the half banker box of documents that we

14  have that are sitting here on the table that you were

15  provided by plaintiffs' counsel, did you see any

16  documents in there related to the design and development

17  of the Prolift and Prolift+M devices?

18              MS. THOMPSON:  Object to form.

19      A.   No, sir.

20      Q.   (BY MR. WEBB)  What's the basis, then, of your

21  opinion that Ethicon did not exercise due diligence in

22  the design and development of the Prolift and Prolift+M

23  devices?

24      A.   The clinical outcomes.  The patients --

25  patients have been harmed.

Bobby Lewis Shull, M.D.

1      Q.   You understand that the FDA has required as

2    its standard that a medical device must be safe and

3    efficient -- it needs to be effective -- safe and

4    effectively for its intended use.  Do you understand

5    that?

6               MS. THOMPSON:  Object to form.

7      A.   I know that -- excuse me.  I know there are

8    different levels of clearance for approval for products,

9    and some require a lesser amount of documentation than

10   others.

11              And initially, the 510(k) for these

12   products required a lower level of substantiating

13   information than is currently being requested by the

14   FDA.

15     Q.   (BY MR. WEBB)  In order for a medical device

16   to remain on the market, it must be safe and effective

17   for its intended use.  Correct?

18              MS. THOMPSON:  Object to form.

19     A.   I don't know the answer to that.

20     Q.   (BY MR. WEBB)  Would you agree that if the FDA

21   feels that a medical device is neither safe nor

22   effective -- not safe or not effective, that it should

23   be removed from the market?

24              MS. THOMPSON:  Object to form.

25     A.   I would presume that would be the case.

Bobby Lewis Shull, M.D.

1      Q.   (BY MR. WEBB)  Do you know if the FDA has ever

2   requested that Prolift or Prolift+M be removed from the

3   market because they were not safe or effective for their

4   intended use?

5             MS. THOMPSON:  Object to form.

6      A.   What I know is that the FDA hasn't removed --

7   not only their products, the other products -- but the

8   products -- most of the products are no longer sold.

9   And the companies have made that decision themselves.

10  So the FDA wasn't obliged to make that decision.

11     Q.   (BY MR. WEBB)  Well, the question I asked you:

12  Has the FDA ever said that the Prolift or Prolift+M

13  products are neither safe or effective and must be

14  removed from the market?

15            MS. THOMPSON:  Object to form.

16     A.   What the FDA has said is that the companies

17  will continue to make the products.  There's a different

18  level of documentation that has to be submitted,

19  including further trials of safety and efficacy, and for

20  some product for some companies, they're attempting to

21  do that.

22            For other products, including these

23  products, that hasn't been done, and the products aren't

24  available.  But the FDA didn't take them off the market.

25  The company chose to quit selling them.

Bobby Lewis Shull, M.D.

1      Q.   (BY MR. WEBB)  You say that the -- Ethicon did

2  not heed the warnings from the hernia and gynecologic

3  literature regarding the use of polypropylene mesh.

4  What are you talking about there?

5      A.   Well, in hernia repair, which is what my

6  report is generally about, there have been warnings

7  about using a synthetic product in an infected wound,

8  for example.  So let's use the case of abdominal or

9  inguinal hernia repair, general surgical principles,

10  which we referred to earlier, would say that you

11  wouldn't put a synthetic product in an infected wound.

12            The vagina -- the vaginal canal is never

13  sterile.  It's what's referred to in medical terms as a

14  clean contaminated field.  So a hernia surgery isn't in

15  a sterile field.  A vaginal surgery is in a clean

16  contaminated field.

17            There was evidence in other literature

18  that -- in the general surgery literature and the

19  pathologic literature that mesh, in fact, does contract

20  in animal models as well as in humans when used for

21  hernia surgery, and there are people who had pain

22  complaints.

23            So when -- this specific reference that

24  you gave that I have in my general report is, in my

25  opinion, those issues weren't adequately addressed

Bobby Lewis Shull, M.D.

1    before the company marketed a product -- synthetic

2    polypropylene mesh to put in a clean contaminated field,

3    which is what the vaginal canal is.

4              In some of the articles in the folder

5    which I have given you -- and I'd have to look them

6    up -- that issue is actually highlighted, the vaginal

7    canal is not the abdominal cavity or abdominal wall,

8    either one.

9       Q.   Ethicon inappropriately marketed the Prolift

10   and Prolift+M products to all physicians and did not

11   properly train these physicians in the unique aspects of

12   patient selection and patient counseling of long-term

13   sequelae of trocar-based mesh kits.

14             Does a company like Ethicon have the

15   right to tell a physician they cannot use a medical

16   device that's been approved by the FDA?

17             MS. THOMPSON:  Object to form.

18      A.   My -- my reasoning for that comment is in the

19   Ethicon study group, the transvaginal mesh group, highly

20   educated, highly skilled, highly experienced with a

21   level of complications I've already referred to,

22   20 percent failure rate at three years, one out of seven

23   with mesh exposure, and these were people who had

24   extensive experience in monitoring.

25             When the product was available for sale,

Bobby Lewis Shull, M.D.

```
 1   physicians could request training if they wanted it, and

 2   Ethicon may provide it.

 3                 Is it reasonable based on the knowledge

 4   that was obtained from the early studies to say that

 5   someone should have training before a product is used?

 6   In my opinion, that's a reasonable thing to do, because

 7   the truth is not everyone is equally capable of doing

 8   these procedures, and, in general, when people who are

 9   advocates of using this particular mesh product comment

10   on complications, one of the variables that's pointed

11   out is the surgeon's technical skills are involved in

12   the complication.

13                 MR. WEBB:  Objection, nonresponsive.

14        Q.   (BY MR. WEBB)  The question I asked you:  Does

15   Ethicon have the right or ability to tell a physician

16   they cannot use a product that's been approved by the

17   FDA?

18                 MS. THOMPSON:  Object to form.

19        A.   I don't know that they would.  I'm sure they

20   could.

21        Q.   (BY MR. WEBB)  So your testimony is that a

22   company could tell a physician that they cannot use an

23   approved medical device, even if they refuse training,

24   that they're using it inappropriately, but a company

25   like Ethicon could refuse to sell to that physician?
```

Bobby Lewis Shull, M.D.

1              MS. THOMPSON:  Asked and answered.

2      A.   Well, you're asking, I think, a hypothetical

3  situation, that could the company do it or is it legal.

4  I mean, I think those are two separate issues.  Could

5  the company do it, and then when the physician or

6  physicians say, then, "You're restraining my practice of

7  medicine," and then it becomes a legal issue about

8  that -- I suspect that's probably what would happen.

9              I don't -- when you ask me can Ethicon do

10  that, I don't know the legal requirements for that.

11      Q.   (BY MR. WEBB)  You expressed an opinion that

12  said that Ethicon inappropriately marketed the Prolift

13  and Prolift+M products to all physicians.

14              Does Ethicon have the right to deny the

15  use of their products by a properly licensed physician?

16              MS. THOMPSON:  Object to form, asked and

17  answered.

18      A.   I think there's -- that's not a binary

19  question.  There is nothing that I know of that says

20  there's a minimum skill set required to use this

21  product.  That would be a reasonable thing to have done,

22  to say, "In order to use this properly, you should have

23  this amount of knowledge to use the product I am making

24  and use it successfully."

25              That's an opinion.  So you asked my

Bobby Lewis Shull, M.D.

1    opinion, and that's mine.

2         Q.   (BY MR. WEBB)  Okay.  And so what's the basis

3    of that opinion?

4         A.   Patient safety.

5         Q.   If a physician refuses to be trained in the

6    unique aspects of patient selection, patient counseling,

7    is there anything that Ethicon can do if they refuse to

8    be trained in the use of the products?

9              MS. THOMPSON:  Object to form.

10        A.   I don't know the -- excuse me.  I don't know

11   legally if Ethicon could do anything about that or not.

12   Ethicon, by the way, doesn't sell to individuals, I

13   don't believe.  I think they sell to hospitals, but I

14   may be wrong about that.

15             In our case, the hospital buys the

16   product, because it's a hospital-based procedure.  In

17   other areas, it's possible that individual physicians

18   can purchase it, but I don't know that.

19        Q.   (BY MR. WEBB)  Well, how in the world is

20   Ethicon even supposed to know the level of expertise or

21   competence of physicians if they're selling it to the

22   hospital, whether or not those hospitals are allowing

23   physicians who are not competent to use the product?

24             MS. THOMPSON:  Object to form.

25        A.   I don't know the answer to that.

Bobby Lewis Shull, M.D.

1      Q.   (BY MR. WEBB)  Is it your opinion that Ethicon

2   did not have a system in place to monitor their product

3   or evaluate physician feedback on the products?

4      A.   If they had one, it wasn't obvious to the

5   physicians who were using the products.

6      Q.   Do you know whether or not the FDA requires

7   that there be adverse event monitoring on all approved

8   medical devices?

9               MS. THOMPSON:  Object to form.

10     A.   There is the MAUDE database which people can

11  use.  I don't know that the FDA can require a physician

12  to report adverse effects.

13              MR. WEBB:  Nonresponsive.  Objection;

14  nonresponsive.

15              THE WITNESS:  I'm sorry.  I didn't

16  understand your question.

17     Q.   (BY MR. WEBB)  Does the FDA require that there

18  be an adverse event database maintained for any approved

19  medical device?

20              MS. THOMPSON:  Object to form.

21     A.   I believe that depends on the level at which

22  the device -- in terms of the potential injury, you

23  know, Level 1, 2, or 3.

24              So the greater the potential for risk,

25  then there may be a requirement for that, but I don't

Bobby Lewis Shull, M.D.

1    know that for sure.

2        Q.   (BY MR. WEBB)  In any of the Ethicon devices

3    that you use in your practice, did you receive training

4    by any sales personnel?

5        A.   No, sir.  I saw the products demoed at

6    meetings, but there wasn't a non-physician

7    representative teaching me how to use the product, if

8    that's your question.

9        Q.   They were demonstrated at medical meetings by

10   other physicians who were using the product?

11               MS. THOMPSON:  Object to form.

12       A.   That's one way.  And then at the medical

13   meetings, at the scientific exhibits and the commercial

14   exhibits, various companies, regardless of what they're

15   selling, will have part of their sales force present to

16   inform people about what they're selling, and they may

17   or may not have a physician available to talk about the

18   physician aspects of it.

19               So early on in the introduction of the

20   retropubic slings, for example, it was common at

21   meetings to have a physician or more than one physician

22   present discussing the use of a product, and it would be

23   common to have a representative of the company there to

24   answer questions or to ask if you needed more

25   information, publications and whatnot.

Bobby Lewis Shull, M.D.

 1        Q.    (BY MR. WEBB)  There's also sales literature,

 2   and there's also, sometimes, videos or CDs?

 3        A.    Yes, sir, there frequently are.

 4        Q.    In your expert report, there's a section about

 5   examples of Ethicon documents supporting these opinions.

 6   Are all these Ethicon documents that you have placed in

 7   the report, are they documents that were provided to you

 8   by plaintiffs' counsel and came out of the banker box

 9   that we have here?

10        A.    Yes.  Excuse me.  Yes, sir.

11        Q.    Okay.  And as you read through those

12   documents, did you request other documents because you

13   saw something referenced and you wanted to see if there

14   was any follow-up?  For example, if there was an email

15   chain, did you ask what happened after this issue was

16   raised?

17        A.    To the best of my knowledge -- excuse me -- I

18   did not do that.

19        Q.    In one of the Ethicon documents they report

20   that Professor Jacquetin is the inventor of the pelvic

21   floor repair technique Gynecare will be marketing this

22   year.

23              Do you know whether Ethicon worked with

24   Dr. Jacquetin or whether it was something he came up

25   with on his own and then approached the company?

Bobby Lewis Shull, M.D.

1          MS. THOMPSON:  Object to form.

2      A.    I don't know that for a fact.  I know him, and

3  I was present when he did one of these mesh kit

4  procedures in Italy before the product was commercially

5  available because he and I were doing live surgery at a

6  surgical course outside of Milan, Italy.

7               And I know that he worked with his group

8  on the concept, but I don't -- to the best of my

9  knowledge, Ethicon or J&J did not approach him to

10  develop a concept, if that's the question.  I believe

11  the idea was his and his group.

12      Q.    (BY MR. WEBB)  Some of the documents you

13  reviewed are actually presentations that were made

14  either in-house or externally by Ethicon.  Is that

15  correct?

16      A.    Yes, sir.

17      Q.    And you've identified some of the problems

18  that they were discussing both internally and what they

19  were discussing in -- outside the company in some of

20  these documents that you've included in your report.

21  Correct?

22      A.    Yes.  Excuse me.  Yes, sir.

23      Q.    Will you agree with the concept that on any

24  medical device, the longer it's in use, the more we

25  understand both the risks and benefits of any medical

Bobby Lewis Shull, M.D.

```
 1    device?
 2                    MS. THOMPSON:  Object to form.
 3         A.   I would say generally that's true.
 4         Q.   (BY MR. WEBB)  Have you talked -- or read any
 5    depositions in which the documents that you have
 6    included, the Ethicon documents you included in your
 7    expert report are discussed or explained?
 8         A.   I don't believe I have.  Excuse me.  I don't
 9    think so.
10         Q.   On some of these documents, did you just take
11    portions of the document to include it in your expert
12    report?
13         A.   I'm sorry.  I don't -- can you give me an
14    example of that?
15         Q.   For example, if you go to Page 44 of your
16    report.
17         A.   I gave you my only copy of the report.  I'm
18    sorry.
19         Q.   Okay.  Did you take out paragraphs or excerpts
20    sometimes in order to make the point that you wanted to
21    make but didn't include the entire document?
22         A.   I'm sure that's possible that I did.
23         Q.   Were you aware that in some of your past
24    general reports, some of your opinions have been
25    excluded by the federal court for various reasons?
```

Bobby Lewis Shull, M.D.

```
 1      A.   I -- excuse me.  I haven't seen the detailed

 2  comments on that, but in general, yes, sir, I understand

 3  that's true.

 4      Q.   Would you agree with the statement that

 5  experience as a surgeon alone does not translate into

 6  experience with or knowledge of the appropriate testing

 7  a medical device manufacturer should undertake when

 8  preparing a device for the market?

 9      A.   Is that something I said in my report?

10      Q.   No.  I'm asking whether you agree with the

11  concept.

12      A.   I'm sorry.  Would you repeat that again?

13      Q.   Sure.  Experience as a surgeon alone does not

14  translate into experience with or knowledge about the

15  appropriate testing a medical device manufacturer should

16  undertake when preparing a device for the market?

17      A.   It may not encompass everything, but

18  experience of the surgeon would certainly incorporate

19  some of the things that would be appropriate to look

20  for.

21      Q.   Do you feel that you have additional

22  experience with product testing or clinical trials that

23  sets you aside from an average pelvic surgeon related to

24  the transvaginal mesh?

25      A.   I wouldn't normally say this about myself.  I
```

Bobby Lewis Shull, M.D.

1    know a lot about pelvic surgery because that's what I

2    do.

3              So I know a lot about it, and other

4    people recognize that because I see people and offer

5    them options for non-surgical, medical, or surgical

6    therapy, and I follow them up.  And I've seen people who

7    have been treated with various other surgical techniques

8    that I may not personally use, and not all of them are

9    patients who have a problem.

10             But the truth is I do see women who have

11   had problems, and I feel, as an experienced,

12   knowledgeable person, that I am more knowledgeable than

13   the average person doing pelvic surgery.  That's what

14   you asked me.  I think I am.

15        Q.   Do you consider yourself to be knowledgeable

16   and trained and have experience with the design of

17   clinical trials?

18        A.   Yes, sir, because I told you that we did

19   several.

20        Q.   Have you ever done one on a testing of a

21   medical device, not the -- the two that you talked to me

22   about were actually not testing a medical device but

23   testing the protocols about using a medical device in

24   certain circumstances?

25        A.   That's correct.

Bobby Lewis Shull, M.D.

```
 1              MS. THOMPSON:  Object to form.
 2      A.   You're accurate about that.  And then I
 3  referred to one other, which doesn't have any name on
 4  it, which was the animal model looking at Pelvicol.  But
 5  have I done a study looking at a specific pelvic -- or a
 6  specific device in surgery from a clinical standpoint in
 7  humans, and the answer is no.
 8      Q.   (BY MR. WEBB)  Do you consider yourself an
 9  expert in the regulations or standards that govern IFUs?
10      A.   I'm not in a position to be involved in the
11  regulations.  I'm in a position as a user to know what
12  would be reasonable for me to know about.  So in that
13  sense, I do feel I'm an expert on the receiver end.  I'm
14  not an expert on the development end.
15      Q.   Have you ever advised a company on how to
16  design or word an IFU?
17      A.   No.
18      Q.   Are you familiar with the industry process
19  governing IFUs?
20      A.   I do not know the process.
21      Q.   Have you ever performed a literature search
22  relating to IFUs?
23      A.   You know, actually, I have read about IFUs.
24  That was several years ago, and I don't have it in my
25  report, but the truth is I have looked at that and
```

Bobby Lewis Shull, M.D.

1    looked at the fact that there are certain requirements,

2    but -- so I've read about it.  I don't -- I haven't

3    participated in developing an IFU.

4                  When I read the 510(k) application for

5    these products, part of the exchange with the agency and

6    the company was what to include in the IFU, and part of

7    the correspondence is -- which you have as documents

8    from Ethicon -- discussed whether or not the IFU ought

9    to be modified to include other information.

10                 MR. WEBB:  That's all I have.

11                 MS. THOMPSON:  I'll have a few questions,

12   but I'll just reserve them until the end of both

13   depositions, if we can agree that they apply to both.

14                 MR. WEBB:  That's fine with me.

15                 MS. THOMPSON:  All righty.

16                 THE VIDEOGRAPHER:  This concludes the

17   deposition of Dr. Shull.  Going off the record, the time

18   is 12:00.

19                 (Recess from 12:00 p.m. to 1:01 p.m.)

20                 THE VIDEOGRAPHER:  Back on the record.

21   This marks the beginning of Disc No. 3.  The time is

22   1:01.

23      Q.   (BY MR. WEBB)  Dr. Shull, we took a break, and

24   this morning we were talking about Prolift and

25   Prolift+M, and you -- we went through your expert

Bobby Lewis Shull, M.D.

1    report, your general report about those products.  Is

2    that correct?

3         A.   Yes.  Yes, sir.

4         Q.   Okay.  And you have a separate expert report

5    that you have prepared for the Prosima product.  Is that

6    correct?

7         A.   Yes.

8         Q.   And as we walk through, it appears, when I

9    compare your expert report for the Prolift and Prolift+M

10   to the Prosima expert report, there's a lot of it that's

11   very similar in some general details.  Would that be a

12   fair statement?

13        A.   Yes, sir.

14        Q.   All right.  And what I will do is I may just

15   ask you questions and say, "Would your answers be the

16   same about Prosima on these areas that are identical to

17   the Prolift and Prolift+M," and then you can either

18   agree with me or tell me how they differ.  Is that a

19   fair way to approach it?

20        A.   That's fine.

21        Q.   All right.  You have prepared -- and by the

22   way, is there any substantial difference in your mind

23   between the Prolift and the Prolift+M?

24             MS. THOMPSON:  Object to form.

25        A.   The Prolift -- the original product was

Bobby Lewis Shull, M.D.

1    entirely non-absorbable.  The Prolift+M was different in

2    that a portion of the graft material is absorbable.

3    That's the primary difference.

4                   To the best of my knowledge, the delivery

5    system itself was basically the same.

6        Q.   (BY MR. WEBB)  And we had some discussion this

7    morning when you were talking about absorbable material

8    when we were walking through the Prolift and Prolift+M.

9    Is that correct?

10       A.   Yes.

11                  (Exhibit No. 5 marked)

12       Q.   (BY MR. WEBB)  In your mind, is there any

13   substantial advantages or disadvantages to either a

14   Prolift or the Prolift+M?

15       A.   I don't know that any advantages were

16   documented.  The presumption was that by making a

17   portion of the Prolift absorbable by replacing the

18   nonabsorbable portion with Monocryl, that there would be

19   less mesh product left in the patient, and a variety of

20   problems could be minimized.

21                  As I understand it, that was the

22   rationale for developing the Prolift+M.  I don't know

23   that that's ever been proven to be the case.

24       Q.   Have you seen any literature that would prove

25   it one way or the other?

Bobby Lewis Shull, M.D.

```
1         A.    No, sir.

2         Q.    I'm going to show you what we've marked as

3    Exhibit No. 5, which is basically your expert report on

4    Prosima.  Do you have -- that's actually -- just giving

5    you back your Prolift one there.

6         A.    I beg your pardon?

7         Q.    And you have with you a copy of -- and what

8    I've done is just marked a copy I have of your expert

9    report.

10        A.    This is the Prosima -- you have my updated

11   curriculum vitae, and here is the time sheet for working

12   on the Prosima report.

13        Q.    Okay.  The -- so Exhibit No. 5 is the Rule 26

14   expert report of Bob Shull regarding Prosima.  Is that

15   correct, sir?

16        A.    Yes, sir.

17        Q.    Okay.  And what you've given me is a time

18   sheet related to the time spent in reviewing documents,

19   researching, and preparing your report on Prosima.

20   Would that be a fair statement?

21        A.    Yes.  Yes, sir.

22             (Exhibit No. 6 marked)

23        Q.    (BY MR. WEBB)  The top page of Exhibit No. 6

24   looks like to be a check stub that was sent to you for

25   $7,637.50, which matches an invoice dated February 7th,
```

Bobby Lewis Shull, M.D.

1    2016 that was sent to -- once again, you just have it

2    listed as Margaret on the invoice?

3        A.   Yes.  I sent it to her to distribute to the

4    appropriate individuals because she had the contact

5    addresses and whatnot.

6        Q.   And that's Margaret Thompson.  Right?

7        A.   Yes, sir.

8        Q.   Okay.  You list review documents and

9    literature for 180 minutes.  Finish review -- discussed

10   with Margaret and Breanne draft report, 365 minutes.

11   Revise and -- review and revise draft, 100.  And final

12   report -- or phone call with Breanne and final report,

13   60, for a total of 705 minutes, or 11 hours and

14   45 minutes at $650 an hour, which was $7,637.50.

15             Is that correct, sir?

16       A.   Yes, sir.

17       Q.   Okay.  Let me ask you generally:  Were you

18   provided separate documents for the Prosima -- separate

19   Ethicon documents for the Prosima product?

20       A.   Yes, sir.  They're in this binder that I have.

21   These -- frankly, I can't remember why I have them out

22   separately, but I do.  They relate to the Prosima, and I

23   don't believe I took them out of here -- and they may be

24   duplicated in here, but I have everything that I used in

25   this binder and in the -- or in the back of the front

Bobby Lewis Shull, M.D.

```
 1   page.

 2              MR. WEBB:  Margaret, does the thumb drive

 3   that you gave me earlier, does it cover this also?

 4              MS. THOMPSON:  It has both Prolift and

 5   Prosima documents, yeah.

 6              MR. WEBB:  All right.

 7       Q.   (BY MR. WEBB)  In the Prosima binder that you

 8   gave me, there is a series of articles at the front, and

 9   I'll just read them into the record.  There's only five,

10   I think.

11              The first one is "Vaginal surgery for

12   pelvic organ prolapse using mesh and a vaginal support

13   device," published in the "BJOG:  An Interventional

14   Journal of Obstetrics & Gynecology," and it's dated

15   2008 -- accepted October 23rd, 2007.

16              Then there's the -- an article,

17   urogynecology, "One year clinical outcomes after

18   prolapse surgery with nonanchored mesh and vaginal

19   support device," the "American Journal of Obstetrics and

20   Gynecology," December 2010.

21              "Medium-term clinical outcomes following

22   surgical repair for vaginal prolapse with tension-free

23   mesh and vaginal support device."  It looks to be the

24   "International Urogynecological Journal," published

25   online December 6th, 2011.
```

Bobby Lewis Shull, M.D.

```
1                "Anatomical study of prolapse surgery

2    with nonanchored mesh and a vaginal support device," the

3    "American Journal of Obstetrics and Gynecology," 2010.

4                "Case report:  Internal pudendal artery

5    injury during prolapse surgery using nonanchored mesh,"

6    the "Journal of Minimally Invasive Gynecology," and

7    accepted for publication June 23rd, 2011.

8                Are these the articles that specifically

9    relate to Prosima that you -- Prosima that you relied

10   upon in preparing your report, Dr. Shull?

11        A.    Yes, sir.

12        Q.    Why did you understand that it was potentially

13   desirable to have a vaginal support device when you're

14   doing a surgical procedure for pelvic organ prolapse?

15        A.    The way I understand the evolution of this

16   type of surgical procedure is that the authors hoped to

17   avoid the use of trocar placement for the arms or the

18   straps of the Gynemesh.

19                They understood that if the arms weren't

20   fixed either by trocars penetrating tissue spaces or by

21   stitching them in place, that there would need to be an

22   alternate way to keep the mesh approximated to the

23   anatomic spots where they were placed at the time of the

24   surgery.

25                I don't recall if the authors had tried
```

Bobby Lewis Shull, M.D.

1    using glue of some sort to hold the straps in place.

2    It's possible they did, but I don't remember that.

3              The mechanism they chose to use was to

4    place the mesh straps into defined spaces, and then for

5    a time period in the recovery, use an object -- excuse

6    me -- which could fill the vaginal canal and minimize

7    the likelihood that the mesh arms or the mesh central

8    portion would either move or be displaced, and that

9    while the vaginal support device was in place, wound

10   healing would begin and perhaps keep the tissue in its

11   desired location.

12        Q.   When was this product placed on the market?

13        A.   I believe the product was actually sold

14   beginning in 2009.

15        Q.   And when was it withdrawn from the market?

16        A.   I believe that it was no longer available for

17   sale sometime in 2012.

18        Q.   What is your understanding about the success

19   rate of this product?

20              MS. THOMPSON:  Object to form.

21        A.   In my review of the literature, the primary

22   physicians who developed the concept of vaginal support

23   device and the nonanchored mesh were Dr. Marcus Carey

24   and Dr. Mark Slack.

25              And Dr. Carey published an article -- or

Bobby Lewis Shull, M.D.

```
1    he began to recruit patients into a study that compared

2    patients who had the nonanchored mesh to patients who

3    had traditional surgery so he could have a baseline to

4    determine what kind of success is obtained with standard

5    surgery.  Then he hoped to be able to improve on the

6    anatomical outcomes using the vaginal support device.

7              And as he developed this product, he did

8    a study, in fact -- and that's involved in the articles

9    I have -- as the first step toward justification for

10   advancing on to a study using the device which

11   ultimately became Prosima.

12        Q.   (BY MR. WEBB)  And is the study you're talking

13   about the one that's entitled "Vaginal surgery for

14   pelvic organ prolapse using mesh and a vaginal support

15   device"?

16        A.   This is not the first study.  Actually, the

17   first group of patients recruited -- I believe that

18   article was reported in 2009, actually.  It may be the

19   first one in the binder which I gave you there.

20             This is a subsequent group of patients

21   that -- for whom Dr. Carey, who is from the United

22   Kingdom, was the primary author.  Dr. Slack was the

23   primary author on the patients who were recruited

24   initially for the comparison of --

25        Q.   Does that look like it's the same article to
```

Bobby Lewis Shull, M.D.

1    you?

2         A.    Let me just look at the next one.

3                   Yes, sir, it is the same one.  I'm sorry.

4    I'm sorry.  It is the same one.  But there's another one

5    which was published a little later.  I just have to find

6    it.  Maybe I have it in here.

7                   Well, actually, there's another one I

8    recall, which I referenced in my report, but I can't

9    find it right here, as a matter of fact.  May I see my

10   general report just a moment?

11                  Okay.  I do have the other article.  It's

12   the one-year clinical outcomes.  I beg your pardon.  I

13   have that.

14                  Ask me the question again, would you,

15   please?  I started looking, and I forgot exactly what

16   you asked me.

17        Q.    I think the question was whether or not the

18   article that I handed you was the same as --

19        A.    Yes, sir.

20        Q.    -- the article that's the first article in

21   your binder?

22        A.    Yes, sir, it is.  And I think what I must have

23   done, I must have copied these articles and just taken

24   them out separately, because this binder has other

25   information, and I wanted to be able to just work with

Bobby Lewis Shull, M.D.

```
1   these.  I thought that they may be different, but

2   they're not.

3        Q.   And were these articles in the information in

4   the binder that was provided to you by plaintiffs'

5   counsel?

6        A.   Yes, they were.

7        Q.   The five articles that I read the names into

8   the record, were those provided by plaintiffs' counsel,

9   or was that something you found in your own independent

10  research?

11       A.   They were provided by counsel.

12       Q.   Okay.  It appears there's also some internal

13  Ethicon documents?

14       A.   Yes, sir, there are.

15       Q.   And some product literature related to

16  Prosima?

17       A.   Yes, that's correct.

18       Q.   Does it appear that Dr. Carey's research was

19  an attempt to address some of the issues that you had

20  reported or that you had opined about this morning

21  regarding the use of trocars when using the Prolift and

22  the Prolift+M products?

23       A.   Yes, sir.  Excuse me.  And the other thing he

24  did is before doing that, he reported -- and that's the

25  article that is actually in the British Journal of
```

Bobby Lewis Shull, M.D.

1    Obstetrics & Gynecology in 2009.  Dr. Carey took a group

2    of patients that he himself recruited and operated on

3    doing mesh with standard surgery so he would have a

4    baseline to know in his own experience what the

5    anatomical outcomes were using mesh alone or using no

6    mesh.

7                He did that first, and then he worked on

8    the vaginal support device in an effort, as you pointed

9    out, to see if not using trocars would minimize or

10   eliminate some of the initial complications with using a

11   mesh product.

12       Q.   Do you have a complaint -- looking through

13   your report, it's not clear to me.  Do you have a

14   complaint about the vaginal support device itself, or

15   are your complaints related to the use of mesh in the

16   type of surgery that the Prosima is used in separate and

17   apart from the vaginal support device?

18       A.   Well, the vaginal support device had as its

19   predicate a device called Silimed, which was cleared to

20   use in women having radiation therapy on the pelvis or

21   having pelvic -- creation of a new vagina.  The Silimed

22   was used to try to maintain the caliber of the vaginal

23   canal.

24                In this particular use of it, there's a

25   different indication for the use because these women

Bobby Lewis Shull, M.D.

1    were having reconstructive surgery using a synthetic

2    product.  The Silimed hadn't been used for that

3    previously.  The thing that it did do, it avoided the

4    passage of trocars.

5              So does the Silimed in and of itself have

6    any potential adverse effect?  We don't know that

7    because, to the best of my knowledge, there was not a

8    group of women who had surgery without a product who had

9    the support device only.  So we don't have any

10   information to say the vaginal support device is likely

11   to be associated with any specific problems.  It's just

12   the predicate was used for a different reason.

13       Q.   Well, and, in fact, one of the documents you

14   were provided was the FDA Department of Health and Human

15   Services approval letter dated August 5th of 1998 in

16   which Silimed, LLC was approved under 510(k) as a

17   Class II device, and it was determined it was

18   substantially equivalent to the devices marketed in

19   interstate commerce prior to May 28, 1976, the enactment

20   date of the medical device amendments, and, therefore,

21   it was subject to the general controls provision of the

22   food -- federal food, drug, and cosmetic act.

23              So there were requirements for annual

24   registration, listing of devices, good manufacturing

25   practice, labeling, and prohibitions against misbranding

Bobby Lewis Shull, M.D.

1   and adulteration.

2            So do you have any complaints as we --

3   I'm trying to parse this to see what we have to discuss.

4   Do you have any complaints about the Prosima or

5   Prosima -- the vaginal support device portion of the

6   Prosima device?

7            MS. THOMPSON:  Object to form.

8       A.   I have -- excuse me.  I have no knowledge that

9   the device in and of itself created a problem, because

10  we don't have any information that the device was used

11  without mesh.  So I'm not -- I don't believe I'm opining

12  about the support device as a standalone issue.  It's

13  simply used in association with a mesh product.

14      Q.   (BY MR. WEBB)  Did you see any reports of any

15  adverse events or adverse reactions when it's used in

16  conjunction with the mesh but that could be attributed

17  directly to only the vaginal support device?

18      A.   No, sir.

19      Q.   I'm going to try to compare the opinions you

20  have Prosima against the opinions you expressed in

21  regard to Prolift and Prolift+M.

22            Your No. 1 opinion, "At the time of this

23  introduction, there was insufficient scientific evidence

24  supporting the implantation of the Prosima devices for

25  pelvic organ prolapse."

Bobby Lewis Shull, M.D.

1            That is the exact same wording except you

2    have replaced Prolift and Prolift+M devices with the

3    Prosima devices.  Is that correct?

4        A.   Yes, sir.

5        Q.   And would your -- are we talking about

6    separate timeframes here for when the Prolift and the

7    Prolift+M devices came on the market compared to the

8    Prosima?

9        A.   They're -- excuse me.  They're different

10   timeframes.  Excuse me.  Gynemesh received 510(k)

11   clearance before either of these, and then in the

12   timeline, the next product that was developed was the

13   Prolift without the M.  It was Prolift.

14            So Prolift was developed, and then

15   subsequent to that, the Prolift+M was a modification,

16   and subject to that modification was the Prosima.  And

17   they were all separated by at least a year or more in

18   between.  So the Prosima was the last in that sequence

19   of events.

20       Q.   All right.  Did the Prolift, the Prolift+M,

21   and the Prosima all use the same Gynemesh?

22       A.   They did -- with the exception of the

23   Prolift+M, had a portion of the mesh that was

24   absorbable.  And the shorter name for the absorbable

25   part is Monocryl, M-O-N-O-C-R-Y-L.  There's a chemical

Bobby Lewis Shull, M.D.

```
 1   name, which is longer.

 2              But the Prolift+M had the Monocryl, and

 3   that dissolved after a period of several months, and you

 4   were left with a smaller amount of the Gynemesh

 5   permanently implanted in someone.

 6      Q.   Did you see any -- let's compare the three.

 7   The complaints you had about the Prolift, did the

 8   Prolift+M relieve any of those complaints?

 9      A.   We don't have any information to indicate that

10   that's true because the thing that's considerably

11   different about the Prolift and Prolift+M is that

12   they're both trocar based, and the product -- the arms

13   that go with the Prolift and Prolift+M are still

14   anchored in muscle.

15              The main difference with the Prosima is

16   instead of arms, they have what are referred to as

17   straps, and the straps are actually put into place, but

18   the device that puts them in place does not penetrate

19   the same muscle group in the pelvis.  So it's a

20   non-trocar based system using the same mesh.  It just is

21   placed in a different way, and it just doesn't end up

22   with the mesh arms -- excuse me -- going through muscle

23   spaces.

24      Q.   Did you actually -- have you seen any

25   comparison in the reported complications between the
```

Bobby Lewis Shull, M.D.

1    Prolift, the Prolift+M, and the Prosima?  I mean, is

2    there any difference in the complication rates?  Are

3    there different complications associated with the

4    products?

5         A.   I think the general categories are similar.

6    The idea behind the use of the Prosima is to eliminate

7    the trocar use, and let's presume that part of the

8    pelvic pain complaints are related to the mesh arms on

9    the Prolift and Prolift+M going through a series of

10   tissues, including muscle, and being left there and

11   being exposed to vessels and nerves.  And if that

12   product then changes configuration, it may cause pain

13   where the muscle has been penetrated, and it becomes

14   very difficult to remove.

15             So as I understand it, the concept was to

16   eliminate that portion of the procedure and simply lay

17   the product against a structure in the pelvis and not

18   penetrate a structure, because the Prolift and Prolift+M

19   actually penetrated muscles and nerves in the pelvis.

20             And theoretically, there should not be

21   the same type of complaints in terms of the mesh arms,

22   but it doesn't eliminate or perhaps even reduce a

23   likelihood of mesh exposure or mesh being approximated

24   to structures and getting smaller and then pulling on

25   structures that are innervated and resulting in pain or

Bobby Lewis Shull, M.D.

1    in distortion of the vaginal canal.  So those things

2    still could happen.

3         Q.    Did you do a comparison of the reported

4    complication rates for each of these products compared

5    to the others?

6         A.    Not side by side.

7         Q.    Off the top of your head, is there one that

8    has less complications than the other, or do they all

9    kind of fall into the same category as far as --

10        A.    They are generally -- they're generally the

11   same in the sense that both of -- both the Prosima and

12   the Prolift and Prolift+M are both associated with mesh

13   exposures.  Both are associated with the surface area,

14   the mesh, becoming smaller and causing contraction or

15   scarification and banding, which can be associated with

16   pain and alteration of the vaginal canal size.  So those

17   things are similar.

18        Q.    Would you agree with the statement that any

19   foreign body that's introduced in the body is going to

20   cause some reaction, whether it's inflammation or

21   scarring or collagen deposition or contracture?

22              MS. THOMPSON:  Object to form.

23        A.    By and large, all foreign bodies are going to

24   create some type of response.

25              Under ideal circumstances, we could use a

Bobby Lewis Shull, M.D.

1    product for a variety of things in the body -- it could

2    be the eye, it could be the heart, it could be the

3    pelvis -- that is totally inert and doesn't stimulate

4    any excess reaction in terms of inflammation or scarring

5    or anything else.  That would be the ideal impact that

6    almost never happens anywhere.

7        Q.   (BY MR. WEBB)  Well, in fact, it does not

8    happen.  There is no material that's completely inert.

9    Correct?

10            MS. THOMPSON:  Object to form.

11       A.   Once it's implanted in the body, you would

12   think it -- stainless steel, for example, you would

13   think would be inert, but the truth is there still is a

14   response because surgery, in and of itself, requires

15   incisions and repair, and when the incisions heal,

16   there's a cascade of events that occur, including, at

17   least temporarily, inflammation.

18       Q.   (BY MR. WEBB)  Your second opinion about the

19   Prosima device is the exact same opinion that you had

20   about Prolift and Prolift+M, that they do not represent

21   a significant departure -- they do represent a

22   significant departure from traditional surgical

23   procedures performed by -- for pelvic organ prolapse,

24   and that they offer no advantage over a traditional

25   repair.  Would you agree with that?

Bobby Lewis Shull, M.D.

```
1        A.   Yes, sir.

2        Q.   And we already talked about the -- what you

3   consider traditional surgical procedures, and those

4   would have been procedures that had been performed prior

5   to 2000?

6        A.   By and large, that would be correct.  Some in

7   2000 -- or beg your pardon, 1996.  Dr. Julian had

8   reported on his use with Marlex, which is a synthetic

9   wrap.  So because his report was in 1996, obviously he

10  began recruiting patients earlier than that, but he

11  first reported it in 1996, but that was the exception.

12  Not very many people were doing that.

13       Q.   Do you consider that to be traditional

14  surgical procedure or --

15       A.   Without the use of mesh products, yes, sir.

16       Q.   Was that product -- or is that product still

17  on the market today?

18            MS. THOMPSON:  Object to form.

19       A.   Well, the Marlex, which Dr. Julian used, may

20  be on the market.  I actually don't know that.  I don't

21  believe that anyone uses it in any gynecological

22  surgery, but could it be used for something else?  It's

23  possible.  I wouldn't know that.

24       Q.   (BY MR. WEBB)  That was the sheep material.

25  Correct?
```

Bobby Lewis Shull, M.D.

1      A.   Marlex is another synthetic sling.  So it's

2 not a biomaterial.  There are biomaterials -- when I

3 talked about Pelvicol earlier, Pelvicol is a

4 biomaterial, and that morphed into several different

5 things by a different company, but those came from

6 animals.  They're basically what's called a xenograft.

7 Marlex was one of the early synthetic fibers that was

8 made, and I don't know that anybody uses that in

9 medicine anymore.

10      Q.   No. 3, "The vagina is a different environment

11 from the abdominal wall.  Maintenance of vaginal

12 compliance and distensibility is essential for bowel,

13 bladder, and sexual function."

14           That's the same opinion that you

15 expressed relating to the Prolift and Prolift+M.

16 Correct?

17      A.   Yes, sir, and that's because, again, the

18 vaginal canal cannot be sterilized.  That's one of the

19 key differences.  Plus, there were other qualities about

20 the vaginal tissue that were important.

21      Q.   And you discussed those earlier today, didn't

22 you?

23      A.   Yes, sir.  Flexibility, distensibility, and

24 sensitivity, and -- all those things.  Excuse me.

25      Q.   No. 4, "Insertion of the device containing

Bobby Lewis Shull, M.D.

1    polypropylene mesh straps presents specific risk and is

2    inconsistent with sound pelvic reconstructive surgical

3    procedures."

4              That's different than the opinion that

5    you had related to Prolift and Prolift+M.

6              "Insertion of a mesh device containing

7    arms involving the blind passage of trocars presents

8    specific risks and is inconsistent."

9              So Prolift and Prolift+M, you had the

10   insertion of a medical device with -- by using trocars.

11   You don't use trocars with the Prosima.  Right?

12       A.   Yes, sir, that's correct.

13       Q.   And tell me what specific risks are associated

14   with using a polypropylene mesh with straps rather than

15   the ones with arms and the trocars.

16       A.   I think there are several possibilities.

17   Excuse me.  One is in the dissection, getting into the

18   proper space in the pelvis to place the straps, and that

19   requires a sophisticated level of knowledge of anatomy

20   and dissection.  So getting to the desirable spaces to

21   place the graft is one thing.

22              The second thing is once these spaces are

23   dissected and the material is placed into the spaces and

24   wound healing begins, access to those spaces is not as

25   easy as it was the first time, and we know, as we

Bobby Lewis Shull, M.D.

1    discussed earlier, foreign bodies invoke an inflammatory

2    response.  So even though there isn't a trocar, the

3    local inflammatory response still occurs, and in these

4    spaces which are developed, there still are vessels and

5    nerves, and it's entirely possible that the mesh straps

6    could form scar -- scar tissue in these pockets.

7                    And if the mesh then shrinks, the mesh is

8    going to pull on this area that's innervated,

9    vascularized, whatnot.  It may be a little different

10   than going all the way through the muscle, but it

11   doesn't avoid that all together.

12       Q.   Have you, in your clinical practice, ever seen

13   a patient that had Prosima?

14       A.   Yes, sir.  I've done an explant surgery, and

15   when I gave you my earlier times that I acted either as

16   a treating physician or an expert or a general report,

17   the patient in whom the -- I was asked to be deposed as

18   a treating physician of someone who had been treated

19   with Prosima.

20       Q.   That was Rabiola?

21       A.   Yes, sir.

22       Q.   Okay.  And is that the one time that you've

23   seen a patient with Prosima?

24       A.   Well --

25                    MS. THOMPSON:  Object to form.

Bobby Lewis Shull, M.D.

1        A.   I know that for certain.  There could be

2   others.

3                  What happens from a practical standpoint

4   is we don't always have the opportunity to note, and the

5   patients may or may not recall exactly what was done,

6   and they may remember that something sounds like it

7   began with a certain letter.

8                  So let's say Prosima and Prolift start

9   with the same letter, or something that sounds like it,

10  Apogee or -- so patients get confused about that, and we

11  actually don't know exactly what happened.

12                 And you would say, "Well, couldn't you

13  ask them about did they have puncture sites externally,"

14  which would help you decide that.  And I do ask them

15  that.  And there are people who don't remember if they

16  had a puncture site somewhere or not.  They just don't

17  remember that.

18                 So I didn't have the operative note on a

19  lot of these people.  I know I had the one patient,

20  Mrs. Rabiola, and I may have had others.  It's just I

21  can't tell you for sure how many.

22       Q.   (BY MR. WEBB)  And refresh my memory if I

23  already asked you this, but did you -- you've identified

24  at least some patients who had Prolift.  Do you know of

25  any that had Prolift+M?

Bobby Lewis Shull, M.D.

1     A.   No, sir, I don't know that.  That was a later

2  iteration of the product, and I would say without the

3  operative note, practically no patient would remember

4  that.  If they remember Prolift, that would be great --

5  or the name of anything else, as far as that goes, not

6  just Prolift.

7     Q.   Did you see any medical literature that talked

8  about the adverse events or the problems associated with

9  the Prosima or Prosima product?

10     A.   Yes, sir, two things.  The one-year clinical

11  follow-up -- or outcomes after prolapse surgery, which

12  was published in 2010 in the American Journal of

13  Obstetrics and Gynecology, Dr. Halina Zyczynski.  So

14  they looked primarily at vaginal support, so that's one.

15  Their primary goal was not to look at other things, but,

16  in fact, they did record other things about pain with

17  balloon removal and pain after surgery.  So they did

18  look at other factors.

19          And in their discussion -- these are the

20  authors themselves discussing their own manuscript,

21  which most authors do, by the way.  Most authors will

22  look at their -- the strengths and weaknesses of their

23  manuscript.  That's one of the expectations that you

24  would do.

25          And these authors said that the absence

Bobby Lewis Shull, M.D.

1    of a comparator group -- which means someone had a

2    similar surgery, same group of people -- they didn't

3    have one of those, so it's hard to know how the outcomes

4    in terms of pain and other issues compare to what they

5    would normally do without mesh.

6              But they didn't have -- another outcome

7    that was reported by Dr. Sayer, S-A-Y-E-R, as the

8    primary physician, and included Dr. Slack, who was one

9    of the earlier users, all a part of what's called a

10   Prosima study group, and they looked at outcomes of

11   surgery.  And it was designed to evaluate women who had

12   to have at least two years of follow-up.

13             And that's what they wanted to report on.

14   They describe the type of people they operated on, the

15   product that they used, and then looking at anatomical

16   outcomes, that was their primary outcome measure, which

17   is what most authors have had, quite frankly.

18             Then they looked at mesh exposures and

19   need to be reoperated for recurrent prolapse.  So that

20   was at a minimum of two years after surgery, and these

21   authors referred to that as medium term -- we had spoken

22   earlier about long-term outcomes.  So two years or more

23   is actually much better than six months or 12 months.

24   It's still referred to as medium term.

25             And the other thing I think the authors

Bobby Lewis Shull, M.D.

1   pointed out is with these -- with this procedure they're

2   specifically referring to, there's a learning curve,

3   and, in fact, that happens with all surgery.  There's a

4   learning curve that goes along with it.

5                   And again, they comment on their own

6   study saying that their major concern is they don't have

7   a control group who was operated on without using either

8   the support device or the mesh.

9                   So all the authors recognize that, and

10  the truth is what they're primarily looking at is a

11  group of women who have the -- this case, the Prosima,

12  which is the mesh and the support device, and they're

13  looking primarily at do they get better anatomical

14  outcomes.

15                  And when you and I talked this morning,

16  one of the stimuli for wanting to find something helpful

17  is to reduce the likelihood that a woman will have

18  surgery for poor support and not have the best

19  opportunity to get that poor support corrected.  So all

20  of them want to improve the anatomical outcomes.  That's

21  the goal of all of these things.

22       Q.   And does it appear that they did have more

23  success with the anatomical results?

24       A.   Yes.  It depends again on how strictly someone

25  defines "success."  They had really rigid criteria for

Bobby Lewis Shull, M.D.

1    anatomical outcomes.  The success rate isn't as high as

2    if they use a more clinically applicable outcome.

3                    And in general -- this applies to these

4    authors, and in general to most authors.  What they find

5    is that if you use anatomy in what's called the treated

6    compartments -- so if it's by the bladder or the rectum

7    and you treat those -- use anatomy in the treated

8    department, as a generalization, the anatomical outcomes

9    are equal to or better than not using mesh.  So that's

10   one outcome variable.

11                   What has become apparent in these

12   different products that have been used, two things.  One

13   is the untreated compartment.  So let's say there are

14   two or three places in the pelvis that could require

15   surgery, but today the woman really needs surgery in one

16   compartment.

17                   What we are learning is that that one

18   compartment is treated with a mesh product, that the

19   longer you follow her, the more likely the untreated

20   area may prolapse out, or something adjacent to where

21   the product is may prolapse.  So that was sort of --

22   that was not necessarily anticipated.  So that's one

23   thing.

24                   And the other thing that they are looking

25   for is not just anatomical success.  It's how many

Bobby Lewis Shull, M.D.

 1    people have erosion, bleeding, with a mesh product.

 2                   So when they report outcomes, in general,

 3    authors are going to say that if you use anatomy as the

 4    endpoint, that mesh products in the anterior compartment

 5    specifically have a better anatomical outcome than

 6    non-mesh.  The follow-up -- the extension of that is the

 7    quality of life in patient subjective satisfaction is

 8    generally equal in mesh and non-mesh product surgeries.

 9                   The third area they look at is

10    requirement for reoperation for any reason.  And almost

11    universally what all authors find is the need for repeat

12    surgery is greater in the women who have mesh than the

13    women who don't.

14                   And the indication for repeat surgery

15    could be recurrence of the prolapse.  It could be pain.

16    It could be exposure of the mesh.  But in the aggregate,

17    women who have mesh end up having more likelihood to

18    have surgery than someone who didn't.

19                   So then what some people look at is they

20    say, well, since the anatomy is better, how do we

21    quantify what we would have to do in order to say that

22    it's really a good idea to use the mesh product?

23                   And if you said you used mesh products on

24    everyone, for example, what you would find is that for

25    prolapse, for example, you would have to put mesh in

Bobby Lewis Shull, M.D.

```
 1   anywhere between six and 19 additional people from what
 2   you're currently doing, six to 19, to reduce the
 3   likelihood that one person would have more surgery.  In
 4   other words, one out of six would be 15 percent.  One
 5   out of 19 would be 5 percent.  So you'd have to treat a
 6   lot of extra people with mesh to minimize the likelihood
 7   that if they didn't have it, that they would get
 8   recurrent surgery.
 9                So I don't think anybody -- this is my
10   assessment of it.  You asked me earlier, I think, about
11   if I look at the literature.  I don't believe that
12   anyone is disputing that in the anterior compartment of
13   a vagina, mesh can offer a better anatomical support.
14                In the posterior compartment, in the top
15   of the vaginal canal, that is probably not true.  It is
16   probably not better than.  So with the anterior
17   compartment, the anatomical outcomes may be better.
18                What we also know is exposure occurs in
19   the anterior compartment, or the posterior, either one.
20   So we know there's mesh exposure, and we know that for
21   almost all authors, the reoperation rate is greater when
22   you use mesh, global reoperation rate.
23                So for some women, there are benefits.
24   Other women, the cost of having it is greater than the
25   benefit.
```

Bobby Lewis Shull, M.D.

1      Q.    Item 5, "There were no studies prior to the

2   introduction of the Prosima device demonstrating safety

3   and efficacy of the vaginal support device - balloon

4   assembly."

5             Do you know what kind of studies were

6   performed on the Silimed vaginal stent?

7      A.    Not by itself.  I'm not sure -- excuse me.  I

8   don't know if there were any efficacy studies on

9   Silimed, quite frankly, because it was indicated for

10  such a defined group of women that it would be -- it's

11  possible, but I'm not aware of it, that someone would be

12  able to look at a group of women who were treated with

13  and without the Silimed device.  I don't know that, and

14  I don't ever remember hearing that discussed anywhere.

15     Q.    Your Item 6 is the same opinion, "Traditional

16  surgical repairs are effective.  The medical literature

17  does not show improved outcomes with the use of the

18  Prosima device or any other transvaginally placed mesh."

19            That's the same opinion you had with

20  Prolift and Prolift+M?

21     A.    Yes, sir.  Dr. Carey himself actually showed

22  that.

23     Q.    Well, you say it does not show improved

24  outcome.  Does it show comparable outcomes?

25     A.    I think in the aggregate, if you look at the

Bobby Lewis Shull, M.D.

1    anatomy, they're probably very comparable.  If you look

2    at reoperation rate, which I mentioned before, they're

3    not comparable, because in any women who has mesh placed

4    in the vagina, there is an almost irreversibly low

5    likelihood that she will get mesh erosion and require

6    either medical treatment or excision of the mesh.

7              So in that sense, the anatomy could be

8    similar, but the reoperation rate is going to be higher,

9    and that's been reported by all authors in women who

10   have mesh.  Excuse me.

11        Q.   What about other complaints like dyspareunia?

12        A.   The other complaints are not easy to

13   determine, and there are reasons for that.  For one

14   thing, unless the author has set up a prospective study

15   looking for a lot of variables, women who have any kind

16   of surgery, with or without mesh -- so if you ask them

17   about their pain complaints after surgery, pain with

18   intercourse, pain with surgery, pain with anything, it

19   doesn't really make any difference -- if you didn't have

20   a baseline for that same variable and have an answer for

21   it before the operation, then what happens is called

22   recall bias.

23             So if someone were to ask me what

24   happened three months ago, I may or may not remember

25   that.  If they ask me a year ago, I'm less likely to

Bobby Lewis Shull, M.D.

1    remember.  So all that information needs to be collected

2    prospectively, and, in fact, it generally isn't.

3                    There are one or two articles that were

4    in that previous report on Prolift from Dr. Anne Weber,

5    who was at the Cleveland Clinic, who tried to look

6    prospectively at the specific sexual complaints before

7    and after surgery, but it wasn't in the context of using

8    mesh.

9                    I think all of us agree that women can

10   have pain following surgery.  The issue is, partly, how

11   can you manage that pain and what seems to be associated

12   with it in the absence of a mesh product.  You're

13   dealing with a certain set of issues.  It could be a

14   trigger point.  It could be a scar is tender.  It could

15   be a variety of things.

16                   Once the mesh is introduced, the mesh

17   itself may be associated with the pain instead of a

18   local inflammatory reaction.  So it wouldn't necessarily

19   be that a woman would have no pain if they didn't have

20   mesh.  I don't think anybody says that.  It would be

21   they have a different kind of pain, and the management

22   of it is potentially much more problematic.

23       Q.   List for me what severe life-changing

24   complications that are not seen with traditional pelvic

25   reconstructive surgery that you find with mesh, unless

Bobby Lewis Shull, M.D.

```
1     you've already gone through them.
2          A.    No, sir.  I haven't answered that for you.  In
3     the referenced articles, which are in my Prolift report,
4     there are two reports from the University of Utah, and
5     Dr. Ingrid Nygaard is one of the authors on both of
6     those reports in our professional journals, and one of
7     them provide free text, so women are allowed to describe
8     what's happened to their lives when they develop these
9     complaints.
10              So the life-altering ones that are in one
11    of her articles says that women who acquire these
12    complaints fall into three categories.  One category is
13    they acquire pain, they see someone, they're managed,
14    and for all practical purposes, they don't have
15    significant complaints after that.
16              There's another group of women who
17    acquire pain complaints, and they're treated, and their
18    complaints don't go away, but they acquire a new sort of
19    baseline activity in their lives that is reduced --
20    their quality of life is reduced from before, but it's
21    more or less stable.
22              And there's a third group of women in
23    whom they acquire pain complaints and they have an
24    intervention, and they are caught in what this group has
25    called a downward spiral of their health, or the other
```

Bobby Lewis Shull, M.D.

 1   term they use is their life has been spoiled by pain,

 2   and that's what the patients describe.  They can't do

 3   their normal activities.  And once that happens, there's

 4   a whole cascade of events that affect their

 5   relationships with their sexual partners, their family,

 6   their job, their everything.

 7              So there are those people that have this

 8   downward cascade.  There are those that reset to a lower

 9   baseline.  And this isn't the same thing, so I'm not

10   purporting that it is.  But my personal observation of

11   that in my own family -- not with mesh, but I'll tell

12   you who how people reset a baseline.  My wife who died

13   had rheumatoid arthritis, and in order to function

14   normally, she had to reset a baseline of how to work.

15   Because you can't expect to do everything you did

16   before.  You're going to be disappointed.  You have to

17   reset what you're capable of doing.

18              And in this case, that's what some of the

19   women with mesh have done.  They've reset their baseline

20   at a lower level than before.

21              That's when I say life altering.  That's

22   what I mean by that.

23   Q.   Give me an approximation of the sizes of these

24   groups, these three groups you're talking about.

25   A.   In this group that was reported from the

Bobby Lewis Shull, M.D.

1   University of Utah, I want to say that the ones who

2   responded and felt better and the ones who reset their

3   baseline were more or less equal.  So I'm going to make

4   these percentages up, because I don't remember the exact

5   percentage, but it's close to accurate -- that about

6   40 percent fell into each of those, and there's in the

7   neighborhood of 20 percent who have this continuing

8   spiral of they hurt, they feel bad, it affects their

9   job, their relationship, and all those things.

10       Q.   Okay.

11       A.   That's a selective group of people who have

12   come specifically because they have had complication of

13   their prior surgery.  I'm not suggesting that 40 percent

14   of all women who have the products have pain and get

15   better and 40 percent reset and 10 percent are on a

16   downward spiral.  I'm referring to the group of people

17   who were bothered enough to come to the doctor to seek

18   intervention because of their pain complaints.

19       Q.   Any other life-changing complications that you

20   have not described earlier?

21       A.   Well, the -- one of the things I would

22   consider to be life changing is the requirement for

23   multiple interventions, and the interventions could be

24   physical therapy, for example.

25              Well, how does that change your life?

Bobby Lewis Shull, M.D.

```
1    Well, it means -- depending on what you're capable of

2    doing, you have to get transportation to and from

3    wherever you're going and spend a certain amount of time

4    there.  So there's a time commitment to that over an

5    extended time period.  That's at one level.

6              Another level is the multiple surgeries,

7    and the multiple surgeries involve everything that could

8    go the matter with surgery, including anesthesia, the

9    recovery, the expense, the time lost for wages, however

10   you calculate all those things.  But if you have one

11   surgical intervention, there's a certain level of time

12   away and cost associated with it, but if you have -- in

13   the case as of some of these people, multiple -- when I

14   say "multiple," I mean more than two -- where they have

15   multiple times where they are having to have surgery and

16   miss work and recovery and whatnot.  That's life

17   altering.

18             The other one which affects people in

19   general is their relationship with their spouse or their

20   partner, so -- all those things happen that really --

21   they change the dynamic in someone's life.

22   Q.   Well, it sounds to me like what you've just

23   described is going to be case specific to each patient.

24             MS. THOMPSON:  Object to form.

25   A.   Well, I think part of the point is what you've
```

Bobby Lewis Shull, M.D.

1    said.  People respond differently to different things,

2    and we are learning more about that as we -- as people

3    learning about diseases become more sophisticated, that

4    we may not all respond the same way to some particular

5    event in our lives.

6               In the future, we may be able to do that,

7    but we don't now.  So you may say in the case of surgery

8    of any kind that someone may respond and do beautifully

9    and have very few complaints regardless of whatever the

10   surgery is, and other people are at greater risk for

11   having an adverse outcome from surgery.

12              We can't -- we -- we know that

13   transpires.  How do we go about picking them out?  There

14   are some clinical clues, so -- we know there are

15   clinical clues to that.

16       Q.   (BY MR. WEBB)  Mesh removal surgery being

17   complex, is there any difference between Prolift,

18   Prolift+M, and Prosima?

19       A.   Yes, sir, there is.  When the mesh arms go

20   through either what's called the sacrospinous ligament

21   or the muscles in the pelvis and the wound heals,

22   getting all of that mesh product out really requires,

23   for lack of a better term, injury to those structures

24   again.  Because you have to incise and cut into the

25   structures where the mesh arms have been implanted.

Bobby Lewis Shull, M.D.

```
1                  From a technical standpoint, that would

2       be on a scale that's more difficult than someone who has

3       a product lying against a surface area.  There still is

4       the difficulty of the dissection to identify the

5       product, but when it's adjacent to something and you

6       don't have to go into the structure to get it out, the

7       degree of technical difficulty in general should be

8       less.

9            Q.    Okay.  Characteristics of polypropylene mesh

10      when implanted vaginally for pelvic organ prolapse

11      include chronic inflammation.

12                  Was chronic inflammation warned about in

13      the product warnings?

14           A.    You know, I don't remember if the specific

15      term "inflammation" was used or not.  I know that it

16      says the mesh can erode, they can have pain or

17      infection.  I'm not -- I don't remember clearly if it

18      says "inflammation."  I don't know that.

19           Q.    How about foreign body reaction, or do you

20      think it's even necessary to warn about foreign body

21      reaction?

22                  MS. THOMPSON:  Object to form.

23           A.    Well, you asked earlier, well, am I an expert

24      on product information and whatnot.  I am not an expert

25      on that, but I would say, in general, patients would be
```

Bobby Lewis Shull, M.D.

1    looking for something that's much more in their own

2    vocabulary than "foreign body reaction" or

3    "granulation."

4        Q.   (BY MR. WEBB)  For example, it could cause

5    pain?

6        A.   Painful, inflamed.  Most people know what

7    inflamed -- so that's not the same as inflammation, but

8    around -- in one sense, it's very similar.

9            Where those products are, the tissue

10   around it is inflamed, or inflammation, maybe, is the

11   best term.  I don't know that.

12           But in the people I deal with, in general

13   what has been shown is for all educational things that

14   you and I do, whatever -- whatever it is, it doesn't

15   make it any difference -- you would like to have it at a

16   level so somebody who is in the 8th grade could

17   understand it, and currently that's not a very

18   sophisticated level.

19       Q.   Do you get fibrosis and scarring with the

20   implantation of any medical device?

21           MS. THOMPSON:  Object to form.

22       A.   I am -- do you get scarring with any?  Anytime

23   there has to be an entry point to do something, yes,

24   there will be a scar formed.

25           So if you have to puncture it, cut it, do

Bobby Lewis Shull, M.D.

1    something to it, the body's reaction is to heal through

2    scar formation.  So, yes, that would happen, whether

3    it's an accident or it's a planned surgical

4    intervention, either one.

5        Q.   (BY MR. WEBB)  You're not saying that every

6    patient is going to have every one of these

7    characteristics, are you?

8        A.   No, sir.  And I'm saying that some patients

9    won't have any of them.

10              There's a -- the way clinical follow-up

11   appears to occur, the authors who report on adverse

12   events by and large are subspecialists working in

13   referral areas, such as I do, or such as the group at

14   Utah or the group in Cincinnati or Ann Arbor, Michigan.

15   It's generally a referral group.

16              And what we see in them is, in general,

17   women who have an adverse outcome are more likely to go

18   to another doctor than they are to the doctor who

19   performed the original or the index surgery.

20              What that does, then, is once the

21   patients either self-select or perhaps are even referred

22   by the treating doctor -- it doesn't make any

23   difference.  But when they self-select, doctors who are

24   in the practice such as I have are more likely to see

25   someone who isn't happy with the outcome, and the

Bobby Lewis Shull, M.D.

```
1    doctors who like to use whatever the technique is may

2    only see their patients back who are happy with it, and

3    they may not see the ones who have had an adverse

4    outcome.  And then the impression is reinforced that

5    actually this works better than most people say because

6    I don't see my patients back complaining.

7              The caveat on that is just because you

8    don't see a patient or I don't see my own patient --

9    just because I don't see them doesn't mean that there

10   isn't an issue.  And we know from reports in the

11   literature that between 60 and 80 percent of women who

12   have adverse outcomes are more likely to go see someone

13   who did not do the primary surgery.

14        Q.   Ethicon did not provide doctors and patients

15   with complete and accurate information regarding the

16   efficacy, safety, and complications associated with the

17   Prosima devices and their management.

18              That's the same complaint that you had

19   about Prolift and Prolift+M.  Is that correct?

20        A.   Yes, sir, that's accurate, because there was

21   not a way to do that.  The duration of follow-up had not

22   lasted long enough.  The factors that were getting

23   followed were relatively narrow in terms of anatomical

24   outcomes and perioperative morbidity, so it wouldn't be

25   practical to collect enough information in those
```

Bobby Lewis Shull, M.D.

1   circumstances to be well informed enough to tell either

2   the implanting doctor or the patient who is receiving

3   the product exactly what to expect.

4       Q.   And these are the same complaints that you

5   made earlier about the Prolift and the Prolift+M?

6       A.   Yes, sir.

7       Q.   And let me try to summarize it.  You complain

8   about the lack and the length of comprehensive study of

9   the patients?

10      A.   Yes, sir.

11           MS. THOMPSON:   Object to form.

12      A.   So the way I interpret what you're commenting

13  on is there wasn't a plan put in place to investigate

14  enough of the variables that relate to -- this is

15  antecedent to the surgery -- who is a good candidate for

16  the surgery, who is the best candidate for the surgery,

17  who is not a candidate for the surgery.

18           The information given and the information

19  for the users is very limited on contraindications.  So

20  what's become obvious to the majority of clinicians that

21  isn't in the IFU, for example, or certainly wasn't, is

22  there are a group of people that are outside what was in

23  the IFU.  There are people that are older than 18 or 21,

24  that are not pregnant, they're not going to be pregnant,

25  they don't have an active infection.  Those are the

Bobby Lewis Shull, M.D.

1    things in the IFU.

2                    What they do have, they have a history of

3    fibromyalgia.  They smoke excessively.  They have

4    diabetes mellitus.  They have a variety of other pain

5    complaints, and none of those were isolated out as a

6    potential contraindication to the use of the predict.

7                    And I would say that currently, even the

8    most avid advocates of using the products, presuming

9    they were all still available, would come to some

10   consensus that there's a group of women that can be

11   identified by their history who are at high risk for

12   being unhappy with the product, and that those people

13   justifiably need to be advised to consider something

14   else.  So that's in the selection criteria.  That's not

15   the follow-up.

16                   The other thing that has been almost

17   nothing written about is not do you have a complication,

18   it is how do you manage a complication.  What's the best

19   way to manage a complication and, ideally, to avoid?

20                   So it's a preoperative selection process

21   or elimination for people who are not candidates.  It's

22   the identification of a person who is most likely the

23   benefit.  So let's presume there are people who do get

24   better.  The obligation, then, is let's identify those

25   people.  Then we can sit down and have a conversation

Bobby Lewis Shull, M.D.

1   with them and feel comfortable that we could say, you

2   know, based on what we know, you actually are a better

3   than average candidate to have this done, but even

4   though you're better than average, these are the things

5   you might expect, and if it occurs, I am capable of

6   managing certain of these things with some degree of

7   knowledge about how likely you are to get better, and we

8   don't have that.

9             In addition to, some of the things that

10  are problematic, which were unintended, don't show up

11  immediately, and once you have a foreign body in you,

12  you're at risk for that event to occur for the

13  foreseeable future.

14            And I can say that in seeing my own

15  patients now -- because I do have a clinical practice of

16  medicine -- is that there are a group of people who are

17  anxious to know, "What can I expect?  Today perhaps I

18  don't really have a complaint, but I know that people

19  have had them, and can you counsel me on what's going to

20  happen?"

21            People want to know that.  And that would

22  have been a helpful thing.

23            Saying that someone has pain is one way

24  to say if you have the surgery, you can have pain.

25  Saying that you may have pain that is lifelong and

Bobby Lewis Shull, M.D.

1    affects the quality of your life and it's practically

2    impossible to manage is a whole different issue.

3              And, in fact, we do see there are people

4    that fall into that category.  I'm not suggesting

5    everyone does.  I don't think anybody suggests that, but

6    there are enough that when you pick up the literature,

7    the group in Cincinnati had 300 patients, the group in

8    Michigan had a hundred and something, the group in

9    Idaho -- or Utah had a hundred and something.

10             So there really are a lot of people who

11   have sought attention from experts, and I have no

12   earthly idea, frankly, if any of them or any percentage

13   of them have actually sought legal counsel because of --

14   they're coming to a doctor because they're -- they need

15   some advice on how to get better.

16   Q.    (BY MR. WEBB)  Well, you also know that there

17   are women who have gone to lawyers and then go to

18   doctors after they've been to lawyers?

19   A.    Yes, sir.

20             MS. THOMPSON:  Object to form.

21   Q.    (BY MR. WEBB)  Have some of your patients been

22   those type of women, who were referred to you by

23   lawyers?

24   A.    There have been some women whom I have seen

25   who before they come for a visit, there has been a

Bobby Lewis Shull, M.D.

1    request sent to me that if they have explant surgery,

2    could the explant material be provided to a lawyer or a

3    particular hospital or somebody for an evaluation.  So I

4    have seen patients like that.

5                   And they may, in fact, have consulted

6    with somebody in advance.  I don't know how many do

7    that, but, yes, some people do that.

8         Q.   And do you have any idea, out of the 100

9    patients that you have seen with mesh, how many were

10   referred to you by lawyers?

11                  MS. THOMPSON:  Object to form.

12        A.   Actually, I don't know that.  I would say my

13   practice is primarily a referral practice, and that's

14   based on a lot of things, almost the least important of

15   which is being referred by a lawyer.  It normally is for

16   other reasons.  Either they have someone they know that

17   I've cared for or their doctor is someone that I've

18   worked with or know or they've read about it somewhere

19   or another.

20                  So the exceptional one would be the one

21   who says that my lawyer asked and gave me your name

22   among, whatever, maybe one name or several names, to be

23   seen.

24        Q.   (BY MR. WEBB)  Ethicon failed to disclose the

25   lack of benefit of pelvic organ prolapse surgery using

Bobby Lewis Shull, M.D.

1    the Prosima device to physicians and patients.

2              For any medical -- well, for any surgery,

3    there's risks and benefits that have to be analyzed on a

4    patient-by-patient basis.  Would you agree with that?

5         A.   I do.

6         Q.   Do you think that the risk with Prosima

7    outweighed the benefits for most patients?

8         A.   Yes, sir.

9         Q.   And have any of your fellow practitioners in

10   your practice used the Prosima device?

11        A.   No, sir, not that I know of.  I will say that

12   in general, when I counsel a patient -- and I've already

13   told you I don't use mesh products for reconstructive

14   surgery.  We do do an abdominal sacrocolpopexy.

15             When I counsel a patient, it isn't that I

16   tell them that what I can do is magic.  I try to point

17   out a reasonable set of expectations.  And an example I

18   would use -- and I use it frequently, particularly when

19   I'm lecturing somewhere -- that one of the easiest

20   hernias in the world to fix is in the inguinal canal.

21   So if you or I or anybody in the room or your child or

22   somebody has an inguinal hernia, that's among the

23   easiest operations to do technically.

24             It doesn't work all the time.  It will

25   never work all the time.  And the only goals for that

Bobby Lewis Shull, M.D.

```
 1    surgery, primarily, are to fix the hernia and, unless

 2    the man wants it, don't remove the testicle or tie off

 3    the vas deferens.  So don't do those things unless they

 4    request it.

 5              So, from that standpoint, there are very

 6    specific outcome parameters, and it doesn't work all the

 7    time.  And the two biggest variables outside surgical

 8    diagnostic skill and technical skill -- so let's presume

 9    they're equal -- the two biggest variables to outcome

10    are how big was the hernia at the beginning, and how

11    long do you follow the patient.  So the bigger it was,

12    the more you'll follow them, the more likely they're

13    going to have a recurrence.

14              In women who have problems with the

15    pelvic floor, the issues are considerably more complex.

16    Their bladder may not work.  The bowel may not work.

17    Their muscles may be injured.  Their nerves may not

18    work.  The connective tissue may not work.  And they may

19    want all of that to be okay, and for a lot of people,

20    that's a reasonable expectation.

21              There isn't anything that works all the

22    time for every person, and I think all of us recognize

23    that.  And everyone recognizes we would like to be able

24    to do better in the context of not causing harm.

25              So we want to do better.  We don't want
```

Bobby Lewis Shull, M.D.

1   someone to be harmed, and all these issues that I have

2   in the general report which you asked me about relate to

3   the fact that there wasn't enough knowledge acquired

4   and/or shared to be able to tell someone, "Not only are

5   you likely to get better, but what is the likelihood

6   that you could be harmed?  And if you are, what's the

7   likelihood we can help you with that?"

8                Those are reasonable things that people

9   would -- I would want to know that.  You would want to

10  know that.  So those are reasonable things, but we don't

11  have the information on that.  That's the -- that's my

12  primary concern.

13      Q.   Describe for me a scientific clinical trial

14  demonstrating the safety of the Prosima device that

15  should have been done before its introduction to the

16  commercial market.

17                MS. THOMPSON:  Object to form.

18      A.   My thought about what would have been helpful

19  to be done is to describe a group of people --

20      Q.   (BY MR. WEBB)  How big a group?  How big a

21  group?

22      A.   There's something called a power analysis that

23  can be done.  So the power analysis determines, based on

24  what you think the outcomes are -- for example, if an

25  operation fails 20 percent of the time -- so whatever

Bobby Lewis Shull, M.D.

1    the failure is, whatever we call failure, if it fails

2    20 percent of the time and you want to be able to reduce

3    that failure rate by 10 percent -- I'm sorry, by

4    50 percent, so instead of failing 20 percent of the

5    time, it fails 10 percent of the time.

6                     So if that's your goal, there is

7    something called a power analysis that can be calculated

8    to tell you that to learn that, presuming 20 percent of

9    the people have an adverse outcome, and you're going to

10   have some people you treat one way and some the other

11   way, you will have to recruit -- I'm making this up, but

12   I'm going to give an example -- you'll have to recruit

13   200 women, because if you recruit 200, actually 20 won't

14   qualify or won't agree.  So you'll end up with 180.

15                    Now those 180, you get that 90 in each

16   group, and then you have the power to make a statistical

17   assessment of are those operations similar or not.  And

18   depending on the number of variabilities you have, that

19   would determine how long you would have to follow those

20   patients.

21                    In my patients -- in an article in 2000,

22   for example, which was not randomized, and I recognize

23   that, it was a group of women I followed, basically 300

24   women, and I had in mind certain variables, but one of

25   the variables which was really important to me -- and it

Bobby Lewis Shull, M.D.

1    is to this whole issue -- is how durable is an

2    operation?

3              So if I agree to be operated on, how long

4    can I expect my -- my knee's replaced.  How long can I

5    expect it to work?  Is it a year?  We know what

6    happens -- actually, it's a function of time, so the

7    longer you go, the more likely it isn't going to do

8    whatever you wanted it to do.

9              But until we reported that in this

10   special statistical analysis called a Kaplan-Meier

11   table, it really hasn't been reported in reconstructive

12   surgery.  Now, almost everyone uses it to say, "This is

13   the durability of the surgery."  That's one important

14   issue.

15             The other thing we've looked at -- and

16   we've learned this as time has gone by -- there are

17   going to be adverse events with surgery.  There is no

18   way to avoid that.

19             My mother died after an operation, so I'm

20   acutely aware of that.  There are adverse events after

21   surgery.  What I want to know, can I avoid it, and if I

22   can't avoid it, how can I identify it and correct it?

23   So we are learning about that.

24             And what I do, I know that there is a

25   little group of women who will acquire a pain complaint

Bobby Lewis Shull, M.D.

1    they did not have before surgery, and it is specific to

2    what I do, and I know when it shows up, and I know the

3    presenting characteristics, and I know how to take care

4    of it.

5                    So if I talk to someone about that, I can

6    say, one woman out of 100, about, will have this very

7    specific adverse event, which I can recognize and I can

8    tell you how to manage it, but I cannot avoid it.  I

9    cannot avoid it all the time.  It's not possible to do

10   that.

11                   And when the patients know that, even

12   when they have the adverse outcome, they have the

13   knowledge that that's something I really do know about,

14   and if it bothers them, I can manage it.  That's a

15   comfort to the doctor and to the patient.  And in these

16   circumstances, the thing that's different is these are

17   complications that in general are different than what

18   we've seen before and, frankly, doctors are still

19   working out how to manage them most effectively.

20                   There's a whole spectrum of thought on

21   that.  If you have pain after mesh, some doctors

22   advocate taking out the entire mesh.  Well, the truth is

23   there's a tiny group of people technically skilled

24   enough to do that without really creating a problem.

25   And even if they are skilled enough to do it, there

Bobby Lewis Shull, M.D.

1    still is a risk that what they do will make the patient

2    worse than they already are.

3                   So we are still working on how to

4    identify and manage it, and that's the dilemma.  And I

5    don't think I'm suggesting that that was a conscious

6    decision on anyone's part to say, you know, we're going

7    to hurt people.  I don't believe that.  I don't think

8    anyone wants to do that.  But the unintended consequence

9    is people were hurt and could you -- could, not you

10   personally -- could people have anticipated that?

11   Frankly, probably not eliminated, but done everything

12   possible to make that less likely to occur.  And if it

13   were to occur, to have a strategy to manage it.

14                  And this is something I know a lot about

15   because I see these people, and, frankly, the people I

16   see almost never have come to me saying, "I want to sue

17   someone."

18                  That's the exception.  They come to me

19   with their spouse because their life has been changed.

20                  MR. WEBB:  Objection; nonresponsive.

21        Q.   (BY MR. WEBB)  Tell me the length of this

22   hypothetical clinical trial that Ethicon should have put

23   in place --

24        A.   Well --

25        Q.   -- to demonstrate the safety -- let me finish

Bobby Lewis Shull, M.D.

1    my question before you start.

2         A.   I'm sorry.

3         Q.   Tell me the length of this hypothetical

4    clinical trial demonstrating the safety of the Prosima

5    device that should have gone on before its introduction

6    to the commercial market.

7         A.   Depending on the outcome variables, it's

8    possible to understand the perioperative complications

9    very quickly.  So then you just have to decide how many

10   people do you need to recruit to do it.  So the

11   perioperative complications can be done quickly.

12              The issue about picking the right patient

13   and have comparable groups -- so you've used the same

14   selection criteria, and then if you're looking for the

15   onset of anatomic failure, most of the anatomical

16   failures that are not technically related -- that means

17   the operation wasn't executed well or was

18   underdiagnosed -- so if you eliminate the immediate

19   postoperative failures -- so somebody is in surgery

20   today and a week from now or a month from now the

21   surgery hasn't worked.  So let's eliminate those.

22              Now it's somebody who had initially a

23   good response but have a recurrence.  That takes at

24   least one year, and even that probably isn't right.

25   Several years, depending on what people -- that's for

Bobby Lewis Shull, M.D.

```
1    the anatomy.

2              Then because some of the problems are

3    actually not known about -- they may be anticipated but

4    you don't know them, pain complaints, contraction of the

5    mesh, and if it contracts, how long does it take to

6    create a problem -- you can't really know that until you

7    set an arbitrary time limit, and that could be one year

8    or two years.  But what most doctors would then do who

9    are involved in a trial, they would say, "Well, I'm

10   going to follow these patients later because what I may

11   find out is all of the problems came up in the first six

12   months, then after six months, there really is nothing,"

13   or, "What I really found out is some of them came up at

14   six months or a year, but, you know, really, the longer

15   we followed them, there's some other things."

16             So that's not practical, to follow

17   somebody indefinitely, but somewhere between 12 and

18   24 months would be a reasonable start on that, along

19   with strict criteria on the patients for whom you can

20   use the procedure.

21             Currently, when I read these reports in

22   both the Prosima and the Prolift, it could have been for

23   a woman who has had prior surgery and failed, a woman

24   who has had no prior surgery, a woman who has a

25   hysterectomy, a women who doesn't have a hysterectomy, a
```

Bobby Lewis Shull, M.D.

```
 1    woman -- so the variables just mount and mount up, and
 2    one of the issues which these documents have shown is:
 3    That's important to know, are they going to have a
 4    hysterectomy and, what kind of incision?  That was
 5    learned on the fly, sort of.
 6              So there are so many variables to look
 7    at, but if you just pick a few of them -- selection,
 8    avoiding complications, managing complications,
 9    anatomical outcome, acquisition of complaints -- that
10    would take at least, for recruitment -- the recruitment
11    would take at least a year.  The follow-up would take at
12    least a year.  And then, depending on how you do the
13    power analysis, the recruitment could take longer.
14              That's one of the issues now with these
15    522 things that some companies are going to do is the
16    power analysis tells them they have to recruit so many
17    people, that one surgeon can't be -- can't do it.  It
18    has to be a multicenter study to do it.  Those things
19    all add complexity and expense to it.
20       Q.   Out of the 100 patients that you've seen who
21    have had complications with mesh, how many of them do
22    you think are surgeon's technique problems?
23       A.   I wouldn't allocate the technique problem,
24    frankly, to any of them with the following exceptions.
25    If I see someone -- or someone I operate on, let's
```

Bobby Lewis Shull, M.D.

1    say -- so I'm not always pointing -- to say somebody

2    else did it.  I could be the one who does that.

3                For example, this one article you asked

4    me to confirm earlier today about placing a TVT in the

5    bowel, that was my patient.  So it wasn't somebody

6    else's patient.  It was my patient.

7                So the surgeon contribution to the

8    problem frequently is identified immediately.  The

9    product is put in the wrong place, in the bladder or in

10   the bowel.  When I say "immediately," either right then

11   or within the next day or two.  So there can be a

12   surgeon error.  There's no doubt about it.

13               The other thing that's much more subtle,

14   which this anatomic report in the Prosima, where they

15   took a group of people and took them to the anatomy lab,

16   that's much more subtle because you are having a surgeon

17   operate in a space where you cannot see what they're

18   doing.

19               And I taught cadaver labs, and I've

20   operated on thousands of people.  A cadaver lab and

21   operating on real people have some similarities, but

22   doing vaginal reconstructive surgery on a cadaver -- and

23   some of these cadavers are 90 years old or 92 years

24   old -- that is extremely difficult to -- not only to do,

25   but for a teacher to watch someone else and effectively

Bobby Lewis Shull, M.D.

1    teach them what to do, that's challenging.

2                    MR. WEBB:  Objection; nonresponsive.

3        Q.   (BY MR. WEBB)  You said you personally have

4    examined, diagnosed, and treated approximately 100

5    patients with mesh complications and removed some mesh

6    from at least 70 women.

7                    How many out of those patients are -- do

8    you think are directly related to physician technique?

9        A.   What I tried --

10                   MS. THOMPSON:  Asked and answered.

11       A.   I'm sorry.  What I tried to explain is what I

12   think would be a physician error, and the ones that I

13   know are physician errors, I haven't seen them, where

14   the mesh was put into something.

15       Q.   (BY MR. WEBB)  So you're saying zero out of

16   the 100.  Is that what you're saying?

17       A.   No, sir.  What I'm saying is --

18       Q.   I'm asking you for a number, Doctor.  If you

19   can give me a number, say it.  If you can't, just say

20   you can't give me a number.

21                   MS. THOMPSON:  Objection.

22       Q.   (BY MR. WEBB)  We're going to be here until

23   9:00 at the rate we're going.

24       A.   I don't --

25                   MS. THOMPSON:  Objection to that --

Bobby Lewis Shull, M.D.

1        A.   I don't know.  I'm sorry.

2              MS. THOMPSON:  -- comment.

3              MR. WEBB:  Well, there's a point when if

4    he's just going to sit there and just -- you know, just

5    blabber and not answer the question, then I'm going to

6    cut him off.  Do you understand?

7              MS. THOMPSON:  I think you can cut him

8    off, but we're not going to be here until 9:00

9    regardless.

10             MR. WEBB:  Let's put it this way, then --

11             MS. THOMPSON:  We're going to be here --

12             MR. WEBB:  -- I'm going to keep going

13   until the maximum time, then, if that's --

14             MS. THOMPSON:  Okay.  Well, you've got --

15             MR. WEBB:  -- the way we're going to play

16   the game.

17             MS. THOMPSON:  -- two hours, and we'll go

18   the two hours.

19             MR. WEBB:  No.  I've got three hours is

20   what I've got on each one of these.

21             MS. THOMPSON:  No.  You have three hours

22   on the first and two hours on the second.

23             MR. WEBB:  Okay.  Well, I -- we'll go

24   until every minute of it is gone if that's the way --

25             MS. THOMPSON:  Okay.

Bobby Lewis Shull, M.D.

```
 1                    MR. WEBB:  -- you're going to play it.

 2                    MS. THOMPSON:  All right.  You've got

 3      about --

 4                    THE WITNESS:  I'm comfortable -- if I'm

 5      not answering effectively, tell me.  I'm fine to stop

 6      and try to answer it.  I'm not trying to avoid your

 7      question.  So I'm happy to try to respond, and just ask

 8      me to do that.

 9          Q.   (BY MR. WEBB)  Tell me why Ethicon did not

10      exercise due diligence in the design and development of

11      the Prosima mesh.

12          A.   I think it's the things we've mentioned

13      already about the unknown, putting something in these

14      spaces and leaving them there and what the potential

15      benefit or non-benefit is to putting a support device in

16      it.

17          Q.   Tell my why Ethicon lacked scientific rigor in

18      the testing and reporting of its pelvic floor products,

19      including the use of Gynemesh.

20          A.   Because we don't have the information about

21      prospective clinical trials on how the products behaved

22      in people.

23          Q.   Ethicon did not heed the warnings from the

24      hernia and gynecologic literature relating to the use of

25      polypropylene mesh?
```

Bobby Lewis Shull, M.D.

```
1        A.   The hernia wall -- the abdominal wall or the
2   inguinal canal are sterile areas, and mesh is used in a
3   sterile area.  And if it -- if there's wound infection,
4   mesh isn't used in those areas.  And the vaginal canal
5   isn't sterile.  It's contaminated.
6             So those are major differences.  And
7   there have been reported incidences of mesh shrinking in
8   the abdomen and pain associated with it.
9        Q.   If Ethicon had properly tested its products,
10  certain problems and complications would have been
11  identified before they were used in a clinical setting.
12             Tell me, if you haven't already, what
13  problems and what complications would have been
14  identified before they were used in a clinical setting.
15       A.   Well, from a clinical use, so the clinical --
16  the evaluation before clinicians in general used them
17  would be more knowledge about erosion rates, pain,
18  contraction, and possible effects on bowel and bladder
19  function.  And in the case of exposure in the vaginal
20  canal, possible injury to the sexual partner or new
21  onset pain complaints.
22       Q.   "Ethicon inappropriately marketed its prolapse
23  mesh products to all physicians."
24             Is this the same answer that you would
25  give me as you did on the Prolift and Prolift+M?
```

Bobby Lewis Shull, M.D.

1    A.   Yes, sir.  People have varying skill levels to

2  use -- and this is a sophisticated operation, and there

3  are varying skill levels, and people, frankly, don't

4  have the skill to do that.

5    Q.   And you said earlier -- this says, "Ethicon

6  inappropriately marketed its prolapse mesh products to

7  all physicians."

8         Yet you told me that the hospitals were

9  the ones that bought the products.  Is that correct?

10   A.   Yes, sir.

11   Q.   And --

12   A.   I beg your pardon.  The hospital may buy it at

13  the request of the physician, for example.  I just -- I

14  don't think there's a direct transaction between the

15  doctor and --

16   Q.   Well, and it also may be that hospitals enter

17  into contracts and they tell you what products are going

18  to be made available to you.  Correct?

19   A.   That's entirely true.

20   Q.   "After the products were used in a general

21  clinical setting, Ethicon did not systematically monitor

22  their products for safety or efficacy or evaluate

23  physician feedback."

24         What do you base that statement on?

25   A.   I didn't see any documents to indicate that.

Bobby Lewis Shull, M.D.

1      Q.   Did you ask for any documents on that?

2      A.   No, sir.

3      Q.   Were -- did you ask the plaintiffs' lawyer,

4   who provided documents to you, to give you documents

5   specifically about Ethicon's monitoring of the products

6   for safety or efficacy or evaluate physician feedback?

7      A.   No, sir.

8      Q.   The problems associated with the Prosima

9   device are inherent in the concept and design and occur

10   even when the device is placed properly.

11            Is this the same complaints that you had

12   about the Prolift and the Prolift+M?

13      A.   It's similar because it uses the same mesh

14   product.  The -- the placement is different, but it's

15   still the same mesh product.

16      Q.   Is there anything about the placement that

17   would be different about the Prolift or Prolift+M?

18      A.   Yes, sir.  Theoretically, it would be a safer

19   placement for Prosima.

20      Q.   Why do you say, "In Carey's randomized trial

21   comparing traditional anterior and posterior surgery

22   with the Prosima precursor, the authors failed to

23   demonstrate any improvement in the treatment of

24   prolapse"?

25      A.   Those are his conclusions.  Well, I mean, when

Bobby Lewis Shull, M.D.

1   you look at the data, that's -- that's what it showed.

2   He showed approximately a 20 percent persistent

3   anatomical defect in both groups of patients.

4            So there were -- it was a randomized

5   trial in which it didn't show that one was appreciably

6   better than the other.

7            THE REPORTER:  I'm sorry.  It didn't --

8            THE WITNESS:  It was a randomized trial

9   which did not show that one was appreciably better than

10  the other.

11           THE REPORTER:  Try to keep your voice up

12  for me, please.  I'm sorry.

13      Q.   (BY MR. WEBB)  You make a statement saying

14  that, "During implantation, tension is placed on the

15  mesh as the instruments are placed in the pockets of the

16  straps, not only during implantation, but after the

17  Prosima straps are put under some tension, which may

18  ultimately lead to mesh bunching, wrinkling,

19  deformation."

20           Do you know whether or not that actually

21  happens?

22      A.   I don't know --

23           MS. THOMPSON:  Object to form.

24      A.   I don't know that it happens every time, but I

25  know from the standpoint of, for example, using a

Bobby Lewis Shull, M.D.

1   midurethral sling, which I've done hundreds of times,

2   that it -- what you intend to do doesn't always go

3   exactly the way you want to do it.  So the mesh may lay

4   flat temporarily and it may not, and you have to

5   manipulate it to get it into position.

6              So it isn't -- it doesn't always lie

7   exactly in the position you would like it to be, and

8   when you work with it in a space where it's actually

9   remote from where you can see, you have to put some

10  degree of tension on it in order to try to flatten it or

11  straighten it out.

12      Q.   (BY MR. WEBB)  Have you actually read the

13  Prosima IFU?

14      A.   Yes, sir.

15      Q.   When did you read the Prosima IFU?

16      A.   I read it twice.  I read it sometime back in

17  January, and I read it again over the weekend.

18      Q.   Is it in the documents that you provided us

19  today?

20      A.   I thought it was, but it may not be.  I may

21  have taken it out, actually, and failed to put it back

22  in there.  But the answer is, yes, I did read it and I

23  highlighted it, and I thought that I had put it in here,

24  and what may have happened is it may be in my study at

25  home.

Bobby Lewis Shull, M.D.

1              So it's possible I -- I apologize.  I

2    didn't look specifically for that, but I did read it.

3    There was information for use, which I highlighted and

4    used that in preparing the report.

5         Q.   What did the IFU say about the use of this

6    product in women with a history of chronic pelvic pain?

7         A.   I'm not sure it said anything.  It said do not

8    use it in women with vaginal infections.  It said that

9    the product stays soft and pliable.  I don't recall that

10   it said anything about the use in women with chronic

11   pelvic pain.

12              It commented on using the product in

13   women who have certain degrees of pelvic organ prolapse,

14   but that degree wasn't specifically quantified, nor the

15   reference point for its -- what was it, for the POP-Q

16   stage, or was it something else -- which people would

17   use in common language to know which candidates are

18   best.

19              MR. WEBB:  Let's take a short break.

20              THE VIDEOGRAPHER:  Going off the record,

21   the time is 2:49.

22              (Recess from 2:49 p.m. to 2:56 p.m.)

23              THE VIDEOGRAPHER:  Back on the record.

24   This marks the beginning of Disc No. 4.  The time is

25   2:56.

Bobby Lewis Shull, M.D.

1      Q.   (BY MR. WEBB)  Dr. Shull, the time that you

2   spent with an attorney representing the plaintiffs, did

3   you include the time that you were talking about Prosima

4   in that time?  Was that total time?

5      A.   Is that on the time sheet that I gave you

6   there, or is that for other patients the other day?

7      Q.   No.  I'm talking about the time you spent

8   yesterday and today.  Was there separate --

9      A.   Yes.

10      Q.   -- time that you spent discussing just Prolift

11   and Prolift+M that you told me about and separate time

12   for just Prosima, or was it just all together?

13      A.   It was in the aggregate.

14      Q.   Are there any complications using native

15   tissue that you do not have with vaginal mesh?

16      A.   There could be the way I do it.  For example,

17   in the specific technique that I use with uterosacral

18   ligaments, entrapping a nerve near one of the ligaments

19   on one side of the pelvis occurs about one time out of

20   100, and I think -- I know that is specific to the

21   technique that I use.  I don't know that that occurs

22   with either the Prolift or the Prosima.  So that may be

23   one difference.

24           Another difference is when I do the

25   reconstructive surgery transvaginally, I frequently use

Bobby Lewis Shull, M.D.

1    some sutures which do not dissolve -- not all, but I use

2    some Ethibond sutures.  Those may end up being exposed

3    in the vaginal tissue at a time after a normally

4    expected recovery interval of six to 12 weeks.  So a

5    patient could come back in months or, frankly, even in

6    several years or more and say they have some vaginal

7    spotting, and I may see a suture exposed through the

8    vaginal skin, which almost always can be removed in the

9    office.

10                There are a few exceptions where it's so

11   high in the vaginal canal that it's better to do it with

12   what's called local MAC anesthesia, where somebody

13   inhales something and gets some IV sedation.  So that

14   occurs occasionally.  And that's a consequence of my

15   intentional decision to use sutures that don't dissolve.

16        Q.   Have you ever reviewed any animal testing

17   either on Prolift, Prolift+M, or Prosima?

18                MS. THOMPSON:  Object to form.

19        A.   Have I personally used it?

20        Q.   (BY MR. WEBB)  Have you personally reviewed

21   any animal testing on Prolift, Prolift+M, or Prosima?

22        A.   I don't think so.

23        Q.   Would you expect a product to look different

24   after implantation than it did when it is explanted?

25        A.   Excuse me.  Would I expect it to look

Bobby Lewis Shull, M.D.

1    different?

2        Q.   Would you expect a product that's been

3    implanted to be -- to look different than that when

4    you -- when it's explanted from the body?

5        A.   Yes, sir.

6        Q.   Especially something with mesh that's designed

7    to have ingrowth into the mesh?

8        A.   Yes, sir.  It may look different from

9    several -- for several reasons.  One of them could be

10   adjacent tissue.  One could be a change in the geometry

11   or the surface area of the product.

12       Q.   Do you consider it the responsibility of a

13   surgeon to keep current on the medical literature in

14   their area of expertise or their area of practice?

15       A.   Yes, sir.

16       Q.   Did Ethicon tell the doctors in the

17   instructions for use document for Prosima that training

18   on the use of Prosima was recommended and available?

19       A.   I believe the wording would be you could

20   request it -- yes, it was available if you wanted it.  I

21   don't think it was indicated it was required, but it

22   was -- if you wanted it, it was available.

23            MR. WEBB:  I'll pass the witness.

24

25

Bobby Lewis Shull, M.D.

```
 1                         EXAMINATION

 2   BY MS. THOMPSON:

 3        Q.   I have a few questions, Dr. Shull.

 4             When you asked for the literature

 5   regarding Prolift and Prolift+M, did you ask for all of

 6   the literature available?

 7        A.   Yes, I did.

 8        Q.   And is the same true for Prosima?

 9        A.   Yes, I did.

10        Q.   And did you personally review and critically

11   assess this literature?

12        A.   Yes, I did.

13        Q.   Were you aware of any kind of screening

14   process that was used to select the articles that we --

15   were sent to you?

16        A.   No, I'm not.  I wasn't.

17        Q.   And did the literature that you reviewed and

18   critically assessed, did it include literature that, at

19   least from the author's conclusions, were both favorable

20   and unfavorable to your opinions?

21        A.   Yes.  I think in every one I read, the authors

22   found something positive to say about the products, and

23   in every one I read, particularly in the discussions,

24   there was information to say there -- there needed to be

25   longer follow-up, and there are other items that could
```

Bobby Lewis Shull, M.D.

1    be learned about.

2        Q.   You were asked questions about your experience

3    with mesh complications.  Are your colleagues and the

4    fellows at Scott & White also seeing patients with mesh

5    complications?

6             MR. WEBB:  Objection.

7        A.   Yes, they are.

8        Q.   (BY MS. THOMPSON)  And are you aware,

9    generally, of the mesh complications that are being seen

10   in your department by others?

11       A.   In general, that's true.  We have what's

12   called an M&M conference every month, and we may talk

13   about specific issues.  They could be related to mesh

14   exposure, or when we look at the operative schedule, we

15   frequently discuss what the day is like, and we'll know

16   that someone is going to be working on a mesh

17   explantation, for example.

18       Q.   And your colleagues are also removing mesh

19   devices at Scott & White?

20       A.   Yes.

21             MR. WEBB:  Objection; form.

22       A.   That's correct.

23       Q.   (BY MS. THOMPSON)  You were asked questions

24   about whether you considered yourself an expert in

25   certain fields.  Do you remember that line of

Bobby Lewis Shull, M.D.

```
 1   questioning?

 2        A.   Yes, I do.

 3        Q.   As a clinician, do you have familiarity with

 4   the medical literature relating to the material and

 5   chemical properties of polypropylene mesh and their

 6   clinical significance?

 7        A.   I think I do.

 8        Q.   And are many of those articles cited in your

 9   report as providing some basis for your opinions?

10        A.   Certainly the background information provides

11   informed -- information for me to come to a conclusion,

12   and I would have to look specifically at the references.

13   Do you have one particular one in mind?  I'd be glad to

14   look at it.

15        Q.   No.  I was just speaking generally.  But let's

16   look at the -- let's look at your Prolift report, if you

17   have that handy.

18        A.   Well, I have the articles, including the -- I

19   think I had some separate articles this morning.  Did I

20   leave some other articles with you this morning?  May I

21   see those just a moment -- or maybe from after lunch?

22   Thank you.

23             These three articles, to ask -- to answer

24   your question, at least in part, this article published

25   in 2004 on "Host response after reconstruction of
```

Bobby Lewis Shull, M.D.

```
 1   abdominal wall defects with a porcine dermal collagen in

 2   a rat model" -- I beg your pardon -- that animal also

 3   had -- in addition to Pelvicol, had Prolene.  So the

 4   investigators looked at a xenograft and a synthetic

 5   material and looked at a variety of microscopic

 6   parameters that could be evaluated, including

 7   inflammatory response and how fast the inflammatory

 8   response went away, and it looked at collagen

 9   deposition.  So that would be in an animal model, not a

10   human.

11        Q.   And looking at footnotes, for example, 10, 11,

12   12, 13, 14 -- I'm just looking at the titles of those

13   articles.  That would be Page 7 of your report.  And I

14   see articles relating to bacterial colonization, to

15   shrinkage, to contraction, to lightweight and large

16   porous concepts, the material's characterization of

17   explant polypropylene hernia meshes, the pathology of --

18   pathological findings of transvaginal polypropylene

19   slings.

20                  Are those just examples of literature

21   that discusses the material properties of polypropylene

22   and their clinical consequences?

23                  MR. WEBB:  Objection; form.

24        A.   Yes.

25        Q.   (BY MS. THOMPSON)  Do you, as part of your
```

Bobby Lewis Shull, M.D.

1    clinical practice, review IFUs or instructions for use

2    for various products?

3         A.   Yes, ma'am, particularly on the ones I use.

4         Q.   And is the information contained in the IFU,

5    including the warnings section, important to you and

6    other physicians in making treatment decisions?

7         A.   It's important in knowing globally what to

8    expect, and ideally it should be in patient selection,

9    for example.

10        Q.   And is the information contained in the IFU,

11   including the warnings, important to you and other

12   physicians when you are obtaining an informed consent

13   from patients?

14        A.   Yes.

15        Q.   Do you have an opinion as to whether the

16   Prolift and Prolift+M devices are defective from a

17   clinical standpoint?

18             MR. WEBB:  Objection; form.

19        A.   Well, from a clinical standpoint, what I see

20   is the consequence of mesh that is -- after implantation

21   becomes reduced in area with tight bands or exposure or

22   tenderness to palpation, leading to clinical

23   consequences of pain, exposure, and other issues.

24             So from that standpoint, I feel that I

25   have a level of expertise for being able to obtain the

Bobby Lewis Shull, M.D.

```
1    history, do the exam, and correlate the exam and the
2    historical information.
3         Q.   (BY MS. THOMPSON)  And are those problems with
4    the Prolift and Prolift+M devices discussed in your
5    report?
6         A.   Yes.
7         Q.   And are they based on the -- your knowledge
8    and review of the peer-reviewed medical literature as
9    well as your experience?
10        A.   That's correct.
11        Q.   And would the same be true for the Prosima
12   device?
13        A.   In the patients in whom I have seen -- and for
14   certain the one I've operated on -- and I don't know if
15   I've operated on more -- yes, I have personal experience
16   in listening to, evaluating, and managing an explant in
17   someone with Prosima.
18        Q.   And do the Prolift and Prolift+M devices and
19   the Prosima behave similarly to other transvaginal
20   polypropylene mesh kits that you're familiar with and
21   that are reported in the medical literature?
22              MR. WEBB:  Objection; form.
23        A.   To the best of my knowledge, they're similar.
24        Q.   (BY MS. THOMPSON)  So literature describing
25   complications of transvaginally placed prolapse mesh in
```

Bobby Lewis Shull, M.D.

1  general would also apply to Ethicon's products?

2              MR. WEBB:  Objection; form.

3       A.   For the --

4       Q.   (BY MS. THOMPSON)  Is that true?

5       A.   For the trocar-based devices, I believe that's

6  true.  For the non-trocar based, I'm not familiar that

7  there is a another product that is similar to Prosima.

8  There may be, but I'm not familiar with it.

9       Q.   You were asked some questions about Ethicon's

10  marketing to physicians.  Did Ethicon market -- even if

11  it didn't sell to physicians, did Ethicon market its

12  products to physicians based on your review of the

13  Ethicon documents and your knowledge of attending

14  meetings and dealing with sales representatives of

15  companies?

16              MR. WEBB:  Objection; form.

17       A.   I think I can answer it two ways.  In review

18  of the information obtained in the documents I have, it

19  looks as if there were presentations prepared and

20  reviewed to be able to discuss with potential customers,

21  the doctors.

22              And when I go to scientific meetings,

23  this is -- in general, whether it's an international

24  meeting or a state or a domestic American meeting,

25  there -- frequently, if not always, there are exhibits

Bobby Lewis Shull, M.D.

1    that are sponsored by various companies in industry to

2    let the registrants know what is available to be

3    purchased.

4              And depending on what the product is,

5    there may be videos.  There may be demonstrations on a

6    model of some sort, and that's particularly true of

7    products that require surgical implantation.

8              In addition to having 3D models and

9    samples of the product available for people to work with

10   and the videos, there may be one or more physicians who

11   have used that particular product and may lead a

12   discussion and/or show a demonstration about how to use

13   the products.

14             So I would say that those aren't -- those

15   demonstration aren't limited to a certain segment of the

16   people who register for the meeting -- let's use the

17   American College of Obstetricians and Gynecologists, for

18   example.  So anyone can participate in listening to

19   and/or perhaps even trying, on the model, different

20   things that are being shown.

21             MS. THOMPSON:  I have no further

22   questions.

23             MR. WEBB:  Let me have a follow-up here.

24

25

Bobby Lewis Shull, M.D.

```
 1                    EXAMINATION

 2  BY MR. WEBB:

 3      Q.   You said that -- you were asked some questions

 4  about colleagues at Scott & White who are also removing

 5  mesh devices.  Do you remember that question?

 6      A.   Yes, sir, I do.

 7      Q.   Do you also have colleagues at Scott & White

 8  that are implanting mesh devices?

 9           MS. THOMPSON:  Object to form.

10      A.   I can answer that in two ways.  I have

11  associates who do abdominal sacrocolpopexy, and they'll

12  use a synthetic mesh for the abdominal sacrocolpopexy.

13           I have colleagues both in urology and GYN

14  who may do that.  I have colleagues in urology and GYN

15  who use midurethral slings, and they're mesh products.

16  So in those two categories, the answer is, yes, there

17  are people who work with me who are doing that.

18           I don't -- to the best of my knowledge, I

19  don't have anyone in our department who is using mesh

20  kits transvaginally, or even the mesh applique, for

21  prolapse.  I don't think our urology group currently

22  has.

23           I believe that our urology group, for

24  which I really don't have any input on anything about it

25  particularly -- I believe they previously had one member
```

Bobby Lewis Shull, M.D.

1    who did use transvaginal mesh, but I don't know how

2    frequently, and I don't believe that particular person

3    works with us anything longer.

4                    MR. WEBB:  That's all I have.

5                    THE WITNESS:  Thank you.

6                    THE VIDEOGRAPHER:  This concludes the

7    deposition of Dr. Bob Shull.  Going off the record, the

8    time is 3:15.

9                    (Whereupon the deposition concluded at

10   3:15 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Bobby Lewis Shull, M.D.

1              ACKNOWLEDGMENT OF DEPONENT

2

           I, _____, do hereby

3    certify that I have read the foregoing pages, and that
     the same is a correct transcription of the answers given

4    by me to the questions therein propounded, except for
     the corrections or changes in form or substance, if any,

5    noted in the attached Errata Sheet.

6

7

     _____

8    BOBBY LEWIS SHULL, M.D.                         DATE

9

10

11

12

13

14

     Subscribed and sworn to before me this _____ day of

15   _____, 20____.

16   My commission expires:_____

17

18   _____

     Notary Public

19

20

21

22

23

24

25

Bobby Lewis Shull, M.D.

1                           CERTIFICATE

2

3        I, Steven Stogel, a Certified Shorthand Reporter in

4   and for the State of Texas, do hereby certify that BOBBY

5   LEWIS SHULL, M.D., the witness whose deposition is

6   hereinbefore set forth, was duly sworn by me and that

7   such deposition is a true record of the testimony given

8   by the witness.

9        I further certify that I am neither related to or

10  employed by any of the parties in or counsel to this

11  action, nor am I financially interested in the outcome

12  of this action.

13       In witness whereof, I have hereunto set my hand and

14  seal this 18th day of March, 2016.

15

16

17

18                       STEVEN STOGEL

19

20

21

22

23

24

25

Bobby Lewis Shull, M.D.

```
 1                    - - - - - -

                   E R R A T A

 2                    - - - - - -

 3    PAGE  LINE  CHANGE

 4    _____ _____  _____

 5      REASON:  _____

 6    _____ _____  _____

 7      REASON:  _____

 8    _____ _____  _____

 9      REASON:  _____

10    _____ _____  _____

11      REASON:  _____

12    _____ _____  _____

13      REASON:  _____

14    _____ _____  _____

15      REASON:  _____

16    _____ _____  _____

17      REASON:  _____

18    _____ _____  _____

19      REASON:  _____

20    _____ _____  _____

21      REASON:  _____

22    _____ _____  _____

23      REASON:  _____

24    _____ _____  _____

25      REASON:  _____
```

Bobby Lewis Shull, M.D.

1                          LAWYER'S NOTES

2    PAGE  LINE

3    _____  _____   _____

4    _____  _____   _____

5    _____  _____   _____

6    _____  _____   _____

7    _____  _____   _____

8    _____  _____   _____

9    _____  _____   _____

10   _____  _____   _____

11   _____  _____   _____

12   _____  _____   _____

13   _____  _____   _____

14   _____  _____   _____

15   _____  _____   _____

16   _____  _____   _____

17   _____  _____   _____

18   _____  _____   _____

19   _____  _____   _____

20   _____  _____   _____

21   _____  _____   _____

22   _____  _____   _____

23   _____  _____   _____

24   _____  _____   _____

25   _____  _____   _____