Christina Pramudji, M.D.

Page 1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2              CHARLESTON DIVISION
3    IN RE: ETHICON, INC.,
     PELVIC REPAIR SYSTEMS
4    PRODUCTS LIABILITY LITIGATION    MDL NO. 2327

5

6    Jo Huskey and Allen
     Huskey,
7         Plaintiffs,
     v.          Case No. 2:12-cv-05201
8
9    Ethicon, Inc., et al.,

          Defendants.

10
11
12
13
14        ORAL DEPOSITION OF
15     CHRISTINA PRAMUDJI, M.D.
16        Friday, April 11, 2014
17
18
19
20
21
22     GOLKOW TECHNOLOGIES, INC.
23    877.370.3377 ph|917.591.5672 fax
24        deps@golkow.com

Page 2

1         ORAL DEPOSITION OF CHRISTINA
2    PRAMUDJI, M.D., produced as a witness at the
3    instance of the Plaintiffs, and duly sworn,
4    was taken in the above styled and numbered
5    cause on Friday, April 11, 2014, from
6    10:06 a.m. to 4:18 p.m., before Susan Perry
7    Miller, CSR-TX, CCR-LA, CSR-CA, CLR, CRR,
8    RDR, Notary Public in and for the State of
9    Texas, reported via Machine Shorthand with
10   Realtime Computer Translation and Interactive
11   Realtime Technology, at the Westin Memorial
12   City, 945 Gessner Road, Houston, Texas
13   pursuant to the Federal Rules of Civil
14   Procedure.
15              --oOo--
16
17
18
19
20
21
22
23
24

Page 3

1              APPEARANCES
2
3    FOR PLAINTIFFS:
4       MOTLEY RICE LLC
5       321 South Main Street, 2nd Floor
6       Providence, Rhode Island  02903
7       (T) 401.457.7700 | (F) 401.457.7708
8       By:  Fidelma Fitzpatrick, Esq.
9          ffitzpatrick@motleyrice.com
10
11      WEXLER WALLACE LLP
12      55 West Monroe Street, Suite 3300
13      Chicago, Illinois  60603
14      (T) 312.346.2222 | (F) 312.346.0022
15      By:  Edward A. Wallace, Esq.
16         eaw@wexlerwallace.com
17
18      LAW OFFICE OF MARGARET M. THOMPSON
19      101 Colorado Street, No. 3304
20      Austin, Texas  78701
21      (T) 512.695.1708
22      By:  Margaret M. Thompson, M.D., J.D.
23         mthompsonmd@gmail.com
24

Page 4

1    APPEARANCES, Continued:
2
3    FOR DEFENDANTS:
4       BUTLER SNOW LLP
5       500 Office Center Drive, Suite 400
6       Fort Washington, Pennsylvania  19034
7       (T) 267.513.1885 | (F) 267.513.1701
8       By:  Nils B. (Burt) Snell, Esq.
9          burt.snell@butlersnow.com
10
11
12              --oOo--
13
14
15
16
17
18
19
20
21
22
23
24

1 (Pages 1 to 4)

EXHIBIT A

Christina Pramudji, M.D.

Page 5

1              INDEX
2       ORAL DEPOSITION OF
3    CHRISTINA PRAMUDJI, M.D., APRIL 11, 2014
4                   Page
5    APPEARANCES                        3
6    PRELIMINARY PROCEEDINGS            7
7
8    EXAMINATION OF CHRISTINA PRAMUDJI, M.D.:
9    BY MS. KIRKPATRICK..................... 7
10   BY MR. SNELL..........................253
11   BY MS. KIRKPATRICK....................264
12   BY MR. SNELL..........................267
13
14   CERTIFICATE              268
15   LAWYER'S NOTES           269
16
17
18
19   Deposition Support Index:
20                   Page / Line
21   Instruction Not to Answer    45   12
22
23
24
25

Page 6

1              EXHIBIT INDEX
2       Description            Page
3    Pramudji-1   Notice of Deposition      9
          and Document Requests
4
     Pramudji-2   Expert Report of          9
5           Christina Pramudji, M.D.
6    Pramudji-3   Report of IME on          10
          Jo Huskey
7
8    Pramudji-4   "Sling surgery for        29
          stress urinary
9           incontinence in women:
          a systematic review and
10          metaanalysis"

11   Pramudji-5   "Randomized Trial of      29
          Tension-Free Vaginal
12          Tape and Tension-Free
          Vaginal Tape-Obturator
13          for Urodynamic Stress
          Incontinence in Women"
14   Pramudji-6   "Polypropylene mesh:      30
          evidence for lack of
15          carcinogenicity"
16   Pramudji-7   "Long-Term Results of     32
          Burch Colposuspension"
17
18   Pramudji-8   "Five-year Results of a   32
          Randomized Trial
19          Comparing Retropubic
          and Transobturator
20          Midurethral Slings for
          Stress Incontinence"
21   Pramudji-9   Gynecare TVT Obturator   149
          System Instructions for
22          Use
23   Pramudji-10  Pelvic Illustration      166
          with Handwritten Labels
24
25              --oOo--

Page 7

1       PRELIMINARY PROCEEDINGS
2       (Friday, April 11, 2014, 10:06 a.m.)
3       (Witness sworn by the reporter.)
4              PROCEEDINGS
5       CHRISTINA PRAMUDJI, M.D.,
6    having taken an oath to tell the truth, the
7    whole truth, and nothing but the truth, was
8    examined and testified as follows:
9              EXAMINATION
10   BY MS. KIRKPATRICK:
11      Q.    Good morning, Dr. Pramudji.  Can
12   you state your name and your address for the
13   record, please?
14      A.    Christina Pramudji, M.D.,
15   2 Lorrielake Lane, Houston, Texas 77024.
16      Q.    And where are you currently
17   employed?
18      A.    Texas Oncology, Texas Urology
19   Specialists.
20      Q.    Okay.  And is that here in
21   Houston?
22      A.    Yes.
23      Q.    Okay.  Now, Dr. Pramudji, you've
24   been deposed before, correct?

Page 8

1       A.    Yes.
2       Q.    And how many times have you been
3    deposed?
4       A.    In this particular litigation or
5    mesh litigation, twice.
6       Q.    Okay.
7       A.    With Schubert --
8       Q.    Do you remember what case?
9       A.    The Schubert case and the Lewis
10   case.
11      Q.    And do you know where the
12   Schubert case was based or out of, what
13   state?
14      A.    Missouri.
15      Q.    And the Lewis case?
16      A.    It was an MDL case.
17      Q.    And you understand that you're
18   here today in connection with a case that is
19   in the MDL, correct?
20      A.    Yes.
21      Q.    And it's against Ethicon.
22      A.    Yes.
23      Q.    Okay.  During the course of the
24   day, I'm going to be asking you a series of

Christina Pramudji, M.D.

Page 9

```
1    questions.  If you can't hear me or you don't
2    understand what I'm asking, please just let
3    me know and I'm happy to rephrase it.  If you
4    do go ahead and answer, I'll just assume that
5    you understood what it was that I was looking
6    for.
7            If you need to take a break,
8    stretch your legs, use the ladies' room,
9    please, just let me know.  This is not an
10   endurance test so if you need a little bit of
11   a break, that's not an issue at all.
12           Before we get started today, I'm
13   going to mark a couple of exhibits.
14           (Whereupon, Exhibit Pramudji-1,
15   Notice of Deposition and Document
16   Requests, was marked for identification.)
17   BY MS. KIRKPATRICK:
18       Q.    Marked as Exhibit 1 is the notice
19   of deposition, and let me show that to you.
20   Have you seen that document before?
21       A.    Yes.
22       Q.    Okay.
23           (Whereupon, Exhibit Pramudji-2,
24   Expert Report of Christina Pramudji,
```

Page 10

```
1    M.D., was marked for identification.)
2    BY MS. KIRKPATRICK:
3        Q.    And I'm going to show now what's
4    been marked as Deposition Exhibit 2.  Can you
5    identify that for me?
6        A.    That's my expert report in
7    relation to this case.
8        Q.    Okay.  You want to take a quick
9    look through and make sure that, at least at
10   a quick glance, that that's a complete copy?
11           (Witness reviews document(s).)
12       A.    Yes, it is.
13           (Whereupon, Exhibit Pramudji-3,
14   Report of IME on Jo Huskey, was marked
15   for identification.)
16   BY MS. KIRKPATRICK:
17       Q.    Okay.  And then I'm going to show
18   you what's been marked as Deposition
19   Exhibit 3 and ask you what that is.
20       A.    That is the report of my IME for
21   Mrs. Huskey.
22       Q.    Okay.  We'll be marking some more
23   exhibits throughout the day, but these are
24   ones that we will refer to often.
```

Page 11

```
1            MR. SNELL:  For the record, there
2    were urodynamics that were also sent
3    over.
4            MS. KIRKPATRICK:  Yes, we're
5    going to be marking those later.  Thank
6    you.
7    BY MS. KIRKPATRICK:
8        Q.    Okay.  You just testified that
9    you gave testimony previously in the Lewis
10   case in the MDL.  Is that right?
11       A.    That's correct.
12       Q.    And what kind of device did
13   Ms. Lewis have?
14       A.    She had a retropubic TDT.
15       Q.    And you also testified that you
16   had been deposed in the Schubert case in
17   Missouri.  What kind of device did
18   Ms. Schubert have?
19       A.    She had a Prolift.
20       Q.    And in the Lewis case you gave
21   deposition testimony.  Is that correct?
22       A.    Yes.
23       Q.    But you did not testify at trial
24   in that matter?
```

Page 12

```
1        A.    That's correct.
2        Q.    Have you ever testified at trial
3    in any mesh-related cases?
4        A.    Not as of yet.
5        Q.    Okay.  And it's my understanding
6    from having reviewed your deposition in the
7    Lewis case that you set forth a number of
8    general opinions concerning Ethicon and
9    concerning the TVT line of products.  Is that
10   right?
11       A.    Yes.
12       Q.    Do you recall those opinions in
13   this case as well?
14       A.    Yes.
15       Q.    What I'd like to do is, I don't
16   want to have to go through and redepose you
17   on the same things that you've been deposed
18   before, so let me ask you this way:  Is there
19   anything that you testified to in the Lewis
20   deposition concerning Ethicon or concerning
21   TVT, the substance of these issues, that you
22   wish to change or amend or alter at any
23   point?
24       A.    No.
```

3 (Pages 9 to 12)

Christina Pramudji, M.D.

Page 13

1    Q.    Okay.  So the opinions that you
2  espoused in that particular deposition remain
3  current today?
4    A.    Yes.
5    Q.    And you've incorporated them into
6  your opinions in Ms. Huskey's case as well?
7    A.    Correct.
8    Q.    Okay.  In addition to your
9  mesh-related depositions, have you given
10  depositions in any other kind of case?
11    A.    Yes, I have.
12    Q.    Okay.  And what are those?
13    A.    When I was in residency, I was
14  deposed as a resident who placed an
15  endotracheal tube on a patient as a fact
16  witness.
17    Q.    Uh-huh.  And that was not expert
18  testimony?
19    A.    No.
20    Q.    And were you a defendant in that
21  lawsuit?
22    A.    No.
23    Q.    Was it a medical malpractice
24  lawsuit?

Page 14

1    A.    Yes.
2    Q.    Okay.  Any other testimony that
3  you've given?
4    A.    Yes.
5    Q.    Okay.  And what's that?
6    A.    I was a defendant in a lawsuit
7  in -- approximately 10 years ago, a patient
8  of my partner's who expired unexpectedly, and
9  I was the physician on call; and that case
10  was dropped against -- against me and against
11  my partner.
12    Q.    Okay.
13    A.    And they only sued the hospital.
14    Q.    And what was -- was the
15  patient an inpatient at the time?
16    A.    Yes.
17    Q.    And what was the condition that
18  he or she --
19    A.    He was in the hospital for a
20  kidney stone and subsequently was found to
21  have a renal mass as well.
22    Q.    Okay.  And did you give your
23  testimony in that case?
24    A.    I was deposed.

Page 15

1    Q.    You were deposed.
2    A.    Yes.
3    Q.    Okay.  And that was as a
4  defendant?
5    A.    As a defendant.
6    Q.    Okay.  Any other cases?
7    A.    And there was one other case
8  where my group was the defendant, and I was
9  the representative of the group in a patient
10  that was in the hospital with gross hematuria
11  and had a bladder rupture.
12    Q.    Okay.
13    A.    And that case was dropped against
14  the group.
15    Q.    And you gave deposition testimony
16  there?
17    A.    Yes, I did.
18    Q.    Okay.  Any other cases where you
19  or your practice was a defendant to a
20  lawsuit?
21    A.    No.
22    Q.    Okay.  Any other cases in which
23  you gave a deposition?
24    A.    No.

Page 16

1    Q.    Are these mesh cases that you're
2  testifying on behalf of Ethicon, are those
3  the first cases where you've served as an
4  expert witness?
5    A.    Yes.
6    Oh, I'm sorry, no.  There is
7  another case where I served as an expert
8  witness for a drugstore company.  It was a
9  patient -- yeah, I guess a person, a customer
10  of theirs, who fell in their store and
11  claimed that the fall caused urinary
12  incontinence; and I was not deposed.  I just
13  wrote an expert report or expert opinion.
14    Q.    On behalf of the drugstore?
15    A.    Correct.
16    Q.    And your opinion in that case --
17    A.    Was that the fall did not cause
18  the incontinence.  She had that before the
19  fall.
20    Q.    Okay.  Is there anything else?
21    A.    That's all.
22    Q.    Okay.  So you understand that in
23  Ms. Huskey's case, you're serving as an
24  expert witness for Ethicon.  Is that right?

Christina Pramudji, M.D.

Page 17

1    A.    Yes.
2    Q.    But in addition to serving as an
3  expert in the litigation and the -- let me
4  make sure I get this right -- Schubert, Lewis
5  and Huskey cases, you've also done other work
6  for Ethicon.  Isn't that right?
7    A.    That's correct.
8    Q.    Okay.  So can you tell me what it
9  is, what type of work you have done for
10 Ethicon outside of the expert witness arena?
11   A.    Sure.  I have done primarily
12 preceptorship work, teaching other physicians
13 the techniques with Prolift, TVT-O, Solyx --
14 not Solyx -- TVT-Secur and Prolift+M.  I have
15 done some advisory panels, for which I was
16 reimbursed.  And I have helped moderate at
17 meetings and at their booth at the AUA.
18   Q.    And in each of these positions,
19 you were compensated for the work that you
20 did for Ethicon?
21   A.    Yes, I was.
22   Q.    And how much -- were you
23 compensated on an hourly basis?
24   A.    They typically do it as a

Page 18

1  half-day basis.
2    Q.    Okay.  And how much were you
3  reimbursed for a half day?
4    A.    $1,500.
5    Q.    Okay.  And how much are you
6  compensated in this litigation for the work
7  that you do for Ethicon?
8    A.    $600 per hour or $700 per hour
9  for deposition and trial.
10   Q.    Okay.  When did you begin doing
11 work for Ethicon?
12   A.    Around 2005.
13   Q.    And how did you come to work with
14 Ethicon regarding their mesh products?
15   A.    My senior partner, Dr. Anhalt,
16 had been a preceptor for Ethicon for the TVT
17 retropubic.  He was the first person in
18 Houston to do that procedure, and so he had a
19 relationship with Ethicon.  And we operate
20 together quite a bit so he recommended to
21 them that they start to involve me as well,
22 and we would do the preceptorships together.
23   Q.    Okay.
24   A.    Most of the advisory boards and

Page 19

1  the preceptorships, we would do together.
2    Q.    And does that continue to this
3  day, that you do most of that work with your
4  partner?
5        MR. SNELL:  Form.
6    A.    No.  We don't have -- we don't do
7  preceptorships anymore.
8  BY MS. KIRKPATRICK:
9    Q.    You don't do them at all?
10   A.    No.  They haven't had any new
11 products that they need preceptors for.
12   Q.    Okay.  So I want to just go
13 through a list of work you may have done with
14 Ethicon and just establish some basic facts
15 about it.  You testified that you've been
16 parts of advisory boards or advisory panels?
17 Is that right?
18   A.    Yes.
19   Q.    And was that compensated at that
20 rate of $1500 a half day?
21   A.    Yes.
22   Q.    What advisory boards or panels
23 did you work on for Ethicon?
24   A.    I can only remember a couple off

Page 20

1  the top of my head.  There was one where they
2  wanted to hear from urologists, it was
3  specifically urologists that went to their
4  headquarters in New Jersey, and they were
5  getting our feedback on the mesh procedures
6  and future directions that they might want to
7  take.
8    Q.    Uh-huh.
9    A.    And I remember one that was
10 specifically just Dr. Anhalt and I and they
11 had some sort of secret new procedures that
12 they were kind of just throwing -- you know,
13 getting our feedback on, getting our opinion
14 on.
15   Q.    Okay.  Do you remember any
16 others?
17   A.    I can't remember any others off
18 the top of my head.
19   Q.    Okay.  Do you remember just
20 generally how many advisory boards you'd have
21 served on for Ethicon, the ballpark figure?
22   A.    I feel like there may have been
23 one or two more than what I can remember.
24   Q.    Okay.  So it's safe to say

5 (Pages 17 to 20)

Christina Pramudji, M.D.

Page 21

1 somewhere between maybe two and five?
2     A.   Yes.
3     Q.   Okay.  You also testified that
4 you were a sponsored speaker or somebody
5 who's addressed or spoken on behalf of
6 Ethicon at meetings?  Is that right?
7     A.   Yes.
8     Q.   Okay.  And can you tell me which
9 meetings you spoke about -- or, excuse me,
10 strike that.
11         Can you tell me which meetings
12 you represented Ethicon at?
13         MR. SNELL:  Form.  Go ahead.
14     A.   AUA in Anaheim; that would have
15 been around -- let's see -- 2007, I believe.
16 I helped give some talks about cases at the
17 AUA booth.
18 BY MS. KIRKPATRICK:
19     Q.   Uh-huh.
20     A.   And then at one of the last -- I
21 think the last TVT summit, which was in
22 Sonoma, I moderated a -- what did they call
23 it -- it was sort of a case discussion where
24 one physician would present cases and I would

Page 22

1 moderate the questions and, you know, if
2 people wanted to ask questions and bring up
3 certain issues that we would talk about.
4     Q.   Did these involve SUI products,
5 POP products or both?
6     A.   Both.
7     Q.   Okay.  So you gave me two that
8 you remember.  Are there any others?  Can you
9 give me a ballpark of how many times you
10 served as a compensated speaker for --
11     A.   That's all I can remember for
12 that.
13     Q.   Okay.  You also said that you did
14 preceptorship work on Prolift, Prolift Plus
15 and TVT-O, TVT Secur.  Is that right?
16     A.   Yes.
17     Q.   Have you ever done it for the
18 TVT Classic?
19     A.   No.
20     Q.   How many times have you done
21 preceptorships for the TVT-O?
22     A.   It would have been in conjunction
23 with the Prolift cases.  They would not have
24 been separate preceptorships only for that.

Page 23

1     Q.   Okay.  And do you know about how
2 many times?
3     A.   Maybe somewhere between five and
4 10, I would say.
5     Q.   Okay.  Have you ever presented to
6 the sales force or any sales representatives
7 at Ethicon?
8     A.   No.
9     Q.   Have you ever performed any
10 product research for Ethicon?
11     A.   No.
12     Q.   Have you ever received any grant
13 money from Ethicon to perform research or do
14 any kind of medical reviews for them?
15     A.   No.
16     Q.   Have you ever been asked to
17 provide any information or input into
18 publications that Ethicon is doing?
19     A.   No.
20     Q.   Have you ever participated in any
21 design validation projects?
22     A.   No.
23     Q.   So in other -- in addition to the
24 things that we've spoken about, is there

Page 24

1 anything else that you have done for Ethicon
2 outside of the expert arena between 2005,
3 when you started working with them, through
4 the present?
5     A.   Not that I can recall.
6     Q.   Can you tell me how much money to
7 date you have been paid by Ethicon for your
8 non-expert work?
9     A.   I don't remember that number.
10 That was presented in the prior case, so that
11 data is available.
12     Q.   Okay.  Since that time, have you
13 been compensated by Ethicon for any
14 non-expert work?
15     A.   No.
16     Q.   So the numbers that you gave in
17 the Lewis case would be current through
18 today?
19     A.   That's correct.
20     Q.   Okay.  When did you become
21 retained or when did Ethicon retain you to
22 work as an expert in pelvic mesh litigation?
23     A.   They started talking to me about
24 a year and a half ago, is the initial

6 (Pages 21 to 24)

Christina Pramudji, M.D.

Page 25

1 meeting, and then I officially was retained
2 last summer, 2013.
3      Q.     So retained in the summer of
4 2013.
5             And who approached you about
6 working with Ethicon as an expert?
7      A.     The first person was Michael
8 Brown.
9      Q.     And who else have you spoken to
10 concerning your work with -- as an expert
11 witness for Ethicon?
12            MR. SNELL:  In any -- just so I
13      understand, in any kind of shape, form?
14      Depositions, trial?
15            MS. KIRKPATRICK:  Yeah, just who
16      have you spoken to.
17            MR. SNELL:  Okay.
18      A.     Well, of course, Burt Snell,
19 Christy Brown -- I mean Christy Jones.  Where
20 did that come from?  Christy Jones.
21 BY MS. KIRKPATRICK:
22      Q.     Don't tell her that, okay?
23      A.     I'm sorry.
24             And when I was in Charleston,

Page 26

1 West Virginia, I met several attorneys but I
2 don't remember all their names.
3      Q.     Okay.  But you've primarily
4 worked with Mr. Snell and Ms. Jones on these
5 cases.  Is that right?
6      A.     Yes.  Oh, I did do one deposition
7 prep with Anita Modak-Truran.
8            MR. SNELL:  Good enough.
9 BY MS. KIRKPATRICK:
10      Q.     Okay.  Anyone else?
11      A.     No, that's all.
12      Q.     Okay.  And can you tell me, were
13 the figures that you relayed before in your
14 Lewis testimony current as of that time on
15 the amount of money that you've been paid for
16 expert services by Ethicon?
17      A.     Yes.
18      Q.     Okay.  Since the time of your
19 Lewis deposition, how much money have you
20 been paid by Ethicon for your expert
21 services?
22      A.     I would have to look at the exact
23 number.  I can give you a ballpark.  It was
24 around $50,000.

Page 27

1      Q.     Okay.  So your best estimate,
2 sitting here, is that you've been paid
3 another $50,000?
4      A.     Correct.
5      Q.     Is there any amount that you've
6 billed that's still owing to date?
7      A.     No.
8      Q.     You've billed for all of your
9 services, except, I'm assuming, for the
10 deposition here today, and you've been
11 compensated for everything that you have
12 done?
13      A.     No.  I haven't billed for my
14 Huskey -- anything related to Huskey as of
15 yet.
16      Q.     Okay.  How much time have you
17 spent on Ms. Huskey's case, approximately?
18      A.     Specifically on Ms. Huskey's
19 case, about 50 hours.
20      Q.     Can you tell me what you did in
21 that 50 hours, just a general breakdown of
22 the type of work that you did?
23      A.     Yeah.  I reviewed the medical
24 records, the depositions, write the report;

Page 28

1 the IME, writing the report for that.
2 Reviewing the literature, preparing for
3 today.
4      Q.     Okay.  Let me just ask you
5 briefly about the literature.  In your
6 previous testimony in Lewis and in the expert
7 report that you gave in Lewis, you had opinions
8 about what the literature reflected
9 concerning TVT devices.
10      A.     Uh-huh.
11      Q.     Is there any other literature
12 that you are relying on in this case in
13 addition to what you discussed or what you
14 identified in the Lewis case?
15      A.     Yes.  There are a couple of
16 papers that have -- that I've added.
17      Q.     Okay.  Can you tell me which
18 those are?
19      A.     I'd have to go through it and
20 look.
21      Q.     Yeah, whatever you need to look
22 at is fine.
23      A.     And I may -- there may be some
24 that I give you in error because there's so

Christina Pramudji, M.D.

Page 29

1  many papers, and it's hard to remember which
2  ones are new and which ones...
3        (Witness reviews document(s).)
4     A.   This one's new.
5        (Witness tenders document.)
6        (Whereupon, Exhibit Pramudji-4,
7  "Sling surgery for stress urinary
8  incontinence in women: a systematic
9  review and metaanalysis", was marked for
10 identification.)
11    A.   You know, I think without going
12 through my report, it's hard to really
13 remember which ones are which.
14       (Witness tenders document.)
15       (Whereupon, Exhibit Pramudji-5,
16 "Randomized Trial of Tension-Free Vaginal
17 Tape and Tension-Free Vaginal
18 Tape-Obturator for Urodynamic Stress
19 Incontinence in Women", was marked for
20 identification.)
21 BY MS. KIRKPATRICK:
22    Q.   Thanks.
23    A.   Those I know.
24       MR. SNELL:  Just so I'm clear,

Page 30

1  Counsel, are you asking in addition to
2  the ones that she has in her report,
3  anything beyond that?
4        MS. KIRKPATRICK:  What I'm trying
5  to understand is -- you know, we kind of
6  agreed that we're not going to rehash old
7  ground with Lewis, so I don't want to ask
8  about all of the literature out there.
9        I'm asking Dr. Pramudji if she
10 can identify for me what specifically
11 she's relying on here that wasn't covered
12 in Lewis so we can narrow the focus of
13 what we're talking about today.
14       (Whereupon, Exhibit Pramudji-6,
15 "Polypropylene mesh: evidence for lack of
16 carcinogenicity", was marked for
17 identification.)
18       MR. SNELL:  Her report has
19 additions, I know that for a fact.  What
20 I'm trying to understand is you mean
21 beyond those obvious additions in her
22 report, or --
23       MS. KIRKPATRICK:  Right.  What I
24 don't want to do --

Page 31

1        We can go off the record here.
2        (Recess, 10:28 a.m. to 10:34 a.m.)
3  BY MS. KIRKPATRICK:
4     Q.   Okay, Dr. Pramudji.  I'm not
5  trying to give you a memory test here.  What
6  I'm really just looking for are the primary
7  documents that you can recall that you've
8  relied on, the primarily medical literature
9  that you relied on for your opinions in this
10 TVT-O case versus the TVT case that you
11 identified or that you used in Ms. Lewis's
12 case.
13    A.   Okay.
14    Q.   And I understand that you have
15 things on your reliance list and cited in
16 your report and that you intend to rely on
17 those.
18    A.   Yes.  These are a couple others
19 that I don't believe are on the report list
20 that I looked at since that deposition.
21    Q.   Okay.  Let me take a look at
22 those.
23    A.   This one's not specifically about
24 TVT-O, but it's got some useful information

Page 32

1  in it.
2        (Whereupon, Exhibit Pramudji-7,
3  "Long-Term Results of Burch
4  Colposuspension", was marked for
5  identification.)
6  BY MS. KIRKPATRICK:
7     Q.   Okay.  Anything else?
8        (Witness tenders document.)
9        (Whereupon, Exhibit Pramudji-8,
10 "Five-year Results of a Randomized Trial
11 Comparing Retropubic and Transobturator
12 Midurethral Slings for Stress
13 Incontinence", was marked for
14 identification.)
15 BY MS. KIRKPATRICK:
16    Q.   And if you come across anything
17 later, you can certainly let me know.
18       Okay.  Let me just identify these
19 for the record.  Exhibit 4 is a medical
20 article entitled, "Sling surgery for stress
21 urinary incontinence in women: a systematic
22 review and metaanalysis."
23       Exhibit 5 is a medical article
24 from the Journal of Urology entitled

8 (Pages 29 to 32)

Christina Pramudji, M.D.

Page 33

1 "Randomized Trial of Tension-Free Vaginal
2 Tape and Tension-Free Vaginal Tape-Obturator
3 for Urodynamic Stress Incontinence in Women."
4 　　　　MR. SNELL:  Who is the author on
5 that?
6 　　　　MS. KIRKPATRICK:  Roderick Teo.
7 　　　　Exhibit 6 is from the
8 International Journal of Urogynecology
9 and Pamela Moalli, "Polypropylene mesh:
10 evidence for lack of carcinogenicity,"
11 there we go, got it out.
12 　　　　Exhibit 7 is from Gynecologic and
13 Obstetric Investigation.  It's entitled,
14 "Long-Term Results of Burch
15 Colposuspension."
16 　　　　And Exhibit 8 is from the
17 European Association of Urology,
18 "Five-year Results of a Randomized Trial
19 Comparing Retropubic and Transobturator
20 Midurethral Slings for Stress
21 Incontinence."
22 BY MS. KIRKPATRICK:
23 　　Q.　　And those are articles that
24 you're relying on for your opinions in

Page 34

1 Ms. Huskey's case.  Is that right?
2 　　A.　　That's correct.
3 　　Q.　　Okay.  Going back to your work
4 specifically for Ethicon, by the time you
5 were retained as an expert for Ethicon in the
6 summer of 2013, you had worked for them for
7 about eight years prior to that in the
8 various roles that we have discussed,
9 correct?
10 　　A.　　That's correct.
11 　　Q.　　And you had been compensated a
12 significant sum of money for your work with
13 Ethicon prior to your retention as an expert
14 witness in the summer of 2013.
15 　　　　MR. SNELL:  Form.  Okay.  Go
16 ahead.
17 　　A.　　Well, define "significant."  I
18 mean, do you have a specific number in mind
19 that you're referring to?
20 BY MS. KIRKPATRICK:
21 　　Q.　　I don't.  We can take significant
22 out if you'd like.  You've been compensated
23 the amount that you identified --
24 　　A.　　Yes.

Page 35

1 　　Q.　　-- in your Lewis testimony?
2 　　A.　　Okay.
3 　　Q.　　And you haven't been compensated
4 beyond that for any other work?
5 　　A.　　Correct, yes.
6 　　Q.　　Okay, thank you.  What
7 specifically were you asked to do in
8 Ms. Huskey's case?
9 　　A.　　Well, first I was asked to review
10 the basic medical records, the most pertinent
11 medical records and decide if I felt that I
12 would support the position of Ethicon in this
13 case.
14 　　　　And then I was asked to provide
15 my opinion based on all the medical records
16 and depositions that had been taken up to
17 that point to formulate my opinions in regard
18 to that case.
19 　　Q.　　And do you know when you were
20 first contacted by Ethicon or their lawyers
21 about Ms. Huskey's case?
22 　　A.　　Yes.  It was mid February.
23 　　Q.　　Mid February of 2014?
24 　　A.　　Correct.

Page 36

1 　　Q.　　Okay.  And what did Ethicon
2 provide you with as of mid February 2014 to
3 allow you to make a decision about whether
4 you supported the position of Ethicon in this
5 particular case?
6 　　A.　　I can't remember exactly.  I know
7 it included the operative reports.  It
8 included Dr. Byrkit's initial evaluation and
9 surgery discussion, Ms. Huskey's deposition
10 and Dr. Byrkit's deposition.  I can't
11 remember.  There was more, but I can't
12 remember everything.
13 　　Q.　　Okay.  Did you look at any
14 medical records from Dr. Siddique?
15 　　A.　　Yes.  Well, the operative
16 reports, and I believe some of the office
17 visits from that.
18 　　Q.　　What other medical records do you
19 recall reviewing at the outset to make the
20 initial decision about whether you could
21 support Ethicon's opinions in this case?
22 　　　　MR. SNELL:  Form.
23 　　　　Go ahead.
24 　　A.　　I can't recall.

9 (Pages 33 to 36)

Christina Pramudji, M.D.

Page 37

1  BY MS. KIRKPATRICK:
2      Q.    Okay.  And when did you make the
3  decision that you were willing to serve as an
4  expert witness for Ethicon in this matter?
5      A.    After I reviewed those records.
6      Q.    Okay.  And how long did that take
7  you?
8      A.    About a day.
9      Q.    Do you remember who at Ethicon
10  you contacted to say that, yes, you were
11  willing to serve as an expert witness?
12      A.    Mr. Snell.
13      Q.    And was Mr. Snell the person who
14  contacted you in the first instance to ask --
15      A.    Yes.
16      Q.    -- if you would consider being an
17  expert?
18          Have you discussed Ms. Huskey's
19  case with anybody else at Ethicon besides
20  Mr. Snell?
21      A.    No.
22      Q.    Did you tell Mr. Snell what
23  information you would want to review before
24  making a decision whether to serve as an

Page 38

1  expert witness in this case?
2      A.    Yes.
3      Q.    And did he provide all of that
4  information to you?
5      A.    Yes, he did.
6      Q.    Did he provide any other
7  information to you that he believed would be
8  helpful in formulating your opinion in this
9  case?
10      A.    I'm not sure, but I would think
11  so, because there's a very -- I mean, just
12  numerous medical records and depositions.
13  There's several things.
14      Q.    Did he provide you with any
15  literature?
16      A.    Yes, he did.
17      Q.    Okay.  And what literature did he
18  provide you with?
19      A.    Well, he actually helped me with
20  almost all the literature.  It's very
21  comprehensive.
22      Q.    Did you do an independent
23  literature review in connection with
24  Ms. Huskey's case to determine what

Page 39

1  literature you believed was relevant to your
2  opinions in this case?
3      A.    No, I did not.
4      Q.    And that was -- the literature
5  that you relied on was the literature that
6  was provided to you by Mr. Snell?
7      A.    Yes.
8      Q.    Okay.  Did Mr. Snell provide
9  you -- after Mr. Snell had provided medical
10  literature to you, did you go out and
11  research or look for any other types of
12  medical literature to answer any other
13  questions that you may have concerning the
14  issues in this case?
15      A.    Well, I'm always reviewing the
16  literature.  I can't say I did a specific
17  search, but I'm always scanning for new
18  information regarding sling and mesh cases.
19  I haven't really found anything else that
20  hasn't been included that I feel like is
21  relevant to my opinions, but I'm always
22  reviewing the literature, looking for all the
23  information that I can regarding the sling
24  and mesh cases.

Page 40

1      Q.    Okay.  About how many -- let's
2  take a look at your expert report, which was
3  marked, I think, as Exhibit 2 in this case.
4      A.    Uh-huh.
5      Q.    And marked as Exhibit B to this
6  is a -- one, two, three, four, five, six,
7  seven, eight -- somewhere around 20 pages,
8  give or take a few pages, that are listings
9  of medical literature.  Is that correct?
10      A.    Yes.
11      Q.    And this is the medical
12  literature that you've identified about your
13  reliance material in addition to the specific
14  medical articles that you've cited in your
15  report itself, correct?
16      A.    Yes.  Yes.
17      Q.    And Mr. Snell provided you with
18  each of these articles?
19      A.    Yes.
20      Q.    And did you read each of these
21  articles?
22      A.    At least I read the abstract on
23  each of them and skimmed through all of them.
24      Q.    And this is -- there's nothing on

10 (Pages 37 to 40)

Christina Pramudji, M.D.

Page 41

1  this list, apart from the medical articles --
2  well, I'm sorry, that's a bad question.
3         In addition to that, there are
4  some Ethicon documents that you have
5  identified on here, patient brochures and
6  some other information at the end of the
7  list.  Do you see that?
8      A.    Yes.  The IFU.
9      Q.    It includes the IFU, there's
10 slide decks.
11     A.    Yes.
12     Q.    There's a whole bunch of videos.
13     A.    Correct.
14     Q.    Is that all information that
15 Mr. Snell provided to you specifically in
16 connection with this case?
17     A.    Yes.
18     Q.    Did you do any kind of
19 independent research into any other source of
20 information concerning Ethicon or the company
21 at all, or did you rely solely on what
22 Mr. Snell had provided to you?
23         MR. SNELL:  Object to form.
24     A.    You know, just looking back at

Page 42

1  some of my own materials that I had, but they
2  were already on the list, yeah.
3  BY MS. KIRKPATRICK:
4      Q.    Okay.  So it's fair to say that
5  everything that is identified in the last
6  three pages here, which are the Ethicon
7  documents, they're all documents that were
8  provided to you by Mr. Snell in connection
9  with this litigation?
10     A.    Yes.
11     Q.    Okay.  Now, do you believe that
12 it's important, as a physician, to gather as
13 much information as you can about a patient
14 before making a determination of the cause of
15 a medical condition?
16     A.    Yes.
17     Q.    Okay.  And you would consider all
18 of the possible causes of a medical condition
19 when reviewing someone's medical records,
20 correct?
21     A.    Yes.
22     Q.    That's no substitute, though, for
23 actually test- -- for actually talking to a
24 patient and getting a firsthand account of

Page 43

1  what their medical condition is, correct?
2      A.    Well, yes.  I mean, the best
3  thing is to take it all in toto; their
4  history, the records that you have, listening
5  to the patient, and of course, examining the
6  patient.
7      Q.    Okay.  When did you ask to
8  perform an IME of Ms. Huskey in this case?
9      A.    I can't remember when.
10     Q.    Did you feel confident generating
11 an expert report in this matter without
12 having had the opportunity to speak with
13 Ms. Huskey and examine her?
14     A.    Yes.
15     Q.    Okay.
16     A.    And I did note in my expert
17 report that I would supplement this, once I
18 did the IME.
19     Q.    And you did do that and you
20 provided us with that this week.  Is that
21 right?
22     A.    Yes.
23     Q.    Did the IME change your opinions
24 at all?

Page 44

1      A.    No.
2      Q.    How many times have you met with
3  Mr. Snell to prepare for your expert reports
4  and testimony in Ms. Huskey's case?
5      A.    Well, we met in person yesterday
6  and we spoke on the phone a handful of times.
7      Q.    How long did you meet for
8  yesterday?
9      A.    Four hours.
10     Q.    Four hours, okay.  You performed
11 the IME of Ms. Huskey on what date?
12     A.    Last Friday, April 4th.
13     Q.    April 4th.
14     A.    Yes.
15     Q.    Okay.  And then you issued the
16 report that we've identified as Exhibit 3 on
17 what day?
18     A.    I issued this I believe on
19 April 9th.
20     Q.    And that was Wednesday of this
21 week.  Is that right?
22     A.    Correct.
23     Q.    Between Ms. Huskey's IME with you
24 on Friday, April 4th, and the time that you

11 (Pages 41 to 44)

Christina Pramudji, M.D.

Page 45

1  issued your written report identified as
2  Exhibit 3, how many times did you talk to
3  Mr. Snell?
4      A.    Once.
5      Q.    And how long was that for?
6      A.    15 minutes.
7      Q.    Who wrote your IME?
8      A.    I did.
9      Q.    Did you have any input from
10  anyone else?
11      MR. SNELL:  Hold on.  You're not
12  answering that.  We had an agreement and
13  I didn't ask your experts about the
14  drafting process.
15      MS. KIRKPATRICK:  No, I think I
16  can ask her if anyone besides -- you're
17  correct, I shouldn't be asking her if it
18  included you, but I think I can ask her
19  if there's anybody else out there who had
20  input into the report and I think you did
21  that in Dr. Steege's deposition regarding
22  Dr. Carey.  So you're right, it's a bad
23  question.
24      MR. SNELL:  Okay.  So she's

Page 46

1  asking you besides any discussions with
2  me, she's talking about any other doctors
3  or any other folks.
4      THE WITNESS:  Okay.
5  BY MS. KIRKPATRICK:
6      Q.    So yes, let me pull that back.
7      A.    I understand.  Okay.
8      Q.    Is there anyone besides Mr. Snell
9  that you talked to or got input on for the
10  IME itself?
11      A.    No.
12      Q.    Okay.  Did you draft your expert
13  report that is identified as Exhibit 2 in
14  this case?
15      A.    Yes, I did.
16      Q.    And is that all your original
17  work product?
18      A.    Yes.
19      Q.    How long did it take you to draft
20  that?
21      A.    A long time.  A lot of it was
22  also carryover from the Lewis case, the
23  general opinions.
24      Q.    And did you draft your opinions

Page 47

1  and expert report in the Lewis case yourself?
2      A.    Yes.
3      Q.    Did you work with any other
4  experts to prepare or discuss Ms. Huskey's
5  case?
6      A.    No.
7      Q.    Do you know who is serving as an
8  expert witness for Ethicon besides yourself?
9      A.    I know Burt's told me, but I
10  can't remember right now.
11      Q.    So besides the communications
12  that you've had with the lawyers for Ethicon,
13  you haven't discussed this case with any
14  other experts or any other physicians or
15  anyone else?
16      A.    No.
17      Q.    Okay.  Now, sitting here today,
18  what we've marked as Exhibit 2 and Exhibit 3
19  contains all of the opinions that you intend
20  to offer in Ms. Huskey's case, correct?
21      A.    Those are my primary opinions.
22  There may be some new -- if there's some new
23  information that comes out, there may be new
24  opinions that I would offer at the time of

Page 48

1  trial.
2      Q.    Sitting here today, do you recall
3  any opinions as of whatever date --
4  April 11th, I think it is -- in addition to
5  what has been set forth in your expert report
6  marked as Exhibit 2 and in your IME marked as
7  Exhibit 3?
8      A.    No.
9      Q.    You haven't discussed any new
10  opinions or reached any new opinions to date.
11  Is that right?
12      A.    That's correct.
13      Q.    Okay.  If you can take a look at
14  Exhibit 1, which is your notice of
15  deposition.
16      A.    Sure.
17      Q.    And I think you testified that
18  you saw this before today?
19      A.    Yes.
20      Q.    Okay.  When did you see it?
21      A.    I don't recall.
22      Q.    And attached to the notice of
23  deposition is a Schedule A that identifies a
24  list of things that we asked you to bring

12 (Pages 45 to 48)

Christina Pramudji, M.D.

Page 49

1   with you today to the deposition.  Is that
2   right?
3       A.   Uh-huh.
4       Q.   And -- oh, I think they're gone.
5   Looks like you brought about five boxes worth
6   materials?
7       A.   Correct.
8       Q.   Okay.  I just want to make sure
9   that I have this correct for the record.
10  That material that you brought today includes
11  all of the materials that you relied on and
12  that were identified in your Lewis case,
13  correct?
14      A.   Hmm...
15          MR. SNELL:  I'm going to object
16  to that.  Object to the form.
17      A.   I believe so.
18  BY MS. KIRKPATRICK:
19      Q.   Okay.  And in addition to that,
20  you've brought information with you that's
21  relevant to Ms. Huskey's case specifically.
22  Is that right?
23      A.   Yes.
24      Q.   Can you identify for the record

Page 50

1   what it is that you brought with you today in
2   response to Schedule A that relates to
3   Ms. Huskey's case?
4       A.   The medical records and the
5   depositions, the reports, the IME report.  I
6   believe that's it, that's all.
7       Q.   Okay.  Let's talk about the
8   depositions.  I know from looking through the
9   box earlier, which I appreciate your letting
10  me do that, that you have a number of
11  reports -- excuse me, a number of depositions
12  that were taken of both fact and expert
13  witnesses in Ms. Huskey's case with you.
14      A.   Yes.
15      Q.   Can you just go through those and
16  identify them for the record, which ones they
17  are that you have reviewed in connection with
18  your testimony and opinions?
19      A.   Uh-huh.  Yes.
20          MR. SNELL:  Do you want her to
21  actually pull the --
22      A.   Do you want me to just look at
23  the list?
24  BY MS. KIRKPATRICK:

Page 51

1       Q.   Yeah, I mean, you can pull them.
2   I know there are some depositions that you've
3   looked at that were not identified.
4          (Discussion off the record.)
5          MR. SNELL:  I thought there was
6   another binder.
7       A.   Dr. Byrkit; Sohail Siddique,
8   S-I-D-D-I-Q-U-E, first name Sohail.
9   Dr. Elizabeth Mueller, M-U-E-L-L-E-R.  Nancy
10  Davidson.  John Steege, S-T-E-E-G-E.  I
11  skimmed Dr. Colleen Fitzgerald.
12  Dr. Vladimir --
13      Q.   Iakovlev?
14      A.   -- Iakovlev, I-A-K-O-V-L-E-V.  Jo
15  Huskey.  Did I say Gretchen Dean already?
16          Dr. Dele Oguneleye, D-E-L-E, last
17  name O-G-U-N-L-E-Y-E.  Dr. Blaivas,
18  B-L-A-I-V-A-S.  Dr. Bruce Rosenzweig,
19  R-O-S-E-N-Z-W-E-I-G.
20      Q.   Is there one right under that
21  too?
22      A.   No, that's Blaivas.  I got extra
23  back.
24      Q.   Okay.  And did you review all of

Page 52

1   these depositions in connection with your
2   testimony here today?
3       A.   Yes, the ones that I said.  There
4   were some that I didn't review in detail.
5       Q.   Okay.  I believe you said you
6   didn't review Dr. Fitzgerald in detail?
7       A.   Right.
8       Q.   Which other ones did you not
9   review in detail?
10      A.   Dr. Rominger, Dr. Schoenig, Ruth
11  Teel, Terry Ward and Brian Yocks and Allen
12  Huskey, James Harms, Michelle Irvin.
13      Q.   Okay.  So those are depositions
14  that you had available to you but you just
15  skimmed because you didn't think that they
16  were central to your opinions in the case?
17      A.   Correct.
18      Q.   Do you -- outside of your
19  connection in this case, do you know any of
20  the physicians that have treated Ms. Huskey?
21      A.   No.
22      Q.   Do you know any of the physicians
23  who have offered expert opinions on behalf of
24  Ms. Huskey?

13 (Pages 49 to 52)

Christina Pramudji, M.D.

Page 53

1    A.    No.
2    Q.    Do you know any of them by
3  reputation?
4    A.    Yes.
5    Q.    Who do you know by reputation?
6    A.    Jerry Blaivas.
7    Q.    And how do you know Dr. Blaivas
8  by reputation?
9    A.    From AUA courses and from the
10  literature.
11    Q.    And do you consider him an expert
12  on the mesh complications and urology issues?
13    A.    No.
14    Q.    You do not.  Why not?
15    A.    I consider him an expert in
16  urology, female urology, but he doesn't have
17  a lot of experience with implanting mesh.
18    Q.    But you agree he's got a lot of
19  experience in explanting mesh, don't you?
20    A.    In incontinence treatment.
21    Q.    In explanting mesh specifically?
22    A.    I don't know how much experience
23  he has with that.
24    Q.    Did you read his deposition?

Page 54

1    A.    I did.
2    Q.    Okay.  Do you remember how many
3  he said?
4    A.    I don't remember what he said.
5    Q.    How many meshes have you removed?
6    A.    I would say I've probably done 10
7  to 20 explants, like complete explants.  And
8  then I've done multiple revisions or partial
9  removals.
10    Q.    And how -- are those SUI related
11  specifically?
12    A.    No.  They could be pelvic organ
13  prolapse or SUI.
14    Q.    Okay.  And I think you started to
15  say innumerable and then you went to multiple
16  partial revisions.
17    A.    Yeah.
18    Q.    Can you give me a ballpark on
19  those?
20    A.    Sure.  I'm going to say probably
21  around 50 to 60, somewhere in that range.
22    Q.    And do you think that work in
23  removing SUI devices qualifies you to testify
24  as an expert here on issues related to the

Page 55

1  removal of Ms. Huskey's mesh?
2         MR. SNELL:  Form.
3         Go ahead.
4    A.    I think, yes, that and my
5  experience with mesh in general.
6  BY MS. KIRKPATRICK:
7    Q.    Okay.
8    A.    Over a thousand slings and
9  Prolift patients.
10    Q.    So you've put mesh in about a
11  thousand times.  Is that right?
12    A.    15 to -- 1500 to 2000, somewhere
13  in there.
14    Q.    Okay.  And you've removed mesh
15  from not quite a hundred patients.  Is that
16  right?
17    A.    Uh-huh.
18    Q.    And you also know that you've had
19  patients who have had their mesh removed by
20  other physicians, correct?
21    A.    Yes.
22    Q.    And how many patients of yours
23  have had their mesh removed by other
24  physicians?

Page 56

1    A.    I know of two.
2    Q.    Okay.  You know of two
3  specifically?
4    A.    Yes.
5    Q.    But you'd agree with me there's
6  probably more than that?
7         MR. SNELL:  Form.
8    A.    I don't know.
9  BY MS. KIRKPATRICK:
10    Q.    Okay.  In addition to
11  Dr. Blaivas, are there any of the other
12  experts that you know by reputation?
13    A.    Elizabeth Mueller.  Well, she's
14  not an expert, she was a fact witness.
15    Q.    Okay.  And what do you know about
16  Dr. Mueller?
17    A.    She's involved in a lot of
18  studies related to incontinence and prolapse.
19    Q.    Okay.  Anyone else?
20    A.    No.
21    Q.    Okay.  Let's try to move pretty
22  quickly through Schedule A, if we can.
23    A.    Yes.
24    Q.    We asked you to bring records

14 (Pages 53 to 56)

Christina Pramudji, M.D.

Page 57

1   related to your fees, billing or time spent.
2   I think you told me already you haven't
3   generated a bill related to Ms. Huskey's
4   case. Is that right?
5       A.    That's correct.
6           MS. KIRKPATRICK:  Burt, when
7       that's generated for Ms. Huskey's case --
8           MR. SNELL:  I'll give it to you,
9       of course.
10  BY MS. KIRKPATRICK:
11      Q.    All right. We asked you to bring
12  an updated copy of your CV. Is the copy that
13  was provided with your expert deposition the
14  most up-to-date copy of that CV?
15      A.    Yes, it is.
16      Q.    I'll go through that in a minute
17  with you.
18          We asked you to bring with you
19  all documents, including but not limited to
20  videotapes, recordings, databases, whether
21  preliminary or final, prepared by or at your
22  direction in connection with your expected
23  testimony or in connection with the
24  development of an opinion or belief, or an

Page 58

1   assessment or determination of facts,
2   relating to this or any other pelvic mesh
3   cases.
4           Did you bring anything else
5   responsive to that?
6       A.    Just -- the boxes that I brought
7   include everything.
8       Q.    Is there any specific information
9   that you have that is responsive to the
10  requests in Schedule A that you did not bring
11  with you today?
12      A.    On this whole list?
13      Q.    Yeah. I just want to see if
14  there's anything that wasn't provided.
15      A.    Okay. I'm trying to think. So I
16  believe we are going to -- you know, I know
17  at the last deposition he asked for the
18  records of compensation from Ethicon and you
19  were going to be able to get that from him,
20  so everything else is comprehensive.
21      Q.    And what you're talking about
22  there is that after your Lewis deposition,
23  you provided records to Mr. Kountze
24  concerning the amount of money that you've

Page 59

1   been compensated by Ethicon, correct?
2       A.    Yes. He wanted the consulting
3   agreements and the record of compensation so
4   I provided everything that I had related to
5   that.
6       Q.    So everything that Mr. Kountze
7   has brings us up to date and current on that
8   request?
9       A.    That's correct.
10          MR. SNELL:  And I'll just make a
11      note for the record it was provided to
12      MDL liaison counsel as well. It was
13      provided to multiple people.
14          MS. KIRKPATRICK:  I just want to
15      know where to get it. So I can get it
16      from --
17          MR. SNELL:  MDL liaison counsel
18      has the payments, all of that stuff.
19          MS. KIRKPATRICK:  MDL liaison
20      counsel or --
21          MR. SNELL:  Jeff Kuntz, Bryan
22      Aylstock, they were all sent that.
23          MS. KIRKPATRICK:  Okay. So the
24      leads for Ethicon specifically had them,

Page 60

1   that's great.
2           MR. SNELL:  Yeah. Also
3       Dr. Pramudji produced documents,
4       communications between her and Ethicon
5       that were --
6           THE WITNESS:  Oh, that's right,
7       all those emails. There weren't that
8       many, but I had to go through them.
9           MR. SNELL:  That production was
10      made on the MDL plaintiffs' counsel as
11      well.
12  BY MS. KIRKPATRICK:
13      Q.    Okay. And that was a production
14  that you made in connection with the Lewis
15  case, correct?
16      A.    Correct.
17      Q.    Is there anything else that you
18  have generated, any other communications you
19  have had with Ethicon outside of your work as
20  an expert witness?
21      A.    No.
22      Q.    There's no other communications?
23      A.    No.
24      Q.    There's no other emails?

15 (Pages 57 to 60)

Christina Pramudji, M.D.

Page 61

1    A.    No.
2    Q.    There's no other billings or
3  anything like that?
4    A.    That's correct.
5    Q.    So what I can get from them will
6  be the complete copy?
7    A.    Yes.
8    Q.    Okay, great.  Is there anything
9  else that you did not bring with you today --
10   A.    No.
11   Q.    -- that would be responsive to
12 this subpoena?
13         Okay.  Is there anything here --
14 well, we can talk about that off the record.
15         Okay, Dr. Pramudji.  You are a
16 urologist, correct?
17   A.    Correct.
18   Q.    And there's a difference between
19 being a urologist and a urogynecologist,
20 isn't there?
21   A.    Yes, there is.
22   Q.    Can you describe the difference
23 for me, please?
24   A.    Yes.  A urologist has six years

Page 62

1  of surgical training centered around the
2  urinary tract, and there is also pelvic floor
3  training in that as well.  We do major
4  surgery such as bladder removal,
5  reconstruction, kidney removal, very detailed
6  reconstruction of the urinary tract.
7          Now, there is -- I'm sure you're
8  aware, the Female Pelvic Medicine and
9  Reconstructive Surgery board, which I did sit
10 for, based on my experience, and passed,
11 which is basically the same thing as
12 urogynecology, minus the hysterectomy.  I do
13 not do hysterectomies but I do everything
14 else that a urogynecologist would do.
15   Q.    Okay.
16   A.    A urogynecologist does a
17 four-year obstetrics and gynecology residency
18 so they only have approximately two years of
19 surgical training and then they have a
20 fellowship of three years, and it's centered
21 around the pelvic floor.
22         But in my training, I worked with
23 Drs. Rodney Appell and Timothy Boone, who are
24 very renowned female urologists, and I did

Page 63

1  not feel the need to do a fellowship because
2  I had excellent training with them.
3    Q.    And you're talking about
4  specifically a fellowship in urogynecology?
5    A.    Or we call it a female urology
6  fellowship from coming out of urology.
7    Q.    Female urology, okay.
8          And you felt that the training
9  that you had received during your residency
10 qualified you to do -- to focus your
11 attention on female urology issues without
12 going through that fellowship?
13   A.    Yes.
14   Q.    How long have you treated women
15 with stress urinary incontinence?
16   A.    Including residency, 16 years.
17   Q.    When did you start using
18 polypropylene slings to treat women with
19 stress urinary incontinence?
20   A.    I was trained on it in residency,
21 2001, and then I used it in private practice
22 starting in 2002 when I first began as a
23 practitioner.
24   Q.    Okay.  And in 2002, the only

Page 64

1  polypropylene sling kits that were on the
2  market were implanted using the retropubic
3  method.  Is that right?
4    A.    That's correct.
5    Q.    So you were trained in your
6  residency to implant a retropubic sling?
7    A.    Yes.
8    Q.    And when you started in private
9  practice, you continued to implant the
10 retropubic sling.  Is that right?
11   A.    That's right.
12   Q.    What brand did you use?
13   A.    I'm sorry, what?
14   Q.    What brand?
15   A.    The Ethicon.
16   Q.    Have you ever implanted anything
17 besides Ethicon?
18   A.    Yes.
19   Q.    Which ones have you used?
20   A.    AMS, Caldera, C-A-L-D-E-R-A,
21 Boston Scientific.  I think that's all.
22   Q.    And at the time you started using
23 these in your practice in 2002, did you
24 believe that the retropubic was an effective

16 (Pages 61 to 64)

Christina Pramudji, M.D.

Page 65

1   way to treat women with stress urinary
2   incontinence?
3        A.    Yes, very effective and very safe
4   and much less invasive than what we had been
5   doing for incontinence.
6        Q.    Okay.  Let's talk about that a
7   little bit, going back to 2002.  When you say
8   that it was safe, did you rely on medical
9   literature at the time to convince yourself
10  that it was safe?
11       A.    Absolutely.  It was a big debate,
12  you know, at residency, because -- and we
13  were, you know, carefully looking at the
14  literature at that time because it was a new
15  procedure.  Members of my faculty were
16  skeptical, so we were, you know, looking at
17  it carefully.
18       Q.    Now, at the time that you started
19  implanting these, the kits to treat stress
20  urinary incontinence had been on the market
21  for about four years.  Is that right?
22       A.    That sounds about right.
23       Q.    Okay.  And you know that there
24  were no clinical trials done prior to the

Page 66

1   launch of the TVT Classic.  Isn't that right?
2        MR. SNELL:  Form, misstates the
3   evidence.
4        A.    There were trials.
5        MR. SNELL:  Foundation, too, for
6   that one.
7   BY MS. KIRKPATRICK:
8        Q.    Which ones did you rely on?
9        A.    The ones in Europe that were done
10  with Ulmsten and...
11       Q.    Okay.  So the Ulmsten, so that
12  was what you relied on for the safety?
13       A.    Uh-huh.
14       Q.    Anything else besides the Ulmsten
15  studies?
16       A.    Are you talking about what I
17  relied on in 2000?
18       Q.    I just want to know what it was
19  that you had looked at to convince yourself
20  that this was safe.
21       A.    I can't remember.  There was
22  multiple studies that -- there was always
23  something coming out in the Journal of
24  Urology that we would look at, at journal

Page 67

1   club.
2        Q.    But the one that stands out to
3   you was the Ulmsten study.  Is that right?
4        A.    Well, that was in response to
5   your question that there were no studies
6   prior to the launch.
7        Q.    Okay.  So in addition to the
8   Ulmsten study, which obviously you do recall,
9   what other studies do you remember looking
10  at, if any?
11       A.    I don't remember.
12       Q.    Were any of the studies that you
13  looked at at the time designed to look at the
14  long-term safety of the product when
15  implanted permanently in women?
16       A.    Well, at that point I think they
17  didn't have more than maybe four- or
18  five-year data, so I can't recall.
19       Q.    Okay.  So we agree that the
20  maximum amount of time that could have been
21  looked at at that time is probably about four
22  to five years?
23       A.    Correct.
24       Q.    Do you recall whether any of the

Page 68

1   studies that you looked at, however, were
2   designed to look at the issue of safety as
3   opposed to efficacy?
4        A.    I don't recall.  But I would
5   think that there were, because that was our
6   big question, is this going to be safe to put
7   in, polypropylene mesh in women, into their
8   vaginal area; so that was definitely on the
9   forefront of our minds.  Baylor residency,
10  top residency program, we were all really
11  looking at that carefully, and the conclusion
12  was that it was safe.
13       Q.    But you don't recall any studies
14  that were specifically designed to look at
15  the issue of safety?
16       MR. SNELL:  Form.
17       A.    That was too long ago.  I can't
18  specifically say any specific studies.
19  BY MS. KIRKPATRICK:
20       Q.    And you'll agree with me, even if
21  those -- if those studies did exist, the
22  maximum amount of time they would have been
23  looking at was about four to five years?
24       A.    Yes.

17 (Pages 65 to 68)

Christina Pramudji, M.D.

Page 69

1    Q.    Do you have any concerns with
2  using the retropubic approach to implant a
3  polypropylene sling?
4    A.    I'm sorry, could you repeat that
5  question?
6    Q.    Did you have any concerns about
7  the safety of using a retropubic device to
8  treat stress urinary incontinence?
9    A.    Well, it has to be done properly.
10 I think it's been well established that if it
11 is done properly and in an appropriate
12 patient, that it is safe.  The risk to
13 benefit ratio is quite favorable for women.
14   Q.    Okay.  What do you mean by "done
15 properly"?
16   A.    Following surgical principles,
17 following the recommended guidelines for use.
18   Q.    And when you're talking about
19 that, are you talking about the instructions
20 for use that, for example, Ethicon will
21 publish with the kits themselves?
22   A.    That's part of it, but also just
23 applying general surgical principles that
24 we're taught in residency.

Page 70

1    Q.    Okay.  Anything else that you
2  mean by "if done properly"?
3    A.    Well, I mean, for me, I think
4  there needs to be that just basic surgical
5  attention to detail, meticulous handling of
6  the tissues, and I think it's important to
7  just be aware of each step that you're doing
8  in a surgical procedure.
9    Q.    Okay.  Thank you.
10        And you also had said that in
11 appropriate candidates.
12   A.    Uh-huh.
13   Q.    Who would not be an appropriate
14 candidate for the implantation of a
15 retropubic polypropylene midurethral sling?
16   A.    Well, a patient that does not
17 have healthy enough tissue, if their tissue
18 is very thinned out, so there might be
19 concerns about how they might heal.
20   Q.    Uh-huh.
21   A.    Or they do not have, of course,
22 documented stress urinary incontinence,
23 either by their history or by urodynamics; if
24 they have only urge incontinence, of course

Page 71

1  that wouldn't be appropriate.
2    Q.    And of course it wouldn't be
3  appropriate if they had neither stress
4  urinary incontinence nor urge urinary
5  incontinence, correct?
6    A.    Yeah.  Yeah, of course.
7    Q.    So you need to have a diagnosis
8  of the condition before it would be
9  appropriate.
10   A.    Yes.
11   Q.    Okay.  So apart from women who
12 don't have SUI and women who may not have
13 healthy tissue, is there any other
14 contraindication that you believe exists for
15 who would be an inappropriate candidate for a
16 retropubic synthetic sling?
17        MR. SNELL:  Form.
18   A.    Not as a general category.
19 BY MS. KIRKPATRICK:
20   Q.    Okay.  How many retropubic
21 devices have you implanted, approximately?
22   A.    I think the number is around 300.
23   Q.    About 300 total?
24   A.    Yes.

Page 72

1    Q.    And of the 300 patients that
2  you've implanted a retropubic device, can you
3  give me a ballpark of how many you've had to
4  remove or excise the device from?  Do you
5  remember?
6    A.    It's going to be a very low
7  number.  I don't -- I mean, honestly, one or
8  two that I would remove it.
9        Now, if there's a mesh exposure,
10 if you're referring to that category as well,
11 that's probably about a half a percent rate
12 for my patients.
13   Q.    So half a --
14   A.    So 1 out of 200.
15   Q.    So 1 out of 2- -- so you think
16 that you've got probably one to two patients
17 that you've actually had to go in and remove
18 the sling and you've probably got one or two
19 other patients that you've had to go and
20 excise the mesh if there's an erosion.  Is
21 that correct?
22   A.    Partially, yes.
23   Q.    Okay.  Why did you have to remove
24 the mesh in the one or two patients?  Do you

18 (Pages 69 to 72)

Christina Pramudji, M.D.



Page 73

1  remember what the complications were?
2      A.    I can't remember the details.
3      Q.    Do you have a general memory?
4      A.    No.
5      Q.    What are the circumstances in
6  which you, as a physician and as a surgeon,
7  would choose to remove a retropubic
8  polypropylene sling from a patient?
9      A.    If they're having significant
10  voiding dysfunction and obstruction and the
11  sling really isn't effective, then I might go
12  in and remove the part of the sling that's
13  around the urethra, so a urethrolysis.
14          Or if they have a mesh exposure
15  that can't be managed just with a small
16  revision, then I might need to go ahead and
17  take out the sling that's around the urethra
18  and in the vagina.
19      Q.    Okay.  Anything else?
20      A.    No.
21      Q.    Okay.  Now, at some point you
22  began to use a transobturator sling as
23  opposed to a retropubic, correct?
24      A.    Yes.

Page 74

1      Q.    And if I remember correctly, is
2  that about 2006?
3      A.    Yes.  Maybe -- I think it was
4  before that.
5      Q.    Before that?
6      A.    Yeah.
7      Q.    When did you start to do that?
8      A.    I think it was 2004.
9      Q.    2004, okay.  And what was the
10  first transobturator midurethral
11  polypropylene sling that you used?
12      A.    The TVT-O.
13      Q.    And you agree with me that the
14  TVT Classic and the TVT-O are made with the
15  same material, correct?
16      A.    That's correct.
17      Q.    But they're inserted into women
18  differently, correct?
19      A.    Correct.
20      Q.    And they go through different
21  parts of their anatomy in the insertion
22  process?
23          MR. SNELL:  Form.
24      A.    The trocar does go through a

Page 75

1  different area.
2  BY MS. KIRKPATRICK:
3      Q.    And the mesh actually sits in a
4  different part of the pelvic cavity.  Isn't
5  that right?
6      A.    That's correct.
7      Q.    Okay.  Before you started
8  implanting TVT-O slings, had you performed
9  any surgery in the transobturator space in a
10  woman?
11      A.    No.
12      Q.    Is there any other surgery that
13  you perform as a urologist that occurs in the
14  transobturator space of a woman?
15      A.    No.
16      Q.    Why did you change from using a
17  retropubic to using a transobturator
18  approach?
19          MR. SNELL:  Form.
20      A.    The TVT Classic had more of a
21  risk of bladder perforation compared to TVT-O
22  and it took longer to do.
23  BY MS. KIRKPATRICK:
24      Q.    How long did it take to do the

Page 76

1  TVT Classic?
2      A.    About 20 minutes.
3      Q.    And how long does it take to do
4  the TVT-O?
5      A.    About 10 minutes.
6      Q.    So about a 10-minute -- okay.
7          What information did you rely on
8  in making a decision to use the new surgical
9  technique of implanting a polypropylene
10  midurethral sling through the transobturator
11  space?
12      A.    I looked at the literature that
13  was available at that time, and I can't
14  remember specifically what it was.  I
15  apologize.  But to show that it was as
16  effective, because that was my concern, that
17  it was going to be as effective as the TVT.
18  It's faster, less risk of bladder
19  perforation, but is it going to work as well.
20      Q.    Okay.  And you looked at the
21  medical literature at the time and satisfied
22  yourself that it was going to be equally
23  effective?
24      A.    Yes.

Christina Pramudji, M.D.

1  Q.  What, if anything, did you do to
2  examine or consider what complications may
3  arise from the use of a midurethral sling
4  through the transobturator approach as
5  opposed to the retropubic approach?
6  A.  Well, the initial literature that
7  was available that would report the
8  complications that they experienced.  Also
9  talking to other pelvic floor surgeons that
10  had used it.
11  Q.  Okay.  And you'll agree with me
12  as well that as far as long-term
13  complications associated with use of a
14  transobturator midurethral polypropylene
15  sling that there was relatively limited data
16  available at the time in 2004, correct?
17  A.  That's correct.
18  Q.  So you would have looked at both
19  the efficacy and you would have looked at
20  what you considered to be the short-term
21  complications that may arise that would have
22  been reflected in medical literature.
23  A.  That's correct.
24  Q.  Did you talk to anyone at Ethicon

1  about it?
2  A.  Yes.
3  Q.  Okay.  Who did you talk to?
4  A.  The sales rep.
5  Q.  Uh-huh.  Anyone else?
6  A.  No.
7  Q.  Did Ethicon provide you with any
8  information that informed or helped you make
9  a decision to start using the transobturator
10  approach?
11  A.  No.
12  Q.  How did you get trained to do it?
13  A.  My partner, Dr. Anhalt, he went
14  to a course and then he came back and trained
15  me.
16  Q.  Talking about the literature
17  that's out there, you agree with me that
18  there's different types of studies that can
19  be done to look at both issues of safety and
20  efficacy in medical devices, correct?
21  A.  Correct.  You can do a
22  prospective study, a randomized study, a
23  retrospective study; so there's several
24  different ways that you can look at it.

1  Q.  So you can do a prospective
2  study, a retrospective study, randomized --
3  A.  Randomized controlled trial, you
4  can just look at a cohort of patients.
5  Q.  You could look at also, I guess,
6  individual case reports.
7  MR. SNELL:  Form.
8  A.  Correct.
9  BY MS. KIRKPATRICK:
10  Q.  What do you think are the best
11  type of studies that can be done to establish
12  the safety of a medical device?
13  A.  Well, a randomized controlled
14  trial is considered the top tier of medical
15  evidence, but it's the hardest study to do.
16  Q.  And when you say it's the hardest
17  study to do, what do you mean?
18  A.  It's hard, especially for
19  surgical studies, to have patients trust in
20  the roll of the dice as far as what procedure
21  they're going to have ahead of time, because
22  they don't know exactly what they're getting
23  into ahead of time.
24  So there have been studies that

1  have not worked out, not specifically related
2  to slings, but in surgery in general, where
3  they couldn't accrue patients.
4  Q.  Okay.  And you would agree with
5  me that's because in randomized controlled
6  studies, most patients want to have a say in
7  what kind of medical/surgical intervention
8  they're going to have, correct?
9  A.  They want to know what they're
10  getting into, yes.
11  Q.  And they want to know what the
12  potential complications or potential side
13  effects are from a certain procedure.  Is
14  that right?
15  A.  Correct.
16  Q.  And they want to know what the
17  potential efficacy of the procedure is,
18  correct?
19  A.  Correct.  But part of that's why
20  you're doing the study, so yeah.
21  Q.  Yeah.  And those patients also,
22  I'll put it in my everyday speak and the
23  non-medical speak, but they kind of want to
24  have some assurance that they're not going to

Christina Pramudji, M.D.

Page 81

1  end up worse off than they were when they
2  went into this trial.  Isn't that right?
3          MR. SNELL:  Form.
4      A.    I think everybody wants that when
5  they go into surgery, yes.
6  BY MS. KIRKPATRICK:
7      Q.    And they want to have some kind
8  of feeling that they're not a human guinea
9  pig in some kind of big surgical experiment.
10  Isn't that right?
11          MR. SNELL:  Objection.
12      A.    Yes.
13  BY MS. KIRKPATRICK:
14      Q.    And so that information is all
15  particularly important to people in making a
16  decision about whether to have a surgical
17  procedure, which is, as you say, one of the
18  limitations of an RCT, correct?
19      A.    Correct.
20      Q.    What would be the next tier down
21  from an RCT?
22      A.    The next tier down would be a
23  prospective study where you're evaluating the
24  results as they come in.

Page 82

1      Q.    And so those are studies in which
2  the device has already been implanted.  Is
3  that right?
4      A.    Typically, yes.
5      Q.    And now you're monitoring a
6  series of patients to see what happens after
7  you put the device in.
8      A.    Correct.
9      Q.    Okay.  And then what is next
10  after that?
11      A.    And then a retrospective study.
12      Q.    Okay.  And can you describe what
13  that is?
14      A.    That's looking back at your data
15  that you have collected.
16      Q.    Okay.  So it's like a data
17  analysis, correct?
18      A.    Correct.
19      Q.    And you'd run like a statistical
20  modeling to see what trends you can discern
21  from the pool of data that you already have
22  in your possession.
23      A.    It can include that, it can
24  include questionnaires of patients, calling

Page 83

1  patients, even examining patients, having
2  them come back in a few years later and
3  looking at where they are right now.
4      Q.    Okay.  And you will agree with me
5  that when you're talking about a permanent
6  medical implant, it's important to look at
7  long-term clinical effects, correct?
8      A.    I think, you know, when you can,
9  obviously, yes.  However, you know, you can't
10  necessarily hold a device for 10 years while
11  you're waiting for long-term studies.
12      Q.    Okay.
13      A.    If you see initial results that
14  demonstrate safety and efficacy, then if
15  the -- you know, if the benefit outweighs the
16  risk, then you proceed forward and then you
17  continue to follow and collect data, which is
18  what I think we've seen with the TVT and the
19  TVT-O, that over, you know, all these years
20  that we've seen thousands of studies that
21  show that or that bear out the safety that
22  was initially seen when it was first
23  beginning to be implanted.
24      Q.    Okay.  So I want to talk a little

Page 84

1  bit about risk-benefit because you just
2  brought this up.
3      A.    Uh-huh.
4      Q.    There's risk-benefit as it
5  applies in the medical literature, which
6  would be what you're discussing, correct?
7  Does the benefit of this product outweigh the
8  risk.  That's a different analysis than what
9  an individual patient goes through to make a
10  decision in her particular case whether the
11  benefit outweighs the risk, correct?
12          MR. SNELL:  Form.
13      A.    Well, to some degree, yes,
14  because each patient is individual.  Each
15  patient has different goals and different --
16  their health is at a different point,
17  different ages, so as far as the literature,
18  we have to look at the whole picture, the
19  whole body of evidence to make a decision
20  about different devices or drugs or what have
21  you.
22          But, yeah, for each patient, it
23  is.  It's a discussion with her doctor and a
24  decision about the risks versus the benefits.

21 (Pages 81 to 84)

Christina Pramudji, M.D.

Page 85

BY MS. KIRKPATRICK:
1
2      Q.     Right.  And so every patient is
3   entitled to make her own decision about
4   whether the potential risks are acceptable in
5   her particular situation, correct?
6      A.     Correct.
7      Q.     And in order to make that
8   determination, you'll agree with me that a
9   patient has to be informed of all of the
10   risks of a procedure, correct?
11           MR. SNELL:  Form.
12      A.     Well, it's impossible, really, to
13   inform a patient of all the risks of each
14   procedure.
15   BY MS. KIRKPATRICK:
16      Q.     Okay.  So how do you decide which
17   risks you're going to tell your patients
18   about and which ones you're not?
19      A.     Well, for me, and I think for
20   most physicians, you evaluate that patient
21   and, you know, where they are and how they're
22   going to respond to the therapy, tell them
23   about any specific risks that they're at
24   higher risk for or that would be more

Page 86

1   pertinent to their life, and also the main
2   risks that are seen in this procedure or any
3   procedure.
4      Q.     Okay.  And when you talk about
5   main risks, there's two parts to that
6   equation.  The first is you look at just the
7   statistical incidence of that risk over the
8   population.  Is that right?
9      A.     Correct.
10      Q.     But you also look at the severity
11   of the potential complication, correct?
12      A.     Correct.  There's -- it's graded
13   as far as a serious event or a minor event.
14      Q.     Okay.  So you could have a
15   serious adverse event that happens in a very
16   small, small percentage of the population,
17   but it would be important to tell a woman
18   that so she can make the decision whether the
19   risk of that particular serious injury is
20   relevant to her case and her decision,
21   correct?
22      A.     If there's a specific reason with
23   that patient why you would tell her that,
24   then yes.  But for every patient, you don't

Page 87

1   need to tell them about every serious
2   potential adverse event.
3      Q.     Well, let me use an example for
4   you.  When you go in to do surgery, do you
5   always warn your patients that there's a risk
6   of death with surgery?
7      A.     Personally, I do not.
8      Q.     You do not?
9      A.     But I know a lot of surgeons that
10   do, yeah.
11      Q.     Okay.  How do you decide who gets
12   the warning about the risk of death from
13   surgery and who doesn't?
14      A.     Well, I typically don't operate
15   on patients with much of a risk of death.  I
16   mean, I can warn them of that when they're
17   leaving my office, there's a risk of death
18   when you drive home, because there's actually
19   more risk of that than with the surgery that
20   I do.
21           However, if there's a patient
22   that's high-risk for kidney removal or if
23   they just have a lot of major issues, then I
24   would warn them of the risk of death.

Page 88

1           But from the surgeries that I do,
2   the risk of death is so small that -- I mean,
3   and also it's kind of obvious if you're going
4   to surgery, you know, that some strange event
5   could happen and you could die.
6      Q.     Nobody likes to think of that,
7   but you're right.
8           So what I'm trying to understand
9   here is -- and maybe let me ask it like this.
10      A.     Okay.
11      Q.     When you have a patient who comes
12   in to get a TVT-O implanted, are there
13   certain patients that you warn that there's a
14   risk of chronic pain?
15      A.     Yes.
16      Q.     Okay.  Who would those patients
17   be?
18      A.     Well, most all patients, but, you
19   know, particularly if it's a younger patient,
20   they tend to have, in my experience, and I
21   don't know that this has been borne out in
22   the literature, but older patients don't seem
23   to have as much pain issues in their pelvic
24   area.  I don't think their nerves are as

22 (Pages 85 to 88)

Christina Pramudji, M.D.

Page 89

1 sensitive.
2        So definitely with younger
3 patients and sexually active patients, I will
4 warn them that that is a very small risk, but
5 it is a risk.
6        Q.    Okay.  What do you consider to be
7 a small risk?
8        A.    Oh, like 1 in 500.
9        Q.    Okay.  And do you reach that
10 statistic from -- or rely on any medical
11 literature in reaching the statistic that
12 approximately 1 in 500 women who are
13 implanted with a TVT-O may experience chronic
14 pain?
15        A.    I think that the studies that
16 look at chronic pain show that it is very --
17 I mean, it's hardly reported at all because
18 it's so rare.
19        Q.    Okay.
20        A.    And in my experience, I don't
21 think I've seen any patient that had that
22 from a TVT-O.
23        Q.    Okay.  So you haven't personally
24 treated physicians [sic].  Can you identify

Page 90

1 any particular studies that you have in mind
2 that you're relying on to support your
3 opinion that it's extremely rare to have
4 chronic pain following the implantation of a
5 TVT-O device?
6        A.    I could look through the studies.
7 I don't have them at my fingertips, but I
8 could look through them.
9        Q.    Would glancing through what you
10 have in your report help, or -- I don't want
11 to send you on an exercise of reading 500
12 articles, but if there's anything that jumps
13 out at you, I just would like to know what
14 those are.
15        A.    Uh-huh.
16        (Witness reviews document(s).)
17        A.    Well, specifically for
18 dyspareunia, dyspareunia, even in the
19 short-term, was rare in the Schimpf study.
20 BY MS. KIRKPATRICK:
21        Q.    Can you spell that for the court
22 reporter?
23        A.    Yes, S-C-H-I-M-P-F.
24        Q.    Would that be what we've

Page 91

1 identified as Exhibit 4?  Is that what you're
2 referring to?
3        A.    Yes.
4        Q.    Okay, great.
5        (Witness reviews document(s).)
6        A.    I can't remember the others right
7 now.  I'd have to go through -- go through my
8 binders.
9        Okay, here's one.  Athanasiou,
10 A-T-H-A-N-A-S-I-O-U, he said no -- they said
11 no patient reported persistent groin pain at
12 the long-term follow-up.
13        And really, looking at the
14 literature, there's really no mention of
15 dyspareunia, groin pain.  As far as, you
16 know, persistent vaginal or pelvic pain,
17 there's really not a lot of that.  I mean,
18 it's hardly mentioned at all in the
19 literature.
20 BY MS. KIRKPATRICK:
21        Q.    Okay.
22        A.    And not -- you know, not really
23 seen in practice.
24        Q.    In your practice?

Page 92

1        A.    Uh-huh.
2        Q.    Okay.  Let's go back to the
3 discussion of just some general principles
4 about the literature.
5        What does primary endpoint mean
6 in the literature and designing a trial?
7        A.    So the primary endpoint is when
8 the study is designed, they're looking at the
9 first thing that they want to evaluate.  So,
10 for instance, the subjective cure rate of
11 stress urinary incontinence at one year would
12 be the primary endpoint.
13        And then secondary would be the
14 other side effects, the other complications
15 that were observed in the study.
16        Q.    So am I correct -- oh, do you
17 need to grab that?
18        A.    No, it's okay.
19        Q.    So what happens when one is
20 conducting one of these trials, there's a
21 primary purpose, for example, to establish
22 the efficacy of a particular device, correct?
23        A.    Correct.
24        Q.    And while doing that study,

23 (Pages 89 to 92)

Christina Pramudji, M.D.

Page 93

1 there's other information that you may gather
2 along the way that are relevant to other
3 considerations, correct?
4     A.    Correct.
5     Q.    But the trial is designed with
6 that primary endpoint in mind, correct?
7     A.    Correct.
8     Q.    Do you -- are you aware of any of
9 the trials that you have -- or, excuse me,
10 any of the literature that you relied on that
11 have a primary endpoint of safety as opposed
12 to efficacy?
13     A.    Yes.  Where is that...
14         (Witness reviews document(s).)
15     A.    Okay, here's one of them.  The
16 Collinet, C-O-L-L-I-N-E-T.
17         Did you say specifically for the
18 TVT-O or TVT?
19     Q.    Well, let's establish that.
20 We've agreed with me that the TVT-O approach
21 differs from the retropubic approach,
22 correct?
23     A.    Yes.
24     Q.    And so because they're different

Page 94

1 surgeries, they have different types of
2 complications associated with them, correct?
3         MR. SNELL:  Form.
4     A.    A couple of the complications
5 are -- one of the complications is different.
6 BY MS. KIRKPATRICK:
7     Q.    Okay.  So in order to determine
8 what the complications associated with the
9 transobturator approach, we'd need to be
10 looking at either TVT-O or transobturator
11 studies, correct?
12         MR. SNELL:  Form again.
13     A.    Correct.
14 BY MS. KIRKPATRICK:
15     Q.    Okay.  So do you see anything in
16 there related specifically to transobturator
17 that was designed with the end purpose of
18 measuring the safety of a transobturator
19 midurethral sling?
20     A.    Okay.
21         (Witness reviews document(s).)
22     A.    Here's one that compares TOT to
23 TVT, Ross.  They were mainly looking at
24 safety.

Page 95

1 BY MS. KIRKPATRICK:
2     Q.    And that was a primary endpoint
3 of safety?
4     A.    Yes, comparing the two
5 procedures.  That was one of the primary
6 endpoints.  Oh, and Seratti, that's the one
7 I've been looking for.  "Efficacy, adverse
8 effects and prognostic factors at 5-year
9 follow-up," Seratti, S-E-R-A-T-T-I.
10         (Witness reviews document(s).)
11     A.    Those are the ones that I can
12 find at this moment that kind of focus on
13 safety, but I think there's more.
14 BY MS. KIRKPATRICK:
15     Q.    Okay.  Well, you know, it's not
16 meant to be a memory test.
17     A.    Okay, thank you.
18     Q.    Let me just ask you just a couple
19 of questions.  Now, that Collinet that you
20 cited, that's not an RCT, is it?  It's
21 actually a registry.
22     A.    That's correct.  It's a French
23 registry, uh-huh.
24     Q.    Okay.  And so that's one of the

Page 96

1 retrospective studies that we had talked
2 about, kind of the third tier down on the --
3     A.    I'd have to look at it to -- but
4 just looking at the title, I think so.
5     Q.    Okay.  And do you recall that
6 what they found in that article was that 2.7%
7 of the women in that registry had residual
8 pain following implantation?
9         MR. SNELL:  Form.
10     A.    I'd have to see the article.  I
11 can't recall.
12 BY MS. KIRKPATRICK:
13     Q.    Well, you'd agree with me that
14 2.7 is significantly higher than the 1-in-500
15 number that you've cited from your
16 experience?
17     A.    Pain where, pain for how long?
18 What are they talking about?
19     Q.    Okay.  Well, why don't we -- we
20 can pull that out and look through that at
21 lunch.
22         And the Ross article that you
23 looked at, that was an RCT, correct?
24     A.    Yes.

24 (Pages 93 to 96)

Christina Pramudji, M.D.

Page 97

1    Q.    Okay.  And do you recall that
2  that article reported that there was 15%
3  groin pain at 12 months in the population
4  studied there?
5    A.    I don't recall.  I'd have to see
6  it.
7    Q.    Okay.  And then you also have
8  given me, from before, the Exhibit 5, which
9  is the Dr. Teo article about the "Randomized
10  trial of tension-free vaginal tape and
11  tension-free vaginal tape-obturator," do you
12  remember that?
13    A.    Yes.
14    Q.    And that was a randomized
15  controlled trial, correct?
16    A.    Yes.
17    Q.    And do you recall that 26.4% of
18  the women in that study complained of leg
19  pain after receiving the TVT-O?
20    MR. SNELL:  Form.
21    A.    Yes.
22  BY MS. KIRKPATRICK:
23    Q.    And in fact, that the study was
24  stopped because that was such a high

Page 98

1  incidence rate of pain following the TVT-O
2  procedure?
3    MR. SNELL:  Form.
4    A.    I think it was short --
5  BY MS. KIRKPATRICK:
6    Q.    Shortened?
7    A.    Short duration of pain.  I don't
8  think it was long-term pain at all.  I'm not
9  sure -- really sure why they stopped that
10  study because it wasn't a severe effect.
11    Q.    Okay.  But of the studies that
12  you could identify for me, none of them are
13  long-term randomized control studies designed
14  specifically to look at the incidence of
15  chronic pain, are they?
16    A.    I'd have to review them to be
17  able to make a comment on that.
18    Q.    Okay.  And do you know whether
19  any of them are long-term RCTs designed to
20  look at the rate of dyspareunia following
21  implantation of a transobturator midurethral
22  sling?
23    A.    I'd have to review them.
24    Q.    Okay.  And do you know whether

Page 99

1  any of them are long-term RCT's designed to
2  look at the rate of groin pain after the
3  implantation of a transobturator midurethral
4  sling?
5    A.    I'd have to review the studies.
6    Q.    And I don't want to go through
7  all of them.  Sitting here today, you just
8  don't recall one way or the other whether
9  they're long-term studies, whether they're
10  RCTs versus registries and what the primary
11  endpoint of those studies are; is that fair
12  and accurate?
13    A.    I've looked at so many studies,
14  I'd have to really have them in front of me
15  to be able to make an educated comment on it.
16    Q.    Okay.  I don't want to give you a
17  memory test so I'm not going to ask you 10
18  questions to have you say, "I'm not sure."
19    A.    Thank you.
20    Q.    Let's talk about what you are
21  opining about in this case.  You're not --
22  you don't offer an opinion here that a woman
23  cannot have chronic long-term pain as a
24  result of an Ethicon TVT-O mesh implant, are

Page 100

1  you?
2    A.    No, I'm not.
3    Q.    And you're not here to opine that
4  a woman cannot suffer from de novo
5  dyspareunia as a result of an Ethicon TVT-O
6  device, are you?
7    MR. SNELL:  Form.  Go ahead.
8    A.    That's correct, but it's very
9  rare.
10  BY MS. KIRKPATRICK:
11    Q.    Okay.  But you will agree with me
12  that a TVT-O -- an Ethicon TVT-O device to
13  treat SUI can cause complications in some
14  women, correct?
15    A.    Correct.
16    Q.    And you'll agree with me that a
17  TVT-O device can cause groin pain?
18    A.    Correct.
19    Q.    And can cause chronic pain?
20    A.    It can, yes.
21    Q.    And it can cause acute pain?
22    A.    Yes, as every surgery does.
23    Q.    And can cause dyspareunia?
24    A.    Yes, it can.

25 (Pages 97 to 100)

Christina Pramudji, M.D.

Page 101

1    Q.    And it can cause vaginal pain?
2    A.    I don't really see vaginal pain
3    from it.
4    Q.    You don't see --
5    A.    No.
6    Q.    And you don't think that it can
7    cause vaginal pain?
8    A.    I suppose it could.
9    Q.    Okay.  And you're not -- in
10   looking at Ms. Huskey's medical records and
11   in Ms. Huskey's IME and the pelvic exam you
12   did of her, you're not testifying that she is
13   not experiencing pelvic pain, correct?
14   A.    That's correct.
15   Q.    And in fact, the clinical
16   observations that you have made are similar
17   to the clinical observations noted by
18   Dr. Blaivas in his IME, correct?
19   A.    Correct.
20   Q.    And they're similar to the
21   clinical observations made by Dr. Steege in
22   his IME, correct?
23          MR. SNELL:  Form.
24   A.    I believe that we all found that

Page 102

1    she had tenderness specifically on the left
2    levator muscle and some tenderness throughout
3    the vagina.
4    BY MS. KIRKPATRICK:
5    Q.    And so I guess what I'm getting
6    at is, your clinical observations aren't that
7    different from the clinical observations that
8    you read in the reports that were issued by
9    the plaintiff's experts in this case,
10   correct?
11   A.    Correct.
12   Q.    So where you differ is what the
13   cause of those injuries are.
14   A.    That's right.
15          MS. KIRKPATRICK:  All right.  If
16   we could take a brief break, because I'd
17   like to use the ladies' room, and then
18   I'd like to look at your report and your
19   IME related to Ms. Huskey.
20          THE WITNESS:  Sounds good.
21          (Recess, 11:52 a.m. to 12:10 p.m.)
22   BY MS. KIRKPATRICK:
23   Q.    Instead of starting with
24   Ms. Huskey and then breaking and getting back

Page 103

1    into it, I'm going to actually ask you just a
2    couple of other general questions, hopefully
3    wrap those up again before lunch.
4    A.    Okay.
5    Q.    You will agree with me that a
6    medical device manufacturer has a
7    responsibility to make a safe product, don't
8    you?
9          MR. SNELL:  Form.
10   A.    Well, they have the
11   responsibility to make a product where the
12   benefit outweighs the risks for patients.
13   BY MS. KIRKPATRICK:
14   Q.    Would that be a 51 to 49 percent,
15   or what do you mean by "outweigh"?
16   A.    I mean, they can't put a number
17   on it, but you have to have good results and
18   you have to have -- there's always going to
19   be a risk with any surgery, and you could say
20   that it's not safe for any surgery because
21   that patient had a complication.
22          So you have to look at the
23   general -- the overall picture of the risks
24   and the number of risks that you see based

Page 104

1    on -- compared to the efficacy of the
2    product.
3    Q.    Okay.  Well, let's talk a little
4    bit about the surgical risks.  Now, there is
5    a risk, I agree, associated with any surgery.
6    Correct?
7    A.    Yes.
8    Q.    But there's a different set of
9    risks that exists when a medical device is
10   permanently implanted in a human body,
11   correct?
12          MR. SNELL:  Form.
13   A.    Each surgery has its own
14   individualized risk, whether it's a medical
15   device or any kind of surgery.  They have
16   their own individual risks.
17   BY MS. KIRKPATRICK:
18   Q.    Well, let me see if I can make
19   this a little clearer to see if we're on the
20   same page here.  For a woman who's undergoing
21   TVT surgery, TVT-O surgery, there is the
22   risks, for example, of being under general
23   anesthesia that come with any surgery,
24   correct?

26 (Pages 101 to 104)

Christina Pramudji, M.D.



Page 105

1    A.    Correct.
2    Q.    And there's the risks of making
3  an incision on the vaginal wall that come
4  with any type of pelvic surgeries that are
5  done, correct?
6    A.    That's done, yeah, with an
7  abdominal wall incision.
8    Q.    And anywhere that you make an
9  incision in the body, you can get a localized
10  infection at the area of the incision,
11  correct?
12    A.    Yes.
13    Q.    And that's the same for TVT-O
14  surgery as it is for hernia surgery as it is
15  for open heart surgery, correct?
16    A.    Correct.
17    Q.    So what I'm getting at is,
18  there's certain risks that are attendant to
19  any surgery that you perform, correct?
20    A.    Correct.
21    Q.    And then separate and apart from
22  that, there are risks that go along with
23  specific individual surgeries, correct?
24    A.    That's right.

Page 106

1    Q.    And in the case of looking at a
2  permanently implantable medical device,
3  there's the risks of undergoing the actual
4  surgery at the time of surgery, correct?
5    A.    Yes.
6    Q.    And then there's the risks that
7  you may experience because you have a
8  permanently implantable medical device in
9  your body, correct?
10    MR. SNELL:  Form.
11    A.    Well, there may be unique risks
12  to that procedure.  For instance, with TVT
13  and TVT-O, the risks are the same as any
14  pelvic surgery with the exception of mesh
15  exposure.
16  BY MS. KIRKPATRICK:
17    Q.    Okay.  So mesh exposure is a risk
18  that is unique to the TVT-O or, in fact, any
19  polypropylene sling, correct?
20    A.    Correct.
21    Q.    And it's actually any kind of
22  permanently implantable mesh into the pelvic
23  cavity, whether it's for SUI or pelvic organ
24  prolapse, correct?

Page 107

1    A.    Right.
2    Q.    So that is a unique risk.  And in
3  addition to that, when you implant a foreign
4  body like the mesh into the pelvic cavity,
5  you incite a foreign body reaction, correct?
6    A.    Well, even with just surgery,
7  with sutures that are used to close the
8  vaginal wall from any pelvic surgery, you get
9  a foreign body reaction.
10    Q.    How often do you use
11  polypropylene permanent sutures in the pelvic
12  cavity?
13    A.    Well, if I do a pubovaginal
14  sling, I would use it for that, on the ends
15  of the sling.
16    Q.    Okay.  Anything else that you use
17  a permanently implantable polypropylene
18  suture in the pelvic cavity?
19    A.    Well, me personally, no.  I use
20  the polypropylene mesh for the sacrocolpopexy
21  with permanent Ethibond sutures to attach
22  that to the vaginal wall.  I know that some
23  pelvic surgeons will do a sacrospinous
24  ligament fixation with polypropylene sutures,

Page 108

1  and those can erode.
2    Q.    And do you know of any surgery
3  that leaves polypropylene sutures in the
4  vagina?
5    A.    Any surgery at all?
6    Q.    Uh-huh.
7    A.    Well, sacrospinous ligament
8  fixation, pubovaginal sling.
9    Q.    I mean in the vaginal wall
10  itself.
11    A.    Oh, in the --
12    Q.    In the vagina, yeah, as opposed
13  to the -- I'd asked you before about the
14  pelvic cavity.  Now I want to move on to are
15  you aware of any surgery that is performed
16  that would leave permanently implantable
17  polypropylene sutures in a vagina?
18    MR. SNELL:  Form.
19    A.    I don't know.
20    MR. SNELL:  Do you mean inside
21  the vagina or in the wall of the vagina,
22  in the rectovaginal space behind it?
23  What do you mean by --
24    A.    No, not in the wall of the

27 (Pages 105 to 108)

Christina Pramudji, M.D.

Page 109

1  vagina.
2  BY MS. KIRKPATRICK:
3      Q.     And in fact, absorbable sutures
4  are generally used, if necessary, to close up
5  the vaginal wall, correct?
6      A.     Correct.
7      Q.     And in fact, absorbable sutures
8  are used in the majority of surgeries or
9  repairs that require surgery throughout the
10  human body, correct?
11         MR. SNELL:  Form.
12      A.     No.
13  BY MS. KIRKPATRICK:
14      Q.     No, you don't agree with that?
15      A.     No.
16      Q.     Okay.
17      A.     Depends on the surgery that
18  you're talking about.  I mean, heart surgery
19  they use polypropylene, cardiac surgery and
20  vessels, they don't use absorbable sutures.
21      Q.     Okay.  But you would agree with
22  me that surgeons and physicians would default
23  and use an absorbable suture in the first
24  instance, and if that was not strong enough

Page 110

1  or was not for the particular application or
2  not appropriate for that particular patient,
3  they would then go to a polypropylene
4  permanently implantable suture, correct?
5         MR. SNELL:  Form, foundation.
6      A.     I mean, that's a broad question.
7  I can't -- I mean, that's a very broad
8  question.  I need more specific insight into
9  what you're asking.
10  BY MS. KIRKPATRICK:
11      Q.     Okay.  Well, you know, I don't
12  want to get too far afield on this.  But with
13  a pubovaginal sling, that's when you use a
14  patient's own tissue to perform a repair for
15  SUI, correct?
16      A.     That's correct.
17      Q.     And in that case, you do use
18  permanent implantable polypropylene sutures,
19  correct?
20      A.     That's correct.
21      Q.     And the actual sling itself
22  cannot and does not erode in that surgery,
23  correct?
24      A.     It can.

Page 111

1      Q.     You've seen a woman's native
2  tissue erode in a pubovaginal sling into an
3  adjacent organ?
4      A.     It's been reported, yes.
5      Q.     Okay.  Where has that been
6  reported?
7      A.     I'd have to go through the
8  papers, but there's --
9      Q.     Would it be in the materials that
10  you've provided to me?
11      A.     Yes.
12      Q.     If that has been reported in the
13  medical literature, you would have noted that
14  here?
15      A.     Yes.
16      Q.     And it's the actual sling
17  material itself as opposed to the
18  polypropylene sutures that you believe can
19  erode into an adjacent organ?
20      A.     It can, yes.
21      Q.     Have you ever seen it?
22      A.     I've never seen it, no.
23      Q.     Okay.  Have you ever used
24  polypropylene slings in the bladder --

Page 112

1         MR. SNELL:  Form.
2  BY MS. KIRKPATRICK:
3      Q.     -- for any kind of bladder
4  surgery?  I'm sorry, suture, polypropylene
5  suture in the bladder.
6      A.     Okay.
7         MR. SNELL:  Form.
8  BY MS. KIRKPATRICK:
9      Q.     No wonder you were looking at me
10  like I was crazy.
11      A.     Yeah.
12      Q.     I was curious, where is she
13  getting that?
14      A.     No.
15      Q.     Okay.  Why not?
16      A.     We use absorbable suture in that.
17  Absorbable suture is adequate for that
18  application.
19      Q.     Okay.  And actually, using the
20  absorbable suture in the bladder application,
21  it eliminates the risk of potential erosion,
22  correct?
23      A.     Decreases the risk.
24      Q.     Have you ever seen an absorbable

28 (Pages 109 to 112)

Christina Pramudji, M.D.

1  suture erode?
2      A.    No, I have not.
3      Q.    Have you ever seen that reported
4  in the medical literature?
5      A.    I don't think so.
6      Q.    Okay.  What I'm getting at is in
7  these applications, it's the polypropylene
8  suture that erodes as opposed to the
9  absorbable suture or the native tissue.
10          MR. SNELL:  Form.
11      A.    Yeah.  I mean, a permanent
12  structure is going to have potentially more
13  likelihood than an absorbable suture because
14  it's there longer.
15  BY MS. KIRKPATRICK:
16      Q.    And you'll agree with me that the
17  amount of polypropylene used in a midurethral
18  sling greatly exceeds the amount of
19  polypropylene that's used in the sutures used
20  to secure a pubovaginal sling, correct?
21      A.    It is more polypropylene, yes.
22      Q.    And it's a lot more
23  polypropylene?
24          MR. SNELL:  Form.

1      A.    Well, it's a 1-centimeter mesh
2  tape that's used.
3  BY MS. KIRKPATRICK:
4      Q.    Okay.  And it's a 1-centimeter
5  mesh tape that's made out of single-filament
6  polypropylene, correct?
7      A.    Correct.
8      Q.    And the suture itself is just a
9  single filament of polypropylene, right?
10      A.    Correct.
11      Q.    That's used to close up a small
12  hole, correct?
13      A.    Right.
14      Q.    About how much polypropylene --
15  single filament of polypropylene do you use
16  in a suture?
17          MR. SNELL:  Form.
18      A.    Can you restate that?
19  BY MS. KIRKPATRICK:
20      Q.    How long is it?  Is it
21  a centimeter, 2 centimeters, 3 centimeters,
22  4?
23          MR. SNELL:  Form.
24      A.    What application are you talking

1  about?
2  BY MS. KIRKPATRICK:
3      Q.    In a pubovaginal sling.
4      A.    Pubovaginal sling, it would be
5  about 10 centimeters.
6      Q.    So you use 10 centimeters total
7  of a single-filament --
8      A.    10 centimeters on each side.
9      Q.    Okay.  So 20 centimeters, thank
10  you, so that's total.
11          Okay.  So we had talked a little
12  bit before about your experience in removing
13  retropubic slings.  Do you remember that?
14      A.    Yes.
15      Q.    And you told me that you had
16  removed about 300 -- I'm sorry.  You had
17  implanted about 300 total and you had removed
18  1 to 2 and you had, just on a repair, of
19  about 1 to 2.  Is that right?
20      A.    Correct.
21      Q.    I forgot to ask you how many
22  transobturator slings you've implanted.
23      A.    About 700.
24      Q.    And do you still use the Ethicon

1  TVT-O?
2      A.    Yes.
3      Q.    And how many TVT-O's have you
4  removed?
5      A.    One.
6      Q.    And how many have you --
7      A.    It's very unusual.
8      Q.    -- gone in to do a revision on?
9      A.    For mesh exposure, for
10  obstruction?  What are you referring to?
11      Q.    You were the one who made the
12  distinction that there was a difference
13  between doing a removal surgery and then
14  doing what you consider to be a less invasive
15  revision surgery.  So you've done one of the
16  more invasive removal surgeries and I'm
17  trying to figure out how many of the less
18  invasive revision surgeries you have done.
19      A.    I don't have a number at the top
20  of my head, but it's, you know, maybe out of
21  700, there may be 20 that I had to go in and
22  cut the sling or go back for a mesh exposure
23  somewhere, ballpark that number, and that
24  would include my patients and patients that

Christina Pramudji, M.D.

---

Page 117

1    were referred to me.
2        Q.    Okay.  And you would agree with
3    me, though, with the transobturator slings,
4    you can't completely remove it if something
5    goes wrong.  Is that right?
6        A.    It can be completely removed.
7        Q.    You think you can remove it
8    without damaging a woman's pelvic anatomy?
9        A.    Well, you have to dissect through
10   the muscles and it's very difficult and it's
11   very rarely done, but it can be completely
12   removed.  And damaging -- I mean, it depends
13   on how you define that.  You -- you know, you
14   do have to go through muscle, so we don't do
15   it very often.  It's kind of painful to
16   recover from.
17       Q.    What muscles do you have to go
18   through in a removal surgery?
19       A.    It's the muscles of the obturator
20   foramen.
21       Q.    Anything else?
22       A.    No.
23       Q.    Okay.  And you know that
24   Ms. Huskey had to have her sling partially

---

Page 118

1    removed.  Is that right?
2        A.    It was partially removed, yes.
3        Q.    Okay.  And when it was partially
4    removed, you are aware that her physician
5    reported that some of the sling retracted
6    back behind the pubic bone.  Is that right?
7            MR. SNELL:  Form.
8            Go ahead.
9        A.    Well, he was pulling on it to try
10   to dissect it as far as he could, so he was
11   putting tension on it whenever he cut it, so
12   I would expect it to retract, just like any
13   tissue would.
14   BY MS. KIRKPATRICK:
15       Q.    Okay.  But at least you'll agree
16   with me it's certainly not easy to fully
17   remove a transobturator sling if a
18   complication arises, correct?
19       A.    That's correct.
20       Q.    We had also started to talk about
21   some of the warnings that you gave to your
22   own patients who receive the TVT-O, and I had
23   asked you about what warnings you
24   particularly tell your patients of potential

---

Page 119

1    complications.
2            Can you give me the kind of
3    laundry list of complications that you would
4    routinely tell all of your patients are
5    potential complications from a TVT-O?
6        A.    Well, in --
7        Q.    And when I say TVT-O, I mean any
8    transobturator midurethral polypropylene
9    sling.
10       A.    So in general, I will tell them
11   about the risk of bleeding, infection, injury
12   to the bladder or the urethra, groin pain,
13   which is typically transitory, failure of the
14   wound to heal with mesh exposure and need for
15   further surgery to repair that, pain, chronic
16   pain, dyspareunia, de novo urge incontinence,
17   persistent urge incontinence, urinary
18   retention, temporary or permanent, requiring
19   sling release, potential sling removal.
20       Q.    And for each of those, you think
21   that is important information to provide to a
22   woman so she can make an informed decision as
23   to whether she's willing to accept the risks
24   of the implantation of a TVT-O sling,

---

Page 120

1    correct?
2        A.    Most women, yes.  And some are
3    more important to some women than to others.
4        Q.    Okay.  Are there any of these
5    that you think are particularly important to
6    thin, active women?
7            MR. SNELL:  Form.
8        A.    I think they're all important to
9    thin, active women.
10   BY MS. KIRKPATRICK:
11       Q.    Okay.  Are there any other --
12   correct me if I'm wrong on this, but I think
13   you also said that there are sometimes
14   warnings that you give patients that might be
15   unique to their particular circumstances or
16   medical conditions.
17           Are there any particular medical
18   conditions or circumstances that you can
19   think of that would warrant different
20   additional warnings regarding the
21   implantation of a TVT-O or a transobturator
22   midurethral sling?
23           MR. SNELL:  Form.
24       A.    Well, if a patient is sexually

---

Christina Pramudji, M.D.

Page 121

1  active, then I would warn her about the risk
2  of dyspareunia with any pelvic surgery. But
3  if it's an older patient that's not sexually
4  active, then it's not -- you know, it's not
5  as important.
6      For a patient with mixed
7  incontinence, with urge incontinence, I would
8  focus on the risk of persistent urge
9  incontinence.
10     For a patient with poor bladder
11  emptying or a difficulty emptying her
12  bladder, I would warn her of the risk of
13  retention, which might be increased for that
14  patient.
15     And if a patient has thin
16  tissues, atrophy or radiation, we would have
17  a discussion about that, about the risk of
18  not being able to heal as well, or if she's a
19  smoker, chronic smoker, we would have a
20  discussion about that so that she could make
21  an informed decision.
22  BY MS. KIRKPATRICK:
23     Q.   Okay.
24     A.   And I might start a patient with

Page 122

1  atrophy on estrogen ahead of time, if it's
2  medically warranted.
3      Q.   Okay. And atrophy is something
4  that happens in a significant population of
5  menopausal women, correct?
6      A.   Yes.
7      Q.   And you would expect to see some
8  change in or thinning of their vaginal tissue
9  with menopause, correct?
10     A.   Yes.
11     Q.   Do you tell all of -- and, you
12  know, barring some godforsaken circumstance,
13  most women hope that they make it until
14  they're old enough to be in menopause,
15  correct?
16     A.   Yes.
17     Q.   And you would just assume that
18  most of your patients who are coming in are
19  likely to get to the point of menopause if
20  they're not already there, right?
21     A.   Correct.
22     Q.   Do you tell any of your patients
23  about the risks that may be attendant to
24  menopausal changes in their vaginal structure

Page 123

1  and the implantation of a TVT-O device?
2      A.   I don't think that's really been
3  borne out in the long-term literature, the
4  17-year data going out on TVT with, you know,
5  exposure suddenly occurring or erosions
6  occurring.
7      So that's part of the discussion
8  with the mesh exposure, a need for further
9  surgery down the line, but I don't
10  specifically talk about that because I don't
11  think that's really been borne out in the
12  vast experience that we have with TVT and
13  TVT-O.
14     Q.   Okay. Now, just talking about
15  pain just for a couple of minutes, there's
16  different kinds of pain that anyone can
17  experience, correct?
18     A.   Correct.
19     Q.   And I'd like to use the example,
20  you can have the regular headache that you've
21  got to take a couple of Advil for, right, and
22  that's different from the pain you experience
23  with a migraine, correct?
24     A.   Correct.

Page 124

1      Q.   Or the pain that you might
2  experience with a concussion, correct?
3      A.   Yes.
4      Q.   Even though they all fall under
5  the kind of umbrella of being a headache.
6      A.   Correct.
7      Q.   And that also is borne out with
8  pelvic pain, correct?
9      A.   Yes.
10     Q.   And there's different kinds of
11  pelvic pain that women can experience?
12     A.   Yes, there's all kinds of
13  different types of pelvic pain.
14     Q.   And there's pelvic pain, for
15  example, that women can experience with
16  menstrual cramps?
17     A.   Yes.
18     Q.   And there's pelvic pain that you
19  can experience if you have a vaginal
20  infection or a yeast infection or something
21  like that?
22     A.   Right.
23     Q.   And there's pelvic pain that you
24  can have from having a bladder infection or

31 (Pages 121 to 124)

Christina Pramudji, M.D.

Page 125

1   something like that, correct?
2       A.    (Witness nods head.)
3       Q.    And do you find in your practice
4   that many women are able to, for example,
5   distinguish between the pain of a bladder
6   infection and menstrual cramps, for example?
7       A.    Yes.
8       Q.    And women generally can
9   differentiate between the degree of pain that
10  they're experiencing pelvically?
11          MR. SNELL:  Form.
12          Go ahead.
13      A.    Most of the time, but there is a
14  lot of overlap in the pelvic area so
15  sometimes it's very difficult to pinpoint
16  where the pain is coming from.
17  BY MS. KIRKPATRICK:
18      Q.    Okay.  And the same is also true
19  that there's different types of dyspareunia
20  and pain with sex, correct?
21      A.    Yes.
22      Q.    And so there's dyspareunia that
23  can be caused by vaginal dryness that's
24  brought on by menopause, correct?

Page 126

1       A.    Yes.
2       Q.    And that's different than the
3   dyspareunia or painful sex that someone can
4   have following, for example, a hysterectomy,
5   when there's some kind of scarring at the
6   vaginal apex, correct?
7       A.    Yes.
8       Q.    And all of that's different from
9   the type of dyspareunia that you would
10  experience if you have a point of tenderness
11  on your vaginal wall in some way, correct?
12          MR. SNELL:  Form.
13      A.    Probably, yes.
14  BY MS. KIRKPATRICK:
15      Q.    Okay.  So dyspareunia isn't
16  dyspareunia isn't dyspareunia, correct?
17      A.    Right.
18      Q.    And you feel that it's important
19  to look at each patient individually to look
20  at their specific symptoms and their specific
21  circumstances to distinguish what type of
22  pelvic pain they're having, correct?
23      A.    Ideally, yes.
24      Q.    Or what type of dyspareunia

Page 127

1   they're experiencing, correct?
2       A.    Yes.
3       Q.    Okay.  And infection is the same;
4   there can be an acute infection at a surgical
5   site, correct?
6       A.    Yes.
7       Q.    And that's resolved in one
8   particular way, correct?
9       A.    Yes.
10      Q.    And then there can also be
11  chronic infections, correct, and those differ
12  from the acute infection?
13      A.    Yes, sometimes.
14      Q.    Okay.  And they're treated
15  differently --
16          MR. SNELL:  Form.
17  BY MS. KIRKPATRICK:
18      Q.    -- than an acute infection?
19      A.    Usually still treated with
20  antibiotics, if it's a bacterial infection,
21  yes.
22      Q.    But it may be the difference
23  between applying, for example, an antibiotic
24  ointment to the site of a surgical incision

Page 128

1   on your skin versus oral antibiotics versus
2   IV antibiotics, correct?
3           MR. SNELL:  Form.
4       A.    It's hard to just categorize it
5   that acute you do this and chronic you do
6   this, because it's --
7   BY MS. KIRKPATRICK:
8       Q.    Okay.  Fair enough.  Fair enough.
9           But you'll agree with me that
10  those are different types of infections and
11  they can't all be lumped together, because
12  they have to be examined and treated
13  differently as to what their particular
14  source is and what the particular duration
15  is, correct?
16          MR. SNELL:  Form.
17          Go ahead.
18      A.    Yeah, you have to take the
19  patient's current situation into
20  consideration, what kind of organism you
21  have, the patient's symptoms, how sick they
22  are; that all has to be taken into
23  consideration.
24  BY MS. KIRKPATRICK:

32 (Pages 125 to 128)

Christina Pramudji, M.D.

1    Q.    Okay.  And there's also
2  subclinical infections that can exist in the
3  body as well, correct?
4    A.    Yes.
5    Q.    Okay.  Now, you've testified
6  earlier that it takes about 10 minutes to do
7  a TVT-O surgery.  Is that right?
8    A.    Correct.
9    Q.    And how long is it for a woman
10  from the time she is, you know, wheeled into
11  the operating room till when she comes out of
12  anesthesia?
13        MR. SNELL:  Form.
14    A.    Till she comes out of the
15  operating room or wakes up in recovery room?
16  BY MS. KIRKPATRICK:
17    Q.    Wakes up in the recovery room.
18    A.    So --
19        MR. SNELL:  Hold on.  Same
20  objection.
21        Go ahead.
22    A.    Probably about an hour and a
23  half, hour and 45 minutes.
24  BY MS. KIRKPATRICK:

1    Q.    Okay.  So she's under general
2  anesthesia for about one hour and 45 minutes
3  with a TVT-O procedure?
4    A.    No, she's under a general
5  anesthetic about 20 or 30 minutes.
6    Q.    Okay, 20 to 30 minutes, okay,
7  you're right.  So it's about an hour and 45
8  minutes from start until when she wakes up
9  and about 30 -- 20 to 30 minutes of that
10  she's under general anesthesia?
11    A.    Correct, and the rest she would
12  be in the recovery room just kind of coming
13  out, you know, breathing on her own, not
14  being administered more anesthesia.
15    Q.    Okay.  How long does it take you
16  to perform a pubovaginal sling surgery?
17    A.    45 minutes.
18    Q.    So it's a difference of about 35
19  minutes of actual surgery time?
20    A.    Uh-huh.
21    Q.    How long is it from the start
22  when she's wheeled into the operating room
23  till a woman comes out of anesthesia with a
24  pubovaginal sling?

1    A.    The prep takes a little longer,
2  so it's probably about two and a half hours.
3    Q.    Okay.  So we're tacking an extra
4  maybe 45 minutes on to the total time?
5    A.    Yes.
6    Q.    Okay.  Now, removal surgeries.
7  The surgery that you did to remove the TVT-O,
8  how long did that take?
9    A.    About 20, 30 minutes.
10    Q.    Okay.  And is that about the same
11  amount of time under -- from the beginning to
12  coming out of general anesthesia as the TVT-O
13  procedure itself?
14    A.    Yes.
15    Q.    About an hour?  You know from
16  talking to your colleagues that some of their
17  removal surgeries can be significantly longer
18  than that, correct?
19    A.    Yeah.  I've read even in some of
20  the records that they take longer to do it.
21    Q.    Do you remember how long
22  Ms. Huskey's took?
23    A.    I don't remember.
24    Q.    And you will agree with me that

1  the removal surgeries can be significantly
2  more complicated than the original
3  implantation surgery for the TVT-O, right?
4        MR. SNELL:  Form.
5    A.    It can be harder to find the
6  sling if it's not a dyed sling.
7  BY MS. KIRKPATRICK:
8    Q.    And the removal surgery requires
9  dissection of some of the pelvic tissue,
10  correct?
11    A.    Well, it requires dissecting
12  around the urethra, primarily.
13    Q.    And that can cause additional
14  scar tissue, correct, simply because you're
15  having more surgery in the same location?
16    A.    It could, yes.
17    Q.    Are there any other complications
18  that you think are risks that come from the
19  removal surgery itself?
20    A.    No.
21    Q.    So just the possibility of
22  additional scarring?
23    A.    Yes.
24    Q.    Okay.  We've been talking a lot

Golkow Technologies, Inc. - 1.877.370.DEPS

Christina Pramudji, M.D.

1  about kind of the procedure that's used here.
2  You're not a biomaterials expert, correct?
3      A.    Well, I know about the materials
4  that I use for surgery, so I would say that
5  I -- you know, I'm knowledgeable about what I
6  implant in patients.
7      Q.    Okay.  What's the Ethicon TVT-O
8  sling made of?
9      A.    Polypropylene.
10     Q.    Okay.  What's added to that
11 polypropylene?
12     A.    What's added to it?
13     Q.    Uh-huh.
14     A.    I don't know if anything's added
15 to it.
16     Q.    Do you know if there's any
17 antioxidants used in it?
18     A.    No, I don't know.
19     Q.    Do you know what its molecular
20 weight is?
21     A.    I've seen it before, but I don't
22 know off the top of my head.
23     Q.    Do you know whether it's been
24 oxidized before it's been placed into a

1  woman's body?
2      A.    No.
3      Q.    Do you know anything about the
4  process of oxidation of polypropylene?
5      A.    No.
6      Q.    And that's not the type of
7  information -- you know that it's made of
8  polypropylene, but you're not intending to
9  offer opinions here concerning the chemical
10 processes that are involved with
11 polypropylene, correct?
12     A.    I don't know about the chemical
13 processes.
14     Q.    Okay.  So you would defer -- you
15 would defer to other experts who would be
16 biomaterials experts or who would be
17 specialists in polypropylene for that
18 particular type of information?
19         MR. SNELL:  Form.
20     A.    I know how it -- I focus on it
21 from the perspective of my patients.
22 BY MS. KIRKPATRICK:
23     Q.    Okay.  So you focus, though, on
24 how you believe the polypropylene sling

1  performs in your patients, both from an
2  efficacy standpoint, correct, and from
3  complications that you see?
4      A.    From my experience and from the
5  vast body of literature that's available on
6  polypropylene slings.
7      Q.    Okay.  But I guess I'm just
8  trying to figure out what the parameters of
9  your testimony are.  You're not going to come
10 in and you're not planning on holding
11 yourself out as an expert on polymers and
12 polypropylene and degradation or any of those
13 particular issues related to polypropylene,
14 are you?
15         MR. SNELL:  Form.  And I will say
16         she is.  I am putting her up on that, and
17         it is in her report.
18 BY MS. KIRKPATRICK:
19     Q.    Okay.  How does polypropylene
20 degrade?
21     A.    It doesn't degrade.
22     Q.    So your opinion, sitting here
23 today, that there is no way that any
24 polypropylene that exists in this world can

1  degrade?
2          MR. SNELL:  That's overbroad,
3          form.
4          Go ahead.
5      A.    That's a very broad question.
6  You know, from how it's used in the body in
7  sutures and in slings, it doesn't degrade;
8  that's why it's a permanent suture.  That's
9  why heart surgeons rely on it and cardiac
10 surgeons rely on it to sew up your aorta when
11 you have aortic surgery.
12         So if it degraded, it would not
13 be used in that application.  There's no
14 clinical degradation that occurs.
15 BY MS. KIRKPATRICK:
16     Q.    So you believe that there's no
17 evidence that exists, either in Ethicon's own
18 documents or in the literature, that supports
19 the theory that polypropylene sutures can
20 degrade --
21         MR. SNELL:  Form.
22         Go ahead.
23 BY MS. KIRKPATRICK:
24     Q.    -- in vivo?

Golkow Technologies, Inc. - 1.877.370.DEPS

Christina Pramudji, M.D.

Page 137

1        MR. SNELL:  Form.
2        A.      I mean, I can't say that there's
3    nothing out there that they didn't do any
4    kind of manipulation to polypropylene or look
5    at it a certain way and found some
6    degradation there, but does it matter to
7    patients and to this case, no.
8    BY MS. KIRKPATRICK:
9        Q.      Has Mr. Snell or any of the
10   attorneys for Ethicon provided you with any
11   Ethicon documents reflecting degradation of
12   polypropylene sutures?
13       A.      I mean, I think I saw some
14   internal communication, I can't remember if
15   it was from Mr. Kountze or from Mr. Snell, I
16   don't remember, but I know that that is out
17   there, that that was something that the
18   engineers were talking about and Ethicon was
19   talking about.
20           But clinically, I'm telling you
21   it does not make a difference, and I don't
22   believe that there's degradation that occurs
23   that it makes any hill of beans' difference
24   for patients.

Page 138

1        Q.      Okay.  So let me just figure out
2    what you are testifying about and what you're
3    not testifying about.  You don't have a basis
4    for saying whether polypropylene does or
5    doesn't degrade.
6           What you are here to offer your
7    opinion on is that regardless of whether
8    polypropylene degrades or doesn't degrade,
9    there's no clinical significance to a
10   particular patient?
11       A.      I don't think it degrades.
12           MR. SNELL:  Hold on, hold on,
13   hold on.  Form.  That misstates, too.
14           Go ahead.
15       A.      I don't think it degrades and I
16   think there's other evidence that shows that
17   it doesn't degrade.
18   BY MS. KIRKPATRICK:
19       Q.      Have you asked Ethicon, in
20   reaching that opinion, to provide you with
21   all of the information that they have
22   concerning the potential degradation of
23   polypropylene sutures?
24       A.      No.

Page 139

1        Q.      And don't you think that the
2    information that Ethicon has and the
3    knowledge that Ethicon has concerning the
4    degradation of polypropylene sutures would be
5    something that you would want to see in
6    reaching your opinions concerning the
7    degradation of polypropylene sutures?
8           MR. SNELL:  Form.
9        A.      No.
10   BY MS. KIRKPATRICK:
11       Q.      You don't think it's important
12   what your -- what Ethicon has said about its
13   own sutures for you to reach your conclusion.
14   Is that right?
15       A.      Right.
16       Q.      Okay.  Have you ever tested it to
17   see whether it degrades?
18       A.      No.
19       Q.      Have you ever looked at
20   polypropylene under a microscope?
21       A.      I've seen pictures of it under a
22   microscope.
23       Q.      Have you looked at it yourself?
24       A.      No.

Page 140

1        Q.      Have you ever looked at explanted
2    polypropylene sutures and analyzed them to
3    see whether there's any degradation in them?
4        A.      No, I have not.
5        Q.      Have you ever looked at explanted
6    polypropylene mesh to see if there's any
7    degradation in that mesh?
8        A.      I've looked at -- when I've taken
9    it out of patients, I've looked at it and
10   it's intact.
11       Q.      Okay.  Let me just clarify.  Have
12   you ever looked at it microscopically to see
13   whether it has degraded microscopically?
14       A.      I've looked at the images that
15   the pathologists have provided to me because
16   I get images back from them.
17       Q.      Okay.  How many of those images
18   have you looked at?
19       A.      I don't know, 10, 20.
20       Q.      Have you ever asked a pathologist
21   to see whether the polypropylene had
22   deteriorated?
23       A.      No.
24       Q.      That's not something that you

35 (Pages 137 to 140)

Christina Pramudji, M.D.



Page 141

1 standardly do when you remove polypropylene
2 from a woman?
3     A.    No, because it doesn't
4 deteriorate.
5     Q.    How do you know that?
6         MR. SNELL:  Form, asked and
7 answered.
8     A.    Because it doesn't.  It's a
9 permanent suture.  You can go back in 20
10 years and you'll still find it in there.
11 BY MS. KIRKPATRICK:
12     Q.    And so your -- is it your opinion
13 here that because 20 years from now, you can
14 find a polypropylene suture where you
15 implanted it and it has not completely
16 disappeared, therefore it cannot degrade?
17         MR. SNELL:  Form.
18     A.    20, 30, 40 years, it's going to
19 be there.  It's not degrading.
20 BY MS. KIRKPATRICK:
21     Q.    Do you think it can crack?
22     A.    No.
23     Q.    Do you think that it can release
24 particles from the surface?

Page 142

1     A.    No.
2     Q.    Do you think that it changes its
3 chemical composition in any way at all?
4     A.    No.
5     Q.    Do you think that polypropylene
6 used in the body can change its molecular
7 weight?
8     A.    No.
9     Q.    Do you think that polypropylene
10 that is used in the body can undergo any
11 mechanical changes to it?
12         MR. SNELL:  Form.
13     A.    Depending on where it's placed
14 and what happens with that patient, it could
15 move slightly, because it's -- you know, just
16 the position of it, like a hernia repair, if
17 a patient gained a lot of weight, it could
18 change its position slightly, if that's what
19 you're referring to.  But it doesn't just
20 change on its own.
21 BY MS. KIRKPATRICK:
22     Q.    Okay.  And once again, the basis
23 for your opinion on that is when you have
24 looked at the polypropylene that you've

Page 143

1 removed, you don't visibly see deterioration?
2         MR. SNELL:  Form.
3     A.    That's part of it, but also
4 because polypropylene is relied upon by
5 surgeons throughout the world for the last 40
6 years as a permanent suture.  If we were
7 having aortas busting open after 30 years, we
8 wouldn't be relying on it.
9 BY MS. KIRKPATRICK:
10     Q.    So that's the basis for your
11 opinion here, it's not any independent study
12 that you've done, correct?
13         MR. SNELL:  Form.
14     A.    In looking at the literature as
15 well.  It's not reported as degrading.
16 BY MS. KIRKPATRICK:
17     Q.    You've never seen any literature
18 that reports polypropylene degrading?
19     A.    Not any significant good
20 literature.  Some remote studies.
21     Q.    Okay.  What literature have you
22 been provided with by Ethicon regarding
23 degradation?  What articles have you looked
24 at?

Page 144

1     A.    I can't recall right now.
2     Q.    Okay.  And when you say not any
3 good literature, what literature are you
4 referring to that would be -- I don't want to
5 say bad literature just because it's the
6 opposite of good -- that documents or deals
7 with degradation of polypropylene in the
8 body?
9     A.    I mean, I think there was maybe a
10 polymer article or something like that that
11 was talking about it in some journal, but I
12 can't recall.  But nothing in the major body
13 of literature that has brought that up as an
14 issue.  It's just not an issue.
15     Q.    You don't believe that that's an
16 issue at all?
17     A.    No.
18     Q.    And you don't believe that that's
19 an issue that's been addressed in the medical
20 and scientific literature?
21     A.    No.
22     Q.    And it's not an issue that was
23 addressed in the materials that were provided
24 to you by Ethicon, either from their internal

36 (Pages 141 to 144)

Christina Pramudji, M.D.

Page 145

1   documents or from the literature that they
2   provided you with, correct?
3           MR. SNELL: Form.
4       A.   Correct.
5   BY MS. KIRKPATRICK:
6       Q.   Okay. And you haven't done
7   any -- you don't have any specialized
8   training in polymer chemistry, do you?
9           MR. SNELL: Form.
10      A.   Well, I'm a chemical engineer, so
11  I had some training in polymers and
12  chemistry.
13  BY MS. KIRKPATRICK
14      Q.   Okay.
15      A.   But, you know -- and that was a
16  long time ago. But, I mean, my main concern
17  is with patients, you know, the materials
18  that I put in patients and how they -- what
19  the literature bears out and how they respond
20  to it.
21  BY MS. KIRKPATRICK:
22      Q.   So when you take a TVT-O or any
23  kind of midurethral sling out of a patient,
24  does it look exactly the same as it did when

Page 146

1   it went in?
2       A.   Sometimes it does, yeah.
3       Q.   Okay. And when -- how often is
4   that?
5       A.   Most of the time.
6       Q.   Most of the time --
7       A.   Yeah.
8       Q.   -- you take out a soft, pliable,
9   pristine --
10      A.   It's this -- yeah, and it's the
11  same strip but it has the ingrowth of tissue
12  in it. But other than that, typically it's
13  just laying, you know -- laying nice and
14  flat. It does not look degraded or deformed
15  or rolled or curled or twisted or anything.
16      Q.   Would you feel differently if you
17  learned or saw evidence that the resin used
18  in Ethicon meshes have additives that weren't
19  supposed to be used in the human body?
20          MR. SNELL: Form, foundation.
21      A.   No, because it's been proven in
22  millions of women that it's not a problem.
23  BY MS. KIRKPATRICK:
24      Q.   So you wouldn't be interested in

Page 147

1   that information?
2       A.   No.
3       Q.   Okay. And if you learned that
4   Ethicon meshes had additives that weren't
5   supposed to be used in the human body, you
6   don't think that's something that a
7   woman, in making a TVT -- a decision to have
8   a TVT-O, would have the right to know?
9           MR. SNELL: Form, foundation.
10      A.   No, I don't think it's -- I don't
11  think it's pertinent.
12  BY MS. KIRKPATRICK:
13      Q.   And you don't think it's
14  pertinent and you don't think that a woman
15  has the right to know that?
16          MR. SNELL: Same objection, form
17  and foundation. Asked and answered.
18      A.   Do you want me to answer that
19  again?
20  BY MS. KIRKPATRICK:
21      Q.   Please.
22      A.   Okay. No, I don't think so.
23      Q.   Okay. And there's nothing that
24  you could learn or you would want to know

Page 148

1   about the specific material used in a TVT --
2   an Ethicon TVT or TVT-O product that would
3   change your opinion, is there?
4       A.   Can you repeat that question?
5       Q.   Probably not. I'm going to
6   reread it. I don't think I can do that.
7           There's nothing that you could
8   learn or you would want to know about the
9   specific material used in an Ethicon TVT or
10  TVT-O product that would change your opinion
11  on this topic, is there?
12          MR. SNELL: Form.
13      A.   No.
14  BY MS. KIRKPATRICK:
15      Q.   Okay. And there's nothing that
16  you could see in the medical literature about
17  degradation of polypropylene that would
18  change your opinion on this matter?
19      A.   No, because it's not going to
20  outweigh all the other literature and all my
21  experience.
22      Q.   Okay. Why don't we take a break
23  for lunch.
24          MR. SNELL: That sounds good.

37 (Pages 145 to 148)

Christina Pramudji, M.D.

Page 149

1         (Recess, 12:50 p.m. to 1:49 p.m.)
2    BY MS. KIRKPATRICK:
3         Q.    Okay.  I want to turn to the
4    instructions for use.
5         A.    Okay.
6         Q.    And I believe we'll mark this as
7    Exhibit 9.
8         (Whereupon, Exhibit Pramudji-9,
9         Gynecare TVT Obturator System
10        Instructions for Use, was marked for
11        identification.)
12   BY MS. KIRKPATRICK:
13        Q.    And you've seen that before,
14   Dr. Pramudji, haven't you?
15        A.    Yes.
16        Q.    And this was actually something
17   that the lawyers for Ethicon had given you in
18   connection with your testimony.  Is that
19   right?
20        A.    Yes.
21        MR. SNELL:  Objection, form.
22   BY MS. KIRKPATRICK:
23        Q.    I'd like you to look at the last
24   two pages here.

Page 150

1         A.    Okay.
2         Q.    And you'll see under the warnings
3    and precautions, it says not to use the TVT-O
4    for patients who are in anticoagulation
5    therapy.  That doesn't apply to Ms. Huskey,
6    does it?
7         A.    Correct.
8         Q.    And she didn't have a urinary
9    tract infection at the time that you could
10   see in the records, correct?
11        A.    Correct.
12        Q.    Was there anything else about
13   Ms. Huskey that in your opinion made her not
14   an appropriate candidate for the implantation
15   of the TVT-O --
16        A.    No.
17        Q.    -- sling?
18        A.    No.
19        Q.    Okay.  It also says here that
20   "The Gynecare TVT Obturator procedure should
21   be performed with care to avoid large
22   vessels, nerves, bladder and bowel.
23   Attention to patient anatomy and correct
24   passage of the device will minimize risks."

Page 151

1         And you will agree with me that
2    not every woman's pelvis is identical to the
3    next woman, correct?
4         A.    Correct.
5         Q.    And that the placement of nerves,
6    particularly the peripheral branches of
7    nerves, can differ from patient to patient,
8    correct?
9         A.    Correct.
10        Q.    And even the placement of the
11   vessels can be, you know, a little bit
12   different from patient to patient, correct?
13        A.    Correct.
14        Q.    And there's a difference in how
15   you do surgery on women who are obese,
16   correct?
17        MR. SNELL:  Form.
18        A.    There may be slight adjustments
19   that you would make, but it's generally the
20   same.
21   BY MS. KIRKPATRICK:
22        Q.    Okay.  So you would take into
23   account if a woman was obese --
24        A.    Yes.

Page 152

1         Q.    -- and that's different than
2    things you may take into account if a woman
3    is thin --
4         A.    Correct.
5         Q.    -- or of a normal weight?
6         A.    Yes.
7         Q.    Okay.  Now, you'll see here it
8    says, "Do not perform this procedure if you
9    think the surgical site may be infected or
10   contaminated."  Do you see that here?
11        A.    Yes.
12        Q.    Okay.  Now, the surgical site is
13   in the vaginal wall, correct?
14        A.    Yes.
15        Q.    And the vagina, you'll agree with
16   me, is a contaminated space?
17        A.    It is.  Clean -- we consider it
18   clean-contaminated after the prep.
19        Q.    Clean-contaminated, but it's
20   still contaminated, correct?
21        A.    Correct.
22        Q.    And there's still bacteria,
23   naturally occurring flora in the vagina, even
24   after it's clean-contaminated and prepped for

Christina Pramudji, M.D.

Page 153

1  surgery, correct?
2      A.    Yes.
3      Q.    So can you explain this to me,
4  how -- it sounds to me like Ethicon is
5  recommending that you don't perform this
6  procedure in any event because the surgical
7  site is always contaminated.
8      Can you explain that to me?
9      MR. SNELL: Form and foundation
10  on your understanding of Ethicon.
11     A.    Well, I think that they mean
12  grossly contaminated. If there is a gross
13  infection or if there is some stool, you
14  know, fistula, something where it's grossly
15  contaminated, it would be contraindicated.
16     But it's, you know, obviously you
17  would have a hard time doing any kind of
18  vaginal surgery if you couldn't do it -- if
19  you're broadly defining contaminated as
20  including clean-contaminated.
21  BY MS. KIRKPATRICK:
22     Q.    So you will agree with me maybe
23  that's not precisely worded --
24     MR. SNELL: Form.

Page 154

1  BY MS. KIRKPATRICK:
2      Q.    -- to reflect what you're
3  describing, correct?
4      MR. SNELL: Form.
5  BY MS. KIRKPATRICK:
6      Q.    It doesn't say "grossly
7  contaminated," does it?
8      A.    Right.
9      Q.    It doesn't say "fistula
10  formation"?
11     A.    I mean, I think you have to take
12  into account just surgical principles. I
13  think that most surgeons would know what
14  they're talking about.
15     Q.    You think that most surgeons
16  would?
17     A.    Yeah.
18     Q.    Okay. Now, it says that
19  postoperatively, the patient should be
20  advised to refrain from heavy lifting and/or
21  exercise -- examples, cycling and jogging --
22  for at least three to four weeks after the
23  surgery, and intercourse after one month.
24  Patients can usually return to normal

Page 155

1  activities after one to two weeks.
2      What is heavy lifting?
3      A.    Well, I recommend to my patients
4  conservatively more than 10 pounds lifting or
5  any kind of straining that would put pressure
6  on your pelvic floor that you can avoid.
7      Q.    And heavy lifting and exercise,
8  now, you don't consider vacuuming either
9  heavy lifting or exercise, do you?
10     A.    Well, it depends on the vacuum,
11  yeah, it could be very heavy lifting.
12     Q.    Okay. Do you ask your patients
13  or when you release them from TVT-O surgery,
14  do you ask them what kind of vacuum they
15  have?
16     A.    No, but I advise them to just
17  avoid it altogether.
18     Q.    So this non -- minimally invasive
19  surgery that allows women to return to normal
20  activities quickly means that you they can't
21  vacuum for a month?
22     A.    Yeah.
23     Q.    And you tell your patients that?
24     A.    Yeah. Avoid housework.

Page 156

1      Q.    What else do you tell -- avoid
2  housework, okay. Can they do the dishes?
3      A.    Yeah. That's not straining their
4  pelvis.
5      Q.    Can they make their bed?
6      A.    That depends. If they have a
7  high bed, it's difficult to make, it may be
8  too much strain.
9      Q.    And you tell them to restrain
10  from that for a period of --
11     A.    I tell them six weeks.
12     Q.    Six weeks?
13     A.    Uh-huh, just to be super
14  conservative.
15     Q.    Okay. What else do you tell them
16  that they can't do?
17     A.    I tell them not to have
18  intercourse for six weeks. I tell them to
19  avoid any straining, cycling, that will put
20  pressure on the pelvic area, squats.
21     Q.    Can they walk?
22     A.    They can walk, they can go
23  upstairs slowly, if they, you know, just are
24  cautious. They can ride in the car. I tell

39 (Pages 153 to 156)

Christina Pramudji, M.D.

Page 157

1  them not to drive a car for the first three
2  days.  They can ride in a car and they can go
3  back to work at three days if it's a desk job
4  or not too strenuous, if they feel up to it.
5      Q.    Okay.  So what about a physical
6  therapist?  When would you advise a physical
7  therapist to go back to work?
8      A.    Depends on what she's doing, but
9  I'd probably advise for her to -- you know,
10  if she's an aquatic physical therapist, to
11  wait about a week or two before she gets back
12  in the pool.  It depends on what she's doing
13  with her patients, too.  If she's actively
14  exercising, I would want her to avoid
15  anything strenuous with that.
16      Q.    Okay.
17      A.    But if she's just, you know, kind
18  of assisting them, watching them, that would
19  be fine.
20      Q.    Okay.  And you consider all of
21  those things to be either heavy lifting or
22  exercise or something that would place too
23  much strain on the pelvic floor and could
24  affect the sling itself?

Page 158

1      A.    Yes.
2      Q.    Okay.  You also see here that
3  Ethicon talks about transient leg pain
4  lasting 24 to 48 hours may occur and can
5  usually be managed with mild analgesics.  Do
6  you see that?
7      A.    Yes.
8      Q.    Now, does that basically mean you
9  should take some Motrin or some Advil if you
10  have some of this transitory pain?
11      A.    That's typically what mild
12  analgesic would mean, Tylenol, ibuprofen.
13      Q.    And it specifies 24 to 48 hours,
14  correct?
15      A.    Yes.
16      Q.    And you will agree with me that
17  Ethicon obviously believed this was important
18  information to put in the IFU to give to
19  physicians, and therefore --
20          (Knock on door, brief
21  interruption.)
22          (Discussion off the record.)
23  BY MS. KIRKPATRICK:
24      Q.    So you'll agree with me,

Page 159

1  Dr. Pramudji, that this was information that
2  Ethicon deemed to be important to put in the
3  instructions for use, correct?
4      A.    I would think so, yes.
5      Q.    Okay.  Do you see anywhere in
6  here that they warn -- well, let me ask you
7  this:  What was the source of the 24- to
8  48-hour transitory leg pain?
9      A.    I'm not exactly sure what source they
10  used for that but there's a few studies that
11  show that, you know, for the most part, it is
12  transitory leg pain.
13      Q.    And you don't know what causes
14  it?
15      A.    Oh, you mean what causes it.
16      Q.    Oh, yes.
17      A.    Oh, I'm sorry, I thought you
18  meant what they were citing.
19      Q.    Oh, no, no, what causes it.
20      A.    I apologize.  Where the helical
21  trocar passes through the obturator foramen,
22  through those muscles that we talked about
23  earlier, they get irritated or maybe a nerve
24  root gets irritated, and we believe that's

Page 160

1  what causes the leg pain.
2      Q.    What nerve -- can you tell me,
3  what muscles were those?
4      A.    The -- just the obturator foramen
5  muscles, there's four or five.
6      Q.    Okay.  In what percentage of
7  cases do you see the transient leg pain
8  lasting for 24 to 48 hours?  How many women
9  experience that as a complication of the
10  surgery?
11      A.    In my practice, you mean, or --
12      Q.    Well, why don't you give me your
13  practice and also tell me what your
14  understanding is from the medical literature.
15      A.    I think the studies show, you
16  know, a range of values.  It went up to --
17  like the Tang study, it was like a quarter of
18  patients and some of them are less, around 6
19  to 10%.  I would say, you know, probably
20  somewhere in there would be a good number.
21      Q.    Okay.  So somewhere from 6% to
22  24% --
23      A.    Uh-huh.
24      Q.    -- I think is what we had.

Christina Pramudji, M.D.



Page 161

1      Now, do you see anywhere in this
2  IFU that Ethicon informs physicians that
3  patients can experience chronic pain after
4  insertion of the transobturator device?
5      MR. SNELL:  Form.
6      Go ahead.
7      A.    I don't think it's specifically
8  laid out, but they talk about the irritation
9  and inflammation and it's sort of a known
10  fact of surgical training that that can occur
11  after any surgery, to have chronic pain.  So
12  it's kind of a commonsense knowledge of
13  surgeons.
14  BY MS. KIRKPATRICK:
15      Q.    Does it say anywhere in this IFU
16  that one of the complications of this can be
17  dyspareunia?
18      A.    I don't think it specifically
19  says that.
20      Q.    Okay.  Does it say anywhere in
21  here that there can be chronic pain in the
22  wall of the vagina for women who get this?
23      A.    I don't believe it does.
24      Q.    So the only pain that Ethicon

Page 162

1  identified is this transient leg pain, and
2  surgeons would know about that too, correct?
3      MR. SNELL:  Form.
4      A.    Well, I think because, as you
5  mentioned before, we don't typically go into
6  the obturator canal before this procedure
7  actually came out so that would be something
8  that they would want to highlight for
9  physicians so they didn't think, oh, did I do
10  something wrong.
11      No, it's just sort of the anatomy
12  there.  It's a sensitive area and patients
13  will have leg pain, but it is typically
14  almost all the time transitory.
15  BY MS. KIRKPATRICK:
16      Q.    Does it tell -- it tells
17  physicians in here how to manage this
18  transient leg pain, correct?
19      A.    It does say to manage it with
20  mild analgesics.
21      Q.    Does it tell physicians anywhere
22  in here how to manage chronic pain that may
23  result from the use of a TVT-O device?
24      A.    No, it doesn't.

Page 163

1      Q.    Does it tell physicians in any
2  way that women may be required to take
3  narcotics to manage pain following -- chronic
4  pain following a TVT-O implant?
5      A.    No.
6      Q.    Does it tell physicians that they
7  may have to be on prescription medication for
8  a significant period of time to control
9  chronic pain?
10      MR. SNELL:  Form.
11      Go ahead.
12      A.    No.
13  BY MS. KIRKPATRICK:
14      Q.    Does it tell physicians anywhere
15  in here how to manage or treat women who have
16  dyspareunia as a result of the TVT-O implant?
17      A.    No, because again, common sense
18  with pelvic floor surgeons, they're going to
19  know about all these things ahead of time.
20      Q.    Okay.  So you think that
21  everything is known about, except for this
22  transient leg pain, this is the only thing
23  that physicians need to be instructed about
24  concerning the TVT-O device?

Page 164

1      A.    Well, what -- I think that that's
2  one thing that's unique to the procedure,
3  that surgeons may not have been able to
4  anticipate because they don't work in that
5  area commonly.
6      And so, like I said, the first
7  time it happens to you, you may think, oh, my
8  gosh, you know, what did I do.  And then --
9  if they didn't tell you about this, but then
10  you realize, okay, that can occur, it's been
11  seen, it's not just me, and it can be managed
12  this way.
13      Q.    Okay.  How many women who have a
14  pubovaginal sling have you seen who have
15  chronic pain?
16      A.    Well, I haven't seen that many
17  patients with pubovaginal slings.  I have one
18  right now, actually, though, that has chronic
19  pain.
20      Q.    What kind of pain does she have?
21      A.    She has lower abdominal pain.
22      Q.    And what's the source of her
23  pain?
24      A.    She had an MRSA infection after

41 (Pages 161 to 164)

Christina Pramudji, M.D.

Page 165

1  the surgery.
2      Q.   Okay.  So is it the MRSA the
3  source of the infection or is it the
4  pubovaginal sling itself?
5      A.   I don't know exactly.  It could
6  be the inflammatory response to the
7  infection, it could be the surgery itself.
8  It's hard to know.
9      Q.   Do you think that that will be
10  chronic pain?
11      A.   I don't know yet.  It's hard to
12  say.
13      Q.   How long has she experienced it
14  for?
15      A.   It's been about three or four
16  months.
17      Q.   And you haven't been able to cure
18  that?
19      A.   Huh-uh, not yet.
20      Q.   Have you sought out any advice
21  from fellow physicians on how to deal with
22  it?
23      A.   No.
24      Q.   Have you talked to anyone who

Page 166

1  does a lot of pubovaginal slings and ask them
2  if they have had this experience before?
3      A.   No.
4      Q.   You've been using a lot of
5  anatomical terms, and I think you've been
6  trying -- doing a very good job of trying to
7  teach me anatomy, but I just want to make
8  sure that we are all on the same page.
9          So I'm going to mark this as
10  Exhibit 10 and ask you to help me out here a
11  little.
12          (Whereupon, Exhibit Pramudji-10,
13      Pelvic Illustration with Handwritten
14      Labels, was marked for identification.)
15  BY MS. KIRKPATRICK:
16      Q.   Okay.  Can you, to orient us,
17  this -- is this the view of a woman who
18  you're looking up towards her pelvic area,
19  correct?
20      A.   Uh-huh.
21      Q.   So this is the view that you
22  would have during --
23      A.   This is looking down from above.
24  It is looking into the pelvis from above.

Page 167

1      Q.   Into the -- okay.  Can you
2  explain that to me?  Can you just label the
3  urethra, the vagina and the rectum for me?
4          MR. SNELL:  No.  She's not here
5      to label things on documents.  She's here
6      to give testimony.  She's not labeling
7      this thing for you.
8          MS. KIRKPATRICK:  Well, yes, she
9      is.  This is a deposition.
10          MR. SNELL:  No, she's not.
11          MS. KIRKPATRICK:  Let's call the
12      Court.
13          MR. SNELL:  Call the Court.  This
14      is not a labeling session.  She's here to
15      answer your questions.
16  BY MS. KIRKPATRICK:
17      Q.   Well, I'll tell you what.  Why
18  don't you point it out to me and I'll label
19  it and you tell me if I'm incorrect where
20  I've labeled the information.
21          MS. KIRKPATRICK:  Can we do it
22      that way?
23          MR. SNELL:  I have no problem
24      with that.  I have no problem with that,

Page 168

1  but she's not here to write any labels.
2          MR. WALLACE:  Can you -- I'm
3  sorry, I'll sit down.
4          MR. SNELL:  It's a deposition.
5  It is a deposition.  It is a
6  question-and-answer session.
7          MS. KIRKPATRICK:  It's absurdity,
8  but, you know, we can deal with people
9  like that.
10      A.   So this is from the bottom.  This
11  is if you take out all the organs and look
12  from above.
13  BY MS. KIRKPATRICK:
14      Q.   Okay.  So, hang on.  Let me just
15  make sure that you and I are oriented to the
16  same place in the anatomy, and then I want to
17  ask you about your report.
18      A.   Uh-huh.
19      Q.   So can you point out to me where
20  the urethra is?
21      A.   Uh-huh.
22          THE WITNESS:  Can I see your pen
23  for a second?
24  BY MS. KIRKPATRICK:

42 (Pages 165 to 168)

Christina Pramudji, M.D.

Page 169

1    Q.    And by the way, you are able to
2  write, correct?  And the only reason you're
3  not writing here is that Mr. Snell has told
4  you not to?
5          MR. SNELL:  Yes.
6  BY MS. KIRKPATRICK:
7    Q.    And I'm going to act as your
8  scribe for you today, so I hope my
9  handwriting is as good as yours.
10   A.    It's this one right there.
11   Q.    This line here, okay.  So I have
12 labeled the urethra here where you told me to
13 label it, right?
14   A.    Uh-huh.
15   Q.    And then where is the vagina?
16   A.    Right here.
17   Q.    Have I correctly labeled the
18 vagina where you pointed it out to me?
19   A.    Uh-huh.
20   Q.    Okay.  And then can you point at
21 the rectum for me?
22   A.    Right here.
23         Why do you want to do this?
24   Q.    Because I want to ask you about

Page 170

1  some of Ms. Huskey's anatomy so I just want
2  to make sure that we're all talking about the
3  same thing here.
4    A.    Okay.
5    Q.    Okay.  So those are basically
6  stacked on top of each other.  Is that right?
7    A.    Uh-huh, correct.
8    Q.    Okay.  And what I'm pointing at
9  here, there's a number of muscles that are
10 identified here.  Can you tell me what
11 muscles those are?
12   A.    Sure.  This is the puborectalis.
13   Q.    This muscle down here, so if I
14 label this here -- can you spell that for me?
15   A.    P-U-B-O-R-E-C-T-A-L-I-S.
16   Q.    Okay.  And then what is this
17 muscle?  Is this a separate muscle?
18   A.    Uh-huh.
19   Q.    Okay.  And what muscle is that?
20   A.    That's going to be the
21 ischiococcygeus.
22   Q.    Okay.  You're going to have to
23 help me out there.
24   A.    I-S-C-H-I-O-C-O-C-C-Y-G-E-U-S.

Page 171

1    Q.    Did I get that right?
2    A.    Uh-huh.
3    Q.    And did I label those two muscles
4  correctly?
5    A.    Yes.
6    Q.    Okay.  And is this here -- this
7  almost looks like a triangle to me, is this a
8  separate muscle?
9    A.    Yes.
10   Q.    Okay.  And what is this one?
11   A.    That is going to be the -- I
12 believe that's the iliococcygeus.
13   Q.    I-L-L?
14   A.    I-L-I-O.
15   Q.    Oh, I-L-I-O?
16   A.    Uh-huh, C-O-C-C-Y-G-E-U-S.
17   Q.    Okay.  And what is this muscle
18 right at the bottom here?
19   A.    That would be the -- I can't
20 remember at the moment.
21   Q.    Okay.  I'll just put a question
22 mark there.  And then --
23   A.    This would be the ischial spine.
24   Q.    I-S-C-H-I --

Page 172

1    A.    A-L.
2    Q.    -- A-L?
3    A.    S-P-I-N-E.
4          This would be the ATFP.
5    Q.    And can you tell me what that is?
6    A.    Arcus, A-R-C-U-S, tendineus,
7  T-E-N-D-I-N-E-U-S -- E-U-S.
8    Q.    Okay.
9    A.    -- fascial pelvis.
10   Q.    Okay.  I will take credit for any
11 spelling errors on this.
12   A.    This is the obturator fascia that
13 they're showing.
14   Q.    Okay.
15   A.    Obturator foramen.
16   Q.    And that's where --
17   A.    Where you want to avoid with the
18 helical trocar.
19   Q.    You want to avoid the obturator
20 foramen?
21   A.    Oh, yeah.  That's where the main
22 branches of the -- that's where the nerves
23 are.
24   Q.    Okay.  And what is this up here?

43 (Pages 169 to 172)

Christina Pramudji, M.D.

Page 173

1    A.    The pubic symphysis.
2    Q.    And that's a bone, correct?
3    A.    It's a connective tissue.
4    Q.    Okay.  And then I don't know if
5  it's labeled here.  What is this here?
6    A.    That's the pelvic bone.
7    Q.    The pelvic bone.
8    A.    Uh-huh.
9    Q.    Okay.  And I think we labeled
10  this up here, but what is this structure down
11  here?
12    A.    That's the perineal body.
13    Q.    Now, these muscles that you've
14  identified for me, which of them are
15  considered part of the levator muscles?
16    A.    All of them.
17    Q.    Okay.  So all of these muscles,
18  which would include the puborectalis, the
19  ischio- -- help me out here?
20    A.    -- -coccygeus.
21    Q.    Okay.  The ischial spine.  Is
22  that right?
23    A.    That's the point on the bone.
24    Q.    Okay.  The iliococcygeus and then

Page 174

1  these muscles down here, this all forms the
2  levator muscles that support the pelvis,
3  correct?
4    A.    Correct.
5    Q.    Okay.  So which of the muscles --
6  which of Mrs. Huskey's muscles on exam, I
7  think you indicated that she had levator
8  muscles that were spasming.  Can you show me
9  which ones those are?
10    A.    Right back here.  Spasm right
11  there and it's kind of tilted I think because
12  of her SI joint problem, so you can see the
13  sling would have been like this, and this
14  muscle here is what's in spasm.
15    Q.    Okay.  So what you drew up here,
16  this top line here, this is the sling
17  placement?
18    A.    Uh-huh.  Yes.
19    Q.    And this is the point of the
20  muscle spasm.  Is that right?
21    A.    Yeah, right here.  It's a band.
22  You can feel it going across the left side of
23  her vagina.  This is left and this is right.
24    Q.    Okay.  So this is also the

Page 175

1  location that you have indicated that you
2  feel the -- I don't know exact -- I've got to
3  go back and take a look at it, but you felt
4  the band of --
5    A.    Muscle spasm.
6    Q.    Something.
7    A.    Yes.
8    Q.    Okay.  So in that band that you
9  feel on the left vaginal wall you believe is
10  a muscle spasm?
11    A.    Yeah, it's a muscle in spasm,
12  yes.
13    Q.    Okay.  It's a muscle in spasm.
14    A.    Yes.
15    Q.    Okay.  And is this also the point
16  in the vaginal wall that you found
17  tenderness?
18    A.    She was tender, yes, on that
19  spot.
20    Q.    Is there anywhere else in the
21  vagina that she was tender?
22    A.    She was a little tender right up
23  under here on the left side, and you can feel
24  a little scar tissue.

Page 176

1    Q.    Like here?
2    A.    Uh-huh.
3    Q.    Okay.
4    A.    And then she was just mildly
5  tender just everywhere.
6    Q.    She was mildly tender throughout?
7    A.    Throughout her whole vagina, but
8  the main spot was here.  That's what's really
9  bothering her.
10    Q.    Okay.  So we have an area of
11  tenderness in the vaginal wall here, and this
12  is a muscle spasm.
13    A.    Uh-huh.
14    Q.    Okay.  Can you -- I just don't
15  want to misrepresent in any way what you've
16  testified about.  Can you just double-check
17  that I have labeled all of that accurately?
18    A.    Yes.
19    Q.    Okay.  I just want to make sure
20  we're all on the same page when we start
21  talking about lefts and rights and anteriores
22  and posteriors.
23    Okay.  So looking at -- you
24  reviewed, I think we talked about, the

44 (Pages 173 to 176)

Christina Pramudji, M.D.

Page 177

1  depositions, you reviewed certain medical
2  records and you also did an IME on
3  Mrs. Huskey, correct?
4      A.    That's correct.
5      Q.    And you'll agree with me that
6  prior to the implantation of her TVT-O, she
7  was a very active woman, correct?
8      A.    Yes.
9      Q.    She exercised frequently?
10     A.    She -- I don't know how often she
11  exercised, but she said she would do the
12  elliptical for eight miles is what she told
13  me.
14     Q.    Okay.  And do you remember seeing
15  in the medical records or the depositions
16  that she would do that three to four times a
17  week?
18     A.    Yeah, I think I do remember that,
19  now that you mention it.
20     Q.    And she had also a fairly
21  physically demanding job as a physical
22  therapist, correct?
23     A.    Yes.
24     Q.    And she, prior to the surgery,

Page 178

1  was able to have intercourse with her
2  husband?
3      A.    Yes.
4      Q.    Correct?
5          And did you see in anything in
6  her medical records prior to the implantation
7  of the TVT-O device that Mrs. Huskey was in
8  any way chronically physically limited in her
9  ability to engage in daily activities?
10     A.    No, I don't believe I did.  She
11  had some chronic complaints, but I don't --
12  there wasn't a limitation there.
13     Q.    Okay.
14     A.    She had chronic back pain, I
15  believe she had some dyspareunia and some
16  pelvic pain, especially on the left.  But
17  there wasn't a limitation.
18     Q.    So she had -- so let's go through
19  the prior conditions that you've noted.  You
20  said she had chronic back pain, she had
21  dyspareunia.  Do you believe that that was --
22  did you see reports of chronic dyspareunia?
23     A.    I can't remember how long that it
24  went on ahead of time, but it was something

Page 179

1  that she had been dealing with.
2      Q.    Okay.  And then, I'm sorry, I
3  missed the last one that you had said.
4          MR. SNELL:  Pelvic pain, it says.
5          MS. KIRKPATRICK:  Pelvic pain,
6  thank you.
7  BY MS. KIRKPATRICK:
8      Q.    And she had reports of pelvic
9  pain.  Did you see any reports of chronic
10  pelvic pain?
11     A.    I don't -- I can't remember.  I
12  don't believe so.
13     Q.    Okay.  What type of pelvic pain
14  was reported in Mrs. Huskey's medical records
15  prior to the implantation of the TVT-O sling?
16     A.    It was left-sided pelvic pain and
17  some rectal discomfort and dyspareunia.  And
18  she also told me at the IME that she had some
19  deep central pain.
20     Q.    And you will agree that those
21  were reported at an OR visit maybe three to
22  four months prior to the implantation of her
23  sling?  Is that right?
24         MR. SNELL:  Form.

Page 180

1      A.    An OR visit?
2  BY MS. KIRKPATRICK:
3      Q.    Yes.  I'm sorry, ER, yes.
4      A.    I believe so.
5      Q.    And Dr. Byrkit, her treating
6  physician, actually saw her at that time,
7  correct?
8      A.    I believe so, yes.
9      Q.    And those symptoms resolved
10  themselves after that ER visit, didn't they?
11         MR. SNELL:  Form.
12     A.    I don't know if they did or not.
13  BY MS. KIRKPATRICK:
14     Q.    Okay.  And do you remember
15  Dr. Byrkit determining that those were not
16  GYN in origin?
17     A.    I think she thought that the left
18  pelvic pain might have been related to the
19  ovarian cyst at that time.
20     Q.    Okay.  Do you remember that she
21  ruled that out after the workup in the ER and
22  dismissed -- or discharged Mrs. Huskey and
23  made a notation that there was no GYN origin
24  to that particular visit, correct?

45 (Pages 177 to 180)

Christina Pramudji, M.D.

Page 181

1    A.    Correct.
2    Q.    And that was an acute incident,
3  correct?
4    A.    I believe so, yeah.  But I think
5  she had been having some complaints prior to
6  that when she had sought care, I can't
7  remember, it was a while back when she was
8  concerned about her hormonal status and being
9  evaluated for some pelvic pain and
10  dyspareunia a couple of years before that.
11    Q.    And you think that there was a
12  connection between that office visit and her
13  ER visit a few months before she had the
14  TVT-O?
15    A.    There could have been.
16    Q.    Could have been, or was?
17    A.    Pelvic pain is very -- as we
18  talked about before, it's so complicated with
19  the overlap of the organs in that area, I
20  think they chalked it up, the ER visit, to
21  diverticulosis at that time.
22    Q.    Do you have any reason to
23  disagree with that diagnosis?
24    A.    No.  The only thing that -- well,

Page 182

1  I guess I do, because when I examined her and
2  talked to her, she has, as I mentioned in my
3  report, she does have bladder pain and pain
4  with filling, which indicates a possible
5  chronic bladder disorder and chronic
6  upregulation of the pelvic pain receptors.
7    So there could be some
8  relationship there with how the nerves are
9  cross-reacting and it could be something
10  that's kind of been developing over time.
11    Q.    And you agree with me that the
12  nerves in the pelvis do cross-react, correct?
13    A.    Yes.
14    Q.    What is your definition of
15  chronic pelvic pain?
16    A.    Chronic pelvic pain would last --
17  typically we consider it, in general in
18  medicine, more than six months, is considered
19  chronic, and it could be any pain in the
20  pelvic area.  It may not be continuous, it
21  could be intermittent, but it's anywhere in
22  the pelvis that could be coming and going for
23  at least six months.
24    Q.    Okay.  And in your practice as a

Page 183

1  urologist, what do you treat that can be the
2  causes of chronic pelvic pain?
3    A.    I treat interstitial cystitis,
4  pelvic floor muscle dysfunction or levator
5  spasm, postsurgical pain from various
6  sources.  I have a few patients with
7  dyspareunia, urogenital atrophy, urethritis,
8  kidney stones or ureteral stones, to be
9  precise.
10    Q.    Anything else?
11    A.    Those would be the main
12  categories of patients that I can think of.
13    Q.    Okay.  So I want to go back for a
14  second to dyspareunia.  Dyspareunia is
15  generally a symptom of some type of pelvic
16  pain, correct?
17    A.    Correct.
18    Q.    And what are the causes of
19  dyspareunia that you treat in your practice?
20    A.    Uh-huh.  Urogenital atrophy,
21  interstitial cystitis, urethritis, pelvic
22  floor muscle spasm.
23    Q.    Anything else?
24    A.    Postsurgical scarring.  That's

Page 184

1  all I can think of at the moment.
2    Q.    Okay.  Did Mrs. Huskey have
3  urogenital atrophy?
4    A.    Yes.
5    Q.    Do you think that's the cause of
6  her dyspareunia?
7    A.    I don't think it's the main
8  cause, but I think it's probably
9  contributing.
10    Q.    How do you treat dyspareunia
11  caused by urogenital atrophy?
12    A.    Typically use either vaginal
13  estrogen cream or tablets, or there's a new
14  medication called Osphena that I've used,
15  O-S-P-H-E-N-A, that I've used a couple of
16  times.  It's new.
17    Q.    Do you believe that Mrs. Huskey's
18  dyspareunia is caused by postsurgical
19  scarring?
20    A.    I think some of it is, but no.
21  Most of it's the levator spasm that she has.
22    Q.    Okay.  So when you say some of
23  it, is the postsurgical scarring would be
24  secondary to either the TVT-O implant,

Christina Pramudji, M.D.

Page 185

1    explant or both, correct?
2        A.    Correct.
3        Q.    And you'll agree with me that
4    that surgery has caused some scarring in her
5    pelvis?
6        A.    It has minimal scarring right
7    under the urethra.
8        Q.    And that that postsurgical
9    scarring can be a cause of her dyspareunia,
10   even if it's not the main cause, correct?
11           MR. SNELL:  Form.
12       A.    It's such minimal scarring, it's
13   possible, but it's very unlikely.  I think if
14   someone didn't know she had surgery and
15   examined her, they wouldn't be able to really
16   tell any difference.
17   BY MS. KIRKPATRICK:
18       Q.    Okay.  Do you -- so let's talk
19   about the pelvic floor muscle spasm.  That is
20   the levator muscles, correct, throughout the
21   entire pelvic region.  And you've identified
22   Mrs. Huskey's muscle spasm as occurring on
23   the left -- basically the left wall of the
24   vagina, correct?

Page 186

1        A.    Yes.  Left posterior wall.  And
2    it's abnormally angled.
3        Q.    The muscle is abnormally angled?
4        A.    Yes.
5        Q.    Okay.  And this muscle spasm that
6    you say you believe that that is a cause of
7    her dyspareunia, correct?
8        A.    That's where her pain is coming
9    from.
10       Q.    Okay.  What's the cause of that
11   muscle spasm?
12       A.    That muscle spasm, I suspect it's
13   related to the SI joint issue that she has
14   causing pelvic tilt.  She wears a belt all
15   the time.  She has a slightly abnormal gait.
16   I don't know if that goes back to the motor
17   vehicle accident she was in.  And I think
18   just the overall upregulation in her pelvic
19   area, I think the stress, that's where she's
20   carrying her stress that she's under.  You
21   know, it's like some people carry it in their
22   neck muscles where they'll get a tight neck
23   or a headache, some people carry it in their
24   pelvic floor muscles, that's where their

Page 187

1    stress will manifest, and she's a very
2    stressed person.  Seemed somewhat depressed,
3    in my opinion.  And so I think that's
4    exacerbating it, not causing it but
5    exacerbating it.
6            I do not think it's from the
7    sling, because it's just not anywhere near
8    where the sling traverses and, really, that
9    was not really described in her medical
10   records or by her until after the sling was
11   actually explanted.
12       Q.    Okay.  So let's talk about this
13   in a little more detail.  Now, these muscles
14   that we've identified here, where do they
15   insert?
16           MR. SNELL:  Form.
17       A.    What do you mean?
18   BY MS. KIRKPATRICK:
19       Q.    Do they insert into the bones, do
20   they insert -- where do they go?
21       A.    Well, you can see on the picture
22   right there where they go.
23       Q.    Is this the end of the muscle?
24       A.    Yes.

Page 188

1        Q.    Okay.  So the muscle ends here
2    and it's connected to what?
3        A.    The bones and the ligaments right
4    there.
5        Q.    These bones and ligaments, the
6    pubic bone here, and which ligaments are
7    these?
8        A.    That's the ATFP and the obturator
9    fascia.
10       Q.    And the sling itself goes through
11   the obturator fascia, right?
12       A.    Yes.
13       Q.    Okay.  And that's actually how
14   it's implanted, correct?
15       A.    That's how it's -- what do you
16   mean, that's how it's implanted?
17       Q.    Through the fascia?
18       A.    That's the design of it, to go
19   through that --
20       Q.    Yes, thank you.
21       A.    -- fascia and through those
22   muscles.
23       Q.    Okay.  And what we know from
24   Dr. Siddique's report is when he went in to

47 (Pages 185 to 188)

Christina Pramudji, M.D.

Page 189

1   remove her sling, he pulled down on it, as
2   you said, right, and then when he let go, he
3   described it as retracting behind the pubic
4   bone, correct?
5       A.    Yes.
6       Q.    So we know that there's some
7   portion of the mesh that still exists in this
8   location through the obturator foramen and
9   back behind this pubic bone, correct?
10      A.    Correct.
11      Q.    And that's the same obturator
12  foramen that the muscles, the levator
13  muscles, insert through, correct?  Or attach
14  to?
15      A.    Not really.  I mean, you can see
16  where they sort of --
17      Q.    Show me where that is.
18      A.    They sort of come over here to
19  this point, but then they end and they're not
20  really near this fascia here, these muscles.
21      Q.    How much distance is there
22  between that -- this muscle here and that
23  fascia there?  How many centimeters is that?
24      A.    Well, the fascia goes right up to

Page 190

1   that point and then the muscles start.
2       Q.    And they're all connected,
3   correct?
4       A.    Yeah.  They're opposing to each
5   other, they're not necessarily connected but
6   they're in the vicinity of each other.
7       Q.    Okay.  And they work in
8   conjunction with each other, don't they, to
9   perform --
10      A.    This is kind of a separate
11  compartment but this works as a floor.  This
12  all works together.  But the obturator is a
13  separate --
14      Q.    Okay.  And I'm sorry that you're
15  giving me an anatomy lesson.
16      A.    That's okay.
17      Q.    But I'm trying to understand
18  here.  Does this muscle connect to this
19  fascia or not?
20      A.    The fascia --
21          MR. SNELL:  Form.
22      A.    -- condenses right there and
23  makes a line and it attaches to that line.
24  BY MS. KIRKPATRICK:

Page 191

1       Q.    Okay.  So this is the fascia --
2       A.    But that line is like a wall
3   that -- kind of a partition between the two
4   compartments.  These are considered different
5   compartments.
6       Q.    But they're attached, correct?
7       A.    They're attached.
8       Q.    So this muscle attaches to this
9   fascia here, and the sling, when it's
10  implanted, goes in through the levator muscle
11  here and it goes into the fascia as well,
12  correct?
13          MR. SNELL:  Form.
14          Go ahead.
15      A.    Yes.
16  BY MS. KIRKPATRICK:
17      Q.    Now, putting aside this muscle
18  spasm here, you said there's a point of
19  tenderness that we've identified on this
20  right here.  What do you think is causing
21  that tenderness?
22      A.    She's got some scar tissue right
23  under there.
24      Q.    And is that scar tissue from the

Page 192

1   implant or explant surgery?
2           MR. SNELL:  Form.
3       A.    Yes.
4   BY MS. KIRKPATRICK:
5       Q.    Okay.  And you believe that that
6   is the cause of the tenderness that she's
7   feeling in this --
8       A.    That one spot.
9       Q.    -- one spot?
10      A.    Yes.
11      Q.    And it's the spot that sits
12  between the urethra and the vagina, correct?
13      A.    Correct.
14      Q.    Okay.
15      A.    It's kind of right on the vaginal
16  wall.  There's a little bump, and that's
17  where she's tender.
18      Q.    Okay.  She's tender on that.  And
19  that is also contributing to the dyspareunia
20  that she experiences, correct?
21      A.    It's hard to say.  It could be.
22      Q.    Okay.  At least --
23      A.    I mean, if that's all she had --
24      Q.    I'm not asking you if it's the

48 (Pages 189 to 192)

Christina Pramudji, M.D.

Page 193

1  cause, the only cause, the only thing that's
2  giving her discomfort, but that's something
3  that's contributing to the dyspareunia and
4  the discomfort that she's having vaginally,
5  correct?
6          MR. SNELL:  Form.
7      A.  It could be, yes.
8  BY MS. KIRKPATRICK:
9      Q.  Okay.  So let me go through with
10 you, then, this area of muscle spasm.  I want
11 to just do a timeline so I can understand, in
12 my mind, how this would work.
13         Now, you'll agree with me that
14 she didn't have any reports of any muscle --
15 do you need to take that?
16     A.  Yes.  It's one of my partners.
17        MS. KIRKPATRICK:  Sure.  No
18     problem.  We'll take a five-minute break.
19     (Recess, 2:31 p.m. to 2:50 p.m.)
20 BY MS. KIRKPATRICK:
21     Q.  So I want to go through some of
22 the other -- the history and get a timeline
23 from you of when Ms. Huskey had certain
24 issues.

Page 194

1      A.  Okay.
2      Q.  So I think some of the issues
3  that you had talked about that you thought
4  were important or relevant to the diagnosis
5  of pelvic pain here were the back surgery
6  that she had?
7      A.  Uh-huh.
8      Q.  When did she have that back
9  surgery, do you remember?
10     A.  She had two.  She had one I
11 believe in '97 and one in 2000.
12     Q.  '97 and 2000.
13     A.  Uh-huh.
14     Q.  And was that her upper, her
15 middle or her lower back?
16     A.  Lower back.
17     Q.  Okay.  Do you believe that the
18 back surgery that she had in 1997 and 2000
19 has any correlation or any connection to the
20 pelvic pain that she's currently
21 experiencing?
22     A.  I'm not -- I'm not sure about
23 that.  It's a possible etiology.  I think her
24 pain is multifactorial.  It's hard to really

Page 195

1  dissect it out completely.
2      Q.  Okay, so hard to dissect out.
3          But would you agree with me that
4  you can't say to a reasonable degree of
5  medical certainty that the back surgery in
6  1997 is causally related to her current
7  pelvic pain issues?
8          MR. SNELL:  Form.
9      A.  I can't say that it's not either.
10 BY MS. KIRKPATRICK:
11     Q.  Okay.  But I'm asking if you can
12 say that it is.
13     A.  I can't say one way or another.
14     Q.  Can't say one way or the other,
15 okay.
16     A.  No.
17     Q.  You also had referenced a
18 shoulder injury.  Is that right?
19     (Brief interruption.)
20        MS. KIRKPATRICK:  I'm sorry,
21     that's me.  I'm sorry.
22 BY MS. KIRKPATRICK:
23     Q.  I thought you had referenced
24 another surgery that she had.  Am I incorrect

Page 196

1  in that?
2      A.  No, I didn't.
3      Q.  Okay, no other surgery.
4          And when you say that her pelvic
5  pain is multifactorial, I just want to make
6  sure that I have a complete, full listing of
7  each of the things that you believe are
8  contributing to her current pelvic pain.
9      A.  The diverticulosis -- well,
10 number one at the top would be the levator
11 spasm.
12     Q.  And you believe that the cause of
13 the levator spasm was the S1 joint issue?
14     A.  I think that might be
15 contributing, because, like I said, it's
16 abnormally angled.  I think she might have
17 some pelvic tilt issues.
18     Q.  Okay.  Anything else -- let's
19 take the levator spasm first.  Anything else
20 that you believe can be causing the levator
21 spasm?
22     A.  Well, like I said before, it can
23 be exacerbated by stress, can cause a muscle
24 spasm.  The pain, you know, just the chronic

49 (Pages 193 to 196)

Christina Pramudji, M.D.

Page 197

1  pain, the pelvic surgery can -- any pelvic
2  surgery can contribute but the pelvic surgery
3  she had could contribute.
4      Q.    Okay.  Anything else?  We've got
5  the pelvic surgery, that's the TVT-O surgery.
6  We have the potential S1 joint issue.
7      A.    Uh-huh.
8      Q.    Okay.  We have that it may be
9  then exacerbated by stress but not caused by
10  stress.  Is that right?
11     A.    We don't really know for sure how
12  it all interplays, nobody has been able to
13  quite figure that out.  I mean, I've seen
14  patients before that it just occurred at the
15  time of stress, there was no inciting factor.
16  They just had a lot of stress and then they
17  developed this pelvic floor spasm.
18     Q.    Okay.  Anything else that you
19  think is a cause of the levator muscle spasms
20  that she is experiencing?
21     A.    I know she's had also some
22  problems with rectal pain with the
23  diverticulosis and there might be some
24  interplay there as well.  But it's one of

Page 198

1  those areas where usually you can't figure
2  out exactly what causes it.
3      Q.    So am I correct in saying that
4  your opinion is that there's not a single
5  cause to the muscle spasm that she was
6  experiencing, but there are multiple causes
7  that working in connection with each other
8  are causing this muscle spasm that she's
9  having?  Is that right?
10     A.    Correct, uh-huh.
11     Q.    And then that muscle spasm that
12  she's having is the source of most of her
13  both dyspareunia and chronic pelvic pain that
14  she's currently having?
15     A.    Correct.
16     Q.    Okay.  And you gave me then a
17  list of the issues or a list of the
18  conditions that you believe were all working
19  in conjunction with each other to cause this
20  levator muscle spasm?
21     A.    Correct.
22     Q.    Is that right?
23     A.    Yes.
24     Q.    Okay.  So what's not on that list

Page 199

1  is the back surgery from '97 to 2000.  Is
2  that right?
3      A.    Uh-huh.
4      Q.    Is there anything else -- okay.
5  So that's the levator spasm.
6      A.    Uh-huh.
7      Q.    Then separate and apart from
8  that, you talked about the diverticulosis,
9  right?
10     A.    Uh-huh.
11     Q.    And that was the diagnosis that
12  she had when coming from the emergency or
13  from her emergency room visit, I believe it
14  was the December time frame?
15     A.    2010, yes.
16     Q.    December 2010, okay.  And you
17  will agree with me that at that time, her
18  treating gynecologist ruled out a GYN origin
19  to that particular lower quadrant pain?
20     A.    I'd have to look at the records
21  again.  I can't remember exactly what her
22  conclusion was about that, but I do recall
23  that the overall thought was that it was the
24  diverticulosis because it was more on the

Page 200

1  left.
2      Q.    Okay.  And you also recall that
3  there were reports in her medical records
4  after that, that she controls the
5  diverticulosis by a diet and she's also, I
6  believe, on MiraLAX.  Is that correct?
7      A.    Yes.
8      Q.    Okay.  And is there any report
9  after December of 2010 that leads you to
10  believe that the diverticulosis is not being
11  controlled by the measures that she's
12  currently taking?
13     A.    There was -- there was a time
14  when she was concerned about the
15  diverticulosis flaring up.
16     Q.    Okay.  And when was that?
17     A.    I don't remember, 2012 or '13.  I
18  can't recall.  She was going to see her GI
19  doctor.
20     Q.    And will you agree with me that
21  when you have diverticulosis, it is, as you
22  termed it, you generally have a flare-up?  Is
23  that right?
24     A.    Typically.

Christina Pramudji, M.D.

Page 201

1  Q.  And then it's typically
2  controlled by your diet, by exercise, and by
3  medication after that.  Is that right?
4  A.  Well, yeah.  Keeping the bowel
5  movements moving.  She has chronic
6  constipation, so, you know, it's hard to know
7  how often it's contributing to her pain and
8  discomfort because she doesn't keep it
9  managed very well at all times.  She doesn't
10  have bowel movements regularly every day.
11  Q.  Okay.  And that's even more
12  difficult for her now since she's not
13  exercising like she used to, because that
14  helps keep your bowel movements regular,
15  correct?
16  MR. SNELL:  Form.
17  A.  It does in most people.
18  BY MS. KIRKPATRICK:
19  Q.  And actually, she has reported
20  that that was helpful to her at a particular
21  period in time in keeping her bowel habits
22  regular, do you remember?
23  A.  I don't recall reading that.
24  Q.  You don't recall reading that?

Page 202

1  A.  No.
2  Q.  Did you ask her anything about it
3  at your --
4  A.  No, we didn't talk about that.
5  Q.  But based on your review -- I
6  should say this:  At the examination, you
7  didn't think that the diverticulosis or the
8  chronic constipation were important enough to
9  address with Mrs. Huskey at the IME, correct?
10  A.  We did address it.  We didn't go
11  into detail with it.
12  Q.  Okay.  You didn't think it was
13  important enough to go into detail with her
14  about it at that time, did you?
15  A.  Yes.  And she didn't mention
16  anything more about it either.
17  Q.  And there were other issues that
18  you considered to be more significant to the
19  diagnosis of the pelvic pain than those
20  particular issues, right?
21  A.  Correct, uh-huh.
22  Q.  So we talked about the levator
23  spasms.  Let me ask you this:  This S1 joint
24  issue, because I think I've asked you -- let

Page 203

1  me get back to this.
2  When did Mrs. Huskey first treat
3  for S1 joint issues?
4  A.  I'd have to refresh my memory by
5  looking at the medical records.  I don't
6  recall.
7  Q.  Do you remember generally that it
8  was significantly before she had the TVT-O
9  sling implanted?
10  A.  I don't.  I really don't recall.
11  I'd have to look.
12  Q.  And do you recall that she had
13  been treated for several years on and off for
14  that condition?
15  A.  That's my impression, yes.
16  Q.  Okay.  And the SI issues that she
17  had been treating for had never, during the
18  entire period of time that she was treating
19  for them, caused a levator muscle spasm,
20  correct?
21  MR. SNELL:  Object to form.
22  A.  I don't -- I don't know.
23  BY MS. KIRKPATRICK:
24  Q.  Okay.  You didn't see anything in

Page 204

1  her medical record that indicated the type of
2  muscle spasm that we're seeing today and the
3  tenderness in the vagina, she had ever
4  experienced anything like that before,
5  correct?
6  A.  There was nothing like that
7  documented until after the explant.
8  Q.  Okay.  So if it is the SI joint
9  issue, she treated for many years with that
10  without having this type of issue, and it
11  didn't come to pass until I think it was
12  about six weeks after she had the explant
13  surgery?  Is that right?
14  A.  Correct.
15  Q.  Okay.
16  A.  But oftentimes joint issues like
17  that are progressive and things can shift.  I
18  don't -- like I said, I don't know if that's
19  the exact cause, but that could be
20  contributing.
21  Q.  Okay.
22  A.  It certainly -- as I said, that
23  muscle is abnormally angled, it is not in the
24  normal position that I've seen in other

Christina Pramudji, M.D.

Page 205

1  patients, and that would make the most sense,
2  that things are -- her pelvis is tilted.
3      Q.    How many women in the general
4  population have a tilted pelvis?
5      A.    I don't know.
6      Q.    Is it a fairly common condition?
7      A.    No.
8      Q.    It's not?
9      A.    No.
10     Q.    Okay. Apart from -- I want to
11  get back to this multifactorial pelvic pain.
12  We dealt with the pelvic pain caused by the
13  levator spasm and I think that was, again,
14  multifactorial. There's several conditions
15  that were kind of coming together that caused
16  that spasm, correct?
17     A.    (Witness nods head.)
18     Q.    And then she's also having pain
19  because of the diverticulosis, we talked
20  about that. And then we also had previously
21  talked about this point tenderness between
22  the urethra and the vagina.
23         Apart from those three issues, is
24  there anything else, in your mind, that is

Page 206

1  the cause of any of the pelvic pain that
2  she's experiencing?
3      A.    The urogenital atrophy.
4      Q.    And what kind of pelvic pain do
5  you think the urogenital atrophy is causing?
6      A.    I think it's causing just general
7  tenderness in the area, from the tissues
8  being a little thinned out.
9      Q.    Okay. Anything else?
10     A.    I don't think she's ever had a
11  laparoscope to rule out endometriosis.
12  That's on the differential. It doesn't sound
13  like endometriosis but it's something that
14  would be on a long differential diagnosis
15  list.
16     Q.    Okay. So let's talk a little bit
17  about endometriosis. Can you tell me what
18  that is? You're better qualified than I am.
19     A.    Yes. It's abnormal endometrial
20  tissue in the pelvic cavity.
21     Q.    Okay. And endometrial tissue is
22  basically the uterine lining, correct?
23     A.    Correct.
24     Q.    And it's when the uterine lining

Page 207

1  is not contained to the uterus itself but
2  also grows outside in tissues in the pelvis.
3      A.    Yes.
4      Q.    What is the treatment for
5  endometriosis?
6      A.    Well, either ablation of the
7  lesions in the pelvis laparoscopically by
8  burning them, cauterizing them, or hormonal
9  therapy.
10     Q.    Okay. And isn't one way that you
11  deal with endometriosis is through a
12  hysterectomy?
13     A.    Sometimes that can be done.
14     Q.    Okay. And at the time that you
15  have a hysterectomy performed, a physician
16  would be able to see if the endometrial
17  lining was growing outside of the uterus,
18  correct?
19     A.    Depends on how the hysterectomy
20  is performed. If it's a vaginal
21  hysterectomy, they probably wouldn't be able
22  to see anything.
23     Q.    Okay. But you'll agree with me
24  that the removal of the uterus or the

Page 208

1  hysterectomy is one way of dealing with
2  problems related to endometriosis, correct?
3      A.    It is, but patients can still
4  have endometrial tissue outside that was not
5  recognized and can still be problematic.
6      Q.    That's basically hypothetical.
7  You haven't seen any evidence in
8  Mrs. Huskey's medical records at all that she
9  had any problems with endometriosis, correct?
10         MR. SNELL: Form.
11     A.    I don't -- I can't recall if that
12  was addressed by one of her gynecologists
13  right off the top of my head. I just kind of
14  have that in the back of my mind on the
15  differential diagnosis.
16  BY MS. KIRKPATRICK:
17     Q.    Okay. And you know that she's
18  had a hysterectomy?
19     A.    Yes.
20     Q.    Okay. And you didn't note
21  anything in the medical records, the
22  hysterectomy or at the time of the
23  hysterectomy that there was any concern with
24  endometriosis?

52 (Pages 205 to 208)

Christina Pramudji, M.D.

Page 209

1    A.    Correct.
2    Q.    And that wasn't the reason for
3  the hysterectomy?
4    A.    Right.
5    Q.    Okay.  So you can't point me to
6  anything in her medical records that would
7  support the hypothesis that she has -- she
8  may have endometriosis, correct?
9         MR. SNELL:  Form.
10   A.    Only the pelvic pain would be the
11 only thing that would be a possible symptom
12 of it.
13 BY MS. KIRKPATRICK:
14   Q.    Okay.  You will also agree with
15 me that at the time Mrs. Huskey had her
16 hysterectomy, she had -- it was observed that
17 she had normal ovaries at that time, correct?
18   A.    I'd have to refresh my memory on
19 that.
20   Q.    Okay.  And generally, you would
21 also agree with me that if you can visualize
22 the ovaries at the time of a hysterectomy and
23 that's reflected in her medical records, it's
24 a good indication that you can visualize the

Page 210

1  pelvic cavity and see whether there's any
2  problem with endometrial tissue, correct?
3         MR. SNELL:  Form.
4    A.    Sure.
5  BY MS. KIRKPATRICK:
6    Q.    Okay.  And are you aware of any
7  reports in the medical literature or any
8  reports elsewhere of endometriosis developing
9  for the first time after a hysterectomy was
10 performed?
11   A.    No, I'm not aware of that.
12   Q.    Okay.  So anything else that you
13 believe is contributing or causing pelvic
14 pain for Mrs. Huskey?
15   A.    No.
16   Q.    Okay.  Now, I think you testified
17 that -- and it's actually in your IME as
18 well -- that Mrs. Huskey had some relief of
19 the pain following the -- immediately
20 following the removal of the sling, correct?
21   A.    Correct.
22   Q.    And that was for a period of
23 about six weeks after the surgery?
24   A.    Correct.

Page 211

1    Q.    And it was when she went back to
2  have a pelvic exam done when the speculum was
3  put into her vagina, it caused -- or I
4  shouldn't say -- it triggered pain in the
5  vagina.  Is that right?
6    A.    Leading up to the surgery that
7  Dr. Siddique did, she had kind of deep
8  central pain and pain around the area of mesh
9  exposure, where it was rubbing, causing an
10 irritation there.  That's what she described.
11 That's what was kind of described in the
12 medical records and with the IME.
13        The pain after it was removed,
14 upon the speculum examination, was a
15 different pain.  It was a vaginal pain, a
16 spasm pain, and that's what she's dealing
17 with now and that's what we're observing on
18 examination.  So it changed.  It was a
19 different -- a different kind of pain, a
20 different area of pain.  You.
21        Know, with Dr. Byrkit's records,
22 you know, the pain was with intercourse,
23 there wasn't this complaint of this chronic
24 pain other than some -- you know, sometimes

Page 212

1  that deep central pain.
2         The other thing that I just
3  thought about was on that list of the
4  possible sources of pelvic pain, did you
5  write down again the interstitial cystitis?
6    Q.    No, I didn't.
7    A.    The possibility that we talked
8  about earlier?
9    Q.    Okay.  Great, I want to talk
10 about that too, thank you.
11   A.    Because when I did the
12 urodynamics, she had pain with bladder
13 filling, when her bladder got full, and
14 there's not too many things that cause that.
15 But interstitial cystitis is the main thing
16 that causes that.
17   Q.    Okay.
18   A.    And it's a diagnosis of symptoms,
19 basically.  Pain with bladder filling,
20 urgency, frequency.  She doesn't really have
21 as much urgency/frequency now, so it's a
22 diagnosis that I would kind of watch a
23 patient and see, maybe try some local
24 treatments with some bladder instillations to

53 (Pages 209 to 212)

Christina Pramudji, M.D.

Page 213

1  calm down the bladder with local anesthetic;
2  something, you know, not too invasive to try
3  to see if that gives her relief.
4      But that said, you know, if she
5  does have interstitial cystitis, that would
6  definitely cause this chronic pelvic pain,
7  that deep central pain that she's described
8  to me and to others, and oftentimes, that
9  goes hand-in-hand with levator spasm, where
10  they both kind of interplay with each other.
11      Q.    Okay. So let me -- so there's
12  pain when her bladder fills, but that's
13  different than the tenderness between her
14  urethra and her vagina and that's different
15  than the muscle spasm, correct?
16      A.    Correct.
17      Q.    And that's kind of what we talked
18  about before when women can tell the
19  difference, for example, between a urinary
20  tract infection and menstrual cramps.
21      A.    Right.
22      Q.    So that's a separate identifiable
23  source of pain for her, correct?
24      A.    Yes.

Page 214

1      Q.    And I think, if I'm remembering
2  correctly, that that interstitial cystitis
3  can be exacerbated by pelvic surgery.  Is
4  that right, the symptoms of it?
5      A.    Yes, it can be.  Uh-huh.
6      Q.    Okay. So then the pelvic surgery
7  that would be relevant to Mrs. Huskey's case
8  would be two different kinds of surgeries,
9  both the implant of the TVT-O device and the
10  explant of the TVT-O device, correct, those
11  two separate surgeries?
12      A.    Yes.
13      Q.    So those two separate surgeries
14  could be a contributing cause of the symptoms
15  that she experiences from the underlying
16  interstitial cystitis?
17      A.    It could be.
18      Q.    If that's what, indeed, she has?
19      A.    Right.
20      Q.    Okay. And you're making that
21  diagnosis based on you believe that that's a
22  possibility, but you can't definitively say
23  that she has it at this point.  Is that
24  right?

Page 215

1      A.    Correct.
2      Q.    Okay. Is there anything -- I
3  want to make sure that I have the whole list.
4  Is there anything else?
5      A.    Well, scar tissue from
6  hysterectomy is always a possibility,
7  adhesions, but it doesn't sound like that to
8  me.  That's all I can think of.
9      Q.    So in this case, even though it's
10  a possibility, it does seem unlikely?
11      A.    It's kind of further down the
12  differential diagnosis.
13      Q.    Okay. So then let's go back to
14  talking about the new type of pain that she
15  experienced.  And you're not suggesting that
16  the use of the speculum during the pelvic
17  exam caused some kind of damage or caused
18  some kind of muscle spasm or tenderness in
19  the vagina, correct?
20      A.    I don't think it caused it.
21  Somehow it triggered that muscle to go into
22  spasm.  I don't know if it was her -- I don't
23  know.  I don't know how that happened.
24      Q.    Okay. And so you agree with me,

Page 216

1  from reading her medical records, that
2  between the explant surgery and that
3  follow-up visit, nothing else had been in
4  Mrs. Huskey's vagina, correct?
5      A.    Correct.
6      Q.    She had not had intercourse with
7  her husband during that time, so it was
8  really the first time that anything was
9  introduced into her vagina following the
10  explant surgery, that triggered both the
11  muscle spasm and the other point tenderness
12  that we discussed, correct?
13      A.    As far as we know.
14      Q.    Okay. And will you agree with me
15  that that all -- one of the causes of that
16  could be the pelvic surgery to remove the
17  TVT-O device itself?
18          MR. SNELL:  Form.
19      A.    I don't think so, because it's in
20  a different compartment.  I mean, I suppose,
21  just speculating, just with any surgery in
22  that area, you know, maybe there could be a
23  reaction there with the muscle.  But it's so
24  far away from it, I just feel like that's

54 (Pages 213 to 216)

Christina Pramudji, M.D.

Page 217

1  very unlikely, in my opinion.
2  BY MS. KIRKPATRICK:
3      Q.   I think that we had -- so you
4  have no explanation for why all of these
5  other conditions which are -- you'll agree
6  with me, are more distal in time to the
7  explant surgery, correct?  They all predated
8  the explant surgery?
9          MR. SNELL:  Form.  Form.
10     A.   What all?
11  BY MS. KIRKPATRICK:
12     Q.   All of the other issues that we
13  talked about.  For example, she had SI joint
14  issues before she had the removal surgery,
15  correct?
16     A.   Uh-huh.
17     Q.   And she had --
18         MR. SNELL:  Hold on.  You have to
19  say yes or no.  It comes out uh-huh,
20  huh-uh.
21         THE WITNESS:  Yes.  Sorry.  Yes.
22  BY MS. KIRKPATRICK:
23     Q.   I'll go back so we have a clean
24  record on that.

Page 218

1         You'll agree with me that the SI
2  joint issues predated the surgery to remove
3  the TVT-O stress, correct?
4      A.   Yes.
5      Q.   And you'll agree with me that she
6  had stress that existed before she had the
7  removal surgery to take out the TVT-O mesh,
8  correct?
9      A.   Yes.
10     Q.   And you'll agree with me that
11  these bladder issues, to the extent they
12  existed, predated the removal of the TVT-O
13  mesh, correct?
14     A.   Yes.
15     Q.   Yet the pain itself didn't
16  express itself until after the surgery.
17     A.   Yes.
18     Q.   Okay.  But you don't think that
19  the surgery, even though it was the closest
20  thing in time, was the cause of the problems
21  that she's having?
22     A.   No.
23     Q.   And you don't think it's a cause
24  of -- in conjunction with the rest of the

Page 219

1  issues that she had to the problem?
2      A.   No.  I think it's way down the
3  list as a possible cause.
4      Q.   So it's just a coincidence?
5      A.   I think so.  I think it's a
6  confluence of factors, and, you know, she had
7  been -- Dr. Siddique had planted in her head
8  that she was going to have dyspareunia and
9  chronic pelvic pain and chronic problems, and
10  I think that, you know, all that contributed
11  to, and all the other factors that she had
12  could have all contributed to make it happen.
13         But I don't know why making an
14  anterior incision in the vaginal wall,
15  removing the piece of mesh, and then she felt
16  great afterwards, I don't know why that would
17  cause a spasm six weeks later.  That's kind
18  of farfetched.
19     Q.   Okay.  What do you mean, "planted
20  in her head"?
21     A.   Well, when she first saw him, he
22  said that, "Well, I need to remove all the
23  mesh but you may still have dyspareunia, you
24  will -- you may have chronic pain and

Page 220

1  recurrent incontinence," and, you know,
2  she -- up till that point, she had some pain,
3  she had dyspareunia, but that was just the
4  mesh exposure.  And I think he kind of
5  sensitized her to that.
6      Q.   You're not suggesting, are you,
7  that Mrs. Huskey's current medical conditions
8  are all in her head, are you?
9      A.   No.  Absolutely not.
10     Q.   And they are clinically
11  documented through your exam and through her
12  medical records, correct?
13     A.   Absolutely.
14     Q.   And you're not suggesting that
15  Mrs. Huskey is willing herself to have such
16  bad chronic pelvic pain that she can't have
17  sex with her husband, are you?
18         MR. SNELL:  Form.
19     A.   No.  But you know that we're not
20  just a body and a mind, it's all
21  interconnected.  And so if there's a -- if
22  you're told that you're not going to get
23  better, then you may not get better.  If
24  you're told that you're optimistic and that

55 (Pages 217 to 220)

Christina Pramudji, M.D.

Page 221

1 you're going to get better, then you have a
2 better chance of getting better. It depends
3 on your outlook, and doctors see this all the
4 time, how patients' outlook on things will
5 improve they're outcome.
6         And so I'm not saying that I'm
7 not -- I don't know if that's what's going on
8 here, but it could be part of it. And I
9 think that she's got a lot of stress and
10 depression that I don't know is adequately
11 treated, and that is known to exacerbate
12 chronic pain and muscle spasm, not just in
13 the pelvic floor but in other parts of the
14 body. Chronic back pain, we talked about
15 migraines.
16         So all that is interconnected.
17 And as a source of the spasm, I don't know if
18 it was, but I think it can definitely
19 exacerbate it and I see that clinically in
20 practice. Anyone that deals with pelvic pain
21 will see patients come in with pelvic floor
22 spasm that's made worse by stress.
23         And all the stress that she's
24 been under with this lawsuit and with her

Page 222

1 breast cancer, I know that's all contributing
2 and making it harder for her. I'm not saying
3 that that caused it and I'm certainly not
4 saying that that's in her head.
5 BY MS. KIRKPATRICK:
6     Q.    Okay. Well, let me go back to
7 that.
8         This muscle spasm occurred before
9 she was involved in any lawsuit, correct?
10    A.    I don't know when she filed the
11 lawsuit, but I know it's after she saw the
12 commercials and asked Dr. Byrkit about the
13 mesh lawsuits. So she had been -- it was on
14 her radar.
15    Q.    Okay. You'll agree with me,
16 though, that if the reports of the muscle
17 spasm and the problems predated that, that
18 there's no correlation; you're not
19 suggesting, are you, that Mrs. Huskey is
20 making up any of this for the purposes of a
21 lawsuit?
22        MR. SNELL: Hold on. Hold on,
23 hold on. Form and foundation.
24        Go ahead.

Page 223

1    A.    I'm not suggesting she's making
2 it up, no. She definitely has a muscle spasm
3 there.
4 BY MS. KIRKPATRICK:
5    Q.    Okay. And you can't fake a
6 muscle spasm, correct?
7    A.    No.
8    Q.    And Mrs. Huskey is not faking a
9 muscle spasm?
10    A.    No.
11    Q.    Okay. So something is causing
12 the muscle spasm that she is having, correct?
13    A.    Yes.
14    Q.    And she's also not faking the
15 point tenderness between the urethra and the
16 vagina, correct?
17    A.    I have to take her word for that.
18 I mean, pain on examination, tenderness, you
19 just have to take the patient's word for it.
20    Q.    Okay. Do you have any reason to
21 doubt her word for it?
22    A.    No. I think she was -- I think
23 she was legitimate on that.
24    Q.    You believe that she was being

Page 224

1 honest with you in what she was telling you
2 during the exam, correct?
3    A.    As far as I could tell, yeah.
4    Q.    Okay. You have no reason to
5 suspect that.
6         And in addition to that, you're
7 not suggesting in any way that Mrs. Huskey
8 had her sling removed for the purposes of any
9 kind of lawsuit, are you?
10        MR. SNELL: Form.
11    A.    No.
12 BY MS. KIRKPATRICK:
13    Q.    And she had it removed because
14 that was, in her doctor's estimation, what
15 was necessary to relieve the physical
16 symptoms that she was having, correct?
17    A.    Correct.
18    Q.    And you don't second-guess that
19 opinion at all, do you?
20    A.    No. I don't know if I would have
21 done as extensive of an excision. I don't
22 think she needed to have the whole thing
23 removed. He could have left the part on the
24 other side and she might have maintained

56 (Pages 221 to 224)

Page 225

1 continence if he had left that in place.
2        She was only complaining of the
3 area where there was an exposure.
4        Q.    But you're not second-guessing
5 his medical judgment in performing the
6 surgery on Mrs. Huskey, correct?
7        A.    Right. I mean, medicine is a
8 practice, so we have different opinions at
9 different times. He saw the patient at that
10 time. That's what he thought. But from what
11 I read, it sounded like he could have just
12 removed that area, that one area.
13        Q.    But you haven't spoken to him
14 about the case, correct?
15        A.    I've read his deposition, but
16 that's all.
17        Q.    Right. But you haven't spoken to
18 him?
19        A.    And the medical record. No.
20        Q.    And you weren't there at the time
21 to see what she was like on examination when
22 he saw her?
23        MR. SNELL:  Form.
24        A.    Right.

Page 226

1 BY MS. KIRKPATRICK:
2        Q.    And you don't have a reason to
3 second-guess that medical judgment?
4        MR. SNELL:  Form.
5        Go ahead.
6        A.    Well, he didn't -- there was no
7 point, there was no record of tenderness on
8 the contralateral side, so --
9 BY MS. KIRKPATRICK:
10        Q.    What's the contralateral side?
11 Can you show me on that drawing?
12        A.    Just the other side from where
13 the mesh exposure was. She had the mesh
14 exposure here on the right within the vaginal
15 wall, so -- was it the right or the left, I
16 get confused -- but on the other side, at
17 that time she didn't have tenderness.
18        MR. SNELL:  If you need to look
19 at the records, feel free to look at the
20 records.
21 BY MS. KIRKPATRICK:
22        Q.    Yeah, you can absolutely feel
23 free to look at the records if you want to.
24        (Witness reviews document(s).)

Page 227

1        A.    On the right. So he noted a
2 2-centimeter mesh exposure on the right
3 sulcus, and rather than just removing that
4 whole area, he removed the whole thing.
5 BY MS. KIRKPATRICK:
6        Q.    Okay. But that wasn't for
7 purposes of litigation, correct?
8        A.    Correct.
9        Q.    And can -- I think we talked
10 about this before, but just let me make sure.
11 The mesh is a foreign body that's implanted
12 in Ms. Huskey's pelvis, correct?
13        A.    Correct.
14        Q.    And anytime you implant a foreign
15 body into someone, it can cause a chronic
16 inflammatory reaction, correct?
17        A.    It's a nerve, so it causes a mild
18 chronic inflammatory reaction. It's not
19 significant.
20        Q.    You believe that's not
21 significant?
22        A.    No.
23        Q.    What's that based on?
24        A.    Based on experience and on the

Page 228

1 literature.
2        Q.    What literature?
3        A.    The whole body of literature.
4 There's not -- hasn't been problems with
5 chronic inflammation in slings.
6        Q.    Okay. So your opinion is that a
7 sling cannot cause a chronic inflammatory
8 response in a person?
9        A.    No.
10        Q.    Is that right?
11        A.    That's not my opinion.
12        Q.    Oh, okay. Can you tell me what
13 your opinion is?
14        A.    I said it can cause a mild
15 chronic inflammatory response but nothing
16 that's clinically significant.
17        Q.    Do you believe that an
18 inflammatory response in connection with scar
19 tissue in the pelvis can cause pain upon
20 bladder filling?
21        A.    Repeat that question, please?
22        Q.    Okay. Do you believe if the
23 pelvis is both inflamed and has scar tissue
24 in it, that that can cause pain upon bladder

Christina Pramudji, M.D.

Page 229

1  filling?
2      A.    Just anywhere in the pelvis?
3      Q.    Anywhere in the pelvis.  Well, I
4  mean, let's -- you know, where the TVT-O is
5  placed.
6          MR. SNELL:  Form.
7          Go ahead.
8      A.    I would think it unlikely.
9  BY MS. KIRKPATRICK:
10     Q.    Around the urethra and bladder?
11     A.    It's unlikely.
12     Q.    You think that's unlikely too.
13     A.    Yeah.
14     Q.    Okay.  Now, you'll agree with me,
15  though, that Mrs. Huskey has had a number of
16  cystoscopies, correct?
17     A.    Yes.
18     Q.    And she's never been diagnosed
19  with interstitial cystitis?
20     A.    Well, it's not a diagnosis that
21  you would make on a regular cystoscopy.
22     Q.    She's never been diagnosed, has
23  she?
24     A.    No.

Page 230

1      Q.    Okay.
2      A.    You would have to do a
3  hydrodistention, and even that's not
4  100 percent specific.  Like I said, it's
5  diagnosed based on symptoms and ruling out
6  other disease processes.
7      Q.    I want to talk about the speculum
8  exam.  Do you perform speculum exams?
9      A.    Yes.
10     Q.    About how many have you performed
11  over the course of your medical career?
12     A.    Thousands upon thousands.
13     Q.    And in those thousands upon
14  thousands of speculum exams that you've done,
15  have you ever seen a situation in which a
16  speculum exam triggered the type of levator
17  muscle spasm that Mrs. Huskey is having?
18     A.    Yes.
19     Q.    Okay.  When did you see that?
20     A.    I've seen patients that would
21  have severe pain afterwards and they had a
22  muscle spasm.
23     Q.    Okay.  Severe chronic pain
24  afterwards?

Page 231

1      A.    Uh-huh.
2      Q.    And it never went away?
3      A.    Yes.
4      Q.    Okay.  How many patients like
5  that have you seen?
6      A.    Just a couple.
7      Q.    Okay.  And what do you believe
8  caused their spasms?
9      A.    Anxiety about the exam.  I don't
10  know, chronic tenderness in the area.  These
11  are chronic pelvic pain patients.
12     Q.    Okay.  So you've seen that in
13  about two of thousands of women, right?
14     A.    Correct, uh-huh.
15     Q.    Okay.  Have you ever seen any
16  reports in the medical literature or anything
17  discussing why a speculum exam would trigger
18  a levator muscle spasm?
19     A.    I've never seen anything like
20  that.
21     Q.    So it's just a couple of patients
22  that you've seen have -- when did you see
23  those patients?
24     A.    I don't know.  Years ago.  I

Page 232

1  don't remember.
2      Q.    Have you seen anyone have that
3  reaction in the last five years?
4      A.    I don't recall.
5      Q.    In the last 10 years?
6      A.    I don't know when it was, but
7  I've seen it happen before.
8      Q.    Can you give me a ballpark of
9  when you saw that?
10     A.    Maybe three or four years ago.
11     Q.    Did either of those patients have
12  mesh?
13     A.    No.
14     Q.    Do you agree with me that the
15  TVT-O sling was the cause of the mesh erosion
16  that was seen by both Dr. Byrkit and
17  Dr. Siddique?
18          MR. SNELL:  Form.
19     A.    The sling was the cause of the
20  mesh erosion?
21  BY MS. KIRKPATRICK:
22     Q.    There's no other cause of it, the
23  sling is the cause of the erosion?
24          MR. SNELL:  Form.

58 (Pages 229 to 232)

Christina Pramudji, M.D.

Page 233

1 Go ahead.
2 A. And the sling was what was
3 exposed. Whether it was the cause of it, I
4 mean, it could have been the bleeding that
5 she had right after the surgery, after she
6 exerted herself and then she immediately had
7 some significant bleeding, and it could have
8 opened up the wound and then allowed the mesh
9 to be exposed at that point.
10 BY MS. KIRKPATRICK:
11 Q. Okay. How many patients have you
12 seen of the thousands that you have treated
13 who had complications from their slings
14 because they vacuumed?
15 A. Have I seen that... probably two.
16 Q. Two?
17 A. Uh-huh.
18 Q. Okay. And what kind of sling did
19 they have?
20 A. I don't remember.
21 Q. Do you remember whether it was a
22 transobturator or retropubic?
23 A. No.
24 Q. And what did you have to do after

Page 234

1 they vacuumed?
2 A. I can't remember the specifics of
3 the case, but I can remember patients
4 having -- coming in with problems after
5 vacuuming. I can't remember if it was
6 recurrence of incontinence or a mesh
7 exposure. But I can think of specific cases
8 where they were vacuuming and then they had
9 problems.
10 Q. Now, I want to go back to this
11 drawing again. Now, we've -- I want to make
12 sure I'm pointing at the right place. These
13 are the muscles and these muscles, like every
14 muscle in the body, operate by contracting,
15 correct?
16 A. Relaxing and contracting.
17 Q. Relaxing and contracting.
18 A. Yes.
19 Q. And they're attached here to the
20 obturator fascia, correct?
21 A. No, to the arcus tendineus.
22 Q. Which is at the edge of that,
23 correct?
24 A. Correct.

Page 235

1 Q. And so as this muscle or any of
2 these levator muscles contract, they
3 necessarily will have an effect on what you
4 just called it that I can't quite remember.
5 A. The arcus tendineus.
6 Q. Arcus tendineus.
7 A. Well, the arcus tendineus is
8 pretty well fixed, so it's designed to be
9 there almost like a wall so that it
10 doesn't -- it doesn't move when the muscles
11 contract.
12 Q. So how do the muscles contract if
13 they're fixed in place?
14 A. Well, it's just like a muscle
15 that's fixed to the bones. The bones don't
16 move but the muscle contracts, so it's the
17 same thing with that arcus tendineus. It's
18 designed to be the fixed point and then the
19 muscles squeeze and the other organs move and
20 the pelvic floor lifts.
21 Q. So the other muscles there would
22 be --
23 A. The pelvic floor lifts or
24 descends.

Page 236

1 Q. The others would be the urethra,
2 the vagina, the rectum, would all move in
3 relation to the contraction of these
4 particular muscles. Is that correct?
5 A. Yes.
6 Q. Okay.
7 A. When you do your Kegels, you
8 know, you'll feel the vagina squeezing around
9 the -- on exam. And this is a 3D rendering.
10 Of course -- well, it's 2D, but in 3D you've
11 got the pelvic floor here, it's like a bowl,
12 and then the arcus tendineus on the side and
13 then the obturator fascia is like this.
14 So these may extend, but this
15 doesn't move. It's not -- even though
16 they're right next to each other, they're not
17 interconnected. The obturator is a
18 completely different compartment, even though
19 they're right there. This is moving but this
20 is not moving in relationship to it
21 (demonstrating).
22 Q. So I think that you drew a
23 picture of -- or I drew -- no, you drew the
24 picture of the sling. I labeled it.

59 (Pages 233 to 236)

Christina Pramudji, M.D.

1    Can you tell me what muscles a
2  transobturator sling goes through, if any,
3  when it's placed?
4    MR. SNELL:  Form.
5    A.    I'd have to look at the anatomy
6  book because I don't have them memorized.
7  There's four or five muscles there.
8  BY MS. KIRKPATRICK:
9    Q.    And the sling is placed through
10  those muscles, correct?
11    A.    Uh-huh.
12    Q.    And is it also placed through the
13  obturator fascia?
14    A.    Yes.
15    Q.    Okay.  And then where does it
16  insert into the obturator space?
17    A.    It's on the medial superior
18  aspect of the obturator foramen.
19    Q.    Okay.  And we've noted the
20  obturator foramen on this picture, correct?
21    A.    I'm sorry, the obturator -- this
22  is the obturator canal.  The obturator
23  foramen is the opening in the bone, so the
24  sling comes through right here and then the

1  obturator canal is over here.
2    Q.    Okay.  So this would be the
3  obturator canal --
4    A.    The obturator canal, yes.
5    Q.    -- not the obturator foramen?
6    A.    Yes.
7    Q.    Okay.  So it goes through the
8  obturator foramen into the obturator space,
9  correct?
10    A.    Well, there's really no obturator
11  space.
12    Q.    Okay.  I thought you just told me
13  that the obturator space was different than
14  the muscles.
15    A.    Well, it's a different muscle
16  compartment.
17    Q.    Okay.  What's the difference --
18  okay.  Compartment, it's the obturator
19  compartment.
20    A.    When I was referring to the
21  pelvic floor, is that what you're talking
22  about?
23    Q.    Yeah, I'm just trying to make
24  sure we have the same terms.

1    A.    It's a compartment.
2    Q.    Okay.  The obturator compartment
3  is different than the pelvic floor
4  compartment?
5    A.    Correct.
6    Q.    But the transobturator sling goes
7  through the pelvic floor muscles and the
8  pelvic floor compartment, correct?
9    MR. SNELL:  Form.
10    A.    I mean, it might go through a
11  little bit of the muscles here, there's not
12  much before it gets to the obturator.
13  These are kind of below where the sling would
14  be, and then it would go through the
15  obturator.
16  BY MS. KIRKPATRICK:
17    Q.    Into the obturator compartment,
18  is that right?
19    A.    Canal, compartment, yeah.
20    Q.    Okay.  And you don't believe --
21  it's your opinion that a transobturator sling
22  cannot cause a levator muscle spasm?
23    A.    Not in that area.  If anything,
24  it would be up in here, right next to the

1  urethra.
2    Q.    So it has to be direct -- in your
3  opinion, it has to be directly adjacent to or
4  intertwined with the sling itself; otherwise
5  it cannot be a cause?
6    A.    Yeah.  I don't think so.  It's
7  really far apart.  You can't tell in this
8  picture, but they're very far apart from each
9  other.
10    Q.    What do you mean by very -- how
11  much is very far?
12    A.    I mean, this far apart.  That's
13  very far apart (demonstrating).
14    Q.    Well, can you give me an estimate
15  of what that is?
16    A.    3 centimeters.
17    Q.    Maybe 3 centimeters apart?
18    A.    Yeah, uh-huh.
19    Q.    So you think there's
20  3 centimeters difference between where the
21  sling would have been implanted and where
22  she's having a muscle spasm?
23    A.    Correct.
24    Q.    Okay.

Christina Pramudji, M.D.



Page 245

1   that it's not Mrs. Huskey's choice that she's
2   not able to have sex her husband,
3   correct?
4           MR. SNELL:  Form.  Form.
5       A.   I don't know for sure.
6   BY MS. KIRKPATRICK:
7       Q.   You think she might be choosing
8   just not to have sex?
9       A.   Some women will come up with
10  excuses.  I don't know.
11      Q.   Do you have any reason to
12  believe, based on what Mrs. Huskey has said
13  to you and what's in her medical records,
14  that she's making up excuses not to have sex
15  with her husband?
16      A.   I don't know.  I mean, I know
17  she's had some difficult relationships in the
18  past.  I don't know her whole past.  But from
19  what I can tell, no, she seems like she's
20  being straight about that.
21      Q.   Okay.  And you also talk about a
22  productive life.  We talked about Mrs. Huskey
23  isn't able to work, correct?
24      A.   Uh-huh.  Yes.  That's what she

Page 246

1   says.
2       Q.   And she's not able to engage in
3   many of the activities that she engaged in
4   both through work and through her personal
5   life, correct?
6           MR. SNELL:  Form.
7       A.   I know that she enjoys her boat
8   and she does a lot of gardening and work
9   around the house, so she's able to be fairly
10  active at times.  I don't think it's as much
11  as she did before.  It may be different.  But
12  our lives change as we get older as well, so,
13  you know, I think that there's a lot that she
14  can still do.
15  BY MS. KIRKPATRICK:
16      Q.   Okay.  Do you think that any of
17  the changes in Mrs. Huskey's life have
18  occurred because she's gotten older between
19  the time of the TVT-O implant and six weeks
20  after the TVT-O explant?
21      A.   Can you repeat that question?
22      Q.   Sure.  You said that things
23  change when we get older, our lives change as
24  we get older.  That's not what's going on

Page 247

1   with Mrs. Huskey right now, is it?
2       A.   I think that's obviously part of
3   it, that she's getting older as well.  But
4   that's not the main part of it, no.  I think
5   the main thing that's holding her back is the
6   levator muscle spasm.
7       Q.   And the pain that that's causing
8   her, correct?
9       A.   Correct.
10      Q.   What do you mean, there's hope?
11      A.   That if she has therapy and she
12  sticks with it, that she could have a good
13  prognosis, that that can be resolved.
14      Q.   Okay.  It could be resolved --
15      A.   Yes.
16      Q.   -- but it won't definitely be
17  resolved, correct?
18          MR. SNELL:  Form.
19      A.   There's no definite in medicine.
20  BY MS. KIRKPATRICK:
21      Q.   Now, I want to ask you just a
22  couple of questions about your pelvic exam of
23  Mrs. Huskey.
24      A.   Sure.

Page 248

1       Q.   First of all, let me ask you
2   this:  You indicated that to Mrs. Huskey her
3   ability to have sexual relations with her
4   husband was important to her, correct?
5       A.   Yes, and I believe she's sexually
6   intimate with him, but just not with
7   intercourse.
8       Q.   Okay.  But that intercourse is
9   important to her, correct?
10      A.   We didn't talk about it
11  specifically.
12      Q.   So you didn't ask her at the exam
13  about her ability to have intercourse?
14      A.   I think we talked about, you
15  know, the intercourse that she had had over
16  time and that right now, it's uncomfortable,
17  but we didn't talk about how important it is
18  to her, which was your question.
19      Q.   Did she say it was uncomfortable
20  or did she say it was painful?
21      A.   She said it was painful at this
22  point.
23      Q.   Okay.  And did she tell you that
24  it caused her so much pain that at times it

Christina Pramudji, M.D.

Page 249

1  has caused her to cry?
2      A.    No.
3      Q.    Those are not normal reactions to
4  intercourse, correct?
5      A.    Correct.
6      Q.    And that's not just something
7  that you could attribute to a vaginal
8  atrophy, correct?
9          MR. SNELL:  Form.
10     A.    There are a lot of women that
11 have severe vaginal atrophy that will cause
12 them to cry when they try to have
13 intercourse.
14 BY MS. KIRKPATRICK:
15     Q.    And that's solved when you give
16 them generally a Premarin cream?
17     A.    Yes, over time.  It takes time
18 for it to be effective, and sometimes they
19 need pelvic floor therapy and stretching of
20 the tissues and more than just the cream.
21     Q.    Okay.  But they would require
22 treatment for that, correct?
23     A.    Yes.
24     Q.    You don't talk in your report

Page 250

1  about sexual function for Mrs. Huskey.  Why
2  not?
3          MR. SNELL:  Form.  Misstates.
4      A.    I do.  Yeah, I talk about the
5  discomfort that she has and the pain with
6  stimulation.
7  BY MS. KIRKPATRICK:
8      Q.    When you're talking about the
9  limitations on her life and what it is --
10 well, you know what, if --
11         (Counsel reviewing realtime
12    transcript on an iPad.)
13 BY MS. KIRKPATRICK:
14     Q.    Show me where in your report you
15 talk about her sexual functioning in your
16 IME.
17     A.    You're talking about the IME?
18     Q.    Uh-huh.
19     A.    The second-to-last paragraph on
20 page 1, when she had intercourse after the
21 TVT, when she had the mesh exposure.
22     Q.    Okay.  That's where you're
23 reciting her medical history, correct?
24     A.    Correct.  Is that what you were

Page 251

1  referring to?
2      Q.    Yeah.
3      A.    And then on page 2, the second
4  paragraph, when she had the -- after the
5  explant, she had painful intercourse.  The
6  third paragraph, she was able to have sex
7  successfully two times that it wasn't
8  horrible, so it was tolerable, it's getting
9  better, and that was when she was actively
10 having physical therapy, which was why I feel
11 like there's hope for her, because when she
12 was having therapy and doing well on the
13 Cymbalta, she was actually doing well or
14 getting better.  She got down to a pain level
15 of 2 to 3, I believe.
16     Q.    Do you consider sex that's not
17 horrible to be doing well?
18     A.    Getting better.  She was getting
19 better.
20     Q.    But it's not doing well, and
21 that's certainly not the standard.
22     A.    No.
23     Q.    We wouldn't want to be aiming
24 just to get her to a point that it's not

Page 252

1  horrible, right?
2      A.    And I think -- that's what she
3  told me.  But I think in the medical records
4  when it was closer to the event, that I read
5  that it was not bad.  I believe that was in
6  Dr. Siddique's records.
7      Q.    Not a rousing endorsement either.
8      A.    But the point is, getting better
9  with therapy.  Not there, but improving.
10     Q.    Okay.  And in your impressions,
11 do you comment on her sexual function as
12 sexual dysfunction?
13     A.    Not specifically, no, I don't.
14     Q.    So in the two -- well, page and a
15 half that you devote to that, that wasn't
16 something that you believed was important
17 enough to note.  Is that right?
18     A.    Well, I'm kind of -- in my mind,
19 I was putting that in with the pelvic pain
20 and the treatments for the pelvic pain and
21 kind of putting that all together, even
22 though I didn't specifically call it out.
23     Q.    Okay.  And -- hang on one second.
24        (Sotto voce discussion.)

63 (Pages 249 to 252)

Christina Pramudji, M.D.

1    MS. KIRKPATRICK:  I think that's
2  all that I have.
3            EXAMINATION
4  BY MR. SNELL:
5    Q.    Dr. Pramudji, Burt Snell.  I have
6  some follow-up questions, and why don't we
7  kind of start where we left off, where
8  Mrs. Huskey is right now.  You saw
9  Mrs. Huskey at the IME, correct?
10   A.    Correct.
11   Q.    You're aware that she has cancer,
12 correct?
13   A.    Correct.
14   Q.    Can that cancer obviously have an
15 effect on her well-being?
16   A.    Yes.
17   Q.    Can it have an effect on her
18 stress levels?
19   A.    Absolutely.
20   Q.    Can the treatment modalities for
21 cancer have an effect on her stress levels
22 and her well-being?
23   A.    Yes, she was in acute pain from
24 the breast expanders on the day of the exam.

1  She was very sensitized and almost tearful to
2  begin with.
3    Q.    Plaintiff's counsel asked you
4  questions about Mrs. Huskey's claim that she
5  cannot work.  Did you see any of the doctors,
6  her treating doctors, say that she could not
7  work because of her sling surgeries?
8    A.    No.
9    Q.    Do you believe she can't work
10 because of her sling surgeries?
11   A.    No.
12   Q.    Plaintiff's counsel asked you
13 about her ability to engage in leisure
14 activities.  Do you think the sling had any
15 effect on her leisure abilities?
16   A.    I don't think so.  I mean, she's
17 been able to enjoy boating and gardening and
18 house projects.
19   Q.    Mrs. Huskey claims that she can't
20 exercise or can't exercise as much.  Do you
21 believe that the sling had any effect or
22 cause on that claim?
23   A.    No.  I think the muscle spasm is
24 what's affecting her.

1    Q.    In your report on page 4, we were
2  just looking at the impression section of
3  your IME.  It says "The levator pain that has
4  occurred since the mesh was explanted was
5  precipitated on speculum exam," and I believe
6  you discussed that part with plaintiff's
7  counsel, correct?
8    A.    Correct.
9    Q.    "And is a spasmodic pain at the
10 posterior wall of the introitus, well away
11 from the area of sling insertion."
12          Did I read that correctly?
13   A.    That's correct.
14   Q.    And I think you've testified to
15 that, you can correct me if I'm wrong or not.
16 But where her spasm and pain was is not in an
17 area where the sling was.  Is that correct or
18 not?
19   A.    Correct.  It's too posterior to
20 be caused by the sling.
21   Q.    And you state "This was not
22 caused by the sling and was precipitated on
23 speculum examination.  The primary area of
24 muscle spasm and pain is too posterior to be

1  caused by the sling."
2          Did I read that correctly?
3    A.    Yes.
4    Q.    Is that an opinion you continue
5  to hold?
6    A.    Yes.
7    Q.    You hold that opinion to a
8  reasonable degree of medical certainty?
9    A.    Yes.
10   Q.    Plaintiff's counsel asked you
11 some questions about vacuuming and whether
12 vacuuming can lead to mesh exposure.  And
13 there seemed to be some cynicism about how
14 strenuous vacuuming was.
15          My question is this:  Did
16 Mrs. Huskey call in to her doctor 10 days
17 after her surgery and report that she was
18 having heavy bleeding?
19   A.    Yes, she did.
20   Q.    Did they ask her to come in and
21 be seen?
22   A.    Yes.
23   Q.    And was a mesh exposure seen at
24 that time?

Christina Pramudji, M.D.

Page 257

1    A.    Yes.
2    Q.    Is a mesh exposure a wound
3  complication?
4    A.    Yes.
5    Q.    Can wound complications occur
6  with any surgery, any pelvic floor surgery?
7    A.    Yes.  Any wound can break down.
8    Q.    And in your initial report, you
9  state that you believe that she had general
10 wound healing issues which led to her
11 exposure.  Is that correct or not?
12   A.    Yes, because of the mesh
13 exposure, that would indicate that there was
14 a problem with the wound healing, and I don't
15 know how the buttonholing contributed to that
16 or not, and then the heavy bleeding
17 definitely, because that had to come out
18 somewhere.  It would come out of the wound,
19 more than likely.
20   Q.    Okay.  Plaintiff's counsel --
21 strike that.
22         There was some testimony about
23 endometriosis.  Do you recall that?
24   A.    Yes.

Page 258

1    Q.    Is endometriosis common?
2    A.    Yes.
3    Q.    Has anybody ruled out
4  endometriosis as a cause of Mrs. Huskey's
5  pain, in your opinion?
6    A.    No.
7    Q.    Do you have Dr. Steege's
8  deposition or deposition exhibits handy?
9    A.    Yes.
10   Q.    I believe plaintiff's counsel
11 asked you about literature regarding how
12 common endometriosis can be?
13         MS. KIRKPATRICK:  Objection.
14         MR. SNELL:  I know you did.
15         MS. KIRKPATRICK:  I know I
16 didn't.
17 BY MR. SNELL:
18   Q.    Do you remember a doctor
19 testifying that endometriosis is commonly
20 seen in women with pelvic pain?
21   A.    Yes.
22   Q.    All right.  Is that opinion based
23 on the literature, your clinical experience,
24 one or both?

Page 259

1    A.    Both.
2    Q.    Looking at Exhibit 7 to
3  Dr. Steege's dep, it's actually an ACOG
4  Technical Bulletin on chronic pelvic pain,
5  and on the subject of endometriosis, it
6  states, "It has been found in up to 48% of
7  women having laparoscope for evaluation of
8  chronic pelvic pain."
9          Do you see that?
10   A.    Yes.
11   Q.    What does that mean, in those
12 women who presented with chronic pelvic pain
13 who actually have a laparoscopic surgery,
14 endometriosis was found in 48 percent?
15 What's the significance of that opinion?
16   A.    That that's very common in anyone
17 with pelvic pain, that you need to do
18 laparoscopy to diagnose it.
19         MS. KIRKPATRICK:  Can I just see
20 that before you put it away?
21         THE WITNESS:  Yeah.
22         MS. KIRKPATRICK:  Thanks.
23 BY MR. SNELL:
24   Q.    Do you believe her back pain --

Page 260

1  strike that.
2          Has her back pain been ruled out
3  as a cause of her pain?
4    A.    I don't think it's been
5  completely ruled out, no.
6    Q.    There was some earlier questions
7  about TVT-O and its placement and questions
8  about placement in the vaginal wall.  Let me
9  just make sure I understand this and ask you,
10 is TVT-O placed in the vaginal wall or behind
11 the vaginal wall?
12   A.    Behind the vaginal wall.  You
13 create a space between the urethra and the
14 vaginal wall and place it in that space.
15   Q.    Okay.  One of the exhibits
16 plaintiff's counsel marked was Exhibit 9, the
17 TVT-O IFU from 2005, and you were asked some
18 questions about that, correct?
19   A.    Yes.
20   Q.    On the first page, I'll read it
21 to you, it states, "It is not a comprehensive
22 reference to surgical technique for
23 correcting SUI (Stress Urinary Incontinence).
24 The device should be used only by physicians

65 (Pages 257 to 260)

Christina Pramudji, M.D.

Page 261

1  in the surgical management of stress urinary
2  incontinence and specifically in implanting
3  the Gynecare TVT Obturator device."
4          Have you seen that before in the
5  TVT-O IFU?
6      A.    Yes.
7      Q.    And when you earlier testified
8  that other than mesh exposure there were
9  overlapping complications, would these be
10 complications that surgeons would be aware of
11 via their medical training and schooling?
12     A.    Yes, absolutely.  Yes, we're
13 taught about complications of pelvic surgery
14 and other various procedures that are
15 specific to those procedures.
16     Q.    Where it talks -- and plaintiff's
17 counsel pointed this out -- about how it
18 should be placed with care to avoid vessels,
19 nerves, discussed those nerves and other
20 parts, is it common surgical knowledge in the
21 types of surgeons who would be doing stress
22 urinary incontinence that damage to nerves
23 can lead to pain?
24     A.    Yes.

Page 262

1      Q.    And is it common knowledge that
2  pain can be short-term or sometimes
3  permanent?
4      A.    Yes.  It's very common knowledge.
5      Q.    Did you see whether or not
6  Dr. Byrkit relied on the IFU?
7      A.    She did not.
8      Q.    In response to one of your
9  questions, I think you were cut off when you
10 were talking about the --
11         MS. KIRKPATRICK:  Objection.
12 BY MR. SNELL:
13     Q.    -- the little piece of scar
14 tissue under the urethra, and I wrote you
15 stated, "If that was all she had."
16         You didn't finish the answer.  My
17 question to you is, were you trying to
18 complete your answer or not?
19     A.    What I was trying to say was that
20 if that was all -- the only problem that she
21 had, I don't think we would be here today.  I
22 don't think it would be a big issue for her
23 at all.
24     Q.    Do you think that would cause

Page 263

1  dyspareunia?
2      A.    Some, but not as much at all.  It
3  would be very manageable.
4      Q.    You were asked questions about
5  the primary endpoint in a study.  Is the
6  primary endpoint the point by which the study
7  is powered?
8      A.    Yes.
9      Q.    You've looked at a lot of
10 literature, metaanalyses, document reviews,
11 correct?
12     A.    Correct.
13     Q.    And did they assess complications
14 and report on them?
15     A.    Yes, absolutely.  They don't just
16 report the success rate; they go into the
17 complications.
18     Q.    And did you consider the data on
19 efficacy and complications for the TVT
20 retropubic device to be important as well in
21 your assessment of the TVT-O data?
22     A.    Yes, absolutely.  The TVT-O is
23 just a minor modification.
24         MR. SNELL:  That's all I have.

Page 264

1  Thanks.
2          FURTHER EXAMINATION
3  BY MS. KIRKPATRICK:
4      Q.    That's -- I just have a couple of
5  questions for you.
6          Does endometriosis cause levator
7  muscle spasm?
8      A.    If it's severe enough, it can put
9  their pelvic floor into spasm.
10     Q.    If it's severe enough?
11     A.    Uh-huh.
12     Q.    Don't you think that it would
13 have been diagnosed before it got severe
14 enough to get to a levator muscle spasm in
15 Mrs. Huskey?
16     A.    Possibly.
17     Q.    Endometriosis is not the cause of
18 her levator muscle spasm, is it?
19     A.    I don't know.
20     Q.    Okay.  You know there's
21 absolutely no evidence in her medical record
22 whatsoever that she has endometriosis, don't
23 you?
24     A.    Well, there's no -- no one has

66 (Pages 261 to 264)

Christina Pramudji, M.D.

Page 265

1 ruled it out, either, completely.
2     Q.     And you don't think that the
3 visual examination of normal ovaries and the
4 removal of her uterus are sufficient to rule
5 out pretty conclusively that she doesn't have
6 endometriosis?
7         MR. SNELL:  Form.
8     A.     Did she have a vaginal or an
9 abdominal hysterectomy?  I can't recall.
10 BY MS. KIRKPATRICK:
11     Q.     Well, you tell me.  You're the
12 doctor.
13     A.     Let me get that, because just
14 looking at the ovaries alone doesn't rule it
15 out.  You can have implants throughout the
16 pelvis.
17         MR. SNELL:  Do you need Byrkit?
18         THE WITNESS:  Yeah, I need
19 Byrkit.  That's what I was looking for.
20         MS. KIRKPATRICK:  Here, I'm going
21 to give you this one too, if you're
22 looking for that.
23         (Witness reviews document(s).)
24         THE WITNESS:  So far everything

Page 266

1     just says hysterectomy.
2 BY MS. KIRKPATRICK:
3     Q.     Okay.
4     A.     I don't recall a lower abdominal
5 incision, so I think it was vaginal, so it
6 would be hard to see anything with a vaginal
7 hysterectomy.
8     Q.     One other question.  I think that
9 you were asked on redirect about the
10 proximity again, and I think we had talked a
11 little bit about that.  You had talked about
12 3 centimeters.  I just want the record to
13 reflect that when you talked about
14 3 centimeters, you held up two fingers,
15 correct?
16     A.     Uh-huh.
17     Q.     And the space from the top to the
18 bottom of those two fingers, that's what
19 you're talking about as the amount of
20 distance between them, correct?
21     A.     Yeah, roughly.
22         MS. KIRKPATRICK:  Roughly, okay.
23 Nothing else, thank you.
24         THE WITNESS:  Okay.

Page 267

1         FURTHER EXAMINATION
2 BY MR. SNELL:
3     Q.     And my follow-up is, do you
4 hold -- continue to hold all your opinions in
5 your reports and IMEs to a reasonable degree
6 of medical and scientific certainty?
7     A.     Yes, I do.
8         MR. SNELL:  Thanks.
9         THE WITNESS:  All right.
10         (Deposition recessed at 4:18 p.m.)
11         --oOo--
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 268

CERTIFICATE

I, SUSAN PERRY MILLER, Registered
Diplomate Reporter, Certified Realtime
Reporter, Certified Court Reporter and Notary
Public, do hereby certify that prior to the
commencement of the examination, CHRISTINA
PRAMUDJI, M.D. was duly sworn by me to
testify to the truth, the whole truth and
nothing but the truth;

That pursuant to Rule 30 of the
Federal Rules of Civil Procedure, signature
of the witness was not reserved by the
witness or other party before the conclusion
of the deposition;

That the foregoing is a verbatim
transcript of the testimony as taken
stenographically by and before me at the
time, place and on the date hereinbefore set
forth, to the best of my ability.

I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
nor counsel of any of the parties to this
action, and that I am neither a relative nor
employee of such attorney or counsel, and
that I am not financially interested in the
action.

_____
Susan Perry Miller
CSR-TX, CCR-LA, CSR-CA
Registered Diplomate Reporter
Certified Realtime Reporter
Certified Broadcast Captioner
NCRA Realtime Systems Administrator
Certified LiveNote™ Reporter
Notary Public, State of Texas
My Commission Expires 03/30/2016

Dated: 24th of April, 2014

Christina Pramudji, M.D.

Page 269

1
2                    LAWYER'S NOTES

3
4   PAGE   LINE
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

68 (Page 269)