# EXHIBIT A

Nicole Fleischmann, M.D.

Page 1

```
 1              IN THE SUPERIOR COURT OF NEW JERSEY

 2                 LAW DIVISION - BERGEN COUNTY

 3                       CIVIL ACTION

 4                        -   -   -

 5   KATHRYN E. CORBET and    : DOCKET NO. BER-L-14589-14 MCL
     ERIC R. CORBET           :
 6           Plaintiffs,      :
                     v.       :
 7   ETHICON, INC., ETHICON   : MASTER DOCKET NO.
     WOMEN'S HEALTH AND UROLGY, : BER-L-11575-14
 8   a Division of Ethicon,   :
     Inc., GYNECARE, JOHNSON & :
 9   JOHNSON, AND JOHN DOES 1-20 :
             Defendants.      :
10

11                        -   -   -

12                   NOVEMBER 24, 2015

13                        -   -   -

14

15            Videotape deposition of NICOLE

16   FLEISCHMANN, M.D., taken pursuant to notice, was

17   held at the law offices of Riker Danzig Scherer

18   Hyland & Perretti, LLP, 500 Fifth Avenue, 49th

19   Floor, New York, New York 10110, commencing at 9:34

20   a.m., on the above date, before Amanda Dee

21   Maslynsky-Miller, a Certified Realtime Reporter and

22   Notary Public in and for the State of New York.

23                        -   -   -

24            GOLKOW TECHNOLOGIES, INC.
         877.370.3377 ph|917.591.5672 fax
25               deps@golkow.com
```

Nicole Fleischmann, M.D.

## Page 2

1  APPEARANCES:
2
3  MAZIE SLATER KATZ & FREEMAN, LLC
   BY:  ADAM SLATER, ESQUIRE
4  103 Eisenhower Parkway
   2nd Floor
5  Roseland, New Jersey 07068
   (973) 228-9898
6  Aslater@mskf.net
   Representing the Plaintiffs
7
8
9
   RIKER DANZIG SCHERER HYLAND & PERRETTI, LLP
10 BY:  KELLY S. CRAWFORD, ESQUIRE
   BY:  MAHA M. KABBASH, ESQUIRE
11 Headquarters Plaza
   One Speedwell Avenue
12 Morristown, New Jersey 07962
   (973) 538-0800
13 Kcrawford@riker.com
   Mkabbash@riker.com
14 Representing the Defendant,
   Ethicon, Inc.
15
16
17
18
19 ALSO PRESENT:  Henry Marte, Videographer
20          - - -
21
22
23
24
25

## Page 3

1           - - -
2        I N D E X
3           - - -
4
5  Testimony of:  NICOLE FLEISCHMANN, M.D.
6
   By Mr. Slater              6, 233
7  By Ms. Kabbash             221
8
9
            - - -
10
     E X H I B I T S
11          - - -
12
13 NO.      DESCRIPTION        PAGE
14 Fleischmann-1  Notice of Deposition     8
15 Fleischmann-2  6/26/14 Letter and Invoices   69
16 Fleischmann-3  Progress Notes    73
17 Fleischmann-4  Expert Report on TVTTM Retropubic,
        N. Fleischmann, M.D.   85
18
   Fleischmann-5  Expert Report on K. Corbet,
19        N. Fleischmann, M.D.   86
20 Fleischmann-6  Supplemental Expert Report on
        K. Corbet, N. Fleischmann, M.D.  86
21
   Fleischmann-7  Materials Reliance List   86
22
   Fleischmann-8  December 2007 E-mails    160
23
24
25

## Page 4

1           - - -
2      E X H I B I T S
3           - - -
4
   NO.        DESCRIPTION          PAGE
5
6  Fleischmann-9   Co-op Program Funds Advertising
          Request        162
7
   Fleischmann-10  November and December 2008
8       E-mails         166
9  Fleischmann-11  March and April 2011 E-mails    168
10 Fleischmann-12  12/28/09 E-mail from S. Jones to
          N. Fleischmann      172
11
   Fleischmann-13  11/6/09 Paper          174
12
   Fleischmann-14  11/7/09 E-mail from N. Fleischmann
13        to S. Jones     175
14 Fleischmann-15  Invoice          178
15 Fleischmann-16  12/13/08 Invoice       180
16
17
18
19
20
21
22
23
24
25

## Page 5

1           - - -
2   DEPOSITION SUPPORT INDEX
3           - - -
4
5  Direction to Witness Not to Answer
6  Page Line   Page Line      Page Line
7  None
8
9
10 Request for Production of Documents
11 Page Line   Page Line      Page Line
12 None
13
14
15 Stipulations
16 Page Line   Page Line      Page Line
17 7      1
18
19
20 Question Marked
21 Page Line   Page Line      Page Line
22 None
23
24
25

2 (Pages 2 to 5)

Golkow Technologies, Inc. - 1.877.370.DEPS

Nicole Fleischmann, M.D.

Page 6

1                    - - -
2              (It is hereby stipulated and agreed
3    by and among counsel that sealing, filing and
4    certification are waived; and that all objections,
5    except as to the form of the question, will be
6    reserved until the time of trial.)
7                    - - -
8              VIDEO TECHNICIAN:  We are now on the
9    record.  My name is Henry Marte.  I am an
10   videographer for Golkow Technologies.  Today's date
11   is November 24th, 2015, and the time is 9:34 a.m.
12   This videotape deposition is being held at 500 Fifth
13   Avenue, New York, New York, taken in the matter of
14   Corbet versus Ethicon, Inc., filed in the Superior
15   Court of New Jersey, Law Division, Bergen County.
16              The deponent is Dr. Nicole
17   Fleischmann.  Counsel will be noted on the
18   stenographic record.  The court reporter is Amanda
19   Miller and will now swear in the witness.
20                   - - -
21              NICOLE FLEISCHMANN, M.D., after
22   having been duly sworn, was examined and testified
23   as follows:
24                   - - -
25              EXAMINATION

Page 7

1                    - - -
2    BY MR. SLATER:
3        Q.      Good morning, Dr. Fleischmann.
4        A.      Good morning.
5        Q.      I'm Adam Slater.  I'm here to take
6    your deposition today.  You understand that's why
7    we're here, right?
8        A.      Yes.
9        Q.      You understand you have to tell the
10   truth in response to all my questions?
11       A.      Yes.
12       Q.      If I ask you a question that doesn't
13   make sense to you for some reason; for example, I
14   may mispronounce medical terminology or I may ask a
15   question where it just doesn't make sense, for
16   whatever reason, just tell me, tell me what's
17   unclear and I'll try to re-ask the question.
18       A.      Okay.
19       Q.      Counsel may object to questions.  If
20   they do, they'll just say objection.  And then
21   you'll answer, unless something happens that I've
22   never seen before.  But who knows?
23              They are allowed to place objections,
24   they're doing that to preserve their rights for the
25   future.  So if they do it, just answer the question

Page 8

1    after they object, okay?
2        A.      Okay.
3        Q.      And at the end of the deposition, if
4    they question you, give me a chance to object to
5    their questions, because I may do that, too.  All
6    right?
7        A.      Okay.
8                    - - -
9              (Whereupon, Exhibit Fleischmann-1,
10   Notice of Deposition, was marked for
11   identification.)
12                   - - -
13   BY MR. SLATER:
14       Q.      We've marked as Exhibit-1 to your
15   deposition the notice for deposition.
16              Have you seen that before?
17       A.      Yes, I have.
18       Q.      One of the questions I have is
19   whether or not you have any, or have had in the
20   past, any consulting agreements with Ethicon?
21       A.      Consulting agreements in terms of
22   being a proctor or preceptor, yes.
23       Q.      How many times did you enter into
24   consulting agreements?
25       A.      It was over the course of a four- or

Page 9

1    five-year period.
2        Q.      What four- to five-year period?
3        A.      2000 and -- I'm really guessing, to
4    be honest.  Somewhere about 2005 and 2010, I would
5    say.
6        Q.      When did you last have a contractual
7    relationship with Ethicon of any nature?
8        A.      Again, I'm guessing.  But I believe
9    it was about 2010, maybe 2011.
10       Q.      You're giving me your best estimate,
11   right?
12       A.      Exactly.
13       Q.      Okay.  How much total money did
14   Ethicon pay you over the years?
15       A.      It was not a tremendous amount.  I
16   think I've seen in the record it was about $10,000
17   over five years.
18       Q.      How much -- rephrase.
19              Are you able to estimate the benefits
20   they gave to you or gave on your behalf, for
21   example, airfare or meals or anything like that, or
22   rides to places?  They did those things, too, right?
23       A.      Probably, all said and done, under
24   $200.
25       Q.      You've had under $200 in meals from

Nicole Fleischmann, M.D.

Page 10

1  Ethicon over the years?
2       A.     If that. I don't remember ever
3  eating any meals on Ethicon.
4       Q.     Okay.
5       A.     Unless -- I can't remember if we ever
6  had a dinner or something that involved a meal.
7       Q.     You can't remember if you ever had a
8  dinner where Ethicon brought you to dinner with
9  other doctors and paid for it?  Is it hard -- you
10 don't remember that?
11      A.     If it happened, maybe it happened
12 once.  I don't -- yeah, I don't recall.  I'll be
13 honest.
14      Q.     Didn't you review e-mails and
15 documents that showed you having dinners where
16 Ethicon took you out to dinner?  Didn't you review
17 that before the deposition?
18      A.     I don't recall any e-mails or
19 documents where I was taken out to dinner by
20 Ethicon.  I did review e-mails, but I don't recall
21 any of those.
22      Q.     Okay.  Who at Ethicon have you had a
23 relationship with over the years?  Tell me the names
24 of the people that you've worked with there.
25      A.     Currently, I don't have any

Page 11

1  relationship with anyone from Ethicon.  I would say
2  that I do remember some of my reps over the years.
3            MR. SLATER:  Move to strike.
4  BY MR. SLATER:
5       Q.     Doctor, if I ask you a question, I'd
6  rather you not tell me about what you don't -- about
7  something else I didn't ask you about.  So it's a
8  very direct question.
9            Who at Ethicon can you name that you
10 have worked with in the past?
11           MS. KABBASH:  Objection.
12           THE WITNESS:  I remember General was
13 my rep, I'm blanking on his last name.  I remember
14 my original Ethicon rep was Jeff Potkul.  And there
15 may have been some other reps in there that I just
16 don't recall their names.
17 BY MR. SLATER:
18      Q.     Anybody else at Ethicon you ever
19 worked with?
20      A.     I had some exchanges with Scott Jones
21 over the years.  But -- maybe Melissa Doyle.
22      Q.     Anybody else?
23      A.     Not that I recall.
24      Q.     Melissa Doyle, what was her role, to
25 your knowledge?

Page 12

1       A.     She was someone in prof/ed and
2  marketing.
3       Q.     What was your interaction with
4  Melissa Doyle from professional education/marketing?
5       A.     I had gone to a couple of pelvic
6  floor meetings where she was running the meeting.
7       Q.     Pelvic floor meetings, who was
8  attending those meetings?
9       A.     Other physicians who were doing
10 Ethicon products, who they were asking for our
11 feedback about the products and their use.
12      Q.     Were you paid to attend those
13 meetings?
14      A.     Yes.
15      Q.     How much were you paid?
16      A.     I believe, maybe, $1,000 for a
17 meeting.
18      Q.     When did those meetings take place?
19      A.     Actually, I want to retract that.  I
20 don't think I was paid for those meetings.  I don't
21 think I was paid for those meetings.
22      Q.     Where did the meetings take place?
23      A.     I don't remember.
24      Q.     New Jersey?  New York?
25      A.     There was one in New Jersey.  I went

Page 13

1  to a couple, two total.  And I think one was in New
2  Jersey, and I can't remember where the other one
3  was.  I remember traveling somewhere.
4       Q.     Traveling by car or traveling by
5  airplane?  Or train or bus?
6       A.     I think by car.  But I can't
7  remember.  I'm being honest.  It was a while ago.
8       Q.     I appreciate you're being honest.
9  I'll assume you will be honest today.
10      A.     I don't remember where the meetings
11 took place.
12      Q.     You understand that you have to be
13 honest today?
14      A.     I do.  I try to be.
15      Q.     Scott Jones, what was his role?
16      A.     Also a liaison in the -- in the
17 marketing area.  And he would attend those meetings
18 as well.  That's how I remember his name.
19      Q.     Do you consider yourself, when you
20 were working with Ethicon, to be helping them with
21 their marketing?
22      A.     No.
23      Q.     Do you know that they considered you
24 to be helping them with their marketing?
25      A.     Perhaps.

Nicole Fleischmann, M.D.

Page 14

1    Q.    Did you understand, when you were
2 working with Ethicon, that they saw you as someone
3 who could help them to market their products?
4         MS. KABBASH:  Objection.
5         THE WITNESS:  I never saw it as that.
6 I saw that they were asking our feedback to help
7 understand how we can better the products.
8 BY MR. SLATER:
9    Q.    Were there times that you spoke to
10 other physicians on behalf of Ethicon?
11   A.    No.
12        MS. KABBASH:  Objection.
13 BY MR. SLATER:
14   Q.    You never did preceptorship or a
15 proctorship?
16   A.    Oh, sure.  I did -- I did a couple
17 preceptorships and proctorships.
18   Q.    And when you were in those events,
19 you spoke to other doctors, right?
20   A.    I was teaching other doctors how to
21 use the products.
22   Q.    Did you understand that one of the
23 purposes of that event, from Ethicon's perspective,
24 was to help get those doctors interested in using
25 the products and, thereby, increasing sales?  Did

Page 15

1 you understand that was one purpose, from Ethicon's
2 perspective?
3    A.    I don't know what Ethicon's
4 perspective was in that.
5    Q.    Well, that was the question.
6         You didn't know?
7    A.    I don't know.  I know what my
8 perspective was.
9    Q.    Didn't you ask you your perspective.
10        So let's try it again.
11   A.    Sure.
12   Q.    When you were a preceptor or proctor,
13 did you understand that one of the purposes of that
14 event, from Ethicon's perspective, was to interest
15 doctors in their product and help increase sales?
16 Did you understand that Ethicon that purpose in
17 mind?
18   A.    I can't speak to what Ethicon's
19 purpose was.
20   Q.    Did you ever consider marketing of
21 Ethicon products to other doctors in any of the time
22 that you interacting with Ethicon?  Was that ever
23 something that you considered?
24   A.    No.
25        MS. KABBASH:  Objection.

Page 16

1 BY MR. SLATER:
2    Q.    Did Ethicon help you advertise your
3 services to patients?
4    A.    No.
5    Q.    Did they ever talk to you --
6 rephrase.
7         Did Ethicon ever contact you and
8 discuss with you, in some way, the possibility they
9 could help to bring patients to your office?
10   A.    If they did, I don't recall.
11   Q.    Jeff Potkul, you said, was your
12 original sales representative?
13   A.    Yes.
14   Q.    Do you have any sense of what the
15 time period was?
16   A.    Probably about 2007 or '06.
17   Q.    You said someone named General
18 something was another sales?
19   A.    General Butler.  I just remembered
20 his last name.
21   Q.    General Butler was your sales
22 representative during what period of time?
23   A.    After -- after Jeff had left.
24   Q.    So after 2007 or around then?
25   A.    Probably around 2010 or '11.

Page 17

1    Q.    Who is your current sales
2 representative from Ethicon?
3    A.    I don't know.  I haven't seen a
4 representative from Ethicon in a long time.
5    Q.    Really?
6    A.    Really.
7    Q.    Do you use the TVTTM Retropubic
8 device currently?
9    A.    Not currently.
10   Q.    When did you stop using the TVTTM
11 Retropubic device?
12   A.    I used the last TVTTM Retropubic
13 device, probably, in 2007.  Well, that's not true.
14 I had done TVTTM Retropubic over the years, but very
15 rarely.  I would say my majority of retropubic
16 devices before 2007.
17   Q.    You -- I think I read in your report
18 that you started with the TVT in about 2002?
19   A.    Right.
20   Q.    And you used it with decreasing
21 frequency up until 2007?
22   A.    Yes.
23   Q.    And after 2007, you don't use it
24 anymore?
25   A.    I use -- I've used it sporadically

Nicole Fleischmann, M.D.

Page 18

1   over the years. Maybe one or -- a couple a year.
2   But now I do more -- if I'm going to do a
3   retropubic, I do the TVT EXACT®.
4       Q.    When is the last time you put a TVT™
5   Retropubic in a woman's body?
6       A.    I don't know the exact date. But
7   probably about 2011 or '12, I would say.
8       Q.    When you make a recommendation to a
9   patient for various surgical options, you weigh
10  risks and benefits, correct?
11      A.    Yes.
12      Q.    And when you recommend a mesh device
13  system, you weigh the risks and benefits of that
14  mesh device system as opposed to the other
15  alternatives available, correct?
16      A.    Yes.
17      Q.    And there came a point, around 2007,
18  where your risk/benefit analysis led you to
19  recommend the TVT EXACT® at that point going forward
20  in virtually every case, as opposed to the TVT™
21  Retropubic where those would be two options,
22  correct?
23          MS. KABBASH: Objection.
24          THE WITNESS: No.
25  BY MR. SLATER:

Page 19

1       Q.    Let me ask you this: There came a
2   point when you started to use the TVT EXACT® instead
3   of the TVT™ Retropubic, correct?
4       A.    Yes.
5       Q.    You did that because you felt there
6   were certain advantages to the EXACT® as compared to
7   the Retropubic, correct?
8       A.    Not specifically.
9       Q.    So you just randomly chose to use
10  another device that you thought was no better than
11  the one that you stopped using and that you were
12  used to using just because you felt like it or
13  was -- there was no good reason for it?
14          MS. KABBASH: Objection.
15          THE WITNESS: I didn't start using it
16  because I thought it was much better than the TVT™
17  Retropubic. I thought the TVT™ Retropubic was a
18  good device. I just liked the TVT EXACT®® as well.
19  BY MR. SLATER:
20      Q.    You liked the TVT EXACT®® better than
21  the TVT™ Retropubic, that's why you switched to the
22  EXACT®, correct?
23          MS. KABBASH: Objection.
24          THE WITNESS: No. I liked the
25  trocars of the TVT EXACT®®; they were a little

Page 20

1   thinner and a little easier for me to use. But the
2   actual device, the TVT, is exactly the same.
3   BY MR. SLATER:
4       Q.    Is the mesh load for the TVT™
5   Retropubic the same as for TVT EXACT®®?
6          MS. KABBASH: Objection.
7          THE WITNESS: In my mind, it is, yes.
8   BY MR. SLATER:
9       Q.    Well, "in your mind," what does that
10  mean?
11      A.    I've seen no difference in clinical
12  outcomes between TVT EXACT®® and TVT™ Retropubic.
13          MR. SLATER: Move to strike.
14  BY MR. SLATER:
15      Q.    Is it the same amount of mesh in the
16  TVT™ Retropubic versus the TVT EXACT®®?
17      A.    Yes.
18      Q.    Exactly the same amount of mesh?
19      A.    Yes.
20      Q.    It's no shorter?
21      A.    No, it's no shorter. We put the same
22  amount of mesh in the patient in the TVT EXACT®® as
23  in the TVT™ Retropubic.
24      Q.    And what is the difference between
25  the TVT EXACT®® and the TVT™ Retropubic?

Page 21

1       A.    Only, in my mind, is the trocars and
2   the size of the trocars.
3       Q.    Are there any other differences
4   between the systems?
5       A.    Well, there are mild variations in
6   how you place the sling. But these are not
7   advantages or disadvantages, in my mind. What
8   you're leaving in the patient's body is the same.
9       Q.    If it's placed differently, is it
10  tensioned differently?
11      A.    No, it's not. It tensioned exactly
12  the same.
13      Q.    Does Ethicon market the TVT EXACT®®
14  as having certain advantages over the TVT™
15  Retropubic?
16      A.    I don't know.
17      Q.    Are there any other mid-urethral
18  slings from Ethicon that you have used in your
19  career?
20      A.    Yes.
21      Q.    What?
22      A.    The TVT Obturator sling.
23      Q.    Do you use that currently?
24      A.    Yes.
25      Q.    If you had to tell me a breakdown

Nicole Fleischmann, M.D.

Page 22

1  between TVT Obturator and TVT EXACT®® in your
2  current practice, how would you break that down?
3      A.    I would say the majority of the
4  patients is TVT Obturator.  And I would say that
5  that number is close to 90 percent.
6      Q.    When did you start using the TVT
7  Obturator?
8      A.    I started using it in my fellowship,
9  which was in 2004.
10     Q.    Once the TVT Obturator became
11 available to you, did you shift to using that in
12 virtually all cases where you were going to put a
13 mid-urethral sling in as compared to the Retropubic?
14     A.    No.
15     Q.    In 2004, you said, you started using
16 the TVT Obturator, correct?
17     A.    I was trained with TVT Obturator in
18 2004 during my fellowship.
19     Q.    And from, say, 2000 -- 2005 --
20 rephrase.
21          When did your fellowship end?
22     A.    2005.
23     Q.    Beginning in 2005 through 2007, when
24 you said you stopped using the Retropubic, what was
25 the breakdown between TVT-O and TVTTM Retropubic?

Page 23

1      A.    I would say that in the beginning, it
2  was more half and half.  And then as we got closer
3  to 2007, I had become -- I would say the TVT
4  Obturator was my go-to case.
5          I didn't use it in all cases, but it
6  was my go-to case --
7      Q.    Did you --
8      A.    -- my go-to sling.
9      Q.    Sorry.  I didn't mean to interrupt
10 you.
11     A.    That's okay.
12     Q.    Why did you switch to the TVTTM
13 Obturator from the TVTTM Retropubic?
14     A.    For me, it just was something that I
15 found was easier to do.  And I liked -- when you
16 said that everything is a risk/benefit profile the
17 risks of the TVTTM Obturator, to me, of not having
18 as many bladder injuries during the case were --
19 were more acceptable.
20     Q.    Did you have a lot of bladder
21 injuries with your patients with the TVTTM
22 Retropubic?
23     A.    I had some.  They were always
24 recognized and the sequelae were -- were never --
25 there was really no sequelae from those.  But I just

Page 24

1  felt like -- I never liked sending my patients home
2  with a catheter for a day or two.  So I pretty much
3  switched to TVTTM Obturator.
4      Q.    The TVTTM Obturator, you don't
5  operate in the retropubic space, correct?
6      A.    Exactly.
7      Q.    And you felt that was a safety
8  advantage, correct?
9      A.    Yes.
10     Q.    So if I understand correctly,
11 beginning in about 2004, 2005, when you were
12 finishing your fellowship up and then going into
13 private practice, you transitioned almost
14 exclusively to the TVTTM Obturator; and then after
15 2007, in the few cases where you would consider the
16 TVTTM Retropubic, or that approach, you switched to
17 the EXACT®?
18     A.    My first year out was not in private
19 practice.  My first year out, I was at Mt. Sinai
20 Hospital, and I was the director of female urology
21 there.  And in that year, I was using -- I was using
22 a great deal of TVTTM Retropubics.
23          Probably, when I transitioned into my
24 private practice, which was 2006, I was starting to
25 become more exclusively a TVTTM Obturator sling --

Page 25

1      Q.    So in 2006 --
2      A.    -- user.
3      Q.    I'm sorry.
4          So in 2006, you transitioned almost
5  entirely to TVTTM Obturator versus a TVTTM Retropubic
6  approach; is that correct?
7      A.    Yes.  It was around the time when all
8  the studies were coming out that were showing some
9  equivalency between the TVTTM Obturator and the TVTTM
10 Retropubic sling, in terms of the success data.
11     Q.    In this case, I've read your reports.
12          It's my understanding that you have
13 certain opinions about the risk/benefit profile of
14 the TVTTM Retropubic, correct?
15     A.    Yes.
16     Q.    Would you agree with me that for you
17 to offer a valid opinion about the risk/benefit
18 profile for the TVTTM Retropubic, you need to be
19 familiar with each of the risks of that device
20 system?
21     A.    Yes, I would agree with that.
22     Q.    It's my understanding that you have
23 some opinions about the warnings for the TVTTM
24 Retropubic; is that correct?  Or you don't?  If you
25 don't --

7 (Pages 22 to 25)

Nicole Fleischmann, M.D.

Page 26

1    A.    I'm not sure I understand the
2  question.
3    Q.    Do you have opinions about whether
4  the warnings -- do you have opinions about whether
5  the warnings for the TVTTM Retropubic are adequate
6  or not?
7    A.    Are you talking about the IFU
8  warnings?
9    Q.    Yes.
10   A.    Do I have opinions about whether
11  they're adequate?
12   Q.    Yes.
13   A.    My opinion is that they're adequate.
14     MR. SLATER:  Move to strike.
15  BY MR. SLATER:
16   Q.    My question is this:  Are you
17  intending to offer opinions in this case about the
18  adequacy of the warnings for the TVTTM Retropubic?
19   A.    Absolutely.
20   Q.    Have you ever done that in any
21  litigation before, given warning opinions?
22   A.    In any litigation?  No.
23   Q.    When you give your opinions about
24  whether or not the warnings for the TVTTM Retropubic
25  are adequate, are you applying any published

Page 27

1  standards for warnings?
2    A.    I don't understand the question.
3      MS. KABBASH:  Objection.
4  BY MR. SLATER:
5    Q.    Did you consult any published
6  standards for what information is supposed to be
7  provided in a medical device warning like for the
8  TVTTM Retropubic?
9    A.    No.
10     MS. KABBASH:  Objection.
11  BY MR. SLATER:
12   Q.    Did you review testimony by witnesses
13  from Ethicon who are responsible for making sure the
14  warnings are adequate, to see what standards they
15  applied, in their industry, in determining what
16  should be warned of?  Did you look at those
17  standards?
18   A.    I never looked at any testimony from
19  Ethicon, no.
20   Q.    Did you look at any internal
21  documents from Ethicon, where they set out the
22  standards or the criteria that they applied in
23  determining what information needed to be in a
24  warning such as for the TVTTM Retropubic?
25   A.    I don't believe I have, no.

Page 28

1    Q.    When you offer your opinions as to
2  the adequacy of the warnings, are you essentially
3  advising us what you believe would be adequate for
4  you in your medical practice, with your basic --
5  with your level of experience and what you're
6  familiar with?
7    A.    Exactly, yes.
8    Q.    There was some reference in your
9  report to the patient brochure or whether or not a
10  patient brochure was shown to Ms. -- Mrs. Corbet,
11  right?  You talked about that a little?
12   A.    Yes.
13   Q.    As you sit here now, am I accurate
14  you don't know which patient brochure she actually
15  saw?
16   A.    I can't say exactly.  But I know the
17  brochure that was out at the time of her -- of her
18  care.
19   Q.    The patient brochure that was out
20  during the time that she had her surgery in 2011, do
21  you know if that's the patient brochure that she was
22  shown during her deposition?
23   A.    That's the one that she felt was
24  familiar to her, in her deposition.
25   Q.    This is my question -- rephrase.

Page 29

1      The patient brochure that was shown
2  to Mrs. Corbet during her deposition, do you know if
3  that's the one that was available during 2011 at the
4  time of her surgery?
5    A.    Yes, it was.
6    Q.    And did you confirm that yourself?
7    A.    Yes.
8    Q.    Did Mrs. Corbet say that is the one
9  she saw or did she say that looks familiar to her?
10   A.    She said that it looked familiar to
11  her.
12   Q.    Have you looked at the patient
13  brochures over the years?
14   A.    Yes, I have.
15   Q.    To somebody who is not used to
16  looking at patient brochures every day, could they
17  look similar?
18     MS. KABBASH:  Objection.
19     THE WITNESS:  I suppose that they
20  could.  But I think because that was the patient
21  brochure that was out at the time of her care and
22  that was the brochure that Kathy Hampton had
23  delivered to the offices in that area at that time,
24  it's more than likely that that's the brochure that
25  she had seen.

8 (Pages 26 to 29)

Nicole Fleischmann, M.D.

Page 30

1                  - - -
2              (Whereupon, a discussion off the
3  record occurred.)
4                  - - -
5              MR. SLATER:  Move to strike from
6  "but" forward.
7  BY MR. SLATER:
8       Q.     Dr. Harrell mentioned an InterStim®
9  to Mrs. Corbet before he operated on her.
10             Is that something you said in your
11  report?
12      A.     That's something he said in his
13  deposition -- I mean, I'm sorry, that was something
14  that was in the medical record.
15      Q.     Did Dr. Harrell recommend an
16  InterStim® to Mrs. Corbet?
17      A.     He warned her that that was a
18  possibility in her future.
19             MR. SLATER:  Move to strike.
20  BY MR. SLATER:
21      Q.     Did Dr. Harrell recommend an
22  InterStim® to Mrs. Corbet before he operated on
23  her?  Did he recommend it to her?
24      A.     Not at the time.
25      Q.     Did Dr. Harrell ever recommend an

Page 31

1  InterStim®  to Mrs. Corbet and say, I think you
2  should have this put in your body?
3       A.     Yes, he did.
4       Q.     When was that?
5       A.     It was after she had had surgery with
6  him.
7       Q.     Do you have any knowledge as to the
8  agreement between Ethicon and Professor Olmstead and
9  his company?  Do you know any of the details of that
10  interaction?
11      A.     I've seen some of the records of that
12  interaction.
13      Q.     Are they listed in your report?
14      A.     Yes -- no, they are listed in my --
15  yeah, in my exhibit.
16      Q.     Did you discuss that issue at all in
17  your report?
18      A.     No.
19      Q.     Have you been involved in clinical
20  studies?
21      A.     No.  I mean, clinical trials?  No.
22      Q.     You've never --
23      A.     Clinical studies?  Yes.  But not
24  clinical trials.
25      Q.     What's your distinction between a

Page 32

1  clinical study and a clinical trial?
2       A.     Well, we've written papers based on
3  our -- on our clinical work.  You know, I'm a
4  director of fellowship, and so there's many papers
5  that have come out or abstracts that have come out
6  based on our patient population.
7       Q.     And what is a clinical trial?
8       A.     Well, a clinical trial, to me, is
9  something that more involves industry.  And I've not
10  been involved in those.
11      Q.     Are you familiar with the concept of
12  financial bias in a clinical trial?
13      A.     Yes.
14      Q.     You would agree with me that
15  financial bias is accepted in the medical field as
16  something that can impact on the results in a study,
17  correct?
18      A.     Except that it's always disclosed.
19      Q.     Financial bias is always supposed to
20  be disclosed, correct?
21      A.     Exactly.
22      Q.     If financial bias is not disclosed in
23  an article written about a clinical trial, that's a
24  bad thing, right?
25             MS. KABBASH:  Objection.

Page 33

1  BY MR. SLATER:
2       Q.     Meaning it's not good; you'd
3  rather -- it's supposed to be disclosed, right?
4       A.     It's supposed to be disclosed, but it
5  doesn't necessarily mean it's a bad thing.
6       Q.     Do you think it's a good thing for
7  doctors who perform clinical trials to not disclose
8  their financial bias?
9       A.     We're supposed to disclose our
10  financial bias.
11      Q.     So it's a bad thing not to disclose
12  your financial bias, because people expect you to do
13  so, so when they read the results, they'll have that
14  information in their mind so they can look at the
15  data that you're reporting with that in mind,
16  correct?
17      A.     I would agree, except I don't always
18  think that it affects the results of the data.
19             MR. SLATER:  Move to strike from
20  "except" forward.
21  BY MR. SLATER:
22      Q.     If the agreement between the person
23  running the clinical trial and the company that is
24  looking to make money on that device that's being
25  studied provides a financial incentive for the

Nicole Fleischmann, M.D.

Page 34

1  doctor to report less complications than may be
2  observed, that would be a significant bias issue
3  that everybody should know about when reading those
4  articles written about that study, correct?
5      MS. KABBASH:  Objection.
6      THE WITNESS:  I would have to know
7  more about what you're referring to before I could
8  answer that.
9  BY MR. SLATER:
10     Q.    Do you know about anything like that
11 happening with Professor Olmstead and his company?
12     A.    I've seen some records, but I can't
13 really take that out of context.
14     Q.    Do you have any opinions, as you sit
15 here now, about whether or not there was any --
16 rephrase.
17          Do you feel comfortable that you
18 understand the factual interaction between Ethicon
19 and Professor Olmstead, in terms of what the
20 payments were predicated upon?  Do you have an
21 understanding of that?
22     A.    I think I do.
23     Q.    Do you know that there was a
24 provision that said that a certain payment of
25 $400,000 wouldn't be made if complications were

Page 35

1  reported beyond those that had been reported in a
2  prior article?
3      A.    I've seen records of that, but I
4  don't interpret it that way.
5      Q.    You don't interpret it that way?
6      A.    No.
7      Q.    Did you ever ask to see the testimony
8  of the people at Ethicon whose job it is to
9  interpret that type of information?
10     A.    No, because I'm not interested in
11 their testimony.  I'm interested in my own
12 interpretation --
13     Q.    Okay.
14     A.    -- of that.
15     Q.    With regard to the agreement between
16 Ethicon and Professor Olmstead and his company, you
17 have no interest in knowing Ethicon's interpretation
18 of that agreement, correct?
19     A.    You're asking me whether I had an
20 interpretation about what that was.  And if you'd
21 like to ask my opinion, I'm glad to give it to you.
22     Q.    But I went beyond that.  And now
23 we're talking about Ethicon's knowledge about it.
24 And you told me -- so I want to ask it very clean.
25          You have no interest in understanding

Page 36

1  what Ethicon thinks that agreement between Ethicon
2  and Professor Olmstead and his company means?
3      A.    Right, I don't.
4      MS. KABBASH:  Objection.
5      THE WITNESS:  Because the reason --
6  BY MR. SLATER:
7      Q.    I didn't ask you why.  I don't care.
8      I just want to know you don't care,
9  right?
10     A.    I don't have any --
11     MS. KABBASH:  Objection.
12     THE WITNESS:  I don't care what
13 Ethicon thinks that agreement was.
14 BY MR. SLATER:
15     Q.    Would it be fair to say that with
16 regard to the risk/benefit profile of the TVT, you
17 don't care what Ethicon thinks about it, you want to
18 draw these opinions 100 percent based on your own
19 knowledge and experience?
20     A.    No.
21     MS. KABBASH:  Objection.
22     THE WITNESS:  It's not just on my own
23 knowledge and experience.  It's on the experience of
24 the vast medical literature that's out there.  That
25 has nothing to do with Ethicon.

Page 37

1  BY MR. SLATER:
2      Q.    Well, this is the question:  In
3  drawing your opinions regarding the risk/benefit
4  profile for the PROLIFT® -- I called it the
5  PROLIFT®.
6      MS. KABBASH:  You're in PROLIFT®
7  mode.
8  BY MR. SLATER:
9      Q.    In drawing your opinions with regard
10 to the risks and benefits of the TVT™ Retropubic,
11 you did not base that upon what Ethicon has said,
12 what Ethicon witnesses have said, or Ethicon
13 internal documents?
14     A.    Right.
15     Q.    Is that fair?
16     A.    That's fair.
17     Q.    Okay.  Your opinions about the risks
18 and benefits of the TVT™ Retropubic are based on
19 your personal experience and your review of the
20 literature, correct?
21     A.    Exactly.  My training.
22     Q.    If Ethicon internally -- well,
23 rephrase.
24          Do you think that Ethicon has access
25 to more information about the potential

10 (Pages 34 to 37)

Nicole Fleischmann, M.D.

Page 38

1    complications with the TVTTM Retropubic than you
2    would have, since they sell the product and interact
3    with doctors around the world about it?
4         A.    No, I don't think that Ethicon
5    internally has that information.
6         Q.    Okay.  If there are risks or adverse
7    reactions relating to the TVTTM Retropubic that
8    you're not familiar with but that Ethicon agrees
9    exist, that could have an impact on your overall
10   opinion if you were to be shown severe risks, for
11   example, you didn't know about, right?
12        MS. KABBASH:  Objection.
13        THE WITNESS:  I have a hard time
14   believing that there are severe risks that I don't
15   know about, since I've done 1,500 or more of these
16   slings --
17   BY MR. SLATER:
18        Q.    Well, you haven't done --
19        A.    -- in my career.
20        Q.    -- 1,500 or more TVTTM Retropubics,
21   have you?
22        A.    I haven't 1,500, but I've probably
23   done about 400.  I think that that's enough to know
24   the risks of the procedure.
25        Q.    Your patients don't always return to

Page 39

1    you when they've had complications, do they?
2         A.    I would say that they probably do.
3         Q.    You think every single patient you've
4    ever had that had a complication came back to you
5    for treatment of that complication?
6         A.    Not every single, but the majority of
7    patients, yes.
8         Q.    You have no idea how many of your
9    patients have had complications and left you and not
10   come back?  You don't know, right?
11        A.    I'm sure there are some that haven't.
12   But I think the majority of my patients, I'm aware
13   when they have a complication.
14        MR. SLATER:  Move to strike from
15   "but" forward.
16   BY MR. SLATER:
17        Q.    You have no way of knowing how many
18   of your patients have had complications from your
19   insertion of a TVT device and not returned to you
20   for that treatment?  You just have no way of knowing
21   that, correct?
22        MS. KABBASH:  Objection.
23        THE WITNESS:  I think I do know when
24   people have complications from my slings that I've
25   put in.

Page 40

1    BY MR. SLATER:
2         Q.    So we're going back-and-forth in a
3    tennis game.
4         Now it's you know everybody?  You
5    know every complication you've had with a patient?
6         MS. KABBASH:  Objection.
7         THE WITNESS:  I'm not saying I know
8    every complication.
9         MS. KABBASH:  Mischaracterizes.
10        THE WITNESS:  I'm saying I know the
11   majority of the people who have had complications,
12   because they come back.
13   BY MR. SLATER:
14        Q.    Have you ever -- do you have a
15   registry for all your patients that you've ever put
16   a TVT into?
17        A.    No.  I have an electronic health
18   record.  I don't -- I don't keep registries on my
19   patients.
20        Q.    An electronic health record, that's
21   not what I was asking, was it?
22        A.    No.
23        Q.    It has nothing to do with a registry,
24   right?
25        A.    Right.  I don't have a registry.

Page 41

1         Q.    This is a very simple question.  You
2    have no way of knowing how many of your patients
3    have had mesh-related complications from a TVTTM
4    Retropubic and not returned to you for care?  You
5    don't know that, right?
6         A.    I can't give you an exact number.
7         Q.    You couldn't give me an estimate,
8    because you don't know, right?
9         MS. KABBASH:  Objection.
10        THE WITNESS:  I would say that I can
11   give an estimate, because most of my patients return
12   to me in follow-up.  And when they're having a
13   problem, they will tell me.
14   BY MR. SLATER:
15        Q.    Have you ever done a study of your
16   patient population to determine how many didn't tell
17   you when they began to have mesh-related
18   complications from a TVTTM Retropubic and went for
19   care elsewhere?  Have you ever studied that
20   question?
21        A.    No.  However, I work in a very small
22   community, and we do see our patients back.  And if
23   we don't, we're usually told where they've gone.
24        MR. SLATER:  Move to strike from
25   "however" forward.

11 (Pages 38 to 41)

Nicole Fleischmann, M.D.

Page 42

1 BY MR. SLATER:
2      Q.      Are you aware that in the medical
3 literature, it's been recognized that patients who
4 have mesh-related complications will often go to
5 other doctors without informing the implanter and
6 the implanter won't know about it?
7      A.      My review of the medical literature
8 shows the majority of patients do go back to their
9 implanting doctor.
10     Q.      Which study is that?
11     A.      In the Welk study it showed that --
12     Q.      Welk, W-E-L-K?
13     A.      Uh-huh.  Yes.
14     Q.      Right.  Said what?
15     A.      That --
16             MS. KABBASH:  What was the question?
17             MR. SLATER:  She knows what the
18 question is.
19 BY MR. SLATER:
20     Q.      Go ahead.
21             MS. KABBASH:  Do you?
22             THE WITNESS:  That the majority of
23 patients went back to their original doctor.
24 BY MR. SLATER:
25     Q.      In the Welk study?

Page 43

1      A.      Yes.
2      Q.      What time period were patients being
3 studied for in that study?
4      A.      I can look at it, and I'll tell you
5 exactly.
6      Q.      It doesn't matter, if you don't
7 remember.  I just want to see.
8             How many patients were studied?
9      A.      About 60,000 patients.
10     Q.      What were they looking at?
11     A.      They were looking at complications
12 from sling procedures.
13     Q.      Where were they collecting these
14 60,000 patients from?
15     A.      From the registry, Canadian registry.
16     Q.      Okay.  That's Canada, right?
17     A.      Yes.
18     Q.      Is Canada a different health system
19 than we have in the U.S.?
20     A.      As far as I know, yes.
21     Q.      It's a socialized system, right?
22     A.      Yes.
23     Q.      A lot less doctors, right?
24     A.      Yeah, that's true.
25     Q.      A lot less options for treatment in

Page 44

1 Canada than the U.S., right?
2      A.      Yes.
3      Q.      Are you familiar with any articles in
4 the peer-reviewed literature that do state that
5 patients will often not return to the implanting
6 physician when they have mesh-related complications
7 and the implanter will not know about it?  Have you
8 use seen that discussed in the literature?
9      A.      I have seen a place that it was
10 discussed in the literature, yes.
11     Q.      Where was that?
12     A.      In the Abbott article.
13     Q.      That's the only article you're
14 familiar with that talks about that?
15     A.      That's the one that comes to mind
16 right now.
17     Q.      How many of your patients --
18 rephrase.
19             Let's try to get some numbers.
20     A.      Sure.
21     Q.      How many -- you tell me, would it
22 make sense to talk about your fellowship, too, when
23 you're placing -- if we want to get your statistics,
24 I guess it would, right?
25     A.      If you'd like.

Page 45

1      Q.      Let's do this.  Let's talk about the
2 fellowship first.
3      A.      Okay.
4      Q.      In your fellowship, how many
5 mid-urethral synthetic slings would you estimate you
6 placed?
7      A.      I probably did between three and five
8 per week.  And that was over a year.  We didn't just
9 do mid-urethral slings that year, I mean, we were
10 doing other slings, too, pubovaginal --
11     Q.      I didn't ask you about other slings.
12     A.      I'm -- you're asking me to calculate.
13 Let me calculate, counselor.
14             I would say about 150.
15     Q.      Of the 150 mid-urethral slings that
16 you estimate you placed during -- this is one year
17 in your fellowship?
18     A.      In my fellowship, yes.
19     Q.      -- how many would you say were TVTTM
20 Retropubic?
21     A.      The majority.  I can't give you an
22 exact number.
23     Q.      I'm not asking for an exact number.
24             When you say "majority" are we
25 talking --

Nicole Fleischmann, M.D.

Page 46

1      A.    80 percent.
2      Q.    Okay.  Fine.  And the other 20
3  percent would be what mid-urethral slings?
4      A.    TVTTM Obturator slings were the only
5  other synthetic slings we were doing at the time.
6      Q.    Of the patients that you placed TVTTM
7  Retropubic during your fellowship -- first of all,
8  how long did you personally follow those patients?
9      A.    In fellowship?  Not long.  I was only
10 there for a year.
11     Q.    Do you know anything about their
12 complications or course after you left the
13 fellowship?
14     A.    No.
15     Q.    After your fellowship, how many --
16 rephrase.
17          After your fellowship, right up until
18 now, how many mid-urethral slings would you say
19 you've placed, synthetic mid-urethral slings?
20     A.    Probably a couple hundred.
21          MS. KABBASH:  You mean retropubic
22 specifically or all mid-urethral slings?
23          MR. SLATER:  I'm talking all
24 mid-urethral slings.
25          THE WITNESS:  Oh.

Page 47

1          MS. KABBASH:  All mid-urethral
2  slings.
3          THE WITNESS:  I'm so sorry.  I
4  misunderstood the question.
5          MR. SLATER:  I'll ask it again.
6          THE WITNESS:  Yes, please.
7  BY MR. SLATER:
8      Q.    Since your fellowship, which you
9  completed in 2005, right?
10     A.    Yes.
11     Q.    How many synthetic mid-urethral
12 slings would you estimate you've placed from 2005
13 until now when we're in late 2015?
14     A.    Over 1,500.
15     Q.    Of the over 1,500 mid-urethral slings
16 that you've placed since 2005, can you estimate how
17 many are TVTTM Retropubic?
18     A.    A couple of hundred.
19     Q.    "A couple hundred" means about 200?
20     A.    About 200.
21     Q.    The balance would be?
22     A.    Towards the beginning of that time
23 period.
24          MS. KABBASH:  Do you need some water?
25          THE WITNESS:  No, it's okay.  I'm

Page 48

1  fine.
2  BY MR. SLATER:
3      Q.    The approximate 200 TVTTM Retropubics
4  would have been placed between 2005 and 2007?
5      A.    Exactly.
6      Q.    The balance of the mid-urethral
7  slings you've placed would be primarily TVTTM
8  Obturator, correct?
9      A.    Yes, after that, it was mostly TVTTM
10 Obturator --
11     Q.    And maybe --
12     A.    -- with some sporadic TVTTM
13 Retropubic or EXACT® in there.
14     Q.    When you say "sporadic," you're
15 talking about maybe a few a year?
16     A.    Exactly.  Except in the last year,
17 I've been doing more EXACTs than in the previous
18 years.
19     Q.    Have you used mid-urethral slings
20 manufactured by someone other than Ethicon?
21     A.    I have.  But it was for a very short
22 period of time.
23     Q.    Which device?
24     A.    It was a device by a company called
25 GMD, General Medical Devices.  I don't think they

Page 49

1  exist anymore.  I'm not sure.  And I was probably --
2      Q.    Lucky them.
3      A.    -- using their sling for about a, you
4  know, a month or two.  I was trialing it.
5      Q.    Did you ever try the AMS slings, the
6  Arc slings, any of that?
7      A.    I've never tried any of those slings.
8      Q.    How come?
9      A.    Because I liked the results I was
10 getting with TVT and Obturator -- Retropubic and
11 Obturator.  I'm afraid to switch.
12     Q.    Now, speaking about your fellowship,
13 the TVTTM Retropubics that you placed, those
14 patients you saw for no more than a year, most of
15 them it would be less than a year as you went
16 forward toward the end, right?
17     A.    Right.  Following them for a year.
18     Q.    So you don't know their outcomes?
19     A.    Not their long-term outcomes.
20     Q.    Well, "long-term" is how long?
21     A.    More than a year in this case.
22     Q.    Well, when you define long-term in
23 evaluating the medical literature, is that more than
24 one year?
25     A.    Well, I would probably say it's more

13 (Pages 46 to 49)

Nicole Fleischmann, M.D.

Page 50

1 about five years is long-term literature.
2      Q.      For the TVTTM Retropubics you placed
3 between 2005 and 2007, how many of those patients
4 returned to you with mesh erosions or mesh
5 exposures?
6      A.      In that time period, I probably had
7 more mesh exposures than I have now.
8      Q.      I --
9      A.      But I can't give you an exact number.
10 It was something that I saw probably about 5 to 10
11 percent of the time.  When I was first doing slings,
12 I definitely had more mesh exposures.
13      Q.      And that was with the TVTTM
14 Retropubic?
15      A.      Or TVTTM Obturator.
16      Q.      So if I understand, during the period
17 of 2005 to 2007, when you were performing TVT
18 Retropubic, you estimate, based on your
19 recollection, that you had about a 5 to 10 percent
20 mesh exposure/erosion rate, correct?
21      A.      In -- yes, in those years, I did.
22 And then later on, it became extremely rare.
23      MR. SLATER:  Move to strike from
24 "and" forward.
25 BY MR. SLATER:

Page 51

1      Q.      With regard to the two -- well,
2 withdrawn.
3                    - - -
4      (Whereupon, a discussion off the
5 record occurred.)
6                    - - -
7 BY MR. SLATER:
8      Q.      With regard to Mrs. Corbet, there
9 were -- well, let me take a step back, actually.  I
10 did forget to ask you about something.
11      When you treat stress urinary
12 incontinence, you don't only use mid-urethral
13 slings, correct?
14      A.      That's correct.
15      Q.      Currently, and over the years, you've
16 used various procedures to treat that condition,
17 right?
18      A.      I have.
19      Q.      In addition to mid-urethral slings,
20 what are the other procedures that you have utilized
21 in your practice to treat stress urinary
22 incontinence?
23      A.      I've used autologous fascial slings.
24 I've used bulking agents.  And I also do robotic
25 Burches.

Page 52

1      Q.      When did you transition to robotic
2 Burches from laparoscopic?
3      A.      I never did laparoscopic.
4      Q.      You never did.  You meant from went
5 from open to robotic?
6      A.      I never did open.
7      Q.      When were you trained on robotic
8 Burch procedures?
9      A.      I was never formally trained on
10 robotic Burch procedures.  I was trained on open
11 Burch procedures during my fellowship.  And when I
12 started doing robotic sacrocolpopexy, I began doing
13 some robotics Burches at that time.
14      Q.      Do you perform Burch procedures where
15 you're not doing them in conjunction with an
16 abdominal sacrocolpopexy for prolapse?
17      A.      Never.
18      Q.      With Mrs. Corbet, for example, with
19 her condition, would one of her options have been
20 abdominal sacrocolpopexy with a Burch?
21      A.      It would have been an option.
22 Patients always have options.
23      Q.      Ultimately, the choice for what
24 procedure would be performed on Mrs. Corbet was Mrs.
25 Corbet's decision, correct?

Page 53

1      A.      Her decision that she made with Dr.
2 Harrell, yes.  But it was her decision.
3      Q.      The patient, Mrs. Corbet, in this
4 case, has the ultimate say-so on whether or not, for
5 example, a mesh device is put in her body, correct?
6      A.      Yes.  But she's counseled by her
7 doctor.  Patients don't understand mesh --
8      MR. SLATER:  Move to strike.
9      THE WITNESS:  -- until their doctor
10 counsel's them.
11      MR. SLATER:  Move to strike from
12 "but" forward.
13 BY MR. SLATER:
14      Q.      I would contend that many doctors
15 don't understand mesh.  So I don't know why you keep
16 throwing in the thing about the doctors.
17      I didn't ask you about that, did I?
18      A.      I guess you didn't.
19      Q.      Okay.  I'll try it again.
20      Ultimately, for Mrs. Corbet, the
21 decision as to whether or not she would place mesh
22 in her body was her decision, correct?
23      A.      It's always the patient's decision,
24 yes, ultimately.
25      Q.      Mrs. Corbet would hear the

14 (Pages 50 to 53)

Nicole Fleischmann, M.D.

Page 54

1 recommendations, and heard the recommendations and
2 information she got from Dr. Harrell, and then made
3 a decision based on what he told her, correct?
4     A.     Yes.  And also, but she might have
5 seen a patient brochure and some other things out in
6 the community, some people talk to their friends,
7 they talk to their siblings, their family.  It's not
8 just from the doctor that they get information from.
9          MR. SLATER:  Move to strike after
10 "yes."
11 BY MR. SLATER:
12     Q.     Is there any evidence you've seen
13 that Mrs. Corbet was talking to friends and family
14 and people on the street about what surgery to have?
15     A.     Not Mrs. Corbet specifically.  But
16 you asked me where do patients get information from,
17 and I'm telling you.
18     Q.     I asked about Mrs. Corbet.  So I'm
19 asking about Mrs. Corbet.
20          Did you see any evidence in the
21 record, any reference to her speaking to people
22 beyond Dr. Harrell to get information that she would
23 rely on?
24     A.     Only from the patient brochure that
25 she might rely on.

Page 55

1     Q.     Mrs. Corbet testified that she
2 glanced at a brochure around the time of the
3 surgery, correct?
4     A.     Yes.
5     Q.     She didn't say she read through it
6 carefully, did she?
7     A.     I can't speak to how -- how much she
8 read it.  I know that it was available to her and
9 that she could understand information from there if
10 she chose to.
11     Q.     There's no record indicating that she
12 actually read the patient brochure cover to cover?
13 That's not established, is it?
14     A.     It's established that she found that
15 brochure familiar only.
16     Q.     Other -- rephrase.
17          You told me that in addition to
18 mid-urethral slings, you utilize, autologous fascial
19 slings, bulking agents and robotic Burch to treat
20 stress incontinence.
21          Anything else?
22     A.     Not that I can think.
23     Q.     In your current practice, do you use
24 autologous fascial slings, bulking agents, and
25 robotic Burch procedures to treat stress

Page 56

1 incontinence?
2     A.     Yes.
3     Q.     From your perspective, they're all
4 acceptable options to treat stress incontinence,
5 correct?
6     A.     Acceptable, but not first-line,
7 usually.  But options, yes.
8     Q.     They're -- rephrase.
9          I think I saw something in your
10 report about gold standards and standards of care
11 and all that kind of stuff I tend to see in these
12 expert reports.
13          So I want to talk to you about that
14 for a minute.
15     A.     Sure.
16     Q.     First of all, the gold standard is
17 not a medical term, right?
18     A.     No, not a medical term.
19     Q.     Do you know what the gold standard
20 actually was back in history?
21     A.     It had to do with gold.
22     Q.     Right.  Where gold was the valuation
23 basis for our entire financial economy.
24     A.     Financial economy, yes.
25     Q.     The gold standard no longer exists in

Page 57

1 this country, does it?
2     A.     I don't think so, no, not in terms of
3 that.
4          MS. KABBASH:  Objection.
5 BY MR. SLATER:
6     Q.     Have there been gold standard medical
7 procedures that are no longer performed?
8     A.     Yes.
9     Q.     Asbestos --
10     A.     I'll give you an example.
11     Q.     Sure.
12     A.     The Burch colposuspension used to be
13 the gold standard procedure for stress urinary
14 incontinence that we compared all stress
15 incontinence procedures to.  Now it's no longer
16 that.
17     Q.     Well, I didn't ask you that.
18          MR. SLATER:  So move to strike.
19 BY MR. SLATER:
20     Q.     I asked you if there were gold
21 standard medical procedures that are no longer
22 performed?
23     A.     I'm sure.  Because technology is
24 always changing and improving, and we find better
25 ways of treating things.  Sometimes we're minimally

Nicole Fleischmann, M.D.

Page 58

1  invasive, less complications and those become the
2  gold standard.
3        Q.     Okay.  Sometimes there are medical
4  procedures that are touted as a gold standard and it
5  turns out that the complications that they're
6  causing are much higher than what people thought or
7  more severe than people thought, and that changes
8  people's perception over time.
9              That's happened, correct?
10       A.     Yes.  That's why we have medical
11 literature out there.  Level 1 evidence that tells
12 us what the gold standard is at the time.
13       Q.     Are you familiar with things in our
14 economy, our commercial economy, that have been
15 called gold standards for things -- like asbestos
16 was a gold standard for insulation?
17       A.     This is not my area.
18       Q.     You wouldn't want asbestos in your
19 house, would you?
20       A.     No.  I would probably have it
21 removed.
22             MS. KABBASH:  Objection.
23             THE WITNESS:  But this is not my
24 area, and I can't really speak about this kind of
25 thing.

Page 59

1  BY MR. SLATER:
2        Q.     Do you know where the term gold
3  standard came from in the medical community?  Do you
4  know how the genesis of that was?
5        A.     I think you're going to tell me.
6        Q.     I'm asking you.  Do you know?
7        A.     No, I don't.
8        Q.     Do you know whether there were
9  doctors being paid by industry who helped to start
10 that rumor that it was the gold standard?
11             MS. KABBASH:  Objection.
12             THE WITNESS:  I'm not aware of that,
13 no.
14 BY MR. SLATER:
15       Q.     Okay.  The mid-urethral sling is not
16 the standard of care treatment for stress
17 incontinence; it is a permissible treatment within
18 the standard of care, correct?
19             MS. KABBASH:  Objection.
20             THE WITNESS:  I think there's
21 multiple, multiple articles and literature out there
22 now that support it as the gold standard.
23 BY MR. SLATER:
24       Q.     I didn't ask you about the gold
25 standard.  Stick with me.

Page 60

1        A.     I'll try.
2        Q.     You understand -- I think you used
3  the term standard of care in your report, right?
4        A.     Okay.
5        Q.     Is this your first deposition?
6        A.     Yes.
7        Q.     Okay.  Have you ever been an expert
8  in any other case before?
9        A.     Yes.
10       Q.     What type of case?
11       A.     A malpractice case.
12       Q.     Were you plaintiff or defense expert?
13       A.     Defense.
14       Q.     One case?
15       A.     Two.
16       Q.     Those were in New York?
17       A.     Uh-huh.
18       Q.     Where you don't get deposed?
19       A.     Right.
20       Q.     You actually didn't write a report?
21       A.     We don't have to write reports.
22       Q.     You make disclosures and show up and
23 they hand in the C.V., and everyone tries to figure
24 out who you are real quick?
25       A.     Right.

Page 61

1        Q.     Did you testify in court?
2        A.     Yes.
3        Q.     Twice?
4        A.     Yes.
5        Q.     How did you do?
6        A.     We won.
7        Q.     So you understand -- rephrase.
8              So you understand what standard of
9  care means, right?
10       A.     Yes, I do.
11       Q.     The mid-urethral sling is an
12 acceptable treatment within the standard of care for
13 the treatment of stress urinary incontinence,
14 correct?
15       A.     Yes, it is.
16       Q.     There are other acceptable treatments
17 for stress incontinence that are within the standard
18 of care as well?
19       A.     Of course.
20       Q.     Autologous fascial slings is one,
21 correct?
22       A.     Absolutely.
23       Q.     Bulking agents is one, correct?
24       A.     Yes.
25       Q.     A Burch procedure is one, correct?

Nicole Fleischmann, M.D.

Page 62

1    A.    Yes.
2    Q.    Behavior modification is one?
3    A.    Yes.
4    Q.    For some women, that can be very
5 helpful, right?
6    A.    It can.
7    Q.    There is nobody and certain --
8 rephrase.
9          You certainly would not be giving the
10 opinion that the only treatment acceptable within
11 the standard of care for stress incontinence is the
12 mid-urethral sling; that's not your opinion, is it?
13   A.    It's not.  I told you I do other
14 slings, and I do other -- other procedures for
15 stress incontinence.
16   Q.    Autologous fascial sling would have
17 been an acceptable treatment for Mrs. Corbet,
18 correct?
19   A.    Possibly.  I don't know if Dr.
20 Harrell does autologous fascial slings.
21   Q.    Was Mrs. Corbet limited to only Dr.
22 Harrell, or could she have gone to somebody else to
23 have her treatment?
24   A.    That would have been her prerogative.
25   Q.    So if Dr. Harrell had -- rephrase.

Page 63

1          If Dr. Harrell had told Mrs. Corbet
2 information and she had any concerns about the TVTTM
3 Retropubic, based on what she heard, she could have
4 asked him about other options, and if he said I
5 don't do those, she could have gone and seen a
6 different doctor and gone a different way, right?
7    A.    I suppose she could have.
8    Q.    That happens in medicine, right?
9    A.    It does.
10   Q.    Burch would have been an acceptable
11 treatment for the stress urinary incontinence of
12 Mrs. Corbet, correct?
13   A.    It would have been acceptable; much
14 more invasive, but it would have been acceptable.
15        MR. SLATER:  Move to strike after
16 "much more invasive."
17 BY MR. SLATER:
18   Q.    Would robotic Burch that you perform
19 have been an acceptable treatment for Mrs. Corbet's
20 stress incontinence?
21   A.    I would never have done a robotic
22 Burch on Mrs. Corbet unless she was getting a
23 sacrocolpopexy at the same time.
24   Q.    That's your practice, correct?
25   A.    That's the practice.  And that's also

Page 64

1 in the guidelines, the ACOG guidelines.
2    Q.    So an open Burch would have been
3 acceptable, not a robotic Burch?
4         MS. KABBASH:  Objection.
5 BY MR. SLATER:
6    Q.    Let me rephrase.
7         An open Burch procedure would have
8 been an acceptable treatment for Mrs. Corbet's
9 stress incontinence, correct?
10   A.    Yes.  Much more invasive, but
11 acceptable.
12        MR. SLATER:  Move to strike after
13 "yes."
14 BY MR. SLATER:
15   Q.    In the medical community today, there
16 are doctors performing open Burch procedures,
17 correct?
18   A.    I'm sure, yes.  Not many, though.  I
19 don't know any, actually.
20        MR. SLATER:  I move to strike from
21 "not many" forward.
22 BY MR. SLATER:
23   Q.    Have you done a study, a scientific
24 study or analysis, to determine how many physicians
25 are performing open Burch procedures currently?

Page 65

1    A.    No.  But I just don't -- I mean,
2 speaking to my colleagues, I can't tell you the last
3 time I heard somebody say they did an open Burch on
4 somebody.  It's just not really done so much
5 anymore.
6         MR. SLATER:  Move to strike from
7 "but" forward.
8 BY MR. SLATER:
9    Q.    Before Mrs. Corbet's surgery, was she
10 taking any medication for her urge incontinence that
11 you have opined she had?
12   A.    No, she wasn't.  Not that anyone
13 prescribed for her that I saw.
14   Q.    You saw no reference in any record
15 that Mrs. Corbet had been recommended medication to
16 treat urge incontinence before her 2011 surgery,
17 correct?
18   A.    No, I didn't see that in the record.
19   Q.    After the procedure that Dr. Harrell
20 performed, ultimately, medications were prescribed
21 and Mrs. Corbet was taking medication to try to
22 treat her urge incontinence, correct?
23   A.    Yes.  But that doesn't mean that she
24 couldn't have been prescribed medications before her
25 surgery.  That was just not what the doctor chose to

Golkow Technologies, Inc. - 1.877.370.DEPS

Nicole Fleischmann, M.D.

Page 66

1    do.  She had urgency before her surgery.
2              MR. SLATER:  Move to strike from
3    "but" forward.
4    BY MR. SLATER:
5         Q.     After the TVTTM Retropubic procedure,
6    Mrs. Corbet began to take medication for urge
7    incontinence, correct?
8         A.     Yes.
9         Q.     Despite that, her urge incontinence
10   persisted and actually worsened, correct?
11        A.     No, that's not true.  She did get --
12   she did get better with medications.
13        Q.     Let me ask it this way:  Mrs. Corbet
14   seemed to have some improvement from the medication
15   in the short-term, correct?
16        A.     Yes, she did have some improvement.
17        Q.     Over the long term, that was not
18   sustained, right?
19        A.     But that's often the way it is with
20   urgency.
21        Q.     Despite being on medication, Mrs.
22   Corbet continued to have urge incontinence, it just
23   seemed to be somewhat improved for a period of time,
24   correct?
25        A.     Yes.

Page 67

1         Q.     After Mrs. Corbet's surgery, her
2    incision healed well, correct?  Let me -- let me be
3    specific.
4              After the procedure performed by Dr.
5    Harrell, he noted in the records, over time, that
6    her incision healed well, correct?
7         A.     Yes.
8         Q.     She seemed to heal well in general,
9    correct?
10        A.     I'm trying to figure out --
11             MS. KABBASH:  Objection.
12             THE WITNESS:  -- how to answer that.
13   BY MR. SLATER:
14        Q.     I'm talking about the incisions.
15             The incisions appeared to heal well,
16   correct?
17        A.     Yes.  There's one part in the record
18   where he talks about a little area that's
19   granulating.  But other than that, he doesn't make
20   any comment about the incisions not healing well.
21        Q.     Let me ask you this:  The granulation
22   tissue that Dr. Harrell noted, he never provided a
23   specific location for that, did he?
24        A.     No, he did not.
25        Q.     So you're not drawing an assumption

Page 68

1    as to where it was?  You don't have information to
2    say exactly where it was?
3         A.     But you didn't ask me that.  You just
4    asked said, are the incisions healing well.  So I'm
5    saying there was a granulating area.
6         Q.     I understand.  I'm asking about the
7    granulation tissue, because I know there was a
8    reference to it.
9         A.     Right.
10        Q.     We don't have information as to where
11   with it specifically was, correct?
12        A.     Exactly.  Right.
13        Q.     It could have been adjacent to the
14   incision?  It could have been away from the
15   incision, correct?
16        A.     Exactly.  Well, there were several
17   incisions, so I'm not sure which incision you're
18   talking about.
19        Q.     The TVT incision.
20        A.     Okay.
21        Q.     You said something in your report
22   about -- actually, I'll withdraw that.  I don't that
23   need that for today.
24             The granulation tissue that Dr.
25   Harrell observed, that was possibly due to the TVT

Page 69

1    mesh, possibly not; you don't know, correct?
2         A.     Right.
3         Q.     I saw a note in February of 2012, and
4    you referred to it in your report, where on February
5    19th, 2012, De. Herrell's exam showed a normal
6    vaginal mucosa.
7              Do you recall that?
8         A.     I don't recall it.  I can look at it
9    if I --
10        Q.     If you want to look at your report,
11   you can.
12             Why don't we do this, why don't we --
13   you know, I'm going to hold off on that.  We'll come
14   back to that.  Let me mark some more documents and
15   identify some documents, and we'll come back to
16   talking about the case.
17                      - - -
18             (Whereupon, Exhibit Fleischmann-2,
19   6/26/14 Letter and Invoices, was marked for
20   identification.)
21                      - - -
22   BY MR. SLATER:
23        Q.     Exhibit-2 in front of you is a June
24   26th, 2014, letter and, it looks like, some
25   invoices.

18 (Pages 66 to 69)

Nicole Fleischmann, M.D.

Page 70

1      What is -- what is this exhibit?
2      A.     These are my invoices regarding my
3  services.
4      Q.     What's the total you've been paid in
5  this case up until now?
6      A.     You know, I have that in my notes,
7  because I added it up.  So let me just --
8      MS. KABBASH:  You can reference them.
9      THE WITNESS:  Thank you.
10     MS. KABBASH:  You're speaking about
11  Corbet, Adam?
12     MR. SLATER:  Corbet.
13     THE WITNESS:  Corbet?  It's hard to
14  say exactly Corbet.
15  BY MR. SLATER:
16     Q.     Well, Corbet and the general reports,
17  since you're putting your general report into the
18  Corbet case?
19     A.     Right.
20     Q.     So it's the work you've done related
21  to the reports and opinions that you're going to
22  offer in the Corbet case?
23     A.     It's about $58,000.
24     Q.     Just so you know, I'm looking at
25  these invoices now.

Page 71

1      There's June 26th, you were paid
2  $25,000, right?
3      A.     Right.
4      Q.     And then there's --
5      MS. KABBASH:  There's some time for
6  Cantrell in here, Adam.
7      THE WITNESS:  Right.  That's why --
8  that's why it gets a little bit dicey, because some
9  of this is for a different case.
10  BY MR. SLATER:
11     Q.     If we wanted to, we could break out
12  the hours that mention Cantrell, and then we could
13  subtract those out, right?  As best we could, I
14  suppose?
15     A.     We could.  But I think we did the
16  calculation, tried to do it, anyway, before I got
17  here.
18     Q.     So your calculation is you billed
19  about $58,000 --
20     A.     Specifically for Mrs. Corbet and the
21  general report, not including Mrs. Cantrell.
22     Q.     How -- where does that take us up to?
23     A.     That takes us up to our -- prior to
24  the supplemental report and the dep prep, the
25  deposition prep.

Page 72

1      Q.     How much time did you spend on -- did
2  you spend on the supplemental report, prepping for
3  the deposition, up until today?
4      A.     It's been about 100 hours, give or
5  take.
6      Q.     And your rate is what?
7      A.     $500 an hour.
8      Q.     So another $25,000.  Is that good
9  math?
10     A.     No, that's not good math.
11     Q.     Let me ask you this: What is 100
12  hours times $500 an hour?  Is that --
13     A.     Just divide it by 2, and you'll get
14  the number.
15     Q.     I'm so bad at math.
16     A.     Really?
17     Q.     Is it $50,000?
18     A.     I think so.  100,000 divided by two.
19     Q.     100 hours times $500 is that $50,000?
20     A.     That would be more -- better math.
21     Q.     So you're estimating between your
22  prior invoices and what you've -- the time you spent
23  up before today, about $108,000?
24     A.     Probably about that, yes.  That's to
25  be billed, though.

Page 73

1      Q.     Got it.  You do plan to bill for
2  that, though, right?
3      A.     I plan to, yes.
4      Q.     I see you got to talk to Burt Snell?
5      A.     Only on the phone.  Once, maybe.  Did
6  I ever?
7      Q.     Tell him, hello.  Tell him hello the
8  next time you spoke to him.  I haven't seen Burt in
9  a while.
10     Q.     What is -- what are the rates that
11  you're going to charge for trial?
12     A.     For a full day it's $7,500.
13     Q.     And for a half day?
14     A.     It's $4,000.
15          - - -
16     (Whereupon, Exhibit Fleischmann-3,
17  Progress Notes, was marked for identification.)
18          - - -
19  BY MR. SLATER:
20     Q.     Exhibit-3 is a set of progress notes.
21     Are those your handwritten notes from
22  your exam of Mrs. Corbet?
23     A.     Yes.  I'm just looking at yours.  I
24  have to find mine, right?  Here they are.
25     Q.     When did you write those notes?

Nicole Fleischmann, M.D.

Page 74

1    A.    This was done in realtime.
2    Q.    While she was present in the room?
3    A.    While she was present on the date.
4  And I can give you the date, if you let me look at
5  my -- my record.  Because I don't see that this is
6  dated.  My supplemental -- I need -- it would be my
7  supplemental report.
8          That would be October 9th, 2015.
9    Q.    When you examined Mrs. Corbet, she
10 told you that she had pain with intercourse,
11 correct?
12   A.    Yes.  Yeah, she told me that before
13 the exam, but --
14   Q.    Let me rephrase.
15         When you met Mrs. Corbet, you took a
16 history and asked her questions, correct?
17   A.    Yes.
18   Q.    She told you she had pain with
19 intercourse, correct?
20   A.    Yes.
21   Q.    When you examined Mrs. Corbet, you
22 found that she had tenderness in the area where the
23 mesh erosion had been excised and removed, correct?
24   A.    It's hard for me to say exactly, but
25 it's in the area of the trajectory of a mid-urethral

Page 75

1  sling.
2    Q.    And I think you said that the scar
3  from -- on the vagina actually tracked away from the
4  incision in that -- into the left, where the mesh
5  excision had taken place, correct?
6    A.    I think so, yes.
7    Q.    So it's reasonably likely that that
8  extended scar correlates to the removal of mesh by
9  Dr. Smith, correct?
10   A.    Well, it correlates to the surgery
11 that had been done in that area, yes.
12   Q.    And that's the location -- one of the
13 locations -- rephrase.
14         And Mrs. Corbet reported tenderness
15 when you palpated that area?
16   A.    Yes.
17   Q.    That made medical sense that she
18 would complain of tenderness at that location?  It
19 wasn't something that you would say, why would
20 someone complain of tenderness there, right?
21      MS. KABBASH:  Objection.
22      THE WITNESS:  I don't understand that
23 question.
24 BY MR. SLATER:
25   Q.    When you palpated and felt tenderness

Page 76

1  at the location where the erosion had been and where
2  there was scarring now from that surgery to remove
3  the eroded mesh, in medicine, tenderness such as was
4  elicited can result from that type of a condition
5  and surgery, correct?
6    A.    Well, she had -- she had scarring at
7  that area where she had had surgery.  And that's
8  where she was feeling pain.
9    Q.    Surgery to remove the mesh, correct?
10   A.    I'm assuming.  I mean, I can't really
11 say what exactly happened at that spot.  I can just
12 tell you that she had scarring at that area and that
13 was the area that she was feeling tenderness.
14   Q.    In drawing your opinions, you're
15 assuming that scarring was from the removal of the
16 mesh, correct?
17   A.    I would assume, but I can't -- I
18 can't say for sure.
19   Q.    But that's your assumption?
20   A.    Yes.
21   Q.    You would agree with me that based on
22 your exam and that finding, that the dyspareunia
23 that Mrs. Corbet is complaining of is at least, in
24 part, being caused by the tenderness she feels at
25 the location where the mesh had been removed,

Page 77

1  correct?
2    A.    She's feeling pain at the site where
3  she had a surgical procedure, yes.
4    Q.    A surgical procedure to remove eroded
5  mesh, correct?
6    A.    She had multiple surgical procedures.
7  First, she had a procedure to place it.  She might
8  have even had surgery back in the early '80s to --
9  in that area.
10         It's really hard to know exactly what
11 happened in that area.  But I can just tell you that
12 in that area is where she had pain and there was
13 scar tissue.
14   Q.    You believe that the area where she
15 had scar tissue where she was complaining of pain,
16 which correlates to where the eroded mesh was
17 removed, that is contributing to her sensation of
18 dyspareunia, correct?
19   A.    In the area that she had surgery,
20 whether it was to place the sling, remove the sling,
21 or whatever had been done back in the early '80s,
22 that is where she had pain because she had scar
23 tissue, yes.
24   Q.    Whatever surgery she had in the early
25 '80s, Mrs. Corbet was not complaining of any

dyspareunia or discomfort with intercourse, whatsoever, when she went to Dr. Harrell, correct?
A. Right.
Q. So whatever had happened before Dr. Harrell operated, it was not causing her any pain or discomfort with sexual intercourse whatsoever, correct?
A. She didn't complain of that.
MS. KABBASH: Objection.
BY MR. SLATER:
Q. Do you have any reason to think she had such pain or discomfort?
A. No. But she also didn't have a lot of complaints of pain in the record following that either. So it's hard to know.
MR. SLATER: Move to strike --
THE WITNESS: The record doesn't reflect her dyspareunia after that either.
MR. SLATER: Move to strike from "but" forward.
BY MR. SLATER:
Q. You're not offering an opinion that Mrs. Corbet had either dyspareunia or discomfort with sexual intercourse before Dr. Harrell's surgery, are you?

A. No, because she doesn't complain about that in her deposition. But if we're talking about the medical record, she doesn't complain about pain in the medical record either.
MR. SLATER: Move to strike after "no."
BY MR. SLATER:
Q. Let's make one thing clear. After the surgery, she does complain of dyspareunia, and she even complains of it to Dr. Scott in 2014 and 2015, correct?
A. Yes.
Q. She complained of dyspareunia to you, correct?
A. Yes, she did.
Q. She complained of dyspareunia to Dr. Rosenzweig, right?
A. Yes. But not to Dr. Smith who was her treating physician.
MR. SLATER: Move to strike from "but" forward.
BY MR. SLATER:
Q. The fact that, according to your reading of the deposition and the records, Mrs. Corbet stopped complaining of dyspareunia to Dr.

Smith doesn't mean she wasn't having it, correct?
A. I can't speak about that. I just know that Dr. Smith was her treating physician and she never complained about it to her, who would have been the primary person she should have talked to about this.
Q. It doesn't mean she didn't have discomfort with sexual intercourse; there may be a reason she that didn't tell Dr. Smith, right?
MS. KABBASH: Objection.
THE WITNESS: I really can't comment on that.
BY MR. SLATER:
Q. Was Mrs. Corbet asked that by the defense lawyer that questioned her? Why didn't you tell Dr. Smith you were still having discomfort with sexual intercourse?
A. I don't recall.
Q. Did you do a full vaginal examination?
A. Yes.
Q. Did you find that -- rephrase.
I saw no references to her vaginal length or vaginal architecture being misshapen in any way; it's not as large as it should be.

You made no findings of a shortened vagina or --
A. No.
Q. -- or any other vagina -- let me ask it again, because I went rambling.
A. Okay.
Q. When you examined Mrs. Corbet, you made no findings of a shortened vagina, correct?
A. Right.
Q. You found -- made no findings of a narrow vagina, correct?
A. No. But she did have scarring in her vagina.
MR. SLATER: Move to strike.
BY MR. SLATER:
Q. When you examined Mrs. Corbet, you did not -- you did not find any narrowing of the vagina, correct?
A. No, not narrowing, but she had scarring.
Q. Why are you throwing in the scarring?
A. Because you could feel -- feel a band of scarring over her posterior vaginal wall, so that's why I'm throwing that in, because I felt it.
Q. The location of the scarring you felt

Nicole Fleischmann, M.D.

Page 82

1  on the posterior vaginal wall, is that further back
2  in the vagina from the scarring in the location
3  where the eroded mesh was removed?
4       A.    It's a completely different place
5  from her previous -- from her anterior surgery.
6       Q.    What I'm asking is, if one were to be
7  going from front to back, you would get to the scar
8  tissue from the -- where the erosion was first
9  before you get to the posterior scarring, correct?
10      A.    I don't understand the question at
11 all.
12            From front to back?  How are you --
13 we don't think of those terms.
14      Q.    From the vaginal opening going
15 internal?
16      A.    From the introitus to the cervix --
17      Q.    Yes.
18      A.    -- or the top of the vagina.  You're
19 asking --
20      Q.    Which one is closer to the introitus?
21      A.    They're just about equally close.
22      Q.    The posterior, it would be on the
23 bottom, the anterior --
24      A.    Exactly.
25      Q.    -- scarring would be on the top?

Page 83

1       A.    Exactly.
2       Q.    You found levator muscle spasm when
3  you examined Mrs. Corbet, correct?
4       A.    She was definitely tender over the
5  levators.  The good thing is that she could relax
6  and contract them, which people who have severe
7  levator spasm can't do.  So she was able to relax
8  her levators properly.
9       Q.    Well, let me ask it then.
10            You found tenderness bilaterally on
11 both levators?
12      A.    Yes, and in the midline as well.  Her
13 entire posterior vaginal wall was very tender, all
14 the way to the levators.
15      Q.    Did you find actual hardening or
16 spasm or just tenderness?
17      A.    Tenderness, but less spasm because
18 she was able to relax and contract her muscles
19 properly.  Most people with levator spasm can't do
20 that.
21      Q.    I didn't see any reference in your
22 report to finding any spasm or hardening of the --
23      A.    Right.
24      Q.    -- levators.
25            There was none?

Page 84

1       A.    No, not that I found.
2       Q.    And that was before she actually was
3  asked to try relax the muscles?  That was -- after
4  you exam, then you say can you relax them, and she
5  was able to do that?
6       A.    Can I look at my --
7       Q.    Sure.
8       A.    -- report, because I don't recall
9  exactly what I wrote there.
10            So there was scarring noted on the
11 anterior and posterior wall of the vagina --
12      Q.    Doctor, just so you know, you can
13 read quietly to yourself.  I just want to know the
14 answer to my question about whether or not --
15      A.    So I wrote, She had specific
16 tenderness of the levator muscles on both sides
17 equally and she was able to relax and contract these
18 muscles upon command.
19      Q.    So you found spasm or hardness,
20 correct?
21      A.    Right.
22      Q.    You found only tenderness?
23      A.    Only tenderness.
24      Q.    And then after you found that, she
25 was able to relax the muscles at your request?

Page 85

1       A.    Exactly.
2            MS. KABBASH:  Adam, can we plan a
3  break around 11:00?  It's 15 minutes from now.
4            MR. SLATER:  Whenever you want.
5                  - - -
6            (Whereupon, a discussion off the
7  record occurred.)
8                  - - -
9            MS. KABBASH:  Why don't we do it now,
10 if that's all right?
11            MR. SLATER:  Sounds like a good time.
12            VIDEO TECHNICIAN:  The time is 10:46
13 a.m.  We are going off the record.
14                  - - -
15            (Whereupon, a brief recess was
16 taken.)
17                  - - -
18            (Whereupon, Exhibit Fleischmann-4,
19 Expert Report on TVTTM Retropubic, N. Fleischmann,
20 M.D., was marked for identification.)
21            VIDEO TECHNICIAN:  This marks the
22 beginning of Videotape Number 2.  The time is 10:55
23 a.m.  Back on the record.
24            BY MR. SLATER:
25

22 (Pages 82 to 85)

Nicole Fleischmann, M.D.

Page 86

1    Q.    Doctor, I've marked a few exhibits I
2  just want to, for the record, establish what they
3  are.
4         What is Exhibit-4?
5    A.    Exhibit-4 is my expert general report
6  on TVTTM Retropubic.
7              - - -
8         (Whereupon, Exhibit Fleischmann-5,
9  Expert Report on K. Corbet, N. Fleischmann, M.D.,
10  was marked for identification.)
11             - - -
12  BY MR. SLATER:
13    Q.    What is Exhibit-5?
14    A.    That is my expert report on Kathryn
15  Corbet, the case of Kathryn Corbet.
16             - - -
17        (Whereupon, Exhibit Fleischmann-6,
18  Supplemental Expert Report on K. Corbet, N.
19  Fleischmann, M.D., was marked for identification.)
20             - - -
21  BY MR. SLATER:
22    Q.    What is Exhibit-6?
23    A.    That is the supplemental report that
24  I wrote on the case of Kathryn Corbet.
25             - - -

Page 87

1         (Whereupon, Exhibit Fleischmann-7,
2  Materials Reliance List, was marked for
3  identification.)
4              - - -
5  BY MR. SLATER:
6    Q.    What is Exhibit-7?
7    A.    The list of materials I've relied
8  upon for my opinions.
9    Q.    Now, you have lists of things you
10  have relied in your -- attached to Exhibit-4, to
11  your general report, right?
12    A.    Yes.
13    Q.    So what is -- Exhibit-7, what is
14  that, more materials or is it the same thing?  It
15  looks like it's --
16        MS. KABBASH:  It's an update, Adam.
17        MR. SLATER:  It's an updated list of
18  things relied on?
19        MS. KABBASH:  Yes.
20  BY MR. SLATER:
21    Q.    Let me understand something.  When
22  you wrote your general report, Exhibit-4, I think
23  you dated it, actually.
24        Your general report in this case is
25  July 8, 2014, correct?

Page 88

1    A.    Where do you see the date?
2    Q.    Page 30.
3        MS. KABBASH:  It's on Page 30.
4        THE WITNESS:  Oh, sorry.
5        The date I signed it, probably, yes.
6  BY MR. SLATER:
7    Q.    This report contains each of the
8  opinions that you had formed with regard to the
9  TVTTM Retropubic, and you put those in the report
10  and signed the report, correct?
11    A.    Yes.
12    Q.    In the course of the report, you talk
13  about certain facts, certain articles, other things
14  that you were considering.
15        Are those the things that you felt
16  were most important to you, the factual things that
17  you talked about in the report, that were most
18  important to you in forming your opinions?
19        MS. KABBASH:  Objection.
20        MR. SLATER:  I'll tell you what I'm
21  getting at.
22  BY MR. SLATER:
23    Q.    In your report, you -- new question.
24        In your report, you recite various
25  facts, things that you know from your background and

Page 89

1  you talk about a lot of specific facts and
2  literature and things like that.
3        Were those the facts that you felt
4  were most important to you in forming your opinions
5  that you set forth in the report?
6    A.    Well, I wrote in my report the facts
7  that I thought supported my opinions, yes.
8    Q.    Exhibit-5, which is your
9  case-specific report --
10        MS. KABBASH:  Are you trying kill
11  something?
12        MR. SLATER:  I just killed a bug.
13  You have an extermination issue here.
14  BY MR. SLATER:
15    Q.    Exhibit-5, which is your
16  case-specific report regarding Mrs. Corbet is dated
17  July 13, 2014, correct?  On Page 39, the last page?
18    A.    Thank you.
19        Yes.
20    Q.    That report contains each of the
21  opinions you formed with regard to Mrs. Corbet,
22  correct?
23    A.    Yes.
24    Q.    In the course of that report, you set
25  forth various facts.

23 (Pages 86 to 89)

Nicole Fleischmann, M.D.

Page 90

1      Were those the facts that were most
2  important to you in forming those opinions?
3      A.    Yes.
4      Q.    Exhibit-6 is what you said is your
5  supplemental report regarding Mrs. Corbet.
6          Why did you write that report?
7      A.    Because that was after my medical
8  exam -- medical examination was performed.
9      Q.    You didn't only talk about your
10 medical exam, though; you talked about other things
11 in the supplemental report as well, correct?
12     A.    Right.  Because there were newer
13 things that had come to my attention; depositions
14 that I had read, specifically plaintiff's
15 deposition.  I felt the need to speak my mind about
16 those.
17     Q.    So the supplemental report contains
18 any additional opinions that you formed when you saw
19 the materials listed in that report, as well as your
20 exam?
21     A.    Exactly.
22     Q.    And --
23     A.    And there were also some newer
24 studies that had come out that I wanted to review.
25     Q.    Newer studies that weren't available

Page 91

1  when you wrote your initial report in July of 2014?
2      A.    I don't -- I'm trying to think if the
3  Ford had come out by then.
4          Yeah, I was constantly reviewing
5  literature.  And then when things came out, I would
6  put them in the newer supplement of the report.
7      Q.    Your supplemental report regarding
8  Mrs. Corbet is dated November 16, 2015, correct?
9  That's on Page 24.
10     A.    Yes.
11     Q.    With regard to Mrs. Corbet, if I were
12 to look at your initial report of July 13, 2014, and
13 your supplemental report, dated November 16, 2015,
14 that would be the sum of your opinions regarding
15 Mrs. Corbet?
16     A.    Yes.
17     Q.    And the facts described in those two
18 reports are the key facts on which you're basing
19 your opinions, correct?
20     A.    Yes.
21     Q.    Exhibit-7 is a list of materials that
22 you reviewed, that's what it says.
23          This was updated from the list that
24 was attached to your initial general report --
25     A.    Yes.

Page 92

1      Q.    -- which was Exhibit-4?
2      A.    Uh-huh, yes.
3      Q.    You did not write a supplemental
4  general report, correct?
5      A.    No.  It's all included in here.
6  Everything I reviewed.  No, I never wrote a
7  supplemental general report.
8          But the -- I believe that these are
9  all compiled of the general and supplemental
10 reliance list.
11     Q.    Okay.  Let me understand.
12          The Exhibit-7, which is your updated
13 reliance list, when was this finalized, do you know?
14     A.    Just recently.  In the last few days.
15     Q.    Because I think we just got it in the
16 last week, I think.
17          MS. KABBASH:  Yes.
18          MR. SLATER:  So it was served some
19 time in the last week?
20          MS. KABBASH:  Right.
21 BY MR. SLATER:
22     Q.    The only general report you've
23 written is the general report that was served July
24 8, 2014, correct?
25     A.    Right.

Page 93

1      Q.    Looking at Exhibit-7, you have a list
2  of treatment records for Mrs. Corbet.
3          Those are the medical records you've
4  reviewed and relied on, correct?
5      A.    Yes.
6      Q.    There's a list of -- if you go to the
7  third page of your supplemental list of materials, a
8  list of company documents that goes from about the
9  third to the sixth page; it's 56 items.
10     A.    Yes.
11     Q.    Did you read all those materials?
12     A.    I read as much as I could.  I perused
13 some and I read others more thoroughly.  But if it's
14 on the list, I had had an opportunity to look at it
15 at some point.
16     Q.    There's a list of deposition
17 transcripts and Exhibits 1 through 12.
18          Have you read each of those
19 transcripts and the exhibits to those depositions?
20     A.    Again, some I've perused and some
21 I've read more thoroughly.  But, yes, I'm familiar
22 at some -- at some level with all of these.
23     Q.    Well, you're not saying you read all
24 these transcripts cover to cover are you?
25     A.    It's not possible, really.

Nicole Fleischmann, M.D.

1    Q.    You're not saying you read all the
2  exhibits, correct?
3    A.    I mean, I can tell you that I've done
4  my best to read almost everything that's in this
5  reliance list.
6    Q.    No, I understand that.
7          Here is what I'm getting at --
8    A.    Yes.
9    Q.    -- with regard to the deposition
10 transcripts and exhibits, you haven't read them all
11 cover to cover, correct?
12   A.    With few exceptions, I pretty much
13 have, yeah. I can't say that I committed them to
14 memory. But I've definitely looked at them.
15   Q.    The publicly sourced documents list
16 is 37 items.
17         And those are professional society
18 statements and other FDA statements, things like
19 that, correct?
20   A.    Yes.
21   Q.    Number 36 on that list is a Premarin®
22 advertisement, right?
23   A.    Yes.
24   Q.    Premarin® is an -- is an estrogen
25 cream?

1    A.    Yes.
2    Q.    There's never been a study that's
3  actually established that the use of estrogen on the
4  vaginal wall will actually make a difference in
5  healing an erosion, correct? It's never been
6  established, right?
7    A.    It is a first-line therapy for a
8  vaginal mesh erosion.
9    Q.    It's never been established that it
10 actually makes a difference, right?
11   A.    I'm not sure of that.
12   Q.    There's no study you can point to
13 that's actually established that, correct?
14   A.    No, I can't point to a study.
15   Q.    You know, just talking to the company
16 documents, you were given these company documents,
17 you looked at them.
18         But I think you told me before your
19 opinions are based on your experience, your training
20 and the literature, correct?
21   A.    For the most part, yes.
22   Q.    Before you told me that was the basis
23 for it.
24   A.    Yes.
25   Q.    Is that changing now?

1    A.    No, no. I'm agreeing with you.
2    Q.    Okay. The company gave you some
3  internal documents, but that -- they didn't impact
4  your opinions, right?
5    A.    No. They don't impact my opinions,
6  but I've looked at them.
7    Q.    If there was deposition testimony
8  given by Ethicon witnesses that could potentially
9  undercut the basis for your opinions, would you have
10 wanted to see those?
11         MS. KABBASH: Objection.
12         THE WITNESS: I don't know how
13 deposition testimony could undercut the basis of my
14 opinions.
15 BY MR. SLATER:
16   Q.    Okay. There's a list of expert
17 reports that you reviewed.
18         Did you review Dr. Klinge's expert
19 report?
20   A.    If it's on here, I reviewed it.
21   Q.    I want to know, did you read it? Do
22 you remember reading Dr. Klinge's expert report?
23   A.    What page are you on?
24   Q.    I'm on the page that says, Expert
25 reports.

1    A.    Oh, we're after this.
2          MS. KABBASH: Note to self, put page
3  numbers on list of materials reviewed.
4          THE WITNESS: I'm sure I reviewed it.
5  I can't tell you I've committed it to memory.
6  BY MR. SLATER:
7    Q.    Do you know who Dr. Klinge is?
8    A.    Yes, a histopathologist.
9    Q.    Do you remember anything about what
10 he said in his report?
11   A.    You'd have to give me a specific
12 question about it, and then maybe it would come to
13 memory.
14   Q.    Do you remember anything he said in
15 his report?
16   A.    I can remember certain things, but I
17 can't give you anything verbatim.
18   Q.    What can you remember that he said in
19 his report?
20   A.    Nothing offhand that I can remember
21 directly.
22   Q.    There's a list of medical literature,
23 and it goes to 160 entries.
24         Is that the medical literature that
25 you are -- that you have reviewed in connection with

Nicole Fleischmann, M.D.

Page 98

1  your opinions?
2      A.    Yes.
3      Q.    Do you consider yourself to be an
4  expert with regard to the material science of the
5  mesh material in the TVTTM Retropubic?
6      A.    I'm not a materials expert, but I'm
7  very familiar with the mesh, as I use it on a daily
8  basis.
9      Q.    Have you ever studied, from a
10  material science perspective, the mesh?
11     A.    No, but it's my medium that I work
12  with.
13           MR. SLATER:  Move to strike from
14  "but" forward on both of those answers, the last
15  two.
16  BY MR. SLATER:
17     Q.    Have you ever participated in a study
18  of the mesh material from a histopathologic
19  standpoint, under a microscope?
20     A.    No.
21     Q.    With regard to the histopathology of
22  the mesh material, do you defer to those people who
23  are pathologists who study that?
24     A.    Yes.  But I'm not as interested in
25  the histopathology of what's going on with the mesh.

Page 99

1  I'm more interested in the clinical outcomes of the
2  mesh, because I am a clinician.
3           MR. SLATER:  Move to strike from
4  "but" forward.
5  BY MR. SLATER:
6      Q.    Do you know -- rephrase.
7           The Nilsson studies are set forth in
8  your list here.
9           Do you know where those patients came
10  from?
11     A.    The original Nilsson patients?
12     Q.    The Nilsson patients --
13     A.    Scandinavia.
14     Q.    The Nilsson patients that he studied
15  and kept having these serial reports on?
16     A.    Right.  They were Scandinavian.
17     Q.    Were those patients that are studied
18  in the Nilsson study, were they studied in any other
19  studies?
20     A.    It was the same patients that were
21  being studied in multiple studies going forward.  We
22  have 5-year data, 7-year data, 11-year data, 17-year
23  data on those same group of patients.
24     Q.    This is my question:  The patients
25  who are -- who are discussed in Nilsson's serial

Page 100

1  articles at different time points up through 17
2  years, do you know if those same patients are also
3  described and studied in another study that's not
4  the Nilsson study?
5      A.    I do believe that they were.  The
6  Olson study, maybe.  But I'm not entirely sure of
7  that.
8      Q.    Do you know the selection process for
9  the patients in the Nilsson study?  How they were
10  selected to be studied?
11     A.    They were the patients who were --
12  underwent the original TVT.
13     Q.    Do you know how they were selected to
14  be the ones that would actually be included in the
15  study going forward?
16     A.    I'd have to look at the study.
17     Q.    Do you know if they were randomly
18  selected?
19     A.    I'm not sure, but I can look at the
20  study and let you know.
21     Q.    I am going to tell you -- let me ask
22  you this:  Is there any indication you're familiar
23  with that the patients in the Nilsson study were
24  randomly selected or that they were even consecutive
25  patients that came for treatment?  Do you know if

Page 101

1  any of those criteria were met?
2           MS. KABBASH:  Adam, you're asking her
3  questions -- I mean, I mean if you want to ask her
4  from her rote memory --
5           THE WITNESS:  Yeah, can I look --
6           MR. SLATER:  That's all I'm asking.
7  I know the answer, so I don't really care.
8           THE WITNESS:  But I would prefer to
9  look at the study so I can give you that answer.
10          MR. SLATER:  Do you have it sitting
11  right there?
12  BY MR. SLATER:
13     Q.    I mean, I really don't want to take a
14  lot of time, because I -- let me ask you this --
15          MS. KABBASH:  It's up to you, but
16  it's an unfair question to ask --
17  BY MR. SLATER:
18     Q.    Let me ask you this --
19          MS. KABBASH:  -- without the study
20  sitting in front of her.
21  BY MR. SLATER:
22     Q.    Let me ask you this --
23     A.    Yes.
24     Q.    -- if, in the Nilsson study, the
25  patients were carefully selected and were not

Nicole Fleischmann, M.D.

Page 102

1  randomly consecutively selected, that can introduce
2  a bias into the study, correct?
3      A.    I am not sure about that.  Because
4  they were the first TVT patients, they were 100
5  patients, no matter what the selectivity of that
6  was.  I would be comfortable with that.
7      Q.    Do you know whether or not Nilsson
8  actually decided which patients to include in his
9  study?
10     A.    You mean whether they had prolapse
11 or -- I mean, they were excluding patients who had
12 certain things, confounding features, but they were
13 genuine stress incontinence patients.
14     Q.    Do you know if there were additional
15 patients available that Nilsson could have included
16 in his study but chose these, based on some criteria
17 known to him?
18     A.    No.
19     Q.    I saw earlier on in this list that
20 you saw the deposition of Dr. Naber?
21     A.    Yes.
22     Q.    Do you know who that is?
23     A.    Yes.
24     Q.    Who is he?
25     A.    He is -- I don't know what his exact

Page 103

1  role in AUGS is, but he -- he's been very active in
2  pelvic mesh.
3      Q.    And what about his deposition was
4  significant to you?
5      A.    I mean, nothing -- nothing stands out
6  as significant.  I remember a lot of questions about
7  biases and financial disclosures and that kind of
8  thing.
9      Q.    Does that matter to you, those types
10 of things?
11     A.    No, not really.
12     Q.    Does it matter to you who wrote the
13 AUGS statements about mid-urethral slings?  Does it
14 matter whether the people who authored those were
15 being paid by industry as consultants?
16     A.    No, it doesn't matter to me.
17     Q.    Does it matter to you whether Ethicon
18 is a member of AUGS?
19     A.    When we have duties as physicians to
20 put forth ideas that are based on science and Level
21 1 evidence, it doesn't matter to me whether Ethicon
22 is present at a meeting or not.
23     Q.    Did you read the AUGS statement cover
24 to cover?
25     A.    Yes.

Page 104

1      Q.    Did you read all the references to
2  see if they actually are accurately referenced?
3      A.    Yes.
4      Q.    Did you read, in the statement
5  itself, when it would reference something, to see
6  whether or not what it said in the statement
7  actually was accurately referencing what the
8  reference stands for?
9              MS. KABBASH:  Objection.
10 BY MR. SLATER:
11     Q.    Did you actually match that up?
12             MS. KABBASH:  Objection.
13             THE WITNESS:  I don't really
14 understand the question, counselor.
15 BY MR. SLATER:
16     Q.    You look at the statements by AUGS,
17 for example?
18     A.    Yes.
19     Q.    And they say X, Y, Z about the
20 mid-urethral sling, and then they cite some article,
21 for example.
22             Did you actually go to the articles
23 and see what they actually say to see if what they
24 were being referenced for, if there was a match?
25     A.    In many cases, yes.

Page 105

1      Q.    Not all?
2      A.    In most cases.
3      Q.    Did you find anything in the AUGS
4  statement where they cited a reference and then if
5  you looked at the reference, you said, well, it
6  doesn't actually stand for that proposition?
7      A.    No, I didn't find that.
8      Q.    Did you see any references in the
9  AUGS statement where you saw the reference and said,
10 you know, this isn't the whole story, the reference
11 also says some other things that may cut the other
12 way and they didn't mention that?
13     A.    I don't really know what you're
14 referring to.  I can't answer these kind of vague
15 questions that you're asking me.
16     Q.    Well, I'm asking about your process
17 as an expert.  Because you want to be really
18 thorough, right, as an expert?
19     A.    Yes.
20     Q.    In fact, you should be held to the
21 standard of being incredibly thorough before you're
22 going to walk into courtroom, in front of a jury,
23 and you should be extremely thorough, right?
24             MS. KABBASH:  Objection.
25             THE WITNESS:  I agree with that.

27 (Pages 102 to 105)

Nicole Fleischmann, M.D.

Page 106

1  BY MR. SLATER:
2      Q.     And if you give an opinion, for
3  example, that a statement by a professional society
4  is important to you, you want to be able to tell the
5  jury, I read that statement, I read all the
6  references, and this is an accurate and a fair
7  portrayal of those references that they're relying
8  on?  You need to be able to say that, right?
9      MS. KABBASH:  Objection.
10     THE WITNESS:  Yes.
11 BY MR. SLATER:
12     Q.     The same would hold true with regard
13 to the AUA statements, right?
14     A.     Yes.
15     MS. KABBASH:  Same objection.
16 BY MR. SLATER:
17     Q.     Now, in this winding road that we're
18 going to continue down, a long time ago, I started
19 to ask you about February 19, 2012, the date that
20 Mrs. Corbet was seen by Dr. Harrell, one of the
21 dates.
22         And I asked you a question, and you
23 wanted to refer to your report to be able to answer
24 the question.
25         So if you want to turn to that date

Page 107

1  in your case-specific report, we can come back to
2  where we were.
3         You have a chronological --
4      A.     Right.  Right.
5      Q.     -- you have a chronological --
6      A.     It's coming back.
7      Q.     -- statement of all her --
8      A.     I do.
9      Q.     -- office visits, et cetera?
10     A.     I do.  So let me go to that.
11         February 12th, 2012, you said?
12     Q.     February 19th, 2012.
13     A.     Okay.
14     Q.     On February 19, 2012, according to
15 your report, Dr. Harrell did an exam and found
16 normal vaginal mucosa, correct?
17     MS. KABBASH:  Do you mean the 29th?
18     THE WITNESS:  What page are you on in
19 my report?
20     MS. KABBASH:  Do you mean the 29th?
21 BY MR. SLATER:
22     Q.     I'm not in your report.  I'm in my
23 notes about your report.  Did I write the wrong
24 date?
25     A.     I don't have that specific date.

Page 108

1      MS. KABBASH:  We have a February
2  29th, 2012.
3      MR. SLATER:  Maybe I mis -- what page
4  is it on?
5      MS. KABBASH:  Page 12 at the top of
6  the page.
7      MR. SLATER:  Maybe I wrote the wrong
8  date in my notes.  Trying to mess with you here.
9          Yes, there you go.  February 29th.
10 See, look at that.  Sorry about that.
11     THE WITNESS:  Now I'm on board.
12 BY MR. SLATER:
13     Q.     On February 29, 2012, Dr. Harrell
14 examined Mrs. Corbet and found normal vaginal
15 mucosa, correct?
16     A.     Uh-huh.
17     Q.     That means there's no vaginal
18 atrophy, correct?
19     A.     No, that doesn't mean that.  Just
20 normal vaginal mucosa means that it could be --
21 atrophy could be normal for someone Mrs. Corbet's
22 age.
23     Q.     Did Dr. Harrell note any vaginal
24 atrophy on February 29th, 2012?
25     A.     Not that he writes in the report.

Page 109

1      Q.     Dr. Harrell wrote that Mrs. Corbet
2  had normal vaginal mucosa?
3      A.     Yes.  But those are not mutually
4  exclusive.
5      MR. SLATER:  Move to strike from
6  "but" forward.
7  BY MR. SLATER:
8      Q.     When a patient has atrophy, do you
9  note that they have normal vaginal mucosa in your
10 records?
11     A.     Sometimes, yeah, I could.
12     Q.     When you mean that it's normal for
13 that patient?
14     A.     It's normal for that patient, it's
15 normal for that age.  Atrophy is normal in
16 someone -- in someone Mrs. Corbet's age.
17     Q.     So you think that you don't -- you
18 can say normal for anyone her age and that means
19 atrophy, even though all women her age don't have
20 atrophy?
21     A.     Most women Mrs. Corbet age have some
22 degree of atrophy, so I would consider that to be
23 normal.
24     Q.     Do they all?
25     A.     Almost all.  Once you lose your

Nicole Fleischmann, M.D.

Page 110

1 estrogen, you get atrophy.  And she lost her
2 estrogen.
3        Q.      On May 18, 2012, Mrs. Corbet
4 complained of bladder spasms, correct?
5        A.      Yes.
6        Q.      That's the first indication I saw of
7 bladder spasms.
8                Is that consistent with your reading
9 of the records?
10        A.      That's not the first indication of
11 bladder spasms.  It's just the first indication of
12 the word "bladder spasms."
13        Q.      That's what I'm asking you.
14        A.      Of the word "bladder spasms," yes.
15 But there are -- there's evidence in the record of
16 bladder spasms earlier than that, even before her
17 surgery.
18        Q.      When you say there's evidence of
19 bladder spasms earlier in the record, you are saying
20 that there are clinical symptoms being reported that
21 are consistent with bladder spasms?
22        A.      Yes.  And a questionnaire where
23 she -- where she documents that she's having bladder
24 spasms and having difficulty making it to the
25 bathroom.

Page 111

1        Q.      Did Mrs. Corbet ever report bladder
2 spasms before the TVT surgery?
3        A.      She didn't use the word "bladder
4 spasms."
5        Q.      That was my question.
6        A.      She did not use the word "bladder
7 spasms."
8        Q.      On May 18, 2012, a medication called
9 Gelnique, G-E-L-N-I-Q-U-E, was prescribed.
10                What is that for?
11        A.      That's for overactive bladder.
12        Q.      After Mrs. Corbet started taking the
13 Gelnique, she started to complain of dry mouth and
14 vaginal dryness, correct?
15        A.      Yes.
16        Q.      Those are side effects of that
17 medication?
18        A.      Dry mouth, yes.  Vaginal dryness is
19 really more of a sign of atrophy.  You don't see a
20 lot of vaginal dryness from overactive bladder
21 medicines.
22        Q.      You do or you don't?
23        A.      No, I don't.
24        Q.      Can it happen?
25        A.      Well, I've never seen it before, and

Page 112

1 I don't think it's ever been reported.
2        Q.      Was Mrs. Corbet complaining of
3 vaginal dryness before she started taking the
4 Gelnique?
5        A.      I'm not sure.  It's not documented in
6 the record, but she might have been.
7        Q.      Doctor, I'm only asking you what
8 you've seen.  So --
9        A.      Right.  It's not documented in the
10 record that she had -- that she complained of
11 vaginal dryness.
12        Q.      On February 19th, 2013, Dr. Smith
13 performed surgery to remove eroded mesh, correct?
14        A.      Yes.
15        Q.      The pathology has certain findings --
16        A.      Can I just -- can I just comment?  It
17 wasn't eroded.  It was exposed.  We have to be
18 careful with our terminology.
19        Q.      It eroded through the vaginal wall,
20 right?
21        A.      But we don't use the word
22 "erosion," --
23        Q.      Who is "we"?
24        A.      -- we use the word "exposure."
25        Q.      I use the word erosion.  So we use

Page 113

1 all sorts of terms.
2        A.      It's just not a technically -- the
3 it's not the medical term --
4        Q.      Really?
5        A.      -- for exposure.
6        Q.      Really?  Aren't there a lot of
7 doctors that talk about mesh erosion through the
8 vaginal wall?
9        A.      But you'd have -- you'd have to
10 really be careful with that, because erosion really
11 refers to -- and even that term is out of favor, but
12 erosion refers to going through the lumen of an
13 organ, which is not what happened here.
14        Q.      Is that because the people who are
15 working with the mesh manufacturers want to make it
16 sound like it's not a big deal?
17                MS. KABBASH:  Objection.  Adam, come
18 on.
19 BY MR. SLATER:
20        Q.      Isn't that -- isn't that what's going
21 on?  Isn't this more of a --
22        A.      It's really not.
23        Q.      -- mind meld by these highly-paid
24 marketers that are influencing the doctors they pay
25 tens of hundreds of thousands of dollars every year?

Nicole Fleischmann, M.D.

Page 114

1    MS. KABBASH:  Objection.
2    THE WITNESS:  Not at all.  That's ICS
3  terminology.
4  BY MR. SLATER:
5    Q.    Who on ICS is being paid by industry,
6  do you know?
7    MS. KABBASH:  Objection.
8    THE WITNESS:  There are plenty of
9  people who are making decisions who are not paid by
10  industry, who are doing trials and they are studying
11  their own patients and it has nothing to do with
12  industry.
13  BY MR. SLATER:
14    Q.    Okay.  That's great.
15    The mesh caused some reaction with
16  the tissue such that the mesh came through the
17  vaginal wall into the vagina, right?
18    A.    No, I don't know that that's the
19  case.
20    Q.    The mesh miraculously appeared within
21  the vagina one day without having gotten through the
22  vaginal wall; is that your testimony?
23    MS. KABBASH:  Objection.
24    THE WITNESS:  No.  That's not -- my
25  testimony is that I'm not sure how the mesh became

Page 115

1  exposed.  But I'm not going to say there was some
2  reaction that caused the mesh to become exposed.
3  BY MR. SLATER:
4    Q.    That's fine.  You don't have an
5  opinion as to the mechanism by which the mesh became
6  exposed into the vagina, correct?
7    A.    I have an opinion on the
8  possibilities of why mesh becomes exposed in
9  general.
10    Q.    I'm not asking in general.
11    In Mrs. Corbet, you're not offering
12  an opinion as to why the mesh -- the mechanism by
13  which the mesh got through the vaginal wall and was
14  exposed in the vagina, correct?  Is that what you
15  just told me?
16    A.    I'm not sure that I'm not offering an
17  opinion for the mesh exposure on Mrs. Corbet.
18    Q.    You just told me that?
19    A.    Well, can we -- can we play it back
20  so I can see what you were saying?
21    Q.    Doctor, it's very simple.
22    Are you giving me an opinion right
23  now as to the mechanism by which the mesh in Mrs.
24  Corbet through the vaginal wall and was exposed into
25  the vagina?

Page 116

1    A.    I'll give you an opinion on the
2  possibilities of how the mesh became exposed.  I
3  cannot say for sure how the mesh became exposed.
4    Q.    Well, I don't want a list of
5  possibilities.  I want to know if you have an
6  opinion as to what occurred?
7    A.    I have an opinion that it did not
8  occur because of reaction of the mesh to the vaginal
9  wall.  That you -- this is what you stated before.
10    Q.    So you think the mesh came through
11  the vaginal wall, it was not due to a reaction
12  between the mesh and the tissue?
13    A.    Right.
14    Q.    But it came through some other way.
15    Tell me the other possible ways.
16    A.    Probably, it had to do with the
17  placement of the sling.
18    Q.    Yeah, what's that?
19    A.    Well, I think if the sling is placed
20  too thinly -- there's lots of reasons why mesh can
21  become exposed.  But if the sling is placed too
22  thinly under the vaginal wall, we do see exposures.
23    Q.    What other possibilities?
24    A.    It depends on the exposure.  I mean,
25  sometimes we see that the -- that the stitch over

Page 117

1  the sling becomes violated, and the vaginal wall
2  opens, revealing the sling underneath.
3    Q.    Is there some indication of a stitch
4  here?
5    A.    This is in general.  This is not in
6  Mrs. Corbet.
7    Q.    All right.  Let me -- let's be really
8  clear.  I don't care about general reasons why mesh
9  exposures or mesh erosions through the vagina occur,
10  okay?  I've read all the same stuff.
11    So here is my question:  As you sit
12  here now, are you offering an opinion as to the
13  mechanism by which the TVT mesh in Mrs. Corbet
14  became exposed into the vagina?
15    A.    I'm offering an opinion that it may
16  have had to do with the placement of the sling and
17  how -- the technical error of how the sling was
18  placed, which is something that happens when slings
19  are placed and is warned about.
20    Q.    You're saying that may have been, but
21  you're not saying that more likely than not that
22  that occurred, correct?
23    A.    More likely than not.
24    Q.    So you're blaming Dr. Harrell for a
25  thin placement of the mesh?  Where does it say that

Nicole Fleischmann, M.D.

Page 118

1  in your report?
2          MS. KABBASH:  Objection.
3          THE WITNESS:  I am saying that most
4  of the mesh exposures that happen have to do with
5  technical error.  And it's not a blame of a doctor,
6  it's just --
7  BY MR. SLATER:
8      Q.    Is there anywhere in your report --
9          MS. CRAWFORD:  I don't think she was
10 finished with her answer, Adam.
11         MR. SLATER:  Oh, I thought you were.
12         MS. KABBASH:  You have to let her
13 finish the answers.
14 BY MR. SLATER:
15     Q.    Go ahead.
16     A.    What I'm saying is when mesh becomes
17 exposed in the area that is exposed, it usually has
18 to do with technical placement of the sling and not
19 the sling itself.
20         It's not a blame, just one of the
21 things that happen.
22     Q.    So that's a generalization, right?
23     A.    But more likely than not, that's what
24 happened here.
25     Q.    Show me in your report where you say

Page 119

1  there was any technical error by Dr. Harrell and how
2  he placed the TVT?
3      A.    I don't have --
4          MS. KABBASH:  Objection.
5          THE WITNESS:  I don't say that in my
6  report.  But you're asking me what my opinions are,
7  and that's my opinion.
8  BY MR. SLATER:
9      Q.    You told me earlier your report
10 contained each of your opinions, right?
11     A.    Yes.
12     Q.    So now you have a new opinion that
13 Dr. Harrell committed a technical error in how he
14 placed the mesh?
15     A.    I never said that Dr. Harrell --
16 you're mincing my words.
17         I never said he committed a technical
18 error.  I said it's a technical placement of the
19 sling, where the sling can be too thin underneath
20 the vaginal -- underneath the vaginal wall.  And
21 that is something that we all know about when we
22 place slings, it's warned about in the IFU.
23     Q.    It's warned about in the IFU that a
24 superficial placement of the mesh can lead to an
25 erosion?

Page 120

1      A.    Erosion -- that exposures can happen,
2  is warned about in the IFU.
3      Q.    There's nothing about superficial
4  placement mentioned in the IFU causing erosions; it
5  doesn't say that, right?
6      A.    No.  But that's something that we all
7  know who do slings on a regular basis.
8          MR. SLATER:  Move to strike from
9  "but" forward.
10 BY MR. SLATER:
11     Q.    Doctor, I understand that you're
12 telling me in general that there's reasons why
13 things can happen.
14         So I want to talk about Mrs. Corbet
15 and a case you're actually going to sit on a witness
16 stand in January on, okay?
17     A.    Sure.
18     Q.    So here is the question:  Show me in
19 your report any criticism of Dr. Harrell whatsoever.
20     A.    I don't criticize Dr. Harrell
21 whatsoever.
22     Q.    And as you sit here now, you have no
23 criticisms of Dr. Harrell, correct?
24     A.    I would never have a criticism of a
25 known -- a known possible risk --

Page 121

1          MR. SLATER:  Move to strike.
2          THE WITNESS:  -- of a complication of
3  a --
4          MS. CRAWFORD:  You have to let her
5  finish.  You can move to strike all you want to, but
6  you've got to let her finish her answer.
7          MR. SLATER:  I just want an answer to
8  my question.  We're never getting out of here, by
9  the way, that's the answer to that.  We will be
10 eating dinner in New York tonight.
11         MS. KABBASH:  Fine.  Just wait until
12 she gets to the end of her answer before you do
13 whatever.
14 BY MR. SLATER:
15     Q.    As you sit here now, you have no
16 criticisms of Dr. Harrell, correct?
17     A.    Right.
18     Q.    If mesh is placed thinly or
19 superficially, for the mesh to become exposed into
20 the vagina, it has to come through the vaginal wall,
21 correct?
22     A.    Yes.
23     Q.    As you sit here now, in this case,
24 you have no indication that Dr. Harrell placed the
25 mesh thinly or superficially?  There's no indication

31 (Pages 118 to 121)

Nicole Fleischmann, M.D.

Page 122

1  in his operative report?  There's no indication in
2  the findings after the surgery?  There's nothing
3  that indicates that, correct?
4       A.    Only that it happened.
5       Q.    Mesh exposure, as occurred in Mrs.
6  Corbet, can happen even if the mesh is not placed
7  superficially or thinly, correct?
8       A.    I disagree with that statement.
9       Q.    You think that's the only way that
10  can happen?
11      A.    Yes.
12      Q.    Really?
13      A.    I think it's -- in that area, in the
14  lateral sulcus, it's just too thin.  And that's what
15  I believe.
16      Q.    You believe that if the mesh was
17  placed at a depth that you think is the depth it
18  should be at, that it couldn't erode through the
19  vaginal wall and be exposed?
20      A.    Right.
21      Q.    Have you ever treated a mesh exposure
22  in the lateral sulcus where the arms are?
23      A.    Yes.
24      Q.    You didn't know whether the mesh was
25  placed superficially or not at that time, did you?

Page 123

1       A.    Yes.
2       Q.    How did you know?
3       A.    Because it had exposed.
4       Q.    So you think the only way mesh can
5  become exposed, where the arms are located, is
6  because it's placed thinly?
7       A.    Yes.
8       Q.    Do you know what Ethicon thinks about
9  that?
10      A.    I'm not really interested in what
11  Ethicon thinks about that.  I'm interested in what I
12  know and what I've talked to about my colleagues
13  with.
14      Q.    Have you had erosions or exposures of
15  mesh that you put into a woman's body in the area
16  where Mrs. Corbet had the exposure?
17      A.    Yes.
18      Q.    So you placed it thinly in those
19  cases, right?
20      A.    It's happened, yes.
21      Q.    So even when one follows the TVTTM
22  Retropubic procedure exactly, as people are trained
23  on, and can be a very high-level surgeon, it can
24  happen that it can be placed at different depths;
25  that just can happen because everyone's body is

Page 124

1  different and every surgery is different, correct?
2       MS. KABBASH:  Objection.
3       THE WITNESS:  Yes.  And it's warned
4  about.
5       MR. SLATER:  Move to strike from
6  "and" forward.
7  BY MR. SLATER:
8       Q.    It's your testimony that it's -- you
9  believe that the mesh was placed closer to the
10  surface than -- rephrase.
11      You're telling me that you think the
12  mesh was placed thinly below the surface of the
13  vaginal wall and that's why it became exposed,
14  correct?
15      A.    Yes.
16      Q.    Do you have an opinion, to a
17  reasonable degree of medical certainty, of how it
18  was that the mesh got from behind the wall to the
19  vaginal side of the wall so that it was exposed?
20      MS. KABBASH:  Objection.
21      THE WITNESS:  When we place mesh too
22  thinly and we slit the thickness of the vaginal
23  wall, mesh is more likely to become exposed.  That's
24  why we all know, in our training, and we're all
25  trained to do these procedures now, that we need to

Page 125

1  do full thickness placement of the mesh.
2       MR. SLATER:  Move to strike.
3  BY MR. SLATER:
4       Q.    I'm not asking about the effect of
5  the mesh being exposed.  I'm talking about in Mrs.
6  Corbet's case, what occurred.  So let me start
7  again.
8       In Mrs. Corbet's case, are you
9  offering an opinion, to a reasonable degree of
10  medical probability, of the mechanism by which the
11  mesh came through the vaginal wall?
12      A.    I'm offering my -- my opinion that it
13  was either placed too thinly, if it wasn't already
14  placed at that level to begin with, as by the
15  granulation tissue she saw within the first month or
16  two after examining her.
17      Q.    Meaning the granulation tissue being
18  related to the mesh?
19      A.    Possibly, because it was placed too
20  thinly.
21      Q.    And what about the mesh causes the
22  granulation tissue?
23      A.    The granulation tissue is just a sign
24  of wound healing, and that there was something about
25  that area where there may have been an exposure.

Nicole Fleischmann, M.D.

Page 126

1    Q.    Granulation tissue can be a precursor
2 to an erosion, correct?
3    A.    It could be, yes.  But not an
4 erosion, an exposure.
5    Q.    I'm going to try this one more time.
6         Do you have an opinion, as you sit
7 here now, as to the mechanism by which the mesh came
8 through the vaginal wall and was exposed into the
9 vagina?
10        MS. KABBASH:  Objection.
11 BY MR. SLATER:
12   Q.    What actually occurred such that the
13 mesh, which was behind the vaginal wall, was then
14 not behind the vaginal wall?  Do you have an opinion
15 as to what occurred?
16   A.    If it was behind the vaginal wall to
17 begin with, it was placed so thinly that that small
18 amount of vaginal wall that was over the mesh was
19 unable to live long enough, so that the mesh would
20 expose.
21        That's my opinion.  And that's how
22 mesh exposures happen.
23   Q.    When Dr. Harrell observed, on
24 physical exam, a normal vaginal mucosa, that would
25 indicate that there was no mesh exposed into the

Page 127

1 vagina, right?
2    A.    Assuming that he looked in that area,
3 yes.
4         MS. KABBASH:  Objection.
5 BY MR. SLATER:
6    Q.    You said something just before,
7 assuming the mesh was actually placed behind the
8 vaginal wall.  Are you saying you think it may have
9 been actually placed where it was exposed into the
10 vagina from the beginning?  Is that -- are you
11 actually offering that as a possibility?
12   A.    It's not out of the realm of
13 possibility.
14   Q.    So you're saying Dr. Harrell may have
15 placed the mesh, actually exposed into the vagina
16 with the left arm exposed into the vagina, and not
17 noticed that?
18        MS. KABBASH:  Objection.
19        THE WITNESS:  It's happened before.
20 BY MR. SLATER:
21   Q.    Has it happened to you?
22   A.    It's happened.
23   Q.    Has it happened to you?
24   A.    Yes, it's happened to me.
25   Q.    You've actually placed a TVT with an

Page 128

1 arm exposed into the vagina and you didn't notice it
2 for months and months and months, that you had
3 placed it not even behind the vaginal wall?
4         MS. KABBASH:  Objection.
5         THE WITNESS:  It can sometimes be
6 very subtle.  But, yes, it can happen.
7 BY MR. SLATER:
8    Q.    Are you offering an opinion, to a
9 reasonable degree of medical probability, that Dr.
10 Harrell placed the mesh and it wasn't even behind
11 the vaginal wall to begin with?  Are you actually
12 saying that's what occurred?
13   A.    I am saying it's not out of the realm
14 of possibility.
15   Q.    There's a lot of possibilities,
16 right?
17   A.    Yes.
18   Q.    One possibility is that Dr. Harrell
19 placed the mesh in accordance with the TVTTM
20 Retropubic procedure, followed the procedure
21 correctly, and the mesh came through the vagina, for
22 whatever reason was exposed into the vagina; it is
23 possible that he did the procedure as instructed,
24 correct?
25   A.    It's unlikely.

Page 129

1    Q.    When you place the mesh in your own
2 patients and it was thinly -- and it was thin, as
3 you called it, and it then came through the vaginal
4 wall, did you follow the TVT procedure?
5    A.    Yes.
6    Q.    So one can follow the TVT procedure
7 and the mesh can be placed thinly, even though
8 followed the procedure correctly, right?
9    A.    Yes.
10   Q.    And when that happens, that increases
11 the risk of a mesh exposure into the vagina,
12 correct?
13   A.    Right.  So about 1 to 2 percent of --
14   Q.    I didn't ask you statistics.
15        MS. KABBASH:  Hang on, Adam.  Let --
16        MR. SLATER:  Are you actually asking
17 your expert to start throwing statistics at me right
18 now?
19        MS. KABBASH:  I don't know what she's
20 about to say, because you didn't let her to finish.
21 So let her finish.
22        MR. SLATER:  There wasn't even --
23 there wasn't even a new question pending.
24        MS. KABBASH:  You asked her when that
25 happens, that increases a risk of a mesh exposure

33 (Pages 126 to 129)

Page 130

1  into the vagina, correct?
2          MR. SLATER:  And she said right.  And
3  that was -- she answered the question.
4          MS. KABBASH:  And she was about to
5  say something.  So let her say it.
6          MR. SLATER:  Go ahead.  I'll strike
7  it.
8  BY MR. SLATER:
9      Q.    Go ahead.  Tell me statistics I
10  didn't ask for.
11     A.    In about 1 to 2 percent of cases, we
12  see mesh exposures in the vagina.
13     Q.    It's your testimony that the mesh
14  exposure rate for the TVTTM Retropubic is 1 to 2
15  percent?
16     A.    In experienced hands, over the
17  long -- over the long-term data, yes; maybe as high
18  as 3 percent.
19     Q.    Experienced hands.
20         What does that mean?
21     A.    People who are following the
22  procedure, who have been well trained to do the
23  procedure, after their learning curve, will have
24  about between a 1 and 3 percent rate of mesh
25  exposure.  And that's probably what I see in my own

Page 131

1  practice.
2          MR. SLATER:  I move to strike.
3  BY MR. SLATER:
4      Q.    Was Dr. Harrell an -- were his hands
5  experienced hands?
6      A.    I assume he was.  He's done a fair
7  amount of slings.
8      Q.    I saw in your report you said you're
9  not a pathologist, but you looked at the pathology
10  report.
11         Are you -- is that basically saying,
12  I'm not an expert in pathology but I can tell you
13  what I think this means?
14     A.    Yes.
15         MS. KABBASH:  Objection.
16         THE WITNESS:  I'm not a pathologist.
17  BY MR. SLATER:
18     Q.    Do you know whether or not a foreign
19  body giant cell reaction is an indication of a
20  chronic foreign body reaction?
21     A.    I believe that that's what a chronic
22  foreign body reaction definition is.
23     Q.    The pathologist found a foreign body
24  giant cell reaction and chronic inflammation in the
25  tissue that was removed with the mesh, correct?

Page 132

1      A.    Which pathologist is this?
2      Q.    Whoever looked at the pathology that
3  was taken from the surgery by Dr. Smith.
4          That's what the hospital pathologist
5  saw, right?
6      A.    The hospital pathology?  Do I have
7  that report?  I know that's in my --
8          MS. KABBASH:  It's in your --
9  BY MR. SLATER:
10     Q.    On Page 14 of your report --
11     A.    Okay.
12     Q.    -- it says, The pathology report
13  references skin and fibroadipose tissue with mesh
14  and associated foreign body giant cell reaction and
15  chronic inflammation.
16     A.    Right.  Okay.  Exactly.
17     Q.    That's what was found by the
18  pathologist at Penn, right?
19     A.    Right.
20     Q.    And that's consistent with a chronic
21  foreign body reaction and a chronic inflammatory
22  response, correct?
23     A.    Okay.
24     Q.    Is that correct?
25     A.    That's correct.

Page 133

1      Q.    On August 19, 2013 -- I'm just
2  walking through your report.
3          On Page 15, you say, Physical exam
4  showed tenderness in the left fornix of the vagina
5  without exposed mesh or erythema.
6          Right?
7      A.    Yes.
8      Q.    That's where the mesh had been
9  removed, correct?
10     A.    Presumably, but I can't be sure.
11     Q.    That's the area where you found
12  tenderness on your exam, correct?
13     A.    That's the area that I found
14  tenderness on my exam.
15     Q.    The TVT procedure that Mrs. Corbet
16  had, that can make one's urge incontinence more
17  refractory to treatment than it was before the
18  procedure, correct?
19         MS. KABBASH:  Objection.
20         THE WITNESS:  Can you repeat that
21  question?
22  BY MR. SLATER:
23     Q.    You know what refractory to treatment
24  means, right?  It means it's harder to treat, right?
25     A.    Uh-huh.

Nicole Fleischmann, M.D.

Page 134

1    Q.    The TVT procedure Mrs. Corbet had can
2  make an urge incontinence condition more refractory
3  to treatment than it would have been, but for the
4  TVT procedure, correct?
5    A.    No, I disagree with that.
6    Q.    The TVT procedure could have
7  exacerbated or made Mrs. Corbet's urge incontinence
8  more persistent, it's possible, right?
9    A.    I don't think there's any evidence of
10 that in the record.
11   Q.    Mrs. Corbet's urge incontinence
12 persisted despite medications, correct?
13   A.    She was -- she was helped by
14 medications significantly.  It did not go away.  But
15 we never tried medications before her sling
16 procedure, so we don't know whether it was
17 refractory then or not.
18   Q.    Mrs. Corbet ultimately was
19 complaining of frequency, correct?
20   A.    Right.  But she was complaining of
21 that also before, urgency before --
22   Q.    I didn't say urgency --
23   A.    -- and the need to go to the
24 bathroom.
25   Q.    -- I said frequency.

Page 135

1         Frequency is different than urgency,
2  right?
3    A.    Yes.  They often go hand-in-hand.
4    Q.    They often do.  But Mrs. Corbet
5  didn't complain of frequency before her TVT surgery,
6  did she?
7    A.    Not entirely sure about that.  I know
8  she complained of urgency and overactive bladder
9  symptoms.
10   Q.    Is there any indication in your
11 report that Mrs. Corbet had frequency before the TVT
12 procedure?
13   A.    More urgency.
14   Q.    You don't mention frequency
15 preoperatively, do you?
16   A.    More urgency than frequency.
17   Q.    It's simple.
18         You don't mention frequency before
19 the TVT procedure, do you?
20         MS. KABBASH:  Objection.
21         THE WITNESS:  I probably mention
22 urgency more than frequency, because that's what she
23 was complaining of more.
24 BY MR. SLATER:
25   Q.    You understand what you're doing.

Page 136

1  You keep saying, I mentioned urgency more than
2  frequency; and what I keep saying is, you didn't
3  mention frequency in your report as a condition Mrs.
4  Corbet had preoperatively; is that true?
5    A.    It's probably true that I didn't say
6  the word "frequency."
7    Q.    In your report, you talked about the
8  extent to which complaints by Mrs. Corbet were
9  either made or documented, with various positions as
10 she went through her care after the mesh was
11 removed, right?
12   A.    Yes.
13   Q.    As you sit here now, am I correct,
14 you're not disputing that Mrs. Corbet has had
15 dyspareunia from after the surgery by Dr. Smith up
16 to the present?  You're not disputing that, are you?
17   A.    No.
18   Q.    The pelvic hematoma that she had,
19 that likely resulted from the TVT procedure, right?
20   A.    It's possible that that's what caused
21 it, yes.
22   Q.    Based on the location of where it was
23 found on the MRI and the CT guided percutaneous
24 drainage, it's in the proximity -- direct proximity
25 to the TVT arm, isn't it?

Page 137

1    A.    It's in the retropubic space where
2  the TVT would have traversed.
3    Q.    It's actually in the left part of
4  that space adjacent to the where the arm was,
5  correct?
6    A.    Right.
7    Q.    The same arm that eroded, correct?
8    A.    It was on the same side as the -- as
9  the exposure.
10   Q.    It's actually adjacent to that spot,
11 right?
12   A.    It's on the same side as the -- the
13 hematoma and the exposure were both on her left
14 side.  Whether they are correlated or connected or
15 not, I cannot say.
16   Q.    Based on the description of the size
17 and location of the hematoma, it likely was adjacent
18 to and touching the mesh, right?
19   A.    Possibly, yeah.
20   Q.    Based on the location and size of the
21 hematoma, as described on the diagnostic studies,
22 the mesh and the placement of the mesh likely caused
23 that hematoma to form, correct?
24   A.    The procedure --
25         MS. KABBASH:  Objection.

35 (Pages 134 to 137)

Nicole Fleischmann, M.D.

Page 138

1    THE WITNESS:  -- of doing a
2  retropubic sling can cause a hematoma.  So that
3  procedure itself could have caused the hematoma,
4  yes.
5  BY MR. SLATER:
6    Q.    Most likely, that's the cause, right?
7    A.    The procedure of doing the retropubic
8  sling, sure, could have caused a hematoma.
9    Q.    Well, most likely that is the cause,
10  right?
11    A.    Moth likely.
12    Q.    And they only retropubic sling she
13  had placed was the TVTTM Retropubic, right?
14    A.    That's right.  That's the procedure
15  that she had performed to treat her stress
16  incontinence.
17    Q.    In your report, you talk about
18  treating -- and this is on Page 29 of your
19  case-specific report we've marked as Exhibit-5.
20    A.    Case specific.
21    Q.    Page 29, Exhibit-5.  I just want to
22  ask you about something.
23    A.    Sure.
24    Q.    You talk about patients having mesh
25  exposure and complaining of dyspareunia, and then

Page 139

1  when the exposed portion of the sling is removed,
2  you've had patients who have resolution of their
3  dyspareunia after that removal.
4    You're talking about that in your
5  practice, right?  That's what you're describing?
6    A.    If dyspareunia is caused by an
7  exposure, usually when you remove the exposure, the
8  dyspareunia goes away.
9    Q.    You say, I have witnessed this
10  repeatedly in my own practice.
11    When you say the word "repeatedly,"
12  how many times are we talking about?  That sounds
13  like a lot.
14    A.    When I --
15    MS. KABBASH:  Objection.
16    THE WITNESS:  When I have had a mesh
17  exposure and I've removed the mesh exposure, and I
18  can't give you a number on how many that is, it's
19  not a great number, but it's enough that I can say
20  with great certainty, that when you remove the
21  exposure, if that's what is causing the dyspareunia,
22  the dyspareunia will become better.
23  BY MR. SLATER:
24    Q.    The exposure of mesh in Mrs. Corbet
25  was not at the site of the incision, it was at a

Page 140

1  different site, correct?
2    A.    It was in the left lateral sulcus,
3  which is not where the incision would have been.
4    Q.    You indicate that TVTs are not
5  difficult to remove in most cases.  I want to ask
6  you about that.
7    Are you talking about complete
8  removal of the entire device?
9    A.    For the vaginal portion all the way
10  up to the retropubic space, it's quite easy to
11  remove the TVT.
12    Q.    This is what -- I want to understand
13  vocabulary right now.
14    You say TVTs are not difficult to
15  remove in most cases.  When you say that, are you
16  talking about the entire TVT?
17    A.    I can take out the entire TVT.  I
18  don't find it very difficult.
19    Q.    How many times have you removed an
20  entire TVT device from a patient?
21    A.    I haven't had to remove an entire TVT
22  in more than maybe one -- one or two patients in my
23  entire career.
24    Q.    You indicate, Dissecting it gently
25  off the surrounding tissues can be accomplished, in

Page 141

1  most cases, quickly and without injury.
2    How many times have you done that?
3    A.    I've probably done about ten or so --
4  between five and ten a year, removal of TVTs.
5    Q.    Is that your patients only or other
6  people's patients, too?
7    A.    It's a combination.  It's more
8  others, but it's a combination.
9    Q.    Five to ten per year for how many
10  years?
11    A.    Ten years.
12    Q.    So 50 to 100?
13    A.    Okay.
14    Q.    You say that gently -- rephrase.
15    You say that you can dissect it
16  gently off the surrounding tissues.  That can be
17  accomplished, in most cases, quickly and without
18  injury, which means that in some cases that cannot
19  be accomplished quickly and without injury, correct?
20    A.    In some cases, right.
21    Q.    In some cases, the removal of some
22  portion of the mesh can be very difficult and can be
23  morbid surgery, correct?
24    A.    I would never say that it's morbid
25  surgery.  It's just more difficult in some cases.

Golkow Technologies, Inc. - 1.877.370.DEPS

Nicole Fleischmann, M.D.

Page 142

1  If it was ever imbedded in a place where it couldn't
2  be reached, it would be harder to get it out.
3        But I can't say that I've ever had a
4  case where I haven't been able to get it out.
5        Q.    You say, at the very bottom of the
6  page, When removed properly and entirely, the risk
7  of further exposure is unlikely, allowing sexual
8  comfort to return to normal.
9        Are you talking about -- when you say
10  "entirely," are you saying the entire mesh, all the
11  mesh in the body?
12       A.    Well, usually, I'm referring to just
13  the vaginal portion up to the retropubic space.  It
14  depends on what type of sling you're referring to.
15       Q.    So this part of your report is not
16  limited to the TVTTM Retropubic?
17       A.    Well, you're asking me in general.
18  But if we're talking about the TVTTM Retropubic
19  specifically, we don't usually go above the pubic
20  bone to get the sling out.
21       Q.    This report is your specific report
22  on Mrs. Corbet.  So you're talking about the TVTTM
23  Retropubic, right?
24       A.    Yes.
25       Q.    In Mrs. Corbet, mesh is still in her

Page 143

1  body, correct?
2        A.    A small part on the right side and
3  maybe up in the retropubic space, deeply, on the
4  left side.
5        Q.    Even on the left side, you can't tell
6  me that there's no mesh, either mesh fibers or
7  portions of mesh, left inside of her?
8        A.    Above -- in the retropubic space,
9  there probably is some, yes.
10       Q.    Even where the left arm was operated,
11  on, it's certainly possible that there are some mesh
12  fibers or mesh material that was left behind,
13  correct?
14       MS. KABBASH:  Objection.
15       THE WITNESS:  Probably.  But it
16  wouldn't have any clinical significance in her.
17       MR. SLATER:  Move to strike from
18  "but" forward.
19  BY MR. SLATER:
20       Q.    Mrs. Corbet does have a risk -- I'm
21  sorry.
22       Mrs. Corbet does have a risk of mesh
23  exposure or mesh erosion from the remaining mesh
24  going forward; that's a risk that exists, correct?
25       A.    It's an infinitesimal risk.

Page 144

1        MR. SLATER:  Move to strike.
2  BY MR. SLATER:
3        Q.    Mrs. Corbet has a risk of mesh
4  exposure or mesh erosion from the remaining mesh in
5  her body, going forward?
6        MS. KABBASH:  Objection.
7  BY MR. SLATER:
8        Q.    That risk does exist, is that a
9  correct statement; yes or no?
10       MS. KABBASH:  Objection.
11       THE WITNESS:  It's extremely
12  unlikely, counselor.
13       MR. SLATER:  Move to strike.
14  BY MR. SLATER:
15       Q.    I'm asking for a yes or no.  I'm not
16  asking for percentages.  I'm not asking for your
17  intuition and on whether it's going to happen or
18  not.  I'm not -- that's not what I'm asking for.
19       So here is my question:  Mrs. Corbet
20  has a risk of mesh exposure or mesh erosion from the
21  remaining mesh in her body, going forward; is that a
22  true statement, that a risk exists?
23       MS. KABBASH:  Same objection.
24       THE WITNESS:  If I say yes to that, I
25  just want to qualify that that is extremely

Page 145

1  unlikely.
2        MR. SLATER:  Move to strike.
3  BY MR. SLATER:
4        Q.    Am I correct that Mrs. Corbet has a
5  risk of mesh exposure or mesh erosion from the
6  remaining mesh in her body, going forward?
7        MS. KABBASH:  Objection.
8  BY MR. SLATER:
9        Q.    Is that a true statement that a risk
10  exists, going forward; yes or no?
11       MS. KABBASH:  Objection.  Asked and
12  answered.
13       THE WITNESS:  I will not say yes
14  without qualifying that it is extremely unlikely.  I
15  can't say -- then I'll just say, no, it's unlikely.
16  It's not going to happen.  I don't believe it's
17  going to happen.
18       Because -- and I'm going to tell you
19  why.
20  BY MR. SLATER:
21       Q.    I haven't asked you.  I mean, let me
22  tell you how this works.  I'm moving to strike what
23  you just did.  I'm going to ask to preclude your
24  testimony at trial for not being willing to answer a
25  very simple question.  It hasn't been asked and

37 (Pages 142 to 145)

Nicole Fleischmann, M.D.

Page 146

1  answered.
2          I don't care --
3          MS. KABBASH:  Four times, actually.
4          MR. SLATER:  It actually has not
5  been, Maha.
6          MS. KABBASH:  It has.
7          MR. SLATER:  What the doctor is doing
8  is telling me a qualification on a yes or no that
9  I've asked for.
10         MS. KABBASH:  She is absolutely
11 entitled to explain to you why she cannot answer
12 your question.
13         MR. SLATER:  When you question her.
14         MS. KABBASH:  She is absolutely --
15         MR. SLATER:  She can't --
16         MS. KABBASH:  -- entitled to explain
17 why she cannot answer it as a yes or no.  That's
18 precisely what she did, and she's entitled to do
19 that.
20 BY MR. SLATER:
21     Q.    Doctor, what you're doing is refusing
22 to answer my question?
23         MS. KABBASH:  That's not true.
24         MS. CRAWFORD:  That's not what she's
25 doing.

Page 147

1  BY MR. SLATER:
2      Q.    You are.
3      A.    I answered your question.
4      Q.    No, you didn't.
5      A.    I said that yes, but that it's
6  extremely unlikely, and that's the only way that
7  I'll say yes --
8      Q.    All right.  Well, I'm not asking
9  you --
10     A.    And I'll tell you why -- what that's
11 based on.
12     Q.    Honestly, I've read your report.  It
13 doesn't matter to me.  I'm trying to move through a
14 deposition.  If they want to ask you whether it's
15 likely or not, the two lawyers to your right will
16 ask you that question when they get to question you,
17 or they'll put you on the witness stand and you can
18 then tell the jury all the reasons why she's never
19 going to have a mesh erosion, in your opinion.  You
20 can do whatever you want.  I just want to get a
21 simple answer to a simple question, okay?
22         Do you agree with me that Mrs. Corbet
23 has a risk of exposure or erosion in the future from
24 the mesh that remains inside her body, going
25 forward?  Is there a risk; yes or no?

Page 148

1      A.    Yes, but no more than anybody else
2  that has a sling in their body.
3          MR. SLATER:  Move to strike from
4  "but" forward.
5  BY MR. SLATER:
6      Q.    You say, on Page 36, It is not the
7  role or responsibility of medical device companies
8  which manufacture products to create surgical
9  alternatives for patients.
10         Do you stand by that statement?
11     A.    Yes.
12     Q.    So if this jury were to find that
13 Ethicon, a medical device company that manufactures
14 products, actually set out to create surgical
15 alternatives for patients to market to doctors and
16 get doctors to want to use their product, that's not
17 their role, according to what you said here, right?
18         MS. KABBASH:  Objection.
19         THE WITNESS:  If I clarify that
20 statement, it's not their role to offer a Burch
21 colposuspension or autologous facial sling to a
22 patient.  And that's what that paragraph is about.
23 BY MR. SLATER:
24     Q.    Really?  Where does it say that?
25         MS. KABBASH:  What page are you on?

Page 149

1  BY MR. SLATER:
2      Q.    Where do you say that?  Where did you
3  talk about a Burch colposuspension, Doctor?
4          MS. KABBASH:  Which page are you on,
5  Adam?
6          MR. SLATER:  36.
7          MS. KABBASH:  Of which report, the
8  general or --
9          MR. SLATER:  The same one I've been
10 asking about the last 20 minutes, Number 5.  The
11 case-specific report.
12         THE WITNESS:  I was -- I was
13 referring to Dr. Rosenzweig's testimony that she
14 could have had a Burch colposuspension or autologous
15 fascial sling, which is what I talk about in the
16 paragraph above that.
17 BY MR. SLATER:
18     Q.    Really?  What --
19     A.    Available to Ethicon such as a Burch
20 procedure or autologous fascial sling, or other
21 meshes.  That's in Number 4.
22     Q.    A medical device company shouldn't be
23 out there trying to influence what the standard of
24 care is, should they?
25     A.    No.

Nicole Fleischmann, M.D.

Page 150

1    MS. KABBASH:  Objection.
2    THE WITNESS:  They shouldn't be.
3    BY MR. SLATER:
4    Q.    They shouldn't set out to set a
5    standard of care, should they?
6    MS. KABBASH:  Objection.
7    THE WITNESS:  No, they should be out
8    to provide the best product that they can, the
9    safest product and most efficacious product to
10   women.
11   BY MR. SLATER:
12   Q.    Should a medical device company like
13   Ethicon be paying doctors and then carefully
14   watching them, when they go to professional society
15   meetings, to make sure that they're only giving
16   positive information about the product that they
17   want them to promote?
18   MS. KABBASH:  Objection.
19   THE WITNESS:  I am not sure what
20   you're referring to there.
21   BY MR. SLATER:
22   Q.    Should Ethicon have their marketing
23   and salespeople at professional society meetings,
24   like AUGS, and talking to their paid consultants who
25   are going to speak at those meetings, to make sure

Page 151

1    they stay on message with a positive message about
2    their products?  Should that be going on?
3    MS. KABBASH:  Objection.
4    THE WITNESS:  I'm not going to speak
5    to what Ethicon does or what Ethicon should be
6    doing.  It doesn't matter to me.
7    BY MR. SLATER:
8    Q.    Okay.  So if Ethicon did that, you
9    don't care?
10   A.    It doesn't -- it doesn't affect me or
11   influence me if Ethicon is there or paying people to
12   speak.  That doesn't matter, they're a company.
13   Q.    Doctor, you've put yourself in this
14   case as a paid expert witness for Ethicon.
15   Do you understand that?
16   A.    Yes.
17   MS. KABBASH:  Objection.
18   BY MR. SLATER:
19   Q.    So do you understand that whether
20   something matters to you as a person when you walk
21   out of being an expert is not what I am asking
22   about?
23   This is you --
24   MS. KABBASH:  Actually, it's exactly
25   what you're asking.

Page 152

1    BY MR. SLATER:
2    Q.    You put yourself out as an expert.
3    So I'm asking all these questions as an expert
4    witness.
5    You want to walk into a courtroom and
6    say, I'm an expert witness, and I stand in front of
7    Ethicon and say Ethicon did the right thing?  Isn't
8    that what you're doing?
9    MS. KABBASH:  Objection.
10   THE WITNESS:  Yes.
11   BY MR. SLATER:
12   Q.    So if Ethicon went out and had their
13   paid doctors at professional meetings, like AUGS,
14   and actually were making sure they stayed on a
15   positive message about the TVT when talking about
16   doctors when they were trying to promote that and
17   make that the standard treatment people would want
18   to use in your field, you're okay with that?
19   MS. KABBASH:  Objection.  Asked and
20   answered.
21   THE WITNESS:  You're --
22   BY MR. SLATER:
23   Q.    Are you okay with that?
24   A.    I'm only okay because you're
25   presuming that doctors will say things and do things

Page 153

1    because they're paid to do it, and not because
2    they --
3    Q.    You don't think that goes on?
4    A.    I have to believe that in my
5    professional society, that doctors have minds of
6    their own and they are looking at the literature
7    objectively, they're looking at their patients
8    objectively and what's best for their patients.
9    Q.    Are you -- if I could show you a
10   document that showed that Ethicon actually was
11   telling the doctors that they pay to make sure they
12   stay with positive messages about the TVT at a
13   professional society meeting, would you be perfectly
14   fine with that?
15   A.    I would never do a product --
16   Q.    I didn't ask --
17   A.    -- that I didn't think it was right
18   for a patient because a doctor had told me that.
19   Q.    That's you.  That's great.
20   MR. SLATER:  Move to strike.
21   BY MR. SLATER:
22   Q.    Would you be okay with that?
23   MS. KABBASH:  Objection.
24   BY MR. SLATER:
25   Q.    I just want to know if you think it's

Page 154

1  a good thing to do or if you think maybe it's a
2  little unsavory.  Whatever you want to say.  If you
3  think it's fine, say it's good.  I don't care.  Just
4  tell me.
5      A.    I don't --
6          MS. KABBASH:  Objection.  And by the
7  way, beyond the scope of the opinions --
8          THE WITNESS:  I can't comment --
9          MS. KABBASH:  -- in the expert
10 report.
11         THE WITNESS:  -- on the practice of
12 the company.  I can just tell you I think that
13 doctors make decisions based on their clinical
14 experience, on their training and review literature;
15 and most of us don't pay a lot of attention to what
16 a medical company tells us.
17 BY MR. SLATER:
18     Q.    You made some comments in your report
19 about Dr. Smith saying she didn't see evidence of
20 either excessive contraction or excessive vaginal
21 scarring.
22         You know you talked about that?
23         MS. KABBASH:  What page are you on
24 again?
25         MR. SLATER:  It's all over.  She

Page 155

1  talked about it several times.  It's on Page 37, for
2  example.
3          MS. KABBASH:  Okay.
4          THE WITNESS:  Okay.
5  BY MR. SLATER:
6      Q.    What did Dr. Smith do to determine
7  whether there was excessive contraction of the mesh?
8  How did she study the mesh to determine that?
9          MS. KABBASH:  Objection.
10         THE WITNESS:  This is before the mesh
11 was excised?
12 BY MR. SLATER:
13     Q.    I don't care.  Either before or
14 after.
15         What did Dr. Smith do to determine
16 whether there was excessive contraction?
17     A.    Well, contraction is something I
18 would assume that you could feel, banding or
19 something underneath the vaginal wall.
20         So if she said she didn't feel that,
21 that's probably why she made that statement.  But
22 you'd have to ask Dr. Smith that to be sure.
23     Q.    Was she asked if she felt banding?
24     A.    She was asked if she felt the
25 contraction -- she said she doesn't feel excessive

Page 156

1  contraction.
2      Q.    Was she asked if she felt banding?
3      A.    Yes, I believe she was.  I'd have to
4  go back to the deposition to look at that for sure.
5      Q.    Did Dr. Smith actually inspect the
6  mesh for the purpose of determining whether there
7  was excessive contraction after she explanted it?
8  Did she actually study it for that purpose?
9          MS. KABBASH:  Objection.
10         THE WITNESS:  I'm not sure what she
11 studied in the operating room.  You'd have to ask
12 her that.
13 BY MR. SLATER:
14     Q.    Did you read the IFU when you started
15 using the TVTTM Retropubic?
16     A.    Probably in the very beginning when
17 we first started using it.
18     Q.    Did you believe what you read in the
19 IFU?
20     A.    I don't recall reading the IFU back
21 then as well as I would like to.  But I don't recall
22 not thinking that there was something in there that
23 was problematic.
24     Q.    Stress urinary incontinence is not
25 debilitating for all women, is it?

Page 157

1      A.    Not for all women, but for many.
2          MR. SLATER:  Move to strike from
3  "but" forward.
4  BY MR. SLATER:
5      Q.    One thing I forgot to ask you about.
6          Do you use any Ethicon prolapse
7  devices?
8      A.    I have.
9      Q.    You don't currently?
10     A.    No.
11     Q.    Why not?
12     A.    I used a lot of PROLIFT® when it was
13 out.  But I haven't used PROLIFT® since it was
14 discontinued.
15     Q.    Did you use the PROLIFT®+M at all?
16     A.    Yes.
17     Q.    When the PROLIFT®+M came out, did you
18 start to use the PROLIFT®+M rather than the
19 PROLIFT®?
20     A.    I believe I did.
21     Q.    You transitioned to that?
22     A.    I did.
23     Q.    And why did you do that?
24     A.    I can't tell you the exact reason.
25 In the end, I actually didn't see a big difference

Nicole Fleischmann, M.D.

Page 158

1 between the meshes.  But that's -- that's what we
2 started stocking on the shelves, the PROLIFT®+M.
3      Q.     You don't remember why you
4 transitioned from the PROLIFT® to the PROLIFT®+M?
5      A.     I wanted to try it.  And it was very
6 good, so I stuck with it.  But in the end, I don't
7 think my outcomes were any different.
8      Q.     Why did you try the PROLIFT®+M?  What
9 about it did you think could be a benefit?
10     A.     I liked the idea that it was
11 partially absorbable for prolapse.
12     Q.     Why did you think that was good?
13     A.     I don't know.  Less mesh sounded
14 good.
15     Q.     You would agree with me the less mesh
16 you need to use, the better, right?
17     A.     Not necessarily, because I just told
18 you that I didn't see a big difference in my
19 prolapse repairs between using +M and not using +M.
20 It's more of a theoretical thought than anything
21 else that translates into clinical outcomes.
22     Q.     So you didn't think the PROLIFT®+M
23 was any better than the PROLIFT®?
24     A.     No, not in clinical outcomes that I
25 saw.  I didn't see a big difference.

Page 159

1      Q.     Why don't you use the PROLIFT®+M
2 anymore?
3      A.     That's been discontinued.
4      Q.     Do you know why?
5      A.     You'd have to ask Ethicon that.
6      Q.     You never did?
7      A.     I assume it has something to do with
8 all the medical litigation that's going on.
9      Q.     Did you ever ask them, why are you
10 not selling the PROLIFT®+M anymore, I've been using
11 it with my patients?
12     MS. KABBASH:  Objection.
13     THE WITNESS:  It was very sad, that I
14 could understand.
15 BY MR. SLATER:
16     Q.     Did you ever ask anyone at Ethicon
17 why they stopped selling the PROLIFT®+M?
18     A.     No, I never specifically asked anyone
19 at Ethicon that question.
20     MS. KABBASH:  I'm going to object to
21 the entire line of questioning.
22     MR. SLATER:  It goes to credibility
23 and bias.
24     MS. KABBASH:  You can say whatever
25 you want about what it goes to, I'm still objecting

Page 160

1 as being beyond the scope.
2      MR. SLATER:  And I'm not going to
3 stop asking it.
4      MS. KABBASH:  It's your time.
5 BY MR. SLATER:
6      Q.     Do you consider yourself to be an
7 expert with regard to the technical terminology of
8 heavyweight and lightweight mesh, in terms of what
9 is heavyweight and what is lightweight?
10     A.     An expert?
11     Q.     Yes.
12     A.     I'm not a medical materials expert,
13 so no.
14                    - - -
15     (Whereupon, Exhibit Fleischmann-8,
16 December 2007 E-mails, was marked for
17 identification.)
18                    - - -
19 BY MR. SLATER:
20     Q.     I've handed you what I've marked as
21 Exhibit-8, which is a couple e-mails from December
22 2007.
23     Do you see the bottom e-mail is an
24 e-mail from Jeff Potkul to you?
25     A.     Yes.

Page 161

1      Q.     And on December 21, 2007, Mr. Potkul
2 wrote to you and said, I dropped off a holiday gift
3 for you yesterday.  Hope all is well and you're
4 enjoying the holiday season.  We appreciate your
5 continued commitment to Ethicon women's health and
6 urology.
7      Do you see that?
8      A.     Yes.
9      Q.     Do you agree that you had a continued
10 commitment to Ethicon?
11     A.     I didn't have a continued commitment
12 to Ethicon.  I had a continued commitment to using
13 what I considered to be the best products for my
14 patients.
15     Q.     What was the holiday gift that Jeff
16 Potkul left you?
17     A.     I don't know.  I'm very curious.  I
18 don't remember it.  Maybe it was a box of
19 chocolates.
20     Q.     Mr. Potkul, on December 21, 2007,
21 says, Let me or General know -- and General was your
22 sales rep?
23     A.     Yes.
24     Q.     -- if you require any assistance in
25 completing the grant application General forwarded

41 (Pages 158 to 161)

Nicole Fleischmann, M.D.

Page 162

1  to you.  If yes, I can get George Callen, my
2  manager, involved, since he has been involved in
3  this process before.
4          Do you know what that refers to?
5      A.    I don't remember a grant application.
6  It's obviously something that never came through.
7      Q.    Mr. Potkul, in his e-mail to you of
8  December 21, 2007, said, If local advertising is of
9  interest, let me know, since capital is budgeted for
10 it.
11         Do you see that?
12     A.    Yes.
13     Q.    Do you recall that?
14     A.    Well, now that I see the e-mail.  But
15 we never did any local advertisements.  I was never
16 involved in anything like that.
17         It's nice for them to offer, though.
18         - - -
19         (Whereupon, Exhibit Fleischmann-9,
20 Co-op Program Funds Advertising Request, was marked
21 for identification.)
22         - - -
23         MR. SLATER:  Exhibit-9.
24 BY MR. SLATER:
25     Q.    What I've just given you as Exhibit-9

Page 163

1  is a co-op advertising program funds request, which
2  we found in the records that were provided to us.
3  And on the second page it has -- seems to have been
4  filled out for you.
5          Do you see that?
6      A.    Yes.
7      Q.    Do you recall Ethicon offering to pay
8  for advertising for your medical practice?
9      A.    I guess the reason I don't recall is
10 because we never did any advertising for my medical
11 practice.  That's never happened.
12     Q.    You don't recall them talking to you
13 about being willing to help advertise your medical
14 practice?
15     A.    Maybe they did.  But it just never
16 came through.  We never did it.
17     Q.    You responded to the December 21,
18 2007, e-mail from Jeff Potkul and said, Thank you
19 for the gift.  I inquired about the grant and was
20 told that they did not give grants to individuals,
21 only institutions, so I don't know if that would
22 work for us.  Remember, we spoke about PROLIFT® TVT
23 training programs?
24         Do you see that?
25     A.    This is sort of coming back to me

Page 164

1  now.
2      Q.    Good.
3      A.    I think I wanted -- I think I was
4  asking if Ethicon could help contribute to our
5  fellowship program, because we were -- we needed
6  funding for our fellowship program; not to use the
7  products, but because -- but in the end, because I
8  spoke to the institution, that was never going to be
9  art of it.
10     Q.    Ethicon couldn't give funding to the
11 hospitals that you worked at?
12     A.    Right, right.  They couldn't.
13     Q.    Why not?
14     A.    Because it's not allowed.
15     Q.    By who?
16     A.    The hospitals.
17     Q.    They won't take money from a medical
18 device manufacturer?
19     A.    No, they won't -- they will not.  And
20 that's why.
21     Q.    The hospitals you work with think it
22 unethical to take money from a medical device
23 manufacture?
24         MS. KABBASH:  Objection.
25         THE WITNESS:  It's not that it was

Page 165

1  unethical.  But we were seeing -- there had been a
2  doctor, I guess, who had -- not from Ethicon, but
3  had gotten some funding, I think, for grants, grant
4  funding for research, and that could be put towards
5  the fellowship program.
6          It never manifested.  It never went
7  anywhere.  So that's why that was the case.
8  BY MR. SLATER:
9      Q.    The hospitals that you worked at
10 would not accept --
11     A.    Monte --
12     Q.    -- funding from a medical device
13 manufacturer, correct?
14     A.    Right.
15         MS. KABBASH:  Dr. Fleischmann, I'm
16 just going to remind you to wait until Mr. Slater
17 gets to the end of his question.
18 BY MR. SLATER:
19     Q.    You tell Jeff Potkul, Remember we
20 spoke about PROLIFT® TVT training programs.
21         And there you were talking about
22 wanting to participate in teaching PROLIFT® and TVT
23 to other doctors, right?
24     A.    Yes.
25     Q.    And you understood that Ethicon would

42 (Pages 162 to 165)

Nicole Fleischmann, M.D.

Page 166

1    pay you to do that, right?
2        A.    Right.
3                    - - -
4            (Whereupon, Exhibit Fleischmann-10,
5    November and December 2008 E-mails, was marked for
6    identification.)
7                    - - -
8    BY MR. SLATER:
9        Q.    This is Exhibit-10.  Some e-mails in
10   November and December of 2008.
11           And starting out at the bottom,
12   there's an e-mail from Melissa Doyle, northeast
13   professional education manager, at Ethicon, to you,
14   November 28, 2006, right?
15       A.    Yes.
16       Q.    And she's just following up with you
17   to confirm that you're going to be teaching for
18   Ethicon PROLIFT® and TVT, correct?
19       A.    Yes.
20       Q.    And she offers, You can arrive Friday
21   night.  If you think you'll be -- Melissa Doyle
22   indicates, you can come in Friday night.  You can
23   come out to dinner.  She's taking another urologist
24   out for dinner that night.
25           She offers to take you out to dinner

Page 167

1    that night, right?
2        A.    I guess she did, yes.
3        Q.    And then she talks about to call
4    American Express Travel, and they're going to set up
5    your flight, your car, hotel, and a ride back to the
6    airport Saturday.
7            Did they take care of all of have for
8    you?
9        A.    I suppose they did.
10       Q.    Do you remember where this lab was?
11       A.    I just -- I'm sorry, I don't have any
12   recollection of this.
13       Q.    You don't recall Ethicon flying you
14   to a training session where you were going to be
15   paid to show other doctors the PROLIFT® and TVT
16   procedure?
17       A.    Back in 2008?  I mean, I can see the
18   e-mail there, but I don't -- you know, this is
19   something that happened quite seldom, so I don't
20   remember it, no.
21       Q.    You did participate in that, correct?
22       A.    I believe I did.  But I'm just saying
23   that I don't have an independent recollection of the
24   course or, you know, where it was.  I'm assuming it
25   happened.

Page 168

1                    - - -
2            (Whereupon, Exhibit Fleischmann-11,
3    March and April 2011 E-mails, was marked for
4    identification.)
5                    - - -
6    BY MR. SLATER:
7        Q.    Let's look at the next exhibit.  This
8    is Exhibit-11.  It's some e-mails in March and April
9    of 2012.
10           And the first one in the chain, which
11   starts at the bottom of the first page is from
12   Michael Dill, a sales representative, to you.
13           Do you see that?
14       A.    The one that says, I hope the lab?
15   Are you talking about the second page?
16       Q.    Yes, but it starts on the first page.
17   It shows it's from Michael Dill to you, March 30th,
18   2012?
19       A.    Are we going to --
20       MS. KABBASH:  Yeah, we are.  But it's
21   the e-mail itself.
22       THE WITNESS:  Okay.
23   BY MR. SLATER:
24       Q.    Looking at the Exhibit-11, there's an
25   e-mail at the bottom from Michael Dill, who is a

Page 169

1    sales representative.
2            Do you remember Michael Dill?
3        A.    No.
4        Q.    Michael Dill wrote to you regarding a
5    dinner with Drs. Fromer, Cooper and Kavaler.
6            Do you see that?
7        A.    Yes.
8        Q.    Do you know Dr. Fromer?
9        A.    I know her.  We trained at the same
10   time in New York.  So I know her.
11       Q.    You trained together?
12       A.    No, no.  But we were all in the same
13   year in residency.
14       Q.    Are you friendly with Dr. Fromer?
15       A.    I mean, I'm not independent friends
16   with her, but I know her.
17       Q.    Have you talked to Dr. Fromer about
18   the fact that she's also been named as an expert in
19   this case?
20       A.    I was aware of that, but I haven't
21   spoken to her specifically.
22       Q.    Have you talked to her about that
23   she -- the fact that you're both experts in this
24   case?
25       A.    I haven't spoken to her specifically.

Nicole Fleischmann, M.D.

Page 170

1    I'm just telling you I'm aware that she's also an
2    expert.
3        Q.    Who is Dr. Cooper?
4        A.    Kim Cooper, she's at Columbia.
5        Q.    And who is Dr. Kavaler?
6        A.    That's Betsy Kavaler.
7        Q.    Do you know her?
8        A.    Yes.
9        Q.    Are you friendly with her?
10       A.    In the same way that I'm friends with
11   Dr. Fromer. I know her, we are colleagues.
12       Q.    Have you ever spoken with Dr. Kavaler
13   about her work as an expert for Ethicon?
14       A.    I know she's that an expert for
15   Ethicon, but I don't talk to her specifically about
16   what she does.
17       Q.    Do you know if Dr. Cooper has been an
18   expert for Ethicon?
19       A.    I don't know.
20       Q.    So Michael Dill, on March 30, 2012,
21   is confirming a dinner with you, Dr. Fromer, Dr.
22   Cooper and Dr. Kavaler.
23             And do you recall having dinner with
24   them?
25       A.    Not on that date.

Page 171

1        Q.    Do you recall that you guys
2    eventually had dinner together?
3        A.    Probably. We've had dinner together
4    in the past.
5        Q.    And at that meeting, three out of the
6    four doctors actually are now Ethicon experts,
7    right, that we can confirm?
8        A.    Looks that way.
9        Q.    You suggested that Dr. Rosenblum be
10   included.
11             Who is that?
12       A.    She's another colleague.
13       Q.    Do you recall where you guys went to
14   New York -- rephrase.
15             Do you recall where you guys went to
16   dinner in New York?
17       A.    No, I don't recall.
18       Q.    Ethicon would have paid for that
19   dinner, correct?
20       A.    I assume. If it ever even happened.
21   I don't really recall it specifically.
22       Q.    Well, he's scheduling and he's
23   picking dates there in June, right?
24       A.    I understand that. But I don't
25   recall the specific dinner. So I can't give you any

Page 172

1    more information about it.
2        Q.    Did you like getting taken out to
3    dinner by Ethicon? Was that fun?
4             MS. KABBASH: Objection.
5             THE WITNESS: You know, as a mother
6    of three kids, I have to tell you, I'd rather be
7    home with my kids on almost any date than go out to
8    dinner with people.
9             MR. SLATER: Move to strike.
10   BY MR. SLATER:
11       Q.    I'm looking at these e-mails, it
12   looks like you were looking forward to this dinner.
13             Were you not looking forward to this
14   dinner?
15             MS. KABBASH: Objection.
16             THE WITNESS: If I don't recall the
17   dinner, how am I going to tell you if I'm looking
18   forward to it? You're looking at the same e-mail
19   that I am.
20                    - - -
21             (Whereupon, Exhibit Fleischmann-12,
22   12/28/09 E-mail from S. Jones to N. Fleischmann, was
23   marked for identification.)
24                    - - -
25   BY MR. SLATER:

Page 173

1        Q.    Handing you Exhibit-12. Exhibit-12,
2    there's an e-mail September 28, 2009 from Scott
3    Jones to you.
4             Do you see that?
5        A.    Yes.
6        Q.    Scott Jones, who is a marketing
7    executive, invited to you a strategic working
8    session regarding the pelvic floor business.
9             Do you see that?
10       A.    Yes, I do.
11       Q.    And do you recall attending a
12   strategic working session with Ethicon regarding
13   their pelvic floor business?
14       A.    I recall going to some meetings where
15   we were meeting with other doctors who were using
16   similar products.
17       Q.    And he said he's also going to be
18   inviting the top fifteen PROLIFT® customers to
19   gather for a one-day working session.
20             Did you know you were one of the top
21   fifteen PROLIFT® customers?
22       A.    I might have been. I really loved
23   PROLIFT®.
24       Q.    He said if you arrived in time, there
25   will be a dinner hosted.

Nicole Fleischmann, M.D.

Page 174

1 Did you get down there for dinner?
2 A. Oh, I don't recall, counselor.
3 Q. It says, you'll attend but arrive the
4 morning of the 5th.
5 So I guess you would have missed
6 dinner on the 4th, right?
7 MS. KABBASH: Objection.
8 THE WITNESS: Possibly.
9 - - -
10 (Whereupon, Exhibit Fleischmann-13,
11 11/6/09 Paper, was marked for identification.)
12 - - -
13 BY MR. SLATER:
14 Q. This is Exhibit-13.
15 Exhibit-13 is a November 6, 2009,
16 paper you wrote to, Dear Scott.
17 And just for the record --
18 MS. CRAWFORD: Can I ask you a
19 question? I don't want to interrupt you. The
20 doctor has indicated she needs to take a break.
21 MR. SLATER: Okay. Go ahead. I
22 can't stop you.
23 VIDEO TECHNICIAN: The time is 12:19
24 p.m. We are going off the record.
25 - - -

Page 175

1 (Whereupon, a brief recess was
2 taken.)
3 VIDEO TECHNICIAN: The time is 12:24
4 p.m. Back on the record.
5 - - -
6 (Whereupon, Exhibit Fleischmann-14,
7 11/7/09 E-mail from N. Fleischmann to S. Jones, was
8 marked for identification.)
9 - - -
10 BY MR. SLATER:
11 Q. Doctor, I've handed you Exhibits-13
12 and 14.
13 14 is an e-mail you sent to Scott
14 Jones, November 7, 2009, and Exhibit-13 is November
15 6, 2009 -- it looks like a letter that you wrote to
16 Scott Jones.
17 So it looks like the e-mail sent the
18 letter; is that correct?
19 A. I think so, yes.
20 Q. And you wrote to Scott Jones to
21 follow up on the November 5 meeting because you
22 wanted J&J to understand how one of their most loyal
23 PROLIFT® users came to be that.
24 You want to tell your story to him,
25 correct?

Page 176

1 A. Yes.
2 Q. I just want to go through certain
3 parts of this.
4 You say, in the second paragraph, By
5 the time I finished fellowship, I had a strong
6 relationship with the company and, naturally,
7 gravitated to using these products, hence the
8 importance of targeting young fellows.
9 Do you see that?
10 A. I do.
11 Q. So it is true that by the time you
12 finished your fellowship, you had a strong
13 relationship with Ethicon, correct?
14 A. Not a financial relationship, though.
15 Q. I didn't ask you that.
16 Here is my question: You said in
17 your letter to Scott Jones, by the time you finished
18 your fellowship, you had a strong relationship with
19 Ethicon; is that true?
20 A. I had a relationship to the products.
21 I had been trained on the products, and that was the
22 relationship.
23 Q. You talk about -- rephrase.
24 You then comment about the importance
25 of targeting young fellows.

Page 177

1 Do you see that?
2 A. Yes.
3 Q. When you said "targeting young
4 fellows," you're talking about marketing, right?
5 A. I probably was, yes.
6 Q. So you were writing to a marketing
7 director at Ethicon to give him advice on how to
8 market their devices to doctors, right?
9 A. But that's not what this letter was
10 about. The letter was about something completely
11 different.
12 MR. SLATER: Move to strike.
13 BY MR. SLATER:
14 Q. Turn to the second page.
15 In the second paragraph, you talk
16 about, the last part of the sentence -- of the
17 paragraph, With the advent of +M, the outcomes are
18 getting better and better.
19 Do you see that?
20 A. Yes, I do.
21 Q. So in your November 6th, 2009, letter
22 to Scott Jones, you're telling him that your
23 outcomes with the PROLIFT®+M were actually getting
24 better and better, right?
25 A. Yes.

Page 178

1    Q.    Better and better compared to the
2  PROLIFT®, right?
3    A.    Yes.  But this letter was written in
4  2009, and I did PROLIFT® for about three more years
5  after that.  And I'm telling you, I didn't feel in
6  the end, that it was much different.
7    I also -- yeah, I didn't feel it was
8  much different after the next three years.  I had
9  just started using +M at that point.
10    MR. SLATER:  Move to strike from
11  "but" forward.
12  BY MR. SLATER:
13    Q.    At the end of your letter to Scott
14  Jones, you say, Remember, keeping your loyal users
15  happy is just as important and recruiting new users.
16    So you're talking about marketing
17  there, right?
18    A.    It looks like it, yes.  And that's in
19  response to a marketing meeting that I was coming
20  off of.
21    - - -
22    (Whereupon, Exhibit Fleischmann-15,
23  Invoice, was marked for identification.)
24    - - -
25  BY MR. SLATER:

Page 179

1    Q.    I just handed you what I've marked as
2  Exhibit-15.
3    That's an invoice where you were
4  invoicing Ethicon $2,000 for a preceptorship where
5  you were teaching the TVT-O procedure to doctors on
6  behalf of Ethicon, correct?
7    A.    On behalf of Ethicon?  I was teaching
8  TVT-O to doctors.  It's very important to me that I
9  teach people properly how to do the device.
10    Q.    You could have taught the TVT-O to
11  doctors without charging any money for that, right?
12    A.    I could have.  But it was my time,
13  and why should I -- why should I give my time
14  without being paid for it?
15    Q.    Well, you could have done teaching to
16  doctors outside of Ethicon, professional education;
17  you could have just made yourself available for
18  seven hours and done it separately from Ethicon,
19  right?
20    A.    I have done that.  I've done a lot of
21  that in my life.
22    Q.    Okay.  You taught for Ethicon and you
23  were paid $2,000 for the preceptorship of June 1,
24  2009, right?
25    A.    I have an invoice for $2,000, there,

Page 180

1  yes.  I never looked at it as teaching for Ethicon,
2  though.
3    - - -
4    (Whereupon, Exhibit Fleischmann-16,
5  12/13/08 Invoice, was marked for identification.)
6    - - -
7  BY MR. SLATER:
8    Q.    Exhibit-16 is an invoice, December
9  13, 2008, $2,000, for teaching an advanced Level 2
10  course.
11    Do you know what that course was?
12    A.    No, I'm not -- I don't recall
13  exactly.
14    MR. SLATER:  If we want to eat, this
15  is probably a good time.
16    MS. KABBASH:  Okay.
17    VIDEO TECHNICIAN:  The time is 12:29
18  p.m.  We are going off the video.
19    - - -
20    (Whereupon, a luncheon recess was
21  taken.)
22    - - -
23    VIDEO TECHNICIAN:  This marks the
24  beginning of Videotape Number 3.  The time is 1:22
25  p.m.  Back on the record.

Page 181

1  BY MR. SLATER:
2    Q.    Doctor, I want to ask you some
3  questions about some known complications with the
4  TVTTM Retropubic.
5    A.    Okay.
6    Q.    Would you agree with me that a known
7  complication with the TVTTM Retropubic mesh is
8  chronic pain?
9    A.    I agree that with any pelvic surgery,
10  not specifically with TVT, that is a known
11  complication.
12    Q.    I'm not asking about any other
13  surgeries.  So I understand the theme of the defense
14  is all surgeries have these risks.
15    A.    Right.
16    Q.    But I am asking about the TVTTM
17  Retropubic mesh, okay.  Which isn't in all
18  surgeries, and I don't really want to talk about
19  other surgeries.  I want to talk about this surgery.
20    A.    Okay.
21    Q.    So I'm going to start over.
22    Would you agree with me that one of
23  the risks with the TVTTM Retropubic is chronic pain?
24    A.    I think that -- I think it is a risk,
25  yes.

Nicole Fleischmann, M.D.

Page 182

1    Q.    Would you agree with me that one of
2  the known risks with the TVTTM Retropubic is pain
3  with intercourse, which, in some patients, may not
4  resolve?
5    A.    It's a risk.  But, again, it's a risk
6  with any pelvic surgery.
7        MR. SLATER:  Move to strike from
8  "but" again -- "but" forward.
9  BY MR. SLATER:
10   Q.    Doctor, tell me, honestly, I told you
11  in the beginning, if my questions aren't clear, tell
12  me.  Are you not clear that I'm asking about the
13  TVTTM Retropubic, because you keep talking about
14  other procedures that I'm not asking you about.
15       MS. KABBASH:  Adam, that's part of
16  her response.  And you move to strike it as you want
17  to.  There's no point in trying to beat her up over
18  this.
19       MR. SLATER:  I'm not trying to beat
20  anyone up.
21       MS. KABBASH:  She's providing what
22  she believes is an accurate response.  Let's just
23  move forward.
24       MR. SLATER:  Don't tell me to move
25  forward.  It's not -- you know what, for all the

Page 183

1  time we've worked together -- I didn't ask about
2  other procedures, that's your defense.  You guys are
3  entitled to your defense; make your defense at
4  trial.  I'm not asking about other procedures.
5  BY MR. SLATER:
6    Q.    Doctor, if I ask you about other
7  procedures, you can talk about them.  I don't want
8  to hear about them.  I'm asking about the TVTTM
9  Retropubic.  So I'll ask again.
10       Do you agree with me that with the
11  TVTTM Retropubic mesh device, one risk is chronic
12  pain?
13   A.    I believe that that is a small risk,
14  yes.
15       MR. SLATER:  Move to strike.
16  BY MR. SLATER:
17   Q.    Did I ask you how large the risk is?
18       MS. KABBASH:  Objection.
19  BY MR. SLATER:
20   Q.    I mean, was my question unclear?  Did
21  you think I asked you how large the risk is?
22   A.    I can answer the question again, if
23  you'd like.
24   Q.    Well, no, I want to know, did you
25  think that I was asking you the size of the risk,

Page 184

1  because if I was, I'll re-ask the question
2  differently.
3    A.    Okay.
4    Q.    Did you think that was what I was
5  asking you?
6    A.    I'm not sure what you asked me.  Why
7  don't you ask it again and I'll try to answer it
8  better.
9    Q.    You weren't sure what I asked you
10  just now?
11   A.    Why don't you ask it again, or have
12  them read it back?
13   Q.    For the record, you didn't understand
14  my last question?
15       MS. KABBASH:  Adam, you're getting a
16  little argumentative.  Just ask her the question.
17  BY MR. SLATER:
18   Q.    Doctor, did you not understand my
19  question?
20   A.    I understand your question, but I
21  think I'm allowed to qualify the answer.
22   Q.    Okay.  I'm telling you, you're not.
23       MS. KABBASH:  Yes, she is, if she
24  believes it produces an accurate response.
25       MR. SLATER:  I'm going to move to

Page 185

1  preclude testimony at trial if I can't get direct
2  answers to direct questions.
3  BY MR. SLATER:
4    Q.    Do you agree with me that with the
5  TVTTM Retropubic mesh device, one risk of the mesh
6  being in the body is chronic pain?
7    A.    Yes, in a very small percentage of
8  patients.
9        MR. SLATER:  Move to strike from "in"
10  forward.
11  BY MR. SLATER:
12   Q.    Doctor, did you think that I asked
13  you how many patients it happens to?
14   A.    No, you didn't ask that.
15   Q.    Do you agree with me that with the
16  TVTTM Retropubic mesh device, that one of the risks
17  is pain with intercourse, which, in some patients,
18  may not resolve?
19   A.    Yes, it can happen.
20   Q.    Do you agree with me that with the
21  TVTTM Retropubic mesh device, one of the risks is
22  neuromuscular problems including acute and/or
23  chronic pain in the groin, thigh, leg, pelvic and/or
24  abdominal area?
25   A.    I'm willing to say that these are

Nicole Fleischmann, M.D.

Page 186

1  risks of the procedure, but I really would like to
2  qualify that it is not specific to the TVTTM
3  Retropubic.
4          MR. SLATER:  Move to strike from
5  "but" forward.
6  BY MR. SLATER:
7      Q.    Do you agree with me that one of the
8  risks with the TVTTM Retropubic mesh device is
9  excessive contraction or shrinkage of the
10 combination of tissue and mesh?
11     A.    I don't know if that's a risk, no.
12 I'm not sure of that.
13     Q.    You don't know one way or the other?
14     A.    I don't know.  No, I don't -- I don't
15 know.
16     Q.    Do you agree with me that one of the
17 risks with the TVTTM Retropubic mesh device is that
18 when adverse reactions occur, that may require
19 surgical treatment?
20     A.    Just repeat the question for me,
21 please.
22     Q.    Do you agree with me that with the
23 TVTTM Retropubic mesh device that one of the risks
24 is that if these adverse reactions that you have
25 said you agree occur in some patients, that if they

Page 187

1  occur, that it may require surgical treatment?
2      A.    Yes, that can happen.
3      Q.    Do you agree with me with the TVTTM
4  Retropubic mesh device, that when the adverse
5  reactions occur, one or more revision surgeries may
6  be necessary to treat these adverse reactions?
7      A.    Yes, that can happen.
8      Q.    Do you agree with me that with the
9  TVTTM Retropubic mesh device, in cases in which the
10 PROLENE® mesh needs to be removed, in part or whole,
11 significant dissection might be required?
12     A.    I don't know what you would call
13 significant dissection.  I think that you can -- you
14 might need to take out the sling.
15     Q.    So you're not able to answer that?
16         MS. KABBASH:  Objection.
17         THE WITNESS:  I can't say what a
18 significant dissection is.  I don't know how to
19 answer that question, because I don't know what
20 significant dissection means.
21 BY MR. SLATER:
22     Q.    Have you ever seen a warning in
23 connection with any TVT device indicating that in
24 cases in which the PROLENE® mesh needs to be
25 removed, in part or whole, significant dissection

Page 188

1  maybe required?
2      A.    I've seen the warning.  But, again,
3  I'm saying I don't know what significant dissection
4  means.
5      Q.    When you say you've seen the warning,
6  you're talking about the warning in the 2015 IFU,
7  right?
8      A.    Yes.
9      Q.    You don't -- you don't understand it,
10 though?
11     A.    I don't -- I think significant
12 dissection needs to be qualified.
13     Q.    So you don't understand what it
14 means?
15     A.    Quantified, I should say.
16     Q.    You don't understand what it means as
17 phrased in the IFU?
18     A.    I understand that significant
19 dissection is not a clear amount of dissection.
20     Q.    So you don't know what it means?
21         MS. KABBASH:  Objection.
22         THE WITNESS:  I think it needs to be
23 quantified.
24 BY MR. SLATER:
25     Q.    I'm asking you, can you define for me

Page 189

1  what significant dissection means as used in the TVT
2  IFU for 2015?
3      A.    I think it's in an IFU and they are
4  leaving it open for there to be significant
5  dissection.  I just don't agree that, necessarily,
6  there's a significant dissection to get out a sling.
7      Q.    How do you define the term
8  significant dissection --
9      A.    I can't.
10     Q.    -- as used in the 2015 TVT IFU?
11     A.    To me, it sounds like a very large
12 dissection, and I don't find that that's necessary,
13 in most cases, to get out a sling.
14     Q.    So you disagree with the warning?
15         MS. KABBASH:  Objection.
16         THE WITNESS:  I don't disagree with
17 the warning.  I think the warning leaves open the
18 fact that there might be a significant dissection.
19 I just don't think that's common in my practice, and
20 what I've seen in my practice and what's in the
21 medical literature.
22 BY MR. SLATER:
23     Q.    Do you know why Ethicon added that
24 adverse reaction to the list in the IFU in 2015?
25     A.    I'm sure it had to do with a lot of

Nicole Fleischmann, M.D.

Page 190

1 the medical -- the medicolegal issues that are out
2 there.
3     Q.    You have no idea why they added it,
4 do you?
5     A.    They redid their IFU to add more of
6 the general principles of surgical risk.
7     Q.    Who told you that?
8     A.    That's my own opinion, and that's the
9 opinion that, I think, a lot of us share.
10     Q.    I'm not asking for your opinion here.
11     I'm asking if you factually know why
12 risks were added to the IFU in 2015 for the TVT?
13     A.    I didn't discuss it with anyone at
14 Ethicon, why they -- why they added it to their
15 risks.
16     Q.    So the answer is you don't know,
17 right?
18     A.    The answer is I never discussed it
19 with Ethicon. I can think about why they would have
20 done it. But I don't -- I never discussed it with
21 anyone at Ethicon.
22     Q.    You could speculate as to why it
23 happened, but you don't know?
24     A.    Right.
25     Q.    Do you know what scar plating and

Page 191

1 bridging fibrosis is?
2     A.    Yes, I've been told that scar plating
3 and fibrosis is.
4     Q.    You've been told what it is by who?
5     A.    Through my reading.
6     Q.    Well, where did you read that?
7     A.    In the medical literature.
8     Q.    In connection with your work to get
9 ready to be an expert in this case, is that when you
10 learned what scar plating and bridging fibrosis was?
11     A.    No, I've heard that term well before
12 I became an expert.
13     Q.    What is scar plating and bridging
14 fibrosis?
15     A.    It has to do with the fibrotic
16 reaction that happens when -- mostly when pore sizes
17 are too small and the bridge happens over the pores
18 where the tissue doesn't infiltrate.
19     Q.    Do you agree that scar plating and
20 bridging fibrosis can cause adverse reactions?
21     A.    I don't know that it has a clinical
22 significance.
23     Q.    Do you agree that the clinical
24 manifestation of scar plating and bridging fibrosis
25 can include contraction, pain, erosion, extrusion

Page 192

1 and exposure?
2     A.    I can't agree with that, no.
3     Q.    So if Ethicon says that, you disagree
4 with Ethicon?
5         MS. KABBASH:  Objection.
6         THE WITNESS:  I don't know what
7 Ethicon says about that. I'm just telling you that
8 I don't see how that's related to anything clinical.
9 BY MR. SLATER:
10     Q.    Here is my question:  If Ethicon
11 believes that scar plating and bridging fibrosis can
12 be associated with adverse events and that the
13 clinical manifestation would be contraction, pain,
14 erosion, extrusion and exposure, you would disagree
15 with that?
16         MS. KABBASH:  Objection.
17 BY MR. SLATER:
18     Q.    Is that what you're saying?
19     A.    I'm saying I would need to see more
20 of the documentation before I respond yes or no to
21 that.
22     Q.    So as you sit here now, you don't
23 know whether or not scar plating and bridging
24 fibrosis can be associated with adverse events and
25 that the clinical manifestation would be

Page 193

1 contraction, pain, erosion, extrusion and exposure?
2     A.    Exactly --
3         MS. KABBASH:  Objection.
4         THE WITNESS:  -- because you're
5 talking about something that's happening on a
6 cellular level, and I don't know how that relates to
7 a clinical outcome.
8 BY MR. SLATER:
9     Q.    And you've never studied that
10 question, correct?
11     A.    I read about it, but I don't see the
12 correlation in my practice or in any of the medical
13 literature that I've reviewed.
14     Q.    This is my question:  Have you
15 actually ever studied that question to try to form
16 an opinion on that question?
17     A.    My opinion is that there's no
18 clinical significance to any kind of scarification
19 that might happen. That is a known process that
20 happens with mesh and one which we actually rely
21 upon.
22     Q.    Is it your testimony that scar
23 plating and bridging fibrosis is something that you
24 rely upon in the use of the mesh?
25     A.    No, scar. Scar. Fibrosis. That's

49 (Pages 190 to 193)

Nicole Fleischmann, M.D.

Page 194

1 the natural reaction of the body to mesh.
2      Q.    I'm asking about scar plating and
3 bridging fibrosis.  So let me be very clear.
4           Have you ever studied the question of
5 whether or not scar plating and bridging fibrosis
6 can be associated with adverse events, the clinical
7 manifestation of which would be contraction, pain,
8 erosion, extrusion and exposure?  Have you ever
9 looked at that question to form an opinion?
10      A.    I haven't --
11           MS. KABBASH:  Objection.
12           THE WITNESS:  I haven't studied that
13 question.  I can tell you, I don't see scar plating
14 or bridging fibrosis clinically in my patients.
15 BY MR. SLATER:
16      Q.    Scar plating and bridging fibrosis is
17 something that would be determined by someone
18 specifically looking for it on a
19 histopathological --
20      A.    Exactly.  That's my point.
21      Q.    So that's not something you look for,
22 right?
23      A.    I can't look for.  It's not something
24 I can see clinically.
25      Q.    If you wanted to, you could have the

Page 195

1 explanted mesh from your patients studied, right?
2      A.    Sure.
3      Q.    You've never done that, right?
4      A.    Well, if I had explanted mesh, it
5 would be sent for pathology, sure.
6      Q.    Have you ever had explanted mesh from
7 your patients studied, on a histopathological basis,
8 to determine whether there was scar plating or
9 bridging fibrosis?
10      A.    Not that I've ordered.  It might have
11 happened, but I've never ordered that.
12      Q.    So just to be very clear so we can
13 move on, but I just want to be clear.
14           Am I correct that you have never
15 studied the question of whether scar plating and
16 bridging fibrosis can cause adverse events, the
17 clinical manifestation of which would be
18 contraction, pain, erosion, extrusion and exposure?
19 Am I correct you have not studied that specific
20 question?
21      A.    I've never studied that on a
22 histopathological level.
23      Q.    Did you read Dr. Klinge's report
24 about that subject?
25      A.    I have, at some point, perused Dr.

Page 196

1 Klinge's report.  But I don't -- I can't quote from
2 it.
3      Q.    Did you read any of the published
4 literature on that question?
5      A.    There's not much published literature
6 on that question.  It's pretty minimal.
7      Q.    So is the answer you haven't?
8      A.    What's out there, I have reviewed.
9 And I don't give much credence to it.
10      Q.    Do you know if Ethicon gives credence
11 to that literature?
12      A.    I'm not part of Ethicon, so I can't
13 say what Ethicon does.
14      Q.    When Ethicon talks about the
15 complications and the risks from the TVTTM
16 Retropubic device, do you think Ethicon knows what
17 it's talking about?
18           MS. KABBASH:  Objection.
19           THE WITNESS:  In some ways.  But
20 Ethicon is not the one that's putting the slings in.
21 We are.  We are the ones that see the outcomes and
22 the clinical outcomes.
23 BY MR. SLATER:
24      Q.    Do you know Peeten Wolf?
25      A.    Not personally.

Page 197

1      Q.    Do you know who he is?
2      A.    I've heard his name.
3      Q.    Do you know what he does for a
4 living?
5      A.    I know that he is very high up in
6 Ethicon.
7      Q.    Do you know what department?
8      A.    I can't tell you his exact -- his
9 exact title.
10      Q.    Do you know -- do you know what his
11 background is before he went to Ethicon?
12      A.    I believe he was a urogynecologist.
13      Q.    Do you know if he actually used the
14 TVT in his own clinical practice?
15      A.    It's not -- it's not something that I
16 know or that affects how I think or what my opinions
17 are about this case.
18      Q.    I just want to know, do you know if
19 Peeten Wolf used the TVT device?
20      A.    I'm not sure.  I can't -- I can't
21 answer that question.
22      Q.    Do you know who Dr. Jim Hart is?
23      A.    No.
24      Q.    Never heard of him?
25      A.    Nope.

Nicole Fleischmann, M.D.

Page 198

1    Q.    In your report, your main report --
2    A.    My general report?
3    Q.    Your general report.
4          -- you talk about the Cochrane review
5 by Ogah, O-G-A-H, et al.
6          Is that an important article for you
7 in forming your opinions in this case?
8    A.    It's one of the articles that I've
9 relied upon.
10   Q.    Did you read it carefully?
11   A.    I read it carefully at some point,
12 not recently.
13   Q.    You talk about that article on Pages
14 18 and 19 of your general report.
15   A.    Okay.
16   Q.    Do you feel that your summary of what
17 that article stands for is a fair summary of the
18 important conclusions and findings by the authors?
19   A.    Yes.
20   Q.    Do you feel that you were obligated,
21 as an expert, when you wrote your report, to try to
22 be fair and balanced in describing that article, so
23 that you would not just point out things that might
24 support Ethicon's position but also things that may
25 cut against?

Page 199

1          Did you try to do that?
2    MS. KABBASH:  Objection.
3    THE WITNESS:  Yes, I tried to do
4 that.
5 BY MR. SLATER:
6    Q.    On Page 20, if you could turn to Page
7 20, you talk about the American Urologic Association
8 guidelines.
9          And towards the bottom of that first
10 paragraph, you say, In the case of TVT, there is an
11 added complication of mesh exposure.
12         Do you see that you said that?
13   A.    Yes, I did say that.
14   Q.    There are additional complications
15 with the TVT as compared to non-mesh procedures,
16 correct?
17   A.    Like what?
18   Q.    How about contraction of the mesh
19 causing pain?
20   A.    I don't think that I can say that
21 that's a definite complication of TVT.
22   Q.    It's your position, testifying as an
23 expert for Ethicon, that contraction of the mesh due
24 to the interrelationship of scar tissue in the mesh
25 cannot cause pain for a patient?

Page 200

1    A.    Not by that process, no.
2    MS. KABBASH:  Objection.
3 BY MR. SLATER:
4    Q.    If one needs to remove mesh due to a
5 complication, the removal of the mesh is now a
6 surgery that is necessary as a result of the mesh
7 problem, right?
8    MS. KABBASH:  Objection.
9    THE WITNESS:  It's a revision of a
10 sling, yes.
11 BY MR. SLATER:
12   Q.    If there's no mesh, that surgery
13 would not need to happen, because you wouldn't be
14 removing mesh, right?
15   MS. KABBASH:  Objection.
16   THE WITNESS:  You wouldn't be
17 removing mesh, but you might need to do another
18 revision surgery for another sling procedure or
19 another anti-incontinence procedure.
20   MR. SLATER:  Move to strike from
21 "but" forward.
22 BY MR. SLATER:
23   Q.    When we're talking about the TVTTM
24 Retropubic, and what the mesh can cause, one of the
25 things the mesh can lead to is the need to remove

Page 201

1 the mesh, right?
2    A.    You might need to remove mesh, yes.
3    MS. KABBASH:  Objection.
4 BY MR. SLATER:
5    Q.    If there's no mesh, you don't have to
6 remove mesh, by definition, right?
7    A.    No, but --
8    MS. KABBASH:  Objection.
9    THE WITNESS:  -- you might need to do
10 something else.
11   MR. SLATER:  Move to strike from
12 "but" forward.
13 BY MR. SLATER:
14   Q.    Was that funny?
15   A.    No.  I'm just trying to clarify what
16 I'm saying.
17   Q.    Mrs. Corbet had options other than
18 the TVTTM Retropubic, correct?
19   A.    Yes.
20   Q.    You can't tell me what would have
21 happened if Mrs. Corbet had a different procedure or
22 different type of treatment?  That would be
23 speculative to say, well, if she had something else
24 let tell me what happened; you can't say, right?
25   MS. KABBASH:  Objection.

51 (Pages 198 to 201)

Nicole Fleischmann, M.D.

Page 202

1   THE WITNESS: I can't say. But I
2   can -- I can tell you what the risks of another
3   surgery would have been.
4   BY MR. SLATER:
5       Q.   I understand you know the general
6   risks of other surgeries.
7            But you can't say whether or not they
8   would have happened, right?
9       A.   You can't say whether a risk ever
10  would have happened. That's what a risk is.
11      Q.   Can you turn to Page 25 --
12      A.   Sure.
13      Q.   -- of your report?
14           The first full paragraph, you say,
15  While several authors have reported on their
16  experience with mesh exposure, there is currently no
17  evidence-based consensus on exactly how to manage
18  exposures.
19           Right?
20      A.   Yes.
21      Q.   Do you stand by that statement?
22      A.   Yes.
23      Q.   At the end of that paragraph, you
24  say, In my experience, removing the extruded mesh
25  almost always resolves the patient's exposure

Page 203

1   problem.
2            That's what you're seeing in your
3   experience, right?
4       A.   That's in my experience. But I think
5   that's also in the literature.
6       Q.   You say, almost always resolves the
7   problem.
8            So sometimes removing the extruded
9   mesh does not resolve the patient's problem, right?
10      A.   It depends on what the problem is.
11      Q.   You called it the exposure problem,
12  right? Isn't that the words you used?
13      A.   Yes.
14      Q.   So removing the extruded mesh does
15  not always resolve the patient's exposure problem,
16  correct?
17      A.   In my experience, it's pretty
18  superlative, when you take out an exposed area of a
19  sling, that that sling exposure is resolved.
20      Q.   Doctor, you use the words "almost
21  always." So my question is: In your experience,
22  removing the extruded mesh does not always resolve
23  the patient's exposure problems; sometimes it
24  doesn't, correct?
25      A.   Sometimes it doesn't. But it would

Page 204

1   be extremely rare.
2       MR. SLATER: Move to strike from
3   "but" forward.
4   BY MR. SLATER:
5       Q.   Turn to Page 26 of your report, if
6   you could.
7            You talk during your report -- in
8   your report, about degradation of mesh. Have you
9   ever studied the question of whether or not the mesh
10  in the TVTTM Retropubic degrades on any level,
11  whether a macro level or a micro level?
12      A.   I've read the literature about
13  degradation. I find it's pretty scant.
14      Q.   Have you ever looked at Ethicon's
15  internal documents regarding degradation of PROLENE®
16  mesh?
17      A.   I've reviewed some of them in
18  preparation for this deposition, yes.
19      Q.   Did the people who showed you Ethicon
20  documents show you any of the internal documents
21  that show that degradation of PROLENE® mesh occurs?
22  Did you see those documents?
23      A.   I didn't find anywhere that there was
24  degradation of mesh that had occurred.
25      Q.   So whatever you were provided from

Page 205

1   Ethicon's documents, you weren't provided those
2   documents, were you?
3       MS. KABBASH: Objection.
4       THE WITNESS: I think if those
5   documents had existed, they might have provided them
6   to me.
7   BY MR. SLATER:
8       Q.   Meaning you would expect you would
9   have been given them, if they existed, right?
10      A.   Yes.
11      Q.   I have a question about the TVT
12  EXACT®® -- rephrase.
13           With the TVT EXACT®®®, it's the same
14  mesh, the same size mesh as with the TVTTM
15  Retropubic, and you said the difference is just the
16  insertion with the trocars, and it's inserted a
17  little bit differently?
18      A.   Well, it depends. I think the TVT
19  EXACT®®® is more the laser cut mesh, whereas the
20  retropubic TVT that I was using years ago was a
21  mechanical cut mesh.
22      Q.   The mesh in the TVT EXACT®®® is laser
23  cut?
24      A.   I think so, yes.
25      Q.   The TVTTM Retropubic mesh that you

Nicole Fleischmann, M.D.

Page 206

1  used was machine cut, correct?
2      A.    Yes.
3      Q.    Are you happy with the performance of
4  the laser cut mesh?
5      A.    I don't really see a difference.
6          MR. SLATER:  Move to strike.
7  BY MR. SLATER:
8      Q.    Are you happy with the performance of
9  the laser cut mesh?
10     A.    Yes.  Because I don't really see a
11 difference from what I was doing before.
12     Q.    I'm sorry, did I ask you if there was
13 a difference?
14     A.    No, you didn't.
15     Q.    Why would you tell me that, then?
16     A.    I don't know.  I felt a need to
17 qualify it.
18     Q.    I can -- I hope you don't expect to
19 do that at trial.
20         MS. KABBASH:  Objection.
21         Don't answer that.
22 BY MR. SLATER:
23     Q.    Doctor, with the TVT EXACT®®®, are you
24 satisfied with the performance of that mesh?
25     A.    Yes.

Page 207

1      Q.    Is the TVT™ Obturator offered in the
2  laser cut mesh?
3      A.    I believe it is, but I haven't used
4  it.
5      Q.    Did Ethicon actively market the
6  existence of the laser cut mesh to physicians?
7      A.    I don't know.
8          MS. KABBASH:  Objection.
9          THE WITNESS:  They didn't market it
10 to me.  And I don't know what they did in the
11 outside world.
12 BY MR. SLATER:
13     Q.    Did Ethicon provide you any internal
14 documents showing that they believed laser cut mesh
15 had advantages over machine cut mesh?
16         MS. KABBASH:  Objection.
17         THE WITNESS:  I saw some documents of
18 some e-mails about laser cut mesh.  I didn't see any
19 evidence-based medicine that showed that laser cut
20 mesh was superior.
21 BY MR. SLATER:
22     Q.    Did you see any internal documents
23 from Ethicon indicating that anyone within Ethicon
24 thought that there were advantages to the laser cut
25 mesh over the machine cut mesh?

Page 208

1      A.    I saw some internal documents about
2  conjecture of whether laser cut mesh would be better
3  than mechanical cut mesh.
4      Q.    Do you have an understanding as to
5  whether or not Ethicon thinks there are some
6  advantages to laser cut mesh over mechanical cut?
7      A.    It doesn't really matter to me if
8  Ethicon thinks about laser or mechanical cut mesh.
9      Q.    I'm just asking if you know whether
10 or not Ethicon believes there's a benefit to the
11 laser cut mesh over the mechanical cut mesh.
12         Do you know?
13     A.    I don't know what Ethicon believes,
14 no.
15     Q.    Do you dispute that particle loss
16 occurs with mechanical mesh?
17     A.    I think it occurs, yes.
18     Q.    You wouldn't dispute that particles
19 of the mesh with a mechanical cut TVT™™ Retropubic
20 can get into the body during implant?  You don't
21 dispute that, right?
22     A.    I would dispute that it gets into the
23 body at large.  I think that particles can come off
24 of the mesh in a local area.
25     Q.    A local area, in --

Page 209

1      A.    That you're working in.
2      Q.    -- the surgical field?
3      A.    In the surgical field, yes.
4      Q.    Do you know what the particles of
5  mesh that come off the machine cut mesh will do once
6  in the body?
7      A.    I believe they have no clinical
8  significance.
9          MR. SLATER:  Move to strike.
10 BY MR. SLATER:
11     Q.    Do you know what the particles of
12 mesh will do when inside the body?
13         MS. KABBASH:  Objection.
14         THE WITNESS:  Yes, they will do
15 nothing.
16 BY MR. SLATER:
17     Q.    That's your understanding?
18     A.    Yes.
19     Q.    The particles of mesh would be a
20 foreign body inside the body, right?
21     A.    Yes, because it's not the patient's
22 own body.
23     Q.    You would expect there to be a
24 foreign body reaction to the particles of mesh,
25 correct?

Nicole Fleischmann, M.D.

Page 210

1    A.    Possibly, but it wouldn't have any
2  clinical significance.
3          MR. SLATER:  Move to strike from
4  "but" forward.
5  BY MR. SLATER:
6    Q.    Have you ever studied the question of
7  whether or not particles of mesh from a TVTTM
8  Retropubic that get into the body cause a foreign
9  body reaction and any clinical issues with the
10 patient?  Have you ever studied that?
11   A.    I've studied it in the 1,500 or more
12 slings that I have placed, which have all been
13 mechanically cut mesh.
14   Q.    Tell me how you studied the impact of
15 particles.
16   A.    I've studied it because I've seen no
17 clinical significance to these -- to these -- to
18 this so-called particle loss that you're talking
19 about.
20   Q.    And what would you be looking for to
21 determine that there's clinical significance?  What
22 were you looking for?
23   A.    Anything.
24   Q.    Did you ever actually look to see if
25 there were particles in the body of any of your

Page 211

1  patients and whether they caused an issue for the
2  patient?  Did you ever look for that?
3    A.    Well, I don't know how I could look
4  at that, because that would be ethically opening up
5  a patient again.
6    Q.    I just want to know if you've ever
7  done it.
8    A.    No, there's been no reason to do it.
9          MR. SLATER:  Move to strike after
10 "no."
11 BY MR. SLATER:
12   Q.    One of your articles in your list of
13 publications is "Pelvic Floor Reconstruction, State
14 of the Art and Beyond."
15         What's the journal that that was
16 published in?
17   A.    This is the article I published in my
18 fellowship.  The Urology Clinics of North America.
19   Q.    Is that -- what level journal is that
20 considered to be?
21   A.    I'm not sure.
22   Q.    That wouldn't be considered to be a
23 Level 1 medical journal, would it?
24   A.    I don't know the answer to that.
25   Q.    What --

Page 212

1    A.    It is a peer-reviewed article, it's a
2  peer-reviewed journal.
3    Q.    What was the article about?
4    A.    Oh, boy.  We're talking about 11
5  years ago.
6          I think we were just talking about
7  slings and, possibly, prolapse in here.  But I
8  haven't reviewed it in a long time.
9    Q.    You don't recall what you said there?
10   A.    I would need to look at the article,
11 if I could.  I would be happy to.
12   Q.    I'm just curious -- you wrote it.
13         I'm just curious if you know what you
14 said in the article?
15   A.    I don't recall exactly.
16   Q.    In looking at your publications, it
17 looks like the first four on list, from 2002, 2003,
18 2004 and 2004, would have all been during your
19 fellowship, correct?
20   A.    No.  The first two were during my
21 residency.
22   Q.    Ah, residency?
23   A.    Yeah.  That's when I was in the lab.
24   Q.    Looking at your publications, the
25 first two, from 2002 and 2003, would be from your

Page 213

1  residency, correct?
2    A.    Correct.
3    Q.    The articles from 2004 would be from
4  your fellowship, correct?
5    A.    Exactly.
6    Q.    You have an article listed here,
7  "Vaginal Approach to Postsurgical Bladder Outlet
8  Obstruction."  And that was printed what, in a
9  textbook?
10   A.    Yes.  Dr. Zimmern?
11   Q.    When was that -- when was that
12 published?  Was that from your fellowship?
13   A.    Yeah, that was also from my
14 fellowship.
15   Q.    Who is Dr. Nitti?
16   A.    Dr. Nitti was my mentor in my
17 fellowship.
18   Q.    Did Dr. Nitti have any affiliation
19 with any medical device manufacturers?
20   A.    Possibly.
21   Q.    Do you know which?
22   A.    I don't know, but I know that he
23 probably did.
24   Q.    There's an article, Fleischmann,
25 Nitti, et al., "Voiding Dysfunction and Urinary

Nicole Fleischmann, M.D.

Page 214

1  Retention."  It looks like it was published in 2007
2  in a text.
3          But that was also written during your
4  fellowship, correct?
5      A.     No.  That was probably something I
6  reviewed later on in 2007.  I was already out in
7  practice.
8      Q.     So you were co-authors with Dr.
9  Nitti?
10     A.     Yes.
11     Q.     Did you write that?  Is it -- what is
12  it?
13     A.     It was a chapter in a book.
14     Q.     The last article you have there is a
15  chapter or is it -- it's actually an article in
16  Obstetrics and Gynecology Survey, is that?
17     A.     Yes.
18     Q.     What's that?
19     A.     It's just a -- it's a journal.
20     Q.     Is it a high-level journal?
21     A.     It's a peer-reviewed journal.
22     Q.     I know.  Is it a high-level journal?
23     A.     I don't know how to qualify that.
24          MS. KABBASH:  Objection.
25  BY MR. SLATER:

Page 215

1      Q.     Do you know the difference between
2  the high-level journals and the lower-level
3  journals?
4      A.     I believe I do.
5      Q.     Is this -- where does this one fall
6  on the spectrum?
7      A.     I don't -- I don't know where this
8  journal falls on the spectrum.
9      Q.     Do any of your publications relate to
10 the treatment of stress urinary incontinence?
11     A.     That would -- in the third and
12 fourth -- probably the first -- after the
13 ovariectomy one, the next five all related to
14 incontinence.
15     Q.     Do any of your articles address
16 potential risks with the TVTTM Retropubic or any
17 other synthetic mid-urethral sling?
18     A.     I have to look at these articles.  I
19 haven't looked at them in a while.  But I'm sure, at
20 least in the 2004 articles, they would have been
21 addressed, yes.
22     Q.     I'm looking, now, at your report that
23 we marked as Exhibit-6, your supplemental report in
24 this case.
25     A.     Okay.

Page 216

1      Q.     And on Page 19, I have a question for
2  you.
3      A.     Sure.
4      Q.     On Page 19, you talk about roping and
5  curling.
6          Are you denying that roping and
7  curling of TVTTM Retropubic mesh can occur in some
8  women?
9      A.     I think it can occur, yes.
10     Q.     So you agree that roping and curling
11 of TVTTM Retropubic mesh can occur in some women,
12 correct?
13     A.     In specific instances it can occur,
14 yes.  When there's a lot of deforming tension placed
15 on the mesh, you can see roping and curling.
16     Q.     Deforming tension is enough tension
17 to be placed on the mesh to cause the mesh to deform
18 its shape?
19     A.     It's usually a surgical technical
20 problem.
21     Q.     When you say a "problem," you mean
22 it's a surgical or technical cause?
23     A.     Yes.
24     Q.     So let me ask you this:  There's no
25 objective measurable way to determine whether the

Page 217

1  right amount of tension is being placed on the mesh
2  when it's placed, that's just a matter of feel and
3  experience, correct?
4      A.     No, it's pretty clear.  You're
5  supposed to be placing these loosely.
6      Q.     What does that mean, "loosely"?
7      A.     Well, it's a tension-free device,
8  which means that you're not supposed to put tension
9  on the mesh when you place it.
10     Q.     Is tension placed on the TVT mesh
11 when it's placed in the body?
12     A.     It is, if it's not placed properly
13 and carefully, and that's part of what our training
14 is about.
15     Q.     A doctor can follow the TVTTM
16 Retropubic procedure and still place tension on the
17 mesh during the insertion process, correct?
18     A.     Sometimes inadvertently they can do
19 it, if they're not being careful.
20     Q.     When mesh is -- rephrase.
21          When tension is placed on the TVTTM
22 Retropubic mesh during implantation, that can deform
23 the mesh, correct?
24     A.     Yes, it could.  If you put too much
25 tension on when you're placing it you can cause

Nicole Fleischmann, M.D.

Page 218

1  deformation.
2         MR. SLATER:  Move to strike from "if"
3  forward.
4  BY MR. SLATER:
5      Q.    When tension is placed on the TVTTM
6  Retropubic mesh, that can cause the mesh to rope and
7  curl, correct?
8      A.    Yeah, I think it could, yes.
9      Q.    Did you ever see Ethicon warn doctors
10  about roping and curling of the mesh as a result of
11  tension?  Did you see a warning to that effect in
12  the IFU or somewhere else?
13     A.    The IFU does warn about putting too
14  much tension on mesh.  It talks about it in the IFU.
15     Q.    Does it -- does the IFU point to the
16  risk that if tension is placed on the mesh, that can
17  lead to roping and curling of the mesh?  Does it say
18  that?
19     A.    No, it doesn't say roping and curling
20  specifically, but it talks about over tensioning of
21  the mesh being a warning.
22     Q.    The IFU says that too much tension
23  applied to the tape may cause temporary or permanent
24  lower urinary tract obstruction; that what you're
25  referring to?

Page 219

1      A.    Yes.
2      Q.    It says -- the IFU says nothing about
3  the risk that tension on the mesh can lead to roping
4  or curling?
5      A.    It doesn't say roping or curling in
6  the IFU.
7      Q.    Have you had roping or curling of
8  mesh that you -- of TVTTM Retropubic mesh that
9  you've put in women's bodies?
10     A.    I can't recall a specific case where
11  I've seen, in my patients, roping and curling.
12     Q.    You've seen roping and curling of
13  TVTTM Retropubic mesh that was placed by other
14  doctors?
15     A.    I have.  I've seen the mesh get
16  banded into a tight rope.  And that's -- and that's
17  just when there's too much tension placed on it.
18     Q.    When the mesh is placed -- actually,
19  let me just check something.
20         When the mesh is placed, if a cough
21  test is performed during the procedure, what should
22  the surgeon be looking for?
23     A.    If you do it that way, you should be
24  looking for just a little bit of leakage with a --
25  with a cough.

Page 220

1      Q.    If there's no leakage, that would
2  mean it's too tight, right?
3      A.    No, not necessarily.
4      Q.    If there's no leakage -- well,
5  rephrase.
6         The reason you want to see a little
7  leakage is because there's going to be some
8  contraction and you don't want it to be too much and
9  then cause an obstruction, right?
10     A.    Yes.  But you know something, I think
11  that it's really the surgeon's prerogative how to
12  tension it.  There is an art more than a science to
13  this.  So we don't go by IFUs when we talk about
14  sling tensioning; that's something we learn in our
15  practice, in our fellowship, in our training, in our
16  experience with doing these slings.
17         So I personally don't do cough tests.
18         MR. SLATER:  Move to strike after
19  "yes."
20  BY MR. SLATER:
21     Q.    Other than your work in this case,
22  reading documents in connection with this case, were
23  you familiar with the concept of cytotoxicity?
24     A.    No.  I mean, not specifically with
25  TVT.  I've heard the word cytotoxicity before, but

Page 221

1  not in relation to the sling.
2      Q.    You're not -- you're not offering
3  opinions -- rephrase.
4         You're not proposing to offer expert
5  opinions regarding cytotoxicity in this case, are
6  you?
7      I'm not a histopathologist, so no.
8         MR. SLATER:  I don't have any other
9  questions.
10                - - -
11         (Whereupon, a discussion off the
12  record occurred.)
13                - - -
14         VIDEO TECHNICIAN:  The time is 2:04
15  p.m.  Going off the record.
16                - - -
17         (Whereupon, a discussion off the
18  record occurred.)
19                - - -
20         VIDEO TECHNICIAN:  The time is 2:08
21  p.m.  We are back on the record.
22                - - -
23         EXAMINATION
24                - - -
25  BY MS. KABBASH:

56 (Pages 218 to 221)

Nicole Fleischmann, M.D.

1    Q.    Dr. Fleischmann, I have some
2  questions to ask you.
3        You were asked several questions
4  today regarding your opinions, in the Corbet case,
5  regarding the adequacy of the TVTTM Retropubic
6  warnings.
7        Do you recall that?
8    A.    Yes.
9    Q.    And you have -- am I correct that you
10  have offered the opinions in your expert report, and
11  here today, that the TVT warnings that were in place
12  at the time of Mrs. Corbet's surgery were adequate,
13  correct?
14        MR. SLATER:  Objection to the form of
15  the question.  Leading.  I object to all leading
16  questions.  I'll continue to say object to the form
17  every time.  It's inadmissible to question your own
18  expert that way here.
19        MS. KABBASH:  You can answer.
20        THE WITNESS:  Yes, I believe the
21  warnings are adequate.
22        - - -
23        (Whereupon, a discussion off the
24  record occurred.)
25        - - -

1  BY MS. KABBASH:
2    Q.    Dr. Fleischmann, what is your opinion
3  on the adequacy of the TVT warnings based on?  What
4  sources of information?
5    A.    I base my opinion on my experience,
6  on my review of the medical records, my training,
7  and everything I've seen regarding TVT, that these
8  warnings were adequate.
9    Q.    In terms of what you've seen
10  regarding TVT, does that include medical literature?
11    A.    Yes.
12    Q.    And can you tell me a bit about the
13  body of medical literature that has informed your
14  opinion about the adequacy of TVT's warnings?
15        MR. SLATER:  Objection.
16        You can answer.
17        THE WITNESS:  I reviewed a lot of
18  literature over the last several months, and even
19  since the beginning of my career.  And there is
20  definitely Level 1 systematic reviews that talk
21  about the risks associated with TVT, and these are
22  adequately addressed in the warnings.
23  BY MS. KABBASH:
24    Q.    You testified -- strike that.
25        Does your opinion that the TVT

1  warnings are adequate mean that they are adequate
2  only for you personally?
3        MR. SLATER:  Objection.
4        THE WITNESS:  No.  The warnings are
5  adequate for any trained person who is placing the
6  TVT.
7  BY MS. KABBASH:
8    Q.    Do you believe that the TVT warnings
9  in place at the time of Mrs. Corbet's surgery were
10  adequate for the medical community of doctors who do
11  pelvic floor surgery to treat stress urinary
12  incontinence?
13    A.    Yes.
14        MR. SLATER:  Objection.
15        THE WITNESS:  Yes.
16  BY MS. KABBASH:
17    Q.    And, Doctor, you were asked some
18  questions about TVT EXACT®®®.
19        Do you currently use TVT EXACT®®®?
20    A.    Yes, I have.
21    Q.    Is TVT EXACT®®® a retropubic approach
22  of sling to treat SUI?
23    A.    Yes, it is.
24    Q.    Does -- do the trocars in TVT EXACT®®®
25  travel the same anatomical path as the trocars in

1  TVTTM Retropubic?
2    A.    The exact same place.
3    Q.    Is it your current intention to
4  continue to use TVT EXACT®®® in the future, in
5  patients for whom you believe it is appropriate?
6        MR. SLATER:  Objection.
7        THE WITNESS:  Absolutely.
8  BY MS. KABBASH:
9    Q.    Is the mesh sling of the TVT EXACT®®®,
10  other than being laser cut, the same as the mesh
11  sling in TVTTM Retropubic?
12    A.    Yes, it's the same.
13    Q.    And have you noticed any difference
14  in the clinical outcomes between your patients who
15  have had TVT EXACT®®® versus your patients who have
16  had TVTTM Retropubic?
17    A.    No, I haven't.
18    Q.    Did the fact that TVT EXACT®®® uses a
19  laser cut mesh sling play any role whatsoever in
20  your decision to use TVT EXACT®®®?
21    A.    No.  In fact, I'm not even sure I
22  knew that it was a laser cut mesh when I first
23  started using it.
24    Q.    Do you continue to use TVT-O today?
25    A.    Yes, I do.

Nicole Fleischmann, M.D.

Page 226

1    Q.    And does the version of TVT-O that
2  you use today have a mechanical cut sling or a laser
3  cut sling?
4    A.    We still have the mechanical cut
5  sling on our shelves.
6    Q.    And that's what you use?
7    A.    Yes, I like it.
8    Q.    Do you have any current intention to
9  switch from a mechanical cut sling to a laser cut
10  sling for your use of TVT-O?
11    A.    No, I don't.
12    Q.    Did you begin to use the TVT-O
13  because you thought TVTTM Retropubic was unsafe?
14    A.    I didn't think it was unsafe.  I just
15  preferred the risks of the TVT-O versus the risks of
16  the TVT-R.
17    Q.    And do you -- do you believe that a
18  choice of TVTTM Retropubic or TVT-O can be a matter
19  of surgeon preference in many cases?
20    MR. SLATER:  Objection.
21    THE WITNESS:  Absolutely.  Because I
22  still use the TVTTM Retropubic.
23  BY MS. KABBASH:
24    Q.    And do you consider -- when you chose
25  to use TVT-O, was that a matter of surgeon

Page 227

1  preference for you?
2    MR. SLATER:  Objection.
3    THE WITNESS:  I found the device easy
4  to use in my hands.  It was -- remember, I'm
5  training a lot of residents and fellows, and I know
6  that, initially with training, you have much higher
7  risks of bladder injuries.  And I just felt that, in
8  my hands and in training, it was -- it was more
9  beneficial to the patients to have a TVTTM
10  Obturator.
11  BY MS. KABBASH:
12    Q.    And the risk of bladder injuries, is
13  that warned of in the TVT warnings that were in
14  place at the time of Kathryn Corbet's surgery?
15    A.    Absolutely warned about.
16    MR. SLATER:  Objection.
17  BY MS. KABBASH:
18    Q.    And the does the risk of bladder
19  injuries exist for any sling to treat SUI that has a
20  retropubic approach?
21    MR. SLATER:  Objection.
22    THE WITNESS:  Absolutely.
23  BY MS. KABBASH:
24    Q.    And that includes TVT EXACT®®®?
25    A.    It includes TVT EXACT®®®.  It includes

Page 228

1  pubovaginal sling.  It includes Burch
2  colposuspension.
3    Q.    Dr. Fleischmann, you were asked some
4  questions earlier today about foreign body reaction
5  and the February 2013 pathology report that was
6  issued by the hospital following Dr. Smith's
7  revision of Ms. Corbet's sling.
8    Do you recall that?
9    A.    Yes.
10    Q.    Did you also, in your review of the
11  records, have occasion to see the pathology report
12  from July 2011 that accompanied Dr. Harrell's
13  initial implant surgery?
14    MR. SLATER:  Objection.
15    THE WITNESS:  I did review his
16  pathology report.
17  BY MS. KABBASH:
18    Q.    And did that pathology report address
19  tissue that had been removed from Mrs. Corbet before
20  her TVT implant was done?
21    MR. SLATER:  Objection.
22    THE WITNESS:  Yes, it did.
23  BY MS. KABBASH:
24    Q.    Does that report refer to chronic
25  inflammation?

Page 229

1    MR. SLATER:  Objection.
2    THE WITNESS:  I recall that it did,
3  which is normal in vaginal tissue, to see chronic
4  inflammation.
5  BY MS. KABBASH:
6    Q.    And why is that?
7    A.    Because vaginal tissue is exposed to
8  the outside world, and it can become chronically
9  inflamed.
10    Q.    Dr. Fleischmann, are you aware of any
11  sling material that eliminates or even reduces the
12  risk of vaginal exposure?
13    MR. SLATER:  Objection.
14    THE WITNESS:  I'm not aware of any
15  sling material that will reduce the risk of vaginal
16  exposure or any exposure.
17  BY MS. KABBASH:
18    Q.    Are you aware of any sling material
19  that eliminates or even reduces the risk of vaginal
20  scarring?
21    MR. SLATER:  Objection.
22    THE WITNESS:  No.
23  BY MS. KABBASH:
24    Q.    Are you aware of any sling material
25  that eliminates or even reduces the risk of urge

58 (Pages 226 to 229)

Nicole Fleischmann, M.D.

Page 230

1    incontinence?
2        A.    No, I'm not.
3        Q.    Are you aware of any sling material
4    that eliminates or even reduces the risk of urinary
5    frequency?
6            MR. SLATER:  Objection.
7            THE WITNESS:  No.
8    BY MS. KABBASH:
9        Q.    Are you aware of any sling material
10   that eliminates or even reduces the risk of
11   hematoma?
12           MR. SLATER:  Objection.
13           THE WITNESS:  Not material.  I think
14   that when you place the device as in an obturator
15   approach, there's much less of a risk of a hematoma.
16   But any -- any sling that's placed in a retropubic
17   space can develop a hematoma.
18   BY MS. KABBASH:
19       Q.    Are you aware of any sling material
20   that reduces or eliminates the risk of pain with
21   sexual intercourse?
22           MR. SLATER:  Objection.
23           THE WITNESS:  No.
24   BY MS. KABBASH:
25       Q.    Dr. Fleischmann, plaintiffs' counsel

Page 231

1    asked you a series of questions before about a
2    series of risks and whether they are a risk of TVT,
3    and I'll just -- I'll list them as best we can.
4            One was chronic pain; another was
5    dyspareunia that, in some patients will not resolve;
6    another was regarding neuromuscular problems, and it
7    went into further detail; another was excessive
8    contraction or shrinkage of the mesh; another was
9    that the risk may require surgical treatment, and
10   that revision surgery may happen; and I believe the
11   last one was that significant dissection might be
12   required.
13           Do you recall that line of
14   questioning by plaintiffs' counsel?
15       A.    Yes, I do.
16       Q.    Dr. Fleischmann, is it your opinion
17   that Ethicon needs to warn doctors of those risks,
18   as plaintiffs' counsel worded them, so that their
19   warnings will be adequate?
20           MR. SLATER:  Objection.
21           THE WITNESS:  I don't believe that it
22   is needed.
23   BY MS. KABBASH:
24       Q.    And why is that?
25       A.    Because I think these are the risks

Page 232

1    that pelvic surgeons know, trained pelvic surgeons
2    know, when placing slings or doing any kind of
3    pelvic surgery.
4        Q.    Do you believe that these risks are
5    common knowledge to the body of surgeons who are
6    pelvic floor surgeons who treat stress urinary
7    incontinence?
8            MR. SLATER:  Objection.
9            THE WITNESS:  Absolutely.
10   BY MS. KABBASH:
11       Q.    Do you believe that several of these
12   risks are risks of general pelvic surgery as opposed
13   to specifically related to a device?
14           MR. SLATER:  Objection.
15           THE WITNESS:  Absolutely.
16   BY MS. KABBASH:
17       Q.    Doctor, based on your experience and
18   your review of the medical literature, have you seen
19   evidence that roping or curling of mesh slings
20   happened in the absence of a doctor putting too much
21   tension on the mesh?
22           MR. SLATER:  Objection.
23           THE WITNESS:  No, I haven't.
24   BY MS. KABBASH:
25       Q.    Dr. Fleischmann, plaintiffs' counsel

Page 233

1    asked you before whether it would be, and I believe
2    he used the word speculative, to say that certain
3    risks would happen if other surgery had been used on
4    Mrs. Corbet.
5            Do you recall that line of
6    questioning?
7        A.    Yes, I do.
8        Q.    Even though you cannot say for sure
9    whether a risk will happen, does the potential that
10   risks could happen, is that relevant to a doctor's
11   recommendation of what the appropriate treatment
12   would be?
13           MR. SLATER:  Objection.
14           THE WITNESS:  Yes, because we need to
15   discuss all of the risks and benefits with our
16   patients so that we can make an informed decision.
17   And there is no procedure that does not involve
18   risk.
19           MS. KABBASH:  I don't have any other
20   questions at this time.  He might have a few more.
21               - - -
22               EXAMINATION
23               - - -
24   BY MR. SLATER:
25       Q.    The TVT-O, the insertion and the

Nicole Fleischmann, M.D.

Page 234

1  trocars, takes a different path than with the TVTTM
2  Retropubic, correct?
3      A.    Yes.
4      Q.    And different from the TVT EXACT®®®,
5  correct?
6      A.    Yes.  Those are both retropubic
7  slings, and the obturator goes to the obturator
8  space.
9      Q.    With regard to the warnings, is it
10  fair to say that you have no information whatsoever
11  as to what a medical device manufacturer, or even
12  Ethicon in specific, is required to do in providing
13  warnings?
14      MS. KABBASH:  Objection.
15      THE WITNESS:  No, I have a lot of
16  ideas of what a medical device manufacturer is
17  supposed to do.
18  BY MR. SLATER:
19      Q.    I understand you may have ideas.
20      But you have no knowledge of any
21  standards or criteria that are applicable to a
22  medical device manufacturer, like Ethicon, in
23  providing warnings, correct?
24      MS. KABBASH:  Objection.
25      THE WITNESS:  I think I do have an

Page 235

1  idea of the standards.  They are supposed to discuss
2  the risks of the procedure that are specific to that
3  device.
4      MR. SLATER:  I have no other
5  questions.
6                - -
7      VIDEO TECHNICIAN:  This marks the end
8  of today's deposition.  The time is 2:21 p.m.  We
9  are going off the record.
10               - - -
11      (Whereupon, the deposition was
12  concluded at 2:21 p.m.)
13               - - -
14
15
16
17
18
19
20
21
22
23
24
25

Page 236

1              CERTIFICATE
2
3
4      I HEREBY CERTIFY that the witness was
5  duly sworn by me and that the deposition is a true
6  record of the testimony given by the witness.
7
8
9
       Amanda Maslynsky-Miller
10       Certified Realtime Reporter
       Dated:  November 25, 2015
11
12
13
14
15
16      (The foregoing certification of this
17  transcript does not apply to any reproduction of the
18  same by any means, unless under the direct control
19  and/or supervision of the certifying reporter.)
20
21
22
23
24
25

Page 237

1         INSTRUCTIONS TO WITNESS
2
3      Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8      After doing so, please sign
9  the errata sheet and date it.  It will be
10  attached to your deposition.
11      It is imperative that you
12  return the original errata sheet to the
13  deposing attorney within thirty (30) days
14  of receipt of the deposition transcript
15  by you.  If you fail to do so, the
16  deposition transcript may be deemed to be
17  accurate and may be used in court.
18
19
20
21
22
23
24
25

Nicole Fleischmann, M.D.

Page 238

```
 1           - - - - - -
           E R R A T A
 2           - - - - - -
 3   PAGE  LINE  CHANGE
 4   _____  _____  _____
 5      REASON: _____
 6   _____  _____  _____
 7      REASON: _____
 8   _____  _____  _____
 9      REASON: _____
10   _____  _____  _____
11      REASON: _____
12   _____  _____  _____
13      REASON: _____
14   _____  _____  _____
15      REASON: _____
16   _____  _____  _____
17      REASON: _____
18   _____  _____  _____
19      REASON: _____
20   _____  _____  _____
21      REASON: _____
22   _____  _____  _____
23      REASON: _____
24   _____  _____  _____
25      REASON: _____
```

Page 240

```
 1              LAWYER'S NOTES
 2   PAGE  LINE
 3   _____  _____  _____
 4   _____  _____  _____
 5   _____  _____  _____
 6   _____  _____  _____
 7   _____  _____  _____
 8   _____  _____  _____
 9   _____  _____  _____
10   _____  _____  _____
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18   _____  _____  _____
19   _____  _____  _____
20   _____  _____  _____
21   _____  _____  _____
22   _____  _____  _____
23   _____  _____  _____
24   _____  _____  _____
25   _____  _____  _____
```

Page 239

```
 1       ACKNOWLEDGMENT OF DEPONENT
 2          I,_____, do
 3   hereby certify that I have read the
     foregoing pages, and that the same
 4   is a correct transcription of the answers
     given by me to the questions therein
 5   propounded, except for the corrections or
     changes in form or substance, if any,
 6   noted in the attached Errata Sheet.
 7
     _____
 8   NICOLE FLEISCHMANN, M.D.      DATE
 9
10
11
12
13
14
     Subscribed and sworn
15   to before me this
     _____ day of _____, 20____.
16
     My commission expires:_____
17
18   _____
     Notary Public
19
20
21
22
23
24
25
```

**A**

Abbott 44:12
abdominal 52:16,20
185:24
able 9:19 83:7,18 84:5
84:17,25 106:4,8,23
142:4 187:15
absence 232:20
absolutely 26:19 61:22
146:10,14 225:7
226:21 227:15,22
232:9,15
absorbable 158:11
abstracts 32:5
accept 165:10
acceptable 23:19 56:4
56:6 61:12,16 62:10
62:17 63:10,13,14,19
64:3,8,11
accepted 32:15
access 37:24
accompanied 228:12
accomplished 140:25
141:17,19
accurate 28:13 106:6
182:22 184:24
237:17
accurately 104:2,7
ACKNOWLEDGM...
239:1
ACOG 64:1
ACTION 1:3
active 103:1
actively 207:5
actual 20:2 83:15
acute 185:22
Adam 2:3 7:5 70:11
71:6 85:2 87:16
101:2 113:17 118:10
129:15 149:5 182:15
184:15
add 190:5
added 70:7 189:23
190:3,12,14 199:11
addition 51:19 55:17
additional 90:18
102:14 199:14
address 215:15 228:18
addressed 215:21
223:22
adequacy 26:18 28:2
222:5 223:3,14
adequate 26:5,11,13,25
27:14 28:3 222:12,21
223:8 224:1,1,5,10
231:19
adequately 223:22

adjacent 68:13 137:4
137:10,17
advanced 180:9
advantage 24:8
advantages 19:6 21:7
21:14 207:15,24
208:6
advent 177:17
adverse 38:6 186:18,24
187:4,6 189:24
191:20 192:12,24
194:6 195:16
advertise 16:2 163:13
advertisement 94:22
advertisements 162:15
advertising 4:6 162:8
162:20 163:1,8,10
advice 177:7
advising 28:3
affect 151:10
affiliation 213:18
afraid 49:11
age 108:22 109:15,16
109:18,19,21
agents 51:24 55:19,24
61:23
ago 13:7 106:18 205:20
212:5
agree 25:16,21 32:14
33:17 76:21 105:25
147:22 158:15 161:9
181:6,9,22 182:1
183:10 185:4,15,20
186:7,16,22,25 187:3
187:8 189:5 191:19
191:23 192:2 216:10
agreed 6:2
agreeing 96:1
agreement 31:8 33:22
35:15,18 36:1,13
agreements 8:20,21,24
agrees 38:8
Ah 212:22
ahead 42:20 118:15
130:6,9 174:21
airfare 9:21
airplane 13:5
airport 167:6
al 198:5 213:25
allowed 7:23 164:14
184:21
allowing 142:7
alternatives 18:15
148:9,15
Amanda 1:20 6:18
236:9
America 211:18
American

167:4 199:7
amount 9:15 20:15,18
20:22 126:18 131:7
188:19 217:1
AMS 49:5
analysis 18:18 64:24
anatomical 224:25
and/or 185:22,23
236:19
answer 5:5 7:21,25
34:8 67:12 84:14
101:7,9 105:14
106:23 118:10 121:6
121:7,9,12 145:24
146:11,17,22 147:21
183:22 184:7,21
187:15,19 190:16,18
196:7 197:21 206:21
211:24 222:19
223:16
answered 130:3 145:12
146:1 147:3 152:20
185:2 239:4
answers 98:14 118:13
185:2 239:4
anterior 82:5,23 84:11
anti-incontinence
200:19
anybody 11:18,22
148:1
anymore 17:24 49:1
65:5 159:2,10
anyway 71:16
APPEARANCES 2:1
appeared 67:15 114:20
applicable 234:21
application 161:25
162:5
applied 27:15,22
218:23
apply 236:17
applying 26:25
appreciate 13:8 161:4
approach 24:16 25:6
213:7 224:21 227:20
230:15
appropriate 225:5
233:11 237:6
approximate 48:3
April 4:9 168:3,8
Arc 49:6
architecture 80:24
area 13:17 29:23 58:17
58:24 67:18 68:5
74:22,25 75:11,15
76:7,12,13 77:9,11
77:12,14,19 118:17
122:13 123:15

125:25 127:2 133:11
133:13 185:24
203:18 208:24,25
argumentative 184:16
arm 127:16 128:1
136:25 137:4,7
143:10
arms 122:22 123:5
arrive 166:20 174:3
arrived 173:24
art 164:9 211:14
220:12
article 32:23 35:2
44:12,13 104:20
198:6,13,17,22
211:17 212:1,3,10,14
213:6,24 214:14,15
articles 34:4 44:3 59:21
88:13 100:1 104:22
198:8 211:12 213:3
215:15,18,20
asbestos 57:9 58:15,18
asked 54:16,18 57:20
63:4 68:4 74:16
80:14 84:3 106:22
129:24 145:11,21,25
146:9 152:19 155:23
155:24 156:2 159:18
183:21 184:6,9
185:12 222:3 224:17
228:3 231:1 233:1
asking 12:10 14:6
35:19 40:21 45:12,23
54:19 59:6 68:6 82:6
82:19 101:2,6 105:15
105:16 110:13 112:7
115:10 119:6 125:4
129:16 142:17
144:15,16,16,18
147:8 149:10 151:21
151:25 152:3 160:3
164:4 181:12,16
182:12,14 183:4,8,25
184:5 188:25 190:10
190:11 194:2 208:9
Aslater@mskf.net 2:6
assistance 161:24
associated 132:14
192:12,24 194:6
223:21
Association 199:7
assume 13:9 76:17
131:6 155:18 159:7
171:20
assuming 76:10,15
127:2,7 167:24
assumption 67:25

76:19
atrophy 108:18,21,24
109:8,15,19,20,22
110:1 111:19
attached 87:10 91:24
237:10 239:6
attend 12:12 13:17
174:3
attending 12:8 173:11
attention 90:13 154:15
attorney 237:13
AUA 106:13
AUGS 103:1,13,18,23
104:16 105:3,9
150:24 152:13
August 133:1
authored 103:14
authors 198:18 202:15
autologous 51:23 55:18
55:24 61:20 62:16,20
148:21 149:14,20
available 18:15 22:11
29:3 55:8 90:25
102:15 149:19
179:17
Avenue 1:18 2:11 6:13
aware 39:12 42:2 59:12
169:20 170:1 229:10
229:14,18,24 230:3,9
230:19
a.m 1:20 6:11 85:13,24

**B**

B 3:10 4:2
back 39:4,10 40:12
41:22 42:8,23 51:9
56:20 69:14,15 77:8
77:21 82:1,7,12
85:24 107:1,6 115:19
156:4,20 163:25
167:5,17 175:4
180:25 184:12
221:21
background 88:25
197:11
back-and-forth 40:2
bad 52:24 33:5,11
72:15
balance 47:21 48:6
balanced 198:22
band 81:22
banded 219:16
banding 155:18,23
156:2
base 37:11 223:5
based 32:2,6 36:18
37:18 50:18 54:3
63:3 76:21 95:19

102:16 103:20
136:22 137:16,20
147:11 154:13 223:3
232:17
**basic** 28:4
**basically** 131:11
**basing** 91:18
**basis** 56:23 95:22 96:9
96:13 98:8 120:7
195:7
**bathroom** 110:25
134:24
**beat** 182:17,19
**began** 41:17 52:12 66:6
**beginning** 22:23 23:1
24:11 47:22 85:23
127:10 156:16
180:24 182:11
223:19
**behalf** 9:20 14:10
179:6,7
**Behavior** 62:2
**believe** 9:8 12:16 27:25
28:3 77:14 92:8
100:5 122:15,16
124:9 131:21 145:16
153:4 156:3,18
157:20 167:22
183:13 197:12 207:3
209:7 215:4 222:20
224:8 225:5 226:17
231:10,21 232:4,11
233:1
**believed** 207:14
**believes** 182:22 184:24
192:11 208:10,13
**believing** 38:14
**beneficial** 227:9
**benefit** 158:9 208:10
**benefits** 9:19 18:10,13
37:10,18 233:15
**Bergen** 1:2 6:15
**BER-L-11575-14** 1:7
**BER-L-14589-14** 1:5
**best** 9:10 71:13 94:4
150:8 153:8 161:13
231:3
**Betsy** 170:6
**better** 14:7 19:10,16,20
57:24 66:12 72:20
139:22 158:16,23
177:18,18,24,24
178:1,1 184:8 208:2
**beyond** 35:1,22 54:22
154:7 160:1 211:14
**bias** 32:12,15,19,22
33:8,10,12 34:2

102:2 159:23
**biases** 103:7
**big** 113:16 157:25
158:18,25
**bilaterally** 83:10
**bill** 73:1
**billed** 71:18 72:25
**bit** 71:8 205:17 219:24
223:12
**bladder** 23:18,20 110:4
110:7,11,12,14,16,19
110:21,23 111:1,3,6
111:11,20 135:8
213:7 227:7,12,18
**blame** 118:5,20
**blaming** 117:24
**blanking** 11:13
**board** 108:11
**bodies** 219:9
**body** 18:5 21:8 31:2
53:5,22 123:15,25
131:19,20,22,23
132:14,21 142:11
143:1 144:5,21 145:6
147:24 148:2 185:6
194:1 208:20,23
209:6,12,20,20,22,24
210:8,9,25 217:11
223:13 228:4 232:5
**bone** 142:20
**book** 214:13
**bottom** 82:23 142:5
160:23 166:11
168:11,25 199:9
**box** 161:18
**boy** 212:4
**break** 22:2 71:11 85:3
174:20
**breakdown** 21:25
22:25
**bridge** 191:17
**bridging** 191:1,10,13
191:20,24 192:11,23
193:23 194:3,5,14,16
195:9,16
**brief** 85:15 175:1
**bring** 16:9
**brochure** 28:9,10,14,17
28:19,21 29:1,21,22
29:24 54:5,24 55:2
55:12,15
**brochures** 29:13,16
**brought** 10:8
**budgeted** 162:9
**bug** 89:12
**bulking** 51:24 55:19,24
61:23
**Burch**

52:8,10,11,14,20
55:19,25 57:12 61:25
63:10,18,22 64:2,3,7
64:16,25 65:3 148:20
149:3,14,19 228:1
**Burches** 51:25 52:2,13
**Burt** 73:4,8
**bus** 13:5
**business** 173:8,13
**Butler** 16:19,21

**C**

**calculate** 45:12,13
**calculation** 71:16,18
**call** 167:3 187:12
**called** 37:4 48:24 58:15
111:8 129:3 203:11
**Callen** 162:1
**Canada** 43:16,18 44:1
**Canadian** 43:15
**Cantrell** 71:6,12,21
**capital** 162:9
**car** 13:4,6 167:5
**care** 28:18 29:21 36:7,8
36:12,17 41:4,19
56:10 59:16,18 60:3
61:9,12,18 62:11
101:7 117:8 136:10
146:2 149:24 150:5
151:9 154:3 155:13
167:7
**career** 21:19 38:19
140:23 223:19
**careful** 112:18 113:10
217:19
**carefully** 55:6 101:25
150:13 198:10,11
217:13 237:4
**case** 18:20 23:4,6,18
25:11 26:17 49:21
53:4 60:8,10,11,14
69:16 70:5,18,22
71:9 86:15,24 87:24
114:19 120:15
121:23 125:6,8
138:20 142:4 151:14
165:7 169:19,24
191:9 197:17 198:7
199:10 215:24
219:10 220:21,22
221:5 222:4
**cases** 22:12 23:5 24:15
104:25 105:2 123:19
130:11 140:5,15
141:1,17,18,20,21,25
187:9,24 189:13
226:19
**case-specific** 89:9,16

107:1 138:19 149:11
**catheter** 24:2
**cause** 138:2,6,9 191:20
195:16 199:25
200:24 210:8 216:17
216:22 217:25 218:6
218:23 220:9
**caused** 76:24 114:15
115:2 136:20 137:22
138:3,8 139:6 211:1
**causes** 125:21
**causing** 58:6 78:5
120:4 139:21 199:19
**cell** 131:19,24 132:14
**cellular** 193:6
**certain** 19:6 21:14
25:13 34:24 62:7
88:13,13 97:16
102:12 112:15 176:2
233:2
**certainly** 62:9 143:11
**certainty** 124:17
139:20
**CERTIFICATE** 236:1
**certification** 6:4 236:16
**Certified** 1:21 236:10
**certify** 236:4 239:3
**certifying** 236:19
**cervix** 82:16
**cetera** 107:9
**chain** 168:10
**chance** 8:4
**CHANGE** 238:3
**changes** 58:7 239:5
**changing** 57:24 95:25
**chapter** 214:13,15
**charge** 73:11
**charging** 179:11
**check** 219:19
**chocolates** 161:19
**choice** 52:23 226:18
**chose** 19:9 55:10 65:25
102:16 226:24
**chronic** 131:20,21,24
132:15,20,21 181:8
181:23 183:11 185:6
185:23 228:24 229:3
231:4
**chronically** 229:8
**chronological** 107:3,5
**cite** 104:20
**cited** 105:4
**CIVIL** 1:3
**clarify** 148:19 201:15
**clean** 35:21
**clear** 79:8 117:8 182:11
182:12 188:19 194:3

195:12,13 217:4
**clinical** 20:11 31:19,21
31:23,24 32:1,1,3,7,8
32:12,23 33:7,23
99:1 110:20 143:16
154:13 158:21,24
191:21,23 192:8,13
192:25 193:7,18
194:6 195:17 196:22
197:14 209:7 210:2,9
210:17,21 225:14
**clinically** 194:14,24
**clinician** 99:2
**Clinics** 211:18
**close** 22:5 82:21
**closer** 23:2 82:20 124:9
**Cochrane** 198:4
**colleague** 171:12
**colleagues** 65:2 123:12
170:11
**collecting** 43:13
**colposuspension** 57:12
148:21 149:3,14
228:2
**Columbia** 170:4
**combination** 141:7,8
186:10
**come** 32:5,5 39:10
40:12 49:8 69:13,15
90:13,24 91:3 97:12
107:1 113:17 121:20
166:22,23 208:23
209:5
**comes** 44:15
**comfort** 142:8
**comfortable** 34:17
102:6
**coming** 25:8 107:6
163:25 178:19
**command** 84:18
**commencing** 1:19
**comment** 67:20 80:11
112:16 154:8 176:24
**comments** 154:18
**commercial** 58:14
**commission** 239:16
**commitment** 161:5,10
161:11,12
**committed** 94:13 97:5
119:13,17
**common** 189:19 232:5
**community** 41:22 54:6
59:3 64:15 224:10
**companies** 148:7
**company** 31:9 33:23
34:11 35:16 36:2
48:24 93:8 95:15,16

96:2 148:13 149:22
150:12 151:12
154:12,16 176:6
**compared** 19:6 22:13
57:14 178:1 199:15
**compiled** 92:9
**complain** 75:18,20 78:8
79:1,3,9 111:13
135:5
**complained** 79:13,16
80:4 110:4 112:10
135:8
**complaining** 76:23
77:15,25 79:25 112:2
134:19,20 135:23
138:25
**complains** 79:10
**complaints** 78:14 136:8
**complete** 140:7
**completed** 47:9
**completely** 82:4 177:10
**completing** 161:25
**complication** 39:4,5,13
40:5,8 121:2 181:7
181:11 199:11,21
200:5
**complications** 34:1,25
38:1 39:1,9,18,24
40:11 41:3,18 42:4
43:11 44:6 46:12
58:1,5 181:3 196:15
199:14
**concept** 32:11 220:23
**concerns** 63:2
**concluded** 235:12
**conclusions** 198:18
**condition** 51:16 52:19
76:4 134:2 136:3
**confirm** 29:6 166:17
171:7
**confirming** 170:21
**confounding** 102:12
**conjecture** 208:2
**conjunction** 52:15
**connected** 137:14
**connection** 97:25
187:23 191:8 220:22
**consecutive** 100:24
**consecutively** 102:1
**consensus** 202:17
**consider** 13:19 15:20
24:15 98:3 109:22
160:6 226:24
**considered** 13:23 15:23
161:13 211:20,22
**considering** 88:14
**consistent** 110:8,21

132:20
**constantly** 91:4
**consult** 27:5
**consultants** 103:15
150:24
**consulting** 8:20,21,24
**contact** 16:7
**contained** 119:10
**contains** 88:7 89:20
90:17
**contend** 53:14
**context** 34:13
**continue** 106:18 222:16
225:4,24
**continued** 66:22 161:5
161:9,11,12
**contract** 83:6,18 84:17
**contraction** 154:20
155:7,16,17,25 156:1
156:7 186:9 191:25
192:13 193:1 194:7
195:18 199:18,23
220:8 231:8
**contractual** 9:6
**contribute** 164:4
**contributing** 77:17
**control** 236:18
**Cooper** 169:5 170:3,4
170:17,22
**Corbet** 1:5,5 3:18,20
6:14 28:10 29:2,8
30:9,16,22 31:1 51:8
52:18,24 53:3,20,25
54:13,15,18,19 55:1
62:17,21 63:1,12,22
65:15,21 66:6,13,22
70:11,12,13,14,16,18
70:22 71:20 73:22
74:9,15,21 75:14
76:23 77:25 78:23
79:25 80:14 81:7,16
83:3 86:9,15,15,18
86:24 89:16,21 90:5
91:8,11,15 93:2
106:20 108:14 109:1
109:21 110:3 111:1
111:12 112:2 115:11
115:17,24 117:6,13
120:14 122:6 123:16
133:15 134:1,18
135:4,11 136:4,8,14
139:24 142:22,25
143:20,22 144:3,19
145:4 147:22 201:17
201:21 222:4 228:19
233:4
**Corbet's** 52:25 63:19

64:8 65:9 67:1
108:21 109:16 125:6
125:8 134:7,11
222:12 224:9 227:14
228:7
**correct** 18:10,15,22
19:3,7,22 22:16 24:5
24:8 25:6,14,24
32:17,20 33:16 34:4
35:18 37:20 39:21
48:8 50:20 51:13,14
52:25 53:5,22 54:3
55:3 56:5 58:9 59:18
61:14,21,23,25 62:18
63:12,24 64:9,17
65:17,22 66:7,10,15
66:24 67:2,6,9,16
68:11,15 69:1 74:11
74:16,19,23 75:5,9
76:5,9,16 77:1,5,18
78:2,7 79:11,14 80:1
81:8,11,18 82:9 83:3
84:20 87:25 88:10
89:17,22 90:11 91:8
91:19 92:4,24 93:4
94:2,11,19 95:5,13
95:20 102:2 107:16
108:15,18 110:4
111:14 112:13 115:6
115:14 117:22
120:23 121:16,21
122:3,7 124:1,14
126:2 128:24 129:12
130:1 131:25 132:22
132:24,25 133:9,12
133:18 134:4,12,15
136:13 137:5,7,23
140:1 141:19,23
143:1,13,24 144:9
145:4 165:13 166:18
167:21 171:19
175:18,25 176:13
179:6 193:10 195:14
195:19 199:16
201:18 203:16,24
206:1 209:25 212:19
213:1,2,4 214:4
216:12 217:3,17,23
218:7 222:9,13 234:2
234:5,23 239:4
**corrections** 237:5,7
239:5
**correctly** 24:10 128:21
129:8
**correlated** 137:14
**correlates** 75:8,10
77:16
**correlation**

193:12
**cough** 219:20,25
220:17
**counsel** 6:3,17 7:19
230:25 231:14,18
232:25
**counseled** 53:6
**counselor** 45:13 104:14
144:12 174:2
**counsel's** 53:10
**country** 57:1
**County** 1:2 6:15
**couple** 12:5 13:1 14:16
18:1 46:20 47:18,19
160:21
**course** 8:25 46:12
61:19 88:12 89:24
167:24 180:10,11
**court** 1:1 6:15,18 61:1
237:17
**courtroom** 105:22
152:5
**cover** 55:12,12 93:24
93:24 94:11,11
103:23,24
**co-authors** 214:8
**co-op** 4:6 162:20 163:1
**CRAWFORD** 2:10
118:9 121:4 146:24
174:18
**cream** 94:25
**create** 148:8,14
**credence** 196:9,10
**credibility** 159:22
**criteria** 27:22 101:1
102:16 234:21
**criticism** 120:19,24
**criticisms** 120:23
121:16
**criticize** 120:20
**CT** 136:23
**curious** 161:17 212:12
212:13
**curl** 218:7
**curling** 216:5,7,10,15
218:10,17,19 219:4,5
219:7,11,12 232:19
**current** 17:1 22:2
55:23 225:3 226:8
**currently** 10:25 17:8,9
21:23 51:15 64:25
157:9 202:16 224:19
**curve** 130:23
**customers** 173:18,21
**cut** 105:11 198:25
205:19,21,23 206:1,4
206:9 207:2,6,14,15

193:12
207:18,19,24,25
208:2,3,6,6,8,11,11
208:19 209:5 210:13
225:10,19,22 226:2,3
226:4,9,9
**cytotoxicity** 220:23,25
221:5
**C.V** 60:23

**D**

**D** 3:2
**daily** 98:7
**Danzig** 1:17 2:9
**data** 25:10 33:15,18
99:22,22,22,23
130:17
**date** 1:20 6:10 18:6
74:3,4 88:1,5 106:19
106:25 107:24,25
108:8 170:25 172:7
237:9 239:8
**dated** 74:6 87:23 89:16
91:8,13 236:10
**dates** 106:21 171:23
**day** 24:2 29:16 73:12
73:13 114:21 239:15
**days** 92:14 237:13
**De** 69:5
**deal** 24:22 113:16
**Dear** 174:16
**debilitating** 156:25
**December** 3:22 4:7
160:16,21 161:1,20
162:8 163:17 166:5
166:10 180:8
**decided** 102:8
**decision** 52:25 53:1,2
53:21,22,23 54:3
225:20 233:16
**decisions** 114:9 154:13
**decreasing** 17:20
**Dee** 1:20
**deemed** 237:16
**deeply** 143:3
**Defendant** 2:14
**Defendants** 1:9
**defense** 60:12,13 80:15
181:13 183:2,3,3
**defer** 98:22
**define** 49:22 188:25
189:7
**definite** 199:21
**definitely** 50:12 83:4
94:14 223:20
**definition** 131:22 201:6
**deform** 216:17 217:22
**deformation** 218:1
**deforming** 216:14,16

**degradation** 204:8,13
204:15,21,24
**degrades** 204:10
**degree** 109:22 124:17
125:9 128:9
**delivered** 29:23
**denying** 216:6
**dep** 71:24
**department** 197:7
**depends** 116:24 142:14
203:10 205:18
**deponent** 6:16 239:1
**deposed** 60:18
**deposing** 237:13
**deposition** 1:15 3:14
5:2 6:12 7:6 8:3,10
8:15,15 10:17 28:22
28:24 29:2 30:13
60:5 71:25 72:3 79:2
79:24 90:15 93:16
94:9 96:7,13 102:20
103:3 147:14 156:4
204:18 235:8,11
236:5 237:3,10,14,16
**depositions** 90:13
93:19
**deps@golkow.com**
1:25
**depth** 122:17,17
**depths** 123:24
**described** 91:17 100:3
137:21
**describing** 139:5
198:22
**description** 3:13 4:4
137:16
**despite** 66:9,21 134:12
**detail** 231:7
**details** 31:9
**determine** 41:16 64:24
155:6,8,15 195:8
210:21 216:25
**determined** 194:17
**determining** 27:15,23
156:6
**develop** 230:17
**device** 17:8,11,13 18:12
18:14 19:10,18 20:2
25:19 27:7 33:24
39:19 48:23,24 53:5
140:8,20 148:7,13
149:22 150:12
164:18,22 165:12
179:9 183:11 185:5
185:16,21 186:8,17
186:23 187:4,9,23
196:16 197:19

213:19 217:7 227:3
230:14 232:13
234:11,16,22 235:3
**devices** 17:16 48:25
157:7 177:8
**diagnostic** 137:21
**dicey** 71:8
**difference** 20:11,24
95:4,10 157:25
158:18,25 205:15
206:5,11,13 215:1
225:13
**differences** 21:3
**different** 43:18 63:6,6
71:9 82:4 100:1
123:24 124:1,1 135:1
140:1 158:7 177:11
178:6,8 201:21,22
234:1,4
**differently** 21:9,10
184:2 205:17
**difficult** 140:5,14,18
141:22,25
**difficulty** 110:24
**Dill** 168:12,17,25 169:2
169:4 170:20
**dinner** 10:6,8,8,16,19
121:10 166:23,24,25
169:5 170:21,23
171:2,3,16,19,25
172:3,8,12,14,17
173:25 174:1,6
**dinners** 10:15
**direct** 11:8 136:24
185:1,2 236:18
**Direction** 5:5
**directly** 97:21
**director** 24:20 32:4
177:7
**disadvantages** 21:7
**disagree** 122:8 134:5
189:14,16 192:3,14
**disclose** 33:7,9,11
**disclosed** 32:18,20,22
33:3,4
**disclosures** 60:22 103:7
**discomfort** 78:1,6,12
78:23 80:8,16
**discontinued** 157:14
159:3
**discuss** 16:8 31:16
190:13 233:15 235:1
**discussed** 44:8,10
99:25 190:18,20
**discussion** 30:2 51:4
85:6 221:11,17
222:23
**dispute**

208:15,18,21
208:22
**disputing** 136:14,16
**dissect** 141:15
**Dissecting** 140:24
**dissection** 187:11,13,18
187:20,25 188:3,12
188:19,19 189:1,5,6
189:8,12,18 231:11
**distinction** 31:25
**divide** 72:13
**divided** 72:18
**Division** 1:2,8 6:15
**DOCKET** 1:5,7
**doctor** 11:5 34:1 42:9
42:23 53:7,9 54:8
63:6 65:25 84:12
86:1 112:7 115:21
118:5 120:11 146:7
146:21 149:3 151:13
153:18 165:2 174:20
175:11 181:2 182:10
183:6 184:18 185:12
203:20 206:23
217:15 224:17
232:17,20
**doctors** 10:9 14:19,20
14:24 15:15,21 33:7
38:3 42:5 43:23
53:14,16 59:9 64:16
113:7,24 148:15,16
150:13 152:13,16,25
153:5,11 154:13
165:23 167:15 171:6
173:15 177:8 179:5,8
179:11,16 218:9
219:14 224:10
231:17
**doctor's** 233:10
**document** 153:10
**documentation** 192:20
**documented** 112:5,9
136:9
**documents** 5:10 10:15
10:19 27:21 37:13
69:14,15 93:8 94:15
95:16,16 96:3 110:23
204:15,20,20,22
205:1,2,5 207:14,17
207:22 208:1 220:22
**doing** 7:24 12:9 45:10
46:5 48:17 50:11
52:12,12,15 114:10
135:25 138:1,7 146:7
146:21,25 151:6
152:8 206:11 220:16
232:2 237:8
**dollars**

113:25
**Doyle** 11:21,24 12:4
166:12,21
**Dr** 6:16 7:3 30:8,15,21
30:25 53:1 54:2,22
62:19,21,25 63:1
65:19 67:4,22 68:24
75:9 78:2,4,24 79:10
79:16,18,25 80:3,9
80:16 96:18,22 97:7
102:20 106:20
107:15 108:13,23
109:1 112:12 117:24
119:1,13,15 120:19
120:20,23 121:16,24
126:23 127:14 128:9
128:18 131:4 132:3
136:15 149:13
154:19 155:6,15,22
156:5 165:15 169:8
169:14,17 170:3,5,11
170:12,17,21,21,22
171:9 195:23,25
197:22 213:10,15,16
213:18 214:8 222:1
223:2 228:3,6,12
229:10 230:25
231:16 232:25
**drainage** 136:24
**draw** 36:18
**drawing** 37:3,9 67:25
76:14
**dropped** 161:2
**Drs** 169:5
**dry** 111:13,18
**dryness** 111:14,18,20
112:3,11
**due** 68:25 116:11
199:23 200:4
**duly** 6:22 236:5
**duties** 103:19
**Dysfunction** 213:25
**dyspareunia** 76:22
77:18 78:1,18,23
79:9,13,16,25 136:15
138:25 139:3,6,8,21
139:22 231:5

**E**

**E** 1:5 3:2,10 4:2 238:1
**earlier** 102:19 110:16
110:19 119:9 228:4
**early** 77:8,21,24
**easier** 20:1 23:15
**easy** 140:10 227:3
**eat** 180:14
**eating** 10:3 121:10
**economy** 56:23,24

58:14,14
**education** 166:13
179:16
**education/marketing**
12:4
**effect** 125:4 218:11
**effects** 111:16
**efficacious** 150:9
**Eisenhower** 2:4
**either** 78:15,18,23 79:4
125:13 136:9 143:6
154:20 155:13
**electronic** 40:17,20
**elicited** 76:4
**eliminates** 229:11,19
229:25 230:4,10,20
**enjoying** 161:4
**enter** 8:23
**entire** 56:23 83:13
140:8,16,17,20,21,23
142:10 159:21
**entirely** 25:5 100:6
135:7 142:6,10
**entitled** 146:11,16,18
183:3
**entries** 97:23
**equally** 82:21 84:17
**equivalency** 25:9
**ERIC** 1:5
**erode** 122:18
**eroded** 76:3 77:4,16
82:3 112:13,17,19
137:7
**erosion** 74:23 76:1 82:8
95:5,8 112:22,25
113:7,10,12 119:25
120:1 126:2,4 143:23
144:4,20 145:5
147:19,23 191:25
192:14 193:1 194:8
195:18
**erosions** 50:4 117:9
120:4 123:14
**errata** 237:6,9,12
239:6
**error** 117:17 118:5
119:1,13,18
**erythema** 133:5
**ESQUIRE** 2:3,10,10
**essentially** 28:2
**establish** 86:2
**established** 55:13,14
95:3,6,9,13
**estimate** 9:10,19 41:7
41:11 45:5,16 47:12
47:16 50:18
**estimating** 72:21
**estrogen**

Nicole Fleischmann, M.D.

94:24 95:3 110:1,2
et 107:9 198:5 213:25
ethically 211:4
Ethicon 1:7,7,8 2:14
  6:14 8:20 9:7,14 10:1
  10:3,8,16,20,22 11:1
  11:9,14,18 12:10
  13:20 14:2,10 15:16
  15:21,22 16:2,7 17:2
  17:4 21:13,18 27:13
  27:19,21 31:8 34:18
  35:8,16 36:1,1,13,17
  36:25 37:11,12,12,22
  37:24 38:4,8 48:20
  96:8 103:17,21 123:8
  123:11 148:13
  149:19 150:13,22
  151:5,5,8,11,14
  152:7,7,12 153:10
  157:6 159:5,16,19
  161:5,10,12 163:7
  164:4,10 165:2,25
  166:13,18 167:13
  170:13,15,18 171:6
  171:18 172:3 173:12
  176:13,19 177:7
  179:4,6,7,16,18,22
  180:1 189:23 190:14
  190:19,21 192:3,4,7
  192:10 196:10,12,13
  196:14,16,20 197:6
  197:11 199:23
  204:19 207:5,13,23
  207:23 208:5,8,10,13
  218:9 231:17 234:12
  234:22
Ethicon's 14:23 15:1,3
  15:14,18 35:17,23
  198:24 204:14 205:1
evaluating 49:23
event 14:23 15:14
events 14:18 192:12,24
  194:6 195:16
eventually 171:2
everybody 34:3 40:4
everyone's 123:25
evidence 54:12,20
  58:11 103:21 110:15
  110:18 134:9 154:19
  232:19
evidence-based 202:17
  207:19
exacerbated 134:7
exact 18:3,6,19 19:2,6
  19:18,20,22,25 20:5
  20:12,16,22,25 21:13
  22:1 24:17 41:6

45:22,23 48:13 50:9
  102:25 157:24 197:8
  197:9 205:12,13,19
  205:22 206:23
  224:18,19,21,24
  225:2,4,9,15,18,20
  227:24,25 234:4
exactly 9:12 20:2,18
  21:11 24:6 28:7,16
  32:21 37:21 43:5
  48:5,16 68:2,12,16
  70:14 74:24 76:11
  77:10 82:24 83:1
  84:9 85:1 90:21
  123:22 132:16
  151:24 180:13 193:2
  194:20 202:17
  212:15 213:5
EXACTs 48:17
exam 69:5 73:22 74:13
  76:22 84:4 90:8,10
  90:20 107:15 126:24
  133:3,12,14
examination 6:25
  80:20 90:8 221:23
  233:22
examined 6:22 74:9,21
  81:7,16 83:3 108:14
examining 125:16
example 7:13 9:21
  38:11 52:18 53:5
  57:10 104:17,21
  106:3 155:2
exceptions 94:12
excessive 154:20,20
  155:7,16,25 156:7
  186:9 231:7
exchanges 11:20
excised 74:23 155:11
excision 75:5
excluding 102:11
exclusive 109:4
exclusively 24:14,25
executive 173:7
exhibit 8:9 31:15 69:18
  70:1 73:16 85:18
  86:8,17 87:1 160:15
  162:19 166:4 168:2,7
  172:21 174:10 175:6
  178:22 180:4
exhibits 86:1 93:17,19
  94:2,10
Exhibits-13 175:11
Exhibit-1 8:14
Exhibit-10 166:9
Exhibit-11 168:8,24
Exhibit-12 173:1,1
Exhibit-13

174:14,15
  175:14
Exhibit-15 179:2
Exhibit-16 180:8
Exhibit-2 69:23
Exhibit-3 73:20
Exhibit-4 86:4,5 87:10
  87:22 92:1
Exhibit-5 86:13 89:8
  89:15 138:19,21
Exhibit-6 86:22 90:4
  215:23
Exhibit-7 87:6,13
  91:21 92:12 93:1
Exhibit-8 160:21
Exhibit-9 162:23,25
exist 38:9 49:1 144:8
  227:19
existed 205:5,9
existence 207:6
exists 56:25 143:24
  144:22 145:10
expect 33:12 205:8
  206:18 209:23
experience 28:5 36:19
  36:23,23 37:19 95:19
  154:14 202:16,24
  203:3,4,17,21 217:3
  220:16 223:5 232:17
experienced 130:16,19
  131:5
expert 3:17,18,20
  56:12 60:7,12 85:19
  86:5,9,14,18 96:16
  96:18,22,24 98:4,6
  105:17,18 129:17
  131:12 151:14,21
  152:2,3,6 154:9
  160:7,10,12 169:18
  170:2,13,14,18 191:9
  191:12 198:21
  199:23 221:4 222:10
  222:18
experts 169:23 171:6
expires 239:16
explain 146:11,16
explanted 156:7 195:1
  195:4,6
expose 126:20
exposed 112:17 115:1,2
  115:6,8,14,24 116:2
  116:3,21 117:14
  118:17,17 121:19
  122:19 123:3,5
  124:13,19,23 125:5
  126:8,25 127:9,15,16
  128:1,22 133:5 139:1

203:18 229:7
exposure 112:24 113:5
  115:17 116:24 122:5
  122:21 123:16
  125:25 126:4 129:11
  129:25 130:14,25
  137:9,13 138:25
  139:7,7,17,17,21,24
  142:7 143:23 144:4
  144:20 145:5 147:23
  192:1,14 193:1 194:8
  195:18 199:11
  202:16,25 203:11,15
  203:19,23 229:12,16
  229:16
exposures 50:5,7,12
  116:22 117:9 118:4
  120:1 123:14 126:22
  130:12 202:18
exposure/erosion 50:20
Express 167:4
extended 75:8
extent 136:8
extermination 89:13
extremely 50:22
  105:23 144:11,25
  145:14 147:6 204:1
extruded 202:24 203:8
  203:14,22
extrusion 191:25
  192:14 193:1 194:8
  195:18
e-mail 4:10,12 160:23
  160:24 162:7,14
  163:18 166:12
  167:18 168:21,25
  172:18,22 173:2
  175:7,13,17
e-mails 3:22 4:8,9
  10:14,18,20 160:16
  160:21 166:5,9 168:3
  168:8 172:11 207:18

—————————————

F

facial 148:21
fact 79:23 105:20
  169:18,23 189:18
  225:18,21
facts 88:13,25 89:1,3,6
  89:25 90:1 91:17,18
factual 34:18 88:16
factually 190:11
fail 237:15
fair 36:15 37:15,16
  106:6 131:6 198:17
  198:22 234:10
fall 215:5
falls 215:8

familiar 25:19 28:6,24
  29:9,10 32:11 38:8
  44:3,14 55:15 58:13
  93:21 98:7 100:22
  220:23
family 54:7,13
far 43:20
fascial 51:23 55:18,24
  61:20 62:16,20
  149:15,20
favor 113:11
fax 1:19
FDA 94:18
features 102:12
February 69:3,4
  106:19 107:11,12,14
  108:1,9,13,24 112:12
  228:5
feedback 12:11 14:6
feel 34:17 81:22,22
  155:18,20,25 178:5,7
  198:16,20 217:2
feeling 76:8,13 77:2
feels 76:24
fellows 176:8,25 177:4
  227:5
fellowship 22:8,18,21
  24:12 32:4 44:22
  45:2,4,17,18 46:7,9
  46:13,15,17 47:8
  49:12 52:11 164:5,6
  165:5 176:5,12,18
  211:18 212:19 213:4
  213:12,14,17 214:4
  220:15
felt 19:5,12 24:1,7
  28:23 75:25 81:24,25
  88:15 89:3 90:15
  155:23,24 156:2
  206:16 227:7
female 24:20
fibers 143:6,12
fibroadipose 132:13
fibrosis 191:1,3,10,14
  191:20,24 192:11,24
  193:23,25 194:3,5,14
  194:16 195:9,16
fibrotic 191:15
field 32:15 152:18
  209:2,3
fifteen 173:18,21
Fifth 1:18 6:12
figure 60:23 67:10
filed 6:14
filing 6:3
filled 163:4
finalized 92:13
financial

Nicole Fleischmann, M.D.

92:13
**financial** 32:12,15,19
  32:22 33:8,10,12,25
  56:23,24 103:7
  176:14
**find** 57:24 73:24 80:22
  81:17 83:15 105:3,7
  140:18 148:12
  189:12 204:13,23
**finding** 76:22 83:22
**findings** 81:1,8,10
  112:15 122:2 198:18
**fine** 46:2 48:1 115:4
  121:11 153:14 154:3
**finish** 118:13 121:5,6
  129:20,21
**finished** 118:10 176:5
  176:12,17
**finishing** 24:12
**first** 24:18,19 45:2 46:7
  50:11 56:16 60:5
  77:7 82:8 102:4
  110:6,10,11 125:15
  156:17 168:10,11,16
  199:9 202:14 212:17
  212:20,25 215:12
  225:22
**first-line** 56:6 95:7
**five** 9:17 45:7 50:1
  141:4,9 215:13
**five-year** 9:1,2
**Fleischmann** 1:16 3:5
  3:17,19,20 4:10,12
  6:17,21 7:3 85:19
  86:9,19 165:15
  172:22 175:7 213:24
  222:1 223:2 228:3
  229:10 230:25
  231:16 232:25
**Fleischmann-1** 3:14
  8:9
**Fleischmann-10** 4:7
  166:4
**Fleischmann-11** 4:9
  168:2
**Fleischmann-12** 4:10
  172:21
**Fleischmann-13** 4:11
  174:10
**Fleischmann-14** 4:12
  175:6
**Fleischmann-15** 4:14
  178:22
**Fleischmann-16** 4:15
  180:4
**Fleischmann-2** 3:15
  69:18
**Fleischmann-3**

3:16
  73:16
**Fleischmann-4** 3:17
  85:18
**Fleischmann-5** 3:18
  86:8
**Fleischmann-6** 3:20
  86:17
**Fleischmann-7** 3:21
  87:1
**Fleischmann-8** 3:22
  160:15
**Fleischmann-9** 4:6
  162:19
**FLEISHMANN** 239:8
**flight** 167:5
**floor** 1:19 2:4 12:6,7
  173:8,13 211:13
  224:11 232:6
**flying** 167:13
**follow** 46:8 129:4,6
  175:21 217:15
**followed** 128:20 129:8
**following** 49:17 78:14
  130:21 166:16 228:6
**follows** 6:23 123:21
**follow-up** 41:12
**Ford** 91:3
**foregoing** 236:16 239:3
**foreign** 131:18,20,22
  131:23 132:14,21
  209:20,24 210:8
  228:4
**forget** 51:10
**forgot** 157:5
**form** 6:5 137:23 193:15
  194:9 222:14,16
  239:5
**formally** 52:9
**formed** 88:8 89:21
  90:18
**forming** 88:18 89:4
  90:2 198:7
**fornix** 133:4
**forth** 89:5,25 99:7
  103:20
**forward** 18:19 30:6
  33:20 39:15 41:25
  49:16 50:24 53:12
  64:21 65:7 66:3
  78:20 79:21 98:14
  99:4,21 100:15 109:6
  120:9 124:6 143:18
  143:24 144:5,21
  145:6,10 147:25
  148:4 157:3 172:12
  172:13,18 178:11

182:8,23,25 185:10
  186:5 200:21 201:12
  204:3 210:4 218:3
**forwarded** 161:25
**found** 23:15 55:14
  74:22 81:10 83:2,10
  84:1,19,22,24 107:15
  108:14 131:23
  132:17 133:11,13
  136:23 163:2 227:3
**four** 8:25 9:2 146:3
  171:6 212:17
**fourth** 215:12
**FREEMAN** 2:3
**frequency** 17:21
  134:19,25 135:1,5,11
  135:14,16,18,22
  136:2,3,6 230:5
**Friday** 166:20,22
**friendly** 169:14 170:9
**friends** 54:6,13 169:15
  170:10
**Fromer** 169:5,8,14,17
  170:11,21
**front** 69:23 82:7,12
  101:20 105:22 152:6
**full** 73:12 80:19 125:1
  202:14
**fun** 172:3
**funding** 164:6,10 165:3
  165:4,12
**funds** 4:6 162:20 163:1
**funny** 201:14
**further** 82:1 142:7
  231:7
**future** 7:25 30:18
  147:23 225:4

---

**G**

**game** 40:3
**gather** 173:19
**Gelnique** 111:9,13
  112:4
**general** 11:12 16:17,19
  16:21 48:25 67:8
  70:16,17 71:21 86:5
  87:11,22,24 91:24
  92:4,7,9,22,23 115:9
  115:10 117:5,8
  120:12 142:17 149:8
  161:21,21,25 190:6
  198:2,3,14 202:5
  232:12
**generalization** 118:22
**genesis** 59:4
**gently** 140:24 141:14
  141:16
**genuine** 102:13

**George** 162:1
**getting** 49:10 63:22
  88:21 94:7 121:8
  172:2 177:18,23
  184:15
**giant** 131:19,24 132:14
**gift** 161:2,15 163:19
**give** 8:4 26:23 35:21
  41:6,7,11 45:21 50:9
  57:10 72:4 74:4
  97:11,17 101:9 106:2
  116:1 139:18 163:20
  164:10 171:25 177:7
  179:13 196:9
**given** 26:21 95:16 96:8
  162:25 205:9 236:6
  239:4
**gives** 196:10
**giving** 9:10 62:9 115:22
  150:15
**glad** 35:21
**glanced** 55:2
**GMD** 48:25
**go** 42:4,8,20 93:6
  104:22 107:10 108:9
  118:15 130:6,9
  134:14,23 135:3
  142:19 150:14 156:4
  172:7 174:21 176:2
  220:13
**goes** 93:8 97:23 139:8
  153:3 159:22,25
  234:7
**going** 18:2,19 22:12
  24:12 40:2 59:5
  69:13 70:21 73:11
  82:7,14 85:13 98:25
  99:21 100:15,21
  105:22 106:18
  113:12,20 115:1
  120:15 126:5 143:24
  144:5,17,21 145:6,10
  145:16,17,18,23
  147:19,24 150:25
  151:2,4 159:8,20
  160:2 164:8 165:16
  166:17 167:4,14
  168:19 172:17
  173:14,17 174:24
  180:18 181:21
  184:25 220:7 221:15
  235:9
**gold** 56:10,16,19,21,22
  56:25 57:6,13,20
  58:2,4,12,15,16 59:2
  59:10,22,24
**Golkow** 1:24 6:10
**good**

7:3,4 19:13,18
  33:2,6 72:8,10 83:5
  85:11 154:1,3 158:6
  158:12,14 164:2
  180:15
**gotten** 114:21 165:3
**go-to** 23:4,6,8
**grant** 161:25 162:5
  163:19 165:3
**grants** 163:20 165:3
**granulating** 67:19 68:5
**granulation** 67:21 68:7
  68:24 125:15,17,22
  125:23 126:1
**gravitated** 176:7
**great** 24:22 114:14
  139:19,20 153:19
**groin** 185:23
**group** 99:23
**guess** 44:24 53:18
  163:9 165:2 167:2
  174:5
**guessing** 9:3,8
**guided** 136:23
**guidelines** 64:1,1 199:8
**guys** 171:1,13,15 183:2
**GYNECARE** 1:8
**Gynecology** 214:16
**G-E-L-N-I-Q-U-E**
  111:9

---

**H**

**H** 3:10 4:2
**half** 23:2,2 73:13
**Hampton** 29:22
**hand** 60:23
**handed** 160:20 175:11
  179:1
**Handing** 173:1
**hands** 130:16,19 131:4
  131:5 227:4,8
**handwritten** 73:21
**hand-in-hand** 135:3
**Hang** 129:15
**happen** 111:24 118:4
  118:21 120:1,13
  122:6,10 123:24,25
  126:22 128:6 144:17
  145:16,17 185:19
  187:2,7 193:19
  200:13 231:10 233:3
  233:9,10
**happened** 10:11,11
  58:9 76:11 77:11
  78:4 113:13 118:24
  122:4 123:20 127:19
  127:21,22,23,24
  163:11 167:19,25

195:11 201:21,24
202:8,10 232:20
**happening** 34:11 193:5
**happens** 7:21 63:8
117:18 129:10,25
185:13 191:16,17
193:20
**happy** 178:15 206:3,8
212:11
**hard** 10:9 38:13 70:13
74:24 77:10 78:15
**hardening** 83:15,22
**harder** 133:24 142:2
**hardness** 84:19
**Harrell** 30:8,15,21,25
53:2 54:2,22 62:20
62:22,25 63:1 65:19
67:5,22 68:25 78:2,5
106:20 107:15
108:13,23 109:1
117:24 119:1,13,15
120:19,20,23 121:16
121:24 126:23
127:14 128:10,18
131:4
**Harrell's** 78:24 228:12
**Hart** 197:22
**Headquarters** 2:11
**heal** 67:8,15
**healed** 67:2,6
**healing** 67:20 68:4 95:5
125:24
**health** 1:7 40:17,20
43:18 161:5
**hear** 53:25 183:8
**heard** 54:1 63:3 65:3
191:11 197:2,24
220:25
**heavyweight** 160:8,9
**held** 1:17 6:12 105:20
**hello** 73:7,7
**help** 14:3,6,24 15:15
16:2,9 163:13 164:4
**helped** 59:9 134:13
**helpful** 62:5
**helping** 13:20,24
**hematoma** 136:18
137:13,17,21,23
138:2,3,8 230:11,15
230:17
**Henry** 2:19 6:9
**Herrell's** 69:5
**high** 130:17 197:5
**higher** 58:6 227:6
**highly-paid** 113:23
**high-level** 123:23
214:20,22 215:2
**histopathologic**

98:18
**histopathological**
194:19 195:7,22
**histopathologist** 97:8
221:7
**histopathology** 98:21
98:25
**history** 56:20 74:16
**hold** 69:13 106:12
**holiday** 161:2,4,15
**home** 24:1 172:7
**honest** 9:4 10:13 13:7,8
13:9,13
**honestly** 147:12 182:10
**hope** 161:3 168:14
206:18
**hospital** 24:20 132:4,6
228:6
**hospitals** 164:11,16,21
165:9
**hosted** 173:25
**hotel** 167:5
**hour** 72:7,12
**hours** 71:12 72:4,12,19
179:18
**house** 58:19
**hundred** 46:20 47:18
47:19
**hundreds** 113:25
**Hyland** 1:18 2:9

**I**

**ICS** 114:2,5
**idea** 39:8 158:10 190:3
235:1
**ideas** 103:20 234:16,19
**identification** 8:11
69:20 73:17 85:20
86:10,19 87:3 160:17
162:21 166:6 168:4
172:23 174:11 175:8
178:23 180:5
**identify** 69:15
**IFU** 26:7 119:22,23
120:2,4 156:14,19,20
188:6,17 189:2,3,10
189:24 190:5,12
218:12,13,14,15,22
219:2,6
**IFUs** 220:13
**imbedded** 142:1
**impact** 32:16 38:9 96:3
96:5 210:14
**imperative** 237:11
**implant** 208:20 228:13
228:20
**implantation** 217:22
**implanter** 42:5,6 44:7

**implanting** 42:9 44:5
**importance** 176:8,24
**important** 88:16,18
89:4 90:2 106:4
178:15 179:8 198:6
198:18
**improved** 66:23
**improvement** 66:14,16
**improving** 57:24
**inadmissible** 222:17
**inadvertently** 217:18
**incentive** 33:25
**incision** 67:2,6 68:14
68:15,17,19 75:4
139:25 140:3
**incisions** 67:14,15,20
68:4,17
**include** 102:8 191:25
223:10
**included** 92:5 100:14
102:15 171:10
**includes** 227:24,25,25
228:1
**including** 71:21 185:22
**incontinence** 51:12,22
55:20 56:1,4 57:14
57:15 59:17 61:13,17
62:11,15 63:11,20
64:9 65:10,16,22
66:7,9,22 102:13
133:16 134:2,7,11
138:16 156:24
215:10,14 224:12
230:1 232:7
**increase** 15:15
**increases** 129:10,25
**increasing** 14:25
**incredibly** 105:21
**independent** 167:23
169:15
**INDEX** 5:2
**indicate** 126:25 140:4
140:24
**indicated** 174:20
**indicates** 122:3 166:22
**indicating** 55:11
187:23 207:23
**indication** 100:22
110:6,10,11 117:3
121:24,25 122:1
131:19 135:10
**individuals** 163:20
**industry** 27:15 32:9
59:9 103:15 114:5,10
114:12
**infiltrate** 191:18
**infinitesimal** 143:25
**inflamed**

229:9
**inflammation** 131:24
132:15 228:25 229:4
**inflammatory** 132:21
**influence** 149:23
151:11
**influencing** 113:24
**information** 27:6,23
33:14 35:9 37:25
38:5 54:2,8,16,22
55:9 63:2 68:1,10
150:16 172:1 223:4
234:10
**informed** 223:13
233:16
**informing** 42:5
**initial** 91:1,12,24
228:13
**initially** 227:6
**injuries** 23:18,21 227:7
227:12,19
**injury** 141:1,18,19
**inquired** 163:19
**inserted** 205:16
**insertion** 39:19 205:16
217:17 233:25
**inside** 143:7 147:24
209:12,20
**inspect** 156:5
**instances** 216:13
**institution** 164:8
**institutions** 163:21
**instructed** 128:23
**INSTRUCTIONS**
237:1
**insulation** 58:16
**intending** 26:17
**intention** 225:3 226:8
**interact** 38:2
**interacting** 15:22
**interaction** 12:3 31:10
31:12 34:18
**intercourse** 74:10,19
78:1,6,24 80:8,17
182:3 185:17 230:21
**interest** 15:14 35:17,25
162:9
**interested** 14:24 35:10
35:11 98:24 99:1
123:10,11
**internal** 27:20 37:13
82:15 96:3 204:15,20
207:13,22 208:1
**internally** 37:22 38:5
**interpret** 35:4,5,9
**interpretation** 35:12
35:17,20
**interrelationship**

199:24
**interrupt** 23:9 174:19
**InterStim** 30:8,16,22
31:1
**introduce** 102:1
**introitus** 82:16,20
**intuition** 144:17
**invasive** 58:1 63:14,16
64:10
**invited** 173:7
**inviting** 173:18
**invoice** 4:14,15 178:23
179:3,25 180:5,8
**invoices** 3:15 69:19,25
70:2,25 72:22
**invoicing** 179:4
**involve** 233:17
**involved** 10:6 31:19
32:10 162:2,2,16
**involves** 32:9
**issue** 31:16 34:2 89:13
211:1
**issued** 228:6
**issues** 190:1 210:9
**items** 93:9 94:16

**J**

**January** 120:16
**Jeff** 11:14 16:11,23
160:24 161:15
163:18 165:19
**Jersey** 1:1 2:5,12 6:15
12:24,25 13:2
**Jim** 197:22
**job** 35:8
**JOHN** 1:9
**JOHNSON** 1:8,9
**Jones** 4:10,13 11:20
13:15 172:22 173:3,6
175:7,14,16,20
176:17 177:22
178:14
**journal** 211:15,19,23
212:2 214:19,20,21
214:22 215:8
**journals** 215:2,3
**July** 87:25 89:17 91:1
91:12 92:23 228:12
**June** 69:23 71:1 171:23
179:23
**jury** 105:22 106:5
147:18 148:12
**J&J** 175:22

**K**

**K** 3:18,20 86:9,18
**Kabbash** 2:10 3:7
11:11 14:4,12 15:25

Nicole Fleischmann, M.D.

18:23 19:14,23 20:6
27:3,10 29:18 32:25
34:5 36:4,11,21 37:6
38:12 39:22 40:6,9
41:9 42:16,21 46:21
47:1,24 57:4 58:22
59:11,19 64:4 67:11
70:8,10 71:5 75:21
78:9 80:10 85:2,9
87:16,19 88:3,19
89:10 92:17,20 96:11
97:2 101:2,15,19
104:9,12 105:24
106:9,15 107:17,20
108:1,5 113:17 114:1
114:7,23 118:2,12
119:4 121:11 124:2
124:20 126:10 127:4
127:18 128:4 129:15
129:19,24 130:4
131:15 132:8 133:19
135:20 137:25
139:15 143:14 144:6
144:10,23 145:7,11
146:3,6,10,14,16,23
148:18,25 149:4,7
150:1,6,18 151:3,17
151:24 152:9,19
153:23 154:6,9,23
155:3,9 156:9 159:12
159:20,24 160:4
164:24 165:15
168:20 172:4,15
174:7 180:16 182:15
182:21 183:18
184:15,23 187:16
188:21 189:15 192:5
192:16 193:3 194:11
196:18 199:2 200:2,8
200:15 201:3,8,25
205:3 206:20 207:8
207:16 209:13
214:24 221:25
222:19 223:1,23
224:7,16 225:8
226:23 227:11,17,23
228:17,23 229:5,17
229:23 230:8,18,24
231:23 232:10,16,24
233:19 234:14,24
**Kathryn** 1:5 86:14,15
86:24 227:14
**Kathy** 29:22
**KATZ** 2:3
**Kavaler** 169:5 170:5,6
170:12,22
Kcrawford@riker.c...

2:13
**keep** 40:18 53:15 136:1
136:2 182:13
**keeping** 178:14
**KELLY** 2:10
**kept** 99:15
**key** 91:18
**kids** 172:6,7
**kill** 89:10
**killed** 89:12
**Kim** 170:4
**kind** 56:11 58:24 103:7
105:14 193:18 232:2
**Klinge** 97:7
**Klinge's** 96:18,22
195:23 196:1
**knew** 225:22
**know** 13:23 15:3,6,7,7
17:3 18:6 21:16
28:14,16,21 29:2
31:9 32:3 34:3,6,10
34:23 36:8 38:11,15
38:23 39:10,23 40:4
40:5,7,10 41:5,8 42:6
43:20 44:7 46:11
49:4,18 53:15 55:8
56:19 59:2,4,6,8
62:19 64:19 68:7
69:1,13 70:6,24
77:10 78:15 80:3
84:12,13 88:25 92:13
95:15 96:12,21 97:7
99:6,9 100:2,8,13,17
100:20,25 101:7
102:7,14,22,25
105:10,13 114:6,18
116:5 119:21 120:7
122:24 123:2,8,12
124:24 129:19
131:18 132:7 133:23
134:16 135:7 153:25
154:22 158:13 159:4
161:17,21 162:4,9
163:21 167:18,24
169:8,9,10,16 170:7
170:11,14,17,19
172:5 173:20 180:11
182:25 183:24
186:11,13,14,15
187:12,18,19 188:3
188:20 189:23
190:11,16,23,25
191:21 192:6,23
193:6 196:10,24
197:1,3,5,7,10,10,13
197:16,18,18,22
202:5 206:16 207:7

207:10 208:9,12,13
209:4,11 211:3,6,24
212:13 213:21,22,22
214:22,23 215:1,7
220:10 227:5 232:1,2
**knowing** 35:17 39:17
39:20 41:2
**knowledge** 11:25 31:7
35:23 36:19,23 232:5
234:20
**known** 102:17 120:25
120:25 181:3,6,10
182:2 193:19
**knows** 7:22 42:17
196:16

_____

### L

**lab** 167:10 168:14
212:23
**laparoscopic** 52:2,3
**large** 80:25 183:17,21
189:11 208:23
**laser** 205:19,22 206:4,9
207:2,6,14,18,19,24
208:2,6,8,11 225:10
225:19,22 226:2,9
**late** 47:13
**lateral** 122:14,22 140:2
**law** 1:2,17 6:15
**lawyer** 80:15
**lawyers** 147:15
**LAWYER'S** 240:1
**lead** 119:24 200:25
218:17 219:3
**leading** 222:15,15
**leakage** 219:24 220:1,4
220:7
**learn** 220:14
**learned** 191:10
**learning** 130:23
**leaves** 189:17
**leaving** 21:8 189:4
**led** 18:18
**left** 16:23 39:9 46:12
75:4 127:16 133:4
137:3,13 140:2 143:4
143:5,7,10,12 161:16
**leg** 185:23
**length** 80:24
**letter** 3:15 69:19,24
175:15,18 176:17
177:9,10,21 178:3,13
**let's** 15:10 44:19 45:1,1
79:8 117:7 168:7
182:22
**levator** 83:2,7,19 84:16
**levators** 83:5,8,11,14
83:24

**level** 28:5 58:11 93:22
103:20 125:14 180:9
193:6 195:22 204:10
204:11,11 211:19,23
223:20
**liaison** 13:16
**life** 179:21
**lightweight** 160:8,9
**liked** 19:18,20,24 23:15
24:1 49:9 158:10
**limited** 62:21 142:16
**line** 5:6,6,6,11,11,11,16
5:16,16,21,21,21
159:21 231:13 233:5
238:3 240:2
**list** 3:21 87:2,7,17
91:21,23 92:10,13
93:1,6,7,8,14,16 94:5
94:15,21 96:16 97:3
97:22 99:8 102:19
116:4 189:24 211:12
212:17 231:3
**listed** 31:13,14 90:19
213:6
**lists** 87:9
**literature** 36:24 37:20
42:3,7 44:4,8,10
49:23 50:1 58:11
59:21 89:2 91:5
95:20 97:22,24 153:6
154:14 189:21 191:7
193:13 196:4,5,11
203:5 204:12 223:10
223:13,18 232:18
**litigation** 26:21,22
219:6
**little** 19:25 20:1 28:11
67:18 71:8 154:2
184:16 205:17
219:24 220:6
**live** 126:19
**living** 197:4
**LLC** 2:3
**LLP** 1:18 2:9
**load** 20:4
**local** 162:8,15 208:24
208:25
**located** 123:5
**location** 67:23 75:12,18
76:1,25 81:25 82:2
136:22 137:17,20
**locations** 75:13
**long** 17:4 46:8,9 49:20
66:17 106:18 126:19
130:17 212:8
**longer** 56:25 57:7,15
57:21
**long-term**

49:19,20,22
50:1 130:17
**look** 27:16,20 29:17
33:14 43:4 69:8,10
74:4 84:6 91:12
93:14 100:16,19
101:5,9 104:16
108:10 156:4 168:7
194:21,23 210:24
211:2,3 212:10
215:18
**looked** 27:18 29:10,12
94:14 95:17 96:6
105:5 127:2 131:9
132:2 180:1 194:9
204:14 215:19
**looking** 29:16 33:24
43:10,11 70:24 73:23
93:1 153:6,7 168:24
172:11,12,13,17,18
194:18 210:20,22
212:16,24 215:22
219:22,24
**looks** 29:9 69:24 87:15
171:8 172:12 175:15
175:17 178:18
212:17 214:1
**loosely** 217:5,6
**lose** 109:25
**loss** 208:15 210:18
**lost** 110:1
**lot** 23:20 43:23,25
78:13 89:1 101:14
103:6 111:20 113:6
128:15 139:13
154:15 157:12
179:20 189:25 190:9
216:14 223:17 227:5
234:15
**lots** 116:20
**loved** 173:22
**lower** 218:24
**lower-level** 215:2
**loyal** 175:22 178:14
**Lucky** 49:2
**lumen** 113:12
**luncheon** 180:20

### M

**M** 2:10 157:15,17,18
158:2,4,8,19,19,22
159:1,10,17 177:17
177:23 178:9
**machine** 206:1 207:15
207:25 209:5
**macro** 204:11
**Maha** 2:10 146:5
**main** 198:1

Nicole Fleischmann, M.D.

**majority** 17:15 22:3
  39:6,12 40:11 42:8
  42:22 45:21,24
**making** 27:13 110:24
  114:9 152:14
**malpractice** 60:11
**manage** 202:17
**manager** 162:2 166:13
**manifestation** 191:24
  192:13,25 194:7
  195:17
**manifested** 165:6
**manufacture** 148:8
  164:23
**manufactured** 48:20
**manufacturer** 164:18
  165:13 234:11,16,22
**manufacturers** 113:15
  213:19
**manufactures** 148:13
**March** 4:9 168:3,8,17
  170:20
**mark** 69:14
**marked** 5:20 8:10,14
  69:19 73:17 85:20
  86:1,10,19 87:2
  138:19 160:16,20
  162:20 166:5 168:3
  172:23 174:11 175:8
  178:23 179:1 180:5
  215:23
**market** 14:3 21:13
  148:15 177:8 207:5,9
**marketers** 113:24
**marketing** 12:2 13:17
  13:21,24 15:20
  150:22 173:6 177:4,6
  178:16,19
**marks** 85:22 180:23
  235:7
**Marte** 2:19 6:9
**Maslynsky-Miller** 1:21
  236:9
**MASTER** 1:7
**match** 104:11,24
**material** 98:4,5,10,18
  98:22 143:12 229:11
  229:15,18,24 230:3,9
  230:13,19
**materials** 3:21 87:2,7
  87:14 90:19 91:21
  93:7,11 97:3 98:6
  160:12
**math** 72:9,10,15,20
**matter** 6:13 43:6 102:5
  103:9,12,14,16,17,21
  147:13 151:6,12

208:7 217:2 226:18
  226:25
**matters** 151:20
**MAZIE** 2:3
**MCL** 1:5
**meal** 10:6
**meals** 9:21,25 10:3
**mean** 20:10 23:9 30:13
  31:21 33:5 45:9
  46:21 65:1,23 76:10
  80:1,7 94:3 101:3,3
  101:13 102:10,11
  103:5 107:17,20
  108:19 109:12
  116:24 130:20
  145:21 167:17
  169:15 183:20
  216:21 217:6 220:2
  220:24 224:1
**Meaning** 33:2 125:17
  205:8
**means** 36:2 47:19 61:9
  108:17,20 109:18
  131:13 133:24,24
  141:18 187:20 188:4
  188:14,16,20 189:1
  217:8 236:18
**meant** 52:4
**measurable** 216:25
**mechanical** 205:21
  208:3,6,8,11,16,19
  226:2,4,9
**mechanically** 210:13
**mechanism** 115:5,12
  115:23 117:13
  125:10 126:7
**medical** 7:14 27:7 28:4
  30:14 32:15 36:24
  42:2,7 48:25 49:23
  56:17,18 57:6,21
  58:3,10 59:3 64:15
  75:17 79:3,4 90:7,8
  90:10 93:3 97:22,24
  113:3 124:17 125:10
  128:9 148:7,13
  149:22 150:12
  154:16 159:8 160:12
  163:8,10,13 164:17
  164:22 165:12
  189:21 190:1 191:7
  193:12 211:23
  213:19 223:6,10,13
  224:10 232:18
  234:11,16,22
**medication** 65:10,15,21
  66:6,14,21 111:8,17
**medications** 65:20,24

66:12 134:12,14,15
**medicine** 63:8 76:3
  207:19
**medicines** 111:21
**medicolegal** 190:1
**medium** 98:11
**meeting** 12:6,17 103:22
  153:13 171:5 173:15
  175:21 178:19
**meetings** 12:6,7,8,13
  12:18,20,21,22 13:10
  13:17 150:15,23,25
  152:13 173:14
**meld** 113:23
**Melissa** 11:21,24 12:4
  166:12,21
**member** 103:18
**memory** 94:14 97:5,13
  101:4
**mention** 71:12 105:12
  135:14,18,21 136:3
**mentioned** 30:8 120:4
  136:1
**mentor** 213:16
**mesh** 18:12,14 20:4,15
  20:18,22 50:4,4,7,12
  50:20 53:5,7,15,21
  69:1 74:23 75:4,8
  76:3,9,16,25 77:5,16
  82:3 95:8 98:5,7,10
  98:18,22,25 99:2
  103:2 112:13 113:7
  113:15 114:15,16,20
  114:25 115:2,5,8,12
  115:13,17,23 116:2,3
  116:8,10,12,20 117:8
  117:9,13,25 118:4,16
  119:14,24 121:18,19
  121:25 122:5,6,16,21
  122:24 123:4,15
  124:9,12,18,21,23
  125:1,5,11,18,21
  126:7,13,18,19,22,25
  127:7,15 128:10,19
  128:21 129:1,7,11,25
  130:12,13,24 131:25
  132:13 133:5,8
  136:10 137:18,22,22
  138:24 139:16,17,24
  141:22 142:10,11,25
  143:6,6,7,11,12,22
  143:23,23 144:3,4,4
  144:20,20,21 145:5,5
  145:6 147:19,24
  155:7,8,10 156:6
  158:13,15 160:8
  181:7,17 183:11

185:5,5,16,21 186:8
  186:10,17,23 187:4,9
  187:10,24 193:20,24
  194:1 195:1,4,6
  199:11,18,23,24
  200:4,5,6,12,14,17
  200:24,25 201:1,2,5
  201:6 202:16,24
  203:9,14,22 204:8,9
  204:16,21,24 205:14
  205:14,19,21,22,25
  206:4,9,24 207:2,6
  207:14,15,18,20,25
  207:25 208:2,3,6,8
  208:11,11,16,19,24
  209:5,5,12,19,24
  210:7,13 216:7,11,15
  216:17,17 217:1,9,10
  217:17,20,22,23
  218:6,6,10,14,16,17
  218:21 219:3,8,8,13
  219:15,18,20 225:9
  225:10,19,22 231:8
  232:19,21
**meshes** 149:21 158:1
**mesh-related** 41:3,17
  42:4 44:6
**mess** 108:8
**message** 151:1,1
  152:15
**messages** 153:12
**met** 74:15 101:1
**Michael** 168:12,17,25
  169:2,4 170:20
**micro** 204:11
**microscope** 98:19
**midline** 83:12
**mid-urethral** 21:17
  22:13 45:5,9,15 46:3
  46:18,19,22,24 47:1
  47:11,15 48:6,19
  51:12,19 55:18 59:15
  61:11 62:12 74:25
  103:13 104:20
  215:17
**mild** 21:5
**Miller** 6:19
**mincing** 119:16
**mind** 15:17 20:7,9 21:1
  21:7 33:14,15 44:15
  90:15 113:23
**minds** 153:5
**mine** 73:24
**minimal** 196:6
**minimally** 57:25
**minute** 56:14
**minutes** 85:3 149:10
**miraculously**

114:20
**mis** 108:3
**Mischaracterizes** 40:9
**mispronounce** 7:14
**missed** 174:5
**misshapen** 80:24
**misunderstood** 47:4
**Mkabbash@riker.com**
  2:13
**mode** 37:7
**modification** 62:2
**money** 9:13 33:24
  164:17,22 179:11
**Monte** 165:11
**month** 49:4 125:15
**months** 128:2,2,2
  223:18
**morbid** 141:23,24
**morning** 7:3,4 174:4
**Morristown** 2:12
**Moth** 138:11
**mother** 172:5
**mouth** 111:13,18
**move** 11:3 20:13 26:14
  30:5,19 33:19 39:14
  41:24 50:23 53:8,11
  54:9 57:18 63:15
  64:12,20 65:6 66:2
  78:16,19 79:5,20
  81:14 98:13 99:3
  109:5 120:8 121:1,5
  124:5 125:2 131:2
  143:17 144:1,13
  145:2 147:13 148:3
  153:20 157:2 172:9
  177:12 178:10 182:7
  182:16,23,24 183:15
  184:25 185:9 186:4
  195:13 200:20
  201:11 204:2 206:6
  209:9 210:3 211:9
  218:2 220:18
**moving** 145:22
**MRI** 136:23
**Mt** 24:19
**mucosa** 69:6 107:16
  108:15,20 109:2,9
  126:24
**multiple** 59:21,21 77:6
  99:21
**muscle** 83:2
**muscles** 83:18 84:3,16
  84:18,25
**mutually** 109:3
**M.D** 1:16 3:5,17,19,20
  6:21 85:20 86:9,19
  239:8

**N**

N 3:2,17,19,20 4:10,12
  85:19 86:9,18 172:22
  175:7
Naber 102:20
name 6:9 11:9,13 13:18
  16:20 197:2
named 16:17 169:18
names 10:23 11:16
narrow 81:11
narrowing 81:17,19
natural 194:1
naturally 176:6
nature 9:7
necessarily 33:5 158:17
  189:5 220:3
necessary 187:6 189:12
  200:6 237:4
need 25:18 47:24 68:23
  74:6 90:15 106:8
  124:25 134:23
  158:16 187:14
  192:19 200:13,17,25
  201:2,9 206:16
  212:10 233:14
needed 27:23 164:5
  231:22
needs 174:20 187:10,24
  188:12,22 200:4
  231:17
neuromuscular 185:22
  231:6
never 7:22 14:5,14
  23:24 24:1 27:18
  31:22 49:7 52:3,4,6,9
  52:17 63:21 67:22
  80:4 92:6 95:2,5,9
  111:25 119:15,17
  120:24 121:8 134:15
  141:24 147:18
  153:15 159:6,18
  162:6,15,15 163:10
  163:11,15,16 164:8
  165:6,6 180:1 190:18
  190:20 193:9 195:3
  195:11,14,21 197:24
new 1:1,19,19,22 2:5
  2:12 6:13,13,15
  12:24,24,25 13:1
  60:16 88:23 119:12
  121:10 129:23
  169:10 171:14,16
  178:15
newer 90:12,23,25 91:6
nice 162:17
Nicole 1:15 3:5 6:16,21
  239:8

night 166:21,22,24
  167:1
Nilsson 99:7,11,12,14
  99:18 100:4,9,23
  101:24 102:7,15
Nilsson's 99:25
Nitti 213:15,16,18,25
  214:9
non-mesh 199:15
Nope 197:25
normal 69:5 107:16
  108:14,20,21 109:2,9
  109:12,14,15,15,18
  109:23 126:24 142:8
  229:3
North 211:18
northeast 166:12
Notary 1:22 239:18
note 69:3 97:2 108:23
  109:9
noted 6:17 67:5,22
  84:10 239:6
notes 3:16 70:6 73:17
  73:20,21,25 107:23
  108:8 240:1
notice 1:16 3:14 8:10
  8:15 128:1
noticed 127:17 225:13
November 1:12 4:7
  6:11 91:8,13 166:5
  166:10,14 174:15
  175:14,14,21 177:21
  236:10
number 22:5 41:6
  45:22,23 50:9 72:14
  85:23 94:21 139:18
  139:19 149:10,21
  180:24
numbers 44:19 97:3

**O**

object 7:19 8:1,4
  159:20 222:15,16
objecting 159:25
objection 7:20 11:11
  14:4,12 15:25 18:23
  19:14,23 20:6 27:3
  27:10 29:18 32:25
  34:5 36:4,11,21
  38:12 39:22 40:6
  41:9 57:4 58:22
  59:11,19 64:4 67:11
  75:21 78:9 80:10
  88:19 96:11 104:9,12
  105:24 106:9,15
  113:17 114:1,7,23
  118:2 119:4 124:2,20
  126:10 127:4,18

128:4 131:15 133:19
  135:20 137:25
  139:15 143:14 144:6
  144:10,23 145:7,11
  148:18 150:1,6,18
  151:3,17 152:9,19
  153:23 154:6 155:9
  156:9 159:12 164:24
  172:4,15 174:7
  183:18 187:16
  188:21 189:15 192:5
  192:16 193:3 194:11
  196:18 199:2 200:2,8
  200:15 201:3,8,25
  205:3 206:20 207:8
  207:16 209:13
  214:24 222:14
  223:15 224:3,14
  225:6 226:20 227:2
  227:16,21 228:14,21
  229:1,13,21 230:6,12
  230:22 231:20 232:8
  232:14,22 233:13
  234:14,24
objections 6:4 7:23
objective 216:25
objectively 153:7,8
obligated 198:20
observed 34:2 68:25
  126:23
Obstetrics 214:16
obstruction 213:8
  218:24 220:9
obturator 21:22 22:1,4
  22:7,10,16,17 23:4
  23:13,17 24:3,4,14
  24:25 25:5,9 46:4
  48:8,10 49:10,11
  50:15 207:1 227:10
  230:14 234:7,7
obviously 162:6
occasion 228:11
occur 116:8 117:9
  186:18,25 187:1,5
  216:7,9,11,13
occurred 30:3 51:5
  85:7 116:6 117:22
  122:5 125:6 126:12
  126:15 128:12
  204:24 221:12,18
  222:24
occurs 204:21 208:16
  208:17
October 74:8
offer 25:17 26:17 28:1
  70:22 148:20 162:17
  221:4
offered

207:1 222:10
offering 78:22 115:11
  115:16 117:12,15
  125:9,12 127:11
  128:8 163:7 221:2
offers 166:20,25
offhand 97:20
office 16:9 107:9
offices 1:17 29:23
Ogah 198:5
Oh 14:16 46:25 88:4
  97:1 118:11 174:2
  212:4
okay 7:18 8:1,2,7 9:13
  10:4,22 23:11 35:13
  37:17 38:6 43:16
  45:3 46:2 47:25
  53:19 58:3 59:15
  60:4,7 68:20 81:6
  92:11 96:2,16 107:13
  114:14 117:10
  120:16 132:11,16,23
  141:13 147:21 151:8
  152:18,23,24 153:22
  155:3,4 168:22
  174:21 179:22
  180:16 181:5,17,20
  184:3,22 198:15
  215:25
Olmstead 31:8 34:11
  34:19 35:16 36:2
Olson 100:6
once 10:12 22:10 73:5
  109:25 209:5
ones 100:14 196:21
one's 133:16
one-day 173:19
open 52:5,6,10 64:2,7
  64:16,25 65:3 189:4
  189:17
opening 82:14 211:4
opens 117:2
operate 24:5
operated 30:9,22 78:5
  143:10
operating 156:11
operative 122:1
opined 65:11
opinion 25:17 26:13
  35:21 38:10 62:10,12
  78:22 106:2 115:5,7
  115:12,17,22 116:1,6
  116:7 117:12,15
  119:7,12 124:16
  125:9,12 126:6,14,21
  128:8 147:19 190:8,9
  190:10 193:16,17

194:9 223:2,5,14,25
  231:16
opinions 25:13,23 26:3
  26:4,10,17,21,23
  28:1 34:14 36:18
  37:3,9,17 70:21
  76:14 87:8 88:8,18
  89:4,7,21 90:2,18
  91:14,19 95:19 96:4
  96:5,9,14 98:1 119:6
  119:10 154:7 197:16
  198:7 221:3,5 222:4
  222:10
opportunity 93:14
opposed 18:14,20
  232:12
option 52:21
options 18:9,21 43:25
  52:19,22 56:4,7 63:4
  201:17
ordered 195:10,11
organ 113:13
original 11:14 16:12
  42:23 99:11 100:12
  237:12
outcome 193:7
outcomes 20:12 49:18
  49:19 99:1 158:7,21
  158:24 177:17,23
  196:21,22 225:14
Outlet 213:7
outside 179:16 207:11
  229:8
ovariectomy 215:13
overactive 111:11,20
  135:8
overall 38:9
O-G-A-H 198:5

**P**

page 3:13 4:4 5:6,6,6
  5:11,11,11,16,16,16
  5:21,21,21 88:2,3
  89:17,17 91:9 93:7,9
  96:23,24 97:2 107:18
  108:3,5,6 132:10
  133:3 138:18,21
  142:6 148:6,25 149:4
  154:23 155:1 163:3
  168:11,15,16 177:14
  199:6,6 202:11 204:5
  216:1,4 238:3 240:2
pages 198:13 239:3
paid 10:9 12:12,15,20
  12:21 59:9 70:4 71:1
  103:15 114:5,9
  150:24 151:14
  152:13 153:1 167:15

171:18 179:14,23
**pain** 74:10,18 76:8 77:2
77:12,15,22 78:5,12
78:14 79:4 181:8,23
182:2 183:12 185:6
185:17,23 191:25
192:13 193:1 194:7
195:18 199:19,25
230:20 231:4
**palpated** 75:15,25
**paper** 4:11 174:11,16
**papers** 32:2,4
**paragraph** 148:22
149:16 176:4 177:15
177:17 199:10
202:14,23
**Parkway** 2:4
**part** 67:17 76:24 95:21
137:3 142:15 143:2
177:16 182:15
187:10,25 196:12
217:13
**partially** 158:11
**participate** 165:22
167:21
**participated** 98:17
**particle** 208:15 210:18
**particles** 208:18,23
209:4,11,19,24 210:7
210:15,25
**parts** 176:3
**path** 224:25 234:1
**pathologist** 131:9,16
131:23 132:1,4,18
**pathologists** 98:23
**pathology** 112:15
131:9,12 132:2,6,12
195:5 228:5,11,16,18
**patient** 18:9 20:22 28:9
28:10,14,19,21 29:1
29:12,16,20 32:6
39:3 40:5 41:16 53:3
54:5,24 55:12 109:8
109:13,14 140:20
148:22 153:18
199:25 210:10 211:2
211:5
**patients** 16:3,9 22:4
23:21 24:1 38:25
39:7,9,12,18 40:15
40:19 41:2,11,22
42:3,8,23 43:2,8,9,14
44:5,17 46:6,8 49:14
50:3 52:22 53:7
54:16 99:11,12,14
99:17,20,23,24 100:2
100:9,11,23,25

101:25 102:4,5,8,11
102:13,15 114:11
129:2 138:24 139:2
140:22 141:5,6 148:9
148:15 153:7,8
159:11 161:14 182:3
185:8,13,17 186:25
194:14 195:1,7 211:1
219:11 225:5,14,15
227:9 231:5 233:16
**patient's** 21:8 53:23
202:25 203:9,15,23
209:21
**pay** 9:14 113:24 153:11
154:15 163:7 166:1
**paying** 150:13 151:11
**payment** 34:24
**payments** 34:20
**peer-reviewed** 44:4
212:1,2 214:21
**Peeten** 196:24 197:19
**pelvic** 12:5,7 103:2
136:18 173:8,13
181:9 182:6 185:23
211:13 224:11 232:1
232:1,3,6,12
**pending** 129:23
**Penn** 132:18
**people** 10:24 33:12
35:8 39:24 40:11
54:6,14,21 58:6,7
83:6,19 98:22 103:14
113:14 114:9 123:22
130:21 151:11
152:17 172:8 179:9
204:19
**people's** 58:8 141:6
**percent** 22:5 36:18
46:1,3 50:11,19
129:13 130:11,15,18
130:24
**percentage** 185:7
**percentages** 144:16
**perception** 58:8
**percutaneous** 136:23
**perfectly** 153:13
**perform** 33:7 52:14
63:18
**performance** 206:3,8
206:24
**performed** 52:24 57:7
57:22 65:20 67:4
90:8 112:13 138:15
219:21
**performing** 50:17
64:16,25
**period** 9:1,2 16:15,22

43:2 47:23 48:22
50:6,16 66:23
**permanent** 218:23
**permissible** 59:17
**Perretti** 1:18 2:9
**persisted** 66:10 134:12
**persistent** 134:8
**person** 33:22 80:5
151:20 224:5
**personal** 37:19
**personally** 46:8 196:25
220:17 224:2
**perspective** 14:23 15:2
15:4,8,9,14 56:3
98:10
**perused** 93:12,20
195:25
**phone** 73:5
**phrased** 188:17
**physical** 126:24 133:3
**physician** 44:6 79:19
80:3
**physicians** 12:9 14:10
64:24 103:19 207:6
**ph|917.591.5672** 1:24
**picking** 171:23
**place** 7:23 12:18,22
13:11 21:6 44:9
53:21 75:5 77:7,20
82:4 119:22 124:21
129:1 142:1 217:9,16
222:11 224:9 225:2
227:14 230:14
**placed** 21:9 45:6,16
46:6,19 47:12,16
48:4,7 49:13 50:2
116:19,21 117:18,19
119:2,14 121:18,24
122:6,17,25 123:6,18
123:24 124:9,12
125:13,14,19 126:17
127:7,9,15,25 128:3
128:10,19 129:7
138:13 210:12
216:14,17 217:1,2,10
217:11,12,21 218:5
218:16 219:13,17,18
219:20 230:16
**placement** 116:17
117:16,25 118:18
119:18,24 120:4
125:1 137:22
**places** 9:22
**placing** 44:23 217:5,25
224:5 232:2
**plaintiff** 60:12
**plaintiffs** 1:6 2:6

230:25 231:14,18
232:25
**plaintiff's** 90:14
**plan** 73:1,3 85:2
**plating** 190:25 191:2
191:10,13,19,24
192:11,23 193:23
194:2,5,13,16 195:8
195:15
**play** 115:19 225:19
**Plaza** 2:11
**please** 47:6 186:21
237:3,8
**plenty** 114:8
**point** 18:17,19 19:2
93:15 95:12,14 178:9
182:17 194:20
195:25 198:11,23
218:15
**points** 100:1
**population** 32:6 41:16
**pore** 191:16
**pores** 191:17
**portion** 139:1 140:9
141:22 142:13
**portions** 143:7
**portrayal** 106:7
**position** 198:24 199:22
**positions** 136:9
**positive** 150:16 151:1
152:15 153:12
**possibilities** 115:8
116:2,5,23 128:15
**possibility** 16:8 30:18
127:11,13 128:14,18
**possible** 93:25 116:15
120:25 128:23 134:8
136:20 143:11
**possibly** 62:19 68:25
69:1 125:19 137:19
174:8 210:1 212:7
213:20
**posterior** 81:23 82:1,9
82:22 83:13 84:11
**Postsurgical** 213:7
**potential** 37:25 215:16
233:9
**potentially** 96:8
**Potkul** 11:14 16:11
160:24 161:1,16,20
162:7 163:18 165:19
**practice** 22:2 24:13,19
24:24 28:4 51:21
55:23 63:24,25 131:1
139:5,10 154:11
163:8,11,14 189:19
189:20 193:12

197:14 214:7 220:15
**preceptor** 8:22 15:12
**preceptorship** 14:14
179:4,23
**preceptorships** 14:17
**precisely** 146:18
**preclude** 145:23 185:1
**precursor** 126:1
**predicated** 34:20
**prefer** 101:8
**preference** 226:19
227:1
**preferred** 226:15
**Premarin** 94:21,24
**preoperatively** 135:15
136:4
**prep** 71:24,25
**preparation** 204:18
**prepping** 72:2
**prerogative** 62:24
220:11
**prescribed** 65:13,20,24
111:9
**present** 2:19 74:2,3
103:22 136:16
**preserve** 7:24
**Presumably** 133:10
**presuming** 152:25
**pretty** 24:2 94:12 196:6
203:17 204:13 217:4
**previous** 48:17 82:5
**primarily** 48:7
**primary** 80:5
**principles** 190:6
**printed** 213:8
**prior** 35:2 71:23 72:22
**private** 24:13,18,24
**probability** 125:10
128:9
**probably** 9:23 16:16,25
17:13 18:7 24:23
38:22 39:2 45:7
46:20 49:1,25 50:6
50:10 58:20 72:24
88:5 116:16 130:25
135:21 136:5 141:3
143:9,15 155:21
156:16 171:3 177:5
180:15 213:23 214:5
215:12
**problem** 41:13 200:7
203:1,7,9,10,11,15
216:20,21
**problematic** 156:23
**problems** 185:22
203:23 231:6
**procedure** 38:24 52:24

Nicole Fleischmann, M.D.

57:13 61:25 64:7
65:19 66:5 67:4 77:3
77:4,7 123:22 128:20
128:20,23 129:4,6,8
130:22,23 133:15,18
134:1,4,6,16 135:12
135:19 136:19
137:24 138:3,7,14
149:20 167:16 179:5
186:1 200:18,19
201:21 217:16
219:21 233:17 235:2
**procedures** 43:12
51:16,20 52:8,10,11
52:14 55:25 57:7,15
57:21 58:4 62:14
64:16,25 77:6 124:25
182:14 183:2,4,7
199:15
**process** 100:8 105:16
162:3 193:19 200:1
217:17
**proctor** 8:22 15:12
**proctorship** 14:15
**proctorships** 14:17
**produces** 184:24
**product** 15:15 38:2
148:16 150:8,9,9,16
153:15
**Production** 5:10
**products** 12:10,11 14:3
14:7,21,25 15:21
148:8,14 151:2
161:13 164:7 173:16
176:7,20,21
**professional** 4:24 94:17
106:3 150:14,23
152:13 153:5,13
166:13 179:16
**Professor** 31:8 34:11
34:19 35:16 36:2
**profile** 23:16 25:13,18
36:16 37:4
**prof/ed** 12:1
**program** 4:6 162:20
163:1 164:5,6 165:5
**programs** 163:23
165:20
**progress** 3:16 73:17,20
**prolapse** 52:16 102:10
157:6 158:11,19
212:7
**PROLENE** 187:10,24
204:15,21
**PROLIFT** 37:4,5,6
157:12,13,15,17,18
157:19 158:2,4,4,8

158:22,23 159:1,10
159:17 163:22
165:20,22 166:18
167:15 173:18,21,23
175:23 177:23 178:2
178:4
**promote** 150:17 152:16
**properly** 83:8,19 142:6
179:9 217:12
**proposing** 221:4
**proposition** 105:6
**propounded** 239:5
**provide** 150:8 207:13
**provided** 27:7 67:22
163:2 204:25 205:1,5
**provides** 33:25
**providing** 182:21
234:12,23
**provision** 34:24
**proximity** 136:24,24
**pubic** 142:19
**Public** 1:22 239:18
**publications** 211:13
212:16,24 215:9
**publicly** 94:15
**published** 26:25 27:5
196:3,5 211:16,17
213:12 214:1
**pubovaginal** 45:10
228:1
**purpose** 15:1,16,19
156:6,8
**purposes** 14:23 15:13
**pursuant** 1:16
**put** 18:4 20:21 22:12
31:2 39:25 40:15
53:5 88:9 91:6 97:2
103:20 123:15
147:17 151:13 152:2
165:4 217:8,24 219:9
**putting** 70:17 196:20
218:13 232:20
**p.m** 174:24 175:4
180:18,25 221:15,21
235:8,12

_____
**Q**

**qualification** 146:8
**qualified** 188:12
**qualify** 144:25 184:21
186:2 206:17 214:23
**qualifying** 145:14
**quantified** 188:15,23
**question** 5:20 6:5 7:12
7:15,17,25 8:4 11:5,8
15:5 26:2,16 27:2
28:25 37:2 41:1,20
42:16,18 47:4 75:23

82:10 84:14 88:23
97:12 99:24 101:16
104:14 106:22,24
111:5 117:11 120:18
121:8 129:23 130:3
133:21 144:19
145:25 146:12,13,22
147:3,16,16,21
159:19 165:17
174:19 176:16
183:20,22 184:1,14
184:16,19,20 186:20
187:19 192:10
193:10,14,15,16
194:4,9,13 195:15,20
196:4,6 197:21
203:21 204:9 205:11
210:6 216:1 222:15
222:17
**questioned** 80:15
**questioning** 159:21
231:14 233:6
**questionnaire** 110:22
**questions** 7:10,19 8:5
8:18 74:16 101:3
103:6 105:15 152:3
181:3 182:11 185:2
221:9 222:2,3,16
224:18 228:4 231:1
233:20 235:5 239:4
**quick** 60:24
**quickly** 141:1,17,19
**quietly** 84:13
**quite** 140:10 167:19
**quote** 196:1

_____
**R**

**R** 1:5 238:1,1
**rambling** 81:5
**randomly** 19:9 100:17
100:24 102:1
**rare** 50:22 204:1
**rarely** 17:15
**rate** 50:20 72:6 130:14
130:24
**rates** 73:10
**reached** 142:2
**reaction** 114:15 115:2
116:8,11 131:19,20
131:22,24 132:14,21
189:24 191:16 194:1
209:24 210:9 228:4
**reactions** 38:7 186:18
186:24 187:5,6
191:20
**read** 17:17 25:11 33:13
55:5,8,12 84:13
90:14 93:11,12,13,18

93:21,23 94:1,4,10
96:21 103:23 104:1,4
106:5,5 117:10
147:12 156:14,18
184:12 191:6 193:11
195:23 196:3 198:10
198:11 204:12 237:3
239:3
**reading** 34:3 79:24
96:22 110:8 156:20
191:5 220:22
**ready** 191:9
**real** 60:24
**really** 9:3 17:5,6 23:25
34:13 58:24 65:4
72:16 76:10 77:10
80:11 93:25 101:7,13
103:11 104:13
105:13,17 111:19
113:4,6,10,10,22
117:7 122:12 123:10
148:24 149:18
171:21 173:22
181:18 186:1 206:5
206:10 208:7 220:11
**realm** 127:12 128:13
**realtime** 1:21 74:1
236:10
**reason** 7:13,16 19:13
36:5 78:11 80:9
128:22 157:24 163:9
211:8 220:6 237:5
238:5,7,9,11,13,15
238:17,19,21,23,25
**reasonable** 124:17
125:9 128:9
**reasonably** 75:7
**reasons** 116:20 117:8
120:12 147:18
**recall** 10:12,18,20
11:16,23 16:10 69:7
69:8 80:18 84:8
156:20,21 162:13
163:7,9,12 167:13
170:23 171:1,13,15
171:17,21,25 172:16
173:11,14 174:2
180:12 212:9,15
219:10 222:7 228:8
229:2 231:13 233:5
**receipt** 237:14
**recess** 85:15 175:1
180:20
**recite** 88:24
**recognized** 23:24 42:3
**recollection** 50:19
167:12,23
**recommend**

18:12,19
30:15,21,23,25
**recommendation** 18:8
233:11
**recommendations** 54:1
54:1
**recommended** 65:15
**Reconstruction** 211:13
**record** 6:9,18 9:16 30:3
30:14 40:18,20 51:5
54:21 55:11 65:14,18
67:17 74:5 78:14,17
79:3,4 85:7,13,24
86:2 110:15,19 112:6
112:10 134:10
174:17,24 175:4
180:25 184:13
221:12,15,18,21
222:24 235:9 236:6
**records** 31:11 34:12
35:3 67:5 79:24 93:2
93:3 109:10 110:9
163:2 223:6 228:11
**recruiting** 178:15
**redid** 190:5
**reduce** 229:15
**reduces** 229:11,19,25
230:4,10,20
**refer** 106:23 228:24
**reference** 28:8 54:21
65:14 68:8 70:8
83:21 104:5,8 105:4
105:5,9,10
**referenced** 104:2,24
**references** 80:23 104:1
105:8 106:6,7 132:13
**referencing** 104:7
**referred** 69:4
**referring** 34:7 105:14
142:12,14 149:13
150:20 218:25
**refers** 113:11,12 162:4
**reflect** 78:18
**refractory** 133:17,23
134:2,17
**refusing** 146:21
**regard** 35:15 36:16
37:9 51:1,8 88:8
89:21 91:11 94:9
98:4,21 106:12 160:7
234:9
**regarding** 37:3 70:2
89:16 90:5 91:7,14
169:4 173:8,12
204:15 221:5 222:4,5
223:7,10 231:6
**registries** 40:18
**registry**

40:15,23,25 43:15,15
**regular** 120:7
**relate** 215:9
**related** 70:20 125:18
  192:8 215:13 232:13
**relates** 193:6
**relating** 38:7
**relation** 221:1
**relationship** 9:7 10:23
  11:1 176:6,13,14,18
  176:20,22
**relax** 83:5,7,18 84:3,4
  84:17,25
**relevant** 233:10
**reliance** 3:21 87:2
  92:10,13 94:5
**relied** 87:7,10,18 93:4
  198:9
**rely** 54:23,25 193:20
  193:24
**relying** 106:7
**remaining** 143:23
  144:4,21 145:6
**remains** 147:24
**remember** 10:2,5,7,10
  11:2,12,13 12:23
  13:2,3,7,10,18 43:7
  96:22 97:9,14,16,18
  97:20 103:6 158:3
  161:18 162:5 163:22
  165:19 167:10,20
  169:2 178:14 227:4
**remembered** 16:19
**remind** 165:16
**removal** 75:8 76:15
  139:3 140:8 141:4,21
  200:5
**remove** 76:2,9 77:4,20
  112:13 139:7,20
  140:5,11,15,21 200:4
  200:25 201:2,6
**removed** 58:21 74:23
  76:25 77:17 82:3
  131:25 133:9 136:11
  139:1,17 140:19
  142:6 187:10,25
  228:19
**removing** 200:14,17
  202:24 203:8,14,22
**rep** 11:13,14 161:22
**repairs** 158:19
**repeat** 133:20 186:20
**repeatedly** 139:10,11
**rephrase** 9:18 16:6
  22:20 28:25 34:16
  37:23 44:18 46:16
  55:16 56:8 61:7 62:8

62:25 64:6 74:14
  75:13 80:22 99:6
  124:10 141:14
  171:14 176:23
  205:12 217:20 220:5
  221:3
**report** 3:17,18,20
  17:17 28:9 30:11
  31:13,17 34:1 56:10
  60:3,20 68:21 69:4
  69:10 70:17 71:21,24
  72:2 74:7 83:22 84:8
  85:19 86:5,9,14,18
  86:23 87:11,22,24
  88:7,9,10,12,17,23
  88:24 89:5,6,9,16,20
  89:24 90:5,6,11,17
  90:19 91:1,6,7,12,13
  91:24 92:4,7,22,23
  96:19,22 97:10,15,19
  106:23 107:1,15,19
  107:22,23 108:25
  111:1 118:1,8,25
  119:6,9 120:19 122:1
  131:8,10 132:7,10,12
  133:2 135:11 136:3,7
  138:17,19 142:15,21
  142:21 147:12 149:7
  149:11 154:10,18
  195:23 196:1 198:1,1
  198:2,3,14,21 202:13
  204:5,7,8 215:22,23
  222:10 228:5,11,16
  228:18,24
**reported** 35:1,1 75:14
  110:20 112:1 202:15
**reporter** 1:21 6:18
  236:10,19
**reporting** 33:15
**reports** 25:11 56:12
  60:21 70:16,21 91:18
  96:17,25 99:15
**representative** 16:12
  16:22 17:2,4 168:12
  169:1
**Representing** 2:6,14
**reproduction** 236:17
**reps** 11:2,15
**request** 4:6 5:10 84:25
  162:20 163:1
**require** 161:24 186:18
  187:1 231:9
**required** 187:11 188:1
  231:12 234:12
**research** 165:4
**reserved** 6:6
**residency** 169:13

212:21,22 213:1
**residents** 227:5
**resolution** 139:2
**resolve** 182:4 185:18
  203:9,15,22 231:5
**resolved** 203:19
**resolves** 202:25 203:6
**respond** 192:20
**responded** 163:17
**response** 7:10 132:22
  178:19 182:16,22
  184:24
**responsibility** 148:7
**responsible** 27:13
**result** 76:4 200:6
  218:10
**resulted** 136:19
**results** 32:16 33:13,18
  49:9
**Retention** 214:1
**retract** 12:19
**retropubic** 3:17 17:7
  17:11,12,14,15 18:3
  18:5,21 19:3,7,17,17
  19:21 20:5,12,16,23
  20:25 21:15 22:13,24
  22:25 23:13,22 24:5
  24:16 25:5,10,14,18
  25:24 26:5,18,24
  27:8,24 37:10,18
  38:1,7 41:4,18 45:20
  46:7,21 47:17 48:13
  49:10 50:14,18 63:3
  66:5 85:19 86:6 88:9
  98:5 123:22 128:20
  130:14 137:1 138:2,7
  138:12,13 140:10
  142:13,16,18,23
  143:3,8 156:15 181:4
  181:7,17,23 182:2,13
  183:9,11 185:5,16,21
  186:3,8,17,23 187:4
  187:9 196:16 200:24
  201:18 204:10
  205:15,20,25 208:19
  210:8 215:16 216:7
  216:11 217:16,22
  218:6 219:8,13 222:5
  224:21 225:1,11,16
  226:13,18,22 227:20
  230:16 234:2,6
**Retropubics** 24:22
  38:20 48:3 49:13
  50:2
**return** 38:25 41:11
  44:5 142:8 237:12
**returned** 39:19 41:4

50:4
**revealing** 117:2
**review** 10:14,16,20
  27:12 37:19 42:7
  90:24 96:18 154:14
  198:4 223:6 228:10
  228:15 232:18
**reviewed** 91:22 92:6
  93:4 96:17,20 97:3,4
  97:25 193:13 196:8
  204:17 212:8 214:6
  223:17
**reviewing** 91:4
**reviews** 223:20
**revision** 187:5 200:9,18
  228:7 231:10
**re-ask** 7:17 184:1
**ride** 167:5
**rides** 9:22
**right** 7:7 8:6 9:11,22
  14:19 17:19 28:11
  32:24 33:3 36:3,9
  37:14 38:11 39:10
  40:24,25 41:5,8
  42:14 43:16,21,23
  44:1,16,24 46:17
  47:9 49:16,17 51:17
  56:17,22 60:3,19,25
  61:9 62:5 63:6,8
  66:18 68:9,12 69:2
  70:19 71:2,3,7,13
  73:2,24 75:20 78:3
  79:17 80:9 81:9
  83:23 84:21 85:10
  87:11 90:12 92:20,25
  94:22 95:6,10 96:4
  99:16 101:11 105:18
  105:23 106:8,13
  107:4,4 112:9,20
  114:17 115:22
  116:13 117:7 118:22
  119:10 120:5 121:17
  122:20 123:19 127:1
  128:16 129:8,13,17
  130:2 132:5,16,18,19
  133:6,24,24 134:8,20
  135:2 136:11,19
  137:6,11,18 138:6,10
  138:13,14 139:5
  140:13 141:20
  142:23 143:2 147:8
  147:15 148:17 152:7
  153:17 158:16
  164:12,12 165:14,23
  166:1,2,14 167:1
  171:7,23 174:6 177:4
  177:8,24 178:2,17

179:11,19,24 181:15
  188:7 190:17,24
  194:22 195:1,3 200:7
  200:14 201:1,6,24
  202:8,19 203:3,9,12
  205:9 208:21 209:20
  217:1 220:2,9
**rights** 7:24
**Riker** 1:17 2:9
**risk** 120:25 129:11,25
  142:6 143:20,22,24
  143:25 144:3,8,20,22
  145:5,9 147:23,25
  181:24 182:5,5
  183:11,13,17,21,25
  185:5 186:11 190:6
  202:9,10 218:16
  219:3 227:12,18
  229:12,15,19,25
  230:4,10,15,20 231:2
  231:9 233:9,18
**risks** 18:10,13 23:17
  25:19 37:10,17 38:6
  38:10,14,24 181:14
  181:23 182:2 185:16
  185:21 186:1,8,17,23
  190:12,15 196:15
  202:2,6 215:16
  223:21 226:15,15
  227:7 231:2,17,25
  232:4,12,12 233:3,10
  233:15 235:2
**risk/benefit** 18:18
  23:16 25:13,17 36:16
  37:3
**road** 106:17
**robotic** 51:24 52:1,5,7
  52:10,12 55:19,25
  63:18,21 64:3
**robotics** 52:13
**role** 11:24 13:15 103:1
  148:7,17,20 225:19
**room** 74:2 156:11
**rope** 218:6 219:16
**roping** 216:4,6,10,15
  218:10,17,19 219:3,5
  219:7,11,12 232:19
**Roseland** 2:5
**Rosenblum** 171:9
**Rosenzweig** 79:17
**Rosenzweig's** 149:13
**rote** 101:4
**rumor** 59:10
**running** 12:6 33:23

_____
**S**
**S** 2:10 3:10 4:2,10,13
  172:22 175:7

172:22 175:7
sacrocolpopexy 52:12
  52:16,20 63:23
sad 159:13
safest 150:9
safety 24:7
sales 14:25 15:15 16:12
  16:18,21 17:1 161:22
  168:12 169:1
salespeople 150:23
satisfied 206:24
Saturday 167:6
saw 14:2,5,6 28:15 29:9
  49:14 50:10 56:9
  65:13,14 69:3 80:23
  90:18 102:19,20
  105:9 110:6 125:15
  131:8 132:5 158:25
  207:17 208:1
saying 40:7,10 68:5
  93:23 94:1 110:19
  115:20 117:20,21
  118:3,16 127:8,14
  128:12,13 131:11
  136:1,2 142:10
  154:19 167:22 188:3
  192:18,19 201:16
says 91:22 96:24
  105:11 132:12
  161:21 168:14 174:3
  192:3,7 218:22 219:2
  219:2
say-so 53:4
Scandinavia 99:13
Scandinavian 99:16
scant 201:13
scar 75:2,8 77:13,15,22
  82:7 190:25 191:2,10
  191:13,19,24 192:11
  192:23 193:22,25,25
  194:2,5,13,16 195:8
  195:15 199:24
scarification 193:18
scarring 76:2,6,12,15
  81:12,20,21,23,25
  82:2,9,25 84:10
  154:21 229:20
scheduling 171:22
Scherer 1:17 2:9
science 98:4,10 103:20
  220:12
scientific 64:23
scope 154:7 160:1
Scott 11:20 13:15
  79:10 173:2,6 174:16
  175:13,16,20 176:17
  177:22 178:13
sealing

6:3
season 161:4
second 163:3 168:15
  176:4 177:14,15
see 27:14 35:7 41:22
  43:7 54:20 56:11
  65:18 73:4 74:5
  83:21 88:1 96:10
  104:2,5,23,23 105:8
  108:10 111:19
  115:20 116:22,25
  130:12,25 154:19
  157:25 158:18,25
  160:23 161:7 162:11
  162:14 163:5,24
  167:17 168:13 169:6
  173:4,9 176:9 177:1
  177:19 192:8,19
  193:11 194:13,24
  196:21 199:12
  204:22 206:5,10
  207:18,22 210:24
  216:15 218:9,11
  220:6 228:11 229:3
seeing 165:1 203:2
seen 7:22 8:16 9:16
  17:3 20:11 29:25
  31:11 34:12 35:3
  44:8,9 54:5,12 63:5
  73:8 106:20 111:25
  112:8 187:22 188:2,5
  189:20 210:16
  219:11,12,15 223:7,9
  232:18
seldom 167:19
selected 100:10,13,18
  100:24 101:25 102:1
selection 100:8
selectivity 102:5
self 97:2
sell 38:2
selling 159:10,17
sending 24:1
sensation 77:17
sense 7:13,15 16:14
  44:22 75:17
sent 175:13,17 195:5
sentence 177:16
separately 179:18
September 173:2
sequelae 23:24,25
serial 99:15,25
series 231:1,2
served 92:18,23
services 16:3 70:3
session 167:14 173:8
  173:12,19
set

27:21 73:20 89:5,24
  99:7 148:14 150:4,4
  167:4
seven 19:18
severe 38:10,14 58:7
  83:6
sexual 78:6,24 80:8,17
  142:7 230:21
shape 216:18
share 190:9
sheet 237:7,9,12 239:6
shelves 158:2 226:5
shift 22:11
short 48:21
shortened 81:1,8
shorter 20:20,21
short-term 66:15
show 60:22 118:25
  120:18 153:9 167:15
  204:20,21
showed 10:15 42:11
  69:5 133:4 153:10
  204:19 207:19
showing 25:8 207:14
shown 28:10,22 29:1
  38:10
shows 42:8 168:17
shrinkage 186:9 231:8
siblings 54:7
side 111:16 124:19
  137:8,12,14 143:2,4
  143:5
sides 84:16
sign 111:19 125:23
  237:8
signed 88:5,10
significance 143:16
  191:22 193:18 209:8
  210:2,17,21
significant 34:2 103:4
  103:6 187:11,13,18
  187:20,25 188:3,11
  188:18 189:1,4,6,8
  189:18 231:11
significantly 134:14
similar 29:17 173:16
simple 41:1 115:21
  135:17 145:25
  147:21,21
Sinai 24:19
single 39:3,6
sit 28:13 34:14 117:11
  120:15,22 121:15,23
  126:6 136:13 192:22
site 77:2 139:25 140:1
sitting 101:10,20
sixth 93:9
size

21:2 137:16,20
  183:25 205:14
sizes 191:16
skin 132:13
Slater 2:3,3 3:6 7:2,5
  8:13 11:3,4,17 14:8
  14:13 16:1 18:25
  19:19 20:3,8,13,14
  26:14,15 27:4,11
  30:5,7,19,20 33:1,19
  33:21 34:9 36:6,14
  37:1,8 38:17 39:14
  39:16 40:1,13 41:14
  41:24 42:1,17,19,24
  46:23 47:5,7 48:2
  50:23,25 51:7 53:8
  53:11,13 54:9,11
  57:5,18,19 59:1,14
  59:23 63:15,17 64:5
  64:12,14,20,22 65:6
  65:8 66:2,4 67:13
  69:22 70:12,15 71:10
  73:19 75:24 78:10,16
  78:19,21 79:5,7,20
  79:22 80:13 81:14,15
  85:4,11,25 86:6,20,21
  87:5,17,20 88:6,20
  88:22 89:12,14 92:18
  92:21 96:15 97:6
  98:13,16 99:3,5
  101:6,10,12,17,21
  104:10,15 106:1,11
  106:16 107:21 108:3
  108:7,12 109:5,7
  113:19 114:4,13
  115:3 118:7,11,14
  119:8 120:8,10 121:1
  121:7,14 124:5,7
  125:2,3 126:11 127:5
  127:20 128:7 129:16
  129:22 130:2,6,8
  131:2,3,17 132:9
  133:22 135:24 138:5
  139:23 143:17,19
  144:1,2,7,13,14
  145:2,3,8,20 146:4,7
  146:13,15,20 147:1
  148:3,5,23 149:1,6,9
  149:17 150:3,11,21
  151:7,18 152:1,11,22
  153:20,21,24 154:17
  154:25 155:5,12
  156:13 157:2,4
  159:15,22 160:2,5,19
  162:23,24 165:8,16
  165:18 166:8 168:6
  168:23 172:9,10,25

174:13,21 175:10
  177:12,13 178:10,12
  178:25 180:7,14
  181:1 182:7,9,19,24
  183:5,15,16,19
  184:17,25 185:3,9,11
  186:4,6 187:21
  188:24 189:22 192:9
  192:17 193:8 194:15
  196:23 199:5 200:3
  200:11,20,22 201:4
  201:11,13 202:4
  204:2,4 205:7 206:6
  206:7,22 207:12,21
  209:9,10,16 210:3,5
  211:9,11 214:25
  218:2,4 220:18,20
  221:8 222:14 223:15
  224:3,14 225:6
  226:20 227:2,16,21
  228:14,21 229:1,13
  229:21 230:6,12,22
  231:20 232:8,14,22
  233:13,24 234:18
  235:4
sling 21:6,22 22:13
  23:8 24:25 25:10
  43:12 49:3 59:15
  61:11 62:12,16 75:1
  77:20,20 104:20
  116:17,19,17 117:1,2
  117:16,17 118:18,19
  119:19,19 134:15
  138:2,8,12 139:1
  142:14,20 148:2,21
  149:15,20 187:14
  189:6,13 200:10,18
  203:19,19 215:17
  220:14 221:1 224:22
  225:9,11,19 226:2,3
  226:5,9,10 227:19
  228:1,7 229:11,15,18
  229:24 230:3,9,16,19
slings 21:18 38:16
  39:24 45:5,9,10,11
  45:15 46:3,4,5,18,19
  46:22,24 47:2,12,15
  48:7,19 49:5,6,7
  50:11 51:13,19,23
  55:18,19,24 62:10
  62:14,20 103:13
  117:18 119:22 120:7
  131:7 196:20 210:12
  212:7 220:16 232:2
  232:19 234:7
slit 124:22
small 41:21 126:17

143:2 183:13 185:7
191:17
**Smith** 75:9 79:18 80:1
80:3,9,16 112:12
132:3 136:15 154:19
155:6,15,22 156:5
**Smith's** 228:6
**Snell** 73:4
**socialized** 43:21
**society** 94:17 106:3
150:14,23 153:5,13
**somebody** 29:15 62:22
65:3,4
**somewhat** 66:23
**sorry** 23:9 25:3 30:13
47:3 88:4 108:10
143:21 167:11
206:12
**sort** 163:25
**sorts** 113:1
**sound** 113:16
**sounded** 158:13
**sounds** 85:11 139:12
189:11
**sourced** 94:15
**sources** 223:4
**so-called** 210:18
**space** 24:5 137:1,4
140:10 142:13 143:3
143:8 230:17 234:8
237:6
**spasm** 83:2,7,16,17,19
83:22 84:19
**spasms** 110:4,7,11,12
110:14,16,19,21,24
111:2,4,7
**speak** 15:18 55:7 58:24
80:2 90:15 150:25
151:4,12
**speaking** 49:12 54:21
65:2 70:10
**specific** 67:3,23 84:15
89:1 97:11 107:25
138:20 142:21
171:25 186:2 195:19
216:13 219:10
234:12 235:2
**specifically** 19:8 46:22
54:15 68:11 71:20
90:14 142:19 158:19
169:21,25 170:15
171:21 181:10
194:18 218:20
220:24 232:13
**spectrum** 215:6,8
**speculate** 190:22
**speculative** 201:23

233:2
**Speedwell** 2:11
**spend** 72:1,2
**spent** 72:22
**spoke** 14:9,19 73:8
163:22 164:8 165:20
**spoken** 169:21,25
170:12
**sporadic** 48:12,14
**sporadically** 17:25
**spot** 76:11 137:10
**stand** 105:6 120:16
147:17 148:10 152:6
202:21
**standard** 56:16,19,25
57:6,13,21 58:2,4,12
58:16 59:3,10,16,18
59:22,25 60:3 61:8
61:12,17 62:11
105:21 149:23 150:5
152:17
**standards** 27:1,6,14,17
27:22 56:10,10 58:15
234:21 235:1
**standpoint** 98:19
**stands** 103:5 104:8
198:17
**start** 19:15 22:6 59:9
125:6 129:17 157:18
181:21
**started** 17:18 19:2 22:8
22:15 52:12 106:18
111:12,13 112:3
156:14,17 158:2
178:9 225:23
**starting** 24:24 166:11
**starts** 168:11,16
**state** 1:22 44:4 211:13
237:5
**stated** 116:9
**statement** 103:23 104:4
104:6 105:4,9 106:3
106:5 107:7 122:8
144:9,22 145:9
148:10,20 155:21
202:21
**statements** 94:18,18
103:13 104:16
106:13
**statistics** 44:23 129:14
129:17 130:9
**stay** 151:1 153:12
**stayed** 152:14
**stenographic** 6:18
**step** 51:9
**Stick** 59:25
**stipulated** 6:2
**Stipulations**

5:15
**stitch** 116:25 117:3
**stocking** 158:2
**stop** 17:10 160:3
174:22
**stopped** 19:11 22:24
79:25 159:17
**story** 105:10 175:24
**strategic** 173:7,12
**street** 54:14
**stress** 51:11,21 55:20
55:25 56:4 57:13,14
59:16 61:13,17 62:11
62:15 63:11,20 64:9
102:13 138:15
156:24 215:10
224:11 232:6
**strike** 11:3 20:13 26:14
30:5,19 33:19 39:14
41:24 50:23 53:8,11
54:9 57:18 63:15
64:12,20 65:6 66:2
78:16,19 79:5,20
81:14 98:13 99:3
109:5 120:8 121:1,5
124:5 125:2 130:6
131:2 143:17 144:1
144:13 145:2,22
148:3 153:20 157:2
172:9 177:12 178:10
182:7,16 183:15
185:9 186:4 200:20
201:11 204:2 206:6
209:9 210:3 211:9
218:2 220:18 223:24
**strong** 156:5,12,18
**stuck** 158:6
**studied** 33:25 41:19
43:3,8 98:9 99:14,17
99:18,21 100:3,10
156:11 193:9,15
194:4,12 195:1,7,15
195:19,21 204:9
210:6,10,11,14,16
**studies** 25:8 31:20,23
90:24,25 99:7,19,21
137:21
**study** 32:1,16 34:4
41:15 42:10,11,25
43:3 64:23,24 95:2
95:12,14 98:17,23
99:18 100:3,4,6,9,15
100:16,20,23 101:9
101:19,24 102:2,9,16
155:8 156:8
**studying** 114:10
**stuff** 56:11 117:10
**subject**

195:24
**Subscribed** 239:14
**substance** 239:5
**subtle** 128:6
**subtract** 71:13
**success** 25:10
**suggested** 171:9
**SUI** 224:22 227:19
**sulcus** 122:14,22 140:2
**sum** 91:14
**summary** 198:16,17
**superficial** 119:24
120:3
**superficially** 121:19,25
122:7,25
**superior** 1:1 6:14
207:20
**superlative** 203:18
**supervision** 236:19
**supplement** 91:6
**supplemental** 3:20
71:24 72:2 74:6,7
86:18,23 90:5,11,17
91:7,13 92:3,7,9 93:7
215:23
**support** 5:2 59:22
198:24
**supported** 89:7
**suppose** 29:19 63:7
71:14 167:9
**supposed** 27:6 32:19
33:3,4,9 217:5,8
234:17 235:1
**sure** 14:16 15:11 26:1
27:13 39:11 44:20
49:1 56:15 57:11,23
64:18 68:17 76:18
84:7 95:11 97:4
100:6,19 102:3 112:5
114:25 115:16 116:3
120:17 133:10 135:7
138:8,23 150:15,19
150:25 152:14
153:11 155:22 156:4
156:10 184:6,9
186:12 189:25 195:2
195:5 197:20 202:12
211:21 215:19 216:3
225:21 233:8
**surface** 124:10,12
**surgeon** 123:23 219:22
226:19,25
**surgeons** 232:1,1,5,6
**surgeon's** 220:11
**surgeries** 181:13,14,18
181:19 187:5 202:6
**surgery** 28:20 29:4

31:5 54:14 55:3 65:9
65:16,25 66:1 67:1
75:10 76:2,5,7,9 77:8
77:19,24 78:25 79:9
82:5 110:17 111:2
112:13 122:2 124:1
132:3 135:5 136:15
141:23,25 181:9,19
182:6 200:6,12,18
202:3 222:12 224:9
224:11 227:14
228:13 231:10 232:3
232:12 233:3
**surgical** 18:9 77:3,4,6
148:8,14 186:19
187:1 190:6 209:2,3
216:19,22 231:9
**surrounding** 140:25
141:16
**Survey** 214:16
**sustained** 66:18
**swear** 6:19
**switch** 23:12 49:11
226:9
**switched** 19:21 24:3,16
**sworn** 6:22 236:5
239:14
**symptoms** 110:20
135:9
**synthetic** 45:5 46:5,19
47:11 215:17
**system** 18:13,14 25:20
43:18,21
**systematic** 223:20
**systems** 21:4

_____

**T**

**T** 3:10 4:2 238:1
**take** 7:5 12:18,22 34:13
51:9 66:6 71:22 72:5
101:13 140:17
164:17,22 166:25
167:7 174:20 187:14
203:18
**taken** 1:16 6:13 10:19
75:5 85:16 132:3
172:2 175:2 180:21
**takes** 71:23 234:1
**talk** 16:5 44:22 45:1
54:6,7 56:13 73:4
88:12 89:1 90:9
113:7 120:14 138:17
138:24 149:3,15
170:15 176:23
177:15 181:18,19
183:7 198:4,13 199:7
204:7 216:4 220:13
223:20

**talked** 28:11 80:5
  88:17 90:10 123:12
  136:7 154:22 155:1
  169:17,22
**talking** 26:7 35:23
  45:25 46:23 48:15
  54:13 67:14 68:18
  69:16 79:2 95:15
  125:5 139:4,12 140:7
  140:16 142:9,18,22
  150:24 152:15
  163:12 165:21
  168:15 177:4 178:16
  182:13 188:6 193:5
  196:17 200:23
  210:18 212:4,6
**talks** 44:14 67:18 167:3
  196:14 218:14,20
**tape** 218:23
**targeting** 176:8,25
  177:3
**taught** 179:10,22
**teach** 179:9
**teaching** 14:20 165:22
  166:17 179:5,7,15
  180:1,9
**technical** 117:17 118:5
  118:18 119:1,13,17
  119:18 160:7 216:19
  216:22
**technically** 113:2
**TECHNICIAN** 6:8
  85:12,22 174:23
  175:3 180:17,23
  221:14,20 235:7
**Technologies** 1:24 6:10
**technology** 57:23
**tell** 7:9,16,16 10:23
  11:6 21:25 41:13,16
  43:4 44:21 59:5 65:2
  73:7,7 76:12 77:11
  80:9,16 88:20 94:3
  97:5 100:21 106:4
  116:15 130:9 131:12
  143:5 145:18,22
  147:10,18 154:4,12
  157:24 165:19 172:6
  172:17 175:24
  182:10,11,24 194:13
  197:8 201:20,24
  202:2 206:15 210:14
  223:12
**telling** 54:17 120:12
  124:11 146:8 153:11
  170:1 177:22 178:5
  184:22 192:7
**tells** 58:11 154:16
**temporary**

218:23
**ten** 141:3,4,9,11
**tend** 56:11
**tender** 83:4,13
**tenderness** 74:22 75:14
  75:18,20,25 76:3,13
  76:24 83:10,16,17
  84:16,22,23 133:4,12
  133:14
**tennis** 40:3
**tens** 113:25
**tension** 216:14,16,16
  217:1,8,10,16,21,25
  218:5,11,14,16,22
  219:3,17 220:12
  232:21
**tensioned** 21:10,11
**tensioning** 218:20
  220:14
**tension-free** 217:7
**term** 56:17,18 59:2
  60:3 66:17 113:3,11
  189:7 191:11
**terminology** 7:14
  112:18 114:3 160:7
**terms** 8:21 25:10 34:19
  57:2 82:13 113:1
  160:8 223:9
**test** 219:21
**testified** 6:22 55:1
  223:24
**testify** 61:1
**testifying** 199:22
**testimony** 3:5 27:12,18
  35:7,11 96:7,13
  114:22,25 124:8
  130:13 145:24
  149:13 185:1 193:22
  236:6
**tests** 220:17
**text** 214:2
**textbook** 213:9
**Thank** 70:9 89:18
  163:18
**theme** 181:13
**theoretical** 158:20
**therapy** 95:7
**thickness** 124:22 125:1
**thigh** 185:23
**thin** 117:25 119:19
  122:14 129:2
**thing** 32:24 33:5,6,11
  53:16 58:25 79:8
  83:5 87:14 103:8
  152:7 154:1 157:5
**things** 9:22 54:5 57:25
  58:13,15 87:9,18

88:13,15,16,25 89:2
  90:10,13 91:5 94:18
  97:16 102:12 103:10
  105:11 118:21
  120:13 152:25,25
  198:23,24 200:25
**think** 9:16 12:20,21
  13:1,6 17:17 29:20
  31:1 33:6,18 34:22
  37:24 38:4,23 39:3
  39:12,23 48:25 55:22
  56:9 57:2 59:5,20
  60:2 71:15 72:18
  75:2,6 78:11 82:13
  87:22 91:2 92:15,16
  95:18 109:17 112:1
  116:10,19 118:9
  122:9,13,17 123:4
  124:11 127:8 131:13
  134:9 153:3,17,25
  154:1,3,12 158:7,9
  158:12,22 164:3,3,21
  165:3 166:21 175:19
  181:24,24 183:21,25
  184:4,21 185:12
  187:13 188:11,22
  189:3,17,19 190:9,19
  196:16 197:16
  199:20 203:4 205:4
  205:18,24 208:17,23
  212:6 216:9 218:8
  220:10 226:14
  230:13 231:25
  234:25
**thinking** 156:22
**thinks** 36:1,13,17 123:8
  123:11 208:5,8
**thinly** 116:20,22
  121:18,25 122:7
  123:6,18 124:12,22
  125:13,20 126:17
  129:2,7
**thinner** 20:1
**third** 93:7,9 215:11
**thirty** 237:13
**thorough** 105:18,21,23
**thoroughly** 93:13,21
**thought** 19:10,16,17
  58:6,7 89:7 118:11
  158:20 207:24
  226:13
**thousands** 113:25
**three** 45:7 171:5 172:6
  178:4,8
**throwing** 53:16 81:21
  81:24 129:17
**tight** 219:16 220:2
**time**

6:6,11 15:21 16:15
  16:22 17:4 18:4 25:7
  28:17,20 29:4,21,23
  30:24 38:13 43:2
  46:5 47:22 48:22
  50:6,11 52:13 55:2
  58:8,12 63:23 65:3
  66:23 67:5 71:5 72:1
  72:22 73:8 85:11,12
  85:23 92:19 100:1
  101:14 106:18
  122:25 126:5 160:4
  169:10 173:24
  174:23 175:3 176:5
  176:11,17 179:12,13
  180:15,17,24 183:1
  212:8 221:14,20
  222:12,17 224:9
  227:14 233:20 235:8
**times** 8:23 14:9 72:12
  72:19 139:12 140:19
  141:2 146:3 155:1
**tissue** 67:22 68:7,24
  77:13,15,23 82:8
  114:16 116:12
  125:15,17,22,23
  126:1 131:25 132:13
  186:10 191:18
  199:24 228:19 229:3
  229:7
**tissues** 140:25 141:16
**title** 197:9
**today** 7:6 13:9,13
  64:15 68:23 72:3,23
  222:4,11 225:24
  226:2 228:4
**today's** 6:10 235:8
**told** 35:24 41:23 54:3
  55:17 62:13 63:1
  74:10,12,18 95:18,22
  115:15,18 119:9
  153:18 158:17
  163:20 182:10 190:7
  191:2,4
**tonight** 121:10
**top** 82:18,25 108:5
  173:18,20
**total** 9:13 13:1 70:4
**touching** 137:18
**touted** 58:4
**tracked** 75:3
**tract** 218:24
**train** 13:5
**trained** 22:17 52:7,9,10
  123:22 124:25
  130:22 169:9,11
  176:21 224:5 232:1
**training**

37:21 95:19
  124:24 154:14
  163:23 165:20
  167:14 217:13
  220:15 223:6 227:5,6
  227:8
**trajectory** 74:25
**transcript** 236:17
  237:14,16
**transcription** 239:4
**transcripts** 93:17,19,24
  94:10
**transition** 52:1
**transitioned** 24:13,23
  25:4 157:21 158:4
**translates** 158:21
**travel** 167:4 224:25
**traveling** 13:3,4,4
**traversed** 137:2
**treat** 51:11,16,21 55:19
  55:25 56:4 65:16,22
  133:24 138:15 187:6
  224:11,22 227:19
  232:6
**treated** 122:21
**treating** 57:25 79:19
  80:3 138:18
**treatment** 39:5,20
  43:25 59:16,17 61:12
  61:13 62:10,17,23
  63:11,19 64:8 93:2
  100:25 133:17,23
  134:3 152:17 186:19
  187:1 201:22 215:10
  231:9 233:11
**treatments** 61:16
**tremendous** 9:15
**trial** 6:6 32:1,7,8,12,23
  33:23 73:11 145:24
  183:4 185:1 206:19
**trialing** 49:4
**trials** 31:21,24 33:7
  114:10
**tried** 49:7 71:16 134:15
  199:3
**tries** 60:23
**trocars** 19:25 21:1,2
  205:16 224:24,25
  234:1
**true** 17:13 43:24 66:11
  106:12 136:4,5
  144:22 145:9 146:23
  176:11,19 236:5
**truth** 7:10
**try** 7:17 13:14 15:10
  44:19 49:5 53:19
  60:1 65:21 84:3

Nicole Fleischmann, M.D.

126:5 158:5,8 184:7
193:15 198:21 199:1
**trying** 67:10 89:10 91:2
108:8 147:13 149:23
152:16 182:17,19
201:15
**turn** 106:25 177:14
199:6 202:11 204:5
**turns** 58:5
**TVT** 17:18 18:3,19
19:2,18,20,25 20:2,5
20:12,16,22,25 21:13
21:22 22:1,1,4,6,10
22:16,17 23:3 36:16
39:19 40:16 49:10
50:17 68:19,25
100:12 102:4 111:2
117:13 119:2 127:25
129:4,6 133:15 134:1
134:4,6 135:5,11,19
136:19,25 137:2
140:11,16,17,20,21
152:15 153:12
163:22 165:20,22
166:18 167:15
181:10 187:23 189:1
189:10 190:12
197:14,19 199:10,15
199:21 205:11,13,18
205:20,22 206:23
217:10 220:25
222:11 223:3,7,10,21
223:25 224:6,8,18,19
224:21,24 225:4,9,15
225:18,20 227:13,24
227:25 228:20 231:2
234:4
**TVTs** 140:4,14 141:4
**TVTTM** 3:17 17:7,10
17:12,14 18:4,20
19:3,16,17,21 20:4
20:12,16,23,25 21:14
22:25 23:12,13,17,21
24:3,4,14,16,22,25
25:5,5,9,9,14,18,23
26:5,18,24 27:8,24
37:10,18 38:1,7,20
41:3,18 45:19 46:4,6
47:17 48:3,7,9,12
49:13 50:2,13,15
63:2 66:5 85:19 86:6
88:9 98:5 123:21
128:19 130:14
138:13 142:16,18,22
156:15 181:4,7,16,23
182:2,13 183:8,11
185:5,16,21 186:2,8

186:17,23 187:3,9
196:15 200:23
201:18 204:10
205:14,25 207:1
208:19 210:7 215:16
216:7,11 217:15,21
218:5 219:8,13 222:5
225:1,11,16 226:13
226:18,22 227:9
234:1
**TVT's** 223:14
**TVT-O** 22:25 179:5,8
179:10 225:24 226:1
226:10,12,15,18,25
233:25
**TVT-R** 226:16
**Twice** 61:3
**two** 13:1 18:21 24:2
49:4 51:1 60:15
72:18 91:17 98:15
125:16 140:22
147:15 212:20,25
**type** 35:9 60:10 76:4
142:14 201:22
**types** 103:9

—————————
         **U**
—————————
**Uh-huh** 42:13 60:17
92:2 108:16 133:25
**ultimate** 53:4
**ultimately** 52:23 53:20
53:24 65:20 134:18
**unable** 126:19
**unclear** 7:17 183:20
**undercut** 96:9,13
**underneath** 117:2
119:19,20 155:19
**understand** 7:6,9 13:12
14:1,7,22 15:1,13,16
24:10 26:1 27:2
34:18 50:16 53:7,15
55:9 60:2 61:7,8 68:6
75:22 82:10 87:21
92:11 94:6 104:14
120:11 135:25
140:12 151:15,19
159:14 171:24
175:22 181:13
184:13,18,20 188:9
188:13,16,18 202:5
234:19
**understanding** 25:12
25:22 34:21 35:25
208:4 209:17
**understood** 16:25
**underwent** 100:12
**unethical** 164:22 165:1
**unfair** 101:16

**unsafe** 226:13,14
**unsavory** 154:2
**update** 87:16
**updated** 87:17 91:23
92:12
**urge** 65:10,16,22 66:6
66:9,22 133:16 134:2
134:7,11 229:25
**urgency** 66:1,20
134:21,22 135:1,8,13
135:16,22 136:1
**urinary** 51:11,21 57:13
61:13 63:11 156:24
213:25 215:10
218:24 224:11 230:4
232:6
**urogynecologist**
197:12
**UROLGY** 1:7
**Urologic** 199:7
**urologist** 166:23
**urology** 24:20 161:6
211:18
**use** 12:11 14:21 17:7,23
17:25 19:2,9 20:1
21:23 23:5 44:8
51:12 55:23 95:3
98:7 111:3,6 112:21
112:24,25,25 148:16
152:18 157:6,15,18
158:16 159:1 164:6
193:24 203:20
224:19 225:4,20,24
226:2,6,10,12,22,25
227:4
**user** 25:2
**users** 175:23 178:14,15
**uses** 225:18
**usually** 41:23 56:7
118:17 139:7 142:12
142:19 216:19
**utilize** 55:18
**utilized** 51:20
**U.S** 43:19 44:1

—————————
         **V**
—————————
**v** 1:6
**vagina** 75:3 81:2,4,8,11
81:13,18 82:2,18
84:11 114:17,21
115:6,14,25 117:9,14
121:20 126:9 127:1
127:10,15,16 128:1
128:21,22 129:11
130:1,12 133:4
**vaginal** 69:6 80:19,23
80:24 81:23 82:1,14
83:13 95:4,8 107:16

108:14,17,20,23
109:2,9 111:14,18,20
112:3,11,19 113:8
114:17,22 115:13,24
116:8,11,22 117:1
119:20,20 121:20
122:19 124:13,19,22
125:11 126:8,13,14
126:16,18,24 127:8
128:3,11 129:3 140:9
142:13 154:20
155:19 213:7 229:3,7
229:12,15,19
**vague** 105:14
**valid** 25:17
**valuation** 56:22
**variations** 21:5
**various** 18:9 51:16
88:24 89:25 136:9
**vast** 36:24
**verbatim** 97:17
**version** 226:1
**versus** 6:14 20:16 25:5
225:15 226:15
**video** 6:8 85:12,22
174:23 175:3 180:17
180:18,23 221:14,20
235:7
**videographer** 2:19
6:10
**videotape** 1:15 6:12
85:23 180:24
**violated** 117:1
**virtually** 18:20 22:12
**visits** 107:9
**vocabulary** 140:13
**Voiding** 213:25

—————————
         **W**
—————————
**wait** 121:11 165:16
**waived** 6:4
**walk** 105:22 151:20
152:5
**walking** 133:2
**wall** 81:23 82:1 83:13
84:11 95:4 112:19
113:8 114:17,22
115:13,24 116:9,11
116:22 117:1 119:20
121:20 122:19
124:13,18,19,23
125:11 126:8,13,14
126:16,18 127:8
128:3,11 129:4
155:19
**want** 12:19 35:24 36:8
36:17 43:7 44:23
56:13 58:18 69:10

84:13 85:4 86:2
96:21 101:3,13
105:17 106:4,25
113:15 116:4,5
120:14 121:5,7
138:21 140:5,12
144:25 147:14,20,20
148:16 150:17 152:5
152:17 153:25 154:2
159:25 174:19
175:24 176:2 180:14
181:2,18,19 182:16
183:7,24 195:13
197:18 211:6 220:6,8
**wanted** 71:11 90:24
96:10 106:23 158:5
164:3 175:22 194:25
**wanting** 165:22
**warn** 218:9,13 231:17
**warned** 27:16 30:17
117:19 119:22,23
120:2 124:3 227:13
227:15
**warning** 26:21 27:7,24
187:22 188:2,5,6
189:14,17,17 218:11
218:21
**warnings** 25:23 26:4,5
26:8,18,24 27:1,14
28:2 222:6,11,21
223:3,8,14,22 224:1
224:4,8 227:13
231:19 234:9,13,23
**wasn't** 62:12 75:19
80:1 112:17 125:13
128:10 129:22,23
**watching** 150:14
**water** 47:24
**way** 16:8 35:4,5 39:17
39:20 41:2 63:6
66:13,19 80:25 83:14
105:12 116:14 121:9
122:9 123:4 140:9
147:6 154:7 170:10
171:8 186:13 216:25
219:23 222:18
**ways** 57:25 116:15
196:19
**week** 45:8 92:16,19
**weigh** 18:9,13
**Welk** 42:11,12,25
**went** 12:25 35:22 41:18
42:23 49:15 52:4
78:2 81:5 136:10
152:12 165:6 171:13
171:15 197:11 231:7
**weren't** 90:25 184:9

—————————

205:1
we'll 69:13,15
we're 7:7 33:9 35:23
  40:2 41:23 47:13
  57:25 79:2 97:1
  106:17 121:8 124:24
  142:18 200:23 212:4
we've 8:14 32:2 138:19
  171:3 183:1
whatsoever 78:2,6
  120:19,21 225:19
  234:10
willing 145:24 163:13
  185:25
winding 106:17
withdraw 68:22
withdrawn 51:2
witness 5:5 6:19 11:12
  14:5 18:24 19:15,24
  20:7 29:19 34:6 36:5
  36:12,22 38:13 39:23
  40:7,10 41:10 42:22
  46:25 47:3,6,25 53:9
  58:23 59:12,20 67:12
  70:9,13 71:7 75:22
  78:17 80:11 88:4
  96:12 97:4 101:5,8
  104:13 105:25
  106:10 107:18
  108:11 114:2,8,24
  118:3 119:5 120:15
  121:2 124:3,21
  127:19 128:5 131:16
  133:20 135:21 138:1
  139:16 143:15
  144:11,24 145:13
  147:17 148:19
  149:12 150:2,7,19
  151:4,14 152:4,6,10
  152:21 154:8,11
  155:4,10 156:10
  159:13 164:25
  168:22 172:5,16
  174:8 187:17 188:22
  189:16 192:6 193:4
  194:12 196:19 199:3
  200:9,16 201:9 202:1
  205:4 207:9,17
  209:14 222:20
  223:17 224:4,15
  225:7 226:21 227:3
  227:22 228:15,22
  229:2,14,22 230:7,13
  230:23 231:21 232:9
  232:15,23 233:14
  234:15,25 236:4,6
  237:1
witnessed

139:9
witnesses 27:12 37:12
  96:8
Wolf 196:24 197:19
woman's 18:5 123:15
women 62:4 109:19,21
  150:10 156:25 157:1
  216:8,11
women's 1:7 161:5
  219:9
won 61:6
word 110:12,14 111:3
  111:6 112:21,24,25
  136:6 139:11 220:25
  233:2
worded 231:18
words 119:16 203:12
  203:20
work 32:3 41:21 70:20
  98:11 163:22 164:21
  170:13 191:8 220:21
worked 10:24 11:10,19
  164:11 165:9 183:1
working 13:20 14:2
  113:15 173:7,12,19
  209:1
works 145:22
world 38:3 207:11
  229:8
worsened 66:10
wouldn't 34:25 58:18
  143:16 200:13,16
  208:18 210:1 211:22
wound 125:24
write 60:20,21 73:25
  90:6 92:3 107:23
  214:11
writes 108:25
writing 177:6
written 32:2,23 34:4
  92:23 178:3 214:3
wrong 107:23 108:7
wrote 84:9,15 86:24
  87:22 89:6 91:1 92:6
  103:12 108:7 109:1
  161:2 169:4 174:16
  175:15,20 198:21
  212:12
W-E-L-K 42:12

———————
X
———————
X 3:2,10 4:2 104:19

———————
Y
———————
Y 104:19
yeah 10:12 31:15 43:24
  74:12 91:4 94:13
  101:5 109:11 116:18

137:19 168:20 178:7
  212:23 213:13 218:8
year 18:1 24:18,19,21
  45:8,9,16 46:10
  48:15,16 49:14,15,17
  49:21,24 113:25
  141:4,9 169:13
years 9:14,17 10:1,23
  11:2,21 17:14 18:1
  29:13 48:18 50:1,21
  51:15 100:2 141:10
  141:11 178:4,8
  205:20 212:5
yesterday 161:3
York 1:19,19,22 6:13
  6:13 12:24 60:16
  121:10 169:10
  171:14,16
young 176:8,25 177:3

———————
Z
———————
Z 104:19
Zimmern 213:10

———————
$
———————
$1,000 12:16
$10,000 9:16
$108,000 72:23
$2,000 179:4,23,25
  180:9
$200 9:24,25
$25,000 71:2 72:8
$4,000 73:14
$400,000 34:25
$50,000 72:17,19
$500 72:17,19
$58,000 70:23 71:19
$7,500 73:12

———————
0
———————
06 16:16
07068 2:5
07962 2:12

———————
1
———————
1 5:17 58:11 93:17
  103:21 129:13
  130:11,14,24 179:23
  211:23 223:20
1,500 38:15,20,22
  47:14,15 210:11
1-20 1:9
1:22 180:24
10 50:10,19
10:46 85:12
10:55 85:23
100 36:18 72:4,11,19
  102:4 141:12

100,000 72:18
10110 1:19
103 2:4
11 16:25 212:4
11-year 99:22
11/6/09 4:11 174:11
11/7/09 4:12 175:7
11:00 85:3
12 18:7 93:17 108:5
12th 107:11
12/13/08 4:15 180:5
12/28/09 4:10 172:22
12:19 174:23
12:24 175:3
12:29 180:17
13 89:17 91:12 180:9
14 132:10 175:12,13
15 85:3 133:3
150 45:14,15
16 91:8,13
160 3:22 97:23
162 4:6
166 4:8
168 4:9
17 100:1
17-year 99:22
172 4:10
174 4:11
175 4:13
178 4:14
18 110:3 111:8 198:14
180 4:15
19 106:19 107:14 133:1
  198:14 216:1,4
19th 69:5 107:12
  112:12

———————
2
———————
2 72:13 85:23 129:13
  130:11,14 180:9
2nd 2:4
2:04 221:14
2:08 221:20
2:21 235:8,12
20 46:2 149:10 199:6,7
  239:15
200 47:19,20 48:3
2000 9:3 22:19
2002 17:18 212:17,25
2003 212:17,25
2004 22:9,15,18 24:11
  212:18,18 213:3
  215:20
2005 9:4 22:19,22,23
  24:11 47:9,12,16
  48:4 50:3,17
2006 24:24 25:1,4
  166:14

2007 3:22 16:16,24
  17:13,16,21,23 18:7
  22:23 23:3 24:15
  48:4 50:3,17 160:16
  160:22 161:1,20
  162:8 163:18 214:1,6
2008 4:7 166:5,10
  167:17 180:9
2009 173:2 174:15
  175:14,15 177:21
  178:4 179:24
2010 9:4,9 16:25
2011 4:9 9:9 18:7 28:20
  29:3 65:16 168:3
  228:12
2012 69:3,5 106:19
  107:11,12,14 108:2
  108:13,24 110:3
  111:8 168:9,18
  170:20
2013 112:12 133:1
  228:5
2014 69:24 79:10 87:25
  89:17 91:1,12 92:24
2015 1:12 6:11 47:13
  74:8 79:11 91:8,13
  188:6 189:2,10,24
  190:12 236:10
21 161:1,20 162:8
  163:17
221 3:7
228-9898 2:5
233 3:6
24 1:12 91:9
24th 6:11
25 202:11 236:10
26 204:5
26th 69:24 71:1
28 166:14 173:2
29 108:13 138:18,21
29th 107:17,20 108:2,9
  108:24

———————
3
———————
3 130:18,24 180:24
30 88:2,3 170:20
  237:13
30th 168:17
36 94:21 148:6 149:6
37 94:16 155:1
39 89:17

———————
4
———————
4 149:21
4th 174:6
400 38:23
49th 1:18

Nicole Fleischmann, M.D.

| 5 |
| --- |
| **5** 50:10,19 149:10 175:21 |
| **5th** 174:4 |
| **5-year** 99:22 |
| **50** 141:12 |
| **500** 1:18 6:12 |
| **538-0800** 2:12 |
| **56** 93:9 |

| 6 |
| --- |
| **6** 3:6 174:15 175:15 |
| **6th** 177:21 |
| **6/26/14** 3:15 69:19 |
| **60,000** 43:9,14 |
| **69** 3:15 |

| 7 |
| --- |
| **7** 5:17 175:14 |
| **7-year** 99:22 |
| **73** 3:16 |

| 8 |
| --- |
| **8** 3:14 87:25 92:24 |
| **80** 46:1 |
| **80s** 77:8,21,25 |
| **85** 3:17 |
| **86** 3:19,20,21 |
| **877.370.3377** 1:24 |

| 9 |
| --- |
| **9th** 74:8 |
| **9:34** 1:19 6:11 |
| **90** 22:5 |
| **973** 2:5,12 |