**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

| | |
|---|---|
| IN RE: ETHICON, INC., PELVIC REPAIR SYSTEM  PRODUCTS LIABILITY LITIGATION | Master File No. 2:12-MD-02327 MDL 2327 |
| THIS DOCUMENT RELATES TO:<br><br>*All cases listed in Exhibit A to Defendants' motion* | JOSEPH R. GOODWIN U.S. DISTRICT JUDGE |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO
EXCLUDE CERTAIN GENERAL OPINIONS OF BRUCE ROSENZWEIG, M.D.**

The Plaintiffs respectfully request that this Court deny Defendants' motion that seeks to

limit Dr. Rosenzweig's general opinions.

## INTRODUCTION

When Defendants filed a motion to exclude Dr. Rosenzweig in the *Mullins*

consolidation,[1] Defendants were simply putting new spins on old arguments.  Now, Defendants

have done the same thing again, essentially repeating their *Mullins* motion against Dr.

Rosenzweig's general opinions, even though most of what was raised in *Mullins* was already

outdated material at the time.

Dr. Rosenzweig's opinions have been vetted as much as any expert's in the various

MDLs.  This Court has consistently found him well qualified to testify on a wide variety of

topics.  In fact, this Court's order in *Huskey* denying Defendants' motion for a new trial cited

extensively to Dr. Rosenzweig's testimony as having provided sufficient support for the

plaintiff's claims, in several different areas.  *See Huskey v. Ethicon, Inc.*, No. 2:12-CV-05201,

---

[1] The Court has not yet ruled on that motion.

1

2015 WL 4944339, at **4-8 (S.D.W. Va. Aug. 19, 2015) (discussing Dr. Rosenzweig's testimony that the TVT-O product shrinks and deforms, causing a foreign body reaction; that the heavyweight Prolene mesh was not suitable for implantation in the human body; and that the warnings in the TVT-O IFU about "transient" groin pain were insufficient).

Dr. Rosenzweig is a pelvic-floor surgeon based in Chicago.  Defendants have described Dr. Rosenzweig as a "[v]ery skilled pelvic floor surgeon,"[2] and Ethicon even invited Dr. Rosenzweig for special training in Belgium on how to implant the TVT-O device.[3]  Dr. Rosenzweig is an assistant professor of Obstetrics and Gynecology at Rush University Medical Center.  Previously, he had fellowships at the State University of New York at Syracuse, and at UCLA.  He started a urogynecology program at the University of Illinois-Chicago, and he has performed more than one thousand surgeries in the pelvic floor, including more than 300 surgeries to address complications associated with synthetic mesh products.  Dr. Rosenzweig has also published numerous articles and given numerous lectures on the treatments of urinary incontinence and pelvic organ prolapse.[4]

This Court has written, in various *Daubert* orders, that "Dr. Rosenzweig has demonstrated extensive knowledge of and experience with the process of polypropylene mesh degradation in the body"; that "[a]lthough Dr. Rosenzweig has never designed vaginal mesh devices, he has considerable familiarity with their structure and use"; that "Dr. Rosenzweig received thorough training on the implantation of sling products in pelvic repair"; that "although Dr. Rosenzweig is not a toxicologist, he stated that he regularly encounters cytotoxicity in his practice, including in women who have polypropylene mesh implants"; and that Dr. Rosenzweig

---

[2] Ethicon surgeon database, attached as Exhibit A, at Line 90.
[3] Rosenzweig *Mullins* TVT Report, Ex. C-1 to Def. Motion, at 3.  Dr. Rosenzweig has submitted several expert reports already in this litigation for the TVT and TVT-O products, so he adopted prior reports rather than submitting new ones for those products.
[4] *Id.* at 2-3.

has performed over a thousand pelvic floor surgical procedures, and over 200 surgeries dealing with complications related to synthetic mesh, including the removal of numerous TVT devices." *Wilkerson v. Boston Scientific Corp.*, No. 2:13-CV-04505, 2015 WL 2087048, at **5-6 (S.D. W. Va. May 5, 2015); *Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 691, 707 (S.D. W. Va. 2014).  As a result, this Court "has considered Dr. Rosenzweig as a general causation expert [several] times in the past, and on each occasion [the Court has] admitted his general causation testimony on the properties of polypropylene mesh."  *Tyree v. Boston Scientific Corp.*, 54 F. Supp. 3d 501, 565 (S.D. W. Va. 2014), *as amended* Oct. 29, 2014.

Plaintiffs have designated Dr. Rosenzweig to testify in several of the Ethicon Wave 1 cases.  This Court should conclude, as it has in the past, that Dr. Rosenzweig is well qualified to offer the general opinions stated in his reports, and that his combination of clinical observations and intense scientific study have formed the foundation of reliable opinions, under the *Daubert* standard.  Based on Dr. Rosenzweig's surgical practice, his academic study, and his years of study associated with this litigation, Dr. Rosenzweig is one the most knowledgeable people in the world on the use of pelvic mesh products to treat SUI.

Ethicon's attacks generally fall into four categories.  Some are attacks on Dr. Rosenzweig's qualifications—which clearly have not changed for the worse, so if he was qualified on a topic before, he is qualified now.  Many address relevance, which is only marginally a *Daubert* issue.  Relevance should be determined on a case-by-case basis, depending on the law of the state at issue.  Other attacks cherry-pick a single line from Dr. Rosenzweig's deposition and try to turn it into a basis for exclusion.  And some attacks try to use Ethicon's own failure to study its devices against Dr. Rosenzweig.  The Court should reject all of Ethicon's attacks and allow Dr. Rosenzweig's opinions, as discussed below.

## LEGAL STANDARDS

Federal Rule of Evidence 702 sets forth the basic framework for analyzing the

admissibility of expert opinions.  The rule reads, in pertinent part, as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

Fed. R. Evid. 702.

If the witness is suitably qualified, then the *Daubert* inquiry generally breaks down into a

two-step analysis.  The first issue is whether the proffered evidence represents "scientific

knowledge," meaning that it is supported by appropriate validation.  The second issue is whether

the evidence would assist the jury.  *United States v. Dorsey*, 45 F.3d 809, 813 (4th Cir. 1995).

This aspect of the inquiry is often discussed in terms of whether the expert's opinions "fit" the

case.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591-92 (1993).

## ARGUMENT

Counting sub-parts, Defendants have 14 different arguments for limiting Dr.

Rosenzweig's testimony—even if the last catch-all section is treated as a single argument.

Plaintiffs will respond point-by-point, as best it can be done in the space available.

**I.      Defendants' first argument is not a *Daubert* issue at all; the relevance of Dr.
Rosenzweig's opinions about alternative methods of treatment for SUI and POP
should be addressed on a case-by-case basis.**

Strangely, Defendants begin with an argument that has no place in the *Daubert*

discussion.  They criticize Dr. Rosenzweig for opining that traditional surgeries lead to fewer

complications than the TVT devices, and that native tissue repair leads to fewer complications

than Ethicon's Prosima for the treatment of pelvic organ prolapse.  (Def. Memo. at 2).

4

Defendants do not argue that Dr. Rosenzweig is unqualified to give the opinions, that his methodology in reaching these conclusions is unreliable, or that his opinions do not "fit" the case. Rather, Defendants assert that in **some** states, such alternatives would not constitute a safer alternative design under the law, and that Dr. Rosenzweig is operating under the premise that all mesh products are unsafe. This is a summary judgment argument, not a *Daubert* argument.

At best, it is a relevance argument. The "fit" question under *Daubert* deals with the relationship between the opinion and the facts of the case. *See Daubert*, 509 U.S. at 591 (describing the inquiry as whether the proffered testimony "is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute"). The question of whether there are safer methods of treating the same problems treated by Ethicon's products is clearly "tied" to the disputed issues in this litigation. The *Daubert* opinion also emphasizes that "fit" can only be determined in context. *Id.* Here, the motion deals with cases involving various plaintiffs and the law if many states. The "fitness" determination should be made on a case-by-case basis.

Defendants' second argument is nonsensical. Opining that **Ethicon's** products are less safe than certain alternatives is not an argument that **all** mesh products are unsafe. Dr. Rosenzweig also has opinions about ways in which mesh products can be made safer. Plaintiffs are not attacking any physician's decision to use the device—they are attacking the Defendants for making an unsafe product, marketing it to millions of women, and injuring tens of thousands of them. It appears that Ethicon is again trying to preclude an opinion about a safer alternative design. (*See* Def. Memo. at 3). That issue is determined by state law and should be addressed on a case-by-case basis. And even where a safer alternative design is required, a jury should decide whether the repairs advocated by Dr. Rosenzweig constitute alternatives designs. *See*

*Hines v. Wyeth*, No. 2:04–0690, 2011 WL 1990496, at *8 (S.D. W. Va. May 23, 2011) (whether using different ingredients creates a different drug to be determined by jury).

Finally, Defendants focus entirely on one issue—the existence of a safer alternative design—which by their own admission is not an issue in every jurisdiction.  Dr. Rosenzweig's testimony about the relative safety of other repair techniques is relevant to other legal issues, such as whether the risks of Ethicon's products outweigh their benefits.

For these reasons, the Court should reject Defendants' first argument.

## II.   Dr. Rosenzweig has considered all of the available information in concluding that a lighter-weight, larger pore mesh would reduce complications for women, and there are studies that support the efficacy of such treatments.

After criticizing Dr. Rosenzweig for opining that certain surgical options are safer than Ethicon's mesh products, Ethicon then turns around and criticizes him for saying that there are safer ways to build mesh slings to treat stress urinary incontinence ("SUI") and mesh devices for pelvic organ prolapse ("POP").  (Def. Memo. at 4).  Defendants' argument on this point is convoluted, to say the least.  But tellingly, it begins with a point that this Court has soundly rejected.

Dr. Rosenzweig is qualified to give opinions about product design, and it is absurd that Defendants would raise this argument again.  This Court previously wrote:

> Although Dr. Rosenzweig has never designed vaginal mesh devices, he has considerable familiarity with their structure and use. First, over the course of his career as a pelvic surgeon, he has accumulated an abundance of knowledge about the use of various surgical procedures in the treatment of SUI, including the implantation of midurethral slings like the Advantage Fit. … Second, Dr. Rosenzweig received thorough training on the implantation of sling products in pelvic repair. … Third, Dr. Rosenzweig has performed these procedures countless times. ... And finally, Dr. Rosenzweig has invented a catheter device, which reinforces his background in the design and use of surgical products. … This knowledge, training, and experience with product design, specifically the design of BSC's midurethral slings, qualify Dr. Rosenzweig to opine on the design of the Advantage Fit and the polypropylene used to construct it.

*Wilkerson*, 2015 WL 2087048, at *6. Dr. Rosenzweig has not lost any qualifications in the year since the Court reached that conclusion.

The rest of the argument claims that Dr. Rosenzweig's methodology is unreliable. But Defendants focus on the **conclusion** that using a lighter-weight, larger-pore mesh would be a safer alternative design. Again, this argument does not go to Dr. Rosenzweig's methodology. Generally, the *Daubert* inquiry is focused on methods, not on conclusions. *See Md. Cas. Co. v. Therm-O-Disc, Inc.*, 137 F.3d 780, 783 (4th Cir. 1998) (stating that courts should focus on expert witnesses' "principles and methodology, not on the conclusions that they generate"). The sole exception is that an opinion is unreliable if there is "simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Here, Defendants do not claim that there is an analytical gap between Dr. Rosenzweig's reasoning and his conclusion. Mainly, they contest his opinion that Ethicon should have used a lighter-weight, larger-pore mesh to treat SUI, as it did in using the lightweight "Ultrapro" mesh to treat hernias. Defendants claim there are no studies supporting the efficacy of Ultrapro—or a similar product—for treatment of SUI. (Def. Memo. at 6). However, as Defendants concede, the issue has been studied. The Okulu study used Ultrapro mesh as a sling to treat SUI, and a three-year study showed that it was effective.[5] The study concluded: "Ultrapro mesh can be used in sling surgery owning to its higher success rates, and lower vaginal and urethral extrusion and de novo urgency rates, which have also been shown in clinical studies."[6] Defendants do not deny this fact; rather, they critique the study itself. (Def. Memo at 6-7).

---

[5] Okulu, et. al, *Use of three types of synthetic mesh material in sling surgery: A prospective randomized clinical trial evaluating effectiveness and complications*, SCANDINAVIAN J. OF UROLOGY, 2013; 47:217-224, study attached as Exhibit B.
[6] *Id.* at 217.

Of course, the Okulu study is not the sole basis for Dr. Rosenzweig's opinion that Ethicon should be using lighter-weight, larger-pore mesh.  Using his TVT-O report as an example, Dr. Rosenzweig notes that as early as the late 1990s, Ethicon discussed internally the benefits of using lighter-weight, larger pore mesh in the pelvic floor.[7]  Dr. Holste testified that Ethicon has developed lighter-weight larger pore meshes to try to limit complications such as foreign body reaction, erosions, and contraction of the mesh.[8]  His report further discusses how Ethicon understood the benefits of using larger-pore, lighter-weight meshes to treat SUI, but was concerned about losing the marketing value of studies supporting the original TVT.[9]

There are other studies that support the use of lighter-weight, larger pore meshes to treat SUI.  The Moalli study tested Ethicon's Gynemesh and two lower-weight higher-porosity meshes, including Ultrapro.[10]  One of its primary conclusions was that the degree of inflammatory response and scaring increases with a decrease in pore size.[11]  A study on the T-sling, an absorbable mesh product designed to treat SUI, discussed how Prolene mesh is subject to curling and shrinkage, leading to urinary retention or urethral erosion.[12]  The T-sling, similar to Ultrapro in that it incorporates absorbable mesh, achieved a perfect cure rate in treating SUI.[13]  The concept of studying absorbable mesh for treatment of SUI is not new.  A 1983 study tested

---

[7] Rosenzweig Ramirez TVT-O Report, Ex. C-5 to Def. Motion, at p. 13 & n.6.
[8] *Id.* at 24.
[9] *Id.* at 64.
[10] Brown BN, et al., *Characterization of the host inflammatory response following implantation of prolapse mesh in rhesus macaque*, Am. J. of Obstetrics & Gynecology (2015), attached as Exhibit C, at 3.
[11] *Id.* at p. 14.
[12] Jeffrey Blitstein, M.D., et al., *A Novel Composite Sling for the Treatment of Stress Urinary Incontinence: First Clinical Experience*, International Congress of the European Hernia Society, presented June 22, 2001.  Article attached as Exhibit D.
[13] *Id.* at p. 1 (Abstract).

8

an absorbable mesh with 21 women, and 20 achieved a cure of their SUI, while just one had a relapse after two months.[14]

In his deposition, Dr. Rosenzweig explained that while Okulu was the only study to specifically study Ultrapro mesh to treat SUI, "there are multiple studies that show why it's advantageous in the pelvic floor to have a larger pore, lighter weight, less stiff mesh because of processes that can lead to cell death, that lead to smooth muscle dysfunction, that lead to more erosions, that lead to more complications."[15]  Clearly, Dr. Rosenzweig is not claiming that 2+2=6.  There is no "analytical gap" between the information he is considering and the opinions he is offering.  Defendants' only argument is that the available data are insufficient to support Dr. Rosenzweig's conclusions—an argument that this Court should reject, for several reasons.

First, the hallmark of the *Daubert* inquiry is whether the expert "employs the same level of intellectual rigor" in forming his opinions for litigation as he would in practice.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  Whether serving as a clinician, academic, or scientist, Dr. Rosenzweig can do no better than reaching conclusions from the best data available.  And that is what Dr. Rosenzweig has done.

Ethicon's argument suggests that it its own failure to study the issue has insulated Ethicon from any argument that using lighter-weight, larger-pore mesh to treat SUI would be a safer alternative.  This result would be absurd.  As it did in *Mullins*, Ethicon accuses Dr. Rosenzweig of "hypocrisy" for relying on Okulu, a three-year study, when he has previously criticized Ethicon for not having enough long-term data to support the safety of its mesh.  (Def. Memo. at 7).  Of course, it is not Dr. Rosenzweig's job to conduct the studies.  When he

---

[14] Stefan Finau, Goran Soderberg, *Absorbable Polyglactin Mesh for Retropubic Sling Operations in Female Stress Urinary Incontinence*, Gynecol. Obstet. Invest. 16:45-50 (1983), at p. 48.  Article attached as Exhibit E.
[15] Rosenzweig Sept. 22, 2015 Dep., portions attached as Exhibit F, at 175:7-176:9.

criticizes Ethicon for relying on only short-term studies, he is criticizing the entity that is capable of generating data based on longer studies.

In addition, the issue Defendants are raising is that Dr. Rosenzweig supposedly has no evidence of **efficacy**.  Long-term studies are much better for studying complications because complications may develop years after surgery, especially when an implant is permanent.[16]  If no one has a complication after two weeks, that fact is not helpful in discerning the safety of the product.  Conversely, if everyone is cured of their SUI within two weeks, that is important information regarding the potential efficacy of the product.  This is not to say that long-term efficacy or short-term safety data is irrelevant.  But it is a matter of degrees, and short-term efficacy information is more helpful than short-term safety information, especially in this context where the TVT is designed as a permanent implant that incorporates non-absorbable polypropylene, which continues the body's reaction to it indefinitely.[17]

Finally, Defendants rely on a wholly distinguishable case in citing *Conklin v. Novartis Pharmaceuticals Corp.*, Civ A. No. 9:11CV-178, 2012 WL 4127295 (E.D. Tex. Sept. 18, 2012).  In *Conklin*, an expert was excluded for having an opinion with a logical fallacy that the court described as follows:

> **Premise:** Studies show that a certain regimen of Zometa helps treat cancer-related bone conditions, but may cause ONJ.
>
> **Premise:** Other studies show that less Zometa will result in less ONJ.
>
> **Conclusion:** A regimen using less Zometa will help treat cancer-related bone conditions.

*Id.* at *9.  In other words, the expert opined that because safety is better, efficacy is necessarily better.  Nowhere has Dr. Rosenzweig made such a claim.  Rather, he said that a product similar

---

[16] Rosenzweig Affidavit, attached as Exhibit G, at ¶¶ 3-6.
[17] *See* Rosenzweig Mullins TVT Report, Ex. C-1 to Def. Motion, at 15-20 (describing problems caused by permanent implantation of polypropylene).

to Ultrapro would change the risk profile so as to affect the risk-utility balance.[18]  Unlike in *Conklin*, there are studies that support the efficacy of using a lighter-weight, larger-pore, absorbable mesh to treat SUI.

For all of these reasons, this Court should reject Defendants' arguments and allow Dr. Rosenzweig's opinion that a lighter-weight, larger-pore mesh is a safer alternative design.

### III.   All of Dr. Rosenzweig's opinions about warnings are relevant and reliable.

The Court should reject each of Ethicon's arguments regarding product warnings.

A.   As Ethicon leadership and this Court have recognized, manufacturers have a duty to warn about the duration, frequency and severity of risks.

Defendants' first argument is belied by statements from their own worldwide medical director.  Ethicon claims that it has no duty to warn physicians and patients about the duration, frequency, or severity of risks.  But Ethicon worldwide medical director Piet Hinoul testified as follows, in discussing a study conducted by Ethicon:

> Q.   Highlighting the issue that that you can't assume that doctors out there in the communities know of the severity and the duration of these chronic debilitating complications, correct?
>
> A.   That's what that states.
>
> Q.   And because of that, it is incredibly important for your company, especially because you're dealing with an implant that will -- will be in the woman's body forever potentially, that's why it's so important for you as a manufacturer to do the right thing and make sure when you know of the risks, the chronicness of them, the duration, the severity, you should warn of them, correct?
>
> A.   Correct.[19]

It is illogical to conclude that, for example, a warning about "pain" would be adequate if a product invariably caused severe and chronic pain.  The case-law cited by Defendants is

---

[18] Rosenzweig Sept. 22, 2015 Dep., Ex. F, at 154:14-155:2.
[19] Hinoul Testimony, *Batiste v. McNabb*, No. DC-12-14350 (Tex. Dist. Ct. 95th Dist. March 26, 2014), portions attached as Exhibit H.

inapposite.  This Court recognized as much in rejecting Defendants' argument in the Bard

litigation.  *See Cisson v. C.R. Bard, Inc.*, No. 2:11-CV-00195, 2013 WL 5700513, at *7 (S.D. W.

Va. Oct. 18, 2013), *aff'd sub nom. In re C.R. Bard, Inc., MDL. No. 2187, Pelvic Repair Sys.*

*Products Liab. Litig.*, 810 F.3d 913 (4th Cir. 2016) (stating that "it was for the jury to decide

whether Bard's warnings to Dr. Raybon were adequate").  *See also Watkins v. Ford Motor Co.*,

190 F.3d 1213, 1220 (11th Cir. 1999) ("The question that must be answered by the fact finder is

whether the warning given was sufficient or was inadequate because it did not provide a

complete disclosure of the existence **and extent** of the risk involved." (emphasis added)).

The Court should either reject Defendants' argument entirely or leave the issue for each

individual trial, depending on what a particular state's law requires.

B. <u>Dr. Rosenzweig relies on Ethicon's world-wide database for information about
    patient populations, and relevance is a case-by-case issue.</u>

Defendants next assert that Dr. Rosenzweig's opinions about problems that the TVT

causes for specific patient populations should be excluded because he relies on the deposition of

Ethicon's medical director, Dr. Kirkemo.  This argument ignores the fact that Dr. Kirkemo was

discussing statistics culled from Ethicon's worldwide database regarding adverse events

involving the TVT.[20]  Thus, to conclude that the information relied upon by Dr. Rosenzweig is

unreliable, this Court must conclude that Defendants' world-wide study of adverse events was

unreliable.  In addition, Dr. Rosenzweig cites to several other sources for his opinions.[21]

As for relevance, that again is a case-by-case issue.  In some cases, the plaintiff will fall

into a particular patient population; in others, she will not.  This Court should not decide

relevance as a matter of law for a large swath of cases.

---

[20] Rosenzweig TVT-O Report, Ex. C-5 to Def. Motion, at p. 88 (reference to "TVT World study").
[21] *Id.* at pp. 88-91.

**IV.     As this Court has recognized, Dr. Rosenzweig's study and his substantial clinical experience give him the knowledge necessary to opine about the properties of the mesh, including issues related to degradation and cytotoxicity.**

The Court should reject Defendants' arguments regarding the properties of the mesh.

A.  Degradation

Ethicon states that Dr. Rosenzweig should not be permitted to opine about degradation. This Court has repeatedly rejected that argument—not only in *Huskey*, as Ethicon acknowledges, but also in later cases. *See Wilkerson*, 2015 WL 2087048, at *5 ("Dr. Rosenzweig's established background and skill in pelvic surgery, polypropylene, and the complications associated with degradation qualify him to opine on the degradation process, even though his knowledge about the precise biochemical interactions involved might not be as extensive as that of others.").

Defendants assert that Dr. Rosenzweig's opinions on degradation and its effects are unreliable because they are derived primarily from his clinical practice. The Court has also rejected this argument. *Id.* at *6 ("Dr. Rosenzweig relied on dozens of scientific articles concerning the degradation of polypropylene in reaching his opinion that mesh degrades.").

Dr. Rosenzweig's clinical experience in this area does have value. His expert report states that he has "personally seen mesh that is broken, cracked, brittle and look different from when it came out of the package."[22] Dr. Rosenzweig also explained in detail the problems that are caused by degradation, including but not limited to: greater foreign body reaction, enhanced inflammatory response, and excessive scarring, which then leads to additional problems.[23]

However, his opinion is not limited to clinical observations. There are scientific studies and internal documents that support Dr. Rosenzweig's opinions on the impact of degradation. For instance, a recent study by Imel, et al., concludes that "[d]egradation causes surface

---

[22] Rosenzweig Ramirez TVT-O Report, Ex. C-5 to Def. Motion, at 21.
[23] *Id.*

cracking, mesh contraction, loss of mass, embrittlement, decreased melting temperature, foreign body reactions and reduced compliance of the material."[24]  An Ethicon document reveals concern that "small particles are released that migrate through the vaginal wall causing pain."[25] A study on the T-sling, an absorbable mesh product designed to treat SUI, discussed how Prolene mesh curls and shrinks, leading to urinary retention or urethral erosion.[26]

There is no basis for the Court to reverse its prior opinions allowing Dr. Rosenzweig to testify about degradation and its clinical impact.

B.  Cytotoxicity

This Court has previously ruled that Dr. Rosenzweig is permitted to discuss cytotoxicity, and has rejected the exact argument raised by Defendants about clinical relevance.  *See Huskey*, 29 F. Supp. 3d at 705 ("To the extent that Ethicon believes cytotoxicity is not clinically significant, it may cross examine Dr. Rosenzweig on that issue.").

Defendants argue that this Court's opinion should change because of Dr. Rosenzweig's response to a deposition question.  In reality, he did not concede anything:

Q.      Are there any clinical studies assessing TVT in women with stress urinary incontinence that reports that cytotoxicity of the mesh is a cause of their – any reported complications?

A.      Erosion is a sign of cytotoxicity.[27]

As Dr. Rosenzweig has previously discussed, cytotoxicity is simply a fancy name for cell death, and it is something he experiences in practice all of the time.[28]  The fact that Ethicon has

---

[24] Imel, A., et al., In Vivo Degradation of Polypropylene Pelvic Mesh, Biomaterials (2015), attached as Exhibit I, at p. 3.
[25] Pelvic Floor Repair – Surgeon's Feed-back on Mesh Concept, at ETH.MESH.05644164, attached as Exhibit J.
[26] Jeffrey Blitstein, M.D., et al., Exhibit D, at p. 1 (Abstract).
[27] Rosenzweig Sept. 22, 2015 Dep., Ex. F, at 256:5-9.
[28] Rosenzweig Dec. 20, 2013 Affidavit, attached as Exhibit K, at ¶ 4.

not created a study with that specific focus does not mean that cytotoxicity has no clinical relevance.  This aspect of Ethicon's motion should clearly be denied.

C.  MSDS

The Material Safety Data Sheet ("MSDS") for the polypropylene resin used by Defendants warns that polypropylene is incompatible with strong oxidizers such as peroxides, which are readily found in the vagina.[29]  As discussed in Dr. Rosenzweig's report, the vaginal area contains significant natural oxidizers, causing a potential bad reaction with the polypropylene.[30]  His primary opinions are that the Defendants should have done "clinically relevant testing," and that physicians should have been warned about the danger of placing this polypropylene in an oxidized area.[31]  The fact that the MSDS covers polypropylene and not Prolene is hardly a basis to exclude an opinion about the MSDS, considering that Prolene is made from polypropylene.[32]  This argument is akin to asserting that information that lettuce is poisonous is irrelevant once the lettuce is incorporated into a salad.

As to qualifications, the same logic that applied to this Court's ruling in *Huskey* about cytotoxicity should apply to the MSDS.  This Court found it important that Dr. Rosenzweig had opined "that the potential for cytotoxicity is important information that physicians need to know."  *Huskey*, 29 F. Supp. 3d at 705.  Similarly, as to the MSDS, Dr. Rosenzweig is not planning to analyze the factors that went into the warning itself.  His opinions focus on the Ethicon's lack of testing, and the fact that this warning was important information that Ethicon should have made available to physicians.[33]  His experience qualifies him to give those opinions.

---

[29] *See, e.g.*, Rosenzweig Prosima Report, Ex. G to Def. Motion, at 35-36.
[30] *Id.* at 36.
[31] *Id.* at 36-37.
[32] *See id.* at 35-36.
[33] Prosima Report, Ex. G to Def. Motion, at 36-37.

**V.     Dr. Rosenzweig is qualified by knowledge and experience to opine about product testing, and he should at least be able to opine about the <u>need</u> for testing.**

In Section V, Defendants discuss four topics.  Dr. Rosenzweig will not opine about adverse events, training, or legal conclusions.  However, Plaintiffs respectfully request that the Court reconsider its prior ruling as to Dr. Rosenzweig's opinions about Ethicon's testing.  Dr. Rosenzweig is not opining as to how a particular test should have been structured.  Rather, in the opinions cited by Defendants Dr. Rosenzweig opines that Ethicon should have performed testing due to certain dangers presented by the mesh.

For example, as to the MSDS, he asserts that Ethicon should have "done clinically relevant testing to determine if naturally occurring conditions in the vagina could cause polypropylene used in the TVT to alter inside a woman's pelvis (as well as other complications)."[34]  This opinion is the product of his expertise about the agents in the female vaginal area.  His report discusses the strong oxidizing agents in that region.[35]  As a pelvic floor surgeon, he knows that the oxidation warning in the MSDS is such that he would want to see the results of testing before implanting the device.[36]  Dr. Rosenzweig further opines that Ethicon should have conducted testing to determine whether the polypropylene degrades.[37]  This opinion is a natural corollary to opinions Dr. Rosenzweig has been permitted to give, that the mesh degrades in vivo.  *See Wilkerson*, 2015 WL 2087048, at *5.

Plaintiffs may not have done a sufficient job of presenting Dr. Rosenzweig's credentials in the past.  He does have significant experience with the testing of products, including:

---

[34] Rosenzweig Mullins TVT Report, Exhibit C-1 to Def. Motion, at 63-64.
[35] *Id.* at 62-63.
[36] *Id.* at 62-64.
[37] Prosima Report, Ex. G to Def. Motion, at 18-19.

- Dr. Rosenzweig was involved in the development of an Amnio-infusion catheter, and he helped to develop a randomized controlled trial ("RCT") to test infusion into the uterus, as compared with placing a sham single catheter.

- He worked with EMPI on testing the Innova electrical simulator designed to treat SUI, and he helped to design an RCT to test using a sham similar as compared to an active simulator.

- He was an investigator for a study for Lea Shield and Fem cap, both cervical cap contraceptives.  The study was designed to choose the appropriate size to avoid pregnancy while also gaining FDA approval as over-the-counter drugs.[38]

Based on this experience, the Court should conclude that Dr. Rosenzweig is qualified to opine about product testing.  Alternatively, even if the Court still believes that Dr. Rosenzweig is unqualified to opine as to the **adequacy** of Ethicon's testing, Dr. Rosenzweig has the experience and expertise to opine about whether testing to evaluate certain potential problems was necessary **at all**, based on the available information.  Therefore, this Court should reject the request to issue a blanket exclusion of all opinions related to testing.

**VI.     Both laser-cutting and mechanically cutting the mesh present particular dangers for patients, and Dr. Rosenzweig has reliable opinions about both.  Any alleged inconsistency is a basis for cross-examination, not exclusion.**

Defendants next try to prevent Dr. Rosenzweig from opining about the dangers created by the two ways in which they cut their mesh, both of which cause injuries.  Defendants claim that it is somehow improper for Dr. Rosenzweig to criticize both laser-cut and mechanically cut mesh, as if they should be excused from criticism because both types of mesh have problems.

---

[38] Rosenzweig Affidavit, Ex. G, at ¶¶ 7-8.

Mechanically cut mesh curls and ropes, and the frayed edges can shed particles.[39]  Laser-cut mesh is stiffer, which can lead to pain for patients—a problem that is particularly acute with mini-slings such as the TVT-Abbrevo, which do not stretch in the way that full-sized slings do.[40] Dr. Rosenzweig's criticisms of both methods of cutting are consistent.  Regardless, claims of inconsistent testimony are a basis for cross-examination, not for exclusion, as this Court has recognized.  *Wise v. C.R. Bard, Inc.*, No. 2:12-CV-01378, 2015 WL 521202, at *13 (S.D. W. Va. Feb. 7, 2015) (stating that "the proper forum for hashing out whether [an expert's] current opinions contradict his previous opinions is cross-examination, not motions practice").

Ethicon also claims that Dr. Rosenzweig's opinions are unreliable because they are not supported by clinical testing.  (Def. Memo. at 18).  Again, Ethicon is trying to insulate itself by hiding behind its failure to test its products.  This argument focuses on mechanically cut mesh, and the problems caused by mechanically cut mesh are well documented within Ethicon's files. As discussed in Dr. Rosenzweig's report, an Ethicon engineer gave a presentation in 2006 that advocated for laser-cutting the TVT mesh, showing how the mesh ropes, frays, loses particles, and degrades at 50% elongation.[41]  Ethicon's internal documents also demonstrate the clinical significance of mechanically cut mesh, discussing the hazards of frayed edges.[42]  The problems with particles flaking off of mechanically cut mesh have been discussed in the literature, and Dr. Rosenzweig has seen this occur in his practice as well—as he testified in the *Lewis* bellwether trial.[43]

Dr. Rosenzweig's opinions about the dangers of both types of mesh are reliable, and the Court should permit them—as it has in the past.

---

[39] *See, e.g.,*. Ramirez TVT-O Report, Ex. C-5 to Def. Motion, at 43-46.
[40] TVT-Abbrevo Report, Ex. D to Def. Motion, at 12-14.
[41] Rosenzweig Mullins TVT Report, Ex. C-1 to Def. Motion, at 44-45.
[42] *Id.* at 45-46.
[43] *Lewis v. Ethicon, Inc.*, Day Two Trans., portions attached as Exhibit L, at 85:2-87:4; 99:9-100:19.

**VII.    Internal documents and literature support the opinion that the shorter length of the TVT Abbrevo leads to complications due to its stiffness.**

Ethicon again raises the "no studies" argument in attacking Dr. Rosenzweig's opinions about the laser-cut TVT Abbrevo mini-sling.  Dr. Rosenzweig opines that "the shorter length of the laser cut mesh in the TVT Abbrevo leads to more complications."[44]  As Ethicon's own documents reveal, stiffness—the major problem with laser-cut mesh—is particularly significant with a smaller product.  As stated in one Ethicon internal document, authored by Dan Smith, the consensus was that laser-cut mesh had "more rigid edges and stiffer feel than mechanical cut mesh," and that tensioning the smaller sling would be easier with mechanically cut edges.[45]

Dr. Rosenzweig's report further notes that two of the inventors of the original TVT, Carl G. Nilsson and Christian Falconer, have refused to use the laser cut mesh, while Dr. Jean de Leval, the inventor of the TVT-O and Abbrevo, noticed increased erosions with the laser cut mesh.[46]  In addition, while TVT Abbrevo is a relatively new product that has not been well studied in the scientific literature, studies have noted the increased stiffness of laser-cut mini-slings.  In a 2011 article, Dr. Neumann noted the 7.9% dyspareunia rate for the TVT-Secur and wrote that this relatively high rate "might be explained in part by the rigidity and reduced flexibility of the synthetic polypropylene implant because it is laser cut, which tends to result in a stiff tape edge."[47]

For these reasons, Dr. Rosenzweig has a reliable foundation for his opinions about the problems caused by laser-cutting the TVT Abbrevo.

---

[44] Rosenzweig TVT Abbrevo Report, Ex. D to Def. Motion, at 13.
[45] Ethicon discussion notes, 4/15/08, at ETH.MESH.03916725, attached as Exhibit M.
[46] Rosenzweig TVT Abbrevo Report, Ex. D to Def. Motion, at 13.
[47] Neuman, et al., *Transobturator vs Single-Incision Suburethral Mini-slings for Treatment of Female Stress Urinary Incontinence: Early Postoperative Pain and 3-Year Follow-up*, J. OF MINIMALLY INVASIVE GYNECOLOGY, Nov.-Dec. 2011, article attached as Exhibit N, at p. 772.

**VIII.  Most of Defendants' arguments should be addressed at trial, but the Court should reject any attempt to remove discussion of study bias.**

Defendants' last section is a catch-all section of issues that are largely case-specific and should be left for individual judges to handle at trial.  But Plaintiffs will address two points.

First, opinions about study bias should be allowed.  This Court has been clear about the need for experts to address information that supports both sides of the arguments regarding Defendants' products.  In fact, the Court specifically referenced Dr. Margolis's assessment of study bias as a basis to **allow** his opinions in one of the BSC cases.  *Mathison v. Boston Sci. Corp.*, No. 2:13-CV-05851, 2015 WL 2124991, at *7 (S.D. W. Va. May 6, 2015) ("Dr. Margolis provides a sufficiently thorough explanation as to why he discounted certain literature, including discussions of bias in corporate-sponsored studies.").  Clearly, it would make no sense to exclude bias testimony when the Court has expressed the need to counter opposing evidence.

As for evidence of complications not suffered by the plaintiff, it is impossible to know what those might be in this circumstance.  In addition, differences in state law could impact the question of whether, for instance, the risk of certain complications is relevant to a risk-utility balancing test on design defect, even if the plaintiff has not suffered the harm at issue in that case.  The Court, therefore, should defer such ruling to the trial judge.

The other issues raised in Section VIII can only be addressed at trial.

## CONCLUSION

For the reasons stated above, the Court should deny Defendants' motion and permit Dr. Rosenzweig's testimony to the extent stated in his reports, except as limited by the concessions in Section V.  Dr. Rosenzweig is an extremely well qualified and knowledgeable expert who has devoted countless hours to the study of pelvic mesh products, both inside and outside his practice.  He should be permitted to give his complete opinions.

Dated: May 9, 2016

Respectfully submitted,

/s/Thomas P. Cartmell
Thomas P. Cartmell, Esq.
Jeffrey M. Kuntz, Esp.
Wagstaff & Cartmell LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
816-701-1102
Fax 816-531-2372
tcartmell@wcllp.com
jkuntz@wcllp.com

/s/ D. Renee Baggett
Bryan F. Aylstock, Esq.
Renee Baggett, Esq.
Aylstock, Witkin, Kreis and Overholtz, PLC
17 East Main Street, Suite 200
Pensacola, Florida  32563
(850) 202-1010
(850) 916-7449 (fax)
rbaggett@awkolaw.com
baylstock@awkolaw.com

4818-0833-6934, v. 1

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document on May 9, 2015, using the Court's

CM-ECF filing system, thereby sending notice of the filing to all counsel of record in this matter.


/s/Thomas P. Cartmell
**Attorney for Plaintiffs**

22

## <u>INDEX OF EXHIBITS</u>

**Exhibit A:** Ethicon surgeon database, at Line 90.

**Exhibit B:** Okulu, et. al, *Use of three types of synthetic mesh material in sling surgery: A prospective randomized clinical trial evaluating effectiveness and complications*, SCANDINAVIAN J. OF UROLOGY, 2013; 47:217-224

**Exhibit C:** Brown BN, et al., *Characterization of the host inflammatory response following implantation of prolapse mesh in rhesus macaque*, Am. J. of Obstetrics & Gynecology (2015)

**Exhibit D:** Jeffrey Blitstein, M.D., et al., *A Novel Composite Sling for the Treatment of Stress Urinary Incontinence: First Clinical Experience*, International Congress of the European Hernia Society, presented June 22, 2001

**Exhibit E:** Stefan Finau, Goran Soderberg, *Absorbable Polyglactin Mesh for Retropubic Sling Operations in Female Stress Urinary Incontinence*, Gynecol. Obstet. Invest. 16:45-50 (1983)

**Exhibit F:** Rosenzweig Sept. 22, 2015 Deposition, excerpts

**Exhibit G:** Affidavit of Bruce Rosenzweig, M.D., executed May 9, 2016

**Exhibit H:** Hinoul Testimony, *Batiste v. McNabb*, No. DC-12-14350 (Tex. Dist. Ct. 95th Dist. March 26, 2014)

**Exhibit I:** Imel, A., et al., In Vivo Degradation of Polypropylene Pelvic Mesh, Biomaterials (2015)

**Exhibit J:** Pelvic Floor Repair – Surgeon's Feed-back on Mesh Concept, at ETH.MESH.05644164

**Exhibit K:** Rosenzweig Dec. 20, 2013 Affidavit

**Exhibit L:** *Lewis v. Ethicon, Inc.*, Day Two Trial Trans., excerpts

**Exhibit M:** Ethicon discussion notes, 4/15/08, at ETH.MESH.03916725

**Exhibit N:** Neuman, et al., *Transobturator vs Single-Incision Suburethral Mini-slings for Treatment of Female Stress Urinary Incontinence: Early Postoperative Pain and 3-Year Follow-up*, J. OF MINIMALLY INVASIVE GYNECOLOGY, Nov.-Dec. 2011