Elizabeth Kavaler, M.D.

Page 1

IN THE CIRCUIT COURT
TWENTY-SIXTH JUDICIAL CIRCUIT
CAMDEN COUNTY, MISSOURI

- - -

| | |
|---|---|
| DONALD BUDKE | : |
|     Plaintiff, | : |
|     v. | : |
| JOHNSON & JOHNSON, a NEW | : |
| Jersey Corporation, ETHICON | : |
| INC., a New Jersey Corporation, | : |
| GYNECARE WORLDWIDE, a division | : |
| of Ethicon, Inc., BECKY | : |
| SIMPSON, M.D., P.C., d/b/a | : Cause No. |
| LAKE AREA WOMEN'S CENTER | : 10CM-CC00085 |
| and BECKY SIMPSON, M.D., | : |
|     Defendants. | : |

- - -
OCTOBER 14, 2014
- - -

Videotaped deposition of
ELIZABETH KAVALER, M.D., taken pursuant
to notice, was held at the law offices of
Bryan Cave LLP, 1290 Avenue of the
Americas, New York, New York 10104,
commencing at 10:37 a.m., on the above
date, before Amanda Dee Maslynsky-Miller,
a Certified Realtime Reporter and Notary
Public in and for the State of New York.
- - -
GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Golkow Technologies, Inc. - 1.877.370.DEPS

```
 1          product and how to compare it to
 2          the way I was -- I was shown how
 3          to use it.
 4              But a lot of the information
 5          in there is not something that I'm
 6          looking to Ethicon to tell me.
 7   BY MR. SLATER:
 8       Q.    I understand you're smart
 9   and you don't need it, but other doctors
10   may not --
11              MR. BALL:  I move to strike
12          the --
13   BY MR. SLATER:
14       Q.    Let me ask you this --
15              MR. BALL:  -- the
16          argumentative preamble.
17   BY MR. SLATER:
18       Q.    -- do you think Ethicon has
19   an obligation, and had an obligation,
20   with the PROLIFT® IFU that when they put
21   information in it, that Ethicon thought
22   the information was truthful?
23              MR. BALL:  Object to the
24          form.
```

Elizabeth Kavaler, M.D.

Page 58

```
 1            THE WITNESS:  I don't put
 2       this much thought into the IFU.  I
 3       don't know any surgeons who do put
 4       that much into the IFU.
 5  BY MR. SLATER:
 6       Q.   You don't have an opinion on
 7  that?
 8       A.   I don't really have much of
 9  an opinion on the IFU.
10       Q.   Okay.  If I understand
11  correctly, you, in your practice, didn't
12  even the read the section of the warnings
13  and indications and adverse reactions;
14  that wasn't even something that you
15  looked at, correct?
16            MR. BALL:  Object to the
17       form.
18            THE WITNESS:  I read it.  I
19       looked at it.  But that wasn't the
20       basis for which I would use it or
21       not use it.
22  BY MR. SLATER:
23       Q.   Did I ask you if that was
24  the basis for which you would use it or
```

Elizabeth Kavaler, M.D.

Page 68

1            MR. SLATER:  So we have a
2       disagreement.
3            MR. BALL:  -- you're right.
4            MR. SLATER:  It doesn't
5       matter.  That's why we have a
6       judge.
7  BY MR. SLATER:
8       **Q.**    You never used the patient
9  brochure in your practice, right?
10      **A.**    That's right.
11      **Q.**    As you sit here now, you
12 have no opinions about whether or not the
13 information in the patient brochure was
14 adequate or not, correct?
15           MR. BALL:  Object to the
16      form.
17           THE WITNESS:  I've read it.
18      I think it's adequate.  I don't
19      know what the obligations are, but
20      it's adequate.
21           So I have read it.  I didn't
22      use it.  And I think it's adequate
23      information.
24 BY MR. SLATER:

Elizabeth Kavaler, M.D.

Page 69

1      Q.     And what's the standard by
2  which you're judging whether or not the
3  information in the patient brochure is
4  accurate?  Define for me that standard.
5      A.     Well, "adequate" is a
6  judgment, right?  It's a subjective
7  assessment of what's right or wrong.
8      Q.     So it's your personal
9  opinion?
10     A.     Right.  So adequate, to me,
11 is that it covers the bases, it gives you
12 a general idea of what's involved.  But
13 it's really a tool for a conversation
14 between the patient and the doctor.
15     Q.     Something you never used it
16 for, right?
17     A.     I never used it for that
18 because I did my own.
19     Q.     Let me ask you this -- to go
20 back to some of the questions I asked you
21 on the IFU, I'm going to ask a few of
22 them for the patient brochure.
23            When Ethicon provided
24 information in the patient brochure for

1     **A.**    Can you be more specific in
2  what you want me to answer?
3     **Q.**    Sure.
4             With regard to the
5  various -- I'll ask it even more
6  specific.
7             With regard to the various
8  prolapse meshes you've used over the
9  years, do you know the difference in pore
10 sizes between the different devices?
11    **A.**    Not specifically.  But I
12 know they are all within the same --
13 they're all Type 1 meshes, all their pore
14 sizes are of a certain size that's
15 acceptable for vaginal surgery.  So as
16 long as they all are within that sort of
17 standard, then it's an appropriate
18 vaginal application.
19    **Q.**    You believe that as long as
20 a mesh has pore sizes of at least 75
21 microns that's acceptable?
22    **A.**    Yes.  But most of them are
23 considerably larger.  The weave is -- the
24 weave is considerably larger.

1    **Q.**   Have you ever studied the
2  question of what happens to the pores of
3  the PROLIFT® once tension is placed on
4  them and they're put into the body?
5    **A.**   Studied is -- I wouldn't
6  use -- I am not sure what you mean by
7  "studied," but I've certainly done a lot
8  of prolapse -- PROLIFT® surgeries and
9  seen the way the mesh is integrated.
10        So I don't know what -- I'm
11  not sure what the question is.
12    **Q.**   Do you know whether or not
13  the pores in the PROLIFT® collapse down
14  when tension is placed on the PROLIFT® in
15  actual use?
16    **A.**   In the patient's body?
17    **Q.**   Yes.
18    **A.**   I don't have that
19  experience.  It gets integrated and
20  incorporated and there's no -- the
21  collapse, it doesn't -- I don't know what
22  you mean by "collapse."  It gets
23  incorporated.
24    **Q.**   When tension is placed on

Elizabeth Kavaler, M.D.

Page 98

1  would -- for me what the -- the meaning
2  of that is.  But is that what you mean,
3  what it means to me?
4      **Q.**   No.  I want to know what --
5  if you understand, from a scientific
6  basis, based on the information that's
7  out there in the medical and scientific
8  community, among people who study that
9  question, if you know the answer to it.
10              MR. BALL:  Object to the
11         form.
12              THE WITNESS:  I understand
13         the importance of pore size in
14         mesh.  That I understand.
15  BY MR. SLATER:
16      **Q.**   I asked about 1 milliliter.
17  Do you know the importance of that for
18  clinical implications?
19      **A.**   I do.
20      **Q.**   And what is your
21  understanding?
22      **A.**   My understanding is that
23  mesh with a certain pore size will allow
24  macrophages and cells to get through the

1   mesh so that bacteria can be eliminated.

2       **Q.**   In terms of how scar tissue

3   forms, do you have any knowledge about

4   the significance or lack of significance

5   of a 1 millimeter pore size?

6           MR. BALL:  Object to the

7       form.

8           THE WITNESS:  In terms --

9       can you define what you mean by

10      "scar tissue"?

11  BY MR. SLATER:

12      **Q.**   Yes.  Fibrotic tissue that

13  forms as part of the inflammatory

14  response to the foreign body.

15          Do you have any knowledge of

16  whether or not a 1 millimeter pore size

17  has any significance for how that scar

18  tissue will form on the mesh?

19      **A.**   I don't use --

20          MR. BALL:  Object to the

21      form.

22          THE WITNESS:  Yeah, "scar

23      tissue" is not some -- a

24      terminology -- a term that I would

Elizabeth Kavaler, M.D.

Page 328

1         MR. SLATER:  Objection.
2     Your questions are leading.
3         MR. BALL:  Okay.  All right.
4     I'll start over.  Let me finish
5     them, though.  You got me all --
6     you got me all confused because I
7     hadn't finished.
8         MR. SLATER:  I thought you
9     were done.  You asked for a list.
10    Well, it's multi-part too.  Ask
11    Bettina, she knows.  Compound
12    queen.
13 BY MR. BALL:
14    Q.    Have you -- have you
15 reviewed the patient brochure, the IFU
16 and the professional education materials
17 in existence before Ms. Budke's surgery?
18        MR. SLATER:  Objection.
19    Foundation.  Leading.
20        MR. BALL:  Go ahead and
21    answer.
22        THE WITNESS:  I have
23    reviewed those materials.
24 BY MR. BALL:

Elizabeth Kavaler, M.D.

Page 329

1   Q.   Do you believe that they
2   were adequate for a -- for the purposes
3   of a surgeon like you, in terms of
4   determining the risks and benefits of
5   PROLIFT® and counseling your patients?
6              MR. SLATER:  Objection.
7              You can answer.
8              THE WITNESS:  Yes, they were
9        adequate.
10  BY MR. BALL:
11  Q.   Okay.  Then, last question,
12  in your experience, does the mesh used in
13  PROLIFT® potentiate infection less than
14  other foreign materials?
15             MR. SLATER:  Objection.
16             MR. BALL:  Go ahead.
17             THE WITNESS:  Yes, it does.
18        The PROLIFT® mesh is a Type 1
19        polypropylene mesh, which is --
20        has a very low infection rate, as
21        evidenced by the literature.
22        We've used prolene sutures for
23        years.  And it potentiates
24        infection much less than most

Golkow Technologies, Inc. - 1.877.370.DEPS

1                CERTIFICATE
2
3
4           I HEREBY CERTIFY that the
5    witness was duly sworn by me and that the
6    deposition is a true record of the
7    testimony given by the witness.
8
9
10
             Amanda Maslynsky-Miller
11           Certified Realtime Reporter
             Dated:  October 15, 2014
12
13
14
15
16
17           (The foregoing certification
18    of this transcript does not apply to any
19    reproduction of the same by any means,
20    unless under the direct control and/or
21    supervision of the certifying reporter.)
22
23
24