Exhibit B

Anne Holland Wilson, MBA

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF
2                 WEST VIRGINIA AT CHARLESTON
                          -   -   -
3    IN RE:  ETHICON, INC.,: Master File No.
     PELVIC REPAIR SYSTEM  : 2:12-MD-02327
4    PRODUCTS LIABILITY     : MDL 2327
     LITIGATION             :
5    ------------------------------------------
     THIS DOCUMENT RELATES TO CASE
6    CONSOLIDATION:
7    Terreski Mullins, et al., v. Ethicon,
     Inc., et al.
8    Case No. 2:12-CV-02952
9                         -   -   -
10                 September 17, 2015
11                        -   -   -
12              Oral deposition of ANNE
13   HOLLAND WILSON, MBA, held in the offices
14   of Riker Danzig, 500 Fifth Avenue, New
15   York, New York 10110, commencing at
16   9:20 a.m., on the above date, before
17   Margaret Peoples, a Registered
18   Professional Reporter and Notary Public
19   in and for the States of Pennsylvania,
20   New York and Connecticut.
21

                          -   -   -

22
23           GOLKOW TECHNOLOGIES, INC.
         877.370.3377 ph|917.591.5672 fax
24              deps@golkow.com

Anne Holland Wilson, MBA

```
 1    A P P E A R A N C E S :
 2    WEXLER WALLACE, LLP
      BY: EDWARD A. WALLACE, ESQUIRE
 3    55 W. Monroe Street
      Suite 3300
 4    Chicago, Illinois 60603
      (312) 589-6272
 5    eaw@wexlerwallace.com
      Counsel for the Plaintiffs
 6
      THOMAS, COMBS & SPANN, PLLC
 7    BY: PHILIP J. COMBS, ESQUIRE
      300 Summers Street
 8    Suite 1380
      Charleston, West Virginia 25301
 9    (304) 414-1800
      Pcombs@tcspllc.com
10    Counsel for the Defendants
11    BUTLER SNOW, LLP
      BY: PAUL N. DAVIS, ESQUIRE
12    1020 Highland Colony Parkway
      Suite 1400
13    Ridgeland, Mississippi 39157
      (601) 948-5711
14    paul.davis@butlersnow.com
      Counsel for the Defendants
15
16                        -   -   -
17
18
19
20
21
22
23
24
```

Anne Holland Wilson, MBA

```
 1                    -   -   -
 2                  I N D E X
 3   WITNESS                     PAGE NO.
 4   ANNE HOLLAND WILSON, MBA
 5        By Mr. Combs         9, 425
 6        By Mr. Wallace     387, 436
 7
                      -   -   -
 8
                E X H I B I T S
 9
     NO.          DESCRIPTION   PAGE NO.
10
     Wilson 1
11    Rule 26 Expert Report of
      Anne Wilson, MBA               29
12
     Wilson 2
13    Total Hours July 26 -
      September 14, 2015             30
14
     Wilson 3
15    Report of Elaine Duncan,
      MSME, RAC                      30
16
     Wilson 4
17    LexisNexis Michie's Code
      of Federal Regulations
18    21 CFR 820.1                   71
19   Wilson 5
      Medical Devices - Application
20    of risk management to
      medical devices
21    Amendment 1: Rationale for
      Requirements                  102
22
23
24
```

Anne Holland Wilson, MBA

1                    -   -   -
2                 E X H I B I T S
3     NO.           DESCRIPTION      PAGE NO.
4     Wilson 6
        EC Certificate
5       DGM-036 with attachment
        Bates Nos. ETH.MESH.
6       10588872 - 10588876          106
7     Wilson 7
        TUV Certificate
8       Bates Nos. ETH.MESH.
        10587930; 10587929           113
9
      Wilson 8
10      Council Directive
        93/42/EEC of 14 June
11      1993 concerning medical
        devices                      168
12
      Wilson 9
13      AUGS Position Statement
        on Mesh midurethral
14      Slings for Stress Urinary
        Incontinence
15      D20218.1 - D20218.4          217
16    Wilson 10
        British Standard
17      Medical devices -
        Risk analysis                233
18
      Wilson 11
19      British Standard
        Specification for
20      Application of EN ISO 9001
        to the manufacture of
21      medical devices              233
22    Wilson 12
        Reliance List, Exhibit 3     240
23

24

Anne Holland Wilson, MBA

```
 1                        -  -  -
 2                 E X H I B I T S
 3  NO.            DESCRIPTION      PAGE NO.
 4  Wilson 13
      Risk assessment TVT blue
 5    Bates Nos. ETH.MESH.
      10587931 - 10587939          245
 6
    Wilson 14
 7    Preventia
      Bates Nos. ETH.MESH.
 8    07295614 - 10618814          279
 9  Wilson 15
      Audit Brief Report
10    Order No. 70038068
      Bates No. ETH.MESH.
11    14481551                     293
12  Wilson 16
      Audit Brief Report
13    Order No. 700063863
      Bates Nos. ETH.MESH.
14    07251148 - 07251155          293
15  Wilson 17
      Gynecare Worldwide
16    Device Design Safety
      Assessment (DDSA)
17    Re-evaluation for TVT
      Bates Nos. ETH.MESH.
18    01317510 - 01317524          299
19  Wilson 18
      Surgeon's Resource
20    Monograph, Expert opinions
      on the use of Gynecare TVT
21    Tension-Free Support for
      Incontinence
22    Bates Nos. ETH.MESH.
      10027307 - 10027328          319
23
24
```

Anne Holland Wilson, MBA

```
 1                 -  -  -
 2              E X H I B I T S
 3   NO.         DESCRIPTION     PAGE NO.
 4   Wilson 19
       Ethicon Women's Health
 5     & Urology, Technical
       File Amendment - Lase Cut
 6     Mesh Product Code 830041BL
       Bates Nos. ETH.MESH.
 7     00309254 - 00309350         326
 8   Wilson 20
       QMS Standards & Guidance    437
 9
     Wilson 21
10     CEN/CLC/TC 3 - Quality
       management and corresponding
11     general aspects for
       medical devices
12     Reference CEN/ISO/TR
       14969:2005                  437
13
     Wilson 22
14     Technical Report
       Medical devices - Quality
15     management systems -
       Guidance on the application
16     of ISO 13485:2003           437
17   Wilson 23
       Svensk Standard SS-EN
18     46 001
       European Standard EN 46001
19     Quality systems - Medical
       devices - Particular
20     Requirements for the
       application of EN 29001      437
21
22
23
24
```

Anne Holland Wilson, MBA

```
 1                    -   -   -
 2                E X H I B I T S
 3    NO.         DESCRIPTION     PAGE NO.
 4
      Wilson 24
 5     International Standard
       Quality systems - Model
 6     for quality assurance in
       design, development,
 7     production, installation
       and servicing              437
 8
      Wilson 25
 9     Bibliography              437
10    Wilson 26
       ANSI/AAMI/ISO 14971:2000
11     & 14971:2000/A1:2003
       Medical devices -
12     Application of risk
       management to medical
13     devices                   437
14    Wilson 27
       Risk Standards & Guidance  437
15
      Wilson 28
16     CEN/CLC/TC 3 - Quality
       management and corresponding
17     general aspects for
       medical devices
18     Reference EN ISO 14971:2012  437
19
                   -   -   -
20
21
22
23
24
```

Anne Holland Wilson, MBA

DEPOSITION SUPPORT INDEX

Direction to Witness Not To Answer
Page   Line   Page   Line
None

Request For Production of Documents
Page   Line   Page   Line
19        22

Stipulations
Page   Line   Page   Line
None

Questions Marked
Page   Line   Page   Line
None

Anne Holland Wilson, MBA

1                  -  -  -

2               ANNE HOLLAND WILSON, after

3           having been duly sworn, was

4           examined and testified as

5           follows:

6                  -  -  -

7               EXAMINATION

8                  -  -  -

9   BY MR. COMBS:

10          Q.    Could you state your name

11  for the record.

12          A.    Anne Holland Wilson.

13          Q.    Ms. Wilson, what's your

14  business address?

15          A.    7500 Rialto Boulevard,

16  Austin, Texas.

17          Q.    How many times have you been

18  deposed before?

19          A.    Once.

20          Q.    Prior to the deposition, did

21  Mr. Wallace explain to you the ground

22  rules of the deposition, and that I don't

23  need to go back over those?

24              MR. WALLACE:  I'll object

Anne Holland Wilson, MBA

 1          just to the extent that it calls

 2          for privileged communications.

 3               But assuming there's no

 4          waiver, you can generally sort of

 5          speak to that.

 6               THE WITNESS:  Why don't you

 7          just go over any ground rules.

 8   BY MR. COMBS:

 9          Q.    Obviously, the most

10   important thing is you're under oath, so

11   you have to tell the truth.

12               If I ask you any questions

13   and you don't understand them, let me

14   know.

15               If I ask you a question and

16   you don't understand it, let us know

17   immediately at that time, if you can.

18               If you have to discuss

19   something with Mr. Wallace, I'm not going

20   to object and throw a fit about it or

21   anything like that, but I would ask that

22   you answer the question that's pending

23   before you do that.

24               Today is not an endurance

Anne Holland Wilson, MBA

1  contest, but we want to respect, you

2  know, convenience for you.  If there's

3  any time today that you need to take a

4  break, just tell us.

5           Before the deposition,

6  Mr. Wallace and I talked, and he

7  indicated you would want to take some

8  breaks throughout.  That's obviously fine

9  with us.

10          And as we get closer to

11  lunch, you can let us know if you want us

12  to order something in or just take a

13  break then.

14      A.    Okay.

15      Q.    But, you know, I don't think

16  there's any more magic than that.

17      A.    Okay.

18      Q.    Ms. Wilson, we got a copy of

19  your report, and attached to that report

20  is a copy of your CV.

21      A.    Mm-hmm.

22      Q.    Is that CV up to date?

23      A.    Yes.

24      Q.    And does it have all the

Anne Holland Wilson, MBA

1    publications that you have authored?

2         A.    Yes.

3         Q.    No publications that would

4    postdate that version of the CV?

5         A.    No.

6         Q.    You said that you had

7    testified one time before.  Was that as a

8    fact witness or an expert witness?

9         A.    It was an expert.

10        Q.    And is that one of the cases

11   that's listed on your reliance list?

12        A.    Yes.

13        Q.    Which one of the cases is

14   that?

15        A.    There was only one listed.

16   It was Parcus, and...

17        Q.    Okay.  Well, you also had

18   the BMD versus Medtronic?

19        A.    Right, but that wasn't a

20   deposition.

21        Q.    Okay.  You got the BMD

22   versus Medtronic.  And was that a case --

23             THE WITNESS:  Can I turn

24        that off?

Anne Holland Wilson, MBA

1                MR. COMBS:  Of course.

2     BY MR. COMBS:

3          Q.    All right.  On your CV,

4     you've got listed, Expert Witness in

5     Litigation Support, and you've got four

6     things listed there.

7                So the first one, BMD versus

8     Medtronic, is that a case in which you

9     just prepared a report?

10         A.    Yes.

11         Q.    And you have not testified

12    yet?

13         A.    That was -- I have to look,

14    but that was like ten years ago.

15         Q.    Oh, okay.  I saw 2005, I

16    thought it said 2015.

17                What was that case?

18         A.    That was a case relating to

19    if due diligence was done properly in a

20    designed -- implantable device design.

21         Q.    What was the device?

22         A.    It was a tissue valve.

23         Q.    And what type of tissue

24    valve?

Anne Holland Wilson, MBA

1       A.      Porcine.

2       Q.      Were you testifying on
3  behalf of the plaintiff or defendant?

4       A.      Defense.  Well, you know, I
5  was testifying on behalf of Medtronic,
6  so...

7       Q.      The Parcus case, that's the
8  case in which you gave a deposition?

9       A.      Yes.

10      Q.      And what was that case
11  about?

12      A.      That was about
13  confidentiality of quality management
14  systems.

15      Q.      And --

16      A.      And proprietary, are they
17  proprietary or not.

18      Q.      And who were you testifying
19  on behalf of in that case?

20      A.      Parcus.

21      Q.      Did that case go to trial?

22      A.      It did not.

23      Q.      Who was the lawyer that you
24  were working with in the Medtronic case?

Anne Holland Wilson, MBA

1       A.     I'm sorry.  I can't recall.

2  That was -- they were in Minnesota.  I

3  can tell you that.

4       Q.     And who was the lawyer that

5  you were working with in the Parcus

6  Medical case?

7       A.     I would have to look it up.

8       Q.     You don't remember?

9       A.     I don't remember his name.

10  I know exactly what he looks like.

11       Q.     Where did that lawyer

12  practice?

13       A.     In Boston.

14       Q.     You've also got two

15  references to litigation support?

16       A.     Correct.

17       Q.     What does that mean?

18       A.     I'm doing some background

19  support work, helping write protocols and

20  evaluate information analyses.

21       Q.     And so let me ask you first

22  about the work with Sanford Heisler.

23              Where is Sanford Heisler?

24       A.     In New York.

Anne Holland Wilson, MBA

1      Q.    And what -- broadly

2  speaking, what did you do for Sanford

3  Heisler?

4      A.    Basically, gave some advice

5  about implantable devices and...

6      Q.    What type of implantable

7  devices?

8      A.    Hips.

9      Q.    And was that in connection

10  with any of the hip implant litigation?

11     A.    Yes.

12     Q.    And have you prepared any

13  reports --

14     A.    No.

15     Q.    -- for that?

16     A.    Just sporadic advice here

17  and there.

18     Q.    So if I could paraphrase

19  that.

20          So lawyers call you when

21  they have issues that relate to your

22  field of expertise and ask you questions

23  about it?

24     A.    Exactly.

Anne Holland Wilson, MBA

1     Q.     How often are you working on
2  that?

3     A.     Rarely.

4     Q.     This is the specificity I
5  need.  Is it once a week, once a month,
6  once a year?

7          MR. WALLACE:  If you know.

8          THE WITNESS:  Twice a year.

9  BY MR. COMBS:

10    Q.     Grant Morris, what does that
11 assignment entail?

12    A.     That's actually doing some
13 development of a test protocol, some
14 research.

15    Q.     And what is the product at
16 issue that will be tested?

17    A.     It's various products,
18 various implantable devices.

19    Q.     What implantable devices,
20 what classes?

21    A.     There's total joints and
22 spine instruments, various materials.
23 Not cardiovascular.

24    Q.     I apologize.  I thought you

Anne Holland Wilson, MBA

1    said it was total joints?

2          A.    Total joints.  Knees, hips,

3    shoulders.

4          Q.    Sure.  So not anything

5    related to stress urinary incontinence?

6          A.    No.

7          Q.    Not anything related to

8    pelvic floor?

9          A.    No.

10         Q.    Ms. Wilson, of the nine

11   publications that are on your CV, how

12   many of those have been peer-reviewed?

13         A.    One.

14         Q.    Is that the one from

15   approximately 1986?

16         A.    Probably, yes.

17         Q.    Okay.

18         A.    Yes, it is.

19         Q.    It's --

20         A.    Absolutely.  That's

21   locomotive.

22         Q.    "Automated Extraction,"

23   blah, blah, blah.

24         A.    Yes, that's it.

Anne Holland Wilson, MBA

1       Q.     You're not relying on that

2   for any part of your testimony today, are

3   you?

4       A.     No, sir.

5       Q.     I saw that you had a

6   publication called, "Risk Management

7   Methods for Medical Devices" from 2001.

8               How do I get a copy of that?

9       A.     I probably have to go back

10  to my office and see if my office manager

11  could help with that.

12      Q.     Do you have a copy of it?

13      A.     I don't have one with me.

14      Q.     I didn't mean with you, but

15  do you have access to a copy of it?

16      A.     I'm sure we can dig through

17  and it would be somewhere.

18      Q.     Okay.  Could you provide --

19      A.     I'm not sure.  I believe

20  that we could dig up a copy somewhere.

21  That's been a long time.

22      Q.     Okay.  Here's what I would

23  ask.  So I would ask that you make

24  efforts to find a copy of that and that

Anne Holland Wilson, MBA

1    you provide that to Mr. Wallace.

2              MR. WALLACE:  Can you do me

3         a favor and send me something?

4              MR. COMBS:  Sure.

5              MR. WALLACE:  Otherwise,

6         it's going to get lost in the

7         shuffle of the deposition.

8              MR. COMBS:  Yes.

9    BY MR. COMBS:

10        Q.    Ms. Wilson, none of the

11   publications that are listed on your

12   curriculum vitae involve surgical mesh,

13   do they?

14        A.    No.

15        Q.    And you've never published

16   on Prolene mesh, have you?

17        A.    No.

18        Q.    You've never published on

19   the TVT product?

20        A.    No.

21        Q.    Never published on stress

22   urinary incontinence?

23        A.    No.

24        Q.    Never published anything

Anne Holland Wilson, MBA

1   regarding any of the risks that are

2   associated with stress urinary

3   incontinence devices?

4        A.    I have not.

5        Q.    I ask you about the

6   publications on your list.

7              Are there any additional

8   presentations that haven't made it to

9   your CV yet?

10       A.    I need to take a look.

11             I believe that's complete.

12       Q.    Ms. Wilson, I forget the

13  exact year, I think maybe it was 2000,

14  but is that when you left Sulzer?

15       A.    I worked for Carbomedics,

16  and that was in 1999.

17       Q.    And is Carbomedics a

18  division of Sulzer?

19       A.    It had several owners.  So

20  at one time it was part of Sulzer.

21       Q.    What did Carbomedics make?

22       A.    Heart valves.

23       Q.    Did Carbomedics have

24  anything to do with set Sulzer's

Anne Holland Wilson, MBA

1   artificial hips?

2         A.    No.

3         Q.    And did you --

4         A.    Could you ask me that again.

5         Q.    Did Carbomedics have

6   anything to do with the artificial hips

7   marketed by Sulzer?

8         A.    No.

9         Q.    Did you ever work on any of

10  the artificial hip products that were

11  manufactured and sold by Sulzer?

12        A.    No.

13        Q.    Did you ever work on any of

14  the quality systems that were used in

15  relation to the hips sold by Sulzer?

16        A.    There may have been some

17  shared quality systems.  I'm not aware of

18  that, because I didn't work on the hips.

19  But given they had the same parent

20  company, there could have been, and I'm

21  just not aware.

22        Q.    What types of quality

23  systems could have been shared between

24  Carbomedics and Sulzer's hip division?

Anne Holland Wilson, MBA

1      A.     There could have been
2  high-level policies.
3      Q.     And what would those
4  policies encompass?
5      A.     It could be quality manuals,
6  there could be statements.
7      Q.     Risk management, standard
8  operating procedures?
9      A.     No.  Those were at the
10 division level.
11     Q.     After you left Sulzer, it's
12 my understanding, from look at your CV,
13 that you have worked as a consultant.
14            Is that how you describe it?
15     A.     Yes.
16     Q.     Approximately how many
17 companies have you consulted with since
18 you left?
19     A.     That's tricky.  I'd have to
20 count.  Fifty.
21     Q.     I was going to ask you --
22     A.     Fifty to 100, I would say.
23     Q.     I was going to ask you, more
24 or less than 20.  So 50 to 100 is fine.

Anne Holland Wilson, MBA

1                    Now, you say in your CV that

2     you have worked with implantables.

3                    What does that mean to you?

4          A.     Any device that's

5     permanently implanted.

6          Q.     What types of permanently

7     implanted devices have you worked for?

8          A.     I have worked in

9     cardiovascular, obviously, in heart

10    valves and annuloplasty rings.  I've

11    worked in -- oh, sorry spine devices.  I

12    have worked in suture anchors.  Six

13    different kinds of spine devices.

14                   Total joints:  Hips, knees,

15    shoulders.

16                   So I think that I worked for

17    at least 13 different types of

18    implantable devices.

19         Q.     Have any of these involved

20    mesh?

21         A.     No.

22         Q.     Have any of them involved

23    hernia products?

24         A.     I did work for a large

Anne Holland Wilson, MBA

1    animal facility that had a study that

2    involved mesh.  They were not my -- I

3    mean, mesh was not my client.  The

4    animals facility was my client.

5         Q.    Was this a facility that was

6    studying a mesh for hernia applications?

7         A.    Yes.

8         Q.    Did you have any involvement

9    with that project?

10         A.    I was the QA unit, because

11    I'm registered in good laboratory

12    practices.

13         Q.    Do you remember what type of

14    mesh that was?

15         A.    I don't.  There were several

16    different types.

17         Q.    Do you know what it was made

18    of?

19         A.    I do not.

20         Q.    Would you have had any

21    active role in designing the clinical

22    trial?

23         A.    No.

24         Q.    Have any of the implantables

Anne Holland Wilson, MBA

1    that you have consulted on involved

2    products that treat stress urinary

3    incontinence?

4           A.    No.

5           Q.    Have any of the devices that

6    you have worked on involved pelvic floor

7    products?

8           A.    No.

9           Q.    And to the best of your

10   knowledge, none of them have involved

11   polypropylene or Prolene?

12          A.    I'm just thinking.  No.

13          Q.    When were you first

14   contacted about this litigation?

15          A.    What is it now, September?

16   Maybe July.

17          Q.    And who contacted you?

18          A.    Actually, I met with Brianne

19   [ph], but I can't remember her last name.

20   She got married, and I just can't

21   remember her last name.

22          Q.    Was Brianne one of the

23   lawyers that is working with the group

24   that has retained you in this case?

Anne Holland Wilson, MBA

1        A.    Yes.

2              MR. COMBS:  Ed, I don't know

3        Brianne.  Do you know Brianne?

4              MR. WALLACE:  (Gesturing.)

5              MR. COMBS:  What's Brianne's

6        last name?

7              MR. WALLACE:  No.

8              THE WITNESS:  Exactly.

9              MR. COMBS:  All right.

10       Never mind.

11    BY MR. COMBS:

12       Q.    What were you asked to do in

13    the case?

14       A.    At that point, nothing.  We

15    just got back in touch and asked if I

16    would be interested in working on some

17    design control and risk

18    management-related work.

19       Q.    And how many times have you

20    met with counsel regarding this project?

21             MR. WALLACE:  Do you mind if

22       I ask in person?

23             MR. COMBS:  Sure.

24    BY MR. COMBS:

Anne Holland Wilson, MBA

1          Q.    We'll start with how many
2     times in person.
3                More or less than five?
4          A.    Twice in DC -- less than
5     five.
6          Q.    And approximately, how many
7     hours have you spent?
8          A.    With counsel or in total?
9          Q.    Yes.  With counsel.
10         A.    Can we look at the details
11    on that?
12         Q.    Sure.
13         A.    I don't have it memorized.
14         Q.    Okay.  Did you bring --
15               MR. WALLACE:  Do you mind if
16         I make a quick statement?
17               MR. COMBS:  Sure.
18               MR. WALLACE:  So we are
19         providing you with a -- it's
20         called total hours, and it was
21         prepared in connection with this
22         deposition so that you could have
23         a record of the hours.
24               Obviously, she can speak to

Anne Holland Wilson, MBA

1   this.

2          And while I'm at it -- and

3   I'd like to go ahead and have that

4   marked, if you don't mind.

5          While I'm at it, there are a

6   number of documents that are in

7   front of you, including binders

8   and a book and her report and

9   Ms. Duncan's report.

10          I don't know what you're

11   going to do with it, but I wanted

12   to note that all of this

13   information is being provided to

14   you pursuant to your Notice of

15   Deposition, and our objections to

16   your Notice of Deposition.

17          So with that, I'll turn it

18   back over to you.

19          MR. COMBS:  Okay.  Thanks.

20          Let's go ahead and mark --

21   we'll mark your copy of the report

22   as Exhibit 1.

23               -   -   -

24          (Whereupon, Exhibit Wilson 1

Anne Holland Wilson, MBA

1          was marked for identification.)

2                        -  -  -

3                    MR. COMBS:  So, for the

4          record, we've marked your copy of

5          the report as Exhibit 1.

6                        -  -  -

7                    (Whereupon, Exhibit Wilson 2

8          was marked for identification.)

9                        -  -  -

10                   MR. COMBS:  So for the

11         record we've marked what

12         Mr. Wallace handed us that's

13         entitled "Total Hours" as

14         Exhibit 2.

15                   And then we'll mark as

16         Exhibit 3 Ms. Wilson's copy of

17         Elaine Duncan's report.

18                       -  -  -

19                   (Whereupon, Exhibit Wilson 3

20         was marked for identification.)

21                       -  -  -

22   BY MR. COMBS:

23             Q.    Ms. Wilson, on Exhibits 1,

24   which is your copy of your own report,

Anne Holland Wilson, MBA

1    and Exhibit 3, which is your copy of

2    Ms. Duncan's report, there are a number

3    of handwritten notations.

4              Did you make all those?

5         A.    I sure did.

6         Q.    Okay.  So anything that's on

7    here was something by you.

8         A.    Yes.

9         Q.    Wouldn't have been written

10   by anybody else.

11        A.    No.

12        Q.    Thank you.

13             Ms. Wilson on Exhibit 2,

14   where you have got the total hours that

15   you spent on the project, would that be

16   the monies that you have billed to date

17   on the project?

18        A.    Yes.  Well, correction.

19        Q.    Current to when?

20        A.    This was actually through

21   September 14th, but we didn't bill for

22   September yet.  So there's 14 days that

23   had not been billed yet.

24        Q.    Approximately, how many

Anne Holland Wilson, MBA

1  hours will be added by virtue of the fact

2  that you didn't have the period from

3  September 1st to September 14th billed?

4        A.    I believe I spent about 30.

5        Q.    So -- and, again, nobody is

6  going to hold you to that.  Just

7  something in the neighborhood of 30 hours

8  between --

9        A.    Yes.

10       Q.    -- September 1st and

11 September 14 --

12       A.    Correct.

13       Q.    -- that would make the total

14 hours spent on the project something like

15 230 hours.

16       A.    No.  My hours between the

17 1st and the 14th have already been

18 included in here.

19             So that 198 includes those

20 hours.  So it would not be additive.

21       Q.    All right.  Is the total

22 right or would the total change when you

23 issue the September bill?

24       A.    We bill monthly.  So the

1    September mid-month total is correct.

2              Could you clarify your

3    question?

4         Q.    Yes.  I guess I'm not doing

5    a very good job asking.  Here's all I'm

6    trying to figure out.

7              You say that up to

8    September 14 you had worked 198 hours; is

9    that correct?

10        A.    My group.

11        Q.    And so far, you have billed

12   $57,075.95.

13        A.    That's not correct.

14        Q.    Okay.

15        A.    I haven't billed for the

16   first 14 days of September, but that

17   total includes those money.

18        Q.    Thank you.  So after you

19   issue that bill, this would be current as

20   of September 14?

21        A.    We will never issue a bill

22   between the mid-month period.  So this

23   will never be a total that comes out.

24   This was completed on for today's

Anne Holland Wilson, MBA

1    purposes.

2           Q.    So it will include this

3    amount --

4           A.    Plus --

5           Q.    -- plus whatever --

6           A.    -- the other half --

7           Q.    -- whatever you do between

8    now and the end of the month.

9           A.    Correct.

10          Q.    But as of September 14,

11   that's the amount that would have been

12   charged if a bill had been issued on that

13   date.

14          A.    Correct.

15          Q.    You say that it's work done

16   by your group.

17                Does that include the

18   quality associate and quality specialist?

19          A.    Correct.

20          Q.    You are the expert?

21          A.    Yes.

22          Q.    And is this all done through

23   your QA consulting business?

24          A.    Yes.

Anne Holland Wilson, MBA

1          Q.    So the quality associate is

2    somebody that's retained in some capacity

3    by QA, and the quality specialist is

4    somebody that's retained in some capacity

5    by QA?

6          A.    Yes.

7          Q.    You told us that you have

8    met with the lawyers a few times,

9    something less than five times.

10               I assume that's also

11   included telephone conferences?

12         A.    Yes.

13         Q.    Approximately how many times

14   have you spoken to counsel on the phone?

15         A.    Oh, boy.  I only recall once

16   on the phone.

17         Q.    Ms. Wilson, I'm going to ask

18   you more questions about this later in

19   the deposition, but you've got a reliance

20   list that's got the documents that you

21   reviewed.

22               Are those all of the

23   documents that you were relying on in

24   this case?

Anne Holland Wilson, MBA

1    A.    Those were the documents

2    that I had available to me.

3    Q.    So the Exhibit 3 to your

4    report, that would be the universe of

5    documents that you had to review?

6    A.    And I could ask for more.

7    Q.    Okay.

8    A.    I often ask for, Oh, how

9    about this, how about that.  So...

10    Q.    By the time the report was

11    done and the opinions were formed, this

12    was the universe of stuff that you had

13    been provided.

14    A.    Yes.

15    Q.    Ms. Wilson, were there any

16    documents which were provided that you

17    chose not to put on the reliance list?

18    A.    Not to my knowledge.

19    Q.    Have you spoken with any

20    other experts in this litigation?

21    A.    No.

22    Q.    So is it a fair statement

23    that there is nothing in your report that

24    you're predicating on the opinion of

Anne Holland Wilson, MBA

1    another expert?

2         A.    Correct.

3         Q.    The opinions that you're

4    offering in this case, you've never

5    published any of them, have you?

6         A.    No.

7         Q.    You've never tested any of

8    them, have you?

9         A.    I don't think I understand

10   what you mean by that question.

11        Q.    Well, have you ever tested

12   any of these opinions?

13        A.    I'm a consultant and I have

14   tested for 20 years or 30 years of

15   experience.  I do this every day for a

16   living.

17        Q.    So how is it that your

18   opinions in this case have been tested?

19             MR. WALLACE:  Objection to

20        form.

21             THE WITNESS:  I don't

22        understand what you mean by

23        "tested" then.

24   BY MR. COMBS:

Anne Holland Wilson, MBA

1    Q.    Has anyone else reviewed

2    these opinions?

3    A.    These are my opinions.  I

4    wrote them.

5    Q.    Have they been reviewed by

6    anyone?

7         MR. WALLACE:  Objection to

8         form.

9         THE WITNESS:  I don't

10        understand who you're speaking

11        about.

12    BY MR. COMBS:

13    Q.    Is there -- what is the

14    methodology that you used in order to

15    prepare that report?

16    A.    I looked at many, many,

17    many, many, many documents and chose

18    those that best related to the topics of

19    risk management, assign control.

20         And then I took those

21    documents and reviewed them again, and

22    started writing.  Did an outline.  And I

23    kept refining and refining, and came up

24    with my report.

Anne Holland Wilson, MBA

1      Q.    I saw in your CV that you

2  hold yourself out as having expertise in

3  auditing.

4            Is that a fair statement?

5      A.    Yes.  I am certified in

6  auditing.

7      Q.    Was, in essence, what you

8  were doing an audit --

9      A.    No.

10     Q.    -- of the design control?

11     A.    Not at all.

12     Q.    And why is it that you say

13  it is not?

14     A.    Audits are very specific and

15  they're done in accordance with the

16  specific snapshot in time, a certain

17  location, certain standards.  And they're

18  directly inquiring with a person, not

19  just relying on documents.  So they're

20  not at all the same.

21     Q.    So the methodology that you

22  used in preparation for this report would

23  not be the methodology that you would use

24  when conducting an audit?

Anne Holland Wilson, MBA

1        A.     No.

2        Q.     It's not the same?

3        A.     No.  They're not the same.

4        Q.     And so the methodology that

5    you use as an auditor is not something

6    that you're relying on in support of this

7    report.

8        A.     I use my expertise and

9    knowledge as a consultant doing a variety

10   of things, and use all of them together

11   to assist me in evaluating the data and

12   writing the report.

13       Q.     And the methodology that you

14   apply in an audit is not something that

15   you applied in the preparation of this

16   report?

17               MR. WALLACE:  Objection to

18          form.  Asked and answered.

19               THE WITNESS:  Could you ask

20          me this again.

21   BY MR. COMBS:

22       Q.     Yeah.

23       A.     I think I answered that one

24   already.

Anne Holland Wilson, MBA

1     Q.    Okay.  Well, I just want to

2  make sure that I understand.

3          I mean, it's my

4  understanding that the process by which

5  you do an audit would be very different

6  than the process by which you prepared

7  this report and the opinions contained in

8  this report.

9          Is that correct?

10          MR. WALLACE:  Objection to

11      form.

12          THE WITNESS:  Audits use one

13      set of skills.  Expert report uses

14      some of those skills, but they're

15      not all the same.

16          I used the sum of my

17      knowledge as a consultant in risk

18      management, auditing, GLPs, design

19      controls, 15 years of work

20      experience, 15 years of business

21      ownership, consultants to come up

22      with my report.

23          So you can't single out

24      auditing.

Anne Holland Wilson, MBA

1   BY MR. COMBS:

2       Q.    And would it be possible for

3   another person with your same skill set

4   to look at these documents and these

5   guide and come up with a different

6   opinion?

7       A.    I'm sure it's possible.

8       Q.    I mean, someone that also

9   was an auditor and also a person that was

10  involved in design control could review

11  these materials and come to a different

12  conclusion.

13      A.    Well, these are generally

14  accepted principles based on standards.

15  So this is pretty cut and dry.

16            The standards have been out

17  there forever.  Actually, I was looking

18  at one of them, it was like the time I

19  was born these standards have been out

20  there.

21            So it's pretty much just the

22  standards state of the art in the

23  industry for medical devices.  Let me

24  qualify.  It's for medical devices only.

Anne Holland Wilson, MBA

1          Q.    And people in your field can

2     have different opinions on these topics,

3     can't they?

4          A.    I'm sure they can.

5          Q.    And, for example, many of

6     the topics that you have opined about in

7     your report are things that regulatory

8     and quality professionals at Ethicon

9     considered and came to different

10    conclusions, didn't they?

11              MR. WALLACE:  Objection to

12         form.

13              THE WITNESS:  Could you

14         restate that.  I'm not sure that

15         was a question.  It sounded like a

16         statement to me.

17    BY MR. COMBS:

18         Q.    That's not a statement, it's

19    a question.

20         A.    Okay.

21         Q.    I mean, many of the things

22    that you opined upon in your report --

23         A.    Okay.

24         Q.    -- those same issues were

Anne Holland Wilson, MBA

1    considered by Ethicon, by the regulatory

2    professionals, the quality management

3    professionals at Ethicon, and they came

4    to different conclusions, didn't they?

5            MR. WALLACE:  Objection to

6        form.

7            THE WITNESS:  To -- who are

8        you speaking about?

9            Are you speaking about

10       Ms. Duncan's report or --

11   BY MR. COMBS:

12       Q.    No.  I'm talking about the

13   people that work at Ethicon, the people

14   that took the actions that you're

15   criticizing in your report.

16           Those people considered the

17   same materials and came to different

18   conclusions, didn't they?

19           MR. WALLACE:  Objection to

20       form.

21           THE WITNESS:  I don't know.

22       I can't say what they concluded.

23       I can't say what they reviewed.

24       I -- I'm not them.  I have no way

Anne Holland Wilson, MBA

1          to say what they thought.

2    BY MR. COMBS:

3          Q.    So no part of your opinion

4    is premised upon conclusions made by

5    Ethicon regarding these issues.

6               MR. WALLACE:  Objection to

7          form.  Misstates testimony.

8               THE WITNESS:  Could you

9          re-ask the question.  When you

10         said "no part," I got sidetracked.

11   BY MR. COMBS:

12         Q.    Okay.  Is any part of your

13   report premised upon the conclusions and

14   actions taken by the employees of

15   Ethicon?

16         A.    My report is based upon my

17   knowledge of the industry and the

18   standards and generally accepted

19   principles thereof.

20         Q.    And was any part of the

21   factual background for your opinion based

22   upon conclusions drawn by the employees

23   of Ethicon?

24               MR. WALLACE:  Objection to

Anne Holland Wilson, MBA

1          form.

2                    THE WITNESS:  My opinion was

3          based upon review of the documents

4          that I saw, as well as my

5          experience in the industry,

6          generally accepted practices, and

7          current standards as well as

8          review of past standards.

9     BY MR. COMBS:

10          Q.    Have you spoken with any

11     other professionals about any of the

12     issues that are contained in your report?

13          A.    No, sir.

14          Q.    Have you spoken with any

15     regulatory bodies about any of the issues

16     contained in your report?

17          A.    No, sir.

18          Q.    Have you spoken with any

19     auditors about any of the issues

20     contained in your report?

21          A.    No, sir.

22          Q.    Were all of the opinions

23     that were contained in your report

24     developed specifically for this

1  litigation?

2       A.    Could you restate that.

3       Q.    The opinions contained

4  within your report, were they developed

5  specifically for this litigation?

6       A.    Yeah.  My opinions in this

7  report was developed specifically for

8  this litigation based on these documents.

9       Q.    I mean, that was the purpose

10 of your report.

11      A.    Yes.

12      Q.    Ms. Wilson, I saw that your

13 undergraduate work was done at

14 Vanderbilt.

15            Did you have any contact

16 with Drs. Guelcher or Dunn during that

17 time?

18      A.    No, sir.

19      Q.    Do you know Dr. Guelcher?

20      A.    Never heard of him or her.

21      Q.    Do you know Dr. Dunn?

22      A.    No, sir.

23      Q.    On page 2 of your report,

24 you say that you were asked to address

Anne Holland Wilson, MBA

1    the design control and risk management

2    processes of Ethicon associated with the

3    manufacture of TVT.

4                 Is that an accurate

5    statement of what you were asked to do?

6          A.    Yes.

7          Q.    You don't want to change

8    that in any way?

9          A.    No.

10         Q.    In your report, you say that

11   you've done 30-plus regulatory

12   submissions.

13                Did any part --

14         A.    Whoa, whoa, whoa.

15               MR. WALLACE:  I'm sorry.

16         Are you referring to --

17   BY MR. COMBS:

18         Q.    "I have been involved in

19   over 30 510k applications and am familiar

20   with the requirements related to FDA

21   clearance of a medical device."

22         A.    Okay.  Could you restate

23   your question, because those two didn't

24   jive in my mind right at the moment.

Anne Holland Wilson, MBA

1    Q.    Okay.  In your report you

2    state, "I have been involved in over 30

3    510k and am familiar with the

4    requirements relating to FDA clearance of

5    a medical device."

6              That's what you're saying in

7    your report.

8         A.    And further, the next

9    statement says that this is not the topic

10   of this report.

11        Q.    Oh, I understand that's

12   what --

13        A.    So that is true.

14        Q.    I understand that's what you

15   say.

16              Were any of the materials

17   that you considered in forming this

18   report, materials that would also be part

19   of regulatory submissions in relation to

20   these products?

21        A.    I did not look at any

22   regulatory submission documents.

23        Q.    But that wasn't my question.

24              Would any of the documents

Anne Holland Wilson, MBA

1    you looked at be part of regulatory

2    submissions in relation to these

3    products?

4              A.    I'm not sure I can answer

5    this.  I have to go back through all of

6    the documents and see if they would be,

7    because I wasn't looking at it from a

8    regulatory submission aspect at all.

9                   So that would take

10   considerable amount of work to go back

11   and look at those documents and see if or

12   if not they were would be part of that.

13             Q.    Well, for example, you have

14   looked at several clinical expert

15   reports, I mean, there were -- at least

16   there's several on your reliance list.

17                  That's part of a regulatory

18   submission, isn't it?

19             A.    Not in the experience.

20             Q.    It's your experience that a

21   clinical expert report is not part of a

22   regulatory submission?

23                  MR. WALLACE:  Objection to

24        form.

Anne Holland Wilson, MBA

1              THE WITNESS:  Are you
2         talking a 510k?
3              I think I need more
4         information before I can answer
5         that question.
6              A regulatory submission is a
7         very, very broad statement.
8         There's different countries.
9         There's different -- you know,
10        there's U.S.  There's EU.  There's
11        Japan.  There's India.
12             I just don't know to what
13        you're speaking.
14   BY MR. COMBS:
15        Q.   Do you know if the clinical
16   expert reports that you reviewed, the two
17   of them that are on your reliance list,
18   do you know whether those were part of
19   regulatory submissions?
20        A.   I have no idea.
21        Q.   You looked at several CE
22   mark technical files.
23             Is that a regulatory
24   submission?

Anne Holland Wilson, MBA

1          A.    To whom?

2          Q.    To a notified body?

3          A.    Oh, you're not asking me.

4    That's not -- I don't -- that's a totally

5    different question.

6          Q.    Okay.  Well, that's the

7    question.

8          A.    What you started with is

9    saying that I was familiar with 510k

10   processes.  And I asked to clarify to

11   whom over and over again.

12               Now, if you are asking me a

13   different question, that's --

14         Q.    Ms. Wilson, I'm not trying

15   to trip you up here.  If my question is a

16   bad question or an unclear question,

17   okay, just tell me that and we'll start

18   over.

19         A.    It's very unclear.

20         Q.    Okay, so here's my question.

21               You looked at two clinical

22   expert reports.

23               Are clinical expert reports

24   part of a regulatory submission?

Anne Holland Wilson, MBA

1        A.    I can't answer that question

2   without knowing exactly to whom.

3        Q.    Okay.  You looked at two CE

4   mark technical files.

5              Is that a regulatory

6   submission?

7        A.    To whom?

8        Q.    To the notified body.

9        A.    The notified body may look

10   at a technical file.

11        Q.    Yes.  That's the purpose of

12   a technical file, isn't it?

13        A.    Yes.

14        Q.    I mean, that's --

15        A.    But I was not asked to look

16   at any submissions.  So I don't feel

17   comfortable talking about any

18   submissions.  I was asked to look at

19   design control and risk management.  And

20   that's my area of expertise.

21        Q.    But that's not my question.

22   My question is you have two CE mark

23   technical files on your reliance list.

24   They're part of the materials that you

Anne Holland Wilson, MBA

1    reviewed in forming that opinion.

2             Those two CE mark technical

3    files would be a regulatory submission

4    that was reviewed by a notified body,

5    wouldn't it?

6        A.    I'm sure the notified body

7    looked at those technical files, yes.

8             MR. WALLACE:  I mean, I

9             would just say for the record that

10            the FDA issue, I believe, has been

11            ruled upon by Judge Goodwin

12            several times.

13            But if you want to go there,

14            of course, that's your prerogative

15            at this point.

16            MR. COMBS:  Sure.

17   BY MR. COMBS:

18       Q.    And, in fact, that's the

19   whole purpose of the CE mark technical

20   filed being compiled, isn't it, to be

21   reviewed by the notified body?

22       A.    I don't see how that has any

23   bearing on what I have been asked to do.

24   I'm just unclear about that.

Anne Holland Wilson, MBA

1      Q.    Ms. Wilson, I understand

2   that's your opinion on it.

3      A.    Okay.

4      Q.    But if you can, answer my

5   question on that.

6            That's why you prepare --

7      A.    A technical file --

8      Q.    -- a CE mark technical file.

9      A.    -- is prepared for a

10  notified body's review.  Absolutely.

11     Q.    And several of the documents

12  that you relied on in forming your

13  opinion were, in fact, CE mark technical

14  files prepared in relation to TVT.

15     A.    They were technical files

16  for review to obtain a C mark.  They

17  weren't CE mark technical files.

18     Q.    And the CE mark was, in

19  fact, granted for those technical files,

20  wasn't it, for the products that were the

21  subject of the technical file?

22     A.    I do not know the answer.

23  I'm assuming so.  I didn't look at that

24  aspect.  I wasn't looking at CE mark as

Anne Holland Wilson, MBA

1    part of my report.

2         Q.    Earlier, I asked you if you

3    had conducted an audit.  You told me no.

4              So now I want to ask you

5    about the process that you engaged in.

6              Can you point me to any

7    published standards that would govern the

8    process that you were engaged in to

9    prepare this report.

10        A.    Published standards were a

11   part of my knowledge base, but there's

12   not a published standard that I'm aware

13   of that says how to prepare an expert

14   report.

15        Q.    And, obviously, I'm not

16   talking about, you know, for example, you

17   have a copy of ISO, you know, 1340.  I'm

18   talking about that.

19              I'm talking about any

20   published standards regarding this

21   process which you were engaged in to

22   prepare this report.

23        A.    I'm not aware, again, of any

24   standard that says how to prepare an

Anne Holland Wilson, MBA

1    expert report for a medical device

2    company.

3          Q.    In regard to what you did in

4    your report, you told me that it's not an

5    audit.  So I want to ask you some

6    questions about it.

7                Did you select a single

8    design project to prepare your report?

9          A.    Is that the QSIT guide you

10   have got there?

11         Q.    Yes.

12         A.    Yes, I'm familiar with the

13   QSIT guide.

14         Q.    Sure.

15         A.    So did I select a single

16   product?

17         Q.    Yes.

18         A.    The TVT-R is the product.

19         Q.    And for the TVT, did you

20   verify that design control procedures

21   that addressed the requirements of

22   Section 820.30 of the regulations had

23   been defined in the document?

24                MR. WALLACE:  Objection to

Anne Holland Wilson, MBA

1          form.  Outside the report.

2                    THE WITNESS:  I did not see

3          design control procedures in

4          accordance with 820.30.

5    BY MR. COMBS:

6          Q.    Is that part of your

7    analysis in this report?

8          A.    I did not see those

9    procedures.  And that's related to

10   statements in this report, yes.

11         Q.    Does the design control

12   process for TVT comply with 820.30?

13         A.    Not to my -- not in my

14   opinion, no.

15         Q.    Did you review the design

16   plan for the selected project to

17   understand the layout of the design and

18   development activities?

19         A.    I did not see a design plan,

20   to the best of my knowledge.

21         Q.    Did you confirm that design

22   inputs were established?

23         A.    I did see design inputs.

24         Q.    And did those design inputs

Anne Holland Wilson, MBA

1    comply with Section 820.30?

2          A.    Not in my opinion, no.

3          Q.    Did you verify that design

4    outputs that are essential for the proper

5    function of the device were identified?

6          A.    You know, I was told not to

7    go down the FDA path, that this wasn't

8    about the FDA.  So I did not look at

9    every single thing in the QSIT guide.

10              That's an inspection

11   technique for the FDA.  That is not an

12   audit or a methodology to prepare an

13   expert report.  Those are apples and

14   oranges.

15         Q.    Did you verify the design

16   outputs that are essential for the proper

17   functioning of the device were

18   identified?

19              MR. WALLACE:  Objection to

20         form.

21              THE WITNESS:  I did not

22         verify that outputs met inputs.  I

23         did not verify each output.  I did

24         not do a QSIT inspection.

Anne Holland Wilson, MBA

1    BY MR. COMBS:

2           Q.    Did you confirm that

3    acceptance criteria were established

4    prior to the performance of verification

5    of validation activities?

6           A.    I did not see those

7    performed prior to verification of

8    validation.  No, I did not.

9           Q.    Did you confirm that risk

10   analysis was performed?

11          A.    At what point in time?

12          Q.    Was any risk analysis

13   performed by Ethicon for TVT?

14          A.    Yes.  And it's stated in my

15   report.

16          Q.    Was risk analysis performed

17   by Medscand for TVT?

18          A.    Yes.  NE [ph] was performed.

19          Q.    And so it's your opinion

20   that -- well, what is your opinion?

21                Was the risk analysis

22   performed by Medscand sufficient?

23          A.    No, it was not.

24          Q.    Was the risk analysis

Anne Holland Wilson, MBA

1   performed by Ethicon sufficient?

2        A.    No, it was not.

3        Q.    And would that risk analysis

4   have been the subject of the audit

5   conducted by the notified body in regard

6   to TVT?

7        A.    I think you have to clarify

8   your question, please.

9        Q.    Okay.  I'll ask you more

10  about that.

11             Did you determine if design

12  reviews were conducted?

13       A.    At what point in time?

14       Q.    At any point for TVT.

15       A.    At any point in time, yes.

16       Q.    Were they, in fact,

17  performed?

18       A.    Yes.

19       Q.    And did you determine

20  whether design transfer occurred?

21       A.    I just don't recall seeing

22  anything, but I wasn't focusing on the

23  FDA 820.30 steps A through, you know,

24  every single input/output, things like

Anne Holland Wilson, MBA

1    that.

2         Q.    Those were not steps that
3    you considered in your report.

4         A.    Absolutely, I considered
5    them, but I wasn't focused on every
6    single thing, because I wasn't focused
7    specifically on the FDA regulations.

8              Of course, I looked at any
9    documents I had cited in my reports.

10        Q.    Your report does not reach a
11   conclusion as to whether this product did
12   or did not comply with Section 820.30,
13   does it?

14        A.    I would have to go back
15   through that.  But I don't think that I
16   specify 820.30 anywhere in this report.

17        Q.    And is it your opinion that
18   this product complies with 21 CFR
19   Section 820.30?

20        A.    The TVT-R mechanically cut,
21   as designed, I don't believe fulfills
22   those requirements.

23        Q.    And for what reasons?

24        A.    They're in my report.  Let's

Anne Holland Wilson, MBA

1    go find them.

2            So the original design, it's

3    a requirement in an original design back

4    in the -- I think that that was 1997 to

5    1999.  I think Ethicon purchased it

6    around '99.  The TVT-R, that's when those

7    design documents should have been, in

8    fact, established.

9            I looked at the design

10   history that was marked as design

11   history, also called the fact book.

12           I looked at the audits that

13   were performed within those.

14           And now I forgot the

15   question.  Could you repeat it, please.

16        Q.   Yeah.  My question was:  If

17   you hold the opinion that TVT did not

18   comply with Section 820.30, I want you to

19   tell me why.  Why did it not comply?

20        A.   Oh, I didn't see design

21   control documents at the point in time it

22   was designed.  I didn't see risk

23   analysis, risk -- I saw one application

24   risk analysis.  I didn't see a design

Anne Holland Wilson, MBA

1  risk analysis or FMEA done at the time it

2  was designed.  I saw subsequent things in

3  2001, 2002.

4          Q.    Anything else?

5          A.    I saw an audit performed of

6  Medscand by Ethicon that said in '96

7  there were nine major non-conformances

8  including specifications, including

9  design documentation.

10            I would have to look at that

11 exact piece of paper, but they were

12 major.

13            And then there was a

14 follow-up audit in 1998 that said, Oh,

15 well, those nine are fixed, but here's

16 nine more non-conformances.

17            So, to me, it looked like

18 there were still significant issues.

19          Q.    When was the design of TVT

20 completed?

21          A.    I know it was being sold in

22 Europe in -- can I look at my --

23          Q.    Yes.

24          A.    -- time line?

Anne Holland Wilson, MBA

1             It says October 1997 it was

2    released in EU.  So at that time I would

3    have expected to see design-related

4    documents and risk analyses.

5             And in the U.S., it was in

6    '98.  Certainly, by '99, when Ethicon

7    purchased it, there should have been some

8    documents, you know.  Perhaps somewhere

9    missing that I didn't see, but I didn't

10   see design risk analysis.

11        Q.    All right.  Now, the

12   question I had was:  When was the TVT

13   design completed?

14        A.    I didn't -- I don't know.  I

15   didn't see the documents.

16        Q.    Did you ask for them?

17        A.    I asked for all risk-related

18   documents.

19        Q.    How do you define

20   risk-related documents?

21        A.    Well, that would be any kind

22   of documents that are as defined in some

23   of the standards.  There are EN 1441.

24   There's that whole binder of standards is

Anne Holland Wilson, MBA

1    risk related.

2              The quality standards say

3    that you need to have -- management needs

4    to -- let's back up a little bit.

5              There's always been a

6    requirement for safe and effective

7    products.  So that means you have to

8    minimize risk.  Every manufacturer has to

9    do that.  And that has been as I cite in

10   my report.

11             When I was learning this

12   MIL Q 9858(a), it was back in the 1980s,

13   I was learning it, one of the revisions

14   came out in '63, one of them came out in

15   '59.

16             So this stuff has been a

17   long time coming.  This is not anything

18   new.

19             So all of those documents

20   and knowledge about risk and quality

21   systems I used in forming this.

22             And I would have expected to

23   see much more design -- I mean much more

24   risk management to show that this was a

Anne Holland Wilson, MBA

1   safe and reliable product device.

2        Q.    Ma'am, here's my question.

3   You said you asked for all risk-related

4   documents.

5        A.    I did.

6        Q.    What does that include?

7        A.    It would include any hazard

8   analysis, HAZOP analysis, risk analysis,

9   risk plans.

10       Q.    I'm sorry.  You need to slow

11  down.  I'm not as fast as you.

12             Hazard analysis?

13       A.    HAZOP.

14             And there's an annex in

15  14971 that was also in the predecessor

16  documents.  It's also in the textbook in

17  front of you that lists a variety of

18  techniques that can be used to analyze

19  risk.

20             So if we wanted to look at

21  that, we could go ahead and pull that

22  out.

23       Q.    And would that include, for

24  example, DDSAs?

Anne Holland Wilson, MBA

1          A.    To my knowledge, that must

2    be an Ethicon term.  That's not something

3    that is a universal medical device

4    terminology.

5          Q.    Is that a risk-related

6    document?

7          A.    Yes.

8          Q.    You said hazard analysis.

9    Would that include FMEAs?

10          A.    A hazard analysis could be

11    an FMEA.

12          Q.    What other risk-related

13    documents did you ask for?

14          A.    I asked for anything related

15    to risk management or risk analysis.

16    Anything on the topic whatsoever.

17          Q.    And are you comfortable that

18    you have all those documents?

19          A.    I am not a hundred percent

20    sure.  There could always be something

21    out there.  There was one thing in

22    Ms. Duncan's report that did not sound

23    familiar to me.

24          Q.    And what was that?

Anne Holland Wilson, MBA

1        A.    Due Diligence Project Tomlin

2   Checklist [ph].  I don't recall hearing

3   that at all.

4        Q.    Other than that, do you

5   believe that you had all of the

6   risk-related documents for TVT?

7        A.    To the best of my knowledge,

8   I asked for.

9        Q.    Your assumption is that you

10  have all.

11       A.    Yeah.  My assumption is I

12  do.

13       Q.    And if there are any you

14  didn't have, you tried to get them.

15       A.    Absolutely.

16       Q.    That was part of what you

17  were doing in this process, was trying to

18  assemble all of the risk-related

19  documents in order to form the basis for

20  your opinion?

21       A.    Right.  I focused on the

22  design.

23       Q.    In the United States, is

24  design control governed by 21 CFR 820?

Anne Holland Wilson, MBA

1          A.     820.30, in fact.

2          Q.     Ms. Wilson, you told us

3     about 21 820.30.

4                 What is that?

5          A.     I believe the title is

6     "Design Controls" of the Quality System

7     Regulations.

8          Q.     And is 21 CFR 820 the

9     section of federal regulations that are

10    related to medical devices?

11         A.     There are many things

12    related to medical devices, so that is a

13    subset.

14         Q.     Is it the subset that

15    involves quality system regulations?

16         A.     Correct.

17         Q.     And so, for example --

18                MR. WALLACE:  You have sort

19         of half a question pending.  So

20         I'll just note an objection and

21         just ask you to restart.

22                MR. COMBS:  Okay.  We'll

23         mark this as Exhibit 4.

24                     -  -  -

Anne Holland Wilson, MBA

1                    (Whereupon, Exhibit Wilson 4

2          was marked for identification.)

3                         -   -   -

4   BY MR. COMBS:

5          Q.    Ms. Wilson, we'll get you

6   your own copy.

7          A.    Would it be okay if I get my

8   reading glasses?

9          Q.    Of course.

10                        -   -   -

11                 (Whereupon, a discussion was

12         held off the record.)

13                        -   -   -

14  BY MR. COMBS:

15         Q.    Ms. Wilson, I think we had a

16  question that got interrupted, so we'll

17  just start back on this.

18                 Exhibit 4, that's part of

19  21 CFR 820, isn't it?

20         A.    This is some document that

21  says "LexisNexis."

22         Q.    And do you see that about

23  halfway down the page it "Section 820.1

24  Scope"?

Anne Holland Wilson, MBA

1           A.    Okay.  This is what -- this

2    is -- when they added -- I believe this

3    is when they added "Design Controls" to

4    820, and they did do that in 1997.

5           Q.    And 21 CFR 820.5 governs the

6    establishment of a quality system for a

7    manufacturer who is selling a medical

8    device in the United States, doesn't it?

9           A.    Gosh, I wish I -- can I look

10   through my own little code book?  820.5?

11           MR. WALLACE:  You have given

12        her -- she's not familiar

13        with LexisNexis.

14           THE WITNESS:  So Michie's

15        code or -- I don't know who Michie

16        is.

17           MR. WALLACE:  Can she look

18        at the actual code?

19           MR. COMBS:  Yeah, of course.

20           THE WITNESS:  I mean, or

21        I'll look if I have my own actual

22        code, but I don't know who Michie

23        is or LexisNexis.

24   BY MR. COMBS:

Anne Holland Wilson, MBA

1       Q.    Well, I'll represent to you

2   that that's a service that has legal

3   documents online.

4       A.    Okay.  Well, I'm not a

5   lawyer, so we -- I'm just going to look

6   if I have any own little code book.

7             And voila, I have the

8   official Code of Federal Regulations.

9             And so may I use this?

10      Q.    Of course.

11      A.    Now, what was your question

12  again?

13      Q.    My question was:  Is 820.5

14  the section that establishes the

15  regulations or quality systems for

16  manufacturers that are selling medical

17  devices in the United States?

18      A.    Yes.  820.5 says, Each

19  manufacturer shall establish and maintain

20  a quality system that is appropriate for

21  the specific medicinal device -- sorry --

22  medical device designated or manufactured

23  and that meets the requirements of this

24  part.

Anne Holland Wilson, MBA

1      Q.    And one of the things that's

2   the subject of your report is whether

3   Ethicon's quality system for TVT is

4   adequate, isn't it?

5      A.    Not -- I did not look

6   specifically with respect to the FDA, but

7   I did look at the adequacy of the quality

8   management system.

9      Q.    And that's one of the things

10  your opining on in this case.

11     A.    Not specifically with the

12  FDA, but yes.

13     Q.    And one of the things that

14  you're opining on in this case is

15  Ethicon's design controls, isn't it?

16     A.    Yes, sir.

17     Q.    And it's your opinion that

18  Ethicon's design controls are inadequate,

19  isn't it?

20     A.    From what I saw, I believe

21  them to be inadequate for the TVT-R

22  mechanically cut mesh.

23     Q.    And 21 CFR 820.30 is the

24  federal regulation that sets the

Anne Holland Wilson, MBA

1    standards for design controls for medical

2    device manufacturers that are selling

3    medical devices in the United States,

4    doesn't it?

5        A.    820.30, right here, is

6    entitled "Design Controls."  And it's in

7    21 CFR 820.  Yes.

8        Q.    And, A, it says, General,

9    Each manufacturer, and then, a Class II

10   device.

11            Ethicon is a manufacturer of

12   TVT, isn't it?

13       A.    Yes.

14       Q.    TVT is a Class II device?

15       A.    My understanding, yes.

16       Q.    Do you know whether a TVT is

17   a Class II device?

18       A.    Yes.

19       Q.    Do you know what it is in

20   Europe?

21       A.    I don't.  I was not looking

22   at the regulatory pathways.

23       Q.    All right.  And what it says

24   is, Shall establish and maintain

Anne Holland Wilson, MBA

1    procedures to control the design of the

2    device in order to ensure the specified

3    design requirements are met.

4                        That's in 820.30 (a) isn't

5    it?

6             A.     Yes.

7             Q.     And 820.30 includes sections

8    on design and development planning,

9    design input, design output, design

10   review, design verification, design

11   validation, design history files, doesn't

12   it?

13            A.     It does say, in design

14   review.

15                        The design history files is

16   in a different section of the

17   regulations, it's back here under

18   records.

19                        So the device history record

20   is not discussed until 8 -- oh, that's

21   the device history file.

22                        So the design history file,

23   excuse me, is called out in 820.30.

24            Q.     And if we can just go back

Anne Holland Wilson, MBA

1  to my question, the question I asked you

2  was:  820.30 establishes requirements

3  regarding it has subsections.

4       A.    Right.

5       Q.    The subsections include

6  design and development planning, design

7  input, design output, design review,

8  design verification, design validation,

9  design transfer, design changes, and

10  design history files, don't they.

11       A.    Yes.

12            MR. WALLACE:  Objection to

13       form.

14  BY MR. COMBS:

15       Q.    And in your opinion in this

16  case, you're opining on matters that are

17  covered by 820.30, aren't you?

18            MR. WALLACE:  Objection to

19       form.

20            THE WITNESS:  I'm looking at

21       also things that are in 13485

22       which covers 90 percent of the

23       same.

24            If you looked at -- if you

Anne Holland Wilson, MBA

1          opened ISO 13485, it also talks

2          about those same things.

3     BY MR. COMBS:

4          Q.    Okay.  But --

5          A.    So I'm talking about in

6     general regulatory quality management

7     system requirements.  So it's not

8     specific to 820.30.

9          Q.    But that wasn't my question.

10          You have opinions in your

11    report that relate to the subjects that

12    are regulated by 820.30, don't you?

13               MR. WALLACE:  Objection to

14          form.

15               THE WITNESS:  I have talked

16          about design control in my report

17          and I have cited 13485.  I have

18          not been talking about 820.30.

19    BY MR. COMBS:

20          Q.    I understand.

21          A.    They have the same topics,

22    though.

23               Is that what you're asking?

24          Q.    And so the topics that for

Anne Holland Wilson, MBA

1    example -- okay.

2          A.    Could we just pull that out?

3          Q.    No.  No.  What I'm -- we're

4    talking about 820.30.

5          A.    All right.

6          Q.    The issues that you're

7    opining on in your report are also

8    addressed by 820.30, aren't they?

9               MR. WALLACE:  Objection to

10         form.  Argumentative.

11              THE WITNESS:  The 13485 and

12         21 CFR 820 Design Controls are

13         approximately the same.

14              I'd have to compare them

15         word to word to tell you what

16         differences there are.

17   BY MR. COMBS:

18         Q.    But, again, that's not my

19   question.

20              I mean, my question is:  You

21   have opinions regarding design controls.

22         A.    Absolutely.

23         Q.    And you have opinions

24   regarding risk analysis, don't you --

Anne Holland Wilson, MBA

1        A.     Yes.

2        Q.     -- in this case?

3               So, for example, you have

4    opinions that Ethicon's design controls

5    were inadequate, don't you?

6        A.     Yes.

7        Q.     You have opinions that

8    Ethicon's risk analysis related to TVT

9    was inadequate, don't you?

10       A.     Yes.

11       Q.     You have opinions that the

12   documentation in the design history file

13   was inadequate for TVT, don't you?

14       A.     I don't believe I said that

15   exactly in my report.

16       Q.     Okay.  Well, let's start

17   with you have --

18       A.     I think that was not quite

19   what I put in my report.

20       Q.     All right.  So you have --

21   so is it your opinion that the design

22   history file for TVT was adequate?

23       A.     No.  That's not also what I

24   said.

Anne Holland Wilson, MBA

1           Q.    Okay.  You would agree with

2    me that design controls are a subject

3    that is regulated by 820.30, wouldn't

4    you?

5           A.    Yes.

6           Q.    And you would agree with me

7    that risk analysis for medical devices

8    sold in the United States is a subject of

9    your report, wouldn't you?

10               MR. WALLACE:  Objection to

11         form.

12               THE WITNESS:  Could you

13         re-ask that question.

14   BY MR. COMBS:

15          Q.    You would agree with me that

16   risk analysis is one of the subjects of

17   your report.

18          A.    It is one of the subjects of

19   my report, true.

20          Q.    And risk analysis is also

21   regulated by 820.30 subsection (g), isn't

22   it?

23               MR. WALLACE:  Objection to

24         form.

Anne Holland Wilson, MBA

1            THE WITNESS:  That is not

2       specifically true.

3  BY MR. COMBS:

4       Q.    So is it your opinion that

5  risk analysis is not governed -- strike

6  that.

7            For a manufacture in the

8  United States that's selling medical

9  devices in the United States, is it your

10 opinion that risk analysis is not

11 governed by 820.30 subsection (g)?

12           MR. WALLACE:  Objection to

13      form.

14           THE WITNESS:  It says right

15      in subsection (g) the words "risk

16      analysis."  So...

17 BY MR. COMBS:

18      Q.    I mean, that's one of the

19 subjects that's regulated by the FDA in

20 820.30 subsection (g), isn't it?

21           MR. WALLACE:  Objection to

22      form.

23           THE WITNESS:  In 820.30

24      subsection (g), it talks -- in

Anne Holland Wilson, MBA

1          Design Validation, it does talk

2          about risk analysis.

3     BY MR. COMBS:

4          Q.    And 820.30 subsection (j)

5     addresses design history file, doesn't

6     it.

7          A.    Yes, it does.

8          Q.    That's one of the subjects

9     that's regulated by the FDA through

10    820.30, isn't it --

11              MR. WALLACE:  Objection.

12    BY MR. COMBS:

13         Q.    -- the adequacy of the

14    design history file?

15              MR. WALLACE:  Objection to

16         form.

17              THE WITNESS:  The FDA does

18         say that you shall establish a

19         design history file, and so does

20         the -- and so do the international

21         regulations.  They just don't use

22         the exact same words.

23    BY MR. COMBS:

24         Q.    And the place where the FDA

Anne Holland Wilson, MBA

1    says that is what we marked as Exhibit 4,

2    it's the 820.30 subsection (j), isn't it,

3    Design History File, Each manufacturer

4    shall establish and maintain a DHF for

5    each type of device?

6               MR. WALLACE:  Objection to

7          form.

8               THE WITNESS:  It does say

9          that, yes.

10   BY MR. COMBS:

11        Q.    But my question was:  That's

12   the regulation by which the FDA is

13   regulating design history files, isn't

14   it?

15               MR. WALLACE:  Objection to

16          form.

17               THE WITNESS:  Yes.  This is

18          the Code of Federal Regulation.

19          In the Code of Federal Regulation,

20          820.30 (j), the topic is Design

21          History File.

22               I don't know how much more

23          clear I can be.

24   BY MR. COMBS:

Anne Holland Wilson, MBA

1        Q.    Okay.  And design control

2   risk analysis and design history files

3   are all regulated through that

4   provision --

5              MR. WALLACE:  Objection to

6         form.

7   BY MR. COMBS:

8         Q.    -- in United States, aren't

9   they?

10             MR. WALLACE:  Objection to

11        form.  Asked and answered.

12             THE WITNESS:  I believe I

13        have answered that several times.

14   BY MR. COMBS:

15        Q.    Okay.  Then the answer is

16   yes.

17             MR. WALLACE:  Objection to

18        form.

19             THE WITNESS:  There are

20        many, many places that risk

21        analysis is also called out in the

22        preamble of the Code of Federal

23        Regulations, and not just

24        narrowly.

Anne Holland Wilson, MBA

1        Those are the only two words
2        that made it into the final, but
3        there's many times in the preamble
4        that it talks about risk.
5    BY MR. COMBS:
6        Q.    So there are other federal
7    regulations that also --
8        A.    In the preamble.  That is
9    not the actual code, but this is -- those
10   are the two words that got into the code
11   under quality management systems.
12       Q.    And is the -- strike that.
13             And --
14       A.    And ISO 14971 is a
15   harmonized standard.  So to isolate it as
16   such is challenging.
17             MR. WALLACE:  Can we take a
18       break now?
19             MR. COMBS:  Let's just
20       finish this question.
21   BY MR. COMBS:
22       Q.    I just want to ask this
23   question to make sure that we're clear on
24   this.

Anne Holland Wilson, MBA

1              Design controls risk

2    analysis and design history file are all

3    regulated in 820.30, aren't they?

4              MR. WALLACE:  Objection to

5         form.

6              THE WITNESS:  They are.

7              MR. COMBS:  We'll take a

8         break now.

9              THE WITNESS:  Please.

10                   -  -  -

11             (Whereupon, a brief recess

12        was taken from 10:33 a.m. to 10:46

13        a.m.)

14                   -  -  -

15   BY MR. COMBS:

16        Q.   Ms. Wilson, have you

17   reviewed any of the documents that were

18   referenced in Ms. Duncan's report, I

19   mean, other than the ones that were on

20   your reliance list?

21        A.   I'm sorry.  I really

22   couldn't hear you.

23        Q.   I'm sorry.  I can be kind of

24   quiet sometimes.

Anne Holland Wilson, MBA

1                You told us earlier -- and

2     we marked as Exhibit 3 Ms. Duncan's

3     report.

4          A.    Right.

5          Q.    Did you review any documents

6     that were cited in Ms. Duncan's report

7     that weren't on your reliance list?

8          A.    Not to my knowledge.

9          Q.    I wanted to ask you a

10    question about when the design for TVT-R

11    was completed.

12                Do you remember I asked you

13    that question, you said you didn't

14    remember exactly when?

15         A.    I don't believe that was my

16    answer.

17         Q.    Well, I'm paraphrasing.

18                Do you remember whether the

19    TVT-R design was completed?

20         A.    I said I don't know, because

21    I didn't see those documents, that I'm

22    aware of.

23         Q.    And here's what I wanted to

24    ask you.

Anne Holland Wilson, MBA

1          Does the fact that the audit

2  was completed in 1996, would that

3  indicate that the design was completed at

4  the time that the audit was conducted?

5          A.    What audit are you speaking

6  of?

7          Q.    I'm talking about the audit

8  that Johnson & Johnson's quality

9  assurances department performed on

10 Medscand and which they reported

11 December 12th, 1996?

12          A.    Not necessarily.  Those are

13 not necessarily the same.

14          Q.    Do you know whether the

15 design was completed at the time that

16 audit was performed?

17          A.    I don't know.

18          Q.    Ms. Wilson, what -- strike

19 that.

20          In the reports -- strike

21 that.

22          In the standards that you

23 relied on, where in those standards does

24 it establish the requirement that a

Anne Holland Wilson, MBA

1    design history file be maintained?

2         A.    They just call it something

3    different.  There's a requirement that

4    there's a compilation of all the

5    documents relating to the specific device

6    design.

7         Q.    And --

8         A.    I could show you, if I

9    could open this.

10        Q.    Yeah, sure.  I would like to

11   know what you're referring to.

12        A.    Sure.  Is there a specific

13   year or time frame you're talking about?

14        Q.    Well, in your report, you

15   said that, In April of 1999, Ethicon

16   purchased Medscand.  I reviewed the

17   design history file, also known as TVT

18   fact book and found it to be lacking

19   critical documentation.

20             So let's start with in 1999.

21   What was the requirement that set forth

22   that a company had to have a design

23   history file?

24        A.    Well, any of the quality

Anne Holland Wilson, MBA

1    management system standards.

2         Q.    And before you do that, let

3    me just make sure that I understand.

4              Are the words "design

5    history file" actually used in these

6    standards?

7         A.    No.  It's the same intent,

8    same content, but the words "design

9    history files" were used by Johnson &

10   Johnson in that audit, and it was found

11   deficient in 1996.

12             And they were also used in

13   the fact book.  It says, "design

14   history."

15             And in that audit, it said,

16   "Design history file."

17             So I used the terminology

18   used.

19             It is a requirement of the

20   exact same, you know, requirements.

21        Q.    And I just want to make sure

22   I understand.

23             Is basically the compilation

24   of documents that's referenced in the

Anne Holland Wilson, MBA

1    international standards that you're

2    looking at right now, is that basically

3    the same as the design history file?

4          A.    May I show you?

5          Q.    Yes.

6          A.    I thought that's what you

7    asked.

8                I'm just going through the

9    sections of the planning inputs, outputs,

10   review, verification, validation.  I'm

11   trying to locate the specific.

12               It's in the documentation

13   requirement, in Section 4.2.  And if you

14   look in the blue text, that will show you

15   where it is.

16         Q.    And just so the record will

17   be clear, what you're referring to is

18   International Standard 13485:2003 (e).

19               And you're looking at 4.2.2.

20         A.    I think it's 4.2.1.

21         Q.    Okay.  Sorry.

22               And you're referring us to

23   subsection (f) of that.

24         A.    That's -- yeah.  But all of

Anne Holland Wilson, MBA

1    these documents, and that's the specific

2    that says for a specific product.

3        Q.    And it's your testimony that

4    a compilation of documents that is

5    discussed in that regulation is

6    essentially the same as the DHF.

7        A.    Right.  And then you go into

8    the design controls in the same sections.

9    You know.  It talks about planning,

10   inputs, outputs, design reviews.

11            And those records, it refers

12   back to this section in 4.2 to say that,

13   yes, you need to keep those documents.

14            So throughout, as you go

15   through the design control aspect of this

16   standard -- may I show you?

17       Q.    Yes.

18       A.    It just says and -- and

19   that's 7.3.

20            If you go through 7.3, say

21   Design Review, for example, which is

22   7.3.4., Record of the results of these

23   reviews and necessary actions shall be

24   maintained.  And it says that throughout.

Anne Holland Wilson, MBA

1           So it points you back to

2    that section of 4.2.

3           Q.    So as a technical matter,

4    Medscand would not have had a requirement

5    to have a design history file, because it

6    wasn't an American manufacturer, but you

7    are saying that the equivalent of that is

8    imposed with ISO 13485.

9           A.    It's -- it's -- yeah.  It's

10   the same thing.

11          Q.    And a compilation of

12   documents is what is meant by the design

13   history file requirement in 820.30 (j).

14          A.    All of the standards require

15   that manufacturers -- I mean, we don't

16   need anything to do with the FDA.  This

17   is a standard that certainly says that

18   you have to keep the history and the

19   specifications associated with a product.

20          Q.    Now, would you agree that

21   the reason that companies comply with ISO

22   standards is to comply with regulatory

23   requirements?

24          A.    Well, they have to -- to get

Anne Holland Wilson, MBA

1    their products on the market, it's the

2    path of least resistance, may I say.

3    That's what the notified bodies are

4    expecting.

5                    So, right.  So if you want

6    to be a player in the medical device

7    field, you need to have a quality

8    management system.

9            Q.    And, companies -- strike

10   that.

11                   The ISO standards,

12   themselves, are intended to be used by

13   regulatory bodies, aren't they?

14                   MR. WALLACE:  Objection to

15           form.

16                   THE WITNESS:  That's one

17           way.  You don't have to use those

18           standards.  You can come up with

19           your own method.

20                   But if you do you use those

21           international standards, then

22           you're basically -- the

23           presumption is conformance.  So

24           that's what your notified bodies

Anne Holland Wilson, MBA

1        are used to looking at.

2              So if you want to make your

3        own up, you can.  It's just...

4    BY MR. COMBS:

5        Q.    And that was the impetus for

6    creating the ISO standards, was to have a

7    set of standards that could be used for

8    regulation of devices in Europe.

9        A.    It was to set forth a

10   standard set of quality management

11   systems, so people would know what they

12   were supposed to do.

13       Q.    For the purposes of

14   marketing devices in Europe.

15             MR. WALLACE:  Objection to

16        form.

17             THE WITNESS:  This isn't

18        just for Europe, but it is for --

19        it's used pretty much throughout

20        the world.

21   BY MR. COMBS:

22       Q.    One of the standards that

23   you reference in your report is

24   BS EN 1441 --

Anne Holland Wilson, MBA

1          A.     Correct.

2          Q.     -- isn't it?

3                 Now, that standard was

4    initiated pursuant to a directive from

5    the EU Council Directive, wasn't it?

6          A.     The EN standards are all

7    initiated from the EU Council Directive,

8    right.

9          Q.     And just to make sure

10   everybody understands, the EU Council

11   Directive, that's the governing

12   regulatory body in Europe, isn't it?

13         A.     The EU is the European Union

14   Direct Council, yeah.  So it's the

15   committee for the European Union.

16         Q.     And the EU Council Directive

17   directed CEN to come up with that

18   standard to be used in European

19   regulatory submissions, didn't it?

20         A.     Could you repeat that

21   question.

22         Q.     The EU Council Directive

23   directed CEN to write standards,

24   including 1441, that would be used for

Anne Holland Wilson, MBA

1  European regulatory submissions, didn't

2  it?

3           A.    All the EN standards do come

4  through that committee and have to do

5  with the medical device central

6  requirements.

7                So the EN -- anything that

8  says EN on it does come through that

9  pathway.

10          Q.    So --

11          A.    I'm trying to answer your

12  question.

13          Q.    You did answer it.  Thank

14  you.

15                If it's an EN standard, it

16  was written and established pursuant

17  to --

18          A.    The CEN/CENELEC Group.

19          Q.    Exactly.  The 1993

20  instructions from the Council Directive

21  that go forth and write these standards.

22          A.    And then they have to be

23  approved, yes.  And they have to be

24  published, and then specific countries

Anne Holland Wilson, MBA

1    can adopt them.

2         Q.    Now, the ISO standards that

3    you have referenced, for example, one of

4    them was 13485; is that correct?

5         A.    Yes.

6         Q.    And 13485 sets forth the

7    medical devices quality management

8    systems requirements for regulatory

9    purposes, doesn't it?

10        A.    Yes.  That's in the title.

11        Q.    And, I mean, that's the

12   purpose of 13485, isn't it?

13        A.    I believe I answered what

14   the purpose of 13485 was already, sir.

15        Q.    All right.  In your report

16   at page 4, subsection 1, you give the

17   title of ISO 13485, don't you?

18        A.    Yes.

19        Q.    And the title that is

20   ISO 13485 - Medical Devices Quality

21   Management Systems, Requirements for

22   Regulatory Purposes, isn't it?

23        A.    Yes.

24        Q.    And in the scope of 13485,

Anne Holland Wilson, MBA

1    it states, This international standard

2    specifies requirements for quality

3    management system where an organization

4    needs to demonstrate its ability to

5    provide medical devices and related

6    services to consistently meet customer

7    requirements and regulatory requirements

8    applicable to medical devices and related

9    services, doesn't it?

10          A.    May I look at my copy?

11          Q.    Sure.

12          A.    I have the EN ISO version

13   here.  Let's see.

14                And you were reading the --

15          Q.    The scope.  Scope 1.1.

16          A.    Okay.  It does say that.

17          Q.    And, in fact, throughout

18   13485, it talks about regulatory

19   requirements, doesn't it?

20          A.    Yes.  That's -- that's what

21   it says.

22                Do you know the reason that

23   it's that way?

24          Q.    You know, I'm sure --

Anne Holland Wilson, MBA

1          A.     You don't want to know.

2          Q.     I'm sure Mr. Wallace will

3     ask you a lot of questions.

4               One of the other standards

5     that you discuss in your report is 14971,

6     isn't it?

7          A.     Yes.  Several versions are

8     out here.

9          Q.     Is it correct that the

10    purpose of 14971 was, quote, A standard

11    for the application of risk management to

12    medical devices became important largely

13    because of the increased recognition by

14    regulators that the manufacturers should

15    apply risk management to medical devices.

16              No medical device risk

17    management standard existed, and ISO

18    14971 was written to fill that gap.

19         A.     Where are you reading from?

20    Because there have been many standards

21    about risk over the years.

22         Q.     Okay.  So --

23         A.     And I cited EN 1441 and

24    before that there were others.

Anne Holland Wilson, MBA

1               MR. COMBS:  We'll mark this

2          as 5.

3                    -   -   -

4               (Whereupon, Exhibit Wilson 5

5          was marked for identification.)

6                    -   -   -

7     BY MR. COMBS:

8          Q.    On page X, at the bottom --

9          A.    So now we're looking at the

10    American version of an ISO standard --

11         Q.    Okay.

12         A.    -- which I did not look at

13    the American version in preparation of

14    this report.

15         Q.    Were you looking at the

16    European version?

17         A.    I was looking at the ISO and

18    EN ISO versions, because that was the

19    focus.  I'm not sure it matters, but --

20         Q.    And EN is what you told us

21    about earlier.  That would be the

22    standards that were done, pursuant to the

23    EU Council Directive?

24         A.    That's right.

Anne Holland Wilson, MBA

1      Q.    Page X.

2      A.    Here it is.

3      Q.    And just it was the first

4  two sentences of that.

5      A.    (Witness reviewing

6  document.)

7            Well, it was an EN standard

8  about risk management prior to ISO 14971.

9            So the fact that there was

10  none, I don't believe to be true.  There

11  is -- maybe there was not an ISO made by

12  a working group, but if you look in this

13  binder, there's the EN 1441.

14      Q.    And that's what we talked --

15      A.    That is cited in the Ethicon

16  procedures and in the other report.

17      Q.    And that's the standard that

18  we talked about earlier, the one --

19      A.    Yeah.

20      Q.    -- done pursuant to the EU

21  Council Directive.

22      A.    Yeah.  It's an EN standard.

23      Q.    And so here, in the

24  introduction, what they say is that 14971

Anne Holland Wilson, MBA

1    was written because of increased

2    recognition by regulators, that the

3    manufacturer should apply risk management

4    to medical devices, no medical device

5    risk management standard existed, and ISO

6    14971 was written to fill that gap.

7           A.    That's what it says, yes.

8           Q.    And you disagree with that?

9           A.    I'm just saying that there

10   are other standards and there always have

11   been related to safety and reliability.

12          I have worked in -- I

13   remember working in oximeters, and we did

14   all kinds of stress screening and we did

15   mill standard evaluation and capacitor

16   de-rating, all kinds of things for safety

17   and reliability, and those kind of

18   things, regardless of -- and there were

19   increasing number of issues that were

20   coming up in the time frame of the first

21   14971-1.

22          So that could have been what

23   they were referring to.  But there always

24   have been standards out there.

Anne Holland Wilson, MBA

1          Q.     And what they're saying is

2     that the impetus to write 14971 was to

3     provide additional standard for

4     regulators.

5          A.     Yeah.   I can't speak to the

6     impetus for regulators.   I'm not a

7     regulator.

8          Q.     Ms. Wilson, as part of the

9     process of receiving the CE mark,

10    Medscand and then Ethicon would have been

11    inspected by a notified body, wouldn't

12    it?

13         A.     You do need to have a

14    notified body come in and look at your

15    quality management system.

16         Q.     And as part of that, the

17    notified body conducts an audit, doesn't

18    it?

19         A.     They do.

20         Q.     And one of the things the

21    notified body does is determine whether

22    the manufacturer is complying with

23    international standards, isn't it?

24         A.     But the notified -- QA

Anne Holland Wilson, MBA

1   Consulting is certified to ISO 13485 with

2   ISO 9001.  So we do have auditors come in

3   and look at our system.

4            And what they do is they

5   come in and make an assessment based on

6   your procedures and some records to make

7   their best determination at a given point

8   in time whether you complied with those

9   regulations.

10       Q.    And, in fact, you know that

11  Medscand was audited by the notified

12  body, wasn't it?

13       A.    May I look at that document?

14       Q.    Yes.

15            MR. COMBS:  We'll mark this

16       as 6.

17            THE WITNESS:  I don't

18       remember the clear -- actually

19       took place and the address and

20       stuff.

21            So I may have to look at

22       that.

23                 -  -  -

24            (Whereupon, Exhibit Wilson 6

Anne Holland Wilson, MBA

1          was marked for identification.)

2                  -   -   -

3  BY MR. COMBS:

4          Q.    Ms. Wilson, here's a copy

5  for you.

6          A.    Thank you.

7                1997 to '99.  Okay.  This

8  was -- oh, I'll read the next page.

9                I did not look at this

10  Annex A to that, or I don't remember

11  looking at the Annex A or anything about

12  the you Cytobrush.

13                Okay.

14          Q.    Did you have a chance to

15  review Exhibit 6?

16          A.    I looked at the parts

17  relating to the TVT, not the Uterobrush

18  or whatever.

19          Q.    And on the first page of

20  Exhibit 6, is that an EC certificate?

21          A.    Yes.

22          Q.    And it was granted to

23  Medscand Medical?

24          A.    That's what it says, yes.

Anne Holland Wilson, MBA

1    Q.    And Medscand Medical was the

2    manufacturer of TVT?

3    A.    In 1997, yes.  1997, it was.

4    Q.    And --

5    A.    I think that's when they

6    went into their agreement, somewhere in

7    1997.

8    Q.    And does the certificate

9    reflect that the certificate was granted

10   and approved in conformity with the

11   requirement of Annex II, Section 3.2,

12   Full Quality Assurance System of Council

13   Directive 93/42/EEC, concerning medical

14   devices?

15   A.    That's exactly what it says.

16   Q.    And the scope of the

17   certification included the design,

18   manufacture, final inspection, and

19   distribution of the TVT device in

20   Class IIb for tension-free vaginal tape

21   procedure.

22   A.    That's what it says.

23   Q.    And it was issued on

24   February 10th, 1997, and then revised

Anne Holland Wilson, MBA

1    on --

2         A.    I think it was October 2nd.

3         Q.    And then revised on

4    September 23, 1999?

5         A.    Yeah.  I don't -- the

6    revision date says that.  I don't see a

7    revised certificate here.  Maybe it's

8    here.

9         Q.    If you could turn to the

10   fourth page of that.

11              Is that the quality system

12   certificate?

13        A.    Yes.

14        Q.    And that would have been

15   issued by the Danish regulators --

16   Swedish regulators?

17        A.    It's cut off, but DS

18   standard -- Dansk.

19        Q.    So the finding of those

20   regulators was that Medscand fulfilled

21   the requirements of DS/EN ISO 9001

22   1994/DS EN ISO 46001:1996?

23        A.    Correct.

24        Q.    And that finding was in

Anne Holland Wilson, MBA

1    regard to the design manufacturer final

2    inspection and distribution of urinary

3    incontinence instruments including the

4    TVT system?

5           A.    And related products.

6           Q.    And the entire --

7           A.    And single-use medical

8    devices for sampling of cells, tissues,

9    body fluids, and hereto-related products,

10   whatever the hereto-related products are.

11          Q.    Okay.  And then it says

12   right below, The certificate is granted

13   in conformity with the DS rules for the

14   certification of quality systems?

15          A.    It -- yes, it says that.

16          Q.    The auditors -- strike that.

17                The regulators that

18   conducted this audit, they came to the

19   conclusion that Medscand was in

20   conformance with the ISO standards at the

21   time that they issued this certificate,

22   didn't they?

23          A.    That's what this document

24   says.

Anne Holland Wilson, MBA

1          Q.    I mean, that would have been

2     the whole purpose of their review, wasn't

3     it?

4                    MR. WALLACE:   Objection to

5          form.

6                    THE WITNESS:   Could you

7          restate that question.

8     BY MR. COMBS:

9          Q.    The regulators, the purpose

10    of their review would have been to see if

11    Medscand complied with the ISO standards.

12         A.    The purpose of any review --

13    the whole purpose would not be just to do

14    that, no.

15         Q.    Would that be a purpose?

16         A.    A purpose, yes.

17         Q.    Would that be one of the

18    tasks that they engaged in during this

19    audit?

20         A.    Could you say the whole

21    question.

22         Q.    Yes.

23         A.    Thanks.

24         Q.    Was one of the jobs that the

Anne Holland Wilson, MBA

1  regulators were doing, to make a

2  determination of whether Medscand

3  complied with the ISO requirements in

4  September of 1999?

5            MR. WALLACE:  Objection to

6       form.

7            THE WITNESS:  I think it

8       says September of 1997.

9  BY MR. COMBS:

10       Q.   Well, on the front, the

11  first page of Exhibit 6, they say it was

12  first issued in October of 1997.

13       A.   Okay.  So one of -- yes.

14  One of the things that the regulators

15  were looking at would have been

16  compliance to these standards.

17       Q.   And it was the regulators'

18  determination that Medscand was in

19  compliance with ISO standards at that

20  time.

21            MR. WALLACE:  Objection to

22       form.

23            THE WITNESS:  The

24       certificate, Exhibit 6, documents

Anne Holland Wilson, MBA

1          that that's what the regulators

2          found.

3    BY MR. COMBS:

4          Q.    And --

5                MR. COMBS:  This is

6          Exhibit 7.

7                     -  -  -

8                (Whereupon, Exhibit Wilson 7

9          was marked for identification.)

10                    -  -  -

11   BY MR. COMBS:

12         Q.    And I have handed you what's

13   been marked as Exhibit 7 -- or the court

14   reporter has handed you what's been

15   marked Exhibit 7.

16         A.    Okay.

17               MR. COMBS:  Thank you.

18   BY MR. COMBS:

19         Q.    And what's Exhibit 7?

20         A.    It says it's a Certificate

21   TUV.

22         Q.    And TUV is a notified body,

23   aren't they?

24         A.    Yes.  It's a different

Anne Holland Wilson, MBA

1   notified body than the prior certificate.

2         Q.    And TUV was certifying

3   Ethicon SARL; is that correct?

4         A.    Right.  I don't know what

5   SARL is, but it's a location of Ethicon,

6   I believe.

7               I don't know where that --

8   it must be in Germany.  Neuchatel?  I

9   don't know where that is.

10        Q.    And at some point in 2000,

11  manufacture of the TVT device was

12  transferred from Medscand to Ethicon,

13  wasn't it?

14        A.    I do believe I read that.

15        Q.    And after that, after the --

16  strike that.

17              After the manufacturing was

18  transferred to Ethicon, Ethicon had to

19  get certified by the notified body

20  regarding the manufacture of TVT, didn't

21  it?

22        A.    I'm not exactly sure how

23  that works for new products within an

24  existing qualified facility.

Anne Holland Wilson, MBA

1              But I -- to be honest, it

2    looks like they had one.  I don't know if

3    it was part of their routine one or if it

4    was because they moved a new product.

5              So I can't answer your

6    question directly.

7         Q.    And what TUV did was they

8    conducted an audit of urinary stress

9    incontinence device TVT and accessories,

10   didn't they?

11        A.    That's what it says here,

12   yes.

13        Q.    And they were auditing

14   Ethicon SARL?

15        A.    That's what it says.

16        Q.    And the notified body

17   concluded that Ethicon SARL in relation

18   to TVT had established and is maintaining

19   a quality system which meets the

20   requirements of the EN 460061:1996 and

21   includes ISO 9001:1994, didn't they?

22        A.    Yeah.  That's what this

23   says.

24              You know, as part of a

Anne Holland Wilson, MBA

1   consultant, I have seen a lot of

2   certificates.

3          One thing that's interesting

4   is you can have these, but that doesn't

5   mean that everything is exactly working

6   as intended.

7      Q.    Okay.  And that was the

8   conclusion drawn by the regulators --

9      A.    Correct.

10     Q.    -- at TUV, wasn't it?

11          MR. WALLACE:  Objection to

12     form.

13  BY MR. COMBS:

14     Q.    And if you turn the page --

15  turn it over -- on the second page, the

16  regulators state that, For the

17  products/product categories:  Urinary

18  stress incontinence TVT device, quote,

19  Maintains a quality system, which ensures

20  that the product conforms with the

21  essential requirements of the Directive,

22  which apply to them at every stage from

23  design to final controls, doesn't it?

24          MR. WALLACE:  Objection to

Anne Holland Wilson, MBA

1    form.

2            THE WITNESS:  This does say

3    that.  I'm not sure exactly if

4    this was -- what TVT this was.

5            So this was -- but that's

6    what this says, TVT devices.

7    Doesn't say anything about the

8    accessories, though, or the

9    system, so...

10  BY MR. COMBS:

11          Q.   It says, For the product

12  categories, quote, urinary stress

13  incontinence (TVT) device.

14          MR. WALLACE:  Are you just

15  asking her to say that -- the

16  document says what it says.

17          You can't ask her to

18  interpret a document that you

19  haven't yourself even

20  authenticated.

21          We have no idea where this

22  is coming from.

23          She will agree that the

24  words on the page say what they

Anne Holland Wilson, MBA

1    say, right?

2            MR. COMBS:  Okay.

3            MR. WALLACE:  I mean, is

4    that what you're asking?

5            MR. COMBS:  No.

6  BY MR. COMBS:

7        Q.    Are you --

8        A.    That's all I'm doing is

9  reading what you're saying and --

10       Q.    I understand.

11       A.    -- agreeing that this page

12 says exactly what it says.

13       Q.    And you told us you have

14 seen these certificates before.

15       A.    If these numbers are called

16 out in my numbers, then I probably

17 browsed them.

18       Q.    I apologize.  That was a bad

19 question.  That was not what I was

20 asking.

21       A.    That's what I have been

22 doing this whole time is repeating after

23 you, because that's what I thought you

24 were asking me.

Anne Holland Wilson, MBA

1       Q.    No.  What I was asking was

2  not whether you had seen this specific

3  certificate before.

4             You have reviewed

5  certificates granted by notified bodies

6  before, haven't you?

7       A.    I don't think you asked me

8  that.  I'm sorry.  You could ask, but of

9  course I have seen them, because I am

10 certified, and I said that directly, that

11 our company is 13485 certified, my

12 company, and ISO 9001 certified.

13      Q.    And people in the industry

14 rely on these certificates, don't they?

15            MR. WALLACE:  Objection to

16      form.

17            THE WITNESS:  Some people

18      do.

19 BY MR. COMBS:

20      Q.    And, in fact, these

21 certificates establish that the

22 regulators, who inspected both Medscand

23 and Ethicon, came to the conclusion that

24 the TVT device was in compliance with ISO

Anne Holland Wilson, MBA

1    standards, didn't they?

2              MR. WALLACE:  Objection to

3         form.

4              THE WITNESS:  I don't know

5         what exactly -- I don't know --

6         from this certificate, I don't

7         know what they inspected.

8              In fact, regulators of

9         notified bodies don't inspect.

10        They audit.

11             I have no records of what

12        they audited, what they looked at.

13        I have none of their documents

14        that go with -- each one of these

15        comes with a report, and each

16        report comes with minor

17        non-conformances, major

18        non-conformances, and comments.

19             And then they have to come

20        back every few years.

21             So this certificate in and

22        of itself doesn't tell me very

23        much of -- about any of these

24        audits.

Anne Holland Wilson, MBA

1    BY MR. COMBS:

2         Q.    And so we'll look at

3    Exhibit 6.  The scope of the

4    certification is design, manufacture,

5    final inspection, and distribution of the

6    TVT device and Class II for tension-free

7    vaginal tape procedure.

8              That's what the scope of the

9    certification is, isn't it?

10        A.    Sorry.  Where is 6 again?

11   Yikes.  Sorry.

12             MR. WALLACE:  Just same

13        objection, for the record.

14             THE WITNESS:  All I can do

15        is read what the certificate says.

16             MR. COMBS:  Sure.

17             THE WITNESS:  And the

18        certificate states -- what's your

19        name again?  Mr.?

20             MR. COMBS:  Philip Combs.

21             THE WITNESS:  Mr. Combs.

22             He's reading it, and I'll

23        read the same thing.

24   BY MR. COMBS:

Anne Holland Wilson, MBA

1      Q.   Sure.  And it says that the

2  scope of the audit included the design

3  and manufacture of TVT.

4           MR. WALLACE:  Same

5       objection.

6           I think that's the fourth

7       time you asked that.

8           THE WITNESS:  I've already

9       answered that question, sir.

10  BY MR. COMBS:

11      Q.   Did you have any information

12  at all in your possession that -- that

13  that was not the scope of that audit?

14      A.   I don't have any -- I don't

15  have any knowledge of this audit besides

16  this piece of paper.

17           Each audit comes with an

18  audit report and a checklist.  So from

19  this piece of paper, I can't tell you --

20  basically, I can tell you like very, very

21  little about the audit itself.

22      Q.   Did you make any efforts to

23  obtain any of the records regarding the

24  audit?

Anne Holland Wilson, MBA

1          A.    My topic was not to look at

2   regulatory submissions or anything like

3   that.  I was to look at risk documents

4   and to look at design controls.

5              So this really has no

6   bearing on those topics.

7          Q.    So is the answer to my

8   question, no, that you made no efforts to

9   obtain the documents that underlay that

10  certificate?

11              MR. WALLACE:  Objection to

12       form.

13              THE WITNESS:  I did not.

14  BY MR. COMBS:

15          Q.    And do you know -- strike

16  that.

17              I want to ask you about

18  TVT's technical files.

19              Do you know what technical

20  files were maintained by Ethicon

21  regarding TVT?

22          A.    I believe in my report I

23  cited a technical file for TVT.

24          Q.    Do you know whether there

Anne Holland Wilson, MBA

1  were any other technical files maintained

2  by Ethicon for TVT other than the one you

3  cited?

4          A.    There were others for

5  different products that were not the

6  scope of my report, yes.

7          Q.    And what are those other

8  products?

9          A.    I don't have them exactly

10 memorized, because that wasn't in the

11 scope of my report.

12             I think they were -- I just

13 don't have it in my head.  I focused in

14 on the TVT-R.

15             I'm just going to grab

16 another water.

17         Q.    Yes, of course.

18             Ms. Wilson, in your reliance

19 list, you referenced two clinical expert

20 reports.

21             Did you review any other

22 clinical expert reports prepared by

23 Ethicon related to TVT?

24         A.    The only things I would have

Anne Holland Wilson, MBA

1   reviewed were in my reliance list.

2           Q.      In your reliance list, you

3   reference review of two CAPAs.

4                   What's a CAPA?

5           A.      Corrective action/preventive

6   action.

7           Q.      Do you know whether there

8   were any other CAPAs performed in regard

9   to TVT?

10          A.      I don't know.  I don't have

11  the whole list of CAPAs that were

12  performed in a breakdown by product type.

13          Q.      So you don't know?

14          A.      Could you restate the

15  question.

16          Q.      You reviewed two CAPAs.  Are

17  those the only two CAPAs that were

18  performed in relation to TVT?

19          A.      I don't know.

20          Q.      Did you make any effort to

21  obtain other CAPAs performed regarding

22  TVT?

23          A.      I did ask for anything

24  related to TVT, CAPAs, risk things,

Anne Holland Wilson, MBA

1   anything related that would have come out

2   of those complaint reviews.  So I did ask

3   for those things.

4        Q.   And what you received were

5   two.

6        A.   I'd have to go look at my

7   reliance list, but I think those are

8   those that are footnoted.

9             I just don't recall every

10  document that I looked at.  I'm sorry.

11       Q.   Did you review any clinical

12  literature related to TVT?

13       A.   Only those things that were

14  cited in my review.

15       Q.   So I saw two pieces of

16  medical literature on your reliance list.

17            Would you have review any

18  other medical literature other than those

19  two?

20       A.   No, sir.  I didn't look at

21  anything that wasn't on that list.

22       Q.   So you didn't review any

23  clinical literature regarding Prolene

24  sutures?

Anne Holland Wilson, MBA

1          A.    Well, on that list there

2    were documents about Prolene sutures, and

3    I do footnote those.

4          Q.    My question -- I'm sorry.

5    My question was:  Did you review any

6    clinical literature, any published

7    medical literature regarding Prolene

8    sutures?

9          A.    There was a published

10   article on my list, and I believe it's

11   footnoted.

12         Q.    What article is that, that

13   you're referring to?

14         A.    I'm not sure I brought it

15   with me today or that I would be able to

16   locate it based on the Bates numbers.

17              Let me see what I can do.

18              Are we allowed to pull up a

19   Bates number and see if it's what it

20   might be?

21         Q.    Yeah.  What footnote is it

22   that you're referring to?

23         A.    It could be Footnote 75.

24         Q.    And could you tell me the

Anne Holland Wilson, MBA

1    Bates number for that?

2           A.    05845592.  I'm not sure, but

3    that's a guess.

4           Q.    So that's on page 17.

5                 So whatever it is you are

6    referring to, you are referring to

7    Footnote 75.

8           A.    Like I said, that's my best

9    estimate.  We'll have to check to see if

10   that's correct.

11          Q.    Okay.  We can check that.

12                Other than that, which might

13   be clinical literature related to Prolene

14   sutures, would you have looked at any

15   other clinical literature related to

16   Prolene sutures?

17          A.    Sir, I believe I said if

18   it's on my list, I might have looked at

19   that.  I did not go outside and try to

20   locate other clinical literature.

21          Q.    So if there's no clinical

22   literature on your list for Prolene

23   hernia mesh, so would that mean you

24   didn't try to go out and get any of that?

Anne Holland Wilson, MBA

1          A.     I did not seek out anything

2     that wasn't on my list.  This article --

3     these footnotes in the section do talk

4     about sutures and they talk about -- I'd

5     have to go read it.  It says right here.

6          Q.     Well, is there a difference

7     between an internal company document and

8     peer-reviewed clinical literature?

9          A.     Yeah.

10          Q.     And so my question is, did

11     you review any peer-reviewed --

12          A.     But you're saying clinical

13     literature versus scientific literature.

14     I'm just not sure what you mean by

15     clinical.

16               I mean, there's many

17     scientific journals --

18          Q.     Okay.

19          A.      -- that may not have

20     anything to do with the clinical aspect.

21     And I can't speak to anything clinical,

22     because I'm not a physician.

23               And I know that I also

24     footnoted that.  So I can't make any

Anne Holland Wilson, MBA

1   clinical judgment.

2           So that's why I'm trying to

3   be very clear versus scientific.  Or --

4   you know, a presentation can be

5   peer-reviewed.

6           So I'm just really not sure

7   what you're asking.

8       Q.    Did you review any

9   preclinical testing that Ethicon did for

10  Prolene sutures?

11      A.    Whatever I looked at is

12  footnoted here or in my list.  And I did

13  look at some data that showed right here

14  on page 17.

15          It says, A series of

16  internal reports on the outcomes

17  associated with implantation of Prolene

18  sutures in human and canine explant

19  studies.

20          So often canines are used in

21  preclinical animal studies.

22          So if that's what you're

23  referring to, then I did look at some

24  reports on canines.

Anne Holland Wilson, MBA

1     Q.    Would you have looked at any

2  other preclinical studies other than

3  what's in that paragraph underneath

4  Degradation on page 17?

5     A.    If it's on my list, I would

6  have to go back and check through that

7  whole list to see if there were any

8  others.

9     Q.    And if it's not on the list,

10  you didn't look at it.

11     A.    No.

12     Q.    Did you review the Prolene

13  new drug application?

14     A.    I'm sorry.  I had so many

15  documents, I just can't remember them

16  all.

17          Did I look at what?

18     Q.    The Prolene suture new drug

19  application from 1969.

20     A.    No.  And I'm not qualified

21  to do anything to do with drugs, only

22  devices.

23     Q.    And do you know whether the

24  Prolene suture was first regulated as a

Anne Holland Wilson, MBA

1    drug?

2              MR. WALLACE:  Just so

3         we're -- we are now -- go ahead

4         and ask your question, and then

5         we'll --

6         Q.    That was the question.

7              MR. WALLACE:  You're calling

8         it a drug.  Well --

9              THE WITNESS:  I have no

10        knowledge of drugs.  And I have no

11        knowledge of anything to do with

12        any regulations of drugs.  I only

13        work in medical devices.

14   BY MR. COMBS:

15        Q.    All right.  Prolene

16   suture -- I'm not trying to trip you up

17   or be tricky here at all.

18              Prolene sutures were first

19   approved through an NDA that was in 1969.

20   That's why I ask you that question.

21        A.    I'm not aware of that.

22        Q.    Okay.  When is the first

23   time you ever heard of a TVT device?

24        A.    Well, of a specific -- the

Anne Holland Wilson, MBA

1    TVT?

2            Q.      Yes, ma'am.

3            A.      July.

4            Q.      Prior to being engaged in

5    this litigation, you had not heard of

6    TVT.

7            A.      Not -- I have heard of mesh,

8    but not TVT, no.

9            Q.      And had you heard of

10   midurethral slings?

11           A.      I'm sure they have

12   commercials on TV and things like that.

13   I've really never focused on it.  I don't

14   have stress urinary incontinence.

15           Q.      Do you have any idea how

16   many TVT devices have been implanted?

17           A.      I do know that one of the

18   complaint analyses say there were 213,000

19   of them at a given point in time.  So I

20   do not know specifically.

21           Q.      Have you ever seen a TVT?

22           A.      I have seen the IFU for

23   them.

24           Q.      Have you ever actually seen

Anne Holland Wilson, MBA

1    a TVT device?

2           A.    I saw a YouTube.  No, I have

3    not physically held one.

4           Q.    Do you understand how to

5    implant a TVT?

6           A.    No.  I'm not a physician.  I

7    have read the IFU, but I think it's

8    clearly stated in my report that I can't

9    comment on anything to do with

10   implantation or physicians.

11          Q.    And is that because you're,

12   I mean, obviously not an M.D.?

13          A.    No, I'm not.

14          Q.    And so in order to be able

15   to comment regarding the implantation or

16   clinical aspects of the device, would you

17   need medical training?

18               MR. WALLACE:  Objection to

19          form.

20               THE WITNESS:  I can comment

21          as to how it says, you know, to

22          implant it in the IFU, and I can

23          certainly understand from a design

24          control, you know, perspective how

Anne Holland Wilson, MBA

1           you go about doing the design, the

2           development, and the risk

3           management things.

4               So from all those

5           perspectives, I feel very

6           comfortable.  But I'm never going

7           to comment on how to physically

8           perform an implant of a device.

9    BY MR. COMBS:

10          Q.    Do you know what part of the

11   urethra is supported by TVT?

12          A.    I know that the urethra is

13   supported, but I don't know the exact

14   portion.  I could read the IFU.

15          Q.    Do you know the difference

16   between polypropylene and Prolene?

17          A.    Polypropylene is -- Prolene

18   is a polypropylene.  I believe that's on

19   page -- let's go back.  That's right in

20   the beginning.

21              In the background section,

22   it says, Prolene, polypropylene mesh.  So

23   it's a brand name of a polypropylene.

24          Q.    And do you know any ways in

Anne Holland Wilson, MBA

1   which Prolene differs from generic

2   polypropylene?

3        A.    I don't know the full

4   manufacturing process.  I certainly know

5   about extrusions of plastics and poly- --

6   various materials, because I've validated

7   those processes.

8             So I understand how they're

9   formed and how they're measured, and how

10  they're validated, and how they can be

11  cut and hollowed, and those things.

12            So I understand the

13  backgrounds of the plastics, but I'm not

14  a plastics person.

15       Q.    So my question was:  Do you

16  know what the difference is between

17  Prolene and polypropylene?

18            MR. WALLACE:  Objection to

19       form.

20  BY MR. COMBS:

21       Q.    Let me start, do you know,

22  is there a difference?

23       A.    All I know is that this is a

24  Prolene with a register.  So to me that

Anne Holland Wilson, MBA

1    means it's a brand name of a

2    polypropylene.

3         Q.    Do you know whether anything

4    is added to the polypropylene in order to

5    make Prolene?

6         A.    I do not know the specific

7    formulation of the material, no.

8         Q.    Do you know whether the mesh

9    that's in TVT is made of knitted

10   filaments of Prolene?

11        A.    That was in a document I

12   read.  I would have to go back and review

13   that.  But there was a document somewhere

14   that talked about different knitting

15   techniques.

16        Q.    And I think you told me

17   earlier, and I don't want to belabor it.

18             I think you told me that you

19   had not worked on any projects that

20   involved polypropylene except for the one

21   where you were the QA monitor for an

22   animal study; is that correct?

23        A.    Not that I recall.  I know

24   that there was -- there were various

Anne Holland Wilson, MBA

1    plastics in knee inserts, and things like

2    that.

3              I just can't -- I don't

4    think they were polypropylenes.  There

5    may have been an instrument handle

6    somewhere, but not an implant.

7         Q.    And certainly no work on

8    Prolene implants prior to this project.

9         A.    No.

10        Q.    And you told us that you're

11   not an M.D.  You're also not a polymer

12   scientist, are you?

13        A.    No, sir.

14        Q.    Are you a biomechanical

15   engineer?

16        A.    My degree is in biomedical

17   engineering.  Biomechanical, no.  Various

18   universities call those various things.

19   That's why I'm being specific.

20              Vanderbilt in the 1980s

21   called it biomedical.  Some universities

22   now, they call it different things.

23        Q.    If I asked you -- well

24   strike that.

Anne Holland Wilson, MBA

1                What are the different kinds

2      of urinary incontinence?

3           A.    I know there's stress

4      urinary incontinence.

5           Q.    Do you know what the other

6      kinds of urinary incontinence are?

7           A.    I couldn't name them, no.

8           Q.    Do you know what causes

9      stress urinary incontinence?

10          A.    Yes.  I did read that.  I'd

11     have to go back and review the documents.

12                It may be in the IFU.

13          Q.    As we --

14          A.    There were a couple of

15     things that cause that.  I'm just not --

16     I didn't focus on the medical aspect,

17     because I was focusing on the design and

18     risk.

19                And as part of any of those,

20     you have a team.  And the team consists

21     of someone that's in the medical realm.

22                My expertise is in the

23     design assurance and design control

24     areas.  And I have done that for many

Anne Holland Wilson, MBA

1    implantable devices, probably many

2    companies for many years.

3              So there's always been a

4    medical expert M.D., marketing expert,

5    clinical experts that were -- that work,

6    you know, as part of those teams that we

7    would draw from for any of those very

8    specific questions.

9         Q.    So the other -- strike that.

10             So when you're working with

11   a team in regard to developing products,

12   the medical questions would be answered

13   through the expertise of the doctor?

14        A.    Well, the design engineer.

15   The user requirements define those

16   things.  And even the procedures that I

17   have referred to all define -- it's a

18   team approach.

19             But they often have the

20   regulatory or the quality person in

21   charge of those teams.  So I would be the

22   person in charge of those teams.

23        Q.    But you would not be the

24   person providing the expertise regarding

Anne Holland Wilson, MBA

1    the medical issue.

2            A.    No, I would not.

3            Q.    So, I mean, somebody --

4            A.    We would have --

5            Q.    -- else on the team would --

6            A.    Right.

7            Q.    -- would be tasked with

8    that.

9            A.    Right.  You know, we would

10   have physicians come in or they would

11   give the user requirements, but I

12   wouldn't be the clinical or the physician

13   expert.

14           Q.    Do you know what the

15   alternative procedures for stress urinary

16   incontinence are that the plaintiffs are

17   putting forth as alternatives in this

18   case?

19           A.    I did read some of those

20   things.  I would have to go back to the

21   documents.  I mean, they talked about

22   open procedures as one of them.

23                 I'm sure that not having a

24   procedure is an alternative.

Anne Holland Wilson, MBA

1        Q.    Do you know what a Burch

2    colposuspension is?

3        A.    No.  Obviously.  Sorry.  You

4    can tell by my face.

5        Q.    Sure.

6              Do you know what a

7    pubovaginal sling is?

8        A.    I'm -- not exactly.

9        Q.    Do you know what the risks

10   are of a Burch colposuspension?

11       A.    How would I know that if I

12   just told you I didn't know what it was?

13       Q.    Do you know what the risks

14   are of a pubovaginal sling?

15       A.    If I was in charge of risk

16   management of those devices, I would go

17   through a very specific defined process

18   as required in the regulations and in the

19   standards and in those guidance

20   documents.

21              There's also other things

22   like global harmonized task force

23   guidance documents.  So it's not just

24   these.

Anne Holland Wilson, MBA

1                And I would make sure that

2     all those risks were defined as far as

3     reasonably foreseeable risks, and make

4     sure that each and every one of those on

5     a system level as well as component level

6     were addressed.

7          Q.     But you haven't done that in

8     preparation for any of the --

9          A.     No, sir.

10         Q.     And do you know whether --

11    well, strike that.

12               Since you don't know what a

13    Burch colposuspension is, you would not

14    know whether any risk analysis has ever

15    been performed on that procedure, would

16    you?

17         A.     No.  I was looking at TVT-R

18    mesh.

19         Q.     All right.  And you would

20    not know whether any risk analysis has

21    ever been performed on a pubovaginal

22    sling, would you?

23         A.     My assumption is that all

24    medical device companies would follow the

Anne Holland Wilson, MBA

1    same industry practice, because that's

2    accepted practice.

3                So I would have to assume

4    that they used the proper tools that are

5    in place.

6          Q.    If they were a medical

7    device.

8          A.    If they were a medical

9    device.

10               If they weren't, then I'm

11   not knowledgeable to talk about it if

12   they're not a medical device.

13         Q.    What's the pore size for

14   TVT?

15         A.    I'm sure that's written in

16   some of these documents.  I think that I

17   don't have that in my head.  I do know

18   some documents talked about weights per

19   cubic centimeter or something.

20               I don't know the pore size.

21   It's probably in the many, many pages

22   somewhere.

23         Q.    Do you know what the weight

24   is for TVT?

Anne Holland Wilson, MBA

1          A.    It, too, is in the documents

2    somewhere.

3                Let's see.  It may be

4    footnoted.

5                (Witness reviewing

6    document.)

7                Okay.  We would have to --

8    if we looked in Footnote maybe 109 is my

9    best guess of where that might be.

10         Q.    For which?  For the weight?

11         A.    Yeah, for the weight.  That

12   would be my best estimate would be --

13   which is on page 20 of my report.

14                I didn't memorize those

15   stats.

16         Q.    As we sit here today, do you

17   know whether -- do you know whether --

18   strike that.

19                Do you know whether TVT had

20   the largest pore size of any stress

21   urinary incontinence mesh sold in the

22   United States?

23         A.    I don't know.  But I do

24   remember that the weight was somewhere, I

Anne Holland Wilson, MBA

1    believe -- well, we could call it up, but

2    I think it was, like, 80 to 110 or 102

3    something per cubic centimeter, but I'd

4    have to go back.

5              I didn't look at pore size,

6    but the weight, when I talked about

7    weight, that would be in the area those

8    footnotes would be.

9         Q.    Do you have any patents?

10        A.    No, I do not.

11        Q.    Okay.  Have you ever

12   invented a medical device?

13        A.    I'm working on it.  No, I do

14   not.

15        Q.    Other than the consulting

16   that you've done -- strike that.

17              You have never performed an

18   FMEA for a stress urinary incontinence

19   device, have you?

20        A.    No.

21        Q.    And you have never performed

22   a DDSA for a stress urinary incontinence

23   device, have you?

24        A.    A DDSA is an Ethicon term.

Anne Holland Wilson, MBA

1    I have not performed that.

2                    However, I have for about 13

3    other permanently implantable passive

4    medical devices, if not more.

5        Q.    And none of those involved

6    the pelvic floor or stress urinary

7    incontinence, did they?

8        A.    No, they did not.

9        Q.    Ms. Wilson, I asked you

10   earlier about the approval of the NDA for

11   Prolene sutures in 1969, and you told me

12   you were not aware of that.

13                   So I just want to ask you to

14   assume that Prolene sutures were approved

15   as part of the NDA in 1969.

16                   Is that a fact that Ethicon

17   could rely on in the risk assessment for

18   TVT?

19                   MR. WALLACE:  Objection to

20        form.

21                   THE WITNESS:  And that was a

22        very complicated question.  I

23        would have to have you break that

24        down.

Anne Holland Wilson, MBA

1   BY MR. COMBS:

2        Q.     I know you don't know if

3   Prolene sutures were approved as part of

4   NDA, but I want you to assume that.

5        A.     Okay.

6        Q.     Now do you know whether TVT

7   is manufactured from the same material as

8   Prolene sutures?

9        A.     I'm already lost.  You're

10  saying that a drug, because there's a

11  drug out there, can they use that on a

12  device for a risk assessment?

13            Is that what you're asking

14  me?

15       Q.     I'm asking you if --

16       A.     Okay.  Sorry.

17       Q.     I want you to assume that

18  Prolene sutures --

19       A.     Okay.

20       Q.     -- were approved as a result

21  of an NDA in 1969.

22       A.     Okay.

23       Q.     And I want -- do you know

24  whether the mesh in TVT is made from the

Anne Holland Wilson, MBA

1    same material as Prolene sutures?

2         A.    I don't know exactly.

3         Q.    I want you now to assume

4    that the mesh is made from the same

5    material as the Prolene sutures.

6         A.    Okay.

7         Q.    Can the fact that Prolene

8    sutures were approved as part of an NDA,

9    can Ethicon rely on that when it's

10   assessing risk --

11             MR. WALLACE:  Objection to

12        form.

13   BY MR. COMBS:

14        Q.    -- for Prolene mesh?

15        A.    It was in my opinion, and

16   I'm going to try to explain it again.

17             When you do a risk

18   assessment for a medical device, you need

19   to look at the different inputs, such as

20   sutures and things like that.

21             But the very first step that

22   you do, and it's also in the figure in my

23   report, is that you look at the very

24   specific indications for use for that

Anne Holland Wilson, MBA

1    device.

2              So you may use those

3    background pieces of information and

4    literature for some information, but

5    that's not what you base your risk

6    assessment on.

7              If you look at my Figure 2,

8    I believe it is, right here, the intended

9    use -- sorry -- intended purpose, you

10   have to identify those characteristics.

11             So, yes, you should look at

12   some of the other background info, but

13   that's just background information, and

14   then you make it for that specific

15   intended use.

16   Q.    Okay.  So as part of that

17   background information, Ethicon could

18   consider the fact that the material that

19   Prolene mesh is made from was approved as

20   a result of an NDA?

21             MR. WALLACE:  Objection to

22        form.

23             THE WITNESS:  I don't have

24        any idea why that would be true.

Anne Holland Wilson, MBA

1          No.  I would not say that's true.
2    BY MR. COMBS:
3          Q.   So it's your opinion that
4    Ethicon can't rely on the fact that the
5    material that the mesh implant is made
6    from has been reviewed and approved by
7    the FDA.
8          A.   That is not what I said
9    either.
10              MR. WALLACE:  Objection to
11         form.
12   BY MR. COMBS:
13         Q.   Okay.  Can that be
14   considered?
15              MR. WALLACE:  Objection to
16         form.
17              THE WITNESS:  You're going
18         to have to please rephrase that.
19              Can what be considered?
20   BY MR. COMBS:
21         Q.   Let me try again.
22              Can the fact that Prolene
23   sutures were approved by the FDA in 1969,
24   can that fact be used by Ethicon when

Anne Holland Wilson, MBA

1    it's considering the risk of a material

2    made from the same material as Prolene

3    sutures?

4              MR. WALLACE:  Objection to

5         form.

6              THE WITNESS:  That was a

7         different question than you asked

8         me previously.

9              Now you are saying the whole

10        FDA rather than the drugs.

11             I think I answered the

12        question that said you should

13        consider literature, other things.

14             However, the very first

15        thing you do, and it's in my

16        report, in the start, the very

17        first block is you look at the

18        specific intended use, form

19        factors, fit, system components.

20             So you don't rely on that.

21             Of course, it can be an

22        input, but it certainly is not

23        something you rely on for your

24        risk assessment.

Anne Holland Wilson, MBA

1    BY MR. COMBS:

2         Q.    That would be one input that

3    can be considered in assessing the risk

4    of --

5         A.    One of many, yes.  And

6    that's specifically stated in the

7    standards, also.

8         Q.    Do you know anything about

9    the regulatory history for Prolene mesh?

10        A.    Anything?  I know what I

11   have reviewed.  I mean, I know that

12   Prolene is used in this device, and this

13   device had a CE mark.  And I know that.

14        Q.    Do you know whether --

15        A.    So that's anything.

16        Q.    Okay.  Sorry.  I didn't mean

17   to interrupt you.  Sorry.

18             Do you know whether prior to

19   TVT being introduced to market, whether

20   Prolene mesh was sold for use as a hernia

21   mesh?

22        A.    Let's go back to page 17 of

23   my report.

24             It does say that Prolene was

Anne Holland Wilson, MBA

1  used in humans, and I know it was used in

2  sutures.

3          It could have been.  I don't

4  know exactly about the hernia, but I do

5  know that the Prolene has been used as a

6  medical device.

7          And that's on 17 of my

8  report.

9      Q.    Do you know what -- I'm

10  going to make sure I use the right term.

11          Have you ever used the term

12  "down-classification"?

13      A.    Sure.

14      Q.    What is down-classification?

15      A.    Sometimes devices -- that's

16  an FDA term.

17          Sometimes devices that used

18  to be Class III or used to be Class II

19  are now classified one level lower.

20          So a II might be, say, oh,

21  okay, now we're going to call it a I.  Or

22  now we're going to say, oh, it used to be

23  a III, we're now going to call it a II.

24      Q.    And why is it that the FDA

Anne Holland Wilson, MBA

1   down-classifies a device?

2        A.     There could be a variety of

3   reasons.  So I couldn't speak as a

4   generalization.  They may feel there's

5   sufficient evidence out there now that

6   warrants it.  There could be other

7   reasons, too.

8        Q.     Do you know whether Prolene

9   sutures were down-classified by the FDA

10  from Class III to Class II?

11       A.     You know, I don't.

12       Q.     Would the fact the FDA had

13  down-classified Prolene sutures be a fact

14  that the engineers could rely on as part

15  of their assessment of risk for the TVT

16  device?

17            MR. WALLACE:  Objection to

18       form.

19            THE WITNESS:  I think that's

20       the same question.

21            The risk assessment for a

22       TVT device has to start with

23       looking at the TVT device.

24            There's many inputs they should be

Anne Holland Wilson, MBA

1          looking at.

2     BY MR. COMBS:

3          Q.    And that could be an input

4     that they would look at?

5          A.    They could look at.  But why

6     they would look at what the FDA says,

7     that's irrelevant to me.

8               I mean, they're looking at

9     the risks associated with a given device.

10    They would have to look at, you know -- I

11    guess, you know, they would have to look

12    at is it biocompatible?  What are the

13    requirements for biocompatibility?

14              So they would have -- like

15    what is it is today?

16              But whether it was

17    down-classified?

18              I'm not sure how that

19    specifically would change anything with

20    risk management.

21         Q.    Do you know whether Prolene

22    is biocompatible?

23              MR. WALLACE:  Objection to

24         form.

Anne Holland Wilson, MBA

1          THE WITNESS:  I have only

2     read the reports that says it.  It

3     said what was in reports.

4  BY MR. COMBS:

5          Q.    And the reports say that

6  it's biocompatible.

7          A.    The reports said they did

8  some biocompatibility testing, yes.

9          Q.    Do you have any evidence at

10 all that Prolene is not biocompatible?

11          MR. WALLACE:  Objection to

12     form.

13          THE WITNESS:  Prolene in and

14     of itself?  Or Prolene mesh?  Or

15     Prolene flakes?  Or Prolene in the

16     vagina?

17          I need more information.

18     Sorry.

19 BY MR. COMBS:

20          Q.    Okay.  Is Prolene sutures

21 biocompatible?

22          A.    I didn't look at sutures,

23 per se, but I did read that the

24 biocompatibilities had been done on those

Anne Holland Wilson, MBA

1   sutures.

2         Q.    Is Prolene mesh

3   biocompatible?

4               MR. WALLACE:  Objection to

5         form.

6               THE WITNESS:  I would have

7         to go back and look if they relied

8         on the sutures to form the

9         biocompatibility on the mesh.

10  BY MR. COMBS:

11        Q.    Do you have any information

12  at all that Prolene sutures are not

13  biocompatible?

14              MR. WALLACE:  Objection to

15        form.

16              THE WITNESS:  I don't have

17        information stating contrary to

18        what's in the reports.

19              I only looked in what was on

20        my list.  I did not seek contrary

21        information to what was onto my

22        list.

23  BY MR. COMBS:

24        Q.    Are you qualified to conduct

Anne Holland Wilson, MBA

1    a medical assessment of whether the risks

2    of the device outweigh its benefits?

3                    MR. WALLACE:  I'm sorry.

4            Can you ask that one more time.

5                    THE WITNESS:  Am I qualified

6            to do the medical?

7                    MR. WALLACE:  Hang on one

8            second.

9                    Do you want her to read it

10           back or --

11                   MR. COMBS:  Oh, I can read

12           it back -- I can ask it again.

13   BY MR. COMBS:

14           Q.    Are you qualified to do a

15   medical assessment of whether the risks

16   of a device outweigh its benefits?

17                   MR. WALLACE:  Objection to

18           form.

19                   THE WITNESS:  I have

20           answered this a couple of times.

21                   I am not qualified to do any

22           medical assessments.  No, I'm not.

23                   I'm not a physician.

24                   And that's in my report

Anne Holland Wilson, MBA

1          clearly identified.

2    BY MR. COMBS:

3          Q.     In your report you say that

4    ISO 13485 has defined the requirements

5    for proper risk analysis since 1996.

6                 What is your support that

7    ISO 13485 has defined the proper --

8    strike that.

9                 What's your support that

10   ISO 13485 has defined the requirements

11   for proper risk analysis since 1996?

12         A.     Where is that in my report?

13   I know where I got that.

14         Q.     It's on page 4.

15         A.     On page 4.  Thanks.

16                I was hoping that we'd be

17   close to lunch.

18                MR. COMBS:  Ms. Wilson, we

19        can stop any time you want.

20                Let's go off the record.

21                     -  -  -

22                (Whereupon, a lunch recess

23        was taken from 12:04 p.m. to 1:07

24        p.m.)

Anne Holland Wilson, MBA

1                    -  -  -

2    BY MR. COMBS:

3          Q.    Ms. Wilson, of the complaint

4    reports that are on your reliance list,

5    how many of these did you actually

6    review?

7          A.    I looked at those complaint

8    reports, all of them.

9          Q.    Do you remember how many

10   there were?

11         A.    There was one in 2002, I

12   believe, and one was in 2006, as part of

13   the TVT-R -- no, excuse me -- as part of

14   the legacy products.  I remember those

15   distinctly.

16         Q.    You remember the 2002 and

17   2006 --

18         A.    Yes.

19         Q.    -- complaint reports?

20         A.    Yes.

21         Q.    Do you remember any others?

22         A.    I don't remember those -- I

23   remember those specifically, and one was

24   titled a DDSA Update, but it really

Anne Holland Wilson, MBA

1    talked about complaints.

2          Q.    Do you remember any of the

3    specific complaint reports themselves?

4          A.    I saw the summary reports.

5    I did see some specific complaints, yes.

6    And I cited them in my report.

7          Q.    We got your report.

8          A.    Okay.

9          Q.    But the ones that you

10   reviewed, they would be the ones that are

11   cited in your report.

12         A.    Sure.  Yes, they were.

13         Q.    You told us earlier that you

14   wanted to look at all the CAPAs and all

15   the risk assessments.

16               Why did you want to look at

17   all CAPAs and all the risk assessment?

18         A.    You know, maybe it was

19   confusing.  I wanted to look at CAPAs

20   related to any risk documents.  Not all

21   the universe of CAPAs, but those related

22   to risk assessments.

23         Q.    Would you have wanted to

24   look at any CAPAs that related to any of

Anne Holland Wilson, MBA

1    the risks that you discuss in your

2    report?

3         A.    Yeah.   That's what I meant

4    by saying related to the risk

5    assessments.

6              I'm sorry if I was unclear.

7         Q.    Well, I may be --

8         A.    Any CAPAs related to those

9    risks in the report and those risk

10   assessments.

11        Q.    That was the part I was

12   unsure about when you said risk

13   assessments.

14             If there was a CAPA related

15   to an underlying risk, you would have

16   wanted to see that, too.

17        A.    Anything to do with that,

18   yes.

19        Q.    Okay.

20        A.    I mean, there may be some

21   documents that are out there somewhere

22   that I didn't cite.  And if that's the

23   case, you can show them to me.

24        Q.    At the beginning of the

Anne Holland Wilson, MBA

1   deposition, I asked you a question about

2   an audit, and you were real careful to

3   say to me, Hey, what I did was not an

4   audit.

5              So here's what I want to ask

6   you:  If you had done an audit, what

7   additional things would you have done?

8        A.    I'm not sure that there

9   would have just been additional, they

10  would have also been different.

11       Q.    Okay.

12       A.    Audits are very specific.

13  You go in and look to a specific

14  standard.  You look at that standard.

15  Then you take a statistically, or if at

16  all possibly, you take a statistically

17  valid sample size.

18              For example, when I audit, I

19  use a C equals 0 sampling plan with an

20  AQL of 2.5 to do my audits.  And I get

21  evidence based on a specific number of

22  incidents.

23              Say, for example, they had

24  20 CAPAs, then I would probably look at

Anne Holland Wilson, MBA

1    five records based on that sampling plan.

2              Then I would look at each.

3    So I would look at the evidence based on

4    a very systematic methodology and only

5    cite maximums as to those standards.  You

6    can sometimes say they're major or minor

7    non-conformances, and then you can have

8    opportunities for improvement.

9              So that's -- again, it's a

10   snapshot in time, and you can't see all

11   the evidence.

12        Q.    Okay.  And so what is it

13   that you did in this project that was

14   different than that?

15        A.    Well, in this project, not

16   only did I look -- you know, keep my

17   auditing hat on, but I also looked at all

18   of my experience from industry.  I looked

19   at my experience from, you know, GLPs.

20             I looked at my experience as

21   quality engineer.  I have been certified

22   as quality engineer for, I can't

23   remember, since probably the '80s, 1980s.

24             I looked at my science

Anne Holland Wilson, MBA

1    background.  I looked at Class I, II, and

2    III devices.

3                You know, so I looked at a

4    whole bunch of evidence and data, and as

5    well as the standards.

6                So I didn't just use a

7    standard, a specific point in time.  I

8    looked at my overall experience.

9                And, you know, I've had a

10   lot of clients in a lot of industries.

11               And so I'm really fortunate

12   that I've been able to look at everything

13   from slaughterhouses -- I did

14   slaughterhouse audits -- through, you

15   know, switchboard manufacturers.

16               So I've really had the

17   chance to bring a lot of different

18   backgrounds to this report.

19        Q.    Have you done audits

20   pursuant to ISO 13485?

21        A.    Many, many.

22        Q.    For what types of products?

23        A.    Oh, my goodness.  I just

24   have a whole audit list I have to keep to

Anne Holland Wilson, MBA

1    keep my certifications.

2              I have done it for all kinds

3    of different medical devices, for their

4    suppliers.  I do a lot of supply chain

5    audits.

6              And as part of that, we do

7    look at the design history documents.

8    But we just, again, look at a point in

9    time.  We take a sample.

10             And I don't look at the

11   whole preponderence of evidence.  That's

12   in my whole background.

13        Q.    Earlier, I asked you

14   questions about the audits that the

15   notified body conducted of Medscand and

16   then Ethicon in the late 1990s and 2000.

17             And you told me that you

18   didn't know what had been reviewed during

19   those audits.

20             Now, does the EU Directive

21   establish what is to be reviewed during

22   those audits?

23        A.    You know, I do remember

24   looking at those as part of the technical

Anne Holland Wilson, MBA

1    file.  I mean, I do remember looking at

2    those certifications.

3                    And each different notified

4    body comes in with their own checklist

5    and basically calls out what they're

6    looking for.

7                    And they -- I don't know if

8    each notified body is exactly the same,

9    but they are becoming more similar over

10   time.

11        Q.    And those are done pursuant

12   to Council Directive 93/42/EEC, aren't

13   they?

14        A.    They're supposed to all be

15   done in accordance.

16                    The notified bodies are

17   supposed to be trained to that.  But I do

18   know there's a huge variation between

19   notified bodies.

20                    MR. COMBS:  This is 8.

21                         -  -  -

22                    (Whereupon, Exhibit Wilson 8

23        was marked for identification.)

24                         -  -  -

Anne Holland Wilson, MBA

1   BY MR. COMBS:

2        Q.   Ms. Wilson, I have handed

3   you what has been marked Exhibit 8, and

4   it's the Council Directive 93/42/EEC of

5   June 14, 1993 concerning medical devices?

6        A.   This is as amended?  This is

7   the most recent one as amended?

8        Q.   You tell me.

9        A.   I would have to read through

10  it all.  That's why I asked.

11       Q.   Okay.

12       A.   So --

13            MR. WALLACE:  This is like

14       double-sided 20 pages.

15            Do you really want her to

16       read through it?

17  BY MR. COMBS:

18       Q.   Well, the questions that I'm

19  going to ask you about it are at

20  Sections 3.2 down through 4.

21       A.   Not these articles?

22            MR. DAVIS:  Annex II.

23            THE WITNESS:  Can you tell

24       me what pages?

Anne Holland Wilson, MBA

1                   So there's the articles.

2                   MR. DAVIS:   It's Annex II.

3    BY MR. COMBS:

4         Q.    So in Annex II.

5         A.    Okay.

6         Q.    Paul has corrected me.  And

7    the pages aren't numbered, but it's

8    about -- you know, about halfway through.

9         A.    I see it.

10        Q.    Have you found it?  Did you

11   find 3.2?

12        A.    Not yet.

13        Q.    It's on the next page.

14        A.    Okay.  Let me just start

15   with this section, Annex II.

16        Q.    Sure.

17        A.    (Witness reviewing

18   document.)

19              3.2 through what?

20        Q.    Well, let's start with

21   Section 3.3.

22        A.    Okay.  I'm just starting at

23   3.2.

24              (Witness reviewing

Anne Holland Wilson, MBA

1    document.)

2              Okay.  I read through 3.3.

3         Q.    And it's Section 3.3, does

4    it require the notified body to audit the

5    quality system to determine whether it

6    meets the requirements referred to in

7    Section 3.2?

8         A.    Just so I'm clear on this,

9    and we don't get into another round of

10   what we did on this one, are you just

11   asking me to re-read what you're asking,

12   what's written here, to confirm

13   what's written here?

14        Q.    You're here as an expert in

15   the field.

16        A.    But that's what I asked --

17   that's what you just asked me, I believe,

18   so that's why I'm asking for

19   clarification.

20        Q.    Well, let's start with this.

21             Is that what it says?

22             MR. WALLACE:  I don't think

23        you need to be an expert to be

24        able to read, but you can read

Anne Holland Wilson, MBA

1        what it says.

2                THE WITNESS:  That's why I

3        was asking for clarification.

4    BY MR. COMBS:

5        Q.    Here's 3.3.  Does it say,

6    The notified body must audit the quality

7    system to determine whether it meets the

8    requirements referred to in Section 3.2?

9                Is that what it says?

10       A.    It does say that, yes.

11       Q.    You have done a hundred-plus

12   audits.

13               Do you know whether under

14   the EU Directive, whether that is

15   something the notified body auditor must

16   do?

17       A.    I need to be clear.  I do

18   quality management system audits or

19   inspections.  I don't do inspections, I

20   do audits on behalf of my clients.  I'm

21   not a regulator.

22               And, of course, I know that

23   they do inspections, because I'm

24   certified.  And I believe I did state

Anne Holland Wilson, MBA

1   that before, that they come in and they

2   do inspections.

3         Q.    Okay.  And is one of the

4   things they inspect, the design

5   specifications including the standards

6   which will be applied and the results of

7   the risk analysis?

8         A.    It depends on the scope of

9   your assessment.

10              So in my case, for example,

11  we don't do design.  We exclude

12  Section 7.3 of ISO 13485.  So in that

13  case they wouldn't, in other cases they

14  would.

15              Sometimes they would check

16  different things.  And also depends if

17  it's a full quality system audit or a

18  surveillance audit.

19              That's why asked.  I didn't

20  know on one of these certificates if it

21  was because it was a full quality system

22  or if it was a surveillance audit

23  follow-up.

24        Q.    And right on the front, it

Anne Holland Wilson, MBA

1  says, Full Quality Assurance System.

2      A.    That's true.  However,

3  sometimes they come in and they do a full

4  system -- they will still say the same on

5  the front, but they do what's called

6  surveillance audits where they don't look

7  at everything.  They do a full audit and

8  then they come back like every second

9  year.  In our case, the next year they do

10  a surveillance audit.

11          So they wouldn't -- the

12  certificate would still say the same, but

13  they wouldn't actually look at all the

14  sections.

15      Q.    And you don't have any

16  information at all as to whether this was

17  a full audit or a surveillance audit, do

18  you?

19      A.    I would have to look at the

20  history of all of these certifications.

21          Like this one says -- when

22  you say "any at all," I'm sure I could

23  try to put all of these side by side for

24  the history of the product and try to

Anne Holland Wilson, MBA

1  figure that out for you.

2      Q.   And that's not something

3  that you've done.

4      A.   No, I haven't.  I just

5  looked at the ones that I have listed in

6  my report and the ones yesterday.

7          I was looking at

8  Ms. Duncan's report and there was a

9  different --

10             -   -   -

11         (Brief interruption.)

12             -   -   -

13         THE WITNESS:  Sorry.  I lost

14     track with that interruption.

15     Refresh me.  Go ahead.

16  BY MR. COMBS:

17      Q.   Certificate indicates it's a

18  whole quality systems assurance audit,

19  doesn't it?

20      A.   Yes.  And they will, whether

21  it's a surveillance or not.

22      Q.   And do you have any

23  information at all that the audits that

24  are reflected on Exhibit 6 and 7 were not

Anne Holland Wilson, MBA

1  full quality assurance system audits?

2       A.    I would not have that

3  information at the present.  I don't know

4  if it was surveillance or not.

5       Q.    In order for the CE mark to

6  be issued --

7       A.    Mm-hmm.

8       Q.    -- does a full audit have to

9  have been conducted?

10      A.    It has to have been

11 conducted.

12      Q.    At some point, in order to

13 get CE mark.

14      A.    Right.  It's generally every

15 third year.  So they do a full and then a

16 surveillance.  At least that's how mine

17 does it, and then -- surveillance, and

18 then a full.

19           But there may be things that

20 are later in here that you have to go and

21 do another full in between, depending on

22 situations.

23      Q.    But you have to have a full

24 before the product is marketed, don't

Anne Holland Wilson, MBA

1   you?

2           A.      Before what product is

3   marketed?

4                   So if you have a full and

5   say you have a line extension, you can

6   also notify and not have to have an

7   additional one.

8                   So it's not as

9   straightforward as you're saying.

10          Q.      Before TVT was marketed

11  pursuant to the CE mark, there had to

12  have been a full audit of TVT, wasn't

13  there?

14          A.      There had to be a notified

15  body audit of Medscand where they looked

16  at some TVT documents.

17          Q.      And the full audit would

18  cover design control, wouldn't it?

19          A.      If that's in the scope, yes.

20          Q.      And, the full audit, the EU

21  Directive discusses design control,

22  doesn't it?

23          A.      Could you point to me where

24  you're looking?

Anne Holland Wilson, MBA

1        Q.    Well, right here, in C,

2   Design specifications, including

3   standards which will be applied and the

4   results of the risk analysis, and also a

5   description of solutions adopted to

6   fulfill the essential requirements...

7        A.    I see this right there.

8        Q.    Techniques used to control

9   and verify the design?

10       A.    Right.  So in their audit,

11  they would take a sample at a point in

12  time, and they would look at a document

13  or two, depends on your notified body, to

14  look at the extent, at what product you

15  samples.

16       Q.    And that would include

17  design control, wouldn't it?

18       A.    Let's look here.

19            It says, Design control

20  here, and it says, Design control here.

21            To the best of my knowledge

22  it would include it.  I have no documents

23  beyond that to state that it wouldn't or

24  would.

Anne Holland Wilson, MBA

1      Q.    And just so the record is

2   clear, when you say, it says, Design

3   control, you were pointing to --

4      A.    It says, Design, it doesn't

5   Design control.

6      Q.    And you you were pointing to

7   Exhibit 6, and then you were pointing to

8   Exhibit 8 when you said, Design control.

9      A.    3.2 (c).

10      Q.    Ms. Wilson, I asked this

11   question right before we went on the

12   break, so if you answered it and I just

13   didn't catch the answer, I'm certainly

14   not trying to badger you with this.

15           I think what I asked you

16   right before we took the break was

17   whether ISO 13485 was ever recognized by

18   the FDA prior to 2003.

19      A.    That's not at all what I

20   recall you asking me, but we can try that

21   question.

22      Q.    Whether I asked it, but

23   let's just ignore whether it was asked

24   before or not, let's just start off.

Anne Holland Wilson, MBA

1                    Like right now, does the FDA

2    require a medical device manufacturer to

3    comply with ISO 13485?

4                    MR. WALLACE:  Object to

5         form.

6                    THE WITNESS:  They -- that's

7         apples and oranges.  That isn't

8         peaches and cream.

9    BY MR. COMBS:

10        Q.    Okay.

11        A.    The FDA has FDA stuff.  EU,

12   Canada, many other countries accept

13   13485.  So that question doesn't make any

14   sense to me.

15        Q.    So I'll try it again.

16   Here's the question.

17                    Does the FDA require

18   compliance to ISO 13485?

19        A.    For products distributed

20   within the U.S. by U.S. medical -- no,

21   they do not.

22                    They do have harmonized risk

23   procedures to ISO 14971, however.

24        Q.    Is there an FDA reg that

Anne Holland Wilson, MBA

1  required Ethicon to have conducted risk

2  analysis of TVT at the time TVT was

3  manufactured by Medscand, not Ethicon?

4          A.    Could you break that up.

5          Q.    Is there an FDA reg that

6  requires Ethicon to have conducted risk

7  analysis of the product, of TVT, at the

8  time it was manufactured by Medscand?

9          A.    I'm going to go back.  My

10  report, I exclusively -- I did not look

11  at FDA because that was outside of the

12  scope of my report.

13              So I just want to make sure

14  that you're aware of that.

15              There's always been

16  standards that medical devices -- are

17  incumbent upon them to have safe medical

18  devices.  And that clearly says that.

19              It doesn't matter what

20  country you're in, it's ethical and

21  right.

22              And so your question was,

23  does the FDA have regulations that

24  required --

Anne Holland Wilson, MBA

1     Q.    That required --

2     A.    -- Medscand; right?

3     Q.    No, ma'am.

4     A.    Okay.

5     Q.    It was:  Are there FDA

6  regulations that required Ethicon to have

7  conducted risk analysis of the product at

8  the time it was manufactured by Medscand?

9         MR. WALLACE:  Same

10        objection.

11        THE WITNESS:  There are FDA

12        harmonized standards that are

13        incumbent upon U.S. manufacturers

14        to follow.

15        So 14971, which is pursuant

16        to risk analysis.

17        So you would need to have --

18        and we talked about risk analysis.

19        So, yes, they had to follow risk

20        analysis, risk management,

21        depending on -- Medscand, it was

22        risk analysis.

23  BY MR. COMBS:

24        Q.    Yes, but I apologize, that

Anne Holland Wilson, MBA

1    wasn't the question I asked.

2              The question I asked was --

3         A.    I'm trying very hard to

4    answer you.

5         Q.    Listen, I'll just try it

6    again.

7              The question I was asking

8    is:  At the time that Medscand was the

9    manufacturer of the product, not Ethicon,

10   so prior to the third quarter of 2000, is

11   there a reg that requires Ethicon to have

12   conducted risk analysis during the time

13   that the TVT is being manufactured by

14   Medscand?

15        A.    What the requirement was is

16   for that Ethicon have supply chain

17   controls.

18              And in supply chain

19   controls, you certainly have -- which is,

20   you know, under Section 7. -- you know,

21   it doesn't matter what section.

22              They had to have control of

23   their suppliers.  That's what Ethicon had

24   to do.

Anne Holland Wilson, MBA

1                And as part of that, it was
2       incumbent upon them to look at their
3       suppliers and ensure that they did have
4       the right systems in place to have a safe
5       device.
6                Q.    Did Ethicon have to do a
7       risk analysis prior to the time it
8       assumed the manufacture of the product?
9                A.    Ethicon, independent of
10      their supplier standards?
11               Q.    Yes, ma'am.
12               A.    That makes no sense.  If
13      they didn't -- if they weren't the
14      manufacturer, but they were under some
15      kind of agreement and they were supplying
16      product, like Medscand was supplying
17      product to Medscand -- sorry,
18      backwards -- Medscand was applying to
19      Ethicon, they were working together, then
20      Ethicon had to have supplier controls.
21      And as part of that, they would look at
22      the safety.
23               Q.    And when you're referring to
24      the supplier controls, what standard are

Anne Holland Wilson, MBA

1    you referring to?

2           A.    Supply chain controls,

3    they're right in there, they have been in

4    every quality system regulation since --

5    at least since 1963.

6           Q.    And do those supply chain

7    controls require Ethicon to perform --

8                      -  -  -

9                 (Brief interruption.)

10                     -  -  -

11   BY MR. COMBS:

12          Q.    Now, is there any

13   requirement that Ethicon have conducted

14   risk analysis of the product at the time

15   it was manufactured by Medscand?

16          A.    I need some clarification

17   about were they in a supply chain

18   agreement?

19                 Was this during a license?

20                 Or was this just when

21   Medscand was supplying it on their own?

22                 I'm not sure of the

23   circumstances around which you're asking.

24          Q.    Do you know what the

Anne Holland Wilson, MBA

1    arrangement was between Ethicon and

2    Medscand?

3         A.    I know that they had some

4    kind of an agreement between 1997 and

5    1999.  I believe it was about 26 months

6    they had an agreement prior to the

7    purchase by Ethicon -- of Medscand by

8    Ethicon.

9         Q.    Okay.  During that 26-month

10   period, was Ethicon required to do a risk

11   analysis?

12        A.    I have not read that

13   agreement.

14             Generally, in those

15   agreements, those quality agreements,

16   they specifically delineate what the

17   requirements are.

18             So if you have that

19   agreement, I'd be glad to take a look at

20   it.

21        Q.    As we sit here today, you

22   haven't read it.

23        A.    I have not looked at the

24   agreement between Ethicon and Medscand to

Anne Holland Wilson, MBA

1    see who took exact requirements for what

2    portion of the different systems.

3          Q.    And as we sit here today,

4    you don't know whether Ethicon was

5    required to do the risk analysis under

6    that agreement.

7          A.    I have not read that

8    agreement, so I cannot say, no.

9               I do write those supplier

10   agreements and do know they vary.

11         Q.    Has the FDA issued

12   performance standards for surgical mesh?

13         A.    Performance standards?

14         Q.    Yes, ma'am.

15         A.    You know, I really didn't

16   look at the FDA and what the requirements

17   were or any of those documents.

18         Q.    Do you know?

19         A.    I don't know.  I looked --

20   really focused on my area of expertise.

21         Q.    What regulations were

22   applicable to Medscand at the time TVT

23   was first brought to market?

24               That wasn't a very good

Anne Holland Wilson, MBA

1    question.

2         A.    What year was that?  Tell me

3    a little more.

4         Q.    I believe it was in 1997.

5               In 1997, what requirements

6    were applicable to Medscand?

7         A.    Okay.  1997 -- I would

8    probably go to my time line.  We have a

9    beautiful clean time line in here.

10              And I also have a cheat

11   sheet, because these things changed over

12   time.  And on here -- and I also

13   footnoted that not all standards are on

14   here.

15              So most of them are very

16   similar over a given point in time.

17              1997.  So I guess now I need

18   to know what exact day and month before I

19   could answer your question.

20              I mean, in October -- I

21   mean, the date of -- I mean, that's

22   how -- most of them are so stinking

23   similar, but it really doesn't matter,

24   because they're ISO 9001 with a 1345, an

Anne Holland Wilson, MBA

1    EN 1441, which was very, very similar to

2    the 46000 ones.

3                So February, the date of

4    publication --

5           Q.    October 1997.

6           A.    October 1997.

7                So 22nd of October 1997 --

8    all right.  Let me dig through here,

9    because there's also cut-in dates.

10                So in one of those binders

11    there's the DAV and the DO, so I have

12    like the 46001.

13                So now you're looking for

14    the quality system and the risk, both?

15           Q.    What ISO regs would have

16    been applicable to Medscand in October of

17    1997?

18           A.    So the full month of

19    October.

20                New standards come out.

21    Look-it, honestly, I'm not being a joke,

22    like the 22nd of October, a new one came

23    out.

24           Q.    The date at issue on the EC

1    certificate is October 2nd, 1997.

2         A.    Okay.

3         Q.    So on October 2nd, 1997.

4         A.    Well, if that's the case,

5    then we have -- right here, we have

6    ISO 9001 is applicable.  And then we have

7    to look at the cut-in date.

8              So when these standards were

9    published, that's the DAV.  And the

10   EN 46001, and...

11        Q.    And --

12        A.    I mean it says right there.

13        Q.    Yeah.

14        A.    But if you want me to go

15   look at it here.

16        Q.    No, no.

17        A.    ISO 9001.  Look-it, I got

18   them both.

19        Q.    Yeah.

20              So the standards that would

21   have been applicable to Medscand as of

22   October 2nd, 1997, the ISO standards --

23        A.    Right.

24        Q.    -- would have been

Anne Holland Wilson, MBA

1    9001:1994, and EN ISO 46001:1996.

2          A.    And that's exactly what I

3    just pulled out.

4          Q.    Okay.

5          A.    And I have got them in these

6    piles.

7                And it gets even trickier,

8    because there's date of availabilities,

9    there's date of, you know, announcements,

10   date of publications.  That's why I

11   wanted to check.

12         Q.    Are EN 1441 and ISO 46001,

13   are they similar?

14         A.    No.  46001 and 1441,

15   they're --

16         Q.    Yeah.  EN ISO 9001 and EN

17   ISO 46001 --

18         A.    No.  This is actually a

19   predecessor of the 1345.  Because this

20   is -- these aren't standalone yet.

21         Q.    Okay.  Thank you.

22               Ms. Wilson, the certificate

23   for -- the 1998 certificate has the same

24   standards, EN ISO 9001:1994 and EN ISO

Anne Holland Wilson, MBA

1   46001:1996, would you agree that those

2   were the standards applicable to Medscand

3   as of --

4           A.    Isn't that the same

5   certificate?  I'm sorry.

6           Q.    No, ma'am.  The first one --

7           A.    Can I take a look?

8           Q.    All right.  So here's the

9   question I have then.

10              For the revision date of

11  September 23rd, 1999, would the same

12  standards have been applicable to

13  Medscand at that time?

14          A.    I'll take a look.  1999 --

15          Q.    Yes, ma'am.  September 23,

16  1999.

17          A.    Do they say which version of

18  the 46001?  Because -- I'm sorry.  I

19  didn't mean to take it from your hand.  I

20  was just starting to look at the exhibit.

21              Because there is an EN 46001

22  that changed dates, but it's the same

23  standard.

24              And they're -- so in 1999,

Anne Holland Wilson, MBA

1   they had to come out with the 1345 had

2   come out, but it was probably in one of

3   those transition periods.

4           So it was in those

5   transition periods.  So you have to go

6   back and say that in 1999, yes, it was

7   46001 and 9001.

8       Q.   And the certificate that we

9   marked as Exhibit 7, which is dated

10  March 7, 2000, it's got the same

11  standards.

12      A.   Right.

13      Q.   And so would those have been

14  the same standards that would have been

15  applicable at that time as well?

16      A.   Now, I just want to mention

17  that, you know, I have seen those

18  certificates, and I have seen those by

19  many companies.

20          And because you have those

21  certificates, that's a great thing.  But

22  that doesn't mean that their quality

23  system is deployed very -- it doesn't

24  guarantee you of a well-deployed system.

Anne Holland Wilson, MBA

```
1           Q.    And the question I'm just
2    asking is that on March 7 of 2000, those
3    would still have been the standards in
4    place.
5           A.    Last you asked me, 1999.
6    I'm sorry.
7                 MR. WALLACE:  Let me object.
8                 Were you finished with your
9           answer?
10                MR. COMBS:  I didn't mean to
11          interrupt you.  If you weren't, I
12          apologize.
13                THE WITNESS:  I totally lost
14          my train of thought.
15                MR. WALLACE:  Okay.  Let me
16          just -- excuse me for one minute
17          just to say something.
18                If you're not finished with
19          your answer, just -- he
20          understands.  Put up your hand or
21          something and go ahead and finish.
22   BY MR. COMBS:
23          Q.    And I'll try not to
24   interrupt you.  I certainly wouldn't do
```

Anne Holland Wilson, MBA

1    it on purpose.

2         A.    Okay.  I was just trying to

3    get the point across that I have seen

4    those at many places and I have audited

5    many places.

6              And because you have those

7    standards in and of themselves, and these

8    are regulators, they know the dates.

9              I'm looking them up, because

10   these regulators are -- and this is not

11   easy, because you have to go back to CEN

12   and CENELEC, and look at each exact date

13   of a publication date, and I have done

14   that on many of these.

15             And then you have to know,

16   sometimes country-specific things.

17             So the regulators, I'm sure

18   they would know.

19             And yes, I'm confirming to

20   the best of my ability.  But I'm not a

21   regulator.  I'm a consultant and I go

22   into places.  And I have seen

23   certificates.  In fact, I saw a

24   certificate.

Anne Holland Wilson, MBA

1          And guess what?  It was

2    issued on a day that happened to be an

3    ice storm day and production wasn't even

4    running.

5          So I think this is great,

6    but it doesn't necessarily mean that

7    everything was hunky-dory.

8          Q.    And for the time periods in

9    question, between September 1997 and

10    March of 2000, the standards that would

11    have been in place for TVT would have

12    been -- in Europe would have been

13    EN 46001:1996 and ISO 9001:1994.

14          A.    Well, now I have go look

15    between '99 and 2000, because I don't

16    think that was covered on the

17    certificate.

18          This one said '99; correct?

19    And then you moved it to 2000?

20          Maybe --

21          Q.    Let's take a step back here

22    for a second.

23          A.    Please.

24          Q.    Because I'm not trying to

Anne Holland Wilson, MBA

1   make this --

2          A.    Because you keep switching

3   here.

4          Q.    I'm not trying to make this

5   any more complicated.

6                The first certificate has

7   got ISO 9001:1994.

8          A.    And we already established

9   that.

10         Q.    And the second certificate

11  has got the same standards for a later

12  time period.

13         A.    Do they have -- what I'm

14  trying to get at is do they have the

15  exact same '94, '96, fine.  I think we

16  have already established that.

17                Right.  I had confirmed that

18  I believe that to be true.

19         Q.    All right.

20         A.    But the regulators do know

21  best.  That's their job.

22         Q.    You mentioned CEN.  I just

23  want to make sure the record is correct.

24                What is CEN?

Anne Holland Wilson, MBA

1      A.    I believe you mention CEN.

2      Q.    Okay.  All right.  I

3  mentioned, it whatever.

4            What is CEN?

5      A.    The technical board that

6  approves -- there's CEN and CENELEC.

7            It's a European -- I would

8  have to go look it up.  It's like a

9  Central European Commission.  It's part

10 of the regulators in the EU.

11           And I'm not an expert

12 regulator.  I'm an expert in quality

13 systems, risk management across all

14 different kinds of medical devices.

15     Q.    And what does CEN approve?

16     A.    CEN, to my knowledge,

17 carries out the -- or execute the

18 regulations by the European Commission.

19     Q.    Thank you.

20           Ms. Wilson, on your reliance

21 list there were no risk assessments for

22 Prolene sutures.

23           You didn't review any risk

24 assessments for Prolene sutures, did you?

Anne Holland Wilson, MBA

1          A.    No.  I was looking at mesh

2     for the TVT-R only and mechanical cut

3     only.

4          Q.    There were no risk

5     assessments for Prolene hernia mesh on

6     your reliance list, were there?

7          A.    No.  Same answer as

8     previous.

9          Q.    In your report, you mention

10    Preventia -- well, strike that.

11              What is the Preventia in

12    this case?

13         A.    There's an application FMEA.

14    There was a Revision 7 in the document

15    called Design History and also called

16    Fact Book.  And that was also in the

17    technical file that I looked at.

18              So it was in multiple spots

19    under different Bates numbers.

20              And, in fact, that was the

21    only thing that I found early on in the

22    design phase.

23              So that was an application

24    FMEA, which looked at during implant what

Anne Holland Wilson, MBA

1    could happen.

2         Q.    Were any aspects of the

3    design looked at in the Preventia?

4         A.    Well, there were eight

5    revisions.  And all I looked at was

6    Number 8.  Actually, I did have a seven,

7    although there was a footnote that

8    said -- there wasn't a seven.

9              I focused on Number 8.  And

10   there were aspects of how the design was

11   put into use.  So with respect to the

12   user emplacement and the application,

13   that was in there.

14             But traditionally what's

15   done, and what I did at the exact same --

16   you know, the same time frame as we would

17   go and we would look at the questions and

18   the standards and say, How does this

19   device fit with this device function?

20             Even if it was like a

21   different version of a shoulder.  And one

22   shoulder is not the same as another

23   shoulder, because it might be installed

24   differently.

Anne Holland Wilson, MBA

1          Then we would look at each

2     and every -- so we would at the overlook

3     view as a system, then you look at the

4     component level, and look at each and

5     every component and what -- for each

6     function what could go wrong.

7          And I did not see that on

8     the design.

9          That would be -- and I have

10    that in my report as the different types

11    of FMEA.  All we saw was the application

12    and the Preventia Report Rev. 8.

13         Q.    And in your report you say

14    that Ethicon does not have previous

15    versions of the risk assessment,

16    including Revisions 1 through 7.

17         And did I understand you

18    just made a correction that you did have

19    7?

20         A.    No.  What I have quoted is

21    what an expert said in his report, that

22    the 1 through 7 -- I think I have that

23    footnoted -- that that was nowhere in

24    Ethicon.

1          But I somehow ended up with

2     a Version 7.  So I think my footnote is

3     what said the 1 through 7 is not there.

4     And then I ended up locating like just

5     yesterday a Version 7.  So...

6          Q.    So here's what it says,

7     Ethicon does not have the previous

8     versions of the risk assessments,

9     including Revisions 1 through 7, which

10    would include the version of the risk

11    assessment performed prior to the launch

12    of TVT-R in 1998.

13          Now, that is not correct, is

14    it?

15          A.    Where are you at?

16          Q.    I'm on page 15 of your

17    report.

18          A.    Right.  There's an expert

19    footnote that says there is no 1 through

20    7.  I think it's footnoted somewhere.  I

21    know it's footnoted in here.

22          Q.    Yeah.  Footnote 67 is what I

23    think you're referring to.

24          A.    So there is no 1 through 7.

Anne Holland Wilson, MBA

1              This is an application only.

2    Like I said, it doesn't have a design.

3    It's just looking at the installation for

4    how you put it in a body under a surgical

5    technique.

6              So it's not what I just

7    described.  And low and behold a

8    Version 7 did show up, like after I wrote

9    this.  And I was just trying to be

10   forthright.

11        Q.    I appreciate it.

12              But the statement that

13   Ethicon doesn't have the Versions 1

14   through 7, that's not correct.

15        A.    To the best of my knowledge,

16   they don't have 1 through 6 now.  I have

17   never seen those.

18              And the other expert that

19   was in charge of the corporate designee

20   said that he had never seen 1 through 7.

21              So I'm just honest and said

22   I saw 7.  So I have never seen 1 through

23   6.

24        Q.    And did you ask the lawyers

Anne Holland Wilson, MBA

1    that retained you in the case to provide

2    you with other copies of the Preventia?

3           A.    I don't know how many times

4    I need to say this.  I'll try again.

5                 I asked them to provide me

6    anything related to risk, whether it's

7    risk anything.  So related to TVT

8    mechanically cut, TVT-R mechanically cut

9    mesh, anything in this great big bucket

10   called risk I asked for.

11          Q.    And earlier versions of

12   Preventia, one of the things you

13   wanted --

14          A.    Anything.  And I got the

15   expert report that said there was no 1

16   through 7 -- 1 through 7, so they relied

17   on 8.

18                And then I recently, since I

19   submitted this report, came into

20   Version 7, and was just trying to be --

21          Q.    But --

22          A.    -- honest.

23          Q.    I'm sorry I interrupted you

24   again.

Anne Holland Wilson, MBA

1                    Were you finished?

2          A.    Yeah.

3          Q.    And as we sit here today,

4    you have never seen Revision 5.

5          A.    No, not to my knowledge.

6          Q.    Was there a requirement that

7    a dFMEA be performed by Medscand in 1997?

8          A.    Yes.

9          Q.    What is that standard?

10         A.    Well, there's EN 1441.  And

11   that talks about in the design --

12   actually, I have it right here.  May I

13   look at it and show it to you?

14         Q.    Of course.

15         A.    But the requirement is that

16   you analyze risk during the design, and

17   you can do it in a variety of ways.  You

18   can use different tools to accomplish the

19   same tasks.

20                So you could use -- and I

21   listed some of these earlier this

22   morning.  You could use a HAZOP.  You can

23   use a hazard analysis.  You can do a

24   fault tree analysis.  But you still have

Anne Holland Wilson, MBA

1    to analyze your risks during the design.

2                    And then as things change,

3    you have to go back and re-evaluate that.

4                    So, you know, the question

5    was:  Does it have to be exactly a dFMEA?

6    Well, it has to accomplish that function.

7    And you could use a slightly different

8    tool.

9                    And that's what the standard

10   says, that you have to look at safety,

11   including the acceptability of risk for

12   the medical device.  You have to look at

13   the benefits of the device and the risks

14   associated with the procedure, the

15   control of the risks.

16                   It talks about the risk

17   analysis.  And it says right here, It

18   shall be followed and it shall be

19   documented.

20                   You could look at all a list

21   of possible hazards as identified.

22                   And so it's pretty -- and

23   it's got a picture in it.  It gives you

24   questions.

Anne Holland Wilson, MBA

1              So it's pretty -- and it

2    does go back and talk about, you know,

3    review of the risk, and then it gives you

4    some other guidance in the back.

5         Q.    So pursuant to 1441, the key

6    is that the risk be analyzed, not that it

7    be titled dFMEA.

8         A.    Right.  And it talks in

9    Annex D about the different things.  The

10   procedures within Ethicon talked about

11   using for risks and safety analysis, they

12   called it a DSA and a FMEA, then later

13   they called it a dFMEA, I believe, and

14   aFMEA.

15              So those are the terms, and

16   they term it a dFMEA.  I have it in my

17   report.  And it's right in that Stamatis

18   book, which is -- I use all kinds for

19   training different medical devices.

20              If you look at Figure 7, and

21   that talks about, you know, system

22   levels, design, and it sort of calls out

23   the whole dFMEA, pFMEAs, things like

24   that.

Anne Holland Wilson, MBA

1            But it is acknowledged that

2    you could use a HAZOP type of format to

3    accomplish the same task.

4            Q.    The key thing is just that

5    the risks are analyzed.

6            A.    Well, and that they are

7    specifically analyzed.  They're

8    evaluated, that the hazards are

9    identified.

10            Then you look at the

11    probability of those hazards and the

12    severity of those hazards.  And that's

13    how you identified the risks.

14            And then you have to look

15    at -- you know, take different things

16    into account, and look at -- most call it

17    the risk priority number, which basically

18    tells you how important those things are.

19            And that you look at it in

20    the design phase.  And that's the key,

21    because if the design phase isn't done

22    right, you don't know what to mitigate,

23    how to mitigate it.

24            Because it's right here.  I

Anne Holland Wilson, MBA

1    mean, you can mitigate in some ways.

2         Q.    And did any standard require

3    a dFMEA to be done at any point?

4         A.    No standard is going to

5    require a specific tool be used.  I

6    believe I said that most commonly in my

7    report, and right here the most common

8    one is FMEA.

9              And, yes, it does say

10   design.  So it does say you need to do a

11   design risk analysis.

12        Q.    So design risk analysis,

13   yes.  Design FMEA specifically, no.

14        A.    No.  That's the most common

15   tool, as I cited, and it's the first tool

16   that's required -- that is defined in

17   here.

18             MR. DAVIS:  "Here" is 1441?

19             THE WITNESS:  Yes.

20   BY MR. COMBS:

21        Q.    What is it about the

22   Preventia Revision 8 that makes it not an

23   analysis of the design risk?

24        A.    Let me go back and try to

Anne Holland Wilson, MBA

1    explain a little different way.

2              So what they did is they

3    went down -- go look back at this figure

4    in my report.

5              So they went down here.

6    After the system concept was developed,

7    after the device was through its design,

8    after the process had been established

9    and said, let's see how it works in the

10   user's hands.

11             So these, I never saw any

12   risk analysis of those phases.  I saw the

13   downstream application risk analysis,

14   which doesn't say, like I tried to

15   explain -- let me try again.

16             You look at the system

17   overall and how, say, the instruments or

18   accessories would interact with the

19   device, how the different components of

20   the devices could interact, and then you

21   break down each component in detail

22   during the initial device phases, then

23   you go reanalyze it as you progress

24   through the design prior to launch.

Anne Holland Wilson, MBA

1            And so you would say, okay,

2    so this component has three -- these

3    three functions.  It has to -- for

4    example, it has to be -- the needle has

5    to be sharp.  It has to be at a certain

6    angle.  It has to fit with the guide.

7            So those functions would

8    each then be analyzed for many different

9    things and a severity -- they're not a

10   one-to-one, they're one to many.

11           So then you would have to

12   look at each and every combination,

13   assess the, okay, what's the hazard?

14   What's the potential severity?  What's

15   the frequency?  What's the RPN?  What's

16   the mitigation?  What's the RPN after

17   mitigation.

18      Q.    And so the critique that you

19   have of Preventia Revision 8 is it

20   doesn't assess the risk of the device

21   itself, it's the application and use of

22   the device?

23      A.    That's not quite what I

24   said.

Anne Holland Wilson, MBA

1    Q.    Okay.

2    A.    Let me try to clarify.

3          I said it doesn't include

4    the design portion of it.  So, yeah, the

5    design is part of the device, but there's

6    other things in the design that you could

7    mitigate through.

8          So you look at the design,

9    absolutely.  You look at the device

10   itself.  But in part of the design, you

11   look at the interaction between the

12   device and the rest of the system.

13         So it's not just the device,

14   it's the system also.

15   Q.    And what parts of the design

16   needed to be included in the risk

17   analysis that aren't in the Preventia?

18   A.    Every single component.

19         Let me restate that.

20         I have tried twice.  I'm not

21   sure how I can restate it.

22         You look at the system

23   level, which is here.

24         MR. WALLACE:  And just to be

Anne Holland Wilson, MBA

1          clear, you also pointed to this

2          earlier.

3                    You're referring to a figure

4          on page 7 and you're circling some

5          boxes.

6                    So just to be clear for the

7          court reporter, if you could refer

8          to --

9                    THE WITNESS:  Oh,

10         absolutely.

11    BY MR. COMBS:

12         Q.    And so you are referring to

13    Figure 4 in your report on page 7?

14         A.    Right.  It comes from this

15    book right here, my favorite, Failure

16    Mode and Effect Analysis, Stamatis book.

17         Q.    And so is the problem with

18    the Preventia risk analysis, that it

19    doesn't address the components?

20         A.    The problem with the

21    Preventia is, it doesn't do -- it's after

22    the fact, and it doesn't address the

23    systems.  It doesn't address the

24    interaction of the system with the

Anne Holland Wilson, MBA

1    components.

2              It doesn't address

3    different -- there are many things called

4    out in the EN 1441 and the subsequent

5    standards that you have to look at.

6              It says, okay, does it talk

7    about the toxicity, the endotoxin?  Does

8    it look at the -- let's just look at some

9    of those things.

10             I mean, they're very

11   specific.

12        Q.    All right.  And just so the

13   record is clear, I want to make sure that

14   what you're looking at right now, it's

15   EN 1441?

16        A.    Correct.

17        Q.    Thank you.

18        A.    Right.  These are just some

19   examples.

20        Q.    All right.  And these are

21   things that need to be covered in the

22   design risk analysis.

23        A.    Right.  So when you look at

24   the design, and these are early, again,

Anne Holland Wilson, MBA

1    in the design phase.  You want to make

2    sure that your system and concepts are

3    good to start with, so you don't get all

4    the way down the road and come up with

5    something that, oh, my goodness, this

6    isn't what we thought was going to be.

7    Right?

8              So you want to say, okay,

9    does this look -- here's just an example

10   of estimation of the risk.

11             Does a hazard occur in the

12   absence of a failure?  Does a hazard

13   occur in a failure mode only?  Is there

14   multiple failure conditions?  Can it be

15   detected by the user of the head of it?

16             You look at the types of,

17   for example, of different hazards with

18   homogeneity.  You look at hazards of the

19   process, manufacturing process -- well,

20   that's not design, that's in the process.

21   I never saw process of FMEA either.

22             I'm sorry.

23        Q.    All right.  And so for TVT,

24   for example, would you need to look at

Anne Holland Wilson, MBA

1    characteristics of the mesh?

2         A.    You would need to look at

3    characteristics of the mesh.  You would

4    look at the needle, the packaging.  You

5    would look at -- it says, incorrect

6    formulation, mechanical forces, moving

7    part, suspended masses, vibration.

8              How about, you know,

9    inadequate specification of accessories.

10             And these are just on a list

11   in 1441, just to be clear.  I'm not

12   making these up, I'm just reading off a

13   list.

14        Q.    So things that you need to

15   look at under 1441 would include looking

16   at the mesh, looking at the needle,

17   looking at the packaging, looking at the

18   accessories.

19        A.    Looking at -- yeah.

20        Q.    Cytotoxicity?

21        A.    Looking at the

22   biocompatibility.  It even says right

23   here, we're looking at the degradation of

24   the material.  I didn't make that up.

Anne Holland Wilson, MBA

1   That's right in the standard.

2              Biological safety test data.

3   Prior use.  And right here it says, you

4   can use -- it says, Available information

5   on previous use.  This is what I was

6   trying to be clear on.

7              It should be reviewed.

8   However, previous use of an ingredient or

9   material does not necessarily assure its

10  suitability in similar applications.

11             So that's really what I was

12  trying to state ahead of time,

13  beforehand.

14             MR. WALLACE:  Before you ask

15        another question, let's take a

16        break.

17                   -  -  -

18        (Whereupon, a brief recess

19        was taken from 2:06 p.m. to 2:17

20        p.m.)

21                   -  -  -

22        (Whereupon, Exhibit Wilson 9

23        was marked for identification.)

24                   -  -  -

Anne Holland Wilson, MBA

1    BY MR. COMBS:

2         Q.    Ms. Wilson, right before the

3    break we were talking about the risk

4    analysis.

5              And is the primary purpose

6    of risk analysis to identify potential

7    hazards?

8              I mean, is that why we're

9    doing it?

10        A.    The primary reason for these

11   risk analysis is to produce a safe

12   product for people and eliminate sources

13   of harm.

14        Q.    And so the goal of the risk

15   analysis is to produce the safest

16   product.

17        A.    Yes.

18        Q.    The risk analysis, that's an

19   engineering tool; correct?

20        A.    It's a team tool.  You need

21   a team to do a real -- a good job at

22   engineering analysis.  It's not something

23   you can do in vacuum.

24        Q.    And, earlier, you told us

Anne Holland Wilson, MBA

1    about the use of the team.  You have

2    members of the team that would bring

3    different specializations to the process.

4         A.    Generally, they have a

5    leader.  I have led quite a few teams of

6    different types of devices, and they do

7    have specialists in specific areas, like

8    design and clinical, for example.

9         Q.    And the medical

10   representative on the team would be the

11   person that would give the primary input

12   regarding the medical risk; correct?

13        A.    It depends.  It depends on

14   the company and how they're structured.

15        Q.    On the teams that -- strike

16   that.

17             Have you been involved in

18   risk assessments that have included

19   physicians?

20        A.    We've had physician inputs,

21   and we have gone out.  But often

22   marketing and clinical will bring that

23   medical input in.

24        Q.    And why is it that you want

Anne Holland Wilson, MBA

1    the medical input?

2         A.    We generally get the

3    clinical input.

4              I say clinical, because it

5    may be a nurse, someone that goes out and

6    trains the physicians.  So it's not

7    necessarily a physician.

8              To understand how it's used.

9         Q.    And if a physician is part

10   of that team, that physician is giving

11   you expert input regarding their

12   knowledge of the medical or clinical

13   risk.

14        A.    That's why often -- could

15   you restate that.  I'm not sure I caught

16   it all.  I'm sorry.

17        Q.    If a physician is on the

18   team, that person is providing expert

19   input from their perspective regarding

20   the medical and clinical risk.

21        A.    Right.  If there is one.

22             Generally, like I just said,

23   you have a clinical person that works for

24   the company, and you have a marketing

Anne Holland Wilson, MBA

1    person.  You have the design person.  And

2    you may have a, you know, medical adviser

3    that comes in just for a bit or reviews

4    it at the end.

5         Q.    And the goal of the process

6    is to produce a safe product.

7         A.    Right.

8         Q.    On your reliance list, I did

9    not see any reference to any position

10   statements by physicians.

11             Is that correct?

12        A.    Was this on my reliance

13   list?

14        Q.    No, ma'am.

15        A.    Because it doesn't look

16   familiar.

17             (Witness reviewing

18   document.)

19             MR. WALLACE:  Can you repeat

20        the pending question, please.

21             MR. COMBS:  I think the --

22        well, let's read it back.

23                  -  -  -

24             (Whereupon, the requested

Anne Holland Wilson, MBA

1          portion was read.)

2                  -   -   -

3   BY MR. COMBS:

4          Q.    So, Ms. Wilson, have you

5   ever reviewed the AUGS position

6   statement?

7          A.    I'm just reviewing it right

8   now.

9          Q.    Do you know what AUGS is?

10         A.    I do not.

11         Q.    AUGS is the American

12  Urogynecological Society.  It's surgeons

13  that treat female pelvic floor disorders.

14              Do you know that?

15         A.    No.

16         Q.    Do you know what SUFU is?

17         A.    Where is that?  It's right

18  after AUGS.

19         Q.    On the front page, the

20  right-hand column.

21         A.    Society -- no.  I don't know

22  of Urodynamics Female Pelvic Medicine.

23              This would be something I

24  didn't look at.

Anne Holland Wilson, MBA

1          Q.      And in determining whether a

2     product is safe, is one of the things

3     you'd want to know is what the surgeons

4     who use it believe about the product?

5          A.      This could be another input

6     to that whole process and the team.  But

7     I haven't read it all the way through,

8     but I certainly think it could be one of

9     the inputs.

10         Q.      And TVT, its a midurethral

11    sling, isn't it?

12         A.      (Gesturing.)

13                 (Witness reviewing

14    document.)

15         Q.      And the question was:  Is a

16    TVT a midurethral sling?

17         A.      I know it supports your

18    urethra.  I don't know -- I believe I

19    said this before, I don't know exactly

20    where along the urethra, but --

21         Q.      All right.  I'll represent

22    to you the TVT is a midurethral sling.

23         A.      Okay.

24         Q.      The AUGS position paper at

Anne Holland Wilson, MBA

1   the very top says, The procedure is safe

2   and effective and has improved the

3   quality of life for millions of women.

4                Do you agree or disagree

5   with that statement?

6                MR. WALLACE:  Objection to

7         form.  This hasn't been

8         authenticated.

9                THE WITNESS:  And a white

10        paper, basically, anyone can write

11        a position paper.

12               As far as risk goes, you

13        have to evaluate all sources.

14               So you would have to make

15        sure that -- you know, this could

16        be one input.  You would get

17        positions papers from around the

18        globe.

19   BY MR. COMBS:

20        Q.    Here's --

21        A.    That's all.

22        Q.    Here's my question.  Do you

23   disagree with AUGS that the procedure is

24   safe, effective, and has improved the

Anne Holland Wilson, MBA

1   quality of life for millions of women?

2           Do you agree or disagree?

3       A.    I have no way of answering

4   that question.

5       Q.    At the bottom of the first

6   page, it says, The FDA website states

7   that the safety and effectiveness of

8   multi-incision slings is well established

9   in clinical trials that followed patients

10  for up to one year.

11          Do you agree or disagree

12  with that statement?

13          MR. WALLACE:  Same

14      objection.

15          THE WITNESS:  I have no way

16      of knowing this.  I haven't

17      researched it.  I have not done

18      anything to have any way of

19      knowing whether this is true or

20      not true.

21  BY MR. COMBS:

22      Q.    On page 2, at the top, AUGS

23  says, Polypropylene material is safe and

24  effective as a surgical implant.

Anne Holland Wilson, MBA

1              Do you agree or disagree

2    with that statement?

3              MR. WALLACE:  Same

4         objection.

5              THE WITNESS:  I have to give

6         you the same answer.  I don't know

7         personally.

8    BY MR. COMBS:

9         Q.    At the bottom of

10   paragraph 1, it says, As a knitted

11   implant for the surgical treatment of

12   SUI, macroporous, monofilament,

13   lightweight polypropylene has

14   demonstrated long-term durability, safety

15   and efficacy up to 17 years.

16              Do you agree or disagree

17   with that statement?

18              MR. WALLACE:  Objection to

19         form.  Same objection.

20              THE WITNESS:  I can't agree

21         nor disagree.

22   BY MR. COMBS:

23         Q.    You don't know.

24         A.    I can't agree nor can I

Anne Holland Wilson, MBA

1    disagree.

2         Q.    Yeah.  And that's because

3    you don't know whether that is a true or

4    an untrue statement.

5         A.    I don't know if any of this

6    is true or not.

7         Q.    Paragraph 2.  The

8    monofilament polypropylene mesh

9    midurethral sling is the most extensively

10   studied anti-incontinence procedure in

11   history.

12              Do you agree or disagree

13   with that statement?

14        A.    I don't have any way of

15   knowing.

16        Q.    You don't know whether it's

17   the most extensively studied

18   anti-incontinence device in history, do

19   you?

20        A.    No.

21        Q.    At the bottom of paragraph

22   2, it says, Among historical SUI

23   procedures, the midurethral sling has

24   been studied as long in follow-up after

Anne Holland Wilson, MBA

1   implantation as any other procedure and

2   has demonstrated superior safety and

3   efficacy.  No other surgical treatment

4   for SUI before or since has been the

5   subject of such extensive investigation.

6           Do you agree or disagree

7   with that statement?

8           MR. WALLACE:  Objection to

9        form.  Same objection.

10           THE WITNESS:  I believe I

11        stated several times that I'm not

12        a clinical expert and I'm not a

13        physician.

14           And my paper specifically

15        was to look at the risk process

16        and the design process.

17           This really, absolutely has

18        nothing to do with my whole paper

19        or my -- what I was asked to do.

20        It's like -- it's irrelevant to my

21        opinion.

22   BY MR. COMBS:

23        Q.   Well, I understand you

24   believe that.  But you don't know whether

Anne Holland Wilson, MBA

1  that statement is true or untrue, do you?

2       A.    I said in my opinion, this

3  has nothing to do with what I was asked

4  to do.

5       Q.    So please answer my

6  question.

7       A.    Okay.

8       Q.    Do you know whether that

9  statement that I just read -- I will read

10 it again if you want.

11      A.    Okay.  Please do.

12      Q.    Do you know whether that

13 statement is true?

14      A.    Could you re-read it.

15      Q.    Yes.  I'm at paragraph 2,

16 the last two sentences of that paragraph.

17 So the first one.

18            Among historical SUI

19 procedures, the MUS, midurethral sling,

20 has been studied as long in follow-up

21 after implantation as any other procedure

22 and has demonstrated superior safety and

23 efficacy.

24            Do you know whether that's

Anne Holland Wilson, MBA

1    true?

2         A.    No.  I don't know if it's

3    true.

4         Q.    The next sentence.

5              No other surgical treatment

6    for SUI before or since has been subject

7    to such -- strike that.

8              The next sentence says, No

9    other surgical treatment for SUI before

10   or since has been subject to such

11   extensive investigation.

12             MR. WALLACE:  Same

13        objection.

14   BY MR. COMBS:

15        Q.    Do you know whether that's

16   true?

17             MR. WALLACE:  Same

18        objection.

19             THE WITNESS:  I don't know

20        if that's true.

21   BY MR. COMBS:

22        Q.    Paragraph 3 says,

23   Polypropylene mesh midurethral slings are

24   the standard of care for the surgical

Anne Holland Wilson, MBA

1    treatment of SUI and represent a great

2    advance in the treatment of this

3    condition for our patients.

4              Do you know whether

5    polypropylene mesh midurethral slings are

6    the standard of care?

7              MR. WALLACE:  Objection to

8         form.

9              THE WITNESS:  When it comes

10        to clinical things, I cannot

11        answer these questions.

12             Again, that's not my area of

13        expertise as noted in my report.

14   BY MR. COMBS:

15        Q.   Ms. Wilson, in paragraph 3,

16   kind of near the bottom, there is -- it's

17   the next-to-last sentence.

18             Full-length midurethral

19   slings, both retropubic and

20   transobturator, have been extensively

21   studied, are safe and effective relative

22   to other treatment options and remain the

23   leading treatment option and current gold

24   standard for stress urinary incontinence.

Anne Holland Wilson, MBA

1          Do you know whether that

2   statement is true?

3          A.    I don't know.

4               MR. WALLACE:  Same

5      objection.

6   BY MR. COMBS:

7          Q.    Ms. Wilson, on the next

8   page, in the conclusion section, the last

9   sentence in that section says, This

10  procedure is probably the most important

11  advancement in the treatment of stress

12  urinary incontinence in the last 50

13  years.

14          Do you know whether that

15  statement is or is not true?

16               MR. WALLACE:  Same

17      objection.

18               THE WITNESS:  Same answer.

19  BY MR. COMBS:

20          Q.    And the answer is you don't

21  know?

22          A.    I don't know.

23          Q.    Are these statements in the

24  AUGS position statement that we've just

Anne Holland Wilson, MBA

1    gone over, are they something that a

2    physician would have more expertise in

3    relation to than you?

4              MR. WALLACE:  Objection to

5         form.

6              THE WITNESS:  I don't

7         understand your question.

8              Would a physician be more

9         interested in this?

10   BY MR. COMBS:

11        Q.    No.  Would they have more

12   expertise than you on the medical --

13        A.    A physician is obviously a

14   clinical person.  And I have stated I'm

15   not.

16              And it has no bearing on my

17   expertise to do what I was asked to do.

18                   -  -  -

19              (Whereupon, a discussion was

20         held off the record.)

21                   -  -  -

22              (Whereupon, Exhibits Wilson

23         10 and 11 were marked for

24         identification.)

Anne Holland Wilson, MBA

1                    -  -  -

2              MR. COMBS:  Ms. Wilson, I

3       just wanted to put in the record

4       that we have done a lot of

5       questioning regarding EN 1441 and

6       EN 46001:1997.  I just thought

7       they out to be in the record.

8              THE WITNESS:  That's fine.

9              I'm thinking that there was

10      an earlier one we were talking

11      about prior to '97.

12             If you look on the

13      certificate -- is that the right

14      one?

15             MR. DAVIS:  Yes.

16             THE WITNESS:  Okay.  I just

17      wanted to make sure.

18             Oh, yeah, because these are

19      my copies.  Aren't they?

20             They came from these

21      binders?

22             MR. COMBS:  No.

23   BY MR. COMBS:

24       Q.   Ms. Wilson, before the last

Anne Holland Wilson, MBA

1    break, you were pointing out to us things

2    that EN 1441 required to be in risk

3    analysis.

4              Do you remember that?

5         A.    I believe I said that those

6    were things to consider, not required.

7         Q.    Okay.  My mistake.

8              You were pointing out to us

9    things that 1441 said to consider in risk

10   analysis; is that correct?

11        A.    Right.  They're in the

12   standard.

13        Q.    And you pointed us to, for

14   example, Annex C as examples of possible

15   hazards that could be considered in a

16   risk analysis; is that correct?

17        A.    In the design.  I was

18   focusing on the design portion of it.

19        Q.    And so for the design

20   portion of the risk analysis, you pointed

21   us to Annex C, which had things such as

22   biological hazards, environmental

23   hazards, hazard related to the use of the

24   device, hazards arising from functional

Anne Holland Wilson, MBA

1    failure, maintenance, aging, things of

2    that nature; is that correct?

3              A.    And many more.  I think I

4    said mechanical forces and a variety of

5    things in there.

6              Q.    Has a risk -- strike that.

7                    Was a risk analysis done of

8    TVT pursuant to EN 1441?

9              A.    As far as I know, there was

10   an application one done.

11                   And then in 2001, I believe,

12   after this product had been on the

13   market, I did see a risk analysis per

14   1441.

15                   However, that wasn't done in

16   the design.  And that's what my report

17   goes back to, is during the design of the

18   device is when this is critical to be

19   done, not some years after the fact.

20             Q.    Now, what is the 2001 risk

21   analysis that you're discussing?  Because

22   it's not on the reliance list.  That's

23   why I'm asking.

24             A.    It is in that 500 --

Anne Holland Wilson, MBA

1        THE WITNESS:  Can you

2    explain that?  I don't know if we

3    can.  It was in a different Bates

4    number.

5        MR. WALLACE:  Ethicon has

6    marked some of the same documents

7    with different Bates numbers.  And

8    I think that's where the confusion

9    might lie.

10        But bottom line is -- I can

11    talk to you about that offline, if

12    you want, but I'm not going to sit

13    here and try to ferret through it

14    during this deposition.

15        MR. COMBS:  Okay.

16        MR. WALLACE:  She has

17    seen -- go ahead.  She has seen --

18    go ahead.

19        THE WITNESS:  I'm not sure

20    how to explain it.  What I looked

21    at -- what's her name -- Ms. --

22    oh, my goodness, I'm drawing a

23    blank.

24        MR. WALLACE:  Duncan.

Anne Holland Wilson, MBA

1              THE WITNESS:  -- Duncan's

2       report there was a reference to

3       the technical file, the numbers

4       didn't match up to my numbers.

5              So I took a double-check of

6       that.  And when I did look at that

7       technical file, I'm like, oh,

8       yeah, but this was done in 2001.

9              I remember looking at these

10      things and it did have the same

11      Preventia documents in there.  It

12      did have a 1441 in there.  It said

13      to 1441.

14             However, in my opinion, it

15      was done after the device was --

16      you know, it was in 2001.

17             So if this was on sale in

18      '97, '98, 2000, maybe it was 2002,

19      even, that's not when the device

20      was being -- the primary design.

21      And it was more like when they

22      were talking about the blue mesh

23      time frame.

24   BY MR. COMBS:

Anne Holland Wilson, MBA

1        Q.    Now, that document is not on

2   your reliance list, is it?

3        A.    Yes.  I believe it's under a

4   different Bates number.  That's what I'm

5   trying to say.

6        Q.    Well, how do I find that?  I

7   mean, I looked at the reliance list, and

8   it's not on there.  But if you say it is,

9   I'd like to look.

10       A.    Well, I'm sorry.  I'm not an

11  expert on Bates numbers.  We would have

12  to go to the Duncan report and

13  cross-reference it and bring that stack

14  of papers.

15            MR. WALLACE:  Is your

16       question whether or not she has

17       previously seen the technical

18       file?

19            MR. COMBS:  The first

20       question is:  Is it on the

21       reliance list?

22            THE WITNESS:  As we -- we

23       have a copy of her report?

24  BY MR. COMBS:

Anne Holland Wilson, MBA

1      Q.     Yes.

2      A.     Let me see if I can go

3   backwards, because the numbers didn't

4   match up.

5           MR. DAVIS:  Are you going to

6       make her reliance list an exhibit?

7           MR. COMBS:  Isn't that in --

8           MR. DAVIS:  It's not

9       attached to her report.  Ask her,

10      I don't think it was.

11          MR. COMBS:  This is 12.

12              -   -   -

13          (Whereupon, Exhibit Wilson

14      12 was marked for identification.)

15              -   -   -

16          THE WITNESS:  (Witness

17      reviewing document.)

18          I'm not sure I can go

19      backwards.  I'm not sure I'm smart

20      enough on Bates numbers to go

21      backwards.

22          But I looked at the

23      technical file.  It was about

24      1,000 pages.  So it was about 500

Anne Holland Wilson, MBA

1          pages double-sided.

2     BY MR. COMBS:

3          Q.    Which technical file?

4          A.    For the TVT.  It was labeled

5     as TVT-L, even though it says it was

6     TVT -- I don't know if they used standard

7     or which code word they used, but it was

8     the TVT base, maybe they said, and blue.

9     But it was about 1,000 pages.

10              And I know, you know, but I

11    might have to refer to our attorneys to

12    explain the Bates numbers.

13         Q.    Okay.  Would you agree with

14    me that nowhere in your report is there

15    any reference to a risk analysis from

16    2001 regarding TVT?

17         A.    Right.  I was talking about

18    my report talked about, like from the

19    very beginning, it talked about right

20    here, the design phase October '98, '93,

21    those kinds of time frames, because

22    that's when the device was being

23    designed.

24              And so I wasn't looking at

Anne Holland Wilson, MBA

1  things that happened four years later as

2  part of the design.

3           Yeah, it's not in my report,

4  that counted.

5      Q.    There's no mention in your

6  report of that, is there?

7      A.    Right.  The application

8  FMEA, which was done earlier in time, is

9  the one that I mentioned, because that

10  was during the design time frame.

11      Q.    Did you purposely leave that

12  out of your report?

13           MR. WALLACE:  Objection to

14           form.  Assumes facts not in

15           evidence.

16           THE WITNESS:  I didn't find

17           that to be of importance, because

18           it wasn't part of the design.  I

19           was focusing, again, on the design

20           portion.

21  BY MR. COMBS:

22      Q.    And in your report, are

23  there places in which you say -- okay.

24  Strike that.

Anne Holland Wilson, MBA

1                 That FMEA is not mentioned

2    anywhere in the report, is it?

3         A.    No.

4         Q.    And is that something that

5    you considered in forming your opinions

6    in this case?

7         A.    It is.  I mean, I looked at

8    it and I said in the very background

9    that, you know, in the summary, that they

10   were either not conducted or were not

11   able to demonstrate that they were --

12   wait.  Let me find this.

13                So they either weren't there

14   or they weren't able to demonstrate they

15   were done in a manner that was good, in

16   my opinion.

17                So you don't come back --

18   and I have been asked to do this as a

19   consultant -- to come back later after

20   the product is on the market and say, oh,

21   by the way, can you make me a design

22   history file.

23                I have been asked to do

24   that.  And, to me, that's just not good

Anne Holland Wilson, MBA

1    practice.  So I did not include that.

2             I considered it, and I

3    decided that that wasn't what's intended

4    to be done by these standards.  And so

5    that's why it wasn't specifically called

6    out.

7        Q.    So you made a decision to

8    exclude that risk analysis, because it

9    was done after the product had been

10   marketed.

11       A.    I didn't exclude it.  I

12   considered it.  And right in here, I

13   said, you know, either it -- either it

14   wasn't conducted or it doesn't say that

15   it was -- the system functioned in a good

16   manner.

17            So I didn't think it was in

18   a good manner.  So I didn't exclude it.

19       Q.    Where in your report does it

20   say that the system didn't function in a

21   good manner?

22       A.    It wasn't able to

23   demonstrate that the acquired system,

24   because it wasn't in the --

Anne Holland Wilson, MBA

1          Q.    And I apologize, ma'am.

2     Where are you reading?

3          A.    I'm in the summary of

4     opinions, number 1, on page 3.  I'm sorry

5     about that.

6          Q.    So is it your basic position

7     that because that risk analysis is done

8     after the product was marketed, it

9     doesn't count?

10          A.    No.  What I'm trying to say

11     is, if it's not done during the design

12     phase, then you're not able to mitigate

13     risk and you're not able to make measures

14     to make it safer.

15               And so what you document

16     after the fact may not be adequate.

17               And so that is -- and, in

18     fact, I didn't feel it was adequate, so

19     that's why I made that statement.

20               MR. COMBS:  All right.  Mark

21          this as 13.

22                    -  -  -

23               (Whereupon, Exhibit Wilson

24          13 was marked for identification.)

Anne Holland Wilson, MBA

1                    -   -   -

BY MR. COMBS:

3          Q.    And is that the risk

4    analysis that you're referring to?

5          A.    Let me take a look here.

6               MR. WALLACE:  Phil, is this

7          from this 1,000-page document that

8          Ms. Duncan cites?

9               MR. DAVIS:  Yes.

10              THE WITNESS:  Yes, it is.

11              MR. COMBS:  I don't know

12         what document she's citing.  This

13         is from the technical file.

14              MR. WALLACE:  So in other

15         words, Anne knows better than both

16         of us.

17              You're saying this is what

18         you saw yesterday.

19              THE WITNESS:  Yes, because

20         the numbers didn't jive.  And I

21         wanted to make sure it was the

22         same thing.  And I didn't bring

23         all these boxes with me, so I did

24         specifically relook at this.

Anne Holland Wilson, MBA

1              And, yeah, I remembered

2         seeing it, because I've never seen

3         anyone put "not imaginable."

4    BY MR. COMBS:

5         Q.    And so did you get a hard

6    copy of this from counsel?

7         A.    I asked for this to be

8    printed out yesterday, yes.  And I had

9    seen it before.

10        Q.    Did you have a hard --

11             MR. WALLACE:  Let me be very

12        clear.  When you say "before,"

13        before yesterday?

14             THE WITNESS:  Correct.

15        Before yesterday.

16   BY MR. COMBS:

17        Q.    You had a hard copy of it

18   before yesterday?

19        A.    Let me try to be clear.

20             All documents were provided

21   to me electronically.  I could choose

22   which ones to print out.  And so as part

23   of my decision-making process, I scanned

24   things and then some I chose to print

Anne Holland Wilson, MBA

1   out.  Some I didn't.

2              I can't recall if I printed

3   this or I looked at it electronically.

4         Q.    Will you provide Mr. Wallace

5   with a copy of the Bates stamp of the

6   document that you say this was within?

7         A.    I'm sorry.  I don't

8   understand the question.

9         Q.    I have asked you today to

10  show me where it is on the reliance list.

11  And you say you can't.  And so I'm

12  asking:  Will you provide that

13  information to Mr. Wallace?

14        A.    Of course.  I'm sure it's

15  tracked down somewhere in one of the

16  computers.

17        Q.    All right.  So we marked a

18  copy of your reliance list as Exhibit 12.

19        A.    Okay.

20        Q.    And so you'll tell

21  Mr. Wallace where on this reliance list

22  this document is.

23        A.    We'll figure that out.  I

24  just don't know right off the top of my

Anne Holland Wilson, MBA

1    head.

2            Q.    Okay.

3            A.    Because the numbers didn't

4    match up.

5            Q.    And so you agree this is

6    risk analysis done pursuant to 1441?

7            A.    Well, that's --

8            MR. COMBS:  It's 13, Ed.

9            THE WITNESS:  That's what

10           this says.  I would not say that

11           it's -- you know, I would not

12           personally say.

13               In my opinion, it doesn't

14           meet what 1441 says to do.  But it

15           says it's per 1441 there.

16   BY MR. COMBS:

17           Q.    And would you agree with me

18   that nothing related to that is set forth

19   in your report?

20               Is there anywhere in your

21   report that you say this risk analysis

22   doesn't comply with 1441?

23           MR. WALLACE:  Objection to

24           form.

Anne Holland Wilson, MBA

1               THE WITNESS:  No.  It's not

2          going to say that in my report.

3     BY MR. COMBS:

4          Q.     I mean, that's not contained

5     within the Rule 26 expert report of Anne

6     Wilson, is it?

7               MR. WALLACE:  Objection to

8          form.

9               THE WITNESS:  It says that I

10          looked at this big, giant

11          document, and in my opinion, that

12          it wasn't a design risk analysis

13          that was either present or

14          adequate.  And that was my

15          opinion.

16     BY MR. COMBS:

17          Q.     What does it say?

18               MR. WALLACE:  Can I cut

19          through the chase?

20               MR. COMBS:  Sure.

21               MR. WALLACE:  Go back to

22          Summary of Opinion 1.  Her entire

23          report references these issues.

24               I think what's happening is

Anne Holland Wilson, MBA

1      you guys are like two ships

2      passing in the night right now.

3      Okay.

4           MR. COMBS:  We're not two

5      ships passing in the night at all.

6      This document isn't on the

7      reliance list, and there is

8      nothing in the expert report --

9           MR. WALLACE:  Well, first of

10     all, she said she's looked at it,

11     she's analyzed it.

12          She pointed to you ten

13     minutes ago, which you were not

14     on, how she says it either was not

15     there or it was inadequate, and

16     she told you that it was

17     inadequate.  She even talked about

18     the unimaginable.

19          I am at a loss to understand

20     what you are insinuating here, but

21     I'm happy to work with you to

22     straighten it out.

23          But to sit here and ask the

24     same questions six times about

Anne Holland Wilson, MBA

1          something not being here when she

2          told you 15 minutes ago before you

3          ever whipped out this Exhibit 13

4          that it was there and she talks

5          about 1,000-page document, and the

6          fact that she's seen this before

7          makes -- we're just not going to

8          allow the record to be this

9          muddied at this point.

10   BY MR. COMBS:

11          Q.    Okay.  Show me the sentence

12   that encompasses your opinion that this

13   does not comply with 1441.

14          Just show it to me so we can

15   read it into the record.

16          MR. WALLACE:  You're asking

17          her to recite her entire report to

18          you.

19          She's talking about a risk

20          management process.  She said she

21          reviewed the technical file.  I

22          mean --

23          MR. COMBS:  Ed, if we're

24          going to keep on with the speaking

Anne Holland Wilson, MBA

1        objection like this, let the

2        witness step out of the room.

3               MR. WALLACE:  Fair enough.

4               THE WITNESS:  I need to use

5        the restroom.

6               MR. WALLACE:  Let me finish.

7        I'm happy to step out of the room

8        with you.  I agree with you.  I

9        don't want to do a speaking

10        objection.

11               I'm just trying to cut to

12        the chase here, because I felt

13        like you guys are two ships

14        passing in the night, because

15        you're asking her to recite Bates

16        numbers, and she's already told

17        you she's not a lawyer.

18               MR. COMBS:  Okay.  Before we

19        break --

20               MR. WALLACE:  Why don't you

21        take a break --

22               MR. COMBS:  No.

23    BY MR. COMBS:

24        Q.    Before we break --

Anne Holland Wilson, MBA

1               MR. WALLACE:  Oh, go ahead.

2     BY MR. COMBS:

3          Q.    Before you break, I want you

4     to show me the portion of your report

5     that says, this risk analysis does not

6     comply with 1441.  And the risk analysis

7     is Exhibit 13.

8          A.    What I said here in Summary

9     of Opinion 1, which includes the summary

10    of the totality of my review of all the

11    documents, so whether it's got --

12    sometimes there's different numbers on

13    the documents, whether it was printed or

14    electronic, I looked at the document and

15    I very distinctly remember that, I said

16    I'm looking at the design, it was called

17    design -- I called it design history file

18    because that's the terminology used both

19    by Ethicon and also by the fact book.

20    And that was the time frame.

21               So I was looking for the

22    risk documents for the design in that

23    time frame.

24               And I said, look, in

Anne Holland Wilson, MBA

1    October '98 through '99, until the

2    purchase in 2000, that was the time frame

3    I looked at, that the design

4    documentation, as outlined in the DHF, it

5    does not evidence the stuff that was

6    acquired.

7              So I'm saying, is there

8    evidence that the design documentation

9    including the risk complied?  Right?

10        Q.    What sentence are you

11   talking about?

12        A.    I'm in the summary.  I'm

13   paraphrasing paragraph 1.

14        Q.    But I'm asking you not to

15   paraphrase.  I want you to show me the

16   sentence that says, this risk assessment

17   doesn't comply with 1441.

18        A.    That's not going to be

19   found.

20        Q.    Okay.  That's not in the

21   report.

22        A.    That sentence that you're

23   trying to put into my mouth, I did not

24   write, because that was not my opinion.

Anne Holland Wilson, MBA

1              It's part of the design --
2    was not conducted as part of the design
3    time frame.
4         Q.    Okay.
5         A.    So I will not write that
6    sentence.  It's not going to come out --
7    I mean, you're trying to put words into
8    my mouth.  That sentence is not in my
9    report.
10        Q.    And so the failing of this
11   risk analysis is that -- the fact that it
12   was done after the product was brought to
13   market.
14        A.    There were many failures.
15   If you would like me to go through those
16   after I use the restroom, I would be glad
17   to go through those.
18              MR. COMBS:  Okay.  We'll
19        take a break.
20                   -  -  -
21              (Whereupon, a brief recess
22        was taken from 2:59 p.m. to 3:09
23        p.m.)
24                   -  -  -

Anne Holland Wilson, MBA

1  BY MR. COMBS:

2       Q.    Ms. Wilson, you told us

3  earlier that you got documents from

4  counsel regarding this case.

5            You received them all

6  electronically?

7       A.    Right.

8       Q.    Were those on CD ROMs or

9  were they on share files?

10      A.    I think they used Box, one

11  of those.

12      Q.    A drop box?

13      A.    Yeah.  It wasn't Dropbox,

14  but one like that.

15      Q.    All right.  Did you get all

16  these at one time, or did you get them

17  over time?

18      A.    There were several time

19  points.  Large quantities at several time

20  points.

21      Q.    Do you still have the share

22  files that you got?

23            MR. WALLACE:  Any

24       communications between us are

Anne Holland Wilson, MBA

1          protected.  We filed some

2          objections.  We can talk about how

3          to work that out, if you want

4          after the deposition.

5               MR. COMBS:  I'm not asking

6          about communications, just asking

7          about whether the documents still

8          exist that were provided to

9          Ms. Wilson.

10               THE WITNESS:  I generally

11          just delete them.  I mean, I might

12          have some hard copies that printed

13          out.  So back in my office I kept

14          hard copies of those that I chose

15          to print out.

16               I can't tell you which ones

17          I did and didn't right off the top

18          of my head.

19     BY MR. COMBS:

20          Q.    So as we sit here today,

21     it's possible that you deleted them?

22          A.    It's possible.

23          Q.    And you don't know?

24          A.    I don't know.  I just don't

Anne Holland Wilson, MBA

1    know.

2              MR. COMBS:  Ed, I don't know

3         what to do about this risk

4         assessment, because, you know,

5         it's my position that it's not in

6         the report.

7              MR. WALLACE:  Well, it's in

8         her entire report.

9              I mean, ask her whatever you

10        want.  I mean, we can either

11        discuss this off the record in

12        front of her, out of her

13        appearance, or whatever.

14             But the bottom line is, it's

15        a very large part of her report.

16             So you want to talk about

17        it, you can talk about it all day

18        long, whatever time you have left.

19        It's up to you.

20             MR. COMBS:  Well, no.  The

21        bigger problem about it is, I

22        don't want you to take a position

23        that I have waived anything by

24        questioning her about it.

Anne Holland Wilson, MBA

1        If I question her about it,

2    will you not take the position

3    that I waived anything?

4        MR. WALLACE:  I'm sorry.  I

5    don't even understand what you're

6    asking me.  And I mean that.

7        MR. COMBS:  My position is,

8    this risk analysis is not

9    discussed in this report.

10        If I question her about it,

11    are you going to take the position

12    that I have waived that?

13        MR. WALLACE:  Well, you're

14    taking an absurd position, in my

15    opinion, but that's fine.  We can

16    agree to disagree on that.  Right?

17        MR. COMBS:  So there won't

18    be any allegation I've waived

19    anything by questioning her on it?

20        MR. WALLACE:  I have no idea

21    what you're even talking about

22    when you talk about waivers.

23        So I mean, if you're talking

24    about a second bite at the apple

Anne Holland Wilson, MBA

1          in terms of another deposition or

2          all these other sorts of things,

3          those are things that we can

4          discuss outside the deposition.

5               MR. COMBS:  That's fine.

6          Just as long as I am not waiving

7          anything by questioning her about

8          this document.  That's all I'm

9          asking.

10              MR. WALLACE:  If I

11         understood waiver, I would be able

12         to speak to that.  But I

13         think Judge Goodwin would agree

14         with this, we need to try to be

15         fair with each other, so --

16              MR. DAVIS:  I think she said

17         she has opinions.  If she has

18         opinions, is that a waiver?

19              MR. COMBS:  Ms. Wilson says

20         she has opinions about this

21         document.

22              MR. WALLACE:  Well, of

23         course, because she authored a

24         Rule 26 report.

Anne Holland Wilson, MBA

1      MR. COMBS:  Okay.  And I

2   want to ask her about those

3   opinions.  It's my position that

4   they're not contained in this

5   report.

6      MR. WALLACE:  Well, you're

7   making a mistake.  So you'd better

8   ask questions about that document.

9      MR. COMBS:  And there is

10  not -- because I'm fine with just

11  stopping the deposition at this

12  point and we can get the judge.

13     MR. WALLACE:  I don't

14  understand why you would stop a

15  deposition when the witness has

16  said she reviewed the report and

17  considered the report in forming

18  her opinions.

19     MR. COMBS:  That's the only

20  thing I'm -- that my

21  questioning --

22     MR. WALLACE:  You don't

23  dispute that; right?

24     MR. COMBS:  If I'm

Anne Holland Wilson, MBA

1    questioning her on this document,

2    that you're not saying that I've

3    waived any right to object --

4         MR. WALLACE:  You can argue

5    whatever you want to argue.  You

6    and I can agree to disagree,

7    though, that this is a part of her

8    report.

9         She has said to you, I

10   looked at this and I looked at

11   this previously.

12        And she pointed to you

13   before you ever whipped that

14   document out, by the way, she

15   pointed at Summary of Opinions 1,

16   and was talking about it.  Okay.

17        And then you brought this

18   out, which she said, absolutely,

19   she cited to you the whole not

20   imaginable thing or whatever the

21   heck she was talking about on

22   that.

23        So I tend to disagree with

24   your position.  I think it's a

Anne Holland Wilson, MBA

1     little bit far afield.  Okay.

2          But you don't have to agree

3     with me on that.

4          But I suggest to you that

5     we're here for her deposition.

6     We're not going to come back.  So

7     you'd better ask her whatever

8     you're going to ask her.

9          MR. DAVIS:  We just agree.

10    If we think her opinion that she's

11    going to give us is not in the

12    report, and we disagree, we're not

13    waiving any right we might have.

14          MR. COMBS:  That's all we're

15    asking.

16          MR. DAVIS:  We're not asking

17    you to agree with us.  We just

18    want you to agree that we're not

19    waiving our position.

20          MR. WALLACE:  Why don't we

21    do this.  Let's go off the record

22    for a second.  If we need to go

23    back on, we'll go back on.

24                -  -  -

Anne Holland Wilson, MBA

1          (Whereupon, a discussion

2      was held off the record.)

3              -  -  -

4          (Whereupon, a brief recess

5      was taken from 3:14 p.m. to 3:22

6      p.m.)

7              -  -  -

8          MR. WALLACE:  Can we go back

9      on the record.

10         So, Phil, you and I talked

11     off the record.  And what I

12     understand to be the case is your

13     position that the part of the

14     technical file is not included in

15     this report, and you understand

16     that we disagree with that as does

17     Ms. Wilson.

18         In fact, she just spent

19     several hours testifying about

20     technical files and design files,

21     and told you she reviewed and

22     considered this document.

23         And you want to ask

24     questions about it.  And I'm

Anne Holland Wilson, MBA

1    specifically referring to

2    Exhibit 13.

3            And I will agree with you

4    that you can and certainly should

5    ask questions about it, and that

6    by doing so, I'm not suggesting

7    that you can't maintain your

8    position that it's not included.

9            So is that satisfactory?

10           MR. COMBS:  Absolutely.

11   Thank you.

12   BY MR. COMBS:

13       Q.   Ms. Wilson, I have some

14   questions now for you about Exhibit 13.

15   It's right there at your left hand.

16       A.   Okay.

17       Q.   Now, it's my understanding

18   that you think that -- strike that.

19           What's your understanding of

20   what this document is.

21       A.   What I understand it to be

22   is a risk assessment to 1441 that was

23   part of the design review, and that it

24   was signed off in 2001, which -- let me

Anne Holland Wilson, MBA

1    check the exact date.

2                    It says August 5th, 2001,

3    and it says, Is this product -- Is safety

4    product adequate?

5                    So it was also nearby some

6    other DDSA and the Preventia documents

7    within that technical file.

8                    So, basically, it's a

9    retrospective -- in my opinion, a

10   retrospective analysis of the design

11   risk.

12        Q.    And when was this analysis

13   performed?

14        A.    Well, the only date I see on

15   it was in 2001.

16                   And then there was a cover

17   memo attached to it about the blue that

18   says it's still adequate for the blue

19   mesh.  And that was -- oh, gosh, it's

20   hard to read, but it looks -- I don't

21   know if you can read any better, maybe

22   December of 2002.  It's like an extra

23   digit, but it looks like August 5th of

24   2001 maybe.

Anne Holland Wilson, MBA

1    Q.    So approximately August of

2    2001.

3         A.    Right.

4         Q.    And it's your understanding

5    the purpose of this, that it was to

6    assess the risk of TVT clear?

7         A.    Right.

8         Q.    And then was used

9    subsequently as part of the risk

10   assessment for TVT blue?

11        A.    Well, there was just a memo

12   that said this also counts as blue.

13        Q.    Because of a conclusion had

14   been reached that there were no new risks

15   presented by TVT blue.

16        A.    Yes.  That's what it says.

17        Q.    Now, it's your position that

18   this -- I'm paraphrasing, but it's your

19   position this doesn't count because it's

20   done after Ethicon assumed the

21   manufacture of the product?

22        A.    No.  That's not my position.

23        Q.    Okay.  So what is your

24   position?

Anne Holland Wilson, MBA

1          A.    I was waiting for your

2     question.

3                So what my position is, is

4     that, ideally, you would look at the

5     design of the product in the design

6     phase.

7                You can go -- with this, so

8     I think it's a remediation effort,

9     because it was found delinquent.  There

10    was a later remediation effort when they

11    did the legacy products.

12               You know, I don't know what

13    their intent was, but it looks to me,

14    like in 2001, they went back and said,

15    we'd better look at this -- to our DDSA

16    procedure.

17               It's not exactly to that,

18    but to the best of my ability, to look at

19    it, because it doesn't exactly meet it.

20               They do have this risk class

21    on a 1 through 6, and the risk class is a

22    1 through 6 in the DDSA procedure.

23               So the adequacy of it, I

24    haven't talked about yet.  But that's

Anne Holland Wilson, MBA

1   what I think it is.  It's a couple of

2   years after the design was out, they came

3   back and back-documented.

4        Q.    And Ethicon assumed the

5   manufacture of the product in third

6   quarter of 2000?

7        A.    I have to go back and check.

8        Q.    Can we agree it was in 2000?

9        A.    It says, April 1999, Ethicon

10  purchases Medscand.

11       Q.    When did Ethicon begin the

12  manufacture of the product?

13       A.    I'm not sure, but they were

14  responsible as soon as they purchased it.

15  So...

16       Q.    Do you know who manufactured

17  the product between 1999 and the third

18  quarter of 2000?

19       A.    I know they moved it to

20  their facility somewhere in -- it says,

21  And moved production to Ethicon SARL.

22  Actually, I have it September of 2000.

23            So I'm not a hundred percent

24  sure what happened between April 1999 and

Anne Holland Wilson, MBA

1    September 2000, where that was made.

2         Q.    You made a statement

3    regarding the procedures, and you made a

4    reference to the DDSA.

5              Do you know what procedure

6    governed this risk analysis?

7         A.    You know, it appears to me

8    that because of the form that was after

9    it in the technical file -- you know,

10   there was another form after it, that was

11   DDSA, it looked like, and so that -- the

12   DDSA was called out in my report as OP --

13   sorry.  Sometimes I get 10 and 11 mixed

14   up.  OP650-10 is the DDSA.

15        Q.    And is it your understanding

16   that this assessment was done pursuant to

17   that procedure?

18        A.    That's my assumption, yeah,

19   because they used a form next to it.

20             And because the other thing

21   that made me assume that, is because

22   right at the back it said, Is the safety

23   adequate?

24        Q.    Would you agree with me that

Anne Holland Wilson, MBA

1   this analysis states that it was done

2   pursuant to 1441?

3        A.    It does state that, yes.

4        Q.    And would that have been the

5   proper standard to have done the Risk

6   Analysis 2 in August of 2001?

7        A.    Let me check.

8             Well, at that point in time,

9   EN ISO 14971 had been issued.  Now, I am

10  not sure if it had already been enforced.

11  So I would have to go back and

12  double-check, because there's transition

13  dates.

14             MR. WALLACE:  Can you read

15        back the question, please.

16                  -  -  -

17             (Whereupon, the requested

18        portion was read.)

19                  -  -  -

20             THE WITNESS:  Yes.  EN 1441

21        was appropriate.  Yes, because in

22        June the date of publication --

23        it's really close there.

24             It supercedes 1441:1997.

Anne Holland Wilson, MBA

1           The date of publication was

2     June 30, 2001.

3           And we're talking now what

4     date again?  I'm sorry.

5           We're right in the

6     transition.  I think we're

7     right -- and the standards are so

8     similar, it's not really not worth

9     a minute to talk about, so...

10  BY MR. COMBS:

11        Q.   All right.  So you don't

12  have issue with the procedure, with the

13  ISO standard that is used for the basis

14  of this?

15        A.   No, I don't.

16        Q.   Now, would you agree that in

17  this risk analysis, that hazards were

18  identified?

19        A.   We did look at some hazards.

20  Some hazards were defined.

21        Q.   And, in fact, seven pages of

22  hazards.

23        A.   You say that with a laugh,

24  but many of these are 20 to 50 pages.

Anne Holland Wilson, MBA

1              So seven pages is really not

2    much at all.

3         Q.    And would you agree that it

4    looked at hazards regarding the device

5    itself?

6         A.    When you say "device," are

7    you talking mesh or the system?  I'm just

8    not clear.

9         Q.    Okay.  Were hazards reviewed

10   regarding the mesh?

11        A.    For example, 13(c) says,

12   Mesh will be fixated.  So yes.

13        Q.    And were hazards reviewed

14   regarding the tools?

15        A.    I'm trying to find one.  It

16   doesn't appear systematic to me.  So it's

17   challenging to find it exactly where.

18        Q.    So, for example, at

19   number 19, were the quantitative

20   properties for the device looked at?

21        A.    It is a hazard, but there's

22   nothing written in.  There's no failure

23   rate.  There's -- it's very incomplete is

24   what I would say.  There is a hazard with

Anne Holland Wilson, MBA

1    nothing else in there.

2         Q.    And below that, at AAA, for

3    example, needle strength was reviewed.

4         A.    Again, there's a hazard, but

5    there's no mitigation.

6              So what you're saying is

7    partially true, in my opinion.  It is

8    not -- tell the complete story.

9         Q.    And were hazards reviewed

10   regarding the surgical complications,

11   could be related to the procedure?

12        A.    I'd like to say that hazards

13   were listed.  They weren't necessarily

14   reviewed, because there wasn't -- the

15   guidance says you don't just list a

16   hazard, you evaluate and you analyze

17   these hazards.

18             And in many of these cases,

19   they were listed, and that was it.  There

20   was no failure rate, severities,

21   mitigations, risk priority numbers.

22             And that's the basis where I

23   think it's inadequate.  And that's why I

24   put that -- why I went on in my report.

Anne Holland Wilson, MBA

1        Q.    Okay.  And so for hazards,

2   they're in the analysis, they looked at

3   the failure mode, didn't they?

4        A.    Where are you looking?  I

5   just don't know what number.  I'm trying

6   to --

7        Q.    Failure mode, right at the

8   top.

9        A.    Okay.

10       Q.    They looked at probability

11   of occurrence?

12       A.    On some of them, you're

13   right.

14       Q.    Looked at risk class?

15       A.    (Gesturing.)

16       Q.    You have to say "yes" or

17   "no."  You have to say something so she

18   can type it.  You can't just nod.

19       A.    Oh, I'm sorry.  I was

20   shaking my head.

21            Right.  On some of these,

22   they did say fill in the blanks, and

23   others, they did not.

24       Q.    And they looked at

Anne Holland Wilson, MBA

1   applicable safety measures?

2          A.    That was a column, yes.

3          Q.    They looked at other hazards

4   generated?

5          A.    Yes.

6          Q.    Looked at risk class?

7          A.    They assigned a risk class

8   where they had some data.  Other times,

9   they did not.  They just left it blank.

10         Q.    And they assessed the

11  remaining risk at the end of the

12  remediation?

13         A.    Again, they did that in some

14  cases, but in others they didn't.  That

15  column header was present.

16         Q.    And do you know what the

17  frequencies were for the probabilities of

18  occurrence?

19               Like, for example, rare, do

20  you know what that means?

21         A.    What you would have to do.

22  Generally, there's a risk plan.

23               No.  Off the top of my head,

24  I don't.  I would have to go track it all

Anne Holland Wilson, MBA

1    down to the procedure in force at that

2    time of day.

3         Q.    And for all of the rest of

4    the categories, you wouldn't know what

5    those were either.

6              For example, you wouldn't

7    know what the frequency was for

8    occasional, frequent, probable.

9         A.    I know what often companies

10   used, but I can't tell you if frequent is

11   1 in 10,000 in this case or 1 in 1,000.

12        Q.    Is part of your assessment

13   of this risk analysis, you didn't look at

14   that issue?

15        A.    You know, I did look at

16   this -- that issue.  And, generally, it's

17   a numerical.  If you go look at the --

18   we'd have to go look at the procedure.

19              But the manufacturer is

20   supposed to come up with a risk plan, and

21   in that they're supposed to say, or you

22   go back to that procedure and it says,

23   you know, one -- this was not a dFMEA in

24   accordance with the dFMEA procedure.

Anne Holland Wilson, MBA

1            But you're supposed to give

2     a number, so that it can be multiplied

3     and come up with a risk priority number.

4            So this isn't a dFMEA.

5        Q.    Does this risk analysis

6     review risks related to the design of the

7     device?

8        A.    It reviews some of them,

9     yes.  And then others, it leaves entirely

10    blank.

11       Q.    And does this risk analysis

12    look at ways in which to remediate the

13    risk?

14       A.    In some cases it does, and

15    in others it doesn't.

16            MR. COMBS:  We'll mark these

17        collectively as Exhibit 14.

18                -  -  -

19            (Whereupon, Exhibit Wilson

20        14 was marked for identification.)

21                -  -  -

22    BY MR. COMBS:

23       Q.    Ms. Wilson, I have handed

24    you what we have marked as Exhibit 14.

Anne Holland Wilson, MBA

1   And take a second to look at that.

2            MR. DAVIS:  Do you mind if I

3        look through this.

4            THE WITNESS:  No, go right

5        ahead.  I think it's the same as

6        this morning.

7            MR. COMBS:  Yeah, but we

8        didn't have time to look at it

9        this morning.

10            THE WITNESS:  (Witness

11        reviewing documents.)

12   BY MR. COMBS:

13        Q.    Ms. Wilson, have you had a

14   second to look at what is in the exhibit?

15        A.    Briefly.

16        Q.    Let's go through these.  And

17   I want to find out if -- so the first one

18   we have is Preventia Revision 5.

19            Is that something that you

20   reviewed?

21        A.    No.  I don't recall anything

22   earlier than 7, like I said this morning.

23            MR. DAVIS:  Can I just ask

24        one second, would you all mind,

Anne Holland Wilson, MBA

1           while we're doing this, if I go

2           get these standards copied?

3                 MR. WALLACE:  Go ahead.

4                 THE WITNESS:  Some of those

5           are just a summary of notes I

6           made.

7                 MR. DAVIS:  I understand.

8    BY MR. COMBS:

9           Q.    And next we got Preventia 7.

10                And is that something that

11   you reviewed?

12          A.    Let me just check.

13          Q.    That's the one you corrected

14   me earlier.

15          A.    Yeah.  Seven and 8 I do

16   believe I reviewed.

17          Q.    The report says that the

18   only one that existed was 8, but you

19   had --

20          A.    And then I said --

21          Q.    -- in fact reviewed 7.

22          A.    Yeah.

23          Q.    Then the next one, the DDSA

24   pursuant to OP650-010 --

Anne Holland Wilson, MBA

1      A.    Let me look at that.

2      Q.    -- had you reviewed that?

3      A.    Let me take a look,

4  because -- I need to take a look at it.

5           This is a different device

6  than the TVT-R.  This is the TVT-AA,

7  which utilizes a different -- as far as I

8  understand it, it uses a different

9  surgical technique, and it also uses some

10 different guides and couplers.

11          So this is outside the scope

12 of my analysis.

13     Q.    So this is something you did

14 not consider?

15     A.    I did see it, and I decided

16 that it wasn't relevant to my report.  I

17 mean, I remember seeing this and saying,

18 oh, this is the AA, and it's not within

19 the scope of my report.

20     Q.    Do you know whether the

21 TVT-AA uses the same mesh as TVT?

22     A.    It's my understanding that

23 it uses the same -- I'd have to check

24 whether it was laser cut or not.  That's

Anne Holland Wilson, MBA

1  one thing I'm not fully clear on.

2            But as far as I understand

3  it, it's not the same accessories or the

4  same surgical technique.

5       Q.   Do you know what the

6  difference is between surgical technique?

7       A.   I'd have to put them side by

8  side.  But I did review it at one point

9  in time.

10      Q.   So this is the something

11 that you had, but something you excluded

12 as not relevant.

13      A.   I said it didn't meet the

14 intent or the scope of my project, so I

15 didn't specifically call it out.

16            Anything that wasn't within

17 the mechanical cut TVT-R would be in that

18 same bucket.

19      Q.   Okay.  And so we have got

20 the risk management for TVT laser cut

21 mesh.

22      A.   Mm-hmm.

23      Q.   And that's

24 ETH.MESH.10618731.

Anne Holland Wilson, MBA

1              Is that something that you

2   had?

3        A.   I had the laser cut, I

4   believe.  And it was a different

5   manufacturer process.  And we talked

6   about that.

7        Q.   And so that's something that

8   you excluded from your analysis.

9        A.   And that's very -- if you

10  look at my report, on page 2, I'm very

11  specific that this is only Prolene

12  polypropylene mesh for the TVT-R

13  mechanical cut.

14       Q.   And so you did not consider

15  that for any part of the bases of your

16  opinions for this report.

17            MR. WALLACE:  Objection to

18       form.  Asked and answered.

19            THE WITNESS:  I was aware of

20       documents regarding laser cut.

21       And I said, jeez, that's not what

22       I'm asked to look at.

23            So if I'm asked to do laser

24       cut, I'll work on the laser cut.

Anne Holland Wilson, MBA

1   BY MR. COMBS:

2          Q.     Okay.  But that did not form

3   the basis for any of the opinions that

4   are in your report.

5          A.     Right.

6          Q.     Now, the next document we

7   have is we have the design FMEA for TVT

8   laser cut mesh project.

9          A.     It's the same answer.

10         Q.     That did not form any basis

11  for any of the opinions in your report.

12         A.     Right.

13         Q.     And we have got the risk

14  management report for TVT laser cut mesh.

15  And that's Bates Number 00309260.

16               Same answer?

17         A.     Well, let me -- I'm trying

18  to rethink what you might be asking.

19  Because I'm looking at things that

20  happened to the TVT-R.

21               I know I looked at things

22  laser cut.  I also know that they weren't

23  necessarily implemented in TVT-R.

24               So I did consider them.  But

Anne Holland Wilson, MBA

1    you asked did they form the basis of --

2          Q.    Did they form the basis of

3    any of the opinions in your report?

4          A.    Can you -- I'm not sure I

5    understand that word choice.

6                I'm sorry.  I'm not trying

7    to be difficult.  They -- specifically,

8    in here, there were things that were

9    considered.

10               MR. WALLACE:  When you say,

11         "in here," can you point to what

12         you're --

13               THE WITNESS:  Sure.

14               For example -- it might be

15         easier that way.

16               When we're talking about

17         particle loss, there were some

18         documents that compared the

19         particle loss with, you know, blue

20         mesh versus not blue mesh, and

21         laser cut might have been stiffer

22         than non-laser cut.

23               So I was aware of them, but

24         I kept my focus on the TVT-R.

Anne Holland Wilson, MBA

1    BY MR. COMBS:

2         Q.    Was particle loss ever

3    studied in one of the risk analysis

4    documents that you reviewed?

5         A.    Not that I used for this

6    report.  I didn't study the risk analyses

7    for these.

8              MR. WALLACE:  Just so we're

9         clear, you're pointing at

10        something?

11             THE WITNESS:  I'm sorry.

12             MR. WALLACE:  Just so we're

13        clear, can you tell the court

14        reporter what you're pointing at.

15             The laser cut Exhibit 14?

16             THE WITNESS:  Right.  So

17        Exhibit 14 has laser cut

18        documents.

19   BY MR. COMBS:

20        Q.    Well, it has other documents

21   in it, too.  I mean, we have been going

22   through and talking about them and

23   identifying them as we have been going

24   through.

Anne Holland Wilson, MBA

1        A.    Which -- the one that you

2   were just asking me about was about laser

3   cut.

4        Q.    Okay.

5        A.    And I do not have the title

6   of that right now.

7        Q.    Ms. Wilson, that's RMR17.

8        A.    I did not study the RMR17

9   document.

10        Q.    And then the next document,

11   Risk Management Report Legacy for TVT and

12   TVT-O, ETH.MESH.10618757.

13        A.    Can you just tell me the

14   Bates number?  That would be easier for

15   me.

16        Q.    ETH.MESH.10618757.

17        A.    1061873.

18        Q.    10618757.

19        A.    Oh, I looked at this, and I

20   referred to it in my report.  The 44,

21   yeah.

22        Q.    The application FMEA for TVT

23   classic, ETH.MESH.10618418.

24        A.    What was the date on that

Anne Holland Wilson, MBA

1    one?  2010?

2         Q.    Yes, ma'am.

3         A.    Yes.  I saw that.

4         Q.    Is that one of the things

5    you considered in your report?

6         A.    Well, you know, I did look

7    at that.  But there was a new -- yes, I

8    did look at this.

9         Q.    That's not set forth in your

10   report, is it?

11        A.    I'm pretty sure that I had

12   it in my list of documents, that I looked

13   at all of the legacy things.

14        Q.    But that's not listed in the

15   report.  It's not listed in your

16   opinions.

17        A.    My opinions don't call out

18   every single document, item by item, and

19   give an opinion based on every single

20   document I reviewed.

21             It's a summary of my overall

22   opinion, and it does bring up the things

23   that I believe were important and omitted

24   or not contained.

Anne Holland Wilson, MBA

1              But it wasn't an

2      accountability of every document, good,

3      bad, yes, no.

4              You know, this is a 2010

5      version, but, you know, after they did

6      the legacy.

7          Q.    All right.  And then we have

8      got the risk management report for laser

9      cut mesh, and we have got Revision 3?

10          A.    Again, that's laser cut, so

11      I didn't use that.

12          Q.    Do you know whether you

13      looked at that?

14          A.    I did not specifically look

15      at it.

16          Q.    And then we have got the

17      risk management report for TVT and TVT-O

18      Revision 2.

19          A.    That, let me check it out.

20      Let's see.  I see Revision 3 here.

21              Yeah, any of these that are

22      44s, I did look at, whether it was 1, 2,

23      or 3.

24          Q.    Now, on page 15 of your

Anne Holland Wilson, MBA

1    report, you state, No dFMEA had been

2    performed on the TVT-R to date.

3              Now, would you agree with me

4    that the 2001 risk assessment -- risk

5    analysis had, in fact, evaluated risk

6    related to the design of TVT?

7         A.    Let me just find where

8    you're talking about.

9         Q.    In the middle paragraph on

10   page 15.

11             MR. WALLACE:  Can you call

12        out the language again, Phil.

13             MR. COMBS:  Yeah.

14             THE WITNESS:  Oh, right

15        here.  No dFMEA.

16             And that's true.  No dFMEA

17        had been.

18   BY MR. COMBS:

19        Q.    And would you agree with me

20   that the risk analysis that was performed

21   in 2001 had analyzed risks related to the

22   design of TVT?

23        A.    I think it was wholly

24   inadequate, and it did not fully look at

Anne Holland Wilson, MBA

1    the design, and it was not an FMEA.

2           Q.    I understand that's what

3    you're saying, but that's not the

4    question I asked you.

5                 The question I asked you

6    was:  Would you agree with me that the

7    risk analysis reviewed risks related to

8    the design of TVT?

9           A.    It looked at some.  It was

10   not a dFMEA, which is what I wrote.

11          Q.    Would you agree with me that

12   the risk analysis from 2001 reviewed some

13   of the risks of the design of TVT?

14          A.    It's the same that I just

15   answered.  I didn't change my mind.

16          Q.    Okay.  What's the answer

17   then?

18          A.    That that was not a dFMEA

19   and it did not look at the risks

20   associated with the design.

21          Q.    Okay.  That analysis does

22   not look at risks associated with the

23   design --

24          A.    It looked at some.  It left

Anne Holland Wilson, MBA

1  a lot of things blank and --

2          Q.    That was my question.  My

3  question was:  Did it look at some of the

4  risks of the design of TVT?

5          A.    It looked at some.

6                MR. WALLACE:  Off the

7          record.

8                    -  -  -

9                (Whereupon, a discussion was

10         held off the record.)

11                   -  -  -

12               (Whereupon, a brief recess

13         was taken from 3:58 p.m. to 4:03

14         p.m.)

15                    -  -  -

16               (Whereupon, Exhibits 15 and

17         16 were marked for

18         identification.)

19                   -  -  -

20  BY MR. COMBS:

21          Q.    Ms. Wilson, I hand you

22  what's been marked as Exhibits 15 and 16.

23          A.    Okay.

24          Q.    Those are audit reports from

Anne Holland Wilson, MBA

1    TUV audits in 2003 and 2004.

2            A.    Okay.

3            Q.    Have you reviewed those

4    before today?

5            A.    I don't recall seeing them.

6    They could have been in the stack of

7    papers, but I don't recall it.

8            Q.    You don't recall seeing it.

9                  And I have given you --

10   well, strike that.

11                 Do you know how many times

12   Medscand was audited by a notified body?

13           A.    I don't know that

14   specifically.

15           Q.    Do you know how many times

16   Ethicon has been audited by a notified

17   body regarding TVT?

18           A.    Worldwide.  I don't --

19           Q.    Regarding TVT.

20           A.    I really don't know that.

21           Q.    Do you know how many times

22   Ethicon has been audited by the FDA

23   regarding TVT?

24           A.    I don't know that.  Because

Anne Holland Wilson, MBA

1    the FDA doesn't audit, and they don't

2    usually do -- I don't know.

3          Q.    I have given you Medscand

4    audits from the late 1990s, Ethicon audit

5    from 2000, Ethicon audit for 2003,

6    Ethicon audit for 2004.

7          A.    May I clarify?

8          Q.    Yes, ma'am.

9          A.    I think the early -- the

10   Medscand, you gave me the certificates.

11   I didn't see any --

12         Q.    Okay.  And have you gone

13   back to get the reports related to those

14   audits?

15         A.    That wasn't the focus of my

16   report.  So I did see those in the tech

17   file, and that was that.

18         Q.    All right.  You're not aware

19   of any audit ever coming to the

20   conclusion that degradation was a risk,

21   are you?

22         A.    A notified body?

23         Q.    Yes.

24               Internal audit, notified

Anne Holland Wilson, MBA

1    body audit, regulatory body audit.

2          A.    All right.  That's why I

3    asked.

4                Let me look at my report.

5                Because "audit" is a very

6    broad term.  Do you also include

7    inspections in that?

8                I mean --

9          Q.    Okay.

10         A.    An audit -- say it again.

11   Am I aware --

12         Q.    Are you aware of any audit

13   of the auditor ever reaching the

14   conclusion that degradation presented a

15   clinical risk?

16         A.    That is not what an auditor

17   would look for.  Auditors don't look for

18   cause and effect of a clinical outcome.

19         Q.    Are you aware --

20         A.    So the question is not

21   making sense yet.

22         Q.    Are you aware of any audit

23   in which an auditor concluded that the

24   risk analysis had failed to properly

Anne Holland Wilson, MBA

1  consider the risk of degradation?

2       A.    That question also doesn't

3  make sense to me.

4            I only saw -- let me try

5  this way.

6            I saw two internal audits

7  conducted by Ethicon of Medscand.  So

8  those are the only two that I have seen.

9            And this morning I talked

10 about those.  Otherwise, I haven't seen

11 other audits, per se.

12      Q.    And those internal audits

13 did not come to the conclusion that

14 degradation presented any risk, did they?

15      A.    They were not that specific.

16 They were much more vague.

17      Q.    And they did not come to the

18 conclusion that roping, curling, or frame

19 presented any clinical risk that

20 outweighed the benefits of the product,

21 did they?

22      A.    That is not how audits are

23 performed.  That doesn't make sense for

24 an auditor to come to a conclusion such

Anne Holland Wilson, MBA

1  as that.

2       Q.    And there was no finding

3  that the risk of particle loss exceeded

4  the benefits of the product, was there?

5       A.    Once again, that's not how

6  audits worked.  We talked about how

7  audits work.  They audit to standards.

8  They don't audit to clinical outcomes,

9  like you're trying to tell me.

10            So they audit and say, Do

11  you have a system in place?  And do you

12  have evidence?

13            But they don't say what

14  we're trying to say that they would do.

15  That's just not how audits work.

16       Q.    Exactly.  They look at the

17  process, don't they?

18       A.    Right.

19       Q.    And so they look at whether

20  the process has been followed, don't

21  they?

22            MR. WALLACE:  Objection to

23       form.

24            THE WITNESS:  What auditors

Anne Holland Wilson, MBA

1          do, I explained this morning, is

2          that they look at a standard or a

3          set of standards.

4               They go in.  They look how

5          you established to those, and then

6          you look at how you deployed to

7          those.

8               So you may have established

9          well and deployed totally poorly.

10         But they don't do apples to

11         oranges, like you were trying to

12         ask me or like you asked me.

13                    -  -  -

14              (Whereupon, Exhibit 17 was

15         marked for identification.)

16                    -  -  -

17    BY MR. COMBS:

18         Q.    Ms. Wilson, I hand you what

19    has been marked as Exhibit 17.

20              What is that?

21         A.    It says it's a Device Design

22    Safety Assessment Re-Evaluation.

23         Q.    And is this one of the

24    documents that you discuss in your

Anne Holland Wilson, MBA

1    report?

2          A.    I do.  And I stated that

3    this was really a complaint analysis

4    rather than a DDSA.

5          Q.    Now, had the risk that

6    Ms. Meltzer talked about in this, had

7    they been the subject of the risk

8    analysis done in 2001?

9          A.    These risks she said are new

10   risks.  And that's why I call them new

11   risks.

12              And if you look right here,

13   they said, Were they previously listed in

14   the DDSA, yes or no?  And the answer for

15   many of them, the ones I cited in my

16   report, and this is key to why I wrote my

17   report like I did, is that they weren't.

18              So in the DDSA, it says

19   right here, No, they weren't in there.

20         Q.    But that wasn't my question.

21   My question was --

22         A.    I thought it was.

23         Q.    It was not.

24              My question was:  Are these

Anne Holland Wilson, MBA

1    risks and risk analysis that was

2    performed in 2001?

3              A.    Let's go double-check.   I

4    don't believe so.

5                    I'm thinking I this at one

6    time, but it's been a couple months and I

7    just can't remember everything.

8              Q.    Let me start take a step

9    back for a second.

10                   Is it your opinion that

11   these risks, the 11 risks that are set

12   forth in these memorandum, that these

13   were risks that Ethicon was not aware of?

14             A.    Right.   And that's what I

15   stated in my report, because it said

16   right here that they were new and they

17   were not in the DDSA.

18                   So I took that as factual,

19   as written by their employees, yes.

20             Q.    So it's your opinion that

21   Ethicon was unaware of these risks.

22             A.    I just took what Ethicon

23   wrote and believed it to be true.

24                   I also think I went back and

Anne Holland Wilson, MBA

1    checked to this and the Medscand -- or

2    the Preventia.  But I can't remember

3    every little cross-reference sheet.

4              MR. DAVIS:  Let the record

5         reflect that this reference was to

6         Exhibit 13.

7    BY MR. COMBS:

8         Q.    And so, for example, the

9    first one, Vaginal Extrusion.

10             Was postoperative erosion of

11   vagina one of the risks analyzed in the

12   2001 risk assessment?

13        A.    I just answered this three

14   times.  I'll have to go compare, so

15   please give me some time.

16        Q.    That's fine.

17             MR. WALLACE:  To speed this

18        along, do you mind if I help?

19             MR. COMBS:  I don't mind at

20        all.  It's 28N, it's the last

21        page.

22             THE WITNESS:  That has no

23        risk.  A rank of zero.

24   BY MR. COMBS:

Anne Holland Wilson, MBA

1    Q.    Was it --

2    A.    It is listed here.  Yes.  I

3 see that now.

4    Q.    And is the remediation for

5 that risk info in IFU in training?

6    A.    That's what it says, yes.

7    Q.    Now, was urethral erosion

8 analyzed in that risk analysis?  28L.

9    A.    There was injury to the

10 urethra.

11    Q.    On 28L, postoperative

12 erosion to the urethra.

13    A.    I see that listed.

14    Q.    And was remediation proposed

15 for that information in IFU in training?

16    A.    That's what this says.

17    Q.    And perforation by mesh on

18 the risk analysis has both postoperative

19 erosion of both the urethra and the

20 vagina?

21    A.    So these two documents are

22 directly contradictory, and I looked at

23 this.

24         MR. WALLACE:  Here.

Anne Holland Wilson, MBA

1               What was your question?

2  BY MR. COMBS:

3          Q.    My question is:  The risk,

4  perforation by mesh, does the risk

5  analysis look at the risk of

6  postoperative erosion of urethra, 28L,

7  postoperative erosion of bladder, 28M,

8  postoperative erosion of vagina, 28N?

9          A.    I know where they are.

10              MR. DAVIS:  I'm just trying

11         to see the exhibit number.

12              MR. WALLACE:  Just answer

13         the question.

14              I'm sorry.  Does it say --

15         sorry.  State it again.  I think

16         he talked to her and sort of --

17              MR. DAVIS:  Sorry.

18              MR. WALLACE:  -- got me off

19         kilter and probably her, too.

20  BY MR. COMBS:

21         Q.    The risk perforation by

22  mesh, my question is:  In the risk

23  analysis at 28L, M, and N, is there the

24  risk set forth of erosion of urethra,

Anne Holland Wilson, MBA

1    erosion of bladder, and erosion of

2    vagina?

3            A.    Those hazards are listed.

4            Q.    And include remediation of

5    information IFU in training?

6            A.    Yes.

7            Q.    And is the risk of infection

8    set forth in the risk analysis?

9                    MR. WALLACE:  Can you give

10           the Bates.  I think it's 932;

11           right?

12                    THE WITNESS:  Did you say 9?

13                    MR. WALLACE:  32.

14                    MR. COMBS:  28D.  It's page

15           937.

16                    MR. WALLACE:  Okay.

17    BY MR. COMBS:

18           Q.    Does it set forth level of

19    wound infection and urinary tract

20    infection higher than for other

21    incontinence procedures?

22           A.    I'm sorry.  Was your

23    question is it listed as hazard?

24           Q.    Yes.

Anne Holland Wilson, MBA

1      A.   Level of wound infection,

2   yes, it says it's not imaginable.

3      Q.   Okay.  And urethral tear, is

4   that listed in -- so at 28H, does it list

5   the risk of injury of urethra?

6      A.   I'm trying to locate it.

7      Q.   28H on page 937.

8      A.   Yes.  Injury.

9      Q.   For mesh broken and torn

10  mesh, is there analysis done -- on page

11  935, it's N19 -- of the tensile strength

12  elongation, bending stiffness, and pore

13  size of the mesh?

14     A.   Those hazards are listed.

15     Q.   For bent needle, at 13AG,

16  does it list, Needle curvature is not

17  required?

18          MR. WALLACE:  Where you at?

19          Because you say bent needle,

20      but that's not in the document.

21          MR. COMBS:  Bent needle.

22      And it says, Needle curvature is

23      not as required.

24          MR. WALLACE:  Give us the

Anne Holland Wilson, MBA

1          Bates, please.

2                    MR. COMBS:  933.  It's on

3          the second page of the document.

4                    THE WITNESS:  It says,

5          Needle curvature is not as

6          required.

7    BY MR. COMBS:

8          Q.    And, for example, Dull

9    needle, two below that, Needle tip is not

10   as required (not as sharp as required).

11                   Is that risk assessed in the

12   risk analysis?

13         A.    The hazard is listed.

14         Q.    Now, what were the

15   frequencies of these risks that are the

16   subject of this memorandum?

17         A.    So the complaint analysis

18   has a list here.

19                   THE WITNESS:  I'm very

20         confused.  He said memorandum.  So

21         I'm assuming that --

22                   What is it you mean when you

23         say "memorandum"?

24   BY MR. COMBS:

Anne Holland Wilson, MBA

1      Q.    I apologize if I called it
2  the wrong thing.  I'm talking about the
3  document written by Ms. Meltzer.
4  Device --
5      A.    Right.  You're talking about
6  the document which says that these are
7  new risks, and they weren't in the DDSA.
8  Right.  Yes.
9      Q.    And we have just gone
10 through them, and --
11     A.    Yes.
12     Q.    -- they were, in fact, in
13 the risk analysis.
14          MR. WALLACE:  Objection to
15     form.  That's not her testimony.
16 BY MR. COMBS:
17     Q.    These risks were in the risk
18 analysis, weren't they?
19     A.    That is not what I said in
20 my report, because I used this.
21     Q.    Ms. Wilson, but I'm not
22 asking that question now.
23          Here's the question I'm
24 asking.

Anne Holland Wilson, MBA

1            The risks that are set

2    forth, those risks are set forth in the

3    risk analysis in 2001, aren't they?

4                MR. WALLACE:  Same

5         objection.  Objection to form.

6                THE WITNESS:  You asked me

7         if the risks.  I answered that the

8         hazards were listed.

9    BY MR. COMBS:

10        Q.    Okay.  Now, on Attachment 1

11   and 2 of that document, the occurrence

12   rates and frequencies are set forth of

13   the complaint review, aren't they?

14        A.    There's two tables, and they

15   talk about -- I'm sorry.  Say it again.

16        Q.    The frequency of the

17   complaints for all of the risk categories

18   are covered on Attachment 1 and 2, aren't

19   they?

20        A.    There's predicted and

21   actual.  And I honestly am confused,

22   because this is talking about the

23   Preventia document, and it's confusing.

24        Q.    I apologize.

Anne Holland Wilson, MBA

1          A.    Yes, the frequencies of

2    complaints are --

3          Q.    I'm going to interrupt you

4    just because that's not what I'm asking.

5    So let me just ask the question again,

6    because I didn't do it -- obviously

7    didn't do a good job of asking it.

8                And then if you want to add

9    that answer after I ask the question

10    again, please feel free to do so.

11                What I was asking you about

12    was that this table just sets forth the

13    actual occurrence rate, that's what I was

14    asking you, for the complaint review.

15          A.    So you're asking the actual

16    number of complaints.

17          Q.    Yes, ma'am.

18          A.    The actual numbers are

19    listed at the tables.

20          Q.    And so, for example, for

21    vaginal extrusion, we're talking about a

22    reported -- a complaint rate of 1 in

23    18,000; right?

24          A.    That's what it says, yes.

Anne Holland Wilson, MBA

1     Q.    And for urethral erosion,

2  we're talking about a complaint rate of 1

3  in 35,000?

4     A.    Yes.    There were six

5  occurrences.

6     Q.    Perforation by mesh, we're

7  talking about a rate of 1 in 53,000?

8     A.    Yes.

9     Q.    Infection, we're talking

10  about a complaint rate of 1 in 213,000?

11     A.    That's what it says.

12     Q.    For vaginal incision, we're

13  talking about a complaint rate of 1 in

14  213,000?

15     A.    Are we doing the same thing?

16  I'm just reading you the numbers in the

17  report?  That's all you want me to do?

18     Q.    Yes.

19     A.    Okay.

20     Q.    I mean, that's what we're

21  talking about in this complaint review.

22  We're talking about the number of

23  complaints.

24     A.    I understand that.  I just

Anne Holland Wilson, MBA

1    want to make sure that's all you want me

2    to do is read what's on the page.

3              Q.    Sure.

4              A.    Okay.

5              Q.    All right.  So those are the

6    rates we're talking about.

7                    And for broken mesh, talking

8    about 1 in 19,000, that's the complaint,

9    the actual occurrence rate?

10             A.    I'm sorry.

11             Q.    It's in Attachment 2.

12                   MR. WALLACE:  We can agree

13             that the document says what it

14             says.

15                   MR. COMBS:  Okay.

16                   THE WITNESS:  I guess my

17             whole thing, that even if the rate

18             is low, the injuries can be

19             severe.

20                   I have worked in several

21             places where we have had very -- I

22             mean, three to five complaints,

23             but they're important.  And we

24             stop everything.  We do a task

Anne Holland Wilson, MBA

1      force.  We address them.

2           So just because the number

3      is low does not mean it's not

4      significant, I guess.

5  BY MR. COMBS:

6           Q.    Ma'am, here's my next

7  question to you.

8           Are those occurrence rates

9  within the predicted occurrence rates in

10  the 2001 risk analysis, every one of

11  those?

12          A.    Are you referring to this

13  document with a Bates number --

14               MR. DAVIS:  Exhibit 13.

15  BY MR. COMBS:

16          Q.    Yes, ma'am, Exhibit 13 in

17  your hand.

18          A.    I don't see any predicted

19  occurrence numbers in this document.

20  Rare, frequent, probables aren't numbers.

21          Q.    Ma'am, have you -- strike

22  that.

23          Is there a procedure that

24  sets forth what the definition is for

Anne Holland Wilson, MBA

1  rare, for probability of occurrence?

2          A.    I'm sure there is one that

3  gives a range.  And we'd have to go

4  locate the one that was in effect on

5  August 5th, 2001, find out the range, and

6  then directly compare.

7                But this document says,

8  predicted versus actual, right here.

9          Q.    And you haven't done that.

10  I mean, you haven't -- you have not

11  looked at whether --

12          A.    What I did is I took this

13  document as an educated person, and that

14  this was factual, and I looked at this

15  document in extreme detail.  And I

16  analyzed it, and I put it in my report.

17  And I did do that.  I did every single

18  bit of that.

19          Q.    Ma'am, here's the question I

20  ask you.

21                The question is:  For the

22  risk analysis for 2001, did you calculate

23  for any of these that are set forth,

24  whether those were within the predicted

Anne Holland Wilson, MBA

1    occurrence rate?

2         A.    I did not go back and do it,

3    because this piece of document is

4    absolutely just terrible.  It's not, in

5    my opinion, worth the paper it's written

6    on.

7         Q.    And you didn't -- I'm sorry.

8         A.    It's my opinion, and that's

9    why it's -- how it is, it says, Not

10   imaginable.  What number is that?  Not

11   imaginable.  I have never seen that in 30

12   years of doing this type of document,

13   that someone would write, Well, I can't

14   imagine that.

15        Q.    And do you know what

16   infection rates are for the other

17   procedures that it was compared to?

18        A.    I know what -- how to find

19   out about infection rates.  And it's very

20   specific to each procedures.  And I don't

21   have that tabulated, no.

22        Q.    And for none of the risks

23   that are set forth in the risk analysis

24   and none of the risks that are set forth

Anne Holland Wilson, MBA

1   in the -- I apologize, I've forgotten the

2   exhibit number -- Exhibit 17, none of

3   those did you go back and check to see

4   whether they were within the estimated

5   probability of occurrence through the

6   risk analysis that was done in 2001.

7            MR. WALLACE:  Objection to

8        form.  Assumes facts not in

9        evidence.

10           THE WITNESS:  This isn't

11       quantitative.  You're trying to

12       ask me to compare qualitative to a

13       quantitative.  Again, that's

14       apples to oranges.

15   BY MR. COMBS:

16       Q.    No. This is probability of

17   occurrence.

18       A.    Right.  That's a range.

19   You're saying --

20       Q.    Listen, I'll represent to

21   you that there's a frequency set forth in

22   the Ethicon procedures.

23       A.    I understand that.

24       Q.    Do you know what it is?

Anne Holland Wilson, MBA

1          A.     I can go look in the

2     procedures.

3          Q.     You didn't do that.  You

4     haven't done that.

5          A.     I have looked in the

6     procedure.  I have cited that procedure.

7     I even classified it.  I said there's six

8     classifications used in that procedure,

9     which is -10.

10               Yes.  I'm aware of that

11    procedure.

12          Q.     But the procedure you're

13    talking about isn't even the procedure

14    that this risk analysis was done to.

15          A.     Well, that's the procedure.

16    It doesn't say, does it?  It doesn't seem

17    to be following anything.

18          Q.     And did you ask your lawyers

19    to provide you with -- you've testified

20    that you reviewed this risk analysis

21    before today.

22               Did you ask anyone to

23    provide you with the procedures that

24    govern this risk analysis?

Anne Holland Wilson, MBA

1       A.    I have every procedure, to

2   my knowledge, regarding risk, and I asked

3   for all them.

4       Q.    So if you don't have the

5   procedure that governs this risk

6   analysis, if you don't have it in your

7   files, then you didn't have one of the

8   things you wanted to do this review, did

9   you?

10       A.    It is possible that

11   something was missed, and I'd be glad to

12   take a look at it.

13       Q.    Sure.  But if you don't have

14   this, if you don't have the procedure

15   that governs this risk analysis that's

16   one of the things you wanted in order to

17   do this review, isn't it?

18       A.    You know, I said several

19   times, if there's something I overlooked

20   or there's some other documents, I'm sure

21   that, you know, in the thousands of pages

22   I could have overlooked it or,

23   furthermore, I would be glad to take a

24   look at it now.

Anne Holland Wilson, MBA

1              MR. COMBS:  Let's mark this

2         as 18.

3                        -   -   -

4              (Whereupon, Exhibit Wilson

5         18 was marked for identification.)

6                        -   -   -

7    BY MR. COMBS:

8         Q.    Ms. Wilson, did you ever

9    look at the Surgeon's Resource Monograph

10   for TVT?

11        A.    I'm not sure.  I might have

12   seen this.

13        Q.    If it's not on your reliance

14   list, does that mean that you didn't

15   review it?

16        A.    If it's not on my reliance

17   list, then I didn't review it.

18              When it came to surgeons'

19   documents, so this is like Surgeon's

20   Monograph, it wouldn't have been one I

21   focused on, so it could have been buried

22   in there.  If it wasn't on the list, then

23   I didn't look at it.

24        Q.    Now, do you know whether

Anne Holland Wilson, MBA

1    Ethicon was teaching surgeons about the

2    risks that are set forth in the DDSA

3    evaluation that you testified about two

4    years prior to that DDSA re-evaluation

5    being prepared?

6         A.    I'm sorry.  Was that a

7    question?

8         Q.    Yes.

9         A.    I'm sorry.

10        Q.    Might have been a bad

11   question, but it was a question.

12              Do you know what the

13   monograph is?

14        A.    Was this on my list?  I

15   don't know.

16        Q.    I do not believe it was on

17   your list.  I could be wrong.

18        A.    I don't remember seeing

19   this.  I said it could have been, and if

20   I did see it --

21        Q.    Ms. Wilson, look, I'm not

22   trying to trip you up whether it was or

23   wasn't on the list.  If I'm wrong, I'm

24   wrong.

Anne Holland Wilson, MBA

1          A.    I don't remember seeing this

2    pretty picture, but I told you several

3    times, I can't remember every document I

4    looked at.

5               It's not cited in my report.

6          Q.    Let's must move past whether

7    it is or isn't in the reliance list and

8    let's ask some questions about it.

9               Now, do you know whether

10   Ethicon was training surgeons in the risk

11   of this procedure years before the DDSA

12   re-evaluation came out?

13              Do you know that?

14              That's the question.

15         A.    I can't state whether

16   Ethicon was doing it at what time or not.

17              I can tell you that most

18   medical device companies have clinical

19   experts that go out and train their

20   surgeons.  And that's very, very common

21   and expected in the medical device

22   industry.

23         Q.    And the risks -- let's look

24   at some of the risks that you discuss in

Anne Holland Wilson, MBA

1    your report from the DDSA re-evaluation.

2              So, for example, vaginal

3    extrusion, do you know whether Ethicon

4    was teaching that risk to surgeons?

5         A.    Are you looking at somewhere

6    on my report?

7         Q.    I'm looking at page 9, mesh

8    protrusions.

9         A.    Here's what I know.  I don't

10   remember looking at this.  I'm not a

11   clinician and I'm not a doctor.

12        Q.    Okay.

13        A.    So do I know if they were

14   doing it and at what time?  No, I do not.

15             I know it's common in the

16   industry.  And whatever they said they

17   did in here, all I'm going to do is

18   assume.

19        Q.    So --

20             MR. WALLACE:  You're asking

21        her to guess.

22             THE WITNESS:  Yeah.  You're

23        asking me to guess, and I can't

24        guess.

Anne Holland Wilson, MBA

1    BY MR. COMBS:

2         Q.    Well --

3         A.    I have not seen this.  I

4    have no facts presented to me to know,

5    yes or no.

6         Q.    So when you're discussing in

7    your report what you describe as new

8    hazards --

9         A.    New hazards from my report

10   directly from this document as stated.

11        Q.    Okay.  And so you just took

12   that out of that document.

13             And did you do anything to

14   confirm whether they were or were not --

15        A.    I did.

16        Q.    -- new hazards?

17        A.    I went back to the Preventia

18   report, which was the reference for this.

19   It clearly refers to that, and I compared

20   that.

21             And so I did do that, yes.

22        Q.    And did you make any efforts

23   to determine whether that's a mistake,

24   whether they are not new hazards?

Anne Holland Wilson, MBA

1      A.    What I did look at -- you

2  can't have the complaint; right?  They

3  didn't have the complaints, the design;

4  right?

5            So these -- I just said I

6  did.

7            Sorry.  I don't know what

8  I'm saying anymore.

9      Q.    So would you agree with me

10 that two years before that DDSA

11 re-evaluation was written, Ethicon is

12 teaching about the risks that in your

13 report you're describing as new?

14     A.    No.  I have no knowledge if

15 they're teaching, if that just is

16 printed, if they used it, if it was -- I

17 have no knowledge.

18     Q.    Did you do any investigation

19 to determine that?

20     A.    That was not in the scope of

21 my report is what they taught the

22 clinicians.

23            I'm talking about the risk

24 management process and design control

Anne Holland Wilson, MBA

1    process.

2         Q.    And in the risk analysis, do

3    they talk about one way to remediate the

4    risk is through surgeon training?

5         A.    They talk about IFU -- is

6    this the right document?

7              Training.  So the IFU could

8    be training.  There's many ways of doing

9    training.

10             I have no knowledge of what

11   they did in training.

12        Q.    You don't know what was done

13   to remediate the risks through training,

14   do you?

15        A.    No.  I think I said that

16   three or four times.  That was not on my

17   list.  I didn't look at that document.

18             MR. WALLACE:  Are we coming

19        up on a break?

20             MR. COMBS:  We can break, if

21        you want.

22             MR. WALLACE:  Let's take a

23        couple of minutes.

24                  -  -  -

Anne Holland Wilson, MBA

1              (Whereupon, a brief recess

2          was taken from 4:40 p.m. to 4:48

3          p.m.)

4                    -   -   -

5              (Whereupon, Exhibit Wilson

6          19 was marked for identification.)

7                    -   -   -

8    BY MR. COMBS:

9          Q.    Ms. Wilson, I want to ask

10   you some questions now about the 2006

11   complaint review --

12         A.    Okay.

13         Q.    -- that you discuss at pages

14   13 and 14 of your report.

15              Now, we talked about the

16   2002 complaint review, and we'll talked

17   about the 2006 complaint review.

18              Were there any other

19   complaint reviews that you reviewed?

20         A.    Not that I recall seeing.

21         Q.    Now, for this complaint

22   review that we'll discuss -- and I have

23   handed you what's been marked as

24   Exhibit 19.  And it's Technical File

Anne Holland Wilson, MBA

1  Amendment for Laser Cut Mesh product

2  Code.

3              Did you review this

4  document?

5        A.    This top one for laser cut?

6        Q.    Yes, ma'am.

7        A.    No.  If it said laser cut, I

8  just put it aside.

9        Q.    All right.  And if you go

10  into the document -- strike that.

11             In your report, you identify

12  five complaint categories:  Mesh

13  fraying/roping, sheath damage, erosion,

14  exposure, and pain.

15             Do you remember that?

16        A.    I do.

17        Q.    Now, were any of those

18  complaint categories new?

19        A.    These complaint categories

20  were delineated.  These were, I believe,

21  I talked about in my report and

22  referenced each one individually and

23  talked about how they were known.

24             So, to my knowledge, they

Anne Holland Wilson, MBA

1    weren't new.

2          Q.    And for the five categories

3    that you discussed, were all five of

4    those complaints within the estimated

5    frequency that had been set forth in the

6    risk analysis plan?

7          A.    In the risk analysis plan?

8          Q.    Yes, ma'am.

9          A.    Where is that document?

10               The legacy risk analysis

11   plan?

12         Q.    Yes, ma'am.

13         A.    I do know that exists.  Let

14   me -- is that in the stack?

15               I know I looked at it, but

16   I'm wondering if it's in the stack or

17   not.

18         Q.    As we sit here right now, do

19   you have any information at all that

20   these five categories that you discuss in

21   your report, that the actual occurrence

22   rate exceeded the estimated occurrence

23   rate?

24         A.    I can tell you that they

Anne Holland Wilson, MBA

1    were either low or moderate.  I can't

2    remember exactly what they were predicted

3    to be.  I don't remember seeing a

4    prediction by failure mode.  I just don't

5    remember ever seeing that document.

6            Q.    As we sit here right now,

7    you don't have any information that they

8    would be above an estimated frequency?

9            A.    I can't looking at failure

10   mode and say I expect this to be

11   moderate.  I just don't know that.

12           Q.    Each one of these risk

13   categories -- strike that.

14                 Each one of these complaint

15   categories, it had been discussed in a

16   prior risk analysis, hadn't it?

17           A.    A prior risk analysis?

18           Q.    Yes.

19           A.    I'm just trying to make sure

20   I understand your question.

21           Q.    Okay.

22           A.    It's getting late in the

23   day.  I'm sorry.

24           Q.    Just if you know was

Anne Holland Wilson, MBA

1    prepared in February 23rd --

2          A.    2006.

3          Q.    Okay.

4          A.    This is sort of going back,

5    and this was for a period of time.  So

6    this says -- let me read it.

7                The base was from 2003 to

8    2006.  So it was a four-year period.

9                And you are asking me again?

10         Q.    I'm asking you if each one

11   of these complaint categories had been

12   identified in a prior risk analysis.

13         A.    There's only two.  So I

14   don't.  I would have to go back and look

15   at the --

16               MR. WALLACE:  If you know.

17               THE WITNESS:  -- specific

18         ones.

19               MR. WALLACE:  You either

20         know or you don't.

21               THE WITNESS:  I just don't

22         know.  I don't know right off the

23         top of my head.  I would have to

24         go look.

Anne Holland Wilson, MBA

1  BY MR. COMBS:

2      Q.    Had Ethicon done CAPAs for

3  any of these complaint categories?

4      A.    I think I talked about

5  CAPAs.  I don't think there was any CAPA

6  for those complaint categories.

7           We talked about CAPAs.  And

8  in my report I talked about one CAPA, and

9  that was relating to missing documents.

10          So I don't know of any

11  CAPAs, no.

12     Q.    So as we sit here right now,

13  you don't know of any CAPAs that relate

14  to any of these five complaint

15  categories.

16     A.    No.  I don't know of them.

17     Q.    Do you agree with me that

18  the purpose of the complaint review that

19  Mr. Lamont did was in order to predict

20  potential risks for laser cut mesh?

21     A.    There's a variety of reasons

22  that you do complaint reviews.  That may

23  be one of them.  But first off, you are

24  required to do periodic trending and look

Anne Holland Wilson, MBA

1    at your complaints, analyze your

2    frequency of complaints.

3                 And you do need to feedback

4    new things into your risk management

5    process and for new product development.

6                 So there's a variety of

7    reasons you would do that.

8         Q.    Okay.  But I'm asking about

9    this complaint review, this complaint

10   review done by Mr. Lamont.

11        A.    I can't say why Ethicon

12   specifically did this for new products.

13   I can't speak to what their intent was

14   for their new products.

15                I do know that it's required

16   to do for existing products.  And that's

17   part of why they did it.

18        Q.    But you don't know why this

19   complaint review was performed.

20        A.    It had been four years since

21   they looked at the TVT, so it's to

22   satisfy the requirements for complaint

23   review.

24                So -- and it's in the their

Anne Holland Wilson, MBA

1    procedure, so that's why it was done in

2    my estimation.

3              If there were other motives,

4    I'm not knowledgeable of those.

5         Q.    And the hazards and harms

6    that are set forth in the Risk Management

7    Report, 17, are the hazards and harms

8    that were being reviewed in preparation

9    for the introduction of laser cut mesh,

10   weren't they?

11        A.    I specifically stated, I was

12   not reviewing laser cut, so I can't speak

13   to that.

14        Q.    You don't know --

15        A.    I analyzed this section that

16   was the TVT base.  And that was what I

17   looked at.

18        Q.    And you don't know what the

19   hazard and harms that were generated from

20   Mr. Lamont's review of this complaint

21   review, you don't know what they were

22   used for.

23        A.    Well, I mean, I read the

24   analysis, but I don't know if there were

Anne Holland Wilson, MBA

1    other uses for it or anything like that.

2    I don't know what Ethicon's thought

3    processes were other than what's stated.

4        Q.    Following this complaint

5    review that was performed in 2006 --

6        A.    May I get another water?

7        Q.    Yes, ma'am.

8        A.    Thank you.

9        Q.    Following this complaint

10   review in 2006, has Ethicon performed any

11   clinical expert reports or clinical

12   evaluation reports?

13       A.    On which products?

14       Q.    On TVT.

15       A.    TVT mechanically cut mesh?

16       Q.    Yes, ma'am.

17       A.    I don't know.  I know that

18   there were some -- couple of them in the

19   documents, but when it went to clinical,

20   I really didn't focus in on whether they

21   did that after 2006 or not.

22       Q.    And is a clinical evaluation

23   one form of risk analysis?

24       A.    That may be an input or an

Anne Holland Wilson, MBA

1  output.  But that in and of itself is not

2  a risk analysis.

3          Q.   Is one of the things that's

4  being done in a clinical expert report to

5  make a determination about whether the

6  product's risks out way its benefits?

7          A.   I don't know.  I would have

8  to look at the document.  There's so many

9  variations of those things.

10          Q.   And as we sit here today,

11  you haven't looked at any of the clinical

12  expert reports that came after this --

13          A.   I don't know --

14          Q.   -- complaint.

15          A.   -- that to be true or not.

16              I know that I did look at a

17  couple.  I don't know what the timing

18  were.  I would have to go back to my

19  documents.

20              Or show me the ones that

21  were in my list and I'll be glad to --

22          Q.   Do you have any opinions

23  regarding any of the clinical expert

24  reports performed after this complaint?

Anne Holland Wilson, MBA

1          A.     I don't even know what the

2     timing was.   I'm sorry.

3          Q.     Is it fair to say, as we sit

4     here today, you don't have any opinions

5     regarding the clinical expert report

6     prepared after this complaint analysis

7     was done?

8          A.     I don't think that's fair,

9     no.   I think it's fair to say I don't

10    know if they exist.

11         Q.     Okay.

12         A.     And I don't know if they

13    exist on the product, which is the scope

14    of my report.

15         Q.     You don't know whether there

16    had been any clinical expert reports

17    after 2006 that addressed TVT.

18         A.     TVT mechanically cut, TVT-R

19    mechanically cut.

20                I don't want to mix

21    procedures.   I don't want to mix

22    processes.   So I just don't know.

23         Q.     Don't know.

24                One of the opinions that you

Anne Holland Wilson, MBA

1   had was that for risk analysis purposes,

2   TVT and TVT-O can't be grouped; is that

3   correct?

4          A.    Absolutely.

5          Q.    What's the indication for

6   use for TVT?

7          A.    TVT is used for stress

8   urinary incontinence.

9          Q.    What is the indication for

10  just for TVT-O?

11         A.    That's not the basis of what

12  my opinion is based on.

13         Q.    My question --

14         A.    I'd have the look at TVT-O

15  and find that out.

16         Q.    What is the indication for

17  use for TVT-O?

18         A.    I would have to go

19  double-check that.  I believe it's for

20  stress urinary incontinence, too.  It's a

21  different surgical technique and

22  different tools accessories.

23         Q.    They have the same

24  indication for use, don't they?

Anne Holland Wilson, MBA

1        A.    Sure.   That has no bearing

2  on why I think they combine.   They cannot

3  become be combined just because of that

4  one little detail.

5        Q.    Ms. Wilson, could you

6  hand --

7        A.    That one?

8        Q.    Yes.   Thank you.

9             Now, what's the procedure

10  that Ethicon used when it was making the

11  decision about whether TVT-O and TVT

12  should be grouped together in a risk

13  manager legacy report?

14        A.    In the plan they made a

15  statement.

16             Is the plan in here?

17        Q.    Your right hand is on top of

18  it.

19        A.    That's the report.

20        Q.    Okay.

21        A.    I'm trying to find the plan.

22  Because there were a couple of versions,

23  and I believe they talked about that in

24  the plan.

Anne Holland Wilson, MBA

1        Q.    Ms. Wilson, let me try a

2   different question then.

3              Who were the Ethicon

4   employees that were involved in the

5   decision for the risk management report?

6        A.    Looks like there was a

7   project manager, a director of risk

8   management, a medical director, an

9   engineering fellow, and a quality --

10  worldwide quality engineering manager.

11       Q.    So quality engineer, that's

12  what you do; right?

13       A.    That's one of the elements I

14  have done for 30 years.  That is...

15       Q.    I mean, that's what you do.

16  That's what you are.  You're a quality

17  engineer.

18              MR. WALLACE:  She's

19         answered.  Objection to form.

20              MR. COMBS:  Okay.

21  BY MR. COMBS:

22       Q.    Now, in addition to a

23  quality engineer being in this team,

24  there was also a director of risk

1    management, wasn't there?

2          A.    I believe I have stated all

3    of those people on that form.

4          Q.    There's a medical director?

5          A.    I have stated that there is

6    a senior project manager, a director, WW

7    risk management, medical director,

8    engineering fellow, RND, WW quality

9    engineering manager.

10         Q.    So at least five people

11   participated in developing the risk

12   management report, TVT and TVT-O, didn't

13   they?

14         A.    That's what this says.

15         Q.    All right.  What are the

16   qualifications of Dr. Robinson, the

17   medical director?

18         A.    I have --

19         Q.    Do you know anything about

20   him?

21         A.    I don't know.  I haven't

22   read his CV, no.

23         Q.    Do you know how many of

24   these procedures he's performed?

Anne Holland Wilson, MBA

1      A.    I could not tell you that.

2      Q.    If I ask you to assume that

3  Dr. Robinson is a urogynecologist, would

4  Dr. Robinson be in a better position than

5  you to judge the clinical risks of these

6  procedures?

7           MR. WALLACE:  Objection to

8      form.

9           THE WITNESS:  As far as the

10     clinical, sure.

11  BY MR. COMBS:

12     Q.    Yes, ma'am.  I mean --

13     A.    He may be.  That has nothing

14  to do with the risk management process

15  and whether to do with combining or not

16  combining the different products, which

17  is the original question you asked me.

18     Q.    You disagree with their

19  decision to combine the two for risk

20  purposes.

21     A.    It's not that I disagree.

22  It's stated in the standards, and it's

23  accepted throughout the industry that you

24  have to look at each thing individually

Anne Holland Wilson, MBA

1    for its application in its placement, and

2    not just for convenience sake.

3           Q.    And what specific standard

4    are you referring to?

5           A.    I'd be glad to show you.  It

6    was the one I pointed out, the very first

7    box this morning.

8                 We started with the 2000

9    version.

10                We start by looking -- oh, I

11   know exactly what you're going to try to

12   catch me on.

13                You go to the Section 4.2.

14                So what it says is, you look

15   at Intended Use.  That's one of the

16   items.  Then you go to 4.2.

17          Q.    I apologize.  I just need

18   you to say on the record what it is you

19   are referring to.

20          A.    I'm referring to ISO 14971,

21   Risk Management -- Medical Devices,

22   Application of Risk Management to Medical

23   Devices.

24                MR. DAVIS:  Which version?

Anne Holland Wilson, MBA

1              THE WITNESS:  This is the

2         2007, but I would be glad to look

3         at the 2000 version, because I

4         think we're talking about 2006,

5         right?

6    BY MR. COMBS:

7         Q.    Yes, ma'am.

8         A.    Let's go to the right one

9    here, the right version.

10              Here, this is the one we

11   were looking at this morning.  It's the

12   ISO 14971, same title, 2000 version.

13              Do you want me to repeat the

14   title?

15         Q.    Medical Devices -

16   Application of Risk Management to Medical

17   Devices.

18              Okay.  And what's the

19   specific standard that you are saying

20   precludes these from --

21         A.    What I'm saying is that you

22   need right here and throughout this

23   document, it's not one phrase you're

24   going to find it, it's the intent of this

Anne Holland Wilson, MBA

1  document.

2            It says, you need to look at

3  the use, the purpose, hazards, risks.

4  Part of that is looking at where it ends

5  up in the woman's body, the surgical

6  techniques, and things such as that, the

7  different system interfaces, not the same

8  materials, different processes of the

9  manufacturing.

10            So you can't mix one thing

11  with another.

12       Q.    What you're pointing to is

13  Figure 1?

14       A.    It's also in figure -- which

15  is also in my report, a little more

16  detail.  It's in Figure 2, if you would

17  like to look at that.

18       Q.    And what is -- what are the

19  different risks of TVT-O and TVT?

20       A.    Well, we have established --

21  or, to me, is that one uses a

22  different -- they use different

23  instrumentation.  They use different

24  surgical techniques.  And I believe they

Anne Holland Wilson, MBA

1    end up in different places in the woman's

2    body.

3              Even though they use the

4    same base mesh, you can't say that apples

5    compare -- again, the apples and oranges,

6    in my opinion.

7         Q.    And my question was:  What

8    are the different risks?

9         A.    I didn't look at the TVT-O

10   risk management and compare that to those

11   in the TVT-R.  So --

12        Q.    You don't know -- I'm sorry

13   to --

14        A.    I do --

15        Q.    -- interrupt.

16        A.    -- need -- in order to

17   answer that question, I would have to go

18   look at the differences in the TVT-O.

19             So you're asking me a

20   question that I would have to guess on.

21        Q.    And I'm asking you a

22   question that to date you haven't done.

23        A.    I wasn't asked to look at

24   TVT-O, no.

Anne Holland Wilson, MBA

1      Q.     So you have not made --

2      A.     Absolutely not.

3      Q.     And, I'm sorry, I started to

4  interrupt you.

5             Are you finished?

6      A.     (Gesturing.)

7      Q.     Are you finished?

8      A.     I am now.

9      Q.     As we sit here today, you

10  haven't assessed the risk for TVT-O, have

11  you?

12     A.     No.

13     Q.     What are the different risks

14  presented by machine cut and laser cut

15  mesh?

16            MR. WALLACE:  And what?

17        Laser cut?

18            MR. COMBS:  Yes.

19            MR. WALLACE:  Hasn't the

20        judge limited to this trial, this

21        is a TVT mechanical cut report.

22            And she's already told you

23        about 50 times she hasn't looked

24        at laser cut.

Anne Holland Wilson, MBA

1          And we're getting -- just so

2     you understand, I have questions

3     for her and you're going to miss

4     your plane if you keep doing this.

5          MR. COMBS:  That's okay.

6          MR. WALLACE:  I think you're

7     intentionally doing it at this

8     point.

9          You're going off on a

10    territory that has absolutely --

11    you know that this a TVT

12    mechanical cut report, and

13    you're -- frankly, she's told you

14    the 50 times today what she looked

15    at what she didn't look at.  And

16    you know that to be the case.

17 BY MR. COMBS:

18    Q.   Ms. Wilson, do you or do you

19 not have the opinion set forth on page 14

20 of your report that it was improper to

21 group mechanically cut and laser cut mesh

22 for purposes of risk analysis?

23    A.   That is my opinion.  And I

24 just stated why.  You cannot mix apples

Anne Holland Wilson, MBA

1    with oranges when it comes to risk.

2         Q.    Now, after the big speech by

3    Mr. Wallace that I'm asking about a

4    question that's not in your report,

5    that's something that's in your report.

6         A.    I did not look at the risks

7    associated with laser cut mesh.  I

8    excluded that.

9              I do believe that you cannot

10   mix different manufacturing processes,

11   different surgical techniques, different

12   products together for the purposes of

13   risk management.  And that's what I

14   stated in my report.

15        Q.    As we sit here today, you

16   have not analyzed what the risks are of

17   laser cut mesh, have you?

18        A.    That's irrelevant to my

19   opinion stated on page whatever it was.

20        Q.    Ms. Wilson, as we sit here

21   today, have you assessed the risk of

22   laser cut mesh?

23        A.    I have not assessed -- I

24   have assessed that they are different

Anne Holland Wilson, MBA

1    products and therefore cannot be grouped.

2         Q.    Have you assessed the risk

3    of laser cut mesh?

4         A.    No.  I have answered that at

5    least 20 times today.  I did not look at

6    the laser cut mesh risk in and of itself.

7         Q.    Now, Ms. Wilson do you know

8    whether the risk management report that

9    you have opined upon, whether that was

10   included in the technical file that was

11   reviewed by BSI?

12        A.    By who?

13        Q.    BSI?

14        A.    I'm trying to remember.  I

15   believe it was, but I'm not a hundred

16   percent sure.

17             I really do believe it would

18   be in there, because that should be in

19   the technical file.

20        Q.    Now --

21        A.    But, please, I'm not a

22   hundred percent sure.  I just think I saw

23   it in there.  It makes sense.

24        Q.    Now, in your report, you

Anne Holland Wilson, MBA

1    also have the opinion that it was

2    improper to group TVT-Exact and TVT

3    together.

4              That's on page 14 of your

5    report.

6         A.    Thank you.

7              Yes.  That's the same

8    answer.

9         Q.    Okay.  Now, what are the

10   different risks presented by TVT-Exact?

11        A.    I just answered that I

12   didn't analyze the risks associated with

13   different products.

14             What I said is, is that you

15   can't combine them because of how the

16   standards are and based on my many years

17   of experience doing this.

18             For example, I have done it

19   for four versions of shoulders, seven

20   different versions of knees, and you

21   don't just combine and mix them and

22   match.  You have to look at each one

23   specifically.

24        Q.    Are you finished?

Anne Holland Wilson, MBA

1        MR. WALLACE:  I think that's

2    a little flippant the way you're

3    doing that.

4        MR. COMBS:  I'm not.  Let's

5    go off the record.

6            -   -   -

7        (Whereupon, a discussion was

8    held off the record.)

9            -   -   -

10 BY MR. COMBS:

11    Q.    Now, in the document that

12 you're referring to about the grouping of

13 TVT and TVT-Exact, what was that

14 document?

15    A.    I've said three or four

16 times, I believe it's the risk plan,

17 there were two or three versions.

18        There was a legacy risk

19 management plan that listed all the

20 different devices that were going to be

21 re-evaluated.  There were two conditions

22 by which the product got on that risk

23 management legacy plan.

24        I just don't have that in

Anne Holland Wilson, MBA

1    front of me as we sit here today.

2         Q.    Okay.  So you think that the

3    grouping of TVT-Exact and TVT was part of

4    a legacy plan?

5         A.    I think that there was a

6    large list of documents.  And it was the

7    plan that goes with this Risk Management

8    Report 44.

9              There was an RMP that goes

10   with that.  To the best of my knowledge,

11   that's what called out which products

12   were on that.

13        Q.    And I may be wrong about

14   this.  It's my belief that what you were

15   referencing in Exhibit 56 was a technical

16   file for TVT-Exact.  I could be wrong.

17   That was my understanding.

18        A.    It may -- I think that I may

19   have misunderstood your question.

20             The document -- could we

21   just look at that risk management plan?

22   Because I think that's the one that calls

23   out the grouping of the reports, which is

24   what I thought you asked me about.

Anne Holland Wilson, MBA

1      Q.    This is what was produced to

2  me as being the document that was

3  Footnote 56 in your report.

4      A.    That's not the document that

5  goes with this management report, which

6  is --

7      Q.    Okay.

8      A.    Do you want to repeat your

9  question again?  It was why -- what to do

10  with -- it had to do with this report and

11  why they grouped these products together?

12      Q.    Yes.  And, ma'am --

13      A.    And there was a plan and it

14  specified exactly why.

15      Q.    And I had -- and, again, I

16  don't think there's any controversy on

17  this.

18          TVT-Exact didn't even exist

19  at the time that this report was written.

20      A.    And I'm sure that I may have

21  looked at that, too.  If it had to do

22  with the fact that they were different

23  products, I may have been making that

24  point.

Anne Holland Wilson, MBA

1                    But that's not what you --
2     let's go back to what you asked, please.
3          Q.    Here's what I asked you.
4     And what I asked you was:  What was the
5     document that grouped TVT and TVT-Exact?
6                    And it's my understanding
7     from Footnote 56 that what you're
8     referring to is this document, the CE
9     mark technical file for Gynecare TVT
10    retropubic devices.
11         A.    If you look at the paragraph
12    above that in my report, and you look at
13    Footnote 52, that's what I believe
14    grouped these devices in the risk
15    management report.
16         Q.    So its your belief that
17    TVT-Exact is grouped in this risk
18    management report?
19         A.    Okay.  The risk management
20    plan called out for a host of documents,
21    a host of products to be reviewed.
22                    Here's some of their catalog
23    numbers.  Right.  I don't have the
24    catalog numbers together, but I do know

Anne Holland Wilson, MBA

1    that TVT is included in here.

2                  So let's go through what I

3    said.

4                  There was a risk -- if you

5    look at page 14, A final risk management

6    plan and associated report analysis of

7    legacy devices, that's Footnote 52,

8    products TVT and TVT-O were conducted.

9         Q.    No.

10        A.    And they were grouped.

11        Q.    But that's not what I'm

12   asking now.  I'm asking about TVT-Exact

13   and TVT.

14                In the bottom paragraph of

15   you say --

16        A.    I said that they tried to

17   incorporate Ethicon products with laser

18   cut mesh.  So some of these are laser cut

19   mesh.

20        Q.    All right.  And in that

21   paragraph you state, For example, the

22   2010 TVT technical file combines risk

23   analysis for the original TVT with

24   TVT-Exact; right?

Anne Holland Wilson, MBA

1          A.     And it probably does.

2          Q.     Okay.  Now, here's the

3     question that I wanted to ask you about

4     that.

5                 I want to make sure the

6     record is clear.  The technical file that

7     you're referring to, that's a technical

8     file used by European regulators, isn't

9     it?

10          A.     We have gone through this at

11     least 20 times.

12                 Technical files are used by

13     European regulators, and they are used to

14     evaluate quality systems and get CE mark.

15     They're very specific.

16          Q.     Exactly.  And that's this

17     document that you're referring to.

18          A.     Many of those same documents

19     are used for many purposes.  They're not

20     just single-purpose documents.  Risk

21     management is one of those documents that

22     serves many purposes.

23          Q.     And what you're specifically

24     referring to -- what your report says is,

Anne Holland Wilson, MBA

1    for example, the 2010 TVT technical file

2    combines risk analysis for the original

3    TVT retropubic mechanical cut device

4    along with TVT-Exact.

5              That's what you're referring

6    to.

7         A.    That is an example.  I

8    believe there are many examples of those

9    things.

10             Yes.  That is an example.

11        Q.    Ms. Wilson, on page 14 of

12   your report, you talk about the grouping

13   of mechanical and laser cut mesh.  And

14   you have seven footnotes that relate to

15   that.

16        A.    On page what?  Oh, down

17   here?

18        Q.    Yeah.  I'm talking about --

19        A.    Okay.

20        Q.    -- pages 14 and it carries

21   over into 15.

22             You have a section in your

23   report that deals with laser cut mesh.

24             And in that, you have -- you

Anne Holland Wilson, MBA

1    reference seven footnotes -- six, I'm

2    sorry, six footnotes, from 57 through 62.

3                  Are there any other

4    documents that you are relying on, other

5    than the documents in those footnotes,

6    for your opinion that laser cut mesh and

7    mechanically cut mesh present different

8    risks?

9         A.    No.  I considered so many

10   documents.  I considered and went back

11   and looked at documents and documents and

12   documents.

13                  These are the ones I quoted.

14   So I'm sure I considered many of them,

15   and these are the ones I footnoted

16   because I specifically called them out.

17        Q.    Who selected the documents

18   that you footnoted?

19        A.    I selected every document

20   that I wrote in this report.

21        Q.    Are there any documents that

22   you were provided that relate to the

23   risks of laser cut mesh that you chose

24   not to include in your report?

Anne Holland Wilson, MBA

1          A.     There may well have been,

2     because I wasn't looking at the risks

3     associated with laser cut mesh.  I was

4     looking at TVT mechanically cut for the

5     TVT-R.

6                    So I was not analyzing laser

7     cut mesh.  So I'm sure that I did not

8     include or reference many of those

9     documents.

10         Q.     There's a clinical expert

11    report related to laser cut mesh that

12    analyzes whether the risks of laser cut

13    mesh and machine cut mesh are different,

14    isn't there?

15         A.     You know, I just couldn't

16    tell you, as I sit here today, whether

17    there is or isn't.

18         Q.     So as we sit here today, you

19    don't know whether there is a clinical

20    expert report that analyzes the risks of

21    laser cut versus machine --

22         A.     I can't remember, because I

23    really wasn't focusing, again, on laser

24    cut mesh.

Anne Holland Wilson, MBA

1              If it was cited here as a

2    footnote, I'm sure that if I relied on

3    it, if I -- for the footnote, I would

4    have footnoted it.

5         Q.    In the last sentence -- last

6    full sentence on page 14, you say,

7    Similarly, the April 18th, 2006 clinical

8    expert report for Ethicon's laser cut

9    mesh noted that laser cut mesh is less

10   susceptible to particle loss compared to

11   the mechanical cut mesh.

12        A.    Well, voila.  I cited it and

13   it's been footnoted.  Just like I said,

14   if I relied on it, I would have footnoted

15   it.

16        Q.    Now, are there other

17   conclusions reached in that clinical

18   expert report that you have chosen to

19   ignore?

20        A.    If you showed it to me, I

21   would have to review it.  I can't

22   remember every word on every page.

23        Q.    Sure.

24              Do you remember that the

Anne Holland Wilson, MBA

1    assessment reached by -- strike that.

2              Do you remember that the

3    assessment made in the clinical expert

4    report is that the risks aren't

5    different?

6         A.    I don't remember the wording

7    of everything.  If you give it to me

8    again, I'll be glad to take a look.  I

9    know I looked at it.  I cited it.

10        Q.    Ms. Wilson, on page 17 of

11   your report, you have five risks that you

12   describe as critical risks ignored by

13   Ethicon.

14             MR. WALLACE:  There is no

15        question pending.

16   BY MR. COMBS:

17        Q.    Yeah, have you gotten to

18   that?  Did you find it?  Are you on

19   page 17?

20             MR. WALLACE:  She is.

21             MR. COMBS:  Okay.  Thank

22        you.

23   BY MR. COMBS:

24        Q.    Now, who selected those five

Anne Holland Wilson, MBA

1   risks?  Did you select those or did

2   counsel select them?

3           A.    You know, we talked about

4   the risks, and I reviewed the complaints.

5   And those are some of those that were on

6   that complaint report.  In fact, many of

7   them were.

8           Q.    I'm sorry.  Did you finish?

9           A.    Right.  So I looked at the

10  documents, and I -- I'm sure I talked to

11  counsel also.

12          Q.    Now, for each one of these

13  five risks that you set forth, I want you

14  to tell me what standard you believe was

15  violated by Ethicon's design control and

16  risk management process in regard to

17  these risks.

18          A.    Okay.  In general,

19  management has the responsibility in

20  ISO 13485, and there is also guidance

21  documents that -- internation documents.

22          So there's a plethora of

23  documentation and also good quality

24  practices.

Anne Holland Wilson, MBA

1                But if you need me to cite a

2    specific standard, it would be ISO 13485

3    and ISO 14971.

4                Those would be the two most

5    relevant standards that say that

6    executive management has a responsibility

7    to, one, consistently evaluate, through

8    management review, their processes,

9    products, complaints -- and we could look

10   at the standards if you choose -- and to

11   make sure that they have, you know,

12   sufficient systems in place, that they're

13   established, meaning they're written, and

14   effective, and that they maintain those

15   systems.

16               So those would the

17   standards.

18        Q.    For the risks that you set

19   forth on page 17, are you relying on any

20   medical literature to support your

21   opinion in regard to any of those risks?

22        A.    Any medical opinion?

23        Q.    Any medical literature.

24        A.    Does that mean scientific

Anne Holland Wilson, MBA

1    literature?

2            Q.    Well, let's start with --

3            A.    Published literature?

4            Q.    Let's start with medical

5    literature.

6            A.    Internal documents?

7            Q.    Let's start with, are there

8    any peer-reviewed articles from medical

9    journals that you're relying on to

10   support your opinions regarding any of

11   those five categories?

12           A.    Yes, I believe so.

13           Q.    What are they?

14           A.    If you look at Footnote

15   Number 75, for example.

16           Q.    And that's Celine, Mary

17   article?

18           A.    Yeah.

19           Q.    Any other scientific or

20   medical literature that you're relying on

21   to support those five categories?

22           A.    All of the canine studies

23   were scientific studies, they had

24   scientific data.

Anne Holland Wilson, MBA

1              Let me keep looking.

2              I looked at medical director

3      testimony.

4              Is that scientific?

5              I'm just not sure where

6      you're drawing the line there.  If it's

7      only peer-reviewed published, then I

8      believe that the one we just called up is

9      the only peer-reviewed published.

10          Q.    Okay.

11          A.    There may be some more.

12     Maybe 109, I can't be sure on that one.

13          Q.    Maybe 108?

14          A.    Oh, yeah, 100 eight.  Excuse

15     me.  I had my finger on 108.

16          Q.    So the two articles that you

17     recall relying on would be the Mary

18     article in Footnote 75 and the Klinge

19     article in Footnote 108.

20          A.    Those were the two that I

21     footnoted.

22          Q.    Are there any other

23     published clinical or scientific

24     literature that you're relying on in

Anne Holland Wilson, MBA

1    support of these opinions?

2                And when I say "these

3    opinions," I'm talking about the five

4    risk categories on page 17.

5         A.    There may have been other

6    documents that I considered.

7                It's the same answer.

8                If I relied on them in these

9    exact sentences, I would have footnoted

10   them.

11        Q.    Okay.  Now, in regard to the

12   first risk category that you call out,

13   degradation, what is your definition of

14   degradation?

15        A.    You know, I did look that up

16   and I wrote it down.

17                It's basically it breaks

18   down over time.

19        Q.    In the second paragraph in

20   1, you have a statement, and I just want

21   to make sure that that is what you're

22   referring to.

23                It's evident that material

24   degradation was not considered as a

Anne Holland Wilson, MBA

1    hazard which, over time, could lead to

2    mesh embrittlement, cracking, and

3    mechanical strength within the patient.

4                    Is that what you're

5    referring to?

6           A.    When I looked at the

7    documents, the application FMEA, which is

8    what was the document at the time that

9    this was designed, that's what I'm

10   referring to.

11                   It wasn't considered in that

12   document.

13          Q.    Okay.  Is that the

14   definition of degradation that you're

15   using, could lead to mesh embrittlement,

16   cracking, and loss of mechanical

17   strength?

18          A.    No.  I just told you the

19   definition.

20                   Do you want to read that

21   back?

22                   It's when something breaks

23   down over time.  So those could be

24   effects of degradation.

Anne Holland Wilson, MBA

1      Q.    So the definition you're

2  using for purposes of this report is that

3  it breaks down over time.

4      A.    That's not the official

5  definition, but that's a paraphrase of

6  the definition.

7      Q.    Do you know whether the

8  plaintiffs' experts in this case take the

9  position that degradation affects the

10  tensile strength of the mesh?

11              Do you know that?

12              MR. WALLACE:  Do you know?

13         That's the only question?

14              MR. COMBS:  Yes.

15              MR. WALLACE:  If you don't

16         know, you don't know.

17              THE WITNESS:  I can't

18         remember.  I don't know.  I might

19         have read that at one time.  I

20         just can't recall.

21  BY MR. COMBS:

22      Q.    Do you have any evidence

23  that would support that Prolene mesh

24  decreases in molecular weight or loses

Anne Holland Wilson, MBA

1  tensile strength after implantation?

2        A.    There was these animal

3  studies cited, and they had quite a bit

4  information on the breakdown of --

5  they're all marked in here.

6              Let's make sure.  I want to

7  make sure I get this right.

8              I do talk about the animal

9  studies.  I'm afraid I'm just at the end

10  of the day and I might get something

11  messed up here.

12              Because it was a series

13  here, they are right here under

14  degradation, and they were very explicit.

15              They were documented.  It's

16  Footnote 76, 77, and 78.

17              And it had specific -- I

18  don't know if they were SEM analyses with

19  them that shows the breakdown in an

20  oxidated fashion.

21        Q.    Do any of the studies that

22  you reviewed show that Prolene mesh or

23  Prolene sutures lose tensile strength or

24  lose molecular weight?

Anne Holland Wilson, MBA

1          A.    I can't recall.  I know I

2     footnoted these.  I would have to go back

3     and read these articles, because it

4     showed degradation.

5          Q.    And your definition of

6     degradation is it breaks down over time?

7          A.    I said that was a

8     paraphrase.  I would go back to these

9     references that I footnoted.

10         Q.    Okay.  I mean, I'm not

11    trying to be difficult here.  I mean,

12    you're talking about degradation.  I just

13    want to know how you defined it.

14         A.    I've answered it twice.

15              MR. WALLACE:  You've asked

16         it, she's told you.

17    BY MR. COMBS:

18         Q.    You've answered it once and

19    then told me that I was trying -- never

20    mind.  I don't want to quibble about it.

21              Now, are you -- is it your

22    position that degradation can cause mesh

23    to lose strength in vivo?

24         A.    It's my position that -- I

Anne Holland Wilson, MBA

1   just believe I said that I would go back

2   to these articles.

3               I don't remember about the

4   strength.  Didn't we just cover that?

5        Q.    Okay.  If the plaintiffs'

6   experts in this case take the position

7   that there is no loss of tensile

8   strength, would you defer to that?

9        A.    I'm not claiming anything to

10  do with tensile strength that I can see

11  here.

12              What I said is, if it

13  degrades over time, it could lead to

14  embrittlement, cracking, and loss.  And

15  those were things that were seen in the

16  complaint report.

17              So I'm bringing these back

18  that way.  I am not a polymer scientist

19  that has analyzed the weight loss.

20  That's the wrong person.

21       Q.    When you're discussing in

22  paragraph A complaints associated with

23  broken and torn mesh, are those

24  complaints that are prior to

Anne Holland Wilson, MBA

1  implantation?

2  A. I would have to review those

3  specific complaints.

4  But there are complaints,

5  and also the Maude database right there.

6  Q. And so my question is: Are

7  you talking about complaints that mesh is

8  broken and torn prior to implantation?

9  A. No. That doesn't make any

10  sense. It's over time.

11  Q. All right. So --

12  A. If it came out of the box

13  that way, that's a manufacturing error.

14  Q. That's not what you're

15  talking about.

16  When you're talking about

17  broken and torn mesh, that's not what

18  you're talking about.

19  A. That is not my intent, no.

20  Q. And so if you have

21  referenced any complaints that --

22  A. Then there could be an

23  incorrect footnote. There could be a

24  typo on the footnote.

Anne Holland Wilson, MBA

1          Q.    Now, what is your support

2     for -- well, strike that.

3                Do you have the opinion that

4     vaginal erosion is caused by mesh

5     degradation?

6                MR. WALLACE:  Are you asking

7          her as a clinician?

8                MR. COMBS:  I'm asking her

9          as the person who wrote, Review of

10         the Maude database in 2008 risk

11         management legacy report also

12         revealed multiple cases of vaginal

13         erosion.

14               THE WITNESS:  So if you look

15         at this report, they talk about

16         vaginal erosion.

17               They talk about the Maude

18         database.  And there's -- oh, I

19         can hardly read this document.

20               And I think these documents

21         that say erosion -- let's see

22         here.

23               Repeat the question.

24    BY MR. COMBS:

Anne Holland Wilson, MBA

1      Q.     Here's what I'm asking.

2             Is it your opinion that the

3   degradation that you refer to on page 17

4   of your report, that that causes vaginal

5   erosion?

6             MR. WALLACE:  That's outside

7        the scope of her report.  And you

8        know it.  And we're not offering

9        her as a clinician.

10  BY MR. COMBS:

11     Q.    Okay.  If you don't have

12  that opinion, that's fine.

13            MR. WALLACE:  It's not

14       whether or not she has that

15       opinion.  It's outside the scope

16       of her report.

17            MR. COMBS:  Okay.  I'll

18       accept that.

19            So, I mean it's in the

20       report --

21            MR. WALLACE:  No, it's not.

22       She identifies harms and hazards.

23            And you're trying to ask her

24       clinical opinions right now, which

Anne Holland Wilson, MBA

1    is, as you know, inappropriate.
2            MR. COMBS:  If the
3    representation right now is --
4            MR. WALLACE:  She's not
5    offering clinical opinions to you
6    as a physician.  She is offering
7    you opinions as someone that's
8    involved in risk management.
9            I have had this very similar
10   discussion with someone on your
11   team, and think it was Byrd [ph]
12   at one point, and in another case.
13           But the bottom line is, just
14   so we're clear, we are not telling
15   you or Judge Goodwin that she is a
16   clinician.
17           She has identified documents
18   that support her opinion, and
19   she's identified harms and hazards
20   that were not recognized.
21           So if you are going to be
22   ask her medical opinions, there
23   are people that are offering those
24   medical opinions.  You should go

Anne Holland Wilson, MBA

1          talk to them.

2    BY MR. COMBS:

3          Q.    Now, Ms. Wilson, is it

4    correct that you are not offering any

5    opinion in this case that degradation

6    causes vaginal erosion?

7                You are not offering that.

8          A.    I am not a clinician.  I

9    footnote that.  I am not claiming

10   medical.  I'm simply looking from the

11   complaints and from the hazard viewpoint.

12   I'm not an M.D.

13         Q.    And you will not be opining

14   at trial that degradation in any way can

15   cause vaginal erosion.

16         A.    What I can do is say that

17   the analysis of the data, just like I

18   have done from a risk management point of

19   view.

20         Q.    Just --

21               MR. WALLACE:  We're not

22         offering any medical opinions,

23         Phil.

24               THE WITNESS:  No medical

Anne Holland Wilson, MBA

 1          opinion.

 2                  MR. COMBS:  That will

 3          include that she will not be

 4          offering the opinion that

 5          degradation causes a risk of

 6          vaginal erosion.

 7                  If that's fair, then we can

 8          move on.

 9                  MR. WALLACE:  We're offering

10          no clinical opinions.  We can move

11          on.

12  BY MR. COMBS:

13          Q.    Ms. Wilson, you, on page 17,

14  discuss what you refer to as heavyweight

15  mesh.

16          A.    On page 17?

17          Q.    Yes.  Page 17 you list --

18          A.    Oh, D.

19          Q.    What support do you have

20  that -- well, strike that.

21                  Is the mesh in TVT

22  heavyweight?

23          A.    I have read a doctor's

24  opinion and quoted the doctor.  That's

Anne Holland Wilson, MBA

1   the support I have.

2        Q.    You don't know whether it's

3   heavyweight, do you?

4        A.    I have read several of these

5   expert opinions from physicians.  And

6   based on that, it is heavyweight.

7        Q.    Do you know what the weight

8   is?

9        A.    I believe it's -- I would

10  double-check.  Based on these footnotes,

11  I think it was like between 110 and 120,

12  or -- it's all specified in there, and I

13  read those documents.

14             I don't have it memorized.

15  I understood this wasn't a memory test.

16       Q.    And what is your basis to

17  conclude that the weight of TVT mesh

18  presents a risk that is not addressed in

19  the risk management processes of Ethicon?

20       A.    So if you go back to the

21  original Preventia report, I don't think

22  it covered long-term effects like

23  inflammation.

24             Let's just look what it says

Anne Holland Wilson, MBA

1    here.

2              In fact, I quoted scientific

3    literature right there, and medical

4    literature.

5              We looked at the complaints.

6    And as far as I know, there was no

7    evidence to say that that TVT-R had a

8    mesh change in it.

9              So the mesh itself wasn't

10   changed based on those complaint data and

11   the scientific evidence and the opinions

12   of the doctors.

13             So that's where I'm coming

14   from.

15        Q.   Are you aware of any support

16   in the world that lighter-weight mesh in

17   an SUI application would cause less

18   clinical harms?

19        A.   I believe the cited

20   footnotes clearly talk about that, yes.

21        Q.   All right.  And is --

22        A.   That's not the whole world,

23   I'm sure.  It's just the thousands of

24   pages I had available to me.

Anne Holland Wilson, MBA

1          Q.    Sure.  And the article that

2     you're referencing is Dr. Klinge's

3     article about Foreign Body Reaction to

4     Meshes Used for the Repair of Abdominal

5     Wall Hernias.

6          A.    I think there were

7     additional cites here, because there was

8     also this doctor -- I want to make sure

9     she's a doctor.

10          There's an article here

11     which is -- 10- -- not an article, excuse

12     me -- Footnote 109, Brigitte Hellhammer,

13     that says, yes, it is heavyweight, and

14     the mesh has been the same all the time.

15          So that's another reference

16     I have to say the mesh is heavyweight and

17     it hasn't been changed, coupled with the

18     other things that say, yes heavyweight

19     does have a more inflammatory response.

20     And then you have complaints.

21          So that circle has not been

22     completed, in my opinion; that you go

23     back look at those risks based on

24     feedback, then you make a change to the

Anne Holland Wilson, MBA

1    product or do something to decrease or

2    mitigate.

3            Q.    You do not have the medical

4    expertise to draw a causal relationship

5    between the weight of the mesh and

6    clinical outcomes, do you?

7            A.    Absolutely not.  But I

8    can -- here's what I can do.

9                Look at complaints and say,

10   has the risk management and quality

11   system process, have those been followed

12   that say, you need to go back and

13   evaluate those and do something about it?

14                And that's what I was trying

15   to say.

16           Q.    And you would agree with me

17   that the weight of the mesh for all risk

18   analyses that has been done since 1997

19   would be for the same weight mesh?

20           A.    I have no basis to state

21   that.  I haven't looked at all risk

22   analyses.

23                MR. WALLACE:  Off the

24                record.

Anne Holland Wilson, MBA

1                    -   -   -

2                    (Whereupon, a discussion was

3          held off the record.)

4                    -   -   -

5    BY MR. COMBS:

6          Q.    Ms. Wilson, one of the risks

7    that you discuss is inability to remove

8    the mesh.

9                    Is this intended to be a

10   permanent implant?

11         A.    Yeah.  It is a permanent

12   implant.

13         Q.    And is there any question in

14   your mind that the surgeons that

15   implanted noted that it's a permanent

16   implant?

17         A.    No.  That's -- however, I

18   have worked on many permanent implants.

19   And I believe, as I have said, there are

20   a number of -- and right here, there are

21   a number of reasons a permanent implant

22   may need to be removed.

23         Q.    Is the function of a mesh to

24   have tissue ingrow into it?

Anne Holland Wilson, MBA

1          A.    I'm not sure I can make a

2  clinical judgment about exactly how it

3  functions, but I do know it's intended to

4  be a permanent implant.

5          Q.    And that surgeons who

6  implant it know that.

7          A.    They certainly should.

8          Q.    Ms. Wilson, I want to ask

9  you about your references to particle

10  loss on page 19.

11          A.    Okay.

12          Q.    Have you reviewed any of the

13  preclinical literature from Ethicon --

14  strike that.

15          Have you reviewed any of the

16  preclinical testing by Ethicon in which

17  they studied the risks associated with

18  particle loss?

19          A.    I'm trying to remember.  Was

20  it on my list?

21          I remember --

22          Q.    I don't believe so.

23          A.    I don't remember looking at

24  it.

Anne Holland Wilson, MBA

1          Q.    Do you know whether

2     Ethicon's preclinical department assessed

3     the risk of particle loss --

4          A.    I don't know what their --

5          Q.    -- from --

6          A.    -- preclinical department

7     did.

8          Q.    And have you reviewed the --

9     strike that.

10          Have you reviewed the

11     compilation of preclinical testing that

12     was introduced by Ethicon's 30(b)6

13     witness, Dr. Barbolt, regarding the

14     testing on degradation and particle loss

15     that was conducted by the preclinical

16     department?

17          A.    No.  That does not sound

18     familiar.

19          Q.    You don't know what that

20     preclinical work showed, do you?

21          A.    No.  I don't think he's on

22     my list either.

23               MR. COMBS:  Ms. Wilson, I'm

24          going to stop, and Mr. Wallace has

Anne Holland Wilson, MBA

1          some questions for you.

2                  There are a few items from

3          the file that you brought that

4          we're going to mark as exhibits.

5                  So if we could just mark

6          those.

7                  MR. WALLACE:  Can we just

8          agree to do that after?

9                  MR. COMBS:  Yes, absolutely.

10                 MR. WALLACE:  That way, we

11         can move smoothly from here.

12                 MR. COMBS:  Sure.  Thank

13         you.

14                       -   -   -

15                 (Whereupon, a brief recess

16         was taken from 5:55 p.m. to 6:00

17         p.m.)

18                       -   -   -

19     BY MR. COMBS:

20             Q.    Ms. Wilson, we pulled out

21     several documents from your file that we

22     are going to make a photocopy of and

23     attach them.

24                 We're going to do that after

Anne Holland Wilson, MBA

1    the deposition is over, but I just have

2    one question on one of them.

3                The document that says, GMS

4    Standard --

5          A.    Q.

6          Q.    I'm sorry.

7                -- QMS Standards and

8    Guidance, that's the document that you

9    were referring as your cheat sheet of the

10   standards?

11         A.    Right.  That's just a

12   summary we put together.

13         Q.    Okay.  And so this is a

14   summary you put together of the standards

15   that you --

16         A.    Tried to keep it straight in

17   my mind.

18         Q.    Okay.  Thank you.

19               MR. DAVIS:  And there's the

20         other one.

21               MR. COMBS:  Okay.

22                   -   -   -

23               EXAMINATION

24                   -   -   -

Anne Holland Wilson, MBA

1  BY MR. WALLACE:

2      Q.    We're still on the record,

3  Ms. Wilson, and I'm going to just ask you

4  a few questions, and, actually, more than

5  a few.

6              How about that?

7      A.    Sure.

8      Q.    But I promise not to take

9  too long, because I know it's been a long

10 day for you.

11             So let me start sort of at

12 the beginning of the day.

13             You were asked about some

14 publications that you may or may not have

15 authored.

16             Do you recall that,

17 generally speaking?

18     A.    Sure.

19     Q.    And --

20     A.    I'm trying to remember back.

21     Q.    Let me ask you this.  Well,

22 you mentioned one publication, if I

23 recall correctly, that was peer-reviewed.

24             In your field doing what you

Anne Holland Wilson, MBA

1  do with medical device companies, what do

2  you believe is more important, your

3  publications or your work and experience?

4       A.    In my field, very few

5  people -- you know, we don't publish

6  much.  We do presentations, because we go

7  to seminars and give presentations.

8  Things like that are much more effective.

9       Q.    You referred to, also

10  earlier in the day, your experience with

11  what you called implantables.

12            And if I'm right, you were

13  referring to permanently implantable

14  medical devices; is that right?

15       A.    Correct.

16       Q.    Why don't you tell us a

17  little about your experience with the

18  implantables --

19       A.    Sure.

20       Q.    -- over the course of your

21  30-year career?

22       A.    I started working with them

23  about 1993.  So before the -- those I

24  worked for Class I and II, and then I

Anne Holland Wilson, MBA

1  started out with -- I worked with heart

2  valves, I worked with AAP, which are

3  ascending aortic prostheses.

4              I worked with tissue valves.

5  I've worked with, you know, a variety of

6  cardiovascular type of systems.

7              And then I moved on to a lot

8  of what I call total joints, which are

9  hip, knees, shoulders.  And -- basically,

10  body parts.  So I worked with lot of

11  those.

12              I also did a couple of

13  shoulder anchors.  So those are also

14  intended to be permanently implanted.

15              Many of these are PEEK

16  devices, some are cobalt and chromium

17  devices.  Some have different kinds of

18  polyethylene material in there.

19              So then I did quite a few

20  different spine.

21              And when I say I worked on

22  them, I not just worked on them, but I

23  mean I worked on maybe six versions of

24  them, yeah, because there were six

Anne Holland Wilson, MBA

1    versions of them.

2             And then I worked with like

3    with interbody fusion devices, cervical

4    plates, medical screws.  Those kind of

5    things.

6         Q.    When you list all those

7    devices, if you can go a little bit

8    slower so we can take those down.

9         A.    Sorry.

10        Q.    Were some of those -- I take

11   it that some of those devices, like some

12   of those shoulders and knees, were made

13   of certain polymers or sometimes

14   plastics?

15        A.    There were some components

16   of those that were polymers.

17             For example, in a knee,

18   there's often a polymer part between two

19   cobalt-chromium parts, and the shoulder

20   might have the same thing.

21        Q.    Do you know whether or not

22   polypropylene is also a polymer?

23        A.    Yes, it is.

24        Q.    And is it fair the say that

Anne Holland Wilson, MBA

1   you're a biomedical engineer --

2         A.    Yes.

3         Q.    -- by training?

4         A.    It's what my education is

5   in.

6         Q.    If I recall correctly, you

7   said that you worked for a QA unit for a

8   mesh.

9               What do you mean by that?

10        A.    Well, in -- if you have a

11  GLP study, so a preclinical animal study,

12  but first you have to get registered to

13  be certified.

14              And then -- anyway, this

15  facility did large animal studies, sheep,

16  pigs -- sheeps and pigs primarily.

17              And so a QA unit makes sure

18  the study is enacted properly.  It

19  follows the rules of 21 CFR 58.  Just a

20  different part of the FDA regulations

21  that deals with good laboratory

22  practices.

23              And so my job was to make

24  sure the studies were adhered to and that

Anne Holland Wilson, MBA

1    the good laboratory practices were

2    performed.

3          Q.    Switching topics.  You were

4    asked earlier about the number of

5    meetings, calls, and/or conference calls

6    that you might have had.

7                You mentioned one call that

8    you had in connection with this report.

9                Were you referring to phone

10   calls or formal conference calls?

11         A.    That was a formal three-way

12   call.  I realized later that there were a

13   bunch of little cell phone calls, but I

14   was thinking of the formal conference

15   call.

16         Q.    You were asked some

17   questions earlier about QSIT.

18                Do you recall that?

19         A.    I saw that the QSIT guide

20   was out, yes.

21         Q.    And you were asked some

22   questions about that earlier today?

23         A.    Yes.

24         Q.    And I wrote a note to

Anne Holland Wilson, MBA

1   myself.

2                   Are QSIT inspections

3   different than the work that is the

4   subject of your expert report?

5           A.     Really, QSIT inspections

6   have no bearing on my report.

7                   I mean QSIT inspections

8   are -- you know, that's how FDA was

9   trained ten years ago on doing

10  inspections.

11                  Some people still follow it,

12  but that really has no bearing on risk

13  management, quality management systems in

14  medical devices.

15          Q.     Thank you, Ms. Wilson.

16                  Let's talk about that for a

17  few more minutes, because you've raised

18  it.

19                  You were asked a lot of

20  questions earlier about the FDA and

21  regulators.

22                  Are the FDA regulations

23  necessary to the analysis and opinions

24  that you offered in your expert report?

Anne Holland Wilson, MBA

1       A.      No.

2       Q.      Why not?

3       A.      Because the same type of

4   regulations are in the other standards

5   that I did cite.  This specifically was

6   not to talk about the FDA.

7               This is about there's

8   guidance documents out there.  There's

9   documents that have been out there for 30

10  years that aren't specific to the FDA

11  that govern how medical device

12  manufacturers should do these things.

13      Q.      So, in other words, if you

14  were told that your report -- the subject

15  of your report and your testimony at

16  trial, that you cannot mention the FDA,

17  is it fair to say that you could offer

18  your opinions at trial without even

19  mentioning the word "FDA"?

20              MR. COMBS:  Objection to

21      form.

22              THE WITNESS:  Absolutely.

23  BY MR. WALLACE:

24      Q.      Were you ever -- you gave

Anne Holland Wilson, MBA

1    some -- at least you tried to give some

2    examples in an exchange with Mr. Combs

3    about what you have been involved in the

4    past for companies that had certificates

5    that were issued to them.

6              Do you remember that?

7         A.    I do.

8         Q.    And I'm specifically

9    referring to Exhibits 6 and 7, which

10   appear to be certificates relating to --

11   relating to Ethicon and in the EC.

12             Do you recall that?

13        A.    I do.

14        Q.    Have you ever worked on

15   product holds or recall involving medical

16   devices?

17             MR. COMBS:  Objection to

18        form.

19             THE WITNESS:  Yeah.  One

20        year, in fact, I had 17 recalls I

21        had to deal with when I was a

22        young engineer.

23             I've also had, you know,

24        product holds.  I think I was

Anne Holland Wilson, MBA

1       telling about the infections where

2       all of a sudden we had like three

3       or four, and then within like a

4       couple-of-week period, so we

5       stopped everything, because we

6       weren't sure -- we just weren't

7       sure what the source was, so we

8       stopped everything and formed a

9       team.

10              We had, like, clinical

11      people.  We had doctors,

12      pathologists, engineers, the

13      design engineers, QA people,

14      regulatory.  And we just all

15      jumped in on it and tried to

16      figure out what was going on.

17              We asked for the products

18      back, because they had -- some had

19      to be explanted.

20              But, you know, there are

21      various degrees of infections out

22      there.

23  BY MR. WALLACE:

24          Q.    You talked about a team.

Anne Holland Wilson, MBA

1  Did I hear you correctly that you

2  assembled that within two weeks?

3         A.    I can't tell you the exact,

4  it could have been a week, it could have

5  been two weeks.

6              I mean, as soon as we became

7  sure there was something going on, and

8  I'm -- basically, overnight, by the time

9  you decide to do something, you do

10 something.

11        Q.    Are pathologists ever part

12 of a team like that, involving

13 permanently implantable medical devices?

14        A.    In my experience, there's a

15 pathologist sort of that works with a

16 company to evaluate explants.  So it's a

17 routine to get an explant.

18             And that's why I brought

19 up -- you know, even though they're

20 supposed to be permanently implantable

21 devices, things happen.

22             You have to have a knee

23 explanted, a heart valve, you know.

24 Unfortunately, you pretty much -- you can

1    replace a heart valve.  It's not a very

2    good process, but -- and then you have

3    pathologists and other scientists that

4    evaluate the cause of the problem.

5         Q.    And, in fact, have you been

6    part of teams that have been assembled to

7    do just that, that also have those kinds

8    of professionals on them.

9         A.    Yeah, I mean --

10        MR. COMBS:  Object to form.

11        THE WITNESS:  Yeah.  I've

12    part of times that basically

13    whoever the company believes is

14    needed.

15        You draw your group, you

16    draw your core team, and you draw

17    a leader.

18 BY MR. WALLACE:

19        Q.    In your role as a consultant

20    after you left the industry, have you

21    ever been involved in recalls or product

22    holds?

23        A.    Yes, I have, which is

24    interesting.

Anne Holland Wilson, MBA

1          Q.    Have some of those companies

2    been given certificates that their

3    systems are okay?

4                MR. COMBS:  Objection.

5                THE WITNESS:  Well, I mean

6          the certificate is the

7          certificate.

8                And some of the companies --

9          I could think of one in

10         particular, and I was trying to

11         explain, they were there on a rain

12         day, I mean an ice day.  The

13         company wasn't even running.  They

14         got their certificate.

15               And then I went in to do an

16         audit, and they were not even

17         keeping inspection data.  So there

18         was no way for you to even know if

19         your device met specifications.

20               So, yeah, I mean the company

21         can be executing great or they can

22         be doing not so great, in my

23         experience.

24    BY MR. WALLACE:

Anne Holland Wilson, MBA

1     Q.    And you're -- well, we'll
2  get to that.
3     A.    I just want to add.  That's
4  why I said there was a big variation
5  between notified bodies.
6     Q.    You were asked a lot about
7  the different dates for standards, and
8  you identified when some of those
9  standards went into effect.
10         My question is this.  Do
11  companies know that these standards are
12  coming, so that they can transition to
13  them?
14     A.    Absolutely.
15         MR. COMBS:  Object to form.
16         THE WITNESS:  There's -- for
17         example, I knew about design
18         controls years before we had
19         design control systems, as far
20         back as '93 established, just
21         ready for implementation in '97.
22            Most of these are coming
23         and, they give a two or three-year
24         window to even be compliant.

Anne Holland Wilson, MBA

1            So there's all kinds of --

2       AdvaMed and all kinds groups that

3       tell you what's coming, what's

4       coming yesterday, what's coming

5       tomorrow.

6  BY MR. WALLACE:

7       Q.    You were asked a fair amount

8  of questions about what surgeons might

9  have been trained on, what surgeons'

10 opinions were, and other issues regarding

11 medicine.

12           Do you have to be a doctor

13 to identify hazards as part of the risk

14 management process?

15           MR. COMBS:  Object to form.

16           THE WITNESS:  No.  In fact,

17      generally, the doctors don't

18      understand the risk management

19      process.  That's why people like

20      myself and others that have done

21      this for a long time are asked to

22      facilitate the process.

23           They don't know the

24      standards.  They don't know the

Anne Holland Wilson, MBA

1       processes.  They don't know inputs

2       and outputs and what needs to be

3       considered.

4             They are knowledgeable

5       about -- know how to place it and

6       how to, you know, do informed

7       consent.

8   BY MR. WALLACE:

9       Q.    You used the word "input" in

10  connection with Exhibit 9, which is the

11  position statement on mesh that you were

12  shown.  And I think you referred to it as

13  a white paper.

14            Do you recall that?

15      A.    Oh, yeah.  Yes.

16      Q.    And you said -- and I think

17  you were cut off, so I want to make sure

18  that we address this.

19            You said that you need to

20  get other inputs and other positions from

21  other people.

22            And I'm sort of paraphrasing

23  your testimony, because I don't believe

24  it was complete.

Anne Holland Wilson, MBA

1            Is what you are saying, when

2    you're designing and understanding the

3    risk processes, that you actually, as a

4    medical device company, a reasonable one,

5    would actually seek out position papers

6    or information from those who might

7    oppose your views?

8            MR. COMBS:  Object to form.

9            THE WITNESS:  I think I --

10           when I went back and I said that

11           there's lots of inputs.  And you

12           would get inputs from all types of

13           sources.

14           And I'd have a picture in

15           there, too, of the various inputs

16           you would get.

17           So, yeah, you would look at

18           ones that support your opinions,

19           ones that wouldn't support your

20           opinions.

21           You would look at clinicals,

22           you would look at complaints.  You

23           would look at -- it's in one of my

24           figures -- all kinds of sources of

Anne Holland Wilson, MBA

1       input.

2  BY MR. WALLACE:

3       Q.   And, in fact, you were asked

4  yourself, the word "reliance" was used or

5  documents considered.

6            Is it fair to say that you

7  looked at all the documents that were

8  given to you and carefully considered,

9  even those that may not entirely support

10 your views?

11           MR. COMBS:  Object to form.

12           THE WITNESS:  I looked at a

13      lot of documents, and looked at --

14      I tried to be fair and look at

15      those all objectively, whether

16      they supported or didn't support

17      my views.

18           I'm sure that there were

19      some I spent more time on than

20      others.

21 BY MR. WALLACE:

22      Q.   Let's move on to a topic

23 that we approached towards the middle to

24 late afternoon.

Anne Holland Wilson, MBA

1                    And it's this idea in

2     Exhibit 13, in the risk analysis that was

3     done in 2001.

4                    I'm sure you remember,

5     generally, that line of questioning, but

6     I'm putting the document in front of you

7     to refresh your recollection.

8                    Do you recall seeing that

9     earlier today?

10          A.    Yes, I do.

11          Q.    You were asked

12    some questions -- or it was represented

13    to you by Mr. Combs that that document

14    was not on your reliance list.  And you

15    seemed to take great exception to that.

16                   You saw this a long time

17    ago?

18          A.    I mean, I looked at the

19    whole 1,000-page file.  And I'm sure I

20    looked at this, because I remembered --

21    because I'd never seen before something

22    that just said, Non-imaginable.

23                   That was my memory jogger.

24    And I looked at it, and I just looked,

Anne Holland Wilson, MBA

1    oh, my gosh, that's incomplete.

2            It doesn't even fill in half

3    the things.  So that's how I distinctly

4    remember I looked at it.

5        Q.    And this Exhibit 13, you're

6    specifically talking about Exhibit 13.

7        A.    Yes.

8        Q.    So you had seen it before

9    you finalized your report; correct?

10       A.    Yeah, I did.

11       Q.    And it became one of the

12   documents that you considered in reaching

13   your opinions.

14       A.    That's why I went on to say

15   that I didn't think things were done

16   adequately, because, in my opinion,

17   that's very inadequate.  It doesn't even

18   talk about a lot of the severities.

19            I mean, if you look at this

20   report, it starts out giving some things,

21   you know.  But the risk classes are all

22   1s, 0s.  Things are missing.  It's

23   incomplete.

24            A whole page, it just says,

Anne Holland Wilson, MBA

1    No hazard, No hazard, Not imaginable.

2            That's not a respectful job,

3    in my opinion.

4        Q.    Mr. Combs led you through a

5    number of questions on Exhibit 13 and

6    compared what was listed in Exhibit 17 to

7    that.

8            Do you recall?

9        A.    I do.

10       Q.    And more specifically, just

11   so it's clear for the record, we're

12   talking about an Exhibit 17, the

13   April 25, 2002 memorandum that is

14   entitled "Device Design, Safety

15   Assessment Re-evaluation for TVT"; right?

16       A.    Right.

17       Q.    And if I understand --

18   because this line of questioning was

19   quite extensive.

20            If I understand you

21   correctly, is it your opinion that you

22   have expressed in your report that the

23   right hand doesn't know what the left

24   hand is doing when it's coming to risk

Anne Holland Wilson, MBA

1    management?

2              MR. COMBS:  Object to form.

3              THE WITNESS:  It's my

4         opinion, yes, that there's bits

5         and pieces, but it's not a

6         cohesive risk management system.

7              So 2002, per this document,

8         they're saying these are new, and

9         these are the complaints.

10   BY MR. WALLACE:

11        Q.   But, in fact, some of them

12   were not new?

13        A.   Some of them had been

14   addressed in this report that I didn't

15   feel was adequate.  It just didn't

16   even -- and those that we looked just

17   were blank.  They weren't assessed.  They

18   weren't listed.

19        Q.   So, in fact, that someone at

20   Ethicon is calling complaints new

21   actually support your opinion?

22              MR. COMBS:  Object to the

23         form.

24              THE WITNESS:  You know, it's

Anne Holland Wilson, MBA

1            just showing that there's not a

2            cohesive quality and risk

3            management system.

4     BY MR. WALLACE:

5            Q.    I believe it was represented

6     to you that -- and I could be wrong,

7     we'll let the record be whatever it is --

8     that all of the hazards were identified,

9     but -- and you can take your -- let me

10    make this clear for the record.

11           A.    Okay.

12           Q.    I believe that it was

13    represented to you that all of the 11

14    hazards identified in Exhibit 17 were

15    prior -- were identified in Exhibit 13,

16    which is the prior what we'll call risk

17    analysis.

18           Do you recall that line of

19    questioning?

20           A.    Yes, I do.

21           Q.    I'm going to let you look

22    through here, but there is no reference,

23    is there, to dull needles, mesh kink,

24    torn mesh, mesh broken, are there?

1              MR. COMBS:  Can you repeat

2         that question.

3                   -   -   -

4              (Whereupon, the requested

5         portion was read.)

6                   -   -   -

7    BY MR. WALLACE:

8         Q.    Or mesh twisted?

9         A.    I do see, and just to be

10   fair, that it says, The tip is not as

11   sharp.

12        Q.    Fair enough.

13        A.    So it's similar to dull.

14              And now I'm looking for the

15   torn mesh.

16              Torn mesh and what was the

17   or one?

18        Q.    Mesh kinked, twisted.

19        A.    I'm going through carefully.

20   I don't see anything about twisted or

21   kinked mesh.

22        Q.    So if, in fact, a clinical

23   expert testifies that the TVT ropes and

24   curls, that was clearly not referenced in

Anne Holland Wilson, MBA

1    Exhibit 13; right?

2                 MR. COMBS:  Object to the

3         form.

4                 THE WITNESS:  I don't see it

5         listed in the hazards.

6    BY MR. WALLACE:

7         Q.    And, in fact, you identified

8    in your report five critical hazards that

9    were never addressed --

10        A.    Where is the report?

11        Q.    -- through the risk

12   management process; right?

13        A.    Right.  I just have to find

14   my report again.

15                Right there.

16        Q.    That's fine.

17                While you're getting the

18   report, let me ask you something for

19   clarification so that it's -- so that

20   we're all singing from the same hemline,

21   so to speak.

22                The fact that someone may

23   send an email or a document is prepared

24   somewhere that mentions the word, say,

Anne Holland Wilson, MBA

1    "degradation" or mentions the word

2    "particle loss," that, in fact, may

3    exist; right?

4              There might be a document

5    out there in all of the documents that

6    you reviewed that uses the word

7    "degradation" or uses the word "particle

8    loss"; right?

9         A.    Right.  I mean, that's

10   why --

11             MR. COMBS:  Object to form.

12             THE WITNESS:  -- I kept

13        saying if I missed something,

14        please show me.

15   BY MR. WALLACE:

16        Q.    But at the end of the day,

17   have you seen anything in either this

18   2001 document, which is Exhibit 13, and

19   Exhibit 17, or any of the risk documents

20   that you reviewed that appropriately

21   addresses the risk management process at

22   Ethicon --

23             MR. COMBS:  Object to form.

24             THE WITNESS:  No.

Anne Holland Wilson, MBA

1  BY MR. WALLACE:

2  Q.    -- when it comes to the five

3  critical hazards that you identified?

4  A.    No.  What I haven't seen is

5  that the feedback system is functional

6  and it goes back and is addressed.

7  And I address that in my

8  report specifically.

9  Q.    So, in other words, the

10  opinions that you have expressed that

11  these five hazards -- you still hold that

12  same opinion today?

13  A.    Right.

14  MR. COMBS:  Object to form.

15  BY MR. WALLACE:

16  Q.    Even after all the questions

17  by Mr. Combs; correct?

18  A.    Right.

19  Q.    Now, you said earlier that

20  Exhibit 13 had a different Bates number,

21  and there was an exchange about that.

22  A.    Right.

23  Q.    You're basing that off your

24  memory; correct?

Anne Holland Wilson, MBA

1        A.     Yes, I am.

2        Q.     So, in fact, whether or not

3   it has a different Bates number, you

4   remember reviewing Exhibit 13 and

5   considering it and addressing these

6   issues in your report.

7        A.     I do.

8        Q.     You represented that the

9   documents were electronically provided to

10  you.  You're not sure whether or not they

11  exist.

12             Is it, in fact, the case

13  that some hard copies were also shared

14  with you at some point?

15       A.     Yes.  There were two binders

16  of hard copies.

17             I didn't go back and look at

18  those, because I had already set up a

19  system.  But I do have two binders of

20  hard copies.

21       Q.     There was an exchange

22  between you and Mr. Combs earlier where

23  you indicated that some risks were

24  identified in Exhibit 13, which is the

Anne Holland Wilson, MBA

1    2001, what we'll call a risk assessment.

2                   Why did you qualify your

3    answer with some risk?

4                   What is your criticism in

5    that regard?

6          A.    I think that document is

7    just inadequate.  It is not good.  It

8    does not follow the intent of risk -- of

9    a risk management -- of a design risk

10   analysis.

11                  And I say that based on the

12   fact that it's incomplete.

13                  I know people have reviewed

14   it.  But to just say it's not imaginable,

15   to not fill in probabilities, and then at

16   the end of the day everything was

17   acceptable.

18         Q.    And is that the basis in

19   which you prepared your report?

20         A.    Right.  And then I called

21   out in the other ones where, you know,

22   all of a sudden, well, it's acceptable.

23   We just have an IFU and it's all

24   acceptable.

Anne Holland Wilson, MBA

1           I mean, I'm generalizing

2   there, but it does say, general risks for

3   the procedure, acceptable, acceptable,

4   acceptable.  And then there's a bunch of

5   blanks, a whole page of blanks,

6   negligible, more blanks.  So...

7           Q.    You were shown a number of

8   laser cut documents, and documents

9   relating to the TVT-Exact and the TVT-O.

10          If I can just try to cut

11  through a lot of time on this issue.

12          Is it fair to say that you

13  did not rely on those risk profiles to

14  examine the risk management process for

15  the TVT because it's your opinion that

16  each product or iteration of a product

17  needs to be examined separately, and you

18  felt that that was the case when it came

19  to the TVT and the other products that

20  were examined?

21          A.    Right.  Yes.

22          Q.    You were asked a lot of

23  questions about audits.  And I believe

24  you were shown some audit reports.

Anne Holland Wilson, MBA

1            Is there a difference

2 between an audit and the reports that you

3 regularly prepare for device companies

4 that address risk management?

5        A.    Could you repeat that

6 question?  I'm sorry.

7        Q.    Yes.

8            Well, what I'm getting at is

9 there's a difference between an audit and

10 a -- for example, a consulting report

11 where you might be asked to go into a

12 medical device company to look at the

13 risk management process.

14        A.    Oh, yeah.  It's exactly what

15 I described earlier.

16            An audit is a specific set

17 of -- a point in time to a specific

18 standard.  And, generally, like my audit

19 reports are about 40 pages long with

20 specific things that are

21 non-conformances, a checklist and very

22 detailed to that standard, with examples.

23        Q.    So just to be clear, you

24 have actually walked in the doors of

Anne Holland Wilson, MBA

1    medical device companies over the course

2    of your career and performed the same

3    analyses that you performed here, right,

4    by looking at their risk management

5    processes and identifying strengths

6    and/or weaknesses?

7         A.    Right.  Those would be

8    called -- like we call them gap analyses.

9    They're not audits.  So we would go in

10   and do a gap analysis to look, gee, how

11   did they, you know, comply with the

12   standards?  How did they respond over

13   time?  How do their documents, you know,

14   look?

15        And then we provide them a

16   management report.

17        Q.    And when you did your expert

18   report in this case, did you use the same

19   methodologies that you use in your

20   professional consulting for medical?

21        A.    Yeah.  It's similar.

22        And then I look -- I

23   consider my background and experience.  I

24   looked at -- as an auditor, I looked at

Anne Holland Wilson, MBA

1   my consulting.  And then I use all of

2   those skills together to come up with a

3   report, looking at the gaps and the

4   opportunities for improvements.

5         Q.    You're familiar with the

6   concept of under-reporting of complaints;

7   correct?

8         A.    Yes.

9         Q.    And is it your experience

10  that the medical device industry is

11  supposed to assume that there is

12  significant under-reporting of

13  complaints; right?

14        A.    I mean, it's known that -- I

15  don't know that you can quantify how much

16  is underreported, but I do know that

17  there is not only under-reporting of

18  complaints, but there's under-reporting

19  of MDRs.  It's a lot up to the specific

20  management and the specific -- actually,

21  even the user facility, staff to the

22  hospital.

23        Q.    You used the word -- and I

24  could be wrong about this, so please

Anne Holland Wilson, MBA

1    correct me if I'm wrong.

2              When you were asked about

3    particle loss earlier, you said you

4    reviewed some documents relating to blue

5    particulates.

6              Do you recall that?

7         A.    Yeah.

8         Q.    And what do you recall

9    reviewing?

10        A.    I'm trying to remember.

11        Q.    And if you do recall, what

12   was significant to you about it?

13        A.    Well, I think there were

14   differences of opinion even within the

15   documents I reviewed.

16             But I remember some people

17   said you can see them better, so they're

18   good, and other people said, well,

19   particulates are bad because you can

20   cause pain.

21             Some said they are

22   biocompatible, so it doesn't matter.

23   Other people said, but in the vagina they

24   move and they can cause other problems.

Anne Holland Wilson, MBA

1          So I think there's a
2   difference of opinion regarding -- I
3   mean, this is what I member about those
4   particles.
5          Q.    Fair enough.
6          So even in Ethicon, if there
7   is a difference of opinion on the
8   clinical significance of the particle
9   loss, is it your opinion that Ethicon's
10  risk management should have addressed
11  that regardless of the difference of
12  opinion?
13         A.    Yeah.  I think together with
14  their quality system, which reviews
15  things periodically, and then they pull
16  in the risk management system when
17  appropriate.
18         So that goes back to the
19  complaints and the follow-up and all
20  those sources of input.  And then you're
21  supposed to review those and update your
22  risk management when things change or
23  when you see difference in technology and
24  things like that.

1               And that's in those

2    standards.

3          Q.    You were criticized -- you

4    know, you've read Ms. Duncan's report;

5    correct?

6          A.    I did, but I don't have it

7    memorized.

8          Q.    Fair enough.

9               Well, there was also some

10   testimony on this topic today as well, so

11   I'm going to go ahead and ask the

12   question.

13              You talked about in the

14   quality management system and risk

15   process that a company has to mitigate,

16   and as part of that, they may have to

17   change their design.

18              You were criticized by

19   Ms. Duncan for suggesting that, and there

20   was also some testimony on that issue

21   today.

22              I want to get something -- I

23   want to understand this better from you.

24              You're not suggesting, are

Anne Holland Wilson, MBA

1    you, that every time there's an issue,

2    that there needs to be a redesign, are

3    you?

4         A.    No.   What I'm trying to say

5    is that you need to re-evaluate, and

6    there may need to be -- if the risk is

7    too high, you may need to redesign it, or

8    you may implement a change to a new

9    product and discontinue another project

10   line.

11             You know, if you come up

12   with a new product, why would you keep

13   the old TVT out there?  Or you might come

14   up with some other mitigations, which I

15   have a picture of, like new accessories,

16   or more -- you know, tighten down the

17   manufacturing process so there's less

18   variability.

19             There's a number of ways

20   that you can get to the same thing.

21        Q.    So, in other words, you

22   would fit the solution to address the

23   problem.

24        A.    Absolutely.

Anne Holland Wilson, MBA

1      Q.    Okay.  You were shown some

2  documents with respect to some surgeon

3  training, and you were asked about that

4  in connection with some of the risk

5  documents.

6             Assuming that, in fact,

7  Ethicon engaged in some training, does

8  that in and of itself solve the entire

9  problem and change the opinions that

10  you've expressed in your report?

11      A.    Well, okay.  Let's assume

12  that they did the training, which they

13  probably did.

14             To me, that just means that

15  the training must not have been fully

16  effective if they did it in 2000 and

17  they're still having the same

18  complaints -- more complaints in 2002,

19  and then there was more complaints in

20  2006.

21             So it's that same cycle that

22  I keep trying to go back to, that the

23  process must not have been effective

24  throughout.

Anne Holland Wilson, MBA

1        Q.    And is one of the failures

2   to be effective, could that be the

3   internal people that are not adequately

4   addressing the feedback that's coming

5   back from the field?

6        A.    Yeah, I really don't know

7   the reason, but that certainly could be

8   one of them.

9              MR. WALLACE:  Give me one

10        minute.

11              Nothing further.

12              MR. COMBS:  I'll keep it

13        really brief.

14                   -  -  -

15              FURTHER EXAMINATION

16                   -  -  -

17   BY MR. COMBS:

18        Q.    Ms. Wilson, you testified to

19   some questions that Mr. Wallace asked you

20   about a product that had an infection

21   problem.  I just want to make sure that

22   the record is clear.

23              That doesn't have anything

24   to do with TVT, does it?

Anne Holland Wilson, MBA

1          A.     No.   That was an example in

2    my consulting career.

3          Q.     Now, Mr. Wallace asked you

4    about the need to take consideration of

5    opposing views.

6                Do you remember those

7    questions?

8          A.     I do.

9          Q.     Do you know what reviews

10   Ethicon does of the clinical literature

11   regarding this product?

12         A.     I didn't look at the

13   clinical evaluation reports.  And I don't

14   think that was cited in my --

15         Q.     So the answer is you don't

16   know.

17         A.     No.

18         Q.     You made a comment about

19   under-reporting of complaints and MDRs.

20                You don't have any

21   information that Ethicon has

22   under-reported any complaints or MDRs, do

23   you, about TVT?

24         A.     I was talking about the

Anne Holland Wilson, MBA

1    industry in general, not your -- not

2    Ethicon specifically.

3           Q.    Now, are you aware that

4    Ethicon tracks complaints by specific

5    product code?

6           A.    I do know that you have a

7    database -- Ethicon has a database and

8    they track it to product code.  I think I

9    saw that.

10          Q.    And so, for example,

11   complaints regarding TVT mechanically cut

12   are tracked by that product code, aren't

13   they?

14          A.    I would assume so.  I didn't

15   go analyze, but usually they're to the

16   ref number, which is like the catalog

17   number.  That's generally how

18   manufacturers do it.

19          Q.    And there is a different I

20   call it SKU number, but there's a

21   different SKU number for TVT mechanically

22   cut and TVT laser cut, isn't there?

23          A.    I would have to just your

24   judgment on that.

Anne Holland Wilson, MBA

1           Sometimes people do that,

2    and sometimes they don't.  Depending if

3    they think it has similar form fit or

4    function, they decide to keep the same

5    ref number.  And I just couldn't tell you

6    how far that got carried through at

7    Ethicon.

8           Q.    But your understanding,

9    complaints are tracked by product code.

10          A.    I believe I saw that.

11          Q.    You said that there was no

12   reference to torn or broken mesh in the

13   risk analysis?

14          A.    I just was looking back

15   through Exhibit --

16          Q.    Thirteen.

17          A.    -- 13, and I didn't see it.

18          Q.    But, in fact, there were

19   hazards assessed regarding strength of

20   mesh, weren't there?

21          A.    Well, strength is not the

22   same as -- to me.  That wasn't what I was

23   asked.

24          Q.    Okay.

Anne Holland Wilson, MBA

1          A.     I can go look for that if

2    you would like me to.

3                 Do you want me to go look at

4    that right now?

5          Q.     Sure.

6          A.     It talks about tensile

7    strength, which, to me, is different than

8    the complaints I saw.

9          Q.     And so tensile strength of

10   the mesh was one of the things in the

11   risk analysis.

12         A.     Right.

13         Q.     And you've never -- strike

14   that.

15                One of the questions

16   Mr. Wallace asked you was about the risk

17   of twisting the mesh.

18                And I want to make sure I

19   understood your answer.

20                You're not equating the

21   twisting of the mesh that is referenced

22   in the 2002 memorandum, you're not

23   equating that as being the same thing as

24   roping and curling, are you?

Anne Holland Wilson, MBA

1          MR. WALLACE:  Objection to

2     form.

3          THE WITNESS:  In my report,

4     I think I call it -- I would have

5     to go back and look.  There's

6     twisting.  There's roping and

7     curling.  There's different types.

8          One is when it doesn't lay

9     flat when it's implanted.  That's

10    what I think is twisting.  And I

11    cited that in my report.

12          I didn't see twisting on

13    here.

14  BY MR. COMBS:

15    Q.    Okay.  So you're equating

16  roping and curling with a twisting of the

17  mesh.

18    A.    I would have to look at my

19  report.  I think that there are

20  different --

21          MR. WALLACE:  It's right

22    here.

23          THE WITNESS:  I think I was

24    asked if those are on this report,

Anne Holland Wilson, MBA

1       which is Exhibit 13.

2               Is that what you were -- no.

3       I forgot your question altogether

4       now.

5   BY MR. COMBS:

6       Q.    My question is on -- I

7   thought I heard you testify that mesh

8   twisting, as referenced in the 2002

9   memorandum that we talked about, that

10  that is the same thing as roping and

11  curling.

12              So if I misunderstood that,

13  that's fine.  I just want to see if that

14  is or is not your understanding.

15      A.    I don't believe that's what

16  I was asked.

17              I was asked if the mesh

18  roping/curling or TVT mesh fraying were

19  my five -- some of these were on here, is

20  what I thought I was asked.

21      Q.    Okay.  So you do not equate

22  mesh twisting as being the same thing as

23  roping and curling.

24              MR. WALLACE:  Objection to

Anne Holland Wilson, MBA

1          form.  Asked and answered.

2               THE WITNESS:  If I look at

3          my report, B, it says, Roping,

4          curling, deforming.  C is fraying

5          and particle loss.

6    BY MR. COMBS:

7          Q.    Ms. Wilson, what's your

8    basis for believing that torn or broken

9    mesh referred to is referring to

10   postimplantation?

11         A.    Torn or broken mesh?

12         Q.    Yes, ma'am.

13         A.    It makes no sense.  If it

14   comes out of the box torn or broken, then

15   that's a manufacturing defect.  It's not

16   something to do with degradation over

17   time.

18              It's a definition of over

19   time versus at a point in time.  A

20   manufacturing defect is out of the box

21   failure, we call it.

22         Q.    Okay.  And so if the

23   complaints are talking about torn or

24   broken mesh preimplantation --

Anne Holland Wilson, MBA

1    A.    Then there must have been a

2    wrong footnote.  I think we went through

3    that, because that wasn't the intent.

4    Q.    And you talked about your

5    criticism of the risk analysis making a

6    finding that the risks were acceptable,

7    the 2001 risk analysis.

8          Do you remember that?

9    A.    Yes, I do.

10   Q.    Now, are you aware of the

11   clinical expert reports that have been

12   prepared by physicians at Ethicon that

13   have weighed the benefits versus the

14   risks of these products?

15   A.    I think I established that I

16   looked at a couple clinical expert

17   reports, certainly only a couple, and I

18   said I'm sure that they're in my body of

19   evidence.

20         So that's all I can say I'm

21   aware of.

22   Q.    And there were clinical

23   expert reports in 2000, 2001, 2006, 2010,

24   and 2013, that all assess that exact

Anne Holland Wilson, MBA

1    issue of whether the risks outweigh the

2    benefits of the product.

3         A.    That's not what I was

4    talking about.

5              I was talking about in that

6    assessment -- I wasn't looking at the

7    clinical harm risk/benefit decision.  I

8    was looking -- and I even cited like 93

9    percent of those, the engineering said --

10   let's just go right to it in my report.

11             That's not at all what I was

12   saying.  I'm sorry.  It's getting dark in

13   here.

14        Q.    The good news is we're about

15   two minutes from being done.

16        A.    So what I was saying, on

17   page 12 of my report said that, The

18   review of the aFMEA from 2000 Issue 8

19   showed that the probability of occurrence

20   of failure in 41 of 44, meaning 93

21   percent of potential failure modes,

22   showed either no risk identified, not

23   likely, or very low.

24             So I'm not looking at the

Anne Holland Wilson, MBA

1   clinical list.  I'm specifically looking

2   at the probability of occurrence of those

3   failures.  So that's an engineering

4   judgment, I believe, that was made at the

5   time they did the aFMEA, or a team

6   judgment.

7          Q.    Okay.  And my only question

8   is:  Are you aware of the fact that there

9   have been clinical expert reports, at

10  least five of them, that have assessed

11  the risks versus the benefits of the

12  product, and concluded that the benefits

13  outweighed the risks?

14         A.    Same answer.  I have only

15  looked at a couple.  And if I put them in

16  the report I have seen them, otherwise,

17  I'm not aware of them.

18              MR. COMBS:  Thank you.  I

19         have no further questions.

20              MR. WALLACE:  I just have

21         one, just because you used it in

22         your answer.

23                  -   -   -

24              FURTHER EXAMINATION

Anne Holland Wilson, MBA

1                    -  -  -

2    BY MR. WALLACE:

3         Q.    You referenced 1,000 pages.

4    And because of this issue of what

5    clinical expert reports you may or may

6    not have looked at, you mentioned 1,000

7    pages earlier, and were referencing, I

8    believe, Exhibit 13.

9              Is it true that you have

10   looked at documents in connection with

11   the risks that were assessed at this

12   point in time?

13        A.    Right.  And in that

14   technical file, there were a whole bunch

15   of process validations.  There were

16   prints.  There were a variety of things

17   like that.

18              There were, you know,

19   sealing studies, there were peeling

20   studies.  There may have been a clinical

21   evidence report that I missed.

22              But what I looked, it looked

23   like a traditional technical file that

24   had all of the process validation, the

Anne Holland Wilson, MBA

1    specs, the -- those kind of things.

2          Q.    And you did review that

3    file; correct?

4          A.    Yes, I did.  And the risk

5    documents were in that file.

6          Q.    And you keep pointing to

7    Exhibit 13, so the risk --

8          A.    Well, the Preventia was in

9    there.  That was -- Exhibit 13 was in

10   there.  The Preventia ones were in there.

11   They were in there.

12              MR. WALLACE:  Nothing

13         further.

14              MR. COMBS:  Nothing more

15         from me.

16                   -  -  -

17              (Whereupon, Exhibits 20

18         through 28 were marked for

19         identification.)

20                   -  -  -

21              (Whereupon, the deposition

22         concluded at 6:49 p.m.)

23                   -  -  -

24

Anne Holland Wilson, MBA

1        C E R T I F I C A T E

2

            I HEREBY CERTIFY that the

3    witness was duly sworn by me and that the

     deposition is a true record of the

4    testimony given by the witness.

5

6

7

8

                     _ _ _ _ _ _ _ _ _ _ _ __

9                    Margaret Peoples, RPR

                     Dated: September 17, 2015

10

11

12

13

14

15

16

17

18

19                   (The foregoing certification

20   of this transcript does not apply to any

21   reproduction of the same by any means,

22   unless under the direct control and/or

23   supervision of the certifying reporter.)

24

Anne Holland Wilson, MBA

INSTRUCTIONS TO WITNESS

1

2        Please read your deposition over

3    carefully and make any necessary changes.

4    You should assign a reason in the

5    appropriate column on the errata sheet

6    for any change made.

7        After making any change which has

8    been noted on the following errata sheet,

9    along with the reason for any change,

10    sign your name to the errata sheet and

11    date it.

12        You are signing it subject to the

13    changes you have made in the errata

14    sheet, which will be attached to the

15    deposition.  You must sign in the space

16    provided.

17        Return the original errata sheet

18    to the deposing attorney within thirty

19    (30) days of receipt of the transcript by

20    you.

21

22

23

24

Anne Holland Wilson, MBA

```
 1              - - - - - - - -

 2            E R R A T A

 3              - - - - - - - -

 4     PAGE        LINE        CHANGE/REASON

 5     _____     _____     _____

 6     _____     _____     _____

 7     _____     _____     _____

 8     _____     _____     _____

 9     _____     _____     _____

10     _____     _____     _____

11     _____     _____     _____

12     _____     _____     _____

13     _____     _____     _____

14     _____     _____     _____

15     _____     _____     _____

16     _____     _____     _____

17     _____     _____     _____

18     _____     _____     _____

19     _____     _____     _____

20     _____     _____     _____

21     _____     _____     _____

22     _____     _____     _____

23     _____     _____     _____

24     _____     _____     _____
```

1    ACKNOWLEDGMENT OF DEPONENT

2

3      I,_____, do

4    hereby certify that I have read the

5    foregoing pages,_____and that the

6    same is a correct transcription of the

7    answers given by me to the questions

8    therein propounded, except for the

9    corrections or changes in form or

10   substance, if any, noted in the attached

11   Errata Sheet.

12   _____

13   ANNE HOLLAND WILSON, MBA        DATE

14

15   Subscribed and sworn to before me this

16   _____day of_____,

17   20_____.

18   My commission expires:_____

19

20   _____

21

22   Notary Public

23

24