Exhibit E

```
 1              UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF WEST VIRGINIA
 2                 CHARLESTON DIVISION
 3  IN RE:  ETHICON, INC.        : Master File No.
    PELVIC REPAIR SYSTEM         : 2:12-MD-
 4  PRODUCTS LIABILITY LITIGATION : MDL 2327
                                  :
 5                                : JOSEPH R.
    THIS DOCUMENT RELATES TO      : GOODWIN
 6  THE CASES LISTED BELOW        : US DISTRICT
                                    JUDGE
 7  _____
 8  Mullins, et al. v. Ethicon, Inc.,
    et al. 2:12-cv-02952
 9  Sprout, et al. v. Ethicon, Inc.,
    et al. 2:12-cv-07924
10  Iquinto v. Ethicon, Inc.,
    et al. 2:12-cv-09765
11  Daniel, et al. v. Ethicon, Inc.,
    et al. 2:13-cv-02565
12  Dillon, et al. v. Ethicon, Inc.,
    et al. 2:13-cv-02919
13  Webb, et al. v. Ethicon, Inc.,
    et al. 2:13-cv-04517
14  Martinez v. Ethicon, Inc.,
    et al. 2:13-cv-04730
15  McIntyre, et al. v. Ethicon, Inc.,
    et al. 2:13-cv-07283
16  Oxley v. Ethicon, Inc.,
    et al. 2:13-cv-10150
17  Atkins, et al. v. Ethicon, Inc.,
    et al. 2:13-cv-11022
18  Garcia v. Ethicon, Inc.,
    et al. 2:13-cv-14355
19
       (Caption Continued on Next Page)
20
                      -  -  -
21               October 6, 2015
            Deposition of Elaine Duncan
22                    -  -  -
23          GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph|917.591.5672 fax
24            deps@golkow.com
```

Elaine Duncan

```
 1    CAPTION CONTINUED:
 2    Lowe v. Ethicon, Inc.,
      et al. 2:13-cv-14718
 3    Dameron, et al. v. Ethicon, Inc.,
      et al. 2:13-cv-14799
 4    Vanbuskirk, et al. v. Ethicon, Inc.,
      et al. 2:13-cv-16183
 5    Mullens, et al. v. Ethicon, Inc.,
      et al. 2:13-cv-16564
 6    Shears, et al. v. Ethicon, Inc.,
      et al. 2:13-cv-17012
 7    Javins, et al. v. Ethicon, Inc., .
      et al 2:13-cv-18479
 8    Barr, et al. v. Ethicon, Inc., .
      et al 2:13-cv-22606
 9    Lambert v. Ethicon, Inc.,
      et al. 2:13-cv-24393
10    Cook v. Ethicon, Inc.,
      et al. 2:13-cv-29260
11    Stevens v. Ethicon, Inc.,
      et al. 2:13-cv-29918
12    Harmon v. Ethicon, Inc.,
      et al. 2:13-cv-31818
13    Snodgrass v. Ethicon, Inc.,
      et al. 2:13-cv-31881
14    Miller v. Ethicon, Inc.,
      et al. 2:13-cv-32627
15    Matney, et al. v. Ethicon, Inc.,
      et al. 2:14-cv-09195
16    Jones, et al. v. Ethicon, Inc.,
      et al. 2:14-cv-09517
17    Humbert v. Ethicon, Inc.,
      et al. 2:14-cv-10640
18    Gillum, et al. v. Ethicon, Inc.,
      et al. 2:14-cv-12756
19    Whisner, et al. v. Ethicon, Inc.,
      et al. 2:14-cv-13023
20    Tomblin v. Ethicon, Inc.,
      et al. 2:14-cv-14664
21    Schepleng v. Ethicon, Inc.,
      et al. 2:14-cv-16061
22    Tyler, et al. v. Ethicon, Inc.,
      et al. 2:14-cv-19110
23
          (Caption Continued on Next Page)
24
```

Elaine Duncan

```
1      CAPTION CONTINUED:
2      Kelly, et al. v. Ethicon, Inc.,
       et al. 2:14-cv-22079
3      Lundell v. Ethicon, Inc.,
       et al. 2:14-cv-24911
4      Cheshire, et al. v. Ethicon, Inc.,
       et al. 2:14-cv-24999
5      Burgoyne, et al. v. Ethicon, Inc.,
       et al. 2:14-cv-28620
6      Bennett, et al. v. Ethicon, Inc.,
       et al. 2:14-cv-29624
7
                      -  -  -
8               October 6, 2015
                      -  -  -
9
10          DEPOSITION OF ELAINE DUNCAN, taken
       pursuant to notice, was held at the law
11     offices of Nilan Johnson Lewis, PA, 120
       South Sixth Street, Suite 400, Minneapolis,
12     Minnesota 55402, commencing at 9:15 a.m. on
       the above date, before Barbara J. Carey,
13     Registered Professional Reporter and Notary
       Public in and for the State of Minnesota.
14
15
16
17
18
19
20
21
22
23
24
```

Elaine Duncan

```
 1
     APPEARANCES:
 2
 3          APPEARING FOR THE PLAINTIFFS:
            Fidelma L. Fitzpatrick, Esquire
 4          Motley Rice, LLC
            321 South Main Street
 5          Providence, Rhode Island 02903
            Phone:  401-457-7728
 6          Email:  ffitzpatrick@motleyrice.com
 7               And
 8          Edward A. Wallace, Esquire
            Wexler Wallace, LLP
 9          55 West Monroe Street, Suite 3300
            Chicago, Illinois 60603
10          Phone:  312-346-2222
            Email:  eaw@wexlerwallace.com
11
12          APPEARING FOR THE DEFENDANT:
            Paul N. Davis, Esquire
13          Butler Snow, LLP
            1020 Highland Colony Parkway, Suite 1400
14          PO Box 6010
            Ridgeland, Mississippi 39157
15          Phone:  601-948-5711
            Email:  paul.davis@butlersnow.com
16
                 And
17
            Philip J. Combs, Esquire
18          Thomas Combs & Spann, PLLC
            300 Summers Street, Suite 1380
19          Charleston, West Virginia 25301
            Phone:  304-414-1805
20          Email:  pcombs@tcspllc.com
21
                       -  -  -
22
23
24
```

Elaine Duncan

```
 1
                          -  -  -
 2                     I N D E X
                          -  -  -
 3
           Testimony of:  ELAINE DUNCAN              PAGE
 4
                By Ms. Fitzpatrick            8, 340
 5              By Mr. Davis                     324
 6                        -  -  -
 7                   E X H I B I T S
 8                        -  -  -
 9
      NO.          DESCRIPTION                    PAGE
10
       1     Amended Notice of Video Deposition      8
11           Pursuant to Rule 30 and Document Requests
             Pursuant to Rule 34 of Elaine Duncan
12           (6 pages)
13     2     Report of Elaine Duncan, MSME, RAC      8
14     3     7/2/10 Clinical Expert Report, Gynecare  56
             Prolift* Pelvic Floor Repair System,
15           David Robinson, MD, FACOG Bates Stamped
             ETH.MESH.10186739 to 766
16
       4     Rule 26 Expert Report of Anne Wilson,   65
17           MBA (35 pages)
18     5     Report of Elaine Duncan, MSME, RAC      67
             (124 pages)
19
       6     Meshes, Version 2011 (1 page)          68
20
       7     Event 1998 Action, Handwritten Notes   69
21           (1 page)
22     8     Handwritten Notes (1 page)             70
23     9     AUGS Position Statement on Mesh Midurethral  70
             Slings for Stress Urinary Incontinence
24           Bates Stamped D20218.1 to 20218.4
```

Elaine Duncan

```
 1
                            -  -  -
 2
                  E X H I B I T S  (Continued)
 3
                            -  -  -
 4
 5    NO.            DESCRIPTION                       PAGE
 6    10    Phillips Sumika Material Safety Data Sheet,  101
            Marlex Polypropylene (All Grades) Bates
 7          Stamped SECANT-BARD-00000021 to 029
 8    11    Ethicon Women's Health & Urology, Product    118
            Pointer, Gynecare TVT* Tension-Free Support
 9          For Incontinence Bates Stamped
            ETH.MESH.00998341 to 8342
10
      12    Figure 1 - Standards Timeline (1 page)       232
11
      13    Risk Analysis (1 page)                       241
12
      14    Flow Chart (1 page)                          242
13
      15    Seven Year Data for Ten Year PROLENE         246
14          Study:  ERF 85-219 Bates Stamped
            ETH.MESH.07690752 to 788
15
      16    GyneMesh II New Mesh Design, a Discussion    257
16          Document for Design of New Mesh for Repair
            Of Prolapse Bates Stamped
17          ETH.MESH.12009027 to 12009035
18    17    Anhang 4-02/3: Bewertung der Gefahrenarten   268
            (Risikoanalyse nach EN 1441) Bates Stamped
19          ETH.MESH.02265803 to 809
20    18    Anhang 4-02/3:  Bewertung der Gefahrenarten  271
            (Risikoanalyse nach EN 1441) Bates Stamped
21          ETH.MESH.10587932 to 939
22    19    Target Sheet, Design History:  DH0263 -      308
            DH0278 Bates Stamped ETH.MESH.06661874
23          To 1979
24
```

Elaine Duncan

1

- - -

2                       DEPOSITION SUPPORT INDEX

- - -

3

    Direction to Witness Not to Answer:    276, 278, 282

4

    Request for Production of Documents:      None

5

    Question Marked:                         None

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Elaine Duncan

```
1                    ELAINE DUNCAN,

2    After having been first duly sworn, was called as a

3    witness and testified as follows:

4                    EXAMINATION

5    BY MS. FITZPATRICK:

6         Q.   Good morning, Ms. Duncan.  My name is Fidelma

7    Fitzpatrick, and before we get started today, I'm going to

8    go ahead and mark some documents and give you copies so

9    you have them with you for today.

10        A.   Okay.

11                  MS. FITZGERALD:  So if we can mark as

12   Deposition Exhibit Number 1, it's the Notice of Deposition

13   itself.

14                  (Whereupon, Exhibit 1 was marked.)

15   BY MS. FITZPATRICK:

16        Q.   Let me mark this document as Exhibit 2 and ask

17   you, Ms. Duncan, if you could identify that for me?

18                  (Whereupon, Exhibit 2 was marked.)

19                  THE WITNESS:  This is my report.

20   BY MS. FITZPATRICK:

21        Q.   Okay.  And so I'm correct that what I've given

22   you is a complete copy of the report that you produced in

23   this consolidated case; is that right?

24        A.   Yes, ma'am, and it includes my CV.
```

Elaine Duncan

1          Q.   Okay.  And that's what you prepared for

2    Ethicon Company as their expert in this case; correct?

3          A.   I updated my CV, yes.

4          Q.   Okay.  Do I have the most updated copy of your

5    CV?

6          A.   Yes, ma'am.

7          Q.   Great.  So you might want to hold on to that

8    because I'll probably be asking you some questions from

9    that.

10         A.   That's fine.

11         Q.   Now, Ms. Duncan, when is the last time you had

12   your deposition taken?

13         A.   Many years ago.  Probably 1980 sometime.

14         Q.   Okay.  So let me just go over a few of the

15   ground rules.  I'm going to ask you just a series of

16   questions.  If at some point you can't hear me or you

17   don't understand what I've asked, please feel free to let

18   me know.  If at any point you need a break, you want to

19   stretch your legs, just let me know and we can easily take

20   a break.  Otherwise, I'll probably keep going and try to

21   get through this as quickly and painlessly for all of us

22   as possible.

23              Do you have any questions for me about how the

24   deposition is going to run?

Elaine Duncan

```
1            A.   No, I think I'm in good hands.

2            Q.   Okay.  Great.

3            A.   Thank you.

4            Q.   Ms. Duncan, do you agree with me that a

5    medical device manufacturer has the responsibility to

6    design their product so as to minimize the risk of

7    injuries to patients?

8            A.   I believe that's the goal of every medical

9    device company, yes.

10           Q.   Okay.  And do you agree with me that in order

11   to design a product to minimize the risk of injuries to

12   patients, a responsible medical device manufacturer has to

13   consider and understand the actual medical condition that

14   the device is intended to treat?

15           A.   Medical device manufacturers, yes, must

16   understand the indication for use, as well as the intended

17   uses, yes.

18           Q.   And they must understand the underlying

19   medical conditions themselves; correct?

20           A.   Yes, to the extent that it is known.

21   Sometimes devices are treating conditions for the

22   underlying conditions not totally known.

23           Q.   Okay.  Well, how about for a responsible

24   medical device manufacturer who is making a product to
```

Elaine Duncan

1    treat stress urinary incontinence?  You'd agree with me

2    that that medical device company would need to fully

3    understand the medical condition of stress urinary

4    incontinence; correct?

5                    MR. DAVIS:  Object to the form.

6                    THE WITNESS:  What I'd like to qualify

7    is that each individual patient can come to the device

8    with variations in their condition.  I mean, sometimes it

9    is not responsible to know every possible condition

10   underlying that individual patient's condition, but as a

11   general rule, it's true; we try to understand the majority

12   of the patients and what conditions they come to the

13   operating room with.

14   BY MS. FITZPATRICK:

15       Q.   Okay.  So fair enough.  So putting aside

16   whether an individual patient, you'd agree with me that a

17   medical device manufacturer making a product to treat

18   stress urinary incontinence would need to know and

19   familiarize themselves with what's available in the

20   medical literature concerning the condition; correct?

21       A.   With respect to my previous comment, yes.

22       Q.   Okay.  And you'd agree with me that a medical

23   device manufacturer that's designing a product designed to

24   treat stress urinary incontinence would need to understand

Elaine Duncan

1    the treatment, alternate treatment methods that are

2    already on the market or available to patients at that

3    time; correct?

4         A.   Let's go back over that one more time.  That

5    was kind of a lengthy question.

6         Q.   Okay.  It was probably a bad question.  Let me

7    see if I can do a better job with that.

8              You agree with me that a medical device

9    manufacturer who is making a product to treat stress

10   urinary incontinence would need to be aware of and

11   familiar with alternate treatment methods for that

12   underlying condition before making a product; correct?

13        A.   Actually, may I say, in addition to what may

14   be available at the time of the design and development,

15   they, most typically, continue to monitor alternate

16   therapies.

17        Q.   Okay.  Great.  And you would agree with me

18   that a medical device manufacturer making any kind of

19   medical device must consider and understand the anatomical

20   location where that device is going to be implanted;

21   correct?

22        A.   That's a reasonable requirement, uh-huh.

23        Q.   Okay.  And you'd agree with me they also must

24   consider the length of time that the device is intended to

Elaine Duncan

```
1    be left inside the patient's body; correct?

2          A.   Obviously, if it's an indicated use as a

3    permanent implant, then they would need to know that it is

4    intended as a permanent implant.

5          Q.   Okay.  And you agree with me, to follow up on

6    that, that there are differences and different

7    considerations for medical devices that are left

8    permanently inside the body as opposed to medical devices

9    that are used temporarily or transitorily in the body;

10   correct?

11         A.   Even the biocompatibility requirements have us

12   identify the length of intended use, like less than

13   30 days, more than 30 days, et cetera.  So that's a

14   general condition we apply for design and development.

15         Q.   Okay.  And when -- a responsible medical

16   device manufacturer is making a medical device, it's

17   necessary that they consider and understand the actual

18   materials that they're going to use in that device;

19   correct?

20         A.   It would be a requirement to understand the

21   materials, yes, qualify -- my term is qualify them.

22         Q.   Your term is qualify, okay.

23              And you agree with me that a medical device

24   manufacturer should understand how the body can react to
```

Elaine Duncan

1    the medical device that's been implanted; correct?

2          A.   Try that again.  I got distracted, I'm sorry.

3          Q.   Sure.  You'll agree with me that a medical

4    device manufacturer should understand how the body can

5    react to a medical device that's been implanted; correct?

6          A.   How the body can react, certainly.  It's part

7    of the biocompatibility.

8          Q.   And you also agree with me that a medical

9    device manufacturer should understand and consider how the

10   device itself can react to the body; correct?

11         A.   How the device itself can react?

12         Q.   Correct.

13                 MR. DAVIS:  Object to the form.

14                 THE WITNESS:  I'm struggling with how

15   that's different from the previous question.

16   BY MS. FITZPATRICK:

17         Q.   So the previous question was the body's

18   response to the device, and now I'm asking the corollary

19   to that, which is the device's response to the body.

20                 So you'll agree with me it's important to know

21   whether the device can deteriorate over time; correct?

22         A.   We consider that as a part of the

23   biocompatibility and qualification of materials.

24         Q.   And you'll agree with me it's important to

Elaine Duncan

```
 1   know that -- if the device can break down or stop working

 2   after a certain period of time; correct?

 3                   MR. DAVIS:  Object to the form.

 4                   THE WITNESS:  I'm sorry, stop working,

 5   like in a battery, or what are you referring to?

 6   BY MS. FITZPATRICK:

 7         Q.   No, I'm talking about a permanently-implanted

 8   medical device.

 9         A.   Like a pacemaker, or what do you mean?

10         Q.   Any kind of medical device.  You need to know

11   what the lifecycle of that product is; correct?

12                   MR. DAVIS:  Object to the form.

13                   THE WITNESS:  I -- the life --

14   "lifecycle" is a term of art in compliance and quality

15   that has a broader meaning than --

16   BY MS. FITZPATRICK:

17         Q.   Okay.

18         A.   -- I think you're trying to use for it.

19         Q.   Probably.  I'm not using it as a term of art.

20   I'm just -- you need to know how long a device is going to

21   last when it's in the body; correct?

22         A.   Many medical devices are permanent implants,

23   but we don't know how long they'll last in each individual

24   patient.
```

Elaine Duncan

1          Q.   Okay.  And let me just clarify, when I'm

2   asking you questions today, I'm not asking you questions

3   about individual patients.  I'm talking about your

4   generalized body of knowledge.

5               So the medical device manufacturer should

6   know on average or try to figure out on average how

7   long its medical device is going to last or work in the

8   body.

9               You agree with me on that; right?

10              MR. DAVIS:  Object to the form.

11              THE WITNESS:  Again, it's not always

12  possible to know when, for example, when the first

13  artificial hip was put in, I don't know that anybody

14  knew exactly how long that particular design would stay

15  in the body.  We try to make them as good as we can, but

16  since disease conditions are progressing in many cases and

17  other conditions are taking place, as well, an individual

18  implant's life, or even a specific model of an implant,

19  we may be able to predict some modes of failure, but

20  the total lifespan in a human, it's not always known.

21  BY MS. FITZPATRICK:

22          Q.   Okay.  Well, let me pick up on something you

23  said.

24              You'll agree with me, though, that a medical

Elaine Duncan

```
1    device manufacturer has a responsibility to make a device

2    as safe as it possibly can; right?

3                    MR. DAVIS:  Object to the form.

4                    THE WITNESS:  Within reason, yes.

5    That's right.

6    BY MS. FITZPATRICK:

7         Q.   And that's -- when you say "within reason,"

8    that's what's feasible, what's --

9         A.   If you made it so safe that it couldn't

10   function.

11        Q.   Okay.

12        A.   You know, there's a limit because some

13   functionality is required.

14        Q.   Okay.

15        A.   And that's what might fail.  So obviously,

16   you have constraints.  You have design constraints,

17   yes.

18        Q.   Okay.  So fair enough.  So assuming that

19   functionality remains constant, you'll agree with me that

20   a medical device manufacturer has the obligation to make a

21   product as safe as is feasible; correct?

22        A.   As safe as feasible, yes.

23        Q.   Now, the report that I've marked as Exhibit

24   Number 2 in here is the report that you produced in this
```

Elaine Duncan

1    case on behalf of Ethicon; correct?

2          A.   Yes, ma'am.

3          Q.   And you understand that the product that's at

4    issue in this case is the TVT retropubic device with

5    mechanically-cut mesh; correct?

6          A.   I was not specifically limited to that in my

7    report.

8          Q.   Okay.  Do you -- were you told by Ethicon or

9    by anyone that the patients who are the plaintiffs in this

10   case have TVT retropubic devices with mechanically-cut

11   mesh, specifically?

12         A.   No, we didn't discuss the patients, you know.

13   The ground rules, my scope.

14         Q.   Uh-huh.

15         A.   Was what I would call due diligence of the

16   development and the compliance of the product of family of

17   TVT up to but not including TVT-O, so I was looking at a

18   timeline.

19         Q.   What?

20         A.   TVT-O, dash O.  In a timeline, since I stopped

21   at that point.  So I was not constrained strictly to the

22   mechanical cut.

23         Q.   Okay.  So your report contains conclusions and

24   opinions that apply to the TVT retropubic mechanically-cut

Elaine Duncan

```
1    and the TVT retropubic laser cut; is that right?

2         A.   Well, frankly, I had to because Ms. Wilson's

3    had included the laser cut in her opinion, so I,

4    obviously, had to consider that, as well.

5         Q.   Okay.  And you understand that Ms. Wilson's

6    report made a distinction between the TVT-R mechanical cut

7    and the TVT-R laser cut.  I'm just asking, did you make

8    that same distinction in your report?

9         A.   Where it was appropriate.

10        Q.   Okay.  Well, I'm going to be asking you a

11   series of questions today, and I want to ask you very

12   specifically about the TVT-R mechanical cut because that's

13   the product that the plaintiffs in this case have been

14   implanted with; okay?

15        A.   I wasn't aware of that, okay.

16        Q.   And if at some point you need to qualify or

17   you want to let me know that you're including a laser cut

18   in that or you have to include laser cut or you've gone to

19   the TVT-O, can you just make sure to let me know?  Because

20   otherwise, I'm going to be talking about this TVT-R

21   mechanical cut.

22             MR. DAVIS:  I'll object to form.

23             THE WITNESS:  As long as you tell me

24   when you're referring to mechanical, I'll stay within that
```

Elaine Duncan

1   boundary, as well.

2   BY MS. FITZPATRICK:

3        Q.   I'm going to be referring to mechanical

4   throughout the deposition, so that's the product that I'm

5   going to be focusing on.  So I just want to let you know

6   that, and if you need to deviate from that, you certainly

7   can.  I just want to know that that's what's happening so

8   you and I are on the same page with what we're discussing;

9   okay?

10       A.   Okay.

11       Q.   Now, do you believe, based on your review of

12   the documents that you've looked at, that Ethicon

13   appropriately designed the TVT-R mechanical-cut device?

14       A.   Well, what I have to clarify for you is the

15   original design was by Dr. Ulmsten, and the qualification

16   of the design was by Ethicon subsequently.  But the

17   original design, as you phrased it in your question, was

18   not by Ethicon.

19       Q.   Okay.  Do you believe, based on your review of

20   the documents that you've seen, that Ethicon appropriately

21   qualified the design of the TVT-R mechanical-cut product?

22            MR. DAVIS:  Object to form.

23            THE WITNESS:  Yes, ma'am, I do.

24

Elaine Duncan

```
 1   BY MS. FITZPATRICK:

 2        Q.   Is there anything that you saw in your review

 3   of the documents in this case that led you to believe that

 4   Ethicon overlooked or didn't properly consider something

 5   when qualifying the design of the TVT-R mechanical cut?

 6        A.   Do I believe they overlooked anything?

 7        Q.   Overlooked or didn't properly consider

 8   something.

 9        A.   Not to my knowledge.

10        Q.   Okay.  And do you believe, based on your

11   knowledge or experience, your training, that there was a

12   better way for Ethicon to qualify the design of the TVT-R

13   mechanical cut than it did?

14        A.   Do I believe there was a better way?  I looked

15   at the process that they went through in the qualification

16   from the standpoint -- from the point of view of -- well,

17   at the time of the original due diligence for licensing a

18   product through to a certain cutoff time for the

19   documentation, and I perceived the engineering and

20   the clinical trial data and the biomaterial testing data

21   were all consistent with knowledge and practice at the

22   time.

23        Q.   Okay.  So let me go back to my question -- and

24   I understand that's your opinion, and that's throughout
```

Elaine Duncan

1    your report.

2              Do you think there was a better way that

3    Ethicon could have gone about qualifying the design of the

4    TVT-R mechanical-cut product?

5         A.   Again, it was not my job to evaluate a better

6    way or to critique the engineering aspects.  I was

7    looking at the process of how they went about it.

8    So I can't tell you in retrospect, either from my own

9    personal experience or what I read, that there was a

10   better way.  Just, it's outside the scope of what I was

11   evaluating.

12        Q.   Okay.  So you don't have an opinion on that;

13   is that right?

14        A.   I don't have -- I can't agree that there

15   is a better way.  I don't say that I don't have an

16   opinion.  What I'm saying is I can't agree that there was

17   a better way.

18        Q.   Okay.  Well, then let me ask the flip of that.

19             Do you believe that Ethicon used the best

20   practices possible in qualifying the design of the TVT-R

21   mechanically-cut mesh?

22        A.   With respect to that time frame, certainly,

23   yes.

24        Q.   Okay.  And sitting here today with the --

Elaine Duncan

1   sitting here today with the benefit of hindsight, which of

2   course we do --

3         A.    20/20.

4         Q.    -- always 20/20.

5               Is there anything that you would recommend

6   today to Ethicon that would have changed that design

7   qualification back in the late '90s, early 2000s?

8         A.    It's my conclusion that this device, based on

9   the clinical experience and the robust endorsement of this

10  device by the AUGS organization, and even the FDA, that I

11  would be foolhardy to try to suggest there's a better way

12  to make this product.

13        Q.    Okay.  So let me ask -- because I think we're

14  maybe talking about two different things here.

15              AUGS was not involved in the design process or

16  the qualification of the design of the TVT-R

17  mechanically-cut mesh; correct?

18        A.    Physicians were certainly incorporating their

19  ideas, yes.

20        Q.    Okay.  But you specifically mentioned the

21  AUGS.

22        A.    Uh-huh.

23        Q.    And you'll agree with me that AUGS had nothing

24  to do with the qualification of the design of the TVT-R

Elaine Duncan

```
1    mechanically-cut mesh back in the late 1990s and early

2    2000S; correct?

3          A.   AUGS would not have been.  They're not --

4    they're physicians and it's a physicians' organization.

5               What I was trying to say is the proof of the

6    pudding is the product we have today, and so that is

7    the judge -- judgment of the design, in my opinion.

8          Q.   But you're not a medical doctor; correct?

9          A.   No.

10         Q.   And you've never done clinical trials in

11   patients; correct?

12         A.   I've managed clinical trials, but I've never

13   done them, no.

14         Q.   You've never done them.

15              And you've never treated a woman who has SUI;

16   correct?

17         A.   That's right.

18         Q.   And you're not a member of AUGS; correct?

19         A.   That's right.

20         Q.   And you don't have any anatomical or special

21   medical training in the TVT device and its use in women;

22   correct?

23         A.   I couldn't implant one, no.

24         Q.   Okay.  So you're not here to talk -- and
```

Elaine Duncan

1    you're not qualified to talk -- about the clinical, the

2    medical risk and benefit of the TVT-R mechanically-cut

3    device today; correct?

4            A.   But ma'am, you asked me -- I think if you go

5    back to the question, it was "Would there be a better way

6    of doing it?"  And I have to say, again, that the proof is

7    in the pudding, that when we look at a device, which is

8    functioning as intended and safe, I would not recommend to

9    a company to go back and redesign it.

10           Q.   And perhaps we're talking about something

11   different.  I think this is what I'm trying to get at with

12   you.

13           A.   Okay.

14           Q.   I'm not talking about going back and

15   redesigning.

16           A.   Okay.

17           Q.   There's a process that every company has to go

18   through when designing a medical device; correct?

19           A.   They vary, but as a general framework, we

20   currently do, yes.

21           Q.   Okay.  And the reason the process is in place

22   is ultimately to ensure patient safety; correct?

23           A.   That's the goal, yes.

24           Q.   And you believe that it's important for

Elaine Duncan

1    companies to go through the process of doing a risk

2    analysis on medical devices prior to putting them on the

3    market or selling them on the market; correct?

4              MR. DAVIS:  Object to the form.

5              THE WITNESS:  You have to have a context

6    for that statement.  So today, it is the common practice.

7    I was working in the medical device industry in the '70s

8    and '80s, and we certainly were not constricted to design

9    control and review at that time, and we made perfectly

10   good devices then, like the St. Jude heart valve.

11   BY MS. FITZPATRICK:

12       Q.   Okay.  Well, maybe if we back up a little bit,

13   we can get on the same page, because I think we might be

14   talking past each other here.

15       A.   Okay.

16       Q.   You agree with me that when you're doing

17   hazard analysis and risk assessment, it's important to

18   take a total product lifecycle view of risk management;

19   correct?

20       A.   That's what we're instructed to do now with

21   the standards, yes.

22       Q.   And you agree with that?

23       A.   Yeah, I would agree with that.

24       Q.   And you would agree with me that when you're

Elaine Duncan

1    looking to do a risk analysis, you should look at a hazard

2    which should be thought of as a failure of the device to

3    meet expected performance requirements; is that right?

4         A.   When we're doing a hazard analysis, that's the

5    exercise we take.

6         Q.   Okay.

7         A.   We take the input requirements and project as

8    a what if it failed to meet that requirement, would there

9    be a hazard associated with it?  That's how that exercise

10   is done.

11        Q.   Okay.  This is what I want to get to.

12             You agree that it's important to employ a

13   systematic and analytical method to document potential

14   hazards; correct?

15        A.   That's what we do now, yes.

16        Q.   And that's the process that I'm talking about.

17        A.   Okay.

18        Q.   And that's something that you believe that a

19   responsible medical device manufacturer should do in order

20   to design the safest medical product that it can; correct?

21        A.   That's what's proven out over time to be a

22   very useful exercise.  It's not the only way to get a

23   product done.

24        Q.   Okay.  And you agree with me that sometimes a

Elaine Duncan

```
1    product developer wants to phone it in; correct -- that

2    they don't follow a process; correct?

3         A.   It's possible that anybody can try to do that.

4         Q.   Okay.  And you agree with me that both the

5    potential customer and the medical device developer will

6    suffer from any shortcuts that a medical device

7    manufacturer takes in this process of hazard analysis and

8    risk assessment; correct?

9                   MR. DAVIS:  Object to form.

10                  THE WITNESS:  It may occur.  It isn't a

11   foregone conclusion.  It's a possibility.

12   BY MS. FITZPATRICK:

13        Q.   Okay.  You say it may suffer or it will

14   suffer?

15        A.   It could suffer.

16        Q.   Okay.  And that's a little different from what

17   you said before; correct?

18                  MR. DAVIS:  Object to the form.

19                  THE WITNESS:  I don't know that it's

20   different.

21   BY MS. FITZPATRICK:

22        Q.   Do you remember writing a book, "The Potential

23   Customer and the Medical Device Developer Will Suffer From

24   Any Shortcuts"?
```

Elaine Duncan

```
 1          A.    That was an article, and that was the context

 2    because that was a training article, and I was trying to

 3    train people in the textile industry who might be

 4    considering getting into the medical industry.

 5          Q.    Okay.  Is that sentence true or not?

 6          A.    I think it's true.

 7          Q.    Okay.  And you also agree that if a company

 8    skips working meetings and just passes around, basically,

 9    a spreadsheet to have people sign off on it, that that can

10    spell disaster; correct?

11          A.    If -- as you said, if they phone it in, it can

12    be a problem because they need the interaction with one

13    another.

14          Q.    Okay.  And so, as part of your preparation for

15    today's deposition, can you tell me what documents related

16    to working meetings that you looked at related to

17    Ethicon's qualification of the design of the TVT-R

18    mechanical cut?

19          A.    As I previously said, Ethicon was not

20    responsible for the original design.  What I looked at

21    was --

22          Q.    Okay.  Let me --

23                MR. DAVIS:  Are you finished with your

24    answer?
```

Elaine Duncan

```
1    BY MS. FITZPATRICK:

2          Q.   I think you missed part of what I asked you.

3                    MR. DAVIS:  Were you through with your

4    answer?

5                    THE WITNESS:  I suggest you start over

6    because you interrupted my train of thought.

7    BY MS. FITZPATRICK:

8          Q.   Sure.  And I'm sorry about that.

9                As part of your preparation for today's

10   deposition, can you tell me what documents you looked at

11   that related to working meetings related to Ethicon's

12   qualification of the design of the TVT-R mechanical cut?

13         A.   As I previously said, the design was already

14   in the clinic.  It had already gone through the normal

15   design process when Ethicon came on the scene.  The

16   product was already in patients.

17               Typically, clinical evaluation is the last

18   stage of the design development process.  So when Ethicon

19   came on the scene, they did a due diligence to qualify the

20   design for their intended purposes, which was an

21   international sales of the device.  So that's what the due

22   diligence process was, and I reviewed the original due

23   diligence documents that Ethicon did before they signed

24   the agreement to license the product.
```

Elaine Duncan

```
 1        Q.   Okay.

 2        A.   That was the review process --

 3        Q.   Uh-huh.

 4        A.   -- that was conducted.  It was -- it's

 5  different than the design review process we do today.

 6        Q.   Uh-huh.

 7        A.   Okay.

 8        Q.   Okay.  What documents have you looked at that

 9  concerned working group meetings by Ethicon when they look

10  to qualify the design -- which is your term -- of the

11  TVT-R mechanical?  I just want to know what those are so I

12  can take a look at them.

13             MR. DAVIS:  Object to the form.  You can

14  answer.

15             THE WITNESS:  I believe there were

16  several design checklists.  There were checklists for the

17  due diligence activities, and that included various

18  requirements, as what a checklist is.  Their due diligence

19  was to organize the information and review the

20  information, and those were, as I recall, several

21  review -- there was certainly at least one, if not two,

22  review meetings where this was taking place.

23  BY MS. FITZPATRICK:

24        Q.   Okay.  I want to talk, not about the
```

Elaine Duncan

1    spreadsheets and the checklists, I want to talk about the

2    actual what you have called working meetings.

3              What working meetings did Ethicon have at the

4    time it qualified the design of the TVT-R mechanical?

5    What did you look at?

6         A.   Do you want me to bring those documents out?

7         Q.   Sure, that would be great.

8              MR. DAVIS:  I don't know that we have

9    them all.  Do you have some -- you can refer to your

10   report.

11             THE WITNESS:  Let me just look at this.

12   BY MS. FITZPATRICK:

13        Q.   Yeah, and I'm just looking for the working

14   group meeting, not the checklist.  We'll get to some of

15   those later, the specific meetings.

16        A.   The checklists were reviewed at the meetings.

17        Q.   Okay.  Tell me how you know that.

18        A.   I can read the documents.

19        Q.   Tell me the document.  That's all I'm asking

20   for.

21        A.   Well, again --

22        Q.   You can take a look through it.  Take your

23   time.  Take a look through it if you want.

24             MR. DAVIS:  They may not all be listed

Elaine Duncan

```
 1    in her report, either.

 2                   THE WITNESS:  Well, here's a start.

 3    BY MS. FITZPATRICK:

 4         Q.   Just if -- if you can just tell me where you

 5    are in your report.

 6         A.   Go to page 15.

 7         Q.   Okay.  I'm with you.

 8         A.   So if you look at the Bates number on the

 9    footnote.

10         Q.   Which footnote?

11         A.   18.

12         Q.   Okay.

13         A.   That was one of the citations in the report.

14         Q.   And you believe that the document cited in

15    Footnote 18 will reflect these working group meetings by

16    Ethicon when qualifying the design of the TVT-R mechanical

17    cut?

18         A.   Well, certainly they reflect the results.

19    Sometimes meetings have minutes or reports after the

20    meetings, so I take this as a reflection of the work they

21    did.  Without double-checking this Bates number, I can't

22    tell you if there's other documents that I would call to

23    your attention.  I can probably get you some of those

24    later, some numbers.  I don't know if this is a complete
```

Elaine Duncan

1    list.

2         Q.   Okay.  So all I'm -- I don't want there to be

3    any confusion in the record.

4              Sitting here right now, you can't point me to

5    a particular Bates number of what you did, but you might

6    look further, and you'll let me know later if you find

7    anything else that supports --

8         A.   It's not something I can recall, all of the

9    Bates numbers.

10        Q.   Completely understandable.  I can't either.

11        A.   I recall at least four or five that I was

12   looking at in that timetable.

13        Q.   Do you recall seeing any meeting minutes of

14   meetings that Ethicon conducted to qualify the design of

15   the TVT-R mechanical cut?

16        A.   Again, I can't recall the numbers, and I

17   recall that there were.

18        Q.   You recall that there were?

19        A.   That's my recall.

20        Q.   And do you also believe that there --

21        A.   Again, I wouldn't necessarily characterize

22   them as minutes.

23        Q.   Okay.  So --

24        A.   It could be a report from a meeting.  I

Elaine Duncan

 1    believe they represented in the documentation that they

 2    had had meetings, and these were reports of those

 3    meetings.

 4           Q.   Okay.  So let me -- let me start with the

 5    minutes.

 6                Do you recall whether you saw any actual

 7    meeting minutes related to the qualifying of the design of

 8    the TVT-R mechanical cut?

 9           A.   I would want to look at the document before I

10    characterized them as minutes.

11           Q.   Okay.  And then I'm going to ask you a second

12    question.

13                Do you remember seeing any meeting reports

14    that documented what had happened in any working meetings

15    that Ethicon had concerning qualification of the design of

16    the TVT-R mechanical cut?

17           A.   Again, the qualification at that juncture for

18    the due diligence was different than a design

19    qualification.

20           Q.   Yeah, I understand.

21           A.   Okay.

22           Q.   I'm asking you with what Ethicon did.

23           A.   Right.  Okay.

24           Q.   Do you recall seeing any meeting -- reports of

Elaine Duncan

1    meetings or minutes -- I don't want to say "minutes."

2        A.   I would say there was some effort, and I

3    can't say if it was a single document report for a

4    single meeting, because there were multiple activities

5    and multiple meetings.

6        Q.   Okay.  But sitting here right now, you just

7    don't know which Bates numbers those would be?

8        A.   I don't know the Bates numbers off the top of

9    my head, I'm sorry.

10       Q.   Okay.  But if it was something that Ethicon --

11   that you saw in the Ethicon documents, you would have

12   considered that to be important in continuing this hazard

13   analysis and risk assessment of the TVT-R; correct?

14            MR. DAVIS:  Object to form.

15            THE WITNESS:  Wait a minute.  That's

16   mixed messages there.

17   BY MS. FITZPATRICK:

18       Q.   Okay.

19       A.   The first part of it, what did you say?

20       Q.   I don't know.  It's not there.

21       A.   You want to ask it again?

22       Q.   Yeah, let me ask it again.  I'm talking about

23   Ethicon generally.

24            If you had seen meeting minutes or you had

Elaine Duncan

```
 1   seen reports of meetings concerning the qualification of

 2   the TVT-R mechanical-cut design, that's something that you

 3   would have considered important to take a look at in

 4   connection with your report here; correct?

 5                   MR. DAVIS:  Object to the form.

 6                   THE WITNESS:  It's out of context,

 7   ma'am.

 8   BY MS. FITZPATRICK:

 9        Q.   Okay.  Tell me how.

10        A.   You were talking previously about the due

11   diligence and license and now you broadened it.

12                   Is that your intention?

13        Q.   I think that I was always talking about the

14   qualification of the design.  That's always been my

15   question.

16                   So what I'm asking you is you have written

17   before that you believe that working meetings are

18   important when conducting any kind of hazard analysis and

19   risk assessment on a particular medical device; correct?

20        A.   The article that you're referring to there and

21   what I was instructing and training people who might read

22   my article about was the efforts that we do

23   contemporaneously today.  This is our expectations from

24   standards and regulations today.  When I was examining the
```

Elaine Duncan

1    due diligence of Ethicon through the phases and brought up

2    refinement for mechanical cut, I looked at their

3    documentation with respect to the requirements upon them

4    then.  It's very important to keep a temporal context when

5    we're looking at these documents.

6        Q.   Okay.  When do you believe it became a

7    requirement or important to conduct working meetings when

8    conducting hazard analysis and risk assessment?  What's

9    the date for that?

10       A.   I believe we started to see a recognition of

11   14971.  It really didn't kick into medical device

12   companies in an active way until probably I'm going to

13   say 2000, 2003, in that time frame.

14       Q.   Okay.  So is it your testimony, just so I

15   understand it, that you believe that working meetings to

16   discuss hazard analysis and risk assessment are required

17   from 2003 on but they weren't required before 2003?

18       A.   Understand, there's practices that go on.  So

19   14971 has been an evolving document, as was EN 1441 was

20   the core document.  When that document was in place,

21   I would have to tell you that in my experience, many

22   companies would exercise risk analysis with one or two

23   people.  They didn't have group meetings and team

24   meetings like they do now, and it was after 2007 when

Elaine Duncan

 1    that standard became more accepted across the U.S. and

 2    internationally that people began to practice hazard

 3    analysis group meetings, sometimes not just one meeting,

 4    but multiple meetings.  It would happen collectively.

 5             I have chaired such meetings, frequently, for

 6    companies where they were learning the process, and

 7    oftentimes, it would be iterative and sometimes quite

 8    contentious.  And so, it was a learning experience back

 9    then.  It wasn't a garage door coming down and everybody

10    did everything after that point in time.

11         Q.   Okay.  So is it fair to say it's your position

12    that Ethicon wasn't required to do working group meetings

13    concerning its hazard analysis and risk assessment of the

14    TVT-R mechanical cut prior to 2003?

15         A.   Required by whom?

16         Q.   You said "required."  I -- I'm going to get to

17    the question of required by whom, but I'm using your

18    terminology there.

19         A.   Well, that's what I'm saying.  No one was

20    requiring group meetings in the context of the way you

21    asked the question.

22         Q.   Okay.  And then you believe that from 2003

23    on -- from 2003 to 2007, if I'm understanding you

24    correctly, these types of group meetings were phased in

Elaine Duncan

```
1    through a learning process; is that correct?

2         A.   I believe that's correct.  I believe there

3    were a number of training programs.  FDA had put out some

4    guidance documents.  It -- it's kind of a group think.

5    We refer to that as best practices, and so oftentimes

6    people will go to a regulatory training or quality

7    training meetings and they start to adopt that and bring

8    that back, and the quality of the document starts to

9    improve when they have broader teams.

10        Q.   Okay.

11        A.   So that -- I didn't mean, when I said "require

12   it," I didn't mean to say that there was a sudden

13   lightning bolt and everybody after that point in time

14   behaved a certain way.  It was an evolution.

15        Q.   Okay.  Fair enough.  And then post from 2007

16   on, this is standard and this is an accepted best

17   practice, that you do group meetings to do risk assessment

18   and hazard analysis?

19        A.   I think that's best practices.  Even today,

20   it's best practices.  It's not -- I can't say it's

21   100 percent of the time.

22        Q.   And you agree that those types of group

23   meetings, regardless of when they were phased in, do --

24   I'll get your -- do help improve the quality of the
```

Elaine Duncan

```
1    documentation --

2         A.   Of the analysis.

3         Q.   -- of the analysis of everything that is --

4         A.   Because you try to have a broad perspective of

5    the team.

6         Q.   Okay.  How broad was the team that Ethicon

7    used --

8              MR. DAVIS:  Object to the form.

9    BY MS. FITZPATRICK:

10        Q.   -- to qualify --

11             MR. DAVIS:  I apologize.  I didn't

12   realize that was a pause.

13   BY MS. FITZPATRICK:

14        Q.   Let me start all over again.

15        A.   He's too fast.

16        Q.   How broad was the team that Ethicon used to

17   qualify the design of the TVT-R mechanical cut?

18             MR. DAVIS:  Object to the form.

19             THE WITNESS:  Again, your -- we have to

20   go back to the design was completed, and in the clinic

21   when Ethicon came on the stage as due diligence, for its

22   due diligence.  So I wouldn't characterize that in that

23   way.  They were not applying the rules we have today when

24   they were doing due diligence.
```

Elaine Duncan

```
 1   BY MS. FITZPATRICK:

 2        Q.   Okay.  So let me -- I don't want us to be

 3   talking past each other.  I'm using "qualified the

 4   design."  I'm using that phrase because that's the phrase

 5   that you told me.  You told me that's what Ethicon went

 6   through when it acquired the TVT-R mechanical cut.  They

 7   qualified it; is that correct?

 8        A.   Are we jumping over to the acquisition phase?

 9             MR. DAVIS:  I object.

10   BY MS. FITZPATRICK:

11        Q.   I'm talking your phrase -- why don't you tell

12   me what you meant by "qualifying the design"?  Maybe

13   that's a better way to do it so we're talking about the

14   same thing.

15        A.   Whenever there's a change to a design, some --

16   well, if I can back up completely.

17             So the design control and review requirements

18   within the FDA regulations look for you to evaluate --

19   well, first to have a design plan, to evaluate input

20   requirements, to assess hazards associated with failing to

21   meet those input requirements; from the hazard analysis

22   and the input requirements, to develop a verification and

23   validation plan, and to then execute those, review those.

24   You may have to circle back and consider your design input
```

Elaine Duncan

1    requirements again.

2              And then you do a design transfer to

3    manufacturing.  And again, in that phase, you may have to

4    circle back again.  So it can be an iterative process.

5    That is an original design qualification process.

6              When we are considering acquiring a design

7    from someone else, we may do a truncated review of the

8    documentation that went with their development process,

9    and when we do that, we have to be mindful of the time and

10   expertise.  So time in terms of chronological time, but

11   also the expertise that went into the original design in

12   the first place.

13             Does that help?  That's what I would call a

14   design qualification.

15        Q.   Of course it gives me 1,000 more questions,

16   but I'll stick with this for right now.

17        A.   I'm sorry, I'm trying to be helpful.

18        Q.   No, no, no.  Thank you.  I appreciate that.

19             The review of the documents -- Ethicon

20   undertook a review of the documentation from Medscand of

21   the TVT-R mechanical cut; correct?

22        A.   Are you speaking of the due diligence phase?

23        Q.   Well, I'm going to --

24        A.   Because when I did my due diligence, I

Elaine Duncan

1    basically, went in layers.  So I evaluated an event, an

2    event, an event; okay?  So when you ask me a question,

3    I have to be in the context of time and place and

4    people.

5            Q.    Okay.

6            A.    Okay?  That's how I did the work.

7            Q.    This is way more confusing, and maybe I'm very

8    simplistic in terms of how I deal with it, so --

9            A.    And I've been accused of being overly

10   detailed.

11           Q.    Let me go back.

12                 You just gave me a good instruction on the

13   design qualification process; correct?

14           A.    Of a new design.

15           Q.    Of a new design?

16           A.    Uh-huh.

17           Q.    And then, I believe that you told me that when

18   you acquire a product, a company can do a truncated review

19   of the documentation that was provided by the company that

20   originally designed the product; correct?

21           A.    That's correct.

22           Q.    And so in this case, it would be Ethicon that

23   would be doing the review of the documentation from

24   Medscand when it acquired the TVT-R mechanical cut;

Elaine Duncan

```
 1   correct?

 2          A.   So we're speaking of acquiring now?

 3          Q.   Uh-huh.

 4          A.   And the question was?

 5          Q.   The question was, just simply, how many people

 6   did Ethicon have involved in the review of the

 7   documentation that it did of the Medscand documents at the

 8   time that it acquired the TVT-R mechanical cut?

 9          A.   I didn't count them all.  I know we're

10   speaking of more than dozens.  I just recall seeing

11   many people involved in that process.

12          Q.   Okay.  So we have dozens of people involved in

13   that process?

14          A.   At least, yeah.

15              MR. DAVIS:  Object to the form.

16   BY MS. FITZPATRICK:

17          Q.   Let me ask you this, then.

18              Did you -- going back to the question of

19   working groupings, did you see any documentation that

20   those dozens of people met to discuss, review, look at,

21   consider collectively the documentation that had been

22   provided by Medscand at the time that Ethicon acquired the

23   TVT-R mechanical cut?  Just, did you see that?

24                  MR. DAVIS:  I object to form.  She did
```

Elaine Duncan

```
 1   not say "dozens," plural.  That was your term.  She said

 2   "at least a dozen."

 3                    THE WITNESS:  I said "at least a dozen."

 4   I don't remember an exact number.

 5   BY MS. FITZPATRICK:

 6        Q.   I'm sorry, let me make sure I've got the right

 7   answer.

 8             You said, "I didn't count them all.  I know

 9   we're speaking of more than dozens."

10             Is that --

11        A.   A dozen.  What -- when you look at the

12   documentation of the asset acquisition review, there

13   were the people whose names were mentioned in the memos,

14   but then there are people behind those memos and the

15   work that was going on to review those products and

16   conduct that activity.

17             For example, in an asset acquisition phase,

18   they were looking at good -- between the due diligence for

19   licensing and up to the phase of asset review from a

20   purchase, they were conducting audits, and they were

21   auditing to the Good Manufacturing Practices from 1976,

22   and they were anticipating the requirements that would be

23   required for the new standards and regulations that were

24   coming out.  So this was a continuum.
```

Elaine Duncan

1              For due diligence, they did a certain group of

2    work.  They anticipated additional work if they were going

3    to acquire it.  It wasn't a foregone conclusion that they

4    would acquire it, so they were doing various exercises to

5    understand the status of the records at the time.

6         Q.    Okay.  I just want to -- I don't want to --

7         A.    You keep talking about group meetings.

8         Q.    Because that's what my question is.  So you're

9    answering a different question.

10        A.    Okay.

11        Q.    Here's the first thing.

12              I asked you how many people at Ethicon --

13        A.    Uh-huh.

14        Q.    -- were involved in the review of the

15   documentation from Medscand on the TVT-R mechanical cut,

16   and I think we had a little miscommunication.  I thought

17   you said "dozens."  Your attorney said that you didn't

18   mean it.

19              Just do you know how many people, just to

20   clarify that for me?

21        A.    Ma'am, I would have to pull the documents

22   and count their heads.  I don't recall an exact

23   number.

24        Q.    So you don't know.  That's okay.

Elaine Duncan

```
 1            A.   It was a team of people.  It's not that I

 2    don't know.  I don't recall.

 3            Q.   Okay.  Do you want to take a look at your

 4    report and tell me where I could find that information?

 5                      MR. DAVIS:  Object to form.

 6                      THE WITNESS:  I'm not sure we're going

 7    to find it in any one Bates-numbered document.  I'll have

 8    to pull the whole record of the due diligence of the --

 9    from the time of the due diligence of the license and the

10    due diligence of assets.

11                      MR. DAVIS:  Let me just say this

12    to make sure it's clear.  We'd be happy, if you'd

13    like, to go off the record and let her -- I've got the

14    documents if you want her to take the time to look at

15    them.

16                      MS. FITZPATRICK:  Sure, if you want to

17    go off the record and take a look at that, I'm happy to do

18    that, give you some time.  I just want to make sure we're

19    on the same page.  Take a break.

20                      (Whereupon, a recess was taken from

21                      10:04 a.m. to 10:05 a.m.)

22                      MS. FITZPATRICK:  Before we took the

23    break, there had been some misunderstanding or

24    miscommunication about whether we're talking about dozens
```

Elaine Duncan

```
 1   of people or a dozen people.  I'm just looking for a

 2   ballpark estimate, and I just was looking for the

 3   documents that you were relying on for that.  That's all.

 4   I'm not looking for anything more than that.

 5                    THE WITNESS:  Okay.  If I get over a

 6   dozen, do you want me to stop?

 7   BY MS. FITZPATRICK:

 8        Q.   Sure.  That's fine.  Just give me a ballpark

 9   figure and give me the Bates numbers, and we'll deal

10   with that.

11        A.   Okay.  From due diligence through assets?

12        Q.   Yes.

13        A.   Okay.  I can do that.

14                    MR. DAVIS:  I do want to say one thing

15   while we're still on the record, though.

16                    I mean, my position is, unless I get

17   countermanded by Phil, that this time will count toward

18   her seven hours.

19                    MS. FITZPATRICK:  We just went off the

20   record.

21                    MR. DAVIS:  No, we're on the record.

22                    MR. COMBS:  And we'll go back on the

23   record.

24                    MR. DAVIS:  We're on the record; aren't
```

Elaine Duncan

```
1    we?

2                    THE REPORTER:  Right now.

3                    MS. FITZPATRICK:  If you want to take

4    the position that she doesn't know and she can't

5    identify --

6                    MR. DAVIS:  No, we're not taking that

7    position, but you know, she's not required to sit here and

8    regurgitate names and numbers.

9                    MS. FITZPATRICK:  Then you just say "I

10   don't know sitting here."

11                   MR. DAVIS:  Let's go off the record.

12   We're going to take a break for five minutes.

13                   (Whereupon, a recess was taken from

14                   10:07 a.m. to 10:12 a.m.)

15   BY MS. FITZPATRICK:

16        Q.   Before we took our break, I think, Ms. Duncan,

17   I had asked if you had particular documents that you were

18   relying on or looking at for your opinion that there were

19   either a dozen or dozens or numerous people that were

20   involved in the review, as you described it, of the

21   documentation from Medscand about the design of the TVT-R

22   mechanical cut at the time it was acquired by Ethicon;

23   correct?

24        A.   Part -- partly correct.  They reviewed broader
```

Elaine Duncan

1   than the design.  They reviewed the entire quality

2   program.

3          Q.   Okay.

4          A.   As it existed at that time.  There were audits

5   to that effect.

6          Q.   Okay.  So we're talking about the design and

7   the quality program, and you have found documentation for

8   your opinions about the number of people or the general

9   number of people that were involved in that process;

10  correct?

11         A.   We're still pulling that together for you, but

12  one document we found had at least 14 people named.

13         Q.   Okay.  And what document is that?

14              MR. DAVIS:  Well, I'll read it off.

15              MS. FITZPATRICK:  Yeah, that would be

16  great.

17              MR. DAVIS:  The Bates number is

18  ETH.MESH09748308 through 385, and just, if it helps you,

19  Fidelma, that is the document that is -- the title on the

20  cover page is "Project Tomo (ph) Due Diligence Summary."

21              MS. FITZPATRICK:  Okay.

22              MR. DAVIS:  About the third -- fourth

23  page of the -- PDF page, that is a document that has a

24  list of all the team members at that time.

Elaine Duncan

```
 1                  MS. FITZPATRICK:  Okay.  Great.

 2                  MR. DAVIS:  Now, the question I have is

 3      do you want a complete list?  I mean it would take her

 4      hours.

 5                  MS. FITZPATRICK:  No, no, I'm not asking

 6      her for a complete list.  We had a -- Ms. Duncan said

 7      "dozens."  I asked her questions based on dozens.  You

 8      didn't think it was -- I'm just trying to make sure we're

 9      on the same page with what we're talking about.

10                  MR. DAVIS:  You and the court reporter

11      may have thought she said "dozens."  I thought I clearly

12      heard her say "At least a dozen."

13                  MS. FITZPATRICK:  It very well could be.

14      I just want to know which it is.  I don't want -- I'm

15      not trying to trick her up here.  I just want to know what

16      the answer is.

17                  THE WITNESS:  It's big.  During the

18      asset acquisition -- and well, actually, during the

19      licensing phase, the Ethicon team, regulatory team,

20      submitted a 510(k), so that group is typically another

21      handful of people, you know, anywhere from one to five,

22      and in looking at some of those documents, I recall there

23      was more than one person involved in that process.

24                  So when I am speaking of teams, I'm speaking
```

Elaine Duncan

1    quite literally that there are not only more than a single

2    individual, that there may be more than a single team.

3    BY MS. FITZPATRICK:

4         Q.    Okay.   Fair enough.   Now, let me ask you about

5    those teams or those groups of people.

6         A.    Uh-huh.

7         Q.    Did you see, in your review of the documents

8    to your recollection, any minutes of any meetings with

9    those team members at that particular time?

10        A.    I, again, have to clarify that I can't recall

11   that they called them minutes.   There were reports of

12   meetings.

13        Q.    Okay.   So you looked at reports of meetings,

14   and those would be cited either in your report itself or

15   in your reliance list; is that right?

16        A.    I believe so, yes.

17        Q.    And sitting here right now, you can't point me

18   to which particular Bates numbers or ranges of documents

19   those are; can you?

20        A.    Well, here's one on page 17.   It says,

21   "Various reports in October 1999 summarized the status of

22   the due diligence activities."   So that Bates number is

23   listed.

24        Q.    Oops, I'm sorry, that's 32?

Elaine Duncan

```
1          A.   Actually, 32 is referring to 31, and 31 is a

2    long list of Bates numbers.

3          Q.   Okay.  So I can take a look at those and that

4    will be what you relied on for that portion of your

5    opinion; correct?

6               MR. DAVIS:  Object to the form.

7    BY MS. FITZPATRICK:

8          Q.   Did you rely on those for that portion of your

9    opinion?

10              MR. DAVIS:  No, my objection was you're

11   trying to limit her to that.  She's got reliances, as

12   well.

13   BY MS. FITZPATRICK:

14         Q.   Did you rely on those for this portion of your

15   opinion?  That's why you footnoted them; right?

16         A.   Ma'am, what I typically did for the footnotes

17   was I would select the best examples, but I reviewed

18   thousands of pages.

19         Q.   Okay.  My only question was, in Footnote 31

20   and 32, you have listed a number of documents.

21              Did you rely on those documents for the

22   opinions that you have set forth in those sentences?

23         A.   Those I would have to say in part, but not

24   exclusively.
```

Elaine Duncan

```
 1          Q.    Okay.

 2          A.    They're footnoted because they're significant.

 3   If you look up above --

 4          Q.    All I want to know is if you relied on them?

 5                    MR. DAVIS:  She didn't finish her

 6   answer.

 7                    THE WITNESS:  Paragraph 3, the last

 8   sentence, is where that footnote begins, 31, and I'm

 9   referring to the CE Mark Analysis by the notified

10   bodies, the QA and the RA due diligence that included

11   the design history files and other quality documentation.

12   That's the statement that those footnotes are referring

13   to.

14                So what I tended to do, is like you do a

15   literature article where you make a declarative statement.

16   You put a footnote to it.  That's justification for that

17   statement.  That doesn't mean those are the only documents

18   I looked at.

19   BY MS. FITZPATRICK:

20          Q.    Okay.  So all I was really getting at -- and I

21   think it's fairly simple -- if you've cited a document in

22   a footnote following the sentence, it's because you

23   believe that document -- not exclusively, not alone -- but

24   that document, in some way, supports the opinions you've
```

Elaine Duncan

1    given?

2           A.   Yeah, uh-huh.

3           Q.   So if you could actually take a look at

4    Footnote 28 for me, please.

5           A.   Do you want us to pull up the Bates number, or

6    what?

7           Q.   No, I'm going to show you one.  I'm going to

8    show you -- you've got Ethicon mesh 10186745.

9                Do you see that?

10          A.   Uh-huh.

11          Q.   And I'm going to give you the document that

12   contains that.  We can mark this as Deposition Exhibit

13   Number 3, please.

14                    (Whereupon, Exhibit 3 was marked.)

15                    MR. DAVIS:  Fidelma, there's a

16   typographical error -- Footnote 28 of the document that

17   she is handed is not the document that is referenced in

18   the report.  It is -- there is a typographical error in

19   the report.  It does say 10186745.  It should be 1058.

20   The 1 should be a 5, and that is a typographical error.

21                    THE WITNESS:  Yes, I would not have

22   cited the Prolift.

23   BY MS. FITZPATRICK:

24          Q.   Yes, that's -- let me just go through it.

Elaine Duncan

```
 1   Well, that's yours and we can put it aside in a second.

 2             So you have a document cited here,

 3   ETH.MESH10186745, and when I pulled that document to look

 4   at what you're relying on, that was a clinical expert

 5   report for the Gynecare Prolift Pelvic Floor Repair System

 6   dated July 2nd, 2010; correct, what is page 45 of that?

 7        A.   That's what this is, yes.

 8        Q.   And this document doesn't actually have

 9   anything to do with or support the opinions that you have

10   in this first sentence on page 17 that ends with footnote

11   28; correct?

12        A.   I'm sorry, that was a typographical error.

13        Q.   Okay.  Did you make that typographical error

14   or did someone else?

15        A.   It's hard to say because what I did was I put

16   the footnote reference after the period, and then I had an

17   assistant actually convert that to a footnote.  So I can't

18   say whether I made the error when I had it typed here,

19   where you see -- in other words, I didn't do the

20   footnoting activity myself.  I put the references at the

21   sentences, and then I had a document clerk convert that

22   reference to the actual footnote you see below.

23        Q.   Okay.

24        A.   And so at either of those two junctures, there
```

Elaine Duncan

```
 1    could have been a transposition error.

 2             Did you check the other one?

 3       Q.   I did, and this is the one I couldn't -- this

 4    is the one I couldn't -- that's going to be part of the

 5    record.

 6             MR. DAVIS:  Fidelma, I think I found

 7    another one somewhere.  You may come to it.

 8    BY MS. FITZPATRICK:

 9       Q.   Well, so let me clarify for the record.

10       A.   Can you say what -- what it was supposed to

11    be?  I don't have a pen.  Can I mark it what it was

12    supposed to be?

13       Q.   So I think I was understanding

14    ETH.MESH10586745 is what it should have been; is that

15    right?

16             MR. DAVIS:  I've got a copy of it here.

17             MS. FITZPATRICK:  That's okay.  I'm

18    going to have to take a look at that, though, because --

19    BY MS. FITZPATRICK:

20       Q.   Were there any other errors in this report to

21    documents that were cited in your footnotes that you are

22    aware of sitting here today?

23       A.   I have been told there's at least one

24    additional one.
```

Elaine Duncan

```
 1          Q.   Okay.  Can you tell me which one that is?

 2                    MR. DAVIS:  Go off the record?  I've got

 3    to go to the other room and get my copy of the report.

 4                    MS. FITZPATRICK:  Sure.

 5                    (Whereupon, a recess was taken from

 6                    10:22 a.m. to 10:35 a.m.)

 7                    MR. DAVIS:  Would you like for her to

 8    tell you where the footnote typos are that we've seen?

 9                    MS. FITZPATRICK:  Yes, that would be

10    great.

11                    THE WITNESS:  So on page 11, the

12    ETH.MESH.000 --

13                    MR. DAVIS:  Tell her which --

14                    THE WITNESS:  Oh, I'm sorry, Number 12.

15    BY MS. FITZPATRICK:

16          Q.   Okay.

17          A.   The second footnote that's supposed to be

18    referencing the hernia mesh 510(k) clearance letter --

19                    THE REPORTER:  Referencing the what?

20                    THE WITNESS:  Oh, I'm sorry, I had my

21    hand in front of my mouth.  It's a hernia mesh 510(k)

22    clearance letter, and that Bates number is incorrect.

23    BY MS. FITZPATRICK:

24          Q.   Okay.  Can you give me the correct one?
```

Elaine Duncan

```
1                        MR. DAVIS:  I will get it for you.  I

2    don't have it yet.

3    BY MS. FITZPATRICK:

4         Q.   Okay.

5         A.   And then Footnote Number 16, my handwriting,

6    ETH.MESH should be .10178872.

7         Q.   Hold on, 78872.  So the first 8 should be a 7?

8         A.   The first 8 should be a 7, and then the rest

9    of that Bates number is correct.

10        Q.   Okay.

11        A.   And go to 16, and Number 24.

12                       MR. DAVIS:  No.

13                       THE WITNESS:  No, not that one.  Number

14   26, sorry.  So the ETH.MESH Number 105886748 is the proper

15   number.

16   BY MS. FITZPATRICK:

17        Q.   I'm sorry, 105 --

18        A.   There's too many numbers.  10588.

19        Q.   Uh-huh?

20                       MR. DAVIS:  1058.

21                       THE WITNESS:  10586748.

22   BY MS. FITZPATRICK:

23        Q.   Okay.  So there's 8872 should come out of the

24   middle of that; is that right?
```

Elaine Duncan

```
1          A.   Right, uh-huh.

2          Q.   Okay.

3          A.   And then the end note, end of that would be

4    1056749.  So it's just two pages.

5                    MR. DAVIS:  And then, Fidelma, what

6    happened is the 88 -- the four digits she took out --

7                    MS. FITZPATRICK:  Uh-huh.

8                    MR. DAVIS:  -- the problem was that was

9    supposed to be two separate documents being cited there.

10   So the 8872 got tied in with the 6748.  So it's actually a

11   second document there.

12                   THE WITNESS:  It's the

13   ETH.MESH10588872-8876.

14                   MS. FITZPATRICK:  Okay.

15                   THE WITNESS:  And there's one more.

16                   MR. DAVIS:  That's one you've already

17   got.

18                   THE WITNESS:  That's one we already got.

19                   MS. FITZPATRICK:  Is that it?

20                   MR. DAVIS:  That's all I've seen.

21   BY MS. FITZPATRICK:

22          Q.   And Ms. Duncan, were those errors that you

23   found in your review of the report, or were those errors

24   your attorneys found in review of your report?
```

Elaine Duncan

```
 1            A.   Paul pointed them out to me.

 2            Q.   Okay.  And you don't believe that having typos

 3    in your report compromises the quality of the opinions

 4    that you're offering; correct?

 5            A.   It doesn't alter the quality of the opinions;

 6    it embarrasses me that I didn't catch those.  Sorry.

 7            Q.   Okay.  Now, Ms. Duncan, let me -- you're

 8    currently the president and founder of Paladin Medical;

 9    correct?

10            A.   Yes, ma'am.

11            Q.   And you founded that company in 18 -- sorry --

12    1987?

13            A.   Move to strike.

14            Q.   Fair enough.  We'll strike that one.

15                 You founded that company in 1987; is that

16    right?

17            A.   Yes.

18            Q.   And is it fair to say that your company

19    specializes in regulatory and clinical strategies for

20    medical device companies?

21            A.   We specialize in a number of activities, but

22    clinical compliance, regulatory development, as you see on

23    the website, I offer a number of services.

24            Q.   Okay.  Now, is the CV that you have provided
```

Elaine Duncan

```
1    in your report, is that your most up-to-date CV?

2         A.   Yes, ma'am.

3         Q.   Okay.  And tell me, what did you do to prepare

4    for your deposition today?

5         A.   I got a good night's sleep, and I reviewed the

6    deposition of Anne Wilson, and I reviewed her markup of my

7    report and her markup of her report, and I think that's

8    pretty much it.

9         Q.   Did you meet with anyone yesterday?

10        A.   Yes.

11        Q.   And who did you meet with?

12        A.   Paul and -- and Phil here.

13        Q.   And how long did you meet with them?

14        A.   Probably about four hours.

15        Q.   Okay.  And apart from the four-hour meeting

16   that you had yesterday to prepare for the deposition, did

17   you meet with them at any other time to prepare for the

18   deposition?

19        A.   I think there was a few hours on Sunday

20   afternoon.

21        Q.   Sunday afternoon?

22        A.   Uh-huh.

23        Q.   And who did you meet with then?

24        A.   Paul, Phil and then Chad Hutchinson, and
```

Elaine Duncan

```
1    Stephen Myers.

2            Q.    So is it fair to say you spent about six hours

3    preparing for the deposition?

4            A.    I would say that's about right.

5            Q.    And what I was referring to is just the

6    meetings that you had; correct?

7            A.    The meetings; right.

8            Q.    And in addition to those meetings, about how

9    much time did you spend on your own preparing for the

10   deposition?

11           A.    Oh, probably about the same amount of time in

12   reviewing.

13           Q.    So 10 to 12 hours total?

14           A.    I would say more like 10, yeah.

15           Q.    Okay.  Now, you mentioned -- I want to make

16   sure that I have this right.  You mentioned markups of

17   certain documents; correct?

18           A.    Yes.

19           Q.    And do you have those with you?

20           A.    Yes, they're the markups of -- these are Anne

21   Wilson's, Anne Wilson's copy that she marked up, plus a

22   few pages of my own markup on those same pages, I think,

23   maybe some notes on here, and then her -- my report with

24   her markups.
```

Elaine Duncan

1          Q.   Okay.  And can we go ahead and get what you

2    have there marked as -- separate that out so we have it

3    all.  I think we're on number -- if I can take a look at

4    what you have there.

5          A.   (Handing.)

6          Q.   First is the report of Ms. Wilson; is that

7    right?

8          A.   That's correct.

9          Q.   And it's got a number of notes on it, and it's

10   got some tabs on it.  Let's mark this as Deposition

11   Exhibit Number 4, and if you can take a look at it and

12   tell me whose handwriting is on that document?

13                    (Whereupon, Exhibit 4 was marked.)

14                    THE WITNESS:  So it's Anne's, except

15   there's a page -- the Post-its are mine.  Then this is an

16   extra page 9.  This is my note.

17   BY MS. FITZPATRICK:

18         Q.   So page 9 with the red handwriting on it?

19         A.   Uh-huh, that's mine.

20         Q.   Okay.

21         A.   And page 14 is a duplicate.  This is my

22   handwriting.

23         Q.   Okay.  That's page 14 with black handwriting?

24         A.   And I wrote "ED's copy" up here.

Elaine Duncan

```
 1          Q.   Okay.  Great.  Thank you very much.

 2                    MR. DAVIS:  There's other handwriting on

 3    that page.  Which part is yours?

 4                    THE WITNESS:  Oh, mine?  I'm in the

 5    margin.

 6                    MS. FITZPATRICK:  Okay.

 7                    MR. DAVIS:  Is all the handwriting on

 8    that page your handwriting, everywhere on that page?

 9                    THE WITNESS:  Yes, that's the way I did

10    it, so that this is Anne's markup, and then this is my

11    page with my markups (pointing).

12    BY MS. FITZPATRICK:

13          Q.   Just so the record is clear, there's a page in

14    the upper left-hand corner that says "ED's copy" and has

15    got handwriting on it.

16               That's your handwriting?

17          A.   That's mine.

18          Q.   There's also a second page 14 that has

19    photocopy notes on it.  That's Ms. Wilson's handwriting;

20    correct?

21          A.   That's right.  That's right, because this was

22    an exhibit from her deposition.  And I believe that's the

23    only two pages that are duplicated.  The rest are all

24    Anne's, just to be double-sure.
```

Elaine Duncan

```
1              Also, I flagged this one because it was an

2    exhibit that, when I looked at her original report, I

3    didn't have.

4         Q.   Okay.  Let me -- what you're referring to

5    there is Figure 5, the report exhibit of Ms. Wilson, it

6    doesn't have a page number at the bottom.

7              So we'll mark that as Exhibit Number 4.

8         A.   Okay.

9         Q.   And then Exhibit Number 5 is a copy of your

10   expert report in this, or at least just the text of your

11   expert report without the --

12        A.   Right.

13        Q.   Okay.

14        A.   And then, they're all Anne's notes.

15        Q.   Okay.  And the yellow flags that are on this,

16   those are your yellow flags; correct?

17        A.   That's correct.

18        Q.   All right?

19        A.   And that last page is not a part of the

20   report.

21        Q.   Okay.  Thank you.  So we'll mark that as

22   Exhibit 5.

23              (Whereupon, Exhibit 5 was marked.)

24
```

Elaine Duncan

```
 1   BY MS. FITZPATRICK:

 2        Q.   Then you also have in here a photocopy -- or a

 3   color copy of Ethicon meshes, and it looks like everything

 4   from MERSILENE from 1950 to PHYSIOMESH in 2010.

 5             Did you bring that with you, as well?

 6        A.   Yes.

 7        Q.   Okay.  Can you tell me why you brought that

 8   with you?

 9                    MS. FITZGERALD:  Mark that as Exhibit 6.

10                    (Whereupon, Exhibit 6 was marked.)

11                    THE WITNESS:  It was stuck in the back

12   of the book, and I forgot it was there.

13   BY MS. FITZPATRICK:

14        Q.   Okay.

15        A.   It was in back.

16        Q.   It just happened to be there?

17        A.   Yeah.  It is a document from the reference

18   list.

19        Q.   Okay.  Perfect.  And in addition to that, you

20   have some handwritten notes in front of you.

21             Can you identify for me what those are?

22        A.   They're some notes I took.  The yellow paper

23   is kind of a first attempt at a timeline.

24        Q.   Okay.  And those are your handwritten notes?
```

Elaine Duncan

```
 1          A.   That's right.

 2          Q.   Okay.  So it looks like here -- is it only

 3   your handwritten notes?

 4          A.   Yes, I write rather differently with different

 5   pens.

 6          Q.   Okay.

 7          A.   So I was attempting to create a timeline as I

 8   was looking at the original documents.

 9          Q.   Okay.

10          A.   And you see I drew a line there as to where I

11   was going to stop.  When I started looking at all the

12   documents, I was looking at everything, just opening them

13   up at random, and when I would find a document, I would

14   try to pin the tail on the donkey; where did it belong in

15   the time frame.

16          Q.   Okay.  So this is your first attempt to do

17   that?

18          A.   Right.

19          Q.   Okay.  We'll mark this as Exhibit 7.

20               (Whereupon, Exhibit 7 was marked.)

21   BY MS. FITZPATRICK:

22          Q.   And you have another handwritten --

23          A.   Yes, just some notes I wanted to have handy to

24   remind myself about certain things that I found.
```

Elaine Duncan

```
1           Q.   Okay.  And let's go ahead and mark that as

2   Deposition Exhibit Number 8.

3                (Whereupon, Exhibit 8 was marked.)

4   BY MS. FITZPATRICK:

5           Q.   And what else did you bring with you?

6           A.   I have a copy of the AUGS statement.

7           Q.   Let's go ahead -- now, parts of this are

8   highlighted and underlined.

9                Are those your highlights and underlining?

10          A.   Yes, ma'am.

11          Q.   Okay.  Let's go ahead and mark this as

12  Deposition Exhibit Number 9.

13                (Whereupon, Exhibit 9 was marked.)

14  BY MS. FITZPATRICK:

15          Q.   Now, I think, when we started today, you said

16  you haven't done a deposition, probably, since the late

17  1980s; is that correct?

18          A.   That's correct.

19          Q.   And what kind of case was that?

20          A.   I was deposed for the 3M breast implants.

21          Q.   And were you testifying on behalf of the

22  manufacturer of the breast implants?

23          A.   I was a former employee of 3M, and they -- the

24  plaintiffs had subpoenaed me.
```

Elaine Duncan

```
 1          Q.   Okay.  So that wasn't in connection with any

 2   expert services that you had --

 3          A.   No, I was just subpoenaed as a previous

 4   employee.

 5          Q.   Okay.  And have you been deposed as an expert

 6   witness in any litigation before?

 7          A.   No, this is my first time.

 8          Q.   So then, obviously, you haven't testified at

 9   trial; correct?

10          A.   No.

11          Q.   Have you prepared any other expert reports in

12   connection with other litigation?

13          A.   No.

14          Q.   So this is the first time, your -- your trial

15   run at the expert?

16          A.   Yes, ma'am.

17          Q.   And you were familiar with pelvic mesh prior

18   to being retained by Ethicon in connection with this;

19   correct?

20          A.   Somewhat familiar, yes.

21          Q.   And you had worked for Proxy Biomedical;

22   correct?

23          A.   Proxy Biomedical, yes.

24          Q.   And you're also familiar with the
```

Elaine Duncan

```
 1   Boston Scientific pelvic mesh products; correct?

 2        A.   Yes, to some extent.  Yes.

 3        Q.   Were you -- we're going to talk about that in

 4   a minute, but were you familiar at all with any of the

 5   Ethicon products, pelvic mesh products, prior to being

 6   retained in this litigation?

 7        A.   None of the pelvic mesh, no.

 8        Q.   Had you worked at all, with PROLENE mesh prior

 9   to being retained in this litigation?

10        A.   I had not worked with it.  I had referenced it

11   in 510Ks.

12        Q.   And what 510Ks did you reference that in?

13        A.   As I'm trying to recall, they would have been

14   hernia mesh 510(k)s and probably the Proxy Biomedical

15   510(k).

16        Q.   Okay.  But apart from that, you've never

17   worked with Ethicon PROLENE in connection with any kind of

18   pelvic mesh product before; correct?

19        A.   No, I worked on an instrument that was a

20   design project for pelvic mesh deployment, but it was an

21   independent physician idea, and we weren't specific on any

22   particular mesh.  It was just trying to develop a better

23   tool, and that's the closest I've come to anything with

24   respect to pelvic mesh.
```

Elaine Duncan

```
 1          Q.   When was that?

 2          A.   Probably three years ago.

 3          Q.   Okay.  And what physician were you working

 4     with in connection with that?

 5          A.   I can't even recall.  I was retained by the

 6     development company.

 7          Q.   And what was your involvement with that

 8     device?

 9          A.   The development company had asked me to help

10     them assess the regulatory strategy and the requirements

11     for testing that would be required to get the instrument

12     cleared through a 510(k).

13          Q.   And can you describe to me what that

14     instrument was?

15          A.   It was a minimally-invasive deployment tool,

16     and actually, the design would be confidential, so I

17     couldn't go much further than that, anyway.

18          Q.   Was it used for a stress urinary incontinence

19     polypropylene sling?

20          A.   It wasn't specific to that.  It could

21     have used any mesh.

22          Q.   Okay.  Was it specific to stress urinary

23     incontinence as opposed to pelvic organ prolapse?

24          A.   As I recall, it was pelvic organ prolapse.
```

Elaine Duncan

```
1          Q.    Okay.  And do you remember whether it was

2    pelvic organ prolapse, either in the anterior compartment

3    or the posterior compartment?

4          A.    No, I don't.  I don't have -- I only saw

5    videotapes of the device in a cadaver study, so I couldn't

6    be very specific with it.

7          Q.    Do you know if that product ever came to

8    market?

9          A.    I believe it did not.

10         Q.    Do you know why it didn't come to market?

11         A.    I think that the atmosphere had changed.

12         Q.    Concerning pelvic organ prolapse mesh devices?

13         A.    The physician just decided not to pursue it.

14   That's all I was told.

15         Q.    Okay.  Now, are you aware that there are 37

16   different plaintiffs involved in this current case that

17   you've offered your expert opinion in?

18         A.    I can read the names on the front.

19         Q.    Okay.

20         A.    That's my level of awareness.

21         Q.    Okay.  And I think that we discussed

22   earlier -- make sure I'm correct -- that you know that

23   they have a TVT retropubic device but were not aware

24   whether it was mechanical cut or laser cut prior to the
```

Elaine Duncan

1    deposition today; correct?

2           A.   I'm not aware of what they knew or did not

3    know.

4           Q.   I'm asking you whether you knew?

5           A.   I -- ask me the question again.  I'm sorry,

6    there was too many "knews."

7           Q.   And I think I asked you this earlier, but

8    prior to coming to the deposition today, you were not

9    aware that all of these women had TVT retropubic

10   mechanically-cut devices; correct?

11          A.   I had not gotten into that discussion at all.

12   I didn't know anything about the plaintiffs, and it wasn't

13   an issue for me to do my job.

14          Q.   Okay.  And you didn't distinguish between the

15   mechanically-cut TVT-R and the laser-cut TVT-R for

16   purposes of the report that you generated today; correct?

17          A.   No, I did.

18                   MR. DAVIS:  Wait a second.  Object to

19   the form of the question.

20                   THE WITNESS:  Yeah, I did distinguish.

21   BY MS. FITZPATRICK:

22          Q.   Okay.  So you recognize that those are

23   separate products; correct?

24          A.   They have the mesh in common and they have

Elaine Duncan

1   different manufacturing processes.

2         Q.   Okay.   So they're related but separate

3   products; would that be fair?

4         A.   They're related and separate products.

5         Q.   Okay.   And --

6         A.   And again, the only reason I considered any of

7   these was because Ms. Wilson had already, in her report,

8   started talking about the laser device, so I had to

9   incorporate my review, as well.

10        Q.   Okay.   Fair enough.   And you know that, from

11   reviewing Ms. Wilson's report, that she drew a distinction

12   between the TVT-R laser cut and the TVT-R mechanical cut;

13   correct?

14        A.   I believe she did, in some places, yes.

15        Q.   Okay.   Now, this isn't the first time that

16   you've been hired by a medical device company; correct?

17        A.   Certainly not.

18        Q.   How many medical device companies have you

19   worked for before?

20        A.   I tried to count them, and I went back

21   about 300, and my records were too old to pull up.

22        Q.   And of those hundreds of medical device

23   companies that you've worked for, how many projects

24   involved a permanently-implantable medical device?

Elaine Duncan

```
1            A.   Let me see my CV for a second.  It's hard to

2    recall.  In my CV, in the "Profiles of Success" in the

3    back.

4            Q.   Okay.  And that would be pages 12 and 13?

5            A.   Yes.

6            Q.   Okay.

7            A.   Of the CV, yes.  So this is a list that I --

8    it essentially represents what's on my website, and it

9    may be a little more current than what's on my website,

10   but this is the list of devices for which I give notice,

11   if you will, to potential clients that I have worked on

12   these devices.  The vast majority of them, I suppose, are

13   implantable.

14           Q.   Okay.  So if I looked at pages 12 and 13, I

15   can take a look at what your involvement with permanently-

16   implanted medical devices is; is that right?

17                     MR. DAVIS:  Object to the form.

18                     THE WITNESS:  My involvement, it doesn't

19   describe my involvement.  It describes the devices and

20   types that I've worked with.

21   BY MS. FITZPATRICK:

22           Q.   Fair enough.

23           A.   But it doesn't go into detail.

24           Q.   Fair enough.  But this will identify what
```

Elaine Duncan

```
 1   those devices are?

 2        A.   Yeah.

 3        Q.   Okay.  How many employees does your company

 4   have?

 5        A.   It varies, but right now, we have four.

 6        Q.   And how does it vary?  Can you give me the low

 7   to high in the last 10 years?  Let's not go back all the

 8   way to 1987.

 9        A.   I typically hold it down to about six is the

10   maximum.

11        Q.   And it's fair to say that the vast majority,

12   if not all of the work that you do and the income you

13   derive comes from work with medical device companies;

14   correct?

15        A.   I work with some universities.

16        Q.   And how much of your work is involved with

17   universities, just a general ballpark percentage?

18        A.   Probably university development projects or

19   university consulting would probably be 15, 20 percent,

20   maybe.

21        Q.   And so the remaining 80 to 85 percent of your

22   business involves work with medical device companies;

23   correct?

24        A.   Let me clarify, too, that sometimes the
```

Elaine Duncan

```
 1   companies aren't companies yet.

 2        Q.   Okay.

 3        A.   They're -- they may be physicians or inventors

 4   that haven't formed a company.

 5        Q.   Okay.

 6        A.   And that might be another 5 percent.

 7        Q.   Okay.  And when you're working with these

 8   physicians who are not quite companies yet, that

 9   involves the -- that involves medical devices; correct?

10        A.   Yes.

11        Q.   And in fact, you have on your website that

12   your company is dedicated to the service of medical device

13   manufacturers.

14             That would be accurate; isn't it?

15        A.   Yes, and want-to-be manufacturers.

16        Q.   And want-to-be -- okay, I like that phrase.

17   Want-to-be manufacturers and actual manufacturers; is that

18   right?

19        A.   That's correct.

20        Q.   And in fact, your company's business really

21   depends on current future business from want-to-be

22   manufacturers and actual manufacturers; correct?

23        A.   That's correct.

24        Q.   That's required for your continued financial
```

Elaine Duncan

1   success.

2            But what percentage of your annual revenue

3   comes from your work with medical device companies or

4   want-to-be medical device companies?

5       A.   I guess the best way to say it is I receive no

6   royalties from patents or anything else, so this would

7   be -- this is the way I earn a living, is by consulting.

8       Q.   Okay.  And that living that you earn or those

9   revenues that you bring in, are about 80 to 85 percent of

10  those attributable to your work with actual medical device

11  companies or want-to-be medical device companies?

12      A.   That's correct.

13      Q.   And you don't make a distinction between how

14  much you charge a medical device manufacturer and how much

15  you charge a university?

16      A.   I probably charge the universities too little

17  for my effort.

18      Q.   Okay.  Is there a difference in what you're

19  charging universities versus what you charge the medical

20  device manufacturers?

21      A.   Well, certainly.  In some aspects of my work,

22  I would say that I offer the services in anticipation

23  of their grant success, so I may consult with them before

24  they even have grant money.

Elaine Duncan

1        Q.    Uh-huh.

2        A.    And sometimes it's a student's work, and

3    sometimes it's training, I'll go to universities and give

4    training so that, in those cases, they'll give me an

5    honorarium.

6                    THE REPORTER:  They'll give you a what?

7                    THE WITNESS:  Honorarium, sorry.  And it

8    typically covers just a portion of the expenses, so it

9    varies, you know, little -- it's not a significant way to

10   make a living.  It varies.  Sometimes it's good work in

11   terms of ongoing, and sometimes it's sporadic.

12   BY MS. FITZPATRICK:

13       Q.    And what percentage of your personal income is

14   derived from Paladin Medical Incorporated?

15       A.    Except from what I inherited from my mother, I

16   would say 100 percent.

17       Q.    So do you advertise your services to medical

18   device companies?

19       A.    I have taken advertisements in different

20   magazines, and I certainly have a website and a corporate

21   Facebook page, but the majority of the time beyond that, I

22   don't advertise.

23       Q.    Okay.  And how did Ethicon, if you know, come

24   to find you to retain you as an expert in this litigation?

Elaine Duncan

```
 1            A.   Through I guess one or more associates.  I

 2    never really inquired.

 3            Q.   And who first contacted you from Ethicon?

 4            A.   Well, actually, it was from Butler & Snow,

 5    Stephen Myers contacted me first.

 6            Q.   Okay.  So you were first contacted by a law

 7    firm that represented Ethicon; is that right?

 8            A.   Oh, yes.  I didn't solicit the work.

 9            Q.   Okay.  And when did Mr. Myers contact you?

10            A.   I'm not exactly sure of the date, but I

11    believe it was approximately July 15th.

12            Q.   So mid-July of this year.

13                 And you've been paid for your work in this

14    case; is that right?

15            A.   So far.

16            Q.   Okay.  And is Butler Snow paying those

17    expenses and those fees for you?

18            A.   I send the invoices to them and they send them

19    on to J&J.

20            Q.   Okay.  And how much money have you been paid

21    for your work in this case?

22            A.   I'm -- I'm going to recall.  I think it's

23    around $59,000.  I haven't looked at it beyond that.

24            Q.   And is that payable to you directly or is that
```

Elaine Duncan

1    payable to your company?

2         A.   No, it's to the corporation, and some of that

3    includes some travel expense.

4         Q.   Okay.  And how much do you charge per hour for

5    your expert services?

6         A.   I have to look what I am charging here.  $250

7    per hour for time spent not involving travel, and then

8    $325 per hour for time spent that includes travel or

9    deposition or trial testimony.

10        Q.   And how does that compare to the amount of

11   money that you charge medical device manufacturers who

12   come and just hire your company for non-expert litigation?

13        A.   It's in the same range, but it is a bit higher

14   for the deposition and trial testimony than average, but

15   it's within the same range.

16        Q.   Now, what is LifeScience Alley?

17             THE REPORTER:  What?

18             THE WITNESS:  LifeScience, one word,

19   Alley.  It is an organization here in the Twin Cities.  I

20   believe it's a non-profit, and it has been characterized

21   as a Chamber of Commerce for medical technology.

22   BY MS. FITZPATRICK:

23        Q.   And your business is a member of that

24   organization; is that right?

Elaine Duncan

```
 1            A.   I believe, in this case right now, I'm an

 2    individual member.  I can't recall which, whether it's

 3    corporate level or individual.

 4            Q.   Okay.  And is American Medical Systems also

 5    a member of that organization, to your knowledge?

 6            A.   I couldn't tell you.  I don't -- I haven't

 7    kept up with who is or isn't.

 8            Q.   Do you know whether Boston Scientific

 9    Corporation is a member of that?

10            A.   I couldn't tell you.

11            Q.   Coloplast Corporation; do you know whether

12    they're a member?

13            A.   They may or may not be.  I don't know.

14            Q.   Do you know whether Johnson & Johnson or

15    Ethicon is a member of that organization?

16            A.   I would tend to doubt it.  We're sort of a

17    local organization.

18            Q.   And you've actually done -- actually,

19    LifeScience Alley is a successor to a different

20    organization called Medical Alley; correct?

21            A.   It's a successor, yes, ma'am.

22            Q.   Okay.  And you've done a number of

23    presentations at Medical Alley conferences; haven't you?

24            A.   And LifeScience Alley.
```

Elaine Duncan

```
 1          Q.   And you know that medical device companies,
 2    including mesh manufacturers, attend these conferences;
 3    right?
 4          A.   I'm not -- typically, I'm not aware of who's
 5    in the audience when I give a presentation.  I couldn't
 6    tell you who's there.
 7          Q.   Do you recall ever giving a presentation
 8    alongside an employee for American Medical Systems?
 9          A.   I may have.  Again, when we get into the
10    LifeScience Alley training sessions, we tend to leave our
11    company badges at the door.
12          Q.   So you don't remember if you've ever given a
13    presentation on anything to do with mesh or pelvic mesh at
14    LifeScience Alley or Medical Alley conference?
15          A.   I'd have to check my CV.  I can't recall off
16    the top of my head.
17          Q.   Now, we talked a little bit earlier about your
18    involvement with Proxy Biomedical.
19               Are you still the United States agent for
20    Proxy Biomedical?
21          A.   Yes, I am.  They're a U.S. agent.
22          Q.   Okay.  And what work do you do specifically
23    for Proxy?
24          A.   I had filed some of their 510(k) submissions,
```

Elaine Duncan

1    and I acted as the liaison when FDA issued the 522 order

2    for their particular 510(k), and as U.S. agent, I'm

3    notified when FDA does an inspection, but I'm typically

4    not involved in their inspections.  I don't have to travel

5    there.

6          Q.   You said you filed 510(k) submissions.  What

7    products made by Proxy have you filed 510(k) submissions

8    for?

9          A.   I'd actually have to refresh my memory, but

10   they've been mesh products with a rather general

11   indication for use.

12         Q.   Okay.  And does the Polyform mesh ring a bell

13   with you?

14         A.   That's one of them, yes.

15         Q.   How about the Polyform Lite mesh; does that

16   ring a bell with you?

17         A.   I can't recall off the top of my head, but it

18   sounds familiar.  I'm not sure.  Some of their people also

19   have filed 510Ks.

20         Q.   Okay.  And when you're talking about the 522

21   orders, can you tell me specifically what product you're

22   referring to there?

23         A.   I can't remember the 510(k) number.  I'd have

24   to look that up for you.

Elaine Duncan

```
 1          Q.   Would it be for the Polyform mesh?

 2          A.   As I recall, Polyform changed the 510(k)

 3    indication for use.

 4          Q.   Okay.

 5          A.   So that's what we did; we modified the 510(k)

 6    indication for use page in order to respond to the 522.

 7    That much I can recall.

 8          Q.   Okay.

 9          A.   I don't recall the number.

10          Q.   And you'll recall -- or am I correct that the

11    original 510(k) indication for use with the Polyform

12    included a vaginal usage for the product?

13          A.   I believe at the time we filed that we were

14    trying to be as broad in our indication for use as we

15    could, and that's what was modified by the 522 order.  We

16    took that out.

17          Q.   Okay.  And what we're talking about here when

18    we're talking about meshes, we're talking about,

19    basically, sheets of surgical mesh or patches?

20          A.   They were always flat products.

21               THE REPORTER:  They were what?

22               THE WITNESS:  Flat.

23    BY MS. FITZPATRICK:

24          Q.   And have you been involved in any of the
```

Elaine Duncan

1    510(k) submissions for Boston Scientific where they used

2    the Polyform mesh and made it into pelvic organ prolapse

3    or stress urinary incontinence devices?

4         A.   It's been many years, so I'm a little bit

5    vague.  I did not refresh my memory on that.  But as I

6    recall, after one of the earliest 510(k)s, I assisted in

7    getting a separate 510(k), and I can't recall if it was

8    in -- I don't recall if Boston Scientific had their name

9    on the 510(k) or if we were making it for their use, but

10   somehow they were involved, and that's all I can recall.

11   I could get more information for you if you need it.  I

12   just don't recall.

13        Q.   Well, are you aware that Proxy Biomedical

14   makes the Polyform mesh for use by Boston Scientific in

15   stress urinary incontinence products?

16        A.   I -- I was aware of that.  I don't know if

17   they continue to do that.  After I got the 522 order

18   satisfied, I haven't talked to them about it since.

19        Q.   Okay.  And when was that?

20        A.   I can't recall.

21        Q.   Give me a ballpark.  Within the last year,

22   three years, five years?

23        A.   It would have been somewhere, I think, after

24   2012 and -- 2012 to 2013, in that time frame.  When FDA

Elaine Duncan

1    had called the 522 order, they held a meeting with

2    manufacturers, and I attended that meeting so I could help

3    Proxy understand what they needed to do.

4         Q.   Okay.  And have you been involved in any of

5    the 522 studies for Boston Scientific for products that

6    use the Polyform mesh?

7         A.   No, after I assisted Proxy with changing the

8    510(k) indication for use statement, I was no longer

9    involved in those meetings, and I was not involved in any

10   of the -- I listened in on some of the early planning for

11   the registries, and Proxy made the decision to change that

12   indication for use statement.  I did that filing with

13   their quality assurance person, and then that was the end

14   of the responsibility for that product.

15        Q.   Okay.  Are you aware whether Proxy Biomedical

16   continues to sell the Polyform mesh for use in pelvic

17   organ prolapse or stress urinary incontinence devices?

18        A.   Proxy does not sell directly, to my knowledge.

19   Let me clarify that.

20             After the 522 order and the change to the

21   indication for use, their sales were limited to that

22   indication for use.  So I don't have any involvement

23   with any other activities they may have with selling

24   their meshes as a component.  I don't get involved in

Elaine Duncan

```
 1   that aspect.  I only filed their submissions with

 2   them.

 3        Q.   Okay.  So let me make sure that I'm

 4   understanding this.

 5             Polyform mesh is made by Proxy; correct?

 6        A.   Yes.

 7        Q.   And that Polyform mesh can be sold directly to

 8   physicians for use as a surgical mesh; correct?

 9        A.   I believe they have a limited distribution.

10        Q.   Okay.  And at one point, Proxy attempted to

11   include a vaginal or pelvic use as an indication for use

12   of its Polyform mesh; correct?

13        A.   It's not stated correctly.  I have to correct

14   you on that.

15        Q.   Sure.  Please do.

16        A.   You said "at one time."  The original 510(k)

17   included the vaginal indication.

18        Q.   Uh-huh.

19        A.   And I am not sure it said "vaginal."  I can't

20   recall the exact wording.  I think it was -- I know it was

21   reinforcement, and it may have been urological.  I can't

22   remember exact words.  So at any rate, when we had to

23   modify the indication for use --

24        Q.   Okay.
```

Elaine Duncan

1        A.   -- we had to refi -- we had to file like a

2    special 510(k) to change that indication for use.

3        Q.   Okay.

4        A.   And after they did that, then I haven't had

5    any more activity with them.

6        Q.   Okay.  Let me make sure that I've got the

7    timeline right here.

8             Polyform mesh and Polyform Lite originally had

9    an indication for the pelvic use -- I'll call it pelvic

10   use.

11       A.   Something, yes.  That's good.

12       Q.   And then the FDA issued a 522 letter

13   concerning the use of the Polyform or Polyform Lite in the

14   pelvic cavity; correct?

15       A.   Not specifically.  They issued the 522 order

16   for all companies.  It wasn't specific to Polyform, but

17   they were included in that order.

18       Q.   Okay.  So Polyform was required to -- in order

19   to continue to sell Polyform for pelvic use --

20       A.   Yes.

21       Q.   -- Proxy was going to be required to abide by

22   the materials of the 522 letter; correct?

23       A.   FDA originally gave companies an opt-in or

24   opt-out.

Elaine Duncan

```
1              Q.   Okay.  And instead of doing the 522 studies

2    for pelvic use --

3              A.   For their product, under their 510(k).

4              Q.   Under their 510 -- I'm just talking about --

5    again, talking about the sheet, the surgical mesh.

6              A.   The flat sheet.

7              Q.   Instead of complying with the 522 for pelvic

8    use, Proxy changed its indications for use to abdominal

9    use only; is that right?

10             A.   We changed the indication for use, and I can't

11   say abdominal only.  That's a little more specific than

12   I --

13             Q.   Okay.  To remove the pelvic use; is that

14   correct?

15             A.   That's correct.  And my understanding was

16   their 510(k) and their products, as they were selling them

17   directly, that was then consistent with what their meshes

18   were actually used for because they weren't really

19   promoting or using them in pelvic because they were flat

20   sheets, and other products were more direct to pelvic

21   applications.

22             Q.   Okay.  So with that change, the Polyform was

23   then marketed as surgical mesh without a pelvic

24   application; is that right?
```

Elaine Duncan

1        A.   Again, I have to now limit this because I

2   can only say that I helped get the 510(k) indication for

3   use changed, and at that point, they were no longer under

4   the 522 order for that product, and I have no idea what

5   they do or don't do with any of the other companies.   I

6   don't -- I'm not involved in that aspect.

7        Q.   Okay.   So that was going to be my next

8   question, but maybe you've answered this already.

9             After Proxy removed the pelvic use, do you

10  know whether Proxy continued to sell that Polyform to

11  Boston Scientific for use in pelvic organ prolapse or

12  stress urinary incontinence devices?

13       A.   No, I was comparted is the best way to say it.

14  I've worked only for their direct sales of 510(k)s.

15       Q.   Okay.   So your experience deals with the sheet

16  surgical mesh; it does not deal with the actual kits and

17  products made by Boston Scientific with that --

18       A.   That's correct.

19       Q.   -- Proxy mesh?

20       A.   That's correct.

21                 MR. DAVIS:  Let me just stop you for a

22  second.

23                 THE WITNESS:  Yeah.

24                 MR. DAVIS:  And make sure she gets her

Elaine Duncan

1    full question out --

2                    THE WITNESS:  Okay.

3                    MR. DAVIS:  -- before you start

4    answering.  It would be better for the court reporter.

5                    THE WITNESS:  Oh, I'm sorry.  Thank you.

6    BY MS. FITZPATRICK:

7        Q.    And in connection with your work for Proxy,

8    you were familiar with the material safety data sheet for

9    Marlex polypropylene used by Proxy in both the Polyform

10   mesh and the Polyform Lite; correct?

11       A.    Ma'am, I'm getting exceedingly uncomfortable

12   for you going further with the Proxy activities.  First

13   off, they were confidential with my client.  I've told you

14   things that are on public record, but I can't go any

15   further down the Proxy line.  I don't believe it's within

16   the scope of my testimony, and I really have to tell you,

17   you're beginning to get into some confidential activities,

18   because the contents of submissions are confidential, and

19   if you want to go down that line, you're going to have to

20   get back to the questions that are pertinent.

21              If you've got questions that are -- like this

22   that are pertinent to what I've done, I'm happy to answer

23   them, but when you start to cross into Proxy's

24   confidential business, I'm not at liberty to continue to

Elaine Duncan

```
 1    answer.  I've answered everything in the public domain.

 2         Q.   Okay.  And you understand that the material

 3    safety data sheet for the Marlex polypropylene used by

 4    Proxy and Boston Scientific as SUI and POP products is

 5    public information; correct?

 6         A.   Yes, I guess the MSDS sheet is public

 7    information.

 8         Q.   And you know that's been the subject of

 9    litigation with Boston Scientific for its pelvic organ

10    prolapse --

11         A.   Ma'am, I did not know that, and I --

12              THE REPORTER:  Pardon?  You're talking

13    over each other.

14              MR. DAVIS:  Try to wait a minute before

15    you start answering.

16              THE WITNESS:  Okay.

17    BY MS. FITZPATRICK:

18         Q.   And you know that MSDS sheet for the Marlex

19    polypropylene has been the subject of litigation with

20    Boston Scientific for its pelvic organ prolapse and SUI

21    devices; correct?

22         A.   No, I did not know that.

23         Q.   And do you know that that has -- okay.

24              Are you -- were you aware that Polyform is
```

Elaine Duncan

1    made with the Marlex HGX-030 polypropylene?

2           A.   I'm, again, going to tell you that I can't

3    answer anything further about Proxy.  That is confidential

4    information.  I'm going to stop you right here.

5           Q.   I'm sorry, what is confidential about the

6    question that I just asked you so I can, maybe, skin this

7    cat a different way?

8           A.   Because you're getting into information that I

9    know or may not know based on my work with that client,

10   which is still under confidentiality, and I refuse to

11   answer any further questions about Proxy business that is

12   confidential.  It is outside the scope of my work in this

13   case.

14          Q.   So you're not relying on any of the work that

15   you've done with Proxy in connection with surgical mesh or

16   polypropylene mesh as part of your experiences underlying

17   your report in this case; is that right?

18                    MR. DAVIS:  Object to the form.

19                    THE WITNESS:  I disagree with the way

20   you've characterized that statement.

21   BY MS. FITZPATRICK:

22          Q.   Okay.

23          A.   What I can tell you is my background with mesh

24   materials of a wide variety are incorporated into my

Elaine Duncan

1   experience that I brought to this project.  But when you

2   ask me specific questions that are germane only to the

3   confidential work I do with Proxy, I have to stop you

4   right there because of my confidentiality agreement with

5   Proxy, and I think that should be very clear.

6              MR. DAVIS:  In a minute, let's take a

7   break, but if you can finish this.

8   BY MS. FITZPATRICK:

9        Q.   Okay.  I mean, it's as simple as this.

10             If you're relying on that experience for what

11  you've done for Ethicon, I get to ask you about that

12  experience, and I'm not trying to get into --

13       A.   And that's fine, I agree with that.

14             MR. DAVIS:  Let me object that, you

15  know, for the record.

16             MS. FITZPATRICK:  I didn't finish the

17  question yet.  I didn't get it out.

18             MR. DAVIS:  No, you made a statement

19  that if she's relying on past experience, you get to

20  ask her all the questions about it.  No, she doesn't --

21  she's not required to violate confidentiality obligations.

22             MS. FITZPATRICK:  You can't have

23  it both ways.  You can't say she's an expert in

24  polypropylene mesh but you can't ask her about how she

Elaine Duncan

1    gained that expertise and what she did.  You just can't

2    have it both ways.  So it's one or the other.  And I'll

3    live with what that is, but you got to tell me what it is.

4                    MR. DAVIS:  She's not here for materials

5    expertise in this case.

6                    MR. WALLACE:  Here's the other thing.

7                    MR. DAVIS:  She's here as an expert in

8    this case for polypropylene mesh.

9                    MR. WALLACE:  She's being asked

10   nonconfidential questions, and perhaps you can take her

11   out in the hall and remind her of that, because you guys

12   know as well as we do that the questions that have been

13   asked are nonconfidential, so I'd rather not have to call

14   the Judge.

15                   MR. DAVIS:  We can go off the record.

16                   THE WITNESS:  Can I --

17                   MR. COMBS:  Stop, we're going to go out

18   and talk.  I don't agree with any of the statements you've

19   made about that, but we'll talk for a second.

20                   MS. FITZPATRICK:  That's not too

21   shocking.  We've rarely agreed, but that's all right.  We

22   usually find a solution.

23                   MR. COMBS:  -- we'll get someone on the

24   phone to work through this.  That's fine with us.

Elaine Duncan

1                    (Whereupon, a recess was taken from

2                    11:24 a.m. to 11:36 a.m.)

3                    MR. DAVIS:  Let me see if I can try to

4    take a stab at clearing something up on the question.

5                    MS. FITZPATRICK:  Awesome.

6                    MR. DAVIS:  I can represent to you that

7    she is not going to be relying on work for Proxy for -- at

8    some specific reference that she intends to testify about.

9    She -- her only reliance on Proxy is simply part of her

10   general background and experience of understanding and

11   working with all the various standards and regulations,

12   but she intends to offer no testimony at all about --

13   about Proxy or any of her specific work with Proxy.

14                    MS. FITZPATRICK:  Okay.  I --

15                    MR. DAVIS:  And let me give you one more

16   example.

17                    Your question, as I understand it, that

18   started all this was a question, "Are you aware of such

19   and such about Proxy?"  And I can't remember what the

20   detail was, but in Ms. Duncan's mind, whether or not she

21   is aware of what it was you're asking her about, that, in

22   and of itself, is confidential, whether or not she's aware

23   of it.  And so, you know, that's what -- and again, she --

24   you know, she is not going to be relying on anything

Elaine Duncan

1   specific about her work with Proxy, you know, in her

2   testimony.  I can represent that.

3                  MS. FITZPATRICK:  Why don't we do this?

4   I don't want to belabor this point.  I don't want to waste

5   our time having a fight about this.  Let me ask my

6   questions.  If she won't answer because of

7   confidentiality, let's just put it on the record.

8                  MR. DAVIS:  That's fair.

9                  MS. FITZGERALD:  When we get to the end

10  of it, let me figure out whether I need to deal with it

11  further or not.

12                 MR. DAVIS:  Fair enough.

13                 MS. FITZPATRICK:  But let's just deal

14  with that way and we'll get through.

15                 MR. DAVIS:  That's a good solution.

16  BY MS. FITZPATRICK:

17      Q.   Ms. Duncan, in your work with surgical meshes,

18  you have worked with material safety data sheets; correct?

19      A.   That's correct.

20      Q.   And in your work with surgical meshes, you

21  have looked at the material safety data sheets as

22  important pieces of information and understanding the

23  material that the surgical mesh is made of; correct?

24      A.   It's a part of it, yes.

Elaine Duncan

```
 1            Q.    But it's an important part of it; correct?

 2            A.    They are of limited value these days.  The

 3    MSDS sheets have limited value.

 4            Q.    Okay.  But you'll agree with me that it

 5    certainly is something that contains information relative

 6    to the material that's being used in the medical device;

 7    correct?

 8            A.    It's a contributing factor, yes.

 9            Q.    Okay.  And you are aware that the MSDS sheet

10    for Marlex HGX-090 contains a medical application caution;

11    correct?

12            A.    I am not at liberty to say.

13            Q.    Do you believe that a medical -- well, and are

14    you citing confidentiality for that?

15            A.    Yes.

16            Q.    Okay.  And are you aware that the MSDS

17    sheet -- let me do this separate and apart from -- let's

18    mark this as the next exhibit.

19                        (Whereupon, Exhibit 10 was marked.)

20    BY MS. FITZPATRICK:

21            Q.    I've put in front of you a material safety

22    data sheet from Phillips Sumika concerning Marlex

23    polypropylene, all grades; correct?

24            A.    Yes, that's what it says.
```

Elaine Duncan

1          Q.   And this material safety data sheet, on page 1

2     at the bottom, has a medical application caution on it;

3     correct?

4          A.   It does.

5          Q.   Okay.  And it says to not -- it says, "Do not

6     use this Chevron Phillips Chemical Company LP material in

7     medical applications involving permanent implantation in

8     the human body or permanent contact with internal body

9     fluids or tissues"; correct?

10         A.   This is what the document says.

11         Q.   Okay.  And you will agree with me that

12    material safety data sheets concerning whatever brands of

13    polypropylene are being used by a medical device

14    manufacturer are something that should be considered and

15    looked at when doing a hazard and risk assessment;

16    correct?

17                    MR. DAVIS:  Objection to form.

18                    THE WITNESS:  That question was

19    convoluted.  I -- I'm going to have to have you repeat it.

20                    (Discussion off the record.)

21    BY MS. FITZPATRICK:

22         Q.   You'll agree with me that the material safety

23    data sheets concerning the polypropylene being used in the

24    medical device are something that should be considered by

Elaine Duncan

```
1    the manufacturer when doing a hazard assessment and risk

2    assessment; correct?

3         A.   It's a portion of it.

4         Q.   And --

5         A.   As I said, they're of limited value these

6    days.

7         Q.   And material safety data sheets can provide

8    information to a manufacturer on how that particular

9    material may interact with the human body; correct?

10        A.   It has limited information for that.

11        Q.   But relevant information, albeit you consider

12   it limited; right?

13        A.   We certainly review it, but it -- it's limited

14   because of its focus to occupational exposure.

15        Q.   Well, certainly something that says "Don't use

16   it for permanent implantation in the human body" has

17   nothing to do with an occupational exposure; correct?

18        A.   Well, you've pointed that sentence out

19   previously.  That's -- that would be something you would

20   want to pay attention to, yes.

21        Q.   Okay.  And my question is to you, that

22   certainly doesn't -- that's not involved with an

23   occupational exposure; correct?

24        A.   It's a caution, but what I know is, not
```

Elaine Duncan

```
 1   uncommon, is that companies can put statements like this

 2   in documents like this and then make separate deals with

 3   different companies to allow them to go on and use the

 4   material in ways that they have stated in the material

 5   safety data sheet that they would prefer that they not

 6   be used for, and it's called product licensing, and

 7   that happens from time to time.

 8              So just because I see something like this on a

 9   material safety data sheet does not mean that I

10   immediately believe that it is never to be used in a

11   medical device.  It may or may not be used in a medical

12   device, despite this caution.

13        Q.   Do you know whether there's any -- I think you

14   called it private licensing -- done between Phillips

15   Sumika for their Marlex polypropylene and any medical

16   device manufacturer who makes polypropylene --

17        A.   I have no specific knowledge in that regard.

18        Q.   -- polypropylene surgical mesh?

19        A.   I'm sorry, when you drop your voice, I think

20   you're finished.

21        Q.   Okay.

22        A.   So speak to my face and I won't do that

23   again.

24        Q.   Okay.  So don't complain later if I'm in your
```

Elaine Duncan

```
1    face.

2            A.   All right.  Fair enough.

3                 Okay.  So no, I do not -- I have no knowledge

4    of any special agreements that Marlex might have that

5    would be proprietary information.

6            Q.   Okay.  And are you aware that Polyform mesh is

7    made from Marlex polypropylene?

8            A.   I'm not at liberty to answer.

9            Q.   Are you aware that Polyform Lite mesh is made

10   from Marlex polypropylene?

11                    MR. DAVIS:  Slow down.

12                    THE WITNESS:  I'm not at liberty to

13   answer.

14                    THE REPORTER:  Can you repeat the

15   question?

16                    MR. DAVIS:  I'm sorry, I was telling her

17   to slow down, so I think she may have missed that

18   question.

19   BY MS. FITZPATRICK:

20           Q.   Are you aware that Polyform Lite is made with

21   Marlex polypropylene?

22           A.   I'm not at liberty to answer.

23           Q.   Okay.  And do you know what the difference

24   between Polyform and Polyform Lite is?
```

Elaine Duncan

1          A.    I'm not at liberty to answer.

2          Q.    Are you aware of any reason why surgical mesh

3     manufacturers have gone to a lighter-weight, larger-pore

4     surgical mesh?

5                    MR. DAVIS:  Object to the form.

6                    THE WITNESS:  I'm not at liberty to

7     answer.

8     BY MS. FITZPATRICK:

9          Q.    Have you seen any Ethicon documents where

10    Ethicon considered making mesh that was lighter-weight or

11    larger-pore than the original PROLENE mesh that is used in

12    TVT-R?

13         A.    Yes, with respect to the work I have done, I

14    saw some documents that discussed different mesh weights,

15    yes, ma'am.

16         Q.    And that is something that Ethicon considered,

17    you'll agree with me, in connection with reducing the risk

18    of its polypropylene mesh products, correct?

19                   MR. DAVIS:  Object to the form.

20                   THE WITNESS:  I disagree with that

21    characterization.  If I could have you restate, perhaps,

22    the question.

23    BY MS. FITZPATRICK:

24         Q.    Sure.  Why did Ethicon consider going to a

Elaine Duncan

```
1    lighter-weight mesh than the original PROLENE mesh that's

2    used in the TVT-R mechanical cut, to your knowledge?

3                    MR. DAVIS:  Object to the form.

4                    THE WITNESS:  I can't speak to why they

5    were considering it.  I can tell you that I saw documents

6    where they were considering it.

7    BY MS. FITZPATRICK:

8         Q.   And in reviewing the documents that you've

9    looked at for this case, you didn't see any reason given

10   by Ethicon for why it was considering moving to a

11   lighter-weight mesh than what was the PROLENE mesh used in

12   the TVT-R mechanical cut?

13                   MR. DAVIS:  Object to the form.

14                   THE WITNESS:  Yes, considering the issue

15   that you're talking about, I have to repeat.  You've

16   altered the context.  The context of the discussion of the

17   lighter-weight mesh was not with respect to TVT.  As I

18   recall, I believe that what I recall reading had to do

19   with use in other pelvic applications.  I don't recall

20   specific -- I do know that there were testing -- there was

21   testing done in animals on different variations of mesh.

22   I don't specifically recall the reason they did those

23   studies.

24
```

Elaine Duncan

```
 1    BY MS. FITZPATRICK:

 2         Q.   Okay.  So let me make sure we're on the same

 3    page here.

 4              The TVT-R mechanical cut is made with a

 5    PROLENE mesh; correct?

 6         A.   Yes, ma'am.

 7         Q.   And that is the same PROLENE mesh that has

 8    been historically going back to -- get your document

 9    here -- can I grab this from you, on the bottom?

10         A.   Sorry.

11         Q.   -- going back to 1975 been used as a surgical

12    mesh; correct?

13         A.   Yes, ma'am.

14         Q.   And 1975 through about the late 1990s, PROLENE

15    mesh was generally used in a hernia application; correct?

16         A.   Let me --

17         Q.   Let me show you Exhibit 6 if that helps you.

18         A.   PROLENE -- say your question again.

19         Q.   From 1975 to the late 1990s, PROLENE mesh was

20    generally used in hernia applications; correct?

21              Do you know that?

22         A.   Yeah, I would agree with that.

23         Q.   Okay.  And in the late 1990s, the PROLENE mesh

24    was incorporated into the TVT-R mechanical cut; correct?
```

Elaine Duncan

1                    MR. DAVIS:  Object to the form.

2                    THE WITNESS:  You said "incorporated

3     into"?

4     BY MS. FITZPATRICK:

5          Q.   It was used in.

6          A.   Okay.  I believe the PROLENE mesh was used in

7     the TVT mesh as it had been developed, and I can't recall

8     the exact year, but it was the -- I would call it the

9     standard mesh, yes.

10         Q.   And what we were referring to, and we'll

11    talk about in a little bit, was you are aware that Ethicon

12    was contemplating a lighter-weight mesh than the PROLENE

13    mesh for incorporation into its pelvic organ prolapse

14    repair products; correct?

15                   MR. DAVIS:  Object to the form.

16                   THE WITNESS:  I was not certain as to

17    which applications they had in mind, but I do recall

18    reviewing documents where they were evaluating alternative

19    mesh, types and styles and composition.

20    BY MS. FITZPATRICK:

21         Q.   Do you recall any documents where Ethicon was

22    considering moving from the PROLENE mesh to a

23    lighter-weight mesh for the TVT-R mechanical-cut product?

24                   Did you see anything like that?

Elaine Duncan

1          A.   I can't recall if it was specific to the TVT

2     mesh or not.

3          Q.   Okay.

4          A.   I do recall the different mesh work but not

5     whether it was specific to mechanical.

6          Q.   Okay.  And have you ever taught a course

7     related to the design of medical devices?

8          A.   Yes.

9          Q.   And what courses are those?

10         A.   I'd have to refresh my memory on my CV here.

11    Okay.  I have one, "Design Control for Professors,"

12    University of Kentucky in 2009.

13         Q.   Is that a semester-long course?

14         A.   No, ma'am.

15         Q.   How long did that course --

16         A.   I believe that was a day.

17              The "Navigating Standards and Regulations for

18    Medical Textiles," at the IFAI Medical Textile Symposium

19    in 2006 included some aspects of design because we were

20    discussing standards and regulations.

21         Q.   And that course, how long was that course?

22         A.   That was an hour.  It was an hour

23    presentation.

24              I can tell you that the specific training I've

Elaine Duncan

```
 1   done with respect to clients where I've done training at a

 2   client location for specific tasks I have not typically

 3   included that.  It was more of a commissioned work

 4   specific to a client, so those may not be listed here, so

 5   when you're asking me about day-long programs --

 6        Q.   Let me make a distinction for you.

 7             Have you ever taught a course a full semester

 8   long or a course at a university about the design of

 9   medical devices?

10        A.   No, I typically give more one to two-hour

11   programs.  Just last weekend, I gave one at the University

12   of Kentucky.

13        Q.   Okay.  And you don't have a Ph.D.; correct?

14        A.   No, I do not.

15        Q.   But on your CV, it says that you've completed

16   coursework for your Ph.D.?

17        A.   Yes.

18        Q.   Is that something you're continuing to work

19   on?

20        A.   No.

21        Q.   What field were you working on a Ph.D. in?

22        A.   Biomedical engineering.

23        Q.   Okay.  And when did you stop working on that

24   Ph.D.?
```

Elaine Duncan

1        A.    I believe it was '82 when I went to Salt Lake.

2        Q.    And why did you stop working on that?

3        A.    I was asked to join the company in Salt Lake

4   City building the artificial heart program.

5        Q.    Okay.  And you haven't completed that

6   coursework in the last, I don't know, 30 years?

7        A.    I decided not to continue that.

8        Q.    And are you a medical -- a biomedical

9   engineer?

10       A.    My degrees are in mechanical with minors in

11  biomedical.

12       Q.    And do you hold yourself out as an expert in

13  biomedical engineering?

14       A.    I do not consider myself a professional

15  engineer in the context of the PE, professional

16  engineering license.

17       Q.    And you're not a polymer scientist; are you?

18       A.    No, ma'am.

19       Q.    And you're not a medical doctor, I think we

20  established before; correct?

21       A.    That's correct.

22       Q.    And because you're not a medical doctor,

23  you're not able to give expert opinions on the

24  medical/clinical risk-benefit of the TVT-R mechanical cut

Elaine Duncan

```
 1    to patients; are you?

 2          A.   Ma'am, I can read and discern the

 3    documentation, but I wouldn't give an expert opinion about

 4    it.

 5          Q.   Okay.  And of the publications listed on your

 6    CV, how many of those have been peer-reviewed?

 7          A.   All of them on page 3.

 8          Q.   Okay.

 9          A.   And the one on -- at the top of page 4.

10          Q.   Page 3, the articles and book chapters, all of

11    those on page 3 are peer-reviewed; is that right?

12          A.   Yes, and then the abstract that went to the

13    ASAIO in 1998 was peer-reviewed.

14          Q.   Okay.  And of those maybe 10 to 15

15    publications, how many of those involved surgical mesh?

16          A.   Well, we have the one development and

17    regulation of medical technology have been -- that was

18    a general one about all meshes, not specific to

19    urological meshes because it was directed to companies

20    in the textile industry, and I believe that's no more.

21          Q.   Okay.

22          A.   Oh, I'm sorry, the chapter, "Regulatory

23    Environment for Biotextiles," of course that would be --

24    included general textiles.
```

Elaine Duncan

```
1           Q.   Okay.  Chapter 7, that's at the beginning?

2           A.   Yes.

3           Q.   Okay.  Now, you've never published

4    specifically on PROLENE mesh; have you?

5           A.   No, not specific to PROLENE.

6           Q.   Have you ever published on polypropylene in

7    general?

8           A.   No, ma'am.

9           Q.   Have you ever published -- before your work

10   here, you've never provided Ethicon with any expert

11   services related to PROLENE mesh; have you?

12          A.   That's correct.

13          Q.   And the only work that you had done was for

14   another company that uses a different polypropylene in

15   their surgical meshes; correct?

16          A.   I am not at liberty to describe the polymers

17   that they used, but it was a different company.

18          Q.   Okay.  Is the Ethicon TVT-R mechanical cut

19   made with Marlex polypropylene made by Phillips Sumika?

20          A.   I'm sorry, say again.

21          Q.   Is the Ethicon TVT-R mechanical cut made with

22   Marlex polypropylene made by Phillips Sumika?

23          A.   I'm not recalling.

24          Q.   Do you know what polypropylene is used by
```

Elaine Duncan

1  Ethicon in --

2         A.   I would have to check my references.  I can't

3  remember that exactly.

4         Q.   And you would agree with me that's something

5  that's important to know when considering the design of a

6  medical device; correct?

7         A.   Well, when I was considering the design of the

8  medical device, this is -- let me explain.

9              When I'm looking at a design and involved in

10  the design and development, I would certainly want to know

11  what the polymer was.  When I was reviewing these

12  documents, I recall seeing that they have MSDS sheets, but

13  I can't tell you at this moment, from recall, the exact

14  content of those MSDS sheets.

15         Q.   Okay.  So you don't know, sitting here today,

16  whether the TVT-R mechanical cut is made with Marlex

17  polypropylene or not?

18         A.   I cannot recall.  As I said, I'd have to look

19  at my references.

20         Q.   Okay.  You've never actually published

21  anything on the TVT product; correct?

22         A.   No, ma'am.

23         Q.   And you haven't published anything on the

24  differences between mechanical-cut and laser-cut surgical

Elaine Duncan

```
1    meshes; correct?

2           A.   No, ma'am.

3           Q.   Now, based on your work here, do you

4    understand that there are clinical differences between the

5    TVT-R and the TVT-O devices?

6           A.   Clinical surgical approach.

7           Q.   And you understand that they're implanted in a

8    different manner; correct?

9           A.   Yes, ma'am.

10          Q.   And you understand that they're implanted into

11   a different anatomical location; correct?

12          A.   Yes, ma'am.

13          Q.   And do you also understand that there's a

14   difference between the mechanically-cut mesh and the

15   laser-cut mesh made by Ethicon?

16          A.   Ask me the question again, please.

17          Q.   Sure.  Do you also understand that there's a

18   difference between the mechanically-cut mesh and the

19   laser-cut mesh made by Ethicon?

20          A.   There are differences, but there are also

21   similarities.

22          Q.   Okay.  And do you understand that Ethicon

23   developed the laser-cut mesh to specifically deal with the

24   problems that physicians were seeing with the
```

Elaine Duncan

```
 1   mechanically-cut mesh?

 2                    MR. DAVIS:  Object to the form.

 3                    THE WITNESS:  I believe in my report, if

 4   I may reference that, I explain what their goals were with

 5   the review of the laser cut.

 6                    Do you want me to look at that?

 7   BY MS. FITZPATRICK:

 8        Q.   Sure, take a look at that.

 9                    MR. DAVIS:  While she's doing that, I'm

10   going to lower this blind.  The sun is starting to -- over

11   here killing me.

12                    MS. FITZPATRICK:  It's starting to warm

13   up.

14                    THE WITNESS:  You want me to proceed?

15   BY MS. FITZPATRICK:

16        Q.   Yes, please.

17        A.   On page 19.

18        Q.   Let me get there.  Uh-huh.

19        A.   In this particular report that I've

20   referenced, they said it was determined that the process

21   modifications to be made increased product yields, reduced

22   cycle time and also reduced possible fraying of the mesh.

23        Q.   Okay.

24        A.   But may I consult with counsel on something,
```

Elaine Duncan

 1   please?

 2         Q.   Not in the middle of a line of questions,

 3   substantively.

 4         A.   Okay.

 5         Q.   Let's mark this as Exhibit 11.

 6                    (Whereupon, Exhibit 11 was marked.)

 7   BY MS. FITZPATRICK:

 8         Q.   You have in front of you Exhibit Number 11.

 9              Have you looked at this document before?

10   You've seen it?

11         A.   I don't specifically recall it.  Typically, I

12   can form an image of it, but I may have.  I cannot

13   specifically recall it.

14         Q.   Okay.  If you've looked at it, it would be in

15   your reliance list that you provided?

16         A.   Yes, I just can't recall it.

17         Q.   Okay.  Well, let's just take a quick look at

18   this.  I want to direct you to the -- let me give you a

19   second to read through it.

20         A.   Thank you.

21                    MR. COMBS:  This is marked?

22                    MS. FITZPATRICK:  Yeah, it's 11.

23                    THE WITNESS:  Okay.  I'm ready.

24

Elaine Duncan

```
 1   BY MS. FITZPATRICK:

 2        Q.   Okay.  And as best I can tell, this came out

 3   somewhere around 2006, according to the first paragraph;

 4   correct?

 5        A.   It would be in that time frame, I guess.

 6        Q.   And is it fair to say what's reflected here is

 7   that Ethicon had looked at the impact of cutting the TVT

 8   mesh using a laser cut instead of the mechanical cut?

 9        A.   They did, indeed, do that.

10        Q.   Okay.  And looking at the middle paragraph in

11   bold, bolded, Ethicon found that the laser cutting reduced

12   particulate loss; is that right?

13        A.   He says this, but I must qualify my answer.

14        Q.   Sure.

15        A.   If you notice, he's referencing the clinical

16   expert report on the back page.

17        Q.   Uh-huh.

18        A.   And when I went to the clinical expert report,

19   it actually referenced the verification testing.

20        Q.   Okay.

21        A.   And I point that out in -- on page 20 in my

22   document.

23        Q.   Okay.

24        A.   And when I read the actual technical testing
```

Elaine Duncan

```
1   report, the average amount of particles were less.  It is

2   correct to say that they're less.  It's the average

3   amount.  When you completely read the report.  It says

4   there's no statistical difference in the particulate loss.

5          And so in this circumstance, this person by

6   quoting the clinical expert report, he's making a

7   reference to the statement that was made in that report

8   that says that the average was reduced, but the average

9   amount was not statistically significantly different in

10  particulates.  If you care to go to those reports, you

11  can see the specifics about the product loss.

12         Q.   Okay.  Well, this is written by the product

13  director from Continence Health; correct?

14         A.   That's what it says his title is.

15         Q.   Okay.  And it's actually two people there;

16  correct?

17         A.   Uh-huh.

18         Q.   And it's been put out by Ethicon Women's

19  Health and Urology as a Product Pointer; correct?

20         A.   Well, it says "Not for Distribution," so I

21  don't know if it was actually put out to anybody.

22         Q.   Well, look at the first page.

23         A.   Yes.

24         Q.   It's written by Ethicon Women's Health and
```

Elaine Duncan

1  Urology; correct?

2          A.   But this says "Not for Distribution."  I don't

3  know who -- to whom it -- for all I know, this could be a

4  draft.  I don't know who put it out or if it went out.  It

5  says --

6          Q.   It says "For Internal Use;" correct?

7          A.   Right, right.  So I don't know who received

8  it.

9          Q.   So you think there's a possibility that this

10 was written and one copy was put in somebody's drawer and

11 it was never meant for anything else beyond that?

12              MR. DAVIS:  Object to form.

13              THE WITNESS:  I can't say one way or the

14 other, ma'am, because it's not signed on here.

15 BY MS. FITZPATRICK:

16         Q.   Fair enough.

17         A.   So I don't know the pedigree of document.

18         Q.   All right.  Fair enough.  Were they wrong when

19 they said, "We reduced particulate loss"?

20         A.    Ma'am, as I explained, the report -- the

21 actual report said that the averages, when you look at the

22 averages, the averages -- the average amount of particles

23 was reduced, but that averages were not statistically

24 significant.

Elaine Duncan

1        Q.   Is this a correct statement or not?  That's

2   all I want to know.  It's yes or no.

3        A.   It's not a precise statement.

4        Q.   So you would draft this statement differently?

5        A.   I can't say if I would or wouldn't.  I'm

6   explaining to you that it isn't precise.

7        Q.   Okay.  But it's, at least, written here by

8   Ethicon; correct?

9        A.   It appears to be so.

10        Q.   It's at least something that was -- purports

11   to be written by product directors who are in charge of

12   the TVT laser cut and the TVT-O laser cut; correct?

13        A.   I believe so.

14        Q.   Okay.  And they state that they reduced

15   particulate loss by going from mechanical cut to laser

16   cut; correct?

17        A.   Ma'am, he's quoting the CER report.

18        Q.   That's what he wrote; isn't it?

19        A.   Again, I don't know any more than I've already

20   told you about this document.

21        Q.   Is that what he wrote?

22        A.   He wrote, "We found by doing so."  Yes, you

23   can quote him.

24        Q.   "We reduced particulate loss, as well as the

Elaine Duncan

```
 1    potential for mesh fraying."

 2              Did I read that correctly?

 3         A.   He wrote that.

 4         Q.   Okay.  And in addition, if you go to the

 5    second paragraph from the end, it says that "The laser-cut

 6    mesh will be available for you to sell as needed,

 7    particularly to customers that have voiced concerns

 8    regarding particle loss and fraying;" correct?

 9         A.   That's what it says.

10         Q.   And a fair assumption, based on that, is that

11    Ethicon had received complaints from certain physicians

12    concerning particle loss and fraying of the

13    mechanically-cut mesh; correct?

14              MR. DAVIS:  Object to the form.

15              THE WITNESS:  I'm sorry, I can't say

16    that I would characterize them as complaints.  I can't

17    recall that specifically.  There's a difference between a

18    customer response and a complaint, and I'd have to check

19    the accuracy of whether it was -- the information came in

20    as complaints, or if they were just general customer

21    comments back.

22    BY MS. FITZPATRICK:

23         Q.   Okay.

24         A.   I can't recall that.
```

Elaine Duncan

```
 1          Q.   Well, using the word "concern," which is their

 2   word.

 3          A.   Uh-huh.

 4          Q.   Concerns aren't usually just run-of-the-mill

 5   general consumer comments; correct?

 6                    MR. DAVIS:  Object to the form.

 7                    THE WITNESS:  Actually, they can be

 8   anything.  We make a very clear distinction between

 9   an allegation of deficiency about the product being a

10   complaint, and there -- oftentimes, physicians make

11   suggestions for improvements, and they're not complaints;

12   they're just different ideas and suggestions.

13   BY MS. FITZPATRICK:

14          Q.   So sitting here today, after you've been paid

15   almost $60,000 by Ethicon and you look at an Ethicon

16   document that says that "customers that have voiced

17   concerns regarding particle loss and fraying," it's your

18   position that you don't know whether they really had a

19   concern or a complaint about the product?

20                    MR. DAVIS:  Object to the form.

21                    THE WITNESS:  You specifically -- thank

22   you.  You specifically asked me a question about

23   complaints.  You were attributing this information to

24   complaints, and I was trying to clarify to you that
```

when I use the word "complaints," I'm very specific within the context of my work as to whether it's a complaint or not, and I would have to check the record to see if there are specific complaints or if these are suggestions and concerns and a suggestion.

So I can't take from this document what you said; okay?

BY MS. FITZPATRICK:

Q. So let -- let's just be very clear on the record.

You draw a distinction between the word expressing a "concern" and a "complaint." You consider those two different things?

A. They may or may not be. A complaint is a very specific thing.

Q. And so after $60,000 from Ethicon, you don't know whether physicians were voicing complaints or concerns regarding particle loss and fraying attributable to the mechanically-cut device that's attributable -- or that is at issue in this litigation; you just don't know?

A. Ma'am, I've had a --

MR. DAVIS: Wait, wait, wait. Object to the form.

THE WITNESS: I have read many, many,

Elaine Duncan

```
 1   many complaint documents, and I have read many, many, many

 2   other documents.  I was trying to be specific to answer

 3   your question, and if you'd like to repeat your original

 4   question, I can explain to you better why I was concerned

 5   with the way you formed it.

 6   BY MS. FITZPATRICK:

 7        Q.   I don't want to get into a word game.

 8        A.   I'm not trying to.

 9        Q.   So let me just go back to this.

10             Voicing concerns is not a favorable

11   observation of a product; correct?

12                  MR. DAVIS:  Object to form.

13   BY MS. FITZPATRICK:

14        Q.   General real world here.  If someone voices a

15   concern to you, it's not a compliment, it's not a

16   favorable commentary on the product.

17             You know that; right?

18                  MR. DAVIS:  Object to the form.

19                  THE WITNESS:  In my own personal

20   experience, when someone expresses a concern to me, they

21   may be concerned for my health, for my benefit, the way

22   I'm doing or not doing something.  That doesn't mean

23   they're complaining to me about what I'm doing.  So I

24   have to -- in my line of work, I have to be specific
```

Elaine Duncan

```
 1    about the term "complaint."

 2    BY MS. FITZPATRICK:

 3         Q.   This is a negative comment.

 4         A.   Where?

 5              MR. DAVIS:  Object to form.

 6    BY MS. FITZPATRICK:

 7         Q.   About the particle loss from the

 8    mechanically-cut mesh; right?

 9              MR. DAVIS:  Object to the form.

10              THE WITNESS:  Please, would you be

11    specific where you're seeing the negative comment?

12    BY MS. FITZPATRICK:

13         Q.   Voicing "concerns regarding particle loss and

14    fraying."

15              MR. DAVIS:  Object to the form.

16    BY MS. FITZPATRICK:

17         Q.   You don't see that as a negative comment?  You

18    think it might actually be positive?

19         A.   Excuse me, I'm trying to get to the section of

20    the document that you're looking at.

21         Q.   Same section we've been looking at for the

22    last 10 minutes.

23              MR. DAVIS:  And I object to the form.

24              THE WITNESS:  If I take this sentence,
```

Elaine Duncan

1    this person is expressing that for those customers who

2    have either voiced a concern for particle loss or voiced a

3    concern for fraying this product will be available.  It

4    is not specifically stating that these customers have made

5    a complaint, and this is the distinction I was trying to

6    make when you asked me the question the first time.

7    BY MS. FITZPATRICK:

8        Q.   You said "or."  Where is the word "or" in that

9    sentence?

10       A.   It's implicit in the sentence because of the

11   way the sentence is constructed.

12       Q.   I read "and."  And "and" and "or" are two

13   different words; right?

14            MR. DAVIS:  Object to the form.

15   BY MS. FITZPATRICK:

16       Q.   So where do you see "or"?

17       A.   It can be either/or; particle loss and/or

18   fraying.

19       Q.   That's not what this document says; does it?

20       A.   It does not say that, but the context is that

21   those customers could have concerns for either, or both,

22   by the construction of the sentence.

23       Q.   Does it say "or" anywhere?

24            MR. DAVIS:  Object to the form;

Elaine Duncan

1    argumentative.

2                      THE WITNESS:  I won't argue with you

3    about the sentence.

4    BY MS. FITZPATRICK:

5         Q.   Okay.  Well, you said "or," and I just want to

6    know where you got "or," because I'm reading "and."

7                      MR. DAVIS:  Object to the form;

8    argumentative.

9                      THE WITNESS:  I suppose there could be

10   some customers who voice both concerns at the same time.

11   I can't say.

12   BY MS. FITZPATRICK:

13        Q.   But the bottom line here, you have to agree

14   with me, Ms. Duncan, some physicians were telling Ethicon

15   that they had concerns about the fact that the

16   mechanically-cut mesh had particle loss and fraying;

17   right?

18                     MR. DAVIS:  Before you answer, I'm going

19   to instruct the witness, you don't have to agree with

20   anything.  You're here to answer questions truthfully to

21   the best of your ability.  You're not required to agree

22   with anything.

23                     THE WITNESS:  In this context, I

24   can't answer your question.  This was a sales piece.  I

Elaine Duncan

```
 1   don't even know if it got out the door, and so if you

 2   want to construe that sentence in the way you said, I

 3   have no way to counter what you've been saying.

 4   BY MS. FITZPATRICK:

 5        Q.   Let's leave it at that.

 6             You've never published on stress urinary

 7   incontinence; right?

 8        A.   No, ma'am.

 9        Q.   And you've never published anything regarding

10   any of the risks that are associated with the stress

11   urinary incontinence device; have you?

12        A.   No, ma'am.

13        Q.   And none of the presentations that are listed

14   in your CV involve surgical mesh; correct?

15        A.   Your sentence is in -- your -- the way you

16   have phrased that question, I can't answer it the way

17   you've asked it.  If you want to ask it again, I'll try

18   to clarify.

19        Q.   Well, am I correct or not?

20        A.   Your sentence -- your question is something

21   not correct.

22        Q.   Are any of the presentations that are listed

23   in your CV involving surgical mesh?

24        A.   Surgical mesh is a term of art with the FDA,
```

Elaine Duncan

```
 1    and it incorporates a wide variety of meshes, not just

 2    urinary incontinence meshes, and I can look at my CV and

 3    tell you if any of them included surgical mesh or not.

 4         Q.   Sure.

 5         A.   If that's what you'd like me to do.

 6         Q.   That would be great.

 7         A.   In my presentations and speeches "Leaping the

 8    Hurdles of Medical Textile Devices," that would have been

 9    incorporating, as a generic product, surgical meshes.  In

10    the context of the FDA guidance document on what is a

11    surgical mesh, I probably touched on that in that

12    presentation.

13              "Biomaterials Qualification and Selection for

14    Spinal Implants," I can't recall if that discussed meshes

15    or not.  It is -- meshes are used in some spinal implants.

16              I believe that's the only two that would

17    have -- presentations and speeches that would have had

18    specific reference to surgical meshes.

19         Q.   Okay.  Did either of those presentations

20    involve PROLENE mesh?

21         A.   Not as a specifically-named product, no.

22         Q.   Have you ever presented on the TVT product,

23    specifically?

24         A.   No, ma'am.
```

Elaine Duncan

```
1          Q.   Have you ever presented on stress urinary

2    incontinence?

3          A.   No, I have not made presentations on that.

4          Q.   Have you ever presented on anything regarding

5    the risks that are associated with stress urinary

6    incontinence devices?

7          A.   As a public presentation?

8          Q.   Yes.

9          A.   No, ma'am.

10         Q.   Okay.  Have any of the products that you've

11   consulted on involved products that treat stress urinary

12   incontinence?

13         A.   Yes, ma'am.

14         Q.   Okay.  And which ones are those?

15         A.   I consulted with a company that had a bulking

16   agent.

17         Q.   Okay.  And what company was that?

18         A.   I can't recall the company name.  I think it

19   was Carbon something.  I can't remember the name.

20         Q.   And how far ago was that?

21         A.   Maybe 10 years.

22         Q.   Okay.  Anything else?

23         A.   Yes, I consulted with a company that made a

24   urinary incontinence insert device.
```

Elaine Duncan

```
 1          Q.   And when was that?

 2          A.   That product was -- the company name was

 3   ContiCare.

 4          Q.   C-O-N-T-I-C-A-R-E?

 5          A.   Yes.

 6          Q.   Okay.  And when was that?

 7          A.   Again, about 10 years ago.

 8          Q.   And can you describe that device to me?

 9          A.   It was an insert.

10          Q.   Into the --

11          A.   Urethra.

12          Q.   Urethra?

13          A.   Yeah.

14          Q.   Okay.

15          A.   Then there was another --

16          Q.   Was that ever marketed?

17          A.   No, we were in clinical trials.

18          Q.   Okay.  And it never made it out of the

19   clinical trials to market?

20          A.   Ran out of money.

21          Q.   Okay.  And anything else?

22          A.   Another urinary incontinence device that was

23   almost 20 years ago, and I can't recall the name.  It was

24   a valved catheter.
```

Elaine Duncan

```
 1          Q.    Okay.

 2          A.    And I consulted with Empi.  That company was

 3   local, and their name has -- has been changed.  I don't

 4   know if Empi's still exists.

 5          Q.    I --

 6          A.    E-M-P-I.  They had a stimulator.

 7          Q.    Okay.  Anything else you worked with on stress

 8   urinary incontinence over the years?

 9          A.    Not stress urinary incontinence, no.

10          Q.    Okay.  Have any of the devices that you've

11   worked on involved pelvic organ prolapse?

12          A.    We might not have been specifically indicating

13   or contraindicating why the patient had the stress

14   incontinence.

15          Q.    Okay.

16          A.    It was more of a symptomatic device.

17          Q.    And what was that?  I'm talking pelvic organ

18   prolapse, I'm sorry.

19          A.    These were external devices.  With the

20   exception of the bulking agent, all of these -- which is

21   an implanted product, but all of the other products are

22   dealing with the symptoms.

23          Q.    Okay.

24          A.    So the stimulating device, I'm not sure that I
```

Elaine Duncan

 1   recall that the specific reason a patient had stress

 2   incontinence was stipulated.  We -- the patients had to

 3   undergo certain clinical testing, PAG, weight and

 4   cystoscopy.

 5        Q.   Cystoscopy?

 6        A.   And if that condition existed, they were

 7   candidates for the devices.

 8        Q.   Okay.

 9        A.   So specifically why they were having their

10   incontinence was -- we were typically not specifying that.

11   They just had to have an incontinence level at a

12   certain --

13        Q.   Okay.

14        A.   External devices.

15        Q.   And those were for stress urinary

16   incontinence; correct?

17        A.   Yes, ma'am.

18        Q.   So I want to flip, pelvic organ prolapse.

19        A.   All right.

20        Q.   Did you work on any devices --

21        A.   No, ma'am.

22        Q.   Okay.  And have you ever seen the TVT device

23   before?

24        A.   Not before this task, this assignment.

Elaine Duncan

1           Q.    In connection with the work that you've done

2    here, have you actually seen or held a TVT device?

3           A.    Yes, ma'am.

4           Q.    And do you know whether it was

5    mechanically-cut or laser cut?

6           A.    I believe I've seen both.

7           Q.    Okay.  And how did you tell the difference

8    between the two?

9           A.    I had a little magnifying glass.

10          Q.    Okay.  So it was visible to you under the

11   magnifying glass?

12          A.    Right.

13          Q.    And who provided those TVTs to you?

14          A.    I believe counsel provided those.

15          Q.    Okay.  And did you also look at the trocar

16   devices that were used?

17          A.    Just briefly to see how many were connected.

18          Q.    Okay.  And how about the instructions for use?

19          A.    Yes, ma'am.

20          Q.    So did you look at it as part of a whole kit

21   that the --

22          A.    It was in the kit.  It was in the kit.

23          Q.    Did you specifically ask to see both the

24   mechanically-cut and the laser-cut meshes?

Elaine Duncan

1        A.   I didn't specifically ask for it.  They were

2    given to me.

3        Q.   Now, when you were initially -- how are you

4    doing?

5             MR. DAVIS:  I think we ought to take a

6    break in about five more minutes.  Find a good stopping

7    point.

8             MS. FITZPATRICK:  Yeah, let me just get

9    through some of this stuff.  It's only a couple of pages.

10   Let me just get through this, and then we'll take a break

11   for lunch.

12            MR. DAVIS:  Okay.

13   BY MS. FITZPATRICK:

14       Q.   When you were consulted by Ethicon's lawyers

15   for work in this case, what specifically were you asked to

16   do?

17       A.   These are my words.

18       Q.   Sure.

19       A.   To do a due diligence review of the

20   documentation for the product from the time period of

21   the -- I guess I could characterize it as the licensure,

22   and then, subsequently, we cut off the review at the

23   TVT-O.

24       Q.   And what date was that?

Elaine Duncan

```
1          A.   Which date?

2          Q.   You said you cut off the review at the TVT-O.

3          A.   Before the TVT-O.  I probably looked at some

4    of the TVT-O documents before we made that determination,

5    so I -- I'm going to estimate that was late July.

6          Q.   Wait, let me make sure that I'm following you

7    here.

8               You have looked at all of the risk assessment

9    and risk hazard assessment files related to the TVT-R;

10   correct?

11         A.   Yes, ma'am.

12         Q.   And that's without a date limitation; is that

13   correct?

14         A.   I would say that's correct.

15         Q.   Okay.  And what you excluded from your

16   analysis were documents related to the TVT-O; is that

17   right?

18         A.   If they specifically said they were only for

19   TVT-O or AA, then I didn't spend any further time on them.

20   If I had seen them, I didn't go back and work on them at

21   all.

22         Q.   Okay.  So you didn't look at the TVT-O

23   specific or the TVT-AA specific risk documents; is that

24   right?
```

Elaine Duncan

```
 1                    MR. DAVIS:  Object to the form.

 2                    THE WITNESS:  I can't recall if I did or

 3      didn't.  Do you have my timeline there?

 4      BY MS. FITZPATRICK:

 5           Q.   Sure.  Is this the one, 7?

 6           A.   Yeah, and my other notes there.

 7           Q.   Yes.

 8           A.   So as you'll see here, I was -- this was

 9      my initial activity to try to put documents on a timeline.

10      So I may have, apparently, looked at some of these

11      documents because I was trying to put them all on a

12      respective timeline.

13           Q.   Okay.

14           A.   And then, basically, later on, I said anything

15      below this line I don't need to continue to look at.

16           Q.   Okay.  And that line looks like a 2010

17      TVT-O-PA; is that correct?

18           A.   And I can't even recall what "PA" stands for.

19      My notes --

20           Q.   I don't know, either.

21           A.   I had looked at some -- very comprehensively

22      looked at documents, tried to put them on a timeline.  And

23      then later, in a discussion, we said, "Oh, you don't need

24      to be specific with the TVT-O documents."
```

Elaine Duncan

1           I don't have a copy of that, by the way.

2      Q.   Sure.  Why did you take the TVT-O document --

3  in fact, if I'm looking at this correct, up in this left

4  corner, you have "TVT-O" circled with an X through it and

5  "TVT Secur" with an X through it.

6           So you eliminated those two products from your

7  consideration for this?

8      A.   For the report.

9      Q.   Why did you do that?

10     A.   The scope was limited.

11     Q.   To the TVT-R; correct?

12     A.   No, it was not limited to just TVT-R.  It cut

13  off at TVT-O, and that's why -- basically, at that time,

14  put that line there.

15     Q.   Okay.  So the TV -- you knew that TVT-O was on

16  the market before 2010; correct?

17     A.   Ma'am, the point I was making was that TVT-O

18  was not specifically -- now, again, if there are common

19  documents, I've looked through them.

20     Q.   Okay.

21     A.   Okay.  But the scope of my review as a

22  comprehensive due diligence did not go out to TVT-O.

23     Q.   Okay.  And that's because it's a different

24  product -- different but related product to the TVT-R;

Elaine Duncan

```
 1   correct?

 2       A.   Because of just things you mentioned, there's

 3   surgical instrumentation and the location of the mesh in

 4   the body.  And so the mesh is common, things that are

 5   about the mesh are common, but specific device, I cut that

 6   off.

 7       Q.   Okay.  And that's the same with the TVT Secur

 8   for the same reasons?

 9       A.   Yes, ma'am.

10       Q.   Okay.  How many times have you met with

11   counsel between the middle of July and when you submitted

12   your report in this case?

13       A.   I think it was about six.

14       Q.   Okay.  Who did you meet with?

15       A.   Well, I think I've mentioned their names.

16   I've met with Kim Moore, I've met with Chad Hutchinson,

17   I've met with Stephen Myers, I've met with Paul and Phil.

18   Can I have my copy of that?

19       Q.   Sure.

20       A.   I don't even have that anymore.  Thank you.

21       Q.   And about how many hours did you spend between

22   the middle of July and the time when you submitted your

23   report in this case?

24       A.   I don't have the exact numbers, but I've
```

Elaine Duncan

1    estimated 120.

2            Q.    Did you bring any billing records with you

3    today?

4            A.    I didn't bring any billing records.  I

5    thought they were going to be provided, so I didn't bring

6    bring them.

7            Q.    And that's something that you produced to

8    Ethicon's lawyers that I can get from them?

9            A.    You can get them from them.  They have copies.

10           Q.    Okay.  And who, besides yourself, at your

11   company worked on the report, if anyone?

12           A.    I had some assistance from some interns in

13   printing and compiling the documents into binders, but the

14   report was specifically my own.

15           Q.    Okay.  And your report has an Exhibit A to it;

16   correct?

17           A.    Yes, ma'am.

18           Q.    Okay.  And does that list represent the

19   universe of documents that you've reviewed in this case?

20           A.    Yes, ma'am.

21           Q.    And if you'd look at it, it's there.

22           A.    Yes, ma'am.

23           Q.    Have you looked at all of the documents that

24   are on that list?

Elaine Duncan

```
 1          A.   It has been my endeavor to look at every one

 2  of them.  I -- believe it or not, yes.

 3          Q.   So you've read all of those documents?

 4          A.   I can't say I've read them all.  I have

 5  certainly scanned and looked at as many possible, yes.

 6          Q.   And where did you get that list of documents

 7  from?

 8          A.   This list --

 9          Q.   Uh-huh.

10          A.   -- was actually compiled on my behalf.  I did

11  not type these all up.

12                    MR. DAVIS:  I'll help you out.  My law

13  firm kept a record of everything that she asked for and

14  has provided, and we provided this for her.

15                    MS. FITZPATRICK:  And you generated

16  that, Exhibit A, which represents everything that you --

17  your firm has provided to Ms. Duncan?

18                    MR. DAVIS:  With one exception.  She

19  went out and got some things on her own and posted them,

20  and we added those to the list.

21  BY MS. FITZPATRICK:

22          Q.   Okay.  Were there any documents that you were

23  provided but you didn't actually put on your reliance

24  list?
```

Elaine Duncan

```
 1          A.    Not to my knowledge.

 2          Q.    Okay.  Have you spoken with any other experts

 3    in this litigation?

 4          A.    No, ma'am, I have not.

 5          Q.    Okay.  Have you published any of the opinions

 6    concerning the TVT devices that are the subject of your

 7    expert report?

 8          A.    No, certainly not.

 9          Q.    Okay.  Have you tested any of these opinions?

10          A.    I would say I have tested them after the fact;

11    after I've written my report, I have tested them in a very

12    specific way.

13          Q.    Okay.  Tell me what way that is.

14          A.    Specifically, I considered the clinical

15    literature, and specifically, I considered the information

16    in the AUGS statement.  The AUGS document was a part of my

17    reading but not a part of my review of due diligence,

18    because this came out afterwards, and so it's supportive

19    of the conclusions that I made, and I consider that

20    testing, but I -- maybe you consider testing in a

21    different way.  I'm not sure, maybe, what you mean.

22          Q.    That's okay.  Have the opinions that you set

23    forth in your report been reviewed by anyone?

24          A.    When I produced the report, we reviewed it.
```

Elaine Duncan

1    Counsel reviewed it with me, yes.

2          Q.   Okay.  So apart from Ethicon's lawyers, have

3    you reviewed that report with anybody else?

4          A.   No, ma'am.

5          Q.   Okay.  Who wrote that report?

6          A.   I did.

7          Q.   And you sat down, and everything that's in

8    there, you typed out yourself?

9          A.   With the exception, I didn't put the footnotes

10   in the document.  I put my references specific in the

11   paragraph, and then they were transposed for me.

12         Q.   Okay.

13         A.   Okay.

14         Q.   And did you receive any edits to your drafts

15   from Ethicon's lawyers?

16         A.   We reviewed and I edited the document.

17         Q.   Okay.  In connection with the conversations

18   that you had?

19         A.   We had conversations about my conclusions, and

20   in some cases, because I'd written rather fast, some of

21   the sentences needed improvement for grammar, but the

22   content and the conclusions are my own.

23         Q.   Okay.  And would you agree with me that it's

24   possible for another person who has expertise in risk

Elaine Duncan

1  management to review the same materials that you've

2  reviewed and come to a different conclusion than you've

3  come to?

4          A.   Apparently, it has happened because Ms. Wilson

5  has a different opinion.

6          Q.   And people in your field can have different

7  opinions on these subjects; correct?

8          A.   I would have to agree with that.

9          Q.   And how much of your opinion is premised on

10 Ethicon's own conclusions regarding the quality management

11 system?

12         A.   I did not have any conversations or review any

13 written statements by the Ethicon people with the

14 exception of when Ethicon did an audit and I read those

15 audits.

16         Q.   Okay.  And the -- all of the opinions that are

17 contained in your report were developed specifically for

18 this litigation; right?

19         A.   Yes, ma'am.

20              MR. DAVIS:  You getting near that --

21              MS. FITZPATRICK:  Yeah, let's take --

22 why don't we take a lunch break now.

23              MR. DAVIS:  If you have --

24              MS. FITZPATRICK:  No.  You know, I'm at

Elaine Duncan

1    a good place for a break, so this is a good time to do

2    that.

3                    (Whereupon, a recess was taken from

4                    12:39 p.m. to 1:42 p.m.)

5    BY MS. FITZPATRICK:

6          Q.   Ms. Duncan, what does RAC stands for?

7          A.   Regulatory Affairs Certification.

8          Q.   And what is a Regulatory Affairs

9    Certification?

10         A.   It's issued by the Regulatory Affairs

11   Professional Society based on qualifications and testing.

12         Q.   Okay.  And you'd agree with me that your

13   company specializes in regulatory strategies; correct?

14         A.   We do that, but we do many other things, as

15   well.

16         Q.   Okay.  And what -- can you tell me what

17   regulatory strategies is?  What does that mean?

18         A.   Well, it's -- from time to time, either a new

19   medical product or an existing product may need to be --

20   the people developing it may need to be aware of the

21   regulations and standards that would apply to the product.

22   So I try to assess the product that they're hoping to

23   produce or the modification they want to make and give

24   them an advance assessment of what kind of work they

Elaine Duncan

 1    would have to do in development and testing, and what

 2    kind of application they might make to respective

 3    agencies.

 4        Q.   And do you help medical device companies

 5    prepare regulatory paperwork?

 6        A.   That's part of what I do.

 7        Q.   Okay.  And in preparing your expert report in

 8    this case, were any of the materials that you considered

 9    in forming your opinions part of regulatory submissions

10    concerning the --

11        A.   Just let him pass (noise).

12        Q.   Sure.

13        A.   Okay.  Start again, thank you.

14        Q.   And were any of the materials that you

15    considered in forming your opinions in this case part of

16    the regulatory submissions relating to the TVT-R product?

17        A.   I'm not understanding the question.  Part

18    of --

19        Q.   Regulatory submissions from Ethicon regarding

20    the TVT-R product?

21        A.   Were those a part of my assessment?

22        Q.   Yes.

23        A.   Yes.

24        Q.   And did you rely solely on regulatory

Elaine Duncan

1    submission documents when you were preparing your opinions

2    in this case?

3          A.    No.

4          Q.    And is it possible for you to reach the

5    conclusions that you reached in this case concerning the

6    adequacy of the design processes and due diligence taken

7    by Ethicon without relying on regulatory submission

8    documents?

9          A.    Is it possible -- I'm sorry, the length of the

10   question, I kind of lost the train.  Say it again.

11         Q.    Is it possible for you to reach the

12   conclusions that you reached in this case concerning the

13   adequacy of the design processes and due diligence taken

14   by Ethicon without relying on regulatory submission

15   documents?

16         A.    It's possible, yes.

17         Q.    Do you believe that the only reason that a

18   company complies with ISO standards is to comply with

19   regulatory standards?

20               MR. DAVIS:  Object to the form.

21               THE WITNESS:  There are many ISO

22   standards so you have to be more specific.

23   BY MS. FITZPATRICK:

24         Q.    The ISO standards that are mentioned in your

Elaine Duncan

1   report.

2          A.   Again, there are several that are mentioned in

3   the report, so can you be specific?

4          Q.   Any of them.  I mean, if you want to go

5   through all of them, we can go through all of them.

6          A.   What's the question, again, then?

7               MR. DAVIS:  The problem is, it may or

8   may not be the same, depending on which one you're talking

9   about.

10  BY MS. FITZPATRICK:

11         Q.   Okay.  You mentioned a number of standards --

12         A.   What page?

13         Q.   It doesn't -- I mean, I'm on page 7.  You

14  don't have to be on page 7.

15              You mention a number of ISO standards in your

16  report; correct?

17         A.   There are several.

18         Q.   Okay.  And which ISO standards did you cite in

19  support of your opinions that you have offered in this

20  case?

21         A.   Did I cite, actually, or consider?

22         Q.   Cite.

23         A.   I believe we cited 13485 and multiple versions

24  of that, and also the ISO 19 -- 14971, versions of that.

Elaine Duncan

```
1    And I can't recall if I brought up -- I don't think I

2    brought up compatibility standards.  So that would be

3    the two specific ones I believe we discussed in the

4    report.

5         Q.   Okay.  So let's go back.

6              Do you have an opinion whether the only reason

7    that a company would comply with ISO Section 13485 is to

8    comply with the regulatory requirement?

9         A.   I can't say it's the only reason.

10        Q.   Okay.  And do you believe that the only reason

11   that a company would comply with ISO Section 14971 was --

12   or is to comply with the regulatory requirement?

13        A.   14971 is actually a voluntary standard, so it

14   is not an obligatory standard.

15        Q.   Okay.  And you would agree with me that it is

16   possible to reach opinions concerning the adequacy of --

17   let me make sure I'm using your words -- qualified design

18   and due diligence without reference to the regulatory

19   process; right?

20                  MR. DAVIS:  Object to the form.

21                  THE WITNESS:  I lost track of your

22   agreement question, there.

23   BY MS. FITZPATRICK:

24        Q.   Would you agree with me that it's possible to
```

Elaine Duncan

```
1    reach opinions concerning the adequacy of the qualified

2    design and due diligence without reference to the

3    regulatory process?

4         A.   Is it possible to reach conclusions based

5    on -- I'm so sorry, I --

6         Q.   There's a regulatory pathway; correct, for

7    preparation?

8              MR. DAVIS:  Object to the form.

9    BY MS. FITZPATRICK:

10        Q.   Are you okay?

11        A.   Yeah, you're losing me with your questions

12   like --

13        Q.   Okay.

14        A.   I'm trying to follow you, but --

15        Q.   We're here talking about a medical device

16   manufacturer; right?

17        A.   Right.

18        Q.   And you understand we're talking about

19   Ethicon?

20        A.   Right, you've got too many commas in your

21   questions for me.  Maybe that's -- my problem is

22   tracking your question.

23        Q.   I'll try to cut them down a little bit for

24   you.
```

Elaine Duncan

1           A.   Thank you.  That would be good.  That would be

2    good.

3           Q.   And we're talking about the Ethicon TVT-R

4    mechanically-cut device; correct?

5           A.   Yes.

6           Q.   And we're talking about the standards that

7    Ethicon did or didn't adhere to in adopting the design of

8    that product and risk hazards that they did subsequent to

9    the marketing of that product; correct?

10                    MR. DAVIS:  Object to the form.

11                    THE WITNESS:  I'm sorry, I can't answer

12   the question because you lose -- I lose track of you in

13   the middle of it.

14   BY MS. FITZPATRICK:

15          Q.   Why don't -- if you're having trouble

16   concentrating, let me know and we'll --

17          A.   It's not the concentrating.

18          Q.   Go ahead and read the question back.

19          A.   Can I see it and see if that would help me to

20   read it, because the way -- it's something about the way

21   you're speaking that I'm losing track in the middle of the

22   sentence.

23          Q.   No, I'm just surprised that this happened

24   after lunch.  You didn't have a problem this morning, but

Elaine Duncan

1    maybe we all get that little afternoon lull.  So maybe if

2    the court reporter tries it with you, we can see where

3    that goes.

4                      MR. DAVIS:  Object to the form.

5                      (The record was read back.)

6                      THE WITNESS:  We're talking about --

7    we're talking about.

8    BY MS. FITZPATRICK:

9         Q.   What do you think we're talking about today?

10                     MR. DAVIS:  Object to the form.

11                     THE WITNESS:  Ma'am, I'm trying to

12   follow your questions to the best of my ability, and

13   they're so convoluted, I lose track of what you're after

14   in the middle of the sentence.  Can you break them down --

15   BY MS. FITZPATRICK:

16        Q.   Sure.

17        A.   -- into maybe shorter questions?

18        Q.   What do you think we're talking about today?

19        A.   You don't have to talk like that to me.

20        Q.   I'm asking a simple question.

21        A.   I'm doing my very best to try and answer --

22        Q.   You had no problem answering before an

23   hour-long break with your lawyer, so I'm trying to get an

24   understanding.

Elaine Duncan

```
 1                    What do you think we're talking about today?

 2                         MR. DAVIS:  Object to the form.

 3                         THE WITNESS:  Yes, I'm insulted, too.

 4                    I am trying to understand --

 5    BY MS. FITZPATRICK:

 6          Q.    So am I, but that's okay.

 7          A.    I'm trying to understand your questions.

 8          Q.    What didn't you understand about the question

 9    I just asked you?

10                         MR. DAVIS:  Object to the form.

11                         THE WITNESS:  Because it was so

12    convoluted, I couldn't keep track of what you were saying.

13    BY MS. FITZPATRICK:

14          Q.    Let's go to the pending question.

15                    What do you think we're talking about today?

16                         MR. DAVIS:  Object to the form.

17                         THE WITNESS:  My report, my due

18    diligence work on this project.  That's what we're talking

19    about.

20    BY MS. FITZPATRICK:

21          Q.    We're talking about Ethicon; correct?

22          A.    Yes, ma'am.

23          Q.    We're talking about the TVT-R mechanical cut;

24    correct?
```

Elaine Duncan

1          A.   I didn't limit my report to that, but if you

2     want to limit it to that, that's fine.

3          Q.   Okay.  We're talking about the due diligence

4     that you believe Ethicon did at the time they acquired the

5     TVT-R mechanical cut; correct?

6          A.   Correct.

7          Q.   And we're talking about the risk hazards that

8     Ethicon engaged in after they acquired and marketed the

9     TVT-R mechanical cut.

10              You understand that?

11         A.   No, because what you said was Ethicon's risk

12    hazards that they engaged in.  That phrase has -- is odd

13    because I don't think that Ethicon engaged in hazards.

14         Q.   Okay.

15         A.   Is that what you're asking me; did Ethicon

16    engage in hazards?

17         Q.   Did they engage in risk-hazard analysis,

18    Ms. Duncan?  Do you know that?

19         A.   That isn't what you said.  You said they

20    engaged in risk-hazards.

21         Q.   Okay.

22         A.   So are you speaking of hazard analysis and

23    risk assessment?

24         Q.   You tell me.  It's your report.  Is that

Elaine Duncan

```
 1   what -- I'm happy to use whatever phrases you want me to

 2   use.

 3                    MR. DAVIS:  Object to the form.

 4   BY MS. FITZPATRICK:

 5        Q.   I'm trying to get us on the same page.  You

 6   tell me the terms and I'm happy to use them.

 7                    So what is it that --

 8                    MR. DAVIS:  Object to the form.

 9                    THE WITNESS:  You asked me if Ethicon

10   engaged in hazards.

11   BY MS. FITZPATRICK:

12        Q.   No, we've got to move on.

13        A.   Okay.

14        Q.   My question to you is, what terms do you want

15   to use, and I'll use them?

16                    MR. DAVIS:  Object to the form.  For

17   what purpose?

18                    MS. FITZPATRICK:  The purpose of the

19   conversation that we're having.

20                    THE WITNESS:  We got to --

21   BY MS. FITZPATRICK:

22        Q.   Ms. Duncan, did something happen at lunch

23   today?

24                    MR. DAVIS:  Object to the form.
```

Elaine Duncan

```
 1                    MR. COMBS:  That's rude.

 2                    MR. DAVIS:  That's rude.

 3                    MR. COMBS:  This is rude.

 4                    MS. FITZPATRICK:  You're rude.  I think

 5   this is extraordinarily rude, and I do question what

 6   happened at lunch, but we will try to move on.

 7                    MR. COMBS:  Get a Judge on the phone.

 8   If you're insulting us and saying we did something at

 9   lunch, then get a Judge on the phone.

10                    MS. FITZPATRICK:  Go right ahead.

11                    MR. COMBS:  You're the one who's making

12   the insults, and you're insulting her.

13                    MS. FITZPATRICK:  I know that you're a

14   little unnerved to have a deposition going, but you guys

15   might want to take it down and not show your hand quite as

16   much.  Let's just get back to the question.

17   BY MS. FITZPATRICK:

18        Q.   Due diligence; do you know what that means?

19        A.   Yes, ma'am, I do.

20        Q.   Okay.  Tell me what that means.

21        A.   The way I work, due diligence is to assess the

22   pattern and practices of the company and the individuals

23   with respect to, number one, the time frame we're working

24   in; number two, the standards and regulations that were
```

Elaine Duncan

1    applicable in that time frame; the procedures that reflect

2    those standards and regulations in that time frame; and

3    the practices of the individuals with respect to those

4    procedures with respect to those regulations and

5    standards.  So I think I am articulate.

6         Q.   Okay.  Well, we both --

7         A.   I didn't have a stroke during lunch.

8         Q.   We both think we're articulate, but maybe

9    we're just talking past each other.

10                  MR. DAVIS:  Object to the form.

11                  THE WITNESS:   Okay.

12   BY MS. FITZPATRICK:

13        Q.   Throughout your report, you know that you have

14   referenced, don't you, regulatory requirements; correct?

15        A.   They are applicable for both Europe and the

16   U.S. and the standards that were cited in Ms. Wilson's

17   report and as a part of my due diligence.  So they are

18   comprehensive to my report.

19        Q.   We are clearly talking past each other, and

20   maybe you didn't understand my question.

21        A.   Okay.

22        Q.   So I'll try it again.

23                  MR. DAVIS:  Object to form.

24

Elaine Duncan

```
1    BY MS. FITZPATRICK:

2         Q.   Throughout your report, you know that you have

3    referenced regulatory requirements; correct?

4         A.   The standards and regulatory requirements,

5    yes.

6         Q.   And some of those regulatory requirements

7    relate to the FDA 510(k) clearance process; correct?

8         A.   Some of those -- I'm sorry, some of those --

9    say it again.

10        Q.   Some of those regulatory requirements relate

11   to the FDA 510(k) clearance process; correct?

12        A.   Very little, actually.  Most of what I relied

13   on was documentation that was not part of the 510(k).

14        Q.   And would you agree with me that it is

15   possible to look at and assess a company's due diligence

16   without reference to its regulatory submissions?

17        A.   I would think that to try to eliminate how the

18   company met regulatory requirements would be to omit a

19   significant portion of the work I would be looking at.

20        Q.   Okay.  So your -- you, in preparing this

21   report, have considered and included reliance on FDA

22   regulatory requirements; correct?

23        A.   Not reliance on.  I don't -- that's the part

24   of the question that I can't comprehend how you're trying
```

Elaine Duncan

 1    to use that in a sense.

 2         Q.   Okay.  I'm going to read you your answer so

 3    we're focused on what that answer is, and then hopefully

 4    you can educate me.

 5              Answer: "I would think that to try to

 6    eliminate how the company met regulatory requirements

 7    would be to omit a significant portion of the work I would

 8    be looking at."

 9              Did you omit -- or excuse me -- did you

10    eliminate how Ethicon met regulatory requirements in

11    preparation for your report today?

12         A.   Did I omit them?

13         Q.   Yes.  "Eliminate" is your word.

14              Did you eliminate them?

15         A.   I did not eliminate them or omit them.

16         Q.   So you did include regulatory requirements as

17    the basis of your opinions?

18         A.   No, right there, that's where you run off the

19    track, if I may say so.

20         Q.   Sure.

21         A.   So start again.  Did I --

22         Q.   I want to know how you think I ran off the

23    track.

24              You said you didn't eliminate regulatory

Elaine Duncan

```
 1    requirements when you prepared your report; correct?

 2         A.    Right.

 3         Q.    So did you rely on the regulatory requirements

 4    when you prepared your report?

 5         A.    There's a difference between omitting them and

 6    relying on them.

 7         Q.    Okay.  Let's get --

 8         A.    I incorporated all of the findings.

 9         Q.    Excuse me, let me ask the question first.

10         A.    Sorry.

11         Q.    What do you say is the difference between

12    omitting and relying?  What am I missing here?

13                   MR. DAVIS:  Object to the form.

14                   THE WITNESS:  If I were to omit them, I

15    would not be comprehensive.  As a part of due diligence,

16    we not only look at their compliance to standards and

17    procedures, we look at how those standards and procedures

18    were germane to the medical device regulations worldwide.

19    BY MS. FITZPATRICK:

20         Q.    Using your words, did you look at how the

21    standards and procedures used by Ethicon were germane to

22    the medical device regulations worldwide?

23         A.    I did.

24         Q.    Okay.  And in doing that, did you consider the
```

Elaine Duncan

```
1    regulatory requirements by the FDA for medical devices?

2         A.   I would have had to in order to do my job.

3         Q.   Okay.  Is there any way you -- you say in

4    order to do your job.

5              Could you have done your job without reference

6    to the FDA regulatory requirements?

7         A.   If we were looking only at the due diligence

8    for a European product, I could have eliminated the FDA.

9         Q.   But we're not talking about a European product

10   here.  We're talking about a product that was marketed in

11   the United States.

12             You do understand that; don't you?

13        A.   It was marketed worldwide.  That's why there's

14   so many languages.

15        Q.   Including in the United States.  You

16   understand that; right?

17        A.   Yes.

18        Q.   And you understand that this litigation is

19   filed in the United States; correct?

20        A.   Yes.

21        Q.   And you understand it's brought by women from

22   the United States; correct?

23        A.   If you say so.  I don't know these people.

24        Q.   And you never thought to ask Ethicon's lawyers
```

Elaine Duncan

1    anything about the underlying merits of the lawsuit?

2         A.   Ma'am, the underlying merits of the lawsuit

3    have nothing to do with the scope of my work.

4         Q.   Interesting.  Okay.  So we are talking about a

5    product that was marketed in the United States; correct?

6         A.   Yes.

7         Q.   And so because it is marketed in the United

8    States and because the lawsuit arises out of actions taken

9    by Ethicon in the United States; do you understand that?

10        A.   Yes.

11        Q.   Okay.  You looked at and considered the FDA

12   regulatory requirements in reaching your opinions in this

13   case; correct?

14        A.   With respect to the compliance of the company

15   to standards that were recognized at the time that I

16   was reviewing.  So in every instance, as I reviewed each

17   phase, I had to appreciate the standards, guidances and

18   regulations; I had to understand how those were translated

19   into procedures and how the personnel behaved accordingly.

20        Q.   Okay.  Now, so we don't get into any confusion

21   about the terms that I use, let me go back and find one of

22   your answers for a second.

23             I asked you earlier, "Could you have done your

24   job in producing this report without reference to the FDA

Elaine Duncan

1    regulatory requirements?"  That was my exact question.

2              And your response was, "If you were looking

3    only at the due diligence for a European product, I could

4    have eliminated the FDA;" correct?

5         A.   That's still correct.

6         Q.   We're looking at the due diligence of a

7    United States product here; correct?

8         A.   Yes, ma'am.

9         Q.   So you could not reach opinions about the due

10   diligence for a United States product like the one at

11   issue here without reference to the FDA requirements.

12             Is that what you're saying?

13             MR. DAVIS:  Object to the form.

14             THE WITNESS:  In order to know if the

15   personnel did the right thing, I had to look at

16   procedures, and those procedures had to conform to the

17   requirements imposed on Ethicon within the United States,

18   and that was directed by way of guidance documents,

19   standards, and regulations.  There's no way to isolate

20   just standards and just regulations because they are

21   intertwined.

22   BY MS. FITZPATRICK:

23        Q.   So the FDA regulations concerning medical

24   devices are intertwined with all of the opinions that you

Elaine Duncan

1    have reached concerning Ethicon's conduct regarding the

2    TVT-R in your report?

3            A.    No, I didn't say that.

4            Q.    Okay.  Tell me where I'm wrong.

5            A.    I said that in order to do due diligence in

6    each of the phases, we have to appreciate, again, how the

7    personnel behaved and did their job, what their

8    deliverables were, what documents they produced and what

9    they look like.  I take it, then, back to the procedures

10   that were required of them at that time, and those

11   procedures are derived directly from all of these things:

12   the standards, the regulations and the guidance documents

13   that are current at the time I am looking at each phase.

14   That's the due diligence I have to do.

15           Q.    I'm not sure what you're not understanding

16   about the question, but I'll try it again.

17                     MR. DAVIS:  Object to the form.

18   BY MS. FITZPATRICK:

19           Q.    Can you do what you did without -- let's see

20   what word you used -- looking at and relying on the FDA

21   regulations concerning medical devices?

22           A.    "Relying on," that's the word I think I

23   have -- the distinction you're making with "relying on."

24                     I have to assess their behavior, their work,

Elaine Duncan

1    their output in the context of what was happening at the

2    time I'm looking.  So if I'm looking at due diligence

3    of a license, I look at what's current at that time with

4    respect to procedures that derive from standards in

5    guidance documents and regulations.

6         Q.   Okay.  You keep giving me the same answer.

7         A.   It's the same answer?

8         Q.   Well, you're not answering the question.

9         A.   I'm sorry, I'm trying my best.

10        Q.   So let me try this again.

11             MR. DAVIS:  Object to the form.

12             MR. WALLACE:  You're talking over her.

13             THE WITNESS:  Thank you.

14   BY MS. FITZPATRICK:

15        Q.   Can you do what you did in this report without

16   looking at and considering the FDA regulations concerning

17   medical devices?

18        A.   You have to consider them.

19        Q.   Okay.  And you considered the FDA regulations

20   concerning medical devices in your report and in your

21   opinions that you reached in this case; right?

22        A.   As one of many things that I considered.

23        Q.   And you're not able to issue this report

24   without considering the FDA regulations.

Elaine Duncan

1                    Is that your testimony?

2         A.   No, I could go back and revise the report

3    and leave out FDA regulations, but it would be less than

4    a diligent job on my part because I have to be present

5    with respect to standards and regulations and best

6    practices that are current in each of these phases.

7                    So if you would want me to go back and revise

8    the report, for example, and take out just FDA

9    regulations, it would be peculiar, at best.

10        Q.   Would it be a different report?

11        A.   I can't say without attempting to do it.  It

12   wouldn't be what I normally do as a part of due diligence.

13        Q.   Okay.  And it wouldn't be --

14        A.   Can I give you an example?

15        Q.   Hang on.  Yes, you can, but let me make sure

16   that I'm understanding.

17        A.   Okay.

18        Q.   Because you and I seem to have lost --

19        A.   Our rapport?

20        Q.   I don't want to say rapport, but we seem to be

21   talking past each other.

22                   The report, as drafted, has intertwined

23   throughout it consideration of the FDA requirements for

24   medical devices; correct?

Elaine Duncan

1                     MR. DAVIS:  Object to the form.

2                     THE WITNESS:  From phase to phase,

3      there may be portions.  That's a very broad question,

4      so I have to answer you broadly.

5      BY MS. FITZPATRICK:

6           Q.   Let me read the question back because I'm not

7      sure why we're having so much trouble now.

8                     The report, as drafted, has consideration

9      throughout your opinions of the FDA requirements for

10     medical devices; isn't that right?

11                    MR. DAVIS:  Object to form.

12                    THE WITNESS:  Could you give me an

13     example where you see that, and then maybe that will help?

14     BY MS. FITZPATRICK:

15          Q.   Well, I just happened to open a page, 17.

16          A.   Okay.

17          Q.   We have reference to the 510(k) application,

18     510(k) clearance, 510(k) application requirements.

19          A.   I'm sorry, what page was that?

20          Q.   We're on page 17, the middle paragraph.  Just

21     randomly happened to open to this page.

22          A.   Okay.

23          Q.   Right in the middle, you're talking about the

24     510(k) application and clearance process.

Elaine Duncan

1          That's part of what you considered in reaching

2     your opinions in this case; correct?

3          A.   As you notice, I also considered the CE Mark

4     Analysis of the notified body.  So the whole paragraph is

5     dealing with the asset acquisition diligence.  So in order

6     for me to review that phase of the product, I had to

7     consider the activities in the context of that work.

8     That was what they were concerned with.  The asset

9     acquisition diligence that they did, their own checklist

10    incorporated these various issues, and I'm stating that as

11    a part of my report.

12         So if you go to their checklist, they cite

13    certain things.  I am summarizing what they were doing as

14    a part of their acquisition diligence.

15         Q.   Okay.  Here's where I think we may be having a

16    little bit of communication problem.

17         I asked you specifically about the 510(k)

18    application and clearance process.  Your response to me

19    concerned the CE Mark Analysis by a notified body.  That's

20    a separate issue.  I am asking you a very simple question.

21         You considered the 510(k) application and

22    clearance process for the TVT-R in reaching the opinions

23    that you have put forth in your expert report; correct?

24              MR. DAVIS:  Object to form.

Elaine Duncan

1                    THE WITNESS:  Specific to this

2    paragraph, no.  So in the example that you have cited, no,

3    I didn't -- that was not a part of it.

4                    MR. DAVIS:  Let her finish her answer.

5                    THE WITNESS:  Okay.  The 510(k)

6    application, I have here parenthetically to explain that

7    during the asset acquisition diligence, Ethicon was asking

8    certain questions and trying to obtain certain

9    information, and parenthetically, they were familiar

10   already with the product because they had already done

11   these things.  So in this paragraph, specifically, I'm

12   speaking of what they were doing during the asset

13   acquisition diligence, and I'm enumerating, basically,

14   what they were trying to do.  I'm putting it in the

15   context of their activities.  I don't need to look at the

16   510(k) to make this paragraph.  I could have left that

17   parenthetic phrase out entirely.

18   BY MS. FITZPATRICK:

19        Q.   Did you consider the 510(k) application and

20   clearance process in reaching your opinions in this case?

21   I've asked you that three times, now.

22        A.    To the extent that the company had

23   accomplished that checklist, it is germane to this

24   paragraph, yes, ma'am.

Elaine Duncan

1        Q.    I'm not talking -- let me just make clear.

2              I'm not talking about a single paragraph on

3    page 17.  I think that I've been very explicit in what

4    I've asked you.  My question concerns what you considered

5    in reaching your opinions in this case.

6              Did you consider the 510(k) application and

7    clearance process for the TVT-R device when reaching your

8    opinions in this case?

9        A.    No, mostly because in these cases, that 510(k)

10   had already been done with the exception of blue, and of

11   course, it's a part of my job to consider whether they

12   did what their obligations were or not.  I didn't look at

13   the 510(k) in order to make any determinations because

14   there's nothing in the 510(k) that would have helped me

15   with this determination.

16       Q.    Okay.  So if you turn to page 12, you cite two

17   Ethicon TVT 510(k) applications; right?

18       A.    Let me catch up with you.  Are you talking

19   about the first bullet point, for example?

20       Q.    The first bullet point, second bullet point,

21   third bullet point, the next paragraph on page 13.

22       A.    I was looking at the FDA's guidance documents

23   for the content of the files that I was looking at, so I

24   was trying to make sure that the due diligence -- in my

Elaine Duncan

1    due diligence review, that they had check-boxed all the

2    requirements for them.  I do not mean to say that I made

3    my conclusions based on the content of the 510(k).  I made

4    my conclusions that the performance testing that they did

5    to the standard, this standard that I'm citing, FDA

6    standard for surgical mesh.  When I looked at the testing

7    records and the kind of information that went into that

8    submission, it was consistent with that FDA standard for

9    surgical mesh.  This is how performance is judged when

10   you're looking at a standard of any type; did the data

11   conform to the standard of the realm.

12        Q.   And the standard is what?

13        A.   This guidance I mention here.  There is no

14   international standard for surgical mesh performance other

15   than this guidance, and this guidance takes the form of a

16   standard because it sets down the requirements for

17   evaluation of the performance of any surgical mesh,

18   regardless of its application.

19        Q.   Okay.  So Ms. Duncan, I don't think this

20   is difficult, and I hope that I'm getting this right.

21             You looked at Ethicon's conduct here against

22   the standard, the FDA standard, which as you say is, "FDA

23   Guidance for the Preparation of a Premarket Notification

24   Application for a Surgical Mesh;" correct?

Elaine Duncan

```
 1                    MR. DAVIS:  Object to the form.

 2                    THE WITNESS:  But I did not make

 3    my judgment based on the 510(k).  I made my judgment

 4    based on the information in the technical information.

 5    BY MS. FITZPATRICK:

 6         Q.   Okay.  So let's -- what I'm really trying to

 7    understand is why I'm looking at two pages that must say

 8    510(k) at least a dozen times, and I'm trying to

 9    understand why we have a recitation of 510(k)s.

10              For example, "I have researched the FDA's

11    records and confirmed that Ethicon received a number of

12    510(k) clearances for the TVT product."

13              You wrote that; correct?

14         A.   Yes.

15         Q.   So you looked at and confirmed that Ethicon

16    had 510(k) clearances for its TVT products; correct?

17         A.   As I said, I looked to confirm that they had

18    done their due diligence as a part of my due diligence.

19         Q.   Okay.  And part of the way that you determined

20    that they did their due diligence --

21         A.   Part of it.

22         Q.   -- is whether they received 510(k) clearances

23    from the FDA; correct?

24         A.   That is a requirement, so I had to confirm
```

Elaine Duncan

1    that as a part of my due diligence.

2         Q.   And you reached the opinion that Ethicon

3    engaged in appropriate due diligence in connection with

4    the TVT-R product; correct?

5         A.   I'm sorry, again?  I confirmed due diligence

6    for the --

7         Q.   In connection with the TVT-R product; correct?

8    That's your opinion?

9         A.   Yeah, this -- just repeat the question, again.

10   I just -- the structure kind of lost me there.  Say it

11   again.

12              MR. DAVIS:  It really doesn't help to

13   keep making faces at the witness.

14              MS. FITZPATRICK:  I'm just so perplexed.

15              MR. DAVIS:  I think it's rude.

16              MS. FITZPATRICK:  I mean, quite frankly,

17   I'm wondering if we need to do this a different day.

18   Maybe things --

19   BY MS. FITZPATRICK:

20        Q.   You reached the opinion in your report that

21   Ethicon engaged in appropriate due diligence in connection

22   with the TVT-R product; correct?

23        A.   The "in connection," you're very vague.  I'm

24   trying to say my due diligence was different phases, and

Elaine Duncan

1    for each of those phases, I found that the diligence

2    was proper and that the end result was adequate

3    performance as judged by the realm, standards of the

4    realm, and safety based on their behavior towards

5    complaints and hazard analysis and all of the things that

6    go into considering safety.

7              So when you just asked me due diligence, I

8    have to make sure I'm talking about the due diligence that

9    you're talking about.

10         Q.   Okay.  This is -- this is -- perhaps we do

11   need to get the Court on the phone to finish the

12   transcript.

13              I asked you to define "due diligence" for me.

14         A.   I did.

15         Q.   And I told you I was going to use your terms

16   so we didn't have this miscommunication issue that you

17   think we're having; okay?

18              I then asked you, very specifically, what I

19   think is a very simple question.  You've reached the

20   opinion in your report that Ethicon engaged in appropriate

21   due diligence -- your term -- in connection with the TVT-R

22   product.

23              Isn't that what you say in your report, or did

24   I miss it?

Elaine Duncan

```
 1          A.    In connection with.  I'm just trying to

 2    understand what you mean by "in connection with."

 3          Q.    As opposed to the TVT-O, as opposed to the

 4    Prolift.  We're talking -- you do understand we're here

 5    talking about what Ethicon did with respect to the TVT-R

 6    product?  You understand that; right?

 7          A.    Now, you said it differently.  You said --

 8    so I can state myself that I believe they did their

 9    due diligence for the product in each of the respective

10    phases that I reviewed for mechanical.

11          Q.    And one of the things that you rely on to

12    reach that conclusion concerning due diligence is the fact

13    that Ethicon received a number of 510(k) clearances for

14    the TVT products?

15          A.    It was only one of the things that I looked

16    at.  I didn't rely on it exclusively.

17          Q.    Okay.  Perhaps you want to listen to my

18    question.

19                One of the things that you rely on to reach

20    that conclusion concerning due diligence is the fact that

21    Ethicon received a number of 510(k) clearances for the TVT

22    products?

23          A.    The family of products.  That was one of the

24    things I looked at.
```

Elaine Duncan

1        Q.   And that's what I asked you.  So the answer is
2    "yes"?

3        A.   Yes.

4        Q.   And you go on in your report to say, "Despite
5    the impression created by the lay press, a 510(k)
6    submission is NOT" -- and you've got that capitalized,
7    -- "a 'shortcut to market.'"

8             What lay press are you referring to?

9        A.   Any of the lay press.  There's constantly -- I
10   live in an area where medical device companies are
11   concentrated, so the Star Tribune and the Pioneer Press
12   and any -- even the New York Times will often refer to a
13   510(k) as the shortcut process for FDA approval, and
14   that's the point I was trying to make.

15       Q.   You -- do you believe that there's a
16   difference between the requirements for PMA versus 510(k)
17   clearance by the FDA?

18       A.   It's not a belief; it's a fact.

19       Q.   Okay.  And you'll agree with me that the
20   510(k) submission takes a shorter period of time to get a
21   product to market; correct, than a PMA?

22       A.   Not always.

23       Q.   Okay.  Give me an example of when a PMA took a
24   shorter period of time to get something to market than the

Elaine Duncan

1    510(k) requirements.

2         A.    I'm not sure I can recall something off the

3    top of my head like that, but there are a number of

4    products that have gotten on the market through a PMA

5    supplement that has taken, certainly, less than a year,

6    and I've been personally involved in 510(k)s that take

7    longer than a year.

8         Q.    Okay.  Tell me what those are.

9         A.    As I said, I can't recall off the top of my

10   head these PMA supplements that have been short, nor

11   can -- would I be able to refer to 510(k)s that have

12   taken longer without divulging confidential information

13   of my clients'.  I'm just explaining to you, I've been

14   personally involved in 510(k)s that have taken more than

15   a year and, I think, in fact, one of them was almost two

16   years, to be clear.

17        Q.    Okay.  Now, we started this whole discussion

18   by me asking what I thought was a simple question.  And

19   the simple question is, you have relied on the federal

20   regulations and the 510(k) process as part or as one of

21   the bases for your conclusion that Ethicon acted

22   appropriately in bringing the TVT to market; correct?

23        A.    I considered it as one.  I didn't rely on it.

24        Q.    Okay.  Why do you spend two pages of probably

Elaine Duncan

1   30 pages discussing the 510(k) process in detail if it's

2   not something that you relied on?  Why did you choose

3   to spend this much paper doing that if it really has no

4   basis in your report?

5            Can I just scratch this whole section out?

6                 MR. DAVIS:  Object to the form.

7                 THE WITNESS:  The question is can you

8   scratch it out?

9   BY MS. FITZPATRICK:

10       Q.   Because it doesn't mean -- is it meaningless

11   in the connection with your report?

12                 MR. DAVIS:  Object to the form.

13   BY MS. FITZPATRICK:

14       Q.   I'm trying to understand why.

15       A.   It is not meaningless, but if you want to

16   scratch it out, feel free, because it would not make an

17   impact on my conclusions.  If you chose to throw every

18   reference I've made to the 510(k) out of this report, my

19   conclusions would be the same.

20       Q.   Okay.  Well, about -- let me back up.  About

21   10 minutes ago, you had a different answer, and I want to

22   make sure that I know which one is correct.

23                 MR. DAVIS:  Are you acknowledging that

24   you're repeating the same questions?

Elaine Duncan

```
1    BY MS. FITZPATRICK:

2         Q.   Ms. Duncan, you just told me that if you took

3    every reference to the 510(k) process out of this, it

4    would be the same report; correct?  Is that what you just

5    said?

6         A.   No, ma'am.  I said if you took them out, my

7    conclusions would be the same.

8         Q.   Okay.  What you told me earlier is that -- I

9    asked you, "You're not able to issue this report without

10   considering the FDA regulations.  Is that your testimony?"

11        And I asked you if it would be a different

12   report, and what you said is, "I can't say it without

13   attempting to do it.  It wouldn't be what I normally do as

14   part of due diligence."

15        So would this report stay the same if you take

16   out references to the FDA regulations and 510(k) process,

17   or do you need to go back and do that and see what the

18   report would look like after that?

19             MR. DAVIS:  I object to the suggestion

20   that those two answers are inconsistent with each

21   other.

22             THE WITNESS:  And I'm sorry to ask you,

23   but please repeat the question because I was interrupted

24   in my train of thought.  Please repeat the question.
```

Elaine Duncan

```
1    BY MS. FITZPATRICK:

2         Q.   I asked you, "You're not able to issue this

3    report without considering the FDA regulations.  Is that

4    your testimony?"

5              Answer: "No, I could go back and revise the

6    report and leave out the FDA regulations, but it would be

7    less than a diligent job on my part because I have to be

8    present with respect to standards and regulations and best

9    practices that are current in each of these phases.  So if

10   you want me to go back and revise the report, for example,

11   and take out just FDA regulations, it would be peculiar at

12   best."

13             Question:  "Would it be a different report?"

14             Answer:  "I can't say without attempting to do

15   it.  It wouldn't be what I normally do as part of due

16   diligence."

17             Okay.  That -- that's verbatim what you read

18   to me before.

19        A.   And that's not inconsistent with what I said

20   later, because what I told you is that my conclusions

21   would be the same if you insisted on taking out any of the

22   510(k) references in my report.

23             You just reminded me that all of these people

24   that are listed on the front of this document are in the
```

Elaine Duncan

1   United States, and now you would want me to remove the

2   regulations that apply to these people?  I don't

3   understand why you would ask me to do that.

4        Q.   I'm not asking you to do anything.  I'm asking

5   if it would be possible to do that.  I'm trying to

6   understand, Ms. Duncan, and I think -- quite frankly, I

7   thought it was a fairly simple concept.

8            You have relied on the FDA regulations to

9   reach your conclusions concerning the appropriateness of

10  Ethicon's conduct with respect to the TVT as set forth in

11  your report; correct?

12               MR. DAVIS:  I object to the form.  Go

13  ahead and answer.

14               THE WITNESS:  Ma'am, yes, I have to

15  take exception to your word "relied."  I've mentioned this

16  many times.  You can ask me many times and I will not

17  agree to the term "rely."  I did a more comprehensive task

18  than just looking at the FDA documentation.  I looked at

19  worldwide documentation, so I take exception to your use

20  of the word "relied."

21  BY MS. FITZPATRICK:

22        Q.   All right.  We can parse words all day.  Let

23  me make it easy.

24            You have considered the FDA regulations in

Elaine Duncan

1    reaching your conclusions concerning the appropriateness

2    of Ethicon's conduct with respect to the TVT as set forth

3    in your report; correct?

4         A.    I had to, yes.

5         Q.    Okay.  And you had to because you couldn't

6    reach the conclusions without considering.

7              Why did you have to do it, then?

8              MR. DAVIS:  Object to the form.

9    BY MS. FITZPATRICK:

10        Q.    Why did you have to do it?

11             MR. DAVIS:  Asked and answered.  You can

12   answer it again.

13             THE WITNESS:  I will try to answer it

14   again.

15             As I told you, the due diligence process,

16   whether I'm looking at a potential acquisition for a

17   client or I'm looking at this specific task, the due

18   diligence process is a systematic process of looking at

19   the time frame we're talking about, the regulations and

20   standards and guidance documents and best practices at

21   that time frame, how they are reduced to practice into

22   procedures, and thirdly, how those procedures are

23   practiced by the personnel and the deliverables that come

24   from that work.  All three of that pyramid must take place

Elaine Duncan

```
 1   in order to do a comprehensive due diligence, and I did my

 2   best to do that throughout the effort that I put into this

 3   report.

 4   BY MS. FITZPATRICK:

 5        Q.   Is it -- I'm trying to understand what you're

 6   saying.

 7             Are you saying that you could not do a

 8   comprehensive due diligence without considering the FDA

 9   regulations in connection with this report?

10        A.   It would be less than professional.

11        Q.   Okay.

12             MR. DAVIS:  At some point, let's take a

13   break, but you can finish this line.

14             MS. FITZPATRICK:  Yeah, let me just

15   finish this; okay?

16   BY MS. FITZPATRICK:

17        Q.   And because of your opinion on that, you

18   mentioned -- in assuming the three -- I don't know

19   where it is -- you said three of that pyramid.

20             One of the three things that is the

21   cornerstone or that you considered is compliance by

22   Ethicon with FDA regulations.  It's one of the three?

23             MR. DAVIS:  Object to the form.

24             THE WITNESS:  All regulations, whether
```

Elaine Duncan

```
1    it's FDA or European, it's part of the comprehensive

2    review.

3    BY MS. FITZPATRICK:

4         Q.   Okay.  And that includes the FDA regulations;

5    right?

6         A.   It has to include that and whatever

7    jurisdiction was appropriate at the time I'm looking at.

8         Q.   Okay.  And did you reach the conclusion, based

9    on your review of the documents, that Ethicon

10   appropriately complied with the requirements of the FDA

11   510(k) clearance process with respect to the TVT-R

12   mechanical device?

13        A.   I did not do an extensive review of the

14   510(k).  I did a cursory review for content and noticed

15   that the FDA had accepted it.  I did not try to do due

16   diligence on the 510(k).

17        Q.   Okay.  Okay.

18        A.   I've been drinking water.

19        Q.   Oh, sure.  Any time you need to take a break

20   like that, don't hesitate to ask me.

21                  (Whereupon, a recess was taken from

22                  2:34 p.m. to 2:45 p.m.)

23   BY MS. FITZPATRICK:

24        Q.   Do you believe, Ms. Duncan, that the FDA's
```

Elaine Duncan

1    review of the 510(k) submissions for the TVT products is

2    evidence that the TVT-R mechanical cut has met certain

3    scientific standards?

4        A.    I would need you to qualify which scientific

5    standards you're speaking of.

6        Q.    Okay.  Well, maybe it's easier if you take out

7    a -- page 13 of your report.

8        A.    Thank you.

9        Q.    "These applications" --

10        A.    Where are you, please?

11        Q.    I'm in the fourth paragraph, third sentence.

12              "These applications follow strict submission

13    content examinations and must meet the FDA's

14    professional, scientific review standards."

15              Is that correct?

16        A.    Okay.  That's speaking of their internal

17    review standards, the way they practice their review.

18    They have review procedures, and they require certain

19    scientific evidence.

20              So what I'm speaking of there is the FDA's

21    review standards.

22        Q.    Okay.  So do you believe that the FDA's review

23    of the 510(k) submissions for the TVT-R product is

24    evidence that that product has met certain professional,

Elaine Duncan

1    scientific review standards?

2         A.   Do I believe that it's evidence that it's met

3    certain scientific review standards?

4         Q.   Uh-huh.

5         A.   It met the FDA's professional review

6    standards.  In order to be clear, that's not -- I think

7    you need to understand "professional" and "scientific"

8    are not both modifying the word "review."  So it's

9    professional standards and scientific standards that

10   they use when they are reviewing.  So we're not -- we're

11   not speaking here in this sentence to any specific

12   scientific standards.  That's not what I meant by that

13   sentence.

14        Q.   What did you mean by "scientific review

15   standards"?

16        A.   When FDA reviews, they have standards for

17   their review of a submission.  They have professional

18   standards, and they have scientific standards when they

19   are conducting their review.  It's their own internal

20   practices.

21        Q.   Okay.  So do you believe that the FDA's review

22   of the 510(k) submission for the TVT-R product is evidence

23   that that product has met these FDA professional,

24   scientific review standards?

Elaine Duncan

1         A.   I said the applications follow the strict

2    submission content examinations.  I am not making a

3    judgment on the quality of the submission contents or

4    whether FDA did their job.  My sentence is the

5    applications have to follow the strict submission content

6    examinations and their own internal standard.

7              So let me give you an example; okay?  So when

8    we make a report to FDA, we have to submit both the

9    protocol and the report; we have to have an acceptance

10   criteria; we have to have statistical analysis of the

11   data; we have to describe the methodology for the testing

12   and sometimes even the test fixtures.  Those are the

13   scientific review standards I'm speaking of.  If they

14   don't see that quality as scientific work, they won't even

15   review the submission.

16        Q.   So you don't have an opinion as to whether

17   Ethicon appropriately completed their 510(k) submission to

18   the FDA; correct?

19        A.   When they were cleared by FDA, that meant that

20   they met FDA's expectations.  I didn't judge whether or

21   not they did it well or did it poorly or -- I didn't

22   get in -- as I said previously, I did not do specific due

23   diligence on the submission, itself.  I didn't judge the

24   content and FDA and the company.  I just recognized that

Elaine Duncan

1    they met FDA's requirement, and therefore, got the 510(k).

2    That's an upper-level review.

3         Q.   Okay.  Can you agree with me, Ms. Duncan, that

4    there are certain steps that a medical device manufacturer

5    must follow to responsibly develop a safe and effective

6    product?

7                   MR. DAVIS:  Object to the form.

8                   THE WITNESS:  As I said previously, many

9    medical devices have been very successfully designed

10   without following certain steps.

11   BY MS. FITZPATRICK:

12        Q.   But there's a reason this process exists.

13             You agree; right?

14        A.   Certainly.  I was part of helping to

15   accomplish that.

16        Q.   Okay.  And medical device manufacturers are

17   not the wild west.  There's a certain way and certain

18   steps that a medical device manufacturer should follow to

19   ensure that they are making the safest, most effective

20   product feasible; right?

21                  MR. DAVIS:  Object to the form.

22                  THE WITNESS:  I have to answer

23   that in the context of today.  There are requirements

24   today, there were requirements yesterday, there were

Elaine Duncan

1    requirements a year ago.  And when we look at the certain

2    steps, as you've called them, I have to be in the context

3    of what are the requirements in that time frame.  I can't

4    make a generalization, as you would hope.

5    BY MS. FITZPATRICK:

6         Q.   Okay.  Not helping.  Let me ask you,

7    regardless of the time frame, it's important that a

8    medical device manufacturer follow the requirements that

9    are in effect at that time; correct?

10        A.   If you're speaking of regulatory requirements,

11   obviously.

12        Q.   I'm not speaking about regulatory

13   requirements.

14             Do you believe that a medical device

15   manufacturer has an ethical obligation to create the

16   safest product that it can?

17                  MR. DAVIS:  Object to the form.

18                  THE WITNESS:  That's essentially the

19   Code of Ethics of most of the medical device manufacturers

20   I work with.

21   BY MS. FITZPATRICK:

22        Q.   Do you agree with it or not?

23        A.   Yes, I agree with it.

24        Q.   Okay.  And you will agree with me that to

Elaine Duncan

1    fulfill that ethical obligation, a medical device

2    manufacturer needs to follow a process to establish the

3    safety and feasibility of a product before it goes on the

4    market; correct?

5                    MR. DAVIS:  Object to the form.

6                    THE WITNESS:  Please forgive me, but

7    your questions are rather tangled.  If you can break it

8    down, I'd be happy to try to answer it.

9                    MS. FITZPATRICK:  Could you read the

10   tangled question back?

11                   (The record was read back.)

12                   THE WITNESS:  "Needs to follow a

13   process."  Read from that point.  "Needs to follow a

14   process."

15                   (The record was read back.)

16                   THE WITNESS:  Okay.  I guess what

17   stumbled me here was you put "feasibility" at the end of

18   the question, so if we took "feasibility" out of that

19   question, I can agree with you in principle, because you

20   have it backwards, basically.

21   BY MS. FITZPATRICK:

22       Q.   You don't think that -- well, let me break it

23   down to two if that makes you happy.

24                   Will you agree with me that to fulfill that

Elaine Duncan

1  ethical obligation, a medical device manufacturer needs to

2  follow a process to establish the safety of a product

3  before it goes on the market?

4                    MR. DAVIS:  Object to the form.

5                    THE WITNESS:  "A process" is rather

6  vague, but in general, they follow processes.

7  BY MS. FITZPATRICK:

8        Q.   Okay.  Now, you agree with me that, ethically,

9  the aim of a medical device manufacturer is not just to

10  create a product that is safe enough.  It must be the

11  safest feasible under the circumstances; is that correct?

12                    MR. DAVIS:  Object to the form.

13                    THE WITNESS:  We don't always know that

14  answer, so when you say, "Is that correct?" again, I have

15  to look at time frame because we get new information as

16  the product is used and even in different markets for

17  different applications.  So when you write a broad -- you

18  say a broad statement like that, you're asking me to

19  assume that we always know everything we need to know,

20  and it's not true.

21  BY MS. FITZPATRICK:

22        Q.   Is it difficult for you to agree with me that

23  a medical device manufacturer should create the safest

24  product feasible under the circumstances?  Is that

Elaine Duncan

```
1    difficult to agree with?

2                     MR. DAVIS:  Object to form.

3                     THE WITNESS:  "Under the circumstances"

4    is the vague part, but with respect to the -- to that, I

5    think it's a generally agreeable statement that we need

6    to make them as safe as feasible, but I don't know the

7    circumstances you're speaking of.

8    BY MS. FITZPATRICK:

9         Q.   Okay.  Let me redraft my question again for

10   you.

11                  Should a medical device manufacturer create

12   the safest product feasible?

13        A.   If they choose to make it, yes, they should.

14        Q.   And in doing that, a medical device

15   manufacturer has to take into account everything that

16   could go wrong with the product; correct?

17        A.   In my professional world, I have to be

18   precise.  So "everything that could go wrong"?

19        Q.   Uh-huh.

20        A.   I believe that's quite imprecise, and I mean,

21   an alien could get the product and misuse it, and believe

22   me, I've sat in on hazard analysis where people will even

23   bring up aliens.

24                  So there are limitations to our ability to
```

Elaine Duncan

1    make the safest product, and "could go wrong" is a very

2    broad term.  We have to be specific when we develop our

3    hazard analysis and risk assessment.

4         Q.   So you can't just agree with me that a medical

5    device manufacturer must take into account everything that

6    can go wrong with the product when designing it?  You

7    can't agree with that statement?

8         A.   You dropped your voice at the end.

9         Q.   So you can't just agree with me that a medical

10   device manufacturer must take into account everything that

11   can go wrong with the product when designing it?

12        A.   "Everything that can go wrong," I -- we would

13   never make the product if we made -- if we followed that

14   concept that you just espoused, "everything that can go

15   wrong."  We can't make a product for everything that can

16   go wrong.  We'd never have one.

17        Q.   Let me repeat the question again.  So we'll

18   try this a third time.

19             Can you agree with me that a medical device

20   manufacturer must take into account everything that can go

21   wrong with a product when designing it?

22             MR. DAVIS:  Object; asked and answered.

23             THE WITNESS:  My same answer.  We cannot

24   take everything into account because, A, we may not know

Elaine Duncan

1    everything, and two, we might not ever make one.

2    BY MS. FITZPATRICK:

3         Q.   Okay.  You certainly can agree with me that a

4    medical device manufacturer must take into account known

5    risks when designing a product; correct?

6         A.   Known risks, yes, ma'am.

7         Q.   And you can agree with me that a medical

8    device manufacturer must take into account all foreseeable

9    risks associated with the product?

10        A.   "All" is a big word, but "foreseeable," I

11   would agree with.

12        Q.   I need to get the full question out, so --

13        A.   I'm sorry.

14        Q.   You can agree with me that a medical device

15   manufacturer must take into account all foreseeable risks

16   associated with the product when designing it; correct?

17        A.   All foreseeable risks, I would agree with

18   that.

19        Q.   Okay.  And you agree with me that a medical

20   device manufacturer must take into account all potential

21   hazards associated with a product when designing it;

22   correct?

23                    MR. DAVIS:  Object to the form.

24                    THE WITNESS:  There's an issue with the

Elaine Duncan

1    word "all possible hazards" because all possible hazards

2    may not be defined.  We have to understand the potential

3    to do harm, and that's not always known at the time of the

4    design and development.

5    BY MS. FITZPATRICK:

6         Q.   Okay.  Do you agree with me that a medical

7    device manufacturer must take into account its past

8    experiences with other medical devices when developing a

9    new medical device?

10        A.   Not only their own past experiences, but the

11   experiences of others in similar product areas.

12        Q.   Okay.  Now, a responsible medical device

13   manufacturer should never assume that their product is

14   safe without verification or validation of the design;

15   correct?

16             MR. DAVIS:  Object to the form.

17             THE WITNESS:  I don't know of anyone who

18   assumes safety.

19   BY MS. FITZPATRICK:

20        Q.   That would be a bad thing to do; wouldn't it?

21        A.   Assuming safety?

22        Q.   Yes.

23        A.   I think there are some considerations for

24   modifications to products and different applications where

Elaine Duncan

1   we can build from past experience, as you say, but that's

2   not necessarily an assumption.  That's developing from

3   past experiences.

4       Q.   You'll agree with me that a medical device

5   manufacturer should err on the side of caution when

6   investigating potential safety concerns and hazards

7   associated with their products; correct?

8              MR. DAVIS:  Object to the form.

9              THE WITNESS:  Err on the side of

10  caution, that's not a phrase we typically use.  We don't

11  err on the side of caution.  We write precautions and

12  cautions and warnings, and so we don't err on the side of

13  caution.

14  BY MS. FITZPATRICK:

15      Q.   Have you ever heard that phrase before?

16      A.   It's not something we use in my field of

17  expertise.

18      Q.   Have you ever heard that phrase before?

19      A.   Certainly.

20      Q.   And what do you understand it to mean?

21      A.   Again, in the medical device industry, we

22  don't err on the side of caution.

23      Q.   Okay.

24      A.   We don't deliberately err anywhere.

Elaine Duncan

```
1            Q.   Okay.  Now, I want to go through a couple of

2    issues to make sure that we're on the same page as we

3    discuss these concepts going forward.

4                 Do you understand that the term "concept"

5    means coming up with the idea of a product?  You come up

6    with the concept of a potential medical device that can be

7    created; correct?

8            A.   Sorry to do this again, but this has a

9    specific meaning in design and development -- design,

10   control and review.  So a concept phase or a concept stage

11   has specific connotations.

12           Q.   Okay.  Tell me what the concept stage is.

13           A.   Typically, we're taking it -- we're taking a

14   look at our -- the conceptual context would be is

15   there a market?  Is there a need?  Is there technological

16   capability?  Do we generally understand what is needed

17   about the product?  But these are all very general

18   contexts.  We -- it's an exploratory process, the concept

19   phase.

20           Q.   Okay.  It sounds to me like it's coming up

21   with the idea for a product, but we can differ on that.

22                What does feasibility mean?

23           A.   Typically, when I see feasibility, what we're

24   really looking at, then, is as we've moved from concept,
```

Elaine Duncan

1    have a conceptual perspective of what the product is

2    going to do, I now need to understand whether or not there

3    is technology to support it.  Can I make a prototype?  Can

4    I make it in 3D form?  Is it -- literally, is it feasible

5    for me to even make the product?

6         Q.   Thank you.  Do you agree with me that the next

7    step would be to actually design a prototype of the

8    product?

9              MR. DAVIS:  Object to form.

10             THE WITNESS:  Sometimes it's done in the

11   feasibility stage.  Sometimes it's even done in the

12   concept stage.  There's no rigid rule about when you make

13   the prototype.

14   BY MS. FITZPATRICK:

15        Q.   But you have to design it; correct?  Someone,

16   somewhere, has to design the product; right?

17        A.   Ma'am, I'm a mechanical engineer, so when I

18   think in terms of designing it, I'm usually talking in

19   terms of drawing it.  And so there are a lot of products

20   that are never drawn or designed in that vernacular.  So

21   designing is the entire process.  It's not one event.

22   Somebody just doesn't sit down and say, "Oh, I designed

23   it."

24        Q.   And any time -- let's use this pen.  Bic came

Elaine Duncan

```
 1   up with the concept of their Velocity Gel 0.7 pen.

 2             Let's just assume that for the purposes of

 3   this; correct?

 4        A.   If you choose to.

 5        Q.   How did this exist if someone didn't come up

 6   with the idea?

 7                  MR. DAVIS:  Object to the form.

 8                  THE WITNESS:  You said "someone."

 9   Often, it's a team.  Often, it's a modification of an

10   existing product.  That product's been around for a long

11   time.  I couldn't tell you how it came about.

12   BY MS. FITZPATRICK:

13        Q.   This particular pen?

14        A.   Uh-huh.

15        Q.   Someone or someones came up with the concept

16   of this pen.

17        A.   I can take that on faith.

18        Q.   Okay.  And to get from the concept to what it

19   is I hold in my hand, someone actually, at some point, had

20   to build a pen; right?

21        A.   Yes.

22        Q.   And that first pen that was built is the first

23   prototype of this pen; correct?

24        A.   Ma'am, not always.  I'm sorry to say that.
```

Elaine Duncan

```
1           Q.   Okay.

2           A.   That isn't always the way it works.

3           Q.   Tell me why not.

4           A.   Because if Bic already knew a lot about pens,

5    they might have gone directly into production.  They may

6    have never made a prototype.

7           Q.   What would you prefer to talk about?

8                    MR. DAVIS:  Object to the form.  How can

9    she answer that question?

10                   MS. FITZPATRICK:  Because it's such a

11   simple concept, but -- and it's a little frightening that

12   you don't understand it, but okay.

13   BY MS. FITZPATRICK:

14          Q.   Included in the design is, you need to do a

15   risk analysis.  So let's just assume this is the very

16   first one of these and this is the very first prototype;

17   okay?  We didn't go directly to market.  We're making a

18   new product -- this is it -- and Bic makes its first

19   prototype of this pen; okay?  Let's just assume that.

20                   Bic should then test this pen to make sure it

21   does what it's supposed to do, that it's effective;

22   correct?

23                   MR. DAVIS:  Object to the form.

24                   THE WITNESS:  I'm sorry, I don't know
```

Elaine Duncan

1    what you mean; should they test it?  Does it write?  Is

2    that what you're asking?

3    BY MS. FITZPATRICK:

4         Q.   Sure.  Does it do what it's supposed to do?

5    Isn't that what I said?  Yeah, does what it's supposed to.

6    And you know a pen is supposed to write, so --

7         A.   I presume they did, but I don't understand

8    the --

9         Q.   They should test it to make sure that it

10   actually writes; correct?

11                   MR. DAVIS:  Object to the form.

12                   THE WITNESS:  Again, "should" is a big

13   word in my world.  "Should" is a requirement.  I don't

14   know if Bic has that requirement.  I would think that, to

15   save money from doing it poorly, they would probably test

16   it somewhere along the line, but you're asking me to

17   conjecture, and "should" means a requirement.

18                   I'm a regulatory professional, and I will use

19   the term of art in my world, and "should" is a

20   requirement.  So I can't say what Bic should or should not

21   do.

22   BY MS. FITZPATRICK:

23        Q.   How much have you been paid by Ethicon here?

24        A.   I think you can call back the record, I --

Elaine Duncan

```
 1          Q.    About $60,000?

 2          A.    Probably.

 3          Q.    So Ethicon has paid you $60,000 and you still

 4    have no idea what we're talking about here?

 5                     MR. DAVIS:  Object to the form.

 6                     THE WITNESS:  Yes, I object to the

 7    form.  I didn't say I didn't have any idea of what you

 8    are talking about.  I said I don't know what Bic has to

 9    do.

10    BY MS. FITZPATRICK:

11          Q.    Okay.  Does Ethicon have an obligation to do a

12    risk analysis on the TVT-R?

13                     MR. DAVIS:  Object to the form.

14                     THE WITNESS:  To -- today, they do a

15    risk analysis on a periodic basis as a part of the risk

16    management.  And so, therefore, I can say yes, they would

17    need to be doing that.

18    BY MS. FITZPATRICK:

19          Q.    Okay.  And Ethicon had an obligation to do a

20    risk analysis on the TVT-R since 1998; correct?

21                     MR. DAVIS:  Object to the form.

22                     THE WITNESS:  Actually, in 1998, their

23    obligation to do one, it would not reside at Ethicon.

24    It would reside at Medscand, and they did.
```

Elaine Duncan

1    BY MS. FITZPATRICK:

2         Q.   After Ethicon acquired the TVT-R, they had a

3    duty to continue to monitor the product that they were

4    marketing for safety; correct?

5         A.   That's correct.

6         Q.   So from the time that Ethicon acquired the

7    TVT-R, it was under a continuing obligation to monitor the

8    TVT-R mechanical device for safety considerations.

9         A.   Excuse me, I wouldn't characterize it as a

10   mechanical device, if you mean a mechanical cut.

11        Q.   Okay.  So from the time that Ethicon acquired

12   the TVT-R, it was under a continuing obligation to monitor

13   the TVT-R mechanically-cut device for safety

14   considerations; correct?

15        A.   That's correct.

16        Q.   And Ethicon was not permitted to simply rely

17   on what Medscand had done and turn a blind eye to any new

18   safety considerations that came up post-1998; was it?

19                  MR. DAVIS:  Object to the form.

20                  THE WITNESS:  I don't understand the

21   blind eye that you're referring to.  If you --

22   BY MS. FITZPATRICK:

23        Q.   Have you ever heard the term "turn a blind

24   eye"?

Elaine Duncan

```
 1                    MR. DAVIS:  Let her finish her answer.

 2                    THE WITNESS:  If you would like to break

 3      the question down again, it was lengthy and I didn't

 4      understand what you were driving at.  So "blind eye," I

 5      don't know when you mean a "blind eye."  Whose blind eye,

 6      and when and where and what?

 7                    So if you want to rephrase the question, I'll

 8      try to answer it.

 9                    MS. FITZPATRICK:  Can you read the

10      three-line, convoluted, confusing question back to

11      Ms. Duncan?

12                    (The record was read back.)

13                    THE WITNESS:  In my due diligence, I

14      never saw a situation where Ethicon, as you put it, turned

15      a blind eye to any known questions of safety -- not only

16      not safety, but questions of safety.  My due diligence

17      showed -- for me, the records I looked at, showed that

18      they were diligent in their review of safety from the time

19      period that they began to market the product, and that

20      was, I believe -- I know the acquisition was November '97,

21      and so I -- I'm sorry, I'm blanking on the actual date

22      when they put the product into the market.

23      BY MS. FITZPATRICK:

24          Q.   I'm going to ask you to listen to my question
```

Elaine Duncan

1    and answer my question.  I didn't ask you whether Ethicon

2    did turn a blind eye.  I asked you whether Ethicon was

3    permitted to turn a blind eye to any new safety

4    considerations that arose after 1998?

5                    MR. DAVIS:  Object to the form.

6                    THE WITNESS:  Permission from whom?

7    BY MS. FITZPATRICK:

8        Q.   Any kind of standards.  You got a lot of

9    requirements in here.

10                   You really don't know what we're talking

11   about?

12                   MR. DAVIS:  Object to the form.

13                   THE WITNESS:  I didn't say I didn't

14   understand what you were talking about.  I'm trying to

15   understand your sentence.  So were they permitted?

16                   So regulatory agencies that were in place at

17   the time would have not given any manufacturer permission

18   to turn a blind eye.  Is that -- are we getting close?

19   BY MS. FITZPATRICK:

20       Q.   That's exactly what I asked.

21       A.   Okay.

22       Q.   Okay.  And do you know what a living document

23   is?

24       A.   I would assume that you're speaking of a

Elaine Duncan

```
 1   document that is revised and changed according to the

 2   context with respect to standards and regulations.

 3          Q.   What's an FMEA?

 4          A.   A failure mode effects analysis.

 5          Q.   And what's a risk assessment?

 6          A.   A risk assessment, typically, goes beyond a

 7   simple FMEA.

 8          Q.   Tell me how.  Let me just do this.

 9               What's the difference between an FMEA and a

10   risk assessment?

11          A.   Well, actually, some FMEAs include a risk

12   assessment.  Basically, a failure modes effects analysis,

13   the analysis part of it is where we take the failure

14   mode and its effect and try to score it, and some

15   individuals consider that relational assessment of

16   the severity, frequency and detectability a form of

17   assessment.  Other people believe that assessment takes

18   place in addition to an FMEA.

19          Q.   What is a design FMEA?

20          A.   That's, typically, where we'll take the input

21   requirements at an early stage in the design and

22   development and attempt to project or hypothetically

23   define a potential hazard based on the failure to meet

24   that input requirement.  Sometimes, the information is
```

Elaine Duncan

1    based on prior products, prior literature, but in the

2    design phase, we may not be fully knowledgeable about what

3    the hazards are associated with a specific product we're

4    working on.

5         Q.    Okay.  You would agree with me that any known

6    hazard should be included in a dFMEA; correct?

7         A.    We certainly try to incorporate known hazards.

8         Q.    And the dFMEA is actually a document;

9    correct -- something that you can look at to see what a

10   company considered as potential hazard; right?

11               MR. DAVIS:  Object to the form.

12               THE WITNESS:  A dFMEA, is that what you

13   asked?

14   BY MS. FITZPATRICK:

15        Q.    Yep.

16        A.    All FMEAs eventually become a type of form of

17   a document, yes.

18        Q.    Okay.  And that document should include any

19   known hazard or known potential hazard; correct?

20        A.    As I said previously, we try to define the

21   known hazards.  If they're known, we try to include

22   them, certainly.

23        Q.    And it should also include the foreseeable

24   hazards associated with the use of the product; correct?

Elaine Duncan

1          A.   We try and base that on literature and

2     knowledge from other products.

3          Q.   And that dFMEA is a living document, meaning

4     that as a company acquires knowledge of additional or new

5     hazards, it should incorporate them into the dFMEA on an

6     ongoing basis; right?

7                    MR. DAVIS:  Object to the form.

8                    THE WITNESS:  I can tell you that the

9     practice in the industry is frequently to consider that

10    the design FMEA is only active -- is only an active

11    document during the design and development phase, and once

12    the product is transferred to manufacturing in the design

13    transfer phase, that many companies will consider that

14    document as a part of the design history file, would only

15    go back to that document if they intend to make

16    significant changes to the design.  So it's not really a

17    perpetual document as you're inferring.

18    BY MS. FITZPATRICK:

19         Q.   Okay.  Would you agree with me that one of the

20    purposes of the dFMEA is to minimize the failure effects

21    of a particular design?

22         A.   We -- it helps us define the failure modes,

23    and it helps us to evaluate counter-measures.

24         Q.   And by "counter-measures," you're talking

Elaine Duncan

1   about either designing out the risk, if that's feasible;

2   correct?

3           A.   That may be one method.

4           Q.   And another method is to, if you can't

5   completely design out the risk, you work to minimize the

6   risk that's in the product; correct?

7           A.   That's typically what will occur.

8           Q.   Okay.  And the third is if you can't design it

9   out or minimize it, is to include that hazard of risk on

10  an instruction for use or a warning to the consumer;

11  correct?

12                  MR. DAVIS:  Object to the form.

13                  THE WITNESS:  In a broader sense, the

14  residual risks are often incorporated in communications,

15  and that takes the form of labeling, and labeling includes

16  an IFE, but that's not the only way we communicate.

17  BY MS. FITZPATRICK:

18          Q.   Okay.  But you're talking about communicating,

19  in whatever form, a risk to, in this case, it would be the

20  physician; correct?  So if a physician understands that

21  there are certain risks or hazards inherent in the

22  product?

23          A.   You've used a lot of terms there, so a hazard

24  has the potential to do harm, and when we assess risk,

Elaine Duncan

```
 1   we're also looking at severity.  So we are in the review
 2   of the mitigation measures we take and the communications
 3   we make, we consider not only the potential to do harm,
 4   the hazard, but we also consider the severity and
 5   detectability, and based on all three of those judgments
 6   and the testing, we come to a conclusion of the best way
 7   to mitigate the hazards.
 8        Q.   Again, we're talking about through the
 9   communication --
10        A.   That's one way.  Sometimes it's testing.  To
11   understand the limits of the product, if we can test
12   on the bench, we can test in the animals, and we can test
13   in a clinical trial, and in each of these sequential
14   validations, if that's what's required -- sometimes it's
15   only bench testing -- as this body of knowledge is formed,
16   we continue to go back into that hazard analysis and make
17   sure that we haven't gained different information and try
18   to make the best comprehensive decisions on the hazards
19   we've identified.
20        Q.   Okay.
21        A.   So it may take iterations.  It's not just one
22   sit-down and one and done.
23        Q.   Okay, agreed.  So you start, you try to
24   mitigate the risks, the harms in whatever way you can.
```

Elaine Duncan

```
1          A.    Uh-huh.

2          Q.    You test it again.  If it's still at an

3    unacceptable range or something you're concerned about,

4    you can go back to the design process.

5                You try to come up with modifications to the

6    design that will minimize the risks to patients; correct?

7          A.    It's important to realize that a failure modes

8    effects analysis does not necessarily always mean that a

9    failure to meet the input requirement creates a harm or a

10   hazard to the patient.  So a component or a part may

11   fail at a defined time without necessarily engendering

12   a harm to the patient.  So all of that is taken into

13   context.

14         Q.    Okay.  But you'll agree with me that the

15   purpose of the dFMEA is to allow a company to -- a medical

16   device manufacturer, to consider the potential failure

17   modes and attempt to make modifications to the design of

18   the product, if necessary, to minimize any failure modes

19   and risks of harm.  That's why you do it?

20                     MR. DAVIS:  Object to form.

21                     THE WITNESS:  As a part of that

22   assessment phase that we were speaking of.

23   BY MS. FITZPATRICK:

24         Q.    Uh-huh.
```

Elaine Duncan

```
 1          A.   We assess which of the failure modes may

 2   need to be addressed, and this is a -- if you will,

 3   hierarchical process.  So you certainly attempt to put

 4   your focus on any failure that would have a high severity

 5   and a high potential, first.  So it's a resource

 6   management tool, as well.

 7          Q.   So to use your analogy from earlier, someone

 8   may come up at a meeting with an idea that aliens come

 9   from Mars, and you're not going to spend a whole lot of

10   time redesigning the product to minimize that risk because

11   it's such a minor risk; correct?

12          A.   The potential is low.

13          Q.   The potential is extraordinarily low; correct?

14          A.   (Witness nodding head.)

15          Q.   Okay.  But you'll agree that, as a company

16   identifies potential failure modes that have severity or

17   have a high probability of occurring or are very difficult

18   to detect, that a company will take those into account and

19   see if there's a modification to the design of the product

20   that would minimize those potential failure modes.  That's

21   generally how it works.  It's the concept behind it.

22                   MR. DAVIS:  Object to the form.

23                   THE WITNESS:  Again, this design FMEA or

24   whatever other method -- there are other methods besides
```

Elaine Duncan

```
 1   design FMEA for assessing any product, whether it's new or

 2   a modification.  This is only one tool.

 3              So as going through design phase, a design

 4   FMEA is a typical tool but not the only tool.

 5   BY MS. FITZPATRICK:

 6        Q.   Okay.  I'm going to ask you to answer my

 7   question.

 8        A.   I'm sorry, I got lost in my answer.

 9        Q.   Yeah.  You'll agree with me that as the

10   company identifies potential failure modes with severity

11   or a high probability of occurring or are difficult to

12   detect, a medical device manufacturer should take those

13   into account to see if there's a modification to the

14   design of the product that would minimize those potential

15   failure modes.

16              That's generally how the process works; right?

17                   MR. DAVIS:  Object to the form.

18                   THE WITNESS:  Only within the

19   design and development context.  When the information

20   occurs for a mature product, a product already on the

21   market, going to the design FMEA is not the most expedient

22   path for addressing the information that's been

23   identified.

24
```

Elaine Duncan

```
1    BY MS. FITZPATRICK:

2         Q.   Okay.  Let's make this easy.

3              Why do companies do design FMEA?  What's the

4    purpose?

5         A.   It's one of many tools.

6         Q.   So accomplish what?

7         A.   As I mentioned, one of the benefits is it

8    helps to define the verification and validation testing

9    that needs to be done for a product.  We -- as I said,

10   it's hierarchical, so oftentimes, as a part of the project

11   plan, the design plan where we have to do verification and

12   validation, we would design the verification and

13   validation protocols with the information we have gained

14   from the risk analysis document.

15        Q.   Okay.  I think I'm, perhaps, asking an easier

16   question than you're hearing.

17             Is one of the reasons why companies do design

18   FMEAs to attempt to minimize the potential risk to

19   patients of that medical device?

20        A.   During the design phase, that's one of the

21   tools.

22        Q.   Okay.  That's one of the reasons that a

23   company does a dFMEA; right?

24        A.   As I said, in a design phase, it's one of the
```

Elaine Duncan

1    tools.  There are many tools, including a usability FMEA.

2           Q.   Okay.  And a design FMEA can provide a medical

3    device manufacturer with information and inputs it needs

4    to go back and look at whether modifications to the

5    original design of the product are necessary to protect

6    patient safety; correct?

7                        MR. DAVIS:  Object to the form.

8                        THE WITNESS:  I believe you have it

9    backwards a little bit.  The inputs are already known when

10   we're doing a design FMEA.  So the design FMEA, itself, is

11   not an input.  The output of a design FMEA may be useful

12   in establishing the verification and validation planning,

13   which would include bench testing, animal testing.  It can

14   also be valuable for helping to define labeling, as an

15   example.

16   BY MS. FITZPATRICK:

17          Q.   But see, I'm asking you something else, and so

18   I'm not sure where you're going, here.

19                   Let me try again.

20                   A dFMEA can provide a medical device

21   manufacturer with information it needs to go back and look

22   at whether modifications to the original design of the

23   product are necessary to protect patient safety; correct?

24          A.   No.

Elaine Duncan

```
 1                    MR. DAVIS:  Wait a second.  Object to

 2    form and asked and answered.

 3    BY MS. FITZPATRICK:

 4          Q.   Okay.  So a dFMEA doesn't provide medical

 5    device manufacturers with any information to allow it to

 6    go back and look at the original design of a product and

 7    see whether modifications are necessary?

 8          A.   You changed the question.

 9          Q.   No, I really didn't, but why don't you just

10    tell me what you mean?

11          A.   You said "any," and the original question

12    was not the same.  So if you'd like to ask it again,

13    I'll try to answer it.

14          Q.   Sure.  Absolutely.

15               A dFMEA can provide a medical device

16    manufacturer with the information it needs to go back and

17    look at whether modifications to the original design of a

18    product are necessary to protect patient safety?

19                    MR. DAVIS:  Object to the form and asked

20    and answered.

21                    THE WITNESS:  To go back and look.  So

22    we have a design FMEA, and as I explained previously, the

23    design FMEA is focused to the design process, and so for

24    you to say that it gives them tools for going back, going
```

Elaine Duncan

```
 1   back to what?  That's where you lose me.  To go back to

 2   the --

 3   BY MS. FITZPATRICK:

 4        Q.   The original design of the product.  You

 5   design -- this is remarkably concerning.

 6             You design a prototype of a new product;

 7   correct?

 8        A.   Uh-huh.

 9        Q.   The company can then do a dFMEA to look at all

10   of the potential known and foreseeable failure modes for

11   that prototype, that original design for the product;

12   correct?

13        A.   I'm sorry, I cannot answer the question you've

14   asked because you're oversimplifying, and you have it

15   backwards.

16        Q.   Okay.

17        A.   I can actually do a design FMEA and never have

18   a prototype.

19        Q.   You have to have a design before you do a

20   design FMEA; right?  I can't possibly have that backwards.

21        A.   Excuse me, ma'am, but if -- you have to have

22   input requirements to the design.  I know it's not your

23   field, but when we do a design FMEA, we're doing it

24   based on the input requirements.  The input requirements
```

Elaine Duncan

1    are not necessarily the design; they're the inputs into

2    the design.  I may not even have a drawing or a form.  I

3    may not have a prototype or even something made out of

4    straw at the time I'm doing a design FMEA because I'm

5    basing my design FMEA on input requirements.

6              And if I may, examples of input requirements

7    are the prevailing regulations of the day, the prevailing

8    standards of the day, the expectations of the customer of

9    the day, and the intended use and indication for use of

10   the product at the time we're doing the design input

11   requirement.  There are multiple standards like software

12   standards, hardware standards, biomaterial standards.  We

13   have to incorporate all of that into the input

14   requirements.  We take the input requirements and build a

15   hazard analysis document.  I know it sounds bizarre, but

16   it can be totally independent of having a drawing or a

17   prototype.

18        Q.   Okay.  So you, in your job, can actually

19   figure out how a product might fail before you even know

20   what that product is and before you even know what the

21   design of that product is.  That's how you do it?

22              MR. DAVIS:  Object to the form.

23              THE WITNESS:  You're taking it out of

24   context, what I said.  I said you can take input

Elaine Duncan

1    requirements or that product and develop a hazard analysis

2    surrounding that input requirements, and you may or may

3    not have a prototype, you may or may not have a final

4    design.  I can have sketches.  I can do an input

5    requirement.  In fact, I have done input requirement

6    documents before anybody's ever put pen to paper.  I can

7    do that in parallel with the design process of the design

8    you talk about like drawing it or making it.  I can do

9    that in parallel and -- repeatedly throughout the whole

10   process, as inputs change, as I learn new information

11   about the product.

12   BY MS. FITZPATRICK:

13        Q.   But the design FMEA looks at a failure mode,

14   the potential failure modes of a medical device; correct?

15        A.   A design FMEA specifically takes each input

16   requirement and propositions what could be the failure

17   mode if I fail to meet the input requirement that I've

18   established.

19             So first I draft the input requirements

20   document.  Again, they're all in the whole, make that

21   document, and then, in parallel to other people doing

22   their tasks, I can start my design FMEA because I'm taking

23   the input requirements and I'm proposing the potential

24   failure modes based on the failure to meet that input

Elaine Duncan

1    requirement.  It's very structured in a design FMEA.

2    That's the way it's supposed to be done.

3         Q.   It is very structured; isn't it?

4         A.   Very structured.

5         Q.   And there's a certain way that it's supposed

6    to be done; correct?

7         A.   It's done many different ways.  I've seen

8    dozens and dozens of different FMEA documents in every

9    company I work with.

10        Q.   Is it structured or not?

11        A.   As I said, every company will structure their

12   own FMEA format.  There's no one FMEA format that fits all

13   people.

14        Q.   Okay.  So it's structured but done in lots of

15   different ways.

16             Is that what you're telling me?

17        A.   It's -- it -- there is a specific style that

18   you will find in common.  There are columns, there are

19   rows, there are headers.  Oftentimes, there's scoring.

20   Some people don't put in detectability, as an example.

21   Some companies put in a second phase of the scoring where

22   they evaluate the risk and potential after they have done

23   mitigation.  I've seen some FMEAs that are three feet long

24   and multiple pages.  I've seen some FMEAs that fit on

Elaine Duncan

1   8-and-a-half-by-11.

2          So there is no one size that fits all

3   products, but typically, a company will establish within

4   it, for itself, its preferred style of procedure that

5   would mean how do you do an FMEA in our shop.  That's

6   typical.

7          Q.   So Ethicon can do whatever it wants in coming

8   up with a design FMEA?  It's whatever way it wants to do

9   it; is that right?  You follow procedure?

10                MR. DAVIS:  Object to the form.

11                THE WITNESS:  Excuse me.  I'm sorry,

12   you're saying they can do whatever they want.

13   BY MS. FITZPATRICK:

14          Q.   Yes.  "A company will establish within it, for

15   itself, its preferred style of procedure.  That will mean

16   how you -- how do you do an FMEA in our shop."

17          So I'm asking you, did Ethicon establish

18   within it, for itself, a preferred style of procedure that

19   meant how it did an FMEA in its shop?

20          A.   In multiple times, in multiple locations, yes,

21   they had various formats depending on the location and the

22   time.

23          Q.   Okay.

24          A.   But they typically were, as I said, columns

Elaine Duncan

```
 1   and rows and typically looked at the potential failure

 2   mode of the input requirement.  But again, the input can

 3   be the user input, the design input or the process.

 4   There's the three typical forms of FMEA.

 5        Q.   Okay.  So I was just going to ask you.

 6             There's a process FMEA; correct?

 7        A.   Uh-huh.

 8        Q.   There's an application FMEA; correct?

 9        A.   Some people call that a usability FMEA.

10   That's not a hard term of art.

11        Q.   Okay.  If a company knows of the risk or

12   potential failure mode and doesn't include it in it's

13   FMEA, is the FMEA incomplete?

14        A.   As I mentioned before, a potential failure

15   mode does not necessarily mean there's a risk associated

16   with it.

17        Q.   If a company knows of a potential failure mode

18   that is associated with a risk to a patient and doesn't

19   include it in the FMEA, is the FMEA incomplete?

20             MR. DAVIS:  Object to the form.

21             THE WITNESS:  If they know of it.  As I

22   said, there are various layers of FMEAs, and so a

23   potential failure mode may be captured in a particular

24   type of FMEA but not in another.
```

Elaine Duncan

1   BY MS. FITZPATRICK:

2        Q.   It's got to be in one of them; right?

3             MR. DAVIS:  Object to the form.

4             THE WITNESS:  Again, if they have

5   discovered this information after the product has already

6   reached the market, they are often going to assess that

7   risk outside of a FMEA document.  They may not go all the

8   way back to a previous signed-off design level FMEA in

9   order to treat that particular risk that they've

10  identified.

11            MR. DAVIS:  In about five minutes, let's

12  do another break.

13  BY MS. FITZPATRICK:

14       Q.   Let me try this again with you because you

15  seem to want to be talking to me about the exception

16  rather than the rule.  I'm talking the rule.

17       A.   I'm a trainer.

18       Q.   Okay.  You'll agree with me that before

19  marketing, if a company knows of a potential failure mode

20  that's associated with a risk and does not include that in

21  it's FMEA -- again, before marketing -- that FMEA is

22  incomplete; correct?

23            MR. DAVIS:  Object to the form.

24            THE WITNESS:  I can't say 100 percent of

Elaine Duncan

1    the time it's incomplete because you have to go back to

2    the input requirements to do the FMEA.  So the first thing

3    they would need to do is go back and assess why their

4    input requirements hadn't caught that potential hazard.

5    BY MS. FITZPATRICK:

6         Q.   Let me give you -- let me give you a

7    hypothetical.  I'm not going to give you a hypothetical.

8    I'm going to give you an actual.

9         A.   Can we do that after a break?

10        Q.   Sure.  Let me ask you just a couple questions.

11             You said you can't say 100 percent of the time

12   it's incomplete.

13             Would you agree with me that the majority of

14   the time that would be considered incomplete?

15             MR. DAVIS:  Object to form.

16             THE WITNESS:  Again, the incompleteness

17   is a perspective on the input requirements.  What we

18   would do if we found out about a potential hazard that

19   had not been captured on any one of the FMEAs, is we

20   would go back, first, to question our input requirements

21   and assess whether or not we were capturing the proper

22   input requirements, because an FMEA, you don't just plop a

23   hazard down into an FMEA.  I told you, it's a process of

24   going from input requirements through failure modes,

Elaine Duncan

1    through effects, scoring severity, scoring potential.

2             So when someone comes up with a risk that we

3    haven't captured in a document, we have to go all the

4    way back and assess how did we not capture an input

5    requirement that would have led to this newly-discovered

6    risk.

7    BY MS. FITZPATRICK:

8         Q.   But see, you changed what I asked you.  I'm

9    not asking you about a newly-discovered risk

10   postmarketing.

11        A.   I didn't say you were.

12        Q.   You just said the input requirement that would

13   have led to this newly-discovered risk.  I'm not talking

14   about a newly-discovered risk.  That was your part.  I'm

15   looking at your answer right there.  So let me try

16   again.

17             If a company has actual knowledge of a failure

18   mode associated with a product that can cause a risk of

19   harm to a patient and does not include that on its FMEA,

20   you will agree with me that, barring -- you will agree

21   with me that the majority of the time, that FMEA is

22   incomplete?

23                  MR. DAVIS:  Object to the form.

24

Elaine Duncan

```
1    BY MS. FITZPATRICK:

2         Q.   The company has to put all its known failure

3    modes that can lead to a risk of harm to patients on its

4    FMEA; right?

5         A.   A known failure mode.

6         Q.   Okay.  And if it doesn't put a known failure

7    mode that can lead to a risk of harm to patients on its

8    FMEA, it hasn't completed the FMEA process; right?

9         A.   The FMEA that you're looking at may be a user

10   FMEA, and so I can't say categorically that all FMEAs are

11   going to capture all potential risks all of the time.  I'm

12   trying to establish that for you, that we have to go back

13   and assess where did we miss the understanding of the

14   product performance and, thus, not capture that risk?  Was

15   it a process potential hazard or was it a -- was it a

16   user -- human factors?  That's a big area, and design is

17   only one part of the FMEAs.

18        Q.   Okay.  So you've given me some examples of how

19   you believe that the FMEA may not be incomplete.  Let me

20   ask you the reverse of that.

21             Using the hypothetical that I gave you,

22   can you tell me when an FMEA would be incomplete if a

23   company does not put a known failure mode that can lead to

24   a risk of harm to a patient in its FMEA?
```

Elaine Duncan

```
 1           A.   If they misunderstood the input requirements.

 2           Q.   And is that the only way it could happen?

 3           A.   As I said, you could do an FMEA based on the

 4   input requirement and the projection of a potential

 5   failure mode.  If someone isn't projecting that potential

 6   failure mode, they wouldn't necessarily come up with the

 7   potential risk.

 8           Q.   Well, you'd agree with me that could happen if

 9   a company is sloppy; right?

10           A.   No, ma'am.  It can happen when people are

11   being very diligent.  Designers may not know every

12   potential failure mode of every product they're working

13   on.

14           Q.   And it can also happen if a company is being

15   sloppy about the way it does its FMEA; right?  It can't

16   happen if a company is being sloppy?

17           A.   I suppose sloppy people can make sloppy FMEAs.

18                     MR. DAVIS:  Let's take a break at some

19   point.

20                     MS. FITZPATRICK:  I'll give you a break

21   in just a second.

22   BY MS. FITZPATRICK:

23           Q.   And it can happen if a company hasn't

24   undertaken the FMEA process with as much due diligence as
```

Elaine Duncan

1    it should have; correct?

2            A.    No, that can happen when they have not

3    understood all of the input requirements, nor -- or not

4    projected all of the potential failure modes.  So there

5    are multiple ways that an FMEA can be incomplete.

6            Q.    And it can also happen when one area of the

7    company knows of its potential failure mode and risk and

8    doesn't communicate it to the team of people who are

9    putting together the FMEA on a different product; correct?

10                    MR. DAVIS:  Object to the form.

11                    THE WITNESS:  It's unlikely to happen

12    because the design team would organize the information

13    that is known by the company at the time they began their

14    design process.

15    BY MS. FITZPATRICK:

16            Q.    That's what the design team should do;

17    correct?

18            A.    That is a part of their requirements.

19            Q.    And if the design team doesn't do that

20    correctly, it can lead to a situation where a known

21    failure mode that is associated with the risk of harm to a

22    patient doesn't end up on an FMEA; correct?

23                    MR. DAVIS:  Object to the form.

24                    THE WITNESS:  It's unlikely.

Elaine Duncan

1    BY MS. FITZPATRICK:

2         Q.   It can happen; can't it?

3         A.   Anything can happen.

4         Q.   If the process isn't done the way it should be

5    done, it can lead to a circumstance where a known failure

6    mode that is associated with risk of harm to a patient

7    does not appropriately show up on an FMEA; correct?  It

8    can happen?

9              MR. DAVIS:  Object to form.

10             THE WITNESS:  If the process is done

11   correctly, it can still happen because we don't know

12   everything when we're in the early stages of design and

13   development.

14   BY MS. FITZPATRICK:

15        Q.   Okay.  So we know it can happen when the

16   process is done correctly.

17             My question to you is, it can also happen when

18   the process is done incorrectly; right?

19        A.   That would be possible.

20        Q.   Let's take a break.

21             (Whereupon, a recess was taken from

22             3:46 p.m. to 3:58 p.m.)

23   BY MS. FITZPATRICK:

24        Q.   Ms. Duncan, in your experience, it would be

Elaine Duncan

1   unusual for a company to have knowledge of a potential

2   failure mode with an attendant risk of harm to a patient

3   and not include that somewhere in its FMEA process;

4   correct?

5                      MR. DAVIS:  Object to form.

6                      THE WITNESS:  It would be unusual.

7   BY MS. FITZPATRICK:

8        Q.   Let me go through some documents with you.

9   Let's mark this as Exhibit 12.

10                     (Whereupon, Exhibit 12 was marked.)

11  BY MS. FITZPATRICK:

12       Q.   Now, Ms. Duncan, do you recognize this from

13  Ms. Wilson's report?

14       A.   Yes.

15       Q.   Okay.  And did you review this in connection

16  with your opinions that you gave in this case?

17       A.   I reviewed her report.  I did not use this

18  document as a part of my opinions.

19       Q.   Okay.  And I'm asking, did you review this

20  document, not --

21       A.   I reviewed it as an attachment to her report.

22       Q.   Okay.  Is there anything in this document as

23  Ms. Wilson has set forth here that you believe is

24  inaccurate or wrong?

Elaine Duncan

```
 1                    MR. DAVIS:  If you're going to answer

 2    that question, take your time to go through every line

 3    item on the document.

 4                    THE WITNESS:  Yes, and I have to get my

 5    little magnifying glass because the print is too small to

 6    read.

 7    BY MS. FITZPATRICK:

 8         Q.   I wish you had an extra because I can't read

 9    it, either.  The purse looks good on you.

10                    (Discussion off the record.)

11                    MR. DAVIS:  While she's looking at that,

12    I'm going to object to the form of the question because

13    you're -- when you ask her if she agrees -- disagrees with

14    anything on it, there's some interpretive -- it looks to

15    me there's some interpretations, so it's hard to say

16    what --

17                    MS. FITZPATRICK:  She can tell me if she

18    feels that.

19                    THE WITNESS:  May I borrow your

20    highlighter?

21    BY MS. FITZPATRICK:

22         Q.   Absolutely.

23         A.   Just one more minute.

24         Q.   Sure.
```

Elaine Duncan

1          A.    Okay.  I think I can answer your question

2    whether there's other items on here to which I would

3    object.

4          Q.    Yep.

5          A.    I think one of the first things I would

6    characterize as, I mean, not necessarily inaccurate but

7    not applicable is, for example, at December 2000, above

8    the line you see ISO 9001:2000, 3rd edition.

9          Q.    Uh-huh.

10         A.    That standard was specifically excluded from

11   being applicable to the medical device industry.

12         Q.    Okay.  So it's not incorrect, but you think

13   it's irrelevant to what we're doing?

14              MR. DAVIS:  Object to the form.  I don't

15   know what "incorrect" means.

16              THE WITNESS:  The evolution of ISO

17   13485 was to specifically -- and it didn't happen at

18   once.  It didn't happen until the 2003 version.  The

19   ISO 13485 is explicit to medical device manufacturers.

20   There are certain contract manufacturers that may use

21   ISO 9001 generically, but it's not applied to the medical

22   device industry.  That's Item Number 1.

23   BY MS. FITZPATRICK:

24         Q.    But let me use your words since Mr. Duncan --

Elaine Duncan

 1    Mr. Davis had a problem with this.

 2              It's not inaccurate, but you challenge the

 3    relevance of it to the reports that we're dealing with

 4    here; right?

 5              MR. DAVIS:  Let me just note my

 6    objection because we may have interrupted the witness.

 7    I'm not sure if the former question is still pending.  We

 8    haven't allowed her to -- I don't know.  Go ahead.  Just

 9    note my objection.

10    BY MS. FITZPATRICK:

11        Q.   You might want realtime next time because you

12    could probably follow it better that way.

13              So what else do you have?

14        A.   As I said, ISO 9001:2000, 3rd edition, if the

15    text is correct, it is not a standard applicable

16    specifically to medical devices, and in fact, the 13485

17    explicitly takes over and instead of 9001:2000, 13485

18    applies to medical device quality-management systems.

19    There are similarities, but we would not meet our

20    obligations if we were using ISO 9000:2000 instead of

21    13485 for those countries where 13485:2003 are required.

22              The second item I need to point out to you is

23    where you look at July 1994 and you look at ISO 9001:1994,

24    in the same token, medical device component manufacturers

Elaine Duncan

```
 1   and some medical device manufacturers voluntarily

 2   subscribe to that standard, but it was actually EN 46001,

 3   which is an extension, if I may call it that, and it's

 4   specific to medical device quality systems for those

 5   products that received their approval to market -- excuse

 6   me -- in Europe, and I don't see the Canadian version of

 7   ISO 13485 on here, so that's number three.

 8            Q.   Is this -- is that a Canadian requirement or a

 9   United States requirement?

10            A.   ISO 13485 is not a U.S. requirement at all.

11            Q.   You said, "I don't see the Canadian version of

12   ISO 13485."

13            Is it your opinion here that the Canadian

14   version of the ISO 13485 is applicable to the subject

15   matter that you've opined on here?

16            A.   I'm trying to be even -- this is describing

17   13485.  That's not applicable to the U.S. at all, anyway.

18   So 13485, since it's here, I was also just pointing out

19   that the Canadian adoption of that is also not on here.

20            And in addition, where we see some of the

21   lines --

22            Q.   Uh-huh.

23            A.   -- horizontal lines, the effective dates --

24   some of the standards are -- may be issued but may not
```

Elaine Duncan

```
 1    have been adopted, and so what's imprecise about the

 2    timeline is the actual adoption date for some of these

 3    standards, and I would also point out another one, is

 4    that --

 5         Q.   I'm sorry, let me --

 6         A.   I'm on 5.

 7         Q.   Take those in order.

 8              Which adoption dates are you referring to?

 9         A.   Well, as a for example, when a standard is

10    issued, different countries adopt them.  So ISO 13485,

11    the chart here shows it in 1996, that has not been adopted

12    in the United States.

13              So if we were to make this timeline relevant

14    to the United States, it is not an adopted standard in the

15    United States.  Any company may subscribe to a notified

16    body and go and pay that notified body -- excuse me,

17    registrar, ISO registrar.  We can go and hire an ISO

18    registrar to come and audit our quality systems on a

19    voluntary basis and pay them for their time and trouble

20    and receive a certification to conformity, but it is not

21    an adopted standard in the United States.

22         Q.   Here -- here's what I'm very confused about,

23    Ms. Duncan.

24         A.   Okay.
```

Elaine Duncan

1          Q.    Where on this chart has Ms. Wilson made the

2    representation that ISO 13485, whatever iteration, was

3    adopted in the United States on any particular date?

4          A.    Okay.  So maybe I'm guilty of assuming.  I was

5    assuming that the reason she went to this effort to create

6    this detailed chart was she was trying to have some

7    relevance to her report.

8          Q.    Let me ask you again.  Where on this chart --

9    she has indicated the dates that these ISO standards were

10   issued.

11              Are any of those dates wrong?

12                  MR. DAVIS:  Just the date on which it

13   was issued?

14   BY MS. FITZPATRICK:

15         Q.    Uh-huh.

16         A.    I would look to her on the dates they were

17   issued, but adoption is a very different thing, and

18   they're adopted in different countries at different times.

19         Q.    But Ms. Duncan (sic) hasn't represented

20   anything about adoption on this; correct?  You're reading

21   into that; am I correct, or am I missing the word

22   "adoption"?

23                  MR. DAVIS:  Object to the form.  It's in

24   her report.

Elaine Duncan

```
 1                    MS. FITZPATRICK:  I asked about this.

 2                    MR. DAVIS:  Well, that's part of her

 3     report.

 4     BY MS. FITZPATRICK:

 5          Q.   I know.  Where on this -- let me make this --

 6     you two are very confusing.

 7                    Where does it say "adoption" on this?  Does it

 8     say it anywhere?

 9          A.   She did not use the word "adoption."  She

10     said, "Quality and risk management standards

11     implementation publication timeline."

12                    So the implementation is germane to the

13     country.  A publication is when the standard was printed

14     and produced.  It can be printed and produced anytime.  It

15     has to be implemented by adoption for it to even be

16     relevant to this topic, and since it was a section in her

17     report, on page 5, she says -- she refers to -- Figure 2,

18     Figure 1.  Sorry, Figure 1 and 2 -- I can't recall.  Was

19     this an exhibit?

20          Q.   I want to make this so much simpler than

21     you do, Ms. Duncan, and I feel that we are very, very

22     far afield right now.

23                    I gave you a one-page document called

24     Exhibit 12.
```

Elaine Duncan

```
1          A.   Right.

2               MS. FITZGERALD:  And I would ask you not

3  to coach the witness.  She can answer of her own account.

4               THE WITNESS:  He's not coaching me.

5  BY MS. FITZPATRICK:

6          Q.   He's pointing out --

7          A.   My point --

8          Q.   I want you to answer my question.

9          A.   Yes.

10         Q.   Because that's -- is there anything on this

11 one page that I gave you that is Exhibit 12 that is

12 inaccurate or incorrect?

13         A.   As I have previously stated, this time chart

14 is inaccurate by omission and commission.  It includes

15 standards that are not applicable to medical devices, and

16 it omits standards that are applicable to medical devices

17 in certain jurisdictions.

18         Q.   Okay.  So you just -- so you can't agree with

19 this?

20              MR. DAVIS:  Let her finish her answer.

21              MS. FITZPATRICK:  No, I'm not going to

22 waste the deposition on this.

23              MR. DAVIS:  We're not going forward.

24 No.  Just --
```

Elaine Duncan

```
 1   BY MS. FITZPATRICK:

 2        Q.   Is this accurate or not?

 3             MR. DAVIS:  We're not answering that.

 4   We're not answering that question until you let her

 5   finish.  You want to withdraw the last question?

 6             MS. FITZPATRICK:  No, I want her to

 7   answer the question.

 8             MR. DAVIS:  Let her finish answering,

 9   then.

10             THE WITNESS:  There are errors of

11   commission and omission, and I've said that already, and

12   that's where I'll stop.

13   BY MS. FITZPATRICK:

14        Q.   And you were paid $60,000 by Ethicon to reach

15   that opinion; correct?

16             I'm going to try another one.  Maybe this will

17   be easier for you.

18             MR. DAVIS:  Object to the form.

19   BY MS. FITZPATRICK:

20        Q.   Let's go to Number 13.  Can I have this one?

21             (Whereupon, Exhibit 13 was marked.)

22   BY MS. FITZPATRICK:

23        Q.   Anything wrong with this one?

24        A.   Well, obviously it's a --
```

Elaine Duncan

```
 1                      MR. DAVIS:  Object to form.

 2                      THE WITNESS:  It's a photocopy out of a

 3    standard, so the only thing I would say might be wrong

 4    with it is you haven't given me a reference to where it

 5    came from.

 6    BY MS. FITZPATRICK:

 7           Q.   It came from Ms. Wilson's report.

 8                Do you recognize this?  Is there anything in

 9    this that you disagree with?

10           A.   As I've said, you've truncated the actual

11    document.  The report, exhibit whatever, because it's been

12    marked through, so you have provided me only a section of

13    the entire flow chart, which, by the way, is a copyrighted

14    document, ISO 14971.

15           Q.   You're talking about a totally different

16    chart.  You're talking about this, which we'll mark as

17    Exhibit 14.

18                      (Whereupon, Exhibit 14 was marked.)

19    BY MS. FITZPATRICK:

20           Q.   Do you disagree with this?

21                      MR. DAVIS:  Object to the form.

22                      THE WITNESS:  Would you please explain

23    to me where this comes from?

24
```

Elaine Duncan

```
1   BY MS. FITZPATRICK:

2        Q.   I'm talking about Exhibit Number 14.

3             Do you disagree with this?

4        A.   Oh.

5                  MR. DAVIS:  Object to the form.

6                  THE WITNESS:  Is this the same chart as

7   in Ms. Wilson's report?

8   BY MS. FITZPATRICK:

9        Q.   Why don't you take a look at it and tell me if

10  you disagree with it?

11       A.   It is the same from her report?

12       Q.   I asked you if you disagree with it.  I didn't

13  ask if it was the same from her report.

14                 MR. DAVIS:  Object to the form.

15                 THE WITNESS:  What is there to disagree

16  with?

17  BY MS. FITZPATRICK:

18       Q.   You tell me.

19       A.   She's copied a document from a standard, and

20  I've agreed that they are the same.

21       Q.   Do you believe that these are the correct

22  steps?  Is there anything in here in this flowchart that

23  you disagree with this document?

24                 MR. DAVIS:  I object to the form.
```

Elaine Duncan

```
1                        THE WITNESS:  As I said, she copied it

2    from a standard.  There's nothing for me to agree or

3    disagree with it about.

4    BY MS. FITZPATRICK:

5         Q.   Okay.  So you don't disagree with it?

6         A.   I have no basis for agreement or disagreement.

7    She copied it from an international standard.

8         Q.   I understand you're telling me where it came

9    from.  I'm asking you a different question.

10            This -- when this shows up at trial, you're

11   going to say, "Yes, that's accurate, that's completely

12   right, I've got no problem with that;" correct?

13                       MR. DAVIS:  Object to the form.

14                       THE WITNESS:  I believe it is an

15   accurate photocopy.

16   BY MS. FITZPATRICK:

17        Q.   Is it an actual -- is it an accurate

18   depiction of the risk analysis and risk control process?

19                       MR. DAVIS:  Object to the form.

20                       THE WITNESS:  I will, again, point to

21   you that she has taken this out of 14971:2000.  When I

22   compared the two, they are the same.  Without seeing where

23   this came from, I can't say anything more than that,

24   ma'am.
```

Elaine Duncan

```
 1   BY MS. FITZPATRICK:

 2         Q.   Did you just tell me where it came from?

 3         A.   I told you they're identical; okay?  But there

 4   are many versions of 14971, and without looking at those

 5   versions, I would not hazard to claim that they are

 6   identical.  I'm saying the two are good photocopies of one

 7   another.

 8         Q.   We're going to be here for a long time.  Let

 9   me tell you what you just said to me in the last two

10   minutes.

11              "I will again point out to you that she has

12   taken this out of 14971:2000.  When I compare the two,

13   they are the same.  Without saying where this came, I

14   can't say for" --

15              Didn't you just tell me where it came from?

16   Is it 14971:2000, or not?

17                   MR. DAVIS:  Object to form.

18                   THE WITNESS:  The images are similar

19   with the exception of her writing.

20   BY MS. FITZPATRICK:

21         Q.   Is what I showed you and what you have as

22   Ms. Wilson's report, as produced in this case without

23   handwriting, did this come from 14971:2000 as you told me

24   not only a minute ago?
```

Elaine Duncan

1          A.   I agree that it is the same photocopy that is

2    in her report marked 14971:2000.  I don't have other

3    standards in front of me to compare.  I will accept it

4    as -- from her report.

5          Q.   Okay.  Let's see what we can do, here.

6               (Whereupon, Exhibit 15 was marked.)

7    BY MS. FITZPATRICK:

8          Q.   Ms. Duncan, have you seen this document

9    before?

10         A.   It looks familiar.

11         Q.   Did the lawyers for Ethicon provide you this

12   document when you prepared your report in this case?

13         A.   To be certain, I would have to check the Bates

14   numbers, but it looks familiar.

15         Q.   Okay.  And is this something that you

16   considered in reaching your conclusions in this case?

17         A.   I recall reading it and reviewing the

18   information that was here, yes.

19         Q.   And you'll see that it's dated 1992; correct?

20         A.   Yes, ma'am.

21         Q.   And you'll agree with me that is prior to

22   Ethicon's acquisition of Medscand and the TVT-R mechanical

23   cut device; correct?

24         A.   It would be prior to that.

Elaine Duncan

1          Q.   I want you to look on your "IR" and "IR

2     Microspectroscopy" on the first page; correct?

3          A.   Yes.

4          Q.   Okay.  And "IR examinations were done for all

5     explants."

6               Do you understand that IR examinations were

7     done for explants of PROLENE sutures in this study?

8          A.   Yes.

9          Q.   And PROLENE is the same material that the

10    TVT-R mechanical cut mesh is made of; correct?

11         A.   That's correct.

12         Q.   Have you -- in all of the documents that you

13    have reviewed in this case, have you seen any evidence

14    that Ethicon did any studies on any explants of vaginal

15    mesh?

16         A.   Of what?

17         Q.   Vaginal mesh, any of its pelvic mesh products

18    made with PROLENE?

19         A.   Yes, I recall some additional studies.

20         Q.   Okay.  And what studies do you believe that

21    Ethicon conducted on explanted PROLENE pelvic mesh?

22         A.   Well, one study, if you would go to my -- it's

23    Exhibit A in medical literature, the first item called "A

24    14-day Rabbit Study," it's my recollection that those were

Elaine Duncan

1   mesh -- that was a mesh study.

2          Q.   And do you believe that that was an IR

3   examination that was done on explanted pelvic mesh?

4          A.   Oh, I'm sorry, I thought your question was,

5   did I know of any other explants studies.

6          Q.   Huh-huh.  It wasn't my question.

7          A.   I would have to say I don't recall.  I could

8   look in the record if you would want me to, but I cannot

9   recall at this time.

10         Q.   Okay.  But you'll agree with me that, as of

11  1992, Ethicon knew how to do IR examinations for explanted

12  PROLENE products; correct?

13         A.   I presume they knew how to do it.

14         Q.   Okay.  And in fact, this document shows that

15  they actually had done IR examination for explanted

16  PROLENE sutures at that time; right?

17         A.   Sutures.

18         Q.   Okay.

19         A.   Yes, ma'am.  I believe -- if I may correct

20  something, I do recall additional studies of mesh, and

21  I cannot recall whether or not Ethicon conducted them.

22  I may have read that in a publication, so I would

23  stand by what I said.  I don't recall that Ethicon did

24  them, but I believe I recall seeing another IR study.

Elaine Duncan

```
 1          Q.    Okay.  And in fact, based on your work back in

 2   the 1980s on silicone breast implants, you participated at

 3   that time in meetings where they discussed the retrieval

 4   of explanted silicone breast implants; correct?

 5          A.    Actually, no, I didn't.  My work was limited

 6   to -- I'll let you two finish.

 7          Q.    No, your work was limited to --

 8          A.    I was an engineer on the acquisition project

 9   for 3M Company, and I did an analysis of -- on

10   not-yet-implanted silicone breast implants, and so I was

11   deposed because of that memo, and although I was involved

12   in the acquisition transition team, I did not personally

13   look at any explanted silicone breast implants.

14          Q.    What I asked you -- what I asked you is, back

15   in the '80s when you worked on the silicone breast implant

16   litigation, you agree with me the medical device companies

17   that had permanent medical devices conducted implant

18   retrieval meetings.

19                And you actually participated in those;

20   correct?

21          A.    Implant retrieval meetings?

22          Q.    Uh-huh.

23          A.    Well, I was a workshop chairman for implant

24   retrieval meetings hosted by the Society for Biomaterials.
```

Elaine Duncan

```
1          Q.   Okay.

2          A.   But I didn't participate in those.  I was the

3     host of the meeting and I listened to the presentations.

4               Is that --

5          Q.   So hosting the meeting --

6          A.   I was the chairman of the meeting.

7          Q.   You were the chairman of the meeting but you

8     didn't participate in the meeting.

9               Is that what you're saying?

10         A.   I didn't say I didn't participate in the

11    meetings.

12         Q.   Ma'am --

13              MR. DAVIS:  Wait.  No, let her finish

14    her answer.

15              THE WITNESS:  You asked me in the 1980s

16    when I was -- I thought you were talking about my

17    activities at 3M Company.

18    BY MS. FITZPATRICK:

19         Q.   Ma'am, I asked you about --

20         A.   Just repeat the question.

21         Q.   Sure, because I think this is one where we may

22    have --

23              Back in the 1980s when you worked on silicone

24    breast implants, you agree with me that medical device
```

Elaine Duncan

1  companies had implant retrieval meetings; correct?  That's

2  what you called it, "Implant retrieval meetings?"

3      A.   I was the workshop chairperson on behalf of

4  the Society for Biomaterials for Implant Retrieval, and

5  some of the participants of that abstracted meeting -- you

6  had to make an abstract and put it in for the meeting --

7  some of the participants may have been silicone breast

8  implant manufacturers.  I can't personally recall.  I'd

9  have to pull up the abstracts for the meeting.  I was the

10  chairperson and helped to organize the meeting.

11          Now, that's a very different thing from asking

12  me if I was a party to a silicone breast implant retrieval

13  meeting.

14      Q.   I think we're slicing and dicing it.  Let me

15  get you -- out of fairness, let me get you the two

16  questions and answers, and maybe then you can understand

17  what my confusion is.

18          Your answer is:  "Well, I was the workshop

19  chairman for implant retrieval meetings hosted by the

20  Society for Biomaterials, but I didn't participate in

21  those.  I was the host of the meeting and I listened to

22  the presentations.  I was the chairman of the meeting."

23          And next question:  "You were the chairman of

24  the meeting but you didn't participate in the meeting; is

Elaine Duncan

1    that what you're saying?"

2              Answer:  "I didn't say I didn't participate in

3    the meetings."

4              I have a direct quote from you that says, "I

5    didn't participate in those."

6              Did you participate or not?

7         A.   If you would go back further to the original

8    question, I think I can straighten this out.

9         Q.   Great.  Tell me how I've got it wrong.

10        A.   Can you read back her original question about

11   silicone breast implants?

12        Q.   Well, the question is, I asked you -- or you

13   told me that you were the workshop chairman for implant

14   retrieval meetings hosted by the Society for Biomaterials

15   "but I didn't participate in those."

16             And then I said, "So what you're saying is,

17   you were the chairman of the meeting but you didn't

18   participate in the meeting," trying to clarify it, and you

19   said, "I didn't say I didn't participate in a meeting."

20             Let's just scratch and go back.

21        A.   I asked you to go back to the original

22   question that got us off track and you don't want to do

23   that and I don't know why.

24        Q.   Did you participate --

Elaine Duncan

```
 1          A.   It started with in the 1980s.  Go back to that

 2   question and I'll try to clarify.

 3          Q.   Did you -- here's how we can clarify this.

 4               Did you --

 5               MR. DAVIS:  Let her ask the question.

 6   BY MS. FITZPATRICK:

 7          Q.   Did you participate in implant retrieval

 8   meetings concerning silicone breast implants?

 9          A.   I participated in an implant retrieval

10   symposium, and there may have been participants there who

11   gave presentations on silicone breast implants, but it was

12   multiple-layered workshops in various parallel sessions,

13   and I honestly cannot recall at this period of time if I

14   sat in on those sessions or not.

15          Q.   Okay.  Were there other sessions involving

16   implant retrieval meetings associated with other medical

17   devices beyond just the silicone breast implants?

18          A.   Please repeat the question.

19          Q.   Sure.  Did these implant retrieval meetings

20   involve retrieval of other medical devices beyond just the

21   silicone breast implants?

22          A.   As well as I recall, yes.  It was open to

23   anyone who had an implant.

24          Q.   And do you recall what implants were discussed
```

Elaine Duncan

```
 1   there?

 2        A.   I can recall temporomandibular joints, I can

 3   recall that there were vascular grafts, I can recall there

 4   were probably polyethylene hip caps.  But there were

 5   probably dozens more.  I can't recall.

 6        Q.   Do you know whether Ethicon has ever

 7   participated in any implant retrieval meetings associated

 8   with the pelvic floor polypropylene device that it sells?

 9        A.   I wouldn't have any way of knowing that.

10        Q.   Did you ask Ethicon that?

11        A.   No, I did not ask Ethicon that.

12        Q.   Okay.  We go to page 2 of the document that I

13   just gave you, under "Conclusions."

14             Am I reading it correctly when it says that

15   "Degradation in PROLENE is still increasing as part of

16   this study"?

17        A.   You didn't read the entire sentence.

18        Q.   Okay.  "Degradation in PROLENE is still

19   increasing and PVDF.  Even though a few cracks were found,

20   it is still, by far, the most surface-resistant in-house

21   made suture in terms of cracking."

22        A.   Yes.

23        Q.   Does that state that degradation was occurring

24   in the PROLENE sutures?
```

Elaine Duncan

1        A.    Increasing -- the context is, "Increasing with

2   respect to time within the context of this experiment."

3        Q.    Okay.  So in the context of this experiment,

4   you'll agree with me that Ethicon concluded that the

5   longer the PROLENE suture stayed in, the more degradation

6   Ethicon saw on that suture; right?

7               MR. DAVIS:  Let me object, and that's a

8   broad question.  If you need to read any of the document,

9   you're entitled to read it before you answer the question.

10              THE WITNESS:  Well, I -- yes, I would

11  like to ask you where you were reading that from?

12  BY MS. FITZPATRICK:

13       Q.    I'm basing that on the question -- I'm just

14  trying to understand the answer that you gave me.

15              And so what I'm asking is, you looked at this

16  document and you considered it when you formed your

17  opinions in this case; correct?

18       A.    I looked at this document, yes.

19       Q.    Okay.  And what you told me is that increasing

20  the context is, "Increasing with respect to time within

21  the context of this experiment."

22              And what I asked you is, does that mean that

23  the longer the PROLENE suture was implanted, the more

24  degradation that Ethicon saw on that suture?

Elaine Duncan

```
 1                    MR. DAVIS:  My only comment, you're free

 2   to read whatever you need to read in the document.

 3                    THE WITNESS:  Okay.  You asked me if it

 4   is increasing, and from the conclusion here, for -- I'm

 5   sorry, when -- if you go up to the "inherent viscosity."

 6   BY MS. FITZPATRICK:

 7        Q.   Uh-huh.

 8        A.   The first conclusion is, "No significant

 9   differences were seen in inherent viscosity after one and

10   two years."

11        Q.   Okay.  So the inherent viscosity was

12   determined on the ETHILON and the NOVAFIL sutures;

13   correct?

14        A.   You're correct.

15        Q.   It's just very simple.

16             Does this document say that degradation in

17   PROLENE is still increasing?  It says that in Bullet 2

18   under "Conclusions;" right?

19        A.   Well, and conclusions Bullet 1, the seven-year

20   in vivo results generally substantiated five-year

21   findings.  So I'm -- and then, what I don't know from what

22   he means, then, he goes on with the second bullet, and

23   says, "Is still increasing."  So I don't know if he means

24   increasing relative to Number 1 explants or still
```

Elaine Duncan

1    increasing between 5 and 7.  It isn't clear, but he is

2    saying it is still increasing, and I don't quite

3    understand that in the context of the report.

4         Q.   Okay.  So whether you understand it or not --

5    and we don't need to debate it, it does state in this

6    report that -- so you'll agree with me that the report

7    looked at degradation of PROLENE sutures; correct?  That's

8    one of the things they looked at?

9         A.   That's one of the things they were trying to

10   determine.

11        Q.   And one of the things that they concluded is

12   degradation of PROLENE is still increasing as of this

13   October 15, 1992 memo that I gave you?

14        A.   And as I said, the conclusions are not

15   consistent with other parts of the report, so I -- I

16   understand that happens from time to time on reports.

17                    (Whereupon, Exhibit 16 was marked.)

18   BY MS. FITZPATRICK:

19        Q.   I'm showing you what's marked as Exhibit 16.

20             You've seen this document before; haven't you?

21        A.   I recall seeing it but I didn't consider it as

22   part of my due diligence activity.

23        Q.   Okay.  So you'll agree with me that this

24   document relates to PROLENE polypropylene mesh; correct?

Elaine Duncan

```
 1          A.   As I said, I'll have to look at it in more

 2  detail.

 3          Q.   Sure.

 4          A.   Because I didn't consider it as part of my

 5  scope of work.

 6               I'm looking for my blue picture.

 7                    MR. DAVIS:  What are you looking for?

 8                    THE WITNESS:  The Ethicon mesh timeline.

 9                    MR. DAVIS:  It's a single page.

10                    THE WITNESS:  Yeah.  Let me see.  Yes.

11  Thank you.  I want to be sure I understand what they're

12  talking about, here.

13               All right.  So what is your question, then?

14  BY MS. FITZPATRICK:

15          Q.   You understand that this relates to PROLENE

16  mesh; correct?

17          A.   It is a specific indication for use using

18  PROLENE.

19          Q.   It deals with PROLENE mesh; correct?

20          A.   There is a PROLENE mesh in the introduction,

21  yes.

22          Q.   Okay.  And you know that the TVT retropubic

23  mechanical cut is made with PROLENE mesh; correct?

24          A.   That's correct.
```

Elaine Duncan

1          Q.    And in this particular document, Ethicon, in

2     1998, is considering some of the disadvantages of that

3     PROLENE mesh when used for pelvic organ prolapse repair;

4     correct?

5          A.    That's correct.

6          Q.    Okay.  And I want you to take a look at some

7     of the -- what they call main concerns.  I don't want to

8     have a disagreement with you over that word again, but

9     main concerns that have arisen as of the end of 1998 with

10    using PROLENE mesh for pelvic organ prolapse repair.

11              Do you see that right at the bottom of the

12    page 9030?

13         A.    Main reason, is that --

14         Q.    The main concerns.

15         A.    I see it, the main reason for dissatisfaction,

16    or you're looking at another paragraph.

17         Q.    No, I'm looking right at the bottom.  "However

18    the main concerns that have arisen so far are."  And then

19    it stops.

20         A.    Oh.

21         Q.    And they identify here a problem or concern

22    with fear of rejection.

23              Is that a potential failure mode?

24         A.    Actually, not to my knowledge.  Fear of

Elaine Duncan

1    rejection -- not to my knowledge.  I have no knowledge of

2    PROLENE being rejected by the body.

3         Q.   Okay.  I'm not asking whether you have

4    knowledge of that.

5              Was fear of rejection of PROLENE by the body

6    identified as a concern of using PROLENE mesh for a pelvic

7    organ prolapse repair?

8                        MR. DAVIS:  Object to the form.

9                        THE WITNESS:  The memo is saying that.

10   I don't understand why it would.

11   BY MS. FITZPATRICK:

12        Q.   Okay.  And it also identifies here another

13   concern of problems with removing the mesh at a later

14   date; correct?

15        A.   Again, with respect to the prolapse, I can

16   understand what they may have been looking at.  I, again,

17   don't have expertise in this field.  This is not what I

18   was -- this is outside my scope.

19        Q.   Is that is a potential failure mode?

20                        MR. DAVIS:  Object to the form.

21                        THE WITNESS:  I can't speak to that

22   because this is a -- this is a marketing document, and I

23   don't see a potential failure mode described here.  Again,

24   fear is not necessarily a failure mode.

Elaine Duncan

1   BY MS. FITZPATRICK:

2        Q.   I asked you if problems with removing mesh at

3   a later date is a potential failure mode?

4        A.   It's a fear.  He says right here, "The main

5   concerns that have arisen so far is a fear of rejection

6   and a fear of problems removing mesh at a later date."

7   That is not a failure mode of the mesh.

8        Q.   You don't think that the body -- the

9   possibility of the body rejecting the mesh is not, in your

10  mind, a failure mode associated with the mesh?

11                 MR. DAVIS:  Object to the form.

12                 THE WITNESS:  Ma'am, rejection in the

13  medical art for biomaterials and materials for use in

14  implants has a specific connotation, and rejection is --

15  is not known to have occurred for synthetic materials.

16  Rejection is an immune response to a natural tissue.

17  BY MS. FITZPATRICK:

18       Q.   That's what your testimony is, today?  Let's

19  leave that one aside.

20                 Problems with removing the mesh at a later

21  date.

22       A.   That's what -- (inaudible.)

23       Q.   That's a potential -- but a failure mode

24  doesn't have to be proven.  I thought we'd already

Elaine Duncan

```
 1   discussed, you put in all known failure modes and

 2   foreseeable potential failure modes; correct?

 3              Ethicon here has identified potential failure

 4   modes associated with the use of the PROLENE mesh.

 5              It's such an easy question.  What's the

 6   problem?

 7                   MR. DAVIS:  Object to the form.

 8                   THE WITNESS:  This is a discussion

 9   document.  It is not a failure modes effects analysis.

10   BY MS. FITZPATRICK:

11         Q.   That's exactly my point.

12                   MR. DAVIS:  Let her finish her answer.

13                   THE WITNESS:  The specific words he has

14   used here, to be precise, are "fear."  That is not a known

15   failure mode.  It may, under certain circumstances, if we

16   were to analyze a specific input requirement, we might

17   determine that there are failure modes like this, but this

18   specific document is talking about fear.  It's not a known

19   failure mode.

20   BY MS. FITZPATRICK:

21         Q.   Did we not already establish that you put in

22   known failure modes and potential, foreseeable failure

23   modes; correct?

24         A.   And neither of these two fears meet your own
```

Elaine Duncan

1   description.

2           Q.   You don't believe that the inability to remove

3   mesh once it's been implanted is a potential failure mode

4   for a PROLENE mesh.

5               Is that your testimony?

6                   MR. DAVIS:  Object to the form.

7                   THE WITNESS:  This memo is not

8   discussing a known failure mode or a potential failure

9   mode.  They are discussing a fear.

10  BY MS. FITZPATRICK:

11          Q.   Okay.  Please answer my question.

12              Is the inability to remove mesh once it's been

13  implanted a potential failure mode for PROLENE mesh?  Yes

14  or no?

15                  MR. DAVIS:  Object to the form.

16                  THE WITNESS:  It is not designed to be

17  removable; so therefore, not being removable is not a

18  failure mode.

19  BY MS. FITZPATRICK:

20          Q.   Okay.  Concern about mesh eroding into the

21  bladder or the rectum, you would agree with me, I'm

22  assuming, that erosion of mesh into adjacent organs is a

23  potential failure mode that should be included in a risk

24  hazard analysis; correct?

Elaine Duncan

```
 1                    MR. DAVIS:  Object to the form.

 2                    THE WITNESS:  Excuse me, ma'am, but it

 3    is not a failure mode of the mesh.  It may be a risk

 4    associated with the surgical placement of mesh, but is not

 5    a failure mode of the mesh.

 6    BY MS. FITZPATRICK:

 7         Q.   What if Ethicon called it a failure mode?

 8    Who's right; you or Ethicon?

 9                    MR. DAVIS:  Object to the form.

10                    THE WITNESS:  That's hypothetical.  If

11    you want to show me a document, I'd be happy to --

12    BY MS. FITZPATRICK:

13         Q.   I'm very happy to do that.

14              "Concern about stiffness of the mesh and the

15    risk of mesh protruding through the vagina."

16              Again, you don't see this as a potential

17    failure mode for the mesh; is that correct?

18                    MR. DAVIS:  Object to the form.

19                    THE WITNESS:  It may be a risk of a

20    surgical procedure and a surgical use of the mesh.  It is

21    not a failure mode of the mesh.

22    BY MS. FITZPATRICK:

23         Q.   Do you believe that as a risk of the surgical

24    procedure and the surgical use of the mesh, it should have
```

Elaine Duncan

1    been included in an FMEA on the TVT-R mechanically-cut

2    FMEA?

3                      MR. DAVIS:  Object to the form.  This

4    has nothing to do with TVT, this document.

5                      MS. FITZPATRICK:  That's fine.

6                      THE WITNESS:  Excuse me, you'll have to

7    ask me the question again.

8    BY MS. FITZPATRICK:

9         Q.   Do you believe that, as a risk of the surgical

10   procedure and the surgical use of mesh, it should have

11   been included on an FMEA for the TVT-R mechanically-cut?

12                     MR. DAVIS:  Object to the form.

13                     THE WITNESS:  Should have been?  That's

14   asking me to conclude that it wasn't, and I don't have

15   information in front of me right now to make that

16   conclusion.  If you'd like to show me a document, I can

17   discuss it.

18   BY MS. FITZPATRICK:

19        Q.   Do you recall ever seeing it on an FMEA?

20        A.   I saw a lot of different FMEAs, so I'm not

21   going to speculate at this hour.

22        Q.   Let's look at 9032.  Under, "Ability to shape

23   mesh," it states, "No frayed ends should be left which may

24   fall off into patient."

Elaine Duncan

1            Do you see that?

2        A.   Help me out, here.  Where are you?

3        Q.   We're right at the bottom, here (pointing).

4        A.   All right.  Thank you.  This is, basically, a

5   performance requirement statement, basically, a wish list.

6   So we would take this as part of our input requirements.

7   This is an input requirement.

8        Q.   Something that should have been considered;

9   correct?

10            MR. DAVIS:  Object to the form.

11            THE WITNESS:  Should have been

12   considered for the GyneMesh II, new mesh design.

13   So I believe --

14   BY MS. FITZPATRICK:

15        Q.   So you don't think this should have been

16   considered for products that were used in the GyneMesh 1

17   that have possibly frayed ends which could be left and

18   fallen off into the patient?

19            MR. DAVIS:  Object to the form.

20            THE WITNESS:  It's my understanding that

21   mesh fraying was extensively considered.

22   BY MS. FITZPATRICK:

23        Q.   And if you can take a look at 9034, there's a

24   subsection, "Stiffness."  And it says, "The mesh, and in

Elaine Duncan

```
 1   particular the edges, should not be sharp in any way or

 2   in any way contribute to the possibility of erosion

 3   through the vaginal wall, bladder, or rectum."

 4           Do you see that?

 5       A.   Yes, ma'am.  I see it.

 6       Q.   And do you agree with me that Ethicon, in

 7   connection with the development of this GyneMesh II, saw

 8   potential problems arising from sharp edges on the mesh

 9   and in pelvic space?

10               MR. DAVIS:  Object to the form.

11               THE WITNESS:  Again, this is an inputs

12   requirement, at best.  It's a marketing document.  It's a

13   proposal for a design, and so I think you've gone a little

14   further than the document's intention.

15   BY MS. FITZPATRICK:

16       Q.   You agree with me, though, that a company

17   should gather information from all its experiences and all

18   its departments when it's creating a risk form on an FMEA

19   for a particular product; correct?

20               MR. DAVIS:  Objection to form.

21               THE WITNESS:  I believe that it's common

22   that that happens, and clearly, this is an example of how

23   Ethicon was attempting to gather a wide variety of

24   information, including some suggested input requirements.
```

Elaine Duncan

```
 1   BY MS. FITZPATRICK:

 2        Q.   Okay.

 3                  MR. DAVIS:  Let's take a break, but I'll

 4   let you get to a stopping point.

 5   BY MS. FITZPATRICK:

 6        Q.   Do you believe that these input requirements

 7   were considered for the TVT-R mechanical cut device?

 8                  MR. DAVIS:  Object to the form.

 9                  THE WITNESS:  Ma'am, this document was

10   outside the context.  This was 1998, and this document was

11   not available to the original designers of the mesh, and

12   so I can't say how they did or if they did consider any of

13   the information in this document.

14   BY MS. FITZPATRICK:

15        Q.   Okay.  Fair enough.  Let me show you the next

16   document.

17                  MR. DAVIS:  Do that and then let's take

18   a break.

19                  MS. FITZGERALD:  Can we mark this as 17?

20                  (Whereupon, Exhibit 17 was marked.)

21                  MR. DAVIS:  Counsel, just one question.

22   If you're going to be a long time on this document, we

23   ought to go take a break now.  If you're going to be a

24   short time, that's fine.
```

Elaine Duncan

```
 1                    MS. FITZPATRICK:  Not too long.

 2                    MR. DAVIS:  I didn't want to interrupt

 3   your thought.

 4                    MS. FITZPATRICK:  I'm not going to be

 5   too long.  It will be a natural break point after this.

 6   BY MS. FITZPATRICK:

 7        Q.   Okay.  Ms. Duncan, I've shown you a document,

 8   and you recognize this document; correct?

 9        A.   Yes.

10        Q.   And this is something that you considered and

11   relied on for your opinion -- I'm sorry.

12                    MR. DAVIS:  Look at the entire document.

13                    THE WITNESS:  Yes, I understand to do

14   that, yes.

15                    MR. DAVIS:  I don't believe this was on

16   your list.

17                    THE WITNESS:  This is not a document

18   I've seen before this time.

19   BY MS. FITZPATRICK:

20        Q.   Ethicon didn't provide you with this document?

21        A.   Ma'am, I don't recall reviewing this document.

22   This document is a draft and it's unsigned.  The one I

23   referenced was signed and later.

24        Q.   Okay.  All right.  Let me get you a copy of
```

Elaine Duncan

```
 1    that.

 2          A.   I'm sorry?

 3          Q.   They showed you this; right?  You're not

 4    telling me that you didn't look at this; right?

 5               MR. DAVIS:  She's telling you she saw

 6    the signed version.

 7               MS. FITZPATRICK:  No, I'm asking her.  I

 8    don't need to you testify.

 9               MR. DAVIS:  She may.

10               THE WITNESS:  I saw a signed version,

11    which I presume is a later version of this document.  This

12    is not the document that I reference in my report, and it

13    is not the document to which I -- for which I used in my

14    due diligence.  Until you handed me this, I had not seen

15    this document.

16    BY MS. FITZPATRICK:

17          Q.   You had not seen that document, so that was

18    not provided to you as part of --

19          A.   No, I'm not saying it was not provided to me.

20    It may have been one of the ones I tried to look at, but

21    when you take this document and look at it in a host

22    of other documents, you may think you're looking at the

23    same document.  This document was not signed and so,

24    therefore, I know, looking at it, that this is not the
```

Elaine Duncan

```
 1   document I was looking at.

 2           Q.   Okay.  Let me show you a number -- let's mark

 3   this as Number 18.

 4                     (Whereupon, Exhibit 18 was marked.)

 5                     MR. DAVIS:  18?

 6                     THE WITNESS:  And your question?

 7   BY MS. FITZPATRICK:

 8           Q.   What's the date of this document?  Why don't

 9   you take a look at the back page.

10           A.   I'm sorry.

11           Q.   It's either August 5th, 2001 or May 8th, 2001,

12   if you look on the very last page; correct?

13                     MR. DAVIS:  I think the standard in

14   Europe is to use the --

15                     MS. FITZPATRICK:  Yeah, I don't know.

16   I'm assuming it's May 2001.

17   BY MS. FITZPATRICK:

18           Q.   Do you see these signatures?

19           A.   I believe there -- there was a company cover

20   memo that had a date on it, and that would have been the

21   proper reference to the date, I think, so --

22           Q.   2001, good enough.

23           A.   You can choose the date.

24           Q.   We'll go with 2001.  This was done after
```

Elaine Duncan

1    Ethicon had acquired the TVT-R mechanical cut; correct?

2         A.   Yes, ma'am.

3         Q.   And this was done after the TVT-R mechanical

4    cut had been on the market, had been sold and implanted

5    into women; correct?

6         A.   I'm having a hard time hearing you.  You

7    dropped your voice.

8         Q.   This was done after the TVT-R mechanical cut

9    had been in the market and had been sold and implanted

10   into women; correct?

11        A.   Yes, ma'am.

12        Q.   Okay.  And it was done after the 1992 memo

13   that I showed you concerning the -- that had the statement

14   about the degradation of PROLENE sutures; correct?

15        A.   Are you speaking of this one (pointing)?

16        Q.   Uh-huh.

17        A.   That was Exhibit 15.

18        Q.   It was done after that; right?

19        A.   Yes, ma'am.

20        Q.   And it was also done after this August 1998

21   GyneMesh II, GyneMesh design document that I showed you;

22   correct?

23        A.   That was '98, so yes, that is true.

24        Q.   Okay.  And can you identify for me on this

Elaine Duncan

```
 1    document where, if anywhere, Ethicon identified

 2    degradation as a potential hazard associated with the use

 3    of PROLENE mesh and the TVT-R mechanical cut?

 4          A.   There are a couple of places I'd like to point

 5    out to you, so this is not -- I'm going to take them in

 6    sequence.

 7          Q.   Sure.

 8          A.   If you go to line item 16 where we see, "Loss

 9    of mechanical integrity."

10          Q.   Is it your opinion that that means degradation

11    of the PROLENE mesh?

12          A.   What we would be looking at is the potential

13    hazard.  If you look at this particular style of FMEA,

14    they've done it in a different way.  In fact, they call

15    it -- it's not considered a process FMEA, it's a design

16    review, and so the -- this is a -- considered a hybrid

17    style of design and user-hazard analysis, so we have to

18    take it in line item.

19               And so I would take you to number -- first to

20    number 16 where they talk about loss of mechanical

21    integrity.  So if we were to have degradation of material,

22    there would be -- loss of mechanical integrity would be

23    its manifestation.  That would be its effect, and they

24    send us to see 19A and G.
```

Elaine Duncan

```
 1                Now, let me go a little further.

 2                Now, when we go down -- it's not a good one.

 3    Okay.  Go to -- they're sending us to 19A and G, so when

 4    you go down further, the first time you see mechanical

 5    property A, they're discussing needles.  So go further,

 6    and you see on G, there is -- no, I'm sorry, go to E,

 7    "strength of mesh" in vivo.  And in this context of

 8    the source, this is how you have to read to this

 9    document.  The second column is source, and they're

10    saying strength of mesh in vivo/in vitro, that being a

11    hazard is not imaginable as they have as a source, either

12    the manufacturer, the user or -- not the third.  It's

13    surgeon, manufacturer --

14         Q.   User?

15         A.   Thank you, user.  So they have considered it

16    here as not imaginable.

17                And then for composition, if a mesh

18    biocompatibility, not imaginable, and I believe that's

19    the materials in this.

20         Q.   Okay.  So let me just ask a couple questions

21    and then we'll take a break.

22                It's your opinion, Ms. Duncan, sitting here,

23    that Ethicon appropriately considered the potential of

24    degradation of the PROLENE mesh when doing this design
```

Elaine Duncan

1    review, and that's reflected in line items 16, 19E and

2    19GB; is that correct?  Those are the three places?

3         A.   I believe that's the -- let me just see if

4    there's anything else.

5              Well, to some extent, this is Number 5 line

6    item, systemic toxicity, a biocompatibility testing might

7    be an indirect consideration for degradation.  So I would

8    say that they have three places, at least, where they have

9    considered degradation.

10        Q.   And just let me clarify.  So the line items

11   16, 19E and 19GB that you first directed me to, Ethicon

12   didn't fill in the box for exposition potential

13   consequence; correct?

14        A.   That would be consistent with their method,

15   because if they haven't identified the source, they would

16   not complete the rest of this document.

17        Q.   They didn't identify a failure mode; correct?

18        A.   They categorized the source.  If -- their

19   SOP said go through this column, then go through this

20   column, then go through this column.  So if there's

21   nothing in the source column, they don't go to the next

22   column over.

23        Q.   They didn't identify a failure mode; correct?

24        A.   They assessed the potential for a failure mode

Elaine Duncan

```
 1   in the sense that they looked at the potential for a

 2   hazard.  Remember, this is a hazard.

 3         Q.   She's not answering the question.

 4              MR. DAVIS:  She is.

 5   BY MS. FITZPATRICK:

 6         Q.   Does failure mode have anything filled in on

 7   it?

 8              MR. DAVIS:  Don't answer that question.

 9   No, we're not going forward until you let her finish or

10   you can withdraw the last question, either way.

11   BY MS. FITZPATRICK:

12         Q.   Withdraw the question and let me ask you.

13              Does the line -- does the column "failure

14   mode," is that filled in line items 16, 19E or 19GB?

15         A.   I don't see them filled in for 19 because

16   it's --

17         Q.   It's a "yes" or "no."

18         A.   Because that is a col -- that is a category.

19   So to go to 19, that is a category.  So that wouldn't be

20   filled in, and you're saying 19A?

21         Q.   No, I said 16, 19E or 19GB.

22              Is there anything written in a failure mode

23   column?

24         A.   Well, 16 directs you to 19A and G.  So there
```

Elaine Duncan

1    would -- that whole entire row is not completed because

2    they're directing you down.  They're trying to avoid

3    duplication.  So then they go to 19, and G begins on the

4    other page.  Get through the needle part.  So in "Mesh" A

5    and B and ABA, BB, C, D, they are assessing the mesh.

6           Q.   Ms. Duncan --

7           A.   Mechanical properties of --

8           Q.   Please answer my question.

9                MR. DAVIS:  Wait.

10               MS. FITZPATRICK:  I'm not wasting my

11   deposition on this nonsense anymore.

12               MR. DAVIS:  No --

13   BY MS. FITZPATRICK:

14          Q.   I asked you very specifically, 16, 19E, and

15   19GB, is there anything written in the failure mode

16   column?  That is the only question that is pending at the

17   moment.

18               Yes or no?

19               MR. DAVIS:  That's the exact question

20   she answered.

21               MS. FITZPATRICK:  Really?  And what is

22   19AB, ABA, ABB, ABC have to do with my question about 19E?

23   Nothing.

24

Elaine Duncan

```
 1   BY MS. FITZPATRICK:

 2        Q.   Is there anything written in 19E, failure mode

 3   column, period?

 4             MR. DAVIS:  Do not answer the question

 5   until she lets you finish your answer.

 6             MS. FITZPATRICK:  I've withdrawn every

 7   question on the table except for one.

 8   BY MS. FITZPATRICK:

 9        Q.   Is there anything written in the 19E failure

10   mode column?

11             MR. DAVIS:  Just answer that question.

12             THE WITNESS:  Just a moment.

13             MR. DAVIS:  She doesn't want to know

14   about the others.  Just answer that.

15             THE WITNESS:  As I have explained before

16   on E, it would not be completed.  The entire row would not

17   be completed because they didn't go past the source of the

18   hazard.  This is a different style than you may be

19   accustomed to.  It is not a true failure modes and effects

20   analysis style.

21   BY MS. FITZPATRICK:

22        Q.   Is there anything written in the column is my

23   question.  Not why.

24             MR. DAVIS:  No.
```

Elaine Duncan

```
 1                    MS. FITZPATRICK:  This is preposterous.

 2  BY MS. FITZPATRICK:

 3        Q.   Is there anything written in that column or

 4  not?

 5                    MR. DAVIS:  She said it, and then she's

 6  explaining.

 7                    MS. FITZPATRICK:  The answer is, "As I

 8  have explained before, it would not be completed

 9  because --" Give me a yes or no.

10  BY MS. FITZPATRICK:

11        Q.   Does it say anything or not?

12                    MR. COMBS:  Okay.  We're not going to

13  yell at the witness.

14                    MS. FITZPATRICK:  I am yelling.  You're

15  darn right I am very upset right now because this witness,

16  for whatever reason, has been paid so much money by

17  Ethicon that she can't even say, "Yes, the column is

18  blank."

19                    MR. COMBS:  You know, Fidelma --

20                    THE WITNESS:  Ma'am, that is my

21  procedure.

22                    MR. COMBS:  Wait.  You don't get to

23  scream at people.  You don't.

24                    MR. WALLACE:  She's not screaming, first
```

Elaine Duncan

1   of all.

2                    MR. COMBS:  She is.

3                    MS. FITZPATRICK:  You're right; I'm

4   agitated right now.  I will freely admit I'm agitated on

5   the record because I have just spent -- and I love this,

6   because it's going to make a great record for me -- I have

7   spent seven minutes trying to get an answer to, "Does 19E

8   have anything written in the failure mode column?"

9                    MR. DAVIS:  She said --

10                   MR. WALLACE:  She did not say that.  She

11  has never said that once.

12                   MR. DAVIS:  See if you can answer that

13  question yes or no.

14                   THE WITNESS:  Can I just please state --

15                   MS. FITZPATRICK:  It's yes or no.

16                   MR. WALLACE:  Answer the question.

17                   MR. DAVIS:  This time say yes or no and

18  then give your explanation.

19                   THE WITNESS:  No, because the procedure

20  does not require it.

21  BY MS. FITZPATRICK:

22       Q.   Here's the idea.  If Mr. Davis wants to ask

23  you why during his time for this deposition, he can go

24  ahead and do that.  Until then, I want you to answer my

Elaine Duncan

 1   questions, and I have been remarkably patient with this

 2   complete lack of ability to answer a direct question.

 3                  MR. DAVIS:  If she feels --

 4   BY MS. FITZPATRICK:

 5        Q.   I want very precise answers to my question,

 6   and if he wants you to explain them, he can certainly do

 7   that.

 8                  MR. DAVIS:  And I'll instruct the

 9   witness if she feels that an explanation is necessary,

10   she's entitled to give it after she answers yes or no or

11   says she can't answer it.

12   BY MS. FITZPATRICK:

13        Q.   19E does not identify the probability of

14   occurrence; does it?

15        A.   19E?

16        Q.   And you can just stay with 19E because all

17   these questions will deal with 19E.

18        A.   There is nothing in that column.

19        Q.   There's nothing in the "Risk Class" column; is

20   there?

21        A.   There is nothing in that column.

22        Q.   There's nothing in the "Applicable Safety

23   Measure" column; is there?

24        A.   There is nothing in that column.

Elaine Duncan

```
 1          Q.   There's nothing in the "Other Hazards

 2   Generated," column; is there?

 3          A.   There's nothing in that column.

 4          Q.   And there's nothing in the "Risk Class"

 5   column; correct?

 6          A.   There's nothing in that column.

 7          Q.   And there's nothing in the assessment of

 8   remaining risks; correct?

 9          A.   There's nothing in that column.  And now may I

10   speak and explain?

11          Q.   You can certainly do that when Mr. Davis

12   questions you.

13                    MR. DAVIS:  If you feel an explanation,

14   you're entitled.

15   BY MS. FITZPATRICK:

16          Q.   GB --

17                    MR. DAVIS:  Is your answer over?

18                    THE WITNESS:  No, sir.

19   BY MS. FITZPATRICK:

20          Q.   Let me make this easy, Ms. Duncan.

21                    MR. DAVIS:  No.  We're not answering the

22   next question until you let her finish.

23                    MS. FITZPATRICK:  Fine.  Don't answer

24   the question.  I'll create a record where there are no
```

Elaine Duncan

```
 1    answers and you've instructed the witness not to answer.

 2    That's completely fine.

 3                    MR. DAVIS:  No, we're not going forward.

 4    BY MS. FITZPATRICK:

 5        Q.   19B, which looks like you have testified

 6    previously --

 7                    MR. DAVIS:  Let's go off the record.

 8                    MS. FITZPATRICK:  I'm not going off the

 9    record.

10                    MR. DAVIS:  We're not going forward with

11    anymore questions.  We're not going -- I'm not going to

12    let you ask questions until you let her answer.

13                    MS. FITZPATRICK:  Call the Judge.

14                    MR. DAVIS:  Let her finish.

15                    MR. COMBS:  You want to call the Judge

16    and say you're screaming at the witness, you're on your

17    own.

18                    MS. FITZPATRICK:  You're darn right

19    we're going to.

20                    THE WITNESS:  I would answer if you --

21                    MS. FITZPATRICK:  -- describe why a

22    college-educated woman can't answer a question that's

23    five words long because she doesn't understand it.  I --

24    I'm fairly sure Judge Goodwin would have little to no
```

Elaine Duncan

```
 1   patience for what is going on in this room today, and he

 2   will have little to no patience when this happens on the

 3   stand, believe me.  I'm not ready to take a break.  I'm

 4   going to keep going.

 5                    MR. DAVIS:  No, we're taking a break,

 6   but --

 7                    THE WITNESS:  It's a logical break.  Put

 8   that on the record.

 9                    MR. DAVIS:  Let the record reflect she

10   was in the middle of an answer and she was not allowed to

11   finish the answer.

12                    (Whereupon, a recess was taken from

13                    5:27 p.m. to 5:36 p.m.)

14                    MR. DAVIS:  As soon as we got off the

15   record, the witness explained to me that one of the times

16   that she was being interrupted a few minutes ago, she was

17   actually trying to correct one of her answers, so I'd like

18   for her to be able to finish making that correction.

19                    MS. FITZPATRICK:  You can feel free to

20   ask her anything she wants.

21                    MR. DAVIS:  No, she's entitled to finish

22   her correction she was making.

23                    MS. FITZPATRICK:  You can put it on the

24   record later.  It's not going to count on my time right
```

Elaine Duncan

1    now.

2                    MR. DAVIS:  Well, it doesn't have to

3    count.  I'll give you an extra couple minutes.  Let her

4    finish her answer.

5                    MS. FITZPATRICK:  Okay.  Go ahead and

6    change your answer.

7                    THE WITNESS:  It isn't so much a change,

8    that I have an omission.  And I apologize, I should have

9    been looking with my magnifying glass because this is a

10   very gray document, and what I meant to include in the

11   19 -- under 19, which is "Lack of Quantitative

12   Properties," and A is "Mechanical Properties."  You see it

13   first starts out with "Needles," and then the subset, they

14   go to "Mesh," and that's why it's AB, and that's what I

15   was trying to explain.

16                   And so the ABA is tensile strength, and what

17   they looked at there was a potential failure of tensile

18   strength, and they have categorized it as probable --

19   probability of occurrence, and then "Risk Class," they

20   have a zero, and then for "Other Hazards Generated," they

21   have a "No," and again, a zero for "Risk Class," and

22   acceptable risk in the category of "Assessment of

23   Remaining Risk."

24                   So when I was going through the columns,

Elaine Duncan

1    before, I had neglected to include that one because I was

2    jumping to the -- from 16 to 19, and that was why I

3    omitted that one.

4              And I was -- I apologize if I disturbed you.

5    I was trying to explain that this is not a classic FMEA.

6    If you see this risk analysis, EN 1441, they are using the

7    list hazards that are provided in that standard as a

8    memory aid, and that's how they were doing this, and if

9    you go to the procedure, it explains why they don't

10   continue to fill in the columns.  I didn't mean to upset

11   you by trying to answer you completely.

12   BY MS. FITZPATRICK:

13        Q.   What's the difference between tensile strength

14   and strength of mesh?

15        A.   Tensile strength and what?

16        Q.   Strength of mesh?

17        A.   Can you help me?  Where do you see that?

18        Q.   Well, you've cited 19ABA tensile strength as

19   somehow being related to degradation, and you've also

20   cited 19E, which is strength of mesh vivo/vitro as part of

21   degradation.

22              What is the difference between them?

23        A.   If you look at the Category 19, if you

24   consider that as a header, you notice there's nothing

Elaine Duncan

```
1    filled out in that, either, because it's subsets.

2              So 19 is lack of quantitative properties, and

3    they subcategorize lack of quantitative properties, and

4    in 16, they're talking about loss of mechanical integrity,

5    and that is different from lack of quantitative

6    properties.

7         Q.   19 is lack of quantitative properties?

8         A.   Yes, ma'am.

9         Q.   You agree with me that 19A deals with the

10   mechanical properties; correct?

11        A.   It's a subset, yes, mechanical properties.

12        Q.   And 19AB is, again, another subset of

13   mechanical properties that is mesh; correct?

14        A.   AB, yes.

15        Q.   And 19ABA is yet another subset dealing with

16   tensile strength of the mesh; correct?

17        A.   ABA deals with tensile strength of the mesh.

18        Q.   My question is, what is the difference between

19   tensile strength of the mesh and 19E, the strength of the

20   mesh?

21        A.   They're talking there of strength of mesh

22   in vivo/in vitro, so they're considering it there, as well

23   as above, because they would have to have a baseline to

24   consider either one.  So you have to consider what is the
```

Elaine Duncan

```
1    tensile strength of the mesh, and then would there be

2    differences in vivo/in vitro, and that's why they've

3    identified that as not imaginable.

4              So they have considered degradation as -- in

5    that context.

6         Q.   Does 19E deal with degradation?

7         A.   Strength of mesh in vivo/in vitro, I

8    understood that to mean that they were considering whether

9    the strength of the mesh was altered in vivo or in vitro.

10   That could also include shelf-life aging, for example.

11        Q.   And 19ABA, tensile strength deals with changes

12   in the tensile strength of the mesh when implanted; right?

13        A.   A -- excuse me, ABA?

14        Q.   Yep, 19ABA.

15        A.   19ABA is dealing with tensile strength and

16   whether or not that would be a failure mode.  Because in

17   that column there, it's four over, in 19A -- ABA, tensile

18   strength, that would be -- they classified that as a

19   probable failure mode.

20        Q.   But my only question is, what is the

21   difference between the failure mode associated with

22   tensile strength and the failure mode that is associated

23   with the strength of mesh?  What is different about those?

24        A.   They are --
```

Elaine Duncan

1          Q.    If you know?

2          A.    They would be a property.  Tensile strength is

3     a -- has a quantitative standard associated with measuring

4     it.  So T and E is a particular method of measuring mesh

5     strength.  So then it would be considering whether

6     strength of mesh in vivo/in vitro is also affected.  So

7     they would go back to consider tensile strength of mesh

8     in vivo/in vitro.

9          Q.    And I will be very honest -- and maybe it's

10    late in the day -- I am so highly confused with what you

11    just said.

12               You'll agree with me that 19ABA deals with a

13    possible failure mode of loss of tensile strength; right?

14         A.    May I please --

15         Q.    Yeah, please do.

16         A.    When I first started trying to read this, I

17    had to put myself back in time, and I had to look at their

18    procedure, and I had to pull out EN 1441, and I had to

19    have all three documents together to begin to understand

20    how these engineers at that time were trying to assess the

21    hazards associated with the product.  It is not something

22    you can do just looking at a document like this.  You have

23    to have the procedure and the standard to understand the

24    document.

Elaine Duncan

1        Q.   My only question was, does 19ABA deal with the

2    possible failure mode of loss of tensile strength?  Is it

3    or not?

4        A.   It's a baseline that you would need to know in

5    order to evaluate it.  So that's part of the issue.  You

6    have to have -- you have to consider both.  The tensile

7    strength -- is it possible that the tensile strength could

8    have a short or marginal type of failure?  And they said

9    probable, and then they scored it, and then they said the

10   risk was acceptable.

11            And then when you go down and you look at

12   strength of mesh in vivo/in vitro, is it adequate for its

13   intended use in vivo and in vitro, meaning when you put it

14   in and when it's implanted?  And so that's what they were

15   considering, was the strength adequate in that category?

16   That's the way you have -- you have to get the document

17   and look at the procedure and the standard to make sense

18   of this.

19       Q.   I will be very honest, your explanation

20   doesn't make any sense to me, but I'm not going to belabor

21   it at this point in time.

22       A.   Well, that's the best I can do with a German

23   document.

24       Q.   Does the word "degradation" appear on this

Elaine Duncan

1    document?

2         A.   The word "degradation" does not appear on this

3    document.

4         Q.   Is there anything on this document that deals

5    with the inability to remove mesh once it's been

6    implanted?

7         A.   Well, if you look at 13A and B, "Complication

8    Rate Higher Than Standard Procedures," they're indicating,

9    "See clinical risks."  That's where they direct you.  So

10   one of the considerations I would have, as I'm reading

11   this document from my background, is the complication rate

12   would be included in the types of complications from the

13   product.  That's the -- that's one of the ways that they

14   would look at this.

15            And then if you look at Number 15,

16   "Insufficient warning of adverse reactions," they are

17   also saying, "See clinical risk."  They're directing you

18   to a different document because this is an engineering

19   document and they've isolated the clinical risk elsewhere.

20        Q.   Well, with all due respect, Ms. Duncan, I

21   think you're reading it wrong.  Because if you go to

22   subsection 28 on this document, that's the clinical risk.

23   It's not a separate document, it's a separate line item

24   with subsections on this document.

Elaine Duncan

```
1          A.   Well -- but this is also backed up by the

2    other clinical risk documents that would have been

3    available to the team at the time.  That's where they got

4    their probabilities.

5          Q.   Okay.  Well, let me ask you this -- 13AB, "See

6    28 clinical risks."  What you said to me is, "They're

7    directing you to a different document because this is an

8    engineering document and they've isolated the clinical

9    risk elsewhere."  That was the answer that you've given

10   me.

11            So do you believe that 13AB where it says,

12   "See 28 clinical risks," they're directing me to a

13   different document, or do you believe that they're

14   directing me to subsection 28 of this document that's

15   called, "Clinical risks"?

16         A.   These clinical risks that they have identified

17   have -- I probably didn't speak clearly.  28 is the line

18   items, and they have, let's call it, derived the

19   probability of occurrence and the failure modes about

20   clinical risks from clinical information that they hadn't

21   had.

22         Q.   13AB, where are they directing me?  Are they

23   directing me to a totally separate document or are they

24   directing me to --
```

Elaine Duncan

```
1          A.   I explained.  28, down below.  And as you see,

2     they're talking about info and IFU training.  So these

3     other documents would have to be reviewed, too, as part of

4     looking at this document.  This is how you go about a

5     hazard analysis, you reference additional documentation.

6     So that's what I meant by that.

7          Q.   You know, when we're talking about precision,

8     I want to make sure that we're precise here.

9               What you said to me, for example, looking

10    at Number -- let's go with Number 15, "Insufficient

11    warning of adverse reactions, only product related."

12              Do you see that?

13         A.   Yes, "See 28 clinical risks."

14         Q.   Okay.  And what you said to me, "That means

15    they're directing me to a different document because this

16    is an engineering document and they've isolated the

17    clinical risk elsewhere."

18              What document do you believe they're directing

19    me to here?

20         A.   I'm sorry, I misspoke.  28 is the line item

21    for clinical risks.  And then when you look at the column

22    called, "Applicable safety measure," that is where they're

23    directing you to the other clinical documentation, such as

24    the IFU, training of user.  Restricted marketing is their
```

Elaine Duncan

1    term, because that's the way they -- we would call it --

2    the FDA would call it prescription.  They call it

3    restricted.  Training, IFU training, patient consents, and

4    patient consents.

5         Q.   Apart from the IFU, what other documents are

6    identified for me here that I can go and look at for these

7    clinical effects?

8         A.   Well, I would presume where they're talking

9    about restricted marking, that would be their regulatory

10   applications, and --

11        Q.   Did you look at that?

12        A.   I know that as a part of the technical files,

13   you describe the intended use and who can use the product.

14   So that's what they mean by restricted use and the IFU and

15   the training of the users.  That's the documents I was

16   referring to.

17        Q.   Okay.  Show me where in this clinical risks it

18   deals with complications arising from attempted removal of

19   the product.

20        A.   Again, I would have to point out that that was

21   not an input requirement.  So the closest we have as a

22   hazard is complications from use, "Complication rate

23   higher than standard procedures.  See clinical risks."  So

24   if they were to start to see higher clinical risk

Elaine Duncan

```
1    occurrences and determine that it had become common to

2    remove the product, that would become a new input

3    requirement to be considered.

4         Q.   But you agree with me, it's not on here as --

5         A.   I don't see the exact wording you're looking

6    for.

7         Q.   Okay.  Rejection, the body's rejection of the

8    device.

9              Do you see that on here?

10        A.   Ma'am, again, it is not part of the input

11   requirements.  Rejection is a specific term for rejecting

12   tissue.  Medical device companies don't typically refer to

13   rejection in that context.

14        Q.   Okay.  Now --

15        A.   We would consider it incompat- --

16   biocompatibility failure, not rejection.  It's not our

17   terminology.

18        Q.   It's not your terminology, but you agree that

19   Ethicon at least used that terminology --

20        A.   No, ma'am.  I believe that he was repeating

21   words that the doctors were using, and it was their fear.

22        Q.   But you agree that the word "rejection"

23   appears in this document that I showed you?

24        A.   It was a fear, yes, ma'am.
```

Elaine Duncan

1       Q.    And it was written by Ethicon; correct?

2       A.    The report was written by Ethicon.

3       Q.    And identified as a main concern; right?

4       A.    As a fear, yes, ma'am.

5       Q.    And it's not in here?  It's not in Exhibit,

6   whatever we're on now, 18?

7                   MR. DAVIS:  Object to form.

8                   THE WITNESS:  Other bio-

9   incompatibilities in Number 9 would be a -- and also

10  allergical effects.  And perhaps you could include

11  teratogenicity, or rather that's a second generation.  So

12  the closest we would come would be the allergical effects

13  and other bioincompatibilities.

14              And as you see, they have identified that as

15  not applicable because other bioincompatibilities, such as

16  rejection, as you're suggesting, is not part of the normal

17  considerations for synthetic materials.  The allergic

18  effect would be, and they send you to Number 5 where they

19  have conducted biocompatibility testing, and it is shown

20  here as the failure would be very rare.

21  BY MS. FITZPATRICK:

22      Q.    Now, do you remember when we were talking

23  about this document before, and I'm not sure what number

24  it was, but I was asking you about the erosions that were

Elaine Duncan

```
 1   introduced -- or discussed here on page 5?

 2        A.   You're speaking of the document that refers to

 3   the repair of prolapse?

 4        Q.   Yes, that's the one.

 5        A.   And where do you want me to look?

 6        Q.   I want you to look on page 5 of that document.

 7             Do you remember when we were talking about

 8   mesh eroding into the bladder and the rectum?

 9                  MR. DAVIS:  Object to the form.

10                  THE WITNESS:  We discussed this page.

11   BY MS. FITZPATRICK:

12        Q.   Okay.  And do you recall -- I can go back and

13   find it for you if you don't remember, but do you remember

14   I asked you whether that's something that should be

15   included in an FMEA, and you didn't believe that it should

16   be?

17        A.   A failure mode effects analysis directed to

18   the failure of the mesh would probably not include this as

19   a failure mode.  A risk analysis document might.

20        Q.   Okay.  So a risk analysis document would

21   include more than the FMEA; is that what you're saying?

22        A.   Different, not more.

23        Q.   And you'll agree with me that some of these

24   major concerns, such as erosion, did actually appear on
```

Elaine Duncan

```
1    this design review; correct?

2         A.   Do you want to direct me to the line you're

3    speaking?

4         Q.   Sure.  I am talking about 28L, M, and N, as in

5    Nancy.

6         A.   Okay.  Postoperative erosion of urethra.

7              And your question?

8         Q.   Do you agree with me that in this design

9    review document, at 28L, M, and N, it talks about the

10   potential of erosion?

11        A.   Yes, ma'am.

12        Q.   Now, who's the user?

13        A.   The user would -- I believe in this

14   circumstance, would be the patient.

15        Q.   Okay.  So in this document, it identifies

16   what's considered the source of the hazard; correct?

17        A.   That's correct.

18        Q.   And so Ethicon here identifies patients as the

19   source of postoperative erosion of the urethra; correct?

20        A.   I think that that's contextual.  They're

21   trying to say that certain patients may have it; others

22   may not.  It's not a -- the source is not by the surgeon

23   and not by the manufacturer.  So the third option would be

24   the user or no one.  So it's not imaginable, user,
```

Elaine Duncan

```
 1   surgeon, or manufacturer.  That's their four choices, or

 2   not applicable.

 3        Q.   Postoperative erosion of the bladder is not

 4   attributable to the user, but it's attributable to

 5   something else called a standard procedure; correct?

 6        A.   Ma'am, I can't speak to that.  I can tell you

 7   what documents say, but I don't know the cause and effect

 8   of erosion.  I can read what people have written, but I

 9   don't know it personally.

10        Q.   Okay.  The source that's identified for

11   postoperative erosion into the bladder is a standard

12   procedure; correct?

13        A.   Right.

14        Q.   What is standard procedure?

15        A.   I believe what they're speaking of here

16   is that the standard procedure would -- could be the

17   source of this postoperative erosion, so it's kind of a

18   hybrid.  They're not saying the surgeon did it; but when

19   you use a standard procedure, that could be the source of

20   a potential erosion.  In other words, that's a known

21   potential side effect of the procedure.

22        Q.   And then we go to another erosion, which is

23   erosion to the vagina, and we've got now another source of

24   delayed healing caused by patient or surgeon; right?
```

Elaine Duncan

1          A.    Yes.  Yes.

2          Q.    Okay.  So each different type of erosion

3    that's identified has a different source here; correct?

4          A.    Let's see.  I believe that's what they were

5    trying to communicate.

6          Q.    Okay.  And I'm particularly interested in the

7    postoperative erosion of the vagina.  It says, "Acceptable

8    as it is equivalent to standard procedures and not product

9    specific."

10               What standard procedures are they referring to

11   there?

12         A.    I would have to speculate, ma'am.  I don't

13   know -- where they're saying, "Acceptable as equivalent to

14   standard procedures," I believe they're speaking of the

15   alternative procedures without mesh, but that is my

16   conjecture.  I don't have their source of that particular

17   assessment of remaining risks.  I don't know where they

18   got that statement from.

19         Q.    So you don't know what that is; is that right?

20         A.    Equivalent to standard procedures, I believe

21   they mean alternative procedures because they've talked

22   about standard procedure elsewhere.

23         Q.    Okay.  Well, what if -- let's hypothetically

24   assume your experts have said -- other experts for Ethicon

Elaine Duncan

1    have said that you can't have an erosion without mesh.

2    Then you agree with me that this assessment of remaining

3    risk can't be equivalent to non-mesh procedures; right?

4                      MR. DAVIS:  Object to the form.

5                      THE WITNESS:  Actually, I couldn't speak

6    to that because postoperative erosion of the vagina, I

7    don't know in this context or in general if other tissues

8    or other procedures such as -- well, I couldn't even say

9    because I'm not -- two reasons; one, I don't know if other

10   procedures have reported erosion of the vagina.

11                   It's my understanding that the vagina can thin

12   and erode as a result of aging, but I don't know -- in

13   this case, I believe what they're speaking of was

14   equivalence to other procedures.  So I can't speak to your

15   question.

16   BY MS. FITZPATRICK:

17        Q.   So you just don't know.  It's not in your

18   wheelhouse or your area of expertise here; right?

19        A.   I will agree, it's not in my wheelhouse.

20        Q.   Okay.  Can you show me on this document

21   where -- this design review, Ethicon looked at the

22   possibility of mesh fraying as a hazard, if they did at

23   all?

24        A.   Well, first I would take you back to loss of

Elaine Duncan

1   mechanical integrity, Number 16.  So they considered that

2   with respect to the material properties.

3       Q.   And that's the one that directs us to 19A;

4   right?

5       A.   19A -- ABA.  So if fraying affected tensile

6   strength, we might see an effect on the strength of mesh.

7            And then also, if you look at C, there's color

8   and appearance, and under C -- CB, they have mesh

9   appearance, and that would be fraying, inclusive of that,

10  if it started to look peculiar, I guess.

11           But as I understand it, fraying is actually an

12  ex vivo condition where the material is fraying as a part

13  of the surgical procedure.  So just let me look for a

14  second for functional equality procedures.  Again, I would

15  say loss of mechanical integrity is the primary category.

16  Erroneous mechanical damage, that Number 17, I believe

17  that's encompassing of the question of fraying.  I think

18  that's -- that encompasses that question.

19           These -- as I said, these memory reminders are

20  out of EN 1441, so they're rather imprecise.  You have to

21  categorize a lot of things under the category.

22      Q.   Okay.  Two more questions about this document.

23           Where on this document does it identify mesh

24  twisting as a potential in the design review?

Elaine Duncan

1          A.    Just a minute.

2          Q.    Let me ask again.

3                Where in this document for the design review

4    does it identify mesh twisting as a potential hazard?

5          A.    One of the considerations would be the

6    erroneous mechanical damage.  So if it was twisted, it

7    would be mechanically damaged.  In other words, it's

8    supposed to be flat, and if it's twisted, it wouldn't be

9    flat.  You could also look at 13F, not manageable with

10   instruments.

11               So these are general characteristics that

12   would incorporate the issue of twisting.  So if they had

13   considered twisting to be an issue, they would have

14   probably put it under these categories.

15         Q.    And what does -- one last question on this.

16         A.    Just a minute.  I want to look at one more

17   thing here.

18               I want to make sure it's not covered in --

19   well, in the clinical 28, I would also believe that C,

20   overtensioning of the tape -- some of the documents I

21   recall reading were suggesting that the twisting can

22   occur when the physician is pulling it too hard, and

23   particularly handling it out of the packaging, but I --

24   it's difficult to discern here whether they were

Elaine Duncan

```
 1    speaking of an issue with -- in the surgical procedure or

 2    as a part of the packaging and delivery, okay?  So

 3    twisting can occur, as I understand it, in either

 4    circumstance.

 5         Q.   Okay.  One more question on not imaginable.

 6    Does that mean it can't happen, or does that mean Ethicon

 7    doesn't know why it happens?

 8         A.   Well, actually, as a part of my due diligence,

 9    I was curious about that term, and if you look at my

10    Exhibit 8, I've written out for you the German word.  When

11    you translate unimaginable, you can find the word -- and I

12    can't pronounce it well, but it's nicht vorstellbar.

13                   THE WITNESS:  Do you want me to spell

14    it?

15                   THE REPORTER:  Yes.

16                   THE WITNESS:  N-I-C-H-T, second word

17    V-O-R-S-T-E-L-L-B-A-R.

18              And when you back translate that, it is the

19    word inconceivable.  And so it would appear that what they

20    were trying to say was, it's inconceivable that these

21    sources that are a part of our list here would be the

22    source for those items that they have called not

23    imaginable.

24
```

Elaine Duncan

```
1    BY MS. FITZPATRICK:

2         Q.   Okay.  So to the extent that 19E, strength of

3    mesh, deals with degradation, according to Ethicon, it is

4    inconceivable that has anything to do with the PROLENE

5    mesh itself, according to this document; is that right?

6         A.   I'm sorry, I'm so tired.  Would you please --

7         Q.   Sure.

8         A.   -- ask me the question again?  I just couldn't

9    follow it all.

10        Q.   19E and 19GB you had identified for me earlier

11   as being related to the degradation, and Ethicon's

12   consideration of degradation, as part of this design

13   review in 2001; correct?

14        A.   As it relates to the properties, the material

15   properties.

16        Q.   Okay.  And so I just want to make sure that,

17   as to 19E and 19GB, Ethicon is saying that it is

18   inconceivable that degradation could have anything to do

19   with the mesh itself; is that right?

20        A.   I would direct you, it's more to the

21   mechanical properties.  So the degradation word would be

22   with respect to mechanical properties.  And at the point

23   in time these gentlemen were working on this document, the

24   relationship of any properties, with respect to observed
```

Elaine Duncan

1    degradation, have not manifested themselves in any

2    mechanical changes, and I believe that's still true.

3        Q.   Okay.  Here's what confuses me about that:

4    19A is the subsection that deals with mechanical --

5        A.   Lack of quantitative property is mechanical

6    property.

7        Q.   Mechanical property?

8        A.   Right.

9        Q.   E and G don't deal with mechanical property.

10   That's 19A.  So 19E and 19GB, which you directed me to as

11   being related to degradation, are not included in the

12   mechanical properties that you're talking about.

13       A.   Well, strength of mesh.  So basically,

14   what they are categorizing here, strength of mesh in

15   vivo/in vitro as a potential hazard, there's -- a change

16   of the strength of the mesh in vivo/in vitro is

17   inconceivable.

18       Q.   And that's a position that -- that's what I

19   was asking.  That's a position that Ethicon is taking here

20   in 2001 concerning degradation?  Because you said these

21   were related to degradation.

22       A.   Strength of mesh changed, degradation,

23   changing the strength of the mesh, as these gentlemen

24   understood it, I believe they meant it was inconceivable,

Elaine Duncan

1  yes.

2        Q.   Okay.  And also the twisting that you said was

3  under 13F, not manageable with instruments?

4        A.   I think that that's the category that that

5  would fall under.

6        Q.   So that's also not imaginable.

7             And 19CB, which was the appearance of mesh

8  that you've related to fraying, once again, as of 2001, in

9  this particular document, Ethicon was saying that it was

10 inconceivable that the mesh and the TVT-R could fray?

11            MR. DAVIS:  Object to form.

12            THE WITNESS:  No, I didn't say that they

13 said it couldn't fray.  19, we were talking about -- I'm

14 sorry, 19E?

15 BY MS. FITZPATRICK:

16       Q.   No, I'm sorry, 19C- -- I'd asked you about

17 fraying, and I asked you where fraying appeared--

18       A.   Oh, I'm sorry.

19       Q.   -- and you said it was in 19CB?

20       A.   Yes, I'm sorry.  I recall now.  CB mesh not

21 imaginable.  Color and appearance.

22            So fraying has not been established to any

23 mechanical property changes, but it obviously has a

24 peculiar appearance.  And they're saying that -- in this

Elaine Duncan

1    case, they were saying it was not imaginable to have a

2    color or appearance change of the mesh.

3            I'm not saying for a fact that they were

4    saying fraying couldn't happen.  I'm saying that's the

5    category they would have put it under.  In other words, if

6    they felt it was a consideration, I believe that fraying

7    would have come in under appearance of mesh, and that's

8    the category of not imaginable.

9        Q.   Okay.  And so the category that you think

10   fraying would have come under is inconceivable to Ethicon

11   as of 2001, according to this document?

12                 MR. DAVIS:  Object to the form.

13                 THE WITNESS:  I can only speculate that

14   that would be the category that fraying would have fallen

15   under, because they knew it didn't affect the tensile

16   strength -- or they knew it didn't affect the tensile

17   strength.

18   BY MS. FITZPATRICK:

19       Q.   How did they know that?

20       A.   The testing that had been done.

21       Q.   Okay.  Let me show you 18.

22       A.   I thought I had 18.

23       Q.   Oh, 19.

24                 (Whereupon, Exhibit 19 was marked.)

Elaine Duncan

```
 1                     THE REPORTER:  And you wanted to know

 2   the time, when we were getting close to the seven hours.

 3   I have that at 6:20 we'll be at the seven hours.

 4                     MR. DAVIS:  We can go to 6:25.  We'll

 5   give you five extra minutes in there.

 6   BY MS. FITZPATRICK:

 7        Q.   Let's take a look at this April 2002 document.

 8   You've reviewed this document before; right?

 9                I want to direct your attention to page 877 of

10   this document.

11                     MR. DAVIS:  Which page, I'm sorry?

12                     MS. FITZPATRICK:  Bates number 877.

13                     THE WITNESS:  Oh, so you're not saying

14   that -- the first page?

15   BY MS. FITZPATRICK:

16        Q.   No, I'm not referring to the first page.

17        A.   877, yes.  All right.

18        Q.   And you'll agree with me, as of April 2002,

19   Ethicon identified 11 potential new hazards for including

20   in the DDSA; correct?

21        A.   No, ma'am, that's not correct.

22        Q.   Okay.  Tell me what they did.

23        A.   First off, this document follows the procedure

24   that Ethicon required, which was to re-evaluate the DDSA
```

Elaine Duncan

```
 1    after two years.

 2          Q.    Uh-huh.

 3          A.    So that's why it's April 25, 2002.  And the

 4    person who's writing this memo is writing this memo as a

 5    result of the procedure that required this re-evaluation.

 6          Q.    Okay.

 7          A.    Now, the new you're referring to, these were

 8    not new hazards.  The reference is to the previous

 9    document --

10          Q.    Okay.  Let me --

11          A.    -- that was attached.

12                MR. DAVIS:  Let her finish the answer.

13                THE WITNESS:  Sorry, that was attached

14    to the memo, okay?

15    BY MS. FITZPATRICK:

16          Q.    So it says here under the first bullet,

17    "Evaluate 11 potential new hazards for inclusion in the

18    DDSA."

19                So when you say -- Ethicon says they're new

20    and you say they're not new.  Which are they?

21                MR. DAVIS:  Object to the form.

22                THE WITNESS:  This re-evaluation, this

23    memo, which was the required procedure, indicates that the

24    July 2000 risk assessment, this one (pointing), would need
```

Elaine Duncan

1    to be updated.  So she wants to include these new hazards,

2    not previously in this document (pointing), in the DDSA.

3    So as a part of her job, she's following procedure to look

4    back two years and add these terms to what is being

5    evaluated.

6              Evaluate, that's an action items word here.

7    "Evaluate 11 potential new hazards for inclusion in the

8    DDSA."  She's saying, "We need to look at whether or not

9    we want to add these new terms, that had not been previous

10   in this document, to the DDSA."  And that is a requirement

11   procedure that Ethicon was following, which is a result --

12   results in this memo.  They were not new hazards.

13   BY MS. FITZPATRICK:

14        Q.   So when they say "11 potential new hazards,"

15   they didn't mean that?

16              MR. DAVIS:  Object to the form.  Asked

17   and answered.

18              THE WITNESS:  As I explained, they

19   were pointing out -- this is an action item.  If you

20   recognize, "evaluate" is a verb here and "reassess" in the

21   next bullet.  So what she is saying is, "Our task is to

22   evaluate these terms, potential new hazards, that were not

23   included in this document" (pointing).

24              If you look at the procedure for reassessing

Elaine Duncan

```
 1   the DDSA, this was considered the original DDSA.  As a

 2   part of the Ethicon procedure, she was doing her job to

 3   update the DDSA from the second anniversary, or close

 4   thereof, to the original risk assessment document.

 5   BY MS. FITZPATRICK:

 6          Q.   Ms. Duncan, if they're not new --

 7          A.   Uh-huh.

 8          Q.   -- why weren't they in the 2000 DDSA?

 9               MR. DAVIS:  Object to the form.  Asked

10   and answered.

11               THE WITNESS:  The -- this analysis,

12   again, was done with a different format.  And you said why

13   weren't these new hazards?  They weren't new hazards.

14   They weren't new hazards to Ethicon as of this date of

15   2002.  They may have not been included in the risk

16   assessment that was done in 2000, but that doesn't mean

17   that they weren't known, even in 2000.  They didn't make

18   it into the document.

19   BY MS. FITZPATRICK:

20          Q.   So -- okay.  Fair enough.

21               If Ethicon knew about these 11 what they call

22   potential new hazards as of 2000, you'll agree with --

23   July 2000, they didn't include them in the risk

24   assessment; correct?
```

Elaine Duncan

1        A.   Ma'am, you're mischaracterizing her statement

2   here.  She says, "Evaluate."  That's an action item.

3   "Evaluate 11 potential new hazards for inclusion in the

4   DDSA."  She's asking, essentially -- she's forming the

5   task, "Do we take these bullets and add them into a new

6   DDSA?"  They were not new hazards to Ethicon, and I think

7   I covered that in my report.

8        Q.   So they're old hazards that for whatever

9   reason didn't make it into the July 2000 DDSA; is that

10  right?

11                 MR. DAVIS:  Object to the form.

12  BY MS. FITZPATRICK:

13       Q.   They're not there; right?  I mean, she says

14  they're not there.

15       A.   It's not exactly accurate to say they weren't

16  addressed because there are crossovers here.  When you

17  look -- realize, this is a procedural FMEA.  This is a

18  usability FMEA.

19                 So one of the things we're looking at, for

20  example, is preparing for the surgical procedure.  So if

21  you look at that category, we'd have to go across and see

22  if a particular failure mode is there, and the same thing,

23  of penetration of tissues.

24                 I know you're pressed for time, so I won't

Elaine Duncan

1    belabor the point, but with each of these categories, we

2    would need to go back into the document and see how they

3    were addressed.  I don't want to say they weren't

4    addressed at all.

5         Q.   Well, you don't have to because she says --

6    and I'm reading this in black and white, so I'm not sure

7    what I'm missing here -- "Complaint categories not

8    identified in the July 2000 risk assessment and are as

9    follows."

10         So she's saying they're not identified in the

11   July 2000 risk assessment.  Are you saying she's wrong,

12   that they were identified in here?

13        A.   I'm saying these terms, these terms, the

14   bullet terms --

15        Q.   Right.

16        A.   -- may not have been in this risk assessment,

17   but that doesn't mean that the hazards had not been

18   considered.  She is talking in terms of complaint

19   categories not identified in July 2000.

20         That -- the categories in this list and how

21   they assessed risk in this document may not have been word

22   for word or item for item, and what she's saying is, to

23   make it consistent with what we know relative to this, we

24   should evaluate whether or not these terms should be added

Elaine Duncan

1    to our DDSA so that we can better categorize these

2    potential new hazards, okay?

3              Again, these are not new, as I've pointed out

4    in my report, and she was doing the job of reassessing the

5    DDSA in its second anniversary, and that's considered --

6    that in the procedure is called out as an interim

7    assessment.  So that's a requirement by Ethicon to do what

8    she did here.

9         Q.   Okay.  Let me ask you this.

10             The risk assessment was completed by Medscand

11   Medical in July 2000; correct?

12        A.   Yes.  Was used to complete this re-evaluation.

13        Q.   Right.  And you've looked at all of the

14   documents that were available from Ethicon concerning the

15   risk assessment that was completed by Medscand Medical in

16   July 2000; correct?

17        A.   I looked at this document.  I don't know if

18   there were other supporting documents that I didn't see.

19   I can't say exactly.

20        Q.   So I don't want to talk about hypotheticals.

21             Have you seen any documents which indicate or

22   show that these -- what she calls potential new hazards,

23   whatever you want to call them, that these 11 potential

24   new hazards were actually considered in July 2000 in the

Elaine Duncan

```
 1   risk assessment completed by Medscand Medical and rejected

 2   or not included in the DDSA for whatever reason?

 3                 MR. DAVIS:  Object to the form.

 4                 THE WITNESS:  Let me get to my report,

 5   if that's all right with you.

 6                 MR. DAVIS:  You are at the deadline, but

 7   I will allow this to finish.

 8                 THE WITNESS:  Yes, I'm sorry for taking

 9   so long.  It's a lot to look at.

10                 Okay.  So what I believe, as I was pointing

11   out here on 21, on my report, that in --

12   BY MS. FITZPATRICK:

13         Q.   Okay.

14         A.   I think -- okay.  These hazards -- I'm

15   looking, I'm sorry, page 22.  These hazards were not new,

16   were already well known prior to 2002, and had already

17   been evaluated.

18         Q.   That's my new question; where were they

19   evaluated?  What is your basis of that?

20         A.   I go on and explain here as we go forward.

21   "As early as June 2000, a panel of 17 surgeons

22   experienced in the use of TVT discussed the then-known

23   hazards associated with the clinical use of the TVT mesh

24   and concluded they were minimal."  And Number 61 is the
```

Elaine Duncan

```
1    footnote reference to the Bates numbers.

2         Q.   Okay.

3         A.   And that was a June panel, okay?  And that

4    was June 2000.

5              Now, the revision date for this was -- for

6    this TVT Preventia document that you were pointing to that

7    was attached to the April 2002 memo, that has a July 12,

8    2000, date, and so the June panel of 17 surgeons had --

9    was virtually on top of this document's creation.

10             So then we go on and we read the review of

11   complaints for the first 10 months of 2005, found again

12   only relatively few reports of the same types of

13   complaints found in the earlier reports discussed above.

14             So basically -- I skipped a sentence there.

15   And it goes over to 23.  "In addition, in December 2001,

16   Ethicon's medical director, Martin Weisberg, M.D., had

17   yet again assessed the then known risks associated with

18   the product."  And that's Footnote 62.

19        Q.   So let me -- I don't mean to cut you off.

20   I know we're --

21        A.   Yeah, I know.  We're short on time.

22        Q.   -- running out of time.  I don't want you to

23   have to read from your expert report.

24             So you don't have anything in addition to what
```

Elaine Duncan

1    you've cited here in your expert report to supplement that

2    with; right?  What you relied on, what your conclusions

3    are, are contained in the four corners of this report?

4         A.   And my assessment of the procedure that govern

5    this activity.  And I believe that procedure was in my

6    reliance document, but I did not footnote it.

7         Q.   Can you go to 881?  Just a couple more

8    questions and then we'll wrap this up.

9              MR. DAVIS:  We'll allow a couple more.

10             MS. FITZPATRICK:  What's that?

11             MR. DAVIS:  I said, we'll allow a couple

12   more, wrap it up.

13   BY MS. FITZPATRICK:

14        Q.   See this attachment?  I don't know whether

15   it's 1 or I, this one right here (pointing), medically

16   related complaints?

17        A.   Uh-huh.  Yes.

18        Q.   So you'll see that a number of these,

19   including vaginal extrusion, erosion urethral, perforation

20   by mesh, infection, post-op complication, vaginal

21   incision, and urethral tear, have not been listed in the

22   DDSA; correct?

23        A.   In the Preventia document, I could not find

24   them with that terminology, no.

Elaine Duncan

1          Q.    Okay.  And it actually states here that it was

2    not listed in the DDSA; correct?

3          A.    Listed in -- there's a yes -- yeses and nos in

4    the second column.

5          Q.    Right.  And vaginal extrusion, erosion

6    urethral, perforation by mesh, infection, post-op

7    complication, vaginal incision, and urethral tear, those

8    are all nos?

9          A.    I believe that's what the memo says, yes.

10          Q.    Okay.  And so because they're nos, there's

11    been no analysis done on the severity, the frequency, or

12    the RPN of those potential complaint categories; right?

13                    MR. DAVIS:  Objection to form.

14                    THE WITNESS:  I can't say that no

15    assessment was done because I thought -- frankly, I

16    thought we saw some of these over in -- the other analysis

17    that we were just looking at referenced 18.

18                    MR. DAVIS:  Exhibit 18?

19                    THE WITNESS:  Exhibit 18.

20    BY MS. FITZPATRICK:

21          Q.    All right.  Well, whoever wrote Exhibit

22    Number 19 either didn't know about or didn't include

23    whatever information you think is relevant from Exhibit 18

24    in here; correct?  It says, for example, "Vaginal

Elaine Duncan

1    extrusion, severity to be determined."

2              MR. DAVIS:  Object to the form.

3    BY MS. FITZPATRICK:

4         Q.   "TBD"; right?

5         A.   Frankly, I'm a little lost in your questions

6    because they've circled around.

7              As I've said before, the Sue Meltzer memo was

8    referencing the risk analysis Preventia; okay?

9         Q.   Right.

10        A.   So when she's saying "Listed in the DDSA,"

11   she's speaking of this document, the -- as I said before,

12   these risks -- these hazards, I should say, these hazards

13   were already known to Ethicon.

14        Q.   Okay.  So they're known to Ethicon, they

15   weren't listed in the DDSA --

16        A.   The Preventia document.

17        Q.   Right, which is what they call the DDSA.  And

18   it says here they have an action item or an action column

19   associated with the medically related complaints here.  So

20   vaginal extrusion, the action was to assess the hazard?

21        A.   Yes.

22        Q.   The erosion urethral, the action was to assess

23   the hazard?

24        A.   Yes.

Elaine Duncan

1          Q.    Perforation by mesh, the action was to assess

2     the hazard?

3          A.    Yes.

4          Q.    Infection, the asset -- action was to assess

5     the hazard?

6          A.    That is correct.  You're reading the column

7     correctly.

8          Q.    Vaginal incision and urethral tears, both were

9     to assess the hazard; correct?

10         A.    Yes.

11         Q.    Have you ever seen this document where the

12    hazard has been assessed and the whole chart is filled

13    out?

14         A.    This document was created in 2002.

15         Q.    Fair enough.

16         A.    It wouldn't --

17         Q.    Fair enough.  Have you seen a later draft of

18    this where those actions have been undertaken and the

19    chart is completely filled out instead of having "NA" or

20    "TBD," that it has been a completed assessment of the

21    hazard by Ethicon?

22         A.    I believe those hazard assessments were done

23    in a different document.

24         Q.    And what document is that?

Elaine Duncan

```
 1          A.   I believe they -- let me see.

 2                    MR. DAVIS:  I'll let her answer this

 3  question --

 4                    MS. FITZPATRICK:  Okay.  There's one

 5  more.  If she can tell me what that document is, I'll move

 6  on from this.

 7                    THE WITNESS:  Well, there was overlap,

 8  so the hazards in the memo were partially covered by the

 9  Anhang document.

10  BY MS. FITZPATRICK:

11          Q.   Which one is that?

12          A.   This is your Exhibit 18.

13          Q.   The one that predates this?

14          A.   They were also assessed as a part of

15  Dr. Weisberg's memo in December 2001, which was following

16  this.

17          Q.   This is April 2002.  The Weisberg memo

18  predates this; right?

19          A.   I'm sorry, it followed this Anhang; it didn't

20  follow -- you're right.  It didn't follow Sue Meltzer's

21  document; it followed the -- let's see, it followed the

22  Anhang document, 18, in reference -- Exhibit 18.

23          Q.   Okay.

24          A.   This is the signed one, yes.
```

Elaine Duncan

1          Q.   Okay.  Let me -- one last question that I

2    have, and I will --

3          A.   But may I also finish the --

4          Q.   Note that I was trying to wrap it up here.

5          A.   I'm sorry, but I just wanted to finish.

6          Q.   Uh-huh.

7          A.   In 2005 and in 2006, there were additional

8    reviews.  In 2006, they conducted a comprehensive review

9    of the TVT complaints for the entire period from 2003,

10   which was a year following the memo, through January 2006,

11   and they assessed -- this is where they assessed the

12   hazards, I believe she referred to them as.  That's when

13   they were formally assessed in the -- 2006, in that

14   document.  That's the comprehensive review document, and

15   the footnote for that is 64.

16         Q.   Footnote 64 on that, okay.

17              Ms. Wilson -- I'm sorry, Ms. Duncan.  I'm

18   getting tired.

19              You state in your report that your opinions

20   are expressed to a reasonable degree of professional

21   certainty within your field of expertise.

22              What field is that?

23         A.   My field of expertise is medical product

24   development and compliance.

Elaine Duncan

```
 1                    MS. FITZPATRICK:  That's all that I

 2     have.

 3                    MR. DAVIS:  Let me take just a couple

 4     minutes.  I'll go get some documents.  We've got a few

 5     questions.

 6                    (Whereupon, a recess was taken from

 7                    6:39 p.m. to 6:42 p.m.)

 8                         EXAMINATION

 9     BY MR. DAVIS:

10          Q.   Could you pull out your report real quickly,

11     Ms. Duncan?

12          A.   Yes.

13          Q.   And turn to page 23.  I'm focusing now on the

14     very last part of the question and one of your answers.

15     You were, I believe, responding to Counsel's questions

16     about what were other reviews that assessed these 11

17     hazards referenced in Ms. Meltzer's memo, Exhibit --

18     whichever exhibit it was, and you got as far as 2006, I

19     believe?

20          A.   Yes.

21          Q.   I just want you to look at your report, and

22     look on down that page in the 2010 and 2013 time frame and

23     tell us whether or not you recall additional evaluations

24     of these types of hazards in these later years.
```

Elaine Duncan

1          A.    Yes, 2008, this was a more comprehensive risk

2     management report, and that was the type of risk

3     assessment that superseded the DDSA method.  In 2010, they

4     performed another complaint review, and this was inclusive

5     from January 2008 to 2009.  And then in August 2010, they

6     prepared a clinical evaluation report, and at that time,

7     the mesh device was the same.  They did yet another

8     complaint review of the TVT device.

9               And in 2013, they prepared a clinical

10    evaluation report for the entire family of TVT, which

11    included reports -- which was including complaints for the

12    period from January 2010 through 2013.  At that point, I

13    didn't review any more current documents.

14          Q.    Okay.  Could you pull out Exhibit 15?

15          A.    Okay.

16          Q.    It's the dog study.

17          A.    Oh, uh-huh.  Yes.

18          Q.    Do you recall being asked a few questions

19    about this?

20          A.    Yes.

21          Q.    And do you recall that the focus was -- was on

22    the second page of the document in the questioning of you?

23    Do you recall that?

24          A.    Yes.

Elaine Duncan

1        Q.   I want to turn you back to the first page.

2        A.   All right.

3        Q.   And direct your attention to the paragraph

4    that appears under the heading, "IV and GPC."

5             Do you see that paragraph?

6        A.   Yes.  Yes.

7        Q.   Read that paragraph to yourself.  Or tell you

8    what, just read it out loud, that paragraph.

9        A.   Okay, "The gel permeation chromatography (GPC)

10   was run on PROLENE sutures explanted from dogs after seven

11   years.  The GPC data was compared to data from current

12   PROLENE -- 4/0 PROLENE suture.  The results indicate that

13   there was no significant difference in the molecular

14   weight between 4/0 PROLENE control and the seven-year

15   explants."

16       Q.   Does -- does that have -- no significant

17   difference in molecular weight, does that have a meaning

18   to you?

19       A.   Yes.  It's my understanding that the molecular

20   weight, particularly the molecular weight distribution,

21   would reflect a degradation of a material.  So it would

22   alter the molecular weight distribution plot.

23       Q.   So by finding no significant difference, can

24   you explain whether or not there's any significant

Elaine Duncan

1   degradation being found?

2          A.   That would indeed mean that the molecular

3   characteristics, the chemical characteristics, have not

4   degraded.

5          Q.   Okay.  And now, I'd like to direct your

6   attention to Exhibit 12 for a minute.  It's that one-page

7   timeline --

8          A.   All right, yes.

9          Q.   -- if you can find it.

10         A.   Yes.

11         Q.   Now, let me ask you this:  Did you see the

12  standard EN 46001 listed on this timeline?

13         A.   Get my magnifier again.  46001?

14         Q.   Yeah, I don't see it on there.  I want to see

15  if you see it on there.

16         A.   No, I don't see EN 46001.

17         Q.   Well, with respect to European standards, if

18  you were going to be interested in knowing what standard

19  applied back in the late 1990s, would you expect to have

20  EN 46001 on this timeline?

21         A.   Well, that was the one that was applicable

22  during the auditing.  And certainly through the due

23  diligence for licensing and acquisition, the audits by the

24  appropriate notified bodies were conducted to EN 46001

Elaine Duncan

1    because that was the applicable standard for that product

2    in that time --

3         Q.   Do you --

4         A.   -- in that location.

5         Q.   I'm sorry.

6         A.   Yeah, sorry.

7         Q.   Do you recall that Anne Wilson's report

8    asserted on page 4 that ISO 13485 defined the requirements

9    of the proper risk analysis since 1996?  Take a look at

10   page 4 of her report.

11                  MS. FITZPATRICK:  Let me find a copy of

12   that.

13                  THE WITNESS:  Did you say page 6?

14   BY MR. DAVIS:

15        Q.   No, page 4.  Look at the last sentence -- the

16   last two sentences above the heading, "Number 2," above

17   paragraph Number 2.

18        A.   Yes.  So --

19                  MS. FITZPATRICK:  Can you hang on one

20   second?

21                  THE WITNESS:  Oh, sure, sure.

22                  MS. FITZPATRICK:  I'm trying to get a

23   copy of this and orient myself.  So where are we?  Page...

24                  MR. DAVIS:  Page 4 of Anne Wilson's

Elaine Duncan

```
 1   report, the second-to-last sentence of -- above the

 2   heading, "Number 2."

 3                   MS. FITZPATRICK:  Okay.

 4   BY MR. DAVIS:

 5       Q.   Do you see where she states that, "ISO 13485

 6   has defined the requirements for proper risk analysis

 7   since 1996"?

 8               Do you see where she says that?

 9       A.   Yes, I see where she says that.  In my copy,

10   it's circled.

11       Q.   Is that accurate?

12       A.   Well, first -- first and foremost, 13485 does

13   not treat proper risk analysis.  That's not in the context

14   of 13485.  And 13485 was not actually applicable to the --

15   it was -- as I recall, it was a DIS standard.  It was

16   still being proposed.  D-I-S is a term -- capital D-I-S is

17   a term.

18               And it was actually the EN standard that

19   was applicable at the time she's citing, 1996 through,

20   I believe, all the way -- I think in my report, I

21   point out that it was applicable up until the ISO

22   13485:2003 was adopted by the European organizations

23   by the director.

24       Q.   So I just want to make sure I got this.
```

Elaine Duncan

1           If you're doing the type of work that you and

2    Anne Wilson were doing, how important is it to identify

3    the correct standards?

4           A.   Well, we have to be able to look at the

5    document that was in effect at the time that we're

6    assessing.

7           Q.   Okay.  And so do I understand you correctly,

8    ISO 13485 did not become an adopted standard for your

9    industry, even in Europe, until 2003?

10          A.   It was in 2003 that they -- that was the

11   cutoff point for no longer accepting EN 46001 in Europe.

12   It's still not the required standard in the United States.

13          Q.   Okay.  And so let me take you, then, back

14   to -- did you review documents that explained when the

15   TVT product was actually designed and developed?  Can

16   you give us a time frame, a range?

17          A.   I think I had that note, because I thought it

18   was a critical time.

19          In my Exhibit 8, I pointed out that TVT was

20   already in the clinic in January 1995.  So the standards

21   that were -- like the ISO 13485:1996 came out some

22   long-term after that, and EN 46001 was not prescribing --

23   it was -- it was still an optional standard for use in

24   Sweden.

Elaine Duncan

1              So if Sweden allowed the product to be put on

2    the market or used in the clinic under their rules, then a

3    company was not required to follow EN 46001, and Sweden

4    didn't adopt the EN standards for quite some time after

5    that.

6         Q.   Okay.  And so back in -- at the time the TVT

7    device was designed and developed, do you know of any

8    standard that called for doing an FMEA?

9         A.   No.  It would not have been applicable to a

10   device sold in Sweden for use in a clinic in 1995.

11        Q.   And again, you see on page 4 of Anne Wilson's

12   report where she says that 13485 define the requirements

13   for risk analysis.

14             And I think, am I correct, you've already said

15   that that's simply wrong?

16        A.   It may have -- I know it is not a document

17   that defines proper risk analysis.  It may make reference

18   to doing analysis.  It certainly isn't defining the risk

19   analysis.  That would have been done within EN 1441.

20             And the BS, by the way, is a British adoption

21   of EN 1441.  EN 1441 was a European issued standard by

22   CEN CENELEC, and it was not adopted yet in Sweden.

23        Q.   Okay.  You mentioned CEN.  Is that C-E-N?

24        A.   C-E-N.

Elaine Duncan

```
1          Q.   And CENELEC?

2          A.   C-E-N-E-L-E-C.

3          Q.   Now, are those two organizations that are

4    delegated under European regulations to adopt standards?

5          A.   Yes, the regulations are essentially -- it's

6    actually called directives.  So those countries that sign

7    onto the European Common Union and adopt the directive

8    then would, by virtue of that, adopt the standard that is

9    created by EN -- excuse me, by CEN or CENELEC, unless they

10   have their own national standard to supersede it.

11         Q.   Is -- the European committee that adopted the

12   medical directive, how do they compare with the FDA?  Are

13   they a European counterpart?

14         A.   Roughly speaking.  So the European directives

15   are, to the European Common Union, sort of an über

16   national recognized group, and then each of the countries

17   within the European Common Union would have to accept or

18   reject their directive.  Once they've adopted the

19   directive, then they convert those requirements into their

20   own national requirements.

21         Q.   Is the directive analogous to what we would

22   call, in the United States, regulations over here?

23         A.   Yes.

24         Q.   I mean, governmental-type regulations?
```

Elaine Duncan

```
 1          A.   It's adopted by each country -- by -- through

 2   the European Union.

 3          Q.   Okay.  And so -- and I believe you said that

 4   EN 1441 for risk analysis and EN 46001, those -- are those

 5   industry-adopted standards or regulatory standards?

 6          A.   They're at the national level.  They're

 7   adopted at the national level.  So if -- a country would

 8   adopt them, and if they don't adopt them, they would have

 9   to have their own equivalent one that would be recognized

10   by the European Union.

11          Q.   Okay.  And I notice on Exhibit 12, it's hard

12   to read, but do you see where Ms. Wilson has written in

13   the title of "ISO 13485:2003"?

14               Can you see that?

15          A.   Yes, "Requirements for regulatory purposes"?

16          Q.   Yeah.  So, I mean, is it correct that even ISO

17   13485:2003 is a standard that is for regulatory purposes?

18          A.   Yes, it exists as a form of regulation of the

19   design, development, production, quality systems, risk

20   management, et cetera, that go along with a medical device

21   being allowed to operate in the European Union.

22          Q.   Was ISO 13485:2003 then adopted by CEN and

23   CENELEC?

24          A.   I believe they were.  They essentially
```

Elaine Duncan

```
 1   obsoleted the EN 46001 and adopted the ISO standard.  They

 2   didn't create it.  International Standards Organization

 3   created it, so they adopted it and made it their own.

 4        Q.   Now, has the FDA adopted ISO 13485?

 5        A.   No, sir, they do not recognize the standard.

 6        Q.   So the European regulators have adopted ISO

 7   13485:2003, but the federal -- United States regulators

 8   have not?

 9        A.   That's correct.

10        Q.   Okay.  And now, I want to speak for a moment

11   about ISO 14971, the 2007 version.

12             Do you know whether or not our FDA has

13   recognized it as a consensus standard, as applicable

14   today?

15        A.   I believe that 2007 is adopted.  I think

16   that's right.  Can I look at my report?

17        Q.   Sure.  And if you have trouble finding it, I

18   can go on.

19        A.   I believe I make reference to it.  I can't

20   find in my report the exact date, but I believe it

21   was 2007 that they adopted.  But I'm frankly getting tired

22   and I can't recall.

23        Q.   That's fine.  We'll move on.

24        A.   Okay.
```

Elaine Duncan

```
 1          Q.   I'm almost through.

 2               Now, do you know of any standard that required

 3     retrospective creation of an FMEA back in the 1990s for a

 4     device that had already been designed and developed back

 5     in the early 1990s?

 6          A.   I don't recall any standard requiring a

 7     retrospective creation, no.

 8          Q.   And now, I understand that in the 2000s, we

 9     got to the point of needing to do, you know, ongoing risk

10     assessment; is that correct?

11          A.   About that time, companies were beginning to

12     say -- well, to recognize that if they hadn't done a risk

13     assessment -- well, certainly the -- in 1997, when the FDA

14     regs came out, the companies -- they were actually told by

15     FDA that the application of the revised quality system

16     regs, which included a statement in the design control to

17     do a risk analysis, they were instructed that they would

18     need to do a design control and review, which included

19     risk analysis, if they made significant changes to the

20     device or made application to FDA about a change to the

21     device.

22          Q.   But what about for an existing device that was

23     not being changed?

24          A.   No.  If a device had been marketed -- designed
```

Elaine Duncan

```
1    and then marketed prior to the effective date of the

2    revised quality system regs, then the companies would not

3    be expected to become compliant with design control until

4    they did that change or introduced a new product.

5         Q.   For the purpose of marketing TVT in the United

6    States by the 1890 -- late 1990s, was there any

7    requirement for Medscand to do the Preventia risk

8    analysis?

9         A.   I believe there had been some --

10        Q.   And let me make sure my question is clear.

11             I'm talking about, is there any industry

12   standard requirement as opposed to an Ethicon requirement?

13        A.   No, there wouldn't have been an industry

14   standard.  The device was already designed, and the

15   kick-in of doing a risk analysis would have only occurred

16   for new products at that point in time.

17        Q.   In 2001, when the design review was conducted

18   that we talked -- you talked about the Anhang document

19   several times today.  Was there any requirement -- for

20   marketing TVT in the United States, was there any

21   regulatory or industry standard requirement for Ethicon to

22   have performed that risk analysis?

23        A.   I believe Ethicon was acting proactively,

24   because at the time that their 510(k) was cleared, the
```

Elaine Duncan

1   product had been manufactured in Europe, and so

2   FDA was not expecting products that were not under

3   the jurisdiction of FDA in their design to be

4   applicable -- to have to follow the new design

5   requirements.

6            They still had to meet GMPs, and we know that

7   Medscand had been audited to GMPs.  And I believe there

8   were some additional inspections of Sorrell at that point,

9   so FDA, at some point, inspected and found them

10  acceptable.

11           Q.   Do you recall Anne Wilson's report criticizing

12  the -- Ethicon's design history file for the original TVT

13  class of product?

14           MR. WALLACE:  Never believe a lawyer

15  when he says he has a few questions.

16           MR. DAVIS:  I'm almost done.

17           THE WITNESS:  Do I recall per --

18  BY MR. DAVIS:

19           Q.   Do you recall just in general -- you don't

20  need -- that one of her criticisms was a lack of

21  information in a design history file for the original TVT

22  product?

23           A.   Yes.  She was, as I recall, looking at

24  document compilations, what I would call a project

Elaine Duncan

1   history, and criticizing that she couldn't find the

2   document she was looking for under the FDA requirements

3   for design history file.

4        Q.   Prior to 2003 -- I'll just take it back to

5   that time -- do you know of any standard anywhere in the

6   world, government or industry, that required a design

7   history file?

8        A.   Prior to 2003?

9        Q.   Yes.

10       A.   Well, the design history file kicked in when

11   the -- in the U.S. when the revised quality system regs

12   took effect in 1997.

13       Q.   Okay.  So let me follow up on that.

14       A.   Yeah.

15       Q.   So the FDA requires a design history file

16   that's -- starting in 1997?

17       A.   If you designed a product in the United

18   States, it was a requirement.

19       Q.   Now -- and in that connection, was there

20   any -- when the FDA did come out with that requirement,

21   was there any retrospective requirement to create a design

22   history file for products that had already been designed

23   and developed?

24       A.   No.

Elaine Duncan

1      Q.   Okay.  So separate from the FDA and its

2  requirements, were there any standards anywhere in the

3  world, prior to 2003, that required a design history file?

4      A.   May have required documentation, but not a

5  design history file.

6      Q.   Okay.  Now, you've mentioned audits a couple

7  of times today.

8           The -- do you recall whether some of those

9  audits were performed by BSI and TUV?

10      A.   At one point, Ethicon went universally over to

11  BSI.  Prior to that, the TVT had been audited by TUV.

12              MS. FITZPATRICK:  It's tough to get out

13  this time of night.

14  BY MR. DAVIS:

15      Q.   Are these auditors organizations that

16  are authorized by the European Union to conduct

17  audits?

18      A.   Yes.  They are considered notified bodies,

19  and some are notified bodies and ISO registrars.

20      Q.   Can you tell me, are these types of audits

21  relevant to a -- due-diligence-type reviews that you were

22  doing or that Anne Wilson was claiming to do?

23      A.   I felt they were relevant in the same way that

24  I was looking at the compliance with all of the regulatory

Elaine Duncan

1   requirements because quality systems are a regulatory

2   requirement.

3            And being compliant -- particularly for

4   Europe, being compliant with the quality systems is the

5   first gate in order to get a product into the European

6   Union.  The second gate is examination of the technical

7   file.  That is a requirement under the directives.  So the

8   annexes that call out what goes into a technical file are

9   established through the medical device directive.

10            MR. DAVIS:  That's all I have.  Thank

11   you.

12                         REEXAMINATION

13   BY MS. FITZPATRICK:

14       Q.  I just have, truly, a couple questions.

15            You referenced quickly some documents from the

16   2008 time frame, a comprehensive risk management report.

17            Do you recall that in response to --

18       A.  Yes.

19       Q.  That wasn't a document that was specific to

20   the TVT-R mechanically-cut mesh; was it?

21       A.  I can't recall at this point.  I would have to

22   assume by the date, it may have included more than just

23   mechanical cut.

24       Q.  And you know that document also contains

Elaine Duncan

```
 1    information concerning the TVT-O; correct?

 2         A.   I believe they were reviewing like what they

 3    called legacy products in that document, but I'm recalling

 4    from memory.

 5         Q.   Okay.  And likewise, with the 2010 clinical

 6    evaluation report, that wasn't specific to the TVT

 7    retropubic mechanically-cut mesh, was it?

 8         A.   It was not exclusive, as I recall.

 9         Q.   That was -- the TVT-R mechanical cut was

10    included with other products in that; is that correct?

11         A.   I believe it was a comprehensive review.

12         Q.   It included other products in addition;

13    correct?

14         A.   I believe that's true.

15         Q.   And did you refer to a 2013 clinical

16    evaluation report, as well?

17         A.   Yes.

18         Q.   And again, that wasn't specific to the TVT-R

19    mechanical cut?

20         A.   It wasn't exclusive, that's correct.

21         Q.   And that included the entire family of the TVT

22    products in a single report; correct?

23         A.   I believe it was considered a family.  I don't

24    know what it may have left out, but yes.
```

Elaine Duncan

```
 1                    MS. FITZPATRICK:  That's all I have.

 2                    MR. DAVIS:  We'll read and sign.  We'll

 3   just take a rough.

 4                    (Whereupon, the deposition concluded

 5                    at approximately 7:20 p.m.)

 6                         *   *   *

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Elaine Duncan

```
 1  STATE OF MINNESOTA )

 2                     ) ss

 3  COUNTY OF ANOKA    )

 4

 5          Be it known that I took the foregoing deposition
    of ELAINE DUNCAN, on the 6th day of October, 2015, in
 6  Minneapolis, Minnesota;

 7          That I was then and there a notary public in and
    for the County of Anoka, State of Minnesota, and that by
 8  virtue thereof, I was duly authorized to administer an
    oath;

 9

            That the witness was by me first duly sworn to
10  testify the whole truth and nothing but the truth relative
    to said cause;

11

            That the testimony of said witness was
12  recorded in Stenotype by myself and transcribed into
    typewriting under my direction, and that the deposition is
13  a true record of the testimony given by the witness to the
    best of my ability;

14

            That I am not related to any of the parties
15  hereto, nor interested in the outcome of the action;

16          That the reading and signing of the deposition
    by the witness and the Notice of Filing were not waived.

17

            WITNESS MY HAND AND SEAL THIS 8TH DAY OF
18  OCTOBER, 2015.

19

20                          _____

                            BARBARA J. CAREY, RPR
21                          Notary Public

22

23

24
```

Elaine Duncan

```
 1                    CORRECTION SHEET

 2    DEPOSITION OF:  Elaine Duncan

      REPORTED BY:   Barbara J. Carey

 3

 4    PAGE#   LINE#       CORRECTION          REASON

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20

          BE IT KNOWN THAT I, the undersigned deponent, have

21    this _____day of _____, 2015, read the within

      transcript of my deposition testimony.  I have made

22    _____ correction(s) (if any) to said transcript

      and have stated my reason(s) for each and every correction

23    above.


                      _____
24                    Elaine Duncan
```