Exhibit F

Anne Holland Wilson

```
 1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF WEST VIRGINIA
 2                    AT CHARLESTON
 3
 4   IN RE: ETHICON, INC.,      Master File No. 2:12-MD-02327
     PELVIC REPAIR SYSTEM                 MDL 2327
 5   PRODUCTS LIABILITY            JOSEPH R. GOODWIN
     LITIGATION                  U.S. DISTRICT JUDGE
 6        ****************************************
            ORAL DEPOSITION OF ANNE HOLLAND WILSON
 7                   MARCH 22, 2016
          ****************************************
 8   THIS DOCUMENT RELATES TO THE
     FOLLOWING CASES IN WAVE 1 OF MDL 200:
 9
10   Marty Babcock v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-10152
11
     Daphne Barker, et al. v. Ethicon, Inc., et al.
12   Civil Action No. 2:12-cv-00899
13   Bonnie Blake, et al. v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-00995
14
     Sharon Boggs, et al. v. Ethicon, Inc., et al.
15   Civil Action No. 2:12-cv-00368
16   Myra Byrd, et al. v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-00748
17
     Angela Coleman, et al. v. Ethicon, Inc., et al.
18   Civil Action No. 2:12-cv-01267
19   Constance Diano, et al. v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-01145
20
     Dina Destefano-Raston, et al. v. Ethicon, Inc., et al.
21   Civil Action No. 2:12-cv-01299
22   Monica Freitas, et al. v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-01146
23
     Rose Gomez, et al. v. Ethicon, Inc., et al.
24   Civil Action No. 2:12-cv-00344
```

Anne Holland Wilson

```
 1   Dawna Hankins v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-00369
 2
     Donna Hankins, et al. v. Ethicon, Inc., et al.
 3   Civil Action No. 2:12-cv-01011
 4   Mary Hendrix, et al. v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-00595
 5
     Mary Holzerland, et al. v. Ethicon, Inc., et al.
 6   Civil Action No. 2:12-cv-00875
 7   Myndal Johnson v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-00498
 8
     Wilma Johnson v. Ethicon, Inc., et al.
 9   Civil Action No. 2:12-cv-00809
10   Holly Jones, et al. v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-00443
11
     Margaret Kirkpatrick v. Ethicon, Inc., et al.
12   Civil Action No. 2:12-cv-00746
13   Paula Kriz, et al. v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-00938
14
     Cheryl Lankston v. Ethicon, Inc., et al.
15   Civil Action No. 2:12-cv-00755
16   Deborah Lozano, et al. v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-0347
17
     Angela Morrison, et al. v. Ethicon, Inc., et al.
18   Civil Action No. 2:12-cv-00800
19   Miranda Patterson v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-00481
20
     Patti Ann Phelps, et al. v. Ethicon, Inc., et al.
21   Civil Action No. 2:12-cv-01171
22   Maria Quijano v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-00799
23
     Jennifer Reyes, et al. v. Ethicon, Inc., et al.
24   Civil Action No. 2:12-cv-05664
```

Anne Holland Wilson

```
 1   Denise Sacchetti v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-01148
 2
     Stacy Shultis v. Ethicon, Inc., et al.
 3   Civil Action No. 2:12-cv-00654
 4   Jennifer Sikes v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-00501
 5
     Carrie Smith v. Ethicon, Inc., et al.
 6   Civil Action No. 2:12-cv-0258
 7   Cindy Smith v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-01149
 8
     Krystal Teasley v. Ethicon, Inc., et al.
 9   Civil Action No. 2:12-cv-00500
10   Lisa Thompson, et al. v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-01199
11
     Roberta Warmack, et al. v. Ethicon, Inc., et al.
12   Civil Action No. 2:12-cv-01150
13   Laura Waynick, et al. v. Ethicon, Inc., et al.
     Civil Action No. 2:12-cv-01151
14
15
              ***************************************
16                     ORAL DEPOSITION OF
                      ANNE HOLLAND WILSON
17                     MARCH 22, 2016
              ***************************************
18
19        ORAL DEPOSITION of ANNE HOLLAND WILSON,
     produced as a witness at the instance of the
20   Defendants, and duly sworn, was taken in the
     above-styled and numbered cause on March 22, 2016, from
21   10:00 a.m. to 1:29 p.m., before Kerrienne L. Bond, CSR
     in and for the State of Texas, reported by machine
22   shorthand, at the offices of Fibich, Leebron, Copeland,
     Briggs & Josephson, 1150 Bissonnet Street, Houston,
23   Texas, pursuant to the Federal Rules of Civil Procedure
     and stipulations of counsel as set out herein or
24   attached hereto.
```

Anne Holland Wilson

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4        EDWARD A. WALLACE, ESQUIRE
          WEXLER WALLACE, LLP

 5        55 West Monroe Street, Suite 3300
          Chicago, Illinois  60603

 6        Phone: (312) 346-2222  Fax: (312) 346-0022
          E-mail: eaw@wexlerwallace.com

 7

                      -and-

 8

          FIDELMA L. FITZPATRICK, ESQUIRE

 9        MOTLEY RICE, LLC

          321 South Main Street, 2nd Floor

10        Providence, Rhode Island  02903

          Phone: (401) 457-7700  Fax: (401) 457-7708

11        E-mail: ffitzpatrick@motleyrice.com

12

     FOR THE DEFENDANTS JOHNSON & JOHNSON AND ETHICON, INC.:

13

          PAUL N. DAVIS, ESQUIRE

14        BUTLER SNOW, LLP

          1020 Highland Colony Parkway, Suite 1400

15        Ridgeland, Mississippi  39158

          Phone: (601) 948-5711  Fax: (601) 985-4500

16        E-mail: paul.davis@butlersnow.com

17

18

19

20

21

22

23

24
```

Anne Holland Wilson

```
 1                     EXAMINATION INDEX
 2
 3   WITNESS:  ANNE HOLLAND WILSON
 4   EXAMINATION                                     PAGE
 5        By Mr. Davis.............................9, 129
          By Mr. Wallace...........................120
 6
     WITNESS CORRECTIONS AND SIGNATURE..............130
 7
     REPORTER'S CERTIFICATION.......................132
 8
 9                       EXHIBIT INDEX
10                                                   PAGE
11   WILSON EXHIBIT NO. 1............................9
          Notice to Take Deposition of Anne Wilson
12
     WILSON EXHIBIT NO. 2............................9
13        Rule 26 Expert Report of Anne Holland
          Wilson, MBA (TVTR)
14
     WILSON EXHIBIT NO. 3............................9
15        Rule 26 Expert Report of Anne Holland
          Wilson, MBA (TVTO)
16
     WILSON EXHIBIT NO. 4............................9
17        Rule 26 Expert Report of Anne Holland
          Wilson, MBA (TVTS)
18
     WILSON EXHIBIT NO. 5............................9
19        Exhibit 1, curriculum vitae
20   WILSON EXHIBIT NO. 6............................9
          Exhibit 2, figure from ISO 14971
21
     WILSON EXHIBIT NO. 7............................9
22        Exhibit 3, "Facts and Data Considered"
23   WILSON EXHIBIT NO. 8............................9
          TVT-R Rev A Report
24
```

Anne Holland Wilson

```
 1              EXHIBIT INDEX (CONTINUED)
 2                                              PAGE
```

 3   WILSON EXHIBIT NO. 9..........................9
          Invoice
 4
     WILSON EXHIBIT NO. 10.........................9
 5        2015 Hourly Fee Schedule
 6   WILSON EXHIBIT NO. 11........................13
          List of standards
 7
     WILSON EXHIBIT NO. 12........................33
 8        International Standard ISO 14971
 9   WILSON EXHIBIT NO. 13........................35
          Military Specification Quality Program
10        Requirements
11   WILSON EXHIBIT NO. 14........................41
          ANSI/AAMI/ISO 14971:2000
12
     WILSON EXHIBIT NO. 15........................53
13        Guidance for Industry and Food and Drug
          Administration Staff, Factors to Consider
14        When Making Benefit-Risk Determination in
          Medical Device Premarket Approval and De
15        Novo Classifications
16   WILSON EXHIBIT NO. 16........................61
          Clinical Evaluation Report
17
     WILSON EXHIBIT NO. 17........................63
18        Guidelines on Medical Devices
19   WILSON EXHIBIT NO. 18........................63
          Final Document, Clinical Evaluation, Study
20        Group 5, The Global Harmonization Task Force,
          May 2007
21
     WILSON EXHIBIT NO. 19........................64
22        International Standard ISO 14155-1
23
24

Anne Holland Wilson

1                    EXHIBIT INDEX (CONTINUED)

2                                                    PAGE

3    WILSON EXHIBIT NO. 20...........................65
          Clinical Evaluation Report, Gynecare TVT
4         Tension-free Vaginal Tape Accessory
          Abdominal Guide
5
     WILSON EXHIBIT NO. 21...........................66
6         Clinical Expert Report, Benefit-Side
          Effect Analysis for TVT Device
7
     WILSON EXHIBIT NO. 22...........................66
8         Clinical Expert Report, Laser Cut Mesh

9    WILSON EXHIBIT NO. 23...........................69
          Ethnor SA - Prolene Mesh Technical File
10
     WILSON EXHIBIT NO. 24...........................71
11        Risk Analysis - Prolene Mesh Sterile
          Propylene Non Absorbable Mesh
12
     WILSON EXHIBIT NO. 25...........................87
13        Correspondence, Re: Reclassification of
          Nonabsorbable Propylene Surgical Suture,
14        Docket No. 88P-0173

15   WILSON EXHIBIT NO. 26...........................97
          International Standard ISO 13485
16
     WILSON EXHIBIT NO. 27..........................104
17        Risk assessment TVT blue

18   WILSON EXHIBIT NO. 28..........................104
          Ethicon Archive Document, Document
19        No. PR602-003

20   WILSON EXHIBIT NO. 29..........................110
          Ethicon Archive Document, Document
21        No. OP650-010

22   WILSON EXHIBIT NO. 30..........................110
          Ethicon Archive Document, Document
23        No. OP650-011

24

Anne Holland Wilson

```
1                    EXHIBIT INDEX (CONTINUED)

2                                               PAGE
```

```
3    WILSON EXHIBIT NO. 31..........................112

          Product Device Design Safety Assessment

4         Effect Analysis for TVT Device

5    WILSON EXHIBIT NO. 32..........................115

          Ethicon document in German/English

6

     WILSON EXHIBIT NO. 33..........................118

7         Risk Assessment, Prolene Mesh
```

```
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Anne Holland Wilson

```
1                (Marked Wilson Exhibit Nos. 1 - 7.)

2                     ANNE HOLLAND WILSON,

3     having been first duly sworn, testified as follows:

4                     E X A M I N A T I O N

5     BY MR. DAVIS:

6          Q.   Good morning, Ms. Wilson.  Would you state

7     your full name for the record, please?

8          A.   Anne Holland Wilson.

9          Q.   Ms. Wilson, we've met.  I'm Paul Davis.  I'll

10    be asking you some questions today.  We'll get started.

11                I've handed you some premarked exhibits,

12    1 through 7.  Could you take a look at those?  I think

13    the first one is the notice of deposition.  Are you

14    familiar with it?

15         A.   I've browsed it.

16         Q.   And we've requested some documents just to

17    bring with you.  Can you just give us an overview of

18    what, if anything, you brought with you today?

19         A.   I believe there's a copy of each of my

20    reports --

21         Q.   Okay.  Anything --

22         A.   -- that are clean copies.  They're in the

23    binder there.

24                (Marked Wilson Exhibit Nos. 8 - 10.)
```

Anne Holland Wilson

```
 1      Q.   And I know that Ed has provided me -- I'll go

 2  ahead and give them to you -- Exhibits 8, 9, and 10.

 3      A.   Those are financial data on how much has been

 4  invoiced and paid, as well as a rate sheet, since the

 5  initiation last July.

 6      Q.   Okay.  And I know that we're waiting on a

 7  couple more pages to get copied for us.  Can you just

 8  give me a brief description of what those two pages are?

 9      A.   Yes.  Those are some drafts, some notes I

10  took, as far as the standards in place, 1345, the

11  quality system and risk standards.  Those are my notes,

12  as far as the dates.

13      Q.   I'll wait till we get those back to ask you a

14  couple more questions about that.

15                Can you confirm that Exhibit 2 is a copy

16  of your TVTR report?

17                MR. WALLACE:  For Wave 1?

18                MR. DAVIS:  I'm sorry?  For Wave 1 cases,

19  yeah.  Thanks, Ed.

20      A.   Yes, the date is correct.

21      Q.   (BY MR. DAVIS)  And can you confirm that

22  Exhibit 3 is a copy of your TVTO report for the Wave 1

23  cases?

24      A.   Yes.
```

Anne Holland Wilson

1    Q.   And can you confirm that Exhibit 4 is a copy

2  of your TVTS report for the Wave 1 cases?

3    A.   Yes.

4    Q.   And am I correct that you had the same three

5  exhibits attached to each one of those three reports?

6    A.   I'd have to look.  I know --

7    Q.   If you need to go off the record and pull out

8  your own copy to confirm --

9    A.   No, no, I don't need to do that.  I just want

10  to check that they all say the same.  There may be -- I

11  mean, this "Facts and Data Considered," I'm not sure I

12  have all of -- if they were separated by report or were

13  all put together as one.  That's --

14    Q.   I mean, I'll just represent to you that I

15  tried -- I'm not saying I did a perfect job, but I tried

16  to put them side by side and look to see if they looked

17  the same.  They looked the same to me; but if you don't

18  know, that's --

19              THE WITNESS:  Do you know if the facts

20  were all together or separated by product?

21              MR. WALLACE:  I mean, that's something --

22    A.   That's one thing I can't remember.

23    Q.   (BY MR. DAVIS)  Okay.  Well --

24    A.   But, otherwise, yes, they are --

Anne Holland Wilson

```
 1        Q.   Let me just --

 2        A.   Other than that one question I have, they are

 3   all the same.

 4        Q.   Okay.  For instance, look at Exhibit No. 5.

 5   Is that -- is that your CV?

 6        A.   Yes, it is.

 7        Q.   Did you use the same CV for all three reports?

 8        A.   I believe so.

 9        Q.   Is that your current CV -- or is that CV

10   current?

11        A.   Yes.

12        Q.   Okay.  And if you'd look at Exhibit No. 6 for

13   a second, can you tell me what Exhibit 6 is?

14        A.   This is like our -- it's actually from

15   ISO 14971.

16        Q.   Well --

17        A.   This is very -- you can hardly read it.  It's

18   a figure from that -- that standard.

19        Q.   Is it fair to say that Exhibit 6 was labeled

20   as Exhibit 2 to each of your three reports?

21        A.   I believe so.

22        Q.   Okay.  And if you would for a moment, look at

23   Exhibit 7.  Can you tell me what Exhibit 7 is?

24        A.   "Facts and Data Considered."
```

Anne Holland Wilson

```
 1        Q.   Okay.  So that would be a list of the facts

 2   and data that you considered?

 3        A.   Yes, it is.

 4              (Marked Wilson Exhibit No. 11.)

 5        Q.   (BY MR. DAVIS)  Okay.  Now let me hand you

 6   Exhibit 11 and see if you can just tell us formally for

 7   the record:  What is Exhibit 11?

 8        A.   It's a draft that has listed, on one column,

 9   all of the standards that are used in the guidances; and

10   then it also lists the dates that they were released and

11   put into effect.

12        Q.   Okay.  And you called Exhibit 11 a draft.  Is

13   that -- I mean, usually, the word "draft" means, to me,

14   that it may not be -- it may have some errors in it or

15   it may not be complete or -- well, what does that mean

16   to you in this case?

17        A.   This is a working document.  This is just what

18   I worked on and what I worked from.

19        Q.   Okay.  Is it your belief that the information

20   shown on here is accurate?

21        A.   Yes.

22        Q.   Okay.  Basically, it would be fair to

23   summarize it -- and you've got a list of various

24   standards, and you've got release dates and
```

Anne Holland Wilson

1   implementation dates and end dates?

2        A.   Correct.

3        Q.   Okay.  And what's the difference between a

4   release date and an implementation date?

5        A.   That's notated on the bottom of the first

6   page.  You can see that "Release Date" says "DAV,"

7   and the date -- "DAV" means "date of availability."

8   That's when the text was actually published, versus the

9   DOP.  That's the implementation date.  And that was

10  really when the date that the -- it has to be -- it says

11  right here it has to be implemented.  So that's

12  basically when it starts to be used.

13       Q.   Okay.  And --

14       A.   And then the --

15       Q.   I'm sorry.  Go ahead.

16       A.   -- next column is when it's withdrawn or

17  superseded.

18       Q.   Okay.  When you say the implementation date is

19  the date that it -- a standard has to be used, who made

20  that decision?

21       A.   I mean, often, there's a grace period.  You

22  know, somethings's published; and it gives the industry

23  time to be prepared for implementation.  So, many times,

24  these guidances or standards are put out there and say,

Anne Holland Wilson

```
 1    "Okay.  We're going to publish in 2003, but we're not

 2    going to implement until 2006."

 3         Q.   Okay.

 4         A.   So that means everyone has to be ready,

 5    prepared, and all changes have to be made by then.

 6         Q.   And is it fair to say that all of these

 7    standards on Exhibit 11 relate in some form or fashion

 8    to the subject matter of quality systems for medical

 9    devices?

10         A.   All of these on the first page relate to risk

11    management.  So --

12         Q.   Okay.  Isn't -- maybe I'm incorrect.  Isn't

13    risk management a part of a quality system?

14         A.   Right.  But more specifically, I mean, there

15    is a second page which is quality systems.  That's why

16    I'm answering like that.

17         Q.   Okay.  So --

18         A.   So you have your quality system standards on

19    one page; and then you have a distinct set of risk

20    procedures or, you know, guidance documents and

21    standards on another page.

22         Q.   May I see your copy of Exhibit 11 just for a

23    second?

24         A.   Actually, I have three of the same thing.
```

Anne Holland Wilson

```
 1          Q.   Oh, they were handed to me this way.  I think
 2   I see --
 3          A.   Ah, this is in error.
 4          Q.   -- what happened.  Okay.  Well, let's try to
 5   correct it.  I think what happened is this --
 6                    MR. WALLACE:  Why don't we work off of
 7   this?
 8                    THE WITNESS:  Yeah, if we could.  This
 9   would be much better for my eyes, too.
10          Q.   (BY MR. DAVIS)  Okay.  Well -- but let's also
11   try to make the exhibit correct.  What happened is we
12   got three copies made, and they apparently handed them
13   to us as three of the same thing and then three of the
14   same thing; so you were looking at one page, and I was
15   looking at the other.  So let me try to see if we can
16   correct that.
17                    Let me hand you back Exhibit 11.  Can you
18   tell me if Exhibit 11, as I'm now handing it to you, is
19   the complete two-page list of standards that you brought
20   with you today?
21          A.   Yes.
22          Q.   Okay.  And the -- one page of the standards
23   lists risk management standards; is that correct?
24          A.   Yes.
```

Anne Holland Wilson

1      Q.   And just so the record will be clear, is that

2  the page that has -- the first entry on it, under the

3  column "Standard," the listing "GHTF/SG3/N15R8"?

4      A.   Yeah.

5           MR. WALLACE:  Objection to form.

6      A.   That is actually not a standard.  It's a

7  guidance.  But it does start like that.

8      Q.   (BY MR. DAVIS)  Okay.

9      A.   So this is not just standards, and nor do they

10  all apply to these, because they're not all within this

11  time frame.  It's just a general listing that I used for

12  my reference.

13     Q.   Okay.  Other than -- you said the first entry

14  on the page I just read to you is a guidance.  Are

15  the other entries on that page -- are they --

16  do they relate to risk management standards?

17     A.   They do relate to risk managements, and

18  they'll all guidance to industry on how to perform

19  medical device risk analysis.

20     Q.   Okay.  And then let's look at the other page

21  of Exhibit 11.  Is it fair to say the first entry on

22  that page is a standard ISO 13485:1996?

23     A.   Yes.

24     Q.   Okay.  How would you characterize all of the

Anne Holland Wilson

1    standards listed on this page?

2        A.   I would characterize these as a variety of

3    quality management system guidelines that tell the

4    fundamental requirements for any medical device.

5        Q.   Okay.  Now, if we try to look at the big

6    picture for a second, is it fair -- would it be fair to

7    say that your three opinions relate to -- or I'm

8    sorry -- your three reports, rather.  Pardon me.

9             Would it be fair to say that your three

10   reports relate to a discussion of Ethicon's quality

11   system and its risk management program?

12       A.   No, I can't really say anything about the

13   entire quality system because I only looked at a small

14   part of the quality system, but -- the part relating to

15   design controls and risk management.

16       Q.   Okay.  Now, these standards that you looked at

17   and evaluated in this case, as applicable to Ethicon, do

18   they relate to the concept of safety of medical devices?

19             MR. WALLACE:  Objection to form.

20       A.   Safety is a key element of risk management.

21       Q.   (BY MR. DAVIS)  Okay.  And would it be fair to

22   say that your reports express opinions to the effect

23   that Ethicon did not comply with industry standards that

24   relate to safety of medical devices?

Anne Holland Wilson

```
 1                    MR. WALLACE:  Objection to form.

 2        A.   My opinions were that -- that, in general,

 3   Ethicon did not follow their own procedures, nor did

 4   they follow the fundamental requirements for a medical

 5   device manufacturer for risk management and design

 6   control.

 7        Q.   (BY MR. DAVIS)  Well, you're not actually

 8   opining, are you, that the TVT, TVTO, and TVTS devices

 9   are not safe, are you?

10                    MR. WALLACE:  Objection to form.  It's a

11   double negative.

12        Q.   (BY MR. DAVIS)  Well, are you testifying -- or

13   strike that.

14                    Did you form opinions in this case that

15   TVT, TVTO, or TVTS was not a safe device?

16                    MR. WALLACE:  Objection to form.

17                    Let me just point one thing out.  You

18   have three different reports here, and you're asking

19   about three different devices; and we have to be very

20   careful about which report we're referring to, if you're

21   asking her specific opinions about the TVTR report

22   because -- and, in fact, if we want to do an hour for

23   each report --

24                    MR. DAVIS:  Well, see, here's my problem.
```

Anne Holland Wilson

```
1    If we've got to do them all separate, then, frankly, I

2    think I need nine hours, because, you know, I'm entitled

3    to --

4                  MR. WALLACE:  Well, we have an agreement

5    on this issue.  I'm not expecting you to move off your

6    agreement.  But let me just point out, I just --

7    all I'm pointing out is I'm assuming we're going

8    to work together and you're going to try to be clear

9    about, if there is a report for you to refer to, you'll

10   ask her to refer to it.

11                 MR. DAVIS:  Well, okay.  I'll try to

12   get -- see if I get a different answer for each report.

13       Q.   (BY MR. DAVIS)  Let's do them one at a time.

14                 For TVTR, does your TVTR report include

15   opinions that TVTR is, in fact, unsafe?

16       A.   No.  I'm not a physician.  What I've done is

17   I've worked with medical device manufacturers, their

18   CEOs.  I've worked with design teams and quality

19   representatives.  And what I'm opining about is that

20   they didn't follow their own procedures to prevent

21   risks, nor did they follow standards out there that are

22   the fundamental minimum requirements that are -- that

23   enable a manufacturer to prevent risks and, therefore,

24   prevent complaints and how you handle those risks as
```

Anne Holland Wilson

1    they come back.

2         Q.   Now, if I ask you that same question about

3    TVTO, are you going to have the same answer?

4         A.   Could you ask me that question again?  I'm

5    sorry.  I can't remember -- I was just focusing on --

6         Q.   Does your report for TVTO include opinions

7    that TVTO is not safe?

8         A.   No.  Mine says that for the O, that was -- the

9    risk management was not conducted in a cohesive manner

10   in accordance with their procedures.

11        Q.   Okay.  And, if you could, because time is

12   important, just answer my question, because I didn't ask

13   you what your report does cover.  I asked you -- or

14   other things.  I asked you only about whether it

15   covers -- whether it opines that TVTO is not safe.

16        A.   Of course.

17        Q.   So same question for TVTS.  Does your TVTS

18   report include opinions that TVTS is not safe?

19        A.   No.

20             MR. WALLACE:  Objection to form.

21        Q.   (BY MR. DAVIS)  Okay.  In fact, you would --

22   would you agree you're not qualified to express an

23   opinion on whether any of those three devices are safe?

24             MR. WALLACE:  Objection to form.

Anne Holland Wilson

```
 1        A.   I believe I've already stated, and it's in my

 2   report, that I am not a medical doctor; and I am not

 3   ever going to state something that's a medical opinion.

 4        Q.   (BY MR. DAVIS)  Okay.  Now, can you -- is it

 5   your opinion that Ethicon did not adequately consider

 6   all of the harms associated with TVTR?

 7        A.   I'm sorry.  Did you say "did not ever"?  I

 8   just --

 9        Q.   No, "did not adequately consider."

10        A.   Is that my opinion?  Yes.

11        Q.   Okay.  Please identify -- just give me a list

12   of the harms that you've opined that Ethicon did not

13   adequately consider relating to TVTR.

14        A.   I would need to look at my report, because I

15   don't have it all memorized.

16             MR. DAVIS:  Let's go off the record.

17   When you're ready --

18             MR. WALLACE:  I don't think we need to go

19   off the record for her just to consult her report.

20             MR. DAVIS:  If she's going to take -- use

21   up my time going through her report, you know --

22             MR. WALLACE:  Well, that's what you're

23   here to ask her about.

24             MR. DAVIS:  Well, I don't think it's fair
```

Anne Holland Wilson

1   to require -- let her use up my time.

2              MR. WALLACE:  Well, you guys do that at

3   every deposition, though; so the playing field is going

4   to be the same.

5        A.   So, for example, it says right here in

6   Table 17 -- or Page 17 that they -- one of the harms

7   they omitted was mesh degradation.  They have complaints

8   about mesh fraying and roping, sheathe damage, erosion,

9   exposure, pain -- there are quite a few things that are

10  in my report, specifically Section C, Section VI,

11  specifically calls out risks ignored by Ethicon.

12       Q.   (BY MR. DAVIS)  But right now, my question is

13  simply to give me a list of the harms that you've opined

14  that Ethicon did not adequately consider.

15       A.   Okay.  A risk has to do with harm.

16       Q.   See, I'm not asking you about -- we're going

17  to get to risk in a minute.  I'm asking only about --

18  only about harms right now.  I want --

19       A.   Degradation, mesh stiffness, roping, curling,

20  deforming, particle loss, difficulty removing.

21       Q.   Okay.  Can you provide me a definition -- or

22  your definition, rather -- of the term "harm"?

23       A.   A hazard is a potential source of harm.  Just

24  let me -- let me answer the question.  A harm is an

Anne Holland Wilson

1   injury to a person, an environment, and is quoted from

2   ISO 14971 and EN 1441.  So --

3        Q.   Okay.  Can you give me a complete list --

4   well, no.  Strike that.

5             Does your report include opinions that

6   Ethicon did not adequately consider any hazards

7   associated with TVTR?

8        A.   Did not adequately?

9        Q.   Yes.

10       A.   Yes.  They did not adequately.

11       Q.   Okay.  Can you give me just a list of the

12   hazards that you've opined that Ethicon did not

13   adequately consider --

14             MR. WALLACE:  Objection to form.

15       Q.   (BY MR. DAVIS)  -- for TVTR?

16             MR. WALLACE:  Objection to form.

17       A.   A list of the hazards they did not adequately

18   consider.  There were -- to my knowledge, prior to

19   introduction, they did not consider any design hazards.

20   So that would include all of the 11 hazards which are in

21   my report, as well as all of those I previously

22   mentioned, as well as the 11 that are in the report.

23       Q.   (BY MR. DAVIS)  When you say all those that

24   you previously mentioned, what -- you're referring to

Anne Holland Wilson

```
 1   your last answer?

 2       A.   Yes.

 3       Q.   Okay.

 4       A.   A hazard is a potential source of harm.  You

 5   asked about harm.  Then you asked about hazards.

 6       Q.   Yeah.  Is it your opinion that "hazard" and

 7   "harm" mean the same thing?

 8       A.   No.

 9       Q.   Okay.

10       A.   But they have a common element.

11       Q.   Okay.  I just -- for right now, I just want a

12   list of the hazards.

13       A.   Okay.  I'll find the list -- a list.

14            MR. WALLACE:  Objection to form.

15       Q.   (BY MR. DAVIS)  I want a list of the hazards

16   that you've opined that Ethicon did not adequately

17   assess or consider relating to TVTR.

18            MR. WALLACE:  Objection to form.

19       A.   Wrong mesh composition, mesh not cuttable,

20   over-tensioning of tape, postoperative erosion,

21   degradation, removal failure.  Let me get some more from

22   my list in my report.  There is vaginal extrusion,

23   erosion of the urethra, perforation by the mesh,

24   infection of incision, urethral tear, mesh broken, torn
```

Anne Holland Wilson

```
1   mesh, bent needle, mesh kinked, dull needle.

2        Q.   Okay.  Is that a complete list?

3               MR. WALLACE:  Objection to form.

4               Her report's right in front of her.  If

5   you're going to make this a memory test --

6               MR. DAVIS:  No.

7               MR. WALLACE:  -- let's go on the record

8   and just say you want to make this a memory test.  This

9   has nothing to do with the report.

10              MR. DAVIS:  No, she's got -- she's been

11  going through her report.

12       Q.   (BY MR. DAVIS)  Have you given me a complete

13  list?

14              MR. WALLACE:  Objection to form.

15  That's --

16       A.   I've given you a list of what's in the form --

17  in my report.

18       Q.   (BY MR. DAVIS)  Are there any other hazards

19  that you've opined that Ethicon did not adequately

20  consider relating to TVTR?

21              MR. WALLACE:  Objection to form; asked

22  and answered.

23       A.   I've presented what's in my report.

24       Q.   (BY MR. DAVIS)  Okay.  How does fraying of
```

Anne Holland Wilson

```
 1   mesh harm a person?

 2                MR. WALLACE:  Objection to form.

 3        A.   I am not a medical doctor.  But what the

 4   documentation has showed me, by reviewing the documents

 5   in my exhibit list, is that fraying of the mesh can lead

 6   to -- when you fray it, it can cause roping; and then it

 7   can lead to urinary retention, and particles can cause

 8   pain.

 9        Q.   (BY MR. DAVIS)  Okay.  And have you

10   reviewed any clinical literature that reports what

11   you've just explained?

12                MR. WALLACE:  Objection to form; asked

13   and answered.

14        A.   I have reviewed what's on my -- the list.

15        Q.   (BY MR. DAVIS)  Well, just answer my question.

16        A.   And, yes, there was a clinical review in

17   there.

18        Q.   Okay.  Let me ask you:  What is a -- do you

19   know what the acronym "CER" stands for?

20        A.   Clinical evaluation report.  Is that what

21   you're asking?

22        Q.   Okay.

23        A.   Yeah.

24        Q.   What is a clinical evaluation report?
```

Anne Holland Wilson

```
 1      A.   It depends on which company you're talking

 2  about; but, generally, it's when you look at the

 3  literature.  And it's a requirement that you look at the

 4  literature and you evaluate what's happening with your

 5  product and what -- your competitors' products and if

 6  there's any new trends that are happening in the -- in

 7  the literature regarding your product or like products.

 8      Q.   Are there any industry standards that relate

 9  to clinical evaluation reports?

10      A.   You know, I am not someone who does the

11  clinical evaluation reports; but there are known methods

12  used to do those.  I couldn't cite which standards there

13  are.

14      Q.   Okay.

15      A.   I hire people to do those.

16      Q.   Would you agree that you're not qualified to

17  pass judgment on the sufficiency of a clinical

18  evaluation report?

19      A.   I can tell you if they were performed -- if

20  they were performed, and I can tell you if there are

21  hazards or harms that were not included.

22      Q.   Have you reviewed any clinical evaluation

23  reports relating to TVTR?

24      A.   If they're on my list, I'm sure that I looked
```

Anne Holland Wilson

1    at it; but I don't believe there's anything in my report

2    about clinical evaluation reports.

3        Q.    That was going to be my next question.  In

4    your TVTR report -- let's take them one at a time -- is

5    there anything in there about clinical evaluation

6    reports?

7        A.    You know, off the top of my head, I don't

8    recall.  I don't believe so, no.

9        Q.    Okay.  And did you discuss clinical evaluation

10   reports in either your TVTO report or your TVTS report?

11       A.    Without --

12                MR. WALLACE:  Objection to form.

13       A.    Without reviewing them, my answer is "no."

14   I'm sure that I reviewed things, but I don't believe I

15   called them out and opined about them in my reports.

16       Q.    (BY MR. DAVIS)  Is a clinical evaluation

17   report an important document to you or not --

18                MR. WALLACE:  Objection to form.

19       Q.    (BY MR. DAVIS)  -- for the work you did in

20   this case?

21                MR. WALLACE:  Objection to form.

22       A.    No, I'm looking primarily at their design

23   control documents, of which clinical evaluation reports

24   are not traditionally a part; and I'm looking at their

Anne Holland Wilson

```
 1   risk control documents, and then there could be some

 2   clinical -- there should be some people that bring in

 3   clinical information as part of that team.  But I am not

 4   the person that is opining about the evaluation of

 5   clinicals.  I am not a physician, as I've mentioned

 6   several times already.

 7        Q.   (BY MR. DAVIS)  Okay.

 8        A.   So I am not making medical judgments about the

 9   clinical effectiveness.

10        Q.   Are clinical evaluation reports part of the

11   risk management process?

12        A.   Generally, they -- clinical people -- I just

13   answered that -- clinical people bring in information

14   for that team that does the risk management; but it is

15   not an output of the risk management process.

16        Q.   Okay.  Are you familiar -- well, let me ask it

17   this way:  Who sets the standards for the safety of

18   medical devices in the United States?

19             MR. WALLACE:  Objection to form.

20        A.   Each company is responsible for defining their

21   thresholds for safety for their products.

22        Q.   (BY MR. DAVIS)  Okay.  But is there

23   a source for who sets the industry standards in

24   the United States that companies are expected to follow,
```

Anne Holland Wilson

```
 1   with respect --

 2        A.   No.

 3        Q.   -- to the safety of medical devices?

 4             Are there --

 5             MR. WALLACE:  Objection to form.

 6        Q.   (BY MR. DAVIS)  Are there standards in the

 7   United States for manufacturers to follow with respect

 8   to ensuring the safety of medical devices?

 9        A.   That's a different question.  I must not have

10   understood what you were asking the first time.  Are

11   you -- could you -- are you -- what are you asking?

12   Could you repeat that?  I must not have understood your

13   question.

14        Q.   If you don't understand the question, just say

15   so; and I'll --

16        A.   I'm trying to say that now, sir.

17        Q.   Sure.  That's fine.  Let's ask a totally new

18   question.

19             What is the role of the FDA, if any, with

20   respect to establishing safety standards for medical

21   devices in the United States?

22        A.   As I understand it, the FDA is out of the

23   scope of this whole project.

24        Q.   But that's not my question.  Can you just
```

Anne Holland Wilson

```
 1   answer my question?

 2               MR. WALLACE:  Well, ask it again.

 3       Q.   (BY MR. DAVIS)  What role, if any, does the

 4   FDA have in connection with setting standards for

 5   ensuring the safety of medical devices in the United

 6   States?

 7               MR. WALLACE:  Objection to form.

 8               This is well beyond the scope of the

 9   report.  Are you asking about the P&A process, as

10   well --

11               MR. DAVIS:  No.

12               MR. WALLACE:  -- or just 510(k)?

13               MR. DAVIS:  No, I didn't ask about

14   510(k), not at all.

15       Q.   (BY MR. DAVIS)  That raises a question.

16   You've talked about design controls, right?

17       A.   Yes.

18       Q.   You've expressed opinions about Ethicon's

19   compliance with design controls, right?

20       A.   Yes, sir.

21       Q.   Now, design controls are not part of the

22   510(k) process, are they?

23       A.   In order to have an effective 510(k), you need

24   to have design controls.
```

Anne Holland Wilson

```
1        Q.    Let me ask it this way:  Does 21 CFR Part 820

2   have anything to do with the 510(k) process?

3                   MR. WALLACE:  Objection to form.

4        A.    They are linked, sir.

5        Q.    (BY MR. DAVIS)  Well, won't you agree with me

6   that 21 CFR Part 820 relates specifically to design

7   controls, among other things?

8                   MR. WALLACE:  Objection to form.

9        A.    You know, the FDA is -- like I've already

10  stated, is outside the scope of this report; but I will

11  say that the 820 regulations and the 13485 regulations

12  are very aligned and cover the same materials.  They

13  cover the same design control elements.  Additionally,

14  ISO 14971 is a recognized, harmonized standard by the

15  FDA.  So they're well aligned.  They do not -- they

16  cover the same areas, and they do not contradict each

17  other.

18                   (Marked Wilson Exhibit No. 12.)

19       Q.    (BY MR. DAVIS)  I'll hand you Exhibit 12.  Are

20  you familiar with Exhibit 12?

21       A.    Of course.  That's referenced -- well, let's

22  see what version this is.  The 2007 version.  Yes, I'm

23  very familiar with that.

24       Q.    Of ISO 14971, correct?
```

Anne Holland Wilson

 1     A.   Yes.

 2     Q.   And with respect to your opinions in your TVTR

 3  report, what standards were you opining that Ethicon was

 4  not complying with?

 5     A.   Well, this standard wasn't even applicable to

 6  the TVTR; so it would not be this one.  If you look in

 7  my report, it was ISO 9001; and then there's a medical

 8  device supplement, so to speak, that's called EN 46001.

 9  Those were both in effect at the time of the TVTR

10  design.  And there's an EN 1441 that related to risk

11  management.

12     Q.   Well, are you saying your TVTR report doesn't

13  opine that Ethicon failed to comply with any part of

14  Exhibit 12?

15     A.   What I'm saying is, at the time of the device

16  design and release, the applicable standards were the

17  ones I just mentioned.

18     Q.   Okay.  But, see, I'm asking a broader question

19  right now.  Have you expressed opinions --

20     A.   These weren't out, so how could I express

21  opinions about them?

22     Q.   Then why is Exhibit 12 mentioned in your TVTR

23  report?

24     A.   Well, because what we were saying is there are

Anne Holland Wilson

1  standards; and there have been -- continuously have been

2  standards.  And it started as early as 1959, back in

3  MIL-STD-9858; and it goes through this date.  That was

4  the purpose of it being in that report.

5       Q.   Can you -- you've mentioned a MIL-STD.  Am I

6  correct?

7       A.   Yes.

8       Q.   Okay.  Can you tell us what that is?

9       A.   Yes.  It's a quality management system

10  standard that was used in the military and for medical

11  devices and universally way back in 19 -- when I was

12  learning quality 30 years ago.

13       Q.   Okay.

14            (Marked Wilson Exhibit No. 13.)

15       Q.   (BY MR. DAVIS)  Let me hand you Exhibit 13.

16  Is Exhibit 13 the standard you just referred to?

17       A.   I believe it is.

18       Q.   Okay.  And is there any reference to medical

19  company -- or device applications in that standard?

20            MR. WALLACE:  Objection to form.

21       A.   It is a general standard; and the scope states

22  that it applies to all supplies, equipment, subsystems,

23  and systems or services when referenced by a

24  specification, contract, or order.

Anne Holland Wilson

```
1                  So, in fact, I actually worked on

2   high-level quadriplegic wheelchairs back around 30 years

3   ago, as well as military components; and we used the

4   same standard back then for quality management systems.

5   So this is not industry-specific, but it's used -- it

6   was used because it's the predecessor of other

7   standards.

8        Q.   (BY MR. DAVIS)  Okay.  Now -- so does

9   Exhibit 12 have any bearing on your TVTR report?

10       A.   Let's go back to what that was.

11       Q.   ISO 14971:2007, does it have any bearing at

12  all on your TVTR report?

13       A.   No.

14       Q.   Okay.  Can you just tell me why you mentioned

15  it in your report?

16       A.   I've already told you that, but I'll be glad

17  to do it again.

18       Q.   Okay.  If you've given me a complete answer,

19  that's fine.

20                  Now let's talk about TVTO.  Do you have

21  opinions on TVTO that Ethicon didn't comply with any

22  part of Exhibit 12, ISO 14971:2007 version?

23       A.   I'm just thinking of the time frames.  For

24  TVTO, I discussed both the 2000 and the 2007 version.  I
```

Anne Holland Wilson

```
 1    believe I footnote them both.  Let me double-check,

 2    please.  Yes, I do.  Both -- I do refer to the 2007

 3    version there.

 4         Q.   But you refer to the 2007 version in your TVTR

 5    report, also, right?

 6         A.   In the section about -- this is a list of

 7    standards; and for history's sake, there are lists of

 8    standards.  But you asked me if I opined about them, I

 9    thought.

10         Q.   Okay.  Let me --

11         A.   I'm sorry.  I'm trying to answer your question

12    specifically.

13         Q.   And I'll try to get more clear.

14              For the TVTO device --

15         A.   Yes, sir.

16         Q.   -- what sections of Exhibit 12 are you opining

17    that Ethicon failed to comply with?

18         A.   Well, for the TVTO, they certainly -- I'm

19    pretty sure they're footnoted, but they certainly -- to

20    just start right off, under 3.2, "Management

21    responsibilities."

22         Q.   Okay.  What else?

23         A.   The section that says that you must

24    continually go back and do this throughout the life
```

Anne Holland Wilson

```
1    cycle of the product.  You have to assess and evaluate

2    risks and update your risk management throughout the

3    whole lifetime of your process.  Do you want me to find

4    the sections for you?

5         Q.   Yeah.  Do you know?

6         A.   I don't have the sections memorized.

7         Q.   Well -- but you --

8         A.   But I can look in my report.  I just didn't

9    want to take up time.  But --

10        Q.   I don't think you'll find it in your report,

11   but please look and see if you find it in your report.

12              MR. WALLACE:  Objection to form.

13        A.   I also -- what was the question?  You said I

14   objected to the -- or I opined in the report about the

15   fact that it was not done as a system, and it was done

16   piecemeal.  That's in here, too.  So if you want to

17   check section by section, it's going to take me a little

18   bit.

19        Q.   (BY MR. DAVIS)  All I'm asking right now is

20   just to tell me which provisions of Exhibit 12 --

21        A.   I'm telling you the provision.  I can't call

22   out the section numbers.

23              MR. WALLACE:  You're interrupting her

24   now.
```

Anne Holland Wilson

1             MR. DAVIS:  No, she interrupted me.  I

2    was still asking my question.  She interrupted me.

3             MR. WALLACE:  No.

4             MR. DAVIS:  Ed, in all due respect,

5    she -- I was asking a question, and she cut me off.

6             MS. FITZPATRICK:  Look, I'm watching

7    this.  You've cut her off in every answer.  Just let her

8    answer the question, and we'll get out of here quickly.

9             MR. DAVIS:  I respectfully disagree.

10            MR. WALLACE:  Okay.  Go ahead and ask

11   your question.  Just --

12       Q.   (BY MR. DAVIS)  Please simply tell me the

13   sections of Exhibit 12 that you've opined that Ethicon

14   failed to comply with, with respect to TVTO.

15            MR. WALLACE:  Objection to form.

16       A.   3.2 --

17       Q.   (BY MR. DAVIS)  You've already answered that.

18       A.   -- 3.3, 3.4, 4.2, 4.3, 4.1 -- sorry, I went

19   out of order there -- 4.4, 6.1, 6.2, 6.3, 6.7, 9.  Shall

20   I go through the annexes, as well?

21       Q.   I just asked you -- no.  Have you finished

22   going through the actual standard?

23       A.   There you go.

24       Q.   Okay.  Now, a minute ago, I believe you said

Anne Holland Wilson

1    that -- I don't want to put words in your mouth, so you

2    can correct me -- I believe you said something to the

3    effect that one of the problems with TVTO is their FMEA

4    did not examine it on a system level.  Or can you

5    explain what you were meaning?

6                    MR. WALLACE:  Objection to form.

7        A.   Could you -- could you clarify your question,

8    please?

9        Q.   (BY MR. DAVIS)  You used the word "system" a

10   minute ago.

11       A.   Right.

12       Q.   Can you just tell me what you were referring

13   to?

14       A.   Oh.  The system is the whole of the device.

15   It's not the parts.  So the system would include the

16   instruments on the O.  It would be the helical passers,

17   the winged guide.  It would include the packaging, the

18   tie-back lid stock.  It would include the

19   sterilization -- or, excuse me.  I take that back.  The

20   system would -- would not include that.

21                   But it would be presented as a sterile

22   pack so that -- as part of the system, how it's

23   presented.  So it is everything taken together,

24   including the mesh, the method of installation, so in a

Anne Holland Wilson

1  transobturator approach.  All of those together go in to

2  form a system.  That's the top level.

3      Q.  Okay.  And you're saying that Ethicon's FMEA

4  didn't do that?

5      A.  No, it did not.

6      Q.  Okay.  And can you show me in the standard,

7  14971, where there's a requirement to do this system

8  approach that you just described?

9      A.  I'd be glad to.

10     Q.  Yes, thank you.

11     A.  I believe the appropriate -- do you want me to

12  show you in the 2007 one?

13     Q.  Well, you tell me whichever standard you're

14  relying on.

15          MR. WALLACE:  Objection to form.

16     A.  I will be glad to.  I'm sure it's footnoted

17  somewhere here.  The appropriate one initially, during

18  the design, would be the 2000 version.  That's why I --

19          (Marked Wilson Exhibit No. 14.)

20     Q.  (BY MR. DAVIS)  Please look at Exhibit 14.  Is

21  Exhibit 14 the version you just referred to?

22          MR. WALLACE:  Objection to form.

23          You mean the 2000 version?

24     A.  This does say --

Anne Holland Wilson

1      Q.   (BY MR. DAVIS)  Is Exhibit 14 the 2000 version

2  of ISO 14971 that you just referred to?

3      A.   It's -- no, it's not.  It's an ANSI/AAMI/ISO

4  version, but the actual -- it's fine to use.  I'd be

5  glad to use it.

6      Q.   Well, other than the title page, aren't the

7  standards the same?

8      A.   I just want to be clear for the record that

9  it's not what you called out.

10     Q.   But now answer my question.

11     A.   I'm working on it.

12     Q.   No.  I've got --

13          MR. WALLACE:  Paul, you just --

14     A.   You want the --

15     Q.   (BY MR. DAVIS)  No, I haven't gotten to that

16  one yet.  I haven't asked that question yet for this

17  2000 version.

18     A.   Could you repeat your question, please?

19     Q.   Yes, ma'am.

20          Is the substance of the contents of

21  Exhibit 14, the 2000 version of ISO 14971, on which you

22  relied for your TVTO report?

23          MR. WALLACE:  Objection to form.

24     A.   Yes.

Anne Holland Wilson

1        Q.    (BY MR. DAVIS)   Thank you.   Now I'll ask the

2   question.   Please identify --

3        A.    It is one of them.

4        Q.    Okay.   Now please identify the provision of

5   Exhibit 14 where it requires this system approach to the

6   FMEA.

7        A.    This is very hard to read, it's so light.

8   So -- so what they call -- it is a device.   A device is

9   the entirety of a device.   It is not a component.   That

10  is right in Section 3.1 at the very -- and 3.2.   They

11  shall establish and maintain a process for identifying

12  hazards associated with a medical device.

13       Q.    Okay.   And did they somehow, in your opinion,

14  suddenly change that standard in moving to the 2007

15  version of ISO 14971?

16       A.    No.   They both --

17              MR. WALLACE:   Objection to form.

18       A.    -- apply to a device.

19       Q.    (BY MR. DAVIS)   Okay.   And -- so let's go back

20  to Exhibit 12 for just a minute.   Can you turn to

21  Page 9?

22       A.    (Complying).

23       Q.    You see Section -- right above Section 4.2 is

24  the carryover part of Section 4.1 that you, a few

Anne Holland Wilson

```
1    minutes ago, said that Ethicon did not comply with, with

2    respect to TVTO.  Do you recall that?

3                     MR. WALLACE:  Objection to form.

4         A.   I was looking where you said.

5         Q.   (BY MR. DAVIS)  Do you recall that a few

6    minutes ago, you opined that Section 4.1 of Exhibit 12

7    is one of the sections that Ethicon failed to comply

8    with, with respect to TVTO?

9                     MR. WALLACE:  Objection to form; asked

10   and answered.

11                    Her testimony is what it is.

12        A.   If that's what I said, then that's what I

13   said.  I believe so.

14        Q.   (BY MR. DAVIS)  Okay.  Let's look at Note 5.

15   Do you see where Note 5 says:  "The scope of the risk

16   analysis can be very broad," parenthesis, "as for the

17   development of a new device with which a manufacturer

18   has little or no experience," close parenthesis, "or the

19   scope can be limited," parenthesis, "as for analyzing

20   the impact of a change to an existing device for which

21   much information already exists in the manufacturer's

22   files," close parenthesis, unquote.

23                    Did I read that correctly?

24        A.   You read Note 5 correctly.
```

Anne Holland Wilson

1    Q.   And do you apply Note 5 in your practice?

2    A.   In fact, this is a very important

3    consideration, yes.

4    Q.   So you agree that a -- that if you make a

5    change to a device, you can have a very limited FEMA,

6    right?

7              MR. WALLACE:  Objection to form.

8    A.   No, I do not agree with that.  If you make a

9    change to the -- a device that's a whole new surgical

10   approach -- new instruments, new attachment method, new

11   way of installing it -- that is a whole new device that

12   says, right here, the scope can be broad as for the

13   development of a new device which has little or no

14   experience.

15             For the TVTO, there was no -- little or no

16   experience; and the device was not the same.  So it

17   tells me exactly as I applied it to my report.

18   Q.   (BY MR. DAVIS)  What parts of the TVTO system

19   were not included in the risk analysis?

20   A.   Well, one would be the mesh and how it's

21   attached.  They started just doing it with a -- it's

22   right here in the report.  As you can see in the

23   table -- I believe it's Table 1 -- they didn't even do a

24   design FMEA on the design of the device.  So --

Anne Holland Wilson

1    Q.   My last question was simply:  First, tell me

2  what components of the system --

3    A.   The mesh.

4    Q.   -- did they not -- any others?

5    A.   The attachment mechanism to the mesh.

6    Q.   What do you mean by that?

7    A.   Let's just look at my -- let's look at the

8  differences.  So they didn't consider the mesh at all.

9    Q.   You've told me about the mesh three times.

10  Are there any others?

11    A.   Just give me a moment, please, sir.  So what

12  they didn't do is look at how the system works together.

13  So -- please let me finish -- you can't say -- one, you

14  can't say that the components equal to the sum of the

15  parts.  That's the false logic.  You cannot say because

16  you looked at a little dib (sic) over here and a little

17  dabble over here, that when you put them together, it

18  will work.  And that is what I've been trying to state.

19  They did not look at those changes that were different.

20            MR. WALLACE:  Do you want me to help you

21  cut to the chase?

22            THE WITNESS:  Yeah, because --

23            MR. DAVIS:  Sure.

24            MR. WALLACE:  (Indicating).

Anne Holland Wilson

```
1                    THE WITNESS:  Right there, yeah.  Thank

2     you.  I knew it was in here somewhere.

3          A.   So they didn't look at the technique, the

4     surgical technique, and how it was fixated.  They didn't

5     look at how it was implanted.  I mentioned those,

6     through the obturator membrane.  They didn't look how

7     the change to the mesh ends and how that would work with

8     the helical passers and the winged guide and how that

9     would work, to the needles connected on the delivery

10    system.  So --

11         Q.   (BY MR. DAVIS)  Okay.  Will you agree that the

12    2007 version of ISO 14971 includes a discussion of some

13    examples of risk analysis techniques?

14         A.   In the annex?

15         Q.   Yes.

16         A.   Yes.

17         Q.   And could you turn to that?  Do you see

18    Annex G?

19                    MR. WALLACE:  And after this, we're going

20    to take a break.

21                    MR. DAVIS:  Sure.

22         Q.   (BY MR. DAVIS)  Do you see -- well, first of

23    all, is there any provision anywhere in ISO 14971 that

24    requires the use of an FMEA to do a risk analysis?  Is
```

Anne Holland Wilson

1    that anywhere in the ISO?

2         A.    No.

3         Q.    Okay.  Is it in any standard that applies to

4    Ethicon?  Any industry standard, I'm talking about.  Is

5    there any industry standard that requires the FMEA

6    approach to risk analysis?

7                   MR. WALLACE:  Objection to form.

8         A.    That tool is not a requirement.

9         Q.    (BY MR. DAVIS)  Okay.  Now -- and do you see

10   where, in Annex G of Exhibit 12, they do give a general

11   description of what an FMEA is, correct?

12        A.    Yes.  And Ethicon has chosen the FMEA to be

13   their tool to do risk analysis.  It's in their

14   procedures.

15        Q.    They chose that at certain times, correct?

16        A.    They've chosen that -- it was throughout the

17   life of these products.

18        Q.    Okay.  Throughout the life of TVTR?

19        A.    In each of these cases, it talks about the

20   procedures.

21        Q.    Okay.

22        A.    And that was the only tool of these that were

23   used.

24        Q.    Okay.  And would you agree that an FMEA is a

Anne Holland Wilson

1    technique by which you look at the effect of individual

2    components systematically?

3        A.   You look at -- no.

4        Q.   Okay.  How would you describe an FMEA?  What

5    is -- describe that technique.

6        A.   You look at the failures associated with any

7    failure modes that can happen with a device.  It could

8    be with a component, but it doesn't have to be.  It's a

9    systematic --

10       Q.   I'm going to stop at one more question.

11       A.   It's a systemic approach to look at how a

12   device can fail --

13       Q.   Okay.

14       A.   -- and rank that failure in severity and

15   probability of occurrence.

16       Q.   Would you agree that in an FMEA, that

17   technique involves taking one component at a time and

18   evaluating it?

19       A.   No, you do not need to do it that way.

20            MR. DAVIS:  Okay.  We can take a break.

21            (Break from 10:58 a.m. to 11:07 a.m.)

22       Q.   (BY MR. DAVIS)  I can't remember if I asked

23   this specific question already, so I want to make sure

24   I've got it.

Anne Holland Wilson

```
 1                    Back to clinical evaluation reports.  I
 2    can't remember.  Are they a part of the risk management
 3    process?
 4                    MR. WALLACE:  Objection to form.
 5         A.    I believe I already stated for the record that
 6    they are not an output of the risk management process.
 7         Q.    (BY MR. DAVIS)  Okay.  Now, if you would,
 8    please turn to -- back to Exhibit 12, ISO 14971:2007.
 9    Could you turn to Page 22 for a moment, please, ma'am?
10         A.    Uh-huh.
11         Q.    Do you see Section A.2.9?
12         A.    I see it.
13         Q.    And then about halfway down in that paragraph,
14    that first paragraph in that section, there's a sentence
15    that starts with the word "however."  Can you find that
16    sentence?
17         A.    Yes, sir.
18         Q.    Do you see where it says, quote:  "However, no
19    amount of modeling can substitute for an actual medical
20    device in the hands of actual users.  Therefore, the
21    manufacturer should monitor production and
22    post-production information for data and information
23    that can affect their risk estimates and, consequently,
24    their risk management decisions.  The manufacturer
```

Anne Holland Wilson

1    should also take into account state-of-the-art

2    considerations and the practicability of applying them,"

3    unquote.

4                    Did I read that part correctly?

5        A.   Yes, you did.

6        Q.   Do you agree with that principle that I've

7    just read?

8        A.   Absolutely.

9        Q.   Okay.  And are you -- do you know what the

10   state of the art is -- strike that.

11                   Back at the time TVTO was developed, do

12   you know what the state of the art was for SUI

13   treatment?

14                   MR. WALLACE:  Objection to form.

15       A.   That question has no bearing on that

16   Section 829.  What this is saying is that the

17   post-production information has to be incorporated into

18   your risk management process; and, yes, I do agree with

19   that statement.

20       Q.   (BY MR. DAVIS)  Okay.  And what does "state of

21   the art" mean, as stated in this paragraph?

22       A.   The state of the art, I believe, is defined

23   here.  It is like current -- in accordance with current

24   technology.

Anne Holland Wilson

1   Q.   Okay.  If you turn to Page 39, do you see they

2   actually define "state of the art"?

3   A.   I knew it was in here somewhere.  I didn't

4   know what page.  Let's see.  Where is it here?

5   Q.   I don't think you're on the correct page.

6   Page 39.

7   A.   39.

8   Q.   You see at the bottom of Page 39, they

9   actually define, quote, "State of the art," unquote, "is

10  used here to mean what is currently and generally

11  accepted as good practice," unquote.

12  A.   Okay.

13  Q.   Do you accept that definition?

14  A.   Of course.

15  Q.   Okay.  And have you gone back, as part of your

16  work in this case, and tried to understand what was the

17  state of the art back at the time of the development of

18  TVTO?

19  A.   With respect to risk management practices,

20  yes.

21  Q.   Okay.  In any other respect?

22  A.   In respect to design control, yes.

23  Q.   Okay.  Any other aspects of state of the art

24  that you tried to understand what it was at that time?

Anne Holland Wilson

```
 1                    MR. WALLACE:  Objection to form.

 2        A.    Those are the topics that I've been asked to

 3    talk about, so that's what I reviewed.

 4        Q.    (BY MR. DAVIS)  Okay.  Do you have any

 5    experience in making benefit/risk determinations?

 6        A.    Personally, I do not.

 7        Q.    Okay.

 8        A.    We usually get the clinicians to do that part

 9    after the risk management is done, and that's what's --

10    it's in accordance with the standards.

11        Q.    Okay.  Do you have any education, training, or

12    experience that would allow you to evaluate someone

13    else's benefit/risk analysis?

14                    MR. WALLACE:  Objection to form.

15        A.    You know, I do.  I've worked in quality

16    regulatory risk management.  I've worked in over a dozen

17    different kinds of implantable medical devices.  So I do

18    know what's generally accepted and what was done in

19    2003.  I lived it.  I've looked at a lot of different

20    medical device, implantable device companies.  And so I

21    think I'm fairly well acquainted with what's appropriate

22    for our risk/benefit decision back in that time frame,

23    and how it's changed over time.

24                    (Marked Wilson Exhibit No. 15.)
```

Anne Holland Wilson

1       Q.   (BY MR. DAVIS)  Let me hand you Exhibit 15.

2   Are you familiar with this guidance issued by the FDA?

3       A.   You know what?  I am not.  This is a 2012

4   standard.  So I believe I've seen it.  I have not -- it

5   depends when you say "familiar."  I've seen it, but I

6   haven't memorized it.

7       Q.   Okay.

8       A.   And it certainly wasn't applicable at the time

9   of the TVTO.

10      Q.   Well, for just a moment on Exhibit 15, if you

11  would, turn to Page 14.

12              MR. WALLACE:  Do me a favor.  Oh, you

13  gave me --

14              MR. DAVIS:  Yeah.

15      Q.   (BY MR. DAVIS)  Do you see on Page 14 of that

16  exhibit, they begin a list of several pages of examples

17  for -- examples of benefit/risk determinations?

18              MR. WALLACE:  You know this is a 55-page

19  document.  Do you want her to read the whole thing?

20              MR. DAVIS:  No.

21      A.   And it's an FDA document which is out of the

22  scope.

23      Q.   (BY MR. DAVIS)  I asked you a very simple

24  question.

Anne Holland Wilson

1    A.   Okay.  I'm not on Page 14.  Hold on.  Go

2   ahead.

3    Q.   Do you see at the beginning on Page 14, it

4   simply lists several examples of benefit/risk

5   determinations?

6         MR. WALLACE:  Are you referring to the

7   one example?

8    A.   There is --

9    Q.   (BY MR. DAVIS)  I said over the next several

10  pages, there's examples to --

11   A.   I thought you said on Page 14.

12   Q.   I said it begins.

13         MR. WALLACE:  No, you didn't.

14         MR. DAVIS:  Well, the record is what it

15  is.

16   A.   Okay.

17   Q.   (BY MR. DAVIS)  I'm not -- I have no plans to

18  go into detailed questions about these.  I'm just asking

19  right now:  Do you see that they list some examples?

20   A.   There is an example on Page 14, an example

21  on 16.  Looks like a third example is on 17.  So I do

22  see three examples over the next few pages.

23   Q.   Well --

24   A.   Oh, there's some more, an example on Page 19.

Anne Holland Wilson

1    Q.   Okay.  So my follow-up question is:  In your

2  practice, do you ever have occasion to need to look at

3  FDA guidance documents?

4    A.   We look at them all the time.

5    Q.   Okay.  And do you rely upon FDA guidelines

6  documents?

7              MR. WALLACE:  For what?

8              Objection to form.

9    Q.   (BY MR. DAVIS)  For any purpose.

10   A.   How does that relate to my reports here?

11   Q.   You don't need to worry about that,

12  Ms. Wilson.  Just --

13   A.   I believe --

14             MR. WALLACE:  I wouldn't take advice from

15  Mr. Davis.  But go ahead and answer the question, if

16  there's a question pending.

17   A.   I look at FDA guidance documents all the time.

18   Q.   (BY MR. DAVIS)  Okay.  And do you have

19  occasion to rely on them?

20             MR. WALLACE:  Objection to form; asked

21  and answered.

22   A.   They're guidance, and we use them as guidance.

23   Q.   (BY MR. DAVIS)  Okay.  Have you worked on a

24  team that used FDA guidance documents in connection with

Anne Holland Wilson

```
 1   benefit/risk analyses?

 2                MR. WALLACE:  Objection to form.

 3        A.   What I already stated was we generally rely on

 4   the clinician to perform them, but we would use the

 5   guidance documents.  And I have not personally done that

 6   because I have a regulatory person on my team.  And

 7   that's not within the scope of what I've been asked to

 8   do.

 9        Q.   (BY MR. DAVIS)  Okay.  Do you have any

10   expertise in the technology relating to the TVT, TVTR,

11   and TVTO and TVTS?

12                MR. WALLACE:  Objection to form.

13        A.   Could you clarify what you mean by

14   "technology," please?

15        Q.   (BY MR. DAVIS)  Well, the underlying

16   technology behind TVT products, do you have any

17   expertise in it?

18        A.   I don't know.  If you're talking about -- for

19   example, I do have knowledge of medical material

20   molding.  Or are you talking about knitting or cutting?

21   So if you could be -- or all of the above, if that's --

22        Q.   Okay.  Do you have any expertise in the

23   application of TVT devices?

24                MR. WALLACE:  Objection to form.
```

Anne Holland Wilson

```
 1        A.   No.

 2        Q.   (BY MR. DAVIS)  Do you have --

 3        A.   I've never installed one.

 4        Q.   Do you have any expertise in the research

 5   methodology for performing a clinical evaluation?

 6                  MR. WALLACE:  Objection to form.

 7        A.   I thought we already covered clinical

 8   evaluations, and that I am not a physician.  I am not a

 9   design engineer.  So I am not going to be able to talk

10   about either of those categories, and it is so footnoted

11   in my reports.

12        Q.   (BY MR. DAVIS)  Do you have any expertise in

13   the diagnosis or management of stress urinary

14   incontinence?

15        A.   That is what a physician does.

16        Q.   Okay.  Would you agree that it's beyond the

17   scope of your three reports for you to attempt to opine

18   that any of the risks associated with TVTR, TVTO, or

19   TVTS are unacceptable?

20                  MR. WALLACE:  Objection to form.

21        A.   I can tell you very -- with much confidence

22   whether the risk management process or the design

23   control process have been performed correctly; and, yes,

24   I feel very comfortable.
```

Anne Holland Wilson

```
1        Q.   (BY MR. DAVIS)  But that's not my question.

2              MR. DAVIS:  Just read back my question,

3    please.

4              (The requested portion was read.)

5              MR. WALLACE:  Objection to form.

6        A.   No.  I believe it is stated in my report that

7    these risks are unacceptable because they are in the

8    field, causing harm.

9        Q.   (BY MR. DAVIS)  Okay.  But you're not

10   qualified -- or strike that.

11             What is the purpose of a benefit/risk

12   analysis?

13       A.   What you do -- it depends what time frame.

14   Are you talking about 2000 or 2007 --

15       Q.   Let's talk about 2000.

16       A.   -- or 2012?

17       Q.   2000.  Let's start there.

18       A.   So you do your risk management process using

19   whatever tool is selected, and it's up to each company

20   to select a tool -- Ethicon chose FMEA -- and they have

21   to choose the threshold.  And based on that threshold,

22   if there's something that exceeds those thresholds, you

23   have to say, "Okay.  Now does the benefit outweigh the

24   risk?"
```

Anne Holland Wilson

1    Q.    But that's not -- my question was simply --

2    A.    That was your question, sir.

3    Q.    No.  My question was:  What is the purpose of

4    a benefit/risk analysis?

5    A.    That was the purpose, to see if you've matched

6    your -- once you've exceeded your self-defined

7    threshold, to see if the benefit of that device

8    exceeds -- excuse me -- if the benefit exceeds the

9    risks.  That is exactly what the purpose is.

10   Q.    What was the purpose of a benefit/risk

11   analysis in 2007?

12         MR. WALLACE:  Objection to form.

13   A.    It is the same.  It changes in 2012, where you

14   have to do it differently.

15   Q.    (BY MR. DAVIS)  Okay.  What was the purpose of

16   benefit/risk assessment as of 2012?

17   A.    Then you have to -- in 2012, they changed it.

18   So you can't look at it holistically.  You have to look

19   at it by failure, by failure.  So you can't say, "Is the

20   overall benefit for this device still outweighed?"  You

21   have to say, "Oh, is the benefit for this" -- say,

22   degradation -- "is that still outweighed?"  You have to

23   say, "Boy, we can't get the implant out.  So is that

24   still" -- so you have to look step by step in 2012.

Anne Holland Wilson

```
 1        Q.    And what document are you referring to now?

 2        A.    The 2012 14971 standard.

 3        Q.    And that has not been recognized as a

 4   consistent standard in the United States, has it?

 5        A.    It certainly is used throughout the world.  It

 6   has not been recognized in -- in the United States.

 7        Q.    Okay.

 8                  (Marked Wilson Exhibit No. 16.)

 9        Q.    (BY MR. DAVIS)  Let me hand you Exhibit 16.

10   Have you ever seen Exhibit 16?

11        A.    2013?  You know, I don't recall, honestly,

12   because I don't think any of my reports even go to 2013,

13   except where there was a footnote.  But nothing in --

14   nothing in O would go out that far.  I could spend some

15   time -- let's see if it's footnoted.

16        Q.    Ma'am, I'll represent to you it's not

17   footnoted in your report.

18        A.    Yeah.  And, you know, I don't -- I don't

19   recall.  If you want me to go through it --

20        Q.    No, I'm not -- I'm just asking you:  Do you

21   ever remember seeing --

22        A.    I don't recall.

23        Q.    Okay.  And if you would, turn to Page 283 of

24   335 of that exhibit.
```

Anne Holland Wilson

1                  MR. WALLACE:  So she's saying that -- she

2      said that she doesn't recall seeing it, yet you're still

3      going to ask her questions about this 335-page document?

4                  MR. DAVIS:  You haven't even heard the

5      question yet, Ed.  Just please be patient.

6                  MR. WALLACE:  I'll give you one.

7          Q.   (BY MR. DAVIS)  On this page, you see there's

8      a reference -- a list of reference documents.  You see

9      the reference guidelines on "Medical Devices -

10     Evaluation of Clinical Data"?

11         A.   Uh-huh.

12         Q.   And it refers to MedDev 2.7.1.

13         A.   Yeah.  There's a whole bunch of MedDev

14     standards out there.

15         Q.   What are the MedDev standards?

16         A.   They're guidance documents in Europe.

17         Q.   Okay.  Are you familiar with this particular

18     one?

19         A.   No.  I think I've stated on numerous

20     occasions, I don't evaluate clinical data personally;

21     nor was it the scope of this report.

22         Q.   Okay.  I believe you did cite a MedDev

23     guidance document in your report.

24         A.   I did.  I did.  And that was about post-market

Anne Holland Wilson

```
 1    surveillance.  You're absolutely correct.

 2         Q.   Okay.

 3              (Marked Wilson Exhibit No. 17.)

 4         Q.   (BY MR. DAVIS)  Given your last answers, I

 5    won't spend much time on this; but can you see that

 6    Exhibit 17 is the MedDev document that's referred to as

 7    the first entry on Page 283 of Exhibit 16?

 8         A.   283, you said?

 9         Q.   Yes, ma'am.

10         A.   The titles are not exactly the same, but it

11    looks to be the same standard due to the number.

12         Q.   I mean, you can see it's the MedDev 2.7.1.

13         A.   Right.  That's what I just stated.

14         Q.   Okay.  And you see the -- on that same page,

15    283, do you see the next entry is referencing a GHTF

16    document?  Do you know what the "GHTF" stands for?

17         A.   Yes, Global Harmonized (sic) Task Force.

18              (Marked Wilson Exhibit No. 18.)

19         Q.   (BY MR. DAVIS)  Can you tell us, does

20    Exhibit 18 appear to be the Global Harmonization Task

21    Force document that is the second entry on that page of

22    Exhibit 16?

23         A.   It does.

24         Q.   And are you familiar with that exhibit, 18?
```

Anne Holland Wilson

1        A.    As I've stated before, I don't personally do

2   clinical evaluations; so I am not familiar with this

3   exact guidance.

4        Q.    Okay.  Are you -- do you have any experience

5   in the use of ISO 14155?

6        A.    What's that number?  What's the title that

7   goes with that?

8        Q.    Let me just hand it to you.

9        A.    That would be handy.

10              (Marked Wilson Exhibit No. 19.)

11       Q.    (BY MR. DAVIS)  I'll hand you Exhibit 19.

12       A.    You know, I believe I've seen this one before;

13   but it hasn't been recently.

14       Q.    Okay.  Well, I'll represent to you that

15   Annex A to Exhibit 19 -- if you'll turn to Page 15 of

16   the document, I'll represent to you that it is a

17   reference material in ISO 14971.  Do you recall that?

18              MR. WALLACE:  Objection to form.

19       A.    There are many references.  No, I don't recall

20   it.

21       Q.    (BY MR. DAVIS)  Okay.  If you would, turn back

22   to Exhibit 12 again.

23       A.    Let's see here.  12, that should be the 14971

24   document, 2007, right?

Anne Holland Wilson

```
 1                   MR. WALLACE:  You got it?

 2                   THE WITNESS:  No, this is 2000,

 3     Exhibit 14.  Is that under here?

 4         Q.   (BY MR. DAVIS)  I tell you what.  We can

 5     just --

 6         A.   I've got it.  It's right here, I think.  12.

 7     All right.  I've found 12.

 8         Q.   If you look at Page 80 --

 9         A.   Okay.  Yes.

10         Q.   -- do you see Entry No. 10 on Page 80?  They

11     list ISO 14155.

12         A.   Yes.  That's one of 42 references in the

13     standard.

14         Q.   And I simply want to make sure that I

15     understand correctly.  Now, do you have any experience

16     in the use and application of this ISO, Exhibit 19?

17         A.   Let me try to be very clear.  As part of a

18     risk/benefit decision, you will get clinicians to help

19     you with that.  The clinicians would -- and regulatory

20     folks would refer to something like this, but I don't

21     personally use that standard.

22         Q.   Okay.

23                   (Marked Wilson Exhibit No. 20.)

24         Q.   (BY MR. DAVIS)  Let me hand you Exhibit 20.
```

Anne Holland Wilson

```
 1        A.    Uh-huh.

 2        Q.    Are you familiar with that clinical evaluation

 3   report?

 4        A.    2010, the TVT -- you know, I really just don't

 5   recall.

 6        Q.    Okay.

 7        A.    Because --

 8              (Marked Wilson Exhibit No. 21.)

 9        Q.    (BY MR. DAVIS)  Let me hand you Exhibit 21.

10   Are you familiar with that clinical --

11              MR. WALLACE:  Are you done with 20?

12              MR. DAVIS:  Yes, sir.  I gave you a copy,

13   if you want it.

14        A.    What's the date of this?  2000?  I do remember

15   reviewing this one.

16        Q.    (BY MR. DAVIS)  Okay.  You can see where the

17   doctor is performing a risk/benefit analysis, right --

18        A.    Yes.

19        Q.    -- in Exhibit 21?  Okay.

20              (Marked Wilson Exhibit No. 22.)

21        Q.    (BY MR. DAVIS)  Let me hand you Exhibit 22.

22   Are you familiar with this clinical expert report?

23              MR. WALLACE:  Objection to form.

24        A.    Yes, I recall this one.
```

Anne Holland Wilson

```
1          Q.   (BY MR. DAVIS)  Okay.  And, again, since

2     you're not a medical doctor, would it be fair to say you

3     have not tried to opine on this report?

4          A.   I have not opined on that specific report.

5          Q.   In your work in this case, did you make any

6     inquiries to see if there were any risk analyses for the

7     Prolene mesh that Ethicon manufactures?

8                    MR. WALLACE:  Objection to form.

9          A.   Yes.

10          Q.   (BY MR. DAVIS)  Okay.  Did you -- did you look

11     at any risk analysis of the -- of just the Prolene mesh?

12                    MR. WALLACE:  Objection to form.

13          A.   There was a PFMEA done by Ethicon on the mesh.

14          Q.   (BY MR. DAVIS)  Okay.  That's a Process FMEA?

15          A.   Yes, sir.

16          Q.   Did you -- and why did you want to look at

17     that?

18          A.   Because it has to do with the overall risk

19     analysis.

20          Q.   Okay.  Did you ask for any design FMEAs

21     relating to just the Prolene mesh?

22          A.   I asked for any and all documents related to

23     risk, whether it was design, application, process,

24     summary reports, anything -- anything to do like that.
```

Anne Holland Wilson

1      Q.   Okay.  And you know that Ethicon has used

2    different formats, sometimes FMEA and sometimes other

3    formats for this analysis?

4      A.   Well, they have DDSA.  The only tool that was

5    used to systematically analyze risk, that I saw used,

6    was an FMEA.

7      Q.   Okay.  But is it fair to say that you asked

8    for all --

9      A.   Any and all.

10     Q.   -- risk analysis documents that relate to the

11   Prolene mesh in general?

12     A.   I think I just answered that three times, sir.

13     Q.   The answer is "yes"?

14     A.   Yes.

15     Q.   Okay.  And why was that important to you?

16     A.   Because that's part of each of the systems or

17   devices.

18     Q.   Okay.  And did you -- were you provided any

19   risk analysis documents dated prior to 1999?

20          MR. WALLACE:  Objection to form.

21     A.   What product are we talking about now?

22     Q.   (BY MR. DAVIS)  Prolene mesh in general.

23     A.   The --

24          MR. WALLACE:  Objection to form.

Anne Holland Wilson

1      A.   -- only document prior to 1999 was the AFMEA

2   done by MedScan, which was also called the Preventia.

3      Q.   (BY MR. DAVIS)  Okay.

4      A.   Oh, wait.  1999.  Let's see.  That's when they

5   moved it over.

6                  (Marked Wilson Exhibit No. 23.)

7      Q.   (BY MR. DAVIS)  Okay.  Let me hand you

8   Exhibit 23.  Would you agree that you have not reviewed

9   this risk analysis document before today?

10     A.   Let me take a look.  Okay?

11                 MR. WALLACE:  Objection to form.

12     Q.   (BY MR. DAVIS) Sure.

13                 MR. WALLACE:  And it assumes facts not in

14  evidence.  So you have -- well, go ahead.

15                 Object to form.

16     A.   This is -- when I said I looked at it, I meant

17  for TVT product, mesh related to TVT.

18     Q.   (BY MR. DAVIS)  My questions for the last five

19  minutes -- I asked you very clearly about just Prolene

20  mesh in general.

21     A.   Well --

22                 MR. WALLACE:  No, you weren't clear about

23  it.

24     A.   I am sorry.  I have never said anything about

Anne Holland Wilson

```
 1    anything other than TVT, nor are my reports anything

 2    other than TVT.

 3         Q.   (BY MR. DAVIS)  Okay.  So let me --

 4         A.   So it was my assumption that you were talking

 5    about TVT mesh.

 6         Q.   Fair enough.  So let me just follow up, then.

 7         A.   Okay.  Please do.

 8         Q.   Would it be important to you to try to see any

 9    and all risk analyses that relate to the mesh in

10    general?

11         A.   No.  It would be important to me that -- if

12    they relate to the intended use, because that's directly

13    what this environment is going to be.

14         Q.   Okay.

15         A.   So something like a suture or a hernia mesh,

16    that's apples and oranges to me.

17         Q.   What if it was for -- in part, to be used

18    for -- to help repair fascial defects in the pelvic

19    area?

20         A.   If it's going to be used in the woman's

21    vagina, that would be very useful.

22         Q.   Okay.  So have you ever seen that Exhibit 23

23    before today?

24         A.   I don't believe so, no.
```

Anne Holland Wilson

```
1        Q.   Okay.

2             (Marked Wilson Exhibit No. 24.)

3        Q.   (BY MR. DAVIS)  And have you ever seen

4   Exhibit 24 before today?  And I'm going to hand that one

5   to you.  It's the next document I'm handing you.

6        A.   Right.  I'm still looking at the first one.

7             THE WITNESS:  Is that the second one?

8             MR. WALLACE:  Yeah.

9             THE WITNESS:  Let's see.  1997.  Is this

10  different than this one?  They are different.

11            MR. WALLACE:  Is there a question

12  pending?

13            MR. DAVIS:  Yeah, I just asked her had

14  she ever seen this risk analysis before today,

15  Exhibit 24.

16            MR. WALLACE:  Are you saying it's a risk

17  analysis?  Are you representing that to her?

18            MR. DAVIS:  I'm not representing

19  anything.

20       Q.   (BY MR. DAVIS)  But you can read the title of

21  the document.

22       A.   I don't believe I've seen this, but I'll be

23  glad to take a look if it has to do with TVT products.

24       Q.   Do you see where it relates to the mesh, the
```

Anne Holland Wilson

1   Prolene mesh?

2       A.   I didn't say that.  I asked if it had anything

3   to do with my reports.

4       Q.   So it's your belief that this risk analysis,

5   if it relates just to the Prolene mesh, is totally

6   irrelevant.  Is that your opinion?

7               MR. WALLACE:  Objection to form on that.

8   You're misstating her testimony.  She asked you a

9   question that you're unwilling to answer.

10      A.   I asked if it had to do with any of the TVT

11  products.

12      Q.   (BY MR. DAVIS)  And I'm asking you:  Do you --

13  is this -- if this report --

14      A.   I have not seen this before, no, sir.

15      Q.   No, let me just -- let me finish my question,

16  please, ma'am.

17      A.   That was your question before this.

18      Q.   No, ma'am.  Will you allow me to ask it?

19               Exhibit 24 --

20      A.   Uh-huh.

21      Q.   -- if that exhibit relates solely to Prolene

22  mesh, not to TVT in particular, is it your opinion that

23  this report is not relevant to you?

24               MR. WALLACE:  Objection to form.

Anne Holland Wilson

```
1        A.   No, that's not what I said.

2        Q.   (BY MR. DAVIS)  Okay.  So you would want to

3   see this document if it -- and analyze it if it relates

4   to Prolene mesh in general?

5        A.   No, that is not --

6             MR. WALLACE:  Objection to form.

7        A.   -- what I said, either.

8        Q.   (BY MR. DAVIS)  Okay.  Tell me what you said.

9        A.   What I said is:  Is it in the same intended

10  use environment?  Is it used in the woman's vagina in

11  the same manner?  That's how you go about starting your

12  risk analysis.

13       Q.   Okay.  As part of your work in this case --

14  well, are you familiar with the concept of a

15  biocompatibility risk assessment?

16       A.   Yes, sir.

17       Q.   Okay.  What is that?

18       A.   Well, you generally look at the materials of

19  construction and -- after processing and see if they're

20  in compliance with 10993 --

21       Q.   Okay.

22       A.   -- which is an ISO standard.

23       Q.   And does ISO 10993 have anything to do with

24  degradation?
```

Anne Holland Wilson

1      A.   You know, I hire a microbiologist to handle

2   the ISO 10993 analyses, in particular; so I would have

3   to go and study that.  It has to -- I do know it has to

4   do with genotoxicity and if there's any cytotoxicity and

5   things like that, but I couldn't answer that question.

6      Q.   When you need some work done under ISO 10993,

7   it sounds like I hear you saying you usually contract

8   that out to third parties?

9           MR. WALLACE:  Objection to form.

10          "Work" meaning?

11     A.   I have consultants that work for me that are

12  qualified microbiologists that have worked in ISO 10993

13  for many years.

14     Q.   (BY MR. DAVIS)  Okay.  Let me ask a different

15  question, then.

16          Do you have any personal experience,

17  expertise, in working with ISO 10993?

18          MR. WALLACE:  "Working with," what do you

19  mean?

20     Q.   (BY MR. DAVIS)  Well, let me ask it this way:

21  Do you have -- or do you consider yourself an expert on

22  the application of ISO 10993?

23     A.   No, I don't.

24     Q.   Okay.

Anne Holland Wilson

```
 1                    MR. WALLACE:  In what context?  You mean

 2    performing experiments?

 3         Q.   (BY MR. DAVIS)  In any context at all.

 4         A.   An expert?

 5         Q.   Yes.

 6                    MR. WALLACE:  I'm going to object to

 7    form.  You're -- you're confusing the issues.

 8         A.   I would not say I'm an expert.  I have looked

 9    at a lot of documents related to biocompatibility, but I

10    am not an expert.

11         Q.   Do you have the expertise necessary to

12    evaluate a biocompatibility risk assessment under

13    ISO 10993?

14                    MR. WALLACE:  Objection to form.

15         A.   I could evaluate that, yes.

16         Q.   (BY MR. DAVIS)  Okay.  How would you go about

17    it?

18         A.   I would compare the risk assessment to the

19    standard and perform a gap analysis, and that's how I

20    would go about doing it.

21         Q.   You said you would compare it to the standard.

22    You would compare it to ISO 10993?

23         A.   Yes.  And if I needed experts that are more

24    than me after I evaluated it, I would call them in.
```

Anne Holland Wilson

1      Q.   Okay.  Have you reviewed any biocompatibility

2  assessments relating to Prolene mesh in connection with

3  your work in this case?

4      A.   Could you clarify if you mean with respect to

5  the TVT products, please?

6      Q.   Okay.  I'll break it down.  I'll ask you that

7  question first.

8           Have you reviewed any biocompatibility

9  risk assessments relating to a TVT -- to the mesh used

10  in TVT?

11     A.   Yes, I have.

12     Q.   Okay.  Did you attempt to evaluate it under

13  ISO 10993?

14     A.   You know, I did look to see if it was

15  reasonable and take a look at it, and if it was

16  complete; but I did not go back to 10993 step by step by

17  step because that wasn't -- I did not do that.

18     Q.   Because I didn't see biocompatibility risk

19  assessments discussed in any of your three reports.  Did

20  I overlook something?

21     A.   I did not opine about it, but I did review

22  one.  I thought that was your question.

23     Q.   Okay.

24              THE WITNESS:  I'm going to get another

Anne Holland Wilson

```
 1   water.

 2                   MR. DAVIS:  Yeah, let's take a break for

 3   a second.

 4                   (Break from 11:47 a.m. to 12:01 p.m.)

 5       Q.   (BY MR. DAVIS)  Ms. Wilson, way back early on

 6   in the deposition today, I had asked you to list for me

 7   all the hazards associated with each of the three

 8   devices at issue; and you gave me a list.  But my

 9   recollection is you were looking at a document, and I

10   failed to ask you:  What were you looking at when you

11   gave me your list of hazards that Ethicon did not

12   adequately consider?

13       A.   I think we were talking about the TVTR, right?

14       Q.   Okay.

15       A.   And we haven't touched on "S," so it can't be

16   that.  And there were -- in my report, there were

17   hazards listed.

18       Q.   Okay.  I just wanted to make sure I understood

19   what you were reading from.  You were looking at your

20   report?

21       A.   Yes.

22       Q.   That's fine.  That's all I wanted to clarify.

23   Now I want to follow up for TVTO.

24       A.   Uh-huh.
```

Anne Holland Wilson

1    Q.   Can you give me a list of the hazards that
you've opined that Ethicon failed to adequately assess?

3    A.   I'll be glad to.  That would be all of these
listed on Page -- Table 2.

5    Q.   Of your report?

6    A.   Do you want me to call them out individually?

7    Q.   No.  What page of your report is Table 2?

8    A.   17.

9    Q.   That's fine.

10   A.   And 18.

11   Q.   Okay.

12   A.   There's a list of those -- well, 17 is the
hazards.  Excuse me.

14   Q.   Okay.  Right now, I just want to know about
the hazards.

16   A.   Okay.

17   Q.   It's all of those listed on Page 17 of the
report?

19   A.   These are some of them.  There may be some
listed throughout the rest of the report, too, if you
want -- do you need a full set?

22   Q.   Yeah, I just want to know what all the --

23   A.   All.  Okay.

24   Q.   -- the matters that you say were hazards that

Anne Holland Wilson

```
1    they didn't adequately assess.

2         A.   So what that means is I just have to take a

3    few minutes.  It would be -- it would be this -- on

4    Table 2; plus, on Page 19, Section 2, these are

5    complaint categories.  And the hazard would be mesh --

6    would be pain, infection.  So I have to separate my

7    hazards from my failure modes.  So I think it's -- I

8    think that I've already done that.  Excuse me.  I've

9    already done that, and Table 2 lists them.

10        Q.   I'm sorry.  I'm having a little trouble

11   following you.  Are you saying that --

12        A.   I'm thinking.

13        Q.   -- Table 2 is a complete list of the hazards?

14        A.   I'm thinking.  I'm thinking.

15        Q.   Okay.

16        A.   It includes all of Table 2, and I have to

17   assess if there are any more throughout my report.

18        Q.   Just so the record will be clear, a minute

19   ago, you called out the word "pain" and a couple other

20   words.  Are you --

21        A.   Right.  Pain is on Table 2.  That's correct.

22   It is already included.

23        Q.   Okay.

24        A.   So I was trying not to be duplicative.
```

Anne Holland Wilson

1      Q.    Okay.

2      A.    Both of those were already on Table 2.  The

3  other hazards, which are -- now I have to see if they're

4  also on Table 2.  I think that Table 2 covers it, to the

5  best of my knowledge, in the short term, without reading

6  my whole report.

7      Q.    Okay.  Where on Table 2 do I look to get a

8  complete list --

9      A.    On Table --

10     Q.    -- of the hazards?  I mean, where on Table 2

11  do you look?

12     A.    Table 2 is titled "Hazard Table," and so all

13  of this table are the hazards.

14     Q.    In the first column, or --

15     A.    This entire table, yes.

16     Q.    Okay.  Now, can you give me a complete list of

17  the harms that you've opined that Ethicon failed to

18  adequately assess in the design and development of TVTO?

19     A.    A hazard is a potential source of harm.  So

20  now I have to go find out the harm that goes with each

21  of these.  So an infection is a hazard, and associated

22  harm -- I don't think I actually talk about the

23  associated harms in this because that's generally a

24  medical opinion.

Anne Holland Wilson

1                   But, for example, if you have an

2   infection, you obviously have an associated harm with

3   it.  I'm not sure I understand exactly what you're

4   trying to get to.  Are you wanting me to name a harm to

5   go with every one of these hazards?

6        Q.   I just wanted a complete list of the harms

7   that you're -- that you have opined that Ethicon did not

8   adequately assess.

9        A.   All of them that go with -- that are matched

10  up with these hazards.

11       Q.   Okay.

12       A.   I have not made a statement of which harms go

13  with each and every hazard or each and every failure

14  mode.

15       Q.   Okay.  Let me follow up and -- for instance, I

16  know when we were asking about TVTR, I believe you

17  said -- you listed fraying, as an example, as a hazard.

18       A.   That is a failure mode.

19       Q.   Is that in your Table 2?

20       A.   It's in Table 3, which is a list of failure

21  modes.

22       Q.   Okay.  Well, what is -- what is the harm, or

23  is there any harm associated with fraying?

24                   MR. WALLACE:  Objection; asked and

Anne Holland Wilson

```
 1   answered.

 2        A.   Okay.

 3                THE WITNESS:  Does that mean --

 4                MR. WALLACE:  Well --

 5        A.   I'm confused.

 6        Q.   (BY MR. DAVIS)  I haven't asked that question,

 7   but he can object.  What harm do you associate with

 8   fraying?

 9                MR. WALLACE:  Objection to form; asked

10   and answered.

11        A.   If the device frays or ropes, then -- fraying

12   and roping are grouped together through all of these

13   reports.  Then what happens is they can make it so you

14   have urinary retention or damage to the urethra.  That

15   is published in these documents, the design history

16   file; and so I know, through review of those documents,

17   that that is a harm that's associated with that failure

18   mode.

19        Q.   (BY MR. DAVIS)  Okay.  Then I believe you

20   said -- you listed degradation as a hazard?

21        A.   Degradation -- I have to always think whether

22   it is a hazard or a failure mode.  So if a device has a

23   failure mode of degradation, that can lead to a harm,

24   which is broken mesh or torn mesh.
```

Anne Holland Wilson

1      Q.    Okay.

2      A.    Because a hazard is a potential source of

3   harm.  They're related.

4      Q.    Do "hazard" and "harm" mean the same thing,

5   or --

6      A.    No, sir.

7      Q.    Okay.  So have you associated any harm with

8   degradation?

9              MR. WALLACE:  Objection to form.

10     A.    I just answered this.  With degradation, if

11   the -- if the material degrades, then it's stated

12   throughout these documents that you can get tears, mesh

13   tears and breaks; and that's also a complaint.  So, yes,

14   that is a harm.

15     Q.    (BY MR. DAVIS)  Can you identify just one

16   document that discusses a mesh tearing or breaking

17   inside the body after implementation?

18              MR. WALLACE:  Objection to form.

19     A.    I can refer to the 2002 complaint analysis.

20   Would you like me to find the Bates number to that, or

21   what?

22     Q.    (BY MR. DAVIS)  You're saying there's a 2002

23   complaint analysis of a torn mesh after it's been

24   implanted?

Anne Holland Wilson

1    A.   Yeah, but it's listed as a complaint; so it

2    would have to have been implanted.  And if you look in

3    my report -- are we still on "O," or are we on "R"?  I'm

4    confused now.  I'm sorry.

5    Q.   Well, whichever report you think it's in.  I'm

6    talking about degradation, and you've now referred to a

7    complaint analysis in 2002.  Yes, if you can -- if

8    you've footnoted that, I'd like you to identify it for

9    me.

10   A.   Okay.  I'm trying to find it.  There's a lot

11   of pages here.  It's going to take me a moment.  This

12   is -- okay.  Let's see here.  I'm getting close.

13              So it is referred to as a 2002 letter,

14   which is -- included a complaint analysis.  It's on --

15   starts on Page 20 of my TVTR report and goes to 21,

16   where it defines the 11 new hazards, one of which is

17   mesh broken; another of which is torn mesh, which can be

18   the harm associated with degradation.

19   Q.   Okay.  Did that complaint report, in any way,

20   shape, or form, associate the torn or broken mesh with

21   degradation?

22   A.   What you asked me, is it -- was it after it

23   was implanted in a woman's body; and that was "yes."

24   Q.   Okay.  So it's your recollection or belief

Anne Holland Wilson

1    that this complaint report was reporting on some mesh

2    that had been implanted inside a woman's body, and then

3    it degraded and tore?

4         A.   Yes.   There's evidence as early as, like,

5    19 -- actually it was, like, in 1983, the first data,

6    because I remember it was back when I was in college

7    about -- in the 1990s, about degradation.   And there was

8    other data that supported the fact -- I can't tell you

9    the Bates number, put my finger on it, of this.   But

10   this one definitely says that there's torn mesh, and

11   it's after it's been in a woman's body; and there's

12   broken mesh after it's been in a woman's body.

13        Q.   And did you footnote that document you're

14   referring to there?

15        A.   Of course I did.   It is right here, 59.

16        Q.   Footnote 59?

17        A.   Which is back to footnote -- it's one of those

18   repeat footnotes from -- 57 was the first time I

19   footnoted it.

20        Q.   Okay.   And that's in your TVTR report?

21        A.   Yes, sir.

22        Q.   Okay.   Thank you.

23             Okay.   If the FDA had ever issued an order

24   making findings on the significance of degradation of

Anne Holland Wilson

1   polypropylene in the body, would that be significant to

2   you?

3                    MR. WALLACE:  Objection to form.

4                    What context?

5       A.   Yeah, I would like to know what -- what you're

6   trying to ask.  If the FDA -- I thought the FDA was not

7   within the scope of this, is what I'm trying to

8   understand.

9       Q.   (BY MR. DAVIS)  My question is simply:  Would

10  it be something you would want to know about if the FDA

11  had entered an order making --

12      A.   If I would --

13                   MR. WALLACE:  Objection.

14      Q.   (BY MR. DAVIS)  Let me -- let me finish my

15  question.

16      A.   Huh-uh.

17                   MR. WALLACE:  Objection to form.

18      Q.   (BY MR. DAVIS)  Well, let me -- please let me

19  finish my question.

20                   Would it be of interest to you, as part of

21  your study in this case, to know whether or not the FDA

22  has ever entered an order making findings on the extent

23  to which polypropylene degrades within the human body?

24                   MR. WALLACE:  Objection to form.

Anne Holland Wilson

```
1          A.   I'm sure it would be of interest, yes.

2          Q.   (BY MR. DAVIS)  Okay.

3          A.   It may not have any relevance to my opinions,

4    but it would be interesting.

5                    (Marked Wilson Exhibit No. 25.)

6          Q.   (BY MR. DAVIS)  I'm going to hand you

7    Exhibit 25.  And it's a lengthy document, but can you

8    tell from just the first page that that document

9    purports to be an order on the part of the FDA?

10                   MR. WALLACE:  Objection to form.

11         A.   I don't know if it's an order.  It says it's a

12   reclassification.

13         Q.   (BY MR. DAVIS)  Look at the -- thank you.

14                   Look at the first paragraph, under the

15   heading "Introduction" on the first page.  Look at the

16   last sentence of that paragraph.  Do you see where it

17   says "this order"?

18         A.   Now I do, now that you pointed it out.

19         Q.   Okay.  So you would agree this --

20         A.   Can I read the first paragraph, please?

21         Q.   Sure.

22         A.   Thank you, sir.

23                   MR. WALLACE:  You've given her a document

24   on sutures.
```

Anne Holland Wilson

```
1        A.   Right.  This -- this is something about

2   sutures.

3        Q.   (BY MR. DAVIS)  Okay.  It's about

4   polypropylene sutures, right?

5        A.   Yes, sutures.

6        Q.   Okay.  And --

7        A.   Polypropylene sutures.

8        Q.   Good.

9             MR. DAVIS:  And, Ed, I don't really think

10  you need to coach the witness.

11             MR. WALLACE:  I'm not.

12             MR. DAVIS:  Yes, you did.

13       Q.   (BY MR. DAVIS)  So let's follow up on this.

14             Do you have any reason to believe that

15  polypropylene in the form of a suture would degrade

16  differently from polypropylene in the form of a mesh --

17             MR. WALLACE:  Objection.

18       Q.   (BY MR. DAVIS)  -- in the human body?

19             MR. WALLACE:  Objection to form.

20       A.   Where in the human body?

21       Q.   (BY MR. DAVIS)  In the pelvic region --

22             MR. WALLACE:  Objection to form.

23       Q.   (BY MR. DAVIS)  -- of a female body.

24       A.   It could.  It could.  It certainly could.
```

Anne Holland Wilson

1    Q.   Okay.  And if you look at --

2    A.   You know, I've had a lot of experience with

3  medical devices where you make assumptions; and they are

4  just faulty.  Like in heart valves, people assumed that

5  changing one of the components would have -- and it was

6  the (inaudible), not the final product -- would make no

7  difference.  And guess what?  People started dying,

8  because, you know, you make one false assumption in one

9  dimension.  And the leakage of those -- the leakage

10 rates went up.  People started having blood clots.  So

11 you can't just assume that one thing is the same as

12 another, in my experience.

13   Q.   Did you consider Exhibit 25 as part of your

14 work in this case?

15   A.    I had read it; but I didn't consider it

16 because it was on surgical sutures, not relating to the

17 mesh that was involved in the TVT.

18   Q.   Okay.  Do you know --

19   A.    I was aware that this happened, that they were

20 Class 2 devices.

21   Q.    And -- well, look at Page 7 of the order,

22 the -- look at the last paragraph on that page.  Do you

23 see in that paragraph where there's a discussion of

24 oxidative degradation?

Anne Holland Wilson

```
 1                    MR. WALLACE:  What page are you on?

 2                    MR. DAVIS:  Page 7.

 3                    MR. WALLACE:  Where at on Page 7?

 4                    MR. DAVIS:  The last paragraph.  I'm

 5     letting her read the last paragraph on the page.

 6          Q.   (BY MR. DAVIS)  Do you see where it discusses

 7     oxidative degradation of polypropylene?

 8          A.   I see that, sir.

 9          Q.   And do you see the FDA's finding?

10          A.   I see it, yeah.

11          Q.   That it proceeds slowly and is not deemed

12     clinically significant under most circumstances?

13                    MR. WALLACE:  Objection to form.

14                    If you're reading from the document, you

15     probably need to read it exactly.

16                    MR. DAVIS:  Well, let's -- let's read it,

17     then.

18          Q.   (BY MR. DAVIS)  Do you see where it says,

19     quote:  "The record data show that the loss of tensile

20     strength in vivo is primarily related to the oxidative

21     degradation of the polypropylene polymer," parenthesis,

22     "Refs. 4, 29, 32, 42, 43, and 44," close parenthesis,

23     "and that the polymer's degradation proceeds slowly and

24     is generally not considered clinically significant under
```

Anne Holland Wilson

1    most circumstances of use," parenthesis, Refs. 1, 4, 42,

2    121, and 149," close parenthesis, unquote.

3              Did I read that correctly?

4        A.   But you also missed part of this, which

5    says -- you know, the first sentence was neglected,

6    which it also says "surgical suture in certain

7    applications."  So from this, I can't make an inference

8    whether this is directly related to the TVT products in

9    my report.

10       Q.   Well, have you taken the time to look at any

11   of the reference materials that --

12       A.   No, sir.

13       Q.   Okay.

14       A.   The FDA is outside the scope of this report.

15   I did not refer to every little reference in this when

16   it didn't have anything to do with the products I was

17   opining about.  My goodness.

18       Q.   Now, in your reports, let's take a -- well,

19   TVTS.  For TVTS, did you opine -- well, what hazards did

20   you opine Ethicon failed to properly or adequately

21   assess?

22       A.   Okay.  Let me shift gears and get to "S,"

23   please.  Where is it?  Is "S" in here?

24       Q.   It's Exhibit No. 4, if you want to look at it.

Anne Holland Wilson

```
 1      A.   Okay.  It should be -- it should be "C."

 2               MR. WALLACE:  No, it's -- I think it's --

 3      it might be the first one here.  I think it's "B."

 4               THE WITNESS:  Oh, no wonder I got

 5      confused.

 6      A.   Okay.  So what was your question, again?

 7      Q.   (BY MR. DAVIS)  Can you simply please list the

 8      hazards that you've opined that Ethicon failed to

 9      properly assess for TVTS?

10      A.   I see a lot of failure modes.  I'm trying to

11      see if I actually opined on hazards.  So please give me

12      a moment.

13               So on Page 16, I talk about susceptibility

14      to in vivo degradation; stiffness; improper warnings;

15      tensioning, improper tensioning; improper learning

16      curve -- that's a hazard because you don't install it

17      right -- and the inability to remove the device.  Those

18      are hazards.

19      Q.   Okay.  What harms have you opined that Ethicon

20      failed to properly assess relating to TVTS?

21      A.   Okay.  So the harms related to failure modes

22      are bleeding, bladder perforation, or hematoma --

23      hematoma.  Those harms are related to inserter not

24      maintaining contact.  This is on Page 14.  Infection,
```

Anne Holland Wilson

1    urinary retention or obstruction.

2         Q.   Is that it?

3         A.   That's all I can see right at this minute.

4         Q.   Okay.  Back to TVTR.  Have you --

5         A.   Are we done with this for a minute?

6         Q.   Right now, I'm back to TVTR.

7         A.   Okay.

8         Q.   For TVTR, have you opined that Ethicon did not

9    adequately assess the severities of any of the harms

10   that you've listed?

11        A.   That's clearly called out in my "O" report

12   because it --

13        Q.   Well --

14        A.   Please let me finish my sentence.

15             MR. WALLACE:  You interrupted her answer.

16             MR. DAVIS:  No, wait a second.  Counsel,

17   you told me not to --

18             MR. WALLACE:  No, you interrupted her

19   answer.

20             MR. DAVIS:  You said we've got to do one

21   report at a time.

22        A.   And you didn't.  You asked me one question on

23   the "S," and now you're back to "R," and I'm --

24        Q.   (BY MR. DAVIS)  I'm back to "R."

Anne Holland Wilson

```
 1        A.   -- trying to answer your question.

 2               MR. WALLACE:  Let her answer the

 3   question.

 4               MR. DAVIS:  Okay.

 5               MR. WALLACE:  If you don't like the

 6   answer, that's too bad.

 7               MR. DAVIS:  No.  I don't like the time.

 8        Q.   (BY MR. DAVIS)  My question is about --

 9        A.   That's not my fault.

10        Q.   -- TVTR.

11               MR. WALLACE:  Well, it --

12        Q.   (BY MR. DAVIS)  Answer my question about TVTR.

13        A.   I am.

14               MR. WALLACE:  You know what?  We have an

15   agreement in place and a court order.  The bottom line

16   is, if you don't like her answer, ask her a different

17   question.

18        A.   Here, the reason I'm not answering it --

19        Q.   (BY MR. DAVIS)  No, I'm withdrawing that

20   question --

21        A.   -- is because they used TVT -- our data for

22   "O," it happens to be placed in there.  Okay?  Because

23   they didn't do their own stinking system analysis, I

24   have to rely on it in a different place.  That's the
```

Anne Holland Wilson

 1   problem.  I keep saying it.

 2       Q.   (BY MR. DAVIS)  Please just tell me the harms

 3   for which you believe Ethicon did not properly assess

 4   the severity --

 5       A.   Absolutely.

 6       Q.   -- for TVTR.

 7                MR. WALLACE:  One thing.  Are you done

 8   giving your answer to the last question?  Because you

 9   were --

10       A.   No, I haven't even answered the question

11   because I have to find it when you change topics on me

12   every question.  I have a whole table on that, and it

13   happens to be --

14                MR. WALLACE:  Do you want to withdraw the

15   question?

16                MR. DAVIS:  No.

17       A.   It happens to be Table 2, Page 17, TVTO, where

18   it clearly shows the TVTR severity ratings and how they

19   were inconsistently applied over time.

20       Q.   (BY MR. DAVIS)  Okay.  Now, my question

21   stands.  I want you to give me a complete list of all

22   the harms which you believe Ethicon failed to properly

23   assess the severity level.  Have you given me a complete

24   list now?

Anne Holland Wilson

```
1                    MR. WALLACE:  Objection to form; asked

2      and answered.

3           A.   I've given you a list that I thought was most

4      important.  This is not a complete list of everything

5      over the 10 or 15 years of documents.  These are

6      representative of the most important things I found.

7           Q.   (BY MR. DAVIS)  Okay.  Now --

8           A.   And there's no way I can go back and complete

9      a list in this time frame.

10          Q.   For TVTR, did you opine that there were some

11     frequencies of harms that Ethicon failed to properly

12     assess?  If so, what are they?  What are those harms?

13                   MR. WALLACE:  Object to form.

14          A.   You're -- could you clarify your question?

15          Q.   (BY MR. DAVIS)  I'll be happy to.

16                   With respect to the TVTR product, did you

17     opine that Ethicon failed to properly assess any of the

18     frequencies relating to any of the harms that you've

19     listed?

20                   MR. WALLACE:  Objection to form.

21          A.   I don't recall discussing the specifics of the

22     frequencies.  That's why I have to look at it.  I talked

23     about the severities and the inconsistencies and that --

24     I did, and how the occurrence was changed without any
```

Anne Holland Wilson

 1   medications.  Do I need to find that in my report?

 2        Q.   (BY MR. DAVIS)  No, you don't -- I don't need

 3   to know the page number of the report if --

 4        A.   Okay.  Yes, I did.

 5        Q.   Okay.  Now, you've opined that the FMEA is a

 6   living document, correct?

 7        A.   That it should be.

 8        Q.   Okay.  Can you show me or just identify for me

 9   a standard that requires an FMEA be a -- what you've

10   described as a living document?

11        A.   Are you talking about these -- their internal

12   procedures?

13        Q.   We're going to break it down.  I asked you

14   first about industry standards.

15        A.   Uh-huh.  Do you, in your pile, have

16   13485:2003, maybe?

17        Q.   I'll be happy to hand you 13485.  I think I've

18   got it somewhere here.  Let's see.

19                  (Marked Wilson Exhibit No. 26.)

20        Q.   (BY MR. DAVIS)  I've got one copy of it for

21   now, 26.  Exhibit 26.  Is that -- is that the document

22   you were wanting to see?

23        A.   Yes.  We should look at Section 7.1.  So if

24   you look at 7.1, the italicized note, it states:  "The

Anne Holland Wilson

1    organization shall establish documented requirements for

2    risk management throughout product realization.  Records

3    arising from risk management shall be maintained."

4        Q.   Okay.  Is there any other written standard

5    anywhere that you're relying on for your opinion that

6    the FMEA is a living document?

7        A.   First you said, "Find me one," and -- yes.

8    Give me 14971.  It's probably in there.

9        Q.   Well, you've got it right in front of you.

10       A.   Oh, okay.

11       Q.   It's an exhibit already.

12            MR. WALLACE:  Which number is it?

13            THE WITNESS:  I bet it's 12.

14            MR. DAVIS:  It's Exhibit 12.

15            THE WITNESS:  And 14.

16       A.   Yes.  In the "Scope," it says you have to --

17   these standards "are applicable to all stages of the

18   life-cycle of a medical device."

19       Q.   (BY MR. DAVIS)  And you're reading from which

20   section?

21       A.   Section 1 in the "Scope."

22       Q.   Okay.  Of Exhibit 12, correct?

23       A.   Correct.

24       Q.   Okay.  Is there any other provision of any

Anne Holland Wilson

1  standard, industry standard, that you're relying on for

2  your opinion that the FMEA is what you call a living

3  document?

4       A.   I'm sure it's also in other sections.  Would

5  you like me to check each section?

6       Q.   Well, do you know of any?

7            MR. WALLACE:  Object to form.

8       A.   I'm sure it's in here somewhere, another

9  section.

10           MR. WALLACE:  Take your time.

11      A.   Because "life cycle" means all phases of the

12  life of a medical device from initial concept to final

13  decommissioning and disposal.

14      Q.   (BY MR. DAVIS)  Okay.  Let me ask you this:

15  Explain what you -- for the court what you mean by a

16  living document.

17      A.   That means that it's continuously updated as

18  new information comes in, just like their procedures say

19  that you'll evaluate complaints and update the documents

20  as appropriate, as the product goes through its life

21  cycle.  So if you find that you're having a change in

22  expectations or you're having more complaints or

23  unexpected results, then you would go back and you would

24  look.

Anne Holland Wilson

1                    If you had done a risk assessment, you

2     would look at those and say, "Oh, we missed something,"

3     or, "Jeez, we didn't do a system-level risk assessment;

4     so we'd better" -- "we'd better go look at that.  Our

5     assumption was false that we relied on in previous -- in

6     previous documents."  So that's what it means.

7          Q.   If a post-market review indicates that you're

8     getting complaints, but they're within the levels that

9     you expected, anticipated in your FMEA, are you

10    saying -- would you go back and then do an update to

11    your FMEA?

12         A.   Yeah, totally.  You can't rely on that.

13    Because what I saw Ethicon do is they set the bar so

14    freaking high -- 294, or something like that -- that

15    nothing would -- nothing would hardly exceed -- I mean,

16    that is just like -- you would have to have something

17    catastrophic -- and this is clearly in my report, that

18    you'd have to have something with very high frequency,

19    very high -- a serious injury with no warning, or

20    catastrophic, nearly, and unable to detect it.

21                    So if you set the bar, as a

22    manufacturer -- which I told you earlier that each

23    manufacturer sets their own threshold.  If you set that

24    threshold so high that your expectations are so low,

Anne Holland Wilson

```
 1   that's where you go out and you say, "Whoa, does this

 2   even make sense?  What are other people saying?"  Or you

 3   find out that doctors are complaining, and peer-reviewed

 4   articles, which I also talked about.  So you can't just

 5   say that, no.  That's not a true statement.

 6        Q.   Okay.  In connection with your opinion --

 7        A.   Do you want me to finish your prior question

 8   about where else in the standard it says you have to do

 9   it throughout the life cycle?

10        Q.   No.

11        A.   Okay.

12             MR. WALLACE:  So you withdrew the

13   question?

14        Q.   (BY MR. DAVIS)  Tell you what.  I'll withdraw

15   the question because I'll challenge your counsel at the

16   appropriate time to show the court where it says that.

17   So I'll worry about --

18             MR. WALLACE:  The bottom line is you're

19   not letting her finish her answer.

20             MR. DAVIS:  Well --

21             MR. WALLACE:  She asked if you wanted her

22   to finish her answer --

23             MR. DAVIS:  No, I don't want to waste

24   any --
```

Anne Holland Wilson

1      MR. WALLACE:  -- and you said, "No, I

2  don't want you to finish your answer."

3      MR. DAVIS:  No.  Can we move on?

4      MR. WALLACE:  So there's no challenge

5  here.  You waived any right you have to any challenge,

6  Paul.

7      MR. DAVIS:  I've already withdrawn the

8  question.  Please quit wasting my time.

9      MR. WALLACE:  Well, you're not going to

10  sit here and say what the court's going to do or not

11  going to do.

12      MR. DAVIS:  No.

13      MR. WALLACE:  The judge is going to make

14  up his own mind based upon the fact that you didn't let

15  her answer the question.

16      MR. DAVIS:  Absolutely.  And I've

17  withdrawn the question.  That question is out.  So let's

18  move on, please.

19      MR. WALLACE:  Fair enough, then.  Go

20  right ahead.

21      Q.   (BY MR. DAVIS)  Now, can you identify -- or

22  let me ask this:  Did you apply any generally accepted

23  standard in your evaluation that led you to believe that

24  Ethicon has set its requirements too high?

Anne Holland Wilson

1      A.   What I applied was 30 years of experience

2   doing this and helping many, many companies in -- of

3   implantable devices set up their risk analysis, and the

4   CEOs and the clinicians I work with on a frequent basis,

5   all of those things, and the design teams.  I applied my

6   knowledge, expert knowledge, to make that assessment.

7      Q.   So answer this question, please:  Did you

8   apply any generally accepted written standards in making

9   your analysis that Ethicon set its standards too high

10  for its -- for its risk to be unacceptable?

11     A.   I did apply the principles of 13485 and 14971.

12     Q.   Okay.  Does --

13     A.   And the MedDev for the post-market

14  surveillance.

15     Q.   Okay.  You're referring to the MedDev

16  12-point --

17     A.   I'd have to look up the number, but it's in my

18  report.

19     Q.   Okay.  Well, just -- well, you only cited one;

20  so I'll rely on that.

21     A.   Yeah, exactly.

22     Q.   Okay.  So -- okay.  Do you have any other

23  source for a written industry standard to support your

24  opinion that Ethicon set its risk numbers too high?

Anne Holland Wilson

```
 1                    MR. WALLACE:  Objection to form.

 2         A.   I think I've named industry standards, my own

 3    experience, and multiple device companies.  So that

 4    pretty much covers it.

 5         Q.   (BY MR. DAVIS)  Okay.  Can you explain for the

 6    court Ethicon's system that generated the number 294?

 7         A.   I have no idea, and I believe I put that in my

 8    report.  But I do know that the only way you can result

 9    in that high of a number is if you look at the -- just

10    look at the combinations.  You have to have a 9 or a

11    10 -- I mean, to get to 294, you'd have to have a 10 by

12    a 10 by a 3, at least, you know.

13         Q.   Okay.

14         A.   So you have to have some highly severe,

15    frequently occurring -- something that's not easily

16    detected, or some combination thereof, to get that high

17    a number.

18                    (Marked Wilson Exhibit Nos. 27 and 28.)

19         Q.   (BY MR. DAVIS)  Let me hand you Exhibit --

20         A.   Or something that you -- you know, it's pretty

21    high.

22         Q.   Let me hand you Exhibit 27.  Do you recognize

23    that exhibit?

24         A.   I certainly do.
```

Anne Holland Wilson

1    Q.    And you opined about this exhibit, didn't you?

2    A.    Yes, sir.

3    Q.    And what were your -- can you give me an

4  overview of your criticisms of Exhibit 27?

5    A.    Well, first off, this is a Design FMEA that

6  was done five to seven years after the design was

7  frozen.  So it's a total retrospective analysis, where

8  the intent of a DFMEA is to start with concept phase;

9  and it's listed in the standards and Ethicon's

10  procedures as to be done in the design input phase.  So

11  that's number one, is that it's sort of "too little, too

12  late," because you're supposed to do these things, you

13  know, often, frequently, not "too little, too late."

14  And so that's -- that's my first opinion.

15              Second, it's -- there's a table in my "R"

16  report, I believe.  Maybe it's the -- that talks about

17  this as like -- I couldn't -- I didn't even, you know,

18  pay attention to it at first, because it says things

19  like "not imaginable," which is not something I'd ever

20  seen before.  And if you go to my R report, it talks

21  about just the contradictions, omissions, things like

22  that in this FMEA.

23              But, most importantly, it's five to seven

24  years after; and it didn't even jive (sic) with or have

Anne Holland Wilson

1   any communication with the complaint system.  So it's

2   way out of sync.

3       Q.   Okay.  But, now, you said an FMEA is a living

4   document.  You should be doing new FMEAs throughout the

5   life cycle.

6       A.   You should start a design -- in the design

7   phase so you can design out the defects.  That is the

8   number-one thing to do to prevent hazards from getting

9   to the field and causing harm.

10      Q.   Okay.

11      A.   It's starting at the design phase.  And they

12  didn't do that.

13      Q.   Are you saying that you believe Ethicon was --

14  should not have tried to do a risk assessment in 2001

15  for TVT?

16      A.   That's not at all what I'm saying.  Listen,

17  please.  I'm saying that they didn't do it during the

18  design phase of the device, which was much more in 1995,

19  not in 2001.  The design has to be -- you can't design

20  out any risks or potential sources of harm if, in fact,

21  you haven't done any analysis.  And there was not.

22      Q.   So my question today, though, now, is:  What

23  imperfections do you see in this risk assessment itself?

24      A.   It's in the report, and that was my first

Anne Holland Wilson

1    answer.

2        Q.   Okay.

3        A.   That was my answer to your -- an answer to

4    your question.

5        Q.   Okay.  It's all in your report?

6        A.   That -- that was not in my report.  I started

7    with that.  I believe that was somewhere in the "O"

8    report.  But if you want to look at this design

9    document -- look at Page 17, some other factors,

10   additional factors, that I think are wrong with this

11   document.

12       Q.   Okay.

13       A.   Look at Page 17 of the "R" report.

14       Q.   That would be fine.  Thank you.  Okay.  So let

15   me ask you --

16       A.   It starts, actually, on Page 16 and starts

17   with a listing of what's wrong with this retrospective

18   report.

19       Q.   Okay.  Now, what industry standard did you

20   apply in evaluating Exhibit 27?

21            MR. WALLACE:  Objection to form.

22       A.   Well, this clearly says it was done to 1441.

23   So I looked at 1441 and --

24       Q.   (BY MR. DAVIS)  Okay.

Anne Holland Wilson

1      A.   -- ISO 9001 and EN 46001, which were the

2  applicable standards at the time that this was

3  performed.

4      Q.   Okay.  And did you apply any company standards

5  in assessing Exhibit 27?

6      A.   Absolutely.  I looked at the SOPs.

7  PR 602.003, OP 650-010 and -011, I believe, are the

8  applicable ones in my report.

9      Q.   Why did you choose those?

10     A.   Because those are the ones that were relevant.

11     Q.   Okay.  What was your basis for believing those

12  were the relevant ones?

13     A.   Well, let's look at them.  Number one -- okay.

14  So the OP -- the PR 602.003 is entitled "Procedure for

15  Medical Device Risk Management."  So that would be

16  appropriate to risk management.  And it talks about a

17  systemic risk management process using a DDSA.

18     Q.   Okay.

19     A.   They didn't use a DDSA.  But then 650-010

20  talks about risk management again, and 611 (sic) talks

21  about DFMEAs --

22     Q.   Okay.

23     A.   -- 650-11 -- excuse me -- "Operating Procedure

24  for Design Failure Mode and Effect Analysis."

Anne Holland Wilson

```
1        Q.   Did you make any effort to find out which

2   company facilities those procedures applied at?

3        A.   I did, yes, sir.

4        Q.   Why?  Why did you try to do that?

5        A.   Well, because if you look -- I wanted to find

6   out which revisions were appropriate at the time it was

7   done.

8        Q.   Okay.

9        A.   And if you look at the revision history for

10  these documents, it tells you, like, when it tries to

11  roll out at each facility.  And so I tried -- although

12  they changed computer systems somewhere along the line,

13  it was very challenging to actually determine on what

14  exact day, because these projects would start; and

15  sometimes, when the procedures rev-bumped -- and I'm

16  quite sure that's in Dan Smith's testimony, also, that

17  once these procedures rev-bumped, the design teams

18  didn't always rev-bump with them.

19       Q.   Okay.

20       A.   So I looked at that in quite a bit of detail.

21       Q.   Okay.  Yeah, I think -- did you just -- you

22  just referred to looking at the revision histories.  Is

23  that an example of the type of document that you looked

24  at, Exhibit 28?
```

Anne Holland Wilson

1    A.   It has similar information on it.  It just

2  doesn't have the same format of the one, because I don't

3  think I have the archived document.  I think I have the

4  full.

5    Q.   Well, you see that Exhibit 28 for procedure

6  PR 602.003 -- it actually shows you which locations the

7  procedure applied at.

8    A.   Let me take a look.  I see that.

9              (Marked Wilson Exhibit No. 29.)

10   Q.   (BY MR. DAVIS)  And the same thing.

11  Exhibit 29 relates to --

12   A.   But let's go through each revision, because it

13  can change.  This is Version 1, which was 981099.  This

14  is 2001.  This is Version 2, Version 3.  And this was

15  conducted in Germany, so I couldn't find any procedure

16  that was in English or -- or any procedure that said --

17  other than these, that said how you're supposed to do

18  FMEAs.

19              (Marked Wilson Exhibit No. 30.)

20   Q.   (BY MR. DAVIS)  Okay.  And I'm handing you

21  Exhibit 30.  That would be for, I think, Exhibit -- for

22  procedure OP 650-011, correct?

23   A.   Right.  And if -- if they're -- these are just

24  saying when they rolled them out.  That doesn't mean

Anne Holland Wilson

1    that corporate doesn't apply to the rest of the

2    corporation.  This just says when they're rolling them

3    out at certain facilities, not when -- that corporate

4    doesn't apply to the corporate holder for design

5    controls.

6         Q.   Have you seen any document that indicated that

7    Exhibits 28, 29, or 30 -- that those procedures in those

8    three exhibits applied in Germany at Neuchâtel?

9         A.   That's Switzerland, isn't it?

10        Q.   I'm sorry.  It applied in Germany or

11   Switzerland?

12        A.   I must say that those documents, if they're

13   the corporate person in charge of design control, then I

14   did make the assumption that the corporate procedures

15   applied.  So Ethicon GmbH in Germany was the corporate

16   design control representative for this document; and it

17   was stated as such in the DHF, the remediated DHF that

18   occurred five years after.

19             So when they transferred from Sweden and

20   to -- and Sweden, which was -- when they transferred the

21   corporation to Germany and the manufacturing to

22   Switzerland, that's when the corporate responsibility

23   for design control switched to Germany.  And that's why

24   I used these corporate documents.

Anne Holland Wilson

```
1              (Marked Wilson Exhibit No. 31.)

2        Q.   (BY MR. DAVIS)  Let me hand you Exhibit 31.

3        A.   Okay.

4        Q.   Is Exhibit 31 one of the risk analyses that

5   you opined on?

6        A.   Did we finish that last question?

7        Q.   If you have more to say, you're free to -- I'm

8   not trying to interrupt you.  I thought you were

9   through.

10       A.   I thought you wanted me to -- know everything

11  wrong with this.  Okay.  I had a whole table on that,

12  of -- I just wanted to point that out.  I don't think we

13  ever got to my answer on that, that this whole table on

14  Page 17 talks about how this design FMEA, which was

15  retrospective, is faulty, in my opinion, because it has

16  things like "not imaginable" when they clearly have

17  documentation that it was -- it was not only imagined,

18  but, for example, said wrong mesh composition.

19            Well, not imaginable, yet they measured

20  the IR spectra.  They had a material spec.  They didn't

21  look at post-market data.  They had contradictions and

22  omissions, and then they -- failure to perform its

23  function.  So there were quite a few things that led me

24  to believe that this was just not a trustworthy
```

Anne Holland Wilson

1    document.  Much more like it was just, "Oh, my God.

2    It's five years later.  We'd better whip one of these

3    out."

4         Q.   Are you through?

5         A.   Yeah, I am now.

6         Q.   I've handed you Exhibit 31.

7         A.   Okay.

8         Q.   You opined on this risk analysis, didn't you?

9         A.   I don't even know what product it is yet, sir.

10   You said TVTO.  So let me go to the "O" and think about

11   this.  I've got my "O" report.  And if it's listed, then

12   I should have opined about it.  Oh, yeah.

13        Q.   So my question is:  Look at -- in the -- on

14   the -- any one of the pages.  Do you see the header at

15   the top of the page, upper left-hand part of the page --

16        A.   Yeah.

17        Q.   -- that shows a reference to PR 602-003,

18   Appendix 1?

19        A.   2, but correct.  It's Appendix 2.

20        Q.   Well, you see it actually says Appendix 1?

21        A.   Well --

22        Q.   Well, it depends on which page -- depends on

23   which page you're looking at, right?

24        A.   I was looking at the page number that ends in

Anne Holland Wilson

1    447 down here in the numbers.  So --

2        Q.   Okay.  The bottom line is:  You understand

3    Ethicon's practice of, when they're filling out one of

4    these risk analyses, they reference the fact that

5    they're using a form from one of their company

6    procedures?

7        A.   Yes.  Yes.

8        Q.   And so it shows the Appendix 1, Appendix 2,

9    et cetera, here?

10       A.   Uh-huh.

11       Q.   Okay.  Now, back to the -- that 2001 risk

12   analysis -- I believe it was Exhibit 27 -- look at the

13   second page of that exhibit.  You see in the upper

14   left-hand corner of the second -- of the second page of

15   the document, they have a header that says

16   "Anhang 4-02/3"?

17       A.   Yes.

18       Q.   Did you take the time to -- well, did you

19   realize that that's in German?

20       A.   Well, I know it's German.

21       Q.   Okay.  And how did you know it was German?

22       A.   I took German three years in high school.

23       Q.   Okay.  And did you -- do you know what

24   "anhang" means?

Anne Holland Wilson

```
 1          A.   I have no clue.

 2          Q.   Did you take the time to look it up?

 3          A.   I did not Google it.

 4          Q.   Okay.  You do realize it's easy to Google it

 5    and -- you can type in the name, and they'll give you --

 6          A.   I know that.

 7          Q.   Okay.

 8          A.   I just didn't Google that word, no.  I looked

 9    at it, that it was per EN 1441, which was the standard

10    in place at the time.

11          Q.   And would it surprise you that "anhang" means

12    'appendix'?

13          A.   What do you know?  I don't know.  I guess it's

14    a surprise to me, yes.  You know, I was analyzing the

15    document, not translating German.

16                    (Marked Wilson Exhibit No. 32.)

17          Q.   (BY MR. DAVIS)  Let me hand you Exhibit 32.

18          A.   Okay.

19          Q.   Have you ever seen this document before today?

20          A.   You know, unless it was translated to English,

21    I don't.  But I'd be glad to take a look at any English

22    translation.

23          Q.   Okay.  Do you recall seeing it in German?

24          A.   I just -- no, I haven't seen this in German.
```

Anne Holland Wilson

```
 1        Q.   Okay.  That's fine.  Have you seen this

 2   document in English?

 3        A.   I don't know.  I just answered that, sir.  I

 4   said unless I've seen it in English, I wouldn't know.

 5                  MR. WALLACE:  Do you have an English

 6   version for her?

 7                  MR. DAVIS:  I've already handed it to

 8   her.  She's got it in front of her.

 9        A.   This is German.

10        Q.   (BY MR. DAVIS)  Well, you've got to look past

11   the first couple pages.

12        A.   Oh, okay.

13                  MR. WALLACE:  Well, it's about a 40-page

14   document; so she's going to take the time to read it.

15        Q.   (BY MR. DAVIS)  No, all I want to know is:

16   Have you seen this document before?

17        A.   I don't know yet.  I'll look.  I'll look.

18                  MR. WALLACE:  All she's seen is German

19   language, Paul.

20                  THE WITNESS:  Sorry.

21                  MR. WALLACE:  Give her the time, man.

22                  THE WITNESS:  I'm at Page 13, and it's

23   still German.

24                  MR. WALLACE:  Okay.  So you've looked
```

Anne Holland Wilson

1   past the first page, right?

2              THE WITNESS:  17 pages, still in German.

3        Q.   (BY MR. DAVIS)  Okay.

4        A.   So it does look like, on Page 18 of 23, that

5   it starts in English.  And I do not recall seeing this

6   document.

7              MR. WALLACE:  Why don't you take the time

8   to read it?

9              THE WITNESS:  I'd be glad to.

10       Q.   (BY MR. DAVIS)  Do you feel like you need to

11   read all 20 or 30 pages in order to know whether you've

12   seen it before?

13       A.   Well, it would only be Pages 18 to 23 --

14       Q.   Okay.

15       A.   -- because that's where the English starts,

16   right?

17       Q.   If you feel --

18       A.   I just said that.

19       Q.   If you feel like you need to read --

20       A.   Are you going to ask me questions about this?

21       Q.   No, I've already asked all I want to ask about

22   it.

23       A.   Well, I can't tell yet if I've read this

24   document.  So --

Anne Holland Wilson

```
 1        Q.    Okay.  Take whatever time you need.

 2              MR. WALLACE:  Are you going to reserve

 3    any time for after I get done, Paul?

 4              MR. DAVIS:  We'll see.

 5        A.    I do not believe I saw this document.

 6        Q.    (BY MR. DAVIS)  Okay.

 7        A.    It doesn't mean I -- I just don't recall ever

 8    seeing this document.

 9              (Marked Wilson Exhibit No. 33.)

10        Q.    (BY MR. DAVIS)  Let me hand you Exhibit 33.

11    Have you ever seen that exhibit before today?

12        A.    From 2008?  You know, I think I've seen this

13    section -- this format in Section 3.2, because they use

14    this long -- I mean, it matches.  This attachment

15    matches the format in this.

16        Q.    Did you opine on Exhibit 33?

17        A.    No.  It's not referenced anywhere in my

18    documents or in my reports, I don't believe.

19        Q.    Okay.

20        A.    I did reference this document.

21        Q.    When you say this -- what document are you

22    referring to?

23        A.    The DFMEA done five or seven years after the

24    design was complete.
```

Anne Holland Wilson

1      Q.   Just so the record is clear, give me the

2  exhibit number.

3      A.   This would be Exhibit No. 27.

4      Q.   Okay.

5      A.   Looks like the format follows the format in

6  the attachment, but I didn't opine on Attachment 33.

7      Q.   And I understand --

8      A.   It's for any mesh, and it's for certain pad

9  sizes.  So, you know, I just didn't --

10      Q.   Well, I understand the format is similar to

11  Exhibit 27.  My question is:  Have you ever seen

12  Exhibit 33 before today?

13      A.   I don't recall.

14      Q.   Okay.

15           MR. DAVIS:  I'll reserve the rest of my

16  questions -- my time.

17           MR. WALLACE:  So you're done?

18           THE WITNESS:  May I take a momentary

19  break?

20           MR. WALLACE:  Yeah.  Let me -- so you're

21  done?

22           MR. DAVIS:  Well, it depends on what I

23  hear you ask.

24           MR. WALLACE:  Subject to what I ask, do

Anne Holland Wilson

```
 1   you have any amount of time --

 2                    MR. DAVIS:  Yeah.

 3                    MR. WALLACE:  Okay.  Why don't we take a

 4   break?

 5                    MR. DAVIS:  Keep a record of how much

 6   time I've got left, please.

 7                    THE REPORTER:  Yes.

 8                    (Break from 1:05 p.m. to 1:17 p.m.)

 9                    E X A M I N A T I O N

10   BY MR. WALLACE:

11        Q.   Ms. Wilson, I have a few questions for you.

12   Okay?

13        A.   Okay.

14        Q.   You were asked some questions earlier about

15   CERs, or clinical evaluation reports, or clinical

16   evidence reports.  Do you recall that line of

17   questioning?

18        A.   Uh-huh.

19        Q.   Is it fair to say, as part of your job as a

20   consultant to medical device companies, that you

21   consider CERs?

22        A.   Yes.

23        Q.   And can you tell me:  Did you consider CERs in

24   the context of providing your reports in these cases?
```

Anne Holland Wilson

```
 1        A.   Yes, I mean, we consider that because

 2   that's -- we consider that and what the clinicians say.

 3   For example, we use doctors, marketing people,

 4   clinicians at the start of the risk management process.

 5   And, you know, then, if the risks -- about the

 6   risk/benefit analysis, I also spoke about that.  If, at

 7   the end, there's high risk, you go back and use those

 8   clinicians or, you know, a group of them, to say, "Does

 9   the risk outweigh the benefit?"

10             And then they rely on the literature and

11   other things to help perform that.  So, yes, as part of

12   my job, I've done that on a number of occasions.

13        Q.   Well, you mentioned a number of times just

14   now, and during your deposition, that you're not a

15   medical doctor; but you work with clinicians.  Can you

16   give me, say, a real-life example of where you've worked

17   with clinicians as part of a team when there has been a

18   product that has had problems?

19        A.   Actually, there's several of them; but one of

20   them was a knee -- was a knee implant, and there was a

21   rash of infections.  And I was the consultant for them

22   in the R&D design control process, and I did a ton of

23   risk management with that team.  But all of a sudden,

24   they had a rash of infections; and, of course, everyone
```

Anne Holland Wilson

1    wants to blame the user, you know, the doctors, or try

2    to figure it out.

3              So what we did is we formed a team

4    immediately, like, overnight, and got the head of all

5    the departments and the VPs involved and clinicians

6    involved; and we opened up a kappa.  We opened up a --

7    you know, a complaint investigation and tried to figure

8    it out.  Brought devices back from the field.  Brought

9    similar lot numbers back to see if there was, in fact, a

10   manufacturing failure.  And it worked out -- it turned

11   out that there was a design defect in the mating parts.

12        Q.    In the what parts?

13        A.    The mating parts.  That's what I was trying to

14   get across, that you can't look at each part

15   individually, because it was in the analysis that they

16   found out that there wasn't enough room between the

17   mating parts, that if there was any sort of problem, the

18   infection just grew and grew and grew.

19        Q.    And were you working with actual clinicians in

20   connection with that?

21        A.    Right.  We were working with the clinicians,

22   the doctors at the hospital, the hospitalists.  We

23   worked with the regulatory folks, meaning the regulatory

24   folks who had to pull the product back.  We worked with

Anne Holland Wilson

```
 1   the design engineering and marketing team, the design

 2   engineers -- you know, quality.  It was -- it was a

 3   pretty big effort.  That's what you'd expect to see if

 4   there's something going on.

 5        Q.   So even though you say you're not a doctor,

 6   you have to understand a device and the potential risk

 7   with the device so that you can work and direct --

 8        A.   Right.  Another example is I would sit there

 9   and do, side by side with the doctor, the failure mode

10   effect analysis.  I'll just take a whole afternoon and

11   go, you know, "What could go wrong?"  "Well, it could

12   hit this nerve."  "Okay."  Then we go side by -- you

13   know, step by step by step.  The doctors don't know how

14   to do the risk analysis, but they can tell me what the

15   harm is associated with failure mode.

16        Q.   Let's move on to the FDA.  Do you recall being

17   shown certain documents, including guidance and letters

18   from the FDA?

19        A.   Uh-huh, yes.

20        Q.   Are you able to offer -- first of all, are you

21   able to offer the opinions in your reports in the Wave 1

22   cases without reliance on documents from the FDA?

23        A.   Absolutely.

24        Q.   And why is that?
```

Anne Holland Wilson

1       A.   Well, first off, the international standards

2  and the -- first, I've worked in this for 30 years; so I

3  really feel like that's why I can do this as an expert.

4  I've done it for a lot of companies which are both

5  international -- which are international; and,

6  furthermore, they're aligned standards.

7       Q.   Okay.  Let me show you a particular exhibit,

8  Exhibit 25.  It's a -- it's called an order or a letter.

9  Can you tell me the date at the top of it?

10      A.   Yeah.  It's way back in 1990.

11      Q.   Okay.  And in Exhibit 25, you were asked about

12  degradation.  Do you recall that line of questioning?

13      A.   Yes, I do.

14      Q.   And you were asked to look at the first

15  paragraph on Page 8.  Do you see that?

16      A.   Yeah.

17      Q.   Or -- I'm sorry -- the last paragraph on

18  Page 8.

19      A.   Oh, yeah.  Back here.

20      Q.   Why don't you take a look at the rest of the

21  paragraph, which actually goes on to Page 9, and tell me

22  whether or not you actually think this document supports

23  your opinion that the -- where the device may be

24  implanted in its intended use is critical.

Anne Holland Wilson

```
 1              MR. DAVIS:  Object to the form.

 2      A.   Let me see if I understand this.  Well, first

 3  I'd have to look at these references, but -- to know.

 4  But what it's telling me is that you have to look --

 5  wait a minute.  You have to look at where the various

 6  sites are, how the healing is done, and look at the

 7  methods.

 8              You can't just apply this universally --

 9  and that's what I was really trying to say -- ahead of

10  time.  You can't take a tensile thing, a tensile --

11  sorry -- a suture test done in 1990 and apply it

12  universally to other places.

13      Q.   (BY MR. WALLACE)  And you believe that's

14  actually supportive of that opinion that you have to

15  consider where the device might be and its intended use,

16  right?

17              MR. DAVIS:  Object to the form.

18      A.   Well, that's -- yeah, that's what I said

19  originally, too.  I just want to make sure I'm on the

20  right --

21      Q.   (BY MR. WALLACE)  You are.

22      A.   -- page.  Because here it talks about

23  inflammatory response.  I mean, you have to evaluate it

24  not in a vacuum.  You have to look at the risks in
```

Anne Holland Wilson

```
 1    various actual -- it says even at any given wound site.

 2    You can't just apply it "one size fits all."

 3         Q.   Thank you.

 4              Now, you were asked some questions earlier

 5    about ISO standard 10993.  Do you recall being asked --

 6         A.   Yes, I do.

 7         Q.   -- a lot of questions about that?

 8         A.   Uh-huh.

 9         Q.   And you indicated at some point that -- with

10    respect to whether or not you were an expert with some

11    of the testing.  Do you recall, generally, that line of

12    questioning?

13         A.   Yeah, yes.

14         Q.   Are you an expert when it comes to risk

15    assessment of the biocompatibility standards enunciated

16    in 10993?

17         A.   Yes.  I mean, I look at the risk assessment

18    portion of it; but I don't actually perform the tests.

19         Q.   So, in other words, you're not actually the

20    microbiologist that would go out and talk to the company

21    about doing a cytotoxicity test?

22         A.   I'm not the microbiologist, but I've been --

23    we've done -- I'm very familiar with it.  We had to do

24    lot-by-lot cytotox testing in -- like in the heart
```

Anne Holland Wilson

1    valves, for every single -- I've had to qualify

2    cytotoxicity measurement devices in my experience, in

3    water systems, for cytotoxicity and things like that.

4              But I don't -- and we tell companies, "You

5    should do this test, this test, this test, per

6    ISO 10993, Part 1."  But what I was referring to is the

7    fact that I don't actually go out there and, you know,

8    do the tests.

9        Q.   You're not the laboratory --

10       A.   I'm not the lab.

11       Q.   -- that would be hired --

12       A.   Right.

13       Q.   -- to do the test?

14       A.   Right.  So maybe I misunderstood.

15       Q.   But is it fair to say that you understand the

16   risk assessment and the -- and the various tests under

17   10993 --

18       A.   Yeah, I mean --

19       Q.   -- in connection with your practice?

20       A.   Yeah.

21       Q.   You were asked a number of times during the

22   deposition whether or not a list was complete or not,

23   and you wanted to consult your report.  Do you -- do you

24   recall, a number of times, being asked those types of

Anne Holland Wilson

1    questions?

2        A.   Yes.

3        Q.   Okay.  Is it fair to say that all of the

4    opinions that you have to offer in these cases are

5    contained in your reports?

6        A.   My reports state my opinions.  That's not a

7    problem.  That's not an issue.  But when the question

8    was are they the universe of harm, you know, my report

9    says the important things.

10       Q.   And you were given some documents that it was

11   unclear whether or not you had seen them before.

12       A.   Yes.

13       Q.   Do you remember that?

14       A.   Yes.

15       Q.   Are you willing to consider any additional

16   facts or data, even if they may not support your

17   opinions?

18       A.   Sure.  And I even said I would be glad to take

19   a look at those and review them.  I'm quite sure that

20   was on my -- on the record already.

21       Q.   Okay.

22            MR. WALLACE:  I have no further

23   questions.

24                            *

Anne Holland Wilson

```
 1              E X A M I N A T I O N

 2  BY MR. DAVIS:

 3       Q.   Just a couple follow-ups.

 4            Am I still correct:  You did not utilize

 5  ISO 10993 in connection with your work on this case, did

 6  you?

 7       A.   I did review -- I answered that question, that

 8  I reviewed a risk assessment related to 10993.  What I

 9  believe I also said is I did not go back and perform a

10  gap analysis to that standard to make sure that

11  everything was -- you know, the T's were crossed and the

12  I's were dotted.

13       Q.   Does ISO 10993 address degradation?

14       A.   I assume the 10993 does address any

15  products (sic) of degradation.  There's a test in there.

16       Q.   Does it address oxidative degradation?

17            MR. WALLACE:  Objection to form.

18       A.   I don't know, off the top of my head.

19            MR. DAVIS:  That's all I have.

20            THE REPORTER:  Read and sign?

21            MR. WALLACE:  Uh-huh.

22            THE REPORTER:  Sending it where?

23            MR. WALLACE:  To me.

24            (The deposition concluded at 1:29 p.m.)
```

Anne Holland Wilson

```
1              WITNESS CORRECTIONS AND SIGNATURE

2         Please indicate changes on this sheet of paper,

    giving the change, page number, line number and reason

3   for the change.  Please sign each page of changes.

4   PAGE/LINE        CORRECTION     REASON FOR CHANGE

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____
```

Anne Holland Wilson

```
 1          S I G N A T U R E   O F   W I T N E S S

 2

 3              I, ANNE HOLLAND WILSON, have read the

 4    foregoing deposition and hereby affix my signature that

 5    same is true and correct, except as noted above.

 6

 7

                  _____

 8                    ANNE HOLLAND WILSON

 9

10    STATE OF _____*

11    COUNTY OF _____*

12

13              Before me, _____, on

      this day personally appeared ANNE HOLLAND WILSON, known

14    to me (or proved to me under oath or through

                _____) (description of identity card

15    or other document) to be the person whose name is

      subscribed to the foregoing instrument and acknowledged

16    to me that they executed the same for the purposes and

      consideration therein expressed.

17              Given under my hand and seal of office

      this _____ day of _____, 2016.

18

19

20

21              _____

                  Notary Public in and for

22                  the State of _____

23

24
```

Anne Holland Wilson

```
 1   COUNTY OF HARRIS  )

 2   STATE OF TEXAS    )

 3

 4                  REPORTER'S CERTIFICATE

 5

 6        I, KERRIENNE L. BOND, Certified Shorthand Reporter

 7   in and for the State of Texas, hereby certify that this

 8   transcript is a true record of the testimony given by

 9   the witness named herein, after said witness was duly

10   sworn by me.

11        I further certify that I am neither attorney nor

12   counsel for, related to, nor employed by any of the

13   parties to the action in which this testimony was taken.

14   Further, I am not a relative or employee of any attorney

15   of record in this cause, nor do I have a financial

16   interest in the action.

17        Certified to by me this 24th day of March 2016.

18

19

20

                  _____

21                KERRIENNE L. BOND, TEXAS CSR NO. 8537

                  Expiration Date:  12-31-16

22                Golkow Technologies, Inc.

                  877-370-3377

23                (713) 583-2442 (FAX)

24
```