Exhibit E

Duane Priddy, Ph.D.

```
 1              UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                   CHARLESTON DIVISION
 3   IN RE: ETHICON, INC., PELVIC )
 4   REPAIR SYSTEM PRODUCTS       ) Master File No.
     LIABILITY LITIGATION         ) 2:12-MD-02327
 5   THIS DOCUMENT RELATES TO THE ) MDL 2327
     FOLLOWING CASES IN WAVE 1 OF ) JOSEPH R. GOODWIN
 6   OF MDL 200:                  ) U.S. DISTRICT JUDGE
     -----------------------------)
 7   HARRIET BEACH                )
     v.                           ) CIVIL ACTION FILE
 8                                ) No. 2:12-CV-00476
     ETHICON, INC., et al.        )
 9   -----------------------------)
     SHARON BOGGS, et al.         )
10                                ) CIVIL ACTION FILE
     v.                           ) No. 2:12-CV-00368
11                                )
     ETHICON, INC., et al.        )
12   -----------------------------)
     JUDITH BRUHN, et al.         )
13                                ) CIVIL ACTION FILE
     v.                           ) No. 2:12-CV-00888
14                                )
     ETHICON, INC., et al.        )
15   -----------------------------)
     JANICE COLONNA               )
16                                ) CIVIL ACTION FILE
     v.                           ) No. 2:12-CV-01274
17                                )
     ETHICON, INC., et al.        )
18   -----------------------------)
     MARY F. CONE                 )
19                                ) CIVIL ACTION FILE
     v.                           ) No. 2:12-CV-00261
20                                )
     ETHICON, INC., et al.        )
21   -----------------------------)
     SANDRA CYRUS                 )CIVIL ACTION FILE
22   v.                           ) No. 2:12-CV-01283
     ETHICON, INC., et al.        )
23   -----------------------------)
         Videotaped Deposition of DUANE PRIDDY, PH.D.
24                   March 8, 2016
```

Duane Priddy, Ph.D.

```
 1   AMANDA DELEON, et al.        )
                                  ) CIVIL ACTION FILE
 2   v.                           ) No. 2:12-CV-00358
                                  )
 3   ETHICON, INC., et al.        )
     ----------------------------)
 4   ROSE GOMEZ, et al.           )
                                  ) CIVIL ACTION FILE
 5   v.                           ) No. 2:12-CV-00344
                                  )
 6   ETHICON, INC., et al.        )
     ----------------------------)
 7   DONNA HANKINS, et al.        )
                                  ) CIVIL ACTION FILE
 8   v.                           ) No. 2:12-CV-01011
                                  )
 9   ETHICON, INC., et al.        )
     ----------------------------)
10   BETH HARTER, et al.          )
                                  ) CIVIL ACTION FILE
11   v.                           ) No. 2:12-CV-00737
                                  )
12   ETHICON, INC., et al.        )
     ----------------------------)
13   MARY HENDRIX, et al.         )
                                  ) CIVIL ACTION FILE
14   v.                           ) No. 2:12-CV-00595
                                  )
15   ETHICON, INC., et al.        )
     ----------------------------)
16   WILMA JOHNSON                )
                                  ) CIVIL ACTION FILE
17   v.                           ) No. 2:11-CV-00809
                                  )
18   ETHICON, INC., et al.        )
     ----------------------------)
19   JANET JONES                  )
                                  ) CIVIL ACTION FILE
20   v.                           ) No. 2:12-CV-00762
                                  )
21   ETHICON, INC., et al.        )
     ----------------------------)
22
23
          Videotaped Deposition of DUANE PRIDDY, PH.D.
24
```

Duane Priddy, Ph.D.

```
 1   PAULA KRITZ, et al.           )
                                   ) CIVIL ACTION FILE
 2   v.                            ) No. 2:12-CV-00938
                                   )
 3   ETHICON, INC., et al.         )
     ----------------------------)
 4   EDITH NOLAN                    )
                                   ) CIVIL ACTION FILE
 5   v.                            ) No. 2:12-CV-00864
                                   )
 6   ETHICON, INC., et al.         )
     ----------------------------)
 7   NOEMI PADILLA                  )
                                   ) CIVIL ACTION FILE
 8   v.                            ) No. 2:12-CV-00567
                                   )
 9   ETHICON, INC., et al.         )
     ----------------------------)
10   MIRANDA PATTERSON              )
                                   ) CIVIL ACTION FILE
11   v.                            ) No. 2:12-CV-00481
                                   )
12   ETHICON, INC., et al.         )
     ----------------------------)
13   REBECCA PRATT                  )
                                   ) CIVIL ACTION FILE
14   v.                            ) No. 2:12-CV-01273
                                   )
15   ETHICON, INC., et al.         )
     ----------------------------)
16   STACY SHULTIS                  )
                                   ) CIVIL ACTION FILE
17   v.                            ) No. 2:12-CV-00654
                                   )
18   ETHICON, INC., et al.         )
     ----------------------------)
19   JANET SMITH                    )
                                   ) CIVIL ACTION FILE
20   v.                            ) No. 2:12-CV-00861
                                   )
21   ETHICON, INC., et al.         )
     ----------------------------)
22

23

          Videotaped Deposition of DUANE PRIDDY, PH.D.
24
```

Duane Priddy, Ph.D.

```
 1   RACHEL TAYLOR, et al.           )
                                     ) CIVIL ACTION FILE
 2   v.                              ) No. 2:12-CV-00765
                                     )
 3   ETHICON, INC., et al.           )
     ----------------------------)
 4   PATRICIA TYLER                  )
                                     ) CIVIL ACTION FILE
 5   v.                              ) No. 2:12-CV-00469
                                     )
 6   ETHICON, INC., et al.           )
     ----------------------------)
 7   VIRGINIA WHITE, et al.          )
                                     ) CIVIL ACTION FILE
 8   v.                              ) No. 2:12-CV-00958
                                     )
 9   ETHICON, INC., et al.           )
     ----------------------------)
10
11                    - - -
12
13        Videotaped Deposition of DUANE
14     PRIDDY, PH.D., taken on behalf of the
15     Defendants, pursuant to the stipulations
16     agreed to herein, before Maxyne Bursky,
17     Registered Professional Reporter, at 111
18     Perimeter Center West, Atlanta, Georgia,
19     on the 8th day of March, 2016, commencing
20     at the hour of 9:59 a.m.
21
22
23
24
```

Duane Priddy, Ph.D.

```
 1                INDEX TO EXAMINATION
 2    Examination                              Page
 3           By Mr. Hutchinson              8,168
 4           By Mr. Jackson                   158
 5
 6                INDEX TO EXHIBITS
 7    Exhibit          Description             Page
 8      1     Notice to take videotaped
              deposition of Dr. Priddy          8
 9
        2     Flash drive (retained by counsel)  9
10
        3     Expert report of Dr. Priddy       12
11
        4     ASTM D3895-14, 8 pages            26
12
        5     ASTM F1980-02, 6 pages            57
13
        6     Polymer Stabilizers, A Survey with
14            Reference to Possible Applications
              in the Conservation Field by Dr.
15            de la Rie                         61
16      7     Report of Dr. Moy from Ethicon,
              ETH.MESH.15958452-469             72
17
        8     Antioxidant Plaox-DLTDP, 1 page   95
18
        9     Seven Year Dog Study by Thomas
19            Barbolt, 4 pages plus
              ETH.MESH.11336183-259, 11336071-088,
20            11336165-177, 09888187-223 and
              11336181-183                     135
21
       10     Diagram of elongation and break
22            strength, 1 page                 140
23
                        -  -  -
24
```

Duane Priddy, Ph.D.

```
 1    APPEARANCES OF COUNSEL:
 2    On behalf of the Plaintiffs:
 3            EDWARD A. WALLACE, Esq.
              TIMOTHY E. JACKSON, Esq.
 4            Wexler Wallace LLP
              55 West Monroe Street
 5            Suite 3300
              Chicago, Illinois 60603
 6            312.346.2222
              312.346.0022  (facsimile)
 7            eaw@wexlerwallace.com
              tej@wexlerwallace.com
 8
              FIDELMA L. FITZPATRICK, Esq.
 9            Motley Rice LLC
              321 South Main Street
10            Providence, Rhode Island 02903
              401.457.7728
11            401.457.7708  (facsimile)
              ffitzpatrick@motleyrice.com
12
13    On behalf of the Defendants:
14            CHAD R. HUTCHINSON, Esq.
              Butler Snow, LLP
15            Suite 1400
              1020 Highland Colony Parkway
16            Post Office Box 6010
              Ridgeland, Mississippi 39158-6010
17            601.948.5711
              601.985.4500  (facsimile)
18            chad.hutchinson@butlersnow.com
19
20    Also Present:
21            PHILIP KIMBALL, Videographer
22
23                      -  -  -
24
```

Duane Priddy, Ph.D.

```
 1                    (The signature of the witness to the

 2                     deposition was reserved.)

 3              THE VIDEOGRAPHER:  We are now on the

 4       record.  My name is Philip Kimball.  I'm

 5       a videographer for Golkow Technologies.

 6       Today's date is March 8, 2016, the time

 7       is 9:59 a.m.  This video deposition is

 8       being held in Atlanta, Georgia, in the

 9       matter of Harriet Beach versus Ethicon,

10       Incorporated, et al., Case Number

11       2:12-CV-00476.

12              This case is being heard in the

13       United States District Court, Southern

14       District of West Virginia at Charleston.

15       The deponent is Duane Priddy.

16              Counsel, will you please identify

17       yourselves for the record.

18              MR. HUTCHINSON:  Chad Hutchinson,

19       counsel for Ethicon and Johnson &

20       Johnson.

21              MR. JACKSON:  Tim Jackson on behalf

22       of the plaintiffs.

23              MR. WALLACE:  Ed Wallace on behalf

24       of the plaintiffs.
```

Duane Priddy, Ph.D.

```
 1            MS. FITZPATRICK:  Fidelma

 2       Fitzpatrick on behalf of the plaintiffs.

 3            THE VIDEOGRAPHER:  The court

 4       reporter is Maxyne Bursky and will now

 5       swear in the witness.

 6                   DUANE PRIDDY,

 7  having been first duly sworn, testifies as follows:

 8  EXAMINATION

 9  BY MR. HUTCHINSON:

10       Q.   Good morning, Dr. Priddy.  How are you?

11       A.   I'm doing well.

12       Q.   Good.  My name is Chad Hutchinson.  I'm

13  counsel for Ethicon and Johnson & Johnson.  Do you

14  understand you are under oath?

15       A.   I do.

16       Q.   Do you understand you are giving testimony

17  subject to the penalty of perjury?

18       A.   Yes.

19       Q.   What is your specialty?

20       A.   Polymer chemistry, materials science.

21       Q.   Do you have any subspecialty?

22       A.   No.

23            (Priddy Deposition Exhibit 1 was

24       marked for identification.)
```

Duane Priddy, Ph.D.

1    BY MR. HUTCHINSON:

2         Q.   I have handed you what we will mark as

3    Exhibit 1 to your deposition.  Did you bring some

4    documents responsive to that notice?

5              (Witness reviewing document.)

6         A.   I read through this and I believe the

7    documents provided to you are responsive, yes.

8              (Priddy Deposition Exhibit 2 was

9         marked for identification.)

10   BY MR. HUTCHINSON:

11        Q.   You have handed me a flash drive that

12   we'll mark as Exhibit 2.

13             MR. HUTCHINSON:  And, Counsel, I will

14        just retain, since this is my copy, we're

15        going to mark it Exhibit 2, but I'll just

16        retain control over it; is that fair?

17             MR. JACKSON:  That's fine.

18   BY MR. HUTCHINSON:

19        Q.   What is included on the flash drive that

20   your counsel handed me?

21        A.   A copy of my report, some documents that I

22   have reviewed, my billing record, my time log in

23   this matter.  That's all I recall offhand.

24        Q.   Does the flash drive contain all of the

Duane Priddy, Ph.D.

```
 1   documents that you reviewed and relied upon in

 2   reaching your opinions?

 3        A.   I believe so.

 4        Q.   Have you reviewed this flash drive that

 5   your lawyer has handed me?

 6        A.   Yes.

 7        Q.   Have you been deposed as an expert in the

 8   AMS litigation?

 9        A.   Yes.

10        Q.   Was that the mesh litigation?

11        A.   Yes.

12        Q.   Were you an expert, a polymer science

13   expert in that litigation?

14             MR. JACKSON:   Objection, form.

15        A.   Yes.

16   BY MR. HUTCHINSON:

17        Q.   How many times have you been deposed in

18   the AMS litigation?

19        A.   Once.

20        Q.   Have you read your testimony transcript?

21        A.   No.

22        Q.   When were you first contacted in this

23   case?

24        A.   I'd say last September maybe.
```

Duane Priddy, Ph.D.

1     Q.   Of 2015?

2     A.   Yes.

3     Q.   Who contacted you?

4     A.   Mr. Wallace.

5     Q.   What did he ask you to do?

6          MR. JACKSON:  Objection, form.

7     A.   Serve as an expert witness in the Ethicon

8   mesh matter.

9   BY MR. HUTCHINSON:

10    Q.   Anything else specifically that he asked

11  you to do?

12    A.   No.

13    Q.   Have you ever had any contacts with Mr.

14  Wallace before?

15    A.   Yes.

16    Q.   In the AMS litigation?

17    A.   Correct.

18    Q.   Did you reach opinions similar in the AMS

19  litigation as you have in this litigation?

20         MR. JACKSON:  Objection.

21    A.   I did not review my AMS testimony, so I

22  don't recall.

23  BY MR. HUTCHINSON:

24    Q.   Did you opine in the AMS litigation that

Duane Priddy, Ph.D.

1    the mesh degrades with oxidation?

2              MR. JACKSON:  Objection, form.

3         A.   I believe so.

4              (Priddy Deposition Exhibit 3 was

5         marked for identification.)

6    BY MR. HUTCHINSON:

7         Q.   Doctor, I will hand you what we'll mark as

8    Exhibit 3 to your deposition.  Do you recognize that

9    as the report that you submitted in this case?

10             (Witness reviewing document.)

11        A.   Yes.

12        Q.   Is it complete and accurate?

13             MR. JACKSON:  Counsel, I just want

14        to note on the record that there are two

15        emails at the end of this document which

16        are not part of Dr. Priddy's report.

17   BY MR. HUTCHINSON:

18        Q.   Doctor, is that complete and accurate?

19        A.   It looks, yes, it looks like I might have

20   to update my list of scientific articles and

21   publications, but other than that, it's accurate.

22        Q.   Are you talking about you need to update

23   your CV in there?

24        A.   Yes.

Duane Priddy, Ph.D.

1        Q.    Otherwise, that report is complete and

2    accurate; is that fair?

3        A.    Yes.

4        Q.    Did anybody else work on that report other

5    than you?

6        A.    No.

7        Q.    How much time did you spend preparing that

8    report?

9        A.    Maybe twelve hours.  I'm not sure.

10        Q.    Would the time that you spent preparing

11    that report be reflected on the flash drive that you

12    handed me before the deposition?

13        A.    Probably not completely because normally I

14    under-record the time I actually spend.  I actually

15    generally spend more than what I write down.

16        Q.    Why do you under-record your time?

17        A.    Just because I -- I just like to make sure

18    that I'm not overcharging, so I tend to be

19    conservative when I'm recording my time.

20        Q.    Doctor, are all the opinions that you

21    intend to offer in this case included in your expert

22    report?

23        A.    I may end up doing a supplemental report.

24        Q.    But as we sit here right now, are all the

Duane Priddy, Ph.D.

1   opinions that you have so far included within your

2   expert report marked as Exhibit 3?

3        A.   Yes.

4        Q.   Do you have plans sitting here now to do a

5   supplemental report?

6        A.   Not specifically, but I may.

7        Q.   Why are you considering doing a

8   supplemental report?

9        A.   While I was preparing for my deposition,

10  reading through everything, I just thought it might

11  be wise for me to do a supplemental report in the

12  future.

13       Q.   On what specific issue would you do a

14  supplemental report on, sir?

15            MR. JACKSON:  Objection, form.

16       A.   I'm not sure at this point.  Maybe my

17  review of the results in the 80s of Ethicon's

18  research, some things caught my eye that I thought

19  were important and I might generate some opinions

20  about those in the future.

21  BY MR. HUTCHINSON:

22       Q.   But sitting here today, if you do a

23  supplemental report, it is your plan to do a

24  supplemental report only on the 1980 documents from

Duane Priddy, Ph.D.

1    Ethicon; is that fair?

2              MR. JACKSON:   Objection, form.

3         A.   At this point, that's -- yeah.

4    BY MR. HUTCHINSON:

5         Q.   Your reliance list, Doctor, included in

6    your expert report, is it complete and accurate?

7         A.   I believe so, yes.

8         Q.   Your CV that's included in your expert

9    report, is that the most recent version if you added

10   the publications that you referenced earlier?

11        A.   Yes.

12        Q.   What publications would you need to add to

13   your CV to make it current?

14        A.   I published a paper -- well, it was just

15   accepted by the peer reviewers -- that I am going

16   to present at a conference here in May, and I'll

17   add that.

18        Q.   What did you present about?

19        A.   It was understanding the science behind

20   the failure of exercise balls.

21        Q.   Doctor, have you ever published anything

22   regarding mesh or Prolene?

23        A.   No.

24        Q.   Have you ever published anything regarding

Duane Priddy, Ph.D.

1    polypropylene?

2         A.   Not that I recall.

3         Q.   Doctor, have you ever given any

4    presentations on mesh, Prolene, or polypropylene?

5         A.   No.

6         Q.   Have you ever worked for a medical device

7    company before?

8         A.   Yes.

9         Q.   Did your work focus on mesh or

10   polypropylene?

11        A.   No.

12        Q.   Other than the attorneys here, have you

13   ever discussed your opinions with anybody else?

14             MR. JACKSON:   Objection, form.

15        A.   Are you talking about the opinions in this

16   report?

17   BY MR. HUTCHINSON:

18        Q.   Yes.

19        A.   No.

20        Q.   Is it fair to say you have never discussed

21   your opinions with any type of scientist or medical

22   doctor or engineer; is that fair?

23        A.   That is correct.

24        Q.   Never communicated your opinions to FDA,

Duane Priddy, Ph.D.

```
1    correct?

2         A.    That's correct.

3         Q.    Or any scientific organization?

4               MR. JACKSON:   Objection, form.

5         A.    That's correct.

6    BY MR. HUTCHINSON:

7         Q.    Doctor, how many hours did you spend

8    reviewing the internal Ethicon documents?

9         A.    I would say probably 14, 15 hours.

10        Q.    Did you sign a confidentiality agreement

11   with respect to the documents you received from

12   Ethicon?

13        A.    Well, I mean, as part of my retainer

14   agreement there's confidentiality in there that I'm

15   not going to share or publish or discuss.

16        Q.    I understand.  Is that retainer agreement

17   included on Exhibit 2 which is the flash drive that

18   was handed to me before the deposition?

19        A.    I'm not sure.

20        Q.    Where is the retainer agreement?

21        A.    I would have a copy probably on my

22   computer, or if not, a hard copy in my files.

23        Q.    When is the last time you have seen the

24   retainer agreement?
```

Duane Priddy, Ph.D.

```
1         A.   I don't recall.

2         Q.   Any reason to believe that it's been lost

3    or destroyed?

4         A.   No.

5         Q.   Other than your retainer agreement,

6    though, did you sign any type of paper regarding a

7    confidentiality agreement with respect to the

8    Ethicon documents you reviewed?

9         A.   I don't believe so.

10        Q.   Do you advertise your services?

11        A.   Yes.

12        Q.   On the internet?

13        A.   Yes.

14        Q.   Anywhere else?

15        A.   Yes.

16        Q.   Where?

17        A.   I'm listed as an expert on three or four

18   different websites, I believe, that aren't mine.

19        Q.   Other than the internet, do you advertise

20   your services anywhere?

21        A.   No.

22        Q.   Your billing rate is $375 an hour for

23   record review and 550 for testimony?

24        A.   Correct.
```

Duane Priddy, Ph.D.

1      Q.   You don't consider yourself an FDA expert,

2   do you?

3              MR. JACKSON:   Objection, form.

4      A.   I mean, I have done a lot of interaction

5   with the FDA when I was at Dow, I did a lot of

6   extraction studies and those kind of things to help

7   fill out paperwork for FDA applications.

8   BY MR. HUTCHINSON:

9      Q.   Do you consider yourself a regulatory

10  expert?

11             MR. JACKSON:   Objection, form.

12     A.   Again, I have done a lot of interaction

13  with government regulatory agencies.

14  BY MR. HUTCHINSON:

15     Q.   I understand that, but do you hold

16  yourself out as an expert, sir?

17             MR. JACKSON:   Objection to form.

18     A.   With regard to FDA?

19  BY MR. HUTCHINSON:

20     Q.   Yes.

21     A.   I know a lot about it.  That's all I can

22  say.

23     Q.   I understand, but my question is:  Do you

24  consider yourself a regulatory or FDA expert?

Duane Priddy, Ph.D.

1          MR. JACKSON:  Objection, calls for a

2      legal conclusion.

3      A.   Let's put it this way:  I don't advertise

4  myself as an expert for FDA.

5  BY MR. HUTCHINSON:

6      Q.   Is there anything on your CV that reflects

7  your expertise as a regulatory or FDA expert?

8      A.   No.

9      Q.   Doctor, you are not a pathologist?

10     A.   I am not a pathologist.

11     Q.   Not a medical doctor?

12     A.   I am not a medical doctor.

13     Q.   Not a toxicologist?

14     A.   No.

15     Q.   Not a biostatistician?

16     A.   What?

17     Q.   A biostatistician?

18     A.   A biostatistician, I do a lot of

19  statistical analysis, but bio, not a

20  biostatistician.

21     Q.   Are you an epidemiologist?

22     A.   No, I'm not.

23     Q.   Are you an expert in biomaterials?

24          MR. JACKSON:  Objection, form.

Duane Priddy, Ph.D.

```
1          A.   I have done a lot of work with different

2    biomaterials.  Again, it's difficult to quantify

3    expert or non-expert, but I have experience working

4    with biomaterials.

5    BY MR. HUTCHINSON:

6          Q.   So it is difficult for you to quantify

7    whether or not you are an expert in biomaterials?

8    Did I understand your testimony correctly?

9               MR. JACKSON:  Objection, form.

10         A.   It's a non-quantifiable question, in my

11   thinking.

12   BY MR. HUTCHINSON:

13         Q.   Do you consider yourself an expert, sir,

14   in biomaterials?

15              MR. JACKSON:  Objection, asked and

16         answered.

17         A.   All I can say is I know a lot about

18   biomaterials.

19   BY MR. HUTCHINSON:

20         Q.   Do you consider yourself an expert, is my

21   question?

22              MR. JACKSON:  Objection to form.

23         A.   I'm an expert in materials.

24   BY MR. HUTCHINSON:
```

Duane Priddy, Ph.D.

```
1        Q.   What about biomaterials?

2        A.   And biomaterials are included in

3   materials.

4        Q.   Are you an expert in biocompatibility?

5        A.   Again, I know a lot about

6   biocompatibility.  It's just difficult for me to

7   give a yes-no answer to that when I know a lot about

8   it, but, yeah.

9        Q.   Doctor, are you an expert in the

10  biological response to foreign bodies?

11           MR. JACKSON:  Objection, form.

12       A.   Again, I know a lot about it but I'm

13  not a pathologist, so.

14  BY MR. HUTCHINSON:

15       Q.   Do you consider yourself an expert in the

16  biological response to foreign bodies?

17           MR. JACKSON:  Objection, form.

18       A.   I'll just say I know a lot about it.

19  BY MR. HUTCHINSON:

20       Q.   You won't answer that question?

21       A.   I just did.

22           MR. JACKSON:  He just gave the

23       answer.

24       A.   It's not a simple yes-no answer.
```

Duane Priddy, Ph.D.

```
 1   BY MR. HUTCHINSON:

 2        Q.   Do you consider yourself an expert in the

 3   design of surgical mesh?

 4             MR. JACKSON:   Objection, form.

 5        A.   As far as the design includes materials

 6   selection for it, yes.

 7   BY MR. HUTCHINSON:

 8        Q.   Do you consider yourself an expert in

 9   female anatomy?

10        A.   No.

11        Q.   Doctor, let's talk about the testing you

12   did.  You did some accelerated aging testing; is

13   that correct?

14             MR. JACKSON:   Objection, form.

15        A.   The testing I did was called oxidation

16   induction time testing.  It is an accelerated test,

17   yes.

18   BY MR. HUTCHINSON:

19        Q.   And at what temperature did you do it?

20        A.   200 degrees Centigrade.

21        Q.   Why did you choose that number?

22        A.   Because it's the recommended temperature

23   in the ASTM D3895 OIT testing standard.

24        Q.   And you followed the protocols from the
```

Duane Priddy, Ph.D.

1    ASTM D3895 and ASTM 1980, correct?

2              MR. JACKSON:  Object to the form.

3         A.   1980, no, I did the ASTM D3895.

4    BY MR. HUTCHINSON:

5         Q.   Did you follow the protocols from the ASTM

6    1980?

7         A.   I would say no.  The 1980 is specific to

8    packaging for medical devices, and so I didn't,

9    since this was not packaging for a medical device, I

10   did not follow that.

11        Q.   Doctor, your expert report, Page 3, states

12   that you followed the Q10 protocol as described in

13   ASTM F1980, correct?

14        A.   Correct.

15        Q.   What was the Q10 protocol that you

16   followed?

17        A.   That protocol is basically a mathematical

18   protocol where you operate under the assumption, and

19   it is an assumption, that the oxidation rate or

20   reaction rate doubles the kinetics of the oxidation

21   reaction, doubles every 10 degrees Centigrade

22   increase in temperature.  So that protocol is used

23   to extrapolate from the elevated temperature to make

24   predictions, and I emphasize the word predictions,

Duane Priddy, Ph.D.

```
 1   because that's all it is, of what would happen at

 2   the lower temperatures.  So that's what's referred

 3   to by the Q10 protocol.

 4        Q.   Is the Q10 protocol defined in the ASTM

 5   1980 protocol?

 6             MR. JACKSON:  Objection, form.

 7        A.   Yes.

 8   BY MR. HUTCHINSON:

 9        Q.   Is that what you followed?

10             MR. JACKSON:  Objection, form.

11        A.   I followed the Q10 protocol regarding the

12   doubling of reaction rate every 10 degrees.  That

13   methodology for calculation is what I followed.

14   BY MR. HUTCHINSON:

15        Q.   Did you follow anything else from ASTM

16   1980?

17             MR. JACKSON:  Objection, form.

18        A.   No.

19   BY MR. HUTCHINSON:

20        Q.   Are you giving any life expectancy

21   opinions regarding Prolene?

22             MR. JACKSON:  Objection, form.

23        A.   No, other than just general, not specific.

24   BY MR. HUTCHINSON:
```

Duane Priddy, Ph.D.

1      Q.   Are your general life expectancy opinions

2   regarding Prolene included in your expert report?

3      A.   My expert opinion is that its life

4   expectancy is not indefinite, that it degrades so

5   it's not going to last forever.

6      Q.   But you are not giving any specific life

7   expectancy opinions, are you, sir?

8          MR. JACKSON:   Objection, form.

9      A.   No.

10          (Priddy Deposition Exhibit 4 was

11      marked for identification.)

12   BY MR. HUTCHINSON:

13      Q.   I hand you what we'll mark as Exhibit 4 to

14   your deposition.

15          (Witness reviewing document.)

16      Q.   This is the ASTM that you followed,

17   correct?

18      A.   Yes.

19      Q.   Is this the version that you followed?

20      A.   I'm not sure if it's the dash 14 version

21   or not.  I would think it probably is not the dash

22   14 version.  It's probably an earlier version,

23   because I have been doing OIT for many years, much

24   earlier than 2014.

Duane Priddy, Ph.D.

1      Q.   But 2014 -- or 14, rather, stands for

2    the year, correct?

3      A.   Correct.

4      Q.   You used an older version of the ASTM

5    3895?

6           MR. JACKSON:   Objection, form.

7      A.   Yes.

8    BY MR. HUTCHINSON:

9      Q.   Why?

10     A.   Because I have been doing it for many

11   years preceding '14, and once I get the lab set up

12   doing a specific test, following a specific standard

13   in a specific way, I just don't deviate it.

14     Q.   Sir, did you ever compare the version, the

15   older version that you used of 3895 to the most

16   recent ASTM 3895 2014?

17     A.   No.

18     Q.   Are you aware of any changes between those

19   two ASTM protocols?

20     A.   I would have to study it in depth to look

21   for those differences.

22     Q.   But you can't tell us those differences

23   now?

24     A.   No.

Duane Priddy, Ph.D.

```
1        Q.    Doctor, on Page 2 of your expert report,

2   you did what is called oxidative induction time

3   testing; is that correct?

4        A.    Correct.

5        Q.    You generated some -- I'm going to call

6   that, by the way, OIT for short.  Are you and I on

7   the same page?

8        A.    Absolutely.

9        Q.    You generated some OIT values contained in

10  your report; is that right?

11       A.    That is correct.

12       Q.    And you used OIT to compare the oxidative

13  stability of 10 different Ethicon mesh samples?

14       A.    That's correct.

15       Q.    Who conducted the tests?

16       A.    A technician at Materials Engineering,

17  Inc. located in Virgil, Illinois.  They are an A2LA

18  certified laboratory.

19       Q.    How far away is that from your office?

20       A.    About 180 miles probably.

21       Q.    Do you know the names of the person who

22  did the testing?

23       A.    Yes.

24       Q.    What were their names?
```

Duane Priddy, Ph.D.

1       A.   Steve Johnson is the technician that runs

2  that test.

3       Q.   Were you present when Steve Johnson did

4  any of the tests?

5       A.   No.

6       Q.   Did you direct the work of Steve Johnson

7  in any way?

8            MR. JACKSON:   Objection, form.

9       A.   To the extent of how I wanted the mesh

10  samples analyzed, yes.

11  BY MR. HUTCHINSON:

12      Q.   Did you provide any written correspondence

13  to Steve Johnson on how to do the tests?

14      A.   No.

15      Q.   Do you know how long Steve Johnson took to

16  do the tests?

17           MR. JACKSON:   Objection, form.

18      A.   About a week.

19  BY MR. HUTCHINSON:

20      Q.   Eight hours a day?

21      A.   I wasn't there to watch him.  I don't

22  know.

23      Q.   Do you know how much specific time Steve

24  Johnson did in doing the tests?

Duane Priddy, Ph.D.

```
 1        A.    No.

 2        Q.    Has Steve Johnson sent you a bill for

 3   doing those tests?

 4        A.    I have a credit card on file with him and

 5   when he's done, he just charges my card.

 6        Q.    Has he charged your card yet?

 7        A.    I have to check.  I don't recall offhand.

 8        Q.    Do you have any idea how much money Steve

 9   Johnson is going to charge you to do the tests that

10   are outlined in your expert report?

11        A.    Well, I know that he charges me about $200

12   to run an OIT test and since he ran these ten tests,

13   I can do the math.

14        Q.    Doctor, do you know if Steve Johnson had

15   any help doing the tests?

16        A.    He has another technician that works with

17   him.

18        Q.    What's that technician's name?

19        A.    It was a new hire.  I don't even recall,

20   Mark somebody.

21        Q.    Do you know how this new hire has been

22   trained?

23        A.    I don't.

24        Q.    Have you ever met this new hire?
```

Duane Priddy, Ph.D.

1      A.   No.

2      Q.   Do you know how much time this new hire

3   named Mark spent on this test?

4           MR. JACKSON:   Objection, form.

5      A.   I don't think he has done anything on the

6   test.  I think Steve Johnson did it all.

7   BY MR. HUTCHINSON:

8      Q.   And Steve Johnson did this DSC test,

9   correct?

10      A.   That's correct.

11      Q.   Differential scanning calorimetry?

12      A.   That's correct.

13      Q.   He used some samples of Ethicon's mesh,

14   right?

15      A.   That's correct.

16      Q.   Did you give the samples to Steve Johnson?

17      A.   I sent them to him.

18      Q.   Is that reflected in the chain of custody

19   documents?

20      A.   It is.

21      Q.   Have you ever received any chain of

22   custody documents from Steve Johnson?

23      A.   No.

24      Q.   Steve Johnson was the one who actually

Duane Priddy, Ph.D.

1    handled the mesh, correct?

2         A.    That is correct.

3         Q.    Have you ever asked for any chain of

4    custody documents from Steve Johnson?

5         A.    I just talked to him to make sure that he

6    received them. He said yes, I have. But I confirmed

7    his receipt of the meshes that I sent to him.

8         Q.    But you have no chain of custody documents

9    showing what Steve Johnson did with the mesh,

10   correct?

11             MR. JACKSON:   Objection, form.

12        A.    I know he received them and analyzed them

13   and he still has them.

14   BY MR. HUTCHINSON:

15        Q.    How did you ship the samples to Steve

16   Johnson?

17        A.    UPS.

18        Q.    Where did you get the samples to ship to

19   Steve Johnson?

20        A.    From Fidelma, an attorney.

21        Q.    When did you receive them?

22        A.    I'd have to look at the chain of custody

23   documents.   I believe it was mid-December.

24        Q.    What products did you receive?

Duane Priddy, Ph.D.

1     A.   I received six different TVTs and four

2  different Gynemeshes.

3     Q.   Would you describe the Gynemeshes that you

4  received?

5     A.   Describe them?

6     Q.   Yes, sir.

7          MR. JACKSON:  Objection, form.

8  BY MR. HUTCHINSON:

9     Q.   Describe them for the jury.  What did they

10  look like?

11     A.   It's just a strip of polypropylene mesh

12  between, I assume, some stainless steel rods.

13     Q.   How else would you describe the Gynemesh

14  that you received?

15          MR. JACKSON:  Objection, form.

16     A.   That's about all I can say about it.

17  BY MR. HUTCHINSON:

18     Q.   How was the Gynemesh that you received

19  with the two stainless rods different from the six

20  TVTs that you received?

21          MR. JACKSON:  Objection, form.

22     A.   They both had mesh between metal rods and

23  I didn't specifically study exactly how they were

24  different so I can't answer that question.

Duane Priddy, Ph.D.

```
 1    BY MR. HUTCHINSON:

 2        Q.   So all products that you received had mesh

 3    between two stainless steel rods; is that correct?

 4        A.   That's my recollection, yes.

 5        Q.   Doctor, let's talk about the sampling that

 6    was used for the DSC.  DSC is a test, by the way,

 7    right?

 8        A.   Yes.

 9        Q.   That's an analytical test?

10        A.   It's a piece of equipment.

11        Q.   And the purpose of the equipment is in

12    essence to melt the product inside, fair enough?

13            MR. JACKSON:  Objection, form.

14        A.   No.

15    BY MR. HUTCHINSON:

16        Q.   What's the purpose of the equipment?

17        A.   It's to detect thermal heat flow, whether

18    it be cooling or heating with plastic materials.

19        Q.   But you do that by melting the plastic

20    material, correct?

21            MR. JACKSON:  Objection, form.

22        A.   Not necessarily.

23    BY MR. HUTCHINSON:

24        Q.   Did you melt the samples that you received
```

Duane Priddy, Ph.D.

1    in this case?

2        A.   At 200 degrees, that's above the melting

3    point so they would be melted, yes.

4        Q.   How did you make the specimen sample?

5        A.   It was cut with scissors.

6        Q.   In your lab or in Steve Johnson's lab?

7        A.   Steve Johnson did the cutting.

8        Q.   Were you supervising the cutting of the

9    samples with Steve Johnson?

10       A.   I was not present, but we discussed the

11   protocol of how to collect the samples.

12       Q.   What was the average sheet thickness of

13   the sample?

14            MR. JACKSON:   Objection, form.

15       A.   I don't recall.

16   BY MR. HUTCHINSON:

17       Q.   Did you ever ask Steve Johnson about what

18   the average sheet thickness was of the sample?

19       A.   I asked him what the thickness was.

20       Q.   What did he tell you?

21       A.   I don't recall.  It was less than -- I

22   don't recall.

23       Q.   Why is that not included in your expert

24   report?

Duane Priddy, Ph.D.

```
 1        A.    Because it wasn't relevant to my opinion.

 2        Q.    Doctor, was this test sample compressed or

 3   molded into a sheet format?

 4        A.    No.

 5        Q.    Why not?

 6        A.    Because that would have given the sample

 7   another heat history, and I wanted to have the

 8   samples tested in their original use shape as

 9   monofilaments.

10        Q.    How many times was the DSC test run?

11              MR. JACKSON:  Objection, form.

12        A.    It's run once, and I had him run it in

13   pure oxygen, switching from nitrogen to oxygen, and

14   I also asked him to run it switching from nitrogen

15   to air, so he ran it twice for each sample.

16   BY MR. HUTCHINSON:

17        Q.    Do you know how long he ran it in pure

18   nitrogen?

19        A.    You run it for so many minutes until the

20   equipment is stable, get a smooth baseline.  That's

21   generally five minutes or so at 200.

22        Q.    But my question is, do you know how long

23   Steve Johnson ran it in pure nitrogen?

24        A.    Whatever the standard dictates, and I
```

Duane Priddy, Ph.D.

```
 1   believe it's five minutes.
 2       Q.   Do you know how long Steve Johnson ran the
 3   sample or ran the test, rather, in pure oxygen?
 4           MR. JACKSON:  Objection, asked and
 5       answered.
 6       A.   It's in the data.  Once you switch from
 7   nitrogen to oxygen, that's time 0, and then you run
 8   it in pure oxygen until the exotherm is over and
 9   that gives you your OIT data.
10   BY MR. HUTCHINSON:
11       Q.   Let's look at Exhibit 4 and turn with me
12   to Page 2.
13       A.   Okay.
14       Q.   Under "9. sampling."  Do you see that?
15       A.   Yes.
16       Q.   9.1 says, "The following sample
17   preparation procedures are recommended:  the test
18   sample is compression molded into sheet format."
19           Did I read that correctly?
20       A.   Absolutely.
21       Q.   Why did you not follow that protocol?
22           MR. JACKSON:  Objection, form.
23       A.   Because it's recommended and, as I said
24   previously, that would require another heat history
```

Duane Priddy, Ph.D.

1    on the sample, and I wanted to look at pristine mesh

2    samples in their use state.  And I didn't want to

3    alter that.

4             So that would have affected the results to

5    have done it that way.  And I emphasize the word

6    "recommended," because you don't have to do it that

7    way, it's just the recommended.

8        Q.   I understand, but fair to say that you

9    didn't follow the recommended sampling procedure in

10   ASTM 3895, correct?

11            MR. JACKSON:  Objection, form.

12       A.   Absolutely for good reason, it would have

13   affected the results negatively.

14   BY MR. HUTCHINSON:

15       Q.   Doctor, there is nothing in your expert

16   report about how the samples were prepared, is

17   there?

18       A.   Not in the report directly, no.

19       Q.   Why did you not include that in your

20   expert report?

21       A.   Because it has no bearing on my opinions.

22       Q.   Doctor, did you do any type of statistical

23   calculations to confirm that the results you got

24   from this test that Steve Johnson did were

Duane Priddy, Ph.D.

1   statistically significant?

2          MR. JACKSON:  Objection, form.

3      A.   What I did do --

4   BY MR. HUTCHINSON:

5      Q.   We are going to get to what you did do in

6   a minute.  I want to know the answer to my question

7   first and then we'll get there.

8          MR. JACKSON:  Counsel, you have to

9          let him answer the question.

10  BY MR. HUTCHINSON:

11     Q.   Did you do any type of statistical

12  calculations to --

13     A.   Yes.

14     Q.   Are those statistical calculations

15  included in your expert report?

16     A.   No.

17     Q.   Why not?

18     A.   Just didn't include it.

19     Q.   Any reason?

20     A.   No.

21     Q.   What type of statistical calculations did

22  you do?

23     A.   I had Steve Johnson extract the additives

24  from the mesh samples and to determine if the OIT

Duane Priddy, Ph.D.

```
 1   numbers data gave a correlation with the level of

 2   antioxidant in the mesh samples.  And the reason I

 3   did that is just to confirm that there's a

 4   statistical correlation between the level of

 5   antioxidant and the OIT values because if there

 6   hadn't have been, then I would have been concerned

 7   about the validity of the results.

 8        Q.   Doctor, let's look at Exhibit 4 for a

 9   minute.  This is that ASTM 3895.

10        A.   Yes.

11        Q.   Bottom of Page 1, 4.3 states, "Unless

12   otherwise specified, the analysis temperature used

13   in this test has been arbitrarily set at 200 degrees

14   C."

15             Do you see that?

16        A.   Yes.

17        Q.   That's the temperature you used?

18        A.   Correct.

19        Q.   You used an arbitrary number?

20             MR. JACKSON:  Objection, form.

21        A.   I used the number specified in the

22   standard, yes.

23   BY MR. HUTCHINSON:

24        Q.   And the number specified in the standard
```

Duane Priddy, Ph.D.

```
 1    is an arbitrary number, correct?

 2              MR. JACKSON:  Objection, form.

 3         A.   It is the number that I run.  Every time I

 4    do an OIT test I do it at 200 degrees.  That's just

 5    always the way I run it.

 6    BY MR. HUTCHINSON:

 7         Q.   I understand that, but the number that you

 8    used is an arbitrary number according to the ASTM

 9    standard, correct?

10              MR. JACKSON:  Objection, form.

11         A.   If they -- they define it as an arbitrary

12    number, so.

13    BY MR. HUTCHINSON:

14         Q.   Doctor, would you ever attempt to publish

15    a paper in a peer-reviewed journal using arbitrary

16    data?

17              MR. JACKSON:  Objection, form.

18         A.   I certainly would attempt to publish an

19    article in a paper based upon following an ASTM

20    standard.

21    BY MR. HUTCHINSON:

22         Q.   Would you ever attempt to publish anything

23    in a peer-reviewed journal with an arbitrary number?

24              MR. JACKSON:  Objection, form.
```

Duane Priddy, Ph.D.

```
 1        A.   If it is specified in the standard, yes.

 2   BY MR. HUTCHINSON:

 3        Q.   Doctor, your report states that the mesh

 4   sample was heated to 200 degrees under pure

 5   nitrogen; is that right?

 6        A.   Yes.

 7        Q.   That's the temperature at which you

 8   conducted this aging study?

 9             MR. JACKSON:  Objection, form.

10        A.   Correct.

11   BY MR. HUTCHINSON:

12        Q.   That's also known as the accelerated aging

13   temperature, correct?

14        A.   Yes.

15        Q.   That equates to roughly 392 degrees

16   Fahrenheit?

17        A.   Correct.

18        Q.   That's about 300 degrees Fahrenheit above

19   the normal temperature of a human being; is that

20   correct?

21        A.   Correct.

22        Q.   And it is well above the melting point of

23   Prolene, isn't it?

24             MR. JACKSON:  Objection, form.
```

Duane Priddy, Ph.D.

1        A.    Yes, it is.

2    BY MR. HUTCHINSON:

3        Q.    What is the melting point of Prolene?

4        A.    165 degrees Centigrade approximately.

5        Q.    Doctor, moving to Page 2, at the top under

6    Significance and Use, are you there with me?

7        A.    Yes.

8        Q.    It says, "The OIT is a qualitative

9    assessment of the level (or degree) of stabilization

10   of the material tested."

11             Do you see that?

12       A.    Yes.

13       Q.    And a qualitative test is different from a

14   quantitative test, isn't it, sir?

15       A.    That's correct.

16       Q.    A qualitative test doesn't give you a

17   lifetime prediction, does it?

18             MR. JACKSON:  Objection, form.

19   BY MR. HUTCHINSON:

20       Q.    Doctor?

21       A.    It's standard practice to use data from

22   these kind of tests to do lifetime predictions,

23   realizing it's only a prediction.  With that

24   understanding that it has to be validated by actual

Duane Priddy, Ph.D.

1  testing.  If there's a red flag there, it will just

2  give you a red flag.  And so with that

3  understanding, as I say, I routinely use this test

4  for doing lifetime predictions.

5       Q.   I understand, but with that understanding,

6  a qualitative test does not give you lifetime

7  predictions, does it?

8            MR. JACKSON:  Objection, form.

9       A.   Yeah, It gives you predictions, certainly.

10  BY MR. HUTCHINSON:

11       Q.   It doesn't give you lifetime facts or

12  lifetime specifics, does it?

13            MR. JACKSON:  Objection, form.

14       A.   Every time you use an accelerated test

15  protocol to get a prediction, it's only a prediction

16  and you have to follow it up with real life, live

17  tests to validate.

18  BY MR. HUTCHINSON:

19       Q.   And you have to follow it up with real

20  time aging tests, correct?

21            MR. JACKSON:  Objection, form.

22       A.   That is correct.

23  BY MR. HUTCHINSON:

24       Q.   Doctor, you wouldn't rely on a qualitative

Duane Priddy, Ph.D.

```
 1    test to determine how long a polymer would retain

 2    its physical properties, would you?

 3              MR. JACKSON:  Objection, form.

 4        A.    I would use it for predictive purposes,

 5    yes.

 6    BY MR. HUTCHINSON:

 7        Q.    Doctor, let's move on to the top of Page

 8    2.  Under Note 2 it states, "The OIT measurement is

 9    an accelerated thermal-aging test and as such can be

10    misleading."

11              Did I read that correctly?

12        A.    Yes.

13        Q.    What does misleading mean?

14              MR. JACKSON:  Objection, form.

15        A.    What they are trying to say there is, if I

16    have different materials, say two different

17    polypropylenes with two different stabilizer

18    packages, one polypropylene has additive stabilizer

19    antioxidant A in it and another one has antioxidant

20    stabilizer package B in it and I run an OIT and I

21    get different values, that it would be misleading

22    for me to say that one is better than the other.

23    BY MR. HUTCHINSON:

24        Q.    Did you consider this statement before
```

Duane Priddy, Ph.D.

1    doing your testing?

2            MR. JACKSON:  Objection, form.

3        A.   Yes.

4    BY MR. HUTCHINSON:

5        Q.   Doctor, one would never expect to use

6    Prolene in the body at 200 degrees C, would they?

7        A.   That's correct.

8        Q.   In fact, you would never expect Prolene to

9    be exposed to a hundred percent nitrogen in vivo,

10   would you?

11       A.   No.

12       Q.   You'd never expect Prolene to be exposed

13   to a hundred percent oxygen in vivo, would you?

14           MR. JACKSON:  Objection, form.

15       A.   Not pure oxygen.  I certainly would expect

16   it to be exposed to oxidizing species, but not a

17   hundred percent pure oxygen, no.

18   BY MR. HUTCHINSON:

19       Q.   Moving on down on Note 2, last sentence it

20   says, "Volatile antioxidants may generate poor OIT

21   results even though they may perform adequately at

22   the intended use temperature of the finished

23   product."

24           Did I read that correctly?

Duane Priddy, Ph.D.

1        A.    Yes.

2        Q.    Did you consider that before you did your

3    testing, Doctor?

4        A.    Yes.

5        Q.    Do you know whether there is a volatile

6    antioxidant in Prolene?

7        A.    The Santonox R and the dilauryl

8    thiodipropionate, both of those additives are not

9    volatile.  At 200 degrees they would not vaporize

10   from the Prolene.

11       Q.    What do you base that on, Doctor?

12       A.    Just my polymer chemistry and experience

13   working with these types of antioxidants.

14       Q.    Did you account for the volatility of

15   DLTDP before you did your testing?

16       A.    Yes.

17       Q.    How?

18       A.    I actually asked the technician to inject

19   a sample of pure dilauryl thiodipropionate -- this

20   is Steve Johnson -- into the gas chromatograph to

21   determine its relative volatility.  In other words,

22   you do that by retention time, how long does it take

23   this chemical to -- before it makes its way through

24   the gas chromatograph, and you get a feel for its

Duane Priddy, Ph.D.

```
 1    level of volatility.

 2            If it comes through in less than 10

 3    minutes, it is volatile.  If it takes 20 minutes to

 4    come off the GC column, you know that at

 5    200 degrees, it is not volatile.  And I did the same

 6    thing for Santonox R.

 7       Q.   Doctor, did you account for the volatility

 8    of any other additives contained in Prolene?

 9       A.   No, I was focused on the antioxidant

10    species.

11       Q.   Did you focus any on Procol LA-10?

12       A.   No.

13       Q.   Did you ever focus on calcium stearate?

14       A.   No.  Those are lubricants, not

15    antioxidants.

16       Q.   Doctor, the intended use temperature of

17    the finished product, what is the intended use

18    temperature of the finished product?

19            MR. JACKSON:  Objection, form.

20       A.   37 degrees C or 98.6 Fahrenheit.

21    BY MR. HUTCHINSON:

22       Q.   It is not 200 degrees C, is it?

23       A.   No.

24       Q.   Doctor, moving on down to Note 3, "There
```

Duane Priddy, Ph.D.

1    is no accepted sampling procedure, nor have any

2    definitive relationships been established for

3    comparing OIT values on field samples to those on

4    unused products.  Hence, the use of such values for

5    determining life expectancy is uncertain and

6    subjective."

7            Did I read that correctly?

8       A.   Absolutely, yes.

9       Q.   Doctor, what would the field sample be in

10   this particular case?

11      A.   The Prolene mesh.

12      Q.   It would be an explant, correct?

13           MR. JACKSON:  Objection, form.

14      A.   No, it's a virgin, unused implant.

15   BY MR. HUTCHINSON:

16      Q.   That's what you consider to be a field

17   sample?

18      A.   Yes.

19      Q.   What's the difference between a virgin,

20   unused piece of Prolene and an unused product?

21           MR. JACKSON:  Objection, form.

22      A.   There is no difference.

23   BY MR. HUTCHINSON:

24      Q.   Doctor, the ASTM that you quote says

Duane Priddy, Ph.D.

```
 1   there have been no definitive relationships

 2   established for comparing values on field samples to

 3   those for unused products.

 4            MR. JACKSON:  Objection, misstates

 5        witness testimony.

 6   BY MR. HUTCHINSON:

 7        Q.    That's what the ASTM says, correct?

 8        A.    Okay.

 9        Q.    And in fact, Doctor, there's been no

10   definitive relationships established for comparing

11   the OIT values of explant to mesh that's never been

12   used in surgery; is that fair?

13        A.    That is fair, yes.

14        Q.    In fact, Doctor, can you stand by your

15   opinions to a reasonable degree of scientific

16   certainty, given that the ASTM that you used says

17   "determining life expectancy is uncertain and

18   subjective"?

19            MR. JACKSON:  Objection, form.

20        A.    I'm sorry, I don't understand that

21   question.  Would you repeat it, please?

22   BY MR. HUTCHINSON:

23        Q.    Can you stand by your opinions, given that

24   the ASTM that you used says "determining life
```

Duane Priddy, Ph.D.

1    expectancy is uncertain and subjective"?

2              MR. JACKSON:  Objection, form.

3         A.   What I can say is this, the life

4    expectancy is uncertain, that's correct.

5    BY MR. HUTCHINSON:

6         Q.   And the life expectancy is also

7    subjective, isn't it, sir?

8              MR. JACKSON:  Objection, form.

9         A.   All I can say is in a nutshell, this data

10   shows that the Prolene material will not last

11   indefinitely in the body.  It is susceptible to

12   oxidative degradation over time.

13   BY MR. HUTCHINSON:

14        Q.   But the life expectancy is subjective,

15   isn't it, sir?

16             MR. JACKSON:  Objection, form.

17        A.   It is subject to the conditions in the

18   body, yes, certainly.

19   BY MR. HUTCHINSON:

20        Q.   It is also subjective according to the

21   ASTM protocol, correct?

22        A.   It's always subjective, lifetime of any

23   article is subject to the conditions that the part

24   is under, exposed to.

Duane Priddy, Ph.D.

```
1        Q.   Doctor, would you ever publish anything in

2   the "American Chemical Society" journal that was

3   uncertain and subjective?

4             MR. JACKSON:   Objection, form.

5        A.   Yes, I would.

6   BY MR. HUTCHINSON:

7        Q.   Doctor, moving on down to Note 7, it

8   states, "The material composition of the specimen

9   holder can influence the OIT test result

10  significantly."

11            Do you see that?

12       A.   I'm sorry, where are you at?

13       Q.   At the bottom of Page 2, note 7.

14       A.   Reagents and Materials?

15       Q.   No, bottom of Page 2.  It says, "The

16  material composition of the specimen holder."

17            Do you see that?

18       A.   I'm sorry, I'm still not with you.

19  Could you point to where you?

20       Q.   I'll be happy to.

21       A.   Okay, thank you.  Okay.

22       Q.   Do you see that, Doctor?

23       A.   Yes.

24       Q.   What type of specimen holder was used by
```

Duane Priddy, Ph.D.

```
1    Steve Johnson?

2        A.   It's called a DSC pan.

3        Q.   What is the DSC pan that Steve Johnson

4    used made out of?

5        A.   He told me.  It's in the report and I

6    don't recall offhand.

7        Q.   It is in your expert report?

8        A.   No, it's in his report to me.

9        Q.   Steve Johnson prepared a report and gave

10   it to you?

11           MR. JACKSON:  Objection, form.

12       A.   It's data.  He gives me the data with a

13   little note and it tells what the pan is, but I

14   don't recall offhand what the pan is.

15   BY MR. HUTCHINSON:

16       Q.   Where is the data that Steve Johnson gave

17   you?

18       A.   It would be on my computer.

19       Q.   It is not included on this flash drive, is

20   it, sir?

21       A.   It probably is.

22       Q.   Can you testify under oath that this data

23   that Steve Johnson gave you is contained on this

24   flash drive?
```

Duane Priddy, Ph.D.

```
 1              MR. JACKSON:  Objection, form.
 2         A.   Not without checking to confirm for sure.
 3    I believe I put it on there.
 4    BY MR. HUTCHINSON:
 5         Q.   Doctor, sitting here today, can you tell
 6    us the type of specimen holder that Steve Johnson
 7    used?
 8         A.   A DSC pan, and I don't recall what the
 9    metal was.
10         Q.   Do you know if Steve Johnson used more
11    than one specimen holder?
12         A.   The little DSC pans are disposable.  In
13    other words, for the OIT test, he uses a specific
14    type of pan that he knows to be, not influence the
15    data and that's the type of pan he uses.  I just
16    don't recall offhand what the metal is.
17         Q.   Doctor, have you done anything to
18    determine if the specimen holder that Steve Johnson
19    used affected the results?
20              MR. JACKSON:  Objection, form.
21         A.   As I say, he in the past has run tests,
22    since he runs the OIT for me all the time, to
23    confirm the OIT test as he runs it is unaffected by
24    the pan that he uses.  It's just I don't recall what
```

Duane Priddy, Ph.D.

1    metal it is.

2    BY MR. HUTCHINSON:

3        Q.   I understand that, Doctor, but I'm asking

4    you, have you done anything personally to determine

5    if the specimen holder that Steve Johnson used

6    affected the test results?

7        A.   I don't run DSC, so technicians do that.

8        Q.   Have you done anything, sir, personally to

9    determine if the specimen holder affected the

10   results?

11           MR. JACKSON:   Objection, asked and

12       answered.

13       A.   As I say, it was done in the past, on past

14   projects.

15   BY MR. HUTCHINSON:

16       Q.   I am talking about this project, sir.

17   Have you personally done anything to determine if

18   the specimen holder affected the results, yes or no?

19           MR. JACKSON:   Objection, asked and

20       answered.

21       A.   In the sense that I made sure that he is

22   using his standard pan under the standard operating

23   procedures for the laboratory as an A2LA certified

24   laboratory.  They are annually audited, all their

Duane Priddy, Ph.D.

1    processes checked by auditors.

2          And so the DSC pan is always the same.

3    It's been confirmed by him not to affect the

4    results.  That's the pan he used.  I just can't

5    recall what the metal is offhand.

6          Q.   That's right. But my question to you is:

7    Have you personally -- I'm not talking about Steve

8    Johnson, I'm talking about you personally -- have

9    you personally done anything to determine if the

10   specimen holder affected the results?

11         MR. JACKSON:  Objection, asked and

12      answered.

13      A.   Other than how I have just answered it,

14   no.

15   BY MR. HUTCHINSON:

16      Q.   Doctor, can you use your DSC data to make

17   lifetime calculations when one is in pure oxygen and

18   the other is implanted in vivo?

19         MR. JACKSON:  Objection, form.

20      A.   I wasn't trying to do that.  That wasn't

21   the purpose.  My purpose for running the test was to

22   look at variability of ten different mesh samples.

23   That was my intent.  And so I was looking to see if,

24   when these different samples with the same

Duane Priddy, Ph.D.

1    antioxidant formulations in them, when they are

2    suddenly exposed to oxygen, do they have the same

3    OIT value or is it extremely variable.  And I saw up

4    to 150 percent variability from the low to the high

5    end.

6           The key message is that these implants

7    have variability in their oxidation resistance.

8    They aren't all the same.  That's it.  That's the

9    only message that I was trying to figure out there.

10          (Priddy Deposition Exhibit 5 was

11          marked for identification.)

12   BY MR. HUTCHINSON:

13       Q.   Doctor, handing you what we'll mark as

14   Exhibit 5 to your deposition.  This is the ASTM

15   that you quoted in your expert report, correct?

16          MR. JACKSON:  Objection, form.

17       A.   Yes.

18   BY MR. HUTCHINSON:

19       Q.   I believe it is your testimony, you didn't

20   follow this ASTM 1980 protocol; is that right?

21       A.   The only portion that I followed is this

22   Q10 estimate for trying to get a feel for predicting

23   lifetimes.

24       Q.   Why didn't you follow anything else?

Duane Priddy, Ph.D.

```
 1               MR. JACKSON:  Objection, form.
 2         A.   Because it's not a -- it has to do with
 3    sterile medical device packages, not what's inside.
 4    So it's really not a standard that's directly
 5    applicable to this situation.
 6    BY MR. HUTCHINSON:
 7         Q.   Doctor, fair to say you never did any
 8    real-time aging studies to confirm the accelerated
 9    aging study results that you generated, correct?
10         A.   That is correct.
11         Q.   All of the studies that you did are
12    contained in your expert report; is that correct?
13               MR. JACKSON:  Objection, form.
14         A.   I mean, I mentioned a few minutes ago, I
15    ran the OIT test under pure oxygen and then
16    switching from nitrogen to air, and I believe that's
17    the only deviation that was done that wasn't
18    included in the report.
19    BY MR. HUTCHINSON:
20         Q.   Doctor, turn with me to Page 2.
21         A.   Of?
22         Q.   Of Exhibit 5 which is ASTM 1980.
23         A.   Yes.
24         Q.   There on Page 2, note 6.4, this is a
```

Duane Priddy, Ph.D.

1    protocol that you followed in determining the Q10

2    level, correct?

3             MR. JACKSON:  Objection, form.

4        A.   Q10.

5    BY MR. HUTCHINSON:

6        Q.   Am I correct?

7        A.   Not really, because they talk about three

8    temperatures here and I only ran one temperature,

9    200.

10       Q.   Doctor, did you follow any type of

11   protocol in your Q10 calculations for determining

12   the temperature that you used?

13            MR. JACKSON:  Objection, form.

14       A.   The temperature that I used?

15   BY MR. HUTCHINSON:

16       Q.   Strike that.  What did you use Q10 for?

17       A.   The only portion of this that I used was

18   just what I described earlier, the doubling,

19   approximately doubling of reaction rate every

20   10 degrees.  That's the only -- I just referenced

21   this to support that concept for doing that crude

22   calculation.  That's all.

23       Q.   Doctor, the double reaction rate for every

24   10 degrees, is that based on any ASTM standard?

Duane Priddy, Ph.D.

1          MR. JACKSON:  Objection, form.

2     A.   No, it's just a normal, understood

3  scientific principle that reaction rates

4  approximately double every 10 degrees.

5     Q.   Is that based on any scientific literature

6  that you can tell me sitting here today?

7     A.   I could, if I was pressed to do so, I

8  could come up with textbook references, organic

9  chemistry 101, polymer chemistry 101 where they

10  teach this doubling of a reaction rate every

11  10-degree principle.  As I say, it's crude and it's

12  just for ballpark, is there a flag, kind of

13  calculations.

14     Q.   But it is your testimony, if I understand

15  it, under oath that ASTM 1980 does not apply to the

16  testing you did, correct?

17          MR. JACKSON:  Objection, form.

18     A.   Yes, because it's for packaging.  The only

19  reason I reference it is because of that Q10

20  doubling of reaction rate principle.

21          MR. JACKSON:  Chad, we have been

22      going just about an hour.  Are we at a

23      good time for a break?

24          MR. HUTCHINSON:  One more thing and

Duane Priddy, Ph.D.

```
 1        we'll take a quick break, okay?

 2            (Priddy Deposition Exhibit 6 was

 3        marked for identification.)

 4   BY MR. HUTCHINSON:

 5        Q.   Doctor, handing you what we'll mark as

 6   Exhibit 6 to your deposition.  This is the

 7   de la Rie article that you quoted in your expert

 8   report; is that correct?

 9            (Witness reviewing document.)

10        A.   Yes.

11        Q.   Did you read this before you quoted it in

12   your expert report?

13        A.   Yes.

14        Q.   Turn to Page 17 with me, please.

15        A.   Okay.

16        Q.   At the bottom of the column on the left,

17   the paragraph starting out with "Materials," are

18   you there with me?

19        A.   Yes.

20        Q.   It states, "Materials which are not

21   exposed to light" -- and by the way, mesh when

22   planted in vivo is not exposed to light, is it?

23            MR. JACKSON:  Objection, form.

24        A.   No.  Not while it is in vivo, it is not.
```

Duane Priddy, Ph.D.

```
 1   BY MR. HUTCHINSON:

 2        Q.   "Materials which are not exposed to light

 3   during their normal life could be tested in heat

 4   aging experiments."

 5             In fact, that's what you did, correct, a

 6   heat aging experiment, correct, on mesh?

 7             MR. JACKSON:   Objection, form.

 8        A.   Yes, I did.

 9   BY MR. HUTCHINSON:

10        Q.   It goes on to say, "But if temperatures

11   are used which are considerably higher than the ones

12   the material is exposed to under normal

13   circumstances, the danger exists of introducing new

14   degradation reactions."

15             Did I read that correct?

16        A.   Yes, you did.

17        Q.   Doctor, did you consider that before you

18   did your accelerated aging tests?

19        A.   Yes.

20        Q.   Did you know what de la Rie said about

21   using higher temperatures?

22        A.   Yes.

23        Q.   How did you account for that?

24        A.   By stating that it is only a rough
```

Duane Priddy, Ph.D.

1    approximation and has to be validated with actual

2    real-time studies because of this possibility.

3        Q.   Doctor, did you do any type of calculation

4    regarding the Arrhenius rate reaction for

5    polypropylene?

6            MR. JACKSON:  Objection, form.

7        A.   That has been done in the literature

8    before.

9    BY MR. HUTCHINSON:

10       Q.   I am asking you:  Did you do any

11   calculation for the Arrhenius rate reaction for

12   polypropylene?

13           MR. JACKSON:  Objection, form.

14       A.   Not on my data, no, I couldn't, because I

15   only ran at one temperature.  I did not run at

16   three temperatures.  You have to run at three

17   temperatures to do the Arrhenius calculations.

18           MR. HUTCHINSON:  We can take a quick

19       break.

20           THE VIDEOGRAPHER:  We are now off

21       the video record.  The time is 10:01 a.m.

22           (Recess.)

23           THE VIDEOGRAPHER:  We are back on

24       the video record with Tape Number 2.  The

Duane Priddy, Ph.D.

```
 1          time is 10:08 a.m.
 2    BY MR. HUTCHINSON:
 3          Q.   Doctor, we are back on the record.  Have
 4    you understood all my questions so far?
 5          A.   Yes.
 6          Q.   Is there anything about the testimony
 7    that you have given that you would like to change?
 8              MR. JACKSON:  Objection, form.
 9          A.   Not at this point.
10    BY MR. HUTCHINSON:
11          Q.   Turn with me to Exhibit 2.  That's your
12    expert report.
13          A.   Okay, got it.
14          Q.   On Page 3 you state you are a plastics
15    consultant for medical supply companies?
16          A.   Yes.
17          Q.   What type of products?
18          A.   Oh, boy.
19          Q.   Let me ask you this:  Any products
20    regarding polypropylene?
21          A.   I mean, I have done materials selection
22    work for Baxalta.
23          Q.   Let's focus on polypropylene.
24          A.   I considered polypropylene as I was
```

Duane Priddy, Ph.D.

```
 1    selecting material, so they just asked me to

 2    recommend a material for a certain application.  And

 3    I considered polypropylene and ruled it out, just

 4    didn't have the right properties for the

 5    application.

 6         Q.   Doctor, have you ever selected a polymer

 7    that has a lifetime warranty?

 8              MR. JACKSON:  Objection, form.

 9         A.   I don't believe so.

10    BY MR. HUTCHINSON:

11         Q.   Doctor, would you ever guarantee to the

12    recipients of these medical devices that you

13    consulted for, would you ever guarantee to them that

14    their material would never oxidize?

15              MR. JACKSON:  Objection, form.

16         A.   No.

17    BY MR. HUTCHINSON:

18         Q.   Doctor, on Page 3 of your expert report,

19    you reference ISOT.  That stands for incipient

20    surface oxidation time; is that correct?

21         A.   Yes.

22         Q.   Is ISOT in any ASTM standard?

23         A.   It is nowhere.  That is my own acronym.

24         Q.   Doctor, you didn't use a publication to
```

Duane Priddy, Ph.D.

1    come up with your own acronym, did you?

2        A.    I did not.

3        Q.    You made it up just for this experiment,

4    didn't you?

5            MR. JACKSON:  Objection, form.

6        A.    No.

7    BY MR. HUTCHINSON:

8        Q.    Where did you come up with your own

9    acronym?

10           MR. JACKSON:  Objection, form.

11       A.    As I say, I have been using OIT testing

12   for years.

13   BY MR. HUTCHINSON:

14       Q.    I want to talk about ISOT.

15       A.    Yes, I know.  And as part of that, I look

16   at the shape of the OIT curve because normally it is

17   a nice, smooth transition with two slopes and when

18   you get the baseline meandering around and doing

19   strange things, you know that there's something

20   going on that's not normal.  And so I always, just

21   for my own thought processes, identify the point to

22   where something chemically starts to happen and I

23   call that the incipient oxidation point.

24       Q.    But that's something you made up?

Duane Priddy, Ph.D.

```
 1         A.    I did, yes.

 2         Q.    Doctor, if you look at Page 5, it states,

 3    polypropylene is subject to degradation or weakening

 4    by oxidative agents.

 5         A.    Where are you at now?

 6         Q.    Page 5.

 7               MR. JACKSON:  Chad, can you let us

 8         know which paragraph you are on?

 9               MR. HUTCHINSON:  Yes, I'm sorry.

10         Second paragraph, second sentence.

11               THE WITNESS:  Okay.

12    BY MR. HUTCHINSON:

13         Q.    It states, the "chemical reactions

14    continue to occur so long as any oxidizing agents,

15    such as those present in the human body, are

16    present."  Do you see that?

17         A.    Yes.

18         Q.    Doctor, what are the names of the

19    oxidizing agents?

20               MR. JACKSON:  Objection, form.

21         A.    Excuse me?

22         Q.    What are the names of the oxidizing agents

23    that you reference here?

24               MR. JACKSON:  Objection, form.
```

Duane Priddy, Ph.D.

```
 1          A.    Are you talking about in the human body?

 2   BY MR. HUTCHINSON:

 3          Q.    Yes, sir.

 4          A.    Hydrogen peroxide, there's all sorts of

 5   oxidizing agents.

 6          Q.    All right, hydrogen peroxide.  What else?

 7          A.    Again, I'm not a medical doctor or a

 8   pathologist, but I have read many reports that refer

 9   to oxidizing agents being present in the body,

10   especially with foreign body reactions.  The body

11   will generate oxidizing species.

12          Q.    Those are called reactive oxygen species,

13   correct?

14          A.    Right, ROS.

15          Q.    My question to you is, though, can you

16   name the oxidizing agents that you are aware of in

17   the human body?

18               MR. JACKSON:  Objection, asked and

19          answered.

20          A.    I just named one, hydrogen peroxide.

21   BY MR. HUTCHINSON:

22          Q.    Can you name any others?

23               MR. JACKSON:  Objection, asked and

24          answered.
```

Duane Priddy, Ph.D.

1       A.   There's all sorts of peroxidases which are

2    oxidative enzymes.

3    BY MR. HUTCHINSON:

4       Q.   Other than hydrogen peroxide and enzymes,

5    can you name any other type of oxidizing agents?

6            MR. JACKSON:  Objection, misstates

7       witness testimony.

8       A.   Oxygen.

9    BY MR. HUTCHINSON:

10      Q.   Anything else?

11      A.   That's all I can recall at this point.

12      Q.   Doctor, do you know the amount of hydrogen

13   peroxide that's secreted in the body?

14           MR. JACKSON:  Objection, form.

15      A.   No.

16   BY MR. HUTCHINSON:

17      Q.   Can you quantify it?

18           MR. JACKSON:  Objection.

19      A.   I cannot.

20   BY MR. HUTCHINSON:

21      Q.   Have you ever attempted to quantify it?

22      A.   No.

23      Q.   Have you ever used any type of

24   concentration of hydrogen peroxide to determine how

Duane Priddy, Ph.D.

1  it affects Prolene?

2      A.   I have not done that.

3      Q.   Doctor, do you have any idea how many or

4  what type of -- strike that.

5           Do you have any idea of the amount of

6  enzymes, oxidizing enzymes that are secreted from

7  the body?

8           MR. JACKSON:  Objection, form.

9      A.   I have never measured it, no.

10  BY MR. HUTCHINSON:

11      Q.   To your knowledge, has it ever been

12  quantified?

13      A.   I do not know.

14      Q.   Doctor, sitting here today, can you

15  quantify the amount of oxidizing agents that are

16  produced by the human body?

17           MR. JACKSON:  Objection, asked and

18      answered.

19      A.   Are you asking have I done it or could it

20  be done?

21  BY MR. HUTCHINSON:

22      Q.   I am asking, have you done it?

23      A.   I have not done it.

24      Q.   Do you know the amount of oxidizing agents

Duane Priddy, Ph.D.

1    produced by the human body?

2           MR. JACKSON:  Objection, asked and

3      answered.

4      A.   No.

5  BY MR. HUTCHINSON:

6      Q.   Doctor, do you have any opinions regarding

7  the quantity of oxidizing agents it would take to

8  oxidize Prolene?

9      A.   Well, Prolene is an oxidizable material,

10  so any oxidant is capable of oxidizing Prolene.

11     Q.   My question, sir:  Do you have any idea

12  about the concentration level of oxidizing agents

13  that it would take to oxidize Prolene?

14     A.   Any detectable, measurable amount of an

15  oxidizing species is capable of oxidizing Prolene.

16     Q.   Can you quantify that, Doctor?

17          MR. JACKSON:  Objection, form.

18     A.   A detectable, I don't know what the

19  detection limit of a test you want to use, but if it

20  is detectable, it is capable of oxidizing Prolene.

21  BY MR. HUTCHINSON:

22     Q.   What about a micromole, can a micromole

23  oxidize Prolene?

24          MR. JACKSON:  Objection, form.

Duane Priddy, Ph.D.

1        A.    Absolutely.

2    BY MR. HUTCHINSON:

3        Q.    Doctor, do you have any idea how the

4    concentration level of hydrogen peroxide found

5    naturally in the body compares to 30 percent of

6    hydrogen peroxide?

7            MR. JACKSON:  Objection, form.

8        A.    I do not.

9    BY MR. HUTCHINSON:

10        Q.    You would expect 30 percent hydrogen

11   peroxide to be much stronger than the amount of

12   peroxide found in the body, correct?

13            MR. JACKSON:  Objection, form.

14        A.    Absolutely, yes.

15            (Priddy Deposition Exhibit 7 was

16        marked for identification.)

17   BY MR. HUTCHINSON:

18        Q.    Doctor, I will hand you what's been marked

19   as Exhibit 7 to your deposition.  Doctor, this is a

20   memo from Ethicon dated November 5, 1984.  Do you

21   see that?

22            (Witness reviewing document.)

23        A.    I do.

24        Q.    If you look with me, please, and by the

Duane Priddy, Ph.D.

1  way, this is a document that you reviewed or relied

2  on in reaching your opinions?

3       A.   I have, yes.

4       Q.   If you look with me on Page 3 at the

5  top --

6            MR. JACKSON:  Chad, can you give us

7       the Bates number of the page you are on?

8            MR. HUTCHINSON:  Yes, it's 15958454.

9            MR. JACKSON:  Thank you.

10 BY MR. HUTCHINSON:

11      Q.   Top paragraph, middle sentence, it says,

12 "Immersion, with Peroxide Changes."

13           Do you see that?

14      A.   Yes.

15      Q.   "To ensure strength of Prolene sutures, in

16 30 percent hydrogen peroxide after a year's time at

17 room temperature do not produce visible surface

18 cracks on any of the fibers."

19           Do you see that?

20      A.   I do.

21      Q.   Doctor, do you have any reason to disagree

22 with this statement?

23      A.   No.

24      Q.   This shows that Prolene exposed to

Duane Priddy, Ph.D.

1   30 percent hydrogen peroxide for a year did not

2   produce visible surface cracks; is that correct?

3        A.   That's what that's saying, yes.

4        Q.   Doctor, how did you account for that when

5   reaching your opinions in this case?

6        A.   Irrelevant.

7        Q.   Why?

8        A.   Because they didn't do anything to

9   determine whether the material had oxidized or not.

10       Q.   Doctor, how do you know that?

11       A.   I don't see the data where they detected

12  whether or not oxidation had actually, degradation

13  of the material had occurred.  They just looked for

14  surface cracks.

15       Q.   Doctor, surface cracks are a form of

16  degradation, are they not?

17       A.   Yes.

18       Q.   In fact, visible surface cracks are a form

19  of oxidation via degradation, correct?

20       A.   Yes.

21       Q.   Doctor, what is a Bakelite cap?

22       A.   A Bakelite what?

23       Q.   Spelled B-A-K-E-L-I-T-E, do you know what

24  a Bakelite cap is on a glass vial?

Duane Priddy, Ph.D.

```
 1              MR. JACKSON:  Objection, form.

 2        A.   Yes.

 3   BY MR. HUTCHINSON:

 4        Q.   What are Bakelite caps generally made of?

 5        A.   Bakelite, which is a phenolic resin.

 6        Q.   Doctor, can you explain why the hydrogen

 7   peroxide ate away the Bakelite cap and did not

 8   affect the Prolene?

 9        A.   Yes.

10        Q.   How so?

11        A.   Bakelite is a very hydrophilic,

12   water-loving, resin because phenolics are

13   hydroxylated materials which are hydrophylic.

14   Polypropylene is very hydrophobic, water-hating, so

15   polypropylene repulses and does not absorb water,

16   whereas Bakelite does absorb water.  So the water,

17   the hydrogen peroxide would penetrate into the

18   Bakelite and allow chemical oxidation to occur.

19        Q.   Let's look at Page 5 of your expert

20   report, Doctor.

21        A.   Page 5, okay.

22        Q.   Bottom paragraph, about the middle of the

23   paragraph.  It states, "These chemicals act to

24   extract the antioxidant stabilizers."
```

Duane Priddy, Ph.D.

1                Do you see that?

2        A.   Yes.

3        Q.   Doctor, have you tested that opinion?

4             MR. JACKSON:  Objection, form.

5        A.   That is basic polymer chemistry 101.

6   BY MR. HUTCHINSON:

7        Q.   My question is:  Have you tested that

8   opinion?

9             MR. JACKSON:  Objection, form.

10       A.   Yes.

11  BY MR. HUTCHINSON:

12       Q.   Are the test results included in your

13  expert report?

14       A.   No.

15       Q.   Doctor, what is the rate that chemicals

16  extract the antioxidant stabilizers?

17            MR. JACKSON:  Objection, form.

18       A.   It is dependent upon conditions.

19  BY MR. HUTCHINSON:

20       Q.   What about conditions in vivo, what is the

21  rate that conditions in vivo extract Santonox R or

22  DLTDP?

23       A.   That will be dependent upon a lot of

24  variables.

Duane Priddy, Ph.D.

1      Q.   Doctor, can you sit here today and

2  quantify that rate of extraction?

3      MR. JACKSON:  Objection.

4      A.   No.

5  BY MR. HUTCHINSON:

6      Q.   Doctor, can you explain to us in chemical

7  terms how blood extracts antioxidant stabilizers?

8      A.   You mean scientifically how?

9      Q.   Yes, sir.

10     A.   Blood contains water plus a lot of other

11  things, it contains triglycerides, lipids, different

12  things.  And it is the oil or the hydrophobic

13  components in blood, the fats, the oils, the lipids,

14  that extract the stabilizers from the plastic, and

15  even Dr., it starts with B, the Ethicon guy that did

16  the FTIR work, he measured the level of dilauryl

17  thiodipropionate in the surface of sutures that had

18  been removed and saw that there was no detectable,

19  it was all extracted out of the surface.  So even

20  Ethicon knows that these antioxidants are

21  extractable from the material.

22     Q.   Doctor, do you know what formalin is?

23     A.   Yes.

24     Q.   You understand that formalin contains

Duane Priddy, Ph.D.

1    formaldehyde?

2        A.    Yes.

3        Q.    Is formaldehyde a solvent?

4        A.    It is normally 37 percent concentration of

5    water, but is it a solvent?  Not really.

6        Q.    Would you consider formalin to be a

7    solvent?

8        A.    Formalin is 37 percent formaldehyde and

9    water.  Water is a terrible solvent.  It is not

10   going to extract anything of consequence from

11   polypropylene.  Polypropylene is repulsive to water.

12       Q.    But my question, sir:  Is formalin a

13   solvent?

14       A.    It is a solvent for ionic species, but it

15   is not a solvent for like additives.

16       Q.    Doctor, would you be able to draw out the

17   chemical structure for the reaction between blood

18   and Santonox R?

19            MR. JACKSON:  Objection, form.

20       A.    The Santonox R does not react with blood,

21   it reacts with oxidizing species that would be

22   in the blood.

23   BY MR. HUTCHINSON:

24       Q.    Doctor, if we turn to Page 7 of your

Duane Priddy, Ph.D.

```
 1   expert report, top paragraph, last sentence, you

 2   reference antioxidant Santonox R that interferes

 3   with the oxidative chain reaction.

 4        A.   Yes.

 5        Q.   Is that correct?

 6        A.   Yes.

 7        Q.   Doctor, we talked about ROS earlier, just

 8   a minute ago, correct?

 9             MR. JACKSON:  Objection, form.

10        A.   Yes.

11   BY MR. HUTCHINSON:

12        Q.   And that stands for reactive oxygen

13   species?

14        A.   Correct.

15        Q.   And reactive oxygen species, they possess

16   a free radical, don't they?

17             MR. JACKSON:  Objection, form.

18        A.   They can, yes.

19   BY MR. HUTCHINSON:

20        Q.   And a reactive oxygen species has a

21   non-bonded electron that wants to bond with

22   something, doesn't it?

23        A.   The ones that are free radicals, yes.

24        Q.   And a free radical is not bonded, is it?
```

Duane Priddy, Ph.D.

```
 1        A.    That's correct.

 2        Q.    And a free radical is -- strike that.

 3              There is no difference between a free

 4   radical formed in the body or a free radical formed

 5   during the heat extrusion process, correct?

 6              MR. JACKSON:   Objection, form.

 7        A.    In the sense they are both free radicals.

 8   BY MR. HUTCHINSON:

 9        Q.    In fact, Santonox R and DLTDP are free

10   radical scavengers, aren't they?

11        A.    DLTDP is not a free radical scavenger,

12   Santonox R is a free radical scavenger.

13        Q.    Why do you say DLTDP is not a free radical

14   scavenger?

15        A.    Because it works by a different mechanism.

16   What it does is the sulfur reacts with oxygen

17   species.

18              It doesn't have to be a free radical

19   oxygen, it can just be oxygen, specifically

20   hydroperoxides, to become a higher, either a sulfone

21   or a sulfoxide which is a higher oxidized form.  The

22   sulfur converts the hydroperoxide group to an

23   alcohol.  But that's a different chemistry.  That's

24   not free radical-based.
```

Duane Priddy, Ph.D.

1          Q.    Let's talk about the chemistry for

2     Santonox R.

3                MR. JACKSON:  Chad, he wasn't

4          through answering his question.  You got

5          to let him finish.

6     BY MR. HUTCHINSON:

7          Q.    Santonox R is designed to remove free

8     radicals when they are formed, correct?

9          A.    I wouldn't say remove, but negate the

10    effects of free -- interferes with free radical

11    chain reactions.

12         Q.    Doctor, let's look at Page 8 at the top.

13    You reference the testing you did, the gas

14    chromatography, mass spectroscopy, did I say that --

15         A.    That's correct.

16         Q.    Is that the testing that you did?

17         A.    Yes.

18         Q.    Did you personally do the GS-MC testing?

19         A.    GC-MS.

20         Q.    GC-MS testing?

21         A.    I don't run lab equipment.  Trained

22    technicians run lab equipment.  I worked with a

23    technician to tell him how I wanted the test

24    performed, yes.

Duane Priddy, Ph.D.

1      Q.   Who did the GC-MS testing, Doctor?

2      A.   Steve Johnson.

3      Q.   He did it too?

4      A.   Yes, he is the technician that does GC-MS

5  and the OIT test.

6      Q.   Which did Steve Johnson do first, did he

7  do the GC-MS or the DSC testing?

8           MR. JACKSON:  Objection, form.

9      A.   He did the OIT first and then I wanted to

10  see if it correlated with the additives so I asked

11  him to do GC-MS so I could see if there was a

12  statistical correlation.

13  BY MR. HUTCHINSON:

14      Q.   Let's talk about the GC-MS testing that

15  Steve Johnson did.  Did Steve Johnson's GC-MS

16  experiment follow any standard or published

17  procedure?

18      A.   It followed what's called SOP, standard

19  operating procedure.  Again, all certified

20  laboratories need SOPs for everything they do.

21  Those SOPs are audited annually, and he followed

22  his SOP for GC-MS.

23      Q.   Which SOP did Mr. Johnson follow?

24      A.   The one for GC-MS in the lab.

Duane Priddy, Ph.D.

1     Q.   But what number?

2     A.   I don't -- it's probably in the lab report

3  he sent me, but I don't have the number memorized.

4     Q.   Doctor, did you ever touch the GC-MS

5  equipment?

6          MR. JACKSON:  Objection, form.

7     A.   No.

8  BY MR. HUTCHINSON:

9     Q.   Did you ever touch the DSC equipment?

10         MR. JACKSON:  Objection, form.

11    A.   No.

12 BY MR. HUTCHINSON:

13    Q.   Have you ever even seen the GC-MS or DSC

14 equipment?

15         MR. JACKSON:  Objection, form.

16    A.   Yes, I have.

17 BY MR. HUTCHINSON:

18    Q.   At Steve Johnson's lab?

19    A.   At Steve Johnson's lab.  As a matter of

20 fact I have watched him in the past run it.

21    Q.   But you didn't watch him do this

22 experiment --

23    A.   No.

24    Q.   -- that we are here about today?

Duane Priddy, Ph.D.

1     A.   No, I did not.

2     Q.   Doctor, did Steve Johnson perform any

3   controls in his GC-MS experiment?

4     A.   Yes.

5     Q.   What were they?

6     A.   He always puts in an internal standard in

7   the solvent that he extracts, the additives from the

8   plastic, and that internal standard he looks at the

9   size of the response and the retention time to make

10  sure that the equipment is operating.  In other

11  words, it is a known material spiked into the

12  solvent and if that peak is not right, he knows

13  there's an issue.

14    Q.   Did that generate data?

15         MR. JACKSON:  Chad, you have to let

16    the witness finish his answer.

17  BY MR. HUTCHINSON:

18    Q.   I'm sorry, Doctor, if I interrupted you.

19  Did that generate data?

20    A.   What do you mean?

21    Q.   Using the control, when Mr. Johnson used

22  the control, did it generate any data?

23    A.   Yes.

24    Q.   Where is that data?

Duane Priddy, Ph.D.

```
1        A.    It would be in his GC-MS data report.

2        Q.    Is Mr. Johnson's GC-MS data report

3   included on the flash drive that you gave me before

4   the deposition?

5        A.    I believe so.

6        Q.    Why wasn't that GC-MS data included in

7   your expert report?

8        A.    I included just this comment of the

9   correlation, but I did not include the data in the

10  report.

11       Q.    But why not?  Why didn't you include the

12  data in your report?

13       A.    I just didn't.

14       Q.    Doctor, did Steve Johnson ever try to

15  measure the concentration level of DLTDP?

16       A.    Yes.

17       Q.    What was the result of the concentration

18  level of DLTDP?

19       A.    When he ran the test, he did not see the

20  DLTDP.  He couldn't detect it.

21       Q.    Doctor, have you personally ever tried to

22  measure the concentration level of DLTDP in Prolene?

23       A.    Through Steve Johnson I have attempted to

24  do it.
```

Duane Priddy, Ph.D.

1      Q.   But you personally?

2           MR. JACKSON:  Objection, asked and

3      answered.

4      A.   I have not run the equipment, no.

5  BY MR. HUTCHINSON:

6      Q.   Doctor, are you aware of any studies that

7  show DLTDP is lost from Prolene once it is implanted

8  in vivo?

9      A.   Yes.

10     Q.   What's the name of the study?

11     A.   That was done by Dr. Burkley, I think his

12  name was.

13     Q.   You are talking about an internal Ethicon

14  scientist?

15     A.   Yes.

16     Q.   Doctor, are you aware of any published

17  peer-reviewed literature that shows DLTDP is lost

18  from Prolene in vivo?

19     A.   Just Dr. Burkley's work.

20     Q.   And nothing else, correct?

21     A.   That's correct.

22     Q.   Doctor, have you ever read Dr. Howard

23  Jordi's expert reports?

24     A.   I don't recall.

Duane Priddy, Ph.D.

1     Q.    Do you know Dr. Howard Jordi?

2     A.    I know there's a Jordi Lab.

3     Q.    Do you know if the Jordi Labs ever

4  detected DLTDP in Prolene?

5     A.    I don't know.

6     Q.    If Dr. Jordi's lab did detect DLTDP in

7  Prolene, that would be inconsistent with the results

8  of your tests, correct?

9          MR. JACKSON:   Objection, form.

10    A.    No.

11 BY MR. HUTCHINSON:

12    Q.    I thought you told me your tests did not

13 detect DLTDP.

14    A.    No, I'm saying that the way the test was

15 run, it did not detect it.  He only saw a peak for

16 the Santonox R.

17    Q.    Doctor, is it your testimony under oath

18 that the Prolene sample that Mr. Johnson used did

19 not have any DLTDP in it?

20    A.    No, it likely did.  It's just the way

21 that particular test was run, it was

22 non-detectable.  But -- yeah, that's all.

23    Q.    It probably wasn't the best test to

24 determine whether or not DLTDP was in the Prolene?

Duane Priddy, Ph.D.

1          MR. JACKSON:  Objection, form.

2      A.    That's correct, yes.

3  BY MR. HUTCHINSON:

4      Q.    Doctor, did you do any type of appropriate

5  testing to determine the level of DLTDP in Prolene?

6          MR. JACKSON:  Objection, form.

7      A.    Yes, I tried to.  I actually had him

8  experiment with different conditions to try to

9  detect the DLTDP.  He did find a condition where he

10  was able to see it.  It's just not -- so it's there,

11  it's just not reported in this data.

12      Q.    What test did he use to detect DLTDP?

13      A.    GC-MS, again.  It's just he ran it under

14  different conditions.

15      Q.    Doctor, why is that information not in

16  your expert report?

17      A.    Because the purpose for doing it was to

18  just make sure that it was there.  I wanted to make

19  sure it was there.

20      Q.    And you confirmed it was there?

21      A.    I confirmed it was there.

22      Q.    Or rather Mr. Johnson confirmed it was

23  there?

24          MR. JACKSON:  Objection, form.

Duane Priddy, Ph.D.

1        A.    Yes.

2    BY MR. HUTCHINSON:

3        Q.    Doctor, let's go back to the GC-MS test.

4    Did you determine the weight loss for Santonox R

5    before Steve Johnson did his testing?

6        A.    Weight loss?

7        Q.    The weight loss rate?

8        A.    I don't understand the question.  You mean

9    by TGA?

10       Q.    Yes, by glass transition, correct.

11       A.    No, TGA is thermogravimetric analysis.

12   It measures weight loss of materials versus

13   temperature.

14       Q.    TGA?

15       A.    TGA.

16       Q.    Did you do any type of TGA analysis to

17   determine the weight loss for DLTDP?

18       A.    No.

19       Q.    Did you do any type of TGA analysis to

20   determine the weight loss of Santonox R?

21       A.    No.

22       Q.    Why not?

23       A.    As I say, the only time I was looking for

24   volatility, if you will, in other words, loss during

Duane Priddy, Ph.D.

1    the heat process, was by retention time and the gas

2    chromatograph which gives me a feel for volatility.

3         Q.   Doctor, do you know what the recommended

4    ranges are for DLTDP and Santonox R by weight?

5              MR. JACKSON:  Objection, form.

6         A.   I mean, that's application-specific.  I

7    know what the formulation for Prolene, has a target

8    range of weight.

9    BY MR. HUTCHINSON:

10        Q.   Do you know what the target range of

11   weight of DLTDP and Santonox R is for Prolene?

12        A.   I have seen it.  It seems like it was

13   between 2,000 and 4,000 parts per million or .2 to

14   .4 percent, I think, in that range.  It's probably

15   not correct, but in that ballpark.

16        Q.   Doctor, do you know what the weight loss

17   rate is for DLTDP?

18        A.   From Prolene?

19        Q.   Yes.

20        A.   Under what conditions?

21        Q.   In vivo.

22        A.   In vivo, again, the only data point I got

23   is Dr. Burkley's data where he saw it was totally

24   depleted from the surface after a period of time in

Duane Priddy, Ph.D.

1    vivo.

2         Q.   Doctor, do you know what the weight loss

3    rate is for DLTDP in vivo?

4         A.   That's what I just answered.  The only

5    thing I know is from Dr. Burkley's work.

6         Q.   Same question for Santonox R:  Do you know

7    what the weight loss rate is for Santonox R in vivo?

8         A.   No.

9         Q.   Doctor, do you know what the melting point

10   is for DLTDP?

11        A.   Not offhand.

12        Q.   Do you know what the melting point for

13   Santonox R is?

14        A.   Again, not offhand.

15        Q.   Doctor, when we talk about the GC-MS

16   testing, what color was the exemplar that Steve

17   Johnson tested?

18        A.   It's in the lab report he sent me.  He

19   listed the lot number and the color.

20        Q.   What color was it?

21        A.   I don't recall if it was blue or white.

22   I'd have to look at the lab report.

23        Q.   What temperature was the GC-MS set for?

24        A.   It's a program.  Its oven temperature is

Duane Priddy, Ph.D.

1  ramped up over time because these additives, like

2  if the oven temperature was set at 40 degrees and

3  you injected the sample, the additive would never

4  come through the instruments. So you've got to keep

5  raising the temperature until it comes through.

6        Q.   What temperature was it when the material

7  began coming through?

8             MR. JACKSON:  Objection, form.

9        A.   I can't tell you precisely.  I can tell

10 you it was over 200 degrees.

11 BY MR. HUTCHINSON:

12       Q.   Was a solvent used by Mr. Johnson with

13 this GC-MS?

14       A.   Yes.

15       Q.   Do you know what type of solvent Mr.

16 Johnson used?

17       A.    Methylene chloride.

18       Q.   Do you know what quantity of methylene

19 chloride that Mr. Johnson used?

20       A.    Again, it is in his lab procedure he sent

21 me.  I don't know the number offhand.

22       Q.   Doctor, you will agree that that solvent

23 only extracts volatile materials, correct?

24             MR. JACKSON:  Objection, form.

Duane Priddy, Ph.D.

```
 1        A.    No.

 2   BY MR. HUTCHINSON:

 3        Q.    Does it extract volatile materials?

 4        A.    Yes.

 5        Q.    Doctor, did you know -- my understanding

 6   in reading your report is that the GC-MS test only

 7   found Santonox R; is that right?

 8        A.    That's the only stabilizer that it saw,

 9   that he identified as a stabilizer.

10        Q.    Did it pick up any other type of additives

11   to the Prolene?

12             MR. JACKSON:   Objection, form.

13        A.    I do not believe so.

14   BY MR. HUTCHINSON:

15        Q.    Doctor, did the GC-MS that Mr. Johnson

16   did, did it detect Procol LA-10?

17        A.    No.

18        Q.    Why not?

19        A.    It was probably not volatile enough to

20   make it through the instrument.

21        Q.    Do you know what the flash point is for

22   Procol LA-10?

23        A.    Not offhand, no.

24        Q.    Do you know the melting point?
```

Duane Priddy, Ph.D.

```
1        A.    No.

2        Q.    Do you know the flash point for Santonox

3   R?

4        A.    No.

5        Q.    Do you know the flash point for DLTDP?

6        A.    I do not.

7        Q.    Do you know the flash point or melting

8   point for calcium stearate?

9        A.    No.

10       Q.    Do you have any idea why Mr. Johnson's

11  GC-MS test did not detect calcium stearate?

12       A.    Yes.

13       Q.    Why?

14       A.    It wouldn't be soluble in methylene

15  chloride.  It's only going to extract out what's

16  soluble in that solvent.

17       Q.    Did the GCMS test detect any blue pigment?

18       A.    No.

19       Q.    Why not?

20       A.    Either it's not soluble in methylene

21  chloride or its boiling point is too high to make

22  it through the gas chromatograph, one of the two.

23       Q.    Do you know what the boiling point is of

24  the CPC blue pigment?
```

Duane Priddy, Ph.D.

```
1        A.    I do not.

2        Q.    Doctor, did you ever do any type of FTIR

3    analyses on Prolene?

4        A.    No.

5        Q.    Did Mr. Johnson to your knowledge do any

6    type of FTIR analyses on Prolene?

7        A.    No.

8        Q.    Doctor, let's look at Page 12 of your

9    expert report.  Are you there with me?

10       A.    I am.

11       Q.    It states, "The mesh sample," in the top

12   of the first paragraph.

13       A.    Yes.

14       Q.    "The mesh sample is heated to 200 degrees

15   C under pure nitrogen."

16             Is that right?

17       A.    Yes.

18       Q.    Doctor, do you know, we talked about this

19   earlier, do you have any idea what the flash point

20   is for DLTDP?

21             MR. JACKSON:  Objection, asked and

22         answered.

23       A.    No.

24             (Priddy Deposition Exhibit 8 was
```

Duane Priddy, Ph.D.

1        marked for identification.)

2    BY MR. HUTCHINSON:

3        Q.    Doctor, I want to hand you what we'll mark

4    as Exhibit 8 to your deposition.

5            (Witness reviewing document.)

6        Q.    Exhibit 8 is for an antioxidant DLTDP, do

7    you see that?

8        A.    I do.

9        Q.    The flash point for DLTDP is 150 degrees

10   C; is that correct?

11       A.    That's what it says, yes.

12       Q.    And Doctor, do you have any reason to

13   believe that the flash point for DLTDP would be

14   significantly different than 150 degrees C?

15       A.    No.   It sounds low but I don't have any

16   reason to dispute it.

17       Q.    Doctor, a sample of mesh heated to

18   200 degrees C is 50 degrees Celsius hotter than the

19   flash point for DLTDP, isn't it?

20       A.    That's correct.

21       Q.    Doctor, that would volatize DLTDP,

22   wouldn't it?

23       A.    No.

24       Q.    Why not?

Duane Priddy, Ph.D.

1      A.   Flash point has nothing to do with boiling

2    point.

3      Q.   A flash point is the temperature at which

4    an organic compound gives off enough vapor to ignite

5    in air; is that right?

6      A.   It's ignitable in air by a spark, yes.

7           MR. JACKSON:  Chad, I am going to

8           object to the use of this document just

9           on foundation.  I don't know what it is.

10   BY MR. HUTCHINSON:

11     Q.   Doctor, what did you do to ensure that

12   DLTDP or Santonox R were not burned off when Mr.

13   Johnson heated the mesh to 200 degrees C?

14     A.   As I explained to you, I had him determine

15   its retention time in the GC which gave me a feel

16   for its level of volatility and based upon that

17   data, I knew it was not a very volatile chemical.

18   And of course when chemicals are embedded in a

19   plastic, it's very difficult to drive them, vaporize

20   them and get them out of the plastic at low levels.

21     Q.   Doctor, on Page 13 of your expert report

22   under Section 11 it states, "The antioxidants,"

23   plural, "present in the ten meshes were then

24   extracted."

Duane Priddy, Ph.D.

1          Did I read that correctly?

2     A.   That's correct.

3     Q.   DLTDP was found as an antioxidant in this

4  case; is that correct?

5          MR. JACKSON:  Objection, form.

6     A.   Just a minute.  Let me read through this

7  real quick.

8          (Witness reviewing document.)

9     A.   Now, what's your question?

10 BY MR. HUTCHINSON:

11    Q.   My question is, sir:  Was DLTDP extracted

12 using the methylene chloride solvent?

13    A.   All I can say is that in this particular

14 test referred to right here, it was not detected,

15 and I don't know exactly why it wasn't detected.  I

16 don't know if it wasn't extracted or if the

17 conditions for the GC-MS analysis just were such

18 that it didn't detect it.

19    Q.   Did you ever make any effort to find out

20 why?

21         MR. JACKSON:  Objection, form.

22    A.   I asked him to try to detect DLTDP and he

23 played around and was finally able to come up with

24 conditions that he could see it.  But it was not

Duane Priddy, Ph.D.

```
 1   this particular test right here, he couldn't see it.

 2   BY MR. HUTCHINSON:

 3       Q.   What concentration level did Mr. Johnson

 4   find DLTDP in?

 5       A.   The particular -- I remember numbers,

 6   hundreds of parts per million.

 7       Q.   Right, but can you quantify the amount of

 8   DLTDP concentration level that Mr. Johnson found?

 9       A.   I'm sorry, the question again?

10       Q.   Can you quantify the concentration level

11   of the DLTDP that Mr. Johnson found?

12       A.   As I said, it was hundreds of parts per

13   million.  I just don't remember the exact number.

14       Q.   Did Mr. Johnson ever tell you that exact

15   number?

16            MR. JACKSON:  Objection, form.

17       A.   Yes.

18   BY MR. HUTCHINSON:

19       Q.   Where would that data be included?

20       A.   In the data report.

21       Q.   Where is the data report?

22       A.   Should be on the flash drive.

23       Q.   Look at Page 9 for me, please, of your

24   expert report under Summary, Number 2.
```

Duane Priddy, Ph.D.

1     A.    Okay.

2     Q.    It states, "The polymer chain is

3   disentangled."

4           Do you see that?

5     A.    Yes.

6     Q.    Doctor, would you agree that

7   disentanglement of polymer chains allows a polymer

8   to elongate?

9           MR. JACKSON:   Objection, form.

10    A.    No.

11  BY MR. HUTCHINSON:

12    Q.    Doctor, if polymers, if polymer chains do

13  not disentangle, would the polymer become brittle?

14    A.    If the polymer chains do not disentangle,

15  would the polymer become brittle?

16    Q.    Correct.

17    A.    Yeah, it can, yes.

18    Q.    But you disagree that disentanglement of

19  polymer chains allows a polymer to elongate?

20          MR. JACKSON:   Objection, misstates

21      witness testimony.

22    A.    A polymer will elongate under stress

23  whether or not it is entangled.  So I guess I'm

24  not --

Duane Priddy, Ph.D.

1   BY MR. HUTCHINSON:

2        Q.   Should the polymer chains become

3   disentangled for a polymer to elongate?

4        A.   No.

5        Q.   Doctor, when you reviewed the internal

6   documents from Ethicon, did you review any documents

7   on biocompatibility?

8             MR. JACKSON:   Objection, form.

9        Q.   Doctor?

10       A.   I'm thinking.  I guess I'm not sure

11   specifically what you are referring to, but I would

12   say yes.

13       Q.   Do you have any opinions about the

14   biocompatibility testing of Prolene that Ethicon

15   did?

16       A.   I don't have an opinion on that.

17       Q.   Doctor, have you ever designed pelvic

18   mesh?

19             MR. JACKSON:   Objection, asked and

20        answered.

21       A.   No.

22   BY MR. HUTCHINSON:

23       Q.   Have you ever done any type of

24   biomechanical testing of pelvic mesh?

Duane Priddy, Ph.D.

1        A.    The only testing I have done regarding

2   Prolene mesh are listed in my report.

3        Q.    So we are clear, you have never done any

4   biomechanical testing of Prolene mesh, correct?

5        A.    That's correct.

6        Q.    You have never done any type of

7   biomechanical testing of Prolene, have you?

8        A.    No.

9        Q.    Have you ever been involved in any type of

10   clinical research regarding Prolene?

11        A.    Other than reviewing a lot of documents on

12   the research, no.

13        Q.    My question is, sir:  Have you personally

14   ever been involved in any type of clinical research

15   regarding Prolene?

16        A.    Not as far as conducting the research, no.

17        Q.    Or mesh, have you ever been involved in

18   any clinical research regarding mesh?

19             MR. JACKSON:  Objection, form.

20        A.    Just reviewing the results of the studies,

21   that's it.

22   BY MR. HUTCHINSON:

23        Q.    Have you ever tested a mesh explant?

24             MR. JACKSON:  Objection, form.

Duane Priddy, Ph.D.

```
 1        A.    I served as a consultant on a project

 2  several years ago involving Kugel mesh and at that

 3  point I received a mesh sample, but I don't recall

 4  actually evaluate -- or testing it.

 5  BY MR. HUTCHINSON:

 6        Q.    Do you know what the chemical composition

 7  is of the Kugel mesh?

 8        A.    Yes, it was a polyester.

 9        Q.    It wasn't Prolene, correct?

10        A.    No.

11        Q.    Doctor, you will agree that Prolene has a

12  chemical composition difference compared to

13  polypropylene?

14        A.    Absolutely, yes.  Compared to what?

15        Q.    Compared to polypropylene.  Polypropylene

16  and Prolene are chemically different, aren't they,

17  sir?

18              MR. JACKSON:  Objection, form.

19        A.    Prolene meshes are polypropylene.

20  BY MR. HUTCHINSON:

21        Q.    Doctor, as a materials scientist, would

22  you agree that Prolene has a different chemical

23  composition compared to pure polypropylene?

24              MR. JACKSON:  Objection, form.
```

Duane Priddy, Ph.D.

```
 1        A.    It's got stabilizers and additives, yes.

 2   BY MR. HUTCHINSON:

 3        Q.    Prolene and polypropylene are not

 4   identical, are they?

 5        A.    Prolene is polypropylene with additives.

 6        Q.    And pure polypropylene is not identical to

 7   Prolene, correct?

 8             MR. JACKSON:   Objection, asked and

 9        answered.

10   BY MR. HUTCHINSON:

11        Q.    Pure polypropylene?

12        A.    Because pure, with no additives, is

13   different than a formulation with additives, yes.

14        Q.    And Ethicon's product is a formulation

15   with additives, correct?

16        A.    That's correct.  All polypropylene

17   products contain additives.  They have to.

18        Q.    But they are different polymers?

19        A.    Polymer is the same.

20        Q.    Doctor, what medical products are you

21   designated to give opinions about?

22        A.    You mean in legal cases?  I've done

23   consulting.

24        Q.    No, in the deposition that you are here
```

Duane Priddy, Ph.D.

```
 1   for today, In Re Ethicon Pelvic Repair System

 2   Products Liability Litigation.

 3              MR. JACKSON:  Objection, form.

 4        A.   I was asked to opine on the use of

 5   polypropylene in the TVT and the Gynemesh product

 6   lines for urinary incontinence and the pelvic

 7   products.

 8   BY MR. HUTCHINSON:

 9        Q.   Doctor, do you know the names of the

10   products that you are designated to give testimony

11   about for the plaintiffs?

12        A.   As I said, the TVT products, there's like

13   four or five of those and then the prolapse

14   products, there are several of those.

15        Q.   Do you know the names of those products?

16        A.   Boy, I'm terrible at names.  I don't

17   remember the details of all the names, no.  I was

18   shown the names and have seen the names and, yes,

19   but I just don't recall all the names.

20        Q.   Do the opinions that you are giving today

21   relate to all of these products?

22        A.   If they contain polypropylene, yes.

23        Q.   Doctor, have you ever seen a TVT -- strike

24   that.
```

Duane Priddy, Ph.D.

1            I am going to represent to you that you

2    are designated in cases involving Prolene Soft mesh,

3    Gynemesh PS, TVT, Prolift, TVT-O, Prolift+M, TVT

4    Exact, TVT Secur, Prosima and TVT Abbrevo?

5        A.   I have seen all those names, yes.

6        Q.   Thank you.  Doctor, have you ever held any

7    of those devices in your hand?

8            MR. JACKSON:  Objection, form.

9        A.   Yes.

10   BY MR. HUTCHINSON:

11       Q.   When?

12       A.   Back in December when I received the

13   samples for lab testing.

14       Q.   Did you receive one sample of each

15   product?

16       A.   No, I received, I think, four of the

17   Gynemesh products and six of the TVT products.

18       Q.   So fair to say you have never held Prosima

19   or Prolift or Prolift+M in your hands?

20           MR. JACKSON:  Objection, form.

21       A.   That's correct.

22   BY MR. HUTCHINSON:

23       Q.   Doctor, do you know what the indications

24   are for those products?

Duane Priddy, Ph.D.

1      A.    Indications?

2      Q.    Yes.

3      A.    What do you mean by indications?

4      Q.    What the product is indicated for from a

5  medical standpoint.

6      A.    In general, yes.

7      Q.    Doctor, do you know how long those

8  products have been on the market?

9      A.    The years vary but it started back in the

10  1990s and then there's recent introductions as

11  recent as, I think 2010 or '11.

12      Q.    Can you tell us the date that each of

13  those products were introduced to the market?

14          MR. JACKSON:  Objection, form.

15      A.    Again, I have seen the dates, I just don't

16  recall.

17  BY MR. HUTCHINSON:

18      Q.    Do you know the physical dimensions of the

19  mesh of each of those products?

20          MR. JACKSON:  Objection, form.

21      A.    Again, I have seen pictures and photo-

22  graphs of them, but I don't recall exact dimensions.

23  BY MR. HUTCHINSON:

24      Q.    Do you know the weight of the mesh of

Duane Priddy, Ph.D.

1    those particular products?

2        A.    Again, I've seen that information.  I just

3    don't recall it.

4        Q.    Do you know how many newtons of force are

5    placed on the mesh in vivo?

6        A.    I do not.

7        Q.    Doctor, what do you know about the

8    manufacturing process Ethicon uses to make Prolene?

9            MR. JACKSON:   Objection, form.

10       A.    I know that the resin is manufactured in

11   West Virginia and then it's converted to fiber in

12   Georgia, and then woven into mesh and sent over to

13   Europe where it's cut and then it's shipped back to

14   the US for sale.

15       Q.    Doctor, is the mesh woven or knitted?

16       A.    Oh, boy, I'm not sure of the semantics of

17   the difference between those to be able to answer.

18       Q.    Doctor, do you know if Prolift+M, the mesh

19   in Prolift+M is made of a hundred percent Prolene?

20       A.    I remember, when I looked through the data

21   in the data sheets, I remember that some of the

22   products have polypropylene plus another

23   biodegradable kind of material, either

24   polycaprolactone or glycolate biodegradable

Duane Priddy, Ph.D.

1    material.  So it is a hybrid system.

2         Q.   Doctor, my question is:  Do you know what

3    type of biodegradable material Prolift+M has in its

4    mesh?

5              MR. JACKSON:  Objection, form.

6         A.   I have seen it, I just don't recall.

7    BY MR. HUTCHINSON:

8         Q.   Doctor, did you make any efforts to find

9    out what type of biodegradable material is in

10   Prolift+M?

11        A.   Other than reading the sheets that

12   describe them, no.

13        Q.   Do you consider yourself an expert in the

14   manufacturing process of pelvic mesh?

15             MR. JACKSON:  Objection, form.

16        A.   Just the manufacture as far as it goes to

17   making the fibers.  Once the fibers are made, I'm

18   not an expert from that point on.

19   BY MR. HUTCHINSON:

20        Q.   Doctor, have you ever invented any type of

21   polypropylene product that's turned into a fiber?

22        A.    Invented a polypropylene product, I have

23   worked on polypropylene additive formulations.  I

24   led a group at Dow for several years in the 1990s

Duane Priddy, Ph.D.

```
 1   where we experimented with different Dow products
 2   including polypropylene and the additives and
 3   stabilizers that need to be added to those to make
 4   various types of products including fibers.
 5       Q.   Doctor, have you personally ever performed
 6   any testing to determine if Prolene degrades in
 7   vivo?
 8       A.   I have not done any in vivo testing
 9   myself, no.
10       Q.   And you haven't done any loss of
11   mechanical property testing in vivo, have you?
12       A.   I just reviewed the Ethicon documents
13   which showed the loss of strength properties from in
14   vivo implanted Prolene sutures.
15       Q.   But you have never done any testing, have
16   you?
17            MR. JACKSON:  Objection, form.
18       A.   Just reviewed work of others, yes.
19   BY MR. HUTCHINSON:
20       Q.   In fact, you have never tested the
21   durability of Prolene?
22       A.   In vivo?
23       Q.   Yes.
24       A.   Not directly, no.
```

Duane Priddy, Ph.D.

1    Q.   Have you ever tested the durability of

2    Prolene in any form or fashion?

3         MR. JACKSON:  Objection, form.

4    A.   Well, yes, the OIT testing.

5    BY MR. HUTCHINSON:

6    Q.   What about tensile strength, have you ever

7    tested tensile strength of Prolene, whether it be in

8    vivo or outside the body?

9    A.   I just reviewed the Ethicon documents

10   which do that kind of testing.

11   Q.   You have never done tensile strength

12   testing, have you?

13   A.   I have done tensile strength testing.

14   Q.   Of Prolene?

15   A.   Not of Prolene, no.

16   Q.   You have never done elongation testing of

17   Prolene, have you?

18   A.   Just reviewed those documents.

19   Q.   You have never done any toughness testing

20   of Prolene, have you?

21        MR. JACKSON:  Objection, form.

22   A.   No, just reviewed the documents.

23   BY MR. HUTCHINSON:

24   Q.   You have never done any Young's modulus

Duane Priddy, Ph.D.

```
1    testing of Prolene, have you?

2         A.   I sure reviewed the Ethicon documents on

3    the Young's modulus of Prolene.  I was shocked by

4    what I saw.

5         Q.   You have never done any testing of that,

6    have you?

7         A.   I have done modulus testing.

8         Q.   On Prolene?

9         A.   Not on Prolene, no.

10        Q.   You have had the resources available to do

11   all of this testing of Prolene, haven't you?

12        A.   I've had it, but I had all those documents

13   which gave me the data that I needed to opine on

14   that issue.

15        Q.   You will agree with me that degradation

16   affects the physical properties of the polymer?

17        A.   Absolutely, yes.

18        Q.   And it will affect the physical properties

19   of the mesh and/or suture, correct?

20        A.   That's correct.

21        Q.   You will agree that evaluation of the

22   physical properties of mesh is an important part in

23   your analysis on degradation, correct?

24        A.   Absolutely, yes.
```

Duane Priddy, Ph.D.

1        Q.    As well as oxidation?

2              MR. JACKSON:   Objection, form.

3        A.    Yes.

4   BY MR. HUTCHINSON:

5        Q.    Doctor, have you ever done any type of

6   testing or analysis on an explanted Prolene mesh?

7        A.    Just reviewed the literature and the

8   documents.

9        Q.    But you have never done any actual testing

10  of an actual explanted Prolene mesh, have you?

11       A.    Not myself, no.

12       Q.    Have you ever seen a Prolene explanted

13  mesh?

14       A.    Yes.

15       Q.    Where?

16       A.    In the literature.

17       Q.    Have you ever seen an actual Prolene

18  explanted mesh?

19       A.    No.

20       Q.    Have you ever seen an actual Prolene

21  explant that has become degraded?

22       A.    Yes.

23       Q.    Where?

24       A.    In the literature.

Duane Priddy, Ph.D.

1    Q.   Outside the literature, have you ever seen

personally a Prolene explant that has become

brittled?

4    A.   No.

5    Q.   Or degraded?

6    A.   No.

7    Q.   Or oxidized?

8    A.   No.

9    Q.   Or lost physical properties?

10        MR. JACKSON:  Objection, form.

11   A.   Just in pictures in the literature.

12   BY MR. HUTCHINSON:

13   Q.   In fact, you have never done any testing

or analysis on the degradation of Prolene before

your involvement in this case; is that correct?

16        MR. JACKSON:  Objection, asked and

17        answered.

18   A.   Before involvement in the case, no.

19   BY MR. HUTCHINSON:

20   Q.   Am I correct?

21   A.   That's correct.

22   Q.   Thank you.  Doctor, you were designated

in -- let's look at Exhibit 1 for me, please, it is

the notice of deposition.

Duane Priddy, Ph.D.

1      A.   Yes.

2      Q.   You were designated as an expert in 23

3   case-specific cases starting with Harriet Beach,

4   Sharon Boggs and going on down all the way to

5   Virginia White.  Do you see that?

6      A.   Yes.

7      Q.   Do you know what type of product these 23

8   women received?

9           MR. JACKSON:  Objection, form.

10     A.   No.

11  BY MR. HUTCHINSON:

12     Q.   Have you ever reviewed the medical records

13  for these 23 plaintiffs?

14     A.   No, I have not.

15     Q.   By the way, Doctor, have you ever

16  attempted to clean an explanted piece of mesh?

17     A.   No.

18     Q.   Why do you laugh?

19     A.   Because I was sent a sample of explanted

20  mesh and asked to analyze it and it made me very

21  nervous.

22     Q.   Who sent it to you?

23     A.   This was the Kugel mesh case and I got to

24  the point of where I just didn't want to handle a

Duane Priddy, Ph.D.

```
 1   piece of explanted mesh because of various obvious

 2   reasons.

 3        Q.   Biohazardous --

 4        A.   Biohazardous, yes, until I was assured

 5   that there was no issue.

 6        Q.   Doctor, fair to say you have never

 7   inspected the explanted mesh from any of these 23

 8   women, correct?

 9        A.   That is correct.

10             MR. JACKSON:  We have been going

11        about another hour.  Can we take a break

12        soon?

13             MR. HUTCHINSON:  Yes.

14   BY MR. HUTCHINSON:

15        Q.   Do you know the date that these women had

16   implanted or explanted mesh in them?

17        A.   No.

18        Q.   Do you have any idea how long these women

19   had their mesh in their bodies before it was

20   explanted?

21        A.   No.

22        Q.   Do you know why from a medical or clinical

23   standpoint, why any of these 23 plaintiffs had their

24   mesh removed?
```

Duane Priddy, Ph.D.

```
 1              MR. JACKSON:  Objection, form.

 2        A.   I can only make assumptions.

 3   BY MR. HUTCHINSON:

 4        Q.   You don't have any hard facts on why the

 5   mesh --

 6        A.   No.

 7        Q.   Excuse me, no hard facts regarding why the

 8   mesh was removed, correct?

 9        A.   Correct.

10        Q.   Doctor, can you make any prediction about

11   when the mesh from any of these 23 different

12   plaintiffs would have oxidized in vivo?

13              MR. JACKSON:  Objection, form.

14        A.   Based upon the results of Ethicon's

15   testing, yes.

16              MR. JACKSON:  Chad, let's take a

17         break now.

18              MR. HUTCHINSON:  Actually, just two

19         more questions and we'll take a break.

20              MR. JACKSON:  I will give you two

21         questions.

22   BY MR. HUTCHINSON:

23        Q.   Doctor, can you tell us a specific date

24   when Harriet Beach's mesh oxidized?
```

Duane Priddy, Ph.D.

```
 1              MR. JACKSON:  Objection, form.

 2      A.   No.

 3              MR. HUTCHINSON:  Thank you.  We'll

 4      take a quick break.

 5              THE VIDEOGRAPHER:  We are off the

 6      video record.  The time is 11:08 a.m.

 7              (Recess.)

 8              THE VIDEOGRAPHER:  We are back on

 9      the video record with Tape Number 3.  The

10      time is 11:18 a.m.

11  BY MR. HUTCHINSON:

12      Q.   Doctor, back on the record.  Anything

13  about the testimony you have given you would like to

14  change?

15      A.   No.

16      Q.   Going back to Exhibit 1 and the list of

17  the 23 different plaintiffs, can you tell us the

18  date on which any of these 23 different plaintiffs

19  had their mesh oxidized?

20              MR. JACKSON:  Objection, form.

21      A.   I could probably tell you if I had the

22  literature when the meshes were removed.

23  BY MR. HUTCHINSON:

24      Q.   Right, but I am asking when they were
```

Duane Priddy, Ph.D.

```
 1   oxidized.

 2        A.    There's so many variables in the human

 3   body, it's impossible to know when a mesh, at what

 4   point it oxidizes to the point of degradation to be

 5   an issue.

 6        Q.    Doctor, can you identify by name one

 7   person who has had their mesh surgery removed

 8   because of degradation?

 9             MR. JACKSON:   Objection, form.

10        A.    My best is all of them had them, they were

11   degraded by oxidation.  Every mesh that was removed

12   from these women, I'm very confident would show

13   evidence of degradation by oxidation.  It is because

14   of my knowledge of polypropylene oxidation.

15   BY MR. HUTCHINSON:

16        Q.    You have never talked to the doctors?

17        A.    I have not.

18        Q.    You have never looked at the medical

19   records?

20        A.    That's correct.

21        Q.    You have never talked to any of these

22   plaintiffs?

23        A.    That's correct.

24        Q.    Or any of these family members?
```

Duane Priddy, Ph.D.

1        A.    That's correct.

2        Q.    Doctor, can you state to a reasonable

3   degree of scientific certainty whether or not any of

4   these 23 plaintiffs have had their mesh removed

5   specifically because of degradation?

6        A.    All I can say is that the meshes removed

7   from these women had undergone oxidation.  I can say

8   that unequivocally.

9        Q.    Doctor, did the mesh from any of these

10  women fail?

11             MR. JACKSON:  Objection, form.

12       A.    Depends on how you define failure.

13  BY MR. HUTCHINSON:

14       Q.    Did the mesh from any of these women stop

15  providing tissue support?

16       A.    I do not know that.

17       Q.    Did the mesh from any of these women lose

18  molecular weight?

19       A.    Yes.

20       Q.    Have you ever done any molecular weight

21  analyses on the explants from these women?

22       A.    No.

23       Q.    How can you tell us that these meshes lost

24  molecular weight without having examined the

Duane Priddy, Ph.D.

1    explant?

2         A.   Because I understand the chemistry of

3    polypropylene, and the fact that it interacts with

4    oxidizing species and degrades, and as part of the

5    oxidation process, molecular weight is lowered.  And

6    the fact that they were implanted for a period of

7    time, I'm a hundred percent confident that if I had

8    a sensitive way to measure molecular weight, or I

9    should say applied a sensitive technique for

10   measuring molecular weight of all of these explanted

11   meshes, I can detect a loss of molecular weight.  I

12   have full confidence of that.

13        Q.   A loss of molecular weight means

14   degradation has occurred, correct?

15        A.   That's correct.

16        Q.   Let's take, for example, Harriet Beach,

17   the first named plaintiff.  Do you have any evidence

18   to confirm that Harriet Beach, her explant, lost

19   molecular weight?

20             MR. JACKSON:  Objection, asked and

21        answered.

22        A.   Do I have data?

23   BY MR. HUTCHINSON:

24        Q.   Yes, sir.

Duane Priddy, Ph.D.

1      A.    Other than my knowledge of polypropylene

2   oxidation chemistry, no.

3      Q.    Doctor, do you have data on any of the 23

4   plaintiffs that would show their mesh lost molecular

5   weight?

6      A.    I have not actually done the measurements

7   to collect the data, no.

8      Q.    In fact, Doctor, you have not done

9   anything according to the scientific method to prove

10  whether or not any of these plaintiffs' mesh

11  degraded in vivo, have you?

12          MR. JACKSON:   Objection, form.

13     A.    I have done a ton of research using the

14  scientific method to study the degradation chemistry

15  of polypropylene.

16  BY MR. HUTCHINSON:

17     Q.    But have you proven that using the

18  scientific method for any of these 23 plaintiffs,

19  yes or no?

20     A.    Not those specific samples, no.

21     Q.    Doctor, are you aware of any peer-reviewed

22  literature that shows there is a clinical effect of

23  degradation in vivo?

24     A.    I've read a ton of literature put out in

Duane Priddy, Ph.D.

1   the last ten years on explanted meshes that show

2   degradation.

3       Q.   Doctor, are you aware of any clinical data

4   that shows degradation is clinically significant?

5           MR. JACKSON:  Objection, form.

6       A.   Clinically, I can't equate to that,

7   clinically significant.

8   BY MR. HUTCHINSON:

9       Q.   Doctor, are you aware of any clinical data

10  that shows degradation causes clinical harm?

11      A.   Again, since I'm not a medical doctor, I

12  can't equate the clinical.

13      Q.   Are you aware of any data that shows

14  degradation causes harm in women?

15      A.   Any data?

16      Q.   As a scientist.

17      A.   Other than reading the scientific

18  literature that I've talked about on explants.

19      Q.   Doctor, have you concluded that Prolene is

20  toxic?

21          MR. JACKSON:  Objection, form.

22      A.   I know from reading the MSDS sheets on the

23  different additives in Prolene, I know that the

24  colorant, the copper phthalocyanine pigment is

Duane Priddy, Ph.D.

1    cytotoxic, so that tells me that any dye that exudes

2    from the surface in the neighboring tissue would be

3    toxic to it.

4         Q.   Are you offering opinions today to a

5    reasonable degree of scientific certainty that

6    Prolene is toxic in the human body?

7              MR. JACKSON:  Objection, form.

8         A.   No, just that pigment is cytotoxic.

9    That's all I can say.

10   BY MR. HUTCHINSON:

11        Q.   Doctor, as a material scientist, are you

12   aware of any material that's completely inert?

13        A.   Completely inert, about the closest to

14   completely inert is diamond.

15        Q.   Are you aware of any medical device on the

16   market that's completely inert?

17        A.   Again, probably the closest would be

18   titanium, but even that is not, completely is a

19   pretty, 100.00 percent is completely and there's no

20   such thing.

21        Q.   Doctor, are you aware of any mesh, medical

22   device on the market that is inert in the human

23   body?

24        A.   All I can tell you is from reading the

Duane Priddy, Ph.D.

1  literature, it appears that PDVF is the closest to

2  being inert but even that's not inert.

3      Q.    Thank you.  Doctor, when we talked about

4  degradation, you will agree that there must be loss

5  of molecular weight for degradation to occur?

6          MR. JACKSON:  Objection, misstates

7      the witness' testimony.

8      A.    No.

9  BY MR. HUTCHINSON:

10     Q.    What happens to a polymer when it loses

11 molecular weight, does it degrade?

12     A.    Yes.

13     Q.    There must be loss of molecular weight for

14 degradation to have occurred, correct?

15     A.    No.

16     Q.    Why not?

17     A.    There's intermediate species like, for

18 example, before molecular weight loss occurs, there

19 is generally oxidation.  There's a hydroperoxide

20 chemical functionality on the polymer and that

21 precedes molecular weight loss.

22     Q.    But for oxidation to have occurred, there

23 must be loss of molecular weight, correct?

24     A.    No.

Duane Priddy, Ph.D.

1    Q.   Why not?

2    A.   The additives oxidize so they are

3    constantly dynamic, changing in their structure.  As

4    I mentioned earlier, the DLTDP changes to a sulfone,

5    ultimately to a sulfoxide.  That's an oxidized

6    species, so it is changing --

7    Q.   I'm not asking about --

8         MR. WALLACE:  Chad, you have to let

9         him finish.  This has been going on for a

10        while.  Just let him finish.  We have

11        been good all day.

12   BY MR. HUTCHINSON:

13   Q.   Let's talk about oxidation.

14   A.   Okay.

15   Q.   For oxidation to occur, there must be a

16   chain scission in the cleavage of the polymer chain,

17   correct?

18   A.   No, just to explain, you can have

19   oxidation going on of the additives of the polymer

20   chain without degradation that precedes molecular

21   weight loss.

22   Q.   If a polymer oxidizes, will there be loss

23   of molecular weight?

24        MR. JACKSON:  Objection, asked and

Duane Priddy, Ph.D.

1      answered.

2      A.   There can be, but there doesn't

3  necessarily have to be.

4  BY MR. HUTCHINSON:

5      Q.   If oxidation occurs, will there be strong

6  carbonyl bands on the FTIR?

7      A.   Again, that's a later stage.  The

8  hydroperoxide group that forms first is not a

9  carbonyl.  You don't see an FTIR carbonyl band.

10          If it changes to another species, then it

11  generates a carbonyl band.  But the first stage of

12  oxidation is generated to a hydroperoxide.  That's

13  still oxidation, but it hasn't formed a carbonyl

14  band yet.

15     Q.   At what point does a loss of molecular

16  weight occur in oxidation?

17     A.   At the point that the hydroperoxide group

18  changes to a carbonyl, it is accompanied by chain

19  scission and you lose molecular weight.

20     Q.   So when you have chain scission, you lose

21  molecular weight?

22     A.   That's correct.

23     Q.   For oxidation to occur, you must always

24  have chain scission of the polymer chain, correct?

Duane Priddy, Ph.D.

```
 1              MR. JACKSON:  Objection, form.

 2       A.   No.  As I mentioned earlier, you can have

 3   oxidation without chain scission.

 4   BY MR. HUTCHINSON:

 5       Q.   If oxidation occurs, you always have

 6   reduced physical properties of the polymer?

 7              MR. JACKSON:  Objection, form.

 8       A.   In the early stages, it's probably

 9   non-detectable.

10   BY MR. HUTCHINSON:

11       Q.   If oxidation occurs, you will have

12   embrittlement?

13       A.   Ultimately.

14       Q.   If oxidation occurs, you will have loss of

15   tensile strength?

16       A.   Ultimately.

17       Q.   If oxidation occurs, you will have loss of

18   elongation?

19       A.   That's dependent.  If body fluids, lipids,

20   oils, fats are absorbed into the polymer, it

21   actually increases elongation.

22       Q.   You will have loss of toughness if

23   oxidation occurs, correct?

24              MR. JACKSON:  Objection, form.
```

Duane Priddy, Ph.D.

```
 1        A.   Depends on how you define toughness, but

 2   generally, yes.

 3   BY MR. HUTCHINSON:

 4        Q.   Let's define it as the area under the

 5   curve on a stress-strain diagram.  With that

 6   definition, you will have a loss of toughness,

 7   correct?

 8        A.   Give me a minute to think about that.

 9             Yes.

10        Q.   Doctor, would you ever expect to see an

11   increase in physical properties in a polymer that is

12   oxidized?

13        A.   Which physical property?

14        Q.   Tensile strength.

15        A.   Yes.

16        Q.   Young's modulus?

17        A.   Can I explain?  Tensile strength, as a

18   material becomes more brittle, generally increases.

19   Young's modulus, if there's no chemicals absorbed

20    into the material to alter its plastic nature,

21   Young's modulus will generally increase as the

22   material embrittles.

23        Q.   What about toughness?

24        A.   Toughness generally decreases even though
```

Duane Priddy, Ph.D.

1    the tensile strength -- of course, you are getting

2    into some issues here which require a lot of

3    materials science explanations.  But in general, as

4    materials embrittle, the Young's modulus and the

5    tensile strength actually increase but the area

6    under the stress-strain curve decreases.

7         Q.   Doctor, are you aware of any product on

8    the market --

9              MR. HUTCHINSON:  We are going to

10        have to take a quick break, and this

11        obviously does not count as my time.  We

12        are going to have to take a quick break

13        because of the noise outside.

14             THE VIDEOGRAPHER:  We are off the

15        video record.  The time is 11:33 a.m.

16        (Recess.)

17             THE VIDEOGRAPHER:  We are back on

18        the video record.  The time is 11:33 a.m.

19   BY MR. HUTCHINSON:

20        Q.   Doctor, are you aware of any medical

21   product on the market that will never oxidize?

22        A.   No.

23        Q.   Doctor, can oxidation of pelvic Prolene

24   mesh -- strike that.

Duane Priddy, Ph.D.

```
 1              Can oxidation of Prolene pelvic mesh ever

 2    be completely eliminated in vivo?

 3              MR. JACKSON:  Objection, form.

 4         A.   No.

 5    BY MR. HUTCHINSON:

 6         Q.   Doctor, you talked about a PVDF earlier;

 7    is that correct?

 8         A.   Yes.

 9         Q.   Is that what you believe would have been a

10    safer alternative than polypropylene?

11              MR. JACKSON:  Objection, form.

12         A.   I have no basis to make that kind of a

13    conclusion other than my understanding of the

14    relative oxidative stability of PVDF versus

15    polypropylene.

16    BY MR. HUTCHINSON:

17         Q.   Doctor, what in your opinion is a safer

18    alternative for Prolene in pelvic floor repair?

19              MR. JACKSON:  Objection, form.

20         A.   I'm not here to opine on that.  I was just

21    asked to talk about polypropylene meshes.  So I'd

22    rather not get into that kind of a discussion.

23    BY MR. HUTCHINSON:

24         Q.   I understand, but do you have an opinion
```

Duane Priddy, Ph.D.

1    sitting here today what the safer alternative for

2    Prolene would be?

3              MR. JACKSON:  Objection, asked and

4         answered.

5         A.   Well, I know from my experience as a

6    polymer scientist, I have worked with PVDF.  It is

7    used in water filtration membranes, and the reason

8    is because it's like a rock when it comes to

9    oxidative stability.

10             They actually clean these membranes by

11   soaking them in concentrated bleach for several days

12   to burn off the organics.  And yet even though it

13   tolerates that for a while, eventually even those

14   membranes eventually oxidize and degrade and have to

15   be replaced.

16        Q.   And there are risks associated with PVDF,

17   correct?

18             MR. JACKSON:  Objection, form.

19        A.   Risks?

20   BY MR. HUTCHINSON:

21        Q.   Yes, medical risks associated with PVDF,

22   correct?

23             MS. FITZPATRICK:  You can't just put

24        an expert up here and ask anything that

Duane Priddy, Ph.D.

```
 1      you want.  So if it is tied to his

 2      report, fine; but other than that, you

 3      are going to have to move on.

 4  BY MR. HUTCHINSON:

 5      Q.   Can you answer that question?

 6      A.   Repeat the question.

 7      Q.   Yes.  Are you aware of any medical risks

 8  using PVDF as a medical device?

 9          MS. FITZPATRICK:  I am going to

10      instruct the witness not to answer unless

11      you can show for some reason it is in his

12      report.

13  BY MR. HUTCHINSON:

14      Q.   Doctor, have you ever tested the

15  durability of PVDF as a mesh material inside the

16  human body?

17          MS. FITZPATRICK:  Same objection,

18      same instruction.

19  BY MR. HUTCHINSON:

20      Q.   Doctor, would you ever guarantee, would

21  you ever provide a lifetime guarantee for PVDF mesh?

22          MR. JACKSON:  Same instruction, same

23      objection.

24  BY MR. HUTCHINSON:
```

Duane Priddy, Ph.D.

1      Q.   Doctor, are you aware of any mesh made, on

2  the market made out of PVDF?

3           MS. FITZPATRICK:  Objection, same

4      instruction.

5           MR. HUTCHINSON:  Instructing the

6      witness not to answer?

7           MS. FITZPATRICK:  I am.  You want to

8      show us why you think that's in his

9      report, I'd be happy to reconsider and

10     look at it; but otherwise, just having an

11     expert witness sitting in the chair and

12     having him opine on things that are well

13     beyond his report is not appropriate.

14  BY MR. HUTCHINSON:

15     Q.   Doctor, could you tell us what would be a

16  reasonably safe alternative to Prolene mesh?

17          MR. JACKSON:  Objection to form.

18     A.   Not without investigating and researching

19  that question.

20  BY MR. HUTCHINSON:

21     Q.   Doctor, have you done any efforts to

22  research or investigate that question?

23     A.   A safer alternative, no.  That's beyond

24  the scope of what I was asked to do.

Duane Priddy, Ph.D.

1      Q.   Doctor, what's your opinion about what

2  Ethicon should have done differently to prevent

3  oxidation of Prolene?

4           MR. JACKSON:  Objection, form.

5      A.   There is no technology that I'm aware of

6  where you can prevent the oxidation of

7  polypropylene.

8  BY MR. HUTCHINSON:

9      Q.   Doctor, if we talk about the physical

10  properties of mesh, have you read the seven-year dog

11  study?

12      A.   I have indeed.

13           (Priddy Deposition Exhibit 9 was

14      marked for identification.)

15  BY MR. HUTCHINSON:

16      Q.   I want to hand you what we'll mark as

17  Exhibit 9 to your deposition.

18           (Witness reviewing document.)

19      Q.   Doctor, this is the seven-year Burkley dog

20  study that you relied on?

21      A.   Yes.

22           MR. JACKSON:  I am just going to

23      object because it says Barbolt on the

24      cover.  You said Burkley.

Duane Priddy, Ph.D.

```
 1   BY MR. HUTCHINSON:

 2       Q.   Doctor, turn with me to the last page of

 3   the seven-year dog study marked as Exhibit 9 to your

 4   deposition.  Are you there with me?

 5       A.   Yes.

 6       Q.   Have you ever seen this particular page

 7   before?

 8       A.   Absolutely, yes.

 9       Q.   Did you look at the breaking strength,

10   elongation and Young's modulus for Prolene?

11       A.   I certainly did.

12       Q.   Doctor, what did you notice about it?

13       A.   I noticed the Young's modulus was

14   ridiculously low after seven years.

15       Q.   Doctor, do you have any reason to believe

16   that the negative 70 shown for Prolene is incorrect?

17       A.   No.

18       Q.   Doctor, do you have any reason to believe

19   that the 111 percent increase of elongation for

20   Prolene is incorrect?

21       A.   No.

22       Q.   What about for the breaking strength of

23   negative 5 percent, any reason to believe that's

24   incorrect?
```

Duane Priddy, Ph.D.

```
 1        A.    No.

 2        Q.    Doctor, have you ever done any type of

 3   analysis using this data from the dog study?

 4        A.    Yes.

 5        Q.    For Prolene?

 6        A.    Yes.

 7        Q.    Is it included in your report?

 8        A.    No.

 9        Q.    Why not?

10        A.    If I do a supplemental report, I'll

11   probably include it, but I didn't include it in this

12   report.

13        Q.    Why not?

14        A.    I can't answer the question.  I just

15   didn't do it.

16        Q.    Did the lawyers that hired you instruct

17   you not to include that in your supplemental report?

18             MR. JACKSON:  Objection, form.

19   BY MR. HUTCHINSON:

20        Q.    I mean in your original report.

21        A.    No.

22        Q.    But you are currently working on

23   evaluating this data, is that your testimony?

24        A.    No, I just said I have evaluated it.
```

Duane Priddy, Ph.D.

```
 1        Q.    Are you currently doing an analysis using

 2    this type of data?

 3              MR. JACKSON:   Objection, asked and

 4        answered.

 5    BY MR. HUTCHINSON:

 6        Q.    Currently?

 7        A.    No, I have analyzed this data.

 8        Q.    But I thought you said you have done some

 9    tests that are not included in the report.

10              MR. JACKSON:   Objection, misstates

11        witness' testimony.

12        A.    I have in the past, yes.  I have done

13    quite a few tests.

14        Q.    What type of tests of the breaking

15    strength, elongation and Young's modulus of Prolene

16    have you done?

17        A.    I haven't done tests, I have evaluated

18    this data.

19        Q.    Doctor, does this data that we are looking

20    at now support your opinions that Prolene degrades?

21        A.    Absolutely.

22        Q.    How so?

23        A.    The 70 percent loss of modulus, that's

24    huge.
```

Duane Priddy, Ph.D.

1      Q.   That means Young's modulus is stiffness,

2  correct?

3      A.   Yes, it does.

4      Q.   And Young's modulus -- strike that.

5           This means that the Prolene lost

6  70 percent of its stiffness after seven years?

7      A.   That's correct.

8      Q.   And why do you believe that supports your

9  opinion?

10     A.   Going from a 700,000 modulus down to

11  200,000, I took that data and plotted it out.  So I

12  took the tensile, the Young's modulus which is

13  tensile modulus times 0 after one year, after two

14  years, after seven years, plotted it.  It's a

15  straight line, with 98 percent statistical linear

16  straight line.  When I extrapolate that until the

17  time it hits 0 modulus, it predicts ten years, three

18  more years, that material would have been water.

19          A stiffness of 200,000 modulus is, the

20  Prolene, if it had been held up, it would have

21  sagged.  There's no stiffness whatsoever, no

22  integrity.  It would have been like jello.  That's

23  huge.

24     Q.   Is that information in your expert report,

Duane Priddy, Ph.D.

1    Doctor?

2         A.    No.

3         Q.    Why not?

4         A.    I focused on the other issues and didn't

5    include that.

6         Q.    You will agree that the physical

7    properties that are shown of the Prolene sutures in

8    the dog study improved after seven years?

9         A.    Absolutely not, no.  Loss of modulus is

10   huge.  That means the material has no integrity.  If

11   it had been any stress at all on it, it would have

12   stretched right out.

13             (Priddy Deposition Exhibit 10 was

14        marked for identification.)

15   BY MR. HUTCHINSON:

16        Q.    Doctor, I want to hand you what we will

17   mark as Exhibit 10 to your deposition.  This shows

18   toughness as the area under the curve, correct?

19             MR. JACKSON:  Objection, form.

20        Q.    The stress-strain chart.

21             (Witness reviewing document.)

22        A.    Yes.

23        Q.    Doctor, these are the same plots or the

24   same data that we saw from the Burkley dog study

Duane Priddy, Ph.D.

1    that we just looked at, correct?

2         A.    I don't know.

3         Q.    Why don't you compare the data on this

4    chart to the data on the last page of the seven-year

5    dog study.

6         A.    These stress-strain curves look strange.

7    I would have to actually see the plot-outs from the

8    instruments that ran this stress-strain curve

9    because you normally don't get a 0 point and a point

10   up here that's a perfect straight line.  It's always

11   an arc.

12             So it looks like somebody took a ruler and

13   hand-drew this out.  It doesn't look right.

14        Q.    Doctor, looking at the red at time 0,

15   elongation was 1.68 pounds according to the Burkley

16   dog study, correct?

17        A.    That's percent.

18        Q.    I'm sorry, percent.

19        A.    Right.

20        Q.    Elongation times 0 is 37 percent; is that

21   right?

22        A.    Again, this data doesn't look -- something

23   is wrong with the data.

24        Q.    What's wrong with the data?

Duane Priddy, Ph.D.

1      A.   I mean, elongation is not to pounds, it's

2    in percent and above it you have got 37 percent.  I

3    mean, that looks correct, year 0, 37 percent.  It

4    must be the breaking strength is 1.68 pounds.  Okay,

5    now I understand.

6      Q.   Now that you have looked at it, you will

7    agree that the data is correct on Exhibit 10?

8         MR. JACKSON:  Objection, form.

9      A.   Well, again, I can't make that leap.

10   BY MR. HUTCHINSON:

11     Q.   Why not?

12     A.   As I say, the curves look weird.  It looks

13   like somebody hand-drew with a ruler.  The plot-outs

14   from a tensile, an Instron, don't look like this.

15   They are not "blocky" like this.  They are nice,

16   smooth curves.  Somebody has taken the data and

17   hand-drawn this.

18     Q.   Doctor, you will agree that the numbers

19   for the breaking strength and elongation at year

20   zero are the same as the Burkley dog study, correct?

21     A.   Hang on.

22         (Witness reviewing document.)

23     A.   Yes.

24         MR. JACKSON:  Chad, are you asking

Duane Priddy, Ph.D.

```
1        him to compare data in Exhibit 9 and

2        Exhibit 10?  Is that what you are asking

3        him?

4    BY MR. HUTCHINSON:

5        Q.   I'm sorry, did you say yes?

6        A.   Yes, I did.

7             THE WITNESS:  That was what I assume

8        he was asking.

9        Q.   And Doctor, at year 7 --

10            MS. FITZPATRICK:  Chad, can he

11       answer the question so it is clear on the

12       record?

13            MR. JACKSON:  Chad, I just asked,

14       were you asking Dr. Priddy to compare

15       Exhibit 9 and Exhibit 10?  Is that what

16       you just asked him to do?

17            MR. HUTCHINSON:  Yes, I did.  I

18       thought the witness answered your

19       question.  My bad.

20   BY MR. HUTCHINSON:

21       Q.   Doctor, at year 7, is the data on

22   Exhibit 10 the same as the data in the Burkley dog

23   study?

24       A.   Yes, it is.
```

Duane Priddy, Ph.D.

```
1       Q.   Thank you.  And Doctor, you will agree

2  that the area under the curve is a measure of

3  toughness, correct?

4            MR. JACKSON:  Objection, form.

5       A.   As I say, there's something wrong here.

6  What I'm seeing here with modulus does not equate to

7  what I'm seeing here (indicating).  There's

8  something wrong.

9  BY MR. HUTCHINSON:

10      Q.   But can you tell us sitting here today

11  what's wrong?

12      A.   What I'm saying, modulus is listed here.

13  It's not reflected here (indicating).  There's a

14  problem.  Something is wrong.

15      Q.   I understand.  My question is:  Sitting

16  here today, can you tell us what is wrong?

17           MR. JACKSON:  Objection, asked and

18      answered.

19      A.   I can't.  I have to figure it out.  I

20  cannot figure it out based on what I'm seeing.  It

21  just doesn't equate, is what I'm saying.  There's

22  something, there's a problem.

23  BY MR. HUTCHINSON:

24      Q.   Have you made any efforts to determine
```

Duane Priddy, Ph.D.

1    what that problem is?

2            MR. JACKSON:  Objection, form.

3        A.   Until I just noticed the problem now, no.

4    I should say yes, I have been trying to figure it

5    out the last five minutes and I can't.  It doesn't

6    add up.

7            I've done literally thousands of

8    stress-strain tensile studies on different samples

9    and this doesn't look right.  Something's wrong.

10           Can I interject something at this point?

11   It's not an answer to a question, it is kind of

12   answering your question.

13           Modulus is slope.  There's a huge

14   difference between a slope of a Young's modulus of

15   200,000 and 700,000.

16           These two curves have almost the same

17   slope, and this does not reflect a difference of 200

18   to 700,000.  As I say, something is clearly wrong.

19       Q.   Doctor, can you quantify the rate at which

20   you believe antioxidants are depleted from Prolene?

21           MR. JACKSON:  Objection, asked and

22       answered.

23       A.   In which?

24   BY MR. HUTCHINSON:

Duane Priddy, Ph.D.

1     Q.   In vivo.

2     A.   It's too many variables.  It's impossible.

3  It's going to be dependent upon the amount of

4  tension, the amount of inflammation, the amount of

5  oxidizing species, but the foreign body response,

6  there's too many variables, plus you've got the

7  variability in the mesh and its oxidative stability.

8  So you just can't predict that.

9     Q.   Have you made any efforts to test that

10  whatsoever?

11          MR. JACKSON:  Objection, form.

12     A.   Test the rate at which it would, just my

13  OIT work.

14  BY MR. HUTCHINSON:

15     Q.   Doctor, you agree that sutures, Prolene

16  sutures have been on the market for a long time?

17     A.   Yes.

18     Q.   Doctor, are you criticizing Ethicon's

19  Prolene sutures in any way?

20     A.   I was not asked to opine on that.

21     Q.   Do you have any criticisms of Ethicon's

22  sutures?

23          MR. JACKSON:  Objection, asked and

24          answered.

Duane Priddy, Ph.D.

```
1          A.    Again, I wasn't -- I haven't even thought
2     about that.
3     BY MR. HUTCHINSON:
4          Q.    Doctor, have you thought about whether or
5     not sutures made out of Prolene oxidize in the body?
6          A.    If they are made out of polypropylene,
7     they oxidize in the body.  That's a given.
8          Q.    Doctor, do you know if Ethicon's sutures
9     were approved by FDA as safe and effective?
10         A.    I remember reading they were approved by
11    FDA.
12         Q.    Doctor, is it your opinion that every
13    person who has a Prolene suture implanted in their
14    body has an oxidized product in their body?
15         A.    Of course, yes, I am.
16         Q.    What about hernia mesh?  Do you know how
17    long hernia mesh has been on the market?
18         A.    I don't know precisely.  I know a long
19    time.
20         Q.    Is it your opinion that Prolene hernia
21    mesh oxidizes in the body?
22         A.    Yes.
23         Q.    And it is your opinion that every person
24    who has ever received a hernia mesh implant has
```

Duane Priddy, Ph.D.

```
 1   oxidized mesh in their body?

 2           MR. JACKSON:  Objection, form.

 3       A.   Yes.

 4   BY MR. HUTCHINSON:

 5       Q.   Doctor, is it your opinion that every

 6   medical doctor who uses Prolene in the body is

 7   committing malpractice?

 8           MR. JACKSON:  Objection, form.

 9       A.   I'm not going to go there.  I'm a plastics

10   scientist.  I'm not into that kind of stuff.

11   BY MR. HUTCHINSON:

12       Q.   Do you believe that every medical doctor

13   who is implanting Prolene in the body is doing

14   something wrong?

15       A.   They are probably relying upon the

16   literature provided to them by Ethicon that said

17   it's safe and effective and they are just relying on

18   that, I presume.

19       Q.   My question to you, though, is:  Do you

20   believe that doctors who implant Prolene in the body

21   are doing something wrong?

22           MR. JACKSON:  Objection, asked and

23       answered.

24           MS. FITZPATRICK:  Beyond the scope
```

Duane Priddy, Ph.D.

1          of his opinions.

2          A.    How can I opine on that?  That's beyond

3     my, what I'm asked to do here.

4     BY MR. HUTCHINSON:

5          Q.    Can you answer that question?

6          A.    I'd rather not.  That's an opinion outside

7     my area of expertise.

8          Q.    Can you answer that question?

9          A.    Can I answer it?  I can give you an

10    opinion for what it's worth.

11               MR. JACKSON:  All asked and

12          answered.

13    BY MR. HUTCHINSON:

14         Q.    What's your opinion?

15         A.    Are they doing something wrong?

16         Q.    Yes, by using Prolene in the body as an

17    implant?

18               MR. JACKSON:  Objection, this is

19          outside the scope of the report.

20         A.    I don't think the doctor is doing anything

21    wrong.  He is just relying upon the information he

22    has, his best judgment.  I think Ethicon is doing

23    something wrong but the doctor isn't doing anything

24    wrong.

Duane Priddy, Ph.D.

1          MR. HUTCHINSON:  Move to strike as

2     non-responsive.

3          MR. WALLACE:  Move to strike because

4     you don't like his answer.

5          MS. FITZPATRICK:  How is that

6     non-responsive?

7          MR. WALLACE:  All right, we are

8     close to done.

9          MR. HUTCHINSON:  How much longer do

10    we have?

11         THE VIDEOGRAPHER:  20 minutes.

12         MR. WALLACE:  We may have some

13    questions so you might want to reserve a

14    couple minutes if you need it.

15  BY MR. HUTCHINSON:

16    Q.   Doctor, let's go back to your expert

17  report on Page 15.  Are you there with me?

18    A.   I am there, yes.

19    Q.   Doctor, are these charts, say, for

20  example, the chart on Page 15.

21    A.   Yes.

22    Q.   What do you call these charts?

23    A.   OIT curves.

24    Q.   Curves.  Doctor, would you expect the

Duane Priddy, Ph.D.

1    additives in Prolene to have an exothermic peak?

2         A.   They will, but it's going to be barely

3    detectable.

4         Q.   Why would it be barely detectable?

5         A.   Excuse me, I got to sneeze.

6              Because they are there in such low

7    concentration relative to the polymer that like,

8    when, for example, the DLTDP is oxidized from the

9    sulfur or the sulfide to the sulfone, ultimately to

10   the sulfoxide, that's an exothermic reaction.  But

11   the DLTDP is such low concentration, the instrument

12   is not sensitive enough to detect it.  So you get a

13   slight elevation in the baseline.

14             This curve is not -- if I was to draw a

15   perfectly horizontal line, you would see this

16   deviating up slightly.  That's probably the Santonox

17   R and the DLTDP slowly oxidizing, but you really

18   don't see a significant response until they are

19   depleted and the polypropylene takes over.

20        Q.   Is that the signs of the additives that

21   you are seeing in your thermogram data?

22        A.   Excuse me?

23        Q.   Is that the signs of the additives that

24   you are seeing in your thermogram data?

Duane Priddy, Ph.D.

1           MR. JACKSON:  Objection, form.

2      A.   Signs?

3  BY MR. HUTCHINSON:

4      Q.   Do you see any signs --

5      A.   I would say it's an indication that they

6  are reacting, yes, they are oxidizing.

7      Q.   Just so the record is clear, what are you

8  referring to specifically?

9      A.   The slight, gradual elevation here is

10  probably due to the antioxidants oxidizing,

11  probably.

12      Q.   That's at the curve, the DSC curve on the

13  top of Page 15, correct?

14      A.   Yes.

15      Q.   Doctor, do you have any opinion regarding

16  the specific concentration level of Santonox R and

17  DLTDP that should have been in Prolene?

18      A.   Just based upon the data sheet I was

19  provided that gave me a target loading level.

20      Q.   Right, but do you have an opinion about

21  Ethicon's Prolene, about what the specific

22  concentration level of Santonox R and DLTDP should

23  have been?

24           MR. JACKSON:  Objection, asked and

Duane Priddy, Ph.D.

1        answered.

2        A.   Should have been for the Prolene

3   application?

4   BY MR. HUTCHINSON:

5        Q.   Yes, sir.

6        A.   My opinion is, it's not appropriate to use

7   polypropylene, stabilized polypropylene with those

8   additives in for that application.  It's not

9   appropriate.

10       Q.   Can you tell us what additives if not

11  Santonox R and DLTDP, can you tell us what

12  antioxidants should have been used?

13       A.   Let me restate.  I do not know of any

14  antioxidant stabilizer formulation that's totally

15  non-extractable by oils and fats in the body that

16  you could put into polypropylene and guarantee that

17  it's going to last for decades in the body because

18  they are going to be extracted from the surface.  It

19  is just a given basic polymer science.

20       Q.   Can you tell the ladies and gentlemen of

21  the jury what additives, specific additives should

22  have been used if not Santonox R and DLTDP?

23            MR. JACKSON:  Objection, asked and

24            answered.

Duane Priddy, Ph.D.

1        A.    Again, I do not believe it's possible to

2    stabilize polypropylene with any additives to make

3    an implantable mesh product that would last for

4    decades, just not going to happen.

5            MR. HUTCHINSON:  I want to take just

6        a quick break, go off the record.

7            THE VIDEOGRAPHER:  We are off the

8        video record.  The time is 12:01 p.m.

9            (Recess.)

10            THE VIDEOGRAPHER:  We are back on

11        the video record.  The time is 12:04 p.m.

12    BY MR. HUTCHINSON:

13        Q.    Doctor, have you understood all my

14    questions so far?

15        A.    Yes.

16        Q.    Is there anything about the testimony that

17    you have given you would like to change?

18            MR. JACKSON:  Objection, form.

19        A.    Not at this point.

20    BY MR. HUTCHINSON:

21        Q.    Has a court ever determined that you could

22    not give an expert opinion?

23        A.    That I could not?

24        Q.    Yes.

Duane Priddy, Ph.D.

1      A.    Yes.

2      Q.    How many times?

3      A.    Twice that I'm aware of.

4      Q.    In what circumstances?

5      A.    One was a patent infringement matter

6   involving, against Nike for a shoe sole design and

7   because I had never designed shoe soles and didn't

8   really have experience working with shoes or shoe

9   soles, they deemed my testimony was not admissible.

10          And the other time was a portion of my

11  testimony was deemed as being not admissible.

12      Q.    In what particular instance?

13      A.    See, that was Jarden versus Hearthmark, et

14  al. Do you want to know the details of that?

15      Q.    Yes.

16      A.    Okay, it involved a company that decided

17  to use hand sanitizer, this gel that we squirt from

18  a bottle on our hands to sanitize them, to market

19  that as a fire starter.  So they used a bottle made

20  out of PVC to dispense that and a child was using it

21  to ignite a fire.  And the flame came up the stream

22  of gel as it was squirting out of the bottle,

23  entered into the bottle, the bottle exploded and

24  blew flaming gel all over him.

Duane Priddy, Ph.D.

1           And I made the analogy of napalm.  The

2    judge said that wasn't acceptable.

3        Q.   Doctor, on this DSC curve at the top of

4    Page 15.

5        A.   Yes.

6        Q.   Is oxidation showing as a smooth

7    transition from time 0?

8           MR. JACKSON:  Objection, form.

9        A.   On this one?

10   BY MR. HUTCHINSON:

11       Q.   Yes.

12       A.   Yes, that's typical, that's a smooth,

13   normal transition, yes.

14       Q.   But you would say that that is showing a

15   smooth transition?

16       A.   Yes.

17       Q.   Did you do any resampling?

18       A.   Any what?

19       Q.   Resampling?

20          MR. JACKSON:  Objection, form.

21       A.   Yes, I had duplicates on a couple samples

22   run, yes.

23   BY MR. HUTCHINSON:

24       Q.   Did you do any retesting?

Duane Priddy, Ph.D.

```
 1        A.    Retesting, I had the same mesh run a

 2   couple times, yes.

 3        Q.    But did you do any retesting of that

 4   particular DSC curve?

 5        A.    I don't understand what you are asking me.

 6        Q.    Did you do the test again to see if you

 7   could generate the same curve?

 8        A.    Oh, yes.

 9             MR. HUTCHINSON:  I don't have

10        anything further.

11             MR. JACKSON:  We'll just take about

12        five minutes.

13             THE VIDEOGRAPHER:  We are off the

14        video record.  The time is 12:07 p.m.

15             (Recess.)

16             THE VIDEOGRAPHER:  We are back on

17        the video record.  The time is 12:20 p.m.

18             MR. JACKSON:  I just want to note on

19        the record that Dr. Priddy said that the

20        materials that were available to him in

21        this case were on the flash drive.  They

22        are not on that drive.  We can provide

23        those later if needed.

24             MR. HUTCHINSON:  I'm sorry?
```

Duane Priddy, Ph.D.

```
1              MR. JACKSON:  The literature and the
2         Ethicon documents are not on there, just
3         his work papers.
4              MR. HUTCHINSON:  This may be, where
5         is the literature and documents?
6              MR. WALLACE:  Since they were your
7         documents, we typically don't include
8         those, but if you want them, we'll give
9         them to you.  Typically, you guys don't
10        like to be bothered with your own
11        documents.  That was the issue.
12             MR. HUTCHINSON:  That was the reason
13        they weren't included on the flash drive?
14             MR. WALLACE:  Yes.  I think we have
15        done that before.
16   EXAMINATION
17   BY MR. JACKSON:
18        Q.   Dr. Priddy, do you remember being asked
19   some questions earlier about your work with AMS?
20        A.   Yes.
21        Q.   You were a fact witness in AMS?
22        A.   I was, yes.
23        Q.   You were not an expert?
24             MR. HUTCHINSON:  Objection, leading.
```

Duane Priddy, Ph.D.

```
 1        A.    Correct.

 2   BY MR. JACKSON:

 3        Q.    You did not give an expert report?

 4        A.    Right.

 5        Q.    Mr. Hutchinson asked you earlier if you

 6   were an expert in various fields.  Do you remember

 7   that?

 8        A.    Yes.

 9        Q.    What did you understand that word expert

10   to mean to you?

11        A.    That that was my primary job function of,

12   specific area of expertise he was mentioning.

13        Q.    But just because you said you are not an

14   expert in a particular area doesn't mean you don't

15   have knowledge and expertise in that area?

16             MR. HUTCHINSON:  Object, form.

17        A.    That is correct.

18   BY MR. JACKSON:

19        Q.    Do you remember being asked some questions

20   earlier about Steve Johnson?

21        A.    Yes.

22        Q.    Steve Johnson is someone who does this

23   testing regularly; is that right?

24        A.    Yes.
```

Duane Priddy, Ph.D.

```
1        Q.   You interact with people like Steve

2    Johnson all the time in your professional career?

3        A.   I do.  I use laboratories all over the US

4    and he is one of the, he's the lab I use for OIT.

5    Depending on the core area of expertise of the lab,

6    I will use different labs for different types of

7    testing.  I always use Steve for OIT and GC-MS

8    analysis.

9        Q.   So you rely on Steve's work regularly?

10            MR. HUTCHINSON:  Form.

11       A.   I do.

12            MR. HUTCHINSON:  Counsel, if you

13       will give me a just a second to lodge my

14       objection.  Form to the last question.

15   BY MR. JACKSON:

16       Q.   Dr. Priddy, when Steve Johnson runs a test

17   for you, it is your job to interpret that data?

18       A.   That's correct.

19            MR. HUTCHINSON:  Form.

20   BY MR. JACKSON:

21       Q.   And you do that regularly in your

22   profession?

23       A.   I do.

24       Q.   Do you recall Mr. Hutchinson asking you
```

Duane Priddy, Ph.D.

```
 1    some questions earlier today about the names of

 2    various Ethicon products?

 3         A.   Yes.

 4         Q.   Did the names of those products have

 5    anything to do with your opinions in this case?

 6         A.   No.

 7         Q.   Dr. Priddy, Mr. Hutchinson asked you some

 8    questions earlier today about Dr. Jordi.  Do you

 9    remember that?

10         A.   Yes.

11         Q.   Can you determine anything about Dr.

12    Jordi's report without seeing his data?

13         A.   No.

14         Q.   Can you evaluate the hypothetical that Mr.

15    Hutchinson gave you earlier today without seeing Dr.

16    Jordi's data?

17              MR. HUTCHINSON:  Object to form.

18         A.   No.

19    BY MR. JACKSON:

20         Q.   Did anything you were asked by Mr.

21    Hutchinson today change any of your opinions in this

22    case?

23         A.   No.

24         Q.   Did anything that Mr. Hutchinson asked you
```

Duane Priddy, Ph.D.

```
 1   today change how you view your methodology in this

 2   case?

 3        A.   No.

 4        Q.   Why didn't you review any plaintiff

 5   medical records in this case?

 6        A.   It wasn't relative to my opinions, didn't

 7   affect my opinions.

 8        Q.   Dr. Priddy, you were asked some questions

 9   earlier about life expectancy of certain products.

10   Do you remember that?

11        A.   Yes.

12        Q.   Can you explain for the jury why you did

13   your testing in this case?

14        A.   Yes, I was looking specifically at the

15   product variability.  Normally, when products are

16   manufactured, they are manufactured to a

17   specification to minimize variability and I just

18   wanted to see if these products, these mesh products

19   were highly variable in their oxidation resistance

20   or if they were all very similar in their oxidation

21   resistance.

22        Q.   Do you remember being asked some questions

23   earlier about how blood in the body interacts with

24   these products?
```

Duane Priddy, Ph.D.

1      A.    Yes.

2      Q.    Is it fair that you need to understand how

3   chemicals in the body interact with these mesh

4   devices to offer your opinions in this case?

5          MR. HUTCHINSON:   Object to form.

6      A.    Well, just the fact that knowing that I

7   do, that bodies contain chemicals which are fats and

8   oils and have the capability to plasticize and

9   extract and affect the properties of plastics that

10   are implanted in the body, the nature of these

11   chemicals, the types of chemicals they are, I

12   understand that and how those types of chemicals

13   interact with materials.  That's all part of my core

14   area of expertise.

15   BY MR. JACKSON:

16      Q.    Dr. Priddy, as the founder and CEO of

17   Plastic Expert Group, what do you do professionally?

18      A.    Consult, serve as an expert witness.

19   Companies are constantly sending me plastic parts

20   that have failed and ask me to figure out the root

21   cause of the failure and make recommendations to

22   them once I determine the cause why they are

23   failing, how to fix it, how to remediate, how to

24   redesign the part, change the material, do what

Duane Priddy, Ph.D.

```
 1    needs to be done so they don't have failures

 2    anymore.

 3              Those are the three main -- it all has to

 4    do with plastics.

 5        Q.   In your profession, you provide consulting

 6    services to medical device companies?

 7        A.   I do.

 8        Q.   You have been hired by medical device

 9    companies to work on implantable medical devices?

10        A.   Correct.

11        Q.   You have provided expert testimony on

12    behalf of medical companies?

13        A.   Expert testimony -- most of my work has

14    been consulting.  I'm trying to think.  Of course,

15    the AMS work I did, my recollection is they were

16    trying to get FDA approval on a mesh product and

17    they asked me to opine, to evaluate and opine on the

18    usefulness of accelerated laboratory testing of

19    their packaging of their device.

20              So it wasn't part of a litigation, it was

21    part of a petition to the FDA.  And I was -- as far

22    as being hired by a medical device manufacturer, to

23    my knowledge, it's all been consulting work except

24    for that.
```

Duane Priddy, Ph.D.

1        Q.    Is the work you have done for medical

2   device companies any different than the work you

3   have done in this case?

4        A.    I have run OIT testing for medical device

5   companies to, for example -- can I give an example?

6        Q.    Sure.

7        A.    Spectranetics was having a problem with

8   degradation of one of their tubing materials that

9   was failing, medical tubing.  So they had me do a

10  failure analysis and I determined that the tubing

11  had degraded.

12             And so I ran OIT testing to determine if

13  it was an oxidation issue, for example.  So to

14  answer your question, it's a little bit different,

15  but I'm using the same kinds of tests, yes.

16       Q.    You have run OIT tests for medical device

17  companies?

18       A.    Yes.

19       Q.    You did an OIT test in this case?

20       A.    Yes.

21       Q.    Is there anything special or unique about

22  the antioxidants used in the Prolene mesh?

23       A.    No, they are just basic workhorse

24  antioxidants.

Duane Priddy, Ph.D.

1        Q.    You have published peer-reviewed

2   literature discussing antioxidants in plastics?

3              MR. HUTCHINSON:  Object to form.

4        A.    Yes, I have.

5   BY MR. JACKSON:

6        Q.    Have you done work with antioxidants as

7   part of your day job in your profession?

8        A.    Yes.

9        Q.    Your opinions in this case are based on

10   your professional expertise as well as the documents

11   you have reviewed in the peer-reviewed literature?

12              MR. HUTCHINSON:  Object to form.

13        A.    That's correct.

14   BY MR. JACKSON:

15        Q.    The plaintiffs in this case asked you to

16   opine on the chemical stability of Prolene; is that

17   right?

18              MR. HUTCHINSON:  Form.

19        A.    Yes.

20   BY MR. JACKSON:

21        Q.    If Ethicon had reached out to you 15 or

22   20 years ago and asked you to do the same thing, if

23   they had asked you to offer the same -- strike that.

24              If Ethicon had reached out to you 15 or

Duane Priddy, Ph.D.

```
1    20 years ago and asked you to offer the same

2    opinions for them, would you have done it?

3         A.   Yes.

4         Q.   Would you have run the same tests and

5    analysis that you have run in this case?

6         A.   Most likely.

7         Q.   Is the testing and analysis that you have

8    done in this case widely accepted in your industry?

9         A.   Yes.

10        Q.   As someone who has worked for medical

11   device companies, is accelerated aging testing alone

12   sufficient to determine the suitability of a

13   material?

14        A.   No.

15        Q.   Why not?

16        A.   Because it is only an approximation.  It

17   just lets you know if there is a red flag there that

18   needs to be followed up on or not.

19        Q.   Why did you review Ethicon documents in

20   this case?

21        A.   I wanted to see the kind of testing that

22   they performed and the data they generated on their

23   Prolene mesh products.

24        Q.   You are not a medical doctor?
```

Duane Priddy, Ph.D.

```
 1        A.    No.

 2        Q.    So why are you here to offer an opinion on

 3   a medical device?

 4        A.    Because the medical device is plastic and

 5   I'm a plastics expert.

 6        Q.    Dr. Priddy, you were asked a lot of

 7   questions earlier today about both DLTDP and

 8   Santonox R.  Do you remember that?

 9        A.    Yes.

10        Q.    Does the presence of either of those

11   antioxidants in the Prolene mesh alter your opinions

12   in this case?

13        A.    No.

14              MR. HUTCHINSON:  Are you done?

15              MR. JACKSON:  I have no more

16        questions.

17              MR. HUTCHINSON:  I got a couple of

18        follow-up questions.

19   EXAMINATION (Continued)

20   BY MR. HUTCHINSON:

21        Q.    Doctor, you testified that you were

22   deposed in the AMS litigation as a fact witness?

23   Did I understand that correctly?

24        A.    Yes.
```

Duane Priddy, Ph.D.

1      Q.   What did you witness?

2      A.   I didn't write a report.  I had done work

3  as a consultant for AMS and so I was deposed, I

4  guess, to just talk, as I recall, just talk about

5  polypropylene oxidation and stability.

6      Q.   Was it a patent type litigation or was it

7  a personal injury type of litigation?

8      A.   I think it was a class action litigation

9  against AMS for their meshes, as I recall.

10     Q.   What was the substance of your testimony

11  in the AMS litigation?

12          MR. JACKSON:   Objection, form.

13  BY MR. HUTCHINSON:

14     Q.   Just in general.

15     A.   It was generally similar to this, the

16  oxidative stability of polypropylene.  It was

17  focused pretty much on chemistry of oxidation of

18  polypropylene.

19     Q.   But you were not designated as an expert

20  in that litigation; is that correct?

21     A.   That's correct.

22     Q.   Did you have a lawyer representing you?

23     A.   Representing me, I had one that hired me.

24     Q.   What did that lawyer hire you to do?

Duane Priddy, Ph.D.

```
1              MR. JACKSON:  Objection, form.

2        A.   Just deposed me just as a consultant on

3    the issues involving polypropylene oxidative

4    chemistry.

5    BY MR. HUTCHINSON:

6        Q.   What's the name of the lawyer that hired

7    you?

8        A.   Ed Wallace.

9        Q.   What did Ed Wallace ask you to do?

10       A.   Just deposed me and asked me a bunch of

11   questions during the deposition.

12       Q.   Ed Wallace asked you --

13       A.   I'm sorry, the AMS attorney asked me.  Ed

14   Wallace asked me some questions too, I believe, but

15   yes.

16       Q.   My question is specifically, sir:  Were

17   you designated as an expert in the AMS litigation?

18             MR. JACKSON:  Objection, asked and

19        answered.

20       A.   No, sir, I don't believe so.

21   BY MR. HUTCHINSON:

22       Q.   Did you provide anybody expert opinions in

23   any type of deposition?

24             MR. JACKSON:  Objection, form.
```

Duane Priddy, Ph.D.

```
1        A.   That deposition I presented information,

2    yes.

3        Q.   As an expert?

4             MR. JACKSON:  Objection, asked and

5        answered.

6        A.   I assume I was considered a plastics

7    expert.

8        Q.   What were your opinions regarding

9    degradation in the AMS litigation, sir?

10       A.   You know, that was what, three years ago.

11   I don't recall the details.  All I remember, it had

12   to do with polypropylene oxidation.

13       Q.   Did it have anything to do with vaginal

14   mesh?

15       A.   I don't even remember that, too long ago.

16       Q.   That was within the last three years?

17       A.   That was about three years ago, I believe.

18       Q.   Did you do any testing of AMS mesh?

19       A.   No, sir.

20            MR. HUTCHINSON:  Let's call it a

21       day.  Thank you, sir, for your time.

22            THE VIDEOGRAPHER:  Now off the video

23       record, the time is 12:37 p.m.

24            (Deposition concluded: 12:37 p.m.)
```

Duane Priddy, Ph.D.

1           E R R A T A   S H E E T

2           Pursuant to Rule 30(e) of the Federal Rules
   of Civil Procedure and/or the Official Code of
3  Georgia Annotated 9-11-30(e), any changes in form or
   substance which you desire to make to your
4  deposition testimony shall be entered upon the
   deposition with a statement of the reasons given for
5  making them.
6           To assist you in making any such
   corrections, please use the form below.  If
7  supplemental or additional pages are necessary,
   please furnish same and attach them to this errata
8  sheet.
                              - - -
9
10          I, the undersigned, DUANE PRIDDY, do hereby
   certify that I have read the foregoing deposition
11 and that to the best of my knowledge said deposition
   is true and accurate (with the exception of the
12 following corrections listed below).
13 Page No._____Line No._____should read:_____
14 Reason for change:_____
15 Page No._____Line No._____should read:_____
16 Reason for change:_____
17 Page No._____Line No._____should read:_____
18 Reason for change:_____
19 Page No._____Line No._____should read:_____
20 Reason for change:_____
21 Page No._____Line No._____should read:_____
22 Reason for change:_____
23 Page No._____Line No._____should read:_____
24 Reason for change:_____

Duane Priddy, Ph.D.

1    Page No._____Line No._____should read:_____

2    Reason for change:_____

3    Page No._____Line No._____should read:_____

4    Reason for change:_____

5    Page No._____Line No._____should read:_____

6    Reason for change:_____

7    Page No._____Line No._____should read:_____

8    Reason for change:_____

9    Page No._____Line No._____should read:_____

10   Reason for change:_____

11   Page No._____Line No._____should read:_____

12   Reason for change:_____

13   Page No._____Line No._____should read:_____

14   Reason for change:_____

15   Page No._____Line No._____should read:_____

16   Reason for change:_____

17   Page No._____Line No._____should read:_____

18   Reason for change:_____

19

     Signature          _____

20

     Sworn to and Subscribed before me

21

     _____, Notary Public.

22

     This _____ day of _____, 20___.

23

24   My Commission Expires:

Duane Priddy, Ph.D.

```
 1              C E R T I F I C A T E
 2
      G E O R G I A:
 3
      HENRY COUNTY:
 4
              I hereby certify that the foregoing
 5      deposition was reported, as stated in the
        caption, and the questions and answers
 6      thereto were reduced to the written page
        under my direction; that the foregoing
 7      pages 1 through 168 represent a true and
        correct transcript of the evidence given.
 8      I further certify that I am not in any
        way financially interested in the result
 9      of said case.
              Pursuant to Rules and Regulations of
10      the Board of Court Reporting of the
        Judicial Council of Georgia, I make the
11      following disclosure:
              I am a Georgia Certified Court
12      Reporter.  I am here as an independent
        contractor for Golkow Global Litigation
13      Services.
              I was contacted by the offices of
14      Golkow Global Litigation Services to
        provide court reporting services for this
15      deposition.  I will not be taking this
        deposition under any contract that is
16      prohibited by O.C.G.A. 15-14-37 (a) or
        (b).
17            I have no written contract to provide
        reporting services with any party to the
18      case, any counsel in the case, or any
        reporter or reporting agency from whom a
19      referral might have been made to cover
        this deposition.  I will charge my usual
20      and customary rates to all parties in the
        case.
21      This, the 9th day of March, 2016.
22
                    _____
23                  MAXYNE BURSKY, CCR-2547
24
```