# Exhibit E

Peggy Pence, Ph.D.

```
 1              UNITED STATES DISTRICT COURT
 2           SOUTHERN DISTRICT OF WEST VIRGINIA
 3                      AT CHARLESTON
 4   _____
 5   IN RE:  ETHICON, INC., PELVIC  ) Master File No. 2:12-MD-02327
     REPAIR SYSTEM PRODUCTS          )        MDL No. 2327
 6   LIABILITY LITIGATION            )
     _____
 7
     THIS DOCUMENT RELATES TO        ) Joseph R. Goodwin
 8   CAROLYN LEWIS, ET AL. v.        ) U.S. District Judge
     ETHICON, INC.                   )
 9   Case No. 2:12-CV-04301          )
     _____
10
11
12                         - - - - -
13                   NOVEMBER 12, 2013
14                         - - - - -
15
16         Deposition of PEGGY PENCE, Ph.D., RAC, FRAPS,
17   VOLUME I, held at Hyatt Westlake Village, 880 South
18   Westlake Boulevard, Westlake Village, California,
19   beginning at 9:10 a.m., on the above date, before
20   Kimberly S. Thrall, a Registered Professional Reporter
21   and Certified Shorthand Reporter.
22
23
24              Golkow Technologies, Inc.
             877.370.3377 ph | 917.591.5672 fax
25                  deps@golkow.com
```

 1    Ethicon.

 2        Q.    Okay.  So these were MDR issue reports?

 3        A.    They're complaints.

 4        Q.    Complaints?

 5        A.    Yeah.  They're -- the issue report is the

 6    document on which Ethicon records complaints and its

 7    investigation of complaints and whether or not they are

 8    reportable to governmental agencies, FDA or in the case

 9    of Europe, for example, the European authorities.

10        Q.    On page 98, I think you say there were 862 TVT

11    issue reports received and reviewed for this report?

12        A.    Yes.

13        Q.    Okay.  258 were determined not to be

14    reportable?

15        A.    Yes.  Approximately 30 percent of those that we

16    received were not reportable, according to Ethicon.

17        Q.    Exhibit 3 has 29 AEs that were not reported?

18        A.    Yes.  Those are, as I said, examples.

19        Q.    Does Exhibit 3 contain all of the issue reports

20    that you believe Ethicon should have reported to the FDA

21    for a serious injury definition?

22        A.    It's not -- it's not a comprehensive

23    compilation.  It's representative examples.

24        Q.    Do you have the other ones that you -- let me

25    ask you this:  Do you intend to come to trial and say

Peggy Pence, Ph.D.

```
 1      A.   So that's why I'm saying I'd have to go back
 2   and look at every MDR for any mesh product to see if FDA
 3   knew about it before or not, if we're talking about
 4   specific -- any specific adverse event, if I understand
 5   your question correctly.
 6      Q.   You did.
 7           With regard to the TVT issue reports that you
 8   believe were not submitted --
 9      A.   But should have been.
10      Q.   -- but should have been, I mean, that's a given
11   in the question.  Let me just redo the question, then.
12           With regard to the TVT issue reports that you
13   believe were not -- strike that.  I see.  You corrected
14   me.
15           With regard to the TVT issue reports which you
16   believe should have been reported, okay, do they impact
17   the overall risk/benefit analysis of the TVT device?
18           MR. KUNTZ:  Objection.
19           THE WITNESS:  There are a couple of points to
20   be made with regard to that.  The regulation requires
21   that all adverse events that made a certain definition
22   be reported to the FDA.  The purpose of that is so that
23   the FDA can have a complete picture and if -- of the
24   true safety profile of products.  We already know
25   there's underreporting.  And in this case, there's
```

Peggy Pence, Ph.D.

```
 1                UNITED STATES DISTRICT COURT
 2             SOUTHERN DISTRICT OF WEST VIRGINIA
 3                       AT CHARLESTON
 4   _____
 5   IN RE:  ETHICON, INC., PELVIC  ) Master File No. 2:12-MD-02327
     REPAIR SYSTEM PRODUCTS         )        MDL No. 2327
 6   LIABILITY LITIGATION           )
     _____
 7
     THIS DOCUMENT RELATES TO       ) Joseph R. Goodwin
 8   CAROLYN LEWIS, ET AL. v.       ) U.S. District Judge
     ETHICON, INC.                  )
 9   Case No. 2:12-CV-04301         )
     _____
10
11
12                          - - - - -
13                     NOVEMBER 13, 2013
14                          - - - - -
15
16         Deposition of PEGGY PENCE, Ph.D., RAC, FRAPS,
17   VOLUME II, held at Hyatt Westlake Village, 880 South
18   Westlake Boulevard, Westlake Village, California,
19   beginning at 10:16 a.m., on the above date, before
20   Kimberly S. Thrall, a Registered Professional Reporter
21   and Certified Shorthand Reporter.
22
23
24              Golkow Technologies, Inc.
              877.370.3377 ph | 917.591.5672 fax
25                   deps@golkow.com
```

1      Let me ask you this:  With regard to medical

2   devices, have you ever had to review adverse event data

3   and make determinations whether MDR reports should be

4   submitted to the FDA?

5      A.   Yes.

6      Q.   Okay.  And when did you have that experience?

7      A.   As recently as within the last year.

8      Q.   Did your experience in reviewing MDR reports

9   ever include surgical mesh?

10     A.   No.  But the same principles apply.

11     Q.   Did your experience ever involve reviewing

12  adverse event data on a device used to treat stress

13  urinary incontinence?

14     A.   No.

15     Q.   Did you individually look at medical

16  information, including the MDR report and any follow-up

17  information you may have seen, and then make your own

18  medical judgment based on your review of the matter

19  whether the MDR should be submitted to the FDA?

20     A.   I think I understood that question, but it was

21  lengthy.  Could I just have you repeat it back, please.

22          MR. SNELL:  I'll ask the court reporter to, if

23  that's okay with you.

24          THE COURT REPORTER:  Of course.

25          (The following record was read by the reporter:

```
 1              "Q.  Did you individually look at medical
 2          information, including the MDR report and any
 3          follow-up information you may have seen, and
 4          then make your own medical judgment based on
 5          your review of the matter whether the MDR
 6          should be submitted to the FDA?")
 7          THE WITNESS:  Let me just clarify a little bit
 8   of the language.  The MDR reports and maybe -- let me
 9   ask you, do you mean the issue reports instead of MDR
10   reports?  Because MDR reports would have already been
11   submitted to the FDA.
12   BY MR. SNELL:
13       Q.   I'm sorry.  The issue reports.
14       A.   Issue reports.  Okay.
15            So, yes, as we discussed yesterday, the issue
16   reports, I have reviewed issue reports which were not
17   reportable and, in fact, you know, as we talked about
18   yesterday, I have examples in my report and the exhibits
19   attached to my report of issue reports that I did review
20   and based on my review of those issue reports determined
21   that they should have been reported to the FDA as MDR
22   reports.
23       Q.   You're not a doctor or a surgeon, so you didn't
24   exercise medical judgment, did you?
25       A.   I exercised -- if you look at the regulations
```

1  and you look at the types of individuals that FDA

2  considers qualified to review issue reports and

3  determine -- or complaints and determine whether or not

4  they qualify as MDR reports, that includes not only

5  physicians, but nurses, risk managers and biomedical

6  engineers.  I have functioned in the capacity of a risk

7  manager for review of medical -- of adverse event

8  reports for years and years of my career and I applied

9  in making my determinations of the reportability of

10  these issue reports that we've -- that we discussed

11  yesterday.

12         And the ones that are in my report, I applied

13  the same standard of practice that I do on a daily basis

14  in execution of my responsibilities for the clients with

15  whom I work.

16     Q.  But you didn't use medical judgment, did you?

17         MR. FREESE:  Object to the form of the

18  question.

19         THE WITNESS:  You don't have to be --

20  BY MR. SNELL:

21     Q.  I'm sorry.  It's a yes-or-no question.

22         MR. FREESE:  Object to the form of the question

23  anyway.

24         THE WITNESS:  I used my -- my medical knowledge

25  as a toxicologist and a clinical development regulatory

1   scientist and applied that in the context of the

2   regulations. I'm not a doctor. So in that sense, I

3   didn't apply a physician's knowledge, but I applied the

4   knowledge in the fashion that I mentioned.

5   BY MR. SNELL:

6       Q.   Have you reviewed any of the attorney

7   advertising that pertains to TVT in connection with your

8   expert report?

9       A.   Attorney advertising?

10      Q.   Yes.

11      A.   No.

12      Q.   Did you ever ask counsel for any of the Lewis

13  case-specific materials, such as her medical records and

14  her depositions?

15      A.   No, I did not. I did ask the date of the

16  surgery and, you know, general information, but not for

17  specific records.

18           MR. SNELL: Let's go off the record for a

19  second.

20           (Brief recess.)

21           MR. SNELL: Let's go back on.

22  BY MR. SNELL:

23      Q.   You looked at the IFU for TVT, correct?

24      A.   Yes.

25      Q.   Okay.

```
 1      A.   Multiple IFUs.
 2      Q.   Right.  Did you look at the IFUs across all
 3   other products to treat incontinence or prolapse that
 4   are mesh products?
 5      A.   Across other manufacturers' --
 6      Q.   Yeah.  I --
 7      A.   -- products?  Certainly, as we talked
 8   yesterday -- are you talking about SUI or are you
 9   talking about POP?
10      Q.   Well, we can start with SUI.  So what other
11   IFUs for SUI products, if any, have you looked at?
12      A.   I'm in the process of looking at some others at
13   the moment for SUI, but --
14      Q.   The one you identified yesterday was the
15   Obtryx, Boston Scientific?
16      A.   Boston Scientific, yes.
17      Q.   And what about for prolapse meshes?  Have you
18   looked at other manufacturers' IFUs, you know, like you
19   did with TVT across time in the different versions?
20      A.   For the Bard Avaulta product.
21      Q.   And I think your report identifies that there
22   are 80 or 90 mesh products in total that have been
23   510(k) cleared?
24      A.   That's not the number of mesh products.  I'm
25   sorry.  That's the number of clearances, if I recall
```