EXHIBIT 15

Jerry G. Blaivas, M.D.

1        IN THE UNITED STATES DISTRICT COURT
2        WESTERN DISTRICT OF NORTH CAROLINA
3               ASHEVILLE DIVISION
4                    -  -  -
5

    BERTIE FRANKUM              :   CASE NO.
6                               :   1:15-CV-00091
         Plaintiff,            :   -MOC
7                               :
              v.                :
8                               :
    BOSTON SCIENTIFIC           :
9   CORPORATION,                :
                                :
10        Defendant.            :
11                   -  -  -
12               May 2, 2016
13                   -  -  -
14
15            Videotaped deposition of
    JERRY G. BLAIVAS, M.D., taken pursuant to
16  notice, was held at the offices of JERRY
    G. BLAIVAS, M.D., 445 East 77th Street,
17  New York, New York, beginning at 11:14
    a.m., on the above date, before Michelle
18  L. Gray, a Registered Professional
    Reporter, Certified Shorthand Reporter
19  and Notary Public.
20
                     -  -  -
21
22        GOLKOW TECHNOLOGIES, INC.
     877.370.3377 ph | 917.591.5672 fax
23           deps@golkow.com
24

Jerry G. Blaivas, M.D.

```
 1   APPEARANCES:
 2
         BEASLEY ALLEN CROW
 3       METHVIN PORTIS & MILES, P.C.
         BY:  P. LEIGH O'DELL, ESQUIRE
 4       218 Commerce Street
         Montgomery, Alabama 36104
 5       (334) 269-2343
         leigh.odell@beasleyallen.com
 6       Representing the Plaintiff
 7
         SHOOK, HARDY & BACON, LLP
 8       BY:  JON A. STRONGMAN, ESQUIRE
         2555 Grand Boulevard
 9       Kansas City, Missouri 64108
         (816) 474-6550
10       jstrongman@shb.com
         Representing the Defendant
11
12
13       VIDEOTAPE TECHNICIAN:
            Daniel Ortega
14
         Margaret Thompson
15       (via telephone)
16
17               -  -  -
18
19
20
21
22
23
24
```

Jerry G. Blaivas, M.D.

```
 1                    -   -   -
 2                  I N D E X
 3                    -   -   -
 4

     Testimony of:
 5                    JERRY G. BLAIVAS, M.D.
 6          By Mr. Strongman              6
 7

 8

                      -   -   -
 9

                  E X H I B I T S
10

                      -   -   -
11

12    NO.            DESCRIPTION           PAGE
13    Blaivas-1      Notice of Deposition  7
14    Blaivas-2      Supplemental Rule 26  8
                     Expert Report of
15                   Jerry G. Blaivas, M.D.
16    Blaivas-3      Safety Considerations 14
                     For Synthetic Sling
17                   Surgery
                     (Blaivas)
18
      Blaivas-4      Supplemental Rule 26  67
19                   Expert Report of
                     Jerry G. Blaivas, M.D.
20                   (With Comments)
21    Blaivas-5      Binder/Notebook of    68
                     Jerry G. Blaivas, M.D.
22

23                    -   -   -
24
```

Jerry G. Blaivas, M.D.

```
 1                    -   -   -

 2            DEPOSITION SUPPORT INDEX

 3                    -   -   -

 4

 5    Direction to Witness Not to Answer

 6    PAGE    LINE
      None.

 7

 8    Request for Production of Documents

 9    PAGE    LINE
      None.

10

11    Stipulations

12    PAGE    LINE
      None.

13

      Questions Marked

14

      PAGE    LINE

15    None.

16

17

18

19

20

21

22

23

24
```

Jerry G. Blaivas, M.D.

1          THE VIDEOGRAPHER:  We are

2     now on the record.  My name is

3     Daniel Ortega.  I'm a videographer

4     for Golkow Technologies.

5          Today's date is May 2nd,

6     2016, and the time is 11:14 a.m.

7          This video deposition is

8     being held at 445 East 77th

9     Street, New York, New York, in the

10    matter of Bertie Frankum versus

11    Boston Scientific, Pelvic Mesh,

12    for the United States District

13    Court for the Western District of

14    North Carolina.

15          The deponent is Dr. Jerry

16    Blaivas.

17          Counsel, please identify

18    yourselves.

19          MR. STRONGMAN:  Jon

20    Strongman on behalf of Boston

21    Scientific.

22          MS. O'DELL:  Leigh O'Dell

23    and Margaret Thompson on behalf of

24    plaintiff Bertie Frankum.

Jerry G. Blaivas, M.D.

1            THE VIDEOGRAPHER:  The court

2       reporter is Michelle Gray and will

3       now swear in the witness.

4                   -  -  -

5            ... JERRY G. BLAIVAS, M.D.,

6       having been first duly sworn, was

7       examined and testified as follows:

8                   -  -  -

9  BY MR. STRONGMAN:

10       Q.    Can you please state your

11  name for the record?

12       A.    Jerry Blaivas.

13       Q.    Dr. Blaivas, my name is

14  Jon Strongman, I represent Boston

15  Scientific here today.  I've got an hour

16  with you.  And I promise to keep it to an

17  hour.  If there's anything that comes up,

18  you need to take a break for some reason,

19  you've got someone visiting, let me know.

20  We're happy to make that accommodation.

21  Okay?

22            You've been deposed a number

23  of times, correct?

24       A.    I have.

Jerry G. Blaivas, M.D.

1              (Document marked for

2         identification as Exhibit

3         Blaivas-1.)

4    BY MR. STRONGMAN:

5         Q.    I'm going to hand you what's

6    been marked as Deposition Exhibit Number

7    1, which is just the notice of your

8    deposition.  Have you brought anything

9    with you to the deposition today?

10        A.    Yeah.  I have -- mm-hmm -- a

11   notebook with a number of documents in

12   it.

13        Q.    Can you describe what's in

14   your notebook for me?

15        A.    It's my -- my supplemental

16   report in this matter, my curriculum

17   vitae, my reliance list, and a number of

18   selected articles that we've used in the

19   reliance list, yeah, and my original

20   expert report.

21        Q.    Have you brought anything

22   else with you today other than what

23   you've described in your notebook?

24        A.    A cup of coffee.

Jerry G. Blaivas, M.D.

1              (Document marked for

2        identification as Exhibit

3        Blaivas-2.)

4   BY MR. STRONGMAN:

5        Q.    All right.  Doctor, I'm

6   going to hand you what has been marked as

7   Deposition Exhibit Number 2, which is a

8   copy of your supplemental report in this

9   matter; is that correct?

10       A.    It is.

11       Q.    All right.  And if you look

12  at the last page, this supplemental

13  report is dated the 21st of December,

14  2015; is that correct?

15       A.    That's correct.

16       Q.    And that's your signature on

17  the tenth page, I believe?

18       A.    It is.

19       Q.    And can you tell me how what

20  we've marked as Deposition Exhibit Number

21  2 came about?  Why did you write your

22  supplemental report in this matter?

23       A.    Because there were things

24  that I felt like I needed to expand upon.

Jerry G. Blaivas, M.D.

1      Q.    What things did you feel
2  like you needed to expand upon?
3      A.    Well, they're in the report.
4  Do you want me to go over them one by
5  one?
6      Q.    Let me ask a question.  You
7  authored a report in this matter
8  regarding the Obtryx device in 2014; is
9  that correct?
10     A.    Yes.
11     Q.    And were you aware that a
12 judge excluded some of your opinions in
13 that report?
14     A.    I was.  Well, I am now.  I
15 wasn't at the time.
16     Q.    Were you aware that the
17 judge excluded some of your opinions
18 regarding the safety of mesh for the use
19 of incontinence before you authored what
20 we've marked as Deposition Exhibit Number
21 2?
22     A.    I don't have an independent
23 recollection of that.  And I don't -- I
24 didn't know it was about the -- just

Jerry G. Blaivas, M.D.

1    about the safety.  But --

2         Q.    Have ever read the order

3    regarding the judge's exclusions of your

4    opinion in this matter?

5         A.    No.

6         Q.    Nobody has provided it to

7    you?

8         A.    I don't have a recollection

9    if it's been provided.  But I know I

10   didn't read it.

11        Q.    Did you meet with

12   plaintiff's counsel today?

13        A.    I did.

14        Q.    And for how long?

15        A.    About an hour and a half,

16   hour and 45 minutes.

17        Q.    And how many times have you

18   met with counsel for plaintiffs in this

19   matter, if you recall?

20        A.    About this case?

21        Q.    Correct.

22        A.    Just once, I think.  Just

23   yesterday.  Excuse me.  This morning.

24        Q.    And did you ever meet with

Jerry G. Blaivas, M.D.

1  counsel before you prepared your

2  supplemental report, Exhibit 2?

3        A.    I did briefly.  I didn't

4  think it -- well, actually I don't have

5  an independent recollection about what

6  case it was involving.

7        Q.    Let me back up.  You said

8  that at some point you became aware of

9  the fact that some of your opinions had

10 been excluded by the judge, correct?

11       A.    Yes.

12       Q.    Okay.  Were you told why?

13       A.    Yes.

14       Q.    And what were you -- what is

15 your understanding as to why some of your

16 opinions were excluded?

17       A.    That I -- the judge believed

18 that I used interpreted -- that I said I

19 used a different standard for my

20 medical -- my scientific and medical

21 positions than I did for legal positions.

22       Q.    And part of what you address

23 in your supplemental report is that

24 issue, correct?

Jerry G. Blaivas, M.D.

1      A.     Correct.

2      Q.     In fact, you include some

3  language in your supplemental report

4  specifically to say that you believe you

5  use the same level of rigor in both

6  settings; is that right?

7      A.     I believe that I use a

8  higher standard than -- I use a higher

9  standard than -- I use the highest

10 possible standard.  Let's leave it at

11 that.

12     Q.     And when you say you use the

13 highest possible standard, are you

14 referring to your work in litigation?

15     A.     No, my -- not specifically.

16 I believe that I use the highest possible

17 standard of scientific rigor when I come

18 to the conclusions about legal matters

19 and about medical matters.  I use the

20 same criteria for both.

21     Q.     You do not believe that

22 there are two different standards, one

23 for legal matters and one for the

24 scientific literature?

Jerry G. Blaivas, M.D.

1      A.    Not with respect to my

2   opinions, no.

3      Q.    And, Doctor, is your fee

4   schedule the same?

5      A.    It is.

6      Q.    And you charge $15,000 for a

7   deposition; is that correct?

8         MS. O'DELL:  Objection.

9         THE WITNESS:  For a day.

10        For -- for twenty- -- for an

11        entire day of deposition, yes.

12   BY MR. STRONGMAN:

13      Q.    What will you charge for the

14   deposition today?

15      A.    I don't know.  That will be

16   up to my administrative assistant.

17      Q.    Have you updated your fee

18   schedule at all over the last couple of

19   years?

20      A.    Changed the dollar amount,

21   what I charge?

22      Q.    Correct.

23      A.    I don't believe so.

24      Q.    And have you previously

Jerry G. Blaivas, M.D.

1   charged $15,000 for a deposition

2   regardless of how long it took?

3           A.    No.  I believe that I charge

4   for a full day and a half day.

5           Q.    One of those two options?

6           A.    Yes.

7           Q.    Okay.  Doctor, when you

8   wrote your supplemental report that we

9   marked as Exhibit Number 2, one of the

10  primary pieces of information that you

11  cite to is your article entitled "Safety

12  Considerations for Synthetic Sling

13  Surgery"; is that correct?

14          A.    That's correct.

15               (Document marked for

16          identification as Exhibit

17          Blaivas-3.)

18  BY MR. STRONGMAN:

19          Q.    And I'm going to hand you

20  what's been marked as Exhibit Number 3.

21  Is that a copy of your article?

22          A.    It is.

23          Q.    And when was the article

24  that we've marked as Exhibit Number 3

Jerry G. Blaivas, M.D.

1   published?

2          A.      2015.   Do you want me to

3   find the exact date?   September of 2015.

4          Q.      It looks like, just like

5   things in today's world, they're

6   published online first and then later in

7   a journal.   Is that typical?

8          A.      Yes.

9          Q.      And so looking at this, this

10  appears that this was first published

11  online in August of 2015; is that

12  correct?

13         A.      Well, if you want me to

14  check, I will.   But that's about correct.

15         Q.      Do you know when this

16  article, "Safety Considerations for

17  Synthetic Sling Surgery," was submitted

18  for publication?

19         A.      I know a number of months

20  before it was -- it went through a very

21  rigorous review process, so it took

22  longer than usual.

23         Q.      Did you submit this article

24  to more than one publication?

Jerry G. Blaivas, M.D.

 1          A.    I did not.  I was invited to

 2    do this.  This wasn't a spontaneous

 3    thing.

 4          Q.    Who invited you to write

 5    this article?

 6          A.    The editors of Nature

 7    Reviews Urology.

 8          Q.    And who specifically was

 9    invited to author the article?  You,

10    yourself, correct?

11          A.    Yes.

12          Q.    Anybody else specifically?

13          A.    No.

14          Q.    And so who was responsible

15    for collecting the authors that are

16    listed on Deposition Exhibit Number 3 to

17    put this article together?

18          A.    Myself.

19          Q.    And you understand that

20    there are other authors that are on this

21    list that are also experts in litigation;

22    is that correct?

23          A.    Correct.

24          Q.    And had you ever met

Jerry G. Blaivas, M.D.

1   Dr. Iakovlev before you became involved

2   in mesh litigation?

3         A.    I have not.

4         Q.    Have you ever met

5   Dr. Iakovlev in person?

6         A.    I have.

7         Q.    How many times?

8         A.    Two or three.  I mean, we

9   eventually wrote an abstract together

10  that -- and were working on a paper.

11        Q.    And in your article, you

12  talk about the fact that, to date, there

13  are over 3 million mesh slings that have

14  been placed; is that correct?

15        A.    We mentioned that, yes.

16        Q.    And you did research to try

17  to collect data to come to a reasonable

18  conclusion as to how many synthetic

19  midurethral slings have been placed in

20  the United States; is that correct?

21        A.    No.  We simply accepted the

22  data from a few papers.  It wasn't

23  something -- that wasn't something that

24  we specifically researched.

Jerry G. Blaivas, M.D.

1    Q.    You have no reason to refute

2  the data that you found in the various

3  papers that you cite though, correct?

4    A.    About the numbers of slings?

5    Q.    Correct.

6    A.    No, I don't.

7    Q.    On the first page of your

8  article, you cite or -- strike that.

9        On the first page of your

10  article, you have a competing interests

11  section.  Can you explain that, what it

12  is?

13    A.    Yes.  It's a standard --

14  it's a standard form that most

15  peer-review journals ask for.  And I --

16  and I simply stated what things that I --

17  what I engage in that might be perceived

18  as a conflict of interest.

19    Q.    And specifically, you listed

20  a couple of things for yourself; is that

21  correct?

22    A.    I did.

23    Q.    And the first one you listed

24  was that you have provided opinions as a

Jerry G. Blaivas, M.D.

1   medicolegal expert in -- expert witnesses

2   in mesh litigation cases, correct?

3          A.     Correct.

4          Q.     And then you also list that

5   you had acted as a consultant for a

6   pharmaceutical company at one time; is

7   that correct?

8          A.     Correct.

9          Q.     And in your competing

10  interest disclosure, do you identify what

11  side you have provided expert opinion for

12  in the pelvic mesh litigation?

13         A.     Well, I presume -- I know

14  because I have provided opinions on both

15  sides.

16         Q.     In a pelvic mesh litigation,

17  have you ever provided an expert opinion

18  on behalf of a manufacturer of mesh?

19         A.     I'm sorry.  I wasn't

20  listening.  You -- I'm sure you said it

21  properly.

22         Q.     Sure.  In the pelvic mesh

23  litigation -- are you with me on that?

24         A.     Yes.

Jerry G. Blaivas, M.D.

```
1          Q.     In that context, have you
2   ever provided an expert opinion on behalf
3   of a mesh manufacturer?
4          A.     I have not.
5          Q.     So in the context that we
6   are in today, that being plaintiffs
7   against mesh manufacturers, you've only
8   offered expert opinions on behalf of
9   plaintiffs, correct?
10         A.     Yes.  Correct.
11         Q.     And then with regard to your
12  consulting with, I believe -- the first
13  thing is Astellas Pharma; is that
14  correct?
15         A.     Yes.
16         Q.     And do you believe that you
17  are able to offer a fair and appropriate
18  opinion despite the fact that you've at
19  times consulted with a pharmaceutical
20  company?
21         A.     Of course.
22         Q.     And you would expect other
23  doctors that have consulted with either
24  pharmaceutical or medical device
```

Jerry G. Blaivas, M.D.

1  companies to be able to offer fair and

2  reasonable opinions as well?

3            MS. O'DELL:  Object to the

4       form.

5            THE WITNESS:  I would hope

6       so.

7  BY MR. STRONGMAN:

8       Q.    At any time with regard to

9  your submission that we've marked as

10  Exhibit Number 3, did you have to

11  disclose how much money you have made in

12  mesh litigation as an expert witness?

13       A.    In individual cases they ask

14  me how much I've billed for those cases.

15  I don't remember anybody asking me about

16  the totality of it, but they might have.

17  I just don't have an independent

18  recollection.

19       Q.    Did the editors or the

20  reviewers of your article, "Safety

21  Considerations," did those editors or

22  reviewers ask for the totality of your

23  compensation in your role as an expert

24  witness in litigation?

Jerry G. Blaivas, M.D.

1    A.    They did not.

2    Q.    Do you believe that the

3  totality of that number has any bearing

4  one way or another?

5    A.    I don't believe it has any

6  bearing on the veracity of my opinions.

7  But conflict of interest, by definition,

8  is what other people perceive.  And I

9  don't know what other people perceive

10 about that.

11    Q.    Do you believe that with

12 regard to the possible perception of

13 conflict of interest, that it would make

14 a difference if you made $5,000 as an

15 expert witness or $5 million as an expert

16 witness?

17    A.    I think that I -- I don't

18 know, and I don't mean to be evasive,

19 because it would depend upon, I would

20 think, the disclosure of the people on

21 the other side.  So if everybody made

22 $5 million, God bless, then I would think

23 it would be neutral.

24    Q.    How much money have you made

Jerry G. Blaivas, M.D.

1   as an expert witness in the mesh

2   litigation in totality?

3         A.    I don't know.  I do know

4   that for this year it's in excess of

5   $300,000, for 2015.

6         Q.    For 2015?

7         A.    Yes.

8         Q.    Do you know what your total

9   is for 2016 to date through April?

10        A.    No.

11        Q.    Do you know what your total

12   was in 2014?

13        A.    I believe it was less than

14   that.  But I don't know the number.

15        Q.    Do you know what your total

16   was in 2013?

17        A.    I assume it was much less.

18   I'm not even 100 percent sure that I was

19   even -- I don't know when I started this.

20   But it's just been a finite number of

21   years.

22        Q.    You've made -- fair to say

23   that you've made hundreds of thousands of

24   dollars in this role as an expert

Jerry G. Blaivas, M.D.

1    witness, correct?

2                    MS. O'DELL:  Object to form.

3                    THE WITNESS:  Yes.  I just

4         said that.

5    BY MR. STRONGMAN:

6         Q.    I want to talk a little bit

7    about the methodology that you used with

8    regard to your Safety Considerations

9    article.  And let me first stop and ask,

10   the article that we're looking at,

11   Exhibit Number 3, is a review article; is

12   that correct?

13        A.    Yes.

14        Q.    What does that mean?

15        A.    Oh, it means different

16   things to different people.  But the

17   essence of it is that you do a search of

18   the literature using certain search

19   criteria that you accumulate all of the

20   articles that are encompassed by your

21   search criteria.

22                    And then you apply exclusion

23   criteria.  And after excluding certain --

24   whatever number of articles is necessary,

Jerry G. Blaivas, M.D.

1   you're left with the articles that relate

2   to the topic at hand.

3                  And then you evaluate each

4   one of those based on the methodology

5   that you've described.

6           Q.    And so a review article is

7   separate from a piece of original

8   research; is that correct?  Those are two

9   different things?

10          A.    Well, one -- I consider them

11  to be similar.  They're different because

12  there are creative ways to do review

13  articles.  I mean, but I think that

14  answers your question.

15          Q.    You have served in a role as

16  an editor of journals, correct?

17          A.    I have.

18          Q.    For a long time, right?

19          A.    Yes.

20          Q.    And you understand that

21  there's something different between

22  offering a piece of original research,

23  which is collecting data, analyzing data,

24  putting forth a study, as opposed to

Jerry G. Blaivas, M.D.

1    saying, "I'm going to look at the

2    literature out there, summarize it, and

3    offer my opinion on it"?  Those are two

4    different things?

5           A.    Yes, they are.

6           Q.    Okay.  With regard to the

7    criteria that you used to develop the

8    article, Exhibit Number 3, at the very

9    end of the article there is a section

10   entitled "Review Criteria"; is that

11   correct?

12          A.    There is.

13          Q.    And does that review

14   criteria section set forth the method by

15   which you and your co-authors went about

16   developing the articles to look at?

17          A.    It does.

18          Q.    And there's a list of search

19   terms that are listed in this -- in this

20   paragraph, correct?

21          A.    Correct.

22          Q.    And among the search terms

23   are some products, for example, Monarc is

24   a search term.  SPARC is a search term.

Jerry G. Blaivas, M.D.

1    TVT is a search term, correct?

2         A.    Correct.

3         Q.    Is the Obtryx listed as a

4    search term?

5         A.    I don't see that there.

6         Q.    Okay.  Is Advantage listed

7    as a search term?

8         A.    I don't see that there

9    either.

10        Q.    With regard to the search

11   that you and your co-authors performed,

12   it says that a total of 995 records were

13   retrieved from Medline; is that correct?

14        A.    Correct.

15        Q.    And then 249 were ultimately

16   included; is that correct?

17        A.    Yes.

18        Q.    And can you describe for me

19   the method by which you and your

20   co-authors went from 995 articles to 249?

21        A.    Well, we started with -- I

22   have to check.  We only -- we started

23   with English language.  And they

24   essentially had to include -- I don't

Jerry G. Blaivas, M.D.

1    have the particulars of it right in front

2    of me.  But we -- we excluded articles

3    that, for whatever reason, we believed

4    were not relevant.

5              In fairness, we did have

6    a -- in the earlier version of this,

7    before the editors, before the

8    reviewers -- by the way, this was the

9    most rigorous review process I've ever

10   been -- I've written hundreds of

11   articles.  And this was the most rigorous

12   review by the journal, to their credit.

13             So they condensed this.  And

14   I don't have in my mind right now what

15   our exclusion criteria were.  But they

16   were in the original article -- in the

17   original rendition of this.

18        Q.    And when you talk about

19   exclusion criteria, those were actually

20   criteria that were written down, so that

21   somebody could go back and look and see

22   what criteria you used?

23        A.    I believe so.  My memory

24   would have been that, yes.

Jerry G. Blaivas, M.D.

1      Q.    How would I go about finding

2  out what those exclusion criteria were?

3      A.    I'd have to look.  You

4  couldn't.  But I'd have to look through

5  all the previous versions, I mean, and

6  try to find it.

7      Q.    If I wanted to recreate the

8  exact task that you did, that being doing

9  a search, coming up with -- or at least

10  seeing what the 995 articles were, and

11  then seeing what the 249 were that were

12  ultimately included, is that something

13  that I can do?

14      A.    Possibly, if I can find it.

15  Actually, you've jogged my memory of

16  this.  I do remember some of the

17  criteria, that we excluded articles that

18  used the same cohort over and over again,

19  and there were many like that, unless

20  they added what we thought was new

21  information.  So that explains one.

22          And we excluded articles if

23  they had no relevant -- no relevant data.

24  I mean, if they said all the -- you know,

Jerry G. Blaivas, M.D.

1   we did -- operated on 100 patients, and

2   they all did great, we would have

3   excluded that.

4          We wanted -- we wanted to

5   see that there was -- that there was

6   adequate science, adequate.

7          I mean, and so for example,

8   the conclusion -- there had to be enough

9   data to allow us to draw a judgment about

10  the integrity of the research.

11         And that was something that

12  at the time we -- at the time I -- it was

13  difficult to categorize and write those

14  things down.  We would have written down

15  the broad category.

16         We subsequently have

17  expanded on that and developed

18  methodology that will actually look at

19  the quality of mesh reviews.  But at the

20  time we did this, a lot of it was

21  subjective.

22         Q.   Doctor, would you agree that

23  in science, the ability to replicate

24  something is one of the indicators of

Jerry G. Blaivas, M.D.

1   reliability?

2        A.    Yeah, I wouldn't -- I

3   wouldn't disagree with it.  But -- but

4   things can be replicated and be

5   incorrect.  So I don't put as high --

6   that's one of the factors about

7   reliability.

8        Q.    Very good.  And when you put

9   out a review like this, Exhibit Number 3,

10  one of the things that you wouldn't want

11  to shy away from is the ability for

12  anybody to look at exactly what you

13  looked at and to replicate the analysis,

14  if they wanted to, correct?

15       A.    Correct.

16       Q.    And based on the information

17  provided in your article, Exhibit Number

18  3, could somebody in fact replicate what

19  you and your co-authors did in terms of

20  figuring out exactly what articles were

21  excluded and why?

22       A.    I would say from the

23  information provided here, the answer is

24  no, not completely, no.  They can

Jerry G. Blaivas, M.D.

1  certainly look at the search terms.

2  They -- but they could not -- there isn't

3  anything in here that I can see about the

4  exclusion.

5            So I would say they could

6  not -- no, it says, only articles

7  published -- yeah, some things, yes.

8            Q.    Okay.

9            A.    I mean, I'm going to retract

10  my no and I'm going to say partially.

11            Q.    Okay.  You would agree with

12  me that partially being able to recreate

13  it is different than entirely being able

14  to recreate it of course?

15            A.    That's why we have words,

16  yes.

17            Q.    And with regard to why an

18  article was included or excluded, is

19  there any written documentation of that?

20            A.    Not in the article.

21            Q.    Is there any written

22  documentation that the authors kept as to

23  each individual article that was included

24  or excluded?

Jerry G. Blaivas, M.D.

1        A.    I don't know.  And part of

2   it is the process.  I mean, we --

3   everybody read all the abstracts.  Then

4   we decided -- then as a group, we decided

5   -- and I don't believe we wrote that

6   down.  We decided which merited further

7   review.

8               And -- but any discrepancies

9   were -- were decided by the group.  And I

10  don't know the extent to which those

11  things were written down.

12       Q.    And with regard to

13  discrepancies being determined by -- I

14  think the term here is open discussion;

15  is that right?

16       A.    Yes.

17       Q.    Is there any record of what

18  those open discussions were?

19       A.    I don't think so.

20       Q.    Was there any criteria

21  specifically that was used to focus or

22  control those open discussions?

23       A.    Well, there were general --

24  I already mentioned one that we didn't

Jerry G. Blaivas, M.D.

1    use the same -- when we added up --

2    excuse me.

3              I'm sorry.  Are you talking

4    about the exclusion criteria or the data

5    analysis?  I didn't -- I don't remember

6    the beginning of the sentence, your

7    sentence.

8         Q.    Let me just read this, and

9    maybe this will help focus what I want to

10   talk about.

11             In this paragraph under

12   review criteria, it says, "Six of the

13   authors reviewed the full text to select

14   relevant papers.  Discrepancies were

15   solved by open discussion."

16             Did I read that correctly?

17        A.    Yes.

18        Q.    Is open discussion

19   scientific?

20        A.    Well, sure it is.

21        Q.    Okay.  Is there anything I

22   can do to replicate what was the

23   guideposts in that open discussion

24   between the authors?

Jerry G. Blaivas, M.D.

1          A.    I don't know.  I'd have --

2     I'd have to look back.

3          Q.    And if there was a

4     discrepancy, were there ultimately

5     disagreements about certain articles

6     between the authors to include or

7     exclude?

8          A.    Well, that's what a

9     discrepancy is.  And we -- we would have

10    resolved it as best we could.  I don't

11    think there were actually -- there were

12    discrepancies, but the discrepancies were

13    resolved by either finding or not finding

14    the necessary requirements.

15              So if -- for example, if we

16    looked at a study and the conclusion said

17    that there was an 80 percent success rate

18    or something, and then we looked at the

19    article and there was no methodology to

20    determine what the success rate is, we

21    would have -- we would have agreed to

22    exclude that.

23              I don't have a recollection

24    anytime of there being a disagreement.

Jerry G. Blaivas, M.D.

1    There were -- it was more -- and not that

2    people don't disagree.  But it was pretty

3    clear -- I don't -- whether or not our

4    requirements were -- were adhered to.

5         Q.    Okay.  Are there any written

6    records or any notes specifically

7    documenting what the discrepancies were

8    and how they were resolved through open

9    discussion?

10        A.    No.

11        Q.    Doctor, in your "Safety

12   Considerations For Synthetic Sling

13   Surgery" article, did you cite any Obtryx

14   studies?

15        A.    I don't remember.  I know

16   there weren't many when I subsequently --

17   after -- in the review for this, I know

18   there were relatively few.

19        Q.    Doctor, sitting here today,

20   do you know whether or not you actually

21   reviewed or cited any Obtryx studies in

22   your article --

23        A.    No.

24        Q.    -- Exhibit Number 3?

Jerry G. Blaivas, M.D.

1           Going back to the first page

2   of your article, you note that the

3   effectiveness of this approach remains

4   unchallenged, correct?

5           A.    Sorry.  Where?

6           Q.    Let me start over.  In the

7   introduction, you talk about somewhat the

8   history of incontinence surgery; is that

9   correct?

10          A.    Yes.

11          Q.    You talk about your

12  preferred surgery, the autologous fascia

13  pubovaginal sling; is that right?

14          A.    Yes.

15          Q.    You also mention the Burch

16  procedure, correct?

17          A.    Yes.

18          Q.    And then you start talking

19  about what you in the article labeled as

20  the synthetic midurethral sling surgery;

21  is that right?

22          A.    Yes.

23          Q.    And describe in the

24  introduction that the synthetic

Jerry G. Blaivas, M.D.

1   midurethral sling surgery is minimally

2   invasive; is that correct?

3          A.    Where are you referencing

4   that?

5              Well, it's preceded by, "In

6   theory."  I said, "The appeal of such

7   procedures is obvious, that midurethral

8   sling is a minimally invasive, easy to

9   perform procedure."  That's in theory.

10         Q.    Okay.  Let me back up and

11  ask a question.

12             You have a sentence that

13  says, "The appeal of such procedures" --

14  and you're referring to the synthetic

15  midurethral slings, correct?

16         A.    Yes.

17         Q.    "The appeal of such

18  procedures is obvious in theory."

19  Correct?

20         A.    Yes.

21         Q.    It then states, "Synthetic

22  midurethral sling implantation is

23  minimally invasive," correct?

24         A.    Yes.

Jerry G. Blaivas, M.D.

1    Q.    "Easy to perform"; is that

2  correct?

3    A.    Yes.

4    Q.    "And is usually completed in

5  under a half an hour"; is that right?

6    A.    I -- that's what people say,

7  yes.

8    Q.    That's a fact, true?

9    A.    I'll grant you that.

10    Q.    And you would agree that the

11  synthetic midurethral sling is widely

12  considered to be minimally invasive?

13    A.    I would agree it's

14  considered to be, yes.  But not by me.

15    Q.    And then you also list that,

16  "The synthetic midurethral sling enables

17  a much faster recovery with less

18  perioperative morbidity than either the

19  Burch colposuspension or autologous

20  fascial slings."

21          Did I read that correctly?

22    A.    You did.

23    Q.    And those are also widely

24  considered the facts with regard to the

Jerry G. Blaivas, M.D.

1   synthetic midurethral sling; is that

2   correct?

3          A.    A lot of people would agree

4   to that.

5          Q.    And doctor, I understand

6   that you have a different opinion than

7   some doctors on midurethral slings; is

8   that correct?

9          A.    I do.

10         Q.    And differences of opinion

11  among doctors happens all the time,

12  correct?

13         A.    Yes.

14         Q.    Just because one doctor

15  agrees or disagrees with another doesn't

16  make one reasonable or unreasonable

17  inherently; is that right?

18               MS. O'DELL:  Objection to

19         form.

20               THE WITNESS:  Hopefully not.

21  BY MR. STRONGMAN:

22         Q.    In other words, reasonable

23  doctors can disagree about surgical

24  treatments, correct?

Jerry G. Blaivas, M.D.

1        A.      Yes.

2        Q.      And then your papers states

3    that the effectiveness of this approach

4    remains unchallenged, correct?

5        A.      That I agree with, without

6    qualification.  Okay.

7        Q.      So to this day, you would

8    agree that the effectiveness of the

9    synthetic midurethral sling is

10   unchallenged, correct?

11       A.      Yes.

12       Q.      Your concerns, as you've

13   laid them out in your supplemental

14   report, deal with doctors' knowledge and

15   patients' knowledge about safety with

16   regard to the synthetic midurethral

17   slings, correct?

18       A.      Correct.

19       Q.      Doctor, going over to the

20   second page of your article under

21   transvaginal mesh slings.  Do you see

22   that?

23       A.      I do.

24       Q.      It states that, "The

Jerry G. Blaivas, M.D.

1    retropubic tension-free vaginal mesh tape

2    sling procedure was introduced for

3    treatment of SUI in 1995."

4              Did I read that correctly?

5        A.    You did.

6        Q.    Now, what was introduced in

7    1995?

8        A.    Well, it was the precursor

9    to the TVT.  It was called Intravaginal

10   Slingplasty.

11       Q.    And how long before 1995 had

12   physicians been cutting mesh and using it

13   to treat stress urinary incontinence

14   surgically?

15       A.    Oh, people have been doing

16   it as far back as the '60s, '70s, 1960s,

17   1970s.

18       Q.    And then you also note that

19   in 2001 the transobturator tape procedure

20   came about in the literature; is that

21   correct?

22       A.    Yes.

23       Q.    And likewise, before 2001,

24   were doctors doing procedures with mesh

Jerry G. Blaivas, M.D.

1   where they were using the transobturator

2   route, but doing it by cutting mesh and

3   doing the procedure themselves?

4        A.    I don't know the exact

5   dates, but yeah, I mean, before it was

6   commercially available, there were people

7   that had done just what you said.

8        Q.    And, Doctor, would you agree

9   that the idea to use mesh to surgically

10  treat stress urinary incontinence was the

11  idea of a doctor?

12       A.    Yes.

13       Q.    And it was the idea of

14  doctors trying to come up with better

15  solutions to treat and cure their

16  patients, true?

17       A.    Yes.

18       Q.    Do you know when the Obtryx

19  device was first marketed?

20       A.    I don't have an independent

21  recollection, but sometime, you know,

22  somewhere in the early 2000s.

23       Q.    Do you know how long the

24  Obtryx was on the market -- strike that.

Jerry G. Blaivas, M.D.

1            Do you know how many years

2    transobturator slings were on the market

3    before the Obtryx came?

4            A.    I don't have any independent

5    knowledge of that.

6            Q.    Going back to your article,

7    one of the things that you do, is you

8    have a series of tables in your article.

9    I want to start with Table Number 1.

10            And can you just describe

11    for me what is included in Table Number

12    1?

13            A.    Long-term follow-up of --

14    follow-up of studies that had five or

15    more years with respect to effectiveness.

16            Q.    And you have both

17    prospective studies and retrospective

18    studies listed there?

19            A.    I do.

20            Q.    And then with regard to

21    Table Number 2, can you tell me what is

22    included in Table Number 2?

23            A.    Complications of either

24    retropubic or transobturator slings,

Jerry G. Blaivas, M.D.

1    which means that we combined both

2    approaches, one set of complications.

3           Q.    Can you tell me how -- or

4    strike that.

5                 Can you tell me where

6    exactly the data in Table Number 2 comes

7    from?

8           A.    Yes.  We took all of -- all

9    of our case -- all of the -- every single

10   study we looked at, and we looked at the

11   complications listed, and that became the

12   numerator.  And the denominator was all

13   the patients in all the series, excluding

14   studies that had -- where they used the

15   same cohort more than once.

16                And just to clarify, I said

17   in the beginning we excluded studies like

18   that, but not if they -- sometimes not if

19   they had completely different data.

20                So sometimes we used the

21   same cohort -- we reviewed the same

22   cohort, but -- in two different studies,

23   but we used as the denominator the total

24   number of patients.  We didn't add the

Jerry G. Blaivas, M.D.

1    two together.

2            Q.      And are all of the articles

3    that you reviewed and compiled to come up

4    with the data in Table Number 2 cited and

5    listed in your article?

6            A.      They are.

7            Q.      And the same would go for

8    Table Number 3?

9            A.      Yes.

10           Q.      And the same would go for

11   Table Number 4, I believe; is that

12   correct?

13           A.      Yes.

14           Q.      And just so it's clear, the

15   data that's presented in Table Number 1

16   is just some of the data that ultimately

17   ends up in the next series of tables, 2,

18   3, and 4; is that correct?

19           A.      Oh, yes.  Yes.

20           Q.      Doctor, in your article, you

21   indicate that a minimum of 12.5 percent

22   of women who undergo synthetic mesh

23   surgery would have a negative outcome?

24           A.      You said 12.5 percent?  No.

Jerry G. Blaivas, M.D.

1  It's actually in the article 15 percent

2  and 12.5 percent.  There it says greater

3  or equal to 12.5.  We subsequently say

4  greater or equal to 15 percent.

5       Q.    Doctor, if you would look

6  with me on what's Page 486 of your

7  article.

8       A.    Yes.

9       Q.    Specifically states that a

10  minimum of 12.5 percent of women who

11  undergo mesh SMUS surgery have a serious

12  adverse event and/or surgical failure; is

13  that correct?

14       A.    Yes.

15       Q.    And if you look at the

16  conclusion, it reiterates the

17  12.5 percent number; is that correct?

18       A.    Yes.

19       Q.    Now, in your report in this

20  case, your supplemental report, you do

21  indicate 15 percent, correct?

22       A.    Correct.  And in the paper,

23  in the other summary.

24             The -- one of the

Jerry G. Blaivas, M.D.

1  differences is, in this statement, does

2  not take into account the 3.9 percent

3  refractory overactive bladder, because we

4  didn't consider that to be a serious

5  adverse event.  We were talking more

6  about surgical -- things that required

7  surgery.  And surgical failure, we were

8  referring to recurrent stress

9  incontinence.

10       Q.    So if a patient had

11  recurrent stress urinary incontinence,

12  they fell within that 12.5 to 15 percent?

13       A.    Yes.

14       Q.    And by math, that would mean

15  85 to 87 percent of women that have mesh

16  implanted to treat stress urinary

17  incontinence don't have negative

18  outcomes, correct?

19            MS. O'DELL:  Object to form.

20            THE WITNESS:  Serious

21       negative outcomes, yes.

22  BY MR. STRONGMAN:

23       Q.    Doctor, does the word

24  "Obtryx" appear anywhere in your "Safety

Jerry G. Blaivas, M.D.

1    Considerations" article that we marked as

2    Exhibit 3?

3           A.    Again, I don't have an

4    independent recollection of that.

5           Q.    And when you talk about the

6    safety considerations that you articulate

7    in your article, you talk about synthetic

8    mesh slings in general, correct?

9           A.    Yes.

10          Q.    And in some categories, you

11   narrow it down to the transobturator

12   approach and the retropubic approach,

13   correct?

14          A.    Yes.

15          Q.    But nowhere in your article

16   do you actually discuss risks divided

17   down by specific device, such as the

18   Obtryx, correct?

19          A.    Correct.

20          Q.    There are sections in your

21   review article toward the back that talk

22   about biomaterials issues, correct?

23          A.    Yes, there are.

24          Q.    Okay.  And did you actually

Jerry G. Blaivas, M.D.

1    author the sections on biomaterial and

2    pathology issues?

3         A.    No.

4         Q.    Who did?

5         A.    Dr. Iakovlev.

6         Q.    And I noticed in the article

7    on Page 491, it indicates that, "Type 1

8    polypropylene mesh is currently

9    considered to be the optimal SMUS mesh

10   material, owing to its large pore size

11   which facilitates infiltration of

12   macrophages and fibroblasts, promotes

13   neovascularity and tissue ingrowth, and

14   minimizes the likelihood of infection,"

15   correct.

16             MS. O'DELL:  Where are you

17        reading, Jon?  Page 491 okay.

18        Thank you.

19             THE WITNESS:  Yes.

20   BY MR. STRONGMAN:

21        Q.    And do you know whether or

22   not the Obtryx is a Type 1 polypropylene

23   mesh?

24        A.    It is.

Jerry G. Blaivas, M.D.

1    Q.    Doctor, as part of your

2  process of putting this article together,

3  did you talk with Dr. Iakovlev about how

4  much money he has made in the mesh

5  litigation?

6    A.    No, we did not.

7    Q.    Is that a relevant

8  consideration to you at all?

9    A.    Not at all.  I judge people

10 by the scientific integrity of what they

11 say and write, not by what their incomes

12 are.

13    Q.    Do you know whether or not

14 Dr. Iakovlev's opinions have been

15 excluded in this case?

16    A.    I do not.

17    Q.    Would it surprise you to

18 find out that he had opinions excluded as

19 being unreliable?

20       MS. O'DELL:  I'll object --

21       I would object to the question,

22       and I would say Dr. Iakovlev has

23       not been named an expert in

24       Ms. Frankum's case.  So to the

Jerry G. Blaivas, M.D.

1      degree that you are suggesting

2      that, that would be incorrect.

3           THE WITNESS:  I --

4           MS. O'DELL:  There is no

5      question.

6           THE WITNESS:  Okay.  Go --

7  BY MR. STRONGMAN:

8      Q.    You can answer it.

9           MR. STRONGMAN:  Your

10      objection is noted.

11  BY MR. STRONGMAN:

12      Q.    You can answer.

13      A.    I think he exhibits the

14  highest degree of significant integrity.

15  And I can't think of a scientific reason

16  why his testimony should be excluded.

17      Q.    Doctor, on the issue of mesh

18  degradation, would you refer to a

19  biomaterials expert?

20      A.    Not a single biomaterials

21  expert.  I think there's a body of

22  literature that anybody can read and

23  formulate opinions, including me.

24      Q.    Doctor, do you believe that

Jerry G. Blaivas, M.D.

1    the question of whether or not

2    polypropylene degrades in the body has

3    yet to be fully resolved?

4          A.    I think there's a

5    substantial body of evidence that it does

6    degrade.  And I am aware of scientific

7    opinions to the contrary.

8          Q.    Do you believe it's a

9    settled question as to whether or not

10   polypropylene degrades in the body?

11         A.    No.  I think I've already

12   answered it -- answered that.  But --

13   have I?

14         Q.    In that you would agree that

15   it's not a settled question, correct?

16         A.    Well, there's controversy.

17   I don't know that anything is ever

18   settled 100 percent.  But there are

19   people on both sides of it.  And I've

20   already expressed my opinion.

21         Q.    Would you agree that there's

22   good scientists on both sides of that

23   debate?

24         A.    Yes, I do.

Jerry G. Blaivas, M.D.

1          Q.    I've got 12 minutes left,

2    Doctor.  It goes fast.

3               Doctor, I want to turn to

4    your expert report, which we've marked as

5    Exhibit Number 2.

6          A.    Okay.

7          Q.    On Page 3, again, you are

8    referencing -- at the very top, you are

9    referencing your article that we've just

10   been going through.

11         A.    Yes.

12         Q.    Correct?

13         A.    Yes.

14         Q.    And one of the things that

15   you say, "The exhaustive research

16   presented" --

17         A.    Where are you looking?

18         Q.    -- "further supports the

19   opinion."

20              Right at the very top.

21         A.    Yes.

22         Q.    All right.  And so the

23   characterization that you have is that

24   the work that went into your "Safety

Jerry G. Blaivas, M.D.

1    Considerations" article was exhaustive

2    research, correct?

3          A.    It was.

4          Q.    And can you sit here today

5    and say whether or not Obtryx studies

6    were actually included in that research?

7          A.    I don't remember.  No, I

8    can't.  I just simply don't remember.

9          Q.    And then when you go through

10   the next paragraph, you discuss somewhat

11   of the nature of the peer review process

12   that your article went through; is that

13   right?

14         A.    Yes.

15         Q.    One of the things about the

16   peer review process is that not all of

17   the peer reviewers agree with each other;

18   is that right?

19         A.    Correct.  I don't know if --

20   are you asking me in general?

21         Q.    Just in general?

22         A.    Yes.

23         Q.    No, no, just in general.

24         A.    Yes.

Jerry G. Blaivas, M.D.

1      Q.    And that's what the peer

2  review process is all about, is getting

3  feedback, right?

4      A.    Yes.

5      Q.    And you list some of the

6  questions in your expert report that the

7  peer reviewers had to consider, right?

8      A.    Yes.

9      Q.    And obviously there are

10  other questions that they had to consider

11  as well, correct?

12      A.    Yes.

13      Q.    And do you consider the peer

14  review process to be protected in that --

15  am I able to see what the peer reviewers

16  actually commented on with regard to your

17  article?

18      A.    I don't know.

19      Q.    Is that something that

20  you're willing to provide?

21      A.    I'd have to -- I don't know

22  if I'd be willing to provide it or not.

23  I don't like to make spot decisions.

24      Q.    I understand.

Jerry G. Blaivas, M.D.

1        A.    But certainly the journal

2    has the option to do whatever they want.

3        Q.    Do you have any issue with

4    us having access to that, provided there

5    aren't other objections from the journal

6    or whatnot?

7        A.    It's their -- at this point,

8    it's their property and they can do what

9    they see fit.

10       Q.    Your second opinion in your

11   supplemental expert report is, "Higher

12   quality and longer term studies are

13   needed to accurately assess the risk of

14   SMUS complications," correct?

15       A.    Correct.

16       Q.    And, Doctor, would you agree

17   that there are publications out there

18   indicating that the safetyness and

19   effectiveness of synthetic midurethral

20   slings is well established already?

21       A.    I'm not sure I -- I don't

22   know about peer-review papers that say

23   that.  That -- certainly I'm not aware of

24   peer-review papers that provide a

Jerry G. Blaivas, M.D.

1    compelling argument for that.

2         Q.    Doctor, you would agree that

3    the overwhelming number of publications

4    that exist on synthetic midurethral

5    slings conclude that it is a safe and

6    effective procedure, correct?

7         A.    They do, but their

8    methodology, in my judgment, does not

9    support those statements.

10        Q.    So the authors make those

11   conclusions, correct?

12        A.    Many do, yes.

13             MS. O'DELL:  Object to form.

14   BY MR. STRONGMAN:

15        Q.    And you disagree with them?

16             MS. O'DELL:  Object to form.

17             THE WITNESS:  Well, I think

18        I've already said -- I've already

19        answered the question.

20   BY MR. STRONGMAN:

21        Q.    And that is that yes, you

22   disagree with their conclusions, correct?

23        A.    Well, I don't disagree with

24   it about safety -- about efficacy.  But I

Jerry G. Blaivas, M.D.

1   think -- I mean, just look at any

2   article.  Almost none of them have any

3   methodology to evaluate safety.  Most

4   don't even define safety, what they mean

5   by safety.

6            Q.    Doctor, would you agree that

7   I could find articles that indicate that

8   patients undergoing the autologous

9   pubovaginal sling procedure are more than

10  15 percent likely to have a negative

11  outcome?

12           A.    It depends on what you mean

13  by negative outcome.  I don't know

14  what --

15           Q.    Well, the same way you

16  defined it with regard to the synthetic

17  midurethral sling.

18           A.    Oh, no.  We use numbers.  We

19  don't -- we used numbers.  We said

20  15 percent, and then we describe what

21  they are.  I don't think -- I don't know.

22  I mean, I'm sure it's possible to find

23  papers that say just about anything.  But

24  I don't know.

Jerry G. Blaivas, M.D.

1           Well, yeah, I mean, if you

2   consider -- look, none of them have

3   100 percent success rate.  And, you know,

4   there are papers that find 40 and 50 and

5   60 percent failure rates with -- maybe

6   not -- yeah --

7           Q.    Yeah.

8           A.    -- failure rates with

9   midurethral slings and autologous slings.

10          Q.    Would you agree that

11  physician experience -- strike that.

12              Would you agree that the

13  physicians' own experience is a paramount

14  factor in deciding what procedure they

15  should use on their patients?

16              MS. O'DELL:  Object to the

17          form.

18              THE WITNESS:  Experience and

19          knowledge and judgment, yes.

20  BY MR. STRONGMAN:

21          Q.    And, Doctor, you also

22  include in your expert report a section

23  on tumorigenicity; is that correct?

24          A.    Yes.

Jerry G. Blaivas, M.D.

1          Q.    And, Doctor, you are not

2    offering an opinion to a reasonable

3    degree of medical certainty that

4    polypropylene mesh causes cancer,

5    correct?

6          A.    No.  I mean, my opinion is

7    quite clear that it's something that

8    should be taken into account and studied

9    in the future.

10          Q.    And you would agree that

11    there's insufficient data today to

12    conclude that there's a causal

13    relationship between cancer and

14    polypropylene mesh, correct?

15          A.    Well, I would say there is

16    no data.  There hasn't been long-term

17    studies.  No one suggests that it causes

18    cancer right away.

19          Q.    And, Doctor, your article

20    that we marked as Exhibit Number 3, all

21    of the information that you cite and all

22    of the articles that you cite in your

23    article were publicly available to

24    doctors other than yourself, correct?

Jerry G. Blaivas, M.D.

1          MS. O'DELL:  Object to the

2       form.

3          THE WITNESS:  Well, it

4       depends on what you mean by

5       publicly available.  If someone

6       were to go to the trouble of

7       looking at so many obscure

8       journals, they could find it, but

9       it wasn't -- everything is

10      publicly available unless it's in

11      a lockbox.  But many of the

12      articles were not readily publicly

13      available because -- because they

14      were in obscure journals.

15  BY MR. STRONGMAN:

16      Q.    But safety information in

17  publications on midurethral slings are

18  available in the published literature,

19  correct?

20      A.    I'm sorry.  Could you -- I

21  want to answer precisely.  Could you read

22  that back or say that again?

23      Q.    Sure.  Safety information on

24  midurethral slings is available in the

Jerry G. Blaivas, M.D.

1   published medical literature, correct?

2        A.    No, I would say that -- I

3   would say no, that there have been almost

4   no studies that specifically looked at

5   safety, except for short-term safety.

6   There is plenty of data on 30 days.  But

7   on long-term safety, there is simply no,

8   or almost no studies that have any kind

9   of a methodology that would even allow

10  you to form a judgment about safety.

11       Q.    Doctor, you would agree that

12  there are reasonable doctors still using

13  synthetic midurethral slings today,

14  correct?

15       A.    Yes.

16       Q.    And you would agree that

17  there are reasonable doctors that,

18  knowing the risks set out in your review

19  article, still decide to use midurethral

20  slings made of polypropylene mesh,

21  correct?

22            MS. O'DELL:  Object.  Object

23       to the form.

24            THE WITNESS:  I would submit

Jerry G. Blaivas, M.D.

1          that the overwhelming majority of

2          doctors don't know about the

3          risks.

4               But yes, to answer your

5          question, there are reasonable

6          doctors that do and make the

7          judgment to use it, to use

8          midurethral slings.

9     BY MR. STRONGMAN:

10         Q.    And you're not critical of

11    those doctors or the judgments that they

12    make for their patients, correct?

13         A.    No -- slightly so.

14    Slightly.  I mean, I wish people paid

15    more attention, but it's difficult.

16         Q.    And, Doctor, you would

17    certainly agree that it is widely

18    accepted, even in light of the

19    information contained in your review

20    article, that synthetic midurethral

21    slings should be an option for doctors,

22    correct?

23               MS. O'DELL:  Object to the

24         form.

Jerry G. Blaivas, M.D.

1              THE WITNESS:  It's currently

2     widely accepted, yes.

3  BY MR. STRONGMAN:

4         Q.    Doctor, do you know

5  Dr. Jennifer Anger?

6         A.    I do.

7         Q.    Do you respect her?

8         A.    Very much so.

9         Q.    Is she a good doctor?

10         A.    She is a wonderful doctor,

11  wonderful person.

12         Q.    Is she a reasonable doctor?

13         A.    Yes, she's a reasonable

14  doctor.

15         Q.    Doctor, you would agree that

16  the Obtryx is still considered to be

17  within the standard of care for the

18  treat --

19         A.    I'm sorry.  The which?

20         Q.    Sure.

21         A.    I just didn't hear the word.

22         Q.    I'll rephrase.

23         A.    Oh, Obtryx.

24         Q.    Doctor, would you agree that

Jerry G. Blaivas, M.D.

1    the Obtryx is still considered to be

2    within the standard of care for the

3    surgical treatment of stress urinary

4    incontinence today?

5         A.    I would.

6         Q.    Doctor, do you intend to

7    testify at the Frankum trial?

8         A.    I have no idea.

9         Q.    Do you know when the trial

10   is set?

11        A.    I do not.

12        Q.    You don't know what month?

13        A.    I guess I just -- the

14   answer, I guess, is yes and yes.

15        Q.    Do you know what month of

16   the year it's set for?

17        A.    No.  I hope it's not May.

18        Q.    But it's fair to say that

19   it's not on your calendar as of today?

20        A.    I honestly don't know.

21        Q.    The last thing I'll do with

22   my 30 seconds, I believe that you brought

23   with you a copy of your supplemental

24   report that had some comments in it.

Jerry G. Blaivas, M.D.

1        A.     Yes.

2        Q.     Is that correct?

3               If it's all right with you,

4    I'd just like to mark that as an exhibit.

5        A.     I'm sorry.  I thought we

6    already did.

7        Q.     No.  We marked the one

8    without comments.

9        A.     Okay.

10              (Document marked for

11              identification as Exhibit

12              Blaivas-4.)

13   BY MR. STRONGMAN:

14       Q.     And then the notebook that

15   you have in front of you, is that your

16   only copy of that notebook?

17       A.     Yes.

18       Q.     Would it be possible for us

19   to mark it as an exhibit so I can see

20   what articles specifically you've

21   included in your notebook?

22       A.     I believe you're entitled to

23   that.

24              MR. STRONGMAN:  And that --

Jerry G. Blaivas, M.D.

1      let me do that on the record.

2            We marked as Exhibit Number

3      4 the supplemental report of Dr.

4      Blaivas with his comments included

5      in them.

6            We will mark as Exhibit

7      Number 5 the notebook that he

8      brought with him today.

9            (Document marked for

10     identification as Exhibit

11     Blaivas-5.)

12           MR. STRONGMAN:  That's all

13     the questions I have.

14           MS. O'DELL:  Nothing.  No

15     questions.

16           THE VIDEOGRAPHER:  The time

17     right now is 12:14 p.m.  We're off

18     the record.

19           (Witness excused.)

20           (Deposition concluded at

21     approximately 12:14 p.m.)

22

23

24

Jerry G. Blaivas, M.D.

1

2                    CERTIFICATE

3

4

5           I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.

7

           It was requested before
8  completion of the deposition that the
   witness, JERRY G. BLAIVAS, M.D., have the
9  opportunity to read and sign the
   deposition transcript.

10

11

12
        _____
        MICHELLE L. GRAY,
13      A Registered Professional
        Reporter, Certified Shorthand
14      Reporter and Notary Public
        Dated:  May 3, 2016

15

16

17           (The foregoing certification
18  of this transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying reporter.)

22

23

24

Jerry G. Blaivas, M.D.

1      INSTRUCTIONS TO WITNESS

2

3          Please read your deposition

4   over carefully and make any necessary

5   corrections.  You should state the reason

6   in the appropriate space on the errata

7   sheet for any corrections that are made.

8          After doing so, please sign

9   the errata sheet and date it.

10          You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14          It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

Jerry G. Blaivas, M.D.

1                      -    -    -    -    -    -

                    E  R  R  A  T  A

2                      -    -    -    -    -    -

3

4     PAGE   LINE   CHANGE

5     _____  _____  _____

6          REASON: _____

7     _____  _____  _____

8          REASON: _____

9     _____  _____  _____

10         REASON: _____

11    _____  _____  _____

12         REASON: _____

13    _____  _____  _____

14         REASON: _____

15    _____  _____  _____

16         REASON: _____

17    _____  _____  _____

18         REASON: _____

19    _____  _____  _____

20         REASON: _____

21    _____  _____  _____

22         REASON: _____

23    _____  _____  _____

24         REASON: _____

Jerry G. Blaivas, M.D.

```
1

2              ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____, do

5    hereby certify that I have read the

6    foregoing pages, 1 - 73, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16    JERRY G. BLAIVAS, M.D.            DATE

17

18

19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20____.
21   My commission expires:_____
22

     _____
23   Notary Public

24
```

Jerry G. Blaivas, M.D.

```
 1                    LAWYER'S NOTES

 2      PAGE   LINE

 3      _____  _____  _____

 4      _____  _____  _____

 5      _____  _____  _____

 6      _____  _____  _____

 7      _____  _____  _____

 8      _____  _____  _____

 9      _____  _____  _____

10      _____  _____  _____

11      _____  _____  _____

12      _____  _____  _____

13      _____  _____  _____

14      _____  _____  _____

15      _____  _____  _____

16      _____  _____  _____

17      _____  _____  _____

18      _____  _____  _____

19      _____  _____  _____

20      _____  _____  _____

21      _____  _____  _____

22      _____  _____  _____

23      _____  _____  _____

24      _____  _____  _____
```