# EXHIBIT 16

```
 1                  UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                     (Asheville Division)

 3   ---------------------------x
     BERTIE FRANKUM, et al,      :
 4             Plaintiffs,       :
                                 :
 5                               :
     vs                          :Civil Action:1:15-CV-091
 6                               :
     BOSTON SCIENTIFIC CORP.,    :
 7   et al,                      :
                 Defendants.     :
 8   ---------------------------x

 9                              Monday, January 4, 2016
                                Asheville, North Carolina
10

11        The above-entitled action came on for a Pretrial
     Conference Hearing Proceeding before the HONORABLE MAX O.
12   COGBURN, Jr., United States District Judge, in Courtroom
     1 commencing at 10:48 a.m.
13

14        APPEARANCES:
          On behalf of the Plaintiff Frankum:
15        ANDY D. BIRCHFIELD, Jr., Esquire
          P. LEIGH O'DELL, Esquire
16        Beasley Allen
          234 Commerce Street
17        Post Office Box 4160
          Montgomery, Alabama 36103-4160
18
          On behalf of the Plaintiff Mathison:
19        CHARLES M. SASSER, Esquire
          The Sasser Law Firm, P.A.
20        1011 Morehead Street, Suite 350
          Charlotte, North Carolina  28204
21
          JIM M. PERDUE, Jr., Esquire
22        Perdue & Kidd
          510 Bering, Suite 550
23        Houston, Texas  77057

24   Tracy Rae Dunlap, RMR, CRR              828.771.7217
     Official Court Reporter
25
```

1    **APPEARANCES CONT'D:**

2    On behalf of Defendant:
     **JON A. STRONGMAN, Esquire**
3    Shook, Hardy & Bacon L.L.P
     2555 Grand Boulevard
4    Kansas City, Missouri  64108

5    **MOLLY H. CRAIG, Esquire**
     Hood Law Firm, LLC
6    172 Meeting Street
     Charleston, South Carolina  29401

7

     **LESLIE C. PACKER, Esquire**
8    Ellis & Winters, LLP
     Post Office Box 33550
9    Raleigh, North Carolina  27636

10

11

12                    **I N D E X**

13

14

15

16

17

18

19

20

21

22

23

                                        <u>Page</u>
24   Reporter's Certificate ......................40

25

**P R O C E E D I N G S**

1

2        THE COURT:  Good morning.  What needs to be done

3   on this pretrial matter?  Have you-all been following the

4   request that you gave?  Anybody got a problem?  We got

5   everybody exchanging everything?  I know you-all have

6   mediation this week.  So while you're here you're going

7   to mediate it?

8        MR.  BIRCHFIELD:  Yes, Your Honor.

9        THE COURT:  It's always good to try to settle

10   those.  Some of these have been won, some of these have

11   been lost by either side.  So you don't know how they'll

12   go down.

13        A couple of things that we have issues with, it

14   looks like, are the -- most of the motions in limine

15   we'll wait until trial.  I'm going to have to hear some

16   evidence before I know what to do.  But there are a

17   couple of things I think we can deal with.  Number one

18   are the witnesses who plaintiff wants to have testify

19   live in a room in Massachusetts.  Is that right?  Am I

20   right about that?

21        MR.  BIRCHFIELD:  Yes, Your Honor.

22        THE COURT:  I want to hear about that.

23        MS.  O'DELL:  Good morning, Your Honor.  May it

24   please the Court.  Leigh O'Dell for the plaintiffs.  We

25   have moved the Court to allow us to have four witnesses

1    appear live in Massachusetts.  And as the Court is aware,

2    recently, there's a moving and right trend to -- in cases

3    where the defendant resides in another state, and very

4    important witnesses are outside subpoena power, to

5    subpoena them to a district court or an agreeable

6    location in the local area within subpoena power and

7    allow those witnesses to testify via video conferencing.

8          Judge Fallon, in the Vioxx litigation, addressed a

9    very similar circumstance to the one that's presented

10   here.  The Vioxx litigation was a litigation with 55,000

11   plaintiffs.  In that particular case, there was a very

12   important witness, David Annis, who was director -- he

13   was vice president of marketing for Vioxx.  And there had

14   been, at that point in time, four bellwether trials.  And

15   Judge Fallon, having been moved by the plaintiffs to

16   bring Dave Anstice live, issued an order and he adopted

17   five criteria that are critical.  Number one, the control

18   of the employees.  The four employees that we've sought

19   here, Janice Connor, James Goddard, Doreen Rao, and

20   Robert Miragliuolo.  I don't know that I got that quite

21   right but close, and I'm sure they'll correct me if I'm

22   wrong on that.

23         THE COURT:  Let me ask this question.  Are you

24   actually going to call them or are they going to sit in a

25   room and not be called?

1          MS.   O'DELL:   We are going to call them.   And let
2   me speak to that aspect of Boston Scientific's
3   opposition.   In the Carlson case, as you know, Judge
4   Voorhees granted the plaintiff's motion allowing this.
5          THE COURT:   He did.
6          MS.   O'DELL:   There was a situation where Janice
7   Connor, who was director of clinical trials, a very
8   important witness, absolutely critical to the plaintiff's
9   case.   Ms. Connor was only available for a very short
10  period of time is my understanding.   And Dr. Galway was
11  on the stand at the time period that Ms. Connor was
12  available.   Dr. Galway was the general causation and
13  specific causation witness for the plaintiff.   He went
14  long and he could not come back.   So there was a very
15  difficult trial strategy decision of, do you continue
16  with Dr. Galway or take Ms. Connor?   So from our
17  perspective, Judge -- one, we weren't involved in that
18  case and certainly can't speak to the trial management
19  decisions that were made.   But if the Court were to grant
20  our motion -- we urge the Court to do that -- then we
21  would make sure that when we call them, we're going to go
22  forward with the witnesses, and we would coordinate so
23  that it is a situation where a witness is not left at a
24  location and really in an unreasonable fashion.
25          THE COURT:   All right.   Let me hear from the other

1   side.

2        MR.  STRONGMAN:  Good morning, Your Honor.  John

3   strongman on behalf of Boston Scientific.  The Court

4   should deny plaintiff's motion for three reasons.  The

5   first one under Rule 43:  The testimony by

6   contemporaneous transmission should only be allowed under

7   compelling circumstances -- good cause and compelling

8   circumstances.  When there are videotaped depositions of

9   the witnesses there are no compelling circumstances.

10  These witnesses -- Ms. Connor has been deposed for days

11  upon days on video for the very purpose of presenting her

12  testimony at trial.  Mr.  Miragliuolo, the same way, and

13  Mr. Goddard and Ms. Rao all the same.  All have video

14  depositions that have been used at trial, are prepared to

15  be used at trial; we will use them at trial just like the

16  plaintiff should.

17       The very purpose of an MDL is to do discovery in a

18  unified fashion and to get things together in a

19  consolidated way that can then be used for cases across

20  the country, and that is what's been done here.  For

21  plaintiffs to be able to continuously compel our

22  witnesses to testify in trials across the country would

23  be to thwart that MDL process.  So there are videos, they

24  have designated from videos, they have used video ins

25  other trials, and they are ready to go.  There are no

1    compelling circumstances, like Rule 43 requires, for a
2    contemporaneous transmission.
3        THE COURT:  Where are your folks located with
4    regard to where they would need to actually testify?
5        MR.  STRONGMAN:  Are folks are in generally around
6    Boston, Middlesex County.  Boston Scientific is in
7    Middlesex County.  The plaintiffs could subpoena the
8    witnesses within 100 miles of that location under their
9    theory.  However, the second reason the motion should be
10   denied is we believe that Rule 45 does not allow a court
11   in North Carolina to subpoena a witness to testify in
12   trial in North Carolina even if it is by a
13   contemporaneous transmission.  I believe it's beyond the
14   scope of Rule 45 and the reach of a subpoena.  Even
15   though the testimony would be via live transmission, it
16   would still be a trial in North Carolina.  We believe
17   that a subpoena simply should not be and cannot be issued
18   to reach those witnesses for a trial here, and that's the
19   second reason the motion should be denied.
20       The third, past experience.  We've talked about
21   Carlson.  In fact, Ms. Connor was available on multiple
22   days.  There were also two other witnesses, Mr. Goddard
23   and Mr. Miragliuolo, who were not mentioned, who were
24   also on call ready to testify and did not actually
25   testify and videos were used instead.

1        Two cases have been tried up to this point, one in

2    -- obviously, the Carlson case.  Another on a remand, a

3    very similar circumstance, a remand case back to the

4    Central District of California, the Sanchez case.  It was

5    similarly tried with no contemporaneous transmission of

6    witnesses.  Videos were used and it worked.  That trial

7    was fast, it was efficient, it was done in four days.

8    Mr.  Perdue, who is here, was trial counsel for the

9    plaintiffs and can attest to that.  It works, there are

10   no compelling circumstances, and the videos should be

11   used.

12       THE COURT:  Thank you.  Speak to the compelling

13   issue of the argument with regard to the fact that you

14   shouldn't be allowed to subpoena them.

15       MS.  O'DELL:  Well in terms of a compelling issue,

16   Judge.  Ms. Connor is a good illustration.  She was

17   deposed -- these were discovery depositions taken over

18   four days.  They range throughout a number of products,

19   different lawyers.  Splicing them together can be done.

20   But I think Judge Goodwin, in his recent ruling in the

21   Mullins case, said it well.  You know, and he was -- he

22   said that having testimony spliced together disjointed is

23   not to be preferred over live testimony.

24       A good illustration is with Ms. Connor.  Some of

25   the deposition testimony that's been designated by the

1    defense occurred on the last -- the fourth deposition.

2    And in regard to Ms. Connor, they have designated

3    testimony -- this is at page 461 of her deposition --

4    where they ask her these broad questions:  Have clinical

5    trials that were supported by Boston Scientific been

6    performed on Obtryx?  It's a very general question.  She

7    says yes.  Well that deposition was taken in 2015.

8    That's very misleading because no studies had been done

9    at the time that Ms. Mathison was implanted with the

10   Obtryx in 2007 or Ms. Frankum in 2009.  So there's very

11   compelling reasons to put the testimony into a seamless,

12   efficient, clear, not misleading way for the jury.

13          In terms of having a subpoena issued.  We would

14   suggest to the Court that a subpoena could be issued out

15   of a court in Massachusetts and that they would be

16   subpoenaed to a location.  We have secured a location

17   that's five miles from the headquarters of Boston

18   Scientific.  We think that would be very convenient,

19   certainly.  And that if you look at the decision in the

20   Hull case in Wisconsin and the Mullins case, as well as

21   Judge Voorhees.  This is a situation where, in light of

22   the specific circumstances of these plaintiffs, there are

23   very compelling witnesses -- excuse me -- very compelling

24   reasons to have these witnesses appear live.

25          THE COURT:  All right.  Anything else you want to

 1    add?

 2         MR.  STRONGMAN:  Nothing further, Your Honor.

 3         THE COURT:  If I do this, are you going to -- how

 4    much -- how long are they going to need to be available

 5    in this room five miles away?  I mean will you use their

 6    time -- well, let me just do this.  I'm going to allow

 7    them to testify, and that will be withdrawn if you don't

 8    use their time wisely in this.  In other words, if I find

 9    there's any gamesmanship going on or they're having to

10    wait a long period of time to testify days on end,

11    depending on how long this trial takes, I'll withdraw it.

12    But I am going to allow it to start off with.  But you're

13    going to have to use their time wisely in this.

14         MS.  O'DELL:  Thank you.

15         THE COURT:  I do understand the need for live

16    testimony.

17         MS.  O'DELL:  Thank you, Your Honor.

18         THE COURT:  I do.  I've tried a lot of cases as an

19    attorney, so I can understand the need for it and what

20    has to be there.  So I will allow that motion.

21         Now with regard to the expert.  Does anybody want

22    to make any comment over what I've already had?  This is

23    the expert that was not originally allowed to testify.

24    Anybody want to argue about that?

25         MR.  PERDUE:  The last name is hard to pronounce,

1    Your Honor, it's Iakovlev.  Jim Perdue for the

2    plaintiffs, Your Honor.  Dr. Iakovlev is Russian and he's

3    also Canadian.

4         THE COURT:  Is he the one who said that it's --

5    there's nothing wrong with this and then now he's changed

6    his mind?

7         MR.  PERDUE:  Well that may be a different one.

8    I'm talking about a pathologist.  And the challenge to

9    Dr. Iakovlev is the pathology supplement.  So there's two

10   -- there's a couple of experts in front of the Court that

11   have been challenged.  You've got one on Dr. Blaivas and

12   one on Dr. Iakovlev's supplemental report.

13        THE COURT:  Okay.  Fire away on the doc you're

14   working on right now.

15        MR.  PERDUE:  So Dr. Iakovlev is a pathologist.

16   He is an expert in pathology, has a history of studying

17   issues of tissue response to polypropylene mesh.

18   Dr. Iakovlev issued a general causation opinion in the

19   MDL that did not address the specifics of anything in

20   particular to this case.  I'm here on behalf of

21   Ms. Mathison, obviously co-counsel with the lawyers for

22   Ms. Frankum, but this is specific to Ms. Mathison, Your

23   Honor.

24        Dr. Iakovlev issued his original report just as a

25   general causation report in the concept that, based on

1   his studies, there is a pathological tissue reaction to

2   polypropylene mesh.  It's a general report about that

3   process.  Judge Goodwin addressed that report on a

4   *Daubert* challenge.  And that opinion, that general

5   opinion, was struck by Judge Goodwin.

6          In the intervening time, Your Honor, Dr. Iakovlev

7   was asked to look at the specific pathology of

8   Ms. Mathison.  Now the timing of that I will -- I need to

9   be quite honest with the Court.  Dr. Iakovlev had

10  available pathology slides to him.  There was a

11  misunderstanding as to the content of the slides based on

12  the written pathology report.  As the Court knows, you

13  get an interpreting pathologist.  This was explant done

14  in Los Angeles.  So you get a pathology report by the

15  interpreting pathologist and then the slides themselves

16  are maintained in a cassette by the facility so you have

17  the actual slides that can go under a microscope.

18         The slides were available, but the pathology

19  report by the interpreting pathologist notes that there

20  is no, in this case, mesh.  That report then apparently

21  leads to a misunderstanding as to what is actually in the

22  slides, the cassette.  Dr. Iakovlev then, in the

23  intervening time, looks at the slides themselves and has

24  issued now a specific causation report based on his

25  interpretation of the slides.  That report is past the

 1  expert deadline.

 2       Ms. Mathison's position, Your Honor, only is that

 3  it is a supplemental report based on evidence that is

 4  factual, and his interpretation of those slides that now

 5  look specific to Ms. Mathison and specific, then, to the

 6  tissue reaction that is available to be seen by

 7  Dr. Iakovlev on her personal slides.  Therefore, the

 8  report is submitted to the Court as a supplemental report

 9  by Dr. Iakovlev under Rule 26 based on the additional

10  information.  Let me be, again, blunt and honest with the

11  Court.  It is not our position the slides were

12  unavailable.  It is that there was a misunderstanding as

13  to the slides based on the written pathology report.

14       THE COURT:  How did you find out that you had this

15  misunderstanding come up with the re-look?  Tell me about

16  that.

17       MR. PERDUE:  My understanding, Your Honor, is

18  that the lawyers handling the case after the -- after the

19  remand for, Ms. Mathison, went back to Dr. Iakovlev with

20  the report and basically posed the question a second

21  time:  Is there no mesh?  And there's not mesh on the

22  slides.  Let me be scientifically honest about that as

23  well.  There's not mesh on the slides.

24       THE COURT:  I'm assuming you're being honest about

25  everything you're telling me, unless something else is

1 proven.

2 MR. PERDUE: So I fear that -- I want to be

3 circumspect in that this is secondhand. And so for all

4 the reasons we have the hearsay rule, representations by

5 a lawyer based on hearsay need to be especially

6 circumspect. There is no mesh on the slides themselves.

7 THE COURT: When did you get this new information

8 to these folks?

9 MR. PERDUE: This new information was given to

10 these folks in the second week of December, 2015.

11 THE COURT: All right. Let me hear from you-all

12 on this.

13 MR. STRONGMAN: Your Honor, Dr. Iakovlev has in

14 fact -- whether there was a misunderstanding on the

15 slides or not, I do not know. However, when you look at

16 Dr. Iakovlev's own report he acknowledges that he himself

17 has had the slides in his own possession since September

18 30th 2014. So there is no good cause for us not getting

19 this information earlier. There's certainly no good

20 cause for it not being disclosed in a timely fashion when

21 expert reports were originally due. And the plaintiffs

22 doing it now simply would prejudice Boston Scientific,

23 you know, just a matter of weeks before trial.

24 Dr. Iakovlev, as Mr. Perdue indicated, in his

25 general opinions were struck as unreliable. Dr. Iakovlev

1    also had any case specific opinion that he would offer

2    struck by Judge Goodwin, specifically in the *Daubert*

3    order.  But the bottom line is this is.

4        THE COURT:  Is that because his original opinion

5    was to some sort of legal certainties instead of medical

6    certainty?  What was the reason he was struck?

7        MR.  STRONGMAN:  He was struck -- and just to be

8    clear, too.  There are two motions before the Court.  One

9    is on Dr. Iakovlev and one is on Dr. Blaivas.

10       THE COURT:  So I'm mentioning the two of them now.

11       MR.  STRONGMAN:  Yes, Your Honor.  Dr. Iakovlev

12   was struck because his methodology that he used to form

13   his opinion was unreliable in that he formed his general

14   opinion on mesh and pathology based solely on information

15   provided to him by plaintiff's lawyers.  Judge Goodwin

16   found that to be an unreliable methodology and struck his

17   opinions accordingly.  So Dr. Iakovlev has had in his own

18   possession since 2014 any kind of slide, any kind of

19   pathology information that was needed to form an opinion,

20   and he didn't offer an opinion on time.  To do so now

21   would require us to not only take Dr. Iakovlev's

22   deposition, get a pathologist of our own to look at it,

23   to look at his report, to look at the pathology, and to

24   offer an opinion on our side.

25           Plaintiffs would certainly want to depose our

1   pathologist as well.  We would then have to re-brief the

2   reliability issues, which certainly would persist,

3   especially because Dr. Iakovlev didn't even look at mesh

4   here in Ms. Mathison's case.  But the bottom line was

5   pathology was available since 2012 and Dr. Iakovlev had

6   it in his own possession since 2014.  It's too late and

7   it would simply prejudice Boston Scientific at this time

8   to allow this new opinion on the eve of trial.

9        MR.  PERDUE:  Just briefly, Your Honor.  So it

10  boils down to a timeliness argument based on that.

11  Dr. Iakovlev is well known to Boston Scientific.  He has

12  looked at pathology in other cases and he has been

13  permitted to testify about pathological interpretations

14  in other cases and found reliable by Judge Goodwin in

15  that.  So to say that Dr. Iakovlev has been struck on

16  specific opinions is not accurate because Dr. Iakovlev

17  has rendered opinions on specific pathology

18  interpretation.  The question here is simply one of

19  timing.

20       Dr. Iakovlev is known to this defendant.  The

21  report that was issued to them is a function of time and

22  -- but we do not see that there's any prejudice given

23  that this is a fact.  I will represent to the Court if

24  they want to get another pathologist, that's fine.  I

25  won't depose him.  They can designate him through a

1   report and bring him on.  But Dr. Iakovlev, in the effort

2   to get to the truth and the facts, has looked at these

3   slides and they do indeed show tissue reaction.  That was

4   a mistake by the lawyers.  They identified it based on

5   the pathology report.  It was remedied immediately upon

6   finding it and that's the good cause that we're asking to

7   find for supplementation.

8        THE COURT:  Why was this so late being found

9   though?

10       MR.  PERDUE:  There was a lawyer with the case

11  that was handling this particular expert.  He left the

12  firm.  The lawyer that then picked up the specific expert

13  handling for this issue then goes back through an e-mail

14  chain, finds the report, understands then why this

15  mistake of fact had been made, revisits it, and then

16  immediately upon finding it gets it remedied as soon as

17  possible and to the defendant.  That's the timeline, Your

18  Honor.

19       MR.  STRONGMAN:  Your Honor, a couple of pieces of

20  context that I think are important here.  We have filed a

21  motion that addresses a number of different items and the

22  plaintiffs haven't responded to it yet, so it's not

23  necessarily ripe before the Court.  But this is just one

24  of about four or five items that the plaintiffs have

25  either supplemented, added, changed in the last week to

```
 1   two weeks with regard to experts.  So we have
 2   Dr. Blaivas.  They want Dr. Blaivas back after he was
 3   excluded and gave us a new report.  They want the
 4   Dr. Iakovlev, even though we never got a report until
 5   December.
 6        The plaintiffs have now designated a new case
 7   specific expert that we believe is improper in the
 8   Frankum case that was not disclosed before.  They've
 9   designated two nondisclosed -- pardon me, non-retained
10   experts that were not disclosed before.  All of this has
11   happened in the last week to two weeks.  So we've got a
12   cumulative effect going on here.  It's not just one
13   thing, it's four or five that are late.  And for us to
14   have to take time away from our trial preparation to do
15   all of this at this point would jeopardize a February 1
16   trial date.  We want this trial to go forward.
17        THE COURT:  Which is another possible solution,
18   too, is to have a different trial date if we have to do
19   that.  What I don't want to do is have the truth be held
20   out just based on just a timing issue.  It's got to be a
21   fairness issue for you --
22        MR.  STRONGMAN:  Correct, Your Honor.
23        THE COURT:  -- to be able to deal with that.  I
24   mean it's not to be -- can't be just, okay, you know,
25   this case didn't work out for us so we're going to
```

1   reshuffle the cards and give them a whole new set of

2   ideas.  Let's try these ideas.  I mean, you know, it's

3   got -- you've got to ride the same horse.  But with all

4   of that said I want to make sure that all -- that the

5   evidence which is -- could be believed by the jury is

6   heard by the jury, if it's properly so.

7        These cases are always difficult.  I tried, as a

8   jury, one of the Dalkon Shield cases, and in that case

9   there were five experts in the world who had the training

10  and the experience to testify in that.  One of them said

11  the Dalkon Shield did not collect bacteria.  The other

12  said, oh, it absolutely does.  You'd think out of five

13  experts they could find something, but one side was

14  paying this one and one side was paying that one.

15       Well I probably need to hear more about all of

16  this that's going on this cumulative effect as opposed to

17  just one deal.  But, under any circumstances, if the

18  Court allows anything to come in and it creates an issue

19  for the other side that can be cured by additional time,

20  the Court will give it.  I mean I'm not going to ram

21  trial through if I decide that that needs to be heard.  I

22  haven't decided yet as to whether or not it needs to be

23  heard but I'd like to know a little bit more about that.

24       MR.  STRONGMAN:  We have filed a motion, I

25  believe, on the morning of the 31st that lays out a

1    number of these cumulative issues for the Court.

2         THE COURT:  All right.  Let's stop for just a

3    minute and go back and see where we are with regard to

4    the rest of this.  Have you-all exchanged all this

5    material you're supposed to exchange?  Anything left to

6    do with regard to this?  Does anybody feel like they have

7    not had given to them what they need in this case?

8         MS.  O'DELL:  No, Your Honor.

9         THE COURT:  Either side?  Both sides have been

10   exchanging this stuff?  Okay.  How long is the case going

11   to take?  Plaintiff's case in chief.

12        MR.  BIRCHFIELD:  Your Honor, we believe it will

13   take eight to nine days to try the case.

14        MS.  CRAIG:  Good morning, Your Honor.  Molly

15   Craig on behalf of Boston Scientific.  We think it will

16   take about six days to try the case.

17        THE COURT:  From your side?

18        MS.  CRAIG:  Our last experience with Judge

19   Voorhees.

20        THE COURT:  You think the total trial, your

21   evidence, their evidence, everything, six days?

22        MS.  CRAIG:  Yes, Your Honor.

23        THE COURT:  Okay.  We're probably six to nine

24   days, depending on what happens.  It probably could be

25   done -- Judge Voorhees is a very nice fellow to try cases

1    in front of and he doesn't -- he's not trying to race to

2    the end of the line.  Usually, these things can be done

3    pretty well when he does them.

4         Any questions about how cases are tried in front

5    of me?  Any questions anybody has?

6         MR.  BIRCHFIELD:  Your Honor, one question.  Andy

7    Birchfield on behalf of plaintiffs.  I know in your Case

8    Management Order, your scheduling order regarding voir

9    dire, however, you pronounce that.  Here we see that you

10   indicate time for lawyers to engage in voir dire.  What's

11   the Court's time limits?  What's your timeframe for

12   conducting that voir dire?

13        THE COURT:  Normally, because I -- what I'm not

14   going to do is allow chumminess with the jury.  I know

15   everybody would like to do that, particularly those who

16   are good at it.  I certainly would like to do it if the

17   judge would let me do it.  But what I'll try to do is ask

18   all the questions I think are relevant with regard to

19   this case, except there's going to be some specific

20   things you have.  It's not going to be you need to ask

21   questions to the panel and if you get a response you can

22   question that person about that response to try to find

23   more out about it.

24        What you're not to do is to get into this chummy,

25   you know, how many children?  I see you answered yes, you

1   have two children, you know, how old?  Just this kind of

2   -- I'm not -- it's not a time for friendships to be made.

3   It's a time to find out if it's the fairest jury that can

4   try this case.  That's really what it's about.  Some

5   jurors, because of past experiences, are not going to be

6   able to sit on this jury.  So I really never set a time

7   because lawyers -- smart lawyers can figure they can

8   watch out.

9       I remember trying a criminal case when I was a

10  federal prosecutor against an outstanding attorney from

11  Miami who changed his Rolex watch for a leather band in

12  my office before he went out there and tried to appear to

13  be the poor attorney representing the defendant.  During

14  voir dire -- during the first 15 or 20 minutes that he

15  had the jury, he had them enthralled.  But he kept going

16  on and on and on in the beginning, and they got irritated

17  with him and felt like they were being had.  You could

18  just see the jury change.  You all are good trial

19  lawyers.  You know how it goes.  You're up and down and.

20  The courtroom changes.  Some people see it, some people

21  don't.  Some lawyers see it and some don't.  He lost

22  them.

23      So if you stay there long enough, they'll decide

24  that your charm is that you are really trying to use

25  them.  And it's really not -- you're not as charming as

1    they thought you were when you started righted.  So I'm

2    not going to set a specific time, but I'll not let the

3    jury be abused.

4              MR.  BIRCHFIELD:  Thank you, Your Honor.

5              THE COURT:  I think lawyers -- you get more as a

6    trial lawyer from talking to jurors to see, are they

7    looking at you?  Are they looking in the eyes?  Do you

8    get a negative feeling about them?  So I think you have

9    to ask them questions.  You can't get that from just me

10   asking the questions.  But I'll cover most of the things

11   that I think -- general questions that need to be asked,

12   and after that I'll turn it over to you-all.

13             MR.  BIRCHFIELD:  Your Honor, in a related vein.

14   We have -- we have exchanged a draft juror questionnaire

15   with the defendants and we're working on that.  Is the

16   Court open to sending out a jury questionnaire in

17   advance?

18             THE COURT:  I've never done that.  If both sides

19   want to do it, I'll think about it.  I've never sent a

20   questionnaire out.  As an attorney I never used one, and

21   as a judge I haven't done that.  I'll take a look and see

22   what you've got with regard to that.

23             MR.  BIRCHFIELD:  Thank you, Your Honor.  In that

24   regard, if we can reach one that is -- that we can agree

25   upon.  We think that there are some issues here that may

1    be dealt with more effectively for privacy reasons in the

2    questionnaire.   So we would like the opportunity to

3    present that to the Court if we could.

4          THE COURT:   I'll take a look at it.

5          MR.   BIRCHFIELD:   Thank you, Your Honor.

6          THE COURT:   I'll take a look at it and consider

7    it.

8          MS.   CRAIG:   Your Honor, just for planning

9    purposes, for opening statement, does Your Honor have a

10   preference for time limits on opening statement?   For

11   example, Judge Voorhees put 20 minutes per side for the

12   openings.   I didn't know if that was your custom as well

13   or the custom of the Western District.

14         THE COURT:   Well it's not -- each judge has their

15   own way of doing things and 20 minutes is a really good,

16   reasonable time to do one.   But if both sides wanted 30

17   minutes I'm not opposed, necessarily, to that and we'll

18   listen to you.   Now if somebody wants an hour for an

19   opening statement, that's not going to happen.   But I'll

20   listen to you as to why you need -- I think most of the

21   time an opening statement can be done in 20 minutes.   But

22   I'm not -- I will -- you-all consider it.   And if both

23   sides agree on how long they need, then I can probably be

24   persuaded to go a little longer than 20 minutes.

25         Also, one of the things in my courtroom is I want

you to be able to try the case with whatever style you use.  Now my practice is -- mostly, here in the Western District of North Carolina, where you question witnesses is seated at counsel table and approach them when you need to talk to them about something.  That's normally the way.  Lots of places it's done at a podium.  And if you're used to doing it that way, then that's the way I'll let you do it.

I'm going to let you question people the way you want to do it.  If you want to do an opening statement in front of a podium, that's fine.  We'll put one out here for you and you can make your opening statement right here.  There's no problem with that.  If you like to walk up and down and look at the jury the way I used to like to do that, that's fine too, you know, just so you don't scare them.  But that's -- in other words, I want you to -- it's hard enough, as a trial lawyer, to try a case. It's a lot easier to be up here than it is to be down there.

As many cases as I tried, I never was at ease when I was down there.  I hope that nobody could tell how uneasy I was, but it's very -- there was a huge amount of pressure when you're carrying somebody else's water and I understand that.  So any style you use I will accommodate.  I need to know what it is and we'll

1   accommodate it.

2        MS.  CRAIG:  Thank you, Your Honor.

3        THE COURT:  Okay.  Anything else from anybody

4   about how we do it?

5        MR.  PERDUE:  Mr.  Sasser has properly reminded

6   me, Your Honor, the Court has motions in limine filed by

7   both sides, I believe.  The limiting rulings do affect

8   the ability to negotiate the deposition cuts.  And it's

9   our understanding from the Case Management Order that we

10  were to come back, it looked like, the Friday before and

11  the Court would take up those kinds of matters.

12       To the extent -- to just let the Court know.  The

13  rulings on those motions directly impact kind of the

14  ability to negotiate the cuts, narrow the cuts, and get

15  the cuts right.  Now it's our position on behalf of the

16  plaintiffs that the four live witnesses narrow the

17  universe of deposition cuts that need to be negotiated

18  and so we've already crossed that bridge.

19       THE COURT:  That's good news.

20       MR.  PERDUE:  That's good news.  But I wouldn't

21  want to leave here without the Court understanding that

22  for us to get the deposition cuts in a position -- I've

23  worked with the fine lawyers on the other side and we

24  negotiate hard but are fair.  But I have found in past

25  experience that there are issues that are unresolvable

1   despite two sides doing everything they can in these

2   deposition objections.  Past experience has said that,

3   unfortunately, too many deposition objections have been

4   brought to the Court needing a ruling so that a cut can

5   be made so that they can get played.

6          The first domino that has to fall on that is the

7   motions in limine so we understand how the Court views

8   some of the evidentiary issues that are in there, pivot

9   onto that.  And so just for scheduling purposes that, I

10  imagine both sides would like a little bit of guidance

11  from the Court, to the extent it can, for how we can work

12  with the Court for that.

13         THE COURT:  All right.  What do you suggest?

14         MS.  CRAIG:  We certainly agree with Mr.  Perdue

15  but there are some key issues, of course, the FDA ruling,

16  the MSDS ruling from Your Honor that, I think, would be

17  helpful for the deposition designations and for

18  preparation for day one at trial.

19         MR.  PERDUE:  I don't know what the Court's

20  calendar is and I don't -- but to the extent that it's --

21  if we have an ability to come here sometime before

22  January 28th, perhaps, and take up those issues.

23         THE COURT:  The next two weeks -- let's see.  Next

24  week -- next week I'm in Charlotte.  I'm gone to Miami

25  the first two days, then I'm in Charlotte the rest of the

```
 1   week or at least for two days.  I think maybe next Friday
 2   -- I might be available next Friday.  And then after that
 3   I've got a two-week term in Charlotte which usually
 4   doesn't last two weeks, but there's no way to know that
 5   right this minute.  Then I would be bouncing into you
 6   guys after that.  So we're talking about the 18th and
 7   25th.  I believe those weeks I'm in Charlotte.
 8            MS.  O'DELL:  We're happy to go to Charlotte, Your
 9   Honor.
10            MS.  CRAIG:  Your Honor, just so that you know,
11   those issues have been fully briefed with the Court as
12   well.
13            THE COURT:  Okay.  Yeah.  I may be able to resolve
14   some of those just beforehand then.  Lots of these,
15   though -- lots of things I like to leave until trial.
16   These deposition things I think we can take care of.
17            MR.  PERDUE:  I think we both agree we could go to
18   Charlotte if need be.
19            MS.  CRAIG:  Yes, sir.
20            THE COURT:  Well there's supposed to be some
21   direct flights there I think.  Okay.  How much time do
22   you-all have today?  What time are you flights out of
23   here?
24            MR.  BIRCHFIELD:  We're here for the day, Your
25   Honor.
```

1          THE COURT:  What time is your mediation?  When is

2   your mediation?

3          MS.  CRAIG:  Your Honor, the mediation is actually

4   going on right now.

5          MR.  BIRCHFIELD:  For one of the plaintiffs.  And

6   the other plaintiff is scheduled for this afternoon at

7   one o'clock.

8          THE COURT:  Okay.  Let me take a recess and maybe

9   we can do some of it this morning and get some of these

10  out of the way now if you-all are ready to go.

11         MS.  CRAIG:  Yes, sir, if Your Honor pleases.

12         THE COURT:  Okay.  Let's do that then.  We'll take

13  a brief recess.

14                    (Off the record at 11:27 a.m.)

15                    (On the record at 11:42 a.m.)

16         THE COURT:  All right.  I'm going to go ahead and

17  hear whatever I can hear on any motions without them

18  being filed, and if we need to have another hearing in

19  Charlotte we'll do something in Charlotte.  Also, I need

20  to know what the defense wants to do with regard to

21  whether they want to move it to April.  What I'm going to

22  do is I'm going to allow the two doctors --

23         MR.  BIRCHFIELD:  Iakovlev and Blaivas.

24         THE COURT:  Iakovlev and Blaivas or as we would

25  probably say in Upper Hominy, "Blaivas," to testify.  I'm

```
 1   going to allow them -- I think most of that can be taken
 2   care of with regard on cross-examination, particularly on
 3   Blaivas.  There's plenty of fodder there for a trial
 4   lawyer to rack him up pretty good on cross-examination
 5   with regard to prior findings, changed information, and
 6   additional stuff.
 7        And with the other fellow, there's just a lot of
 8   cases -- this is not like your normal situation.  There
 9   were probably a lot of slides from a lot of people that
10   were there, but you may need more time to deal with that.
11   And if you do, I'm going to give it to you.  Whatever
12   time you need, I'm going to give it to you.  He says you
13   can bring any expert in and he won't even depose him.  So
14   then you really have -- you would have your own stealth
15   person coming in there.  But if you want the extra time
16   to depose and do those kinds of things and get an expert
17   which he can depose, if he has the time to do it, then I
18   could -- we looked at April and April 4th is available as
19   a mixed term.  We might have to move some things around a
20   little bit, but there's not a pressing need for something
21   in April that I could work this in on those first two
22   weeks in April instead of those first two weeks in
23   February.
24        MS.  CRAIG:  Thank you, Your Honor, for the offer
25   for additional time.  In light of your ruling with regard
```

1   to the April 4th trial date, we do think that that will

2   work.  But could we just double check with our client and

3   get back with you timely?

4        THE COURT:  Okay.  It's the only fair thing to do

5   if I let them do that.  This was brought late to the

6   table.  But in this type of case, with multiple people,

7   there's -- you know, this seems unfair at that point.

8   And we get -- we're probably bringing our case to trial

9   fairly fast.  With regard to some of the other districts

10  we may not be the quickest but we do try to get to these

11  cases and try to try as many as we can.

12        I know I think in '14 I tried five or six civil

13  cases.  The year before I came on the bench there was one

14  trial in North Carolina, one civil case in all three

15  districts.  So we try to get these cases tried.  If

16  you've got a civil case, we try to have a term where we

17  can try a civil case.  So I think we can get that done in

18  April if that's what you need.  It looks like you're

19  going to go to April, which will give us some more time

20  on some of these other doctors.

21        Now there's some other folks that came up,

22  non-paid experts.

23        MS. O'DELL:  Yes, sir, that's correct.

24        THE COURT:  I think one's a treating physician.

25  If it's a treating physician, that's different.  The

1    whole idea of giving an expert report is to know whether

2    -- where the person is coming from on their testimony.  I

3    mean do they have -- is it complete junk or does it have

4    some basis?  Treating physicians would state treated.  So

5    you know where it came from.  You know, their opinion may

6    be junk but they at least are treating physicians, so you

7    know where it came from.

8         MS.  O'DELL:  Three of the physicians are treating

9    physicians.  Dr. Blackley was the implanting physician.

10   He has already been deposed fully on his care and

11   treatment of Ms. Frankum.

12        THE COURT:  What about these folks that you

13   brought in late?

14        MS.  O'DELL:  Dr. Zolnoun and Dr. Geller had

15   recently seen Ms. Frankum.  When we were here last time

16   before the Court I mentioned to the Court that she was

17   going to get an additional evaluation.

18        THE COURT:  Did she find these folks out there on

19   her own?

20        MS.  O'DELL:  Sir?

21        THE COURT:  Can she find these folks on her own?

22   I'm kidding.  I know she was sent there by you guys.

23        MS.  O'DELL:  We're very happy she's in good care.

24        THE COURT:  I understand that.  I understand that.

25        MS.  O'DELL:  So for Dr. Zolnoun and Dr. Geller,

1   we had given an indication that would happen and it has

2   happened.  So now we felt it was appropriate to update

3   our expert disclosures.  And the --

4          THE COURT:  Yeah, because they've got to have time

5   to deal with all this.

6          MS.  O'DELL:  Yes, sir.

7          THE COURT:  I mean I'm hoping April is going to be

8   soon enough to be able to do that because it's going to

9   be a --

10         MS.  O'DELL:  To be clear, Your Honor, they're not

11  -- they're non-retained experts.  They are treating

12  physicians so they won't be serving an expert report in

13  Ms. Frankum's case.  The last physician in question was a

14  guy named Dr. Bob Harris.  He has been deposed in the

15  Frankum case.  Scientific took his deposition in February

16  of last year.  The expert disclosure lists him as a -- he

17  did an IME.  He was a retained engagement for that IME.

18  His opinions will be limited to what he expressed in his

19  deposition and his IME report.  So there's no prejudice

20  there.  He was not on the official disclosure previously

21  but, as I said, he was disclosed, and we just felt that

22  that needed to be cleaned up.

23         THE COURT:  Why was he not originally disclosed?

24         MS.  O'DELL:  His IME was relied on by the case

25  specific expert in Ms. Frankum's case, Dr. Sung.  I don't

know the full answer to that question, Your Honor, other

than to say he was disclosed in the sense that his IME

report was a part of Dr. Sung's reliance materials.  His

opinions were expressed in that IME report; he was fully

deposed by Boston Scientific counsel.  So there's no --

there's no hiding the ball.  There's no sense that

Dr. Harris will say anything other than what he's already

been asked under oath.

MR.   STRONGMAN:  Your Honor, I'll address the

physicians and I want to start with Dr. Harris.  Counsel

sent Ms. Frankum to see Dr. Harris.  I don't know that I

would call what he did an IME.  He saw her and he wrote

up a medical record like any doctor does.  He was deposed

on that medical record.  It's not an expert report by any

stretch of the imagination.  It's just a medical record.

So he was deposed in that capacity alone.  In that

deposition, that visit with Dr. Harris was done back

before the original expert disclosure deadline in 2014.

So, again, there's just no reason that we're just getting

this now.

Plaintiffs have designated Dr. Harris not as a

non-retained expert but as a retained expert.  Under Rule

26, all retained experts are required to put forward a

Rule 26 compliant report.  So to the extent that

Dr. Harris is allowed to be designated at this point as a

1  retained expert, we believe that Rule 26 requires an

2  actual expert report not just a medical record.

3      Yes, Dr. Harris was deposed in that capacity of

4  his one visit with Ms. Frankum.  Plaintiffs did not

5  designate any deposition testimony from Dr. Harris's

6  deposition which indicates to us that they're planning on

7  calling Dr. Harris live which would, again, be consistent

8  with their brand new designation of him as a retained

9  expert.  Therefore, we believe again that we should get a

10  report and the opportunity to depose Dr. Harris as a

11  retained expert.

12      THE COURT:  What says the plaintiff about that?

13      MS.  O'DELL:  Well, you know, this distinction of

14  retained versus non-retained.  In Dr. Harris' case he's a

15  little bit of a hybrid.

16      THE COURT:  To the extent he is, though, don't you

17  think you could comply with that rule and get an expert

18  report out here to him?

19      MS.  O'DELL:  Certainly we could do that, Your

20  Honor.

21      THE COURT:  I think that's the better way to do

22  it.  I understand it's based on one visit, apparently,

23  and it's going to be extremely limited what you can get

24  in one visit but -- and I don't know.  Maybe he will be a

25  key witness, I don't know.  It doesn't seem to me that

1    that's going to be the "carry the day" one.  How long

2    would it take you to get a report done so they can depose

3    him on that if they want to?

4         MS.  O'DELL:  I would need to check with

5    Dr. Harris.  I can't -- it would take -- within a couple

6    of weeks, Your Honor, we should be able to do that.

7         THE COURT:  Okay.  All right.  I'm going to -- any

8    treating physicians that you-all are aware of I'm going

9    to let testify.  I mean they're subject to you being able

10   to, if you want to depose them and give you the time to

11   do that.

12        MR.  STRONGMAN:  Thank you, Your Honor.

13        THE COURT:  I'm not going to keep out any treating

14   testimony.

15        MR.  STRONGMAN:  Thank you, Your Honor.

16        THE COURT:  You can handle most of that, I think,

17   with regard to cross-examination.  Together with all

18   these other experts, I think with this additional time

19   you should be able to deal with it as much as you.  Let's

20   go ahead and get that report done.

21        MS.  O'DELL:  Yes, sir.

22        THE COURT:  And that will take care of -- that

23   gives -- it protects you then.  I think he's right with

24   regard to the retained expert.  To the extent it's a

25   hybrid, it's better just to follow the rule especially

1    when he's not the only -- if he was the only treating

2    physician and they were aware of that and he was now

3    going to testify and was being retained also as an

4    expert, I might say ha.  But his basis -- the basis of

5    his opinion comes from that examination, and then they

6    can find out what expertise he has to be able to inform

7    that from that visit.  And I think that's what they're

8    looking to see is how, in that one visit, he was able to

9    come up with the opinion ahead of time.  They want to be

10   able to depose him on it, so I think that's fair.  That's

11   fair.

12         MS.  O'DELL:  Thank you, Your Honor.

13         THE COURT:  Anything else that we can do now?  We

14   know all the docs are going to testify and we're going to

15   probably move this to April.  What do you-all say about

16   April?  Sound good to you?  You can do it?

17         MR.  BIRCHFIELD:  Yes, Your Honor.

18         THE COURT:  I think you have to check with your

19   client.

20         MS.  CRAIG:  In light of changing the trial date

21   we can certainly address these other issues with the

22   Court.

23         THE COURT:  I think we can -- with the other stuff

24   coming in, since you-all are filing all these things, you

25   can probably let the rest of that go with regard to all

1    of that.  Try to work it out, to the extent you can, on

2    the depositions.  I realize there are always going to be

3    some things that people disagree about, and to the extent

4    I can let it in I will.  Sometimes there's just stuff

5    that takes place in these depositions you just can't let

6    in.  There's such a free flow of questioning that goes on

7    and a substantial amount of competent information is out

8    there.

9         All right.  Anything else that we need to take

10   care of today?  Mr. Davis is mentioning that you-all

11   have tried this case in front of Judge Voorhees with a

12   complete set of jury instructions.  Have you-all -- is

13   there any reason not to use those?  Is there some

14   disagreement?  Did you-all think he erred?  Can we use

15   some of those, rather than reinvent the wheel with regard

16   to jury instructions?  I'm sure that there's some that

17   maybe he and I would disagree or do something different

18   on.  But, basically, you know, anything that you-all have

19   already agreed on for instructions, that would help us

20   from having to reinvent the wheel.

21        MR.  BIRCHFIELD:  Your Honor, Andy Birchfield on

22   behalf of Mrs. Frankum.  We were not part of that trial.

23   We would like the opportunity -- I mean we've reviewed

24   those.  But before we commit to those we'd like the

25   opportunity to revisit it.

39

1        THE COURT:  That's fine.  Fair enough.  Take a

2   look at those though.  Anything that you-all can agree

3   on, let's get it agreed ahead of time.  This is an

4   experienced group of folks so we don't need to be doing

5   any original authorship of jury instructions unless it's

6   absolutely necessary.

7        Yes, ma'am.

8        MS.  CRAIG:  On behalf of the defendant.  We were

9   involved with the trial recently with Judge Voorhees and

10  we have absolutely no objection to using his

11  instructions.

12       THE COURT:  Okay.

13       MS.  CRAIG:  We thought they were very fair.

14       THE COURT:  So you may want to look at them since

15  they were successful and they want something different.

16       MR.  PERDUE:  Given that statement, Your Honor, on

17  behalf of Ms. Mathison --

18       THE COURT:  You'll object to it?

19       MR.  PERDUE:  No.  We'll certainly try to work

20  that out.

21       THE COURT:  Just check and see.  And if there's

22  any that you have any objections to or disagreements with

23  I'll consider it.  Okay.  All right.  Thank you.

24              (Off the record at 11:55 a.m.)

25

1

## **CERTIFICATE**

2       I, Tracy Rae Dunlap, RMR, CRR, an Official Court
Reporter for the United States District Court for the
3 Western District of North Carolina, do hereby certify
that I transcribed, by machine shorthand, the proceedings
4 had in the case of BERTIE FRANKUM,  et al versus BOSTON
SCIENTIFIC CORPORATION, Civil Action Numbers 1:15-CV-091
5 on January 4, 2016.

6       In witness whereof, I have hereto subscribed my
name, this 14th day of January, 2016.

7

8                     __/S/__Tracy Rae Dunlap__
                    TRACY RAE DUNLAP, RMR, CRR
9                   OFFICIAL COURT REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25