# EXHIBIT 1

Douglas Grier, M.D.

```
 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                     CHARLESTON DIVISION
 4
 5   IN RE: ETHICON, INC. PELVIC REPAIR      )
     SYSTEM PRODUCTS LIABILITY LITIGATION    )
 6   _____     )
     THIS DOCUMENT RELATES TO THE            )
 7   FOLLOWING CASES IN WAVE 1 OF 200:       )
                                             ) 2:12-MD-02327
 8   Barbara A. Hill                         )
     Case No. 2:12-cv-00806                  ) MDL No. 2327
 9                                           )
     Constance Daino                         )
10   Case No. 2:12-cv-01145                  )
                                             ) Joseph R. Goodwin
11   Monica Freitas                          ) U.S. District Judge
     Case No. 2:12-cv-01146                  )
12                                           )
     Patricia Ruiz                           )
13   Case No. 2:12-cv-01021                  )
                                             )
14   Pamela Gray Wheeler                     )
     Case No. 2:12-cv-00455                  )
15                                           )
     Rebekah Bartlett (Pratt)                )
16   Case No. 2:12-cv-01273                  )
                                             )
17   Dawna Hankins                           )
     Case No. 2:12-cv-00369                  )
18                                           )
     Patricia Tyler                          )
19   Case No. 2:12-cv-00469                  )
20
                 DEPOSITION OF DOUGLAS GRIER, M.D.
21
                         March 22, 2016
22
23                    Seattle, Washington
24
25
```

Douglas Grier, M.D.

```
 1   A   Yes.

 2   Q   And the TVT Exact uses only laser cut mesh; is that

 3       correct?

 4   A   I don't know that to be true.  I don't know whether or

 5       not they offer both mechanical or laser.

 6   Q   Okay.  You just don't know, as you sit here?

 7   A   I don't know.

 8   Q   And the TVT Abbrevo is the new version of TVT-O; is that

 9       fair?

10   A   Yes.

11                   MR. KOOPMANN:  I object just to this

12       line of questioning as it relates to other products, for

13       the record.  This is supposed to be the TVT, TVT-O, and

14       TVT-Secur, so --

15   Q   (By Mr. DeGreeff)  Okay.  TVT Abbrevo uses only laser cut

16       mesh; correct?

17   A   I think that's correct.

18   Q   Doctor, do you have an understanding of why mechanically

19       cut mesh isn't used in those products?

20   A   Well, I think the reason that there was a change in the

21       product to laser from mechanical was to smooth out the

22       edges so that it may be a little less irritating and

23       perhaps have less of an inflammatory response of the

24       tissues.

25           But clinically there's no difference between the
```

Douglas Grier, M.D.

```
 1        two.  I've never noticed any difference in the placement

 2        or in the results of whether the sling was mechanical or

 3        laser cut.  And --

 4   Q    And, Doctor, do you -- is that something you track within

 5        your office?

 6   A    I track all my patients in the office.

 7   Q    Do you track whether you're putting in laser cut or

 8        mechanical cut mesh?

 9   A    Well, if I'm putting in a TVT Abbrevo, then I assume that

10        it's laser cut.

11   Q    Okay.  What if you're putting in one of the other

12        products?

13   A    I don't track it because I don't find it clinically

14        relevant.

15   Q    Okay.  So it's not something you track within your office

16        whether you're putting in mechanically or laser cut mesh?

17   A    I don't actively track it because it's not -- it's -- I

18        have no concern of one mesh cut or the other because I

19        consider them equivalent.  My experience with them is

20        equivalent.  But I do know that if I'm putting in a TVT

21        Exact or an Abbrevo, that it's laser cut.

22   Q    Okay.  I guess my question's pretty simple.  Do you or do

23        you not track whether you're putting in a laser cut or

24        mechanical cut mesh?

25                      MR. KOOPMANN:  Object to form.  Asked
```

Douglas Grier, M.D.

```
 1        and answered.

 2                       THE WITNESS:  I don't track it.

 3   Q    (By Mr. DeGreeff)  And I think you mentioned that the

 4        reason for the switch from laser cut to mechanical was

 5        because the mechanical cut mesh can cause more

 6        irritation, given it's not as smooth on the edges?

 7   A    That's the theoretical consideration, yes.

 8   Q    And, Doctor, given that you don't track whether you're

 9        putting in laser or mechanical cut mesh, as you sit here,

10        you can't say whether there's -- whether you're having an

11        equivalent number of complications with one versus the

12        other; correct?

13   A    I know of no literature that shows any comparative

14        difference between the two cuts, so I'm not aware that

15        there is a problem for me to track.  And in all my

16        colleagues around the country, I know of no one who's

17        tracking the results between mechanical and laser cut

18        because there's no clinical significance because no one

19        has identified there to be a problem.

20                       MR. DEGREEFF:  Can you read back my

21        question?

22                            (Question on Page 32, Line 8

23                             read by the reporter.)

24                       THE WITNESS:  Yes.

25   Q    (By Mr. DeGreeff)  Is there -- is laser cut stiffer than
```

Douglas Grier, M.D.

```
 1   Q   Any documents in there specifically that you remember

 2       reading front to back?

 3   A   At this -- well, the IFU is in there, so I have read that

 4       in the past front to back.  I read the historical

 5       documents about how TVT first was developed.  And those

 6       are the ones that I remember in particular.  There are a

 7       couple PowerPoint presentations that I probably was in --

 8       present for or were delivered to me.

 9   Q   Doctor, how many of these -- how many of these 34

10       documents do you think you actually reviewed in full?

11                       MR. KOOPMANN:  Object to form.

12                       THE WITNESS:  I can't give you an

13       exact answer to that, but if you look through it, they're

14       historical documents, so I don't -- I didn't spend much

15       time at all with the Internet discussions between the

16       Ethicon people and the corporation.

17   Q   (By Mr. DeGreeff)  Did you -- in rendering your opinions,

18       did you rely at all on internal company documents?

19   A   No.

20   Q   Why not?

21   A   I don't find them necessarily relevant.

22   Q   Why are they not relevant?

23   A   Well, because a lot of it has to do with research and

24       development early on in the development of the products,

25       and quite frankly, it's not -- I don't find it relevant
```

Douglas Grier, M.D.

```
 1        for me in rendering an opinion.

 2   Q    Did you review any of the design documents for the

 3        product?

 4                    MR. KOOPMANN:  Objection.  Form.

 5                    THE WITNESS:  I don't recall design

 6        documents.  You mean the original design of the -- of the

 7        mesh?

 8   Q    (By Mr. DeGreeff)  Yeah, the design documents, the

 9        internal design documents for the mesh product?

10   A    Well, if you could show me one, I could tell you whether

11        I've reviewed it or not.

12   Q    Well, do you know what I'm talking about when I say

13        design documents?

14   A    Not precisely, no.

15   Q    Okay.

16   A    Are you talking about before it was submitted to the FDA?

17   Q    Well, have you reviewed the design device file?

18                    MR. KOOPMANN:  Objection.  Form.

19                    THE WITNESS:  I don't recall.

20   Q    (By Mr. DeGreeff)  As you sit here, do you remember

21        recalling any -- reviewing any internal Ethicon documents

22        specifically relating to design of the TVT products?

23   A    I'm sure I've looked at several, but none come to mind

24        specifically.

25   Q    Okay.  If you think you looked at several, what did those
```

Douglas Grier, M.D.

1     documents look like?  What did they tell you?

2   A   Oh, I don't recall.  I looked at them prior to the Perry

3     trial, I would imagine.

4   Q   Okay.  So -- and the Perry trial was about the TVT

5     Abbrevo; correct?

6   A   Correct.

7   Q   And we're not here -- you're not rendering any opinions

8     in this -- at this point generally about the TVT Abbrevo?

9   A   No.

10  Q   So my question is about design documents that would be

11    relevant to the products that we're here about.  Do you

12    remember reviewing any of those design documents?

13  A   Not specifically.

14  Q   Well, not specifically.  Do you remember reviewing any at

15    all?

16  A   If you put one in front of me, I can tell you whether I

17    have or not.

18  Q   Well, Doctor, you've got them -- are they on your

19    reliance list?

20  A   Some may be.

21  Q   And did you review everything on your reliance list?

22  A   I've -- in a general sense, yes.  Specifically, I mean,

23    there's a lot of documents, and some I may have just

24    looked at the title and then what the conclusions were,

25    and if something was interesting in there, I would go

Douglas Grier, M.D.

```
 1   A   This binder contains multiple studies on TVT.  It has my

 2       general report in it, and it has articles that I reviewed

 3       for my opinion.  It has the different specialty body

 4       position papers on the use of mesh and different papers

 5       comparing Burches.  It has an article on abdominal wall

 6       hernia repair using mesh.

 7   Q   And, Doctor, you don't have to go through every one of

 8       them in general.  I'm just kind of trying to figure out

 9       in general what categories of documents are in there.

10   A   Well, scientific papers.  Papers that are produced by the

11       different specialty bodies, like AUGS and SUFU, and

12       multiple articles and abstracts.  There's an article on

13       the elongation characteristics of TVT Prolene.  There's

14       an expert report on mechanical mesh versus laser cut.

15       There's an IFU for TVT-Secur.

16           There is a research and development memorandum on

17       mesh for TVT-O.  There is some comment on FDA hearing in

18       2011, the FDA executive summary.  A Cochrane review of

19       midurethral slings.  Long-term efficacy of TVT --

20   Q   Maybe we can do this.  Is this all articles and clinical

21       studies?  Is that essentially what's in there?

22   A   Yes.

23   Q   Okay.  And that -- is this a binder that you prepared,

24       yourself?

25   A   No.
```

Douglas Grier, M.D.

```
 1   Q   Who prepared that binder for you?

 2   A   The attorneys, after sending me these articles for

 3       review.

 4   Q   Are those all articles that the attorneys sent you?

 5   A   Yes.

 6   Q   Okay.  Those weren't articles that you did a systematic

 7       review and found them yourself?

 8                        MR. KOOPMANN:  Objection.  Form.

 9                        THE WITNESS:  Well, I'm looking at one

10       that I wrote, that I was -- I participated in.  There are

11       just multiple studies.

12   Q   (By Mr. DeGreeff)  That wasn't my question.

13   A   Oh, sorry.

14   Q   Did you do an independent systematic review and decide on

15       which articles you wanted to review in rendering your

16       opinions?

17   A   Not this extensive.  I've read the literature for the

18       last ten, fifteen years, and so I keep abreast of it.  So

19       not every article is in journals that I have -- that I

20       get.

21   Q   Okay.  So I think the answer to my question is no, you

22       didn't do an independent systematic review for the

23       literature that's on your reliance list?

24   A   Yes, that's correct.

25   Q   And you didn't put together that binder.  Defense counsel
```

Douglas Grier, M.D.

```
 1       did.

 2   A   Correct.

 3   Q   And defense counsel selected the articles that are in

 4       that binder?

 5                       MR. KOOPMANN:  Objection.  Form.

 6       Misstates the record.

 7                       MR. DEGREEFF:  I don't think it does.

 8                       THE WITNESS:  Well, I don't know what

 9       they -- how they selected them.

10   Q   (By Mr. DeGreeff)  You --

11   A   They're not all positive articles.

12   Q   Well, that's true too, but you didn't select all of

13       those; correct?

14   A   Correct.

15   Q   Those were selected for someone else -- by someone else

16       for you?

17   A   Yes.

18   Q   And they were sent to you by defense counsel?

19   A   Yes.

20   Q   And did you review all of the articles in that binder?

21   A   The majority of them, yes.

22   Q   Okay.  Did you review -- did you rely on all the articles

23       in that binder?

24   A   I relied on all those that I reviewed.

25   Q   And which ones -- did you review those that were -- that
```

Douglas Grier, M.D.

```
 1    A    My memory, last time I saw him was when I did a cadaver

 2         lab with about ten surgeons from around the country on

 3         the TVT-O.  It was our first experience with the TVT-O,

 4         and we were using the device prior to having used it in

 5         our practices.

 6              And another article by Leval and Waltigney on the

 7         one-year follow-up on TVT-O.  And Leval's white paper on

 8         the TVT-O.

 9    Q    Who is Leval?

10    A    Jean Leval is a Belgian urologist out of Liege, Belgium,

11         as I recall, and he was the developer of the inside-out

12         approach for transobturator slings.

13    Q    Do you know Dr. Leval?

14    A    I met him once.  He does not speak English.  Talked to

15         him through a -- an interpreter.

16    Q    You met -- did you meet Dr. Leval and Dr. Weisberg at

17         Ethicon events?

18    A    Yes.  Yes.

19    Q    So fair to say that that binder you're looking at

20         contains just a bunch of materials that are on TVT-O?

21    A    Yes.

22    Q    And did you put that binder together, yourself?

23    A    No.

24    Q    Was that put together for you by defense counsel?

25    A    Yes.
```

Douglas Grier, M.D.

```
 1   Q   Did defense counsel select the documents that went into

 2       that binder?

 3   A   Yes.

 4   Q   Have you reviewed all of the documents in that binder?

 5   A   Well, I've reviewed them -- a lot of them I've reviewed

 6       before they ever were put in the binder, before I was

 7       ever asked to review them.

 8   Q   Okay.  So my question was a little different than that.

 9           Have you reviewed -- and I don't care when you

10       reviewed them.  Have you reviewed all of the lit- -- all

11       of the documents that are in that binder?

12   A   Well, no.  The ones I haven't reviewed were the pre-FDA

13       design documents, which are very tedious, and I didn't

14       find relevant.

15   Q   So fair to say, you did not review the design documents

16       that were relied on by Ethicon for approval by the FDA?

17                       MR. KOOPMANN:  Objection to form.

18                       THE WITNESS:  That's true.

19   Q   (By Mr. DeGreeff)  Anything else?

20   A   Well, there's just a bunch of minutes and discussions by,

21       I guess, engineers within the -- within the company on

22       the product specifications and the launch of the product.

23   Q   And did you review those?

24   A   I did not.

25   Q   Why not?
```

Douglas Grier, M.D.

```
 1   A   Well, because I don't find it relevant.

 2   Q   And that's the -- those are memos done by the engineers

 3       who designed the product?

 4   A   Correct.

 5   Q   Why did you not find that relevant?

 6   A   Well, because it's tremendously tedious, and it's not

 7       clinically relevant.  It was how they developed the

 8       product and -- the device, and it's kind of too technical

 9       for my interest.

10   Q   And you didn't -- so you didn't review that in rendering

11       your opinions?

12   A   No.

13   Q   Did you review any documents related to the -- kind of

14       the -- what you referred to as the tedious portion of the

15       design of the -- of the document and getting FDA

16       approval?

17                       MR. KOOPMANN:  Objection.  Form.

18                       THE WITNESS:  There may be a few that

19       I reviewed.

20   Q   (By Mr. DeGreeff)  Which ones?  Any as you sit here that

21       you remember?

22   A   My patients' list at home.

23   Q   I was wondering how that got in there.

24   A   Yeah, that just got -- it fell in.

25           The ones I reviewed were -- see, a lot of this is
```

Douglas Grier, M.D.

```
 1     just -- it's not even in English.  It's the documents

 2     that are -- came out of Belgium that aren't even

 3     translated, so I certainly didn't read those.

 4         The others were just kind of how the sheath was

 5     developed, not the actual sling, but the sheath that

 6     helps place it.  So these -- and, you know, this TVT flow

 7     of process qualifications, I looked at it.  It's a very

 8     technical engineering document on the product production.

 9     I'm not an engineer, so it's not relevant to me.  There's

10     just a lot of that.  How to package it, what kind of box

11     it should be in, things --

12  Q  So you're not an engineering expert; correct?

13                    MR. KOOPMANN:  Objection.  Form.

14                    THE WITNESS:  I'm not an engineering

15     expert, but I am an expert on the use and placement and

16     management of vaginal mesh because that's what I've done

17     a lot of.

18  Q  (By Mr. DeGreeff)  That doesn't make you -- you are

19     not --

20  A  It does not make me an engineer.

21  Q  You're not holding yourself out as an expert in the field

22     of engineering, are you, Doctor?

23  A  No, of course not.

24  Q  And fair to say, you're not holding yourself out as an

25     expert in the field of transvaginal mesh design?
```

Douglas Grier, M.D.

```
 1                    MR. KOOPMANN:  Objection.  Form.

 2                    THE WITNESS:  I will say no.  I will

 3      say, though, that -- that all of us give feedback to the

 4      companies that we use mesh, as to what might be better

 5      about it.

 6   Q  (By Mr. DeGreeff)  I think we agree.  My question is

 7      pretty simple.  Yes or no, are you holding yourself --

 8      yes, no, or you can't answer.  Are you holding yourself

 9      out as an expert on the design of transvaginal mesh

10      products?

11                    MR. KOOPMANN:  Objection.  Form.

12      Asked and answered.

13                    THE WITNESS:  Do I answer?

14                    MR. KOOPMANN:  Go ahead, yeah.

15                    THE WITNESS:  So I am not a product

16      engineer that has designed mesh products.  However, I

17      have used them, and I have opinions about what -- what is

18      good or bad about a particular product, which I have

19      expressed to multiple companies when asked.  So -- but I

20      am not an engineer.

21   Q  (By Mr. DeGreeff)  Let's try this again.  Doctor, yes,

22      no, or you cannot answer my question as it's phrased:

23      Are you holding yourself out as an expert in the design

24      of transvaginal mesh products?

25                    MR. KOOPMANN:  Same objection.
```

Douglas Grier, M.D.

```
 1   A    Yes.

 2   Q    Did you submit it to the -- to the --

 3   A    FPRMS, yes.

 4   Q    -- FPRMS?

 5        And so given that you had that role, you still don't

 6        remember what that number was?

 7   A    Oh, it was the number of all the surgeries that you've

 8        done.  No, I have no idea what that number is.

 9   Q    All of the surgeries that you've done since when?

10   A    Well, in a six-month -- in a six-month period, but that's

11        all -- that's general urology, female urology,

12        whatever -- whatever surgical cases I was doing.

13   Q    You also treat males as part of your practice; correct?

14   A    Correct.

15   Q    What percentage of your practice deals with treating men?

16   A    Roughly 50 percent.

17   Q    Are you a member of AUGS?

18   A    No.

19   Q    Why not?

20   A    Well, I'm a urologist, and so the urologic focus for

21        female urology is SUFU, society of uro-gynecon- --

22        urology and gyne- -- and -- female urology.  And I'm a

23        member of the AUA, but I'm not a member of AUGS.  I have

24        gone to several AUGS meetings in the past.  The last one

25        was this last October.
```

Douglas Grier, M.D.

```
 1   Q   And what does AUGS stand for?

 2   A   American Urogynecology Society.  If you want me to give

 3       you kind of a history of urogynecology, I can.

 4   Q   No, that's okay.

 5           You've got teaching positions listed on your -- on

 6       Exhibit 2, which is your CV, on the second page.

 7   A   Yes.

 8   Q   Let's kind of talk about those.  The first one is Ethicon

 9       Endosurgical Institute; correct?

10   A   Yes.

11   Q   And that obviously is something that is through Ethicon,

12       the defendant in this case; correct?

13   A   Correct.

14   Q   How long have you been teaching for Ethicon Endosurgical

15       Institute?

16   A   Well, I started in the '90s, and then probably the last

17       course I gave, I don't know the year.  2013 perhaps.

18   Q   So you were doing that for roughly 15, 16 years?

19   A   Yes.

20   Q   And who takes those courses?

21   A   Urologists and gynecologists take those courses.

22   Q   And were you paid for those courses -- to give those

23       courses?

24   A   Yes.

25   Q   And Ethicon paid you for that?
```

Douglas Grier, M.D.

```
 1   A   Yes.

 2   Q   And was that done under a contract with Ethicon?

 3   A   Yes.

 4   Q   Would that be --

 5   A   Annual contracts.

 6   Q   It would be a one-year rolling contract?

 7   A   Uh-huh.

 8   Q   And was that -- was that pursuant to what I've seen

 9       called as the consulting agreement?

10   A   Yes.

11   Q   And that's not a course that's taught for any college?

12   A   No, no.  But over the years, I have taught courses at

13       medical schools, in medical schools, and have taught

14       urologists who are academics how to do these procedures.

15   Q   And there's no continuing education given for taking an

16       Ethicon Endosurgical Institute course, is there?

17   A   No.  And the reason being is that they don't charge the

18       participants to go to the courses, so that because

19       they're -- because they're there without a tuition, they

20       don't -- they're not allowed to grant CME.  Because, to

21       grant CME, it has to go through a national body that

22       credentials.

23   Q   The question was a little different than that, a little

24       more simple than that.

25           There's no continuing education given for Ethicon
```

Douglas Grier, M.D.

```
 1        in studies on the inventor's device?

 2   A    Oh, again, I have no idea.  How would I know that

 3        information?  I've not heard it.

 4   Q    Do you think they should?

 5   A    Should prevent?  No.

 6   Q    Do you know whether Ethicon has any policies in place

 7        that prohibit inventors from participating in studies on

 8        the inventor's device?

 9   A    I'm not aware.

10   Q    Do you think they should?

11   A    It's -- I don't have an opinion.

12   Q    It doesn't matter to you?

13   A    No.

14   Q    Doctor, are you aware of how long it took the -- it took

15        Ethicon to get the TVT-O product to market?

16   A    I don't recall the timeline.

17   Q    Doctor, what is Provencia?

18   A    I don't know.

19   Q    Do you know what a failure modes and effect analysis is?

20   A    That sounds like an engineering design study to look at

21        physical properties of different products/materials.

22   Q    Have you ever been involved in one of those analyses?

23   A    No.

24   Q    What should be in a failure modes and effects analysis?

25                    MR. KOOPMANN:  Objection.  Form.
```

Douglas Grier, M.D.

```
 1                    THE WITNESS:  Well, can you give me a

 2        product or material that you want to apply it to?

 3   Q    (By Mr. DeGreeff)  Mesh.  What should be in a failure

 4        mode designs effect analysis for mesh?

 5                    MR. KOOPMANN:  Objection.  Form.

 6                    THE WITNESS:  Well, one would be what

 7        its tensile strength is, elongation overload.  Those

 8        would be the main ones.

 9   Q    (By Mr. DeGreeff)  Have you ever -- did you review the --

10        any of the FMEAs in this case?

11   A    I've seen some, yes.

12   Q    For transvaginal mesh?

13   A    Uh-huh.

14   Q    Which ones?

15   A    Oh, I think Guenther is one.  Moalli has some.  But

16        there's Dietz study from Australia that described the

17        bench loading and elongation.

18   Q    You're talking about articles and studies; correct?

19   A    Yes.  But I -- as far as the -- you mean as far as

20        corporate documents in terms of what they did prior to

21        the product being released?

22   Q    Yes.

23   A    I would glance over them and not -- and not read them.

24   Q    All potential hazards should be in the failure modes

25        effects analysis for TVT; correct?
```

Douglas Grier, M.D.

```
 1                    MR. KOOPMANN:  Objection.  Form.

 2                    THE WITNESS:  Again, I don't know what

 3         that means.

 4    Q    (By Mr. DeGreeff)  You don't know what a design failure

 5         modes effect analysis is?

 6    A    Well, I know -- I know what the term is, but when you're

 7         saying -- there's a difference between in vivo and ex

 8         vivo.  If you're talking about bench testing products

 9         that the stresses that are put on them are greater than

10         the physiologic stress in the body, I don't think those

11         are relevant.

12             I mean, it's fine to do the studies to get a sense

13         of what the burst strength is of mesh, but it's never

14         going to be seen after it's deployed.

15    Q    And you don't find those studies relevant, or those

16         relevant?

17    A    Well, it has a relevance, but it doesn't have a high

18         significance.

19    Q    You don't find them significant?

20    A    It has a significance.  I can't -- I'm not going to give

21         you a degree of significance.

22    Q    You didn't rely on them in giving your opinions in this

23         case; fair?

24    A    Well, when I looked at them, I want to make sure that the

25         stressors of these meshes, after they're deployed in the
```

Douglas Grier, M.D.

```
 1        there was a surgical misadventure and, say, the mesh was

 2        placed through the wall of the bladder, then I would have

 3        to go after all that area that was involved.

 4           But there's no reason to chase all of it out of the

 5        body because it's -- it's biologically inert where it is

 6        and doesn't need to be done.

 7   Q    (By Mr. DeGreeff)  Do you believe that the mesh used in

 8        TVT-R is biologically inert?

 9   A    I think the -- there's a local inflammatory effect

10        initially, which induces fibrosis, some scarring, some

11        collagen deposition, angiogenesis into the -- into the

12        monofilament, and then it settles down over time.

13   Q    So you believe that long-term the -- the transvaginal

14        mesh used in the TVT products is biologically inert?

15                      MR. KOOPMANN:  Objection.  Form.

16                      THE WITNESS:  I don't know your

17        definition of inert, but I would use the word quiet.  I

18        have patients who are out 15 years from slings that I

19        have done and I've examined them and they're asymptomatic

20        and they have great results, and they're not concerned

21        with the sling in their body.  It's not bothering them.

22   Q    (By Mr. DeGreeff)  Doctor, what's the definition of

23        inert?

24   A    Well, inert is nonactive.

25   Q    So your definition of inert is nonactive?
```

Douglas Grier, M.D.

```
 1   A    Yeah.  That there's nothing going on.

 2   Q    So you believe that long-term transvaginal mesh is

 3        nonactive within a woman's body?

 4   A    In the vast majority of cases, I would say yes.

 5   Q    So when you remove mesh, you sometimes make the decision

 6        to leave portions of the mesh in because you believe

 7        long-term it's nonactive within a woman's body?

 8   A    Well, the only reason to remove a portion of mesh is if

 9        they are symptomatic in that area.  So if one area

10        there's a trigger point and they have pain and they

11        haven't responded to conservative measures, you can

12        remove the sling in that location, but you could leave

13        the contralateral side alone if it's not bothering them.

14        In fact, if you leave the majority of the sling in place,

15        there's a good chance they'll remain continent.

16   Q    So, Doctor, you have done TVT-R removal surgeries,

17        correct, whether it was removing all of it or part of it?

18   A    Along with multiple other companies, yes.

19   Q    And you've done TVT-O removal surgeries, I'm assuming?

20   A    Just portions.  Just, again, the exposed area.

21   Q    But you've done explant surgeries based on complications

22        caused by TVT-O; is that fair?  Not caused -- strike

23        that.  I know you probably aren't going to like that

24        word.

25            You've done remove- -- you've done explant surgeries
```

Douglas Grier, M.D.

```
 1      of TVT-Os due to complications; correct?

 2                      MR. KOOPMANN:  Objection.  Form.

 3                      THE WITNESS:  I have removed sections

 4      of TVT-Os for exposure.  I can't remember any for any

 5      other reason.

 6   Q  (By Mr. DeGreeff)  And is that something you track?

 7   A  Oh, I -- well, I track all my patients.  I see them -- I

 8      try to see them on an annual basis, and if they don't

 9      agree, I try to make it every other year.

10   Q  So do you have something in your office where you track

11      the reason for each removal and what product it is you're

12      removing?

13   A  Their medical records.

14   Q  Is that a list you would keep in your office somewhere?

15   A  It's one I could retrieve.

16   Q  So you have a list currently kept in your office of the

17      product you removed and with -- with the reason for

18      removal?

19   A  No, I don't have a list.

20   Q  And how many TVT-O removal surgeries have you done?

21   A  Well, partial TVT-O, I would say a half dozen maybe.

22   Q  What about TVT-R?

23   A  Same.  About a half dozen.

24   Q  What about TVT-S?

25   A  Maybe three or four.
```

Douglas Grier, M.D.

```
 1   Q   So in your entire time working with transvaginal mesh,

 2       between TVT, TVT-O, and TVT-S, you believe you've only

 3       done 15 to 16 removal surgeries?

 4   A   I'm sure I've removed 35, 40 other products that are

 5       either transobturator or retropubic slings.

 6   Q   So you've only done 50 total removal surgeries in your

 7       time working with transvaginal mesh?

 8   A   Do you -- are you including POP repair, like Prolift or

 9       elevate, Apogee, Perigee, the other products?

10   Q   Well, I was asking specifically about TVT, but sure, we

11       can talk about those too.

12   A   I mean, I don't keep numbers of it, but I've removed each

13       of those products in the past.

14   Q   That was going to be my question.  Where's the tracking

15       data on TVT-Rs that were removed, on the number of

16       explants you've done?

17   A   What do you mean by "tracking data"?

18   Q   Is that something you keep track of in your office?

19   A   No, I don't keep track of the numbers.

20   Q   How long have you been doing removal surgeries?  When did

21       you first start doing them?

22   A   Well, again, when you use the word "removal," I'll take

23       out a specific area that may be exposed, or if there's a

24       specific trigger point area of pain, I'll remove that

25       part.
```

Douglas Grier, M.D.

```
 1   Q   Are those included in the six, six, and three?

 2   A   Yes.  But I mean, the -- it's -- these numbers are not --

 3       are not exact, by any means.  I don't keep a log of them.

 4   Q   Okay.  How many days a week do you operate, Doctor?

 5   A   Well, I don't know what you mean by operations.  I do

 6       operations on Wednesdays in the hospital.  I do

 7       operations on Tuesdays in my surgery center.  And I do

 8       procedures on Mondays, but they could be any day of the

 9       week.  I could do them night, weekend.  So it varies on a

10       week-to-week basis.

11   Q   So you don't have certain designated surgery days or

12       times?

13   A   I do.  Wednesdays for surgeries at the hospital, and

14       Tuesdays in my surgery center.

15   Q   Okay.  And do you do them all day, or what's the --

16   A   Depends on how many.  As little as two or as many as all

17       day.

18   Q   Okay.

19   A   Into the night.

20   Q   And we already talked about the fact that 50 percent of

21       your practice is with men; right?

22   A   Yes.

23   Q   What percentage of your practice is related to treatment

24       of stress urinary incontinence and POP?

25   A   Before the mesh litigation, it was at least 50 percent of
```

Douglas Grier, M.D.

```
 1        my entire practice was.  At that point I was probably

 2        seeing one-third males and two-thirds females.  But

 3        because of the shrinking volume of women who seek care

 4        for these problems, I do less and less each year.

 5   Q    And what percentage of your practice is related to

 6        treating TVM complications?

 7   A    Oh, less than 1 percent.

 8   Q    What percentage of your practice is related to the

 9        surgical treatment of TVM complications?

10   A    Oh, I'd say less than 1 percent at this point.  I don't

11        see them that often.

12   Q    Doctor, do you do anything within your office to track

13        what percentage of the women that you do implants in are

14        lost to follow-up?

15   A    No.

16   Q    Do you know what the national average is?

17   A    No.

18   Q    Do you know what the national average is on complications

19        related to following implant surgeries with TVM?

20   A    Oh, there's several papers that provide those numbers.

21   Q    Certainly greater than 1 percent, isn't it?

22   A    I think it's about 3 and a half percent.

23   Q    So you believe 3 and a half is the rate?

24   A    One recent paper I reviewed, that was the rate of

25        complications that required something to be done.
```

Douglas Grier, M.D.

```
 1   Q   Ever seen any others that's different?

 2   A   Oh, it's all -- it depends on what study and what cohort.

 3       If you happen to be a referral center, you're going to

 4       see a lot more because a lot of gynecologists aren't

 5       comfortable with doing repairs or revisions.

 6   Q   And a lot of patients aren't comfortable going back to

 7       the person who put in an implant that gave them

 8       complications; fair?

 9   A   That's -- complications in general, for all of medicine,

10       a lot of times patients have unrealistic expectations and

11       will go elsewhere when they don't have exactly the

12       outcome that they want.  That's very common, not just in

13       this.

14   Q   Okay.

15   A   It's common with all complications.

16   Q   So it's typical for anybody -- any surgeon to have a

17       significant loss to follow-up; is that fair?

18   A   It really -- it depends on what community you're in.  If

19       there are -- if you're in a smaller community and there's

20       less choices of where to go, a lot of times, if a patient

21       has a complication and doesn't see you, they'll see one

22       of your colleagues, and they'll -- we can discuss it,

23       they'll -- you'll find out about it.  There's many a time

24       where I've called a physician to tell them that a patient

25       of theirs came in and this was their concerns.
```

Douglas Grier, M.D.

```
 1        resolve in some patients, is a risk associated with TVT

 2        devices?

 3    A   It's associated with all pelvic surgery, whether a device

 4        is used or not.

 5    Q   Do you agree that it's associated with TVT devices?

 6    A   Directly, I can't prove that it's directly associated.

 7    Q   You agree that chronic pain in the groin, thigh, leg,

 8        pelvis and/or -- pelvic and/or abdominal area is a risk

 9        associated with TVT devices?

10    A   Slings that go through muscle can cause some -- chronic

11        pain.  Rarely, but can cause chronic pain, and through --

12        you're talking about transobturator.  There's some thigh

13        pain associated regardless of what product is used.  It's

14        a very small number.

15    Q   Do you agree with the statement that chronic --

16    A   What I can't -- what I can't agree on is if it caused

17        chronic pain, why wouldn't every case you do result in

18        chronic pain?  The few cases that patients have chronic

19        pain after a pelvic surgery, I can't identify a specific

20        cause of it.

21    Q   Doctor, do you agree one or more revision surgeries is a

22        risk associated with TVT devices?

23    A   It's a risk, yes.  A low risk, but it is a risk.

24    Q   Agree that TVT removal may be needed, and that removal

25        may require significant dissection?
```

Douglas Grier, M.D.

```
 1   A   Depending on the cause, it's a possibility.

 2                         (Discussion off the record.)

 3                         EXAMINATION

 4   BY MR. KOOPMANN:

 5   Q   Dr. Grier, you reviewed case-specific medical records in

 6       connection with forming your opinions on the cases in

 7       which you were asked to form case-specific opinions;

 8       correct?

 9   A   Yes, yes.

10   Q   And you reviewed those records before you drafted those

11       reports; correct?

12   A   Yes.

13   Q   The reliance list that Counsel was asking some questions

14       about, did you come up with the title of that document?

15   A   No.

16   Q   Okay.  Do you use the term "reliance list" in your

17       practice?

18   A   Not at all.

19   Q   Is it your understanding that that's a list of materials

20       that one of the law firms involved in this litigation has

21       sent you over the years?

22   A   Yes.

23   Q   And in your reports regarding the TVT and TVT-O

24       midurethral slings that we've marked as Exhibit 14, and

25       you report regarding the TVT-Secur slings, did you cite a
```

Douglas Grier, M.D.

```
 1       number of articles and position statements and

 2       peer-reviewed literature and things like that?

 3   A   Yes, I did.

 4   Q   Okay.  And are those the materials that you're primarily

 5       relying on in support of your opinions regarding --

 6   A   Yes.

 7   Q   -- these devices?

 8   A   Yes.

 9   Q   The FDA guidance document that some questions were asked

10       about very early in the deposition, that's something that

11       you considered in forming your opinions, but it isn't all

12       you considered in judging the adequacy of the

13       instructions for use for the TVT, TVT-O, and TVT-Securs;

14       correct?

15   A   That's correct.

16   Q   You also considered your use of those products throughout

17       the past?

18   A   Yes.

19   Q   And you considered the sort of results that you achieved

20       in treating patients with those products; correct?

21   A   Yes.

22   Q   Did you also consider the complications that you saw

23       develop in your practice from your use of those products?

24   A   Yes.

25   Q   And all of that went into forming your opinions regarding
```

Douglas Grier, M.D.

```
 1       the adequacy of the warnings in --
 2                       MR. DEGREEFF:  Objection.  Form.
 3   Q   (By Mr. Koopmann)  -- in the IFUs for the TVT, TVT-O, and
 4       TVT-Secur?
 5   A   That's correct.
 6                       MR. DEGREEFF:  Object to the form.
 7   Q   (By Mr. Koopmann)  And did your analysis and your reading
 8       of the literature that you cited in your reports for the
 9       TVT, TVT-O, and the TVT-Secur, and the efficacy and
10       complications discussed in that literature, also go into
11       your analysis of the adequacy of the warnings in the IFUs
12       for the devices we're here to talk about today?
13                       MR. DEGREEFF:  I'm going to object to
14       form.  Do you just want to give me a running objection on
15       leading?
16                       MR. KOOPMANN:  Sure.
17                       MR. DEGREEFF:  Okay.  Running
18       objection on the fact that all of these questions are
19       leading.
20                       THE WITNESS:  Yes.  I considered
21       all -- all that information in -- in determining what I
22       think is appropriate for the IFU.
23   Q   (By Mr. Koopmann)  And the opinions that you set forth in
24       the reports we've marked as Exhibit 14 and 15 regarding
25       the TVT, TVT-O, and TVT-Secur slings, you hold those
```

Douglas Grier, M.D.

```
 1        opinions to a reasonable degree of medical certainty?

 2   A    Yes.

 3   Q    You don't hold yourself out to the community as a design

 4        expert; is that fair?

 5   A    That is fair.

 6   Q    But are you an expert in urologic surgery?

 7   A    Yes.

 8   Q    And are you an expert in the materials used in urologic

 9        surgery?

10   A    Yes, I am.

11   Q    And you don't hold yourself out to the community as a

12        warnings expert; correct?

13   A    No, I don't.

14   Q    But you've used a lot of medical devices throughout your

15        career?

16   A    Yes.

17   Q    Dozens, certainly?

18   A    Yes.

19   Q    Hundreds?

20   A    Yes.

21   Q    And before you use a medical device, you read the

22        instructions for use accompanying the device?

23   A    I do.

24   Q    And after treating patients with devices, you get a sense

25        of what sort of complications you see?
```

Douglas Grier, M.D.

```
 1   A   Yes.

 2   Q   Okay.  And you factored in all of that experience with

 3       the TVT, TVT-O, and TVT-Secur slings in forming your

 4       opinions about the warnings accompanying those devices?

 5   A   I have.

 6   Q   You've been provided -- you were asked some questions

 7       earlier about being provided articles, including some of

 8       the articles we've got in front of us here today.  But

 9       did Ethicon provide -- or Ethicon's counsel provide all

10       of these articles the first time that you saw them, or

11       did you read them in the course of your reading as a

12       surgeon?

13   A   Oh, many of them I read in the course of my reading.

14   Q   You were asked some questions about Professor Ulmsten and

15       payments that he's received.  Has Professor Ulmsten's

16       data regarding the TVT sling been reproduced by many

17       other studies?

18   A   Yes, it has, all around the world.  It's the most studied

19       of all the pubovaginal slings, the urethral synthetic

20       slings.

21   Q   Do you practice evidence-based medicine?

22   A   I do.

23   Q   And what does that mean?

24   A   That means what I choose to provide for my patients has

25       scientific scrutiny and is as safe and efficacious as
```

Douglas Grier, M.D.

```
 1        what is the standard of care.

 2   Q    And are there different levels of evidence?

 3   A    There is different levels of evidence.  From the bottom,

 4        which is anecdotal reporting, to the top, which is, say,

 5        Cochrane review, meta-analysis, systematic reviews.

 6   Q    Where do internal company emails fall on the hierarchy of

 7        levels of evidence?

 8   A    They don't fall at all, in any of it.

 9   Q    Where do failure modes and effects analyses fall in the

10        hierarchy of levels of evidence?

11   A    They don't fall at all in the levels of evidence.

12   Q    The opinions that you've expressed in your reports

13        regarding the safety and efficacy of the TVT, TVT-O, and

14        TVT slings, are those opinions based in part on your

15        education, including your medical school and residency?

16   A    Yes.

17   Q    Is it also based on continuing ed courses?

18   A    Yes.

19   Q    Are those opinions about the safety and efficacy of the

20        devices based on your clinical training and experience?

21   A    Yes.

22   Q    Are those opinions about the safety and efficacy of the

23        devices based on your review of the peer-reviewed

24        literature, book chapters, podium, and poster

25        presentations and abstracts?
```

Douglas Grier, M.D.

```
 1   A   Yes.

 2   Q   Are they also, your opinions, based on professional

 3       society position statements?

 4   A   Yes.

 5   Q   Are they also based to some extent on ongoing discourse

 6       between yourself and your colleagues regarding these

 7       devices?

 8   A   That is true.

 9   Q   And your opinions are based in part on your review of

10       complications discussed in the literature and those that

11       you've seen in your practice?

12   A   Yes.

13   Q   Are the complications that you've seen in your practice

14       consistent with the warnings that you see listed in the

15       adverse reactions section of the IFUs for the TVT and

16       TVT-O and TVT-Secur prior to 2015?

17   A   Yes, they're consistent.

18   Q   Is chronic pain a risk of any pelvic floor surgery?

19   A   Yes, it is.

20   Q   It is a risk of the Burch procedure?

21   A   Yes, it is.

22   Q   It is a risk of pubovaginal sling procedures?

23   A   Yes, it is.

24   Q   Is dyspareunia a risk of any pelvic floor surgery?

25   A   Yes.
```

Douglas Grier, M.D.

```
 1    Q    And are any complications that occur after any surgery --

 2         do they have the potential to be temporary or chronic?

 3    A    Yes.

 4    Q    And do any complications that occur following any pelvic

 5         floor surgery have the potential to be mild, moderate, or

 6         severe?

 7    A    Yes.

 8    Q    Do you have an opinion as to whether chronic pain and

 9         dyspareunia are common complications with any pelvic

10         floor procedures, that all pelvic floor surgeons are

11         expected to know?

12    A    Yes.

13    Q    And what is that opinion?

14    A    That opinion is very common, and every pelvic floor

15         surgeon knows that it is a possible complication.

16    Q    When you were teaching professional education courses for

17         Ethicon, did any of your colleagues ever express any

18         concern about the complications listed in the IFU?

19    A    Well, yes, we discussed it.  We would discuss it about --

20         just about every meeting.

21    Q    Did they express any concerns about the complications

22         they saw listed?

23    A    No.  They're known and expected.

24    Q    How many TVT slings would you say you've implanted, if

25         you could estimate?
```

Douglas Grier, M.D.

```
 1   A   Probably 1,500.

 2   Q   How many TVT retropubics?  Let me be more specific.

 3   A   At least 500.

 4   Q   And how many TVT-O slings have you implanted, if you

 5       could estimate?

 6   A   Another 500.

 7   Q   And how many TVT-Secur slings would you say you've

 8       implanted?

 9   A   Oh, probably between 50 and 75.

10   Q   How do the complications that you've seen in your

11       practice from the TVT, TVT-O, or TVT-Secur slings compare

12       with the complications reported in the literature?

13   A   They're very similar.

14   Q   And how do the complications that you've seen -- strike

15       that.

16           Is it basic medical and surgical knowledge that

17       postsurgical pain can be chronic or temporary?

18   A   Yes.

19   Q   Is it basic surgical knowledge that, when an adverse

20       reaction occurs, further surgery may be required to

21       correct it?

22   A   Yes.

23   Q   And did you know, prior to ever putting in a TVT, TVT-O,

24       or TVT-Secur sling in a patient, that tissue in-growth

25       would occur in the pores of the sling?
```

Douglas Grier, M.D.

```
 1   A   Yes.

 2   Q   And based on that understanding, did you also have an

 3       understanding that if, for some reason, part of that

 4       sling needed to be removed, that dissection would be

 5       required?

 6   A   Yes.

 7   Q   Did you have many patients who experienced no

 8       complications in connection with a TVT surgery?

 9   A   Yes.

10   Q   And is the same true for TVT-O surgeries?

11   A   Yes.

12   Q   And is the same true for TVT-Secur surgeries?

13   A   Yes.

14   Q   When you did have a patient that received one of those

15       slings who had a complication, did you treat those

16       complications?

17   A   Yes.

18                     MR. DEGREEFF:  I hope so.

19   Q   (By Mr. Koopmann)  And you were asked some questions

20       earlier about follow-up of your patients in your

21       practice; is that right?

22   A   Yes.

23   Q   From time to time, patients don't return to you; that's

24       true?

25   A   That is true.
```

Douglas Grier, M.D.

1    Q    Okay.  And that's true of any doctor, presumably?

2    A    It is true of all of us, yes.

3    Q    When patients go to other doctors after they have a

4         complication following one of your surgeries, do you

5         often learn about the fact that they went to another

6         doctor?

7    A    Yes.

8    Q    And how do you do that?

9    A    They usually out of courtesy will call me, or if the

10        reverse is true, I will call them.

11   Q    Can you think of a single randomized control trial that

12        says the TVT mesh degraded or was cytotoxic?

13   A    No.

14   Q    And does that apply to the TVT-O sling mesh and the

15        TVT-Secur mesh?

16   A    I know of no randomized control trials that show any

17        degradation in any of the mesh products.

18   Q    They all have the same mesh; right?

19   A    For this line of -- for Ethicon, yes, they're all the

20        same weave, same monofilament.

21   Q    For those company documents that you were provided and

22        read, did any of them change your opinions that you

23        formed based upon the peer-reviewed literature that

24        you've reviewed and your experience using the slings?

25                   MR. DEGREEFF:  I'm going to object to

Douglas Grier, M.D.

```
 1      the form.  He said he didn't read any review.

 2                    THE WITNESS:  No, I didn't -- none of

 3      them changed my opinions.

 4  Q   (By Mr. Koopmann)  And while Ethicon's counsel may have

 5      sent you some articles in the course of your work in this

 6      litigation, did you also do your own searches for

 7      articles and literature?

 8  A   Yes.

 9  Q   You don't think chronic pain occurs with any of the TVT

10      family of products due to any defect in the mesh;

11      correct?

12  A   That's correct.

13  Q   You said that, with respect to -- I think it was

14      stiffness, you said there was a point at which you would

15      see diminishing returns if you had a very elastic sling.

16          What did you mean by that?

17  A   Well, if --

18                    MR. DEGREEFF:  I'm going to object to

19      form.  I think that misstates.

20                    THE WITNESS:  Do I answer?

21  Q   (By Mr. Koopmann)  Yes.

22  A   So if a mesh is too soft and has very, very little

23      stiffness or integrity, it no longer supports the tissues

24      that it's -- that it's designed to support.

25  Q   Okay.  Is it more lucrative for you to do surgery or to
```

Douglas Grier, M.D.

```
 1        give lectures for device companies?

 2   A    To do surgery and be in the office.

 3   Q    So why is it that you've devoted a significant amount of

 4        time to giving lectures for device manufacturers or

 5        pharmaceutical manufacturers?

 6   A    Because I enjoy teaching, and I like the collaboration

 7        with other physicians around the country, and I find it

 8        to be professionally enhancing.

 9   Q    In what way?

10   A    Well, because I've developed a network of friends around

11        the country, of colleagues that I can call if I have a

12        problem with a particular patient.  Some of the brighter

13        minds that are in our profession.  And it also -- it

14        requires me to stay vigilant in terms of training and

15        study.

16   Q    Counsel asked a question about RCTs that have the primary

17        end point of safety regarding the TVT.

18            My question for you is, do all or almost all of the

19        RCTs that you have reviewed on the TVT and TVT-O and

20        TVT-Secur products discuss complications?

21   A    Yes.  It may not be the primary outcome, but every one of

22        them comments on percentages of complications, adverse

23        outcomes, and issues about pain.

24   Q    You were asked some questions about chronic pain

25        associated with the TVT sling, and one of the articles
```

Douglas Grier, M.D.

1    that you had out a few minutes ago was this Tommaselli

2    systematic review and meta-analysis.

3  A  Yes.

4  Q  That's an article that you reviewed and relied on in

5    forming your opinions?

6  A  Yes.

7  Q  And in that study, there were 3,974 retropubic TVT -- I'm

8    sorry -- retropubic sling patients?

9  A  Yes.  And -- well, it was retropubic and transobturator,

10    total.

11  Q  Right.  But if you look at Table 3 of that study --

12    Table 3.

13  A  Got it.

14  Q  There were 3,974 total retropubic patients in that study?

15  A  Yes.

16  Q  And then there were a total of 2,432 transobturator

17    patients?

18  A  That's correct.

19  Q  And then on the next page, from the right-hand column, it

20    talks about tape-related long-term complications?

21  A  Yes.  It was --

22  Q  And they say there, "Persistent or chronic pain was

23    reported by 13 patients for the retropubic midurethral

24    sling group and 30 patients for transobturator

25    midurethral sling patients"; correct?

Douglas Grier, M.D.

```
 1    A    Yes.

 2    Q    And so 13 patients --

 3    A    Over 3974.

 4    Q    -- divided by 3974 is a rate of chronic or persistent

 5         pain of .3 percent; correct?

 6    A    That's correct.

 7    Q    And for 30 patients with the transobturator midurethral

 8         slings, divided by 2,432 patients with transobturator

 9         midurethral slings, that would yield a persistent or

10         chronic pain rate of 1.2 percent; correct?

11    A    Yes.

12    Q    One of the articles you have in your binder is an article

13         by Jonsson-Funk, et al.?

14    A    Yes.

15    Q    That study looked at 188,454 women who underwent a

16         midurethral sling procedure?

17    A    Yes.

18    Q    And that study showed the nine-year cumulative risk of

19         sling revision or removal was 3.7 percent?

20    A    Yes.  Over nine years.

21    Q    And they found that the nine-year risk of sling revision

22         removal for mesh erosion was 2.5 percent; right?

23    A    Yes.

24    Q    You've got a study here by Cecile Unger.  Is that a study

25         that you reviewed and relied on in forming your opinions
```

Douglas Grier, M.D.

```
 1        in this case?

 2   A    Yes.

 3   Q    And did you also review and rely on the Jonsson-Funk

 4        study in forming your opinions in these cases?

 5   A    The previous study, yes.

 6   Q    In that Unger study, they looked at 3,307 women who

 7        underwent sling placement; is that right?

 8   A    Yes.

 9   Q    And they found that 89 women underwent sling revision?

10   A    Yes.  2.7 percent.

11   Q    And if you do the math there, the rate of sling revision

12        for erosion was 0.57 percent?

13   A    That's right.

14   Q    And the rate of --

15   A    Pain is 0.21 percent.

16   Q    The rate of vaginal pain or dyspareunia causing sling --

17        or necessitating sling revision?

18   A    Yes.

19                  MR. DEGREEFF:  Can I see those,

20        Doctor, the ones you just spoke about?

21                  THE WITNESS:  Oh, it was this one

22        here.

23                  MR. DEGREEFF:  Is this the only one

24        you were just talking about, or was there another one?

25                  THE WITNESS:  No, that was Funk I
```

Douglas Grier, M.D.

```
 1      think you had there.

 2                      MR. DEGREEFF:  Tommaselli, what was

 3      the other one?

 4                      THE WITNESS:  Jonsson-Funk.

 5                      MR. DEGREEFF:  Thank you.

 6                      THE WITNESS:  This is Welk.

 7   Q  (By Mr. Koopmann)  You also reviewed a study by Welk and

 8      relied on that in forming your opinions in these cases?

 9   A  Yes.

10   Q  And this study was a population-based retrospective

11      cohort study that included all adult women undergoing an

12      incident procedure for SUI with synthetic mesh in

13      Ontario, Canada, from April 1st, 2002, through

14      December 31, 2012; is that right?

15   A  Yes.

16   Q  And the number of those women was 59,887?

17   A  Yes.

18   Q  And the author's conclusion was that ten years after SUI

19      mesh surgery, 1 of every 30 women may require a second

20      procedure for mesh removal or revision?

21   A  That's their conclusion, yes.

22   Q  So turn to Page E-3, the primary analysis section.  It

23      said, overall 1,307 women, or 2.2 percent underwent mesh

24      removal or revision a median of 0.49 years after

25      receiving a mesh implant for SUI.  The sling complication
```

Douglas Grier, M.D.

```
 1      was treated by the same surgeon responsible for the

 2      original procedure in 812 of the 1,307 cases, which was

 3      62.1 percent; is that right?

 4   A  Correct.  Yes.

 5   Q  You also had a study by Nguyen; is that right?

 6   A  John Nguyen, yes.

 7   Q  Nguyen.  And that's a study that you relied on in forming

 8      your opinions in these cases?

 9   A  Yes.

10   Q  And in this Nguyen study, they looked at all female

11      members of Kaiser Permanente, Southern and Northern

12      California and Hawaii, who underwent sling procedures or

13      pelvic organ prolapse surgeries using implanted grafts of

14      mesh between September 1, 2008, and May 31, 2010; is that

15      right?

16   A  Correct.

17   Q  And they looked at 3,747 sling patients; is that right?

18   A  Yes.

19   Q  And 30 of the 3,747 experienced a vaginal mesh erosion?

20   A  Yes.

21   Q  And that was a 0.8 percent rate for erosions?

22   A  That's correct.

23   Q  One of the articles you had earlier was an article by

24      Schimpf, et al.; is that right?  It's right here.

25   A  Okay.
```

Douglas Grier, M.D.

```
 1    Q    And that Schimpf study was a systematic review and

 2         meta-analysis of randomized control trials from 1990

 3         through April 2013, with a minimum of 12 months of

 4         follow-up?

 5    A    Yes.

 6    Q    And the RCTs were comparing the sling procedure for SUI

 7         to another sling or Burch urethropexy?

 8    A    Correct.

 9    Q    And they looked at full-length midurethral slings like

10         the TVT and TVT-O?

11    A    Yes.

12    Q    And they looked at single-incision slings like the

13         TVT-Secur?

14    A    Correct.

15    Q    And if you look at Table 1 on Page 71.E5, they list in

16         Table E1 the randomized control trials looking at

17         mini-slings versus any other sling; right?

18    A    Yes.

19    Q    And all of those mini-sling studies that they looked at

20         studied the TVT-Secur except one; is that right?

21    A    Yes.

22    Q    And then in Table 3 of that study, they look at the rates

23         of adverse events by sling type analyzed from randomized

24         control trials, and included adverse event studies; is

25         that right?
```

Douglas Grier, M.D.

```
 1   A   Correct.

 2   Q   And they compare, when possible, transobturator slings

 3       like the TVT-O, mini-slings like the TVT-Secur,

 4       retropubic slings like the TVT retropubic --

 5   A   Yes.

 6   Q   -- and the Burch procedure and pubovaginal sling

 7       procedures; right?

 8   A   Yes.

 9   Q   And is this table something that you reviewed and relied

10       on in forming your opinions in this litigation?

11   A   I have.

12   Q   And the author's conclusion with respect to the

13       midurethral slings versus the Burch procedure, was that

14       they suggested either intervention based on the cure

15       rates -- the objective cure rates and said the decision

16       should balance on -- balance potential adverse events and

17       concomitant surgeries; right?

18   A   Yes.

19               MR. DEGREEFF:  I don't have anything

20       from Exhibit 4 right here, do I?

21               MR. KOOPMANN:  I don't think so.

22   Q   (By Mr. Koopmann)  Another study you have in your binder

23       for the TVT and TVT-O general report is a study by

24       Mohamed Abdel-Fattah; is that right?

25   A   Yes.
```

Douglas Grier, M.D.

```
 1    Q    And that study looked at -- their objective was to

 2         determine the lifetime risk of undergoing pelvic floor

 3         surgery in a cohort of U.K. parous women, and the

 4         reoperation rates for pelvic floor surgery?

 5    A    Yes.

 6    Q    And they ended up looking at 34,631 women?

 7    A    Yes.

 8    Q    If you'll turn to Page 5, they talk about some risk

 9         factors for reoperation?

10    A    Yes.

11    Q    And they found that the -- that 8.8 percent of the women

12         studied had at least one repeat urinary incontinence

13         surgery?

14    A    Yes.

15    Q    And then they also indicate on the right-hand column that

16         the reoperation rate for urinary incontinence was

17         3.2 percent in the --

18    A    In the midurethral group.

19    Q    In the midurethral sling group; right?

20    A    Yes.

21    Q    And it was 10.7 percent in the abdominal retropubic

22         surgery group?

23    A    Yes.

24    Q    Is that a Burch procedure?

25    A    That's exactly what that is.
```

Douglas Grier, M.D.

```
 1   Q   In your TVT-Secur general report binder, you have a

 2       systematic review and meta-analysis by Colin Walsh; is

 3       that right?

 4   A   Yes.  Yes.  2011?

 5   Q   And that study looked at -- well, it was published in

 6       2011; correct?

 7   A   Yes.

 8   Q   And it looked at 1,178 women who received the TVT-Secur?

 9   A   Yes.

10   Q   And that was in ten studies?

11   A   Ten studies.

12   Q   And they found both the objective and subjective cure

13       rate at 12 months was 76 percent?

14   A   Yes.

15   Q   And they found a 2.4 percent incidence of mesh exposure

16       in the first year?

17   A   Yes.

18   Q   And a 1 percent rate of dyspareunia?

19   A   Yes.

20   Q   And a return to theater for complications rate of

21       0.8 percent?

22   A   Yes.

23   Q   Is this a study that you reviewed and relied upon in

24       forming your opinions about the TVT-Secur sling?

25   A   Yes.
```

Douglas Grier, M.D.

```
 1    Q    Did you also review a study by Mohamed Abdel-Fattah,

 2         which was a meta-analysis regarding single-incision

 3         mini-slings?

 4    A    Yes.  But let's find it.  Oh, here it is.  No. 1.  Yes.

 5    Q    In that study, they looked at a total of 758 women in

 6         nine randomized control trials with a mean follow-up of

 7         nine and a half months?

 8    A    Yes.

 9                        MR. DEGREEFF:  Hey, Barry, I'm going

10         to have to object.  I mean, all you're doing is sitting

11         here reading documents to him.  I mean, if you want to

12         ask him questions about the documents, that's fine, but I

13         feel like you're just reading them to him.  I think

14         that's leading.

15    Q    (By Mr. Koopmann)  Single-incision midurethral slings

16         were associated with significantly lower patient reported

17         and objective cure rates at 6 to 12 months compared with

18         standard midurethral slings.

19             Is that what it reports?

20    A    And that was my experience in a study that I contributed,

21         that there was an early -- less pain initially postop,

22         but at the one-year mark was the same as the longer

23         slings.

24                        MR. DEGREEFF:  Objection.  Form.

25    Q    (By Mr. Koopmann)  Then on Page 471, they note that the
```

Douglas Grier, M.D.

1      single-incision midurethral sling meta-analysis was

2      possible for studies comparing TVT-Secur versus standard

3      midurethral slings; right?

4   A   Yes.

5                  MR. DEGREEFF:  Objection to form.

6   Q   (By Mr. Koopmann)  And they noted that a trend towards

7      lower rates of patient reported success and objective

8      cure with the TVT-Secur was seen; however, it did not

9      reach statistical significance.  Is that right?

10  A   Yes.

11                 MR. DEGREEFF:  Objection.  Form.

12  Q   (By Mr. Koopmann)  And what does that mean, that it did

13     not reach statistic significance?

14                 MR. DEGREEFF:  You've got to let me

15     get my objections on the record before you answer,

16     Doctor.

17                 THE WITNESS:  Well, what it means is

18     that --

19                 MR. DEGREEFF:  Objection.  Form.

20                 THE WITNESS:  -- there wasn't a

21     statistical difference that was enough to be means tested

22     that it was significant.  The P testing was not high

23     enough to -- to say that there's a delta here where Secur

24     was different than the standard midurethral sling.

25  Q   (By Mr. Koopmann)  Okay.  And then in the right-hand

Douglas Grier, M.D.

```
 1        column under Quality of Life, it indicates that there was

 2        a trend towards better quality of life score in the

 3        standard midurethral sling group, but it was not

 4        statistically significant; is that right?

 5   A    Yes.

 6                        MR. DEGREEFF:  Objection for form.

 7        And just to be clear, is my running objection on form

 8        still going for leading?

 9                        MR. KOOPMANN:  I thought it ended

10        because you started objecting again to leading.

11                        MR. DEGREEFF:  Well, I actually -- I

12        think what happened is that I forgot that we had a -- we

13        had an agreement that I could -- that it was -- I had a

14        running objection.  So if my running objection is still

15        in place, then I'll stop saying objection to form on

16        everything.

17                        MR. KOOPMANN:  I'll put it back in

18        place now.

19                        MR. DEGREEFF:  Okay.  Thanks.

20   Q    (By Mr. Koopmann) So does that basically mean that the

21        quality of life scores between the standard midurethral

22        slings and single-incision midurethral slings was no

23        different?

24   A    They're -- they're close enough that they are the same.

25   Q    And you've reviewed TVT-Secur-related literature,
```

Douglas Grier, M.D.

```
 1      including randomized control trials, that were both

 2      favorable regarding the sling, and unfavorable?

 3  A   That's correct.

 4  Q   Okay.  And you factored all of that in, in forming your

 5      opinions about the device?

 6  A   Yes.

 7                  MR. JONES:  Could we see that one,

 8      that Abdel-Fattah?

 9                  MR. KOOPMANN:  Here, I think I've got

10      copies.

11                  MR. DEGREEFF:  Do you have copies of

12      all of those that you just did that we could have?

13                  MR. KOOPMANN:  Several.

14                  MR. DEGREEFF:  Okay.

15                  MR. KOOPMANN:  Do you want one to take

16      with you?

17                  MR. DEGREEFF:  Yeah.

18                  MR. KOOPMANN:  Do you want it now or

19      can I do it after we're done?

20                  MR. DEGREEFF:  We can do it after

21      we're done.  That's fine.

22                  MR. KOOPMANN:  I think those are all

23      the questions I have for you, Dr. Grier.  I may have some

24      more if Counsel has some more.

25      ////
```

Douglas Grier, M.D.

```
 1                              (Recess from 9:12 p.m. to

 2                              9:18 p.m.)

 3                         FURTHER EXAMINATION

 4      BY MR. DEGREEFF:

 5   Q  Doctor, you mentioned earlier, I believe when Counsel was

 6      questioning you, that there was some discord among your

 7      colleagues about -- regarding transvaginal mesh.

 8          Do you remember giving that testimony?

 9   A  I don't recall.  Discord?

10   Q  That's the word you used.  Because that's not even a word

11      I would ever come up with.

12   A  There's differing opinions in terms of techniques and how

13      to place it and some people will come up with the idea of

14      putting in drains.  It's different iterations of the same

15      surgery that may not follow the IFU.  So occasionally

16      someone would come up with a concept like that.

17   Q  Doctor, you're aware that a number of your colleagues

18      believe that transvaginal mesh is not safe?

19                      MR. KOOPMANN:  Object to form.

20                      THE WITNESS:  I think very few of my

21      colleagues agree to that.  If you look at the position

22      papers by the different societies, they're -- they feel

23      that it has efficacy and safety, and it should still be

24      used.

25   Q  (By Mr. DeGreeff)  I guess my question was a little
```

Douglas Grier, M.D.

```
 1        STATE OF WASHINGTON )     I, Cindy M. Koch, CCR, RPR, CRR,
                              ) ss CLR, a certified court reporter
 2        County of Pierce    )     in the State of Washington, do
                                     hereby certify:

 3

 4

                    That the foregoing deposition of DOUGLAS GRIER, M.D.
 5        was taken before me and completed on March 22, 2016, and
          thereafter was transcribed under my direction; that the
 6        deposition is a full, true and complete transcript of the
          testimony of said witness, including all questions, answers,
 7        objections, motions and exceptions;

 8                  That the witness, before examination, was by me
          duly sworn to testify the truth, the whole truth, and
 9        nothing but the truth, and that the witness reserved the
          right of signature;

10

                    That I am not a relative, employee, attorney or
11        counsel of any party to this action or relative or employee
          of any such attorney or counsel and that I am not
12        financially interested in the said action or the outcome
          thereof;

13

                    That I am herewith securely sealing the said
14        deposition and promptly delivering the same to
          Attorney David DeGreeff.

15

                    IN WITNESS WHEREOF, I have hereunto set my
16        signature on the 25th day of March, 2016.

17

18

19

20

21

22

23        Cindy M. Koch, CCR, RPR, CRR, CLR
          Certified Court Reporter No. 2357

24
```