# EXHIBIT 2

Joseph M. Carbone, M.D.

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE: ETHICON, INC., PELVIC    )  Master File No.
REPAIR SYSTEM PRODUCTS          )  2:12-MD-02327
LIABILITY LITIGATION            )  MDL 2327

_____

THIS DOCUMENT RELATES TO
PLAINTIFFS:

Diane Kropf
Case No. 2:12-cv-01202                JOSEPH R. GOODWIN
                                      U.S. DISTRICT JUDGE
Judy Williams
Case No. 2:13-cv-00657

Myra Byrd
Case No. 2:12-cv-00748
Angela Coleman
Case No. 2:12-cv-01267

Susan Thamen (Reeves)
Case No. 2:12-cv-00279
Donna Zoltowski
Case No. 2:12-cv-00811

DEPOSITION OF JOSEPH M. CARBONE, M.D.
GENERAL TVT
Wednesday, March 16, 2016
Danville, Virginia
5:18 p.m.

Reported by:  Karen K. Kidwell, RMR, CRR, CLR
GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Joseph M. Carbone, M.D.

Page 25

1        Q.    Is it fair that Exhibit 6 represents

2   invoices that you've billed for your litigation

3   consulting work in this transvaginal mesh litigation?

4   These are the invoices for your expert consulting

5   work, correct?

6        A.    Yeah.

7        Q.    Okay.  But for the missing Prolift invoice

8   that we're going to get and add to Exhibit 6,

9   correct?

10       A.    Yes.

11       Q.    Okay.  Have you totaled these up?

12       A.    Nope.

13       Q.    Okay.  We'll do that on break.

14             How many total hours have you spent in

15   your role as a litigation consultant for Ethicon?

16       A.    That's an interesting question.  How many

17   hours have I spent reviewing all the materials or how

18   many hours have I billed?

19       Q.    Both.

20       A.    I spent a lot more hours reviewing the

21   materials than what I billed.

22       Q.    Okay.  How many?

23       A.    A lot.

24       Q.    A lot?

25       A.    A lot.

Joseph M. Carbone, M.D.

Page 26

1      Q.    More than what you billed for?

2      A.    Yeah.

3      Q.    So if we look at the invoices, we total

4   up all the hours, including with the missing invoice

5   that wasn't brought today, we'll know the total

6   amount of hours you've billed, correct?

7      A.    We'll know the total amount of hours that

8   I've billed, yes.

9      Q.    And then you're saying that you spent more

10   working on the case above and beyond the hours that

11   you've actually billed, correct?

12      A.    Oh, yes.

13      Q.    Okay.  And if we double the amount of

14   hours that you billed?

15          MR. MORIARTY:  Objection.

16   BY MR. JONES:

17      Q.    I just want a general idea of the total

18   amount of time you spent on the case.

19      A.    When I reviewed these articles -- I've

20   been reviewing this material since I was introduced

21   to the mesh in 1998.  So the body of my professional

22   career was spent reviewing these materials.  And in

23   that way, I've been reviewing these materials for

24   over 20 years.

25      Q.    Okay.

Joseph M. Carbone, M.D.

Page 27

1      A.    So I would submit that I spent a career of
2   preparing to answer the questions you may ask me.
3      Q.    Okay.  You've spent close to 20 years
4   reviewing materials in support of your opinions in
5   this litigation?
6              MR. MORIARTY:  Objection.  Form.
7              Go ahead.
8              THE WITNESS:  Not continuously.
9   BY MR. JONES:
10      Q.    Okay.  For the past 20 years off and on,
11   you've reviewed -- you have reviewed materials that
12   support your opinions in this litigation?
13      A.    I've read.  I've gone to CME.  I've talked
14   with other clinicians.  I've presented.  I've been
15   involved in -- I've operated.  My knowledge, my
16   training, my experience, my review of the literature,
17   my interaction with other colleagues, all that is the
18   sum of what has gone into, and more -- I'm sure I'm
19   not touching on everything -- is the sum of what I
20   drew upon, if you will, to determine my opinions.
21      Q.    Okay.  And does that include review of the
22   medical literature?
23      A.    Yes.
24      Q.    Okay.  So over the course of the past 20
25   years off and on, you've reviewed medical literature

Joseph M. Carbone, M.D.

Page 28

1    related to the topics in your report that you've

2    written, correct?

3         A.    Off and on, yes.

4         Q.    And do you continue to keep up to date

5    with the medical literature on these subjects?

6         A.    I try.

7         Q.    You try?

8         A.    (Nodding head up and down.)

9         Q.    When's the last time you did a literature

10   review?

11        A.    Read an article?

12        Q.    Sure.

13        A.    I read an article last week.

14        Q.    Okay.  What article was that?

15        A.    There was an article -- well, last week I

16   reviewed the article, the Schimph article.

17        Q.    Okay.  How did you find that article?

18        A.    I reviewed it -- well, I had reviewed it

19   in the past in my general reading, and then I

20   reviewed in preparation for this litigation.

21        Q.    Was that article sent to you by Ethicon?

22        A.    Originally, no.

23        Q.    Eventually, Ethicon sent you that article,

24   though?

25        A.    Eventually it was in the materials that

Joseph M. Carbone, M.D.

Page 55

1        A.    I joined a practice.  I joined an existing

2   practice.

3        Q.    Joined an existing practice?

4        A.    Yes.

5        Q.    And at the time, was that called the

6   Danville Urologic Clinic, now operating as

7   Southside -- or South -- what's the name of the

8   clinic that you practice at right now?

9        A.    Southside Urology & Nephrology.

10       Q.    Is that the same clinic you joined in

11  2000 --

12       A.    Yes.

13       Q.    -- when you came to Danville?  What is the

14  Piedmont Institute for Incontinence?

15       A.    It's called the Piedmont Institute for

16  Continence and Urinary Control.

17       Q.    Okay.

18       A.    It's the name I gave my specific aspect of

19  the practice.

20       Q.    Is that a separate company that you've set

21  up?

22       A.    No.

23       Q.    When Ethicon pays you as a consultant, do

24  they pay you or the clinic?

25       A.    They pay me.

Joseph M. Carbone, M.D.

Page 56

1      Q.    Personally?

2      A.    Yes.

3      Q.    You haven't set up an LLC or a side

4   company to accept payment, consultant payments?

5      A.    No.

6      Q.    Okay.  What I want to do now -- should be

7   fairly uncontroversial -- is I want to get the lay of

8   the land for what mesh products you've used, when you

9   used them, and how many times you used them.

10     A.    Okay.

11     Q.    And I think it might be easier to set out

12  a little chart here.  But let's start with Ethicon

13  products.  We'll start with the TVT line.

14           How many times have you used TVT

15  Retropubic?

16     A.    May I use a pen -- I'm just trying to,

17  again, math.

18           MR. ROSENBLATT:  This isn't a written

19      deposition.

20  BY MR. JONES:

21     Q.    Sorry.  He says you can't use a pen.

22     A.    Okay.  That's fine.

23     Q.    I was trying to make it easier.

24     A.    Be patient with me as I do my math in my

25  head.

Joseph M. Carbone, M.D.

Page 57

1    Q.   He'll probably let you use a pen so long
2    as I don't see it, though.  Right?
3    A.   No, I don't need to go there.  Which ones
4    was it the one you were asking?
5    Q.   TVT Retropubic?
6    A.   Maybe 300.
7    Q.   300.  Okay.
8    O.   I'm going to go through them all.
9    A.   I know.  I'm with you.  I've got a number
10   here, and I'm trying to figure out, based on the
11   year, how many apparently I did.  Let me give you
12   that number.  Hold on.
13        MR. MORIARTY:  Is there a question
14   pending?
15   BY MR. JONES:
16   Q.   There is.
17   A.   Change that to about 400.
18   Q.   TVT-R?
19   A.   Retropubic, yeah.
20   Q.   Okay.
21   A.   I don't know.  300 to 400.
22   Q.   300 to 400?
23   A.   Yeah, that's fine.
24   Q.   And the question pending was TVT-O.
25   A.   200 to 300.

Joseph M. Carbone, M.D.

Page 58

1      Q.   Okay.  TVT-Secur?

2      A.   200.

3      Q.   TVT Abbrevos?

4      A.   What is my total right now?  400.

5      Q.   Okay.  And Exact?

6      A.   Probably about 100.

7      Q.   Okay.

8      A.   Let me look at my numbers.

9      Q.   Yeah, sure.

10      A.   That's about right, give or take a couple

11   hundred.

12      Q.   Give or take, rough estimates?

13      A.   Yeah.

14      Q.   Years.

15      A.   Okay.

16      Q.   Years and years.  So let's start with TVT

17   Retropubic, since that's the oldie but goodie.

18      A.   Started in -- hmm, 2004.  Four years.

19      Q.   2004 you started?

20      A.   No, no.

21      Q.   No.

22      A.   I started here in 2000.  So about four

23   years.

24      Q.   Okay.  TVT-O next.

25      A.   Uh-huh.  I did that probably until -- I

Joseph M. Carbone, M.D.

Page 59

1   did it a while.  The Secur came out what -- in,

2   trying to remember.

3        Q.   '6 or '7?

4        A.   '6 or '7.  Maybe picked it up in '7.

5   Probably did it until like 2007, 2008.

6        Q.   Okay.  Then Secur, sometime 2007?

7        A.   2008.  And I did it until Abbrevo came

8   out, which is like in 2010, I think.  And I've done

9   it pretty well since mostly.  Majority of Abbrevos

10  have been since 2010.

11       Q.   And Exact?

12       A.   I use, with the Abbrevo, since -- you

13  know, throughout the course since the -- I did the

14  Os, since it came out.

15       Q.   When did Exact come out?

16            MR. ROSENBLATT:  2010.

17            THE WITNESS:  Yeah, that's what I thought.

18            And I did -- I apologize.  To clarify, I

19       did some Os, Rs, S, you know.

20  BY MR. JONES:

21       Q.   There's some overlap?

22       A.   There's overlap.

23       Q.   This is roughly speaking.

24       A.   Yeah.

25       Q.   All right.  So sounds like today, your

Joseph M. Carbone, M.D.

Page 78

1       A.    No.

2       Q.    Do you know the stiffness of the TVT mesh?

3       A.    No.

4       Q.    Do you know the antioxidants that Ethicon

5   uses in the TVT mesh?

6       A.    The antioxidants?

7       Q.    Sure.  Do you know whether or not Ethicon

8   adds antioxidants to the TVT mesh or not?

9       A.    Aren't antioxidants used in all Prolene?

10  I believe antioxidants are used in all Prolene, and I

11  don't know what antioxidants are used.

12      Q.    There you go.  That's my question.  You

13  don't know what antioxidants are used in TVT mesh,

14  correct?

15      A.    Correct.

16      Q.    Okay.  Do you know the name of the resin,

17  polypropylene resin, used in TVT mesh?

18      A.    The resin?

19      Q.    (Nodding head up and down.)

20      A.    No.

21      Q.    Do you consider yourself a materials

22  expert?

23      A.    Well, what do you mean by "materials

24  expert"?

25      Q.    Do you -- will you be -- do you consider

Joseph M. Carbone, M.D.

Page 79

1  yourself an expert in the properties of the TVT mesh?

2       A.   I believe that I am an expert in the

3  clinical properties of the TVT mesh.  If you ask me

4  do I have a Ph.D. in material science?  No, I don't.

5  Have I spoken with material scientists?  Yes.  Have

6  I, you know, interacted with them?  Have I talked to

7  them about the Amid classification?  Have I taught on

8  the mesh itself?  Have I used -- most importantly,

9  have I used the mesh -- my experience with the mesh

10 clinically and how it works in vivo?

11      I would say that I have an expert -- I

12 have a -- a knowledge and a -- I have knowledge and

13 training and experience that would allow me to

14 provide expert opinion in that context.

15      Q.   Does the TVT mesh degrade inside a woman?

16      A.   I don't believe so.

17      Q.   Have you reviewed any test by Ethicon of

18 the mesh used in TVT that concludes the mesh does

19 degrade?

20      A.   Say it again?

21      Q.   Sure.  Have you reviewed any medical

22 literature that disagrees with you that mesh does not

23 degrade inside a patient?

24      A.   I have not reviewed any Level 1 material

25 randomized controlled trials to that effect.

Joseph M. Carbone, M.D.

Page 80

1        Q.   Okay.  That's not -- I didn't ask about

2   Level 1.  I'm just asking about any medical

3   literature.

4             MR. MORIARTY:  Objection.

5             Go ahead.

6             THE WITNESS:  Geez.  I guess I'm sure, as

7        I've gone around -- I mean, I've done a lot of

8        review.  I'm sure there is very low-evidence

9        material out there that would suggest that.

10  BY MR. JONES:

11       Q.   Okay.  So it's fair to say that in your

12  review, you've come across medical literature that

13  concludes mesh degrades inside the patient, correct?

14       A.   When you say "inside the patient," are you

15  talking about explanted materials or are you talking

16  about materials that are still inside the patient?

17       Q.   Either.  We'll go with explant.  How about

18  that?

19       A.   Well, there's literature -- not good

20  literature -- there's literature that suggests that

21  TVT or -- yeah, polypropylene TVT mesh might degrade.

22  Yeah.

23       Q.   Is there -- do you recall what literature

24  is that?  Do you recall any authors, titles?

25       A.   No.

Joseph M. Carbone, M.D.

Page 89

1       Q.    Is today the first time you have ever
2   given expert testimony as an expert in a transvaginal
3   mesh case?
4       A.    To the best of my recollection, yeah.
5       Q.    Is this case the first time you've ever
6   acted as an expert in litigation in a case involving
7   transvaginal mesh?
8       A.    Again, acted as an expert in transvaginal
9   litigation mesh -- or transvaginal mesh litigation?
10      Q.    (Nodding head up and down.)
11      A.    And that means both the TVT polypropylene
12  Prolene mesh and the -- okay -- and the Prolift
13  polypropylene mesh.
14      Q.    Any mesh in transvaginal --
15      A.    To the best of my recollection, none of
16  the med mal -- and they were all med mal -- cases
17  that I reviewed were -- involved TVT polypropylene or
18  Prolift polypropylene mesh.
19      Q.    Okay.  Great.  Perfect.  Is this case the
20  first time you've acted as an expert in the design
21  and safety of a device?
22      A.    Expert in the design and safety.  I mean,
23  the -- what do you mean by "expert"?  I think we've
24  had this discussion before with respect to the expert
25  in the materials.  But now you're talking about

Joseph M. Carbone, M.D.

Page 90

1    design and safety; is that correct?  Different?

2            Q.    (Nodding head up and down.)

3            A.    So I ask again the same question.  What do

4    you mean by "expert in design and safety"?

5            Q.    You don't have -- you don't understand my

6    question of whether -- are you an expert in this case

7    on the design of the TVT device?

8                    MR. MORIARTY:  Objection.

9                    Go ahead.

10                   THE WITNESS:  Insomuch as -- I'm not an

11           engineer.  Okay?  But insomuch as I'm familiar

12           with the design, I've used the design, I've been

13           trained, I have experience with the design, I've

14           read the literature regarding the design, I've

15           used it clinically, I feel like I am an expert.

16           But -- in that context, I believe I'm an expert.

17           I'm not -- I'm saying that I'm not an engineer.

18           I can't speak with any --

19   BY MR. JONES:

20           Q.    Okay.  Here's my question.

21           A.    Go ahead.

22           Q.    Have you ever been asked by a medical

23   device company prior to Ethicon in this case to be an

24   expert in litigation?

25           A.    Repeat it.  Seriously.  Just want to make

Joseph M. Carbone, M.D.

Page 91

1   sure I get it right.

2          Q.    Have you ever been asked by a medical

3   device company other than Ethicon to be an expert in

4   litigation?

5          A.    To the best of my recollection, I don't

6   believe any of the medical malpractice cases involved

7   medical devices.

8          Q.    Now I've got to ask you again.  Yes or no.

9   To the best of your recollection, has a medical

10  device company other than Ethicon ever asked you to

11  act as an expert in litigation?

12         A.    Is it the same question?

13         Q.    Yes or no?

14         A.    Was my answer inadequate?

15         Q.    Yes or no?

16         A.    Not that I recall.

17         Q.    Okay.   Perfect.

18         A.    Okay.

19         Q.    We went back and we did tally up the

20  payments from Exhibit 5.

21         A.    Okay.

22         Q.    So you have Exhibit 5 in front of you, and

23  we added up those payments from Ethicon to you

24  between the years 2003 to 2012.  And the total I'll

25  represent to you is $452,398.

Joseph M. Carbone, M.D.

Page 105

1          THE WITNESS:  D-E-A-T-H?

2          MR. JONES:  Yes.

3          MR. MORIARTY:  Objection.

4          THE WITNESS:  You know what?  In the form

5     that you're asking it, I can't answer that

6     question.

7   BY MR. JONES:

8          Q.    Okay.  Do you tell your patients when

9   you -- before you implant a TVT device or Ethicon

10  mesh product, that you have consulted for Ethicon

11  since 2003?

12         A.    Now?

13         Q.    We'll start with now.

14         A.    No.

15         Q.    Have you ever?

16         A.    Yes.

17         Q.    When?

18         A.    When I was consulting for Ethicon and TVT.

19         Q.    Okay.  So between 2003 -- between 2003 and

20  2012, you told your patients you were an Ethicon

21  consultant?

22         A.    It was my usual practice.

23         Q.    Currently, you don't tell -- currently,

24  what do you tell your patients?

25         A.    I don't tell them I'm a consultant.

Joseph M. Carbone, M.D.

Page 106

1        Q.    Okay.  Do you tell them that you're a

2    litigation consultant for Ethicon?

3        A.    No.

4        Q.    Okay.  Do you agree that one of the risks

5    of the TVT mesh is chronic pain?

6        A.    I don't attribute it to the mesh.

7        Q.    Is that a no?

8        A.    I guess we'd say that's no.

9        Q.    Do you agree that one of the risks of the

10   TVT mesh is chronic dyspareunia?

11       A.    I don't attribute it to the mesh.

12       Q.    Is that a no?

13       A.    That's a no.

14       Q.    Do you agree one of the risks of the TVT

15   device is chronic pain in women?

16       A.    I don't attribute it to the device.

17       Q.    Is that a no?

18       A.    That's a no.

19       Q.    Do you agree that one of the risks of the

20   TVT device is chronic dyspareunia?

21       A.    I do not attribute it to the device.

22       Q.    Is that a no?

23       A.    That's a no.

24       Q.    Do you agree one of the risks of the TVT

25   mesh is erosion of the mesh through the woman's

Joseph M. Carbone, M.D.

Page 107

1   vaginal tissues?

2       A.    Restate the question.

3       Q.    Sure.

4           MR. JONES:  Can you read it back?

5           (Whereupon the Court Reporter read the

6           previous question.)

7           THE WITNESS:  The risk of using any mesh

8       is potential erosion.

9   BY MR. JONES:

10      Q.    That's a yes, correct?

11      A.    That's a yes.

12      Q.    Do you agree that TVT mesh that erodes

13  through a woman's vaginal tissue can cause pain to a

14  woman?

15      A.    I don't attribute that to the mesh, no.

16      Q.    Do you agree TVT mesh that erodes through

17  a woman's vaginal tissue can cause dyspareunia?

18      A.    I don't attribute that to the mesh.

19      Q.    Do you believe TVT mesh that erodes

20  through a woman's vaginal tissue can cause discomfort

21  to the woman?

22      A.    That's pretty broad.  What do you want to

23  say is discomfort?  I mean, how are you describing

24  "discomfort"?

25      Q.    We'll just leave that at that question.

Joseph M. Carbone, M.D.

Page 108

1          All right.  Is the TVT Retropubic the gold

2     standard?

3          A.   Well --

4               MR. MORIARTY:  Objection.

5               Go ahead.

6               THE WITNESS:  I have to defer to the AUA,

7          AUGS, and SUFU that have described the

8          polypropylene mid-urethral sling as the gold

9          standard for the treatment --

10              Now, wait a second.  What was your

11         question?

12    BY MR. JONES:

13         Q.   Right.

14         A.   There you go.

15         Q.   Is TVT Retropubic the gold standard?  Yes

16    or no.  To you.  I'm asking you.

17         A.   Oh, me?

18         Q.   Yeah.

19         A.   Me.  I wouldn't specifically say the

20    Retropubic.

21         Q.   In your opinion, is the TVT-Secur the gold

22    standard?

23         A.   I wouldn't say specifically the Secur.

24         Q.   In your opinion, is the TVT Obturator the

25    gold standard?

Joseph M. Carbone, M.D.

Page 122

1    Q.   Okay.  But if we wanted to know which ones
2  you looked at, no dice, not going to happen?

3    A.   I can't provide you with that.

4    Q.   Okay.  Do you have any background in
5  polymer chemistry?

6    A.   Again, I don't have a Ph.D., no.

7    Q.   Have you ever done bench research on
8  polypropylene mesh?

9    A.   Bench research?  No.

10    Q.   Lab research on polypropylene mesh?

11    A.   Lab research?  No.

12    Q.   Your opinion that TVT mesh does not
13  degrade in vivo, have you ever attempted to have that
14  opinion published in a peer review journal?

15    A.   No.

16    Q.   Any of the opinions that you'll be
17  offering in this litigation, have you ever attempted
18  to have published in a peer review journal?

19    A.   No.

20    Q.   Are the opinions you're offering in this
21  litigation solely for litigation purposes?

22         MR. MORIARTY:  Objection.

23

24  BY MR. JONES:

25    Q.   I'll withdraw it.

Joseph M. Carbone, M.D.

Page 123

1                   Are you an expert on warnings?

2          A.    I'm sorry?

3          Q.    I'll withdraw that last question.  Are you

4    an expert on warnings?

5          A.    Warnings?

6          Q.    Warnings related to TVT mesh.

7          A.    Warnings related to TVT mesh.  I'm trying

8    to consider what an expert in warnings would be.

9    Again, I don't know what an expert in warnings would

10   be.

11         Q.    Have you ever drafted an IFU?

12         A.    No.

13         Q.    Do you rely in your normal course of

14   practice as a physician on IFUs?

15         A.    Do I rely?

16         Q.    (Nodding head up and down.)

17         A.    No.

18         Q.    Do you review IFUs before you use the

19   product?

20         A.    Yes.

21         Q.    Okay.  Always?

22         A.    Which product?

23         Q.    Any product.

24         A.     It is my usual practice to review IFUs

25   before using a new product.

Joseph M. Carbone, M.D.

Page 124

1         Q.    Thank you.  Do you -- are you aware the
2    industry standards that govern what warnings must be
3    in an IFU?
4         A.    The industry standards?  No, I don't know
5    that --
6         Q.    Do you agree that all material risks
7    related to the TVT mesh must be included in the IFU?
8              MR. MORIARTY:  Objection.  Form.
9              THE WITNESS:  I guess define "material
10        risk."
11   BY MR. JONES:
12        Q.    It's in your report.  How do you use it?
13   I'm using your term.
14        A.    I understand.  I just wanted to know on
15   how you were using it in your question.
16              (Off record discussion.)
17        Q.    I wish I could let you take all day,
18   Doctor, but we're on a tight time frame.
19        A.    I apologize.  I just don't see where I
20   write on this TVT IFU section the term "material
21   risk."  If you would like to point out to me
22   specifically where I'm using it, I'll be happy to cut
23   to the chase for you.
24        Q.    Yeah.  Why don't you go to page 4?  First
25   sentence, page 4.

Joseph M. Carbone, M.D.

Page 127

1          A.    The risks unique to the proper use of the

2    device.

3          Q.    It's your opinion all risk unique to the

4    TVT device, specifically proper use of the TVT

5    device, must be included in the TVT IFU, correct?

6                MR. MORIARTY:   Objection.   Form.

7                THE WITNESS:   Read it back again.   I just

8          want to make sure.

9                MR. JONES:   I'm going fast because I'm on

10         a tight --

11               THE WITNESS:   I'm with you.   I'm sorry.   I

12         apologize.   I want to make sure it's right.

13               MR. JONES:   Can you read that question

14         back?

15               (Whereupon the Court Reporter read the

16               requested question.)

17               THE WITNESS:   All risks unique to the TVT

18         device.

19               Yeah, I think that's -- if that's what I

20         said, yeah, that's what I mean.

21    BY MR. JONES:

22         Q.    It's your opinion that, the risks

23    associated with the device is caused by improper use

24    of the device, that risk does not need to be in the

25    IFU, correct?

Joseph M. Carbone, M.D.

                                                          Page 128

1        A.    Correct.

2        Q.    Okay.  What risks are unique to the TVT

3   device that need to be in the TVT IFU?

4             MR. MORIARTY:  Objection.  Form.

5             Go ahead.

6             THE WITNESS:  The unique risks to the TVT

7        device is erosion of the mesh material.

8   BY MR. JONES:

9        Q.    Is erosion of the mesh material the only

10  unique device -- or unique risk associated with the

11  TVT device?

12       A.    In my opinion, yes.

13       Q.    If erosion is the only risk listed in the

14  TVT IFU, is the TVT IFU adequate, in your opinion?

15            MR. MORIARTY:  Objection.  Form.

16            THE WITNESS:  I know you're on a time

17       constraint, but I'd like to look specifically at

18       the TVT IFU that you're speaking about.

19            MR. MORIARTY:  He just asked a

20       hypothetical.

21            THE WITNESS:  I'm sorry?  What --

22            MR. JONES:  I think that was an objection.

23       I'm not for sure, though.

24            MR. MORIARTY:  I did object.

25            MR. JONES:  That was an objection?

Joseph M. Carbone, M.D.

Page 129

```
 1              MR. MORIARTY:  No.  I objected before I
 2        got out of my seat.
 3              MR. JONES:  Okay.  I was talking about
 4        what you said just then.
 5    BY MR. JONES:
 6        Q.   I'll ask the question again.
 7        A.   Go ahead.
 8        Q.   Okay.
 9        A.   Go ahead.
10              MR. MORIARTY:  No, wait.
11              MR. JONES:  Let me ask my question.  Is
12        that okay?
13              MR. MORIARTY:  Yeah.
14    BY MR. JONES:
15        Q.   Is erosion the only unique risk associated
16    with the TVT device?  Yes or no?
17              MR. MORIARTY:  Objection.  Form.
18              Go ahead.
19              And asked and answered.
20              THE WITNESS:  Yes.
21    BY MR. JONES:
22        Q.   Okay.  If the TVT IFU device only includes
23    erosion as the unique risk associated with TVT --
24        A.   You got a lot detail there.  If the TVT
25    IFU --
```

Joseph M. Carbone, M.D.

Page 130

1      Q.   -- only includes erosion as a risk of the
2   device, is the IFU adequate?
3      A.   -- only includes erosion of the TVT
4   device.  I mean, in a sense, yeah.
5      Q.   In the cadaver labs in educational courses
6   that you've done for Ethicon, have you ever taught
7   anything that is contradicted by the product IFU?
8      A.   Not that I'm aware of.
9      Q.   So it's fair to say the information you
10  give to surgeons in these educational labs and
11  seminars are consistent with the content in the
12  instructions for use for that device?
13     A.   Yes.
14     Q.   Have you ever appeared in any marketing
15  videos for Ethicon?
16     A.   I don't recall.  I don't recall being
17  asked either.
18     Q.   Okay.  You have no recollection of Ethicon
19  getting your approval for your use of -- of your
20  likeness in their marketing videos?
21     A.   No, not that I'm aware.
22     Q.   Okay.  Describe to the jury what a normal
23  week in the life of Dr. Carbone is.
24     A.   Define "normal."
25     Q.   Limiting it to -- here's what I'm looking

Joseph M. Carbone, M.D.

Page 131

1  for.

2          A.    Okay.  Thanks.

3          Q.    What you do when you go in as a doctor

4   Monday through Friday, or Monday through Sunday.

5          A.    I kind of feel like you told me I was

6   under a time constraint.

7          Q.    How about this?  What percentage of your

8   practice is related to evaluating patients with

9   stress urinary incontinence?

10         A.    25 to 30 percent.

11         Q.    What percentage of your practice as an

12  urologist involves treating males?

13         A.    30 percent.

14         Q.    Okay.  What percentage of your practice

15  involves operating on patients with stress urinary

16  incontinence?

17         A.    I guess you'd -- I'd have to ask you, is

18  this before all the litigation or since all the

19  litigation?

20         Q.    Today.

21         A.    Today.

22         Q.    Today, how about -- let me ask the

23  question.  Today, what percentage of your practice

24  involves operating on patients related to stress

25  urinary incontinence?

Joseph M. Carbone, M.D.

Page 132

```
 1        A.    20 to 25 percent.
 2        Q.    Before 2011, what percentage of your
 3   practice was related to operating on patients for
 4   stress urinary incontinence?
 5        A.    Maybe 30, 35 percent.
 6        Q.    Over the past three years, your usage of
 7   transvaginal mesh has decreased, correct?
 8        A.    Yes.
 9        Q.    Over the past three years, your usage of
10   TVT mesh has decreased, correct?
11        A.    Yes.
12        Q.    You no longer use transvaginal mesh to
13   treat pelvic organ prolapse whatsoever, correct?
14        A.    Correct.
15        Q.    Have you ever used any mesh products
16   transvaginally since the year 2000 that are not made
17   by Ethicon?
18        A.    No.
19        Q.    Do you treat mesh complications?
20        A.    Yes.
21        Q.    What percentage of your practice is
22   related to mesh -- treating mesh complications?
23        A.    A very small amount.  Less than 5 percent.
24        Q.    How many -- have you removed mesh from a
25   patient before?
```

Joseph M. Carbone, M.D.

Page 133

1      A.   Yes.

2      Q.   How many times?

3      A.   I can't give you an exact count.  Slings?

4  I'm sorry?

5      Q.   I was telling him to cut me off on time

6  whenever.

7      A.   I apologize.  I thought you were talking

8  about the question.

9      Q.   Sorry.

10     A.   40 or 50, I guess, in -- now, what -- let

11 me ask you.  What is the time frame you're asking?

12     Q.   Your entire career.

13     A.   What did I say?

14     Q.   40 or 50.

15     A.   40 or 50.  Yeah, that's right.  That's

16 about right.

17     Q.   Of those 40 to 50 mesh products you have

18 removed from women, how many are Ethicon mesh

19 products?

20     A.   Most of them.  I can't give you a number.

21     Q.   In your role as a consultant for Ethicon,

22 have you trained sales representatives for Ethicon?

23     A.   Yes.

24     Q.   Have you participated in what's called the

25 Gynecare sales school?

Joseph M. Carbone, M.D.

Page 134

1          A.    I think that's what I was referring to,
2     yes.
3          Q.    Okay.  How long did you participate in the
4     Gynecare sales school?
5          A.    I don't remember how many -- I don't
6     remember, but I did participate.
7          Q.    Explain to the jury what your role in the
8     Gynecare sales school was.
9          A.    What I did at the Gynecare sales school
10    was to discuss the condition that was appropriate --
11    I'm sorry -- the conditions that the product was
12    intended to be used for.
13         Q.    Did you see your role in the Gynecare
14    sales school as assisting in the education of Ethicon
15    sales reps?
16         A.    Assist.  What do you mean by "assist"?
17    Like taught them about the pathophysiology of the
18    disease, rare -- I mean, that's what I taught them
19    about.
20         Q.    And when you taught Ethicon sales reps in
21    the Gynecare sales school, did you do your best to
22    deliver accurate information to Ethicon sales
23    representatives?
24         A.    On the disease process, yes.
25         Q.    Did you ever describe the obturator space

```
1                     C E R T I F I C A T E

2

3           I, Karen K. Kidwell, RMR, CRR, in and for

4    the Commonwealth of Virginia, do hereby certify that

5    there came before me on Wednesday, March 16, 2016, the

6    person hereinbefore named, who was by me duly sworn to

7    testify to the truth and nothing but the truth of his

8    knowledge concerning the matters in controversy in this

9    cause; that the witness was thereupon examined under

10   oath, the examination reduced to typewriting under my

11   direction, and the deposition is a true record of the

12   testimony given by the witness.

13           I further certify that I am neither attorney

14   or counsel for, nor related to or employed by, any

15   attorney or counsel employed by the parties hereto or

16   financially interested in the action.

17           This the 18th day of March, 2016.

18

19

20           _____
             Karen K. Kidwell, RMR, CRR
21           Notary Public #7625774

22   My Commission Expires: 9/30/2019

23

24

25
```