# EXHIBIT 3

Joseph M. Carbone, M.D.

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                     CHARLESTON DIVISION
 3      ----------------------------   )
        IN RE:  ETHICON, INC., PELVIC  )
 4      REPAIR SYSTEM PRODUCTS         ) Master File No.:
        LIABILITY LITIGATION          ) 2:12-MD-02327
 5      ----------------------------   )
        THIS DOCUMENT RELATES TO THE   ) MDL-2327
 6      FOLLOWING CASES IN WAVE 1 OF   )
        MDL 200:                       )
 7      DIANE KROPF                    )
        (Case No. 2:12-cv-01202),      )
 8      Judy Williams                  ) JOSEPH R. GOODWIN
        (Case No. 2:12-cv-00657),      ) U.S. DISTRICT JUDGE
 9      Myra Byrd                      )
        (Case No. 2:12-cv-00748),      )
10                                     )
        Angela Coleman                 )
11      (Case No. 2:12-cv-01267),      )
                                       )
12      Susan Thamen (Reeves)          )
        (Case No. 2:12-cv-00279),      )
13                                     )
        Donna Zoltowski                )
14      (Case No. 2:12-cv-00811),      )
                                       )
15            Plaintiffs,              )
        vs.                            )
16                                     )
        ETHICON, INC., ET AL.,         )
17                                     )
              Defendants.              )
18      ----------------------------   )
19
                DEPOSITION UPON ORAL EXAMINATION
20
                  OF JOSEPH M. CARBONE, M.D.
21
                            TVT
22
                      Danville, Virginia
23         Thursday, March 17, 2016, 5:45 p.m.
24    Reported by:  Bobbi J. Case, RPR, CCR
```

Joseph M. Carbone, M.D.

1       A.    Like I said, I'm sure I've reviewed some, but

2    the one I'm most familiar with is Amid.

3       Q.    Okay.  Is it fair to say you're most familiar

4    with the Amid classification, but there are probably

5    other classifications that exist on pore size related

6    to mesh?

7       A.    I can't say that with certainty.

8       Q.    You can't say with certainty whether there's

9    any mesh classification on pore size besides Amid.

10   Correct?

11      A.    Correct.

12      Q.    Ethicon has never sent you any documents or

13   medical literature related to a pore size

14   classification other than Amid.  Correct?

15      A.    I don't recall.

16      Q.    You don't know one way or the other?

17      A.    I don't recall.

18      Q.    Okay.  Do you customarily implant TVT mesh in

19   obese patients?

20      A.    Yes.

21      Q.    Do you have any --

22            Has Ethicon ever told you not to put TVT mesh

23   in obese patients?

24      A.    No.

Joseph M. Carbone, M.D.

```
 1          Q.    Are you aware of any Ethicon marketing

 2    materials that specifically target obese women?

 3          A.    "Targeting"?  I'm not aware of any Ethicon

 4    materials where they specifically target obese women.

 5          Q.    Okay.  Are you aware of any Ethicon materials

 6    that state -- that recommends using TVT mesh in obese

 7    patients?

 8          A.    Recommends using?  No.

 9          Q.    Okay.  You stated the other day you've

10    removed about 50 to 40 mesh products in women.

11    Correct?

12          A.    Probably about that.

13          Q.    Mostly Ethicon mesh products.  Correct?

14          A.    Yes.

15          Q.    What were the indications for some of those

16    removals?

17          A.    Most of the indications were erosion.

18          Q.    When's the last time you did a removal

19    surgery?

20          A.    Tuesday.

21          Q.    Tuesday?  What product was it?

22          A.    Spark.

23          Q.    Spark?  Erosion?

24          A.    Yes.
```

Joseph M. Carbone, M.D.

```
1        Q.   Pain?

2        A.   No.

3        Q.   Dyspareunia?

4        A.   Yes.

5        Q.   Dyspareunia?

6        A.   Yes.

7        Q.   Did you remove all the mesh?

8        A.   No.

9        Q.   Why not?

10       A.   Because I removed the exposed mesh.

11       Q.   Trimmed it?

12       A.   No.  I dissected it free and tunneled under,

13   excised a segment of mesh, oversewed the vaginal

14   epithelium, and removed the mesh.

15       Q.   When's the last time you removed an Ethicon

16   mesh product?

17       A.   Probably last year.

18       Q.   Okay.  Do you recall which Ethicon mesh

19   product it was?

20       A.   No, I don't.

21       Q.   Okay.  Have you ever removed a TVT mesh

22   product from a woman because of an erosion?

23       A.   Yes.

24       Q.   Have you ever removed a TVT mesh product from
```

Joseph M. Carbone, M.D.

```
 1          Q.    I mean partners.

 2          A.    Urology partners or --

 3          Q.    Urology partners.

 4          A.    Urology partners, there are two.

 5          Q.    Two urology partners at your practice?

 6          A.    Yes.

 7          Q.    Including yourself?

 8          A.    Yes.

 9          Q.    How many other partners?

10          A.    I'm counting.  Six.

11          Q.    Six total partners?

12          A.    No.

13          Q.    Eight total partners?

14          A.    It's supposed to be seven.  Seven total

15    partners.

16          Q.    Okay.  So we've got seven total partners at

17    your practice?

18          A.    Yes.

19          Q.    So when you put in an Ethicon mesh sling, the

20    proceeds from that Ethicon mesh sling you put in are

21    split between seven partners?

22          A.    Yes -- eight.

23          Q.    Okay.

24          A.    Eight total partners.
```

Joseph M. Carbone, M.D.

```
 1          Q.    I'm not going to go back to it.

 2          A.    Thank you.

 3          Q.    Do you consider yourself an expert on TVT

 4     warning statements, yes or no?

 5          A.    Yes.  I have read the warning statements.  I

 6     have taught physicians regarding warnings about the

 7     procedure.  I have read the warning statements

 8     themselves.  So I'm uniquely an expert regarding the

 9     warning statements.

10          Q.    Do you know who Dr. Piet Hinoul is?

11          A.    I'm sorry?

12          Q.    Do you know who Dr. Piet Hinoul is?

13          A.    No.

14          Q.    Should the TVT IFU warning statement include

15     the frequency of the risks associated with the TVT

16     device, yes or no?

17          A.    Which risks?

18          Q.    All of them.  Yes or no.  All of them.  I'm

19     not distinguishing between risks.

20          A.    No.  It should be the risks specific to the

21     TVT device, not all pelvic surgery.

22          Q.    Okay.  So frequency of the risk you just

23     described not required to be in a TVT IFU.  Correct?

24               MR. ROSENBLATT:  You mean like a certain
```

Joseph M. Carbone, M.D.

```
1    percentage?

2    BY MR. JONES:

3         Q.   Do you understand what the word "frequency"

4    means?

5         A.   It depends on --

6         Q.   You don't understand what the word

7    "frequency" means?

8         A.   I don't understand how you're using it, no.

9         Q.   Okay.  Do you understand what the word

10   "severity" means?

11        A.   It's a scale, but it's a very subjective

12   scale.

13        Q.   Do you believe -- have you ever reviewed the

14   deposition testimony of Piet Hinoul?  You don't know

15   who he is.  Right?

16             Do you know who Piet Hinoul is, Dr. Carbone,

17   yes or no?

18        A.   I'm trying to answer your other question.

19        Q.   I'll strike that question.  I'll withdraw it.

20             The question pending is:  Do you know who

21   Dr. Piet Hinoul is?

22        A.   No.

23        Q.   Okay.  Do you know who Catherine Beath is?

24        A.   No.
```

Joseph M. Carbone, M.D.

```
  1          A.    It's a no.

  2          Q.    Thanks.

  3          A.    All right.

  4          Q.    Trust me, it's a lot better on the record if

  5    you answer the questions.

  6                Dr. Erikson, do you know who Dr. Erikson is?

  7          A.    Yes, I do, Debbie Erikson.

  8          Q.    And I take it you know him from your time

  9    as --

 10          A.    Do I know him?

 11          Q.    -- as a consultant?

 12                Him.  Ty Erikson.

 13          A.    I got --

 14          Q.    Dr. Ty Erikson.

 15          A.    I got the wrong --

 16          Q.    You don't know Dr. Ty Erikson in Idaho?

 17          A.    I apologize.

 18          Q.    Okay.  He states, "Many slings require a

 19    higher skill set to make sure you're reproducing its

 20    application.  So in training I think the Abbrevo, when

 21    you spread it out to the larger mass of surgeons, will

 22    have a more reproducible result than mini slings."

 23                Do you agree or disagree with the content of

 24    that statement?
```

Joseph M. Carbone, M.D.

```
 1        A.    I disagree with it.

 2              MR. JONES:  Okay.  I think that's all the

 3     questions I have, Doctor.  Okay.

 4

 5                          EXAMINATION

 6     BY MR. ROSENBLATT:

 7        Q.    All right.  Doctor, my name is Paul

 8     Rosenblatt.  I represent Ethicon.  I'm going to ask you

 9     a few questions to follow up after your general

10     depositions on Prolift, TVT and TVT-O.  Okay?

11        A.    Okay.

12        Q.    Now, I understand you brought with you a

13     number of materials.  Is that correct?

14        A.    Yes.

15        Q.    And those would be the three bankers boxes of

16     documents that have been printed out in the binders

17     behind us?

18        A.    Yes.

19        Q.    And are those materials that you would have

20     reviewed in this case?

21        A.    Yes.

22        Q.    Okay.  Doctor, in your practice have you gone

23     back and done any type of systematic review of your

24     complications?
```

Joseph M. Carbone, M.D.

```
 1        A.   I've asked my office manager to look up the

 2   ICD-9 codes for erosion of the mesh for the vagina, and

 3   she was able to provide for me several years of

 4   ICD-9 -- well, ICD-9 and ICD-10 codes now, and that's

 5   how I was able to come up with the number of

 6   complications that I quoted.

 7        Q.   And based on these complication codes or CPT

 8   or -- what was the --

 9        A.   ICD-9 and ICD-10 coding.

10        Q.   Based on that coding, what were you able to

11   determine, based on the data available, was your

12   complication rate for mesh erosions?

13        A.   I would say my complication rate was a little

14   lower than the reported complication rate in the

15   medical literature, the randomize control trial, the

16   analysis.

17        Q.   And would be this be for the TVT products?

18        A.   For the TVT products and also for some of the

19   Prolene -- sorry, the Prolift product and Prosima.

20        Q.   Okay.

21        A.   I should say prolapse products.  I put them

22   all together.

23        Q.   Now, would you agree that the erosion rates

24   that you just told us, are a little bit lower than some
```

Joseph M. Carbone, M.D.

1    of the averages we've seen in the medical literature?

2          A.    Yes.

3          Q.    To the best of your understanding, why do you

4    think that might be?

5          A.    Well, to the best of my understanding, I feel

6    like my patient population is a unique patient

7    population in that I get the first swing at things.

8                They are a patient population that had not

9    been operated on before, typically, with respect to

10   urinary incontinence and pelvic floor prolapse.  So I'm

11   not dealing with re-operations, and I'm able to provide

12   the first and best operation for the patient for their

13   urinary incontinence and pelvis floor prolapse.

14         Q.    And, Doctor, I think you mentioned to

15   Mr. Jones that you were one of the only, if not the

16   only, subspecialty female pelvic medicine

17   reconstructive surgery -- surgeons in the -- was it the

18   Southern Virginia area?

19               MR. JONES:  I will object to form.

20               THE DEPONENT:  Yes.  To the best of my

21   understanding, I'm the only female pelvic medicine

22   reconstructive surgeon from about Suffolk to the Blue

23   Ridge Mountains.

24

Joseph M. Carbone, M.D.

```
 1    BY MR. ROSENBLATT:

 2         Q.   And would you say in a rural area such as

 3    Southern Virginia, that your follow-up with patients is

 4    pretty high?

 5              MR. JONES:  Objection.

 6              THE DEPONENT:  I believe my follow-up with

 7    patients is pretty high.

 8    BY MR. ROSENBLATT:

 9         Q.   Now, Doctor, have you reviewed the

10    literature, the randomized control trials, evaluating

11    Prolift and other vaginal mesh kits compared to native

12    tissue repairs for pelvic organ prolapse?

13         A.   I have.

14         Q.   And when you reviewed those randomized

15    control trials, did they show any difference between

16    rates of vaginal or pelvic pain or de novo dyspareunia?

17              MR. JONES:  Objection.

18              THE DEPONENT:  No significant differences.

19    BY MR. ROSENBLATT:

20         Q.   So, Doctor, when counsel was asking you

21    questions about does the product cause pain, would you

22    like to explain some of the answers that you were

23    trying to give there?

24              MR. JONES:  Objection.
```

Joseph M. Carbone, M.D.

 1            THE DEPONENT:  When he asked me that

 2    question, I said I don't attribute it to the product.

 3    I attribute it to the pelvic surgery, and any pelvic

 4    surgery for the treatment of prolapse is associated

 5    with complications.  The unique complication associated

 6    with the use of mesh products, specifically the Prolift

 7    product, is erosion of the mesh.

 8            Now, if you're talking about pain, if you're

 9    talking about dyspareunia, de novo dyspareunia, I don't

10    attribute that specifically to the product.  I

11    attribute that to the pelvic surgery.

12    BY MR. ROSENBLATT:

13        Q.   And is it fair to say that the pain or

14    dyspareunia is a well-known complication by surgeons in

15    their field for any pelvic floor surgery?

16            MR. JONES:  Objection.

17            THE DEPONENT:  It is a well-known

18    complication of surgeons in my field of any pelvic

19    floor surgery.

20    BY MR. ROSENBLATT:

21        Q.   And, Doctor, you're offering opinions about

22    the adequacy of the warnings in the Prolift, TVT, and

23    TVT-O instructions for use.  Correct?

24        A.   Yes, I am.

Joseph M. Carbone, M.D.

```
1          Q.   And what are your opinions regarding the IFUs

2     for Prolift, TVT, and TVT-O?

3          A.   I believe they adequately restricted the

4     unique complications associated with those products.

5          Q.   And --

6               MR. JONES:  These questions were asked

7     already, but go ahead.

8     BY MR. ROSENBLATT:

9          Q.   What are you -- how do you know what --

10    strike that.

11              What are you basing your opinions on that the

12    IFUs are adequate?

13              MR. JONES:  Objection.

14              THE DEPONENT:  I have -- first and foremost,

15    I have my education and my training.  I have my

16    experience, but more than that, you can look at a

17    number of different reports in the medical literature

18    regarding randomized control trials using these

19    products, and the safety and efficacy regarding those

20    products, and the statements also of the main

21    societies, including the AUA, OGS, SUFU, as well as the

22    general knowledge that pelvic floor surgeons have

23    regarding pelvic floor surgery.

24
```

Joseph M. Carbone, M.D.

 1    BY MR. ROSENBLATT:

 2         Q.   And where and when do surgeons in their field

 3    get this basic understanding of complications

 4    associated with pelvic floor surgery?

 5              MR. JONES:  Objection.

 6              THE DEPONENT:  The basic complication occurs

 7    in medical school and in residency training.

 8    BY MR. ROSENBLATT:

 9         Q.   And then what is the significance, if any, of

10    surgeons in your field keeping up with the medical

11    literature?

12              MR. JONES:  Objection.

13              THE DEPONENT:  The importance of the surgeons

14    maintaining a contemporary understanding of the medical

15    literature keeps them up-to-date with respect to

16    products that are coming out and techniques that are

17    available for the treatment.

18    BY MR. ROSENBLATT:

19         Q.   And would it be fair to say that surgeons in

20    your field do not rely on the instructions for use as

21    the only source of obtaining information about risk?

22              MR. JONES:  Objection.

23              THE DEPONENT:  I would expect that the

24    surgeons in my field should not rely solely on the

Joseph M. Carbone, M.D.

```
 1              THE DEPONENT:  Yes.

 2   BY MR. ROSENBLATT:

 3       Q.   And what types of things would you discuss

 4   with other surgeons in the didactic sessions?

 5              MR. JONES:  Objection.

 6              THE DEPONENT:  We discussed the procedures.

 7   We discussed the anatomy.  We discussed the

 8   pathophysiology.  We discussed complications associated

 9   with the procedure.  We discussed the technique.  We

10   discussed the literature.  And we tried to point out --

11   when surgeons came with speculation, we would try to

12   provide them with high-level information, or direct

13   them to high-level information, that would be

14   independent of any Ethicon materials or publications so

15   that they can make their own judgment regarding the

16   product.

17       Q.   Why do you rely on high-level medical

18   literature?

19       A.   Well, the high-level medical literature

20   provides compelling evidence.  It minimizes outliers.

21   It collects randomized control trials that minimize

22   confounders, and it -- and in the systematic reviews,

23   it collects the data from different randomized control

24   trials.
```

Joseph M. Carbone, M.D.

1      Q.    And are your opinions set forth in your

2   report about the safety of the design and adequacy of

3   the warnings as to Prolift, the TVT, and the TVT-O,

4   based on your review of the Level 1 medical literature?

5      A.    That, and my clinical experience and my

6   training.

7      Q.    Would you also rely on your discussions with

8   other surgeons?

9      A.    Yes.

10         MR. JONES:  Objection.

11         THE DEPONENT:  My discussions with other

12   surgeons.  My interaction with physicians, with

13   clinicians.  My interactions with my patients.

14   BY MR. ROSENBLATT:

15      Q.    And, Doctor, we looked at Exhibit 5, which is

16   a -- it looks like a history of your payments, and I

17   believe counsel tallied them up and it came to about

18   $452,000 over a ten-year period.  Does that sound

19   correct?

20         MR. JONES:  Object to form.

21         THE DEPONENT:  Sounds correct.

22   BY MR. ROSENBLATT:

23      Q.    Could you just tell us what type of

24   consulting activities you performed for Ethicon between

Joseph M. Carbone, M.D.

1    2003 --

2              MR. JONES:  Objection.  Asked and answered.

3              THE DEPONENT:  What I did for Ethicon was to

4    educate clinicians, and obviously, the sales force,

5    with respect to the pathophysiology, with respect to

6    the pathologic conditions relating to pelvic floor

7    prolapse and relating to stress urinary incontinence,

8    and the clinical use of those products for the

9    treatment of these conditions.

10        Q.   Were you proud of the professional education

11   work that you did?

12        A.   I was very proud of the educational work that

13   I did.

14        Q.   Now, if you were spending time teaching other

15   surgeons professional education on the Prolift, TVT,

16   and TVT-O products, amongst others, would you have to

17   forgo the time that you would have spent in your

18   clinic?

19             MR. JONES:  Objection.

20             THE DEPONENT:  Yes.

21   BY MR. ROSENBLATT:

22        Q.   And would it be fair to say that -- or did it

23   provide you any financial -- strike that.

24             Did you consider the payments that Ethicon

Joseph M. Carbone, M.D.

```
1    paid to you for your consulting work and teaching other

2    surgeons and the sales force, to be fair market value?

3         A.   It was.  In fact, I probably would have made

4    more money had I stayed at home.

5         Q.   So why did you teach professional education

6    for Ethicon?

7              MR. JONES:  Objection.

8              THE DEPONENT:  Because I enjoyed interacting

9    with clinicians.  I like interacting with the

10   engineers.  I like expanding my knowledge base and the

11   people I interact with.  I'm proud of educating people.

12   BY MR. ROSENBLATT:

13        Q.   And I know you weren't really able to spit

14   off the exact pore sizes or the exact weights in

15   response to plaintiff's questioning, but would that

16   type of information have been contained in the

17   professional education materials that you would have

18   been teaching at that time?

19             MR. JONES:  Objection.  Form.

20   BY MR. ROSENBLATT:

21        Q.   And when I say "that information," I mean --

22             MR. JONES:  Same objection.

23   BY MR. ROSENBLATT:

24        Q.   -- product -- information about the product
```

Joseph M. Carbone, M.D.

```
 1   design.

 2           MR. JONES:  Same objection.

 3           THE DEPONENT:  The --

 4   BY MR. ROSENBLATT:

 5       Q.   I'll strike that.

 6           Doctor, you're offering opinions about the

 7   design of Prolift, TVT, and TVT-O.  Correct?

 8       A.   Yes.

 9       Q.   And what are your opinions about whether or

10   not the designs are safe?

11           MR. JONES:  Asked and answered, Paul.

12           THE DEPONENT:  They are safe.

13   BY MR. ROSENBLATT:

14       Q.   And what are you basing that opinion on?

15           MR. JONES:  Asked and answered.

16           THE DEPONENT:  I'm basing that opinion on

17   medical literature from the Cochrane review comparing

18   native tissue repairs to the mesh products.  I'm

19   referring to the SGS article that, again, compares the

20   two.  And there are comparable risks with respect to

21   dyspareunia pelvic pain.

22   BY MR. ROSENBLATT:

23       Q.   And would it be fair to say you're just

24   describing a few studies, but there are a significant
```

Joseph M. Carbone, M.D.

```
 1   number of other studies?

 2              MR. JONES:  Objection.  Leading.

 3              THE DEPONENT:  They're ones I highlight, but

 4   there are a number of other studies that I reviewed

 5   that look into that question and collaborate that --

 6   corroborate those findings.

 7   BY MR. ROSENBLATT:

 8       Q.   And, Doctor, you told counsel that you

 9   currently use the TVT Abbrevo and TVT Exact.  Is that

10   correct?

11       A.   Yes.

12       Q.   Are you using the TVT Abbrevo and TVT Exact

13   because you have any concerns about the TVT mesh that's

14   used in the TVT Retropubic and the TVT-O?

15              MR. JONES:  Objection.  Leading.

16              THE DEPONENT:  No.

17   BY MR. ROSENBLATT:

18       Q.   Do you have any opinions about whether or not

19   the TVT Abbrevo and TVT Exact are safer than the

20   TVT Retropubic or TVT-O?

21              MR. JONES:  Objection.  Asked and answered.

22              THE DEPONENT:  I believe they're equivalent.

23   BY MR. ROSENBLATT:

24       Q.   And, Doctor, are you drawing on your
```

Joseph M. Carbone, M.D.

1    experiences from not only teaching professional

2    education and implanting the Prolift, TVT, and TVT-O,

3    but also removing some mesh when necessary?

4         A.   Yes.

5         Q.   And when you've removed mesh from patients,

6    have you ever noticed any type of degradation, particle

7    loss, fraying, curling, or roping?

8              MR. JONES:  Objection.  Asked and answered.

9              THE DEPONENT:  I've never seen any of those.

10   BY MR. ROSENBLATT:

11        Q.   And when you've removed mesh at times, if

12   there was mesh in any tissue, did you see good tissue

13   integration?

14             MR. JONES:  Objection.

15             THE DEPONENT:  Yes.

16             MR. JONES:  Leading.

17   BY MR. ROSENBLATT:

18        Q.   And counsel asked you a question about does

19   Ethicon know more about the design of TVT than you, and

20   you responded that, well, you would know more about the

21   clinical use.  Would you just tell us what you mean by

22   drawing on your experiences with the clinical use of

23   the design of TVT?

24             MR. JONES:  Objection.

Joseph M. Carbone, M.D.

1            THE DEPONENT:  From an engineering

2    standpoint, material science standpoint -- I'm not an

3    engineer, but as a surgeon who uses the product, I'm

4    aware of how the body reacts to the product, I'm aware

5    how the body incorporates the product.  I'm aware of

6    how the product is safe and effective in the body, and

7    in identifying and removing mesh that has eroded, I can

8    actually see the incorporation of a tissue in the

9    product.

10   BY MR. ROSENBLATT:

11       Q.   Are you drawing on any of your experience

12   from using meshes that were not Amid Type 1 meshes?

13       A.   No.

14            MR. JONES:  Objection.

15   BY MR. ROSENBLATT:

16       Q.   Are you familiar with complications that are

17   associated with meshes that are not Amid Type 1 meshes?

18       A.   Yes.

19       Q.   And how do the complications with those

20   meshes that are not Amid Type 1 compare to meshes like

21   TVT and Prolift that are Amid Type 1?

22            MR. JONES:  Objection.  Leading.

23            THE DEPONENT:  The complications are much

24   higher in non-Amid Type 1 meshes.

Joseph M. Carbone, M.D.

```
 1    BY MR. ROSENBLATT:

 2         Q.   And when considering the design of a pelvic

 3    floor mesh as the end user of that design, what

 4    significance, if any, does the Amid Type 1

 5    classification have for you regarding the design of the

 6    mesh?

 7         A.   Well, the Amid Type 1 classification is the

 8    type of mesh that is most biologically compatible and

 9    is appropriate for the use, for the treatment of stress

10    urinary incontinence and pelvic floor prolapse in

11    women.

12         Q.   Is there any other experience that you have

13    with the design of pelvic mesh that we have not

14    discussed today?

15              MR. JONES:  Objection.

16              THE DEPONENT:  I have spoken with the

17    engineers, I have interacted with the surgeons, I have

18    taught about the pelvic mesh, and I have learned

19    extensively about the pelvic mesh.

20    BY MR. ROSENBLATT:

21         Q.   And someone who has taught not only about the

22    design of the mesh, but also the warnings, would you

23    consider yourself an expert in the TVT warnings and

24    adverse reactions?
```

Joseph M. Carbone, M.D.

```
 1        A.   Yes.  He had asked that.

 2        Q.   And would the same be true --

 3             MR. JONES:  Good point.

 4   BY MR. ROSENBLATT:

 5        Q.   -- for Prolift?

 6             MR. JONES:  Objection.  Asked and answered

 7   again.

 8             THE DEPONENT:  Yes.

 9   BY MR. ROSENBLATT:

10        Q.   Counsel also asked you questions about

11   whether or not you analyzed Ethicon internal complaints

12   about the various complications.  And my question to

13   you is:  Have you analyzed the Level 1 evidence that's

14   been published in the peer reviewed literature for

15   complications associated with Prolift, TVT, and TVT-O?

16             MR. JONES:  Same Objection.

17             THE DEPONENT:  Yes.

18   BY MR. ROSENBLATT:

19        Q.   And are the complications that are reported

20   in the medical literature for the most part consistent

21   with your clinical experience?

22        A.   Yes.

23        Q.   Now, there were several agreements that we

24   looked at.  I want to show you Exhibit 9.
```

Joseph M. Carbone, M.D.

```
 1              Counsel had you read Section 9-B, but just a
 2   portion of it.  What is the first sentence that counsel
 3   did not read?
 4        A.   "For consulting activities for EG, cadaveric
 5   labs, telesurgery, and proctorship, et cetera,
 6   compensation will be determined based on the extent of
 7   travel required and the amount of time preceptor is
 8   required to be away from the office."
 9        Q.   Now, would it be fair to say that if you were
10   teaching other surgeons, that you weren't always able
11   to do that in your own office?
12              MR. JONES:  Objection.  Leading.
13              THE DEPONENT:  Yes.
14   BY MR. ROSENBLATT:
15        Q.   And would you expect to be compensated for
16   your time out of the office if you're training another
17   surgeon?
18              MR. JONES:  Objection.  Asked and answered.
19              THE DEPONENT:  Yes.
20   BY MR. ROSENBLATT:
21        Q.   Counsel also mentioned something about you
22   weren't allowed to discuss anything unless it was
23   approved by Ethicon.  Was there anything, while you
24   were teaching professional education, that you felt you
```

1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2         I, Bobbi J. Case, Registered Professional Court

3    Reporter and Notary Public for the Commonwealth of

4    Virginia at Large, and whose commission expires

5    October 31, 2019, do hereby certify that the

6    within-named deponent, JOSEPH M. CARBONE, M.D.,

7    appeared before me at Danville, Virginia, as

8    hereinbefore set forth, and after being first duly

9    sworn by me, was thereupon examined by counsel for the

10   parties; that his examination was recorded in Stenotype

11   by me and reduced to computer printout under my

12   direction; and that the foregoing constitutes a true,

13   accurate, and complete transcript of such proceeding,

14   produced to the best of my abilities.   I further

15   certify that deponent was not advised of reading and

16   signing.   I further certify that I am not related to

17   nor otherwise associated with any counsel or party to

18   this proceeding, nor otherwise interested in the event

19   thereof.

20        Given under my hand and notary seal this 23rd

21   day of March 2016 at Virginia Beach, Virginia.

22                        _____

23                        Bobbi J. Case, RPR, CCR
                          NCRA No. 837774, VCRA No. 0315042
24                        Notary No. 181018