# EXHIBIT C

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1                        - - -
 2
 3   IN RE:                      :SUPERIOR COURT OF
     PELVIC MESH/GYNECARE        :NEW JERSEY
 4   LITIGATION                  :LAW DIVISION -
                                 :ATLANTIC COUNTY
 5                               :
                                 :MASTER CASE 6341-10
 6                               :
                                 :CASE NO. 291 CT
 7
         CONFIDENTIAL-SUBJECT TO STIPULATION AND ORDER OF
 8                         CONFIDENTIALITY
                              - - -
 9
                         September 12, 2012
10
                              - - -
11
12          Volume I of the transcript of the
13   Deposition of CHARLOTTE OWENS, M.D., called for
14   Videotaped Examination in the above-captioned
15   matter, said deposition taken pursuant to
16   Superior Court Rules of Practice and Procedure,
17   by and before JoRita B. Meyer, a Certified
18   Realtime Reporter, Registered Merit Reporter,
19   and Certified Court Reporter for the State of
20   Georgia, at the offices of Troutman Sanders,
21   600 Peachtree Street Northeast, Atlanta,
22   Georgia, commencing at 9:39 a.m.
23                            - - -
24              GOLKOW TECHNOLOGIES, INC.
           877.370.3377 ph|917.951.5672 fax
25                deps@golkow.com
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1    little bit before we talk about some specific
 2    facts.
 3              Okay?
 4       A.    Okay.
 5       Q.    Let's start with my understanding
 6    from the CV as to your medical education.  You
 7    went to University of Michigan Medical School,
 8    correct?
 9       A.    Correct.
10       Q.    You then did your internship and
11    residency at Henry Ford Health System in the
12    department of obstetrics and gynecology,
13    correct?
14       A.    Correct.
15       Q.    And that's affiliated with the
16    University of Michigan?
17       A.    At the time it was.  It no longer is
18    a direct affiliation.
19       Q.    After you -- well, rephrase.
20              It says that your residency ended in
21    July of 1999; is that correct?
22       A.    Correct.
23       Q.    And when you finished your residency,
24    it looks to me like you went into clinical
25    practice in Florida.  Is that accurate?
```

Confidential - Subject to Stipulation and Order of Confidentiality

1    A.    Yes.

2    Q.    So from 1999 to 2003, you had the
3    general OB-GYN practice that you described to
4    me earlier, correct?

5    A.    Correct.

6    Q.    And in terms of the types of pelvic
7    floor repairs that you performed, was that
8    consistent between 1999 and 2003?

9    A.    Yes.

10    Q.    Between 1999 and 2003, other than
11    utilizing Marlex mesh to augment pelvic floor
12    repairs, did you use any other specific mesh
13    products that you can recall as you sit here
14    now?

15    A.    I'm sure I -- I'm sure we did, but,
16    again, I can't recall the names at this time.

17    Q.    According to your CV, in 2003 you
18    became Worldwide Medical Director at Gynecare;
19    is that correct?

20    A.    Yes, it is.

21    Q.    And what was it that led you to go to
22    work at Gynecare as Worldwide Medical Director
23    in 2003?

24    A.    During the time of my clinical
25    practice, I became a speak -- on the speaker

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1            MS. KABBASH:  Okay.
 2            THE VIDEOGRAPHER:  Going off video
 3       record, 9:54 a.m.
 4            (Recess)
 5            THE VIDEOGRAPHER:  And we're back
 6       on video record at 10:02 a.m.
 7  BY MR. SLATER:
 8       Q.   Dr. Owens, you went to work at
 9  Gynecare in 2003, and you stayed at Gynecare
10  until 2005, correct?
11       A.   Correct.
12       Q.   Can you give me more specific dates,
13  even if it's just months, within those years
14  that you started and finished?
15       A.   I remember it was summertime of 2003,
16  and I left late August of 2005.
17       Q.   According to your CV, when you left
18  Gynecare, you went to work at Kimberly-Clark
19  Corporation as Director of Global Clinical
20  Affairs; is that correct?
21       A.   Correct.
22       Q.   In very, very general, simple terms
23  what was your position?  What did that entail
24  at Kimberly-Clark?
25       A.   I was responsible for the clinical
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1            I also did some work for the state of
 2   Florida, where I reviewed potential cases that
 3   were coming against other physicians on behalf
 4   of the state.
 5       Q.   That would be in connection with
 6   medical malpractice cases, correct?
 7       A.   Correct.
 8       Q.   When you -- when you were on the
 9   speaker advisory board at Johnson & Johnson
10   before you joined Gynecare, what types of
11   technologies or products were you consulting
12   with regard to?
13       A.   I spoke about their oral
14   contraceptives and they had a hormone
15   replacement therapy line that I also spoke
16   about and I was also a consultant for
17   Ortho Evra, the birth control patch.
18       Q.   Before you went to work at Gynecare,
19   would it be fair to say that you didn't
20   consider yourself to be an expert with regard
21   to the use of mesh to treat pelvic floor
22   prolapse?
23       A.   I considered myself to be competent
24   but I was not a urogynecologist and so I didn't
25   routinely, you know, have that focus as the
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1    mainstay of my practice, no.
 2         Q.   And before you joined Gynecare, when
 3    you performed pelvic floor repairs on your own,
 4    as you told me a little earlier, those would
 5    have been native tissue repairs, correct?
 6         A.   Predominantly native tissue
 7    repairs --
 8         Q.   Okay.
 9         A.   -- yes.
10         Q.   Well, you said that when you would
11    use any sort of a mesh to augment, you would do
12    that in conjunction with one of your
13    partners --
14         A.   Sure.
15         Q.   -- who you said had a lot of
16    experience using that type of material,
17    correct?
18         A.   Correct.
19         Q.   Okay.  When you went to work at
20    Gynecare -- well, let me -- let me take a step
21    back.
22              How is it that you went to --
23    actually -- well, rephrase.
24              How did you end up getting that job?
25    You said that you had worked on the speaker
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1            Before you went to work at Gynecare,
 2   you didn't have any knowledge with regard to
 3   the specific physical characteristics of the
 4   actual Gynemesh material, correct?
 5        A.   Correct.
 6        Q.   You relied on other people within the
 7   company as well as potentially others outside
 8   the company who consulted to give you
 9   information about that, correct?
10        A.   That, plus they had some -- some data
11   that they had generated, both in what we'll
12   call preclinical or animal studies, and had
13   also did some R&D analysis of it.
14             So, you know, I want to make sure
15   that it's not like people just tell me and you
16   believe it, that we actually do review
17   information independently in order to make our
18   own final opinion.
19        Q.   Okay.  As you -- well, rephrase.
20             As time went forward, after you
21   started at Gynecare and Project d'Art was going
22   forward, the feasibility of that project was
23   assessed routinely, correct?
24        A.   Correct.
25        Q.   In evaluating the feasibility of
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1   education package; so this would be one of the
 2   things that they would look to, yes.
 3        Q.   Do you understand the significance
 4   under FDA regulations of the IFU being the
 5   primary label for the PROLIFT?
 6        A.   I understand the FDA regulations
 7   around the document.  I also understand the way
 8   that physicians are trained and operate.
 9            MR. SLATER:  Move to strike from "I
10        also" forward.
11   BY MR. SLATER:
12        Q.   What's your understanding as to the
13   significance of the IFU being the primary label
14   for the PROLIFT from FDA regulatory standpoint?
15        A.   That the agency sees this as the
16   document that they review as a part of the
17   packaging for our materials.  So it should
18   contain the relevant indications, description,
19   and -- and other pertinent information as
20   prescribed by the regulations.
21        Q.   That would also include all necessary
22   contraindications, warnings and precautions,
23   and adverse reactions, correct?
24        A.   It would include warnings,
25   precautions, contraindications, adverse
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1    reactions, sterility, disposal, storage,
 2    et cetera.
 3        Q.   You have understood that all of the
 4    information in the IFU needed to be accurate,
 5    correct?
 6        A.   Yes.
 7        Q.   You understood that physicians were
 8    going to rely on the IFU in making decisions
 9    about whether or not to use the PROLIFT in
10    treating patients, correct?
11             MR. BROWN:  Objection.
12             THE WITNESS:  Physicians will not
13         rely solely on the IFU for making their
14         decisions.  Physicians will use the IFU
15         to help inform them, but they will also
16         use other information.
17    BY MR. SLATER:
18        Q.   You understood physicians would rely,
19    at least in part, on the PROLIFT IFU in making
20    decisions about whether they wanted to use that
21    product, that medical device, that system, in
22    their patients, correct?
23             MR. BROWN:  Objection.
24             THE WITNESS:  Physicians will use
25         this document and other documents to
```