# EXHIBIT 1

Nicolette S. Horbach, M.D.

```
  1        IN THE CIRCUIT COURT OF JASPER COUNTY, MISSOURI

  2                        AT JOPLIN

  3

  4   CONNIE SCHUBERT and KEVIN SCHUBERT,   • Case No.

  5        Plaintiffs,                      • 10AO-CC00219

  6   v.                                    •

  7   CHRISTOPHER H. ROBERTS, M.D.,         •

  8   FREEMAN HEALTH SYSTEM d/b/a           •

  9   SOUTHWEST WOMEN'S CENTER, FREEMAN     •

 10   HEALTH SYSTEMS, ETHICON, INC.,        •

 11   ETHICON WOMEN'S HEALTH AND UROLOGY,   •

 12   a division of Ethicon, Inc.,          •

 13   GYNECARE, and JOHNSON & JOHNSON,      •

 14        Defendants.                      •

 15

 16      VIDEOTAPED DEPOSITION OF NICOLETTE HORBACH, M.D.

 17                     Washington, D.C.

 18                     August 21, 2013

 19                     10:00 a.m.

 20

 21   Ref. No. 74003

 22   Pages 1-323

 23   Reported by:  Linda S. Kinkade, RDR, CRR, RMR, CSR

 24   Video Specialist:  Michael Gay, CLVS
```

Nicolette S. Horbach, M.D.

1

2

3

4

5          The following is the videotaped deposition of

6    NICOLETTE HORBACH, M.D. held at the offices of:

7

8

9          O'Melveny & Myers LLP

10         1625 Eye Street, N.W.

11         Washington, DC 20006

12

13

14

15         Taken pursuant to applicable Rules of Civil

16   Procedure, before Linda S. Kinkade, Registered

17   Diplomate Reporter, Certified Realtime Reporter,

18   Registered Professional Reporter, Registered Merit

19   Reporter, Certified Shorthand Reporter, and Notary

20   Public, in and for the District of Columbia.

21

22

23

24

Nicolette S. Horbach, M.D.

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF PLAINTIFFS:

 4            MAZIE SLATER KATZ & FREEMAN, LLC

 5            103 Eisenhower Parkway

 6            Second Floor

 7            Roseland, New Jersey 07068

 8            (T) 973.228.9898 | (F) 973.228.0303

 9            By: Adam M. Slater, Esquire

10            (Appearing via teleconferencing)

11            Email: aslater@mskf.net

12

13

14   ON BEHALF OF DEFENDANTS ETHICON and JOHNSON & JOHNSON:

15            BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC

16            Renaissance at Colony Park

17            1020 Highland Colony Parkway

18            Suite 1400

19            Ridgeland, Mississippi 39157

20            (T) 601.948.5711 | (F) 601.985.4500

21            By: Christy D. Jones, Esquire

22            Email: christy.jones@butlersnow.com

23

24
```

Nicolette S. Horbach, M.D.

```
 1   APPEARANCES (continued):

 2

 3   ON BEHALF OF DEFENDANT FREEMAN HEALTH SYSTEM:

 4            HYDE, LOVE & OVERBY, LLP

 5            1121 South Glenstone

 6            Springfield, Missouri 65804

 7            (T) 417.831.4046 | (F) 417.831.4989

 8            By: David E. Overby, Esquire

 9            Email: deoverby@cs.com

10

11

12

13

14   ALSO PRESENT:

15            Stephanie Gardner, Esquire

16            Ashcraft & Gerel, LLP

17

18

19

20

21

22

23

24
```

Nicolette S. Horbach, M.D.

```
 1                   INDEX OF EXAMINATION

 2    Examination of NICOLETTE HORBACH, M.D.        Page

 3         By Adam M. Slater, Esquire              9

 4                                                 297

 5                                                 313

 6         By Christy D. Jones, Esquire            298

 7         By David E. Overby, Esquire             281

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Nicolette S. Horbach, M.D.

```
 1                 INDEX OF EXHIBITS

 2              (Attached to transcript)

 3    NO.          DESCRIPTION                   PAGE

 4    Exhibit 1    Notice to Take Videotaped     266

 5                 Deposition Duces Tecum of

 6                 Nicolette S. Horbach, M.D.

 7    Exhibit 2    Defendants Disclosure of Expert   not

 8                 Testimony                         used

 9    Exhibit 3    Curriculum Vitae Nicolette    265

10                 Horbach, M.D., FACOG

11    Exhibit 4    Reliance List                 80

12    Exhibit 5    Email correspondence from C.  not

13                 Pypcznski sent 11/11/2005     used

14    Exhibit 6    Email correspondence from K. Mahar   not

15                 sent 1/10/2006                      used

16    Exhibit 7    Email correspondence from K.  247

17                 Mahar sent 9/12/2006

18    Exhibit 8    Urogyndocs.com Surgical Mesh  237

19    Exhibit 9    (not marked)

20

21

22

23

24
```

Nicolette S. Horbach, M.D.

```
 1                INDEX OF EXHIBITS (continued)

 2    NO.              DESCRIPTION                  PAGE

 3    Exhibit 10    Handwritten notes on legal pad   124

 4                  Connie Schubert - Other - Med

 5                  Records

 6    Exhibit 11    Handwritten notes Connie Schubert  124

 7                  Interrogatories

 8    Exhibit 12    Handwritten notes on legal pad   124

 9                  9/14/2008

10    Exhibit 13    Handwritten notes re My          126

11                  qualifications as a clinical

12                  expert

13    Exhibit 14    Handwritten notes on legal pad   126

14                  DEPO - Ann Weber, MD re Schubert

15    Exhibit 15    AJOG Urogynecology: De novo      198

16                  stress incontinence and pelvic

17                  muscle symptoms after

18                  transvaginal mesh repair

19    Exhibit 16    Expert report on the treatment of  287

20                  pelvic organ prolapse

21

22

23

24
```

Nicolette S. Horbach, M.D.

1              P R O C E E D I N G S

2              VIDEO SPECIALIST:  We are on the

3     record.  The time now is 10:24.  This marks the

4     beginning of disc number 1 in the videotaped

5     deposition testimony of Dr. Nicolette Horbach in

6     the matter of Schubert versus Ethicon, et al.

7              This case is pending in the Circuit Court

8     of Jasper County, Missouri at Joplin, case number

9     10 AO-CC 00219.  Today's date is August the 21st,

10    2013.  This deposition is being conducted at 1625

11    Eye Street, northwest, Washington, D.C.

12             Will all attorneys present please identify

13    themselves and who they represent.

14             MR. SLATER:  Adam Slater on behalf of

15    the plaintiffs.

16             MS. JONES:  Christy Jones on behalf of

17    Ethicon and J&J, Johnson & Johnson.

18             MR. OVERBY:  David Overby on behalf of

19    Freeman Health System.

20             VIDEO SPECIALIST:  My name is Michael

21    Gay.  I am with Golkow Technologies.  Our court

22    reporter today is Linda Kinkade, also with Golkow

23    Technologies, and will now swear in our witness.

24

Nicolette S. Horbach, M.D.

```
 1              NICOLETTE S. HORBACH, M.D.,

 2         Having been first duly sworn, was

 3    thereafter examined and testified as follows:

 4              VIDEO SPECIALIST:  You may proceed.

 5                   EXAMINATION

 6    BY MR. SLATER:

 7         Q.  Good morning, Dr. Horbach.

 8         A.  Good morning.

 9         Q.  I introduced myself a moment ago.  My

10    name is Adam Slater.  I'm going to take your

11    deposition now.  You understand that's the

12    purpose of this proceeding, correct?

13         A.  Yes.

14         Q.  You understand you must tell the truth

15    in response to every single question I ask you

16    since you've now taken an oath to tell the truth?

17         A.  Yes.

18         Q.  If I ask you a question or anybody

19    asks you a question that doesn't make sense to

20    you for any reason, for example, I may

21    mispronounce a medical term or I may ask a

22    question that I think I understand a medical

23    process and I don't, if for some reason it

24    doesn't make sense to you, just tell me what's
```

Nicolette S. Horbach, M.D.

1    unclear or what doesn't make sense, and I'll try

2    to refine the question so that it's something

3    that you feel you can answer truthfully,

4    accurately and completely.  Okay?

5         A.  Okay.

6         Q.  The attorneys may object.  I don't

7    expect there to be much speaking other than to

8    say "objection," and then you'll be told to go

9    ahead and answer.  You don't need to be thrown

10   off by that; it just may occur from time to time.

11   Okay?

12        A.  Okay.

13        Q.  Have you ever been deposed before?

14        A.  Yes.

15        Q.  How many times?

16        A.  I don't recall specifically, but

17   probably 10 or 12.

18        Q.  And what were those depositions in

19   connection with?

20        A.  Typically for medical-legal action

21   where I served as an expert or a treating

22   physician.

23        Q.  I assume you've acted as an expert --

24   well, rephrase.

Nicolette S. Horbach, M.D.

```
 1              You've acted as an expert for defendants

 2    in medical malpractice actions?

 3         A.  Yes.

 4         Q.  Have you acted as an expert for a

 5    plaintiff in a medical malpractice action?

 6         A.  Yes.

 7         Q.  How many times?

 8         A.  I don't recall the specific number,

 9    but probably of the cases I've reviewed somewhere

10    between 25 and 30% is plaintiff and the remainder

11    is defense.

12         Q.  Of the depositions you've done, how

13    many have been for the plaintiff?  You said 10 to

14    12 depositions.

15         A.  I don't totally keep track.  I know

16    that I've testified at least in several trials

17    for plaintiff, but I don't recall whether each of

18    those required depositions.  Depending upon the

19    state, some do, some don't.

20         Q.  Have you testified in court?

21         A.  Yes.

22         Q.  How many times?

23         A.  Probably less than ten.

24         Q.  Of the cases you've acted as an expert
```

Nicolette S. Horbach, M.D.

```
1    in the past, you estimate about 25 to 30% has

2    been for the plaintiff and the other 70 to 75%

3    has been for the defense?

4         A.  I'm sorry.  Was that that I testified

5    in or that I've -- I meant that I've reviewed,

6    sort of being given medical records to review.

7    That's typically the balance.  Not always does

8    that go on to either deposition or court.

9         Q.  Okay.  Good.  Thank you for refining

10   that.

11        Once you get a file sent to you by

12   somebody, you look at it and say yes or no, I can

13   go forward as your expert, right, that's the

14   general process?

15        A.  Typically, yes, or I give my

16   opinion --

17        Q.  What --

18        A.  Sorry.

19        Q.  Of the cases where you have said, yes,

20   I'll go forward, what percentage is for the

21   plaintiff, what percentage is for the defense?

22        A.  Probably 20, 25% plaintiff and the

23   rest defense.

24        Q.  If you've given different percentages
```

Nicolette S. Horbach, M.D.

1    under oath in the past, would you adhere to those

2    percentages you've given under oath in other

3    proceedings?

4         A.   I think that's hard because things

5    continue to evolve from the last time I may have

6    given a deposition, and I don't keep a list of

7    all of the specific cases that I review.  Once

8    they -- I've reviewed them, I toss them, and so,

9    as a result, I'm doing my best estimate of what I

10   can recall.

11        Q.   When's the last time you testified for

12   a defendant in court as an expert?

13        A.   For a defendant?  It's been several

14   years.

15        Q.   When's the last time you testified for

16   a plaintiff in court?

17        A.   More recently.  That was probably

18   within the last two or so years.  My last

19   testimony in court was for a plaintiff.

20        Q.   You hold yourself out as an expert in

21   the field of gynecology and urogynecology?

22        A.   Yes.

23        Q.   That is your expertise, correct?

24        A.   Yes.  I'm a board certified ob/gyn,

Nicolette S. Horbach, M.D.

1    and I am trained as a urogynecologist and female

2    pelvic reconstructive surgeon.

3         Q.  You do not hold yourself out as an

4    expert with regard to regulatory or FDA matters,

5    correct?

6         A.  Correct.

7         Q.  You do not hold yourself out as an

8    expert with regard to medical device industry

9    practices, meaning the internal practices of how

10   a medical device is developed, correct?

11        A.  Correct.

12        Q.  You have no expertise with regard to

13   design control or risk analysis, correct?

14            MS. JONES:  I'm going to object to the

15   form of the question.

16   BY MR. SLATER:

17        Q.  Let me ask you this.  Do you know what

18   design control is?

19        A.  I -- probably not in its manufacturing

20   definition, but I have an idea.

21        Q.  Well, I'm not asking if you know what

22   the words "design control" means.  My question

23   is, do you know what the term design control as

24   that term is used as a term of art in quality

Nicolette S. Horbach, M.D.

 1   engineering in the medical device industry means?

 2        A.   No.

 3        Q.   Okay.  So you don't hold yourself out

 4   as an expert with regard to design control,

 5   correct?

 6        A.   Correct.

 7        Q.   Do you know the standards by which

 8   Ethicon -- rephrase.

 9        Do you know what standards Ethicon

10   believed it needed to meet with regard to the

11   labeling for the Prolift?

12        A.   No, I don't know what Ethicon -- I

13   mean, I don't know what Ethicon was thinking or

14   believed that they needed to do.  I wasn't there.

15        Q.   And that would -- okay.  I'm sorry.

16   When I say labeling, I'm talking about do you

17   know what Ethicon's internal standards were, what

18   they thought they had to do, in terms of -- well,

19   rephrase.

20        So you don't know what information Ethicon

21   internally believed they needed to include in the

22   IFU, the patient brochure, marketing documents,

23   all that sort of thing, that's not something

24   you're aware of, what standards they felt they

Nicolette S. Horbach, M.D.

```
 1    had to meet, correct?

 2          A.  Not within their internal standards,

 3    just from the standpoint as a physician.

 4          Q.  So you don't know what standards

 5    Ethicon Medical Affairs, Regulatory Affairs, what

 6    those areas within the company felt they needed

 7    to accomplish in putting information in the IFU,

 8    the patient brochure, marketing documents, all

 9    that sort of thing, correct?

10          A.  Well, to some extent, but obviously

11    any of the documents that they were doing had to

12    meet regulatory approval through the FDA.  I

13    mean, you can't start publishing issues or

14    putting information down that has not necessarily

15    received regulatory approval at least in portions

16    of it.  Depends on how much they do through the

17    510(k).

18          Q.  You think that the IFU and the patient

19    brochure that were reviewed and relied on by

20    Connie Schubert and Dr. Roberts were approved by

21    the FDA before they reviewed them?

22          A.  Those were not because the FDA did not

23    look at the information until after, I think, it

24    was 2008 or later at the time that they were
```

Nicolette S. Horbach, M.D.

1    reviewing the documents for Prolift+M.

2         Q.  Let me come back to my question.  You

3    do not know what standards Ethicon Medical

4    Affairs and Regulatory Affairs believed applied

5    to what information had to be included in the

6    IFU, the patient brochure, marketing materials,

7    you don't know what those standards were that the

8    company believed it had to adhere to; is that a

9    true statement?

10            MS. JONES:  Object to the form.

11            THE WITNESS:  Okay.  Yes, I think

12   that's a true statement.  I wasn't there at the

13   time.

14   BY MR. SLATER:

15        Q.  Okay.  And from the materials you've

16   reviewed, you don't know what those standards

17   are, correct?

18        A.  I've looked at some of the internal

19   documents from the standpoint of emails,

20   et cetera, but I have not seen anything that

21   specifically addresses what has -- what they felt

22   had to be in the IFU or the patient brochure.

23        Q.  Since you don't know what standards

24   Ethicon felt it had to meet, you won't be

Nicolette S. Horbach, M.D.

1   offering any opinion as to whether or not Ethicon

2   met those standards because, if you don't know

3   what the standard is, you can't give an opinion

4   whether the standard was met, correct?

5          MS. JONES:  Object to the form.

6          THE WITNESS:  I disagree with that.  I

7   disagree with that.

8   BY MR. SLATER:

9       Q.  Well, let me ask you this.  If you

10  don't know what -- if you don't know the standard

11  that Ethicon applied, you can't tell me whether

12  or not Ethicon met that standard or not as you

13  sit here right now, correct?

14         MS. JONES:  Object to the form.

15  BY MR. SLATER:

16      Q.  It's a yes-or-no question.

17      A.  I think that from your type of

18  question that's probably correct, but I think

19  that the issue of the standard of what Ethicon

20  needs to be able to -- the medical standard that

21  Ethicon needed to be able to document for the IFU

22  or patient brochure, there is a medical standard

23  that needs to be adhered to as well, whether

24  that's an internal standard on the part of the

Nicolette S. Horbach, M.D.

1    company or it's a more global standard that's

2    applied medically, since the standard that

3    Ethicon had may be different than what it is on a

4    global perspective.

5         Q.  Well, the standard that you're

6    applying to your opinion as to whether or not the

7    IFU, for example, was adequate, that's your own

8    personal standard of what you think would need to

9    be in the IFU, correct?

10        A.  It's a medical decision.  It's a

11   medical determination on the part of my expertise

12   and my medical opinion, yes.

13        Q.  As to whether or not Ethicon met its

14   own internal standards or the standards that

15   Ethicon thought it needed to meet because you

16   don't know what those standards are.

17        A.  That's correct.

18        Q.  Correct?

19        A.  That's correct.

20        Q.  Okay.  You do not know -- rephrase.

21        Am I correct that you do not know what the

22   internal design standards were that Ethicon was

23   following in determining whether or not to market

24   the Prolift?

Nicolette S. Horbach, M.D.

```
1              MS. JONES:  I'm sorry.  What was the

2    last part of that question?

3    BY MR. SLATER:

4        Q.  I'll ask it again.  Am I correct that

5    you do not know what the internal Ethicon

6    standards were that they were following to

7    determine whether or not the Prolift should be

8    marketed or not?

9        A.  I'm not sure.  If you could specify

10   more by "standards."

11       Q.  Are you aware of any standards that

12   existed within Ethicon that people within Ethicon

13   had to follow in order to determine whether or

14   not they could market the Prolift?

15       A.  That were rules within Ethicon itself?

16   No, I'm not aware of them.

17       Q.  Yes.  Okay.  You don't know those

18   standards --

19       A.  I don't know what the rules are within

20   Ethicon that allowed themselves to market or not

21   market the product.

22       Q.  Since you don't know those rules, you

23   obviously won't be offering an opinion as to

24   whether or not those rules or standards were met,
```

Nicolette S. Horbach, M.D.

```
 1   correct?

 2        A.  Not within -- whether or not the

 3   standards within the company were met by the

 4   company, no, I would not be --

 5             THE REPORTER:  Wait a minute, counsel.

 6   We need to finish the answer before the next

 7   question.

 8   BY MR. SLATER:

 9        Q.  I apologize.  There's a delay.  I'll

10   be more patient.

11             THE REPORTER:  Thank you.

12             MR. SLATER:  Could you read me her

13   answer, please, because I think I did -- I

14   apologize.  I'll try to not do that again.

15        (The record was read by the reporter.)

16   BY MR. SLATER:

17        Q.  Were you going to finish saying you

18   would not be offering an opinion on that subject?

19        A.  Correct.  I would not be offering an

20   opinion on whether or not Ethicon met its own

21   internal standards and rules before it marketed

22   the product.

23        Q.  Have you ever been paid money by

24   Ethicon other than as a legal expert in this
```

Nicolette S. Horbach, M.D.

1    litigation?

2        A.   In this litigation, no, I have not

3    been paid money by Ethicon period yet.

4        Q.   Okay.  Other than acting as a

5    litigation expert with regard to this litigation,

6    have you ever been -- well, let me ask this

7    question.  Have you ever been a precept or a

8    proctor for any Ethicon medical device?

9        A.   No.

10       Q.   Have you ever been a precept or a

11   proctor for any device or drug that was marketed

12   by any Johnson & Johnson company?

13       A.   No.

14       Q.   Have you ever participated in any

15   meetings sponsored by or run by Ethicon with

16   regard to any Ethicon device or product?

17       A.   In 2001 I participated in a focus

18   group with myself and a number of other

19   physicians within the urogynecologic community

20   that was apparently an Ethicon-based meeting

21   asking our opinions regarding different products.

22       Q.   When you gave your opinions and your

23   thoughts on that, did you tell what you actually

24   thought?

Nicolette S. Horbach, M.D.

1        A.  Yes.

2        Q.  Have you reviewed the document that

3   documents that meeting?

4        A.  Not the entire document, only a brief

5   statement of, you know, that I was more of a

6   skeptic and looking at getting more information.

7        Q.  That brief statement was found in the

8   document?

9        A.  Yes, in the document that I saw.  I

10  mean, I personally had totally forgotten that I

11  had ever done the meeting since it was in 2001,

12  but it was brought to my attention by the Ethicon

13  attorneys.

14       Q.  Here's my question.  Did you actually

15  review the document itself or did you just get a

16  summary of what was in the document?

17       A.  No, I saw the piece of paper that made

18  the statement that had my name on it.  I did not

19  see the entire minutes of the meeting, if there

20  were any.

21       Q.  So other than the part of -- so other

22  than the part of the document that indicated you

23  were a skeptic, you didn't look at any of the

24  other statements that were attributed to you in

Nicolette S. Horbach, M.D.

1    the document?

2          A.   I don't know whether any other

3    statements were attributed to me.  I don't know

4    what the -- what the rest of the minutes or what

5    other statements were in there, in that document.

6          Q.   Can you describe to me your medical

7    practice?

8          A.   My current medical practice, I am in a

9    group of four other fellowship-trained

10   urogynecologists and reconstructive surgeons.

11   I'm the senior partner.  My practice is primarily

12   based out of Fairfax, Virginia where our primary

13   office is.  I do operate primarily at INOVA

14   Fairfax Hospital, although I do have privileges

15   and operate periodically at a hospital in

16   Montgomery County at Shady Grove Adventist

17   Hospital.

18          My practice is almost exclusively

19   urogynecology and pelvic reconstructive surgery.

20   I have a very small number of patients that I

21   currently see as general gynecology, individuals

22   that I've been taking care of for long periods of

23   time.

24          Within urogynecology my focus is areas of

Nicolette S. Horbach, M.D.

```
1    incontinence, pelvic organ prolapse, urinary

2    tract infections, pain issues, pelvic muscle

3    dysfunction.  I also deal with patients who have

4    had complications associated with prior

5    surgeries.  We are a referral group, and so I see

6    a fair number of patients who were sent to me

7    with complications from other surgeries with or

8    without mesh, with or without incontinence versus

9    prolapse surgeries.  And then will oftentimes be

10   the person involved with managing that patient

11   postoperatively.

12        Q.  Pelvic muscle dysfunction, you're

13   talking about pelvic-floor myalgia?

14        A.  Well, we use the term a little more

15   specifically that the patient has either pain

16   associated or dysfunction associated with

17   abnormalities of the pelvic muscles usually due

18   to increased tone causing increased tenderness in

19   the area, that then causing pain, which can then

20   also create other functional symptoms.

21        Q.  The definition you just gave me would

22   be your definition of pelvic muscle dysfunction?

23        A.  That's what we will use commonly to be

24   the clinical definition within our practice.
```

Nicolette S. Horbach, M.D.

```
 1   There is not really a --

 2        Q.  So pelvic --

 3            MS. JONES:  I don't think she was

 4   finished, Adam.

 5            THE WITNESS:  That's okay.  I'll stop.

 6            MS. JONES:  Okay.

 7   BY MR. SLATER:

 8        Q.  Pelvic-floor myalgia would fall within

 9   the overall context of pelvic muscle

10   dysfunction --

11        A.  Yes.

12        Q.  -- by your definition?

13        A.  Yes.

14        Q.  How did you get contacted to act as a

15   litigation expert for Ethicon with regard to the

16   Prolift?

17        A.  I was contacted by an attorney

18   approximately a year and a half ago or so -- I

19   think it was early 2012 -- and was asked if I

20   would be willing to review a medical record for a

21   patient who was -- had filed a claim against

22   Ethicon.

23        Q.  Why did you agree to do it?

24        A.  Well, I agreed to review it.  I agreed
```

Nicolette S. Horbach, M.D.

1    to review the record.  Why?  I think --

2         Q.  Yes.

3         A.  I'm sorry.  We lost your auditory.

4         Q.  Sure.  My question is this:  Why did

5    you agree to review the medical record of

6    somebody who was suing Ethicon?  Why did you

7    agree to do that for Ethicon?

8         A.  Because I had had experience with the

9    product and I had actually believed that the

10   product was a good product and was something that

11   I had used in my practice.  So I was willing to

12   at least look at the record and determine whether

13   or not I felt that there was evidence that I

14   could support or not relative to the care of this

15   particular patient.

16        Q.  Who was the patient?

17             THE WITNESS:  Am I allowed to give

18   that from confidentiality standpoints?  I'm

19   sorry.  I just lost his auditory.

20   BY MR. SLATER:

21        Q.  Who was the patient?

22             MS. JONES:  Let me just get one

23   issue -- let me talk with Dr. Horbach one second.

24             I think you can answer the question, but

Nicolette S. Horbach, M.D.

1   let me just go off the record one second.

2           VIDEO SPECIALIST:  The time now is

3   10:44.  We are going off the record.

4       (Proceedings recessed.)

5           VIDEO SPECIALIST:  The time now is

6   10:45.  We are back on the record.

7           THE WITNESS:  Can you repeat -- would

8   you repeat the question, please?

9   BY MR. SLATER:

10       Q.  Who was the patient?

11       A.  The initial patient that I was asked

12   to review was Pamela Wicker.

13       Q.  Pam Wicker was the first record that

14   you reviewed on behalf of Ethicon regarding the

15   Prolift litigation?

16       A.  Yes.

17       Q.  Do you intend to act as an expert with

18   regard to Ethicon stress urinary incontinence

19   devices?

20       A.  I don't know.  I haven't been

21   specifically asked to review a -- anything

22   related to a case for stress incontinence

23   devices.  I've been primarily involved with this

24   case, Ms. Schubert, as well as Ms. Wicker.

Nicolette S. Horbach, M.D.

1          Q.  You would agree with me that the

2     overall -- rephrase.

3          You would agree with me that the

4     overwhelming majority of your publications

5     address stress urinary incontinence, correct?

6          A.  They may or may not, yes.  I don't

7     recall.

8          Q.  You don't know the fact that with the

9     exception of maybe two or three publications

10    every other one addresses stress urinary

11    incontinence?

12         A.  My practice and my expertise --

13         Q.  One second.  I want to get one ground

14    rule straight.  If I ask you a direct question

15    about a specific subject, I just ask you to

16    answer it.

17         I didn't ask you about your practice.  I

18    didn't ask you about your background.  I asked

19    about your publications and the fact that the

20    overwhelming majority is stress urinary

21    incontinence other than a couple of articles,

22    maybe two or three; is that a true statement?

23         A.  I was trying to answer your question

24    originally.  My answer was I don't know because I

Nicolette S. Horbach, M.D.

1    haven't looked at my CV and those publications

2    recently.  And because I do not publish on a

3    regular basis, I haven't counted how many

4    articles I've done relative to stress

5    incontinence versus pelvic organ prolapse.  And I

6    was prefacing that statement by saying that the

7    type of practice and my expertise is not

8    necessarily in the research area; it's more in

9    clinical practice as well as educational

10   guidelines in the field and my participation

11   nationally.

12          Q.  Do you hold yourself out as an expert

13   with regard to clinical study design?

14          A.  As clinical study design itself, no.

15          Q.  -- on a regular basis, correct?

16          A.  What was --

17              MS. JONES:  Adam, you got cut off.

18              THE WITNESS:  What was the regular

19   basis?

20   BY MR. SLATER:

21          Q.  You do not publish in the medical

22   literature on a regular basis, correct?

23          A.  I don't know what you mean by "regular

24   basis."

Nicolette S. Horbach, M.D.

1        Q.   Doctor, I'm taking exactly what you

2   just said to me as part of your answer before.

3   You said you do not publish on a regular basis.

4   So what I did was I pulled that out and asked it

5   as a discrete question.  So I'll ask the question

6   again.

7        Am I correct that you do not publish in

8   the medical literature on a regular basis?

9        A.   I don't know whether your definition

10  of regular basis is the same as mine, but I do

11  not publish -- I do not publish in the medical

12  literature on a yearly or more than yearly basis,

13  no, not typically.

14       Q.   And that's been true throughout your

15  career, correct?

16       A.   Yes.  My focus has been more in

17  teaching rather than in original research.

18       Q.   In your medical practice have you had

19  patients that you placed a Prolift into and they

20  had complications?

21       A.   I don't know what you mean by

22  "complications."  You need to be more specific.

23       Q.   What it means --

24       A.   I'm sorry.  You're cutting out during

Nicolette S. Horbach, M.D.

```
 1   many of the questions.
 2        Q.  Do you know what the word
 3   "complications" means?
 4        A.  Yes.
 5        Q.  Have you had patients that you placed
 6   a Prolift into who had complications as a result?
 7        A.  Yes.
 8        Q.  How many Prolifts would you say you've
 9   placed?
10        A.  Probably between a hundred and two
11   hundred.
12        Q.  How many Prolift+Ms have you placed?
13        A.  Not very many.
14        Q.  Why not?
15        A.  I just never transitioned to it.  I
16   didn't feel a need to.
17        Q.  Can you estimate the number of
18   Prolift+M medical devices you've placed in women?
19        A.  I said not very many.  I can't
20   estimate better than that.
21        Q.  Could you give me a more specific
22   estimate?  "Not very many," are you talking about
23   less than ten?
24        A.  I can't answer that.
```

Nicolette S. Horbach, M.D.

1          Q.  Are you talking about less than 20?

2          A.  I said, I can't answer that.  I don't

3    know.

4          Q.  Could it be as few as one or two?

5          A.  It's possible.

6          Q.  Could it be that you've never used a

7    Prolift+M?

8          A.  No.

9          Q.  So you think you've used it in maybe

10   as few as one or two times?

11         A.  It's possible.  I don't keep -- I

12   mean, you know, I don't keep track of every

13   particular procedure I do, but I use -- the bulk

14   of my surgeries were with the standard Prolift.

15         Q.  Did you prepare for this deposition?

16         A.  Yes.

17         Q.  How much time did you spend preparing?

18         A.  Are you saying for the entire review

19   of this particular record or are you saying just

20   for this deposition here?

21         Q.  Just for the deposition.

22         A.  Probably between 30 and 40 hours.

23         Q.  Prior to your preparation for the

24   deposition how much time had you spent working on

Nicolette S. Horbach, M.D.

```
 1   this litigation?

 2          A.  On this particular patient?

 3          Q.  -- of documents and information and

 4   this patient's records as well.

 5          A.  I'm sorry.  You cut out through the

 6   first part of the question.

 7               MS. JONES:  Adam?  Adam, I don't

 8   know -- I'm not sure what it is, but we're not

 9   getting the first three or four words of your

10   questions sometimes, so just -- you may want to

11   put the speaker closer to you.

12               MR. SLATER:  If it happens -- it's

13   right in front of me, so it's not that.  If it

14   happens, just tell me and I'll have to repeat it.

15   Technology is not perfect.  We'll do the best we

16   can.

17   BY MR. SLATER:

18          Q.  How much time overall have you spent

19   with regard to the Prolift litigation and the

20   review of Connie Schubert's medical records aside

21   from the deposition prep that you just told me

22   was 30 to 40 hours?

23          A.  And aside from my involvement with the

24   Wicker case?
```

Nicolette S. Horbach, M.D.

1        Q.  Aside from the time you spent specific

2   to Pam Wicker's medical records.

3        A.  It's probably between 75 and a hundred

4   or so hours.

5        Q.  How much time did you spend looking at

6   just Pam Wicker's medical records?

7        A.  A lot.  I don't recall off the top of

8   my head.  She had a very extensive medical

9   record.

10       Q.  More than 50 hours?

11       A.  I don't think so, but I'm not sure.

12       Q.  Have you invoiced Ethicon for the time

13   you've spent working as an expert for them in the

14   mesh litigation?

15       A.  No.

16       Q.  Do you have a record of how much time

17   you've spent?

18       A.  Loosely.

19       Q.  What are you billing for your time in

20   this litigation, what amount?

21       A.  Five hundred dollars per hour.

22       Q.  Is that for everything you do?

23       A.  I charge $500 per hour for review of

24   records and/or, you know, preparation.  I charge

Nicolette S. Horbach, M.D.

1    for either depositions or trial based on half

2    days out of my office.  So at $2,500 for a half

3    day out of my office.

4         Q.  If you're going to be a full day like

5    today, you would charge $5,000 for today's

6    deposition?

7         A.  Yes.

8         Q.  Is that what you're going to charge

9    when you go to Missouri to testify in this trial,

10   $2,500 for a half day or $5,000 for a full day?

11        A.  Yes.

12        Q.  Will you also be traveling -- well,

13   rephrase.

14        You will also charge for your time

15   traveling and preparing for the trial as well,

16   right?

17        A.  Preparing for the trial.  I don't

18   always necessarily charge for my travel time.  If

19   I'm doing something else during the time that I'm

20   traveling that's not related to the litigation, I

21   don't typically charge.

22        Q.  Out of the one hundred to two hundred

23   Prolifts that you have put in -- rephrase.  Let

24   me just ask the question.

Nicolette S. Horbach, M.D.

1        The best estimate you can give me for the

2   number of Prolifts that you have surgically

3   implanted in women is one hundred to two hundred?

4        A.  That is the best estimate.  I

5   attempted to get a better estimate by asking my

6   office to be able to pull information; however,

7   we've just gone through a practice reorganization

8   and a practice split, so they had difficulty

9   being able to retrieve the exact number for me.

10        Q.  Of the one hundred to two hundred

11   Prolifts that you've placed, can you estimate the

12   percentage of those that would be total Prolifts?

13        A.  I would expect that at least half

14   probably would be total Prolifts.

15        Q.  You were trained on the Prolift by

16   Vincent Lucente, correct?

17        A.  Yes.

18        Q.  Do you know why the Prolift and

19   Prolift+M were pulled off the market?

20            MS. JONES:  Object to the form.

21            THE WITNESS:  I have an

22   understanding --

23   BY MR. SLATER:

24        Q.  What, Doctor?  I have to ask the

Nicolette S. Horbach, M.D.

1   question again.  Do you know why it is that

2   Ethicon stopped marketing the Prolift and the

3   Prolift+M?

4          A.  It was my understanding from talking

5   with Ethicon that they felt the ability to

6   continue marketing the product in the face of

7   current litigation was something that was not

8   going to be a beneficial decision for the part of

9   the company, and that although they believe

10  strongly in the product and use of it in patients

11  as an alternative, that it was something that

12  they elected to do based on corporate decisions

13  or I don't know whether it was strictly

14  financially based or whether it was based on

15  medical-legal issues per se.

16         Q.  You said in the start of your answer

17  they stopped marketing due to the current

18  litigation.  That was your understanding?

19         A.  It was current litigation sort of

20  climate more than in this specific litigation

21  itself, but the current litigation climate and

22  the current negative viewpoint for mesh.

23         Q.  When you say "the current negative

24  viewpoint for mesh," you're talking about within

Nicolette S. Horbach, M.D.

```
 1    the medical and patient communities?

 2         A.  Yes.

 3         Q.  When's the last time you put a Prolift

 4    into a woman's body?

 5         A.  It probably was -- it may have been

 6    2011-ish or so.  I don't really recall off the

 7    top of my head.

 8         Q.  During the period of time when you

 9    were using the Prolift were you also performing

10    alternative procedures to treat pelvic organ

11    prolapse?

12         A.  Yes.

13         Q.  You felt that there were certain

14    patients who were appropriate candidates for the

15    Prolift and you thought there were certain

16    patients who were not appropriate candidates,

17    correct?

18         A.  Yes.

19         Q.  And what was your criteria for

20    somebody to be an appropriate patient for the

21    Prolift?

22         A.  The first criteria is that the patient

23    had symptomatic prolapse as defined by both

24    having symptoms as well as having sufficient
```

Nicolette S. Horbach, M.D.

1    anatomic abnormalities to be able to explain the

2    degree of symptoms that the patient was

3    experiencing.

4          In addition, I would choose at times for

5    patients who were interested in uterine

6    preservation as being able to do a total Prolift,

7    typically allowed me to preserve the uterus,

8    where if I were doing something like a

9    sacrocolpopexy, I would usually recommend at

10   least a supracervical hysterectomy.

11         I would choose it at times in patients

12   where they had had a significant number of other

13   abdominal surgeries, and, therefore, entry into

14   the abdomen would not be preferable.  I would

15   choose it in women who perhaps were more -- had

16   anesthetic issues or anesthetic risks such that a

17   full general anesthesia as required in a

18   sacrocolpopexy may not be optimal for them, and,

19   therefore, I could do a Prolift under perhaps

20   regional type of anesthesia and IV sedation.

21         I would choose it in patients where the

22   issue was relative to recuperation as the

23   alternative apical procedure that I was primarily

24   performing at that time was an open

Nicolette S. Horbach, M.D.

1    sacrocolpopexy, and that was going to require the

2    patient to have a longer hospitalization as well

3    as longer restrictions and longer time to

4    recovery.

5        I'll follow up that statement.  But in

6    reality, you know, my choice of doing a Prolift

7    is very much tied hand in hand with my counseling

8    of the patient.  And so it becomes a mutual

9    decision between myself and my patient whether

10   it's a Prolift or any other type of surgery I do,

11   as I discuss with them the pros and cons of the

12   different surgical approaches.

13       Q.  Over the last eight years can you

14   estimate for me the number of prolapse repair

15   procedures that you perform on an annual basis?

16       A.  We have -- we have tracked the number

17   of prolapse procedures that we perform as a group

18   with the four of us.  We haven't necessarily

19   specifically separated them out, although myself

20   and one of my other partners are the busiest

21   surgically.

22       We tend to perform -- I'm trying to

23   remember -- it's in the -- it's multiple

24   hundreds, but I would be -- I would be remiss in

Nicolette S. Horbach, M.D.

1    giving a specific.  I know that, when we have

2    looked at our volumes in our practice over the

3    years compared to other centers, such as the

4    Cleveland Clinic, that we do similar type of

5    volume as there is at Cleveland Clinic.

6           Q.  -- of prolapse procedures you have

7    been performing over the last seven or eight

8    years on an annual basis?

9           A.  I'm sorry.  You have to start the

10   question again since it was lost.

11          Q.  What is your best estimate of the

12   number of prolapse repair procedures you have

13   performed on an annual basis over the past seven

14   or eight years?

15          A.  I would say probably between a hundred

16   and two hundred procedures, but I think it would

17   be difficult for me to give you anything more

18   specific than that.

19          Q.  So your best estimate is that on an

20   annual basis over the last seven or eight years

21   you've been performing one hundred to two hundred

22   prolapse repair procedures per year?

23          A.  That's my best estimate.

24          Q.  Besides the Prolift, over the last

Nicolette S. Horbach, M.D.

1    seven or eight years have you been using any

2    other mesh devices or materials for the treatment

3    of prolapse?

4        A.  I've used other materials, no other

5    specific mesh kits, if you want to say mesh kits

6    per se, I've not used any other companies.

7        Q.  What material or what mesh brands have

8    you used for your abdominal sacrocolpopexy?

9        A.  I've used a number over the past

10   years.  Most commonly it's been either Gynemesh

11   or more recently perhaps even Restoril for the

12   sacrocolpopexies.  There was a period of time --

13   and I don't remember whether it was, you know,

14   prior to eight years ago or not -- where we used

15   standard Prolene meshes.  We have probably at

16   some point in time more than eight years ago

17   would have been things like Marlex or Mersilene.

18       Q.  From the time that the Prolift came

19   out, which was March of 2005, if you were going

20   to use mesh through the vagina to treat prolapse,

21   did you use the Prolift exclusively or did you

22   also at times take mesh and cut it and

23   incorporate it into a transvaginal repair?

24       A.  No, I would use the Prolift

Nicolette S. Horbach, M.D.

1    exclusively.

2         Q.  So once the Prolift came on the

3    market, if you were going to use a vaginal --

4    rephrase.

5         So from the time the Prolift came on the

6    market, if you were going to perform a procedure

7    through the vagina to treat prolapse, you used

8    the Prolift, correct?

9         A.  Yes.  To the best of my recollection,

10   yes.

11        Q.  And then sometime in to your best

12   estimate 2011 you stopped using the Prolift,

13   correct?

14        A.  I stopped using it somewhere around

15   that time in part because we began using -- doing

16   laparoscopic sacrocolpopexies rather than open

17   procedures.  And so the advantages of

18   laparoscopic sacrocolpopexies versus Prolift in

19   terms of recuperation, things became more

20   neutral, and so oftentimes we would go to

21   sacrocolpopexy.

22        Q.  There came a point somewhere in 2011

23   to the best of your recollection when you

24   determined that, when you weighed the risks and

Nicolette S. Horbach, M.D.

1   benefits for most of your patients, laparoscopic

2   abdominal sacrocolpopexy was a better procedure

3   than the Prolift for your patients in most cases,

4   correct?

5          A.   In --

6               MS. JONES:   Object to the form.

7               THE WITNESS:   Does that mean I -- you

8   have -- does that mean you have to change -- say

9   it again or --

10  BY MR. SLATER:

11         Q.   You can answer.

12         A.   Okay.   I think that I -- in weighing

13  the pros and cons -- I did decide that -- with

14  the patient -- that a laparoscopic sacrocolpopexy

15  may be more appropriate for that individual

16  patient.

17         Q.   In around 2011 that conclusion was

18  reached with most of your patients and you

19  stopped using the Prolift, correct?

20         A.   Yeah, to the best of my recollection

21  that was the time period.

22         Q.   In your treatment of women with the

23  Prolift you had some patients who developed

24  complications due to the Prolift, correct?

Nicolette S. Horbach, M.D.

```
 1          A.  Yes.

 2          Q.  The complications you saw included

 3  mess erosion and mess exposure into the vagina,

 4  correct?

 5          A.  No.

 6          Q.  You never had an exposure of any of

 7  your patients with the Prolift?

 8          A.  No.  That's correct.  Not to my

 9  knowledge.

10          Q.  One of the things you realize is that

11  when women have complications following a surgery

12  like the Prolift, it's actually likely that they

13  are going to leave the doctor who did the surgery

14  and go to somebody else without telling the first

15  doctor what happened, correct?

16              MS. JONES:  Object to the form.

17              THE WITNESS:  That is correct, except

18  I think in this situation it is a little bit

19  different than it might be out in the generalized

20  community.  Part of the issue is that there are

21  very few groups that do the more specialized

22  urogynecologic procedures.  So we are typically

23  the -- one of the centers of last resort.

24              In addition, the two other centers that
```

Nicolette S. Horbach, M.D.

1    might see the patients, we typically, among the

2    three of us, will send letters to each other

3    about having seen one of -- one of the other's

4    patients, whether it's second opinion, whether

5    it's a complication, so that there is that

6    communication that goes on back and forth.

7         In addition, if -- you have a frown.  You

8    don't understand that?

9         Q.  I understand.  I'm just listening.

10        A.  Okay.  And the third issue is that

11   typically patients who will choose to go to

12   another physician for care will usually request

13   records of their surgery so that they can -- the

14   more current treating physician will be able to

15   know what was done, and that has not been

16   something that's happened in this -- in the cases

17   of my patients.

18        Q.  If you had patients who suffered

19   complications, went to another doctor and told

20   that doctor, I don't want you in contact with

21   Dr. Horbach, I want to be treated by you now, I'm

22   unhappy how that Prolift went, you'd have no way

23   to know that, right?

24        A.  That's correct.

Nicolette S. Horbach, M.D.

1          Q.  Have you treated women who had

2     Prolifts placed by other doctors and then came to

3     you suffering from complications?

4          A.  Yes.

5          Q.  How many times?

6          A.  I don't recall.

7          Q.  Can you give me an estimate?  Is it

8     more or less than ten?

9          A.  Yes.

10         Q.  Which one?

11         A.  I'm sorry.  More.

12         Q.  More than 20?

13         A.  I don't know.  When patients come to

14    see us, they will at times have had complications

15    associated to the insertion of mesh.  I typically

16    have not kept track of whether that mesh was a

17    Pinnacle, an Apogee, a Perigee, a Prolift or a

18    free-formed mesh.

19         Q.  The complications you've seen

20    regardless of whether it's a Prolift or these

21    other devices are similar, correct?

22         A.  Are similar to what?  To each other?

23         Q.  One another, yes.

24         A.  Yeah, that's typical.

Nicolette S. Horbach, M.D.

```
 1          Q.  Your partner is Dr. Welgoss or

 2   Welgoss?

 3          A.  He is one of my partners, yes.

 4          Q.  How do you pronounce his last name?  I

 5   just don't want to mispronounce it the whole

 6   deposition.

 7          A.  Welgoss.

 8          Q.  Welgoss.  You're familiar with the

 9   fact that Dr. Welgoss has consulted with Ethicon

10   for many years, correct?

11          A.  No.

12          Q.  Didn't know that until right now?

13          A.  I mean, I -- we don't keep track of

14   what each other does on an individual -- on our

15   own individual time.  Typically I know that he's

16   worked as a preceptor for InterStim implants with

17   Mentor, but I wasn't aware of his specific

18   consultant work with Ethicon.

19          Q.  So as of right now you're not aware

20   that Dr. Welgoss has consulted with Ethicon?

21          A.  I can't say I -- I am aware that he

22   might have at some point had some interaction

23   with Ethicon similar to what I had back in 2001,

24   but when you said am I aware that he has
```

Nicolette S. Horbach, M.D.

```
1    consulted for Ethicon on a regular basis, no, I

2    was not aware of that.

3         Q.  In terms of patient-selection criteria

4    with the Prolift, do you believe that the

5    patient-selection criteria set forth in Committee

6    Opinion 513 should be applicable to the Prolift?

7         A.  You're talking about from the

8    standpoint of the ACOG committee opinion?

9         Q.  The ACOG/AUGS Committee Opinion 513,

10   do you believe that patient-selection criteria

11   that is stated in that committee opinion should

12   be applicable to the Prolift?

13        A.  For me to accurately answer that, I'd

14   have to pull it.  So if you give me a second,

15   I'll pull it out.

16        Q.  Let me just ask you this.  I'm not

17   asking you to pull it out.  Are you familiar with

18   what Committee Opinion 513 says with regard to

19   patient-selection criteria?

20        A.  I'm familiar with the bulk of it, but

21   if you're -- I can't tell you exactly each thing

22   that they list on the list.

23        Q.  You read that committee opinion when

24   it came out, correct?
```

Nicolette S. Horbach, M.D.

1          A.   Yes.

2          Q.   And when it came out, did you believe

3     it was a reasonable committee opinion and that

4     the conclusions were reasonable?

5          A.   I think that they, at least from my

6     experience, that they overstated the problem, at

7     least from what we had seen.

8          Q.   When you say what we have seen, you

9     mean within your own practice?

10         A.   Correct.

11         Q.   You're aware of the fact that your

12    practice is likely not representative of the

13    outcomes that would be obtained by physicians in

14    community medical practices throughout the

15    country, correct?

16              MS. JONES:  Object to the form.

17              THE WITNESS:  Yes, I'm aware that our

18    outcomes are probably not the same.

19    BY MR. SLATER:

20         Q.   Your outcomes are likely much better

21    than what you would see across the board for

22    community physicians, correct?

23         A.   I would hope so, but yes.

24         Q.   I mean, you're a group of

Nicolette S. Horbach, M.D.

1    fellowship-trained surgeons working out of

2    well-known hospitals with high levels of training

3    that would be beyond what you would expect most

4    physicians would have, correct?

5         A.  Again, that's -- that would be

6    difficult for me to say.  There are gynecologists

7    who are not fellowship trained, gynecologists who

8    still have a significant level of clinical skill

9    and experience in doing prolapse surgery.

10        Q.  I'm generalizing.

11        A.  Again, I would expect so, but I don't

12   think that it necessarily can be a global

13   generalization.

14        Q.  Would you agree that my statement is

15   generally accurate although there may be

16   exceptions?

17        A.  I think that's a reasonable statement,

18   yes.

19        Q.  You do not hold yourself out as an

20   expert with regard to the material science issues

21   with regard to the various meshes that have been

22   used for prolapse repair, correct?

23        A.  I -- before I answer that question,

24   I'd like to take a break for a second, please.

Nicolette S. Horbach, M.D.

1    Can we go off the record?

2         Q.  Not for a discussion with counsel,

3    right?

4         A.  Yes.

5         Q.  I'm correct?

6         A.  I'm sorry.  I missed the first part of

7    that question.

8         Q.  You need to answer my question.  We're

9    not going to take a break with a question

10   pending.  So you need to answer that question,

11   please.

12        A.  I can't answer that question, then.

13        Q.  Okay.  You can't answer it?

14        A.  You wanted a yes or no, and that's why

15   I said I can't answer that without discussion

16   further.

17        Q.  Well, you can't speak to counsel and

18   ask counsel how you should answer a question.  So

19   I need to go through this with you.  You can't go

20   to counsel and get advice on how to answer my

21   questions because your only guidance is to be to

22   answer me truthfully.

23        So you're unable to tell me whether or not

24   you hold yourself out as an expert with regard to

Nicolette S. Horbach, M.D.

1    the material science of the meshes used for

2    prolapse repair, correct?

3         A.  Correct, that's -- then to the best of

4    my ability, that's my statement.

5         Q.  -- internal Ethicon documents with

6    regard to the understanding of the internal

7    Ethicon scientists as to the key material science

8    issues with the Prolift and Prolift+M, correct?

9         A.  The beginning of your question was

10   lost, but did you say did I review them?  Did I

11   review documents?

12        Q.  Here's my question.  Did you review

13   the internal documents from Ethicon that set

14   forth what the scientists and medical affairs

15   people in Ethicon thought were the key issues

16   with regard to the mesh used in the Prolift?

17        A.  I reviewed some of the basic science

18   work that was done through Ethicon relative to

19   the animal studies associated with different

20   meshes, yes.  I don't know whether that's every

21   single document.

22        Q.  That's what you looked at, with regard

23   to material science internally at Ethicon, you

24   looked at the preclinical studies with animals

Nicolette S. Horbach, M.D.

1    that you listed on your reliance materials,

2    correct?

3           A.  Yes, that's primarily it.

4           Q.  Well, is there anything else?  Right

5    now I just need to know.  That's what you looked

6    at, right?

7           A.  I believe so.

8           Can I take a break now, please?

9           Q.  Sure.

10          A.  Thank you.

11          VIDEO SPECIALIST:  The time now is

12   11:16.  We are going off the record.

13          (Proceedings recessed.)

14          VIDEO SPECIALIST:  The time now is

15   11:28.  We are back on the record.

16          MR. SLATER:  Sara, do you have the

17   exhibit, the committee opinion --

18          THE WITNESS:  I actually just had

19   pulled out the committee opinion, although I

20   think my copy was my own and does not have an

21   exhibit.

22   BY MR. SLATER:

23          Q.  We have a marked one from another

24   litigation.  Let's use that one.

Nicolette S. Horbach, M.D.

```
 1        A.   So does somebody have that?  I'd be
 2   happy to look at it.
 3        MS. JONES:  Adam, what your assistant
 4   here has handed me is marked Plaintiff's Exhibit
 5   number 125.
 6        MR. SLATER:  That's the document,
 7   Committee Opinion 513.
 8        MS. JONES:  Okay.  December 2011.  All
 9   right.  And do you want it separately --
10        MR. SLATER:  It was marked in another
11   deposition in the consolidated litigation.
12        MS. JONES:  All right.  But we're not
13   part of the consolidated litigation, so do you
14   want this separately marked?  That's my question.
15        MR. SLATER:  No.  No, I'm good.
16        MS. JONES:  Okay.  That's fine.
17        MR. SLATER:  I don't think we'll ever
18   have a dispute about whether or not this is the
19   committee opinion or not.
20        MS. JONES:  No, that's fine.  I wanted
21   to make sure we were dealing with this as you
22   preferred.
23        MR. SLATER:  No problem.
24   BY MR. SLATER:
```

Nicolette S. Horbach, M.D.

 1          Q.   Okay.  Doctor -- are we back on?

 2               THE REPORTER:  Yes, sir.

 3               MS. JONES:  We are.

 4     BY MR. SLATER:

 5          Q.   Okay.  Doctor, in front of you is

 6     Committee Opinion 513.  It actually has a sticker

 7     or a copy of a sticker on the top right that says

 8     Exhibit 125 from another deposition.  Do you see

 9     that?

10          A.   Yes.

11          Q.   You're familiar with this committee

12     opinion, correct?

13          A.   Yes.

14          Q.   Did you have any involvement in the

15     drafting of this committee opinion?

16          A.   No.

17          Q.   What I'd like to do is turn to the

18     recommendations at the very end, page 1463.

19          A.   Okay.

20          Q.   The second bullet point of the

21     recommendations says:

22

23               Pelvic organ prolapse, vaginal mesh

24               repair, should be reserved for

Nicolette S. Horbach, M.D.

```
1                 high-risk individuals in whom the

2                 benefit of mesh placement may

3                 justify the risk such as

4                 individuals with recurrent prolapse

5                 particularly of the anterior

6                 compartment or with medical

7                 comorbidities that preclude more

8                 invasive and lengthier open and

9                 endoscopic procedures.

10        Do you see that?

11        A.   Yes.

12        Q.   -- recommendation is reasonable,

13   correct?

14        A.   I don't agree with it.

15        Q.   Do you believe it's a reasonable

16   recommendation?

17             MS. JONES:  Object to the form.

18             THE WITNESS:  I think you need to be

19   more specific about reasonable.  I think that it

20   is -- it is something that ACOG put together as

21   information to go out to the general ob/gyn

22   community.  And sometimes, based on how ACOG

23   generates these types of documents, they create

24   sort of a narrower window where they are -- it's
```

Nicolette S. Horbach, M.D.

1    less applicable to specialists who are doing this

2    type of surgical training or -- sorry -- it's

3    less applicable to specialists surgeons who are

4    doing prolapse work.

5    BY MR. SLATER:

6        Q.  When you say a specialist, you're

7    talking about someone like yourself who is

8    fellowship-trained and does a very high volume of

9    this type of surgery?

10       A.  Yes, that's one component, but I'm

11   also talking about there are general gynecologic

12   surgeons, people who are not specifically

13   fellowship-trained, but who are extremely skilled

14   reconstructive surgeons and who do do that as a

15   bulk of their practice.  I don't think you have

16   to be specifically fellowship trained to be able

17   to do this type of surgery well.

18       Q.  Would you agree with me that this

19   recommendation is reasonable for doctors who are

20   not the most highly skilled surgeons, as you've

21   described them, those who are either

22   fellowship-trained with high volume or those who

23   may not be fellowship-trained but still have a

24   high volume and have a very high level of skill?

Nicolette S. Horbach, M.D.

1            MS. JONES:  Object to the form.

2            THE WITNESS:  I think that this is a

3    reasonable comment for someone who does not do

4    prolapse surgery as their primary focus of their

5    practice.

6    BY MR. SLATER:

7        Q.  And with regard to that profile of

8    physician, this would be a reasonable

9    recommendation with regard to the Prolift or the

10   Prolift+M, correct?

11       A.  Yes.

12       Q.  Let's look through some of the

13   language in this document.  If you could, turn to

14   page 1461.  In the right-hand column the first

15   full paragraph it says:

16           Risk factors for developing intractable

17   pain after vaginal mesh placement are not

18   understood.

19           Is that a statement you agree with?

20       A.  I think that there is some

21   understanding of some of the risk factors.  I

22   don't think that there is an understanding about

23   all of the risk factors.

24       Q.  A little further down right after

Nicolette S. Horbach, M.D.

1    footnote 17 it says:

2         Hernia mesh also is known to undergo

3    retraction and pain persists in patients at five

4    years.

5         Do you see that?

6         A.  Yes, I see that.

7         Q.  Are you aware of the fact that, with

8    hernia mesh, there are patients who suffer

9    retraction of the mesh and chronic pain that can

10   be disabling for patients?

11        A.  Yes.

12        Q.  A little further down it talks about

13   the fact that mesh grafts in the vagina are

14   placed in a clean contaminated field with a

15   single vaginal incision and the arms --

16        A.  Can you hold on?  Okay.  Thank you.  I

17   found it.  I'm sorry.

18        Q.  I'll start over.  In that first full

19   paragraph on the right column of page 1461 it

20   talks about the placement of mesh grafts in the

21   vagina being a clean contaminated field, and then

22   it says:

23             And the arms of some mesh

24             configurations pass into the

Nicolette S. Horbach, M.D.

```
 1                obturator internus and levator ani

 2                muscles.  Shrinkage or contraction

 3                of mesh around these structures or

 4                excess tension on the mesh arms can

 5                cause vaginal pain in some

 6                individuals.

 7                Do you see where I just read?

 8         A.  Yes.

 9         Q.  Those are true statements, correct?

10         A.  Yes.

11         Q.  And that would apply to the Prolift

12    and Prolift+M, correct?

13         A.  Yes.

14         Q.  A little further down it talks about,

15    about three lines down:

16                The addition of synthetic mesh

17                could make the vagina a cylindrical

18                organ that expands and contracts

19                less pliable and perhaps more prone

20                to pain or dyspareunia.

21                That's a true statement, correct?

22         A.  Yes.

23         Q.  And that would apply to the Prolift

24    and Prolift+M, correct?
```

Nicolette S. Horbach, M.D.

```
 1            A.  Yes.

 2            Q.  The next paragraph -- rephrase.

 3            The second full paragraph in the right

 4   column of page 1461 there is a statement about

 5   four lines down that points to a small but

 6   significant group of patients who experience

 7   permanent and life-altering sequelae including

 8   pain and dyspareunia from the use of vaginal

 9   mesh.  Do you see that?

10            A.  Yes, I see that.

11            Q.  And you would agree there is a

12   significant group of patients who experience

13   those -- that level of complication, correct?

14            A.  I think that the term "significant" is

15   something that can be interpreted in different

16   ways, so I don't know that I could say

17   significant, but there is a portion -- there are

18   a portion of women who develop problems that can

19   have significant impacts or be life-altering.

20            Q.  And that's true for the Prolift and

21   Prolift+M, correct?

22            A.  Yes.

23            Q.  Just a sentence -- rephrase.

24            Just in the middle of this second full
```

Nicolette S. Horbach, M.D.

1    paragraph on page 1461, right column, it says,

2    large-scale registries are urgently needed.  Do

3    you see that?

4           A.  Yes.

5           Q.  Do you know why Ethicon did not

6    utilize a registry for the Prolift?

7           A.  No.

8           Q.  If Ethicon decided not to have a

9    registry with regard to the Prolift because they

10   were afraid that this would create more accurate

11   information about the complications from the

12   Prolift and thus give more of an accurate view of

13   the entire complication profile and as compared

14   to devices sold by other manufacturers without

15   registries, from a marketing standpoint, the

16   Prolift would look worse.  If that's the reason

17   Ethicon didn't have a registry, you would have a

18   serious problem with that, correct?

19              MS. JONES:  Object to the form.

20              THE WITNESS:  I don't know that I

21   could say that.

22   BY MR. SLATER:

23          Q.  Let's go to the next page.  Go to the

24   right-hand column.  There is a long continuation

Nicolette S. Horbach, M.D.

```
 1    of a paragraph, and just above the first full

 2    paragraph there is a phrase I want to ask you

 3    about.  Okay?  It says:

 4              The removal of mesh because of mesh

 5              complications may involve multiple

 6              surgical procedures and

 7              significantly impair the patient's

 8              quality of life.  Complete removal

 9              of mesh may not be possible and may

10              not result in complete resolution

11              of complications including pain.

12         That's a true statement with regard to the

13    Prolift and Prolift+M, correct?

14         A.  Yes.

15         Q.  Let's look at the -- right under the

16    summary in the right-hand column.  It says:

17              Mesh kits for repair of prolapse

18              were first marketed to urologists

19              and gynecologists as a way to

20              improve success rates for prolapse

21              repairs with native tissue but

22              without well-designed trials to

23              establish the safety and efficacy

24              of these devices.
```

Nicolette S. Horbach, M.D.

1          That's a true statement, correct?

2          MS. JONES:  Object to the form.

3          THE WITNESS:  The comment of

4   "well-designed," if you were to substitute

5   without randomized controlled trials, I would say

6   yes.

7   BY MR. SLATER:

8          Q.  Randomized controlled trials are

9   considered the gold standard for clinical studies

10  in this field, correct?

11         A.  Yes, any field.

12         Q.  And that statement would be true for

13  the Prolift, that the Prolift was launched

14  without randomized controlled trials to establish

15  the safety and efficacy of the Prolift, correct?

16         A.  Yes.

17         Q.  In fact there was never a study done

18  of the Prolift as it was actually marketed before

19  it went on the market.  Are you aware of that?

20         MS. JONES:  Object to the form.

21         THE WITNESS:  I want to clarify your

22  question, meaning there wasn't -- that the

23  studies that were there prelaunch were

24  specifically more the TVM studies and that the

Nicolette S. Horbach, M.D.

1    actual kit itself wasn't involved in those

2    prelaunch studies.  Is that -- I just want to

3    make sure that that's the question you're asking.

4    BY MR. SLATER:

5         Q.  Right.  There was never a study

6    performed by Ethicon of the Prolift as it was

7    marketed in the package.  That system was never

8    studied before it went on the market, correct?

9         A.  The package system that they sent,

10   yes, that's correct.

11        Q.  Do you know how or to what extent

12   Ethicon Medical Affairs relied on the data from

13   the French and U.S. TVM studies before the launch

14   of the Prolift?

15            MS. JONES:  Object to the form.

16            THE WITNESS:  Relied for what?

17   BY MR. SLATER:

18        Q.  In any way.  Do you know how -- I'll

19   ask the question again.

20        Do you know how Ethicon Medical Affairs

21   relied on the data from the French and U.S. TVM

22   studies either before or after the launch of the

23   Prolift?  Do you know how Ethicon Medical Affairs

24   used and relied on that data?

Nicolette S. Horbach, M.D.

```
 1            A.  To do what?  I'm still not -- I'm

 2   sorry.  I don't --

 3            Q.  For any reason, for any purpose.  Do

 4   you have any knowledge of how Ethicon Medical

 5   Affairs used that data?

 6            A.  Probably --

 7            Q.  I'm not asking you to speculate or

 8   guess.

 9            A.  No, no.

10            Q.  I want to know based on -- let me

11   finish.  I want to know based on something you

12   read in actual documents that were provided to

13   you.

14            A.  That was why I paused to think about

15   whether or not I had read anything specifically

16   in a document.  I do not recall reading anything

17   specifically in any of the Ethicon documents

18   regarding that issue.

19            Q.  Same question with regard to the

20   Gynemesh PS study.

21            A.  Of how the -- of how Ethicon relied on

22   that in its marketing or -- is that what you're

23   asking?

24            Q.  For any reason.  If you have knowledge
```

Nicolette S. Horbach, M.D.

1    of how Ethicon relied on that data for any reason

2    at all from reading the internal documents to see

3    how they actually used or relied on that data.

4            A.  I think --

5                 MS. JONES:  I'm going to object to the

6    form.

7                 THE WITNESS:  I think your question --

8    you have to rephrase the question, then, in that

9    case.  It's hard for me to answer.

10   BY MR. SLATER:

11           Q.  Okay.

12           A.  I think that -- I do recall reading

13   information about internal communications among,

14   you know, Ethicon when they were talking about,

15   you know, the clinical report or issues that

16   were, you know, involved with gathering data, but

17   I'm not sure I can give you the specifics.

18           Q.  Okay.  This is my question.  Do you

19   have any knowledge as you sit here right now from

20   the review of all the materials you were given as

21   to how or to what extent the people in the

22   Ethicon Medical Affairs actually used or relied

23   on the data from the Gynemesh PS study?

24           A.  That question I can answer.  No, I

Nicolette S. Horbach, M.D.

1    don't.

2         Q.  Okay.  You did not review the actual

3    case report forms or data compilations or any of

4    the underlying data with regard to the Gynemesh

5    PS study, correct?

6         A.  I reviewed -- not for the Gynemesh PS.

7    I had examples of the data collection form, I

8    think, for the TVM portion of the study.

9         Q.  My question is limited to the Gynemesh

10   PS study.  You have not looked at of the

11   underlying case report forms or underlying data

12   with regards to that study, correct?

13        A.  No, I don't think so.

14        Q.  Meaning I'm correct?

15        A.  Yes.  Yes, you're correct.  Sorry.

16        Q.  With regard to the French and U.S. TVM

17   studies, did you review any of the underlying

18   case report forms or data for that -- for those

19   studies?

20        A.  I have seen an example of some of the

21   case report forms that I believe were part of the

22   TVM study in the United States.

23        Q.  Was that just so you could see what

24   the forms look like and see what information was

Nicolette S. Horbach, M.D.

1    generally found on them?

2         A.  Yes.

3         Q.  You did not do an analysis of the

4    underlying data for the French or U.S. TVM

5    studies, correct?

6         A.  Correct.

7         Q.  Would you agree with me that, when you

8    put yourself up as an expert witness in a case

9    like that, that it's important for you to give

10   objective testimony?

11        A.  Yes.

12        Q.  Would you agree with me that, when you

13   put yourself up as an expert in this case --

14   well, rephrase.

15        Would you agree with me that, when you put

16   yourself up as an expert in a case like this,

17   that you review the documents that provide the

18   information you would need to provide a

19   well-supported opinion?

20        A.  Yes, I believe that -- if I followed

21   your train of questions -- yes, I would think

22   that that would be the case for any opinion that

23   I'm asked to render, yes.

24        Q.  -- in offering opinions in a case like

Nicolette S. Horbach, M.D.

1    this that you, as an expert, need to know the key

2    facts that would go into the issues that you're

3    giving opinions on?

4         A.   Yes.

5         Q.   Would you agree that you want to have

6    all of the necessary background information so

7    that when you give your opinions they are

8    supported by the actual facts of what existed and

9    what occurred?

10        A.   Yes, I have either felt that I have

11   reviewed the information that was necessary or

12   have reviewed comments by other individuals who

13   have reviewed the information that's necessary to

14   render my opinion.

15             MR. SLATER:   Could I have that read

16   back to me, please?

17        (The record was read by the reporter.)

18   BY MR. SLATER:

19        Q.   When you say you've reviewed comments

20   by other individuals, who are you referring to?

21        A.   The deposition of Dr. Anne Weber.

22        Q.   -- Weber's deposition?

23        A.   I'm sorry?

24        Q.   -- deposition?

Nicolette S. Horbach, M.D.

1            A.  We're still -- you're still cutting

2    out for half of that.

3            Q.  Oh, I'm sorry.  Well, it's better than

4    me having to come to D.C., so...

5            Did you review Dr. Weber's deposition?  Is

6    that what you're saying?

7            A.  Yes, I did.

8            Q.  Which deposition?

9            A.  The deposition that was recently taken

10   regarding this particular case.

11           Q.  Okay.  Do you know the volume of

12   documents that were produced in this litigation?

13           A.  I understand from Dr. Weber's

14   deposition that it was perhaps close to a million

15   or so documents that she has reviewed.

16           Q.  -- overall volume of documents that

17   have been produced in the overall litigation

18   involving the Prolift and Prolift+M?

19           A.  Again, I missed the first part, but do

20   I know what the total is?  I don't know what the

21   total number of documents, but I know she said

22   she has reviewed close to a million documents.

23           Q.  Ask anybody what the total volume of

24   documents is that has been produced in this

Nicolette S. Horbach, M.D.

1    litigation regarding the Prolift or Prolift+M?

2         A.  No.

3         Q.  Did you ever ask anybody what has been

4    produced in the overall litigation so you could

5    have an understanding of what existed and then

6    you could ask to see the things you thought were

7    important to see?

8         A.  I did not ask what has been produced

9    for the entire litigation.

10        Q.  Did you make an effort to learn what

11   important documents existed -- and when I say

12   "important" -- documents that would be important

13   to being able to give a fully informed opinion on

14   the issues you wanted to address -- did you ever

15   make an effort to learn what documents and

16   information existed so you could then say, well,

17   I want to see this, I want to see that?

18        A.   In this particular case I have

19   requested the information that I thought I needed

20   to make the opinions that I was making

21   clinically, yes.

22        Q.  Clinically, you're talking about with

23   regard to Connie Schubert specifically?

24        A.  Yes, that's what we're taking the

Nicolette S. Horbach, M.D.

1    deposition about is Connie Schubert.

2         Q.  Is it your understanding that your

3    role in this case is to talk solely with regard

4    to Connie Schubert?

5         A.  Well, let me -- you missed the first

6    question.  If your question is, is my role just

7    to talk about her, my role in this case, I've

8    been asked to be a clinical expert relative to

9    prolapse as a problem in general, approaches to

10   prolapse from surgical and nonsurgical

11   standpoint, the use of Prolift as a potential

12   alternative for surgical management of prolapse,

13   the methodology involved with doing the surgical

14   procedure, the complications that are seen

15   subsequent to the procedure, the information that

16   is provided in the IFU, the professional

17   education material for -- as well as the patient

18   brochure, and, finally, the specifics of the

19   treatment for Ms. Schubert.

20        Q.  What you've just described is

21   essentially the scope of the opinions that you

22   have formed and that those are the areas you

23   intend to address, correct?

24        A.  Those are the primary areas that I

Nicolette S. Horbach, M.D.

```
1    intend to address.  I mean, the areas that I

2    intend to address are indicated in my general

3    report on Prolift as well as on the information

4    that was the, I guess, disclosure, or whatever

5    you call it that -- of what I'm going to discuss

6    that was specifically written for this particular

7    case.

8              Q.  You understand that the reason we take

9    your deposition is so that we can talk to you

10   directly and not rely on documents that may have

11   had input from lawyers or people other than

12   yourself?  Do you understand that's why we talk

13   directly to you as to what issues you're going to

14   address and what your opinions are?  You

15   understand that, right?

16             A.  Yes, I understand that.

17             Q.  The description you gave a moment ago

18   starting with addressing prolapse as a problem in

19   general and going down through the specifics of

20   Connie Schubert's treatment, as you sit here now,

21   those are the areas that you have formed opinions

22   on that you intend to address in this trial,

23   correct?

24             A.  Yes.  I mean, I also plan on
```

Nicolette S. Horbach, M.D.

1    addressing in the trial my opinion regarding

2    Dr. Weber's opinions and approach to the

3    information in the Prolift that she has listed in

4    her 28 points of what should or should not have

5    been addressed.

6        Q.  Let me ask you a question.  Am I

7    correct that you do not know the full extent of

8    complications that were known to Ethicon Medical

9    Affairs at any particular point in time?

10       MS. JONES:  Object to the form.

11   BY MR. SLATER:

12       Q.  -- Prolift+M?

13       A.  I know the -- I know complications --

14   I know information regarding complications that

15   were reported to Ethicon or that they were aware

16   of as part of the type of complications

17   associated with a specific mesh.  I have not

18   specifically seen an email or a document that

19   says from Ethicon, these are all of the

20   complications we are aware of for this particular

21   product at this particular time in the use of the

22   product, a specific document saying that, I have

23   not.

24       Q.  As you sit here now, did you see any

Nicolette S. Horbach, M.D.

1    documents that indicated to you the full scope of

2    complications that were known to Ethicon with

3    regard to the Prolift at the time the Prolift was

4    first put on the market?

5            MS. JONES:  Asked and answered, object

6    to the form.

7            THE WITNESS:  It is my opinion that

8    there really -- that additional new and unusual

9    and unique complications that have occurred with

10   Prolift, I'm trying to think of any complication

11   that I am aware of that would not have been part

12   of what Ethicon would have been aware of based on

13   just mesh use in prolapse surgery in general.

14   BY MR. SLATER:

15       Q.  But is there anything that you can

16   tell me to answer that question?

17       A.  I think I just did.

18           MR. SLATER:  Can I have the question

19   read back, please?  And I'll ask you to just

20   directly answer the question.

21           (The record was read by the reporter.)

22           THE WITNESS:  I don't recall seeing a

23   specific document, as I mentioned earlier, that

24   says exactly which complications Ethicon was

Nicolette S. Horbach, M.D.

1    aware of at which point in time.

2    BY MR. SLATER:

3        Q.  Do you know the scope of complications

4    related to the Prolift that was known to medical

5    affairs at Ethicon at the time the Prolift went

6    on the market?

7        A.  Other than what would be typical for

8    any type of mesh in prolapse surgery, I don't

9    know whether there were anything specifically as

10   additional alternative -- or additional

11   complications that they were aware of.

12       Q.  If I understand correctly, to the

13   extent that you believe certain complications or

14   risks were generally understood in the medical

15   community with regard to a device like the

16   Prolift, you believe that's what would have been

17   known to Ethicon Medical Affairs at the time the

18   Prolift went on the market.  Do I understand you

19   correctly?

20       A.  Yes.

21       Q.  Do you have any knowledge as to

22   whether Ethicon had more extensive information

23   regarding the complications with regard to the

24   Prolift than what would have generally been known

Nicolette S. Horbach, M.D.

1    or assumed in the general medical community at

2    the time the Prolift went on the market?

3         A.  I don't have any knowledge that they

4    did or did not.

5         Q.  If we could, let's mark -- what we

6    marked as Exhibit 4, what I was given that has a

7    title on it Dr. Nicolette Horbach Schubert

8    Reliant List.

9         (Exhibit No. 4 marked for identification.)

10        MR. OVERBY:  They always leave me off.

11   It's okay.  I'm used to it.

12        MR. SLATER:  Extra in there, David?  I

13   apologize.

14        MR. OVERBY:  That's fine.  I memorized

15   it from the email yesterday.

16        MS. JONES:  You can have it.

17   BY MR. SLATER:

18        Q.  Exhibit 4 has a title on it,

19   Dr. Nicolette Horbach -- Schubert Reliance List.

20   Can you tell me what this document is?

21        A.  This is a compilation of all of the

22   documents that were forwarded to me regarding the

23   litigation for Ethicon, including both for the

24   Wicker case as well as for the Schubert case.

Nicolette S. Horbach, M.D.

1          Q.  Did you read and consider each of

2     these materials?

3          A.  There are some of these materials that

4     I did not review specifically for the Schubert

5     case, no.

6          Q.  Let me ask you this.  Starting with

7     the section on transcripts, you list David

8     Robinson.  Do you know which dates of deposition

9     transcripts you've reviewed for him?

10          A.  I can probably make it easier for you

11     by saying that I can tell you which transcripts

12     I've specifically reviewed in this case, and that

13     includes the transcripts of the deposition for

14     Anne Weber that was taken in June 2013, the

15     deposition of Christopher Roberts, the deposition

16     of Connie Schubert as well as the deposition of

17     Lewis Wall.  Those are the depositions that I've

18     read for this case in specific.

19          Q.  So if I understand correctly, even

20     though you've read other deposition transcripts

21     listed there, you would not be relying on those

22     for your testimony in this case?

23          MS. JONES:  I'm going to object to the

24     form of the question.  I'm going to allow

Nicolette S. Horbach, M.D.

1  Dr. Horbach to answer the question, but so that

2  I'm -- I need to put on the record, counsel, what

3  I discussed earlier in the sense that, though

4  this has the term --

5          MR. SLATER:  Well, I don't want to do

6  this right now.  I really at this point -- I

7  don't think it's an appropriate time for this.

8  I'm in the middle of a line of questioning, and

9  there is a question pending.  So I don't think

10  it's appropriate, with all due respect, to put a

11  statement on the record while a question is

12  pending --

13          MS. JONES:  Well --

14          MR. SLATER:  -- that's a very direct

15  question.

16          MS. JONES:  I will allow the witness,

17  but I'm going to object to the form of the

18  question based upon my discussion with you

19  earlier at the outset of the deposition where I

20  wanted to put on a statement on the record about

21  what this list is.

22          Dr. Horbach can answer it, but I'm going

23  to put a statement on here that clarifies what

24  this is that I've already discussed with you.

Nicolette S. Horbach, M.D.

1          You may go ahead, Doctor.

2     BY MR. SLATER:

3          Q.  Dr. Horbach, the materials you just --

4     rephrase.

5          Those depositions that you just identified

6     for me, is it your intention to rely on those

7     depositions that you specifically pointed to for

8     your testimony in this trial?

9               MS. JONES:  Object to the form.

10              THE WITNESS:  Yes, primarily, yes.

11              MS. JONES:  Now, counsel, let me put

12    the statement on the record at this point --

13    you've gotten your answer -- that this list was

14    compiled by me yesterday essentially at your

15    request.  It does include the materials that

16    Dr. Horbach has in her possession.  She -- they

17    are intended to be a statement of materials in

18    her possession or that she has reviewed whether

19    or not she specifically relies upon those, and

20    there are some additional materials about which

21    you can ask her that are not on this list.

22              MR. SLATER:  Okay.  I'll get to those.

23    BY MR. SLATER:

24         Q.  As you sit here now -- it says you

Nicolette S. Horbach, M.D.

1    read David Robinson's transcripts.  Do you know

2    what dates those were, those transcripts?

3           A.  No.  My comment was I didn't say that

4    I had done that.  I have copies of David

5    Robinson's transcripts.  I have glanced through

6    them, you know, in a little more briefer fashion

7    prior to my review of anything about Connie

8    Schubert.  It was more relative to the

9    information on Wicker.  So I can't give you the

10   specific dates.  All that information's at home.

11          Q.  Okay.

12          MS. JONES:  Counsel, I'd be happy --

13   BY MR. SLATER:

14          Q.  Is it fair to say -- let me continue.

15          Is it fair to say that, with regard to the

16   Ethicon employees listed here -- well, let me ask

17   you this.  Do you know which of these people are

18   Ethicon employees that are listed on this list of

19   transcripts?

20          A.  I know -- I recognize the names of

21   some of the individuals here as Ethicon

22   employees, yes.

23          Q.  Which ones?

24          A.  Williams, Robinson, I know that there

Nicolette S. Horbach, M.D.

1    have been emails going back and forth with

2    Hinoul, I guess it is, so -- I think that's how

3    you pronounce that name -- as well as Gauld.

4        I don't recall whether I've seen emails or

5    information about Jessica Shen as an employee.

6    Obviously Dr. Lucente is not an employee.  And

7    Ping Yu, I don't recall -- I'm trying to remember

8    whether I've seen specifics whether she was or he

9    was.

10       Q.  Is it fair to say that, with regard to

11   the Ethicon employees whose transcripts you have,

12   you have not read them in their entirety?

13       A.  That would be fair to say, yes.

14       Q.  Would it be fair to say that, with

15   regard to each of those Ethicon employees who you

16   were provided transcripts from, you may have

17   glanced at them but you have not read them in

18   depth at all?

19       A.  I have not read them in depth.

20       Q.  As you sit here now, is it fair to say

21   you are not relying specifically on anything

22   stated in any of the depositions of the Ethicon

23   employees for your opinions?

24       A.  Of those that I've -- of those

Nicolette S. Horbach, M.D.

1    employees that I mentioned, yes, that's correct.

2           Q.  Is it fair to say you're not relying

3    specifically on anything in Vincent Lucente's

4    deposition transcript for any of your opinions in

5    this case?

6           A.  I have not read his in entirety at

7    this point in time, so, no -- yes, it would be

8    correct.

9           Q.  Did you read Anne Weber's deposition

10   transcript from June 2013 in its entirety?

11          A.  Yes.

12          Q.  Did you read the deposition of

13   Christopher Roberts in its entirety?

14          A.  Yes.

15          Q.  Did you read the deposition of Connie

16   Schubert in its entirety?

17          A.  Yes.

18          Q.  Did you read the deposition of Lewis

19   Wall in its entirety?

20          A.  Yes.

21          Q.  Are you aware of who Dr. Wall is?

22          A.  Yes.

23          Q.  He's a nationally recognized medical

24   ethicist and a highly respected urogynecologist,

Nicolette S. Horbach, M.D.

1    correct?

2              MS. JONES:  Object to the form.

3              THE WITNESS:  I think that Dr. Wall is

4    a nationally recognized ethicist and

5    humanitarian, and he does do a urogynecologic

6    practice, yes.

7    BY MR. SLATER:

8         Q.  With regard to the specifics of Connie

9    Schubert's medical condition, would you defer to

10   Lewis Wall as her treating surgeon with regard to

11   those specifics?

12        A.  No.

13        Q.  Do you know when the last time was

14   that Dr. Wall saw Connie Schubert?

15        A.  The last record I have was when she

16   was seen in July of 2013 at her four-week

17   postoperative visit.

18        Q.  At that time Dr. Wall was seeing her

19   postoperatively to her July 10, 2013 surgery,

20   correct?

21        A.  Yes.

22        Q.  The surgery performed by Dr. Wall on

23   July 10, 2013 was extensive, correct?

24        A.  I don't know that you can call it

Nicolette S. Horbach, M.D.

1   necessarily extensive per se.  I know he incised

2   tissue and dissected and closed the area.  That

3   typically, to me, would not be referred to as

4   extensive.

5        Q.  In July of 2013 Dr. Wall removed

6   eroded mesh from Connie Schubert's vagina and

7   pelvis, correct?

8        A.  He did -- he removed some of the

9   synthetic mesh that was presumed to be the two

10   little blue areas that were seen on the

11   photograph.

12        Q.  Is it your understanding that the two,

13   as you call them, the two little, blue areas on

14   the photograph, that that's the only mesh that

15   was removed from Connie Schubert during the July

16   10, 2013 surgery, just what's visible on those

17   photographs?

18        A.  Not necessarily.  He did -- he did

19   remove a piece of tissue that pathology read as

20   being a centimeter by .5 centimeters, that that

21   had tissue and mesh within it, so I can't tell

22   you how much of that was mesh and how much of

23   that was tissue.

24        Q.  You understand that Dr. Wall did not

Nicolette S. Horbach, M.D.

1   send everything he removed from Connie Schubert

2   down to pathology.  You know that, right?

3        A.  That's against hospital policy.

4        Q.  You believe that every single bit of

5   tissue or mesh that Dr. Wall would have removed

6   would need to have been sent down to pathology?

7        A.  That's JACO standards, yes.

8        Q.  Once that material would have been

9   sent -- well, rephrase.

10       You would understand that the pathology

11  lab, when it received material from Dr. Wall,

12  would not keep all that material; it would sample

13  some of it and discard the rest.  Do you know

14  that?

15       A.  That's incorrect.

16       Q.  Do you believe that in the state of

17  Missouri when a surgery is performed to remove

18  mesh and tissue that every bit of everything that

19  is removed needs to be preserved by the hospital

20  pathology lab?  Is that your understanding?

21       A.  I can't say that based on Missouri

22  law, but in this particular case, when you remove

23  a specimen, you do a gross assessment where you

24  do the measurement of the specimen, and there are

Nicolette S. Horbach, M.D.

1    listed two specific areas that were removed and

2    the size and dimensions of that tissue, and then

3    you sample sections of it for microscopic

4    analysis.  But you do measure the entire

5    aggregate or gross amount of the tissue that was

6    removed, yes.  You don't just measure some of it

7    and not measure other parts of it, at least from

8    the gross description.  You may not sample every

9    bit of it microscopically, but at least from the

10   gross description.

11        Q.  When Dr. Wall operated on Connie

12   Schubert in July of 2013, he found eroded mesh

13   and he found contracted and scarred mesh as well,

14   correct?

15        A.  Let me pull back his specific

16   operative report.  I have the -- my summary

17   notes, but let me pull his specific operative

18   report.

19        All right.  I have the operative report

20   now.

21        Q.  You can see under the operative

22   findings that Dr. Wall commented in part, there

23   was a transverse mesh band at the vaginal apex

24   which was smaller than two fingers in diameter

Nicolette S. Horbach, M.D.

1   with sharp edges clearly palpable and blue fibers

2   of mesh clearly visible.  Do you see that?

3          A.  Yes.

4          Q.  That is contracted and scarred mesh

5   that had eroded through the vagina, correct?

6          A.  I can't -- I mean, I can't know

7   whether or not the transverse band that he

8   specifically is referring to is mesh in its

9   entirety or it's part mesh and part contraction.

10  Oftentimes they may be --

11          THE REPORTER:  Slow down for me,

12  please, Doctor.  "Oftentimes they may be --"

13          THE WITNESS:  Oftentimes during

14  surgery it is difficult to determine whether or

15  not the band that you're feeling is

16  specifically -- has mesh underneath it versus

17  simply scar.

18  BY MR. SLATER:

19          Q.  Dr. Wall described it as a transverse

20  mesh band.  Do you see that?

21          A.  Yes, but he does not say the

22  measurements of the band.

23          Q.  Doctor, my question is this -- move to

24  strike.

Nicolette S. Horbach, M.D.

```
1            Dr. Wall refers to a transverse mesh band,
2    correct?
3            A.  Yes.
4            Q.  In the common vocabulary for this type
5    of surgery, that would mean that you had mesh
6    that had scar tissue that had formed around it
7    and contracted it down and made it hard and
8    tight, correct?  That's what a transverse mesh
9    band would be in this context, right?
10           A.  I don't -- I mean, I don't know what
11   he specifically is meaning when he says that.
12   All I have to do is be able -- that's a
13   subjective statement, and I have information to
14   look at objectively based on the path. report
15   that tries to give me information about the
16   extent of that band.
17           Q.  Move to strike.  I didn't ask you the
18   extent of the band, so --
19           A.  Well --
20           Q.  All I asked you was, if I'm correct
21   that what he describes there would be commonly
22   understood to be a combination of mesh and scar
23   tissue that would have contracted down and
24   hardened this mesh.  That's the common
```

Nicolette S. Horbach, M.D.

 1   vocabulary, right?

 2             MS. JONES:  Object to the form.

 3             THE WITNESS:  Again, I don't know

 4   whether that's what he's referring to, but he

 5   says that there is a transverse mesh band at the

 6   apex.  So I would -- it could be just it's mesh,

 7   it could be that it's mesh and tissue.  I can't

 8   tell you.

 9   BY MR. SLATER:

10        Q.  Your understanding would be that that

11   transverse mesh band referred to by Dr. Wall

12   would be either just mesh or mesh combined with

13   scar tissue, one or the other, correct?

14        A.  Yes.

15        Q.  Certainly Dr. Wall would have a better

16   understanding than you would have as to what he

17   actually saw and what he actually removed from

18   Ms. Schubert's body because he performed the

19   surgeries, correct?

20        A.  Yes.

21        Q.  You've referred to the pathology

22   report.  The pathology report is quite terse with

23   regard to the specimens that were removed after

24   this surgery, correct?

Nicolette S. Horbach, M.D.

```
 1          A.  Yes.

 2          Q.  One would not necessarily know exactly

 3   what was removed from Connie Schubert or the

 4   quality of what was removed from reading that

 5   pathology report, correct?

 6          A.  No.

 7          Q.  Not correct?

 8          A.  No.  I said to you specifically before

 9   that the pathologist is required to measure and

10   at least -- the gross specimen, and that's what

11   they have indicated on the pathology report.  So

12   there is a measurement of the two gross --

13   G-R-O-S-S -- specimens as well as sampling of one

14   of the specimens.

15          Q.  When one looks at the pathology

16   report, do you have an understanding of the

17   quantity of material that was measured by the

18   pathologist -- that's one of the things there,

19   correct?

20          A.  Yes.

21          Q.  Beyond that, the pathologist did not

22   provide much information about the specific

23   quality or characteristics of what was removed,

24   correct?
```

Nicolette S. Horbach, M.D.

1          A.  No.  Well, I'm not saying -- no, I

2     can't answer -- I can't -- I would not agree with

3     that.  The pathologist says that they removed or

4     that they investigated one portion of the

5     specimen that was removed, which I presume is the

6     part that did not necessarily have the mesh in

7     it, and said that there was simply -- trying to

8     find this reference here -- I think it was

9     epithelial tissue or something.  It does not

10    describe that there was actually foreign body.

11    It appears as if the pathologist only sampled

12    perhaps one of the area.

13         Q.  The pathologist actually -- well,

14    rephrase.

15         The vaginal tissue would be epithelial

16    tissue, correct?

17         A.  Yes.

18         Q.  The pathologist actually calls the

19    tissue squamous mucosa, which would be an

20    inaccurate description of vaginal tissue,

21    correct?

22         A.  No.

23         Q.  Do you believe that epithelial tissue

24    is the same thing as mucosa?

Nicolette S. Horbach, M.D.

1          A.  No.  The vagina is made up of squamous

2     epithelium.

3          Q.  The vagina -- the vaginal tissue is

4     epithelial tissue; it's not mucosal tissue,

5     correct?

6          A.  We've referred to the vaginal wall as

7     a squamous epithelium, and we will use the terms

8     interchangeably, epithelium and mucosa, to

9     describe the lining of the vagina.

10         Q.  Okay.  Ultimately, the pathologist, as

11    you described it, did an analysis of a portion of

12    tissue and made a very terse report on it, and

13    that's all the information we have from the

14    pathology, correct?

15         A.  Well, he said that the soft tissues

16    were submitted in total, so -- and he made the

17    comments about what he saw.  So there was no

18    histologic abnormality on the soft tissues that

19    he saw.

20         Q.  Do you know what the pathologist meant

21    when he said no histo -- rephrase.

22         Do you know what the pathologist meant

23    when he said that there was no histopathologic

24    abnormality with the tissue that he sampled?

Nicolette S. Horbach, M.D.

1          A.   Typically that would be interpreted as

2    there were not any other abnormal cell findings

3    such as chronic inflammation, such as, you know,

4    granuloma, such as inflammatory cells.

5          Typically, as in her first pathology

6    report, they did mention that there was a chronic

7    inflammation seen at the time of the pathology

8    report.  That was not -- that was specifically

9    stated as not being present at the time of the

10   second pathology report.

11         Q.   Well, there is no description one way

12   or the other with regard to -- rephrase.

13         The pathologist does not talk one way or

14   the other about the term chronic inflammation,

15   granulomas, inflammatory cells.  He doesn't use

16   those terms, correct?

17         A.   No, you're wrong.  He specifically

18   says they weren't there.  He says specifically

19   there's no histo -- histopathologic

20   abnormalities, so he is telling you that those

21   changes were not seen.

22         Q.   Well, the pathologist doesn't use the

23   term chronic inflammation or no chronic

24   inflammation.  He doesn't say that, right?  Do

Nicolette S. Horbach, M.D.

1    those words appear in the report?

2         A.  On his report?  On that particular

3    report?  No, but on the --

4         Q.  --

5         A.  -- on the previous report --

6         Q.  He doesn't use the word -- Doctor,

7    it's a very simple question.

8             MS. JONES:  Let --

9    BY MR. SLATER:

10        Q.  Okay?  Does the pathologist use the

11   word "chronic inflammation" one way or the other

12   in this report?

13        A.  No.

14        Q.  Does he use the word "granulomas" in

15   this report?

16        A.  No.

17        Q.  Does he use the word "inflammatory

18   cells" in this report?

19        A.  No.

20        Q.  He states with regard to the portion

21   of tissue that he actually analyzed that that

22   portion of the tissue had no histopathologic

23   abnormality, correct?

24        A.  Yes.

Nicolette S. Horbach, M.D.

```
1          Q.  One of the things Dr. Wall did in July

2    of 2003 was he made an effort to treat the

3    vaginal anatomic distortion that Mrs. Schubert

4    was suffering from, correct?

5          A.  Surgery from 2013, I think you mean,

6    rather than 2003.  Yes, he says that he did a

7    vaginoplasty as part of his procedures and

8    describes cutting through tissue and then

9    suturing it closed.

10         Q.  I'm just going to ask the question

11   again because, you're right, I missed by a

12   decade.

13         One of the things Dr. Wall did in July of

14   2013 is he treated as best he could the vaginal

15   anatomic distortion that Mrs. Schubert was

16   suffering from, correct?

17              MS. JONES:  Object to the form.

18   BY MR. SLATER:

19         Q.  Is that a true statement?

20         A.  Distortion I would -- I mean, I

21   don't -- I can't necessarily -- I won't answer

22   that based on distortion.  He corrected the

23   anatomy that he found at the apex of the vagina.

24         Q.  The anatomy at the apex of Connie
```

Nicolette S. Horbach, M.D.

1    Schubert's vagina was significantly irregular,

2    correct?

3         A.  He doesn't describe it as irregular.

4    He describes it as being narrowed.

5         Q.  Well --

6         A.  That's different.

7         Q.  Compared to a normal vaginal apex, it

8    was not normal, right?

9         A.  That -- that is true, yes.

10        Q.  The surgery that Dr. Wall performed in

11   July of 2013 was necessitated at least in part by

12   the fact that Connie Schubert had a Prolift and a

13   Prolift+M placed in her body previously, correct?

14        A.  Yes.

15        Q.  So the Prolift and Prolift+M surgeries

16   contributed at least in part to the need for this

17   surgery and this treatment for these

18   complications, correct?

19             MS. JONES:  Form.

20             THE WITNESS:  Yes.  Yes.

21   BY MR. SLATER:

22        Q.  And in fact all of the treatment

23   Connie Schubert had of a surgical nature from --

24   after her initial surgery in December 2008 was

Nicolette S. Horbach, M.D.

1   necessitated at least in part by the Prolift

2   surgery and then the Prolift+M surgery, correct?

3         MS. JONES:  Object to the form.

4         THE WITNESS:  Necessitated -- let me

5   just clarify it.  The -- she had surgery done to

6   treat issues of the mesh.  Whether that surgery

7   was indicated at each time that she was treated,

8   that I may not totally agree with.  I think that

9   there are sometimes alternative measures that can

10  be done.  But if she was going to end up having

11  surgery for removal of eroded mesh, then, yes,

12  that was -- that mesh was from the Prolift.

13  BY MR. SLATER:

14        Q.  Okay.  I understand.  Let me ask the

15  question cleaner.  After the Prolift was

16  initially put in Connie Schubert's body, she had

17  multiple procedures either in the office or in

18  the operating room to revise or remove mesh and

19  then ultimately to try to fix the shape of her

20  vaginal apex.  That happened over the course of

21  time, correct?

22        A.  Yes.

23        Q.  The cause of those surgeries at least

24  in part was the fact that the Prolift had been

Nicolette S. Horbach, M.D.

1    put in her body and then the Prolift+M was put in

2    her body, correct?

3            MS. JONES:  Object to the form.

4            THE WITNESS:  Yes.

5    BY MR. SLATER:

6        Q.  In other words, these complications

7    that Connie Schubert had would be properly termed

8    Prolift and Prolift+M complications that

9    needed -- that were ultimately treated, correct?

10           MS. JONES:  Form.

11           THE WITNESS:  Yeah.  Yes.

12           THE REPORTER:  I'm sorry?

13           THE WITNESS:  I said not just

14   potentially from the Prolift, but yes.

15   BY MR. SLATER:

16       Q.  Certainly the Prolift and Prolift+M

17   were significant contributing factors to these

18   complications, correct?

19           MS. JONES:  Object to the form.

20           THE WITNESS:  They were contributing

21   factors.

22   BY MR. SLATER:

23       Q.  You're not going to offer an opinion

24   that if Connie Schubert had had a different

Nicolette S. Horbach, M.D.

```
 1   surgery in December of 2008 what the outcome of

 2   that surgery would have been, correct?

 3        A.  No, I don't think I would be --

 4        Q.  It would be speculation, right?

 5        A.  Yes.  I don't think I would be able to

 6   offer that unless I was clairvoyant.

 7        Q.  Well, if you are, I would like to

 8   invite you to the racetrack or the casino after

 9   this deposition.

10        A.  Wish that was the case, but, no.

11        Q.  You with agree with me that at the

12   time Connie Schubert was initially treated in

13   December of 2008 she had multiple reasonable

14   options, not just the Prolift, correct?

15        A.  She had multiple other options, yes,

16   for treatment.

17        Q.  One of the reasonable options for

18   Connie Schubert at that time would have been to

19   do no surgery, watch her condition, do exercises

20   and just see how she progressed.  That would have

21   been a reasonable option, correct?

22             MS. JONES:  Object to form.

23             THE WITNESS:  I can say that it would

24   have been a reasonable option to do no surgery
```

Nicolette S. Horbach, M.D.

```
 1    and see how she progresses.  I don't think that

 2    exercises are going to make any difference in

 3    this case.

 4    BY MR. SLATER:

 5         Q.  One option -- rephrase.

 6         One reasonable option for Connie Schubert

 7    as of December 2008 would have been to have no

 8    surgery and just watch and wait and see how she

 9    did and see if she could live with her symptoms,

10    correct?

11         A.  That is one option, yes.

12         Q.  One option that would have been a

13    reasonable option for Connie Schubert would have

14    been to just have an anterior colporrhaphy and no

15    other surgical treatment, correct?

16              MS. JONES:  Object to the form.

17              THE WITNESS:  I disagree with that.

18    BY MR. SLATER:

19         Q.  Why?

20         A.  Based on the surgeon's description

21    that there was an enterocele present at the time

22    of her original examination prior to the Prolift

23    placement and anterior repair lobe will not

24    correct an enterocele.
```

Nicolette S. Horbach, M.D.

```
1         Q.  Do you have an understanding to a
2    reasonable degree of medical probability as to
3    the extent of an enterocele that Connie Schubert
4    had before the first surgery in December 2008?
5         A.  No, but it doesn't make any
6    difference.
7         Q.  The answer to my question is no,
8    correct?
9         A.  Correct.  The answer is no.
10        Q.  There are enteroceles -- well,
11   rephrase.
12        An enterocele can present with varying
13   severities, correct?
14        A.  Yes.
15        Q.  -- and some would not, correct?
16        A.  I'm sorry.  Half that question went
17   away.
18        Q.  Sure.  Depending on the severity of an
19   enterocele, some may require surgery from your
20   perspective and some may not, correct?
21        A.  If you're only treating an enterocele
22   as the only problem, yes, I agree with that
23   statement, but you can't treat an anterior
24   prolapse in the place of an enterocele and leave
```

Nicolette S. Horbach, M.D.

1    an enterocele untreated without increasing the

2    risk that the patient is going to have a more

3    rapid deterioration of their apical support

4    and/or recurrence of -- or progression of their

5    enterocele requiring further surgery, or,

6    alternatively, if you only do an anterior repair

7    and you try to treat the enterocele at the same

8    time with just an anterior repair, you'll result

9    in vaginal shortening.

10          Q.  So if I understand correctly, you

11   think that if the decision had been made to do an

12   anterior colporrhaphy that a procedure would have

13   also been needed just to support the apex due to

14   the fact that there was an enterocele of some

15   degree as well.

16          A.  Yes.

17          Q.  Do I understand you correctly?

18          A.  Yes, that would need to be treated.

19          Q.  I'm sorry.  And what would have been

20   the reasonable options to treat the enterocele in

21   conjunction with the anterior colporrhaphy?

22          A.  There is the option of a transvaginal

23   enterocele repair.  There is the option -- and

24   that can be done in multiple different ways of

Nicolette S. Horbach, M.D.

1    a -- some form of a McCall's type of suspension.

2    There is the possibility of doing a sacrospinous

3    ligament fixation with repair of the enterocele

4    to support the apex.  There is the possibility of

5    doing a uterosacral ligament suspension, but that

6    is usually much more challenging to do in a

7    post-hysterectomy patient as the ligaments can be

8    more difficult to find.  Or there was the option

9    of proceeding with an abdominal approach for

10   apical support and correction of the enterocele.

11        Q.  And all of those options from your

12   perspective would have been reasonable options

13   for Connie Schubert, correct?

14        A.  I think that there -- I mean,

15   reasonable is hard to say because it would depend

16   a little bit more on her anatomy before I would

17   make a decision about what would be a more or

18   less reasonable option.

19        Q.  Okay.  So you're not going to form an

20   opinion on that issue as we sit here now,

21   correct?

22        A.  I'm not going to form an opinion on

23   what should have been done as an alternative?

24        Q.  Well, what of that list of options

Nicolette S. Horbach, M.D.

1    would have been reasonable options for her?  You

2    said you would need more information to give that

3    opinion.  Do I understand you correctly?

4         A.  I think all of them would be

5    reasonable options from a hypothetical,

6    theoretical standpoint.  In this individual

7    patient they all might be reasonable options as

8    well, but when I make a recommendation for a

9    patient, at least myself, I take into account

10   other aspects of anatomy.  But those are all --

11        Q.  With regard to --

12        A.  Do you want me to finish?

13        Q.  Yes, I do.  I apologize.

14        A.  But those are all reasonable options

15   that can be used for treatment of a patient who

16   has a similar description on exam.

17        Q.  With regard to Connie Schubert

18   specifically as a patient, you're not able to

19   form an opinion to a reasonable degree of medical

20   probability as to which of these options would

21   have been reasonable for her because you would

22   need more information to give that opinion.  Do I

23   understand you correctly?

24        A.  Yeah, I guess so, I mean... yeah, I

Nicolette S. Horbach, M.D.

```
1    guess so.  I'd have to be -- I'd have to examine

2    before I would myself make a decision.  I think,

3    you know, from a global medical perspective, I

4    think that different surgeons may choose any of

5    those as options.  That's the hard part about our

6    surgical specialty is that it's an art as much as

7    it is a science -- or actually probably an art

8    more than it is a science.

9         Q.  There was a note pre-operatively in

10   Dr. Roberts' records referring to dyspareunia.

11   You saw that, right?

12        A.  Yes.

13        Q.  Do you know specifically what he was

14   referring to when he used the term dyspareunia?

15   I don't mean what the general understood

16   definition is, but I want to know if you know

17   what specific symptoms he was referring to with

18   regard to Connie Schubert.

19        A.  He didn't specify anything more than

20   that, so I can't -- I don't know what he means by

21   that specifically.

22        Q.  -- in general terms, doctors use the

23   word dyspareunia to cover a whole range of

24   different levels of symptoms or complaints that
```

Nicolette S. Horbach, M.D.

1    they might include under that definition, so

2    you'd need to know more to know exactly what her

3    specific symptoms were, fair?

4         A.  I think dyspareunia can cover a

5    variety of different types of complaints, yes.

6         Q.  Do you know whether Connie Schubert

7    was sexually active and had a satisfying sexual

8    life right up until the time of the December 2008

9    surgery one way or the other?

10        A.  She reports in her deposition that she

11   was sexually active and had viewed that as being

12   satisfying prior to the surgery.

13        Q.  Did you review a clinical expert

14   report in this case with regard to the Prolift or

15   Prolift+M?

16        A.  I reviewed a clinical expert report

17   that was done by David Robinson, I believe.  That

18   was dated, I believe, in 2011.

19        Q.  Okay.  Did you form any opinions one

20   way or the other based on that clinical expert

21   report?

22        A.  I think his report was part of the

23   information that I reviewed in forming my

24   opinions, but I can't specifically tell you which

Nicolette S. Horbach, M.D.

1    specific opinion was only based on that

2    information.

3         Q.  Do you know, as you sit here now, what

4    medical affairs in Ethicon knew or thought with

5    regard to the causes or the consequences of mesh

6    contraction with the Prolift or Prolift+M?

7         A.  Do I know what they knew about the

8    causes?  No, I don't think I can say specifically

9    whether they knew what, you know, what -- I

10   don't -- I can't specifically say whether they

11   knew or not what the consequences of using

12   Prolift or Prolift+M or a mesh in the vagina

13   could end up causing.  I don't know what their

14   extent was of knowledge.

15        Q.  Let me ask you a question.  Let's come

16   back to Exhibit 4, if we could.  This is your

17   so-called reliance list.  I started to ask you

18   this before, and I want to go through it a little

19   bit.  We went through the transcripts.  I'd like

20   to look now at the section that says Expert

21   Reports.  Do you see that?

22        A.  Yes.

23        Q.  -- reports from cover to cover?

24        A.  I'm sorry.  Did I what?

Nicolette S. Horbach, M.D.

1          Q.  Did you read each of the listed expert

2    reports from cover to cover?

3          A.  I have read, I think, them from cover

4    to cover, not as recently, though, because some

5    of these I read in evaluation of the Wicker case.

6          Q.  I just want to be clear because I

7    might have just spaced out for a second.  Did you

8    say that you read each of these expert reports

9    from cover to cover at some point?

10         A.  Yes, I believe so.

11         Q.  Okay.  Was the information found in

12   these expert reports of importance to you in

13   forming your opinions?

14         A.  Some of them were; some of them

15   weren't.

16         Q.  Was the information in Dr. Elliott's

17   report of importance to you in forming your

18   opinions?

19         A.  I can't -- I can't give you the

20   specifics about that because they were -- I read

21   them a while back, and so what -- which piece of

22   information from which expert report I relied in

23   creating a global opinion I won't be able to

24   answer that even if you go down the entire list.

Nicolette S. Horbach, M.D.

```
 1          Q.  Am I correct that with regard to each

 2   of these expert reports you at least had that

 3   information available to you and it's something

 4   that you would have known about at some point?

 5          A.  Yes.

 6          Q.  With regard to Dr. Klinge's expert

 7   report, is that something you took into account

 8   in forming your opinions?

 9          A.  It was part of the information that

10   I've used in forming my opinion, yes, his report

11   plus the work he's done in the literature.

12          Q.  You're familiar with who Dr. Klinge

13   is?

14          A.  Yes.

15          Q.  You're aware that he's a

16   world-renowned expert with regard to the

17   materials that are used in the various meshes for

18   surgical treatment in the pelvis and abdomen?

19               MS. JONES:  Object to the form.

20               THE WITNESS:  I'm aware that he is --

21   that his research is in areas of the tissue

22   response of meshes in the abdomen primarily,

23   although he has done some work in the pelvis.

24   BY MR. SLATER:
```

Nicolette S. Horbach, M.D.

1          Q.  Did you -- well, rephrase.

2          Do you know to what extent -- withdrawn.

3     Withdrawn.

4          Would you agree with me that the

5     contraction of the Prolift mesh was a

6     contributing factor to the recurrence of prolapse

7     that ultimately occurred with Connie Schubert?

8               MS. JONES:  Object to form.

9               THE WITNESS:  I think it could be a

10    contributing factor.  I can't tell you for sure

11    that it was absolutely a contributing factor.

12    BY MR. SLATER:

13         Q.  It may not have been.  You can't say

14    better than that?  Fair?

15         A.  I think that it potentially had a part

16    of the -- it had a role in contributing

17    potentially to her -- her recurrent prolapse.  We

18    don't totally understand in every single patient

19    what all of the factors are that create a

20    recurrence of prolapse.  So we make a hypothesis

21    of factors that we think are related to it.

22         Q.  It's certainly understood with the

23    type of contraction of mesh that was documented

24    in the operative reports for Connie Schubert that

Nicolette S. Horbach, M.D.

1   contraction of that nature in that location can

2   lead to a recurrence of prolapse as Connie

3   Schubert actually experienced, correct?

4          A.  I think --

5              MS. JONES:  Object to the form.

6              THE WITNESS:  I think that the -- I

7   can't answer -- I don't agree with that statement

8   in part because the area of contraction that is

9   oftentimes referred to is usually more in the

10  area distally where the graft may pull superiorly

11  making the patient more at risk for a distal type

12  of recurrence, or, alternatively, could the graft

13  pull medially and make the patient more at risk

14  for more lateral issues.

15          In this particular case the patient

16  developed a recurrence that was superior to the

17  proximal edge of the anterior mesh, and,

18  therefore, it would be a little more difficult to

19  postulate from a mechanistic standpoint that the

20  contraction of the mesh alone was responsible for

21  creating that.

22          Q.  You would agree with me that it's

23  likely that the contraction of the Prolift mesh

24  was a contributing factor to the occurrence of

Nicolette S. Horbach, M.D.

1    the -- recurrence of the prolapse, correct?

2              MS. JONES:  Object to the form.

3              THE WITNESS:  I can't answer that per

4    se.  I think it's possible, but I can't say that,

5    yes, you know, for medical certainty that it was

6    absolutely a contributing factor.

7    BY MR. SLATER:

8         Q.  You can't say one way or the other,

9    it's possible one way or the other?  Do I

10   understand correctly?

11        A.  Well, first of all, the whole issue of

12   contracture of the mesh, it is unclear whether

13   that contracture, quote/unquote, or fold or

14   whatever you want to call it that Roberts refers

15   to is proximal or distal to the location of where

16   the recurrence was.  That information isn't

17   clearly spelled out.  So the difficulty is that,

18   if the mesh -- if the recurrence was distal to

19   that area, then the mesh probably didn't have a

20   role to play in it because the mesh was still

21   covering that aspect.

22        Q.  As you sit here now, are you familiar

23   with any internal documents within Ethicon's

24   records where people in medical affairs or others

Nicolette S. Horbach, M.D.

1  analyzed the subject of contraction and

2  recurrence in such a way that it would cut for or

3  against connecting the contraction of Connie

4  Schubert's mesh to her recurrence?

5       A.  I'm sorry.  Is there a way to

6  rephrase?  You're gone again.

7       Q.  -- any --

8       A.  Sorry.  You were gone again.

9       Q.  Are you familiar with any internal

10  Ethicon documents analyzing the connection

11  between contraction of mesh and recurrence of

12  prolapse?

13       A.  I'm familiar with emails discussing

14  that aspect of whether or not that may be a

15  factor in contributing to recurrent prolapse.

16       Q.  Are you aware of whether medical

17  affairs at Ethicon believed that contraction of

18  mesh was a contributing factor to recurrence?

19       A.  I don't know whether they were

20  specifically aware, no.

21       Q.  The contraction of the Prolift mesh is

22  a complication, correct?

23       A.  Yes.

24       Q.  The erosion of the Prolift mesh is a

Nicolette S. Horbach, M.D.

```
1   complication, correct?

2        A.  Yes.

3        Q.  The contraction and erosion of the

4   Prolift+M mesh, that is -- well, rephrase.  I'll

5   ask it broken down.

6        The contraction of Prolift+M mesh, that is

7   a complication, correct?

8        A.  Yes.

9        Q.  The erosion of the Prolift+M mesh was

10  a complication, correct?

11            MS. JONES:  Object to the form.

12            THE WITNESS:  If indeed the mesh that

13  eroded was the Prolift+M mesh at a subsequent

14  time, yes, that would be -- that would be a

15  complication of the procedure.  I think that

16  there is perhaps some debate about what actually

17  eroded subsequent to the time of the Prolift+M

18  being placed, how much of it was Prolift itself

19  versus Prolift+M.

20  BY MR. SLATER:

21       Q.  It's difficult for you to tell because

22  the Prolift had been put in, portions had been

23  revised and removed, and then an anterior

24  Prolift+M was put in with Prolift mesh remaining
```

Nicolette S. Horbach, M.D.

```
1    in her body, correct?

2         A.  Correct, so that the mesh that came

3    out was either Prolift+M or Prolift itself, yes,

4    either one.

5         Q.  To the extent that Dr. -- rephrase.

6         If, hypothetically, Dr. Roberts had

7    removed the entire anterior part of the Prolift

8    other than the arms, if that had happened, the

9    contracted mesh and the eroding mesh in the

10   anterior part of the vagina would have been

11   Prolift+M mesh after the Prolift+M was put in,

12   correct?

13        A.  Yes.

14        Q.  Did you have an opinion to a

15   reasonable degree of medical probability as to

16   whether that scenario is likely what occurred

17   here?

18        A.  I think it probably did, yes.

19             MS. JONES:  Counsel, when you get to a

20   stopping point --

21             MR. SLATER:  Do you guys want to eat

22   soon?

23             MS. JONES:  Well, I'm going to have to

24   send somebody down.  I mean, even if we take a
```

Nicolette S. Horbach, M.D.

```
1    quick break and come back for a minute while

2    we --

3              MR. SLATER:  You know what?  This is a

4    good time.  Let's break.  Fine.  We're making

5    good progress.

6              VIDEO SPECIALIST:  The time now is

7    12:45.  We are going off the record.  This is the

8    end of disk number 1.

9         (Proceedings recessed.)

10             VIDEO SPECIALIST:  The time now is

11   1:44.  We are back on the record.  This is the

12   beginning of disk number 2.

13   BY MR. SLATER:

14        Q.  Okay.  Dr. Horbach, I'm going to ask

15   you some more questions about Exhibit 4, the list

16   of reliance materials.

17        A.  Okay.

18        Q.  On the second page there is a heading

19   that says Employment Records.

20        A.  Mm-hmm.

21        Q.  Is there anything in those employment

22   records that was of significance to you in

23   forming your opinions in this case?

24        A.  Yes.
```

Nicolette S. Horbach, M.D.

1          Q.   What?

2          A.   The information -- there are several

3     pieces of information for her employment records.

4     Specifically the association with her working at

5     her employer, the Justin Brands, around the time

6     that the patient experienced her symptoms of

7     prolapse, and the level of activity that she was

8     doing at that time in her job, the amount of

9     physical exertion that she was doing in her job.

10          In addition, during that time period she

11     also had filed or she also was filing components

12     of workman comp for activities that were

13     associated with her job, and that that in and of

14     itself, the lifting of this cement bucket of

15     something or other was associated with triggering

16     part of her bladder problems as well as her

17     all-over body problems that she mentioned, and

18     certainly with the physical exertion she's doing,

19     that can make her at increased risk for

20     developing issues of the prolapse.

21          In addition, the employment records that

22     go from her postoperative time period after her

23     original surgery and the aspect of going back to

24     work, and, you know, full-time, and when she was

Nicolette S. Horbach, M.D.

1   doing that as well as potentially then increasing

2   the rate -- the risk of her having a problem with

3   a recurrence of a prolapse.  She also eventually

4   -- hang on.  Let me get back to my section where

5   I wrote my notes, if I can find it.  Okay.  I'm

6   sorry.

7        So that she is, during that time of her

8   employment with Justin Boots, she is stating, as

9   part of her workman's comp complaint, that her

10  injury, that is, i.e., the prolapse began

11  December 1st at work and was, therefore, a

12  work-related problem.  She, you know,

13  subsequently had her surgery.  She returns to

14  work, and then at one point ends up having -- at

15  one point is no longer working at the boot or

16  Justin Brands, whatever that is.

17        And then subsequently some of the

18  discussion regarding her employment when she was

19  working at Casey's and her level of activity, her

20  full-time work essentially that occurred until

21  she was terminated in August of 2012 gives me

22  information a little bit about her level of

23  physical activity.

24        Her information in her disability claim

Nicolette S. Horbach, M.D.

1    that was filed in January 2013 relative to her

2    physical activity seems to be in contradiction to

3    some of the other information that she has

4    provided relative to how physically active she

5    was at her job, how much lifting, et cetera she

6    was doing.

7         So I looked at that relative to risk

8    factors for her prolapse initially, risk factors

9    for her recurrence of prolapse, and risk factors

10   associated with or issues associated with her

11   level of physical activity/disability.

12        Q.  What are you reading from?

13        A.  I am reading from -- I keep a summary

14   of notes that I take when I read through a

15   medical record just, I guess, like you-all

16   probably do.  So it just has dates and times or

17   dates and what was going on at that time so I

18   don't have to go through the entire medical

19   record to find the information.

20        Q.  All right.  What I'd like to do is

21   mark all your notes right now as an exhibit.

22        A.  I figured so.  That's fine.

23            MS. JONES:  I don't have any objection

24   to marking all of the notes, but what I would

Nicolette S. Horbach, M.D.

```
1   like to do is to let her continue to look at
2   them -- she has got them organized by what she
3   was reviewing at a given time.
4        We can't hear a word you're saying.
5        THE WITNESS:  Sorry.  Can't hear you.
6        MR. SLATER:  I have no problem,
7   Christy, with her continuing to use the notes,
8   but I want to mark them and we're going to have
9   to get copies, you know, made so that the court
10  reporter can take copies.
11       MS. JONES:  That's fine.  That's fine.
12       THE WITNESS:  Mark them right now?
13       MR. SLATER:  Mark it now, all your
14  notes.  Let's mark them -- I think we premarked a
15  few exhibits.  I'm not sure I'm going to get to
16  all of them, but let's start at Horbach 10.
17       MS. JONES:  Do you want each thing
18  marked separate or do you want them all together?
19       MR. SLATER:  One is 10, one is 11, one
20  is 12, and so on, so forth.
21       (Exhibit Nos. 10, 11 and 12 marked for
22    identification.)
23       THE WITNESS:  I guess that tablet is
24  the next one.
```

Nicolette S. Horbach, M.D.

1           MR. SLATER:  That's all the notes?

2    There are no other notes.

3           THE WITNESS:  Not regarding medical

4    issues and -- medical histories and summaries and

5    other things like that.

6           MR. SLATER:  I want notes on anything,

7    any of your notes that you've taken.

8           MS. JONES:  Adam, the only -- let me

9    say that the other --

10          MR. SLATER:  I mean, if they are

11   setting on the table, if there are notes that are

12   set setting on the table that she is using to

13   help her know what things happened or whatever --

14          THE WITNESS:  No, the rest of it is

15   not.  They are just tagged things that have where

16   -- when things occurred where -- or actually I

17   don't think I used --

18          MR. SLATER:  I don't care about

19   Post-It notes.

20          MS. JONES:  That's what the other

21   stuff is, is Post-It notes that are on the

22   records themselves.

23          THE WITNESS:  I mean, I don't know if

24   you want to -- this is a summary of, like, the

Nicolette S. Horbach, M.D.

1   statements out of Wall's deposition, Dr. Wall's

2   deposition.  So I don't know if you want --

3           MR. SLATER:  Sure.  Might as well

4   because then I don't have to ask you about it and

5   we can get done a lot quicker.

6           THE WITNESS:  They are direct quotes

7   from parts of the deposition.

8           MR. SLATER:  That's fine.  If we mark

9   it, then I'm not one of these -- I'm not going to

10  have them sent to me and question about it.

11      (Exhibit Nos. 13 and 14 marked for

12   identification.)

13          MS. JONES:  All right.  They are

14  marked, Adam.

15  BY MR. SLATER:

16      Q.  So let's go back on and we'll identify

17  them for the record and we'll continue.

18          MS. JONES:  Do you want me to just

19  have the doctor identify them as exhibits?

20          MR. SLATER:  Are we still on the

21  record?

22          MS. JONES:  Yeah, we've been on the

23  record.

24          MR. SLATER:  Oh, okay.

Nicolette S. Horbach, M.D.

1    BY MR. SLATER:

2         Q.  Dr. Horbach, we've just marked your

3    notes.  Starting with Horbach 10, what is that

4    exhibit?  What is that document?

5         A.  It is a clinical summary of the

6    patient's medical record from sources other than

7    specifically Dr. Roberts' or Dr. Wall's care.

8    It's other medical issues that she has had,

9    visits with her primary care physician, visits

10   with her -- with, you know, orthopaedic people.

11   Just summarizes her chronologic history.

12        Q.  What is Horbach 11?

13        A.  Horbach 11 is a summary of her answers

14   to interrogatories.  I mean, it's only a single

15   page.

16        Q.  What is Horbach 12?

17        A.  Horbach 12 is a clinical chronology of

18   her medical care associated with Dr. Roberts and

19   following with Dr. Wall, both on the office as

20   well as notes from the hospitalizations.

21        Q.  Is there another exhibit?

22        A.  Yeah, one more.

23        Q.  13?

24        A.  13.  Actually two more.  Number 13 are

Nicolette S. Horbach, M.D.

1    notes regarding, you know, issues that I

2    potentially would be covering in my expert

3    opinions.  When you had asked me previously what

4    were my opinions going to be, these were simply

5    just supplemental notes for me regarding -- from

6    my report and also regarding Connie Schubert of

7    opinions.

8         And the last is Exhibit 4 -- sorry, 14 --

9    which is a combination of summary from Dr. Wall's

10   deposition, chronologically what he said in

11   pages, et cetera, and also some from Dr. Weber's

12   definition -- or deposition -- regarding some of

13   her concerns with Prolift.

14   BY MR. SLATER:

15        Q.  So Exhibits 10, 11, 12, 13 and 14 are

16   all the notes that you prepared in order to get

17   ready for this deposition and to give your

18   opinions?

19        A.  Other than if I've read an article,

20   sometimes I will write down, you know, what the

21   specifics of an article is per se, but these are

22   only -- these are really the clinical notes, yes.

23        Q.  Well, I just need to know what else

24   there is that you're -- that you've written down

Nicolette S. Horbach, M.D.

```
 1    that reflects what your thoughts or opinions are,

 2    and you're telling me there's the pads that we've

 3    just marked.  Then you might have put Post-It

 4    notes or written onto actual articles or

 5    documents, correct?

 6         A.  Yes.  Yes, those are not where --

 7         Q.  And that's it?

 8         A.  Yes, that's correct.

 9         Q.  Now, let's talk a little bit about the

10    employment records that you talked about a few

11    moments ago.

12         A.  Okay.

13         Q.  First of all, you're not basing your

14    medical opinions on a claim that was made in a

15    workers' compensation petition or similar

16    document; you base your medical opinions on

17    medical documents and medical records and

18    testimony of doctors and Connie Schubert,

19    correct?

20         A.  Well, her -- that's correct in part,

21    but her documents that she filled out as part of

22    workman's comp. and as part of her disability

23    claim are medical documents regarding the

24    patient.  That's not -- they are not in isolation
```

Nicolette S. Horbach, M.D.

1    to the patient's care and they are not in

2    isolation relative to the particular issues that

3    this patient is having.  So it has --

4         Q.  You said something about --

5         A.  Sorry.  Go ahead.

6         Q.  You said something about her lifting

7    cement.  Do you know how heavy the so-called

8    cement was?

9         A.  She has reported in parts of her

10   records that she never lifted more than 11

11   pounds, but then in her disability claim she says

12   that during that job she lifted between -- up to

13   25 plus pounds on a regular basis.

14        Q.  Well, do you have any idea what the

15   actual weight is of the so-called cement was that

16   she lifted?

17        A.  No, I don't think there is any way

18   that I would have that information.

19        Q.  Do you have an opinion to a reasonable

20   degree of medical probability as to why Connie

21   Schubert had pelvic organ prolapse that was

22   initially treated by Dr. Roberts on December 8,

23   2008?

24        A.  I have an opinion regarding risk

Nicolette S. Horbach, M.D.

1    factors that she had that are typically known to

2    contribute an increased risk to women developing

3    pelvic organ prolapse.

4         Q.  I understand that.  You're saying that

5    there are some factors in her background that

6    could contribute.  Do you have an opinion to a

7    reasonable degree of medical probability when

8    you're saying this is the reason why she got

9    prolapse?

10        A.  I think I can give you within a

11   reasonable degree of medical certainty the

12   combination of factors.  There's never one single

13   factor typically that causes prolapse in an

14   individual.

15        Q.  What is your opinion?

16        A.  Regarding the factors that are

17   associated with it?

18        Q.  I don't want a general description of

19   factors associated with prolapse.  That's not my

20   question.

21        A.  I understand that.  You want --

22        Q.  My question is this -- here's my

23   question.  Do you have an opinion to a reasonable

24   degree of medical probability as to why Connie

Nicolette S. Horbach, M.D.

1    Schubert ended up having pelvic organ prolapse

2    that was treated on December 8, 2008?

3         A.   That's what I'm trying to answer for

4    you, that the contributing factors that are

5    within my opinion contributing to her developing

6    prolapse in her specific case.

7         Q.   What are they?

8         A.   First of all --

9         Q.   Why did she get prolapse?

10         A.   First of all, she is Caucasian, which

11    significantly is going to increase her risk

12    relative to if she were non-Caucasian.

13         Secondly, she had a hysterectomy performed

14    and at a young age and post-hysterectomy she was

15    at increased risk.  She also had her ovaries

16    removed at a very young age with intermittent use

17    of hormone replacement.  And so the lack of

18    estrogen in the tissues will typically

19    deteriorate the tissues, and we will see an acute

20    exacerbation oftentimes following a patient going

21    through menopause and the degree of prolapse that

22    they experience.

23         Third issue or another issue was from a

24    physical standpoint how much a patient does

Nicolette S. Horbach, M.D.

1    lifting or not lifting can be -- contribute to

2    the problems of pelvic organ prolapse.  And I

3    cannot tell you in this particular patient

4    what -- whether 5% was due to this or 10% is due

5    to that, et cetera.  I mean, that's an

6    impossibility for anyone to say for an individual

7    patient, but it is the global components that are

8    associated with her particular situation that I

9    think are at risk for her developing prolapse.

10        Q.  You said that lifting can contribute

11   to prolapse.

12        A.  Yes.

13        Q.  In this case you can't say whether or

14   not Connie Schubert lifting anything actually was

15   a cause of her prolapse, correct?

16        A.  No.  I think that's incorrect.  I

17   think I'm more -- I think I'm more -- I'm able to

18   say with more probability than not that her

19   physical occupation had increased her risk of

20   developing pelvic organ prolapse.

21        Q.  Increased the risk.  Here's my

22   question:  Is it your opinion, yes or no, or you

23   don't have an opinion, that the physical activity

24   of Connie Schubert's occupation contributed to or

Nicolette S. Horbach, M.D.

1    caused her prolapse?

2         A.  Yes, absolutely, that's my opinion, it

3    did.

4         Q.  And your opinion is it contributed to

5    some extent; you just can't say to what extent,

6    right?

7         A.  I think it's a significant issue in

8    this particular patient, yes.

9         Q.  Do you know for how long she had been

10   lifting whatever she was lifting and doing

11   whatever activity she had been doing?

12        A.  She's actually been having a history

13   of lifting for quite some time, even preceding

14   her presentation in 2008.  When you look at her

15   claims of her disability application, depending

16   upon the job portion that she was doing, she was

17   lifting heavier objects when she was at Justin

18   Boots and also lifting heavier objects when she

19   was in the preceding employment, I think, at

20   Ozark Village, I believe it is, at least based on

21   how she has indicated on her disability

22   application.

23        Q.  Would you agree with me that, from

24   Ethicon's perspective, it was foreseeable that

Nicolette S. Horbach, M.D.

1    someone like Connie Schubert with her background

2    and history and her level of prolapse would have

3    a Prolift put into her body?

4            MS. JONES:  Object to the form.

5            THE WITNESS:  Do I think Ethicon knew

6    she was going to have a Prolift?

7    BY MR. SLATER:

8            Q.  -- what I asked you.

9            A.  I'm sorry.  That's what I thought --

10           Q.  Do you agree with -- do you agree with

11   me that it was foreseeable to Ethicon that a

12   woman with Connie Schubert's profile, her medical

13   history, her background, her occupational

14   history, would be somebody who would have a

15   Prolift put in her body?

16           A.  Yes.

17           Q.  And you would agree with me,

18   therefore, that Ethicon was obligated to design

19   the Prolift to be effective and safe in a woman

20   with Connie Schubert's profile, correct?

21           MS. JONES:  Object to the form.

22           THE WITNESS:  I think that, yeah, it

23   was -- it was ideally their -- or the company was

24   trying -- was responsible for trying to design a

Nicolette S. Horbach, M.D.

1  repair that would be able to treat prolapse in a

2  particular patient like this.

3  BY MR. SLATER:

4      Q.  One of the things that Ethicon did was

5  they claimed that the Prolift would provide a

6  more durable repair than a native tissue repair,

7  right?

8      A.  Yes.

9      Q.  After Connie Schubert had the Prolift

10  put in her body, she eventually went back to

11  work, right?

12      A.  Yes.

13      Q.  Do you know how much activity she did

14  at work once she went back to work after the

15  Prolift?

16      A.  I know based on her employment records

17  the number of hours that she was working during

18  that time period.  I cannot specify whether

19  she -- what she actually did during each of those

20  different work days.

21      Q.  Therefore, you would not --

22      A.  Oh, may I --

23      Q.  Go ahead.

24      A.  I'm sorry.  I will say, though, that

Nicolette S. Horbach, M.D.

1    based on the medical record she was doing a level

2    of physical activity that her physician felt was

3    of concern and that that could contribute to

4    problems with less-than-optimal results from the

5    Prolift or with recurrent prolapse, as the

6    physician specifically wrote a letter to her

7    employer saying that she needed to have a

8    reduction in her activity or physical demands at

9    work.  So, clearly --

10        Q.  At the time Dr. Robert --

11        A.  Go ahead.  Sorry.

12        Q.  At the time Dr. Roberts wrote that

13   note, you don't know what Connie Schubert was

14   actually doing at work at that time period,

15   right?

16        A.  No.

17        Q.  It was foreseeable to Ethicon that a

18   woman like Connie Schubert would have a Prolift

19   put in her body and then would eventually go back

20   to work and attempt to perform her functions at

21   work, right?

22            MS. JONES:  Object to the form.

23            THE WITNESS:  I would expect that

24   Ethicon would know that the patient would return

Nicolette S. Horbach, M.D.

1    to her activities after the surgery.  At which

2    point after the surgery she would return and to

3    what level of activities I don't think that

4    Ethicon could know that.

5    BY MR. SLATER:

6         Q.  Well, Ethicon certainly marketed the

7    Prolift as a device that would provide a durable

8    repair and let women like Connie Schubert go back

9    to work and be active and return to their active

10   lifestyle, right?

11        A.  They marketed it as allowing patients

12   to return to normal activities, yes, and to be a

13   repair that would allow them to do that.

14        Q.  There's no -- well, rephrase.

15        You're not forming the opinion to a

16   reasonable degree of medical probability that any

17   particular activity performed by Connie Schubert

18   after the Prolift surgery caused her recurrence

19   of prolapse, are you?

20        A.  Not a particular.  I think it's

21   probably a cumulation of multiple things, not a

22   single thing.

23        Q.  And among the things that caused or

24   contributed to her recurrence was the -- most

Nicolette S. Horbach, M.D.

```
 1   likely the contraction of the Prolift mesh.

 2   That's one of the contributing factors, correct?

 3        A.  No, I'm not saying that that's the

 4   most likely.  I mean, the whole point is, even if

 5   the patient had not had a Prolift performed and

 6   had had a native tissue repair, she still is at a

 7   risk of failing from that procedure.  So you

 8   can't sit there and say that just because she

 9   failed and she had a Prolift, that Prolift was

10   the contributing factor or the cause because the

11   same thing could have happened if she had had

12   some other different type of repair.  So I don't

13   think that you can point to just that Prolift in

14   and of itself caused the patient to develop the

15   issue of recurrence.

16        Q.  So if I understand correctly, you're

17   not giving an opinion as to what caused Connie

18   Schubert's recurrence, correct?

19        A.  That's not what I said.  I said that

20   there are contributing -- a group of contributing

21   factors that would probably be associated with

22   her developing her recurrence of her prolapse,

23   and some of those factors would be independent of

24   what surgery or not the patient actually
```

Nicolette S. Horbach, M.D.

1    experienced.  Some of the factors may be

2    surgically dependent.

3         Q.  When you say "surgically dependent,"

4    you mean related to the Prolift, correct?

5         A.  Yes.

6         Q.  Connie Schubert has complained

7    consistently of painful sexual intercourse and in

8    fact had to stop attempting to have sexual

9    intercourse due to pain, correct?

10        A.  That's what the record indicates, yes.

11   Sorry.  You're gone again.  You're gone.

12        Q.  Oh, sorry.  Am I back?

13        A.  Yes.

14        Q.  Okay.  And certainly that complaint

15   and those symptoms were caused at least in part

16   by the Prolift and then ultimately the Prolift+M,

17   correct?

18             MS. JONES:  Object to the form.

19             THE WITNESS:  I think that the Prolift

20   and the Prolift+M could be a contributing

21   component to her current dyspareunia or her

22   postoperative dyspareunia.  I don't know that

23   they are necessarily the major or the only factor

24   associated with it -- well, actually I feel

Nicolette S. Horbach, M.D.

1   pretty -- I feel quite comfortable that they are

2   not the only aspect of what's going on.

3   BY MR. SLATER:

4        Q.  Well, certainly they are contributing

5   factors, correct?

6        A.  The Prolift and the Prolift+M, yes,

7   are probably contributing factors, yes, but not

8   necessarily the only contributing or the majority

9   contributing factor.

10        Q.  What are the other contributing

11   factors in your opinion along with the Prolift

12   and Prolift+M?

13        A.  I think that part of the difficulty in

14   this patient with symptoms of dyspareunia is that

15   the prolapse in and of itself can be associated

16   with dyspareunia and the patient did have initial

17   prolapse, she did develop recurrent prolapse,

18   and, although we don't understand exactly why,

19   there is association of dyspareunia in those

20   patients even when they are treated regardless of

21   which method.

22        She has been on theoretically vaginal

23   estrogen to try to improve the quality of her

24   tissue.  There are comments in the medical

Nicolette S. Horbach, M.D.

1    records sort of plus and minus regarding whether

2    or not the tissue is more hypoestrogenic or

3    thinner based on estrogen state.

4         She has had comments in the medical

5    literature regarding tenderness that she

6    experiences at the vaginal introitus that is

7    potentially related to scar tissue that is yes or

8    no associated with the Prolift since the Prolift

9    isn't any longer in that particular area, and

10   certainly even after a native tissue repair you

11   can have that type of introital dyspareunia.

12        More recently she has been seen by

13   Dr. Wall who, in examining her back in June of

14   2013, noted that there was some constriction at

15   the apex of the vagina, as we discussed

16   previously, that could be a contributing factor.

17   She also was noted to have tenderness along her

18   bilateral levator muscle.  So what we talked

19   about before of the levator myalgia, et cetera,

20   that can be contributing factors to dyspareunia.

21   So I think there are multiple different issues.

22        Q.  What you just listed for me, that

23   combination of issues you would say contributed

24   to some extent to the dyspareunia that she has

Nicolette S. Horbach, M.D.

1    complained of since the surgery?  Do I understand

2    correctly?

3         A.  Yes.  I think even some of her

4    underlying orthopedic issues can be contributory

5    to patients -- oh, you can put your arms up, but,

6    unfortunately, we see it every day, even in

7    patients who have never had Prolift surgeries or

8    Prolift+M surgeries.  So even orthopedic issues

9    can contribute to this type of problem and

10   dyspareunia in patients just because it triggers

11   the levator myalgias.

12        Q.  Okay.  I'm not asking for theoretical

13   possibilities, though.  So you gave me a list

14   before, before you started talking about

15   orthopedic injuries.  Did you hold the opinion to

16   a reasonable degree of medical probability that

17   each of those factors actually contributed to the

18   dyspareunia?  You listed them: the Prolift, the

19   Prolift+M, pelvic organ prolapse, tissue quality,

20   scar tissue.  You listed all those things.  Is it

21   your opinion to a reasonable degree of medical

22   probability that those factors combined to all

23   contribute to her having the dyspareunia?

24        A.  Yes.

Nicolette S. Horbach, M.D.

1        Q.  You don't hold the opinion to a

2   reasonable degree of medical probability that

3   there is any orthopedic issue contributing to

4   dyspareunia in Connie Schubert, correct?

5        A.  There could be.  I'm just saying --

6        Q.  I'm not asking you what could be.

7   That's not my question.  My question is very

8   direct.  You don't hold the opinion to a

9   reasonable degree of medical probability that

10  Connie Schubert has an orthopedic issue that's

11  causing her to have -- or contributing to her

12  having dyspareunia, are you?

13       A.  I can't say that that is an absolute

14  certainty, no.

15       Q.  You're not forming that opinion,

16  correct?

17       A.  I mean, I think I've given you my

18  opinion of what I think.  I think it's a

19  contributing factor.  I can't tell you that it is

20  absolutely a contributing factor.

21       You have to understand that the problem is

22  with patients that we see, patients can have all

23  of these types of complaints, they can have all

24  of these types of findings on exam, they can

Nicolette S. Horbach, M.D.

1    never have had a prolapse surgery, they can never

2    have had any type of mesh placed, and yet still

3    have these.  So the body doesn't tell us this

4    is -- this is, you know, 10% due to this and 30%

5    due to that and 5% due to that.  You have a group

6    of contributing factors.  You try to address each

7    of those individual factors, and as you remove

8    each of those individual factors from the

9    differential or the contributing list, if the

10   patient's symptoms alternatively then resolve, it

11   gives you sort of de facto data or evidence to

12   support perhaps that that was the primary cause.

13        Q.  That analysis you have not performed

14   in this case, correct?

15        A.  In her case, no.  I've relied on the

16   analysis that's present in the chart based on

17   Dr. Wall's comments and also based on the

18   disability examination she had.

19        Q.  You have not examined Connie Schubert,

20   correct?

21        A.  Correct.

22        Q.  You would agree with me that if you

23   had examined her that may have provided you

24   important information to help support your

Nicolette S. Horbach, M.D.

1    opinions or inform your opinions, correct?

2         A.  If I had examined her, that might be

3    part of it, yes.

4         Q.  When you actually treat patients and

5    form opinions about what's happening with your

6    own patients, you actually examine them, correct?

7         A.  Yes.

8         Q.  You wouldn't diagnose your own patient

9    without examining your own patient, would you?

10        A.  I will sometimes make a presumptive

11   diagnosis without an examination, yes.

12        Q.  And then you would examine and do

13   testing to decide whether your presumptive

14   diagnosis was correct or not, right?

15        A.  I might if I thought that that was

16   indicated.

17        Q.  When you actually treat patients,

18   Dr. Horbach, you examine them.

19        A.  Not always.

20        Q.  You speak to them.

21        A.  I don't --

22        Q.  You evaluate them -- please let me

23   finish.  When you examine -- rephrase.

24            When you treat your own patients, you base

Nicolette S. Horbach, M.D.

1    your treatment on meeting with the patient,

2    speaking to the patient and examining the

3    patient, correct?

4         A.  Evaluating a patient and determining

5    the cause for symptoms or problems does not

6    always require you to do a physical exam on the

7    patient.

8         Q.  Well, in the case of Connie Schubert,

9    with somebody like her, where you're trying to

10   figure out what's the cause of her issues, you

11   would need to examine a patient like that if they

12   came to your office, right?

13        A.  Yes, I would.

14        Q.  Connie Schubert did not have a native

15   tissue repair, correct?

16        A.  Correct.  She had a little bit of work

17   done along the, sounds like, along the distal

18   portion of the posterior vaginal wall that was

19   just plication.

20        Q.  Are you talking about during which

21   operation?

22        A.  Well, she had anterior wall plication

23   during operation number 2 with Dr. Roberts, and

24   it was my recollection that he did some degree at

Nicolette S. Horbach, M.D.

1    the first operation, but let me review my notes.

2         No, I'm sorry, in that particular

3    procedure, it just looks as if he put the

4    posterior Prolift in.

5         Q.  Would you agree with me Connie

6    Schubert did not have a native tissue repair,

7    correct?

8         A.  Not at the first surgery, no.

9         Q.  Rephrase.  Before you mentioned, you

10   know, some things can happen even if you don't

11   have a Prolift.  Well, Connie Schubert had a

12   Prolift, so we should be evaluating what happened

13   to her in the setting of her having a Prolift and

14   then a Prolift+M, correct?

15        MS. JONES:  Object to the form.

16        THE WITNESS:  Yeah, that's what I am

17   trying to do.  But what I'm saying is that you

18   can't directly link a causative aspect for a

19   symptom or problem to a particular treatment if

20   that symptom or problem can happen in the absence

21   of that particular treatment.

22   BY MR. SLATER:

23        Q.  The Prolift is a procedure, correct?

24        A.  Yes.

Nicolette S. Horbach, M.D.

1        Q.   Connie Schubert underwent a Prolift

2   procedure, correct?

3        A.   Yes.

4        Q.   That procedure encompassed from the

5   very first incision through all the dissections,

6   the placement of the mesh, the insertion and the

7   removal of the cannulas and the guides, right

8   down to closing all of the incisions at the end,

9   that is the Prolift procedure from beginning to

10  end, correct?

11       A.   Yes.

12       Q.   So whatever resulted from that

13  procedure resulted from the Prolift procedure,

14  correct?

15            MS. JONES:  Object to the form.

16            THE WITNESS:  Yeah, I mean, I don't

17  know that I can answer that yes or no.

18  BY MR. SLATER:

19       Q.   Well, here's the thing.  Connie

20  Schubert had a Prolift procedure.  That's what

21  was done to her body.  You can agree to that,

22  right?

23       A.   Yes, but I can't tell you that it in

24  itself is the only reason that the patient

Nicolette S. Horbach, M.D.

 1    developed these symptoms.

 2          Q.  Didn't ask you that.  You're being a

 3    little defensive.  I never asked you that.

 4          A.  No, then I may have misunderstood.

 5          Q.  Yeah.  I'm starting very small.

 6    Connie Schubert had a Prolift procedure, correct?

 7          A.  Yes.

 8          Q.  To the extent that any complications

 9    resulted from the procedure that she had, by

10    definition, they resulted from the Prolift

11    procedure, correct?

12          A.  No.  That's why we just had the

13    discussion.

14          Q.  You didn't listen to my question.

15    Here's my question.  To the extent a complication

16    resulted from the procedure that she had on

17    December 8, 2008, the extent that any

18    complication resulted from that procedure, by

19    definition, that complication resulted from the

20    Prolift procedure because that's the procedure

21    she had, correct?

22          MS. JONES:  Object to form.

23          THE WITNESS:  If I understand that

24    question, it is -- if she has a

Nicolette S. Horbach, M.D.

1    procedure-dependent complication, then the

2    Prolift was the cause of that since that's the

3    procedure she had.  Is that my -- is that

4    correct?

5    BY MR. SLATER:

6         Q.  Yes.

7         A.  Then, yes, I'd answer yes.

8         Q.  Yes.  Okay.  She did not have any

9    other procedure performed on December 8.  She had

10   a Prolift procedure, correct?

11        A.  Yes.

12        Q.  So even though it may be that

13   alternative procedures that were not performed

14   could have lead to certain similar complications,

15   it would be speculative to say those procedures

16   would have had the same result because she didn't

17   have any alternative procedure, correct?

18        A.  It is speculation, yes, but it's also

19   medically --

20        Q.  And the same --

21             MS. JONES:  Let her finish the answer.

22   BY MR. SLATER:

23        Q.  I didn't mean to interrupt you.  I'm

24   sorry.  I thought you had answered.

Nicolette S. Horbach, M.D.

1        A.  But it's also medically and clinically

2   a reality of what we see in patients that we

3   treat.  So it's not just pulling something out of

4   the air.

5        Q.  Well, move to strike from "but"

6   forward.

7        Just to be very clear, it would be

8   speculative to say, well, if Connie Schubert had

9   a different procedure, here's what would have

10  happened, right?

11       A.  Yes.  It's speculative based on my

12  clinical experience and judgment, yes.

13       Q.  The things I just asked you about the

14  Prolift procedure would apply to the Prolift+M

15  procedure in 2009, correct?

16       A.  I would expect, yes.

17       Q.  Is there a specific orthopedic injury

18  or condition that you would say, as you sit here

19  now, that that condition to a reasonable degree

20  of medical probability is a cause of her, Connie

21  Schubert's, dyspareunia since the Prolift

22  surgery?

23       A.  I think that there is a reasonable

24  degree of medical certainty that it can be a

Nicolette S. Horbach, M.D.

1    cumulative effect of some of the orthopedic

2    issues that has been -- have been going on in the

3    past.  I've certainly seen patients who develop

4    solely an orthopedic issue where they have a

5    fractured ankle and they develop dyspareunia

6    secondary to their fractured ankle.  I mean,

7    you -- that is something that we see in clinical

8    practice, yes, and this patient has had --

9          Q.  Did Connie --

10         A.  Go ahead.

11         Q.  Did Connie Schubert have a fractured

12   ankle?

13         A.  No, but she certainly has a number of

14   other orthopedic issues that are going on.

15         Q.  Here's the question.  Do I understand

16   you correctly to be saying -- Connie Schubert has

17   some orthopedic issues in her background.  It's

18   possible that an orthopedic issue could be

19   contributing to her post-Prolift condition in

20   terms of her dyspareunia, her pain, her

21   discomfort in her pelvis.  You're not saying to a

22   reasonable degree of medical probability that it

23   is; you're just saying that it could be.  Are

24   we -- do I understand you?

Nicolette S. Horbach, M.D.

```
1            A.  I think that that's a fair statement.
2            Q.  Now, coming back to Connie
3     Schubert's -- actually let me -- let's go back to
4     your reliance list, Exhibit 4.  You have a list
5     of medical literature that goes on for several
6     pages.
7            A.  Mm-hmm.
8            Q.  Why did you list that medical
9     literature?
10           A.  As we had said at the beginning of
11    looking at this list, these are simply -- these
12    are information or articles that were sent to me
13    as part of the documentation related to this
14    case.
15           I have, in addition, articles that I have
16    potentially read or articles that I've read over
17    the last year, year and a half involved in the
18    Prolift litigation, especially since I just sat
19    down and took my board exams in June.  So there's
20    a huge amount of literature that I've read or
21    reviewed that I use as a background clinically to
22    make my decision and my conclusions about this
23    particular case.  So this is simply the
24    information that was sent to me via from the --
```

Nicolette S. Horbach, M.D.

1   regarding the case and from the attorney's

2   office.

3          Q.  The list of literature on this

4   document is literature that was sent to you by

5   Ethicon's attorneys, correct?

6          A.  Yes.

7          Q.  Did you read all these articles in

8   their entirety?

9          A.  I would say pretty much all of these

10  articles in their entirety I have read, yes, at

11  one point or another in the last year and a half.

12  When we went through this --

13         Q.  Are you relying --

14         A.  Sorry.

15         Q.  Go ahead.  I didn't mean to interrupt

16  you.  There was a delay.

17         A.  When we went through this I think

18  yesterday, I marked a couple notes on ones that I

19  couldn't recall absolutely for sure that I had

20  read in its entirety, but that was probably, you

21  know, half a dozen or ten of these particular

22  papers.

23         Q.  You're not telling me that every one

24  of the articles here on this list supports your

Nicolette S. Horbach, M.D.

1    opinions in this case, are you?

2          A.   I'm not saying that they support, but

3    they are a part of what I used to generate my

4    opinion.  Some of the papers may not support my

5    opinion.  They may have data that suggests that

6    my opinion is -- is different.  But then I have

7    to evaluate the data to determine whether I think

8    it is -- it accurately -- that it is a reliable

9    study and reliable data for me to use in making a

10   decision.

11         So you're going to look at supportive

12   evidence and you're going to look at evidence

13   that's contrary, and you're going to weigh the

14   pros and cons of those evidence to create an

15   overall opinion relative to this particular

16   patient and the Prolift.

17         Q.   There is literature on this list that

18   would be irrelevant to your opinions in this

19   case, correct?

20         A.   I'm not sure that is the case per se.

21   I would have to go through each of them to

22   determine.  I'm not sure which ones you're

23   referring to.

24         Q.   You're not relying on literature with

Nicolette S. Horbach, M.D.

1   regard to SUI mesh or TVT mesh to form your

2   opinions in this case, are you?

3           A.   Yes.

4           Q.   You believe that the characteristics

5   and the performance of the TVT meshes is relevant

6   to determining the safety or efficacy of the

7   Prolift?

8           A.   Yes, for TVT and TOT.

9           Q.   Do you know whether or not Ethicon

10  ever told the FDA whether or not Ethicon thinks

11  that the TVT is something that should be

12  considered in determining the safety and efficacy

13  of the Prolift?

14          A.   I do not know that.

15          Q.   If Ethicon told the FDA that the TVT

16  devices should not be considered in evaluating

17  the safety and efficacy of the Prolift, would you

18  defer to that statement by Ethicon to the FDA?

19          MS. JONES:  Object to the form.

20          THE WITNESS:  I think that it -- it

21  doesn't necessarily -- it doesn't impact my

22  clinical opinion regarding the relevance of the

23  TVT and TVT data to the Prolift.

24  BY MR. SLATER:

Nicolette S. Horbach, M.D.

```
1          Q.  Would you expect that Ethicon's
2    internal medical affairs doctors and the
3    scientists that work there have a significantly
4    larger body of knowledge and insight into the
5    properties and the safety and efficacy of the
6    Prolift and the Prolift+M than you do?
7               MS. JONES:  Object to the form.
8               THE WITNESS:  I can't answer that one
9    way or the other.  I -- you know, they may, they
10   may not.  They don't do Prolifts, so they may or
11   may not have the same ideas.
12   BY MR. SLATER:
13         Q.  You don't know -- do you know --
14   rephrase.
15         Do you know whether anybody working in
16   Ethicon Medical Affairs had actually performed
17   Prolift surgery as physicians?
18         A.  I don't know for sure, although there
19   was a reference that David Robinson had made in
20   something I read that seemed to imply that he may
21   have.
22         Q.  Would you expect that Ethicon has a
23   greater body of knowledge about the safety and
24   efficacy of the Prolift by virtue of the fact
```

Nicolette S. Horbach, M.D.

1    that they have access to doctors all over the

2    world and they have been studying this device

3    internally and looking at data on a day-to-day

4    basis?  Let me ask the question cleaner.  I got a

5    little lost.

6         Would you agree that Ethicon likely has a

7    greater body of knowledge regarding the safety

8    and efficacy of the Prolift and Prolift+M than

9    you do?

10        A.  They probably have more information

11   about it, yes.

12        Q.  Is there any -- well, let me ask you

13   this.  You said that in addition to the medical

14   literature listed here that you've reviewed other

15   medical literature, correct?

16        A.  Yes.

17        Q.  You've obviously reviewed other

18   medical literature other than what's on this

19   list.

20        A.  Yes.

21        Q.  What I need to understand is -- what I

22   need to understand is what medical literature

23   you're specifically going to point to if we go to

24   trial and say this is the literature that I'm

Nicolette S. Horbach, M.D.

1   relying on for my opinions.  Is there any

2   particular article as we sit here now you can

3   point to and say, you know, this article and that

4   article I'm specifically relying on to support my

5   opinions, so I understand when I go to trial what

6   to expect for you to talk about?

7        A.  At this particular time I think it's

8   more of the global information.  I think there

9   are individual articles that I may use to support

10  my opinion, and some of those are, you know, here

11  in my stack or pulled last night, et cetera.  So

12  that they are clearly not on your list, but

13  you're welcome to have the list.

14       Q.  Well, here's what I want to know.  You

15  have a pile of articles there that --

16       A.  I actually have --

17       Q.  -- that's in addition to what's on

18  this list?

19       A.  I have some that are in addition to

20  that list.  I mean, I have a huge, couple

21  notebooks, but some of that is already on this

22  list and some of it isn't.

23       Q.  Well, here's what I need to know.

24  Which articles do you believe are the ones that

Nicolette S. Horbach, M.D.

1    support your opinions -- and I'm talking about

2    the articles that you would rely on to say to me

3    these are the articles I rely on for my opinions

4    in this case?

5         A.   There are probably specific articles

6    that I would cite and there are articles -- I

7    mean, I'm using all of this information to rely

8    on my opinion.  If there was a -- if there is a

9    specific article, I'm going to say, according to

10   the study of Dr. X, that this is the data that's

11   there -- is that what you're asking for, that

12   type of article?

13        Q.   Right.  I want to know is there a

14   specific article or articles that you can tell me

15   now, look, this article clearly supports my

16   opinions, I'm going to rely on this?

17        A.   Yes, I have --

18             THE REPORTER:  One at a time, please.

19             MS. JONES:  One at a time.

20             THE WITNESS:  I have, yes, I do have

21   some of those articles, and I -- you know, you

22   can have any of them now.  Otherwise, if you

23   would like, I can go back through each of the

24   individual articles that I have with me to say --

Nicolette S. Horbach, M.D.

1    and provide you with a list that says these are

2    ones that I will probably be citing during my

3    testimony.

4    BY MR. SLATER:

5         Q.  I don't want you to go back because

6    this trial is in one month and today's the day

7    for me to talk to you.  So, to the extent you

8    can, tell me right now, these are the key

9    articles that I'm going to rely on for my

10   opinions, or, if you're not prepared to do that,

11   you can tell me you can't do it.  I just need to

12   know.  I don't want some supplemental list.  I

13   have a lot of work to do between now and trial,

14   with all due respect, and today is my day to

15   analyze you as an expert and then move on to

16   other witnesses.

17        A.  All right.  So, in that case, we can

18   sit there and go through the notebook and we can

19   go article by article so that you'll have the

20   information today since you don't want a

21   supplemental report.

22        Q.  Let me just tell you something,

23   Doctor.  Sit up for a second, please.  Let me

24   explain to you what we're doing here.  This is a

Nicolette S. Horbach, M.D.

```
 1   very, very formal and important proceeding.  So

 2   understand something.  You're testifying under --

 3   you don't have to look at the attorney.  You look

 4   at me.  You don't --

 5             MS. JONES:  Wait, wait, wait.

 6   Counsel --

 7             MR. SLATER:  No, I'm going to talk.

 8   BY MR. SLATER:

 9        Q.  You're not going to now look at me and

10   you're not going to say to me in a snide way,

11   well, I'll read the whole notebook to you of at

12   least a thousand articles.  Because let me tell

13   you something.  That's not how it works in any

14   court in this country.  Okay?  I asked you a

15   direct question, which any expert would be

16   expected to be able to answer.  Okay?  And I

17   can't get a direct answer.  And if you think

18   you're going to read to me a thousand article

19   titles and it's going to hurt me, you'll be

20   coming back for this deposition to continue in a

21   couple days, probably Saturday, okay, because I'm

22   going to finish your deposition.  I'm not going

23   to leave it open.  I'm not going to get a

24   supplemental report.  You're not going to rethink
```

Nicolette S. Horbach, M.D.

1    it and figure out what you want to say.  Today is

2    the deposition.

3         I spent a lot of time preparing for this.

4    Mr. Overby flew in from Missouri.  He expects the

5    same type of concise testimony.  So we're not

6    going to play games and I'm not going to be

7    spited and have, well, if you ask for it, here's

8    what you get.  I would ask for a professional

9    answer.

10        You're an expert witness being paid a lot

11   of money by a big corporation, and this is not a

12   surprising question.  Either you're ready to

13   answer it or you're not.  So let's try to cut to

14   the chase.

15             MS. JONES:  Counsel --

16   BY MR. SLATER:

17        Q.  Counsel has asked me to get her out of

18   here by a certain point.

19             MS. JONES:  Counsel --

20   BY MR. SLATER:

21        Q.  So let's not keep things going for

22   more than it needs to.

23             MS. JONES:  And let's not have any

24   more diatribes and tirades by plaintiff's counsel

Nicolette S. Horbach, M.D.

1    in this case.  She has tried to answer your

2    questions.  The witness has tried to answer your

3    questions.  She has offered to give you a list

4    here.  She has got all the materials here.  We've

5    given you a list of the materials that she has

6    reviewed.  She is trying to answer it.

7         So, please, let's have a little common

8    courtesy, and she will go through and give you

9    the list by going through the notebooks and the

10   materials that she has here.  Okay?

11   BY MR. SLATER:

12        Q.  Tell me which articles -- tell me

13   which articles, please, are most significant to

14   you in supporting the opinions in this case.

15        A.  There are a group of articles that are

16   part of the randomized trials that have occurred

17   subsequent to the launch of Prolift.  And I can

18   give -- sorry.  I'm trying to remember where I

19   have that specific list.

20        There is also -- but I will give you the

21   names of the articles here in a second.  Some of

22   those are on here; some of them aren't.  There

23   is, I mean, the CARE trial that is part of the

24   NIH's Pelvic Floor Treatment Network at the

Nicolette S. Horbach, M.D.

1    two-year data and the seven-year data.  The, you

2    know, Altman, New England Journal of Medicine

3    article that was published fairly recently.

4    There is an article that was published via Matt

5    Barber on the OPTIMAL study and the sister study

6    that is information also about use of pain scales

7    in evaluating patients after pelvic

8    reconstructive surgery.  That's Matt Barber's

9    article from Female Pelvic Medicine in July or,

10   sorry, August of 2012.

11        There is -- you know, again, I'm trying to

12   remember what's on this list and what's not on

13   this list.  There is the most recent Cochran

14   review.  There is the SGS review for the use of

15   mesh.  There is the, I think, 11-year data on

16   TVTs is already present for here.  There are

17   articles -- just trying to remember...

18        You know, you have to bear with me to some

19   extent too since some things, especially when

20   there was a repetitive forwarding of articles, I

21   tried to combine to be able to have one notebook

22   instead of four different notebooks.  So some of

23   these have marks and some of them don't, even

24   though they are articles that were possibly in

Nicolette S. Horbach, M.D.

1    this list.  I may not recall off the top of my

2    head whether those are on in list -- this one is

3    already an exhibit -- because of the fact that

4    the list is a combination of things.

5               MS. JONES:  Why don't you -- I think

6    what he's asking for is just the title or the

7    authors of --

8               THE WITNESS:  The bulk of them?

9               MS. JONES:  -- what you believe are

10   the more important studies.  Why don't you just

11   flip through there --

12        Is that acceptable to you?

13              THE WITNESS:  I think that --

14              MR. SLATER:  I want to know which of

15   the key articles that Dr. Horbach intends to rely

16   on at trial to support her opinions.  There's a

17   list -- I obviously don't expect her to talk

18   about 50 or a hundred articles.  I need to know

19   which are the ones she actually intends to rely

20   on.

21              THE WITNESS:  I think you and I have a

22   different definition -- no, I think you and I

23   have a different definition of what it means to

24   rely on them.  That's why there is a confusion.

Nicolette S. Horbach, M.D.

```
 1              The article that is from Obstetrics and

 2      Gynecology in 2011 for the Withagen article,

 3      Trocar-Guided Mesh Compared to Conventional

 4      Repairs, the article that is by Lowe from

 5      Abdominal Sacrocolpopexies and Sacrospinous

 6      Ligament Comparison.  The Hiltunen articles --

 7      and there's three of them -- on their studies

 8      about at the short-term interval for randomized

 9      trial, the three-year data, I believe, and then a

10      subsequent article that came out by them in --

11      there's 2007, 2008 and 2010.

12              The Carey article, Vaginal Repair with

13      Mesh versus colporrhaphy; the Lopez article of

14      Transvaginal Polypropylene Mesh versus

15      Sacrocolpopexy.  Those are all articles that I

16      would potentially be looking at.

17              The -- there was one -- the VAMP trial by

18      Iglesia that was published in 2010.  There was an

19      article in Ultrasound -- let me see here --

20      talking about mesh contraction in Gynecologic

21      Ultrasound.

22      BY MR. SLATER:

23              Q.  -- article?

24              A.  I'm sorry?  Yes, I'm trying to give
```

Nicolette S. Horbach, M.D.

1    you --

2         Q.   -- article?

3              MS. JONES:  Can't hear you.

4              THE WITNESS:  Yeah.  I'm sorry.  I

5    can't -- you keep cutting out, but there is an

6    article --

7    BY MR. SLATER:

8         Q.   I asked you if that's the Velemir

9    article.

10        A.   Yes, I think it's that.  I'm terrible

11   with names, so I will assume that that's the same

12   one, but it talks about mesh retraction in the

13   Ultrasound article.

14        Q.   The other one is Jacquetin, et al.,

15   right?

16        A.   Probably.

17             MR. SLATER:  Jacquetin, which is

18   J-A-C-Q-U-E-T-I-N.

19             THE WITNESS:  He's probably better at

20   pronunciation of names than I am.

21        That covers this particular notebook, I

22   think.  Give me a second.

23             THE REPORTER:  If we're on the record,

24   I need to hear you.

Nicolette S. Horbach, M.D.

```
 1                    THE WITNESS:  I'm sorry.  I was just

 2    talking to myself.

 3                    THE REPORTER:  I know.

 4                    MS. JONES:  Just so we're clear --

 5                    THE WITNESS:  Do you want --

 6                    THE REPORTER:  One at a time.

 7                    MS. JONES:  If you think they are

 8    important articles to you, even though they are

 9    on the list, go ahead and give him the titles of

10    them again or at least the authors.

11                    THE WITNESS:  All right.  This is the

12    article with Mark Walters, Anne Weber, Barber,

13    et cetera, the Reanalysis of the Three Randomized

14    Trials or the Three Randomized Techniques for

15    Anterior Colporrhaphy; the Ridgeway article

16    regarding -- from the American Journal of

17    Obstetrics and Gynecology in 2008 regarding

18    Excision of Mesh; the article by Matt Barber

19    regarding Defining Success after Surgery for

20    Pelvic Organ Prolapse.

21         We talked about -- there was -- trying to

22    remember who the article is.  There is an article

23    on Uterosacral Ligament Suspensions and the

24    Associated Ureteral Injury Rates that are as high
```

Nicolette S. Horbach, M.D.

1    as the 11%, and I am trying to remember which

2    institution that that came out of.

3         The Maher article about sacrocolpopexy

4    and -- Sacrocolpopexy versus Sacrospinous

5    Ligament Fixation in 2004; the Diwadkar -- which

6    I can't pronounce -- article on Complications and

7    Re-Operations.

8         I would be using also the articles on

9    Transvaginal Mesh, both the French and the U.S.

10   series that have been published short-term as

11   well as the long-term since you're wanting to be

12   specific about those as well as the combination

13   one.  Would be from the John DeLancey, Dee

14   Fenner's article back in 2008, American Journal

15   of Ob/Gyn regarding Complications Following

16   Operations for Vaginal Mesh Kits.

17        The article that we published with Matt

18   Aungst as the primary author about Stress

19   Incontinence and Pelvic Symptoms -- Pelvic Muscle

20   Symptoms Postoperatively; the article by Milani

21   about Outcomes and Predictors of Failure after

22   Trocar Placement; the Nguyen article on

23   Perioperative Complications that is from

24   Obstetrics and Gynecology in 2012.

Nicolette S. Horbach, M.D.

1          There is information regarding urinary

2     tract -- well, the Nerve Entrapment Issues for

3     Lower Extremities.  This author is Hollis.  I

4     don't know that I have a date on that.  We're

5     almost done.

6          The Mickey Karram article on Sexual

7     Function after Vaginal Surgery for Prolapse; the

8     Altman article on Sexual Function after

9     Trocar-Guided Repairs; the Handa article on

10    Sexual Function Before and After Sacrocolpopexy.

11         I think that is the group.  Again, some of

12    them may or may not be on that list already.

13   BY MR. SLATER:

14         Q.  The SGS review you talked about was

15    authored by Miles Murphy, correct?

16         A.  No, that's the SGS -- well, actually

17    that's a good point.  Miles Murphy's response

18    that was done by the Pelvic Surgeons Group, that

19    is one that I would use, but the one I was

20    talking about is the systematic -- the SGS's

21    systematic review that was published -- I think

22    Vivian Sung is the author, I think, on that.

23         Q.  Let me ask you a question about the

24    Miles Murphy, Time to Rethink.  That's not a

Nicolette S. Horbach, M.D.

```
1   peer-reviewed article.  You know that, right?

2        A.  Yes, I know that.

3        Q.  And you know that the Pelvic Surgeons

4   Network or whatever they called themselves was a

5   made-up name that he and Vince Lucente came up

6   with?

7        A.  Yes.

8        Q.  It's not considered to be a

9   peer-reviewed, scholarly article, correct?

10       A.  I think -- no, it was an opinion or an

11  editorial.

12       Q.  Okay.  With regard to the TVM study,

13  you mentioned the three- and five-year articles,

14  correct?

15       A.  I believe so.  I can pull them back

16  out, if you want.

17       Q.  You did not analyze, as you told me

18  earlier, whether or not the reported data was

19  accurate, correct?

20       A.   No, I did not look back at the

21  original data, no.

22       Q.  Do you know to what extent there were

23  errors with the POP-Q measurements in the TVM

24  studies performed in the U.S. and France?
```

Nicolette S. Horbach, M.D.

1          A.   It was my understanding that there

2    were 78 errors according to Dr. Weber's review of

3    the data.

4          Q.   If there were systemic errors with the

5    POP-Q measurements and no reliable way to correct

6    them, that creates serious questions about the

7    accuracy of that data, correct?

8               MS. JONES:  Object to the form.

9               THE WITNESS:  I don't necessarily

10   agree with that.

11   BY MR. SLATER:

12         Q.   Okay.  With regard to the recurrence

13   rate reported in the TVM study, if there were

14   systemic errors and systemic lack of

15   understanding of POP-Q measurements, you could

16   not state that the recurrence data would be valid

17   or reliable, right?

18              MS. JONES:  Object to the form.

19              THE WITNESS:  I don't think that I

20   necessarily can agree with that statement.  If

21   you look at the number of measurements that could

22   have been -- were potential during that study, if

23   you have 78 errors out of the thousands that were

24   potentially measured, given you have 90 patients

Nicolette S. Horbach, M.D.

1    and you have multiple measurements, your error

2    rate is actually not particularly, you know, a

3    high percentage.

4         In addition, many of the -- when there was

5    an error, it was sent back to be queried by the

6    initial clinical investigator.  If you hold the

7    same kind of -- I'm just going to stop there.

8         Q.  This was followed to correct the

9    errors that were found --

10        A.  I'm sorry.

11        Q.  I'll ask it again.  You don't know

12   what process was followed to try to correct the

13   errors in the POP-Q measurements that were

14   actually detected because the measurements were

15   found to be impossible.  You don't know what was

16   done, do you.

17        A.  It was my understanding that the

18   investigators were -- that the information was

19   sent back to the investigators and/or clinical

20   study sites for querying to determine whether or

21   not there was a mis-entry or whether or not that

22   information was accurate.

23        Q.  The people who reviewed the data found

24   multiple entries where the data was impossible.

Nicolette S. Horbach, M.D.

1    Are you aware of that?

2         A.  Yes.

3         Q.  The fact that the people who are

4    recording the POP-Q measurements were coming up

5    with impossible figures creates reliability

6    questions about the recurrence rates reported,

7    correct?

8              MS. JONES:  Object to the form.

9              THE WITNESS:  I don't agree

10   necessarily with that.  I don't think that just

11   because they were --

12   BY MR. SLATER:

13        Q.  Fine.  You don't agree.  That's fine,

14   Doctor.  That's all I wanted to know.

15        A 15% mesh exposure rate is a very high

16   rate, isn't it?

17        A.  15% is a 15% rate.  I mean, whether

18   you determine it high or not, if it's the

19   patient, she probably does determine it's high.

20   If it's looking at across the board, it may not

21   represent a number that is substantially higher

22   than in some other mesh procedures that are done

23   with sacrocolpopexies and certain types of mesh.

24   But it is on the higher side, yes.

Nicolette S. Horbach, M.D.

```
1          Q.  A 20% exposure rate, if that's what a

2    study showed is consistently being obtained for

3    community physicians, if there was a study that

4    said that, you would say that's unacceptably high

5    and the device shouldn't be used, right?

6              MS. JONES:  Object to the form.

7              THE WITNESS:  I would say that that

8    was not something -- that would not be a material

9    that I would use for -- in that particular

10   procedure -- I probably would not use with a 20%

11   erosion rate.

12   BY MR. SLATER:

13         Q.  Did there come a time in your practice

14   where you -- well, let me ask you this.  Take a

15   step back.

16         You said you did a hundred to two hundred

17   Prolift procedures during the time you started

18   using it through when you stopped in 2011.

19   Therefore, based on the gross number of prolapse

20   procedures you did, Prolift was actually a small

21   number of the prolapse repairs that you were

22   doing, correct?

23         A.  I'm not sure that it was -- I would

24   say it's a small number.  I mean, you were asking
```

Nicolette S. Horbach, M.D.

1    me to give you estimates, and I gave them to you

2    to the best of my ability.  There certainly was a

3    period of time prior to us beginning to do

4    laparoscopic sacrocolpopexies where there was a

5    bulk of the procedures that we were doing were

6    Prolift procedures, yes.

7         Q.  During the time that you did the

8    Prolift, the Prolift was always less than half of

9    the prolapse procedures you were doing, correct?

10        A.  If you take that entire span of time,

11   probably, yes.  If you take sort of more narrowed

12   times during that time period it was probably at

13   a higher percentage.

14        Q.  Over the entire time you did the

15   Prolift, it was less than 50% of the prolapse

16   procedures you were performing during that time

17   period, correct?

18        A.  Again, I'm answering this to the best

19   of my ability.  I can't really say whether it's

20   going to be more or less than that.

21        Q.  You said you were doing several

22   hundred prolapse procedures a year and you did a

23   total of a hundred to two hundred Prolifts.  I

24   understand those are estimates, but if you take

Nicolette S. Horbach, M.D.

1    those numbers as being your best estimate, the

2    Prolift was a small percentage of the overall

3    prolapse procedures you were doing, correct?

4         A.  We've already -- I mean, I've answered

5    that to the best of my ability.

6         Q.  Am I correct?

7         A.  I can't say that you're correct or

8    not.  I've answered the question to the best of

9    my ability so far -- or already.

10        Q.  Did there come a point where you began

11   to have concerns about the safety of the Prolift

12   and started to cut back on utilizing the Prolift?

13        A.  Not for safety reasons, no.

14        Q.  Why did you start to cut back on the

15   use of the Prolift?

16        A.  In part because we were able to do the

17   laparoscopic procedures, but in part it was that

18   I found or that we found that there -- there was

19   a group of patients that did have a higher chance

20   of prolonged postoperative recuperation or some

21   increased problems with pain or muscular

22   dysfunction that required, let's say, physical

23   therapy postoperatively, that there was a group

24   of patients that fell into that category, and,

Nicolette S. Horbach, M.D.

1    unfortunately, since I'm referred a fair number

2    of patients with sort of some type of chronic

3    pain condition, a number of my patients fall into

4    that category.

5         I also found that for certain anatomic

6    aspects of a patient's exam, the Prolift did not

7    do as well as other procedures.  If I was trying

8    to get a apical support procedure as my primary

9    type of support procedure, that was the primary

10   thing I needed, then I did not feel that the

11   Prolift could give me quite as deep of an apical

12   support as what I could obtain with the

13   sacrocolpopexy.  When the sacrocolpopexies were

14   open procedures, then the pro/con, risk/benefit

15   still sometimes went in the favor of the Prolift.

16   When the sacrocolpopexies became laparoscopic

17   procedures, sometimes the pro/con for apical

18   support shifted into the direction of the

19   sacrocolpopexy.

20        Q.  You said you found that some patients

21   had a higher risk to develop pain or chronic pain

22   after a Prolift procedure, correct?

23        A.  More I said that they have a higher

24   risk of having pain or increased pain

Nicolette S. Horbach, M.D.

```
 1    postoperatively after the procedure that --
 2         Q.   Which patients?
 3         A.   Fibromyalgia definitely were at, I
 4    think, increased risk.  Patients who had
 5    preoperative levator myalgia that was associated
 6    perhaps with biomechanical abnormalities and
 7    structural abnormalities from, again, the
 8    orthopedic components.
 9         I don't think I -- I don't really treat a
10    lot of patients at this point with interstitial
11    cystitis, so that doesn't really apply for me.  I
12    think it was more the people with biomechanical
13    abnormalities history.  I mean, I examine each of
14    my patients to look at alignment issues,
15    symmetry, and if those patients had significant
16    asymmetry or they had preoperative muscular
17    abnormalities already, then I would counsel them
18    that they may have more difficulty
19    postoperatively or they may require a longer
20    recuperation or they may require physical therapy
21    treatment, just like I would tell them even for
22    sacrocolpopexy that would be the case.  But I
23    think it probably was a little bit more likely to
24    happen after Prolift in those patients.
```

Nicolette S. Horbach, M.D.

```
1           Q.  Did you -- I think what I'm hearing,
2    but tell me if I'm correct -- you came to
3    conclude over time that, if a patient had a
4    pre-existing chronic pain condition, that person
5    would have a higher risk of developing pain or
6    prolonged pain after a Prolift?
7           A.  Yes.
8           Q.  And you felt that it was better to
9    avoid using a Prolift in those patients, correct?
10          A.  I mean, I'd counsel the patient
11   regarding the pros and cons.  Sometimes we would
12   still proceed with a Prolift because there were
13   other reasons that we would do it, but other
14   times we would not choose to do a Prolift.  We
15   would choose another round.
16          Q.  If the patient could safely undergo an
17   alternative procedure and the patient had a
18   chronic pain condition of some sort, your
19   counseling would have been we shouldn't do a
20   Prolift, we should do the other procedure,
21   correct?
22          A.  That's certainly a possibility, yes,
23   that could -- I would have potentially counseled
24   the patient that this is probably a procedure
```

Nicolette S. Horbach, M.D.

1   that's going to result in more issues

2   postoperatively than if we do it this way, even

3   though the other procedure doesn't necessarily

4   eliminate the possibility of those problems as

5   well.

6        Q.  You're just trying to reduce the risk

7   as best you can for those patients, and your

8   counseling was you're better off not doing the

9   Prolift because it increases your risk more than

10  these other procedures.  Fair statement?

11       A.  Correct.  And sometimes I would not

12  include Prolift as an option in my counseling

13  just like I wouldn't include sacrocolpopexy as an

14  option in my counseling for some patients based

15  on their underlying history and anatomy and risk

16  factors, et cetera.

17       Q.  You said that patients -- well,

18  rephrase -- you said some patients -- well,

19  rephrase.

20       In certain anatomic issues you didn't

21  think the Prolift did as well, and one of those

22  was if apical support was needed, correct?

23       A.  Well, apical support in a specific

24  situation where the patient has a uterus in

Nicolette S. Horbach, M.D.

1    place, she has a retroverted uterus, a shorter

2    anterior wall compared to posterior vaginal wall

3    length, then I didn't always find that I got as

4    well-supported apex at the level of the depth

5    that I wanted if I went to a Prolift.

6            Q.   Looking at Exhibit 4 again, let's go

7    to the list on -- the pages aren't numbered, but

8    after the list of literature, it then says,

9    "Pleadings."  Were those pleadings of

10   significance to you or was it just something you

11   were provided and you put -- and you just put on

12   the list?

13           A.   Let me see if I can get to that point.

14   Okay.  In the interrogatories that I reviewed I

15   don't think that there was anything that I relied

16   on specifically in my opinions.  As I recall --

17           Q.   The next section says -- I'm sorry.  I

18   didn't mean to interrupt you.

19           A.   That's okay.  As I recall, they were

20   fairly brief answers.

21           Q.   The last section on this sheet says

22   "Other."  Do you see that?

23           A.   Yes.

24           Q.   These would be materials that were

Nicolette S. Horbach, M.D.

1   provided by the Ethicon attorneys to you,

2   correct?

3          A.  Yes.

4          Q.  Did you read all these materials and

5   watch all the videos?

6          A.  I saw most of the videos.  As far as I

7   recall, I read all of these different other

8   issues, emails, all of the professional education

9   materials, some of the FDA information going back

10  and forth, yes, I think most all of the rest of

11  it I read.

12         Q.  You've referred a couple times to

13  emails.  To the extent you're referring to

14  emails, they would be within these documents in

15  the list of, quote/unquote, Other?

16         A.  Yes.

17         Q.  In terms of whether or not the IFU

18  adequately warned of the risks and complications,

19  you're basing that on just from the perspective

20  of being a medical doctor who works in this field

21  reading it and saying from your perspective

22  whether or not you think it's adequate.  Fair

23  statement?

24             MS. JONES:  Object to the form.

Nicolette S. Horbach, M.D.

1              THE WITNESS:  Yes, it's based on my

2    clinical medical opinion as a clinical -- as a

3    clinician and practicing physician.

4    BY MR. SLATER:

5         Q.  And in terms of the standard you're

6    applying in giving that opinion, it's basically

7    the standard is what you think is adequate from

8    your own personal perspective, correct?

9              MS. JONES:  Form.

10             THE WITNESS:  Well, it's my

11   perspective for clinicians that are doing this

12   type of procedure.  So, I mean, the IFU is

13   designed to provide information to us as

14   clinicians.  And so the question is, is there

15   sufficient information in that IFU that us -- we,

16   as clinicians, who are, you know, focusing on

17   Prolift and have experience with dealing with

18   mesh, that the information provided in that IFU

19   is sufficient for us to be guided about how to

20   perform the procedures and risks and benefits of

21   the procedures, et cetera, yes.  That's a long

22   answer, but...

23   BY MR. SLATER:

24        Q.  Do you agree that the information in

Nicolette S. Horbach, M.D.

1    the IFU should be supported by foundational facts

2    and data?

3              MS. JONES:  Object to the form.

4              THE WITNESS:  Yes, I imagine that they

5    would -- you'd want data in there, not just

6    making up things, yes.

7    BY MR. SLATER:

8         Q.  -- made claims to the IFU that --

9         A.  I'm sorry.

10        Q.  I'm sorry.  If it turned out that

11   Ethicon made claims in the IFU as to the

12   qualities or attributes of the Prolift and those

13   claims were not supported by any data, you would

14   criticize that, right?

15             MS. JONES:  Object to the form.

16             THE WITNESS:  I'm not sure that I

17   would criticize it.  I'd probably just ignore it

18   because I would think that I'm, you know, that's

19   not something that I think is consistent with my

20   knowledge and experience in dealing with meshes,

21   so I would probably just ignore that aspect.

22   BY MR. SLATER:

23        Q.  As an expert in this case, if it

24   turned out and it was shown to you that there was

Nicolette S. Horbach, M.D.

1    a statement made in the IFU, for example,

2    claiming some attribute of the Prolift and it

3    turned out that claim had no supporting data, as

4    an expert you would say that's something you

5    criticize, Ethicon should not have done that,

6    right?

7              MS. JONES:  Same objection.

8              THE WITNESS:  I mean, I don't think --

9    I don't think that Ethicon's statement regarding

10   that one way or the other would influence my

11   decision-making as a clinician.  So, yeah, in the

12   perfect world --

13   BY MR. SLATER:

14        Q.  That's not my question.

15        A.  In the perfect world, yeah, they

16   probably shouldn't have put that into the IFU,

17   but I don't think that their statement in the IFU

18   to that effect would influence me one way or the

19   other regarding my understanding of the product

20   and my use of it as a clinician.

21        Q.  I haven't even given you content.

22   This is a question in general, so I'm not sure

23   why you're saying it wouldn't impact your

24   decision-making when I haven't even asked you

Nicolette S. Horbach, M.D.

1    content-wise what it would be.  So let's go back.

2         MS. JONES:  Move to strike comments of

3    counsel.

4    BY MR. SLATER:

5         Q.  I'm asking you a straightforward,

6    general question.  If it turned out that Ethicon

7    made claims about the Prolift in the IFU that

8    Ethicon did not have support for, did not have

9    data to support it, you would criticize that,

10   correct?

11        MS. JONES:  Object to form.

12        THE WITNESS:  I have answered that

13   already.

14   BY MR. SLATER:

15        Q.  Would you agree with me that that

16   would be a violation of Ethicon's duties or do

17   you not know?

18        A.  I mean, it's not -- the -- Ethicon's

19   duty of what it is required to do or not do is

20   something that is difficult for me to say from a

21   legal standpoint.

22        From a clinician's standpoint, I feel that

23   the -- what is placed in the IFU, since the IFU

24   is designed to be information to the provider but

Nicolette S. Horbach, M.D.

1    not a substitute for medical care and textbooks

2    and information of what you know, I am going to

3    take most of what's in that IFU with a grain of

4    salt regardless.

5         Q.  Do you think the IFU is an important

6    document?

7         A.  I think it's a document that's, you

8    know, that is required to be written, but it's a

9    document that each physician who's going to

10   potentially be treating Prolift -- or treating

11   prolapse and doing a Prolift, they have to

12   evaluate based on the context of their medical

13   knowledge whether they agree with the statements

14   that are in the IFU or not.  I mean, the IFU is

15   not the end all -- I'm sorry.  The IFU is not the

16   end-all be-all for information for physicians

17   regarding this particular procedure.

18        Q.  Do you know from a regulatory

19   perspective what the purpose of the IFU is, the

20   specific purpose?

21        A.  From a regulatory standpoint, no.

22        Q.  You don't know from the perspective of

23   Ethicon Medical Affairs as to what purpose they

24   thought the IFU had, correct?

Nicolette S. Horbach, M.D.

```
 1            A.  I don't know what they thought, no.

 2            Q.  When you evaluate whether or not the

 3    warnings in the IFU are adequate or not and

 4    whether the information is adequately provided or

 5    not, the standard you're applying is you, as

 6    Dr. Horbach, based on your experience, what you

 7    think is appropriate or not, correct?

 8            MS. JONES:  Object to the form, asked

 9    and answered.

10            THE WITNESS:  I'm stating that it's

11    based on my opinion as a practicing

12    urogynecologist who has experience dealing with

13    prolapse surgery and with meshes as is part and

14    parcel of what this product was indicated for and

15    specifically what it states in the IFU.  I think

16    I'm basing my opinion based on that, not just my

17    personal opinion, but what those of us in the

18    community who do this type of work and who do

19    treatment with mesh, what our understanding would

20    be regarding the procedure and the potential

21    positives and negatives about the procedure.

22    BY MR. SLATER:

23            Q.  Are you applying any specific

24    objective standard to whether or not the IFU
```

Nicolette S. Horbach, M.D.

1    warnings are adequate?

2           A.  Not a specific objective standard.

3    It's a clinical standard, yes.  It's more of a

4    clinical standard, yes.

5           Q.  It's just --

6           A.  I'm sorry.

7           Q.  -- that's what I'm getting at.  The

8    standard you're applying to whether or not the

9    warnings and the information provided in the IFU

10   or the patient brochure or any of the other

11   documents you looked at, your standard for

12   whether it's adequate is, based on your

13   experience, what you think is adequate and

14   reasonable; is that fair?

15              MS. JONES:  Form.

16              THE WITNESS:  Yes, it's based on

17   clinical experience and clinical judgment and

18   expertise, yes.

19   BY MR. SLATER:

20          Q.  You're not applying any specific

21   standard whether something that Ethicon was

22   holding itself up to or otherwise, no objective

23   standard, correct?

24          A.  Correct.

Nicolette S. Horbach, M.D.

1        Q.  Would you agree with me that Ethicon

2   should not have provided false information in the

3   IFU, the patient brochure, the professional

4   education or any of their other documents that

5   doctors and patients were going to read?

6            MS. JONES:  Object to form.

7            THE WITNESS:  Yes, I would agree with

8   that.

9   BY MR. SLATER:

10       Q.  If it turned out that Ethicon provided

11  false information, you would criticize that,

12  correct?

13           MS. JONES:  Form.

14           THE WITNESS:  I would criticize it in

15  terms of what?

16  BY MR. SLATER:

17       Q.  Would you say that's a violation of

18  Ethicon's duties?

19       A.  Duties as what?  I mean, that's a

20  legal definition.

21       Sorry.  You've gone away.

22       Q.  Let me ask you this question.  Let me

23  ask this question.  We might be able to

24  short-circuit a line of questions.

Nicolette S. Horbach, M.D.

1          Is it fair to say that you are not in a

2    position to tell me what the duties of Ethicon as

3    a medical device manufacturer were with regard to

4    providing warnings and information to doctors and

5    patients?  In terms of what standards or duties

6    Ethicon was required to meet, you don't have that

7    information, correct?

8              MS. JONES:  Object to the form.

9              THE WITNESS:  From a -- from a legal

10   standpoint, I don't have that information.  I'm

11   doing this based on clinical judgment as a

12   clinician.

13             MS. JONES:  Counsel, the tape, you've

14   got five minutes.

15             MR. SLATER:  Okay.  Five minutes

16   total?

17             MS. JONES:  Yes.

18             VIDEO SPECIALIST:  Four now.

19             MS. JONES:  Four and a half now.

20   BY MR. SLATER:

21        Q.  Do you know whether or not the French

22   TVM study met its primary endpoint?

23        A.  It did not.

24        Q.  It failed its primary endpoint,

Nicolette S. Horbach, M.D.

1   correct?

2        A.  Correct.

3        Q.  That is significant, correct?

4            MS. JONES:  Object to the form.

5            THE WITNESS:  Significant --

6   significant in terms of what?

7   BY MR. SLATER:

8        Q.  Is it significant to you that the

9   French TVM study failed its primary endpoint?  A

10  simple yes-or-no question.

11       A.  No.

12       Q.  Did you ever look at the data for the

13  Prolift+M clinical study?

14       A.  I think I do -- I think I did.  I

15  don't -- trying to remember specifically.  I

16  believe I did, yes, but I can't recall that.

17       Q.  Can you tell me anything -- can you

18  tell me how much -- rephrase.

19       Do you know what stage the clinical study

20  for the Prolift+M was at when the Prolift+M was

21  launched?

22       A.  My recollection is that it was greater

23  than stage 2 rather than greater and equal to

24  stage 2.

Nicolette S. Horbach, M.D.

1          Q.  Here's my question.  Do you know how

2     many -- how much -- how long the Prolift+M study

3     had been ongoing at the time the Prolift+M was

4     put on the market?

5          A.  Sorry.  I misinterpreted your

6     question.  I think it had been approximately -- I

7     think they had the six-month data compiled.  The

8     one-year data was around the time period that

9     they put it on the market.

10          Q.  Do you feel that was an adequate

11     amount of data to launch the Prolift+M?

12          A.  Certainly within the standard of what

13     our procedures have typically -- what our

14     literature has -- it's certainly within the

15     standards of what our literature has been in the

16     past in terms of describing surgeries or new

17     surgeries and publishing literature in that

18     degree to support those procedures.

19          Q.  If Ethicon only had three months or

20     less of clinical data on the Prolift+M, would you

21     agree they should not have launched the Prolift+M

22     at that point and should have waited to have data

23     for a longer period of time?

24          A.  I think that would be optimal per se.

Nicolette S. Horbach, M.D.

1    I'm not sure that it's below the standard of care

2    to do that.

3         I think he's trying to tell you that the

4    tape is done.

5              MR. SLATER:  All right.  We can change

6    the tape.

7              VIDEO SPECIALIST:  The time now is

8    3:15.  We are going off the record.  This is the

9    end of disc number 2.

10        (Proceedings recessed.)

11             VIDEO SPECIALIST:  The time now is

12   3:27.  We are back on the record.  This is the

13   beginning of disc number 3.

14   BY MR. SLATER:

15        Q.  Do you know what the ultimate outcome

16   was of the Prolift+M clinical study?

17        A.  I can't give you that information at

18   this point.  No, I can't recall it.

19        Q.  With regard to the actual design of

20   the Prolift, you don't hold yourself out as an

21   expert with regard to the design of the Prolift,

22   correct?

23        A.  Correct.

24        Q.  Same with the Prolift+M, correct?

Nicolette S. Horbach, M.D.

1        A.  Correct.

2        Q.  I'd like to go back to one thing -- we

3   had kind of a banter off the record -- but for

4   your own benefit, did you have a chance to review

5   your list of articles to confirm that most of

6   your articles address incontinence?

7        A.  Yes, that's what I had said.  Yes,

8   most of my articles in the past have addressed

9   incontinence.

10            MR. SLATER:  If you could, I think,

11   Sara, we have an article there, and it's

12   Dr. Horbach's article from 2009, titled De Novo

13   Stress Incontinence and Pelvic Muscle Symptoms

14   After Transvaginal Mesh Repair, could you pull

15   that out and we'll mark it as an exhibit.

16        (Exhibit No. 15 marked for

17    identification.)

18            MS. JONES:  It's been marked as

19   Exhibit 15.

20            MR. SLATER:  15?  Thank you.

21   BY MR. SLATER:

22        Q.  Dr. Horbach, we've handed you Exhibit

23   15.  For the record, this is an article titled De

24   Novo Stress Incontinence and Pelvic Muscle

Nicolette S. Horbach, M.D.

```
 1   Symptoms after Transvaginal Mesh Repair, and

 2   you're one of the authors, correct?

 3        A.  Correct.

 4        Q.  And this addresses the experience of

 5   your medical practice based on a retrospective

 6   chart review with the Prolift, correct?

 7        A.  Yes.

 8        Q.  I just want to understand one thing,

 9   going back to something you told me generally

10   before actually.  You talked about a symptom

11   called levator muscle tenderness, and I believe

12   you noted that Connie Schubert has that symptom,

13   correct?

14        A.  That's a sign on her examination that

15   she has, yes.  It's a sign, not a symptom.

16        Q.  And where would the arms of the

17   Prolift and Prolift+M be in proximity to the

18   levators?

19        A.  Typically the anterior proximal arm is

20   going to be somewhat near the levators.  The

21   posterior arm is typically below the levators.

22        Q.  The anterior arm of the Prolift or

23   Prolift+M due to either tension or contraction

24   can cause levator muscle tenderness, spasm, pain,
```

Nicolette S. Horbach, M.D.

```
 1   correct?

 2           A.  Yes.

 3           Q.  Let's look at your article.  Your

 4   article was published in 2009, correct?

 5           A.  Yes.

 6           Q.  In the second column on the first page

 7   at the very bottom you note that there is debate

 8   and controversy over the appropriateness of this

 9   new therapy and how it should be applied to

10   clinical practice, and you're talking about the

11   Prolift, correct?

12           A.  That's it, yes.

13           Q.  Just above that you say:

14               There is increasing industry

15               pressure for surgeons to adopt

16               mesh-augmented repairs into their

17               practice and many surgeons are

18               using the therapy liberally.

19               Do you see that?

20           A.  Yes, I see it.

21           Q.  And you were pointing that out

22   because, from your perspective, that was a

23   problem, correct?

24               MS. JONES:  Object to the form.
```

Nicolette S. Horbach, M.D.

1           THE WITNESS:  That was a statement

2    that was part of our fellow's original

3    manuscript.  Not all of us agreed with the

4    statement, but it is something that we left in

5    the article.

6    BY MR. SLATER:

7         Q.  Well, you would agree with that

8    statement and you would agree that that's a bad

9    thing, that the industry, companies like Ethicon,

10   were pressuring surgeons to adopt mesh-augmented

11   repairs into their practice, correct?

12          MS. JONES:  Object to form.

13          THE WITNESS:  You know, again, I mean,

14   I personally did not have that experience and I

15   don't know that, you know -- certainly among our

16   practice we didn't have that experience.  Whether

17   that was going on elsewhere, that I can't state.

18   BY MR. SLATER:

19        Q.  If companies like Ethicon were

20   bringing pressure on surgeons to adopt

21   mesh-augmented repairs like the Prolift, that

22   would be a bad thing, right?

23          MS. JONES:  Object to the form.

24          THE WITNESS:  I think it would be a

Nicolette S. Horbach, M.D.

```
 1   bad thing only if the surgeons responded to the

 2   pressure.  I mean, whether -- the company --

 3   sorry.  The company can pressure you or whether

 4   it's this company or a drug company or anybody

 5   else can sit there and say, you should do this,

 6   do this, but I'm not going to do anything nor

 7   would, hopefully, any reasonable and competent

 8   and ethical physician do something that they

 9   don't believe to be appropriate regardless of

10   what they are told by company representatives or

11   pressured in any way.

12   BY MR. SLATER:

13        Q.  If a company -- well, rephrase.

14        If Ethicon provided false and/or

15   misleading information to doctors in an effort to

16   get them to adopt the Prolift, that would be a

17   bad thing, right?

18            MS. JONES:  Object to the form.

19            THE WITNESS:  Yeah.

20   BY MR. SLATER:

21        Q.  That would be reprehensible, correct?

22        A.  I'm not sure that I would use that

23   word.

24        Q.  Well, what word would you use to
```

Nicolette S. Horbach, M.D.

1   describe that?

2          A.  I think it would be -- it would be

3   something that -- that I would be disappointed to

4   see that the company was doing.

5          Q.  If in fact it turns out in this case

6   that Ethicon provided false and misleading

7   information to Dr. Roberts, and, as a result of

8   that false and misleading information,

9   Dr. Roberts recommended and placed the Prolift

10  and Prolift+M into Connie Schubert leading to

11  these complications she has suffered from, if

12  that went on, you would agree with me Ethicon

13  should be punished for that, correct?

14              MS. JONES:  Object to the form.

15              THE WITNESS:  No.

16  BY MR. SLATER:

17          Q.  You think it's acceptable if Ethicon

18  provided false and misleading information to

19  Dr. Roberts which Dr. Roberts believed and then

20  relied on that information in recommending the

21  Prolift and Prolift+M to Connie Schubert and

22  putting those devices in her body?

23              MS. JONES:  Object to the form.

24              THE WITNESS:  No, I don't think it's

Nicolette S. Horbach, M.D.

1    an issue.

2    BY MR. SLATER:

3         Q.  I'm talking -- let me explain

4    something before you answer.  I'm talking about

5    Ethicon's conduct here.  That's what I'm asking

6    you to comment on.

7         A.  If Ethicon provided, you know, false

8    information to a physician, I think that that is

9    not a correct, you know -- I think that's a

10   problem that the company did, but if that -- if

11   that physician then goes on and does a procedure

12   without having, you know, any kind of

13   intellectual questioning or any kind of

14   evaluation based on their background and

15   understanding of things, then, I mean, that's the

16   physician's responsibility to question that.

17        I mean, you don't -- I mean, I don't know

18   about you, but I don't believe everything that's

19   advertised to me.  I don't believe everything I

20   see on TV or hear on TV.  I don't make my

21   decisions based on that nor do most people.

22        So, as a clinician, it is our

23   responsibility to weigh what we are told or

24   information that we get from multiple sources,

Nicolette S. Horbach, M.D.

```
 1   whether it's a company, whether it is a article,

 2   whether it's a national organization, and weigh

 3   the accuracy or not of that -- of that

 4   information in making a decision about how we

 5   manage patients.

 6   BY MR. SLATER:

 7        Q.  Do you know if Ethicon expected

 8   doctors to believe what Ethicon was telling

 9   doctors about the risks and benefits of the

10   Prolift?

11        A.  I can't say what Ethicon believed or

12   not believed.

13        Q.  Okay.  That was my question.  If in

14   fact Ethicon provided false and misleading

15   information to Dr. Roberts in the professional

16   education that he actually attended that was

17   sponsored by Ethicon, and, as a result of that

18   information, Dr. Roberts put the Prolift and

19   Prolift+M into Connie Schubert's body, Ethicon

20   should be punished for providing that false and

21   misleading information in professional education

22   that it was sponsoring and providing, correct?

23             MS. JONES:  Object to the form.  It

24   calls for legal conclusion.
```

Nicolette S. Horbach, M.D.

```
 1              THE WITNESS:  I don't -- I mean, I

 2    don't agree with that.  I think --

 3    BY MR. SLATER:

 4         Q.  That's all I asked you.  You don't

 5    agree.  I'm not asking for your explanation.

 6         A.  Okay.  No.

 7         Q.  If Ethicon provided false and

 8    misleading information in the patient brochure

 9    for the Prolift and if Dr. Roberts relied on that

10    information in speaking with Connie Schubert and

11    in recommending the Prolift to Connie Schubert,

12    should Ethicon be punished for providing that

13    false and misleading information in the patient

14    brochure?

15              MS. JONES:  Object to the form.

16              THE WITNESS:  I mean, I can't make

17    that statement one way or the other.  I mean,

18    it's not my role to decide whether Ethicon should

19    be punished or not for something.

20    BY MR. SLATER:

21         Q.  Would you agree with me that Ethicon

22    needed to tell the truth when it provided

23    information to doctors and patients?

24              MS. JONES:  Object to the form.
```

Nicolette S. Horbach, M.D.

```
 1                 THE WITNESS:  I would expect that they
 2    were telling the truth when they provided the
 3    information.
 4    BY MR. SLATER:
 5         Q.  If Ethicon knowingly provided false
 6    information to doctors and/or patients, you would
 7    agree with me that would be wrongful, right?
 8                 MS. JONES:  Object.
 9                 THE WITNESS:  Again, that's a more of
10    a legal conclusion, I think, than it is from a
11    clinical standpoint.  So that I think I would
12    have a hard time giving you an answer one way or
13    the other.
14    BY MR. SLATER:
15         Q.  Let's look at your article, your 2009
16    article, and let's go to the second page,
17    right-hand column, 73.e2, right-hand column, just
18    towards the top, about eight lines down, it says:
19                 For our study we defined pelvic
20                 muscle symptoms as pelvic-floor
21                 symptoms attributed to pelvic
22                 muscle dysfunction that persisted
23                 greater than 12 weeks beyond
24                 surgery.
```

Nicolette S. Horbach, M.D.

1           That was your definitional terminology for

2    this study, correct?

3           A.   Yes.

4           Q.   And you explain:

5                We restricted these symptoms,

6                meaning those that fit into that

7                category, to the sexual function

8                and pain subcategories of the

9                International Continence Society's

10               definition of pelvic muscle

11               dysfunction, which specifically

12               included new onset or worsening

13               dyspareunia and vaginal pain.

14               Correct?

15          A.   Correct.

16          Q.   And then you say, you also included

17   within that definition, findings and symptoms

18   that were attributed to the pelvic floor that are

19   specific to vaginal mesh procedures including

20   groin pain, buttock pain, pain with sitting and

21   pain with walking.

22               Do you see that?

23          A.   I see the statement, yes.

24          Q.   So you would agree with me that

Nicolette S. Horbach, M.D.

1    symptoms that are specific to vaginal mesh

2    procedures include groin pain, buttock pain, pain

3    with sitting and pain with walking, correct?

4         A.   I don't think they are specific for

5    just vaginal mesh procedures.  I think that they

6    are specific for vaginal procedures or even some

7    abdominal procedures.

8         Q.   Why did you use that terminology,

9    then?

10        A.   That was terminology that was written

11   by the primary author.  Again, we go through a

12   dialogue regarding what ends up being in the

13   final version of the article but doesn't

14   necessarily mean that all of us view that as the

15   only thing.  And I think it's -- the implication

16   is different than what it was intended to be.

17        Q.   Did you review this article before it

18   was published?

19        A.   Yes, I did.

20        Q.   Did you ask to have that language

21   changed?

22        A.   I don't recall.

23        Q.   When you performed Prolift procedures,

24   did you attempt to perform the procedure in a

Nicolette S. Horbach, M.D.

 1   tension-free manner?

 2        A.  Yes.

 3        Q.  And what is your definition of

 4   tension-free in the context of the Prolift?

 5        A.  It is placing -- there's two aspects

 6   of it.  There is one aspect of the mesh patch

 7   itself and there is another aspect relative to

 8   the arms of the Prolift.

 9        So that in the arms of the Prolift, when

10   you are adjusting the length of those arms, there

11   is a surgical methodology to try to keep the arms

12   as loose as possible or to not have any traction

13   applied to the arms.

14        So once the arms are withdrawn through the

15   cannula, simply just to put that physically in

16   the space, then you return the anatomy to its

17   proper position and you actually push back on the

18   arms to try to -- trying to think of the right

19   word -- to try to bring the arms back through the

20   tissue.

21        So you've pulled it forward, but you try

22   to back up the arms essentially by applying

23   pressure to the area where the arms join the

24   patch and try to ensure, then, that, once you

Nicolette S. Horbach, M.D.

1   remove the cannula, that that is -- that arm

2   placement does not involve any type of

3   palpable -- you know, that you're not feeling any

4   linear type of palpable object, I guess, is the

5   best word here in that area.  So that if you were

6   then to palpate the tissue or palpate the mesh

7   area without the cannulas being in place, you do

8   not feel essentially that the mesh is there.

9        Q.  And what -- you said there's two parts

10   to tension free.  One part is that, when the arms

11   have been placed, you adjust the length, you keep

12   the arms as loose as possible, and so that when

13   you palpate it there -- it would not feel like

14   the arms are there, right?

15        A.  Correct.  And then the second part is

16   relative to the patch, that the patch is simply

17   laid under the vaginal wall between either the

18   vaginal wall and the bladder or the vaginal wall

19   and the rectum, that you do not sort of -- you do

20   not pull it taut side to side or superiorly to

21   inferiorly.  Typically you do not -- you

22   certainly don't usually attach sutures to the

23   lateral margins.  You may use a suture to tack

24   the mesh inferiorly or superiorly, but typically

Nicolette S. Horbach, M.D.

1    that is not with anything that's permanent.

2    That's an absorbable type of suture.  And you

3    avoid trying to overtrim the material itself and

4    avoid any type of trimming of the vaginal wall so

5    that you leave, purposely leave, redundancy

6    within the vaginal wall to allow for appropriate

7    healing of the combination of the mesh and the

8    vaginal wall.

9          Q.   In the patients that are described in

10   this article, you and the others in your practice

11   performed what you've defined here for me as a

12   tension-free placement of a Prolift, correct?

13         A.   That's what we attempted to perform,

14   yes.

15         Q.   And even despite you being four

16   fellowship-trained surgeons that you would

17   consider to be highly skilled, including

18   yourself, you still ended up with contraction of

19   mesh in patients that you attribute to tension,

20   correct?

21         A.   I think that that was more in the

22   earlier stages of our work with prolapse --

23   Prolift.  I think that we over a period of time

24   developed some adjustments that allowed us to

Nicolette S. Horbach, M.D.

1    have less of that occur, at least that was my

2    personal experience.  I did not go back and

3    review --

4         Q.  Move to -- I'm striking your answer

5    because it wasn't, from my perspective,

6    responsive.  My question is very simple.

7         Despite yourself and the other

8    fellowship-trained surgeons in your practice

9    attempting to obtain a tension-free placement of

10   the Prolift, as you just defined it for me a

11   moment ago, you still had patients who had

12   contraction of the mesh that you attributed to

13   tension either from leaving excessive tension on

14   the mesh or due to the fact that the contraction

15   of the mesh caused tension itself, correct?

16        A.  Yes, there were patients in this

17   series where that was the case.

18        I'm sorry.  You're lost.

19        Q.  I'm sorry.  So even a doctor who is

20   highly skilled, who is following the training per

21   Ethicon, as you understood it, trying to place

22   the mesh in a tension-free way, you can still end

23   up with tension and contraction leading to

24   painful symptoms, correct?

Nicolette S. Horbach, M.D.

```
 1              MS. JONES:  Object to the form.

 2              THE WITNESS:  Yes.  Even if you place

 3    it correctly, yes, you can.

 4    BY MR. SLATER:

 5         Q.  Now, what you call pelvic muscle

 6    symptoms, you're not ruling out the potential

 7    that there is nerve involvement leading to this

 8    pain as well, correct?

 9         A.  Yes, usually you -- in our use of the

10    term, we usually have tried to eliminate that

11    that was specifically related to nerve injuries.

12         Q.  Do you know whether or not Ethicon

13    Medical Affairs had the understanding that where

14    a patient had contraction accompanied by pain

15    that that likely was due to nerve entrapment and

16    nerve involvement?  Do you know whether Medical

17    Affairs held that view?

18         A.  I don't know.

19         Q.  Some of the patients in your study, in

20    fact 35% of them, were only stage 2 prolapse when

21    you operated on them, meaning you and your group,

22    correct?

23         A.  I believe that's what the information

24    states.
```

Nicolette S. Horbach, M.D.

1          Q.  Were you ever aware that Ethicon

2     intended the Prolift to be used in stage 3 or 4

3     prolapse?

4              MS. JONES:  Object to the form.

5              THE WITNESS:  I believe I saw

6     something to that effect, although the --

7     ultimately it was designed or marketed for stage

8     2 or greater.

9     BY MR. SLATER:

10         Q.  The prolapse -- rephrase.

11         The Prolift was marketed for pretty much

12     anybody that a doctor wanted to put it into as

13     long as the patient wasn't a child or wasn't

14     going to be getting pregnant; other than that,

15     there were no limitations in the materials that

16     marketed the Prolift, correct?

17             MS. JONES:  Object to the form.

18             THE WITNESS:  I don't think that

19     that's necessarily true.  I mean, there were

20     other patients that they felt or that the patient

21     education information, et cetera recommend that

22     those were -- the Prolift was potentially

23     counter-indicated in those patients.

24     BY MR. SLATER:

Nicolette S. Horbach, M.D.

1        Q.  When did they start putting that

2   information in the professional education, what

3   year?

4        A.  I'd have to go back and look at the

5   specific slides to let you know, but -- I don't

6   recall whether it was -- exactly when it was.  It

7   was probably in the --

8        Q.  It certainly --

9            THE REPORTER:  I'm sorry.  Excuse me.

10  Counsel, wait.  I did not hear the remainder of

11  the doctor's answer.

12           "It was probably in the..."

13           THE WITNESS:  It may or may not have

14  been in the first set, but I think it was in the

15  second set of professional education materials.

16  BY MR. SLATER:

17       Q.  You would agree with me that Ethicon

18  at least internally intended the Prolift to be

19  used for stage 3 and 4 prolapse, correct?

20       A.  I don't know whether that's the case.

21       Q.  You would agree with me that, based on

22  your experience over the course of years, you

23  reached the conclusion that the Prolift really

24  should be limited to stage 3 and 4 prolapse,

Nicolette S. Horbach, M.D.

 1    correct?

 2          A.   I did not reach that conclusion.

 3          Q.   In reporting your results you

 4    understood that somebody with a stage 2 prolapse

 5    would have a much less like -- much lower

 6    likelihood of a recurrence than someone at stage

 7    3 or 4, correct, in general terms?

 8          A.   In the general data regarding Prolift

 9    recurrence, yes.

10          Q.   You note on page e3, in the right-hand

11    column, that of the 290 women who completed

12    greater than or equal to 12 weeks of follow-up,

13    18.3% experienced pelvic muscle symptoms

14    postoperatively including new onset dyspareunia,

15    vaginal pain, groin pain, pain with walking and

16    pain with sitting, correct?

17          A.   That's what it states.

18          Q.   So that is 18.3% of the patients

19    having at least three months of pain following

20    Prolift surgery, correct?

21          A.   That's what it states.

22          Q.   And in 25% of those women the pain did

23    not resolve within six months and continued

24    beyond six months, correct?

Nicolette S. Horbach, M.D.

1          A.  I think that that was the information.

2    I'd have to double-check.

3          Q.  It's right there.  It says, in 74% of

4    these women --

5          A.  Okay.  Sorry.

6          Q.  -- the symptoms resolved within -- I'm

7    sorry.  So am I correct?

8          A.  Yes.  I did it the opposite -- you

9    changed the numbers around, so --

10          Q.  And it indicates that in 14 patients

11    we were not able to document resolution of their

12    pelvic muscle symptoms within six months.  The

13    outcome of these 14 cases is listed in Table 3.

14    Those are the 25% of the pain patients for which

15    the pain did not resolve within six months,

16    correct?

17          A.  Yes.

18          Q.  And you would agree with me that the

19    complications described for those 14 patients are

20    significant complications, correct?

21          MS. JONES:  Object to the form.

22          THE WITNESS:  I mean, the term -- they

23    are complications.  Whether they are significant

24    or not, you know, that's a subjective

Nicolette S. Horbach, M.D.

1   determination.  From the standpoint of the

2   patients, they are probably significant issues,

3   yes.  They are not the same as --

4   BY MR. SLATER:

5       Q.  -- patients described in this table

6   are clinically significant, correct?

7       A.  They are having clinical symptoms,

8   yes.

9       Q.  Turn to page e5, if you could.  In the

10  middle column you talk about in your current

11  study 3% of the women experienced continued

12  pelvic-floor-related discomfort after the Prolift

13  procedure that does not respond to conservative

14  therapy.  Do you see that?

15      A.  Yes.

16      Q.  So these women that are listed on this

17  table, you attempted conservative therapy with

18  them, but it did not resolve their pain, correct?

19          MS. JONES:  Object to the form.

20          THE WITNESS:  Yes, in the series.

21  BY MR. SLATER:

22      Q.  -- indicate some cases of pelvic

23  muscle discomfort are caused by mesh bunching and

24  banding.  I want to stop there.  When you talk

Nicolette S. Horbach, M.D.

1    about mesh bunching and banding, we're talking

2    basically about contraction of the mesh, correct?

3         A.  I'm not sure you can say it's

4    contraction of the mesh versus a rolling of the

5    mesh versus an overlap the mesh.  I mean, it's

6    simply --

7         Q.  Do you have an understanding -- I

8    didn't mean to -- I apologize.  When you pause,

9    there is a delay and then I thought you were

10   done.  Go ahead.

11        A.  It simply means that you're able to

12   feel under the epithelium that the -- that there

13   is more mesh material there than perhaps in the

14   adjacent area where the mesh is laying completely

15   flat and smooth, but you can't necessarily say

16   whether it's due to vertical, horizontal

17   contraction, a foldover, you know.  I mean,

18   there's multiple different ways of determining

19   that.  That would be independent --

20        Q.  Are you aware of whether -- are you

21   aware of whether Ethicon Medical Affairs believe

22   that where you have mesh bunching, that that's

23   essentially synonymous with contraction?

24             MS. JONES:  Object to the form.

Nicolette S. Horbach, M.D.

```
1              THE WITNESS:  I'm not aware that they

2    made that equivalency.

3    BY MR. SLATER:

4         Q.  Are you aware of whether or not

5    Medical Affairs at Ethicon believed that, where

6    you have mesh that's either folded on itself or

7    bunched together or wrinkled, that that increases

8    the risk of developing contraction?

9              MS. JONES:  Object to the form.

10             THE WITNESS:  I don't know whether

11   they were aware of that information or not.

12   BY MR. SLATER:

13        Q.  You would agree -- I'll ask a new,

14   clean question.

15             You would agree that where there is

16   bunching of mesh or folding of mesh or wrinkling

17   of mesh, that increases the risk of contraction

18   of the mesh.

19             MS. JONES:  Form.

20             THE WITNESS:  I certainly think that

21   that's a possibility.  I probably would be in

22   that area more concerned maybe about erosion of

23   the mesh rather than contracture of the mesh in

24   that area.
```

Nicolette S. Horbach, M.D.

1    BY MR. SLATER:

2         Q.  Certainly you would agree that, if

3    there is bunching or folding or wrinkling of the

4    mesh, that would increase the risk for erosion,

5    correct?

6         A.  That's what I just said, yes.

7         Q.  In the right-hand column on this page

8    you talk about the fact that in our limited

9    experience -- rephrase.

10        You talk about in the right-hand column

11   about just above the first full paragraph, some

12   women who experience these problems seek care at

13   other institutions and women with initial pain

14   symptoms that resolve may defer follow-up as

15   well.  Do you see that?

16        A.  I'm just reading through it just a

17   minute.  Yes.

18        Q.  And you're talking about the fact

19   that, when women have complications from this

20   type of surgery, they often will go be treated by

21   somebody else for those complications, correct?

22        A.  Yes.  We discussed that previously.

23        Q.  And you in fact cite in your article,

24   footnote 23, to an article by Blandon, Gebhart,

Nicolette S. Horbach, M.D.

```
 1    Trabuco, Occhino and Klingele from the Mayo

 2    Clinic for that proposition because they describe

 3    that in their article, correct?

 4         A.  Yes.

 5         Q.  In fact, in that article they pointed

 6    out that where they talked about treatment of

 7    women with very significant mesh complications,

 8    that only 14% of those women had been referred by

 9    their doctors and the rest of the women were

10    self-referred, right?

11         A.  Yes, that was true in the article.

12              You disappeared again.

13         Q.  Are you familiar with the Blandon

14    article?

15         A.  Yes.

16         Q.  And you have read that article and the

17    very significant complications and the

18    consequences of those complications described in

19    that article, correct?

20              MS. JONES:  Object to the form.

21              THE WITNESS:  Yes, I've read the

22    article.

23    BY MR. SLATER:

24         Q.  And those complications -- and those
```

Nicolette S. Horbach, M.D.

1    complications described in that article and the

2    consequences of those complications all apply to

3    the Prolift and Prolift+M, correct?

4         A.  I don't recall whether that was the

5    only mesh kit that was discussed in the article

6    or it was more than one mesh manufacturer.

7         Q.  I'll rephrase my question because I

8    wasn't clear.  And I'll tell you, some of the

9    women had Prolift, some had other mesh, so that's

10   not what I was getting at.

11        The scope of complications and the

12   consequences of those complications which the

13   doctors talk about as life-altering and other

14   very severe language, those profiles apply to the

15   Prolift and Prolift+M meaning some women suffer

16   complications that severe from those devices,

17   correct?

18             MS. JONES:  Object to the form.

19             THE WITNESS:  Yes.

20   BY MR. SLATER:

21        Q.  If Ethicon knew that on the day that

22   Prolift was launched, Ethicon would have needed

23   to warn about that to doctors and patients

24   meaning that complications that severe can occur,

Nicolette S. Horbach, M.D.

```
 1    correct?

 2            A.  I think that they -- that that should

 3    have been included, yes.

 4            Q.  In this study you studied the de novo

 5    stress incontinence rate and came up with 24.3%,

 6    correct?

 7            A.  Yes.

 8            Q.  You did not have them do cough stress

 9    tests, correct, all the women?

10            A.  At what period of time?  Pre or

11    post-op?

12            Q.  Postoperatively -- post-op.

13            A.  I don't remember whether the stress

14    incontinence symptoms were specifically

15    documented postoperatively in each of the

16    patients.  I think it was primarily based on more

17    symptoms, and we would at times document it,

18    depending on if the patient was seeking --

19    depending on if the patient's symptoms were more

20    problematic and she was seeking resolution of the

21    symptoms.

22            Q.  On page e2 it says, in the top right

23    column:

24                Postoperative cough stress tests
```

Nicolette S. Horbach, M.D.

```
 1                  and urodynamics were not routinely

 2                  performed in women with mild

 3                  symptoms who did not want to pursue

 4                  possible surgical therapy --

 5        A.   Yeah, that's just what I said.

 6        Q.   -- correct?

 7        A.   That's just what I said before you

 8   read it.

 9        Q.   So, as a result, it's likely that

10   there were some women who would have fit the

11   criteria for postoperative stress

12   incontinence who were not captured within the

13   24%, correct?

14        A.   No, I think you've misinterpreted.  I

15   think the 24% represent patients who presented

16   with symptoms of stress incontinence.  We --

17   because we were obviously not doing a prospective

18   study, we're doing a retrospective study, not

19   every patient undergoes a postoperative stress

20   test or urodynamics to look for objective

21   evidence of stress incontinence.

22        Q.   Got it.  I got it.  I did misread it.

23   That's what you get for reading this stuff late

24   at night.
```

Nicolette S. Horbach, M.D.

 1          On the last page of the text, page e6 in

 2   the left column, the first full paragraph, second

 3   sentence --

 4          A.  Let me get there.

 5          Q.  You say, visceral injury -- let me

 6   know when you're there.  I'll start over.

 7          A.  Last page.  Where was it?

 8          Q.  -- paragraph, second sentence.

 9          A.  Okay.

10          Q.  You say in page e6 in the left column:

11              Visceral injury, a most

12              disconcerting experience for the

13              surgeon, can be expected to occur

14              occasionally with the Prolift

15              system because of the deep level of

16              dissection and passage of the

17              Prolift guides near the bladder.

18          That's a true statement, correct?

19          A.  I think visceral injury is

20   disconcerting, and I think that there is a risk

21   of it occurring at the time of a Prolift

22   procedure.

23          Q.  And part of the reason is, as you

24   state there, there are deep dissections.

Nicolette S. Horbach, M.D.

1          A.  Yes.

2          Q.  In fact, if you go further down, a

3    little further down, just below footnote 24,

4    about two-thirds of the way down, you talk about

5    the fact that the deeper level of dissection

6    required to avoid mesh exposure increases the

7    risk of injury during dissection especially a

8    cystotomy, correct?

9          A.  I think that's true especially in the

10   early stages of performing Prolifts when you're

11   not as familiar or comfortable with that level of

12   dissection.  I think that, once you are, as a

13   surgeon, more familiar and comfortable with that

14   level of dissection, then the risk of cystotomy

15   doesn't really end up being particularly

16   different than it is in other surgeries that we

17   do where we're in the same space such as a

18   vaginal hysterectomy.

19         Q.  In the last part of this text, the

20   second column on this page, on e6, just after

21   footnote 28, you say:

22              Until prospective studies further

23              clarify the merits and deficits of

24              the Prolift vaginal mesh system, we

Nicolette S. Horbach, M.D.

```
 1              recommend that surgeons who choose

 2              to incorporate it into their

 3              practice include a realistic

 4              discussion of potential bothersome

 5              outcomes such as transient pelvic

 6              muscle discomfort and de novo

 7              stress incontinence into the

 8              preoperative counseling, which

 9              should help patients and their

10              surgeons work through these events

11              should they occur.

12              Do you see that?

13      A.  Yes.

14      Q.  Now, you knew at the time that the

15 pelvic muscle symptoms that you're describing

16 here that you've put under that umbrella were not

17 just transient but, for some patients, were

18 chronic or permanent, correct?

19      A.  The permanent part is hard for me to

20 say.  I think that certainly there can be some

21 chronicity to that, and there were some patients

22 that were more susceptible to that than others.

23 That's when we came --

24      Q.  So why did you only refer to transient
```

Nicolette S. Horbach, M.D.

1    there when you knew that these symptoms could be

2    chronic and in fact you knew from the Blandon

3    article they could be disabling?

4              MS. JONES:  Object to the form.

5              THE WITNESS:  Well, the Blandon

6    article doesn't describe -- is not our patient

7    population that we're talking about.  We're

8    discussing it relative to the patient population

9    in this particular study.

10         So in this particular study the majority

11   of our patients did have transient symptoms.  We

12   did have some patients who ended up experiencing

13   symptoms for a longer period of time, and they

14   would then have continued physical therapy or

15   they would have other treatments issues to be

16   able to try to resolve the problems.  Some of

17   those patients had resolution of their problems.

18   Some of those patients were, you know, lost to

19   follow-up.

20         So it's -- it's hard for me to say that

21   the symptoms are going to be permanent and

22   disabling and life threatening in the patients

23   we're talking about in this article versus the

24   Blandon article.

Nicolette S. Horbach, M.D.

1    BY MR. SLATER:

2         Q.  You're not just talking about your

3    patients because just above that you're talking

4    about the recent report of superior outcomes in

5    randomized controlled trials with polypropylene

6    augmented repairs, et cetera.  You're talking in

7    this article, not just about your own patients,

8    but it's your patients and your review of the

9    literature, correct?

10             MS. JONES:  Object to the form.

11             THE WITNESS:  Yes, to a certain

12   extent, but we're saying that, yes, the symptoms

13   are most commonly transient, that -- we didn't

14   put down and can be permanent.  I can't give you

15   a reason for why that wasn't included per se.

16   BY MR. SLATER:

17        Q.  You should have recommended that the

18   patients be warned, not only about transient

19   pain, but chronic pain as well, correct?  That

20   would have been more reflective of what you

21   actually learned in this study, right?

22             MS. JONES:  Object to the form.

23             THE WITNESS:  I think it would have

24   been -- if we had stated that a small number of

Nicolette S. Horbach, M.D.

1    women would have potentially chronic symptoms, I

2    think that that is correct.

3    BY MR. SLATER:

4         Q.  Now, there are disclosures on the

5    front page, do you see that, about people's

6    background and where they came from?

7         A.  Yes.

8         Q.  Why was it not disclosed that

9    Dr. Welgoss was working as a paid consultant for

10   Ethicon, the manufacturer of the Prolift device

11   that was being described in this article?

12        A.  I can't answer that.

13        Q.  It should have been disclosed, right?

14             MS. JONES:  Object to the form.

15             THE WITNESS:  I don't know, first of

16   all, whether he was doing it at that particular

17   time, and, secondly, whether or not the

18   requirements of this particular journal required

19   it.

20   BY MR. SLATER:

21        Q.  I'm going to tell you, I'm right now

22   looking at an agreement that Dr. Welgoss had that

23   was signed by himself and Paul Parisi in February

24   of 2008, a year -- more than a year before this

Nicolette S. Horbach, M.D.

```
 1   article was published, and it's an agreement

 2   whereby Dr. Welgoss was working with Ethicon and

 3   agreeing to work as a consultant being paid

 4   money.  Okay?

 5        So based on that, you know well enough

 6   that Dr. Welgoss' consulting relationship with

 7   Ethicon, the manufacturer of the Prolift device

 8   at issue in this article, should have been

 9   disclosed, right?

10             MS. JONES:  Object to the form.

11             THE WITNESS:  He may have a contract

12   with that.  Whether he was actually spending time

13   doing it and/or being paid from that, I don't

14   know.  So I wasn't responsible --

15   BY MR. SLATER:

16        Q.  Doctor, can you see me?

17        A.  Yes.

18        Q.  Do you see what I'm holding up?  These

19   are Dr. Welgoss' consulting contracts with

20   Ethicon.  We have them all --

21        A.  That's fine.

22        Q.  -- something called a Defense Fact

23   Sheet, and there are cases where he treated

24   patients that had complications.  And I've got
```

Nicolette S. Horbach, M.D.

```
1   years of Dr. Welgoss getting paid money by

2   Ethicon to act as a paid consultant.

3        So here's my question.  Here's one going

4   back to 2006 also signed by Paul Parisi.  I mean,

5   I could go through this with you chapter and

6   verse, but here's my question.  So here's my

7   question.

8        In light of the fact that Dr. Welgoss

9   worked for years as a paid consultant for

10  Ethicon, including for several years before this

11  article was published, you would agree with me

12  that the right thing to do would have been to

13  disclose Dr. Welgoss' consulting relationship

14  with Ethicon in this article, correct?

15           MS. JONES:  Object to the form and

16  move to strike the testimony of counsel.

17           THE WITNESS:  Okay.  I think that, if

18  that is indeed the case, which I was not aware of

19  or not, then -- and the requirements of the

20  journal require you to disclose that, then it

21  should have been disclosed.  I disclose whether

22  or not I have a -- or I have a relationship.  I'm

23  not responsible for disclosing whether or not one

24  of the other authors appropriately discloses
```

Nicolette S. Horbach, M.D.

1    their relationship that I wasn't even aware of.

2    BY MR. SLATER:

3         Q.  Well, you didn't know that Dr. Welgoss

4    was working as a paid consultant with Ethicon,

5    your own partner?

6         A.  We had that discussion previously,

7    and, no, I did not know that.

8         Q.  You're familiar with the conflict of

9    interest disclosure requirements for the American

10   Journal of Obstetrics and Gynecology.  You know

11   what those were.  You're familiar with that.

12        A.  I would have to go back and read the

13   specifics, but, again, that is something that is

14   not part of what I was aware of or not, and

15   whether you think it's unusual or not, I had no

16   awareness of his relationship.  We function

17   fairly independently of each other, and what he

18   does separately I'm not always aware of.

19        Q.  Dr. Welgoss had input into the writing

20   of that article, right?

21        A.  He would have reviewed it from the

22   standpoint of, you know, saying yes or no he

23   agrees with this or not.  I don't know whether or

24   not he specifically made any changes in the

Nicolette S. Horbach, M.D.

1    article.  The primary people writing the article

2    were going to be Dr. Aungst, who was our fellow

3    at the time, and that was reviewed primarily by

4    Dr. Von Pechmann, who was the primary person

5    working with him to edit this.

6          Q.  Dr. Welgoss had input into the

7    language that was used in that article, correct?

8               MS. JONES:  Objection, asked and

9    answered.

10               THE WITNESS:  I can't tell you that he

11    did or didn't.  I don't know whether he wrote --

12    read the article or didn't read the article or

13    whether or not he changed anything in it or

14    didn't change anything in it.  You'd have to ask

15    him.

16               MR. SLATER:  Sara, do you have the

17    website information?

18               MS. GARDNER:  Yes, there was one

19    marked as Exhibit 8.

20               MR. SLATER:  Is it the one that says

21    Mid-Atlantic Urogynecology and Pelvic Surgery and

22    then it says Surgical Mesh on it?

23               MS. GARDNER:  Yes.

24               MR. SLATER:  Let's use that exhibit as

Nicolette S. Horbach, M.D.

1    the next one.  It's Exhibit 8?

2              MS. GARDNER:  Yes.

3         (Exhibit No. 8 marked for identification.)

4    BY MR. SLATER:

5         Q.  Doctor, what we've provided you is a

6    page from the website for your medical practice

7    that was printed yesterday.  Do you recognize

8    this?

9         A.  In reality, probably not.

10        Q.  Well, you would agree with me that you

11   would only put truthful information on your

12   medical practice website, right?

13        A.  I would expect that that would be the

14   case, but I did not -- let me back up.  Our

15   practice as of less than a month ago separated

16   from a joint practice of gynecologists and -- or

17   sorry -- urogynecologists, the four of us, as

18   well as gyn/oncologists.  During that time period

19   there has been a lot of transitions and changes.

20             One of the physicians in our former group

21   was primarily responsible for drafting the

22   changes that were going to be addressed in the

23   new website.  I personally had not seen that nor

24   did I have input in it at that time period given

Nicolette S. Horbach, M.D.

1    other responsibilities that I had.  So that's why

2    I said I have not seen it.  I would expect that

3    what we would place on the website would be

4    truthful.

5         Q.  What you're looking at in Exhibit 8

6    was taken from your medical practice website, it

7    was printed yesterday, and this website would be

8    intended for patients to read to get information

9    about you, the other doctors and about various

10   medical treatment that your practice offered,

11   correct?

12        A.  Yes, one would expect so.

13        Q.  Now let me ask you this.  Did Ethicon

14   have any impact into the content on your website

15   at any point before today?

16        A.  I certainly don't believe so.  We have

17   not had any funding or relationship with them to

18   be able to draft this particular website, no.

19        Q.  Let's look at this page that says

20   "Surgical Mesh."  If you could, let's look at the

21   second paragraph.  It says, in recent years the

22   FDA has received ongoing reports of complications

23   following the use in gynecologic surgery -- the

24   use of mesh in gynecologic surgery.  Do you see

Nicolette S. Horbach, M.D.

1    that?

2           A.   Yes.

3           Q.   Then it talks about the fact that the

4    FDA conducted a systematic review of the

5    scientific literature to learn more about the

6    safety and effectiveness of mesh in surgery for

7    prolapse and SUI.  Do you see that?

8           A.   Yes.

9           Q.   Your website says, based on a thorough

10   assessment, the FDA determined that there is not

11   conclusive evidence that using transvaginally

12   placed mesh in prolapse repairs improves outcomes

13   and it may expose patients to greater risk.  Do

14   you see that?

15          A.   Yes.

16          Q.   And that was placed on your website

17   because you thought that was important

18   information for patients to know, correct?

19               MS. JONES:  Object to the form.

20               THE WITNESS:  It was placed on our

21   website because of the fact that, when we see

22   patients, we oftentimes do end up recommending a

23   procedure that may involve mesh, whether it's a

24   sacrocolpopexy, whether it's a TVT, et cetera,

Nicolette S. Horbach, M.D.

1    and based on the press related to mesh, and, you

2    know, litigation, if a patient hears the concept

3    of mesh or hears the word mesh, they assume that

4    that means the -- entirely the same thing and the

5    same risks exist for all procedures.

6         So in an attempt to try to stratify some

7    of the issues that we now know relative to

8    procedures involving mesh, not involving mesh,

9    you know, laparoscopic TVTs, et cetera, this is

10   an attempt for -- for us to explain that there

11   are variations in the use of mesh in different

12   procedures, and that there are different

13   complications associated with those.

14        Q.  With regard to transvaginally placed

15   mesh kits like the Prolift, you referred just a

16   moment ago to issues we now know.  Would you

17   agree with me that you know a great deal more now

18   about the scope of risks and complications and

19   the consequences of something like the Prolift

20   than what was known when they first went on the

21   market in 2005 --

22        A.  Yes.

23        Q.  -- and the years after that?  Okay.

24        A.  Yes.

Nicolette S. Horbach, M.D.

```
1        Q.  So, for example, the scope of risks,
2   the scope of complications, the consequences of
3   those complications, the adverse events, in other
4   words, you know more about that now than you knew
5   back when the Prolift went on the market, fair?
6        A.  I think we -- we know -- the events
7   themselves and what can happen was known at the
8   time this went on the market by -- or was
9   suspected at the time this went on the market by
10  pretty much any surgeon that was involved with
11  the use of mesh.  We knew that those specific
12  adverse events could occur when mesh was used,
13  whether it was done with Prolift or transvaginal
14  patches or abdominal patches, et cetera.  I mean,
15  mesh in and of itself creates a certain set of
16  risk.
17       As to the frequency of those complications
18  or not occurring, I think we have a better
19  understanding of that now than what we did when
20  Prolift was initially launched.  We also have a
21  better understanding of who may be more at risk
22  for those complications as well as steps that can
23  be taken to try to mitigate those complications
24  following -- or with the use of mesh and
```

Nicolette S. Horbach, M.D.

1    regardless of which way the mesh is placed.

2         Q.  Would you also agree that you know

3    more about the consequences of the adverse events

4    in terms of how severe they really can be?

5              MS. JONES:  Object to the form.

6              THE WITNESS:  Yeah, I think that's

7    true across the board for any mesh, whether

8    it's -- yes, for TVT -- I'm sorry -- for Prolift,

9    yes, and all mesh, basically all mesh procedures

10   we do.

11   BY MR. SLATER:

12        Q.  You state on this website, the third

13   paragraph down, there is a thin little website --

14   thin little paragraph.  Let me start over.

15        The third paragraph under Surgical Mesh

16   says:

17              The focus of the FDA's patient

18              safety advisory, the new

19              regulations being considered and

20              the class action lawsuits

21              undertaken involve transvaginal

22              mesh for pelvic organ prolapse

23              repair, not transabdominal mesh for

24              prolapse or mesh for SUI.

Nicolette S. Horbach, M.D.

1              Do you see that?

2         A.  I see that, yes.

3         Q.  And is that what you were basically

4    referring to a moment ago, that you wanted to

5    make sure patients understood that the area the

6    FDA was most concerned about was the mesh kits

7    like the Prolift and the FDA was not focused on

8    mesh that was used through either abdominal

9    sacrocolpopexy or for stress urinary incontinence

10   treatment, that there was much less concern about

11   those?

12        A.  That was the purpose of that

13   statement.

14        Q.  Let's go down to the very bottom under

15   "transvaginal mesh."  It says:

16              Transvaginally placed mesh is

17              associated with higher complication

18              rates than traditional vaginal

19              surgery or sacrocolpopexy.

20              That's a true statement, correct?

21        A.  I think in the literature that's

22   probably correct, yes.  In our experience I'm not

23   sure that I would agree with that, but I think in

24   the literature, yes.

Nicolette S. Horbach, M.D.

```
1          Q.  And when you report -- when you refer

2    to your experience, you're talking about you and

3    your practice group, right?

4          A.  Correct.

5          Q.  You then state:

6               In particular, these products are

7               associated with serious adverse

8               events including vaginal mesh

9               erosion, a complication that can

10              require multiple surgeries to

11              repair and may result in continued

12              pain even after mesh removal.

13              And that's a true statement,

14   correct?

15         A.  Yes.

16         Q.  And that would be a true statement for

17   the Prolift and Prolift+M, correct?

18         A.  Yes.

19         Q.  You then state, on this website,

20   compounding the concerns regarding adverse events

21   are performance data that fail to demonstrate

22   improved clinical benefit over traditional

23   non-mesh repair.

24              And that's a true statement, correct?
```

Nicolette S. Horbach, M.D.

1          A.  They have failed to demonstrate

2    subjective benefits.  There is some data to

3    support that there may be preferential anatomic

4    outcomes for the mesh versus a traditional

5    non-mesh repair.

6          Q.  That would be true for the Prolift,

7    correct?

8          A.  Yes.

9          Q.  And for the Prolift+M, correct?

10         A.  Yes.

11         Q.  When you referred to subjective versus

12   anatomic outcomes, you're talking about, for

13   example, the Altman study in 2011 where they

14   found that with anterior Prolift they could get a

15   better anatomic repair in terms of less prolapse,

16   but from a subjective functional quality of life

17   standpoint the patients reported basically the

18   same results, correct?

19         A.  I think the Altman study is one of

20   them.  There were, I think, other studies that

21   showed somewhat similar results.  There are

22   studies that -- well, I'll stop there.

23         Q.  It's come -- rephrase.

24             In your medical field the understanding

Nicolette S. Horbach, M.D.

1    has evolved over the years that the focus really

2    needs to be on the functional quality of life

3    outcomes whereas the focus had originally been on

4    the anatomic outcomes.  Fair statement?

5              MS. JONES:  Object to the form.

6              THE WITNESS:  I think that there has

7    been a pendulum.  I think that the pendulum

8    currently is more in looking at the subjective

9    information as opposed to strict anatomic

10   criteria on examination, but the pendulum used to

11   be looking at subjective criteria only and then

12   it flipped to objective anatomic and now it's

13   flipped back to more of the subjective quality of

14   life.  I don't know that we have a -- an

15   agreement per se of what is the optimal outcome

16   measure that we need to do in these studies.

17             Q.  You would agree with me that, in terms

18   of patients and what women are looking for, they

19   are most concerned with how they feel, how they

20   function and what they are comfortable with as

21   opposed to what you might measure on an exam,

22   correct?

23             MS. JONES:  Object to the form.

24             THE WITNESS:  I think that that's

Nicolette S. Horbach, M.D.

1    the -- yes, that that is most patients' goals

2    with surgery.  And then part of what we discuss

3    is, you know, or what a surgeon should discuss

4    with a patient is what is their specific goals

5    for the surgery because patients have varying

6    goals and they can be achieved with various

7    success with different types of operations.

8    BY MR. SLATER:

9        Q.  Let's look at Exhibit -- if you could,

10   Sara, if could you give Exhibit 7?  It's an email

11   from September 2006.

12           THE REPORTER:  Counsel, just for the

13   record, her name is Stephanie.

14           MR. SLATER:  Oh, did I say Sara?

15           THE WITNESS:  Are we done with the

16   other two exhibits that I can pass them back?

17           MR. SLATER:  Sure.

18       (Exhibit No. 7 marked for identification.)

19   BY MR. SLATER:

20       Q.  I've provided you Exhibit 7, which is

21   an email chain within Ethicon.  If you could,

22   let's start on the second page.

23           MS. JONES:  Mr. Slater, I got -- I

24   have an issue here, so just -- I need to make

Nicolette S. Horbach, M.D.

1    sure what's supposed to be part of Exhibit 7.

2              MR. SLATER:  It's a three-page email,

3    and the Bates numbers in the bottom right are 30,

4    31 and 32.

5              MS. JONES:  Okay.  I've got a separate

6    email here.  I mean, this is the reason -- it's a

7    two-page one --

8              MR. SLATER:  You can probably just

9    give it back to Stephanie because she probably

10   gave it to you by accident.

11        (Discussion regarding marking the

12   exhibit.)

13   BY MR. SLATER:

14        Q.  On the second page of this email,

15   right in the middle of the page is an email from

16   someone named Christine Maroulis to several

17   people at Ethicon including Price St. Hilaire

18   regarding yourself, Dr. Nicolette Horbach.  Do

19   you see that?

20        A.  Yes.

21        Q.  And it's dated September 8, 2006.  And

22   what it deals with is apparently there was going

23   to be a presentation at something called The

24   Prolapse Repair Coalition and that you had agreed

Nicolette S. Horbach, M.D.

1    to make this presentation based on the

2    recommendation apparently of Vince Lucente.  Do

3    you see that?

4          A.  I see that it's written here in the

5    email.

6          Q.  Do you remember making that

7    presentation?

8          A.  I have no recollection of that at all.

9    I don't know whether -- I have no recollection

10   that I did.  I've never heard of -- or I don't

11   have any recollection of what the prolapse repair

12   coalition is.

13         Q.  Let's look.  You have this email where

14   this Christine Maroulis from Ethicon is asking --

15   is explaining that you had agreed to give this

16   presentation, and now let's go to the next page,

17   which is actually the first page, and someone

18   named Eric Globerman is providing information

19   back now to Christine Maroulis as to who you are.

20   Do you see that?

21         A.  Yes.

22         Q.  And he points out -- first of all,

23   Eric Globerman was the sales rep who you dealt

24   with at that time for Ethicon, correct?

Nicolette S. Horbach, M.D.

1          A.  I have no idea.

2          Q.  Because on the prior page it says that

3    Eric Globerman was your representative --

4          A.  I have no --

5          Q.  -- assigned representative from

6    Ethicon.

7          A.  I have no idea.  I rarely if ever know

8    the names of the reps who are supposedly assigned

9    to my hospital.

10         Q.  Okay.  Let's look at the September 11,

11   2006 email where Eric Globerman says that you are

12   a well-known urogynecologist, you are in practice

13   with two other urogynecologists, and all three of

14   you are very big Prolift users.  And then he

15   points out, her and Vince Lucente know each other

16   very well, and I believe Vince was recommending

17   her for this project.  Are you with me?

18         A.  Yes, I see it.

19         Q.  Okay.  You knew Vince Lucente by that

20   point, September 2006, very well?  Is that a true

21   statement?

22         A.  I mean, I knew him well.  I had known

23   him since, you know, he finished training and in

24   our national meetings, yes.  I mean, I interacted

Nicolette S. Horbach, M.D.

1    with him at our national meetings, but, other

2    than that, not.

3        Q.  Vince Lucente, is he somebody who you

4    listened to and relied on in any way with regard

5    to your decisions about the use of the Prolift?

6        A.  Of whether to begin using it?  I don't

7    think I relied on his input into my decision to

8    do it or not.

9        Q.  He trained you, right?

10       A.  I went up and, yes, spent a day with

11   him to learn how to do the procedure, yes.

12       Q.  So Vince Lucente trained you.  And

13   when was that?  When were you trained?

14       A.  I think we talked about when we looked

15   back -- I think it was like December 2005.

16       Q.  Do you consider Vince Lucente to be a

17   friend?

18       A.  I mean, I'd probably go out to dinner

19   with him, but he's not somebody that I'm, you

20   know, call other than for a medical or

21   patient-related issue.  I don't know --

22       Q.  Are you aware that within the -- I

23   apologize.  I keep doing that.  Go ahead.

24       A.  I mean, I wouldn't know the name of

Nicolette S. Horbach, M.D.

1   his wife, I don't know how many kids he has.  So

2   obviously I don't know him particularly well

3   from -- from a non-medical perspective.

4        Q.  Are you aware of concerns within the

5   medical community about the veracity of the

6   things that Vince Lucente has published with

7   regard to his data with the Prolift or any other

8   devices?

9             MS. JONES:  Object to the form.

10            THE WITNESS:  Other than the comments

11   that were made by Dr. Weber in her deposition

12   questioning the clinical measurements for

13   POP-Q -- and I don't know whether those were

14   specifically from Dr. Lucente or not -- I have no

15   awareness of his -- of people questioning the

16   veracity of his data in his presentations.

17   BY MR. SLATER:

18        Q.  Before this case and this litigation

19   on the Prolift, had you ever been asked to

20   determine what information would need to be in an

21   IFU for a medical device?

22        A.  No.  I'm sorry.  You've gone away.

23   You disappeared again.

24        Q.  Same question -- new question.  Before

Nicolette S. Horbach, M.D.

```
 1    this case had you ever been asked by anybody to

 2    evaluate what should be in a patient brochure for

 3    a medical device?

 4         A.  Not for a medical device.  Patient

 5    brochures for other things, but not for a medical

 6    device.

 7         Q.  Did you ever consult with a

 8    pharmaceutical company regarding what information

 9    should be in a patient brochure?

10         A.  I don't think -- I think I have in the

11    past when I was periodically consulting with Eli

12    Lilly.  They may have shown me information, but I

13    don't recall that I participated in the drafting

14    or of any type of patient education brochures

15    since the medication was not ultimately -- the

16    FDA application was ultimately removed or

17    retracted.

18         Q.  What pharmaceutical or medical device

19    companies have you consulted for in any fashion

20    in your career?  You can just list them for me.

21         A.  They are actually on my CV.  I have

22    worked with Eli Lilly relative to trials for, you

23    know, Cymbalta or duloxetine for mixed urinary

24    incontinence.  I was involved in a trial for
```

Nicolette S. Horbach, M.D.

1    that.

2         I have functioned in the role of -- it's

3    not really a consultant, but I function in the

4    role of a member of a educational foundation that

5    is sponsored by Berlex Laboratories that provides

6    education for early training physicians as part

7    of trying to improve their academic career and

8    choosing who would be able to attend the meetings

9    or not.

10        This is actually not my CV.  That part.

11   Thank you.

12        The Miniguard was a device that was used

13   for -- as a nonsurgical device for urinary

14   incontinence, and I guess it was Advanced

15   Surgical Intervention, I guess, was the company.

16        The bladder neck prosthesis device, it's

17   listed as J&J here.  At the time I did the -- was

18   involved in the clinical trial I don't believe

19   that J&J actually owned the company.  I think

20   they purchased it subsequent to the time that I

21   was involved in it.  It was part of a much

22   smaller device company.

23        And then obviously it says here Terodiline

24   for Forrest Laboratories.

Nicolette S. Horbach, M.D.

1          I don't recall that there has been really

2    anything else.  There is a possibility that I may

3    have given a ground rounds, you know, here and

4    there at a different institution where some of

5    the expenses were covered by different either

6    pharmaceutical or device or -- company, but I

7    don't recall -- nothing that I have a specific

8    contract relationship with.

9          Q.  Have you ever studied the question of

10    what surgeons in general expect will be provided

11    to them by way of information in an IFU?

12          A.  No.

13          Q.  Do you agree that if Ethicon modified

14    the IFU at some point to add information about a

15    risk and Ethicon knew that information from the

16    very beginning when the Prolift was first

17    launched, do you agree that information should

18    have been in the IFU from day one?

19               MS. JONES:  Object to the form.

20               THE WITNESS:  I think it depends on

21    what the information is.  If it's a new

22    complication that was not listed in the original

23    IFU and they knew about it previously, then

24    ideally it should be there in the original IFU.

Nicolette S. Horbach, M.D.

```
 1    I think if it is information that is maybe

 2    defining more specifically a complication, such

 3    as the pain issue, then -- I don't know that it's

 4    necessarily required that the initial IFU has

 5    that information, just like we change documents

 6    and we change educational information to provide

 7    more details or less details about things over

 8    time.

 9    BY MR. SLATER:

10         Q.  As you sit here now, what are the most

11    important risks you believe should be listed in

12    an IFU for the Prolift?

13         A.  The most important risks... recurrence

14    of the prolapse or failure of the procedure,

15    injury to adjacent organs or neurovascular

16    injuries that would, I guess, include nerves and

17    hemorrhage, that type of thing, but usually we

18    just refer to it as injury to adjacent organs

19    and, you know, neurovascular structures.

20         Erosion, scarring, pain.  There may be --

21    oh, postoperative voiding, I guess dysfunction, I

22    guess, is what you would say, voiding

23    dysfunction, whether it's voiding dysfunction

24    itself or retention issues.  I think that sort of
```

Nicolette S. Horbach, M.D.

1    falls in the whole category.  And then stress

2    urinary incontinence.  I think those are --

3         Q.  Dyspareunia?

4         A.  Dyspareunia is within the pain

5    syndromes.

6         Q.  Anything else?

7         A.  There may be something else that I'm

8    not recalling off the top of my head.  You can

9    ask me specifically, but nothing that I'm --

10   nothing that I'm thinking of right now.

11        I mean, those are typically the risks that

12   we talk with about our patients' surgery can --

13   or any of those issues can require further

14   surgery to correct, whether it's injuries,

15   mesh-related problems, recurrence of the prolapse

16   itself.

17        Q.  What about the inability to safely and

18   effectively remove mesh when necessary in some

19   patients?

20        A.  I think that that is part and parcel

21   of any mesh procedure, and I think a surgeon who

22   uses mesh procedures would be aware of that.

23   Whether it needs to be specific -- I mean, I --

24   whether it needs to be specifically listed in the

Nicolette S. Horbach, M.D.

1    IFU, I wouldn't necessarily say that that's the

2    case.

3         Q.  Well, is your -- are you saying that,

4    if a surgeon would know the risk anyway, there is

5    no reason to list it?

6         A.  Yeah, I think that -- I mean, I think

7    that if you are saying that the -- the

8    individuals who are going to be using the product

9    need to be people who are experienced with using

10   the product, then I don't think that it is

11   absolutely necessary to outline all the risks

12   that those people are already going to know

13   about.

14        Q.  Well, you just gave me a list of risks

15   that you personally think anybody using the

16   Prolift would know, right?

17        A.  Yes, they all -- any of the -- I mean,

18   everything that I've given you, yes, anybody

19   doing prolapse surgery, especially a prolapse

20   surgery using mesh, would know that those are

21   risks for Prolift or any other surgeries that

22   involve mesh.

23        Q.  So really, based on your own

24   standards, you would not need to warn about any

Nicolette S. Horbach, M.D.

1    risks in the Prolift that you listed because you

2    would assume somebody would know them already.

3            A.  If you're stating that, you know -- I

4    think it's a redundant piece of information that

5    you're providing in the IFU, that if you are

6    someone who's done surgery for -- with patients

7    and have been involved with the use of mesh, then

8    you're sort of, you know, you're repeating

9    yourself.

10           I mean, it's -- it's what we say in every

11   consent form that we do that, if we're going to

12   do surgery on a patient, that there could be a

13   risk of bleeding.  Well, you know, 99.9% of

14   patients know that, if they are having surgery,

15   there is going to be a risk of bleeding, but yet

16   we put it into the consent forms or -- so I think

17   there is -- there is a built-in redundancy.

18           Q.  Ethicon was aware of a risk or a group

19   of patients or a patient criteria -- well, let

20   me -- let me break it down.

21           If Ethicon was aware of a risk that was

22   not generally understood in the medical

23   community, you would agree Ethicon needed to warn

24   about that in the IFU, correct?

Nicolette S. Horbach, M.D.

1          A.   If there was a specific risk that was

2   not generally known in the medical community for

3   people who do prolapse surgery or use meshes,

4   that that risk isn't generally known by that

5   group of -- that treating population, then, yes,

6   I think it should be included in the warning.

7          Q.   You would agree with me that, if

8   Ethicon internally believed there were certain

9   patients that were not optimal patients for the

10  Prolift, that Ethicon should put that information

11  in the IFU so physicians would know that?

12         A.   I think that they could place it in

13  the IFU as a suggestion or recommendation, but

14  ultimately it's the physician who is going to

15  make that decision whether or not the balance of

16  factors still weigh in favor of doing the

17  Prolift.

18         Q.   Certainly to the extent Ethicon

19  Medical Affairs believed there were certain

20  patients for whom caution needed to be used, for

21  example, before putting a Prolift into that

22  woman, that's something that should be in the

23  IFUs so doctors know, hey, the people within

24  Ethicon who are responsible for this device are

Nicolette S. Horbach, M.D.

1  telling you they think you need to use caution

2  before you put it into this type of a woman.

3  You'd agree that that warning should be there,

4  right?

5              MS. JONES:  Object to form.

6              THE WITNESS:  If it was a different

7  type of caution or warning than what would be

8  generally known for a prolapse and/or mesh-type

9  surgeries, that, yes, that they should include

10  it.

11  BY MR. SLATER:

12              Q.  You would agree with me that, when a

13  patient is suffering from chronic pain following

14  a Prolift, treatment has been provided, the pain

15  continues, and the patient is left with a choice

16  of either keep living with this decreased quality

17  of life and pain or to go for the potentially

18  risky surgery to try to remove mesh, that the

19  patient is in a very difficult situation at that

20  point, correct?

21              MS. JONES:  Object to the form.

22              THE WITNESS:  I think if those are the

23  only two options that are presented to the

24  patient, that, yes, the patient would be in a

Nicolette S. Horbach, M.D.

1   difficult situation.  The question is whether

2   that is indeed the case, are there other options

3   that could be used.

4            MS. JONES:  Adam, counsel --

5            MR. SLATER:  Do you want to stop the

6   tape for a second?

7            THE WITNESS:  I'd like to take a quick

8   break.

9            VIDEO SPECIALIST:  The time now is

10   4:44.  We are going off the record.

11        (Proceedings recessed.)

12            VIDEO SPECIALIST:  The time now is

13   4:56.  We are back on the record.

14   BY MR. SLATER:

15        Q.  Doctor, earlier you mentioned that you

16   had a patient who had a broken ankle and then

17   developed dyspareunia, and did I understand you

18   correctly to think the broken ankle may have

19   caused the dyspareunia?

20        A.  It actually not may have, it did cause

21   the dyspareunia.

22        Q.  And how did the ankle fracture cause

23   dyspareunia?

24        A.  Sort of like the child's song about

Nicolette S. Horbach, M.D.

1    one bone's connected to the next bone connected

2    to the next bone, but in this particular patient,

3    because she had a broken ankle and during the

4    time of her healing she was not able to walk in

5    her normal gait and pattern, as a result, she

6    created increased strain and pressure on the hip

7    and started doing compensatory gait aspects to

8    try to protect the hip.

9         Because of the problems then with the hip,

10   she changes her body mechanics relative to the

11   muscles of the pelvis to try to compensate for

12   the pain that she was having in the hips.

13        So within a approximately 6- to 12-month

14   time period from the time of the original broken

15   ankle, even though it had healed, it ultimately

16   had the body mechanic issues that she developed

17   levator muscle spasms, and so during intercourse

18   she was experiencing pain.

19        When we treated her with physical therapy

20   for her pelvic floor muscle spasms, then her

21   dyspareunia resolved.  But we traced it back to

22   the orthopedic and the different body mechanic

23   issues that were going secondary to the

24   orthopedic issues.

Nicolette S. Horbach, M.D.

```
 1            I'm sorry.  You've disappeared.

 2            Q.  -- you treated who broke her ankle,

 3    then walked differently, developed levator ani

 4    muscle spasms and discomfort with sexual

 5    relations had no contracted or eroded mesh in her

 6    pelvis, did she?

 7            A.  No, she did not.

 8            Q.  Would you agree with me that, once a

 9    woman has a Prolift or Prolift+M in her body, to

10    the extent that mesh remains, there's no safe

11    time from erosion until the woman remains at

12    lifelong risk for erosion of mesh?

13                MS. JONES:  Object to the form.

14                THE WITNESS:  I think that that is a

15    hard statement to make in general.  I think that

16    the mesh erosion, when it occurs, has typically

17    occurred within the earlier stages

18    postoperatively, and, in addition, the mesh

19    erosions are going to occur usually in the more

20    superficial areas where the mesh is placed.

21            So that the -- it would be extremely

22    unusual to think that an arm that's along the

23    lateral pelvic sidewall or the posterior arm

24    that's inferior to the levators, if that was the
```

Nicolette S. Horbach, M.D.

1   only remaining mesh in the patient, that that

2   itself would erode through to the surface.  So I

3   think it depends on where the remaining mesh is

4   and whether the patient has a lifelong risk or

5   not.

6        Q.  You would agree with me that for some

7   women they develop erosion of mesh years after

8   the Prolift is put in their body, correct?

9        A.  If -- that certainly has been seen in

10  the literature for some women.

11       Q.  We've marked -- let's look at Exhibit

12  3, your CV.

13       (Exhibit No. 3 marked for identification.)

14       MR. SLATER:  And we can use the one,

15  Christy, that you redacted.  That's fine.

16       MS. JONES:  Okay.  I've just done a

17  handwritten note on there for Exhibit 3.  Can I

18  borrow one of your exhibit -- just write 3 on

19  there and I'll stick it on there.  Thank you.

20  BY MR. SLATER:

21       Q.  Is Exhibit 3 your up-to-date CV?

22       A.  Yes, this is up to date relative to

23  pretty much most of what I would have in it.

24  There may be some lectures that I've done or not

Nicolette S. Horbach, M.D.

```
1   done towards the -- that I haven't added on to

2   the very end of it, but I printed this out this

3   morning.

4         Q.  Directly relevant to the issues in

5   this case that's not listed on the CV?

6         A.  I don't believe so.

7         Q.  Let's look at Exhibit 1, which is the

8   deposition notice.

9         (Exhibit No. 1 marked for identification.)

10  BY MR. SLATER:

11        Q.  Did you see that deposition notice

12  before today?

13        A.  No.

14        Q.  Is this the first time you're seeing

15  it?

16        A.  Yes.

17        Q.  Let me ask you this.  Exhibit 4 we

18  went through in some detail, your quote/unquote

19  reliance list, and you, in addition to the

20  documents and materials listed on there, you also

21  went through medical literature that may not have

22  been listed on here.

23        What I want to know is are there any other

24  documents that you've reviewed or are relying on
```

Nicolette S. Horbach, M.D.

1    that are either not listed on this reliance list

2    or that you didn't tell me about today when you

3    went through your list of medical literature?

4         A.  Not that I can recall, no.

5         Q.  We're now getting to the catchall part

6    of the deposition potentially.

7         A.  Can you hold for just a second?  I

8    just want to make sure one thing.

9         Q.  Sure.

10        A.  There is -- I just was trying to see

11   if it was on my CV.  There is one article that

12   came out of our group that looked at

13   complications, gastrointestinal complications

14   associated with laparoscopic sacrocolpopexy, and

15   I don't think that that's on my CV or my list.

16        So I would -- I think it's been published

17   within the last two years or so, and it's by --

18   the primary author is William Warner,

19   W-A-R-N-E-R, who is one of our fellows.  I don't

20   think I'm listed as an author on that

21   particularly.

22        Q.  You are actually.  I'm looking at it

23   right now.

24        A.  Fine.  I didn't remember.

Nicolette S. Horbach, M.D.

```
 1            Q.  This is an article titled Effect of

 2   Operative Technique on Mesh Exposure in

 3   Laparoscopic Sacrocolpopexy?

 4            A.  No, that's a different article.

 5   That's one -- the article --

 6            Q.  I don't know --

 7            A.  The article that I'm referring is not

 8   that article.  That's why I wanted to make it

 9   specific.  It's by William Warner, and it's

10   gastrointestinal complications of laparoscopic

11   sacrocolpopexies.

12            Q.  Is that article listed on your CV?

13   I'm flipping through it.

14            A.  I don't think it's listed on my CV

15   because it came out of my group, but I don't

16   think I was an author on it.

17            Q.  Is there anything of significance in

18   that article that you'd rely on in this case?

19            A.  It talks about the, you know, risks --

20   I mean, the postoperative complications and risks

21   associated with sacrocolpopexy even if it's done

22   laparoscopically.

23            Q.  In fact in the article I asked you

24   about, the 2012 article, Effective Operative
```

Nicolette S. Horbach, M.D.

```
 1    Technique on Mesh Exposure in Laparoscopic

 2    Sacrocolpopexy --

 3          A.  Yes.

 4          Q.  I'm going to withdraw that question.

 5    I don't need to ask you about that.  I'm trying

 6    to cut through everything here.  Okay.

 7          During the course of this deposition we've

 8    talked in great detail about many of your

 9    opinions.  Have we covered the opinions that you

10    hold in this case?

11          MS. JONES:  Well, I'm going to object

12    to the form of the question, Adam.  Talked about

13    a lot of them.  She told you at the beginning the

14    different areas she was going to address.  So she

15    can go back over that and so forth, but I think

16    it's a little bit unfair asking her to go through

17    each and every specific opinion.

18    BY MR. SLATER:

19          Q.  Well, let me tell you what I'm getting

20    at, Doctor.  I'm trying not to go through this

21    for another three years, so what I'm trying to do

22    is this.  We had your disclosure, and, you know,

23    I read that, but ultimately I wanted to get into

24    the nitty-gritty with you and ask you about
```

Nicolette S. Horbach, M.D.

1    specific issues in the case, and you've told me

2    your opinions that you hold.

3         What I want to know is whether or not

4    there is any significant opinion you hold in this

5    case that we haven't talked about today.  I mean,

6    I tried to cover everything and you've told me

7    some areas you're an expert in, some you're not,

8    so I've stayed away from the areas where you said

9    you're not an expert.  You've told me some things

10   you didn't have an opinion on so we understood

11   that.

12        What I want to know is, is there any

13   opinion you hold in this case that you believe is

14   significant in this case that you have not --

15   that we have not talked about today?

16        A.  I think any opinion that I would be

17   discussing in addition is more specifically

18   related to the patient herself.  I think that the

19   opinions that I have relative to Prolift as a

20   product or the treatment of prolapse, et cetera,

21   that we've either addressed that and/or it's in

22   the original general expert report.

23        I think we've addressed the issues about

24   the patient herself that she was a candidate for

Nicolette S. Horbach, M.D.

1   -- appropriate candidate for surgical treatment.

2   We discussed some of the other alternatives, that

3   Prolift was an option for her as a choice

4   surgically.  I think that -- I've also -- we've

5   also discussed the fact or I've at least

6   intimated during the discussion that the

7   complications that she has experienced following

8   her Prolift were known complications regarding

9   the Prolift surgery and are also known

10  complications regarding other surgeries for

11  prolapse and/or especially associated with mesh.

12        We've discussed that I -- my opinion

13  regarding issues for the IFU and the professional

14  education issues, et cetera.  We've talked about

15  the complications that she's experiencing and why

16  I felt that she has risk factors in addition to

17  the Prolift that may be associated with the

18  complications that she is experiencing.  And we

19  talked a little bit about the issues associated

20  with her disability and some of the other medical

21  aspects in her history that may predispose her to

22  some of the symptoms that she is currently

23  experiencing.

24        The issue of other opinions that I might

Nicolette S. Horbach, M.D.

```
1    raise during the procedure or during the trial,

2    I've addressed some of -- I think most of the

3    things that I would have said relative to

4    Dr. Wall's deposition and comments that he's made

5    that I may or may not agree with.

6            We haven't really addressed too much of

7    what Dr. Weber has addressed in her deposition,

8    but there are statements in her deposition that I

9    do not agree with and would give an alternative

10   opinion.

11           Q.  You mentioned other aspects in Connie

12   Schubert's medical history that may be

13   contributing to her issues.  Are you talking

14   about her activity level and the work that she

15   did after she had the Prolift surgery and you

16   think that may have contributed?

17           A.  And her, you know, and the associated

18   medical problems that she has, the associated,

19   you know, biomechanical problems that she has,

20   all of the things that we've talked about

21   previously.

22           Q.  Well, what is the associated medical

23   problems that you're talking about?

24           A.  I think that -- I mean, we addressed
```

Nicolette S. Horbach, M.D.

1    that to some extent previously relative to her

2    prior hysterectomy surgery, her oophorectomy, her

3    hypoestrogenic state.  She definitely has an

4    elevated BMI that does give some factors relative

5    to recurrent prolapse issues, et cetera.  I'm

6    trying to remember if there were medical factors

7    other than that.

8          Q.  Let me just stop you there.  What

9    you're talking about there is that, A, you've

10   explained to me why you think Connie Schubert

11   likely had a prolapse to begin with, correct?

12         A.  Yes.

13         Q.  And, B, you've told me that, in

14   addition to the Prolift procedure, you believe

15   that other factors may have also contributed to

16   her having a recurrence of prolapse when she

17   eventually had it?

18         A.  Yes.

19         Q.  You talked about associated

20   biomechanical problems.  What are --

21         A.  That's what we spoke about --

22         Q.  -- Connie Schubert's --

23         A.  I'm sorry.  That's what we spoke about

24   previously relative to some of the asymmetric

Nicolette S. Horbach, M.D.

 1    demands on her skeleton, on her abdominal wall,

 2    on her pelvic floor based on some of the

 3    orthopedic issues she has, some of the changes

 4    from her prior surgeries that she's had, some of

 5    the changes that are noted on the disability

 6    examination.  I think those have factors -- or

 7    those are contributing factors for her -- some of

 8    her pain issues -- and pain both in terms of her

 9    complaints of constant pain plus pain in terms of

10    her complaints of dyspareunia.  I --

11         Q.  And, again, those would -- I'm sorry.

12    And, again, those would be combined with the

13    Prolift and the Prolift+M to contribute to those

14    complaints, correct?

15              MS. JONES:  Object to the form.

16              THE WITNESS:  Again, they may or may

17    not be related to the Prolift or Prolift+M.  I

18    mean, you know, she didn't fracture her leg

19    previously because of the Prolift+M.  She didn't

20    have other things specifically because of the

21    Prolift+M.  It's these combination of issues and

22    often over time these combinations of insults or

23    defects in multiple aspects of the patient's

24    skeletal structure will have a cumulative effect

Nicolette S. Horbach, M.D.

1    on a patient and can contribute to them

2    experiencing pain issues whether a Prolift is

3    there or not there.  That's my comments.

4    BY MR. SLATER:

5         Q.  Tell me what specific asymmetric

6    demands there are on Connie Schubert's skeleton

7    that you think may have contributed to her pain

8    and her dyspareunia and the symptoms and

9    complications that she has suffered from since

10   the Prolift surgery.  Tell me specifically what

11   you're talking about.

12        A.  I'm talking about that -- well,

13   unfortunately, a systematic evaluation that

14   involves -- that the skeletal muscle components

15   and the pelvic-floor issues has not really been

16   combined particularly by any clinician evaluating

17   her.  However, she, you know, in her most recent

18   evaluation that she had with a -- the disability

19   examination, she is walking with a left knee

20   brace, she has a history of a left leg fracture.

21   Those, in turn, can end up, especially if there

22   is asymmetry of leg length, it can cause

23   asymmetry of hip alignment.  She's got

24   restricted -- I don't remember whether it was

Nicolette S. Horbach, M.D.

```
 1   flexion or extension -- but she's got some

 2   restricted range of motion in her lower

 3   extremities that then can have roles in terms of

 4   how it impacts a patient from a biomechanical

 5   standpoint.

 6        She is shorter and has a little bit of a

 7   tummy like many of us postmenopausal.  That can

 8   create issues as women.  So there is a

 9   combination of factors that go on.  She has seen

10   a chiropractor in the past because she has had

11   back problems and neck problems and she's had a

12   motor vehicle accident.  I mean, all of these

13   things can ultimately contribute and should be

14   evaluated as part of the decision about what is

15   going on currently in her pain condition.

16        Q.  Before you could offer an opinion to a

17   reasonable degree of medical probability that

18   those issues are a cause of her pain and

19   dyspareunia and issues since the Prolift, the

20   evaluation of these skeletal issues and the

21   biomechanical assessment would need to be done,

22   correct?

23        A.  Before saying that those are

24   absolutely the cause of her current symptoms?
```

Nicolette S. Horbach, M.D.

1   Yes.

2        Q.   And before saying it to a reasonable

3   degree of medical certainty -- that's the

4   standard --

5        A.   Nope.

6        Q.   -- you would need that testing, right?

7        A.   I don't think so.  I think within a

8   degree -- based on my clinical practice and based

9   on my experience with patients in this type of

10  situation, it is more likely than not that some

11  of her complaints are going to be related to

12  these issues that I've addressed.

13       Q.   Let me just be very clear so when I

14  walk out of here I understand what's going to

15  happen.  You're going to walk into a courtroom in

16  Joplin, Missouri.  You're going to sit in front

17  of a jury and you're going to tell the jury that

18  Connie Schubert, who has documented mesh

19  contraction and mesh erosions, multiple

20  operations to remove this contracted and eroded

21  mesh and actually ended up with vaginal anatomic

22  distortion that a doctor in St. Louis, named

23  Lewis Wall, had to basically reapproximate her

24  vagina and try to open it up again at the apex,

Nicolette S. Horbach, M.D.

1    in the setting of all those -- of the mesh and

2    all those complications and all the surgery that

3    she has had, you're going to tell the jury that

4    you think that the reason she has pain in her

5    vagina and discomfort with sexual relations is

6    due in part to the fact that she fractured her

7    leg when she was a child and went to a

8    chiropractor to get her neck adjusted several

9    times, and whatever else you threw into that

10   list?  Do I -- it's a yes-or-no question -- do I

11   understand you correctly?

12        A.  Yes.

13            MS. JONES:  Object to the form.

14   BY MR. SLATER:

15        Q.  Okay.  You do agree with me that the

16   Prolift and the Prolift+M and then the contracted

17   mesh and the eroded mesh and the surgeries that

18   were performed which would cause damage to nerves

19   and to blood vessels and devascularize the

20   tissue, and all these things that went along with

21   multiple operations, you would agree with me that

22   that is a contributing factor, even if you won't

23   say the most important contributing factor, it's

24   certainly a contributing factor causing her pain,

Nicolette S. Horbach, M.D.

1    her dyspareunia and the symptoms she has been

2    complaining of in her vagina and pelvis since the

3    Prolift surgery, correct?

4            MS. JONES:  Object to the form.

5            THE WITNESS:  I think that

6    contributing factor from the standpoint of the

7    dyspareunia because that has been a persistent

8    complaint, the other pain issues that are more

9    recently raised in the medical record, those have

10   been very, you know, there have been medical

11   records statements that she has not had those

12   pain or the pain has been better or worse, and so

13   it's hard for me to say whether those other

14   associated symptoms are specifically related to

15   the Prolift.

16   BY MR. SLATER:

17         Q.  You know that when a woman has

18   complications like what Connie Schubert has and

19   undergoes these types of multiple operations, it

20   is common for the woman to have pain that will

21   wax and wane in severity, correct?

22           MS. JONES:  Object to the form.

23   BY MR. SLATER:

24         Q.  You know that that occurs, correct?

Nicolette S. Horbach, M.D.

1          A.   I think it depends a little bit.  I

2   think that may be partially dependent on what the

3   underlying reason is and what the patient's level

4   of physical activity and what are the

5   exacerbating factors for the patient experiencing

6   pain.  But just sitting there and, you know, or

7   doing no change in activity, et cetera, it is not

8   particularly typical that that patient -- that

9   that pain waxes and wanes.

10          Q.   You would agree with me that the

11   presence of contracting mesh, eroding mesh and

12   the multiple operations that Connie Schubert has

13   gone through over the last several years

14   certainly would significantly increase her risk

15   to develop pelvic-floor myalgia and pelvic-floor

16   dysfunction as a response to the insults of these

17   multiple operations, correct?

18          MS. JONES:  Object to the form.

19          THE WITNESS:  I think that is --

20   certainly that situation that you're presenting

21   can increase her risk of developing those

22   problems, yes.

23   BY MR. SLATER:

24          Q.   Let me do this, if it's okay with --

Nicolette S. Horbach, M.D.

1    well, actually I want to come back to one thing.

2         When I was asking you about your opinions,

3    you said you had other opinions specific to

4    Connie Schubert.  Have you now refined what those

5    opinions are so I understand what they are?

6         A.  I think -- yeah, I think we've gone

7    through those specific aspects of her situation.

8              MR. SLATER:  Okay.  What I would try

9    to do, if it's okay with the other attorneys

10   here, David, I would suggest, if you want to

11   question now, I'll look through my notes while

12   you do it.  I'm pretty close to being done, if

13   not being done, and then when you finish, I'll

14   see if I have any cleanup, and then we can go

15   from there.  Is that okay with you guys?

16             MR. OVERBY:  It's fine with me.

17                  EXAMINATION

18   BY MR. OVERBY:

19        Q.  Are you okay, Doctor, to keep going

20   for a little bit?

21        A.  I'm fine.

22        Q.  I'm not going to be very long, but I

23   want to make sure I've covered the bases I think

24   I need to.

Nicolette S. Horbach, M.D.

1        First of all, let's talk just very briefly

2   about Exhibit 4 here.  Did you bring all this

3   stuff with you or just part of it today?

4        A.  I have all of the medical records with

5   me.  I have the transcripts of the depositions

6   that I specified previously.  I have all of her

7   employment records that I've received.  I have a

8   significant bulk of the articles, but I'm not

9   sure every single one of them with me.  I have

10  the emails that I've received.  I have -- not the

11  videos.  I have the professional education

12  documents, and I have the, you know, the FDA

13  statement, the SGS statements, the IFU drafts,

14  the patient brochure drafts.

15       Q.  Okay.  Give you a little hint.  I'm

16  going to be real short to the extent I can.  So

17  the answer, I think, is, no, you don't have all

18  of it, but you have most of it?

19       A.  Yes.  I think the only --

20       Q.  Okay.

21       A.  Yeah.

22       MR. OVERBY:  And here's what I'm

23  interested in.  Rather than go through some of

24  this right now on the employment records and

Nicolette S. Horbach, M.D.

1  medical records, I'd like to look after we're

2  done at what she has just to make sure that I've

3  got the same thing, and, if she has something in

4  addition, to get a copy of it.

5      Is that okay with you, Christy?

6          MS. JONES:  I have no problem with

7  that.

8  BY MR. OVERBY:

9      Q.  That's what I was really focused on.

10  You'd have a hard time getting me to look at this

11  literature very long.

12      A.  Yeah.

13      Q.  The literature that you did refer to,

14  though, there was a point in time when you were

15  asked about things that are more significant to

16  your opinions or something like that, I think.

17  Do you remember that?

18      A.  Yes, or that I might be using at trial

19  to quote statistics from articles.

20      Q.  So here's my question.  I want to make

21  sure that this is -- this list is one and the

22  same.

23      Those things that you reference, that

24  literature, at least as you sit here today based

Nicolette S. Horbach, M.D.

```
1    upon what you have and what you -- the list you

2    have in front of you, are the things that you

3    would think I might actually specifically refer

4    to that in my testimony.

5         A.   Those are the things that I listed

6    more as a verbal discussion, yes, because that

7    list, I said verbally, does overlap with some of

8    this, but then there also are additional things

9    that I might have pulled up last night that

10   obviously are not on this list that I might refer

11   to.

12        Q.   I understand.  What you're relying on,

13   though, as far as, i.e., what's been put into

14   your data bank, your brain, is a lot broader than

15   that shorter list, true?

16        A.   Oh, absolutely.

17        Q.   It's probably even, to some extent,

18   broader than the reference list here in that

19   you've read stuff that's, through the years, is

20   probably not on here, true?

21        A.   Absolutely.  Plus I just spent

22   umpteen --

23        Q.   Hours?

24        A.   -- hours and hours and hours and hours
```

Nicolette S. Horbach, M.D.

1  studying my board exams and going through a huge

2  volume of review material in addition to what I

3  have read, gathered and had the knowledge of over

4  the last 27 years that I've been a

5  urogynecologist.

6        Q.  Were you doing the boards for this new

7  board that's being recognized?

8        A.  Yes.

9        Q.  Have you heard back yet?

10       A.  Nope.  We don't hear back until

11 September.

12       Q.  When you were being asked a little

13 while ago about your opinions and kind of how

14 we've covered your opinions, you were looking at

15 some handwritten notes, correct?

16       A.  This is the Exhibit 13.

17       Q.  Okay.  Can I see that real quickly?

18 Is this kind of your sort of short list to

19 yourself of the issues that you intend to cover,

20 that is, contained in Exhibit 13, or is there

21 more than that?

22       A.  No, typically that's going to help me

23 sort of outline and make sure that, when he asks

24 me a question about have I given all my opinions,

Nicolette S. Horbach, M.D.

1    that I can look at something rather than say off

2    the top of my head.  I think the older you get

3    the more crowded your brain gets and the harder

4    it is to remember everything off the top of my

5    head.

6         Q.  If I, though, were to look at the

7    notes that you have here that have been marked

8    Exhibit number 13, would this serve as a pretty

9    good outline of the areas upon which you're going

10   to or expect to give your opinion testimony in

11   this case?

12        A.  Yes, that plus the original expert

13   report, yes, those are the two things that I

14   would rely on.

15        Q.  And that's something -- you just

16   mentioned the expert report.

17        A.  It is one of these.

18        Q.  It's typed up, isn't it?

19        A.  Yeah, somewhere.

20        Q.  I think I saw it earlier.

21        A.  It's somewhere in this stack.  It's a

22   relatively large --

23        Q.  Is that it?

24        A.  Yeah, it's a relatively large

1    document, although -- I printed that out

2    yesterday, and I think I was just looking through

3    and there were one or two things that were maybe

4    even part of the old -- my old notes where I've

5    outlined information I was going to include in

6    there but hadn't written it out longhand.

7         Q.  Here's my question.  If we take, then,

8    the notes you have in 13 along with the expert

9    report that I have here in front of me, which

10   I've not seen before so I'm going to mark it --

11        What are we up to, 16?

12        (Exhibit No. 16 marked for

13    identification.)

14   BY MR. OVERBY:

15        Q.  I've marked that now as 16, the expert

16   report, true?

17        A.  Yes.

18        Q.  If we take 13 and 16, is that a fair

19   summary of the areas in which you're going to

20   give opinions in this case?

21        A.  Yes, I believe so.  If you would just

22   give me that one right back again, let me just

23   make sure.

24            MS. JONES:  While Dr. Horbach is

Nicolette S. Horbach, M.D.

1   looking at that, just for the record, counsel,

2   that general report is a report that was prepared

3   in the New Jersey litigation and had been

4   previously forwarded to Mr. Slater and all in

5   that context.

6           MR. OVERBY:  Sure.

7           MS. JONES:  I'm sorry we didn't give

8   it to you.

9           MR. OVERBY:  No, that's fine.  I

10  understand that.  I was going to cover that with

11  her that this may be more generic than just to

12  this case.

13          THE WITNESS:  Right.  I think that

14  that would really cover the bulk of the opinions

15  unless somebody asks me something totally out of

16  the blue.

17  BY MR. OVERBY:

18      Q.  And then what we were just discussing

19  while you were looking at number 13, Exhibit 16

20  is something not created specifically for this

21  case, the opinion in Joplin, Missouri, true?

22      A.  That is correct.  It was -- I was

23  requested to create a general opinion regarding

24  more global aspects of prolapse and the

Nicolette S. Horbach, M.D.

```
1    involvement of Prolift.

2         Q.  You have not been disclosed in this

3    case, Connie Schubert's case, as someone who is

4    going to give standard-of-care testimony

5    regarding the care and treatment of Dr. Chris

6    Roberts.  Is it true that you do not intend to

7    give that opinion?

8         A.  I have not been requested to do that,

9    no.

10        Q.  And as you sit here today, that's not

11   part of the list of things that you anticipate

12   explaining to the jury one way or another.

13        A.  Correct.

14        Q.  Okay.  What I get to do today, and

15   different jurisdictions vary a little bit, but I

16   get to learn from you, to the extent you can tell

17   me, all of the opinions that you intend to give

18   at trial, but what I really want to limit my

19   questions to as they pertain to my client, which

20   is Freeman, but for the acts of Chris Roberts.

21        Do you think that you have touched on the

22   opinions that you have and intend to give to the

23   jury in this case as they touch on the care and

24   treatment of Dr. Roberts or do you think there
```

Nicolette S. Horbach, M.D.

1    are some areas that are left uncovered at this

2    point?

3         A.  No, I think that it essentially has

4    been covered based on that plus the comments that

5    I've made regarding previously that she was an

6    appropriate candidate for surgery and the

7    management that she has had to date.

8         Q.  Your use of mesh has changed over the

9    years; is that true?

10        A.  Yep.  Sorry.  Yes.

11        Q.  True in medicine that there are things

12   probably that physicians do today that they

13   couldn't even do, depending on the category of

14   medicine we're talking about, five, ten, 15 years

15   ago, right?

16        A.  Absolutely.

17        Q.  One of the things about medicine, good

18   things, I think mostly, is it's constantly

19   changing, right?

20        A.  We are -- we are -- medicine is an

21   evolutionary process.  Our specialty in

22   particular is going through dramatic evolutionary

23   changes because we are very young and new

24   specialty.  We are just undergoing our

Nicolette S. Horbach, M.D.

1    certification aspects.  We are just over the last

2    ten years been able to get NIH funding to look at

3    some of the more, you know, more difficult issues

4    within our specialty, and doing -- beginning to

5    just start doing randomized trials through that

6    and biomechanical evaluations that require a more

7    extensive funding than what can be done in

8    individual situations.  So we are having a really

9    exponential growth in the information that is

10   coming out in our field and potentially its

11   impact on our clinical practice.

12        Q.  There is a lot -- and I'm going to

13   tell you what I think I understand -- you tell me

14   if I get it wrong -- there is a lot more emphasis

15   today than there was just three, four, five years

16   ago on, for example, pelvic-floor muscle issues

17   and how they might impact dyspareunia, for

18   example.

19        A.  Yes, I think that that's true.  It was

20   something that -- our collaboration with other

21   disciplines, whether it's physical therapy,

22   colorectal, biomechanical engineers, et cetera,

23   muscle physiologists, it has allowed us to learn

24   aspects of patients' problems and patient care

Nicolette S. Horbach, M.D.

```
1    that we may not have been aware of in our

2    isolated training as simply ob/gyn physicians or

3    urogynecologists because some of these are --

4    we're a very multidisciplinary group or our part

5    of the body is very multi-disciplinary, shall we

6    say, and there's lots of organs and lots of

7    structures in that area that can affect each

8    other, and...

9          Q.  And then what -- I want to make sure I

10   understand this -- because I think earlier you --

11   very early in this deposition you said that you

12   have had some patients of yours who have

13   experienced some complications with Prolift, and

14   I may have misunderstood.  Is that accurate?

15         A.  Yes, I have.  I mean, again, it

16   depends on what you're viewing as

17   complications --

18         Q.  Right.

19         A.  -- because, you know --

20         Q.  And here's -- I think you were then

21   asked whether or not erosion or exposure were the

22   complications, and my memory is you said no.

23         A.  In my personal practice --

24         Q.  Right.
```

Nicolette S. Horbach, M.D.

1          A.  -- to my recollection I have not had a

2    patient where I've had to treat them for an

3    exposure or erosion secondary to a Prolift that I

4    placed.

5          Q.  Sure.

6          A.  I have -- go ahead.

7          Q.  Here's what --

8          A.  I've been lucky.

9          Q.  What have you experienced?

10         A.  I think the -- one of the issues that

11   I've experienced with Prolift is a failure of the

12   Prolift to treat the prolapse in the long term.

13         Q.  So prolapse returns?

14         A.  Recurrence of prolapse.  A second

15   issue is the onset of stress urinary

16   incontinence.

17         Q.  I think that was discussed earlier in

18   your deposition.  That's a known thing that can

19   in fact be -- maybe caused isn't the right

20   word -- but exposed with fixing an anterior

21   prolapse?

22         A.  Yeah, we usually refer to it as a

23   masking of the incontinence, yes.  And we -- the

24   issue of voiding dysfunction, I think there have

Nicolette S. Horbach, M.D.

1    been some patients in my practice that were

2    experiencing more prolonged difficulty with

3    voiding or slower voiding that required than some

4    management for it.  I don't -- I certainly have

5    no one that's become catheter dependent or

6    necessary for intermittent self-catheterization.

7         And then the last group of issues are the

8    patients who have experienced some type of pain

9    component afterwards, whether it's been

10   specifically related to dyspareunia only or

11   whether it's been related to, you know, not

12   dyspareunia, but some other type of pain

13   complaint.

14        Q.  So you've had patients that you have

15   operated for prolapse, installed a Prolift kit

16   into them, and they have had some dyspareunia

17   and/or other pain that they were not complaining

18   about prior?

19        A.  Either not complaining about prior or

20   there may have been an exacerbation of a

21   baseline -- baseline symptoms following the

22   surgery that then subsequently required

23   treatment.

24        Q.  And when you discuss voiding

Nicolette S. Horbach, M.D.

1    dysfunction, I think I'm following you.  There

2    could be maybe a little urinary retention and/or

3    slowing of starting your stream?  Those are some

4    things that you've seen?

5         A.  Right.  So voiding dysfunction from

6    the standpoint of, you know, hesitancy to void,

7    slower stream, sometimes a sensation of

8    incomplete evacuate -- or incomplete emptying,

9    sometimes the -- some increased urinary

10   frequency.  I forgot to add urinary tract

11   infections postoperatively.

12        So I think that would be -- we don't -- I

13   mean, urinary -- overactive bladder symptoms of

14   urgency frequency and urge incontinence, we

15   occasionally see those in postoperative patients,

16   but most of the time that's more of a transient

17   phenomenon.

18        Q.  And you may have been asked this and

19   answered it and I've forgotten, so forgive me if

20   it's true.  Is the only kit that you've used to

21   treat prolapse in women Prolift and/or Prolift+M

22   or have there been others in the past?

23        A.  No, I have not used any other kits.

24        Q.  Okay.  And I think you were asked, you

Nicolette S. Horbach, M.D.

1    did, though, there was a time when you would use

2    Gynemesh pieces cut up and --

3         A.  My primary use of Gynemesh has been

4    more with sacrocolpopexies.  In fact I still use

5    it now with sacrocolpopexies if a patient still

6    has a uterus or cervix.  I don't recall really

7    placing Gynemesh as patches within the vaginal

8    area.  I tended to shy away from that in my

9    previous work with vaginal repairs.

10        Q.  Do you think that you have discussed

11   with me the -- and/or earlier on the record --

12   here in your deposition today the opinions that

13   you hold as they relate specifically to the care

14   and treatment of Dr. Roberts to the extent that

15   you intend to express them to the jury?

16        A.  Yes.

17        Q.  Doctor, I appreciate your time.  Thank

18   you.

19             MR. OVERBY:  I told you I'd be short.

20             MR. SLATER:  I just have a couple

21   follow-up questions before Christy goes.

22        I assume, Christy, you want me to get out

23   of the way first, right?

24             MS. JONES:  Please.

Nicolette S. Horbach, M.D.

1            MR. SLATER:  Just take a look here and

2    see what I have.

3            MR. OVERBY:  She meant that in the

4    kindest of ways, I can tell.

5            EXAMINATION (resumed)

6    BY MR. SLATER:

7        Q.  Doctor, a couple times a few weeks ago

8    you referred to your expert report from another

9    case, in another litigation.  I don't want to go

10   through that entire report with you.  The

11   opinions we've discussed today during the

12   deposition, are those your opinions in this

13   litigation?

14       A.  Yes, from the standpoint of opinions,

15   I would imagine.  I mean, you did not say what is

16   my opinion of, you know, how I approach -- how

17   prolapse should be evaluated, how you should

18   counsel the patient regarding surgical risks or

19   doing informed consent.  There were aspects of

20   that that are part of the general report that you

21   had not specifically asked me about.  I don't

22   know whether I'm going to be asked to provide

23   that information at the time of trial.  But

24   whatever I would be asked relative to those

Nicolette S. Horbach, M.D.

1    questions are in that report.

2        Q.  With regard to the Prolift and the

3    Prolift Prolift+M specifically and Connie

4    Schubert's medical condition and the causes of

5    her condition, we've covered those issues and

6    your opinions on those issues today during the

7    deposition, correct?

8        A.  Yes, I think we've covered them quite

9    effectively.

10       Q.  Thank you.

11           MR. SLATER:  I will now hand off the

12   mic to Christy.

13                    EXAMINATION

14   BY MS. JONES:

15       Q.  Doctor, I have just a few follow-up

16   reports -- questions.  Let me ask specifically,

17   with respect to what I believe has been marked as

18   Exhibit 16, the report that Mr. Slater and

19   Mr. Overby have just asked you about, does that

20   report set forth general opinions relating to

21   pelvic-floor repair surgery, prolapse, Prolift

22   and Prolift+M?

23       A.  Yes, it does.  Although I don't recall

24   if I specifically addressed Prolift+M during that

Nicolette S. Horbach, M.D.

1   document per se.

2        Q.  And in that report did you also

3   address the adequacy of the information contained

4   in the IFUs and the patient brochures?

5        A.  Yes.

6             MR. SLATER:  Objection.  You can

7   answer.

8             THE WITNESS:  I address in that report

9   my opinion regarding the IFU, the patient

10  brochure, the professional education, and the

11  role of Ethicon or not in the credentialing

12  aspect of physicians for this type of surgery.

13  BY MS. JONES:

14       Q.  And let me just ask -- I think it's

15  probably implicit in your comments today, but I

16  don't think the question was specifically asked,

17  so let me ask this question.

18           In your opinion, Doctor, from a medical

19  standpoint, as a clinician performing surgery and

20  using the Prolift or the Prolift+M, is the

21  information in the IFUs adequate to advise

22  pelvic-floor physicians of the risks and benefits

23  associated with Prolift?

24       A.  I believe it is, yes.

Nicolette S. Horbach, M.D.

1          Q.  And you were asked about a number of

2    complications, including complications that some

3    of your patients have experienced who had had

4    Prolift.  First of all, were those complications

5    known and recognized in the medical community at

6    the time that Prolift was first marketed?

7               MR. SLATER:  Objection.  You can

8    answer.

9               THE WITNESS:  I think the

10   postoperative complications associated with

11   Prolift and certainly the postoperative

12   complications I've encountered with my patients

13   were known or are known complications of prolapse

14   surgery itself and especially prolapse surgery

15   associated with the placement of a synthetic

16   mesh.

17   BY MS. JONES:

18         Q.  And my question is really

19   specifically, were those complications known and

20   recognized by the medical community of

21   pelvic-floor surgeons at the time that Prolift

22   was first marketed?

23         A.  Yes.

24               MR. SLATER:  Objection.  You can

Nicolette S. Horbach, M.D.

1    answer.

2    BY MS. JONES:

3         Q.  And to your knowledge -- you were

4    asked, Mr. Slater did, about the evolution of

5    development of knowledge, but my question

6    specifically is, based upon your experience, your

7    knowledge of the medical literature, have there

8    been any known -- any new previously unknown

9    complications associated with --

10        Let me start over.  I got confused on my

11   question.  Let me strike it.

12             MR. OVERBY:  Confused yourself.

13             MS. JONES:  I confused myself.

14             MR. OVERBY:  That's not good.

15             THE WITNESS:  I was following.

16   BY MS. JONES:

17        Q.  Have there -- are you aware of any

18   complications associated with Prolift or

19   Prolift+M that have become known to pelvic-floor

20   surgeons for the first time after the marketing

21   of Prolift?

22        A.  No, I am not aware of any new

23   complications that have become evident after the

24   marketing of the Prolift+M.

Nicolette S. Horbach, M.D.

1        Q.  And how did the --

2        A.  Prolift and Prolift+M, I'm sorry.  I

3    just said Prolift+M.

4        Q.  And how do the recognized

5    complications that have been reported or

6    associated with Prolift or Prolift+M compare to

7    the complications associated with any other

8    pelvic-floor repair surgery, prolapse surgery?

9            MR. SLATER:  Objection.  You can

10   answer.

11           THE WITNESS:  Other than the -- if we

12   take any type of prolapse surgery, the

13   complications that are seen with Prolift or

14   Prolift+M are the same across the board except,

15   let's say, when you take into account the issue

16   of the mesh-related complications of, you know,

17   erosion, et cetera.  However, those mesh-related

18   complications are -- can be seen in patients who

19   undergo prolapse surgery that involves mesh even

20   done in a way that doesn't involve Prolift such

21   as a sacrocolpopexy or a vaginal placement of a

22   patch of mesh, et cetera.

23   BY MS. JONES:

24       Q.  Now, one of the things that Mr. Slater

Nicolette S. Horbach, M.D.

1    showed you was Exhibit 8, which was the website

2    from your clinic, and I believe you testified --

3    correct me if I'm wrong -- that you had not

4    previously seen the contents of this?

5          A.  I had not previously seen the content.

6    I was not involved with that part.  I'm, as my

7    husband says, electronically challenged.

8          Q.  Okay.  Well, one of the things that he

9    asked you about was the statement that

10   transvaginally placed mesh is associated with

11   higher complication rates than traditional

12   vaginal surgery or sacrocolpopexy.  In particular

13   these have been associated with serious adverse

14   events, including mesh erosion that can lead to

15   multiple surgeries to repair and may result in

16   continued pain even after mesh removal.

17         My question to you, Doctor, is, did you

18   find that to be true, one, in your practice?

19         A.  I actually -- no, I did not find it to

20   be true in my practice.  I personally have

21   encountered more complications and/or more

22   persistent/challenging complications following

23   sacrocolpopexy than I did following Prolift.

24         Q.  Now, my second question is:  Are you

Nicolette S. Horbach, M.D.

1   aware of articles and studies that have compared,

2   for example, the use of transvaginal mesh with --

3   or transvaginal mesh kits -- with sacrocolpopexy

4   or others and evaluated the complication rates?

5           A.   Yes, there are a number of different

6   trials that have looked at that or a number of

7   series.

8           Q.   And am I correct that some of those

9   trials actually show lower complication rates in

10  the use of mesh?

11          A.   Some of them do.

12               MR. SLATER:   Objection.   You can

13  answer.

14               THE WITNESS:   Some of those trials do

15  show a lower complication rate.   There also are

16  trials that are done just specifically about,

17  let's say, sacrocolpopexy that indicates, even

18  though it's not a comparison to a cohort of

19  Prolift patients, they are specifically

20  sacrocolpopexy patients, but there are some --

21  some studies indicate equivalent complication

22  issues or sometimes even higher complication

23  rates for some aspects or some complications

24  associated with sacrocolpopexies than there is

Nicolette S. Horbach, M.D.

1    with a Prolift.

2    BY MS. JONES:

3         Q.  And are you specifically familiar with

4    the Diwadkar study that you referenced earlier

5    today?

6         A.  Yes.

7         Q.  And that study compared the

8    complication rates of the different types of

9    surgeries?

10        A.  Yes, it did.

11        Q.  And in general what did that study

12   show with respect to those complication rates?

13        A.  That Prolift or the transvaginal mesh

14   kits was not associated with an increased rate of

15   complications when compared to other Prolift --

16   other prolapse surgeries.

17        Q.  I'm trying to do this quickly, and so

18   I confess to you that I'm going to ask you a

19   question that I think I've already asked, but I'm

20   not sure.

21        A.  Okay.

22        Q.  In your judgment were the contents of

23   the IFUs for the Prolift and the Prolift+M

24   adequate to advise pelvic-floor surgeons of the

Nicolette S. Horbach, M.D.

1    risks associated with the product?

2         A.  I believe so, yes.

3              MR. SLATER:  You may answer.

4    BY MS. JONES:

5         Q.  Now, you were asked a number of

6    questions about whether or not you based that

7    opinion upon any particular standards.  Let me

8    ask you this, Doctor.  Are you active in

9    professional organizations?

10        A.  Yes.

11        Q.  Do you have discussions with

12   colleagues and other urogynecologists and

13   pelvic-floor surgeons about their experiences

14   with surgery --

15        A.  Yes.

16        Q.  -- and their experiences with Prolift

17   and other mesh kits?

18        A.  Yes.

19        Q.  And have you attended meetings where

20   there have been presentations about those?

21        A.  Yes.

22        Q.  And have you reviewed the medical

23   literature with respect to risks associated with

24   that?

Nicolette S. Horbach, M.D.

```
1          A.  With Prolift?  Yes.

2          Q.  And you've reviewed the medical

3   literature as it relates to other pelvic-floor

4   repair surgeries?

5          A.  Yes.

6          Q.  And are you generally familiar with

7   the type of training that pelvic-floor surgeons

8   receive with respect to -- to pelvic-floor

9   repairs and specifically with Prolift or mesh

10  kits?

11         A.  Yes, I'm aware of the type of training

12  that is done for general -- for pelvic-floor

13  surgeons who do general types of prolapse

14  surgeries across the board, all the different

15  types that we've talked about, as well as

16  specifically for Prolift.

17         Q.  And have you considered all of that

18  information when you -- in determining whether or

19  not in your judgment the IFUs adequately advised

20  of the risks associated with Prolift surgery or

21  Prolift+M?

22         A.  Yes, I've used all that information to

23  make my opinion that I think that there was

24  adequate information.
```

Nicolette S. Horbach, M.D.

1        Q.  As a doctor practicing medicine, doing

2   surgeries, do you generally rely upon internal

3   company documents to reach your opinions, your

4   medical opinions, on the safety or efficacy of a

5   particular product?

6        A.  No, I do not.

7        Q.  What do you rely upon in determining

8   whether or not in your judgment a particular

9   product or surgical procedure is safe and

10  efficacious for the patient?

11       A.  I begin that type of analysis first

12  with trying to look at the underlying concept

13  behind the surgery that is being contemplated,

14  does this surgery make sense relative to what we

15  currently know about the pelvis and how it

16  behaves as well as the other surgeries that we've

17  done for, you know, previously for pelvic floor

18  or pelvic prolapse.  So it's whether this is

19  based on our prior experience, based on our prior

20  knowledge, does this make sense, or if this is

21  something very different than what we typically

22  have done, is there information to support that

23  there is a reason that this would be an effective

24  and safe treatment as opposed to what we

Nicolette S. Horbach, M.D.

1    traditionally do.

2         I rely on the information that is

3    communicated at our national meetings as we

4    sometimes discuss the pros and cons of early data

5    coming out or data that may or may not be present

6    looking at a particular treatment.

7         I rely upon the discussions I may have one

8    on one with my colleagues, whether at national

9    meetings or with my partners, regarding their

10   experiences with doing surgery in patients, have

11   they found a particular problem, how have they

12   addressed that particular problem, either in a

13   different type of surgery or in a Prolift

14   surgery.

15        I rely on the fact that every time I

16   operate every day of the week that I learn

17   another small amount of information of how to try

18   to treat patients more effectively.  You know, I

19   evaluate my own surgeries every time I come out

20   of the operating room.  I look at what the -- at

21   least the anatomic effect is, and ultimately the

22   clinical effect in my post-op care and say,

23   knowing this outcome would I have changed how I

24   approach the patient differently going forward,

Nicolette S. Horbach, M.D.

1    how might I use that information for my next

2    patient to address the issues?  I mean, there is

3    a whole host of different things we use in making

4    our clinical decisions regarding patient

5    management.

6          Q.  And have you used all of that

7    information and the different types of

8    information in evaluating whether or not in your

9    judgment Prolift or Prolift+M were safe and

10   effective devices for use in appropriate

11   patients?

12         A.  Yes, that's the information that I

13   used in making my opinions that I stated today.

14         Q.  And what is your opinion with respect

15   to whether or not Prolift or Prolift+M are safe

16   and effective for use in patients?

17         A.  I think, yes, that they are.  I mean,

18   I see patients now who come to see me

19   postoperatively, someone even in the last week or

20   two, who was a total Prolift from, I think, 2006

21   and totally asymptomatic, very happy with the

22   results, happy that she did not have a more

23   invasive procedure or laparoscopic -- or open

24   procedure since that laparoscopy was really not

Nicolette S. Horbach, M.D.

1   being done by us at that time.

2         Q.  And you were asked specifically about

3   the Blandon article.  Do you remember those

4   questions?

5         A.  Regarding, yeah, from the Mayo Clinic

6   about dealing with the complications, et cetera,

7   yes.

8         Q.  Right.  And asked about whether or not

9   those complications should have been or potential

10  risks should have been warned of.  In your

11  judgment were those complications in fact covered

12  by the IFU?

13        A.  I believe that --

14              MR. SLATER:  Objection.  You can

15  answer.

16              THE WITNESS:  I believe that the

17  discussion regarding being familiar with the use

18  of mesh as a pelvic surgeon and the complications

19  associated with mesh does illustrate in the

20  majority of cases the complications that have

21  been encountered with Prolift.

22  BY MS. JONES:

23        Q.  Was there any evidence in this case --

24  you were asked some questions about visceral

Nicolette S. Horbach, M.D.

1   injury.  Was there any evidence in this case that

2   Ms. Schubert experienced a visceral injury during

3   the Prolift procedure?

4        A.   During the placement of the Prolift or

5   the Prolift+M, no.

6        Q.   Based upon your review of the

7   literature, the clinical experience, the

8   knowledge you have, do you believe that there was

9   sufficient clinical data to support the launch of

10  Prolift at the time it was first marketed?

11       A.   Yes, I do, especially in light of the

12  state of the art at that particular time.

13       Q.   And, finally, Doctor, you were asked a

14  number of questions about pelvic muscle symptoms.

15  Do you remember those?  Do patients who have

16  pelvic-floor surgery not involving mesh, are they

17  at risk also for experiencing clinically

18  significant pelvic muscle symptoms?

19       A.   Yes, they are.

20            MR. SLATER:  Objection.

21  BY MS. JONES:

22       Q.   I thank you.  I think that's all I

23  have.

24            MR. SLATER:  All right.  I have some

Nicolette S. Horbach, M.D.

1    follow-up questions.  So let's launch into them

2    and we'll get done in a couple minutes.

3                  EXAMINATION (resumed)

4    BY MR. SLATER:

5         Q.  Doctor, let's start from the end.  You

6    said that Ethicon had enough clinical data to

7    support the launch of the Prolift; is that what

8    you said?

9         A.  Yes.  Sorry.  You're gone.  Can't hear

10   you.

11        Q.  You do not know what clinical data

12   Ethicon Medical Affairs relied on to support the

13   launch of the Prolift, correct?

14        A.  Other than what was published in the

15   literature and whether they had additional data,

16   I don't know that.

17        Q.  You don't know what data existed

18   within Ethicon other than what was published and

19   was generally available in the literature,

20   correct?

21        A.  Correct, yes, the literature that was

22   from the transvaginal mesh studies, et cetera.

23        Q.  Your opinion that the -- well,

24   rephrase.

Nicolette S. Horbach, M.D.

1          At the time that the Prolift+M was

2    launched, other than what was publicly available,

3    you don't know what literature or -- rephrase.

4          Other than what was generally available in

5    the literature at the time the Prolift+M was

6    launched, you don't know what clinical data

7    Ethicon Medical Affairs relied on to support the

8    launch of the Prolift+M, correct?

9          A.  Correct.

10              THE REPORTER:  Start over again.

11              THE WITNESS:  I'm sorry.  We lost you

12    again.

13    BY MR. SLATER:

14          Q.  In offering the opinion you offered a

15    few minutes ago that you think the Prolift is a

16    safe and effective medical device, that opinion

17    is only based on the information that you've read

18    and the things you know, correct?

19          A.  Yeah, I think it's hard for me to base

20    an opinion on things that, you know --

21          Q.  Let's just stick with yes or no so we

22    can get done.  Okay?

23          A.  Yes.

24          Q.  Is the answer to my question yes?

Nicolette S. Horbach, M.D.

1          A.  Yes.

2          Q.  To the extent that Ethicon's internal

3    documents would have information that is

4    significant to whether or not the Prolift was

5    safe and effective, the fact that you didn't see

6    that information can undercut the validity of

7    your opinion, correct?  It can, right?

8               MS. JONES:  Object to the form.

9               THE WITNESS:  I think that it would --

10   it possibly -- it depends upon -- you know, my

11   definition of whether that data shows a problem

12   with safety and effectiveness may be different

13   than someone else who has analyzed the data and

14   says that this is a problem.

15   BY MR. SLATER:

16          Q.  With regard to your opinion as to

17   whether the Prolift is safe and effective, you

18   don't know what Ethicon knew or what was in their

19   files with regard to that question other than

20   what was publicly available, so you don't know

21   how that internal information would impact on

22   your opinion, correct?

23          A.  Correct.

24          Q.  You don't know how Ethicon determined

Nicolette S. Horbach, M.D.

1    internally that the Prolift was safe and

2    effective and could be marketed, correct?

3         A.  I think -- yes.

4         Q.  And the same holds true for the

5    Prolift+M, correct?

6         A.  Yes.

7         Q.  You mentioned earlier in the

8    deposition some animal studies with mesh.

9    Remember that?

10        A.  Yes.

11        Q.  You don't hold yourself out as an

12   expert with regard to how one would take the

13   results of an animal study, for example, putting

14   mesh in a rat for 91 days and how that would

15   correlate to the use of mesh in a female pelvis,

16   correct?

17        A.  I do not consider myself an expert in

18   that research area, no.

19        Q.  -- forming any opinions based upon the

20   preclinical testing that you may have seen with

21   regard to the mesh, correct?

22        A.  The first part is -- I missed because

23   you were gone, the first part of the question.

24        Q.  You're not forming any opinions based

Nicolette S. Horbach, M.D.

1    on the preclinical testing that you may have

2    seen, correct?

3         A.  I have used the preclinical

4    information of the animal studies, both at

5    Ethicon and in other animal studies, as part of

6    my evaluation of mesh in and of itself, yes, and

7    how it -- and how it works within --

8         Q.  I think this is going to disconnect

9    me.  I'm getting very -- okay.  We're good.

10        (The record was read by the reporter.)

11   BY MR. SLATER:

12        Q.  The bottom line is, you're not holding

13   yourself out as an expert with regard to the

14   question of how does the preclinical testing with

15   the mesh translate to whether or not the mesh

16   would be safe or effective in a female pelvis or

17   vagina, correct?

18        A.  I'm not sure that I totally understand

19   your question, in which direction, but, you know,

20   the information that's in the animal studies is

21   part of what is used to begin to evaluate the use

22   of any product in itself.  It doesn't necessarily

23   mean that the response in the animal is going to

24   be exactly the same as the response in the

Nicolette S. Horbach, M.D.

1  patient, but since we in our field do not have an

2  established animal model for prolapse, it is

3  difficult for us to do specific animal studies

4  that we know are going to be absolutely

5  correlating, but it is a starting point in

6  looking at the response of materials in vivo.

7       Q.  There is no animal study where you're

8  saying that animal study in my opinion proves to

9  a reasonable degree of medical certainty that the

10  mesh used in the Prolift or the Prolift+M would

11  be safe and effective in use in the female

12  pelvis, correct?

13       A.  I don't think there is a study that I

14  can specifically cite that makes that conclusion,

15  you know, in an absolute form.

16       Q.  With regard to the Prolift itself, you

17  were not convinced that it was the right answer

18  for more than half your patients during the time

19  you used the Prolift, correct?

20       A.  We've had this discussion previously.

21  I cannot tell you --

22       Q.  It's a simple yes or no question.

23       A.  No, it's not a yes or no question.  I

24  can't give you a yes or no answer.

Nicolette S. Horbach, M.D.

1        Q.   There are women for whom the Prolift

2   would not be the appropriate treatment, correct?

3        A.   Yes, that's correct.

4        Q.   And the group of women for which the

5   Prolift would not be the correct treatment is a

6   larger group of women than just women who are

7   either pregnant or considering getting pregnant

8   in the future, correct?

9        A.   I think there are other patients that

10  it may not be the best choice for them, yes.

11       Q.   Assuming no other questions are asked,

12  that is the end of my questioning of you.

13            MS. JONES:  We're done.

14            VIDEO SPECIALIST:  The time now is

15  6:06.  This deposition has concluded.

16            THE REPORTER:  Do you want your

17  previous order, regular delivery and email?

18            MR. SLATER:  I need the rough and then

19  however they normally send it, but I'll need a

20  rough for this.

21            THE REPORTER:  And regular delivery on

22  the final?

23            MS. JONES:  Me too.

24

Nicolette S. Horbach, M.D.

1          (Proceedings concluded.)

2    //

3              (Signature having not been waived, the

4    deposition of NICOLETTE HORBACH, M.D. adjourned

5    at 6:06 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Nicolette S. Horbach, M.D.

1              ACKNOWLEDGMENT OF DEPONENT

2

3          I, NICOLETTE HORBACH, M.D., do hereby

4    acknowledge that I have read and examined the

5    foregoing testimony and that the same is a true,

6    correct and complete transcription of the

7    testimony given by me, with the exception of the

8    noted corrections, if any, appearing on the

9    attached errata page.

10

11    _____  _____

12    DATE            NICOLETTE HORBACH, M.D.

13

14

15

16    Subscribed and sworn to before me this _____ day

17    of _____, 20_____.

18    _____ (Notary Public)

19    My Commission expires: _____

20

21

22

23

24

Nicolette S. Horbach, M.D.

```
1                    - - - - - -

                  E R R A T A

2                    - - - - - -

3     PAGE   LINE   CHANGE

4     _____  _____  _____

5       REASON:     _____

6     _____  _____  _____

7       REASON:     _____

8     _____  _____  _____

9       REASON:     _____

10    _____  _____  _____

11      REASON:     _____

12    _____  _____  _____

13      REASON:     _____

14    _____  _____  _____

15      REASON:     _____

16    _____  _____  _____

17      REASON:     _____

18    _____  _____  _____

19      REASON:     _____

20    _____  _____  _____

21      REASON:     _____

22    _____  _____  _____

23      REASON:     _____

24    _____  _____  _____
```

Nicolette S. Horbach, M.D.

1              C E R T I F I C A T E

2

3          I, LINDA S. KINKADE, Registered

4    Diplomate Reporter, Certified Realtime Reporter,

5    Registered Merit Reporter, Certified Shorthand

6    Reporter, and Notary Public, do hereby certify

7    that prior to the commencement of examination the

8    deponent herein was duly sworn by me to testify

9    truthfully under penalty of perjury.

10         I FURTHER CERTIFY that the foregoing is a

11   true and accurate transcript of the proceedings

12   as reported by me stenographically to the best of

13   my ability.

14         I FURTHER CERTIFY that I am neither

15   counsel for nor related to nor employed by any of

16   the parties to this case and have no interest,

17   financial or otherwise, in its outcome.

18         IN WITNESS WHEREOF, I have hereunto set my

19   hand and affixed my notarial seal this 27th day

20   of August 2013.

21         My commission expires:  July 31, 2017

22   _____

23   NOTARY PUBLIC IN AND FOR

24   THE DISTRICT OF COLUMBIA

Nicolette S. Horbach, M.D.

1                    C E R T I F I C A T E

2

3           I, LINDA S. KINKADE, Registered

4    Diplomate Reporter, Certified Realtime Reporter,

5    Registered Merit Reporter, Certified Shorthand

6    Reporter, and Notary Public, do hereby certify

7    that prior to the commencement of examination the

8    deponent herein was duly sworn by me to testify

9    truthfully under penalty of perjury.

10          I FURTHER CERTIFY that the foregoing is a

11   true and accurate transcript of the proceedings

12   as reported by me stenographically to the best of

13   my ability.

14          I FURTHER CERTIFY that I am neither

15   counsel for nor related to nor employed by any of

16   the parties to this case and have no interest,

17   financial or otherwise, in its outcome.

18          IN WITNESS WHEREOF, I have hereunto set my

19   hand and affixed my notarial seal this 27th day

20   of August 2013.

21          My commission expires:  July 31, 2017

22

23   _____

       NOTARY PUBLIC IN AND FOR

24     THE DISTRICT OF COLUMBIA