# EXHIBIT 3

Prof Dr. Med Uwe Klinge

```
 1           UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF WEST VIRGINIA
 2                    AT CHARLESTON
 3
    IN RE: ETHICON, INC,     ) MASTER FILE
 4  REPAIR SYSTEM PRODUCTS,  ) NO. 2:12-MD-02327
    LIABILITY LITIGATION     )
 5                           ) MDL NO. 2327
    _____)
 6                           ) JOSEPH R. GOODWIN
    THIS DOCUMENT RELATES TO ) US DISTRICT JUDGE
 7  CAROLYN LEWIS, ET AL. V. )
    ETHICON, INC.            )
 8  CASE NO. 2:12-CV-04301   )
 9
              THURSDAY, NOVEMBER 14, 2013
10
                         - - -
11
12          Deposition of Prof. Dr. Med.
13  Uwe Klinge, Volume I, held at the Quellenhoff
14  Hotel, Monheimsallee 52, 52062 Aachen, Germany,
15  commencing at 9:01 a.m., on the above date,
16  before Carrie A. Campbell, Registered
17  Professional Reporter, Certified Realtime
18  Reporter, Certified Shorthand Reporter,
19  and Certified Court Reporter.
20                       - - -
             GOLKOW TECHNOLOGIES, INC.
21      877.370.3377 ph|917.591.5672 fax
                 deps@golkow.com
22
23
24
```

Page 94

1  Q. Okay.
2  A. But this is the --
3  Q. Does the next section --
4  A. Compensation is €120,000 and
5  then for five years, we got royalties. So
6  this is the right of 1.5 percent.
7  Q. 1.5 percent of what?
8  A. Of the internal -- the internal
9  costs, not without the -- so the value of the
10 meshes they sold in this time period.
11 Q. Okay. For all meshes?
12 A. It is not specified here. It
13 is not specified. So later on, I know that
14 it -- that they took the VYPRO, but they took
15 as well VYPRO II and ULTRAPRO™.
16 Q. Okay. So you --
17 A. It is not limited to VYPRO.
18 Q. So you had VYPRO I, VYPRO II
19 and ULTRAPRO™ for which you were paid
20 royalties?
21 A. Yes.
22 Q. Okay.
23 A. So this was what I learned from
24 the letters I got from Ethicon.

Page 95

1  Q. Okay. Is that pretty much the
2  substance of this contract?
3      Is there anything else of
4  significance to you in the contract?
5  A. Yeah, I think that is -- and
6  I'm not -- I'm not allowed to talk to anyone
7  else about this agreement. So -- but I was
8  told that Ethicon asked for this agreement
9  and, therefore, I provided it, but otherwise,
10 I would -- I don't hope that I will get in
11 conflict by someone else because I open it to
12 a third --
13 Q. You won't. We arranged that.
14 A. Okay. Please --
15 Q. She takes down every word, and
16 she's very good.
17 A. That is so fine.
18 Q. Now, I understand from your
19 last deposition, I don't want to replow this
20 ground, but sometime in 2005, there was a
21 discussion about negotiating a new contract?
22 A. Yes.
23 Q. Did you produce any draft
24 contracts to me --

Page 96

1  A. Yes. There is a draft.
2  Q. Maybe this is it.
3      (Klinge Exhibit 6 marked for
4  identification.)
5  QUESTIONS BY MR. THOMAS:
6  Q. Let me show you what I've
7  marked as Deposition Exhibit Number 6.
8      What is Deposition Exhibit
9  Number 6?
10 A. This is a -- so after the
11 first -- after this contract stopped in 2005,
12 then we had some discussions how to continue
13 our collaboration, our work, and this was
14 provided in 2009. It was a draft of a
15 possible contract consulting agreement, how
16 to make the further collaboration.
17 Q. Now, last time we were
18 together, you testified that the reason why
19 you weren't interested in the contract was
20 because Ethicon would not allow you to work
21 with other manufacturers, that's what I
22 recall.
23     Is that right?
24 A. That is -- that is one aspect

Page 97

1  of this.
2  Q. Okay.
3  A. There are several arguments and
4  there are always some pros and some cons, but
5  overall, it is just consulting. It is some
6  money for some time period where you were
7  asked and this to the prize that you're not
8  allowed to do any other work there.
9  Q. Okay.
10 A. And I'm not interested in being
11 a tester for devices or a consulter, just
12 being consulting. I wanted to work on it.
13     This would mean when I sign
14 this, I may earn some money for some
15 consulting activities, but I'm limited in my
16 scientific work. And there's no option to
17 work scientifically in some projects. That
18 was not included in this and that is my major
19 criticism to this.
20 Q. Exhibit 6 was a document that
21 you produced to us.
22     Is that the only draft that you
23 were able to find?
24 A. I'm sure that in the documents

Page 334

1  limited as the other, yeah, you can
2  think about it, but it doesn't help.
3  QUESTIONS BY MR. THOMAS:
4    Q.  Okay. So if you were asked
5  today to find out the rate of complications
6  associated with the risk of the use of mesh
7  for the treatment of stress urinary
8  incontinence, you don't have anyplace to go,
9  is that what you're telling me?
10       MR. ANDERSON: Objection to
11    form.
12       Answer the question.
13       THE WITNESS: The only
14    situation I would think that is
15    relevant if you have a specific
16    patient and she's asking you what do
17    you think is the risk there.
18  QUESTIONS BY MR. THOMAS:
19    Q.  So --
20    A.  So then it depends whether it's
21  young, whether there's comorbidities and so
22  on. And then you can say within the first
23  weeks it is a very low risk. That is
24  probably an estimate that you can give.

Page 335

1    Q.  So if a doctor is treating a
2  woman who has stress urinary incontinence and
3  they're discussing about whether to use mesh
4  to treat the stress urinary incontinence,
5  where does the doctor go to understand the
6  nature of the risks associated with that
7  mesh?
8    A.  He has to go to his own
9  experience. So whether -- if he made a
10  follow-up investigation of this patient and
11  that is something that has to be required
12  more and more, you need some backup from the
13  surgical communities, you have to re -- or
14  you have to underline the importance of
15  follow-up investigations so that you have
16  your own experience. You have to go to the
17  literature, you have to go -- you take the
18  information of the companies and that is what
19  you can provide to the patient. And you have
20  to think about the long-term -- possible
21  long-term complications and that, yeah -- and
22  you have to address some specific risks of
23  the patient, that is the discussion about the
24  possible disadvantages and advantages in a

Page 336

1  specific situation.
2       MR. THOMAS: Let's stop for the
3    day.
4       MR. ANDERSON: Okay.
5       MR. THOMAS: Thank you, Doctor.
6   (Off the record at 5:57 p.m.)
7       - - - - - - -

Page 337

1            CERTIFICATE
2
3       I, CARRIE A. CAMPBELL, Registered
Professional Reporter, Certified Realtime
4  Reporter and Certified Court Reporter, do
hereby certify that prior to the commencement
5  of the examination, Uwe Klinge was duly sworn
by me to testify to the truth, the whole
6  truth and nothing but the truth.
7       I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
ability.
10
      I DO FURTHER CERTIFY that I am
11  neither a relative nor employee nor attorney
nor counsel of any of the parties to this
12  action, and that I am neither a relative nor
employee of such attorney or counsel, and
13  that I am not financially interested in the
action.
14
15
      _____
17  CARRIE A. CAMPBELL,
   NCRA Registered Professional Reporter
18  Certified Realtime Reporter
   Missouri Certified Court Reporter #859
19  Illinois Certified Shorthand Reporter
   #084-004229
20  Notary Public
21  Dated: November 26, 2013
22
23
24