## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

IN RE:  ETHICON, INC. PELVIC
REPAIR SYSTEM PRODUCTS LIABILITY
LITIGATION

MDL No. 2327

_____

THIS DOCUMENT RELATES TO
THE FOLLOWING CASES:

| | |
|---|---|
| Daphne Barker, et al. | 2:12-cv-00899 |
| Kathy Barton | 2:12-cv-00351 |
| Barbara Bridges | 2:12-cv-00757 |
| Carolyn Doyle | 2:12-cv-00555 |
| Ann Fuller | 2:12-cv-00539 |
| Amelia Gonzales | 2:12-cv-00468 |
| Amy Holland | 2:12-cv-00256 |
| Mary Kilday | 2:12-cv-00387 |
| Kimberly Lager | 2:12-cv-01305 |
| Patti Ann Phelps, et al. | 2:12-cv-01171 |
| Rhoda Schachtman | 2:12-cv-00548 |
| Deanna Thomas | 2:12-cv-00601 |
| Lisa Thompson, et al. | 2:12-cv-01199 |
| Jennifer Van Rensburg | 2:12-cv-00749 |
| Mary Wise | 2:12-cv-00571 |

## PLAINTIFFS' RESPONSE AND OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE GENERAL CAUSATION TESTIMONY OF KIMBERLY H. ALLISON, M.D.

Plaintiffs respectfully submit this Response in Opposition to Ethicon, Inc. and Johnson & Johnson's ("Ethicon") Motion to Exclude the General Causation Testimony of Kimberly H. Allison, M.D., requesting that the Court deny Ethicon's motion in its entirety.

Ethicon has filed this motion in relation to ALL Wave 1 cases.  Dr. Allison is not a general causation expert.  Dr. Allison has been disclosed as a case-specific expert in only the

fifteen cases listed above.[1]  Dr. Allison does not hold opinions in relation to other cases in Wave 1 nor will she be offering testimony in other cases in Wave 1.  For this reason and for the reasons outlined below, the motion should be denied.

## LEGAL STANDARDS

Plaintiffs will not repeat the applicable standards relating to the admission of expert testimony as this Court is well-versed in those standards.  For the purposes of this opposition, as this Court has recognized "[t]he proponent of expert testimony does not have the burden to 'prove" anything' but must '""come forward with evidence from which the court can determine that the proffered testimony is properly admissible.'"[2]  Additionally, as this Court has noted that it "need not determine that the proffered expert testimony is irrefutable or certainly correct"— "[a]s with all other admissible evidence, expert testimony is subject to testing by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'"[3]

## ARGUMENT

**I.      Dr. Allison Should Be Allowed to Testify to the General Principles That Form the Basis of Her Opinions**

Ethicon argues that Dr. Allison should not be allowed to testify to the first portion of her report which is entitled, "general opinions" Plaintiffs improperly limited the scope of inquiry during Dr. Allison's deposition.  This is simply not the case.

---

[1] *See* Ex. A at p.1 (Rule 26 Expert Report of Kimberly H. Allison, M.D.)  Dr. Allison was initially disclosed as an expert in Deborah Joplin v. Ethicon, Inc. (2:12-cv-00787) and Maria Eugenia Quijano v. Ethicon, Inc. (2:12-cv-00799) as well, but her opinions in these cases were withdrawn.
[2] *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 601 (S.D.W.Va. 2013) (quoting *Maryland Cas. Co. v. Therm–O–Disc, Inc.*, 137 F.3d 780, 783 (4th Cir.1998)).
[3] *In re C.R. Bard*, 948 F. Supp. 2d at 601 (quoting *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006)); *see also Maryland Cas. Co.*, 137 F.3d at 783.

The "general" section of Dr. Allison's report[4] is outlines the scientific and medical basis for Dr. Allison's case specific opinions with specific citations to the medical and scientific literature. Dr. Allison explains how based on the "medical and scientific literature and review of the pathology of explanted vaginal meshes, there is evidence that the use of vaginal mesh composed of polypropylene fibers can result in adverse medical outcomes such as chronic pain (including surreptitious irreversible neuralgia or SIN syndrome), dyspareunia, mesh erosion, urinary dysfunction, infection and bowel dysfunction."[5] Ethicon's motion essentially seeks to prevent Dr. Allison from testifying the literature she relies on in rendering her case-specific opinions. Ethicon's motion flies in the face of the *Daubert* standard.

Ethicon's attack on Dr. Allison has some similarity to the motion filed in relation to Dr. John Steege in *Huskey v. Ethicon, Inc.* where Ethicon sought to prevent Dr. Steege from testifying to the bases of his case-specific opinions, namely, degradation, shrinkage, chronic inflammation, etc.[6] The Court rejected Ethicon's motion and ruled that Dr. Steege could testify to the etiology of mesh-related pain, including chronic inflammation, shrinkage, direct trauma to nerves, nerve entrapment, mesh-related neuropathy, and alternation of the function of surrounding organs as mechanisms of mesh-related pelvic pain.

Dr. Allison's opinions are the product of her review of the pathology, the individual plaintiff's medical record, her experience, training, and education, and an application of the general principles of mesh-related complications outlined in her report.[7] That is all that *Daubert* requires.

Secondly, Ethicon argues that Plaintiffs improperly limited the scope of inquiry into Dr.

---

[4] Ex. A at p.3-4.
[5] *Id.* at 3.
[6] *Huskey v. Ethicon, Inc.*, 2014 WL 3362264 at * 14-18.
[7] Ex. A at 5.

Allison's general opinions by limiting the duration of the deposition to two hours. The Co-Lead Counsel of the Ethicon MDL entered into an agreement with Ethicon counsel to limit the depositions of case-specific experts to two hours. Dr. Allison is not a general expert, but a case-specific expert. Dr. Allison has not been proffered in the litigation to opine about the etiology of complications for any plaintiffs other than those listed above.

Any suggestion that Ethicon counsel was prevented from asking Dr. Allison about the general principles in her report is simply not true.[8] Moreover, Ethicon's argument that it was not provided sufficient time to explore the general principles outlined in Dr. Allison's report is not supported by the facts. Ethicon had more than sufficient time to examine her about the general principles in her report and her application of those principles to individual cases. Ethicon counsel spent most of the time, however, having Dr. Allison read the reports of her Stanford colleagues, Dr. Longacre and Dr. Vogel line-by-line to have her comment on the opinions with which she had disagreement.[9] Dr. Allison was not asked one question about the general sections of her report.

## II.     Dr. Allison Is Qualified to Testify to Case-Specific Opinions

Plaintiffs seek to have Dr. Allison offer case-specific opinions in relation to fifteen women, making clinical correlations between their surgically removed mesh viewed under the microscope and their symptoms which is precisely the process Dr. Allison undertakes on a daily basis in her clinical practice.[10]

Kimberly H. Allison, M.D. is an experienced, practicing, anatomical pathologist;

---

[8] Ex. B at 22:15-23:2 (Thompson)

[9] Ethicon counsel's conduct in the depositions of Dr. Allison consisted in large measure of attempting to intimidate Dr. Allison because her opinions diverge with members of the Stanford faculty who have seniority. *See* Ex. B at 23:4-13:25-16.

[10] Ex. C (a spreadsheet outlining Dr. Allison's specific findings for each plaintiff per slide which was attached to Dr. Allison's Rule 26 Report as Exhibit C).

board certified in Anatomic and Clinical Pathology; a Fellow with the College of American Pathologists; and Associate Professor of Pathology at Stanford University Medical Center.[11] Dr. Allison has specialty training in breast and gynecologic pathology.[12]  Dr. Allison co-directs the breast and gynecology pathology fellowship at Stanford.[13]  Dr. Allison has published more than 50 peer-reviewed research articles on pathology.

Defendant challenges Dr. Allison's qualifications stating that she is a clinical pathologist who does not review gynecologic pathology in her role at Stanford.  Ethicon's challenge of her qualifications is unfounded and ignores the facts.  Dr. Allison's education, training and experience more than qualify her to opine on the biocompatibility of polypropylene, tissue response to foreign bodies and to perform diagnostic examinations of specimens surgically removed from humans.[14] Moreover, though Dr. Allison's focus on a daily basis is primarily breast pathology, she was hired at Stanford to fill a position as a gynecology pathologist and regularly reviews gynecology pathology.[15]

Ethicon argues that Dr. Allison is not qualified to testify regarding chronic inflammation and degradation of polypropylene histologically because she has not rendered such an opinion outside of litigation.  Dr. Allison is a board-certified gynecological anatomical and surgical pathologist.  Dr. Allison routinely as a part of her clinical practice examines explanted breast implants and other medical devices in her clinical practice to determine the foreign body response to those devices.[16]  The findings of chronic inflammation and nerve entrapment are

---

[11] Ex. D (Dr. Allison's Curriculum Vitae).  Among other responsibilities, Dr. Allison is responsible for the training of pathology residents.  Ex. E at 62:19-64:13 (Phelps).
[12] Ex. A (Rule 26 Expert Report of Kimberly H. Allison, M.D.); Ex. B at 13:17 - 19.
[13] Ex. B at 56:5-12.  Dr. Allison directed the breast and gynecology pathology fellowship at the University of Washington School of Medicine.  Id. at 59:4-5.
[14] Id.
[15] Ex. B at 23:3-24:3.
[16] Ex. A at p.2.

findings that are a part of her daily practice and are a part of the core disciplines of surgical pathology.  Dr. Allison has reviewed between 80 to 100 mesh explants.[17]

In the Court's recent ruling in *Wise*, the Court found that Bard's expert Dr. Austin was qualified to render opinions about the biocompatibility of polypropylene.  The Court found that Dr. Austin was qualified:

> [I]in light of Dr. Austin's demonstrated knowledge, training, and experience as a gynecological surgical pathologist. See, e.g., Coll. of Am. Pathologists, CAP Fact Sheet, http://www.cap.org (last visited Feb. 9, 2015) ("[Clinical pathologists] are involved in a broad range of disciplines, including surgical pathology, cytopathology, dermatopathology, . . . clinical chemistry, microbiology, immunopathology, and hematology."). In addition to his extensive background in the field of gynecological pathology, where his experience ranges from publishing research to giving academic lectures, Dr. Austin has examined hundreds of vaginal mesh explants over the past ten years.

*Wise v. C.R. Bard, Inc*., No. 2:12-cv-01378, Order of Feb. 11, 2015 (S.D. W.Va.).  Similarly, Dr. Allison has demonstrated knowledge, training and experience as a gynecological surgical pathologist.  Dr. Allison has published research in gynecological pathology.[18]  Dr. Allison also regularly lectures regarding breast and gynecological pathology.[19]  Dr. Allison has reviewed between 80 and 100 explanted vaginal mesh specimens, 10-20 from her clinical practice at the University of Washington prior to her transition to Stanford.[20]

The Court's *Daubert* analysis of Plaintiffs' expert Dr. Trepeta in *Sanchez v. Boston Scientific Corp.*[21] is helpful here.  Dr. Trepeta, like Dr. Allison, is a board-certified pathologist. Like Dr. Allison, Dr. Trepeta is a Fellow of the College of American Pathologists.  Boston Scientific argued that Dr. Trepeta was not qualified to opine on the properties of polypropylene mesh or the clinical responses to mesh implant and that his opinions were unreliable.  In *Sanchez*

---

[17] Ex. B at 37:4-7.
[18] Ex. D at 4-9 (citing approximately 50 original peer-reviewed published manuscripts).
[19] Ex. D at 10-17; Ex. B at 37:11-38:13.
[20] Ex. B at 37:11-38:13.
[21] No. 2:12-cv-05762, Order of Sept. 29, 2014, at 32-42 (S.D. W. Va.).

(and as adopted in *Tyree)*, the Court disagreed:

> In making [its] argument, however, BSC downplays Dr. Trepeta's knowledge, training, and experience as a clinical pathologist. In general, a clinical pathologist "will be knowledgeable in the areas of chemistry, hematology, microbiology, . . . serology, immunology, and other special laboratory studies." 33 Am. Jur. *Trials* § 17 (1986); *see also* Coll. of Am. Pathologists, *CAP Fact Sheet*, http://www.cap.org (last visited Sept. 22, 2014) ("[Clinical pathologists] are involved in a broad range of disciplines, including surgical pathology, cytopathology, . . . clinical chemistry, microbiology, immunopathology, and hematology."). Dr. Trepeta's thirty years' experience as a clinical pathologist therefore demonstrates sufficient knowledge to provide expert testimony about the chemistry and surgical pathology of materials like transvaginal mesh. Moreover, Dr. Trepeta has knowledge of and experience with pelvic mesh explants in particular, having examined fifty explant samples over the past five years. (See Trepeta General Report [Docket 86-1], at 2). According to Dr. Trepeta, by examining the mesh explants under a microscope, he has witnessed the polypropylene's chemical changes. (See Trepeta Dep. [Docket 110-3], at 217:14–19). Given Dr. Trepeta's knowledge and experience as an anatomical and clinical pathologist, I FIND that he is qualified to testify about mesh degradation, mesh shrinkage, and mesh migration, and I therefore DENY BSC's motion in this respect.[22]

Dr. Allison is similarly qualified and should be allowed to offer testimony concerning mesh degradation, chronic inflammation and mesh shrinkage. The Court has consistently held that pathologists (both plaintiffs and defense) are qualified and may testify regarding the degradation and shrinkage of polypropylene. Plaintiffs urge the Court to make the same ruling in regard to Dr. Allison.

### III.    Dr. Allison's Opinions As to Her Review of Explanted Mesh Are Case-Specific

Ethicon argues that Dr. Allison review of explanted mesh from litigation is an insufficient sample upon which to base general opinions. Dr. Allison only offers opinions as to the specific plaintiffs. Dr. Allison is not proffered as a general expert offering opinions as to all Wave cases.

---

[22] *Id.*

Dr. Allison's case-specific opinions are grounded on her review of the relevant medical records, pathology, and relevant scientific and medical literature.  Since the inception of the transvaginal mesh litigation, in ruling on motions filed by multiple defendants challenging the admissibility of the opinions of Dr. Iakovlev and other case-specific pathologists, this Court has consistently determined that where, as here, Dr. Allison has conducted an examination of an individual plaintiff's explanted mesh, specific causation opinions are reliably based, and admissible.[23]  This Court should reach the same conclusion here.

## IV.    Dr. Allison's Opinions Regarding Degradation Are Relevant and Reliable

Ethicon argues that Dr. Allison's opinions regarding degradation are unreliable because they are based solely on publications by Dr. Iakovlev.  This is not the case.

Dr. Allison did not rely solely on Dr. Iakovlev's work to appreciate and identify degradation histologically.  Dr. Allison testified to numerous publications from other authors in the peer-review literature that discuss pathology, histology, degradation, and tissue reaction – Klosterhalfen and Iakovlev among them.[24]

As noted above, Dr. Allison experience as a clinical pathologist therefore demonstrates sufficient knowledge to provide expert testimony about the chemistry and surgical pathology of materials like transvaginal mesh.  Dr. Allison's opinion regarding degradation is based on her review of the scientific and medical literature.[25]  Moreover, Dr. Allison bases her opinions in the

---

[23] *Edwards v. Ethicon, Inc.*, 2014 U.S. Dist. LEXIS 92316 *60 (S.D. W. Va. July 8, 2014); *Eghnayem v. Boston Scientific Corp.*, 2014 U.S. Dist. LEXIS 152457 *111 (S.D. W. Va. Oct. 27, 2014); *Bellew v. Ethicon, Inc*., No. 2:13-cv-22473, Order of Nov. 11, 2014 (S.D. W. Va) (citing the Court's order in *Edwards*).  *Mathison v. Boston Scientific Corp.*, 2015 WL 2124991 *26-27 (S.D. W. Va. May 6, 2015); *Trevino v. Boston Scientific Corp.*, 2016 WL 1718836 *31 (S.D. W. Va. Apr. 28, 2016).
[24] Ex. 3 at 96:25-97:24.
[25] Ex. F (Materials Reviewed – Ex. B of Dr. Allison's report) (Bendavid R, Lou W, Koch A, Iakovlev V. *Mesh-Related SIN Syndrome. A Surreptitious Irreversible Neuralgia and Its Morphologic Background in the Etiology of Post-Herniorrhaphy Pain.* Int J of Clinical Medicine, 2014; 5:799-810.; Clavé A, Yahi H, Hammou JC, *et al. Polypropylene as a reinforcement in pelvic surgery is not inert: comparative analysis*

specific cases on a finding under the microscope of degradation for each specific plaintiff.[26]  Dr.

Allison testified:[27]

> Q.     And the people who have talked about this, or written about it in the literature, are Dr. Iakovlev and some of the other plaintiffs' experts?
>
> A.     Dr. Iakovlev has –
>
>          ****
>
> A.     There are not many pathologists that have published about this in the literature, and he is one of them.
>
> Q.     Anyone else you can think of?
>
>          * * *
>
> A.     Klosterhalfen did some, but Iakovlev's work has been probably the most detailed in terms of what I can correlate with under the microscope.
>
> Q.     Is it fair to say that it's his theories on degradation upon which you rely for your specific case opinions?
>
>          * * *
>
> THE WITNESS:  It's not his theories, per se, but the evidence he presents for the tree barking effect that I can see under the microscope.

The Court has consistently held that pathologists (both plaintiffs and defense) are

qualified and may testify regarding the degradation and shrinkage of polypropylene.[28]     In

*Sanchez* (and as adopted in *Tyree),* the Court disagreed with Boston Scientific's challenge to Dr.

---

of 100 explants. Int Urogynecol J, 2010; 21:261-270.; Costello CR, Bachman, SL, Ramshaw, BJ, *et al. Materials Characterization of Explanted Polypropylene Hernia Meshes.* J Biomed Mater Res B Appl Biomater, 2007; Oct; 83(1):44-49. Iakovlev VV, Carey ET, Steege J. *Pathology of Explanted Transvaginal Meshes.* Int J Med, Health, Pharm & Biomed Eng, 2014; 8(9):510-513.; Klinge U, Park JK, Klosterhalfen B. *'The Ideal Mesh?'* Pathobiolog, 2013; 80:169-175.; Klosterhalfen B, Klinge U, Rosch R, Junge K. *Long-term Inertness of Meshes.* V Mesh Biology, 2004; 16:170-78.; Ostergard DR. *Polypropylene Vaginal Mesh Grafts in Gynecology.* Obstetrics & Gynecology, 2010;116(4):962-966.; Ostergard DR. *Degradation, infection and heat effects on polypropylene mesh for pelvic implantation: what was known and when it was known.* Int Urogynecol J, 2011; 22:771-774.; Riccetto C, Miyaoka R, de Fraga R, *et al. Impact of the structure of polypropylene meshes in local tissue reaction: in vivo stereological study.* Int Urogynecol J, 2008; 19:1117-1123.; Sternschuss G, Ostergard DR, Patel H. Post-*Implantation Alterations of Polypropylene in the Human,* J of Urology;188:27-32.)
[26] Ex. C; See e.g. E at 53:20-54:4 (Phelps);
[27] Ex. B at 46:4-47:3 (Thompson).
[28] *Sanchez v. Boston Scientific Corp.*, 2014 WL 4851989, at *20 (S.D. W. Va. Sept. 29, 2014).

Trepeta's testimony regarding mesh degradation:

> Given Dr. Trepeta's knowledge and experience as an anatomical and clinical pathologist, I FIND that he is qualified to testify about mesh degradation, mesh shrinkage, and mesh migration, and I therefore DENY BSC's motion in this respect.[29]

In regarding to Dr. Iakovlev, the Court has consistently allowed him to testify to a case-specific opinion of degradation. Dr. Allison is similarly qualified and should be allowed to offer testimony concerning mesh degradation.

Ethicon also argues that Dr. Allison should not be allowed to offer the opinion that degradation, fibrosis and inflammation she observed in mesh explants causes certain clinical outcomes.[30] In *Eghnayem*, this Court rejected a similar attack on Dr. Iakovlev's qualifications to testify the a mesh device "caused foreign body type reaction, chronic inflammation, degradation of the mesh, bridging fibrosis, scarring with scar plate formation, nerve entrapment, smooth muscle damage and vascular abnormalities, . . ."[31] The defendant argued that Dr. Iakovlev was not qualified to render a clinical opinion.[32] This Court rejected the first argument and found that "I have allowed numerous pathologists to testify regarding the properties of polypropylene mesh."[33] The Court should do the same in regard to Dr. Allison.

## V. Dr. Allison's Opinions Regarding Degradation Are Based on Sound Methodology

Ethicon argues that Dr. Allison's opinions regarding degradation are unreliable because she fails to consider the use of zylene in the processing of tissue slides. Ethicon suggests that Dr. Allison does not dispute the statement in Dr. Longacre's report that the processing of mesh

---

[29] *Id.*

[30] Doc. 1991 at p.9.

[31] *Eghnayem*, 2014 WL 5461991 at *46.

[32] *Id.*

[33] *Id.* (citing *Sanchez*, 2014 WL 4851989, at *19–20 (discussing Dr. Richard W. Trepeta); *In re C.R. Bard, Inc.*, 948 F.Supp.2d 589, 621 (S.D.W.Va.2013) (discussing Dr. Bernd Klosterhalfen).

explant material and the use of solvents such as zylene are responsible for the treebarking effect that Dr. Allison opines is degradation.  Nothing could be farther from the truth.

Dr. Allison testified that she did consider whether the processing of tissue slides affects the polypropylene mesh fibers.[34]  Dr. Allison testified that the best study to evaluate this was Dr. Iakovlev's 2015 publication, "Degradation of polypropylene in vivo: A microscopic analysis of meshes explanted from patients."[35]  Dr. Allison testified that there is not contrary literature examining the question.[36]

Dr. Allison's took into consideration the role processing may have in relation to her opinion that polypropylene mesh degrades, but ruled it out based on reliable scientific data.  Her methodology, therefore, was sound, and Ethicon's motion is due to be denied.

## VI.     Dr. Allison's Opinion That Nerve Entrapment Causes Pain Is Relevant and Reliable

Ethicon argues that Dr. Allison's opinions regarding nerve entrapment are not reliable because she does not identify whether a nerve is a sensory versus motor nerve.  In doing so, Ethicon quotes at length the testimony of its expert, Dr. Vogel.  In essence, Ethicon argues that some nerves cause pain but just not these pelvic nerves. It is irrefutable that our bodies sense pain from nerves; that transvaginal mesh causes pain in a significant number of women; and that surgeons who remove mesh due to focal pelvic pain remove mesh that often contains the very nerves that were causing the pain.

Dr. Allison bases her opinion that the entrapment of nerves in fibrosis and tissue in growth in and around mesh is a mechanism for chronic pain and dyspareunia.[37]  Dr. Allison

---

[34] Ex. G, 49:24-52:20 (Barker).
[35] Iakovlev, VV, et al. Degradation of polypropylene in vivo: A microscopic analysis of meshes explanted from patients. J Biomed Mater Res Part B 2015:00B:000–000 (Ex. H)
[36] Ex. G, 49:24-52:20 (Barker).

11

supports this opinion with medical and scientific literature. Moreover, Dr. Allison only opines that mesh is the cause of pain in cases where she has reviewed pathology and found histological evidence of a nerve entrapment in women whose clinical presentation included pain. This methodology is sound and has been approved by the Court numerous times.

In *Edwards*, this Court rejected Defendants' challenges to Dr. Iakovlev's opinions relating to the cause of the Ms. Edwards' pain and dyspareunia. Defendants argued that Dr. Iakovlev did "not offer a scientific basis for connecting what he sees in a microscope with pain."[38] The Court noted that Dr. Iakovlev identified areas where nerves grew into the pores of the mesh and explained how this process could cause pain. The Court rejected Defendants' challenge to Dr. Iakovlev's pain opinions.[39] The Court also rejected similar challenges to Dr. Iakovlev's opinions concerning ischemia and edema causing pain.[40]

## VII. Dr. Allison's Case-Specific Opinions Are Based on Sound Methodology and Are Reliable

As note earlier, Dr. Allison is not a general causation expert. She offers only case-specific opinions, and those opinions are offered in the specific cases listed in the style of this motion based on the general principles outlined in her report, the medical and scientific literature, her review of the pathology, and relevant medical records.

Therefore, Ethicon's argument the she is precluded from offering specific causation testimony because her "general" causation opinions are unreliable is ridiculous. Dr. Allison is not a general causation expert. But even in other situations where experts were disclosed as general causation experts, the Court has stated that the admissibility of general causation opinion

---

[37] Ex. A at 3-4.
[38] *Edwards*, 2014 WL 3361923 at *25.
[39] *Id.*
[40] *Id.* at * 26.

is an inquiry separate and apart from the admissibility of a case-specific opinion.[41]

## **CONCLUSION**

Ethicon has filed this motion in relation to ALL Wave 1 cases.  Dr. Allison is not a general causation expert.  Dr. Allison has been disclosed as a case-specific expert in only the fifteen cases listed above.  Dr. Allison does not hold opinions in relation to other cases in Wave 1 nor will she be offering testimony in other cases in Wave 1.

Dr. Allison is a highly qualified pathologist with extensive experience in examining pathological specimens of mesh patients and the pathological correlation between mesh and complications.  Her case-specific opinions are reliable and relevant.

For the reasons outlined above, Ethicon's the motion is due to be denied.

This 9th day of May, 2016.

<div style="margin-left:40%">

By: /s/ P. Leigh O'Dell
ANDY D. BIRCHFIED, JR.
P. LEIGH O'DELL
WESLEY CHADWICK COOK
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C
218 Commerce Street
Montgomery, Alabama 36104
334-269-2343
andy.birchfield@beasleyallen.com
leigh.odell@beasleyallen.com
chad.cook@beasleyallen.com

</div>

---

[41] *Eghnayem v. Boston Scientific Corp.*, 57 F.Supp.3d 658, 711 (S.D.W.Va. 2014).

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.


/s/ P. Leigh O'Dell_____
**Attorney for Plaintiffs**