# EXHIBIT B

Kimberly H. Allison, M.D.

```
 1            IN THE UNITED STATES DISTRICT COURT

 2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                  CHARLESTON DIVISION

 4   IN RE:  ETHICON, INC., PELVIC    ) MASTER FILE NO.
     REPAIR SYSTEM PRODUCTS           ) 2:12-MD-02327
 5   LIABILITY LITIGATION             ) MDL NO. 2327
                                      )
 6   THIS DOCUMENT RELATES TO THE     )
     FOLLOWING CASES IN THE WAVE 1    )
 7   OF MDL 200:                      )
     LISA THOMPSON, et al.,           ) CASE NO.
 8                                    ) 2:12-cv-01199
                  Plaintiff,          )
 9                                    )
     V.                               )
10                                    )
     ETHICON, INC., ET AL.,           )
11                  Defendants.       )
12        DEPOSITION OF KIMBERLY H. ALLISON, M.D.
13
14   DATE:              THURSDAY, MARCH 17, 2016
15   TIME:              12:58 P.M.
16   LOCATION:          STANFORD PARK HOTEL
17                      100 El Camino Real
18                      Menlo Park, California
19
20
21   Reported by:
22   LUCY CARRILLO-GRUBBS, RMR, CRR, RPR, CRP, CSR
     License No. 6766
23
24
25
```

Page 2

A P P E A R A N C E S
1
2  FOR PLAINTIFF:
3    P. LEIGH O'DELL, ESQUIRE
     Law Offices of BEASLEY ALLEN CROW METHVIN PORTIS
4    & Miles, P.C.
     218 Commerce Street
5    Montgomery, AL  36103
     Tel: 334.269.2343
6    Fax: 334.954.7555
     Email:  Leigh.Odell@BeasleyAllen.com
7
8  FOR DEFENDANTS:

     S. PETER VOUDOURIS, ESQUIRE
9    Law Offices of TUCKER ELLIS, LLP
     950 Main Avenue, Suite 1100
10   Cleveland, Ohio  44113
     Tel: 216.592.5000
11   Fax: 216.592.5009
     Email:  peter.voudouris@tuckerellis.com
12
     TRACI L. SHAFROTH, ESQUIRE
13   Law Offices of TUCKER ELLIS, LLP
     One Market Plaza, Steuart Tower
14   Suite 700
     San Francisco, CA  94105
15   Tel: 415.617.2400
     Fax:415.617.2409
16   Email:  traci.shafroth@tuckerellis.com
17          -oOo-
18
19
20
21
22
23
24
25

Page 3

1          I N D E X
2  Examinations              Page
3  BY MR. VOUDOURIS                    4
4  BY MS. O'DELL                      79
5  FURTHER EXAMINATION BY MR. VOUDOURIS    84
6
7
8
9          E X H I B I T S
10 No.    Description         Page
11 1    Amended Notice of Deposition of    4
12      Kimberly H. Allison
13 2    Rule 26 Expert Report of Kimberly H.   4
14      Allison, M.D.
15 3    Curriculum Vitae            4
16 4    Facts or Data Considered in Forming   4
17      Opinions
18 5    Spreadsheet labeled Exhibit C     4
19 6    Expert report of Teri Longacre, M.D.   17
20 7    Expert report of Hannes Vogel, M.D.   54
21 8    Color photo              64
22 9    Document titled Final Tissue Report   77
23
24
25

Page 4

1  BE IT REMEMBERED THAT, pursuant to the laws

2  pertaining to the taking and use of depositions,

3  and on THURSDAY, MARCH 17, 2016, commencing at the

4  hour of 12:58 p.m. thereof, at the STANFORD PARK

5  HOTEL, 100 El Camino Real, Menlo Park, CA

6  California, before me, LUCY CARRILLO-GRUBBS, CRP,

7  RMR, CRR, RPR, CSR No. 6766, a Certified Shorthand

8  Reporter in and for the State of California,

9  personally appeared

10

11      KIMBERLY H. ALLISON, M.D.

12

13 being called as a witness by the Defendants, who,

14 having been by me first duly sworn, was thereupon

15 examined and interrogated as hereinafter set forth.

16          -oOo-

17    (Defendants' Exhibit No. 1, 2, 3, 4 and 5 were

18 marked for identification.)

19          -o-

20      EXAMINATION

21    BY MR. VOUDOURIS:

22    Q.  Can you state your full name for the

23 record, please?

24    A.  Kimberly Heller Allison.

25    MR. VOUDOURIS:  Before we start today, I just

Page 5

1  want to put something on the record.

2      As you know, Ms. O'Dell, it was our

3  position that since Dr. Allison has never given a

4  deposition in an Ethicon case or any kind of TVT

5  case, and does have a report that has a general

6  opinion section, that we believe that we are

7  entitled to a three-hour expert deposition on her

8  general opinions.

9      You have objected to that in two of the

10 e-mails, both to Mr. Snowden, I believe one was on

11 March 15th, and another one on March 16th, where

12 you said we will not make Dr. Allison available for

13 a general expert three-hour deposition.

14      Is that still your position today?

15    MS. O'DELL:  Yes, it is.  The agreement in the

16 MDL between counsel for Ethicon and the Plaintiffs'

17 Steering Committee has been that for experts who

18 have been disclosed as general causation experts,

19 that they are subject to a three-hour deposition on

20 their general opinions.

21      For experts who have not been disclosed as

22 a general causation expert but only as a case

23 specific expert, like Dr. Allison, the agreement of

24 the parties was limited to two hours per case.

25      So our position is, as you know, that

Kimberly H. Allison, M.D.

Page 6

1 Dr. Allison has not been disclosed as a general
2 causation expert.  She has only been disclosed as a
3 case specific expert; and, therefore, for her
4 deposition in the Thompson, Phelps and Barker
5 cases, the limitation is two hours per case.
6    MR. VOUDOURIS:  And you understand from
7 previous e-mails that that is not the defense's
8 opinion and we're going to file a motion on that
9 issue, just so you know.
10      Second part of housekeeping, prior to last
11 evening we were anticipating taking your deposition
12 in at least four case specific cases, maybe a
13 fifth, and we just were informed last night that
14 you would no longer be giving case specific
15 opinions in the Deborah Joplin case; is that
16 correct?
17    MS. O'DELL:  That is correct.
18    MR. VOUDOURIS:  Okay.
19    Q.  Do you understand, Dr. Allison, that to be
20 correct?
21    A.  Yes.
22    Q.  And you're also not going to be giving any
23 expert testimony in the Maria --
24    MS. O'DELL:  It's Quijano.
25    MR. VOUDOURIS:  Quijano.

Page 7

1    MS. O'DELL:  And as -- Dr. Allison will not be
2 giving case specific opinions in the Quijano case,
3 based on the decision of counsel.
4    I would say further --
5    MR. VOUDOURIS:  And I have copies of everything
6 if you want to see it.
7    Go ahead.
8    MS. O'DELL:  Further, Dr. Allison has been
9 disclosed not only in the Thompson, Phelps and
10 Barker matters, and -- and I'm counsel of record in
11 those matters, but she's also been disclosed as a
12 case specific expert in numerous cases that are
13 represented by Blazen, Game, Birch & Girard, and
14 those cases, as I understand, have been deferred to
15 another setting that's not yet been decided.
16    BY MR. VOUDOURIS:
17    Q.  Dr. Allison, I've handed you what we've
18 marked as Defendants' Exhibit C, can you identify
19 that for us?
20    A.  Yes.  This is the spreadsheet of my case
21 specific findings on the pathology and review of
22 records.
23    Q.  You created this spreadsheet?
24    A.  Yes.
25    Q.  And the purpose of creating this

Page 8

1 spreadsheet was to assist you in offering your case
2 specific opinions; is that correct?
3    A.  Yes.
4    Q.  And the Joplin case and the Quijano case,
5 based on Exhibit C, there was no mesh in those two
6 cases; is that correct?
7    A.  There was no mesh on a slide from their
8 cases, no.
9    Q.  Did you ever see any mesh in those two
10 cases?
11    A.  No.  I was only provided with some
12 available cervical tissue and things that were not
13 related.
14    Q.  And yet you issued case specific reports
15 in those two cases; is that correct, regarding the
16 TVT?
17    A.  Just based on medical record review, yes.
18    Q.  So I'm correct in that statement?
19    A.  Yes, just based on medical record review,
20 yes.
21    Q.  Is that something that you do at Stanford
22 when you're at work, give opinions on matters where
23 you don't have the pathology?
24    A.  Sometimes we do based on review of
25 pathology records, only in discussion at like a

Page 9

1 tumor board, if slides aren't available, say, does
2 this make sense, given the pathology that was
3 recorded.
4    Q.  Other than a tumor board, do you do that
5 as part of your daily practice at Stanford?
6    A.  In terms of writing a pathology report?
7    Q.  Right, without pathology slides.
8    A.  So actually we do.  So we sometimes give
9 second opinions on outside reviews, we do that a
10 lot.  So they come in with slides and a pathology
11 report and sometimes they don't send all of the
12 slides available on a case.  And so we say that
13 some of our opinions are based on report only.
14    Q.  Okay.
15      Maybe I wasn't clear enough in my
16 question, and I don't want to interrupt you.
17      By the way, we're going to be here for a
18 few hours today, let's not try and interrupt each
19 other, because it's tough for the court reporter,
20 okay?
21    A.  I understand.
22    Q.  All right.
23      I meant at Stanford, other than getting a
24 consult -- and actually the example you gave me is
25 someone did send you pathology slides.

Kimberly H. Allison, M.D.

Page 10

1 At Stanford when you're there working
2 every day and you're reading breast pathology, do
3 you ever issue a report without looking at the
4 histology?
5 A. No. Usually we receive some of the
6 histology.
7 Q. We're here to take your deposition in the
8 case involving an Ethicon product named TVT and the
9 TVT-O.
10 Have you ever been deposed in those types
11 of cases before?
12 A. No, I've not.
13 Q. When was the last time you were deposed in
14 I'll call it a mesh case?
15 A. Last year sometime, I don't recall the
16 exact date.
17 Q. All right.
18 2015?
19 A. I believe so.
20 Q. Do you remember what time of year?
21 A. I could check my records and tell you
22 that.
23 Q. Okay.
24 Will you do that for us?
25 A. Sure.

Page 11

1 Q. All right.
2 What was the product that you were
3 involved with in that deposition?
4 A. Bard slings.
5 Q. And have you -- you've given other
6 deposition testimony against Bard; is that correct?
7 A. Correct.
8 Q. How many times have you testified in cases
9 against Bard?
10 MS. O'DELL: Just to clarify, Peter, you're
11 talking about like a day-long deposition or are you
12 talking about the number of cases?
13 MR. VOUDOURIS: Well, we can break that down.
14 Q. How many depositions have you given in
15 cases against Bard?
16 MS. O'DELL: And I would just clarify the
17 record, those depositions were done in composite so
18 it was one deposition, it was multiple cases, so I
19 don't know -- your question's a little unclear.
20 THE WITNESS: Yeah.
21 So I think there have been two
22 depositions, different time points; is that
23 correct? And there were multiple patients,
24 multiple cases in each deposition.
25 BY MR. VOUDOURIS:

Page 12

1 Q. Do you remember how many cases or patients
2 those involved?
3 A. Ten to 15. I could -- again, I could look
4 at my records.
5 Q. All right.
6 And then you'll let us know?
7 A. Yes.
8 Q. Have you testified in court?
9 A. No.
10 Q. Do you have any plans to?
11 A. No.
12 Q. I'm sorry?
13 A. No.
14 Q. The three patients that we're going to be
15 talking about over the next two days, I just want
16 to make sure, have you seen any of those patients?
17 A. No.
18 Q. Treated them in any way?
19 A. No.
20 Q. Talked to any of their doctors?
21 A. No.
22 Q. Read any of the other expert reports in
23 those cases?
24 A. I think they've been made available to me,
25 but I may have read parts of some.

Page 13

1 Q. I'm sorry, you have to keep your voice up.
2 A. I may have read parts of some of them.
3 Q. In what case or cases?
4 A. I believe Barker.
5 Q. You read an expert report in Barker?
6 A. Yes.
7 Q. Do you know who it was authored by?
8 A. Felix.
9 Q. Do you know Dr. Felix?
10 A. No.
11 Q. Do you know him by reputation?
12 A. No.
13 Q. Do you know what type of pathologist he
14 is?
15 A. OB-GYN.
16 Q. Okay.
17 And would I be correct in saying that your
18 specialty in pathology is breast?
19 A. And GYN.
20 Q. And we'll talk about your experience with
21 GYN in a moment.
22 Any other reports?
23 A. I read the Longacre report that was -- I
24 don't believe it was case specific, maybe it was.
25 Q. Do you know Dr. Longacre?

Kimberly H. Allison, M.D.

Page 14

1   A. Yes.
2   Q. I imagine you do.
3      What is her position at Stanford?
4   A. She's a professor of pathology.
5   Q. And you are an associate professor?
6   A. Associate professor.
7   Q. So in terms of the hierarchy, she's higher
8   up on the totem pole, so to speak, than you?
9   A. Yes, she's been there a lot longer.
10  Q. Right.
11     What's her position at Stanford?
12  A. Professor of pathology.  She has many
13  positions, I mean, many other roles,
14  administrative-wise.
15  Q. Right.
16  A. So...
17  Q. Is she known as a GYN pathologist at
18  Stanford?
19  A. She is, and we codirect the breast and GYN
20  fellowship together.
21  Q. I'll talk about that in a minute.
22     Do you trust Dr. Longacre?
23  A. Yes.
24  Q. Do you believe she's a competent and
25  capable GYN pathologist?

Page 15

1   A. Yes.
2   Q. Would you send patients to her to have
3   their GYN path read?
4   A. Yes.
5   Q. You value her opinion?
6   A. Yes.
7   Q. And she's well respected in the GYN
8   pathology community?
9   A. Yes.
10  Q. Any other reports?
11  A. I'm not recalling.  I definitely read
12  those two.
13  Q. Anything else that you can remember?
14  A. No.
15  Q. All right.
16     Any expert reports in those three cases?
17  MS. O'DELL:  Other than the one she just
18  mentioned.
19  MR. VOUDOURIS:  I'm sorry.
20  Q. Plaintiff's expert reports.
21  A. Besides the pathologist ones?
22  Q. Well, you named two defense pathologists,
23  you named Dr. Felix and Dr. Longacre, who you know
24  very well.
25  A. Yeah, yeah, yeah.

Page 16

1      No, I don't think I have.
2   Q. When did you read Dr. Felix's report?
3   A. I was just perusing it.  It was made
4   available last night, so I was just perusing it an
5   hour ago.
6   Q. Okay.
7      Did you finish it?
8   A. I did not read it in-depth.
9   Q. Okay.
10     Did you have any disagreements with it, as
11  you sit here today?
12  A. Well, yes, of course I did.  I mean, we
13  have different opinions on the -- on the cases,
14  yes.
15  Q. Okay.
16     How do you differ from Dr. Felix's
17  opinions?
18  A. Well, shall we go through them step by
19  step or can I see the report so we can discuss them
20  and I can --
21  Q. Did you bring it with you?
22  A. No.
23  Q. Okay.
24     How about Dr. Longacre?
25  A. I didn't bring that one with me either.

Page 17

1   MR. VOUDOURIS:  Okay.
2      Well, you're in luck today.
3   (Defendants' Exhibit No. 6 was marked for
4   identification.)
5   BY MR. VOUDOURIS:
6   Q. Dr. Allison, we hand you what we've marked
7   as Defendants' Exhibit 6.  This is the copy of the
8   general report of Dr. Longacre, that you told us
9   you were provided.
10  A. Yes.
11  Q. And did you read it?
12  A. I read the majority of this, yes.
13  Q. Is there anything else you specifically
14  disagree with in Dr. Longacre's report?
15  MS. O'DELL:  Feel free to go through it and --
16  and if you need a minute to review it.
17  THE WITNESS:  So there are some things I agree
18  with in the way that she stated them, and, you
19  know, they're very subtle ways that we disagree
20  that I think are important.
21  BY MR. VOUDOURIS:
22  Q. Well, let's stop and go through this and
23  tell me, because you had an opportunity to read it,
24  what you disagree with her that is important.
25  A. Okay, so I agree that mesh erosion -- she

Kimberly H. Allison, M.D.

Page 18

1  says, on page 7: "Mesh erosion with TVT slings is
2  a rare complication. This is a known
3  complication."
4      I agree it's a known complication. I
5  think it's a little more common than rare. I don't
6  know how she's defining rare there.
7      Q. Well, how do you define more common?
8      A. Well, she hasn't given a percent, I
9  mean --
10     Q. No, my question is to you.
11     A. Oh, okay.
12     Q. How do you define more common?
13     A. Well, the literature that I've reviewed
14  look -- said complication rates like erosion and,
15  you know, up to ten percent of patients, so one in
16  ten doesn't seem that rare to me.
17     Q. Are you talking about a TVT product?
18     A. I'm talking about mesh products in
19  general.
20     Q. Do you know what the rate is for the TVT
21  product?
22     A. Specifically I've been thinking of these
23  as a group, so five percent.
24     Q. Do you know or are you just guessing?
25     A. There's a variety of percentages in the

Page 19

1  literature, so if I give you a number, I'm sure I
2  could point to another article that would give a
3  different percentage.
4      Q. Okay.
5      But my question was, five percent, are you
6  just guessing?
7      A. I'm estimating between five and ten
8  percent.
9      Q. Dr. Allison, I hand you what we've marked
10  as Defendants' Exhibit 4.
11     Can you identify that for us, please?
12     A. This is the literature list, data that I
13  used in consideration of my opinion.
14     Q. Your opinions in the three cases that
15  we're going to talk about?
16     A. Yes, including these three cases.
17     Q. And you created that list?
18     A. Yes.
19     Q. And I understand some of the things you
20  found and others were provided to you by
21  plaintiff's counsel, is that accurate?
22     MS. O'DELL: Object to the form.
23     THE WITNESS: Yes, we both were contributing
24  articles to this list and I looked at them.
25     BY MR. VOUDOURIS:

Page 20

1      Q. Can you tell me what literature supports
2  your contention that the risk of erosion with TVT
3  is between five and ten percent?
4      A. No. I can't point you to the specific.
5  This is a very long list of articles and I can't
6  point to one in particular off the top of my head
7  that has the specific findings.
8      I really read through the literature. I
9  have a general picture of the rates of
10  complications and the types of complications that
11  occur with mesh, based on looking at it all, and
12  then I also focused in on the pathology findings.
13     Q. You understand you're here to give
14  specific case opinions regarding a TVT-O product
15  and a TVT product, correct?
16     A. Correct.
17     Q. And as we sit here today, you can't tell
18  us what the rate of exposure is -- or erosion, I'm
19  sorry, for a TVT product; is that correct?
20     A. I gave you a percentage of five to ten
21  percent, my estimate.
22     Q. Yeah.
23     But that's an estimate for mesh in
24  general, correct?
25     MS. O'DELL: Object to the form.

Page 21

1      THE WITNESS: Which includes TVT.
2      BY MR. VOUDOURIS:
3      Q. Well, is there -- are there specific
4  literature out there that gives specific rates of
5  complications for TVT?
6      A. I'm sure it's in all of this.
7      Q. Can you tell us which ones? This is your
8  list, not mine.
9      A. No. I -- I cannot point to the exact one.
10  I focused on pathology findings in -- in even more
11  depth, so I'm a pathologist. I'm not a
12  urogynecologist. I don't quote percentages of
13  complications to patients.
14     I look at findings under the microscope
15  and in the gross room. I review pathology
16  literature and then I review in a broader sense,
17  the rest of the literature that's related to what
18  kinds of complications these patients get.
19     And then in a specific case, I don't need
20  to know the percentage rate. I need to know, you
21  know, does this patient have one of these
22  complications that has been described in the
23  literature, and do I see pathologic findings that
24  make sense in that setting.
25     Q. So the answer to my question is, no, you

Kimberly H. Allison, M.D.

Page 22

1 can't tell us on your list what specific articles
2 give specific rates of various complications
3 regarding the TVT products?
4     A.  That's correct.
5     MS. O'DELL:  Object to the form.
6     BY MR. VOUDOURIS:
7     Q.  Dr. Allison, we handed you what is
8 Defendants' Exhibit 2, I believe.
9         Can you identify that for the record,
10 please?
11     A.  This is my expert report.
12     Q.  And it contains your background and
13 qualifications, correct?
14     A.  Yes.
15     Q.  A section on general opinions, which your
16 counsel has prohibited us from asking about, and
17 then a section on case specific; is that correct?
18     MS. O'DELL:  That is not correct.  I've not
19 prohibited you from asking about the general
20 principles that she's relied on in rendering her
21 opinions in these cases.
22         What I have stated on the record
23 repeatedly today and by e-mail is that
24 Dr. Allison's not been disclosed as a general
25 causation expert, as you're well aware.

Page 23

1         You're welcome to ask her about anything
2 in her report.
3     BY MR. VOUDOURIS:
4     Q.  You do mention here that you're the
5 codirector at the Stanford Breast/GYN Pathology
6 Fellowship; is that accurate?
7     A.  Yes.
8     Q.  Is there a director?
9     A.  A director that --
10     Q.  At Stanford -- sorry.
11     A.  Teri Longacre.
12     Q.  So Teri Longacre sits above you in that
13 position; is that correct?
14     MS. O'DELL:  Object to the form.
15     THE WITNESS:  Correct, she was there before I
16 came to Stanford in 2013.  She had that fellowship
17 established, and when I arrived, she asked me to
18 codirect it with her.
19     BY MR. VOUDOURIS:
20     Q.  She was part of your hiring process,
21 correct?
22     A.  Yes.
23     Q.  Now, at Stanford, do you review GYN
24 pathology?
25     A.  Not currently.  They have needed me more

Page 24

1 in the breast pathology, but I originally applied
2 for the job which was posted as a GYN pathologist,
3 and they hired me based on my expertise in both
4 breast and GYN.  They've needed people to fill in
5 more on the breast service, and so that's what I've
6 done.
7     Q.  You came to Stanford in January of 2013, I
8 believe?
9     A.  Yes.
10     Q.  Since January 2013, have you signed out
11 any GYN path at Stanford?
12     A.  No, I have not.
13         I've done frozen sections on GYN
14 pathology, which is intraoperative consultations.
15     Q.  Right, but that's for cancer, correct?
16     A.  No.  They're not all for cancer.
17     Q.  What else are they for?
18     A.  Intraoperative evaluations are for "what
19 is this" questions, a surgeon wants to know what
20 they have in the OR, immediately, and so they'll
21 send tissue to us to freeze and rapidly tell them.
22     Q.  How often do you do that?
23     A.  Every single day that I'm on service.
24     Q.  And have you ever asked to evaluate a
25 frozen section regarding vaginal tissue while at

Page 25

1 Stanford?
2     A.  Vaginal tissue, there's a lot of GYN
3 frozen, but vaginal tissue is not an intraoperative
4 consultation.
5     Q.  So the answer to my question would be no?
6     A.  I think it would be no, yes.
7     Q.  When was the last time you looked at -- or
8 signed out, I'm sorry, a report on vaginal tissue
9 that was not a frozen section?
10     MS. O'DELL:  Are you talking about in the -- in
11 the course of her clinical --
12     MR. VOUDOURIS:  Yes.
13     MS. O'DELL:  -- practice?
14     MR. VOUDOURIS:  I'm sorry.
15     THE WITNESS:  Probably would have been in 2012,
16 before I came.  I -- you know.
17     BY MR. VOUDOURIS:
18     Q.  To the best of your knowledge, have you
19 ever looked at mesh from a TVT product as part of
20 your clinical practice?
21     A.  I've looked at explanted mesh as part of
22 my clinical practice in the past.  I was not paying
23 attention during those years I was looking at those
24 cases with, you know, what type of procedure it had
25 been removed from, so I don't know.

Kimberly H. Allison, M.D.

Page 26

1    Q.  You don't know?
2    A.  I don't know.
3    Q.  I apologize, we got a little sidetracked.
4        We were going through Dr. Longacre's
5    report, and you were up to page 7, I believe.
6    A.  Yes.
7    Q.  Do you agree with everything that she said
8    before page 7?
9    A.  I would really rather not have to disagree
10   on a case on a statement-by-statement basis with my
11   colleague.  I'm happy to talk about my case
12   specific findings and if you have disagreements
13   with them, to go through them, but it's putting me
14   in a very awkward position.
15       I -- we all disagree with each other in
16   practice on occasion, but this is a very awkward
17   position for me to be in.
18   Q.  Well, it's going to be an awkward position
19   regardless, Dr. Allison.  So is there anything that
20   you disagree with up to page 7 in Dr. Longacre's
21   report?
22   MS. O'DELL:  And, Dr. Allison, if you -- if
23   you -- if he's asking you to go through every line
24   and word, then feel free to just take a few minutes
25   and to do that.

Page 27

1    THE WITNESS:  I need a break.
2    MS. O'DELL:  Okay.  Let's go off the record.
3    (Recess taken from 1:34 p.m. to 1:56 p.m.)
4    MR. VOUDOURIS:  It's -- we've been off the
5    record now for how long, court reporter?
6    THE REPORTER:  From 1:34 to 1:56.
7    BY MR. VOUDOURIS:
8    Q.  And, Dr. Allison, you went outside to
9    collect yourself, correct?
10   A.  Yes.
11   Q.  Are you ready to proceed?
12   A.  Yes.
13   Q.  Okay.
14       And you understand the defense didn't put
15   you in this position, okay?  You're going to be
16   offering testimony that's going to be directly
17   adverse to and opposite to the chairman of the
18   department of GYN pathology at Stanford.
19       Do you understand that?
20   A.  Yes.
21   Q.  And are you ready to proceed?
22   A.  Yes.
23   Q.  Okay.
24       We're going through Dr. Longacre's report,
25   right?

Page 28

1    A.  Yes.
2        Okay.
3    MS. O'DELL:  And what's the question, Counsel?
4    MR. VOUDOURIS:  Can you check, please?
5    (The Reporter read back as follows:
6    "Question:  So is there anything
7     that you disagree with up to page
8     7 in Dr. Longacre's report?")
9    THE WITNESS:  Okay.  So we want to start at the
10   beginning of what looks like her opinions at page
11   2.  "So foreign material, however inert, when
12   implanted into the human tissue typically invokes
13   an inflammatory response in the initial phase,
14   which can be associated with acute inflammation,
15   but generally evolves into a more chronic tissue
16   response with associated lymphocytes, mast cells
17   and macrophages."
18       So I agree that that occurs, but then over
19   time that typically resolves.
20   BY MR. VOUDOURIS:
21   Q.  Typically resolves regarding what?
22   A.  The chronic inflammation, the foreign body
23   giant cell type reaction continues, so I agree with
24   that.
25       I agree that the acute inflammatory

Page 29

1    response typically disappears, and then it's
2    followed by chronic inflammatory cells consisting
3    of lymphocytes, plasma cells, mast cells,
4    macrophages, occasionally eosinophils.
5    Q.  Dr. Longacre (sic), I'm sorry, I don't
6    mean to interrupt, but my original question was
7    what you disagree with.
8    A.  Okay.
9    Q.  You're going through here and you're
10   agreeing with what she's saying.  So to make it
11   easier on you and to make this process shorter, is
12   there anything that you disagree with up to and
13   including page 7 in Dr. Longacre's report?
14   MS. O'DELL:  I'd just object to the question,
15   she -- the form of the question you've just asked,
16   you asked her to go through the report line by
17   line, that's what she's doing.
18       And it's not fair to ask a general
19   question if she agrees with every word and comma of
20   the report.  And if you've asked her that question,
21   she's free to go through it line by line.
22   MR. VOUDOURIS:  Ms. O'Dell, that's fine, and
23   please stop the speaking objections so we can get
24   through this.
25   Q.  Go ahead.

Page 30

1    A.  So I disagree that the chronic
2  inflammatory response continues, but I agree that
3  the foreign body giant cell type response --
4    Q.  What's your basis --
5    A.  -- doesn't --
6    Q.  -- for disagreeing with Dr. Longacre on
7  that point?
8    A.  I think she just hasn't gone into much
9  detail in terms of she's left out the lymphocytic
10  response as the component that continues.  So she's
11  not being specific as to the type of -- the exact
12  type of inflammatory response that continues over
13  time or doesn't continue over time.
14    Q.  Are you basing your disagreement with her
15  because of your review of explanted TVT meshes?
16    A.  I'm basing -- well, what I'm saying is
17  she's not being specific in terms of the type of
18  inflammation that continues in a chronic
19  inflammatory response that's abnormal.  There are
20  many statements in here that I agree with.
21    Q.  That wasn't my question.
22    A.  Can you repeat your question?
23    Q.  I want to know where you have disagreement
24  with Dr. Longacre's opinions that are part of her
25  expert report that's in front of you, that you told

Page 31

1  me that you read.
2    A.  Okay.  Well, I'm going to keep going line
3  by line, then.
4    Q.  That's fine.
5    A.  Just so that we're detailed and we're
6  making sure that I'm going over it all.
7    Q.  And, please, when you get to a place where
8  you disagree with her, tell me the basis for your
9  disagreement.
10    A.  Okay.
11    Q.  Whether it's experience, whether it's
12  literature, you tell me.
13    A.  Okay.  Okay, I'm continuing to read and
14  I'm agreeing with some of the statements she's
15  saying about integration of fibrosis into the mesh
16  as a part of the process that is expected to occur.
17    Q.  What page are you on?
18    A.  I'm on 4.
19    Q.  Do you see where she quotes a 17-year data
20  demonstrating a high cure rate and very low
21  complication rate with the TVT sling?
22    A.  I do.
23    Q.  Do you disagree with that?
24    A.  I think --
25    Q.  That's a simple question, Dr. Allison, do

Page 32

1  you disagree with that?
2    MS. O'DELL:  She's free to answer.
3    THE WITNESS:  Can finish up my answer?
4    MS. O'DELL:  Yeah.  You're free to answer when
5  you'd like to.  You can consider the question and
6  you're free to answer with whatever explanation
7  you'd like to give.
8    THE WITNESS:  The complications are clear and
9  she lists them here, pain, dyspareunia, mesh
10  exposure, those have occurred in the patients that
11  we are going to be talking about.
12  BY MR. VOUDOURIS:
13    Q.  Each of which occur in less than five
14  percent of patients, correct?
15    A.  But they occurred in these patients.
16    Q.  That wasn't my question.
17      Do you disagree with that sentence?
18    A.  I guess it depends on how low you think
19  five percent is.  Certainly if you're the patient
20  who that happens to you don't think that that's an
21  insignificant complication.
22    Q.  That's not my question, Dr. Allison.
23  We'll be here for a long time.
24      Do you disagree with that sentence?
25    A.  It's not a black and white, you know,

Page 33

1  agree or disagree.  It's -- I think those
2  complications are significant.  I think five
3  percent is, you know, not an insignificant number
4  and so I agree with the sentence.  Very low I guess
5  is a subjective term.
6    Q.  Do you agree that the complication rates
7  including pain, dyspareunia, mesh exposure, each of
8  which occur in less than five percent of patients
9  with TVT according to the 17-year study, do you
10  agree with that?
11    MS. O'DELL:  Object.
12    THE WITNESS:  Yes.
13    MS. O'DELL:  Object to the form.
14  BY MR. VOUDOURIS:
15    Q.  Continue.
16    MS. O'DELL:  With what?
17    MR. VOUDOURIS:  I don't think it's that
18  confusing, is it, reading line by line and telling
19  us where you disagree with Dr. Longacre.
20    THE WITNESS:  She states:  "The FDA stated that
21  polypropylene is safe and effective in the
22  treatment of stress urinary incontinence."
23      Although I know the FDA also has warnings
24  about the use of mesh.
25    BY MR. VOUDOURIS:

Kimberly H. Allison, M.D.

Page 34

1    Q.  That's not the question and the process
2  that we're going through here, Dr. Allison.
3        The process is, you're going through here
4  line by line, and I'll let you do that, and you're
5  going to tell us where you disagree with the head
6  of GYN pathology at Stanford.
7    A.  This isn't black and white, so to say I
8  agree or disagree, I want to tell you my thoughts
9  on the sentences that she's got in here.  And so
10  I'm trying to express my opinions and my knowledge
11  about these statements she's making.
12    Q.  Actually, it is black and white because
13  this is black and white, these statements, and in
14  trial it's going to be very black and white,
15  Dr. Allison.
16        So do you disagree with the statement that
17  Dr. Longacre has in bold, "The FDA has stated that
18  polypropylene is safe and effective in the
19  treatment of stress urinary incontinence"?
20    MS. O'DELL:  Object to the form of the
21  question.
22    BY MR. VOUDOURIS:
23    Q.  Do you disagree with that sentence?
24    A.  I would say it is not safe and effective
25  in all patients.

Page 35

1    Q.  Do you disagree with that statement?
2    MS. O'DELL:  And if you don't have an opinion
3  about it, you're welcome to say that.
4    MR. VOUDOURIS:  Objection.
5    THE WITNESS:  I mean, I told you my opinion.
6    MR. VOUDOURIS:  Stop, stop, excuse me --
7    THE WITNESS:  You're trying to make me say --
8    THE REPORTER:  I'm sorry, I can't take two of
9  you at the same time.
10    BY MR. VOUDOURIS:
11    Q.  Go ahead, Dr. Allison.
12    MS. O'DELL:  She's answered your question.
13    MR. VOUDOURIS:  I don't think she has.
14    Q.  Go ahead.
15    MS. O'DELL:  I believe she has.
16    THE WITNESS:  I told you what I would say
17  instead of this statement, so it's not that I a
18  hundred percent disagree with the statement, I
19  would state it in a different way.
20    BY MR. VOUDOURIS:
21    Q.  Have you ever contacted the FDA and told
22  them that you don't think that polypropylene is
23  safe and effective in a few patients or however you
24  worded it?
25    A.  No, and I don't think Dr. Longacre

Page 36

1  contacted them either to ask them if it was safe
2  and effective.
3    Q.  That wasn't the question.
4        The question was you, have you ever
5  contacted the FDA --
6    A.  No. Of course not.
7    Q.  -- and told them that polypropylene is not
8  safe and effective in the treatment of stress
9  urinary incontinence?
10    A.  No.
11    Q.  Continue, please.
12    A.  So she says:  "There's no correlation
13  between the degree of fibrosis and inflammation in
14  the presence of pain and/or mesh exposure."
15        So there are parts I agree with and parts
16  I disagree with about that statement.
17        The degree of fibrosis and inflammation, I
18  agree that that hasn't been systematically linked
19  to patients with pain versus patients without pain
20  or patients with exposure versus patients without
21  exposure.
22        However, I don't think that that means
23  that the patients who have those symptoms, that it
24  wasn't caused by the presence of the mesh and the
25  fibrosis and inflammation in those patients.

Page 37

1    Q.  And is that based on your experience?
2    A.  My experience as a pathologist?
3    Q.  Yes.
4    A.  Yeah, my experience looking at 80 to 100
5  of these cases of explants and reading the
6  literature and understanding these are known
7  complications of this procedure.
8    Q.  You've looked at 80 to 90 what?
9    A.  Mesh explant tissues.
10    Q.  Okay.
11        How many TVT explant tissues have you
12  looked at?
13    A.  Again, you asked me that question earlier,
14  and I don't know the exact percentage.
15    Q.  Do you have any idea what the percentage
16  is?
17    A.  No.
18    Q.  And in the -- I'm sorry, what was the
19  number, 80 to 90 of mesh explants?
20    MS. O'DELL:  I think it's what she said.
21    THE WITNESS:  I said 80 to 100, yes.
22    MR. VOUDOURIS:  Okay.
23    Q.  Where did you get those cases from?
24    A.  Well, in my prior practice at University
25  of Washington, I probably saw ten to 20, just

Kimberly H. Allison, M.D.

Page 38

1 explants being removed.
2     And then I saw I think 60 or so cases when
3 I was first working on the Bard product litigation,
4 that were sent to me just to review.  Some of them
5 weren't even cases I was opining on, just to look
6 at what kinds of findings there were in mesh
7 explants, so that I could have more exposure to it.
8     Q.  I've had an opportunity to look at some of
9 your depositions in the Bard cases, and you
10 testified that when you were at University of
11 Washington you saw maybe ten to 12; is that
12 accurate?
13     A.  Sure, that's between ten and 20.
14     Q.  All right.
15     Of those ten to 20 patients, did all of
16 them experience pain?
17     A.  So when you're making a surgical pathology
18 report, you're cognizant of what symptom -- why --
19 why something's being removed when the clinician is
20 asking you to explain a symptom.
21     So if there was a biopsy for a mass and
22 they want to know what is the mass, we explain to
23 them what is the mass.
24     So for -- for most foreign material
25 removal, the clinician already knows this is the

Page 39

1 reason I'm removing this.  I've made a decision as
2 the surgeon that I think this is causing a problem,
3 whether it's pain, erosion, dysfunction of some
4 kind.  It's time to take this out, this foreign
5 body out.
6     And so -- so as a pathologist, your job is
7 to document that something was removed for them.
8 It's not the same question as is being asked of me
9 here, in these cases.  It's linking the pathology
10 with the clinical symptoms.
11     Q.  Okay.
12     I believe my question was pretty simple,
13 the ten to 12 cases that you looked at in
14 University of Washington of mesh explants, did all
15 of those women complain of pain?
16     MS. O'DELL:  Objection to the form.
17     THE WITNESS:  We didn't always have the
18 clinical information about why things were being
19 removed.
20     BY MR. VOUDOURIS:
21     Q.  So you don't know?
22     A.  I don't know.
23     Q.  All right.
24     The other meshes you've looked at have all
25 been part of litigation, correct?

Page 40

1     A.  Correct.
2     Q.  And they were provided to you by
3 plaintiffs?
4     A.  Yes.
5     Q.  Okay.
6     Is it fair for me to assume that all of
7 those patients complained of pain?
8     A.  I think many of them did, yes.
9     Q.  Okay.
10     As we sit here today, can you tell me any
11 of them who didn't?
12     A.  I believe some were probably just for
13 erosion or other dysfunction.
14     Q.  Do you know that or are you just guessing?
15     A.  I don't -- I don't have a spreadsheet of
16 all of the cases I've ever looked at and have a --
17 of course I'm just guessing.
18     Q.  All right.
19     A.  These are all educated guesses you're
20 asking me to make.
21     Q.  What statement were you at, or sentence?
22     A.  The degree of fibrosis and inflammation.
23 So I think I addressed that one.
24     Q.  Anything else in 4 you agree with?
25     MS. O'DELL:  Object to form.

Page 41

1     THE WITNESS:  I'm not going to go through each
2 sentence in great detail because we'll be here way
3 too long.  I think it would be better if I just
4 scanned through and said which ones I disagree with
5 in a major way.  And I think I reserve the right to
6 go back and look at some of the details and say
7 whether I agree or disagree.
8     BY MR. VOUDOURIS:
9     Q.  Dr. Allison.
10     A.  Yes.
11     Q.  The task that you've been asked to do, and
12 Ms. O'Dell has asked you to do too, is to go
13 through here line by line and tell us where you
14 disagree with the head of GYN pathology at
15 Stanford, Dr. Longacre.
16     A.  Should I read the entire statement to you,
17 then?
18     Q.  Yeah, keep reading.  You don't have to
19 read out loud, read to yourself.
20     A.  Okay.
21     Q.  And when you get to a place where you
22 disagree with Dr. Longacre, you tell us, and you
23 tell us the basis for that disagreement.
24     MS. O'DELL:  And, Dr. Allison, you're free to
25 read out loud if you'd like to, you're free to

Kimberly H. Allison, M.D.

Page 42

1  respond to the question any way that you would
2  choose, and you're free to take all the time you
3  would like to take, and we've got, you know, two
4  hours on the record and that's what it's going to
5  be.
6      MR. VOUDOURIS:  Well, we took 20 minutes
7  because Dr. Longacre (sic) had to go outside and
8  compose herself.  And then she's come back in and
9  now we're going through this process.  And please
10  stop with the speaking objections.
11      Stop, please.
12  MS. O'DELL:  I can say whatever I want to.
13  MR. VOUDOURIS:  You can, but --
14  MS. O'DELL:  I will.
15  MR. VOUDOURIS: -- what you're doing is not
16  proper.
17  Q.  So go ahead, Dr. Allison.
18  MS. O'DELL:  It certainly is.  It's proper for
19  me to make objection.
20      And take the time that you need,
21  Dr. Allison.
22  MR. VOUDOURIS:  No one has told her to do
23  anything else.
24  THE WITNESS:  So she mentions on page 4 that a
25  pathologist -- "The cumulative literature data on

Page 43

1  mesh explants does not enable a pathologist to
2  reliably and reproducibly correlate the pathology
3  findings in mesh explant materials to any specific
4  symptom."
5  BY MR. VOUDOURIS:
6  Q.  And I'm sorry, you're on page 4, where?
7  A.  About two lines -- five lines from the
8  bottom, six lines from the bottom.
9  Q.  All right.
10  A.  And then she goes on to say:  "Although
11  there are several studies that attempt to compare
12  the histology findings in mesh material removed
13  from symptomatic and asymptomatic patients, valid
14  comparisons cannot be drawn and clinical
15  pathological correlations cannot be made on the
16  basis of current data."
17      I find it hard to argue that an erosion in
18  a patient who -- vaginal erosions are
19  extraordinarily rare, and they're much more common
20  in patients who have these mesh material implanted.
21  And, you know, they recur in the patients who have
22  mesh material implanted.
23      So I -- I do think that the literature
24  allows us to reproducibly correlate those kind of
25  findings with that specific symptom.

Page 44

1      I -- I do think that dyspareunia that
2  begins at the time of mesh implantation and was not
3  present in the same way beforehand is linked to the
4  mesh material that was implanted.
5  Q.  What literature is on your alliance list
6  that supports your disagreement with Dr. Longacre?
7  A.  There's plenty of literature that
8  discusses these erosions and dyspareunia and pain
9  that are -- I mean, she states in her very report
10  that those are known adverse outcomes.  She states
11  that up earlier.  This low complication rate
12  includes pain, dyspareunia and mesh exposure.
13  Q.  That's not my question.
14  A.  So she's read the same literature as me.
15  Q.  She comes to very different conclusions
16  than you do, doesn't she?
17  A.  They're subtly different.
18  Q.  Subtly different?
19  A.  Uh-hmm.
20  Q.  Do you think Dr. Longacre's going to label
21  them as subtly different?
22  A.  Is that a question?
23  Q.  Yes, it is.
24  A.  Yes.
25  Q.  Keep reading, please.

Page 45

1      Would you tell me when I have a half hour
2  left, please?
3  A.  So it looks like we disagree with mesh
4  degradation.
5  Q.  What page are you on?
6  A.  Five.
7  Q.  Whereabouts?
8  A.  Second full paragraph.
9  Q.  What sentence?
10  A.  "Several studies including some by Ethicon
11  have suggested there may be degradation of the mesh
12  following implantation.  These data when taken in
13  aggregate are not compelling arguments at this
14  point in time.
15      "First, it is not clear that degradation
16  occurs to any extent in vivo.  Second, if it
17  does" --
18  Q.  Do you disagree with that statement?
19  A.  I -- I do disagree with that statement.
20  Q.  And is the basis for that your experience?
21  A.  Yes.  I've seen what has been described by
22  others in the literature as evidence of degradation
23  in the cases that I've looked at.
24  Q.  Okay.
25      And those are -- the cases you're talking

Page 46

1 about are the cases that were referred to you by
2 plaintiffs' attorneys, correct?
3    A.  Yes.
4    Q.  And the people who have talked about this,
5 or written about it in the literature, are
6 Dr. Iakovlev and some of the other plaintiffs'
7 experts?
8    A.  Dr. Iakovlev has --
9    MS. O'DELL:  Object to form.
10    THE WITNESS:  -- published about this, yes.
11    BY MR. VOUDOURIS:
12    Q.  Okay.
13    A.  There are not many pathologists that have
14 published about this in the literature, and he is
15 one of them.
16    Q.  Anyone else you can think of?
17    A.  Besides Iakovlev?
18    Q.  Yes.
19    A.  Klosterhalfen did some, but Iakovlev's
20 work has been probably the most detailed in terms
21 of what I can correlate with under the microscope.
22    Q.  Is it fair to say that it's his theories
23 on degradation upon which you rely for your
24 specific case opinions?
25    MS. O'DELL:  Object to the form.

Page 47

1    THE WITNESS:  It's not his theories, per se,
2 but the evidence he presents for the tree barking
3 effect that I can see under the microscope.
4    BY MR. VOUDOURIS:
5    Q.  Other than you qualifying it a different
6 way, am I correct?
7    MS. O'DELL:  Object to the form.
8    THE WITNESS:  Can you state it again for me?
9    (The Reporter read back as follows:
10    "Question:  Other than you qualifying
11    it a different way, am I correct?")
12    THE WITNESS:  Before that.
13    MS. O'DELL:  I think she meant the statement
14 before that.
15    (The Reporter read back as follows:
16    "Question:  Is it fair to stay that
17    it's his theories on degradation
18    upon which you rely for your
19    specific case opinions?")
20    MS. O'DELL:  Object to the form.
21    THE WITNESS:  It's the -- yeah, the evidence
22 that he presents, yes, I wouldn't call them
23 theories.  He's published about them and provided
24 evidence that was accepted in peer reviewed
25 literature.

Page 48

1    BY MR. VOUDOURIS:
2    Q.  Have you ever dictated in a path report
3 that you saw degradation of mesh as part of your
4 clinical practice?
5    A.  His papers were describing this entity in
6 the last several years, so no, I've not.
7    Q.  Have you told Dr. Longacre that you
8 believe mesh in vivo degrades?
9    A.  We do not speak -- we have not spoken
10 about this litigation.
11    Q.  Okay.  Continue.
12    A.  On page 6 she talks about nerve twigs in
13 the first paragraph, and mentions:  "The presence
14 of nerves or nerve twigs in and around the mesh
15 material does not necessarily (and, in fact, is
16 unlikely to) reflect the presence of increased pain
17 sensation."
18         And I am of the opinion that the
19 integration of nerve fibers into the scarring
20 around these mesh fibers more likely than not
21 contributes to the pain in these patients, and
22 would emphasize that there are plenty of sensory
23 nerves in that area that it is likely to affect.
24    Q.  All right.
25         This is your opinion, but see, as an

Page 49

1 expert, you have to have a basis for your opinion.
2 So what's the basis for that opinion?
3    MS. O'DELL:  Object to the form.
4         You asked her what she disagreed with,
5    she's told you.
6    MR. VOUDOURIS:  Yeah.
7    MS. O'DELL:  So don't lecture her about being
8    an expert.
9    MR. VOUDOURIS:  I've asked you three times now,
10    maybe four, to stop.
11    MS. O'DELL:  Just --
12    MR. VOUDOURIS:  Just stop.
13    Q.  Go ahead, Dr. Allison.
14    MS. O'DELL:  Just fine, I'll keep making my
15    objections.  Stop lecturing the witness.
16    THE WITNESS:  Your question is why do I think
17    I'm qualified -- I'm a pathologist.
18    BY MR. VOUDOURIS:
19    Q.  No, it wasn't my question.
20         You're a breast pathologist, right, you're
21    not a GYN pathologist?
22    A.  I'm trained in GYN and breast pathology,
23    I'm trained in pathology as well.
24    Q.  And you do not --
25    A.  Nerves are not unique --

Kimberly H. Allison, M.D.

Page 50

1  Q. -- practice GYN pathology at Stanford; is
2  that correct?
3  A. Nerves are not unique to GYN.
4  Q. Do you practice GYN pathology at Stanford?
5  A. You already asked me that question, and
6  I'm not currently practicing GYN pathology at
7  Stanford.
8  MR. VOUDOURIS: Could you go back, please, when
9  I asked her about the basis of her opinion.
10  MS. O'DELL: Counsel, if you would let her
11  finish her responses, don't interrupt her, please.
12  (The Reporter read back as follows:
13  "Answer: On page 6 she talks about
14  nerve twigs in the first paragraph,
15  and mentions: 'The presence of
16  nerves or nerve twigs in and around
17  the mesh material does not necessarily
18  (and, in fact, is unlikely to)
19  reflect the presence of increased
20  pain sensation.'
21  "And I am of the opinion that the
22  integration of nerve fibers into
23  the scarring around these mesh
24  fibers more likely than not
25  contributes to the pain in these

Page 51

1  patients, and would emphasize
2  that there are plenty of sensory
3  nerves in that area that it is
4  likely to affect.
5  "Question: This is your opinion, but
6  see, as an expert, you have to have
7  a basis for your opinion. So what's
8  the basis for that opinion?")
9  THE WITNESS: The general principles of
10  pathology, and review of cases where women are
11  experiencing pain and do have these small nerve
12  fibers.
13  BY MR. VOUDOURIS:
14  Q. Where would I find this general principle
15  of pathology to support your statement, your
16  opinion, I'm sorry?
17  A. Well, nerves -- it's the nerve -- sensory
18  nerves help experience sensation, including pain,
19  and there is not normally scarring and fibrosis
20  around those. And I think that that may affect the
21  function.
22  Q. Okay.
23  Now, you say "I think that might affect
24  the function," and again, my question earlier was:
25  Can you -- an article, textbook, any of the

Page 52

1  literature that you have on that chair, can you
2  point to me that supports your opinion on that
3  regard?
4  A. I mean, other pathologists have noticed
5  the presence of these nerve fibers and come to
6  similar conclusions around the mesh and in the
7  fibrosis.
8  Q. That wasn't my question.
9  Do you need the court reporter to read it
10  back to you?
11  MS. O'DELL: Just --
12  THE WITNESS: Well, you were asking me about
13  the literature.
14  MS. O'DELL: Excuse me.
15  THE WITNESS: So I was telling you about the
16  literature.
17  MS. O'DELL: She answered your question.
18  MR. VOUDOURIS: Can you read back my question
19  to her, please.
20  MS. O'DELL: Dr. Allison, feel free to go
21  through your literature, feel free to go through
22  your report, whatever you'd like to do.
23  (The Reporter read back as follows:
24  "Question: Now, you say 'I think
25  that might effect the function,'

Page 53

1  and again, my question earlier
2  was: Can you -- an article,
3  textbook, any of the literature
4  that you have on that chair, can
5  you point to me that supports
6  your opinion on that regard?")
7  MR. VOUDOURIS: In that regard.
8  THE WITNESS: So in my report I say others have
9  identified similar findings of small nerves
10  entrapped in fibrosis around mesh fibers in
11  explants.
12  And then I list Klosterhalfen, 2004;
13  Iakovlev, 2014; and Bendavid, 2015.
14  Would you like me to find those articles
15  or --
16  BY MR. VOUDOURIS:
17  Q. No.
18  A. Okay.
19  Q. Those are all experts for the plaintiff,
20  isn't that correct?
21  MS. O'DELL: Object to the form.
22  THE WITNESS: I don't know. I know Iakovlev
23  is, but I don't know if the others are.
24  BY MR. VOUDOURIS:
25  Q. Would it surprise you to learn that they

Kimberly H. Allison, M.D.

Page 54

1 were?
2     MS. O'DELL:  Object to the form.
3     THE WITNESS:  It wouldn't, and you know why,
4 because there aren't other -- your -- there's not
5 literature to the contrary.  I mean, there are
6 pathologists.  The pathology literature is -- there
7 isn't pathology literature that says anything other
8 than this.
9     MR. VOUDOURIS:  What number are we at?
10    THE REPORTER:  The next one would be 7.
11    THE WITNESS:  Dr. Longacre has not published on
12 this.
13    (Defendants' Exhibit No. 7 was marked for
14 identification.)
15    THE WITNESS:  Have any of your experts
16 published --
17    MS. O'DELL:  There's no question pending,
18 Dr. Allison.
19    BY MR. VOUDOURIS:
20    Q.  Dr. Allison, I'll hand you what's marked
21 as Defense Exhibit 7.
22        Do you recognize that name?
23    A.  You're finding all my colleagues.
24    Q.  You betcha we are.  All the colleagues
25 that you're going to get up in front of a witness

Page 55

1 stand, in front of a jury and say are incorrect.
2    A.  Is that meant to intimidate me?
3    Q.  It's not at all, it's just a fact.
4        So who's authored this report that I just
5 gave you that's Exhibit 7?
6    A.  Who's authored, Hannes Vogel.
7    Q.  Yes.
8        And who is Hannes Vogel?
9    A.  He's a neuropathologist.
10   Q.  And where is he a neuropathologist?
11   A.  At Stanford.
12   Q.  Okay.
13       And is he an assistant professor, an
14 associate professor?
15   A.  He's a full professor.
16   Q.  Okay.
17       Has he written books on nerves?
18   A.  I have not read books on nerves, so no.
19   Q.  Is -- do you know Dr. Vogel?
20   A.  Yes.
21   Q.  Is he well regarded?
22   A.  Yes.
23   Q.  If you had a question about nerves in a
24 pathology slide, would he be one of the people you
25 would consult?

Page 56

1    A.  Yes, I consult with him for brain tumors
2 most often.
3    Q.  So you've -- you've reached out to
4 Dr. Vogel and consulted with him on brain tumors;
5 is that correct?
6    A.  Well, I don't read out brain tumor
7 pathology, but he consults with me when he has
8 metastatic breast cancer cases in the brain, so we
9 do -- we do look at cases together occasionally.
10   Q.  Would you have -- would you feel
11 comfortable referring a patient or a friend to
12 Dr. Vogel to review their slides?
13   A.  Yes.
14   Q.  For any type of nerve pathology?
15   A.  Yes.
16   Q.  By the way, in the three case specific
17 reports that you're going to talk about, were you
18 able to visualize nerve receptors on any of those
19 slides?
20   A.  Nerve receptors?
21   Q.  Yes.
22   A.  What do you mean by that?
23   Q.  You don't know what a nerve receptor is?
24   A.  A neurotransmitter, a neuro- -- the
25 receptor?

Page 57

1    Q.  Yeah.
2    A.  It's smaller than I could see with a light
3 microscope.
4    Q.  Okay.
5        So the answer to my question would be, no,
6 you didn't identify any, correct?
7    A.  No, of course not.
8    Q.  All you did was H&E and S100 stains?
9    A.  H&E and S100 stains were provided to me, I
10 didn't perform them.
11   Q.  Okay.
12       I want you to turn to page 6 of
13 Dr. Vogel's report.  And again, you don't dispute
14 that he's an expert in the field of neuropathology,
15 do you?
16   A.  Of course not.
17   Q.  All right.
18       Page 6, fourth line down, can you read
19 that -- that sentence that starts with pathologists
20 and then has a dash?
21   A.  "Pathologists - even those trained and
22 experienced in neuropathology such as myself - are
23 not able to examine a histology section under the
24 light microscope and determine whether nerve twigs
25 in the field are sensory, motor or autonomic in

Kimberly H. Allison, M.D.

Page 58

1  nature."
2      Q.  Keep reading.
3      A.  "Stains such as immunohistochemistry for
4  S100 and neurofilament, which can aid in the
5  identification of parts of nerves, specifically
6  Schwann cells and axons respectfully, are incapable
7  of differentiating between sensory, motor and
8  autonomic nerves.  Moreover, S100 and neurofilament
9  do not identify sensory receptors."
10     Q.  Do you disagree with those sentences?
11     A.  No.
12     Q.  Okay.
13         Can we go back to Dr. Longacre again.
14         I believe we're on page 5.  The second
15  full paragraph.
16     A.  Page 5 or 6?  I think 6.
17     Q.  Okay, even better.
18     A.  So on page 7, second paragraph:  "The mesh
19  material as itself as a foreign object and the body
20  reaction to the mesh do not significantly damage
21  the tissues in this anatomic location."
22         I mean, I've seen cases where skeletal
23  muscle is scarred and fibrosed and in the
24  surrounding tissue with mesh kind of embedded
25  within it, and I think that that's damaging the

Page 59

1  tissue in that anatomic location.
2         So I disagree with that statement as an
3  all-encompassing statement.  I think in some
4  patients the mesh has -- is causing very
5  problematic symptoms, and that reaction is -- the
6  reaction that occurs is not causing the same
7  symptoms in every patient, but it doesn't detract
8  from the women who are experiencing the sequelae of
9  the mesh eroding and causing dyspareunia.
10         Should I move on?
11     Q.  Yes.
12         Before you do, I'm sorry to interrupt.
13         Was it part of your medical school, your
14  residency, your training fellowship -- where did
15  you go to medical school?
16     A.  New York Medical College.
17     Q.  Okay.
18         As part of any of that training there,
19  were you taught how to look at a nonneoplastic
20  tissue on a slide and correlate it with clinical
21  symptoms of pain?
22     MS. O'DELL:  Object to the form.
23     THE WITNESS:  We're taught to correlate
24  clinical symptoms in general with pathologic
25  findings, and that's part of our training as

Page 60

1  pathologists.
2      MR. VOUDOURIS:  That wasn't my question.  Could
3  you read it back, please.
4      (The Reporter read back as follows:
5      "Question:  As part of any of that
6      training there, were you taught
7      how to look at a nonneoplastic
8      tissue on a slide and correlate
9      it with clinical symptoms of pain?")
10     THE WITNESS:  There wasn't a course on pain and
11  correlation with pathology, no.  It's not as common
12  a clinical symptom to produce a pathologic specimen
13  as other findings are, so it's for any pathologist
14  probably the minority of clinical symptoms that
15  we're correlating with.
16         But in this case we are being asked to do
17  that.
18     BY MR. VOUDOURIS:
19     Q.  So that the answer to my question is "no"?
20     MS. O'DELL:  She answered your question.
21     THE WITNESS:  Let me think about the
22  specific -- more specific scenarios.
23         So for a patient who's experiencing bone
24  pain and they do a bone biopsy, we would be
25  describing the findings that would be causing the

Page 61

1  bone pain, whether it be cancer or Paget's disease
2  or osteomalacia or some other fracture.  So there's
3  an example for you of a time it might correlate
4  with pain.
5         If a woman had a lot of pain during labor
6  and she has a condition where her placenta has
7  embedded too deep into the uterus, that would be a
8  reason for pain.
9         Endometriosis causes pain and when we look
10  under the, you know, microscope at the findings in
11  one of those patients, we diagnose endometriosis,
12  which correlates with the symptom of pain.
13     BY MR. VOUDOURIS:
14     Q.  So Dr. Longacre testifies that at Stanford
15  the medical students, the residents and the fellows
16  in pathology are not instructed or taught or told
17  that they're able to look at a nonneoplastic tissue
18  on a slide and correlate it with a clinical
19  symptom, is she wrong?
20     MS. O'DELL:  Object to the form.
21     THE WITNESS:  She may be just looking at it
22  from a different angle and not thinking about
23  examples that I just gave.
24     BY MR. VOUDOURIS:
25     Q.  You mean angle as a GYN pathologist at

Kimberly H. Allison, M.D.

Page 62

1  Stanford?
2      MS. O'DELL:  Object to form.
3      THE WITNESS:  She is the GYN pathologist at
4  Stanford, yes.
5      MR. VOUDOURIS:  Okay.
6      Q.  Keep going, please.
7      A.  She mentions scar form- -- this is on page
8  7.  It's a sentence on its own without supporting
9  sentences.  "While scar formation does occur, it is
10  typically minimal and does not lead to deformation
11  of the mesh."
12      Others have described in the literature
13  deformation of mesh.  And from my personal
14  experience, looking at cases of mesh removed, I've
15  seen -- in one of the patients we'll talk about
16  today, I've seen extensive scarring and surgery --
17  the operative reports describe extensive scarring,
18  it's why this mesh is hard to remove in its
19  entirety.  So I don't agree with the statement that
20  it's minimal in the patients that have issues that
21  require removal of the mesh.
22      Q.  In the patients that you've seen that have
23  been sent to you by plaintiffs' counsel?
24      A.  The ones that have symptoms and are --
25  yes.

Page 63

1      Q.  And --
2      A.  Need examination.
3      Q.  -- what literature supports your
4  disagreement with Dr. Longacre?
5      A.  The deformation and scarring?  Oh, there's
6  plenty of those.
7      Let's see.  2013, Rogo Rogowski, we could
8  look at that one if you want, or do you want me
9  just to list?
10      Q.  Just list.
11      A.  Okay.
12      Garcia-Urena, 2007; Tunn, T-u-n-n, 2007.
13  I have ultrasound data looking at decreases in mesh
14  size after insertion.  Animal studies have also
15  shown, like Feola in 2014, F-e-o-l-a.  And then
16  there's been literature describing the severity of
17  the scarring and how irreversible that can be, such
18  that it can continue to cause symptoms even after
19  it's removed.
20      And I list Crosby with a C, 2014;
21  Bendavid, 2014; and Rogo-Gupta, 2013.
22      Q.  Anything else?
23      A.  No.
24      Q.  Continue, please.
25      A.  She talks about mesh erosion at the end of

Page 64

1  page 7 stating it's a rare complication, but a
2  known complication, and that there are a multitude
3  of factors, including infection inherent poor
4  vascular supply, and poor or impaired wound
5  healing.
6      And I guess I don't disagree with any of
7  the statements she's made, but I think it is caused
8  by the mesh and it's -- it is a known complication,
9  so actually I agree with that statement.
10      Q.  What sentence are you up to, Dr. Allison?
11      A.  I'm on page 9, I'm trying to --
12      Q.  Why don't we stop there, because that
13  talks about pelvic organ prolapse mesh implants --
14      A.  Yeah.
15      Q.  All right, so we're done, you've gone
16  through this, at least up to the page -- the
17  section on pelvic organ prolapse mesh implants and
18  told us all the places where you disagreed with
19  Dr. Longacre, is that accurate?
20      A.  The most -- ones that stand out most to
21  me, yes.
22      BY MR. VOUDOURIS:  Okay.
23      Let's talk about the Thompson case.
24      (Defendants' Exhibit No. 8 was marked for
25  identification.)

Page 65

1      BY MR. VOUDOURIS:
2      Q.  Dr. Longacre (sic), we're handing you
3  Defendants' Exhibit 8.
4      Can you tell us what that is?
5      A.  My name is Dr. Allison.
6      Q.  I'm sorry, Dr. Allison.
7      A.  This is a photograph of -- it's an image
8  of a photograph I took of material that was removed
9  from patient Thompson.
10      Q.  And this correlates with which pathology?
11      A.  So this is from her 2010 -- let me get my
12  spreadsheet.  Her third, I believe, revision.
13      So this is from part A, the squamous
14  mucosa that was removed during the procedure where
15  they removed -- attempted to remove all the mesh
16  that was present in the patient, because she had
17  continued symptoms of erosion and urinary
18  retention.
19      Q.  I'm going to hand you -- you might have it
20  in front of you, you're welcome to use mine, I have
21  a red pen and I have a blue pen.
22      A.  Okay.
23      Q.  And if you can, on Exhibit 8, please
24  highlight for us all the things that you think are
25  abnormal on that slide and what you're going to

Kimberly H. Allison, M.D.

Page 66

1 tell the jury about.
2    A. So the most abnormal -- I mean, the mesh
3 material was described in their gross report and so
4 I don't have the tissue around the mesh, because it
5 wasn't sampled.
6    Q. Okay.
7       If you could do me a favor, please,
8 because I'm limited on time, and I'd just ask you a
9 question about the photograph that you took, and
10 for you to highlight for us the abnormalities that
11 you're going to tell the jury about or anything
12 that you're going to tell the jury about, could you
13 do that for us, please?
14    MS. O'DELL: She's answering your question, so
15 you just interrupted her.
16    THE WITNESS: The abnormalities present were
17 the gross presence of the mesh, and this
18 particular -- this was vaginal mucosa that was
19 removed and submitted separately from the mesh. It
20 was part A in the pathology report, and -- or part
21 B, it was a separate part from the mesh specimen
22 that was removed.
23       And so it shows minimal abnormalities,
24 other than the sort of denser fibrosis and scarring
25 down at the base of it, which is in the deepest

Page 67

1 tissue.
2    BY MR. VOUDOURIS:
3    Q. Can you, with that red pen, show us --
4    A. It's such a pixilated photograph, a
5 very --
6    Q. Are you telling me -- go ahead.
7    A. We do have better images of this, the
8 images I took. I apologize, somehow the printout
9 is very pixilated, but it would be hard for anybody
10 to judge the reproduction here.
11    Q. Okay.
12       I haven't been provided with any other
13 images, so I have no idea what you're talking
14 about, but --
15    A. It's a printout of --
16    Q. -- we're here today -- so what you circled
17 in red is what?
18    MS. O'DELL: I would just state for the record,
19 I think what Dr. Allison's trying to say is the
20 printer in the hotel is -- is not very good, but
21 I've provided to you a -- a PDF of the image.
22    BY MR. VOUDOURIS:
23    Q. Did you take more than one photograph?
24    A. No.
25    Q. Okay.

Page 68

1       So this is the photograph that was printed
2 off in the hotel I guess this morning, and the red
3 shows what?
4    A. In the original digital image, which I'm
5 sure we can provide, it shows dense fibrosis and
6 scarring.
7    Q. Okay.
8       So what you -- what did you circle in red?
9    A. Just the deepest aspect of the tissue.
10 It's very hard on this reproduction for me to tell
11 sort of where that is located, but it was, per my
12 report, the deepest aspect of the tissue.
13    Q. Okay.
14       Would you mark for us on that what you
15 have circled?
16    MS. O'DELL: And because it's in pink, can I
17 make a suggestion that we use blue?
18    MR. VOUDOURIS: Sure, that's fine.
19       See, we can agree on things, Leigh.
20    MS. O'DELL: Our first opportunity for
21 agreement.
22    MR. VOUDOURIS: Is on pen color.
23    MS. O'DELL: Unbelievable.
24    BY MR. VOUDOURIS:
25    Q. Do you mind if I come over your shoulder

Page 69

1 because I can't read upside down.
2    A. Sure.
3    Q. Can you read that so the court reporter
4 can put it down, you've written what?
5    A. "Deepest aspect of tissue has dense
6 fibrosis/scar. Image is too pixilated to
7 appreciate."
8    Q. All right.
9       Which is it, dense fibrosis or scar?
10    A. I think it's -- I mean, scar is composed
11 of dense fibrosis, so I made a slash because I
12 think they're both similar. Do you want me to use
13 just one term?
14    Q. I want you to use the term that you think
15 best describes what you see.
16    A. That's -- that's how I've described all of
17 these, so that's -- that's the terms --
18    Q. And --
19    A. -- I'm using.
20    Q. -- what's the significance of that finding
21 in the Thompson case?
22    A. Just that that's the aspect that was
23 probably closest to the mesh. I mean, this image
24 isn't -- and this particular slide is probably not
25 representative of the pathology at play, so we're

Page 70

1 dependent on what tissue was put in for submission
2 under the microscope.
3     Q. Any other abnormalities on that slide that
4 you want to tell us about?
5     A. No.
6     Q. What are some risk factors for healing?
7     A. Risk factors for healing, you mean poor
8 healing?
9     Q. Yes, sorry.
10     A. Smoking, diabetes, obesity.
11     Q. Did Ms. Thompson have any of those?
12     A. She did, she had diabetes and I believe
13 she's a smoker. However, she didn't have any
14 issues immediately post-op, and that would be where
15 you would see the poor healing.
16     Q. Do you know what her tissues looked like
17 before she had the mesh inserted?
18     A. The surgeon in their operative reports
19 don't describe any erosions or other abnormalities,
20 so I'm assuming, based on the records that I have
21 available, that they were normal.
22     Q. And what's the basis for your opinion on
23 that?
24     A. Reading the operative notes.
25     Q. Anything else?

Page 71

1     A. I could look through the medical records
2 again.
3     Q. Did you review all of the medical records?
4     A. I reviewed the ones that were made
5 available to me, most of them.
6     Q. Most of them?
7     A. Would you like me to go through them with
8 you or --
9     Q. No, I'm just asking you what you reviewed.
10     A. I reviewed operative notes, a few clinic
11 notes, the pathology report.
12     Q. Did you read any depositions?
13     A. I don't recall.
14     Q. Is it safe for me to assume that other
15 than this photograph and what you've written in
16 Exhibit C, that those are your findings in this
17 case?
18     MS. O'DELL: Object to form.
19     THE WITNESS: That based on the photographs.
20     BY MR. VOUDOURIS:
21     Q. And what you have in Exhibit C?
22     A. In Exhibit C, these are the findings in
23 this case, yes.
24     Q. And you saw minimal inflammation?
25     A. Yes.

Page 72

1     Q. Do you know whether Ms. Thompson
2 complained of dyspareunia before the mesh was
3 inserted?
4     A. I know she had a history of endometriosis,
5 and that the dyspareunia after her procedure with
6 the mesh was different in nature or described as
7 cutting her partner, because of the mesh being
8 exposed. Which is not a known complication of
9 endometriosis.
10     Q. I believe my question was: Did she have
11 dyspareunia before she had the mesh inserted?
12     MS. O'DELL: And she answered your question.
13     BY MR. VOUDOURIS:
14     Q. And the answer is?
15     MS. O'DELL: She answered your question.
16     THE WITNESS: She had pain related to
17 endometriosis.
18     BY MR. VOUDOURIS:
19     Q. Pain anywhere else?
20     A. She had pelvic pain.
21     Q. So she had pelvic pain prior to having the
22 TVT implanted, correct?
23     A. She had pelvic pain and heavy bleeding
24 from menstrual periods, which is why I believe they
25 did a hysterectomy as well, which took care of that

Page 73

1 issue.
2     MS. O'DELL: Dr. Allison, if you need to review
3 your electronic records or anything else, you can
4 do so.
5     BY MR. VOUDOURIS:
6     Q. Did you do a differential diagnosis at all
7 in this case?
8     A. A differential diagnosis? No. I believe
9 that the mesh was causing her symptoms, which is
10 why it was removed by the surgeon. She had known
11 complications of mesh, repeated erosion, and then
12 she had issues with urinary retention and
13 dyspareunia.
14     Q. You didn't see any mesh, correct?
15     A. The gross --
16     MS. O'DELL: Object to form.
17     THE WITNESS: -- pathology report describes
18 mesh, so there was definitely mesh present.
19     BY MR. VOUDOURIS:
20     Q. But you didn't in your pathologic
21 findings, did you?
22     A. No. But the gross -- when you review
23 somebody's outside gross pathology, you read their
24 report and you see if it makes sense, and they're
25 documenting that there was mesh.

Kimberly H. Allison, M.D.

Page 74

1    Q.  I don't question that.
2       You yourself, when you looked at the
3  slides, you didn't see any mesh, correct?
4    MS. O'DELL:  She answered your question and
5  don't tell her what to do.  She's responding to
6  what she relied on.
7    THE WITNESS:  They did not sample the mesh for
8  microscopic examination, so it was not available to
9  me.
10   BY MR. VOUDOURIS:
11   Q.  Are you going to be rendering any opinions
12  about the mesh at trial in this case to a
13  reasonable degree of medical certainty?
14   A.  Other than the gross findings and the
15  documentation that mesh was removed, no, not unless
16  additional slides become available.
17   Q.  And is the final tissue report that the
18  gross findings you're referring to, is that
19  Thompson PSR 01188?
20   A.  Oh, the number -- where are you getting
21  the number from?  Where would you like me to look,
22  the pathology report or the --
23   Q.  Bottom right-hand corner I have a Bates
24  stamp number.
25   A.  Yeah, okay.

Page 75

1    MS. O'DELL:  Tell me that again, Peter, I
2  didn't hear it.
3    MR. VOUDOURIS:  It's PSR 01188.
4    MS. O'DELL:  There are medical records with
5  different Bates numbers that have been produced in
6  this case and in all the cases, so I'm not sure
7  that Dr. Allison's Bates numbers are going to match
8  yours.
9    BY MR. VOUDOURIS:
10   Q.  Do you have a final tissue report dated
11  6-25-10?
12   A.  I'm looking through all the material now.
13      So I have S-1271-10.
14   MS. O'DELL:  It's Graham MDR 000840 is the
15  Bates number.
16   THE WITNESS:  Bates number, I don't even know
17  what that is.
18   BY MR. VOUDOURIS:
19   Q.  So this is the only record that describes
20  mesh, correct?
21   A.  The --
22   Q.  Pathology record, I apologize.
23   A.  The operative note describes the scarred
24  mesh and removal of it.  And then, yes, this part B
25  was the mesh, the gross description of --

Page 76

1    Q.  And based on this gross description of the
2  mesh, are you going to be offering any opinions to
3  a reasonable degree of medical certainty?
4    A.  Based on the gross description, yes, I am
5  basing part of my opinion on that, because I
6  believe that her erosions were related to the mesh
7  that was removed.
8    Q.  Okay.
9       Maybe there's a disconnect here.  Are you
10  going to be saying that this mesh was degraded,
11  based on this report?
12   A.  No.
13   Q.  Are you going to say that there was
14  particle loss?
15   A.  I can theorize on it, but because I
16  haven't been provided with any material to review,
17  microscopically, I can't do anything other than
18  link by experience with these kinds of cases with
19  the symptoms that she had.
20   Q.  Are you going to say to a reasonable
21  degree of medical certainty that there was any
22  particle loss?
23   A.  Particle loss?  Can you describe what you
24  mean by that?
25   Q.  Particle loss from the mesh material.

Page 77

1    A.  Like the tree barking degradation?
2    Q.  Yes.
3    A.  I don't have the mesh.
4    Q.  Okay.
5    A.  Under the microscope, you're right.
6    Q.  Are you going to say to a reasonable
7  degree of medical certainty that this mesh rope
8  curled or frayed?
9    A.  No.
10   MR. VOUDOURIS:  Can we go off the record for
11  one second.
12   (Recess.)
13   (Defendants' Exhibit No. 9 was marked for
14  identification.)
15   BY MR. VOUDOURIS:
16   Q.  Dr. Allison, I am handing you what we've
17  marked as Defendants' Exhibit 9.
18      Could you identify that, please?
19   A.  This is the pathology report on Lisa
20  Thompson's procedure performed to remove the mesh
21  on 6-25-2010.
22   Q.  And before we took a little break, that
23  was the pathology report we were talking about,
24  correct?
25   A.  Correct.

Kimberly H. Allison, M.D.

Page 78

1   Q. Do you have an idea how much time you
2  spent reviewing the Thompson case?
3      A. Several hours.
4      Q. Now, as a lawyer when he hears the answer
5  several hours, he has no idea what that means. So
6  can you elaborate on that any further?
7      A. All the records and everything? Or are
8  you just talking about the slide that I reviewed
9  and the pathology report?
10     Q. The total time you spent reviewing the
11 Thompson case.
12     A. Four to five hours.
13     Q. On Exhibit 8, is there anything else that
14 you would consider abnormal on that
15 photomicrograph?
16     A. No.
17     Q. Have you ever treated a woman for urinary
18 symptoms?
19     A. I'm a pathologist.
20     Q. So the answer to my question would be
21 "no"?
22     A. No.
23     Q. You don't treat patients in a clinic,
24 correct?
25     A. No.

Page 79

1      Q. And particularly, you don't treat patients
2  like Ms. Thompson with her complaints, correct?
3      A. No. I'm a pathologist, I'm diagnostic,
4  not -- I don't treat patients.
5      Q. Any other opinions about Ms. Thompson that
6  we haven't talked about?
7      A. No.
8      MR. VOUDOURIS: Okay. I think we're done with
9  Ms. Thompson.
10     MS. O'DELL: I've got a few follow-up
11 questions.
12         -o-
13         EXAMINATION
14 BY MS. O'DELL:
15     Q. Dr. Thompson -- Dr. Allison.
16     MR. VOUDOURIS: No one's going to get your name
17 right today.
18     MS. O'DELL: Yeah.
19     Q. What type of -- of product did
20 Ms. Thompson have?
21     A. A TVT-O.
22     Q. And you were asked a number of questions
23 today about the TVT, but that's not the product
24 that Ms. Thompson was implanted with; is that
25 correct?

Page 80

1      A. That's correct.
2      Q. And earlier in the deposition you were
3  asked about mesh specimens that you had seen in
4  your clinical practice, and specifically you were
5  asked if you knew whether those specimens were a
6  TVT. Is it -- is it customary for a pathologist to
7  be given the identity or the brand name of a device
8  when they're asked to review pathology?
9      A. No, it is not.
10     Q. When -- would you be given -- in a
11 circumstance where a woman had mesh explanted,
12 would you be provided with the original implant
13 report, prior to reviewing her pathology?
14     A. That would not be typical, no.
15     Q. And so -- is that general information
16 that's not been available to pathologists?
17     A. Generally not.
18     Q. And you were asked a number of questions
19 about the -- your role here at Stanford and the
20 fact that your focus now is more on breast
21 pathology. Were you trained in GYN pathology?
22     A. Yes, I was.
23     Q. Did you -- were you practicing in the area
24 of GYN pathology when you were at the University of
25 Washington?

Page 81

1      A. Yes, I was.
2      Q. And does your board certification cover
3  GYN pathology?
4      A. Yes, it does.
5      Q. And are you -- even though your duties
6  here at Stanford presently are focused on breast
7  pathology, is there anything that would prevent you
8  from reviewing GYN pathology and diagnose -- making
9  diagnoses based on your review?
10     MR. VOUDOURIS: Objection.
11     THE WITNESS: No, there's nothing that would
12 prevent me from that, no.
13 BY MS. O'DELL:
14     Q. You were asked a number of questions about
15 can you correlate pain with findings on histology,
16 do you remember that line of questions?
17     A. Yes.
18     Q. And -- is that something that you were
19 trained to do as a pathologist?
20     A. Yes, definitely.
21     Q. And is that something that you have --
22 that you have done in your practice as a
23 pathologist, and that is, review histology and make
24 findings or make diagnoses regarding pain?
25     A. I'm sorry, can you say it again?

Kimberly H. Allison, M.D.

Page 82

1    Q.  Yeah, sorry, it's probably a bad question.
2    A.  It's something I do --
3    Q.  In your clinical practice, have you
4  reviewed pathology and made correlations to pain?
5    A.  Yes.  I mean, we went over some examples
6  where a patient --
7    Q.  And is that generally accepted in the
8  field of pathology, that -- your -- the practice of
9  doing that?
10    MR. VOUDOURIS:  Objection.
11    THE WITNESS:  Yes, we describe the pathology
12  findings and often -- you know, sometimes they are
13  in patients with pain and we might -- that might
14  offer an explanation for the patient's pain.
15    BY MS. O'DELL:
16    Q.  Is that process of making correlations
17  between pathological findings and pain in -- where
18  indicated, something that's generally accepted in
19  the field of pathology?
20    MR. VOUDOURIS:  Objection.
21    THE WITNESS:  Yes.  We correlate with many
22  symptoms.
23    BY MS. O'DELL:
24    Q.  Dr. Allison, in rendering your opinions in
25  the Thompson case, did you base your opinions on

Page 83

1  the review of her medical records, the clinical and
2  pathological literature and your training and
3  experience?
4    MR. VOUDOURIS:  Objection.
5    THE WITNESS:  Yes, I used all of that.
6    BY MS. O'DELL:
7    Q.  And when you considered Ms. Thompson's
8  case, did you consider other possibilities for the
9  cause of her symptoms?
10    MR. VOUDOURIS:  Objection, asked and answered.
11    THE WITNESS:  Yes.  The -- yeah, earlier I was
12  asked about differential diagnoses, if that's what
13  you mean.
14    MS. O'DELL:  Yes.
15    Q.  Tell us what would -- what -- as a
16  pathologist, what would be involved in the
17  differential diagnosis of a patient like
18  Ms. Thompson?
19    A.  The differential diagnosis in a patient
20  like her is very short, given that, as I mentioned
21  before, the presence of a vaginal erosion would be
22  very rare.  And, you know, typically in diabetics,
23  ulcers and erosions are caused by pressure ulcers.
24  I'd never heard of a pressure ulcer in the vagina.
25  This is clearly caused by a foreign object, which

Page 84

1  she had removed, because of the symptoms she was
2  having.
3    So the list became very short very quickly
4  to implicating mesh as the cause of her symptoms.
5    MR. VOUDOURIS:  Objection, lack of foundation.
6    MS. O'DELL:  I have no further questions,
7  Dr. Allison.
8    -o-
9    FURTHER EXAMINATION
10    BY MR. VOUDOURIS:
11    Q.  Dr. Allison, I have a few follow-up
12  questions.
13    Did any of the opinions that you gave me
14  over the two hours that we talked going through
15  Dr. Longacre's report actually that dealt with TVT
16  and TVT-O, are any of your opinions different now
17  because we're talking about a TVT-O product?
18    A.  No.
19    MS. O'DELL:  Object to the form.
20    BY MR. VOUDOURIS:
21    Q.  Has any urologist, gynecological surgeon
22  at Stanford come down to your office with a vaginal
23  slide after a mesh excision and asked you to
24  correlate any symptom with what you found on the
25  slide?

Page 85

1    A.  No.  And I doubt any pathologist has had
2  that occur.
3    MR. VOUDOURIS:  Okay.
4    MS. O'DELL:  Nothing further.
5    (Recess.)
6    MR. VOUDOURIS:  Going back on the record.
7    Q.  Dr. Allison, I'm going to hand you what we
8  marked as Defense Exhibit 1, could you identify
9  that, please?
10    A.  This is the notice of deposition.
11    Q.  Had you seen that prior to today?
12    A.  Yes.
13    Q.  When did you see that?
14    A.  I don't recall.  I saw it again this
15  morning, though.
16    Q.  All right.
17    There's an exhibit A attached, did you
18  have an opportunity before the deposition started
19  to look at Exhibit A?
20    A.  Attached?
21    MS. O'DELL:  I would just note for the record
22  that plaintiffs filed responses and objections to
23  Exhibit A to the notice and we reassert those
24  objections at this time.
25    MR. VOUDOURIS:  When did you file those?  I

Kimberly H. Allison, M.D.

Page 86

1 never saw anything?
2  MS. O'DELL: Last week. What's today?
3  MR. VOUDOURIS: Today is Thursday, the 17th.
4  MS. O'DELL: Yeah. It was either late last
5 week or early this week.
6  THE WITNESS: I don't have that.
7  MS. O'DELL: Yeah.
8  BY MR. VOUDOURIS:
9  Q. And Dr. Allison, as you're briefly looking
10 through that and take the time that you need, but
11 do you believe that you've -- other than the
12 objections stated by counsel -- provided or brought
13 the information that's requested?
14  A. Not all of it, no.
15  MS. O'DELL: Dr. Allison has -- has brought
16 information to the deposition in keeping with the
17 objections that were filed on the March 15th
18 document No. 92 in --
19  MR. VOUDOURIS: Did she bring billing records?
20 I'm sorry to interrupt.
21  MS. O'DELL: We've not been billed for her work
22 in the Thompson matter, or Barker or Phelps for
23 that.
24  BY MR. VOUDOURIS:
25  Q. So you have no bills for those cases; is

Page 87

1 that correct?
2  A. Not yet, yeah.
3  Q. Is there anything as you look through this
4 schedule A that you believe you have in your
5 possession that you did not bring today?
6  A. I gave you my CV.
7  MS. O'DELL: The objections have been filed and
8 there's some things that -- that -- the only thing
9 that she's -- that's responsive to the Exhibit A
10 consistent with our objections are on this jump
11 drive, and that's the materials that were provided
12 to Dr. Allison. And I'll be happy to make that
13 available to you if you'd like.
14  MR. VOUDOURIS: That would be great.
15  THE WITNESS: So you want to know if I provided
16 all that on here?
17  MS. O'DELL: Yes.
18  THE WITNESS: What --
19  MS. O'DELL: I would just -- I think he's --
20  MR. VOUDOURIS: We're doing this to make a
21 record.
22  MS. O'DELL: Counsel's being a little tricky,
23 not the first time today. But....
24  MR. VOUDOURIS: I object to that
25 characterization, counselor, considering that came

Page 88

1 from a person who gave me a medical report that
2 should have been given to me three weeks ago last
3 night, but anyway, go ahead.
4  MS. O'DELL: Well, she had to have surgery
5 before we could give a pathology report, that's
6 what happens.
7  MR. VOUDOURIS: She had surgery two days ago.
8  MS. O'DELL: You said three weeks ago, and she
9 had surgery, it takes a little while to get
10 materials, as you know.
11  So Dr. Allison has brought with her, and
12 I've got in my hand, prepared to give you, Counsel,
13 everything responsive to Exhibit A consistent with
14 our objections.
15  MR. VOUDOURIS: That's fine.
16  Q. For the record, is Exhibit 2, can you
17 identify that, please?
18  A. This is my expert report.
19  Q. And I believe we talked about that earlier
20 in the deposition, but we did -- didn't hand you
21 the exhibit, correct?
22  A. Okay. Yes.
23  Q. And the record will show what happened.
24 All right, but that's your expert report for these
25 three cases?

Page 89

1  A. Yes.
2  Q. All right.
3  MS. O'DELL: Just note for the record, as you
4 know, Barker is not included in Exhibit 2, we're
5 not here for Barker at the moment. The complete
6 report for Barker, as counsel knows, is included in
7 a supplemental report.
8  MR. VOUDOURIS: Right.
9  But she does talk about Barker under her
10 case specific opinions.
11  MS. O'DELL: She references the Barker case,
12 she says she'll supplement a report, which she did.
13 We did not talk about it if that's Exhibit A.
14  MR. VOUDOURIS: Yeah, we did not.
15  MS. O'DELL: We did not.
16  BY MR. VOUDOURIS:
17  Q. Dr. Allison, we're going to hand you
18 Defense Exhibit 3, can you identify that for the
19 record, please?
20  A. This is my CV.
21  Q. Is it current?
22  A. I believe so. If it was the one that was
23 provided recently, yes.
24  Q. Why don't you take a look, that's why
25 we're here.

Page 90

1    A.  Yes, it looks -- yes, looks current.
2    Q.  Any additions or deletions to that
3  exhibit?
4    A.  No.
5    MR. VOUDOURIS:  I believe that's it.
6    MS. O'DELL:  Nothing further.
7    (Whereupon, the deposition adjourned at
8  3:42 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 92

1
2    ACKNOWLEDGMENT OF DEPONENT
3
4    I,_____, do
5  hereby certify that I have read the
6  foregoing pages, and that the same is
7  a correct transcription of the answers
8  given by me to the questions therein
9  propounded, except for the corrections or
10  changes in form or substance, if any,
11  noted in the attached Errata Sheet.
12
13
14  _____
15  KIMBERLY H. ALLISON, M.D.        DATE
16
17
18  Subscribed and sworn
   to before me this
19  _____ day of _____, 20____.
20  My commission expires:_____
21
   _____
22  Notary Public
23
24
25

Page 91

1         - - - - - -
          E R R A T A
2         - - - - - -
3
4  PAGE  LINE  CHANGE
5  ____  ____  _____
6    REASON:  _____
7  ____  ____  _____
8    REASON:  _____
9  ____  ____  _____
10    REASON:  _____
11  ____  ____  _____
12    REASON:  _____
13  ____  ____  _____
14    REASON:  _____
15  ____  ____  _____
16    REASON:  _____
17  ____  ____  _____
18    REASON:  _____
19  ____  ____  _____
20    REASON:  _____
21  ____  ____  _____
22    REASON:  _____
23  ____  ____  _____
24    REASON:  _____
25

Page 93

1    REPORTER'S CERTIFICATE
2    I hereby certify that the witness in the
3  foregoing deposition, KIMBERLY H. ALLISON, M.D.,
4  was by me duly sworn to testify to the truth, the
5  whole truth, and nothing but the truth, in the
6  within-entitled cause; that said deposition was
7  taken at the time and place herein named; that the
8  deposition is a true record of the witness'
9  testimony as reported by me, a duly certified
10  shorthand reporter and a disinterested person, and
11  was thereafter transcribed into typewriting by
12  computer.
13    I further certify that I am not interested
14  in the outcome of the said action, nor connected
15  with, nor related to any of the parties in said
16  action, nor to their respective counsel.
17    IN WITNESS WHEREOF, I have hereunto set my
18  hand 3/21/2016.
19
20
21
22    LUCY CARRILLO-GRUBBS RPR
23    CSR No. 6766
24    STATE OF CALIFORNIA
25