# EXHIBIT E

Kimberly H. Allison, M.D.

```
 1           IN THE UNITED STATES DISTRICT COURT

 2       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                 CHARLESTON DIVISION

 4   IN RE:  ETHICON, INC., PELVIC   ) MASTER FILE NO.

     REPAIR SYSTEM PRODUCTS          ) 2:12-MD-02327

 5   LIABILITY LITIGATION            ) MDL NO. 2327

                                     )

 6   THIS DOCUMENT RELATES TO THE    ) JOSEPH R. GOODWIN

     FOLLOWING CASES IN THE WAVE 1   ) U.S. DISTRICT JUDGE

 7   OF MDL 200:                     )

     PATTI ANN PHELPS, et al.,       ) CASE NO.

 8                                   ) 2:12-cv-01171

                  Plaintiff,         )

 9                                   )

     V.                              )

10                                   )

     ETHICON, INC., ET AL.,          )

11                 Defendants.       )

12        DEPOSITION OF KIMBERLY H. ALLISON, M.D.

13

14   DATE:              THURSDAY, MARCH 17, 2016

15   TIME:              4:10 P.M.

16   LOCATION:          STANFORD PARK HOTEL

17                      100 El Camino Real

18                      Menlo Park, California

19

20

21   Reported by:

22   LUCY CARRILLO-GRUBBS, RMR, CRR, RPR, CRP, CSR

     License No. 6766

23

24

25
```

Kimberly H. Allison, M.D.

---

**Page 2**

1  A P P E A R A N C E S
2  FOR PLAINTIFF:
3  P. LEIGH O'DELL, ESQUIRE
   BEASLEY ALLEN CROW METHVIN PORTIS
4  & Miles, P.C.
   218 Commerce Street
5  Montgomery, AL  36104
   Tel:  334.269.2343
6  Fax:  334.954.7555
   Email:  Leigh.Odell@BeasleyAllen.com
7
8  FOR DEFENDANTS:
   S. PETER VOUDOURIS, ESQUIRE
9  TUCKER ELLIS, LLP
   950 Main Avenue, Suite 1100
10 Cleveland, OH  44113
   Tel:  216.592.5000
11 Fax:  216.592.5009
   Email:  peter.voudouris@tuckerellis.com
12
   TRACI L. SHAFROTH, ESQUIRE
13 TUCKER ELLIS, LLP
   One Market Plaza, Steuart Tower
14 Suite 700
   San Francisco, CA  94105
15 Tel:  415.617.2400
   Fax::415.617.2409
16 Email:  traci.shafroth@tuckerellis.com
17          -oOo-
18
19
20
21
22
23
24
25

---

**Page 3**

1          I N D E X
2  Examinations                    Page
3  BY MR. VOUDOURIS                    5
4  BY MS. O'DELL              78
5  FURTHER EXAMINATION BY MR. VOUDOURIS     82
6  FURTHER EXAMINATION BY MS. O'DELL       86
7
8
9
10         E X H I B I T S
11 No.    Description         Page
12 1  Amended Notice of Deposition of     5
13    Kimberly H. Allison
14 2  Rule 26 Expert Report of Kimberly H.    5
15    Allison, M.D.
16 3  Curriculum vitae         5
17 4  Facts or data considered in forming     5
18    opinions
19 5  Excel spreadsheet titled Exhibit C     5
20 6  Expert report of Teri Longacre, M.D.    5
21 7  Expert report of Hannes Vogel, M.D.    5
22 8A- Photos of slides, Bates stamped Phelps   14
23 8E  09-S-2400 1A 2x
24 9  Document from the Department of      23
25    Pathology and Laboratory Medicine

---

**Page 4**

1  E X H I B I T S (CONTINUED)
2  No.    Description              Page
3  10  Article from CAP Today        82
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 5**

1
2      BE IT REMEMBERED THAT, pursuant to the laws
3  pertaining to the taking and use of depositions,
4  and on THURSDAY, MARCH 17, 2016, commencing at the
5  hour of 4:10 P.M. thereof, at the STANFORD PARK
6  HOTEL, 100 El Camino Real, Menlo Park, CA
7  California, before me, LUCY CARRILLO-GRUBBS, CRP,
8  RMR, CRR, RPR, CSR No. 6766, a Certified Shorthand
9  Reporter in and for the State of California,
10 personally appeared
11
12      KIMBERLY H. ALLISON, M.D.
13
14 being called as a witness by the Defendants, who,
15 having been by me first duly sworn, was thereupon
16 examined and interrogated as hereinafter set forth.
17          -oOo-
18     (Defendants' Exhibit No. 1, 2, 3, 4, 5, 6 and 7
19 were marked for identification.)
20           -o-
21        EXAMINATION
22 BY MR. VOUDOURIS:
23 Q.  Good afternoon, Dr. Allison.
24 A.  Good afternoon.
25 Q.  Next on the agenda, among other things, is

---

Kimberly H. Allison, M.D.

Page 6

1 a discussion about your opinion in the Phelps case.
2     But just for the record, at the beginning
3 of the deposition counsel for the plaintiffs and I
4 had a discussion on the record in which we outlined
5 our positions about the scope of your testimony and
6 inquiry today and we both agreed to copy that
7 verbatim, if need be, at the beginning of this
8 transcript, or at least note that we're in
9 agreement that our soliloquy from the beginning of
10 the Thompson case also applies to the Phelps case.
11     MS. O'DELL:  And just to be clear, we've
12 offered Dr. Allison as a case specific expert and
13 she's not offered in this litigation as a general
14 causation expert; therefore, her depositions by
15 agreement of counsel are limited to two hours.
16     Is that fair?
17     MR. VOUDOURIS:  I don't know about agreement of
18 counsel, but I understand what you're saying.
19     MS. O'DELL:  No.  The agreement of counsel
20 relates to case specific experts being limited to
21 two hours and that's been agreed to by -- at the
22 county counsel in the Plaintiffs' Steering
23 Committee, that's what I was referring to.
24     Okay.
25     BY MR. VOUDOURIS:

Page 7

1     Q.  Dr. Allison, I have marked as Defendants'
2 Exhibit 1.
3     Could you please identify that for the
4 record, please?
5     A.  This is the notice of deposition.
6     Q.  And you've seen that document before?
7     A.  Yes.
8     MS. O'DELL:  And, Counsel, just --
9     MR. VOUDOURIS:  And counsel for plaintiff, why
10 don't you just reiterate your position regarding
11 schedule A.
12     MS. O'DELL:  You read my mind.
13     On March the 15th we filed responses and
14 objections to schedule A to the notice of
15 deposition and I reassert those at this time.  I
16 believe those were filed as document No. 92, but
17 I'm not sure, I could be wrong.
18     MR. VOUDOURIS:  And in the places where you did
19 not file an objection, Dr. Allison has brought the
20 materials with her today responsive to schedule A?
21     MS. O'DELL:  That is correct.
22     BY MR. VOUDOURIS:
23     Q.  Dr. Allison, defendants are handing you
24 Defendants' Exhibit 2.
25     Could you please identify that for the

Page 8

1 record, please?
2     A.  This is my expert report.
3     Q.  Which covers the Phelps case?
4     A.  Yes, it covers the Phelps case.
5     Q.  Now handing you Defendants' Exhibit 3.
6     Could you please identify that for the
7 record, please?
8     A.  This is my current CV.
9     Q.  And the same applies to your testimony in
10 the Thompson case, this CV is current and
11 up-to-date?
12     A.  Yes.
13     Q.  No additions or deletions?
14     A.  No additions or deletions.
15     Q.  Hand you what's Defendants' Exhibit 4.
16     Could you please identify that for the
17 record, please?
18     A.  These are the facts or data considered in
19 forming opinions, it's a reference list.
20     Q.  And that also applies to the Thompson
21 case?
22     A.  Yes.
23     Q.  And applies to all the cases that you've
24 reviewed?
25     A.  Yes.

Page 9

1     Q.  Handing you what's Defendants' Exhibit 6.
2     MS. SHAFROTH:  This one's 5.
3     BY MR. VOUDOURIS:
4     Q.  And I'm sorry, I went out of order.  Let
5 me hand you Defendants' Exhibit 5 first.
6     Can you identify that for the record,
7 please?
8     A.  This is a spreadsheet with my pathology
9 record review findings.
10     Q.  That includes the Thompson case?
11     A.  That includes the Thompson case and the
12 Phelps case.
13     Q.  Defendants' Exhibit 6?
14     A.  This is the expert report of Dr. Longacre.
15     Q.  And you testified that you had read that
16 before or at least you received a copy before your
17 deposition in the Thompson case, correct?
18     A.  Correct.
19     Q.  Defendants' Exhibit 7?
20     A.  The expert report of Hannes Vogel.
21     Q.  And Dr. Vogel's a professor of
22 neuropathology at Stanford, correct?
23     A.  Correct.
24     Q.  Handing you Defendants' Exhibit 8A through
25 E.

Kimberly H. Allison, M.D.

1  Could you please identify that for us,
2  please?
3      A.  These are copies of the photos that I took
4  of Ms. Phelps's pathology.
5      Q.  Are those all the photos that you took?
6      A.  Yes.
7      Q.  Handing you what we previously marked at
8  Defendants' Exhibit 2.  This is your expert report,
9  and I want to refer you to page 13.
10      And is that where you list your rate for
11  reviewing these cases?
12      A.  Yes.
13      Q.  And what do you charge an hour?
14      A.  $685 an hour.
15      Q.  I believe in earlier deposition testimony
16  I read in one of your Bard cases, you said you
17  consulted some Stanford colleagues to come up with
18  that number, is that accurate?
19      MS. O'DELL:  Object to form.
20      THE WITNESS:  I did, yes.
21      BY MR. VOUDOURIS:
22      Q.  Who were those Stanford colleagues?
23      A.  It was not Dr. Longacre.
24      Q.  And it was not Dr. Vogel, was it?
25      A.  No.

1      Q.  Do you remember who it was?
2      A.  Dr. Berry.  He didn't tell me exactly what
3  to charge, he just gave me a range.  I was also
4  charging about Dr. Longacre's rate back in
5  Washington.  I didn't know what Dr. Longacre's rate
6  was at the time.
7      And when I moved here and the taxes were
8  much higher, I wanted to earn a similar amount and
9  so I raised my rate.
10      Q.  Do you remember the range that Dr. Berry
11  gave you?
12      A.  Four to 600.
13      Q.  Do you believe that the rate that you
14  charge for review of these cases should be
15  commissariat with your experience?
16      A.  Well, I consider myself an expert in
17  breast and GYN pathology and I don't -- I don't
18  have the information of what all of the other
19  experts are charging, it's not transparent all the
20  time.  And I don't want to set my rates low enough
21  that I'm constantly being asked to do legal cases.
22      Q.  Is it -- I'm sorry, I believe my question
23  was:  Do you believe that the rate that you charge
24  for review of these cases should be commissariat
25  with your experience?

1      A.  Not necessarily.
2      Q.  Why do you say that?
3      A.  It's the amount I think my time is worth.
4      Q.  So you don't think that the amount that
5  you charge should have any relation to your level
6  of experience?
7      MS. O'DELL:  Object to the form.
8      THE WITNESS:  It's one part of it, for sure.
9  But it's my -- what -- what rate would be
10  personally worth it to me to take time out of my
11  normal career to look at a legal case, and I'm only
12  taking cases that I am interested in taking, but...
13      Q.  Do you believe that Dr. Longacre has more
14  experience than you do in the field of GYN
15  pathology?
16      A.  Yes.  She's been practicing a lot longer
17  than me, and she's well known as an expert in the
18  field.
19      Q.  And well respected, correct?
20      A.  Yes.
21      Q.  You value her opinions, don't you?
22      A.  Yes, I do.
23      Q.  I'm going to hand you what we've marked as
24  Defendants' Exhibit No. 6.
25      A.  Okay.

1      Q.  Is that Dr. Longacre's report?
2      A.  Yes.
3      Q.  And I think your thumb might have the page
4  on it, do you see how much Dr. Longacre charges an
5  hour?
6      A.  Yes.
7      Q.  What does she charge?
8      A.  $500 an hour.
9      Q.  And Dr. Vogel.  Dr. Vogel, I don't think
10  you'd argue with me, is well known in the field of
11  neuropathology?
12      A.  Yes.
13      Q.  He's highly respected?
14      A.  Yes.
15      Q.  Do you know how many years he's been at
16  Stanford?
17      A.  No.
18      Q.  I'm going to hand you what's marked as
19  Defendants' Exhibit 7.  And I refer you to what's
20  the page on the bottom?
21      A.  20.
22      Q.  And does that indicate what Dr. Vogel
23  charges an hour for -- to perform the similar tasks
24  that you're doing?
25      A.  Yes.

Kimberly H. Allison, M.D.

Page 14

1    Q. And what does he charge?
2    A. $500 an hour.
3    Q. So do you believe your time is worth
4 more -- your professional time is worth more than
5 Dr. Longacre and Dr. Vogel?
6    A. Well, those two are full professors and
7 they don't have to worry about being promoted
8 anymore. I'm an associate professor, and if I'm
9 taking time from the things that I should be
10 focusing on for my career to do a legal case, this
11 was the rate that I felt would make it personally
12 worth it to me. And people are welcome to not hire
13 me as an expert at that rate.
14    Q. Has any plaintiffs' firm told you that
15 your rate's too high?
16    A. I have heard that before, once.
17    Q. By a plaintiffs' firm?
18    A. By -- no, maybe not by a plaintiffs' firm.
19    Q. So they'll pay what you charge?
20    MS. O'DELL: Object to the form.
21    THE WITNESS: I have been paid what I charge,
22 yes.
23    (Defendants' Exhibit No. 8A to 8E were marked
24 for identification.)
25    BY MR. VOUDOURIS:

Page 15

1    Q. And I'm sorry, Defendants' Exhibits 8A
2 through E -- good, there wasn't a question pending.
3       Those are the photomicrographs you took?
4    A. Yes.
5    Q. Regarding Ms. Phelps?
6    A. Yes.
7    Q. Do you have an idea -- any idea how many
8 hours you've spent on the Phelps case?
9    A. Probably a similar total amount. I said
10 before between four to six hours, I believe, four
11 to five hours.
12    Q. So you believe you spent five hours
13 reviewing the Phelps case?
14    MS. O'DELL: Object to the form, she said
15 between four to five.
16    THE WITNESS: Yes. What I said, it was between
17 four and five.
18    BY MR. VOUDOURIS:
19    Q. And what did you review to come to your
20 opinions in the Phelps case?
21    A. I reviewed her medical records.
22    Q. All of them?
23    A. All of the ones provided to me.
24    Q. And those would be on the jump drive that
25 you have?

Page 16

1    MS. O'DELL: Yes. And also listed on the
2 materials list, which I believe you marked as
3 Exhibit 4.
4    BY MR. VOUDOURIS:
5    Q. And you read all of those medical records?
6    A. Yes.
7    Q. What else?
8    A. Reviewed and organized her slides and
9 her -- read her pathology report, photographed her
10 pathology.
11    Q. Anything else?
12    A. Discussed the cases with counsel.
13    Q. And those four items only were four to
14 five hours?
15    A. That would be my estimate.
16    Q. Did you read any depositions?
17    A. Felix was provided to me, I've reviewed
18 that this morning.
19    Q. Okay.
20       Dr. Felix hasn't been deposed in this case
21 yet, so --
22    MS. O'DELL: I think he's -- she's referring to
23 the report.
24    MR. VOUDOURIS: I understand that.
25    THE WITNESS: Yes, you're right, I'm sorry.

Page 17

1    BY MR. VOUDOURIS:
2    Q. My question was depositions.
3    A. No.
4    Q. That's okay.
5       Have you read any depositions regarding
6 the Phelps case?
7    A. No, I have not.
8    Q. So you didn't read any of the healthcare
9 providers' depositions; is that correct?
10    A. No, I have not.
11    Q. Or Mr. and Mrs. Phelps?
12    A. No. Definitely not.
13    Q. And you reviewed Dr. Felix's report this
14 morning?
15    A. Yes.
16    Q. Do you have that with you?
17    A. I had an electronic copy, I don't think I
18 have a printout of it.
19    Q. Based on your review of Dr. Felix's
20 report, do you have any objections with what he
21 wrote in his report?
22    MS. O'DELL: If you've got a question, Counsel,
23 about Dr. Felix's report, I'm sure, being the
24 qualified, very prepared lawyer that you are, that
25 you have a copy that you can provide to Dr. Allison

Kimberly H. Allison, M.D.

Page 18

1 and she can answer your questions.
2     But in the abstract, I think it's an
3 unfair question you've asked her.
4     BY MR. VOUDOURIS:
5     Q. Can you answer my question?
6     A. I would like to be more specific, I'm sure
7 there were things in there that I disagreed with.
8 I only got to review it very quickly.
9     Q. What does very quickly mean?
10     A. Scanning it over lunch, basically.
11     Q. Anything else that you scanned over
12 briefly at lunch?
13     A. No. Not other than reviewing my own
14 things I'd reviewed initially.
15     Q. Obviously you didn't have Dr. Felix's
16 report before you issued yours, but have we covered
17 the universe of materials you reviewed to come to
18 your opinions in the Phelps case?
19     A. Have we covered the universe of opinions?
20     Q. Information that you reviewed to come to
21 your opinions in the Phelps case?
22     A. During this testimony here? I don't think
23 we've reviewed it.
24     Q. No, I'm asking you --
25     A. Oh, the material that I used?

Page 19

1     Q. Yes, yes.
2     A. Yes, we have.
3     Sorry.
4     Q. By the way, did you make any notes?
5     A. No. I have no notes.
6     Q. Do you have any notes in any of the cases
7 that you reviewed against Ethicon?
8     A. No. My notes are basically those
9 spreadsheets.
10     Q. Exhibit 5?
11     A. Yes.
12     Q. That would constitute your notes?
13     A. Yes.
14     MR. VOUDOURIS: Off the record.
15     (Brief discussion off the record.)
16     BY MR. VOUDOURIS:
17     Q. Did you do any type of chemical analysis
18 on Ms. Phelps's sample?
19     A. No.
20     Q. Was your evaluation of her tissue limited
21 to light microscopy?
22     A. Yes.
23     Q. And if we look at your photomicrographs
24 from Exhibit 8, you have -- do you mind if I come
25 over your shoulder?

Page 20

1     A. Okay.
2     Q. 8A, is that an H&E stain?
3     A. Yes.
4     Q. Why don't you go through and tell us the
5 type of stain.
6     A. B is an H&E stain, C is an H&E stain, D is
7 an H&E stain, and E is an S100 stain.
8     Q. And were these provided to you with those
9 stains or did you have tissue and then stain them
10 yourself?
11     A. They were provided to me.
12     Q. And was all you were provided with was
13 slides?
14     A. Yes.
15     Q. Other than the other documents that we
16 already talked about.
17     A. Right.
18     Q. Have you talked -- have you spoken with
19 the plaintiffs?
20     A. Have I spoken with them?
21     Q. Yes.
22     A. No.
23     Q. Okay.
24     Any of Ms. Phelps's healthcare providers?
25     A. No.

Page 21

1     Q. You've never met Ms. Phelps, have you?
2     A. No.
3     Q. Did you talk to anyone else about
4 Ms. Phelps?
5     A. Other than counsel, no.
6     Q. Looking at Exhibit 5, can you tell us what
7 your opinions are regarding Ms. Phelps?
8     MS. O'DELL: You could also look at your
9 report, Dr. Allison, feel free to do that.
10     THE WITNESS: So I reviewed the medical records
11 and pathology on Ms. Phelps, and the spreadsheet
12 shows the date that her mesh was implanted was back
13 in July of 2000.
14     BY MR. VOUDOURIS:
15     Q. And she had a TVT?
16     A. And she had a TVT. And then she had --
17 she had multiple symptoms prior to the removal of
18 the specimen that I reviewed. She presented in
19 October of 2005 and in November of 2008 with
20 vaginal pressure, pelvic pain, dyspareunia, bladder
21 pain and pressure and urinary leakage. They saw
22 mesh erosion on cystoscopy in December of 2008.
23 And then in -- on January of 2009 she had resection
24 of the eroded mesh, which is the specimen I
25 received for review.

Kimberly H. Allison, M.D.

Page 22

1    The --
2    Q. I'm sorry, again, that specimen correlates
3 with what date?
4    A. It correlates with February 11th -- wait.
5 Sorry, it was her second revision. She had -- she
6 had the January 2009 resection, which I did not
7 review, and then in February of 2009, a month
8 later, there was an additional area of erosion and
9 that was what I reviewed, a month apart.
10   So the mesh removed was described grossly
11 in the pathology report, and on my review of the
12 specimen submitted for microscopic examination from
13 that procedure she had mucosal and submucosal
14 tissue with abundant mesh fibers surrounding
15 fibrosis, some mild chronic inflammation, and
16 trapped nerves that were present. You could see
17 them on H&E and on the S100 stain.
18   There was so-called tree barking or the --
19 the rim of the damaged mesh fiber present in the --
20 invisible in the H&E slides of the mesh fibers
21 within the tissue. And then there was also
22 separate tissue that was submitted as rule out
23 foreign material, and it was skeletal muscle that
24 is completely scarred and damaged.
25   And that's what's in images C and D.

Page 23

1    Q. And what images did you see mesh?
2    A. The images labeled A and B contained mesh,
3 and that was -- let me look up the pathology
4 report. If you look up the pathology report, I
5 believe it was part A. Let me make sure.
6    So according to the pathology report,
7 there were two specimens received. Part A was the
8 sling resection and those images that I've taken
9 are from part A, 1A. And the second specimen was
10 the rule out foreign material and that was the
11 scarred skeletal muscle.
12   (Defendants' Exhibit No. 9 was marked for
13 identification.)
14   BY MR. VOUDOURIS:
15   Q. Dr. Allison, I'm going to hand you what we
16 marked as Defendants' Exhibit 9.
17   Can you please identify that for the
18 record?
19   A. This is the surgical pathology report from
20 the February 11th, 2009 surgery that she underwent.
21   Q. Is that the same report that you're
22 referencing?
23   A. Yes, it does look like it's the same.
24   Q. That you --
25   A. There's something on the back of the page

Page 24

1 too, that's not relevant.
2    MR. VOUDOURIS: Off the record.
3    (Brief discussion off the record.)
4    MR. VOUDOURIS: Back on the record.
5    Q. Dr. Allison, I'm sorry, the original
6 Exhibit 9 had some other records on the back of it.
7    So this Exhibit 9 that we've just handed
8 you, can you identify that, please?
9    A. Yes, it's the surgical pathology report
10 for the February 2009 mesh removal.
11   Q. And you have a copy of that report in
12 front of you?
13   A. Yes.
14   Q. And this relates to the slides that you
15 reviewed and put your comments on Exhibit 5?
16   A. Yes.
17   Q. Is there any microscopic analysis done on
18 this report?
19   A. On the pathology report?
20   Q. Correct.
21   A. Yes. It looks like they submitted tissue
22 from both parts, from microscopic examination and
23 they have a final diagnosis that is based on
24 microscopic examination.
25   Q. And that's under final diagnosis?

Page 25

1    A. Yes.
2    Q. Does the pathologist here document that
3 the mesh degraded?
4    A. No. The pathologist states fibrous tissue
5 with histiocytic reaction to polarizable or foreign
6 material.
7    Q. Did the pathologist note that the mesh
8 curled or frayed?
9    A. No. The pathologist does not.
10   Q. Does the pathologist indicate that the
11 mesh contracted?
12   A. No.
13   Q. Is there any mention of particle loss on
14 that pathology report?
15   A. I've never used the term "particle loss."
16 I don't know exactly what you're referring to, but
17 no, they don't mention particle loss.
18   Q. Is there any mention of any nerve
19 abnormality?
20   MS. O'DELL: Object to the form.
21   THE WITNESS: No.
22   BY MR. VOUDOURIS:
23   Q. In fact, it's silent as to nerves,
24 correct?
25   A. Yes.

Kimberly H. Allison, M.D.

Page 26

1    Q. Is there any documentation of any vascular
2  abnormality?
3    A. No.
4    Q. Do you mind again if I come over your
5  shoulder and we'll do a blue pen, because that
6  seems to work better than red.
7    A. Okay.
8    Q. All right.
9      So we're now looking at 8A?
10   A. Yes.
11   Q. And this is a photograph that you made of
12 the slide, correct?
13   A. Correct.
14   Q. Okay.
15     What is significant to you in this slide
16 that you intend to tell the jury about?
17   A. There are multiple mesh fibers with dense
18 fibrosis surrounding and encasing them, so this low
19 power image is really to show that sort of scar
20 fleet that's being formed around the mesh fibers.
21   Q. All right.
22     That's a very good question, what's the
23 magnification on this image?
24   A. 2X.
25   Q. All right.

Page 27

1      And can you circle for us the findings
2  that you just discussed?
3    A. (Witness complies.)
4    Q. So everything in that blue circle is what?
5    A. Scar around mesh fibers.
6    Q. Can you put that there, please?
7    A. (Witness complies.)
8    Q. Anything else of significance that you're
9  going to tell the jury about with that picture?
10   A. No.
11   Q. All right.
12     Let's go to the next one.  8B is taken at
13 10X?
14   A. Yes.
15   Q. And I'm sorry, I apologize, 8A, do you
16 know where that was taken from, exactly?
17 MS. O'DELL:  She's already answered that.
18     Are you talking about the magnification?
19 MR. VOUDOURIS:  No.
20 THE WITNESS:  Where it was taken from?
21 MR. VOUDOURIS:  8A goes with --
22 THE WITNESS:  Oh, with 1A.
23 BY MR. VOUDOURIS:
24   Q. With 1 --
25   A. Yes.

Page 28

1    Q. -- A.  So specimen labeled Rice sling
2  resection?
3    A. Yes.
4    Q. Four fragments?
5    A. Yes.
6    Q. All right.
7      And then 8B?
8    A. 8B is reflected in --
9    Q. I think you have 8C there.
10   A. I'm sorry.  8B, you mean the picture,
11 okay, is also from the same -- it's a higher
12 powered view of this area here (indicating), looks
13 like this matches.
14   Q. Okay.
15 MS. O'DELL:  When you say here, just so the
16 record's clear, you are referring to Exhibit 8A is
17 a higher -- 8B is a higher power selection of 8A,
18 is that you're -- what you're saying?
19 THE WITNESS:  Yes.
20 MR. VOUDOURIS:  Okay.
21   Q. Can you show me where on 8A you have this
22 higher mag of 8B?
23   A. Would you like me to --
24   Q. Yeah, why don't you draw another circle
25 around it and label it 8B --

Page 29

1    A. Okay.
2    Q. -- on 8A.
3      So what are you going to tell the jury
4  about the significance of 8B?
5  MS. O'DELL:  Object to the form.
6  THE WITNESS:  8B is a higher power image of
7  similar features that were seen in 8A, dense
8  fibrosis and scar surrounding mesh fibers.
9      At this magnification you can see some
10 lymphocytic chronic inflammation centered around
11 the mesh fibers.  And you can see the tree barking
12 effect on the mesh fibers where the damaged hull of
13 the mesh fiber is remaining in the tissue.
14 BY MR. VOUDOURIS:
15   Q. The damaged what?
16   A. I use the word "hull," but it's the rim of
17 the mesh fiber.  Tree barking is the word in the
18 literature that's been used to describe this
19 phenomenon.
20   Q. Tree barking is the word that Dr. Iakovlev
21 uses in the literature, correct?
22   A. He is the author who's been publishing on
23 this, yes.
24   Q. All right.
25     And again, your opinion that you believe

Kimberly H. Allison, M.D.

Page 30

1  that this is degraded polypropylene is based on
2  Dr. Iakovlev's work, is that fair?
3      MS. O'DELL:  Object to the form.
4      THE WITNESS:  Yes.
5          And my observations seem to match his.
6      BY MR. VOUDOURIS:
7      Q.  Have you done any analysis yourself to
8  figure out what this so-called tree barking is?
9      A.  It is refractile, it's similar in
10 appearance to the -- sometimes you'll see the whole
11 mesh fiber left in the tissue, and so it has
12 similar properties under the light microscope.
13     Q.  But do you know what this tree barking is,
14 what it's made out of?
15     A.  I am of the opinion that it's made of the
16 same material as the mesh fiber, it's degraded mesh
17 fiber rim.
18     Q.  And that's based on Dr. Iakovlev's work,
19 correct?
20     A.  Yes.
21     MS. O'DELL:  Object to the form.
22     THE WITNESS:  And the observations I'm seeing.
23     BY MR. VOUDOURIS:
24     Q.  Are there foreign body giant cells around
25 the perimeter of all of these mesh fibers?

Page 31

1      A.  It's a bit hard to appreciate from this
2  magnification and with this tissue preservation,
3  there's not a lot of them, no.
4      Q.  So you don't see a --
5      A.  Not a prominent --
6      Q.  You don't see a prominent foreign body
7  giant cell reaction around these mesh fibers; is
8  that correct?
9      A.  That's correct.  This would not be a good
10 example of that.  It's more of a lymphocytic
11 looking monocytic response in this particular
12 image.
13     Q.  Do you see any normal tissue, just a few
14 hundred microns away?
15     A.  Normal tissue?
16     MS. O'DELL:  Object to the form.
17     THE WITNESS:  No.  There's no normal tissue in
18 this image.
19     MR. VOUDOURIS:  Okay.
20     Q.  How about expected tissue?
21     A.  Expected tissue?
22     Q.  Of a woman this age, with her vaginal
23 symptoms.
24     MS. O'DELL:  Object to the form.
25     THE WITNESS:  No, this does not look like a

Page 32

1  normal --
2      BY MR. VOUDOURIS:
3      Q.  What would you characterize this area
4  around here (indicating) in the upper left?
5      A.  Well, that's sort of the edge of the dense
6  fibrosis.  We have a few adipose sites here and
7  probable nerve, these two may be nerves
8  (indicating).
9      Q.  Are you saying more likely than not that
10 those are nerves?
11     A.  I hadn't marked them or labeled them as
12 nerve, but --
13     Q.  That's why I asked the question.
14     MS. O'DELL:  Let her finish.
15     THE WITNESS:  They show up on the S100 stain
16 even -- sometimes it's hard to see on the H&E stain
17 and be definitive that you're looking at a nerve,
18 these have features that look consistent with a
19 nerve to me.
20     BY MR. VOUDOURIS:
21     Q.  Why don't you put circles around those and
22 say nerve, please.
23     A.  (Witness complies.)
24     Q.  Can you tell what type of nerve that is?
25     A.  A peripheral nerve.

Page 33

1      Q.  All right.
2          Do you know if it's a motor?
3      A.  No.
4      Q.  Do you know if it's a sensory?
5      A.  No.
6      Q.  You just know it's there?
7      A.  Yes.
8      Q.  Any comment on its appearance?
9      MS. O'DELL:  Apparent?
10     MR. VOUDOURIS:  Appearance.
11     THE WITNESS:  Okay.
12     MS. O'DELL:  Apparent of a nerve, I'd never
13 heard that before.  Appearance.
14     THE WITNESS:  No, they're not neuromas, if
15 that's what you're asking.
16     BY MR. VOUDOURIS:
17     Q.  No traumatic neuromas?
18     A.  No.
19     Q.  Are there any ganglia there?
20     A.  No, not in this image, no.  I don't think
21 I noted ganglia in this particular case.
22         No, I did not.
23     Q.  Can you circle for me where you see a
24 foreign body giant cell reaction?
25     A.  It's not prominent in this image.

Kimberly H. Allison, M.D.

Page 34

1    Q. Okay.
2    A. I wouldn't circle anything.
3    Q. What do you call this area here
4  (indicating)?
5    A. That looks to me like poor tissue
6  preservation effect. It's paler than the rest of
7  the stain on the slide, and that can happen when
8  the tissue for whatever reason wasn't -- this --
9  this spot didn't process well.
10    Q. Could you put a circle around that,
11  please?
12    A. But the rest of it looks fine.
13    (Witness complies.)
14    Q. So you believe that's due to processing?
15    A. Yes.
16    Q. Could you just mark that?
17    A. (Witness complies.)
18    Q. The tree barking, can you point me to
19  anywhere in your reference literature, any article
20  that describes or ascribes any clinical
21  significance to a patient from this tree barking?
22    A. Iakovlev's the one who has described this,
23  and would you like me to review it? He's looked
24  at --
25    Q. No, that's fine. You're referring to

Page 35

1  Dr. Iakovlev.
2    A. Okay.
3    Q. Anyone else other than Dr. Iakovlev?
4    A. There are not other pathologists who have
5  published on this particular topic, no.
6    Q. Anything else of significance you want to
7  tell the jury about 8B?
8    A. 8B. No.
9    Q. 8C. What, if anything, would you tell the
10  jury significant about your findings on 8C?
11    A. This is very abnormal skeletal muscle.
12  It's very scarred and fibrotic. The skeletal
13  muscle fibers are -- the fibrosis courses through
14  them in a very abnormal way. This isn't just a
15  scar adjacent to skeletal muscle. This is all
16  scarred area that envelopes the skeletal muscle.
17  And the next page I have some more of the higher
18  powered findings.
19    Q. I'm sorry, are you done? I just want to
20  stick with 8C before I move on.
21    A. Okay.
22    Q. 8C reflects to what on the pathology
23  report that we marked as Exhibit 9?
24    A. Specimen No. 2, rule out foreign material.
25    Q. Again, there's no mesh here?

Page 36

1    A. There's no mesh here, no.
2    Q. Any nerves here?
3    A. I can't tell from this power.
4    Q. Again, we're at 4X?
5    A. Yes.
6    Q. And you said there was abnormal tissue?
7    A. Scarred skeletal muscle.
8    Q. Why don't you draw where the scarred
9  skeletal muscle is?
10    A. That's the whole image.
11    You want me to indicate the skeletal
12  muscle fiber with an arrow or --
13    Q. However you want to do it.
14    A. (Witness complies.)
15    Skeletal muscle fiber. Fiber, I guess
16  example of one. They're all over. I guess I could
17  circle the whole thing.
18    Q. You just want to circle that, is that what
19  you mean?
20    MS. O'DELL: Well, don't let defense counsel
21  suggest to you what you mean, Dr. Allison.
22    MR. VOUDOURIS: I never want to do that,
23  Dr. Allison.
24    MS. O'DELL: You do what you feel is
25  appropriate.

Page 37

1  BY MR. VOUDOURIS:
2    Q. You circled skeletal muscle fiber, so
3  that's a fiber right there?
4    A. Yes.
5    Q. There you go, that's all I wanted you to
6  do. Maybe circle a few more so we have an idea.
7    A. This is all scar (indicating), and these
8  nucl- -- these dark spots are multinuclei,
9  atrophic, dead, dying skeletal muscle fibers, but
10  they're better seen on the next image and I'm happy
11  to circle them more on this.
12    This is all scar, this whole thing is scar
13  (indicating).
14    Q. The entire thing is scar?
15    A. It's -- it's all scarred skeletal muscle
16  fibers. It's a very low powered picture of that
17  whole thing.
18    Q. Want to just put that up here, then?
19    A. (Witness complies.)
20    Q. Do you know what a tissue would look like
21  in a woman suffering from pelvic laxity who did not
22  have mesh?
23    A. We don't typically see explants from those
24  patients, but I would not imagine that her skeletal
25  muscle would be this disorganized and scarred.

Kimberly H. Allison, M.D.

Page 38

1    Q.  And at Stanford, have you seen skeletal
2  muscle from women who have pelvic laxity that do
3  not have mesh?
4    MS. O'DELL:  Object to form.  That's too close,
5  Counsel, just --
6    THE WITNESS:  No, we don't get those kinds of
7  specimens, as far as I'm aware.
8    MR. VOUDOURIS:  Okay.
9    Q.  So you haven't; is that correct?
10    A.  Correct.
11    Q.  All right.
12    What's the next slide?
13    A.  So this is a 10X view of one of these
14  areas with the scar engulfing the skeletal muscle
15  fibers.
16    Q.  Can you go back and like you did before
17  and do a little box to show what 8D looks like on
18  8C?
19    MS. O'DELL:  If you can, don't guess.
20    THE WITNESS:  I'm not sure that it's...
21    Yeah, I think it's this area here, so
22  let's put a box (witness complies.)
23    MR. VOUDOURIS:  Why don't you make that box a
24  little more definable for everybody.
25    MS. O'DELL:  Yeah, I was just about to say

Page 39

1  that.  Because I can't --
2    MR. VOUDOURIS:  I can read your mind,
3  Counselor.
4    MS. O'DELL:  I doubt that.
5    THE WITNESS:  (Witness complies.)
6    Good?
7    MR. VOUDOURIS:  Fine by me.
8    Q.  All right, so what findings are you going
9  to tell the jury about that are significant to you
10  on 8D?
11    A.  These are damaged skeletal muscle fibers
12  that when skeletal muscle becomes atrophic and
13  damaged, it --
14    Q.  It what?
15    A.  It gets smaller and the nuclei that are
16  normally around the periphery of the skeletal
17  muscle fibers become like a ball of nuclei, that's
18  what these tombstones of the skeletal muscle fibers
19  are.
20    Q.  Would you just label that, please, as ball
21  of nuclei, is that what you call it?
22    A.  Yes.
23    Q.  You say nuclei from?
24    A.  Degenerated skeletal muscle fiber.
25    Q.  And you attributed this to what?

Page 40

1    A.  Consequences of scar and the -- I
2  attribute it to the mesh being irritating and
3  scarring around the area that it was implanted in.
4    Q.  When you say irritating, what do you mean
5  by irritating?
6    A.  Well, it's a foreign material and it's
7  generating a host response that involves chronic
8  inflammation and scarring.
9    Q.  Was it -- is it normal for mesh to
10  generate a response of chronic inflammation?
11    A.  Initially, yes.
12    Q.  And then what?  And then what, I'm sorry?
13    A.  Initially yes, and then over time,
14  inflammation should resolve and the scarring will
15  remain.
16    The scarring in this case looks like it's
17  gone all the way into the skeletal muscle, which is
18  more than you would want, and -- and I would
19  imagine would produce symptoms.
20    Q.  You would imagine would produce symptoms?
21    A.  Yes.
22    Q.  A little more definitive than that or is
23  it just you imagine?
24    A.  No, I'm -- I'm linking this to as a part
25  of complex findings that explain her symptoms, yes.

Page 41

1    Q.  All right.
2    Link it for us.
3    A.  The scarring caused by the foreign
4  material of the mesh inserted into her has caused
5  erosions, pain, and bladder dysfunction.
6    Q.  How did it cause erosion?
7    A.  The -- the mesh causes erosion because
8  it's causing scarring and abnormal tissue formation
9  and irritation of the tissues that are normally
10  present there, and the overlying mucosa breaks down
11  over it and causes an erosion.
12    Q.  And how does it cause pain?
13    MS. O'DELL:  How does -- when you say "it,"
14  what are you referring to, erosion, mesh?
15    BY MR. VOUDOURIS:
16    Q.  Mesh, I'm sorry.
17    A.  Mesh.
18    Well, the pain can be related to the
19  erosion that was caused by it, and the entrapped
20  neurofibers in the scar may contribute to the pain
21  from -- upon movement of areas that have these
22  nerve fibers entrapped with them.
23    Q.  Okay.
24    I'm not interested in could, I'm
25  interested in more likely than not.

Kimberly H. Allison, M.D.

Page 42

1  A. Yes, more likely than not.
2  Q. Have we discussed everything on 8D --
3  A. Yes.
4  Q. -- that you find significant?
5  Do you see any nerves?
6  A. No.
7  Q. Do you see any vessels?
8  A. No.
9  Q. Do you see any capillaries?
10  A. No.
11  Q. Do you see any capillaries in the other
12  three photos?
13  A. Capillaries?
14  Q. Uh-hmm.
15  A. I wasn't specifically looking for
16  capillaries. There is a -- looks like a blood
17  vessel.
18  Q. Could you circle that, please?
19  A. (Witness complies.)
20  Q. See any other capillaries?
21  A. From this power I'm not seeing definite
22  capillaries.
23  Q. Next page, 8B, do you see any capillaries?
24  A. It's hard to tell. I mean, that's a fat
25  cell and a lipocyte and then usually next to a

Page 43

1  nerve you might find a small capillary, that's
2  possibly one, but I'm not going to hang my hat on
3  it. I didn't describe capillaries in my pathology
4  findings and it wasn't something that I was focused
5  on.
6  Q. Can you do me a favor and just -- and you
7  can mark it possible capillary, but just where you
8  think there is a capillary.
9  MS. O'DELL: No, that's not her testimony,
10  so --
11  THE WITNESS: Yeah, I'd rather not be circling
12  things that, you know, I haven't confirmed under
13  the microscope and I wasn't going to describe to
14  the jury.
15  BY MR. VOUDOURIS:
16  Q. Okay, so you don't know whether or not
17  there are capillaries in 8A or 8B, correct?
18  MS. O'DELL: Object to the form.
19  THE WITNESS: If I looked at it under the
20  microscope I could give you a more definitive
21  answer, it's not that I'm not able to recognize
22  capillaries.
23  BY MR. VOUDOURIS:
24  Q. Are capillaries in scar?
25  A. Capillaries are typically in granulation

Page 44

1  tissue, which is the precursor to a scar, so it's
2  organizing fiber vascular tissue that then
3  organizes itself into a scar.
4  Q. So a capillary's in the scar?
5  A. Typically not in the middle of the scarred
6  area, but they can be found on the periphery.
7  Q. Okay.
8  A. Scar tends to push things out of the way.
9  But you have to have some blood vessels feeding any
10  tissue, otherwise it would necrose.
11  So in some way -- I mean, the scar is
12  mainly extracellular material, but there are some
13  cells present as well.
14  Q. 8D I think, I apologize, we're going back
15  and forth, anything else that you want to --
16  anything else of significance on 8D?
17  A. No.
18  Q. And this -- there's scar on this
19  photograph?
20  A. Yes.
21  Q. Where's the scar?
22  A. Again, it's the whole area, the scar is
23  engulfing the entire image, and these are little
24  islands of dying skeletal muscle within it. So I
25  can't really -- I would have to circle the whole

Page 45

1  area.
2  (Witness complies.)
3  Some areas have, you know, more scar and
4  less skeletal muscle, but the scar's going all the
5  way around these muscle fibers.
6  Q. All right.
7  So can you just label scar, please?
8  A. (Witness complies.)
9  Q. All right.
10  Next, microphotograph 8E. What of
11  significance are you going to tell the jury about
12  8E?
13  A. 8E is an S100 stain which highlights
14  nerves, and in this image you can see multiple
15  nerve fibers present within the tissue around the
16  mesh that has fibrosis in it.
17  Q. Where are the nerves?
18  A. I can circle them.
19  Q. I would hope so.
20  A. (Witness complies.)
21  Q. Thank you. Mark those as nerves.
22  A. (Witness complies.)
23  Q. And you agree with Dr. Vogel's testimony,
24  or at least his report, that using an S100 stain,
25  you're not able to tell whether those nerves are

Kimberly H. Allison, M.D.

Page 46

1 sensory, correct?
2    A.  Correct.
3    Q.  And you would agree with Dr. Vogel's
4 statement in that regard?
5    MS. O'DELL:  Object to the form.
6    THE WITNESS:  Yes.
7    BY MR. VOUDOURIS:
8    Q.  You see anything abnormal with these
9 nerves?
10    A.  Only that they're not present in normal
11 tissue, they're present in scarred tissue around
12 mesh fibers.
13    Q.  And that's the only place you find nerves?
14    MS. O'DELL:  Object to the form.
15    THE WITNESS:  That's not a normal place you
16 find nerves.
17    BY MR. VOUDOURIS:
18    Q.  How close are some of these nerves to the
19 mesh fiber?
20    A.  Very close.
21    Q.  What's very close mean?
22    A.  Less than a millimeter.
23    Q.  All right.
24       Want to just put here less than a
25 millimeter?

Page 47

1    A.  (Witness complies.)
2    Q.  Is there any foreign body giant cell
3 reaction going around this nerve that's less than a
4 millimeter from the mesh?
5    A.  You can't appreciate that from this image.
6    Q.  Can you appreciate any foreign body giant
7 cell reactions around any of these nerves in 8E?
8    A.  No, that's not what this stain is for.  It
9 highlights the nerve fibers and it's not -- doesn't
10 give you resolution for the rest of the tissue,
11 that would easily let you -- that's why we use H&E
12 for most of our characterization for the histologic
13 findings.
14       But, you know, it's the same area that we
15 see the chronic inflammation and scarring from the
16 other -- it's the same specimen, from the other
17 images.
18       So 8E is probably taken --
19    Q.  These are from specimen one or two?
20    A.  One.  You'll see the blood vessel up here.
21 With each cut, though, you get slightly different
22 findings at each level, so it's not going to match
23 up perfectly with the pattern of the mesh that
24 you're seeing here.
25       But I would imagine it would be around

Page 48

1 here somewhere (indicating).
2    Q.  Okay, that's not going to show up when the
3 court reporter types up the transcript, so --
4    A.  Did you want me to --
5    Q.  That would be great.
6    A.  -- mark the first.
7    Q.  On 8A, maybe you can mark a box and say
8 8E.
9    A.  Yeah.
10    Q.  Because that's the way you've been doing
11 that in the other ones.
12    A.  (Witness complies.)
13    Q.  Going back to 8E, do you see any traumatic
14 neuromas?
15    A.  No.
16    Q.  Are those nerves distorted in any way?
17    A.  They're embedded in fibrosis and --
18    Q.  Do you consider that distortion?
19    MS. O'DELL:  Did you finish, Doctor?
20    THE WITNESS:  I guess they're distorted by
21 fibrosis and scarring.
22    BY MR. VOUDOURIS:
23    Q.  How so?
24    A.  They're not normally embedded in the
25 middle of scar tissue.

Page 49

1    Q.  Are any of these nerves adjacent to scar
2 tissue?
3    A.  This looks like it's embedded in it.  They
4 all look less than a millimeter from mesh and scar
5 or within it.
6    Q.  Okay.
7       So my question was, I'm sorry, are all of
8 the nerves on 8E embedded in scar?
9    A.  Yes.
10    MS. O'DELL:  That's a different question.
11    THE WITNESS:  That's different than what I've
12 circled here.
13    MR. VOUDOURIS:  It is a different question,
14 you're correct.
15    Q.  So all of those nerves on 8E are embedded
16 in scar not --
17    THE WITNESS:  Yes.
18    MS. O'DELL:  She testified that she did -- she
19 circled.
20    BY MR. VOUDOURIS:
21    Q.  And then, I'm sorry, you also saw nerves
22 on another photograph, correct?
23    A.  On another photograph?
24    Q.  Yes, keep going, there we go, on 8B.
25    A.  Yes.

Kimberly H. Allison, M.D.

Page 50

1  Q. Are those nerves embedded in scar tissue?
2  A. Yes, they are from the same area, it's
3 probably one of these three or two of those three
4 nerves.
5  MS. O'DELL: And you're referring to 8B?
6  THE WITNESS: Yes.
7  BY MR. VOUDOURIS:
8  Q. So you see nerves on 8B that you also
9 believe are on 8E, correct?
10  A. Yes.
11  Q. And can you go back to 8B and circle how
12 you've been doing a box and say 8E?
13  MS. O'DELL: If you can.
14  THE WITNESS: It would be easier to do it the
15 other way because this is a higher power image,
16 so...
17    You could draw 8B on here on 8E.
18  BY MR. VOUDOURIS:
19  Q. Could you do that, please?
20  A. I'm going to attempt to figure out exactly
21 how that might correlate.
22    Again, the --
23  MS. O'DELL: Again, don't guess.
24  THE WITNESS: Yeah, the mesh fibers are
25 slightly different. I couldn't be certain if it

Page 51

1 was this (indicating) upper two nerves or the lower
2 two nerves. It's not easy to tell. I guess it
3 would be these, but...
4  MS. O'DELL: Then don't guess.
5  THE WITNESS: Yeah, it's hard to -- when you
6 cut deeper into the tissue, it's hard to tell
7 without having the slide in front of me, I could
8 definitely do it under the microscope.
9  MR. VOUDOURIS: All right.
10  Q. Based on the photomicrographs you have in
11 front of you, you can't reliably see where the
12 nerves in 8E might be on 8B?
13  MS. O'DELL: Object to the form of the
14 question.
15  THE WITNESS: I could tell you the vicinity but
16 I wouldn't be precise, because there's sort of two
17 possibilities of where that could come from.
18  BY MR. VOUDOURIS:
19  Q. Do you have any differential diagnosis
20 before you arrived at your opinions in the Phelps
21 case?
22  A. Of course, you always think about other
23 possibilities in a differential diagnosis, ended up
24 being very short in this case, given that the
25 patient had erosion with mesh exposure and there

Page 52

1 aren't many causes of that, other than the foreign
2 substance of mesh, it's a known complication of
3 mesh implantation, especially in the vagina.
4    And my differential was quite short.
5  Q. And what was your differential?
6  A. So you could have an erosion from an
7 infection. This doesn't look like active
8 inflammation anywhere. It's like a chronic process
9 that's occurred over time. It -- the time course
10 doesn't fit with infection, it's nine years after
11 implantation. It fits more with a chronic
12 irritant, a chronic foreign body.
13  Q. You don't place these slings, correct?
14  A. Correct.
15  Q. So I imagine you're not going to be --
16 offering any opinions on the operative procedure to
17 place the sling, correct?
18  A. Only the -- you know, what you've read in
19 the operative note, if they notice scarring when
20 they're trying to remove it.
21  Q. Other than that?
22  A. No.
23  Q. Ms. Phelps had this mesh implanted in
24 2000?
25  A. Yes.

Page 53

1  Q. And then it was removed in 2009, correct?
2  A. Correct.
3  Q. Do you have any opinion as to the
4 condition of Mrs. Phelps's pelvic laxity between
5 2000 and 2009?
6  MS. O'DELL: Object to the form.
7  THE WITNESS: The condition of her pelvic
8 laxity.
9    No, I don't have an opinion on that.
10  BY MR. VOUDOURIS:
11  Q. Wouldn't be out of the realm that it was
12 worsening over that eight-year period, would it?
13  MS. O'DELL: I'm sorry, I didn't hear what you
14 said.
15  BY MR. VOUDOURIS:
16  Q. Wouldn't be out of the realm that it was
17 worsening over this period, from 2000 to 2009, am I
18 correct?
19  A. I don't know.
20  Q. Your report says that you noticed mild
21 chronic inflammation with a foreign body reaction.
22  A. Yes.
23  Q. Is that abnormal or is that expected?
24  A. Foreign body reaction can continue. The
25 chronic inflammation was not severe in this case,

Kimberly H. Allison, M.D.

Page 54

1  but it -- its presence tells me that the body's
2  continuing to react to the mesh in a way that to me
3  fits more with a, you know, long-term degradation
4  and irritation of the surrounding tissues.
5      Q.  When did this degradation of the mesh
6  start in Ms. Phelps?
7      A.  I don't think we know the answer to that
8  question, but it wasn't that it occurred
9  immediately, it was more of a long-term process
10 given that she didn't even have symptoms until, you
11 know, years after implantation.
12     Q.  Okay.
13         When did she start to have symptoms?
14     A.  October 2005 and again in November 2008
15 she presented with pressure in the vaginal area,
16 pelvic pain, dyspareunia, bladder pain and pressure
17 and urinary leakage.  In December of 2008 she had
18 mesh erosion noted on cystoscopy.
19     Q.  So 2005 complaints you believe more likely
20 than not were caused by mesh degradation?
21     A.  Yes.
22     Q.  And then her complaints in 2008 you
23 believe more likely than not were caused by mesh
24 degradation?
25     A.  Yes, and the presence of the mesh and her

Page 55

1  reaction to it, yes.
2      Q.  When -- you don't know when this
3  degradation process started, correct?
4      A.  No.  How would we know that?
5      Q.  Do you know when it ended?
6      A.  We don't know that it -- I mean, when it's
7  removed it's hopefully ended, if you remove the
8  offending material.
9      Q.  Prior to removal, do you know if the
10 degradation process stopped?
11     A.  Doesn't look like it, because I see
12 evidence of it.  I mean, I don't think it can
13 reverse itself.
14     Q.  Does it ever stop?
15     A.  Stabilize you mean?
16     MS. O'DELL:  Object to form.
17     BY MR. VOUDOURIS:
18     Q.  Does it stabilize?
19     A.  I don't know.
20        I see evidence of degradation in my
21 microscopic examination.
22     Q.  On your microscopic examination there, on
23 your photographs, did you measure the degradation?
24 How many microns is it?
25     A.  Did I measure it?

Page 56

1      Q.  Yeah.
2      A.  No, I did not.  I just noted its presence.
3      Q.  Could you do that for us?
4      A.  No, I don't have my -- my micrometer or
5  any sort of device to measure with.
6      Q.  Do you know how many microns it is?
7      MS. O'DELL:  She's already answered your
8  question, asked and answered.
9      THE WITNESS:  No.
10     BY MR. VOUDOURIS:
11     Q.  Is it more than ten?
12     A.  No, I don't think so.
13     Q.  Is it more than five?
14     A.  I would guess between one and five,
15 probably less than that, actually.
16     Q.  Probably less than five?
17     A.  Yeah.
18     Q.  What do you think?
19     A.  I need a scale, I can't answer your
20 question.
21     Q.  But at least reviewing your own
22 photographs there that you took, you believe it's
23 less than five, correct?
24     MS. O'DELL:  Objection to form.
25     THE WITNESS:  I don't know the answer to your

Page 57

1  question.  I did not measure the degradation.
2      BY MR. VOUDOURIS:
3      Q.  Are any of the findings you put down in
4  Exhibit C what you would expect to see after a TVT
5  mesh had been implanted for eight years?
6      A.  In C?
7      Q.  Exhibit C, which is -- I apologize,
8  Exhibit 5, which you have labeled Exhibit C.
9      A.  Your question was, are any of the findings
10 expected for what you'd see after a mesh
11 degradation?  Can you repeat it?
12     Q.  No.  After a mesh being implanted for
13 eight years, nine years.
14     A.  The mesh is present, that's an expected
15 finding.  You would expect to see some degree of
16 fibrosis around it.
17        The inflammation is not expected.  You
18 would expect after eight years to have only chronic
19 foreign body giant cell reaction and not much
20 inflammation.  There isn't a lot of inflammation
21 here, but there's some.
22        I wouldn't expect the skeletal muscle
23 fibrosis and damage.
24     Q.  Is there a foreign body cell reaction
25 around what you believe to be degradation in your

Kimberly H. Allison, M.D.

Page 58

1 photographs?
2    A. In the photograph that I took, I see the
3 chronic inflammation, and I -- I have already
4 stated that I don't see clear foreign body giant
5 cell reaction, although I noted it in my report and
6 so I noted it under the microscope.
7    Q. Can you note it anywhere in your
8 photographs?
9    A. I couldn't be certain on this one. I was
10 not aiming to take a picture of foreign body giant
11 cells, and I noted the processing artifact that's
12 making it difficult in this particular field to
13 look at that.
14       So this image was really more to show the
15 tree barking effect, the degradation around the
16 mesh fibers, and then the overall scarring and
17 fibrosis around it.
18    MS. O'DELL: Are you referring to 8B?
19    THE WITNESS: Yes, I'm referring to 8B.
20    MR. VOUDOURIS: Take a quick break.
21    (Recess.)
22    BY MR. VOUDOURIS:
23    Q. Can we go back to that pathology report --
24 the pathology report, there it is and that's marked
25 as Exhibit?

Page 59

1    A. 9.
2    Q. 9. Did that pathologist comment at all
3 about a vaginal erosion?
4    A. No, there was no erosion documented with
5 tissue histology, it was a clinical finding.
6    Q. Did any clinician diagnose her with a
7 vaginal erosion?
8    A. Oh, back in 2005 -- 2008 she had a mesh
9 erosion, noted at the end of 2008, so just a few
10 months before.
11    Q. Vaginal?
12    A. Cystoscopy.
13       And she ends up with a fistula.
14    Q. Did any of her clinicians diagnose her
15 with a vaginal erosion?
16    A. They describe an erosion, but it looks
17 like the -- they were on cystoscopies and
18 urethroscopic examination.
19    Q. So not the vagina, correct?
20    A. I could check the records again, just to
21 make sure, but I don't state that in my report,
22 so...
23       Pooling when standing -- I mean, they
24 describe a urethrovaginal fistula later, but I
25 think the erosions were mainly noted on cystoscopy,

Page 60

1 mesh visible in the urethra.
2    Q. Yeah, my question was: Did any of her
3 clinicians diagnose her with a vaginal erosion?
4    A. I'm just double-checking to be sure with
5 my answer. And -- I don't -- I don't believe so,
6 no.
7    Q. And what we've marked as Defendants'
8 Exhibit 5 for Patti Phelps, under reason for
9 removal, you write dyspareunia.
10    A. Yes.
11    Q. Is it your opinion to a reasonable degree
12 of medical certainty that the -- that the mesh
13 caused dyspareunia?
14    A. Yes, that was my opinion, is my opinion.
15    Q. Okay.
16       Did Ms. Phelps have dyspareunia before the
17 sling was implanted?
18    A. She I believe had endometriosis in the
19 past, but not the same type of dyspareunia.
20    Q. Do you know?
21    MS. O'DELL: I think she's answered your
22 question.
23    MR. VOUDOURIS: I think she said I think.
24    THE WITNESS: Yes.
25    BY MR. VOUDOURIS:

Page 61

1    Q. Yes what?
2    A. I think she -- as far as I understand, she
3 had some symptoms related to endometriosis in the
4 past, but the dyspareunia was new and -- and
5 believed to be related to her mesh.
6    Q. You believed it to be related to her mesh,
7 right?
8    MS. O'DELL: Object to the form.
9    THE WITNESS: Well, I think the clinicians
10 involved in her care also were thinking that it was
11 related to her dyspareunia.
12    BY MR. VOUDOURIS:
13    Q. Well, when you did a differential
14 diagnosis, how did you differentiate between the
15 dyspareunia that was before the sling was put in
16 and the dyspareunia that was noted after the sling
17 was put in?
18    A. I don't know that she had dyspareunia,
19 other than prior to sling placement she had
20 endometriosis which caused some pain.
21    Q. Well, if she had dyspareunia before she
22 had the sling placement, how did you differentiate
23 the pain from presling implantation to postsling
24 implantation?
25    A. Endometriosis causes pelvic pain that is

Kimberly H. Allison, M.D.

---

Page 62

1 more diffuse in nature, and I think you can have
2 dyspareunia with it, but I would relate her pain
3 with intercourse to her erosions and pain in the
4 area around the mesh fibers. They did not -- I did
5 not find any endometriosis on the specimens
6 removed, so I removed that from the differential.
7    Q. In your five photographs that you took,
8 photomicrographs, did you see any blue granules?
9    A. Blue granules?
10    Q. Yes. Blue granules.
11    A. Can you elaborate on that for me? I'm not
12 sure what you're referring to. The blue mesh
13 fibers that you can see?
14    Q. No. Blue granules, you haven't heard the
15 term "blue granules"?
16    A. You mean what you might see on a Pap smear
17 from endometriosis? Or from shedding? You
18 wouldn't see that in a surgical specimen.
19    Q. Do you understand that there are changes
20 going on at Stanford regarding the breast and GYN
21 pathology program?
22    A. The fellowship you mean?
23    Q. Yes.
24    A. Yes.
25    Q. Okay.

---

Page 63

1      What's going to happen in July?
2    A. We're going to split it into two, because
3 the volume's gone up so much in GYN and in breast,
4 that we want to have a fellow dedicated to both of
5 those services independently.
6    Q. All right.
7      So they're going to split it between GYN
8 and breast, correct?
9    A. Correct, one fellow will do GYN and one
10 fellow will do breast.
11    Q. And they're also going to split the
12 staff's position in those two programs, correct?
13    A. They were never combined.
14    Q. Well, I'm a little confused. What do you
15 mean they were never combined?
16    A. Well, what do you mean by the staff's
17 position? You mean the faculty that we --
18    Q. Yes, the faculty.
19    A. We -- breast and GYN are separate
20 services, so the faculty are either on breast or
21 GYN at a given time.
22    Q. Okay.
23      Come July when the split happens you're no
24 longer going to be part of the GYN program, is that
25 accurate?

---

Page 64

1    A. Correct. I'm going to have my own
2 independent breast pathology fellowship.
3    Q. Right.
4    A. That I'll be the director of.
5    Q. But you'll no longer be part of the GYN
6 fellowship program, correct?
7    A. Well, Teri has me interview her fellows,
8 still, that are going to be GYN only because they
9 may interact with me on the consultation service,
10 which currently is still general in some aspects,
11 so the GYN resident will see some breast consults
12 and the breast follows will see some GYN consults
13 on the service.
14    Q. So if Dr. Longacre says as of July you
15 will no longer be part of the GYN fellowship, she's
16 incorrect?
17    MS. O'DELL: Object to the form.
18    THE WITNESS: She can -- I'm going to be
19 involved in teaching those residents breast
20 pathology if they are working on breast consults.
21    BY MR. VOUDOURIS:
22    Q. My question was -- maybe I'll restate the
23 question.
24      So as of July, is it accurate that
25 Dr. Longacre states that you will no longer be part

---

Page 65

1 of the GYN fellowship program?
2    MS. O'DELL: Object to the form.
3    THE WITNESS: She is probably meaning that I
4 won't be part of the core faculty that she lists
5 and I will no longer be listing the GYN faculty on
6 my fellowship as core faculty.
7      So we list the core faculty involved in
8 the fellowship and those are the faculty that are
9 involved in evaluating fellowship at the end of the
10 year and things like that.
11      But we'll certainly be interacting with
12 each other's fellows. I interact with the GI
13 fellow, I interact with the surgical pathology
14 fellow. And I --
15    BY MR. VOUDOURIS:
16    Q. I'm sorry, keep going, I won't interrupt
17 you.
18    A. Just on the cases that they bring to me in
19 consultation, interact with them on frozen
20 sections.
21    Q. So I'm looking at your expert report that
22 I thought we had marked as?
23    A. That may be my copy of it, here's the
24 marked.
25    Q. Whatever's easiest for you, it's marked as

---

Kimberly H. Allison, M.D.

Page 66

1  Exhibit 2?
2     A. Uh-hmm.
3     Q. That's a "yes"?
4     A. Yes.
5     Q. So if we go to the second paragraph under
6  qualifications, where it says you codirect the
7  Stanford Breast/GYN Pathology Fellowship, as of
8  July of this year, are you going to have to correct
9  that statement?
10    A. Yes, I will.
11       Currently I work with both of those breast
12 and GYN fellows, we have two this year.
13    Q. Dr. Allison, I marked your CV, it's
14 Exhibit 3. Under organizations and boards, you
15 list that you're a member of the College of
16 American Pathologists.
17       Is that true?
18    A. I think so, sometimes my memberships
19 expire. I'm no longer a member of the Washington
20 State Society of Pathologists, I let that expire
21 for sure. I would have to check on my latest dues
22 for CAP.
23    Q. Okay.
24    A. I just renewed my dues for the first one,
25 the USCAP. I've given talks at their meetings, the

Page 67

1  College of American Pathologist meetings.
2     Q. If you go back to your report, what did we
3  mark that as?
4     A. 2.
5     Q. 2. Can we go to your paragraph on Patti
6  Phelps. I think it's on page 9.
7       Do you have it?
8     A. Yes.
9     Q. The last sentence. "From my review of the
10 medical records and my pathological findings that's
11 described here" -- meaning above in that paragraph
12 in Exhibit C, and we've gone through those,
13 correct?
14    A. Yes.
15    Q. "It's my opinion that the TVT device was
16 the cause of Ms. Phelps's erosion, dyspareunia,
17 pelvic pain and pressure, bladder pain and
18 pressure, and resulting surgical procedures for
19 mesh removal and urethrovaginal fistula repair."
20       What is it about the TVT that caused her
21 erosion?
22    A. Well, mesh was visible in the erosion, so
23 the overlying mucosa of the urethra was eroded.
24    Q. Are you talking about just the mere
25 presence of mesh or is it something about this mesh

Page 68

1  that happened in this mesh?
2     MS. O'DELL: Object to the form.
3     THE WITNESS: The foreign material caused a
4  foreign body response and the mucosa overlying it
5  was affected by the scarring that occurred around
6  it, and was more apt to erode in the presence of
7  the foreign body.
8     BY MR. VOUDOURIS:
9     Q. Okay. And there was no vaginal erosion,
10 correct?
11    A. Correct.
12    Q. And again, you're not opining about how
13 the surgery was performed, correct, the implanted
14 mesh?
15    A. No. Not opining about that.
16    Q. All right.
17       And dyspareunia, we talked about that --
18 well, actually, how did the TVT cause her
19 dyspareunia?
20    A. It caused scarring around the area,
21 entrapment of nerve fibers, and damage to the
22 muscles around that area. And scarring and those
23 kind of nerve entrapment can cause pain upon
24 mobility of that, and intercourse being one of the
25 instigators of that pain.

Page 69

1     Q. Again, you couldn't, in your analysis,
2  determine whether the nerves that you saw within
3  the scar were motor or sensory; is that correct?
4     A. That's correct.
5     Q. Pelvic pain, how did the TVT device cause
6  Ms. Phelps's pelvic pain?
7     A. It was causing a tugging feeling in her
8  that she describes, and I think, you know, a
9  similar phenomena is occurring where foreign
10 material that not -- is not normally present was
11 causing scarring and pain and all of the complex
12 pelvic floor there that when you're walking around,
13 moves around some and that can cause pain.
14    Q. What are the vessels that make up the
15 pelvic floor?
16    A. You want me to list the pelvic floor
17 muscles?
18    Q. I do, there aren't that many of them.
19    A. Well, what's the point of doing that? I
20 didn't have to -- I can't tell what that skeletal
21 muscle was -- you know, the name of the skeletal
22 muscle specifically in the images I showed you. I
23 could tell there was skeletal muscle damage. I
24 don't know which muscle it was.
25    Q. Which muscles make up the pelvic floor, do

Kimberly H. Allison, M.D.

Page 70

1  you know?
2      A.  There are several, but I never use those
3  terms in my clinical practice, so I learned them in
4  medical school and there are lots of muscles in the
5  body that I couldn't list off all the names of.
6      Q.  So as you sit here today, after reviewing
7  cases that involve pelvic pain, you can't tell us
8  the muscles that make up the pelvic floor?
9      A.  The levator muscles, levator ani, and I'm
10  forgetting the names of the other ones.
11      Q.  Just can't remember?
12      A.  Yeah, I --
13      MS. O'DELL:  Object to the form.
14      THE WITNESS:  Seems irrelevant.
15      BY MR. VOUDOURIS:
16      Q.  Do you know the mechanism of how women get
17  stress urinary incontinence?
18      A.  Relaxation of those structures.
19      Q.  Which structures?
20      A.  The pelvic floor muscles.
21      Q.  Which you can't remember, correct?
22      MS. O'DELL:  Object to the form.
23      BY MR. VOUDOURIS:
24      Q.  Correct?
25      A.  Correct, I don't have all the details of

Page 71

1  all the anatomical structures at the top of my
2  memory.  It's not part of my job.
3      Q.  Pressure, how did the TVT device cause
4  Mrs. Phelps's pressure?
5      MS. O'DELL:  Object to the form.
6      THE WITNESS:  Again, a similar process is going
7  on, the fibrosis and scarring is causing abnormal
8  contracture and scarring in the area that's
9  creating a feeling of pressure.
10      BY MR. VOUDOURIS:
11      Q.  Abnormal contraction of what?
12      A.  The scar tissue.
13      Q.  How did the TVT cause her bladder pain?
14      A.  Well, she had erosion in the urethra and
15  she had episodes of obstruction too.
16      Q.  Well, was it something about the
17  polypropylene material in the mesh that caused her
18  bladder pain or is it simply the presence of the
19  mesh itself?
20      MS. O'DELL:  Objection to form.
21      THE WITNESS:  The material is the mesh itself,
22  right?  I mean, aren't they one and the same?  The
23  mesh is composed of the polypropylene material.
24      BY MR. VOUDOURIS:
25      Q.  Well, is it something, this tree barking

Page 72

1  effect that's happening with the polypropylene
2  that's causing the bladder pain?
3      A.  It's the whole reaction to the degrading
4  mesh fibers that cause additional scarring and
5  cause additional contractures.
6      Q.  Explain this reaction.
7      MS. O'DELL:  What reaction?  And what are
8  you -- be more specific, please.
9      BY MR. VOUDOURIS:
10      Q.  It's the whole reaction to the degrading
11  mesh fibers that cause additional scarring and
12  cause additional contractures, and I want you to
13  explain this reaction to me.
14      A.  The chronic irritant of the foreign
15  material that the mesh fibers represent being
16  present in the body, reacting to degradation over
17  time, causing more scarring.  I mean, these
18  symptoms progressed over time.
19          So it wasn't an immediate response, it's a
20  chronic process.  And a chronic process creates a
21  cycle of increased scarring and fibrosis that's
22  creating structural issues in the pelvic area.
23      Q.  And the only person you're relying on
24  to -- to opine that this degradation has some type
25  of clinical sequelae is Dr. Iakovlev; is that

Page 73

1  correct?
2      MS. O'DELL:  Object to the form.
3      THE WITNESS:  The degradation
4  specifically that you can see under the light
5  microscope, there are other studies that look at
6  electron scanning microscopy and things like that.
7      BY MR. VOUDOURIS:
8      Q.  You don't do any of that, right?
9      A.  I did not do that.
10      Q.  So again --
11      A.  I'm looked at literature.
12      MS. O'DELL:  Let her finish, please.
13      BY MR. VOUDOURIS:
14      Q.  The only person you're relying on to opine
15  that this degradation has some kind of clinical
16  sequelae is Dr. Iakovlev; is that correct?
17      MS. O'DELL:  Object to form.
18      THE WITNESS:  No, not that it has some type of
19  clinical sequelae.
20          Iakovlev's the only pathologist who first
21  described the tree barking effect that you can see
22  under the microscope, the light microscope.  There
23  are others who've described degradation in the
24  scanning electron microscopy environment.
25      BY MR. VOUDOURIS:

Kimberly H. Allison, M.D.

Page 74

1    Q. My question has to do with relating
2  degradation to clinical sequelae.
3    MS. O'DELL:  She's answered.
4    THE WITNESS:  There --
5    MS. O'DELL:  Excuse me, she's answered your
6  question.
7      You don't like the answer, but she's
8  answered your question.
9    THE WITNESS:  How can I answer that more
10 specifically?
11   BY MR. VOUDOURIS:
12   Q. Show me --
13   MS. O'DELL:  You don't have to.
14   BY MR. VOUDOURIS:
15   Q. Show me in your binders of medical records
16 that you have there scientific literature that has
17 proven and confirmed and it's widely accepted that
18 this alleged degradation has any clinical sequelae.
19   MS. O'DELL:  Object to the form of the question
20 as misstates the records.
21   THE WITNESS:  Many of the articles in here
22 describe the complications of mesh and rather than
23 going through the entire binder, I mean, I state
24 them in my report.  We've gone over them before.
25   MR. VOUDOURIS:  You're not answering my

Page 75

1  question, Doctor.
2    THE WITNESS:  I'm not sure what you're looking
3  for.  Are you looking for a specific paper that
4  says --
5    BY MR. VOUDOURIS:
6    Q. I'm looking for any medical literature
7  that supports your contention that there is
8  clinical sequelae to mesh degradation?
9    MS. O'DELL:  Objection to the form, it's a
10 different question.
11   THE WITNESS:  And that is a different question.
12      I think -- I stand by my opinions and I --
13 I'm not sure how I can help you out here.
14   MR. VOUDOURIS:  Can you read the question back.
15   (The Reporter read back as follows:
16   "Question:  Show me in your binders
17     of medical records that you have
18     there scientific literature that
19     has proven and confirmed and it's
20     widely accepted that this alleged
21     degradation has any clinical sequelae.")
22   MS. O'DELL:  Objection to form.
23   THE WITNESS:  Well, these -- there are no
24 complications.  Dr. Longacre's report even says
25 erosion is a known complication of mesh.

Page 76

1    MR. VOUDOURIS:  Read the question to her again,
2  please.
3    (The Reporter read back as follows:
4    "Question:  Show me in your binders
5      of medical records that you have
6      there scientific literature that
7      has proven and confirmed and it's
8      widely accepted that this alleged
9      degradation has any clinical sequelae.")
10   MS. O'DELL:  Objection to the form.
11   THE WITNESS:  The degradation has been seen in
12 mesh that has been removed from patients who had
13 these symptoms, that is the literature I would
14 point you to.
15   MR. VOUDOURIS:  Read it again, please, my
16 question.
17   MS. O'DELL:  Asked and answered.
18   THE WITNESS:  This is ridiculous.
19   MS. O'DELL:  Asked and answered, and for the
20 fifth time, so move on, Counselor.
21   MR. VOUDOURIS:  One more time, please.
22   (The Reporter read back as follows:
23   "Question:  Show me in your binders
24     of medical records that you have
25     there scientific literature that

Page 77

1      has proven and confirmed and it's
2      widely accepted that this alleged
3      degradation has any clinical sequelae.")
4    MS. O'DELL:  If you've answered his question,
5  just tell him you've given your answer.
6    THE WITNESS:  I've given my answer.
7    BY MR. VOUDOURIS:
8    Q. The answer is none, correct?
9    MS. O'DELL:  Object to the form.
10   THE WITNESS:  I've given my answer.
11   BY MR. VOUDOURIS:
12   Q. The answer is none, correct?
13   MS. O'DELL:  Object to the form.
14   THE WITNESS:  There is literature looking at
15 degradation.
16   MR. VOUDOURIS:  Not my question.
17   THE WITNESS:  In patients who have had clinical
18 symptoms.
19   MR. VOUDOURIS:  Not my question.
20   MS. O'DELL:  It was your question.  She
21 answered your question.  You can ask it again and
22 she's just going to give the same answer, but she
23 answered your question.
24   BY MR. VOUDOURIS:
25   Q. Handing you as what we've marked as

Kimberly H. Allison, M.D.

Page 78

1  Defendants' Exhibit 4.
2      What is that?
3      A.  A reference list.
4      Q.  So it's in addition to medical records,
5  the medical literature that you've reviewed in
6  coming to your opinions in this case, correct?
7      A.  Yes.
8      Q.  Can you circle for me or highlight on that
9  exhibit the literature that proves to a reasonable
10  degree of medical certainty that there is clinical
11  sequelae in vivo from in vivo degradation?
12      MS. O'DELL:  Object to the form.
13      THE WITNESS:  No.
14      MR. VOUDOURIS:  Take a quick break.
15      (Recess.)
16      MR. VOUDOURIS:  Back on the record.
17      Dr. Allison, I do not have any more
18  questions for you on Ms. Phelps, pending any
19  recross after your questions by plaintiffs'
20  counsel.
21          -o-
22          EXAMINATION
23      BY MS. O'DELL:
24      Q.  I have just a few questions, Dr. Allison.
25  You've been asked a series of questions about the

Page 79

1  medical and scientific literature supporting your
2  opinions in this case.  Dr. Allison, is there
3  literature that you reviewed and relied on to
4  support your conclusion that degradation would
5  cause ongoing chronic inflammation?
6      MR. VOUDOURIS:  Objection.
7      THE WITNESS:  Yes.  In my report, I have all of
8  my references there which support the statements
9  that I make, including -- I mean, I can list them
10  off again like I did in the previous case.
11      Costello, 2007; Iakovlev, 2015; Klinge,
12  2013; Klosterhalfen, 2004; Bendavid, 2014;
13  Riccetto, 2008; Feola, F-e-o-l-a, 2015.
14      BY MS. O'DELL:
15      Q.  Without listing them all at this moment,
16  are there other references that support your
17  opinions on your reliance list which has been
18  marked as Exhibit 2 -- or Exhibit 4?
19      MR. VOUDOURIS:  Objection, foundation and
20  objection, foundation to the prior question too.
21      THE WITNESS:  Well, there's -- it's a long
22  list.
23      There's a lot of literature out there, and
24  of course there are others that I haven't listed in
25  specific -- specifically by name.

Page 80

1      BY MS. O'DELL:
2      Q.  You were asked questions about the
3  photomicrographs that you took of Ms. Phelps's
4  pathology.  Tell us the process that you went
5  through in selecting what you photographed and what
6  you did not photograph in the pathology.
7      A.  So I took photographs of representative
8  areas to show certain findings but not all of the
9  findings.  I mean, if I described that I saw a
10  foreign body giant cell reaction, then I saw that
11  under the microscope and I didn't necessarily take
12  a photograph of every -- everything in my
13  descriptions.
14      Q.  So to make it clear, you didn't take a
15  photograph of everything that you saw under the
16  microscope?
17      A.  It would be too many photographs, yes.
18      Q.  And did you endeavor to take a
19  representative sample?
20      A.  Yes.
21      Q.  And if there are findings on the pathology
22  spreadsheet that are not in the photographs, was
23  that something you noted while you were undergoing
24  your review?
25      MR. VOUDOURIS:  Objection.

Page 81

1      THE WITNESS:  Yes, it should be noted in my
2  spreadsheet description, or the report.
3      BY MS. O'DELL:
4      Q.  And that spreadsheet has been marked as
5  Exhibit --
6      A.  5.
7      Q.  Okay.
8      And I want to ask you to turn, if you
9  would, please, to Exhibit A, your photomicrographs.
10  And you were asked questions about 8B, and then you
11  were asked to correlate the image in 8B to 8E.
12      Do you remember those questions?
13      A.  Yes.
14      Q.  Why is it impossible with the
15  current photos you have in front of you to
16  correlate the images?
17      (Interruption in the proceedings.)
18      THE WITNESS:  It's not possible to correlate --
19  each section you take deeper into the tissue alters
20  the exact relationship of the different findings
21  present slightly.  It wasn't what I was setting out
22  to do.  I could have done that while I was
23  examining the slides and said, okay, this is a
24  higher power area of this specific area and kept
25  track of that.  If that is important I could

Page 82

1 certainly go back and do that.
2    MS. O'DELL: Okay.
3    Q. And do the difference in the stains
4 make it difficult to correlate the location of 8B
5 within 8E?
6    A. Yes. The S100 stain, it looked
7 significantly different from the H&E stain, we can
8 see the detail of the histology better.
9    MS. O'DELL: I don't have any further
10 questions.
11    (Defendants' Exhibit No. 10 was marked for
12 identification.)
13           -o-
14       FURTHER EXAMINATION
15    BY MR. VOUDOURIS:
16    Q. Doctor, I'm going to hand you what we
17 marked as Defendants' Exhibit 10. And in the upper
18 left hand corner, this is a publication from CAP,
19 right?
20    A. Yes.
21    Q. And CAP stands for?
22    A. College of American Pathologists.
23    Q. And that's the organization that's on your
24 CV, correct?
25    A. Yes.

Page 83

1    Q. And this is entitled "Expert Witness
2 Guidelines For the Specialty of Pathology,"
3 correct?
4    A. I see the title up on the upper left, yes.
5    Q. Have you ever seen this document before?
6    A. No. It looks like it was printed from --
7 on the CAP today online.
8    Q. So you've never seen this before, have
9 you?
10    A. No.
11    Q. Were you aware that this organization had
12 established guidelines for expert testimony like
13 you're giving today?
14    A. No.
15    Q. Can you read down under the heading
16 fairness and objectivity, please, on the fourth
17 bullet down?
18    A. Okay. "The expert witness," that one?
19    Q. Yup.
20    A. "Should not provide expert medical
21 testimony that is false, misleading or without
22 medical foundation. The key to this process is a
23 thorough review of available and appropriate
24 medical records and contemporaneous literature
25 concerning the case being examined. After this

Page 84

1 process is completed, the expert's opinion should
2 reflect the state of the medical knowledge at the
3 time of the incident."
4    Q. So is it your testimony that the medical
5 literature that you cite in your report stands for
6 or supports your opinion that there is a clinical
7 sequelae to degradation of mesh in vivo?
8    A. My report states that --
9    Q. That wasn't my question.
10    MS. O'DELL: No, let her finish her answer.
11    MR. VOUDOURIS: Well, she can --
12    MS. O'DELL: No, you asked the question.
13    MR. VOUDOURIS: She can answer.
14    MS. O'DELL: You asked the question and she can
15 answer it.
16    MR. VOUDOURIS: Of course she can answer it,
17 but she's got to be --
18    MS. O'DELL: You don't interrupt her, then.
19    MR. VOUDOURIS: -- responsive to the question.
20    MS. O'DELL: Do not interrupt her.
21    MR. VOUDOURIS: Can you read the question back,
22 please --
23    MS. O'DELL: No, she --
24    MR. VOUDOURIS: -- for the witness.
25    MS. O'DELL: If she remembers the question, you

Page 85

1 may answer the question.
2    THE WITNESS: My report covers the mechanisms
3 responsible for the symptoms produced by the mesh,
4 and that they're related to the chronic
5 inflammation and degradation of the mesh while in
6 the body.
7       The nerve entrapment around the fibrosis
8 and scar, and the stiffness that that whole process
9 creates, and that the clinical sequelae are related
10 to all of those things together. I'm not isolating
11 one factor.
12    MR. VOUDOURIS: I am isolating one factor in my
13 question.
14    THE WITNESS: Okay, well --
15    BY MR. VOUDOURIS:
16    Q. Are you stating under oath that the
17 references that you said in your report that we've
18 marked as Exhibit 2, are medical literature that
19 proves that there's a clinical sequelae to the
20 degradation of mesh in vivo?
21    MS. O'DELL: Object to the form.
22    THE WITNESS: We are linking all of these
23 findings together, so...
24    BY MR. VOUDOURIS:
25    Q. Who is "we"?

Kimberly H. Allison, M.D.

Page 86

1    A.  Me, sorry, I'm linking all of these
2   findings together.  The literature, I'm balancing
3   all of the findings that have been reported
4   clinically, the erosion, the dyspareunia, the
5   sequelae of mesh.
6         With the findings that I'm seeing, I do
7   see some evidence of degradation that has been
8   documented by other publications.  And I link those
9   too as all related to the clinical symptoms that
10  these patients are undergoing.
11    Q.  Not my question.
12       My question is simple:  Are you stating
13  under oath that the references that you've said in
14  your report marked as Exhibit 2 are medical
15  literature that proves that there's a clinical
16  sequelae to the degradation of mesh in vivo?
17    A.  No.
18    MR. VOUDOURIS:  Okay, thank you.
19              -o-
20           EXAMINATION
21    BY MS. O'DELL:
22    Q.  I have a couple more questions, Doctor.
23       Do you base the opinions that you've
24  expressed today in your deposition as well as in
25  your report on your review of the scientific and

Page 87

1   medical literature?
2    A.  Yes.
3    Q.  And do you believe the medical and
4   scientific literature supports your opinions that
5   you've expressed here?
6    A.  Yes.
7    Q.  And do you base your opinions here today
8   also on your review of not only the medical records
9   in this case, but also the pathology that you
10  reviewed?
11    A.  Yes.
12    Q.  And Counsel has pulled out this policy
13  from July of 2006 and suggested that you had
14  somehow given testimony without -- that is false,
15  misleading and without foundation.
16    MR. VOUDOURIS:  Objection.
17    BY MS. O'DELL:
18    Q.  Is that true?
19    A.  No.  I do not consider any of my testimony
20  to be false or misleading.
21    Q.  And have you endeavored to be
22  straightforward and honest in answering Counsel's
23  questions today?
24    A.  Yes, I have.
25    Q.  And then Counsel suggested earlier

Page 88

1   in regard to your qualifications that somehow when
2   there is an administrative change in your
3   fellowship, that you would need to correct your
4   report.  Do you recall that question?
5    A.  Yes.
6    MR. VOUDOURIS:  Object to the characterization.
7       Go ahead.
8    BY MS. O'DELL:
9    Q.  And I believe the word was correct, I'm
10  sure you remember that.
11       That would be inaccurate, you're -- if
12  there's going to be a change, you would need to
13  make a change in your report, right?  Your report
14  is correct in terms of stating your qualifications
15  as you sit here today?
16    A.  Right.  I would change my one
17  qualification that I am the director of the breast
18  pathology fellowship and not the co-director of
19  the breast --
20    Q.  Does the -- excuse me.
21       Does the fact that you at some point in
22  the future will have a different title in terms of
23  being director of the breast pathology fellowship
24  in any way change your qualifications or
25  credentials to give expert opinion in GYN

Page 89

1   pathology?
2    A.  No.
3    MS. O'DELL:  I have nothing further.
4    MR. VOUDOURIS:  Nothing further.
5    THE REPORTER:  Did you both want copies?
6    MR. VOUDOURIS:  Yes.
7    MS. O'DELL:  Yes.
8    THE REPORTER:  Ms. O'Dell, did you also want a
9   rough?
10    MS. O'DELL:  Yes, please.
11    (Whereupon, the deposition adjourned at
12  6:27 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Kimberly H. Allison, M.D.

Page 90

```
1           - - - - - -
              E R R A T A
2           - - - - - -
3
4   PAGE  LINE  CHANGE
5   ____  ____  _____
6       REASON: _____
7   ____  ____  _____
8       REASON: _____
9   ____  ____  _____
10      REASON: _____
11  ____  ____  _____
12      REASON: _____
13  ____  ____  _____
14      REASON: _____
15  ____  ____  _____
16      REASON: _____
17  ____  ____  _____
18      REASON: _____
19  ____  ____  _____
20      REASON: _____
21  ____  ____  _____
22      REASON: _____
23  ____  ____  _____
24      REASON: _____
25
```

Page 91

```
1
2        ACKNOWLEDGMENT OF DEPONENT
3
4        I,_____, do
5   hereby certify that I have read the
6   foregoing pages, and that the same is
7   a correct transcription of the answers
8   given by me to the questions therein
9   propounded, except for the corrections or
10  changes in form or substance, if any,
11  noted in the attached Errata Sheet.
12
13
14  _____
15  KIMBERLY H. ALLISON, M.D.       DATE
16
17
18  Subscribed and sworn
    to before me this
19  _____ day of _____, 20____.
20  My commission expires:_____
21
22  _____
    Notary Public
23
24
25
```

Page 92

```
1        REPORTER'S CERTIFICATE
2       I hereby certify that the witness in the
3   foregoing deposition, KIMBERLY H. ALLISON, M.D.,
4   was by me duly sworn to testify to the truth, the
5   whole truth, and nothing but the truth, in the
6   within-entitled cause; that said deposition was
7   taken at the time and place herein named; that the
8   deposition is a true record of the witness'
9   testimony as reported by me, a duly certified
10  shorthand reporter and a disinterested person, and
11  was thereafter transcribed into typewriting by
12  computer.
13      I further certify that I am not interested
14  in the outcome of the said action, nor connected
15  with, nor related to any of the parties in said
16  action, nor to their respective counsel.
17      IN WITNESS WHEREOF, I have hereunto set my
18  hand 3/21/2016.
19
20
21
22              LUCY CARRILLO-GRUBBS RPR
23              CSR No. 6766
24              STATE OF CALIFORNIA
25
```