# EXHIBIT G

```
 1              IN THE UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                     CHARLESTON DIVISION
 4
    IN RE: ETHICON, INC.,       )  Master File No.
 5  PELVIC REPAIR SYSTEM        )  2:12-MD-02327
    PRODUCTS LIABILITY          )
 6  LITIGATION                  )  MDL 2327
                                )
 7                              )  JOSEPH R. GOODWIN
                                )  U.S. DISTRICT JUDGE
 8  THIS DOCUMENT RELATES TO    )
    THE FOLLOWING CASES IN      )
 9  WAVE 1 OF MDL 200:          )  Civil Action Number
                                )  2:12-cv-00899
10  Daphne Barker, et al. v.    )
    Ethicon, Inc., et al.       )
11                              )
                                )
12
13
14                         - - - -
15             EXPERT WITNESS TESTIMONY OF
16               KIMBERLY H. ALLISON, M.D.
17                    (Pages 1 - 64)
18           Held at the Stanford Park Hotel
19     100 El Camino Real, Menlo Park, California
20           Friday, March 18, 2016, 8:45 a.m.
21                         - - - -
22  REPORTED BY:  ELAINA BULDA-JONES, CSR NO. 11720
23              GOLKOW TECHNOLOGIES, INC.
24       877.370.3377 ph | 917.591.5672 fax
25                  deps@golkow.com
```

Page 2

```
 1              APPEARANCES
 2
 3  For the Plaintiffs:
 4     Beasley Allen Crow Methvin Portis & Miles, P.C.
        218 Commerce Street
 5      Montgomery, Alabama 36104
        BY: P. LEIGH O'DELL, ESQUIRE
 6      334.269.2343
        Leigh.ODell@Beasley Allen.com
 7
 8
    For the Defendants:
 9
        Tucker Ellis LLP
10      950 Main Avenue, Suite 1100
        Cleveland, Ohio 44113-7213
11      BY: S. PETER VOUDOURIS, ESQUIRE
        216.696.4634
12      Peter.voudouris@tuckerellis.com
13      Tucker Ellis LLP
        One Market Plaza
14      Steuart Tower, Suite 700
        San Francisco, California 94105
15      BY:  TRACI L. SHAFROTH, ESQUIRE
        415.617.2228
16      Traci.shafroth@tuckerellis.com
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1           INDEX OF EXAMINATIONS
 2
 3  EXAMINATIONS                          PAGE
 4  MR. VOUDOURIS                            6
 5  MS. O'DELL                              57
 6  MR. VOUDOURIS                           58
 7
 8
 9
10            INDEX OF EXHIBITS
11  NO.           DESCRIPTION             PAGE
12  Exhibit 1    Amended Notice of Deposition   6
                  of Kimberly H. Allison, M.D.
13
    Exhibit 2    Rule 26 Expert Report of       7
14                Kimberly H. Allison, M.D.
15  Exhibit 3    Curriculum Vitae of Kimberly   7
                  H. Allison, M.D.
16
    Exhibit 4    Facts or Data Considered in    8
17                Forming Opinions
18  Exhibit 5    Exhibit C, Updated 3/16/2016,  9
                  spreadsheet
19
    Exhibit 6    Expert Report of Teri         10
20                Longacre, M.D.
21  Exhibit 7    Expert Report of Hannes Vogel, 11
                  M.D.
22
    Exhibit 8    Supplemental Rule 26 Expert   11
23                Report of Kimberly H. Allison,
                  M.D.
24
    Exhibit 9A   Photograph                    12
25
```

Page 4

```
 1  Exhibit 9B   Photograph                    12
 2  Exhibit 9C   Photograph                    12
 3  Exhibit 9D   Photograph                    12
 4  Exhibit 9E   Photograph                    12
 5  Exhibit 9F   Photograph                    12
 6  Exhibit 10   Surgical Pathology Report,    12
                  2/12/2016, BARKER, D - 000503
 7
    Exhibit 11   Histopathology of Excised     31
 8                Midurethral Sling Mesh, Audra
                  Jolyn Hill
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1          KIMBERLY H. ALLISON, M.D.,
 2  called as a witness by the Defendants herein, being
 3  first duly sworn by the Certified Shorthand Reporter
 4  was thereupon examined and testified as is
 5  hereinafter set forth.
 6          MR. VOUDOURIS:  Let the record reflect
 7  we're here to cross-examine Dr. Allison on her
 8  opinions in the Barker case, but by doing so, we're
 9  not going to waive any right we have to strike her
10  supplemental report of those opinions based on their
11  untimely production.
12          MS. O'DELL:  For the record, the report in
13  this matter was produced after February 1st, which
14  is the deadline set by the Court because
15  Ms. Barker's surgery occurred after the deadline and
16  it would have been impossible to comply with the
17  Court's scheduling order.
18          And so on that basis --
19          MR. VOUDOURIS:  Counsel, I believe --
20          MS. O'DELL:  -- I'll oppose your motion.
21          MR. VOUDOURIS:  I believe you produced her
22  supplemental report of materials on March 16th; is
23  that correct?
24          MS. O'DELL:  That's correct.  You will
25  have full opportunity to examine her on the report
```

Page 6

1 today.
2          EXAMINATION
3 BY MR. VOUDOURIS:
4    Q.  Dr. Allison, good morning.
5    A.  Good morning.
6    Q.  Maybe we can go through some clerical
7 housecleaning before we start asking some further
8 questions.  I'm going to hand you what we've marked
9 as Exhibit 1.
10       Can you identify that, please?
11   A.  This is the notice of deposition.
12       (Whereupon, Exhibit 1 was marked for
13 identification.)
14 BY MR. VOUDOURIS:
15   Q.  And you've seen that document before?
16   A.  Yes.
17       MR. VOUDOURIS:  And, Counsel, regarding
18 Schedule A, do we have agreement that she has
19 produced the documents or materials requested in
20 Schedule A, although I know you did file objections,
21 correct?
22       MS. O'DELL:  They are produced consistent
23 with her -- excuse me, consistent with the
24 objections and responses involved in this case.  I
25 would give to you, Peter, a jump drive.  I think I

Page 7

1 gave it to you yesterday.
2       MR. VOUDOURIS:  I don't believe so.  You
3 showed it to me.
4       MS. O'DELL:  Yes, and I will give it to
5 you.  Giving you that jump drive will ensure that
6 everything that is consistent with our objections
7 and responses have been produced to you during the
8 depositions yesterday and today.
9 BY MR. VOUDOURIS:
10   Q.  Dr. Allison, I'll hand you what we have
11 marked as Exhibit 2.  Could you identify that for
12 the record, please?
13   A.  This is my expert report.
14       (Whereupon, Exhibit 2 was marked for
15 identification.)
16 BY MR. VOUDOURIS:
17   Q.  Is that your first expert report regarding
18 this case?
19   A.  Yes, my supplemental report --
20   Q.  We'll get there.
21   A.  -- came subsequently.
22   Q.  Can you identify for us what we have
23 marked as Exhibit 3?
24   A.  This is my CV.
25       (Whereupon, Exhibit 3 was marked for

Page 8

1 identification.)
2 BY MR. VOUDOURIS:
3    Q.  Is it current?
4    A.  Yes.
5    Q.  Any additions or deletions you would like
6 to make?
7    A.  No.
8    Q.  Doctor, I'm going to hand you what we have
9 marked as Exhibit 4.  Can you identify that?
10   A.  These are my literature lists.
11       (Whereupon, Exhibit 4 was marked for
12 identification.)
13 BY MR. VOUDOURIS:
14   Q.  Your reliance list?
15   A.  Reliance list.
16   Q.  There is also some medical records that
17 are listed in the back.
18   A.  Yes.
19   Q.  And you have additional medical records
20 for Ms. Barker; is that correct?
21       MS. O'DELL:  Object to the form.  Did you
22 say additional medical records?
23       THE WITNESS:  Beyond this list, let's see.
24 BY MR. VOUDOURIS:
25   Q.  What I'm getting at is you -- in our other

Page 9

1 cases, you had a document very similar to this, but
2 it did not list out Ms. Barker's medical records
3 concerning her revision or her excision, so --
4    A.  Yes.
5    Q.  -- that's what I'm asking.
6    A.  They were likely not available at the
7 time.
8    Q.  Do you know when you got the medical
9 records in Barker that resulted in your
10 supplementation of your report?
11   A.  Medical records, I got the slides in the
12 beginning of March.  So I was reviewing medical
13 records and the pathology at that time.  I have been
14 away at a meeting for the last week.
15   Q.  Up in Seattle, right?
16   A.  Yes.
17   Q.  Was Dr. Longacre at the same meeting?
18   A.  Yes, she was.
19   Q.  I'm going to hand you what we -- and I'm
20 sorry, did you get the pathology slides and the
21 medical records at the same time, at the beginning
22 of March?
23   A.  I believe so.
24   Q.  I'll hand you what is marked as Exhibit 5.
25       (Whereupon, Exhibit 5 was marked for

Page 10

1 identification.)
2 BY MR. VOUDOURIS:
3     Q.  What is that?
4     A.  This is the spreadsheet that I used to
5 summarize my findings.
6     Q.  And it now has a column filled in for
7 Ms. Barker?
8     A.  Correct.
9     Q.  Whereas the similar sheets that we talked
10 about yesterday did not have any information filled
11 in for Ms. Barker?
12    A.  Correct.
13    Q.  Handing you what is marked as Exhibit 6.
14         (Whereupon, Exhibit 6 was marked for
15 identification.)
16 BY MR. VOUDOURIS:
17    Q.  Can you identify that, please?
18    A.  This is the expert report of Dr. Teri
19 Longacre.
20    Q.  And we discussed in detail the contents of
21 that report yesterday, correct?
22    A.  Yes, we did.
23    Q.  And for the record, Dr. Longacre is whom?
24    A.  She is a GYN pathologist at Stanford.
25 She's a professor of pathology.

Page 11

1     Q.  Is she head of the GYN department at
2 Stanford?
3     A.  There is no GYN department currently.
4     Q.  She's a program director of the breast/GYN
5 residency training program, correct?
6     A.  Yes, which I co-direct.
7     Q.  Handing you what is marked as Exhibit 7.
8         (Whereupon, Exhibit 7 was marked for
9 identification.)
10 BY MR. VOUDOURIS:
11    Q.  Can you identify that, please?
12    A.  This is the expert report of Dr. Hannes
13 Vogel.
14    Q.  And Dr. Vogel is who?
15    A.  He's a neuropathologist at Stanford.
16    Q.  And do you know Dr. Vogel?
17    A.  Yes, he is one of my colleagues.
18    Q.  Well respected in his field?
19    A.  Yes.
20    Q.  Exhibit 8.
21        (Whereupon, Exhibit 8 was marked for
22 identification.)
23        THE WITNESS:  This is my supplemental
24 report on the pathology that became available to me
25 after my initial report was produced.

Page 12

1 BY MR. VOUDOURIS:
2     Q.  And that's dated when?
3     A.  It's dated February -- what is the date?
4     Q.  The last page.
5     A.  16th of March.
6     Q.  Handing you what is marked as Exhibits 9A
7 through 9F.
8         (Whereupon, Exhibit 9A, Exhibit 9B,
9 Exhibit 9C, Exhibit 9D, Exhibit 9E, and Exhibit 9F
10 were marked for identification.)
11 BY MR. VOUDOURIS:
12    Q.  Can you identify those, please?
13    A.  These are the representative photographs I
14 took of the pathology slides on Ms. Barker.
15    Q.  Were the slides already given to you
16 stained?
17    A.  Yes, they were.
18    Q.  Did you do anything to the slides other
19 than take photographs?
20    A.  No, I did not.
21        MS. O'DELL:  Other than review them.
22        MR. VOUDOURIS:  Exhibit 10.
23        (Whereupon, Exhibit 10 was marked for
24 identification.)
25        THE WITNESS:  This is the pathology report

Page 13

1 from Ms. Barker's February 12, 2006, procedure.
2 BY MR. VOUDOURIS:
3     Q.  And does that correspond with the slides
4 that you reviewed?
5     A.  It is the gross specimen -- gross
6 exam-only component of that.  They did not do a
7 microscopic examination.
8     Q.  Do you know what the volume of GYN path
9 sign-outs was in 2015 at Stanford?
10    A.  No, I do not.  I don't know the volume of
11 breast pathology either.  I don't know the volume.
12 I know our overall volume.  We hit -- how many --
13    Q.  50?
14    A.  -- thousands of specimens.
15    Q.  If you can, can you get Dr. Longacre's
16 report in front of you?
17    A.  Okay.
18    Q.  Has plaintiffs' counsel told you, informed
19 you that Dr. Longacre is going to be an expert in
20 this case for the defense?
21    A.  I am aware of that now.
22    Q.  When did you become aware of that?
23    A.  Last week.
24    Q.  Can you go to page two of Dr. Longacre's
25 report?  That top paragraph, there is a sentence

Page 14

1 that starts "Because," about six or seven lines
2 down.
3    A. Page two?
4    Q. Yes.
5    A. Okay.
6    Q. Do you see that?
7    A. Yes.
8    Q. Can you read that sentence, please?
9    A. "Because of my expertise in gynecologic
10 pathology, I was invited to become a member of the
11 American Board of Pathology Test Committee in order
12 to provide gynecologic pathology questions for the
13 certification exam for pathology residents as well
14 as the maintenance of certification exam for
15 practicing pathologists."
16    Q. Okay. What does that mean?
17    A. It means she helps write questions for the
18 boards.
19    Q. Helps write GYN pathology questions for
20 the board exam, correct?
21    A. Correct.
22    Q. Do you do that?
23    A. No, I do not.
24    Q. Let's go to Dr. Vogel's report. You can
25 also go to page two of that report. Bottom

Page 15

1 paragraph that starts with, "I held." Can you read
2 that, please?
3    A. "I held a position of responsibility for
4 writing test questions in neuropathology, including
5 nerve and muscle pathology, on the American
6 Association of Neurologists Committee For Preparing
7 the Residency In-Service Training Examination used
8 in every accredited neuropathology training program
9 in the United States between 2005 and 2012."
10    Q. And the next sentence, please?
11    A. "I have recently provided test questions
12 in the field of nerve and muscle pathology for the
13 autologous in-service examination of neuropathology
14 fellows in the U.S. administered by the American
15 Association of Neuropathologists."
16    Q. And what does that basically mean?
17    A. He writes test questions.
18    Q. For the board exam?
19    A. For the -- one is the residency in-service
20 training exam so it's a practice board exam. And
21 the same thing, they are not board exams.
22    Q. Have you ever been asked to do -- to write
23 questions, board exam questions, for these entities
24 like Dr. Vogel?
25    A. No.

Page 16

1    Q. So when it comes to interpretation of
2 nerves and scar tissue surrounding mesh and whether
3 there is a generation of pain sensation, who is more
4 qualified to answer those questions, you or
5 Dr. Vogel?
6    A. Dr. Vogel is an expert in neuropathology.
7 He does a lot of work with nerve, muscle and brain
8 tumors. I am a pathologist who was trained in
9 general pathology and specialized in GYN and breast
10 pathology. I have been in practice for ten years
11 and I -- it's -- evaluating whether nerves are
12 present in scar tissue is not an expert-level
13 diagnosis. Identification of nerves and scar tissue
14 is pretty basic.
15    Q. All right. Listen to my question again,
16 please. When it comes to the interpretation of
17 nerves in scar tissue or adjacent to scar tissue,
18 and whether there is a generation of pain sensation,
19 who is more qualified to answer those questions,
20 Dr. Vogel or you?
21    A. Dr. Vogel has more experience than I do in
22 his career, and I think the identification of nerves
23 in scar tissue and linking them to clinical symptoms
24 like pain is something that both of us are qualified
25 to do.

Page 17

1    Q. And what makes you qualified to do that?
2    A. It's part of general pathology.
3    Q. Yesterday we had an opportunity to go
4 through Dr. Longacre's report line by line and had
5 you indicate where you disagreed with Dr. Longacre's
6 opinions. So I would like to do the same with
7 Dr. Vogel, please. Take your time.
8    A. I have not seen this report before. So it
9 could take some time.
10    Q. I want you to read from page one to the
11 top of page 15, including that last paragraph. And
12 I want you to jump, when you are finished with that,
13 to his conclusion that starts on page 19.
14      MS. O'DELL: Dr. Allison, if there are
15 other aspects of the report that you need to read to
16 answer Peter's question, you are welcome to do that.
17      THE WITNESS: Okay.
18 BY MR. VOUDOURIS:
19    Q. What page are you on?
20    A. Seven.
21    Q. Let me know when you get to -- when you
22 finish before you get to response to plaintiffs'
23 expert.
24    A. Okay. So I'm now at response to
25 plaintiffs' expert. I don't disagree with anything

Page 18

1 he said so far.
2    Q. All right. Now let's go on to the next
3 paragraph, response to plaintiffs' expert.
4    A. So he is mainly discussing Dr. Iakovlev.
5    Q. Correct. Who you rely upon for many of
6 your opinions in this case, correct?
7        MS. O'DELL: Object to the form.
8        THE WITNESS: I relied upon the literature
9 that he has published as a pathologist who has
10 looked at many of these questions about mesh.
11 BY MR. VOUDOURIS:
12    Q. So the answer to my question is yes?
13        MS. O'DELL: Object to the form.
14        THE WITNESS: Yes, but I may not have the
15 exact same assessment on a case as Dr. Iakovlev.
16 BY MR. VOUDOURIS:
17    Q. Tell me when you get to response to
18 Dr. Iakovlev's published medical literature.
19    A. Okay. Okay. I'm now at response to
20 Dr. Iakovlev's published medical literature.
21    Q. Okay. So you have read the response to
22 plaintiffs' expert which is on pages 7, 8, and 9,
23 correct?
24    A. Yes.
25    Q. Any disagreements with what Dr. Vogel has

Page 19

1 written in this report?
2    A. He's mainly discussing Dr. Iakovlev's
3 interpretation of cases that -- and publications as
4 well that look at the number of nerve fibers present
5 and argues that they may not be significant and it's
6 hard to link them to pain. I have reviewed cases
7 and the constellation of findings, I think, are
8 linked to the patient's pain.
9        So -- which include the presence of nerves
10 entrapped in the dense scar and the erosions that
11 are formed and it's multifactorial. Pain isn't
12 caused by a single factor, I think. But it all is
13 linked to the mesh present in the cases that I have
14 reviewed.
15        So I really can't comment on what he's
16 referring to in Dr. Iakovlev's report, which I don't
17 have. And it just doesn't seem that relevant to my
18 evaluation of the cases.
19    Q. Dr. Allison, is there any sentence in this
20 section of Dr. Vogel's report response to
21 plaintiffs' expert that is incorrect?
22    A. No, I mean, he is very specific in the
23 sentences he's using. I don't disagree with the
24 specific things that he is saying. "For example, as
25 the case with his vaginal mesh analysis,

Page 20

1 Dr. Iakovlev has not established anything that would
2 enable other pathologists to predict which patients
3 would experience pain based on nerve fiber
4 densities."
5        I have not argued that nerve fiber density
6 is the only factor that I'm using in my analysis.
7 Pathologists use many features to come to
8 conclusions about linking clinical symptoms to
9 pathology.
10    Q. All right. Can you read the next section,
11 please, response to Dr. Iakovlev's expert report?
12    A. Response to Dr. Iakovlev's.
13    Q. I apologize. I skipped a whole section.
14 We're on page nine, right?
15    A. Yes.
16    Q. Response to Dr. Iakovlev's published
17 medical literature. Which you have reviewed,
18 correct?
19    A. Yes.
20    Q. And you reviewed as part of your
21 conclusions reached to a reasonable degree of
22 medical certainty in this case, correct?
23    A. Correct.
24    Q. All right. So you and Dr. Vogel have read
25 the same literature, correct?

Page 21

1    A. Some of it, yes.
2    Q. All right. Please read this section that
3 starts on page nine and goes to 13 and tell us any
4 sentence in here that you disagree with.
5        MS. O'DELL: Dr. Allison, if there are any
6 references that are mentioned in Dr. Vogel's report
7 that you need to see, I'm sure Peter can provide
8 those to you.
9        MR. VOUDOURIS: Let the record reflect
10 that plaintiffs' counsel has opened up one of the
11 binders and put it in front of Dr. Allison with an
12 article by Blaivas.
13    Q. Continue to read, please.
14    A. And Iakovlev. So that section of his
15 report really is quoting Dr. Iakovlev and mentioning
16 studies and statistics that I don't disagree with
17 because it's -- it's not relevant to my opinion.
18        It's discussing Iakovlev's particular
19 phrasing in his articles. I mean, the fact is that
20 it is a known complication of mesh procedures to
21 have chronic pain. That's in studies that Iakovlev
22 has not authored.
23        Erosions are also a known complication.
24 Erosions can be painful as well.
25    Q. Are you through?

Page 22

1    A.   And I don't disagree that, you know, we
2 can't tell what kind of receptors are on the nerves
3 present.  Their presence alone is something that I
4 comment on in my report and link it all together to
5 the full picture of the patient who actually
6 presents with pain.
7    Q.   Do you disagree with any sentence that
8 Dr. Vogel has in his report in the section response
9 to Dr. Iakovlev's published medical literature?
10   A.   Some of the reason I disagree with, but I
11 can't pick out a sentence that I would say, oh, I
12 don't agree -- that's relevant to my case opinions.
13   Q.   All right.  The next section starts on
14 page 13 of Dr. Vogel's report, response to
15 Dr. Iakovlev's expert report, correct?
16   A.   Correct.
17   Q.   Could you read that, please, and tell us
18 if there is any sentence in this section that you
19 believe is incorrect?  And you only have to read to
20 the top of page 15.
21        MS. O'DELL:  I would object to this line
22 of inquiry because Dr. Allison has neither seen nor
23 relied on Dr. Iakovlev's report in rendering her
24 opinions in this case.  So it's unfair to ask her to
25 read criticisms of a report that is not been made

Page 23

1 available to her.
2        THE WITNESS:  So the first sentence, you
3 know, that Dr. Iakovlev's expert report
4 recapitulates "the erroneous link between fibrosis
5 and/or inflammation with pain in a small percentage
6 of patients having undergone mesh explantation as
7 described above."
8        I mean, I think that that is a link that
9 has been appropriately documented in patients with
10 pain.
11 BY MR. VOUDOURIS:
12   Q.   So are you saying that first sentence by
13 Dr. Vogel is incorrect?
14   A.   I would not use the word "erroneous" in
15 that sentence.
16   Q.   I'm sorry, my question was --
17        MS. O'DELL:  She answered your question,
18 no.
19        MR. VOUDOURIS:  No, she didn't.
20        MS. O'DELL:  Yes, she did.  And she --
21        MR. VOUDOURIS:  So you're saying that the
22 first sentence --
23        MS. O'DELL:  I'm talking.  I'm talking.
24 She answered your question and just because you
25 don't like the answer doesn't mean you are entitled

Page 24

1 to badger the witness.
2        MR. VOUDOURIS:  Are you done with your
3 speaking objections?
4        MS. O'DELL:  Probably not.  But you may
5 talk now.
6        MR. VOUDOURIS:  Thank you.
7    Q.   Dr. Allison, is the first sentence of
8 Dr. Vogel's report response to Dr. Iakovlev's expert
9 report contained on page 13 incorrect?
10   A.   I answered that question saying I would
11 remove the word "erroneous" from that sentence.
12   Q.   Keep reading.
13        MS. O'DELL:  I would renew my objection to
14 this line of questioning because Dr. Allison has
15 neither been provided nor has she reviewed nor has
16 she relied on Dr. Iakovlev's expert report that was
17 served in this case.
18        MR. VOUDOURIS:  Counsel, you already made
19 that objection.  It's duly noted.
20        THE WITNESS:  So the end of page 14,
21 Dr. Vogel states, "Stated differently, Dr. Iakovlev
22 has not provided any criteria of any sort whereby an
23 independent and unbiased microscopist could make a
24 link between the presence of incidental nerve twigs
25 and the usual inflammation associated with implanted

Page 25

1 mesh and pain symptoms in a small minority of
2 patients reporting pain versus the significant
3 majority of symptom-free patients having undergone
4 synthetic sling implantation."
5        Again, I would reiterate my previous
6 comments that when you are -- when I'm evaluating a
7 patient presenting with pain, which can be
8 multifactorial, I am going to note things like the
9 presence of nerve fibers embedded in the dense
10 fibrosis and consider it more likely than not that
11 they may contribute.  This is in a patient who is
12 presenting with pain.
13       Erosion also can contribute to pain.  And
14 when a patient walks in the door presenting with a
15 symptom, whether it be pain or a mass, we don't look
16 at randomized controlled trials to evaluate that
17 patient.  We evaluate that patient.
18 BY MR. VOUDOURIS:
19   Q.   I don't want to cut you off.  Are you
20 through?
21   A.   Yes.
22   Q.   Okay.  So is Dr. Vogel's statement that
23 you just requoted incorrect?
24   A.   It's a little more subtle answer than that
25 because he is being very specific in this sentence

Page 26

1 saying that Dr. Iakovlev has not provided any
2 criteria of any sort. And I am telling you that
3 when I evaluate a case, I can't comment on what
4 Dr. Iakovlev is doing. I can comment on what I am
5 doing.
6     I don't have access to this report. I
7 don't know what Dr. Iakovlev's opinions are on the
8 case. I have read some of his literature. So I
9 can't say that he is incorrect. I could say that I
10 disagree with the concept that we can never link a
11 patient's symptom to the pathology in cases like
12 this.
13     Q. And your basis for that statement is?
14     A. Evaluation of cases where patients are
15 presenting with specific symptoms and linking the
16 pathology findings with them on a case-by-case
17 basis.
18     Q. In all the medical literature that you
19 have reviewed for your opinions in this case, which
20 is in Exhibit 3 -- I'm sorry, Exhibit 4, what
21 articles support the statement that you just made?
22     A. That patients present with pain. You want
23 me to find articles that look at patient's
24 presenting with pain? That --
25     Q. No, I'm sorry. And we can have the court

Page 27

1 reporter read back your answer so you know exactly
2 what the question is. Please?
3     (Whereupon, the reporter read the record
4 as follows:
5     "Answer: Evaluation of cases where
6 patients are presenting with specific symptoms and
7 linking the pathology findings with them on a
8 case-by-case basis.")
9     THE WITNESS: That's in general the
10 pathologist's job is to link the pathology findings
11 whenever possible with the symptoms the patient is
12 presenting with. There is not literature to tell me
13 what my job is.
14 BY MR. VOUDOURIS:
15     Q. Can you show us any literature in
16 Exhibit 4 that supports your opinion that you can
17 look at histology of vaginal tissue and link
18 specific symptoms, and I'm going to call pain the
19 specific symptoms, with what is found on a pathology
20 slide?
21     A. Again, that's not the sort of thing that
22 you would put in a random -- in an article that --
23 this is my job that I do every day. Someone
24 presents with a mass, I'm going to try to explain
25 the mass on pathology.

Page 28

1     When a physician sees a patient in their
2 office, they are going to take a history and try to
3 figure out what is going on and what is causing
4 their symptoms. There are not randomized trials on
5 when to use a microscope or when to use a
6 stethoscope.
7     Q. Are there any randomized trials that you
8 know of contained in your Exhibit 4 that link the
9 clinical symptom of pain to what is seen on vaginal
10 tissue surrounding mesh?
11     A. The studies link the presence of pain and
12 erosions to the clinical presentation. Pathologists
13 were not involved in the randomized trials. We get
14 left out of a lot of studies.
15     Q. Can you point to anything in Exhibit 4
16 that is a randomized trial or trial that has a
17 control that links a specific clinical symptom of
18 pain to what can be seen on a pathology slide of
19 vaginal tissue that contains mesh?
20     A. No.
21     Q. Can you go to the conclusion in
22 Dr. Vogel's report that starts on page 19?
23     Are you finished?
24     A. Yes.
25     Q. Is any sentence in Dr. Vogel's conclusion

Page 29

1 in this report incorrect?
2     A. Dr. Iakovlev describes the pathologic
3 findings in patients that have had mesh removed and
4 for a variety of reasons, including pain. So I
5 disagree with the sentence that his methodology is
6 not accepted. These were peer-reviewed articles
7 that were published, so the scientific community did
8 accept them for publication.
9     Q. Anything else that is incorrect in that
10 conclusion?
11     A. I disagree that it's a normal -- well, it
12 may be part of the normal healing process. He
13 states, "Dr. Iakovlev's opinions are not supported
14 by the histology which shows the normal healing
15 process in the vicinity of an implanted mesh."
16     So while some of that healing process may
17 be normal, so I don't disagree with that, the issue
18 is that those nerves are there in this disrupted
19 tissue which has a foreign material in it and that
20 has the potential to create pain by having a scarred
21 area have nerve entrapped in it and disrupt the
22 functionality of that area.
23     Q. So you are saying that sentence by
24 Dr. Vogel is incorrect?
25     MS. O'DELL: She answered your question.

Page 30

1    THE WITNESS: I said I don't disagree that
2 it may be part of the healing process. So I guess I
3 don't disagree with that specific sentence, you
4 know. Obviously we have slightly different
5 opinions.
6 BY MR. VOUDOURIS:
7    Q. I don't think you have slightly different
8 opinions, Dr. Allison. I think you have vastly
9 different opinions than Dr. Longacre and Dr. Vogel.
10    In Exhibit 4, which is your reliance list,
11 is there any literature or randomized control study
12 in there that compares the tissues surrounding
13 midurethral slings in women who did not complain of
14 pain versus women who did complain of pain?
15    MS. O'DELL: Would you mind repeating the
16 question, please?
17    THE WITNESS: Yeah.
18    (Whereupon, the reporter read the record
19 as follows:
20    "Question: In Exhibit 4, which is your
21 reliance list, is there any literature or randomized
22 control study in there that compares the tissues
23 surrounding midurethral slings in women who did not
24 complain of pain versus women who did complain of
25 pain?")

Page 31

1    THE WITNESS: Yes. Is this on my reliance
2 list?
3 BY MR. VOUDOURIS:
4    Q. Are you talking about the Hill study?
5    A. Yes. So the Hill study addresses --
6    Q. Hold on one second. I'm sorry. There is
7 no -- I'm looking for a sticker. Are we on 11?
8    (Whereupon, a brief discussion off the
9 record.)
10    (Whereupon, Exhibit 11 was marked for
11 identification.)
12 BY MR. VOUDOURIS:
13    Q. Doctor, I'm handing you what we have
14 marked as Exhibit 11. Can you identify that,
15 please?
16    A. This is a histopathology of excised
17 midurethral sling mesh, which is an article by
18 Dr. Hill.
19    Q. And these physicians and these authors are
20 from the Cleveland Clinic?
21    A. Yes.
22    Q. Is the Cleveland Clinic a well-respected
23 medical institution in the United States?
24    A. Yes.
25    Q. Is their pathology department also highly

Page 32

1 regarded?
2    A. Yes.
3    Q. I know you mentioned the Hill paper as one
4 of your references, but do you mention the Hill
5 paper in your report itself?
6    A. No.
7    Q. Does Dr. Vogel mention the Hill paper in
8 his report?
9    A. I would have to look. I'm not sure.
10 Would you like me to go through it?
11    Q. Let me see if I can help you out. Page
12 ten.
13    A. Yes, he does.
14    Q. And could you read the conclusion for us
15 on the first page of the Hill paper?
16    A. "Midurethral sling mesh excised for
17 voiding dysfunction demonstrates elevated levels of
18 inflammation compared to mesh that is excised for
19 pain and/or exposure."
20    Q. All right. Next sentence.
21    A. "The vaginal tissue fibrosis and giant
22 cell reaction are similar in patients who undergo
23 mesh excision for voiding dysfunction and pain
24 and/or mesh exposure."
25    Q. Do you question those conclusions?

Page 33

1    A. Well, this study tries to look at pain
2 versus no pain and in different groups. But there
3 is no control group of patients with absolutely no
4 symptoms. So they are comparing voiding dysfunction
5 without pain. They are calling that the control
6 group.
7    Q. Right. Sounds like a reasonable control,
8 doesn't it?
9    A. There is still -- I mean, the best control
10 would be patients who don't have any dysfunction.
11 Don't you agree?
12    Q. I'm sorry. Sounds like a reasonable
13 control?
14    MS. O'DELL: Object to the form. Asked
15 and answered.
16    THE WITNESS: I would say a better control
17 would be patients who don't have any symptoms.
18 BY MR. VOUDOURIS:
19    Q. I know. My question was, is that a
20 reasonable control?
21    MS. O'DELL: That was not your question.
22    MR. VOUDOURIS: That's my question now.
23    THE WITNESS: I would have preferred a
24 different control group, but that's the one that
25 we're working with in this study and you have to

Page 34

1 draw your conclusions on the basis of what they used
2 for their control group.
3 BY MR. VOUDOURIS:
4    Q.  Is it a reasonable control?
5    A.  I have answered your question two times.
6        MS. O'DELL:  Yes, she has.
7 BY MR. VOUDOURIS:
8    Q.  Is it a reasonable control?
9        MS. O'DELL:  You have no -- you are not
10 compelled to give a different answer to the same
11 question, Dr. Allison.  If you have answered his
12 question, you stand on your answer.
13       MR. VOUDOURIS:  Are you done with your
14 speaking objection?
15       MS. O'DELL:  I'm done.
16       THE WITNESS:  I am not obligated to give a
17 yes-or-no answer.  So I gave you my answer.
18 BY MR. VOUDOURIS:
19   Q.  Who says you are not obligated to give a
20 yes-or-no answer, the judge?
21   A.  I thought I was allowed to speak freely
22 about my opinions in this setting and explain my
23 answers.
24   Q.  Who told you you are not allowed to give a
25 yes-or-no answer?

Page 35

1    A.  I was under the assumption that I wasn't
2 forced into a yes-or-no response, but maybe I'm not
3 accurate in that assumption.
4        MS. O'DELL:  You may answer the questions
5 in any fashion you want to, Dr. Allison.  And you
6 can disregard the representations being made by
7 counsel for Ethicon.
8        MR. VOUDOURIS:  Speaking objection
9 number seven.
10   Q.  Dr. Allison, in the Hill paper that you
11 have in front of you that we have marked as
12 Defendants' Exhibit 11, is that a reasonable
13 control?
14       MS. O'DELL:  Object to the form.  Asked
15 and answered.
16       THE WITNESS:  I believe I answered your
17 question.
18 BY MR. VOUDOURIS:
19   Q.  Then do it again.  Please answer my
20 question.
21       MS. O'DELL:  Stop badgering the witness,
22 Counsel.  She's answered your question.  You may not
23 like the answer, but she's answered it.
24       MR. VOUDOURIS:  There is no badgering
25 going on.  Did I raise my voice?

Page 36

1        MS. O'DELL:  You don't have to raise your
2 voice to badger the witness.  You are clearly
3 badgering the witness and it's improper.  So let the
4 record reflect that you have asked the same question
5 five times.  It's improper.
6        MR. VOUDOURIS:  And let the record reflect
7 she hasn't answered it five times.
8        MS. O'DELL:  She has answered your
9 question.
10       MR. VOUDOURIS:  One more time,
11 Dr. Allison.
12   Q.  The exhibit that you have in front of you,
13 which is the Hill paper marked as Defendants'
14 Exhibit 11, is that a reasonable control, yes or no?
15   A.  It's the control group that they had and
16 you have to draw your conclusions on the basis of it
17 in the context of this study.  They thought it was a
18 reasonable control group.  They published the study.
19 I would have preferred a different control group.
20 That is my answer.
21   Q.  So you can't comment one way or another
22 whether it was a reasonable control?
23   A.  I just did comment whether it was
24 reasonable or not.
25   Q.  So it is?

Page 37

1    A.  It's reasonable in the context of their
2 study.
3        MS. O'DELL:  We have been going about an
4 hour.  Let's go off the record.
5        MR. VOUDOURIS:  What is our time?
6        (Whereupon, a brief recess was taken.)
7 BY MR. VOUDOURIS:
8    Q.  Dr. Allison, in reaching your opinions in
9 any of the three Ethicon cases that we have been
10 discussing over the last two days, did you rely on
11 any of Dr. Iakovlev's expert reports?
12   A.  No.
13   Q.  In rendering your opinions or reaching
14 your opinions in these three Ethicon cases, did you
15 rely on any of Dr. Iakovlev's sworn testimony?
16   A.  No.
17   Q.  If we can, let's go to the
18 photomicrographs that you took.  And again, if you
19 don't mind, I'm going to come over your shoulder
20 again and I'm going to give you a blue pen.
21       MS. O'DELL:  Why don't you just stay right
22 there.
23       MR. VOUDOURIS:  I'll stand up.  How is
24 that?
25       THE WITNESS:  Okay.  So you want me to --

|Page 38|Page 40|
|---|---|

Page 38

1  BY MR. VOUDOURIS:
2     Q.  Hold on one second.
3     A.  -- use a different set of -- we want an
4  exhibit or --
5     Q.  Yes, you want the ones that have the
6  exhibit stickers on them.  There you go.
7        Identify for the record, please, the first
8  photograph.
9     A.  First photograph is a low-power image of
10 the tissue removed for microscopic examination from
11 the February 12, 2006, surgery to remove the
12 patient's TVT device.
13    Q.  And do you know exactly where this tissue
14 was taken from?
15       MS. O'DELL:  Can I just -- excuse me,
16 Counsel.
17       I'm sorry, I think you said 2006.  Did you
18 mean --
19       THE WITNESS:  I meant 2016, yes.  Thank
20 you.
21       MS. O'DELL:  I'm sorry.  Go ahead.
22 BY MR. VOUDOURIS:
23    Q.  I forgot my question.
24       (Whereupon, the reporter read the record
25 as follows:

Page 39

1        "Question:  And do you know exactly where
2  this tissue was taken from?")
3        THE WITNESS:  It was taken from the three
4  fragments of cauterized pink, tan, red, brown soft
5  tissue that contained the mesh.
6  BY MR. VOUDOURIS:
7     Q.  Does cauterized mean heat was used to take
8  this material out of the body?
9     A.  Potentially.  I couldn't comment on that.
10    Q.  Can you please explain to us what you find
11 of significance on 9A that you are going to tell the
12 jury is related to Ms. Barker's mesh?
13    A.  So she has findings typical of the cases
14 that I have examined in patients that are
15 complaining of symptoms related to their mesh.  So
16 she's got dense fibrosis and scarring surrounding
17 the mesh fibers which are these holes here, one of
18 which has retained some blue suture or mesh
19 material.
20    Q.  Can you circle for us dense fibrosis?
21    A.  (Witness complies.)
22    Q.  I think Ms. O'Dell has a pen that has more
23 ink in it.
24    A.  (Witness complies.)
25    Q.  And can you mark for us the scar?

Page 40

1     A.  Oh, it's all sort of one in the same.
2     Q.  So you equate dense fibrosis with scar?
3     A.  Yes.
4     Q.  Any other findings that you're going to
5  tell the jury that is of significance to this
6  microphotograph 9A?
7     A.  Presence of the mesh fibers and the dense
8  fibrosis scar is the main findings demonstrated in
9  this image.
10    Q.  Okay.  I understand they are the main
11 findings in this image, but I need to know what you
12 are going to tell the jury about the significance of
13 this slide.  Or have we covered it all?
14    A.  I think we have covered it.
15    Q.  All right.
16    A.  So Exhibit 9B has a higher power image,
17 representative image, of the area of the fibrosis
18 and the scar which is encasing the mesh fibers.
19 Again, I'll circle the entire area and label it.
20       And there is minimal chronic inflammation
21 in this image.
22    Q.  Can you circle the minimal chronic
23 inflammation, please?
24    A.  (Witness complies.)
25    Q.  And can you somehow label that?  Thank

Page 41

1  you.
2     A.  And then there's also --
3     Q.  I'm sorry to interrupt you.
4     A.  You want me to label each one?
5     Q.  Yes.
6     A.  Okay.  In addition to the spaces formed by
7  mesh fibers, there is one mesh fiber present that
8  was retained in the tissue and then there is the
9  so-called tree barking that I take as evidence under
10 the light microscope of degradation of the mesh
11 fiber that's present in one of these spaces.  I'll
12 label that "tree barking."
13    Q.  Did you measure that tree barking?
14    A.  No.
15    Q.  Do you have any idea how -- the depth of
16 that tree barking?
17    A.  No, I didn't measure it.
18    Q.  Anything else of significance that you are
19 going to tell the jury about Exhibit 9B?
20    A.  No.
21    Q.  9C?
22    A.  9C is just a higher power image so you can
23 see that tree barking in the mesh fiber region.  You
24 can see it around a mesh fiber that is still intact
25 here a little bit better.  I'll try to highlight

Page 42

1  this.  You can see it's present around the mesh
2  fiber and then in most of these spaces, the main
3  component of the mesh fibers come out with tissue
4  processing, but it's left behind this rind or rim of
5  material.
6      Q.  That you believe is tree barking?
7      A.  Yes.
8      Q.  That represents degraded polypropylene
9  in vivo?
10     A.  That's what has been described and I see
11 evidence of that under the microscope in this case.
12     Q.  Anything else?
13     A.  I could circle some of the chronic
14 inflammation, although it's a bit crushed in these
15 particular fields.  I'll write "crushed."
16     Q.  And why is it crushed?
17     A.  It looks like it's just crushed from
18 compression of the tissue, maybe it was being pulled
19 out.  The lymphocytes are fragile and they can crush
20 easily.  So you can see the rest of the tissue is
21 not that crushed.
22     Q.  Do you see any blood vessels?
23     A.  I see some red blood cells, but I think
24 they are probably procedure related.  So not in a
25 blood vessel, per se.  So I don't see good

Page 43

1  capillaries in here.
2      Q.  Good capillaries -- are you saying you
3  don't see any capillaries in here?
4      A.  I don't see ones that I could label for
5  you and say this is definitely a capillary.
6      Q.  Do you see any traumatic neuromas?
7      A.  No, I do not.
8      Q.  Do you see any ganglia?
9      A.  No, I do not.
10     Q.  Do you see any abnormal vessels?
11     A.  No, I don't believe that was part of my
12 findings that I listed in my report.
13     Q.  Same questions on 9A and B regarding
14 finding any neuromas, traumatic neuromas, ganglia,
15 abnormal vessels?
16     A.  No.
17     Q.  All right.  Anything else you want to tell
18 us about photograph 9 -- your thumb is on it.
19     A.  9C.
20     Q.  9C.
21     A.  No.
22     Q.  All right.  9D.
23     A.  9D is a trichrome stain which highlights
24 areas of collagen deposition in blue.  So that's
25 what you would see in fibrosis and scar.  So all of

Page 44

1  this blue is collagen-related tissue, so...
2      Q.  Can you indicate that, please, on there?
3      A.  It highlights the scar.  Red blood cells
4  are stained in red.
5      Q.  So there are blood vessels in that scar?
6      A.  I can't definitively say there are blood
7  vessels in there based on this.
8      Q.  Do you know who stained that slide?
9      A.  No, it was provided to me.
10     Q.  Did you request that particular stain?
11     A.  No.
12     Q.  Anything else you want to tell us about
13 9D?
14     A.  Mesh fibers are present, but the main
15 finding is the blueness of the collagen.
16     Q.  Do you see any traumatic neuromas?
17     A.  No.
18     Q.  Any ganglia?
19     A.  No.
20     Q.  Any thrombosed vessels?
21     A.  No.
22     Q.  Anything else of significance that you
23 want to tell us about the photomicrograph 9D?
24     A.  No.
25     Q.  9E.

Page 45

1      A.  9E and 9F are both S100 stains which were
2  performed to highlight the nerves present in the
3  tissue.  On low power 9E shows the distribution of
4  these S100 positive nerve fibers and then 9F shows a
5  higher power image of the nerve fibers.
6      Q.  Is there anything of significance on 9E
7  that you are going to tell the jury about?
8          MS. O'DELL:  Objection to the form.
9          THE WITNESS:  So the nerve fibers are
10 embedded in the scar tissue immediately around the
11 mesh.
12 BY MR. VOUDOURIS:
13     Q.  Could you draw for us the scar tissue?
14     A.  (Witness complies.)
15     Q.  And could you label that, please?
16     A.  (Witness complies.)
17     Q.  And circle, if you can, nerves that are in
18 the scar tissue.
19     A.  The reason I have a higher power image is
20 because it's hard to identify them definitively on
21 low power, so I'm showing you two images to confirm
22 their presence.
23     Q.  And you have no idea whether those nerves
24 are motor or sensory, do you?
25     A.  No.

Page 46

1  Q.  Okay. 9E?
2     MS. O'DELL:  Were you finished?
3     MR. VOUDOURIS:  I'm sorry. I don't want
4  to cut you off.
5     THE WITNESS:  I was going to say in a
6  patient presenting with pain in this area, I would
7  assume that some of these are sensory.
8  BY MR. VOUDOURIS:
9  Q.  And the basis for that statement?
10 A.  The pain the patient is experiencing in
11 the area. If I cut your finger and you're
12 experiencing pain in the area, I'm going to guess
13 you have some sensory nerves there that caused the
14 pain.
15 Q.  And I'm sorry if I already asked this, but
16 in your reference list I think that we had as
17 Exhibit 4, are there any case-controlled studies
18 comparing nerves contained in mesh scar tissue in
19 women who do not complain of pain versus an
20 assessment of nerves and scar tissue with women who
21 do complain of pain after removal of a midurethral
22 sling?
23 A.  Yes.
24 Q.  Which one?
25 A.  Hill. We discussed that one.

Page 47

1  Q.  Anything else?
2  A.  Pain perception can be complex. I'm only
3  documenting that the nerves are present in the
4  patients who are complaining of pain.
5  Q.  And I'm sorry if my question wasn't clear.
6  We were talking about Exhibit 4. And the question
7  was, could you point me to any case-controlled
8  studies that compared nerves and scar tissue in
9  women who did not have complaints of pain versus
10 nerves and scar tissue with women who did complain
11 of pain after excision of a midurethral sling?
12 A.  Yes.
13 Q.  You mentioned Hill. Is there anything
14 else on Exhibit 4?
15 A.  Hill would be the best example of that, I
16 believe.
17 Q.  Okay.
18 A.  That comes to mind.
19 Q.  Next.
20 A.  But I would mention that pain is -- we all
21 know different people have different thresholds for
22 pain. And that doesn't mean that you can't find
23 similar findings in patients who experience pain.
24 Pain is a complex clinical entity, but I think that
25 the pathology in these patients who are experiencing

Page 48

1  pain supports their clinical symptoms presentation.
2  Q.  And what about the appearance on histology
3  that you believe supports your opinion?
4  A.  The extensive scarring, the presence of
5  the nerves entrapped in the scar, and the physical
6  presence of erosions in the area. That's what I'm
7  linking together.
8  Q.  9E. And I'm sorry, is there -- 9E, is
9  there anything else you want to tell the jury about
10 that is significant on 9E?
11 A.  No.
12 Q.  9F?
13 A.  I have circled the higher power areas of
14 nerves.
15 Q.  Do you have an opinion to a reasonable
16 degree of medical certainty whether the nerves in 9E
17 and 9F are motor or sensory?
18 A.  Some of them are likely -- more likely
19 than not sensory.
20 Q.  Which ones?
21 A.  I cannot point to -- you cannot tell under
22 histology which ones are. That's not something we
23 can do.
24 Q.  What type of sensory-invoking nerves are
25 these?

Page 49

1  A.  I don't know.
2  Q.  Okay. Anything else in Exhibit 9F that
3  you find significant that you are going to tell the
4  jury?
5  A.  No.
6  Q.  We marked your supplemental report as
7  Exhibit 8?
8     MS. O'DELL:  You marked it as Exhibit 8.
9     MR. VOUDOURIS:  Is that correct?
10    THE WITNESS:  Yes.
11 BY MR. VOUDOURIS:
12 Q.  As part of your review of these three
13 Ethicon cases, including Ms. Barker, did you,
14 yourself, do any experiments with a control group?
15 A.  No.
16 Q.  Do you know how this tissue was fixed
17 after it was removed from Ms. Barker?
18 A.  In formalin.
19 Q.  What does formalin do to tissue?
20 A.  It hardens it, makes it easier to cut. It
21 cross-links proteins and makes them better for
22 processing in histology, the tissue better
23 preserved.
24 Q.  Do you know if formalin has any effect on
25 polypropylene?

Page 50

1  A.  Dr. Iakovlev did look at that question in
2  one of his studies.  Would you like me to refer to
3  that one?
4  Q.  I'm asking you, I'm sorry.
5  A.  So I haven't performed experiments
6  personally.  But there is literature available that
7  I relied on that used control groups looking at
8  polypropylene mesh exposed to formalin that had not
9  been implanted in patients and in ones that had been
10 implanted in patients.  The longer they were
11 implanted in patients, the more degradation they
12 saw.  They did not see degradation in the ones that
13 had sat in formalin for up to, I think, four months.
14 Q.  And those case-controlled studies would be
15 contained in Exhibit 4?
16 A.  They are Iakovlev, the most recent one,
17 2005, I believe.  Would you like me to --
18 Q.  2005?
19 A.  2015.
20 Q.  Yes, please tell us the one that you are
21 referring to.
22 A.  Oh, yeah.  Let's see.
23 Q.  Just -- can you tell us the title of the
24 article?
25 A.  I just want to confirm because there are

Page 51

1  several articles here which one it is so I'm not
2  giving you the wrong testing of pristine mesh.
3      Up to four months of formalin exposure and
4  there was no detectable degradation.  So this is the
5  study and it was published in 2015.
6  Q.  Could you --
7  A.  Title is Degradation of Polypropylene
8  In Vivo, a Microscopic Analysis of Meshes Explanted
9  From Patients.
10 Q.  Anyone else other than Dr. Iakovlev that
11 you're relying upon for that statement?
12 A.  I don't believe that there is other
13 literature to the contrary, looking at the specific
14 finding of the tree barking.
15 Q.  That wasn't my question.
16 A.  Your question is are there other articles
17 that I looked at?
18     MR. VOUDOURIS:  Can you read it back,
19 please?
20     (Whereupon, the reporter read the record
21 as follows:
22     "Question:  Anyone else other than
23 Dr. Iakovlev that you're relying upon for that
24 statement?")
25     THE WITNESS:  I guess his coauthors,

Page 52

1  Scott Guelcher, G-U-E-L-C-H-E-R, and
2  Robert Bendavid.  There are multiple institutions.
3  BY MR. VOUDOURIS:
4  Q.  Any article in your reference list other
5  than that one?
6  A.  I don't think so.  I think that was a nice
7  case-controlled study looking at the effects of
8  formalin on mesh.
9  Q.  What is Xylene?
10 A.  What is Xylene?
11 Q.  Yes.
12 A.  It's another preservative and used in
13 tissue processing as well.
14 Q.  Do you know if it was used in the tissue
15 processing in Ms. Barker?
16 A.  I don't know.
17 Q.  How about in Ms. Thompson or Ms. Phelps?
18 A.  I don't know.
19 Q.  What does Xylene do to polypropylene?
20 A.  I don't know.
21 Q.  Have you ever treated women who have had a
22 midurethral sling implanted for erosion?
23 A.  I am a pathologist, so I don't treat
24 patients.
25 Q.  Same question for urinary dysfunction?

Page 53

1  A.  I'm a pathologist.  I don't treat
2  patients.
3  Q.  Same for pelvic pain?
4  A.  I am a pathologist.  I don't treat
5  patients.
6  Q.  Same for dyspareunia?
7  A.  Same answer.
8  Q.  I also imagine you don't have any opinions
9  on when a midurethral sling should be revised
10 because you don't perform the surgery, correct?
11 A.  True, I don't perform the surgery.
12 Q.  Exhibit 10, please.
13 A.  Exhibit 10 is the surgical pathology
14 report.
15 Q.  Right.
16 A.  For Ms. Barker.
17 Q.  Does the pathologist comment on any mesh
18 degradation?
19 A.  No, they did a gross exam only, which is
20 common in some pathology labs.
21 Q.  Did this pathologist mention tree barking?
22 A.  They didn't do a microscopic examination
23 so they could not have commented on tree barking.
24 Q.  So the answer to my question is no?
25 A.  Correct.

Page 54

1    Q.  Did this pathologist document anything
2  about mesh shrinkage?
3    A.  No, they were documenting that the mesh
4  material was removed.
5    Q.  Did this pathologist document anything
6  about mesh contracture?
7    A.  No.
8    Q.  Did this pathologist document anything
9  about mesh roping?
10    A.  No, that wouldn't be standard.
11    Q.  And how about curling?
12    A.  No, it would not be standard.
13    Q.  And how about fraying?
14    A.  No.
15    Q.  Did this pathologist do any type of
16  clinical pathologic diagnosis?
17    A.  They did a gross diagnosis only.
18    Q.  So the answer to my question is no,
19  correct?
20        MS. O'DELL:  She answered your question.
21        THE WITNESS:  Well, the clinical
22  pathologic correlation that they did was
23  confirmation that it was a GU device that was
24  removed, basically.
25

Page 55

1  BY MR. VOUDOURIS:
2    Q.  That's it, correct?
3    A.  Yeah.
4        MR. VOUDOURIS:  Can we go off the record
5  for a minute.
6        (Whereupon, a brief recess was taken.)
7  BY MR. VOUDOURIS:
8    Q.  Dr. Allison, did you ever examine
9  Ms. Barker?
10    A.  No.
11    Q.  Did you ever speak to any of her
12  physicians?
13    A.  No.
14    Q.  Have you read any depositions in this
15  case?
16    A.  No.
17    Q.  Have you consulted with any other health
18  care professional in your review of the Barker case?
19    A.  No.
20    Q.  Did you consult with any health care
21  professional in your review of either the Phelps or
22  the Thompson case?
23    A.  No.
24    Q.  Is the extent of your review in this case,
25  when it comes to the pathology, reviewing the slides

Page 56

1  under the light microscope?
2    A.  Yes.
3    Q.  Did you measure the tree barking thickness
4  in any of your photographs?
5    A.  No.
6    Q.  Do you have any idea what the thickness
7  is?
8    A.  I did not measure them.
9    Q.  Do you believe it's all -- that they are
10  five microns or less?
11    A.  Likely.
12    Q.  Handing you what is marked as Defense
13  Exhibit 5.  Can you identify that again for us,
14  please?
15    A.  This is the spreadsheet used to summarize
16  my findings.
17    Q.  And this is a spreadsheet that you
18  created?
19    A.  Yes.
20    Q.  And have we discussed all the findings for
21  Daphne Barker that you have on this spreadsheet?
22    A.  I believe we have when we reviewed the
23  images.
24    Q.  Did you do any testing of the mesh that
25  was explanted from Ms. Barker last month?

Page 57

1    A.  No, I did not.
2    Q.  Are you relying on anyone's opinions
3  regarding an inspection for analysis of that
4  explanted mesh for your opinions in this case?
5    A.  I have the gross examination report from
6  the person who grossed the case.
7    Q.  But other than that, no?
8    A.  No.
9    Q.  Dr. Allison, those are all the questions I
10  have for now.  I may have a few follow-up questions
11  after redirect by counsel.
12    A.  Okay.
13        MR. VOUDOURIS:  What one are you looking
14  for?
15        MS. O'DELL:  I'm looking for Exhibit 10.
16        THE WITNESS:  This one?
17        MS. O'DELL:  I'm sorry, Exhibit 8.
18             EXAMINATION
19  BY MS. O'DELL:
20    Q.  Dr. Allison, Exhibit 8 is your
21  supplemental report in the Barker case, correct?
22    A.  Correct.
23    Q.  And looking at page one, is there a typo
24  regarding the date of Ms. Barker's implant in -- or
25  excuse me, explant surgery on the first page of your

Page 58

1 report?
2   A. Yes, there is. I noticed that this
3 morning.
4   Q. Okay. And describe what the typo is.
5   A. So the date of the partial excision of the
6 TVT midurethral sling is -- the year is incorrect.
7       So February 12, 2012, should read
8 February 12, 2016. I mean, that's documented in the
9 pathology report and obviously occurred after she
10 presented in December 29, 2015.
11   Q. Okay. Would you mind just correcting that
12 on the exhibit, please?
13   A. (Witness complies.)
14       MR. VOUDOURIS: You probably just want to
15 put your initials next to that.
16       MS. O'DELL: I have nothing further.
17       MR. VOUDOURIS: One follow-up question
18 regarding your report, which is Exhibit 8.
19       THE WITNESS: Yes.
20           EXAMINATION
21 BY MR. VOUDOURIS:
22   Q. The paragraph that starts with "My job."
23   A. Okay.
24   Q. Do you have a sentence there that says,
25 "Other physicians rely on me to diagnose the cause

Page 59

1 of their patient's problems," correct?
2   A. Yes.
3   Q. Does any physician at Stanford rely upon
4 you to diagnose clinical sequelae from explanted
5 midurethral meshes?
6   A. No, not currently.
7   Q. Has any surgeon relied upon you to
8 diagnose the cause of sequelae from explanted
9 midurethral meshes?
10   A. No, the surgeons are removing them because
11 they have made their own clinical judgment that they
12 need to be removed because the symptoms they are
13 causing.
14   Q. And you are not a surgeon, correct, who
15 implants or explants these?
16   A. No, I simply describe the findings that
17 are linked to those in my pathology report.
18       MR. VOUDOURIS: Those are all the
19 questions I have unless there is further direct.
20       MS. O'DELL: I have nothing further.
21       MR. VOUDOURIS: All right. We're done.
22       (Whereupon, a brief recess was taken.)
23       MR. VOUDOURIS: Are you having her read
24 any of these transcripts?
25       MS. O'DELL: She will read and sign.

Page 60

1       MR. VOUDOURIS: And do you plan to appear
2 live at trial in this case?
3       THE WITNESS: If necessary.
4       MR. VOUDOURIS: Now we're done. Thank
5 you.
6       (Whereupon, the deposition was concluded
7 at 10:33 a.m.)

Page 61

1           INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over carefully
4 and make any necessary corrections. You should
5 state the reason in the appropriate space on the
6 errata sheet for any corrections that are made.
7       After doing so, please sign the errata
8 sheet and date it.
9       You are signing same subject to the
10 changes you have noted on the errata sheet, which
11 will be attached to your deposition.
12       It is imperative that you return the
13 original errata sheet to the deposing attorney
14 within thirty (30) days of receipt of the deposition
15 transcript by you. If you fail to do so, the
16 deposition transcript may be deemed to be accurate
17 and may be used in court.

Page 62

1        ERRATA SHEET
2
3  PAGE   LINE    CHANGE
4  ____   ____   _____
5            REASON:_____
6  PAGE   LINE    CHANGE
7  ____   ____   _____
8            REASON:_____
9  PAGE   LINE    CHANGE
10 ____   ____   _____
11           REASON:_____
12 PAGE   LINE    CHANGE
13 ____   ____   _____
14           REASON:_____
15 PAGE   LINE    CHANGE
16 ____   ____   _____
17           REASON:_____
18 PAGE   LINE    CHANGE
19 ____   ____   _____
20           REASON:_____
21 PAGE   LINE    CHANGE
22 ____   ____   _____
23           REASON:_____
24
25

Page 63

1        ACKNOWLEDGMENT OF DEPONENT
2
3
4
5       I,_____, do hereby certify
6  that I have read the foregoing pages, and that the
7  same is a correct transcription of the answers given
8  by me to the questions therein propounded, except
9  for the corrections or changes in form or substance,
10 if any, noted in the attached Errata Sheet.
11
12
13    _____   _____
14       KIMBERLY H. ALLISON, M.D.      DATE
15
16
17
18 Subscribed and sworn
   to before me this
19 _____ day of _____, 20____.
20 My commission expires:_____
21
   _____
22 Notary Public
23
24
25

Page 64

1  STATE OF CALIFORNIA  )
2  COUNTY OF YOLO       )
3       I, ELAINA BULDA-JONES, a Certified Shorthand
4  Reporter of the State of California, duly authorized
5  to administer oaths pursuant to Section 2025 of the
6  California Code of Civil Procedure, do hereby
7  certify that
8       KIMBERLY H. ALLISON, M.D.,
9  the witness in the foregoing deposition, was by me
10 duly sworn to testify the truth, the whole truth and
11 nothing but the truth in the within-entitled cause;
12 that said testimony of said witness was reported by
13 me, a disinterested person, and was thereafter
14 transcribed under my direction into typewriting and
15 is a true and correct transcription of said
16 proceedings.
17      I further certify that I am not of counsel or
18 attorney for either or any of the parties in the
19 foregoing deposition and caption named, nor in any
20 way interested in the outcome of the cause named in
21 said deposition dated the _____ day of
22 _____, 2016.
23
24
25 ELAINA BULDA-JONES, RPR, CSR 11720