# EXHIBIT F

```
IN THE CIRCUIT COURT, SEVENTH JUDICIAL CIRCUIT, IN AND
            FOR VOLUSIA COUNTY, FLORIDA


ELIZABETH WAY and STUART M. WAY,


        Plaintiffs,


v.                           CASE NO.:   2011-10945-CIDL


GEORGE T. BESONG, M.D.; GEORGE
T. BESONG, M.D., OB/GYN, LLC d/b/a
WOMEN'S HEALTH RESOURCE
CENTER; and SOUTHWEST VOLUSIA
HEALTHCARE CORPORATION d/b/a
FLORIDA HOSPITAL FISH MEMORIAL,
and C.R. BARD, INC.,


        Defendants.



             Videotaped Deposition of
                RALPH ZIPPER, M.D.
             Saturday, August 29, 2015
                    10:26 a.m.
          Zipper Urogynecology Associates


     200 South Harbor City Boulevard, Suite 401


                Melbourne, FL   32901


             Georgeanne Rodriguez, RPR
```

Case 2:12-md-02327 Document 2190-6 Filed 05/10/16 Page 3 of 4 PageID #: 67842

Way vs. Besong　　　　　　　Ralph Zipper, M.D.　　　　　　　8/29/2015

Page 38

1　　　　THE WITNESS: To the best of my recollection,
2　　that is a correct statement. I do believe that you
3　　will find opinions on the Align product in my notes
4　　which you received today, Exhibit Number 2.
5　BY MR. BOWDEN:
6　　Q. Okay. Okay. I'm just trying to figure out
7　the best way to go about this, Doctor. Do you want --
8　let's do it like this:
9　　　　Can you tell me your opinion regarding what
10　you call the negligent and defective design of the Align
11　product that's implanted in Mrs. Way on November 21st,
12　2008?
13　　　　MR. THORNBURGH: Objection.
14　　　　THE WITNESS: My --
15　　　　MR. THORNBURGH: You just want him to go off?
16　You just want him to explain all of his opinions?
17　　　　MR. BOWDEN: Yes.
18　　　　Well, no, his opinion regarding -- he says the
19　first opinion is the --
20　　　　THE WITNESS: Okay. Here, I'm going to help
21　everybody here, because, I mean, I understand --
22　　　　MR. BOWDEN: Sure. And I just got this report
23　this morning so I haven't read it yet.
24　　　　THE WITNESS: It was our intent to get that to
25　you yesterday --

Page 39

1　　　　MR. BOWDEN: I understand that.
2　　　　THE WITNESS: -- but there were factors.
3　　　　I think Mr. Thornburgh's concern is you have
4　asked for what could be construed as a general
5　opinion. There's a lot of information that goes
6　behind determining the material -- and I have an
7　opinion on the material defects and the
8　methodological defects.
9　　　　I will start off by saying that the material
10　defects are well characterized in my general
11　opinion, which he have agreed not to talk about
12　today unless there's --
13　BY MR. BOWDEN:
14　　Q. Well, the Align general opinion you can't talk
15　about.
16　　　　MR. THORNBURGH: That was the question.
17　　　　THE WITNESS: Please, let me finish.
18　　　　Gentlemen, we talked about this earlier, we're
19　all going to let --
20　　　　MR. BOWDEN: You're right, Doctor, you're
21　right.
22　　　　THE WITNESS: And I'll do it to you a few
23　times too, so it happens.
24　　　　The material defects of the Align product,
25　many of those material defects are well described

Page 40

1　in my general opinion of the Avaulta because they
2　involve a Marlex mesh product of high density. And
3　the severe inflammation, contraction, degradation,
4　and associated pain of those products are well
5　described in my general report.
6　　　　Now, I can go over those. I can go over the
7　overwhelming breadth of medical literature that
8　quite consistently demonstrates the material
9　mismatch associated with polypropylene mesh; the
10　concerns of heavier polypropylene meshes compared
11　to the lightweight polypropylene meshes, the
12　concerns over pore size; concerns over the methods
13　that it transgress and transit the obturator
14　foramen in proximity to the obturator canal; the
15　anatomic concerns as they pertain to instructions
16　for use which were inadequate by both a
17　conscientious physician's standpoint and I would
18　suggest also from the regulations, requirements,
19　and recommendations of the FDA as it pertains to
20　both premarket notification applications and also
21　as well as labeling requirements both dating back
22　to the late 1980s through the early 2000s,
23　including the mesh-specific recommendations and
24　regulations.
25　　　　So what I would suggest for the most part is

Page 41

1　that we consider all of my opinions in the general
2　opinion as it relates to the Avaulta product that
3　relate to polypropylene mesh, pore size, the
4　material defects of polypropylene mesh, and all
5　those defects that involve transgressing the
6　obturator foramen and the arms of the mesh to be my
7　opinions with regard to the material defects and at
8　least a portion of the methodological defects of
9　the Align.
10　BY MR. BOWDEN:
11　　Q. Okay. So --
12　　**A. And I can begin to describe those, but we will**
13　**be going over, probably at length, many of the opinions**
14　**that appear in the Avaulta.**
15　　Q. And I'm not trying to do that, Doctor, because
16　I know that time and efficiency --
17　　　　THE WITNESS: Georgia, I'm sorry. Are you
18　okay?
19　　　　THE REPORTER: Yeah.
20　　　　THE WITNESS: All right.
21　BY MR. BOWDEN:
22　　Q. I know that -- I know that time and efficiency
23　is a concern for everybody, the court, Mr. Thornburgh,
24　myself, you, Georgia.
25　　**A. Mostly Georgia.**

11 (Pages 38 to 41)

Case 2:12-md-02327   Document 2190-6   Filed 05/10/16   Page 4 of 4 PageID #: 67843

Way vs. Besong        Ralph Zipper, M.D.        8/29/2015

Page 306

1   **I have explanted on other patients, I cannot -- I have**
2   **not -- I have not looked at or touched Mrs. Way's mesh**
3   **explants.**
4       Q.  I'm sorry.  Could you today analyze the
5   explanted mesh from Mrs. Way's various explants and
6   trimmings to determine if it is degraded at all?
7           MR. THORNBURGH:  Objection.  We've got other
8   experts.
9           MR. BOWDEN:  Oh, Iakovlev?
10          MR. THORNBURGH:  Yeah.
11          MR. BOWDEN:  Okay.  Good enough.
12  BY MR. BOWDEN:
13      Q.  I'm assuming that your opinions do not overlap
14  with Dr. Iakovlev's opinions, Doctor?
15          MR. THORNBURGH:  Objection.
16          MR. BOWDEN:  Well, is it fair to state,
17  Counsel, that he's not going to be testify to
18  degradation of mesh?
19          MR. THORNBURGH:  He's not going to -- well, I
20  think there's a difference, so if you want to know
21  what I think, I'll tell you.
22          MR. BOWDEN:  He's not going to testify to
23  degradation of Mrs. Way's mesh; is that correct?
24          MR. THORNBURGH:  Well, Dr. Iakovlev is going
25  to testify about the degradation of Mrs. Way's

Page 307

1   mesh.
2           MR. BOWDEN:  Right.
3           THE WITNESS:  My general opinion.
4           MR. BOWDEN:  His general opinion has already
5   been covered, I know.
6           MR. THORNBURGH:  His general opinion has
7   already been covered, but the question may be --
8   and I don't know.  The question may be does he have
9   any opinions based on Dr. Iakovlev's analysis and
10  findings of the explanted degraded mesh.
11          THE WITNESS:  Or the findings and descriptions
12  of the general pathologist.
13          MR. THORNBURGH:  Right.
14  BY MR. BOWDEN:
15      Q.  Do you?
16      A.  Yes.
17      Q.  Are they in your report?
18      A.  No.
19      Q.  What are they?
20      A.  **I agree with Dr. Iakovlev's findings and the**
21  **fragmented nature of the explants, especially the**
22  **explants of Dr. Thompson, are consistent with my**
23  **findings on multiple explantation surgeries where the**
24  **mesh I removed, the physical characteristics suggested**
25  **or were quite indicative of change in the material**

Page 308

1   **properties of the mesh since the time of initial**
2   **implantation to a more brittle, fragile, less elastic**
3   **state.**
4       Q.  Doctor, just for the sake of formality, and I
5   don't have to go into depth, this is your CV,
6   Exhibit 18, that was attached to your expert disclosure
7   in this case.
8           (Exhibit 18 marked for identification.)
9   BY MR. BOWDEN:
10      Q.  I'll give you one with the pretty purple
11  staple that I borrowed from your receptionist outside.
12      A.  Oh, cool.
13      Q.  Doctor, I just wanted to establish whether
14  this is up to date as of the date today that you're
15  sitting here.  I sorry, I put that --
16      A.  It's okay.
17      Q.  -- exhibit sticker over Mount Sinai.
18      A.  That's all right.
19      Q.  No disrespect intended.
20      A.  **Yeah, I mean, it's up to date with the**
21  **exception of the fact that I have an additional C-level**
22  **consultation contract going on -- or I should say that**
23  **I'm performing C-level consultation work for a company**
24  **that I cannot name at this point, a publicly traded**
25  **company, which includes labeling advice and regulatory**

Page 309

1   **advice.**
2       Q.  What is -- and, I'm sorry, what does the term
3   C level mean?  Is that the letter C?
4       A.  **CEO.**
5       Q.  Oh, CEO.  CEO level.  I'm sorry.
6       A.  **Oh, no, I said C.  I mean, it's an**
7   **abbreviation.**
8       Q.  Okay.
9       A.  **CEO, COO, CFO.**
10      Q.  Oh, C-level, got you, so chief officers in
11  some in format, CFO, something like that.
12      A.  **Something like that.**
13          (Exhibit 19 marked for identification.)
14  BY MR. BOWDEN:
15      Q.  Well, I've learned more than one new thing
16  today, but that's the most recent new thing I've learned
17  today.
18          Doctor, this is, just for the sake of
19  thoroughness, the amended complaint in this matter.
20          Have you seen this document before?
21      A.  Yes, I have.
22      Q.  Do you know when the first time you saw that
23  document was?
24      A.  **I think when you showed it to me earlier.**
25          **No, I'm only kidding.  I mean --**