# Exhibit

## "2"

Alan Garely, M.D., FACOG, FACS

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON
-------------------------------------------------
IN RE:  ETHICON, INC., PELVIC    Master File No.
REPAIR SYSTEM PRODUCTS              2:12-MD-02327
LIABILITY LITIGATION                   MDL 2327
                            U.S. DISTRICT JUDGE
                                    JOSEPH R.
                                    GOODWIN
-------------------------------------------------
Deposition of ALAN GARELY, M.D., relating to the
following cases in Wave 1 of MDL 200:

Carey Beth Cole, et al. V. Ethicon, Inc.
Civil Action No. 2:12-cv-00483

Amanda Deleon, et al. V. Ethicon, Inc.
Civil Action No. 2:12-cv-00358

Rose Gomez, et al. V. Ethicon, Inc.
Civil Action No. 2:12-cv-00344

Donna Zoltowski, et al. V. Ethicon, Inc.
Civil Action No. 2:12-cv-00811
-------------------------------------------------


DEPOSITION OF ALAN GARELY, M.D., FACOG, FACS

Friday, April 15, 2016

New York, New York



GOLKOW TECHNOLOGIES, INC.

877.370.3377 ph | 917.591.5672 fax

Deps@golkow.com

Alan Garely, M.D., FACOG, FACS

Page 2

```
 1          Deposition of ALAN GARELY, M.D., FACOG, FACS
 2     pursuant to Notice, on the the 15th day of April 2016,
 3     at Loews Regency Hotel, 540 Park Avenue & 61st Street
 4     New York, New York, commencing at 9:00 a.m.;
 5     before DANA N. SREBRENICK, a Certified Court
 6     Reporter, a Registered Realtime Reporter and
 7     Notary Public within and for the State of New
 8     York.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1
 2          APPEARANCES:  (Continued.)
 3
 4          On behalf of Defendant:
 5          BUTLER SNOW, LLP
 6          1020 Highland Colony Parkway
 7          Suite 1400
 8          Ridgeland, Mississippi  39157
 9          601.948.5711
10          BY:  PAUL S. ROSENBLATT, ESQ.
11          paul.rosenblatt@butlersnow.com
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1
 2     APPEARANCES:
 3
 4          On behalf of Plaintiff:
 5          BLASINGAME, BURCH, GARRARD, ASHLEY, P.C.
 6          440 College Avenue
 7          Suite 320
 8          Athens, Georgia  30601
 9          706.354.4000
10          BY:  JAMES B. MATTHEW, ESQ.
11          Jbm@bbgbalaw.com
12
13          On behalf of Defendant:
14          RIKER DANZIG SCHERER HYLAND &
15          PERRETTI, LLP
16          Headquarters Plaza
17          One Speedwell Avenue
18          Morristown, New Jersey  07962
19          973.538.0800
20          BY:  MAHA M. KABBASH, ESQ.
21          Mkabbash@riker.com
22
23
24
```

Page 5

```
 1               - - -
 2             I N D E X
 3               - - -
 4
 5     Testimony of:
 6          ALAN GARELY, M.D., FACOG, FACS
 7     BY MS. KABBASH.......................... 9
 8
 9               - - -
10           E X H I B I T S
11               - - -
12     GARELY
13     NO.        DESCRIPTION            PAGE
14     Exhibit 1    Notice to take Deposition
15          of Alan Garely, M.D........ 11
16     Exhibit 4    Disk with reference
17          documents.................. 13
18     Exhibit 5    Flask drive with reliance
19          list documents............. 13
20     Exhibit 2    Dr. Garely's Prolift
21          Expert Report.............. 14
22     Exhibit 3    Dr. Garely's Prolift+M
23          Expert Report.............. 14
24
25
```

2 (Pages 2 to 5)

Alan Garely, M.D., FACOG, FACS

Page 6

```
 1              - - -
 2         E X H I B I T S (Continued.)
 3              - - -
 4    GARELY
 5    NO.      DESCRIPTION           PAGE
 6    Exhibit 6   Dr. Garely's Curriculum
 7              Vitae.....................22
 8    Exhibit 7   E-mail chain Bates
 9              numbered
10              ETH.MESH.08622118..........63
11    Exhibit 8   Printout from Alan
12              Garely, M.D.'s website ....89
13    Exhibit 9   Handwritten estimation of
14              prior TVT retropubics
15              performed by Dr. Garely....108
16    Exhibit 10   Handwritten notes by Dr.
17              Garely estimating number
18              of TVT-O brand slings and
19              obturator slings that
20              he's performed ............119
21    Exhibit 11   Document entitled
22              Position Statement on
23              Mesh Midurethral Slings
24              for Stress Urinary
25              Incontinence...............120
```

Page 7

```
 1              - - -
 2         E X H I B I T S (Continued.)
 3              - - -
 4    GARELY
 5    NO.      DESCRIPTION           PAGE
 6    Exhibit 12   Document entitled
 7              Surgeon's Resource
 8              Monograph on Gynecare TVT..123
 9    Exhibit 13   Document entitled
10              Gynecare TVT with
11              abdominal guides, Early
12              Clinical Experience........129
13    Exhibit 14   Document entitled Oxford
14              Levels of Evidence
15              Pyramid for Practitioners..147
16    Exhibit 15   Document entitled
17              Magnetic Resonance
18              Imaging of Abdominal
19              versus Vaginal Prolapse
20              Surgery with Mesh..........151
21    Exhibit 16   Document entitled
22              Gynecare Prolift
23              Surgeon's Resource
24              Monograph..................219
25
```

Page 8

```
 1              - - -
 2         E X H I B I T S (Continued.)
 3              - - -
 4    GARELY
 5    NO.      DESCRIPTION           PAGE
 6    Exhibit 17   Document entitled Pelvic
 7              Organ Prolapse and Sexual
 8              Function...................233
 9    Exhibit 18   Document entitled Exhibit
10              B, Dr. Garely's review
11              materials..................249
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 9

```
 1         ALAN GARELY, MD, FACOG, FACS, having
 2    first been duly sworn by the Notary Public of
 3    the State of New York, was examined and
 4    testified as follows:
 5              - - -
 6         EXAMINATION BY MS. KABBASH:
 7              - - -
 8    Q   Good morning, Dr. Garely.  I'll
 9    introduce myself again.  My name is Maha Kabbash
10    and I work for the Riker Danzig firm in
11    Morristown, New Jersey, and I represent the
12    defendants in the litigation, Johnson & Johnson
13    and Ethicon.  And I'm here with my colleague,
14    Paul Rosenblatt, from the Butler Snow firm.
15         And we are here to take your deposition
16    on your general opinions on Prolift and
17    Prolift+M in the Ethicon litigation.
18         And I understand that your opinions
19    have been served in four cases that I'll just
20    put on the record, Carey Beth Cole, Amanda
21    Deleon, Rose Gomez and Donna Zoltowski.
22         So thank you for your time in being
23    here today.
24    A   Thank you.
```

3 (Pages 6 to 9)

Alan Garely, M.D., FACOG, FACS

Page 10

1    Q  I have in front of you -- I should
2  start out -- and, sir, I understand that you've
3  been deposed -- how many times have you been
4  deposed in the past in this litigation or in any
5  litigation?
6    A  In against product liability or in
7  general?
8    Q  Anything.  How many depositions have
9  you ever given?
10    A  Probably somewhere between eight and
11  12.
12    Q  So you're very familiar then with the
13  process of a deposition.  I'll just tell you two
14  things; first, it's important that we try as
15  much as we can not to talk over each other so
16  that the court reporter doesn't have to try to
17  take down what we're both saying at the same
18  time.
19        And also, if I ask a question that you
20  don't understand or that just doesn't make sense
21  medically or otherwise, please let me know and
22  I'll do my best to clarify it.  And if you
23  answer a question that I asked, I will assume
24  that you understood it, okay?

Page 11

1    A  Yes, ma'am.
2    Q  I've put in front of you a dep notice,
3  which is marked as Exhibit Garely 1.
4        (Exhibit Garely 1, Notice to take
5  Deposition of Alan Garely, M.D., marked for
6  identification.)
7  BY MS. KABBASH:
8    Q  And if you look to the fifth page of
9  it, there's a series of document requests there
10  that requests -- that request various documents
11  related to your opinions in this litigation.
12  Have you brought documents with you today?
13    A  Just what Mr. Matthews brought.
14    Q  Okay.  And I know we discussed that a
15  little bit off the record, but can you describe
16  what you brought with you today, and I'm happy
17  to either have you testify about it or to take
18  your counsel's representation, either way.
19        MR. MATTHEWS:  It might be quicker if
20  counsel talks.
21        MS. KABBASH:  I was hoping.
22        MR. MATTHEWS:  We have copies of his
23  expert reports, copies of the documents that are
24  referenced in his expert reports via the

Page 12

1  footnotes, a CD which consists of the same
2  things, and a thumb drive which contains all of
3  the materials that he considered in forming his
4  opinions in this case.  Everything that he was
5  sent is on the thumb drive.
6        MS. KABBASH:  Okay.  What's the
7  difference between what's on the disk and what's
8  on the thumb drive?
9        MR. MATTHEWS:  The thumb drive is
10  Exhibit B to his report, which is the whole
11  reliance list.  What's on the disk is simply
12  those documents that are referenced in
13  footnotes.
14        MS. KABBASH:  I see.
15        MR. MATTHEWS:  So the disk is much
16  shorter than the thumb drive.  This has got
17  hundreds or thousands of documents on it.
18        MS. KABBASH:  Okay.
19        MR. MATTHEWS:  This has 100, maybe.
20  BY MS. KABBASH:
21    Q  So the disk contains the documents that
22  are referenced in the footnotes of your report,
23  Dr. Garely, correct?
24    A  Yes, ma'am.

Page 13

1    Q  Okay.
2        MS. KABBASH:  Can I mark both of those?
3        MR. MATTHEWS:  The notebook too?
4        MS. KABBASH:  No, the flash drive.
5        MR. MATTHEWS:  You can mark them and
6  you can have them.
7        MS. KABBASH:  Thank you.  I'm going to
8  mark the disk that's been produced as Exhibit 4.
9        (Exhibit Garely 4, Disk with reference
10  documents, marked for identification.)
11        MS. KABBASH:  And I'll mark -- I'm not
12  sure how to mark the flash drive.  We'll mark
13  the flash drive as Exhibit 5.
14        (Exhibit Garely 5, Flask drive with
15  reliance list documents, marked for
16  identification.)
17  BY MS. KABBASH:
18    Q  Doctor, have you brought with you today
19  any invoices regarding your work in the Ethicon
20  pelvic mesh litigation?
21    A  I did not.
22    Q  Are you prepared to testify about how
23  much time you've spent on the litigation in
24  Ethicon and how much money you have billed or

Alan Garely, M.D., FACOG, FACS

Page 14

1    are entitled to bill?
2        A  Roughly, yes.
3        Q  Why don't we do this, I think we marked
4    your report -- I've marked your report as
5    Exhibit 2. And I've also marked your -- I
6    should say I've marked your Prolift report as
7    Exhibit 2 and I've market your Prolift+M report
8    as Exhibit 3.
9            (Exhibit Garely 2, Dr. Garely's Prolift
10    Expert Report, marked for identification.)
11           (Exhibit Garely 3, Dr. Garely's
12    Prolift+M Expert Report, marked for
13    identification.)
14   BY MS. KABBASH:
15       Q  If you could turn to, in your regular
16   Prolift report, the last page before the
17   footnotes.
18       A  Would that be page 32?
19       Q  Page 32, correct.
20       A  Yes, ma'am.
21       Q  And you have a section there, section
22   5, Compensation for My Review, Study and
23   Testimony, correct?
24       A  Correct.

Page 15

1        Q  And does this set forth what your
2    hourly rates are and what your half day and full
3    rates are for testimony?
4        A  It does.
5        Q  So you're charging $1,000 per hour for
6    review and study of records, correct?
7        A  Correct.
8        Q  And when you were provided records
9    within 30 days of some deadline, you charge an
10   additional 50 percent per hour?
11       A  Correct.
12       Q  If you provide deposition or trial
13   testimony in the litigation, you're charging
14   $6,000 for a half day and $10,000 for a full
15   day?
16       A  Correct.
17           MR. MATTHEWS:  Take that into
18   consideration.
19           MS. KABBASH:  I'm assuming you are as
20   well.
21   BY MS. KABBASH:
22       Q  And outside of an eight-hour workday if
23   you travel, you bill $250 an hour for that?
24       A  I do.

Page 16

1        Q  When were you first retained to work on
2    the -- to work as a plaintiff's expert in the
3    Ethicon litigation?
4        A  I think I was asked if I would
5    participate in this review somewhere in the
6    summer or fall of 2015, but it could have been
7    earlier. I just don't recall.
8        Q  And at the time that you were retained,
9    what were you asked to do?
10       A  I was asked if I would be willing to
11   review the -- the documents and the literature
12   regarding the product and see if I felt that
13   there were problems with the product, that I
14   would be willing to be an expert.
15       Q  And am I correct that in -- you have
16   not issued any case-specific opinions thus far
17   in the Ethicon litigation? Do you know what I
18   mean by "case-specific opinions"?
19       A  I do not.
20       Q  You haven't issued any opinions
21   regarding a specific plaintiff and what may have
22   caused her alleged injuries?
23       A  I have reviewed charts on a few
24   patients, yes.

Page 17

1        Q  But you haven't issued any opinions yet
2    regarding those patients, correct? Strike that.
3            You haven't prepared a report that has
4    been served in the litigation yet to your
5    knowledge?
6        A  I don't know if it's been served, no.
7        Q  Okay.
8            MR. MATTHEWS:  I think there was one.
9            MS. KABBASH:  Oh.
10   BY MS. KABBASH:
11       Q  You prepared a report in the Katherine
12   Grace Erwin case?
13       A  Correct.
14       Q  Okay, that's right. I forgot about
15   that.
16           Is that the only one that you have
17   prepared so far?
18       A  I think there was another one. I
19   just -- because I've been focusing on this, I
20   haven't looked at those cases and I think there
21   was a second one. I just don't remember. If
22   you said the name, I might remember.
23       Q  Am I correct that you have not issued
24   opinions regarding Carey Beth Cole?

5 (Pages 14 to 17)

Alan Garely, M.D., FACOG, FACS

Page 18

1    A  I don't believe so.
2    Q  Amanda Deleon?
3    A  Doesn't sound familiar.
4    Q  Rose Gomez?  As you sit here right now,
5  that's not ringing a bell?
6    A  No.
7    Q  And Donna Zoltowski?
8    A  Zoltowski sounds familiar only because
9  I may -- I've reviewed so many, that was one
10  sounds sort of familiar.  I just don't recall if
11  I reviewed that one.
12    Q  Okay.  So can you tell me -- have you
13  already billed plaintiff's counsel for the work
14  that you've done in the Ethicon litigation?
15    A  I have not.
16    Q  Can you tell me how many hours you have
17  spent so far on the Ethicon litigation to
18  include, and you're welcome to break it down if
19  you want to, but everything from meeting with
20  counsel, from document review, preparing your
21  reports, preparing for your deposition today?
22    A  I think that between the review of
23  records and preparation, the total hours from
24  the beginning of review to now are going to come

Page 19

1  in somewhere between 250 and 350 hours.
2    Q  And by and large, those 250 to 350
3  hours would be at the hourly rate of $1,000,
4  other than the time that you're in the
5  deposition today?
6    A  Yes, ma'am.
7    Q  And for the time that you're in the
8  deposition today, will you be charging your
9  $10,000 full day rate?
10    A  I believe so, yes.
11    Q  Who retained you in this mesh
12  litigation, which firm?
13    A  Blasingame.
14    Q  And you have been previously retained
15  as a plaintiff's expert in other mesh
16  litigations as well, correct?
17    A  Correct.
18    Q  Is that the Bard litigation also or
19  have you been retained in other -- in cases
20  against other manufacturers?
21    A  Just in Bard.
22    Q  And you were deposed twice in the Bard
23  litigation as an expert?
24    A  Yes, ma'am.

Page 20

1    Q  And you've also been deposed as a
2  treating physician, correct?
3    A  Correct.
4    Q  What products were involved in the case
5  in which you were deposed as a treating
6  physician?  Was that a Bard product?
7    A  It was a Bard product.
8    Q  A Bard sling?
9    A  I think it was an Avaulta or maybe -- I
10  don't -- I think it was an Avaulta, I just don't
11  recall.
12    Q  Are the opinions that you've issued in
13  the two reports that we have marked as Exhibit 2
14  and 3, are these the first opinions, expert
15  opinions that you have issued in litigation
16  against Ethicon?
17    A  Yes, ma'am.
18    Q  How did you prepare for the deposition
19  today?
20    A  I reviewed literature.  I reviewed
21  notes that I received from medical conferences
22  that I've attended.  I have reviewed videos.  I
23  have -- depended on my knowledge of the product
24  in speaking with people from the company and

Page 21

1  other users of the products.
2    Q  Which videos did you review?
3    A  There were procedural videos on
4  Prolift.
5    Q  Did you meet with counsel to prepare
6  for your deposition?
7    A  Yes, ma'am.
8    Q  How many times did you meet?
9    A  Once.
10    Q  Did you meet with Mr. Matthews?
11    A  I did.
12    Q  And how long was your meeting for?
13    A  It was for an hour and 40 minutes.
14    Q  And how long ago was that?
15    A  It was yesterday.
16    Q  Did you review any particular documents
17  while you were meeting with Mr. Matthews
18  yesterday?
19    A  I did.
20    Q  Which documents did you review?
21    A  The documents that are in front of me
22  right now.
23    Q  Your reports?
24    A  Yes, ma'am.

6 (Pages 18 to 21)

Alan Garely, M.D., FACOG, FACS

Page 22

1     Q   Anything other than your reports?
2     A   No.
3     Q   How many hours would you say you've
4   spent preparing for the deposition?
5     A   Close to 60.
6     Q   Let's mark your CV.
7       (Exhibit Garely 6, Dr. Garely's
8   Curriculum Vitae, marked for identification.)
9   BY MS. KABBASH:
10    Q   Dr. Garely, I've just handed you what's
11  been marked as Exhibit 6.  Is that your updated
12  curriculum vitae?
13    A   I think I just updated another like
14  about two weeks ago.  I think I may have added
15  something minor to it.  I just don't remember
16  what.
17    Q   Do you remember what it was in relation
18  to, a published article or a speaking event or
19  something along those lines?
20    A   It was either a publication and I think
21  something -- one of my -- I think one of my
22  fellows wrote a paper that was either accepted
23  for publication or it was presented somewhere so
24  I added it.

Page 23

1     Q   Was that paper that was added, did it
2   relate to the use of mesh to treat either stress
3   urinary incontinence or prolapse?
4     A   No.
5     Q   What was the subject matter of that
6   paper?
7     A   I think it was on -- I think she was
8   looking at incisions and patient perceptions.
9     Q   Uh-huh.
10    A   Abdominal versus laparoscopic.  It had
11  nothing to do with vaginal approaches.
12    Q   Other than that one addition, Doctor,
13  does this version of your CV at Exhibit 6 appear
14  to be an updated version of your CV and your
15  credentials?
16    A   I think -- actually, I think I remember
17  now what I added.  I think for the American
18  College of Surgeons, I was -- I'm now part of
19  the program committee, so I think I updated
20  that.  My representation to the American College
21  of Surgeons from the American Urogynecologic
22  Society was also my board representation to the
23  Gynecologic Advisory Board was updated.  So from
24  2015 to present, I'm also the program -- on the

Page 24

1   program committee.
2     Q   I see, thank you.
3     A   You're welcome.
4     Q   So you went to medical school at St.
5   George's University School of Medicine?
6     A   I did.
7     Q   And that was in Grenada in the West
8   Indies, correct?
9     A   That's correct.
10    Q   After that, you did an internship at
11  St. Vincent's OB/GYN department here in New
12  York?
13    A   I did.
14    Q   And then you did a residency also at
15  St. Vincent's in OB/GYN?
16    A   I did.
17    Q   And was that -- was your internship and
18  residency sort of the same program or were they
19  two different programs?
20    A   One program.
21    Q   So that was from the time frame from
22  1989 to 1993?
23    A   Yes, I never understood why everybody
24  breaks down their internship and residency, but

Page 25

1   everybody does it, so I just did it when I made
2   my CV, but it makes no sense.
3     Q   Did you perform surgeries during that
4   time frame, gynecological surgery?
5     A   As a resident, yes.
6     Q   What type of surgeries did you perform
7   as a resident?
8     A   Everything that encompasses general
9   obstetrics and gynecology, and assisted on
10  subspecialty types of surgery with
11  fellowship-trained subspecialists.
12    Q   At that point in time, were you trained
13  in doing surgeries to treat prolapse or stress
14  urinary incontinence?
15    A   To the best of everybody's ability at
16  that time, I was.  They weren't very effective,
17  but that's what we learned.
18    Q   When you say "they weren't very
19  effective," what are you referring to?
20    A   I'm referring to approaches that if
21  people did them today, they would be considered
22  not the standard of care.
23    Q   And what were those approaches?
24    A   To treat stress incontinence, we were

Golkow Technologies, Inc. - 1.877.370.DEPS

Alan Garely, M.D., FACOG, FACS

Page 26

1   doing things like anterior repairs or needle
2   procedures.  To fix prolapse, we were relying on
3   sacrospinous ligament fixations and anterior and
4   posterior repairs for everybody.
5       Q   And so what you're saying is it would
6   no longer be the standard of care today to do a
7   sacrospinous ligament fixation or an anterior
8   colpopexy or posterior colpopexy on everybody?
9       A   On everybody.  I think these operations
10  for sure still have a place.  I was more
11  referring to the incontinence procedures as
12  being outdated.
13      Q   I see.  So you're saying the -- was
14  it -- which operations did you say again?  I
15  apologize.
16      A   The needle procedures, like staining
17  procedures.
18      Q   So the staining procedures and the Ross
19  needle procedures would be considered out of
20  date today, correct?
21      A   Correct.
22      Q   After your residency at St. Vincent's,
23  you did a fellowship in urogynecology at Mount
24  Sinai at the University of Connecticut, correct?

Page 27

1       A   Correct.
2       Q   And that was from 1993 to 1994?
3       A   Correct.
4       Q   What -- I assume that you were trained
5   in doing urogynecological surgeries during your
6   fellowship, correct?
7       A   I was.
8       Q   And what types of surgeries did you
9   train in at that time?
10      A   The procedures ran the gamut from
11  vaginal approach operations to abdominal
12  approach operations.
13      Q   And which ones were they?
14      A   For vaginal approach operations, we did
15  anterior/posterior repairs, sacrospinous
16  ligament fixations, uterosacral ligament
17  fixations.  We had developed a procedure where
18  we were affixing the vaginal apex to the arcus
19  tendineus.  That was sort of a modified
20  paravaginal repair done vaginally.
21          Abdominal approach procedures included
22  sacrocolpopexies, uterosacral ligament
23  suspensions.  And then incontinence procedures,
24  such as Burch procedures, MMK procedures, and

Page 28

1   native tissue slings.
2       Q   The native tissue slings, is that also
3   referred to as fascial slings?
4       A   It can.  When I say "native tissue," it
5   implies fascial and also muscle slings.
6       Q   What are muscle slings?
7       A   So it's where you take the fascia, but
8   you don't just strip it off the muscle, you take
9   the underlying muscle with it, and so it adds a
10  big bulky repair.  It's for people who have
11  really severe incontinence or people who have
12  had radiation or a fascial sling won't do the
13  trick.
14      Q   Are those types of slings that you're
15  describing to me that involve taking part of the
16  muscle, are those considered out of date today?
17      A   I would say that knowing how to do them
18  is beneficial in the rare cases that come up
19  that may need them.  I would say the majority of
20  pelvic surgeons that are trained today probably
21  don't know how to do them, which is why when
22  people need those type of surgeries in New York,
23  they'll often refer them to me because they know
24  I have a lot of experience with those.

Page 29

1       Q   After your fellowship at Mt. Sinai, you
2   did another fellowship in urogynecology at
3   Louisiana State?
4       A   LSU, correct.
5       Q   Okay.  And that was from 1994 to 1995?
6       A   Correct.
7       Q   And in your second fellowship, did you
8   do the same surgeries as in the first fellowship
9   or were there additional surgeries that you were
10  trained in?
11      A   The additional surgeries I was trained
12  in at LSU were mostly complex fistula repairs,
13  because the person that I -- that was the head
14  of that program was an internationally-known
15  expert on fistulas.
16      Q   And synthetic slings were not around at
17  the time of your fellowships, correct?  You
18  didn't learn that until afterwards?
19      A   I don't know that they were around.  I
20  don't -- the -- I remember us discussing -- as a
21  fellow and then after my fellowship discussing
22  the use of synthetic meshes as a sling and it
23  seemed like an incredibly outrageous idea at the
24  time.

8 (Pages 26 to 29)

Alan Garely, M.D., FACOG, FACS

Page 30

1    Q   It was definitely a new mind set at the
2  time in how to go about treating SUI in women?
3    A  Correct.
4    Q   So you are board certified in OB/GYN,
5  correct?
6    A  Correct.
7    Q   And you've also sat for the Female
8  Pelvic Medicine and Reconstructive Surgery
9  Boards?
10   A  I did.
11   Q   And that was in 2013 that you were
12 board certified in that?
13   A  I believe that's correct.
14   Q   You're not board certified in urology,
15 correct?
16   A  Correct.
17   Q   Can you take me through the chronology
18 of your private practice.  Where did you start
19 your private practice?
20   A  I've never been in private practice.
21   Q   So you've just been affiliated with --
22 how would you describe your practice, then?
23   A  I've been an employed physician my
24 entire life.

Page 31

1    Q   But you've treated patients in your
2  capacity as an employed physician for the
3  institutions that are listed in your CV?
4    A  Yes, ma'am.
5    Q   How long have you been treating
6  patients for prolapse and SUI?
7    A  I started treating patients two weeks
8  after I finished my fellowship in 19 -- July of
9  1995.
10   Q   So it's been 21 years now?
11   A  I don't like to count.
12   Q   I don't like it either because it's a
13 very similar number to mine.
14   A  Okay.
15   Q   When you say that you're an employee as
16 opposed to being in private practice, I probably
17 should know what this means, but what is the
18 distinction in your mind between the two things?
19   A  I am part of an academic group that's
20 employed by a hospital which has
21 responsibilities for seeing patients and
22 training medical students, residents and
23 fellows.  That has been my life since I was a
24 fellow and since I finished my fellowship.

Page 32

1    I've never had to hire office managers
2  or look for office space or worry about whether
3  a bill's coming in to pay electricity.  I show
4  up and do the job that I am requested based on
5  my contract with my employer and I fulfill the
6  duties of my -- my job.
7    Q   I see.  So rather than having what we
8  would consider like a doctor's office practice
9  type thing, you work for the hospitals that
10 you've been employed for?
11   A  Yes, ma'am.
12   Q   How many patients would you see in a
13 given week?  How much of your time is dedicated
14 to seeing patients as opposed to performing
15 surgeries?  Let's take now.
16   A  Well, now is a little different than
17 before.  Because in 2012, I became a chairman
18 and my -- my duties and responsibilities changed
19 dramatically at that juncture.  Currently, I see
20 patients on Mondays and Wednesdays for a full
21 day, and I operate on Tuesdays and Thursdays for
22 a full day.  And on Fridays is a full day
23 dedicated to administrative work, which I also
24 interject in between cases and patients Monday

Page 33

1  through Thursday.
2    Q   And how -- for how long has that been
3  your schedule?
4    A  Since July of 2012.
5    Q   And before that, how often -- what was
6  your division of time in terms of what days you
7  saw patients and what days you performed
8  surgery?
9    A  Before that, I almost always saw
10 patients on Mondays, Wednesdays and Fridays, and
11 operated on Tuesdays and Thursdays.
12   Q   So since 2012, you've basically taken
13 on more administrative responsibilities at your
14 hospital?
15   A  Correct.
16   Q   You have on -- in your CV, in the first
17 page of your CV, you have what appear to be
18 three academic positions listed.  Clinical
19 associate professor at Mount Sinai, adjunct
20 clinical professor, Ross University School of
21 Medicine, and then adjunct clinical associate
22 professor at NYIT, College of Osteopathic
23 Medicine?
24   A  Correct.

Alan Garely, M.D., FACOG, FACS

Page 34

1      Q   And you hold all those positions
2   currently?
3      A   I do.
4      Q   Who do you teach in those positions?
5      A   At Mount Sinai, I teach medical
6   students, residents and fellows.  At Ross, we
7   have medical students from Ross that come on to
8   the OB/GYN rotation at South Nassau Community
9   Hospital, where I'm the chairman, and at New
10  York Institute of Technology, the osteopathic
11  school, they also have medical students that
12  come to rotate at South Nassau.
13     Q   Have you ever trained any of your
14  students, whether fellows or residents, in
15  surgery to treat SUI or prolapse?
16     A   Well, I don't train students
17  specifically in -- to do these type of
18  treatments.  Students are more getting a broader
19  experience of the indications and how we treat
20  things.  It's not like I would spend any time
21  trying to teach a medical student how to do a
22  prolapse surgery.        Residents, I
23  will take them through cases and I don't have
24  the expectation that they will perform these

Page 35

1   procedures, but I do have the expectation that
2   they will know how to do them.  And then my
3   fellows, I train them because I have an
4   expectation that they will absolutely be doing
5   them.
6      Q   What types of SUI or prolapse surgeries
7   do you train your fellows in?
8      A   I train them on retropubic
9   urethropexies, such as Burch procedures.  I
10  don't do the MMK anymore, but I tell them how to
11  do it.  And we train them on how to do slings.
12     Q   Okay.
13     A   Also suburethral bulking procedures as
14  well.
15     Q   Which slings do you train your fellows
16  in?
17     A   At this point, we only train them in
18  retropubic slings.
19     Q   Is there a particular brand that you
20  use when you train them?
21     A   I use different brands, depending on
22  which hospital I'm operating at.  I don't
23  usually have too much problem with any of the
24  products.  They're different, but I can work

Page 36

1   with almost all of them.
2      Q   We'll come back to the products in a
3   little bit.  Am I correct, Dr. Garely, that you
4   are not an expert in biomaterials?
5      A   Well, I'm familiar with biomaterials,
6   but I'm not a biomaterial engineer.
7      Q   Okay.  You're not a polymer scientist,
8   correct?
9      A   That is correct.
10     Q   You're not a trained pathologist,
11  correct?
12     A   That is correct.
13     Q   And you're not board certified in
14  pathology, correct?
15     A   That is correct.
16     Q   You're not trained in neuropathology;
17  is that correct?
18     A   That is correct.
19     Q   And you're not an epidemiologist,
20  correct?
21     A   That is correct.
22     Q   Have you ever been involved in drafting
23  instructions for use for a medical device?
24     A   When -- I've been involved in advising

Page 37

1   companies in formulating the instructions for
2   use, but I've actually not physically put the
3   pencil to the paper and written up those
4   instructions myself.
5      Q   Tell me what you have done in advising
6   companies on instructions for use.
7      A   Well, when I was asked to be an expert
8   by Ethicon, back in the late '90s, to come
9   on-board and evaluate the TVT sling, I was sent
10  as part of a group to Sweden and learned the
11  procedure from the inventors of the TVT
12  procedure.
13         When we came back to the United States,
14  we were intimately involved in formulating the
15  IFUs to help instruct and educate physicians in
16  the United States on how to use the product.
17     Q   So that was the TVT Retropubic, the
18  original TVT sling?
19     A   Yes, ma'am.
20     Q   As best as you can remember, what was
21  your involvement with respect to the TVT IFU at
22  the time, did you receive a draft of it and
23  review it and provide commentary, what did you
24  do exactly with respect to the IFU?

10 (Pages 34 to 37)

Alan Garely, M.D., FACOG, FACS

Page 38

1    A  It was almost 20 years ago.  I just
2  recall that we would have a lot of meetings with
3  the people who were putting the product out.
4  We -- we did everything from educational
5  preparation, educational materials, to helping
6  design the way that the product looked.
7        We went through different iterations of
8  the needles and the mesh, and we discussed
9  things that belonged in the IFU so that
10  physicians could be properly educated on the use
11  of the product.
12    Q  As you sit here today, can you recall
13  actually reviewing draft versions of the IFU and
14  providing feedback on those draft versions?
15    A  There were so many papers that we were
16  looking at and formulating that to say that I
17  specifically remember any one of those, I can't
18  get my mind around that, no.
19    Q  Dr. Garely, is it fair to say that you
20  do not hold yourself out as an expert in product
21  labeling?
22    A  I don't understand the question.
23    Q  You don't consider yourself an expert
24  in formulating labels for medical devices and

Page 39

1  what components those labels need to have?
2    A  I guess I'm not familiar with what a
3  label would be.
4    Q  Fair point.  Am I correct that you
5  don't hold yourself out as an expert of what the
6  requirements of the contents of an instructions
7  for use should be?
8    A  Well, I do believe that I'm an expert
9  when it comes to the instructions for use when
10  it applies to products that I'm familiar with,
11  yes.
12    Q  Have you reviewed regulatory guidances
13  or regulations that address what the
14  requirements of device labeling are?
15    A  Only in documents that I reviewed from
16  internal documents of when companies were
17  writing their IFUs and they had background
18  information to go on, but that would have been
19  the only time that I would have reviewed those
20  documents.
21    Q  And what are the documents that you
22  reviewed?
23    A  Whatever -- from this case or from the
24  Bard case, when I had the internal documents

Page 40

1  from the companies where they were trying to
2  come up with IFUs and they were talking about
3  the regulatory issues regarding the IFUs, those
4  were the documents that I saw.
5    Q  Have you ever reviewed FDA regulations
6  relating to labeling and what needs to go into
7  product instructions for use?
8    A  I don't know that I've specifically
9  seen that document.
10    Q  Have you ever reviewed the document
11  that is known as the FDA Blue Book Memo on what
12  needs to go into instructions for use?
13    A  That one sounds familiar.  I just don't
14  recall having -- what I would have read in it.
15  But it does sound familiar.
16    Q  It sounds familiar to you, but as you
17  sit here today, you're not sure whether or not
18  you've looked at that particular document?
19    A  Correct.
20    Q  Have you ever reviewed Ethicon's
21  standard operating procedures regarding what
22  information needs to go into instructions for
23  use?
24    A  I don't know if I've looked at that

Page 41

1  manual, only what I've seen from the internal
2  documents and discussion of what should be
3  included and excluded from the IFU.
4    Q  Okay.  As you sit here right now, you
5  can't recall looking at a particular Ethicon
6  labeling standard operating procedure, SOP
7  document, that lays out what needs to be in an
8  instructions for use, correct?
9    A  Based on the internal documents that I
10  read, I don't even know if such a thing existed
11  because they were choosing to exclude
12  information that would have helped physicians to
13  use the product better.
14        So if there was some guideline, some
15  guideline that would have told them what to do,
16  I don't know that they followed it.  Apparently
17  they just chose indiscriminately to include or
18  exclude information that could have or could not
19  have been helpful to physicians.
20        MS. KABBASH:  Move to strike as
21  nonresponsive.
22  BY MS. KABBASH:
23    Q  My question, Doctor, is as you sit here
24  today, am I correct that you do not recall

11 (Pages 38 to 41)

Alan Garely, M.D., FACOG, FACS

Page 42

1   reviewing a particular Ethicon standard
2   operating procedure document related to what
3   should go in labeling?
4      A   I don't recall.
5      Q   Am I correct that you are not an expert
6   in design control procedures and requirements
7   for bringing a product through development?
8      A   I don't know what you mean by "design
9   control."
10      Q   So there are various FDA regulations
11   and requirements that govern a company's process
12   of bringing a product through the design stages,
13   and eventually to market, they're called design
14   controls.  And are you familiar with FDA
15   regulations that govern what a company must
16   accomplish in their design controls?
17      A   Only from my participation in products
18   coming from the drawing board to marketing.
19   That's my only experience with that.
20      Q   And you would not hold yourself out as
21   an expert in FDA regulations on design controls,
22   correct?
23      A   That would be correct.
24      Q   You would not be able to speak to how,

Page 43

1   if at all, design control requirements have
2   changed over the past 15 or 20 years?
3      A   I'm sorry, could you please repeat the
4   question?
5      Q   Sure.  You would not be able to comment
6   on how design control requirements have changed
7   over the past 15 or 20 years?
8      A   I can comment.
9      Q   Okay.  What -- what is your basic
10   knowledge about that?
11      A   Well, specifically related to pelvic
12   floor products, I know that the -- in the past,
13   the ability to get a product to market was based
14   on approval of similar products.  And I know
15   that the FDA has changed its approach to a lot
16   of these products in that they've looked more
17   closely at what is coming on and whether there
18   really is true similarity to previous products.
19   And they have been more stringent in the
20   requirements of premarket testing to show that
21   the procedures and the devices are safer.
22      Q   You're referring to the FDA's recent
23   orders to up-classify pelvic floor kits from
24   class 2 to class 3?

Page 44

1      A   That would be correct.
2      Q   So that issue would relate to what a
3   company must do to get FDA permission to market
4   a product in the United States, correct?
5      A   More or less, correct.
6      Q   But that does not relate to what steps
7   a company has to take internally in order to
8   meet its various design control obligations,
9   correct?
10      A   To some degree, it does.
11      Q   Have you ever worked in the R&D
12   department of a medical device company?
13      A   As an employee or as a consultant?
14      Q   As an employee.
15      A   No.
16      Q   Have you ever advised the FDA on issues
17   related to medical devices to treat pelvic organ
18   prolapse or FUI?
19      A   I have not.
20      Q   So I take you have never testified in
21   front of the FDA on those subjects?
22      A   I have not.
23      Q   Have you ever assisted any medical
24   device company in completing their risk

Page 45

1   assessments or -- are you familiar with what an
2   FMEA or a DDSA is; do you know what those
3   documents are?
4      A   I'm not good on the acronyms.  Could
5   you tell me what they stand for?
6      Q   I will try.  Design Device Safety
7   Assessment.  I need to remind myself what an
8   FMEA is, Failure Mode Effects Analysis.  Are you
9   familiar with what those documents are and what
10   purpose they serve within a company's design
11   control processes?
12      A   I do and I am.
13      Q   Have you had involvement in the
14   preparation of those documents?
15      A   I believe that I was involved in the
16   preparation of those documents for a device.
17      Q   Which device was that?
18      A   I think I was involved in that for the
19   device of ligature made by -- at the time I
20   think it was U.S. Surgical and I think it was
21   acquired or changed its name to Covidien.
22      Q   And what type of device is that?
23      A   It's a device that -- it grabs tissue,
24   it seals the tissue with heat, and then it cuts

12 (Pages 42 to 45)

Alan Garely, M.D., FACOG, FACS

Page 46

1    the tissue between the jaws of the grabber.  And
2    so it can -- it can clamp, cauterize and cut
3    tissue.  So instead of putting clamps and using
4    sutures and scissors, it's a one -- one device.
5        Q  So what was your role with respect to
6    the -- was there an FMEA for that device; is
7    that what you're referring to?
8        A  Correct.
9        Q  What was your role with respect to that
10   FMEA?
11       A  I was traveling up to Connecticut where
12   their research lab was with the veterinarians
13   and working on the animal labs on a regular
14   basis from New York. I was traveling.  And then
15   when they moved to Boulder, I was flying out to
16   Boulder, and working with them on -- in the
17   animal labs in looking at the data to see
18   whether the device was safe on certain vessel
19   sizes.
20       Q  And were you actually participating in
21   the generation of the FMEA and the putting the
22   information in it that was needed to complete
23   the FMEA?
24       A  The veterinarians were doing that.  I

Page 47

1    was -- I guess I was a consultant to them.
2        Q  Were you aware at that time of what the
3    requirements were that needed to go into the
4    FMEA for that device?
5        A  Not specifically, no.
6        Q  As you sit here today, are you familiar
7    with what type of information needs to go into
8    an FMEA?
9        A  At the time, I may have been familiar;
10   but I don't recall at this point.
11       Q  And that's the only -- is that the only
12   product where you can recall providing feedback
13   that would have fed the FMEA process?
14       A  I don't know whether or not I was
15   involved with the IVS Tunneller at an earlier
16   stage when they were formulating that
17   information as well because I was doing animal
18   labs or cadaver labs with them as well.  I just
19   don't recall.
20       Q  Doctor, can you describe for me the
21   procedures that you have used to treat prolapse
22   in women?
23       A  Yes.
24       Q  Go right ahead.

Page 48

1        A  Do you want the names of the procedures
2    or you want me to describe the operations?
3        Q  Why don't you tell me the names of the
4    procedures that you've done and we'll take it
5    from there.
6        A  Vaginal approach would be anterior
7    vaginal repairs, posterior vaginal repairs.
8    Sacrospinous ligament fixations, uterosacral
9    ligament suspensions.  The IVS Tunneller.  There
10   was an operation that I had developed on my own
11   that was presented at the American
12   Urogynecologic Society that I had developed in
13   conjunction with Boston Scientific where we were
14   taking a piece of mesh and we were stitching it
15   with a Capio device to the sacrospinous
16   ligaments on both sides and then anchoring the
17   vaginal apex to the mesh.  It didn't really have
18   a name.  We had a name we called -- just in
19   reference, we called it the Garelypexy just
20   because I had developed it, but it had not
21   really gone any further because we had a lot of
22   complications with that procedure.
23       Q  That was a vaginal procedure?
24       A  That was a vaginal procedure.  And then

Page 49

1    I did paravaginal repair anchoring of the
2    vaginal apex.
3        Q  And abdominal -- oh, you're telling me
4    only vaginal approaches.
5        A  I'm still trying to think to see if
6    there were any other vaginal approach operations
7    that I had either done or attempted.
8           I had used biologic graft augmentation
9    in the vagina on multiple occasions.  I think
10   that is it for vaginal; if I think of others,
11   I'll let you know.
12       Q  How about abdominal approach?
13       A  Abdominal approach would be uterosacral
14   ligament suspensions.  Abdominal
15   sacrocolpopexies.  For vaginal, I remember I did
16   Manchester procedures.
17       Q  What's that?
18       A  A Manchester is where you amputate the
19   cervix and you get the uterosacral -- the
20   uterosacral ligaments from intraabdominal
21   through an incision in the vagina and you bring
22   the uterosacral ligaments over the top of the
23   cervix.  You shorten them.  And so it's a
24   procedure where you leave the uterus in to fix

13 (Pages 46 to 49)

Alan Garely, M.D., FACOG, FACS

Page 50

1   the prolapse.
2       It's not a very elegant operation and
3   the success rates were not very good.
4       Q   How many times have you used biologic
5   grafts to treat prolapse?
6       A   Innumerable, I could not venture a
7   guess.  I used them for probably two or three
8   years on multiple cases.
9       Q   Do you still use them today?
10      A   Not as a -- not as a material to -- for
11  prolapse.  I use them for -- to help with
12  healing.
13      Q   Which biologic grafts have you used?
14      A   I used -- what was the name of that
15  one.  It encapsulated -- it was like a porcine
16  dermis.  It was --
17          MR. MATTHEWS:  Who made it?
18          THE WITNESS:  I think it was made by
19  Bard.
20          MR. MATTHEWS:  Pelvicol?
21      A   Pelvicol, thank you.  I used Pelvicol a
22  lot.  I used Surgisis.  There were -- there were
23  a few others.  I just don't remember.  It's been
24  such a long time since I've used biologics, it's

Page 51

1   just not in my memory.
2       Q   How long ago did you stop using
3   biologics?
4       A   For prolapse, probably maybe 12 -- ten
5   years, 12 years ago.  I use biologics on a
6   regular basis for healing still, but not for
7   prolapse support.
8       Q   And what do you mean when you say that
9   you use it for healing?
10      A   When I take out a big piece of mesh and
11  there's a large erosion on the vagina and I know
12  that I won't have enough vaginal epithelium to
13  pull together without causing marked distortion
14  of the vagina, I use ACell graft, which is a --
15  made from a pig bladder, and it causes
16  reepithelialization of the tissue and it heals
17  beautifully.
18          And so patients who have had -- I would
19  say radiation injuries, mesh erosions and
20  patients who have had previous surgery where
21  somebody was too aggressive and took out a lot
22  of the vagina and the patient can't have sexual
23  relations, I'll use the ACell as a filler and it
24  bridges the gaps and it heals beautifully.

Page 52

1       Q   So you use the biologics to help
2   restore the vaginal wall, essentially, where
3   there's been a lot of surgery?
4       A   Correct.
5       Q   Why did you stop using biologic grafts
6   to treat prolapse?
7       A   For a few reasons.  The first reason
8   was is that I don't think that the repairs were
9   holding.  They weren't -- if I was using the
10  graft abdominally, the recurrence rates were
11  extraordinarily high.  If I used it vaginally,
12  the recurrence rates were extraordinarily high.
13  And the problem with the Pelvicol was that it
14  encapsulated, it made the tissue very hard and
15  firm, and it wasn't a very realistic repair.
16  Patients complained when they had sex.
17      Q   So is it fair to say that at least for
18  the past ten years, biologics have not really
19  been a part of the tool chest that you use to
20  treat women's prolapse?
21      A   I would say for at least ten years,
22  yes.
23      Q   Possibly more?
24      A   Possibly more.

Page 53

1       Q   Can you give me a sense on say for the
2   past five to ten years, what has been your
3   primary tool chest in order to treat prolapse,
4   in other words, do you use certain surgeries in
5   certain types of patients, other types of
6   surgeries in other types of patients?
7       A   The answer is yes.  And I want to go
8   back and add again to the vaginal procedures for
9   prolapse.  I also use colpocleisis, and I forgot
10  to mention that.
11      Q   And that is when you sew up the vaginal
12  opening entirely, correct?
13      A   It's not sewing the opening, per se,
14  it's more like pushing up the prolapse, and it's
15  an imbrication technique without removing the
16  uterus.
17      Q   And that basically means -- you do that
18  for patients who will not be having sexual
19  relations anymore, correct?
20      A   Correct.
21      Q   For patients for whom colpocleisis is
22  not a realistic option, what are the surgeries
23  that you offer currently and say for the past
24  five years that you offer to patients who have

Alan Garely, M.D., FACOG, FACS

Page 54

1  prolapse?
2      A  Abdominal sacrocolpopexy.  And
3  sacrospinous ligament fixations.  That would be
4  the bulk of my surgical repertoire for prolapse.
5      Q  And that's for how many years now would
6  you say that's the case?
7      A  Well, sacrocolpopexies and sacrospinous
8  ligament fixations since the time of my
9  training.
10     Q  Do you not offer anterior colpopexies
11 and posterior colpopexies in your practice?
12     A  I -- I'm sorry.  I misinterpreted your
13 question.  I thought you were just referring to
14 apical prolapse.
15     Q  No, with prolapse in general.
16     A  With prolapse in general, I absolutely
17 do have anterior and posterior repairs I would
18 say probably to 80 percent of my cases.
19     Q  What governs whether you choose to do
20 an anterior or posterior repair versus an
21 abdominal sacrocolpopexy or a sacrospinous
22 ligament fixation?
23     A  It depends on where in the vagina the
24 prolapse is located.  If it's an anterior wall

Page 55

1  defect, then it's fixed with an anterior repair.
2  If it's a prolapse -- I'm sorry, if it's a
3  posterior wall defect, then it's fixed with a
4  posterior repair.  And if it's an apical defect,
5  then it would be fixed with the sacrospinous
6  ligament fixation or a sacrocolpopexy.
7          And depending on the presence of one,
8  two, three or a combination of any of those
9  defects, the patient could end up getting one or
10 two or three of those procedures concurrently.
11     Q  What do you think makes a patient a
12 good candidate for an abdominal sacrocolpopexy?
13     A  Any patient that can medically
14 withstand two hours of anesthesia and surgery is
15 a good candidate for a sacrocolpopexy, assuming
16 that they haven't had so many previous abdominal
17 surgeries that it would make the -- the risks of
18 the surgery greater than the benefits.
19     Q  In a patient who's had a lot of
20 previous abdominal surgery, why are the risks
21 higher for abdominal sacrocolpopexy?
22     A  It's a relative contraindication.  It's
23 not absolute and it depends on the types of
24 procedures that they've had.  But the biggest

Page 56

1  risk would be injury to the bowel or the urinary
2  tract or injury to vessels.
3      Q  I think you said you've done abdominal
4  sacrocolpopexy since your training; is that
5  right?
6      A  That's correct.
7      Q  And have you -- when you do abdominal
8  sacrocolpopexy, do you use a synthetic graft?
9      A  I do.
10     Q  What -- did you start out doing open
11 abdominal sacrocolpopexy and then transition to
12 laparoscopic and robotic?
13     A  No.
14     Q  Okay.  What have been the types of
15 abdominal sacrocolpopexies that you've
16 performed?
17     A  I started with large open incisions on
18 sacrocolpopexies, and then through the
19 development of my techniques, I'm able to do
20 these operations through one five-centimeter
21 incision by the pubic bone.  And I use
22 laparoscopic instruments through a very small
23 incision, so I don't need a laparoscope or a
24 robot.

Page 57

1      Q  So that's sort of like your own way of
2  doing them; is that --
3      A  It's the way I developed and it's been
4  presented and I would say a lot of people have
5  adopted this technique.
6      Q  So the incision -- the five-centimeter
7  incision that you use, is that in a sense
8  somewhere in between the incision that would be
9  required for a laparotomy as opposed -- and the
10 type that would be used for laparoscopy, is it
11 like a medium-size incision?
12     A  It's not a medium-size incision, it's a
13 very small incision.
14     Q  Okay.
15     A  And I developed it because the
16 discussion at the time revolving around
17 laparoscopic or robotic was for cosmetic
18 reasons, and so by making one small incision
19 below the hairline, I completely eliminated the
20 need for any scarring on the abdomen.
21     Q  Do you know how many other doctors
22 perform abdominal sacrocolpopexy using this
23 technique?
24     A  I don't know the absolute number.

15 (Pages 54 to 57)

Alan Garely, M.D., FACOG, FACS

Page 58

1     Q  Do you have a sense of how many, like
2  at least five, at least ten?
3     A  I would say probably -- I know Roger
4  Goldberg in Chicago does the same technique
5  because he and I have discussed it multiple
6  times.  And all the people he's trained, the
7  people I've trained, I would say there's
8  probably at least 20 people in the country, if
9  not more, who are doing this technique.
10         It involves making a transverse
11  incision on the skin and a vertical incision on
12  the fascia.  It's called a Kustner incision.
13     Q  How do you spell that?
14     A  K-U-S-T-N-E-R.
15     Q  What grafts have you used in your
16  abdominal sacrocolpopexy over time?
17     A  I've used IntePro.  I've used the
18  Caldera graft.  I've -- I want to preface this
19  by saying that I'm not good with remembering all
20  of the product names because they come and go so
21  frequently that I made a decision 20 years ago
22  to just not use up brain space in memorizing all
23  the names of the -- and the names are so hard to
24  remember, but I can tell you who makes the

Page 59

1  products.
2     Q  Okay.
3     A  I have used AMS's product, which I
4  think is the IntePro.  I use Caldera's graft,
5  which I don't remember the name of it.  There's
6  another graft that was made by a group of
7  people -- I can't remember the name of the
8  company, they worked with Caldera, but I don't
9  use their graft because the graft is too flimsy.
10         I've used off-the-rack Prolene and cut
11  the graft myself.  There are probably one or two
12  other Y-meshes that's along the line, I tried
13  them and didn't like them.
14     Q  When you say you used off-the-rack
15  Prolene, for how many abdominal sacrocolpopexies
16  would you have done or did you do with Prolene?
17     A  Hundreds.
18     Q  Hundreds?
19     A  Hundreds.
20     Q  And was that -- do you know the
21  difference between Prolene and Prolene Soft?
22     A  I do.
23     Q  Okay.  Was it Prolene or Prolene Soft
24  that you were using?

Page 60

1     A  Prolene.
2     Q  Do you still use Prolene today?
3     A  I do not.  Not the brand name Prolene.
4  I use Prolene mesh, but not the brand -- I use
5  mesh made out of polypropylene.  We generically
6  refer to polypropylene as Prolene.
7     Q  Yes, if you don't mind, I'm going to
8  try to defend my client's trademarks.  So when I
9  say "Prolene," just actually this is a good
10  clarification for us, when I say "Prolene," I'm
11  going to be referring specifically to Ethicon's
12  branded Prolene mesh, their polypropylene flat
13  meshes.  So it's good that we clarify that.
14         If I mean polypropylene meshes in
15  general, I'll say "polypropylene meshes in
16  general."
17     A  Understood.
18     Q  What period of time were you performing
19  these hundreds of abdominal sacrocolpopexies
20  using Prolene?
21     A  There was no commercially or there were
22  no commercially-available Y-meshes for
23  sacrocolpopexy until the early 2000s, I think.
24  And so from the time I started my fellowship in

Page 61

1  1993 until probably 2002, and I could be off by
2  a few years, but no less than seven years, I
3  used off-the-rack Prolene made by the company
4  that you're defending.
5     Q  And did you -- I assume you cut it into
6  whatever shape you felt was appropriate for that
7  patient?
8     A  I did.  I cut it and I fastened it and
9  I made it and I was very proud of my work.
10     Q  You made it into what you needed it to
11  be, right?
12     A  Yes, ma'am.
13     Q  Did you ever use Prolene Soft or
14  Gynemesh PS for abdominal sacrocolpopexy?
15     A  I think there was a time, a short time
16  when I used the Gynecare Soft.  It was the
17  softer version.  It was a short period of time,
18  only a few months when there was a transition
19  period between when that came out and when I
20  started using commercially-prepared Y kits.
21     Q  Why did you transition to the Y kits?
22     A  Because it was more convenient.
23     Q  They were precut?
24     A  Yes.

16  (Pages 58 to 61)

Alan Garely, M.D., FACOG, FACS

Page 62

1     Q  The Y kits that you started using, that
2  would have been around 2000, 2002, you're
3  saying?
4     A  You have to forgive me.  I --
5  between -- I got married, I think, in 2002 and
6  then my whole life is a blur between my wife and
7  my kids and products.
8     Q  I understand.  Were the Y kits that you
9  transitioned to, were those meshes made out of
10  polypropylene?
11     A  They were polypropylene.
12     Q  And I assume at that point in time,
13  they were all nonabsorbable polypropylene?
14     A  Correct.
15     Q  At any point in time did you transition
16  to partially absorbable meshes for your
17  abdominal sacrocolpopexies?
18        Or not just transition, but more
19  broadly, did you ever use partially absorbable
20  meshes for your abdominal sacrocolpopexies?
21     A  I don't believe I ever did.
22     Q  Did you ever use a mesh -- flat mesh
23  called Ultrapro made by Ethicon, which was part
24  polypropylene and part absorbable Monocryl

Page 63

1  layer?
2     A  I don't think I ever used the Ultrapro.
3     Q  Did you ever use a Y-Mesh made by
4  Ethicon that came out in about 2012 called
5  ARTISYN Y-Mesh?
6     A  I don't think I used it.  I looked at
7  it and I think I -- the reason I didn't use it
8  was because for me, I need to use a tacker.  I
9  can't suture the grafts onto the longitudinal
10  ligament of the sacrum because my incision is so
11  small, and so the first thing I do in the office
12  when someone brings me one of these meshes is I
13  pull out the tacker and tack it to a -- I have a
14  model of a tailbone, and if it looks like the
15  mesh won't hold with the tacks, then I don't use
16  it.
17        So I don't recall.  I recall looking at
18  the product, I just don't think I've ever used
19  it.
20     Q  Let me show you what I'm marking as
21  Exhibit 7.
22        (Exhibit Garely 7, E-mail chain Bates
23  numbered ETH.MESH.08622118, marked for
24  identification.)

Page 64

1  BY MS. KABBASH:
2     Q  Doctor, this is a very short e-mail
3  chain.  It goes a little bit on to the back, but
4  there's nothing really on there other than a
5  signature block.  And the bottom e-mail is from
6  Brian Luscombe to you dated August 13, 2012.  Do
7  you remember Brian Luscombe at Ethicon?
8     A  I do.
9     Q  Have you had recent contact with him?
10     A  Brian and I were e-mailing probably six
11  months ago because we were going to get the old
12  group together that brought TVT to market, but I
13  was on vacation in Europe, I think, at that
14  meeting and so I'm sorry, but I missed it.  We
15  were going to bring the old band back together.
16     Q  When you say "the old band," who are
17  you referring to?
18     A  I'm referring to the original group
19  that went to Sweden.  That would be Nicholas
20  Lucente and then Kohli joined afterwards and
21  Chip Butrick.  There was probably ten of us.
22     Q  Were you trained by Professor Uhmston
23  there?
24     A  I was trained by Christian Falconer,

Page 65

1  his partner.
2     Q  Oh, at Karolinska?
3     A  Karolinska.
4     Q  And he was one of the original
5  investigators on the Scandinavian multicenter
6  trial for DVT, correct?
7     A  Correct.  Do you want me to read this?
8     Q  You're welcome to take a second to read
9  it.  I just want to see if it refreshes your
10  recollection about your use -- or the extent to
11  which you used ARTISYN.
12        Let me know when you're ready.
13     A  Okay.
14     Q  Does reading this e-mail refresh your
15  recollection as to whether you used ARTISYN in
16  any number of patients?
17     A  It doesn't.  I don't remember.
18     Q  It says here, "Brian, thanks for the
19  note," or I should say you say at the top,
20  "Brian, thanks for the note.  I thought the mesh
21  was a little stretchy.  I also found that the
22  attachment point for the Y was hard to see.
23  Otherwise, I found the graft to be fine.  Let me
24  know how you" -- how -- I assume that means "how

17 (Pages 62 to 65)

Alan Garely, M.D., FACOG, FACS

Page 66

1    I can help you, and I am happy to assist.  If
2    you have doctors who want to watch the cases,
3    get me the contract and I'm good to go."  And
4    you sign A.          Does the last line
5    indicate to you that you had some ARTISYN cases
6    set up in which you were going to try the mesh
7    and you were inviting doctors to come watch
8    those cases?
9         A  No, not necessarily.
10        Q  What is your understanding of that last
11   line?
12        A  Well, my relationship with the company
13   that went back at that point 13 years was that
14   when they wanted to send people to watch my
15   cases, they had a consulting agreement in place,
16   and we were paid by doctor per case.  And so it
17   was just an extension of the way that we had
18   always dealt with each other, which is if you
19   wanted to send doctors to train on his
20   particular product, then he would have to have a
21   consulting agreement in place.
22        Q  And do you recall whether there was a
23   consulting agreement that was entered into at
24   this time in 2012?

Page 67

1         A  I don't believe so.
2         Q  As you sit here -- well, let me ask
3    you, did you ever use ARTISYN on a regular
4    basis?
5         A  I don't believe so because I don't -- I
6    barely remember -- I don't really remember even
7    using the thing, but the fact that I made a
8    comment about it indicates that I did use it,
9    but I just don't recall.
10        Q  What meshes have you used for abdominal
11   sacrocolpopexy over the past say five to ten
12   years?
13        A  Mostly I used the IntePro and the
14   Caldera one.
15        Q  Is the IntePro -- is the IntePro still
16   available today?
17        A  I used it yesterday.
18        Q  Is it going to -- I understand that AMS
19   is no longer going to be making certain
20   products.  Do you know if the IntePro is going
21   to continue to be available?
22        A  I do not know.
23        Q  You haven't been told otherwise?
24        A  I haven't been told and I haven't

Page 68

1    asked.
2         Q  And you mentioned Caldera's mesh?
3         A  Yes.
4         Q  Do you use that today?
5         A  You mean on a regular basis?
6         Q  Do you use that currently as one of the
7    meshes that is in your tool chest to treat
8    prolapse?
9         A  I do.
10        Q  Do you have a current go-to in terms of
11   your abdominal sacrocolpopexy mesh?
12        A  I'm pretty flexible.  The hospitals --
13   I work at three different hospital systems and
14   the hospitals have their own deals with the
15   companies in terms of getting product based on
16   price points.  And for me, I have a pretty
17   standard mantra with products which is if the
18   products are all relatively equal and similar,
19   then I would always go for the cheaper product.
20        But if the hospitals choose to go with
21   a more expensive product as long as it's
22   something that I find to be acceptable, then
23   it's okay by me, I'll use it.
24        Q  For the Caldera mesh and the IntePro,

Page 69

1    are they both fully nonabsorbable or do they
2    have partially absorbable components?
3         A  They are both fully nonabsorbable.
4         Q  It sounds like you have not regularly
5    used a partially absorbable mesh to treat
6    prolapse, correct?
7         A  That's correct, to the best of my
8    memory.
9         Q  When you used Prolene mesh, were you
10   aware of what the pore size was of the mesh?
11        A  Yes.
12        Q  What is the pore size?
13        A  Of the IntePro or the Caldera?
14        Q  No, I'm sorry, I'm talking about the
15   Prolene mesh made by Ethicon that you used many
16   years ago until the Y-Meshes came out.  Did we
17   have a miscommunication?
18        A  No.
19        Q  Oh, okay.
20        A  I'm just laughing only because I am
21   trying -- I can barely remember what I had for
22   dinner last night.  I don't recall what the pore
23   size was on a mesh that I haven't used in 12
24   years.

18 (Pages 66 to 69)

Alan Garely, M.D., FACOG, FACS

Page 70

1    Q   Do you recall whether you knew at the
2  time what the pore size of the mesh was?
3    A   I do.
4    Q   You just don't happen to recall it
5  today?
6    A   That's correct.
7    Q   Did you -- at the time, whatever the
8  pore size was of the Prolene mesh you were
9  using, you found that to be appropriate for
10 purposes of an abdominal sacrocolpopexy, right?
11   A   I thought the sacrocolpopexy was the
12 best operation for prolapse and I still do.
13 Given the materials that I had available to me
14 to do the operation, at the time I felt that the
15 Prolene mesh was the best material that I could
16 get.
17   Q   And you used it in hundreds of women,
18 correct?
19   A   Hundreds.
20   Q   Over a thousand, do you think?
21   A   Over a thousand.
22   Q   What period of time have you used
23 IntePro?
24   A   From whenever it came out to current.

Page 71

1    Q   And what period of time have you used
2  the Caldera product?
3    A   Same thing.  From whenever it was
4  released to current.
5    Q   Is there any other abdominal
6  sacrocolpopexy mesh that you've used regularly
7  that we haven't already talked about?
8    A   I don't believe so.
9    Q   Have you ever used mesh or any graft
10 for abdominal sacrocolpopexy that was not
11 polypropylene?
12   A   I have.
13   Q   I think we talked a little bit earlier
14 about biologics?
15   A   True.
16   Q   All of the meshes that you've used for
17 abdominal sacrocolpopexy that were not
18 polypropylene, would they all fall into the
19 biologic category?
20   A   No.
21   Q   What non-biologic products did you use?
22   A   I used a polyester graft made by a
23 company, I think it was Safriderm or Sofra
24 something.

Page 72

1    Q   Sofradim?
2    A   Sofradim.  And I put that mesh into a
3  patient once.
4    Q   I take it it didn't go very well?
5    A   It went well.  But I developed a -- I
6  put the one in and then I wanted to see how the
7  patient would do and the patient developed an
8  erosion.  And I also had used Marlex at some
9  point when I was just finishing my fellowship in
10 1995, I used Marlex on a few patients and I
11 didn't like the way that it healed.  It was too
12 hard.
13   Q   Both the IntePro and the Caldera mesh
14 are made of polypropylene, correct?
15   A   Correct.
16   Q   And is it fair to say that you've used
17 IntePro and the Caldera product thousands of
18 times?
19   A   That would be correct.
20   Q   So between the -- your use of Ethicon's
21 Prolene mesh, I think you said some limited use
22 of the Prolene Soft mesh, your use of Caldera's
23 product and IntePro, fair to say that you have
24 implanted a polypropylene graft to treat

Page 73

1  abdominal sacrocolpopexy in thousands of women,
2  correct?
3    A   That's correct.
4    Q   And that's going back to your
5  fellowship, correct, or even to your residency?
6    A   Oh, no, I did not use these devices in
7  residency.
8    Q   Okay.
9    A   Since fellowship, yes.  But the
10 majority clearly -- my fellowship was two years.
11 The majority of these cases were not as a
12 trainee, but as an attending physician.
13   Q   So you clearly believe that
14 polypropylene is an appropriate graft to use to
15 treat prolapse in an abdominal approach,
16 correct?
17   A   Correct, in an abdominal approach.
18   Q   Doctor, let me try in a sense to sort
19 of cut to the chase on one particular issue.  Is
20 it your opinion that the polypropylene is fine
21 to use to treat prolapse, but it should not be
22 used in a transvaginal approach; is that -- if I
23 had to kind of boil down your opinion, is that
24 what your opinion is?

19 (Pages 70 to 73)

Alan Garely, M.D., FACOG, FACS

Page 74

1    A   That's my opinion.
2    Q   Well, let me kind of get -- we'll get
3  more into this later, but you have various
4  opinions in your report, Doctor, about
5  alternative designs that don't use mesh arms,
6  don't use trocars, and you propose some
7  alternative materials at one point in your
8  report.
9        At the end of the day, isn't it correct
10  that your opinion is regardless of mesh arms,
11  regardless of the use of trocars, regardless of
12  pore size, you don't think that mesh should be
13  implanted vaginally to treat prolapse; is that
14  correct?
15    A   In its current state, I believe that
16  that's correct.
17    Q   And when you say "in its current
18  state," what are you referring to?
19    A   I'm referring to the fact that in
20  medicine, we have research and development and
21  new products come along all the time, and I'm
22  optimistic and hopeful that we will develop a
23  product that can be implanted vaginally, but
24  that device does not exist in its current form

Page 75

1  today as we sit here.
2    Q   Okay. And so that opinion applies not
3  only to Ethicon's products, but you're saying
4  that you have not seen a transvaginal mesh
5  product from any manufacturer to date that you
6  believe is appropriate for transvaginal
7  implantation to treat prolapse?
8    A   Some are safer than others, but it
9  still wouldn't be my choice.
10    Q   We'll come back to that in a little
11  bit. Are there any particular patients that you
12  feel are not good candidates -- we discussed
13  this a little bit. Are there patients that you
14  feel are not good candidates for abdominal
15  sacrocolpopexy?
16    A   I do.
17    Q   And can you describe those patients for
18  me, again, what categories of patients?
19    A   Well, patients that won't do well with
20  anesthesia for two hours. I'm not saying that
21  the operation has to take two hours, but I think
22  that two hours is a safe amount of time to
23  budget given anything that can happen in an
24  operation. So I wouldn't subject a patient to

Page 76

1  the surgery unless I knew that they could safely
2  withstand two hours of anesthesia.
3        I think a patient that has had certain
4  types of abdominal-type procedures may not be a
5  good risk. For me in my practice and with the
6  team that I work with, there are virtually no
7  patients that would not be a good candidate for
8  the procedure if they needed it.
9    Q   I think you mentioned -- well, strike
10  that.
11        Are patients who have an isolated
12  cystocele or rectocele and not necessarily an
13  apical defect, are they not optimal candidates
14  for abdominal sacrocolpopexy?
15    A   Well, the purpose of the sacrocolpopexy
16  would be to address apical prolapse, whether
17  it's with a uterus or whether it's without a
18  uterus, so if the apex is well supported, the
19  patient would probably do well with an isolated
20  anterior repair or posterior repair.
21    Q   So for those patients that abdominal
22  sacrocolpopexy would not be the right fit
23  necessarily, they should be getting -- you're
24  saying they would be better suited for a native

Page 77

1  tissue repair as opposed to an abdominal
2  sacrocolpopexy because they don't have an apical
3  defect?
4    A   You wouldn't do an operation for a
5  problem that doesn't exist. That would be
6  wrong.
7    Q   So you only do abdominal sacrocolpopexy
8  where there is an apical defect?
9    A   There are some instances when I do
10  sacrocolpopexies on non-apical defects when
11  patients have rectal prolapse, and colorectal
12  surgeons oftentimes believe if you stabilize the
13  vaginal apex, it will help the patient when they
14  repair the rectal prolapse for the indications
15  of constipations, that if you stabilize the
16  apex, the pressure forces will get transmitted
17  better to the rectum, and the patients will have
18  an improvement in defecatory function.
19        And so in those cases, I do tell the
20  patient that this is an operation that's usually
21  reserved for prolapse. In your case, you don't
22  really have prolapse, but this is why I'm going
23  to do the procedure.
24    Q   But in general, you perform the

20 (Pages 74 to 77)

Alan Garely, M.D., FACOG, FACS

Page 78

1 abdominal sacrocolpopexy on patients with apical
2 defects?
3     A   Correct.
4     Q   Is the IVS Tunneller the only device
5 that you've ever used to transvaginally treat --
6 strike that.
7         Is the IVS Tunneller the only synthetic
8 device that you've ever used to treat prolapse
9 transvaginally?
10     A   No.
11     Q   What others have you used?
12     A   The operation that I developed in
13 conjunction with Boston Scientific where we took
14 the Prolene mesh and we anchored it to the
15 sacrospinous ligament bilaterally.
16     Q   How many times did you perform that
17 procedure with the Prolene that you were
18 developing with Boston Scientific?
19     A   Somewhere between ten and 20.
20     Q   And that ultimately did not result in
21 a -- well, were you trying to develop a device?
22     A   I was not trying to develop a device.
23 I was trying to develop a technique.
24     Q   And that was with Prolene mesh?

Page 79

1     A   It was.
2     Q   I apologize.  I know you said this, but
3 why is it that you abandoned that procedure?
4     A   Because the mesh was eroding at the
5 suture line.
6     Q   And you performed -- how many times did
7 you perform the IVS Tunneller procedure?
8     A   I think I used it 14 times before I
9 stopped using it, 12 or 14, but over -- it was
10 somewhere in that -- that range.
11     Q   And am I right that the IVS Tunneller,
12 you would have used that in the time frame
13 leading up to about 2002?
14     A   Somewhere in that neighborhood.
15     Q   And is that procedure a posterior and
16 apical procedure?
17     A   It is posterior and apical.  Some
18 people were using it for anterior as well.
19     Q   Did you ever use it for anterior?
20     A   I did not.
21     Q   Am I correct that you have never used
22 mesh transvaginally to treat an apical defect?
23     A   That's not correct.
24     Q   That answer related to what you were

Page 80

1 doing with Boston Scientific?
2     A   And the IVS Tunneller.
3     Q   So you did use the IVS Tunneller to
4 treat an anterior defect?
5     A   Not anterior, you said apical.  Have you ever
6     Q   I apologize, I misspoke.  Have you ever
7 used transvaginal mesh to treat an anterior
8 defect?
9     A   When I used the Prolene mesh on the
10 device with Boston Scientific, we were also
11 using it to treat anterior defects.
12     Q   Am I correct that you have never
13 implanted Gynemesh PS transvaginally in any
14 women?
15     A   I think you're correct.
16     Q   You've never implanted the Prolift,
17 correct?
18     A   I've never implanted the Prolift.
19     Q   And you've never implanted the
20 Prolift+M, correct?
21     A   Correct.
22     Q   You've never implanted Bard's Avaulta?
23     A   Correct.
24     Q   You've never implanted AMS's Elevate?

Page 81

1     A   Correct.
2     Q   You've never implanted Boston
3 Scientific's Uphold?
4     A   Correct.
5     Q   You've never implanted any transvaginal
6 mesh kit, correct?
7     A   Incorrect.
8     Q   Other than the IVS Tunneller?
9     A   Correct.
10     Q   Have you published any studies that
11 address the Prolift+M?
12     A   I have not.
13     Q   Have you ever served as an investigator
14 in any clinical trial of Prolift+M?
15     A   I have not.
16     Q   Have you served as an investigator in
17 any clinical trial of Prolift?
18     A   No.
19     Q   So obviously, Doctor, based on your
20 prior answers to me, you don't have your own
21 body of patients who've had Prolift that you
22 have assessed in followup, correct?
23     A   Incorrect.
24     Q   Let me be a little more specific.  You

21 (Pages 78 to 81)

Alan Garely, M.D., FACOG, FACS

Page 82

1  don't have any patients in whom you have
2  implanted a Prolift that you've had the
3  opportunity to follow up postoperatively,
4  correct?
5      A  Correct.
6      Q  You have treated patients who have had
7  a Prolift implanted by other people?
8      A  Correct.
9      Q  Am I correct that you've never done a
10 study looking at or measuring contraction or
11 shrinkage in patients who have undergone
12 transvaginal mesh to treat prolapse?
13     A  Incorrect.
14     Q  Why is that incorrect?
15     A  Well, I did an MRI study where we
16 looked at sacrocolpopexies in transvaginal mesh
17 patients to see whether the vaginal lengths were
18 shortened in a short period of time, it was over
19 a three-month period of time, so we did look at
20 contractions.
21     Q  And the purpose of that study was to
22 assess the total vaginal length?
23     A  Correct.
24     Q  In what way in that study did you

Page 83

1  assess contraction or shrinkage?
2      A  We used an MRI to do measurements based
3  on landmarks of the pelvis.
4      Q  And in that study, when you -- my
5  understanding of that study is that you were
6  assessing the success of maintaining -- strike
7  that.  Let me rephrase this.
8          My understanding of that study was that
9  you were trying to measure the success of the
10 efficacy of the procedure or how well it was
11 able to uphold, for lack of a better term; is
12 that correct?
13     A  Well, correct, more or less.
14     Q  In what way did that study assess
15 contraction, what did you do to assess whether a
16 patient had experienced contraction?
17     A  Well, we were just -- it was a -- it
18 wasn't specifically to contraction, but it was
19 -- we just wanted to see whether there was
20 shortening of the vagina, and if there was --
21 and we weren't looking to draw conclusions as to
22 whether it was a contraction or not.
23         We were just looking to see whether or
24 not -- a contraction implies a shrinkage, and so

Page 84

1  we were looking to see whether the vaginal vault
2  maintained its length, based on these
3  procedures.
4      Q  The published version of your study
5  does not report on how many patients experienced
6  contraction or shrinkage, correct?
7      A  Correct.
8      Q  That was not an endpoint of the study
9  either primary or secondary, correct?
10     A  Correct.
11     Q  You've never taught any courses or
12 given any training on the use of Prolift,
13 correct?
14     A  Not specifically to teach it, but I
15 mentioned the Prolift device in lectures.
16     Q  You've mentioned it in lectures, but
17 you've never given any course or training on how
18 to appropriately implant it, correct?
19     A  Correct.
20     Q  And you've never taught any course or
21 professional training on the safe and effective
22 use of Prolift+M, correct?
23     A  Correct.
24     Q  Have you ever attended any

Page 85

1  Ethicon-sponsored professional education courses
2  on Prolift after it was marketed?
3      A  I wanted to attend one, but the --
4  George, the regional rep, told me that unless I
5  had promised to line up some Prolift cases, he
6  wouldn't sponsor me to go to the course.
7      Q  That was a rep that you were dealing
8  with at the time?
9      A  He was -- the rep was Tracy.  He was
10 Tracy's boss.  His name was George.
11     Q  So to date, you have not attended any
12 Ethicon professional training courses on
13 Prolift, correct?
14     A  Just what I've seen at my conferences,
15 national and international.
16     Q  But not any Ethicon-sponsored
17 professional educational event, correct?
18     A  They may have sponsored a lunch
19 symposium.  I don't recall whether it was
20 specifically sponsored by them or whether it was
21 presented by independent presenters.
22     Q  And am I correct that you have not
23 attended any Ethicon-sponsored professional
24 education courses on Prolift+M?

22 (Pages 82 to 85)

Alan Garely, M.D., FACOG, FACS

Page 86

1     A   That's correct.
2     Q   Have you ever looked at a piece of
3  Gynemesh PS under the microscope?
4     A   No.
5     Q   Have you ever looked at a piece of
6  Prolift+M under the microscope?
7     A   Well, I'd like to just add to that in
8  that I've not physically put the mesh under the
9  microscope, but I have papers that I have
10 reviewed that have pictures of the material
11 under the microscope, so I've looked at
12 photographs of microscopic material, but I've
13 never actually physically taken the mesh and put
14 it under the microscope myself.
15    Q   You've not performed benchtop testing
16 on Prolift or Gynemesh PS mesh or tools,
17 correct?
18    A   Correct.
19    Q   And you've not performed benchtop
20 testing on Prolift+M mesh or tools, correct?
21    A   Correct.
22    Q   You have not performed animal studies
23 on Prolift or Gynemesh PS mesh, correct?
24    A   Correct.

Page 87

1     Q   And you've not performed animal studies
2  on Prolift+M mesh, correct?
3     A   Correct.
4     Q   Dr. Garely, do you agree that it is not
5  a standard -- strike that.  Let me start again.
6         Do you agree that it would not be a
7  deviation from the standard of care for a doctor
8  to have utilized Prolift and implanted Prolift
9  into women?
10    A   I'm sorry, could you repeat the
11 question?
12    Q   Sure.  Would it have been a deviation
13 from the standard of care for a doctor to
14 implant Prolift in women, for a trained pelvic
15 floor surgeon to implant Prolift in women?
16    A   Given the information that was
17 presented to a surgeon back in the initial time
18 of release, I don't think it would have been
19 against the standard of care.  I think today if
20 someone were to implant it, I think it would be
21 against the standard of care.
22    Q   I assume the same answer would apply to
23 Prolift+M?
24    A   Correct.

Page 88

1     Q   At what point in time would it have
2  been a deviation from the standard of care, in
3  other words, at what point in time did the
4  information shift such that you believe it would
5  have been a deviation from the standard of care
6  to have used it from that point forward?
7     A   I think that around the time 2007 and
8  '8 when the papers started coming out with the
9  erosion rates and the dyspareunia rates and the
10 pelvic pain issues, that's when I think that --
11 when I think surgeons should have started to
12 rethink their position on the application of
13 this device.
14    Q   So if a surgeon was using the Prolift
15 device in 2009 or '10 or if a surgeon was using
16 the Prolift+M device in 2009 or '10, would your
17 testimony be that that surgeon deviated from the
18 standard of care in using those devices at that
19 time?
20    A   I think it was a deviation from good
21 judgment, but I think up until the time when the
22 FDA reviewed all the literature and doctors
23 relied on reputable sources to advise them, I
24 think that up until that time, I think the

Page 89

1  standard of care would still have been met.
2     Q   Do you need a break?
3     A   I do.
4         MS. KABBASH:  Let's take one.
5         (Whereupon, a brief recess is taken.)
6  BY MS. KABBASH:
7     Q   We are back on the record and had a
8  brief break.  Dr. Garely, are you ready to
9  proceed?
10    A   I am.
11        (Exhibit Garely Garely 8, Printout from
12 Alan Garely, M.D.'s website, marked for
13 identification.)
14    Q   I'm handing you what's been marked as
15 Exhibit 8.  And I will represent to you that as
16 you probably recognize it, that's a printout
17 from your website, specifically the frequently
18 asked questions from your website.  Do you
19 recognize it to be that?
20    A   Yeah, I can't read the questions
21 because they're dark.
22    Q   Yeah, I know.  And that's unfortunately
23 how it printed out from the website.  But
24 there's one I want to ask you about and what

Alan Garely, M.D., FACOG, FACS

Page 90

1   we've done is if you go to the third page of
2   this, it's a little bit more clear to read.
3       A  Okay.
4       Q  It's on the right.  And if you prefer,
5   we've actually -- even though it doesn't look
6   exactly the way it does on our website, we've
7   blown it up on the very last page and that might
8   be the easiest to look at.
9           One of the frequently asked questions
10  that you answer on your website is you have the
11  question, "I have heard or read bad things about
12  synthetic mesh.  Do you use this material?"  And
13  then you provide a response, correct?
14      A  Correct.
15      Q  Okay.  And let's go through the
16  response a little bit.  You indicate, "Yes, most
17  mesh used in pelvic reconstructive surgery is
18  made of a material called polypropylene.  This
19  is commonly called Prolene."  And then just to
20  stop there, when you reference Prolene there,
21  you mean polypropylene in a generic way,
22  correct?
23      A  Well, that's why I put it in quotes so
24  that there would be no confusion between the

Page 91

1   trademark brand name and what we refer to as
2   polypropylene.
3       Q  Okay.  It goes on to say, "Pelvic
4   prolapse and incontinence is often caused by
5   because of a weakness or absence of normal
6   muscle and ligaments.  To compensate for these
7   weaknesses, we need to use materials that can
8   reconstruct or recreate the normal anatomy.
9   We've tried to do this by using the patient's
10  own tissues," and then you say, "unfortunately
11  this has resulted in high failure rates."  Do
12  you see that?
13      A  I do.
14      Q  So is that language there essentially
15  saying that native tissue repairs, one of the
16  downsides of native tissue repairs is that they
17  have high failure rates?
18      A  Well, I was being broad in the
19  description.  I was just saying that certain
20  applications of native tissue repairs, the
21  failure rates would be high.  I'm not
22  specifically referencing an anterior repair or a
23  posterior repair, but more generically, my frame
24  of mind when I was writing this applied more to

Page 92

1   apical prolapse than to anterior and posterior
2   repairs.
3       Q  Okay.  So you're pointing out here that
4   sometimes because of the weakness of a patient's
5   tissues, you're relying on the patient's own
6   tissues is going to result in a high failure
7   rate and sometimes there is a need to look for
8   something else, correct?
9       A  Well, only in certain applications.
10  Obviously, I still do native tissue repairs
11  because I think that they have -- I don't think
12  they have terribly high failure rates.  I think
13  that they're good operations to apply.  I just
14  think in this particular section, I was -- I was
15  applying this towards apical descent.
16      Q  Okay.  So at least with apical descent,
17  your experience has been that native tissue
18  repairs of apical descent has resulted in high
19  failure rates, correct?
20      A  Correct.
21      Q  And that's consistent with what's in
22  the medical literature, correct?
23      A  More or less, yes.
24      Q  Then you go on to say, "In a quest to

Page 93

1   achieve better results" -- strike that.
2           But Doctor, you would agree with me
3   that even with anterior colporrhaphies and
4   posterior colporrhaphies, those procedures,
5   there are reported high failure rates of those
6   procedures in the medical literature, correct?
7       A  Well, it depends how you look at the
8   application.  When people do anterior and
9   posterior repairs and they don't address apical
10  descent, then the failure rates are very high
11  because the wrong operations were done.
12          But in cases where the patient will do
13  well with an anterior or a posterior repair,
14  then native tissue repairs are good
15  alternatives, just like in those applications
16  you can use other materials that are good
17  alternatives than what it is we're talking about
18  today, which is the Prolift or the Prolift+M.
19          I'm just saying that everything has a
20  success and failure rate, but in the right
21  application, they're not necessarily bad.
22      Q  You are noting high failure rates here
23  at the very least for native tissue repairs for
24  apical prolapse, correct?

24 (Pages 90 to 93)

Alan Garely, M.D., FACOG, FACS

Page 94

1    A   More or less, yes.
2    Q   You indicate here, "In a quest to
3   achieve better results, new formulations of
4   Prolene have been developed."  And you say,
5   "This new material is very safe."  Do you see
6   that?
7    A   I do.
8    Q   Which materials are you referring to
9   there?
10    A   I was talking about the lighter weight
11   meshes that we were applying for
12   sacrocolpopexies and that was what I was --
13   because the previous iterations of
14   sacrocolpopexy mesh had higher erosion rates.
15   So the newer material was much safer.
16    Q   And you're referring to here -- and the
17   materials that you're referring to here would
18   include the Caldera product and the IntePro that
19   you used?
20    A   Correct.
21    Q   And those are polypropylene products,
22   correct?
23    A   Correct.
24    Q   Do you know what the pore sizes of the

Page 95

1   Caldera and IntePro products are?
2    A   As we sit here today, off the top of my
3   head, I don't recall.  I looked at those at the
4   time when I started using the products, but I
5   don't recall exactly right now.
6    Q   Do you remember if you -- if the pore
7   size was ever part of your consideration as to
8   whether you would use those products?  In other
9   words, did you ever say I'm not using those
10   products unless they have a pore size of at
11   least X?
12    A   Absolutely.
13    Q   And so did you look at the pore sizes
14   for that purpose?
15    A   It was one of the things I looked at.
16    Q   What was your exposure rate when you
17   were using the hand-fashioned Prolene for
18   abdominal sacrocolpopexy?
19    A   It was around 3 percent.
20    Q   That's a relatively low rate, isn't it?
21    A   I thought it was pretty okay.
22    Q   Certainly if you had a much higher
23   exposure rate, you would not have implanted the
24   Prolene in over a thousand women, correct?

Page 96

1    A   I think I would have had to rethink the
2   procedure if the erosion rates were coming in
3   much higher.
4    Q   What are your erosion rates now with
5   the Caldera product and the IntePro?
6    A   Probably around 1 percent.
7    Q   And that's based on your personal
8   experience in your practice, correct?
9    A   Correct.
10    Q   When you say -- well, we'll get to that
11   in a second because you quote a 1 percent rate
12   here.  You go on to say a couple of sentences
13   down from where we left off, "Research studies
14   have shown that mesh placed through the vagina
15   to fix vaginal prolapse has a much higher rate
16   of complications than mesh applied through an
17   abdominal or laparoscopic incision," and then
18   you note, "often less than 1 percent."  What
19   does that 1 percent refer to?
20    A   It corresponds to reports of mesh
21   erosions from people who have done laparoscopic
22   or abdominal approach sacrocolpopexies.
23    Q   Is this -- does the 1 percent represent
24   your personal exposure rate in performing

Page 97

1   abdominal sacrocolpopexies?
2    A   No.
3    Q   What -- is it -- what is it based on?
4   Is it based on the medical literature?
5    A   Based on the medical literature and
6   discussions with surgeons at meetings and what
7   people say their erosion rates are.
8    Q   With respect to the medical literature,
9   what studies are you relying on here for the
10   fact that -- of a 1 percent erosion rate?
11    A   Well, there are -- if you -- I said
12   often less than 1 percent.  I didn't say that
13   was the rate.  And when I quote patients at the
14   time of surgery, I don't talk about what other
15   surgeons have.  I give them in writing what my
16   erosion rates are.
17         And I have two erosion rates.  I have
18   an erosion rate if I do a hysterectomy with
19   removal of the cervix, or if I do a suspension,
20   when there is a presence of a cervix.  So I have
21   two separate erosion rates.
22    Q   In terms of the medical literature,
23   what medical literature supports an erosion rate
24   of 1 percent for abdominal sacrocolpopexy?

25 (Pages 94 to 97)

Alan Garely, M.D., FACOG, FACS

Page 98

1    A   There have been studies where people
2  have  published success rates with erosion rates
3  in the 1 percent range.
4    Q   Would you agree the majority of studies
5  that look at erosion rates for abdominal
6  sacrocolpopexy report erosion rates that are
7  higher than 1 percent?
8    A   Some do, some don't.
9    Q   Are you familiar with the Nygaard study
10  from 2013 on the extended care study patients?
11    A   I don't recall the study specifically,
12  but if you show it to me I would like to review
13  it.
14    Q   Okay.  Do you recall as you sit here
15  today that the care study reported erosion rates
16  well over 1 percent?
17    A   I do recall that.
18    Q   And what is the exposure rate that you
19  recall the care study reporting?
20    A   Off the top of my head, I don't recall,
21  but I would have to look at the paper, the
22  specific number.
23    Q   As you sit here right now, can you
24  point to a particular medical study that

Page 99

1  reported an exposure rate for abdominal
2  sacrocolpopexy of less than 1 percent?  Can you
3  point to one right now?
4    A   Specifically, no, I would have to look
5  at the literature.
6    Q   Your FAQ response goes on to say, "When
7  considering the safety of any mesh product or
8  procedure, the skill of the surgeon implanting
9  the material is of paramount importance."  You
10  continue to agree with that today, correct?
11    A   Absolutely.
12    Q   And that applies to not just pelvic
13  surgery, but any surgery, that the skill of the
14  surgeon is something that can have a very
15  important impact on the outcome and the success
16  of the surgery, correct?
17    A   Correct.
18    Q   You go on to say here, "Some of the
19  finest surgeons in the world use vaginal" --
20  strike that.
21        You go on to say, "Some of the finest
22  surgeons in the world use vaginally applied mesh
23  with low complication rates."
24        Who are the finest surgeons in the

Page 100

1  world that you're referencing here?
2    A   When I wrote this, I was mostly
3  thinking about Vince Lucente.
4    Q   And in this sentence, are you
5  acknowledging that, you know, there are some
6  very highly trained pelvic floor surgeons out
7  there who use transvaginal mesh to treat
8  prolapse and have great success with it?
9    A   Well, when you say "success," I look at
10  it like do the ends justify the means.  Yes,
11  they may be successful in treating the problem,
12  but that doesn't necessarily eliminate the risks
13  that are associated with their success.
14        And so if you're asking me -- I'm not
15  sure if I understand the question.
16    Q   Let me reframe the question.
17    A   Okay.
18    Q   You're acknowledging in this sentence
19  that there are certain fine surgeons in the
20  world, including Dr. Lucente, who use
21  transvaginal mesh and have low complication
22  rates with that use of mesh, correct?  That's
23  what you say here, right?
24    A   According to Vince's data, yes, that

Page 101

1  would -- that would apply to him.
2    Q   Do you know Dr. Lucente?
3    A   I do.
4    Q   Do you regard him highly as a surgeon?
5    A   I do.
6    Q   And there are other surgeons beyond
7  Dr. Lucente who are well trained and have
8  reported positive experience with transvaginal
9  mesh with low complication rates, correct?  He's
10  not the only one, is what I'm saying, correct?
11    A   That's correct.
12    Q   On that note, Doctor, let me ask you,
13  is it your opinion that even doctors well
14  trained like Dr. Lucente and others who have
15  used transvaginal mesh and have had low
16  complication rates with it, is it your opinion
17  that those meshes should not be available to
18  them to use?
19    A   It is my opinion, yes.
20    Q   Why shouldn't they have the choice of
21  this tool to use when they feel that it's
22  appropriate?
23    A   Because they can't pick the patients
24  that are going to get complications any better

26 (Pages 98 to 101)

Alan Garely, M.D., FACOG, FACS

Page 102

1  than anyone else.  And when we talk about, yes,
2  they can have great results, I just don't think
3  that -- that one patient out of 100 who has
4  irreparable harm with pain, sexual dysfunction,
5  bladder and rectal dysfunction, justifies the
6  fact that they may have a good percentage of
7  patients that do well.
8          I don't -- I don't believe that that is
9  good medical judgment.  That's why I don't think
10 they should have these tools available.  They're
11 dangerous.  And the arms of the particular
12 Prolift and the Prolift+M contributed to a lot
13 of those problems, and I think there are better
14 alternative products than that product.
15     Q  Doctor, I'm sure you're aware that in
16 other parts of our mesh litigation, there are
17 plaintiffs' experts who are asserting that the
18 TVT slings are dangerous.  Are you -- you're
19 aware of that, right?
20     A  I'm aware of that.
21     Q  You're not one of them today, you
22 haven't provided an opinion that the TVT slings
23 are defective, right, that's not one of your
24 opinions?

Page 103

1      A  Correct.
2      Q  Am I correct that -- we'll talk about
3  this more later, but you've used a considerable
4  number of the TVT slings, correct?
5      A  Correct.
6      Q  You've implanted TVT in its various
7  iterations in many women, correct?
8      A  Correct.
9      Q  Would it be appropriate for those
10 products to be removed as a choice from you to
11 treat your patients because plaintiffs' experts
12 were alleging that they were dangerous?
13     A  There's a difference between them
14 alleging that it's dangerous and me stating that
15 it's dangerous.  Prolift and Prolift+M are
16 dangerous.  TVT slings are not dangerous.
17 That's the difference.
18     Q  You certainly would not want the TVT
19 slings taken away from you as an option to treat
20 your patients, correct?
21     A  Because it's not dangerous and the FDA
22 has said that it's not dangerous, but the FDA
23 has said that the Prolift and the Prolift+M are
24 dangerous.

Page 104

1      Q  The Prolift -- the FDA actually has not
2  said anything specifically about the -- well,
3  strike that.
4          The FDA has not made any statement that
5  the Prolift in particular is dangerous, correct?
6  The FDA has put out an order to seek to
7  reclassify transvaginal mesh kits, but it has
8  not formulated any conclusion as to the safety
9  of Prolift in particular, correct?
10         MR. MATTHEWS:  Objection to the
11 compound question.
12 BY MS. KABBASH:
13     Q  Go ahead, you can answer.
14     A  Without using the word -- they don't
15 need to use the word "dangerous."  It's implied
16 when they say that there's a high risk of, and
17 then they list the risks such as pelvic pain,
18 dyspareunia, urinary incontinence, urinary
19 retention, issues with bowel function, erosions,
20 chronic bleeding.  I don't need the FDA to use
21 the word "dangerous" when they list those
22 complications.  I think it's implied that they
23 are dangerous.
24     Q  Dr. Garely, am I correct that the FDA

Page 105

1  has never -- prior to the discontinuation of
2  Prolift, the FDA never revoked the 510(k)
3  clearance for Prolift, correct?
4      A  They did not revoke the 510(k)
5  clearance, but they came back with additional
6  requirements.
7      Q  And am I also correct that the FDA
8  never revoked the 510(k) clearance of Prolift+M,
9  correct?
10     A  Same answer.
11     Q  Let's talk about slings for a second.
12 We've spoken before about the nonsynthetic mesh
13 surgeries that you've performed to treat stress
14 urinary incontinence.  I'm going to ask you
15 about some slings and I'd like you to tell me if
16 you've used them as best you can.
17         You have used the TVT Retropubic,
18 correct?
19     A  Yes.
20     Q  Do you use it today?
21     A  Yes.
22     Q  Have you used it ever since it came out
23 on the market in 1998?
24     A  Yes.

27 (Pages 102 to 105)

Alan Garely, M.D., FACOG, FACS

Page 106

1      Q  So you have used TVT Retropubic for 18
2   years, correct?
3      A  More or less, yes.
4      Q  Is it fair to say that you have
5   implanted -- how many women have you implanted
6   with TVT Retropubic?
7      A  I probably do 120 slings a year, give
8   or take, maybe a little less now that I'm doing
9   administrative stuff.  There was a period of
10  time for probably three years where I did --
11  majority were transobturator tape slings.  So if
12  you discount three or four years of TOTs and
13  then you subtract down for the last three years,
14  I've probably down 80 slings a year instead of
15  120.
16      So let me see, so that's -- I don't
17  know, I'm not any better with all this
18  compounded math either, but I would say the
19  number is probably going to come in somewhere
20  between 1500 and 2,000.
21      Q  Is that -- is the 1500 to 2,000 number,
22  is that -- strike that.
23      1500 to 2,000, does that apply to all
24  slings that you've done, mesh slings?

Page 107

1      A  No, I'm just talking about the TVTs.
2      Q  So 1500 to 2,000 TVT slings or slings
3   that fall in the TVT family of products?
4      A  Correct.
5      Q  Okay.  So that would include
6   retropubics, correct?
7      A  Well, I'm talking only retropubic TVTs.
8   I'm not talking about a separate category, which
9   is TVT-Os or TOTs.
10      Q  Okay.  Thank you, I appreciate it.  I
11  want to make sure I'm referring to the numbers
12  accurately.
13      A  If you just give me a minute, I'll give
14  you a much better number of breakdown.
15      Q  Do you want to take a short break so
16  you can sort of think it through and write down
17  the numbers?
18      A  Well, let's see, from 1998 to probably
19  2003 or '2, that was probably four years of 120.
20  And then there was a three-year break of
21  probably -- I probably did 20, because I was
22  doing -- the rest were TOTs.  And then I went
23  back to TVTs.  So that was from -- let's see,
24  2000 to 2007.  From 2007 to present, to 2012, I

Page 108

1   went back to 120 times '7, '8, '9, '10, '11,
2   '12, '13, '14, that's eight years.
3      So that's 480 plus 60, plus 0, 6, 1 --
4   960, and the last two years, I've probably done
5   160.  So what's 160 plus 960 plus 60 plus 480?
6   That's about right, that's what I said, 1,516,
7   1,516 TVTs.
8      MS. KABBASH:  Let's mark that what you
9   just wrote so we can refer to it.
10      A  Okay.
11      (Exhibit Garely 9, Handwritten
12  estimation of prior TVT retropubics performed by
13  Dr. Garely, marked for identification.)
14      MS. KABBASH:  So I'm going to mark this
15  piece of lined paper in which you've done
16  calculations as Exhibit 9, and you have the
17  number on here 1,516 TVT.
18  BY MS. KABBASH:
19      Q  And, Doctor, is that your best estimate
20  as to how many TVT Retropubic procedures you've
21  done?
22      A  More or less.
23      Q  If you don't mind, I'm going to write
24  the word "retropubic" on here, just to be clear

Page 109

1   that it's retropubic as opposed to another
2   approach.
3      A  Sure.
4      Q  Doctor, have you performed TVT EXACT?
5      A  Which one is the EXACT?
6      Q  The EXACT is the newer iteration of the
7   retropubic that came out in 2010 and it has a
8   slightly thinner needle.
9      A  Yes.
10      Q  When you perform TVT Retropubic today,
11  which version are you using?  Are you using the
12  EXACT or are you using sort of the classic
13  original version?
14      A  Oh, I want to clarify.  When you're
15  saying "TVT," I lumped all the product -- all
16  the different companies into that number.
17      Q  Ah, I see.  Okay.  So Exhibit 9
18  reflects how many retropubic slings you have
19  done, regardless of whether it was TVT or some
20  other brand?
21      A  Correct.
22      Q  When you wrote "TVT" on here, you were
23  using the term generically?
24      A  Generic.

28 (Pages 106 to 109)

Alan Garely, M.D., FACOG, FACS

Page 110

1    Q  I'm going to change this to say "1516
2  retropubic slings"; is that fair?
3    A  That's fair.
4    Q  Okay.  Of the 1516 retropubic slings,
5  are you able to estimate for me how many of
6  those are TVT brand retropubic slings?
7    A  For the first four years, they were
8  exclusively TVT brand; and then after the first
9  four years, I would say probably 5 percent were
10  TVT brand.
11    Q  So from say 1998 to about 2002, you
12  used only TVT Retropubic?
13    A  Correct.
14    Q  And then after 2002, you started
15  opening up your practice to other brands of
16  retropubic slings, correct?
17    A  Correct.
18    Q  Have you performed -- and just to be
19  clear, when I say "TVT Retropubic," I'm
20  referring to the Ethicon brand of sling.
21    A  Okay.
22    Q  As opposed to other retropubic slings.
23    A  Understood.
24    Q  Since 2002, have you continued to use

Page 111

1  the TVT Retropubic sling?
2    A  On occasion, yes.
3    Q  How often would you say since then
4  you've used TVT Retropubic?
5    A  The only hospital that it's available
6  in that I go to since 2002 -- well, from 2002, I
7  was at Winthrop, and we used -- interchangeably,
8  I think I used the TVT brand and non-TVT brand.
9  And I don't know during the 2002 to 2008 what
10  percentage was the TVT brand.
11        And then from 2008 when I went to Mount
12  Sinai, the only hospital that I operated at that
13  had the TVT brand was Mount Sinai Hospital and
14  Good Samaritan Hospital.  And so the bulk of my
15  work was being done actually at South Nassau, so
16  probably 15 percent from 2008 to 2016.
17  Somewhere between that, I guess -- yeah, about
18  15 percent.
19    Q  So between 2008 and 2016, about 15
20  percent of the slings that -- retropubic slings
21  that you've done have been the TVT brand
22  retropubic sling?
23    A  Correct.
24    Q  Is it fair to estimate that you have

Page 112

1  implanted the TVT brand of retropubic sling in
2  hundreds of women?
3    A  That would be fair.
4    Q  Would it be fair to say you've
5  implanted the TVT brand of retropubic sling in
6  over 1,000 women is that too much?
7    A  Well, I don't know, we can go look at
8  the numbers again.  The first four years were
9  like 480.
10    Q  I see.
11    A  Then you just figure 15 percent of
12  whatever the residual is.
13    Q  Is it fair to say that you've implanted
14  the TVT brand of retropubic sling in over 500
15  women, that's fair, right?
16    A  That's fair.
17    Q  How about the TVT Obturator sling?  And
18  if you want, you know, how many -- what is your
19  best estimate of how many TVT Obturator slings
20  you have used?
21        MR. MATTHEWS:  Can we call it like --
22  so that he doesn't start generically messing
23  this up again, the Gynecare TVT-O versus other
24  transobturator or --

Page 113

1  BY MS. KABBASH:
2    Q  However best helps you to
3  differentiate.
4    A  I probably only used the TVT-O, the
5  branded TVT, probably 50 times.
6    Q  Did you use other obturator approach
7  slings?
8    A  I did.
9    Q  Do you have a sense of how many -- were
10  they -- by the way, strike that.
11        For the retropubic slings, TVT
12  Retropubic obviously is made out of Prolene
13  polypropylene, correct?
14    A  Correct.
15    Q  Were all the other retropubic slings
16  that you used also made out of polypropylene?
17    A  Yes.
18    Q  Same for the obturator approaches
19  you've used?
20    A  Yes.
21    Q  Are you able to estimate how many
22  obturator approach you've -- approach slings
23  you've used in total, other than the obturator
24  -- other than the TVT-O brand?

Alan Garely, M.D., FACOG, FACS

Page 114

1    A  Yes.
2    Q  About how many?
3    A  So it was probably over a period of
4    three years, I probably did 100 TOTs during
5    those three years per year, so it was probably
6    300.  Then I sort of transitioned over.  So I
7    would say probably somewhere between three and
8    400.
9    Q  So you've used between three and 400
10   obturator approach slings of which about 50 were
11   the Gynecare TVT-O brand?
12   A  That was either in addition to or
13   including the 50, somewhere around there.
14   Q  Okay.  Did you -- have you moved away
15   from obturator or do you continue to use it
16   today?
17   A  I moved completely away from obturator.
18   Q  So you -- when you do slings, you
19   solely do the retropubic approach?
20   A  Solely.
21   Q  And what was the reason for that?
22   A  Because patients were complaining of
23   pain under the area where the sling was going
24   into the obturator muscle, and patients that

Page 115

1    were having sex were complaining of pain with
2    sex.  And so I started seeing, in my own
3    practice, a lot of patients who were having
4    discomfort pain issues and I was not -- and then
5    the mesh was contracting in the TOT space, it
6    was getting tight.
7        So when I put it and it wasn't
8    necessarily a tight band, it would contract down
9    and turn into a tight band.  And that wasn't
10   good, so I changed the practice and we stopped
11   doing TOTs.
12   Q  In what time frame was that?
13   A  I'm going to say somewhere around 2007
14   or '8.  I mean, it was probably a three-year run
15   that I did.  I just don't remember the dates.
16   Q  What were the other obturator mesh
17   slings that you used primarily?
18   A  Primarily, I was using Monarc and I was
19   using the Caldera device.
20   Q  Did you ever use any mini slings?
21   A  No.
22   Q  So you've never used TVT Secure?
23   A  I've never used it.
24   Q  Okay.  You've never used AMS MiniArc?

Page 116

1    A  No.
2    Q  Have you ever used TVT ABBREVO?
3    A  Yes.
4    Q  How many times have you used that?
5    A  Refresh my memory.  Was the ABBREVO a
6    retropubic sling?
7    Q  No, ABBREVO is the newer iteration of
8    the Obturator, and it's an obturator approach
9    sling that has a sling implant, same as TVT-O,
10   but it's 12 centimeters long and instead of the
11   sling continuing up, there are positioning lines
12   which are removed after the implantation.
13   A  I'm sorry, I got confused between the
14   ABBREVO and the EXACT.  As I told you earlier, I
15   have a hard time remembering all those trade
16   names.
17   Q  No problem.
18   A  No, I did not ever use that.
19   Q  Okay.  What are the slings that you are
20   primarily using today?
21   A  Today I use standard Gynecare TVT or I
22   use the new one, the --
23   Q  The EXACT?
24   A  EXACT.  I use the Caldera TVT.  Oh, and

Page 117

1    there's another one, another company -- it's
2    called T-Sling.  I don't know who makes it.  I
3    can't remember who makes it.  I have been using
4    T-Sling too occasionally.
5    Q  Why do you use the TVT brand slings?
6    A  Because that's what's available on the
7    shelf.
8    Q  And the TVT brand of slings are made of
9    Ethicon's Prolene, correct?
10   A  It's made of polypropylene, correct.
11   Q  Are you aware of what the pore size of
12   the TVT slings are?
13   A  I used to know, but I don't recall
14   right now.
15   Q  If I said it was 1.3 millimeters, does
16   that sound right to you?
17   A  That sounds right.
18   Q  Have you taught others how to perform
19   the TVT brand -- strike that.
20       Have you taught others how to perform
21   surgery using the TVT brand of slings?
22   A  I have.
23   Q  How many people?
24   A  Hundreds.

30 (Pages 114 to 117)

Alan Garely, M.D., FACOG, FACS

Page 118

1    Q  And do those hundreds encompass
2  fellows, residents and attendings?
3    A  They do.
4    Q  Let me ask you more broadly, what types
5  of people have you trained on TVT?
6    A  Well, formal training.  I mean, we're
7  not talking about academic, we're talking about
8  as a consultant to industry.  I used to do big
9  symposiums where there would be hundreds of
10  people in the audience and they would watch
11  videos and we would instruct them on cadavers on
12  how to do these procedures.
13    I guess they would include fellows and
14  attendings.  I guess industry wouldn't sponsor
15  residents to go to those.  But in the operating
16  room, I've instructed residents and fellows as
17  well as attendings.
18    Q  Have you done all of that training in
19  your capacity as a preceptor or consultant to
20  Ethicon?
21    A  Not all, some.
22    Q  So some of those hundreds of cases you
23  trained as an Ethicon preceptor and others you
24  did outside of that role?

Page 119

1    A  That's correct.
2    Q  Are you able to estimate how many
3  trainings you gave as an Ethicon preceptor?
4    A  In the beginning when we came back from
5  Sweden, we were -- I was single and I was on the
6  road a lot.  I don't -- I didn't have anything
7  holding me back from traveling all over the
8  country to do these lectures and to do these
9  meetings.  Sometimes I would do two in a
10  weekend.
11    (Exhibit Garely 10, Handwritten notes
12  by Dr. Garely estimating number of TVT-O brand
13  slings and obturator slings that he's performed,
14  marked for identification.)
15    MS. KABBASH:  Just so that the record
16  is clear, Exhibit 10 is the lined notebook paper
17  where Dr. Garely has estimated the number of
18  TVT-O brand slings and obturator slings in
19  general that he's done.
20  BY MS. KABBASH:
21    Q  Is that correct, Doctor?
22    A  Sorry for the messy handwriting, but
23  yes.
24    Q  That's quite all right.

Page 120

1    (Exhibit Garely Garely 11, Document
2  entitled Position Statement on Mesh Midurethral
3  Slings for Stress Urinary Incontinence, marked
4  for identification.)
5  BY MS. KABBASH:
6    Q  I'm going to hand you what's been
7  marked as Exhibit 11.  Doctor, do you recognize
8  this statement?
9    A  I do.
10    Q  This is the Position Statement on Mesh
11  Midurethral Slings for Stress Urinary
12  Incontinence that was put out by two
13  organizations, AUGS and SUFU, correct?
14    A  Correct.
15    Q  And that was put out in January 2014,
16  correct?
17    A  Correct.
18    Q  And am I correct that you are currently
19  a member of AUGS?
20    A  Yes.
21    Q  And in past years, you have served on
22  the board of AUGS, correct?
23    A  Correct.
24    Q  Are you a member of SUFU?

Page 121

1    A  I am not.
2    Q  At the top, Doctor, under the name of
3  the document, this statement -- and this
4  statement was approved, as it says on the third
5  page, it was approved by the AUGS Board of
6  Directors and the SUFU Board of Directors
7  January 3, 2014, correct?
8    A  Correct.
9    Q  At the top this statement says, "The
10  polypropylene mesh midurethral sling is the
11  recognized worldwide standard of care for the
12  surgical treatment of stress urinary
13  incontinence.  The procedure is safe, effective
14  and has improved the quality of life for
15  millions of women."  Do you agree with that
16  statement, Doctor?
17    A  I do.
18    Q  Look on the next page.  In the second
19  page of the paragraph marked number 3, there is
20  -- a little bit more than halfway down the page,
21  there's a sentence that starts, "Full length
22  midurethral."  Do you see that?
23    A  I do.
24    Q  And it says, "Full length midurethral

Alan Garely, M.D., FACOG, FACS

Page 122

1    slings, both retropubic and transobturator, have
2    been extensively studied and are safe and
3    effective relative to other treatment options
4    and remain the leading treatment option and
5    current gold standard for stress incontinence
6    surgery." Do you see that?
7        A  I do.
8        Q  Do you agree with that statement?
9        A  I do not.
10       Q  Why don't you agree with that
11   statement?  Well, strike that.
12          Before I ask you that question, do you
13   agree with that statement if it were limited to
14   retropubic?
15       A  I do.
16       Q  You don't agree with that statement as
17   it relates to transobturator?
18       A  Correct.
19       Q  Is there any other basis for your
20   disagreement with that statement?
21       A  No.
22       Q  So is it your opinion that
23   transobturator slings are not the gold standard
24   for stress urinary surgery?

Page 123

1        A  Correct.
2        Q  But you believe that retropubic
3    approach slings are the gold standard?
4        A  Correct.
5        Q  Okay.  So to the extent that you don't
6    believe that full length transobturator slings
7    are the gold standard, you would acknowledge
8    that your position on that would be inconsistent
9    with that taken by AUGS and SUFU in this
10   statement, correct?
11       A  I'm sorry, could you repeat that?
12       Q  Sure.  So to the extent that you --
13   strike that.
14          You do not believe that transobturator
15   full length slings are the gold standard, that
16   position is inconsistent with the position
17   that's taken by AUGS and SUFU in this statement,
18   correct?
19       A  I don't believe the transobturator
20   slings are the gold standard.
21       Q  Let me mark another document and hand
22   that to you.
23          (Exhibit Garely Garely 12, Document
24   entitled Surgeon's Resource Monograph on

Page 124

1    Gynecare TVT, marked for identification.)
2    BY MS. KABBASH:
3        Q  Doctor, would you agree that the FDA
4    has not distinguished between full length
5    obturator slings and full length retropubic
6    slings in finding them to be safe and effective
7    up to one year in their recent statement; the
8    FDA does not make that distinction, correct?
9        A  I don't recall that they made a
10   distinction, but I would have to review their
11   statement.
12       Q  Doctor, I'm going to show you what's
13   been marked as Exhibit 12.  And this document
14   says at the top, Surgeon's Resource Monograph.
15   Do you see that?
16       A  I do.
17       Q  Do you remember this document?
18       A  I do.
19       Q  When was the last time that you have
20   seen it?
21       A  In the last -- it's bringing back old
22   memories.  The last time I saw this was --
23       Q  Has it been years?
24       A  It's been years.

Page 125

1        Q  That's fine.
2        A  But I remember it.
3        Q  Okay.  And in fact, if you look at the
4    fourth page, it says at the top, "Advisory
5    Panel"?
6        A  Okay.
7        Q  Your name is listed there on the left
8    column?
9        A  Yes.
10       Q  You're in fact one of the surgeons that
11   played a major role in creating this document,
12   correct?
13       A  Correct.
14       Q  And this booklet, which is called the
15   Surgeon's Resource Monograph for TVT, this is a
16   booklet of information about the TVT device that
17   Ethicon put out that gathered the experiences of
18   many surgeons who had performed a lot of TVT
19   surgeries, correct?
20       A  For the retropubic approach TVT, yes.
21       Q  For retropubic, thank you.
22          And am I correct that the purpose of
23   this document was to collect the experiences of
24   surgeons who were experienced with TVT and put

Alan Garely, M.D., FACOG, FACS

Page 126

1  them in a document and disseminate it out to
2  other doctors so that they would have the
3  benefit of those experts' experiences, correct?
4      A  Correct.
5      Q  Do you recall that this was one of the
6  materials that was distributed by Ethicon in its
7  trainings for TVT?
8      A  I do.
9      Q  And did you in fact distribute it to
10  other doctors?
11      A  I don't think I would have ever
12  distributed it to any doctors.
13      Q  But you recall Ethicon distributing it
14  in the context of their trainings and
15  professional educations for doctors?
16      A  Yeah, I remember the people would get
17  like a binder and there would be all kinds of
18  stuff in it, but that wasn't anything I would
19  have anything to do with.  They would show up
20  and it would be there.
21      Q  But you recall Ethicon actually giving
22  it out to doctors at that time?
23      A  I do.
24      Q  Did you write any portion of this

Page 127

1  document?  Do you remember -- let me ask you the
2  broader question.
3          What was your role with respect to this
4  document?
5      A  When we did this, I'm getting a memory
6  that we were in breakout sessions.  We all sat
7  down, we hashed out each one of these sections.
8  I don't recall any particular section that I was
9  in when we did this.  But I remember -- I
10  remember participating in it.  I just don't --
11  it's...
12      Q  A long time ago?
13      A  It was 16 years ago.  I just don't
14  remember.
15      Q  Okay.  The front page of this document
16  references -- it says, "A report on the June
17  2000 summit meeting, a 17-surgeon panel
18  representing more than 1200 cases."  Do you see
19  that?
20      A  I do.
21      Q  Do you remember attending summit
22  meetings where information that was discussed
23  that eventually gave rise to this document?
24      A  Again, vaguely.  I know that I

Page 128

1  participated.  I can't tell -- there were so
2  many events during that time period, I can't
3  tell you where it took place.  I'm thinking
4  somehow maybe it took place in Florida.  I don't
5  know.
6      Q  Doctor, do you agree that it is a
7  positive thing, a good thing that the company
8  put out this monograph and provided it to
9  doctors?
10      A  I do.
11      Q  It was a good thing that the company
12  was sharing the experiences of some of the top
13  experts on TVT so that other doctors could have
14  the benefit of that information, correct?
15      A  As long as it was truthful, I thought
16  it was a good idea, yes.
17      Q  And you believed this document to be
18  truthful at the time that it was put out,
19  correct?
20      A  I would have to sit down and look
21  through it page by page.  I don't recall in my
22  brain thinking that there was anything in it
23  that I disagreed with.  I may not have agreed
24  with everything in here, but I don't think -- no

Page 129

1  one -- we didn't take a vote as to whether
2  everybody agreed on every part of this.
3      Q  Do you agree, Doctor, that assuming
4  that the information in here was accurate, that
5  it was a responsible step for Ethicon to put out
6  a monograph like this to share information with
7  doctors?
8      A  Yes.
9      Q  I'm going to show you now what I've
10  marked as Exhibit 13.
11          (Exhibit Garely Garely 13, Document
12  entitled Gynecare TVT with abdominal guides,
13  Early Clinical Experience, marked for
14  identification.)
15  BY MS. KABBASH:
16      Q  And this says at the first page,
17  Gynecare TVT with abdominal guides, Early
18  Clinical Experience.  Do you see that?
19      A  Yes.
20      Q  And if you -- by the way, do you
21  remember ever using a TVT brand -- Gynecare
22  brand TVT that had an abdominal rather than a
23  vaginal approach?
24      A  I do.

33 (Pages 126 to 129)

Alan Garely, M.D., FACOG, FACS

Page 130

1      Q  Do you remember how many of those you
2   did?
3      A  Not very many.  I did not like that
4   approach at all.
5      Q  If you look on the acknowledgments
6   page, which is the third or fourth page here?
7      A  Yes.
8      Q  It says, This paper represents the
9   collective experiences of the following
10  physicians who participated in this
11  postmarketing clinical evaluation of Gynecare
12  TVT with abdominal guides.  The views expressed
13  by these physicians do not necessarily represent
14  those of Gynecare," et cetera.  And you were
15  one of the surgeons who are listed here,
16  correct?
17     A  Correct.
18     Q  And did you -- and so you used some
19  number of Gynecare TVTs in an abdominal approach
20  and provided your feedback for the creation of
21  this document, correct?
22     A  That's correct.
23     Q  And this is also like a monograph-type
24  training material that was provided to surgeons,

Page 131

1   correct?
2      A  Correct.
3      Q  Do you remember this actually -- that
4   Ethicon actually distributed this to surgeons at
5   the time?
6      A  This one I don't remember.
7      Q  Okay.  But you remember the preparation
8   and completion of this document, correct?
9      A  Vaguely, but I didn't like that
10  approach at all, so it's not something that I
11  would have participated in after the initial
12  group getting together for this.
13     Q  This monograph for the TVT with
14  abdominal guides is a similar type of document
15  to the retropubic monograph that we just looked
16  at, correct?
17     A  Correct.
18     Q  It's intended to collect the clinical
19  experience of certain doctors and to disseminate
20  that to other doctors so that they may benefit
21  from it, correct?
22     A  Yes, correct.
23     Q  And again, that is assuming everything
24  in there is accurate, that is a good and

Page 132

1   positive thing for Ethicon to do, correct?
2      A  Well, there were 17 clinical centers.
3   I don't know how many of the cases that were
4   contributed from those 17 centers were from my
5   center.
6      Q  Okay.
7      A  My partner at the time, Larry Lind, was
8   also in this and so it's possible Larry was
9   doing the majority of these and not just me.
10     Q  But in asking just about the general
11  nature of this document, you'd agree that as
12  with the TVT Retropubic Surgeon's Resource
13  Monograph, that it is a positive thing that
14  Ethicon was trying to compile the clinical
15  experience of surgeons and to disseminate that
16  to other surgeons so that they might have the
17  benefit of that information, correct?
18     A  If it's truthful, correct.
19     Q  Doctor, you'd agree with me that
20  assuming a woman is going to have a surgical
21  approach to treat her prolapse, any surgical
22  approach that she could have would present
23  risks, correct?
24     A  Correct.

Page 133

1      Q  There's no surgical approach that comes
2   without risks, unfortunately; is that correct?
3      A  Unfortunately, correct.
4      Q  And any one of the surgical approaches
5   to treat prolapse can pose serious risks,
6   correct?
7      A  Well, some more than others.  They're
8   not all created equal.
9      Q  But all of the surgeries to treat
10  prolapse do pose some amount of -- do pose risk
11  of serious injury, correct?
12     A  Given certain circumstances, the answer
13  would be correct.
14     Q  Would you agree with me that when a
15  surgeon is considering treatment options for a
16  patient, he or she is -- doesn't consider a
17  treatment option in a vacuum, rather you have to
18  compare the benefits and risks of that treatment
19  option against the benefits and risks of the
20  other treatment options, correct?
21     A  Correct.
22     Q  What are the potential risks associated
23  with native tissue repair in a colporrhaphy, for
24  example?

34 (Pages 130 to 133)

Alan Garely, M.D., FACOG, FACS

Page 134

1      A  You can have pelvic pain.  You can have
2  dyspareunia.  You can have hemorrhage, hematoma.
3  You can have granulation tissue.  You can have
4  recurrence.  You can have fistula formation.
5  You can have incontinence.
6      Q  Is -- I'm sorry.  Were you finished
7  or --
8          Is vaginal shortening or narrowing also
9  a possible risk of colporrhaphies?
10     A  It's a possibility.
11     Q  Is it also a risk that if a patient
12  experiences pelvic pain from a colporrhaphy,
13  that that pain could be persistent?
14     A  Depending on the way that the
15  colporrhaphy is carried out, the answer is it's
16  possible it could be persistent.
17     Q  Would you agree, Doctor, that in any
18  pelvic floor surgery, there's a risk of pelvic
19  pain, correct?
20     A  There's always a risk.  Anything's
21  possible.
22     Q  Whenever -- strike that.
23        A risk of any pelvic floor surgery is
24  nerve pain, correct, or injury to nerves,

Page 135

1  correct?
2      A  Well, some operations more than others.
3  I mean, that's part of being a surgeon is
4  weighing the risks of different operations.  If
5  you have an operation like Prolift or Prolift+M
6  where you know they have arms that are going
7  through vital structures in your nerves or blood
8  vessels, that operation would put the patient at
9  a much higher risk of developing complications
10  than something like a native tissue repair,
11  which would be an alternative.
12      MS. KABBASH:  Move to strike as
13  non-responsive.
14  BY MS. KABBASH:
15     Q  I'm not asking you relative rates
16  between different surgeries right now.  The
17  question I'm asking is, do you agree that nerve
18  injury is a risk of any surgery to treat
19  prolapse?
20     A  Any surgery to treat prolapse, it's
21  possible.
22     Q  And when a nerve injury occurs, that
23  can result in a pain that is persistent,
24  correct?

Page 136

1      A  Well, theoretically, if a nerve injury
2  occurs, it could be a sensory nerve or it could
3  be a motor nerve.  Not all nerve injuries would
4  be sensory, some could be motor.
5      Q  But my question is if a nerve injury
6  occurs, am I correct that in any surgery to
7  treat prolapse, a nerve injury can result in
8  chronic pain?  Is there any pelvic organ
9  prolapse surgery that is immune from that risk?
10     A  Well, in anterior and posterior
11  repairs, chronic pelvic pain just from an
12  isolated nerve injury are not very common
13  because they're -- you can get pain associated
14  if you've taken out too much tissue, but there
15  really are not that many sensory nerves on the
16  anterior vaginal wall and posterior wall per se.
17     Q  Is chronic pain -- pelvic pain from
18  an -- is chronic pelvic pain from an anterior or
19  posterior colporrhaphy -- strike that, let's
20  start again.
21        Is chronic pelvic pain a risk of an
22  anterior colporrhaphy or a posterior
23  colporrhaphy for reasons unrelated to nerve
24  damage or nerve injury?

Page 137

1      A  In a -- I don't know that I've ever
2  seen a patient with chronic pelvic pain from
3  nerve injury in an anterior or posterior repair
4  that has been carried out in a correct
5  anatomical fashion, meaning if I looked at the
6  repair and did the repair or postoperatively in
7  the office and the patient has normal anatomical
8  support and repair without foreshortening of the
9  vagina, I don't know that I've ever seen a
10  patient with chronic pelvic pain.
11        If the patient -- there was an
12  anatomical deformity, meaning that the surgeon
13  took out too much tissue or pulled muscles
14  together in the midline, or did something that
15  distorted the normal access and anatomy of the
16  vagina, those patients can have chronic pelvic
17  pain from nerve issues, yes.
18     Q  And my question was not necessarily
19  limited to nerve issues.  Outside of nerve
20  issues, are there other ways that an anterior or
21  posterior colporrhaphy can result in chronic
22  pain to the patient, chronic pelvic pain?
23     A  Aside from what I just mentioned?
24     Q  Yes.

35 (Pages 134 to 137)

Alan Garely, M.D., FACOG, FACS

Page 138

1    A  I don't know that I can answer that
2  question, because if a surgeon does an anterior
3  repair or posterior repair the way an anterior
4  repair or a posterior repair is supposed to be
5  done, then there shouldn't be really other ways
6  that a patient would experience pain issues.
7       If a surgeon didn't know what they were
8  doing, and anything's possible, in those
9  particular cases, somebody could have other
10  issues.  I don't know what they would be.
11       Q  You listed pelvic pain and dyspareunia
12  as -- strike that.
13       What are the possible risks of
14  abdominal sacrocolpopexy?
15       A  Erosion of mesh is one of them.
16  Dyspareunia.  Chronic pelvic pain, hemorrhage,
17  hematoma, infection.  Injury to the bowel,
18  injury to the urinary tract.  That's most of
19  them.  I'm sure I can find smaller ones if I
20  think harder, but that's the majority.
21       Q  Is symptoms related to contraction or
22  shrinkage also risks of abdominal sacrocolpopexy
23  because it involves the mesh implant?
24       A  Not really.

Page 139

1       Q  Why is that?
2       A  Well, because sacrocolpopexy, if
3  they're done properly, they don't involve entry
4  of the mesh into the vagina.  They're placed
5  abdominally, there's no splitting of the vagina.
6  There's relying on full thickness of the vagina.
7       Most -- because of the access, the way
8  that the vagina gets pulled upward, you don't
9  usually get a constriction of the vagina or a
10  narrowing.  You get a pull up.  It makes the
11  vagina longer because of the vector forces that
12  are applied on the sacrocolpopexy.
13       So I'm sorry, was the question about --
14       Q  In -- when abdominal sacrocolpopexy is
15  done and you use a mesh graft, obviously you're
16  relying on tissue integration into that mesh
17  graft, correct?
18       A  To some extent, yes.
19       Q  You would expect some normal process of
20  contraction for wound healing, correct, and
21  tissue integration, correct?
22       A  Well, because it's pulling upward, it
23  doesn't -- the contraction doesn't affect the
24  vaginal tissue the way it would if it were

Page 140

1  placed transvaginally, where everything sort of
2  gets shrinkwrapped around -- circumferentially
3  or in one area of the vagina, as opposed to when
4  it's placed abdominally, if there's a
5  contraction of the mesh because of the --
6  because of the distensibility of the vagina and
7  the laxity of vaginal tissue, it's imperceptible
8  what happens to the vagina secondary to any mesh
9  contracture.
10       Q  So it's your testimony that a
11  contraction or shrinkage is not a possible -- or
12  is not a potential risk of abdominal
13  sacrocolpopexy?
14       A  Well, I don't know how a contraction of
15  the mesh would manifest itself clinically.  I'm
16  not saying it doesn't happen, I'm just saying if
17  you ask me what the risks are, I would never
18  tell a patient on a sacrocolpopexy that the risk
19  would be contracture of the mesh because that's
20  not a clinical finding.  I would have to relate
21  that to a clinical scenario.
22       What would be a clinical scenario with
23  mesh contracture from a sacrocolpopexy, I don't
24  know.  I -- I know that you can get a percentage

Page 141

1  of patients that can get mesh erosion.  Do I
2  know that that's related to mesh contracture?
3  No, I do not know that.
4       Q  And is that opinion based on your
5  personal experience in what you've seen in your
6  practice?
7       A  And review of the literature.  I don't
8  recall reading in the literature that there were
9  mesh contracture that contributes to a clinical
10  scenario.
11       Q  Doctor, are you able to identify
12  specific meshes that you have explanted?
13       A  I am.
14       Q  Let me ask you first about Prolift and
15  Prolift+M.  Have you -- let's start with
16  Prolift.  Have you explanted meshes that you
17  have known to be Prolift or Gynemesh PS?
18       A  Yes.
19       Q  And how do you know that they are
20  Prolift or Gynemesh PS?
21       A  I base it on a few factors.  One is
22  where the patient had their surgery and who the
23  surgeon was.  Two is the patient telling me what
24  the procedure was.  Three would be looking at

36 (Pages 138 to 141)

Alan Garely, M.D., FACOG, FACS

Page 142

1    the operative report. Four would be explanting
2    the material and looking at it.
3        Q   Are you able to tell by looking at
4    Prolift that it's Prolift? Do you recognize it
5    when you explant it?
6        A   I usually do.
7        Q   How do you recognize it?
8        A   Because the blue lines in the white
9    mesh.
10       Q   Are you able to tell when you explant
11   it whether it's Prolift or Prolift+M?
12       A   I've tried to distinguish between the
13   two. I don't know that -- given the way that
14   the meshes are explanted, sometimes it's very
15   difficult.
16       Q   How many meshes have you explanted that
17   you have known to be either Prolift or
18   Prolift+M?
19       A   Somewhere between 10 and 20 for sure.
20   Over that, I don't know for sure.
21       Q   Does your office have some method of
22   tracking what mesh is explanted in any way other
23   than what you described to me already? Do you
24   document that in some way when you explant a

Page 143

1    mesh and identify what type of mesh it is?
2        A   I don't specifically document the brand
3    name of the mesh, no.
4        Q   For the -- am I correct that for
5    the 10 to 20 mesh explants that you're referring
6    to, you would not be able to distinguish whether
7    they are Prolift versus Prolift+M, correct?
8        A   Only based on the patient's operative
9    report or in discussion with their surgeon.
10       Q   So if you did not find out about it
11   through the patient's surgeon or the patient
12   telling you what procedure they had, you would
13   not be able to know by looking at it whether it
14   was a Prolift or Prolift+M?
15       A   I think it's hard for me.
16       Q   For any of those explants, did you ever
17   view any of them under the microscope?
18       A   No.
19       Q   Would it have been your practice to
20   send those explants to pathology?
21       A   A hundred percent.
22       Q   Okay. Is it fair to say that you would
23   not have performed a pathological analysis of
24   those explants, correct?

Page 144

1        A   No, I don't do pathological analysis.
2        Q   You're not trained for that, correct?
3        A   I'm not trained for that. In addition,
4    the pathologist usually just documents what it
5    is I've explanted in terms of foreign material
6    mesh and then they'll talk about inflammation
7    and whatever else is -- attached to the mesh.
8    It's not like I'm looking for them to give me a
9    diagnosis of cancer or anything.
10       Q   Are you able to tell from when you're
11   doing the explant, whether the mesh was
12   implanted via a vaginal route versus an
13   abdominal route?
14       A   Absolutely.
15       Q   And in what way can you tell that?
16       A   Because vaginal applied mesh is almost
17   always just at the apex, and transvaginal mesh,
18   applied mesh, is almost always on the anterior
19   wall, apex or posterior wall. It has to do with
20   the anatomic location of where the mesh is
21   explanted.
22           The difference is also with Prolift and
23   Prolift+M, because of the arms and contracture
24   and shrinkage of the mesh, I can almost always

Page 145

1    feel the entry points of the mesh into the
2    pelvis, which is different than you would get on
3    an abdominally approached mesh, because
4    abdominally placed mesh doesn't use arms.
5        Q   Have any of the patients for whom
6    you've explanted mesh been sent to you by
7    attorneys?
8            I really should say, have any of the
9    patients for whom you've explanted mesh been
10   sent to you by the patient's attorney?
11       A   I don't recall ever getting a patient
12   sent to me by an attorney for that purpose. I
13   have had patients sent to me by attorneys for
14   other reasons, but not for -- I don't think I've
15   ever had anybody from a mesh case.
16           There was -- there was some firm that
17   was trying to see if we would do explants on
18   patients with mesh, that they were going to do
19   this weird medical funding thing, but it didn't
20   pass the sniff test at my hospital so we didn't
21   allow it.
22       Q   You received outreach from a law firm
23   like that?
24       A   I can't remember if it was a law firm

37 (Pages 142 to 145)

Alan Garely, M.D., FACOG, FACS

1  or a loaning guy, a lending guy.  There was
2  some -- it was -- it was something about where
3  they were going to give a loan to the patient to
4  pay for the surgery and then we were going to
5  bill the patient and then the patient was going
6  to go to a lawsuit and settle the lawsuit and
7  then the money from their lawsuit was going to
8  come and pay the doctor.  And we did not like
9  it.  It did not look kosher.
10     Q  Do you have any record of who that
11  company was?
12     A  If you made some names, I might
13  remember.  I -- I really didn't have any
14  interaction with them.  The person at my
15  hospital is the person in charge of physician
16  services, who I trust implicitly, and he was the
17  person who did all the discussions with this
18  guy.  And he didn't like it.
19     Q  If I said the name MedStar Funding,
20  does that sound right?
21     A  That sounds right.
22     Q  So you think MedStar Funding is the
23  company that contacted your office for that
24  purpose?

1      A  Correct.
2      Q  You ultimately declined to do this type
3  of work for MedStar Funding?
4      A  Absolutely.
5      Q  How long ago was that?
6      A  It was when I was at South Nassau, so
7  it must have been somewhere between 2012 and
8  like 2013 or 2014.  Somewhere in that range.
9  I'd just left Mount Sinai as a full-time
10  employee and I went to South Nassau as a
11  full-time employee.
12     Q  I'm going to show you what I've marked
13  as Exhibit 14.
14        (Exhibit Garely Garely 14, Document
15  entitled Oxford Levels of Evidence Pyramid for
16  Practitioners, marked for identification.)
17  BY MS. KABBASH:
18     Q  So you see at the bottom, this is the
19  reference to the Oxford Levels of Evidence
20  Pyramid for Practitioners; do you see that?
21     A  I do.
22     Q  Are you familiar with this
23  representation of this pyramid or one that's
24  close to it?

1      A  No, I don't believe I've ever seen this
2  before.  Well, actually now I'm sort -- I was
3  sort of looking at the pyramid.  As I'm reading
4  through these things, I understand what this is
5  about.
6      Q  And what is your understanding of what
7  this is reflecting?
8      A  They're saying that -- that the
9  majority of studies are based on background
10  information and expert opinion and they have low
11  quality of evidence.  It's sort of a model of
12  what we call evidence-based medicine, and sort
13  of just because I'm the expert and the professor
14  and there's lots of us, we're in every medical
15  school, our opinions are really not worth a lot
16  in the paradigm of evidence-based medicine.
17        I'm not saying our opinions are not
18  worth something because there is a whole other
19  school of thought that says that expert opinions
20  do have validity.  But if you look at it based
21  on other criteria, they're saying case series
22  are better.  Case-controlled studies are better.
23  Cohort studies are better than that.
24        And then above that would be randomized

1  controlled trials, and then systematic reviews
2  and then metaanalysis, which looks at multiple
3  studies lumped together.
4      Q  According to this pyramid, metaanalyses
5  and systematic reviews are considered the
6  highest quality of evidence, correct, followed
7  by randomized controlled trials and others that
8  are listed lower on the page, right?
9      A  There are, but there's criticism for
10  each one of these.
11     Q  Do you practice evidence-based
12  medicine?
13     A  I believe so.
14     Q  You certainly strive to, correct?
15     A  I do strive to.
16     Q  Would you -- do you generally agree
17  with the presentation that's set forth on this
18  pyramid as a general matter?  I understand that
19  you can attack a particular study for various
20  reasons, but do you generally agree that
21  metaanalyses and systematic reviews are the
22  highest form of evidence followed by randomized
23  controlled trials?
24     A  That's accepted, yes.

38 (Pages 146 to 149)

Alan Garely, M.D., FACOG, FACS

Page 150

1     Q   Is there any other way in which the
2  information is presented on this page that you
3  disagree with on a general -- in a general way?
4     A   No.
5     Q   Where would you consider that animal
6  studies fall in this hierarchy here?  They're
7  not really referenced on it.  Would animal
8  studies fall below this pyramid?
9     A   I -- I don't know where I would put an
10  animal study on this.  This is -- I don't know.
11     Q   Fair to say that animal studies, while
12  they can be informative and helpful, are not as
13  meaningful to you in assessing the safety of a
14  device as clinical studies are, correct?
15  Clinical studies assessing the use of a device
16  in women?
17     A   That would be better.
18     Q   Let's take a look at your report.
19        MR. MATTHEWS:  Is now a good time to
20  take a break?
21        MS. KABBASH:  Yeah, sure.
22        (Whereupon, a brief recess is taken.)
23  BY MS. KABBASH:
24     Q   Doctor, am I correct that in the study

Page 151

1  that you published on the magnetic resonance
2  imaging of abdominal versus vaginal prolapse
3  mesh, am I correct that you found that there was
4  no statistically significant difference in total
5  vaginal length between the abdominal and the
6  vaginal approach?
7     A   At three months, yes.
8     Q   In that study, you indicate, "In our
9  study, we used Prolift as the vaginal mesh kit
10  because of surgeon preference."  Whose
11  preference was that?
12     A   Michael Vardy.
13     Q   Is he the only doctor in the study who
14  implanted the Prolifts?
15     A   I'd have to see the paper.  I'll tell
16  you.
17        MS. KABBASH:  Actually, we can go ahead
18  and mark it.  We'll mark it Exhibit 15.
19        (Exhibit Garely Garely 15, Document
20  entitled Magnetic Resonance Imaging of Abdominal
21  versus Vaginal Prolapse Surgery with Mesh,
22  marked for identification.)
23     A   Okay.  Azin was our fellow, so she
24  would have done what Dr. Vardy did.  Cedric was

Page 152

1  our fellow, and Sue was our fellow, so the three
2  of them were the fellows, so they would have
3  only participated in whatever Dr. Vardy did.
4        Dr. Gramann never did mesh
5  kits.  And Ascher-Walsh, he may have done mesh
6  kits, but I don't know if he ever did the
7  Prolift.  I don't know what Chuck did.  And then
8  Dr. Condrea -- well, Shimon was our fellow too,
9  so I don't know -- so Shimon didn't do any of
10  the Prolifts.
11        He was a visiting fellow from Israel
12  and he did not have clinical privileges.  So
13  Shimon was doing a research fellowship with us,
14  so he only was compiling data.  And then
15  Dr. Condrea is a partner of Shimon's in Israel,
16  so I don't think any of the cases were
17  contributed by him.
18     Q   You obviously did not do any of the
19  Prolift cases that are reflected in the study,
20  correct?
21     A   Obviously.
22     Q   Did you do any of the MRI analysis of
23  those Prolift patients?
24     A   Well, I -- Jonathan Luchs, the

Page 153

1  radiologist, was at my center at Winthrop, where
2  I was based, and I went between Winthrop and
3  Sinai, but I sat with Jonathan and looked at a
4  lot of the images with him, but he did all the
5  interpretations.
6     Q   Doctor, if you could turn to your
7  report for Prolift, which is Exhibit 2.  And
8  turn to page 6.
9     A   Okay.
10     Q   Doctor, on page 6 under opinion 2A, you
11  opine that Ethicon brought these products to
12  market without FDA 510(k) clearance, correct?
13  Do you state that opinion there?
14     A   I do.
15     Q   And by "these products," I understand
16  that you mean the Prolift kits, the different
17  iterations of the Prolift kit?
18     A   That's correct.
19     Q   Am I correct that you've never worked
20  at the FDA?
21     A   That is correct.
22     Q   Am I correct that while you may have
23  some familiarity with the 510(k) process, you
24  don't hold yourself out as an expert in the

Alan Garely, M.D., FACOG, FACS

Page 154

1  510(k) clearance process, correct?
2      A  Correct.
3      Q  You're not an expert on FDA
4  regulations, correct?
5      A  I'm not a regulatory expert, correct.
6      Q  Have you ever reviewed a company's
7  510(k) submission to the FDA before you became
8  an expert in mesh litigation?
9      A  I have worked as an industry consultant
10 on and off for the last 25 years.  There have
11 been products where things were coming to market
12 and as part of an advisory group, I have looked
13 at the 510(k) applications.  I don't know
14 specifically which products those would have
15 been, but I have seen the applications.
16     Q  Have you ever provided feedback to the
17 company submitting the 510(k) applications on
18 the content of the application and what should
19 or should not be in it?
20     A  Well, I know that when I reviewed some
21 of these before they were submitted -- and I
22 wasn't just by myself, it was usually with a
23 group of people, and we would look at these.
24 There were times when we would make suggestions

Page 155

1  if we thought things needed to be added.  I
2  don't know that I ever said something should
3  have ever been omitted.
4      Q  You made suggestions on additions to
5  make to the 510(k) application itself?
6      A  Correct.
7      Q  And what product or submission was
8  that?
9      A  I have been part of these groups on so
10 many products, I don't specifically remember
11 because it wasn't something that I would have
12 ever thought I would have needed to remember.  I
13 just remember looking at the binders.  I'm
14 trying to think.
15     Q  Let me ask you, when was the last time
16 you recall providing such feedback?
17     A  It would have been before 2003.
18     Q  So it would have been at least 13 years
19 ago that you would have provided such feedback,
20 correct?
21     A  Correct.
22     Q  Have you ever reviewed the FDA guidance
23 document on when to submit a 510(k)?
24     A  I don't recall.

Page 156

1      Q  Have you ever reviewed Federal statutes
2  or regulations on whether a product is
3  misbranded or adulterated?
4      A  I do not recall.
5      Q  As you sit here today, is it fair to
6  say that you don't have an understanding of what
7  Federal statutes or regulations address
8  misbranding or adulteration of products?
9      A  Not today, no.
10     Q  Am I correct that you will not be
11 offering opinions at trial regarding whether
12 Ethicon complied with FDA requirements or
13 regulations in its sale of Prolift or in its
14 labeling for Prolift?
15     A  Just what I put in my expert report on
16 2A.
17     Q  You indicate here that Ethicon brought
18 Prolift to market without FDA 510(k) clearance,
19 correct?
20     A  That is correct.
21     Q  Am I correct that --
22     MR. MATTHEWS:  I can state in my place
23 that he will not be offering an opinion on that
24 at trial.  You can ask him about it all you

Page 157

1  want.
2      MS. KABBASH:  On 2A?
3      MR. MATTHEWS:  2A.
4      MS. KABBASH:  Okay.  I will rely on
5  that representation.
6  BY MS. KABBASH:
7      Q  Dr. Garely, would you agree with me
8  that there is no transvaginal mesh kit to treat
9  prolapse that has been the subject of more
10 studies than Prolift?  Would you agree with
11 that?
12     A  I have not done an independent research
13 into the other mesh kits for me to be able to
14 say that Prolift has had the most amount of
15 research.  I cannot say that.
16     Q  So as we sit here today, you don't know
17 whether that's true or not?
18     A  Not to my -- not to my memory.
19     Q  Do you know if Prolift has more RCTs in
20 particular studying it than other manufacturers'
21 mesh kits?
22     A  I have not delved into the research of
23 the other mesh kits.  I cannot say.
24     Q  So you have not studied the quality and

40 (Pages 154 to 157)

Alan Garely, M.D., FACOG, FACS

Page 158

1  volume of the medical literature about Prolift
2  vis-à-vis the other mesh kits put out by the
3  other manufacturers, correct?
4      A  I'm sorry.  I don't understand the
5  question.
6      Q  That was a bad question.  You have not
7  done an analysis to assess the medical
8  literature addressing Prolift compared to the
9  medical literature studying other manufacturers'
10 mesh kits, correct?
11     A  I have studied other manufacturers'
12 mesh kits.  I just don't know if the absolute
13 body of knowledge is greater on those kits
14 versus this kit.
15     Q  So you have not made that comparative
16 analysis, correct?
17     A  Not in a formal sense, no.
18     Q  Do you agree that Prolift has
19 demonstrated superiority to native tissue
20 repairs in RCTs in demonstrating anatomic
21 success?
22     A  In some studies on anterior wall
23 repairs, there has been a greater success rate,
24 but not on apical or posterior, and that's just

Page 159

1  looking in a vacuum, a structural repair, it
2  doesn't have to do with anything functional or
3  in terms of complications.
4      Q  Right.  And I'm not asking about
5  complications or functional repairs.  I'm asking
6  if -- I think you've indicated that there are
7  RCTs that demonstrate at least in the anterior
8  compartment that Prolift has demonstrated
9  superiority to native tissue repairs in
10 demonstrating anatomic success in the anterior
11 compartment, correct?
12     A  That's correct.
13     Q  And which studies are you referring to?
14 Is that the Altman and Withagen?
15     A  Withagen.
16     Q  Yeah, Wit-hog-an (phonetic).
17     A  You don't speak Dutch?
18     Q  I don't.
19     A  Yes, I mean, I would have to see the
20 actual studies because I don't recall them all
21 off the top of my head.  Altman and Withagen
22 have written multiple papers, so I'd have to see
23 the papers that you're referring to.
24     Q  Let's take a look back to your MRI

Page 160

1  article again, which is Exhibit --
2      A  15.
3      Q  15, okay.  Let's take a look at page
4  1573.  And you are second listed author on this
5  article, correct?
6      A  That's correct.
7      Q  If you look at page 1573, towards the
8  bottom of the first column.
9      A  Bottom?
10     Q  Here, it's a short column.
11     A  Oh, okay.
12     Q  Do you see there?
13     A  So the part that's right here?
14     Q  Right, exactly.
15        In the middle of that paragraph, you're
16 addressing different types of mesh kits,
17 correct, you mention the Apogee, Avaulta and you
18 mention Prolift, correct?
19     A  Give me a minute.  I just want to get
20 oriented.  I haven't seen this paper in a while.
21        Okay.
22     Q  Back to where we were in the middle of
23 that left column, you've referenced various
24 transvaginal mesh kits, including the Prolift,

Page 161

1  correct?
2      A  Correct.
3      Q  And then you go on to say starting at
4  the bottom of that column, "These new mesh
5  techniques offer the advantage of rebuilding the
6  uterosacral cardinal ligament complex and
7  providing rectovaginal fascial support and
8  decreasing the dependence of the repair on a
9  fixation point of either suture or mesh."
10        And then you go on to say, "Short-term
11 followup studies have shown lower failure rates
12 with mesh kits compared to traditional repairs."
13 That's what you indicate there, correct?
14     A  Correct.
15     Q  And it goes on to say, "Reported
16 success rates range from 87 percent to 95
17 percent at three to four" -- "14 months of
18 followup."  So that's what you're reporting
19 about the success rates of mesh kits at that
20 time, correct?
21     A  In this reference, three to 14-month
22 followup, correct.
23     Q  And that reference was the Feiner
24 article from 2009, correct?

41 (Pages 158 to 161)

Alan Garely, M.D., FACOG, FACS

Page 162

1    A   Correct.
2    Q   And you go on to say, "The most common
3  complications reported include vaginal mesh
4  erosions in 5 to 11 percent and dyspareunia in
5  1.5 to 3 percent."  And for that proposition,
6  you again cite the Feiner article, correct?
7    A   Correct.
8    Q   So at this point in time, the -- again,
9  this was in 2012 that this article was
10  published, correct?
11    A   Yeah, and that was relying on a
12  systematic review from 2009.
13    Q   Okay.
14    A   From the British journal of -- journal
15  of medical whatever.
16    Q   And that was a systematic review of
17  many studies, correct?
18    A   Correct.
19    Q   Going back to our Oxford levels of
20  evidence, one reason why you found that
21  systematic review to be reliable is because
22  systematic reviews are considered to be among
23  the higher levels of evidence, correct?
24    A   More or less, yeah.

Page 163

1    Q   And in that systematic review of many
2  trials, the erosion rates that you were citing
3  in this article fell within a range of 5 to 11
4  percent for transvaginal mesh kits, correct?
5    A   From that journal article, the way they
6  referenced the erosion rates, that's correct.
7    Q   And, Doctor, have you seen the recent
8  MAR 2016 Cochrane review on the treatment of
9  prolapse?
10    A   I don't recall if I -- if I read it.
11  Do you have a copy of it?
12    Q   I do.  We can talk about it in a little
13  bit, but as of right now, you're not sure if
14  you've read that one?
15    A   MAR has written a bunch of papers.
16  This is a Cochrane review?
17    Q   Right.  This is a Cochrane review that
18  just came out in 2016, like just a couple of
19  months ago.
20    A   Oh, I don't know that I've seen it yet.
21    Q   Okay.
22    A   Okay.
23    Q   Doctor, would you agree with me that
24  even though you're citing a particular

Page 164

1  metaanalysis for the 5 to 11 percent rate of
2  exposure, would you agree with me that the bulk
3  of the medical literature on transvaginal mesh
4  kits reports an exposure rate that is consistent
5  with that range, recognizing that there are
6  outliers lower and higher, but the 5 to 11
7  percent that you reported here is consistent
8  with the bulk of the medical literature on mesh
9  exposure from transvaginal mesh kits, correct?
10    A   Well, in general, the lower range is
11  not more consistent.  It's mostly with the upper
12  range.
13    Q   11 percent?
14    A   11 percent or more.
15    Q   And you also reported here based on the
16  Feiner article that there were dyspareunia found
17  in 1.5 to 3 percent of patients, correct?
18    A   Right.  We're just citing what was
19  already published in another journal.  It wasn't
20  the purpose of our paper.
21    Q   But certainly in putting together this
22  article, you would only cite to sources that you
23  found were reliable and accurately portrayed
24  information as best you could tell, correct?

Page 165

1    A   As best we could tell.
2    Q   You certainly would not cite that
3  information if you had reason to believe that
4  the information in it was inaccurate, correct?
5    A   It seemed reasonable at the time.
6    Q   And next you go on to say, "Randomized
7  controlled trials comparing vaginal mesh repair
8  to conventional vaginal colporrhaphy repair
9  demonstrates higher anatomic success after
10  tension-free vaginal mesh insertion, though
11  symptom decrease and improved quality of life
12  were equal in both groups."  Correct?
13    A   Those were the anterior vaginal wall
14  findings, correct.
15    Q   And those were the findings --
16    A   Perhaps we could have been more
17  specific in that description.  I mean, when you
18  write these papers, sometimes in retrospect when
19  you go back you realize you should have been
20  more clear.  Perhaps we could have been clearer
21  that it was applying to the anterior wall.
22    Q   And that's fine.  In making this
23  statement here in this article, you have cited
24  two randomized controlled trials, correct?

42 (Pages 162 to 165)

Alan Garely, M.D., FACOG, FACS

Page 166

1    A  Correct.
2    Q  The first one, which is footnote 13, is
3  the Withagen study?
4    A  The first one was number 12.
5    Q  I apologize.
6    A  That was Altman.
7    Q  That was Altman.  And the Altman RCT
8  studied Prolift versus anterior colporrhaphy,
9  correct?
10    A  Correct.
11    Q  And the reference 13 is to the Withagen
12  study and that also studied Prolift versus
13  conventional vaginal repair, correct?
14    A  Correct.
15    Q  Okay.  Let's take a look at your report
16  at page 10.  Before we get to that, Doctor,
17  whenever -- strike that.
18      Did you ever express concern to Ethicon
19  about the IFUs for either TVT or TVT-O?  Well,
20  first let me ask you, have you ever seen the
21  IFUs for either TVT Retropubic or TVT Obturator,
22  the Gynecare brand name?
23    A  Yes.
24    Q  Did you ever express any concerns to

Page 167

1  Ethicon at any time about the adequacy of those
2  IFUs, for TVT Retropubic or TVT Obturator?
3    A  I don't know that I specifically made a
4  comment to them about the IFUs.  I think that
5  when I stopped -- I wasn't really a big TVT-O
6  user for Gynecare for Ethicon brand, so when
7  I -- so I don't know that I would have gone out
8  of my way to have expressed my opinion about
9  their products since I really wasn't using it.
10  And I don't have any problems with the IFU for
11  the TVT.
12    Q  Okay.  So as you sit here today, you
13  don't recall ever expressing concerns to Ethicon
14  with regard to the risk warnings in the TVT
15  Obturator IFU, you don't have any specific
16  recollection of voicing such concerns as you sit
17  here now?
18    A  The only thing that I would add to
19  that, not specific to the TVT-O, and I did
20  express multiple concerns about the TVT when I
21  was in the thick of it as a preceptor, and it
22  wasn't just me.  Many of us that were teaching
23  were concerned with the IFU in that we didn't
24  think that they were selecting people who were

Page 168

1  appropriately capable of doing the procedures.
2      And we knew this because when they were
3  sending people to precept with us, the people
4  would ask questions like, oh, how do you hold
5  that cystoscope?  And we knew that if they
6  didn't know how to use a cystoscope, these were
7  not the people that should be implanting the
8  device.
9      So we had specifically requested to
10  them that they make a criteria for the use of
11  the product be properly trained or having a
12  proper background, because we didn't think that
13  it was appropriate for us to train someone by
14  letting them watch us do three procedures and
15  then letting them go back home to their
16  institution and throw a device into a human
17  being.
18      So there was a lot of discussion at the
19  time amongst the preceptors that that was --
20  that there was not an appropriate screening
21  process for people who were coming across to do
22  the slings.
23    Q  Okay.  So am I understanding you
24  correctly, Doctor, that the nature of your

Page 169

1  concern or criticism at the time was not the IFU
2  per se, but it was the training level of certain
3  surgeons who were coming to train with you at
4  the time?
5    A  Well, it transcends that because we
6  knew the IFU didn't have anything specific in it
7  about the background or training of the person
8  who was doing the procedure.
9    Q  Do you recall, Doctor, that the TVT IFU
10  even to its earliest iterations contained
11  language in it saying that surgeons using this
12  device must be appropriately trained in surgical
13  procedures to treat SUI and in the use of this
14  device?  As you sit here today, do you have
15  recollection of that language being in the TVT
16  IFU for the past 16 years back to its launch?
17    A  I do not.
18    Q  If it did have such language in it,
19  that would at least in part speak to the concern
20  that you are discussing right now, correct?
21    A  It would.
22    Q  Let's look at page 10 of your report.
23  And the first full paragraph starts, "The
24  biomechanical incompatibility."  Do you see

43 (Pages 166 to 169)

Alan Garely, M.D., FACOG, FACS

Page 170

1  that?
2      A  I do.
3      Q  It says, "The biomechanical
4  incompatibility of the Gynemesh PS with the
5  female pelvis which Ethicon failed to study or
6  establish before selling the product was also
7  demonstrated in a published study involving the
8  vaginal implantation of three types of mesh in
9  monkeys."  Do you see that?
10     A  I do.
11     Q  And there you reference I think the
12 Mark Lang study.  As I think you indicate,
13 Doctor, the Lang study, it's an animal study,
14 correct?
15     A  Correct.
16     Q  It involved three monkeys, correct?
17     A  Correct.  Three types of mesh in
18 monkeys.  I don't -- I would have to use the
19 study, I don't remember how many monkeys.
20     Q  Do you find that a study involving
21 implantation in a monkey is more instructive of
22 the safety of a device than the RCTs that
23 analyze the use of that device in real women?
24     A  Do I think that the animal study is

Page 171

1  better than a randomized controlled trial in
2  humans?
3      Q  In assessing the biomechanical
4  compatibility of the mesh?
5      A  I don't -- I think that the animal
6  studies can give you information about some
7  parts -- some properties of the material that
8  you're implanting into humans, but there are
9  reasons why you want to do things in animals and
10 there are reasons why you want to do things in
11 humans.  I think that the purpose of the
12 implantation in the animals in this particular
13 study were to just get a baseline understanding
14 of how the mesh would do in a biologic, living
15 condition.
16         I think that ultimately the randomized
17 controlled trial in a human is going to give you
18 the best information in how it's going to
19 perform in a human.  A lot of the problems with
20 this mesh had to do with the mesh load.  It had
21 to do with the volume, the surface area of the
22 mesh, which is why this mesh performed
23 differently than mesh that's placed for a TVT.
24     MS. KABBASH:  Move to strike from "A

Page 172

1  lot of the problems" forward.
2      Q  But you would agree, Doctor, that in
3  terms of assessing how the mesh is going to
4  perform in human women, the best source of
5  information to look to is the studies that
6  actually study the use of that mesh in women and
7  not in monkeys, correct?  That is a better
8  source of information than a monkey study,
9  correct?
10     A  Which is why we know now that the mesh
11 was problematic because when it was implanted in
12 women, it demonstrated so many problems.
13     MS. KABBASH:  Move to strike.
14     Q  My question is, Doctor, would you agree
15 that in assessing whether a mesh is
16 biocompatible in women, clinical studies
17 assessing that mesh in women is more instructive
18 and reliable than an animal study assessing that
19 mesh in monkeys; would you agree with that
20 statement, that general statement?
21     A  In general, it's better to do a trial
22 on a human being.
23     Q  Let's look at opinion 5 on page 10.
24 And there you indicate your opinion that the

Page 173

1  mesh in the Prolift kits is too stiff for its
2  intended application?
3      A  I see it.
4      Q  Okay.  On the next page, you say, "In
5  light of the published literature establishing
6  that mesh can be or become rigid or restrictive,
7  Ethicon should not have used this material in
8  the vagina, which has much greater sensitivity
9  and requires far greater flexibility than the
10 abdomen."
11         And by the way, that reference to the
12 abdomen, just above that, you're relying for
13 that opinion on references in the hernia
14 literature, correct?
15     A  Correct.
16     Q  Then you go on to say, "The fibrotic
17 scar that encapsulates the mesh used in the
18 Prolift implant due to its defective design
19 features causes greater rigidity, less
20 flexibility and pain."
21         And you hold the same opinion not only
22 with regard to the Prolift, but with regard to
23 the Prolift+M also, correct?
24     A  That's correct, based on the documents

44 (Pages 170 to 173)

Alan Garely, M.D., FACOG, FACS

Page 174

1    that were provided to me from Johnson & Johnson,
2    this is what they were utilizing as the basis of
3    their usage of the mesh in the vagina. So it
4    wasn't that I just decided to go to abdominal
5    mesh. I relied on the same materials that the
6    people who were formulating Prolift and
7    Prolift+M were using.
8        Q  So you -- in forming this opinion, you
9    were relying on company documents that have been
10   provided to you, correct?
11       A  That and the literature, my own
12   independent literature search.
13       Q  And your review of the hernia
14   literature?
15       A  Correct.
16       Q  Doctor, would you agree that the
17   Prolene -- branded Prolene material that is in
18   the Gynemesh PS, is the same Prolene that is in
19   TVT slings, but in a different knit?
20       A  Same Prolene, different knit?
21       Q  Right.
22       A  Yes.
23       Q  You agree with that?
24       A  I don't have any reason to disagree

Page 175

1    with that. That's my understanding.
2        Q  Okay. Would you agree with me that the
3    body of evidence on TVT slings do not
4    demonstrate fibrotic bridging over the TVT
5    slings, and I mean that the whole TVT family,
6    whether obturator or retropubic.
7        A  I'm sorry, repeat the question.
8        Q  Sure. I assume that since TVT came out
9    in 1998, you have reviewed the body of
10   literature on the TVT, correct?
11       A  Correct.
12       Q  And that's been an important part of
13   your practice, to stay current on the medical
14   literature of the products that you use,
15   correct?
16       A  Correct.
17       Q  And there has now amassed almost 20
18   years of medical literature, in fact, 20 years
19   of medical literature on the use of TVT since
20   Uhmston first published on it in the 1990s,
21   correct?
22       A  Correct.
23       Q  And would you agree with me that that
24   body of medical literature does not support the

Page 176

1    notion that there is fibrotic bridging
2    demonstrated over the TVT implants when they are
3    used; do you agree with that?
4        MR. MATTHEWS:  And you're talking about
5    TVT-O, all the TVT --
6        MS. KABBASH:  The Gynecare TVT family
7    of products because they have the same implant.
8        A  No, I think there is fibrotic bridging
9    that occurs. Especially in -- well, there's
10   fibrotic bridging that occurs in all the meshes,
11   but the reason that the TVT Retropubic is
12   different is because it's the space that it's
13   placed in and the way that the load of the mesh,
14   the TVT Obturator behaves in a similar way to
15   transvaginal mesh for prolapse because of the
16   way it's positioned.
17       So it has to do -- there are multiple
18   factors that influence the way the a mesh
19   behaves in the vaginal area. It -- there's --
20   there's fibrotic bridging that occurs in all of
21   these meshes. For me to say that the fibrotic
22   bridging somehow is safe in one product or less
23   in product and then it's applicable to another
24   product, I cannot do that, I can't do that.

Page 177

1    BY MS. KABBASH:
2        Q  In the TVT context, is it your opinion
3    that the fibrotic bridging that occurs has
4    negative clinical impact on the patient?
5        A  In a situation of TVT Retropubic, I
6    don't believe that it is a negative, no.
7        Q  When you say "fibrotic bridging," what
8    do you mean exactly?
9        A  Fibroblasts that reach across to each
10   other from one strand of the mesh to another
11   strand of the mesh causing scar plate formation
12   and hardening in a firmness. That's -- given
13   the surface area of the mesh that's in contact
14   under the urethra is 2 centimeters. We're not
15   talking about 2 centimeters by 2 centimeters
16   which is a square area of 4 centimeters.
17       We're talking about the width and
18   length of the mesh that goes into the vagina for
19   transvaginal mesh procedures where the surface
20   areas can approximate -- even if you have 5
21   centimeters by 4 centimeters, that's 20 square
22   centimeters of mesh.
23       It's a big mesh load. The tissue
24   behaves differently. You can't -- it's

45 (Pages 174 to 177)

Alan Garely, M.D., FACOG, FACS

Page 178

1  comparing apples to oranges.  That's what I'm
2  saying.
3      Q  Do you agree that the pore size of
4  Gynemesh PS is larger than that of the TVT mesh?
5      A  Again, I haven't reviewed the pore
6  size.  You told me it was 1.3?
7      Q  Yes.
8      A  And we're comparing it to --
9      Q  If I represented to you that Gynemesh
10  PS and Prolift mesh had a pore size of 2.4
11  millimeters, does that sound right to you?
12      MR. MATTHEWS:  Object to the form of
13  the question in that it misstates the evidence.
14  You can answer it.
15  BY MS. KABBASH:
16      Q  Have you seen -- well, actually -- hang
17  on.  Let me restate the question.
18      Have you seen company documents that
19  indicate that the pore size for Prolift and
20  Gynemesh PS is 2.4 millimeters?
21      A  I don't recall that it was 2.4
22  centimeters.  If you could show it to me, then I
23  would remember it.
24      Q  Sitting here right now, you cannot

Page 179

1  recall that?
2      A  Well, there were so many different
3  iterations of the pore size based on whether it
4  was at rest or whether it was at stretch or
5  tension or whether -- the axis of the stretch
6  occurred.  So know that greater than 1
7  millimeter was good and 2.4, that was better
8  than 1, but there was a distortion of the pores
9  that occurred, once the tissue was implanted --
10  once the material was implanted into the tissue.
11      Q  On what are you basing your opinion
12  that there was a distortion of the pores that
13  occurred?  What body of information is that
14  opinion based on?
15      A  It's in my -- somewhere in my report,
16  but it was based on internal documents from
17  research that I had looked at that was done by
18  Johnson & Johnson.
19      Q  Okay.  Are you pointing to any --
20  besides company documents, which you've just
21  discussed, is there any medical literature that
22  you can specifically point me to that concludes
23  that the pores in Prolift mesh deform or
24  distort?

Page 180

1      A  Yes.
2      Q  Which study?
3      A  Well, I cite different papers in my
4  footnotes in different parts of this paper.
5      Q  Where are you?
6      A  I'm on page 12.  And talking about
7  excessive scarification and shrinkage, when
8  there's shrinkage, there's a decrease in the
9  pore size.  That's reference 22.
10      Q  Reference 22 is to Ethicon cadaver
11  labs, correct?
12      A  That reference for that point.
13      Q  But my question is, can you point me to
14  a study piece -- a published -- peer-reviewed
15  published medical literature?
16      Let me ask a more precise question.
17  Can you point me to any peer-reviewed published
18  medical literature that has concluded that the
19  pores in Ethicon's Prolift mesh collapse or
20  deform to be less than 1 millimeter?
21      A  Well, the -- there's the same mesh that
22  was used on abdominal hernia repairs
23  demonstrated shrinkage.  I don't -- I'd have to
24  see the papers right in front of me to recall

Page 181

1  whether or not they said that the pore size
2  actually shrunk.  I need a minute to just take a
3  look.
4      Q  Why don't we go off the clock for a
5  second, and you can take a look to find it.
6      A  Okay.
7      (Whereupon, a brief recess is
8  taken.)
9      THE WITNESS:  Okay.
10  BY MS. KABBASH:
11      Q  Okay?
12      A  What I was relying on was the internal
13  documents from Ethicon which are cited as
14  number 6 and number 7.  Those would be --
15      Q  I apologize.  What page are you on?
16      A  It would be page 9.  The top paragraph
17  number 3 with reference number 6 and reference
18  number 7.  Those were internal documents done by
19  Ethicon.
20      So off the top of my head, no, I cannot
21  cite a published paper, but Ethicon knew from
22  their own internal research that the pores did
23  shrink down to less than 1 millimeter.
24      Q  Okay.  So just to make the record

46 (Pages 178 to 181)

Alan Garely, M.D., FACOG, FACS

Page 182

1  clear, as we sit here right now, you cannot
2  point me to a piece of published medical
3  literature which concludes that the pore size of
4  Prolift mesh deforms to less than 1 millimeter,
5  correct, as we sit here right now?
6      A  Well, there's -- I mean, I don't have
7  my PubMed in front of me, but if I'm -- and I
8  don't know that I can recall specifically that
9  Klausterhoffen made a note about pore size.  But
10  I think that one of his papers did discuss
11  shrinkage of pore size, but I can't be a hundred
12  percent certain without looking at the paper.
13      Q  And you have not cited that paper in
14  your report, correct?
15      A  I don't think I did.
16      Q  Okay.  You also have -- let's go to
17  page 11 of your report, which I think we're
18  already here.  Opinion number 6, you say, "As
19  the Prolift mesh scars in, the resulting
20  shrinkage or contracture of the tissues
21  surrounding the mesh can entrap nerves, deform
22  the vagina and pelvic anatomy," et cetera.  And
23  then you go on to say below that, you discuss
24  nerve entrapment with chronic pain.  Do you see

Page 183

1  that?
2      A  I do.
3      Q  You say sometimes after one year there
4  are no complaints and then complaints happen --
5  oh, I'm sorry, you're quoting something here, an
6  Ethicon surgeon panel meeting, and it goes on to
7  say, "Often the result of tiny nerves in the
8  granuloma and that's just a matter of" -- strike
9  that.
10      In this opinion, you were making -- you
11  were opining that patients may suffer
12  complications from tiny nerves that get
13  entrapped in the mesh, correct?
14      A  I was opining that I agreed with
15  Ethicon's surgeon panel's assessment.  I was
16  agreeing with them.
17      Q  And that opinion is that tiny nerves
18  can get entrapped in the mesh due to
19  contraction, correct?
20      A  Yes.
21      Q  Okay.  And you also hold this same
22  opinion with respect to Prolift+M, correct?
23      A  I do.
24      Q  Okay.  Would you agree that the

Page 184

1  entrapment of tiny nerves, to the extent that it
2  happens, is something that has to be viewed
3  under a microscope?  In other words, you cannot
4  clinically discern the entrapment of tiny nerves
5  in mesh, right?  You have to view that under a
6  microscope to see that, correct?
7      A  Well, if a patient has pain at the site
8  of where the mesh is, and if you take the mesh
9  out and it relieves the pain, we're all I'm sure
10  in agreement that nerves cause pain, so there
11  would be nothing else other than nerve issues
12  surrounding the mesh that would be causing the
13  pain.
14      So do I need a microscope to confirm
15  nerve presence in a mesh?  I do not.  But if you
16  wanted to say, hey, are there nerves in this
17  mesh, then you would need to do appropriate
18  nerve stains and use a microscope, but from a
19  clinical perspective, that's not something that
20  you would care about the patient, if patients
21  got better by removing the mesh.
22      Q  From a clinical perspective, if you --
23  if a patient was in pain, and you removed the
24  mesh, you would -- and the patient got better

Page 185

1  and the pain got better, you would deduce or
2  make an assumption that there were nerves in the
3  mesh, correct?
4      A  That's fair.
5      Q  To actually investigate the explants
6  and see if there is evidence of nerves in the
7  mesh, you would have to take that mesh, put it
8  on a slide, and put it under a microscope and
9  look at it, correct?
10      A  Well, it's a matter -- it's a point of
11  semantics, but yes, if you wanted to actually
12  prove it, it's not something that's done in
13  common practice.
14      Q  I think plaintiff's expert pathologist
15  might disagree with that, but...
16      Am I correct that you were not trained
17  in interpreting what can be viewed on explant
18  slides under a microscope?  In other words, not
19  only have you not put a mesh slide under a
20  microscope and looked at it, even if you had,
21  you are not trained in how to interpret what
22  you're seeing on that slide; is that correct?
23      A  Just from what I know from basic
24  histology and pathology in medical school.  And

47 (Pages 182 to 185)

Alan Garely, M.D., FACOG, FACS

Page 186

1    I did do two months of pathology as a resident
2    as well.
3        Q   And that was about 20 years ago?
4        A   I did that probably -- I did that
5    rotation in my second year of residency, that
6    was 1990.
7        Q   Is it fair to say that if you -- if we
8    had a mesh that was on a slide and it got put
9    under the microscope, you would need the
10   assistance of a pathologist to be able to
11   properly and reliably interpret what was on that
12   mesh slide, correct?  Or some other professional
13   with a background other than yours?
14       A   I could probably muddle through it on
15   the bigger structures, but I would have a
16   problem on the smaller things.
17       Q   Tiny nerves in particular, correct?
18       A   I'm not really good at looking at tiny
19   nerves under the microscope.
20       Q   You don't typically use a microscope to
21   make treatment recommendations and decisions for
22   your patients, correct?
23       A   I do not.
24       Q   And you don't use a microscope in order

Page 187

1    to assess how to treat complications if you have
2    patients with complications, correct?
3        A   I do not.
4        Q   Do you know which stains need to be
5    used so that nerves can be seen on a mesh slide
6    under a microscope?
7        A   I know for a fact that I used to know
8    the answer to this, but as I sit here today, I
9    do not recall.
10       Q   Okay.  Do you know what level of
11   magnification needs to be used so that nerves
12   can be viewed in a mesh explant?
13       A   Now I feel bad that I didn't pay more
14   attention in pathology.  I do not recall.
15       Q   Okay.  If we move to page 12 -- I'm
16   coming to a good stopping point soon, I'm just
17   trying to get there.  I'm not trying to starve
18   you or anything, believe me.
19           As we come to page 12 of your report,
20   you have opinion number 7, and in the second
21   paragraph of opinion 7 or paragraph 7, you say,
22   "As the parts of the mesh arms of Prolift kits
23   incorporate into tissue via a scarring process,
24   they pull asymmetrically on the center mesh

Page 188

1    portion, causing it to move and/or to change
2    shape in untended and unpredictable ways."
3        A   I don't see it.  Where are you reading?
4        Q   Oh, I apologize.  Page 12.
5        A   Where?
6        Q   I'll point you to it, if you don't
7    mind.
8        A   Thank you.
9        Q   And I read up to "unpredictable ways"?
10       A   Right here, okay.
11       Q   And a couple of lines below that it
12   says, The arms pulling on and deforming the
13   central mesh from their anchoring points in the
14   pelvic side wall muscles also causes pain during
15   daily activities, which necessarily exert forces
16   on the pelvic muscles and tissues."
17           And again, you hold this opinion both
18   as to the Prolift kit and the Prolift+M kit,
19   correct?
20       A   Correct.
21       Q   What body of information or source is
22   the basis for this opinion that the mesh arms
23   pull asymmetrically on -- what information or
24   source is the basis for this opinion in your

Page 189

1    report that the mesh arms pull asymmetrically on
2    the center mesh portion and deform the mesh?
3        A   A lot of this was -- is my personal
4    experience working with the Prolift and the
5    Prolift+M.
6        Q   What do you mean when you say working
7    with it because you've never implanted it,
8    correct?
9        A   No, I'm talking about explanting it.
10       Q   Okay.
11       A   But the same -- the same can apply to
12   the implant because if you apply the skills that
13   I know from implanting the IVS Tunneller and the
14   TOT sling, they're the same entry points as the
15   Prolift and the Prolift+M.  So in essence, I
16   have done exactly the same approaches and
17   techniques as it required for your implantation
18   of the Prolift and Prolift+M, but this is
19   specific to the experience I have with removing
20   this material as an explanting surgeon.
21           And everything that I've said in this
22   statement is things that are found not just by
23   me, but among all pelvic surgeons who are
24   explanting this mesh.  This is -- these are

Alan Garely, M.D., FACOG, FACS

Page 190

1    what -- what -- when people talk about standard
2    of care, this is what we would accept to be as
3    standard body of knowledge among the specialty.
4          Everybody that removes this material
5    and works with it in any way, whether it's an
6    implant or an explant, every single person
7    understands that this mesh -- it's because of
8    the arms that the mesh starts to behave in
9    asymmetrical fashions and starts to cause
10   problems with sexual penetration, attempts at
11   defecation, urination, and these are
12   specifically related to the contracture of the
13   mesh specifically related to the arms.
14         Q  Doctor, you make reference to what
15   every doctor knows; am I correct that you have
16   not done any kind of study or assessment of what
17   anyone other than you knows about the impact of
18   the mesh arms?  You have not done an analysis of
19   that, correct?
20         A  Perhaps I misspoke by saying "every."
21   I -- the better statement would have been the
22   majority.  And I can speak for the majority
23   because these are things that we talk about at
24   our conferences all the time.  I would -- it

Page 191

1    would be virtually impossible for anyone to say
2    that less than 50 percent of pelvic surgeons do
3    not find these problems in transvaginal mesh
4    with arms.
5          Q  You indicated before your experience.
6    Am I correct that the opinion that you
7    articulate here about the asymmetrically pulling
8    on the center portion of the mesh is based on
9    what you've seen in your practice?
10         A  It's what I've seen on explanted meshes
11   on a regular basis.
12         Q  And you've testified before that -- I
13   think it was 20 to 25 meshes that you have
14   explanted were Prolift or Prolift+M, correct?
15         A  I think I said between 10 and 20 for
16   sure.  More than 20, I couldn't say.
17         Q  Okay.  Thank you for correcting me.
18         And in those 10 to 20 Prolift or
19   Prolift+M explants, what did you see or observe
20   that leads you to conclude that the mesh arms
21   pull asymmetrically on the center mesh portion?
22         A  You asked me two parts to that
23   question.  What did I see or observe?  Is that
24   what you said?  I'm sorry.

Page 192

1          Q  I'll go with observe and that would
2    mean what you see or what you observe in any
3    other way.
4          A  So the first thing that you notice is
5    when you put a speculum into the vagina to
6    assess the anterior vaginal wall or the
7    posterior vaginal wall or the apex is symmetry.
8    And in a patient who has had these mesh problems
9    from transvaginal mesh with arms, the first
10   thing you notice is that there's asymmetry of
11   the walls, meaning one side may be higher than
12   the other, and that tells you right away that
13   one side is either contracted or not contracted.
14   One side is lower.
15         The distance from the introitus to the
16   apex is shortened, it's not what you would
17   expect it to be in a normal anatomic vagina.
18   And that applies to the anterior wall and the
19   posterior wall.  So just on observation and
20   palpation, you can assess what's happened with
21   this mesh before you even get into cutting or
22   removing it.
23         Then you can feel as the arms go
24   through these attachment points, whether it's

Page 193

1    the obturator or the -- where the anterior goes
2    through or the further ones in, which are near
3    the sacrospinous ligament, you can feel
4    contracture of the mesh arms and pulling.
5          When you're examining a patient while
6    they're awake, if you touch these points, these
7    are the points where the patient will experience
8    significant pain.  Now, you can touch anywhere
9    else in the vagina, if there's no tension on it,
10   they may not experience pain.
11         But if you're asking me based on what
12   observation or assessment, that's my observation
13   and assessment.  It doesn't look right.  It's
14   not right.  And then you know that when you go
15   in and you make a cut in the vagina and you
16   skeletonize and isolate the mesh, and you nip
17   and chip away at it, one muscle fiber, one
18   strand at a time until you skeletonize the mesh
19   out without injuring the bladder or the rectum.
20         And you finally cut it free from the
21   arms and the mesh pops out, when you remove it
22   and put it on a table and look at it, you know
23   that it's not symmetric, and you know that there
24   was contracture of the mesh, and you know the

Alan Garely, M.D., FACOG, FACS

Page 194

1    patient was in pain and suffering because of the
2    way that this stuff healed.
3        Q   What is it about putting it on a table
4    and looking at it that tells you that the mesh
5    was asymmetric and pulling?
6        A   Because the mesh went in as one flat
7    piece of material, and when you pull it out, it
8    doesn't look like that.  It's completely
9    distorted.
10       Q   Distorted in what way?
11       A   The mesh arms are tubularized, they
12   turn into small strings.  There are a huge
13   amount of tissue that's stuck to the underside
14   of this.  It doesn't -- it's -- it looks like a
15   crumpled up piece of paper.  It doesn't look
16   like a flat sheet.
17       Q   In the explants that you've done for
18   Prolift or Prolift+M, have you removed the mesh
19   arms?
20       A   I have not gone beyond the obturator or
21   the sacrospinous to remove the arms, but you can
22   pull on the arms and you can cut with a scissor
23   where you push tight against the muscle so that
24   portions of the arms do come out.

Page 195

1        I'm not saying that you're getting the
2    bulk of the arm, but you're getting the -- the
3    only way that you -- you can only pull the mesh
4    through the obturator to the body of the mesh.
5    You're only pulling the arms.  You're not
6    pulling the body of the material through the --
7    through the tunnels.
8        Q   So when you're assessing whether the
9    arms are roped or curled as you're mentioning in
10   your report, that's based also on those 10 to 20
11   explants?
12       A   Correct.
13       Q   And when you do that, that's after
14   you've pulled on the arms so that you can remove
15   it and observe it?
16       A   You're not pulling on the arms.  You're
17   skeletonizing the material to the side wall.
18   The only pulling you're doing is just gentle
19   traction so that you can put your scissor up
20   against the obturator and cut it.
21       If you leave it flaccid, there's a
22   chance you'll possibly draw down some of the
23   bladder or the rectum from below.  So you put it
24   on a little bit of a tension so that you can get

Page 196

1    a better bite next to the muscle.
2        Q   So your opinion about the roping and
3    curling of the arms is based on what you've
4    observed in the 10 to 20 Prolift explants that
5    you've done, correct?
6        A   Well, in addition -- for sure, based on
7    my assessments, but also you can look at number
8    22 in my reference sheet, that in 2006, Ethicon
9    conducted cadaver labs in which an Ethicon
10   consultant demonstrated that the Prolift mesh
11   arms deform upon implantation.  They crumple.
12       These labs also produced photographic
13   evidence of arm deformation with Prolift arms
14   that were later included in several of Ethicon's
15   internal documents, explaining this phenomena as
16   set forth below.
17       And then I have an explanted picture
18   and a photograph, and I have followed by
19   additional photographs of where the arms
20   tubularized and deform.  And I'm basing my
21   opinion based on my personal experience with
22   explanting this device, in addition to
23   supporting documents from Ethicon.  So I agree
24   with Ethicon.

Page 197

1        Q   Am I correct, Doctor, that in this
2    opinion, regarding the asymmetrical pulling on
3    the arms and the roping and curling opinion,
4    that in your report as you articulate these
5    opinions, you have not relied on peer-reviewed
6    medical literature to support these opinions?
7        We've just discussed the cadaver lab
8    that you just mentioned.  We've discussed your
9    experience with the 10 to 20 explants.  Am I
10   correct that in support of your roping and
11   curling opinion and your asymmetrical pulling
12   opinion, you are not relying in this report on
13   peer-reviewed medical literature, correct?
14       A   I don't -- I don't know what else to
15   call it when the -- when the arms rope and curl,
16   other than roping and curling.
17       MS. KABBASH:  Move to strike.
18   BY MS. KABBASH:
19       Q   You have not cited in your report on
20   these two points any peer-reviewed medical
21   literature that supports your opinions on
22   roping, curling and asymmetrical pulling,
23   correct?
24       A   I don't know that it's not included in

50 (Pages 194 to 197)

Alan Garely, M.D., FACOG, FACS

Page 198

1    any of the references that I've put forth into
2    my expert report, but off the top of my head, I
3    can't recall a specific paper where they noted
4    roping and curling.
5        Q  Okay.  Why don't we break for lunch.
6        (Whereupon, a luncheon recess is
7    taken.)
8        MR. MATTHEWS:  He'll read and sign.
9    BY MS. KABBASH:
10       Q  Dr. Garely, we took a break for lunch.
11   Are you ready to proceed?
12       A  Yes, ma'am.
13       Q  Dr. Garely, will you be offering an
14   opinion at trial to a reasonable degree of
15   medical certainty that polypropylene mesh
16   degrades after implantation in the body?
17       A  Only what I've referenced in my expert
18   report.
19       Q  You've referenced in your expert report
20   -- you have a paragraph on page 23 that there's
21   a statement in the IFU, "The material in
22   Gynemesh is not absorbed nor is it subject to
23   degradation or weakening by the action of tissue
24   enzymes is contradicted by Ethicon internal

Page 199

1    documents and reports which clearly show that
2    the material was subject to degradation inside
3    the body."
4        That's what your statement in your
5    report is, correct?
6        A  Correct.
7        Q  So is your opinion that the line in the
8    IFU is contradicted by Ethicon's internal
9    documents?
10       A  I'm not saying that it's contradicted.
11   I'm just saying that it's not substantiated by
12   the documents that I reviewed based on the
13   internal -- the internal documents from the
14   company.
15       Q  And what documents are those that you
16   reviewed?
17       A  It's reference 39.
18       Q  And in reference 39, you reference a
19   series of internal Ethicon minutes and
20   PowerPoint documents and internal memos,
21   correct?
22       A  Correct.
23       Q  And that is the basis for your opinion
24   that you -- we just discussed about the line in

Page 200

1    the IFU about degradation, correct?
2        A  That's my basis of opinion.
3        Q  Okay.  There -- you have not cited in
4    footnote 39 any medical literature,
5    peer-reviewed medical literature to support your
6    opinion, correct?
7        A  Correct.
8        Q  I have to ask the question again, sir.
9    Am I correct that at trial you will not be
10   opining to a reasonable degree of medical
11   certainty that polypropylene mesh degrades
12   within the body?  Let me strike that.
13       Is it your opinion to a reasonable
14   degree of medical certainty that polypropylene
15   mesh degrades within the body?  Do you believe
16   that?
17       A  I believe it has possibly -- I don't
18   think the degradation related to the mesh is the
19   major part of why this mesh is problematic.
20       Q  Okay.  I appreciate that, but that
21   wasn't my question.  My question is, do you have
22   an opinion to a reasonable degree of medical
23   certainty that polypropylene mesh degrades
24   within the body?  That is not one of your

Page 201

1    opinions, is it, Doctor?
2        A  No, it's not.
3        Q  Certainly if you believe that, you
4    wouldn't have implanted thousands of retropubic
5    slings into women, correct?
6        A  Correct.
7        Q  Okay.  So your sole opinion with
8    respect to degradation is that the statement in
9    the IFU that we just discussed is not supported
10   by the internal company documents that you cite
11   in footnote 39, correct?
12       A  I'm sorry, repeat that question.
13       MS. KABBASH:  Sure.  Can I ask you,
14   Dana, to repeat it?
15       (Whereupon, the question is read back
16   by the reporter.)
17       A  Correct.
18       Q  Doctor, on page 29 of your report, and
19   you're welcome to refer to it, you opine that
20   Ethicon had at its disposal a number of safer
21   feasible alternative designs that could have
22   been utilized instead of the Prolift kits,
23   correct?
24       A  That's correct.

51 (Pages 198 to 201)

Golkow Technologies, Inc. - 1.877.370.DEPS

Alan Garely, M.D., FACOG, FACS

Page 202

1      Q  Two of the things that you mentioned
2   are elimination of the mesh arms and elimination
3   of the armed blind trocar implantation design,
4   correct?
5      A  That's correct.
6      Q  Okay.  First on the issue of blind
7   trocar passage, you have opined in your report
8   that one of the features of the Prolift that you
9   find to be unreasonably dangerous is the blind
10  trocar passage, correct?
11     A  That is correct.
12     Q  Isn't it correct that the TVT
13  Retropubic involves a blind trocar passage?
14     A  It's specific to the anatomy in the
15  place of where the trocars are passed.  That's
16  what makes the difference.
17     Q  What do you mean?
18     A  What I mean is that if you pass blind
19  trocars in TVT Retropubic, the -- there's a
20  place we call the safe zone.  The safe zone of
21  the tip of those trocars has a lot of latitude.
22  It can deviate 2 or 3 centimeters to the lateral
23  side before you hit a vital structure that will
24  injure the patient.

Page 203

1      In the passage of the TOT, and I never
2   found this to be problematic in terms of -- in
3   terms of injuring a structure at the time of
4   placement, but I found it to be a problem later
5   in TOT was when -- was when the mesh contracted
6   and caused the problem, which is why I stopped
7   using it.
8      But specifically in the passage of the
9   needles that go back towards the sacrospinous
10  ligament or towards the arcus tendineus near the
11  ischial spine, your safe zone is much smaller
12  and the risk of injuring a vital structure is
13  much higher.
14     And that structure as it passes lateral
15  to the rectum can be a rectal perforation, it
16  can be injuring the plexus vessels that run in
17  the lateral space next to the rectum.  It can be
18  either a pudendal nerve or artery that run just
19  inferior to the pudendal -- to the sacrospinous
20  ligament or the coxalgias muscle.  It can be
21  injuring other vessels that are in that area or
22  other small nerves like the splanchnic nerves.
23     So I find, again, it's like comparing
24  apples to oranges with the blind passage on the

Page 204

1   TVT compared to the passage of these other
2   needles and I know that because I've passed
3   those needles on live human beings.
4      Q  So am I correct that your opinion about
5   the blind passage, your concern is not that the
6   passage is blind, your concern is about the path
7   that the trocar is taking; is that correct?
8      A  Correct.  I mean, I pass blind -- a
9   trocar is when I implant a nerve stimulator on
10  an InterStim, on the back, that I tunnel
11  distances of sometimes 15 or 20 centimeters
12  blindly, but under the skin on your back, the
13  only thing that there is is just fat and some
14  underlying muscle.  There's no major vessels or
15  nerves back there.  The same thing applies to
16  the TVT.
17     Q  Is it correct that every sling that
18  you've ever placed has involved a blind trocar
19  passage?
20     A  No, that's not true.
21     Q  Which ones don't?
22     A  If I do a fascial -- a fascial sling or
23  I do a muscle sling, oftentimes I'll open those
24  patients abdominally and then I'll make a tunnel

Page 205

1   lateral to the urethra.
2      Q  Let me be more precise in my question.
3   Am I correct that every synthetic mesh sling
4   that you've implanted has involved a blind
5   trocar passage?
6      A  I believe so.
7      Q  And of those, I think about -- you've
8   told me about 300 have been from an obturator
9   approach, correct?
10     A  Correct.
11     Q  And the obturator approach takes the
12  obturator sling through the same area that the
13  Prolift anterior mesh arms go through, correct?
14     A  That's correct.
15     Q  In 2010, Ethicon came out with a pelvic
16  mesh kit, prolapse repair kit called Prosima,
17  are you familiar with Prosima?
18     A  Only superficially.
19     Q  When you say "only superficially," what
20  do you mean?
21     A  I didn't use it and I don't recall
22  spending a lot of time looking into the
23  literature regarding Prosima.
24     Q  So do you understand that Prosima does

52 (Pages 202 to 205)

Alan Garely, M.D., FACOG, FACS

Page 206

1   not have mesh arms and does not involve the use
2   of trocars?
3       A   Yes.
4       Q   But you did not ever try Prosima,
5   correct?
6       A   I did not.
7       Q   And you have not reviewed in
8   preparation -- strike that.
9           You have not reviewed the medical
10  literature addressing Prosima in preparing your
11  opinions in your report, correct?
12      A   That's correct.
13      Q   You also mention polyvinylidene
14  fluoride, and then you have in parentheses,
15  PVDF/PRONOVA. What is PVDF and what is PRONOVA,
16  are they the same thing or different things?
17      A   PVDF is the basis of the PRONOVA mesh.
18      Q   Is PRONOVA a mesh?
19      A   It's a mesh.
20      Q   Where is PRONOVA -- is PRONOVA
21  available --
22      A   I don't believe it is available. It's
23  available to -- internally to the company that
24  makes it, which is Johnson & Johnson, but I

Page 207

1   don't believe at this time that it's
2   commercially available.
3       Q   Am I correct that you are not aware --
4   strike that.
5           Am I correct that FDA has never cleared
6   or approved PRONOVA for use in the United States
7   to treat pelvic organ prolapse; is that correct?
8       A   I don't know for a fact, but I believe
9   it is correct.
10      Q   Am I correct that FDA has never cleared
11  PVDF mesh for use in the United States to treat
12  prolapse?
13      A   I don't believe so.
14      Q   Have you ever used PVDF or PRONOVA
15  mesh?
16      A   I have not.
17      Q   Have you ever -- to your knowledge, are
18  there any studies published in the medical
19  literature about the use of PVDF or PRONOVA for
20  pelvic organ prolapse repair?
21      A   I think the only literature I reviewed
22  regarding PVDF was based on internal
23  documentation from Johnson & Johnson.
24      Q   Am I correct, Dr. Garely, that your

Page 208

1   opinion proposing PVDF/PRONOVA as a proposed
2   alternative design is based solely on company
3   documents that you have reviewed in your role as
4   an expert?
5       A   Yes.
6       Q   So if there is -- so fair to say you
7   have not reviewed any medical literature on the
8   application of PVDF in a hernia application,
9   correct?
10      A   That was not something that I was
11  looking at, no.
12      Q   And am I correct that you have not
13  reviewed any medical literature assessing PVDF
14  or PRONOVA in an indication -- or let me start
15  that over again.
16          You have not reviewed any medical
17  literature assessing PVDF or PRONOVA to treat
18  pelvic organ prolapse, correct?
19      A   I only mentioned it because the
20  internal documentation showed that -- that
21  Ethicon's own people were considering this as an
22  alternative because they thought it was a better
23  material. That's the only reason that I
24  included it in here, was I followed the guide

Page 209

1   from Ethicon.
2       Q   But you are not aware of any clinical
3   studies that actually assess whether PVDF or
4   PRONOVA would be safe and effective when used to
5   treat prolapse, correct?
6       A   Correct.
7       Q   You're not aware of any such data,
8   right?
9       A   Correct.
10      Q   And am I correct that your opinion on
11  PVDF or PRONOVA as an alternative design is
12  based on your inferences of what Ethicon knew
13  about PVDF?
14      A   It wasn't so much of an inference as it
15  was just restating what was stated in the
16  internal documentation, which was they, the
17  people in the documents that were provided to
18  me, had opined that they thought PVDF would be a
19  better alternative than polypropylene.
20      Q   Isn't it correct that the people at
21  Ethicon who were discussing that were
22  considering PVDF as an alternative as they
23  consider lots of materials as alternatives --
24  well, strike that.            Am I correct

53 (Pages 206 to 209)

Alan Garely, M.D., FACOG, FACS

Page 210

1  that you have not seen anything in the company
2  documentation where anyone made a conclusion
3  based on medical evidence that PVDF was safer
4  than Gynemesh PS?
5      A  I don't know if it's a conclusion if
6  someone says maybe we should use PVDF because it
7  might be better than Prolene.  I don't know if
8  that's a conclusion.
9      Q  When someone says maybe we should use
10 PVDF, that's an indication that they are
11 exploring other options, correct?
12     A  Correct, because they wanted to explore
13 other options because they knew they had a
14 problem with their product as it was.
15     Q  Doctor, you've done a lot of work with
16 Ethicon and other companies as a consultant,
17 correct?
18     A  Correct.
19     Q  And you know very well that part of the
20 business of being a medical device manufacturer
21 is that you are always looking for new
22 iterations and new innovations to the products
23 that you already offer, correct?
24     A  Again, in a vacuum, you can't just say

Page 211

1  that sentence without taking into account all
2  the other things surrounding your assumption.
3  Yes, you want to always come up with new and
4  more innovative products.
5      Q  Just because a company is considering a
6  particular material as a basis for a new product
7  does not mean that it has concluded that prior
8  products are defective or problematic, correct?
9      A  In this particular case, they were
10 considering alternatives because they had a
11 product that was problematic.
12     Q  And that's based on your opinion,
13 correct, not what -- not any position that
14 Ethicon is taking, correct?
15     A  No, that was based on the opinion of
16 Ethicon.  They themselves were revealing in
17 their own internal documentation that they knew
18 they had a problem.  They wanted to change the
19 IFU, but there was a printer -- the product had
20 already gone to the printer and they didn't want
21 to make a change in the printing.
22         There were many instances when Ethicon
23 knew that they had a product that was plagued
24 with problems, that were going to hurt people,

Page 212

1  and they chose to continue promoting their
2  product.  And by the way, we're now going to
3  look at some alternatives.
4          MS. KABBASH:  Move to strike everything
5  after "Ethicon."
6  BY MS. KABBASH:
7      Q  Doctor, am I correct that your opinion
8  proposing PVDF and PRONOVA as an alternative
9  safer design is not based on any published or
10 unpublished medical literature that studies the
11 use of this mesh to treat prolapse in women,
12 correct?
13     A  Only based on what I saw from Ethicon.
14     Q  Only based on what you read in the
15 company documents, correct?
16     A  Correct.
17     Q  And what you interpreted as what
18 Ethicon believed or knew about PVDF at that
19 time, correct?
20     A  More or less, correct.
21     Q  Doctor, you've issued several opinions
22 relating to the warnings that Ethicon has issued
23 in relation to Prolift and Prolift+M, correct?
24     A  I have.

Page 213

1      Q  Your opinions obviously are that the
2  warnings accompanying Prolift and Prolift+M are
3  inadequate, correct?
4      A  They're incomplete.
5      Q  Okay.  What do you mean by that?
6      A  Well, you'd have to show me where the
7  list is because off the top of the head, I
8  don't -- I don't know what's missing and what's
9  not.
10     Q  What generally do you mean by
11 "incomplete," are you saying you're not taking
12 issue what's in the IFUs, but you believe that
13 more should be in there; is that what your
14 opinion is?
15     A  My opinion is that -- that there's a
16 little bit of deception in the IFU because they
17 don't fully disclose what the severity of the
18 complications can be.  There's a big difference
19 between saying a patient can have pelvic pain,
20 as opposed to this person is going to have
21 lifelong pelvic pain even if this material is
22 explanted.            And I don't think
23 that the IFU gave fair warning to surgeons to
24 know that it was going to be extraordinarily

54 (Pages 210 to 213)

Alan Garely, M.D., FACOG, FACS

Page 214

1    difficult to explant this material.  Almost to
2    the point where the worldwide medical director
3    David Robinson states himself that the
4    explanting surgeon, the person who takes it out,
5    may need even more skill than the person who
6    puts it in because the -- and I have a copy of
7    the internal document with me, if you would like
8    to see it, where Dr. Robinson makes the
9    inference that the only people who should be
10   explanting the material are people who are
11   putting it in because the reputation of the
12   product is getting destroyed by all the doctors
13   who are taking it out being better trained than
14   the doctors who were putting it in.
15       Q   Doctor, you opine in your report that a
16   physician must be warned not only of the
17   potential adverse events, but also of frequency,
18   severity, duration and potential permanence,
19   correct?
20       A   I'm sorry, can you show me where you're
21   reading?
22       Q   Sure.  It's on page 22.
23       A   Where?
24       Q   Towards the top of the first full

Page 215

1    paragraph.
2        A   Okay.
3        Q   Do you see that?
4        A   Yes.  So what part did you read?
5        Q   I read basically the first sentence.
6    "The physician must be warned not only of the
7    potential adverse events that may be associated
8    with the product, but also of the frequency,
9    severity, duration and potential permanence of
10   adverse events."
11       A   Sorry.  I don't see it.  Oh, it's the
12   second paragraph.
13       Q   Yes, first complete paragraph, sorry.
14       A   So, "In making an informed decision of
15   whether or not to use a medical implant, the
16   physician must be warned not only of the
17   potential adverse events that may be associated
18   with the product, but also the frequency,
19   severity, duration and potential permanence of
20   adverse events."  I believe that to be true.
21       Q   Okay.  What is your belief based on?
22   Is that your personal opinion about what should
23   go into a warning?
24       A   Yes, I think it is.

Page 216

1        Q   Is there any warnings or labeling
2    standard outside of your personal opinion that
3    you looked to for the opinion that a warning
4    needs to include frequency, severity, duration
5    and potential permanence?
6        A   Again, it applies specifically to these
7    two products.  If it's -- if there are products
8    that don't have permanence and significant
9    complications that result in the type of
10   severity and duration that these particular
11   products have, then I don't think it needs to be
12   stated because it wouldn't be true.
13           But if you knew that it were true, then
14   you should state it.  And they did know that it
15   were true.
16       Q   My question is, are you -- is there any
17   objective standard or regulatory standard that
18   you are pointing to that imposes upon Ethicon a
19   duty to include frequency, severity, duration
20   and permanence information in its instructions
21   for use?
22       A   I think the only standard would be
23   their own credo, their own Ethicon credo of
24   doing no harm to patients, following your own

Page 217

1    honor code, your own belief system.
2        Q   The J&J credo is not a regulatory
3    standard, correct?
4        A   They -- it's their credo.  If they
5    state it, then they should live to the -- to
6    their credo, then why state it?
7        Q   I appreciate that.  But my question is,
8    can you point to any Federal regulation,
9    guidance or other type of objective standard
10   that requires Ethicon's IFU to include
11   frequency, severity, duration and permanence
12   information?  Can you point to such a standard?
13       A   As I sit here right now, I cannot point
14   to it.
15       Q   Would you agree with me that the 2009
16   version of the Prolift IFU did include frequency
17   information because it reported the results of
18   the -- one-year results of the French and U.S.
19   TVM studies?
20       A   I would have to see the IFU because I
21   don't recall the different iterations of it, but
22   if you're telling me that's what it said, I will
23   believe you and I would have no reason to doubt
24   that to be true.

55 (Pages 214 to 217)

Alan Garely, M.D., FACOG, FACS

Page 218

1    Q  If the 2009 version of the Prolift IFU
2   does contain the results of the TVM French and
3   U.S. prospective studies and reports the success
4   rates and the rates of complications on --
5   complications such as mesh exposure and
6   contraction and other complications, that would
7   speak to -- or that would address your criticism
8   here regarding frequency, severity, duration,
9   correct?
10       MR. MATTHEWS:  Object to the form of
11   the question.
12   BY MS. KABBASH:
13       Q  You can answer.
14       A  Well, it -- basically, it's like asking
15   for a do-over.  They knew when they released the
16   product, there were problems with it.  They went
17   four years with an IFU that didn't state the
18   problems, and then they get a do-over and then
19   they want to put it in and somehow this is going
20   to make the past four years of ignoring what was
21   going on with the product okay.
22       So do I think that's a good thing that
23   it's in the new IFU?  Of course, but I think
24   they were irresponsible by not doing enough

Page 219

1   background work on the product before they
2   launched it, and then allowing the IFU not to
3   reflect the severity of the problems that were
4   occurring.
5       (Exhibit Garely Garely 16, Document
6   entitled Gynecare Prolift Surgeon's Resource
7   Monograph, marked for identification.)
8   BY MS. KABBASH:
9       Q  I'm going to show you, Doctor, what's
10   been marked as Exhibit 16.  Do you recognize
11   this document?
12       A  I do.
13       Q  Do you recognize this to be the
14   Surgeon's Resource Monograph that Ethicon put
15   out for the Prolift product?
16       A  I do.
17       Q  And when was the last time you reviewed
18   this document?
19       A  Maybe less than two or three days ago.
20       Q  Okay.  Did you review this document in
21   formulating your opinions in your reports?
22       A  I did.
23       Q  Do you understand that Ethicon put this
24   monograph out in 2007 as a training material for

Page 220

1   doctors?
2       A  I was -- I was unfamiliar with the time
3   that it was released, but I know that was the
4   purpose for it.
5       Q  And this monograph in terms of its --
6   just the type of document that it is, is similar
7   to the monographs that you participated in for
8   TVT that we looked at earlier today, correct?
9       A  I think it served the same purpose.
10       Q  Okay.  By the way, this monograph is
11   not cited in your expert report.  Is there a
12   particular reason why that's the case?
13       A  Well, you asked me if I used it to help
14   formulate my opinions.
15       Q  Yeah, I know this is a different
16   question.
17       A  Okay.
18       Q  My question is, I did not see a
19   reference to the monograph in your expert report
20   and I was wondering if there was a particular
21   reason for that?
22       A  Well, you know, when we write papers of
23   any sort, academic papers, and you want to use
24   footnotes, I usually can find a footnote for

Page 221

1   every sentence in the entire thing.  But I chose
2   to sort of not clog up the entire paper, my
3   expert report, with a thousand references.  I
4   tried to use references that I thought were more
5   applicable to the thought process of each
6   section in general.     So I don't
7   know that there was anything specific in this
8   report that would have helped me support my
9   position.
10       Q  Am I correct that you didn't have --
11   play any role in the generation of this
12   document, correct?
13       A  No.
14       Q  Okay.  You were not one of the surgeons
15   that was consulted or attended the user forums
16   from which this information came about, right?
17       A  If I was, I have no memory of it.
18       Q  Okay.  If you look to your report --
19   Doctor, would you implant PVDF transvaginally in
20   one of your patients?
21       A  I would not.
22       Q  You would not?
23       A  Not based on not knowing clinical data
24   on the product, I would not, or unless I

Alan Garely, M.D., FACOG, FACS

Page 222

1    participated in a study for the product.
2       Q   That would be -- clinical data on that
3    product would be the prerequisite for you to
4    consider implanting PVDF in one of your
5    patients, correct?
6       A   Clinical data in the vagina, correct.
7       Q   Doctor, have you ever seen an IFU for a
8    transvaginal mesh implant to treat POP that you
9    concluded was adequate?
10      A   I don't know.  I never looked at an IFU
11   with that eye.  I would have to have all the
12   IFUs in front of me, read through them and make
13   that assessment.  I can't do that right now.
14      Q   You've reviewed Bard IFUs?
15      A   I have.
16      Q   Have you reviewed IFUs of any other
17   manufacturers?
18      A   I reviewed -- for pelvic organ
19   prolapse?
20      Q   Yes.
21      A   Or for incontinence?
22      Q   For pelvic organ prolapse.
23      A   For pelvic organ prolapse, I've looked
24   at the Apogee and the Perigee IFUs.  I have not

Page 223

1    looked at Elevate.  What am I missing?  I
2    have --
3       Q   Uphold?
4       A   I have looked at the IFUs for the
5    Avaulta products.  And Uphold, I haven't looked
6    at that one.
7       Q   Of the ones that you have reviewed,
8    have you ever found any of those IFUs to be
9    appropriate and adequate in their warnings?
10      A   Well, I know that the Avaulta products,
11   I did not find the IFUs to be adequate or
12   appropriate.  And I don't recall, it's been a
13   long time since I looked at the Apogee, Perigee
14   IFUs, I would have to see them again.
15      Q   So you don't recall what your
16   conclusion was about those as you sit here right
17   now?
18      A   Correct.
19      Q   If you look at page 24 of your report,
20   paragraph 4.  In that paragraph, you say at the
21   bottom, "Ethicon never provided any such warning
22   or information to doctors" -- well, in fairness,
23   let me start at the beginning.  There you
24   mention that, "One Prolift clinical study showed

Page 224

1    that Prolift kits are not well suited for
2    patients suffering from stage 1 or stage 2
3    prolapse and that the kits are better suited for
4    those with more severe prolapse"; that's what
5    you say, correct?
6       A   That is correct.
7       Q   And then the last line of that
8    paragraph says, "Ethicon never provided any such
9    warning or information to doctors nor indicated
10   in the labeling any limitation on the use of the
11   Prolift kits relative to the grade or severity
12   of prolapse."  That's your opinion there,
13   correct?
14      A   That is my opinion.
15      Q   If you look at the monograph for a
16   second and look to the page on patient
17   selection, which is on page 3 of the monograph.
18   Do you have page 3, Doctor?
19      A   I do.
20      Q   If you look at the first paragraph
21   under patient selection.
22      A   I see it.
23      Q   It says -- the second line says, "Only
24   the treating surgeon can determine where it is

Page 225

1    best used.  Although in patients with previous
2    failure, patients with risk factors for failure
3    and/or the most severe degree of prolapse, it
4    has been very successfully employed and has the
5    clearest indications."  Do you see that?
6       A   I do.
7       Q   Do you believe that that language
8    informs doctors that the Prolift is most clearly
9    indicated for the most severe degree of
10   prolapse?
11      A   I do not.
12      Q   Why is that?
13      A   Because that paragraph doesn't support
14   that statement, number one.  Number two, if you
15   look at the internal documents and the poster --
16   Prolift poster presentation made in 2005, which
17   I quote as a source in my expert report, from
18   9/8/05 by Michael Cosson, quote, "We can
19   recommend the use of mesh for Prolift surgery,
20   especially patients with big prolapses and
21   recurrent prolapses.  He said noting that
22   women" -- "noting that women with grade 4
23   prolapse and greater are better suited for mesh
24   surgery than patients with less severe disease."

Golkow Technologies, Inc. - 1.877.370.DEPS

Alan Garely, M.D., FACOG, FACS

Page 226

1      Q   And you don't -- based on what you just
2   read, you don't believe that this indication
3   that the most severe degree of -- strike that.
4          You don't believe that this language in
5   the Prolift monograph that says, "The most
6   severe degree of prolapse is where it has its
7   clearest indications," that is not speaking to
8   the same point that is raised by Dr. Cosson?
9      A   It just says "very successfully
10  employed."
11     Q   "And has the clearest indications,"
12  correct?
13     A   It says that, but it goes on to say
14  it's useful in any patient that a surgeon feels
15  would require synthetic graft augmentation.  But
16  that's -- first of all, this is -- this is two
17  years after they knew that it wasn't really
18  great in patients with minimal prolapse.
19         But they still waited two years to put
20  this out.  And so then now they're saying that
21  it's successfully employed and has the clearest
22  indications in patients with a constellation of
23  things, previous failure, patients with risk
24  factors for failure and/or the most severe

Page 227

1   degree of prolapse.  So --
2      Q   Doctor, I'm sorry.  I didn't mean to
3   cut you off.
4      A   I mean, I don't know -- I don't really
5   know -- maybe I'm missing the fine point of what
6   the question is asking me.
7      Q   Doctor, am I correct that it's your
8   opinion that Prolift should not even be used in
9   women with grade 3 and 4 prolapse, correct?
10     A   I don't understand the question.  Can
11  you please clarify it?  Do you mean presently
12  today or back then?
13     Q   Well, at any point in time, I mean, if
14  you don't feel the product is safe today, you
15  didn't think it was safe then, right?
16     A   Well, correct.
17     Q   So whether or not Ethicon is warning
18  about what stages of prolapse are appropriate
19  for Prolift, that really has no impact on your
20  opinion because your opinion is that even grade
21  3 and grade 4 -- even women who have grade 3 and
22  grade 4 prolapse should not have a Prolift
23  anyway, right?
24     A   I believe that to be true.

Page 228

1      Q   Doctor, what are your opinions -- what
2   are your -- strike that.
3          What are your opinions about the
4   Ethicon and Prolift warnings based on?  What
5   sources of information is that coming from, your
6   opinions about the warnings?
7      A   Which warnings?
8      Q   You have several numbered warnings in
9   your -- in your report, saying that Ethicon did
10  not properly warn of various things, and I'm
11  asking what is that coming from?  Is that based
12  on your personal opinion, based on your
13  practice?  What is that based on?
14     A   It's based on my personal opinion, my
15  practice and what I've read in the literature.
16     Q   When you say "the literature," what are
17  you referring to?
18     A   I'm talking about papers that have been
19  written about Prolift and Prolift+M with respect
20  to their complications.
21     Q   Is there -- can you point me to any
22  peer-reviewed medical literature that concluded
23  that dyspareunia is chronic and cannot be
24  treated?

Page 229

1      A   Well, it's always -- it's always a
2   tough question to ask a physician, is this going
3   to be a permanent condition?  Well, it's only
4   permanent until you cure it.  It's not permanent
5   if you cure it.  As long as it's ongoing, it's
6   permanent unless -- as long -- if the patient
7   died today and the patient had the problem, that
8   was considered permanent.
9          So if you're asking me on a followup
10  study of a year or two years, can they make an
11  assessment about permanency, it can be implied
12  if patients don't get better that are in the
13  study.     I can speak for myself as a
14  doctor who takes care of many of these patients
15  that despite multiple removals of the mesh,
16  these patients have chronic and ongoing
17  dyspareunia and chronic pelvic pain that, in my
18  opinion, barring some miracle, they're going to
19  have permanency of their complaints.
20     Q   Am I correct that your opinion that
21  patients' injuries, including dyspareunia and
22  pelvic pain, is permanent, because that's one of
23  your opinions, that that is based on what you've
24  seen in your practice and not based on any

58 (Pages 226 to 229)

Alan Garely, M.D., FACOG, FACS

Page 230

1  particular piece of medical literature that
2  you've relied upon?
3      A  Well, every paper that I've cited in my
4  expert report that has followed patients out, I
5  don't know that any of those patients that
6  have -- any of those papers that have followed
7  patients for more than two years have ever said,
8  and by the way, we had all the patients in this
9  study that had pelvic pain and dyspareunia, 100
10  percent of them have had resolution of their
11  symptoms, given if the paper were powered
12  appropriately.            Obviously if
13  the paper had a small number of patients,
14  there's a statistical chance that some of them
15  in that paper may experience resolution.  But
16  I'm saying that among -- the discussions that I
17  have among my peers at professional society
18  meetings and among patients that I see in my
19  practice and patients that are seen in other
20  practices that specialize in the repair of
21  transvaginal mesh complications, I can say with
22  a hundred percent certainty that there are some
23  patients in this -- in my practice that will go
24  on to have lifelong dyspareunia and pelvic pain

Page 231

1  because they've already seen four or five other
2  doctors and have had four or five operations to
3  try to relieve the pain and nothing seems to
4  work.
5          I'm not saying I would give up on them
6  and say, okay, you now have permanent pelvic
7  pain, you have to live with it for the rest of
8  your life and we're just going to accept that.
9  I refuse to do that.
10         I am always looking for something to
11  help and alleviate the chronicity of pain that
12  my patients experience.  I -- I -- that's one of
13  my things that is sort of a hallmark of our
14  practice, that we try not to give up on anybody.
15      Q  You are not relying on any
16  peer-reviewed medical literature or any medical
17  literature to support your conclusion that
18  pelvic pain and dyspareunia following Prolift is
19  permanent and not treatable, correct?
20      A  Anything that's published in the
21  literature regarding patients is just someone
22  else's experience with their patients.  That's
23  all they're reporting.  They're reporting in
24  their experience, this is how our patients did.

Page 232

1          I can tell you that without publishing
2  my experience on these patients, that I have
3  patients who have permanent disability up until
4  this point that I don't know if it will get
5  better.  So if you're asking me is there a
6  publication that says that these patients are
7  going to get better?
8          No, there's no paper that's going to
9  say that these patients are going to get better,
10  just like there's no paper that has said we can
11  predict with 100 percent certainty that every
12  one of these patients is going to have lifelong
13  pain.  I don't really -- I'm telling you that
14  there are patients that are going to be plagued
15  with pain for the rest of their lives, barring a
16  miracle.  That's the best I can do.
17      Q  And your opinion about that is based on
18  what you've seen in your patients, correct?
19      A  In a very large -- one of the largest
20  pelvic surgery practices in the country.
21      Q  Your practice, correct?
22      A  My practice.
23      Q  I just realized, I never marked your
24  reliance lists.  Let's do that.

Page 233

1          Doctor, before we do that, would you
2  agree with me that the medical literature shows
3  that the dyspareunia rates for native tissue
4  repairs and for transvaginal mesh repairs are
5  equivalent?
6      A  I do not agree with that.
7      Q  You don't believe that that's what the
8  medical literature shows?
9      A  I think that -- that there are -- that
10  dyspareunia rates, the de novo dyspareunia rates
11  are lower in native tissue repairs than in mesh
12  augmentations.
13      Q  Did you tell me earlier that as of
14  today, you had not yet reviewed the 2016
15  Maher/Cochrane review that came out earlier this
16  year?
17      A  I have not reviewed it.
18      Q  Do you know Christopher Maher?
19      A  Not personally, no.
20      Q  You've read his other publications?
21      A  Well, I don't know if I've read every
22  of his publications, but I've read multiple
23  publications.
24          (Exhibit Garely Garely 17, Document

59 (Pages 230 to 233)

Alan Garely, M.D., FACOG, FACS

Page 234

1    entitled Pelvic Organ Prolapse and Sexual
2    Function, marked for identification.)
3        Q  I'm handing you what's been marked as
4    Exhibit 17.  This article, Doctor, is published
5    in the International Urogynecology Journal,
6    correct?
7        A  Correct.
8        Q  Have you acted as a reviewer for that
9    journal?
10       A  I have.
11       Q  And it's a journal that's very well
12   respected in your field, correct?
13       A  I believe so, yes.
14       Q  This article is entitled Pelvic Organ
15   Prolapse and Sexual Function, and it's
16   co-authored by Viviane Dietz and Christopher
17   Maher, correct?
18       A  Correct.
19       Q  Did you review this article in
20   preparing your report or in for preparing for
21   this deposition?
22       A  I remember looking at or reading this
23   paper when it was first published in the
24   journal.  I don't recall if I specifically read

Page 235

1    it again as part of the formulation of my
2    opinion.
3        Q  And in this study, Drs. Dietz and Maher
4    reviewed several studies that have been done to
5    compare or to address pelvic organ prolapse and
6    sexual function -- strike that.  Let me start
7    again.
8            In this article, Drs. Dietz and Maher
9    have discussed that they have reviewed several
10   studies informing their conclusions in this
11   article, correct?
12       A  Correct.
13       Q  And they say in the abstract, about
14   halfway down, "The highest level of evidence was
15   utilized by the committee to make evidence-based
16   recommendations based upon the Oxford grading
17   system."
18           The Oxford grading system, that's what
19   we discussed earlier, correct?
20       A  Correct.
21       Q  If you look at the results, the results
22   said, "With regard to anterior compartment, the
23   use of mesh is associated with neither a
24   worsening in sexual function nor an increase in

Page 236

1    de novo dyspareunia compared with traditional
2    anterior colporrhaphy."  Do you see that?
3        A  I do.
4        Q  And then below that in the conclusion,
5    it says, "Sexual function" -- in the second
6    sentence, it says, "Sexual function and
7    dyspareunia rates are similar after anterior
8    polypropylene mesh and anterior colporrhaphy."
9    Do you see that?
10       A  Show me that part again.
11       Q  Sure.  In conclusion.
12       A  Oh, okay, fine.
13       Q  If you look on the next page, there's a
14   table one.
15       A  Okay.
16       Q  And that table 1 reflects the
17   metaanalysis of sexual function data from RCTs
18   comparing transvaginal mesh with native tissue
19   repairs, correct, that's what table 1 is?
20       A  Yeah, actually, I reviewed this paper
21   in the last week.
22       Q  Oh, you did?
23       A  I did.  Now that I'm looking at the
24   table, I remember that within the last seven

Page 237

1    days, I reviewed this paper.
2        Q  Okay.  And in the -- in the column for
3    De novo dyspareunia, the authors have looked at
4    several RCTs, correct, Altman, Vollebregt, Cary
5    and several others, right?
6        A  Uh-huh.
7        Q  And they conclude or they find de novo
8    dyspareunia rates for vaginal mesh at 10.6
9    percent and native tissue -- excuse me, and de
10   novo dyspareunia rates of 11.8 percent for
11   native tissue, correct?
12       A  Correct.
13       Q  And you would agree that those rates
14   that the authors of this study found in this
15   metaanalysis are pretty equivalent?
16       A  All I'm going to agree with is what is
17   presented in this paper, but not their
18   conclusions.
19       Q  Okay.  So you don't agree -- so you
20   acknowledge that what rates are in table 1, they
21   are what they are?
22       A  They are what they are.
23       Q  But you don't agree -- despite those
24   rates in this metaanalysis that these authors

60 (Pages 234 to 237)

Alan Garely, M.D., FACOG, FACS

Page 238

1  have found, you don't agree with the conclusion
2  that sexual function and dyspareunia rates are
3  similar after anterior polypropylene mesh and
4  anterior colporrhaphy, correct, you don't agree
5  with that conclusion?
6      A  I'm going to agree with the authors,
7  which -- which is their conclusion, which is
8  there is a paucity of data on the impact of
9  prolapse surgery on sexual function. That says
10  it right there. There's no good data. "Sexual
11  function and dyspareunia rates are similar after
12  anterior polypropylene mesh and anterior
13  colporrhaphy grade B. Grade B recommendation
14  depends on consistent level 2 and/or 3 studies
15  or 'majority evidence from randomized control
16  trials.'"
17      Q  I apologize, where are you reading
18  from?
19      A  I'm reading from the abstract. The
20  bottom, right here.
21      Q  Okay.
22      A  And so they're not talking about grade
23  A recommendations. They're talking about grade
24  B. That's not a grade A. And they've already

Page 239

1  summarized it in the first sentence about the
2  paucity of data.
3          The studies that they quoted, they
4  weren't even powered very well. "We recommend
5  using validated questionnaires measuring sexual
6  function in women before and after prolapse
7  surgery and reporting sexual activity and
8  dyspareunia rates pre and post interventions in
9  all patients." What they're saying is, garbage
10  in, garbage out.
11      MS. KABBASH: Off the record.
12          (Whereupon, a brief discussion is held
13  off the record.)
14  BY MS. KABBASH:
15      Q  Doctor, am I correct that you are
16  critical of Dr. Maher and Dr. Dietz's conclusion
17  that sexual function and dyspareunia rates are
18  similar because you don't believe that the grade
19  of the evidence is high enough to make that
20  conclusion, correct?
21      A  When you look at metaanalysis, it's --
22  it's like the old doctrine about how you can
23  take a sow's ear and put it all together and
24  that's not going to make a quilt. It's the same

Page 240

1  thing with the data here. I applaud Dr. Maher
2  for trying to quantify pelvic organ prolapse and
3  sexual function. I think that it needs to be
4  done.
5          And he himself is drawing the
6  conclusion that we're just not asking the right
7  questions to get the right data. This is not
8  what I would call an overwhelming support of
9  mesh as having the same outcome as an anterior
10  colporrhaphy.
11          I certainly don't believe in my
12  practice that patients that undergo native
13  tissue repairs have the same rate of dyspareunia
14  as patients that undergo transvaginal mesh
15  procedures. Based on his conclusion, I don't
16  even get the sense that he believes that.
17      MS. KABBASH: Objection, move to
18  strike.
19      A  Right here, he's says, "Although data
20  from randomized controlled trials are valuable,
21  sexual function was a secondary outcome
22  measurement and most studies are underpowered to
23  detect differences in sexual function."
24          That's what I remember reading in the

Page 241

1  paper during the week.
2      Q  Can you identify for me any studies
3  that analyze abdominal sacrocolpopexy where
4  sexual function is a primary end point of the
5  study?
6      A  Not off the top of my head. I do not
7  recall.
8      Q  Can you identify for me any
9  metaanalyses that look at grade A evidence
10  regarding -- strike that.
11      MS. KABBASH: Why don't we take a break
12  right now and let's reassess where we are and
13  then we'll finish.
14          (Whereupon, a brief recess is taken.)
15  BY MS. KABBASH:
16      Q  Dr. Garely, if you go to page 8 of the
17  monograph, not 9, would you agree that there are
18  several paragraphs going from page 8 on to page
19  9 that address mesh complications, erosion,
20  exposure and extrusion?
21      A  I would.
22      Q  And would you agree that this is a
23  fairly detailed description of the risk of mesh
24  exposure and erosion?

Alan Garely, M.D., FACOG, FACS

Page 242

1    A  I need a minute just to look it over.
2    Q  Okay.
3    A  Okay, please repeat the question.
4    Q  Would you agree that this discussion
5  from pages 8 to 9 is a fairly detailed
6  description of the risk of mesh exposure and
7  erosion?
8    A  I would not agree.
9    Q  In the second paragraph under mesh
10 complications, it says, "This is to be
11 contrasted with the known occurrence of simple
12 vaginal mesh exposure.  It occurs in
13 approximately 3 to 17 percent of cases."  Do you
14 see that?
15   A  What they're calling simple mesh
16 exposure, yes, I see that.
17   Q  Does the range of 3 to 17 percent
18 that's provided there, would you agree that that
19 range appropriately reflects the rates of mesh
20 exposure that are reported in the medical
21 literature on transvaginal mesh kits?
22   A  That's not what this says.  This says
23 "simple vaginal mesh exposure."  If you're
24 asking me about mesh exposure, I agree.  But if

Page 243

1  you're asking me about simple mesh exposure, I
2  do not agree.
3    Q  What is your understanding of what
4  simple vaginal mesh exposure means?
5    A  A simple mesh exposure is a patient
6  that has her surgery and is living a great life
7  and has no problems.  May notice a little
8  spotting, goes to her surgeon.  He says, hey,
9  there is a little mesh exposed in the vagina, I
10 just need to cover it over.  That's a simple
11 mesh exposure.
12      Those are not the kind of mesh
13 complications -- which again, I go back to when
14 I use the word "I believe it's deceitful."  It's
15 deceitful in this monograph that they don't
16 mention the mesh exposures that are not simple,
17 the ones that are complicated, that cause
18 chronic granulation and bleeding and chronic
19 pain and dyspareunia.  This is minimizing mesh
20 exposure by using the word "simple."  It's
21 nothing.  It's not nothing.
22   Q  Doctor, would you agree that all
23 incidences of mesh exposure, whether they are
24 simple or not, that the rates that are reported

Page 244

1  in the medical literature fall within this range
2  of 3 to 17 percent?
3    A  Or higher, yes.
4    Q  What is your understanding of the rate
5  of complicated mesh exposures based on your
6  review of the medical literature -- strike that.
7      What is your understanding of the
8  incidence rate of complicated mesh exposures?
9    A  There's a range, just like there's a
10 range in the literature from 3 to 17 percent for
11 simple mesh exposures.  I -- I would say the
12 range is probably somewhere in the range of
13 probably close to 5 -- you know, 3 to 5 percent
14 is where I would probably go with complicated
15 mesh exposures.  I'm not saying it's less, but I
16 don't know that it's more.
17   Q  Would you agree with me that most of
18 the peer-reviewed medical literature that
19 reports mesh exposure rates for pelvic floor
20 repair kits reports all mesh exposures at 17
21 percent or less except for a few outlier
22 studies?
23   A  I agree with that.
24   Q  Is there anything else that you believe

Page 245

1  is misleading regarding the section on mesh
2  complications, exposure, erosion and extrusion?
3    A  I don't see anything in here where they
4  say some mesh exposures are so severe that the
5  patient may require a -- a graft to close the
6  defect, which is not something that the majority
7  of surgeons are capable of using or doing.
8    Q  Doctor, I -- you explained to me
9  earlier that that is your practice, to use a
10 graft to close the defect, but can you point me
11 to any literature that states that that is the
12 standard of care to address a mesh exposure or a
13 mesh revision surgery, by using a graft?
14   A  Absolutely.  There are published
15 accounts of people using grafts to cover large
16 defects.  The alternative would be catastrophic
17 for the patient.
18   Q  What literature is that?
19   A  I -- I would have to go and look in my
20 PubMed.  I don't recall off the top of my head.
21 I think the paper was written by -- give me a
22 second.
23   Q  You know what, I'll strike the
24 question.  Let's move on.

62 (Pages 242 to 245)

Golkow Technologies, Inc. - 1.877.370.DEPS

Alan Garely, M.D., FACOG, FACS

Page 246

1     A   Okay.
2     Q   In the dyspareunia section, you'll see
3  that on page 9, there is five paragraphs there
4  discussing with doctors the risk of dyspareunia
5  and vaginal pain.  Do you see that?
6     A   I see it.
7     Q   Okay.  And one of your criticisms of
8  the Ethicon warnings for Prolift is that for a
9  period of time contraction was not warned of,
10  correct?
11     A   Correct.
12     Q   Do you see the last line of this first
13  paragraph that says, "Contraction of the mesh
14  and/or reduction in the vaginal epithelial
15  dimension is the primary exam finding in a
16  subset of patients with dyspareunia."  Do you
17  see that?
18     A   I see it.
19     Q   Is it a true statement?
20     A   I believe it to be a true statement.
21     Q   And if this document, this Surgeon's
22  Resource Monograph, was put out in April 2007,
23  then this is a warning that would have been
24  available to surgeons at least as of that time,

Page 247

1  correct?
2     A   At least as of that time, but this is
3  not the instructions for use, so I don't know
4  that -- instructions for use are given to every
5  surgeon who's implanting the device every time
6  they implant it.  I do not know that this
7  document was handed out to every surgeon that
8  implants this device nor do I know that every
9  surgeon was required to read this.
10         This wasn't published in any
11  literature.  This was just handed out by the
12  company.  I do not have any basis or knowledge
13  of who was given this document.
14         MS. KABBASH:  Move to strike everything
15  after "but."
16  BY MS. KABBASH:
17     Q   Doctor, physicians aren't required to
18  read the IFU; are they?
19     A   It depends on your institution.  I
20  don't know whether your institution requires you
21  to read the IFUs.
22     Q   The manufacturer has no way of
23  requiring any doctor to do anything, correct?
24     A   No, but I know that every doctor that

Page 248

1  uses any device in the operating room, I know
2  that they come with an instructions for use in
3  the package.
4     Q   With regard to the monograph, do you
5  have any information -- strike that.
6         With regard to the monograph, have you
7  reviewed the company internal documents that
8  discuss the distribution of this monograph to
9  doctors?
10     A   Of the thousands of pages that I
11  reviewed, I do not recall reading anything about
12  the distribution of this monograph.
13     Q   Did you ask to see that information?
14     A   I did not because it did not occur to
15  me that it would be an issue.
16     Q   That what would be on issue?
17     A   That I would need to know how they
18  distributed this.  It just wasn't in the
19  spectrum of where I was thinking when I read
20  this document, the Surgeon's Resource Monograph.
21     Q   You certainly don't dispute that this
22  document was made available to doctors, correct?
23     A   I have no basis to dispute it or not to
24  dispute it.  For all I know, they printed it up,

Page 249

1  put it in boxes and put it in the basement.  I
2  do not know.
3     Q   And it wasn't important to you to find
4  out how widely this document was distributed,
5  correct?
6     A   I'm not saying that it wasn't
7  important.  What I'm saying is that in the
8  spectrum of things that I was reviewing in
9  preparation for this deposition, and to make and
10  formulate my opinions in my expert report,
11  wondering whether or how they distributed one
12  monograph called the Surgeon's Resource
13  Monograph was given out wasn't high on my
14  priority list.
15     Q   Doctor, I'm going to show you what's
16  been marked 18.
17         (Exhibit Garely Garely 18, Document
18  entitled Exhibit B, Dr. Garely's review
19  materials, marked for identification.)
20  BY MS. KABBASH:
21     Q   I'm going to show you what's been
22  marked as Exhibit 18.  And what is that
23  document?
24     A   Exhibit B.

63 (Pages 246 to 249)

Alan Garely, M.D., FACOG, FACS

Page 250

1    Q  Is that Exhibit B to your reports?
2    A  This is -- it looks like all the stuff
3  that I reviewed.  Somebody went through it.
4      MR. MATTHEWS:  Can I answer?
5      MS. KABBASH:  Sure, go ahead.
6      MR. MATTHEWS:  Yes.  That is Exhibit B
7  to his report.
8      MS. KABBASH:  Okay.
9  BY MS. KABBASH:
10    Q  And does that list contain -- what is
11  your understanding of what that list contains?
12    A  Everything that I reviewed, every piece
13  of paper, every document, everything that was
14  provided to me that I looked at is documented
15  here, like an index.
16    Q  Did you generate that list or did
17  someone else generate that list?
18    A  Somebody else generated this list.
19    Q  Did counsel generate it?
20    A  I believe so.
21    Q  How many -- what proportion of those
22  documents were provided by counsel and what
23  proportion were provided by you?  I'm not trying
24  to hold you to an exact percentage, but can you

Page 251

1  give me a sense of how many of those documents
2  came from counsel and how many came from you?
3    A  Regardless of whether I had them or
4  not, a hundred percent of them were supplied by
5  counsel.
6    Q  So I think what you're saying is that
7  all of the documents on that list were supplied
8  by counsel; you may have already had or seen
9  some of them in advance, correct?
10    A  Correct.
11    Q  Such as medical literature that you
12  happened to have read before you got involved in
13  the litigation, correct?
14    A  Correct.
15    Q  Okay.  Are any of the documents that
16  are on Exhibit B there because you did
17  independent research and found articles on your
18  own that you asked counsel to add to the list?
19    A  It would be more like a chicken and an
20  egg situation, where I asked counsel to provide
21  me with all the documents that were -- for
22  instance, I said I want a full PubMed search on
23  these terms and that's what counsel provided me,
24  so...

Page 252

1    Q  Did you separately find other articles
2  that you realized were not already provided to
3  you and told counsel, please add this to my list
4  because I just found this?
5    A  No.  I think maybe there were things
6  that I read that came out after the list was
7  done, but I didn't include it in my report.
8      MS. KABBASH:  I think I'm out of time
9  and I don't want to keep you from picking up
10  your kids, so I think we're finished.
11      THE WITNESS:  Good excuse.
12      (Time noted:  3:33 p.m.)
13
14  _____
15  ALAN GARELY, M.D., FACOG, FACS
16
17
18  _____
19  Subscribed and sworn to
20  before me this _____
21  day of _____ 2016.
22
23  _____
24   Notary Public

Page 253

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

64 (Pages 250 to 253)

Alan Garely, M.D., FACOG, FACS

Page 254

1    CERTIFICATION

2

3

4  I, DANA N. SREBRENICK, a Notary Public for

5 and within the State of New York, do hereby

6 certify:

7  That the witness, ALAN GARELY, M.D., FACOG,

8 FACS, whose testimony as herein set forth, was

9 duly sworn by me; and that the within transcript

10 is a true record of the testimony given by said

11 witness.

12  I further certify that I am not related to

13 any of the parties to this action by blood or

14 marriage, and that I am in no way interested in

15 the outcome of this matter.

16  IN WITNESS WHEREOF, I have hereunto set my

17 hand this 18th day of April 2016.

18

19  _____

20  DANA N. SREBRENICK, CLR, CRR

21

22   * * *

23

24

Page 256

1

2   ACKNOWLEDGMENT OF DEPONENT

3

4  I,_____, do

5 hereby certify that I have read the

6 foregoing pages, and that the same is

7 a correct transcription of the answers

8 given by me to the questions therein

9 propounded, except for the corrections or

10 changes in form or substance, if any,

11 noted in the attached Errata Sheet.

12

13

14 _____

15 ALAN GARELY, M.D., FACOG, FACS DATE

16

17

18 Subscribed and sworn

  to before me this

19 _____ day of _____, 20____.

20 My commission expires:_____

21

  _____

22 Notary Public

23

24

Page 255

1   - - - - - -

   E R R A T A

2   - - - - - -

3

4 PAGE LINE CHANGE

5 ___ ___ _____

6  REASON: _____

7 ___ ___ _____

8  REASON: _____

9 ___ ___ _____

10  REASON: _____

11 ___ ___ _____

12  REASON: _____

13 ___ ___ _____

14  REASON: _____

15 ___ ___ _____

16  REASON: _____

17 ___ ___ _____

18  REASON: _____

19 ___ ___ _____

20  REASON: _____

21 ___ ___ _____

22  REASON: _____

23 ___ ___ _____

24  REASON: _____

65 (Pages 254 to 256)