IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE: ETHICON, INC. PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION<br><br>_____<br>THIS DOCUMENT RELATES TO:<br><br>*WAVE 1 CASES* | Master File No. 2:12-MD-02327<br>MDL No. 2327<br><br><br>JOSEPH R. GOODWIN<br>U.S. DISTRICT JUDGE |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS OF ROBERT D. MOORE, D.O.**

COMES NOW, the Plaintiffs in the above-styled action, and file their Response in Opposition to Defendants Ethicon, Inc.'s and Johnson & Johnson's (hereinafter referred to as "Defendants") Motion to Exclude Opinions of Robert D. Moore, D.O. (hereinafter referred to as "Dr. Moore"), and show the following:

**Introduction**

Defendants do not seek to challenge Dr. Moore's qualifications to render his opinions, and with good reason: Dr. Moore is eminently qualified.

Plaintiffs will not attempt here to recite all of Dr. Moore's numerous credentials, accomplishments and accolades, which are more fully set forth in his Report and Curriculum Vitae filed with Defendants' Motion, but will briefly address his qualifications in order to demonstrate his unquestioned expertise.

Dr. Moore, Director of Advanced Pelvic Surgery and Director of Urogynecology at the Atlanta Center for Laparoscopic Urogynecology, is Board Certified in Obstetrics and Gynecology and also in the subspeciality of Female Pelvic Medicine and Reconstructive Surgery. (Dkt. No. 2119-3, pp. 2-3). He is an Adjunct Professor of Ob/Gyn at Emory University

in Atlanta, and Assistant Clinical Professor of Ob/Gyn at Philadelphia College of Osteopathic Medicine. (*Id.*, pp. 2-3).

Dr. Moore is well-versed in the scientific and medical literature relating to female pelvic repair surgery, serving as the Executive Editor-in-Chief of the Online Journal of Urology (Dkt. No. 2119-3, p. 3), and on the Editorial Review Board for several respected medical journals. (*Id.*, p. 56).

Dr. Moore has implanted over 1,000 slings and approximately 500 or more other vaginal mesh implants. (Dkt. No. 2119-3, p. 5). Dr. Moore and his partner have explanted more than 700 mesh devices, including more than 500 since 2010, including several of the Defendants' products, specifically a number of TVT-O devices. (*Id.*, pp. 7-8).

As his Report and CV reflect, much of Dr. Moore's professional work has been related to synthetic pelvic repair mesh devices used to treat pelvic organ prolapse and/or stress urinary incontinence, including the study and treatment of mesh-related complications. Aside from his general familiarity with the published literature, Dr. Moore himself has authored or co-authored a volume of abstracts, book chapters, and articles that have been presented professionally, and numerous of which subject to peer-review and publication. (Dkt. No. 2119-3, pp. 66-80). Dr. Moore has also conducted or participated in numerous clinical studies and trials, including several studies related to pelvic repair mesh products. (*Id.*, pp. 5-8; 80-86). Dr. Moore's clinical experience and published, peer-reviewed work related specifically to pelvic repair mesh devices is simply too voluminous to try and recount here.

Dr. Moore has chaired or presented multiple seminars and courses on pelvic mesh and vaginal mesh complications. (Dkt. No. 2119-3, p. 8; 57-65).

Dr. Moore has also served as a consultant and preceptor for medical device manufacturers, including AMS, Bard, Caldera, and U.S. Surgical/Tyco, specifically with respect to the study and development of and training for pelvic repair mesh devices. (Dkt. No. 2119-3, pp. 5-6, 8; *See also*, *Id.*, pp. 65-66).[1] In fact, Dr. Moore served as a preceptor and consultant with these Defendants for their TVT device. (*Id.*, pp. 5-6, 8).

In short, Plaintiffs submit, Dr. Moore's qualifications as an expert are beyond question.

### Argument and Citation of Authority

**I.  Defendants' attempt to prevent Dr. Moore from discussing his own published, peer-reviewed study on pelvic mesh complications – the largest such study ever conducted – has no merit.**

Defendants urge that the Court should exclude Dr. Moore's general causation opinions that the TVT-O can cause certain complications "to the extent it is based on a flawed study he conducted." (Defendants' Brief, pp. 3-4). It is important to note here that Dr. Moore's general causation opinions are based on his extensive knowledge and experience in diagnosing and treating mesh-related complications, his review and familiarity with the published literature and Ethicon internal documents relating to TVT-O and other pelvic repair mesh devices, as well as his own extensive published, peer-reviewed research and literature on the subject of pelvic repair mesh and related complications. His study, which is the subject of this motion, is merely one component of the multi-faceted background and bases for his opinions.

Reduced to its essence, Defendants urge the Court to hold that Dr. Moore should not be allowed to discuss the results of the largest known studies of mesh complications in the world in

---

[1] As Judge Eifert observed in the AMS MDL, "Dr. Moore has a long-standing relationship with AMS as a physician consultant on its mesh products. According to AMS, Dr. Moore has been involved in many aspects of its product development, clinical trials, and physician training. Plaintiffs likewise acknowledge that Dr. Moore is one of AMS's top preceptors and medical advisors whose relationship with AMS dates back at least a decade…." *In re AMS*, 2:12-md-2325, Dkt. No. 676, p. 2.

which Dr. Moore himself personally participated. (Moore Report, pp. 5-6). These studies were subject to peer review, and the results of these studies were recently published in a respected medical journal, the *International Urogynecology Journal*. (Dkt. No. 2119-5; 2119-6; 2119-7 (copies of Dr. Moore's studies attached to Defendants' motion)). This is the largest published manuscript in the world on the subject of mesh complications. (Moore Report, pp. 5-6). It is difficult to conceive of a more unassailable basis for a general causation expert opinion related to mesh complications than Dr. Moore's own unprecedented research and study and peer-reviewed, published articles on this very subject. The mere fact that the study was not solely limited to the TVT-O is meaningless. Dr. Moore should not be prohibited from discussing his own research and study and peer-reviewed, published scientific literature in testifying with respect to his opinions as to the types of complications that the TVT-O is capable of causing. Defendants' motion should be denied.

**II.     Dr. Moore does not and will not attempt to offer any improper "legal conclusions."**

Plaintiffs are well aware of the Court's repeated admonition about expert opinion testimony that states a legal standard or draws a legal conclusion by applying law to fact. *See, e.g.*, *Wise v. C.R. Bard, Inc.*, 2015 WL 521202, *3 (S.D.W.Va.2015). Dr. Moore will not make improper "legal conclusions" at trial, but he should not be prevented from offering his opinions regarding the dangerousness or defective design of the TVT-O, or the adequacy of Defendants' warnings and instructions for the TVT-O.

**III.    Dr. Moore's opinions regarding the propensity of TVT-O to cause pain and bladder, bowel and sexual dysfunction are valid and reliable.**

Section III of Defendants' Brief is founded entirely on a mischaracterization of Dr. Moore's testimony. Contrary to Defendants' assertion in its Brief that Dr. Moore "provides no

support for this opinion," Dr. Moore's Report cites extensively to published, peer-reviewed literature as well as internal Ethicon documents in support of the opinion that TVT-O can cause a variety of complications, including but not limited to pain, and bowel, bladder and sexual dysfunction, and he explains in detail how and why that is true in his report. (Moore Report, pp. 9-28). Dr. Moore also explained at length how and why the TVT-O causes pain, bladder, bowel and sexual dysfunction – as well as several other complications – in his deposition, and he discussed extensively the peer-reviewed literature that supports those opinions, as well as his familiarity with Ethicon's documents addressing these complications. (Moore depo., 73:24-74:18; 75:19-110:23). Defendants' contention that Dr. Moore "provides no support for this opinion" is contrary to fact.

### IV. Defendants' arguments seeking to exclude Dr. Moore's general causation opinions are all demonstrably groundless.

Defendants' argument in Section IV of its Brief that Dr. Moore's opinions regarding the causal relationship between the TVT-O and thigh and groin pain is tantamount to a disagreement with extensive peer-reviewed, published literature addressing these specific subjects. Although Defendants acknowledge that Dr. Moore's general causation opinions are supported by published studies and medical literature, they take issue not with Dr. Moore, but with the studies and literature themselves. This argument borders on fallacious. Defendants cannot wish away the body of peer-reviewed literature cited in Dr. Moore's Report, and discussed at length on his deposition, simply because they do not like what the literature says about their product.[2]

---

[2] In this and several other portions of their Brief, Defendants essentially seek to challenge the information relied upon by Dr. Moore, rather than the methodology that he employed in relying on such information to support his opinions. At best, this argument goes to the weight, not the admissibility, of Dr. Moore's testimony. *In re St. Jude Medical, Inc. Silzone Heart Valves Prods. Liab. Litig.*, 493 F.Supp.2d 1082, 1089 (D.Minn.2007) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."); *In re: Digitek Prods. Liab. Litig.*, 821 F.Supp.2d 822, 837

As one example, Defendants seek to challenge Dr. Moore's opinion that the TVT-O can cause groin and thigh pain because the Cochrane review cited in his Report and discussed in his deposition – an objective scientific review of the available, published data from 18 clinical trials involving 3,221 mesh patients – "does not give an explanation as to cause." It is not clear exactly what Defendants believe the Cochrane review would have to say about "cause" that would be more unambiguous than what Dr. Moore states in his Report: that there is a statistically significant increased rate of groin pain in patients implanted with mesh implanted via the transobturator route than those with mesh implanted retropubically. Defendants cannot prevent an expert from discussing peer-reviewed published medical literature simply because it is adverse to their litigation position.

Defendants' appear to contend that because published medical articles do not contain the sort of talismanic legalese that would be required in a courtroom ("to a reasonable degree of scientific certainty"), they therefore cannot serve as the basis for an expert opinion. This argument is invalid on its face.[3] Experts are allowed to offer opinions founded on relevant peer-reviewed, published scientific literature. *See, e.g.*, *Tyree v. Boston Scientific Corp.*, 54 F.Supp.3d 501, 522-23 (S.D.W.Va. 2014) (denying, in part, *Daubert* challenge to urogynecologist's expert opinion "because [expert's] opinion was founded in scientific literature."); *Id.* at 538-39 (denying, in part, *Daubert* motion against materials expert because the expert "relied not only on his knowledge and experience, but also on scientific literature, which are sufficiently reliable

---

(S.D.W.Va.2011) (the *Daubert* inquiry focuses solely on "the 'principles and methodology' employed by the expert, not on the conclusions reached.").

[3] To accept Defendants' argument would require the Court to similarly exclude every opinion from every defense expert founded on any published literature because, as Dr. Moore testified, scientific and medical journal articles – whether supportive of mesh or not – are not stated in terms of scientific certainty. The logical result of Defendants' argument would be, to borrow a phrase, to turn the well-established *Daubert* case law allowing experts to base their opinions on peer-reviewed literature "on its head."

methods of forming his particular opinion."); *Wise v. C.R. Bard, Inc.*, 2015 WL 521202, *15 (S.D.W.Va.2015) ("because [plaintiff's urogynecologist expert] has undeniable experience on this subject matter and has substantiated his opinion with testable, peer-reviewed literature, I must open the gates to his testimony."); *Eghnayem v. Boston Scientific Corp.*, 57 F.Supp.3d 658, 714 (noting that expert "also supports his opinions with citations to scientific literature," and "[a]ccordingly, I FIND that [the expert's] knowledge, experience, and review of scientific literature provide sufficiently reliable bases for opinions under *Daubert*."). Indeed, Defendants' own Brief states "Ethicon acknowledges that an expert's review of the scientific literature is an acceptable methodology." (Defendants' Brief, p. 7) (Emphasis added). Defendants' argument should be rejected, and its motion should be denied.

Defendants' criticism of Dr. Moore's citation of and reliance upon a published TVT-O study by Teo (Defendants' Brief, pp. 7-9) is merely a disagreement with Dr. Moore's characterization of the study.[4] To the extent Defendants appear to contend that Dr. Moore misinterprets or mischaracterizes some aspect of the Teo study, that may provide fodder for cross-examination at trial. However, it is not a valid basis to move to exclude Dr. Moore's reliance on this peer-reviewed, published study.

V. **Contrary to Defendants' assertions, Dr. Moore's opinion regarding the design of the TVT-O, which includes the specific surgical approach marketed and sold by Defendants as part of the TVT-O system, are relevant and reliable.**

---

[4] Whereas Dr. Moore's Report states that Teo concluded that "it is no longer ethical to use TVT-O given the clear negative impact of patient health," Defendants urge that the article actually says that the study authors "believed it was no longer ethical to randomize women to the TVT-O arm in light of these published studies." (Defendants' Brief, p. 8). This would appear to be the legal equivalent of "toe-MAY-toe" versus "toe-MAH-toe." If Defendants truly want to make this semantic argument a focal point of their defense of the TVT-O, the jury will hear both sides and decide for themselves; this is not a valid basis for a *Daubert* attack. Defendants' argument that the Teo article did not address "chronic pain" is misguided; Dr. Moore does not purport to base his pain-related opinions solely on the Teo article, but instead cites numerous articles and internal Ethicon documents in his Report. *See, e.g.*, Moore Report, pp. 9-23; 34-38 and footnotes 22, 23, 26, 29 and 30).

7

Defendants' contention that Dr. Moore cannot offer any opinion regarding the surgical implantation technique for the TVT-O defies logic, and is self-contradictory. The Court has addressed an analogous argument by these same Defendants that preemption applies to its pelvic repair mesh kits because the Prolene suture was approved by the FDA. The Court properly concluded that the Prolene material cannot be considered separately, but must be considered as part of the entire kit submitted to the FDA for 510(k) clearance. *Lewis v. Johnson & Johnson*, 991 F.Supp.2d 748, 756-61 (S.D.W.Va.2014). The Court noted that the Defendants themselves had previously argued that their products must be analyzed in terms of the entire kit that was marketed, not component-by-component, an analysis which is consistent with nearly every court to consider the issue in the preemption context. *Id.* at 758-61. The TVT-O kit, which Dr. Moore addresses in his Report, does not merely consist of the strip of polypropylene mesh that is implanted in the body, but also specifically-designed implantation devices ("Helical Passers") intended to implant the TVT-O mesh in one way – and only one way: via the "inside-out" transobturator approach.

Defendants' attempt to divorce the design of its product from its intended use is legally meritless. The risk-utility analysis for design defect necessarily takes into account the manner in which the product was designed and intended to be used. In fact, the very definition of "design defect" in many jurisdictions expressly references dangerousness for the product's "intended use." *See, e.g.*, *Talkington v. Atria Reclamelucifers Fabriefken BV*, 152 F.3d 254, 262-63 (4th Cir.1998) (observing that state law links strict liability to product's "intended use," and noting that "In South Carolina, "to recover under a strict liability theory, the plaintiff must establish that: (1) the defendant's product was in a defective condition unreasonably dangerous for its *intended use*.") (Emphasis in original); *Lewis v. Ethicon, Inc.*, 2014 WL 457544, *5

(S.D.W.Va.2014) ("[t]he risk-utility analysis does not operate in a vacuum, but rather in the context of the product's intended use and its intended users.") (citing Texas law); *King v. Sears Roebuck & Co.*, 2013 WL 870572 (S.D.W.Va.2013) ("In this jurisdiction the general test for establishing strict liability in tort is whether the involved product is defective in the sense that it is not reasonably safe for its intended use.") (citing West Virginia law). This only makes common sense: a product may be safe and non-defective for one use, but may present an unreasonable risk of injury if sold for another use.

For Defendants to argue that the surgical approach was not a vital component of the TVT-O kit/system strains credulity. On Ethicon's website, the first line of the TVT-O product description does not mention any product feature, but instead outlines the "procedure," stating "[t]he procedure starts at a precise mid-urethral point and continues away from critical structures utilizing an Atraumatic Winged Guide for accurate introduction and passage of the device, allowing for minimal dissection."[5] The IFU for TVT-O similarly describes the "inside-out" transobturator surgical approach in explicit detail.[6] The IFU directs that "[t]he device should be used only by physicians trained…specifically in implanting the Gynecare TVT Obturator device," and later instructs that "[u]sers should be…adequately trained in the Gynecare TVT Obturator procedure before employing the Gynecare TVT Obturator device." The IFU later instructs that in order to minimize certain potential complications, "make sure to place the tape as described above." Likewise, the FDA 510(k) application submitted by Defendants for the TVT-O specifically outlined the unique "inside-out" transobturator surgical approach, stating

---

[5] *See*, TVT-O website screen shot from http://www.ethicon.com/healthcare-professionals/products/uterine-pelvic/incontinence-slings/gynecare-tvt-obturator-system-tension-free-support-incontinence (last viewed 5/5/16), copy attached hereto as **Exhibit 1**.

[6] *See*, TVT-O IFU, copy attached hereto as **Exhibit 2**.

9

that "[t]he Helical Passers come assembled to the Gynecare TVT Obturator device and are used to deliver of the mesh implant via the trans-obturator 'inside-out' approach. The 'inside-out' approach delivers the mesh trans-vaginally, along the posterior ischiopubic ramus and through the obturator membrane."[7] The "inside-out" transobturator approach was not only an essential part of the TVT-O system sold by Defendants, it was, in fact, the primary selling point for the product.[8] Indeed, but for the "inside-out" surgical approach, the TVT-O mesh sling is no different from that used in the TVT retropubic. Defendants' attempt to limit Dr. Moore's testimony based on its assertion that "a surgical technique is not a product design" should be denied.

Defendants' next argument, that Dr. Moore "fails to scientifically account for contrary studies," is equally groundless. This argument hinges entirely on a single study (the Debodinance study) that they claim Dr. Moore did not "account for." First, even if Dr. Moore had not reviewed the Debodinance study, that would not provide a grounds for limitation of his testimony. S*ee, e.g.*, *Carlson v. Boston Scientific Corp.*, 2015 WL 1931311 (S.D.W.Va.2015) (denying defense *Daubert* challenge to plaintiff's urogynecologist expert because he allegedly only reviewed one scientific article referencing the product at issue, and instructively holding that "if there are certain device-specific publications that [the expert] failed to review in preparing his expert report, [the defendant] is free to inquire about those publications on cross-examination."); *Wise v. C.R. Bard, Inc.*, 2015 WL 521202, *12 (S.D.W.Va.2015) (denying defense Daubert challenge to plaintiff's expert for allegedly failing to account for contrary literature where – as here – the record reflected that the expert had, in fact, addressed the article

---

[7] *See*, TVT-O 510(k) application, copy attached hereto as **Exhibit 3**.

[8] *See, e.g.*, ETH.MESH.00523733 (2005 Internal Ethicon Marketing PowerPoint emphasizing "inside-out" transobturator approach as the primary selling point versus retropubic and "outside-in" TO approach).

in question). Defendants' reliance on the fact that the Debodinance study is one of several referenced in an article by their Medical Director Piet Hinoul merely underscores the invalidity of their argument; Dr. Moore discusses the Hinoul article at length in his Expert Report. (Moore Report, pp. 14-15). Moreover, Dr. Moore's Review Materials not only include the specific Debodinance article referenced in the Hinoul article, but numerous other published studies authored or co-authored by Dr. Debodinance. (Dkt. No. 2119-3, pp. 113, 119-120, 157-64, 170-71, 189, 199). Indeed, Dr. Moore himself participated in a clinical study relating to another transobturator sling <u>with Dr. Debodinance</u>, and that study is referenced in his CV. (Dkt. No. 2119-3, p. 77). To the extent that Defendants appear to contend that the Debodinance study would support their position, and undermine that of Dr. Moore, that is fair game for cross-examination at trial. It does not, however, provide a basis for a *Daubert* challenge.

Defendants seek to exclude Dr. Moore's opinion that their TVT-Abbrevo was a safer alternative to the TVT-O prior to July 1, 2010. (Defendants' Brief, pp. 11-12; *See also*, Moore Report, pp. 19-24). Defendants claim that because Abbrevo was not "legally available" until July 1, 2010, it could not be considered a safer feasible alternative prior to that time. This argument miscomprehends the safer feasible alternative legal analysis, where such is applicable. The safer feasible alternative analysis (where such is applied) looks to whether a safer alternative was "feasible," not whether or when an actual product incorporating that safer design was actually marketed and sold in the U.S. *See, e.g.*, *Cardenas v. Dorel Juvenile Group, Inc.*, 230 F.R.D. 611, 621-22 (D.Kan.2005) (granting plaintiff's motion to compel discovery in design defect product liability action of defendant's engineering change notices reasoning that such could reveal safety changes to the product, and noting that "[i]t does not necessarily matter whether the change was made to a [device] sold in the United States or not, for, as discussed

11

above, one of the issues in this case is whether a safer, feasible alternative design was available. It could also lead to the discovery of evidence regarding [defendant's] *knowledge* of a design defect or of safer, alternative designs.") (Emphasis in original). Indeed, there is no requirement for a product liability plaintiff to prove that the safer alternative design was ever marketed or sold anywhere.[9] Aside from being legally unfounded, Defendants' argument also fails because the information about safer design features ultimately incorporated into the Abbrevo device (such as the reduced tape length) was available, if not known, to Defendants years before the Abbrevo was ever marketed. (Moore Report, pp. 19-24).

### VI. Dr. Moore's opinions regarding the inadequate TVT-O IFU are reliable, and none of Defendants' arguments to the contrary can withstand scrutiny.

Defendants seek to exclude Dr. Moore's opinions regarding the inadequacy of the TVT-O IFU because he cites to and relies in part on Defendants' internal documents in forming those opinions. (Defendants' Brief, pp. 12-13). Dr. Moore's citation to specific corporate documents in support of his opinions regarding the inadequate TVT-O IFU falls squarely within the parameters previously recognized by this Court – "an expert may testify as to a review of internal corporate documents solely for the purpose of explaining the basis for his or her opinions—assuming the opinions are otherwise admissible…."[10] *See also*, *Wise*, 2015 WL 521202 at *13 ("[T]hough an expert may not simply narrate corporate documents in front of the jury, he may rely on such information in forming and supporting his opinions….").

---

[9] Even if Defendants had cited or could cite to any legal authority from any jurisdiction that would purport to require that the safer alternative actually be marketed or sold in a given country before any evidence may be admissible – which they do not – that would perhaps serve as the basis for a motion in limine in an individual case in that jurisdiction. It is not a valid basis for a *Daubert* attack on an expert's opinion.

[10] *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 610 (S.D.W.Va.2013).

12

In *Smith v. Pfizer*, 714 F.Supp.2d 845 (M.D.Tenn.2010), the court denied a similar *Daubert* motion arguing that the plaintiff's expert had offered improper "state of mind/intent" opinions, stating as follows:

> [Plaintiff's expert] King may properly testify as to his interpretation of internal marketing-related documents that he relied on in forming his opinions. *See In re Seroquel Prods. Liab. Litig.,* No. 6:06–md–1769, 2009 WL 3806436, at *4 (M.D.Fla. July 20, 2009) (holding that expert witnesses may 'rely on and discuss [the defendant's] internal corporate documents.... To rule otherwise would unduly restrict Plaintiffs' experts from explaining the bases of their opinions.'). He may not, however, testify as to the defendants' motives or intent. *Id.* The defendants highlight instances of arguably objectionable portions of King's testimony in previous MDL cases. (*See* Docket No. 119 at 11, 11 n. 12.) But King's statement, which has been filed with the court and will constitute his direct testimony in this case, does not contain any speculation regarding the defendants' motives or intent. (*See* Docket No. 180, Ex. 6.) The court notes that the defendants may object at trial if they believe that King's testimony, outside of his statement, improperly discusses motive or intent."

*See also*, *In re Yasmin and Yaz (Drospirenone) Prods. Liab. Litig.*, 2011 WL 6301625 (S.D.Ill.2011) (plaintiffs' OB-GYN experts were qualified to render risk-benefit and warning opinions based, in part, on review of internal corporate documents, and review of such materials – along with peer-reviewed literature – was a reliable methodology for rendering such opinions).

Here, Dr. Moore's Report does not contain any speculation regarding Defendants' motives or intent. Defendants' internal documents, some of which are cited in support of Dr. Moore's opinions, speak directly to design defect and safer feasible alternative design that are key issues in these cases, as well as the inadequacy of the TVT-O IFU. Whether Defendants had information known or available to them bearing on the safety or efficacy of its TVT-O device is a critical component the adequacy of the warnings provided by Defendants to physicians and patients. Whether Defendants were aware of other risks, or information that the TVT-O could increase the frequency, severity or duration of known risks, bears directly on the question of whether the warnings were adequate. Dr. Moore is not opining about Defendants' motives or intent, or that Defendants engaged in "bad acts," and he is not otherwise offering any opinion

related to corporate conduct or ethics. Instead, Dr. Moore is examining the warnings in light of information that was known or available to Defendants about the product in question as reflected in Defendants' own internal documents, as well as published medical literature. What information was known to Defendants, but not provided to physicians, is fundamental to the failure to warn analysis. Indeed, without the ability to assess what was known – or at least knowable – to Defendants, it would be next to impossible for Dr. Moore (or any expert) to offer any opinion of what information should have been provided to physicians using this device.

Defendants' assertion that a medical device manufacturer is not required to provide information regarding the frequency, severity and duration of the risks associated with its products in its IFU is a legal argument, and one that is contrary to law. As this Court observed in *Cisson v. C.R. Bard, Inc.*, 2013 WL 5700513, *7 (S.D.W.Va.2013):

> Other courts have found that a failure to warn about the rate or severity of potential injury creates a jury question over the adequacy of warnings. *See Watkins v. Ford Motor Co.,* 190 F.3d 1213, 1220 (11th Cir.1999) ("The question that must be answered by the fact finder is whether the warning given was sufficient or was inadequate because it did not provide a complete disclosure of the existence and extent of therisk involved.") (internal quotation omitted); *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.,* 711 F.Supp.2d 1348, 1377 (M.D.Ga.2010) (where medical device manufacturer's warning stated that the plaintiffs' injuries could occur "very rarely," holding that there was "a genuine issue of material fact as to whether such complications were indeed 'very rare'"); *Sands v. Kawasaki Motors Corp.,* No. CV608–009, 2009 WL 3152859, at *5 (S.D.Ga. Sept.30, 2009) (holding that jury was not precluded from finding that manufacturer failed to warn end user "of both the extent of the danger and the severity of any injury").

*See also*, *McNeil v. Wyeth*, 462 F.3d 364, 370 (5th Cir.2006) (Fifth Circuit reversed the district court's grant of summary judgment to a pharmaceutical manufacturer on the plaintiff's failure to warn claim. Although the manufacturer warned of a "higher" risk with long-term use of its product, the Fifth Circuit held that "the mere statement that the risk increases with use does not put a physician on notice that the increase in risk is of a completely different order of magnitude and class of risk. Thus, a jury could find that the risk of developing [the plaintiff's complication] from long-term use was not just higher, but that it was 'significantly' higher, and that the label was therefore misleading and inadequate.").

From his perspective as an expert physician, Dr. Moore can properly opine that this is the sort of information that physicians would expect to be provided if the manufacturer has such information available.[11] Defendants' motion should be denied.

## VII. Dr. Moore should be allowed to offer his opinion regarding the adequacy of physician selection and training in light of the consistent "doctor fault" defenses asserted in these cases.

One of the consistent defenses in the pelvic mesh MDL cases generally, including the Ethicon cases, has been that the doctors lacked sufficient skill or experience to properly perform the specific implant procedure, or else that the doctor committed some error (either in the implantation or post-implant treatment) that led to the patient's injury. Particularly when physician error (or physician skill or experience) is asserted as a defense, and when the facts show that Defendants made no effort to determine physician skill and experience before allowing surgeons to implant these products, it is appropriate and necessary for Plaintiffs to be allowed to respond with expert testimony regarding this subject matter. Dr. Moore's testimony regarding physician training and selection is demonstrably reliable, and it is relevant in light of the "blame the doctor" defenses asserted in many of these cases.

## VIII. Defendants' final argument, that Dr. Moore's opinion regarding "unacceptable" complications is purely a matter of semantics, and is not a valid basis for a Daubert challenge.

Defendants' argument that Dr. Moore's opinion that the risks and frequency, severity and duration of risks, associated with the TVT-O are unacceptable is a matter of semantics. Defendants appear to take issue with the use of the phrase "unacceptable," and urge that this

---

[11] *Wise v. C.R. Bard, Inc.*, 2015 WL 521202, *14 (S.D.W.Va. 2015) "as an experienced urogynecologist, [urogynecologist] may testify about the risks he perceives that the [defendant's mesh] product poses to patients and then opine that the [product's] IFU did not convey those risks."); *See also*, *Id.*, p. *5 ("A urogynecologist…is qualified to make this comparison [whether the product's risks were adequately conveyed in the IFU]."); *Edwards v. Ethicon, Inc.*, 2014 WL 3361923 at *13 (S.D.W.Va. 2014) ("[A]s a urologist, Dr. Blaivas is qualified to testify about the risks of implanting the TVT-O and whether those risk were adequately expressed on the TVT-O's IFU.").

opinion "should be framed differently." (Defendants' Brief, p. 15). Filing a *Daubert* motion to quibble over whether a single word in a thorough and detailed 42-page Expert Report was "framed properly" is a waste of the Court's limited judicial time and resources. If Dr. Moore uses any word or phrase at trial that Defendants contend "should be framed differently," they can object. They cannot seek to exclude Dr. Moore's opinions simply because they object to how they are "framed."

This 13th day of May, 2016.

By: */s/ Henry G. Garrard, III*
Henry G. Garrard, III
hgg@bbgbalaw.com
Georgia Bar No. 286300
Josh B. Wages
jbw@bbgbalaw.com
Georgia Bar No. 730098
Counsel for the Plaintiffs

Blasingame, Burch, Garrard & Ashley, P.C.
P.O. Box 832
Athens, GA 30603
(706) 354-4000

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

          *By*:   */s/ Henry G. Garrard, III*
                  Henry G. Garrard, III
                  hgg@bbgbalaw.com
                  Georgia Bar No. 286300
                  Josh B. Wages
                  jbw@bbgbalaw.com
                  Georgia Bar No. 730098
                  Counsel for the Plaintiffs

Blasingame, Burch, Garrard & Ashley, P.C.
P.O. Box 832
Athens, GA 30603
(706) 354-4000