# EXHIBIT V

Steven MacLean, Ph.D., P.E.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | | |
|---|---|---|
| IN RE:  ETHICON, INC. PELVIC | : | Master File No. |
| REPAIR SYSTEM PRODUCTS | : | 2:12-MD-02327 |
| LIABILITY LITIGATION | : | MDL NO. 2327 |
| _____ | : | |
| | : | JOSEPH R. GOODWIN |
| | : | U.S. DISTRICT JUDGE |
| THIS DOCUMENT RELATES TO | : | |
| PLAINTIFFS: | : | |
| | : | |
| Ida Evans | : | |
| 2:12-cv-01225 | : | |
| | : | |
| Rose Gomez | : | |
| 2:21-cv-00344 | : | |
| | : | |
| Jeanie Holmes | : | |
| 2:12-cv-01206 | : | |
| | : | |
| Mary Jane Olson | : | |
| 2:12-cv-00470 | : | |
| | : | |
| Christine Wiltgen | : | |
| 2:12-cv-01216 | : | |
| | : | |
| Kathleen Wolfe | : | |
| 2:12-cv-00337 | : | |
| | : | |
| Monica Freitas | : | |
| 2:12-cv-01146 | : APRIL 18, 2016 | |
| | : | |
| Denise Sacchetti | : | |
| 2:12-cv-01148 | : | |
| | : | |
| Sheri Scholl | : | |
| 2:12-cv-00738 | : | |
| | : | |
| Cindy Smith | : | |
| 2:12-cv-01149 | : | |
| | : | |
| Waynick, Laura | : | |
| 2:12-cv-01151 | : | |

DEPOSITION OF STEVEN MACLEAN, Ph.D, P.E.

Steven MacLean, Ph.D., P.E.

| | | |
|---|---|---|
| Page 2 | | Page 4 |

**Page 2**

```
 1   Caption Continued:
 2   Denise Burkhart            :
     2:12-cv-01023
 3                             :
     Jo'Ann Lehman              :
 4   2:12-cv-00517
                               :
 5   Patricia Ruiz             :
     2:12-cv-01021
 6                             :
     Pamela Free
 7   2:12-cv-00423             :
 8   Melissa Ridgley           :
     2:12-cv-01311
 9                             :
     Marty Babcock
10   2:12-cv-01052             :
11   Dorothy Baugher           :
     2:12-cv-01053
12                             :
     Patti Ann Phelps
13   2:12-cv-01151             :
14   Lisa Thompson             :
     2:12-cv-01199
15                             :
     Rebecca Wheeler
16   2:12-cv-01088             :
17   Thelma Wright             :
     2:12-cv-01090
18                             :
     Rocio Herrara-Nevarez
19   2:12-cv-01294             :
20   Debra A. and Donald Schnering :
     2:12-cv-01071
21                             :
     Rebekah Bartlett (Pratt)
22   2:12-cv-01273             :
23   Amanda Deleon             :
     2:12-cv-00358
24
```

**Page 4**

```
 1        Deposition of STEVEN MACLEAN, Ph.D., P.E.,
 2   taken before and by Janis L. Ferguson, Notary
 3   Public in and for the State of New York, on
 4   Monday, April 18, 2016, commencing at 8:41 a.m.,
 5   at the Rochester Airport Marriott, 1890 Ridge
 6   Road West, Rochester, New York 14614.
 7
 8
 9        A P P E A R A N C E S
10
11   For the Plaintiffs:
12        Daniel Thornburgh, Esquire
          Aylstock Witkin Kreis and Overholtz, PLC
          17 E. Main Street, Suite 200
13        Pensacola, FL 32502
          850-202-1010
14        dthornburgh@awkolaw.com
15   For the Plaintiff Pamela Free:  (Via teleconference)
          Joseph Kramer, Esquire
16        Tor Hoerman Law LLC
          617 West Fulton Street
17        Chicago, IL 60661
          312-372-4800
18        joe@thlawyer.com
19   For the Defendant Ethicon:
          David B. Thomas, Esquire
20        Thomas Combs & Spann, PLLC
          300 Summers Street, Suite 1380
21        Charleston, WV 25301
          304-414-1800
22        dthomas@tcspllc.com
23
24
```

| | | |
|---|---|---|
| Page 3 | | Page 5 |

**Page 3**

```
 1   Caption Continued:
 2   Karyn Drake                :
     2:12-cv-00747
 3                             :
     Paula Kriz
 4   2:12-cv-00938             :
 5   Stacy Shultis             :
     2:12-cv-00654
 6                             :
     Kimberly Thomas (Wyatt)   :
 7   2:12-cv-00499
 8   Patricia Tyler            :
     2:12-cv-00469
 9                             :
     Myndal Johnson
10   2:12-cv-00498             :
11   Beverly Kivel             :
     2:12-cv-00591
12                             :
     Karen Bollinger
13   2:12-cv-01215             :
14   Virginia Dixon            :
     2:12-cv-01081
15                             :
     Shirley Walker
16   2:12-cv-00873             :
17   Dawna Hankins             :
     2:12-cv-00369
18                             :
     Wilma Johnson
19   2:11-cv-00809             :
20   Margaret Kirkpatrick      :
     2:12-cv-00746
21                             :
     Harriet Beach
22   2:12-cv-00476             :
23   Holly Jones               :
     2:12-cv-00443
24
```

**Page 5**

```
 1        I N D E X
 2
 3   TESTIMONY OF STEVEN MACLEAN, Ph.D
 4   EXAMINATION BY:              PAGE
 5   Attorney Thornburgh          7
 6   Attorney Thomas            129
 7   Attorney Thornburgh        132
 8
 9
10   MACLEAN DEPOSITION EXHIBIT          PAGE
11   No. 1 - Notice of Deposition      13
12   No. 2 - Thumb Drive               15
13   No. 3 - MacLean Expert Report     15
14   No. 4 - MacLean Supplemental Report Wave 1    16
15   No. 5 - Microphotograph           17
16   No. 6 - Microphotograph           17
17   No. 7 - Binder of Published Literature   18
18   No. 8 - Clavé Article             19
19   No. 9 - Summary of Publications   19
20   No. 10 - Plaintiffs Experts' Reports    24
21   No. 11 - Excerpt of Duane Priddy Testimony   25
22   No. 12 - June 15, 2015 Letter     26
23   No. 13 - Invoices                 27
24   No. 14 - Copy of MacLean Expert Report    34
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Steven MacLean, Ph.D., P.E.

Page 6

1        I N D E X  (Continued)

3    MACLEAN DEPOSITION EXHIBIT        PAGE
4    No. 15 - Copy of MacLean Supplemental Report    36
5    No. 16 - Histology Protocol        46
6    No. 17 - Automation in IHC Document        69
7    No. 18 - Iakovlev Degradation Article        78
8    No. 19 - Guelcher Protocol        121
9    No. 20 - Benight/MacLean/Garcia Publication    129

Page 7

1        S T E V E N   M A C L E A N, Ph.D., P.E., first
2    having been duly sworn, testified as follows:
3
4            EXAMINATION
5    BY MR. THORNBURGH:
6
7        Q.  Good morning, Dr. MacLean.
8        A.  Good morning.
9        Q.  How are you?
10       A.  I'm well.  How are you?
11       Q.  Good.  My name is Daniel Thornburgh.  And you
12    and I have met before in a prior deposition?
13       A.  We have.
14       Q.  And you understand that you're here to give
15    deposition testimony in the Wave 1 cases?
16       A.  Correct.
17       Q.  Okay.  And you've given deposition testimony
18    before, and so you know the ground rules.  I'm not
19    going to go through all of them.
20          But I would ask that if you don't understand
21    a question that I ask, let me know.  Okay?
22       A.  (Witness nods head.)
23       Q.  If you answer the question, I'm going to
24    assume that you understood it, and then we'll just move

Page 8

1    forward.  Okay?
2        A.  Understood.
3        Q.  And I'm not, obviously, a polymer scientist,
4    I'm not an expert, so I may ask a question poorly.  If
5    I do, just let me know.
6        A.  Will do.
7        Q.  I want to make sure that we have a clean
8    record.  Okay?
9        A.  Understood.
10       Q.  And you understand that you're under oath?
11       A.  I do.
12       Q.  And that you need to provide truthful and
13    accurate testimony.
14       A.  That's correct.
15       Q.  Have you given any depositions since the last
16    time you and I met?
17       A.  I believe there are two, yes.
18       Q.  In what cases?
19       A.  I don't remember.
20       Q.  Is it on your testimony list?
21       A.  It should be, yes.  The two cases that I
22    recall are Brunswick v. Slocum, and the second case is
23    Hower v. Excel.
24       Q.  So Brunswick versus Slocum?

Page 9

1        A.  (Witness nods head.)
2        Q.  What does that case concern?
3        A.  That was involving adhesive failure for wood
4    laminates.
5        Q.  Okay.  And did you -- were you retained in
6    that case to offer expert opinion testimony on behalf
7    of the Defendant manufacturer?
8        A.  For Slocum, correct.  The adhesive
9    manufacturer.
10       Q.  And what's the second case again?
11       A.  Hower v. Excel.  H-O-W-E-R v. -- and Excel is
12    E-X-C-E-L.
13       Q.  And what was the nature of that case?
14       A.  That was a products case involving a ride-on
15    lawnmower.
16       Q.  And so the Plaintiff is alleging some sort of
17    defect with the riding lawnmower?
18       A.  Yes.  Specifically, the fuel system and the
19    fuel lines.
20       Q.  Okay.  And you represented Excel, the
21    Defendant, in that lawsuit?
22       A.  That's correct.
23       Q.  And that was a Defendant manufacturer?
24       A.  That's correct.

3  (Pages 6 to 9)

Steven MacLean, Ph.D., P.E.

Page 10

1    Q.   And did you offer testimony in your capacity
2  as an employee for Exponent?
3    A.   I offered expert testimony as an expert in
4  polymer science.
5    Q.   As an employee of Exponent.
6    A.   As an employee of Exponent, correct.
7       (Discussion held off the record.)
8    Q.   Doctor, before we mark this exhibit, you
9  haven't personally analyzed any explanted polypropylene
10  meshes, correct?
11    A.   I have.
12    Q.   Okay.  Since -- did you do that in this case?
13    A.   I did that in the last few months, over the
14  last few months.
15    Q.   Okay.
16    A.   It was with regard to certain explants from
17  Wave 1.
18    Q.   Which Wave 1 explants did you analyze?
19    A.   (No response.)
20    Q.   Did you do a case-specific report?
21    A.   I did -- for those particular explants?
22    Q.   Right.
23    A.   I did not.
24    Q.   Okay.

Page 11

1    A.   The first one is Kathy Barton, B-A-R-T-O-N.
2  The second one is Michelle Bellito-Stanford.
3  B-E-L-L-I-T-O.  The third one is Barbara Bridges,
4  B-R-I-D-G-E-S.  Mary Jean Simpson.  Margaret
5  Stubblefield, S-T-U-B-B-L-E-F-I-E-L-D.  Charlene
6  Taylor, T-A-Y-L-O-R.  And last one is Mary
7  Wise-Turner, W-I-S-E - T-U-R-N-E-R.
8    Q.   Are these the first set of explanted mesh
9  material that you've analyzed as a polymer scientist?
10    A.   Analyzed, no, because I've analyzed scores of
11  data from other explants.
12    Q.   Data that was reported by other -- other
13  witnesses, other experts?
14    A.   By other researchers, experts, Ethicon
15  themselves, correct.
16    Q.   But this is the first time -- this batch of
17  Plaintiffs, this is the first time that you've
18  personally conducted or oversaw the analysis of
19  explanted mesh material.
20       MR. THOMAS:  Object to form of the question.
21    A.   This will be at least the second time,
22  because I did some work with the blue explant a few
23  years ago.  A year or so ago.
24    Q.   What work did you do with the blue explant?

Page 12

1    A.   Just examined it under the microscope after
2  the case was either settled or dismissed.  I can't
3  recall the outcome of that case.
4    Q.   There was some leftover material from that
5  lawsuit that you analyzed?
6    A.   Correct.
7    Q.   And what was the purpose of analyzing the
8  blue material?
9    A.   Just to look at the mesh with the tissue
10  around it.
11    Q.   Because you had not done it previously?
12    A.   Not prior to that.
13    Q.   So you were just trying to get sort of an
14  idea of what it looked like?
15    A.   I would say to just have an opportunity to
16  see it first-hand.
17    Q.   What did you do?  Just look at it by optimum
18  microscopy?
19    A.   Looked at it optically.  Also looked at it
20  under scanning electron microscopy.
21    Q.   Okay.  And you didn't perform any FTIR or any
22  other analysis?
23    A.   I don't believe so.  On that particular mesh.
24    Q.   We'll get back to the Plaintiffs that you've

Page 13

1  looked at their mesh specimens later on today.  Okay?
2    A.   Okay, sure.
3       (MacLean Deposition Exhibit 1 - Notice of
4        Deposition - marked for identification.)
5    Q.   Doctor, I've marked as Exhibit No. 1 the
6  Notice of Deposition.  Have you seen this document
7  before?
8    A.   I have.
9    Q.   And attached to the Notice and the Schedule A
10  that asks for a set of document requests, have you gone
11  through this Schedule A to look for any documents that
12  were responsive to this request?
13    A.   I have.
14       MR. THOMAS:  Dan, just so you know, you know
15       we filed a response to the Notice?
16       MR. THORNBURGH:  Okay.
17       MR. THOMAS:  Okay?
18    Q.   Were there any documents that you felt were
19  responsive to the request that you did -- that you did
20  not produce?
21       MR. THOMAS:  Objection.  There are a number
22       of the documents that we've objected to
23       producing in the response to the -- to the
24       Notice.  If you want to go through those one

Steven MacLean, Ph.D., P.E.

Page 14

1    by one, I'm happy to, but I think you'll find
2    that his complete file that he relies on for
3    his opinions in the case has been produced.
4        Q. Let me ask you this question: Did you
5    conduct any testing or analysis of -- in this
6    litigation that you did not produce the underlying data
7    for?
8        A. No.
9        Q. So you've produced all of the underlying data
10   related to all of the testing that you conducted in
11   this case.
12       A. For Wave 1, yes, correct.
13       Q. For Wave 1. And that was produced to me
14   electronically yesterday. I wasn't able to print out
15   any -- hardly any documents from that. Did you bring
16   any documents with you today? I see some notebooks.
17       A. I did.
18       Q. Let's go ahead and mark those documents.
19       A. Okay.
20       MR. THOMAS: For your information, Dan, he's
21       got a thumb drive in his computer which is
22       the complete set of what was sent to you
23       yesterday. If you want to mark the thumb
24       drive as well.

Page 15

1        MR. THORNBURGH: Yeah. We'll go ahead and
2    mark the thumb drive as well. Let's mark the
3    thumb drive as Exhibit No. 2.
4        MR. THOMAS: I'll put the sticker on it.
5        (MacLean Deposition Exhibit 2 - Thumb Drive -
6        marked for identification.)
7    BY MR. THORNBURGH:
8        Q. Okay, I'm going to mark as Exhibit No. 3 a
9    binder that you brought with you today that appears to
10   be your expert report.
11       A. Correct.
12       (MacLean Deposition Exhibit 3 - Expert Report
13       of Dr. Steven MacLean - marked for
14       identification.)
15       Q. I'm going to thumb through it real quickly.
16       A. By all means.
17       Q. And there's some highlighting on this report.
18   Are these highlighting -- is this highlighting that you
19   made?
20       A. My highlighting, correct.
21       Q. On Exhibit 3, there's a tab. Can you tell me
22   what that tab says. It's on Page 68 of your expert
23   report. I just can't read your handwriting.
24       A. Yep. No, that's fine. It's Becke,

Page 16

1    B-E-C-K-E.
2        Q. And what does "Becke" mean?
3        A. It's -- refers to a Becke line, which can be
4    an artifact of optical microscopy.
5        Q. Okay. We'll talk about that in a little bit.
6    Do you have any -- other than what's contained in
7    your report, did you bring any hard copies of the
8    microphotographs?
9        A. Very few. I have them all on the thumb
10   drive, so if there's one particular one you want to
11   focus in on, we can certainly pull it up.
12       Q. Okay. Does Appendix G of Exhibit 3 contain
13   all of the microphotographs that you took in this case?
14       A. It does.
15       Q. Did you take additional microphotographs in
16   your supplemental report of the work that you conducted
17   in the -- to produce the supplemental report?
18       A. Yes.
19       Q. Let's go ahead and mark Exhibit No. 4.
20       (MacLean Deposition Exhibit 4 - Wave 1
21       Supplemental Report of Dr. Steven MacLean -
22       marked for identification.)
23       Q. That is your supplemental report. I'll thumb
24   through it really quick.

Page 17

1        Okay. And Exhibit No. 4, there are a number
2    of separated -- looks like two microphotographs or
3    copies of microphotographs of -- it looks like the
4    chemical-treated specimens.
5        A. Correct.
6        Q. I'm going to go ahead and mark those
7    separately as Exhibit No. 5.
8        (MacLean Deposition Exhibit 5 -
9        Microphotograph - marked for
10       identification.)
11       Q. And Exhibit No. 6.
12       (MacLean Deposition Exhibit 6 -
13       Microphotograph - marked for
14       identification.)
15       Q. I don't see an appendix on exhibit to your
16   supplemental report that contains the images that we
17   saw in your original report, which was the
18   microphotographs. Is it fair to say that you did not
19   attach the microphotographs to your -- strike that.
20       Is it fair to say that you did not attach to
21   your supplemental report, or at least what you brought
22   with you today, the microphotographs of the work that
23   relates to the supplemental report?
24       A. I did not print hard copies of those,

5 (Pages 14 to 17)

Steven MacLean, Ph.D., P.E.

Page 18

1    correct.  But, again, they're on the hard drive.
2         Q.  Right.  I'll hand you back Exhibit No. 3 and
3    4.
4         (Discussion held off the record.)
5         Q.  We'll just keep those out so the court
6    reporter can find them as well.
7         A.  Sure.
8         (MacLean Deposition Exhibit 7 - Binder of
9          Published Literature of Dr. Steven MacLean -
10         marked for identification.)
11        Q.  Okay.  We've marked as Exhibit No. 7 a binder
12   that you brought with you today that appears to be some
13   published literature?
14        A.  (Witness nods head.)
15        Q.  Is that correct?
16        A.  It is correct.
17        Q.  There are a couple of additional documents in
18   the sleeve of Exhibit No. 7 that I'll mark as separate
19   exhibits.  The highlighting that's contained within --
20   or on any of these publications, who highlighted
21   those?
22        A.  I did.
23        Q.  And are the electronic copies of those
24   publications also contained on your thumb drive?

Page 19

1         A.  They are.
2         Q.  I'll mark as Exhibit No. 8 the Clavé article,
3    which was in the sleeve of Exhibit No. 7.
4         (MacLean Deposition Exhibit 8 - Clavé Article
5          - marked for identification.)
6         Q.  And looks like a summary of some of the
7    publications.  Correct?
8         A.  Correct.
9         Q.  Which I'll mark as Exhibit No. 9.
10        (MacLean Deposition Exhibit 9 - Summary of
11         Publications - marked for identification.)
12        Q.  Who drafted the summaries of these
13   publications?
14        A.  I did.
15        Q.  When did you draft this?
16        A.  Several weeks ago.
17        Q.  Was that in conjunction with the work that
18   you did on the supplemental report?
19        A.  I would say it was during the same time as
20   the supplemental report was being drafted.
21        Q.  Did you make any notes of any of the
22   publications prior to submitting your Wave 1 report?
23        A.  Those would be the only notes I have on the
24   literature that I've taken.  I don't recall the timing.

Page 20

1         Q.  Was the first time that you looked at the --
2    did you first read the articles that are summarized in
3    Exhibit No. 9 in conjunction with the work that you did
4    in your -- in drafting your supplemental report?
5         A.  Could you just repeat that.
6         Q.  Yeah.
7         MR. THORNBURGH:  Can you read that back.
8         (Record read back by the reporter.)
9         A.  No.  Many of those pieces of literature I
10   read over a year ago.
11        Q.  Okay.  So this was just a re-review of the
12   articles --
13        A.  Correct.
14        Q.  -- and publications?
15        A.  Correct.  Just to try to keep it all
16   straight.
17        Q.  When we met in the Mullins litigation and I
18   took your deposition, you had issued a report in that
19   case; the consolidated TVT set of cases.  And you had
20   testified during your deposition that you had help from
21   your technicians or staff members at Exponent in
22   drafting your expert report in the Mullins case.
23        A.  I had some assistance with some of the
24   sections of the report, correct.  Initial drafts of the

Page 21

1    report.
2         Q.  Okay.  Did you have any assistance in -- from
3    your staff or technicians in drafting your first
4    expert report, your primary expert report that was
5    issued in the Wave 1 cases?
6         A.  I did, but it was fairly limited, because
7    the -- it was only some additional sections from the
8    Mullins report that were added into the supplemental.
9         Q.  I'm talking about --
10        A.  I'm sorry.
11        Q.  -- the initial report, yes.
12        A.  Yes.
13        Q.  And then what about your supplemental report?
14   Did you have assistance in drafting that report from
15   staff members or employees of Exponent?
16        A.  I did.  I had two colleagues that assisted
17   with that work.
18        Q.  And what are their names?
19        A.  Dr. Garcia and Dr. Benight.
20        (Witness asked for clarification by the
21         reporter.)
22        A.  B-E-N-I-G-H-T.
23        Q.  And who helped you with drafting the -- some
24   of the sections in your Wave 1 primary initial report?

6  (Pages 18 to 21)

Steven MacLean, Ph.D., P.E.

Page 22

1    A.  Dr. Moll.
2    Q.  Okay.
3    A.  And Dr. McGann.  M-O-L-L, M-C-G-A-N-N.
4    Q.  For your first report in Wave 1 -- we'll
5    call it your primary report -- what sections were
6    drafted by the employees of Exponent?
7    A.  I think we'd have to go look at the report
8    and look at the additional sections.
9        (Discussion held off the record.)
10   A.  So Dr. Moll and I had worked on the Mays
11   section, M-A-Y-S.  Dr. McGann and I worked on the
12   Priddy section, P-R-I-D-D-Y.  And Dr. Moll and I worked
13   on the Klinge, K-L-I-N-G-E, section.
14   Q.  And are those -- those sections represent the
15   only additions to your report that was issued in the
16   Mullins case?
17   A.  Not exactly.  So in this -- in the Wave 1
18   report, I consolidated the original microscopy report
19   with the Mullins report, so that, arguably, is also an
20   addition.
21   Q.  Right.
22   A.  And I think that is the total of the
23   additions, compared from -- Mullins, compared to Wave
24   1.

Page 23

1    Q.  Okay.  And regarding your supplemental
2    report, which I think was marked as Exhibit No. 3 -- 2
3    or 3 --
4        MR. THOMAS:  4.
5    Q.  I'm sorry, 4.  Who, again, helped you with
6    that report?
7    A.  I'm sorry.  Which report?
8    Q.  You said Dr. Benight and another doctor.
9    A.  And Dr. Garcia.
10   Q.  Dr. Benight and Dr. Garcia helped you draft
11   the additional sections that were added to the
12   supplemental report?
13   A.  I just want to make sure we have all the
14   reports --
15   Q.  Exhibit No. 4.
16   A.  So just ask me that one more time.
17   Q.  Yeah.  Dr. Benight and Dr. --
18   A.  Garcia.
19   Q.  -- Garcia, they helped you draft certain
20   sections of the supplemental report.  Right?
21   A.  Correct.  That's correct.
22   Q.  Which has been marked as Exhibit No. 4.
23   Which section did those doctors or those technicians
24   assist you with?

Page 24

1    A.  They're not technicians.  They're -- they are
2    Ph.D. scientists.  And I don't recall which sections
3    exactly.  We went through that report several times.  I
4    couldn't parse out which sections they helped with and
5    which ones they didn't.
6    Q.  Okay.  Well, we'll go through it --
7    A.  Okay.
8    Q.  -- in greater detail.
9    A.  Sure.
10   Q.  I'm going to hand you back Exhibit No. 7,
11   which is the published literature.
12   A.  Okay.
13   Q.  Here is Exhibit No. 8, which is your
14   marked-up copy of the Clavé study.
15   A.  Thank you.
16   Q.  And Exhibit No. 9, which is your summary of
17   some of the publications.
18       I'll mark as Exhibit No. 10 a binder that you
19   brought with you that appears to be copies of certain
20   expert reports from the Plaintiffs.
21       (MacLean Deposition Exhibit 10 - Plaintiffs
22        Experts' Reports - marked for
23        identification.)
24   A.  Correct.

Page 25

1    Q.  In the sleeve, there appears to be a
2    deposition excerpt from Dr. Priddy.
3    A.  Correct.
4    Q.  I'll mark that as a separate exhibit, No. 11.
5       (MacLean Deposition Exhibit 11 - Excerpt of
6        the testimony of Duane Priddy, Ph.D. -
7        marked for identification.)
8    Q.  It's two pages.  It's 139 and 140 of Dr.
9    Priddy's deposition.
10   A.  Correct.
11   Q.  And this is an excerpt -- was this excerpt
12   provided to you by Ethicon's counsel?
13   A.  No.  The entire deposition was provided to me
14   from Ethicon's counsel.  That was an excerpt that I
15   took out and highlighted.
16   Q.  Okay.  And so you did the highlighting of
17   this -- on this document?
18   A.  Correct.  I read his entire deposition, and I
19   highlighted those sections and pulled them out.
20   Q.  Okay.  And there's some flags on Exhibit
21   No. 10.  Are those flags done by you?
22   A.  They were done by me.
23   Q.  It looks like all of these flags relate to
24   the expert report of Dr. Iakovlev.

7 (Pages 22 to 25)

Steven MacLean, Ph.D., P.E.

Page 26

1    A.  It would appear.  Just show me the yellow
2  one.  You are correct.
3    Q.  Okay.  Are there any documents or materials
4  that you brought with you today that we have not
5  marked?
6    A.  No.  I believe that's everything.
7    Q.  Dr. MacLean, when were you retained by
8  Ethicon as an expert in the Wave 1 cases?  Actually,
9  this might help you out.
10    (MacLean Deposition Exhibit 12 - June 15,
11      2015 letter from Steven MacLean to Chad R.
12      Hutchinson - marked for identification.)
13    Q.  I've marked as Exhibit No. 12 a letter.  It
14  looks like it's from Exponent to Chad Hutchinson, which
15  is a lawyer for Butler Snow, representing Ethicon.  It
16  looks like a retention letter.
17    A.  That is correct.
18    Q.  Okay.  So based on -- according to the
19  retention letter, you were retained formally by
20  letter -- or you accepted the request to be retained on
21  June 15th, 2015.  Is that correct?
22    A.  Correct.  That's when this formal letter was
23  written.
24    MR. THOMAS:  And just to be fair, it's

Page 27

1      general consulting.  I don't think Wave 1
2      existed at the time this letter was written.
3    MR. THORNBURGH:  Okay.
4    Q.  So this was general consulting for future
5  work -- future unknown work to be conducted on behalf
6  of -- or as an expert employed at Exponent,
7  representing Ethicon.
8    A.  It's a retention for mesh-related matters,
9  correct.
10    Q.  What's your hourly fee, again?
11    A.  In 2016, it's 380.
12    Q.  380.  So at the time --
13    (Discussion held off the record.)
14    Q.  At the time that you were retained as a
15  general expert in June of 2015, your hourly rate was --
16  appears to be $355 per hour?
17    A.  In 2015, correct.
18    Q.  Okay.  And it has gone up in 2016 to $380 per
19  hour?
20    A.  It is now $380 an hour, correct.
21    Q.  All right.  You also produced a number of
22  invoices.  We'll mark it as Composite Exhibit No. 13.
23    (MacLean Deposition Exhibit 13 - Invoices -
24      marked for identification.)

Page 28

1    Q.  Which Composite Exhibit 13 contains an
2  invoice from July 17th, 2015, in the amount of $72,174.
3  So about a month after your -- the retention letter,
4  you invoiced Ethicon in this amount.  Correct?
5    A.  Correct.
6    Q.  So the $72,174, does that represent payment
7  for the work that was conducted by you or by Exponent
8  related to the retention letter of June 15th, 2015?  Is
9  that all work -- strike that.
10    Does that invoice represent work that was
11  conducted by you or Exponent after the June 15th, 2015
12  retention letter?
13    A.  For my projects, correct.
14    Q.  Okay.  So in less than a month, you and/or
15  Exponent billed Ethicon for $72,174.
16    A.  We provided services that equated to $72,174.
17    Q.  Okay.  What services did you provide from
18  June 15th, 2015 to July 17th, 2015 which represent the
19  billing of $72,174?
20    A.  Consulting services.
21    Q.  What type of consulting services?
22    A.  We were working on -- at this time we would
23  have been working on the Mullins consolidated cases.
24  So I would -- without having any more detail, this work

Page 29

1  would have been in support of that effort, primarily.
2    Q.  When did you begin your work for the Wave 1
3  cases?
4    MR. THOMAS:  Object to form of the question.
5    A.  I don't recall a specific date.
6    Q.  If you look at the next invoice, it's dated
7  August 13th -- let's see here.  August 13th, 2015.  And
8  the August 13th, 2015 invoice, which is about a month
9  later from the last invoice that we looked at, is in
10  the amount of $19,848.  Correct?
11    A.  Correct.
12    Q.  Was this -- did this -- the work that you
13  conducted and billed for this August 13th invoice, does
14  that relate to the work that you did in the Wave 1
15  litigation?
16    A.  For the -- I'm sorry; for which invoice?  The
17  August 13th invoice?
18    Q.  August 13th.
19    A.  No.  This would not have included Wave 1.
20    Q.  The next invoice is dated October 30th, 2015.
21  I'll hand you a copy of that.  And this invoice, it
22  doesn't have a total.  Doesn't appear to be totaled.
23  Right?
24    A.  It does not appear to be totaled, unless the

8 (Pages 26 to 29)

Steven MacLean, Ph.D., P.E.

Page 30

1    second page is perhaps missing.
2        Q. And it looks like it's somewhere north of a
3    hundred thousand dollars. Right? I didn't do the
4    math, but somewhere north of a hundred thousand?
5        A. It's probably somewhere between 90 and a
6    hundred thousand dollars.
7        Q. Okay. And does the work that's reflected on
8    the invoice of October 30th, 2015, which is just two
9    months later from the last invoice, does that represent
10   any work that was conducted by you or Exponent as it
11   relates to the Wave 1 litigation?
12       A. My best recollection is no, that this is
13   still prior to Wave 1.
14       Q. Okay. December 29th, 2015 is the next
15   invoice that was produced. And this is an invoice in
16   the amount of $34,781.70. Approximately two months
17   since the last invoice. Does any of the work contained
18   on the December 29th, 2015 invoice relate to the work
19   that was conducted by you in Wave 1?
20       A. I don't believe so.
21       Q. Here's the January 21st, 2016 invoice. It
22   looks like this is in the amount of $6,078. Is that --
23   does this invoice represent any work that was conducted
24   by you in Wave 1?

Page 31

1        A. Most likely.
2        Q. Okay. Would this indicate to you
3    approximately the time that you would have been
4    retained in the Wave 1 --
5        A. I wouldn't use the word "retained". I think
6    our Wave 1 discussions and conversations started in or
7    around the 1st of January.
8        Q. So is it fair to say that all of the invoices
9    after January 21st, 2016 would relate to the work that
10   you conducted in the Wave 1 litigation?
11       A. No, not necessarily. Actually, I take that
12   back. With regards to this project number, yes.
13       Q. Okay. So Project No. 1504469 would -- would
14   represent the project number for the Wave 1 work?
15       A. And -- and Mullins, correct.
16       Q. Okay. So January 21st, 2016 is an invoice,
17   again, for $6,078. The next invoice is a month later;
18   approximately February 23rd, 2016. It's not totaled,
19   but would be somewhere between 30- and $40,000?
20       A. Approximately.
21       Q. The next invoice I have is March 16th, 2016.
22   Again, this invoice is not totaled, but it would appear
23   to be somewhere north of -- somewhere close to a
24   hundred thousand?

Page 32

1        A. Roughly between 90 and a hundred thousand.
2        Q. And I've got another invoice that is out of
3    order. This is from November 24th, 2015, so before the
4    work that you conducted on Wave 1. I have marked
5    that -- or it's already marked, but I'll hand it over
6    to you.
7            And this invoice is also not totaled, but it
8    looks -- appears to be somewhere around $80,000,
9    approximately. A little more than that.
10       A. Somewhere in that ballpark, correct.
11       Q. Okay. So the -- and you've -- going back to
12   the last invoice, March 15th, 2016, you have and
13   Exponent has conducted additional -- or has performed
14   additional services or work for Exponent [sic] since
15   March 15th, 2016, correct?
16           MR. THOMAS: Object to form. I think you --
17       A. Yeah.
18           MR. THOMAS: -- said we did the work for
19       Exponent.
20       Q. I'm sorry. Let me re-ask the question.
21           Since the March 15th, 2016 invoice, Exponent
22   or yourself has performed additional services on behalf
23   of Ethicon, correct?
24       A. Are you asking me since March 15th?

Page 33

1        Q. Yeah. There would be additional billing,
2    right?
3        A. Yeah. Sure.
4        Q. Okay. And what work has been conducted by
5    you or Exponent related to the Wave 1 cases since the
6    March 15th, 2016 invoice? If you know.
7        A. I don't think I know specifically, without
8    looking at the -- I would say the pending or the
9    current invoices which have not been generated yet. I
10   suspect some of them would have been related to my
11   deposition prep.
12       Q. And how much time have you spent prepping for
13   the deposition?
14       A. I don't -- I don't know a number.
15       Q. 20 hours or more?
16       A. I think, yeah, probably 20 to 30 hours.
17       Q. And does that include prep that you've --
18   strike that.
19           Does that include meetings that you've held
20   or had with Ethicon's counsel in preparation for the
21   deposition?
22       A. Yes, that would include that.
23       Q. Okay. And when did you meet with Ethicon's
24   counsel to prepare for the deposition?

9 (Pages 30 to 33)

Steven MacLean, Ph.D., P.E.

Page 34

1     A.  Dr. -- excuse me.  Mr. Thomas and I met last
2   night for a few hours.
3     Q.  How many hours did you meet last night to
4   prepare for the deposition?
5     A.  Probably two.
6     Q.  We're done with the invoices.  Just keep
7   those invoices together, because they're a composite
8   exhibit.
9         Doctor, I'm going to go ahead and mark my
10  copy of your expert report, the primary expert report
11  that was issued in Wave 1, as Exhibit No. 14.
12        (MacLean Deposition Exhibit 14 - Copy of
13         Expert Report of Dr. Steven MacLean - marked
14         for identification.)
15    Q.  I've remarked it just so that we could
16  navigate easier, because I've got my own marked-up
17  copy, so.
18        But your Wave 1 expert report, if you turn to
19  the -- maybe the first page, it shows a date of
20  March 1st, 2016.
21    A.  Correct.
22    Q.  Okay.  And is that -- to your recollection,
23  is that when you had finished and signed your Wave 1
24  first report?  Approximately.

Page 35

1     A.  I don't recall, but I'll take the date at
2   face value.
3     Q.  Okay.  And we're not going to spend a whole
4   lot of time on your first report, because it's --
5   contains a lot of the same information and testimony
6   that you had provided in the Mullins case.  Okay?
7     A.  (Witness nods head.)
8     Q.  We may -- we might jump to it, but we're not
9   going to spend too much time on it.
10    A.  Understood.
11    Q.  And after you had submitted your initial
12  report in Wave 1, you then submitted a supplemental
13  report, correct?
14    A.  Correct.
15    Q.  And the supplemental report was submitted
16  late, after the deadline for expert disclosures?  Do
17  you --
18    A.  I don't recall those dates.  I can only go
19  with what date was on the actual report.
20    Q.  Why weren't you able to submit your
21  supplemental report earlier?
22    A.  Because the work that we were performing did
23  not conclude, I think, until early March.
24    Q.  So the work that is contained within your

Page 36

1   supplemental report did not conclude until, you said,
2   early March?
3     A.  Yeah.  I can give you a date.
4     Q.  I'll go ahead and -- let's mark as Exhibit
5   No. 15 my copy of your supplemental report.
6         (MacLean Deposition Exhibit 15 - Copy of the
7          Supplemental Report by Steven MacLean -
8          marked for identification.)
9     Q.  Your supplemental report is dated March 22nd,
10  2016?
11    A.  Correct.
12    Q.  And the reason why you couldn't submit it
13  earlier was because the work that you were conducting,
14  which is contained within the supplemental report,
15  wasn't yet complete.
16    A.  Correct.
17    Q.  Were you provided with a deadline for
18  which the work needed to be completed for the Wave
19  1 cases?
20    A.  No.  I was not given a deadline.
21    Q.  And the work that you -- that is reported in
22  your supplemental report, the additional analysis of
23  the TVT products, the hernia product, and the suture
24  product, when did you begin that work?

Page 37

1     A.  Off memory, in and around February 1st, 2016.
2     Q.  And why don't you just briefly describe what
3   additional experiments you did which are contained
4   within your Wave 1 supplemental report.
5     A.  Okay.  So we sought to expand the previous
6   work that we did.  And so I acquired a number of
7   different PROLENE products.  As you mentioned, a TVT
8   mesh, hernia mesh, PROLENE sutures.  We also went out
9   in the open market and bought an off-the-shelf grade of
10  polypropylene from Sigma-Aldrich.  And we deliberately
11  oxidized those specimens under two defined protocols.
12  And then after we oxidized them, they were microtomed
13  and stained in H&E staining solutions.  And we then did
14  some microscopy work to determine if the stain was
15  retained by any of those specimens.
16    Q.  Okay.  If we turn to Page 4 of your
17  supplemental report, Exhibit No. 15, you have sort of
18  the introduction of your report.  Page 4.  I'm sorry,
19  Exhibit No. 15.
20        MR. THOMAS:  That's the wrong one.
21    Q.  There you go.  Okay.
22        (Discussion held off the record.)
23        (Attorney Joseph Kramer joins deposition by
24         teleconference.)

10 (Pages 34 to 37)

Steven MacLean, Ph.D., P.E.

Page 38

1      Q.   Back to Exhibit No. 15, Page 4, you sort of
2  summarize the additional testing or materials that you
3  analyzed for your supplemental report.  Correct?
4      A.   That is correct.
5      Q.   And so it looks like you looked at three TVT
6  samples, one hernia sample, and one suture sample.
7  Correct?
8      A.   Correct.
9      Q.   Okay.  And you conducted additional -- an
10  additional experiment using the QUV oxidation.
11  Correct?
12      A.   Correct.
13      Q.   Which is UV radiation, right?
14      A.   It is.
15      Q.   You intentionally oxidized the -- or your
16  intent was to intentionally oxidize the samples using
17  UV light?
18      A.   Correct.
19      Q.   And energy?
20      A.   We irradiated the samples with UV light,
21  correct.
22      Q.   And you accelerated that -- that by
23  increasing the temperature?
24      A.   It was 60 degrees Celsius inside the chamber.

Page 39

1      Q.   Okay.  And how many pieces of the TVT device
2  were subjected to the UV irradiation experiment?
3      A.   There were several hundred individual fibers
4  that were exposed to QUV.
5      Q.   How many samples of the -- so I'm just trying
6  to break this down.  Okay?
7      A.   Sure.
8      Q.   You received three TVT pristine,
9  in-the-package products from Ethicon.  Correct?
10      A.   (No response.)
11      Q.   If you turn to Page 9 -- maybe this will help
12  you out.  If you turn to Page 9 of your supplemental
13  report.
14      A.   (Witness complies.)
15      Q.   You talk about sample preparation.
16      A.   Correct.
17      Q.   Okay.  And it says that from each of the TVT
18  products, the hernia mesh product, and the suture,
19  somebody from Exponent used a razor blade to cut about
20  a one-centimeter-long section -- or sections of each
21  sample.  Do you see that?
22      A.   I do.
23      Q.   Okay.  So is it fair to say that for each of
24  these devices or products, one section was cut and

Page 40

1  prepared for these experiments, and a section of
2  approximately one centimeter?
3      A.   It says each sample that was cut was
4  approximately one centimeter in length.
5      Q.   Okay.  So from each product --
6      A.   Yep.
7      Q.   -- for the QUV/UV oxidation experiment, how
8  many pieces were cut to conduct that experiment of each
9  of those products; the TVT, the hernia mesh, and the
10  suture?
11      A.   That were exposed to QUV?
12      Q.   Yeah.
13      A.   So I have one swath of material from Device
14  3859228.  A second one, second swath of material from
15  3859228.
16      Q.   What product is 389228 [sic]?
17      A.   TVT device.
18      Q.   Okay.  And then it's --
19          MR. THOMAS:  It's the lot number in the
20  paragraph, Dan.
21      A.   Yeah.  And then there's a second mesh from
22  that same lot, which we took out two swaths.
23      Q.   And when you say "swaths," are you talking
24  about the one-centimeter sample?

Page 41

1      A.   That's right.  A region of the mesh that was
2  excised out.  Each one of those swaths contains up --
3  on the upwards of 200 individual fibers.
4          And then we have two -- two swaths that were
5  excised from TVT device, Lot No. 3832826.  We have a
6  swath excised from hernia mesh Lot No. 27770-20.  And a
7  second swath that was excised from that same mesh.
8          So -- and those would be the universe of QUV
9  specimens.
10      Q.   Okay.  Did you -- I thought you did some QUV
11  on the suture 6-0.
12      A.   Right.  I was just talking about mesh.
13      Q.   Okay.  Did you also do UV radiation on the
14  PROLENE sutures?
15      A.   Yes.
16      Q.   How many swaths?
17      A.   Appears to be 15 sutures.
18      Q.   15 sutures?
19      A.   (Witness nods head.)
20      Q.   Okay.  And were -- so let me try to summarize
21  how many samples were exposed to UV radiation on the
22  QUV experiment.
23          As I understand it, there were four -- what
24  you call swaths of the TVT.

11 (Pages 38 to 41)

Steven MacLean, Ph.D., P.E.

Page 42

1    A.  Correct.
2    Q.  Correct?  There were four swaths from the
3  hernia.
4    A.  I have six swaths from TVT and two additional
5  ones from hernia.
6    Q.  Okay.  So six from TVT, two from hernia, and
7  then 15 individual sutures?
8    A.  I believe so.
9    Q.  And based on your report, these samples were
10  exposed to QUV radiation for a period of five to 12
11  days?
12    A.  Correct.
13    Q.  And then they were analyzed by you or
14  somebody at Exponent using scan electron microscopy?
15    A.  They were.  Their surfaces -- surface
16  topography and morphology was monitored through SEM.
17    Q.  Okay.  Who monitored the surface morphology?
18    A.  Dr. Lyons.
19    Q.  Okay.  Who --
20    A.  L-Y-O-N-S.
21    Q.  Okay.  So Dr. Lyons was conducting the SEM
22  imaging or analysis during the QUV oxidation
23  experiment.
24    A.  Correct.

Page 43

1    Q.  And after the five to 12 days, after the
2  morphology or the cracking started to appear on the
3  surface of the material, you did some additional
4  analysis using FTIR?
5    A.  Correct.
6    Q.  And you did some additional SEM EX?  Is that
7  correct?
8    A.  Correct.
9    Q.  And then at some point some of these samples
10  were submitted for histology preparation.
11    A.  All of -- it's all from the same universe of
12  specimens.  So after they came out of the QUV chamber,
13  a small section was excised off of one of the corners
14  of the mesh, and that was analyzed through the FTIR
15  technique that you just described.  And the remainder
16  of that specimen was sent off to histology.
17    Q.  Okay.  So how many samples were sent to
18  histology?
19    A.  All of them.
20    Q.  Okay.  So all -- so the six sutures -- I'm
21  sorry.  Strike that.  The six TVT's, the two hernia
22  samples, and the 15 sutures were sent to a third-party
23  company called Histion?
24    A.  Right.  Which contained 7- to 800 individual

Page 44

1  fibers.
2    Q.  Okay.  And Histion was asked to do what?
3    A.  They were asked to perform the staining
4  portion of the work.
5    Q.  And Histion is the same pathology company
6  that you and Exponent used in the Mullins case?
7    A.  Correct.
8    Q.  Have you ever used Histion for any other work
9  prior to Mullins?
10    A.  I have not.  Exponent has.
11    Q.  How did you learn about Histion?
12    A.  Through Dr. Garcia.
13    Q.  So Dr. Garcia recommended to you Histion as
14  the laboratory to conduct the processing and staining
15  of -- of these samples.  Is that correct?
16    A.  Yes.  I asked her to identify a lab that had
17  this expertise, and that's the lab she mentioned.
18    Q.  And how were the -- how did Histion -- strike
19  that.
20        How many of the samples that we just
21  discussed were sent to Histion for paraffin embedding?
22    A.  Oh, it was roughly half.  About half went
23  into paraffin, and about half went into the resin.
24    Q.  Is there a document that would identify for

Page 45

1  me -- I don't need you --
2    A.  Yeah.
3    Q.  Just for later on, if I want to go and find
4  out how many pieces of samples were embedded in
5  paraffin by Histion, is there a document I can look to,
6  to find that out?
7    A.  If you look at all of the -- two things.  You
8  can look at the log.  The log may contain that
9  information.  But if you look at the file names of all
10  the micrographs, if you see a capital "P", that stands
11  for paraffin.  If you see an isolated capital "R", that
12  stands for resin.
13    Q.  Okay.  So -- so roughly half of these samples
14  were submitted -- or were embedded into paraffin by
15  Histion.  Right?
16    A.  Correct.
17    Q.  And what protocol did you instruct Histion to
18  use in embedding these samples in paraffin?
19    A.  The protocol that's listed in my report.  So
20  if you look at it on the thumb drive -- I know you
21  don't have it.  I'll just speak to -- speak to it, so
22  it's on the record.
23    Q.  I may -- I may have it.  I have a protocol
24  here.  Is that what you're referring to?

12 (Pages 42 to 45)

Steven MacLean, Ph.D., P.E.

Page 46

1      A.  I am.
2          MR. THOMAS:  There's several protocols.
3      A.  Yeah, there's several.  But this one's
4  entitled Histology, Embedding, and Staining Protocol
5  for PROLENE Mesh and Sutures.
6      Q.  You didn't -- when we -- when I took your
7  deposition in Mullins, you didn't have any written
8  protocols.
9          MR. THOMAS:  Object to the form.
10     A.  Sure, we did.
11     Q.  You didn't produce any protocols.
12     A.  These -- this staining protocol's in my
13  report, in the Mullins report.
14     Q.  Okay.  Let's go ahead and mark as Exhibit
15  No. --
16         (Discussion held off the record.)
17         (Recess held from 9:50 a.m. till 9:53 a.m.)
18         (MacLean Deposition Exhibit 16 - Histology,
19          Embedding, and Staining Protocol for PROLENE
20          Mesh and Sutures - marked for
21          identification.)
22  BY MR. THORNBURGH:
23     Q.  Okay, Doctor, I'm going to hand you what I've
24  marked as Exhibit No. 16, which appears to be -- or is

Page 47

1  labeled the Laboratory Protocol for Histology,
2  Embedding, and Staining Protocol for PROLENE Mesh and
3  Sutures.
4         (Discussion held off the record.)
5      Q.  Doctor, do you recognize Exhibit 16?
6      A.  I do.
7      Q.  Okay.  And is Exhibit 16 the written protocol
8  for paraffin embedding and staining?
9      A.  It is.
10     Q.  Okay.  And when was this protocol first
11  written?
12     A.  This particular document was written on
13  January 19th, 2016.
14     Q.  Okay.  And that would have been after your
15  Mullins deposition, correct?
16     A.  This document, correct.
17     Q.  Okay.  So there wasn't an actual laboratory
18  protocol like the one that we have here as Exhibit 16
19  that was written out by Exponent and produced to me in
20  that litigation.  Correct?
21     A.  I disagree.  Appendix A of my September 10th,
22  2015 report has histology protocols in it.
23     Q.  There wasn't a formal Exponent document,
24  correct?

Page 48

1          MR. THOMAS:  Object to form.
2      A.  Our reports are formal.
3      Q.  There wasn't a formal Exponent document
4  protocol.
5          MR. THOMAS:  Object to form.
6      Q.  Other -- other than what was contained within
7  your expert report.  Right?
8      A.  The expert report contains the protocol that
9  we use.
10     Q.  In any event, after I took your deposition in
11  the Mullins case, this document, Exhibit No. 16, was
12  created.
13     A.  Correct.
14     Q.  All right.  And this is -- and the intent of
15  this document is to have a protocol that can be
16  followed by you or -- or individuals at Exponent so
17  that you can follow the steps appropriately.  Right?
18     A.  That's what the protocol is used for.
19     Q.  And it says -- under "Purpose", it says, "The
20  purpose of this document is to describe histology,
21  embedding, and staining procedures for PROLENE mesh and
22  suture material."
23         Did I read that correctly?
24     A.  You did.

Page 49

1      Q.  Okay.  If you go down to Section C, it says
2  "Paraffin-Embedding Protocol".
3      A.  Yes.
4      Q.  Okay.  And it says -- under Section C, it
5  says -- there's a -- well, strike that.
6         It says "Paraffin-Embedding Protocol", and
7  there's a Footnote No. 1.  Which if you go to the
8  Footnote No. 1, it says, "Paraffin-embedded samples are
9  prepared and stained following the protocol submitted
10  by Dr. Iakovlev."
11         Did I read that correctly?
12     A.  You read the footnote correctly.
13     Q.  So what was the purpose of creating a
14  paraffin-embedding protocol that would follow the
15  protocol submitted by Dr. Iakovlev?
16     A.  We were attempting to replicate his work on
17  non-explanted mesh and PROLENE materials.
18     Q.  Okay.  So your goal was to attempt to
19  reproduce the results of Dr. Iakovlev.  Is that
20  correct?
21     A.  No, that's not correct.  Not his results.  We
22  were just performing the control study which his
23  experiments were missing.
24     Q.  Okay.  So it's your testimony that your

13 (Pages 46 to 49)

Steven MacLean, Ph.D., P.E.

Page 50

1  purpose was to see if his study was reproducible --
2      A.  No.
3      Q.  -- in your control.
4      A.  No.  That's not what we tried to do.  Mr. --
5  Dr. Iakovlev's experiment was on explanted materials.
6  His experiments lacked a control in known oxidized
7  material exposed to staining, and so we simply filled
8  that gap.  We didn't try to reproduce what he did.  It
9  was a fundamental step missing from his experiments
10 that we filled with our control experiment.
11     Q.  So it was important for your control
12 experiment, since it's a control, to follow the
13 protocol that was outlined by Dr. Iakovlev.
14     A.  Correct.
15     Q.  And who provided to you the protocol of
16 Dr. Iakovlev?
17     A.  I believe it came in some form from all the
18 production documents.  I don't remember where it came
19 from.
20     Q.  I didn't -- I looked through the materials
21 that were produced, and I didn't see any written
22 protocol of Dr. Iakovlev within the documents you
23 produced.  Maybe I'm missing it.  I'm not suggesting
24 that --

Page 51

1      A.  Yeah.  I don't -- I don't recall off the top
2  of my head what production document that came from or
3  where we found it, for that matter.  I just don't
4  recall.
5      Q.  Do you know when you received it?
6      A.  Well, we certainly had it before the first
7  round of work.  So sometime last summer, last fall.
8      Q.  Okay.
9      A.  He may have referenced something that was
10 publicly available, and that's what we used.  I just --
11 I just don't recall.
12     Q.  Okay.  But your -- your goal was to follow
13 the same protocol that Dr. Iakovlev has -- had used.
14 Right?
15     A.  Yes.  That was our intent; to basically do
16 the same type of staining that he did; embedding and
17 staining that he did.
18     Q.  And if you don't follow the protocol of
19 Dr. Iakovlev, your conclusions could be inaccurate.
20        MR. THOMAS:  Object to form.
21     A.  I think you'd have to show me what you mean
22 by "different".
23     Q.  If you didn't follow the protocol of
24 Dr. Iakovlev, that could call into question your

Page 52

1  results.
2         MR. THOMAS:  Object to form.
3      A.  I'd need more information to pass judgment on
4  that.
5      Q.  Your intent was to follow Dr. Iakovlev's
6  protocol.
7         MR. THOMAS:  Object to form.
8      A.  Our intent was to stain deliberately oxidized
9  specimens from a well-accepted H&E process, correct
10     Q.  As a control.
11     A.  As a control.
12     Q.  And if you're doing a control, it's important
13 for you to follow the procedures and protocol of
14 Dr. Iakovlev.
15        MR. THOMAS:  Object to form.
16     Q.  Right?
17     A.  We did a control experiment with H&E stains.
18 That's what we did; oxidized specimens that were then
19 ultimately stained with H&E.
20        (Witness asked for clarification by the
21         reporter.)
22     A.  We did an experiment with intentionally
23 oxidized specimens that were ultimately H&E stained.
24     Q.  Well, the purpose of a control is that you

Page 53

1  treat the control the same way that you treat the
2  experimental material.  Right?
3      A.  Correct.  We make every attempt to follow the
4  procedure that was outlined in our protocol.
5      Q.  And if you don't, you have an invalid
6  control.
7      A.  No, not necessarily.
8         MR. THOMAS:  Object to form.
9      A.  Not necessarily.  You'll need to give me more
10 information if you --
11     Q.  I'm just trying to get some background
12 information.
13     A.  Asked and answered.
14     Q.  Well, let's look at Exhibit -- let's look at
15 Exhibit 16, Paraffin-Embedding Protocol.  And you say
16 that your -- you prepared this protocol following the
17 protocol of Dr. Iakovlev.  And then if you look at the
18 very -- No. 1, it says you process and embed samples in
19 an automated tissue processor according to the
20 following schedule.  Did I read that correctly?
21     A.  I'm sorry, what page are you on?
22     Q.  Page 1, Exhibit 16.
23     A.  Um-hum.
24     Q.  Section C.

14 (Pages 50 to 53)

Steven MacLean, Ph.D., P.E.

Page 54

1    A.  Yep.
2    Q.  Where you are laying out the protocol for
3  paraffin embedding.  And you have a set of steps,
4  right?  1 through 6?
5    A.  Correct.
6    Q.  And the first step is 70 percent reagent
7  alcohol; number of changes, two; one hour each.  Right?
8    A.  Correct.
9    Q.  Okay.  And what was the purpose of doing that
10  step?
11    A.  Those are just dehydration steps.
12    Q.  Now, there's no tissue, right?
13    A.  There is no tissue.
14    Q.  So there's no tissue on your samples.  Right?
15    A.  No.  They're control specimens.
16    Q.  Okay.  So you're not really dehydrating
17  tissue.
18    A.  No, but we're following a standard embedding
19  procedure.  So we didn't want to leave any steps out.
20    Q.  You didn't want to leave any steps out.
21    A.  Correct.
22    Q.  It's important to follow the steps.
23    A.  Sure.
24    Q.  Okay.  If you go to Step 2, 80 percent

Page 55

1  reagent alcohol.  Right?
2    A.  Um-hum.
3    Q.  What was the purpose of that?  Additional
4  dehydration?
5    A.  Correct.
6    Q.  And number of changes, one, for one hour.
7    A.  Correct.
8    Q.  Okay.  If you go to Step 3, 95 percent
9  reagent alcohol; number of changes, one, for another
10  hour.  Right?
11    A.  Correct.
12    Q.  And this is all going to be -- all these
13  steps are going to be performed by Histion, right?
14    A.  That's right.
15    Q.  Exponent didn't have any role in
16  performing these --
17    A.  We oversaw --
18    Q.  -- steps --
19    A.  Excuse me.  We oversaw the work.
20    Q.  Step 4 is another dehydration.  Right?
21    A.  It is.
22    Q.  Step 5, it says, "Xylene substitute (ProPar,
23  Manufacturer)."  What's that?
24    A.  It's just part of the protocol.  Xylene is a

Page 56

1  solvent that's part of the protocol.
2    Q.  What was the purpose of using xylene in Step
3  4 -- or Step 5?
4    A.  Probably just -- additional dehydration, if
5  not alcohol removal, residual alcohol removal.
6    Q.  Okay.  And then Step 6 is the Lerica
7  paraffin waxing; is that correct?
8    A.  Leica, correct.
9    Q.  Leica.  And why did you have Leica here?
10    A.  It's just the brand name.
11    Q.  Okay.  Is that the same brand that was used
12  by Dr. Iakovlev?
13    A.  I don't recall, and it wouldn't matter,
14  because that paraffin goes away after you go through
15  the entire process.
16    Q.  Okay.  So --
17    A.  Just -- the paraffin's just used to hold the
18  specimen in place during the microtoming.
19    Q.  So, so far, your control, you've done
20  dehydration, and then you've added some -- you've done
21  the paraffin waxing.  Right?
22    MR. THOMAS:  Object to form.
23    A.  In between there, there's the xylene
24  substitute step.  But, yes.

Page 57

1    Q.  Okay.  And you said that at some point the
2  wax -- the paraffin wax gets removed through the steps
3  in the protocol.
4    A.  Correct.
5    Q.  And that's important to remove the wax,
6  right?
7    A.  It's a by-product of the process.  You're
8  trying to -- you're ultimately trying to isolate the
9  fibers.  So, yes.
10    Q.  What would happen if you didn't remove all
11  the wax?  Before you tried to stain.
12    A.  I don't know, because we didn't have that
13  issue.  The paraffin was removed.
14    Q.  You don't know what would -- or how the
15  staining of your samples would be compromised if you
16  didn't remove the wax?
17    A.  I'm telling you I don't know because it
18  didn't happen.
19    Q.  I'm just -- I'm trying to understand.  Do you
20  have an understanding of the importance of removing the
21  wax?
22    A.  I don't know if I'd classify it as important.
23  It just happens during the process.
24    Q.  You don't --

Steven MacLean, Ph.D., P.E.

Page 58

1    A.  So if you think about it, the paraffin is on
2  the outside of the fiber.  We're staining a
3  cross-section.  Right?  So the cross-section is not
4  influenced or in contact with the paraffin itself.
5  That's actually an encasement around the outside of the
6  fiber.  You would be staining a pristinely cut, if you
7  will, cross-section which has no paraffin on it.  So I
8  don't -- I don't understand what you're getting at.
9    Q.  Well, if the mesh was -- if the fibers were
10  oxidized and cracked, right, that's not -- it's not
11  cracked in the cross-section.  It's cracked around the
12  fibers on the outer layer.
13    A.  Correct.
14    Q.  Where the -- where the wax is going to be
15  located.  Right?
16    A.  Right.
17    Q.  Okay.  So do you have an understanding of the
18  importance of deparaffinizing these samples?
19    A.  I have an understanding that the paraffin is
20  removed from the process.
21    Q.  How could the failure to remove the paraffin
22  wax compromise the staining?
23    A.  I would argue that it may not compromise the
24  staining, because I have a freshly cut cross-section of

Page 59

1  all available material that has never been in contact
2  with the pristine material, aside from what might have
3  come in from the cracks.  But I still have a layer of
4  material that would not have been in contact, direct
5  contact with the paraffin.  So I don't understand your
6  question.
7    Q.  You're not a pathologist, are you?
8    A.  I never said I was a pathologist.
9    Q.  You don't hold yourself out as an expert in
10  pathology.  Right?
11    A.  Correct.  I do not study tissue.
12    Q.  You don't know, sitting here right now, how a
13  failure to deparaffinize these samples could compromise
14  the staining in your study.
15    A.  It won't compromise -- first of all, it
16  didn't happen.  And, second of all, it won't compromise
17  my specimens for the reason I just described to you.
18    Q.  It's your opinion that it wouldn't compromise
19  the specimens if the paraffin wax is not adequately
20  removed.
21    MR. THOMAS:  Object to form.
22    A.  Look, there is no evidence that there was
23  insufficient removal of paraffin in our specimens.  And
24  what I'm telling you is the material that gets stained

Page 60

1  is a cross-section of the specimen.  The paraffin is on
2  the outside.  So all of the cross-sectional area that
3  we've now produced from the microtoming process is
4  inboard from the paraffin.
5    Q.  If you look at No. 2, it says, "Embed samples
6  in paraffin blocks using Leica."  Do you see that?
7    A.  I do.
8    Q.  And you go down through these sections until
9  you get to Section D.  Strike that.
10    "Trim the paraffin blocks, as necessary, and
11  cut a 4-6 micron-thick sections [sic]."
12    "Briefly float the paraffin sections in a
13  water bath set to 40-45 degrees Celsius to remove
14  wrinkles and allow them to flatten."
15    Do you understand what the purpose of that
16  step is?
17    A.  Step No. 4?
18    Q.  Yeah.
19    A.  Yes.
20    Q.  What is the purpose of that step?
21    A.  To make it as flat as possible after floating
22  in the water.
23    Q.  Step 5 says, "Mount the sections onto
24  adhesive-coated glass slides, then air dry for 30

Page 61

1  minutes and bake in a 45-50 degree oven overnight."
2  Correct?
3    A.  That's what it says.
4    Q.  What is the purpose of that?
5    A.  Just to drive off any excess moisture.
6    Q.  The next section is a staining protocol for
7  paraffin-embedded samples.  Right?
8    A.  Um-hum.  Correct.
9    MR. THOMAS:  Did you say standing?
10    MR. THORNBURGH:  Staining.
11    Q.  And so this is the section of the protocol
12  where the mesh becomes stained.  Right?  Or the samples
13  become stained.
14    A.  Yes.  There's -- there's some additional
15  preparation steps to take on the staining, and then
16  ultimately the staining, yes.
17    Q.  Okay.  And it says, "Stain samples using an
18  automated stainer programmed with the following
19  protocol."
20    A.  Correct.
21    Q.  Do you know what automated stainer program is
22  used?
23    A.  Not off the top of my head.  It might be in
24  the files somewhere.

16  (Pages 58 to 61)

Steven MacLean, Ph.D., P.E.

Page 62

1     Q.  In fact, if you were following Dr. Iakovlev's
2   protocol, his protocol calls for manual staining.
3   Correct?
4     A.  Correct.
5     Q.  All right.  You did not follow
6   manual-staining protocol.
7     A.  No, we actually did.  We ultimately chose to
8   go manual in the second round.
9     Q.  So you deviated from your protocol?
10        MR. THOMAS:  Object to form.
11    A.  We did.  We determined that the automated
12  stainer was a bit too aggressive and abusive, and we
13  were -- we were losing some of the specimens during the
14  staining process.  So we felt like it would be --
15  because the specimens are so delicate, that it would be
16  in our best interests to do hand-staining.
17    Q.  How many of -- how many of your samples, the
18  QUV -- yeah, UV-oxidized samples were -- went through
19  the automatic or automated staining process?
20    A.  In this round, none.
21    Q.  And which round are you referring to?
22    A.  The Wave 1 supplemental work.  None of them
23  went through the automated process.
24    Q.  So the Mullins samples did?

Page 63

1     A.  Correct.
2     Q.  And you determined in Mullins that the
3   automated stainer was too aggressive, and so it's your
4   testimony that after Mullins, you decided to go from
5   the automated staining to the manual staining.
6     A.  Correct.  And let me clear the record up on
7   what I meant by "aggressive".  The specimens just were
8   not staying on the slides as well as we would have
9   liked because of all the movement.  And we just felt
10  like a more delicate procedure by hand would allow us
11  to maintain more specimens on the slides.
12    Q.  Okay.  So you testified in the Mullins
13  litigation after you had already conducted the work.
14    A.  Correct.  Yes.
15    Q.  You had already conducted the work, you had
16  already experienced what you called the aggressive
17  automatic staining.  So you, before your deposition,
18  already knew that automated staining would be
19  inappropriate.
20        MR. THOMAS:  Object to form of the question.
21    A.  No.  We would -- no, I would not characterize
22  it as inappropriate.  It was a discussion we had
23  following -- just in follow-up to our Mullins work.  I
24  don't remember when it was.  But we just said, hey,

Page 64

1   let's do manual staining next time.
2     Q.  Okay.  And so you decided to no longer do the
3   automated staining.
4     A.  Correct.
5     Q.  And then you draft this protocol dated
6   January 19th, 2016, after your deposition in Mullins,
7   after the work that you performed in Mullins.  And in
8   your written protocol that was drafted after your
9   experience with the automated staining, you write in
10  your protocol that Histion needs to use an automated
11  stainer.
12    A.  Yes.  But you're misinterpreting it.  It's
13  simply for efficiency and productivity.  There's
14  nothing wrong with either processes -- hold on.  Let me
15  answer my -- let me answer your question.  There is
16  nothing wrong with either one.  We just wanted to be
17  more efficient with how many survived the staining
18  process.
19        There is nothing wrong or -- you don't get
20  poor results from automatic staining.  We just felt
21  like we could be more efficient and have more slides
22  survive the staining process if we did it manually.
23  That's all.  It was just a productivity discussion; no
24  more, no less.

Page 65

1     Q.  But what you're telling me doesn't make
2   sense --
3     A.  Sure it does.
4     Q.  -- from -- chronologically.  Okay?  So in
5   Mullins --
6     A.  There's nothing chronological about it.
7     Q.  Let me finish my question.
8     A.  Go ahead.
9     Q.  Okay?  In the Mullins litigation, you
10  performed some work using automated staining.
11    A.  Correct.
12    Q.  You determined that the automated staining
13  was too aggressive to the samples.
14        MR. THOMAS:  Object to form.
15    Q.  Right?
16    A.  It was not giving us the right amount of
17  samples at the end of the day.  Some of them were
18  falling off.
19    Q.  You decided in Mullins not to use the
20  automated stainer anymore.
21        MR. THOMAS:  Object to form.
22    A.  Incorrect.  Not during Mullins.
23    Q.  Or after Mullins.
24    A.  Sometime after Mullins, correct.

17 (Pages 62 to 65)

Steven MacLean, Ph.D., P.E.

Page 66

1    Q.  Then you or somebody drafts this written
2  protocol after you've already gone through that
3  experience, and you have written in here that the
4  protocol needs to be done using an automated stainer.
5    A.  All correct.  It was simply a reflection --
6  before we started the second set of experiments --
7  excuse me -- second set of experiments, we reflected on
8  what we learned from Mullins, and we said, hey, we
9  don't get a high-enough yield using the automated
10  stainer; let's just do it by hand; we think we can get
11  more specimens to survive the process.  That's it.
12    Q.  Who performed the manual staining?
13    A.  Histion.
14    Q.  Who at Histion?
15    A.  Simon Smith.
16    Q.  Do you know Simon Smith?
17    A.  I've met him.
18    Q.  Is he a pathologist?
19    A.  He has done staining for decades.  I don't
20  know his exact background.
21    Q.  Do you know if he's a pathologist?
22    A.  I just don't know.
23    Q.  Have you worked with Simon Smith before?
24    A.  We have.

Page 67

1    Q.  You personally?
2    A.  Yes.  In -- for the Mullins work.
3    Q.  But in the Mullins work, there was -- it was
4  done by the automatic staining program.
5    A.  Correct.  But Simon was part of our effort.
6  He was actually leading some of the effort inside the
7  laboratory.  You still have to do a lot of hands-on
8  work to follow this protocol.  So he was our --
9  basically, our main liaison, our main scientist there.
10    Q.  Okay.  So automatic staining -- when
11  automatic staining is conducted, it's conducted
12  automatically.  You set the program; the machine does
13  it itself.
14    A.  To a large extent.
15    Q.  So you take -- there's -- it's hands-free.
16  Hands-off.
17    A.  A portion of it is definitely hands-free.
18    Q.  That's why it's called automated.  Right?
19    A.  That is correct.
20    Q.  And so Histion was set up as a laboratory
21  that routinely uses automated staining.
22    A.  I can't -- I can't say it's routinely.  They
23  have an automatic stainer.  They know how to use it.
24  Is was employed during our Mullins work.

Page 68

1    Q.  And then you deviated from that protocol,
2  from the Mullins protocol, and -- had Mr. Simon
3  Smith, who's been using the automated staining program,
4  you asked him to now use a manual staining program?
5    MR. THOMAS:  Object to form.
6    A.  He was the one that performed the manual
7  staining, correct.
8    Q.  Was he the same person in Mullins who set up
9  the automated staining program?
10    A.  He was.
11    Q.  Do you know how comfortable Mr. Simon -- or
12  Mr. Smith would have been going from what he performs
13  in his laboratory, the automated -- automatic staining
14  program to manual staining?
15    A.  He didn't flinch.
16    Q.  Do you know what his experience is with doing
17  manual staining versus automatic staining?
18    A.  Yes.  He says he's done it all the time.
19    Q.  Do you know -- personally, do you have any
20  knowledge of what his experience is?
21    A.  I can tell you that Histion has been staining
22  products for 25 years, and they conform to the code of
23  federal regulations in terms of their capabilities and
24  report-outs.

Page 69

1    Q.  How many years have they been using automated
2  staining?
3    A.  I don't know.
4    Q.  You have no understanding, as you sit here
5  today, how many times Mr. Smith had performed manual
6  staining?
7    A.  I don't have an exact number, no.
8    Q.  You don't know, as you sit here today, what
9  his skill level was for performing the manual staining.
10    A.  I've already explained to you that this is a
11  lab that's been doing staining for 25 years.  He's an
12  older gentleman with tremendous experience.  I'd have
13  no doubt in my mind that he did it correctly.
14    Q.  Automated staining programs have been around
15  for 20 years.
16    A.  Show me a document that said that they've
17  been around for 20 years.
18    MR. THOMAS:  I'll have you mark as Exhibit
19    No. 17 a document entitled Automation in IHC.
20    (MacLean Deposition Exhibit 17 - Document
21    titled Automation in IHC - marked for
22    identification.)
23    Q.  So if you look at Exhibit 17 --
24    MR. THOMAS:  Did you mean to give me your

18 (Pages 66 to 69)

Steven MacLean, Ph.D., P.E.

Page 70

1    highlighted copy?
2    MR. THORNBURGH:  No.
3    Q.  What does "automation in IHC" mean?
4    A.  Immunohistochemistry.
5    Q.  Okay.  And if you turn to the first page of
6    Chapter 17 -- of Exhibit 17, Chapter 9.1, it says
7    "History of IHC Automation".
8         MR. THOMAS:  Is this from a textbook?  Is
9    there a title for the book, Dan, do we know?
10        MR. THORNBURGH:  Automation in IHC.
11        MR. THOMAS:  That's the chapter title.  Do
12    you know the book that it's from?
13        MR. THORNBURGH:  I don't know the title.  I
14    don't.
15        MR. THOMAS:  Okay.  I'll just object to the
16    question for that reason.
17    Q.  "History of IHC Automation".  "The first --"
18    if you look at the first paragraph, about four lines
19    up, "The first automated device capable of both IHC and
20    in situ hybridization (ISH) was described in 1990."
21    A.  I'm sorry, could you just tell me where you
22    are, again.
23    Q.  Page 1 under Chapter 9.1, first paragraph.
24    A.  Um-hum.  Yes.

Page 71

1    Q.  Do you see there's -- see No. 4, about four
2    lines up from the bottom.
3    A.  I do.
4    Q.  It says, "The first automated device capable
5    of both IHC and in situ hybridization (ISH) was
6    described in 1990."  Right?  Did I read that
7    accurately?
8    A.  You did.
9    Q.  Okay.  It says, "Automation quickly caught
10    on."  "Next Generation Sequencing into cancer
11    diagnostics, and by 1995, there were several IHC
12    instruments," (as read.)  Right?
13    A.  That's what it says.
14    Q.  Okay.  So the automation has been around for
15    greater than 20 years.
16        MR. THOMAS:  Object to form.
17    Q.  Right?
18    A.  Certainly the automation stated in this
19    literature says that.
20    Q.  Okay.  And Histion was using automated
21    staining in the Mullins case.  Right?
22    A.  Correct.
23    Q.  And they have -- they have an automated
24    staining program there.  Right?

Page 72

1    A.  Correct.
2    Q.  Do you know how long it's been in place?
3    A.  I do not.
4    Q.  Do you know when the last time Mr. Simon
5    [sic] conducted -- or performed manual staining on any
6    sample before he met with you to work on the Wave 1
7    experiments?
8    A.  No.  But he assured us that he's quite
9    capable and competent of doing manual staining.
10    Q.  Were you there when he performed the
11    staining?
12    A.  I was not there on those days.  And, by the
13    way, just as a confirmation, that's why we do positive
14    controls.  So if you look at our rabbit tissue and all
15    of the bovine serum which we have yet to talk about yet
16    that's around some of the specimens, they all achieved
17    staining.
18        So it's a moot point, in my opinion, because
19    he clearly demonstrated that he has the capability and
20    the expertise to do it, because all of our positive
21    controls stained.
22    Q.  Do you know if the automated system that he
23    was accustomed to using and used in the Mullins case
24    prior to this -- these experiments was an open or

Page 73

1    closed system?
2    A.  I don't recall.
3    Q.  So if we go back to the protocol, Exhibit 16,
4    Section D where we were discussing earlier, where it
5    says, "Stain samples using automated stainer programmed
6    with the following protocol," that was a deviation.  By
7    going from automated to manual, that would have been a
8    deviation of the protocol, right?
9        MR. THOMAS:  Object to form.
10    A.  We did not use an automated stainer.
11    Q.  So it would have deviated from the written
12    protocol.
13        MR. THOMAS:  Object to form.
14    A.  We chose to go with a manual staining for the
15    reasons -- manual staining for the reasons I already
16    talked about.
17    Q.  And then if you look at the steps that were
18    supposed to be programmed into the automated staining
19    program, these steps would no longer be programmed, and
20    now a human would be performing these steps.  Right?
21    A.  A human would be performing those steps,
22    correct.
23    Q.  Which part of this protocol describes
24    deparaffinizing?

19 (Pages 70 to 73)

Steven MacLean, Ph.D., P.E.

Page 74

1      A.  These xylene steps, that's a solvent that's
2   actually going to remove the paraffin.
3      Q.  So Steps 19 and 20?
4      A.  No.  Much earlier on.  Steps 2, 3, 4.
5      Q.  Sorry.  I didn't see those.  And you had
6   testified earlier that the deparaffinizing steps that
7   were taken -- or that were used would have been
8   sufficient for removing the paraffin wax?
9      A.  Correct.
10     Q.  What's your basis for that opinion?
11     A.  The 25 years of experience that Histion
12   touts.  And also visual observations from the
13   microscopy work.
14     Q.  So it's not your personal experience.  It's
15   the fact that Histion has been around for 25 years?
16         MR. THOMAS:  Object to the form of the
17         question.  He just said he's looked at it
18         himself.
19     A.  Exactly.  It's two -- the answer is two-fold.
20   One is the expertise and experience of Histion, having
21   done this type of work for decades.  And, two, it's the
22   visual observation of the slides when they come out.
23   You don't see any paraffin to the outside.
24     Q.  So let's talk about touting the experience of

Page 75

1   Histion.  Is Histion a laboratory that does diagnostic
2   evaluation for patient clinically -- for patients
3   clinically?
4         In other words, if someone gets a cancer,
5   develops a cancer, or they have a tumor that gets
6   removed by a surgeon, Histion is not the facility that
7   would look at and determine whether or not a patient
8   needs treatment, has cancer.
9         MR. THOMAS:  Object to form.
10     Q.  Right?
11     A.  You're talking about histological examination
12   of tissue.  There are no tissues in my specimens.  So I
13   just don't understand the dots you're trying to connect
14   here.  There's -- we're not doing a tissue histological
15   exam with my specimens.
16     Q.  Histion is a pre-clinical laboratory.
17     A.  That's correct.
18     Q.  They're not a clinical laboratory.
19     A.  It doesn't mean that they can't stain with
20   expertise.
21     Q.  Just answer my question.  Okay?  Histion is
22   not a clinical laboratory.  Correct?
23     A.  They are not a clinical lab, correct.
24   However, their data is good enough for the Government,

Page 76

1   for the Federal Government, because they do conform to
2   the code of federal regulations with regard to their
3   data.
4         So if someone comes to them for, say,
5   pre-clinical experimentation, their data is accepted by
6   the FDA.
7      Q.  Move to strike, non-responsive.  My question
8   is very simple.  Histion is not a clinical pathology
9   laboratory.  Correct?
10     A.  Not according to their website.
11     Q.  In other words, I'm correct.  Right?
12         MR. THOMAS:  Object to the form of the
13         question.
14     Q.  I just want to make sure the record's clear.
15     A.  From what I have read, correct.  You can ask
16   them.  They perhaps have done work that's not openly
17   marketed on their website.  I don't know.  That's a
18   question for them.
19         But in terms of the publicly available
20   information, what you said was correct.
21     Q.  Do you know what additional federal
22   requirements are needed to run and maintain a clinical
23   pathology laboratory?
24     A.  Off the top of my head, no.

Page 77

1      Q.  Are any of the individuals who are
2   supervising and managing Histion, are any of those
3   individuals pathologists?
4      A.  I don't know.
5      Q.  Do you believe that the steps that are
6   outlined under Section D are the steps and the protocol
7   that would have been used by Dr. Iakovlev?
8      A.  What I can tell you is that we put what we
9   believed was Dr. Iakovlev's protocol in front of the
10   expertise and experts at Histion, and they developed
11   something that we believed would be similar, if not
12   identical, to what his steps were.  That's how I can
13   answer that.
14     Q.  You, sitting here right now, you don't know
15   whether or not the steps that are identified under
16   Section D followed the protocol of Dr. Iakovlev.
17         MR. THOMAS:  Object to form.
18     A.  I believe we've made every attempt to follow
19   what he did, based on the documentation that we have.
20   And, again, our positive control specimens tell us that
21   we achieved staining.  I mean, that's what we're trying
22   to do here.  We're trying to see if oxidized material
23   stains.  Period.
24     Q.  But were the slides charged or uncharged?

20  (Pages 74 to 77)

Steven MacLean, Ph.D., P.E.

Page 78

1     A.  Charged.
2     Q.  Were the -- how was the staining conducted?
3  Was it a horizontal?  Vertical?
4     A.  Vertical.
5     Q.  Vertical staining?
6     A.  Correct.
7     Q.  And you think that's consistent with the
8  protocol outlined by Dr. Iakovlev?
9     A.  I don't believe his protocol mentioned the
10  orientation.  But if you have a document that says
11  otherwise, let me know.
12         (MacLean Deposition Exhibit 18 - Iakovlev
13          Article on Degradation - marked for
14          identification.)
15     Q.  Marked as Exhibit No. 18 the publication from
16  Dr. Iakovlev, Degradation of Polypropylene in Vivo,
17  Microscopic Analysis of Mesh Explanted from Patients
18         Have you seen that publication before, Dr.
19  MacLean?
20     A.  Yes.
21     Q.  Okay.  Do you see the section on Page 2 of
22  Exhibit 18 called "Staining"?
23     A.  I do.
24     Q.  Okay.  Do you see where Dr. Iakovlev explains

Page 79

1  the types of staining that he conducted in his studies?
2     A.  (No response.)
3     Q.  At the very beginning.  He did H&E staining,
4  and he did additional staining using trichrome, Von
5  Kossa, and some -- do you see where I'm at?
6     A.  I do.  I see the paragraph, bottom right-hand
7  corner on Page 2.  I believe that's what you're
8  referring to.
9     Q.  Okay.  You only did H&E staining, right?
10     A.  Correct.
11     Q.  You didn't do the Von Kossa staining.  You
12  did not perform the trichrome staining.  Right?
13     A.  We did not.
14     Q.  You did not perform the immunoparaffinized
15  staining using immunoperoxidase, right?
16     A.  I did not.
17     Q.  Okay.  If you turn to Page 3, see the "New
18  Mesh Control"?  Do you see where I'm at?
19     A.  I do.
20     Q.  "Portions of pristine trans --" and this is
21  the protocol that Dr. Iakovlev uses.
22     A.  In -- this publication.
23     Q.  Okay.  It says, "Portions of pristine
24  transvaginal sling devices of three different

Page 80

1  manufacturers were placed in 10 percent buffered
2  formalin."  Right?  "The mesh was then sampled for
3  light microscopy at two weeks and one, two, and four
4  months in two separate experiments."
5         Did I read that correctly?
6     A.  You did.
7     Q.  Okay.  "Tissue processing; embedding,
8  sectioning," says, "Charged coated slides."  Do you see
9  that?
10     A.  I do.
11     Q.  And then it says, "And staining (manual and
12  [sic] horizontal tray) were carried out."
13         Did I read that correctly?
14     A.  It says "manual on horizontal tray".
15     Q.  Um-hum.
16     A.  Correct.
17     Q.  Okay.  So Dr. Iakovlev's staining was
18  conducted manually on a horizontal tray.
19     A.  In this publication.
20     Q.  Okay.  And the staining that was conducted by
21  Histion would have been -- in Mullins, it would have
22  been automated.  Right?
23     A.  In Mullins, correct.
24     Q.  In the Wave 1 cases, it was, according to

Page 81

1  you, it was done manually on a vertical tray --
2  vertical standing.
3     A.  Correct.
4     Q.  So it was not horizontal.
5     A.  Ours was not horizontal.
6     Q.  Okay.  And, by the way, where -- in all of
7  your materials that you've produced, where did you --
8  where did you record the fact that the protocol wasn't
9  followed; that the -- your written protocol, Exponent's
10  written protocol was deviated from by going from
11  automated staining to manual staining?
12         (Discussion held off the record.)
13     A.  Do you have a full copy of my supplemental
14  report?  Is that what you handed me?
15     Q.  That's what I handed you.
16     A.  If you look on Page 37 of the supplemental
17  report, it is documented.  I'm sorry.  Page 36 and 37.
18  Item 6 on Page 36 reads, "Paraffin-embedded samples
19  were stained by hand using the following protocol."
20  And, likewise, a similar comment is on Page 37 by the
21  number four for the resin-embedded samples.
22     Q.  Do you know what the -- why some pathologists
23  would use vertical staining versus horizontal staining?
24     A.  The only thing I can tell you, that in the

21 (Pages 78 to 81)

Steven MacLean, Ph.D., P.E.

Page 82

1  discussions that we've had with Histion, vertical
2  staining -- vertical orientation is preferred, because
3  it ensures that you get good rinsing, and the rinse
4  actually moves away from the specimen. The slide, I
5  should say. So it was just -- it's a preferred method
6  by Histion. They feel that they get a better wash from
7  that -- from that technique.
8      Q.  And what do you mean by a "better wash"?
9      A.  Well, the -- the slides are vertically
10 oriented, so gravity actually pulls or drops the wash
11 solution down over the sides of the slides and then
12 down away from the slides. So rinsing and washing is
13 facilitated by that orientation.
14     Q.  You agree with -- would agree with me that
15 the protocol that was used by Dr. Iakovlev, at least as
16 to the positioning of the slides as they're stained,
17 was different from that used by Histion.
18         MR. THOMAS: Object to the form of the
19         question.
20     A.  Only with respect to his publication. Can
21 you show me in his reports for any of these matters
22 where he's cited horizontal orientation?
23     Q.  Did you believe, when you endeavored to
24 conduct these experiments and follow the protocol of

Page 83

1  Dr. Iakovlev, that Dr. Iakovlev performed the staining
2  vertically, rather than horizontally?
3      A.  We had no indication. From -- per reading
4  his reports.
5      Q.  Did you attempt to look at Dr. Iakovlev's
6  publications to determine what protocols Dr. Iakovlev
7  used?
8      A.  We certainly referenced them.
9      Q.  All right. And you would agree with me that
10 the protocol that Dr. Iakovlev used was different than
11 the protocol that you used, at least with respect to
12 the positioning of the slides when they were stained.
13     A.  Show me --
14         MR. THOMAS: Object to the form of the
15         question.
16     A.  Show me the protocol in any of -- in his
17 reports that cite horizontal orientation that I would
18 have made that determination from. From his reports,
19 not a publication.
20     Q.  Listen to my question.
21     A.  Okay.
22     Q.  Okay? I mean, your goal was to follow the
23 protocol outlined by Dr. Iakovlev.
24     A.  To the best of our ability, correct.

Page 84

1      Q.  And my question to you was: Based on your
2  review of the publication, Exhibit No. 18, of
3  Dr. Iakovlev, you'd agree with me that the positioning
4  of the slides for staining purposes was different.
5         MR. THOMAS: Object to form.
6      Q.  Than the positioning used by Dr. -- by
7  Histion.
8         MR. THOMAS: Same objection.
9      A.  Only in that publication. Not in his reports
10 with respect to any of these litigation matters.
11     Q.  Do you have any basis to believe or to
12 testify that Dr. Iakovlev used any other protocol other
13 than that used and reported in Exhibit 18, his
14 publication on degradation?
15     A.  We have no basis either way. It's not --
16 there's no written protocol assigned with his report --
17 associated with his reports that tell us either way.
18     Q.  Well, you said that your goal was to follow
19 the protocol of Dr. Iakovlev.
20     A.  To the best of our ability, based on what he
21 submitted for expert reports.
22     Q.  You didn't follow the protocol --
23     A.  Is that --
24     Q.  -- of Dr. Iakovlev --

Page 85

1      A.  -- an expert report?
2         MR. THOMAS: One at a time.
3      Q.  -- as described in Dr. Iakovlev's
4  publication concerning the degradation of explanted
5  PROLENE mesh?
6         MR. THOMAS: Object to form of the question.
7      A.  In a non-expert report, correct.
8         (Discussion held off the record.)
9         (Recess held from 10:45 a.m. till 10:51 a.m.)
10 BY MR. THOMAS:
11     Q.  Okay, Dr. MacLean, why did you decide to only
12 use H&E staining and not the other staining that
13 Dr. Iakovlev has used?
14     A.  Because I think when you look at his reports,
15 he certainly suggests that the staining that's taking
16 place in his cracked bark is H&E. I know that there
17 are other stains that we used, but the one that we
18 chose to focus on was H&E.
19     Q.  Did you ever try to use any of the other
20 stains?
21     A.  We did not.
22     Q.  If you'd turn to Page 5 of Exhibit No. 18,
23 which is Dr. Iakovlev's publication.
24     A.  One more time. Figure or page?

22 (Pages 82 to 85)

Steven MacLean, Ph.D., P.E.

Page 86

1    Q.  Page 5, Figure 4.
2    A.  Okay.  I am there.
3    Q.  Do you see where in Figure 4 there's
4  different staining that was discussed that was done by
5  Dr. Iakovlev?
6    A.  (No response.)
7    Q.  If you look at -- on Image (a) on Figure 4 --
8    A.  Correct.
9    Q.  -- Von Kossa staining -- do you see that --
10  was negative for calcium in the brittle bark?
11    A.  That's what it says, correct.
12    Q.  Says, (b), "Trichrome stain shows that the
13  deeper parts of the bark have smaller staining porosity
14  (red) than those close to the surface (green) which
15  correlates with TEM," transmission electron microscopy,
16  "findings."  Do you see that?
17    A.  Yes, that's what it says under (b), yes.
18    Q.  Okay.  You didn't use trichrome, right?
19    A.  We did not.
20    Q.  Okay.  And do you have any opinions about why
21  in (b), why trichrome would be able to be trapped
22  within the degraded -- what we allege to be the
23  degraded layer of the PROLENE fibers?
24    MR. THOMAS:  Object to form of the question.

Page 87

1    A.  I have no opinion on that.
2    Q.  You're not going to offer any opinions at
3  the -- at any trial concerning the additional findings
4  of Dr. Iakovlev that are discussed in his publication,
5  in his expert report, and here in Figure 4?
6    MR. THOMAS:  Object to form of the question.
7  That's much too broad.
8    A.  I don't have any opinions at this time on Von
9  Kossa staining of the crust layer.
10    Q.  And you don't have any opinions regarding Von
11  Kossa stainer -- staining of the outer layer of the
12  mesh because you didn't conduct any of those studies.
13  Right?
14    A.  I have not conducted any Von Kossa staining
15  studies.
16    Q.  Okay.  And you don't -- won't offer any
17  opinions concerning Dr. Iakovlev's trichrome staining
18  and his findings related to the trichrome.
19    MR. THOMAS:  Object to form of the question.
20    A.  Well, I -- I don't know.  I don't know.  But
21  at this point in time I can tell you this:  That his
22  discussion on the trichrome stain simply talks about
23  porosity that may exist in that crust.  It does nothing
24  to characterize that material in terms of whether it's

Page 88

1  PROLENE or some other material.  It's just talking
2  about the relative size of alleged pores that are on
3  either side of the bark.
4    So to the extent that he uses that technique
5  to determine that it's PROLENE, I would have an
6  opinion.  But if he's just using it to talk about
7  porosity and porosity alone, then I wouldn't have an
8  opinion.
9    Q.  Would you -- would it be significant to you
10  at all if Dr. Iakovlev conducted additional staining to
11  determine whether or not the outer layer was
12  proteinaceous; used a stain to look for protein, and
13  the outer layer didn't stain?
14    MR. THOMAS:  Object to form of the question.
15    Q.  Would it be significant, in your opinion, as
16  an expert here, whether or not Dr. Iakovlev had
17  actually done some testing, staining that would
18  identify whether or not that outer layer is protein?
19    MR. THOMAS:  Object to form of the question.
20    A.  Well, he's already done some of that work
21  today.  We know that there's a biological component to
22  this crust layer, because it takes on H&E staining.  So
23  I guess I'm missing your point.
24    Q.  Well, if you -- well, Dr. Iakovlev's

Page 89

1  opinion's different than yours, right?  Dr. Iakovlev's
2  opinion is that the degraded polypropylene layer traps
3  H&E, which is different than your opinion.  We can
4  agree that you have different opinions, right?
5    A.  We have -- sure, we can agree on different
6  opinions.
7    Q.  Okay.  But did you -- would it be important
8  to you if Dr. Iakovlev had done additional protein
9  staining and found that the outer layer did not stain?
10    MR. THOMAS:  Object to form of the question.
11    A.  I -- I would need to see that research.  I'd
12  need to see that study.
13    Q.  Well, if you look at Page 5 of his
14  publication, Exhibit 18.
15    A.  (Witness complies.)
16    Q.  "Immunohistochemical stain for immunoglobulin
17  G (IgG stained brown)."  Do you see that?  "IgG,"
18  immunoglobulin, "is present in almost all human tissues
19  and fluids.  It is deposited on the surfaces of
20  degraded polypropylene, but it is not mixed within it."
21    Do you see -- do you see Figure C?
22    A.  I do.  And I think you're reading the text
23  that corresponds to Figure C.  Is that correct?
24    Q.  Okay.  So do you see Figure C, that when

23 (Pages 86 to 89)

Steven MacLean, Ph.D., P.E.

Page 90

1  immunoglobulin staining was conducted, immunoglobulin
2  staining only stains protein brown.  Right?
3      A.  Well, that's what he says, but I haven't done
4  my own research to verify that.
5      Q.  You don't know one way or the other.
6      A.  No, but I could certainly find out.
7      Q.  Okay.  But sitting here today, because you're
8  not a pathologist, you don't know one way or the other
9  whether or not immunoglobulin would stain brown in the
10  presence of tissue or fluids.
11      A.  No.  But I know --
12      Q.  Protein.
13      A.  No.  But I know that H&E stains biological
14  materials.  And there's no biological component to
15  native PROLENE.
16      Q.  Do you understand that immunoglobulin is
17  found within the tissues and the fluids of the human
18  body?
19      A.  I can only recite what's written here.
20      Q.  Do you understand that immunoglobulin is
21  found within protein?
22          MR. THOMAS:  Object to form of the question.
23      A.  It's the same answer.
24      Q.  Okay.  So do you agree that based on the

Page 91

1  staining done, as depicted in Figure (c) of --
2  Image (c) of Figure 4, it didn't stain brown?
3          MR. THOMAS:  Object to form of the question.
4      A.  (No response.)
5      Q.  There is no immunoglobulin within the cracked
6  layer of the PROLENE.
7          MR. THOMAS:  Object to the form of the
8          question.
9      A.  I am -- I am going to leave the
10  interpretation of these figures up to Dr. Iakovlev.
11  These are not my figures, this is not my work.
12      Q.  Okay.  So you defer to Dr. Iakovlev in
13  that --
14          MR. THOMAS:  Object to form of the question.
15      A.  I'm not -- I'm not deferring to him.  I would
16  say he needs to be asked those questions, not me.
17      Q.  Okay.  You're not going to offer any opinions
18  at trial concerning the images contained within Figure
19  4.
20      A.  Not at this time.
21      Q.  Okay.  And you're not going to be offering
22  any criticisms of Dr. Iakovlev containing -- concerning
23  any of his other opinions as they relate to other
24  histopathological staining that he conducted.

Page 92

1          MR. THOMAS:  Object to form of the question.
2      A.  If it's -- could you -- I need to hear that
3  question again.
4          (Read back by the reporter.)
5      A.  I think it depends on the question I'm going
6  to get asked.  Because, like I just mentioned, going
7  back to the trichrome stain, he hasn't used that
8  technique to verify that the cracked layer is PROLENE.
9          So it really is going to come down to what
10  questions I'm asked and -- and how it relates to my
11  polymer science background.  That's -- that's how I'll
12  answer that.
13      Q.  So you're saying that the trichrome staining
14  that was conducted by Dr. Iakovlev doesn't determine
15  whether or not the cracked outer layer is -- is
16  PROLENE?
17      A.  What I'm saying is the only thing that he's
18  mentioning with respect to trichrome stain is the
19  presence of some alleged set of pores that vary in
20  size.  He's not using it as a technique to confirm that
21  the cracked layer is PROLENE or oxidized PROLENE.  He's
22  simply making a statement about some, in his opinion,
23  inherent pore size within that layer.  We -- he still
24  hasn't identified what that material is within that

Page 93

1  layer.
2          In other words, I could have a crust or a
3  cracked layer on the outside of Material X that has
4  nothing to do with PROLENE, and it can still have pores
5  in it.
6      Q.  You've seen some of the other work done by
7  Dr. Iakovlev, where he uses polarized light to
8  identify -- to identify polypropylene.  Right?
9          MR. THOMAS:  Object to form of the question.
10      A.  No.  He has not.  He has identified a
11  material that illuminates.  But polarized light by
12  itself does not tell you that the material it's
13  illuminating is PROLENE.
14      Q.  Are you going --
15      A.  It just -- it just tells you that you have a
16  material that has some degree of molecular order to it.
17  That's it.
18      Q.  Are you going to offer any opinions at trial
19  that tissue or protein -- proteinaceous material is
20  birefringent when reviewed under polarized light
21  microscopy?
22      A.  We may.  There's certainly evidence of that
23  in some of his micrographs.  We see that collagen will
24  actually illuminate to a certain degree under polarized

24  (Pages 90 to 93)

Steven MacLean, Ph.D., P.E.

Page 94

1  light.
2      Q.  Okay.  Have you looked at -- have you
3  conducted any polarized light experiment to determine
4  whether or not protein is birefringent?
5      A.  (No response.)
6      Q.  Under polarized light?
7      A.  (No response.)
8      Q.  You didn't conduct any separate experiment
9  concerning whether or not protein is birefringent,
10  right, using polarized light?
11          MR. THOMAS:  He's looking right now.
12      Q.  Maybe I can speed things up --
13      A.  Hold on.  I apologize for the delay.  It
14  depends on the degree of cross-polarization.  There are
15  certainly some images -- and, again, this will be all
16  in the files that you have -- where if you look at
17  serum and then some degree of magnification and then
18  H&E, which means it's been stained, cross-polarization.
19  XPOL, there are certainly several images that are
20  viewed under polarized light that show the serum
21  proteins; that they're illuminated in those
22  micrographs.
23          So there is some degree of illumination of a
24  proteinaceous material in my vials.  I can show you an

Page 95

1  image, if that helps.
2      Q.  You were just reading -- let me see what
3  you're looking at.
4      A.  (Witness indicates.)  And the file name is in
5  the top left-hand corner, if you want me to read that
6  into the record.
7      Q.  Yes, read -- it's at
8  15791_serum_R_63XH&EXPOL_03-imageexport-29?  Is that
9  the file?
10      A.  Correct.
11      Q.  And who took that image?
12      A.  It would be -- Dr. Benight took this image
13  for me.
14      Q.  And what is that image of?
15      A.  This is a microtome sample of a mesh that was
16  put through the protocols that we've talked about, but
17  it includes the presence of bovine serum on the outside
18  of the mesh.
19      Q.  Okay.  So you say that that -- the bovine
20  serum experiment you conducted went through the same
21  protocol as the -- as outlined in the paraffin
22  embedding?
23      A.  Correct.
24      Q.  And then it was polarized -- or analyzed

Page 96

1  looking at -- with polarized light?
2      A.  Correct.
3      Q.  And that was done by Dr. Benight?
4      A.  Correct.
5      Q.  And it's your testimony that the bovine serum
6  experiment demonstrated that bovine serum protein is to
7  some degree birefringent?
8      A.  It illuminates under polarized light.
9      Q.  Okay.  And was the -- that was -- in the
10  bovine serum experiments, those samples weren't
11  oxidized.  Right?
12      A.  Correct.
13      Q.  If you look at -- if you turn to Figure 18 of
14  your report.
15          MR. THOMAS:  Which one?  The supplemental?
16          MR. THORNBURGH:  The supplemental report.
17          MR. THOMAS:  Page 27?
18          MR. THORNBURGH:  Yeah.
19      Q.  I'm sorry, Page 28, Figure 19.  Supplemental
20  report, Exhibit 15.  You have some images of the
21  UV-oxidized or QUV-oxidized PROLENE fibers?
22      A.  (No response.)
23      Q.  Are you there?
24      A.  Yes, I am.

Page 97

1      Q.  Okay.  And you write that, "Fibers with
2  several cracks embedded in paraffin.  No staining is
3  evident.  Mesh fibers are shown under bright field
4  light, (a) and (b), and illuminated under
5  cross-polarized light, (c)."
6          And the cracking that you describe here in
7  these figures -- let me ask you this question:  Do you
8  know what "chatter" is?
9      A.  In a general sense I know what chatter is.
10  Maybe -- maybe you can help me define it.
11      Q.  In the pathology field, field of pathology
12  and microtoming, do you know what "chatter" is?
13      A.  I don't know if I've heard it expressed as
14  the term "chatter", but perhaps you're talking about
15  the blade chattering as it comes across the
16  cross-section?  Am I correct?  Is that what you're --
17      Q.  Right.
18      A.  -- describing?
19      Q.  Right.  So you -- when the microtome blade
20  isn't sharp enough, it can create chatter, right,
21  where it comes across the fiber during the
22  cross-section and cracks it -- the material up.
23      A.  I understand what you mean by "chatter".  I'm
24  not going to agree with the whole notion that it

25 (Pages 94 to 97)

Steven MacLean, Ph.D., P.E.

Page 98

1   necessarily cracks things up.  But go ahead and ask
2   your question.
3       Q.  Okay.  What do -- well, I need to know what
4   your basis is for -- so let me just -- if you look at
5   Figure 19, (b) and (c), you describe this as cracks
6   caused by the UV oxidation.
7       A.  You bet.
8       Q.  Okay.  And have you ever seen chatter under a
9   microscope?
10      A.  I've certainly seen on occasion some
11  artifacts on a microtome surface that might be related
12  to the movement of the blade.
13      Q.  Has anybody ever trained you on how to
14  identify artifact caused by chatter?
15      A.  I don't know if anyone has formally trained
16  me, but I've been doing microtoming for 20 years, and I
17  understand the general phenomenon that you're
18  describing.
19      Q.  And in Figure (d) and (c), you don't believe
20  those -- that cracking that's demonstrated on these
21  images is actually chatter, rather than cracks caused
22  by the oxidation of PROLENE?
23      A.  Here's what I can tell you:  These samples
24  are definitively cracked, because if you look at the

Page 99

1   pre-microtomed micrographs, all of these specimens are
2   riddled with cracks.
3       And, more importantly, when we went from the
4   whole fiber specimen down to the microtoming, we
5   actually denoted where we were going to do the
6   microtoming so that our microtomes would align with
7   known cracks from the oxidation process.
8       So there's zero doubt in my mind that cracks
9   that are that are shown on these images are a result of
10  UV oxidation.
11      And -- and just let me add to that.  We've
12  done the FTIR work to confirm oxidation was achieved.
13      Q.  The cracking that you observed in the
14  UV-treated specimens, did that cracking penetrate
15  through the entire fiber, or did it only go to a
16  certain depth?
17      A.  It depends.  I think for some of the PROLENE
18  fibers -- sutures, rather, we got some pretty
19  significant cracking and damage throughout -- I'll call
20  it the bulk of the suture.
21      In the mesh, I would say more of it was
22  around the perimeter, like we've seen before.  Similar
23  to what we saw in the microstaining -- in the
24  microscopy work last fall.

Page 100

1       Q.  In Figure 19 (b) and (d), are those images of
2   the mesh fibers or the suture fiber?
3       A.  Those are mesh fibers.  And I'm just going to
4   correct the record.  That's (b) as in boy, (c) as in
5   Charlie.
6       Q.  Correct.  Did you identify -- strike that.
7       Who took the images, the microscopy images?
8       A.  Dr. Benight, with some assistance from
9   Dr. Garcia.
10      Q.  Okay.  And prior to her involvement in this
11  litigation, had she ever taken -- had she -- strike
12  that.
13      Prior to her involvement in this litigation,
14  had she ever done microscopy imaging before?
15      A.  I'm sure she has, but I have to -- I would
16  either defer to her CV or whatever she's testified to.
17      Q.  Do you know whether or not she's ever done
18  microscopy before?
19      MR. THOMAS:  Microscopy or --
20      Q.  Microscopy imaging.
21      A.  I can certainly look it up.  She might
22  reference it on her CV.
23      Q.  I only say this because I -- you know, when I
24  looked at the materials that were produced yesterday,

Page 101

1   the microscopy images and the microscopy that was
2   produced in the Mullins case, those images were very
3   blurry.
4       MR. THOMAS:  Which ones?
5       MR. THORNBURGH:  Virtually all of them.
6       Q.  I mean, you've seen them, right?
7       A.  I have seen them.
8       Q.  They're pretty poor images.  Right?
9       A.  I would -- I would argue that it was still
10  clear enough to discern what was stained and not
11  stained.  But we certainly attempted to improve on our
12  microscopy this time around, in terms of their visual
13  clarity.
14      Q.  Okay.  The visual clarity, even this time
15  around, wasn't very good, were they?
16      MR. THOMAS:  Object to form.
17      A.  No, I disagree.  They're fine.  I think that
18  they're very good.
19      Q.  Well, turn to Page 25.
20      A.  (Witness complies.)  Okay.
21      Q.  I'm just going to use this as an example.  25
22  of your report, there's a Figure 15.  Blurry image,
23  right?
24      A.  Only a portion that's in a different focal

26 (Pages 98 to 101)

Steven MacLean, Ph.D., P.E.

Page 102

1    plane is blurry.
2        Q.  There's a -- the focal point in the right and
3    left of this image is blurry.
4            MR. THOMAS:  Object to form.
5        A.  There is some discreet regions that are
6    blurry, but it's -- it's not because of the microscope,
7    it's not because of the user.  It's because of the
8    focal plane that you're focusing in on.
9            Not -- like we talked about six months ago,
10   not all these specimens are perfectly flat.  There's
11   going to be some slight variability.  And you're at the
12   micron level.  So when you're zoomed in this close on a
13   specimen that's not ideally flat, you're going to be in
14   different focal planes.  It's inevitable.
15       Q.  If you look at (b), it's also blurry.
16           MR. THOMAS:  Object to form.
17       A.  I'm sorry; which one?
18       Q.  Figure 15, Image (b) is blurry.
19           MR. THOMAS:  Object to form.
20       A.  No.  Not -- no.  Not every region is blurry.
21   There are certainly some areas -- there are certainly
22   some areas that are not blurry.
23       Q.  Turn to 26.
24       A.  (Witness complies.)  All three of these

Page 103

1    images are blurred out.
2            MR. THOMAS:  Object to form.
3        Q.  Right?
4        A.  I disagree.  There are certainly discreet
5    regions that are in focus, and that's what we would
6    expect.
7        Q.  Do you -- you see on Page 26, the bottom
8    image, is there any area on that image that isn't
9    blurry?
10       A.  I'm going to look at the native image,
11   because I don't think that's a fair indication of
12   what's blurry and what's not blurry with that size
13   micrograph inside to record it.
14       Q.  While you're looking at it, did you ever go
15   back and talk to Miss Benight and ask her if she could
16   take some better images?
17       A.  No.  I was happy with the images that she
18   made.
19       Q.  You were happy with the images that Dr.
20   Benight provided to you?
21       A.  Yeah.  Not every -- at this magnification,
22   this sample size, not every single one of them is going
23   to be a perfect picture, if you will.  It's just not --
24   it's just not realistic.

Page 104

1        Q.  Can you point out for me on any of these
2    images where the degraded -- on these microphotographs,
3    where the degraded outer layer of the PROLENE fiber
4    begins and ends?
5            MR. THOMAS:  On which images are you talking
6    about?
7        A.  Yeah, which images?
8        Q.  On any image in your report.
9        A.  Well, for the -- for the chemically oxidized,
10   it would be all of the exterior surfaces, because
11   they've all seen the same chemical environment.
12           So when we confirmed through our spectroscopy
13   that oxidation was achieved, it would be all of the
14   surfaces.  It wouldn't be just in the discreet regions.
15           That -- I'm giving you that answer because
16   we -- the last thing we were on was on Page 26.
17       Q.  I'm just trying to understand this.  In the
18   images I look at, I don't see the degraded outer layer.
19       A.  Be more specific.  In what?
20       Q.  I don't see a degraded, cracked outer layer
21   on any of these microphotographs that you've provided.
22           MR. THOMAS:  Anywhere in the report?
23       A.  Did you look at the SEM images?  They're --
24   they're riddled with cracks.

Page 105

1        Q.  Well, but the SEM images are a different
2    image.  Right?
3        A.  No.  What I'm explaining to you is when the
4    SEM -- when the individual fibers were cracked, we
5    mounted those specimens on a mounting board, and we
6    actually noted, look, here's a specific crack, let's
7    microtome right through this cracked region.  So, in
8    essence, this one-to-one correlation between SEM
9    cracking and the cracks that are -- the cracking that's
10   exhibited around some of the QUV specimens that we
11   talked about.
12       Q.  You'd expect that if you took a -- what you
13   called an intentionally oxidized PROLENE sample --
14       A.  Which method?
15       Q.  Using QUV.
16       A.  Okay.
17       Q.  -- and you looked at it under the standing
18   electron microscopy, and you saw the severe cracking
19   that some of your images have demonstrated --
20       A.  Correct.
21       Q.  -- then you'd take that same material, and
22   you do, you know, embedding and microtoming and do a
23   cross-section --
24       A.  And I --

27 (Pages 102 to 105)

Steven MacLean, Ph.D., P.E.

Page 106

1    Q. -- and put it under a microscope --
2    A. Sure.
3    Q. -- you expect to see that outer degraded
4  layer in the microphotograph. Right?
5    A. Yeah, and we -- and we do. It's on 6 -- it's
6  on 19 (b). I mean, the cracking that's at -- if I use
7  that mesh cross-section as a clock, you know, certainly
8  the cracking that we see at 9:00, 10:00, 11:00, I am a
9  hundred percent convinced that that is from UV
10 oxidation.
11   Q. You think that's from UV oxidation and not
12 chatter.
13   A. I do.
14   Q. Okay.
15   A. Again, that's for two reasons. One, we've
16 confirmed it through FTIR. That's -- there's certainty
17 there. And then, two, we've got it connected back to
18 the SEM microcracks.
19   Q. So how do I connect Figure (b) and (c) --
20 which are the same image, right? Same fiber, right?
21   A. Yes.
22   Q. How do I track backwards this figure to a
23 scanning electron microscopy and then to FTIR?
24   A. It's all in the files that we've given you.

Page 107

1  All of -- all of that one-to-one correspondence exists.
2  If you can -- if and when you can find these images on
3  the information we've given you, you find that image,
4  and you trace it back to the overall bulk swath
5  specimens that we've talked about, you will see how
6  they are mounted, you will see the location that we
7  chose to microtome from. It's all there.
8    Q. This image on Figure 19, is this the best
9  image that you had of an intentionally oxidized
10 PROLENE sample?
11       MR. THOMAS: Object to form.
12   Q. For microphotograph --
13   A. I don't know --
14   Q. -- imaging?
15   A. I don't know if it's the best. It's
16 certainly a representative fiber that suffered from UV
17 oxidation.
18   Q. And the image is blurry, right?
19   A. No. I don't think the image is blurry.
20   Q. You don't think the image is blurry?
21   A. No. Can you not see the cracking at 9:00,
22 10:00, 11:00? Can you not see that? Because I --
23   Q. I see some cracking, but it looks like --
24 that looks like chatter to me.

Page 108

1    A. Okay. It doesn't look like chatter to me.
2  And -- and the chatter -- we know it's not chatter
3  because of the reasons that I just walked you through.
4    Q. Is this sample -- has this sample been
5  preserved?
6    A. Sure. Yes.
7    Q. And where is it being preserved at?
8    A. In Menlo Park.
9    Q. Are all the samples preserved at -- where did
10 you say?
11   A. Menlo Park. That's our -- that's where
12 Dr. Benight and Dr. Garcia work from.
13   Q. Menlo Park is --
14   A. That's two words; Menlo Park in California.
15   Q. California.
16   A. (Witness nods head.)
17   Q. Did you look at any of these images yourself
18 under a microscope?
19   A. We may have done some video sharing at some
20 point to get some realtime microscopy across the
21 country. I've also looked at all of the ones from the
22 Mullins work first-hand.
23   Q. You have some additional -- so the only ones
24 that you looked at first-hand were for Mullins. You

Page 109

1  didn't look at any of these --
2        MR. THOMAS: Object to form.
3    A. I've looked at all of those.
4    Q. Through the microphotographed images that
5  were sent to you from Dr. Benight.
6    A. Yeah. And/or a -- some sort of video session
7  that we might have set up at some point in time.
8    Q. On Page 30 -- or, actually, Page 31, you talk
9  about polarizing artifact.
10   A. Yes.
11   Q. And here you are -- I think what you're doing
12 is you're attempting to demonstrate what you believe
13 the -- it's your opinion that the cracked outer layer
14 that is identified by Dr. Iakovlev is artifact from
15 polarized light microscopy?
16   A. Oh, no. Not necessarily. It's -- this is
17 just a caution and a warning that when you use
18 polarized lighting, that you can get some degree of
19 shading and some -- and varying degrees of
20 illumination, and you just need to be aware of those
21 artifacts as you interpret the results.
22   Q. Are you going to offer any opinion at trial
23 that any of the photo -- or the microphotographs that
24 you've looked at that were taken by Dr. Iakovlev were

28 (Pages 106 to 109)

Steven MacLean, Ph.D., P.E.

Page 110

1  caused by polarizing artifact?
2      A.  I don't know.  I'd have to go back and look
3  at his universe of images.  All I'm saying here is that
4  when you use polarized light, you just need to be
5  careful, because you could introduce things that just
6  truly aren't there.  That's -- that's all I'm saying.
7          MR. THOMAS:  And just so you know, just in
8          case you don't know, there are two videos in
9          the information --
10         MR. THORNBURGH:  I've seen those.
11         MR. THOMAS:  Okay.
12         MR. THORNBURGH:  I've seen those.
13         MR. THOMAS:  That's fine.
14     Q.  Are you offering -- are you -- have --
15  sitting here right now, do you have any opinion that
16  any of the microphotographs that were taken from -- by
17  Dr. Iakovlev and are in his expert report are actually
18  depicting some sort of polarizing artifact?
19         MR. THOMAS:  Object to form.
20     A.  I can say this:  That there may be polarizing
21  artifacts in his images.  If you're asking me if I
22  believe that the crust that we've all been talking
23  about for a very long time is an artifact of polarized
24  light, the answer's no.

Page 111

1      Q.  Okay.  And you've seen that in the
2  degraded -- what we call the degraded crust or degraded
3  bark, that Dr. Iakovlev has found that within that
4  cracked layer, there are blue granules caused from the
5  placement of those dye or the pigments during the
6  manufacturing by the Defendant.  Right?
7      A.  I --
8      Q.  So, in other words, the Defendant uses a --
9  blue granules or blue pigments to -- to color their
10  fibers blue.  Right?
11     A.  Correct.
12     Q.  And in the cracked outer layer of the mesh
13  that Dr. Iakovlev has looked at, in that cracked layer,
14  there are blue pigments or blue granules.  Okay?
15         MR. THOMAS:  Object to the form of the
16         question.
17     A.  I think that is his interpretation of what he
18  sees.
19     Q.  What is your interpretation of what is shown
20  in the microphotographs of Dr. Iakovlev?
21     A.  I think I -- I see two discreet layers, and I
22  can show you an image that will help tease that out.
23         So if you look at Dr. Iakovlev's Wave 1
24  report, Page 94.  I'm in Figure 13(k), as in Karen, and

Page 112

1  I'm in specifically Image (c) as in Charlie.
2      Q.  Okay.
3      A.  Are you with me?
4      Q.  Yeah, I'm there.
5      A.  So in that particular image, I clearly see a
6  stained region that's just in -- I'll call it inboard
7  from the white reference arrow, and then a defined
8  boundary between -- there's no staining in the blue
9  particles.
10         So, to me, this is a clear indication that
11  the crust is something else, for two reasons:  There's
12  no blue granules in the purple swath of material that
13  you see there, is a discreet boundary, and, likewise,
14  there's no staining in and around the blue dyes, the
15  blue particles.
16         So I -- I see it very differently than he
17  does.
18     Q.  So let me ask you this question:  Do you
19  know -- do you have any understanding as to whether or
20  not those blue granules will also oxidize and degrade
21  over time?
22     A.  The blue granules --
23     Q.  Um-hum.
24     A.  -- themselves?

Page 113

1      Q.  Right.
2      A.  I haven't thought about that enough.  I would
3  have to think about that before I give you an answer.
4      Q.  Okay.  Because if they did, it would make
5  sense that towards the surface, where the highest
6  activity of oxidation is occurring of the fibers, that
7  you'd expect to see a decrease in the blue fibers at
8  that level.
9      A.  Well, fine.  Let's continue that logic, then.
10  What is the answer as to why the inner boundary didn't
11  stain?
12     Q.  Where are you looking at?
13     A.  I'm just looking to the left -- let me just
14  point it out to you so we're all on the same page.
15     Q.  Well, let me just -- let's just do this real
16  quick.
17     A.  Sure.
18     Q.  We're running out of time.
19     A.  Okay.
20     Q.  Let's look at Exhibit No. -- or Image No. (d)
21  of Figure -- of this figure set.  Okay?  On Page 94.
22  Do you see (d)?
23     A.  I see (d).
24     Q.  Okay.  Do you see the detached degraded --

29 (Pages 110 to 113)

Steven MacLean, Ph.D., P.E.

Page 114

1  what we have allege to be degraded bark?
2      A. I do.
3      MR. THOMAS: Object to form of the question.
4      Q. Do you see the blue granules throughout that
5  degraded layer?
6      A. I do.
7      MR. THOMAS: Object to form.
8      Q. Okay. And what is your explanation for the
9  degradation and the presence of the blue granules in
10  this image?
11      A. Well, because what you can have on a
12  biased-cut specimen, you can actually have two layers
13  of material. And you're only looking at a
14  one-dimensional image here.
15      So if this has, say, a portion -- and I
16  talked about this in one of my reports. Because of the
17  bias cutting, I can have the crust layer on top, if you
18  will, and then some of the residual PROLENE on the
19  bottom of that same specimen. And so when I look at it
20  top down, I'm actually looking through both
21  simultaneously.
22      Q. So what evidence do you have that you're
23  looking at a crust layer that is on top of a
24  polypropylene layer causing this image to look the way

Page 115

1  it does?
2      A. You can actually just show it through basic
3  geometry. If you cut a basic -- excuse me. If you
4  have a bias-cut fiber, you can actually just show it
5  through simple geometry, that you can have this -- what
6  I'll call a compounding effect; one material on top of
7  the other around the perimeter.
8      Q. Is that what you were attempting to do in
9  your supplemental report on Page 31?
10      A. No. No. 31 was just talking about artifacts
11  that come up from the -- that come about from the
12  polarization process or the polarized light
13  illumination.
14      Q. On Page 30? Is that what you're referring
15  to?
16      A. Yeah, to some extent. I mean, this is just
17  showing how you can have this bias cut that we talked
18  about.
19      So if you look at Image (b) -- Figure 21,
20  Image (b), you can -- none of these specimen, when you
21  microtome them, you don't -- you aren't guaranteed a
22  perfect circle. Is that clear? Does that make sense?
23  Because of the fact that the mesh is a
24  three-dimensional knit. And so when I microtome up

Page 116

1  across some sort of arbitrary plane, I'm also going to
2  have some degree of bias cutting.
3      And what I'm saying is that, yes, if I have a
4  bias cut and now I place it on a slide, I may have the
5  notion of two materials, one which is PROLENE, and one
6  which is the crust in the same field of view looking
7  top down.
8      Q. There's no evidence in -- on Page 94 of
9  Dr. Iakovlev's report, Image (d), of a bias view or
10  bias cut.
11      A. We can't tell here. You need to actually
12  look at the entire cross-section father away to know
13  whether you've got a perfect circle or some sort of
14  bias. You just can't tell.
15      Q. Because I think the way you've described it
16  is that if you have a biased cut, where it's not a
17  totally flat cross-section, then at -- then the crust
18  could look as if it has blue granules in it, but it's
19  really an artifact caused by the core.
20      A. Not necessarily the core. It could be any
21  residual PROLENE that's sitting just below the crust
22  itself. So it doesn't have to be the core. I know why
23  you're asking that, because (d) has no core in it. You
24  don't have to have the core.

Page 117

1      It's just a matter of that -- that banded
2  crust material coming from a bias cut could -- could be
3  two different materials, one on top of the other. And
4  you're making -- you're getting an illusion of the blue
5  dyes and the blue granules being inside of the crust.
6      Q. So you think -- it's your opinion, on Page
7  94, that Image (d) is actually an illusion.
8      A. I'd need to see that -- I'd need to see that
9  specimen first-hand to be able to make that assessment.
10      Q. So you can't offer an opinion to a reasonable
11  degree of scientific probability or certainty that the
12  image on Page 94, (d), is caused by an artifact.
13      A. There's no question I can demonstrate that
14  through simple geometry. You know, it's just an
15  extension of what's on Figure 21.
16      I can show that you can get a multi-layer
17  optical illusion, if you will, by having a bias-cut
18  specimen. There's no doubt.
19      Q. Have you attempted to reproduce this artifact
20  in any of your images?
21      MR. THOMAS: Object to form of the question.
22      A. Yes. So in the bovine serum specimens, we
23  definitely have some micrographs that show when you
24  have an overlap of a proteinaceous material on top of

30 (Pages 114 to 117)

Steven MacLean, Ph.D., P.E.

Page 118

1  the outside perimeter of the fiber, that you can have
2  the illusion of blue granules in some sort of protein
3  crust.
4      Q.  What image are you referring to in your
5  report?
6      A.  I'm trying to find it right now.  I can
7  rattle off the file name when you're ready.
8      Q.  Ready.
9      A.  Okay.  157183_serum_R -- as in Robert --
10  _63X_H&E_ANA --
11      (Discussion held off the record.)
12      A.  -- _06-imageexport40.  And then I'm not going
13  to make you go through that whole thing again, but the
14  next one is --
15      (Discussion held off the record.)
16      A.  -- imageexport16.
17      Q.  And that's not in your expert report.  That's
18  just a microphotograph?
19      MR. THOMAS:  Object to the form of the
20      question.
21      A.  It would certainly be in the -- it is,
22  actually.  One of them is.  So Figure 14 (b), as in
23  boy, would be one of them.  And, likewise, Figure 15
24  (a) and (b) show overlapping of the bovine serum -- the

Page 119

1  fixed bovine serum with the mesh specimen.
2      Q.  Doctor, if you turn to -- let's look at your
3  protocol for the chemical oxidizing experiment that you
4  did.
5      A.  Okay.  (Witness complies.)
6      Q.  Okay.  Do you have it in front of you?
7      A.  I do.  I just want to make sure we're working
8  off the same document.  So mine says "Guelcher Chemical
9  Oxidation Protocol".
10      Q.  Right.  And, again, was it your -- the
11  purpose of following Dr. Guelcher's protocol was to see
12  if -- was, again, I guess, to use it as a control?
13      A.  We were -- we wanted to actually include a
14  chemical oxidation technique in addition to the QUV
15  technique.
16      Q.  Okay.  And so you were attempting to see if
17  you could produce the results of Dr. Guelcher.
18      MR. THOMAS:  Object to form of the question.
19      A.  No, not necessarily.  We were using it as a
20  method, an established method in the literature for
21  oxidizing polypropylene-based materials.  That's all.
22  Chemically oxidizing polypropylene-based material.
23      Q.  And you actually did find evidence in your
24  FTIR analysis of the chemically oxidized samples of

Page 120

1  oxidation.
2      A.  There was some oxidation species, correct.
3      Q.  Okay.  So you were actually able to begin the
4  oxidation process using the chemicals in your protocol.
5      A.  Yes.  We found some evidence of oxidation.
6      Q.  And were you trying to mimic the in vivo
7  environment where these meshes are placed in a woman's
8  body?
9      MR. THOMAS:  Object to the form of the
10      question.
11      A.  No, not at all.
12      Q.  Did any of your experiments mimic the in vivo
13  environment of a woman's body?
14      A.  No.
15      Q.  If you look at your protocol, you actually
16  added a step to -- to Dr. Guelcher's protocol, didn't
17  you?
18      A.  Can you just orient me so we can save time.
19      Q.  Okay.  Let's go ahead and mark as exhibit --
20  mark as an exhibit the Guelcher Chemical Oxidation
21  Protocol.
22      (MacLean Deposition Exhibit 19 - Guelcher
23      Chemical Oxidation Protocol - marked for
24      identification.)

Page 121

1      MR. THOMAS:  Do you have an extra one, Dan?
2      What number did we mark that?
3      THE WITNESS:  It was 19.
4      MR. THORNBURGH:  19.
5      Q.  In your protocol, you used ultrasonic
6  cleaning, right?
7      A.  Can you just -- again, just for sake of time,
8  just orient me to what number or what page you're on.
9      Q.  Okay.  So if we're on Exhibit 19, do you see
10  the top, you talk about the equipment and supplies.
11  Then you talk about the procedure.
12      A.  Yes.
13      Q.  At the bottom of Page 1.
14      A.  (Witness nods head.)
15      Q.  And then you talk about on Page 2 the
16  chemical oxidation protocol.
17      A.  Yes.
18      Q.  And you go through the protocol, and you
19  discuss on Section 6, sonicating, if necessary, to
20  remove any cobalt chloride crystals.
21      A.  Yes.  Correct.
22      Q.  Did you sonicate any of the chemical
23  oxidation samples or the chemically treated samples?
24      A.  I believe so.  We did.  We tried to remove

31 (Pages 118 to 121)

Steven MacLean, Ph.D., P.E.

Page 122

1   some of the cobalt crystals that were adhered to some
2   of the fibers.
3       Q.  Okay.  And you did that in an ultrasonic bath
4   or --
5       A.  We did.
6       Q.  Okay.  And what type of cleaning solution did
7   you use?
8       A.  I believe it was just distilled water.
9       Q.  So you put the samples into the ultrasonic
10  bath with distilled water?
11      A.  Correct.
12      Q.  No other ultrasonic fluid was used?
13      A.  No.
14      Q.  You'd agree that that's a different protocol
15  than was used by Dr. Guelcher?
16      A.  I don't recall.  I don't have them side by
17  side.  But it would -- it doesn't affect the results.
18  You're just trying to remove these crystals that are
19  now sitting on the surface.  There's no interaction
20  between them.
21      Q.  Well, why did you add this step if it wasn't
22  part of Dr. Dunn and Guelcher's protocol?
23      A.  Because we wanted to isolate the fibers, and
24  we had so many of the cobalt crystal -- crystals --

Page 123

1   excuse me -- cobalt chloride crystals that were
2   adhering to the surface that we wanted to remove them.
3   That's all.
4       Q.  Did you use ultrasonic cleaning in any of the
5   UV-treated samples?
6       A.  We did not.
7       Q.  Okay.  And have you read any publications
8   that discuss how using -- or how the abrasive steps are
9   taken in cleaning explanted samples can actually remove
10  the degraded surface layer?
11      MR. THOMAS:  Object to form of the question.
12      A.  I know that when some people have cleaned
13  explanted specimens, that there is a removal of this
14  crust, if that's what you're asking me.
15      Q.  Did you, in any of your experiments that you
16  conducted -- were you ever asked to see whether or not
17  the cleaning steps that are taken by, for example,
18  Dr. Timms (phonetic) can actually remove the oxidized
19  degraded surface layer?
20      A.  That's a question for Dr. Timms.  I didn't do
21  that work.
22      Q.  You weren't asked to do that work?
23      A.  I was not.
24      Q.  Turn to Table 1 of your expert report in Wave

Page 124

1   1.
2       A.  And what page is that on?
3       Q.  It's actually your supplemental report,
4   Page 11.
5       A.  (Witness complies.)  Okay.
6       Q.  This Table 1 discusses the PROLENE samples
7   that were processed --
8       A.  Correct.
9       Q.  -- in your experiment.
10      A.  Correct.
11      Q.  And you expose -- we talked about all the
12  samples that were exposed to QUV resin.  But if you
13  look at Column -- let's see here.  Actually, strike
14  that.
15          Let's just turn real quick to Page 176 of
16  your supplemental report.
17      A.  (Witness complies.)  176.
18      Q.  Is this where your FTIR analysis begins on --
19  in the experiments that you conducted?
20      A.  Correct.
21      Q.  Okay.  And on Page 176, you have a number of
22  controls?
23      A.  I do.
24      Q.  And then on Page 177, you have additional

Page 125

1   controls.  And then you get, finally, to Page 180, it
2   looks like; the FTIR related to the QUV experiment.
3       A.  Yes.
4       Q.  And these are samples that are actually
5   treated with QUV, right?
6       A.  Correct.
7       MR. THOMAS:  It's 11:45.
8       (Discussion held off the record.)
9       Q.  If you look at the images on Page 180, the
10  FTIR, you have identified some carbonyls that are
11  consistent with degradation, right?
12      MR. THOMAS:  Object to form.
13      Q.  And oxidation.
14      MR. THOMAS:  Object to form of the question.
15      A.  I will say that there are carbonyls where I
16  would expect them to be between 16- and 1800.
17      Q.  Where would you expect them to be in a
18  oxidized material, polypropylene material, right?
19      A.  Correct.  That would be one -- that would be
20  one indication or that would be one reason why
21  carbonyls would form in that area.
22      Q.  Okay.  And it's a broad band -- I think you
23  said a broad band, between 1600 -- 1650 and 1800?
24      A.  Yeah.  More or less.

32 (Pages 122 to 125)

Steven MacLean, Ph.D., P.E.

Page 126

1    Q.  Okay.  And that would be -- it's your
2    opinion, as a polymer scientist, that a carbonyl within
3    that location would be consistent with oxidized
4    polypropylene.
5         MR. THOMAS:  Object to the form of the
6         question.
7    A.  Let's be clear about this.  It's because I
8    know the environment that those specimens were put
9    into.  So I can't just look at this spectrum in
10   isolation and say I achieved oxidation.
11        It's because I know it went under QUV, I know
12   it started in the pristine state.  And once I have
13   those additional factors known to me, and there's no
14   other variables, then, yes, I can ascribe that to
15   oxidation.
16   Q.  On your chemical-treated samples --
17   A.  Um-hum.
18   Q.  -- where is the FTIR in your report?
19   A.  I don't see it, so it's probably on the thumb
20   drive.
21   Q.  Why didn't you include the FTIR in your
22   report from the chemically treated samples?
23   A.  No reason.  Could have just been an
24   oversight.  It's definitely in our produced data set.

Page 127

1    Q.  Was the FTIR findings of the chemical --
2    chemically treated samples consistent with the FTIR
3    band seen in the QUV-treated samples?
4    A.  I wouldn't --
5         MR. THOMAS:  Object to the form of the
6         question.
7    A.  I wouldn't use the word "consistent" or
8    "inconsistent."  There were, I would say, different
9    oxidation species that developed under chemical
10   oxidation.
11   Q.  Okay.  Which oxidation species developed
12   under chemical oxidation?
13   A.  We saw hydroxyl formation in the 32- to 3500
14   range, and we saw C single bond O in some -- I think in
15   most, if not all, of the specimens at 1050 and 1150.
16        MR. THOMAS:  I have to stop you, Dan, because
17        I have to ask a few questions, and I have to
18        go.  You've been three hours.
19        (Discussion held off the record.)
20   BY MR. THORNBURGH:
21   Q.  Where were the carbonyl peaks in the
22   chemically treated samples?  Where were they located or
23   the spectrum?
24   A.  Well, carbonyl peaks would show up like we

Page 128

1    talked about; anywhere from, say, 1650 to 1800.
2    Q.  Okay.  And how is it different, the
3    QUV-treated, how is that different than the
4    chemical-treated?
5         MR. THOMAS:  Object to form of the question.
6    A.  One is oxidized through chemicals, one is
7    oxidized through UV radiation.
8    Q.  So the mechanism of action is different?
9    A.  I would say the energy imparted to induce
10   oxidation is different.  The energy method.
11   Q.  And I think you said this earlier, but the
12   QUV-treated samples that you -- experiment that you
13   performed, that doesn't happen in the human body.
14   A.  Well, with the exception of the eye, if we're
15   just talking about pelvic meshes, you're correct.
16   Q.  So the experiments that you conducted in this
17   case -- I think you testified to this -- did not mimic
18   the environment of the human body.
19   A.  Correct.  And we didn't attempt to do that.
20        MR. THORNBURGH:  Okay.
21        MR. THOMAS:  Finished?
22        MR. THORNBURGH:  Yes.
23        (Discussion held off the record.)
24

Page 129

1              EXAMINATION
2    BY MR. THOMAS:
3
4    Q.  Doctor, I just have a couple questions for
5    you.
6         If you turn to Exhibit No. 14, which is your
7    Wave 1 report, on Pages 36 and 37 there is discussion
8    of papers by Bracco and Imel.
9    A.  Correct.
10   Q.  Is that correct?
11   A.  That is correct.
12   Q.  Are those additions to this report?
13   A.  They are.  I missed those in my first
14   pass-through.  I missed Bracco and Imel; would be
15   additions.
16   Q.  Those are the only additions beyond what you
17   described to Mr. Thornburgh before?
18   A.  That is correct.
19        (MacLean Deposition Exhibit 20 - Publication
20        by Benight, MacLean, Garcia, and Moll -
21        marked for identification.)
22   Q.  I want to hand you now what I've marked as
23   MacLean Exhibit No. 20, a document that's contained in
24   what we've produced to Plaintiffs on the thumb drive.

33 (Pages 126 to 129)

Steven MacLean, Ph.D., P.E.

Page 130

1   What is Exhibit No. 20?
2      A.  It is a pending publication regarding the
3   work that we did last fall.
4      Q.  And when you say the "work that you did last
5   fall", is that the work that you did in the Mullins
6   case?
7      A.  It is.
8      Q.  And what was your intent when you submitted
9   Exhibit No. 20?
10      A.  To get published in a peer-reviewed
11   conference proceeding.
12      Q.  Did you change any of the procedures, the
13   data, the findings in Exhibit No. 20, as reported in
14   your report from the Mullins case, before submitting it
15   for publication?
16      MR. THORNBURGH:  Objection.
17      A.  I did not.
18      Q.  Okay.  And to what journal was it submitted?
19      A.  This is -- this was submitted to the medical
20   division, medical device division of the Society of
21   Plastics Engineers.
22      Q.  And has it been accepted for publication?
23      A.  It has.
24      Q.  Was it accepted without change?

Page 131

1      A.  Without change.
2      Q.  And when will it be published?
3      A.  It will be published at the end of May.
4      Q.  And will it be presented?
5      A.  It will be -- also be presented at the end of
6   May.
7      Q.  And where will it be presented?
8      A.  In Indianapolis.
9      Q.  At what proceeding?
10      A.  At the an.tech. conference.  It's the annual
11   technical conference for the Society of Plastics
12   Engineers.
13      Q.  And what is an.tech. conference to plastics
14   engineers?
15      A.  It's where industrial polymer scientists and
16   researchers come together for three or four days to
17   author publications and have seminars and technical
18   symposium, things like that.
19      Q.  And who will present that paper?
20      A.  It hasn't been decided, but it will be either
21   Dr. Benight or myself.
22      MR. THOMAS:  That's all the questions I have.
23      Thank you.
24      MR. THORNBURGH:  Can I ask two questions

Page 132

1      about this?
2      MR. THOMAS:  Yes.
3
4            EXAMINATION
5   BY MR. THORNBURGH:
6
7      Q.  Doctor, regarding the publication, you said
8   it was accepted by the medical device division
9   of the --
10      A.  Society of Plastics Engineers.  SPE, it's
11   informally known as.
12      Q.  Are they peer-reviewed?
13      A.  They are.
14      Q.  Okay.  And did you attempt to submit this
15   publication to any other journal?
16      A.  Not at this time.
17      Q.  And on the last page of this abstract, you
18   note the conflict of interest.
19      A.  On the last page of the publication, yes, I
20   note a conflict of interest disclosure.
21      Q.  And did you disclose that you were being paid
22   as an expert to defend Ethicon in claims that its mesh
23   material oxidized and degraded, causing injury to
24   patients?

Page 133

1      MR. THOMAS:  Object to the form of the
2      question.
3      A.  I disclosed what's written here in those two
4   or three sentences under the disclosure.
5      MR. THOMAS:  Okay.  That's all.  I've got to
6      go.
7
8      (Deposition concluded at 11:54 p.m.)
9
10         * * * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24

34  (Pages 130 to 133)

Steven MacLean, Ph.D., P.E.

Page 134

```
 1    STATE OF NEW YORK  )
 2                       ) SUPREME COURT
 3    COUNTY OF NEW YORK )
 4        I, Janis L. Ferguson, RPR, CRR, a Notary Public in
 5    and for the State of New York, do hereby certify:
 6
 7        That the witness whose testimony appears herein
 8    before was, before the commencement of his/her
 9    testimony, duly sworn to testify the truth, the whole
10    truth, and nothing but the truth; that the testimony
11    was taken pursuant to notice at the time and place
12    herein set forth; that said testimony was taken down in
      shorthand by me and after, under my supervision,
13    transcribed into the English language, and I hereby
      certify the foregoing testimony is a full, true, and
14    correct transcription of the shorthand notes so taken.
15        I further certify that I am neither counsel for,
      nor related to any parties to said action, nor in any
16    way interested in the outcome thereof.
17        IN WITNESS WHEREOF, I have hereunto subscribed my
      name this 20th day of April, 2016.
18

19

20

21        Janis L. Ferguson, RPR, CRR
          Notary Public in and for the State of New York
22
23    My Commission expires:  5/28/2017
24    Registration No. 01FE6282686
```

35 (Page 134)

**A**

**ability** 83:24 84:20
**able** 14:14 35:20
    86:21 117:9 120:3
**abrasive** 123:8
**abstract** 132:17
**abusive** 62:12
**accelerated** 38:22
**accepted** 26:20
    76:5 130:22,24
    132:8
**accurate** 8:13
**accurately** 71:7
**accustomed** 72:23
**achieved** 72:16
    77:21 99:12
    104:13 126:10
**acquired** 37:6
**action** 128:8
    134:15
**activity** 113:6
**actual** 35:19 47:17
**add** 99:11 122:21
**added** 21:8 23:11
    56:20 120:16
**addition** 22:20
    119:14
**additional** 16:15
    18:17 21:7 22:8
    23:11 32:13,14,22
    33:1 36:22 37:3
    38:2,9,10 42:4
    43:3,6 55:3 56:4
    61:14 76:21 79:4
    87:3 88:10 89:8
    108:23 124:24
    126:13
**additions** 22:15,23
    129:12,15,16
**adequately** 59:19
**adhered** 122:1
**adhering** 123:2
**adhesive** 9:3,8
**adhesive-coated**
    60:24
**affect** 122:17

**aggressive** 62:12
    63:3,7,16 65:13
**ago** 11:23,23 19:16
    20:10 102:9
**agree** 82:14,14 83:9
    84:3 89:4,5 90:24
    97:24 122:14
**ahead** 14:18 15:1
    16:19 17:6 34:9
    36:4 46:14 65:8
    98:1 120:19
**air** 60:24
**Airport** 4:5
**alcohol** 54:7 55:1,9
    56:5,5
**align** 99:6
**allege** 86:22 114:1
**alleged** 88:2 92:19
**alleging** 9:16
**allow** 60:14 63:10
**Amanda** 2:23
**amount** 28:2,4
    29:10 30:16,22
    65:16
**analysis** 11:18
    12:22 14:5 36:22
    42:22 43:4 78:17
    119:24 124:18
**analyze** 10:18
**analyzed** 10:9 11:9
    11:10,10 12:5
    38:3 42:13 43:14
    95:24
**analyzing** 12:7
**and/or** 28:14 109:6
**Ann** 2:12
**annual** 131:10
**answer** 7:23 64:15
    64:15 74:19 75:21
    77:13 90:23 92:12
    104:15 113:3,10
**answered** 53:13
**answer's** 110:24
**anybody** 98:13
**anymore** 65:20
**an.tech** 131:10,13
**apologize** 94:13

**appear** 26:1 29:22
    29:24 31:22 43:2
**appears** 15:9 18:12
    24:19 25:1 27:16
    32:8 41:17 46:24
    134:7
**appendix** 16:12
    17:15 47:21
**appropriately**
    48:17
**approximately**
    30:16 31:3,18,20
    32:9 34:24 40:2,4
**April** 1:17 4:4
    134:17
**arbitrary** 116:1
**area** 60:2 103:8
    125:21
**areas** 102:21,22
**arguably** 22:19
**argue** 58:23 101:9
**arrow** 112:7
**article** 5:18 6:7
    19:2,4 78:13
**articles** 20:2,12
**artifact** 16:4 98:14
    109:9,14 110:1,18
    110:23 116:19
    117:12,19
**artifacts** 98:11
    109:21 110:21
    115:10
**ascribe** 126:14
**aside** 59:2
**asked** 21:20 44:2,3
    44:16 52:20 53:13
    68:4 91:16 92:6
    92:10 123:16,22
**asking** 32:24
    110:21 116:23
    123:14
**asks** 13:10
**assessment** 117:9
**assigned** 84:16
**assist** 23:24
**assistance** 20:23
    21:2,14 100:8

**assisted** 21:16
**associated** 84:17
**assume** 7:24
**assured** 72:8
**attach** 17:19,20
**attached** 13:9
**attempt** 49:18 53:3
    77:18 83:5 128:19
    132:14
**attempted** 101:11
    117:19
**attempting** 49:16
    109:12 115:8
    119:16
**Attorney** 5:5,6,7
    37:23
**August** 29:7,7,8,13
    29:17,18
**author** 131:17
**automated** 53:19
    61:18,21 62:11,19
    62:23 63:3,5,18
    64:3,9,10 65:10
    65:12,20 66:4,9
    67:18,21 68:3,9
    68:13 69:1,14
    70:19 71:4,20,23
    72:22 73:5,7,10
    73:18 80:22 81:11
**automatic** 62:19
    63:17 64:20 67:4
    67:10,11,23 68:13
    68:17
**automatically**
    67:12
**automation** 6:6
    69:19,21 70:3,7
    70:10,17 71:9,14
    71:18
**available** 51:10
    59:1 76:19
**aware** 109:20
**Aylstock** 4:12
**a.m** 4:4 46:17,17
    85:9,9

**B**

**b** 4:19 86:12,17,21
    97:4 98:5 100:1,4
    102:15,18 106:6
    106:19 115:19,20
    118:22,24
**Babcock** 2:9
**back** 12:24 18:2
    20:7,8 24:10
    31:12 32:11 38:1
    73:3 92:4,7
    103:15 106:17
    107:4 110:2
**background** 53:11
    66:20 92:11
**backwards** 106:22
**bake** 61:1
**ballpark** 32:10
**band** 125:22,23
    127:3
**banded** 117:1
**Barbara** 11:3
**bark** 85:16 86:10
    86:13 88:3 111:3
    114:1
**Bartlett** 2:21
**Barton** 11:1
**based** 26:18 42:9
    77:19 84:1,20
    90:24
**basic** 115:2,3
**basically** 51:15
    67:9
**basis** 74:10 84:11
    84:15 98:4
**batch** 11:16
**bath** 60:13 122:3
    122:10
**Baugher** 2:11
**Beach** 3:21
**Becke** 15:24 16:2,3
**beginning** 79:3
**begins** 104:4
    124:18
**behalf** 9:6 27:5
    32:22
**believe** 8:17 12:23
    26:6 30:20 42:8

50:17 77:5,18
78:9 79:7 82:23
84:11 98:19
109:12 110:22
121:24 122:8
**believed** 77:9,11
**Bellito-Stanford**
11:2
**Benight** 21:19 23:8
23:10,17 95:12
96:3 100:8 103:15
103:20 108:12
109:5 129:20
131:21
**Benight/MacLea...**
6:9
**best** 30:12 62:16
83:24 84:20 107:8
107:15
**bet** 98:7
**better** 82:6,8
103:16
**Beverly** 3:11
**beyond** 129:16
**bias** 114:17 115:17
116:2,4,9,10,14
117:2
**biased** 116:16
**biased-cut** 114:12
**bias-cut** 115:4
117:17
**billed** 28:15 29:13
**billing** 28:19 33:1
**binder** 5:17 15:9
18:8,11 24:18
**biological** 88:21
90:13,14
**birefringent** 93:20
94:4,9 96:7
**bit** 16:5 62:12
**blade** 39:19 97:15
97:19 98:12
**blocks** 60:6,10
**blue** 11:22,24 12:8
111:4,9,9,10,14
111:14 112:8,12
112:14,15,20,22

113:7 114:4,9
116:18 117:4,5
118:2
**blurred** 103:1
**blurry** 101:3,22
102:1,3,6,15,18
102:20,22 103:9
103:12,12 107:18
107:19,20
**board** 105:5
**body** 90:18 120:8
120:13 128:13,18
**Bollinger** 3:12
**bond** 127:14
**book** 70:9,12
**bottom** 71:2 79:6
103:7 114:19
121:13
**bought** 37:9
**boundary** 112:8,13
113:10
**bovine** 72:15 95:17
95:19 96:5,6,10
117:22 118:24
119:1
**boy** 100:4 118:23
**Bracco** 129:8,14
**brand** 56:10,11
**break** 39:6
**Bridges** 11:3
**briefly** 37:2 60:12
**bright** 97:3
**bring** 14:15 16:7
**brittle** 86:10
**broad** 87:7 125:22
125:23
**brought** 15:9 17:21
18:12 24:19 26:4
**brown** 89:17 90:2,9
91:2
**Brunswick** 8:22,24
**buffered** 80:1
**bulk** 99:20 107:4
**Burkhart** 2:2
**Butler** 26:15
**by-product** 57:7
**B-A-R-T-O-N** 11:1

**B-E-C-K-E** 16:1
**B-E-L-L-I-T-O**
11:3
**B-E-N-I-G-H-T**
21:22
**B-R-I-D-G-E-S**
11:4

## C

**c** 4:9 7:1 49:1,4
53:24 89:21,23,24
91:1,2 97:5 98:5
98:19 100:4
106:19 112:1
127:14
**calcium** 86:10
**California** 108:14
108:15
**call** 22:5 41:24
51:24 99:19 111:2
112:6 115:6
**called** 43:23 63:16
67:18 78:22
105:13
**calls** 62:2
**cancer** 71:10 75:4,5
75:8
**capabilities** 68:23
**capability** 72:19
**capable** 70:19 71:4
72:9
**capacity** 10:1
**capital** 45:10,11
**Caption** 2:1 3:1
**carbonyl** 126:2
127:21,24
**carbonyls** 125:10
125:15,21
**careful** 110:5
**carried** 80:12
**case** 8:22 9:2,6,10
9:13,14 10:12
12:2,3 14:3,11
16:13 20:19,22
22:16 35:6 44:6
48:11 71:21 72:23
101:2 110:8

128:17 130:6,14
**cases** 7:15 8:18,21
20:19 21:5 26:8
28:23 29:3 33:5
36:19 80:24
**case-specific** 10:20
**caught** 71:9
**caused** 98:6,14,21
110:1 111:4
116:19 117:12
**causing** 114:24
132:23
**Celsius** 38:24 60:13
**centimeter** 40:2,4
**certain** 10:16 23:19
24:19 93:24 99:16
**certainly** 16:11
51:6 71:18 83:8
85:15 90:6 93:22
94:15,19 98:10
100:21 101:11
102:21,21 103:4
106:7 107:16
118:21
**certainty** 106:16
117:11
**certify** 134:5,13,15
**Chad** 26:11,14
**chamber** 38:24
43:12
**change** 130:12,24
131:1
**changes** 54:7 55:6
55:9
**chapter** 70:6,6,11
70:23
**characterize** 63:21
87:24
**charged** 77:24 78:1
80:8
**Charlene** 11:5
**Charleston** 1:2
4:21
**Charlie** 100:5
112:1
**chatter** 97:8,9,12

97:14,20,23 98:8
98:14,21 106:12
107:24 108:1,2,2
**chattering** 97:15
**chemical** 104:11
119:3,8,14 120:20
120:23 121:16,22
127:1,9,12
**chemically** 104:9
119:22,24 121:23
126:22 127:2,22
**chemicals** 120:4
128:6
**chemical-treated**
17:4 126:16 128:4
**Chicago** 4:17
**chloride** 121:20
123:1
**chose** 62:7 73:14
85:18 107:7
**Christine** 1:13
**chronological** 65:6
**chronologically**
65:4
**Cindy** 1:21
**circle** 115:22
116:13
**cite** 83:17
**cited** 82:22
**claims** 132:22
**clarification** 21:20
52:20
**clarity** 101:13,14
**classify** 57:22
**Clavé** 5:18 19:2,4
24:14
**clean** 8:7
**cleaned** 123:12
**cleaning** 121:6
122:6 123:4,9,17
**clear** 63:6 76:14
101:10 112:10
115:22 126:7
**clearly** 72:19 112:5
**clinical** 75:18,22,23
76:8,22
**clinically** 75:2,3

**clock** 106:7
**close** 31:23 86:14
   102:12
**closed** 73:1
**coated** 80:8
**cobalt** 121:20
   122:1,24 123:1
**code** 68:22 76:2
**collagen** 93:23
**colleagues** 21:16
**color** 111:9
**Column** 124:13
**Combs** 4:20
**come** 59:3 74:22
   92:9 115:11,11
   131:16
**comes** 76:4 97:15
   97:21
**comfortable** 68:11
**coming** 117:2
**commencement**
   134:8
**commencing** 4:4
**comment** 81:20
**Commission**
   134:23
**company** 43:23
   44:5
**compared** 22:23,23
**competent** 72:9
**complete** 14:2,22
   36:15
**completed** 36:18
**complies** 39:14
   89:15 101:20
   102:24 119:5
   124:5,17
**component** 88:21
   90:14
**composite** 27:22
   28:1 34:7
**compounding**
   115:6
**compromise** 58:22
   58:23 59:13,15,16
   59:18
**compromised**

57:15
**computer** 14:21
**concern** 9:2
**concerning** 85:4
   87:3,17 91:18,22
   94:9
**conclude** 35:23
   36:1
**concluded** 133:8
**conclusions** 51:19
**conduct** 14:5 40:8
   44:14 82:24 87:12
   94:8
**conducted** 11:18
   14:10 16:16 27:5
   28:7,11 29:13
   30:10,19,23 31:10
   32:4,13 33:4 38:9
   63:13,15 67:11,11
   72:5 78:2 79:1
   80:18,20 87:14
   88:10 90:1 91:24
   92:14 94:3 95:20
   123:16 124:19
   128:16
**conducting** 36:13
   42:21
**conference** 130:11
   131:10,11,13
**confirm** 92:20
   99:12
**confirmation** 72:13
**confirmed** 104:12
   106:16
**conflict** 132:18,20
**conform** 68:22
   76:1
**conjunction** 19:17
   20:3
**connect** 75:13
   106:19
**connected** 106:17
**consistent** 78:7
   125:11 126:3
   127:2,7
**consolidated** 20:19
   22:18 28:23

**consulting** 27:1,4
   28:20,21
**contact** 58:4 59:1,4
   59:5
**contain** 16:12 45:8
**contained** 16:6
   18:19,24 30:17
   35:24 36:14 37:3
   43:24 48:6 91:18
   129:23
**containing** 91:22
**contains** 17:16 28:1
   35:5 41:2 48:8
**continue** 113:9
**Continued** 2:1 3:1
   6:1
**control** 49:22 50:3
   50:6,10,11,12
   52:10,11,12,17,24
   53:1,6 54:15
   56:19 77:20 79:18
   119:12
**controls** 72:14,21
   124:22 125:1
**conversations** 31:6
**convinced** 106:9
**copies** 16:7 17:3,24
   18:23 24:19
**copy** 5:24 6:4 24:14
   29:21 34:10,12,17
   36:5,6 70:1 81:13
**core** 116:19,20,22
   116:23,24
**corner** 79:7 95:5
**corners** 43:13
**correct** 7:16 8:14
   9:8,22,24 10:6,10
   11:15 12:6 14:12
   15:11,20 17:5
   18:1,15,16 19:7,8
   20:13,15,24 23:21
   23:21 24:24 25:3
   25:10,18 26:2,17
   26:21,22 27:9,17
   27:20 28:4,5,13
   29:10,11 31:15
   32:10,15,23 34:21

35:13,14 36:11,16
   38:3,4,7,8,11,12
   38:18,21 39:9,16
   42:1,2,12,24 43:5
   43:7,8 44:7,15
   45:16 47:15,16,20
   47:24 48:13 49:20
   49:21 50:14 52:9
   53:3 54:5,8,21
   55:5,7,11 56:7,8
   57:4 58:13 59:11
   61:2,8,20 62:3,4
   63:1,6,14 64:4
   65:11,24 66:5
   67:5,19 68:7
   71:22 72:1 73:22
   74:9 75:17,22,23
   76:9,11,15,20
   78:6 79:10 80:16
   80:23 81:3 83:24
   85:7 86:8,11
   89:23 95:10,23
   96:2,4,12 97:16
   100:4,6 105:20
   111:11 120:2
   121:21 122:11
   124:8,10,20 125:6
   125:19 128:15,19
   129:9,10,11,18
   134:14
**correctly** 48:23
   49:11,12 53:20
   69:13 80:5,13
**correlates** 86:15
**correlation** 105:8
**correspondence**
   107:1
**corresponds** 89:23
**counsel** 25:12,14
   33:20,24 134:15
**country** 108:21
**COUNTY** 134:3
**couple** 18:17 129:4
**court** 1:1 18:5
   134:2
**crack** 105:6
**cracked** 58:10,11

58:11 85:16 91:5
   92:8,15,21 93:3
   98:24 104:20
   105:4,7 109:13
   111:4,12,13
**cracking** 43:2 97:6
   98:20 99:13,14,19
   105:9,9,18 106:6
   106:8 107:21,23
**cracks** 59:3 97:2,22
   98:1,5,21 99:2,7,8
   104:24 105:9
**create** 97:20
**created** 48:12
**creating** 49:13
**criticisms** 91:22
**cross-polarization**
   94:14,18
**cross-polarized**
   97:5
**cross-section** 58:3
   58:3,7,11,24 60:1
   97:16,22 105:23
   106:7 116:12,17
**cross-sectional**
   60:2
**CRR** 134:4,21
**crust** 87:9,23 88:22
   93:2 110:22 111:2
   112:11 114:17,23
   116:6,17,21 117:2
   117:5 118:3
   123:14
**crystal** 122:24
**crystals** 121:20
   122:1,18,24 123:1
**current** 33:9
**cut** 39:19,24 40:3,8
   58:6,24 60:11
   115:3,17 116:4,10
   116:16 117:2
**cutting** 114:17
   116:2
**CV** 100:16,22

────────────
**D**
────────────
**d** 5:1 6:1 60:9 73:4

77:6,16 98:19
100:1 113:20,22
113:23 116:9,23
117:7,12
**damage** 99:19
**Dan** 13:14 14:20
40:20 70:9 121:1
127:16
**Daniel** 4:11 7:11
**data** 11:11,12 14:6
14:9 75:24 76:3,5
126:24 130:13
**date** 29:5 34:19
35:1,19 36:3
**dated** 29:6,20 36:9
64:5
**dates** 35:18
**David** 4:19
**Dawna** 3:17
**day** 65:17 134:17
**days** 42:11 43:1
72:12 131:16
**deadline** 35:16
36:17,20
**Debra** 2:20
**decades** 66:19
74:21
**December** 30:14,18
**decide** 85:11
**decided** 63:4 64:2
65:19 131:20
**decrease** 113:7
**deeper** 86:13
**defect** 9:17
**defend** 132:22
**Defendant** 4:19 9:7
9:21,23 111:6,8
**defer** 91:12 100:16
**deferring** 91:15
**define** 97:10
**defined** 37:11
112:7
**definitely** 67:17
117:23 126:24
**definitively** 98:24
**degradation** 6:7
78:13,16 84:14

85:4 114:9 125:11
**degrade** 112:20
**degraded** 86:22,23
89:2,20 104:2,3
104:18,20 106:3
111:2,2,2 113:24
114:1,5 123:10,19
132:23
**degree** 61:1 93:16
93:24 94:14,17,23
96:7 109:18 116:2
117:11
**degrees** 38:24
60:13 109:19
**dehydrating** 54:16
**dehydration** 54:11
55:4,20 56:4,20
**delay** 94:13
**Deleon** 2:23
**deliberately** 37:10
52:8
**delicate** 62:15
63:10
**demonstrate**
109:12 117:13
**demonstrated**
72:19 96:6 98:20
105:19
**Denise** 1:18 2:2
**denoted** 99:5
**deparaffinize**
59:13
**deparaffinizing**
58:18 73:24 74:6
**depends** 92:5 94:14
99:17
**depicted** 91:1
**depicting** 110:18
**deposited** 89:19
**deposition** 1:24 4:1
5:10,11 6:3 7:12
7:15,17 13:3,4,6
15:5,12 16:20
17:8,12 18:8 19:4
19:10 20:18,20
24:21 25:2,5,9,13
25:18 26:10 27:23

33:11,13,21,24
34:4,12 36:6
37:23 46:7,18
47:15 48:10 63:17
64:6 69:20 78:12
120:22 129:19
133:8
**depositions** 8:15
**depth** 99:16
**describe** 37:2 48:20
97:6 98:5
**described** 43:15
59:17 70:20 71:6
85:3 116:15
129:17
**describes** 73:23
**describing** 97:18
98:18
**detached** 113:24
**detail** 24:8 28:24
**determination**
83:18
**determine** 37:14
75:7 83:6 88:5,11
92:14 94:3
**determined** 62:11
63:2 65:12
**developed** 77:10
127:9,11
**develops** 75:5
**deviated** 62:9 68:1
73:11 81:10
**deviation** 73:6,8
**device** 39:1 40:13
40:17 41:5 70:19
71:4 130:20 132:8
**devices** 39:24 79:24
**diagnostic** 75:1
**diagnostics** 71:11
**different** 37:7
51:22 79:24 82:17
83:10 84:4 86:4
89:1,3,4,5 101:24
102:14 105:1
117:3 122:14
127:8 128:2,3,8
128:10

**differently** 112:16
**direct** 59:4
**disagree** 47:21
101:17 103:4
**discern** 101:10
**disclose** 132:21
**disclosed** 133:3
**disclosure** 132:20
133:4
**disclosures** 35:16
**discreet** 102:5
103:4 104:14
111:21 112:13
**discuss** 121:19
123:8
**discussed** 44:21
86:4 87:4
**discusses** 124:6
**discussing** 73:4
**discussion** 10:7
18:4 22:9 27:13
37:22 46:16 47:4
63:22 64:23 81:12
85:8 87:22 118:11
118:15 125:8
127:19 128:23
129:7
**discussions** 31:6
82:1
**dismissed** 12:2
**distilled** 122:8,10
**DISTRICT** 1:1,1,5
**division** 1:2 130:20
130:20 132:8
**Dixon** 3:14
**doctor** 10:8 13:5
23:8 34:9 46:23
47:5 119:2 129:4
132:7
**doctors** 23:23
**document** 1:6 6:6
13:6,10 25:17
44:24 45:5 47:12
47:16,23 48:3,11
48:15,20 51:2
69:16,19,20 78:10
119:8 129:23

**documentation**
77:19
**documented** 81:17
**documents** 13:11
13:18,22 14:15,16
14:18 18:17 26:3
50:18,22
**doing** 52:12 54:9
68:16 69:11 72:9
75:14 98:16
109:11
**dollars** 30:3,6
**Donald** 2:20
**Dorothy** 2:11
**dots** 75:13
**doubt** 69:13 99:8
117:18
**Dr** 7:7 15:13 16:21
18:9 21:19,19
22:1,3,10,11,12
23:8,9,10,10,17
23:17 25:2,8,24
26:7 34:1,13
42:18,21 44:12,13
49:10,15,19 50:5
50:13,16,22 51:13
51:19,24 52:5,14
53:17 56:12 62:1
77:7,9,16 78:8,16
78:18,24 79:21
80:17 82:15 83:1
83:1,5,6,10,23
84:3,6,12,19,24
85:3,11,13,23
86:5 87:4,17
88:10,16,24 89:1
89:8 91:10,12,22
92:14 93:7 95:12
96:3 100:8,9
103:19 108:12,12
109:5,14,24
110:17 111:3,13
111:20,23 116:9
119:11,17 120:16
122:15,22 123:18
123:20 131:21
**draft** 19:15 23:10

23:19 64:5
**drafted** 19:12,20
  22:6 64:8
**drafting** 20:4,22
  21:3,14,23
**drafts** 20:24 66:1
**Drake** 3:2
**drive** 5:12 14:21,24
  15:2,3,5 16:10
  18:1,24 45:20
  61:5 126:20
  129:24
**drops** 82:10
**dry** 60:24
**dthomas@tcspllc...**
  4:22
**dthornburgh@a...**
  4:14
**Duane** 5:21 25:6
**duly** 7:2 134:9
**Dunn** 122:22
**dye** 111:5
**dyes** 112:14 117:5

——————
**E**
——————

**E** 4:9,9,12 5:1 6:1
  7:1,1,1
**earlier** 35:21 36:13
  73:4 74:4,6
  128:11
**early** 35:23 36:2
**easier** 34:16
**effect** 115:6
**efficiency** 64:13
**efficient** 64:17,21
**effort** 29:1 67:5,6
**either** 12:2 64:14
  64:16 84:15,17
  88:3 100:16
  131:20
**electron** 12:20
  42:14 86:15
  105:18 106:23
**electronic** 18:23
**electronically**
  14:14
**embed** 53:18 60:5

**embedded** 45:4,14
  97:2
**embedding** 44:21
  45:18 46:4,19
  47:2,8 48:21
  51:16 54:3,18
  80:7 95:22 105:22
**employed** 27:6
  67:24
**employee** 10:2,5,6
**employees** 21:15
  22:6
**encasement** 58:5
**endeavored** 82:23
**ends** 104:4
**energy** 38:19 128:9
  128:10
**engineers** 130:21
  131:12,14 132:10
**English** 134:13
**ensures** 82:3
**entire** 25:13,18
  56:15 99:15
  116:12
**entitled** 46:4 69:19
**environment**
  104:11 120:7,13
  126:8 128:18
**equated** 28:16
**equipment** 121:10
**Esquire** 4:11,15,19
**essence** 105:8
**established** 119:20
**Ethicon** 1:3 4:19
  11:14 26:8,15
  27:7 28:4,15
  32:23 39:9 132:22
**Ethicon's** 25:12,14
  33:20,23
**evaluation** 75:2
**Evans** 1:7
**event** 48:10
**evidence** 59:22
  93:22 114:22
  116:8 119:23
  120:5
**evident** 97:3

**EX** 43:6
**exact** 66:20 69:7
**exactly** 22:17 24:3
  74:19
**exam** 75:15
**examination** 5:4
  7:4 75:11 129:1
  132:4
**examined** 12:1
**example** 101:21
  123:17
**Excel** 8:23 9:11,11
  9:20
**exception** 128:14
**excerpt** 5:21 25:2,5
  25:11,11,14
**excess** 61:5
**excised** 41:2,5,6,7
  43:13
**excuse** 34:1 55:19
  66:7 115:3 123:1
**exhibit** 5:10 6:3
  10:8 13:3,5 15:3,5
  15:8,12,21 16:12
  16:19,20 17:1,7,8
  17:11,12,15 18:2
  18:8,11,18 19:2,3
  19:4,9,10 20:3
  23:2,15,22 24:10
  24:13,16,18,21
  25:4,5,20 26:10
  26:13 27:22,23
  28:1 34:8,11,12
  36:4,6 37:17,19
  38:1 46:14,18,24
  47:5,7,18 48:11
  53:14,15,22 69:18
  69:20,23 70:6
  73:3 78:12,15,22
  84:2,13 85:22
  89:14 96:20
  113:20 120:19,20
  120:22 121:9
  129:6,19,23 130:1
  130:9,13
**exhibited** 105:10
**exhibits** 18:19

**exist** 87:23
**existed** 27:2
**exists** 107:1
**expand** 37:5
**expect** 103:6
  105:12 106:3
  113:7 125:16,17
**experience** 64:9
  66:3 68:16,20
  69:12 74:11,14,20
  74:24
**experienced** 63:16
**experiment** 38:10
  39:2 40:7,8 41:22
  42:23 50:5,10,12
  52:17,22 94:3,8
  95:20 96:6 119:3
  124:9 125:2
  128:12
**experimental** 53:2
**experimentation**
  76:5
**experiments** 37:3
  40:1 49:23 50:6,9
  66:6,7 72:7,24
  80:4 82:24 96:10
  120:12 123:15
  124:19 128:16
**expert** 5:13,24 8:4
  9:6 10:3,3 15:10
  15:12,22 20:22
  21:4,4 24:20
  25:24 26:8 27:6
  27:15 34:10,10,13
  34:18 35:16 48:7
  48:8 59:9 84:21
  85:1 87:5 88:16
  110:17 118:17
  123:24 132:22
**expertise** 44:17
  72:20 74:20 75:20
  77:10
**experts** 5:20 11:13
  11:14 24:22 77:10
**expires** 134:23
**explained** 69:10
**explaining** 105:3

**explains** 78:24
**explanation** 114:8
**explant** 11:22,24
**explanted** 10:9
  11:8,19 50:5
  78:17 85:4 123:9
  123:13
**explants** 10:16,18
  10:21 11:11
**Exponent** 10:2,5,6
  20:21 21:15 22:6
  26:14 27:6 28:7
  28:11,15 30:10
  32:13,14,19,21
  33:5 39:19 42:14
  44:6,10 47:19,23
  48:3,16 55:15
**Exponent's** 81:9
**expose** 124:11
**exposed** 39:4 40:11
  41:21 42:10 50:7
  124:12
**expressed** 97:13
**extension** 117:15
**extent** 67:14 88:4
  115:16
**exterior** 104:10
**extra** 121:1
**eye** 128:14
**E-X-C-E-L** 9:12

——————
**F**
——————

**face** 35:2
**facilitated** 82:13
**facility** 75:6
**fact** 62:1 74:15
  81:8 115:23
**factors** 126:13
**failure** 9:3 58:21
  59:13
**fair** 17:18,20 26:24
  31:8 39:23 103:11
**fairly** 21:6
**fall** 51:7 99:24
  130:3,5
**falling** 65:18
**far** 56:19

Steven MacLean, Ph.D., P.E.

**father** 116:12
**FDA** 76:6
**February** 31:18
37:1
**federal** 68:23 76:1
76:2,21
**fee** 27:10
**feel** 82:6
**felt** 13:18 62:14
63:9 64:20
**Ferguson** 4:2 134:4
134:21
**fiber** 58:2,6 97:21
99:4,15 100:2
104:3 106:20
107:16 115:4
118:1
**fibers** 39:3 41:3
44:1 57:9 58:9,12
86:23 96:21 97:1
97:3 99:18 100:2
100:3 105:4
111:10 113:6,7
122:2,23
**field** 97:3,11,11
116:6
**figure** 85:24 86:1,3
86:7 87:5 89:21
89:23,24 91:1,2
91:18 96:13,19
98:5,19 100:1
101:22 102:18
106:19,22 107:8
111:24 113:21,21
115:19 117:15
118:22,23
**figures** 91:10,11
97:7
**file** 1:3 14:2 45:9
95:4,9 118:7
**filed** 13:15
**files** 61:24 94:16
106:24
**filled** 50:7,10
**finally** 125:1
**find** 14:1 18:6 45:3
45:6 90:6 107:2,3

118:6 119:23
**findings** 86:16 87:3
87:18 127:1
130:13
**fine** 15:24 101:17
110:13 113:9
**finish** 65:7
**finished** 34:23
128:21
**first** 7:1 11:1,8,16
11:17 20:1,2 21:3
22:4 34:19,24
35:4 47:10 51:6
54:6 59:15 70:5
70:17,18,19,23
71:4 129:13
**first-hand** 12:16
108:22,24 117:9
**five** 42:10 43:1
**fixed** 119:1
**FL** 4:13
**flags** 25:20,21,23
**flat** 60:21 102:10
102:13 116:17
**flatten** 60:14
**flinch** 68:15
**float** 60:12
**floating** 60:21
**fluid** 122:12
**fluids** 89:19 90:10
90:17
**focal** 101:24 102:2
102:8,14
**focus** 16:11 85:18
103:5
**focusing** 102:8
**follow** 48:17 49:14
50:12 51:12,18,23
52:5,13 53:3
54:22 62:5 67:8
77:18 82:24 83:22
84:18,22
**followed** 48:16
77:16 81:9
**following** 49:9
53:16,20 54:18
61:18 62:1 63:23

73:6 81:19 119:11
**follows** 7:2
**follow-up** 63:23
**footnote** 49:7,8,12
**foregoing** 134:13
**form** 11:20 29:4
32:16 46:9 48:1,5
50:17 51:20 52:2
52:7,15 53:8
56:22 59:21 62:10
63:20 65:14,21
68:5 71:16 73:9
73:13 74:16 75:9
76:12 77:17 82:18
83:14 84:5 85:6
86:24 87:6,19
88:14,19 89:10
90:22 91:3,7,14
92:1 93:9 101:16
102:4,16,19 103:2
107:11 109:2
110:19 111:15
114:3,7 117:21
118:19 119:18
120:9 123:11
125:12,14,21
126:5 127:5 128:5
133:1
**formal** 26:22 47:23
48:2,3
**formalin** 80:2
**formally** 26:19
98:15
**formation** 127:13
**forth** 134:12
**forward** 8:1
**found** 51:3 89:9
90:17,21 111:3
120:5
**four** 41:23 42:2
70:18 71:1 80:3
81:21 131:16
**Free** 2:6 4:15
**Freitas** 1:16
**freshly** 58:24
**front** 77:9 119:6
**FTIR** 12:21 43:4

43:14 99:12
106:16,23 119:24
124:18 125:2,10
126:18,21 127:1,2
**fuel** 9:18,19
**full** 81:13 134:13
**Fulton** 4:16
**fundamental** 50:9
**further** 134:15
**future** 27:4,5

**G**
**G** 16:12 89:17
**gap** 50:8
**Garcia** 21:19 23:9
23:10,18,19 44:12
44:13 100:9
108:12 129:20
**general** 27:1,4,15
97:9 98:17
**generated** 33:9
**Generation** 71:10
**gentleman** 69:12
**geometry** 115:3,5
117:14
**getting** 58:8 117:4
**give** 7:14 36:3 53:9
69:24 113:3
**given** 7:17 8:15
36:20 106:24
107:3
**giving** 65:16
104:15
**glass** 60:24
**go** 7:19 13:24 14:18
15:1 16:19 17:6
22:7 24:6 34:9
35:18 36:4 37:21
45:3 46:14 49:1,7
54:24 55:8 56:14
60:8 62:8 63:4
65:8 73:3,14 98:1
99:15 103:14
110:2 118:13
120:19 121:18
127:18 133:6
**goal** 49:18 51:12

83:22 84:18
**goes** 56:14
**going** 7:19,23 15:8
15:15 17:6 24:10
32:11 34:9 35:3,9
46:23 55:12,13
58:14 68:12 73:7
74:2 81:10 87:2
91:9,17,21 92:5,6
92:9 93:14,18
97:24 99:5 100:3
101:21 102:11,13
103:10,22 109:22
116:1 118:12
**Gomez** 1:9
**good** 7:7,8,11 75:24
82:3 101:15,18
**GOODWIN** 1:5
**Government** 75:24
76:1
**grade** 37:9
**granules** 111:4,9
111:14 112:12,20
112:22 114:4,9
116:18 117:5
118:2
**gravity** 82:10
**greater** 24:8 71:15
**green** 86:14
**ground** 7:18
**guaranteed** 115:21
**Guelcher** 6:8 119:8
119:17 120:20,22
122:15
**Guelcher's** 119:11
120:16 122:22
**guess** 88:23 119:12

**H**
**half** 44:22,22,23
45:13
**hand** 18:2 24:10
29:21 32:5 46:23
63:10 66:10 81:19
129:22
**handed** 81:14,15
**hands-free** 67:15

67:17
Hands-off 67:16
hands-on 67:7
handwriting 15:23
hand-staining
   62:16
Hankins 3:17
happen 57:10,18
   59:16 128:13
happens 57:23
happy 14:1 103:17
   103:19
hard 16:7 17:24
   18:1
Harriet 3:21
head 7:22 9:1 18:14
   35:7 41:19 51:2
   61:23 76:24
   108:16 121:14
hear 92:2
heard 97:13
held 10:7 18:4 22:9
   27:13 33:19 37:22
   46:16,17 47:4
   81:12 85:8,9
   118:11,15 125:8
   127:19 128:23
help 20:20 26:9
   39:11 97:10
   111:22
helped 21:23 23:5
   23:10,19 24:4
helps 95:1
hereunto 134:17
hernia 36:23 37:8
   38:6 39:18 40:9
   41:6 42:3,5,6
   43:21
Herrara-Nevarez
   2:18
hey 63:24 66:8
highest 113:5
highlighted 18:20
   25:15,19 70:1
highlighting 15:17
   15:18,18,20 18:19
   25:16

high-enough 66:9
Histion 43:23 44:2
   44:5,8,11,13,18
   44:21 45:5,15,17
   55:13 64:10 66:13
   66:14 67:20 68:21
   71:20 74:11,15,20
   75:1,1,6,16,21
   76:8 77:2,10
   80:21 82:1,6,17
   84:7
histological 75:11
   75:14
histology 6:5 43:10
   43:16,18 46:4,18
   47:1,22 48:20
histopathological
   91:24
History 70:7,17
his/her 134:8
Hoerman 4:16
hold 56:17 59:9
   64:14 94:13
Holly 3:23
Holmes 1:10
horizontal 78:3
   80:12,14,18 81:4
   81:5,23 82:22
   83:17
horizontally 83:2
hour 27:16,19,20
   54:7 55:6,10
hourly 27:10,15
hours 33:15,16
   34:2,3 127:18
Hower 8:23 9:11
human 73:20,21
   89:18 90:17
   128:13,18
hundred 30:3,4,6
   31:24 32:1 39:3
   106:9
Hutchinson 26:12
   26:14
hybridization
   70:20 71:5
hydroxyl 127:13

H&E 37:13 52:9,17
   52:19,23 79:3,9
   85:12,16,18 88:22
   89:3 90:13 94:18
H-O-W-E-R 9:11

I
Iakovlev 6:7 25:24
   49:10,15,19 50:13
   50:16,22 51:13,19
   51:24 52:14 53:17
   56:12 77:7,16
   78:8,12,16,24
   79:21 82:15 83:1
   83:1,6,10,23 84:3
   84:12,19,24 85:13
   86:5 87:4 88:10
   88:16 89:8 91:10
   91:12,22 92:14
   93:7 109:14,24
   110:17 111:3,13
   111:20
Iakovlev's 50:5
   52:5 62:1 77:9
   80:17 83:5 85:3
   85:23 87:17 88:24
   89:1 111:23 116:9
Ida 1:7
idea 12:14
ideally 102:13
identical 77:12
identification 13:4
   15:6,14 16:22
   17:10,14 18:10
   19:5,11 24:23
   25:7 26:12 27:24
   34:14 36:8 46:21
   69:22 78:14
   120:24 129:21
identified 77:15
   92:24 93:10
   109:14 125:10
identify 44:16,24
   88:18 93:8,8
   98:14 100:6
IgG 89:17,17
IHC 6:6 69:19,21

70:3,7,10,17,19
   71:5,11
IL 4:17
illuminate 93:24
illuminated 94:21
   97:4
illuminates 93:11
   96:8
illuminating 93:13
illumination 94:23
   109:20 115:13
illusion 117:4,7,17
   118:2
image 86:7 91:2
   95:1,11,12,14
   101:22 102:3,18
   103:8,8,10 104:8
   105:2 106:20
   107:3,8,9,18,19
   107:20 111:22
   112:1,5 113:20
   114:10,14,24
   115:19,20 116:9
   117:7,12 118:4
imageexport16
   118:16
images 17:16 91:18
   94:15,19 96:20
   98:21 99:9 100:1
   100:7,7 101:1,2,8
   103:1,16,17,19
   104:2,5,7,18,23
   105:1,19 107:2
   108:17 109:4
   110:3,21 117:20
   125:9
imaging 42:22
   100:14,20 107:14
Imel 129:8,14
immunoglobulin
   89:16,18 90:1,1,9
   90:16,20 91:5
Immunohistoche...
   89:16
Immunohistoche...
   70:4
immunoparaffini...

79:14
immunoperoxida...
   79:15
imparted 128:9
importance 57:20
   58:18
important 50:11
   52:12 54:22 57:5
   57:22 89:7
importantly 99:3
improve 101:11
inaccurate 51:19
inappropriate
   63:19,22
inboard 60:4 112:6
include 33:17,19,22
   119:13 126:21
included 29:19
includes 95:17
inconsistent 127:8
Incorrect 65:22
increasing 38:23
Indianapolis 131:8
indicate 31:2
indicates 95:4
indication 83:3
   103:11 112:10
   125:20
individual 39:3
   41:3 42:7 43:24
   105:4
individuals 48:16
   77:1,3
induce 128:9
industrial 131:15
inevitable 102:14
influenced 58:4
informally 132:11
information 14:20
   35:5 45:9 52:3
   53:10,12 76:20
   107:3 110:9
inherent 92:23
initial 20:24 21:11
   21:24 35:11
injury 132:23
inner 113:10

**inside** 38:24 67:6
  103:13 117:5
**instruct** 45:17
**instruments** 71:12
**insufficient** 59:23
**intent** 38:16 48:14
  51:15 52:5,8
  130:8
**intentionally** 38:15
  38:16 52:22
  105:13 107:9
**interaction** 122:19
**interest** 132:18,20
**interested** 134:16
**interests** 62:16
**interpret** 109:21
**interpretation**
  91:10 111:17,19
**introduce** 110:5
**introduction** 37:18
**invalid** 53:5
**invoice** 28:2,10
  29:6,8,9,13,16,17
  29:20,21 30:8,9
  30:15,15,17,18,21
  30:23 31:16,17,21
  31:22 32:2,7,12
  32:21 33:6
**invoiced** 28:4
**invoices** 5:23 27:22
  27:23 31:8 33:9
  34:6,7
**involvement**
  100:10,13
**involving** 9:3,14
**in-the-package**
  39:9
**irradiated** 38:20
**irradiation** 39:2
**ISH** 70:20 71:5
**isolate** 57:8 122:23
**isolated** 45:11
**isolation** 126:10
**issue** 57:13
**issued** 20:18 21:5
  22:15 34:11
**Item** 81:18

**J**

**Jane** 1:12
**Janis** 4:2 134:4,21
**January** 30:21 31:7
  31:9,16 47:13
  64:6
**Jean** 11:4
**Jeanie** 1:10
**joe@thlawyer.com**
  4:18
**Johnson** 3:9,18
**joins** 37:23
**Jones** 3:23
**Joseph** 1:5 4:15
  37:23
**journal** 130:18
  132:15
**Jo'Ann** 2:3
**JUDGE** 1:5
**judgment** 52:3
**July** 28:2,18
**jump** 35:8
**June** 5:22 26:10,21
  27:15 28:8,11,18

**K**

**Karen** 3:12 111:24
**Karyn** 3:2
**Kathleen** 1:15
**Kathy** 11:1
**keep** 18:5 20:15
  34:6
**Kimberly** 3:6
**Kirkpatrick** 3:20
**Kivel** 3:11
**Klinge** 22:13
**knew** 63:18
**knit** 115:24
**know** 7:18,21 8:5
  13:14,14 33:6,7
  33:14 45:20 51:5
  57:12,14,17,22
  59:12 61:21 66:16
  66:20,21,22 67:23
  68:11,16,19 69:3
  69:8 70:9,12,13
  72:2,4,22 76:17

76:21 77:4,14
78:11 81:22 85:16
87:20,20 88:21
90:5,8,11,13 97:8
97:9,12,13 98:3
98:15 100:17,23
105:22 106:7
107:13,15 108:2
110:2,7,8 112:19
116:12,22 117:14
123:12 126:8,11
126:11
**knowledge** 68:20
**known** 50:6 99:7
  126:13 132:11
**Kossa** 79:5,11 86:9
  87:9,11,14
**Kramer** 4:15 37:23
**Kreis** 4:12
**Kriz** 3:3
**K-L-I-N-G-E**
  22:13

**L**

**L** 4:2 7:1 134:4,21
**lab** 44:16,17 69:11
  75:23
**labeled** 47:1
**laboratory** 44:14
  47:1,17 67:7,20
  68:13 75:1,16,18
  75:22 76:9,23
**lacked** 50:6
**laminates** 9:4
**language** 134:13
**large** 67:14
**late** 35:16
**Laura** 1:22
**Law** 4:16
**lawnmower** 9:15
  9:17
**lawsuit** 9:21 12:5
**lawyer** 26:15
**layer** 58:12 59:3
  86:23 87:9,11
  88:11,13,18,22
  89:2,9 91:6 92:8

92:15,21,23 93:1
93:3 104:3,18,20
106:4 109:13
111:4,12,13 114:5
114:17,23,24
123:10,19
**layers** 111:21
  114:12
**laying** 54:2
**leading** 67:6
**learn** 44:11
**learned** 66:8
**leave** 54:19,20 91:9
**left** 102:3 113:13
**leftover** 12:4
**left-hand** 95:5
**Lehman** 2:3
**Leica** 56:8,9,9 60:6
**length** 40:4
**Lerica** 56:6
**letter** 5:22 26:11,13
  26:16,19,20,22
  27:2 28:3,8,12
**let's** 14:18 15:2
  16:19 29:7 36:4
  46:14 53:14,14
  64:1 66:10 74:24
  105:6 113:9,15,20
  119:2 120:19
  124:13,15 126:7
**level** 69:9 102:12
  113:8
**LIABILITY** 1:4
**liaison** 67:9
**light** 38:17,20 80:3
  93:7,11,20 94:1,3
  94:6,10,20 96:1,8
  97:4,5 109:15
  110:4,24 115:12
**lighting** 109:18
**liked** 63:9
**likewise** 81:20
  112:13 118:23
**limited** 21:6
**line** 16:3
**lines** 9:19 70:18
  71:2

**Lisa** 2:14
**list** 8:20
**listed** 45:19
**Listen** 83:20
**literature** 5:17 18:9
  18:13 19:24 20:9
  24:11 71:19
  119:20
**litigation** 1:4 14:6
  20:17 29:15 30:11
  31:10 47:20 63:13
  65:9 84:10 100:11
  100:13
**little** 16:5 32:9
**LLC** 4:16
**located** 58:15
  127:22
**location** 107:6
  126:3
**log** 45:8,8
**logic** 113:9
**long** 72:2 110:23
**longer** 64:2 73:19
**look** 12:9,17 13:11
  22:7,8 29:6 45:5,7
  45:8,9,20 53:14
  53:14,17 59:22
  60:5 69:23 70:18
  72:14 73:17 75:7
  81:16 83:5 85:14
  86:7 88:12 89:13
  94:16 96:13 98:4
  98:24 100:21
  102:15 103:10
  104:18,23 105:6
  108:1,17 109:1
  110:2 111:23
  113:20 114:19,24
  115:19 116:12,18
  119:2 120:15
  124:13 125:9
  126:9
**looked** 12:14,19,19
  13:1 20:1 29:9
  38:5 50:20 74:17
  94:2 100:24
  105:17 108:21,24

109:3,24 111:13
**looking** 33:8 94:11
  95:3 96:1 103:14
  113:12,13 114:13
  114:20,23 116:6
**looks** 17:2,3 19:6
  25:23 26:14,16
  30:2,22 32:8 38:5
  107:23,24 125:2
**losing** 62:13
**lot** 35:4,5 40:19,22
  41:5,6 67:7
**Lyons** 42:18,21
**L-Y-O-N-S** 42:20

---

### M

**M** 7:1
**machine** 67:12
**MacLean** 1:24 4:1
  5:3,10,13,14,24
  6:3,4 7:7 13:3
  15:5,12,13 16:20
  16:21 17:8,12
  18:8,9 19:4,10
  24:21 25:5 26:7
  26:10,11 27:23
  34:12,13 36:6,7
  46:18 69:20 78:12
  78:19 85:11
  120:22 129:19,20
  129:23
**magnification**
  94:17 103:21
**main** 4:12 67:9,9
**maintain** 63:11
  76:22
**making** 92:22
  117:4
**managing** 77:2
**manual** 62:2,8 63:5
  64:1 66:12 68:4,6
  68:14,17 69:5,9
  72:5,9 73:7,14,15
  80:11,14 81:11
**manually** 64:22
  80:18 81:1
**manual-staining**

62:6
**manufacturer** 9:7
  9:9,23 55:23
**manufacturers**
  80:1
**manufacturing**
  111:6
**March** 31:21 32:12
  32:15,21,24 33:6
  34:20 35:23 36:2
  36:9
**Margaret** 3:20
  11:4
**mark** 10:8 14:18,23
  15:2,2,8 16:19
  17:6 18:18 19:2,9
  24:18 25:4 27:22
  34:9 36:4 46:14
  69:18 120:19,20
  121:2
**marked** 13:4,5 15:6
  15:13 16:22 17:9
  17:13 18:10,11
  19:5,11 23:2,22
  24:22 25:7 26:5
  26:12,13 27:24
  32:4,5 34:13 36:8
  46:20,24 69:21
  78:13,15 120:23
  129:21,22
**marked-up** 24:14
  34:16
**market** 37:9
**marketed** 76:17
**Marriott** 4:5
**Marty** 2:9
**Mary** 1:12 11:4,6
**Master** 1:3
**material** 11:9,19
  12:4,8 40:13,14
  43:3 48:22 50:7
  53:2 59:1,2,4,24
  77:22 87:24 88:1
  92:24 93:3,11,12
  93:16,19 94:24
  97:22 105:21
  112:12 114:13

115:6 117:2,24
  119:22 125:18,18
  132:23
**materials** 26:3 38:2
  49:17 50:5,20
  81:7 90:14 100:24
  116:5 117:3
  119:21
**math** 30:4
**matter** 51:3 56:13
  117:1
**matters** 27:8 82:21
  84:10
**Mays** 22:10
**McGann** 22:3,11
**MDL** 1:4
**mean** 16:2 51:21
  69:24 70:3 75:19
  77:21 82:8 83:22
  97:23 101:6 106:6
  115:16
**means** 15:16 94:18
**meant** 63:7
**mechanism** 128:8
**medical** 130:19,20
  132:8
**meet** 33:23 34:3
**meetings** 33:19
**Melissa** 2:8
**members** 20:21
  21:15
**memory** 37:1
**Menlo** 108:8,11,13
  108:14
**mentioned** 37:7
  44:17 78:9 92:6
**mentioning** 92:18
**mesh** 11:8,19 12:9
  12:23 13:1 37:8,8
  39:18 40:9,21
  41:1,6,7,12 43:14
  46:5,20 47:2
  48:21 49:17 58:9
  61:12 78:17 79:18
  80:2 85:5 87:12
  95:15,18 97:3
  99:21 100:2,3

106:7 111:12
  115:23 119:1
  132:22
**meshes** 10:10 120:7
  128:15
**mesh-related** 27:8
**met** 7:12 8:16
  20:17 34:1 66:17
  72:6
**method** 82:5
  105:14 119:20,20
  128:10
**Michelle** 11:2
**microcracks**
  106:18
**micrograph** 103:13
**micrographs** 45:10
  93:23 94:22 99:1
  117:23
**micron** 102:12
**micron-thick** 60:11
**microphotograph**
  5:15,16 17:9,13
  106:4 107:12
  118:18
**microphotograp...**
  109:4
**microphotographs**
  16:8,13,15 17:2,3
  17:18,19,22 104:2
  104:21 109:23
  110:16 111:20
**microscope** 12:1
  98:9 102:6 106:1
  108:18
**Microscopic** 78:17
**microscopy** 12:18
  12:20 16:4 22:18
  37:14 42:14 74:13
  80:3 86:15 93:21
  99:24 100:7,14,18
  100:19,20 101:1,1
  101:12 105:18
  106:23 108:20
  109:15
**microstaining**
  99:23

**microtome** 95:15
  97:19 98:11 105:7
  107:7 115:21,24
**microtomed** 37:12
**microtomes** 99:6
**microtoming** 56:18
  60:3 97:12 98:16
  99:4,6 105:22
**mimic** 120:6,12
  128:17
**mind** 69:13 99:8
**mine** 119:8
**minutes** 61:1
**misinterpreting**
  64:12
**missed** 129:13,14
**missing** 30:1 49:23
  50:9,23 88:23
**mixed** 89:20
**moisture** 61:5
**molecular** 93:16
**Moll** 22:1,10,12
  129:20
**Monday** 4:4
**Monica** 1:16
**monitored** 42:16
  42:17
**month** 28:3,14 29:8
  31:17
**months** 10:13,14
  30:9,16 80:4
  102:9
**moot** 72:18
**morning** 7:7,8
**morphology** 42:16
  42:17 43:2
**Mount** 60:23
**mounted** 105:5
  107:6
**mounting** 105:5
**move** 7:24 76:7
**movement** 63:9
  98:12
**moves** 82:4
**Mullins** 20:17,22
  21:8 22:16,19,23
  28:23 31:15 35:6

44:6,9 46:7,13
47:15 48:11 62:24
63:2,4,12,23 64:6
64:7 65:5,9,19,22
65:23,24 66:8
67:2,3,24 68:2,8
71:21 72:23 80:21
80:23 101:2
108:22,24 130:5
130:14
**multi-layer** 117:16
**Myndal** 3:9
**M-A-Y-S** 22:11
**M-C-G-A-N-N**
22:3
**M-O-L-L** 22:3

**N**

**N** 4:9 5:1 6:1 7:1,1
**name** 7:11 56:10
95:4 118:7 134:17
**names** 21:18 45:9
**native** 90:15
103:10
**nature** 9:13
**navigate** 34:16
**necessarily** 31:11
53:7,9 98:1
109:16 116:20
119:19
**necessary** 60:10
121:19
**need** 8:12 45:1 52:3
53:9 89:11,12
92:2 98:3 109:20
110:4 116:11
117:8,8
**needed** 36:18 76:22
**needs** 64:10 66:4
75:8 91:16
**negative** 86:10
**neither** 134:15
**never** 59:1,8
**New** 4:3,6 79:17
134:1,3,5,21
**night** 34:2,3
**nods** 7:22 9:1 18:14

35:7 41:19 108:16
121:14
**non-expert** 85:7
**non-explanted**
49:17
**non-responsive**
76:7
**north** 30:2,4 31:23
**Notary** 4:2 134:4
134:21
**note** 132:18,20
**notebooks** 14:16
**noted** 105:6
**notes** 19:21,23
134:14
**notice** 5:11 13:3,6,9
13:15,24 134:11
**notion** 97:24 116:5
**November** 32:3
**number** 13:21 17:1
27:21 31:12,14
33:14 37:6 40:19
54:7 55:6,9 69:7
81:21 121:2,8
124:21

**O**

**O** 127:14
**oath** 8:10
**object** 11:20 29:4
32:16 46:9 48:1,5
51:20 52:2,7,15
53:8 56:22 59:21
62:10 63:20 65:14
65:21 68:5 70:15
71:16 73:9,13
74:16 75:9 76:12
77:17 82:18 83:14
84:5 85:6 86:24
87:6,19 88:14,19
89:10 90:22 91:3
91:7,14 92:1 93:9
101:16 102:4,16
102:19 103:2
107:11 109:2
110:19 111:15
114:3,7 117:21

118:19 119:18
120:9 123:11
125:12,14 126:5
127:5 128:5 133:1
**objected** 13:22
**objection** 13:21
84:8 130:16
**observation** 74:22
**observations** 74:12
**observed** 99:13
**obviously** 8:3
**occasion** 98:10
**occurring** 113:6
**October** 29:20 30:8
**offer** 9:6 10:1 87:2
87:16 91:17 93:18
109:22 117:10
**offered** 10:3
**offering** 91:21
110:14
**off-the-shelf** 37:9
**Oh** 44:22 109:16
**Okay** 7:17,21 8:1,8
9:5,20 10:12,15
10:24 12:21 13:1
13:2,16,17 14:19
15:8 16:5,12 17:1
18:11 20:11 21:2
22:2 23:1 24:6,7
24:12 25:16,20
26:3,18 27:3,18
28:14,17 30:7,14
31:2,13,16 32:11
33:4,23 34:22
35:3,6 37:5,16,21
38:9 39:1,6,17,23
40:5,18 41:10,13
41:20 42:6,17,19
42:21 43:17,20
44:2 45:13 46:14
46:23 47:7,10,14
47:17 49:1,4,18
49:24 51:8,12
54:9,16,24 55:8
56:6,11,16 57:1
58:17 61:17 63:12
64:2 65:4,9 67:10

70:5,15 71:9,14
71:20 75:21 78:21
78:24 79:9,17,23
80:7,17,20 81:6
83:21,22 85:11
86:2,18,20 87:16
89:7,24 90:7,24
91:12,17,21 94:2
95:19 96:9 97:1
98:3,8 100:10
101:14,20 105:16
106:14 108:1
110:11 111:1,14
112:2 113:4,19,21
113:24 114:8
118:9 119:5,6,16
120:3,19 121:9
122:3,6 123:7
124:5,21 125:22
126:1 127:11
128:2,20 130:18
132:14 133:5
**older** 69:12
**Olson** 1:12
**once** 126:12
**ones** 24:5 42:5
101:4 108:21,23
**one's** 46:3
**one-centimeter**
40:24
**one-centimeter-l...**
39:20
**one-dimensional**
114:14
**one-to-one** 105:8
107:1
**open** 37:9 72:24
**openly** 76:16
**opinion** 9:6 59:18
72:18 74:10 87:1
88:6,8,15 89:2,3
92:22 109:13,22
110:15 117:6,10
126:2
**opinions** 14:3
86:20 87:2,8,10
87:17 89:4,6

91:17,23 93:18
**opinion's** 89:1
**opportunity** 12:15
**optical** 16:4 117:17
**optically** 12:19
**optimum** 12:17
**order** 32:3 93:16
**orient** 120:18 121:8
**orientation** 78:10
82:2,13,22 83:17
**oriented** 82:10
**original** 17:17
22:18
**outcome** 12:3
134:16
**outer** 58:12 87:11
88:11,13,18 89:9
92:15 104:3,18,20
106:3 109:13
111:12
**outlined** 50:13 53:4
77:6 78:8 83:23
95:21
**outside** 58:2,5 60:2
74:23 93:3 95:17
118:1
**oven** 61:1
**overall** 107:4
**Overholtz** 4:12
**overlap** 117:24
**overlapping** 118:24
**overnight** 61:1
**oversaw** 11:18
55:17,19
**oversight** 126:24
**oxidation** 38:10
40:7 42:22 98:6
98:22 99:7,10,12
104:13 106:10,11
107:17 113:6
119:9,14 120:1,2
120:4,5,20,23
121:16,23 125:13
126:10,15 127:9
127:10,11,12
128:10
**oxidize** 38:16

Steven MacLean, Ph.D., P.E.

112:20
**oxidized** 37:11,12
  38:15 50:6 52:8
  52:18,23 58:10
  77:22 92:21 96:11
  104:9 105:13
  107:9 119:24
  123:18 125:18
  126:3 128:6,7
  132:23
**oxidizing** 119:3,21
  119:22

**P**

**P** 4:9,9 45:10
**page** 5:4,10 6:3
  15:22 30:1 34:19
  37:16,18 38:1
  39:11,12 53:21,22
  70:5,23 78:21
  79:7,17 81:16,17
  81:18,20 85:22,24
  86:1 89:13 96:17
  96:19 101:19
  103:7 104:16
  109:8,8 111:24
  113:14,21 115:9
  115:14 116:8
  117:6,12 121:8,13
  121:15 124:2,4,15
  124:21,24 125:1,9
  132:17,19
**pages** 25:8 129:7
**paid** 132:21
**Pamela** 2:6 4:15
**paper** 131:19
**papers** 129:8
**paraffin** 44:21,23
  45:5,11,14,18
  47:8 54:3 56:7,14
  56:21 57:2,13
  58:1,4,7,19,21
  59:5,19,23 60:1,4
  60:6,10,12 74:2,8
  74:23 95:21 97:2
**paraffin's** 56:17
**paraffin-embedd...**

49:8 61:7 81:18
**paraffin-embedd...**
  49:2,6,14 53:15
**paragraph** 40:20
  70:18,23 79:6
**Park** 108:8,11,13
  108:14
**parse** 24:4
**part** 55:24 56:1
  67:5 73:23 122:22
**particles** 112:9,15
**particular** 10:21
  12:23 16:10 47:12
  112:5
**parties** 134:15
**parts** 86:13
**pass** 52:3
**pass-through**
  129:14
**pathologist** 59:7,8
  66:18,21 90:8
**pathologists** 77:3
  81:22
**pathology** 44:5
  59:10 76:8,23
  97:11,11
**patient** 75:2,7
**patients** 75:2 78:17
  132:24
**Patricia** 2:5 3:8
**Patti** 2:12
**Paula** 3:3
**payment** 28:6
**peaks** 127:21,24
**peer-reviewed**
  130:10 132:12
**pelvic** 1:3 128:15
**pending** 33:8 130:2
**penetrate** 99:14
**Pensacola** 4:13
**people** 123:12
**percent** 54:6,24
  55:8 80:1 106:9
**perfect** 103:23
  115:22 116:13
**perfectly** 102:10
**perform** 12:21 44:3

79:12,14
**performed** 32:13
  32:22 55:13 64:7
  65:10 66:12 68:6
  69:5 72:5,10 83:1
  128:13
**performing** 35:22
  49:22 55:16 69:9
  73:20,21
**performs** 68:12
**perimeter** 99:22
  115:7 118:1
**period** 42:10 77:23
**person** 68:8
**personal** 74:14
**personally** 10:9
  11:18 67:1 68:19
**Phelps** 2:12
**phenomenon** 98:17
**phonetic** 123:18
**photo** 109:23
**Ph.D** 1:24 4:1 5:3
  7:1 24:2 25:6
**picture** 103:23
**pieces** 20:9 39:1
  40:8 45:4
**pigments** 111:5,9
  111:14
**place** 56:18 72:2
  85:16 116:4
  134:11
**placed** 80:1 120:7
**placement** 111:5
**Plaintiff** 4:15 9:16
**Plaintiffs** 1:6 4:11
  5:20 11:17 12:24
  24:20,21 129:24
**plane** 102:1,8 116:1
**planes** 102:14
**plastics** 130:21
  131:11,13 132:10
**PLC** 4:12
**PLLC** 4:20
**point** 43:9 57:1
  72:18 87:21 88:23
  102:2 104:1
  108:20 109:7

113:14
**polarization**
  115:12
**polarized** 93:7,11
  93:20,24 94:3,6
  94:10,20 95:24
  96:1,8 109:15,18
  110:4,23 115:12
**polarizing** 109:9
  110:1,18,20
**polymer** 8:3 10:4
  11:9 92:11 126:2
  131:15
**polypropylene** 10:9
  37:10 78:16 89:2
  89:20 93:8 114:24
  125:18 126:4
**polypropylene-b...**
  119:21,22
**poor** 64:20 101:8
**poorly** 8:4
**pore** 92:23
**pores** 88:2 92:19
  93:4
**porosity** 86:13
  87:23 88:7,7
**portion** 44:4 67:17
  101:24 114:15
**Portions** 79:20,23
**positioning** 82:16
  83:12 84:3,6
**positive** 72:13,20
  77:20
**possible** 60:21
**Pratt** 2:21
**preferred** 82:2,5
**prep** 33:11,17
**preparation** 33:20
  39:15 43:10 61:15
**prepare** 33:24 34:4
**prepared** 40:1 49:9
  53:16
**prepping** 33:12
**presence** 90:10
  92:19 95:17 114:9
**present** 89:18
  131:19

**presented** 131:4,5
  131:7
**preserved** 108:5,7
  108:9
**pretty** 99:18 101:8
**previous** 37:5
**previously** 12:11
**pre-clinical** 75:16
  76:5
**pre-microtomed**
  99:1
**Priddy** 5:21 22:12
  25:2,6
**Priddy's** 25:9
**primarily** 29:1
**primary** 21:4,24
  22:5 34:10
**print** 14:14 17:24
**prior** 7:12 12:12
  19:22 30:13 44:9
  72:24 100:10,13
**pristine** 39:8 59:2
  79:20,23 126:12
**pristinely** 58:6
**probability** 117:11
**probably** 30:5
  33:16 34:5 56:4
  126:19
**procedure** 53:4
  54:19 63:10
  121:11
**procedures** 48:21
  52:13 130:12
**proceeding** 130:11
  131:9
**process** 52:9 53:18
  56:15 57:7,23
  58:20 60:3 62:14
  62:19,23 64:18,22
  66:11 99:7 115:12
  120:4
**processed** 124:7
**processes** 64:14
**processing** 44:14
  80:7
**processor** 53:19
**produce** 13:20 14:6

16:17 46:11
119:17
**produced** 14:3,9,13
27:21 30:15 47:19
50:21,23 60:3
81:7 100:24 101:2
126:24 129:24
**producing** 13:23
**product** 36:23,24
39:18 40:5,16
**production** 50:18
51:2
**productivity** 64:13
64:23
**products** 1:3 9:14
36:23 37:7 39:9
39:18,24 40:9
68:22
**program** 61:21
67:4,12 68:3,4,9
68:14 71:24 73:19
**programmed** 61:18
73:5,18,19
**programs** 69:14
**project** 31:12,13,14
**projects** 28:13
**PROLENE** 37:7,8
41:14 46:5,19
47:2 48:21 49:17
85:5 86:23 88:1,5
90:15 91:6 92:8
92:16,21,21 93:4
93:13 96:21 98:22
99:17 104:3
105:13 107:10
114:18 116:5,21
124:6
**ProPar** 55:22
**protein** 88:12,18
89:8 90:2,12,21
93:19 94:4,9 96:6
118:2
**proteinaceous**
88:12 93:19 94:24
117:24
**proteins** 94:21
**protocol** 6:5,8

45:17,19,23 46:4
46:19 47:1,2,7,10
47:18 48:4,8,15
48:18 49:2,6,9,14
49:15 50:13,15,22
51:13,18,23 52:6
52:13 53:4,15,16
53:17 54:2 55:24
56:1 57:3 61:6,11
61:19 62:2,2,6,9
64:5,8,10 66:2,4
67:8 68:1,2 73:3,6
73:8,12,23 77:6,9
77:16 78:8,9
79:21 81:8,9,10
81:19 82:15,24
83:10,11,16,23
84:12,16,19,22
95:21 119:3,9,11
120:4,15,16,21,23
121:5,16,18
122:14,22
**protocols** 37:11
46:2,8,11 47:22
83:6 95:16
**protocol's** 46:12
**provide** 8:12 28:17
**provided** 25:12,13
28:16 35:6 36:17
50:15 103:20
104:21
**Public** 4:3 134:4,21
**publication** 6:9
78:15,18 79:22
80:19 82:20 83:19
84:2,9,14 85:4,23
87:4 89:14 129:19
130:2,15,22 132:7
132:15,19
**publications** 5:19
18:20,24 19:7,11
19:13,22 20:14
24:17 83:6 123:7
131:17
**publicly** 51:10
76:19
**published** 5:17

18:9,13 24:11
130:10 131:2,3
**pull** 16:11
**pulled** 25:19
**pulls** 82:10
**purple** 112:12
**purpose** 12:7 48:19
48:20 49:13 50:1
52:24 54:9 55:3
56:2 60:15,20
61:4 119:11
**purposes** 84:4
**pursuant** 134:11
**put** 15:4 77:8 95:16
106:1 122:9 126:8
**P-R-I-D-D-Y** 22:12
**P.E** 1:24 4:1 7:1
**p.m** 133:8

___

### Q

**question** 7:21,23
8:4 11:20 14:4
29:4 32:20 51:24
59:6 63:20 64:15
65:7 70:16 74:17
75:21 76:7,13,18
82:19 83:15,20
84:1 85:6 86:24
87:6,19 88:14,19
89:10 90:22 91:3
91:8,14 92:1,3,5
93:9 97:7 98:2
111:16 112:18
114:3 117:13,21
118:20 119:18
120:10 123:11,20
125:14 126:6
127:6 128:5 133:2
**questions** 91:16
92:10 127:17
129:4 131:22,24
**quick** 16:24 113:16
124:15
**quickly** 15:15 71:9
**quite** 72:8
**QUV** 38:10 39:4
40:11 41:8,10,22

42:10,22 43:12
62:18 105:10,15
119:14 124:12
125:2,5 126:11
**QUV-oxidized**
96:21
**QUV-treated** 127:3
128:3,12
**QUV/UV** 40:7

___

### R

**R** 1:5 4:9 26:11
45:11
**rabbit** 72:14
**radiation** 38:13
41:13,21 42:10
128:7
**range** 127:14
**rate** 27:15
**rattle** 118:7
**razor** 39:19
**read** 15:23 20:2,7,8
20:10 25:18 48:23
49:11,12 53:20
71:6,12 76:15
80:5,13 92:4 95:5
95:7 123:7
**reading** 83:3 89:22
95:2
**reads** 81:18
**ready** 118:7,8
**reagent** 54:6 55:1,9
**real** 15:15 113:15
124:15
**realistic** 103:24
**really** 16:24 54:16
92:9 116:19
**realtime** 108:20
**reason** 36:12 59:17
70:16 125:20
126:23
**reasonable** 117:10
**reasons** 73:15,15
106:15 108:3
112:11
**Rebecca** 2:15
**Rebekah** 2:21

**recall** 8:22 12:3
19:24 24:2 29:5
35:1,18 51:1,4,11
56:13 73:2 122:16
**received** 39:8 51:5
**Recess** 46:17 85:9
**recite** 90:19
**recognize** 47:5
**recollection** 30:12
34:22
**recommended**
44:13
**record** 8:8 10:7
18:4 20:8 22:9
27:13 37:22 45:22
46:16 47:4 63:6
81:8,12 85:8 95:6
100:4 103:13
118:11,15 125:8
127:19 128:23
**record's** 76:14
**red** 86:14
**reference** 100:22
112:7
**referenced** 51:9
83:8
**referring** 45:24
62:21 79:8 115:14
118:4
**refers** 16:3
**reflected** 30:7 66:7
**reflection** 66:5
**regard** 10:16 76:2
**regarding** 23:1
87:10 130:2 132:7
**regards** 31:12
**region** 41:1 102:20
105:7 112:6
**regions** 102:5
103:5 104:14
**Registration**
134:24
**regulations** 68:23
76:2
**relate** 25:23 29:14
30:18 31:9 91:23
**related** 14:10 28:8

33:5,10 87:18
98:11 125:2
134:15
**relates** 1:6 17:23
30:11 92:10
**relative** 88:2
**relies** 14:2
**remainder** 43:15
**remarked** 34:15
**remember** 8:19
50:18 63:24
**removal** 56:5,5
59:23 123:13
**remove** 57:5,10,16
58:21 60:13 74:2
121:20,24 122:18
123:2,9,18
**removed** 57:2,13
58:20 59:20 75:6
**removing** 57:20
74:8
**REPAIR** 1:3
**repeat** 20:5
**replicate** 49:16
**report** 5:13,14,24
6:4 10:20 15:10
15:12,17,23 16:7
16:16,17,21,23
17:16,17,21,23
19:18,20,22 20:4
20:18,22,24 21:1
21:4,4,8,11,13,14
21:24 22:4,5,7,15
22:18,18,19 23:2
23:6,7,12,20 24:3
25:24 34:10,10,13
34:18,24 35:4,12
35:13,15,19,21
36:1,5,7,9,14,22
37:4,17,18 38:3
39:13 42:9 45:19
46:13,13 47:22
48:7,8 81:14,17
84:16 85:1,7 87:5
96:14,16,20
101:22 104:8,22
110:17 111:24

115:9 116:9 118:5
118:17 123:24
124:3,16 126:18
126:22 129:7,12
130:14
**reported** 11:12
36:21 84:13
130:13
**reporter** 18:6 20:8
21:21 52:21 92:4
**reports** 5:20 23:14
24:20,22 48:2
82:21 83:4,17,18
84:9,17,21 85:14
114:16
**report-outs** 68:24
**represent** 22:14
28:6,10,18 30:9
30:23 31:14
**representative**
107:16
**represented** 9:20
**representing** 26:15
27:7
**reproduce** 49:19
50:8 117:19
**reproducible** 50:1
**request** 13:12,19
26:20
**requests** 13:10
**requirements**
76:22
**research** 89:11
90:4
**researchers** 11:14
131:16
**residual** 56:5
114:18 116:21
**resin** 44:23 45:12
124:12
**resin-embedded**
81:21
**respect** 82:20 83:11
84:10 92:18
**response** 10:19
13:15,23 39:10
79:2 86:6 91:4

94:5,7 96:22
**responsive** 13:12
13:19
**result** 99:9
**results** 49:19,21
52:1 64:20 109:21
119:17 122:17
**retained** 9:5 26:7
26:19,20 27:14
31:4,5 37:15
**retention** 26:16,19
27:8 28:3,8,12
**review** 84:2
**reviewed** 93:20
**re-ask** 32:20
**re-review** 20:11
**riddled** 99:2
104:24
**ride-on** 9:14
**Ridge** 4:5
**Ridgley** 2:8
**riding** 9:17
**right** 10:22 18:2
22:21 23:20 27:21
29:23 30:3 33:2
38:13 41:1,12
43:24 45:15 48:7
48:14,17 51:14
52:16 53:2 54:4,7
54:12,14 55:1,10
55:13,14,20 56:21
57:6 58:3,10,15
58:16 59:10,12
61:7,12 62:5
65:15,16 67:18
71:6,12,17,21,24
73:8,20 75:10
76:11 77:14 79:9
79:12,15 80:2,22
83:9 86:18 87:13
89:1,4 90:2 93:8
94:10,11 96:11
97:17,19,20 101:6
101:8,23 102:2
103:3 105:2,7
106:4,20,20
107:18 110:15

111:6,10 113:1
118:6 119:10
121:6 125:5,11,18
**right-hand** 79:6
**rinse** 82:3
**rinsing** 82:3,12
**Road** 4:6
**Robert** 118:9
**Rochester** 4:5,6
**Rocio** 2:18
**role** 55:15
**Rose** 1:9
**roughly** 32:1 44:22
45:13
**round** 51:7 62:8,20
62:21
**routinely** 67:21,22
**RPR** 134:4,21
**Ruiz** 2:5
**rules** 7:18
**run** 76:22
**running** 113:18

───────

**S**

**S** 4:9 7:1
**Sacchetti** 1:18
**sake** 121:7
**sample** 38:6,6
39:15,21 40:3,24
72:6 95:15 103:22
105:13 107:10
108:4,4
**sampled** 80:2
**samples** 38:6,16,20
39:5 41:21 42:9
43:9,17,22 44:15
44:20 45:4,13,18
49:8 53:18 54:14
57:15 58:18 59:13
60:5 61:7,12,17
62:17,18,24 65:13
65:17 73:5 81:18
81:21 96:10 98:23
108:9 119:24
121:23,23 122:9
123:5,9 124:6,12
125:4 126:16,22

127:2,3,22 128:12
**save** 120:18
**saw** 17:17 99:23
105:18 127:13,14
**saying** 92:13,17
110:3,6 116:3
**says** 15:22 39:17
40:3 48:19,19
49:1,4,5,6,8 53:18
55:22 60:5,23
61:3,17 68:18
70:6 71:4,9,13,19
73:5 78:10 79:23
80:8,11,14 86:11
86:12,17 90:3
119:8
**scan** 42:14
**scanning** 12:20
106:23
**schedule** 13:9,11
53:20
**Schnering** 2:20
**Scholl** 1:19
**science** 10:4 92:11
**scientific** 117:11
**scientist** 8:3 11:9
67:9 126:2
**scientists** 24:2
131:15
**scores** 11:10
**second** 8:22 9:10
11:2,21 30:1
40:14,14,21 41:7
59:16 62:8 66:6,7
**section** 22:11,12,13
22:23 39:20,24
40:1 43:13 49:1,4
53:24 60:9 61:6
61:11 73:4 77:6
77:16 78:21
121:19
**sectioning** 80:8
**sections** 20:24 21:7
21:24 22:5,8,14
23:11,20 24:2,4
25:19 39:20 60:8
60:11,12,23

Steven MacLean, Ph.D., P.E.

see 12:16 14:16
  17:15 29:7 39:21
  45:10,11 50:1,21
  60:6 71:1,1 74:5
  74:23 77:22 78:21
  78:24 79:5,6,17
  79:18 80:8 86:3,9
  86:16 89:11,12,17
  89:21,21,24 93:23
  95:2 103:7 104:18
  104:20 106:3,8
  107:5,6,21,22,23
  111:21 112:5,13
  112:16 113:7,22
  113:23,24 114:4
  117:8,8 119:11,16
  121:9 123:16
  124:13 126:19
seen 13:6 78:18
  93:6 98:8,10
  99:22 101:6,7
  104:11 110:10,12
  111:1 127:3
sees 111:18
SEM 42:16,21 43:6
  104:23 105:1,4,8
  106:18
seminars 131:17
sense 65:2 97:9
  113:5 115:22
sent 14:22 43:16,17
  43:22 44:21 109:5
sentences 133:4
separate 18:18
  25:4 80:4 94:8
separated 17:2
separately 17:7
September 47:21
Sequencing 71:10
serum 72:15 94:17
  94:20 95:17,20
  96:5,6,10 117:22
  118:24 119:1
services 28:16,17
  28:20,21 32:14,22
session 109:6
set 11:8 13:10

14:22 20:19 54:3
  60:13 66:6,7
  67:12,20 68:8
  92:19 109:7
  113:21 126:24
  134:12
settled 12:2
severe 105:18
shading 109:19
sharing 108:19
sharp 97:20
Sheri 1:19
Shirley 3:15
shorthand 134:12
  134:14
show 26:1 51:21
  69:16 82:21 83:13
  83:16 94:20,24
  111:22 115:2,4
  117:16,23 118:24
  127:24
showing 115:17
shown 97:3 99:9
  111:19
shows 34:19 86:12
Shultis 3:5
sic 32:14 40:16
  60:11 72:5 80:12
side 88:3 122:16,17
sides 82:11
Sigma-Aldrich
  37:10
signed 34:23
significant 88:9,15
  99:19
similar 77:11 81:20
  99:22
Simon 66:15,16,23
  67:5 68:2,11 72:4
simple 76:8 115:5
  117:14
simply 50:7 64:13
  66:5 87:22 92:22
Simpson 11:4
simultaneously
  114:21
single 103:22

127:14
sit 69:4,8
sitting 59:12 77:14
  90:7 110:15
  116:21 122:19
situ 70:20 71:5
six 42:4,6 43:20,21
  102:9
size 88:2 92:20,23
  103:12,22
skill 69:9
sleeve 18:18 19:3
  25:1
slide 82:4 116:4
slides 60:24 63:8,11
  64:21 74:22 77:24
  80:8 82:9,11,12
  82:16 83:12 84:4
slight 102:11
sling 79:24
Slocum 8:22,24 9:8
small 43:13
smaller 86:13
Smith 1:21 66:15
  66:16,23 68:3,12
  69:5
Snow 26:15
Society 130:20
  131:11 132:10
solution 82:11
  122:6
solutions 37:13
solvent 56:1 74:1
somebody 39:19
  42:14 66:1
sonicate 121:22
sonicating 121:19
sorry 21:10 23:5,7
  29:16 32:20 37:18
  43:21 53:21 70:21
  74:5 81:17 96:19
  102:17
sort 9:16 12:13
  37:17 38:1 109:6
  110:18 116:1,13
  118:2
sought 37:5

SOUTHERN 1:1
Spann 4:20
SPE 132:10
speak 45:21,21
species 120:2 127:9
  127:11
specific 29:5
  104:19 105:6
specifically 9:18
  33:7 112:1
specimen 43:16
  56:18 60:1 82:4
  99:4 102:13
  114:12,19 115:20
  117:9,18 119:1
specimens 13:1
  17:4 37:11,15
  41:9 43:12 52:9
  52:18,23 54:15
  59:17,19,23 62:13
  62:15 63:7,11
  66:11 72:16 75:12
  75:15 77:20 99:1
  99:14 102:10
  105:5,10 107:5
  117:22 123:13
  126:8 127:15
spectroscopy
  104:12
spectrum 126:9
  127:23
speed 94:12
spend 35:3,9
spent 33:12
Stacy 3:5
staff 20:21 21:3,15
stain 37:14 52:8
  57:11 61:17 73:5
  75:19 86:12 87:22
  88:12,13 89:9,16
  90:9 91:2 92:7,18
  113:11
stained 37:13 49:9
  52:19,23 59:24
  61:12,13 72:21
  81:19 82:16 83:12
  89:17 94:18

101:10,11 112:6
stainer 61:18,21
  62:12 63:3 64:11
  65:20 66:4,10
  67:23 73:5,10
  87:11
staining 37:13 44:3
  44:14 46:4,12,19
  47:2,8 48:21 50:7
  51:16,17 57:15
  58:2,6,22,24
  59:14 61:6,10,15
  61:16 62:2,14,19
  63:5,5,17,18 64:1
  64:3,9,17,20,22
  65:10,12 66:12,19
  67:4,10,11,21
  68:3,4,7,9,13,14
  68:17,17,21 69:2
  69:6,9,11,14
  71:21,24 72:5,9
  72:11,17 73:14,15
  73:18 77:21 78:2
  78:5,22 79:1,3,4,9
  79:11,12,15 80:11
  80:17,20 81:11,11
  81:23,23 82:2
  83:1 84:4 85:12
  85:12,15 86:4,9
  86:13 87:9,11,14
  87:17 88:10,17,22
  89:9 90:1,2 91:1
  91:24 92:13 97:2
  112:8,14
stains 52:17 77:23
  85:17,20 90:2,13
standard 54:18
standing 61:9 81:2
  105:17
stands 45:10,12
started 31:6 43:2
  66:6 126:12
state 4:3 126:12
  134:1,5,21
stated 71:18
statement 92:22
STATES 1:1

staying 63:8
step 50:9 54:6,10
    54:24 55:8,20,22
    56:2,3,6,24 60:16
    60:17,20,23
    120:16 122:21
steps 48:17 54:3,11
    54:19,20,22 55:13
    55:18 57:2 61:15
    73:17,19,20,21
    74:1,3,4,6 77:5,6
    77:12,15 123:8,17
Steven 1:24 4:1 5:3
    15:13 16:21 18:9
    26:11 34:13 36:7
sticker 15:4
stop 127:16
straight 20:16
Street 4:12,16,20
strike 17:19 28:9
    33:18 43:21 44:18
    49:5 60:9 76:7
    100:6,11 124:13
Stubblefield 11:5
studies 79:1 87:12
    87:15
study 24:14 49:22
    50:1 59:11,14
    89:12
subjected 39:2
submit 35:20 36:12
    132:14
submitted 35:11,12
    35:15 43:10 45:14
    49:9,15 84:21
    130:8,18,19
submitting 19:22
    130:14
subscribed 134:17
substitute 55:22
    56:24
suffered 107:16
sufficient 74:8
suggesting 50:23
suggests 85:15
Suite 4:12,20
summaries 19:12

summarize 38:2
    41:20
summarized 20:2
summary 5:19 19:6
    19:10 24:16
summer 51:7
Summers 4:20
supervising 77:2
supervision 134:12
supplemental 5:14
    6:4 16:16,17,21
    16:23 17:16,21,23
    19:18,20 20:4
    21:8,13 23:1,12
    23:20 35:12,15,21
    36:1,5,7,9,14,22
    37:4,17 38:3
    39:12 62:22 81:13
    81:16 96:15,16,19
    115:9 124:3,16
supplies 121:10
support 29:1
supposed 73:18
SUPREME 134:2
sure 8:7 13:2 18:7
    23:13 24:9 33:3
    39:7 46:10 54:23
    65:3 76:14 89:5
    100:15 106:2
    108:6 113:17
    119:7
surface 42:15,17
    43:3 86:14 98:11
    113:5 122:19
    123:2,10,19
surfaces 42:15
    89:19 104:10,14
surgeon 75:6
survive 64:22
    66:11
survived 64:17
suspect 33:10
suture 36:23 38:6
    39:18 40:10 41:11
    48:22 99:20 100:2
sutures 37:8 41:14
    41:17,18 42:7

43:20,22 46:5,20
    47:3 99:18
swath 40:13,14
    41:6,7 107:4
    112:12
swaths 40:22,23
    41:2,4,16,24 42:2
    42:4
sworn 7:2 134:9
symposium 131:18
system 1:3 9:18
    72:22 73:1
S-T-U-B-B-L-E-...
    11:5

_____

T
T 7:1
tab 15:21,22
Table 123:24 124:6
take 16:15 31:11
    35:1 61:15 67:15
    103:16 105:21
taken 4:2 19:24
    74:7 100:11
    109:24 110:16
    123:9 134:11,12
    134:14
takes 88:22
talk 16:5 39:15
    72:15 74:24 88:6
    103:15 109:8
    121:10,11,15
talked 73:16 95:16
    102:9 105:11
    107:5 114:16
    115:17 124:11
    128:1
talking 21:9 40:23
    41:12 75:11 88:1
    97:14 104:5
    110:22 115:10
    128:15
talks 87:22
Taylor 11:6
tease 111:22
technical 131:11,17
technicians 20:21

21:3 23:23 24:1
technique 43:15
    82:7 88:4 92:8,20
    119:14,15
teleconference 4:15
    37:24
tell 15:21 68:21
    70:21 77:8,20
    81:24 84:17 87:21
    93:12 98:23
    116:11,14
telling 57:17 59:24
    65:1
tells 93:15
TEM 86:15
temperature 38:23
term 97:14
terms 68:23 76:19
    87:24 101:12
testified 7:2 20:20
    63:12 74:6 100:16
    128:17
testify 84:12 134:9
testimony 5:3,21
    7:15,17 8:13,20
    9:6 10:1,3 25:6
    35:5 49:24 63:4
    96:5 134:7,9,10
    134:12,13
testing 14:5,10 38:2
    88:17
text 89:22
textbook 70:8
Thank 24:15
    131:23
Thelma 2:17
thereof 134:16
thing 81:24 92:17
    104:16 118:13
things 45:7 94:12
    98:1 110:5 131:18
think 14:1 22:7,22
    23:2 27:1 31:5
    32:16 33:7,16
    35:23 51:21 58:1
    66:10 78:7 85:14
    89:22 92:5 99:17

101:17 103:11
    106:11 107:19,20
    109:11 111:17,21
    113:3 116:15
    117:6 125:22
    127:14 128:11,17
third 11:3
third-party 43:22
Thomas 3:6 4:19
    4:20 5:6 11:20
    13:14,17,21 14:20
    15:4 23:4 26:24
    29:4 32:16,18
    34:1 37:20 40:19
    46:2,9 48:1,5
    51:20 52:2,7,15
    53:8 56:22 59:21
    61:9 62:10 63:20
    65:14,21 68:5
    69:18,24 70:8,11
    70:15 71:16 73:9
    73:13 74:16 75:9
    76:12 77:17 82:18
    83:14 84:5,8 85:2
    85:6,10 86:24
    87:6,19 88:14,19
    89:10 90:22 91:3
    91:7,14 92:1 93:9
    94:11 96:15,17
    100:19 101:4,16
    102:4,16,19 103:2
    104:5,22 107:11
    109:2 110:7,11,13
    110:19 111:15
    114:3,7 117:21
    118:19 119:18
    120:9 121:1
    123:11 125:7,12
    125:14 126:5
    127:5,16 128:5,21
    129:2 131:22
    132:1 133:1,5
Thompson 2:14
Thornburgh 4:11
    5:5,7 7:5,11 13:16
    15:1,7 20:7 27:3
    46:22 61:10 70:2

Steven MacLean, Ph.D., P.E.

70:10,13 96:16,18
101:5 110:10,12
121:4 127:20
128:20,22 129:17
130:16 131:24
132:5
**thought** 41:10
113:2
**thousand** 30:3,4,6
31:24 32:1
**three** 38:5 39:8
79:24 102:24
127:18 131:16
133:4
**three-dimensional**
115:24
**thumb** 5:12 14:21
14:23 15:2,3,5,15
16:9,23 18:24
45:20 126:19
129:24
**till** 46:17 85:9
**time** 8:16 11:16,17
11:21 19:19 20:1
23:16 27:2,12,14
28:22 31:3 33:12
35:4,9 64:1 68:18
72:4 85:2,24 87:8
87:21 91:20
101:12,14 109:7
110:23 112:21
113:18 120:18
121:7 132:16
134:11
**times** 24:3 69:5
**timing** 19:24
**Timms** 123:18,20
**tissue** 12:9 53:19
54:12,13,14,17
59:11 72:14 75:12
75:14 80:7 90:10
93:19
**tissues** 75:12 89:18
90:17
**title** 70:9,11,13
**titled** 69:21
**today** 13:1 14:16

15:9 17:22 18:12
26:4 69:5,8 88:21
90:7
**top** 51:1 61:23
76:24 95:5 114:17
114:20,23 115:6
116:7 117:3,24
121:10
**topography** 42:16
**Tor** 4:16
**total** 22:22 29:22
**totaled** 29:22,24
31:18,22 32:7
**totally** 116:17
**touting** 74:24
**touts** 74:12
**trace** 107:4
**track** 106:22
**trained** 98:13,15
**trans** 79:20
**transcribed** 134:13
**transcription**
134:14
**transmission** 86:15
**transvaginal** 79:24
**trapped** 86:21
**traps** 89:2
**tray** 80:12,14,18
81:1
**treat** 53:1,1
**treated** 121:23
125:5 126:22
127:2,22
**treatment** 75:8
**tremendous** 69:12
**trial** 87:3 91:18
93:18 109:22
**trichrome** 79:4,12
86:12,18,21 87:17
87:18,22 92:7,13
92:18
**tried** 50:4 57:11
121:24
**Trim** 60:10
**true** 134:13
**truly** 110:6
**truth** 134:9,10,10

**truthful** 8:12
**try** 20:15 41:20
50:8 85:19
**trying** 12:13 39:5
53:11 57:8,8,19
75:13 77:21,22
104:17 118:6
120:6 122:18
**tumor** 75:5
**turn** 34:18 37:16
39:11,12 70:5
79:17 85:22 96:13
101:19 102:23
119:2 123:24
124:15 129:6
**TVT** 20:19 36:23
37:7 38:5 39:1,8
39:17 40:9,17
41:5,24 42:4,6
**TVT's** 43:21
**two** 8:17,21 17:2
21:16 25:8 30:8
30:16 34:5 37:11
40:22 41:4,4 42:4
42:6 43:21 45:7
54:7 74:19,21
80:3,3,4 106:15
106:17 108:14
110:8 111:21
112:11 114:12
116:5 117:3
131:24 133:3
**two-fold** 74:19
**Tyler** 3:8
**type** 28:21 51:16
74:21 122:6
**types** 79:1
**T-A-Y-L-O-R** 11:6
**T-U-R-N-E-R** 11:7

─────────────
**U**
─────────────
**ultimately** 52:19,23
57:8 61:16 62:7
**ultrasonic** 121:5
122:3,9,12 123:4
**Um-hum** 53:23
55:2 61:8 70:24

80:15 112:23
126:17
**uncharged** 77:24
**underlying** 14:6,9
**understand** 7:14
7:20 8:10 41:23
57:19 58:8 59:5
60:15 75:13 90:16
90:20 97:23 98:17
104:17
**understanding**
57:20 58:17,19
69:4 112:19
**understood** 7:24
8:2,9 35:10
**UNITED** 1:1
**universe** 41:8
43:11 110:3
**unknown** 27:5
**upwards** 41:3
**use** 31:5 45:18 48:9
64:10 65:19 67:23
68:4 73:10 81:23
85:12,19 86:18
101:21 106:6
109:17 110:4
119:12 122:7
123:4 127:7
**user** 102:7
**uses** 67:21 79:21
88:4 93:7 111:8
**UV** 38:13,17,20
39:2 41:13,21
98:6 99:10 106:9
106:11 107:16
128:7
**UV-oxidized** 62:18
96:21
**UV-treated** 99:14
123:5
**U.S** 1:5

─────────────
**V**
─────────────
**v** 7:1 8:22,23 9:11
9:11
**value** 35:2
**variability** 102:11

**variables** 126:14
**vary** 92:19
**varying** 109:19
**verify** 90:4 92:8
**versus** 8:24 68:17
81:23
**vertical** 78:3,4,5
81:1,2,23 82:1,2
**vertically** 82:9 83:2
**vials** 94:24
**video** 108:19 109:6
**videos** 110:8
**view** 116:6,9
**viewed** 94:20
**Virginia** 1:1 3:14
**Virtually** 101:5
**visual** 74:12,22
101:12,14
**vivo** 78:16 120:6,12
**Von** 79:4,11 86:9
87:8,10,14

─────────────
**W**
─────────────
**walked** 108:3
**Walker** 3:15
**want** 8:7 13:24
14:23 16:10 23:13
45:3 54:19,20
76:14 95:5 119:7
129:22
**wanted** 64:16
119:13 122:23
123:2
**warning** 109:17
**wash** 82:6,8,10
**washing** 82:12
**wasn't** 14:14 36:15
47:17,23 48:3
81:8 101:15
122:21
**water** 60:13,22
122:8,10
**Wave** 5:14 7:15
10:17,18 14:12,13
16:20 19:22 21:5
21:24 22:4,17,23
26:8 27:1 29:2,14

29:19 30:11,13,19
30:24 31:4,6,10
31:14 32:4 33:5
34:11,18,23 35:12
36:18 37:4 62:22
72:6 80:24 111:23
123:24 129:7
**wax** 57:2,2,5,11,16
57:21 58:14,22
59:19 74:8
**waxing** 56:7,21
**way** 53:1 72:13
81:6 84:15,17
90:5,8 114:24
116:15 134:16
**Waynick** 1:22
**website** 76:10,17
**weeks** 19:16 80:3
**well-accepted** 52:9
**went** 24:3 37:8
44:22,23 62:18,23
95:20 99:3 126:11
**weren't** 35:20
96:10 123:22
**West** 1:1 4:6,16
**we'll** 7:24 12:24
15:1 16:5 18:5
22:4 24:6 27:22
**we're** 34:6 35:3,8
54:18 58:2 75:14
77:21,22 113:14
113:18 119:7
121:9 128:14
**we've** 13:22 18:11
60:3 77:18 82:1
95:16 99:11,22
106:15,17,24
107:3,5 110:22
129:24
**Wheeler** 2:15
**WHEREOF**
134:17
**white** 112:7
**Wilma** 3:18
**Wiltgen** 1:13
**Wise-Turner** 11:7
**Witkin** 4:12

**witness** 7:22 9:1
18:14 21:20 35:7
39:14 41:19 52:20
89:15 95:4 101:20
102:24 108:16
119:5 121:3,14
124:5,17 134:7,17
**witnesses** 11:13
**Wolfe** 1:15
**woman's** 120:7,13
**wood** 9:3
**word** 31:5 127:7
**words** 75:4 76:11
93:2 108:14 111:8
**work** 11:22,24
16:16 17:22 19:17
20:3 21:17 27:5,5
28:7,9,10,24 29:2
29:12,14 30:7,10
30:17,18,23 31:9
31:14 32:4,14,18
33:4 35:22,24
36:13,18,21,24
37:6,14 44:4,8
49:16 51:7 55:19
62:22 63:13,15,23
64:7 65:10 67:2,3
67:8,24 72:6
74:13,21 76:16
88:20 91:11 93:6
99:12,24 108:12
108:22 123:21,22
130:3,4,5
**worked** 22:10,11
22:12 66:23
**working** 28:22,23
119:7
**wouldn't** 31:5
56:13 59:18 88:7
104:14 127:4,7
**Wright** 2:17
**wrinkles** 60:14
**write** 64:9 97:1
**written** 26:23 27:2
46:7 47:7,11,12
47:19 50:21 64:8
66:1,3 73:11 81:9

81:10 84:16 90:19
133:3
**wrong** 37:20 64:14
64:16,19
**WV** 4:21
**Wyatt** 3:6
**W-I-S-E** 11:7

_____

**X**

**X** 5:1 6:1 93:3
**XPOL** 94:19
**xylene** 55:22,24
56:2,23 74:1

_____

**Y**

**yeah** 15:1 20:6
23:17 32:17 33:1
33:3,16 36:3
40:12,21 45:2
46:3 51:1 60:18
62:18 96:18
103:21 104:7
106:5 109:6 112:4
115:16 125:24
**year** 11:23 20:10
**years** 11:23 68:22
69:1,11,15,17
71:15 74:11,15
98:16
**yellow** 26:1
**Yep** 15:24 40:6
54:1
**yesterday** 14:14,23
100:24
**yield** 66:9
**York** 4:3,6 134:1,3
134:5,21

_____

**Z**

**zero** 99:8
**zoomed** 102:12

_____

**$**

**$19,848** 29:10
**$34,781.70** 30:16
**$355** 27:16
**$380** 27:18,20

**$40,000** 31:19
**$6,078** 30:22 31:17
**$72,174** 28:2,6,15
28:16,19
**$80,000** 32:8

_____

**0**

**01FE6282686**
134:24
**06-imageexport40**
118:12

_____

**1**

**1** 5:11,14 7:15
10:17,18 13:3,5
14:12,13 16:20
19:22 21:5,24
22:4,17,24 26:8
27:1 29:2,14,19
30:11,13,19,24
31:4,6,10,14 32:4
33:5 34:11,18,23
35:12 36:19 37:4
49:7,8 53:18,22
54:4 62:22 70:23
72:6 80:24 111:23
121:13 123:24
124:1,6 129:7
**1st** 31:7 34:20 37:1
**10** 5:20 24:18,21
25:21 80:1
**10th** 47:21
**10:00** 106:8 107:22
**10:45** 85:9
**10:51** 85:9
**1050** 127:15
**11** 5:21 25:4,5
124:4
**11:00** 106:8 107:22
**11:45** 125:7
**11:54** 133:8
**1150** 127:15
**12** 5:22 26:10,13
42:10 43:1
**121** 6:8
**129** 5:6 6:9
**13** 5:11,23 27:22,23

28:1
**13th** 29:7,7,8,13,17
29:18
**13(k)** 111:24
**132** 5:7
**1380** 4:20
**139** 25:8
**14** 5:24 34:11,12
118:22 129:6
**140** 25:8
**14614** 4:6
**15** 5:12,13,22 6:4
26:10 36:5,6
37:17,19 38:1
41:17,18 42:7
43:22 96:20
101:22 102:18
118:23
**15th** 26:21 28:8,11
28:18 32:12,15,21
32:24 33:6
**1504469** 31:13
**157183_serum_R**
118:9
**15791_serum_R...**
95:8
**16** 5:14 6:5 46:18
46:24 47:5,7,18
48:11 53:15,22
73:3 125:16
**16th** 31:21
**1600** 125:23
**1650** 125:23 128:1
**17** 4:12 5:15,16 6:6
69:19,20,23 70:6
70:6
**17th** 28:2,18
**176** 124:15,17,21
**177** 124:24
**18** 1:17 4:4 5:17 6:7
78:12,15,22 84:2
84:13 85:22 89:14
96:13
**180** 125:1,9
**1800** 125:16,23
128:1
**1890** 4:5

Steven MacLean, Ph.D., P.E.

**19** 5:18,19 6:8 74:3
96:19 98:5 100:1
106:6 107:8
120:22 121:3,4,9
**19th** 47:13 64:6
**1990** 70:20 71:6
**1995** 71:11

**2**

**2** 5:12 15:3,5 23:2
54:24 60:5 74:4
78:21 79:7 121:15
**2:11-cv-00809** 3:19
**2:12-cv-00337** 1:15
**2:12-cv-00358** 2:23
**2:12-cv-00369** 3:17
**2:12-cv-00423** 2:7
**2:12-cv-00443** 3:23
**2:12-cv-00469** 3:8
**2:12-cv-00470** 1:12
**2:12-cv-00476** 3:22
**2:12-cv-00498** 3:10
**2:12-cv-00499** 3:7
**2:12-cv-00517** 2:4
**2:12-cv-00591** 3:11
**2:12-cv-00654** 3:5
**2:12-cv-00738** 1:20
**2:12-cv-00746** 3:20
**2:12-cv-00747** 3:2
**2:12-cv-00873** 3:16
**2:12-cv-00938** 3:4
**2:12-cv-01021** 2:5
**2:12-cv-01023** 2:2
**2:12-cv-01052** 2:10
**2:12-cv-01053** 2:11
**2:12-cv-01071** 2:20
**2:12-cv-01081** 3:14
**2:12-cv-01088** 2:16
**2:12-cv-01090** 2:17
**2:12-cv-01146** 1:17
**2:12-cv-01148** 1:18
**2:12-cv-01149** 1:21
**2:12-cv-01151** 1:23
2:13
**2:12-cv-01199** 2:14
**2:12-cv-01206** 1:11
**2:12-cv-01215** 3:13

**2:12-cv-01216** 1:14
**2:12-cv-01225** 1:8
**2:12-cv-01273** 2:22
**2:12-cv-01294** 2:19
**2:12-cv-01311** 2:8
**2:12-MD-02327**
1:3
**2:21-cv-00344** 1:9
**20** 6:9 33:15,16
69:15,17 71:15
74:3 98:16 129:19
129:23 130:1,9,13
**20th** 134:17
**200** 4:12 41:3
**2015** 5:22 26:11,21
27:15,17 28:2,8
28:11,18,18 29:7
29:8,20 30:8,14
30:18 32:3 47:22
**2016** 1:17 4:4 27:11
27:18 30:21 31:9
31:16,18,21 32:12
32:15,21 33:6
34:20 36:10 37:1
47:13 64:6 134:17
**21** 115:19 117:15
**21st** 30:21 31:9,16
**22nd** 36:9
**23rd** 31:18
**2327** 1:4
**24** 5:20
**24th** 32:3
**25** 5:21 68:22 69:11
74:11,15 101:19
101:21
**25301** 4:21
**26** 5:22 102:23
103:7 104:16
**27** 5:23 96:17
**27770-20** 41:6
**28** 96:19
**29th** 30:14,18

**3**

**3** 5:13 15:8,12,21
16:12 18:2 23:2,3
55:8 74:4 79:17

**30** 31:19 33:16
60:24 109:8
115:14
**30th** 29:20 30:8
**300** 4:20
**304-414-1800** 4:21
**31** 109:8 115:9,10
**312-372-4800** 4:17
**32** 127:13
**32502** 4:13
**34** 5:24
**3500** 127:13
**36** 6:4 81:17,18
129:7
**37** 81:16,17,20
129:7
**380** 27:11,12
**3832826** 41:5
**3859228** 40:14,15
**389228** 40:16

**4**

**4** 5:14 16:19,20
17:1 18:3 23:4,5
23:15,22 37:16,18
38:1 55:20 56:3
60:17 71:1 74:4
86:1,3,7 87:5 91:2
91:19
**4-6** 60:11
**40-45** 60:13
**45-50** 61:1
**46** 6:5

**5**

**5** 5:15 17:7,8 55:22
56:3 60:23 85:22
86:1 89:13
**5/28/2017** 134:23

**6**

**6** 5:16 17:11,12
54:4 56:6 81:18
106:5 121:19
**6-0** 41:11
**60** 38:24
**60661** 4:17

**617** 4:16
**63X_H&E_ANA**
118:10
**68** 15:22
**69** 6:6

**7**

**7** 5:5,17 18:8,11,18
19:3 24:10 43:24
**70** 54:6
**78** 6:7

**8**

**8** 5:18 19:2,4 24:13
**8:41** 4:4
**80** 54:24
**800** 43:24
**850-202-1010** 4:13

**9**

**9** 5:19 19:9,10 20:3
24:16 39:11,12
**9.1** 70:6,23
**9:00** 106:8 107:21
**9:50** 46:17
**9:53** 46:17
**90** 30:5 32:1
**94** 111:24 113:21
116:8 117:7,12
**95** 55:8