# Exhibit A

Christina K. Pramudji, M.D.

```
 1                IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF WEST VIRGINIA
 2                       CHARLESTON DIVISION
                              - - -
 3
        IN RE:  ETHICON, INC., PELVIC   :  MASTER FILE NO.
 4      REPAIR SYSTEM PRODUCTS          :: 2:12-MD-02327
        LIABILITY LITIGATION            :
 5                                      :  NO. 2327
 6      THIS DOCUMENT RELATES TO:       :  CASE NO.
        DIANNE M. BELLEW,               :: 2:13-CV-22473
 7
 8
                              - - -
 9
                        September 17, 2014
10
                              - - -
11
12            Videotaped deposition of CHRISTINA K. PRAMUDJI,
13      M.D., taken pursuant to notice, was held at the Westin
14      Galleria, 5060 West Alabama, Street, Houston, Texas, beginning
15      at 10:24 a.m., on the above date, before Mary Kay Hendricks,
16      CSR, a Registered Professional Reporter, Certified Shorthand
17      Reporter.
18
19
20                            - - -
21
22
23                  GOLKOW TECHNOLOGIES, INC.
24            877.370.3377 ph|917.951.5672 fax
25                    deps@golkow.com
```

```
 1    the FDA that specify what type of information is

 2    supposed to be found in warnings for the products like

 3    the Prolift, correct?

 4              MR. SNELL:  Form.

 5        A.  No, I'm not.

 6        Q.  (BY MR. SLATER)  You're not familiar with the

 7    internal standards at Ethicon that the medical affairs

 8    and regulatory affairs people followed in terms of what

 9    information needed to be in the IFU and the patient

10    brochure and other documents about the Prolift, correct?

11        A.  That's correct.  I don't know that.

12        Q.  In drawing (sic) your opinions, you did not

13    rely on any internal standards or any deposition

14    testimony by any Ethicon witness as to what information

15    needed to be in the IFU, the patient brochure or any

16    other document about the Prolift, correct?

17              MR. SNELL:  Form.

18        A.  I don't -- I don't believe I did, not that I

19    can recall off the top of my head, no.

20        Q.  (BY MR. SLATER)  You do not know what the

21    requirements were that Ethicon had to satisfy before

22    they could market the Prolift, do you?

23        A.  No, I don't.

24        Q.  You do not know what was considered by the

25    Ethicon medical affairs director at the time that she
```

1    Q.  (BY MR. SLATER)  If Ethicon misrepresented

2  information in the patient brochure, you would criticize

3  that, right?

4    A.  Yes.

5    Q.  You would criticize that because that would be

6  misleading to doctors and patients, correct?

7          MR. SNELL:  Form.

8    A.  Correct.

9    Q.  (BY MR. SLATER)  And you would criticize that

10  because that could have an impact on patients' safety,

11  correct?

12          MR. SNELL:  Form.

13    A.  It could have -- it could have an impact on

14  patient safety, yes.

15    Q.  (BY MR. SLATER)  Do you know what the purpose

16  of the IFU is from the perspective of Ethicon?

17    A.  From the perspective of Ethicon, no.  I have my

18  perspective as a surgeon.

19    Q.  Do you know what the purpose of the IFU is

20  pursuant to FDA regulations?

21    A.  No.

22    Q.  Do you know the standards that apply to what

23  information is supposed to be in the patient brochure?

24    A.  No, I don't.

25    Q.  Do you know what FDA regulations would require

1  you would want to have known that, correct?

2          MR. SNELL:  Form.

3      A.  I mean, I don't -- I mean, they did provide

4  some guidance to that, and a lot of it was intuitive

5  surgical principles.  So I don't know that they would

6  have added anything to -- to what I would have done, my

7  decision making, how I used the product.

8          MR. SLATER:  Move to strike --

9      A.  So I would say "no."  The answer would be "no."

10          MR. SLATER:  Okay.  Move to strike.

11      Q.  (BY MR. SLATER)  If Ethicon thought that there

12  were certain women as to whom caution needed to be shown

13  based on information that Ethicon had, would you have

14  wanted them to share that information so you could

15  consider it?

16          MR. SNELL:  Form.

17      A.  Yes, I would.

18      Q.  (BY MR. SLATER)  Your level of knowledge and

19  experience would not be the same as all physicians

20  considering using the Prolift, correct?

21      A.  That's correct.

22      Q.  So simply saying that doctors would understand

23  something or know something, you -- leaves questions as

24  to what different doctors know.  Let me rephrase it.

25  You don't know the level of experience and knowledge of

```
 1   each doctor that considered using the Prolift.  You
 2   haven't studied that question, right?
 3        A.   No.  That would be impossible to know.
 4        Q.   And in providing warnings and information, you
 5   wouldn't want to assume that all physicians would have
 6   the same level of knowledge and experience as you would
 7   have, right?
 8        A.   Well, I think the IFU clearly states that it's
 9   designed for pelvic surgeons that are familiar with the
10   pelvic -- with pelvic surgery.  So I think we're
11   starting with a baseline knowledge.
12        Q.   Okay.  Familiar with pelvic surgery with mesh.
13   How many surgeries does that mean?  Is there a defined
14   number?
15        A.   No, there's not a defined number.
16        Q.   A doctor could do one procedure with mesh and
17   think that he or she is familiar with that type of
18   surgery, correct?
19        A.   I suppose a doctor could assume that.  Yeah,
20   some -- some doctors --
21        Q.   So saying that doctors need to be familiar with
22   surgery with mesh really doesn't tell you anything about
23   the level of knowledge and experience the doctor needs
24   to have, correct?
25        A.   I mean, you're -- it's common sense basically
```

1   that if there's a -- if you go through training and you

2   have been trained on pelvic surgery in residency or

3   after fellowship, then -- then you have a knowledge of

4   pelvic surgery.  I mean, it's obvious common sense that

5   if you just do one that you're not familiar with it

6   whether a doctor thinks that or not.

7       Q.  Telling doctors that they need to be familiar

8   with pelvic surgery does not tell the doctor

9   specifically what their level of knowledge and

10  experience needs to be.  It's not defined, correct?

11      A.  Yes.  It's not defined.  It's not specific.

12  You're correct.

13      Q.  And, in fact, sales representatives are paid

14  more money when they can get more doctors in their

15  territory interested in using a product and procedure

16  like the Prolift, right?

17          MR. SNELL:  Form.

18      A.  I don't know how they're paid.

19      Q.  (BY MR. SLATER)  Well, I think you assume that

20  sales representatives get more money based on generally

21  more sales from the doctors and facilities in their

22  territory.  Okay --

23      A.  Okay.  I'll grant you that.

24      Q.  That would give the sales representatives an

25  incentive to bring doctors in for training regardless of