# EXHIBIT D

Juan Carlos Felix, M.D.

```
 1            IN THE UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                    CHARLESTON DIVISION
 4
 5   IN RE:  ETHICON, INC., PELVIC    )
     REPAIR SYSTEM PRODUCTS           )
 6   LIABILITY LIGATION,              )   Master File No.
     _____   )   2:12-MD-02327
 7                                    )
     THIS DOCUMENT RELATES TO:        )   MDL No. 2327
 8                                    )
     Ruiz, Patricia v. Ethicon,       )   JOSEPH R. GOODWIN
 9   Inc., et al.                     )   U.S. DISTRICT JUDGE
                                      )
10   Case No.:  2:12-cv-01021         )
     _____   )
11
12
13
14
15
16          DEPOSITION OF JUAN CARLOS FELIX, M.D.
17                 Monday, March 28, 2016
18                   Long Beach, California
19
20
21   Reported By:  Kristi Johnson, CSR 12585
22
23             GOLKOW TECHNOLOGIES, INC.
24       877.370.3377 ph | 917.591.5672 fax
25                deps@golkow.com
```

|  | Page 10 |
|---|---|
| 1 | A. Not particularly that I can recall. |
| 2 | Q. There's also her Complaint. |
| 3 | Is there a reason why you wanted to see the |
| 4 | Complaint that she made in this case? |
| 5 | A. I thought it was reasonable since I'm going to |
| 6 | be testifying. |
| 7 | Q. So other than skimming Ms. Ruiz's deposition, |
| 8 | no other case-specific depositions have you reviewed for |
| 9 | Ms. Ruiz's case; correct? |
| 10 | A. Correct. |
| 11 | (Plaintiff's Exhibit 5 was marked for |
| 12 | identification by the court reporter.) |
| 13 | BY MR. AYLSTOCK: |
| 14 | Q. Exhibit 5 is the report of Dr. Iakovlev for |
| 15 | Ms. Ruiz that was also provided to me by Mr. Thomas. |
| 16 | Do you recognize that? |
| 17 | A. Yes. |
| 18 | Q. The thumb drive we'll mark as Exhibit 6, |
| 19 | materials that were also provided to me by Mr. Thomas. |
| 20 | (Plaintiffs' Exhibit 6 was marked for |
| 21 | identification by the court reporter.) |
| 22 | BY MR. AYLSTOCK: |
| 23 | Q. Do you know what materials for Ms. Ruiz are on |
| 24 | the thumb drive that is Exhibit 6? |
| 25 | A. Yes. |

|  | Page 11 |
|---|---|
| 1 | Q. What are those, please? |
| 2 | A. The complete medical records. Dr. Iakovlev's |
| 3 | report is in there as well. |
| 4 | Q. Anything else that you know of? |
| 5 | A. Dr. McLean's report is in there as well. |
| 6 | Q. I don't see that in here. |
| 7 | A. You don't? Was it in the last one? |
| 8 | MR. THOMAS: That was the one that was filed, |
| 9 | the supplemental reliance list. There's one in the |
| 10 | general report, and then there was a supplemental |
| 11 | reliance list. The only reports produced is the Iakovlev |
| 12 | report specific to this case, the deposition transcripts |
| 13 | specific to this case, and the medical records specific |
| 14 | to this case. |
| 15 | BY MR. AYLSTOCK: |
| 16 | Q. And Dr. McLean's report is not specific to |
| 17 | Ms. Ruiz; correct? |
| 18 | A. Correct. |
| 19 | Q. Nor is Dr. McLean's report specific to |
| 20 | Ms. Loustaunau, for that matter? |
| 21 | A. Correct. |
| 22 | Q. And with regard to your case-specific opinions, |
| 23 | you're not relying on Dr. McLean's report for your |
| 24 | case-specific reports in Ms. Ruiz; correct? |
| 25 | MR. THOMAS: Object to form. |

|  | Page 12 |
|---|---|
| 1 | THE WITNESS: Because I rely on his findings to |
| 2 | form my general opinions, his findings are important to |
| 3 | my specific opinions. |
| 4 | BY MR. AYLSTOCK: |
| 5 | Q. In what way? |
| 6 | A. In finding no evidence of polypropylene |
| 7 | degradation. |
| 8 | Q. Have you reviewed any other expert reports of |
| 9 | the plaintiffs or the defendants as it relates to |
| 10 | polypropylene degradation? |
| 11 | A. Yes. |
| 12 | Q. Who else? |
| 13 | A. I have to look. |
| 14 | MR. THOMAS: We're getting into the general |
| 15 | report. |
| 16 | MR. AYLSTOCK: I know, but you just |
| 17 | supplemented with Dr. McLean, so I need to understand. |
| 18 | If he had answered the question no, I wouldn't be getting |
| 19 | into this, but he answered it, apparently it's important |
| 20 | to his case-specific opinions. So I need to know exactly |
| 21 | what degradation materials he finds important for his |
| 22 | case-specific opinions for Ms. Ruiz. |
| 23 | MR. THOMAS: Different question. |
| 24 | What reports do you find significant to you for |
| 25 | your case-specific evaluation of Ms. Ruiz? |

|  | Page 13 |
|---|---|
| 1 | THE WITNESS: In that instance, it would be |
| 2 | Dr. McLean's report alone. |
| 3 | BY MR. AYLSTOCK: |
| 4 | Q. I just want to make sure I cover the waterfront |
| 5 | on that. |
| 6 | A. Um-hum. |
| 7 | MR. AYLSTOCK: Off the record. |
| 8 | (Recess.) |
| 9 | (Plaintiffs' Exhibit 7 was marked for |
| 10 | identification by the court reporter.) |
| 11 | BY MR. AYLSTOCK: |
| 12 | Q. Now handing you, Doctor, Exhibit 7, which is |
| 13 | your report in the Patricia Ruiz case. |
| 14 | Do you recognize that? |
| 15 | A. Yes, I do. |
| 16 | Q. When were you first contacted about being an |
| 17 | expert in Ms. Ruiz's case on behalf of Johnson & Johnson |
| 18 | and Ethicon? |
| 19 | A. The end of last year, 2015, or the beginning of |
| 20 | this year. |
| 21 | Q. Who contacted you? |
| 22 | A. A gentleman by the name of Andy Snowden, |
| 23 | S-N-O-W-D-E-N. |
| 24 | Q. What were you told about Ms. Ruiz and her case |
| 25 | by Mr. Snowden when you were first contacted? |

Page 54

1 well; correct?
2    A. Yes, but the hydrogen peroxide is contained
3 within very specific cells.
4    Q. Well, some of those cells --
5       MR. THOMAS: Are you finished?
6       THE WITNESS: Yes.
7 BY MR. AYLSTOCK:
8    Q. What specific cells are they contained in?
9    A. They are contained in macrophages and in
10 neutrophils, to name the two most common ones where it is
11 contained.
12    Q. You don't dispute that upon implantation of the
13 TVT-S in Ms. Ruiz, macrophages and neutrophils initially
14 in the acute phase attempted to deal with the foreign
15 body that was the TVT-Secur in Ms. Ruiz; correct?
16       MR. THOMAS: Object to form.
17       THE WITNESS: There is inflammation that is
18 created by the implantation of the mesh.
19 BY MR. AYLSTOCK:
20    Q. And that inflammation results in hydrogen
21 peroxides being formed by the body in proximity to the
22 mesh; correct?
23    A. Inside of cells, not outside of cells.
24    Q. So because we don't have pathological material
25 during the acute phase for Ms. Ruiz, you can't rule out

Page 55

1 the fact that these macrophages and neutrophils that were
2 present in the acute phase may have created a biological
3 situation that resulted in some degradation of her mesh,
4 can you?
5    A. I completely disagree with that possibility.
6    Q. Why is that?
7    A. Because it would have caused enough
8 extracellular hydrogen peroxide, which is what you need
9 if it's going to be exposed to the mesh; right? Just
10 because hydrogen peroxide is inside of a cell doesn't
11 matter because it can't get out of the neutrophil. It
12 can't get out of the macrophage to affect the mesh and
13 degrade it. If it's inside the cell, it doesn't matter.
14 If it's outside of the cell and it's in sufficient
15 quantities to degrade polypropylene, it would destroy the
16 cells around it. It would create an abscess.
17    Q. What's the basis for your opinion that -- or at
18 what quantity in Ms. Ruiz would the hydrogen peroxide
19 needed to have been present to destroy the cells?
20    A. In far less quantity than it would to degrade
21 polypropylene.
22    Q. How do you know what quantity it takes of
23 hydrogen peroxide to degrade polypropylene? What is that
24 number?
25    A. I'm not certain, but I'm certain that if it

Page 56

1 degrades polypropylene, it will destroy the cell next to
2 it. There's no question that the cellular membranes are,
3 by far, more delicate than polypropylene.
4    Q. Do we know, because we don't have pathology
5 from the acute phase after implantation, that it did, in
6 fact, not destroy some of Ms. Ruiz's cells? How do we
7 know that?
8    A. Every fiber in this specimen has a continuous
9 layer that Dr. Iakovlev claims is bark, every single mesh
10 fiber. If there was that much hydrogen peroxide creating
11 all of that degradation, it is impossible for that tissue
12 to have survived it.
13    Q. What is your basis for the fact that it takes a
14 specified level of hydrogen peroxide to degrade the
15 polypropylene in Ms. Ruiz?
16    A. Well, there has to be some; right?
17    Q. We don't know, in the acute phase, how much was
18 there, do we, if any? You don't know that?
19    A. For one thing, Dr. Iakovlev says that in the
20 acute phase there is no degradation. He needs a year
21 before it shows up. That's what Dr. Iakovlev says.
22       Second, as I mentioned, to degrade every single
23 fiber, every single fiber, the entire complete fiber of
24 every strand of mesh, if it had been caused by hydrogen
25 peroxide, this tissue would not be alive.

Page 57

1    Q. Well, the body regenerates tissue over time;
2 right? Is there some marker that would have been left
3 off in the pathological material -- is there some
4 marker -- had old cells been killed off by the hydrogen
5 peroxide, they wouldn't be there anymore? They would
6 have been replaced by new cells; right?
7    A. You cannot -- you don't understand. If you're
8 saying that in the acute phase there was enough hydrogen
9 peroxide there to degrade the polypropylene mesh, that
10 tissue would never have healed. It would have been --
11 there would have been enough cellular destruction and
12 acute inflammation for there to have been a gigantic
13 abscess, which does not occur.
14    Q. Abscesses don't occur in association with mesh,
15 or you're saying it didn't occur in Ms. Ruiz?
16    A. It does not occur in the vast majority, in over
17 99 percent of patients.
18    Q. But it does occur in mesh patients?
19    A. Bacterial abscesses, not due to hydrogen
20 peroxide.
21    Q. Okay. Let me mark your reliance list for
22 Ms. Ruiz Number 8.
23       (Plaintiffs' Exhibit 8 was marked for
24       identification by the court reporter.)
25 ///

Page 58

1  BY MR. AYLSTOCK:
2     Q. You recognize that document?
3     A. Yes.
4     Q. Is this a document created by counsel for
5  Ethicon and Johnson & Johnson?
6     A. Yes.
7     Q. We went over this for Ms. Loustaunau, but if
8  you'll turn to the third to the last page, there's
9  Patricia Ruiz case specific, Juan Carlos Felix, reliance
10 list.
11        Do you see that?
12    A. Yes.
13    Q. And it has deposition listed transcript of
14 Dr. Buscema and Dr. Kalota.
15        Do you see that?
16    A. Yes.
17    Q. And you never reviewed those transcripts, did
18 you?
19    A. I have not.
20    Q. So therefore, you didn't rely on them and don't
21 intend to rely on them for your opinions in this case;
22 correct?
23    A. Correct.
24    Q. There's a section as well with regard to
25 documents that you were provided a couple pages back.

Page 59

1        Do you see that?
2     A. Where it says, "Other Materials"?
3     Q. "Document Description," right after the medical
4  literature.
5     A. Yes.
6     Q. These were documents selected by Ethicon's
7  lawyers to provide to you, internal Ethicon documents; is
8  that right?
9     A. Correct.
10    Q. You didn't ask them for these documents; they
11 were sent to you?
12    A. Well, I asked them for information regarding
13 polypropylene used in TVT.
14    Q. And this is the sum total of what you were
15 provided for that; correct?
16    A. Yes.
17    Q. Did you ask them for internal documents related
18 to degradation of polypropylene in the TVT family of
19 products?
20    A. Yes.
21    Q. And did you expect them to provide all that
22 information to you?
23    A. Yes.
24    Q. The section before the "Medical Literature"
25 section, do you see that?

Page 60

1     A. The section before?
2     Q. Well, there are a large number of medical
3  literature articles.
4        Do you see that?
5     A. Yes.
6     Q. And these are articles that you reviewed in
7  preparation for your report?
8     A. Yes.
9     Q. And are there any particular articles in this
10 reliance list for Ms. Ruiz that you find pertinent to her
11 case in particular?
12    A. No.
13    Q. Same question with regard to the internal
14 Ethicon documents, any internal Ethicon document you find
15 is particularly pertinent to Ms. Ruiz's case in
16 particular?
17    A. Not in particular, no.
18    Q. The deposition of Dr. Barbolt, did you review
19 that deposition?
20       MR. THOMAS: In connection with his
21 case-specific report, I guess.
22       THE WITNESS: I don't recall.
23 BY MR. AYLSTOCK:
24    Q. Thomas A. Barbolt?
25    A. I have to look it up to refresh my memory

Page 61

1  because I did read some depositions here.
2     Q. This would have been an Ethicon corporate
3  person. He's not a treating physician.
4     A. I don't recall.
5     Q. It's fair to say, since you didn't review all
6  of the deposition transcripts, that this reliance list
7  contains things that you actually didn't rely on; fair?
8     A. You're correct.
9     Q. In your report, you state, in relation to the
10 degradation of polypropylene, you state, "There's no
11 evidence that this phenomenon occurred in vivo rather
12 than as an artifact of processing."
13       Do you see that?
14    A. Yes.
15    Q. What did you mean by that?
16    A. When tissues are processed for paraffin
17 embedding and eventual sectioning, they go through a
18 series of alcohols and organic solvents. Organic
19 solvents have been shown to degrade polypropylene.
20 Specifically xylenes have been shown to degrade
21 polypropylene, and all of these tissues have gone through
22 that processing.
23    Q. Is that what you claim is being seen in
24 Dr. Iakovlev's photomicrographs with the polarized light?
25    A. It's one of several possibilities.