# EXHIBIT 1

Christopher E. Ramsey M.D.

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                   CHARLESTON DIVISION
 3
      IN RE: ETHICON, INC.        )  Master File No.
 4    PELVIC REPAIR SYSTEM        )  2:12-MD-02327
      PRODUCTS LIABILITY          )
 5    LITIGATION                  )  MDL No. 2327
      _____ )
 6                                )
      THIS DOCUMENT RELATES TO     )  JOSEPH R.
 7    PLAINTIFFS:                  )  GOODWIN
                                   )  U.S. DISTRICT
 8    Mary Hendrix                 )  JUDGE
          Case No. 2:12-cv-00595   )
 9    Danni Laffoon                )
          Case No. 2:12-cv-00485   )
10    Alfreda Lee                  )
          Case No. 2:12-cv-01013   )
11    Mary Holzerland              )
          Case No. 2:12-cv-00875   )
12    Heather Long                 )
          Case No. 2:12-cv-01275   )
13    Donna Shepherd               )
          Case No. 2:12-cv-00967   )
14    Cheryl Lankston              )
          Case No. 2:12-cv-00755   )
15    _____
16
17
18
                        DEPOSITION OF
19
             CHRISTOPHER E. RAMSEY, M.D.
20
           Taken on behalf of the Plaintiff
21
                     April 6, 2016
22
23                     6:11 p.m.
24
```

Christopher E. Ramsey M.D.

```
 1   A P P E A R A N C E S
 2
     FOR THE PLAINTIFFS:
 3
     Nate Jones, Esquire
 4   Wagstaff & Cartmell LLP
     4740 Grand Avenue, Suite 300
 5   Kansas City, Missouri 64112
     816.701.1100
 6   njones@wcllp.com
 7
     FOR PLAINTIFF DONNA SHEPHERD:
 8
     Matthew C. Barsenas, Esquire
 9   (Present Telephonically)
     The Oliver Law Group
10   363 West Big Beaver Road, Suite 200
     Troy, Michigan 48084
11   800.939.7878
     mbarsenas@oliverlg.com
12
13   FOR PLAINTIFF CHERYL LANKSTON:
14   Dawn R. Meade, Esquire
     (Present Telephonically)
15   The Spencer Law Firm
     4635 Southwest Freeway, Suite 900
16   Houston, Texas 77027
     713.961.7770
17   dawnmeade@spencer-law.com
18
     FOR THE DEFENDANTS AND THE WITNESS:
19
     Matthew P. Moriarty, Esquire
20   Tucker Ellis, LLP
     950 Main Avenue, Suite 1100
21   Cleveland, Ohio 44113
     216.592.5000
22   matthew.moriarty@tuckerellis.com
23
24
```

Christopher E. Ramsey M.D.

```
 1              E X A M I N A T I O N
 2
                                              PAGE
 3
    Examination by Mr. Jones                      5
 4
 5
 6                 E X H I B I T S
 7
                                              PAGE
 8
    Exhibit 1   First Amended Notice to Take     25
 9              Deposition of Christopher E.
                Ramsey, M.D.
10
    Exhibit 2   Expert Report of Christopher E.  28
11              Ramsey, M.D.
12  Exhibit 3   Reliance List in Addition to     45
                Materials Referenced in Report
13              (Cheryl Lankford)
14  Exhibit 4   Curriculum Vitae               146
15  Exhibit 5   2006 Consulting Agreement -    152
                ETH.MESH.06581329 - -1340
16
    Exhibit 6   2008 Consulting Agreement -    154
17              ETH.MESH.07640373 - -0383
18  Exhibit 7   2009 Consulting Agreement -    155
                ETH.MESH.03616761 - -6724
19
    Exhibit 8   2011 Consulting Agreement -    155
20              ETH.MESH.08066506 - -6517
21  Exhibit 9   Advisory Boards -              156
                ETH.MESH.00000698 - -0705
22
    Exhibit 10  Advisory Boards -              157
23              ETH.MESH.00006951 - -6959
    Exhibit 11  Advisory Boards -              159
24              ETH.MESH.05767918 - -7924
```

Christopher E. Ramsey M.D.

1             Deposition of CHRISTOPHER E. RAMSEY,

2    M.D., taken on behalf of the Plaintiff, on

3    April 6, 2016, at Hampton Inn Suites Downtown

4    Knoxville, 618 West Main Street, Knoxville,

5    Tennessee, for all purposes under the Federal Rules

6    of Civil Procedure.

7             The formalities as to caption,

8    certificate, et cetera, are waived.  All

9    objections, except as to the form of the questions,

10   are reserved to the hearing.

11            It is agreed that Lise S. Matthews,

12   being a Notary Public and Certified Court Reporter

13   for the State of Tennessee, may swear the witness,

14   and that the reading and signing of the completed

15   deposition by the witness is waived.

16

17

18                    * * *

19

20

21

22

23

24

```
 1              CHRISTOPHER E. RAMSEY, M.D.

 2    was called as a witness, and after having been

 3    first duly sworn, testified as follows:

 4

 5    EXAMINATION BY MR. JONES:

 6        Q.      Doctor, state your name for the record.

 7        A.      Christopher Eric Ramsey.

 8        Q.      And do you understand why you're here

 9    today?

10        A.      Yes.

11        Q.      And what is your understanding of why

12    you're here today?

13        A.      I'm here to give a deposition about

14    mesh litigation.

15        Q.      Are you here to give opinions as to the

16    safety of the design of the TVT-O device?

17        A.      Yes.

18        Q.      TVT-S device?

19        A.      Yes.

20        Q.      The TVT Retropubic device?

21        A.      Yes.

22        Q.      The TVT Exact device?

23        A.      Yes.

24        Q.      The TVT Abbrevo device?
```

Christopher E. Ramsey M.D.

```
1      A.      Yes.

2      Q.      The Prolift?

3      A.      No.

4      Q.      Any Ethicon prolapse mesh products?

5      A.      No POP device.

6      Q.      Do you use Ethicon mesh POP devices?

7      A.      No.

8      Q.      Have you ever used Ethicon POP mesh

9   devices?

10     A.      No.

11     Q.      You've never used Prolift?

12     A.      No.

13     Q.      You've never used Prolift+M?

14     A.      No.

15     Q.      Have you ever considered doing any

16  consulting work for Ethicon related to Prolift+M?

17     A.      No.

18     Q.      Have you ever received any professional

19  education materials from Ethicon related to

20  Prolift+M?

21     A.      No.

22     Q.      Have you ever reviewed Prolift+M

23  professional education materials?

24     A.      No.
```

Christopher E. Ramsey M.D.

```
 1        Q.        If there are internal records at

 2   Ethicon that indicate you were involved as a

 3   consultant for Prolift+M, would you disagree with

 4   those records?

 5        A.        Yes.

 6        Q.        Have you done consulting work on all of

 7   Ethicon SUI mesh devices?

 8        A.        What do you mean by "consulting work"?

 9        Q.        You tell me what you think "consulting

10   work" means.

11        A.        I mean, I really don't know what you

12   mean.

13        Q.        How about let's limit it to in your

14   CV you list proctorships.

15        A.        Okay.

16        Q.        Have you acted as a proctor for every

17   single one of Ethicon SUI mesh devices?

18        A.        No.

19        Q.        Which ones have you acted as a proctor

20   for?

21        A.        TVT Obturator and TVT-Secur.

22        Q.        Are those the only two Ethicon mesh

23   products you've acted as a proctor for?

24        A.        Yes.
```

Christopher E. Ramsey M.D.

1     Q.     Have you done marketing events for

2   Ethicon related to Ethicon mesh products?

3     A.     I guess what do you mean by "marketing

4   events"?

5     Q.     You don't understand what the term

6   "marketing event" means?

7     A.     Well, I mean, it could mean a lot of

8   things.  But I'm just wondering what you mean

9   specifically by marketing event.  Do you mean,

10   like, doing a dinner presentation?  I mean, I don't

11   know what you mean.

12     Q.     Would you include a dinner presentation

13   under the definition of a marketing event?

14     A.     I would.

15     Q.     Okay.

16     A.     But I've not done that.

17     Q.     Okay.  You've never done a dinner

18   event --

19     A.     Not a dinner event, no.

20     Q.     -- for Ethicon?

21     A.     No.

22     Q.     Not once?

23     A.     I haven't presented one.  I've been to

24   one where I've listened to other people speak, but

Christopher E. Ramsey M.D.

1    I've never presented at an Ethicon dinner event.

2        Q.      How many Ethicon dinner events have you

3    been to?

4        A.      A handful, maybe five.

5        Q.      You've never given one, correct?

6        A.      No.

7        Q.      Have you been asked to give a dinner

8    event presentation by Ethicon?

9        A.      I don't remember being asked to give a

10   dinner event.

11       Q.      Have you ever done any marketing events

12   for Ethicon related to the mesh products?

13              MR. MORIARTY:  Objection.

14              Go ahead.

15              THE WITNESS:  Yeah.  I'm -- I'm just

16   trying to think back if I've done -- that's why I'm

17   pausing.

18              The only marketing event that I would

19   consider doing that would be marketing for them

20   would be to go with the representative -- the

21   device representative and discuss it with an OB/GYN

22   or another urologist at his office or maybe in the

23   operating room, is the closest I would think I've

24   done any marketing for them.

Christopher E. Ramsey M.D.

1    BY MR. JONES:

2       Q.      Okay.  Can you think of any consulting

3    work you've done for Ethicon outside of

4    proctorships?

5       A.      Specifically with mesh?

6       Q.      Correct.

7       A.      Other than going to the dinners myself,

8    that I've directed and I've been responsible for, I

9    have not.

10      Q.      You've been responsible for directing

11   dinner events?

12      A.      No.  I've not been responsible for

13   directing --

14      Q.      So --

15      A.      I've been -- I've been to them where

16   other physicians have spoken and given their data.

17      Q.      Okay.  Let me break this down.

18              You've attended a handful of dinner

19   marketing events held by Ethicon, correct?

20      A.      Right.

21      Q.      You have in your role as a consultant

22   for Ethicon acted as a proctor for TVT-S and TVT-O,

23   correct?

24      A.      Correct.

Christopher E. Ramsey M.D.

1      Q.      How many proctor events for TVT-O and

2  TVT-S have you done for Ethicon?

3      A.      Between 15 to 20, that I remember.

4      Q.      Fifteen to 20 total events you've done

5  for Ethicon in your role as a consultant physician,

6  correct?

7      A.      Probably.

8      Q.      Over what time period did you perform

9  these 15 to 20 events for Ethicon in your role as a

10  consultant physician?

11     A.      Probably from 2005 to 2010 or '11,

12  maybe.

13     Q.      Fair to say from 2005 to 2011, you were

14  a consultant physician for Ethicon?

15     A.      Yes.

16     Q.      Fair to say from 2005 to 2011, you

17  would have signed a contract dictating the terms of

18  your consulting agreement with Ethicon?

19     A.      Yes.

20     Q.      Fair to say that between the years 2005

21  to 2011 you would have been under contract as a

22  consultant for Ethicon?

23     A.      Yes.

24     Q.      Fair to say from 2005 to 2011 you would

Christopher E. Ramsey M.D.

1    have received payments from Ethicon in your role as

2    a consultant physician?

3        A.        When I did a proctoring event, I would,

4    yes.

5        Q.        Okay.  So from 2005 to 2011, you got

6    paid for each event that you did for Ethicon in

7    your role as a consultant physician, correct?

8        A.        Yes.

9        Q.        When you were paid for these events,

10   were you paid directly by Ethicon?

11       A.        Yes.

12       Q.        So Ethicon issued a check made out to

13   Dr. Chris Ramsey, correct?

14       A.        Right.

15       Q.        As you sit here today, can you tell us

16   the total amount that you were paid by Ethicon in

17   your role as a consultant physician?

18       A.        It would be a complete guess.  I

19   probably did maybe half observations, where they

20   would pay me $500 for an observation, where someone

21   would come and watch me, and then the other half,

22   maybe, you know, ten -- I think they would pay me

23   $1,500 for a proctor -- for actually proctoring,

24   when I'd go on site and proctor the physician.

Christopher E. Ramsey M.D.

```
1        Q.      Okay.  I'm just trying to get the

2   totality of your consulting --

3        A.      Right.

4        Q.      -- events.

5                Fifteen to 20 proctors -- proctorships.

6                How many observations?

7        A.      Probably about half and half.  So I

8   would say probably close to $20,000 total between

9   those years, maybe 5,000 for the -- if I did ten

10  observations, that's 5,000, right?  And then, if I

11  did ten proctor, that would be 15,000.

12       Q.      Okay.

13       A.      That's a complete, you know --

14       Q.      Complete guess, right?

15       A.      Well, it's accurate -- close, but. . .

16       Q.      Yeah.  Just want to focus on the

17  events, not the payments.  So 15 to 20 proctorship

18  events for Ethicon in your role as a consultant

19  physician, correct?

20       A.      Right.

21       Q.      How many observations?

22       A.      Probably about ten.

23       Q.      In addition to the 20 -- 15 to 20 --

24       A.      No, no.  That's total.  So that's why I
```

Christopher E. Ramsey M.D.

1    said earlier ten proctor- -- ten observations and

2    then maybe ten proctorships.

3        Q.        How many times total do you think

4    Ethicon paid you for an event?

5        A.        Like I said, 15 to 20 times, probably.

6        Q.        Did you ever serve on any advisory

7    boards for Ethicon?

8        A.        No.  Not --

9        Q.        No?

10       A.        No.

11       Q.        Ethicon ever ask you to serve on any

12   advisory boards?

13       A.        No.

14       Q.        Ever serve on any product review

15   committees --

16       A.        No.

17       Q.        -- for Ethicon?

18       A.        No committees, no.

19       Q.        Ethicon ever ask you to serve on any

20   product review committees?

21       A.        No.

22       Q.        Ever serve on any product design

23   committees for Ethicon?

24       A.        No.

Christopher E. Ramsey M.D.

1        Q.        Ever serve on any IFU committees for

2    Ethicon?

3        A.        No.

4        Q.        Ethicon ever ask you to serve on any

5    IFU committees?

6        A.        No.

7                  MR. MORIARTY:  Objection.

8                  Go ahead.

9    BY MR. JONES:

10       Q.        Ethicon ever ask you to serve on any

11   product design committees?

12                 MR. MORIARTY:  Objection.

13                 Go ahead.

14                 THE WITNESS:  No.

15   BY MR. JONES:

16       Q.        Sounds like -- is it fair to say for a

17   six-year period you were a consultant physician for

18   Ethicon?

19       A.        Yes.

20       Q.        And during that six-year period,

21   Ethicon never approached you to serve on any

22   advisory boards or product review committees,

23   correct?

24                 MR. MORIARTY:  Objection.

Christopher E. Ramsey M.D.

```
 1                THE WITNESS:  Right, correct.

 2    BY MR. JONES:

 3        Q.      Did they ever ask you -- did Ethicon

 4    ever ask you to provide input into drafting any

 5    IFUs?

 6        A.      No.

 7        Q.      Did Ethicon ever ask you to provide any

 8    input into assisting with any department at Ethicon

 9    in drafting IFUs?

10        A.      No.

11        Q.      Did Ethicon ever ask you to help design

12    any of their mesh products?

13        A.      No.

14        Q.      Ethicon ever ask you to do a

15    risk/benefit analysis on any of their mesh

16    products?

17        A.      No.

18        Q.      When did you first become certified in

19    urology, board certified?

20        A.      Board certified in 2004, is when my

21    board certification took place.

22        Q.      When is the first time you put in a

23    transvaginal mesh product?

24        A.      Probably around 2000, in residency.
```

Christopher E. Ramsey M.D.

1      Q.       When is the first time you put in a TVT

2   mesh product?

3      A.       Same time.

4      Q.       TVT the first mesh you put in?

5      A.       Uh-huh, yes.

6      Q.       Ever use POP mesh, period?

7      A.       No.

8      Q.       Never?

9      A.       Never.

10     Q.       Always native tissue repair for POP?

11     A.       I don't treat POP.

12     Q.       You don't treat POP?

13     A.       Huh-uh.  In residency we did some

14   cystocele repairs, and most of it were just Kelly

15   plications.

16     Q.       Okay.  Since residency you've never

17   treated pelvic organ prolapse, correct?

18     A.       No.

19     Q.       That's not correct?

20     A.       No, that is correct.  I'm sorry.  I

21   have not treated -- I have not treated pelvic organ

22   prolapse.  Thank you.

23     Q.       Sorry.  That's my fault.

24              What was the first mesh product you

Christopher E. Ramsey M.D.

1    used after your residency?

2        A.        The TVT Retropubic.

3        Q.        When is the first time you used TVT

4    Retropubic as a practicing physician?

5        A.        Probably 2002, when I was out of

6    residency.

7        Q.        2004, you become board certified in

8    urology, correct?

9        A.        Correct.

10       Q.        When did Ethicon first approach you to

11   be a consultant for them?

12       A.        Probably 2003.  If -- probably around

13   2005.

14       Q.        Okay.

15       A.        They wouldn't have -- too new in 2003.

16   They probably wouldn't have asked me then.

17       Q.        Because you weren't board certified in

18   urology?

19       A.        Well, I wasn't board certified.  I just

20   hadn't been as -- wasn't as experienced.  I hadn't

21   done as many at that point.

22       Q.        How many had you done when they first

23   approached you to be a consultant?

24       A.        Around maybe 100 total, including TVT-O

Christopher E. Ramsey M.D.

1    and TVT Retropubic.  I probably did -- I didn't do

2    very many TVT Retropubics total, including in

3    residency and private practice.  So between 25 to

4    50 Retropubics ever.  And I haven't done one of

5    those in several -- years.

6       Q.      Okay.  We'll get to that later.

7       A.      Okay.

8       Q.      At 2000- -- in 2005, you had implanted

9    around 100 TVT mesh products, correct?

10      A.      Correct.

11      Q.      In 2005, Ethicon approached you to be a

12   consultant physician for them, correct?

13      A.      Right.

14      Q.      So a year after you became board

15   certified in urology, you were a consultant

16   physician for Ethicon related to transvaginal mesh

17   products, correct?

18      A.      Repeat the question again.

19      Q.      One year following -- a year after you

20   became board certified in urology, you signed a

21   contract to be a consultant physician for Ethicon

22   related to transvaginal mesh products?

23      A.      Probably.

24      Q.      What percentage of your practice is

Christopher E. Ramsey M.D.

1    relating to treating males?

2    A.      Now it's probably 70 percent.

3    Q.      Currently 70 percent of your practice

4    relates to treating males?

5    A.      Yes.

6    Q.      Do you know whether you're one of the

7    most prolific users of the da Vinci robot system in

8    the United States or not?

9    A.      I think I am.

10   Q.      What procedures do you use the da Vinci

11   robot system for?

12   A.      Prostatectomy, nephrectomy, partial

13   nephrectomy, nephroureterectomy, pyeloplasty,

14   ureteral reimplantation.

15   Q.      Do any of those procedures relate to

16   the treatment of females?

17   A.      Yes.

18   Q.      Which ones?

19   A.      Pyeloplasty, nephrectomy, partial

20   nephrectomy, nephroureterectomy, reimplantation,

21   fistula.

22   Q.      Any of those relate to treating stress

23   urinary incontinence?

24   A.      No.

Christopher E. Ramsey M.D.

1    Q.     What percentage of your practice is

2  related to performing surgeries with the da Vinci

3  robot surgery or da Vinci robot device?

4    A.     As far as my surgical practice,

5  probably 40 to 50 percent.

6    Q.     Half of your surgical practice --

7    A.     Maybe not quite half.  About 40

8  percent.

9    Q.     Forty percent of your surgical practice

10  is related to use of the da Vinci robot system,

11  correct?

12    A.     Yes.

13    Q.     So close to half of your surgical

14  practice has nothing to do with stress urinary

15  incontinence, correct?

16    A.     Yes.

17    Q.     Seventy percent of your practice does

18  not relate to treating females, correct?

19    A.     Yes.

20    Q.     Do you use mesh today, transvaginal

21  mesh?

22    A.     Yes.

23    Q.     What transvaginal mesh do you use

24  currently?

Christopher E. Ramsey M.D.

1      A.       Currently I'm using MiniArc-Precise.

2      Q.       When is the last time you implanted a

3  female patient with MiniArc-Precise?

4      A.       Monday.

5      Q.       When is the last time you used a

6  Ethicon mesh product?

7      A.       Probably 2013.

8      Q.       Fair to say it's been over two years

9  since you've used an Ethicon mesh product?

10     A.       Yes.

11     Q.       What was that product you used in

12  2000 --

13     A.       TVT Abbrevo.

14     Q.       Have you used TVT Exact?

15     A.       I've not.

16     Q.       When is the last time you used TVT-O?

17     A.       2013.

18     Q.       You made a qualification earlier about

19  your consulting work, whether it was related to

20  mesh or not.

21               Have you done consulting work for

22  Ethicon outside of transvaginal mesh?

23     A.       Yes.

24     Q.       Okay.  Tell me more about it.

Christopher E. Ramsey M.D.

1      A.      The hand assist device that they --

2   that they have, I've used in the past and helped

3   train physicians for their hand-assisted

4   nephrectomies, laparoscopic hand-assisted

5   nephrectomies.

6      Q.      Okay.

7      A.      Lap-Disc.

8      Q.      Lap-Disc.

9      A.      And then I also use -- I think Ethicon

10  does the Harmonic Scalpel.  I'm pretty sure they

11  do.  So I've trained physicians on the Harmonic

12  Scalpel, too.  That's been a while.

13     Q.      What years?

14     A.      Probably 2003 until they didn't need me

15  anymore, '05, probably, '06.

16     Q.      From 2003 to 2006, in addition to your

17  consulting work for Ethicon related to transvaginal

18  mesh, you also did consulting work on two other

19  Ethicon mesh -- or two other -- on Ethicon -- two

20  other Ethicon devices, correct?

21     A.      Yes.

22     Q.      Were you paid for that consulting work

23  as well?

24     A.      Yes.

Christopher E. Ramsey M.D.

1      Q.      Do you recall how much you were paid

2   for that consulting work?

3      A.      $1,500, I think, for each case.

4      Q.      Did you bring any records with you

5   today that would indicate how much you've been paid

6   by Ethicon?

7      A.      I could not find many records.  I

8   brought one 1099, and I looked back in my records

9   at home until 2006, and I couldn't find any other

10   1099 forms.  I'm sure they're around somewhere.

11     Q.      Did you ask Ethicon?

12     A.      I did not ask Ethicon.  I asked my

13   accountant, and he did not find any.

14     Q.      Does your accountant know how much you

15   have been paid by Ethicon?

16     A.      I'm sure he does.

17     Q.      Did you ask him?

18     A.      I asked him to find the 1099s.

19     Q.      You didn't ask him the amount, though?

20     A.      No.

21     Q.      If you did, he or she would know that

22   amount pretty easily, though, correct?

23     A.      I asked him to find the 1099s.  He

24   couldn't find them, so I don't know if he'd be able

Christopher E. Ramsey M.D.

1    to find them easily or not.  Probably take some

2    research and digging out.  I'm not an accountant,

3    so I don't know how he keeps his records.

4        Q.      Fair enough.  Fair enough.

5        A.      Yeah, sorry.

6        Q.      All right.  I tried to do us both a

7    favor.  I premarked some exhibits for the record.

8        A.      Okay.

9                (Whereupon Exhibit 1 was marked as an

10   exhibit.)

11   BY MR. JONES:

12       Q.      Exhibit 1 is the first amended notice

13   to take your deposition.  Only going to ask you a

14   couple questions about this.

15               Have you seen this document before?

16       A.      No.

17       Q.      Okay.

18               MR. MORIARTY:  Well, he's seen a

19   version of the notice.

20               THE WITNESS:  I haven't seen this one

21   because there's names on here that I don't

22   recognize.

23   BY MR. JONES:

24       Q.      Got it.  Turn to page 7.

Christopher E. Ramsey M.D.

```
1        A.       (Witness complies.)

2        Q.       Look under the heading "Schedule A."

3        A.       Okay.

4        Q.       Have you seen those before?

5        A.       Yes.

6        Q.       Okay.  Did you bring your current CV

7   with you today?

8        A.       Yes.

9        Q.       Do you have that?

10              MR. MORIARTY:  Well, that was produced.

11              MR. JONES:  Got it.  Just want to make

12   sure the one that was --

13              THE WITNESS:  Yeah.  It's up to date.

14              MR. JONES:  Got it.

15              MR. MORIARTY:  Obviously, Nate, there

16   was a document filed with the Court objecting to

17   the notice of depo, basically saying the CV's been

18   produced, the --

19              MR. JONES:  "We're not bringing

20   anything."

21              MR. MORIARTY:  -- the reliance list has

22   been produced, et cetera.

23              MR. JONES:  Got it.  Got it.  Okay.

24   BY MR. JONES:
```

Christopher E. Ramsey M.D.

```
1        Q.       And turn to page 8.

2        A.       Uh-huh.

3        Q.       Under heading Number 9, 9(c), "Identify

4   assumptions that Plaintiff's counsel provided you

5   and that you relied on in forming your opinions."

6                 Will you identify any assumptions that

7   you're relying on in forming your opinions in this

8   litigation?

9                 MR. MORIARTY:  Objection.

10                Go ahead and answer if you can.

11                THE WITNESS:  I don't think that I've

12  had any assumptions that counsel has given me to

13  make my opinions.  So I don't think there's

14  anything to provide.

15  BY MR. JONES:

16       Q.       Okay.  Did you bring anything with you

17  today?

18       A.       I brought several boxes -- not all the

19  boxes I have, but several boxes.

20       Q.       Okay.  You brought some of the boxes.

21                What are in those boxes?

22       A.       The boxes that I have here relate to

23  TVT and TVT-O and TVT-Secur, some internal records,

24  studies that have been done on the procedures.
```

Christopher E. Ramsey M.D.

1                    MR. JONES:  Okay.  We'll probably get

2     into those tomorrow.  It's under Exhibit 2.

3                    I'm done with Exhibit 1.

4                    (Whereupon Exhibit 2 was marked as an

5     exhibit.)

6     BY MR. JONES:

7         Q.      Doctor, is this your first deposition?

8         A.      No.

9         Q.      When have you been deposed before?

10        A.      I was deposed in a suit where I was an

11    expert for defense for a PSA case that did not go

12    to court.  I was deposed in --

13        Q.      What's a PSA case?

14        A.      Prostate-specific antigen, prostate

15    cancer case.

16        Q.      So you were an expert in a prostate

17    matter, correct?

18        A.      Correct.

19        Q.      Did that case have anything to do with

20    transvaginal mesh?

21        A.      No.

22        Q.      Does that case have anything to do with

23    stress urinary incontinence?

24        A.      No.

Christopher E. Ramsey M.D.

1      Q.        It sounds like that case had nothing to

2   do with women's health?

3      A.        No.

4      Q.        Any other depositions?

5      A.        Deposition in a lawsuit against my

6   partner and myself in a radical nephrectomy that

7   had complications.

8      Q.        Is that it?

9      A.        As far as depositions?

10               And I was deposed in residency for a

11   radial nerve injury or something like that.

12               And I was also deposed in a case where

13   a patient had an accident in our office -- wasn't

14   my patient -- and -- and so they deposed me in that

15   case.

16      Q.        How many times have you been sued for

17   malpractice?

18      A.        Once.

19      Q.        When was that?

20      A.        '05.

21      Q.        What was that for?

22      A.        That was for the radical nephrectomy

23   case.  I was an assistant.

24      Q.        Do you know how many of your patients

Christopher E. Ramsey M.D.

1    that you've implanted transvaginal mesh with are

2    currently plaintiffs in the MDL for transvaginal

3    mesh in the United States District Court for West

4    Virginia, Southern District?

5        A.      I don't know.

6        Q.      So you have no idea how many of your

7    patients that you've implanted transvaginal mesh

8    with currently have filed a lawsuit?

9        A.      No.

10       Q.      Have you ever attempted to figure that

11   out?

12       A.      No.

13       Q.      Never made any effort to find out which

14   one of your patients have filed lawsuits?

15       A.      It would be a research in futility to

16   find that out.

17       Q.      That's a no, correct?

18       A.      That's a no.

19       Q.      Okay.  Have you ever acted as a

20   litigation expert witness prior to today?

21       A.      I've -- I've been a litigation expert

22   witness in I think two other cases that I was never

23   deposed -- in which I was never deposed.

24       Q.      What cases are those?

Christopher E. Ramsey M.D.

1      A.      They were two TVT cases, one in 2014

2  and one in 2015.

3      Q.      Where were those cases?

4      A.      I'm not sure where they were.  I was

5  just asked to review charts and -- and medical

6  records.

7      Q.      Do you remember the patients' name?

8      A.      One was -- and I may get this wrong,

9  but Rabiola, I believe, R-a-b-i-o-l-a, Rabiola, and

10  then there's a Williams.  And I can't remember

11  which one was 2014 or 2015.

12      Q.      Okay.  Outside of those two cases, have

13  you ever acted as a expert in any capacity,

14  litigation expert witness in any capacity

15  whatsoever?

16      A.      Just the PSA case.

17      Q.      What year was that, the PSA case?

18      A.      Maybe 2010.

19      Q.      Okay.  Other than Ethicon asking you

20  to act as a litigation expert witness starting

21  in 2014, has any other transvaginal mesh company

22  asked you to act as a litigation expert witness?

23      A.      No.

24      Q.      Has any other medical device company

Christopher E. Ramsey M.D.

```
 1    other than Ethicon asked you to act as a expert in

 2    any capacity --

 3        A.      No.

 4        Q.      -- on --

 5        A.      Sorry.

 6        Q.      That's fine.

 7                Other than Ethicon, has any medical

 8    device company asked you to act as an expert in any

 9    capacity, whether inside litigation or outside of

10    litigation?

11        A.      No.

12        Q.      And that includes transvaginal mesh

13    products, correct?

14        A.      Yes.

15        Q.      That includes medical devices for the

16    treatment of stress urinary incontinence, correct?

17        A.      Yes.

18        Q.      Have you ever acted as a consultant

19    physician for any other mesh companies besides

20    Ethicon?

21        A.      Say that one more time.  I'm sorry.

22        Q.      Have you acted as a consultant

23    physician for a mesh company besides Ethicon?

24        A.      Yes.
```

Christopher E. Ramsey M.D.

1      Q.      Who?

2      A.      AMS, and then Astora, when they became

3   Astora.

4      Q.      In addition to your consultant

5   physician work you did for Ethicon, you also did

6   consulting physician work for AMS as well, correct?

7      A.      Yes.

8      Q.      Other than AMS and Ethicon, any other

9   mesh companies?

10     A.      No.

11     Q.      Okay.  When did you start doing

12   consulting work for AMS?

13     A.      2012.  Maybe 2013.  2012 or 2013.

14     Q.      Okay.  In 2012 or 2013 you started

15   performing consulting work for AMS, correct?

16     A.      Yes.

17     Q.      Related to transvaginal mesh, correct?

18     A.      Yes.

19     Q.      Are you still currently a consultant

20   for AMS?

21     A.      I don't think so.  They've disbanded

22   Astora, so if it is a consulting agreement, I think

23   it's null and void now.

24     Q.      Okay.

Christopher E. Ramsey M.D.

```
1       A.      As of April 1st.

2       Q.      When is the last contact you had with

3   AMS or Astora?

4       A.      At the beginning of March.

5       Q.      March?

6       A.      2016.

7       Q.      2016.  What was the nature of that

8   contact?

9       A.      To tell me that they were dissolving

10  Astora.

11      Q.      To tell you they were going to stop

12  selling --

13      A.      Yes.

14      Q.      -- the mesh products?

15      A.      Yes.

16      Q.      You put in an AMS mesh product on

17  Monday, correct?

18      A.      Astora.

19      Q.      Astora.  Yeah.  If I accidentally use

20  "AMS" --

21      A.      That's fine.

22      Q.      -- and "Astora" interchangeably, you

23  know what I'm saying.

24              All right.  So you -- AMS or Astora
```

Christopher E. Ramsey M.D.

1    calls you in the beginning of March 2016 to notify

2    you they would no longer be selling transvaginal

3    mesh products, correct?

4        A.    Yes.

5        Q.    Just on Monday, you implanted a patient

6    with an AMS or Astora transvaginal mesh product,

7    correct?

8        A.    Yes.

9        Q.    When is AMS or Astora ceasing

10   commercialization of their transvaginal mesh

11   products?

12       A.    From my understanding, March 31st, they

13   stopped distributing any -- any product.

14       Q.    So the product, that AMS or Astora

15   transvaginal mesh product you put in on Monday, was

16   already sold to the hospital, correct?

17       A.    Yes.

18       Q.    And it was sitting there already in the

19   inventory, and that's why you were able to use it?

20       A.    Yes.

21       Q.    Okay.  Are you going to still use the

22   remaining inventory of AMS mesh products?

23       A.    Until they're gone.

24       Q.    Until they're gone?

Christopher E. Ramsey M.D.

1      A.      Yes.

2      Q.      Okay.  I take it AMS, when they

3   communicated to you in that phone -- was it a phone

4   call?

5      A.      Yes.

6      Q.      AMS communicated to you in a phone

7   call, I take it they stand by the safety of the AMS

8   MiniArc-Precise, correct?

9      A.      Yes.

10     Q.      And that's why you feel comfortable

11  still using it?

12     A.      That, and because it works very well in

13  my hands.

14     Q.      Okay.

15     A.      And, yes, it's very safe.

16     Q.      Are there any differences between

17  the mesh used by AMS and the mesh used by Ethicon

18  in transvaginal mesh products?

19     A.      Not that I'm aware of.  There may be --

20  well, so, yes, there are differences in pore sizes

21  and I'm not sure about the width -- honestly, I

22  don't know what the width of the MiniArc-Precise

23  is.  But in all intents and purposes in my clinical

24  use, I consider it the same.

Christopher E. Ramsey M.D.

1      Q.      You as a physician considered the mesh

2   used by AMS and the mesh used by Ethicon the same,

3   correct?

4      A.      Yes.

5      Q.      You do know that there is a difference

6   in pore size, correct?

7      A.      Yes.

8      Q.      You know that the AMS meshes has larger

9   pore size than the TVT mesh, correct?

10     A.      I'm not certain.  I don't know.  I --

11   I -- I don't know what the AMS mesh pore size is.

12   I think the -- the TVT mesh is larger.

13     Q.      Okay.

14     A.      The mesh pore size is larger.

15     Q.      It's your opinion as you sit here today

16   that the TVT mesh has larger pores than the AMS --

17     A.      Yes.

18     Q.      -- products you use, correct?

19     A.      Yes.

20     Q.      Is there a difference in the weight of

21   the mesh used in the --

22     A.      I think --

23     Q.      -- TVT devices and the AMS mesh that

24   you've used?

Christopher E. Ramsey M.D.

1      A.       I think the mesh weight is, if not the

2    same, very similar.

3      Q.       So you don't know whether the mesh used

4    by AMS in the products you use is lighter than the

5    mesh used by Ethicon in the TVT products, correct?

6      A.       I'm not certain of the exact weight of

7    the --

8      Q.       You don't know whether it's less dense,

9    correct?

10     A.       No.

11     Q.       Which -- is the mesh used by AMS softer

12   than the mesh used by Ethicon in the TVT products?

13     A.       They've always felt very similar to me.

14     Q.       You can't ascertain any difference in

15   the softness?

16     A.       No.

17     Q.       Can you ascertain any difference in the

18   stiffness?

19     A.       No.

20     Q.       Can you ascertain any difference in the

21   tensioning of the devices?

22     A.       I tension them the same.  The TVT-Secur

23   and the MiniArc-Precise, I tension the same.

24     Q.       How about the rest of the TVT products?

Christopher E. Ramsey M.D.

1       A.      The tensioning is different for the

2   TVT-O and the TVT Retropubic than the TVT-Secur.

3       Q.      Okay.  Explain that.

4       A.      The TVT Obturator and the TVT

5   Retropubic require less tensioning than the

6   TVT-Secur.

7       Q.      What do you mean by "less tensioning"?

8       A.      When I tension a TVT-O or a TVT-Secur,

9   I actually use a clamp, a small clamp, to isolate

10  about 10 millimeters of mesh so that when I pull

11  the sheath off there's actually a gap between the

12  mesh and the urethra.

13          And when I do a TVT-Secur -- when I did

14  a TVT-Secur and when I do a MiniArc-Precise, I do a

15  tension-free tensioning, but it -- it is touching

16  the urethra.

17      Q.      Okay.

18      A.      So there's no gap between the urethra

19  and the mesh.

20      Q.      You place more tension on the mesh when

21  you place a TVT-Secur than you do when you place a

22  TVT Retropubic or TVT Obturator, correct?

23      A.      Correct.

24      Q.      Fair to say when you place a TVT-O or

Christopher E. Ramsey M.D.

```
 1    TVT-R, there is less tension placed on the mesh

 2    than when you place a TVT-S?

 3       A.      Yes.

 4       Q.      Is there still -- have you seen in

 5    some documents, is there still a degree of

 6    tension placed on the mesh when you place a TVT

 7    Retropubic or a TVT Obturator?

 8       A.      I don't think there's any tension on

 9    it.  I think it lays right up against the urethra.

10    You don't want tension on it to kink -- potentially

11    kink the urethra and potentially cause an

12    obstruction.

13       Q.      Okay.  How about minimal tension?

14       A.      I wouldn't --

15             MR. MORIARTY:  Object to form.

16             THE WITNESS:  I wouldn't call it

17    "minimal tension."  I would call it still "tension

18    free."

19    BY MR. JONES:

20       Q.      Would you disagree with Ethicon

21    documents that instruct surgeons to place the mesh

22    with minimal tension?

23             MR. MORIARTY:  Objection.  Form.  Which

24    mesh are you talking about?
```

Christopher E. Ramsey M.D.

1    BY MR. JONES:

2        Q.      TVT-R, TVT-O.

3              MR. MORIARTY:  Form.

4              THE WITNESS:  Say that again, please.

5    BY MR. JONES:

6        Q.      Would you disagree with a Ethicon

7    document communicating to surgeons to place the

8    TVT-O or TVT-R mesh with minimal tension?

9        A.      I would say that is minimal tension.

10       Q.      Okay.  So you would agree with that?

11       A.      Yes.

12       Q.      AMS, is the mesh you use with AMS

13   laser-cut or mechanical-cut mesh?

14       A.      I believe it's laser cut, but I can't

15   say that with 100 percent certainty.

16       Q.      Are the edges of the mesh with AMS as

17   compared to the edges in the mesh to the TVT

18   products softer?

19       A.      I think they're very similar.

20       Q.      Softer at all?

21       A.      Similar.  The same.

22       Q.      So you can't tell any difference in the

23   edges of the mesh?

24       A.      I have never noticed that when I've

Christopher E. Ramsey M.D.

1    been placing them in there.

2        Q.      Does the AMS mesh have a -- any product

3    features that assist the physician in tensioning

4    the mesh?

5        A.      Compared to the TVT-Secur?

6        Q.      Absolutely.

7        A.      I think that they're similar devices to

8    help tension the mesh.  So I think it's -- I think

9    they're similar as far as tensioning.

10       Q.      Okay.  As you sit here today, you can't

11   list any mesh -- unique mesh characteristic of the

12   AMS mesh that assists the surgeon in tensioning the

13   mesh?

14       A.      Of the mesh itself?  No.  There's no --

15   no difference in the mesh in its -- in tensioning.

16       Q.      No difference in any product design

17   features that would affect tensioning of the mesh

18   between AMS mesh and TVT mesh, correct?

19               MR. MORIARTY:  Objection.  Are you just

20   talking about mesh or tools?

21   BY MR. JONES:

22       Q.      Just the mesh.

23       A.      Not with the mesh.  The mesh is --

24   there's no difference between the mesh as far as

Christopher E. Ramsey M.D.

1     assisting me with tensioning one way or the other.

2          Q.     Okay.  All right.  Let's get back to

3     these exhibits.

4                  Exhibit 2.  Tell us what Exhibit 2 is,

5     Doctor.

6          A.     Looks like my general report, I

7     believe.

8          Q.     And this is your general expert report

9     related to Wave 1 TVT cases, correct?

10         A.     Yes.

11         Q.     And you drafted this report, correct?

12         A.     Yes.

13         Q.     Did you type this report?

14         A.     I dictated this report.

15         Q.     And what do you mean by "dictated"?

16         A.     I dictated it and someone else typed

17    it.

18         Q.     Okay.  So these are your words?

19         A.     Yes.

20         Q.     How long did you spend drafting this

21    report?

22         A.     Oh, gosh.  I -- I'd have to look back

23    at my records to find out exactly how long, but

24    more than ten hours --

Christopher E. Ramsey M.D.

1    Q.      Okay.

2    A.      -- probably.

3    Q.      Put you down for more than ten hours --

4    A.      Ten to 12 hours.

5    Q.      -- ten to 12 hours drafting your expert

6    general report, correct?

7    A.      Yes.

8    Q.      Okay.  Are there any other general

9    expert reports that we don't know about?

10   A.      No.

11   Q.      This is it?

12   A.      Yes.

13   Q.      The only one you drafted, correct?

14   A.      Yes.

15   Q.      What products does this general expert

16   report that you drafted cover?

17           MR. MORIARTY:  Objection.

18           Go ahead.

19           THE WITNESS:  TVT Obturator, TVT-Secur,

20   and TVT Retropubic are the ones I talk about in

21   here.

22   BY MR. JONES:

23   Q.      Okay.  You mentioned earlier TVT Exact.

24           You haven't used TVT Exact, correct?

Christopher E. Ramsey M.D.

```
 1      A.      Yes.  That's correct.

 2      Q.      Are you going to be offering opinions

 3   in this litigation as to the safety of the TVT

 4   Exact?

 5      A.      Not that I know of.

 6      Q.      Okay.  How about TVT Abbrevo?

 7      A.      Not that I know of.

 8      Q.      How about TVT-Secur?

 9      A.      Yes.

10      Q.      TVT-R?

11      A.      Yes.

12      Q.      TVT-O?

13      A.      Yes.

14              MR. JONES:  All right.  Exhibit 3.

15              (Whereupon Exhibit 3 was marked as an

16   exhibit.)

17   BY MR. JONES:

18      Q.      Take a look at that.  Tell us what

19   Exhibit 3 is.

20      A.      This is my reliance list.  And it's

21   specifically for Cheryl Lankston, but I think it's

22   basically the reliance list I've used for all my

23   reports.

24      Q.      Okay.  And did you draft this reliance
```

Christopher E. Ramsey M.D.

1    list?

2         A.        I assisted with the drafting of this

3    list.

4         Q.        Okay.  How did you assist in drafting

5    this list?

6         A.        The -- the Ethicon lawyers helped me

7    with -- with some -- some of this.

8         Q.        Okay.  What is your understanding of

9    what's included in the reliance list --

10        A.        These are --

11        Q.        -- marked as Exhibit 3?

12        A.        These are studies and documents that I

13   used to make my list -- I'm sorry -- make my expert

14   reports.

15        Q.        How long did you spend reviewing the

16   materials listed in your reliance list?

17        A.        Oh, gosh.  I continue to do it,

18   continue to review them.  But probably 30 or 40

19   hours.

20        Q.        You're continuing to review those

21   materials, correct?

22        A.        Yes.

23        Q.        So, as of today, you have not reviewed

24   every single one of the materials listed in your

Christopher E. Ramsey M.D.

```
1    reliance list, correct?

2         A.      I have reviewed all of them.  I may not

3    have read every single word in every one of them,

4    but I've reviewed them and looked at them.

5         Q.      Every single one of the items listed on

6    your reliance list --

7         A.      To the best of my knowledge.

8         Q.      -- marked as Exhibit 3, you have

9    actually taken a look at and reviewed, correct?

10        A.      To the best of my knowledge.

11        Q.      Okay.  And if it's not listed -- if an

12   item is not listed on Exhibit 3, your reliance

13   list, then it's an item that you have not reviewed

14   in preparation for your report and your opinions in

15   this case, correct?

16        A.      I probably have reviewed other things

17   that are not on this list that -- that I have

18   reviewed.

19        Q.      Okay.

20        A.      I cannot tell you the exact documents

21   that I may have looked at.

22                You know, for sure I've looked at

23   Campbell's "Urology," other well-known -- excuse

24   me -- books and volumes on urology.
```

Christopher E. Ramsey M.D.

1    Q.       Anything stand out as something that

2    doesn't appear in this reliance list as something

3    you're going to be relying on for your opinions in

4    this litigation that we're not going to know about

5    that's not on this list?

6    A.       Not off the top of my head.

7    Q.       Okay.

8               MR. MORIARTY:  Just for clarification,

9    Nate, are you just talking about the general part

10   or are you including the case-specific parts, too?

11              MR. JONES:  General.

12              MR. MORIARTY:  Okay.

13   BY MR. JONES:

14   Q.       I assume case specific you also

15   reviewed medical records as well?

16   A.       Yes.

17   Q.       And did you do any additional review

18   for the case-specific portions?

19   A.       Medical records?  Or of documents

20   relating just to the mesh in general?

21   Q.       Well, let me break it up.

22   A.       Medical records to me seem more

23   specific to the individual case.

24   Q.       Yeah.  So in those case specific, where

Christopher E. Ramsey M.D.

1    you were offering causation opinions in the

2    specific cases, you reviewed medical records as

3    well?

4        A.      Yes.

5        Q.      And so if we look at the medical

6    records you looked at and we look at the

7    reliance list marked as Exhibit 3, that will

8    represent the totality of materials that you're

9    relying on for your opinions in this case?

10              MR. MORIARTY:  Objection.

11              Go ahead.

12              THE WITNESS:  I think for the most

13   part, yes.  And I'm -- you know, I'm not sure if

14   there's other things out there that I've looked at

15   that is not exactly on this, but --

16   BY MR. JONES:

17       Q.      Okay.

18       A.      -- for the most part this is pretty

19   inclusive.

20       Q.      Okay.  And if there are other things

21   that you've looked at that you've decided not to

22   include on this list, you will do your best to

23   let counsel know that --

24       A.      Absolutely.

Christopher E. Ramsey M.D.

1      Q.       -- and to share that information,

2   correct?

3      A.       Yes.

4      Q.       Okay.

5             MR. MORIARTY:  I think what I was

6   getting at is that the case-specific parts may have

7   evolved since these were produced, these reliance

8   lists were produced, because depositions were taken

9   after.

10             MR. JONES:  Okay.

11   BY MR. JONES:

12      Q.       What depositions have you reviewed?

13             MR. MORIARTY:  Well --

14             THE WITNESS:  I can't -- I can't tell

15   you the names of them.  I've reviewed most of the

16   depositions from the expert witnesses on -- for the

17   plaintiff on each one of the cases, and also the --

18   most of the plaintiff ones that -- that I've been

19   provided -- I'm sorry -- most of the defense expert

20   witnesses, as well as the depositions from each one

21   of the plaintiffs or their --

22   BY MR. JONES:

23      Q.       Okay.  Let me break it down.

24             Depositions, it sounds like you've

Christopher E. Ramsey M.D.

1    reviewed potentially the plaintiff?

2         A.      Yes.

3         Q.      You've reviewed depositions,

4    potentially, of the plaintiff's expert witness?

5         A.      Yes.

6         Q.      As it relates to specific causation

7    opinions or as it relates to that expert's general

8    opinions?

9         A.      Both.

10        Q.      Both.  And so you reviewed plaintiff

11   depositions.  You've reviewed expert witness

12   depositions.

13              Have you reviewed any other

14   depositions?

15        A.      Depositions of treating physicians.

16        Q.      Okay.  Anything else?

17        A.      Depositions of the plaintiff's either

18   significant other or friend.

19        Q.      Okay.  Anything else?

20        A.      Not that I can think of.

21        Q.      Okay.  Have you reviewed any of the

22   prior trial testimony on the TVT product?

23        A.      No trial testimony.

24        Q.      Do you know who Piet Hinoul is?

Christopher E. Ramsey M.D.

```
1       A.      No.

2       Q.      Do you know who Catherine Beath is?

3       A.      No.

4       Q.      Do you know who Ming Chin is?

5       A.      No.

6       Q.      Do you know who Martin Weisberg is?

7       A.      No.

8       Q.      Do you know who Laura Angelini is?

9       A.      No.

10      Q.      Do you know who Aaron Kirkemo is?

11      A.      No.

12      Q.      Can you name a single medical director

13   at Ethicon?

14      A.      No.

15      Q.      Can you name a single TVT design

16   engineer at Ethicon?

17      A.      I guess you can call Dr. Ulmsten a

18   design engineer.

19      Q.      Do you know who Dan Lamont is?

20      A.      No.

21      Q.      Do you know who Dan Smith is?

22      A.      No.

23      Q.      Do you know who designed the TVT-Secur?

24      A.      No.
```

Christopher E. Ramsey M.D.

1    Q.    Do you know who designed the TVT-O?

2    A.    No.

3    Q.    Have you reviewed any documents related

4    to how long it took Ethicon to get TVT-O to market?

5    A.    No, I have not.

6    Q.    Have you reviewed any documents related

7    to the internal risk assessments of TVT-O?

8    A.    Not that I remember.

9    Q.    Have you -- do you know what an FMEA

10   is?

11   A.    Can you tell me what the acronym is?

12   Q.    Failure modes and effects analysis.

13   A.    I've heard of that.  I'm not very

14   familiar with it.

15   Q.    Not very familiar with it?

16   A.    Not very familiar with it.

17   Q.    Have you ever participated in one?

18   A.    No.

19   Q.    Have you ever been asked to participate

20   in one?

21   A.    No.

22   Q.    Ethicon's never asked you to

23   participate in an FMEA analysis?

24   A.    No.

Christopher E. Ramsey M.D.

1      Q.       Fair to say that your role as a

2   consultant for Ethicon was solely limited to what

3   you have described as proctor events?

4      A.       Yes.

5      Q.       Have you reviewed the internal

6   complaint files related to TVT-O?

7      A.       No.

8      Q.       Have you reviewed the internal

9   complaint files related to TVT-Secur?

10     A.       No.

11     Q.       Have you reviewed the internal

12   complaint files related to TVT Retropubic?

13     A.       No.

14     Q.       Will you be offering opinions in this

15   litigation related to the potential risk associated

16   with the TVT products?

17     A.       Yes.

18     Q.       Will you be offering opinions in this

19   litigation related to the complaint rates for the

20   TVT products?

21               MR. MORIARTY:  Objection.  Form.

22               Go ahead.

23               THE WITNESS:  I guess what do you mean

24   by "complaint rates"?

Christopher E. Ramsey M.D.

1    BY MR. JONES:

2        Q.      Complication rates?

3        A.      Complication, yes.

4        Q.      You will be offering opinions in this

5    litigation related to the complication rates of the

6    TVT products, correct?

7        A.      Yes.

8        Q.      The materials on your reliance list,

9    did Ethicon provide you these materials?

10       A.      They helped me with -- with this.

11   There are some that are known fairly well, but --

12   but, yes, I did have help.

13       Q.      Okay.  How did you get the internal

14   documents?

15       A.      Oh, Ethicon gave me the internal

16   documents.

17       Q.      How did you get the medical literature?

18       A.      Oh, from -- the medical literature?

19       Q.      Yes.

20       A.      Those are published in our medical

21   journals.

22       Q.      How did you get them?

23       A.      By reading the journals, by going to

24   conferences.

```
1      Q.      Okay.  Turn to page -- so you actually

2  went and retrieved these articles listed in the

3  medical --

4      A.      So -- most of these were given to me,

5  but I --

6      Q.      Most of these were given to you by

7  Ethicon?

8      A.      -- but I knew what they -- I knew what

9  a lot of them are.

10     Q.      That's what I'm getting at --

11     A.      Right.

12     Q.      -- is how you actually physically got

13 these.

14     A.      Oh, they were given to me.

15     Q.      Ethicon physically gave you these

16 documents?

17     A.      Well, my lawyers did.

18     Q.      Ethicon's lawyers physically gave you

19 these documents?

20     A.      Yes.

21     Q.      And they're the ones who decided which

22 articles to give you, correct?

23     A.      Not all of them, no.

24     Q.      Sometimes you asked for some articles?
```

Christopher E. Ramsey M.D.

1        A.        Yes.

2        Q.        Which ones?

3        A.        Gosh, I can't --

4        Q.        As you sit here today, you can't name a

5    single article?

6        A.        I can't -- I can't name a single

7    article that I asked for specifically.

8        Q.        How about -- turn to the first page.

9        A.        Uh-huh.

10        Q.        I'll pick one out for you.  This

11    Abdel-Fattah, "Single-Incision Mini-Slings Versus

12    Standard Midurethral Slings in Surgical Management

13    of Female SUI:  A Meta-analysis of Effectiveness

14    and Complications," in "European Urology."

15             Do you see that listed on page 1?

16        A.        Which one -- which one is that one?

17        Q.        I just read it.

18        A.        Yeah.  Which one down the list?  One,

19    two, three, four, five -- five?

20        Q.        Yeah.

21        A.        Yeah.  That's one that I've seen in

22    some -- in the conferences in the past.  I can't

23    remember when.

24        Q.        Okay.

Christopher E. Ramsey M.D.

1      A.      But I was -- the reason is I was very

2    interested in the mini-slings, and that's what I

3    did -- did a lot of.

4      Q.      Okay.

5      A.      Now that I look back here, some of the

6    Tomaselli ones I had asked for.

7      Q.      Let me stop you.  My question is, do

8    you recognize the article I listed by the

9    author Abdel-Fattah related to single-incision

10   mini-slings versus standard midurethra slings and

11   meta-analysis?

12     A.      Yes, I've seen that before.

13     Q.      Okay.  Is that an article Ethicon

14   provided to you or that you knew of before --

15     A.      I knew of it before, but they provided

16   it to me.

17     Q.      Okay.  And you knew of -- you were

18   familiar with this article through your

19   discussions with other surgeons; is that

20   correct?

21     A.      Not with discussions with other

22   surgeons.  With conferences that I've gone to, the

23   AUA.

24     Q.      What AUA conferences have you gone to?

Christopher E. Ramsey M.D.

1      A.      I went to the one last year, the one

2   in --

3      Q.      San Diego?

4      A.      No.  That's this year.

5      Q.      Okay.

6      A.      -- New Orleans last year.

7      Q.      Okay.

8      A.      And then I think '05 was the one before

9   that that I went to.  So it's been a while since

10  I've been to the AUA, but there are also sectional

11  meetings.  And I can't remember which one, you

12  know, that I went to.  That -- there's several of

13  them.

14     Q.      Do you plan on going to AUA this year?

15     A.      Yes.

16     Q.      You do?  Will you be presenting

17  anything at AUA?

18     A.      No.

19     Q.      Who is going to pay your way?

20     A.      Me.

21     Q.      Okay.  Astora is not going to pay your

22  way?

23     A.      No.

24                  (Reporter interruption for

Christopher E. Ramsey M.D.

```
 1    clarification.)

 2              MR. JONES:  Astora.

 3    BY MR. JONES:

 4       Q.     You won't be making any presentations

 5    at the AUA convention this year?

 6       A.     No.

 7       Q.     You're just going to participate --

 8       A.     CME, medical education.

 9       Q.     Okay.

10              MR. MORIARTY:  We've been going about

11    an hour.  If anybody wants to get a bite to eat,

12    you know --

13              MR. JONES:  Let me finish this up.

14    Like, five minutes.

15              MR. MORIARTY:  Okay.

16              MR. JONES:  This is really boring

17    questioning on the AUA.

18    BY MR. JONES:

19       Q.     You went last year to AUA --

20       A.     Yes.

21       Q.     -- in New Orleans?

22       A.     Yes.

23       Q.     Did you make any presentations?

24       A.     No.
```

Christopher E. Ramsey M.D.

```
1      Q.      Any presentations related to

2   transvaginal mesh at the AUA conference in New

3   Orleans stand out?

4      A.      Oh -- no, nothing stands out.  I mean,

5   they had several that I went to.  And they're all

6   interesting and basically state-of-the-art, up-to-

7   date information.

8      Q.      Okay.  But not a single presentation at

9   last year's AUA national convention on transvaginal

10  mesh stands out to you?

11     A.      Not specifically.

12     Q.      Okay.  Is there a debate in the AUA as

13  to the safety of transvaginal mesh?

14     A.      No.

15            MR. MORIARTY:  Objection.  Form.

16  BY MR. JONES:

17     Q.      There's no debate?

18     A.      No debate that I'm aware of.

19     Q.      That you're aware of?

20     A.      No.  No, sir.

21            MR. MORIARTY:  I assume you're talking

22  about slings, because that's what he's here to talk

23  about?

24            MR. JONES:  Yeah.  Yeah.
```

Christopher E. Ramsey M.D.

1    BY MR. JONES:

2        Q.       Is there any controversy in AUA related

3    to the use of transvaginal mesh?

4        A.       Not any controversy in the AUA, no.

5        Q.       And there's no debate?

6        A.       No debate of the safety.  No debate,

7    no.

8        Q.       Is there any debate among -- in the AUA

9    as to whether to use transvaginal mesh for

10   treatment of SUI?

11       A.       There's no -- there's no debate in --

12   through the AUA of whether you should use or not

13   use mesh.  There's discussions about complications

14   and how to best treat your patients, what are the

15   best options, what are the alternatives, those type

16   of things.

17       Q.       Fair to say that part of the

18   presentations that you went to at AUA last year

19   involved discussion of complications associated

20   with transvaginal mesh?  Correct?

21       A.       Yes.

22       Q.       Those presentations included

23   discussions about the permanency of transvaginal

24   mesh complications, correct?

Christopher E. Ramsey M.D.

1     A.      They discussed complications of -- of

2  transvaginal mesh.

3     Q.      And they discussed at AUA that those

4  complications can be permanent, correct?

5     A.      Any complication from any surgery can

6  be permanent.  So yes.

7     Q.      Yes.  They discussed that the

8  complications associated with transvaginal mesh for

9  SUI could be life altering, correct?

10            MR. MORIARTY:  Objection.

11            Go ahead.

12            THE WITNESS:  They discussed how rare

13  it is for it to become life altering.

14  BY MR. JONES:

15     Q.      I didn't ask you anything about the

16  frequency.  I just asked if they were discussed or

17  not.

18     A.      It was discussed, yes.

19            MR. JONES:  Move to strike the

20  unresponsive portion.

21  BY MR. JONES:

22     Q.      Okay.  So this Abdel-Fattah article,

23  that's an article that you were familiar with prior

24  to this litigation -- prior to you becoming

Christopher E. Ramsey M.D.

1    involved in this litigation, correct?

2        A.      Vaguely familiar with it, yeah.  It's

3    an article that I've read in the past.  I mean,

4    that's --

5        Q.      Okay.

6        A.      -- what I can say.

7                I can't quote you and tell you exactly

8    what it is.  I'd have to look at it again.

9        Q.      Is a meta-analysis a high level of

10   evidence?

11       A.      I believe it is, yes.

12       Q.      What is a meta-analysis?

13       A.      They're looking at several -- several

14   different -- several different review papers and

15   randomized controlled studies and looking at all of

16   them together to see what the general safety --

17   safety and efficacy of a certain product may be, or

18   certain surgery.

19       Q.      And do you -- when you reviewed this

20   article -- do you normally review the conflict of

21   interest statement?

22       A.      I -- I'm sure I notice them.  I'm sure

23   I noticed them.

24       Q.      It's part of your normal routine when

Christopher E. Ramsey M.D.

1    you read a medical journal article to review the

2    conflict of interest statement, correct?

3        A.      Yes.

4        Q.      Why is that?

5        A.      Because it's important to see if

6    someone does have some type of conflict of interest

7    associated with a company or drug or -- or device,

8    to see if there could be potential bias.

9        Q.      And the reason why it's important to

10   disclose that is so that the reader can make a

11   determination for themselves whether there's a

12   potential conflict of interest, correct?

13       A.      Correct.

14       Q.      And the author -- or the individual

15   with the perceived potential conflict of interest

16   should err on the side of caution when deciding

17   whether to disclose any potential conflict of

18   interest, correct?

19              MR. MORIARTY:  Objection.

20              Go ahead.

21              THE WITNESS:  Yes.

22   BY MR. JONES:

23       Q.      And have you ever written any published

24   medical literature?

Christopher E. Ramsey M.D.

1      A.      It's in my CV.  It's been a while since

2   I've written one.

3      Q.      Okay.  Have you ever disclosed a

4   conflict -- have you ever made a conflict of

5   interest statement?

6      A.      I didn't have to.  Because I did not

7   have a conflict of interest with the published

8   articles I've --

9      Q.      I've noticed in some of the materials

10  that you used for -- in your role as a consultant

11  for Ethicon, there's a conflict of interest

12  disclosure.

13             Do you recall that?

14     A.      If -- for myself?

15     Q.      Yes.

16     A.      I honestly can't remember what I wrote.

17     Q.      Okay.  When you gave presentations for

18  Ethicon as a consultant, did you tell the doctors

19  that you were being paid by Ethicon?

20     A.      Yes.  Yes.

21             Again, the presentations that I had

22  were proctoring.  I did not do dinner

23  presentations.  I didn't do really formal

24  presentations that would require me, to a large

Christopher E. Ramsey M.D.

1    group of people, tell that.

2              So the people that I was assisting and

3    proctoring knew that I was being paid.

4         Q.      Okay.  How about your patients?  Did

5    you tell your patients -- do you tell your patients

6    that you're a consultant for Ethicon?

7         A.      No.

8         Q.      Do you tell your patients you're a

9    consultant for AMS or Astora?

10        A.      No.

11        Q.      Have you ever told a single patient

12   that you are a consultant for Ethicon?

13        A.      Yes, I'm sure I have.

14        Q.      Okay.  When?

15        A.      Randomly.

16        Q.      Okay.  Randomly?

17        A.      Yeah.  It's not something that I would

18   typically do.

19        Q.      Not something that's typically part of

20   your practice to disclose to your patients that

21   you're a consultant with companies, correct?

22        A.      Correct.

23        Q.      Do you tell your da Vinci robot

24   patients that you're a consultant for the company

Christopher E. Ramsey M.D.

1    that designs and markets the da Vinci robot system?

2         A.        Occasionally.

3         Q.        Occasionally.  Is it part of your

4    normal routine to do that?

5         A.        No.

6         Q.        Do you do the AUGS statement to your

7    patients?

8         A.        The AUGS statement is posted in all of

9    our rooms.  So I don't give it to them, but it's

10   available.  And I -- in all of our rooms.

11        Q.        It's posted -- the -- you posted the

12   AUGS statement in all of your rooms in your office?

13        A.        The AUGS and AUA statements.

14        Q.        Okay.  In all of the rooms in your

15   clinic, correct?

16        A.        Yes.

17        Q.        In all the rooms in your hospital?

18        A.        No, not in the hospital.

19        Q.        Just your clinic --

20        A.        Yes.

21        Q.        -- where you work, where you practice?

22        A.        Yes.

23        Q.        You put up the AUGS and the AUA

24   position statement in every room?

Christopher E. Ramsey M.D.

1      A.      Yes.

2      Q.      Okay.  Have you put any other materials

3   up in every room?

4      A.      Yes.

5      Q.      Okay.  What else?

6      A.      Oh, we put up information about

7   erectile dysfunction.  We put up information about

8   different treatments for prostate cancer.

9      Q.      Well, I'm going to limit it to

10   information related to transvaginal mesh.

11              Other than the AUGS statement and the

12   AUA statement that you place in every room in your

13   clinic -- on the wall, I suppose?

14      A.      Yes.  On, yeah, the cabinet.

15      Q.      Other than the AUGS statement and the

16   AUA statement that you put up on the wall in every

17   room in your clinic, do you post any other

18   materials related to transvaginal mesh?

19      A.      There are brochures.  Patient brochures

20   are -- not in every single room; they're in the

21   halls -- hallways, that type -- I think you're

22   asking about --

23      Q.      Patient brochures from the companies?

24      A.      All -- several different companies.

Christopher E. Ramsey M.D.

1    Q.      Which companies?  Ethicon?

2    A.      Ethicon.

3    Q.      AMS?

4    A.      AMS.  And then I think we may have

5    Boston.  I'm -- some of my other partners use

6    different ones.  I'm not really sure what they use.

7    So they'll -- they'll have their brochures there as

8    well.

9    Q.      Okay.  Other than the AUGS statement,

10   the AUA statement, and mesh company patient

11   brochures, do you place anything up on the walls in

12   your office related to transvaginal mesh?

13   A.      No.

14           MR. JONES:  Okay.  I think we can take

15   a break.

16           (Brief recess.)

17   BY MR. JONES:

18   Q.      Okay, Doctor, after a short break, are

19   you ready to proceed?

20   A.      Yes.

21   Q.      Do you currently treat mesh

22   complications?

23   A.      Yes.

24   Q.      What percentage of your practice

Christopher E. Ramsey M.D.

1    relates to treating mesh complications?

2        A.      A very small amount, less than 1

3    percent.

4        Q.      Do you perform mesh removal surgeries?

5        A.      Yes.

6        Q.      How many have you performed?

7        A.      Maybe -- total?  Maybe 20.

8        Q.      You've performed a total of 20 mesh

9    removal surgeries, correct?

10       A.      About 20.

11       Q.      What percentage of those were Ethicon

12   mesh products?

13               MR. MORIARTY:  Objection.

14               If you know.

15               THE WITNESS:  Oh, yeah, gosh.  Eighty

16   percent.

17   BY MR. JONES:

18       Q.      Eighty percent of the mesh removal

19   surgeries you performed have been Ethicon mesh

20   products, correct?

21       A.      Yes.

22       Q.      Were those your own patients, or were

23   those patients that were referred to you?

24       A.      Mostly my own.

Christopher E. Ramsey M.D.

1      Q.      Which physicians refer patients to you

2   to treat mesh complications?

3      A.      I honestly don't know.  I've not had

4   anybody refer their own complications to me.

5      Q.      Okay.

6      A.      I've had maybe -- a couple GYNs refer

7   patients of theirs that they noticed had mesh

8   complications to me, but I don't -- I don't recall

9   the specific physicians.

10     Q.      And those surgeons currently are

11  referring you patients specifically to treat mesh

12  complications, correct?

13     A.      Well, not specific -- that's part of

14  what they refer, that -- they're just -- the

15  physicians refer to me most of their patients

16  anyway for whatever GYN issue that they want me to

17  treat.

18              So if they have a patient that comes to

19  see them and they may have had a mesh put in by

20  somebody else, a sling put in by somebody else, and

21  there's an issue, then they'll send them to me.

22     Q.      Okay.

23     A.      Doesn't happen very often.

24     Q.      Doesn't happen very often?

Christopher E. Ramsey M.D.

```
1      A.      No.

2      Q.      Do you consider that a -- treating mesh

3   complications a specialty of your clinical

4   practice?

5      A.      It's -- it's a specialty of what I do.

6   It's not something that I concentrate on, I guess

7   is what I would say.

8      Q.      It's not a concentration of your

9   clinical practice?

10     A.      Yes.  Correct.

11     Q.      Treating mesh complications is not a

12  concentration of your clinical practice, correct?

13     A.      Yes.

14     Q.      The overwhelming vast majority of your

15  practice relates to treating males, correct?

16             MR. MORIARTY:  Objection.

17             THE WITNESS:  Seventy percent, yes.

18  BY MR. JONES:

19     Q.      And the main concentration area of your

20  clinical practice relates to treating males,

21  correct?

22     A.      Yes.

23     Q.      And the bulk of your experience as a

24  urologist is in treating males, correct?
```

Christopher E. Ramsey M.D.

1      A.      I would disagree with that.  I --

2  that's -- I'm talking about presently what I

3  concentrate on.  So the bulk of my practice in its

4  entirety, I wouldn't say is -- is mostly male.

5      Q.      Well, certainly it's fair that the bulk

6  of your practice as a urologist has not been

7  focused on the treatment of women with stress

8  urinary incontinence, correct?

9      A.      I would say that at a time that was a

10  significant portion of my practice.  It's not as

11  much anymore.  But during -- during the time -- you

12  know, from '05 to probably within, you know, 2012

13  or so, it was a pretty significant portion of what

14  I do.

15          It still is a -- females are still a

16  significant portion of what I do directly with

17  stress incontinence.  Those are the -- most of the

18  women I deal with are mostly stress incontinence,

19  unless it's -- someone has a kidney stone, which is

20  pretty 50/50.  I'll see those patients, too.  You

21  know, they can be male or female.

22          But that's over the entirety of my

23  practice.  So today it's mostly towards men.

24      Q.      Okay.  And here's -- I think I asked,

Christopher E. Ramsey M.D.

1   the bulk of your practice as a whole has not been

2   devoted to treating women with stress urinary

3   incontinence, correct?

4           MR. MORIARTY:  Objection.  Asked and

5   answered.

6           But go ahead.

7           THE WITNESS:  No, I wouldn't agree with

8   that.  As a whole, I've done a lot of slings.  I've

9   done almost as many sling procedures as I've done

10  prostate or robot surgeries, you know.  So I

11  would -- I would consider the sling surgeries that

12  I do to be a pretty significant portion of -- of my

13  overall practice.

14  BY MR. JONES:

15  Q.     What years -- tell me, then, what years

16  of your practice where over half of your clinical

17  practice related to the treatment of stress urinary

18  incontinence in women with transvaginal mesh.

19  A.     I probably never had half -- over half

20  of my practice with stress incontinence.

21  Q.     Okay.

22  A.     I would say probably a third of my

23  practice overall is stress incontinence.

24  Q.     Men or women, though, correct?

Christopher E. Ramsey M.D.

1      A.      No.  Women.  Specifically women.  I'm

2    sorry.  There are men with stress incontinence I

3    deal with, but --

4      Q.      But never over half, correct?

5      A.      Never over half of my practice being

6    female stress incontinence?  No.

7      Q.      Not a single year as -- that you've

8    been a practicing urologist has over half of your

9    practice related to treating women with stress

10   urinary incontinence, correct?

11     A.      That's correct.

12     Q.      Do you hold yourself out in any regard

13   in the medical community as an expert in treating

14   mesh complications?

15     A.      I don't try to advertise myself as a

16   doctor who treats mesh complications.  I would say

17   that I'm an expert at treating mesh complications.

18     Q.      Have you referred patients suffering

19   from mesh complications to any other surgeons?

20     A.      Yes.

21     Q.      Who?

22     A.      I usually send them to Vanderbilt.

23     Q.      Who at Vanderbilt?

24     A.      Dr. Demkowski, and I'm not certain --

Christopher E. Ramsey M.D.

```
1    he's not practicing as much anymore.  I'm not
2    certain who --
3         Q.      Okay.
4         A.      -- the new lady is.
5         Q.      Fair to say, though, that --
6         A.      And I've sent two, is what I remember.
7         Q.      Okay.  Fair to say that you've sent
8    patients to Vanderbilt who have been suffering from
9    mesh complications, correct?
10        A.      Yes.
11        Q.      And the reason you sent them to
12   Vanderbilt was to receive additional treatment,
13   correct?
14        A.      Yes.
15        Q.      And you believed, sending them to
16   Vanderbilt, they would receive treatment that may
17   be able to alleviate their symptoms, correct?
18        A.      Yes.
19        Q.      Related to their mesh complications,
20   correct?
21        A.      Yes.
22        Q.      And for whatever reason you felt that
23   the physicians at Vanderbilt would be able to
24   provide those particular patients treatment --
```

Christopher E. Ramsey M.D.

1    additional treatment than you were able to offer to

2    those patients, correct?

3         A.        That I was unable to offer them.

4         Q.        That you were unable to offer them?

5         A.        Yes.

6         Q.        Fair to say, then, that when it comes

7    to treating mesh complications, Vanderbilt is able

8    to offer certain treatments that you're unable to

9    offer, correct?

10        A.        I agree.

11        Q.        And those treatments would be related

12   to surgical treatments for mesh complications that

13   may potentially alleviate those mesh complications,

14   correct?

15        A.        Yes.

16        Q.        Fair to say that within the last four

17   years your use of transvaginal mesh has decreased?

18        A.        Maybe a little bit.  I've probably put

19   in 50 a year over the last four years.

20        Q.        Prior to 2012 you were placing more

21   than 50 slings a year, correct?

22        A.        Probably more like 75.

23        Q.        So in the last four years your use of

24   transvaginal mesh has decreased by almost a third,

Christopher E. Ramsey M.D.

1    correct?

2        A.      Yes.

3        Q.      Starting in 2012 -- well, when is the

4    last time you acted as a consultant physician for

5    Ethicon?

6        A.      I think I answered that earlier, but I

7    think it was 2011.

8        Q.      Okay.  And at about the same time as

9    you stopped acting as a consultant physician for

10   Ethicon, your use of transvaginal mesh also

11   decreased, correct?

12       A.      Probably -- no.  Probably not right

13   away.  The next year, probably.

14       Q.      Okay.  All right.

15              I got you as ten to 12 hours for

16   drafting the general report?

17       A.      Uh-huh, yes.

18       Q.      I've got 30 to 40 hours in reviewing

19   materials that would support your opinions that

20   you've expressed in your general report?

21       A.      Best guess, but that's also reviewing

22   materials for case-specific reports, too.

23       Q.      Okay.  So ten to 12 hours drafting the

24   report; 30 to 40 hours total reviewing materials.

Christopher E. Ramsey M.D.

 1      Correct?

 2           A.      Up to the -- up to the review of my --

 3      up to the writing of my general report.  Since then

 4      I've done --

 5           Q.      Okay.

 6           A.      -- more.

 7           Q.      Forty to 50 hours reviewing materials

 8      in total prior to issuing your general report,

 9      correct?

10           A.      Right.

11           Q.      How many hours spent reviewing

12      materials since then?

13           A.      I've -- including -- yeah, probably 70

14      hours, 60 or 70 hours.

15           Q.      Sixty to 70 hours since issuing your

16      report of your --

17           A.      Just over the last two weeks.  That's

18      why I'm tired.

19           Q.      I get it.

20                   How many hours spent drafting your

21      case-specific reports?

22                   MR. MORIARTY:  Objection.  We've got

23      invoices for those.  So at the appropriate time we

24      can get those out.

Christopher E. Ramsey M.D.

```
1    BY MR. JONES:

2       Q.      Okay.  How about this?  Did you bill

3    Ethicon for all the time you spent working on this

4    case -- these cases?

5       A.      Not all the time, not yet, no.

6       Q.      So that's what I want to know.  I want

7    to know your total time.  I don't want to know what

8    you've billed for.  So that's why I don't care

9    about the invoices right now.

10      A.      My total time?  Ninety-five or 100

11   hours.

12      Q.      Ninety-five to 100 total hours you've

13   spent reviewing materials and drafting your

14   reports --

15      A.      Everything related to --

16      Q.      Everything?

17      A.      Everything.

18      Q.      Ninety-five to 100 hours spent on all

19   the work you've done for Ethicon as an expert

20   witness for transvaginal mesh, for these wave

21   cases?

22      A.      For these wave cases, yes.

23      Q.      Excluding the two prior cases --

24      A.      Right.
```

Christopher E. Ramsey M.D.

1      Q.      -- in 2013 -- or '14 --

2      A.      '15.

3      Q.      -- one of which is the Rabiola case?

4      A.      Uh-huh.

5      Q.      So if we exclude those cases and we

6    focus on what today's deposition is covering and

7    tomorrow will be covering, 95 to 100 hours total?

8      A.      Yes.

9      Q.      And that includes drafting the reports,

10   correct?

11     A.      Yes.

12     Q.      That includes looking at medical

13   literature, correct?

14     A.      Yes.

15     Q.      That includes looking at medical

16   records, correct?

17     A.      Yes.

18     Q.      That includes reviewing depositions of

19   the plaintiffs?

20     A.      Yes.

21     Q.      That includes reviewing depositions of

22   the treating physicians?

23     A.      Yes.

24     Q.      That includes reviewing depositions of

Christopher E. Ramsey M.D.

1    the expert witnesses?

2         A.      Yes.

3         Q.      And that includes -- well, how many

4    internal documents do you think you reviewed?

5         A.      Hundreds.

6         Q.      Hundreds?

7         A.      (Witness moves head up and down.)

8         Q.      Okay.  And that includes reviewing

9    those internal documents?

10        A.      Yes.

11        Q.      Okay.  How about expert reports?

12        A.      Yes.

13        Q.      You reviewed -- that includes reviewing

14   other expert reports?

15        A.      (Witness moves head up and down.)

16        Q.      Who -- what other expert reports did

17   you review?

18        A.      I can't name the names of them.  Again,

19   it's the experts for the four to six cases that

20   were given to me.  And I know two of them I had

21   already prepared for before.  They were not going

22   to be within what I've -- what I'm doing now.  So

23   they're -- that's out of the picture now.  But it's

24   numerous expert reports.

Christopher E. Ramsey M.D.

1      Q.      Okay.  Got it.

2              When did Ethicon first contact you

3      either directly or through their attorneys to ask

4      you about being an expert witness in this

5      litigation?

6      A.      This wave or --

7      Q.      This wave.

8      A.      -- originally?

9      Q.      Good question.  Thanks.

10             When did Ethicon first contact you

11     either directly or through their attorneys to act

12     as an expert witness in Ethicon Wave 1 TVT cases?

13     A.      Okay.  So not including Rabiola?

14     Q.      Correct.

15     A.      So I think probably August or

16     September.

17     Q.      Of 2000- --

18     A.      2015.

19     Q.      August 2015, potentially September 2015

20     is the first time Ethicon contacts you in

21     relationship to acting as an expert in the wave,

22     correct?

23     A.      Yes.

24     Q.      And at that point did you agree?

Christopher E. Ramsey M.D.

1      A.      Yes.

2      Q.      And how many cases did you -- did they

3   ask you to work on at that point?

4      A.      Six.

5      Q.      Did they say, "Dr. Ramsey, we have six

6   cases we would like you to look at, and we would

7   also like you to weigh in on the general safety and

8   warning statements that accompany the TVT-R, TVT-O,

9   and TVT-S"?  Correct?

10      A.      Specifically the TVT-O and TVT-S --

11      Q.      Okay.

12      A.      -- but yes.

13      Q.      And at that point you agreed to do

14   that, correct?

15      A.      Yes.

16      Q.      And in each of those six cases that

17   Ethicon asked you to review, have you made

18   conclusions in each of those six cases?

19      A.      At least four of them.

20      Q.      Okay.  In the four out of six cases

21   that you've made conclusions in, where you're

22   acting as an expert for Ethicon, have you ever

23   concluded that the mesh played any role whatsoever

24   in the alleged injuries?

Christopher E. Ramsey M.D.

```
1                    MR. MORIARTY:  Objection.  Form and

2       otherwise.

3                    Go ahead and answer.

4                    THE WITNESS:  No.

5       BY MR. JONES:

6           Q.       No.  So every case you've looked at,

7       you've determined that mesh is not the cause or a

8       cause of any of the alleged injuries, correct?

9           A.       Correct.

10          Q.       How about the other two cases that you

11      haven't made conclusions on?

12          A.       I can't remember which -- I can't

13      remember what -- even the specifics of those right

14      now.

15                   MR. MORIARTY:  Some of those cases went

16      to stand down.

17                   MR. JONES:  Okay.  Stand down.

18      BY MR. JONES:

19          Q.       The -- how about the two cases from --

20      how about Rabiola?  What did you conclude in that

21      case?

22          A.       Again, the details elude me at this

23      point.

24          Q.       Okay.  Do you remember what products
```

Christopher E. Ramsey M.D.

1    are at issue in the Rabiola case?

2        A.      I think it was TVT-Secur was in that

3    case.

4        Q.      Okay.

5        A.      I think most of the things I've looked

6    at -- all the things I've looked at are TVT-Secur.

7        Q.      Okay.  And is that because you feel

8    like you have the most experience with TVT-Secur

9    than other Ethicon mesh products?

10       A.      I have more experience with that, yes.

11       Q.      Okay.  You have more experience with

12   the TVT-Secur product than any other mesh device,

13   correct?

14       A.      Yes.

15       Q.      You have more experience with TVT-Secur

16   than any other Ethicon mesh device, correct?

17       A.      Yes.

18       Q.      And fair to say that the majority of

19   the review you've done as a expert witness in

20   litigation has been related to the TVT-Secur

21   product?

22       A.      The majority of the review that I've

23   done for case specifics, yes.

24       Q.      Okay.  And is that because you feel

Christopher E. Ramsey M.D.

1    like you have -- as -- more expertise with

2    TVT-Secur than you do with TVT-R?

3                MR. MORIARTY:  Objection.  Form.

4                THE WITNESS:  Yes.

5    BY MR. JONES:

6        Q.       Do you have more expertise with

7    TVT-Secur than you do with TVT-O?

8        A.       Close.  But I've done more cases with

9    TVT-S.

10       Q.       Fair to say that you have more

11   expertise in TVT-Secur than any other Ethicon mesh

12   product?

13       A.       Yes.

14       Q.       More expertise in TVT-Secur than any

15   other mesh product, period, correct?

16       A.       Yes.

17       Q.       And fair to say that when you offer

18   opinions related to the TVT Obturator that you will

19   be relying on your experience and expertise with

20   TVT-Secur, correct?

21       A.       No.  It's with my experience with

22   TVT-O.

23       Q.       Okay.  So when you offer an opinion

24   with the TVT Obturator, you're not going to rely on

Christopher E. Ramsey M.D.

1    your experience or expertise with TVT-Secur

2    whatsoever, correct?

3        A.      I think that the -- so -- I guess I

4    don't understand the question.

5        Q.      Okay.  Here's what I want to know.

6    Does -- well, first, ask this -- answer this:  Is

7    there any difference in the mesh characteristics

8    used in the TVT-O as compared to the TVT-Secur?

9        A.      Not the mesh characteristics other than

10   maybe length.

11       Q.      Okay.  But the mesh design is the same,

12   correct?

13       A.      Yes, correct.

14       Q.      The mesh density is the same?

15       A.      Yes.

16       Q.      The mesh pore size is the same?

17       A.      Yes.

18       Q.      The mesh weave is the same?

19       A.      Yes.

20       Q.      The stiffness is the same?

21       A.      Yes.

22       Q.      The antioxidants are the same?

23       A.      Yes.

24       Q.      The material's the same?

Christopher E. Ramsey M.D.

1    A.    Yes.

2    Q.    Okay.  And when you offer an opinion as

3    to the safety of the mesh used in the TVT-O, will

4    you be relying on -- at all on your experience and

5    expertise with the mesh used in the TVT-Secur?

6    A.    Specifically with TVT-O, I'll be

7    relying on my experience with TVT-O.

8    Q.    Okay.  Will be you relying on your 400

9    TVT-Securs that you put in when you offer opinions

10   on TVT-O?

11   A.    Yes, I will.

12   Q.    Okay.  Will you be relying on safety

13   data on TVT-Secur and TVT-Secur mesh when you're

14   giving opinions on TVT-O?

15   A.    Yes.

16   Q.    Will you be relying on safety

17   assessments by Ethicon on TVT-Secur and the mesh

18   used in TVT-Secur when you're giving opinions on

19   TVT-O?

20   A.    Yes.

21   Q.    Same for deposition testimony?

22   A.    Yes.

23   Q.    Okay.  Same for medical literature?

24   A.    Yes.

Christopher E. Ramsey M.D.

1      Q.      Have you ever performed the Burch

2   procedure?

3      A.      No.

4      Q.      You have not?

5      A.      No.

6      Q.      How about --

7      A.      I've probably assisted in residency,

8   but I've never performed one as a primary surgeon.

9      Q.      How about biologics mesh?  Have you

10  ever used it?

11     A.      Is that a brand name, "Biologics"?

12     Q.      Any nonsynthetic material, whether it

13  be animal material, human tissue.  Yeah, have you

14  used pubovaginal slings?

15     A.      Yes.  I guess I wouldn't call those

16  mesh, but. . .

17     Q.      Okay.  Now we're getting into

18  semantics.

19             Have you used mesh that isn't made from

20  polypropylene?

21     A.      No.

22     Q.      Okay.  So you haven't used animal

23  tissue mesh, correct?

24     A.      That's, again, semantics, I guess.

Christopher E. Ramsey M.D.

1      Q.      Okay.  Tell me --

2      A.      So -- so mesh I consider as a -- is

3   a -- how do I put that?  Mesh is a synthetic

4   material, is how I would look at that.  And I would

5   call porcine or cadaveric or autologous -- I would

6   call that "graft material" as opposed to "mesh."

7      Q.      Awesome.  So have you used graft

8   material --

9      A.      Yes.

10     Q.      -- in the treatment of SUI?

11     A.      Yes.

12     Q.      And what graft devices have you

13  used?

14     A.      Porcine.  I've used cadaveric tissue.

15  I've used autologous fascia.  Those are the ones

16  that I can --

17     Q.      You've used them all?

18     A.      -- think of.

19              Yes.

20     Q.      What specific product names have you

21  used?

22     A.      I did quite a few bone anchors before I

23  started using TVT-O.  I did probably mostly bone

24  anchor with porcine or cadaveric tissue.  Probably

Christopher E. Ramsey M.D.

1    mostly cadaveric tissue.

2        Q.        When is the last time you used a graft

3    material for treatment of SUI?

4        A.        Before 2005.

5        Q.        Since 2005, what surgical treatments

6    have you done for stress urinary incontinence

7    besides synthetic mesh?

8        A.        Specifically in women?

9        Q.        Women, yes.

10       A.        Synthetic slings.

11       Q.        None besides synthetic slings, correct?

12       A.        Correct.

13       Q.        How about in males?

14       A.        Artificial urinary sphincter.  I've put

15   in a few slings in -- in men as well.

16       Q.        Synthetic slings?

17       A.        Yes.

18       Q.        Or grafts?

19       A.        Synthetic slings.

20       Q.        Since 2005, have you used grafts at

21   all?

22       A.        For stress urinary incontinence in

23   women, no.  I'm trying to think if I've used grafts

24   as far as -- technically, grafts for anything else.

Christopher E. Ramsey M.D.

1    But for stress urinary incontinence in women, no.

2        Q.      Right.  You're the one that made the

3    distinction, so now I'm curious.

4        A.      So I've used mesh -- a synthetic

5    Gore-Tex mesh in Peyronie's disease, which is a

6    disease of the penis, to help straighten the penis

7    out.  So I've used that.

8        Q.      What about grafts, though?

9        A.      I've used autologous grafts in

10   Peyronie's disease as well, such as a penile

11   foreskin graft.  That's a -- that's an autologous

12   graft in that type of treatment.

13       Q.      So you've used -- you have used graft

14   materials inside the human body since 2005?

15       A.      And recently I -- I -- I've used a

16   placental membrane called AmnioFix, which basically

17   are stem cells.  And I've used that in fistula

18   repairs, and I've used it with prostatectomies in

19   nerve-sparing procedures.

20       Q.      Okay.  And what's the name of that

21   product?

22       A.      AmnioFix, A-m-n-i-o-F-i-x.

23       Q.      When was that product first marketed?

24       A.      Oh, it's been out -- I first heard of

Christopher E. Ramsey M.D.

1    it in 2013, but I didn't start using it until last

2    year.

3         Q.      And did you perform a literature review

4    on that product before using it?

5         A.      Yes.

6         Q.      And what literature was available on

7    that product prior to using it?

8         A.      Prior to using it, there wasn't --

9    there were maybe one or two studies that had

10   been -- that had been done on it that I used.

11        Q.      Do you still -- even though there was

12   one or two studies back at the time when you

13   decided to use it, I take it you still felt

14   comfortable with the safety and efficacy of that

15   device, correct?

16        A.      Very comfortable.

17        Q.      Are there any potential benefits to

18   using graft materials inside the human body in

19   relationship to synthetic mesh inside the body?

20             MR. MORIARTY:  Objection.  Form.

21             Go ahead.

22             THE WITNESS:  Do you mean compared to?

23

24   BY MR. JONES:

Christopher E. Ramsey M.D.

1      Q.      Yeah.

2      A.      Okay.  So repeat the question again.

3      Q.      Yeah.  Let me ask it with the right

4   word there.

5              Are there any potential benefits to

6   using graft materials inside the human body in

7   comparison to synthetic mesh inside the human body?

8      A.      I guess do you mean cadaveric, porcine,

9   or autologous specifically --

10     Q.      Correct.

11     A.      -- or all of the above?

12     Q.      All of the above.

13     A.      I don't think there are any -- any

14   advantages of using graft versus a synthetic mesh.

15     Q.      Are there any disadvantages to using

16   graft materials inside the body in comparison to

17   synthetic mesh materials inside the body?

18     A.      I think, especially when you're using

19   an autologous tissue, there's a disadvantage of

20   extra morbidity of harvesting the tissue, would be

21   the main disadvantage.  But I think it's very safe.

22     Q.      Other than -- so you feel using graft

23   materials inside the human body is very safe,

24   correct?

Christopher E. Ramsey M.D.

1        A.      Yes.

2        Q.      Other than the disadvantages of

3    harvesting the material, can you point to any other

4    disadvantages of using graft materials inside the

5    human body in comparison to synthetic mesh?

6        A.      Specifically cadaveric tissue, there's

7    a theoretical risk of -- of transmitted diseases,

8    proverbially prions, which I'm not very familiar

9    with, but I know they're subviral.  They're very

10   small molecules that can cause Mad Cow disease.

11   That's about my extent of that knowledge.

12              But technically -- or theoretically

13   that's a potential risk.  HIV transmission is

14   always a worry that patients, when I would tell

15   them I would use cadaveric tissue, some refused.

16   And so then I would use porcine or pig graft.

17              Some people didn't want xenographic

18   material in their body.  So I would use cadaveric

19   even before the sling.  So those are the

20   disadvantages I think of those -- those other

21   grafts.

22       Q.      Other than harvesting the material and

23   the theoretical concerns of transmitted diseases

24   and Mad Cow disease, are there any disadvantages to

Christopher E. Ramsey M.D.

```
 1    using graft materials inside the human body as

 2    compared to synthetic mesh?

 3         A.      I don't believe so.

 4         Q.      What -- are you familiar with the IFU

 5    for AminoFix?

 6         A.      AmnioFix?

 7         Q.      AmnioFix?

 8         A.      Yes, I am.  I'm familiar with it.

 9         Q.      Okay.  Are you familiar with their

10    patient brochures?

11         A.      They really don't have patient

12    brochures.

13         Q.      Or their website?

14         A.      Well, they just -- they recently came

15    out -- yes, I -- yes, I am.

16         Q.      Yes, you are familiar with the

17    brochure --

18         A.      Yes, yes.

19         Q.      -- correct?

20         A.      Very recently.

21         Q.      Are you familiar with their website?

22         A.      I am familiar with it.

23         Q.      Okay.  How about Ethicon's website?

24    Have you ever been to it?
```

Christopher E. Ramsey M.D.

1      A.       That's a good question.  I'm sure I

2   have.  I'm sure I have.

3      Q.       Do you recall the last time you visited

4   Ethicon's website?

5      A.       No.

6      Q.       Why would you visit Ethicon's website?

7      A.       Out of curiosity more than anything.

8   Or -- if I'm -- I think they have videos on -- on

9   their different procedures.

10              When I was learning how to do the

11  TVT-O, before I would do the first one or the

12  second one, I would look at the video.  Same with

13  the TVT-Secur early on.

14              But other than that, I -- I haven't

15  gone to the website in years.

16     Q.       You haven't gone to their website in

17  years, correct?

18     A.       Correct.

19     Q.       What medical journals do you subscribe

20  to?

21     A.       "Journal of Urology" and the gold

22  journal.

23     Q.       Anything else?

24     A.       I subscribe to the "Society of Robotic

Christopher E. Ramsey M.D.

```
 1    Surgeons."

 2        Q.      Anything else?

 3        A.      No other journals, no.

 4        Q.      Okay.  Gold journal and "Journal of

 5    Urology" are the only two journals you subscribe to

 6    that might relate to stress urinary incontinence

 7    and transvaginal mesh, correct?

 8        A.      Correct.

 9        Q.      How often do you do an independent

10    literature search on the products you use in your

11    practice?

12        A.      Usually when I first start to use the

13    product, and then intermittently afterwards,

14    depending on, you know, if I see something new in a

15    conference that may pertain to that device, then

16    I'll look into that as well.

17        Q.      Okay.  It's your practice as a

18    physician, prior to using a product, you perform an

19    independent literature search on that product,

20    correct?

21        A.      Yes.

22        Q.      And I take it you don't just rely on

23    the representations of that company's sales rep?

24        A.      No, no.
```

Christopher E. Ramsey M.D.

1      Q.      Okay.  Why is that?

2      A.      Well, I think it's important to know

3   what the literature is about a device beforehand,

4   what studies have been done, and what potential

5   complications can occur by looking at -- at an

6   independent, as you said, or maybe an unbiased

7   point of view.

8      Q.      Have you ever performed a Kelly

9   plication?

10      A.      Yeah, I said I did earlier, in

11   residency.

12      Q.      Okay.  Since residency, though?

13      A.      No.

14      Q.      How about an MMK?

15      A.      Never.

16      Q.      Since residency, it sounds like you've

17   done graft materials and mesh materials for -- to

18   surgically treat SUI, correct?

19      A.      In females, yes.

20      Q.      And since 2005, just synthetic mesh to

21   surgically treat SUI in women, correct?

22      A.      Yes.

23      Q.      Are you an expert on the mesh

24   performance characteristics in the TVT line of

Christopher E. Ramsey M.D.

```
1    products?

2                MR. MORIARTY:  Objection to form.

3                Go ahead.

4                THE WITNESS:  Yes.

5    BY MR. JONES:

6        Q.      Okay.  Does increasing the pore size in

7    mesh used to treat SUI decrease inflammation in the

8    patient?

9        A.      I don't think that there's any strong

10   literature that has shown that increasing what's

11   already available has decreased inflammation in the

12   patient with -- with mesh.

13       Q.      Does making the mesh softer than the

14   mesh currently available to treat SUI result in

15   less inflammation for patients?

16               MR. MORIARTY:  Objection to form.

17               Go ahead.

18               THE WITNESS:  I haven't seen -- I

19   haven't seen any literature that has shown that.

20   BY MR. JONES:

21       Q.      You haven't seen any medical literature

22   that says making transvaginal mesh softer results

23   in less irritation for women?

24               MR. MORIARTY:  Objection to form.
```

Christopher E. Ramsey M.D.

1                    Go ahead.

2                    THE WITNESS:  No, I haven't seen any --

3      any type of long-term study that has suggested that

4      a softer mesh may have a better result or decrease

5      the inflammation compared to what's already been

6      shown to have very good efficacy.

7      BY MR. JONES:

8          Q.      Have you seen any medical literature

9      that discusses whether stiff mesh may be

10     potentially detrimental to the woman's adjacent

11     tissues to the mesh?

12                    MR. MORIARTY:  Objection to form.

13                    Go ahead.

14                    THE WITNESS:  No, I have not.

15     BY MR. JONES:

16         Q.      You haven't reviewed any medical

17     literature that discusses the stiffness values of

18     transvaginal mesh and that relationship to

19     complications in women?

20         A.      I haven't seen anything like that.

21         Q.      Okay.  Do you know who Pam Moalli is?

22         A.      I have seen Moalli's studies.

23         Q.      Okay.  And generally speaking, what is

24     the discussion involved in the Moalli studies?

Christopher E. Ramsey M.D.

1     A.      He's typically looking at weight of the

2     individual meshes that are available, the pore

3     sizes, the diameter.

4     Q.      Okay.  And what is the conclusion --

5     overall conclusion of those studies?

6     A.      That the mesh that -- the mesh that is

7     available is considered a macroporous mesh and has

8     fairly minimal inflammation.

9     Q.      Okay.  Do those studies discuss at all

10    fraying of the mesh?

11    A.      I can't remember specifically what

12    the -- what it discussed about the fraying.

13    Q.      Do they discuss the stiffness of the

14    mesh?

15    A.      I can't remember specifically about

16    stiffness.  I would have to look at the study

17    again.

18    Q.      Do they discuss whether the inflammatory

19    response is decreased when the stiffness of the

20    mesh is decreased?

21    A.      I can't -- I don't remember that.

22    Q.      Do they discuss whether -- when the

23    weight of the mesh is decreased, whether the

24    inflammatory response is decreased in patients?

Christopher E. Ramsey M.D.

1      A.      Again, I don't recall that.

2      Q.      Okay.  Do you know where Dr. Moalli

3   practices at?

4      A.      No, I don't.

5      Q.      Do you know whether Dr. Moalli is a

6   consultant for Ethicon or not?

7      A.      No.

8      Q.      Have you reviewed the contract between

9   Dr. Ulmsten and Ethicon?

10      A.      No, I have not.

11      Q.      Are you familiar with the term "milestone

12   payment"?

13      A.      No, I don't.

14      Q.      Do you know what a milestone payment is

15   in conjunction with a clinical study?

16      A.      No, sir.

17      Q.      Have you ever done a clinical study on

18   transvaginal mesh before?

19      A.      No.

20      Q.      Have you ever done a clinical study on

21   stress urinary incontinence in women before?

22      A.      No.

23      Q.      Have you ever done a survey on those

24   topics before?

Christopher E. Ramsey M.D.

```
1       A.      No.

2       Q.      Have you been ever asked to participate

3   in a clinical trial for the treatment of female SUI

4   with transvaginal mesh?

5       A.      No.

6       Q.      Ethicon's never asked you to

7   participate in a study like that?

8       A.      No.

9       Q.      AMS never asked you to participate in a

10  study like that?

11      A.      No.

12      Q.      Have you ever published -- how about

13  this:  Have you ever done any studies focusing on

14  treating pelvic pain in women?

15      A.      No.

16      Q.      Ever studied treating dyspareunia in

17  women?

18      A.      Have I studied it?

19      Q.      Yeah.

20      A.      Or have I done a study?

21      Q.      Have you done a study?

22      A.      No.

23      Q.      Published any literature on dyspareunia

24  in women?
```

Christopher E. Ramsey M.D.

```
 1      A.      No.

 2      Q.      Published any articles whatsoever on

 3   women's SUI?

 4      A.      No.

 5      Q.      Using mesh in women -- published

 6   anything on using mesh in women?

 7      A.      No.

 8      Q.      How about on -- have you done any

 9   research on graft materials --

10      A.      I've --

11      Q.      -- of treatment of SUI in women?

12      A.      I've researched it.

13      Q.      Okay.  And what was the just findings

14   of your research?

15      A.      Again, not clinical research -- not --

16   not bench science research, but just clinical

17   research of the medical literature.

18      Q.      Okay.

19      A.      So I've not --

20      Q.      You've never done a study --

21      A.      Correct.

22      Q.      -- on the Burch procedure, correct?

23      A.      No.

24      Q.      Never done a study on any graft
```

Christopher E. Ramsey M.D.

```
 1    material, correct?

 2        A.      Correct.

 3        Q.      Never done a study on any mesh

 4    material, correct?

 5        A.      Correct.

 6        Q.      Never done a study on SUI in women,

 7    correct?

 8        A.      Correct.

 9        Q.      Don't have any current research on

10    women's health, correct?

11        A.      Correct.

12        Q.      You're not an expert in chemical

13    engineering, correct?

14        A.      Correct.

15        Q.      Not an expert in pathology, correct?

16        A.      Correct.

17        Q.      You're not an expert in polymer

18    chemistry, correct?

19        A.      Correct.

20        Q.      You've got no background whatsoever in

21    polymer chemistry, correct?

22        A.      Well, as far as dealing with the mesh

23    products, that would be the only background that I

24    would have.
```

Christopher E. Ramsey M.D.

1      Q.      You have no educational background in

2   polymer chemistry whatsoever, correct?

3      A.      Correct.

4      Q.      Undergrad or medical education,

5   correct?

6      A.      Correct.

7      Q.      Whatsoever?  Okay.

8             You've never done bench research on

9   synthetic mesh, correct?

10      A.      Correct.

11      Q.      Never done any lab research on

12   synthetic mesh, correct?

13      A.      Correct.

14      Q.      Never done any bench research on SUI

15   devices, period, correct?

16      A.      Correct.

17      Q.      Never done any lab research on SUI

18   devices, correct?

19      A.      Correct.

20      Q.      You are not a biomaterials specialist,

21   correct?

22             MR. MORIARTY:  Objection.  Form.

23             Go ahead.

24             THE WITNESS:  Same thing I said earlier

Christopher E. Ramsey M.D.

1    about the polymer chemistry.  With my, you know,

2    clinical experience in handling those type of

3    things, I'm very comfortable with it.

4    BY MR. JONES:

5        Q.      You've never held yourself out as a

6    biomaterials specialist before, correct?

7        A.      No.

8        Q.      Okay.  And you've never published

9    anything in the medical literature?

10       A.      Correct.  Well, no, wait.  No.  I take

11   that -- yes, I have published.

12       Q.      I'll strike that.

13       A.      I've got a couple --

14       Q.      I'll strike that.  That's a bad

15   question.

16               Let me get to -- how about this:

17   The -- any of the opinions that you're expressing

18   in your general expert report, have any of those

19   opinions been published in a peer-reviewed medical

20   journal?

21       A.      Have any of my opinions?  Specifically

22   my opinions?

23       Q.      Yes.

24       A.      No.

Christopher E. Ramsey M.D.

1    Q.      Okay.  And you've never tried to have

2  any opinions that you've expressed in your report

3  published in peer-reviewed medical literature,

4  correct?

5    A.      Correct.

6    Q.      And no one's asked you to ever try to

7  have your opinions published in any peer-reviewed

8  medical literature, correct?

9    A.      Relating to SUI?

10   Q.      Yeah.

11   A.      Correct.

12   Q.      You've never published anything,

13  medical literature or otherwise, on the appropriate

14  warnings that must be in medical device IFUs,

15  correct?

16   A.      Correct.

17   Q.      You've never studied what warnings are

18  required to be in a medical device IFU, correct?

19   A.      Repeat that question.

20   Q.      You've never done a study --

21   A.      Okay.  You kind of confused me when you

22  say "You never studied," because --

23   Q.      I'll ask a better question.

24   A.      Correct.

Christopher E. Ramsey M.D.

1      Q.      You've never done a study on what

2  warnings are required to be in a medical device

3  IFU, correct?

4      A.      Correct.

5      Q.      You've never done a study on what

6  industry standards govern medical device IFUs,

7  correct?

8      A.      Correct.

9      Q.      You don't know what industry standards

10  govern medical device IFUs, correct?

11      A.      I think I would say I know what -- what

12  standards govern it.  The FDA has --

13      Q.      Industry standards.

14      A.      I guess --

15      Q.      Industry standards.  So the industry

16  among -- the standards among the industry.  Putting

17  aside regulation standards, I'm just asking, are

18  you familiar with the industry standards that

19  govern what warnings must be in medical device

20  IFUs?

21      A.      I guess I believe I do know what they

22  are.  Again, it relates to, you know, specifically

23  the safety of the -- of the device; that is

24  important to me in IFUs.  The potential

Christopher E. Ramsey M.D.

1    complications that can be -- can be related to the

2    device, specifically to the device.

3              Does that answer your question?

4       Q.     Are those all the industry standards

5    you're familiar with that govern what warnings must

6    be in a medical device IFU?

7       A.     I'm sure that there are more.

8       Q.     As you sit here today, you can't think

9    of those, correct?

10      A.     I can probably think about them for a

11   while and name some things, but I'd have to think.

12      Q.     Tell you what, next break, I'll give

13   you all the time you want to think about it, and

14   just see what you can come up with tonight.  If you

15   come up with any, just let us know at any time.

16              What -- since you're familiar with the

17   industry standards that govern the warnings on

18   medical devices, I have a series of questions for

19   you.

20      A.     Okay.

21      Q.     Is it true that a medical device

22   company must include all risks that are associated

23   with the device in the IFU?

24      A.     No.

Christopher E. Ramsey M.D.

1      Q.      Is it true a medical device company

2   must include all possible risks associated with the

3   use of the device in the IFU?

4      A.      No.

5      Q.      Do you agree that a medical device

6   company must include all risks associated with the

7   proper use of the device in the IFU?

8      A.      No.

9      Q.      Is it your opinion that the only risk a

10   medical device company must include in the IFU is a

11   risk associated with the unique use of that device?

12      A.      That's correct.

13      Q.      What is the risk that you believe

14   Ethicon must include in the TVT-O IFU?

15      A.      I think that the -- the main risk is

16   exposure of the graft.

17      Q.      Exposure of the mesh --

18      A.      Mesh -- thank you --

19      Q.      -- correct?

20      A.      -- according to my definition.

21      Q.      Exposure of the mesh.

22              Any other risk required under the

23   industry standards that Ethicon must include in the

24   IFU?

Christopher E. Ramsey M.D.

1       A.      I think that's the -- the one that must

2    be required.  I think that they can put in others

3    that are associated with the procedure, but I don't

4    think it's required.

5       Q.      Okay.  I'm only -- I'm only asking

6    about what's required under the industry standards

7    that you're familiar with.

8            Per the industry standards that you've

9    stated you're familiar with, the only risk Ethicon

10   must put in any of the TVT IFUs is exposure of the

11   mesh, correct?

12      A.      Yes.

13      Q.      If Ethicon only lists exposure of the

14   mesh as a risk in the TVT IFUs, it's your opinion

15   that the IFUs are adequate, correct?

16      A.      I agree.

17      Q.      And it's your opinion that an Ethicon

18   TVT IFU can be silent on chronic pain, can be

19   silent on dyspareunia, can be silent on removing

20   the mesh, can be silent on complications that may

21   be associated with removal of the mesh, and so long

22   as it includes exposure of the mesh the IFU is

23   adequate, correct?

24            MR. MORIARTY:  Objection to form.

Christopher E. Ramsey M.D.

1              Go ahead.

2              THE WITNESS:  Yes.

3    BY MR. JONES:

4        Q.      Are you familiar with the IFU for the

5    AMS MiniArc-Precise?

6        A.      Yes.

7        Q.      And I take it that will be something

8    that you'll be relying on for your basis that

9    you're qualified to testify about the adequacy of

10   the warning statements in the TVT IFU, correct?

11             MR. MORIARTY:  Objection.

12             THE WITNESS:  I don't think that I'll

13   rely on the AMS version IFU.

14   BY MR. JONES:

15       Q.      For your qualifications at all?

16             MR. MORIARTY:  Objection to form.

17             Go ahead.

18             THE WITNESS:  Not concerning the

19   TVT-Secur mesh.

20             (Reporter interruption for

21   clarification.)

22             MR. JONES:  For your qualifications.

23   BY MR. JONES:

24       Q.      So you won't be -- your review of other

Christopher E. Ramsey M.D.

1    mesh company IFUs, you won't be using that

2    experience as background for your opinions as to

3    the adequacy of the Ethicon TVT IFUs?

4        A.      No.

5        Q.      The same question for any other medical

6    device IFUs that you've reviewed.

7        A.      Which ones would you say?

8        Q.      The da Vinci and robot ones.

9        A.      No, I wouldn't use the IFU for that.

10       Q.      Okay.  Any other AMS mesh IFUs?

11       A.      No.  I haven't used any other AMS mesh

12   products.

13       Q.      Okay.  As you sit here today, can you

14   point to a single medical device IFU that you've

15   used in all your time as a urologist that adheres

16   to your standard of only risk -- only listing the

17   risk that is associated -- uniquely associated with

18   that device?

19       A.      None of them do.

20       Q.      None of them do?

21       A.      No.

22       Q.      Not a single medical device IFU that

23   you've ever looked at in your time as a urologist

24   adheres to the standard that you've presented

Christopher E. Ramsey M.D.

```
 1    today, correct?

 2        A.      Correct.

 3        Q.      Are you familiar with the Abbott

 4    article?

 5        A.      Spell that.

 6        Q.      A-b-b-o-t-t.

 7        A.      Abbott?

 8        Q.      Sarah Abbott?

 9        A.      Not off the top of my head, no.

10        Q.      Mickey Krimm is a coauthor on it?

11        A.      The names sound familiar, but I'm not

12    sure.  I obviously can't tell you specifics.

13        Q.      2014?

14        A.      I don't know.  I don't know the

15    specifics.  When I read my articles, I honestly

16    don't remember the authors.

17        Q.      Okay.  It discusses warnings -- warning

18    statements --

19        A.      Okay.

20        Q.      -- in IFUs.

21        A.      Right.

22        Q.      Still nothing?

23        A.      Sounds familiar, vaguely familiar, but

24    I'm not sure.
```

Christopher E. Ramsey M.D.

```
1        Q.        Okay.  But as you sit here today,
2   you're not -- you don't recall generally what that
3   article concludes as to the adequacy of warnings in
4   IFUs?
5        A.        I do not.
6        Q.        Can you point me to a single article as
7   you sit here today that discusses the adequacy of
8   the warning statements in the TVT IFUs?
9        A.        No, I don't think I've ever read an
10  article -- a medical article about that.
11       Q.        Can you point me -- as you sit here
12  today, can you point me to a single internal
13  Ethicon document that discusses the adequacy of the
14  TVT IFUs?
15       A.        I think there are -- there are internal
16  documents that talk about what should be in the IFU
17  and what they want to include in -- so I think
18  there are probably a lot of those.  And I'd have to
19  look through my list of -- my reliance list -- you
20  know, all those boxes that I have.  Probably could
21  find the emails and internal records that I've
22  seen.  So there is discussion internally about what
23  they want to put in their IFU.
24       Q.        Did Ethicon ever learn of any new risk
```

Christopher E. Ramsey M.D.

1   associated with the TVT devices after marketing the

2   devices?

3       A.      Safety risks?  No.  Not that I know of.

4   Not that I'm aware.

5       Q.      So Ethicon knew all the safety risks

6   associated with the TVT products prior to launching

7   them, correct?

8       A.      I believe so.

9       Q.      Did Ethicon ever make any changes to

10  the mesh used in the TVT products since 1998?

11      A.      Specifically the mesh itself?  Not that

12  I'm aware of.

13      Q.      Correct.

14          You're not aware of Ethicon ever making

15  the TVT mesh softer, correct?

16      A.      I'm not familiar with that.

17      Q.      You're not familiar with Ethicon ever

18  making the TVT mesh less dense, correct?

19      A.      No.

20      Q.      You're not aware with Ethicon ever

21  making the TVT mesh with bigger pore size, correct?

22      A.      No, I'm not aware of that.

23      Q.      You're not aware of Ethicon ever making

24  the edges of the mesh used in the TVT softer,

Christopher E. Ramsey M.D.

1    correct?

2    A.      No.

3    Q.      Have you reviewed the design history

4    file for laser-cut mesh?

5    A.      I've read some articles about the

6    laser-cut mesh, but I'm not certain exactly what

7    you're talking about --

8    Q.      Okay.  You --

9    A.      -- but I've read documents about it.

10   Q.      Do you know what a design history file

11   is?

12   A.      I can -- I guess I can guess.  I'm not

13   specifically aware of --

14   Q.      Don't guess.

15   A.      Okay.

16   Q.      Do you know what a -- do you know what

17   the stage-gates are in a design process for a

18   medical device?

19   A.      No.

20   Q.      Did Ethicon ever add any warnings to

21   the TVT-O IFU since launch?

22           MR. MORIARTY:  Objection.  Go ahead.

23           THE WITNESS:  I'm not aware that

24   they've added to the TVT-O.

Christopher E. Ramsey M.D.

1    BY MR. JONES:

2        Q.      How about the TVT-R?

3        A.      Not that I'm familiar with.

4        Q.      Okay.  You're not familiar with any

5    changes -- strike that.

6                You're not familiar with any additions

7    that Ethicon's made to the warning statements in

8    the TVT-O or TVT-R IFU, correct?

9        A.      I'm not aware of them.

10               MR. MORIARTY:  When it's convenient,

11   let's take five minutes.

12               MR. JONES:  Let's take five minutes.

13   Let's take a break.

14               (Brief recess.)

15   BY MR. JONES:

16       Q.      Doctor, after a short break, are you

17   ready to proceed?

18       A.      Yes.

19       Q.      Do you use the website

20   ceramsey@charter.net?

21       A.      That's a -- may be an old email address

22   of mine.

23       Q.      Okay.  But you're familiar with that

24   email address?

Christopher E. Ramsey M.D.

1      A.      That's my email -- well --

2      Q.      Okay.

3      A.      I think so.  That's been a long time.

4      Q.      Okay.

5      A.      I think it was chartertn.net.

6      Q.      Chartertn.net.  You got it.

7              You are familiar with it?

8      A.      Yeah.

9      Q.      Is it possible that you did any

10     consulting working for Ethicon in 2014?

11     A.      For Ethicon in 2014?  Other than case

12     review, I can't think of it.

13     Q.      That's a good point.

14             When did Ethicon first contact you to

15     ask about being an expert in the Rabiola case or

16     the other case that you've described?

17     A.      I think it was 2014 was the first time.

18     Q.      2014?

19     A.      Correct.

20     Q.      What month?

21     A.      Oh, I have no idea.

22     Q.      Early 2014?

23     A.      Probably mid.

24     Q.      Mid-2014?

Christopher E. Ramsey M.D.

```
1      A.      May-ish maybe.

2      Q.      First time --

3      A.      No idea.

4      Q.      Mid-2014 is most likely the first time

5   Ethicon approached you either directly or

6   indirectly about being an expert witness in

7   transvaginal mesh litigation, correct?

8      A.      To the best of my recollection.

9      Q.      And did you agree at that --

10     A.      Yes.

11     Q.      -- point?

12             And then at some point they sent you

13  materials to review, correct?

14     A.      Yes.

15     Q.      And they sent you materials related to

16  TVT-Secur, correct?

17     A.      Yes.

18     Q.      Okay.  And this would have been

19  sometime in 2014, correct?

20     A.      Correct.

21     Q.      Did you ever make any determinations in

22  the -- in those two cases?

23     A.      I think I did a -- a case specific for

24  Rabiola, I think.  I'm not certain if I did one for
```

Christopher E. Ramsey M.D.

1    the other one, but I may have.

2         Q.        Okay.  Did you determine that the mesh

3    was not the cause or a cause of the alleged

4    injuries in those two cases?

5         A.        Yes.

6         Q.        So in every instant where Ethicon has

7    asked you to review a transvaginal mesh case, you

8    have determined that the Ethicon mesh device is not

9    the cause or a cause of the alleged injuries,

10   correct?

11        A.        Correct.

12        Q.        Do you know who Scott Finley is?

13        A.        I know Scott Finley.

14        Q.        You know Scott?

15        A.        Yes.

16        Q.        How long have you known Scott?

17        A.        Gosh.  Probably around 2005, I'd say,

18   2004 or 2005.

19        Q.        Okay.  How do you know Scott?

20        A.        He was the Ethicon representative for

21   Gynecare, and he's the manager now.

22        Q.        So when you first met Mr. Finley

23   in 2005, he was an Ethicon sales rep, correct?

24        A.        Correct.

Christopher E. Ramsey M.D.

```
 1        Q.        And then at some point thereafter, he

 2   moved on up the company ladder, correct?

 3        A.        Correct.

 4        Q.        And you continued to have a

 5   relationship with Mr. Finley, correct?

 6        A.        Only social at this point.  I've -- and

 7   very rarely now.  I -- I can't remember the last

 8   time that I -- I might have seen him in the

 9   hospital and said hi, but it's not a -- a

10   professional relationship at this point.  It might

11   be if I start using TVT again.

12        Q.        Correct.  Correct.

13        A.        I've got to make some decisions.

14        Q.        Correct.  From 2005 to 2012, you had a

15   business and professional relationship with

16   Mr. Finley, though, correct?

17        A.        Yes.

18        Q.        A close relationship with him, correct?

19        A.        Yes.

20        Q.        Professional?

21        A.        Professional, yes.

22        Q.        And you worked closely with him,

23   correct?

24        A.        Correct.
```

Christopher E. Ramsey M.D.

1     Q.     And is he someone you have placed your

2   trust in as an Ethicon employee?

3     A.     Yes.

4     Q.     How about Mike Lewis?

5     A.     Mike Lewis, I know him very well.

6     Q.     Ethicon sales rep?

7     A.     He was.

8     Q.     Okay.

9     A.     He was -- I first knew him as an Pfizer

10  rep.  He sold Viagra.  Great friend then.  And then

11  he was a -- worked for Gynecare, and now he works

12  for Intuitive.

13    Q.     Okay.  So you knew Mike Lewis before he

14  joined Ethicon in his role as a sales rep for

15  Pfizer, correct?

16    A.     Correct.

17    Q.     And I take it that as a urologist, you

18  had contact with him in his role as an Ethicon

19  sales rep for Pfizer, correct?

20    A.     You said "Ethicon sales rep for

21  Pfizer."

22    Q.     In his role as a sales rep for Pfizer,

23  correct?

24    A.     Correct.

Christopher E. Ramsey M.D.

1      Q.      Thank you.

2              And that related to, at least in part,

3   his role of selling Viagra?

4      A.      Correct.

5      Q.      And then he went on to be a sales rep

6   for Ethicon?

7      A.      Correct.

8      Q.      And you were a consultant for Ethicon,

9   correct?

10     A.      Correct.

11     Q.      And at some point, he went on to be a

12  sales rep for Intuitive Surgical Instruments --

13  Surgical Instruments, correct?

14     A.      Correct.

15     Q.      And you're a consultant for that

16  company, correct?

17     A.      Correct.

18     Q.      A longstanding relationship with

19  Mr. Lewis, correct?

20     A.      Correct.

21     Q.      You consider him a friend, correct?

22     A.      Yes.

23     Q.      You consider Mr. Finley a friend, too,

24  correct?

Christopher E. Ramsey M.D.

```
 1      A.      He's -- he's a friend.

 2      Q.      How about Jason Martin?

 3      A.      I know Jason.

 4      Q.      Ethicon sales rep, correct?

 5      A.      Correct.

 6      Q.      Do you know him well?

 7      A.      Yeah, I know him well.

 8      Q.      For how long have you known Mr. Martin?

 9      A.      I think he took over after Mike Lewis

10   left Ethicon, and so from that point on.  I'm

11   not -- about 2008, '9, maybe, something like that.

12      Q.      Yeah.  Sometime around the 2009 time

13   period, Jason Martin took over for Mike Lewis in

14   the role as an Ethicon sales rep for you, correct?

15      A.      Correct.

16      Q.      Would you consider yourself a customer

17   of Ethicon?

18      A.      Yes.

19      Q.      Okay.  Would you consider yourself a

20   partner with Ethicon?

21              MR. MORIARTY:  Objection.

22              Go ahead.

23              THE WITNESS:  A partner -- no, I

24   wouldn't consider myself a partner with Ethicon.
```

Christopher E. Ramsey M.D.

1   BY MR. JONES:

2       Q.      A business partner with Ethicon?

3       A.      A consultant.  I wouldn't consider it a

4   partner, though.

5       Q.      Did you ever see your role as a

6   consultant for Ethicon including converting other

7   physicians to Ethicon mesh products?

8       A.      No.  I wasn't -- I didn't try to

9   convert other people to Ethicon products.

10              I -- I would be asked to help them

11  out -- the doctor -- I would be asked to help the

12  physician out in learning how to do the procedure,

13  but I never tried to make other people use the

14  product.

15      Q.      Never tried --

16      A.      I didn't coerce anybody.

17      Q.      Never tried to convert any of your --

18      A.      No.

19      Q.      -- partners to use Ethicon mesh

20  products?

21      A.      No.  They were already using them.

22      Q.      Never introduced any of your partners

23  to Ethicon mesh products?

24      A.      No.

Christopher E. Ramsey M.D.

1      Q.       Never introduced any of your partners

2    to the TVT-Secur device?

3      A.       I probably proctored one of my partners

4    in -- one or two of my partners in using it.  So I

5    guess I introduced that to him.  Yeah, they were

6    already using TVT products, though.

7      Q.       Do you feel like you converted them to

8    TVT-Secur?

9               MR. MORIARTY:  Objection.  Form.

10              THE WITNESS:  I think they saw the

11   benefits of the TVT-Secur in their professional

12   good judgement.

13   BY MR. JONES:

14     Q.       Fair to say you don't like the word --

15   you don't feel comfortable with associating your

16   role as a consultant with converting other

17   physicians to Ethicon mesh products?

18     A.       I wasn't a missionary for them.

19     Q.       You don't like that word, correct?

20     A.       Well --

21     Q.       In this context?

22     A.       Correct.

23     Q.       Did you ever consider yourself a loyal

24   customer of Ethicon's?

Christopher E. Ramsey M.D.

```
1                MR. MORIARTY:  Objection.  Form.

2                Go ahead.

3                THE WITNESS:  No.  I don't think I was

4    a loyal customer, because I used other products.

5    When TVT-Secur was off the market, I went to a

6    different company pretty quickly.

7    BY MR. JONES:

8        Q.      Did you ever go to any of the Ethicon

9    annual summits?

10       A.      No.

11       Q.      How about one -- you never went to

12   Celebration, Florida?

13       A.      I've been to Celebration, Florida.

14       Q.      For Ethicon?

15       A.      I don't remember one for Ethicon.  I

16   remember going with -- with -- with Intuitive for a

17   CME experience, but not even with a -- as a

18   consultant there.

19       Q.      You've gone to Celebration, Florida, in

20   your role as a consultant for industry, but not for

21   Ethicon, correct?

22       A.      No, I didn't -- I went, again, as a CME

23   credit.  So I paid my way and. . .

24       Q.      You've never gone to Celebration,
```

Christopher E. Ramsey M.D.

1    Florida, for Ethicon, though, correct?

2        A.      No.

3        Q.      Never for an Ethicon event, correct?

4        A.      Not that I recall, no.

5                MR. MORIARTY:  I've heard about

6    Celebration, Florida.  Where is Celebration,

7    Florida?

8                THE WITNESS:  Close to Orlando.

9                MR. MORIARTY:  Okay.

10               THE WITNESS:  It's a little mini city

11   that has a really nice hospital.

12               MR. MORIARTY:  Okay.

13               MR. JONES:  Next to Kissimmee.

14   BY MR. JONES:

15       Q.      How about Atlanta?  Did Ethicon send

16   you to Atlanta to any events?

17       A.      Not for me to do an event, no.  If I --

18   the only time I remember going anywhere with

19   Ethicon is -- I guess where it's -- is it New

20   Jersey? is where their headquarters are, if I

21   remember right.  But that's when the TVT-Secur was

22   launched in early '06-ish or something like that.

23       Q.      Okay.  The only travel you recall for

24   Ethicon is traveling to their headquarters in

Christopher E. Ramsey M.D.

```
1    Morristown, New Jersey, correct?

2        A.      If that's where it is.

3        Q.      Okay.  The only travel you ever

4    recall -- as you sit here today, the only travel

5    you recall for Ethicon is going to their

6    headquarters in New Jersey, correct?

7        A.      Unless I was a proctor somewhere, and

8    then I would -- you know, they would pay for my

9    travel to wherever I went, which was always a car

10   drive away.  I never -- I never went anywhere that

11   was -- that was longer than just a couple of hours

12   away, that I would get -- but I would get mileage

13   for that or. . .

14       Q.      Yeah.

15       A.      Is that -- okay.

16       Q.      Outside of Tennessee -- outside of

17   Tennessee and this one trip --

18       A.      Kentucky.

19       Q.      Outside of the two-hour range that you

20   just described and this one trip to Ethicon's

21   headquarters, any other travel?

22       A.      Specifically related to TVT?  I can't

23   remember.  And even with the hand-assist device,

24   I'm trying to remember if I went somewhere for
```

Christopher E. Ramsey M.D.

1    that.  And I don't think I -- I don't think I did.

2        Q.       They never sent you to Paris?

3        A.       Tennessee?

4        Q.       Paris, France.

5        A.       No.

6        Q.       Francais.

7                 In 2006 you visited Ethicon's

8    headquarters, correct?

9        A.       Yes.

10       Q.       In 2006 you visited Ethicon's

11   headquarters in relation to a TVT-Secur event,

12   correct?

13       A.       Yes.

14       Q.       And what was the nature of that event?

15       A.       I think it was the original launch.

16   They wanted me to be one of the early adapters.  I

17   wanted to be an early adapter.  And so I went

18   there.  I think I was the first person to place a

19   TVT-Secur in Tennessee.  I think.  It's been a

20   while.  I've slept since then.

21               But that was what that was about, was

22   to have early adapters, high-use users to learn the

23   new device, to be exposed to it, and see if that's

24   something that I would be interested in using.  So

Christopher E. Ramsey M.D.

1    I think it was a two-day event.

2        Q.      And you would describe yourself as a

3    high-use user of a TVT-Secur device, correct?

4        A.      Yes.

5        Q.      Would you describe yourself as a

6    high-use user of Ethicon mesh products in general?

7        A.      Not lately.

8        Q.      How about over the course of your

9    career?

10       A.      It's kind of averaged out over the last

11   four years.

12       Q.      Okay.  Over the last four years --

13   strike that.

14              So in 2006, Ethicon pays for you to

15   travel to their headquarters for a two-day event,

16   correct?

17       A.      Yes.

18       Q.      And this is in relationship to the

19   launch of TVT-Secur, correct?

20       A.      Correct.

21       Q.      And you were invited to this two-day

22   event at Ethicon's headquarters in 2006 because you

23   were a early adapter and high-use user of

24   TVT-Secur, correct?

Christopher E. Ramsey M.D.

```
1        A.       Well, no.  I was a high-use user of TVT
2    Obturator and wanted to become -- wanted to learn
3    about the TVT-Secur.
4        Q.       Okay.
5        A.       That's why I was invited to that,
6    because it -- it was a new device.  It wasn't out
7    yet at the time I went up there.
8        Q.       And the two-day event in 2006 at
9    Ethicon's headquarters was a launch event for
10   TVT-Secur?
11       A.       It was -- it was -- not even a launch
12   event, because it still wasn't available at the
13   time.  It was more of a learning event and a
14   didactic event and a training event.
15               There was -- there was a cadaver lab
16   that they showed us how to use it, didactic, you
17   know, going over some of the studies that they had.
18   Also talking about TVT-O and probably TVT
19   Retropubic.  I can't remember that far back.  Tour
20   the facilities.
21       Q.       Tour the facilities, two-day event.
22               Other Ethicon consultants attended,
23   correct?
24       A.       I don't know if they were consultants
```

Christopher E. Ramsey M.D.

```
 1    or not.  Maybe -- you know, there were other

 2    doctors, OB/GYNs and urologists, that were there.

 3         Q.       When you agreed to become a consultant

 4    for Ethicon, were you required to sign a contract?

 5         A.       Yes.

 6         Q.       And did you agree to the terms of that

 7    contract?

 8         A.       Yes.

 9         Q.       Did you have -- did you review those

10    contracts prior to signing them?

11         A.       I didn't have a lawyer look at it, but

12    I looked at them.

13         Q.       Okay.  And I take it you signed a

14    contract for each year that you were a consultant

15    for Ethicon, correct?

16         A.       Yes.

17         Q.       Did you bring those with you today?

18         A.       I don't know if I have them or not.

19         Q.       Okay.  Did you ask Ethicon?

20         A.       No.

21                   I thought you brought them.

22                   MR. MORIARTY:  He did.

23                   THE WITNESS:  There they are.

24    BY MR. JONES:
```

Christopher E. Ramsey M.D.

1     Q.      Have you ever promoted the use of

2   Ethicon mesh products --

3              MR. MORIARTY:  Objection --

4   BY MR. JONES:

5     Q.      -- in your role as a consultant

6   physician?

7              MR. MORIARTY:  Objection.  Form.

8              THE WITNESS:  Again, I wouldn't say

9   "promote."  That goes along with "convert."  I

10   advocated it, maybe.

11   BY MR. JONES:

12     Q.      Okay.  Do you consider yourself an

13   advocate of Ethicon TV [verbatim] mesh products?

14     A.      Yes.

15     Q.      Do you consider yourself an ambassador

16   of Ethicon TV mesh products?

17     A.      No, I don't consider myself an

18   ambassador.

19     Q.      Do you think -- I noticed that you

20   wrote one report for TVT-R, TVT-O and TVT-S,

21   correct?

22     A.      All-inclusive.

23     Q.      Okay.  And --

24     A.      Correct.

Christopher E. Ramsey M.D.

1      Q.        -- will you be offering any opinions in

2   this litigation that any of the TVT-O products are

3   safer than any of the TVT products?  Meaning --

4   meaning, will you be making a distinction as to the

5   level of safety of those devices -- will you be

6   offering an opinion that TVT-R is safer than TVT-S?

7               MR. MORIARTY:  Objection --

8               THE WITNESS:  No.

9               MR. MORIARTY:  -- form.

10  BY MR. JONES:

11     Q.        Will you be offering an opinion in this

12  litigation that TVT-S is safer than TVT-R?

13     A.        I would say yes.

14     Q.        Okay.  Will be you offering an opinion

15  in this case that TVT-S is safer than TVT-O?

16     A.        Yes.

17     Q.        Will be you offering an opinion that --

18  in this case that mini-slings are safer than

19  Retropubic slings?

20     A.        Yes.

21     Q.        Will be you offering an opinion in this

22  litigation that mini-slings are safer than

23  Obturator slings?

24     A.        Yes.

Christopher E. Ramsey M.D.

```
 1        Q.       Have you ever used hernia mesh?

 2        A.       In residency.  I've done hernias since

 3     residency.  '02 -- well, '99 really.

 4        Q.       Do you know the differences between

 5     hernia mesh and transvaginal mesh?

 6                 MR. MORIARTY:  Objection.

 7                 Go ahead.

 8                 THE WITNESS:  Depends on the -- I think

 9     it depends on the type of mesh that you're -- that

10     you're using.  So yes, I know the differences

11     between hernia mesh and --

12     BY MR. JONES:

13        Q.       From a general standpoint?

14        A.       From a general standpoint.

15        Q.       What are the differences between hernia

16     mesh and transvaginal mesh?

17        A.       So the hernia meshes, from my

18     understanding, number one, are placed in a

19     different compartment of the body.  They may have

20     different characteristics with the pore size.

21                 They may not be just kind of a -- a --

22     I don't know how to say this -- a single woven

23     mesh; it may have more of a polyfilament mesh.

24                 I would not consider myself an expert
```

Christopher E. Ramsey M.D.

```
 1    in hernia mesh, though.

 2        Q.      Is the reaction -- tissue reaction to

 3    the mesh the same or different in hernia mesh

 4    repair as in transvaginal mesh repair?

 5        A.      I would say it depends on the hernia

 6    mesh and the characteristics of that hernia mesh.

 7    So, I mean, you would have to be specific on which

 8    hernia mesh that you -- that you have.

 9        Q.      Fair to say that there -- the tissues

10    in a woman's vagina are more supple than in the

11    abdominal wall, though, correct?

12               MR. MORIARTY:  Objection.  Form.

13               Go ahead.

14               THE WITNESS:  More supple?

15    BY MR. JONES:

16        Q.      Yeah.

17        A.      I would say they're -- no, I wouldn't

18    say that it's necessarily more supple.

19        Q.      Okay.  Is one area of the body less

20    forgiving than the other?

21               MR. MORIARTY:  Objection.

22    BY MR. JONES:

23        Q.      In the context of mesh?

24               MR. MORIARTY:  Go ahead.
```

Christopher E. Ramsey M.D.

1                    THE WITNESS:  Not in my opinion.

2     BY MR. JONES:

3         Q.      Okay.  Is the woman's -- are there more

4     nerves in a woman's vagina than in the abdominal

5     wall?

6         A.      No, I don't think so.

7         Q.      Okay.  The woman's vaginal tissue is

8     more sensitive to mesh than the tissue in the

9     abdominal wall, correct?

10        A.      I don't agree with that.

11        Q.      The foreign body response is greater in

12    a woman's vagina than in the abdominal wall,

13    correct?

14        A.      I don't agree with that either.

15        Q.      The inflammatory response is greater in

16    a woman's vagina in reaction to mesh than the

17    abdominal wall, correct?

18        A.      I don't agree with that.

19        Q.      Mesh contraction occurs at a greater

20    rate when implanted transvaginally than in the

21    abdominal wall, correct?

22                    MR. MORIARTY:  Objection.

23                    THE WITNESS:  I don't agree with that.

24    BY MR. JONES:

Christopher E. Ramsey M.D.

```
1        Q.       You do know that mesh contraction does

2    occur inside the human body, though, correct?

3        A.       I don't think that the mesh itself

4    contracts.

5        Q.       Do you think the mesh at all changes

6    inside the body?

7        A.       No, I don't think it changes.

8        Q.       It just stays the same the whole time

9    it's inside the body?

10       A.       It has a reac- -- the human body has a

11   reaction to it, and it has infiltration of

12   inflammatory cells.  So there's going to be a

13   change because of that.  So it doesn't stay a sheet

14   of mesh by itself; it's incorporated into the body.

15       Q.       But the mesh doesn't stay flat inside

16   the -- when the TVT mesh is placed, it doesn't

17   stay flat underneath the urethra, correct?

18       A.       I think it stays -- the mesh widthwise

19   remains flat.  Lengthwise, it's going to have

20   curvature.  Because that's how it's placed,

21   especially if you use a U-formation.  Even an

22   H-formation, there's still going to be some

23   curvature to the mesh itself.

24       Q.       The width of the TVT mesh remains the
```

Christopher E. Ramsey M.D.

1    same after it's implanted in the woman's body,

2    correct?

3        A.      I agree.

4        Q.      It never decreases in width, correct?

5        A.      No, I don't think so.  Not that I've

6    seen.

7        Q.      Do you know what the forces placed on

8    the mesh are inside the human body when -- on TVT

9    mesh?

10       A.      I can't tell you what the actual joules

11   are, but I do know what the forces are.

12       Q.      What are they?

13       A.      As far as forces from lifting,

14   coughing, sneezing, and bearing down, just whatever

15   a human body --

16       Q.      Everyday --

17       A.      Right.  Yeah.

18       Q.      -- life activities, correct?

19       A.      Everyday life activities.

20       Q.      Let me see if I can't make it through

21   some of these exhibits.  I kind of got lost.

22   Sorry.  All right.

23              Exhibit 3, your reliance list, correct?

24       A.      Uh-huh.

Christopher E. Ramsey M.D.

```
1        Q.       Exhibit 4 is your CV?

2        A.       Okay.

3        Q.       Correct?

4        A.       Yes.

5        Q.       Do you recognize this as your CV?

6        A.       I do.

7                 (Whereupon Exhibit 4 was marked as an

8    exhibit.)

9                 THE WITNESS:  Impressive.

10   BY MR. JONES:

11       Q.       It is.  A couple things --

12       A.       It's not as long as the other ones I've

13   seen.

14       Q.       Proctoring, you've listed proctor for

15   Ethicon and Intuitive Surgical, correct?

16

17       A.       Correct.

18       Q.       Those are both medical device

19   companies, correct?

20       A.       Correct.

21       Q.       Have you done any proctoring for --

22   outside of proctoring for medical device companies?

23       A.       Proctoring for medical. . .

24                I'm sorry.  I have to think about that.
```

Christopher E. Ramsey M.D.

1    I mean --

2        Q.      How about --

3        A.      Technically, I'd say I would with other

4    surgeries that I do in either assisting my partners

5    in learning a new technique for something that

6    I've -- that I've brought in.

7                There's one in here, buccal mucosal

8    graft for strictures.  So I've shown that.  That's

9    not a medical device.  And so I've helped my

10   partners, you know, do that for strictures,

11   urethral strictures.

12               There's another graft, buccal mucosal

13   graft.

14       Q.      Uh-huh.

15       A.      So yes.  I guess the answer to that

16   question's yes.

17       Q.      But in an official capacity for a

18   university?

19       A.      No.

20       Q.      Or a hospital?

21       A.      No.

22       Q.      On SUI?

23       A.      No.

24       Q.      On transvaginal mesh?

Christopher E. Ramsey M.D.

1    A.    No.

2    Q.    Have you ever given any presentations

3    at any medical societies on transvaginal mesh?

4    A.    No.

5    Q.    Have you given any presentations to

6    medical societies on female stress urinary

7    incontinence?

8    A.    No.

9    Q.    Have you given any presentation at any

10   medical society since 2001?

11   A.    No.

12   Q.    And when did you finish your residency?

13   A.    2002.

14   Q.    Okay.  Following your residency, have

15   you given a single presentation at any medical

16   society?

17   A.    No, not at a medical society, no.

18   Q.    Okay.  That obviously includes SUI,

19   female SUI --

20   A.    Correct.

21   Q.    -- transvaginal mesh?  Yeah.

22         Under "Research" you've listed two

23   entries --

24   A.    I have.

Christopher E. Ramsey M.D.

 1      Q.      -- one in '96 and one in '94.

 2              Have you done any research since the

 3      entry listed March 1996?

 4      A.      Not what I would call clinical

 5      research.

 6      Q.      Not that you would list here on your

 7      CV?

 8      A.      Right.  Not -- the presentations were

 9      research, but. . .

10      Q.      Okay.  Under "Medical Societies,"

11      when -- are you a member of AUGS?

12      A.      No.

13      Q.      Are you a member of SUFU?

14      A.      No.

15      Q.      Are you a member of ICS?

16      A.      No.

17      Q.      IUGA?

18      A.      No.

19      Q.      AGOS?

20      A.      No.

21              MR. MORIARTY:  He's making them up now.

22      BY MR. JONES:

23      Q.      Have -- are you a urogynecologist?

24      A.      No.

Christopher E. Ramsey M.D.

1      Q.      Did you do a fellowship?

2      A.      No.

3      Q.      Okay.  Did you apply to sit for the

4   FPRM exam in 2013?

5      A.      You're making that one up, too.

6      Q.      Yeah.  I may be.

7      A.      No.  No.  I know what you're talking

8   about.  No, I did not.

9      Q.      Okay.  If you know the proper acronym,

10  feel free to correct me.

11              Female Pelvic -- but you understand

12  that there was a credentialing program sometime in

13  2003 -- 2013?

14     A.      Yes.

15     Q.      And you didn't apply to take that test?

16     A.      No.

17     Q.      Why not?

18     A.      Because I didn't do most of the things

19  that they do, which is a lot of pelvic floor. . .

20     Q.      Okay.  So you wouldn't have even

21  qualified to take the test, correct?

22     A.      Probably could have -- sure, I could

23  have qualified to take the test.  I don't think

24  that they had any -- anybody can take the test if

Christopher E. Ramsey M.D.

1    you're a urologist or a gynecologist, but I

2    wouldn't -- I wouldn't have done it.

3        Q.      If you had researched it and there was

4    a minimal requirement for the level of -- or level

5    and/or number of pelvic floor surgeries that you

6    had to do in order to even sit for the exam, it's

7    possible that you wouldn't have been even able to

8    sit for the exam, correct?

9        A.      That's true.

10       Q.      Okay.  And you're not -- as you sit

11   here today, you don't know the requirements,

12   correct?

13       A.      No.

14       Q.      But you didn't try to apply for it?

15       A.      No.

16            MR. MORIARTY:  So it's after 9:00.

17   Let's just look for the next convenient stopping

18   point.

19            MR. JONES:  Okay.

20   BY MR. JONES:

21       Q.      Under "Honors," "Leadership,"

22   "Publications," "Presentations," and/or "Research,"

23   none of the listings in your CVA [verbatim] relate

24   to SUI or transvaginal mesh, correct?

Christopher E. Ramsey M.D.

```
 1        A.        In my CV?  No.  Correct.

 2                  (Whereupon Exhibit 5 was marked as an

 3     exhibit.)

 4     BY MR. JONES:

 5        Q.        Exhibit 5.

 6        A.        I did bring them.

 7        Q.        You did bring them.  Somebody brought

 8     them.

 9                   What is Exhibit 5, Doctor?

10        A.        When?

11        Q.        What is Exhibit 5, Doctor?

12        A.        What is -- oh, it's a consulting

13     agreement for Ethicon.

14        Q.        Take a look -- take a second and look

15     through Exhibit 5, and all I'm going to ask is what

16     the documents are, if you're familiar with them,

17     you know, if your name appears on them and what

18     year they are.  I'm just going to ask basic

19     questions like that --

20        A.        Okay.

21        Q.        -- and then we'll be done for the

22     evening.  But take a second and look through them.

23        A.        (Reviews documents.)

24                   Okay.  I've looked at the first one.
```

Christopher E. Ramsey M.D.

```
1    Are they all fairly similar?
2       Q.     Yeah.  Okay.  Exhibit 5 contains a
3    variety of documents that I've given you an
4    opportunity to review.
5            Go ahead.
6            MR. MORIARTY:  Are you just asking him
7    about Exhibit 5, or is all of this Exhibit 5?
8            MR. JONES:  Why don't we, in the
9    interest of time, scrap this.  Scrap Exhibit 5.
10   We'll pick that up tomorrow.
11           THE WITNESS:  I mean, I've -- I don't
12   know -- unless you're -- think that I don't -- I
13   don't know how difficult it will be.
14   BY MR. JONES:
15      Q.     Okay.  How about this?  Do you
16   recognize the documents contained within Exhibit 5,
17   Doctor?
18           MR. MORIARTY:  Okay.  And just for
19   clarity, for the record, only one of the documents
20   in this --
21           MR. JONES:  They're all Exhibit 5.
22           MR. MORIARTY:  -- folder are marked.
23   And there's maybe five documents.  So you've got
24   consulting agreements and then advisory board
```

Christopher E. Ramsey M.D.

```
 1    documents.

 2              So the question is, does he recognize

 3    them?

 4    BY MR. JONES:

 5       Q.     Yeah.  Do you recognize those documents

 6    contained within Exhibit 5?

 7       A.     I recognize them as -- yeah, consulting

 8    agreement here.  Consulting agreement.  Consulting

 9    agreements.  And so -- this is '06.  This one is

10    '08.  This one is '09.  Consulting --

11       Q.     Let's just --

12              MR. MORIARTY:  Let him finish.

13    BY MR. JONES:

14       Q.     -- let's stop for a second, Doctor.

15       A.     Okay.

16       Q.     Exhibit 5 you recognize as a consulting

17    agreement between yourself and Ethicon, correct?

18       A.     Correct.

19       Q.     And what is the date of that?

20       A.     '06.

21              MR. JONES:  And this will be Exhibit 5.

22              (Whereupon Exhibit 6 was marked as an

23    exhibit.)

24    BY MR. JONES:
```

Christopher E. Ramsey M.D.

1      Q.      I'm marking Exhibit 6.

2              Tell us what Exhibit 6 is, Doctor?

3      A.      It looks like another consulting

4      agreement from '08.

5      Q.      Exhibit 6 is a consulting agreement

6      between yourself and Ethicon for 2008, correct?

7      A.      Correct.

8              (Whereupon Exhibit 7 was marked as an

9      exhibit.)

10     BY MR. JONES:

11     Q.      Okay.  I'll mark Exhibit 7.

12     A.      Consulting agreement from '09.

13     Q.      Exhibit 7 is a consulting agreement

14     between Ethicon and yourself for the year 2009,

15     correct?

16     A.      Correct.

17             MR. JONES:  Exhibit 8.

18             (Whereupon Exhibit 8 was marked as an

19     exhibit.)

20     BY MR. JONES:

21     Q.      Tell us what Exhibit 8 is.

22     A.      Consulting agreement for 2011.

23     Q.      Exhibit 8 is a consulting agreement

24     between Ethicon and yourself for 2011, correct?

Christopher E. Ramsey M.D.

1        A.        Does it say "Ethicon" in there?   I

2    just. . .   I'm sure it is.   But do you see

3    "Ethicon" there?

4        Q.        Yeah.

5        A.        Yeah.   Sorry.   Thank you.   Yeah.   Yeah.

6    (Reviews documents.)   Okay.

7        Q.        Okay.   And do you recognize -- the next

8    document is entitled "Advisory Board"?

9        A.        Yes.

10       Q.        Do you recognize that document?

11       A.        I don't remember it.   It's 2007, but --

12   yes.

13                Do you want to put that on there if you

14   want?

15       Q.        Okay.

16                (Whereupon Exhibit 9 was marked as an

17   exhibit.)

18   BY MR. JONES:

19       Q.        Exhibit 9 is a 2007 advisory board

20   document; is that correct?

21       A.        Yes.

22       Q.        And what is Exhibit 9 discussing?

23       A.        It says -- it's a pelvic floor

24   incontinence summit in Orlando, Florida.   I must

Christopher E. Ramsey M.D.

1    have been there.  I don't remember it.

2        Q.    Okay.  Is it your understanding that

3    you did attend a pelvic floor summit in Orlando,

4    Florida, in 2009?

5            MR. MORIARTY:  Objection to form and

6    otherwise.

7            THE WITNESS:  It looks like I did.

8            MR. MORIARTY:  Don't assume just based

9    on this stuff.

10           THE WITNESS:  Right.  Well, yes, I

11   understand.  I just don't remember it.

12   BY MR. JONES:

13       Q.    Okay.  You don't recall as you sit here

14   today one way or the other?

15       A.    Right.  Right.  Right.

16           (Whereupon Exhibit 10 was marked as an

17   exhibit.)

18   BY MR. JONES:

19       Q.    Exhibit 10.  Tell us what Exhibit 10

20   is, Dr. Ramsey.

21       A.    This is an advisory board.  And this

22   was in Fort Lauderdale.  I don't really ever

23   remember going to Fort Lauderdale.

24       Q.    Okay.  Exhibit 10 is discussing a

Christopher E. Ramsey M.D.

1     pelvic floor Summit held by Ethicon in Fort

2     Lauderdale, Florida, correct?

3         A.      Right.

4         Q.      You're listed as one of the physicians

5     attending the 2009 summit in Fort Lauderdale,

6     Florida?

7         A.      2007.

8              MR. MORIARTY:  Objection.  Form.

9              Go ahead.

10             THE WITNESS:  2007.

11    BY MR. JONES:

12        Q.      Correct?

13        A.      Correct.

14             MR. MORIARTY:  Did you scoop up my red

15    pen by any chance?

16             MR. JONES:  I did.

17             THE WITNESS:  I'm just looking at the

18    other one.  Looking at the dates.

19             And so Exhibit 9 was February 6th

20    through 8th, 2009.

21             Exhibit 10 was February 6th through

22    8th, 2009, as well.

23             So 2009 -- so they must have been the

24    same.

Christopher E. Ramsey M.D.

```
 1    BY MR. JONES:

 2        Q.      Okay.

 3        A.      Same thing.

 4    BY MR. JONES:

 5        Q.      And then last one in the pile, correct?

 6        A.      Another advisory board.

 7        Q.      I'll put a sticker on that for the

 8    record.  I'm going to put "Exhibit 11."

 9              (Whereupon Exhibit 11 was marked as an

10    exhibit.)

11    BY MR. JONES:

12        Q.      Exhibit 11 is another advisory board

13    document, correct?

14        A.      Correct.

15        Q.      And what event is discussed in

16    Exhibit 11?

17        A.      It was December 11th through 12th,

18    2008, in New -- in Somerville, New Jersey.

19        Q.      Do you recall participating in a 2008

20    event?

21        A.      I really don't.  I -- vaguely.

22    Honestly, I don't.  Until you showed me that, I

23    don't remember it.

24        Q.      Okay.  Does that -- as you sit here
```

Christopher E. Ramsey M.D.

1    today, do you know one way or the other, according

2    to that document, whether you attended --

3        A.      I can't remember.  You know, it looks

4    like I was there, but. . .

5                MR. JONES:  Okay.

6                I think that's all the questions I have

7    for tonight.

8                MR. MORIARTY:  Okay.

9                MR. JONES:  Are we off the record?

10               MR. MORIARTY:  We are now.

11               (Proceedings adjourned at 9:16 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

Christopher E. Ramsey M.D.

```
 1                C E R T I F I C A T E
 2    STATE OF TENNESSEE )

      COUNTY OF DAVIDSON )
 3                I, Lise S. Matthews, RMR, CRR, CRC, LCR
      353, Licensed Court Reporter and Notary Public, in
 4    and for the State of Tennessee, do hereby certify
 5    that the above deposition was reported by me, and
 6    the transcript is a true and accurate record to the
      best of my knowledge, skills, and ability.
 7                I further certify that I am not related
 8    to nor an employee of counsel or any of the parties
      to the action, nor am I in any way financially
 9    interested in the outcome of this case.
                  I further certify that I am duly
10    licensed by the Tennessee Board of Court Reporting
11    as a Licensed Court Reporter as evidenced by the
      LCR number and expiration date following my name
12    below.  I further certify that this transcript is
13    the work product of this court reporting agency and
14    any unauthorized reproduction and/or transfer of it
      will be in violation of Tennessee Code Annotated
15    39-14-104, Theft of Services.
16                IN WITNESS WHEREOF, I have hereunto set
      my hand and affixed my notarial seal this _____
17    day of _____, 2016.
18

19

20    _____
      Lise S. Matthews, RMR, CRR, CRC
21    LCR 353 Expiration Date 6/30/2016
22    Notary Public Commission Expires
23    March 6, 2018
24
```