IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE:  ETHICON, INC. PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION<br><br>_____<br><br>THIS DOCUMENT RELATES TO:<br><br>*WAVE 1 CASES* | Master File No. 2:12-MD-02327<br>MDL No. 2327<br><br><br>JOSEPH R. GOODWIN<br>U.S. DISTRICT JUDGE |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE GENERAL-CAUSATION TESTIMONY OF DIONYSIOS K. VERONIKIS, M.D.**

COMES NOW, the Plaintiffs in the above-styled action, and file their Response in Opposition to Defendants Ethicon, Inc.'s and Johnson & Johnson's (hereinafter referred to as "Defendants") Motion to Exclude "General-Causation" Testimony[1] of Dionysios K. Veronikis, M..D. (hereinafter referred to as "Dr. Veronikis"), and show the following:

**Introduction**

Defendants do not seek to challenge Dr. Veronikis's qualifications in any section of their motion or supporting brief.  Nonetheless, Plaintiffs will briefly address Dr. Veronikis's qualifications to provide some background for addressing the attack on his opinions asserted in Defendants' motion.  A copy of Dr. Veronikis's CV is attached as **Exhibit 1**.

Dr. Veronikis is fellowship trained with Board Certifications in Female Pelvic Medicine and Reconstructive Surgery and Obstetrics/Gynecology.  Since 1997, Dr. Veronikis has been the Chief of Gynecology and Director of Vaginal Reconstructive Surgery and Urogynecology at St. John's Mercy Medical Center in St. Louis, Missouri, and in this capacity, he is responsible for

---

[1] Although the title of Defendants' motion would appear to seek to challenge Dr. Veronikis's "general causation" opinions, neither the motion nor accompanying brief in any way relate to any causation opinion proffered by Dr. Veronikis.

1

training general Ob/Gyn residents in vaginal surgery and urogynecology in the clinic, classroom, and operating room. He has also served as Program Director for the Ob/Gyn Residency Program at St. John's Mercy Medical Center since 2003. (Veronikis TVT Report, pp. 1-2; Veronikis Gynemesh PS Report, pp. 1-2).

With a surgical practice focused exclusively on Vaginal Reconstructive Surgery and Urogynecology since 1994, Dr. Veronikis estimates that he has personally performed nearly 10,000 vaginal reconstructive surgeries for incontinence and pelvic organ prolapse, and he has personally implanted thousands of mesh products, beginning in 1994. In his Rule 26 Reports, Dr. Veronikis describes his extensive knowledge and experience regarding the identification, diagnosis and treatment of mesh-related complications in women throughout the world. (Veronikis TVT Report, pp. 3-4; Veronikis Gynemesh PS Report, pp. 3-4). Of the more than 1,000 mesh revision/removal surgeries that he has performed, Dr. Veronikis has removed both Gynemesh PS mesh and TVT mesh from his own patients, and he has photographic evidence of his removal of these products. (Veronikis TVT Report, p. 4; Veronikis Gynemesh PS Report, p. 4; *See also*, Veronikis Gynemesh PS Report, pp. 7-9 (including photographs of Gynemesh PS mesh removed by Dr. Veronikis from his patients); Veronikis depo., copy attached hereto as **Exhibit 2**, 93:10-96:5 (Dr. Veronikis testifying that he has "lots of pictures" showing frayed mesh particles in patients from whom he has removed TVT products)).

## ARGUMENT AND CITATION OF AUTHORITY

I.  **Dr. Veronikis does not purport to offer any opinion regarding Defendants' "knowledge, conduct, or motives."**

Defendants' contention that any opinion set forth in Dr. Veronikis's Report could somehow be construed as an opinion regarding Defendants' knowledge, conduct or motives is factually without support. The quotations from Dr. Veronikis's Report recited in Defendants'

2

Brief (Defendants' Brief, pp. 2-4) are not "knowledge, conduct, or motives" *opinions*, but instead are Dr. Veronikis's citations to and summaries of the specific *facts* and *evidence* which he reviewed and which form part of the basis for his opinions regarding the design, warnings and causation opinions he intends to offer in these cases. Dr. Veronikis cites to specific documentation from published data or else from Defendants' own documents or corporate deposition testimony to support his reliance upon these facts as foundations for the opinions he intends to offer at trial.

      Although Defendants criticize Dr. Veronikis's citation of several pertinent internal corporate documents that support his opinions (Defendants' Brief, pp. 2-4), the documents referenced in Dr. Veronikis's Report speak to design defect and safer feasible alternative design, both of which are key issues in these cases. The documents referenced in Dr. Veronikis's Report also bear directly on what information was available to Defendants regarding the safety and efficacy of the TVT and Gynemesh PS, and in turn, what information Defendants included (or failed to include) in their labeling and marketing materials for these devices. Whether Defendants were aware of other risks, or information that the TVT or Gynemesh PS could increase the frequency, severity or duration of known risks, bears directly on the questions of general causation and whether the warnings provided were adequate. Dr. Veronikis is not opining about Defendants' motives or intent, or that Defendants engaged in "bad acts," and he is not otherwise offering any opinion related to corporate conduct or ethics. Instead, he is examining the warnings in light of information that was known by – or at least knowable by or available to – Defendants about the products in question as reflected in Defendants' own internal documents, as well as published medical literature and other evidence. What information was known to Defendants, but not provided to physicians and/or patients, is fundamental to the

failure to warn analysis. Indeed, without the ability to assess what was known – or at least knowable – to Defendants, it would be next to impossible for Dr. Veronikis (or any expert) to offer any opinion of what information should have been provided to physicians using these devices.

Simply because Dr. Veronikis cites to an internal corporate document – which may reflect what information was available to Defendants and what was done (or, more appropriately here, not done) in light of that information – to form his design, causation and/or warnings opinions, does not mean he is offering impermissible "knowledge, conduct, or motives" opinions. Dr. Veronikis's discussion of Defendants' internal documents in his expert report falls squarely within the parameters previously recognized by this Court – that is, "an expert may testify as to a review of internal corporate documents solely for the purpose of explaining the basis for his or her opinions—assuming the opinions are otherwise admissible. . . ."[2] *See also*, *Wise v. C.R. Bard, Inc.*, 2015 WL 521202, *13 (S.D.W.Va.2015) ("[T]hough an expert may not simply narrate corporate documents in front of the jury, he may rely on such information in forming and supporting his opinions….").

In *Smith v. Pfizer*, 714 F.Supp.2d 845 (M.D.Tenn.2010), the Court denied a similar *Daubert* motion arguing that the plaintiff's expert had offered improper "state of mind/intent" opinions, stating as follows:

> [Plaintiff's expert] King may properly testify as to his interpretation of internal marketing-related documents that he relied on in forming his opinions. *See In re Seroquel Prods. Liab. Litig.,* No. 6:06–md–1769, 2009 WL 3806436, at *4 (M.D.Fla. July 20, 2009) (holding that expert witnesses may 'rely on and discuss [the defendant's] internal corporate documents.... To rule otherwise would unduly restrict Plaintiffs' experts from explaining the bases of their opinions.'). He may not, however, testify as to the defendants' motives or intent. *Id.* The defendants highlight instances of arguably objectionable portions of King's testimony in

---

[2] *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 610 (S.D.W.Va.2013).

previous MDL cases. (*See* Docket No. 119 at 11, 11 n. 12.) But King's statement, which has been filed with the court and will constitute his direct testimony in this case, does not contain any speculation regarding the defendants' motives or intent. (*See* Docket No. 180, Ex. 6.) The court notes that the defendants may object at trial if they believe that King's testimony, outside of his statement, improperly discusses motive or intent.").[3]

Defendants' efforts to prevent Dr. Veronikis from citing to corporate documents – which form part of the basis of his opinions – by mischaracterizing his report and his testimony are unavailing. Consistent with the Court's prior rulings, Dr. Veronikis draws on the important facts of this case, including but not limited to Defendants' internal corporate documents and employee testimony, in order to support his opinion. Defendants' argument about "knowledge, conduct, or motives" opinions is misplaced.

## II. Defendants' argument to exclude Dr. Veronikis's opinions regarding degradation, fraying, and particle loss, cannot withstand scrutiny.

Defendants urge the Court to exclude Dr. Veronikis's opinions regarding the propensity of the TVT and Gynemesh PS to degrade, and the TVT to fray and suffer particle loss, because he relies in part on Ethicon internal documents. As set forth in Section I above, the Court has held that an expert can properly cite to relevant corporate documents to support his or her opinions. Again, it is difficult to discern how any expert would be in a position to offer an opinion regarding the adequacy of warnings or information provided with a given product without the ability to address what information regarding the risks or problems associated with the product was in the possession of or available to the manufacturer. That is the *sine qua non* of the defective warning analysis, i.e., whether information that was known or at least available to the manufacturer regarding risks or problems associated with a product was adequately conveyed

---

[3] *See also*, *In re Yasmin and Yaz (Drospirenone) Prods. Liab. Litig.*, 2011 WL 6301625 (S.D.Ill.2011) (plaintiffs' OB-GYN experts were qualified to render risk-benefit and warning opinions based, in part, on review of internal corporate documents, and review of such materials – along with peer-reviewed literature – was a reliable methodology for rendering such opinions).

5

to the consumers of that product.  If an expert cannot address or even refer to information that was indisputably in the manufacturer's possession, the expert could not reasonably be expected to be able to render any opinion about whether that information should have been provided to the consumer.  Defendants' indirect attempt to prevent the jury from learning what its own documents show, and what it did (or, more accurately, failed to do) in light of that information, is unavailing.

Furthermore, Defendants' contention that a review of Defendants' internal documents is the sole basis for his opinions is contrary to his testimony.  For example, with respect to fraying and particle loss, Dr. Veronikis certainly does cite to internal Ethicon documentation – and sworn testimony from Defendants' own employees – demonstrating that the mechanical cut TVT would fray and suffer particle loss, and reflecting information available to the Defendants that this fraying/particle loss would increase the inflammatory response and could contribute to complications. (Veronikis TVT Report, pp. 9-10).  However, Defendants disregard Dr. Veronikis's testimony that he personally handled the TVT when considering whether to use the product, and he personally observed that the edges of the TVT mesh frayed "drastically" when he manipulated the mesh. (Veronikis depo., copy attached hereto as **Exhibit 2**, 34:11-35:5; 70:2-4; 72:1-19)  Furthermore, Defendants' counsel asked Dr. Veronikis directly whether he had seen any evidence of fraying causing any clinical problems, and Dr. Veronikis explained that he had seen TVT fraying/particle loss in his own patients and described what the mesh fragments looked like that he saw, and also what fraying/particle loss does to the mesh.  (*Id.*, 64:23-66:6; *See also*, *Id.*, 91:13-92:11 (Dr. Veronikis explaining again to defense counsel how he has personally observed TVT mesh fraying when he has handled TVT mesh, and also in his own TVT explant patients)).  In fact, as Dr. Veronikis explained to defense counsel in his deposition, he has "lots

6

of pictures" showing frayed mesh particles in patients from whom he has removed TVT products, and he explained why this occurs with the mechanical-cut TVT and not with other mesh devices. (*Id.*, 93:10-96:5).

With respect to degradation, it should be noted here that Defendants specifically and expressly stated in their IFU that the material used in their TVT and Gynemesh PS products "is not absorbed, nor is it subject to degradation or weakening by the action of tissues enzymes." (Veronikis Gynemesh PS Report, p. 6; Veronikis TVT Report, p. 8). As Dr. Veronikis points out in his Reports, however, Defendants' own documents reflect that this representation is demonstrably inaccurate. Dr. Veronikis cites to extensive documentation within Defendants' possession (including internal scientific testing/studies) that demonstrates that, contrary to their IFU statements, the Defendants were aware for decades that their polypropylene was subject to degradation inside the body. (Veronikis Gynemesh PS Report, p. 6 and footnote 3; *Id.*, pp. 17-18 and footnote 22; Veronikis TVT Report, p. 8 and footnote 9; *Id.*, p. 12 and footnote 29). He cites to and relies upon this documentation, as well as his familiarity with certain published literature (including the Clave article, discussed in his deposition), as support for his opinion that Defendants should have but failed to provide any warning or information about the propensity for degradation.[4] Defendants' contention that information in Defendants' own possession for years cannot serve as a valid basis for offering an expert opinion regarding the adequacy – and accuracy – of the IFUs' specific representations regarding degradation (or lack thereof) should be rejected, and its motion should be denied.

---

[4] Defendants' contention that Dr. Veronikis did not cite to the Clave article in his Report is also wrong. The Clave article, as well as another published article (1998 article by Mary), were both cited directly in the internal documents cited in Dr. Veronikis's Report (Veronikis Gynemesh PS Report, p. 27 footnote 3; Veronikis TVT Report, pp. 20-21 footnote 29), and Dr. Veronikis explained in his deposition that he is familiar with both the Mary article and the Clave article and their findings. (Veronikis depo., 97:19-98:8; 291:16-292:9).

**III.     Defendants' contention that Dr. Veronikis did not give an opinion in his TVT Report about surgical procedure or instrumentation is inaccurate, and the argument that surgical procedure and instrumentation are not part of the TVT kit sold by Defendants is contrary to fact.**

Defendants argue that Dr. Veronikis should not be allowed to offer an opinion criticizing the TVT instrumentation and surgical procedure because no such opinion is included in his Rule 26 Report. (Defendants' Brief, p. 6). Such argument is simply incorrect. Dr. Veronikis's opinion on the surgical procedure and instrumentation is set forth on page 9 of his TVT Report. (Veronikis TVT Report, p. 9). Dr. Veronikis gives his opinion how the implantation force and trocar puncture results in mesh deformation due to the required force and imperfect circular penetration, and how the design of the TVT trocar and the arc/handle and width of the TVT mesh creates a mismatch with the pelvis. *Id.* Rather than address the substance of these opinions, Defendants improperly attempt to read these opinions out of Dr. Veronikis's Report.

Defendants' contention that Dr. Veronikis cannot offer any opinion regarding the surgical implantation procedure and instrumentation for the TVT defies logic, and is self-contradictory. The Court has addressed an analogous argument by these same Defendants that preemption applies to its pelvic repair mesh kits because the Prolene suture was approved by the FDA. The Court properly concluded that the Prolene material cannot be considered separately, but must be considered as part of the entire kit submitted to the FDA for 510(k) clearance. *Lewis v. Johnson & Johnson*, 991 F.Supp.2d 748, 756-61 (S.D.W.Va.2014). The Court further noted that the Defendants themselves had previously argued that their products must be analyzed in terms of the entire kit that was marketed, not component-by-component, an analysis which is consistent with nearly every court to consider the issue in the preemption context. *Id.* at 758-61.

The TVT, which Dr. Veronikis addresses, does not merely consist of the strip of polypropylene mesh that is to be implanted in the body, but also specifically-designed

implantation devices intended to implant the TVT, as well as the specific surgical technique used to implant the TVT. As set forth in the TVT 510(k), for example, the introducer sold with the kit is intended to be used to implant the device. (TVT 510(k) summary, copy attached hereto as **Exhibit 3**). In comparing the TVT to its predicate device (the Boston Scientific Protegen), the 510(k) explains that "both devices utilize accessories for use in the surgical procedure." (*Id.*). The IFU for the TVT device, also part of the kit, provides the following "DESCRIPTION (System)":

> GYNECARE TVT consists of the following:
>
>> GYNECARE TVT Single Use Device, provided sterile (available separately)
>>
>> GYNECARE TVT Reusable Introducer, provided non-sterile (available separately)
>>
>> GYNECARE TVT Reusable Rigid Catheter Guide, provided nonsterile (available separately)

(A copy of the TVT IFU is attached hereto as **Exhibit 4**).

The IFU also instructs that "[t]he device should be used only by physicians trained in the surgical treatment of Stress Urinary Incontinence and specifically in implanting the GYNECARE TVT device." *Id.* The IFU further provides that "Users should be familiar with surgical technique for bladder neck suspensions and should be adequately trained in implanting the GYNECARE TVT system before employing the GYNECARE TVT device. It is important to recognize that GYNECARE TVT is different from a traditional sling procedure in that the tape should be located without tension under midurethra." *Id.* In addition, the IFU refers

repeatedly to the "GYNECARE TVT procedure," and provides specific, step-by-step instructions on how this "GYNECARE TVT procedure" must be performed. *Id.*[5]

Similarly, in a TVT brochure, the Defendants tout the purported benefits of the retropubic surgical procedure, and refer repeatedly to the "tension-free vaginal tape (TVT) procedure" (as well as "the TVT operation"), explaining, for example, that the "TVT procedure" is "the first minimally invasive mid urethra sling operation…." (A copy of the "Gynecare TVT Retropubic System" brochure is attached hereto as **Exhibit 5**).

Defendants' attempt to divorce the design of its product from its intended use is legally meritless. The risk-utility analysis for design defect necessarily takes into account the manner in which the product was designed and intended to be used. In fact, the very definition of "design defect" in many jurisdictions expressly references dangerousness for the product's "intended use." *See, e.g.*, *Talkington v. Atria Reclamelucifers Fabriefken BV*, 152 F.3d 254, 262-63 (4th Cir.1998) (observing that state law links strict liability to product's "intended use," and noting that "In South Carolina, "to recover under a strict liability theory, the plaintiff must establish that: (1) the defendant's product was in a defective condition unreasonably dangerous for its *intended use*.") (Emphasis in original); *Lewis v. Ethicon, Inc.*, 2014 WL 457544, *5 (S.D.W.Va.2014) (*"[t]he risk-utility analysis does not operate in a vacuum, but rather in the context of the product's intended use and its intended users.") (citing Texas law); *King v. Sears Roebuck & Co.*, 2013 WL 870572 (S.D.W.Va.2013) ("In this jurisdiction the general test for establishing strict liability in tort is whether the involved product is defective in the sense that it is not reasonably safe for its intended use.") (citing West Virginia law). Defendants' attempt to

---

[5] Stated otherwise, if an implanting physician did not use the TVT instrumentation provided in the kit to implant the TVT sling, or if a physician did not utilize the specific surgical technique as instructed in the TVT kit sold by Defendants, the Defendants would undoubtedly assert a "misuse" defense.

separate the TVT mesh from the introducers and implantation procedure sold with the TVT kit is unavailing.

IV. **Defendants' argument regarding Dr. Veronikis's "opinion that polypropylene mesh is defective" challenges an opinion that does not appear in Dr. Veronikis's Report, and as such, is an invalid Daubert challenge.**

Citing exclusively to his answers to defense counsel's questioning, Defendants attribute to Dr. Veronikis an opinion that "all polypropylene slings are unsafe." However, no such opinion appears in Dr. Veronikis's Report.[6] Dr. Veronikis does not intend to offer any opinion at trial that "all polypropylene slings are unsafe," so Defendants' argument in Section IV of their Brief is moot.

V. **Defendants' challenge to Dr. Veronikis's safer alternative design opinions is unfounded.**

Defendants' criticism of Dr. Veronikis's opinion that the use of Pronova, or polyvinylidene fluoride (PVDF), would have made the TVT and Gynemesh PS devices safer amounts to little more than a disagreement with his opinions. This is not a valid basis for a *Daubert* challenge.

Initially, Defendants' challenge that Dr. Veronikis did not offer any opinion about PVDF in his Report is, again, wrong. On page 8 of his TVT Report, Dr. Veronikis states that "Ethicon had other materials available for use in the TVT which were safer than polypropylene," and specifically cites to multiple internal studies and documents demonstrating the problems inherent in polypropylene and recognizing PVDF as a safer feasible alternative material to polypropylene. (Veronikis TVT Report, pp. 17-18 footnotes 7-9; pp. 20-21 footnote 29; *See also*, *Id.*, pp. 20-21 footnotes 29-30).

---

[6] The fact that Defendants elicited such an opinion on cross-examination is of no consequence. This is a red herring.

11

Defendants' criticism of Dr. Veronikis's opinion that polyvinylidene fluoride (PVDF) was a safer feasible alternative material to polypropylene because Dr. Veronikis has not reviewed published literature relating to use of PVDF mesh as a prolapse treatment is ill-founded. (Defendants' Brief, p. 10). There is no such literature because there is no PVDF pelvic organ prolapse product (likely, Plaintiffs submit, because PVDF is more expensive than polypropylene). Dr. Veronikis cites to a volume of internal Ethicon corporate documents, including internal scientific testing, dating back decades that consistently recognize the safety advantages of PVDF, and specifically PVDF versus polypropylene. (Veronikis TVT Report, p. 8, pp. 17-18 footnotes 7-9 and pp. 20-21 footnotes 29-30)).[7] Defendants' factually unfounded argument should be denied.

---

[7] HMESH_ETH_02860031 (7/06/07 internal e-mail from Ethicon Research Fellow regarding "dog" study) – "I recall the long-term dog study did show some 'fibrillation' of PROLENE suture where none was observed for PRONOVA [PVDF] suture. My polymer colleagues tell me that PP has the potential to do this because of its molecular structure."); HMESH_ETH_00228962 (2/17/10 internal e-mail chain discussing literature about polypropylene degradation) – "[W]e know from literature that polyester and even polypropylene tend to alter over time in the body…. [H]ow has the general surgery group responded to this [degradation literature]?...[W]e proposed for several new product developments...to use PVDF or PRONOVA as a more stable filament, however Senior Management decided to go ahead with PP as a standard."); ETH.MESH.14445346 (1/17/12 PowerPoint), Slide 11 (comparing Polypropylene to PVDF) – "PP – Stress cracking after 2 years of implantation [citing Mary article from 1998]… PP – In vivo degradation of PP [citing Clave article from 2009]."); ETH.MESH.09888188 (10/15/92 internal study report) – "Degradation in PROLENE is still increasing and PVDF, even though a few cracks were found, is still by far the most surface resistant in-house made suture in terms of cracking"; ETH.MESH.05644809 (8/2/01 internal notes) – "Advantages of Pronova • 50% reduced granuloma (Aachen group) • high inertness (like Teflon) • durability • reduced bending stiffness (better flexibility) • elasticity (fiber elasticity contributing 25% to mesh elasticity, rest by construction) • higher purity (only a blend)"; ETH.MESH.05588125 (7/6/07 internal email) – Dr. Dieter Engel: "Pronova has a reduced foreign body reaction compared to Prolene, as shown in several animal studies, and will improve the perceived biocompatibility of our mesh"; ETH.MESH.05878699 (9/13/07 internal study report) – Prof. Klosterhalfen: "Pronova [compared to Prolene] indicates a superior biocompatibility in the crucial early stage of wound healing within the first weeks"; ETH.MESH.15377374 (8/12/09 internal communication to a supplier) – "…PVDF polymers showed acceptable and often improved performance as compared to PP mesh devices. We have previously shared the preclinical biocompatibility studies for PRONOVA suture (report dated June 1998). Similar findings would be expected for a mesh device made from PRONOVA blend materials"; ETH.MESH.03722384 (9/16/09 internal e-mail) Dr. Thomas Divilio: "We're seeing a lot of work published that indicates that polypropylene produces an ongoing, chronic inflammatory reaction…Might be better off working with something that is less reactive, like PVDF"; ETH.MESH.00857704 (2/12/09 internal e-mail regarding future mesh design advantages) – "If we use

**VI.     Dr. Veronikis does not purport to offer any "legal conclusions."**

Plaintiffs are well aware of the Court's repeated admonition about expert opinion testimony that states a legal standard or draws a legal conclusion by applying law to fact. *See, e.g.*, *Wise v. C.R. Bard, Inc.*, 2015 WL 521202, *3 (S.D.W.Va.2015). Dr. Veronikis will not make improper "legal conclusions" at trial, but he should not be prevented from offering his opinions regarding the dangerousness or defective design of the TVT or Gynemesh PS, general causation, or the adequacy of Defendants' warnings and instructions for the TVT or the Gynemesh PS devices.

**VII.    Defendants' argument regarding Dr. Veronikis's alleged "opinions on Ethicon's intentions" and alleged "narrative review of corporate documents" should be denied.**

In Section VII of their Brief, Defendants' make essentially the same argument as they do in Section I. Plaintiffs have previously addressed the ability of an expert under applicable case law and the Court's prior rulings to rely upon internal corporate documents and corporate representative testimony in forming and supporting their opinions, and Plaintiffs incorporate their argument from Section I above in its entirety.

Plaintiffs' recognize that the Court will disallow any expert opinions that go to Defendants' "state of mind, knowledge, motives, or intention," and Plaintiffs do not intend to have Dr. Veronikis offer any such opinions at trial. *Wise v. C.R. Bard, Inc.*, 2015 WL 521202, *13 (S.D.W.Va.2015).

Contrary to Defendants' argument in their Brief, Dr. Veronikis does not purport to offer any "narrative review" of any documents, but instead as explained above, he cites to and relies upon Defendants' internal documents as well as Defendants' own employees' testimony to

---

PRONOVA a more elastic fiber which shows less degradation than PP. Better, longer function of Implant."

inform and support his opinions. *See*, Section I *supra*; *See also*, *Wise*, 2015 WL 521202 at *13 ("[T]hough an expert may not simply narrate corporate documents in front of the jury, he may rely on such information in forming and supporting his opinions…For the most part, [plaintiffs' expert] has properly used Bard's internal documents to develop and reinforce his opinions rather than to narrate Bard's corporate conduct.").

This 31st day of May, 2016.

By: */s/ Henry G. Garrard, III*
Henry G. Garrard, III
hgg@bbgbalaw.com
Georgia Bar No. 286300
Josh B. Wages
jbw@bbgbalaw.com
Georgia Bar No. 730098
Counsel for the Plaintiffs

Blasingame, Burch, Garrard & Ashley, P.C.
P.O. Box 832
Athens, GA  30603
(706) 354-4000

**CERTIFICATE OF SERVICE**

I hereby certify that on May 31, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

> By: */s/ Henry G. Garrard, III*
> Henry G. Garrard, III
> hgg@bbgbalaw.com
> Georgia Bar No. 286300
> Josh B. Wages
> jbw@bbgbalaw.com
> Georgia Bar No. 730098
> Counsel for the Plaintiffs

Blasingame, Burch, Garrard & Ashley, P.C.
P.O. Box 832
Athens, GA 30603
(706) 354-4000