# EXHIBIT B

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                          AT CHARLESTON

 4

 5   IN RE: ETHICON, INC.,                  Master File No.

 6   PELVIC REPAIR SYSTEM PRODUCTS          2:12-MD-02327

 7   LIABILITY LITIGATION                   MDL 2327

 8   ----------------------------------

 9   THIS DOCUMENT RELATES TO CASE

10   CONSOLIDATION:

11   Terreski Mullins, et al., v.

12   Ethicon, Inc., et al.

13   Case No. 2:12-CV-02952

14   ----------------------------------

15

16

17                        DEPOSITION OF

18                   VLADIMIR IAKOVLEV, M.D.

19

20                          *  *  *  *

21                 HIGHLY CONFIDENTIAL PORTION

22                          *  *  *  *

23

24                     September 11, 2015

25                    9:00 a.m. - 5:05 p.m.
```

```
 1            A.   They were kept in formalin, in a
 2   jar, and then they were put in the cassette for
 3   tissue processing and then they went through the
 4   whole process of xylene alcohol and everything else
 5   and then I had slides made.
 6            Q.   And no analytical chemistry done
 7   of that control, correct?
 8            A.   Why would I?  I'm doing histology.
 9            Q.   I understand.  No analytical
10   chemistry; is that correct?
11            A.   That is correct.
12            Q.   Thank you.  Number 19.
13            A.   Yes.
14            Q.   "Request all materials related
15                to testing of intentionally oxidized
16                polypropylene that had not been
17                implanted or exposed to formalin."
18                Do you see that?
19            A.   Yes, I do.
20            Q.   Is there any information on
21   Exhibit No. 4 related to that kind of testing?
22            A.   No, because the test is still in
23   progress.  I mean, I kept part of mesh in different
24   solutions and I haven't taken them out yet.  I
25   haven't examined them yet.
```

Vladimir Iakovlev, M.D.

```
 1              Q.   Okay.  Tell me what that
 2   experiment does?
 3              A.   I did the same thing as I did for
 4   formalin exposure.  I took pieces of mesh and put
 5   them in solutions of hydrogen peroxide, hydrogen
 6   peroxide with catalysts, few strong acids,
 7   solvents, and just they are stored in these
 8   solutions.
 9              Q.   How many pieces of mesh are you
10   testing?
11              A.   It's hard to say now.  It might be
12   over 20 small pieces.
13              Q.   And how are they stored right now?
14              A.   In a dark room in a cabinet.
15              Q.   In a vial?
16              A.   What do you mean, vial?
17              Q.   Are they in a container with a
18   cover on them?
19              A.   Yes, of course.  Some of them are
20   acids and they're in glass containers.
21              Q.   What temperature are they being
22   stored?
23              A.   Just room temperature.
24              Q.   Do you have a protocol that you
25   wrote up for this test?
```

```
 1                A.   No.  The only protocol I used was
 2    there was a published paper, they introduced this
 3    stimulated body environment -- simulated, not
 4    stimulated.  Simulated body environment.  Hydrogen
 5    peroxide was the catalyst.  Catalyst is a chromium
 6    salt.
 7                Q.   Cobalt chloride?
 8                A.   Probably.
 9                Q.   That's Dr. Guelcher's paper?
10                A.   I'm not sure if it's his paper,
11    it's another paper.  But anyway, I'm testing his
12    protocol.  I followed exactly the description in
13    the paper and kept it in the solution for almost a
14    year by now, but it's still too early to take it
15    out.
16                Q.   Why is it still too early to take
17    it out?
18                A.   Because based on my analysis of
19    the specimens explanted from the body I can barely
20    see the degradation bark after a year in the body.
21    So if I take them now it would be too early.
22                I may just waste samples, so I have to
23    wait for probably a few extra months or maybe
24    another year.  Because by year two or 1 1/2 years
25    in the body, the bark becomes visible in
```

```
 1   100 percent of the cases.
 2            If I take them out by 12 months, I may
 3   or may not see something and then it would -- I'll
 4   just waste samples.
 5            Q.   Did you prepare the solution in
 6   which these samples are stored?
 7            A.   Yes, I did.
 8            Q.   And what is the recipe for the
 9   solution that you used?
10            A.   It's written in the original paper
11   I used for the --
12            Q.   Can you tell me what the original
13   paper is?
14            A.   I'd have to check now.
15            Q.   And how many samples are stored?
16            A.   As I said, probably over 20.
17            Q.   And how many different kinds of
18   mesh are being tested?
19            A.   There is one from one
20   manufacturer, and then -- four types of mesh.
21            Q.   How many Ethicon meshes are being
22   tested?
23            A.   At least one.
24            Q.   What kind?
25            A.   It's written on the jars.  I may
```

```
 1   have to check later.
 2              Q.   Doctor, do you have an inventory
 3   of what's in each vial written down?
 4              A.   It's written on the jar.
 5              Q.   Is it written down on a piece of
 6   paper anywhere?
 7              A.   No.
 8              MR. ORENT:  Objection.
 9              BY MR. THOMAS:
10              Q.   Is it written in a computer
11   somewhere?
12              A.   No, just on jars.  Jars label when
13   the case was put and what type of mesh was put in.
14              Q.   When did you start this
15   experiment?
16              A.   Last September.
17              Q.   So it's been a full year?
18              A.   Yes.
19              Q.   And did you put the mesh in this
20   solution in these 20 or so samples all at the same
21   time?
22              A.   Within two weeks.
23              Q.   All right.  As I understand it,
24   there are at least four different mesh
25   manufacturers that are a part of this experiment?
```

```
 1            A.   At least four different type of
 2   mesh.  I would have to check with the labels what
 3   is written there, what manufacturers, what mesh was
 4   put in there.  I don't remember.  It's been a year.
 5            Q.   Are you working with anybody else
 6   on that experiment?
 7            A.   No.
 8            Q.   This is solely your work?
 9            A.   Yes.
10            Q.   Did you consult with anybody about
11   the kind of solution that you would use for your
12   experiment?
13            A.   No.  Whom I would consult?  Nobody
14   did it before.  The only information I extracted
15   was from that specific simulation body environment
16   simulation from the paper.
17            Q.   You know Dr. Guelcher has tried to
18   insulate oxidized polypropylene, don't you?
19            MR. ORENT:  Objection.
20            THE WITNESS:  I know that he did an
21   experiment, and he asked me what I see.  I said
22   it's too early, I'm not going to take them out yet.
23   I will keep them a little longer.
24            BY MR. THOMAS:
25            Q.   Did Dr. Guelcher tell you he had
```

Vladimir Iakovlev, M.D.

1   intentionally oxidized polypropylene by exposing it
2   to some chemical solution?
3              MR. ORENT:  Objection.
4              THE WITNESS:  Yes, he did.
5              BY MR. THOMAS:
6         Q.   Did you ask him to have that mesh
7   so that you could determine whether this
8   intentionally oxidized polypropylene absorbed
9   stain?
10             MR. ORENT:  Objection.
11             THE WITNESS:  No.
12             BY MR. THOMAS:
13        Q.   Why not?
14             MR. ORENT:  Objection.
15             THE WITNESS:  Because I'm doing my own
16  experiment and I believe I need to keep it for at
17  least a year and a half.
18             BY MR. THOMAS:
19        Q.   Did you discuss with Dr. Guelcher
20  the scope of his experiment?
21             MR. ORENT:  Objection.  At this point,
22  Counsel, I think you're getting into -- I think you
23  need to clarify whether your questions are in the
24  context of litigation or research.
25             To the extent it's in litigation it's

 1   covered by privilege and I would instruct the

 2   witness not to answer under the rules.  But to the

 3   extent that you're discussing research, I think

 4   that's fair game to discuss.

 5             BY MR. THOMAS:

 6        Q.   Okay.  From a research

 7   perspective, did you have any discussions with Dr.

 8   Guelcher about his experiment?

 9        A.   It's work in progress so it's

10   privileged to researchers, I guess, at this point.

11        Q.   Are you going to assert a

12   privilege for your research?

13        A.   For research information, yes.

14        Q.   Okay.  And you asserted a

15   litigation privilege, which I don't think is

16   appropriate -- I'm not arguing with you.  You said

17   there's no research privilege.  Now he's trying to

18   assert a research privilege?

19             MR. ORENT:  No, what I said was in

20   terms of legal -- in terms of legal privileges that

21   I can, that I have, that I have an attorney-client --

22   excuse me, a attorney work product under the Rule

23   26.

24             Rule 26 specifically allows for expert

25   witnesses to consult with one another under the

```
 1   2010 amendments to the federal rules.
 2              So, what I was clarifying is that it is
 3   my privilege to seek and to utilize for my client,
 4   and that's what I was exercising with regard to
 5   non-research thought processes for litigation.
 6              To the extent Dr. Iakovlev has
 7   proprietary interests in research that is ongoing
 8   or may be ongoing, that's up to him as to whether
 9   or not -- and I know that on both sides in this
10   mesh litigation have previously taken a position
11   that those sort of things are not discoverable.
12              To the extent the doctor is
13   comfortable, I'd be happy to designate this portion
14   of the transcript highly confidential and allow the
15   witness to answer.
16              THE WITNESS:  I also need to add that
17   that experiment is not in my opinions.  I was not
18   base my opinions on any part of that experiment.
19   And I'm not really sure why you asking me these
20   questions.
21              BY MR. THOMAS:
22         Q.   Because I get to ask them.
23              MR. ORENT:  If I can just have a minute
24   with the witness and explain what the highly
25   confidential designation means, that may clarify
```

```
 1   this.
 2              MR. THOMAS:  Thank you.
 3              -- RECESS AT 9:42 --
 4              -- UPON RESUMING AT 9:43 --
 5              MR. ORENT:  We can go back on the
 6   record.
 7              I'll just say for the record over the
 8   break I just explained to Dr. Iakovlev what the
 9   highly confidential designation is and that all the
10   lawyers in this litigation have all signed on to
11   it.
12              Confidentiality agreement whereby there
13   are limited distribution on each side as to who can
14   receive highly confidential information and that
15   after discussing it I believe the witness is
16   comfortable with the designation and will proceed
17   to answer.
18              BY MR. THOMAS:
19          Q.  Thank you.  Have you have
20   discussed with Dr. Guelcher the results of his
21   test?
22          A.  Yes, I asked him what he saw.
23          Q.  And what did he tell you?
24          A.  He said that there is flaking on
25   the surface early, it's not confluent but there are
```

```
 1   some flakes forming.
 2            I said it might be too early, because
 3   he did it I think on six weeks or so, maybe more,
 4   maybe up to three months.
 5            I said, well, I keep my specimens for
 6   at least a year and a half because I believe that
 7   that's much time you need to make it visible by my
 8   techniques.  Maybe by SCM we can see a little bit
 9   earlier, and we stopped at that.
10        Q.   Do you know whether he conducted
11   any analytical chemistry testing on any of the mesh
12   he analyzed?
13        A.   I think he did.
14            MR. ORENT:  Objection.
15            THE WITNESS:  I don't remember at this
16   point.  It's not my specifically methodology, so I
17   didn't do these things.
18            BY MR. THOMAS:
19        Q.   Did you have discussions with Dr.
20   Guelcher about trying to stain the polypropylene
21   that he had intentionally oxidized?
22        A.   He asked me.  I said it's too
23   early.
24        Q.   Okay?
25        A.   So I said maybe by your methods
```

```
 1   you can detect it.  By my methods, probably I
 2   cannot.  And I said I will keep my pieces for
 3   longer and then we'll see what happens.
 4              Q.   And how did you decide -- strike
 5   that.  Did I understand you to say that you have
 6   chosen 18 months as the time when you think it will
 7   be appropriate to test for oxidation?
 8              MR. ORENT:  Objection to form.
 9              THE WITNESS:  Yes.
10              BY MR. THOMAS:
11              Q.   And at 18 months is it your
12   intention to remove all of those meshes from the
13   chemical solution and determine whether it's
14   intentionally oxidized?
15              A.   Part of it.  Probably not all of
16   them in one shot.  I will start taking some pieces
17   and examining them see what happens and if I --
18   depends on what I see, I may keep them longer.
19              Q.   And what kind of tests do you
20   propose to run on them after 18 months?
21              A.   Histology, what I've done -- what
22   I showed in the paper.
23              Q.   The same kind of tests that you've
24   run on the meshes that are contained in your
25   reports?
```

```
 1               A.   Similar.
 2               Q.   Any differences?
 3               A.   Don't plan on anything different
 4   at this point.  I may, I mean, it's work in
 5   progress research.  Maybe I'll find something else,
 6   I don't know.
 7               Q.   Are you consulting with anybody
 8   else on this particular experiment?
 9               A.   We discussed it only with Scott
10   Guelcher.
11               Q.   And is the mesh that's being
12   tested pristine new mesh?
13               A.   Yes.
14               Q.   Never been exposed to tissue?
15               A.   That is correct.
16               Q.   Never been exposed to formalin?
17               A.   That is correct.
18               Q.   Who is paying for this testing?
19               A.   Nobody.  I just took chemicals
20   from our histo lab.
21               Q.   Did counsel fund this experiment?
22               A.   No, there is no additional
23   funding.  What funding would I need for it?
24   Chemicals are in the lab.
25               Q.   Where did you get the mesh?
```

```
 1              A.   They came from some law firms
 2    during earlier cases.
 3              Q.   Okay.  And where did you get the
 4    chemicals?
 5              A.   I said, they are in the lab.
 6              Q.   Okay.  So you used materials from
 7    the St. Michael's histo lab to put them, and you
 8    combined those chemicals in a recipe that you're
 9    now exposing this polypropylene to?
10              A.   That is correct.  These are
11    regular chemicals that are used in histo lab.
12              Q.   And the reason why you're doing
13    this test is to determine whether, first, after
14    18 months this polypropylene will oxidize due to
15    exposure to this chemical mixture, correct?
16              A.   Could you repeat the question?
17              MR. THOMAS:  Can you read it back?
18              -- REPORTER'S NOTE:  Question read back
19    as recorded above.
20              THE WITNESS:  That's correct.
21              BY MR. THOMAS:
22              Q.   And how will you determine whether
23    it's oxidized?
24              A.   I would see degradation layer on
25    the surface.
```

```
 1              Q.   And that would be by light
 2   microscopy?
 3              A.   Yes.
 4              MR. ORENT:  Objection.
 5              BY MR. THOMAS:
 6              Q.   Any other analytical technique
 7   that you propose to use?
 8              A.   As I said, none at this point.
 9              Q.   And as a part of your experiment
10   do you then intend to see whether -- if you are
11   able to oxidize polypropylene, according to your
12   visual observation by light microscopy, will you
13   then see whether the oxidized polypropylene holds
14   stain?
15              A.   Yes, that's the way to see it.
16   This just becomes porous and after absorbs stain.
17              Q.   And the way you will test that is
18   the same way you've processed the slides in Exhibit
19   No. 1 and 2 -- you'll put them through the sample
20   preparation histology analysis that you've done in
21   all your other cases?
22              A.   Can be tried without putting them
23   through histology; you can immerse exposed mesh
24   into the dye solution.
25              Q.   Just drop it in the jar?
```

```
 1                A.   Pretty much.  If it stains, then
 2    you can see staining on the surface.  That means
 3    there is a layer of porous polypropylene on the
 4    surface.
 5                It's like, this is not stain, this is
 6    anodized aluminum.  So there's porous layer on
 7    aluminum.  If you drop unprepared aluminum in the
 8    jar with black ink it will not absorb anything
 9    because it's sealed.
10                If you drop it with anodized layer it
11    will become black because it will absorb it.  It's
12    the same technique; it's pretty basic.
13                Q.   I understand.  Thank you.
14                Are you aware of a method where you can
15    take a piece of pristine mesh that's been exposed
16    as you've described, and prepare a histological
17    slide of that exposed material without embedding it
18    in some other medium?
19                A.   Let me ask you if I got your
20    question right.
21                Am I aware of a histological technique
22    which will allow me to cut through the mesh without
23    embedding it into anything?
24                Q.   Correct.
25                A.   No.  It has to be embedded into
```

```
 1                CERTIFICATE OF REPORTER

 2   CANADA              )

 3   PROVINCE OF ONTARIO )

 4

 5   I, Judith M. Caputo, the officer before whom the

 6   foregoing deposition was taken, do hereby certify

 7   that the witness whose testimony appears in the

 8   foregoing deposition was duly sworn by me; that the

 9   testimony of said witness was taken by me in

10   shorthand, using Computer Aided Realtime, to the

11   best of my ability and thereafter reduced to

12   written format under my direction; that I am

13   neither counsel for, related to, nor employed by

14   any of the parties to the action in which the

15   deposition was taken, and further that I am not

16   related or any employee of any attorney or counsel

17   employed by the parties thereto, nor financially or

18   otherwise interested in the outcome of the action.

19

20

21   _____

22   Judith M. Caputo, RPR, CSR, CRR

23

24   Commissioner for taking

25   Oaths in the Province of Ontario
```