Peter L. Rosenblatt, M.D.

```
 1              UNITED STATES DISTRICT COURT

 2           SOUTHERN DISTRICT OF WEST VIRGINIA

 3                  CHARLESTON DIVISION

 4

 5   * * * * * * * * * * * * * * *

 6    IN RE:  ETHICON, INC.      * Master file No.

 7   PELVIC REPAIR SYSTEM        * 2:12-MD-02327

 8   PRODUCTS LIABILITY          * MDL NO. 2327

 9   LITIGATION                  * JOSEPH R. GOODWIN

                                   U.S. DISTRICT JUDGE

10   * * * * * * * * * * * * * * *

11   THIS DOCUMENT RELATES TO PLAINTIFFS:

12   Toni Hernandez

     2:12-cv-02073

13

     Karen Doucette

14   2:12-cv-02125

15   Sheryl & Kevin E. Lary

     2:12-cv-02136

16

     Teresa Scott

17   2:12-cv-02100

18       DEPOSITION OF PETER L. ROSENBLATT, M.D.

                      GYNEMESH PS

19            COURTYARD BY MARRIOTT

20              777 Memorial Drive

21           Cambridge, Massachusetts

22          July 1, 2016     9:00 a.m.

23

24         Maryellen Coughlin, RPR/CRR

25
```

EXHIBIT
D

Peter L. Rosenblatt, M.D.

```
 1    APPEARANCES:

 2    Representing the Plaintiffs:

 3            MOSTYN LAW

 4            3810 W. Alabama Street

 5            Houston, Texas 77027

 6            BY:  Jeff D. Crawford, Esq.

 7            713-714-0000

 8            Jeff@mostynlaw.com

 9    Representing the Defendants:

10            BUTLER SNOW LLP

11            1010 Highland Colony Parkway

12            Ridgeland, Mississippi 39157

13            BY:  Paul S. Rosenblatt, Esq.

14            601-985-4596

15            paul.rosenblatt@butlersnow.com

16

17

18

19

20

21

22

23

24

25
```

Peter L. Rosenblatt, M.D.

```
 1                    I N D E X

 2  EXAMINATION                          PAGE

 3   BY MR. CRAWFORD                         6

 4   BY MR. ROSENBLATT                     144

 5   BY MR. CRAWFORD                       186

 6   BY MR. ROSENBLATT                     232

 7                    EXHIBITS

 8    NO.       DESCRIPTION            PAGE

 9   1    General Prolene, Gynemesh PS and    7

10        Prolift Expert report of Peter

11        Rosenblatt, M.D.

12   2    Rule 26 Expert Report of Bruce     16

13        Rosenzweig, M.D.

14   3    Notice to Take Deposition of       22

15        Dr. Peter Rosenblatt

16   4    Invoice #2                         24

17   5    Invoice #1                         24

18   6    Presentations                      27

19   7    "Influence of implantation        187

20        Interval on the long-term

21        biocompatibiity of surgical

22        mesh" by Klosterhalfen, et al

23   8    "Histopathology of excised        188

24        midurethral sling mesh" by Hill,

25        et al
```

Peter L. Rosenblatt, M.D.

```
 1              EXHIBITS CONTINUED

 2     NO.       DESCRIPTION              PAGE

 3     9     "Current Controversies Regarding   189

 4           Oncologic Risk Associated with

 5           Polypropylene Midurethral

 6           Slings" by King, et al

 7     10    "Polypropylene as a            191

 8           reinforcement in pelvic surgery

 9           is not inert: comparative

10           analysis of 100 explants" by

11           Clavé

12     11    "Long-Term Results of Burch    192

13           Colposuspension" by Demirci

14     12    "Biocompatibility of prosthetic   193

15           meshes in abdominal surgery" by

16           Binnebösel

17     13    "Does the tension-free vaginal   194

18           tape stay where you put it?" by

19           Dietz

20     14    "Ultrasound Assessment of      195

21           Mid-Urethra Tape at Three-Year

22           Follow-Up after Tension-Free

23           Vaginal Tape Procedure" by Lo,

24           et al

25
```

Peter L. Rosenblatt, M.D.

```
 1                  EXHIBITS CONTINUED

 2      NO.          DESCRIPTION                  PAGE

 3     15     "Mesh contraction: myth or          196

 4            reality?" by Dietz, et al

 5     16     "Basic science and clinical         197

 6            aspects of mesh infection in

 7            pelvic floor reconstructive

 8            surgery" by de Tayrac, et al

 9     17     "The Myth: In Vivo Degradation      198

10            of Polypropylene Meshes" by Ong

11            et al

12     18     "Purely Transvaginal/Perineal       199

13            Management of Complications From

14            Commercial Prolapse Kits

15            Using a New Prostheses/Grafts

16            Complication Classification

17            System" by Firooz, et al

18     19     Material Safety Data Sheet for      200

19            polypropylene

20     20     Frequently Asked Questions by       200

21            Providers Mid-urethral Slings

22            for Stress Urinary Incontinence

23     21     AUGS position statement             232

24

25
```

```
 1              P R O C E E D I N G S

 2

 3              PETER L. ROSENBLATT, M.D.,

 4       having been first duly sworn, was examined

 5       and testified as follows:

 6

 7                     EXAMINATION

 8   BY MR. CRAWFORD:

 9       Q.      Good morning, Doctor.  My name is

10   Jeff Crawford, and I'm here this morning to ask

11   you some questions about the opinions you have

12   rendered in this case.

13              Do you understand that?

14       A.      Yes.

15       Q.      Would you state your full name for

16   the record, please?

17       A.      Peter Rosenblatt.

18       Q.      How would you describe your role in

19   this case?

20       A.      I am -- I was asked by counsel to

21   render my opinion about various aspects of mesh

22   in the cases that were involved here.

23

24

25
```

Peter L. Rosenblatt, M.D.

1          (Whereupon, Deposition Exhibit 1,

2           General Prolene, Gynemesh PS and Prolift

3           Expert report of Peter Rosenblatt, M.D.,

4           was marked for identification.)

5     BY MR. CRAWFORD:

6          Q.      Okay.  Do you recognize the

7     document that's been marked as Exhibit No. 1?

8          A.      So this a little bit different

9     format than when I presented it, but it looks

10    like this is my general report.

11         Q.      What do you mean a different format

12    than when you presented it?

13         A.      I think when I --

14                 MR. ROSENBLATT:  I'll just

15    represent we added the cover page with the case

16    style to it.

17         A.      Yeah.  And, actually, when I sent

18    it, I think it was maybe a different font or

19    different size font, but this is my report.

20         Q.      So originally you drafted an expert

21    report, a general causation expert report, and

22    you submitted it to someone?

23         A.      I -- right, I did a report, and I

24    sent it in a Word format.  I think maybe like the

25    reason that I took a minute is because I'm not

Peter L. Rosenblatt, M.D.

```
 1   sure it was doubled spaced the way it is.  So it

 2   just looked a little bit different than when I

 3   sent it in, but this is the report.

 4        Q.      Who did you send it to?

 5        A.      I sent it to counsel.

 6        Q.      What counsel?

 7        A.      Mr. Rosenblatt.

 8        Q.      And Mr. Rosenblatt's with what

 9   firm?

10        A.      With Butler Snow.

11        Q.      Representing Ethicon?

12        A.      Representing Ethicon.

13              MR. ROSENBLATT:  And, Jeff, I'll

14   state on the record, I don't know if you're going

15   to ask, there's no familial connection.

16              MR. CRAWFORD:  That's interesting

17   to know.

18              Where's the original that you

19   submitted to defense counsel?

20              MR. ROSENBLATT:  And I will just

21   object that under Rule 26 drafts are not

22   discoverable.

23              THE WITNESS:  Can I answer or?

24              MR. ROSENBLATT:  I mean, if it's on

25   your computer, you can say it's on your computer.
```

Peter L. Rosenblatt, M.D.

1        A.       It's on my computer.

2        Q.       The one that's in front of you

3    right now as Exhibit No. 1, have you ever seen it

4    in that form, specifically in that font and

5    format?

6        A.       Yes, I have.  Just different than

7    the Word format that I sent.  But I just -- when

8    you asked me, I wanted to make sure that this was

9    my report, and I've gone through it, and this is

10   my report.

11       Q.       Does that document, Exhibit No. 1,

12   contain all the opinions that you hold in this

13   case?

14       A.       You know, I'm happy to answer any

15   questions that you have if there are additional,

16   but I tried to put into the report all my

17   opinions, but if there are others that you want

18   to ask about today, I'm happy to answer that.

19       Q.       Sure.  But when you drafted

20   Exhibit No. 1, it was your intention to include

21   in that document all the opinions that you hold

22   in this case?

23       A.       Yeah, I did the best I could with

24   respect to that.

25       Q.       Since you've written it, between

Peter L. Rosenblatt, M.D.

```
1    that time and today, are there any opinions that

2    you've -- that you've come up with that aren't in

3    that report?

4         A.      Not that I can think of.

5         Q.      When were you retained by Ethicon?

6         A.      I was not retained by Ethicon.  I

7    have had no discussions with Ethicon.  I was

8    asked by Attorney Rosenblatt and his firm to

9    review the materials I think back maybe in March

10   or April of this year.

11        Q.      Approximately March or April of

12   2016 is when you were first approached or

13   contacted by an attorney with Butler Snow about

14   becoming involved in this case?

15        A.      Yeah, if I remember correctly, I

16   think that actually Attorney Rosenblatt contacted

17   me sometime in 2015, but then nothing happened at

18   that point, and it was only when I was contacted

19   earlier this year when, you know, I started to

20   review materials.

21        Q.      When did you start to review

22   materials?

23        A.      I think it was about March or

24   April.

25        Q.      Had you ever done any work for or
```

Peter L. Rosenblatt, M.D.

```
 1   work with or for Butler Snow prior to being

 2   contacted in regards to this Ethicon case?

 3        A.      No.

 4        Q.      We are here today to talk to you

 5   about your general causation report, right?

 6        A.      Yes.

 7        Q.      To be clear, you have generated a

 8   general causation report about mesh in general,

 9   and then you've also been retained as an expert

10   witness on specific cases; is that fair?

11        A.      Yes.

12        Q.      How many specific cases are you

13   also retained for?

14        A.      I believe it was -- I believe it

15   was five cases.

16        Q.      Do you know the names of them off

17   the top of your head?

18        A.      Yeah, I remember there's Hernandez,

19   Lary, L-A-R-Y, Loomis.  I can't think of the

20   others right now.

21        Q.      Are those approximately --

22        A.      Ah, Doucette is another one,

23   D-O-U-C-E-T-T-E.  Yeah.

24        Q.      Okay.

25        A.      And I think there's one more.
```

Peter L. Rosenblatt, M.D.

1    Q.      Are those approximately five cases

2  that you're involved in now the only Ethicon

3  transvaginal mesh cases you've ever been involved

4  with?

5    A.      In terms of reviewing for the

6  purposes of --

7    Q.      Yes, sir.

8    A.      -- this litigation.

9    Q.      Yes, sir.

10   A.      Yes.  No, I think there was

11 actually one other.  One other, and I don't

12 remember the name of that one, but apparently,

13 that's for some reason not going forward.

14   Q.      There's a difference between

15 reviewing cases and writing reports on cases,

16 correct?

17   A.      I suppose so, but I don't know what

18 the difference is.

19   Q.      Well, some of them you review and

20 send back and then others you review and actually

21 write a report and submit a report on, right?

22          MR. ROSENBLATT:  Object to form.

23   A.      So of the four or five, whatever it

24 was that were sent to me, I reviewed the cases

25 and wrote reports on each of the ones that I was

Peter L. Rosenblatt, M.D.

1    asked to report on.

2          Q.       Okay.  Have you been -- have any of

3    the cases been submitted to you by Butler Snow

4    that you didn't write reports on?

5          A.       There was -- you know, I was sent,

6    and actually, it's probably in these boxes.

7    There was I think one other that was sent to me

8    but within a day I received a message that one of

9    the cases I did not need to even look at, so I

10   never actually, you know, looked at that case.

11         Q.       And who did that message come from?

12         A.       Someone at Butler Snow.  I don't

13   know if it was Attorney Rosenblatt or someone

14   that he works with.

15               MR. ROSENBLATT:  And, Jeff, I will

16   represent, if I remember correctly, I think it

17   was a case that was either dismissed or -- it

18   went away.

19         Q.       What did you do specifically to

20   prepare for this general causation deposition?

21         A.       In addition to reviewing the

22   records that were sent to me and writing the

23   report and, you know, reviewing some of the

24   literature, re-reviewing some of the literature,

25   and reading through some of the other records

Peter L. Rosenblatt, M.D.

1   that I had in terms of the IFUs and some internal

2   e-mails within Ethicon, that's general -- and

3   discussions with Attorney Rosenblatt.

4        Q.      I'm particularly interested in the

5   literature that you re-reviewed just prior to

6   coming to your deposition.

7               Can you identify that literature

8   for me, please?

9               MR. ROSENBLATT:  Object to form.

10       A.      I would have a tough time

11  mentioning which ones because I just -- you know,

12  my mind doesn't work that way.  But I looked at

13  some of the RCTs for both, you know, Prolift and

14  Gynemesh, and I re-reviewed the, you know,

15  Cochrane review and systematic reviews.

16       Q.      Do you know what systematic

17  reviews?

18       A.      The one I remember was the SGS

19  systematic review from several years ago.

20       Q.      So as I understand it, as a general

21  causation expert in this case, you've reviewed a

22  lot of literature, fair to say?

23       A.      Well, right.  I mean, I've reviewed

24  it in connection with this, but I've also -- I've

25  known this literature from when it was published.

Peter L. Rosenblatt, M.D.

```
 1           Q.       Right.  And of all of the

 2   literature that you've reviewed over the years

 3   concerning transvaginal mesh, you chose to review

 4   three particular pieces of literature in

 5   preparation for this deposition; is that fair?

 6                   MR. ROSENBLATT:  Object to form.

 7   Mischaracterizes the testimony.

 8           A.       Right, what I felt was most

 9   important was to review what I thought was the

10   most important Level I evidence.

11           Q.       And what is in your opinion the

12   most important Level I evidence in this case?

13           A.       Well, that would be -- you know,

14   the Level I evidence was what I just mentioned,

15   systematic reviews, the Cochrane meta-analysis

16   and RCTs.

17           Q.       Is there a group of evidence that

18   you categorize yourself as Level II evidence in

19   this case?

20           A.       Yes.

21           Q.       What is Level II evidence?  What is

22   the Level II evidence comprised of?

23           A.       I wouldn't be able to name it off

24   the top of my head but, you know, non-randomized

25   studies, so prospective cohort studies and some
```

Peter L. Rosenblatt, M.D.

```
 1    large retrospective studies.

 2         Q.      Is there a Category III?  Is there

 3    a Level III category of evidence in your mind?

 4         A.      Yes.

 5         Q.      What does that consist of?

 6         A.      You know, either, either case

 7    reports or opinions, expert opinions.

 8         Q.      Would that include the expert

 9    opinion of Dr. Rosenzweig?

10         A.      Well, I've read -- I've read

11    Dr. Rosenzweig's -- I'm trying to remember what

12    I've read from him.  I know I've read an expert

13    report in connection with this case, you know,

14    one of the cases, and I don't remember if I read

15    anything in the medical literature from

16    Rosenzweig specifically in connection with the

17    mesh literature.

18    (Whereupon, Deposition Exhibit 2,

19     Rule 26 Expert Report of

20     Bruce Rosenzweig, M.D.,

21     was marked for identification.)

22    BY MR. CRAWFORD:

23         Q.      I'm going to hand you what's marked

24    as Exhibit No. 2 to your deposition.  Do you

25    recognize that document?
```

Peter L. Rosenblatt, M.D.

```
1          A.      Yes.

2          Q.      What is that?

3          A.      This is Dr. Rosenzweig's expert

4    report.

5          Q.      Is that his general causation

6    report?

7                  MR. ROSENBLATT:  For TVT?

8          A.      Can you show me where this says

9    exactly what it is about?  I'm happy to read it

10   all, if you want.

11         Q.      If you'll just peruse it briefly

12   and tell me how you would describe that report.

13   It doesn't appear to be specific to any one

14   particular case, does it?

15         A.      It does not.  It appears to be

16   about TVT.

17         Q.      Did you review Exhibit No. 2 in

18   preparation for this deposition?

19         A.      I remember seeing a report by

20   Rosenzweig.  I assume that this is it.  I can't

21   say for certain, but I did see -- and if this is

22   the one that I reviewed, then I did.  I didn't

23   review it specifically for this deposition, but

24   I've read through a lot of reports in the last

25   three months, and I believe this is one of them.
```

Peter L. Rosenblatt, M.D.

```
 1          Q.      When was the first last time that
 2  you reviewed a Rosenzweig report?
 3          A.      It's got to be over a month ago.
 4  Probably more like two months ago.
 5          Q.      There's reference to literature in
 6  his report, correct?
 7          A.      There appears to be, yes.
 8          Q.      When you reviewed Dr. Rosenzweig's
 9  report, did you pull any of the literature that's
10  cited or referenced in that report?
11          A.      Can you tell me which ones you're
12  referring to?
13          Q.      Any of it.
14          A.      Oh.
15          Q.      For example, do you recall when
16  reviewing Dr. Rosenzweig's report reading any
17  footnotes or anything contained in that report
18  and looking up the literature that's referenced
19  therein?
20                  MR. ROSENBLATT:  And I'll just
21  represent he was not retained to offer opinions
22  on TVT.
23          A.      So I don't recall specifically, but
24  I'm happy -- you know, if there is a reference
25  you want me to tell you -- you know, if you want
```

Peter L. Rosenblatt, M.D.

1    to point to a reference, then I'll be happy to

2    tell you if I read that.  But did I go through

3    his reference list and look all these articles

4    up, no.

5         Q.     Yes, sir, that's what I was asking.

6         A.     No, I couldn't do that.  Time did

7    not permit it.

8         Q.     Do you recall looking any of them

9    up?

10        A.     No, I guess what I'm saying is that

11   there are -- oh, here we go.  It's here at the

12   bottom.

13              MR. ROSENBLATT:  I think it's

14   mostly company testimony, but he might have --

15              THE WITNESS:  That's what it looks

16   like.

17              MR. ROSENBLATT:  -- a couple

18   literature references in there.

19        A.     So that is correct.  So I have no

20   idea about these company references.  Like, for

21   instance, Reference 246 is an article from

22   de Tayrac in 2004, you know, that I've seen.  And

23   there is another reference -- it actually doesn't

24   have a number by Jacquetin that I have seen, and

25   some of these reference videos which I have not

Peter L. Rosenblatt, M.D.

```
 1    seen.

 2         Q.      Are there types of evidence that

 3    you consider Level IV evidence?

 4         A.      If you could tell me what Level IV

 5    is.  I don't recall.

 6         Q.      I don't know.  I was asking you.

 7    Do you know --

 8         A.      I can't remember if there is a

 9    Level IV evidence.  Yeah, for example, No. 11,

10    Clavé, I've read through that as well.

11         Q.      In addition to what you've

12    identified as Level I, Level II and Level III

13    evidence, you've also reviewed internal e-mails

14    in preparation for this deposition, correct?

15         A.      Well, I have read through them but,

16    you know, not specifically for this, in

17    preparation for this.  I read them before I wrote

18    my report.  Probably the last time I read through

19    internal documents was maybe, you know, four

20    weeks ago.

21         Q.      Do any particular internal e-mails

22    that you reviewed approximately four weeks ago

23    come to mind?

24         A.      Not specifically.

25         Q.      There's an attorney sitting to your
```

Peter L. Rosenblatt, M.D.

```
 1   left, correct?

 2        A.       Yes.

 3        Q.       He's from Butler Snow?

 4        A.       Yes.

 5        Q.       Did you have an opportunity to meet

 6   with him prior to this deposition?

 7        A.       I did.

 8        Q.       Where did that meeting take place?

 9        A.       We met for the last hour and a

10   half, two hours in the hotel.

11        Q.       Your deposition is being taken in a

12   hotel?

13        A.       Yes.

14        Q.       In Cambridge, Massachusetts?

15        A.       Yes.

16        Q.       And for approximately an hour and a

17   half or so you were able to meet with defense

18   counsel prior to walking into this conference

19   room?

20        A.       Correct.

21        Q.       Did you take any notes during that

22   meeting?

23        A.       No.

24

25
```

Peter L. Rosenblatt, M.D.

```
 1       (Whereupon, Deposition Exhibit 3,

 2        Notice to Take Deposition of

 3        Dr. Peter Rosenblatt,

 4        was marked for identification.)

 5   BY MR. CRAWFORD:

 6       Q.     No. 3 is a deposition notice for

 7   today's deposition.  Do you recognize that?

 8       A.     I do.

 9       Q.     Have you looked at Exhibit A to

10   that deposition notice or I should say Schedule

11   A?

12       A.     Yes, I have.

13       Q.     Schedule A is a list of documents

14   and tangible items that you were requested to

15   bring with you to your deposition today; is that

16   true?

17       A.     Do you know -- can you take a look

18   at this, 'cause I don't think -- it's missing

19   some pages.  I don't think it actually says

20   Schedule A anywhere.

21               MR. ROSENBLATT:  The version I have

22   cuts off at page 7.

23               THE WITNESS:  Oh, is it on the back

24   pages maybe.

25               MR. ROSENBLATT:  I think you maybe
```

Peter L. Rosenblatt, M.D.

 1    tried to print double-sided but it --

 2         Q.      That one's double-sided.

 3         A.      Okay.  What was the question again?

 4         Q.      Did you have an opportunity to

 5    review Schedule A?

 6         A.      I have, yes.

 7         Q.      And have you brought documents and

 8    tangible items with you today that are responsive

 9    to Schedule A?

10              MR. ROSENBLATT:  And I'll just note

11    for the record that I think we filed objections

12    but if we haven't, they will be filed, but you

13    can answer.

14         A.      Right.  So that was one of the

15    reasons we met earlier, is that Attorney

16    Rosenblatt brought things that I had provided to

17    him, and so we went over those, which are sitting

18    in front of me.

19         Q.      Okay.

20         A.      It's all yours (indicating).

21         Q.      There's a large number of, in my

22    opinion, a large number of -- several folders

23    containing documents sitting in front of me here

24    at this conference table.

25              Can you make an effort to summarize

Peter L. Rosenblatt, M.D.

1    what's contained here?

2         A.      Sure.  So first are my billing

3    records for work done in these cases.

4         Q.      Okay.  I'm going to mark that as

5    Exhibit No. 4.  Bear with me just a second.

6         A.      Yeah.

7         Q.      Actually, it appears to be two

8    different documents; is that right?

9         A.      Correct.

10        Q.      Okay.  I will mark the first one as

11   Exhibit No. 4 and the second as Exhibit No. 5.

12        (Whereupon, Deposition Exhibit 4,

13         Invoice #2,

14         was marked for identification.)

15        (Whereupon, Deposition Exhibit 5,

16         Invoice #1,

17         was marked for identification.)

18   BY MR. CRAWFORD:

19        Q.      And, again, for purposes of the

20   record, Exhibits 4 and 5 are documents that

21   relate to the work you've done on these files or

22   on this case and the amount charged, correct?

23        A.      Correct.

24        Q.      While we have them out in front of

25   us, there appears to be one invoice, specifically

Peter L. Rosenblatt, M.D.

```
1    Invoice No. 1.  It's dated June 12th, 2016.

2    That's Exhibit No. 5; is that right?

3         A.      Yes.

4         Q.      And that invoice is for a total of

5    $63,200.

6         A.      Correct.

7         Q.      Then there's a second invoice

8    that's marked as Exhibit No. 4, and that invoice

9    is dated --

10        A.      Somehow that did not get translated

11   properly.

12        Q.      So the invoice marked as

13   Exhibit No. 4 doesn't have a date.  However, it

14   does have a --

15        A.      It was sometime after this date

16   (indicating).

17        Q.      The invoice marked as Exhibit No. 4

18   doesn't have a date at the top, but you believe

19   that that invoice was generated at sometime after

20   June 11th, 2016?

21        A.      Probably after June 12th.

22        Q.      Okay.  And the amount for that

23   invoice is $21,200?

24        A.      Correct.

25        Q.      So to date, you've billed
```

Peter L. Rosenblatt, M.D.

1    approximately $84,400 for your services as an

2    expert witness in this case?

3         A.        Correct.

4         Q.        Does that include your time as a

5    general causation expert only or is that also

6    charges for the work you've done as a

7    case-specific expert?

8         A.        Both.

9         Q.        Okay, let's turn to the next

10   document or set of documents that you brought in

11   response to Schedule A to your deposition notice.

12        A.        Well, there are a number of folders

13   where there are PowerPoint presentations that

14   have been printed out, and the first set is

15   labeled TVT-O.  The second set is labeled TVT-S.

16   The third group is referred to as additional

17   slides.  The next are presentations labeled TVT

18   Exact.  The next are presentations labeled TVT.

19   The next are presentations, yup, labeled

20   Prosima™.  And the next are a group of

21   presentations labeled Ethicon.

22             MR. ROSENBLATT:  Jeff, I'll just

23   represent there are two copies of each

24   presentation or there should be two copies of

25   each presentation in there.

Peter L. Rosenblatt, M.D.

```
 1              THE WITNESS:  My phone is on
 2   vibrate, but I may be getting a text just 'cause
 3   one of my partners has a patient who has a
 4   significant problem, and I may get a text about
 5   it, and I'll try not to let this interfere with
 6   the deposition, but I just want to let you know
 7   I'm not being rude if I check a text.
 8        Q.     Of course.  I completely
 9   understand.
10              I ran into one I got confused on.
11   Let's go off the record?
12              (Discussion off the record.)
13     (Whereupon, Deposition Exhibit 6,
14      Presentations, was marked
15      for identification.)
16   BY MR. CRAWFORD:
17        Q.     Doctor, we've finagled with some
18   exhibits and documents.  I'm holding in my hand
19   Exhibit No. 6 to your deposition, correct?
20        A.     Okay.
21        Q.     What is this?
22        A.     These are presentations that I've
23   given in the past that are related to the topics
24   that we're discussing.
25        Q.     And are the documents contained in
```

Peter L. Rosenblatt, M.D.

1    Exhibit No. 6 documents and things that you've

2    reviewed just prior to coming to your deposition

3    in preparation for this deposition?

4         A.     I honestly just scanned through

5    those to make sure those were the ones that I had

6    sent.  But have I read all the slides, absolutely

7    not.

8         Q.     Of all the documents, the things

9    that you've reviewed in conjunction with being an

10   expert on transvaginal mesh, is there any

11   particular reason you chose these documents

12   marked as Exhibit No. 6 to refresh yourself on

13   and look at just prior to your deposition?

14        A.     They were not to refresh my memory.

15   They were just in response to Schedule A I guess

16   it is.  Yeah, Schedule A.  Any presentations that

17   had to do with the topics that we're discussing.

18        Q.     Returning to -- our attention to

19   Schedule A of your deposition notice, did you

20   bring with you a current copy of your curriculum

21   vitae?

22             MR. ROSENBLATT:  And I'll just

23   represent I think the current version was

24   attached as an exhibit to his general deposition.

25        Q.     Is that true, Doctor?

Peter L. Rosenblatt, M.D.

1     A.     Yes, it is.

2     Q.     No. 2 of Schedule A requires you or

3  requests you to bring with you any and all

4  documents in your possession including but not

5  limited to correspondence, notes, videos, CVs,

6  DVDs, flash or USB drives, photographs, databases

7  or materials in other form provided to you or

8  created by you which you relate to your opinions,

9  expected testimony or development of your

10  opinions in this litigation.

11            Have you brought those with you

12  today?

13     A.     Anything that I thought was

14  relevant that I brought that I knew was

15  accessible.

16     Q.     Is that contained in Exhibit No. 6

17  or are there other documents that are responsive

18  to that particular request that aren't contained

19  in Exhibit No. 6?

20            MR. ROSENBLATT:  And, Jeff, I will

21  just again note for the record we have filed

22  objections to the notice and Schedule A.

23            MR. CRAWFORD:  I understand.

24     A.     Anything I thought that was

25  relevant that I could get my hands on are there.

Peter L. Rosenblatt, M.D.

1           You know, what comes to mind, for

2    instance, is there may be like marketing DVDs

3    that I received 15 years ago that I have no idea

4    where they exist.  So I made the best effort I

5    could to bring what, you know, was asked of me.

6        Q.      Very good.  Referring to No. 5,

7    have you reviewed any deposition testimony in

8    preparation for this deposition today?

9        A.      I've seen some depositions from

10   other experts that I have scanned through that

11   I've tried to read, and I briefly looked through

12   a deposition that I did for a Bard litigation

13   which was I think about two years ago.

14       Q.      How long ago did you review the

15   deposition testimony of other experts?

16       A.      It's varied over a number of weeks.

17   Well, I did look at one within the last two or

18   three days as well.

19       Q.      Which one was that?

20       A.      There was one -- I'm going to say

21   his name wrong.  Sepulveda.

22       Q.      Okay.

23       A.      And Tomezsko.  And there may have

24   been one other.  Toglia.

25       Q.      Are those the only deposition

Peter L. Rosenblatt, M.D.

1    transcripts you can think of right now?

2         A.      Off the top of my head, yes.

3         Q.      Schedule A requests you to bring

4    with you those deposition transcripts.  Did you

5    do that?

6              MR. ROSENBLATT:  I'm just going to

7    object, Jeff.  No, he didn't bring them with him.

8         Q.      Did you review any pleadings in

9    connection with preparing for this deposition?

10        A.      I guess I'm not familiar with that

11   term exactly.  I've heard the term, but I don't

12   know if I've seen pleadings.

13        Q.      Have you seen anything that you

14   think looks like it has been filed with the

15   court?

16        A.      Not that I recall.

17        Q.      You haven't brought any pleadings

18   with you today, have you?

19        A.      I guess not.

20        Q.      If you don't know what they are,

21   you haven't brought them then.

22              Do you have any photographs of any

23   of the case-specific plaintiffs that you're

24   involved in?

25        A.      I don't recall if any photographs

Peter L. Rosenblatt, M.D.

1    were sent to me about those specific cases.

2         Q.      Do you know off the top of your

3    head whether you've seen a photograph of Toni

4    Hernandez?

5         A.      I would be happy to look at

6    anything and tell you if I have seen it.  I just

7    don't remember off the top of my head.

8         Q.      As you sit here right now, you

9    don't recall ever seeing a photograph of Toni

10   Hernandez?

11        A.      I may have, but I don't want to

12   state that I did or didn't.  I just don't

13   remember.  But I'd be happy to look at a

14   photograph and -- if you showed me a photograph,

15   I would definitely be able to tell if I saw it

16   before.

17        Q.      The invoices marked as Exhibits No.

18   4 and No. 5 to your deposition, do those include

19   any time sheets, invoices, time records or

20   billing records that record or document the work

21   you've performed in this case?

22        A.      I'm not sure I --

23               MR. ROSENBLATT:  Object to form.

24        A.      Yeah.  I'm not sure I understand.

25   Sorry.  I'm not sure I understand the question.

Peter L. Rosenblatt, M.D.

```
 1          Q.       Do you have any other time sheets
 2    or any other documents that reflect the specific
 3    work you've done on this case, other than the
 4    invoices that are marked as Exhibits No. 4 and
 5    No. 5?
 6          A.       No.  Everything I've done, that's
 7    how I record it, and then I generate an invoice
 8    based on that.
 9          Q.       Are there other documents other
10    than 4 and 5 that contain information that was
11    used to generate Exhibits No. 4 and 5?
12          A.       No.
13          Q.       Do you prepare these invoices
14    yourself?
15          A.       I do.
16          Q.       Using what software?
17          A.       Word.  I don't mean that like when
18    my son says word.  I mean "Word."
19          Q.       I noticed you didn't flash any gang
20    signs when you said that, so.
21          A.       I felt funny when I said that.
22    Microsoft Word.
23          Q.       There we go.  The point is you
24    don't generate time sheets and then hand them to
25    someone who then uses that information to compile
```

Peter L. Rosenblatt, M.D.

1    or generate these invoices?

2         A.       No.

3         Q.       Something tells me you didn't bring

4    with you copies of your Schedule C and Form 1099

5    of your tax records for the preceding five years.

6              MR. ROSENBLATT:  You don't need to

7    answer that.  No, we're not producing that.

8         Q.       No. 14 requests that you produce

9    all documents related to your involvement with

10   Ethicon's professional education, including, but

11   not limited to any and all PowerPoints, course

12   materials, outlines, videos or presentations,

13   live surgical presentations, marketing

14   evaluations created by or provided to you related

15   to any pelvic mesh product sold by Ethicon.

16             Do you have any materials or items

17   that fit that description other than what you

18   have already produced and has been marked as

19   Exhibit No. 6 to your deposition?

20        A.       The only thing I could think of

21   besides what's already been produced is I did --

22   I did personally create a video that was used by

23   Ethicon for tensioning slings, and we can make

24   that available.  It's a short video on how to

25   tension a sling.

Peter L. Rosenblatt, M.D.

```
1          Q.      When was that video created?

2          A.      Oh, it's got to be ten years ago.

3          Q.      Where is it right now?

4          A.      It's -- where's the video?

5          Q.      Yes, sir.

6          A.      I mean, they made it into DVDs, and

7    I most likely have a copy of the video on my

8    computer.

9          Q.      Yes, sir, I would appreciate it if

10   you'd produce that.

11                 Are we in agreement on that?

12                 MR. ROSENBLATT:  If he's able to

13   find it and send it to me, I'll pass it along to

14   you.

15         Q.      Is there any particular reason you

16   didn't bring that with you today?

17         A.      No.  I'm happy to provide it,

18   though.

19         Q.      Do there exist any transcripts or

20   statements between you and any governmental

21   agency regarding any pelvic mesh product used for

22   treatment of stress urinary incontinence or

23   pelvic organ prolapse?

24         A.      I don't believe so.

25         Q.      No. 18 requests that you produce or
```

Peter L. Rosenblatt, M.D.

1   bring with you any and all documents relating to

2   any presentations, PowerPoints or lectures

3   regarding any female pelvic mesh product used for

4   treatment of stress urinary incontinence or

5   pelvic organ prolapse.

6            Have you brought those with you?

7            MR. ROSENBLATT:  And I'll just note

8   our objection to being overbroad and vague.

9        A.    Well, I was going to ask you, are

10  you talking about Ethicon products there?

11       Q.    The request specifically says any

12  female pelvic mesh product used for treatment of

13  stress urinary incontinence or pelvic organ

14  prolapse.

15       A.    So I know that there are other

16  presentations.  I did not bring them.  And with

17  permission from counsel, I would be perfectly

18  willing to provide those to you.

19       Q.    As you sit here today, what

20  presentations are you aware of that you're in

21  possession of that weren't brought with you

22  today?

23       A.    Well, what comes to mind is that I

24  in the last several years have been doing some

25  teaching for Boston Scientific as well as some,

Peter L. Rosenblatt, M.D.

```
 1   you know, presentations that I've done on my own
 2   not in connection with Boston Scientific that
 3   have included the Uphold mesh device and before
 4   that Pinnacle.
 5              I think when I read this -- I'm
 6   only now seeing that it was just any treatment,
 7   and I was thinking about Ethicon and that's why I
 8   produced those.
 9        Q.     If it had said Ethicon
10   specifically, have you satisfied that requirement
11   as set forth in No. 18?
12        A.     Yes.
13        Q.     We're through with the notice.  Do
14   you want to take a break?
15              (A break was taken.)
16   BY MR. CRAWFORD:
17        Q.     Doctor, is it fair to say that the
18   risks of you using mesh in pelvic reconstructive
19   surgery are well-known?
20        A.     Yes.
21        Q.     And they've been well-known for a
22   long time?
23        A.     Right, decades.
24        Q.     Some risks are common with pelvic
25   reconstructive surgery regardless of whether mesh
```

Peter L. Rosenblatt, M.D.

```
 1    is used?

 2         A.      Correct.

 3         Q.      Such as bleeding, infection, injury

 4    to adjacent organs, scarring and dyspareunia?

 5         A.      Correct.

 6         Q.      Then there's some risks that are

 7    unique to surgeries that involve the use of mesh,

 8    including mesh erosion into the surrounding

 9    organs?

10         A.      So when you put it that way, you

11    know, erosion into surrounding organs can happen

12    with any permanent material like suture.  But

13    when you say, quote/unquote, mesh erosion, you

14    can't get -- you can't get erosion of mesh unless

15    you use mesh.  But we certainly see erosions of

16    permanent sutures, for instance, into surrounding

17    organs or into the vagina.

18         Q.      I understand that.  I appreciate

19    that clarification.

20                 But mesh erosion is unique to

21    surgeries that involve the use of synthetic mesh?

22         A.      Correct.

23         Q.      Mesh erosion into surrounding

24    organs such as the bladder and the urethra and

25    the rectum are a known risk associated with
```

Peter L. Rosenblatt, M.D.

```
 1    Prolene® mesh, fair?

 2         A.      Well, no.  When you say Prolene®

 3    mesh -- Prolene® mesh is a trade name, right --

 4         Q.      Sure.

 5         A.      -- so it can happen with any

 6    polypropylene mesh.  Fortunately mesh erosion

 7    into a surrounding organ is exceedingly rare as

 8    opposed to mesh exposures.

 9         Q.      But it is a known risk.  Whether

10    it's rare or not it's a known risk?

11         A.      It is a known risk.

12         Q.      And for clarification, Prolene®

13    mesh is a synthetic polypropylene mesh?

14         A.      It's one of the -- it's one type of

15    polypropylene mesh.

16         Q.      And in October of 2008, the FDA

17    issued a pelvic health notification regarding

18    transvaginal mesh.

19         A.      Correct.

20         Q.      That would include Ethicon's

21    Prolene® mesh, right?

22         A.      Correct.

23         Q.      The FDA stated that surgeons and

24    patients should be aware of what's termed

25    "serious complications" associated with surgical
```

Peter L. Rosenblatt, M.D.

1   mesh placed through the vagina, including mesh

2   erosion and exposure?

3             MR. ROSENBLATT:  And, Jeff, do you

4   have a copy to show him or do you plan on marking

5   that as an exhibit?

6             MR. CRAWFORD:  I don't.  I'm making

7   reference to it as it was described in his

8   report.

9        A.     Just one second.

10            (Discussion off the record.)

11       A.     I'm sorry, did you say that we did

12  have a copy of the 2008 FDA Public Health

13  Notification?

14            MR. ROSENBLATT:  I think he said he

15  was just referring to your report.

16       A.     Okay, got it.

17       Q.     You're pretty familiar with that --

18       A.     Yes, I am.

19       Q.     -- aren't you?

20       A.     Yeah, I just wanted to know if Paul

21  wanted to have it in front of me, but yes, I am.

22       Q.     I'll re-ask the question.

23       A.     Thank you.

24       Q.     The FDA stated that surgeons and

25  patients should be aware of what it termed

Peter L. Rosenblatt, M.D.

1    "serious complications" associated with surgical

2    mesh placed through the vagina including mesh

3    erosion and exposure; is that right?

4         A.      That's correct.

5         Q.      And that would include Ethicon's

6    Prolene® mesh as indicated?

7         A.      Yes.

8         Q.      In 2008, did the FDA warn the

9    public that over the previous three years it

10   received over 1,000 reports of complications that

11   were associated with surgical mesh devices used

12   to repair pelvic organ prolapse and stress

13   urinary incontinence?

14        A.      That is correct.

15        Q.      And those devices also included

16   those made with Ethicon Prolene® mesh, true?

17        A.      That is correct.

18        Q.      Was it noted by the FDA that the

19   most frequent complications include exposure of

20   the mesh through the vagina -- through the

21   vaginal epithelium, infection, pain, urinary

22   problems and recurrence of either prolapse or

23   incontinence?

24        A.      Well, if I remember correctly, the

25   most common was the mesh exposure, but those

Peter L. Rosenblatt, M.D.

1    others that you mentioned are also potential

2    risks but not necessarily related specifically to

3    mesh, but with any -- you know, infection can

4    happen, scarring can happen with any pelvic

5    surgery.

6         Q.      Did the FDA in 2008 stress the need

7    for adequate informed consent and specialized

8    training for specific mesh kits?

9         A.      Yes, they did.

10        Q.      And did the FDA also stress the

11   need to be vigilant for mesh complications

12   including erosion and infection as well as

13   complications associated with the tools used in

14   the placement of transvaginal mesh?

15        A.      Yes, they did.

16        Q.      In 2008 did the FDA also recommend

17   that surgeons inform their patients that the

18   implantation of surgical mesh is to be considered

19   permanent and that some complications associated

20   with the mesh may require additional surgery?

21        A.      Yes, they did.

22                MR. ROSENBLATT:  It's on page 13

23   and 14.

24                THE WITNESS:  Thank you.

25        Q.      Finally, did the FDA in 2008 also

Peter L. Rosenblatt, M.D.

1    encourage surgeons to inform their patients about

2    potentially serious complications affecting their

3    quality of life including pain during intercourse

4    and vaginal scarring?

5         A.      Yes, they did.

6         Q.      In 2011, the FDA issued an update

7    of that 2008 notification based on a continuing

8    analysis of adverse events that had been reported

9    to the FDA between 2008 and 2011.

10        A.      Correct.

11        Q.      While basically reiterating the

12   information from the 2008 public health notice,

13   the FDA went further in 2011 stating that the

14   complications noted in the 2008 notice were not

15   rare?

16        A.      That's what they reported, correct.

17        Q.      In fact, from January 1st, 2008,

18   through December 31st, 2010, the FDA had received

19   2,874 additional reports of complications

20   associated with surgical mesh devices used to

21   treat pelvic organ prolapse and stress urinary

22   incontinence?

23        A.      Correct.

24        Q.      Those devices would include the

25   devices made with Ethicon Prolene® mesh?

Peter L. Rosenblatt, M.D.

1          A.          Presumably, yes.

2          Q.          Do you think that it was wrong for

3    the FDA to have told the public that

4    complications associated with transvaginal mesh

5    are not rare?

6          A.          I think it was wrong of the FDA.

7          Q.          Why?

8          A.          As stated in my report, there were,

9    you know, 1503 reports to the FDA about

10   complications associated with mesh, and in the --

11   in I believe it's the white paper that was

12   associated with the safety update, they talk

13   about that there were approximately 75,000

14   transvaginal mesh cases done in the United States

15   per year.  And if you do the math, over that

16   three-year period, that's over 200,000 cases, and

17   you've got 1503 reports.  So if you do the math,

18   it comes down to .06 percent which in my mind --

19   if a doctor was operating on me and said your

20   chance of a serious complication was about a half

21   a percent, I would consider that pretty rare,

22   personally.

23         Q.          Do you criticize the FDA for

24   opening the door to plaintiffs attorneys who've

25   now filed tens of thousands of cases against

Peter L. Rosenblatt, M.D.

1    medical device manufacturers for transvaginal

2    mesh?

3         A.      I think that's part of the

4    situation.  I don't think it rests solely with

5    the FDA, but I think that contributed to it.

6         Q.      What else do you believe

7    contributes to it?

8              MR. ROSENBLATT:  Object to form.

9         A.      I believe the fear mongering with

10   all the plaintiff ads on TV have done a real

11   disservice to women throughout this country.

12        Q.      Anything else?

13        A.      The only thing that comes to mind

14   are, you know, I recall seeing an article in

15   Reuters about medical lenders who are also taking

16   advantage of, I believe, the situation and taking

17   advantage of women who may have problems with

18   mesh.

19        Q.      In what ways are they taking

20   advantage?

21        A.      By lending patients money and

22   jacking up the bills artificially so that when

23   women get their settlements most of the

24   settlement money goes to the entrepreneurs and

25   not to the patients who have been hurt by these,

Peter L. Rosenblatt, M.D.

1   potentially hurt by these procedures.

2        Q.      What evidence do you have that

3   that's going on?

4        A.      Just an article that I read in

5   Reuters about this.

6        Q.      Do you have any personal knowledge

7   regarding that going on?

8        A.      Yes, my personal knowledge is my

9   discussions with a urogynecologist colleague of

10  mine named Dr. Cassidenti in the Los Angeles area

11  who was contacted by one of these medical lenders

12  and was asked to remove mesh in women and would

13  be paid cash to do this.

14       Q.      Any other evidence?

15       A.      Not that I can think of.

16       Q.      Have you yourself been approached

17  by any such lenders?

18       A.      I have not.

19       Q.      You perform around 300 surgeries

20  for prolapse and incontinence every year?

21       A.      Roughly.

22       Q.      Approximately how many of those 300

23  surgeries that you perform each year involve the

24  use of Ethicon Prolene® mesh?

25                MR. ROSENBLATT:  Object to form.

Peter L. Rosenblatt, M.D.

1    Jeff, are you referring specifically to Prolene®

2    or are you using Prolene® more broadly?  Just --

3                    MR. CRAWFORD:  I want to know

4    Prolene®, how often does he use Ethicon's

5    Prolene® mesh.  And my next question will be in

6    how many of those procedures do you use synthetic

7    mesh that's not Ethicon Prolene® mesh?

8                    MR. ROSENBLATT:  Jeff, I'm not

9    trying to be difficult but Gynemesh® PS is also

10   made from Prolene.  So I'm just wondering are you

11   asking about Prolene® or Prolene in general.

12        Q.      Prolene in general.

13        A.      So it varies per year, but if you

14   want to know currently --

15        Q.      Yes, sir.

16        A.      So I'm still using TVT-O, and

17   occasionally Gynemesh®.  I think those are the

18   only two products that I'm currently using.

19        Q.      Were you using those last year?

20        A.      Yes.

21        Q.      And last year you performed

22   approximately 300 surgeries?

23        A.      Correct, but that wasn't the --

24   that wasn't the only sling type that I was using.

25        Q.      And that's what I'm getting at.

Peter L. Rosenblatt, M.D.

1              What percentage of your surgeries

2    last year involved Ethicon mesh, those two

3    products that you just referred to?

4         A.      I would say of the -- I probably do

5    roughly 100 sling operations a year, maybe 100 to

6    125, and percentage-wise, probably 40 percent of

7    them are TVT-O, but that's been decreasing over

8    the last couple years.  So maybe this year it's

9    probably more like 30 percent or 25 percent.

10        Q.      So last year approximately 40

11   percent of your 100 sling operations involved the

12   use of Ethicon products?

13        A.      I believe that's correct.

14        Q.      And that number has decreased this

15   year?

16        A.      Correct.

17        Q.      Why?

18        A.      Only because I'm using more of a

19   different transobturator sling.  I still do a lot

20   of transobturator slings, but I'm using more of

21   the Boston Scientific slings at this point.

22        Q.      Why did you switch?

23        A.      Well, I haven't switched, but my

24   fear is that over the past --

25        Q.      And I'm sorry to cut you off.  Let

Peter L. Rosenblatt, M.D.

1    me rephrase the question so you don't have to

2    answer twice.

3         A.        Sure.

4         Q.        Why have you -- I don't mean to be

5    rude.  I'm just trying to save you the time.

6         A.        Are you talking to me?

7         Q.        Yeah.

8         A.        Okay.

9         Q.        What is the reason that you've

10   decreased your use of Ethicon products and

11   increased your use of Boston Scientific products?

12        A.        Right.  So if I thought that I

13   could use the Ethicon products from now until the

14   day I retire, I would, but over the last couple

15   years, Ethicon has dropped their sales force, and

16   there are rumors that they may stop manufacturing

17   altogether.  So I wanted to get prepared for that

18   day, and so I started looking at other sling

19   products from companies that I believe will

20   continue to be around for the long term, and

21   that's why I have transitioned myself slowly to

22   Boston Scientific.

23        Q.        When did you begin that transition?

24        A.        I would say not long after they

25   dropped their sales force.

Peter L. Rosenblatt, M.D.

1      Q.      When was that?

2      A.      I don't remember precisely, but I'm

3   going to say about three years ago.

4      Q.      Approximately 2013?

5      A.      I believe so.

6      Q.      In 2013, were you still performing

7   approximately 100 sling procedures?

8      A.      100 to 125, yeah.

9      Q.      Back then what percentage of your

10  sling procedures involved the use of Ethicon

11  mesh?

12     A.      I believe it was 100 percent.

13     Q.      And today, three years later,

14  that's down to approximately 30 percent?

15     A.      Correct.

16     Q.      What's the BSC product that's

17  comparable to the Ethicon product you're

18  replacing it with?

19     A.      Yeah, it's not really comparable,

20  but it's an outside-in as opposed to the

21  inside-out transobturator sling, and it's called

22  the Obtryx II.  Roman numeral II, O-B-T-R-Y-X.

23     Q.      Back to the FDA.  In conjunction

24  with its 2011 update, did the FDA conduct a

25  systematic review of the published scientific

Peter L. Rosenblatt, M.D.

1    literature to evaluate the safety and efficacy of

2    transvaginal mesh for pelvic organ prolapse?

3         A.       Yes.

4         Q.       Did that systematic review

5    demonstrate that transvaginal mesh repairs do not

6    improve symptomatic results or qualify -- strike

7    it.

8              Did that systematic review

9    demonstrate that transvaginal mesh repairs do not

10   improve symptomatic results or quality of life

11   over traditional non-mesh repair?

12             MR. ROSENBLATT:  Object to form.

13        A.       That's what they stated.

14        Q.       Did the literature review conducted

15   by the FDA reveal that mesh used in transvaginal

16   repairs introduces risks not present in non-mesh

17   surgery for pelvic organ prolapse?

18        A.       That is what the FDA said.

19        Q.       Did the FDA discover in 2011 that

20   there was no evidence that transvaginal repair to

21   support the top of the vagina or the back wall of

22   the vagina with mesh provided any added benefits

23   compared with traditional surgery that did not

24   use mesh?

25        A.       That is what the FDA stated.

Peter L. Rosenblatt, M.D.

1      Q.      Is it fair to say that you

2   recommend for the use of transvaginal mesh --

3   strike that.

4              Is it fair to say you recommend the

5   use of transvaginal mesh in pelvic reconstructive

6   surgery?

7      A.      Not as a general statement, but in

8   select cases, I do.

9      Q.      You're not suggesting that mesh is

10  recommended for all patients who are in need of

11  surgical repair?

12     A.      Absolutely not.

13     Q.      There are alternatives to using

14  synthetic mesh in pelvic reconstructive

15  surgeries?

16     A.      There are.

17     Q.      Sometimes transvaginal mesh is the

18  best option but sometimes an alternative may be

19  the best option?

20     A.      That is correct.

21     Q.      Do you believe the FDA in its

22  public health notices of 2008 and 2011 presented

23  a biased view of transvaginal mesh?

24     A.      Yes.

25     Q.      Why?

Peter L. Rosenblatt, M.D.

1          A.        For the reasons I already stated,

2     that their interpretation of the -- whether or

3     not serious complications were rare is based on

4     their interpretation of the data.  And, also, I

5     think the bias is that any return trip to the

6     operating room is considered a serious

7     complication by the FDA but that return to the

8     operating room may be a minor procedure such as

9     excision of a few fibers of mesh that have been

10    exposed in the vagina, and coupled along with

11    that is that if a patient fails a prolapse repair

12    with native tissue and has to go back to the

13    operating room to have a whole another procedure

14    done for her prolapse, that is not considered a

15    serious AE, or adverse event, by the FDA, but

16    it's a much bigger operation.  So that, to me,

17    demonstrates an inherent bias in their

18    notifications.

19          Q.        Generally speaking, do you believe

20    that a complication that requires a woman to go

21    to the operating room for surgical repair of that

22    complication is considered a serious

23    complication?

24               MR. ROSENBLATT:  Object to form.

25          A.        So that is how the FDA sets up what

Peter L. Rosenblatt, M.D.

1    they consider a serious adverse event, is a

2    return trip to the operating room, and I'm not

3    taking that lightly at all.  But from a clinical

4    standpoint, I would much rather -- if I had to

5    choose between taking someone back for a small

6    mesh exposure incision under local anesthesia

7    versus an entirely new operation to repair

8    recurrent prolapse with the inherent scarring

9    and...  I would much rather, if I had to choose,

10   take the former rather than the latter.

11        Q.     If I were to tell someone the

12   complication Woman A had is a serious

13   complication, and I know it was a serious

14   complication because it required her to go to the

15   emergency room to repair it, do you agree with

16   that statement?

17             MR. ROSENBLATT:  Object to form.

18        A.     I guess I'm not sure what you're

19   talking about in terms of going to the emergency

20   room.

21        Q.     I meant operating room.  I'm sorry.

22   I got to re-ask it.

23        A.     Please.

24        Q.     If I were to tell someone Ms. Smith

25   has a serious complication with her transvaginal

Peter L. Rosenblatt, M.D.

1    mesh, and the reason I know it's a serious

2    complication is because she had to go to the

3    operating room to have it repaired, do you think

4    I'm making a fair statement?

5        A.    I guess what I'm saying is I don't

6    think that's unreasonable.  What I'm saying is to

7    consider that a serious complication but not to

8    consider a recurrent prolapse requiring a whole

9    new operation for prolapse, not considering that

10   a serious complications is somewhat hypocritical.

11       Q.    I understand.  And I don't mean to

12   belabor the point, but is it fair to say that by

13   it's very def- -- strike it.

14             Is it fair to say that a

15   complication that requires a woman to go to the

16   operating room for a surgical repair that by its

17   very nature should be considered a serious

18   complication?

19             MR. ROSENBLATT:  Object to form.

20   Asked and answered.

21       A.    I think that that is reasonable,

22   but there are different degrees of serious

23   adverse events.  And if the FDA wishes to

24   categorize that as a serious adverse event

25   because it's a return to the operating room, I

Peter L. Rosenblatt, M.D.

1   don't disagree with that.  I'm talking about the

2   hypocrisy about not considering a return trip to

3   the operating room for recurrent prolapse not a

4   serious adverse event, that's all.

5        Q.     Do you have any reason to believe

6   that what you consider to be a misrepresentation

7   of the data by the FDA was intentional on the

8   FDA's part?

9             MR. ROSENBLATT:  Object to form.

10       A.     I have no reason to believe that.

11       Q.     For example, do you believe that

12   the FDA has some kind of a vendetta against

13   synthetic mesh manufacturers?

14       A.     No, I don't believe that is true at

15   all.

16       Q.     Can you imagine any reason why

17   anyone at the FDA would want to mislead the

18   public with a biased view of risks associated

19   with the use of transvaginal mesh to treat

20   women's health issues?

21       A.     I can't think of any reason why

22   they would want to do that.

23       Q.     Two risks unique to transvaginal

24   mesh include mesh exposure through the vaginal

25   wall and also erosion, which is the migration of

Peter L. Rosenblatt, M.D.

1   the mesh, into other organs.  Is that right?

2        A.      Right.

3        Q.      Do you hold the opinion that most

4   cases of mesh exposure are minor complications

5   and are even asymptomatic?

6        A.      That's true much of the time,

7   correct.

8        Q.      On what studies or peer-reviewed

9   medical literature is that opinion based?

10        A.      It's actually based on many studies

11   throughout the literature that many of the mesh

12   exposures are asymptomatic and that many mesh

13   exposures require either just an in-office

14   procedure or just observation or treatment with

15   estrogen cream.  And, in addition, that's been my

16   experience for the past, you know, 15 years or so

17   in my clinical practice, that most of the mesh

18   exposures are either asymptomatic or minimally

19   bothersome to a patient.

20        Q.      And by most, you mean the majority?

21        A.      The majority, correct.

22        Q.      Can you identify off the top of

23   your head any particular peer-reviewed literature

24   that supports that opinion?

25        A.      Yes.  I'd have to look to

Peter L. Rosenblatt, M.D.

1    specifically mention names, but a number of the

2    RCTs on Prolift.  I believe Hiltunen.  I believe

3    Nieminen.  I'm probably saying that wrong.  Talk

4    about how often mesh exposures are asymptomatic.

5         Q.     Any others off the top of your

6    head?

7         A.     No, but I'd be happy to look at

8    any, and there are many.  It's throughout the

9    literature.

10             MR. ROSENBLATT:  Did you want him

11   to go through his expert report and pull out any

12   references for you?

13             MR. CRAWFORD:  No, I don't need

14   that.  I just wanted to know what he could think

15   of off the top of his head.  Thank you, though.

16             Do you hold the opinion that

17   there's a significantly higher rate of recurrent

18   prolapse with native tissue repair as compared to

19   use of transvaginal mesh.

20        A.     Yes.

21        Q.     On what studies or peer-reviewed

22   medical literature is that opinion based?

23        A.     On many.  I mean, even the RCTs

24   such as Altman and several others that, you know,

25   I'm familiar with but just don't come to mind,

Peter L. Rosenblatt, M.D.

1    but I've read many, many RCTs as well as -- well,

2    the RCTs, that the rate of recurrent prolapse is

3    much higher with native tissue repairs.

4         Q.      For the benefit of a jury, what is

5    an RCT?

6         A.      Oh, RCT.  It's a randomized

7    controlled trial.

8         Q.      Do you agree that there's no chance

9    of mesh erosion or exposure with a native tissue

10   repair?

11             MR. ROSENBLATT:  Object to form.

12        A.      That's true when you use the word

13   mesh, but it's certainly not true with native

14   tissue repairs that use permanent synthetic

15   materials where there's a risk of erosion.  And,

16   you know, in fact, just that you mentioned it,

17   the one that leaps off my mind is the Iglesia RCT

18   comparing Prolift to native tissue repair that

19   was stopped during an interim analysis because

20   the mesh exposure rate was over 15 percent, which

21   was a predetermined percentage at which they

22   would stop the procedure, but in the same

23   article, they talk about the native tissue

24   repairs showing a GORE-TEX exposure rate of over

25   15 percent as well, but they don't -- you know,

Peter L. Rosenblatt, M.D.

1    they don't talk about cancelling the native

2    tissue repairs because of over 15 percent

3    exposure rate.

4        Q.      You say in your report that the

5    Gynemesh® PS mesh used in Prolift is not

6    defective just because a small percentage of

7    patients may experience exposures or other

8    well-known and acceptable complications.

9        A.      Correct.

10       Q.      In your opinion, what percentage of

11   Prolift patients would have to experience mesh

12   exposures for you to consider the Prolift device

13   defective?

14               MR. ROSENBLATT:  Object to form.

15       A.      So I don't think there's a specific

16   number, and different studies show different

17   exposure rates.  So I think a lot of it has to do

18   with technique, surgeon technique, as well as,

19   you know, the factors associated with the

20   patient.  You know, clinical factors, like age

21   and estrogenization and menopausal status,

22   obesity, comorbidities like diabetes.  But, to

23   me, that does not, a specific percentage does not

24   denote a defect in the product itself.

25       Q.      So there is no particular specific

Peter L. Rosenblatt, M.D.

1   percentage at which you would say this is a

2   defective product?

3              MR. ROSENBLATT:  Object to form.

4   Asked and answered.

5       A.     No, only in that different

6   studies -- you know, I've seen exposure rates as

7   high as 20 percent.  I've seen exposure rates of

8   5 percent or 2 percent.  So, you know, every

9   study is different, and you're going to have

10  different exposure rates.

11      Q.     Your report says the medical

12  literature commonly reports that eight or nine

13  out of ten women who have Prolift report that the

14  Prolift surgery improved their quality of life,

15  correct?

16      A.     Correct.

17      Q.     What medical literature are you

18  referring to or relying upon to make that

19  statement?

20      A.     Can I take a look at --

21             MR. ROSENBLATT:  I think you've got

22  it.

23             THE WITNESS:  Oh, I do?

24      Q.     Page 46.  The very first sentence

25  on page 46.

Peter L. Rosenblatt, M.D.

1        A.       Oh, thank you.  You know, as an

2    example, the article I quote with Feiner from

3    2010 shows that despite some patients developing

4    de novo dyspareunia, the overwhelming majority,

5    in this case 94 percent of the women, say they

6    would have had the same surgery again, and over

7    90 percent would recommend it to a friend.

8        Q.       Is there anything other than the

9    Feiner report in 2010 on which you base your

10   opinion that the medical literature commonly

11   reports that eight or nine out of ten women who

12   have Prolift report that the Prolift surgery

13   improved their quality of life?

14       A.       I believe that there -- there is

15   other literature, and I'm trying to remember.  I

16   believe possibly Lowman, L-O-W-M-A-N, discusses

17   that as well.  That they specifically looked at

18   dyspareunia rates, but that most women were very

19   satisfied with the procedure, and that even the

20   dyspareunia was considered mild for most women.

21       Q.       Are there any other studies?

22       A.       There are --

23               MR. ROSENBLATT:  Object to form.

24       A.       -- but nothing that comes to mind.

25       Q.       What year was the Lowman study?

Peter L. Rosenblatt, M.D.

1        A.        What year was the Lowman study?

2        Q.        Yes.  Do you recall?

3        A.        I don't recall off the top of my

4    head.

5        Q.        Okay.

6        A.        2008.

7        Q.        Thank you.  What's your

8    understanding of Bruce Rosenzweig's role in this

9    case?

10                 MR. ROSENBLATT:  Object to form.

11       A.        I know that Dr. Rosenzweig has been

12   identified as an expert for the plaintiff.

13       Q.        Do you know anything beyond just

14   the fact that he is an expert for the plaintiff?

15   Do you know what he is an expert in?

16                 MR. ROSENBLATT:  Object to form.

17   Assumes facts not in evidence.

18       Q.        Let me rephrase.

19                 Do you know what subjects Bruce

20   Rosenzweig is held out to be an expert by the

21   plaintiffs' lawyers in this case?

22       A.        Not specifically, although I've

23   read his report and I believe he discusses the

24   specific qualities of mesh, mesh properties.

25       Q.        And do you know his specialty?

Peter L. Rosenblatt, M.D.

1          A.        I believe he's a urogynecologist.

2          Q.        Do you know Dr. Rosenzweig

3    personally?

4          A.        I may have met him many, many years

5    ago.

6          Q.        Do you have any specific

7    recollection of that?

8          A.        Yeah, I remember he taught at a

9    course I attended in the late 1990s.  I believe

10   it was actually in Frisco, Colorado.  And then he

11   sort of disappeared off the grid for a number of

12   years before he resurfaced.

13                   MR. CRAWFORD:  I will respectfully

14   object to the non-responsive portions of that

15   answer.

16                   MR. ROSENBLATT:  I think he's

17   referring to his skiing videos.

18   BY MR. CRAWFORD:

19         Q.        Was there anything -- I mean, no

20   offense, but the late 1990s has been a while.

21                   Is there any particular reason you

22   recall meeting Dr. Rosenzweig at that conference?

23         A.        No, just that I remember him

24   lecturing at a conference I attended out there.

25         Q.        Do you recall what topic or subject

Peter L. Rosenblatt, M.D.

```
 1   he lectured on?

 2        A.      No.

 3        Q.      What do you know about

 4   Dr. Rosenzweig's reputation in the medical

 5   community?

 6        A.      Only that he is -- I've seen his

 7   name in connection with a number of legal cases

 8   as a plaintiff expert.  Not just limited to

 9   Ethicon but in a number of cases.

10        Q.      Anything else?

11        A.      No.

12        Q.      Do you have any reason to believe

13   Dr. Rosenzweig is a biased witness in this case?

14        A.      I have no knowledge about anything

15   like that.

16        Q.      Dr. Rosenzweig has opined that

17   Ethicon's Prolene® mesh is not suitable as a

18   permanent implant for pelvic reconstructive

19   surgery because the pores are too small.  Do you

20   agree with that?

21        A.      No.

22        Q.      Why not?

23        A.      So the Prolene® mesh, you know, has

24   been used in literally, you know, millions of

25   sling cases with phenomenal results.
```

Peter L. Rosenblatt, M.D.

1              I mean, if anything, you know, the

2     TVT products have revolutionized the field of

3     urogynecology, and that's not just from my

4     personal experience, which it is, but it's also

5     from, you know, hundreds of peer-reviewed, if not

6     thousands of peer-reviewed, articles about the

7     success of the material.

8          Q.      I understand that you're an

9     advocate of the mesh, the synthetic mesh and the

10    use of synthetic mesh in pelvic reconstructive

11    surgery, but my question is a little more narrow,

12    and that is do you agree with the opinion that

13    the pores are too small in the Ethicon Prolene®

14    mesh?

15              MR. ROSENBLATT:  Object to form.

16         A.      Right, I don't agree with that.

17    And the reason is that the Prolene® mesh is a

18    macroporous Type 1 monofilament material that

19    undergoes excellent integration into patients'

20    tissues, which I have seen on countless cases,

21    and I think it's completely appropriate and

22    probably the most appropriate in that it also has

23    great qualities in terms of being tension free

24    and not moving and incorporating well into

25    tissue.

Peter L. Rosenblatt, M.D.

1      Q.      You said that it has a history of
2  excellent integration into human tissue?
3      A.      Correct.
4      Q.      Does that happen 100 percent of the
5  time?
6      A.      What I have seen in my own clinical
7  practice is that it does.  I mean, can you get
8  exposures, yeah, that's possible.
9              Fortunately, you know, Prolene®
10  mesh which is used for slings such as TVT and
11  TVT-O has an extremely low exposure rate of about
12  1 percent, and so, you know, I guess those are
13  the exceptions when you don't get tissue
14  integration.  But for the vast majority of cases,
15  there's excellent integration with the tissue.
16      Q.      But there are cases where that
17  doesn't occur?
18      A.      But that can also occur with
19  Prolene® suture, and there are, you know, mesh --
20  you know, suture exposures in the vagina that
21  happen with suture, and the suture has been
22  around for over five decades.
23              So, yes, there are always going to
24  be exceptions, but when you think of the 99
25  percent of women whose lives have been improved

Peter L. Rosenblatt, M.D.

1  from this one device, there's no comparison.

2  There's no other procedure that's been as

3  successful to help women with these problems.

4       Q.     I'll respectfully object to the

5  non-responsive portions of the answer other than,

6  yes, there are exceptions.

7            MR. ROSENBLATT:  Doctor, you can

8  answer however you see fit.

9       Q.     And you know I mean no disrespect

10 by those objections.

11      A.     I understand.  I appreciate that.

12      Q.     I have to respectfully move to

13 strike portions of your answers that I don't

14 believe are responsive to my questions.

15            You understand that, right?

16      A.     I do understand that.

17      Q.     You've been deposed before, haven't

18 you?

19      A.     I have.

20      Q.     That doesn't hurt your feelings,

21 does it?

22      A.     No, not all.  Thank you for saying

23 that.

24      Q.     I'll represent to you that

25 Dr. Rosenzweig also holds the opinion that

Peter L. Rosenblatt, M.D.

1   polypropylene mesh is not suitable as a permanent

2   implant due to its heavy weight.

3            Does the weight of polypropylene

4   mesh have a bearing on whether or not it's

5   suitable for use in pelvic reconstructive

6   surgery?

7       A.      So I respectfully disagree with his

8   opinion that it's a heavy weight mesh.  It is

9   considered a lightweight mesh by the -- you know,

10  by classifications in the urogynecologic

11  literature.

12      Q.      Is there something known as old

13  mesh as opposed to new mesh?

14            MR. ROSENBLATT:  Object to form.

15      A.      I haven't heard that specifically,

16  those terms.

17      Q.      You've never seen the internal

18  Ethicon documents where Ethicon representatives

19  refer to some types of Ethicon mesh as old mesh?

20            MR. ROSENBLATT:  Object to form.

21  Mischaracterization of the documents.

22      A.      I don't recall seeing that, but I'd

23  be happy to look at any documents you want me to

24  look at.

25      Q.      The notion that there's a old mesh

Peter L. Rosenblatt, M.D.

1    and a new mesh, that's a foreign concept to you

2    as you sit here today?

3         A.      Well, I can imagine what you're

4    referring to.

5                 You know, for instance, I think

6    of -- you know, polypropylene mesh is like

7    Marlex® mesh, being a heavier mesh than the

8    current meshes, but I would consider Prolene®

9    mesh, which is the mesh used for TVT and TVT-O

10   and TVT Abbrevo, for instance, and TVT Secur as

11   being a newer lightweight Type 1 macroporous

12   monofilament mesh.

13        Q.      Okay.  That stated, do you believe

14   that the weight of a mesh, synthetic mesh, would

15   have a bearing upon whether or not it's suitable

16   for pelvic reconstructive surgery?

17        A.      So taking with what I said that

18   these are considered lightweight meshes, I

19   suppose that you could have heavier meshes than

20   what we're talking about that may not be

21   appropriate, but I'd have to know exactly which

22   meshes you're referring to.

23        Q.      Well, in what ways can you conceive

24   of that a heavier mesh would be inappropriate for

25   an implant?

Peter L. Rosenblatt, M.D.

```
 1                    MR. ROSENBLATT:  Object to form.
 2          A.        Well, bearing in mind that we're
 3   not talking about the meshes that I just
 4   described, you know, if you had a mesh which had
 5   extremely limited pore size, that might affect
 6   the ability of the mesh to incorporate.  And in
 7   my mind, you know, I'm not thinking about
 8   specifically Ethicon meshes, but I think of other
 9   meshes that are, for instance, woven, like the
10   IVS mesh or the ObTape which are much less
11   porous, and so I guess I'm thinking about those
12   being heavier meshes which did have issues with
13   them.
14          Q.        The heavier the mesh, the smaller
15   the pore size?
16                    MR. ROSENBLATT:  Object to form.
17          A.        Not necessarily, right?  You can
18   have a very wide open weave with, depending on
19   what the weave is, with a heavier mesh, with a
20   heavier diameter of the strands.  So I don't
21   think there's a direct correlation between the
22   diameter of the strands and the pore size.
23          Q.        Do you believe that the smaller the
24   pore size, the more problems it can create for
25   the woman?
```

Peter L. Rosenblatt, M.D.

```
 1              MR. ROSENBLATT:  Object to form.
 2       A.       No, I think what the literature
 3  shows and mesh science shows is that if you have
 4  microporous mesh it's possible that you may
 5  not -- for instance, you may not get good tissue
 6  integration throughout the mesh, but also, the
 7  possibility that bacteria could get into the
 8  interstices of the mesh and the body's ability to
 9  fight those bacteria with macrophages might be
10  compromised, but I don't think that has anything
11  to do with the Prolene® mesh that we're talking
12  about.
13       Q.       I'll represent to you that
14  Dr. Rosenzweig holds the opinion that
15  polypropylene is not suitable as a permanent
16  implant because it causes chronic foreign body
17  reactions.
18              Do you agree with that?
19       A.       No.
20       Q.       Why not?
21       A.       There are many implants that are
22  used throughout surgical interventions, including
23  anything from artificial hips to pacemakers to
24  mesh, to hernia mesh, which incite a foreign body
25  reaction.  That's a normal response of the body
```

Peter L. Rosenblatt, M.D.

```
1    to a foreign object.  That doesn't translate --
2    there's no correlation between that and the
3    development of problems such as, you know, pelvic
4    pain or dyspareunia.  So it's sort of apples and
5    oranges.  Just because you may get a foreign body
6    reaction does not mean that's an untoward effect
7    toward the implant.
8         Q.    Is there a difference between a
9    transitory foreign body reaction and a chronic
10   foreign body reaction?
11        A.    I believe it is possible to get a
12   transient versus a permanent, a foreign body
13   reaction, but that again doesn't translate into a
14   clinically significant problem.
15        Q.    What is the difference between --
16   I'm using the word transitory, and you said
17   transient.  Am I calling it the wrong thing?
18        A.    I believe that those are
19   synonymous.
20        Q.    Okay.  I'm just going to say
21   transitory because that's how I know it.
22        A.    Okay.
23        Q.    Is there a difference between a
24   transitory foreign body response and a chronic
25   foreign body response?
```

Peter L. Rosenblatt, M.D.

1        A.        Well, I think the way you're using

2    it and the way I'm using it I believe that one

3    with time it tends to go away, and one would be

4    sort of a permanent reaction, but I'm not aware

5    of any literature that shows that that translates

6    into a clinical difference for the patient.

7        Q.        When you're talking about foreign

8    bodies inserted into a woman's vagina, is the

9    difference between a transitory foreign body

10   response and a chronic foreign body response a

11   significant distinction to make?

12       A.        From a clinical standpoint, I don't

13   believe that's true.

14       Q.        Why not?

15       A.        Because I don't know any literature

16   that has shown that to be the case.

17       Q.        You don't know of any literature

18   that shows that synthetic transvaginal mesh

19   causes chronic foreign body reactions?

20       A.        That's not what I said.  What I'm

21   saying is that has not translated into a

22   clinically significant difference, whether it's

23   chronic or transitory.

24                 MR. ROSENBLATT:  Once you finish

25   this line of questioning, if we could take a

Peter L. Rosenblatt, M.D.

1    break.

2         Q.      Help us understand what you mean by

3    clinical difference.

4         A.        In other words, what is the

5    difference for the patient, that's what I mean by

6    clinical difference.

7                  In other words, if you take

8    biopsies and you show that there's a chronic

9    versus a transitory or transient foreign body

10   response, that doesn't translate or correlate

11   with a patient's symptoms, so it may be

12   inconsequential, even though on a pathological

13   report you may see a chronic foreign body

14   response versus one that's transitory.

15        Q.      So you don't think it's a more

16   serious issue for a woman to be facing a chronic

17   foreign body response than it is to be facing a

18   transitory foreign body response?

19        A.      I have not seen literature that

20   suggests that a chronic foreign body response

21   translates to a clinical difference for a

22   patient.

23        Q.      Well, a chronic foreign body

24   response could be recurrent infections for a

25   woman who's having foreign body response to

Peter L. Rosenblatt, M.D.

1   something that's been implanted into her vagina?

2        A.      Right, so fortunately infection of

3   mesh that we use in the vagina for either slings

4   or prolapse is exceedingly rare, and I can think

5   of -- of the over 2,000 slings or mesh that I've

6   put into a woman, I can think of one case where

7   an infection required me to remove the mesh.

8   That's a very low percentage.

9        Q.      You have had a patient who had a

10  chronic foreign body response to transvaginal

11  synthetic mesh that required you to go in and

12  remove the mesh because it caused recurrent

13  infections?

14            MR. ROSENBLATT:  Object to form.

15  Misstates the testimony.

16       A.      Yeah, that's not what I'm saying at

17  all.

18       Q.      I'm trying.  I'm trying.

19       A.      Okay.  It actually wasn't recurrent

20  infections.  It was a patient who had a TVT-O

21  obturator sling who within the first week of

22  surgery developed a serious infection which

23  required me to remove the mesh probably within

24  four days of the insertion.

25       Q.      What caused that infection?

Peter L. Rosenblatt, M.D.

```
1          A.       The causative agent was I believe
2   Group A Strep which is a very serious infection.
3          Q.       Do you have any idea how that mesh
4   got infected with the Strep?
5          A.       No.
6          Q.       Based upon a reasonable degree of
7   medical probability, did it occur as the mesh was
8   being inserted into her vagina?
9          A.       I think that's a reasonable
10  assumption.
11         Q.       In other words, did it pick up some
12  Strep on its way in?
13         A.       I believe that's reasonable, but
14  that's exceedingly rare.
15                  MR. CRAWFORD:  You want to take a
16  break?
17                  MR. ROSENBLATT:  Yeah.
18                  (A break was taken.)
19  BY MR. CRAWFORD:
20         Q.       Doctor, we are back from a break.
21  At the risk of beating a dead horse, we have to
22  talk just a little bit longer about this
23  transitory versus chronic, okay?
24         A.       Sure.
25         Q.       To let you know where I'm coming
```

Peter L. Rosenblatt, M.D.

1    from, I'll represent to you the plaintiffs in

2    this case are going to criticize Ethicon for

3    warning physicians that their synthetic mesh

4    could cause a transitory foreign body response

5    but not going that extra step and advising it

6    could cause a chronic foreign body response.

7             Do you follow me so far?

8        A.      Yes.

9        Q.      I gather from your testimony that

10   you don't think that's a fair criticism.

11       A.      I agree.

12       Q.      Why?

13       A.      From what I've already stated,

14   which is that that does not -- I've never seen

15   any literature or in my personal experience doing

16   this for, you know, 20 years that any kind of

17   response to a foreign material translates into a

18   clinically significant problem, and I'll give you

19   an example.  We implant -- we implant pacemakers.

20   I'm not talking about cardiologists.  I'm talking

21   about urogynecologists implant pacemakers for

22   overactive bladder, for fecal incontinence, for

23   urinary retention.  That's a foreign body.  The

24   body responds to that by walling off the device,

25   and I guarantee you a metal pacemaker is not

Peter L. Rosenblatt, M.D.

```
 1    porous.  So you get a walled off -- you know,

 2    that's one response to a foreign body.  You may

 3    do pathologic studies, if you want, and show that

 4    you may have a chronic foreign body response

 5    'cause the body sees that has a foreign body.

 6    Patients are asymptomatic.  It's irrelevant what

 7    the body is doing as long as the patient doesn't

 8    have a bad reaction to it, clinically.

 9          Q.     And I think that's the point is --

10    I think what we're doing is equating chronic

11    foreign body responses to chronic recurrent

12    infections in women.

13          A.     When you say "we," who are you

14    talking about?

15                 MR. ROSENBLATT:  Object to form.

16          Q.     Is it fair to equate chronic

17    foreign body responses to chronic recurrent

18    infections in these women?

19          A.     No, it's not fair because a foreign

20    body response has nothing to do with infection.

21    That would be a chronic infection.  That's not

22    the same thing as a chronic body reaction.

23          Q.     The body's reaction to a foreign

24    body is inflammation, right?

25          A.     Usually initially.
```

Peter L. Rosenblatt, M.D.

1      Q.      And what else?  Strike that.

2              How does the body respond to a

3  foreign body?

4      A.      In many different ways, but often

5  it's with fibrosis, but you know, you get

6  fibrosis just with any surgery in the body.  You

7  know, think of a scar on your arm if you cut

8  yourself or a keloid, that's scar tissue.  So

9  that's a normal response to healing.

10             Another normal response in this

11  case to a foreign body is to try to wall off the

12  foreign body or try to cause scarring or fibrosis

13  around the foreign body, and that is a foreign

14  body response.  That doesn't mean it's a bad

15  response.  That's a pathologic diagnosis.  But we

16  know, and in this case, we have literally

17  millions of women who've had the surgery, and

18  it's done -- you know, and it's been so

19  beneficial for these women.  So having a foreign

20  body does not mean that it's a bad response of

21  the body to a foreign material.

22      Q.      Move to strike the non-responsive

23  portions of that answer.

24             A foreign body response is not

25  necessarily a bad thing, correct?

Peter L. Rosenblatt, M.D.

1        A.        Right, and also, it doesn't equate

2   to infection.

3        Q.        A foreign body response is not a

4   bad thing, correct?

5        A.        Correct.

6        Q.        Unless it creates symptoms for the

7   woman.

8                  MR. ROSENBLATT:  Object to form.

9        A.        Well, I think there's -- I have to

10   disagree.

11        Q.        Okay.

12        A.        There's a foreign body response,

13   but then there are possibly effects that are

14   separate from that foreign body response such as

15   exposure.  Exposure of mesh which can occur

16   doesn't mean that it happened because of a

17   foreign body response.  Exposures can be caused

18   by other things like a hematoma or a suture line

19   that opened up.  So I think what you're doing is

20   equating a foreign body response with chronic

21   infection, and that's just not -- that's just not

22   how it happens.

23        Q.        What about -- what about equating a

24   chronic foreign body response to chronic symptoms

25   such as pain, dyspareunia, and -- go ahead.

Peter L. Rosenblatt, M.D.

```
 1                  MR. ROSENBLATT:  Object to form.
 2        A.        So I'm glad you brought that up.
 3   And there was -- there are studies that have
 4   looked at this.  I can't remember what the first
 5   author's name is, but there was one study which
 6   was a great idea.  They removed pieces of mesh
 7   from women who needed a revision of their slings,
 8   which is not that unusual, right?
 9                  So someone who develops urinary
10   retention or overactive bladder or some other
11   type of voiding dysfunction occasionally -- you
12   know, I do these surgeries -- we have to bring
13   women back for revision of the mesh which is
14   usually just cutting the mesh.
15                  What these researchers did was to
16   take out a portion of the mesh and look at it
17   under the microscope, send it to pathology.  And
18   they actually found that the women who had their
19   mesh removed for voiding dysfunction had more
20   foreign body reaction than the women that had
21   pain.  So there was no correlation between
22   foreign body reaction and pain.  There was
23   actually more foreign body reaction with voiding
24   dysfunction.  So you cannot equate pain with
25   foreign body reaction.
```

Peter L. Rosenblatt, M.D.

1      Q.      You cannot equate pain with a

2  foreign body response to synthetic mesh?

3      A.      Correct.

4      Q.      What study were you just referring

5  to?

6      A.      I don't remember the first author,

7  but I'm happy to --

8      Q.      Well, there's been several times

9  where I've said, nah, you don't have to look that

10  up, but that was a pretty significant answer, so

11  I'd like to know the name of that study.

12      A.      Okay.

13            MR. ROSENBLATT:  We can try to get

14  it during a break.

15            MR. CRAWFORD:  Okay, that sounds

16  good.

17      A.      I'll make a note.

18      Q.      Dr. Rosenswine -- excuse me.

19  Dr. Rosenzweig --

20      A.      Is that a Freudian slip?

21      Q.      Dr. Rosenzweig opines that

22  Ethicon's Prolene® mesh is not suitable for

23  permanent implant because the material safety

24  data sheet for polypropylene resin used to make

25  polypropylene states that it's incompatible with

Peter L. Rosenblatt, M.D.

1    strong oxidizers such as peroxides which are

2    readily found in the vagina.

3                    Is he wrong about that?

4          A.       I don't agree with his statement at

5    all for several reasons.

6                    One is that Prolene® mesh is simply

7    made up of polypropylene fibers which we've been

8    using for over 50 years.  I've gone back in on a

9    personal, you know, anecdotal level, and I've

10   seen Prolene® sutures that have been placed a

11   decade before I've been there, and I've seen no

12   evidence of any degradation of the Prolene®.

13   I've removed Prolene® mesh before and have not

14   seen any degradation of the mesh.

15                   And in addition, and I can't speak

16   for all polypropylene, but I know with Prolene®

17   that there are specifically antioxidants that are

18   proprietary that resist oxidation.

19         Q.       So the basis for your opinion --

20   strike that.

21                   The basis for you disagreeing with

22   Dr. Rosenzweig's opinion is that you've seen

23   polypropylene sutures in women that have been

24   there for a long time and they hadn't oxidized or

25   degraded, therefore other synthetic meshes

Peter L. Rosenblatt, M.D.

1    shouldn't oxidize or degrade; is that right?

2                 MR. ROSENBLATT:  Objection to form.

3         A.        No, that's one example, but also,

4    I'm familiar with the literature that has looked

5    at this.  I'm familiar with the scanning electron

6    microscopy which in some people's eyes has looked

7    like it has shown evidence of cracking and

8    degradation, but I'm also familiar with other

9    studies that have shown that that's a biofilm,

10   that the cracking is not in the polypropylene

11   itself, and if you wash it away, you get pristine

12   polypropylene.  So I am not aware of any

13   definitive literature in humans that has shown

14   that there's degradation from oxidation of

15   Prolene® mesh.

16        Q.        I got to go back and clean that up

17   a bit.

18                 Dr. Rosenzweig opines that

19   Ethicon's Prolene® mesh is not suitable for

20   permanent implant because the material safety

21   data sheet for polypropylene resin used to make

22   the mesh said it's incompatible with strong

23   oxidizers such as peroxides which are readily

24   found in the vagina.  And you disagree with that

25   opinion, correct?

Peter L. Rosenblatt, M.D.

1        A.        Correct.

2        Q.        And one of the reasons that you

3    disagree with that opinion is because you're

4    unaware of any medical literature that indicates

5    degradation due to oxidation of polypropylene

6    mesh?

7        A.        No, I said of Prolene® mesh.

8        Q.        I'm sorry.  Prolene® mesh.

9        A.        Correct.

10        Q.        The other reason that you disagree

11   with Dr. Rosenzweig's opinion on that is because

12   you, yourself, have seen Prolene® sutures in

13   patients of yours that have been there for years,

14   if not over a decade, and they weren't oxidized

15   or degraded?

16        A.        So not only Prolene® sutures but

17   also Prolene® mesh.

18        Q.        Used to treat?

19        A.        Stress incontinence.

20        Q.        What does it mean for something to

21   be cytoxic?  Cytotoxic.  Excuse me.

22                  What does it mean for something to

23   be cytotoxic?

24        A.        My understanding is that it would

25   be toxic to cells.

Peter L. Rosenblatt, M.D.

1          Q.         If a material is cytotoxic, does

2    that mean it can cause cell death and

3    complications?

4                     MR. ROSENBLATT:  Object to form.

5          A.         I believe the definition of

6    cytotoxicity is death to cells.

7          Q.         Dr. Rosenzweig opines that

8    Ethicon's Prolene® mesh is not suitable for

9    permanent implant in women because it's

10   cytotoxic.  Do you agree with that?

11         A.         I have not seen any literature that

12   would substantiate that claim.

13         Q.         If there was credible scientific

14   evidence that polypropylene is cytotoxic, would

15   that render it not suitable for permanent

16   implants in women?

17                    MR. ROSENBLATT:  Object to form.

18         A.         No, I think it would have to have

19   some clinical significance.

20                    And again, let's go back and state,

21   as I did earlier, that we've been using

22   polypropylene and Prolene® sutures for decades,

23   and I'm not aware of any untoward effects that

24   that might have of any clinical significance, and

25   you know, you've got -- you've got several

Peter L. Rosenblatt, M.D.

1   million women that have benefited greatly from

2   this technology over a period of, you know, over

3   17 years, probably more like 20 years at this

4   point including Europe, and I think that's sort

5   of a ridiculous statement because we just don't

6   see that clinically.

7        Q.      Move to strike after the first

8   reference to clinical significance.

9             MR. ROSENBLATT:  Doctor, you can

10  answer however you see fit.

11       Q.      What condition is the Burch

12  procedure designed to treat?

13       A.      Stress urinary incontinence.

14       Q.      Do you agree that although the

15  Burch procedure may take longer and require a

16  short hospitalization, it's a safer procedure

17  than synthetic slings?

18             MR. ROSENBLATT:  Object to form.

19       A.      I disagree with that statement.

20       Q.      Why?

21       A.      First of all, I do Burch

22  procedures.  I've been doing laparoscopic Burch

23  procedures since 1993.  I think it's a very good

24  procedure to treat stress incontinence, but the

25  long-term results are not as good as with

Peter L. Rosenblatt, M.D.

1    midurethral slings, and you open up a whole host

2    of other potential complications that are not

3    seen with midurethral slings.

4         Q.      What are those?

5         A.      Well, there's, you know, in general

6    the risk of general anesthesia.  So if you do a

7    laparoscopic Burch, you really need to use

8    general anesthesia, so that increases the risk

9    compared to doing a midurethral sling under local

10   anesthesia with conscious sedation.

11            Now, you're also getting

12   intraperitoneal with a laparoscopic Burch or an

13   open Burch, so there's the potential of major

14   vascular injury.  There's the potential of a

15   bowel injury.  And although, you know,

16   theoretically you could get a bowel injury with a

17   midurethral sling, it's exceedingly rare.  It's

18   an incredibly low number.

19            And, you know, any time you do

20   general anesthesia and you take longer, there are

21   always going to be inherent risks of DVTs and,

22   you know, aspiration and et cetera.

23            So I think midurethral slings have

24   been shown to be a much safer alternative than

25   the Burch.  That said -- may I continue?

Peter L. Rosenblatt, M.D.

```
 1          Q.      Of course.
 2          A.      I'm doing some more of them these
 3    days just because of all the, again, fear
 4    mongering, that women come in and have a --
 5    they're afraid of mesh.  And so even after
 6    talking to them, some women will prefer,
 7    honestly, to have the old-fashion Burch, which is
 8    a very good procedure, but I don't think it's as
 9    good as a midurethral sling.
10          Q.      Move to strike the reference to
11    fear mongering.
12          A.      I like that.
13          Q.      Me, not so much.
14                  The Burch procedure is a very good
15    procedure to treat stress urinary incontinence,
16    correct?
17          A.      Yes.
18          Q.      You perform Burch procedures to
19    this day, correct?
20          A.      Correct.
21          Q.      In fact, you perform more Burch
22    procedures now than you use to.
23          A.      No.
24          Q.      No?
25          A.      No.  You know, back in 1995 when I
```

Peter L. Rosenblatt, M.D.

1    first started my practice, that was -- 90 percent

2    of my anti-incontinence operations were

3    laparoscopic Burch.

4         Q.      You're performing more Burch

5    procedures in recent years than you use to,

6    correct?

7         A.      Slightly more, yes.

8         Q.      The reason you're performing more

9    Burch procedures in recent years is due to fear

10   of complications by the general public concerning

11   the use of polypropylene mesh slings, true?

12        A.      No.  It's because of patient's

13   anxiety seeing ads on TV and what they read in

14   the internet about transvaginal mesh, and they

15   equate midurethral slings with transvaginal mesh,

16   and some women will come in with an attitude,

17   please do not talk to me about using any mesh in

18   the vagina.

19        Q.      Does that irritate you when that

20   happens?

21        A.      I think irritate's the wrong word.

22   I think -- you know, I'm -- I think it's a shame

23   that women have -- you know, that women are being

24   exposed to this because first and foremost my

25   goal is to take care of my patients and to offer

Peter L. Rosenblatt, M.D.

1    them the best treatment possible.

2              Although I think a Burch is a good

3    procedure, I don't think it's the best treatment

4    possible, and I think what we're going to be

5    seeing are more patients coming back with

6    recurrences of their stress incontinence, and you

7    know, I hope that's not the case, but I do know

8    it's the case just if you look at the literature.

9    Ultimately there is a decrease in the efficacy of

10   a Burch procedure over time.

11        Q.      Over what period of time?

12        A.      Well, certainly, you know, the

13   early studies on comparing Burch with TVT are

14   similar, but as you get out to about five years,

15   seven years, there's a significant decline, and

16   there are studies even going out 15 years that --

17   you know, whereas when you do a midurethral

18   sling, it's pretty rare for a patient to come

19   back and say, you know, that sling worked for a

20   couple of years and now it's not working.  It

21   really is consistent.  But with Burchs, I'm

22   seeing patients I operated on 20 years ago who

23   are coming back saying, yeah, I got that stress

24   incontinence again, what can you do for me now?

25        Q.      Do you agree that if complications

Peter L. Rosenblatt, M.D.

1    do occur following a Burch procedure they're

2    rarely long-term and they're easy to treat?

3            A.       Well, again, if you consider

4    failure, you're talking about a whole another

5    operation for their stress incontinence.  I've

6    seen ureteral injuries.  In fact, I've published

7    on a ureteral injury after a Burch, where I've

8    never seen a ureteral injury after a midurethral

9    sling.  In fact, I'm not even aware that it's

10   ever been -- I'm not sure if it's ever been

11   reported, but certainly I've never had that

12   experience.  But failure is not to be taken

13   lightly, and to me, that is a complication

14   because it requires the patient undergo another

15   operation.

16                   I've also seen urinary retention

17   after a Burch, although, you know, obviously you

18   can see that after any anti-incontinent

19   operation, but to relieve urinary retention after

20   a sling is much easier than to relieve urinary

21   retention after a Burch.

22           Q.      What's the most common complication

23   resulting from a Burch procedure?

24           A.       I would have to say voiding

25   dysfunction.

Peter L. Rosenblatt, M.D.

```
1        Q.      Is that easy to treat?
2        A.      Well, sometimes it will manifest --
3   it can be treated just with time and with
4   catheterization, but occasionally you have to go
5   back in and remove the stitches, and that would
6   require another general anesthesia, entry into
7   the space of Retzius and literally cutting the
8   sutures, and I've had to do that a couple times.
9        Q.      And that's what you would consider
10  a complete fail, a complete failure of the Burch
11  procedure?
12       A.      I mean, to me -- in my mind, a
13  failure of the Burch is when it doesn't treat the
14  stress incontinence which is about 15 percent of
15  the time, so.  Yeah, about 15 percent of the
16  time.  As opposed to a failure versus a
17  complication.  So I look at them differently, you
18  know, yeah.
19       Q.      What percentage of Burch procedure
20  patients require another surgery?
21           MR. ROSENBLATT:  Jeff --
22       Q.      Strike that.  What percentage of
23  Burch patients have their procedure fail thus
24  requiring another surgery?
25           MR. ROSENBLATT:  Are we going to
```

Peter L. Rosenblatt, M.D.

1    count this as his TVT general depo as well?

2                    MR. CRAWFORD:  Sure.

3                    MR. ROSENBLATT:  All right.

4        A.       So what most people will quote in

5    the literature is that the success rate, meaning,

6    you know, successful treatment of stress

7    incontinence, is about 85 percent with a Burch

8    whether it's done open or laparoscopic.

9        Q.       When Burch procedures fail

10   completely, typically how long after the surgery

11   does that occur?

12       A.       It's variable.  So it can occur

13   immediately if you don't tension the sutures

14   correctly, and that's really done by surgeon

15   judgment.  You know, it's a kind of -- Gestalt.

16   I don't know how to spell Gestalt.  Anyways.  But

17   over time because we're just dealing with

18   sutures, that can tear through.

19                    And by the way, we are talking

20   about permanent sutures, whether they're Prolene®

21   or GORE-TEX, but there is a -- you know, if you

22   look at like a Kaplan-Meier survival curve.  So

23   that when you start out with all the patients

24   that are successful over time, the survival

25   curve, meaning, you know, failure, does continue

Peter L. Rosenblatt, M.D.

1    to grow with advancing time up to, you know, 15,

2    20 years.

3         Q.      And I understand there's variables

4    and there's a range, but if a woman were to peek

5    her head in the door right now and say, Doctor,

6    I've got stress urinary incontinence, I want to

7    undergo a Burch procedure, if it fails typically

8    how long after the surgery will it fail?

9         A.      So it can either be immediate,

10   right, because of 85 percent success, and 15

11   percent of women will come back and say, you

12   know, it just -- it isn't working.  I mean, this

13   to me, it's like Goldilocks, right.  So it's

14   either too tight, which puts you into retention.

15   Too loose, and you're in the 15 percent that

16   have, you know, quote/unquote, failed.  Or it's

17   just right, which is, you know, the 85 percent

18   range.  But typically, in my experience, that we

19   may see people five years out, seven years out

20   who are coming back saying it worked, but you

21   know, now I've got stress incontinence again.

22        Q.      But would it be fair to say the

23   majority of women whose Burch procedure fails,

24   they know it immediately.  You know right away

25   you're not the Goldilocks.

Peter L. Rosenblatt, M.D.

```
 1           A.       So that is a -- I don't know what
 2    the breakdown would be, but that can happen, but
 3    I've also seen women who after a year or two or
 4    three come back with complaints of symptoms, and
 5    I think it has to do with not just the way the
 6    procedure is performed, but it has to do with the
 7    patient's lifestyle, if she's a woman who has
 8    chronically increased intra-abdominal pressure,
 9    she's an asthmatic, she's a nurse and she lifts
10    patients, she goes to the gym a lot, she's
11    constipated.  You know, there are lifestyle
12    issues that can affect the long-term success, so
13    it is very variable.
14           Q.       Do you agree with Dr. Rosenzweig
15    that polypropylene is chemically reactive and not
16    inert?
17           A.       I do disagree with that.
18           Q.       Why?
19           A.       I think most -- the literature that
20    I've read, quality of literature, suggests that
21    polypropylene is for all intents and purposes
22    biologically inert.
23           Q.       What quality literature are you
24    referring to?
25           A.       I've read a number of studies about
```

Peter L. Rosenblatt, M.D.

```
 1    polypropylene or Prolene® mesh.  I can't quote
 2    for you the names, but that discuss the fact that
 3    it is biologically inert, and also, in the
 4    clinical literature, it is referred to as
 5    biologically inert, and I've never seen anything
 6    either in literature or in my personal experience
 7    that suggests that it's not inert.
 8         Q.      I'm really interested to see what
 9    quality literature you're referring to that shows
10    that it's inert.  Can we look that up on the next
11    break?
12         A.      Yes.
13         Q.      What does inert mean?
14         A.      Non-immunogenic.
15         Q.      What does non-immunogenic mean?
16         A.      Doesn't elicit a immune response of
17    any clinical significance from the host.
18         Q.      In layman's terms, does that mean
19    the body doesn't attack it?
20         A.      Not really.  I mean, you know, we
21    talked about foreign body response, but it isn't
22    seen as something that you could -- like a kidney
23    transplant, you know, something that you would
24    develop a severe immune response to that would
25    elicit a severe immune response, basically.
```

Peter L. Rosenblatt, M.D.

1          Q.        Do you agree with Dr. Rosenzweig

2    that polypropylene can degrade and release toxic

3    compounds into pelvic tissues?

4          A.        No, I don't agree with that.

5          Q.        Why not?

6          A.        Well, I've never seen any evidence

7    that there's any clinical significance that there

8    are any toxins released.  I'm not aware of any

9    literature that I've reviewed that suggests that.

10         Q.        I think we may have touched on this

11   already, but it will only take a second.

12                   Do you agree with Dr. Rosenzweig

13   that polypropylene mesh can oxidize inside the

14   vagina thus causing the mesh to degrade, crack

15   and break apart?

16                   MR. ROSENBLATT:  Object to form.

17         A.        So are we talking about

18   polypropylene or Prolene®, first?

19         Q.        Polypropylene.

20         A.        So I have not seen evidence of

21   that, and I've read the literature, you know, the

22   biochemistry, as we've discussed, some people

23   suggesting that there's cracking, surface

24   cracking, but other excellent evidence that I've

25   seen that shows that that's a biofilm, that's an

Peter L. Rosenblatt, M.D.

1   artifact of the preparation of the material, and

2   that if you do a proper washing of that, you'll

3   seen pristine polypropylene without any evidence

4   of degradation or oxidation.  And in addition,

5   you know, with the mesh that we're talking about

6   here, which is Prolene®, has additives that are

7   antioxidants.

8        Q.     Are you aware of any literature

9   that indicates polypropylene mesh can oxidize

10  inside the vagina, thus causing mesh to degrade

11  and crack and break apart?

12       A.     So I have seen literature, but

13  there seems to be two schools of thought, and

14  the, quote/unquote, artifacts that I've seen with

15  scanning electron microscopy, appear to be just

16  that, where it's not the cracking of the

17  polypropylene material but of a biofilm that is

18  on top of the polypropylene.

19       Q.     To be clear, you have seen

20  literature that indicates polypropylene mesh can

21  oxidize inside the vagina, thus creating or thus

22  causing it to degrade, crack and break apart?

23            MR. ROSENBLATT:  Object to the

24  form.

25       A.     The literature I've seen is

Peter L. Rosenblatt, M.D.

```
 1   interpretation of scanning electron microscopy

 2   but not that proves that degradation or cracking

 3   exists.

 4        Q.      Are you aware of any changes

 5   Ethicon has made to Prolene® mesh since it was

 6   introduced to the market?

 7        A.      Are we talking about Prolene®

 8   suture or Prolene® mesh?

 9        Q.      Mesh.

10        A.      The only thing that I'm aware of is

11   the way that it's, the Prolene® mesh, is cut.

12        Q.      What change was made?

13        A.      Well, it was being offered

14   initially as mechanically cut, and then it was

15   being offered both as mechanically -- mechanical

16   or laser cut.  I'm not aware of any other

17   changes.

18        Q.      Which came first, mechanically cut

19   mesh or laser cut mesh?

20        A.      I believe mechanically cut.

21        Q.      Do you know why they started making

22   it laser cut as opposed to mechanically cut?

23        A.      I believe it was -- it simplified

24   the manufacturing process, I believe.  I believe

25   I heard that.
```

Peter L. Rosenblatt, M.D.

1      Q.      Are you aware of any reasons why

2   Ethicon began to cut its polypropylene mesh using

3   lasers, as opposed to mechanically, other than

4   because it simplified the manufacturing process?

5      A.      No, I'm not aware.

6      Q.      You've never heard it said that

7   laser cut polypropylene mesh is safer than

8   mechanically cut polypropylene mesh?

9      A.      No.

10     Q.      You never heard it said that

11  laser -- there's less complications with the use

12  of laser cut mesh as opposed to mechanically cut

13  mesh?

14     A.      No.  You know, that may have been

15  said by a plaintiff expert opinion, but you know,

16  I've had experience with both.  I can tell you

17  from my personal experience I've not noticed any

18  difference, and I haven't had, you know, any

19  change in complications going from one type of

20  cut to another.  Nor am I aware of any literature

21  that shows there's a difference.

22     Q.      Is another way of saying that

23  you're unaware of any clinical difference between

24  the use of mechanically cut mesh and laser cut

25  mesh?

Peter L. Rosenblatt, M.D.

1          A.          Correct.

2          Q.          Are you aware of any internal

3    studies performed by Ethicon in which scientists

4    working for Ethicon concluded that Prolene® can

5    degrade while implanted in the human body?

6                      MR. ROSENBLATT:  Object to form.

7          A.          I am not aware of any such studies.

8    Is that the word you used?

9          Q.          Yes, sir.

10         A.          No.

11         Q.          You're unfamiliar with a study in

12   1987 where Ethicon scientists found that Prolene®

13   degrades?

14                     MR. ROSENBLATT:  Object to form.

15         A.          I have not seen that study.

16                     MR. ROSENBLATT:  Do you want to

17   show it to him to see if he's seen it?

18         Q.          Do you know whether Ethicon was

19   advised by an outside consulting group in June of

20   2011 that an animal study showed polypropylene

21   can degrade following an implant?

22         A.          Did you say an animal study?

23         Q.          Yes, sir.

24         A.          I don't recall seeing that, but I'm

25   not sure what significance that has coming from

Peter L. Rosenblatt, M.D.

1    an animal study.

2        Q.      Move to strike after "don't recall

3    seeing that."

4                Are you aware of a 2009

5    presentation in which Ethicon Medical Director

6    Piet Hinoul stated that meshes are not

7    biologically inert?

8                MR. ROSENBLATT:  Object to form.

9        A.      I may have seen something to that

10   effect, but I don't agree with that.  And are we

11   talking about in humans or in animals?

12       Q.      Have you ever opened an Ethicon

13   mesh product and found that synthetic mesh inside

14   is broken, cracked or brittle?

15       A.      No.

16       Q.      Doctor, I'm referring to

17   Exhibit No. 2, specifically page 43 of

18   Dr. Rosenzweig's report, and this particular page

19   bears two images of what appear to be blue mesh.

20               Do you see those?

21       A.      Yes.

22               MR. ROSENBLATT:  And this is

23   Rosenzweig's TVT report?

24               MR. CRAWFORD:  Yes, it is.

25               Do those images appear to reveal

Peter L. Rosenblatt, M.D.

1    particles of the mesh that have begun to break

2    off inside the package.

3              MR. ROSENBLATT:  Object to form.

4    Lack of foundation.

5        A.      So I don't know what you mean by

6    broken off, but it looks like there are small

7    pieces of polypropylene fibers that are separate

8    from the body of the mesh.

9        Q.      Have you ever opened an Ethicon

10   product and seen mesh that looks like that?

11       A.      I don't recall ever seeing that,

12   but if I did see that, that wouldn't bother me at

13   all.

14             MR. CRAWFORD:  Move to strike after

15   I don't believe I've ever seen that.

16             Well, let me ask you, if you were

17   to open a package of Ethicon mesh and it were to

18   look at that, would that bother you?

19       A.      Not at all.

20       Q.      Why?

21       A.      We leave sutures in people's

22   bodies, permanent sutures, all the time.  We've

23   done it for decades.  We leave surgical metal

24   clips in people's bodies all the time.  There's

25   no evidence that I'm aware of that small pieces

Peter L. Rosenblatt, M.D.

1    of suture, basically that's what that is, would

2    cause any untoward effects.

3                So to me that looks like an

4    artifact of the cutting process, that when you

5    cut it either -- I don't know if that's laser or

6    mechanical, but there will be little pieces of

7    suture that may be inside the body.  Obviously,

8    those pieces have fallen off, and they're not

9    going to be implanted.  But even if a mesh did

10   that and little pieces came off, it would be

11   inconsequential.  That wouldn't affect anything.

12        Q.      100 percent of the time?

13        A.      100 percent of the time.

14        Q.      All right.  Did you say there's

15   been other operative procedures where you've left

16   things, foreign bodies, in people's body?

17        A.      Yes.  Not me, every surgeon.

18        Q.      What kind of stuff?

19        A.      Surgical titanium clips, float

20   rings, which are, you know, for tubal ligation,

21   sutures.  That's a part of doing surgery.

22        Q.      And you've never heard of anyone --

23   you've never heard of an instance where a surgeon

24   has inadvertently left a foreign body in someone

25   after a surgery and it caused horrible

Peter L. Rosenblatt, M.D.

1    complications?

2         A.        I didn't see that.  I mean, you

3    wouldn't like to leave like a clamp inside

4    someone's body.  You wouldn't want to leave a

5    sponge inside a body or a retractor.  All those

6    things have been left in people's bodies.  But

7    things that we just talk about like suture that

8    are covered inside the vagina or inside the body

9    are inconsequential.

10        Q.        100 percent of the time?

11        A.        Well, I just gave you an example of

12   things that you wouldn't want to leave inside the

13   body, but I don't see any issue with a piece of

14   mesh or, I'm sorry, a piece of suture of that

15   magnitude causing any problems.  I've never ever

16   seen that in 20, 21 years of practice.

17        Q.        How many times over the course of

18   your practice have you seen a suture

19   inadvertently left in someone's body following a

20   surgery?  Not a suture.  What else did you say

21   was inconsequential?  You likened the suture

22   to --

23        A.        Clips.

24        Q.        Clips.  Thank you.  How many times

25   over the course of your career have you seen

Peter L. Rosenblatt, M.D.

1  clips inadvertently left in someone's body and

2  there be no consequence?

3       A.      When you say inadvertently, you're

4  saying not on purpose.

5       Q.      Yes, sir.

6       A.      Oh, that's not what I'm talking

7  about.  I'm talking about clips for bleeding.  So

8  they're not inadvertently.  They're done on

9  purpose.  But they're left.  And if you take a

10  x-ray of countless women, you'll see little metal

11  clips throughout their body.  You know, that's a

12  common occurrence.  And most surgeons don't even

13  tell their patients that they have these clips in

14  them.  That's just sort of a -- you know, that

15  goes along with having surgery.  Excuse me, one

16  second.  Okay.  And, you know, I've not seen that

17  cause any untoward effect.

18       Q.      Hypothetically speaking, if there

19  were credible scientific evidence that Ethicon

20  Prolene® mesh degrades in the human body, would

21  that make it unsuitable as a permanent implant

22  for stress urinary incontinence?

23              MR. ROSENBLATT:  Object to form.

24       A.      I guess, again, you'd have to look

25  at, you know, whether it's clinically

Peter L. Rosenblatt, M.D.

1    significant.  In other words, let's say you used

2    absorbable material for a sling, like, you know,

3    polyglactin.  That is meant to degrade.  It's

4    meant to be hydrolyzed and get absorbed.  But if

5    the woman were continent afterwards, it would be

6    inconsequential.  But, you know, I've not seen

7    evidence of degradation of the Prolene® mesh, but

8    if it did degrade but it wasn't clinically

9    significant, it wouldn't matter.

10        Q.      If Ethicon became aware of credible

11   scientific evidence that polypropylene has the

12   potential to degrade, would you, as a practicing

13   physician, expect them to conduct relevant

14   testing to determine if naturally occurring

15   conditions in the vagina could cause

16   polypropylene degradation?

17              MR. ROSENBLATT:  Object to form.

18        A.      I guess it would have to be --

19   there would have to be some clinical significance

20   associated with it.  It would have to -- to me it

21   would have to cause some harm to the patient, and

22   without that, it would be inconsequential.

23        Q.      A recurring theme that I'm hearing

24   and correct me if I am wrong, but a recurring

25   theme I keep hearing in your testimony is that it

Peter L. Rosenblatt, M.D.

1    doesn't matter if the polypropylene degrades

2    inside the human body if there's no symptoms due

3    to it.  Is that fair?

4                MR. ROSENBLATT:  Object to form.

5    Misstates the testimony and assumes that

6    degradation does occur.

7          A.      Well, I was actually going to say

8    exactly that which is, you know, I don't see any

9    credible scientific evidence that there is any

10   degradation of Prolene®.  And again, which we

11   have already talked about, Prolene® mesh is just

12   made up of Prolene® fibers that have been woven

13   together, and we have literally a half a century

14   or more of data and clinical experience with

15   Prolene®.  So I'm very comfortable that it

16   doesn't degrade.  But there would have to be some

17   clinical significance for it to be reportable to

18   physicians.  And, you know, what we've seen with

19   TVT slings is an operation that is better than

20   any other operation known to mankind in the

21   history of man -- in the history of women for

22   treating stress incontinence.  There is nothing

23   better.  It has revolutionized the field of

24   urogynecology, that's a fact.  And our world

25   changed in 1999 or 1998 in the United States when

Peter L. Rosenblatt, M.D.

1    that technology came here, and I'm not being --

2    I'm not speaking with hyperbole.  That was one of

3    the greatest things that have happened in the

4    field of urogynecology for our patients.  So I

5    don't see any evidence of there being a problem

6    with it.

7                 MR. CRAWFORD:  Objection as

8    non-responsive and move to strike.

9                 Is there a difference between pores

10   in the mesh and interstices?

11        A.      There is.  Pores usually refer to

12   the large holes, for lack of a better word, that

13   you can see with the naked eye, where interstices

14   refers to the smaller holes within the weaving of

15   mesh.

16        Q.      Does the weave of Ethicon's

17   Prolene® mesh produce very small interstices that

18   allow bacteria to enter and hide from the natural

19   body defenses that are designed to eliminate

20   them?

21                 MR. ROSENBLATT:  Object to form.

22   Lack of foundation.

23        A.      Yeah, fortunately -- no, it's not

24   true, in that, and I think it is because of the

25   fact that polypropylene is a monofilament, that

Peter L. Rosenblatt, M.D.

```
1    even the smaller interstices are large enough to
2    allow macrophages to get in between where
3    bacteria potentially are, and that's evidenced by
4    the fact that we don't see infections, you know,
5    we don't see -- we don't commonly see infections
6    in this mesh even when it's placed
7    transvaginally.
8         Q.      Does bacteria that's caught up in
9    transvaginal placed pelvic mesh secrete a slimy
10   biofilm that serves to protect and shield the
11   bacteria from destruction by white blood cells?
12                MR. ROSENBLATT:  Object to form.
13        A.      I don't know if that's a -- I
14   actually -- I'm actually not sure where the
15   biofilm comes from, if that's secreted by
16   bacteria or it's from the host response, yeah.
17        Q.      Following the placement of
18   transvaginally placed pelvic mesh, does there
19   appear a slimy biofilm that serves to shield the
20   bacteria from destruction by white blood cells?
21                MR. ROSENBLATT:  Object to form.
22        A.      I think it's been shown that there
23   can be a biofilm.  I don't know if that happens
24   all the time.  And, you know, again, we have to
25   come back to it being -- whether or not it's
```

Peter L. Rosenblatt, M.D.

1    clinically significant, and for someone who has

2    placed over 2,000 slings, and I've only had one

3    serious infection, I think Prolene® mesh is

4    incredibly resistant to infection.

5            MR. CRAWFORD:  Objection as

6    non-responsive.  Move to strike everything after

7    "happens all the time."

8            Does the biofilm that surrounds the

9    pelvic -- strike that.

10           Does the biofilm that surrounds the

11   transvaginally placed pelvic mesh increase the

12   foreign body reaction?

13           MR. ROSENBLATT:  Object to form.

14   Lack of foundation.

15       A.     I am not aware of that.

16       Q.     Can you say one way or the other

17   whether it does?

18       A.     No.

19       Q.     Do you agree with Dr. Rosenzweig

20   when he says fibrotic bridging occurs when the

21   fiber surrounding the mesh -- strike that.

22           Do you agree with Dr. Rosenzweig

23   when he says the fibrotic bridging occurs -- God

24   dang.  It's getting later.  Strike it.

25           Do you agree with Dr. Rosenzweig

Peter L. Rosenblatt, M.D.

1    when he says fibrotic bridging occurs when the

2    fibers surrounding the pores of the mesh are too

3    close together to allow the tissue in the pore

4    space enough room to recover from the trauma of

5    tissue damage due to implanting a surgical

6    prosthetic device?

7              MR. ROSENBLATT:   Object to form.

8         A.      I'm not actually sure what he's

9    referring to because there -- though I'm very

10   familiar with the concept of fibrotic bridging, I

11   haven't heard of that being an explanation of

12   recovering from the inflammation.  I just haven't

13   heard that argument, nor have I seen that, you

14   know, clinically.

15        Q.      Dr. Rosenzweig opines that small

16   mesh pores that cause fibrotic bridging turn the

17   mesh into a solid sheet of scar tissue, then

18   there's no room for the tissue to grow into the

19   mesh.  Do you agree with that?

20        A.      I don't agree with that.

21        Q.      Why not?

22        A.      Well, if the mesh is placed

23   correctly, which is in a tension-free fashion,

24   there's plenty of space between the pores to

25   prevent fibrotic bridging.

Peter L. Rosenblatt, M.D.

1        Q.        Have you ever seen a video of

2   Ethicon consultant Todd Heniford saying, quote,

3   there's no excuse for using heavy weight, small

4   pore meshes in the human body, closed quote?

5                MR. ROSENBLATT:  Object to form,

6   lack of foundation.

7        A.        I have not seen that video, but I

8   can't imagine why that would ever have any

9   relevance to what we're talking about and the

10   types of meshes that we're talking about today.

11                MR. ROSENBLATT:  Just so you know,

12   Jeff, that video was not any of Ethicon's meshes.

13                MR. CRAWFORD:  I'll object as

14   non-responsive and move to strike after "have not

15   seen it."

16                Thanks, Paul.

17                Do you agree with Dr. Rosenzweig

18   that polypropylene mesh is known to contract or

19   shrink once it's put into the human body?

20                MR. ROSENBLATT:  Object to form.

21        A.        So in my experience, I have not

22   seen that clinically in my patients.

23        Q.        To be clear, you've never once in

24   all of your years of clinical practice seen a

25   patient where their polypropylene mesh had

Peter L. Rosenblatt, M.D.

```
1    contracted or shrank inside their body?

2         A.      So no.  I have seen patients who

3    have come in where -- in patients who have had

4    mesh placed with someone else where it seemed

5    like the mesh had a smaller surface area than

6    what you'd expect to see.  But there are a couple

7    of issues there.  One is that mesh does not

8    shrink.  There's no contractile elements within a

9    mesh.  The body reacts to surgery and could react

10   around a mesh to contract, that's why even native

11   tissue repairs you get some vaginal

12   foreshortening and you get vaginal scarring,

13   that's a natural occurrence.  And if the mesh

14   happens to be there, it will take up less space.

15   But what I've experienced would be, you know,

16   with hundreds and hundreds of transvaginal

17   meshes, is that there's no clinically significant

18   shrinkage that occurs when a mesh is placed

19   correctly.

20        Q.      Since you are of the opinion that

21   mesh does not shrink, am I safe to assume you

22   dispute that shrinkage was known by Ethicon as

23   early as 1998 in published works by Ethicon's

24   many consultants, Uwe Klinge and Bernd

25   Klosterhalfen?
```

Peter L. Rosenblatt, M.D.

```
 1          A.        So I am aware of that, and I have
 2   seen those reports, but the first part of your
 3   statement was that I don't believe that mesh
 4   shrinks, and mesh does not shrink.  There's no
 5   such thing as mesh shrinking.  It's not like you
 6   put it in a dryer like, you know, a shirt in a
 7   dryer and it gets smaller.  It's the fibrosis
 8   that occurs as a natural healing process of
 9   surgery that causes shrinkage.  Because as I
10   said, native tissue repairs you can get stenosis
11   of the vagina, you can get foreshortening of the
12   vagina.  Mesh does not shrink.  So if there is
13   any decrease in the surface area of the mesh,
14   it's not from the mesh itself.  It's the tissue
15   around the mesh.
16                MR. CRAWFORD:  Object and move to
17   strike the non-responsive portions of that
18   answer.
19                You are familiar with the Klinge
20   and the Klosterhalfen study.
21          A.        Yes.
22          Q.        And you're aware that they noted in
23   their paper that polypropylene mesh shrinks 30 to
24   50 percent; is that right?
25                MR. ROSENBLATT:  Object to form.
```

Peter L. Rosenblatt, M.D.

1    If you have the paper and you want to put it in

2    front of him, he can take a look at it.

3         A.      Yeah, I was about to say I'd like

4    to see the paper 'cause I want to see if that was

5    from an animal study.  I am familiar with the

6    so-called, you know, quote/unquote, shrinkage or

7    contracture in hernia meshes, but I'm almost

8    familiar with literature -- the one that comes to

9    mind is Dietz -- I think it's D-E-I-T-Z or

10   D-I-E-T-Z -- that shows using ultrasound that

11   there is no shrinkage of mesh implanted in

12   humans.  So I think that is debatable and

13   controversial.

14        Q.      Do you agree that if there is

15   credible scientific evidence that polypropylene

16   mesh shrinks 30 to 50 percent and as a result

17   there's an adverse clinical effect on the

18   patient, then it's not suitable for its intended

19   application as a permanent prosthetic implant in

20   women?

21             MR. ROSENBLATT:  Object to form.

22   Lack of foundation, compound.

23        A.      What you're suggesting is not the

24   case.  You know, and the reason I say that and

25   I'm comfortable saying that is I've been

Peter L. Rosenblatt, M.D.

1    implanting mesh transvaginally for 15 years, and

2    I do not see that clinically.

3              Could a particular woman have a

4    fibrotic reaction where she would have had a

5    fibrotic reaction and scarring with a native

6    tissue repair?  Yeah, that can happen, and there

7    might be mesh there, but I do not see that --

8    when you say, you know, if you could show that

9    mesh -- mesh does not shrink.  So it doesn't make

10   a lot of sense to me to assume that, you know,

11   mesh shrinks 'cause it doesn't shrink.

12             MR. CRAWFORD:  Objection.

13   Non-responsive, move to strike.

14             I understand that you've opined

15   mesh doesn't shrink.  I'm asking you a

16   hypothetical question, and I'll pose a

17   hypothetical question to you.

18             If there's -- strike it.

19             Hypothetically speaking if there's

20   credible scientific evidence that polypropylene

21   mesh shrinks 30 to 50 percent in the human body

22   and that shrinkage results in a clinically

23   adverse effect upon the patient, then it's not

24   suitable for application as a permanent

25   prosthetic implant in a woman.

Peter L. Rosenblatt, M.D.

```
 1              MR. ROSENBLATT:  Object to form.

 2    Compound, incomplete hypothetical.

 3         A.      So I think that you said if there

 4    is credible scientific evidence.  I'd want to

 5    weigh all the evidence, right.  I mean, so you

 6    can't cherry pick, and what I mean by that is

 7    just -- you know, like, for instance, when I

 8    started, and don't object to this, please, but

 9    when I started -- hear me out.

10              When I started doing this work for

11    Butler Snow, I asked them to send me all -- you

12    know, I did my own searches, PubMed search, but

13    they have pretty good resources, too, and I said

14    send me the literature, the good and the bad.

15    Send me the literature that -- for instance, in

16    this topic, this particular topic, if there's

17    literature that shows that there's no shrinkage,

18    like the Dietz article, I want to see the

19    literature that seems to suggest there is

20    shrinkage, and I want to evaluate it.  I looked

21    at all of it.  I didn't cherry pick to say, okay,

22    that article supports my theory and that's all

23    I'm going to look at.  I looked at it all.  So

24    there may be an article out there that you're

25    referring to, and I'd be happy to see it, that
```

Peter L. Rosenblatt, M.D.

1  suggests that mesh shrinks, but I would want to

2  look at all the data.  And if the preponderance

3  of data show that mesh shrinks, then I would have

4  a different opinion, but I don't.

5            MR. CRAWFORD:  Objection.

6  Non-responsive, move to strike.

7            MR. ROSENBLATT:  Want to take

8  another quick break?

9            MR. CRAWFORD:  Yeah.

10           (A break was taken.)

11  BY MR. CRAWFORD:

12      Q.      Dr. Rosenzweig has opined that in

13  addition to fraying and particle loss

14  mechanically cut synthetic polypropylene mesh has

15  been shown to rope, curl and deform when it's

16  under tension.  Do you have an opinion on that?

17      A.      So maybe I missed the first part of

18  this.  Which mesh are we talking about?

19      Q.      Let's go with Prolene® mesh.

20      A.      Prolene®.  So I do have an opinion

21  on that and that is under normal clinical

22  conditions you would never put Prolene® mesh,

23  like in TVT or any of those products, under that

24  kind of tension that would cause roping or

25  curling.

Peter L. Rosenblatt, M.D.

1              If you take a piece of Prolene®

2    sling mesh and pull it really hard, it will turn

3    into a cord, no question about it.  You would

4    never ever do that clinically.  It just -- it

5    doesn't make any sense.  So whether that happens

6    in a bench or you do that in a cadaver, it's

7    clinically insignificant.

8         Q.     To summarize your testimony, it

9    doesn't matter whether Prolene® mesh frays or has

10   particle loss and has been shown to rope, curl

11   and deform when it's under tension because in

12   real-life situations it's never going to be under

13   that kind of tension; is that fair?

14              MR. ROSENBLATT:  Object to form.

15        A.     Not if it's done using the

16   instructions for use the way peer to peer,

17   surgeon to surgeons teach how to perform a

18   procedure, that is not clinically relevant.

19        Q.     Dr. Rosenzweig has opined that

20   characteristics of Ethicon's mesh including

21   particle loss, fraying, roping and curling make

22   it improper for use in the vaginal canal.  Do you

23   agree with that?

24        A.     So, again, you mentioned mesh, and

25   just so I know which mesh we're talking about --

Peter L. Rosenblatt, M.D.

```
1          Q.      Prolene®.

2          A.      Prolene® mesh like in TVT?

3          Q.      Yes, sir.

4          A.      I disagree with it because I think

5    it's completely appropriate for use in the

6    vagina, and that's been borne out after millions

7    of cases.

8          Q.      Do you agree that particle loss and

9    fraying of synthetic mesh can lead to an

10   increased inflammatory response?

11              MR. ROSENBLATT:  Object to form.

12         A.      Again, maybe I'm missing the point,

13   but I think it's my same answer, which is that

14   under normal conditions you would never pull mesh

15   tight enough to cause roping or fraying, and so

16   it's sort of irrelevant.  But even if you did

17   have particle loss, those particles are

18   inconsequential clinically.

19              MR. CRAWFORD:  Objection as

20   non-responsive.  Move to strike everything other

21   than "if you did have particles" and thereafter.

22              If synthetic polypropylene mesh

23   were to rope or curl, would that lead to a loss

24   of pore size?

25              MR. ROSENBLATT:  Object to form.
```

Peter L. Rosenblatt, M.D.

1          A.          Yes, it's possible that if you pull

2     on mesh, which you shouldn't do because -- and

3     it's not just in the instructions, but you know,

4     this is how it's taught, is that you leave these

5     meshes, whether it's prolapse mesh or sling mesh

6     for stress incontinence, in a tension-free

7     manner, then you don't get that reduction in pore

8     size, and you get good -- excellent tissue

9     ingrowth.

10               MR. CRAWFORD:  Objection.

11     Non-responsive, move to strike.

12               I'm just going to ask you a

13     yes-or-no question.

14               Do you agree that roping or curling

15     of the mesh, that is the synthetic polypropylene

16     transvaginal mesh, can lead to a loss of pore

17     size?

18               MR. ROSENBLATT:  Object to form.

19     Asked and answered, broad.

20          A.          And I can't answer that yes or no

21     without saying that's clinically irrelevant

22     because you would never pull on it like that, but

23     obviously, if you pull on mesh inappropriately,

24     you will reduce the pore size, depending on the

25     configuration of the mesh.

Peter L. Rosenblatt, M.D.

1      Q.      If a certain amount of tension is

2    put on synthetic polypropylene mesh, can that

3    lead to a loss of pore size.

4              MR. ROSENBLATT:  Object to form.

5      A.      If you put inappropriate tension on

6    a mesh, depending on the configuration of the

7    mesh, the way it's woven, it can lead to a

8    decrease in pore size, that is correct.

9      Q.      I think attached to your report,

10   which is Exhibit No. 1, there's a reliance list.

11   Can you pull that out?

12     A.      This one doesn't have it.

13     Q.      I know I have it in here somewhere.

14             Were you able to get your hands on

15   your reliance list?

16     A.      Yes.

17     Q.      What is this?  What does this list

18   represent?

19     A.      This list represents all the

20   documents and medical literature and other

21   materials that I have relied on for my opinions

22   in my report.

23     Q.      Should someone who is considering

24   your report look at this reliance list and assume

25   that before you wrote your report that you

Peter L. Rosenblatt, M.D.

1   submitted in this case you sat down and read each

2   and every single one of these documents and

3   watched every single one of these videos in

4   conjunction with writing your report?

5                  MR. ROSENBLATT:  Object to form.

6        A.       So many of these articles I've been

7   reading about for the last 15 years.  There some

8   some materials in this reliance report that were

9   documents that I scanned that I didn't read every

10  word.  There's no way I could have.  And there

11  were articles where I scanned but I read the

12  abstracts, but yes, this is all the material

13  that's in there, and I went through it to come up

14  with my opinions.

15       Q.       Turn to the -- shoot, I don't know

16  what page this is.  Man, I wish this had page

17  numbers on it.

18       A.       Good point.

19       Q.       I'll start from the back.  Flip,

20  one, two, three, four pages, and there will be a

21  list that's got a bunch of videos.  It's going to

22  be on this side, I believe.  Yeah, right here.

23       A.       Okay.

24       Q.       There's a list of videos that

25  begins with ETH.MESH.PM.000001, Prolift

Peter L. Rosenblatt, M.D.

1    Professional Education Videos.  Do you see that?

2         A.      Yes.

3         Q.      I have counted 33 videos in that

4    list.  Do you have any reason to dispute that's

5    about how many there were there?

6         A.      No, I will take your word for it.

7         Q.      When was the last time you watched

8    any of those videos?

9         A.      I don't remember exactly when, but

10   some of these videos I had seen in the past and

11   was familiar with them, but you know, what I did

12   with these videos is, and I couldn't tell you

13   which one is which, but I would take the cursor

14   and move along and just familiarize myself with

15   the videos.

16        Q.      Okay.  When's the last time you did

17   that with any of these videos?

18        A.      Probably two weeks ago.

19        Q.      And did you do that with all the

20   videos?

21        A.      If they're listed there, yeah.  I

22   don't remember exactly when.  Some of them I may

23   have seen a long time ago, but I remember videos.

24        Q.      When you say a long time ago, how

25   long are we talking?

Peter L. Rosenblatt, M.D.

```
1            A.       Oh, it could have been years ago.

2            Q.       As long as ten years back?

3            A.       It might have been.  It might have

4    been five years.

5            Q.       Turn to the last page, please.

6    Actually, it's going to be the second-to-last

7    page.  I've counted 30 notations of deposition

8    testimony.  Does that look about right?

9            A.       Yes.

10           Q.       Okay.  Do those represent -- does

11   each one of those represent an entire deposition

12   transcript?

13           A.       I believe so.

14           Q.       Okay.  So there's -- we know

15   there's 30 deposition transcripts that you've

16   read front to back in preparation for drafting

17   your report in this case?

18           A.       I scanned some of these.  You know,

19   just kind of like going in looking for words that

20   I, you know, cared about.  Did I read them word

21   for word, no, no.  There was not enough time to

22   do that.

23           Q.       Yeah, that's kind of what I was

24   thinking?

25           A.       Yeah.  It's a lot.
```

Peter L. Rosenblatt, M.D.

1          Q.       It is a lot.  Where did you obtain

2     all the deposition testimony that's listed in

3     your reliance list?

4          A.       From counsel.

5          Q.       From the attorneys representing

6     Ethicon in this case?

7          A.       Yes.

8          Q.       When you received deposition

9     testimony from the attorneys working for Ethicon,

10    did you get entire deposition transcripts, or did

11    you just get excerpts, certain pieces of the

12    testimony?

13         A.       I would have to look.  I don't know

14    for sure.  I assume they were all complete.  I

15    assume they were all complete.

16         Q.       Well --

17         A.       I can't tell you for sure.

18         Q.       -- you just got involved in this

19    case about three months ago.

20         A.       That's right.

21         Q.       Can you remember back about three

22    months to tell us whether or not you received

23    from Ethicon's attorneys full transcripts of

24    these depositions or just excerpts?

25         A.       So when I would get a transcript --

Peter L. Rosenblatt, M.D.

```
1   just let me answer it this way -- you know, it's
2   usually like four pages on a page, right?  And I
3   wouldn't check the page number.  I would just
4   kind of scan.  So I'm not paying attention to the
5   actual page number, but I'm just scanning it to
6   see what's important to me.  Did I read word for
7   word?  No, I couldn't have.  But no, it didn't
8   seem -- to me, it did not seem ever that it was,
9   like, okay, cherry picking, this is a good thing
10  for you to read.  No, it was the transcript, I
11  believe.
12              MR. CRAWFORD:  Objection.
13  Non-responsive to the cherry picking part.
14              When you received deposition
15  testimony from the attorneys for Ethicon, was it
16  highlighted.
17       A.     No.
18       Q.     Having reviewed the deposition
19  testimony that's listed on your reliance list,
20  did you then ask for additional testimony from
21  any of these witnesses?
22       A.     I didn't know that there was
23  additional testimony, if there was any.
24       Q.     Did you read any of these
25  deposition excerpts and request -- and say, "Hey,
```

Peter L. Rosenblatt, M.D.

1    I need to learn a little bit more about what was

2    said in this deposition.  Do you have A, B or C?"

3    Did that ever happen?

4         A.     So I object because you used the

5    word "excerpt," and I don't think that we decided

6    that there were excerpts.

7         Q.     Objection overruled.

8         A.     But, no, I did not request anything

9    else.

10             MR. ROSENBLATT:  He's doing my job

11    for me.

12         Q.     To clarify, this reliance list

13    includes articles, literature, videos and a

14    variety of other documents and materials that

15    relate to issues in this case that you have seen

16    or reviewed over the course of your career --

17         A.     Correct.

18         Q.     -- going years back?

19         A.     Correct.

20         Q.     These are not -- strike that.

21             This is not a list of materials and

22    documents that you have reviewed in their

23    entirety since becoming involved in this case in

24    March or April of 2016?

25             MR. ROSENBLATT:  Object to form.

Peter L. Rosenblatt, M.D.

1          A.        I agree to an extent in that, as

2    you mentioned, many of these go back many years,

3    and that's what I do, right?  I mean, I review

4    literature on a weekly basis.  I mean, there are

5    always new studies that come out.  But I thought

6    it would be important to list the total, again

7    good or bad, that my opinions that have formed

8    over the course of 25 years should be in here in

9    case I need to reference it.  But, you know, did

10   I read every word that's here in the last three

11   months, no.

12         Q.        I'm just -- I'm just trying to

13   clarify.  It would be incorrect for a juror or

14   anyone else to look at this long reliance list

15   and assume that you have done a comprehensive

16   review and exam of everything in this list since

17   becoming involved in this case three months ago?

18                   MR. ROSENBLATT:  Object to form.

19   Asked and answered.

20         A.        So, right, as I said, my opinions

21   that are in my report are based on 25 years of

22   experience, and many of those articles that have

23   shaped my opinion are listed here in the reliance

24   list.

25         Q.        Okay.  What, if any, Ethicon

Peter L. Rosenblatt, M.D.

1   internal documents did you review in conjunction

2   with generating your general causation report in

3   this case?

4              MR. ROSENBLATT:  Object to form.

5   It's on the reliance list.

6        A.      Right, so it includes -- it can't

7   be exclusive or else I can't -- my mind doesn't

8   think that way, but it includes certainly

9   e-mails.  It includes design specifications of

10  failure mode analysis, discussions, you know,

11  animal studies, the IFUs.  Those are the types of

12  internal documents that I reviewed.

13       Q.      If there are any internal

14  documents -- strike that.

15              If there are any Ethicon internal

16  documents you reviewed in conjunction with

17  generating your report, they're contained in this

18  reliance list that's included with Exhibit --

19              MR. ROSENBLATT:  I don't know if

20  you marked it to be honest.

21       Q.      -- No. 1 of your deposition.  That

22  (indicating).

23              Is that correct, Doctor?

24       A.      I did the best I could to make sure

25  that what's listed in the reliance list

Peter L. Rosenblatt, M.D.

1    represents the documents that I reviewed for my

2    general report.  Is that what the question was?

3         Q.       Yeah, pretty much.

4              Are you aware of any Ethicon

5    internal documents that you reviewed in

6    conjunction with generating your report that are

7    not in your reliance list?

8         A.       Not that I'm aware of.

9         Q.       Are the 30 depositions -- strike

10   that.

11             Are the 30 or so depositions that

12   are listed at the tail end of your reliance list

13   included in those boxes over there?

14        A.       I'm not sure, and I'll tell you why

15   I'm not sure.  Some material was sent to me by

16   e-mail or -- not Dropbox but some other.  And so

17   some of -- and there were redundancies.  So there

18   are some things that are there, some things that

19   I have, and I kind of went between the two when I

20   reviewed them.

21        Q.       So you don't know?

22        A.       I don't know.  Can I just say

23   something?

24        Q.       Yeah.

25        A.       I got kind of tired of lugging

Peter L. Rosenblatt, M.D.

1   around those boxes between my house and my

2   office, that's the truth.  You have no idea.

3          Q.      Oh, I do.  I do.

4          A.      Oh, my God.

5          Q.      How many times have you been

6   deposed over the course of your career?

7          A.      I don't keep a list, but it has got

8   to be about 25 to 30 times, I guess.

9          Q.      Any idea of how many of those were

10  depositions involving synthetic mesh litigation?

11         A.      No.  At least, at least a handful.

12  At least, you know, five or ten.

13         Q.      Have you ever testified in a trial

14  of a synthetic mesh case?

15         A.      I don't know for sure.  I know I

16  once was -- it was sort of like a -- maybe you

17  know what it's called.  It was like a video

18  deposition, but it was going to be used at trial,

19  right, and it was actually a plaintiff case

20  involving TVT.  I was a plaintiff expert.  But I

21  don't think it actually went to trial, so.

22         Q.      Okay.  You've never gone to the

23  courthouse and taken the witness stand and

24  testified in front of a judge and jury?

25         A.      Sure I have.

Peter L. Rosenblatt, M.D.

1      Q.      Okay.  How many times?

2      A.      Maybe about a dozen.

3      Q.      When was the most recent?

4      A.      Oh, it's got to be -- definitely

5  within the last year.  You know, I could get that

6  information for you.  In fact, I think I -- we

7  produced something I believe in my report

8  about -- I think about trials that I've testified

9  in in the last four years.

10     Q.      Is it in your CV?

11     A.      No.  In the CV?  No, it wouldn't be

12  in the CV.

13     Q.      Okay.  I saw some stuff in your

14  report about it.

15     A.      Where?

16     Q.      I've seen some things in your

17  report.

18     A.      Yeah, I thought so, too.

19     Q.      It's on page 4.

20     A.      Oh.  That's it.

21     Q.      "Within the last four years I have

22  testified as an expert in the cases of Hayes v.

23  Jordan; Vercher, Bryant, Smith v. Milhorat; Banks

24  v. Witkowski; Watts v. Davidson; and Taylor-Ricci

25  v. Coutinho and Staffer;" is that right?

Peter L. Rosenblatt, M.D.

1        A.      Yes.

2        Q.      Are any of those cases involving

3    synthetic mesh?

4        A.      I don't remember.  I believe -- I

5    don't remember.  I don't remember.

6        Q.      Well, which one of those cases is

7    the one you testified at trial in within the past

8    year?

9        A.      Oh.  I'd have to look.  I just

10   don't remember.

11       Q.      It's one of these that's listed,

12   though?

13       A.      I believe so.  I don't remember.

14       Q.      Do you keep anywhere a log of your

15   experience testifying whether it be in deposition

16   or in trials?

17       A.      No.  I know I had to put together a

18   list at one point, and I thought I did a couple

19   years ago with -- when I did some work for Bard.

20   Not for Bard.  I was working with Greenberg

21   Traurig in Bard litigation for mesh, and I think

22   I had to put together a list for that, and I

23   thought that's where this came from.  I don't

24   keep track per se of my depositions.  I'm sure I

25   could find out if you need that information, like

Peter L. Rosenblatt, M.D.

 1    when was the last time I testified.  I just don't

 2    remember.

 3         Q.      Have you ever been retained as an

 4    expert witness by Bard?

 5         A.      Not by Bard.  By Greenberg Traurig,

 6    and they represent Bard.

 7         Q.      Okay.  Have you ever been hired as

 8    an expert witness aligned with the defense of

 9    Bard?

10         A.      Isn't that what we just said?

11         Q.      You know what I'm asking you.

12         A.      I do, but what I'm saying is, and I

13    think it's important to make the distinction,

14    honestly, is that when -- just like in this case,

15    they asked me -- they didn't say, you know, we're

16    hiring you to defend Ethicon or we're hiring you

17    to defend Bard.  They're, like, here's the

18    information.  We want your honest opinion.

19    Whether you think something, you know, is going

20    on here that we should know about, you know,

21    whether it's good or bad, what is your honest

22    opinion, and that's what I always do whenever I

23    do any kind of legal work.

24              MR. CRAWFORD:  Objection.

25    Non-responsive, move to strike.

Peter L. Rosenblatt, M.D.

1           Have you ever been involved in any

2   cases involving Bard?

3           A.      When you say involving Bard, what

4   do you mean.

5           Q.      Like women suing Bard.

6           A.      Well, I guess -- well, so put it

7   this way, I know I've been -- I've been involved

8   in cases where Board products have been used, and

9   I've been retained by attorneys representing

10  physicians, but then, I think it's probably two

11  years ago, I was retained by Greenberg Traurig as

12  part of the MDL, you know, to give my opinion

13  about a number of cases.  And, again, similar to

14  this, general report about Bard products and then

15  a number of cases of women who were involved in

16  the MDL against Bard.  Does that answer your

17  question?

18          Q.      Yeah, I'm trying to figure out how

19  I can ask it in a way where you can answer it.

20          A.      Okay.

21          Q.      Have you ever been hired by

22  attorneys representing Bard in litigation that

23  involves transvaginal mesh?

24          A.      Yes.

25          Q.      Have you ever been hired by

Peter L. Rosenblatt, M.D.

1    attorneys representing Boston Scientific

2    Corporation in cases involving transvaginal mesh?

3         A.     No.

4         Q.     Have you ever been hired by

5    attorneys representing American Medical Systems

6    or AMS in cases involving transvaginal mesh?

7         A.     No.

8         Q.     Have you been hired by attorneys

9    representing any other transvaginal mesh

10   manufacturer other than Ethicon and Bard?

11        A.     No.

12        Q.     When you were hired by the

13   attorneys representing Bard, did you generate a

14   general causation report?

15        A.     Yes.

16        Q.     Did you also generate case-specific

17   expert opinions?

18        A.     Yes.

19        Q.     On how many different individual

20   cases?

21        A.     I think it was -- oh, I think it's

22   about 20.

23        Q.     How long ago was that?

24        A.     Maybe a year and a half or two

25   years ago.

Peter L. Rosenblatt, M.D.

1      Q.      Did any of those Bard cases go to

2  trial?

3      A.      Not that I'm aware of.  Not that

4  anyone made me aware of.

5      Q.      You teach for Boston Scientific

6  Corporation?

7              MR. ROSENBLATT:  Object to form.

8      A.      I don't teach for them, but they

9  have asked me to be an instructor at courses on

10  various topics, transvaginal mesh, slings,

11  laparoscopic sacrocolpopexy.

12      Q.      Have you taught similar courses for

13  Ethicon?

14      A.      I have.

15      Q.      When was the last time?

16      A.      Going back quite a long time ago.

17  It's probably been, oh, gosh, maybe, you know,

18  seven years, I would guess.  Seven or eight

19  years.

20      Q.      Do you know what course it was?

21      A.      There were a number of courses.

22  You know, there was a number of cadaver labs

23  for -- you know, going back to the early 2000s,

24  you know, TVT, TVT-O, Prolift, and I believe

25  early on maybe even involved TVT Secur.  I don't

Peter L. Rosenblatt, M.D.

1    think there were any other products that I taught

2    on, I don't think.  Yeah.

3         Q.      Did I hear you say earlier that

4    whenever you were contacted by Butler Snow who

5    represents Ethicon in this litigation you asked

6    Butler Snow to provide you with literature and

7    research materials for you to review in

8    conjunction with generating your report?

9         A.      In addition to research I did

10   myself, yes.

11        Q.      Percentage-wise when we look at

12   your reliance list, what percentage of the

13   materials on that list are things that you came

14   up with yourself as opposed to being provided by

15   Butler Snow?

16             MR. ROSENBLATT:  Object to form.

17   Asked and answered.

18        A.      Yeah.  I mean -- by the way, excuse

19   me, it's difficult to answer that just because so

20   many of the things that I had in my possession

21   they sent me duplicates of, including abstracts,

22   papers.

23             So, you know, maybe, maybe 20

24   percent of the studies, you know, that I hadn't

25   seen before, but then, you know, obviously, I'd

Peter L. Rosenblatt, M.D.

1  never seen any of the internal documents.

2  Obviously, I had seen the IFUs, you know, and I

3  had seen videos that I had from years ago.  So

4  it's really difficult to say.

5       Q.     Some of the videos that appear on

6  your reliance list were provided to you by Butler

7  Snow?

8       A.     Yes.

9       Q.     A couple of breaks ago you were

10  going to look up the literature that supports

11  your opinion that polypropylene is inert and not

12  chemically reactive.  Have you had an opportunity

13  to do that?

14            MR. ROSENBLATT:  If we could take a

15  more extended break --

16            MR. CRAWFORD:  Sure.  I'm honestly

17  asking if he had a chance to grab it yet.

18            MR. ROSENBLATT:  I don't think so.

19  We weren't sure how long you were going to go.

20  If you want to take a lunch break, we can try to

21  do it over lunch.

22            MR. CRAWFORD:  No, we're on the

23  tail end of this.

24            THE WITNESS:  We can pull it in a

25  very short period of time.

Peter L. Rosenblatt, M.D.

1              MR. CRAWFORD:  Do you have any

2    questions, Paul?

3              MR. ROSENBLATT:  Yeah, I'll have

4    some.  And if you want to give me a little bit of

5    time with the Doctor, we'll try to pull the

6    studies that you asked for.

7    BY MR. CRAWFORD:

8         Q.      And there was another one, too,

9    right?

10        A.      Yeah, the dyspareunia -- the path

11   reports with the resection of the mesh, right?

12        Q.      Okay.

13        A.      Chronic pain versus voiding

14   dysfunction.  Yeah, that's it.

15        Q.      Okay.  For the time being I'll pass

16   the witness.

17              (A break was taken.)

18

19                   EXAMINATION

20   BY MR. ROSENBLATT:

21        Q.      Dr. Rosenblatt, my name is Paul

22   Rosenblatt from Butler Snow representing Ethicon

23   and Johnson & Johnson.

24              You were asked some questions today

25   about Dr. Rosenzweig's report.  Do you recall

Peter L. Rosenblatt, M.D.

1    that?

2         A.      Yes.

3         Q.      And, in fact, that report was

4    Dr. Rosenzweig's TVT report, right?

5         A.      Correct.

6         Q.      And you were asked a significant

7    number of questions about TVT in this deposition?

8         A.      Yes.

9         Q.      And stress urinary incontinence

10   procedures?

11        A.      Yes.

12               MR. ROSENBLATT:  And, Counsel, I

13   think you'll stipulate that this deposition will

14   also satisfy as the TVT general deposition?

15               MR. CRAWFORD:  I don't know that

16   I'm qualified to make any sort of stipulation

17   like that.

18               MR. ROSENBLATT:  Don't sell

19   yourself short like that.

20               Would it be fair to say, Doctor,

21   that in addition to reviewing -- strike that.

22               Would it be fair to say, Doctor,

23   that you considered not only Dr. Rosenzweig's

24   report but also the reports from other

25   plaintiffs' experts regarding Ethicon's prolapse

Peter L. Rosenblatt, M.D.

1    and SUI products.

2         A.      Yes.

3         Q.      And, in fact, you mentioned that

4    you asked for the good and bad.  Did you in fact

5    review a significant number of the materials

6    cited in plaintiffs' experts reports?

7                 MR. CRAWFORD:  Objection to form.

8         A.      Yes.

9         Q.      And that would include internal

10   documents and medical literature that plaintiffs'

11   experts referred to?

12        A.      Yes.

13        Q.      And did reviewing any of those

14   materials change your opinions about the safety

15   and efficacy of Ethicon's prolapse and

16   incontinence products?

17        A.      I took it into consideration, but

18   it didn't change my opinions.

19        Q.      And in addition to our law firm

20   providing you with some of the materials

21   referenced in your reliance list, would it be

22   fair to say that a significant number of those

23   materials you had already seen previously?

24        A.      Yes.

25        Q.      And, in fact, that's part of your

Peter L. Rosenblatt, M.D.

1    job as a physician, is to continuously review the

2    medical literature?

3         A.      It's my job as a physician, and

4    it's also my job as an educator.  You know, I

5    have residents and medical students and fellows

6    that I teach.  I do a lot of teaching around the

7    country and around the world, and I feel it's

8    important to stay up on the literature.

9         Q.      And where do you -- just so we have

10   an understanding -- I know we could run through

11   your CV, but Doctor, where do you teach?

12        A.      Primarily at Mount Auburn Hospital

13   which is a community teaching hospital of Harvard

14   Medical School.

15        Q.      And in addition to teaching

16   residents and fellows at Harvard, are you also

17   teaching continuing medical education across the

18   country?

19              MR. CRAWFORD:  Objection to form.

20        A.      Yes.

21        Q.      And are you -- strike that.

22              If you could just describe some of

23   your experience teaching professional education

24   for the Ethicon products?

25        A.      So in addition to, you know, CME

Peter L. Rosenblatt, M.D.

1    courses, and I teach quite a bit of CME courses

2    here and regionally and nationally, and I also

3    present quite a bit at national and international

4    meetings.  But specifically with Ethicon products

5    I started doing some teaching probably back in

6    the year, I would imagine, 2000, and I've done a

7    number of -- many cadaver courses educating

8    surgeons on proper use of Ethicon products which

9    started out, you know, with TVT but then TVT-O

10   and Prolift as well.

11        Q.      Did you ever feel like you were

12   being influenced by Ethicon to promote their

13   products?

14        A.      Absolutely not.  It has always been

15   very important to me to offer my patients the

16   best treatment.  So, you know, I never wanted to

17   be seen that I was working for one company.  I

18   use the products on my patients that I think are

19   the best.  I've used products from various

20   companies, and as well as just, you know, not

21   always products, right?  I mean, you know,

22   techniques and, you know, custom-made pieces of

23   mesh.  And if I believe in a product like I

24   believe in, you know, TVT or Prolift, then I

25   would agree to, you know, to instruct surgeons on

Peter L. Rosenblatt, M.D.

```
 1    the correct use.  But there were times I've been

 2    asked to, you know, teach for products that I

 3    wasn't -- that I didn't believe in, that I didn't

 4    use, and I wouldn't teach those products.

 5         Q.      And Doctor, were you paid for your

 6    time to teach professional education?

 7         A.      Yes.

 8         Q.      And how did -- the amount that you

 9    were paid for your time teaching or strike that.

10              Doctor, what was the opportunity

11    cost of you teaching professional education as

12    far as --

13         A.      So let's clarify that for a moment.

14    So when I teach a CME course, most often it

15    doesn't involve any payment to me.  That's

16    something that I do 'cause I really enjoy

17    teaching, and I think it's a really important

18    thing for some surgeons who are dedicated to do

19    that type of work.  But when it involved a

20    specific company like Ethicon, they were often,

21    you know, taking time away from my practice, and

22    so, you know, I think I was compensated fairly

23    for that because that's the opportunity cost.

24    I'm not seeing patients in the office, and I'm

25    not doing surgery on those days.  But there's
```

Peter L. Rosenblatt, M.D.

1    also teaching in the evenings and teaching on

2    weekends that took me away from my family, but I

3    really enjoyed the teaching, and I think I was

4    compensated, you know, appropriately for that.

5         Q.      So did you teach professional

6    education because you wanted the money?

7         A.      It was not -- it's never been about

8    the money.  It's been about teaching proper use

9    of devices.  And I've always seen it as not the

10   responsibility of the companies themselves to do

11   the teaching but of the surgeons who are thought

12   leaders in our industry to properly instruct

13   other surgeons on how to use products

14   appropriately.

15        Q.      And I think that's what you

16   referred to earlier as, what, peer-to-peer

17   teaching?

18        A.      Correct.

19        Q.      And, Doctor, in addition to the

20   material -- well, the materials referenced in

21   your report, would it be fair to say that not

22   only have you reviewed a significant number of

23   those materials prior to becoming involved in the

24   litigation but that you in addition to reviewing

25   those materials performed your own PubMed

Peter L. Rosenblatt, M.D.

Case 2:12-md-02327  Document 2425-4  Filed 07/21/16  Page 151 of 246 PageID #: 75522

Peter L. Rosenblatt, M.D.

```
1    searches to satisfy yourself of the medical

2    literature?

3         A.      Yes.

4         Q.      And when you were asked questions

5    about the levels of evidence, if you could just

6    explain why Level I and Level II evidence is

7    significant to you?

8         A.      Yeah.  So there are many -- there

9    are many reports out in the literature, and they

10   vary in terms of their quality, and it's

11   generally recognized that the highest quality

12   studies are randomized prospective studies or

13   RCTs, randomized controlled trials, and

14   obviously, there are other Level I evidence or

15   ways to kind of synthesize all the data that's

16   put together which is referred to as a

17   meta-analysis.  And a meta-analysis is a

18   statistical form where you can pool data from

19   high level studies to try to make sense on a

20   grander scale of the significance.  And then also

21   systematic reviews where you have a, you know, a

22   question that you want answered and you look at

23   all the high quality evidence, and it's a matter

24   of, you know, throwing out studies that aren't as

25   useful.  You know, there are still studies like
```

Peter L. Rosenblatt, M.D.

```
 1    prospective studies or even retrospective cohort
 2    studies that provide some use and are considered
 3    generally Level II evidence, but they're not as
 4    high as the Level I evidence.  So we tend to in
 5    general in all of medicine, not just in surgery
 6    but also in medicine looking at, you know, drugs,
 7    et cetera, that Level I evidence is the most
 8    important.
 9         Q.     And when you look at that Level I
10    evidence, for example, the randomized controlled
11    trials for prolapse meshes involving
12    polypropylene and specifically Ethicon's
13    Gynemesh® PS and Prolift, what is the statistical
14    significance, if any, when those RCTs compare
15    native tissue repairs to mesh repairs for
16    prolapse?
17         A.     Well, there are a couple of ways of
18    looking at it.  And when you look at objective
19    success, in other words, based on pelvic
20    examination, across the board the success rate is
21    significantly higher for transvaginal mesh.  It's
22    become widely accepted in our field that it's
23    important to look at subjective outcome as well
24    and coming up with like a composite score.  And
25    there's good Level I evidence as well that
```

Peter L. Rosenblatt, M.D.

1    subjective outcome is either improved or not

2    significantly different from native tissue

3    repair, but in total, you're going to prevent

4    recurrences from happening with transvaginal mesh

5    compared to native tissue repairs.

6         Q.     And when you look at the randomized

7    controlled trials for transvaginal mesh to treat

8    prolapse versus native tissue repairs, is there

9    any statistical significance regarding de novo

10   dyspareunia?

11        A.     You know, that's something we talk

12   about as, you know, mesh and dyspareunia, but

13   when you look at the randomized controlled

14   trials, there is no statistically significant

15   difference in the highest level studies.  In

16   fact, there are studies that show less de novo

17   dyspareunia with transvaginal mesh compared to

18   native tissue repair.

19        Q.     And I believe in your expert report

20   you referred to specifically the Withagen study

21   to support that?

22        A.     Correct.

23        Q.     Okay.  And would the same be true,

24   Doctor, for pelvic pain and just general quality

25   of life?

Peter L. Rosenblatt, M.D.

```
 1         A.       Those are -- those as well.
 2   There's no statistically significant difference
 3   between native tissue repairs and transvaginal
 4   mesh when you look at those.
 5         Q.       And it's important to look at those
 6   subjective factors in the context of a randomized
 7   controlled trial to make sure you're not
 8   comparing apples and oranges but that you're
 9   comparing apples to apples; is that fair?
10         A.       That's correct.
11         Q.       Doctor, two of your invoices were
12   marked as I believe Exhibits 4 and 5.  Would it
13   be fair to say that you charged for your time in
14   performing the research and rendering your
15   opinions in this litigation?
16         A.       As best I can, yes.
17         Q.       And, in fact, there was a charge of
18   your deposition rate that you submitted on your
19   invoice because -- not because of counsel's fault
20   but your deposition was originally scheduled
21   several weeks ago and was cancelled at the last
22   minute; is that fair?
23         A.       I remember distinctly.  The
24   deposition was scheduled for a Monday, and I
25   found out that the deposition was cancelled on a
```

Peter L. Rosenblatt, M.D.

1    Saturday.  And Monday is -- Mondays and Wednesday

2    are my primary surgical days, and I have block

3    time, and that day would have been filled with,

4    you know, three to six cases, and a week before

5    the block time, the block gets released, and

6    there's no way to -- so that was a wasted day, a

7    completely wasted day.

8         Q.      And, Doctor, we talked a little bit

9    about some of your teaching experience contained

10   on your CV, but would it be fair to say that

11   you've published a significant number of studies

12   in the medical literature on incontinence and

13   prolapse?

14        A.      Right, primarily my field of

15   interest is prolapse, urinary incontinence and

16   fecal incontinence.

17        Q.      And are you involved in any

18   editorial activities such as reviewing for

19   medical journals?

20        A.      Yes, I'm a peer reviewer for a

21   number of journals, and I've been on the

22   editorial board of the Gold journal which is the

23   Journal of Female Pelvic Medicine Reconstructive

24   Surgery and also the JMIG which is more of the

25   minimally invasive gynecologic surgery.

Peter L. Rosenblatt, M.D.

```
1              Q.       And you mentioned Female Pelvic
2    Medicine Reconstructive Surgery, that would be
3    abbreviated FPMRS?
4              A.       Right.
5              Q.       Is that a subspecialty in your
6    field?
7              A.       Correct.
8              Q.       And that would be a board
9    certification?
10             A.       Correct, it became a board
11   certification I think it was 2013.
12             Q.       And so if Dr. Rosenzweig has not
13   sat for the FPMRS board, then he would not be a
14   board-certified urogynecologist?
15             A.       That's right.
16             Q.       You are, though, right?
17             A.       I am.
18             Q.       And are you in fact an examiner for
19   the FPMRS exam?
20             A.       Yeah, I'm actually a board examiner
21   for the general boards, but I just transitioned
22   to being a board examiner for the subspecialty of
23   FPMRS.
24             Q.       So it would be fair to say, then,
25   Doctor, that you would have a good understanding
```

Peter L. Rosenblatt, M.D.

1    of what fellows and surgeons are expected to know

2    in your field about procedures and risks

3    associated with those procedures including pelvic

4    mesh, correct?

5            MR. CRAWFORD:  Objection to form.

6        A.       No, that's correct.  That's -- you

7    know, what we do as board examiners is -- I'm

8    very familiar with the standard of care, and we

9    are making sure that people who are quali- -- you

10   know, that the only people who become board

11   certified are qualified to do so and are

12   performing within the standard of care.

13       Q.       And, for example, would you test

14   fellows and surgeons on their knowledge of

15   potential complications of mesh-based repairs for

16   incontinence and prolapse?

17       A.       Yes.

18       Q.       And how to manage those

19   complications that may occur?

20       A.       Correct.

21       Q.       And the same would be true for

22   native tissue repairs for stress urinary

23   incontinence and pelvic organ prolapse?

24       A.       Correct.

25       Q.       Doctor, you were asked some

Peter L. Rosenblatt, M.D.

1    questions about whether or not mesh exposure was

2    a serious complication.  Do you recall that line

3    of questioning?

4        A.      Yes.

5        Q.      In your experience, are mesh

6    exposures typically considered serious

7    complications?

8        A.      So the vast majority of them are

9    not from a clinical standpoint considered serious

10   complications.  Could there be a mesh erosion?

11   Let's take away exposures.  Could there be a mesh

12   exposure that's serious?  Yeah, it could happen.

13   You know, I've seen a couple examples in 15 years

14   of patients who have developed hematomas who have

15   opened their incision and have large mesh

16   exposures but the vast majority, I'm talking

17   about over 95 percent of them, are usually minor

18   mesh exposures that can either be taken care of

19   in the office or can be taken care of in an

20   operating room under local anesthesia with

21   conscious sedation.  So how we look at them as

22   clinicians versus how the FDA classifies them

23   because it's a return trip to the OR, there's a

24   disparity there.

25       Q.      And if there is a complication

Peter L. Rosenblatt, M.D.

1   associated with a native tissue repair, does that

2   get reported to a MAUDE database?

3          A.        No, because it doesn't involve --

4   as far as I know, it doesn't involve a device, so

5   no one would report it to a MAUDE database.

6          Q.        And so when you were seeing you

7   didn't necessarily agree with the FDA's 2011

8   public health notice description as complications

9   are not rare, was that in part because they did

10  not consider the complications that occur with

11  native tissue repairs?

12         A.        Correct.

13         Q.        And was that also in part because

14  when you performed the mathematical calculation

15  as you described, 0.6 percent would in fact be

16  rare?

17         A.        In my book, that's very rare.

18         Q.        Doctor, if we look at your expert

19  report, starting on page 33.

20         A.     Yes.

21         Q.        In the middle of the page, you cite

22  to the Damoiseaux 2015 RCT.  Do you see that?

23         A.     Yes.

24         Q.        A little further down they describe

25  a mesh exposure rate, but then, even though there

Peter L. Rosenblatt, M.D.

1  were some mesh exposures with the mesh group, did

2  that translate into any statistical significant

3  difference with respect to dyspareunia or pelvic

4  pain?

5                MR. CRAWFORD:  Objection to form.

6       A.      No, it did not.

7       Q.      And if you look on the next page,

8  34, you cite to the Heinonen 2016 study.

9       A.      Yes.

10      Q.      And although you describe here that

11  the authors reported a 23 percent mesh exposure

12  rate, you note that the exposures were

13  asymptomatic in 24 of 32 or 66.7 percent of

14  patients.  Do you see that?

15      A.      That's correct.

16      Q.      So, if you could, just describe

17  whether or not an asymptomatic mesh exposure

18  would be of any clinical concern?

19      A.      So it depends on the situation but,

20  you know, many women do have small mesh exposures

21  and are not aware of it, and it doesn't pose any

22  danger to the patient, and there's no reason to

23  treatment an asymptomatic mesh exposure.  And

24  when I say asymptomatic, I'm talking about for

25  the patient, and if the patient is sexually

Peter L. Rosenblatt, M.D.

1    active, to her partner.  So, obviously, if the

2    patient didn't have symptoms but her partner had

3    symptoms, then that would be symptomatic, but the

4    majority of these mesh exposures are asymptomatic

5    to the patient and her partner.

6         Q.    And, Doctor, I don't want to rehash

7    everything that's already in the report, but

8    would it be fair to say if you continue flipping

9    the pages that you describe a significant number

10   of studies and the reported outcomes to include

11   success rates and complications of those studies

12   involving Prolift and Gynemesh® PS?

13        A.    Yes.

14        Q.    And I do want to look at one in

15   particular on page 37.  Towards the bottom you

16   cite to De Landsheere and Cosson in 2011 which

17   was a three-year follow-up study of 524 patients,

18   and then on the next page, could you just

19   describe some of the complications that were

20   noted in this large patient study?

21             MR. CRAWFORD:  Objection to form.

22        A.    So in that study, which I believe

23   was a cohort study -- it was not one of the

24   randomized controlled trials, but it was a very

25   large study because it had, you know, so many

Peter L. Rosenblatt, M.D.

1    patients in it -- the total mesh-related

2    complications was 3.6 percent with a mesh

3    exposure rate of 2.7 percent which is relatively

4    low.  And the other important part about this

5    study was that most of the mesh exposures

6    occurred in the first year of the study, so we're

7    not seeing mesh exposures that are continually

8    coming out.  It's usually during the healing

9    process when you see a mesh exposure.

10        Q.      Is that supported by additional

11   studies that you've seen in the medical

12   literature?

13        A.      Yes.

14        Q.      And would that also be supported by

15   your clinical experience?

16        A.      Yes.

17        Q.      Would that also be supported by

18   your discussions with colleagues?

19        A.      Yes.

20        Q.      And what did the De Landsheere

21   study find with respect to severe symptomatic

22   mesh retractions?

23        A.      That it was found in an extremely

24   low number of patients of less than half a

25   percent.

Peter L. Rosenblatt, M.D.

1        Q.        And would that be consistent with

2    what you would expect from Prolift?

3        A.        Yes.

4        Q.        Doctor, you were describing some

5    factors that could contribute to mesh exposures

6    earlier.  Do you recall that testimony?

7        A.        Yes.

8        Q.        And I believe you mentioned surgeon

9    technique and other patient factors.  So would it

10   be fair to say that there are factors unrelated

11   to the mesh itself that contribute to mesh

12   exposures?

13       A.        Yes, that's widely accepted.

14       Q.        And I believe you also testified

15   that exposure or erosion is not necessarily

16   unique to mesh because you can also have a suture

17   erosion or exposure; is that correct?

18       A.        Correct.

19       Q.        Okay.  Would that be true for any

20   foreign body implant?

21       A.        Absolutely.

22       Q.        Do you implant urethral sphincters?

23       A.        I do not.

24       Q.        Do you know if urologists in your

25   field do?

Peter L. Rosenblatt, M.D.

```
 1           A.        Mm-hmm, yes.

 2           Q.        Do you know if there's literature

 3    to suggest that urethral sphincters can erode?

 4           A.        Urethral sphincters, anal

 5    sphincters, anything in that area can erode.

 6           Q.        And, Doctor, you were asked a

 7    number of questions regarding Dr. Rosenzweig's

 8    TVT report and whether or not you agreed or

 9    disagreed with those opinions.  Do you recall

10    that?

11                     MR. CRAWFORD:  Objection to form.

12           A.        Yes.

13           Q.        And a lot of those questions dealt

14    with properties of the mesh and potential

15    complications of mesh; is that fair?

16           A.        Yes.

17           Q.        If you could, just -- I know you

18    have a lot of that in your expert report, but if

19    you could just briefly describe your experience

20    with mesh design and mesh properties?

21                     MR. CRAWFORD:  Objection to form.

22           A.        Well, I've actually -- I personally

23    have been -- besides reading the literature,

24    which I'm very familiar with, but I've also had

25    the opportunity to work with a number of
```

Peter L. Rosenblatt, M.D.

1    companies on mesh designed.  And so I've worked

2    with engineers on some of my own products and

3    some with companies and some completely

4    independent.

5              So, you know, I've approached --

6    for instance, there's a company in Rhode Island

7    called Biomedical Structures that I, right

8    outside of Providence, that I worked with them on

9    some of my own mesh designs.  So I'm very

10   familiar with design of polypropylene mesh.

11             I've also worked, again,

12   personally, not with a company, with a mesh

13   manufacturer in Ireland called Proxy Medical that

14   actually does make some mesh for some companies

15   in the United States, including Boston

16   Scientific, on devices that I've designed.  So

17   I've worked with engineers, design engineers, on

18   mesh design.

19             MR. CRAWFORD:  Objection.

20   Non-responsive.

21        Q.    And would it be fair to say that

22   you also have -- strike that.

23             Doctor, could you describe your

24   experience, if any, with respect to taking a new

25   product through the regulatory cycle and drafting

Peter L. Rosenblatt, M.D.

1    IFUs?

2                    MR. CRAWFORD:  Objection to form.

3         A.        Yeah, so I've been very fortunate

4    that I've taken -- there was one device that I

5    worked on -- that I've been working on since 2004

6    which is a mesh device, very similar to the

7    Prolene® mesh.  It was actually with American

8    Medical Systems.  It was actually very similar to

9    the SPARC mesh that they use, but it was

10   different.  It had additional fibers added to it.

11   And that's something I worked with them from 2007

12   'til this year on designing the mesh, working on

13   the device of the IFUs and other materials,

14   including, you know, animations and online

15   training, et cetera.

16                   So I've taken that product from the

17   beginning through IDE studies, investigational

18   device exemption studies, and the PMA process,

19   premarket approval I think it stands for.  So

20   I've been very involved in that type of design.

21   Plus, I wrote much of the instructions for use,

22   the IFUs, for that device.

23                   MR. CRAWFORD:  Objection.

24   Non-responsive.

25        Q.        And, Doctor, as part of your

Peter L. Rosenblatt, M.D.

1   experience teaching professional education, would

2   you teach on the IFUs?

3        A.      Right.  So when we teach, what

4   we're doing is sort of summarizing the IFUs,

5   because, you know, the IFUs come with the device,

6   right?  So when you open up a package in the

7   operating room, you're really not going to sit

8   there while the patient's under anesthesia and

9   read the instructions like you're programming a

10  VCR.  I don't know if people know what a VCR is

11  anymore.

12       Q.      Good lord.

13       A.      Yeah, I shouldn't have said that.

14  I meant a Beta max.  Yeah, I got to rethink that.

15              Anyway, so I think the way most

16  surgeons learn how to use a device is by, or

17  should learn how to use a device, is by going to

18  professional education conferences and learning

19  from PowerPoint presentations, animations,

20  cadaver dissections, procedural videos.  That's

21  how people really learn.

22       Q.      By medical literature?

23              MR. CRAWFORD:  Objection.

24  Non-responsive.

25       A.      And medical literature.  And that

Peter L. Rosenblatt, M.D.

```
 1   is basically encompassing what is in an IFU.
 2        Q.      And if you had any concerns about
 3   Ethicon's IFUs for the TVT products or the
 4   Gynemesh® PS or the Prolift devices as being
 5   inadequate, would you have voiced your concerns?
 6        A.      Yes.
 7        Q.      And in your opinion, are those
 8   IFUs, all the versions that you've reviewed,
 9   adequate?
10              MR. CRAWFORD:  Objection to form.
11        A.      Yes, they are.
12        Q.      And you were asked some questions
13   about your legal work, Doctor.  Would it be fair
14   to say that you have been an expert for both
15   sides, both plaintiffs and defendants?
16        A.      Yes, I have.  I would say more so
17   for defense, but I have done plaintiff work as
18   well.
19        Q.      Doctor, you were asked about
20   shrinkage and whether or not -- I believe it was
21   couched just in broad terms about mesh shrinkage.
22   Do you recall those questions?
23        A.      Yes.
24        Q.      I believe one of the documents that
25   you cited to was the Dietz paper.
```

Peter L. Rosenblatt, M.D.

1          A.       Yes.

2          Q.       And what does the Dietz paper

3    regarding TVT describe about whether or not TVT

4    contracts or shrinks?

5          A.       So this is one of the studies that

6    I relied on, and Dr. Dietz is very well for his

7    work on transvaginal ultrasound, and this study

8    shows that the TVT does not seem to contract or

9    shorten over a period of over a year and a half.

10                  MR. CRAWFORD:  Objection.

11   Non-responsive.

12         Q.       And in another study by Lo, which

13   was an ultrasound study, what did Lo and

14   colleagues find about whether or not ultrasound

15   assessment found any shrinkage or contraction

16   with TVT?

17         A.       They also -- and, again, both of

18   these researchers are very well-known.  Lo is in

19   Taiwan, and showed that TVT does not show any

20   shrinkage.  And if -- and there's actual clinical

21   data to support that, in that if shrinkage did

22   occur you'd expect to see patients who were

23   initially voiding.  If shrinkage occurred, they'd

24   go into retention, and we just don't see that

25   happening.

Peter L. Rosenblatt, M.D.

```
 1                MR. CRAWFORD:  Objection.
 2   Non-responsive.
 3        Q.        And do you recall in the 17-year
 4   Nelson study whether or not they noticed any
 5   shrinkage of TVT?
 6        A.        They did not notice any shrinkage
 7   of TVT.
 8        Q.        And would that be consistent with
 9   your medical practice?
10        A.        Yes.
11        Q.        Would that be consistent with your
12   discussions with colleagues?
13        A.        Yes.
14        Q.        And would that be consistent with
15   your general review of the medical literature?
16        A.        Correct.
17        Q.        And additionally, another Dietz
18   paper that I believe you referred to looked at
19   prolapse meshes.  I believe in particular the AMS
20   Perigee.  Do you recall that paper?
21        A.        Yes.
22        Q.        Is the Perigee similar to the
23   Prolift?
24                MR. CRAWFORD:  Objection to form.
25        A.        It's similar in that it is a Type 1
```

Peter L. Rosenblatt, M.D.

1  macroporous monofilament polypropylene mesh.

2      Q.      And what was Dietz's conclusion in

3  this paper from 2011 about whether or not Perigee

4  or transvaginal mesh for prolapse contracted?

5      A.      Yeah, there was no evidence on

6  ultrasound examination of any mesh contraction in

7  this study.

8      Q.      And, Doctor, you were asked some

9  questions about biocompatibility and inertness.

10 I want to show you a paper that I believe you

11 reviewed by Binnebösel.  If you could, just

12 describe what they noted about mesh integration.

13     A.      So they stated that these materials

14 are physically and chemically inert, stable and

15 non-toxic.

16     Q.      And they're referring to

17 polypropylene meshes?

18     A.      Yes, they are.

19     Q.      Doctor, you were asked some

20 questions about the Burch procedure.  When you

21 were describing your experience with the Burch,

22 were you describing the open Burch or the

23 laparoscopic Burch?

24     A.      Both.

25     Q.      And do you primarily -- do you

Peter L. Rosenblatt, M.D.

1    still perform open Burchs on a regular basis?

2         A.      No, I use to, but I haven't done an

3    open Burch in probably 20 years.

4         Q.      And why is that?

5         A.      Oh, just because we can do the

6    exact same procedure in a minimally invasive

7    fashion.

8         Q.      So would it be fair to say that the

9    Burch is a -- the open Burch is a more invasive

10   procedure than, for example, a midurethral sling?

11        A.      Significantly more invasive.

12        Q.      And what are some of the -- strike

13   that.

14               Now, with regard to the Burch, are

15   you familiar with an article by Demirci

16   describing the long-term results of the Burch?

17        A.      Yes.

18        Q.      And what did this paper by Demirci

19   find about the rates of dyspareunia and growing

20   pain as late complications of the Burch?

21        A.      Yeah, so these are potential

22   complications in a Burch procedure, and you know,

23   dyspareunia occurred in 6 patients out of the

24   220, groin or suprapubic pain in 15, which is

25   probably about, you know, 7 percent or so, but

Peter L. Rosenblatt, M.D.

1    there were also other complications including

2    enteroceles in over 10 percent of patients and

3    rectoceles, and it's felt that the change in the

4    axis of the vagina predisposes to posterior,

5    which would be rectocele and enteroceles,

6    prolapse.

7         Q.      And would that be a complication

8    that would occur more frequently after a Burch

9    than after a midurethral sling?

10              MR. CRAWFORD:  Objection to form.

11        A.      Yes.

12        Q.      And it would be fair to say,

13   Doctor, that complications such as dyspareunia

14   and pain, whether it's short term or chronic, are

15   well-known complications of any vaginal

16   procedure?

17        A.      That's correct.

18        Q.      You were asked some questions about

19   degradation, and I believe you referred

20   specifically to the Clavé paper.

21        A.      Yes.

22        Q.      What did the authors conclude about

23   their hypotheses concerning degradation,

24   specifically oxidation degradation?

25        A.      They brought up these as

Peter L. Rosenblatt, M.D.

1   hypotheses, but they stated that none of their

2   hypotheses, and in particular direct oxidation,

3   could be confirmed by the study.

4        Q.    So, Doctor, when you said you were

5   not familiar with the literature that described

6   in vivo degradation, would it be fair to say that

7   scientists have tried to study that issue but

8   have not been able to confirm in vivo

9   degradation?

10            MR. CRAWFORD:  Objection to form.

11       A.    That's correct.

12       Q.    And you were asked some

13  hypotheticals, Doctor.  Hypothetically if

14  degradation did occur, what in your opinion,

15  based on your clinical experience and your review

16  of the medical literature, would be the clinical

17  significance of degradation if it hypothetically

18  did occur?

19       A.    So when it came to like slings, you

20  would expect to see failures, and we're not

21  seeing that.  And when it comes to prolapse, then

22  you'd expect over time to see degradation would

23  lead to disappearance of the mesh and failures,

24  and that's just not what we're seeing clinically.

25       Q.    And, Doctor, AUGS and SUFU released

Peter L. Rosenblatt, M.D.

1    a Frequently Asked Questions by Providers

2    regarding midurethral slings for stress urinary

3    incontinence.  Have you seen this document

4    before?

5         A.      Yeah, I use that with my patients,

6    too.

7         Q.      And one of the questions that they

8    ask is does the midurethral sling made of

9    polypropylene degrade over time.  Could you just

10   summarize what their response was in this

11   document?

12              MR. CRAWFORD:  Objection to form.

13        A.      So AUGS and SUFU are the leading

14   organizations for surgeons and patients in

15   urogynecology and female reconstructive surgery,

16   and it's stated here that polypropylene is a

17   stable and well-accepted biomaterial with, as we

18   mentioned, a history of over five decades in

19   use -- of use in mesh implants.  And though

20   people have raised the issue of possible

21   degradation, including what we talked about like

22   cracked surfaces, that there's no evidence that

23   that is actually happening.

24        Q.      And Doctor, one of the other

25   studies that I believe you relied on was a 2011

Peter L. Rosenblatt, M.D.

1    study by de Tayrac which followed the Clavé

2    study, and you noted earlier this biofilm when

3    you wash it off the mesh wasn't degraded.  Could

4    you just describe what the authors found in this

5    study --

6                    MR. CRAWFORD:  Objection.

7         Q.        -- in 2011?

8                    MR. CRAWFORD:  Objection to form.

9         A.        So what these authors showed is

10   that when you properly washed the material with,

11   in this case, DMSO which is a solvent -- it's

12   actually a byproduct of the wood industry -- and

13   you also used ultrasonic shock, that after the

14   biofilm was removed there is absolutely no

15   polymer degradation, and you know, according to

16   this, scanning electron microscopy image, to my

17   eyes and anyone who would read this, it looks

18   like it's pristine material.

19                   MR. CRAWFORD:  Objection.

20   Non-responsive.

21        Q.        And, Doctor, I believe one of the

22   other studies you were relying on was a recent

23   study from the International Urogynecology

24   Journal by Ong.  Do you recall that?

25        A.        Yes.

Peter L. Rosenblatt, M.D.

1    Q.      What did this study conclude about

2    explanted Prolene® meshes and whether or not they

3    underwent any clinically significant degradation?

4    A.      Well, they concluded something very

5    similar in that these explanted Prolene® meshes

6    did not undergo any meaningful or harmful

7    degradation in vivo but that the, you know,

8    quote/unquote, cracked layer was actually

9    composed of protein coatings arising from a

10   well-established phenomenon occurring immediately

11   upon implantation which is what we referred to

12   earlier as a biofilm.

13   Q.      And, Doctor, you were asked some

14   questions about the MSDS.  I represent to you

15   this is the Sunoco MSDS for Ethicon's Prolene®.

16   A.      Yes.

17   Q.      Would it be fair to say that MSDS,

18   material safety data sheets, are under the

19   purview of OSHA and not the FDA?

20           MR. CRAWFORD:  Objection to form.

21   A.      That is correct.

22   Q.      And so in your opinion would this

23   document have anything to do with the safety of

24   an implantable medical device outside of the

25   context of employees working with various

Peter L. Rosenblatt, M.D.

```
 1    chemicals?

 2                 MR. CRAWFORD:  Objection to form.

 3         A.       Right, so the MSDS, as you

 4    mentioned, is under the purview of OSHA to

 5    protect workers who are handling materials, but

 6    we're talking about raw materials.  We're not

 7    talking about devices that are then -- you know,

 8    this refers to, for instance, like the

 9    polypropylene pellets and when they're heated up

10    and extruded, but that has nothing to do with

11    when it's implanted into a human.

12         Q.       And one of the references I believe

13    Dr. Rosenzweig was citing to under

14    incompatibility was strong oxidizers such as

15    chlorine, peroxides, et cetera, and you were

16    asked questions about whether or not mesh would

17    undergo oxidative degradation due to peroxides in

18    the vagina.  Do you recall those questions?

19                 MR. CRAWFORD:  Objection to form.

20         A.       Yes.

21         Q.       In your opinion, is that a

22    realistic possibility?

23                 MR. CRAWFORD:  Form.

24         A.       No, there's no evidence of that.

25    In addition, you know, again, this is the MSDS
```

Peter L. Rosenblatt, M.D.

1    for polypropylene, but then there are additives

2    in Prolene® mesh which are antioxidants.

3                    MR. CRAWFORD:  Objection.

4    Non-responsive.

5          Q.      Doctor, if you were going to offer

6    the opinion in a court of law that polypropylene

7    mesh was incompatible in the human body because

8    of an MSDS sheet, in your opinion would that be

9    relying on sound evidence-based medicine?

10                    MR. CRAWFORD:  Objection to form.

11         A.      Absolutely not.

12         Q.      Doctor, are you familiar with a

13   paper by Ashley King and Howard Goldman regarding

14   whether or not polypropylene causes cancer or

15   could be cytotoxic?

16         A.      Yes.

17         Q.      What did those authors conclude

18   about whether or not that was a concern of

19   polypropylene midurethral slings?

20         A.      So they concluded that there's

21   absolutely no evidence in the medical literature

22   that polypropylene slings are associated with a

23   risk of malignancy.

24         Q.      And, Doctor, you were asked about

25   chronic inflammatory responses, and I want to

Peter L. Rosenblatt, M.D.

1    show you a paper I believe you relied on by

2    Firoozi and Goldman at the Cleveland Clinic.

3         A.       Yes.

4         Q.       And this study involves a total of

5    23 patients involving removal of mesh, prolapse

6    mesh, including Ethicon's Prolift.  Do you recall

7    that?

8         A.       I do.

9         Q.       And, if you could, just describe

10   whether or not their removal procedure was

11   successful without removing the arms of the mesh?

12                 MR. CRAWFORD:  Objection to form.

13        Q.       In terms of curing the patient's

14   pain?

15        A.       Well, I think one of the most

16   important parts of this study was that they were

17   able to show that patients who had pain where

18   they determined they wanted to remove the mesh

19   that they could remove the mesh safely.

20                 MR. CRAWFORD:  Objection.

21   Non-responsive.

22        Q.       And, Doctor, is that consistent

23   with your clinical experience?

24        A.       It is.

25        Q.       And if there's an instance where

Peter L. Rosenblatt, M.D.

1    you need to leave the mesh in place or it's not

2    easily accessible, do you generally have any

3    concerns, based on your experience and review of

4    the literature and your review of patients, as to

5    leaving mesh in that patient if they don't have

6    any significant complaints?

7         A.     So, first of all, it is extremely

8    rare in my experience and in the medical

9    literature to have to remove mesh totally.  And

10   in my experience, patients who do present with

11   pain after prolapse operations such as, you know,

12   armed transobturator mesh systems, if you just

13   relieve the tension on the mesh arm the pain will

14   go away.  Mesh itself does not cause pain, but it

15   can cause pain where it inserts into the pelvic

16   floor muscles.  And there are techniques that

17   have been described.  In fact, one was described

18   by one of my former fellows, and I've shown this

19   in videos, of getting into the space of Retzius

20   laparoscopically and just relieving the tension

21   on the mesh arms and successfully treating women

22   with pelvic pain.

23        Q.     And so would it be fair to say that

24   you're able to successfully treat women who may

25   have some pain after a mesh procedure without

Peter L. Rosenblatt, M.D.

```
 1    performing significant dissection?

 2         A.      Correct.

 3         Q.      And in terms of severity of pain,

 4    is it an accurate statement that any mesh -- any

 5    patient who has mesh undergoes more severe pain

 6    or dyspareunia than a patient who had a native

 7    tissue repair for prolapse?

 8                 MR. CRAWFORD:  Objection to form.

 9         A.      That is not true.

10         Q.      And is that based on your clinical

11    experience, Doctor?

12         A.      That's based on my clinical

13    experience, but it's also based on the

14    literature, that patients with native tissue

15    repairs can have significant pain.  The one that

16    comes to mind is posterior repairs went anywhere

17    from 19 to 32 percent of women with undergoing

18    levator plication can have significant

19    dyspareunia, and there is -- so pain and

20    dyspareunia can happen with any native tissue

21    repair.

22         Q.      So would it be fair to say that

23    pain and dyspareunia are not unique to mesh?

24         A.      That is correct.

25         Q.      And counsel asked you to look
```

Peter L. Rosenblatt, M.D.

1    during a break for a study to support your

2    opinion about inflammatory response and whether

3    or not a chronic inflammatory response correlated

4    to chronic pain.  Could you just describe that

5    article that you were able to find?

6         A.       Right.  So this is an article by

7    Audra, A-U-D-R-A, Jolyn, J-O-L-Y-N, Hill in the

8    International Urogynecology Journal from 2015

9    where they excised portions of mesh for both

10   voiding dysfunction as well as pain and

11   interestingly found that mesh excised for voiding

12   dysfunction demonstrated elevated levels of

13   inflammation compared to mesh that was excised

14   for pain and/or exposure.

15        Q.       And what else did they conclude or

16   how else did they summarize that?

17        A.       Well, basically in their summary

18   they stated that vaginally placed midurethral

19   slings that are excised for voiding dysfunction

20   demonstrated elevated levels of inflammation

21   compared to mesh that was excised for pain or

22   exposure.

23        Q.       So does this study in addition to

24   your clinical experience and review of other

25   medical literature support your opinion that a

Peter L. Rosenblatt, M.D.

1    chronic inflammatory response is not indicative

2    or causally related to chronic pain?

3         A.      That is correct.

4         Q.      And, in fact, if you look at

5    another study by two of plaintiffs' experts,

6    Dr. Klosterhalfen and Dr. Uwe Klinge from 2002,

7    what did they conclude in this paper about

8    describing the long-term biocompatibility of

9    surgical mesh?

10        A.      They concluded that long-term

11   incorporation of polypropylene mesh in humans has

12   a more favorable tissue response with increasing

13   implantation interval.

14        Q.      And similar to the Hill article,

15   what did Klosterhalfen and Klinge note about any

16   correlation between an inflammatory response and

17   chronic pain?

18              MR. CRAWFORD:  Objection to form.

19        A.      So they concluded that, and they

20   mentioned it was striking that there was very

21   little difference in inflammatory response in

22   mesh removed for recurrence or for chronic pain.

23        Q.      And, Doctor, counsel asked you a

24   number of questions about what specific internal

25   documents can you recall reviewing off the top of

Peter L. Rosenblatt, M.D.

```
 1    your head.  Do you recall that?
 2         A.      Yes.
 3         Q.      Would it be fair to say that you
 4    showed up here with five banker's boxes worth of
 5    documents in addition to a flash drive that we'll
 6    provide to counsel?
 7         A.      Yes.
 8         Q.      And those would be materials that
 9    you reviewed in some shape or form?
10         A.      Yes.
11         Q.      And while you may not have been
12    able to read every single word of every document,
13    were you at least able to skim through to
14    determine whether or not there was something that
15    caught your eye --
16         A.      Yes.
17         Q.      -- that you wanted to read more
18    closely?
19         A.      That's correct.
20         Q.      And, again, just -- I think I asked
21    you about this, but I want to make sure.  When
22    you asked us to provide with the good and the
23    bad, we did in fact provide you with the
24    documents and literature referenced in the body
25    of plaintiffs' expert reports, correct?
```

Peter L. Rosenblatt, M.D.

```
 1                 MR. CRAWFORD:  Objection to form.
 2         A.      That is correct.
 3         Q.      Doctor, are all the opinions that
 4   you've offered in your expert report and today in
 5   your general TVT, Prolene®, Gynemesh® PS and
 6   Prolift deposition held to a reasonable degree of
 7   medical certainty?
 8         A.      Yes, they are.
 9                 MR. ROSENBLATT:  I have no further
10   questions at this time.
11
12                 FURTHER EXAMINATION
13   BY MR. CRAWFORD:
14         Q.      Doctor, you just testified
15   regarding several studies, correct?
16         A.      Yes.
17         Q.      And when you were testifying about
18   those studies, you were reading from those
19   studies, weren't you?
20         A.      Yes, I was.
21         Q.      Okay, I need to see them.
22                 Doctor, I've been handed a stack of
23   studies that you were reading from in your
24   testimony to questions asked by defense counsel
25   just now; is that right?
```

Peter L. Rosenblatt, M.D.

```
 1          A.      Yes.

 2      (Whereupon, Deposition Exhibit 7,

 3       "Influence of implantation Interval on the

 4       long-term biocompatibility of surgical mesh"

 5       by Klosterhalfen, et al,

 6       was marked for identification.)

 7  BY MR. CRAWFORD:

 8          Q.      In your examination by defense

 9  counsel, did you read from Exhibit No. 7?

10          A.      I did.

11          Q.      How would you describe that report?

12  What's the name of that report?

13          A.      "Influence of implantation interval

14  on the long-term biocompatibility of surgical

15  mesh."

16          Q.      For purposes of time and economy,

17  if you were talking to one of your colleagues,

18  would you say this is the Klosterhalfen report?

19          A.      Yes --

20          Q.      Okay.

21          A.      -- but you know, you want to make

22  sure because authors often write multiple papers,

23  so you want to make sure you're referencing the

24  right paper.

25          Q.      Okay.  This document has highlights
```

Peter L. Rosenblatt, M.D.

```
 1    on it, correct?

 2         A.      Correct.

 3         Q.      Are those the highlights you were

 4    reading from in your examination by defense

 5    counsel?

 6         A.      Yes.

 7         Q.      Did you put those highlights on

 8    there?

 9         A.      I did not.

10         Q.      Who did?

11         A.      The counsel did, but I've read

12    these articles myself.

13              MR. CRAWFORD:  Objection.

14    Non-responsive.  Move to strike after "counsel

15    did."

16      (Whereupon, Deposition Exhibit 8,

17       "Histopathology of excised midurethral sling

18       Mesh" by Hill, et al,

19       was marked for identification.)

20    BY MR. CRAWFORD:

21         Q.      I'm going to show you what was

22    marked as Exhibit No. 8.

23              Do you recognize that as one of the

24    studies you were reading from in your examination

25    by defense counsel?
```

Peter L. Rosenblatt, M.D.

```
 1        A.      Yes.

 2        Q.      How would you describe it to one of

 3   your colleagues, that article?

 4        A.      This is the Hill study about

 5   histopathology of excised midurethral sling mesh.

 6        Q.      Does that exhibit have highlights

 7   on it?

 8        A.      Yes, it does.

 9        Q.      Did you make those highlights?

10        A.      On this particular copy, no.

11        Q.      Did you read from those highlights

12   during your examination by defense counsel?

13        A.      Yes, I did.

14        Q.      Who put those highlights on that

15   document?

16        A.      Attorney Rosenblatt.

17        Q.      The lawyer for Ethicon?

18        A.      Yes.

19                MR. ROSENBLATT:  And, Counsel, I'll

20   just represent I only had one copy, so I showed

21   him my highlighted copy.

22    (Whereupon, Deposition Exhibit 9,

23     "Current Controversies Regarding Oncologic

24     Risk Associated with Polypropylene

25     Midurethral Slings" by King, et al,
```

Peter L. Rosenblatt, M.D.

```
 1          was marked for identification.)

 2  BY MR. CRAWFORD:

 3          Q.       Do you recognize the exhibit marked

 4  as -- strike that.

 5                   Do you recognize the document

 6  marked as Exhibit No. 9?

 7          A.       Yes.

 8          Q.       Is that a study you were referring

 9  to in your examination by defense counsel?

10          A.       Yes.

11          Q.       How would you describe that study

12  to one of your colleagues?

13          A.       This is a study by -- the first

14  author is King, and it's "Current Controversies

15  Regarding Oncologic Risk Associated with

16  Polypropylene Midurethral Slings."

17          Q.       Does that document have highlights

18  on it?

19          A.       Yes, it does.

20          Q.       Did you read from those highlights

21  during your examination by defense counsel?

22          A.       I did.

23          Q.       Who put those highlights on that

24  document?

25          A.       Attorney Rosenblatt.
```

Peter L. Rosenblatt, M.D.

```
 1        Q.      The attorney for Ethicon?

 2        A.      Yes.

 3     (Whereupon, Deposition Exhibit 10,

 4      "Polypropylene as a reinforcement in pelvic

 5      surgery is not inert: comparative analysis

 6      of 100 explants" by Clavé,

 7      was marked for identification.)

 8     BY MR. CRAWFORD:

 9        Q.      Do you recognize the document

10   marked as Exhibit No. 10?

11        A.      Yes.

12        Q.      How would you describe that

13   document to one of your colleagues?

14        A.      This is the Clavé article about

15   polypropylene as a reinforcement in pelvic

16   surgery is not inert.

17        Q.      Does that document have highlights

18   on it?

19        A.      It does.

20        Q.      Did you read from those highlights

21   during your examination by defense counsel?

22        A.      I did.

23        Q.      And who put those highlights on

24   that document?

25        A.      Attorney Rosenblatt.
```

Peter L. Rosenblatt, M.D.

1        Q.      Is that the attorney for Ethicon?

2        A.      Yes.

3      (Whereupon, Deposition Exhibit 11,

4       "Long-Term Results of Burch Colposuspension"

5       by Demirci, was marked

6       for identification.)

7    BY MR. CRAWFORD:

8        Q.      Do you recognize the document

9    marked as Exhibit No. 10?

10       A.      Yes.

11       Q.      How would you --

12              MR. ROSENBLATT:  Just, Counsel, I

13   think that says 11 there.

14              MR. CRAWFORD:  I'm sorry.  Thank

15   you.

16              Do you recognize the document

17   marked as Exhibit No. 11?

18       A.      Yes.

19       Q.      How would you describe that

20   document to one of your colleagues?

21       A.      The first author is Demirci,

22   D-E-M-I-R-C-I, and it's "Long-Term Results of

23   Burch Colposuspension."

24       Q.      Did you read from that document

25   during your examination by defense counsel?

Peter L. Rosenblatt, M.D.

1         A.      Yes.

2         Q.      Did you read the highlighted

3    portions?

4         A.      I did.

5         Q.      And who put those highlights there?

6         A.      Attorney Rosenblatt.

7         Q.      Is that the attorney representing

8    Ethicon?

9         A.      Yes.

10      (Whereupon, Deposition Exhibit 12,

11       "Biocompatibility of prosthetic meshes in

12       abdominal surgery" by Binnebösel,

13       was marked for identification.)

14   BY MR. CRAWFORD:

15        Q.      Do you recognize the document

16   marked as Exhibit No. 12?

17        A.      Yes.

18        Q.      How would you describe that

19   document to one of your colleagues?

20        A.      The first author is Binnebösel, and

21   it's entitled "Biocompatibility of prosthetic

22   meshes in abdominal surgery."

23        Q.      Is that document highlighted?

24        A.      Yes.

25        Q.      Did you read from those highlights

Peter L. Rosenblatt, M.D.

```
 1   during your examination by defense counsel?
 2        A.      I did.
 3        Q.      Who put those highlights on that
 4   document?
 5        A.      Attorney Rosenblatt.
 6        Q.      Is that the lawyer representing
 7   Ethicon?
 8        A.      It still is.
 9      (Whereupon, Deposition Exhibit 13,
10       "Does the tension-free vaginal tape stay
11        where you put it?" by Dietz,
12        was marked for identification.)
13   BY MR. CRAWFORD:
14        Q.      Do you recognize the document
15   marked as Exhibit No. 13?
16        A.      Yes.
17        Q.      How would you describe that
18   document to one of your colleagues?
19        A.      That's the article by Dr. Dietz on
20   "Does the tension-free vaginal tape stay where
21   you put it?"
22        Q.      Does that document have highlights
23   on it?
24        A.      It does.
25        Q.      Did you read from those highlights
```

Peter L. Rosenblatt, M.D.

```
 1   during your examination by defense counsel?

 2        A.      I did.

 3        Q.      Who put those highlights on that

 4   document?

 5        A.      Attorney Rosenblatt.

 6        Q.      Is that the attorney for Ethicon in

 7   this case?

 8        A.      Correct.

 9     (Whereupon, Deposition Exhibit 14,

10      "Ultrasound Assessment of Mid-Urethra Tape

11       at Three-Year Follow-Up after Tension-Free

12       Vaginal Tape Procedure" by Lo, et al,

13       was marked for identification.)

14   BY MR. CRAWFORD:

15        Q.      Do you recognize the document

16   that's been marked as Exhibit No. 14 to your

17   deposition?

18        A.      Yes.

19        Q.      How would you describe that

20   document to one of your colleagues?

21        A.      The first author is Lo, L-O, and

22   it's "Ultrasound Assessment of Mid-Urethra Tape

23   at Three-Year Follow-Up After TVT Procedure."

24        Q.      Does that document have highlights

25   on it?
```

Peter L. Rosenblatt, M.D.

```
 1         A.      It does.

 2         Q.      Did you read from those highlights

 3   during your examination by defense counsel?

 4         A.      I did.

 5         Q.      Who put those highlights on that

 6   document?

 7         A.      Attorney Rosenblatt.

 8         Q.      Is that one of the attorneys

 9   representing Ethicon in this case?

10         A.      Yes.

11    (Whereupon, Deposition Exhibit 15,

12     "Mesh contraction: myth or reality?"

13     by Dietz, et al,

14     was marked for identification.)

15   BY MR. CRAWFORD:

16         Q.      Do you recognize the document

17   marked as Exhibit No. 15 to your deposition?

18         A.      Yes.

19         Q.      How would you describe that

20   document to one of your colleagues?

21         A.      So that's another article by

22   Dr. Dietz, and it's "Mesh Contraction:  myth or

23   reality?"

24         Q.      And does that document have

25   highlights on it?
```

Peter L. Rosenblatt, M.D.

```
 1        A.      It does.

 2        Q.      Did you read from those highlights

 3   during your examination by defense counsel?

 4        A.      Yes, I did.

 5        Q.      Who put those highlights on that

 6   document?

 7        A.      Attorney Rosenblatt.

 8        Q.      Is that the lawyer for Ethicon in

 9   this case?

10        A.      It is.

11     (Whereupon, Deposition Exhibit 16,

12      "Basic science and clinical aspects of mesh

13       infection in pelvic floor reconstructive

14       surgery" by de Tayrac, et al,

15       was marked for identification.)

16   BY MR. CRAWFORD:

17        Q.      Do you see the document marked as

18   Exhibit No. 16 to your deposition?

19        A.      Yes.

20        Q.      How would you describe that

21   document to one of your colleagues.

22        A.      This is an article by de Tayrac,

23   D-E T-A-Y-R-A-C, and it's entitled "Basic signs

24   and clinical aspects of mesh infection in pelvic

25   floor reconstructive surgery."
```

Peter L. Rosenblatt, M.D.

```
1          Q.       Is that document highlighted?

2          A.       Yes.

3          Q.       Did you read from those highlights

4     during your examination by defense counsel?

5          A.       I did.

6          Q.       Who highlighted that document?

7          A.       Attorney Rosenblatt.

8          Q.       Is that the attorney representing

9     Ethicon in this case?

10         A.       Yes.

11      (Whereupon, Deposition Exhibit 17,

12       "The Myth: In Vivo Degradation of

13        Polypropylene Meshes" by Ong et al,

14        was marked for identification.)

15    BY MR. CRAWFORD:

16         Q.       Do you recognize the document

17    marked as Exhibit No. 17 to your deposition?

18         A.       I do.

19         Q.       How would you describe that

20    document to your colleagues?

21         A.       That is an article -- an abstract

22    by Ong, O-N-G, and it's entitled "The Myth:  In

23    Vivo Degradation of Polypropylene Meshes."

24         Q.       Is that document highlighted?

25         A.       It is.
```

Peter L. Rosenblatt, M.D.

1       Q.      Did you read from those highlights

2   during your examination by defense counsel?

3       A.      I did.

4       Q.      Who highlighted that document?

5       A.      Attorney Rosenblatt.

6       Q.      Is that the attorney representing

7   Ethicon in this case?

8       A.      Yes.

9      (Whereupon, Deposition Exhibit 18,

10       "Purely Transvaginal/Perineal Management of

11       Complications From Commercial Prolapse Kits

12       Using a New Prostheses/Grafts Complication

13       Classification System" by Firooz, et al,

14       was marked for identification.)

15   BY MR. CRAWFORD:

16       Q.      Do you recognize document number --

17   excuse me.

18               Do you recognize the document

19   marked as Exhibit No. 18 to your deposition?

20       A.      Yes.

21       Q.      How would you describe that

22   document to one of your colleagues?

23       A.      This is by first author Firoozi,

24   F-I-R-O-O-Z-I, and it's entitled "Purely

25   Transvaginal/Perineal Management of Complications

Peter L. Rosenblatt, M.D.

```
 1   From Commercial Prolapse Kits."
 2        Q.      Is that document highlighted?
 3        A.      It is.
 4        Q.      Did you read from those highlights
 5   during your examination by defense counsel?
 6        A.      I did.
 7        Q.      Who highlighted that document?
 8        A.      Attorney Rosenblatt.
 9        Q.      Is that the attorney for Ethicon in
10   this case?
11        A.      Yes.
12      (Whereupon, Deposition Exhibit 19,
13       Material Safety Data Sheet for
14       polypropylene, was marked
15       for identification.)
16   BY MR. CRAWFORD:
17        Q.      Do you recognize the document
18   marked as Exhibit No. 19?
19        A.      Yes.
20        Q.      What is that?
21        A.      This is the MSDS for polypropylene.
22      (Whereupon, Deposition Exhibit 20,
23       "Frequently Asked Questions by Providers
24       Mid-urethral Slings for Stress Urinary
25       Incontinence, was marked
```

Peter L. Rosenblatt, M.D.

```
 1          for identification.)

 2     BY MR. CRAWFORD:

 3          Q.      Okay.  Do you recognize the

 4     document marked as Exhibit No. 20 to your

 5     deposition?

 6          A.      Yes.

 7          Q.      Do you recognize that document?

 8          A.      Yes.

 9          Q.      All right.  How would you describe

10     that document to one of your colleagues?

11          A.      This is the Frequently Asked

12     Questions by Providers regarding midurethral

13     slings that is from AUGS and SUFU, A-U-G-S and

14     S-U-F-U.

15          Q.      Is that document highlighted?

16          A.      Yes.

17          Q.      Did you read from those highlights

18     during your deposition?

19          A.      Yes.

20          Q.      And who highlighted that document?

21          A.      Attorney Rosenblatt.

22          Q.      Is that one of the attorneys

23     representing Ethicon in this case?

24          A.      Yes.

25          Q.      Exhibit Nos. 7 through 20 all
```

Peter L. Rosenblatt, M.D.

1    documents that were highlighted by defense

2    counsel handed to you which you read from in your

3    deposition, are these all materials that were

4    provided to you by Butler Snow, the law firm

5    representing Ethicon in this case, when you were

6    first hired --

7                    MR. ROSENBLATT:  Object to form.

8         Q.       -- as an expert witness?

9         A.       I can't tell you how many, but many

10   of those are articles that I had already pulled

11   myself.

12        Q.       Are any of Exhibits No. 7 through

13   20 materials that were provided to you by defense

14   counsel Butler Snow when you were retained or in

15   conjunction with your retainment by them for

16   expert witness testimony in this case?

17                   MR. ROSENBLATT:  Objection, asked

18   and answered.

19        A.       I thought I answered that.

20        Q.       One more time.

21        A.       Some of them I've already seen, but

22   those were just handed to me, but I'm familiar

23   with all of those.

24        Q.       So you're telling me that you've

25   seen them before.  I'm asking you were they given

Peter L. Rosenblatt, M.D.

1    to you by Butler Snow in the materials that

2    Butler Snow provided to you shortly after you

3    were hired by them as an expert witness in this

4    case?

5            MR. ROSENBLATT:  Object to form.

6    Mischaracterizes the testimony, asked and

7    answered.

8        A.      What I'm trying to say is that, and

9    I can go through each one of them, but many of

10   them I was already familiar with before they were

11   provided to me by Butler Snow.

12       Q.      I understand, but were they all

13   provided to you by Butler Snow regardless of

14   whether you were familiar with them?

15           MR. ROSENBLATT:  Object to form.

16   You mean in addition to him having them himself?

17           MR. CRAWFORD:  Yes, sir.

18       A.      In addition to me having them

19   myself, they were also given to me by Butler

20   Snow.

21       Q.      The copies that were sent to you by

22   Butler Snow, were they highlighted?

23       A.      No.  No documents from Butler Snow

24   were highlighted before they got to me.

25       Q.      Are all of these documents marked

Peter L. Rosenblatt, M.D.

```
 1    Exhibits 7 through 20 included in your reliance

 2    list?

 3         A.      I would have to check, and the

 4    reason I say that is -- can I take a look for a

 5    minute?

 6         Q.      Sure.

 7         A.      The one in particular that I

 8    believe is not -- that I know is not in my

 9    reliance list, at least I don't think so, is the

10    abstract from the IUGA meeting which has taken

11    place yet.  So it was provided recently because

12    the abstracts were recently, you know, published

13    in the International Urogynecology Journal.

14         Q.      One of these articles that's

15    contained in Exhibits No. 7 through 20 was an

16    article I'd asked you for during my examination

17    of you, and you said that you'd check on one of

18    the breaks and you'd get it for me and bring it

19    to me, correct?

20         A.      Correct.

21         Q.      We came back from break and you

22    provided it, correct?

23         A.      Yes.

24         Q.      Did you find it yourself or did

25    defense counsel find it for you?
```

Peter L. Rosenblatt, M.D.

```
 1        A.       Defense counsel found it 'cause I
 2  couldn't find it in my own, but I know it's
 3  there.  It's in one of these banker's boxes.
 4        Q.       And then he highlighted it for you,
 5  right?
 6        A.       Yes, I think to save time.
 7               MR. ROSENBLATT:  Object to form.
 8  That was the only copy.  For efficiency sake, I
 9  printed one copy.
10        Q.       You testified that you reviewed and
11  considered materials that are cited in
12  Dr. Rosenzweig's report, correct?
13        A.       Yes.
14        Q.       Do you know which ones?
15               MR. ROSENBLATT:  Object to form.
16        A.       No, it's been quite a while.  I'd
17  have to go back and look at it.
18        Q.       If you look at it, can you tell us?
19        A.       Is this it?
20        Q.       That's a good question.  This one
21  is it.
22        A.       Okay.  Thank you.  Ask me what the
23  question was again.
24        Q.       Well, you've indicated that you've
25  reviewed materials that were attached to
```

Peter L. Rosenblatt, M.D.

```
1    Dr. Rosenzweig's report, and I want to know which
2    of those materials that are attached to
3    Dr. Rosenzweig's report have you reviewed?
4         A.      Not exclusively, but I'm just
5    telling you which ones I recognize that I've
6    reviewed.  Clavé, which we talked about, that
7    polypropylene as a reinforcement in pelvic
8    surgery is not inert.  I believe that the Coda,
9    C-O-D-A, article.  I believe that's in my
10   reliance report.  There are others as well.  I
11   would have to do the cross-reference to see if
12   they are in my reliance report, but I'm aware of
13   these articles.
14        Q.      Well, I know that -- is there a
15   difference between being aware of the articles
16   and reviewing the articles?
17        A.      No, I have.  I have reviewed.  I
18   can't say that I reviewed 100 percent of these,
19   but ones I thought were important I looked at.
20             I know I've seen articles by
21   K-L-I-N-G-E, Kling or Klingy.  I don't know which
22   one of these I've looked at, but I have seen
23   those articles.
24        Q.      I know it's late.  I know we've
25   been on for a long time.
```

Peter L. Rosenblatt, M.D.

1          A.       No, I'm okay.  Thank you.

2          Q.       And I promise I'm not picking on

3     you.  And I'll be completely candid with you, I

4     expect to hear something to the tune of

5     Dr. Rosenzweig not only reviewed all the

6     materials in his report but he also, in

7     criticizing Dr. Rosenzweig, has reviewed all of

8     the stuff Dr. Rosenzweig has reviewed.  And if

9     that's not true, I need to know, and that's why I

10    need to know what you've -- what is attached to

11    Dr. Rosenzweig's report that you've reviewed.

12         A.       So I think, in my mind, the

13    important thing is I've reviewed Dr. Rosenzweig's

14    report.  He references those other reports.  Have

15    I read every one of those other reports,

16    absolutely not, but I know what's contained.

17    What he's doing is summarizing what's in those

18    reports in his report.  And I would not expect

19    him to fabricate anything, so I take it at face

20    value his opinions are based on those reports.

21         Q.       That will do.  We'll move on.

22    Thank you.

23                  Ethicon approached you to teach

24    students or other doctors about Ethicon products,

25    correct?

Peter L. Rosenblatt, M.D.

1      A.      Correct.

2      Q.      You have also been approached by

3  other medical device manufacturers and asked to

4  teach about their products, correct?

5      A.      I have been, yes.

6      Q.      And there's other products that are

7  manufactured by other manufacturers that you

8  either didn't believe in or weren't compelled to

9  teach because either you don't use them or you

10  just aren't that crazy about the product; is that

11  fair to say?

12      A.      Well, if I'm not crazy about a

13  product, I won't use it.

14      Q.      And you won't teach it?

15      A.      And I won't teach it.

16      Q.      What manufacturers have approached

17  you about -- asking you to teach about their

18  products that you've declined?

19      A.      Caldera, for instance.

20      Q.      What device?

21      A.      Their slings.

22      Q.      Okay.

23      A.      Mentor approached me years ago

24  about ObTape which I was not pleased with.

25      Q.      And who was that?  I'm sorry.

Peter L. Rosenblatt, M.D.

1          A.          Mentor, M-E-N-T-O-R.  I've been

2    asked about teaching for AMS when they had

3    Elevate, and I declined.  Those are the ones that

4    come to mind.

5          Q.          Why did you decline Caldera's offer

6    to teach others how to use their slings?

7          A.          Only in that I wasn't using their

8    slings, and there was nothing particularly wrong

9    with their sling, but I wasn't using it.

10         Q.          Why did you decline Mentor's

11   request to teach others how to use their tape?

12         A.          I did not like the characteristics,

13   the physical characteristics, of their tape.

14         Q.          What about it did you not like?

15         A.          It was a multifilament microporous

16   tape that didn't have the characteristics of a

17   Type 1 polypropylene monofilament that we talked

18   about earlier.

19         Q.          Did the microporous nature of the

20   tape turn you off for lack of a better term?

21         A.          Yes.

22         Q.          Why?

23         A.          Because of the risk of infection

24   and lack of incorporation into the tissues.

25         Q.          Anything else about the Mentor tape

Peter L. Rosenblatt, M.D.

 1    that you didn't like?

 2         A.      There were already reports of

 3    exposures and erosions, and I didn't feel like it

 4    was something that I wanted to get involved in.

 5         Q.      Why did you decline AMS's request

 6    to teach others how to use their Elevate®

 7    product?

 8         A.      No other reason than that I was

 9    using a comparable product from Boston Scientific

10    at that point and was very pleased with the way

11    it worked on, and I just wasn't -- I had tried

12    the Elevate® product a couple times, and I

13    thought it was fine, but I just wasn't using it,

14    and I didn't think it was right to teach

15    something I wasn't using.

16         Q.      Regarding teaching other doctors

17    how to use Ethicon products, you testified that

18    while you were doing it for the love of

19    teaching -- strike it.

20              Regarding teaching other doctors

21    how to use Ethicon products, you've testified

22    that you were doing that for the love of

23    teaching, not for the money, true?

24         A.      I could make just as much from my

25    practice by staying, you know, at home and seeing

Peter L. Rosenblatt, M.D.

1    patients and doing surgery, that's correct.

2         Q.      You testified that you were doing

3    it for the love of the product, not the money.

4    Is that true?

5              MR. ROSENBLATT:  Object to form.

6    Asked and answered.

7         A.      Right.  I think I actually said for

8    the love of teaching and teaching products that I

9    was using.

10        Q.      Nevertheless, Ethicon paid you?

11        A.      They compensated me.

12        Q.      How much were you compensated by

13   Ethicon for teaching others how to use their

14   products?

15        A.      I don't remember, but it was in

16   line with what everyone else was getting.  As far

17   as I knew, it was fair market value for teaching.

18        Q.      What was everybody else getting?

19        A.      You know, I don't remember 'cause

20   it was over a span of many years, but there were

21   consulting agreements that spelled out what I was

22   making.

23        Q.      How many different consulting

24   agreements have you entered into with Ethicon

25   concerning teaching their products?

Peter L. Rosenblatt, M.D.

```
 1          A.       I don't know.

 2          Q.       More than five?

 3          A.       Well, I think it -- I think it had

 4   a term on it of maybe a year or maybe two years,

 5   and so when that was up, I was sent a new

 6   consulting agreement.

 7          Q.       And for how many years?

 8          A.       I'm going to guess it started

 9   around the year 2000, and I do not remember the

10   last year that I signed a consulting agreement,

11   but it's got to be at least five years ago.

12          Q.       Five years ago from today would be

13   2011, correct?

14          A.       Yeah, but that's a rough estimate.

15   I really don't know.

16          Q.       I totally understand we're dealing

17   with a rough estimate --

18          A.       Yeah.

19          Q.       -- but if you started around 2000

20   and ended in 2011, you were under consulting

21   agreements with Ethicon for approximately 11

22   years.

23          A.       I think that's about right.

24          Q.       And I'll rephrase the question.

25                   For approximately 11 years from
```

Peter L. Rosenblatt, M.D.

1   about year 2000 to around 2011 you were under

2   consulting agreements with Ethicon concerning

3   teaching others how to use their products?

4        A.     Correct.

5        Q.     But as you sit here today under

6   oath as an expert witness in this case involving

7   Ethicon, you cannot recall the compensation rate

8   for any of the consulting agreements you entered

9   into with Ethicon between the year 2000 and 2011?

10              MR. CRAWFORD:  Object to form.

11  Asked and answered.

12       A.     So I would be guessing which I

13  don't want to do but if -- and I'd be happy if --

14  if my counsel wants me to guess, I'd be happy to

15  guess.

16              MR. ROSENBLATT:  I'd prefer if you

17  did not guess.

18       Q.     I'd prefer for you to estimate,

19  kind of like you estimated that your last

20  consulting agreement with Ethicon was about five

21  years ago.  Estimate for me about how much were

22  the consulting agreements?

23              MR. CRAWFORD:  Object to form.

24  Asked and answered, asking the witness to

25  speculate.  If you can provide a reliable

Peter L. Rosenblatt, M.D.

1    estimate, you can do so.

2         A.      My best guess would be that a day

3    of consulting was probably $2,000 dollars to

4    $2,500.

5         Q.      Did that remain the same from 2000

6    to 2011?

7         A.      I don't remember.

8         Q.      How many days a month were you

9    consulting for Ethicon?

10              MR. ROSENBLATT:  Object to form.

11        A.      I really do not remember.

12        Q.      Do you have an estimate?

13        A.      It was -- I don't even think it was

14   number of days per month.  It was probably number

15   of days per year.  You know, maybe there were six

16   courses, maybe there were ten.

17        Q.      How many days would a course last?

18        A.      I think it varied, but it was never

19   more than two.  It was usually one.

20        Q.      One to two days each course?

21        A.      Correct.

22        Q.      Again, we're using estimates here.

23        A.      Yeah.

24        Q.      And to summarize, you were involved

25   in consulting agreements with Ethicon for

Peter L. Rosenblatt, M.D.

1    approximately 11 years from 2000 to 2011,

2    correct?

3         A.       Correct.

4         Q.       You're estimating you were

5    compensated approximately $2,000 per day for each

6    day of consulting, correct?

7         A.       I think I said between 2,000 and

8    2,500.

9         Q.       You would teach approximately six

10   to ten courses per year --

11                 MR. ROSENBLATT:  I object to form.

12        Q.       -- is that right?

13                 MR. ROSENBLATT:  Assumes facts not

14   in evidence.

15        A.       Yeah, I wish I could be more

16   precise.  It may have been less, and it may have

17   been more, and it varied per year.

18        Q.       That's why you're estimating a

19   range which is approximately six to ten courses

20   per year; is that right?

21        A.       Yeah, the best I can recall, yes.

22        Q.       Each course would last between one

23   to two days but no more than two days?

24        A.       Correct.

25        Q.       Did you keep any of those

Peter L. Rosenblatt, M.D.

1    consulting agreements?

2         A.      I believe -- I probably have kept

3    the last one.  I may have others.

4         Q.      If you were going to retain an

5    Ethicon consulting agreement, where would you

6    keep it?

7              MR. ROSENBLATT:  Object to form.

8    Counsel, I think those would have all been

9    produced in the general Ethicon production.

10        Q.      Would they be at your office?

11        A.      They'd either be in my office or in

12   my home.

13        Q.      How much do you charge per day to

14   testify for Ethicon?

15        A.      I think it's listed in my report.

16   So it's $9,000 a day and a day is considered any

17   more than three hours which includes traveling

18   time.

19        Q.      Your deposition was scheduled to

20   start today at 9 a.m., correct?

21        A.      Correct.

22        Q.      And we got started at about that

23   time, right?

24        A.      (Witness nods.)

25        Q.      Right?

Peter L. Rosenblatt, M.D.

1          A.        Correct.

2          Q.        And it's 3 o'clock now, correct?

3          A.        Correct.

4          Q.        So you're in excess of the three

5    hour minimum, right?

6          A.        Correct.

7          Q.        So we're in the $9,000 range today,

8    correct?

9          A.        Correct.

10         Q.        You expect to be compensated $9,000

11   for your testimony at this deposition today --

12         A.        Correct.

13         Q.        -- which is taking place at the

14   Courtyard by Marriott located at 777 Memorial

15   Drive in Cambridge, Massachusetts?

16         A.        Correct.

17         Q.        Did you also charge for review of

18   materials in preparation for this deposition?

19         A.        I haven't yet but yes.

20         Q.        How long did you spend reviewing

21   materials for this deposition that you'll charge

22   for?

23                    MR. ROSENBLATT:  I was just going

24   to say to the best of your recollection.

25         A.        Yeah, I don't have it in front of

Peter L. Rosenblatt, M.D.

```
1    me, but if I had to guess, my best estimate would

2    probably be in the, you know, 20-hour range.

3            Q.      How much do you charge for

4    reviewing documents in preparation for this

5    deposition?

6            A.      $800 an hour.

7            Q.      Did you charge for your meeting

8    with defense counsel prior to walking into the

9    deposition this morning?

10           A.      You mean this morning?

11           Q.      Yes, sir.

12           A.      No, that's part of the $9,000 per

13   day.

14           Q.      Did you come from out of town

15   today?

16           A.      I live about 20 minutes from here.

17           Q.      See, I couldn't remember.  So

18   that's a no.  You didn't stay at the Courtyard

19   last night, did you?

20           A.      It's a different town.  It's out of

21   town.

22           Q.      Is it far enough to get a per diem

23   payment?

24           A.      No.

25           Q.      So if you've got $9,000 for your
```

Peter L. Rosenblatt, M.D.

1  deposition time today plus $800 per year for 20

2  hours of depo prep time, that would be $16,000.

3            $800 per hour for 20 hours is

4  $16,000 charged for your records review in

5  preparation for this deposition.

6       A.     Correct.

7       Q.     Plus there's $9,000 for the actual

8  deposition time, correct?

9       A.     Correct.

10      Q.     So that's a $25,000 charge for the

11  work you've done in preparation for this

12  deposition today?

13      A.     Correct.

14      Q.     This deposition lasted

15  approximately six hours?

16      A.     If you do the math, I believe you.

17      Q.     Well, we're not quite done, but

18  let's say from -- if we started at 9 a.m. and we

19  end right now at approximately 3 p.m., that would

20  be approximately six hours, correct?

21      A.     Yes.

22      Q.     Your report that's been marked as

23  an exhibit to your deposition today, that's your

24  general causation report, correct?

25      A.     Yes.

Peter L. Rosenblatt, M.D.

1    Q.     When you submitted that report to

2    Butler Snow, it was in a different font than what

3    it's in right now; is that right?

4    A.     Yeah, when I say different font, I

5    think it might have been just -- again, I think

6    it was the line spacing.  That's why I just

7    wanted to make sure it was mine that you were

8    handing me.

9    Q.     Do you know who modified that

10   report between the time you submitted it to

11   Butler Snow and today?

12   A.     When you say "modified," it was

13   just a change in the format.  There's no changes

14   in the language or the words.  And do I know who

15   did that --

16   Q.     Yes, sir.

17   A.     -- no, I don't.

18          MR. ROSENBLATT:  Counsel, I'll

19   represent that I double spaced his report, and I

20   put the cover page on there with the case heading

21   because I don't think Dr. Rosenblatt really knew

22   how to format that first page.

23          MR. CRAWFORD:  Thank you, Paul.

24          One of the exhibits to your

25   deposition is a document related to AUGS; is that

Peter L. Rosenblatt, M.D.

```
 1    correct.

 2          A.       The one that we just read a little

 3    while ago?

 4          Q.       Yes, sir.

 5          A.       Yes.

 6          Q.       In fact, it's Exhibit No. 20 to

 7    your deposition, correct?

 8          A.       Yes.

 9          Q.       What is AUGS?

10          A.       AUGS is the American Urogynecologic

11    Society.

12          Q.       In 2013, AUGS released a position

13    statement on surgical options for pelvic floor

14    disorders; is that right?

15          A.       Yes.

16          Q.       Can you summarize what AUGS said in

17    2013 as it relates to surgical options for pelvic

18    floor disorders?

19          A.       I mean, there have been several

20    position statements that AUGS has released, and I

21    think the one you're referring to is -- well,

22    there are several.  There was one that had to do

23    with midurethral slings for stress incontinence,

24    and the other one that I recall is the one that

25    had to do with limiting, you know, limiting
```

Peter L. Rosenblatt, M.D.

1    options for pelvic floor reconstruction.

2         Q.      What is your understanding as far

3    as AUGS position on transvaginal mesh used for

4    midurethral slings?

5         A.      Right.  So what the position

6    statement was saying for that was that, you know,

7    slings have become the gold standard, that

8    they've been used in millions of women with great

9    success and that it was not the intention of the

10   FDA to limit the use of suburethral slings and

11   that it was a very important procedure for stress

12   incontinence.

13        Q.      Is it fair to say that AUGS

14   advocates the use of transvaginal mesh for --

15                MR. ROSENBLATT:  Object to form.

16        Q.      -- stress urinary incontinence

17   repairs?

18                MR. ROSENBLATT:  Object to form.

19        A.      Yeah, I'm not sure I'd use the word

20   advocates.  I don't mean to be splitting hairs,

21   but it is a very important device that the

22   overwhelming majority of AUGS members which

23   represent the primary surgeons in the country

24   from a, you know, urogynecologic standpoint who

25   take care of women who have stress incontinence,

Peter L. Rosenblatt, M.D.

1   and it's used by over I think it's 95 percent of

2   AUGS members, and that there should be no

3   limiting of that by any, you know, government

4   body.

5        Q.      What's required to gain membership

6   in that organization?

7        A.      Presently paying dues.

8        Q.      How much are the dues?

9        A.      I really don't remember.  It's a

10  couple hundred dollars a year.

11       Q.      Is there a board of directors for

12  AUGS?

13       A.      There is.

14       Q.      What does it take to get on the

15  board of directors?

16       A.      It just quoted you.  How does that

17  happen?

18       Q.      I don't know.

19               MR. ROSENBLATT:  We'll get Siri to

20  testify.

21       A.      I'm sorry, what were you saying?

22       Q.      How do you get on the board of

23  directors for AUGS?

24               MR. ROSENBLATT:  Object to form.

25       A.      It is usually an elected position.

Peter L. Rosenblatt, M.D.

1        Q.      Who elects you?  Who elects the

2   board members?

3        A.      I think names are brought up that

4   are nominated, and then the society itself will

5   vote on the board members.

6        Q.      You've been on the board of

7   directors for AUGS?

8        A.      Yes.

9        Q.      What years did you serve on the

10  AUGS board of directors?

11       A.      Do you have my CV?  I believe it

12  was -- 2012 to 2014, I believe.  In that time

13  frame.

14       Q.      So you were on the AUGS board of

15  directors when the 2013 position statement was

16  issued, correct?

17       A.      I was, but I was not part of that.

18  I completely support it, but I was not part of

19  drafting that.  I think it was drafted right

20  before I came on to the board.

21       Q.      Did you have any involvement in the

22  editorial process concerning that position

23  statement in 2013?

24       A.      No.

25       Q.      Did you vote on it, whether it

Peter L. Rosenblatt, M.D.

1    should be issued by AUGS?

2         A.       No, I think it was right before I

3    came on the board, I believe.  I did not vote on

4    that, but I would have voted for it.

5         Q.       Do you agree with the notion that

6    when trying to determine the credibility of a

7    statement one should consider the relationship

8    between the one making the statement and the one

9    benefitting from the statement?

10                 MR. ROSENBLATT:  Object to form.

11        A.       Can you say that again?

12        Q.       Yes.  Do you agree with the notion

13   when trying to determine the credibility of a

14   statement one should consider the relationship

15   between the one making the statement and the one

16   benefitting from the statement?

17                 MR. ROSENBLATT:  Object to form.

18        A.       Yeah, I think it's kind of a vague

19   statement, but if you gave me a more specific

20   example or maybe how it relates to what we're

21   talking about, I'd be happy to answer that.

22        Q.       Do you agree that whether or not

23   AUGS board members are receiving direct financial

24   benefits from mesh manufacturers is a factor to

25   consider when trying to determine the credibility

Peter L. Rosenblatt, M.D.

1    of an AUGS position statement?

2              MR. ROSENBLATT:  Object to form.

3    Lack of foundation.

4         A.    I'll just say that I know the

5    members of the board.  I know the members of the

6    board when this position statement came out, and

7    I completely believe in their integrity and their

8    motivation, and their motivation and their only

9    motivation is to protect their patients, and I do

10   not believe that there was any influence and

11   financial compensation when they came out with

12   the position statement.

13             MR. CRAWFORD:  I'll object as

14   non-responsive and move to strike.

15             My question is a little bit more

16   narrow and tailored.  I'll ask it again.

17             Do you agree that whether or not

18   AUGS board members are receiving direct financial

19   benefits from a mesh manufacturer is a factor to

20   consider in determining the credibility of an

21   AUGS position statement about the use of mesh?

22             MR. ROSENBLATT:  Object to form,

23   asked and answered.

24        A.    So I'm going to say it again,

25   that -- by the way, there are some board members,

Peter L. Rosenblatt, M.D.

1  including the president, the -- I assume it's

2  called the vice president or the president elect.

3  No.  Whoever the next in line is.  There are

4  several of the executive board who are not

5  permitted to have any potential conflicts of

6  interest.

7            There are others on the board,

8  myself included at the time, but not during the

9  position statement but while I was on the board,

10  that were permitted to have potential conflicts

11  of interest, but we had to declare those

12  potential conflicts of interest.  So as long as

13  you declare those potential conflicts of interest

14  and you have integrity as a person and a

15  physician, then I have no problem with what the

16  position statement would say.

17            MR. CRAWFORD:  I object as

18  non-responsive and move to strike.

19            Can you answer the question I just

20  asked you with a yes-or-no answer or is that

21  impossible?

22       A.    I think it's impossible.

23       Q.    Okay.  Have you ever been involved

24  in a program whereby you were paid by a synthetic

25  mesh manufacturer to mentor other doctors or

Peter L. Rosenblatt, M.D.

```
 1   promote synthetic mesh products?

 2              MR. ROSENBLATT:  I object to the

 3   characterization.

 4        A.     I've taught at professional

 5   education courses, you know, under the support of

 6   medical device manufacturers.

 7        Q.     Have you ever been part of Boston

 8   Scientific's Healthcare Professional or also

 9   known as HCP program?

10        A.     If that's what it's called.  I

11   guess maybe I am not familiar with that term, but

12   I have taught for Boston Scientific, yes.

13        Q.     As you sit here today, you don't

14   know whether or not you've ever been involved in

15   the Boston Scientific Corporation Healthcare

16   Professional Program?

17        A.     I don't think I've ever heard it

18   referred to as that, but if that's what I've been

19   a part of, then I think the answer is yes.  I

20   don't deny it.  I just don't know what it's

21   called.

22        Q.     In 2009, did you receive a

23   quarterly payment of $10,000 each quarter from a

24   synthetic mesh manufacturer for participation in

25   a program where you would mentor other doctors or
```

Peter L. Rosenblatt, M.D.

1    promote synthetic mesh products?

2              MR. ROSENBLATT:  Object to the

3    form, the characterization of promote.

4         A.     Right, but I'm also asking you are

5    you suggesting that I was paid $10,000 regardless

6    of what I taught?

7         Q.     No, I have no idea what you were

8    teaching.  I'm just exploring this issue.

9         A.     Understood.  So I don't recall that

10   particular year, but any time I've done any

11   teaching for any mesh manufacturer I've been paid

12   for my services.  I have never been paid like

13   a -- what's the word I'm looking for.  Like a

14   retainer.  I've never been paid as a retainer.

15   I've been paid for my services.

16        Q.     Have you ever received set

17   quarterly payments?

18        A.     No, never.

19        Q.     Is it true that during the years

20   2011 and 2012, that being the years leading up to

21   the release of the 2013 AUGS position statement,

22   you were paid approximately $100,000 by Boston

23   Scientific Corporation for participation in their

24   Healthcare Professionals Program?

25        A.     I don't have the exact figures, but

Peter L. Rosenblatt, M.D.

1    that is possible, but I think -- did you say

2    leading up to the position statement?

3         Q.       I said in 2011, 2012.  I'll ask it

4    again.

5         A.       Yeah, please.

6         Q.       Is it true that during the years

7    2011 and 2012 you were paid approximately

8    $100,000 by Boston Scientific Corporation for

9    participation in their Healthcare Professionals

10   Program?

11        A.       If that's what it's called.  I did

12   consulting work for Boston Scientific, and it's

13   quite possible that that was the amount of money

14   that I was paid.

15        Q.       You're just not sure if it was

16   called the Healthcare Professionals Program?

17                 MR. ROSENBLATT:  Object to form.

18        A.       Correct.

19        Q.       Of the 13 board members who were on

20   the AUGS board when the 2013 position statement

21   was released, how many of them had received

22   financial compensation from synthetic mesh

23   manufacturers during the two years preceding the

24   release of the statement?

25        A.       I have no idea.

Peter L. Rosenblatt, M.D.

```
 1        Q.        Being a former AUGS board member,
 2  is that information you would expect to be kept
 3  in the regular course of business activity within
 4  the AUGS organization?
 5        A.        So I guess I missed that point.
 6  Being an AUGS member, what was the question?
 7        Q.        Being a former AUGS board member,
 8  do you believe that the information I just asked
 9  you about is information that would be kept in
10  the regular course of business activity within
11  the AUGS organization?
12        A.        Yes.
13                  MR. ROSENBLATT:  Object to form.
14        A.        But let me just state that again
15  there is I believe it's called the executive
16  board that are not permitted to have any
17  potential conflicts of interest, but any
18  conflicts of interest, potential conflicts of
19  interest of the other board members is declared
20  and is publicly available.
21        Q.        How is it declared and where is it
22  made publicly available?
23        A.        I don't know.  All I know is that
24  at every board meeting we were required to list
25  any potential conflicts of interest, and if we
```

Peter L. Rosenblatt, M.D.

1    had a potential conflict of interest that would

2    affect any decisions, we were asked to abstain

3    from those decisions.

4         Q.      Doctor, I appreciate your patience

5    with me in coming out here to talk to us today.

6    At this point in time I don't have any further

7    questions for you.  I pass the witness.

8              MR. ROSENBLATT:  I'll be very, very

9    brief.

10

11                   FURTHER EXAMINATION

12   BY MR. ROSENBLATT:

13        Q.      Doctor, we were just talking about

14   AUGS position statement.  I want to hand you --

15   what are we on?

16             MR. CRAWFORD:  21, I think.

17     (Whereupon, Deposition Exhibit 21,

18      AUGS position statement,

19      was marked for identification.)

20   BY MR. ROSENBLATT:

21        Q.      I'm going to hand you what's been

22   marked as Exhibit 21.  If you could take a second

23   and flip through that.

24        A.      Mm-hmm.

25        Q.      Now, Doctor, do you see any

Peter L. Rosenblatt, M.D.

1    highlighting on this document?

2         A.       No, I do not.

3         Q.       Good.  I will represent to you this

4    is my only copy, but to spare counsel another set

5    of questioning, I will not highlight anything.

6              Was this position statement

7    initially published in January of 2014 and then

8    updated in June of 2016?

9              MR. CRAWFORD:  Objection to form.

10        A.       It was.

11        Q.       And was this position statement

12   limited to the support of AUGS?

13        A.       No.

14        Q.       And if you could just describe the

15   organizations that joined in showing their

16   support for the AUGS/SUFU position statement?

17        A.       Right.  And just so I know is this

18   the one from 2000 -- this is the one from 2016?

19        Q.       Correct.

20        A.       Yeah.  So there were other

21   organizations that supported this, including the

22   AAGL, the American Association of Gynecologic

23   Laparoscopists, the American College of

24   Obstetrics and Gynecologists, the National

25   Association for Continence, and the Society of

Peter L. Rosenblatt, M.D.

1    Gynecologic Surgeons, as well as the Women's

2    Health Foundation.

3         Q.        So, Doctor, it would be fair to say

4    that the support for the AUGS/SUFU position

5    statement on midurethral slings is not limited to

6    professional societies but also patient support

7    groups such as the NAFC and the WHF?

8                  MR. CRAWFORD:  Objection to form.

9         A.        That is correct.

10        Q.        And, Doctor, is this position

11   statement something that you would have received

12   on your own?  Strike that.

13                 Doctor, is this position statement

14   something that you were made aware of directly

15   through AUGS?

16        A.        Yes.

17        Q.        Is this also something that was

18   provided to you by Butler Snow?

19        A.        Yes.

20        Q.        And so although it was provided to

21   you from Butler Snow, that was not in fact the

22   first time you had seen that document?

23        A.        That is correct.

24        Q.        And the same would be true for a

25   significant amount of medical literature that

Peter L. Rosenblatt, M.D.

```
1    we've discussed?
2          A.      That is correct.
3          Q.      And counsel asked you about some of
4    the studies that we looked at earlier where we
5    quickly went through and there was some
6    highlighting on those studies.  Do you remember
7    those?
8          A.      Yes.
9          Q.      Had you reviewed those studies
10   prior to today's deposition?
11         A.      Yes.
12         Q.      And when counsel suggested that you
13   were just reading the highlights, would it be
14   fair to say that -- well, strike that.
15                 Would it be fair to say that
16   counsel asked you to provide some of the
17   documents and literature that you had discussed
18   with him earlier today?
19         A.      Can you ask that again?
20         Q.      Would it be fair to say that you
21   provided literature in response to some of the
22   questions that counsel asked today?
23         A.      Yes.
24         Q.      And you in fact asked me to print
25   out some of those studies so that we could move
```

Peter L. Rosenblatt, M.D.

1    things along today since counsel asked you to

2    find those during a break; is that correct?

3              MR. CRAWFORD:  Objection to form.

4        A.      That is correct.  I mean, we have,

5    you know, one, two, three, four, I believe it's

6    five, yeah, banker's boxes of documents, and just

7    to expedite things, I asked you to print these

8    out.  But these are articles that are in here

9    that I've highlighted either here or on my

10   computer.

11       Q.      And counsel asked you questions

12   about your experience teaching for various

13   manufacturers.  Do you recall those questions?

14       A.      Yes.

15       Q.      And in his questions, he used the

16   word promote their products.  What is your

17   interpretation of whether or not you were or

18   strike that.

19              What is your understanding of

20   whether or not you were promoting products for

21   these manufacturers?

22              MR. CRAWFORD:  Objection, form.

23       A.      Yeah, so that's never been my goal,

24   is to promote a product for a company.  My goal

25   is to share my experience with others.  And you

Peter L. Rosenblatt, M.D.

1   know, just to give you an example, when TVT came

2   out, you know, and I was first very skeptical of

3   it, and then when I started using it, I realized

4   what an incredible advantage it was compared to

5   what I had been using previously.  The same was

6   true with TVT-O when that came out.  But, you

7   know, just to give another example with the same

8   company, I think it was 2006 is when Ethicon

9   introduced TVT Secur which is a single incision

10  sling, and I wasn't so sure about it.  The data

11  was not as compelling as it had been for the

12  other slings, and my center did a randomized

13  prospective trial comparing TVT-O, which is

14  something that we had been using for several

15  years and very happy with, with TVT Secur.  This

16  was a study that was funded by Ethicon, and we

17  decided even before we started the study that we

18  would do an interim analysis, and based on the

19  interim analysis, we felt compelled to stop the

20  study because the results were so significantly

21  different between TVT-O and TVT Secur where we

22  were not satisfied with the results, and we

23  published those results.

24          MR. CRAWFORD:  Objection.

25  Non-responsive.

Peter L. Rosenblatt, M.D.

1    Q.      Did Ethicon try to prohibit you

2    from publishing the results of that study in any

3    way?

4    A.      No, never.

5    Q.      Did Ethicon try to retract the

6    funding from that statement because of the data

7    that you presented?

8    A.      No, that was never ever even a

9    question, and it was based on I believe our study

10   and several other studies that were similar

11   studies that Ethicon decided not to -- decided

12   not to sell that product anymore.

13   Q.      And would that be an example of how

14   a product with less mesh such as TVT Secur is not

15   necessarily a better product than something that

16   uses -- than a product that has more mesh such as

17   TVT-O just based on the amount of mesh that's

18   used?

19           MR. CRAWFORD:  Objection to form.

20   A.      That is correct.

21   Q.      And you were asked some questions

22   about consulting agreements with Ethicon.  Do you

23   recall those questions?

24   A.      Yes.

25   Q.      The consulting agreements to my

Peter L. Rosenblatt, M.D.

1    understanding would list a maximum amount; is

2    that consistent with your understanding?

3                   MR. CRAWFORD:  Objection to form.

4         A.        Yeah, I do remember that.

5         Q.        So would it be fair to say that the

6    amount listed on the consulting agreement is not

7    necessarily an accurate portrayal of what you

8    were actually paid for any given year?

9         A.        That is correct.

10        Q.        You were asked some questions about

11   how much you're being paid here today and how

12   much you've been paid over the time you were

13   teaching Ethicon professional education.

14                  Do you think that payments you've

15   received from industry for teaching on the safe

16   and efficacious use of products has in any way

17   inhibited your ability to provide a fair and

18   balanced review of the medical literature

19   regarding the products at issue?

20                  MR. CRAWFORD:  Objection to form.

21        A.        So, you know, since I started in

22   practice 21 years ago, I've always been

23   committed.  My primary interest is helping women

24   and teaching surgeons.  I mean, that's what I've

25   been dedicated to being at Harvard, having

Peter L. Rosenblatt, M.D.

1    medical students, residents and fellows.  We

2    started the fellowship in 1999.  This is what I'm

3    dedicated to in my career.  I would only teach

4    products that I felt that were worthy of being

5    taught and that were excellent products, but my

6    teaching is based on the medical literature, it's

7    based on evidence-based medicine, and I'm very

8    comfortable with that.

9         Q.      And so the fact that Dr. Rosenzweig

10   has testified that he has been paid by

11   plaintiffs' counsel more than a million dollars

12   in the pelvic mesh litigation, that alone would

13   not in itself in your opinion automatically

14   discount his opinions solely based on the

15   millions of dollars he's been paid by plaintiffs'

16   counsel --

17              MR. CRAWFORD:  Objection to form.

18        Q.      -- is that fair?

19        A.      I think it's a fair statement.

20        Q.      All right.  Would you agree or

21   disagree that there is a difference between

22   actual bias and a potential for a conflict of

23   interest?

24        A.      Yes.

25        Q.      You would agree?

Peter L. Rosenblatt, M.D.

```
 1          A.       I would agree.

 2          Q.       I appreciate your time, Doctor.  No

 3    further questions.

 4                   MR. CRAWFORD:  I have nothing

 5    further.  Thank you very much.

 6                   (Deposition concluded at 3:37 p.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Peter L. Rosenblatt, M.D.

1              C E R T I F I C A T E

2              I, Maryellen Coughlin, RPR/CRR and

3    notary public in the Commonwealth of

4    Massachusetts, do hereby certify that the

5    foregoing is a true and accurate transcript of

6    my stenographic notes of the deposition of

7    PETER L. ROSENBLATT, M.D., who appeared before

8    me, satisfactorily identified himself, and was

9    by me duly sworn, taken at the place and on the

10   date hereinbefore set forth.

11             I further certify that I am neither

12   attorney nor counsel for, nor related to or

13   employed by any of the parties to the action in

14   which this deposition was taken, and further

15   that I am not a relative or employee of any

16   attorney or counsel employed in this case, nor

17   am I financially interested in this action.

18             THE FOREGOING CERTIFICATION OF THIS

19   TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF

20   THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT

21   CONTROL AND/OR DIRECTION OF THE CERTIFYING

22   REPORTER.

23

24             MARYELLEN COUGHLIN, RPR/CRR

25

Peter L. Rosenblatt, M.D.

```
 1                 INSTRUCTIONS TO WITNESS

 2

 3

 4              Please read your deposition over

 5    carefully and make any necessary corrections.

 6    You should state the reason in the appropriate

 7    space on the errata sheet for any corrections

 8    that are made.

 9              After doing so, please sign the

10    errata sheet and date it.  It will be attached to

11    your deposition.

12              It is imperative that you return

13    the original errata sheet to the deposing

14    attorney with thirty (30) days of receipt of the

15    deposition transcript by you.  If you fail to do

16    so, the deposition transcript may be deemed to be

17    accurate and may be used in court.

18

19

20

21

22

23

24

25
```

Peter L. Rosenblatt, M.D.

```
 1                 -   -   -   -   -   -

                 E R R A T A

 2                 -   -   -   -   -   -

 3

 4    PAGE   LINE   CHANGE

 5    _____  _____   _____

 6        REASON:   _____

 7    _____  _____   _____

 8        REASON:   _____

 9    _____  _____   _____

10        REASON:   _____

11    _____  _____   _____

12        REASON:   _____

13    _____  _____   _____

14        REASON:   _____

15    _____  _____   _____

16        REASON:   _____

17    _____  _____   _____

18        REASON:   _____

19    _____  _____   _____

20        REASON:   _____

21    _____  _____   _____

22        REASON:   _____

23    _____  _____   _____

24        REASON:   _____

25
```

Peter L. Rosenblatt, M.D.

1

2          ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____, do

5   hereby certify that I have read the

6   foregoing pages, and that the same is

7   a correct transcription of the answers

8   given by me to the questions therein

9   propounded, except for the corrections or

10  changes in form or substance, if any,

11  noted in the attached Errata Sheet.

12

13

14   _____

15    PETER L. ROSENBLATT, M.D.        DATE

16

17

18  Subscribed and sworn

    to before me this

19  _____ day of _____, 20_____.

20  My commission expires:_____

21

     _____

22  Notary Public

23

24

25

Peter L. Rosenblatt, M.D.

```
 1                    LAWYER'S NOTES

 2     PAGE   LINE

 3     _____  _____   _____

 4     _____  _____   _____

 5     _____  _____   _____

 6     _____  _____   _____

 7     _____  _____   _____

 8     _____  _____   _____

 9     _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____

25     _____  _____   _____
```