# EXHIBIT C

Nathan W. Goodyear, MD

0   01


2               UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF WEST VIRGINIA
3                     AT CHARLESTON
4    RE: ETHICON, INC, PELVIC,      )  Master File No.
     REPAIR SYSTEM PRODUCTS         )  2:12-MD-02327
5    REPAIR SYSTEM PRODUCTS         )  JOSEPH R. GOODWIN
     LIABILITY LITIGATION           )  U.S. DISTRICT JUDGE
6    _____)
     THIS DOCUMENT RELATES TO THE
7    FOLLOWING CASES IN THE WAVE 1
     OF MDL 200:
8    TINA and KENNETH MORROW,       )  Case No.
                                    )  2:12-cv-00378
9            Plaintiffs,            )
     vs.                           )
10   ETHICON, INC., ET AL.,         )
             Defendants.            )
11   _____/
12
13    VIDEOTAPED DEPOSITION OF NATHAN W. GOODYEAR, M.D.
14
15
16                  March 4, 2016
17             8:15 a.m. to 12:37 p.m.
18
19                  TRACY IMAGING
20             KNOXVILLE, TENNESSEE
21
22
23          Michele Faconti, RPR, LCR (667)
24

```
 1                APPEARANCES OF COUNSEL
 2
      On behalf of the Plaintiffs:
 3            JOSEPH A. KOTT, ESQUIRE
              MIKALIA M. KOTT, ESQUIRE
 4            Herman, Herman & Katz
              820 O'Keefe Avenue
 5            New Orleans, LA 70113
              504-581-4892
 6            jkott@hhklawfirm.com
              mkott@hhklawfirm.com
 7
 8    On behalf of Defendants:
              KIM E. MOORE, ESQUIRE
 9            CAMALA E. CAPODICE, ESQUIRE
              Irwin, Fritchie, Urquhart & Moore, LLC
10            400 Poydras Street, Ste. 2700
              New Orleans, LA 70130
11            504-310-2108
              kmoore@irwinllc.com
12            ccapodice@irwinllc.com
13
14
15
16    Also Present:  Ernie Tracy, Videographer
17
18
19
20
21
22
23
24
```

Nathan W. Goodyear, MD

```
 1                  INDEX OF EXAMINATION
 2                                              Page
 3    WITNESS:  NATHAN W. GOODYEAR, M.D.
 4    Examination by Ms. Moore                      7
      Examination by Mr. Kott                     156
 5    Examination by Ms. Moore                    184
 6
 7                  INDEX TO EXHIBITS
 8                                              Page
 9    Exhibit No. 52,
           Amended Notice of Video Deposition
10         (Marked but not mentioned.)
      Exhibit No. 53,
11         Rule 26 Expert Report (Morrow)          63
12    Exhibit No. 54,
           Reliance List                           64
13
      Exhibit No. 55,
14         Transvaginal Repair of Genital Prolapse 23
15    Exhibit No. 56,
           Bates No. DFS-CHARLENELOGANTAYLOR-0001-36  62
16
      Exhibit No. 57,
17         Nathan Goodyear, MD Bates No. 000001-79  65
18    Exhibit No. 58,
           Bates No. TAYLOR_PSR_00104-105         73
19
      Exhibit No. 59,
20         Bates No. MORROWT_NGOODY_MDR00043-50    77
21    Exhibit No. 60,
           Bates No. MORROWT_PSR_00083-87          86
22
      Exhibit No. 61,
23         Consent for Medical Procedures          87
      Exhibit No. 62,
24         October 28th, 2015 Tina Morrow deposition  98
```

Nathan W. Goodyear, MD

```
 1                    INDEX OF EXHIBITS

 2                                              Page

 3      Exhibit No. 63,

            Bates No. MORROWT_NLOMC-MDR00014-15     107

 4

        Exhibit No. 64,

 5          Amended Cross Notice of Video Deposition  160

 6      Exhibit No. 65,

            Prolift Patient Brochures-In Globo       160

 7

        Exhibit No. 66,

 8          Bates No. ETH.MESH.06003247-3262         162

 9      Exhibit No. 67,

            Bates No. Dr. Ensminger 000104,

10          105 and 95                              163

11      Exhibit No. 68,

12          Bates No. Landon Smith, MD 00002-4       163

13      Exhibit No. 69,

            Bates No. Robert L. Harris, MD 000005-23  165

14

        Exhibit No. 70,

15          Bates No. Dr. Winters 000011-13          167

16

17

18

19

20

21

22

23

24
```

Nathan W. Goodyear, MD

```
 1                   STIPULATION

 2          The deposition of Nathan W. Goodyear, M.D.,

 3     called as a witness by the Defendants, pursuant to

 4     all applicable rules of the 4th day of March, 2016,

 5     at the offices of Tracy Imaging, Knoxville,

 6     Tennessee, before Michele Faconti, RPR, Licensed

 7     Court Reporter and Notary Public in and for the

 8     State of Tennessee.

 9          It being agreed that Michele Faconti, a

10     Tennessee Licensed Court Reporter, may report the

11     deposition in machine shorthand, afterwards reducing

12     the same to typewritten form.  All objections,

13     except as to the form of the question, are reserved

14     to on or before the hearing.

15          It being further agreed that all formalities as

16     to notice, caption, certificate, transmission,

17     etcetera, are expressly waived, EXCLUDING the

18     reading of the completed deposition by the witness,

19     and the signature of the witness.

20

21

22

23

24
```

Nathan W. Goodyear, MD

```
 1      (08:15 A.M.)

 2              VIDEOGRAPHER:  Okay.  We are on the

 3      record.  Today's date is March the 4th, 2016.

 4      The time on the camera is 8:15 a.m.  My name is

 5      Ernie Tracy.  I am a videographer for Golkow

 6      Technologies.

 7              This deposition is being held in

 8      Knoxville, Tennessee in the case of Tina Morrow

 9      versus Ethicon, Incorporated.  And the deponent

10      today is Dr. Nathan Goodyear, M.D.  And the

11      attorneys will now identify themselves for the

12      record.

13              MS. MOORE:  Kim Moore on behalf of the

14      defendants.

15              MS. CAPODICE:  Cami Capodice on behalf of

16      defendants.

17              MS. KOTT:  Mikalia Kott on behalf of Tina

18      Morrow and her husband Kenneth Morrow; Charlene

19      Taylor, Teri and Johnny Shively, and Dina

20      Bennett, the plaintiffs.

21              MR. KOTT:  My name is Joe Kott.  I'm here

22      on behalf of the plaintiffs, including the MDL

23      consortium, in addition to those identified by

24      my colleague.
```

Nathan W. Goodyear, MD

```
 1              Good morning, everyone.

 2    WHEREUPON,

 3                  Nathan W. Goodyear, M.D.,

 4    having been first duly sworn, as hereinafter

 5    certified, testified as follows:

 6              DR. GOODYEAR:  I do.

 7                      EXAMINATION

 8    BY MS. MOORE:

 9         Q.   Good morning, Dr. Goodyear.

10         A.   Good morning.

11         Q.   Got a chance to get a little bit of rest

12    last night?

13         A.   Of course.

14         Q.   Going to continue today asking you

15    questions about the care, treatment of your

16    patients.  I believe next up we have Mrs. Tina

17    Morrow.  So we'll be focusing on her.  But as you

18    are aware, these cases have been cross noticed, so

19    your testimony in one can apply to testimony in

20    another or all.

21         A.   Uh-huh.

22         Q.   And have you had a chance to do any

23    homework, research last night after you got home on

24    any of the issues in the case?
```

1        A.   Sure.  As I would anytime, I go back and

2    research some things.

3        Q.   All right.  What did you research last

4    night?

5        A.   Researched basically -- there was great

6    debate about erosion rate quoted.  And so I came

7    across, again, just an example of some of the

8    literature available at that time that helped to

9    form my opinion of the 3 to 5 percent erosion rate.

10   Was a proven study out of 2007 looking at -- it was

11   a multicenters trial of Prolift implantation and

12   they found their erosion rate to be 4.7 percent.

13       Q.   4.7 percent.  And do you have --

14       A.   I printed it out.

15       Q.   And so this is research you did?

16       A.   Not research that I did.  It was research

17   that was published that I -- was used as a part of

18   my --

19       Q.   Listen to my question.  This was research

20   you did last night after I asked you a question to

21   try to find some research to help you respond?

22       A.   It was a study and range that was similar

23   to what was available at the time that I made that.

24       Q.   Listen to my question, please.  You left

Nathan W. Goodyear, MD

1      here last night after I asked you questions based on

2      your report and the information contained in your

3      report.  And you did some research last night to

4      find some additional support?

5          A.   Yeah, but this was similar to what was

6      available to me at the time.

7          Q.   And I understand that.  That's your

8      opinion.  But I'm just saying, you did not do that

9      research until last night?

10         A.   It's not my opinion, that was available at

11     the time.

12         Q.   Well, you did not do the research and find

13     the article?

14              MR. KOTT:  He means scientific research,

15         not literary.

16              MS. MOORE:  Counsel, object to form.

17              MR. KOTT:  I understand, I'm trying to

18         move things along.

19              MS. MOORE:  And I appreciate that you and

20         I are trying to make flights today, but --

21              THE WITNESS:  If your research is

22         identified as a Google search --

23     BY MS. MOORE:

24         Q.   Yes.

Nathan W. Goodyear, MD

1        A.    -- I'm talking about scientific research.

2        Q.    What did you do last night -- did you have

3   this opinion yesterday, did you have this paper

4   yesterday?

5        A.    The 3.5 percent is consistent with what

6   was published in that.

7        Q.    That was not my question.  I'm not asking

8   what is consistent.

9        A.    Okay.

10       Q.    I'm asking, did you go home last night and

11   do some research to find additional support for your

12   opinion?

13       A.    I did a Google search.

14       Q.    Okay.  You did a Google search.  And you

15   found that the Prolift 2007 article referencing

16   erosion rates was around 4.7?

17       A.    No, not around.  It was 4.7 in a

18   multitrial -- multicenter trial study.

19       Q.    And it was in the 2007 time period?

20       A.    It was published in 2007.

21       Q.    All right.  Where was it published?

22       A.    International -- I printed it out.  It's

23   International Urology Journal, I believe.

24       Q.    We'll find it and attach it.

Nathan W. Goodyear, MD

```
 1          A.   It's been printed out.

 2          Q.   And what other research did you find?

 3          A.   I just did a quick Google search.  That

 4     was all.  Actually, there was another

 5     review article.  I'm sorry, it was a review article

 6     of the history of mesh that basically went through

 7     the different aspects of mesh.

 8          Q.   And do you remember the authors of any of

 9     these two articles?

10          A.   No, but I can print that out.

11          Q.   On a break I'd ask that you do that.  And

12     history of mesh, it was also in the 2007 time

13     period?

14          A.   I'd have to go back.  I can't remember the

15     time on that one.

16          Q.   Do you remember the author on the first

17     one?

18          A.   Yes.  Give me just a moment.  Does that

19     every time.  Asks me to sign in every time.

20          Q.   Do you need to take a break, sir?

21          A.   No, give me just a moment.

22          MS. MOORE:  Why don't we go off the

23     record.

24          VIDEOGRAPHER:  We are going off the
```

Nathan W. Goodyear, MD

```
 1           record.  The time is 8:20.

 2                (Off the record.)

 3                VIDEOGRAPHER:  Okay.  We are back on the

 4           record.  The time is 8:20.

 5                THE WITNESS:  I'm not sure how to

 6           pronounce it, but it's F-a-t-t-o-n.  Fatton.

 7           First initial is B.  Fatton B., et al., the

 8           International Urogynecological Journal of

 9           Pelvic Floor Dysfunction, published in 2007.

10      BY MS. MOORE:

11           Q.  Okay.  And you are -- this is the article

12      you found last night?

13           A.  On a Google search.

14           Q.  And you did not reference this, it's not

15      on your reliance list?

16           A.  I did not cross reference it with the

17      reliance list.  I was just looking to see is

18      something just on a Google search.  They are there

19      available to anybody to support what I reference as

20      was readily available in the literature at the time.

21      And it was right there on the first page.

22           Q.  You were looking for support for your

23      reference of 3 to 5 percent?

24           A.  No.
```

Nathan W. Goodyear, MD

```
 1        Q.   What were you looking for?  Help me there.

 2        A.   What I was doing was to see anybody that

 3   wasn't attuned to looking in the scientific

 4   literature through PubMed, etcetera.

 5        Q.   What --

 6             MR. KOTT:  Object.  Please let him finish

 7        his answers.

 8        A.   Somebody that is just in the medical field

 9   knows where to go into the scientific literature to

10   look in the science.  I'm saying a nonscientific

11   person.  If I'm just nonscientific and I want to go,

12   wow, let me just Google and see if anything pops up.

13   And so I took it from a nonscientific medical

14   perspective to say, is there anybody that just says,

15   you know what, I'm just curious and it popped up.

16   First page, so, there you go.

17        Q.   And why didn't you include that in your

18   report beforehand?

19        A.   Like I said, I have not cross-referenced

20   that with the reliance.  It was late.

21        Q.   And so you're saying you don't know if

22   it's on your reliance list or not?

23        A.   That is correct.

24        Q.   As we sit here today, when you were asked
```

Nathan W. Goodyear, MD

```
 1     about that number, you were unable to identify that

 2     yesterday on the reliance list?

 3          A.   Correct.  I did not identify that

 4     particular study.  But, as I said, that is very

 5     similar to the reference range that was available at

 6     the time.  That's why that percentage was listed

 7     there.

 8          Q.   Okay.  So I'm a little confused now.

 9     You're saying that your range was supported by what

10     was in the literature?

11          A.   I told you based on -- the Prolift was

12     marketed as a revolutionary procedure.  There was

13     limited data available to go to as this procedure

14     came to market.  There was data.  The data supported

15     that range, but the majority of the recommendations

16     about the erosion rates and complication rates came

17     from the manufacturer of that procedure.  Because

18     they brought it to market.  They were behind the

19     studies that brought it to market.  And so they

20     would have been our greatest resource to turn to.

21          Q.   Have you gone through the literature and

22     looked at all the papers on erosion rates during

23     that time period?

24          A.   Have I looked at all of them?
```

Nathan W. Goodyear, MD

1        Q.    Uh-huh.

2        A.    No.  That would be an unfair statement for

3    anybody to make.

4        Q.    Okay.  I was just wondering why you said

5    the majority of the papers were by the manufacturer?

6        A.    Well, when a new product comes as it

7    recurs vis-a-vis FDA approval, they are going to be

8    the money behind -- the funding behind those

9    studies.  When you bring something to FDA approval,

10   okay, it is the company's or the manufacturer's

11   responsibility to show that it is a safe and

12   beneficial product, okay.  They fund those studies.

13   They don't get independent people to fund those.

14       Q.    So they fund the studies, and do you have

15   a problem with that?

16       A.    No, I don't.

17       Q.    Okay.  So --

18       A.    It's their product.

19       Q.    And then publications come out over time?

20       A.    It does inherently provide bias,

21   potentially bias.  Because if you invested millions

22   and millions of dollars into a product and then it

23   doesn't get FDA approval, then basically it's an

24   investment that you've lost.

Nathan W. Goodyear, MD

```
1         Q.   So you're saying that all the

2    investigators and individuals that have taught the

3    skills and techniques of the product are biased?

4              MR. KOTT:  Object to the form.

5              THE WITNESS:  I did not say that.  I said

6         it does provide for bias.  So that means it's

7         going to potentiate, that is a possibility.

8    BY MS. MOORE:

9         Q.   But investigators -- the authors on the

10   various studies about the Prolift and the TVT and

11   other mesh products, you're saying they are biased?

12             MR. KOTT:  Object to the form.

13             THE WITNESS:  You're inferring that.  I

14        did not say that.

15   BY MS. MOORE:

16        Q.   You said bias?

17        A.   I said it would potentiate the

18   possibility.

19        Q.   Okay.  But I'm trying to understand in a

20   study that's being conducted by doctors at various

21   centers throughout the country and the world, you're

22   suggesting that they could be influenced by bias?

23             MR. KOTT:  Objection.

24             THE WITNESS:  Again, you're inferring
```

Nathan W. Goodyear, MD

```
 1            that.
 2       BY MS. MOORE:
 3            Q.   Help me understand.
 4                 MR. KOTT:  Let him finish his answers,
 5            please.
 6                 THE WITNESS:  When studies are designed,
 7            we as humans inherently there is bias.  We all
 8            have bias from perspectives.  We all bring that
 9            to the table with everything.  Studies are
10            designed to try and limit that:  Can't do it
11            completely, but they are designed to do that.
12       BY MS. MOORE:
13            Q.   And --
14            A.   I was just simply stating it potentiates
15       the possibility of biases.
16            Q.   And are you acknowledging that you may by
17       biased in some of the work that you're currently
18       doing now?
19                 MR. KOTT:  Object to the form.
20                 THE WITNESS:  As I may, so may be the
21            experts that you use.
22       BY MS. MOORE:
23            Q.   So it is a possibility?
24            A.   Sure.
```

Nathan W. Goodyear, MD

```
1          Q.   And then --
2          A.   But my bias is based on experience with
3     the use of this product.
4          Q.   I'm not limiting to that, but kind of the
5     new work that you're doing that is being questioned
6     by the scientific -- some people in the scientific
7     arena.  The work that you have done with the FAARN,
8     is your work bias --
9               MR. KOTT:  Object to form.
10    BY MS. MOORE:
11         Q.   -- in your arena?
12         A.   My work as it relates to the publication
13    via the literature.
14         Q.   I'm not talking about Manboob Nation.  I'm
15    talking about -- because that's one aspect of your
16    work, the testosterone.  I was talking about -- and
17    maybe it's all related.  I was talking about some of
18    the other things that you're doing currently and
19    some of your presentations.
20         A.   I think you're misleading on the facts.
21    That's just an organization that I pay a fee to.
22         Q.   So you can speak?
23         A.   No, no.  It's just an organization I pay a
24    fee, a membership.
```

Nathan W. Goodyear, MD

```
 1            Q.   So you are a membership -- a member of

 2       that organization?

 3            A.   Yeah.  But I don't do research for them

 4       and I don't do anything like that.

 5            Q.   Okay.  All right.  So back to my question.

 6       You did research last night to help supplement your

 7       opinion?

 8                 MR. KOTT:  Object to the form.

 9                 THE WITNESS:  I did a Google search.

10       BY MS. MOORE:

11            Q.   Okay.  I'm sorry.  You did a Google search

12       to help supplement the bases for your opinion?

13                 MR. KOTT:  Object to the form.

14                 THE WITNESS:  I did a Google search just

15            to see if there's quickly something available

16            out there, that any nonscientific person can

17            just say, wow, is there anything possibly

18            remotely out there to support it.

19                 MS. MOORE:  And do we want to go off

20            record for a second and print that?

21                 THE WITNESS:  It's already printed.

22                 MS. MOORE:  You want to get that?

23                 THE WITNESS:  Sure.

24                 VIDEOGRAPHER:  You want to go off the
```

Nathan W. Goodyear, MD

1         record?

2                MS. MOORE:  Yes, please.

3                VIDEOGRAPHER:  We are going off.  The time

4         is 8:28.

5                (Off the record.)

6                VIDEOGRAPHER:  Okay.  We are back on the

7         record.  The time is 8:34 a.m.

8     BY MS. MOORE:

9         Q.   Okay.  Let's see, Doctor.  So we took a

10    brief break and you handed me a copy of an abstract

11    entitled "Transvaginal Repair Genital Prolapse:

12    Preliminary Results of the New Tension-free Vaginal

13    Mesh Prolift Technique, case series multicentric

14    study."  Looks like it was first online in November

15    of 2006, correct?

16        A.   Correct.

17        Q.   And then the next two pages it says,

18    "related articles containing similar context."  What

19    is that?

20        A.   Just printed as part of the abstract, that

21    commercial.

22        Q.   And what was your search term?

23        A.   Search term?

24        Q.   Yes, sir.

Nathan W. Goodyear, MD

```
 1            A.    This is based on my memory, but I would
 2      say it was Prolift, erosion rate.  And I think that
 3      was it.
 4            Q.    Okay.  Did you do a search for TVT?
 5            A.    I did not do a search for TVT.
 6            Q.    The statement in your consent that we have
 7      been focusing on of 3 to 5 percent is for Prolift or
 8      for Prolift and TVT?  We really did not get into
 9      that.
10            A.    I can't recall without looking at it.
11            Q.    All right.  We'll take a look at it.  Now
12      -- so let me make sure I understand.  So the
13      significance of this is that it shows you that there
14      was literature out in the peer review -- strike
15      that.
16                  There was information available in the
17      peer-review literature showing a similar revision
18      (sic) rate to what you referenced?
19            A.    No.  I knew that material like that was
20      also there.  I was just showing you how readily
21      available something was to quickly support and
22      challenge what you were saying yesterday.
23            Q.    All right.  And so --
24            A.    Because I knew information like this was
```

Nathan W. Goodyear, MD

 1      already available, thus I came up to 3 to 5 percent.

 2           Q.   I'm just trying to make sure I understand

 3      what we are -- you're trying to challenge that I was

 4      saying.  This abstract supports -- stands for what?

 5      Why is this important to you?

 6           A.   Yesterday you were implying that there was

 7      no scientific evidence for the 3 to 5 percent that I

 8      was using in my consent, as I told you.  It was

 9      employing the evidence available at the time in the

10      literature, as well as guidance from the

11      manufacturer of the product who, again, marketed as

12      a revolutionary product.  So, of course, they are

13      going to be bringing (sic) it new and they need a

14      resource to lean on.  But you challenged --

15               MS. MOORE:  Move to strike comments of

16           Counsel -- or the answer.

17               MR. KOTT:  He keeps answering your

18           question.

19               MS. MOORE:  Move to be strike comments.

20           Non-responsive.

21               MR. KOTT:  You can answer.

22               THE WITNESS:  What I was simply doing was

23           showing how readily available access to that

24           research that I used to formulate that ratio

Nathan W. Goodyear, MD

```
1              currently is through a simple Google search.
2       BY MS. MOORE:
3             Q.   So there was literature in the -- strike
4       that.
5                  But there was -- literature was available
6       that supported the rate that you used in your
7       consent form?
8                  MS. KOTT:  No, it's not in the consent
9             form.
10      BY MS. MOORE:
11            Q.   I'm sorry the case --
12                 MR. KOTT:  Let's stop.  Let's retract.
13      BY MS. MOORE:
14            Q.   The literature was available that
15      supported the 3 to 5 percent erosion rate that you
16      have referenced?
17            A.   That is correct.
18                 MS. MOORE:  Okay.  Got it.  Thank you.
19            We'll go ahead and attach that.
20                 (Exhibit No. 55 marked.)
21      BY MS. MOORE:
22            Q.   But so I understand your experience was
23      different, though.  Your personal experience using
24      the Prolift and the TVT was of erosion rate with the
```

Nathan W. Goodyear, MD

1      15 to 20 percent?

2           A.   Understand when you look at the volume of

3      evidence that I had in my practice, though it was

4      substantiated -- substantial comparatively to the

5      volume of evidence, the power that was available

6      through Ethicon, as a manufacturer of this product,

7      it was much more powerful.  And thus as you analyzed

8      data, the power of that has to be taken into context

9      with the limited power of my personal.  So if I had

10     gone on and done more, or say, doubled what I had

11     done and their claims about the safety and the

12     erosion rate of the product were as they claimed,

13     then I simply could have had zero the remaining

14     aspects of my surgical procedures.  However, I think

15     evidence and history points to just the opposite.

16          Q.   Move to strike.  Non-responsive.

17               The question that I asked is, what was

18     your experience, your erosion rate?

19          A.   I quoted you that my experience rate was

20     15 to 20 percent erosion rate.

21          Q.   And -- so you are a member of the 4AR

22     committee, organization?

23          A.   A4M.

24          Q.   Sorry.

Nathan W. Goodyear, MD

```
 1              A.    Correct.

 2              Q.    Correct?

 3              A.    Yeah, correct.

 4              Q.    And I believe you testified you're aware

 5      that the organization is not recognized by the

 6      American Medical Association?

 7              A.    And I think I said yesterday I recognize

 8      that.

 9              Q.    And that many of the recommended

10      treatments, such as hormone treatment, do not have

11      support from a consensus of the scientific and

12      medical community?

13              A.    Well, it's referenced in my book.  What I

14      wrote was that as it relates to testosterone, the

15      majority of the literature actually contradicts what

16      is in traditional medical -- in a traditional

17      medical practice.  So just because I'm a member of

18      that organization does not mean I full -- I support

19      any and everything that they do just as if I'm a

20      member of ACOG.

21              Q.    You are a member of ACOG now?

22              A.    I am.

23              Q.    It's not on your CV?

24              A.    Is it not?
```

Nathan W. Goodyear, MD

 1          Q.    No.

 2          A.    Okay.  Sorry.

 3          Q.    Because I asked you yesterday and you said

 4     that you were not.

 5               MR. KOTT:  Object to that.

 6               THE WITNESS:  You did not ask if I was a

 7          member of ACOG.

 8     BY MS. MOORE:

 9          Q.    I'll tell you how I asked, I asked if you

10     were a member of any of the professional societies,

11     and you said no.

12          A.    Then that slipped.  I am a member of ACOG.

13          Q.    I'm looking at your two-page CV, right?

14     This is it, two pages?

15          A.    Yeah, that's what I gave you yesterday.

16     Actually, it may be three.  But, okay.

17          Q.    If there's another page, I want to see it.

18          A.    If that's what you got, that's what I gave

19     you so --

20          Q.    All right.  And --

21          A.    I've always been a member of ACOG.  I have

22     to be a member of ACOG.  I just missed that.

23          Q.    Okay.  Do you --

24          A.    When you referenced that question, I

1    thought you were talking SGS, AUGS, etcetera.

2        Q.   Move to strike.  Non-responsive.

3             Did you -- have you published on any

4    issues that were -- any gynecological issues?

5        A.   I have not.

6        Q.   You have not submitted any peer-review

7    paper on any -- any papers to peer-review journals

8    on obstructives in gynecology?

9        A.   Obstructives?

10       Q.   Obstetrics.

11       A.   Obstetrics?  No, I have not.

12       Q.   Not obstructives.  I don't know, have you

13   done that?

14       A.   No.  I don't think there's anywhere to

15   publish that.

16       Q.   Yes.  That would be definitely very

17   interesting.  And, of course, you haven't prepared

18   any books or manuscripts in that area, correct?

19       A.   Correct.

20       Q.   Where are your notes from the preparation

21   of the reports?

22       A.   My notes for the preparation of the

23   reports?

24             MR. KOTT:  Object to the form.

Nathan W. Goodyear, MD

```
 1              THE WITNESS:  I don't have notes.  I have
 2         maybe edits.
 3    BY MS. MOORE:
 4         Q.   Where are your edits?
 5         A.   I have them on file in my computer.
 6         Q.   So you -- the only notes that you have
 7    would be the edits that you made to your report?
 8              MR. KOTT:  Object to the form.
 9              THE WITNESS:  That's how I write.
10    BY MS. MOORE:
11         Q.   I'm trying to understand when you were
12    preparing the reports, how did you go about doing
13    that?
14         A.   Well, it's a review of the literature, as
15    I put there.  And it's a formulation of my opinions
16    as I write it.
17         Q.   And did you take any notes when you were
18    looking at the medical records?  How did you
19    remember all the medical records and all the dates
20    and the treatments?
21         A.   Well, the dates and the treatments, those
22    are in the medical records.
23         Q.   Did you highlight the medical records?
24         A.   I had it in front of me, and so I would
```

Nathan W. Goodyear, MD

```
1      read it.
2           Q.   And then -- so you have no notes or no
3      highlighted information, you were just able to do
4      all this?
5           A.   I had my laptop here, I had the medical
6      records here.  I pull it there.  I write.  Pull it.
7      Write.  So I wasn't taking notes as you would
8      describe it.  That's not the way I write.
9           Q.   Okay.  And throughout the entire practice
10     of working on the four reports, you did not take any
11     notes?
12          A.   I don't recall taking notes, as you
13     described them.  I told you how I structured that
14     process.
15          Q.   So you would just pull -- review records
16     and pull what you needed, and type it into your
17     report?
18          A.   That's how I write.
19          Q.   So the record is clear, you have no notes?
20          A.   I told you I have edits of my opinions.
21          Q.   What are your opinions on the flu vaccine?
22               MR. KOTT:  Object to the form.  Relevance.
23               THE WITNESS:  Well, what do you want to
24          know about it?
```

Nathan W. Goodyear, MD

```
 1    BY MS. MOORE:

 2         Q.   Do you think that the evidence supports --

 3    the scientific evidence supports the vaccine?

 4              MR. KOTT:  Object.

 5              THE WITNESS:  I think when you look at the

 6         evidence of the literature, okay, Cochrane

 7         Review, time and time again, and I have that

 8         published at length to that, the evidence and

 9         their conclusions is when you're looking at the

10         transmission rate of the flu vaccine, it does

11         not prevent transmission, number one.

12              Number two, does the flu vaccine prevent

13         secondary complications such as pneumonia?  The

14         answer based on the literature review, via

15         Cochrane Review multiple times, is no.  So in

16         some contexts the flu vaccine is not the best

17         option.  There are others where it is.

18    BY MS. MOORE:

19         Q.   So the CDC says everyone over six months

20    should get a flu shot, correct?

21              MR. KOTT:  Object to the form.  Object to

22         the assertion.

23              THE WITNESS:  That is correct what it

24         says.
```

Nathan W. Goodyear, MD

```
 1    BY MS. MOORE:

 2         Q.   Do you disagree with the CDC?  Center for

 3    Disease Control.

 4         A.   I'm saying what the scientific literature

 5    shows.

 6         Q.   Well, I'm asking your opinion versus the

 7    Center for Disease Control, CDC, Doctor.

 8         A.   My opinion is guided by the volume of

 9    evidence of the literature.

10         Q.   So your opinion is at odds with the CDC?

11         A.   As a lot of physicians can disagree --

12         Q.   Absolutely.

13         A.   -- experts can disagree.  I disagree with

14    their broad bases of it.  As I stated earlier, there

15    are some indications for it, and there are some not

16    indications for it.

17         Q.   But for the opinion that everyone over six

18    months should get a flu shot, do you agree with that

19    CDC statement -- I'm sorry.  Strike that.

20              You disagree with that CDC statement?

21         A.   As I told you, in select cases the

22    evidence does not show it, and I referenced those

23    Cochrane Reviews that support it.

24         Q.   And you have published on that.  Where is
```

Nathan W. Goodyear, MD

1      the publication?

2            A.    Published?

3            Q.    You said something about I have a

4      publication?

5            A.    I wrote a blog.

6            Q.    What else have you written blogs on?

7            A.    Written blogs on hormones.  On nutrition.

8      On exercise.

9            Q.    Things that are current to your focus

10     today?

11           A.    Correct.  Since I made the change based on

12     my experience with the product.

13           Q.    Since you made the change based on your

14     experience with the product, what does that mean?

15           A.    That as I discussed yesterday, with the

16     new product and the teachings -- the new product as

17     it came to market, the confidence in those products,

18     as I told you before, I lost confidence in the

19     information that was presented about the safety and

20     efficacy of the product.  And that over time as my

21     erosion rates and complication rates began to be

22     published in the literature and supported what I was

23     finding and not what was being told to me, I stopped

24     pelvic organ prolapse, urinary incontinence

Nathan W. Goodyear, MD

```
 1      surgeries because of that.  And made the change

 2      outside of that type of practice.

 3           Q.   When did you fist start having some

 4      concerns with the TVT or the Prolift?

 5           A.   To give you a date of when I first started

 6      having concerns, I can't give you a date.

 7           Q.   Can you give me a range?  Was it 2005,

 8      2006, 2007, 2008?

 9           A.   I'd say 2008.  2008.

10           Q.   So around 2008 -- before 2008, you did not

11      have any questions?  Because I thought in 2007 you

12      were questioning at the round table --

13           A.   No.  That actually -- I was incorrect on

14      that.  The date is actually 2008.

15           Q.   That's in 2008?

16           A.   Yeah.  That was not 2007, that was 2008.

17      They would have those every year and that was a 2008

18      conference.

19           Q.   When did you remember that?

20           A.   Last night.

21           Q.   So what else did you remember last night?

22           A.   That in 2009 there was a conference and I

23      was sick and I did not go to it.  And that in 2008

24      Ethicon paid for us to go skiing when we were up in
```

Nathan W. Goodyear, MD

```
1       Utah.  They had us for cocktails.  I saw the Jonas

2       Brothers in the lobby of the American.

3            Q.   Did your daughter like that?

4            A.   And I got a signature so.... and they were

5       very cool so.... you know, so those are the things

6       that I remember.

7            Q.   All right.  So last night did you do any

8       research on this?

9            A.   No.

10            Q.   But you remembered that the round table

11       was in 2008?

12            A.   Yes.

13            Q.   Was the round table also in 2007?  Was

14       there another similar-type conference in 2007 or

15       2006 was that held every year?

16            A.   These were annual events that they would

17       have.  Because, like I said, there was one in 2009

18       that I was unable to attend.

19            Q.   Okay.  So did you go to the one in 2006?

20            A.   No.

21            Q.   You did not?

22            A.   I don't recall going, no.

23            Q.   Did you go to the one in 2007?

24            A.   As I said, no.
```

Nathan W. Goodyear, MD

```
 1           Q.   So how do you know that you went to the
 2      one in 2008?
 3           A.   Because I asked Mikalia and she sent me an
 4      email referencing some emails.
 5           Q.   Okay.  Where are the emails?
 6           A.   They are emails that were sent to me this
 7      morning.
 8                MS. KOTT:  I've got them.  These are your
 9           documents that I just looked at last night
10           based on where your questions were going.
11      BY MS. MOORE:
12           Q.   So you asked her to help you find some
13      things?
14                MR. KOTT:  Object to the form.
15                THE WITNESS:  No.  This was months ago
16           when we were discussing on the timeline of this
17           conference, and I had referenced 2007.  And I
18           guess she just -- she sent me an email this
19           morning said, hey, here's some documents that
20           the defense attorneys -- that actually say
21           2008.
22      BY MS. MOORE:
23           Q.   I'm going to move to strike.  That is
24      wholly inappropriate for you to be having
```

Nathan W. Goodyear, MD

```
 1      information fed to you by your lawyers in the midst

 2      of a deposition, and now you're changing your

 3      testimony.  I'm going to move to strike any

 4      reference to information that you're asking people

 5      to help you find to go back and change your

 6      testimony.

 7           A.   You're implying that I asked, I did not

 8      ask.

 9           Q.   Whether you asked or received, you're

10      referencing it now, and that is inappropriate, sir.

11               MR. KOTT:  Hold on a second.  Let me know

12           when you're finished, please.

13               MS. MOORE:  I'm finished.

14               MR. KOTT:  Okay.  There's nothing that's

15           been done in this deposition and last night or

16           days before.  I believe what the Doctor is

17           referencing is that there was communications

18           that the defendant asked us to pull up last

19           night, emails, that contained information that

20           indicated the meeting was in 2008.  I'm

21           finished with that.

22               I object strongly to the comments that

23           Counsel is putting on this record, that

24           something is inappropriate, that you can't talk
```

Nathan W. Goodyear, MD

```
 1              to your expert in between separate depositions

 2              about separate clients.

 3      BY MS. MOORE:

 4         Q.   Your testimony yesterday throughout a

 5      very, not one deposition, but two, and very detailed

 6      questions was about a 2007 time period and six

 7      months before that.  And now you're changing that.

 8      Do you have any other mysterious sales reps that

 9      have appeared last night?

10              MR. KOTT:  I'm sorry, could you repeat the

11              question?

12              MS. MOORE:  Absolutely.  Could you repeat

13              the question?

14              (Requested portion read.)

15              MR. KOTT:  Object to the form of the

16              question.  And I'll put on the record, the best

17              evidence of when this meeting took place and

18              what time that this doctor attended, it would

19              be in the hands of the defendant if they kept

20              their records accurately.

21              MS. MOORE:  Move to strike comments of

22              Counsel.

23      BY MS. MOORE:

24         Q.   Sir, why did you bring that up today?
```

Nathan W. Goodyear, MD

```
 1          A.   Why did I bring up what?

 2          Q.   Why did you try to rectify your testimony

 3     from yesterday?

 4               MR. KOTT:  Object to the form.

 5     BY MS. MOORE:

 6          Q.   Was that important to you?

 7          A.   You asked me another question.

 8          Q.   Yes, I am.

 9          A.   No, you asked me a first question and had

10     her read it back.

11          Q.   I'm moving on to another question.

12          A.   Okay.

13          Q.   Why is it important to rectify your

14     testimony from yesterday?

15               MR. KOTT:  Object to the form.

16               THE WITNESS:  I wasn't showing a need to

17          rectify.

18     BY MS. MOORE:

19          Q.   Okay.  So why did you --

20               MR. KOTT:  Object to the form.  He's not

21          finished his answer.

22               THE WITNESS:  I was confident in the

23          numbers that I quoted you.

24
```

Nathan W. Goodyear, MD

```
1     BY MS. MOORE:

2          Q.   Okay.

3          A.   And I was just showing you how readily

4     available that information was.

5          Q.   I'm not talking about the research that

6     you did last night.

7          A.   Okay.

8          Q.   I'm talking about the fact that you

9     received emails from your Counsel this morning --

10         A.   You asked for all information related to

11    our emails and this was --

12         Q.   And you selected one thing that you're

13    going to refer to today?

14              MR. KOTT:  Object to the form.

15              THE WITNESS:  We gave you all the emails.

16              MS. MOORE:  I don't have any emails.

17              MR. KOTT:  Just hand her the emails.  This

18         is ridiculous.  There, there's your emails.

19    BY MS. MOORE:

20         Q.   We'll go through those at a break.  Now,

21    anything else that has come to you that you would

22    like to change in your testimony?

23              MR. KOTT:  Object to the form.

24              MS. KOTT:  This is the email he's talking
```

Nathan W. Goodyear, MD

```
 1              about.

 2                   THE WITNESS:  Not as it relates to my

 3              testimony, no.

 4     BY MS. MOORE:

 5         Q.   Okay.  Let's see.  So -- now, let me just

 6     make sure I understand.  When did you have erosion

 7     rates of 15 to 20 percent?  Was it in -- now it's

 8     2008 -- not until 2008 -- everything looked good

 9     until 2008?

10                   MR. KOTT:  Object to the form.

11                   THE WITNESS:  You're asking me for a

12              review of -- from 2016 to that time frame, and

13              I'm giving you a range of time as I referenced

14              initially 2007 as a reference to that

15              conference.  And that conference was actually

16              in 2008, the one that I attended.  And so as I

17              referenced the speaker, referencing a 1 percent

18              erosion rate, and my conversation with my

19              colleague to my left, that that was a

20              difference.

21                   So when you asked me to identify a time

22              point, though that's hard to identify a time

23              pointed, because I never sat down and said,

24              aha, I have 15 to 20 percent.  Okay.  I was
```

Nathan W. Goodyear, MD

```
1                giving you a range of when I started to look at
2                my rates compared to what was published and
3                what I feel to be not correct publication of
4                that material by Ethicon.
5        BY MS. MOORE:
6                Q.   And were your erosion rates correct?
7                A.   Were my erosion rates?
8                Q.   Correct.
9                A.   Well, at that time Ethicon was promoting a
10       1 percent erosion rate per the expert.
11               Q.   I'm talking about yours.
12               A.   My erosion rates had actually turned out
13       to be what is supported in the literature currently.
14               Q.   So they were lower?
15               A.   No, I didn't say that.  I said -- you're
16       asking -- what I quoted was 3 to 5 percent, which
17       was guided by Ethicon in the literature available at
18       the time.
19               Q.   Okay.
20               MR. KOTT:  Please quit interrupting the
21               witness.
22       BY MS. MOORE:
23               Q.   I apologize.
24               A.   And I told you my erosion rate was 15 to
```

Nathan W. Goodyear, MD

```
1       20 percent.
2               MR. KOTT:  Wait a second.  Object to
3           commentary on the record.
4               THE WITNESS:  So you have questioned why I
5           didn't counsel patients on the high erosion.
6           My erosion rate actually is what is turning out
7           to be supported in the literature currently.
8           Which, by the way, has resulted in the pulling
9           of the product in 2012.  And thus my erosion
10          rate was much higher and my suspicions which
11          finally proved to bear out contrary to what was
12          published by Ethicon.
13  BY MS. MOORE:
14          Q.   Move to strike as non-responsive.
15               Your erosion rates were in -- let's say in
16  the 2006, 2007, 2008 period, what were your erosion
17  rates?
18          A.   Can you re-ask that question?
19          Q.   Sure.  During the 2005 to 2008 time
20  period, what were your erosion rates?
21          A.   At that point, to be honest with you, I
22  can't say that I could tell you a percentage of
23  erosion rates.
24          Q.   So -- okay.
```

Nathan W. Goodyear, MD

1      A.   You have asked me to estimate it based on

what I started to question what was being promoted.

3      Q.   And when did you -- okay.

4           When did you start to question what was

being --

6      A.   As I told you earlier, at that conference.

7      Q.   That's the first you hit it -- you --

8      A.   When I started to question and formulate

9  questions in my mind.

10     Q.   -- was in 2008?

11     A.   Yes.

12     Q.   Okay.  So prior to 2008, there was nothing

13  that concerned you?

14     A.   I don't recall.  You know, this is a new

15  product.  I had no reason to -- I trusted Ethicon

16  and their teachings and their publications on that

17  material that this was a safe and effective product.

18     Q.   And your experience up until 2008 -- when

19  was the conference?

20     A.   It was in the winter, because they took us

21  skiing.

22     Q.   Okay.  So this is -- it looks like the --

23  it doesn't specify when the conference is, but the

24  emails are in March of 2008?

Nathan W. Goodyear, MD

```
 1           A.   Yeah.  Spring skiing.

 2           Q.   So --

 3           A.   We went skiing.

 4           Q.   So sometime you were skiing, and it was on

 5      that trip or right before that trip that you started

 6      having concerns about your erosion rate?

 7           A.   As I've mentioned repetitively, is that at

 8      the round table is where they were quoting very,

 9      very low erosion rates, of which I was not seeing,

10      of which I would then speak to a colleague on my

11      left and they would verify they were not seeing the

12      same erosion rates.  That process started.  I

13      started to question.

14           Q.   But the erosion rates that were being

15      discussed by the Ethicon presenter were not the type

16      of erosion rates that you were seeing, you said it

17      was around the 15 to 20 percent?

18           A.   When I started to formulate that question,

19      when you asked me for a date and a percentage,

20      that's what I told you, yes.

21           Q.   It was around --

22           A.   Fifteen to 20 percent.

23           Q.   -- 15 to 20 percent.  And, let's see -- so

24      what did you do with your concerns?  Did you express
```

Nathan W. Goodyear, MD

1       them to Ethicon?

2               A.   I -- excuse me, I expressed them when I

3       returned to my practice, to my rep when he showed up

4       in my office.

5               Q.   Other than -- and have you had a chance to

6       remember the rep's name?

7               A.   No.   I told you I don't remember his name.

8               Q.   Do you remember anything at all about the

9       rep?

10              A.   As I told you yesterday, I don't remember

11      anything at all about the rep.   But it is very, very

12      normal for Ethicon to have reps, for every company

13      to have reps.   They would visit me all the time.

14      Bard, AMS, pharmaceutical reps would come in all the

15      time.   But that doesn't mean I remember their hair,

16      their skin color, their name, their background,

17      their family tree, etcetera.

18              Q.   Move to strike as non-responsiveness.

19              So you approached the sales rep on one

20      occasion, several occasions?   Were you upset,

21      frustrated, what did you do?

22              A.   No, usually when he came into the OR.

23              Q.   And he came in the OR and you said, I'm

24      not seeing your erosion rates that you're telling

Nathan W. Goodyear, MD

1    me?

2         A.   That's correct.

3         Q.   What did he say?

4         A.   So, obviously, when that happens, you go,

5    well, could it be my limited experience in my volume

6    and then maybe I just don't have the power that

7    matches their power.  So is that possible.  Is it

8    because they are an expert and I am an expert, but

9    as a gynecologist.  And the response was, no, we

10   bring physicians to you to train.  So we would not

11   do that if we did not feel you had the skill set and

12   the proper technique to provide a good placement of

13   the mesh and management of these clients.

14        Q.   So you had that one conversation with him.

15   Did you have any other conversations?

16             MR. KOTT:  On any topic?

17   BY MS. MOORE:

18        Q.   No.  About his concerns with the products.

19   I mean, with the erosion or with the Prolift or the

20   TVT.

21        A.   To say do I remember a specific

22   conversation, there would be multiple conversations

23   as it relates to other reps come in about -- with

24   competing products and their claims on erosion and

Nathan W. Goodyear, MD

1    complication rates.  And we would contrast -- I

2    would ask him to contrast that with the evidence

3    that I had, as well as the company Ethicon said.  So

4    we would have those conversations.  But I don't

5    remember the specifics of these conversations.

6         Q.   Did you ever bring it -- strike that.

7              Did you ever go beyond the sales rep and

8    contact anyone at Ethicon say, hey, I'm concerned,

9    I'm seeing higher erosion rates than what you're

10   telling me?

11        A.   The rep's role is to be the interceder

12   between the physician and the company.  And so when

13   I gave him that information, it was for him to relay

14   that up.  It was not intended for coffee talk.

15        Q.   Okay.  And so you said reps.  I want to

16   make sure, now there's several reps involved?

17        A.   I said rep.  You may have heard reps.  I

18   said rep.  If I said reps it was a misspeak.  But

19   that is what reps to do.

20        Q.   There's one rep that we are referencing

21   that you were having these discussions with?

22        A.   Correct.

23        Q.   All right.  And the discussions started

24   when?

Nathan W. Goodyear, MD

```
1          A.   Every time he would come and see me, we

2     would have discussions.

3          Q.   About your concerns?

4          A.   No, about discussions in general.

5          Q.   All right.  So the record is clear, I'm

6     talking about discussions that you may have had with

7     the rep, that you can't recall, about concerns with

8     the Prolift or the TVT.  Specifically we'll stay

9     with the erosion.

10         A.   As I mentioned, when I came back from that

11    conference, that was when I distinctly remember a

12    conversation that entailed the quoted erosion rate

13    by the speaker.  And my erosion rate of which I was

14    seeing that were exceeding that, as well as the

15    published, i.e., 3 to 5 percent range.

16         Q.   And you had discussions with him and he

17    basically told you that --

18         A.   When I had discussions with him about this

19    or anything in the matter, it was to relay it.  So,

20    for example, when there was discussions about the

21    trip to go to Utah, you know, he asked me if I

22    wanted to go skiing.  I said, I'd be happy to get on

23    that bus.  He relayed that information on up.  So

24    that's exactly what happens.  I expected that
```

Nathan W. Goodyear, MD

1    information to be relayed up, so as any information

2    that needed to clarify would be relayed down.

3         Q.   Okay.  How concerned were you?  I mean,

4    did you have several conversations with him or just

5    one?

6         A.   To be honest, I don't recall the number.

7         Q.   So did you -- did your concerns go away?

8    Were you suddenly fine and just --

9              MR. KOTT:  Object.

10   BY MS. MOORE:

11        Q.   I'm trying to understand.  At some point

12   before the conference in 2008, you came to the

13   conclusion that your erosion rates were around 15 to

14   20 percent?

15        A.   As I told you before, I started to

16   formulate the idea that my erosion rates were

17   exceeding that and you asked me to quote a

18   percentage, and that's what I quoted you as an

19   estimate, and I did.  And I said that started the

20   formulation in my idea that this product was not

21   safe and effective as described.  And that process

22   of change allowed me to build confidence, and it

23   took time, where I eventually stopped doing this

24   product.  Prior to its elimination from the market,

Nathan W. Goodyear, MD

1      by the way.

2           Q.   Move to strike from elimination from the

3      market on as non-responsive.

4                Now, you started having concerns about the

5      product not being safe, correct?

6           A.   Correct.

7           Q.   And when did you start having those

8      concerns?

9                MR. KOTT:  Object.  Asked and answered.

10               THE WITNESS:  Yeah.  As I told you, the

11          process started when I was seeing quotes from

12          other surgeons that were outside the realm of

13          what I was seeing.  One percent.

14     BY MS. MOORE:

15          Q.   Lower than what you were seeing?

16          A.   Exactly.

17          Q.   Did you question your technique?

18          A.   Any good surgeon would do so.

19          Q.   Okay.  And you did?

20          A.   Correct.

21          Q.   And I did note in all of the reports that

22     you have prepared in this litigation, you have

23     exonerated your technique, correct?

24          A.   I didn't exonerate.  When the rep was in

Nathan W. Goodyear, MD

1      the operating room with me, I asked him if my

2      technique was an issue, number one.

3              Number two, Ethicon saw me as a person to

4      train others to do it.  And they called me a master

5      consultant, number two.

6              Number three, when I asked him that, he

7      would tell me that, "Look, we have physicians that

8      come to you, to watch you, not only in Celebration,

9      but also here in the operating room in Louisiana to

10     learn how to do the procedure.  So, no, there's not

11     a technique issue."  So that provided confirmation

12     to me that Ethicon felt I had the surgical

13     capability and expertise to be able to perform the

14     surgery well, and teach others.

15         Q.   I'm not talking about anything but the

16     four cases before us.  And is it your opinion, as an

17     expert, that the -- that you as the implanter did

18     nothing wrong?

19         A.   I followed the procedure guidelines and

20     teachings that Ethicon provided.

21         Q.   And so to answer my question, you were

22     serving as an expert in this case, and in that

23     capacity you have done your differential diagnosis,

24     including looking at the implanter, who happens to

Nathan W. Goodyear, MD

```
1     be you, your technique, and said, there's nothing

2     wrong with that technique?

3         A.   I provided the technique that Ethicon

4     taught me.

5         Q.   And did you do everything that Ethicon

6     taught you?

7         A.   Well, as it relates to the technique of

8     prolaft -- Prolift, excuse me.  They were the author

9     of that technique.  So as they trained me, I did

10    provide that.

11        Q.   Did you not provide any medical judgment

12    or skill from yourself, or are you just like a robot

13    doing whatever Ethicon tells you?

14            MR. KOTT:  Object the form.

15            THE WITNESS:  Of course I do.

16    BY MS. MOORE:

17        Q.   That's what I'm trying to understand.

18        A.   But you did not ask that.

19        Q.   Let's ask that.  Did you provide any skill

20    and technique, or do you bring anything to the table

21    or do you solely rely on what Ethicon tells you?

22        A.   The technique is the steps involved.

23    That's what Ethicon provided.  Okay.  I provided the

24    hands, correct.  The hands for which I was named the
```

Nathan W. Goodyear, MD

```
 1        top surgeon in my residency class.  For which

 2        Ethicon saw as valuable.

 3              Q.   How many years ago is that?

 4              MR. KOTT:  Don't interrupt him, please.

 5              THE WITNESS:  For which Ethicon saw value

 6        in teaching other physicians in Celebration,

 7        Florida, as well as bringing physicians in to

 8        teach.  So they obviously saw the value there.

 9        Others obviously saw the value in my hands.  So

10        if you're questioning my hands, I think

11        Ethicon's choice of my hands as a surgical

12        example I think basically bears that out.

13   BY MS. MOORE:

14              Q.   And in these four cases that you have

15   reviewed as the expert, looking at your work as a

16   treater -- you're playing dual roles here, right?

17              A.   I understand that.

18              Q.   You're sitting in a position where you're

19   judging what has taken place with these cases, and

20   part of your judgment includes looking at what you,

21   yourself, did as a doctor treating one of the

22   patients?

23              A.   That's correct.

24              Q.   And you have checked that box and said,
```

Nathan W. Goodyear, MD

1       what I did was perfectly fine?

2           A.   What I knew available at the time of the

3       evidence, yes.  But as I've mentioned beyond that

4       yesterday, is if I had available evidence now, I

5       would have never implanted those materials, because

6       of the evidence bearing out that these were not safe

7       products.

8           Q.   Okay.  And when did you first start --

9       getting concerned about the safety of the product?

10          MR. KOTT:  Object to the form.  Asked and

11          answered repetitively.

12          THE WITNESS:  I think I've answered that

13          several times.

14      BY MS. MOORE:

15          Q.   I need you to answer, please.

16          A.   Okay.  The meeting in Salt Lake City where

17      the quote on the complications of the mesh erosion

18      that was quoted as being below what the -- what the

19      published literature was showing, okay, the

20      1 percent that was being quoted.  And beyond what --

21      not what was just published, but beyond what I was

22      seeing, started to formulate the questions and

23      started the process of challenging my belief that

24      the product was safe and effective.

Nathan W. Goodyear, MD

```
 1              Q.   Okay.  And so up until that time period
 2       you started -- I guess if you -- strike that.
 3              At this meeting, you had concerns about
 4       what you were hearing from Ethicon about revision
 5       rates based on your experience?
 6              A.   That is correct.
 7              Q.   And your experience was a higher revision
 8       rate?
 9              A.   Higher erosion rate reference.
10              Q.   I'm sorry.
11              MR. KOTT:  That's okay, it gets confusing.
12       BY MS. MOORE:
13              Q.   It was an erosion rate?
14              A.   Correct.  Erosions will lead to revisions.
15              Q.   Thank you.
16              MR. KOTT:  Can we take a break, we have
17       been at it about an hour?
18              MS. MOORE:  Sure.
19              VIDEOGRAPHER:  Going off the record.  The
20       time is 9:13.
21              (Off the record.)
22              VIDEOGRAPHER:  Okay.  We are back on the
23       record.  The time is 9:23 a.m.
24
```

1    BY MS. MOORE:

2         Q.   All right, Doctor.  I think we were kind

3    of working through some issues.  I asked to -- what

4    you did last night.  You told us about some of the

5    research you did.  You talked about the emails.  And

6    now I want to make sure is there anything else, any

7    additional information you have, any way you want to

8    change your testimony from yesterday?

9              MR. KOTT:  Object to the form.

10             THE WITNESS:  Uh-uh.

11   BY MS. MOORE:

12        Q.   You stand by what you said?

13        A.   I was providing clarification.  You asked

14   if I did anything, and so I told you.

15        Q.   And your testimony yesterday was truthful

16   and accurate?

17        A.   Yeah, 3 to 5 percent as I quoted and I

18   supported that today.

19        Q.   Supported the 3 to 5 percent with what you

20   were seeing -- what was also available in the

21   literature?

22        A.   Correct.

23        Q.   And so during this time period, though,

24   you started getting more and more concerned with the

Nathan W. Goodyear, MD

```
 1     products, meaning the Prolift and the TVT?
 2               MR. KOTT:  Object to the form.  Vague.
 3               THE WITNESS:  I was concerned about the
 4          efficacy and safety, as was being -- the
 5          information as it was being provided by the
 6          company, yes.
 7     BY MS. MOORE:
 8          Q.   And so you approached the sales rep and
 9     was -- did you ever hear back?
10          A.   Again, you're asking me to recall specific
11     conversations.  I can remember generalizations, but
12     I don't recall any response back.
13          Q.   And so did that trouble you?
14          A.   Well, obviously, this was a process of
15     formulation.  And so I was formulating opinion.  If
16     I would say troubling, the continued ongoing
17     complication rates were troubling.  And that, again,
18     eventually led to my cessation of these procedures.
19          Q.   And so all this started around the 2008
20     period, a little before you started recognizing your
21     erosion rates were higher than what you were being
22     told by Ethicon?  And that continued -- that concern
23     continued through 2008, 2009, 2010?
24               MR. KOTT:  Object to the form.
```

Nathan W. Goodyear, MD

```
 1                    THE WITNESS:  Again, when you asked me to
 2             try to narrow down a time frame, I'm giving you
 3             a time frame period as best I can based on
 4             history recollection from eight to ten years
 5             ago.
 6      BY MS. MOORE:
 7             Q.   Right.  And so the best reference point
 8      you have is the meeting that you attended in -- the
 9      skiing trip you attended in -- where is -- Salt Lake
10      City?
11                    MR. KOTT:  Object to the form.
12                    THE WITNESS:  Yeah.  They not only paid us
13             an honorarium, they paid for our expenses up
14             there.  This was at the American in Salt Lake
15             City and they were in round tables dealing with
16             the complications.  Dinners, cocktails, and
17             they took us skiing.
18      BY MS. MOORE:
19             Q.   All right.  And you enjoyed that?
20             A.   Well, yeah.
21             Q.   And it was during this time period,
22      though, that you started having concerns about the
23      safety --
24                    MR. KOTT:  Jesus.
```

Nathan W. Goodyear, MD

```
1     BY MS. MOORE:

2          Q.   -- of Prolift and TVT?

3               MR. KOTT:  Object the form.

4               THE WITNESS:  Again, you're identifying

5          when I maybe noticed a difference that

6          concerned me.  And that is in my mind a point

7          that is significant.

8     BY MS. MOORE:

9          Q.   Okay.  So at least that's the time point

10    we know you started having some concerns, correct?

11         A.   That is correct.

12         Q.   And then that would have continued until

13    the time you stopped using the product?

14         A.   That is correct.

15         Q.   When I say the product, I mean the TVT and

16    the Prolift.

17         A.   Correct.

18         Q.   Okay.  And so during this time period, you

19    continued to teach people on techniques of the TVT

20    and the Prolift?

21              MR. KOTT:  Object to the form.  Vague.

22    BY MS. MOORE:

23         Q.   Meaning after the 2008 time period.

24         A.   I believe that my last contract was in
```

Nathan W. Goodyear, MD

1    2009, but then at that point I decided not to

2    continue that process.

3          Q.   So you accepted money and signed a

4    contract dated January 2009 to be a consultant for

5    Ethicon on the Prolift, despite the fact that you

6    had concerns about the safety and efficacy of the

7    product?

8               MR. KOTT:   Object to the form.

9               THE WITNESS:   I told you I was processing

10               the concerns about the product.  But as you

11               know beyond 2009, I did not.

12    BY MS. MOORE:

13          Q.   So it was okay for you to accept money

14    from the company while you were having concerns

15    about the safety and efficacy of the product?

16               MR. KOTT:   Object.  Form.

17               THE WITNESS:   I was still formulating my

18               opinion at that point.  And, obviously, Ethicon

19               still felt that I was a valuable surgeon in

20               that aspect.

21    BY MS. MOORE:

22          Q.   Move to strike anything about what Ethicon

23    thought.

24               My question is, during this time when

Nathan W. Goodyear, MD

```
1      you're talking about concerns, it was okay for you

2      to continue to accept Ethicon payments?

3                     MR. KOTT:  Object to the form.

4                     THE WITNESS:  At that point I did not come

5              to a formulated final decision, and when I did,

6              I stopped.

7      BY MS. MOORE:

8              Q.   When did you do your last Prolift surgery?

9              A.   I don't recall when I did my last.

10             Q.   You have no recollection?

11             A.   No, you don't.  It's -- as a surgeon you

12     don't bandy that stuff around.  You don't put that

13     on a wall or something.

14             Q.   When did you do your last TVT surgery?

15             A.   Again, I don't recall.

16             Q.   Okay.  But in 2009 you did accept money

17     from Ethicon to be a consultant and teach in

18     Florida, you taught the Prolift?

19             A.   I don't believe I taught the Prolift in

20     Florida in 2009.

21             Q.   So you just accepted the money, but you

22     did not teach --

23                     MR. KOTT:  Object to the form.

24                     THE WITNESS:  I just have what's right
```

Nathan W. Goodyear, MD

```
 1            there.

 2     BY MS. MOORE:

 3            Q.   Okay.  We'll go ahead and --

 4            A.   Yeah, I'm sorry, I thought I turned it

 5     off.

 6            Q.   You want to go off record?  You need to

 7     take that?

 8            A.   No, I just need to turn it off.  Sorry.

 9                 MS. MOORE:  We'll go ahead, and -- I think

10            this has been marked as the individual one,

11            2009 has been marked?

12                 MR. KOTT:  The whole package has been

13            submitted.

14                 MS. MOORE:  I'm going to pull this one

15            out, since it's unique to 2009, and go ahead

16            and mark that as Exhibit No. 56.

17                 (Exhibit No. 56 marked.)

18     BY MS. MOORE:

19            Q.   Did Ethicon approach you in 2010 to serve

20     as a consultant?

21            A.   I don't recall.

22            Q.   All you know is that you served as a

23     consultant, received payment for doing that in 2009

24     while having concerns about Prolift and TVT?
```

Nathan W. Goodyear, MD

```
 1                    MR. KOTT:  Object to the form.

 2                    THE WITNESS:  Yeah, I think that you see

 3          that there.

 4     BY MS. MOORE:

 5          Q.   Let's see.

 6          A.   Excuse me.

 7          Q.   You want to turn to Tina Morrow, your

 8     report that we have previously marked as --

 9                    MR. KOTT:  They have one.

10                    THE WITNESS:  Okay.

11                    (Exhibit No. 53 marked.)

12     BY MS. MOORE:

13          Q.   Yeah, No. 53.  Did you all bring a report

14     with you today?

15          A.   I have it on my computer.

16                    MR. KOTT:  We have a copy somewhere.

17     BY MS. MOORE:

18          Q.   Here you go.

19          A.   Try to stay digital.

20          Q.   Now -- and your reliance list, you

21     probably want to have -- thank you.  We marked the

22     reliance list as Exhibit No. 54.  Just take a

23     moment.  Go off record, take a moment and have a

24     look at your report.
```

Nathan W. Goodyear, MD

1           (Exhibit No. 54 marked.)

2           VIDEOGRAPHER:  Going off.  The time is

3      9:31.

4           (Off the record.)

5           MS. MOORE:  All right.  We are back on the

6      record.

7           VIDEOGRAPHER:  We are.

8  BY MS. MOORE:

9      Q.  All right.  And looking at your report in

10     the Morrow case, and your background section is

11     similar to reports that we have discussed

12     previously; is that fair to say?

13     A.  Correct.  It's exactly the same in the

14     other reports.

15     Q.  Let's turn to the first time you had an

16     opportunity to see her.  And my records indicate

17     June -- June 11th, 2008?

18     A.  Yeah, just have my report in front of me.

19     Q.  Did you bring the records today that we

20     requested?

21          MR. KOTT:  They have been produced

22          multiple times.  Do we have a copy --

23          MS. MOORE:  Let's go off the record for a

24          second.

Nathan W. Goodyear, MD

```
 1              VIDEOGRAPHER:  We are going off the

 2         record.  The time is 9:34.

 3              (Off the record.)

 4              VIDEOGRAPHER:  We are back on the record.

 5         The time is 9:37.

 6              (Exhibit No. 57 marked.)

 7    BY MS. MOORE:

 8         Q.   So, Doctor, you have in front of you what

 9    has been marked as Exhibit No. 57.  It's the records

10    that you have produced through your Counsel for the

11    client here, Mrs. Morrow?

12         A.   Correct.

13         Q.   And are there any communications

14    referenced in there, emails, documents, to

15    Mrs. Morrow?

16         A.   I think I referenced yesterday,

17    communications I had with patients would be face to

18    face.

19         Q.   Let's go to the first visit, June 11th,

20    2008.  And let's talk about the complaints she had

21    on that particular visit.  And the records I have

22    are that she had joint pain, fatigue, migraines, and

23    difficulty sleeping?

24         A.   Well, I have a little bit more than that.
```

Nathan W. Goodyear, MD

```
 1              Q.   Okay.  Please.

 2              A.   Joint aches, dry skin, fatigue --

 3                   (Reporter clarification.)

 4                   THE WITNESS:  I'm sorry.  Joint aches, dry

 5         skin, fatigue, memory impairment, sore muscles,

 6         poor appetite, weakness, weight gain, bloating.

 7         Incontinence she described as stress and

 8         urgency influenced.  Dry skin, as I mentioned.

 9         Headaches.  And sleep disturbance.

10    BY MS. MOORE:

11              Q.   Anything else?

12              A.   No, I think that sums that up.

13              Q.   And her weight at the time?

14              A.   Her weight --

15              Q.   I have 269 with a BMI of 41.8?

16              A.   I think that's a five.  But I think it's

17         259.

18              Q.   Whatever you say, Doctor.

19              A.   Yeah, the BMI would be correct, because

20         that would incorporate that weight.

21              Q.   And then let's go to your physical exam.

22         You did genitourinary.  And looks like you found a

23         cystocele, rectocele, enterocele; is that correct?

24              A.   Yeah, that's how it reads, correct.
```

Nathan W. Goodyear, MD

```
 1          Q.   And then it says "pelvic enterocele," what
 2     does that mean?  That's further down.
 3          A.   That's just a CPT code.
 4          Q.   Okay.  And this also -- why don't we get
 5     your expert report in front of you.
 6          A.   Got it right here.
 7          Q.   You have captured that in your expert
 8     report about the patient presenting for menopausal
 9     symptoms and hyperthyroidism.  And then you capture
10     cystocele, rectocele, enterocele, and I guess you
11     did an examination.  And then I guess you did the
12     POP Quantification on that date as well?
13          A.   Actually, if you look back in the plan for
14     recommendations and also in the plan it says
15     "schedule POP-Q."
16          Q.   Okay.  Your report -- for clarification,
17     look at your report, and it says that a stage two
18     cystocele, rectocele, and enterocele were found on
19     examination?
20          A.   Uh-huh.  Yes.
21          Q.   And were they found -- they weren't found
22     on June 11th, '08, they were found on a subsequent
23     examination?
24          A.   Well, just when you see somebody with
```

Nathan W. Goodyear, MD

```
1    prolapse, when you have done enough prolapse exams,

2    you have a very good -- when you have done enough of

3    them and become an expert, you have a good idea of

4    what a range is going to be of their prolapse based

5    on their symptoms.  Again, stage one and stage two

6    are really clearly identifiable.  It's the stage

7    three and stage four that become a little bit more

8    difficult to quantify.  So you have a good idea on

9    most stage twos where they are, although a POP-Q is

10   scientifically recommended really to quantify to

11   follow.

12        Q.   All right.  What is a spit test?

13        A.   I don't know.  Where do you see that?

14        Q.   Did you -- Ashley Moore worked for you at

15   one point, or Mrs. Moore's daughter?

16        A.   She was the receptionist.

17        Q.   Okay.  And she referenced you doing a new

18   test, a spit test?

19        A.   Who did?

20        Q.   Mrs. Moore was referencing what you were

21   doing.  Did you do a spit test at your office?

22        A.   Well, there's a wide variety of test

23   mediums, and saliva is one of them, that is correct.

24        Q.   Are they known as spit tests?
```

Nathan W. Goodyear, MD

1        A.   I guess you could say that that's how you

2   did it, yeah, you spit or drool.

3        Q.   And what do the spit or drool tests show

4   you?

5        A.   They can show you a variety of things.

6   They can show you cancer markers.  They can show you

7   hormones.  They can show you inflammatory markers.

8   They can show bacterial content of the mouth.

9        Q.   All right.  So let's go further down.  It

10  looks like you did some testing, urodynamics and

11  cystoscopy.  And based on those studies, there was a

12  diagnosis of mixed urinary incontinence that's

13  referenced in your expert report; does that sound

14  about right?

15       A.   Correct.  As matched via her complaint

16  when she came in.

17       Q.   Okay.  Let's go to the next visit, July

18  3rd, 2008, an office note.

19       A.   July 3rd?

20       Q.   That's what I have.  July 3rd, 2008.

21       A.   Okay, sorry.  Yes, I have that.

22       Q.   And did she have any complaints on that

23  date?

24       A.   Again, when you look at a review of

Nathan W. Goodyear, MD

1    symptoms, they are as she was when she came in,

2    which was the abdominal bloating, urinary

3    incontinence.  Both she described as stress but also

4    urgency induced.

5         Q.   All right.  But no other complaints other

6    than those contained in the review of symptoms?

7         A.   That is correct.  Or in her HPI.

8         Q.   Right.  And just any complaint -- what's

9    complained in her HPI, tell me what's in the HPI.

10        A.   Right.  About history, present illness.

11        Q.   And what are the complaints?

12        A.   It's as I read before, you want me to

13   reread those?

14        Q.   I'm trying to understand the July 3rd,

15   2008 visit, was there any specific complaints that

16   she referenced that day?

17        A.   Yeah.  As I referenced related to -- you

18   asked me -- did she have any complaints related to

19   her pelvis.  And I referenced in her review of

20   symptoms, she gave the same at that visit as she did

21   on the initial visit.

22        Q.   And that would have been the bloating --

23        A.   The bloating, the urinary incontinence,

24   stress but also urgency associated.

Nathan W. Goodyear, MD

1      Q.   She was taking Estrace at that time three

2  times a week?

3      A.   Where do you see that?

4      Q.   The Estrace is going to be under your

5  prescription.

6      A.   That is on July 3rd.  When I look at

7  prescriptions on that date, I see Levothroid and

8  APPI or Ranitidine.

9      Q.   All right.  I'm looking at --

10      A.   That's July 3rd.

11      Q.   I am looking at July 3rd, and if you go to

12  the one -- the fourth page back up -- let me give an

13  example --

14      A.   I prescribed it that day.  Thank you.  I

15  was looking at her history of medicine.  Her

16  medicine she had that day.  Yes, correct.  Okay.

17      Q.   And my question was, why were you

18  prescribing the Estrace?

19      A.   Atrophic vaginitis, although I did not

20  comment, here can be common contribution to urinary

21  incontinence.  So a conservative approach to urinary

22  incontinence would employ, at least in part, vaginal

23  estrogen to strengthen the vaginal mucosa.

24      Q.   And diagnosis, it looks like pelvic

Nathan W. Goodyear, MD

1     enterocele.  That's a small bowel prolapse?

2          A.   Again, these are CPT codes and these CPT

3     codes have numerous different descriptions attached

4     to them.  That's just the one that happened to pop

5     up.  But, yes, an enterocele is an upper large

6     intestine prolapse, or it could be small intestine

7     into the vaginal vault.

8          Q.   All right.  Let's go through the risks you

9     discussed with her on that date.  So at this point

10    you're July 3rd, you're talking to her about

11    surgery; is that right?

12         A.   That is correct.

13         Q.   And you're telling her the pre-op plan.

14    And, again, the risks discussed include infection,

15    hemorrhage, blood clot, transfusion, 3 to 5 erosion

16    risk, failure for reconstructive support, damage to

17    bowel or bladder, incidental oophorectomy.  Now,

18    that's a new one, we did not see that in what we

19    discussed yesterday.

20              MR. KOTT:  Object to the form.

21    BY MS. MOORE:

22         Q.   Incidental oophorectomy, extrusion graft,

23    graft infection, death, conversion to laparotomy, de

24    novo urinary irritative voiding symptoms, VTE.

Nathan W. Goodyear, MD

```
 1                    Are those the risks you discussed with
 2       her?
 3            A.   Yeah, as you've listed there and read all.
 4            Q.   All right.  I'll find it and attach it.
 5       I'm going to ask you to look at the -- the risks
 6       that you read yesterday to Ms. Taylor in August of
 7       '08.  So that would be a month later.  And I just
 8       wonder why different risks for different people.
 9       Was a sales rep involved in altering the form at
10       this point?
11                    MR. KOTT:  Object to the question.
12       BY MS. MOORE:
13            Q.   Please take a look at this.  I'm going to
14       look -- find the exhibit number in a minute.
15                    MS. KOTT:  You want a mic?
16                    MR. KOTT:  I think this is picking up.
17                    MS. MOORE:  Let's go off the record for a
18            second.
19                    VIDEOGRAPHER:  We are going off the
20            record.  The time is 9:48.
21                    (Off the record.)
22                    (Exhibit No. 58 marked.)
23                    VIDEOGRAPHER:  We are back on the record.
24            The time is 9:54.
```

Nathan W. Goodyear, MD

```
 1      BY MS. MOORE:

 2          Q.   All right, Doctor.  Took a quick break so

 3      that we could identify what we have previously

 4      referenced as a consent discussion with another one

 5      of your patients, Ms. Charlene Taylor.  That exhibit

 6      is labeled as Exhibit No. 58.  And I wanted you to

 7      take a moment and compare the consent discussion you

 8      had with Ms. Taylor in August of 2008 with the

 9      consent discussion you're having with Mrs. Morrow

10      in -- three months earlier, July of 2008.

11          A.   Okay.  I don't have that.

12               MR. KOTT:  He needs a copy.  It would

13          help.

14               THE WITNESS:  Okay.  So you want me to

15          read the two --

16      BY MS. MOORE:

17          Q.   I'll make it easier for you, if -- the

18      Taylor discussion references failure urinary

19      retention, at the end, I believe.

20          A.   Yes.

21          Q.   Pardon?

22          A.   Yes.

23          Q.   So you have that in one consent, but you

24      don't have that in the consent for Mrs. Morrow?
```

Nathan W. Goodyear, MD

1               MR. KOTT:  I'm going to object to the

2          form.  Characterizing consent, this is a

3          discussion.

4     BY MS. MOORE:

5          Q.   Consent discussion, is that fair to say?

6     Is this a consent discussion, sir?

7          A.   Yes.  Well, when you look at these, you're

8     comparing two different things here.  Because what

9     we have got here as reference that you had -- that

10    you read with Charlene Taylor, it was for the stress

11    incontinence and then you're comparing that here to

12    the discussion I had that's documented here as it

13    relates to the pelvic enterocele.

14         Q.   Would you look at the following paragraph,

15    sir?

16         A.   Okay.

17         Q.   And does that --

18         A.   I don't see that it says anything about

19    the bladder issue that you described.

20         Q.   If you will pass it back to me, please.

21              MS. KOTT:  Let him keep that one.

22              MR. KOTT:  Keep that one.

23    BY MS. MOORE:

24         Q.   The paragraph that I'm referencing is the

Nathan W. Goodyear, MD

```
 1        second paragraph under vaginal enterocele.

 2              A.   I see one paragraph, so the first one?

 3                   MS. CAPODICE:  It's the paragraph entitled

 4              vaginal --

 5                   THE WITNESS:  Right.  And you read the

 6              failure urinary retention from the stress

 7              incontinence.  But I'm not seeing that listed

 8              below in the Prolift counseling in Taylor.

 9        BY MS. MOORE:

10              Q.   Failure urinary -- if you go up to --

11        did you do a TVT on Mrs. Morrow?  Yes, you did.

12              A.   I did.

13              Q.   And my question to you is, in the Taylor

14        case when you did the TVT, you warned her of the

15        potential of a failure of urinary retention, but you

16        do not appear to be warning her of that in this

17        particular visit?

18              A.   Who?  Are we jumping back and forth here?

19              Q.   We are.

20              A.   So you're asking me did I reference the

21        potential for TVT in Mrs. Morrow?

22              Q.   Not the potential for TVT.  There's a

23        specific risk involved in the failure of urinary

24        retention that you warned Ms. Taylor about, and when
```

Nathan W. Goodyear, MD

```
1        you were discussing the potential risks involved

2        with the TVT surgery.  And I'm asking you why you

3        did not warn Mrs. Morrow about that same risk in the

4        TVT surgery?

5             A.   Because the preoperative evaluation wasn't

6        done.

7             Q.   Okay.  So you did not do a pre-op

8        evaluation?

9             A.   No, we were still in process.

10            Q.   Okay.  We'll see that as we move on you

11       think?

12            A.   Yes.

13            Q.   Okay.  And then look at your pre-op --

14       Morrow, look at pre-op exam now.  This is going to

15       be on page -- the second to the last page -- I'm

16       going to mark it to kind of streamline this.  This

17       is going to be Exhibit No. 59, take a look at the

18       second to the last page.  And so your Counsel has

19       it, it's an office visit of July 3rd, 2008.  I

20       believe it is what you have, but we have a little

21       different format.

22            A.   Okay.

23                 (Exhibit No. 59 marked.)

24       BY MS. MOORE:
```

Nathan W. Goodyear, MD

```
 1            Q.   If you look to the second to the last page

 2      and you go down under pelvic enterocele --

 3            MS. CAPODICE:  Bates page 49 for the

 4            record.

 5            THE WITNESS:  Okay.  This is July -- but

 6            this is of the July 3rd visit, right?

 7      BY MS. MOORE:

 8            Q.   If you turn to the first page, sir.

 9            MS. CAPODICE:  It's on the last page.

10      BY MS. MOORE:

11            Q.   It's under Tina Morrow visit date

12      Thursday, July 3rd.  Right here.

13            A.   Okay.  Yeah.  I'm just making sure I have

14      the records here.  I'm just trying to make sure I'm

15      on the --

16            Q.   It didn't make sense to us either.

17            A.   I don't know why it all printed out this

18      many pages and this is just --

19            MR. KOTT:  It's a different format.

20      BY MS. MOORE:

21            Q.   So if you turn to the second to the last

22      page of what we have now marked as Morrow -- I'm

23      sorry -- Morrow Exhibit No. 59, under pelvic

24      enterocele.  Preoperative plan, risks discussed.
```

Nathan W. Goodyear, MD

1      Take a look down there and tell me if you see the

2      risk of failure urinary retention.

3          A.   You're asking do I see those words?

4          Q.   Yes, sir.

5          A.   No, I don't see those words.

6          Q.   Okay.  And my question is, a couple months

7      later, your consent changed and why is that?

8          A.   As we -- this is a verbal discussion

9      consent and then there's a written.  So what I write

10     down is verbally what we specifically discussed.

11     And it's unique to that individual.  So, for

12     example, Ms. Taylor did not -- she already had a

13     hysterectomy, so there's no reason to discuss with

14     her an incidental oophorectomy as a potential risk

15     versus here that might be indicated.  So it needs to

16     be --

17         Q.   Tailored?

18         A.   -- customed and tailored to each

19     individual client.

20         Q.   And did you get Ethicon's feedback on

21     that?

22         A.   No.

23         Q.   Why not?

24         A.   This was a discussion, he wasn't in the

Nathan W. Goodyear, MD

```
 1    room with me when I was talking to my patient.

 2    That's a HIPAA violation.

 3         Q.   But you're having risk discussions and did

 4    you want to discuss with the Ethicon rep what

 5    Ethicon thought about these risks associated with

 6    the mesh surgeries?

 7         A.   As I think we have discussed this before,

 8    when I formulated the written consents and it was

 9    based on the available literature easily findable at

10    that time, and this company bringing a new product

11    to market, I wanted to make sure that what I was

12    claiming the literature supported about the safety

13    and efficacy of this product, that Ethicon agreed

14    with, because they were bringing this new procedure

15    to market.

16         Q.   And it had been on the market for how many

17    years in 2008?

18         A.   The Prolift first came on the market in

19    2005.

20         Q.   Two years?

21         A.   Roughly.  I think it was mid 2005 it came

22    out.  So two and a half years.

23         Q.   So it was important to discuss with

24    Ethicon some risks, but not all of them?
```

Nathan W. Goodyear, MD

```
 1                MR. KOTT:  Object to the form.

 2                THE WITNESS:  No.  If you're developing a

 3           consent risk on a new procedure, okay, the

 4           power of evidence available at the -- on the

 5           procedure itself is by the creator of the

 6           product, the creator of the technique.  So the

 7           power of evidence lies there.  And so that

 8           obviously has to be a resource -- a resource to

 9           utilize in that.

10      BY MS. MOORE:

11           Q.   And the power of evidence from the

12      manufacturer is more important than the power of

13      evidence from the person who actually does the

14      surgery, and has the experience?

15           A.   Can we look at power?  What you're doing

16      is you're looking at volume of studies.  You're

17      looking at patients.  I'm one surgeon versus

18      multitudes of surgeons.

19           Q.   Right.  You're one surgeon doing the

20      surgery not the other surgeons?

21           A.   That's correct.  That's correct.  But when

22      you look at the power of it, you have to bring it

23      all in.

24           Q.   And what's more important in the end, your
```

Nathan W. Goodyear, MD

1      experience, right, sir?

2              MR. KOTT:  Object to the form.

3              THE WITNESS:  The objective is to not hurt

4          the patient.  First, do no harm.

5      BY MS. MOORE:

6          Q.   First, do no harm.  And you believe it was

7      best to put the lower risk in, that would be more

8      beneficial for your patient, despite the fact that

9      you had concerns about that risk?

10             MR. KOTT:  Object to the form.

11             THE WITNESS:  No.  Again, I think I showed

12         you that the evidence available at that time

13         readily provided that risk profile.

14     BY MS. MOORE:

15         Q.   Now, you can't have it both ways.  You're

16     saying on one hand, this is what the evidence said,

17     and this is what I'm hearing from Ethicon.  Which

18     one is it?

19             MR. KOTT:  Object to the form.

20     BY MS. MOORE:

21         Q.   I'll withdraw the question.

22         A.   Okay.

23         Q.   But you can't have it both ways, can you?

24             MR. KOTT:  Object to the form.

Nathan W. Goodyear, MD

1              MS. MOORE:  It sounded so good.  Strike

2         that.

3              MR. KOTT:  Object to the form twice.  You

4         still want to try to answer that?  "You can't

5         have if both ways," I think it's a question

6         that Counsel has proposed -- proposed to the

7         witness.

8    BY MS. MOORE:

9         Q.   It seems -- it seems you're in a little

10   bit of a quandary, aren't you, Doctor?

11              MR. KOTT:  Object to the form.

12              THE WITNESS:  I don't think so.

13   BY MS. MOORE:

14        Q.   Let's move on.  So what is a -- well, what

15   is an incident -- what is an incidental

16   oophorectomy?  Is that vaginal -- where you're

17   closing the vagina?

18        A.   No, incidental oophorectomy is referencing

19   the ovaries.

20        Q.   Okay.  All right.  And then the failure of

21   urinary retention, did -- you did not discuss with

22   Mrs. Morrow?

23        A.   Now, you're referencing what was discussed

24   with Ms. Taylor?

Nathan W. Goodyear, MD

```
 1            Q.   Yes.  And I'm questioning why you did not

 2      discuss that with Mrs. Morrow.

 3            A.   Again, this is a documentation of a verbal

 4      discussion.

 5            Q.   Right.

 6            A.   So I was only going to document what we

 7      verbally discussed in broad, and so I don't know

 8      why.

 9            Q.   I just didn't know if the rep told you it

10      was not important to discuss --

11            A.   Again, the rep was not in with me with the

12      patient.

13            Q.   You were relying on what the rep had told

14      you, and so I didn't know if they passed on anything

15      about failure of urinary retention?

16                 MR. KOTT:  Object to the form.

17                 THE WITNESS:  No.

18      BY MS. MOORE:

19            Q.   The only aspect of information that you

20      relied on from the Ethicon rep was about erosion

21      rates?

22                 MR. KOTT:  Object to form.

23                 THE WITNESS:  No, that's what you were

24            asking the questions primarily was about the
```

Nathan W. Goodyear, MD

```
1              erosion rates.

2       BY MS. MOORE:

3              Q.   What other things in your consent -- and

4       we'll turn to that now -- did you rely on from

5       Ethicon?

6              A.   In broad, it's the effectiveness and all

7       the complications and side effects associated with

8       it.

9              Q.   In your consent -- let's see.  That's

10      TVT-O.  I'm going to hand you the consent that was

11      used with Mrs. Morrow.  And --

12              MS. MOORE:  We have got one for you in a

13          second.

14              MR. KOTT:  Kim, can you be more concise

15          now?  We are using consent in two terms.  One

16          to reference the recording in the exam, and

17          then the other one I think you now mean the

18          form that was signed by the client.

19              MS. MOORE:  Give me one second, Counsel,

20          and I'll --

21              MR. KOTT:  You'll straighten that out.

22          Thank you.

23

24      BY MS. MOORE:
```

Nathan W. Goodyear, MD

1          Q.   It looks like you now have -- may I see

2     the notes that you're making on your report, please?

3          A.   Sure.

4          Q.   Different patients, different -- the

5     record reflects -- I'm looking at your notes.

6     Different patients, different risks.  "Taylor's

7     previous hysterectomy, no need for incidental

8     oophorectomy.  Evolve."  What does evolve mean?

9          A.   It means that with new knowledge, things

10    will change.

11         Q.   Meaning the consent and warning?

12         A.   Exactly.  And the safety and efficacy of

13    the device.

14         Q.   And knowledge about that?

15         A.   Well, that comes with time.

16              (Exhibit No. 60 marked.)

17    BY MS. MOORE:

18         Q.   Okay.  So let me hand you the consent

19    we'll mark as Exhibit No. 60:  These are the Tina

20    Morrow written consents.

21              MS. KOTT:  All three of them?

22              MS. MOORE:  Yes.  And they are dated

23         July 3rd, 2008.  And then there's a mesh

24         consent dated August 12th, '08.  And I'll mark

Nathan W. Goodyear, MD

```
 1              that as Exhibit No. 61.  And then finally

 2              another Tina Morrow consent.

 3                   MR. KOTT:  The first one looks like a

 4              general consent, and then there seems to be --

 5              they are kind of -- it seems to be --

 6                   (Exhibit No. 61 marked.)

 7      BY MS. MOORE:

 8          Q.   The first one seems to be what we've seen

 9      as the mesh consent.  And it's a three-page

10      document.  It says number one under one.

11          A.   Looks like you duplicated the first two

12      pages.

13                   MR. KOTT:  Yeah, something is screwy.

14      BY MS. MOORE:

15          Q.   Placement of polypropylene mesh is the

16      first one.

17          A.   Yeah, but what I'm saying, it looks like

18      the first page is a duplicate.

19                   MS. MOORE:  There may be.  There's two

20              different Bates numbers.

21                   MR. KOTT:  I see it now.

22                   MS. MOORE:  In an abundance of caution we

23              did not want to pull what we wanted -- so the

24              first one --
```

Nathan W. Goodyear, MD

```
 1              MR. KOTT:  May I show him?  It's a

 2        duplicate first page.

 3              MS. MOORE:  I don't know for sure why,

 4        that's how it came to us.  It may or may not

 5        matter.  And then the second one is TVT/TVT-O.

 6        TVT-S circled.

 7              MR. KOTT:  Correct.

 8              MS. MOORE:  All right.  And that's another

 9        two-page document.

10              MS. KOTT:  A third --

11              MR. KOTT:  Is there a third?  Let's go off

12        the record a minute.  You want to go off the

13        record, Kim, and try to straighten it out?

14              MS. MOORE:  What's No. 61?  I'm sorry, I

15        might have handed you --

16              VIDEOGRAPHER:  Okay.  We are going off the

17        record.  The time is 10:10.

18              (Off the record.)

19              VIDEOGRAPHER:  Time is 10:14.

20              MR. KOTT:  Make copies of them after you

21        finish them.

22              MS. MOORE:  Absolutely.  This will now be

23        Exhibit No. 61, which is going to be, I

24        believe, the complete set of consents that Dr.
```

Nathan W. Goodyear, MD

1          Goodyear had Mrs. Morrow sign.

2              MR. KOTT:  Exactly.  Perfect.

3              MS. MOORE:  And so having said that if

4      you --

5              MR. KOTT:  May I give it to him?

6              MS. MOORE:  Absolutely.

7      BY MS. MOORE:

8          Q.  Take a look at that.  And, Doctor, we have

9      looked at, you know, consents for your other

10     patients, and seen, I believe, in many instances, if

11     not all, where you have gone through the consent for

12     the TVT, for the mesh, and for the Prolift; is that

13     fair to say?

14         A.   TVT, the mesh, and the Prolift, yes.

15         Q.   It would be your custom to take the time

16     to discuss, as you have in the office, the risks

17     that you believe to be important and then take the

18     patient through the actual consent, provide them

19     with an opportunity to ask questions, and then have

20     them sign it and have it witnessed?

21         A.   Correct.

22         Q.   And if you look, for example, under the

23     mesh risk, you discussed with the patient,

24     obviously, the purpose of the surgery and the

Nathan W. Goodyear, MD

1    alternatives of the surgery and the fact that there

2    are no guarantees, correct?

3        A.   Correct.

4        Q.   And I think we've read this into the

5    record a couple of occasions, but it was important

6    for you to document, to discuss, the items that are

7    listed on -- for example, if you turn to the

8    following risks known to be associated with this

9    treatment, have been explained to me.  Next page,

10   beginning with brain damage?

11       A.   Yes.

12       Q.   And it goes all the way down and it talks

13   about some of the risks here.  And it says,

14   "infection and erosion."  Now, in this particular

15   signed one in July of 2008, is there a reason why

16   you took the 3 to 5 percent out?

17           MR. KOTT:  Object to the form.

18           THE WITNESS:  I don't know why that's not

19       there.

20   BY MS. MOORE:

21       Q.   I didn't know if that was a result of

22   information you were getting at the time in the 2008

23   period?

24       A.   Again, I think it's --

Nathan W. Goodyear, MD

```
 1                  MR. KOTT:  Hand those to me, please.

 2                  THE WITNESS:  If I remember correctly, one

 3            did not have 3 to 5 percent, the written; and

 4            it was the verbal where that was quoted.

 5       BY MS. MOORE:

 6            Q.   Right.  So this one is a signed one,

 7       though?

 8            A.   Yeah, but what I'm saying, I don't think

 9       that was ever there.  I think it was in the verbal

10       that was there.  The percentage quote.

11            Q.   And I can show you, it's also in the

12       written consents and others.

13            A.   Okay.  I don't know why it wasn't there.

14            Q.   That's my question.  I did not know if

15       the -- did the Ethicon sales rep tell you to delete

16       the reference?

17            A.   Well, this predated, I believe, Ms.

18       Taylor, so --

19            Q.   Wait.  No, I'm talking about -- this is in

20       '08?

21            A.   Right.

22            Q.   So when did you have the discussion with

23       the Ethicon --

24            A.   Again, the conference was in '08.  You
```

Nathan W. Goodyear, MD

1     wanted me to try to nail it down.

2          Q.   The conference is in '08?

3          A.   I think what you're trying to say, if

4     there was a change in percentage.  You're trying to

5     say that the percentage here -- Mrs. Morrow, her

6     surgery occurred before Ms. Taylor?

7          Q.   Right.

8          A.   Okay.  So I quoted a three point -- 3 to

9     5 percent for Ms. Taylor.  Who occurred -- the

10    surgery was in August.  So that is a surgery after

11    this one.  So the 3 to 5 percent would still apply

12    that I would have quoted here.  So I did not --

13    hadn't changed the 3 to 5 percent.

14         Q.   Okay.  That's what I want to make sure.

15    And there was no -- I just want to make sure when

16    there's a different patient or different time

17    period, if there was anything going on with the

18    sales rep that you recall that altered what you were

19    doing or what you were saying to the patient?

20         A.   No.

21         Q.   So this one is silent on potential risk,

22    but you did discuss erosion?

23              MR. KOTT:  Object to the form.  Silent on

24         potential risk.  Vague.

Nathan W. Goodyear, MD

```
 1                    MS. MOORE:  Silent on -- withdrawn on my

 2           question.

 3      BY MS. MOORE:

 4           Q.   Your consent here with Mrs. Morrow is

 5      silent with respect to the percentage range for

 6      erosion, correct?

 7           A.   Correct.  That's not listed here.

 8           Q.   All right.  And you continue throughout

 9      this to risk -- a list of the risks of other things

10      that we have talked about, and that would be, for

11      example, failure for improvement or even temporary

12      improvement.  It says failure improvement -- lack of

13      improvement?

14           A.   Can you reference where you are?

15           Q.   Yes.  The last one down says --

16           A.   Is that number five?

17           Q.   No, I'm kind of looking at -- the section

18      here I'm pointing to, it says, "The following risks

19      known to be associated with this treatment have been

20      explained to me."  This is under placement of mesh.

21      Do you see that, sir?

22           A.   Yes.  This is the second one, correct.

23           Q.   Yes, sir.  And I just wanted to make sure

24      I understood, you talked about "there is a
```

Nathan W. Goodyear, MD

1    possibility of lack of improvement, being the

2    patient will not get better"?

3         A.   Correct.

4         Q.   "There is a possibility of a temporary

5    improvement, you might get better for some time and

6    then return to baseline or get worse"?

7         A.   Correct.

8         Q.   And then you could have a "failure of

9    urine problems, control or prolapse symptoms again"?

10        A.   Correct.

11        Q.   Discomfort with sexual intercourse?

12        A.   Correct.

13        Q.   So all of these risks that are in here

14   were known to you before you did surgery on Mrs.

15   Morrow, Mrs. Shively, and Ms. Taylor, correct?

16        A.   Correct.  The issue, though, is the

17   underrepresentation of the degree of the risk.

18        Q.   Okay.  Now, that's a good point.  Because

19   in your -- if you go right underneath what I just

20   read, it says, "I have been informed of the

21   probability of occurrence of each of the above risks

22   as the result of or in connection with the surgical

23   or medical procedure contemplated herein.

24             What probability of occurrence did you

Nathan W. Goodyear, MD

1    provide Mrs. Morrow for each of the risks in

2    connection with the surgical or medical procedures

3    listed above?

4        A.   I don't know what probability I quoted for

5    them.

6        Q.   Okay.  Well, it's in your consent.

7        A.   "I have been informed, Mrs. Tina Morrow,

8    there's a probability of surgical repair.  Mrs. Tina

9    Morrow, there is a probability that this mesh will

10   create chronic inflammatory response and result in

11   erosion risk.  Mrs. Tina Morrow, there's a

12   possibility."  So there were certain aspects where

13   the probability was general probability.

14       Q.   So you're saying --

15       A.   Because this was a new procedure.

16       Q.   -- probability of occurrence not

17   possibility?

18       A.   Probability.  Possibility.  Possibility

19   (sic).

20       Q.   Let's use the words that you chose for

21   your consent, or was this language that came from

22   Ethicon?

23       A.   This language was not from Ethicon.

24       Q.   Okay.  You want your patients to affirm

Nathan W. Goodyear, MD

```
1     that they have been informed by you of the

2     probability of occurrence of each of the risks --

3     above risks as the result of or in connection with

4     the surgical, medical procedures contemplated

5     herein.  And I'm asking you what was the probability

6     of occurrence for each of the above risks that you

7     shared with Mrs. Morrow on or before July 3rd, 2008?

8          A.   I don't recall what I quoted her.  I'm

9     sorry, I thought I just opened her water.

10         Q.   Go ahead and attach that, please.  Let's

11    turn then to -- we'll attach those consents.  And

12    then -- it was -- were you aware that Mrs. Morrow

13    testified that on July 3rd of 2008 -- strike that.

14    I apologize.

15              On October 29th, 2015, that she wasn't

16    having any symptoms at the time you told her and

17    recommended that she have surgery?

18              MR. KOTT:  Object to the form.

19              THE WITNESS:  Actually, I think I pointed

20         out that she was having symptoms of bloating,

21         stress urinary incontinence, and urgency

22         associated with incontinence.

23

24    BY MS. MOORE:
```

Nathan W. Goodyear, MD

```
1            Q.   If she were to testify that -- the
2     question, "Was that because you weren't having" --
3     strike that.
4                 "What do you recall about the visit on
5     July 3rd, 2008, with Dr. Goodyear?"
6                 "That he said I had a prolapsed wall and
7     my colon had fell, too.  But I also remember that I
8     was shocked by that, and that I was going to have to
9     have surgery."
10                And question, "Why were you shocked?"
11                "I did not know.  I did not realize that
12    it was -- that it needed to be."
13                Question, "Was that because you weren't
14    having any symptoms that you recall?"
15                Answer, "Nothing I can remember.  I guess,
16    maybe there was pressure.  But I just -- I don't
17    know that it was bad.  I had trouble using the
18    bathroom, a bowel movement."
19                Do you recall any discussions with Mrs.
20    Morrow about not really having symptoms that would
21    necessitate surgery?
22                MR. KOTT:  Object to the form of the
23         question.  Misstates the testimony.
24                MS. MOORE:  We are going to attach that
```

Nathan W. Goodyear, MD

```
 1              testimony to the deposition as Exhibit No. 62.
 2                   MR. KOTT:  I object to it being attached
 3              unless the whole deposition is attached.
 4                   MS. MOORE:  You want to attach the whole
 5              deposition?  We'll attach that section, if he
 6              wants to pull something else out.
 7      BY MS. MOORE:
 8              Q.   And then let's go to the next step --
 9                   MR. KOTT:  She said she's not going to.
10              If I wanted to do it --
11                   MS. MOORE:  You know what, Counsel, I'll
12              be happy to print the whole thing.  It's not a
13              big deal.
14                   (Exhibit No. 62 marked.)
15      BY MS. MOORE:
16              Q.   July 11th, 2008, I have that you're doing
17      a POP exam.  You told us about that yesterday,
18      correct?
19              A.   Correct.
20              Q.   And your results from that POP exam, you
21      pretty much had a sense already according to your
22      testimony a few minutes ago, right?
23              A.   The results of the POP-Q are in here in
24      her medical records.
```

Nathan W. Goodyear, MD

```
1          Q.   Right.  But you had a pretty good idea

2     before you did the POP-Q of where she would be as

3     far as --

4          A.   As I discussed earlier, usually, stage

5     one, stage two, it's pretty obvious, and the POP-Q

6     basically gives you confirmation.

7          Q.   And let's go to the actual surgery,

8     August 12th, 2008.  And --

9          A.   The operative report, is that where we are

10     going?

11          Q.   Yes, sir.  And just basically --

12          A.   And what was the date of that?

13          Q.   August 12th, 2008.

14          A.   Okay.

15          Q.   And your findings on that date were very

16     large enterocele.  Mid-high, low rectocele.

17     Paravaginal defects with proximal cystocele.  Normal

18     bladder urethral mucosa with negative cough test,

19     correct?

20          A.   Yeah.  When I look at the preoperative

21     diagnosis, I see stage two enterocele.  Stage two

22     vault prolapse.  Stage two cystocele with

23     paravaginal defects, stress urinary incontinence.

24          Q.   Right.  And I was going to the findings
```

Nathan W. Goodyear, MD

1    after you did surgery, that's what I was reading

2    from.  I apologize, I wasn't clear.

3           A.   Okay.

4           Q.   And it appears that the surgery was

5    without complication?

6           A.   My recollection is correct and as stated.

7           Q.   And it's also referenced in your report?

8           A.   Sure.

9           Q.   August 18th -- I'm just going to move

10   through these, so you might just want to follow.

11   And, of course, anytime you want to look through

12   something --

13          A.   The way these are laid out, I'm going back

14   and forth.  So August --

15          Q.   August 8th, and then we'll go to August

16   25th, kind of in chronological order.  If you want

17   to take a minute and go off record to fix that,

18   would that help you?

19          A.   August 25th.

20          Q.   Okay.  It appears she --

21          A.   Hold on a second.  I jump from July 25th

22   to August 18th.

23          Q.   Thank you.  You're with me.

24          A.   Great.

Nathan W. Goodyear, MD

```
 1           Q.   All right.  Says, "post-op visit."  And
 2      she is feeling worse.  She passed a large clot after
 3      having trouble with her bowel movement.  And she had
 4      bled significantly.  And she had a lot of strain
 5      that weekend.  So what -- just help me understand
 6      what's going on with this particular patient.  This
 7      is post surgery and she's having difficulty with her
 8      bowel movements.  Is that as a result of anything
 9      with the surgery or is that her constipation or a
10      combination of factors?
11           A.   It's a combination of factors.
12           Q.   All right.  And go to the next visit,
13      that's just about a week later.  She's still
14      hurting --
15           A.   Just for verification it's August 25th.
16           Q.   Thank you.  About a week later.
17           A.   Yeah.
18           MR. KOTT:  Excuse me, does anyone have
19      their luggage out by the elevator?
20           MS. CAPODICE:  It's probably mine.
21           MR. KOTT:  I'll get it, I'll get it, if
22      you will just hold off a minute.
23           MS. MOORE:  If anybody wants my dirty
24      underwear, and you can put that on the record.
```

Nathan W. Goodyear, MD

```
 1                  MR. KOTT:  Don't do that.  Turn off the
 2           thing.  I'll get it, okay.
 3                  VIDEOGRAPHER:  We are off.
 4                  (Off the record.)
 5                  VIDEOGRAPHER:  All right.  We are back on
 6           the record.  The time is 10:32 a.m.
 7    BY MS. MOORE:
 8           Q.   Doctor -- strike that.
 9                  Doctor, we are going through Mrs. Morrow's
10    visits with you.  And I believe we were on
11    August 25th, '08.  She returns for a follow-up
12    visit.  She's still hurting.  That means she's still
13    hurting in what particular area, any reference,
14    post-op?
15           A.   Well, we did the surgery in the pelvis, so
16    I would assume to be pelvis anywhere.
17           Q.   So that would be kind of normal,
18    especially post-op?
19           A.   Immediately post-op.
20           Q.   All right.  She's negative for
21    dyspareunia.  So she's not having --
22           A.   She wouldn't be sexually active at the
23    time.
24           Q.   At that time.  Dyspareunia, nocturia,
```

Nathan W. Goodyear, MD

1     polyuria, vaginal discharge or itching.

2            Let's go to the next visit, September 8th.

3     Looks like she doesn't have any complaints; is that

4     true?

5            A.   Yes.  It says well -- "no complaints.

6     Still with some Valsalva to move bowels.  Taking

7     stool softeners, no bulge, no odor, pain much

8     improved."

9            Q.   And why was she still requiring -- and for

10    the ladies and gentlemen of the jury, what is

11    Valsalva to move bowels?  Is it what we talked about

12    before?

13           A.   Valsalva is simply bearing down, abdominal

14    pressure, to evacuate.

15           Q.   Why was she requiring, or needed, Valsalva

16    to move her bowels?

17           A.   Couple things.  Number one, she's still in

18    the immediate post-op period.

19           Q.   And, again, negative for any kind of

20    abnormal vaginal bleeding or vaginal discharge.  And

21    then a follow-up, again, I have in September 28th,

22    she's -- September 28th, 2008.  And she,

23    at this point, complains of "still with abdominal

24    soreness and some small bleeding"; is that right?

Nathan W. Goodyear, MD

1        A.   That's what's recorded there, yes.

2        Q.   All right.  And if you look under

3   genitourinary, it looks like you're examining her

4   genital area, you see that the trocar sites were

5   well healed.  "Vagina suture lines intact without

6   exposure.  Stress test negative."  And then you "cut

7   the proline suture anteriorly.  Small spread of

8   graft anteriorly.  Cut and removed, none palpable."

9   What are you doing, what does that mean?

10       A.   Well, when I did the exam there, it looked

11  like there was what appeared to be a small suture,

12  but it's hard at that stage of the game sometimes to

13  tell between the suture and maybe a small piece of

14  exposed mesh.

15       Q.   Okay.  So in your expert report, if you

16  look at your reference at six weeks -- are you with

17  me?

18       A.   Yeah.

19       Q.   It says "six weeks post-op, 9/22/08.  A

20  small piece of mesh, or less likely suture, was

21  noted anteriorly on exam."  Why are you saying less

22  likely suture when at the time you actually did the

23  exam, you put PROLENE suture?

24       A.   Because when -- the typical suture we

Nathan W. Goodyear, MD

```
1    would use would be a fairly rapidly absorbing
2    microl.  And so -- though it can stay longer than
3    the company currently recommends -- says that it
4    stays, it can kind of give the appearance, if it's
5    cut really short, of a PROLENE.  So without actually
6    opening it up and saying what is this, it's really
7    hard to assess that because you don't want to do a
8    lot of digging in and around that area.
9         Q.   Fair enough.  And so at this point you
10   just weren't really sure one way or the other?
11        A.   Correct.
12        Q.   Okay.  Let's move forward to October 6th
13   in 2008.  She's having some bleeding.  "Still having
14   bleeding, especially after bowel movements.  Her
15   pain for the most part is resolved and she's feeling
16   better."  You note on exam, "good pelvic support.
17   Small exposure proximal anteriorly, small exposure
18   at the posterior fourchette," correct?
19        A.   That is correct.
20        Q.   And you're doing a -- you ask her to do a
21   consent for reclosure of incision?
22        A.   Following that exam, correct.
23        Q.   All right.  Now, looking at your expert
24   report on your reference to October 6th, 2008 --
```

Nathan W. Goodyear, MD

1          A.    Yes.

2          Q.    -- it says -- you reference increased

3     blood discharge.  And I don't see the word increased

4     in your notes on that day.

5          A.    That's October 5th?

6          Q.    October 6th.

7          A.    Oh, I'm sorry, 6th, yes.

8          Q.    And under the history and physical, has a

9     brown discharge all day long with strong odor.

10    Still with blood discharge.  I just did not see the

11    word increased in your notes.  Did you add that in

12    your report?

13         A.    Yeah.  It was a continued vaginal

14    bleeding.

15         Q.    Not necessarily increased, but continued?

16              MR. KOTT:  Object to the form.

17              THE WITNESS:  Yeah.

18    BY MS. MOORE:

19         Q.    Is that correct?

20         A.    Correct.

21         Q.    Okay.  And we go to October 4th when

22    you're doing the procedure.  You're removing vaginal

23    exposure of mesh and reclosure of the vaginal

24    mucosa.  At this point you're seeing --

Nathan W. Goodyear, MD

```
 1          A.   The October 4th operative?

 2               MR. KOTT:  14th, I believe.

 3               MS. MOORE:  14th.

 4               MR. KOTT:  I think it's the 14th.

 5               MS. MOORE:  I believe you're right.  I

 6          hope I clarified that.

 7     BY MS. MOORE:

 8          Q.   Let the record reflect I believe it's

 9     October 14th, Doctor.

10          A.   Thank you.  I'm not seeing that operative

11     report.

12          Q.   Okay.  No problem.

13               MS. KOTT:  It's in the hospital records.

14               MS. MOORE:  We are going to mark that as

15          Exhibit No. 63.

16               (Exhibit No. 63 marked.)

17     BY MS. MOORE:

18          Q.   Take a moment and look at that.  If you

19     look at the record here:  Removal of vaginal

20     exposure of mesh.  The closure of vaginal mucosa.

21     And no complications, correct?

22          A.   That's how it reads, correct.

23          Q.   And this was -- let's see.  And it was

24     "removed via curved Mayo's very easily."  What does
```

Nathan W. Goodyear, MD

1    the removed via curved Mayo's very easily mean?

2         A.   You're asking me to go back and try to

3    review what I was thinking when I dictated that.

4    But it means that I was able to cut the exposed

5    mesh -- it cut very easily, there was not -- that's

6    typically what it means.

7         Q.   And once you did that, there was no

8    palpable visible mesh exposed at that point?

9         A.   Correct.  That's how it reads.

10        Q.   And you have no reference in here to any

11   type of fraying or roping or degradation with the

12   mesh that you trimmed?

13        A.   Not as it relates to, you know, this

14   particular aspect of Mrs. Tina Morrow, no.

15        Q.   Well, any aspect of Mrs. Morrow, there's

16   no reference to anything in your report?

17        A.   Correct.

18        Q.   And, in fact, in all the reports that

19   we've seen so far, you have not documented where

20   you've seen fraying, roping, or degradation in any

21   of the mesh that you have excised, correct?

22        A.   Correct.  But it wasn't in a lot of these

23   women and a lot of information available at that

24   time in terms of the fraying, etcetera.

Nathan W. Goodyear, MD

1          Q.   But, Doctor, you have never noted anything

2     about any particular aspect of mesh once you've

3     excised it?

4               MR. KOTT:  I'm sorry --

5               MS. MOORE:  Correct?

6               MR. KOTT:  I'm sorry.  Object to the form.

7          I may not object.  You asked if he had noted it

8          in his record?

9               MS. MOORE:  Yes.

10              MR. KOTT:  Sorry, no objection.

11              THE WITNESS:  Not noted in the record.

12     BY MS. MOORE:

13         Q.   Or any of your records?

14         A.   I've got Tina's in front of me, so I can't

15     be completely --

16         Q.   Well, if you had seen something, you would

17     have noted it?

18              MR. KOTT:  Objection to the form.

19              THE WITNESS:  Correct.

20     BY MS. MOORE:

21         Q.   Let's continue.  You also saw a small

22     exposure posteriorly at the posterior fourchette

23     that you also removed, correct?

24         A.   Correct.

Nathan W. Goodyear, MD

1           Q.    Did you send the specimen to pathology?

2           A.    Pathology.  No, I did not.

3           Q.    And why not?

4           A.    Again, you're asking me to go back to that

5      point in time, I don't know.

6           Q.    It just wasn't something that you deemed

7      to be necessary at that point?

8           A.    Well, they were small.  And so --

9           Q.    Small incisions, not significant?

10          A.    Small --

11                MR. KOTT:  Object to the form.

12                THE WITNESS:  Small, typically being very

13                little to send off.

14     BY MS. MOORE:

15          Q.    Thank you.  And then post-op -- I think we

16     got this.  Let's see.  Post-op you did not palpate

17     or see any mesh?

18          A.    What day of the visit would that be?

19          Q.    Well, let's just look at 11/6/2008.

20          A.    I'm there.  Okay.

21          Q.    She's doing great here, right?  But "still

22     with straining with her bowels"?

23                MR. KOTT:  Object to the form.

24                THE WITNESS:  That's how it reads,

Nathan W. Goodyear, MD

```
 1            correct.

 2     BY MS. MOORE:

 3            Q.   So she's doing better.  And why is she

 4     "still straining with her bowels"?

 5            A.   There could be, again, a variety of

 6     reasons, because this is now a -- where we have

 7     repeated a surgery, so still extended healing

 8     process possibly going on.

 9            Q.   And there are negative -- "suture lines

10     are intact without evidence of exposure," correct?

11            A.   That's how it reads, correct.

12            Q.   Let's go to November 24th.  Another follow

13     up.  Negative for lesions, hematuria, menstrual

14     problems, polyuria, abnormal vaginal bleeding, and

15     discharge.  So she's not having any of those types

16     of problems, correct?

17            A.   That is correct.

18            Q.   And let's look at your expert report.  I

19     believe it's on the first page at the bottom of the

20     page, beginning with postoperatively.

21            A.   Okay.  Yeah.  The very first word, yeah.

22            Q.   And you say postoperatively the pain and

23     bleeding persisted.

24            A.   This is under clinical summary.  What
```

Nathan W. Goodyear, MD

```
 1     paragraph?

 2           Q.   It's on --

 3           A.   I've got it, very bottom of the page.

 4           Q.   So you say postoperatively the pain and

 5     bleeding persisted.  But she wasn't having any pain

 6     and she wasn't having bleeding, at least of the last

 7     two couple of visits, right?

 8           A.   Yes.  At least per the last couple of

 9     visits.  Let's go back to the last one, that page.

10     That is correct.

11           Q.   Okay.  So is that an error?

12           A.   No, I wouldn't say it was an error, it's

13     just at this point in the chart, she wasn't

14     having --

15           Q.   Well, why did you not --

16           MR. KOTT:  Whoa, whoa.  Please let him

17           finish his answer.

18     BY MS. MOORE:

19           Q.   Please finish.

20           A.   At this point in her chart, at those

21     particular times, visits, I did not, you know, see

22     any.  But when you look at the extent of her follow

23     up, she continued to have it.

24           Q.   All right.  Why did you not reference that
```

Nathan W. Goodyear, MD

```
1     she's doing great and no pain and bleeding noted in

2     your expert report during the October, November 2008

3     time period?

4          A.   Just like the same way where I did not put

5     that she was still requiring Valsalva and splinting,

6     I don't know why I didn't include those.

7          Q.   So you just put problems with pain and

8     bleeding persisted?

9          A.   Correct.

10         Q.   Is the persisted correct, because it's not

11    persisting?

12              MR. KOTT:  Object to the form.

13              THE WITNESS:  Well, persistent means

14         something that occurs, that's just typically

15         what it means.

16    BY MS. MOORE:

17         Q.   Is persistent ongoing?

18         A.   Not necessarily.

19         Q.   What does persistent mean to you?

20         A.   Persistent to me means that it's something

21    that has continued that existed before.  That

22    doesn't imply that it's a continuous process.

23         Q.   Okay.  What you mean here is

24    postoperatively the pain and the bleeding --
```

Nathan W. Goodyear, MD

```
 1              A.   Because a lot of times what will happen in

 2       these cases is you have a very small amount of

 3       vaginal bleeding and it will stay in the vaginal

 4       vault and they won't notice that for potentially

 5       hours to days and then they move and it will come

 6       out.

 7              Q.   Move to strike anything about the vaginal

 8       vault.

 9                   But -- so if we were to make this accurate

10       postoperative, the pain and bleeding occurred

11       sometimes?

12                   MR. KOTT:  Object to the form.

13                   THE WITNESS:  I'm sorry, can you re-ask

14          that question?

15       BY MS. MOORE:

16              Q.   Let's keep going to see what you mean by

17       persistent.  Okay?

18              A.   Okay.

19              Q.   Because we are now in November -- January

20       of 2009.  And let's look at your notes.  And --

21              A.   January -- what's the date?

22              Q.   30th, 2009.

23              A.   I'm there.

24              Q.   And from the history -- she comes in with
```

Nathan W. Goodyear, MD

```
 1      some occasional spotting.  And history and physical,

 2      her husband noticed a rough area during intercourse.

 3      No pain per Tina.

 4            A.   That's with reference to intercourse.

 5            Q.   So she's not having pain.  Let's see if

 6      you see evidence --

 7                 MR. KOTT:  Object to the form.

 8      BY MS. MOORE:

 9            Q.   Look at your note there and see if you see

10      any indication of persistent pain on that visit?

11            A.   Well, if you look in the context of that,

12      she's referencing intercourse.

13            Q.   Any pain.  I'm not limiting it to just --

14      so she's not having pain with intercourse, she's

15      not.  Her husband, obviously, has noticed what has

16      been described here.  My question to you is, though,

17      with respect to your comment in your report that

18      Mrs. Morrow had persistent pain.  Once again, we see

19      a record where there is no evidence of Mrs. Morrow

20      having pain?

21                 MR. KOTT:  Object to the form.

22                 THE WITNESS:  There's pain with

23            intercourse.  There can be pain otherwise.

24      BY MS. MOORE:
```

Nathan W. Goodyear, MD

1          Q.    Where is there evidence of any pain?

2          A.    Well, this right here is referencing

3    intercourse.  That's all I'm saying.  What is

4    written here is with reference to intercourse.  So

5    in terms of what she told me was, I'm here because

6    I'm -- my husband is noticing there's something

7    there that's painful.

8          Q.    All right.

9          A.    Now, that's not painful to her, that is

10   the act of intercourse.  But there's no confirmation

11   that -- is there pain outside of that, because

12   that's what she was --

13         Q.    Your records do not indicate that she was

14   having any type of pain on the visit of

15   January 30th, 2009, correct?

16         A.    That would be correct.

17         Q.    So there's no evidence that pain is

18   persisting on this particular visit, correct?

19         A.    On this particular visit, she is not

20   claiming that there is pain at that moment.

21         Q.    Would you rely on her to tell you if she

22   was having pain?

23         A.    Well, of course, I would.  Who else would

24   I rely on?

Nathan W. Goodyear, MD

```
 1            Q.   Well, we had seen in the last three visits

 2      no pain, but yet you're saying pain is persisting?

 3               MR. KOTT:  Object to the form.

 4               THE WITNESS:  Again, in the total scope,

 5           pain persists.  As I mentioned with the vaginal

 6           bleeding, there can be an interval where

 7           there's no bleeding, because it collects.

 8           These things can come and go.  We are not

 9           talking about continuous.

10      BY MS. MOORE:

11            Q.   Okay.  Let's keep going then.  Let's see.

12      There's no evidence of --

13            A.   Where are we now?

14            Q.   I'm still on that visit -- that visit

15      being January 30th and -- "atrophic mucosa

16      moderate" --

17            A.   January 30th?

18            Q.   Yes, sir.  And there was "good pelvic

19      support," correct?

20               MS. KOTT:  What date are we on?

21               MS. MOORE:  January 30th, 2009.

22               THE WITNESS:  Okay.  Sorry.  Would you

23           please re --

24      BY MS. MOORE:
```

Nathan W. Goodyear, MD

1          Q.    "Good pelvic support?"

2          A.    This is on exam?

3          Q.    Yes.

4          A.    Okay.

5          Q.    "Good pelvic support.  Atrophic mucosa?"

6          A.    Correct.

7          Q.    "Moderate?"

8          A.    Correct.

9          Q.    What, again, is the "atrophic mucosa"?

10         A.    Again, that's the thinning of the vaginal

11    mucosa.

12         Q.    And what can that -- what complications

13    could one see as a result of atrophic mucosa?

14         A.    You could have a thinning of the vaginal

15    mucosa, so you can have irritation, dryness, you

16    have decreased blood flow to that area.

17         Q.    Occasional spotting?

18         A.    It can, yes.

19         Q.    The occasional spotting that's referenced

20    on that January 30th, '09, what did you attribute

21    that to?

22         A.    I did not specifically direct what I

23    attributed it to, so I can't comment on it.

24         Q.    Let's go to July 8th, 2009.

Nathan W. Goodyear, MD

1          A.   July 8th, 2009?

2          Q.   Yes, sir.

3          A.   January 30th.  I go to March 19th.

4          Q.   I have July 8th.  It's an office visit.

5          A.   Okay.  July 9th, the next page.

6          Q.   All right.

7          A.   Out of order.

8          Q.   She's saying, "no pain with intercourse.

9     Some bleeding recently, though husband says it is

10    rough at times."  So there's no -- take a moment,

11    please, look at the entire report.  Is there any

12    evidence that Mrs. Morrow complained of any type of

13    pain with intercourse or otherwise to you on that

14    particular visit?

15              MR. KOTT:  That's a fair question.

16              THE WITNESS:  I don't see that documented

17         either.

18    BY MS. MOORE:

19         Q.   So the pain, again, is not persistent, we

20    have not seen pain at all?

21              MR. KOTT:  Object to the form.

22              THE WITNESS:  In here it's in reference to

23         intercourse.

24    BY MS. MOORE:

Nathan W. Goodyear, MD

```
 1              Q.   All right.  My question, though, was --
 2      and you told us earlier, it would be your custom and
 3      your habit when taking a history to write down
 4      anything significant, any complaints the patient
 5      has, correct?
 6              A.   That is correct.
 7              Q.   And is there a complaint of pain
 8      referenced on the July 8th, 2009 visit by
 9      Mrs. Morrow?
10              A.   There is not.
11              Q.   So there is, again, no evidence of
12      persistent pain that we have seen since immediately
13      post-op to at least through July 2009, correct?
14                   MR. KOTT:  Object to the form.
15                   THE WITNESS:  That we discussed or that I
16              asked, correct.
17      BY MS. MOORE:
18              Q.   Well --
19              A.   She wasn't aware that she had a stage two
20      prolapse.
21              Q.   You're saying she may have pain but not
22      know it?
23              A.   No.  The reference when she came in was
24      with regards to the intercourse and the pain that
```

Nathan W. Goodyear, MD

```
1      her husband was encountering.

2           Q.   But if she had any pain and documented --

3      and told you that, you would have recorded it?

4           A.   That is correct.

5           Q.   Okay.  So there's evidence in your records

6      of persistent pain, correct?

7           A.   The visit was about the painful

8      intercourse.

9           Q.   Why are you fighting me on this?

10          MR. KOTT:  Objection.  Objection.

11          Commentary.  Argumentative.  Interruptive.

12          Rude.

13     BY MS. MOORE:

14          Q.   All right.  Is there any evidence of pain

15     in any of the records that we have discussed post-op

16     until July 8th, 2009?

17          MR. KOTT:  Kim, the problem is there are

18          references to pain, you want to know if she --

19          okay, then you're going to get the same answer.

20          THE WITNESS:  In my records here with the

21          visits related to what you're referencing, it's

22          about intercourse, and there's no reference to

23          pain that she's saying there, it's all

24          reference to her husband.  But outside of that
```

Nathan W. Goodyear, MD

```
1            there are episodes where pain is attributed

2            beyond.

3       BY MS. MOORE:

4            Q.    Where?

5            A.    Other visits.

6            Q.    Okay --

7            A.    Beyond mine.

8            Q.    Okay.  I'm just talking about during this

9       time period.

10           A.    Well, these particular two here, no.

11           Q.    No, it's more than two.

12           A.    Well, I mean, the ones that you're

13      referencing.

14           Q.    There's no evidence of pain?

15           A.    Beyond the intercourse, as I've said

16      several times here, there is no other documentation

17      here.

18           Q.    So there is no evidence of pain recorded

19      of any type in any of the visits we have discussed

20      postsurgery?

21           A.    An individual -- a woman can have pelvic

22      pain with certain positions, standing, walking --

23           Q.    But she did not report that to you?

24           A.    -- and then say -- and then say, well,
```

Nathan W. Goodyear, MD

```
 1    does it hurt when you have intercourse?  No, it
 2    doesn't hurt.  There are very different processes.
 3    Because if you're talking about a nerve entrapment
 4    potentially with a mesh, as it relates to the
 5    healing process, that can create a radiation or
 6    radiculopathy type of pain.  So that can be a
 7    chronic ongoing pain that is different.  These
 8    visits are specifically about the dyspareunia.  So
 9    there may not have been any questioning beyond that
10    point.  These were specifics about what her husband
11    was encountering as it relates to intercourse.
12         Q.   Oh, there were limited visits, you did not
13    ask her how --
14         A.   Her complaints were with regards to that.
15         Q.   Right.  No complaints on anything else,
16    right?
17         A.   Not that she said.
18         Q.   And you wouldn't have limited her and
19    said, I don't want to hear about anything but your
20    problems with your husband's pain?
21              MR. KOTT:  Objection.
22              THE WITNESS:  Now you're leading to say I
23         would say that.  I would never say --
24    BY MS. MOORE:
```

Nathan W. Goodyear, MD

```
1          Q.   I'm not asking you --
2          A.   I would never say something like that.
3     That patient in my office is the most important
4     thing to me.  And that's why it's so important what
5     Ethicon did here, and they are representing the
6     risks of this procedure.
7          Q.   And that's what's really messed up
8     everything, right, that's the whole reason?
9          A.   Yeah, because there were a lot of women
10    that were hurt based on knowledge that we did not
11    know and was not given to us by your company.
12         Q.   And we are going to talk about that, but
13    right now the woman we are discussing is
14    Mrs. Morrow.  And you've said in your report, and
15    you have signed that report, that she experienced
16    postoperatively the pain and bleeding persistent.
17    Now, we are seeing here a complaint of bleeding, but
18    we have not yet in your records seen any indication
19    of Mrs. Morrow having pain, correct?
20              MR. KOTT:  Object to the form of the
21         question.
22              THE WITNESS:  I think I've already
23         answered that.
24    BY MS. MOORE:
```

Nathan W. Goodyear, MD

```
 1          Q.   I'm going to ask you to answer it again.

 2          A.   I seem to answer a lot of questions

 3     multiple times.

 4          Q.   Well, I'm sorry, sir, that's part of the

 5     process when you are trying to evade the question.

 6          A.   I'm not trying to evade.

 7               MR. KOTT:  Objection.  Objection.

 8               MS. MOORE:  Then answer the question.

 9               MR. KOTT:  Hold on a second.  I object to

10               this ongoing commentary.  I object to the

11               arguing with the witness.  And I know that this

12               is a long orgulous process, but please ask

13               Counsel to stop and gather herself.

14               THE WITNESS:  There is no documentation

15               here when she comes in talking about these

16               visits, I'm here with pain with intercourse,

17               per her husband, that she is commenting on

18               pelvic pain herself.

19     BY MS. MOORE:

20          Q.   Thank you.  All right.  Let's go on.  It

21     looks like that's the last time you saw her for --

22     until after she got involved in the litigation and

23     hired her lawyers, correct?

24               MR. KOTT:  Object to the form.
```

Nathan W. Goodyear, MD

```
 1              THE WITNESS:  I don't know when she got

 2         involved in litigation, so I can't tell you

 3         that.

 4    BY MS. MOORE:

 5         Q.   But just so you -- before we move on.

 6    Throughout the time you treated her, you said

 7    there's no evidence of pain.  Let's look at the --

 8              MR. KOTT:  Objection to the comment.

 9    BY MS. MOORE:

10         Q.   -- on the last visit, "no erosion,

11    extrusion seen or palpated," correct?

12         A.   Where are you, again?

13         Q.   Under genitourinary.

14              MR. KOTT:  Which date?

15              MS. MOORE:  Sorry.  July 8th, 2009.

16              THE WITNESS:  I read external genitalia:

17         Normal external genitalia, without lesions or

18         urethral abnormalities.  Vagina, atrophic

19         mucosa.  Moderate, as we discussed.  Good

20         pelvic support, no erosion, extrusion seen or

21         palpated, correct.

22    BY MS. MOORE:

23         Q.   All right.  Let's go, then, to turning

24    back into your, I believe, your report.
```

Nathan W. Goodyear, MD

```
 1            MR. KOTT:  We are about two hours in.

 2       What time is it now, sir?

 3            VIDEOGRAPHER:  You have about ten minutes

 4       before reaching two hours.

 5            MS. MOORE:  You want to just knock that

 6       out and take a break?

 7            MS. KOTT:  Yes.

 8            MS. MOORE:  I might be able to get through

 9       this IME report.

10   BY MS. MOORE:

11       Q.   Doctor, let's turn to your IME report.  I

12   guess before I do that, let me quickly ask questions

13   about your methodology, you talked about that.

14            MR. KOTT:  Can you -- is it --

15            VIDEOGRAPHER:  We have gone over the two

16       hours, that was my mistake.

17            MR. KOTT:  Okay.  Can you put -- perhaps,

18       just order that pizza like we talked about?

19            VIDEOGRAPHER:  Let us know what you want

20       and they will go get it.

21            MS. MOORE:  Why don't we take a break?

22            VIDEOGRAPHER:  We are going off.

23            (Off the record.)

24            VIDEOGRAPHER:  Okay.  We are back on the
```

Nathan W. Goodyear, MD

1              record.  The time is 11:11 a.m.

2    BY MS. MOORE:

3          Q.   Doctor, before we took a break, we were

4    talking a little bit about methodology.  Let's come

5    to that after we get through your complete report, I

6    think that would be easier.  So what I would like to

7    do, then, is turn to the section of your report

8    where you had an opportunity to discuss your most

9    recent visit and examination of Mrs. Morrow.  And

10   can you tell us about that, please?  Beginning with

11   the history she gave you at the time.

12         A.   Can you --

13         Q.   Your report?

14         A.   From that visit.  Let me make sure this is

15   correct.  November 19th, 2015.  Would you like me to

16   read this?

17         Q.   You know what -- let's try to get through

18   this quickly.  She presented -- kind of recap --

19   bleeding and pain has been persistent and has

20   increased in intensity since the surgery.  And we

21   have talked about your records, at least, did not

22   show, and we are not talking about other records, we

23   can talk about that in a little bit, but your

24   records did not show persistent pain since the

Nathan W. Goodyear, MD

```
 1    surgery prior to the November 19th, 2015 visit,

 2    correct?

 3         A.   That is correct.  These are just her

 4    complaints that she is telling me at the visit.

 5         Q.   Thank you.  And then the bleeding during

 6    the time period you saw her, we did note some

 7    spotting and occasional bleeding in the last visit,

 8    correct?

 9         A.   Correct.

10         Q.   Which would have been July 8th, 2009.  And

11    with respect to that bleeding, are you able to

12    attribute the bleeding to anything in particular

13    given the fact that she had the atrophic vaginitis?

14         A.   The most likely contributing factor was,

15    in fact, the mesh when she had the mesh erosion.

16    Now, on that last visit, which was July 8th; is that

17    correct?

18         Q.   I believe so.

19         A.   She was on vaginal estrogen, so that

20    should exclude atrophic vaginitis as a possibility

21    because that vaginal estrogen is a part of that

22    process of healing it.

23         Q.   That's a good question.  Where do you see

24    that she's on that?  I know you just described it
```

Nathan W. Goodyear, MD

```
 1    but --
 2          A.   It's just a continuation of the
 3    prescription there.
 4          Q.   It's in your records?
 5          A.   Well, it just says "prescription Estrace,"
 6    she had been on it before.  It's a continuance.
 7          Q.   So you have given her medication --
 8          A.   I put her on it before the first
 9    surgery -- after the first surgery.
10          Q.   If the records indicate that she was not
11    taking the Estrace during that time period, what --
12    could the vaginal atrophy be playing a role in the
13    bleeding?
14               MR. KOTT:  Object to the form.
15               THE WITNESS:  Yes, correct.
16    BY MS. MOORE:
17          Q.   Let's go then, continuing along, there's
18    discussion of -- bleeding, pain has been persistent
19    and increased in tenderness since the surgery.
20    That's based on what she told you?
21          A.   Correct.
22          Q.   Pain was dull constantly and acts as a
23    sharp pain that can be as high in intensity.  She
24    can't exercise and walking is painful in doing her
```

Nathan W. Goodyear, MD

1    work around the house.  That, again, is all based on

2    what she tells you.  And then you go forward and

3    you -- your exam, correct?

4         A.   Yeah.  Correct.

5         Q.   "Good support."  Under genitourinary.

6    "Good support, tight banding with arms bilaterally

7    interiorly.  Erosion noted interiorly proximally but

8    just to the left of midline.  Anteriorly pain has

9    persisted along the entire graft, maximal at arms.

10   A hard-like shelf area anteriorly is very tender

11   proximally in the midline.  Almost contracture like

12   in the arm.  Posterior granulation tissue is noted

13   along the midline."  I don't know why I had to do

14   that.  Strike that.  "A very hard shelf-like ridge

15   is noted posteriorly proximally in the vagina.  No

16   erosions were seen, nor palpated posteriorly.

17   Bloody vaginal discharge noted."  And then I have

18   induration or subcutaneous nodules.  Dot, dot, dot.

19   But those are your findings with respect to the

20   mesh, would that be fair to say, sir?

21        A.   That's correct, that's how it reads.

22        Q.   And then your assessment was prolapse in

23   vaginal vault after the hysterectomy?

24        A.   That's, again, just a CPT code.  That's

Nathan W. Goodyear, MD

1     initially what this was involved with, the mesh.

2          Q.   And then if you look at your notes -- I'm

3     sorry.  Your notes don't establish -- your personal

4     notes don't establish that she was having persistent

5     bleeding, vaginal discharge, pelvic and groin pain,

6     or burning in the groin area from the initial

7     placement of the product, correct?

8          A.   Can you rephrase that question or ask it

9     again, because I'm trying to get clarity when you

10    say my notes?

11         Q.   Yeah.  Look at your report beginning

12    with -- all right.  Thank you.  Okay.  On page three

13    of your report, under "see my notes for the most

14    recent exam"?

15         A.   Correct.

16         Q.   Records attached as Exhibit No. 3.  It

17    begins, "vaginal bleeding, vaginal discharge with

18    odor.  Pelvic and groin pain and burning in the

19    groin area were persistent from the initial

20    placement of the mesh product."

21              Do you see that, sir?

22         A.   I do.

23         Q.   Does -- the intensity of the pain has

24    progressed -- progressively increased since the

Nathan W. Goodyear, MD

1     placement of the mesh product.

2              Leaving aside what you may have from other

3     sources, just speaking to your experience, treating

4     the patient, that is not a correct statement --

5              MR. KOTT:  Object to the form.

6     BY MS. MOORE:

7         Q.   -- is it?

8         A.   Well, that's hard to say, because that's

9     what she told me when she came in.

10        Q.   And I'm asking you about -- so this isn't

11    your opinion, this is just resuscitation of what the

12    patient is telling you?

13             MR. KOTT:  Object to the form.

14             THE WITNESS:  And when you look at -- this

15        is basically -- I'm saying what she told me

16        that's happening in intervals since I last saw

17        her.

18    BY MS. MOORE:

19        Q.   All right.  So let me ask you about the

20    claim of vaginal discharge.  And if you would like,

21    we can go back through, because I have them right

22    here, every time in your report where it's negative

23    for vaginal discharge.  Negative for vaginal

24    discharge.  So my question is -- let's go through

Nathan W. Goodyear, MD

```
1    each one of these.  Vaginal discharge.  Isn't it

2    correct that as you sit here today, based on your

3    treatment of Mrs. Morrow, you do not attribute the

4    vaginal discharge to anything associated with the

5    mesh?

6              MR. KOTT:  Object to the form.

7              THE WITNESS:  Well, she's had some

8         multiple erosions and there's a long interval

9         where I don't see her and she comes in with

10        complaints of that, and then on exam -- so I

11        don't know how I cannot attribute it to it,

12        because that's what she told me.

13   BY MS. MOORE:

14        Q.   During the time you treated her -- I

15   understand that you have just recently seen her

16   since she's been involved in the litigation?

17        A.   December, correct.  November.

18        Q.   But prior to that, every time you asked

19   her about vaginal discharge or checked her, there

20   was no evidence of it?

21        A.   Not that I documented.

22        Q.   Not that you documented, meaning there was

23   no evidence of it?

24        A.   Correct.
```

Nathan W. Goodyear, MD

```
 1              Q.    So how can you say that it's persistent?
 2              MR. KOTT:   Object to the form.
 3              THE WITNESS:   Because she's talking about
 4         this being present and the visits outside of
 5         seeing me.
 6   BY MS. MOORE:
 7              Q.    I've already excluded that.  I'm talking
 8   about your care and treatment of her.
 9              A.    My expert opinion, it's taking in toto her
10   entire follow ups, including others and myself.
11              Q.    All right.  I'm asking you about your care
12   and treatment, though.  They can ask you about that
13   in a few minutes.
14              A.    I understand that.
15              Q.    But based on what you have laid eyes on
16   and dealt with with respect to Mrs. Morrow over the
17   years, not until the very last visit did she tell
18   you that she had had vaginal discharge as a result
19   of the mesh, correct?
20              A.    According to my chart, when I saw her,
21   that would be correct.
22              Q.    Okay.  So are you discounting your work
23   with her and your care and treatment of her and only
24   basing your opinions on her treatment -- I mean, her
```

Nathan W. Goodyear, MD

1    subjective complaints?

2              MR. KOTT:  Object to the form.

3              THE WITNESS:  No.  It's taking it in toto,

4         including her last visit with the interval that

5         occurred before where she comes in and says,

6         look, here is what I'm dealing with now and

7         here's what's transpired between now and when I

8         last saw you.

9    BY MS. MOORE:

10        Q.   Well, then why wouldn't you give any

11   credence to what you observed and instead of saying,

12   it's persistent, say, was not noted throughout the

13   time I treated her, but she reports that it has now

14   occurred and is now reporting it on this visit?

15   Isn't that more accurate?

16             MR. KOTT:  Object to the form.

17             THE WITNESS:  Taking it in toto, in terms

18        of all of it, persistency is simply it's

19        present.  It's not saying the volume, the

20        frequency, or anything.  It's just saying it

21        has occurred and it's occurred again and it's

22        related to the same product or possibility.

23        Which at this point is simply the recurrent

24        mesh erosion.

Nathan W. Goodyear, MD

```
 1    BY MS. MOORE:

 2         Q.   So you're completely discounting what took

 3    place when you treated her?

 4              MR. KOTT:  Object to the form.

 5    BY MS. MOORE:

 6         Q.   Okay.  What role does that have to do

 7    here?  Why didn't you comment anywhere --

 8         A.   Because this comment here was following

 9    this visit on November 19th, so it's basically a

10    summary of that visit that encompasses -- sorry?

11              MR. KOTT:  No, no.  Please let him answer,

12         please.

13              THE WITNESS:  It's encompassing the

14         extended time frame from which I last saw her.

15    BY MS. MOORE:

16         Q.   The way I read, and maybe it's me,

17    "vaginal bleeding, vaginal discharge with odor,

18    pelvic and groin pain, burning in the groin were

19    persistent from the initial placement of the mesh

20    product."  And there was a time period after the

21    initial placement of the mesh product where she did

22    not have any complaints of any of those symptoms.

23    And I can read them out for you.  "August 25th,

24    2008, negative for vaginal discharge.  Negative for
```

Nathan W. Goodyear, MD

```
1      pain."  I mean, do we want to go through all of this

2      or can you recall sitting here --

3          A.   I recall sitting here right now.

4          Q.   Okay.  I'm just trying to understand, and

5      maybe you can't explain it, and that's -- but why

6      are you discounting what you did and what she told

7      you during that time period and accepting what other

8      doctors are saying and what she's telling you now

9      that she's involved in litigation?

10             MR. KOTT:  Object to the form.

11             THE WITNESS:  As an expert opinion for

12         this client who was a patient of mine for a

13         time --

14     BY MS. MOORE:

15         Q.   And had no complaints?

16             MR. KOTT:  Object to the form.  Object to

17         the interruption.

18             THE WITNESS:  With regards to when she got

19         involved with litigation, I have no idea, so I

20         can't judge on when that happened.  As a

21         clinician when she came to see me on November

22         19th, I have to take what she tells me as the

23         truth.  I can't sit here and go, hey, is this

24         litigation induced?  I did not know that.  My
```

Nathan W. Goodyear, MD

```
 1              job is to see her at that point.  Listen to

 2              her, write down what she reported to me.

 3              Examine her, write down what I saw.  Okay.

 4              Now, so in reference to the reference here, as

 5              an expert for this patient, it's what I saw

 6              versus also in contrast and encompassing what

 7              others saw through the extended time frame of

 8              which I did not see her or in conjunction of

 9              when I may have seen her as well.

10      BY MS. MOORE:

11          Q.   Tell me about the time you did see her

12      when there were no complaints.

13              MR. KOTT:  Objection to the form.

14              THE WITNESS:  I think I already answered

15              that, where I said did not document vaginal

16              discharge.

17      BY MS. MOORE:

18          Q.   Or pain or any of these things, right?

19      During the time you saw her -- up until, let the

20      record be clear, up until November 19th, 2015, when

21      you treated Mrs. Morrow, there was no evidence of

22      bleeding until the last visit, no evidence at all of

23      the vaginal discharge.  No evidence of pelvic and

24      groin pain.  No evidence of burning in groin area --
```

Nathan W. Goodyear, MD

1        in the groin area, correct?

2                MR. KOTT:  If you include one thing, I

3            won't object:  On his records.

4                MS. MOORE:  I will include that.

5                MR. KOTT:  Thanks.

6    BY MS. MOORE:

7            Q.   This is only on your records and your care

8    and treatment.

9                MR. KOTT:  It's been answered.

10               THE WITNESS:  As I mentioned, and that is

11           correct.  When you take, then, in the other

12           visits, etcetera, between that time frame,

13           correct.

14   BY MS. MOORE:

15           Q.   Okay.  So --

16               MR. KOTT:  Come on.

17   BY MS. MOORE:

18           Q.   -- the intensity of the pain progressed.

19   That's, again, based on what she's telling you?

20           A.   That's correct.

21               MR. KOTT:  Object to the form.

22   BY MS. MOORE:

23           Q.   During the time you treated Mrs. Morrow,

24   did she ever report -- outside of this most recent

Nathan W. Goodyear, MD

1    visit again in --

2             MR. KOTT:  November 2015.

3             MS. MOORE:  -- November 2015 --

4    BY MS. MOORE:

5        Q.   -- did she ever complain of a chronic

6    urinary tract infection?

7        A.   When she was with me, again, just review

8    encompasses all the visits.  But when she was with

9    me, there was none documented, correct.

10       Q.   Okay.  You mention rheumatoid arthritis,

11   are you attributing that to the mesh product?

12       A.   That was something she brought up to my

13   attention, the new diagnosis of rheumatoid

14   arthritis, and I'm just simply stating it's a new

15   significant diagnosis.

16       Q.   And are you attributing that to the mesh

17   product?

18       A.   There's a chronic inflammation stated in

19   this situation.  I'm just stating she has a new

20   diagnosis.  She has a chronic inflammatory

21   condition.  I'm not making any conclusions.

22             MS. MOORE:  Let's go off the record --

23        back on for a second.

24             VIDEOGRAPHER:  Okay.  We are going off the

Nathan W. Goodyear, MD

 1          record.  The time is 11:28.

 2                  (Off the record.)

 3                  VIDEOGRAPHER:  We are back.

 4      BY MS. MOORE:

 5          Q.   Let me know, sir, what complaints, if any,

 6      that Mrs. Morrow is complaining of that you would

 7      attribute to the Ethicon device?  And as you go

 8      through that, I want to know if you're talking about

 9      the Prolift or the TVT.

10          A.   Okay.

11                  MR. KOTT:  As of this current state of

12              knowledge or just on his records?

13                  MS. MOORE:  As an expert.

14                  MR. KOTT:  As an expert.

15                  THE WITNESS:  Involving all of the

16              information, not just when she saw me?

17                  MS. MOORE:  Yes, sir.

18                  MR. KOTT:  Thank you.

19      BY MS. MOORE:

20          Q.   Your whole collective constellation.

21          A.   The bleeding and the pain.  Obviously the

22      intensity is an added adjective to describe it.

23      Obviously the dullness as described it.  Sharpness

24      is a description of it.  The limitation of the

Nathan W. Goodyear, MD

```
 1     exercise due to the pains.  She comments that even

 2     walking is painful.  Simple daily activities or

 3     quality of life issues, such as working around the

 4     house, yard, bending, squatting is intolerable.  The

 5     recurrent erosions.  The granulation tissue.  The

 6     repeated interventions and surgical revisions

 7     required.  The -- again, the transaction of the mesh

 8     arms there.  Again, what she described as chronic

 9     urinary tract infections.  The splinting that

10     occurred with constipation.  And the bowel movements

11     with vaginal bleeding.  In terms of her symptom

12     complaint, that is what I would attribute to the

13     mesh.

14          Q.   Okay.  And just quickly go through these.

15     You are aware that bleeding would be a risk of any

16     surgery with or without mesh?

17          A.   Yes.

18          Q.   And you were aware that pain, as outlined

19     in your consent forms, could be a risk of any

20     surgery with or without mesh?

21          A.   Yes.

22          Q.   Pain can, of course, limit one's

23     activities, you're aware of that?

24          A.   Correct.
```

Nathan W. Goodyear, MD

```
 1           Q.    Erosion, you were aware of the risk of
 2      erosion.   We have discussed and debated the range.
 3      Your experience was higher than what you say was
 4      reported to you by Ethicon, but nonetheless you were
 5      aware that that could occur, correct?
 6           A.    Also included in the literature, but yes,
 7      correct.
 8           Q.    You were aware that granulation tissue is
 9      a natural response to healing with or without
10      surgery?
11           A.    I wouldn't describe it as a natural
12      process, no.
13           Q.    It is a response that can occur from
14      surgery?
15           A.    But in this case with a mesh, which is a
16      post-hyperaggressive inflammation, it's going to be
17      more predisposed to cause a patient to have that
18      type of reaction.
19           Q.    You were aware, as a surgeon, that
20      granulation tissue could occur in a surgery with or
21      without mesh, correct?
22           A.    Correct.
23           Q.    You were aware that there could be failure
24      of an outcome or a necessary reason to repeat the
```

Nathan W. Goodyear, MD

1      surgery?

2          A.   Correct.

3          Q.   And have a repeat of the underlying

4      condition that warranted the surgery?

5          A.   Correct.

6          Q.   You were aware of the risk of infection,

7      including the risk of UTI?

8          A.   Correct.

9          Q.   You were aware that there could be bowel

10     problems as a result of surgery?

11         A.   Correct.

12         Q.   Now, in all the things we just discussed,

13     you were aware, before you did surgery with any of

14     the patients that we have talked about thus far,

15     Mrs. Shively, Ms. Taylor, Ms. Goodyear, and as we

16     turn to -- in a few minutes --

17         A.   My wife wasn't involved in this.

18              MR. KOTT:  You said Ms. Goodyear.

19     BY MS. MOORE:

20         Q.   My apologies.

21         A.   That's okay.

22         Q.   You were aware of all these risks --

23              MR. KOTT:  For all the patients involved.

24              MS. MOORE:  Thank you very much.

Nathan W. Goodyear, MD

```
 1                    MR. KOTT:  You're welcome.

 2       BY MS. MOORE:

 3            Q.   For all of these patients, for Mrs.

 4       Shively, Ms. Taylor, Mrs. Morrow, and as we are

 5       about to discuss this afternoon, Ms. Bennett,

 6       correct?

 7            A.   I was aware that there were risks.

 8            Q.   That could occur with mesh surgeries, and

 9       as we said yesterday, even without mesh surgery?

10            A.   Not the erosion.  Because you have no --

11       if you're doing a posterior colporrhaphy, anterior

12       colporrhaphy there's nothing to erode.  So the

13       erosion --

14            Q.   There are mesh surgeries with other types

15       of grafts, with porcine and with cadavers, correct?

16            A.   And that is correct.

17            Q.   And with sutures?

18            A.   Yes.  That is correct.  But sutures are

19       typically --

20                    MR. KOTT:  Whoa, whoa, let him answer.

21       BY MS. MOORE:

22            Q.   Move to strike.  You were aware that that

23       could occur with other surgeries outside of mesh,

24       correct?
```

Nathan W. Goodyear, MD

```
1          A.   But the sutures will dissolve.  But, yes,
2     to answer your question specifically, the answer is
3     yes.
4          Q.   Thank you.  And then, finally, when doing
5     your differential diagnosis that you discussed --
6          A.   So we moved on to methodology?
7          Q.   Yes, please, turn back to that, if you
8     don't mind.  How were you able to rule out that the
9     vaginal discharge being caused by any of the other
10    potential items listed on page four of your report?
11         A.   The listing of the differential diagnosis
12    here is including all possibilities.
13         Q.   Yes, sir.
14         A.   So I guess I'm not understanding your
15    question.
16         Q.   So in determining -- did you determine
17    that her vaginal discharge that you never noted --
18    in your treatment of her -- was related to the mesh?
19              MR. KOTT:  Object to the form.
20              THE WITNESS:  Okay.  Can you re-ask that
21         question again, I'm sorry?
22    BY MS. MOORE:
23         Q.   Sure.  You have down here under
24    methodology --
```

Nathan W. Goodyear, MD

```
 1            A.    Yes.

 2            Q.    -- possible -- you say "made a

 3    differential of the possible causes of Tina Morrow's

 4    postoperative issues" --

 5            A.    Correct.

 6            Q.    -- "and the relationship to the mesh, if

 7    any."  You say "vaginal discharge."  That is

 8    something that you did not see or she did not

 9    complain about during the time you treated her?

10            MR. KOTT:  Object to the form.

11            THE WITNESS:  Until she followed up on

12      November 19th?

13    BY MS. MOORE:

14            Q.    Yes, sir.  Until she followed up?

15            A.    Correct.

16            Q.    And so are you attributing her complaint

17    of vaginal discharge to you in November of 2015 to

18    the mesh?

19            A.    I am.

20            Q.    And what allowed you to land on the mesh,

21    to pick the mesh as the problem or the reason for

22    the discharge, despite that she had other potential

23    causes?

24            MR. KOTT:  Object to the form.
```

Nathan W. Goodyear, MD

```
 1                    THE WITNESS:  She had recurrent erosions,
 2              recurrent surgical resection required.  So it
 3              showed itself to be a persistent problem.
 4   BY MS. MOORE:
 5         Q.   You ruled out the atrophic vaginitis?
 6         A.   As the primary cause.
 7         Q.   And so atrophic vaginitis can cause
 8   discharge?
 9         A.   Yes, but does not cause erosion.
10         Q.   I'm not talking about erosion, sir, I was
11   asking about vaginal discharge.
12         A.   Yeah, but the erosion causes the vaginal
13   discharge.
14         Q.   Okay.  I'm talking about causes for
15   vaginal discharge.  Is erosion the only thing that
16   can cause vaginal discharge?
17         A.   No, but she has the recurring vaginal mesh
18   erosion.
19         Q.   And she also has an atrophic vaginitis,
20   did that go away?
21         A.   It did not, but she was --
22         Q.   Is that recurring?
23         A.   But she was on therapy for it too.
24         Q.   If the records indicate that --
```

Nathan W. Goodyear, MD

```
1          A.   When she saw me and I documented in my

2     charts, where there was no vaginal discharge, I had

3     her on -- majority there on vaginal estrogen.

4          Q.   And if the records indicate that she was

5     not taking the Estrace, would your opinion differ on

6     the possible cause of the vaginal discharge?

7               MR. KOTT:  Object to the form.

8               THE WITNESS:  No, because of the mesh

9          erosion.

10    BY MS. MOORE:

11         Q.   No matter what I say you're going to say

12    mesh, mesh, mesh?

13              MR. KOTT:  Form.

14              THE WITNESS:  When you look at issues,

15         there's always going to be primary problems.

16         And there's going to be secondary.  So the

17         primary issue here, the culprit, is the mesh

18         exposure that is recurrent.

19    BY MS. MOORE:

20         Q.   Okay.  And then she's menopausal too, is

21    that --

22         A.   That is correct.

23         Q.   And do menopausal women sometimes have

24    vaginal discharge?
```

Nathan W. Goodyear, MD

```
 1          A.   That is correct.

 2          Q.   Did that play --

 3          A.   I'm sorry up.  Back up, ask that question

 4     again.

 5          Q.   Can menopausal women have vaginal

 6     discharges?

 7          A.   Yes, they can.

 8          Q.   So that did not play a role at all you

 9     think?

10          A.   The atrophic vaginitis postmenopausal

11     state?

12          Q.   Those other two conditions that may cause

13     vaginal discharge did not play a role in the vaginal

14     discharge that Mrs. Morrow referenced to you in

15     November of 2015?

16          A.   As I referenced yesterday, most women will

17     have a discharge and it varies from -- during the

18     cycle, that's pretty normal.  Process of fertility

19     is involved there as well.  But when you look at the

20     discharge that when a woman moves beyond menopause

21     because of the hormone deficiency state, you

22     actually see a significant decline in the vaginal

23     discharge.  And that's one of the issues associated

24     with some of the increased risk for vaginal
```

Nathan W. Goodyear, MD

```
 1      infections and UTIs that are associated, because you

 2      have a decreased vaginal discharge because of

 3      altered vaginal floor associated with the declining

 4      hormones that are associated here.  So if you take

 5      that in context, what we are dealing with here is a

 6      mesh erosion that's recurrent.  A vaginal

 7      atrophic -- atrophic vaginal mucosa, which should

 8      preclude the patient to a decline in vaginal

 9      discharge, but we are actually seeing an increase.

10           Q.   Move to strike as non-responsiveness.

11                Do you have any literature at all to

12      support your differential diagnosis on vaginal

13      discharge, is that referenced in your reliance list?

14           A.   The reference in the reliance list as it

15      pertains to the mesh Prolifts, TVT-O.

16           Q.   Now, let's move to -- so the answer is no?

17                MR. KOTT:  Objection to the form.

18                THE WITNESS:  It's not specifically

19           labeled there as such.

20      BY MS. MOORE:

21           Q.   Let's go to dyspareunia.  And throughout

22      the entire time that Mrs. Morrow saw you up until --

23      until November '15, she did not complain of any pain

24      with sexual intercourse, correct?
```

Nathan W. Goodyear, MD

```
1              A.    In my office visit, she herself did not

2       complain, correct.

3              Q.    And you testified that atrophic vaginitis

4       can cause pain or discomfort with sexual relations,

5       intercourse?

6              A.    It can be due to vaginal dryness and

7       decreased lubrication.

8              Q.    You discounted that and in your opinion,

9       it's the mesh here?

10             A.    Again, what I said, as you process through

11      menopausal transition, the decline in the vaginal

12      discharge, that mucus is very important for

13      lubrication and moisture involved in the vaginal

14      mucosa to receive the act of intercourse.  So you

15      remove that, then you have the decrease in the

16      lubrication, you're going to get more tearing and

17      shearing as it relates to that very thin mucosa.  So

18      it's not likely that that is the process involved

19      there.

20             Q.    And so your -- despite that she never

21      during the time you treated her until November of

22      2015 complained of pain with sex, you are going to

23      say that any pain she may have with sex is related

24      to the mesh, fair enough?
```

Nathan W. Goodyear, MD

1                MR. KOTT:  Objection to the form.

2                MS. MOORE:  I'll withdraw it.

3                MR. KOTT:  If you can rephrase it.

4                MS. MOORE:  I'll withdraw it.

5        BY MS. MOORE:

6            Q.   It's your opinion that if she's having

7        pain with sex, it's a result of the mesh?

8            A.   Because of the recurrent vaginal mesh

9        exposure, correct.

10           Q.   And pelvic pain, she never complained of

11       pelvic pain to you during the time you treated her

12       up until November of 2015 and she was involved in

13       the litigation, right?

14               MR. KOTT:  Object to the form.

15               THE WITNESS:  Again, the time that I saw

16           her during the immediate postoperative period

17           and the follow-up thereafter, she did not

18           complain of that.  But beyond that she did, and

19           I included that in her summary when she came

20           back.

21       BY MS. MOORE:

22           Q.   So you now say, okay, pelvic pain, that's

23       going to be caused by the mesh?

24               MR. KOTT:  Object to the form.

Nathan W. Goodyear, MD

1    BY MS. MOORE:

2         Q.   Anything she tells you -- anything she

3    says you accept as being caused by the mesh?

4              MR. KOTT:  Object to the form.

5              THE WITNESS:  She has a recurrent vaginal

6         mesh exposure.

7    BY MS. MOORE:

8         Q.   And that's causing all the problems that

9    Mrs. Morrow is experiencing?

10             MR. KOTT:  Object to the form.

11             THE WITNESS:  As it relates to the pelvic

12        pain and vaginal bleeding and the discharge,

13        etcetera, yes.

14   BY MS. MOORE:

15        Q.   And walking?

16        A.   It is the foci of chronic inflammation.

17   Without it being there, there would be no foci for

18   that presence, which is part of the issue related to

19   this product, the safety and efficacy.

20        Q.   Vaginal bleeding.  I think we have talked

21   a lot about the bleeding.

22             MR. KOTT:  Yes, we have.

23

24   BY MS. MOORE:

Nathan W. Goodyear, MD

```
 1          Q.   And despite the fact she had other

 2    possible causes of the vaginal bleeding, being

 3    postmenopausal and having atrophic mucosa, you have

 4    discounted that and said, if she tells you that it's

 5    caused by the mesh, you're going to agree with that?

 6              MR. KOTT:  Object to the form.

 7              THE WITNESS:  Again, she had a recurrent

 8         vaginal mesh here, this is the primary foci of

 9         the chronic vaginal bleeding and discharge

10         because of the chronic inflammatory response.

11    BY MS. MOORE:

12          Q.   That's your methodology, right?  Anything

13    else you want to add to your methodology?

14          A.   I think we covered that yesterday and

15    today.

16              MS. MOORE:  I don't know if I have time

17         left; but if I do, I will save it for rebuttal.

18              VIDEOGRAPHER:  Yes, you have about 15

19         minutes.

20              MS. MOORE:  Thank you so much.

21              MR. KOTT:  Thank you.  Thank you.

22              (Off the record.)

23              VIDEOGRAPHER:  We are off the record.  The

24         time is 11:52.
```

Nathan W. Goodyear, MD

1                    MS. KOTT:  Hang on a second.

2                    VIDEOGRAPHER:  I'm sorry.

3                    (Off the record.)

4                    VIDEOGRAPHER:  We are on.  11:57 a.m.

5                         EXAMINATION

6      BY MR. KOTT:

7           Q.   Doctor, as you know, my name is Joseph

8      Kott.  And one of the plaintiffs that I represent in

9      this matter, amongst others, is Mrs. Tina Morrow.

10          A.   Correct.

11          Q.   Okay.  And also, so I speak clear, you

12     were her treating doctor for a period of time,

13     correct?

14          A.   Correct.

15          Q.   And also I retained you as an expert

16     witness in this matter too; is that correct?

17          A.   Correct.

18          Q.   An article came up this morning regarding

19     the percentages -- the percentages that you put in

20     your report -- excuse me, in your notes and the

21     record, for some reason, seem to be very much

22     discussed in this process; is that fair to say?

23          A.   Fair to say.

24          Q.   And you pulled up one such article that

Nathan W. Goodyear, MD

```
 1    shows about 4.7 percent, not about, actually shows a

 2    4.7 percent of mesh exposure; is that correct?

 3         A.   That is correct.

 4         Q.   And that's labeled with Bates number --

 5         A.   Deposition Exhibit No. 55.

 6         Q.   Excuse me, I meant to say deposition

 7    exhibit.  And, Doctor, would you recite the title of

 8    this article?

 9         A.   "Transvaginal Repair of Genital Prolapse:

10    Preliminary Results of a New Tension-free Vaginal

11    Mesh, Prolift Technique, a case series multicentric

12    study."

13         Q.   Thank you.  Now, do you recognize -- would

14    you please just put on the record the name of the

15    authors of this article?

16         A.   I may mispronounce them.  Fatton, Amblard,

17    Debondinance, Cosson, and Jacquetin.

18         Q.   Did you recognize any of those names?

19         A.   I recognize the last two.

20         Q.   What about those names jogs your memory as

21    to knowing who they might be?

22         A.   They were involved in the original TVM

23    procedures in France that originally came over and

24    came forth to the Ethicon Prolift product.
```

Nathan W. Goodyear, MD

```
 1          Q.    Okay.  Do you know if there was a patent

 2    held by any of those two people on the TVM material?

 3          A.    Yes, they hold the patent.

 4          Q.    Do you know if one of those persons sold

 5    the patent to Ethicon?

 6          A.    I do know that.

 7          Q.    Which one of those was it?

 8          A.    Jacquetin.

 9          Q.    Thank you.  So is it fair to say that this

10    information that you discussed this morning

11    regarding the reported percentage of 4.7 percent was

12    promulgated by people -- physicians closely

13    affiliated with Ethicon?

14                MS. MOORE:  Object to the form of the

15          question.

16                THE WITNESS:  That's correct.

17    BY MR. KOTT:

18          Q.    Pretty obvious?

19          A.    Very obvious.

20                MS. MOORE:  Same objection.

21                MR. KOTT:  I'm going to, just for the sake

22          of completion, to attach as Exhibit No. 64, the

23          Cross Notice, like we do.  I'm going to put

24          that right here to keep it there.
```

Nathan W. Goodyear, MD

```
 1              MS. MOORE:  No worries.

 2              (Exhibit No. 64 marked.)

 3      BY MR. KOTT:

 4         Q.   Okay.  Now, Doctor, we have an in globo

 5      exhibit that has been numbered as Exhibit No. 66 in

 6      this --

 7              MS. KOTT:  Should be No. 65.

 8              MR. KOTT:  That should be No. 65.  And we

 9         are going to change it to No. 65 momentarily.

10         Thank you.

11              (Exhibit No. 65 marked.)

12      BY MR. KOTT:

13         Q.   Doctor, and I'm going to ask you to please

14      look through these.  There are three separate, for

15      lack of a better term, we'll call them brochures.

16      If you will look at those three terms -- maybe it's

17      the best "brochures."

18         A.   Yeah, they are the brochures that I'm

19      familiar with as it relates to these products.

20         Q.   And those brochures were given to you --

21      who gave those brochures to you when you were

22      practicing in this capacity as an operating

23      gynecologist?

24         A.   The Ethicon representative would have
```

Nathan W. Goodyear, MD

```
 1      given them to me.
 2           Q.   May I see those, please?  And, Doctor,
 3      also I've been reminded by my colleague, the
 4      brochures from Ethicon are referenced in your
 5      reliance list -- in your report.  Excuse me?
 6           A.   Yes, that's correct.
 7           Q.   Thank you.  And were these what you
 8      provide to patients or put in your office in some
 9      fashion for patient review?
10           A.   Yes.
11           Q.   Okay.  And were those in your office the
12      times that you performed the surgery on the four
13      patients subject to this -- let me finish -- subject
14      to this deposition process?
15                MS. MOORE:  Object to the form.
16                THE WITNESS:  The Ethicon pamphlets
17           available at that time were in my office as it
18           relates to the TVT products and the Prolift,
19           correct.
20      BY MR. KOTT:
21           Q.   Thank you.  And where is the front page to
22      No. 66?  No. 65.  Thank you.
23                Doctor, I'm going to show you another
24      brochure that I'm going to again -- another document
```

1     that is multipage, it's Bates numbers 8003247

2     through 3262, and ask you if you would identify

3     this?  I will, again, categorize it as a brochure

4     for the TVT.

5          A.   That is correct.

6          Q.   Doctor, do you recognize that?

7          A.   Yes, I do.

8          Q.   Doctor, is that a brochure that would have

9     been like the others provided by Ethicon through the

10    sales rep?

11         A.   Correct.

12         Q.   And was that one that was in your office

13    during the periods relative to this case?

14         A.   Bonnie Blair, TVT brochures of many

15    different varieties were very, very common in our

16    office.

17              (Exhibit No. 66 marked.)

18         Q.   Thank you.  And that's No. 66.  Exhibit

19    No. 66.  Doctor, in relation to the previous

20    questioning about what symptoms Mrs. Morrow was

21    distributing -- exhibiting and what complaints she

22    had in November of 2009 as reflected in your office,

23    do you remember those questions?

24         A.   I do.

Nathan W. Goodyear, MD

1            (Exhibit No. 67 marked.)

2       Q.   Doctor, I'm going to show you what we have

3    marked as Exhibit No. 67, which is a three-page

4    document.  And I'll tell you it's from a Dr. Bobby

5    Ensminger.

6       A.   Ensminger, yes.

7       Q.   Do you recognize that doctor's name?

8       A.   I do.

9       Q.   How do you know about this doctor?

10       A.   We actually went to medical school

11    together.

12       Q.   Okay.  And did he also see Mrs. Morrow

13    in November of 2009?

14       A.   Correct.

15       Q.   And what was her chief complaint with Dr.

16    Ensminger?

17       A.   Dr. Ensminger, correct.  She complained of

18    abdominal pain, constipation, diarrhea, vaginal

19    bleeding.

20       Q.   Okay.

21       A.   And migraine.

22            (Exhibit No. 68 marked.)

23       Q.   Thank you.  Next document number is No.

24    68, it is a two-page document -- three page, excuse

Nathan W. Goodyear, MD

1     me, I'll purport that it is a medical record from

2     Dr. Landon Smith.  Is that --

3          A.   That is correct.

4          Q.   And what date did Dr. Smith see Mrs. Tina

5     Morrow?

6          A.   That was November 13th, 2009.

7          Q.   Okay.  And would you record -- is that

8     about the same time you had seen her in that

9     November 2009 period?

10         A.   It was in close proximity.

11         Q.   Would you record the complaints made to

12    Dr. Smith at that time?

13         A.   Female, she presents with dyspareunia,

14    vaginal discharge, dyspareunia and dysuria.  Patient

15    states that her bladder tacked up and thinks that

16    may be the source of the pain.

17         Q.   Thank you.  And, Doctor, we have marked

18    this as Exhibit No. 68.  And, Doctor, when you

19    prepared your report in this case, is it fair to say

20    that you had access to these medical records in

21    addition to your own?

22         A.   Correct.

23         Q.   Okay.  When you refer to the vaginal

24    bleeding, the dyspareunia, the discharge, dysuria,

Nathan W. Goodyear, MD

1     that Mrs. Tina Morrow complained of, you had access

2     to these other doctors' records too, correct?

3          A.   That is correct.

4               (Exhibit No. 69 marked.)

5          Q.   Okay.  I have another document here that

6     is No. 69, and it is also Bates numbered 5 through

7     23.  We have different Bates number systems, but

8     this is in globo Exhibit No. 69.  I'll give this

9     document to you.

10              And, Doctor, would you tell us the date on

11    this document?

12         A.   January 26th, 2010.

13         Q.   And who is this doctor?

14         A.   It's a Dr. Robert L. Harris.

15         Q.   Do you know that doctor also?

16         A.   I do not know him personally, but I know

17    of him.

18         Q.   And in January 2010, if you would look in

19    the history of the present illness in 2010,

20    January 26th, does she report to Dr. Harris that

21    she continued to bleed, in the fifth line down or

22    sixth line down?

23         A.   "She had mesh exposed anterior and

24    posterior.  Patient states she now feels pelvic

Nathan W. Goodyear, MD

```
 1    pressure like prolapse returned.  Some symptoms of
 2    urinary urgent incontinence and does have feelings
 3    of IBE."  I'm not sure what that is.  As well as
 4    intermittent urinary urgent incontinence, stress
 5    urinary incontinence." Yes, here we go.  When she
 6    attempted intercourse, her husband again felt mesh
 7    and she continued to bleed.
 8         Q.   Thank you.  Were these records available
 9    to you when you prepared your report?
10         A.   They were.
11         Q.   Thank you.  And that's No. 69.
12              So in your report when you're saying she's
13    having all these symptoms, while she did not have
14    those symptoms -- she did not complain of those to
15    you, contemporaneously she was being seen by other
16    physicians for those symptoms?
17         A.   That is correct.
18         Q.   Thank you.  And you incorporated that
19    information in your report, correct?
20         A.   That is correct.
21              MS. KOTT:  Can we go off the record for a
22         second?
23              VIDEOGRAPHER:  Time is 12:09.
24              (Off the record.)
```

Nathan W. Goodyear, MD

```
 1              VIDEOGRAPHER:  Okay.  We are going back on

 2         the record.  12:09.

 3              (Exhibit No. 70 marked.)

 4    BY MR. KOTT:

 5         Q.   Doctor, I'm going to show you an in globo

 6    document of -- I see.  So it's three.  No. 70.  And

 7    ask you if you would look at this document, please,

 8    from 2015?

 9         A.   Correct.

10         Q.   Do you see who the author of this document

11    is?

12         A.   Dr. Winters.  Jack Christian Winters.

13         Q.   Did you review Dr. Winters' notes also in

14    your preparation of your report?

15         A.   I did.

16         Q.   Okay.  And in Dr. Winters' notes, did he

17    recommend surgery to her ultimately in his care for

18    her?

19         A.   He did.

20         Q.   Okay.  Thanks.  All right.  That's enough.

21    I've got stuff to do.

22              Now, Doctor, you were asked questions to

23    show that any surgical procedure has risks, correct?

24         A.   Correct.
```

Nathan W. Goodyear, MD

```
 1          Q.   And you went through a long list of
 2     surgical risks with Ms. Moore?
 3          A.   Morrow.
 4          Q.   No, I was thinking Kim.  You did?
 5          A.   Yes.
 6          Q.   Now, Doctor, you knew all these risks
 7     existed when you did the surgery on all these
 8     patients; is that correct?
 9          A.   Correct.
10          Q.   Is the point that you're making that those
11     risks had been underestimated in educating you by
12     the manufacturer?
13               MS. MOORE:  Object to the form.  Move to
14          strike the leading question.
15               THE WITNESS:  The point I'm making is that
16          the procedure and the mesh, the device itself,
17          underestimated the risks as well as the
18          benefits.
19     BY MR. KOTT:
20          Q.   Did they underestimate the benefits or
21     overestimate the benefits?
22               MS. MOORE:  Same objection.
23               THE WITNESS:  They overestimated the
24          benefits.
```

Nathan W. Goodyear, MD

```
 1                VIDEOGRAPHER:  We just crossed three

 2          hours.

 3                MR. KOTT:  You have to keep track of my

 4          time, I had 30 minutes.

 5                VIDEOGRAPHER:  That's right.  My

 6          apologies.  I am keeping track.

 7     BY MR. KOTT:

 8          Q.   In Mrs. Morrow's case, based upon the

 9     extensive detailed review you did of your records

10     with Ms. Moore, it seems like in your view she had

11     had -- she thought she had recovered to a certain

12     degree from the initial surgery; is that fair to

13     say?

14          A.   That's correct.

15          Q.   And it seems like some time later she

16     started developing the serious problems for which

17     she was treated by other physicians; is that

18     correct?

19                MS. MOORE:  Object to the form.  Leading.

20                THE WITNESS:  Along with the recurrent

21          mesh exposure, that is correct.

22     BY MR. KOTT:

23          Q.   And does that fit with the medical

24     paradigm that one sees when there are complications
```

Nathan W. Goodyear, MD

```
 1     from mesh erosion?

 2               MS. MOORE:  Same objection.  Object to the

 3          form.  Object to the leading nature of all

 4          these questions.

 5               THE WITNESS:  The literature clearly

 6          describes a continuous ongoing chronic

 7          inflammatory nature state as it relates to the

 8          mesh insertion, with a continued increase

 9          exposure rate as you progress from the time of

10          surgery.

11     BY MR. KOTT:

12          Q.   Is that what happened in Mrs. Morrow's

13     case?

14               MS. MOORE:  Same objection.

15               THE WITNESS:  That's correct.

16     BY MR. KOTT:

17          Q.   Now, Doctor, let's go to your report, if

18     we could.

19          A.   Okay.

20          Q.   Doctor, you have gone through your

21     methodology in part with Ms. Moore, correct?

22          A.   Correct.

23          Q.   You also listed opinions; is that correct?

24          A.   That is correct.
```

Nathan W. Goodyear, MD

```
 1          Q.   And you have at the top on page six that,
 2     "all opinions given to a reasonable degree of
 3     medical probability"; is that correct?
 4          A.   Correct.
 5          Q.   Can we also apply the standard of medical
 6     certainty?
 7          A.   Correct.
 8          Q.   Doctor, you were asked earlier about a
 9     term you used in one of your consent of probability.
10     Do you remember that?
11          A.   I do.
12          Q.   Okay.  Would you tell the Court the
13     distinction between the concept of statistical
14     probability used in a scientific term versus what
15     you know of the legal term "probability," that you
16     have learned in this work?
17          A.   The probability as it relates to
18     statistical medicine is that you are excluding the
19     opportunity of chance involved in the issue in
20     question.
21               MS. MOORE:  Objection.
22     BY MR. KOTT:
23          Q.   Okay.  And you learned that there's a
24     different meaning attached to that in the law,
```

Nathan W. Goodyear, MD

1      correct?

2                 MS. MOORE:  Objection.

3                 THE WITNESS:  I don't know.  But as it

4           relates to the science, this is what I do know.

5                 MR. KOTT:  Thank you.

6                 If you want to put an objection on, you

7           can.

8                 MS. MOORE:  I did.

9      BY MR. KOTT:

10          Q.   Okay.  And you were using that as a

11     scientific term, correct?

12          A.   That is correct.

13          Q.   Thank you.  Doctor, I noticed during the

14     course of the deposition you have a little bottle

15     that you have a -- drops that you put in your water?

16          A.   Peppermint.

17          Q.   What is that?

18          A.   It's peppermint.  It's an essential oil.

19          Q.   Okay.  Thank you.  The other question I

20     had.  Did you receive -- did you ever get any

21     instruction from anybody, from the rep, the doctors

22     involved that you should not use these products on

23     patients that are obese?

24          A.   No.  In fact, they encouraged us that this

Nathan W. Goodyear, MD

```
 1      would be a more minimally invasive procedure, and it

 2      would be better tolerated than -- versus an

 3      abdominal sacral colpopexy or abdominal approach.

 4      So it was actually advocated as a safer alternative.

 5          Q.   Now, Doctor, back to your opinions on page

 6      six.  Would you tell me your opinion expressed in

 7      item number one?

 8          A.   "Tina Morrow's injuries were caused by the

 9      implanted Prolift and TVT-O devices."

10          Q.   Okay.  Doctor, you go on after that item

11      to have several paragraphs supporting those

12      opinions; is that correct?

13          A.   That is correct.

14          Q.   Doctor, is -- are those paragraphs -- now

15      that you look at them, are you willing to under oath

16      assert those paragraphs as the bases for your

17      opinion, item number one?

18          A.   Yes.

19              MS. MOORE:  Object to the form.  I don't

20          want to keep interrupting, but I want to note

21          my continuing line of objection to form and

22          leading with respect to these questions.

23              MR. KOTT:  Okay.  Well, let's put this on

24          the record.  Because of the nature of this
```

Nathan W. Goodyear, MD

```
 1              deposition, plaintiff is given one half hour to

 2              question this witness.  This is characterized

 3              as a discovery deposition, and the only way to

 4              get any evidence on in this matter, practically

 5              for the plaintiff, is to ask leading questions.

 6              And we'll deal with that at a later time.

 7                   MS. MOORE:  Same objection.

 8    BY MR. KOTT:

 9         Q.   Item number two in your report.

10         A.   Yes.

11         Q.   What was your second opinion?

12         A.   "The Prolift and TVT-O devices implanted

13    in Tina Morrow were unreasonably dangerous due to

14    the lack of adequate warning."

15         Q.   And, Doctor, you go on in subsequent

16    paragraphs to establish the bases for that opinion;

17    is that fair to say?

18         A.   That's correct.

19                   MS. MOORE:  Same objection.

20    BY MR. KOTT:

21         Q.   Under oath, do you assert that those --

22    bases for that opinion are, in fact, those that you

23    have used to support conclusion two?

24         A.   Correct.
```

Nathan W. Goodyear, MD

```
1        Q.   Now, Doctor, right above conclusion two on

2   seven -- page seven, you have, "safer alternatives

3   were available that are equally effective"; is that

4   correct?

5        A.   Correct.

6        Q.   What were those safer alternatives for

7   Mrs. Morrow?

8        A.   That would be observation, that would be

9   pessary, surgical procedures were to be including

10   non-mesh implants such as anterior/posterior

11   colporrhaphy.  They could include a sacrospinous

12   fixation.  They could include abdominal sacral

13   colpopexy.  The safer the alternatives would be the

14   observation, the pessary, and then the non-mesh of

15   the anterior/posterior colporrhaphy.

16        Q.   And what about the TVT, were there

17   alternatives to doing the TVT, the sling?

18        A.   There are alternatives to the TVT.  You

19   can use pessaries, you can use biofeedback.  You can

20   use Kegel exercise.  You can even use vaginal

21   estrogen.

22        Q.   Now, did we do item three?  Yes, we did.

23        A.   No, we have not done.

24        Q.   Please do item number three.  Your opinion
```

Nathan W. Goodyear, MD

```
 1        three.

 2            A.    "The Prolift and TVT-O implanted in Tina

 3        Morrow were unreasonably dangerous because they did

 4        not conform to the manufacturer's express warranty."

 5            Q.    Okay.  And, again, you go on for a page or

 6        two, a page and a half, expressing the bases for

 7        that opinion; is that correct?

 8            A.    That is correct.

 9            Q.    And under oath is it fair to say that you

10        assert that those are your bases?

11                 MS. MOORE:  Same objection.

12                 THE WITNESS:  That is correct.

13        BY MR. KOTT:

14            Q.    Let's go to those bases, Doctor.  Item A,

15        you are here, the Prolift mesh was soft?

16            A.    Correct.

17            Q.    Was the Prolift mesh after it had been

18        implanted for a period of time soft?

19            A.    It was not.

20            Q.    This is something that the manufacturer

21        had asserted, correct, that it was soft?

22                 MS. MOORE:  Object to the form of the

23            question.

24                 THE WITNESS:  That it was a soft mesh,
```

Nathan W. Goodyear, MD

```
 1          correct.

 2     BY MR. KOTT:

 3          Q.   Okay.  Item B -- what was Item B that you

 4     felt the manufacturer did not meet an express

 5     warranty?

 6          A.   The Prolift allowed for the restoration of

 7     sexual function by restoring normal vaginal anatomy.

 8          Q.   Manufacturer asserted that?

 9          A.   They did.

10          Q.   Was that true?

11               MS. MOORE:  Object to the form.

12               THE WITNESS:  That is not true.

13     BY MR. KOTT:

14          Q.   Item C, "many patients return to

15     normal" -- would you read Item C?

16          A.   "Many patients return to normal daily

17     activities within three to four days, most

18     completely recover within a two- to three-week

19     period."

20          Q.   Was that true?

21               MS. MOORE:  Object to the form.

22               THE WITNESS:  Not even close.

23

24     BY MR. KOTT:
```

Nathan W. Goodyear, MD

1          Q.   What about D, "risks are rare and small"?

2               MS. MOORE:  Same objection.

3               THE WITNESS:  Completely untrue.

4     BY MR. KOTT:

5          Q.   Item E on page nine, would you read that

6     into the record?

7          A.   "The Prolift is appropriate for almost all

8     patients, including patients who are overweight,

9     elderly or have undergone pervious surgeries for

10    pelvic organ prolapse."

11         Q.   Was that true?

12              MS. MOORE:  Objection.

13              THE WITNESS:  No.  And I alluded to that

14         earlier, that it was advocated as a safer

15         alternative by the company.

16    BY MR. KOTT:

17         Q.   Item A is the next Prolift item, would you

18    read that into the record?

19         A.   "The mesh elicits a minimum to slight

20    inflammatory reaction is transient."

21         Q.   The manufacturer asserted that?

22         A.   They did.

23         Q.   Was that correct?

24         A.   That isn't.

Nathan W. Goodyear, MD

```
 1                    MS. MOORE:  Object to the form.

 2                    THE WITNESS:  That is not correct.  And

 3            studies have shown that it is an ongoing

 4            chronic inflammatory process.

 5   BY MR. KOTT:

 6            Q.  We could go down this entire list, but is

 7   it fair to say that on your report, that entire

 8   list, you swear to those as your opinions?

 9                    MS. MOORE:  Same objection.

10                    THE WITNESS:  I do.

11   BY MR. KOTT:

12            Q.  And we'll get a chance to do that but not

13   in this setting.

14                    Now, Doctor, did the mesh cause the

15   symptomatology that you -- and problems and need for

16   surgery that you itemized in your report?  Did the

17   mesh cause those problems in Mrs. Morrow?

18                    MS. MOORE:  Objection.

19                    THE WITNESS:  They did.

20   BY MR. KOTT:

21            Q.  Did the failure to warn about the risks

22   and the failure to meet the express warranties of

23   the product, did they lead to the use of the mesh by

24   you?
```

Nathan W. Goodyear, MD

```
 1                MS. MOORE:  Object to the form.

 2                THE WITNESS:  They did, and I would have

 3           never used it if I'd otherwise known correctly.

 4   BY MR. KOTT:

 5        Q.   So you would have not used this product on

 6   Mrs. Morrow if you had had the actual risk and knew

 7   that the warranties were not going to be met?

 8                MS. MOORE:  Objection.

 9                THE WITNESS:  That is correct.

10                MS. KOTT:  Can we go off the record?

11                MR. KOTT:  Yeah, let's go off the record

12           for a second.

13                VIDEOGRAPHER:  Going off the record.  The

14           time is 12:21.  You have six minutes.

15                (Off the record.)

16                VIDEOGRAPHER:  We are back on the record,

17           12:22.

18   BY MR. KOTT:

19        Q.   Okay, Doctor.  When you took courses from

20   Ethicon, they taught you the appropriate level at

21   which you should position the mesh and TVT in the

22   submucosa tissue?

23                MS. MOORE:  Object to the form.

24                THE WITNESS:  That is correct.
```

Nathan W. Goodyear, MD

```
 1    BY MR. KOTT:

 2         Q.   And you always did that?

 3         A.   Correct.

 4         Q.   And in Mrs. Morrow, there was some comment

 5    on pelvic examination about banding and the arms?

 6         A.   That is correct.  The banding or the arms

 7    related to the Prolift create contracture with a

 8    chronic inflammatory state, and is a foci for pain.

 9    So that could -- likely did and likely contributed

10    to her dyspareunia and pelvic pain that she noted.

11         Q.   In addition to the erosion?

12              MS. MOORE:  Object to the form.

13              THE WITNESS:  Correct.

14    BY MR. KOTT:

15         Q.   Doctor, in the warranty section -- if you

16    go back to the warranty on your report, you have a

17    number of things in quotes.  Can you see that as we

18    go through the list there in quotes?

19         A.   Yes.

20         Q.   Soft is in quotes.  Many things; is that

21    correct?

22         A.   That is correct.

23         Q.   Why are they in quotes?

24         A.   Because they are the words from Ethicon.
```

Nathan W. Goodyear, MD

```
 1            Q.   And where did you find all those words?

 2            A.   These were in the brochures or IFUs.

 3            Q.   So you did not make those up, that's

 4      actual language you saw in these documents?

 5            A.   That is correct.

 6            Q.   And -- I'll withdraw that start of the

 7      question.  Go back to my notes here.

 8                 Doctor, you were asked if you had looked

 9      at any specific literature in forming your list of

10      differential diagnoses in the methodology section.

11      Do you remember that?

12            A.   I do.

13            Q.   Doctor, how many books have you read in

14      gynecology about the causes of vaginal pain?

15                 MS. MOORE:  Object to the form of the

16            question.

17                 THE WITNESS:  Many, many.

18      BY MR. KOTT:

19            Q.   How many books in gynecology have you read

20      about infection?

21                 MS. MOORE:  Same objection.

22                 THE WITNESS:  Many, many.

23

24      BY MR. KOTT:
```

Nathan W. Goodyear, MD

```
1          Q.   And how many articles?

2               MS. MOORE:  Same objection.

3               THE WITNESS:  Too many to count.

4    BY MR. KOTT:

5          Q.   So while you did not do any specific --

6    necessarily any specific literature research for

7    your differential, but there's a body of study that

8    you have done about differential; is that fair to

9    say?

10              MS. MOORE:  Same objection.

11              THE WITNESS:  That is correct.

12              MS. KOTT:  Can we go off the record for a

13         second?

14              VIDEOGRAPHER:  Sure.  12:25.

15              (Off the record.)

16              MR. KOTT:  We are back on the record.

17   BY MR. KOTT:

18         Q.   I just have one -- I think one loose end

19   to clear up.  The email this morning about whether

20   you were at the meeting in 2007 in Utah and you said

21   it was 2008?  Do you remember that?

22         A.   I did.

23         Q.   It's clear in your mind it was 2008?

24         A.   Correct.
```

Nathan W. Goodyear, MD

1          Q.   Did you mean to deceive anyone or anybody

2     or anything by saying it was 2007 yesterday?

3               MS. MOORE:  Object to the form.

4               THE WITNESS:  No.  Just miscited the year,

5          that's all.

6     BY MR. KOTT:

7          Q.   All right.  Doctor, you were asked a

8     number of questions this morning for close to three

9     hours regarding your opinions in this case, and

10    other things; is that correct?

11         A.   That is correct.

12         Q.   Doctor, based on that question, has that

13    questioning changed any of the opinions that you

14    have expressed in your report?

15         A.   Absolutely not.

16              MR. KOTT:  Thanks.  I'm done.

17              MS. MOORE:  Quick switch and we'll knock

18         this out.

19              VIDEOGRAPHER:  I'm off.

20              (Off the record.)

21                        EXAMINATION

22    BY MS. MOORE:

23         Q.   Let's look at Exhibit No. 67.  A visit by

24    Mrs. Morrow to Bobby Ensminger.

Nathan W. Goodyear, MD

```
 1                    VIDEOGRAPHER:  You want to go on?

 2                    MS. MOORE:  Catch me if you can.

 3                    VIDEOGRAPHER:  We are on.  12:28.

 4                    THE WITNESS:  No. 67?

 5        BY MS. MOORE:

 6             Q.   Yes, sir.

 7             A.   Okay.  Do you have that in front of you?

 8        I don't.

 9             Q.   Yeah, this is my -- I bet it's here.  Are

10        we on the record?

11                    VIDEOGRAPHER:  We are on the record.

12                    MR. KOTT:  Wait, here it is.  There's No.

13        67.

14        BY MS. MOORE:

15             Q.   Exhibit No. 67, which is an office visit

16        Mrs. Morrow had with Dr. Bobby Ensminger, looks like

17        the date is November 10th, 2009?

18             A.   That is correct.

19             Q.   And if you review further down, under HPI,

20        she says, "have seen Goodyear once and wants another

21        opinion."  Do you know why she was seeking another

22        opinion outside of yours?

23             A.   No clue.  I wasn't there, so I don't know.

24             Q.   In the care of Mrs. Morrow, the TVT was
```

Nathan W. Goodyear, MD

1    used to address any problems with stress urinary

2    incontinence, correct?

3        A.    Correct.

4        Q.    And as you sit here today, she does not

5    have problems with stress urinary incontinence,

6    correct?

7        A.    According to my last exam, she does not

8    complain of stress urinary incontinence.

9        Q.    So would it be fair to say that the TVT

10   performed its intended function and assisted her in

11   eliminating any stress urinary incontinence

12   complaints?

13       A.    Per my last visit, that would be correct.

14       Q.    And in your report, you don't address or

15   attribute any stress urinary incontinence to the

16   TVT, correct?

17       A.    I'm sorry?

18       Q.    In your report, you do not attribute any

19   problems with stress urinary incontinence to the

20   TVT, correct?

21       A.    Are you asking me if I'm attributing -- if

22   I'm saying that in the report that the TVT corrected

23   her stress urinary incontinence or the post -- post

24   the TVT-O that her stress urinary incontinence

Nathan W. Goodyear, MD

1      resolved?

2           Q.   Good point.  Did the TVT correct her

3      stress urinary incontinence?

4           A.   The symptoms she came in with and

5      basically up to this point, that is correct, that

6      has resolved.

7           Q.   You talked a little bit about

8      inflammation, and inflammation is something you have

9      actually researched, correct?

10          A.   Correct.

11          Q.   Recently researched it.  And you published

12     on it in the sense of blogging on it?

13          A.   It's an ongoing process, it is critical in

14     any chronic disease of aging, so looking at any

15     preventative process, it has to be a part of that.

16          Q.   And it's your opinion in this case that

17     the mesh caused some type of inflammatory response

18     in Mrs. Morrow?

19          A.   It's a foci of a foreign body which

20     creates a foreign body reaction which is an

21     inflammatory reaction.  When you put a foreign body

22     in the body, what happens is the body creates an

23     inflammatory reaction to it, tries to wall it off,

24     and that process then develops the ongoing process

Nathan W. Goodyear, MD

1    that you see in these chronic issues associated with

2    mesh, including the contraction, mesh erosion,

3    etcetera.

4         Q.   So you are, at least in this instance,

5    saying that Mrs. Morrow's inflammation would be

6    caused solely by the mesh?  If she's having any

7    inflammation, it's caused by the mesh?

8         A.   Well, as it relates to the vagina if that

9    mesh was not put there, there wouldn't be that

10   external foreign body, so to answer that, yes.

11        Q.   Now you have talked and published recently

12   that there are many causes of inflammation, correct,

13   many sources?

14        A.   There are many sources, correct.

15        Q.   And you talk about obesity being one?

16        A.   Correct.

17        Q.   Was Mrs. Morrow obese?

18        A.   She was.

19        Q.   Okay.  Could her obesity contribute to

20   inflammation?

21        A.   Oh, it does.

22        Q.   How come you did not report on that or

23   discuss that in your report?

24        A.   I don't know that I mentioned the mesh

Nathan W. Goodyear, MD

1    creating a -- being the foci of inflammation, did I?

2         Q.   I thought you discussed it today, and you

3    did reference the ongoing problem that Mrs. Morrow

4    has had with her obesity.

5         A.   Because this deposition was with regard to

6    the placement of the mesh.

7         Q.   All right.  And just so you know, I don't

8    want to limit it to just the placement of the mesh.

9    I want your opinion on Mrs. Morrow, and that

10   includes anything and everything about her that may

11   play a role in the conditions that we are

12   discussing, and more importantly, the conditions

13   that you are saying are caused by the mesh.

14        A.   And I understand that.  But I have to be

15   very careful not to pretend to know what you're

16   thinking, that you want me to answer as it relates

17   to the questioning.

18        Q.   I'll try to be clearer for you.  We are

19   talking about inflammation.  What type of -- how

20   would you qualify her obesity?

21        A.   Her last weight here on November 9th,

22   2015, was -- BMI 43.8.  That would be morbid

23   obesity.

24        Q.   And she's had that condition since you

Nathan W. Goodyear, MD

1    first started treating her?

2         A.   Here on the initial visit, which is

3    June 11th, her BMI was 41.8.  So, correct, those

4    both meet that qualification.

5         Q.   So you said the inflammation is related to

6    the mesh?

7         A.   As it relates to the vagina, that is

8    correct.

9         Q.   Could her morbid obesity, that you discuss

10   on your blog that causes inflammation, also cause or

11   contribute to any inflammation in that area?

12        A.   Without the foci or the external foreign

13   body, there's no source or chronic site for the

14   inflammation to setup.

15        Q.   So what you have talked about and

16   published with respect to obesity doesn't play any

17   role in any inflammation that Mrs. Morrow may have

18   in any part of her body?  You are able to wall that

19   off and just say it can affect anything else but not

20   the vagina?

21             MR. KOTT:  Object to the form.

22             THE WITNESS:  At this time this procedure

23        was advocated as an alternative for traditional

24        therapies for morbid obese women, so it was

Nathan W. Goodyear, MD

```
 1              actually advocated as an alternative method for

 2              these patients.

 3   BY MS. MOORE:

 4        Q.   And so the answer to my question is

 5   Mrs. Morrows' morbid obesity may cause inflammation

 6   in every other part of her body but the vagina?

 7        A.   But if you have no alternative exogenous

 8   mesh there, there's foci for that to setup.

 9        Q.   So the answer is her morbid obesity would

10   cause the inflammation in any part of her body but

11   the vagina?

12              MR. KOTT:  Objection.

13              THE WITNESS:  I did not say that.  I said

14              there was an implanted device that was said to

15              be implanted that was safer for obese women,

16              because of the co-morbidity and complications

17              associated with surgery.  The implant of this

18              foreign body created a foci for the

19              inflammation to be involved with and create a

20              chronic foci for exacerbation of this

21              inflammation of the foreign body reaction,

22              created the contracture and everything

23              associated with the potential issues.

24   BY MS. MOORE:
```

Nathan W. Goodyear, MD

```
 1          Q.   Move to strike as non-responsive.

 2               My question is, you have acknowledged on

 3      your blog that obesity can cause inflammation and

 4      that's something you're very concerned about,

 5      correct?

 6          A.   Yes.

 7          Q.   And in a patient who is morbid obese and

 8      has been in that condition for some time, that

 9      patient will have inflammation, correct?

10          A.   That's absolute.

11          Q.   Now in Mrs. Morrow's case, will that

12      inflammation be throughout the body or throughout

13      the body but not in the vagina?

14          A.   It will be --

15               MR. KOTT:  Objection.

16               THE WITNESS:  -- throughout the body but

17          with the implant, wherever it could be, whether

18          it be in the abdomen, whether it be in the

19          vagina, wherever it be, you're adding a foreign

20          body which is going to be attacked by your

21          immune system.  And thus if you are

22          hyperstimulated with your immune system with a

23          chronic inflammatory state that's not

24          regulated, you are setting up a foci for that
```

Nathan W. Goodyear, MD

1          problem.

2                MS. KOTT:  Time.

3                MS. MOORE:  Am I out of time?  I think the

4          Judge will allow me to have one last question.

5                THE WITNESS:  Try that getting on the

6          plane, one more minute.

7                MS. MOORE:  Believe me, I've tried that

8          and they slam the door in my face.  Believe me

9          there's no sympathy.  I think I'm done.  Thank

10         you.

11               VIDEOGRAPHER:  We are going off.  The time

12         is 12:37.

13            (Deposition concluded at 12:37 p.m.)

14                        * * * * * * * *

15

16

17

18

19

20

21

22

23

24

Nathan W. Goodyear, MD

```
 1                   -  -  -  -  -  -

 2                 E   R   R   A   T   A

 3                   -  -  -  -  -  -

 4

 5      PAGE   LINE   CHANGE

 6      _____  _____  _____

 7           REASON:  _____

 8      _____  _____  _____

 9           REASON:  _____

10      _____  _____  _____

11           REASON:  _____

12      _____  _____  _____

13           REASON:  _____

14      _____  _____  _____

15           REASON:  _____

16      _____  _____  _____

17           REASON:  _____

18      _____  _____  _____

19           REASON:  _____

             _____  _____  _____

20           REASON:  _____

21      _____  _____  _____

22           REASON:  _____

23      _____  _____  _____

24           REASON:  _____
```

Nathan W. Goodyear, MD

```
1              ACKNOWLEDGMENT OF DEPONENT

2

3                 I,_____, do

4       hereby certify that I have read the

5       foregoing pages, and that the same is

6       a correct transcription of the answers

7       given by me to the questions therein

8       propounded, except for the corrections or

9       changes in form or substance, if any,

10      noted in the attached Errata Sheet.

11

12

13      _____

14       NATHAN W. GOODYEAR, M.D.          DATE

15

16

17      Subscribed and sworn

18      to before me this

19      _____ day of _____, 20_____.

20      My commission expires:_____

21

22      _____

23      Notary Public

24
```

Nathan W. Goodyear, MD

```
 1                  REPORTER CERTIFICATE

 2     STATE OF TENNESSEE

 3     COUNTY OF KNOX

 4          I, Michele Faconti, RPR, Licensed Court

 5     Reporter, LCR #667, in and for the State of

 6     Tennessee, do hereby certify that the deposition of

 7     Nathan W. Goodyear, M.D., taken on March 4th, 2016,

 8     was reported by me and that the foregoing

 9     transcript, pages 1 through 195, inclusive, is a

10     true and accurate record to the best of my

11     knowledge, skills and ability.

12          I further certify that I am not related to, nor

13     an employee or counsel of any of the parties to the

14     action as defined under T.C.A. Section 24-9-136, nor

15     am I financially interested in the outcome of this

16     case.  Read and sign not waived.

            In witness thereof, I have hereunto set my hand

17     on this 16th day of March, 2016.

18

19

20

21                        _____

22                        Michele Faconti: 03/16/16

23                        22:32:01 AM; Knoxville

24                        Tennessee; TN LCR 667
```