# EXHIBIT D

Nathan W. Goodyear, MD

```
 0   01


 2              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF WEST VIRGINIA
 3                   AT CHARLESTON
 4   RE: ETHICON, INC, PELVIC,    )  Master File No.
     REPAIR SYSTEM PRODUCTS       )  2:12-MD-02327
 5   LIABILITY LITIGATION         )  MDL 2327
     _____)
 6   THIS DOCUMENT RELATES TO THE
     FOLLOWING CASES IN THE WAVE 1
 7   OF MDL 200:
     TERI KEY and JOHN SHIVELY,   )  Case No.
 8                                )  2:12-cv-00379
              Plaintiffs,         )
 9   vs.                          )
     ETHICON, INC., ET AL.,       )  JOSEPH R. GOODWIN
10                                )  U.S. DISTRICT JUDGE
              Defendants.         )
11   _____/
12
13    VIDEOTAPED DEPOSITION OF NATHAN W. GOODYEAR, M.D.
14
15
16                   March 3, 2016
17              9:15 a.m. to 3:30 p.m.
18
19                   TRACY IMAGING
20              KNOXVILLE, TENNESSEE
21
22
23          Michele Faconti, RPR, LCR (667)
24
```

Nathan W. Goodyear, MD

```
 1                     APPEARANCES OF COUNSEL

 2

        On behalf of the Plaintiffs:
 3               JOSEPH A. KOTT, ESQUIRE

                 MIKALIA M. KOTT, ESQUIRE
 4               Herman, Herman & Katz, LLC

                 820 O'Keefe Avenue
 5               New Orleans, LA 70113

                 504-581-4892
 6               jkott@hhklawfirm.com

                 mkott@hhklawfirm.com
 7

 8      On behalf of Defendants:
                 KIM E. MOORE, ESQUIRE
 9               CAMALA E. CAPODICE, ESQUIRE

                 Irwin, Fritchie, Urquhart & Moore, LLC
10               400 Poydras Street, Suite 2700

                 New Orleans, LA 70130
11               504-310-2108

                 kmoore@irwinllc.com
12               ccapodice@irwinllc.com

13

14

15

16

17

18

19

20      Also Present:  Ernie Tracy, Videographer

21

22

23

24
```

Nathan W. Goodyear, MD

```
 1                  INDEX OF EXAMINATION

 2                                              Page

 3    WITNESS:  NATHAN W. GOODYEAR, M.D.

 4    Examination by Ms. Moore                     8

      Examination by Mr. Kott                    202

 5

 6                   INDEX TO EXHIBITS

 7                                              Page

 8    Exhibit No. 1,

          Notice of Video Deposition            14

 9

      Exhibit No. 2,

10        Curriculum Vitae                       24

11    Exhibit No. 3,

          Rule 26 Expert Report (Shively)        24

12

      Exhibit No. 4,

13        Time Documentation                     18

14    Exhibit No. 5,

          Bates No. 000001-000089                24

15

      Exhibit No. 6,

16        Rule 26 Expert Report (Taylor)         30

17    Exhibit No. 7,

          Charlene Taylor Medical Records        31

18

      Exhibit No. 8,

19        Reliance List (Shively)                40

20    Exhibit No. 9,

          Reliance List (Taylor)                 40

21

      Exhibit No. 10,

22        Potts v University Health Systems Complaint 75

23    Exhibit No. 11,

          Dykes v Kim Complaint                  78

24
```

Nathan W. Goodyear, MD

```
 1                      INDEX OF EXHIBITS

 2                                                 Page
```

```
 3      Exhibit No. 12,

            Huskey v University Health Systems

 4          Complaint                              84

 5      Exhibit No. 13,

            Nathan Goodyear, M.D., LinkedIn Page   113

 6

        Exhibit No. 14,

 7          Manboob Nation book                     138

 8      Exhibit No. 15,

            Bates No. SHIVELYT_NGOODY_MDR00124-127  145

 9

        Exhibit No. 16,

10          Bates No. SHIVELYT_NGOODY_MDROOO79-86   156

11      Exhibit No. 17,

            Bates No. ETH.MESH.03460813-853         163

12

        Exhibit No. 18,

13          Bates No. ETH.MESH.02341454-458         165

14      Exhibit No. 19,

            Bates No. ETH.MESH.00860239-245         166

15

        Exhibit No. 20,

16          Bates No. SHIVELYT_NGOODY_MDR00033-38   169

17      Exhibit No. 21,

            Bates No. SHIVELYT_NGOODY_MDR00019-21   173

18

        Exhibit No. 22,

19          Bates No. SHIVELYT_NGOODY_MDR00068-71   176

20      Exhibit No. 23,

            Bates No. SHIVELYT_NOVHU_MDR00004-7

21

        Exhibit No. 24,

22          Advanced Laparoscopic Gynecological

            Procedures Certificate                  205

23      Exhibit No. 25,

            Tension-free Support for Incontinence

24          Professional Education Program Certificate 206
```

Nathan W. Goodyear, MD

```
 1                    INDEX OF EXHIBITS
 2                                                 Page
```

```
 3        Exhibit No. 26,
               Pelvic Floor Repair System Professional
 4             Education Program Certificate          206
 5        Exhibit No. 27,
               June 19th, 2007 Consultant Invoice    208
 6
          Exhibit No. 28,
 7             Ethicon, Inc., Travel Guidelines       208
 8        Exhibit No. 29,
               December 15th, 2008 letter             209
 9
          Exhibit No. 30,
10             Ethicon Preceptor agreement            211
11        Exhibit No. 31,
               Bates No. ETH.MESH.01722663-attachments  214
12
          Exhibit No. 32,
13             November 14th, 2005 email              218
14        Exhibit No. 33,
               Cross Notice Video Deposition          221
15
          Exhibit No. 34,
16             Bates No. ETH.MESH.24068047-attachments  215
17        Exhibit No. 35,
               Amended Cross Notice                   221
18
          Exhibit No. 36,
19             Not attached
20        Exhibit No. 37,
               Alex Gomelsky, M.D. records            233
```

```
21
22
23
24
```

Nathan W. Goodyear, MD

```
 1                      STIPULATION

 2           The deposition of Nathan W. Goodyear, M.D.,

 3      called as a witness by the Defendants, pursuant to

 4      all applicable rules on the 3rd day of March, 2016,

 5      at the offices of Tracy Imaging, Knoxville,

 6      Tennessee, before Michele Faconti, RPR, Licensed

 7      Court Reporter and Notary Public in and for the

 8      State of Tennessee.

 9           It being agreed that Michele Faconti, a

10      Tennessee Licensed Court Reporter, may report the

11      deposition in machine shorthand, afterwards reducing

12      the same to typewritten form.  All objections,

13      except as to the form of the question, are reserved

14      to on or before the hearing.

15           It being further agreed that all formalities as

16      to notice, caption, certificate, transmission,

17      etcetera, are expressly waived, EXCLUDING the

18      reading of the completed deposition by the witness,

19      and the signature of the witness.

20

21

22

23

24
```

Nathan W. Goodyear, MD

```
 1      (09:15 a.m.)

 2              VIDEOGRAPHER:  We're on the record.  My

 3          name is Ernie Tracy.  I'm a videographer for

 4          Golkow Technologies.

 5              Today's date is March the 3rd, 2016.  The

 6          time is 9:15 on the camera.

 7              This is in the matter of Shively versus

 8          Ethicon.  And the deponent today is Dr. Nathan

 9          Goodyear, M.D.

10              And the attorneys will now identify

11          themselves for the record.

12              MS. MOORE:  Kim Moore on behalf of the

13          defendants.

14              MS. CAPODICE:  Cami Capodice on behalf of

15          the defendants.

16              MS. KOTT:  Mikalia Kott appearing on behalf

17          of all plaintiffs, Ms. Shively, Ms. Morrow,

18          Ms. Taylor and Ms. Bennett, as well as the

19          consortium plaintiffs in cases where that applies.

20              MR. KOTT:  And my name is Joseph Kott and

21          I am appearing on behalf of the same plaintiffs

22          identified by my Co-Counsel.

23

24
```

Nathan W. Goodyear, MD

```
 1       WHEREUPON,

 2                   Nathan W. Goodyear, M.D.,

 3       having been first duly sworn, as hereinafter

 4       certified, testified as follows:

 5                   DR. GOODYEAR:  I do.

 6                          EXAMINATION

 7       BY MS. MOORE:

 8            Q.   Good morning, Dr. Goodyear.

 9            A.   Good morning to you.

10            Q.   My name, as you heard, is Kim Moore, and

11       I'm going to be asking you some questions today

12       about your expert report -- I should say, expert

13       reports, that you prepared in the Shively, Taylor

14       Morrow, and Bennett cases.

15            A.   Uh-huh.

16            Q.   And before I get into any specifics, let's

17       just begin with some specific ground rules.

18                 Have you ever been deposed before?

19            A.   It's been a few years ago, but yes.

20            Q.   Okay.  And how long ago was that?

21            A.   It was during my residency.

22            Q.   All right.  And you understand the rules

23       with respect to the deposition.  You're under oath,

24       correct?
```

Nathan W. Goodyear, MD

```
 1          A.   Just like being in court.

 2          Q.   Just like being in court.

 3               And if I ask you a question, you need to

 4     answer --

 5          A.   Uh-huh.

 6          Q.   -- verbally.

 7          A.   Okay.  Yes.

 8          Q.   No problem.  I'll try and remind you as we

 9     go throughout the day.  But it's important to respond

10     verbally so our court reporter can take it down.

11               If I ask you a question, you don't

12     understand it, let me know and I'll be happy to

13     rephrase it.

14          A.   Sure.

15          Q.   And if I ask you a question and you

16     answer, I will assume that you understood my

17     question; is that fair?

18          A.   That's fair.

19          Q.   Now, as we move forward today, if you need

20     a break, let me know.  We'll be happy to accommodate

21     you.  I know we're going to try and tackle four of

22     the cases.  So let me just begin.

23               Have you prepared expert reports in any

24     other mesh cases?
```

Nathan W. Goodyear, MD

```
1              A.   Not in addition to these, no.

2              Q.   So the only mesh cases where you've

3       prepared a report would be in the Shively, Taylor,

4       Morrow, and Bennett cases?

5              A.   That is correct.

6              Q.   Okay.  And when were you first retained in

7       these matters?

8              A.   The exact date I cannot recollect, but I

9       can tell you that the first invoice that I submitted

10      was in November.

11             Q.   Of 2015?

12             A.   That is correct.

13             Q.   And who contacted you?

14             A.   I cannot recall who exactly contacted me.

15             Q.   Well -- and why is that?

16             A.   It was a phone call, so I can't remember

17      specifically who.  And so if I can't tell you

18      exactly who, I'm not telling the whole truth.

19             Q.   Okay.  But you were contacted by someone

20      at the --

21             A.   The firm.

22             Q.   The firm meaning?

23             A.   That's correct.

24             Q.   Which firm?  The Herman and Herman?
```

Nathan W. Goodyear, MD

```
 1              A.   Yes.  HHK.

 2              Q.   And tell me about the request that you

 3         received in November of 2015.

 4              A.   What I do remember is they asked if I

 5         had -- these were clients of mine, and they

 6         initially wanted to assess, you know, my care of

 7         these clients.  And that's about what I recall, the

 8         initial conversation.

 9              Q.   They were clients?

10              A.   The patients.

11              Q.   The patients were clients of yours?

12              A.   Yeah.

13              Q.   And with respect to your clients that

14         you -- you were contacted by somebody at The Herman

15         Law Firm?

16              A.   Uh-huh.

17              Q.   And requested to provide what your

18         opinions on the care and treatment or --

19              A.   Well, the initial --

20              Q.   Can you be a little bit more specific?

21              A.   Yeah.  Just because of the -- the time

22         frame and the specificity of the conversation, they

23         asked if I would be willing to be involved in being

24         an expert witness for these particular clients.
```

Nathan W. Goodyear, MD

1          Q.   All right.  And what did you say?

2          A.   I said "yes."

3          Q.   And why did you say "yes"?

4          A.   Because as a physician, I took care of

5     them and just to get to the -- you know, the truth

6     of the matter, not to hide anything.

7          Q.   And did anyone ever suggest that you

8     should hide anything?

9          A.   No.

10          Q.   Okay.  Because you brought it up.  I

11     didn't know why you brought up hiding something.

12          A.   Yeah.  No.  Just because somebody asked

13     you to do something, you just say "yes."

14          Q.   So have you ever served as an expert

15     before?

16          A.   I have not.

17          Q.   Okay.  This is the first time you've ever

18     been asked to serve as an expert?

19          A.   That is correct.

20          Q.   And when you were first contacted by

21     someone at the Herman firm to serve as an expert for

22     your clients, which client was it that you were asked

23     to prepare a report for?  Was it all of them at that

24     time or --

Nathan W. Goodyear, MD

```
1           A.   Yes, it was all at that time.

2           Q.   And all, just so the record's clear, would

3      be Shively, Taylor, Morrow and Bennett?

4           A.   That's correct.

5           Q.   And what did you do at that point in time?

6      You had a call with someone.  Was it a lawyer?

7           A.   Yes.

8           Q.   But you don't remember the name of the

9      lawyer?

10          A.   I think it was a representative, Wendy

11     first, and then I think Mikalia was involved

12     thereafter.

13          Q.   Mikalia Kott who's with us here today?

14          A.   Yeah.  But, again, that's not -- you know,

15     I don't have a photographic memory, so...

16          Q.   That's understandable.

17               And so you were asked to prepare reports.

18               Did you have a -- before agreeing to serve

19     as an expert, did you speak individually to

20     Ms. Shively or any of your other clients?

21          A.   No.

22          Q.   So you just agreed to go forward in

23     your work on behalf of these clients at the

24     request of the Herman firm?
```

Nathan W. Goodyear, MD

```
 1            A.   Yes.

 2                 (Exhibit No. 1 marked.)

 3            Q.   And -- let's see.  Let's look at your

 4       Notice of Deposition, which I've marked as Exhibit

 5       No. 1.  I'll attach that to the record.

 6                 Do you have a copy, sir?

 7            A.   I do not.

 8            Q.   Okay.  I'll give you a copy.  You can look

 9       at this.

10                 I know we've had many notices going back

11       and forth.  But what I want to direct your attention

12       to is Schedule A.  Would you take a moment just to

13       look at that, please?

14                 MR. KOTT:  Do you have a copy?

15                 MS. CAPODICE:  We don't have an extra

16            copy, I apologize.

17                 MR. KOTT:  That's fine.  We'll work

18            through it.

19       BY MS. MOORE:

20            Q.   And with respect to the documents that you

21       were requested to bring today, you know that you're

22       being deposed as an implanter, someone who treated

23       your clients, correct?

24            A.   That is correct.
```

Nathan W. Goodyear, MD

```
 1              MR. KOTT:  I'm going to object to calling

 2         them his clients.  These are his patients.  But

 3         you can go on.

 4              MS. MOORE:  Okay.  I'm going to object to

 5         the commentary on the record.  I'm only using

 6         the words that Dr. Goodyear used earlier when

 7         referring to Ms. Shively, Morrow, Taylor and

 8         Bennett.

 9    BY MS. MOORE:

10         Q.   Is that correct, Dr. Goodyear?

11         A.   Well, they are -- they are my patients.

12         Q.   And you did say "clients," though,

13    correct?

14         A.   I may have inappropriately spoken, but

15    yes.

16         Q.   Okay.  All right.  Let's look at the

17    Schedule A.  And the first one asks for all

18    documents relating to fees and billing.  And I

19    believe your Counsel has provided us with what is

20    December time documentation.  Actually, let's see.

21    And it goes into December and then into January.

22    And then February.

23              All right.  It looks like based on --

24              MR. KOTT:  I'm sorry.  There's one page
```

Nathan W. Goodyear, MD

1              missing.  There's a November page, I think.

2                    MS. MOORE:  Okay.  You have a

3              November 30th, just so the record is clear.

4                    MR. KOTT:  It's up to date.  It seems

5              to be up to date.

6                    Are there any bills before this?  Yes,

7              there are.  There's a sheet from the entirety

8              of November that hasn't been printed.

9                    MS. MOORE:  Okay.

10                   MR. KOTT:  You can look at it on here, if

11             you want.

12                   MS. MOORE:  No, you can print -- okay.

13             You can print that.

14       BY MS. MOORE:

15             Q.   The record reflects you were -- I think

16       you believe -- strike that.

17                   You said you were retained in November

18       sometime, and as your Counsel has pointed out, you

19       have some additional invoices for that time period;

20       is that fair to say?

21             A.   Correct.

22             Q.   Okay.  And what is your hourly rate?

23             A.   $500 an hour.

24             Q.   And the total amount of time you've spent

Nathan W. Goodyear, MD

```
1        on these matters would be how much?

2              A.   Well, it's -- it's itemized there if you

3        read it, what's the November hours from there,

4        Mikalia?  It's five something.

5                   MS. KOTT:  Five and a half.

6                   THE WITNESS:  Five and a half.  So maybe

7              twenty-two and a half.  51, three-quarters.  Looks

8              like it's close to a hundred hours.

9        BY MS. MOORE:

10             Q.   Close to --

11             A.   Or it's over a hundred hours.

12             Q.   Over a hundred hours.  So that would be

13       about how much, sir?

14             A.   Well, 500 times that.

15             Q.   So that would be about how much have you

16       earned since being retained to work in this

17       litigation?

18             A.   Let's see.  So 500 times 12.  So we're

19       talking what, 50,000, $60,000.  48.

20             Q.   Now, in your invoice that we'll mark as

21       Exhibit No. 4 -- I've got the CV and the deposition

22       already marked.  So we'll go ahead and mark your

23       invoices four, noting that we'll attach the missing

24       sheet on a break.
```

Nathan W. Goodyear, MD

```
 1                    But under "Description," it references

 2          emails and communication emails.

 3                    Have you produced those emails today?

 4          A.    Like I said, everything I've got, they've

 5          produced.  I didn't bring those with me.

 6                    MS. MOORE:  Do you have emails and

 7               correspondence?

 8                    MR. KOTT:  No.

 9                    (Exhibit No. 4 marked.)

10          BY MS. MOORE:

11          Q.    And why don't you have your email?  Did

12          you do a search for all your emails with Plaintiffs'

13          Counsel?

14          A.    I mean, I have them, but I haven't -- I

15          mean, I was just told --

16                    MR. KOTT:  Well, I'll --

17                    THE WITNESS:  -- not to bring them.

18                    MR. KOTT:  I'm sorry.  I'll put on the

19               record, he got this last night. Okay.

20               And we have not had a chance to go

21               through the emails, we can't produce them

22               in bulk to you.  All right.  The emails --

23               in other words, some of it's privileged,

24               obviously, and some of it is work product.
```

Nathan W. Goodyear, MD

```
 1                MS. MOORE:  Well, see, that's what gets --

 2           he's an implanter, so I don't believe that

 3           those are privileged.

 4                MR. KOTT:  Okay.  Well, it's obviously an

 5           issue, so we will have to address it separate.

 6                He does -- on the record, he does not have

 7           those with him --

 8                MS. MOORE:  All right.  Then we're going

 9           to have to --

10                MR. KOTT:  -- by instruction of Counsel.

11                MS. MOORE:  And then we're going to have

12           to hold open, because that's going to be --

13           that's part of --

14                MR. KOTT:  You can hold it open and we'll

15           object to holding it open.  That's just how it

16           goes.

17      BY MS. MOORE:

18           Q.   All right.  But so the record is clear,

19      we've requested certain communications, including

20      emails referenced in Schedule A for your Notice of

21      Deposition.  And you received a copy of this, I

22      understand, from your Counsel last night?

23           A.   No --

24                MS. KOTT:  Hang on.  Do you want me to
```

Nathan W. Goodyear, MD

1              make the record?

2                     I'll make the record.

3                     MS. MOORE:  How many people just so -- are

4              going to appear?  I mean, that's fine --

5                     MS. KOTT:  I'm appearing as Counsel for

6              the plaintiffs.

7                     MS. MOORE:  But as we go forward, that's

8              fine, Ms. Kott, that's fine for responding now,

9              but as we go forward, it's probably easier for

10             all of us if we deal with one.

11                    MS. KOTT:  As far as questioning goes,

12             you'll be dealing with one attorney, but for

13             the purpose of making this record, the Notice

14             of Deposition and this Schedule A, Exhibit A,

15             was emailed to Dr. Goodyear's office, to some

16             general office email address, after 7:00 p.m.

17             Eastern time.  Dr. Goodyear, as far as I

18             understand, did not access that email and has

19             not seen the specific emails that were

20             requested, that you're referring to here.  Or

21             the whole document in general.

22                    So, if Counsel wishes to have the

23             emails that were requested, which are

24             specifically what is required under Rule 26 and

Nathan W. Goodyear, MD

```
 1              not broad all emails, it is what is required to

 2              be disclosed under Rule 26, we will go through

 3              the emails and produce them for you tomorrow.

 4                   MS. MOORE:  Okay.  Thank you.  We would

 5              request all the emails and correspondence that

 6              you have with your Counsel --

 7                   MR. KOTT:  Object to the form that we are

 8              not --

 9                   MS. MOORE:  Please don't interrupt me.

10                   Counsel, I did not interrupt --

11                   MR. KOTT:  You keep referring to me as his

12              Counsel.

13                   MS. MOORE:  Okay.  Now, I got --

14                   MR. KOTT:  Okay.

15                   MS. MOORE:  I got -- don't interrupt me,

16              please.

17                   MR. KOTT:  Okay.

18                   MS. MOORE:  As I said, we have requested

19              copies of all your correspondence that would be

20              to any attorneys that you've worked with.  And

21              also to any of, as you said earlier, clients,

22              or your patients.

23                   MR. KOTT:  Object to the word "clients."

24              He told you he misspoke.
```

Nathan W. Goodyear, MD

```
1                    MS. MOORE:  Okay.  And I'm going to object
2              to your coaching this early on.  All right?
3                    MR. KOTT:  Well, I'm going to object to
4              you asking leading and misleading questions.
5                    MS. MOORE:  I can ask leading questions.
6                    MR. KOTT:  You're asking misleading
7              questions.
8                    MS. MOORE:  I object to the coaching of
9              the witness and the characterization.  Move to
10             strike.
11                   MR. KOTT:  Yeah.  Well, I still think
12             you're asking misleading questions.
13      BY MS. MOORE:
14             Q.   All right.  So let's go through -- as
15      referenced in the invoice in Exhibit No. 4, there
16      are many emails and communications.  Those are the
17      documents that obviously we'll need you to produce,
18      in addition to anything that you have -- did you
19      bring your files today pertaining to these patients?
20             A.   Yes, I did.
21             Q.   Okay.  And where are they?
22             A.   They're in one of the boxes.
23             Q.   Okay.  Let's start with just Ms. Shively,
24      please.
```

Nathan W. Goodyear, MD

1          A.   Okay.  Do you want me to get those?  Is

2     that what you're asking?

3          Q.   Yes.

4               THE WITNESS:  You want me to take this

5     off?

6               VIDEOGRAPHER:  Sure.

7               MS. MOORE:  Going off the record for a

8     moment.

9               VIDEOGRAPHER:  Okay.  We're going off.

10    The time on the camera is 9:30 a.m.

11              (Off the record.)

12              VIDEOGRAPHER:  We are back on the record.

13    And the time is 9:35 a.m.

14    BY MS. MOORE:

15         Q.   All right.  Doctor, back on the record.

16              I see you have in front of you what looks

17    like two binders and a clip, some information.  Will

18    you describe what you have there for us?

19         A.   These are the medical records for Teri

20    Shively.  This is medical records for Charlene

21    Taylor.  And this is the same medical records for

22    Dina Bennett.

23         Q.   Thank you.  And if you will hand me -- let

24    me do this before we go too far down the path.  I

Nathan W. Goodyear, MD

1        want to go ahead and mark those.  But let me first

2        mark your CV, which is also requested.

3                You've given me an updated copy of your

4        CV, correct?

5                A.   That is correct.

6                Q.   So we'll mark that as Exhibit No. 2.  And

7        then your report in the Shively case we'll mark as

8        Exhibit No. 3.

9                A.   Okay.

10               (Exhibit No. 2 and No. 3 marked.)

11               Q.   Exhibit No. 4 I'd like to mark as what

12       you've produced today.  And I think you said the

13       first one is pertaining to the invoice, and the

14       fifth one would be the Shively records; is that

15       right?

16               A.   Yes.

17               (Exhibit No. 5 marked.)

18               Q.   Now, looks like it's Bates stamped

19       Goodyear 00 -- well, Goodyear 1 through 89?

20               A.   If that's what it's marked.

21               Q.   And these are records that come from

22       where?

23               A.   From my database of medical records.

24               Q.   All right.  And this came from your

Nathan W. Goodyear, MD

```
1     office?

2          A.   Well --

3          Q.   Let me hand it back to you so you can

4     explain it, please.

5          A.   I mean, they came from my database that I

6     sent to them that she just gave to me today.

7          Q.   When you say your database meaning -- when

8     you say "database," I'm trying to understand, is

9     that from your office, your medical office?

10         A.   We're required to hold those records --

11         Q.   Okay.  So that came from your --

12         A.   -- for a certain time.

13         Q.   -- your medical office, you printed

14    them out?

15         A.   That's correct.

16         Q.   Okay.  Thank you.

17              And this is what you relied on in

18    preparing your report?

19         A.   Not alone.

20         Q.   Okay.  And what else did you rely on?

21         A.   I relied on my education.  My residency

22    training.  My clinical practice training.  My

23    clinical practice further education.  Basically

24    further additional CME training provided by other
```

Nathan W. Goodyear, MD

```
 1      companies, i.e., Ethicon as well as further, you

 2      know, up-to-date evaluation of literature.

 3           Q.   Thank you.  With respect to medical

 4      records, do you have any other medical records that

 5      you relied on other than what's in what we've now

 6      labeled as Exhibit No. 5?

 7           A.   Pertaining to Shively, no.

 8                MR. KOTT:  This is an in globo exhibit for

 9           the entirety.

10                MS. MOORE:  Thank you.

11                MR. KOTT:  You put the numbers in, 1

12           through 89?

13                MS. MOORE:  Yes.  Thank you.

14      BY MS. MOORE:

15           Q.   Now, what else have you relied on -- okay.

16      Those are the only medical records you relied on?

17           A.   Those are the only medical records I have

18      for Ms. Teri Shively pertaining to my care of her.

19           Q.   My question is, any and all records that

20      you've relied on in preparing your report for Ms.

21      Shively are contained in that exhibit?

22           A.   If they're related to Dr. Gomelsky's

23      visit, Dr. Porter's visit, those were also relied

24      upon as well.
```

Nathan W. Goodyear, MD

```
1              Q.   And where are those records?

2              A.   Okay.

3              Q.   Okay.

4              A.   They're not in here, but they're reflected

5         in my expert opinion and summary.

6              Q.   Again, the request attached to your Notice

7         of Deposition requested for you to bring copies of

8         all the medical records --

9              A.   Okay.  Just --

10             Q.   Doctor, one second just so we don't talk

11        over each other.

12             A.   Sure.

13             Q.   And I'll try to do the same for you.  I

14        know it can be challenging.

15                  But the request asks for documents that

16        pertain to all medical records that you relied on in

17        forming your opinion.  And so you're telling us now

18        that you have additional records that you didn't

19        bring today?

20             A.   They're not my records.  I mean --

21             Q.   Well, I'm saying you relied on additional

22        records, but you don't have them here today?

23             A.   That is correct.

24             Q.   And why is that?
```

Nathan W. Goodyear, MD

```
 1              A.   Well, I think Ms. Mikalia commented on the

 2         timing of the email and the request.

 3              Q.   The timing of the -- now, this deposition

 4         has been scheduled and your Counsel -- I'm sorry,

 5         the Herman firm has known about it for some

 6         time and you're saying that you didn't get

 7         notification of documents until last night?

 8              A.   That's when the email came.

 9              MR. KOTT:  I'm going to put on the record

10         at this point in time that any records that he

11         is relying on, medical records, have been

12         provided to Counsel for the defendants in this

13         matter.  And I will also remind you that these

14         are requests, okay.  And some of these

15         requests -- most of them, first of all, have

16         been answered and provided information to you

17         that you have in your possession.  And some of

18         them are simply -- we don't feel are legally

19         appropriate for us to divulge, just for the

20         record.

21              MS. MOORE:  Move to strike comments of

22         Counsel.

23         BY MS. MOORE:

24              Q.   Sir, now when you were preparing for
```

Nathan W. Goodyear, MD

```
1      today's deposition, you got -- the first time you

2      get any type of notice of what to bring is last

3      night.  So you -- I guess did you expect you would

4      just show up today and -- without the information

5      you relied on and give your opinions?

6           A.   Well, I'm here with my expert opinion, so

7      that's what I assumed I was here for.

8           Q.   That's what you expected?

9           A.   Uh-huh.

10          Q.   All right.  We're going to request any and

11     all records that you relied on.  And that would be

12     anything in performing your opinion.

13               I did note you prepared a reliance list,

14     but the request asked for the actual documents.  So

15     we'll have to try and work this out with Mr. Kott on

16     a break and then see if we can resolve this in the

17     morning.  So let's keep going with the other

18     documents requested.

19               Emails, I think you said you have, but you

20     didn't bring those.  So we're going to hold that

21     open as well.

22               And then how about documents with respect

23     to any videotapes or recordings that you may have

24     used at any time in preparation of your opinion?
```

Nathan W. Goodyear, MD

```
 1          A.   No.

 2          Q.   And --

 3               MR. KOTT:  For clarity, are you asking if

 4          he has any or if he brought any?

 5     BY MS. MOORE:

 6          Q.   I think my -- well, both.

 7          A.   No.

 8          Q.   Thank you.  And we marked your deposition

 9     report, your expert report of Ms. Shively as

10     Exhibit No. 3.

11               Your other reports, do you have those

12     today?

13          A.   Yes.

14               MS. MOORE:  All right.  Why don't we go

15          ahead -- and do you have copies of those?

16               MS. KOTT:  We have Shively and Taylor.

17               MS. MOORE:  All right.

18               MR. KOTT:  And we will

19          provide authorization --

20               MS. MOORE:  That's fine.  That's fine.

21               Let's go ahead and mark Taylor as No. 6.

22               (Exhibit No. 6 marked.)

23     BY MS. MOORE:

24          Q.   All right.  And, Doctor, with respect to
```

Nathan W. Goodyear, MD

```
 1       the Taylor matter, can you identify for us what

 2       medical records, emails, invoices you may have?

 3            A.   This is the information I have right here

 4       that pertains to Ms. Taylor.

 5            Q.   And that's going to be in a binder.

 6                 Did you prepare that binder?

 7            A.   This was -- this is my printed material.

 8       But did I put it in a binder, no.

 9            Q.   Okay.  Who put it in a binder?

10            A.   It was sent to me in a binder, I am assuming

11       the firm.

12                 MS. MOORE:  Let's mark that as in globo

13            Exhibit No. 7.

14                 And, let's see, I'll read into the

15            record -- may I?

16                 MR. KOTT:  Yeah.

17                 MS. MOORE:  And it's Taylor 1 through 173.

18            That will be Exhibit No. 7.

19                 (Exhibit No. 7 marked.)

20       BY MS. MOORE:

21            Q.   And this particular binder has a tab

22       called "Medical Records and Bills Volume 1 of 1."

23       So this one actually includes medical records and

24       bills, that would be fair to say?
```

Nathan W. Goodyear, MD

```
 1              A.    That's -- that's what it reads, yeah.

 2              Q.    Okay.  And just so I'm clear, the medicals

 3        that we looked at for Ms. Shively, are those bills

 4        or just records?  And that's exhibit --

 5              A.    Medical records.

 6              Q.    Just medical records?

 7              MR. KOTT:  May I?

 8              MS. MOORE:  Yes, please.  Please.

 9              And that's Exhibit No. 5?

10              MR. KOTT:  This is No. 5.

11              MS. MOORE:  So --

12              MR. KOTT:  I don't see any bills.

13              MS. MOORE:  So we'll ask for the medical

14        bills for Ms. Shively, as well.

15              MR. KOTT:  No problem.

16              MS. MOORE:  Okay.  Thank you, Counsel.

17              MR. KOTT:  Oh, there are no bills in that

18        one?

19              THE WITNESS:  There's no bills in that

20        one, it's just medical records.

21              MS. MOORE:  Okay.  Thank you.  Then --

22        because I was just -- again, it says "Medical

23        Records and Bills," but they're -- okay.  So

24        we'll ask for copies of bills for Ms. Shively
```

Nathan W. Goodyear, MD

```
 1              and Ms. Taylor.

 2                   MR. KOTT:  Well, we'll bring all four of

 3              them.  We have the bills he has.  I think

 4              you're entitled to them.

 5                   MS. MOORE:  Absolutely.  Thank you.

 6                   MR. KOTT:  That's quick.

 7    BY MS. MOORE:

 8         Q.   All right.  We covered reports, we're

 9    going to deal with the other two reports tomorrow.

10              No. 5 asked for any kind of testing or

11    examination that you may have done with respect to

12    any of the patients that you have treated.

13              Do you have any documentation other than

14    your medical records on examination or testing for

15    any of the patients or any of the devices, mesh in

16    question?

17         A.   That would be in the medical records.

18         Q.   Okay.  Everything would be in the medical

19    records?

20         A.   That's correct.

21         Q.   Now, as you sit here today, do you have

22    any independent recollection of tests?  Did you do

23    any testing on the mesh?

24         A.   What do you mean by "testing on the mesh"?
```

Nathan W. Goodyear, MD

1        Q.   Well, what does "testing of mesh" mean to

2    you?

3        A.   I mean, my job is as a physician to

4    provide clinical guidance for a patient, not to test

5    the mesh itself.

6        Q.   Thank you.  That helps clarify.

7             All right.  So then the only information

8    you would have on any type of tests or examination

9    would be -- that which would be contained in your

10   records?

11            MR. KOTT:  Objection.

12   BY MS. MOORE:

13       Q.   Correct?

14       A.   Everything I've got is there.

15       Q.   So to answer my question, any testing that

16   you had or examination would be in the records?

17       A.   Medical records.

18       Q.   Thank you.

19            All right.  Let's see.  And then the next

20   one I'm looking at is No. 6, just, again, the

21   correspondence, emails with any -- I'm just going to

22   broaden it to any of the lawyers you've worked with,

23   any of the plaintiffs, any of the healthcare

24   providers, any communication you had with the four

Nathan W. Goodyear, MD

1      plaintiffs, where would that -- where would those

2      communications be?

3            A.   With the plaintiffs?

4            Q.   Well, it's a broad question.  If you want

5      to take -- yes, start with plaintiffs.  Any

6      communication that you've had over the years with,

7      say, Ms. Shively?

8            A.   Those -- in terms of follow-up visits,

9      those should be in the medical records.

10           Q.   Okay.  So any --

11                MR. KOTT:  Separate from --

12     BY MS. MOORE:

13           Q.   Any -- let me do it this way.

14           A.   I have no other communication with them

15     outside of my clinical practice visits.

16           Q.   Okay.  Did you email -- strike that.

17                Have you emailed patients over the years?

18           A.   No.

19           Q.   What's your primary way of communicating

20     with your patients?

21           A.   Face to face.

22           Q.   And then document it in the records?

23           A.   Immediately.

24           Q.   And as you document things in the records,

Nathan W. Goodyear, MD

1        it's important to be accurate?

2            A.    Yes.

3            Q.    Truthful?

4            A.    Yes.

5            Q.    And complete?

6            A.    Yes.

7            Q.    And if someone tells you something, a

8    particular symptom, that you would be as complete as

9    possible, correct?

10           A.    Try to use their words when possible.

11           Q.    Thank you.

12                 VIDEOGRAPHER:  Doctor?

13                 THE WITNESS:  Yes.

14                 VIDEOGRAPHER:  Can I get you to move your

15           mic up on your tie?

16                 THE WITNESS:  Yeah.  My wife says I'm soft

17           spoken.

18                 VIDEOGRAPHER:  You are very much.

19                 Much better.

20    BY MS. MOORE:

21           Q.    So we covered emails.  And just for

22    ease of going through this, when I'm asking about

23    emails and communications with -- that we're asking

24    for, it's any communication with each -- strike

Nathan W. Goodyear, MD

1      that.

2              Any communication with respect to any of

3      the four plaintiffs.  So it could be communication

4      with the patients, and you said the only

5      communications you had would be contained in the

6      records?

7          A.   The only time I've communicated with these

8      patients is face to face.

9          Q.   All right.  You've never had a phone call

10     with any of them?

11         A.   No, not that I recall.

12         Q.   All right.  Have you talked to any of

13     their healthcare providers?

14         A.   Their healthcare providers, what do you

15     mean?

16         Q.   Have you had an opportunity to speak to

17     any other healthcare provider about the care and

18     treatment of any of the patients involved in this

19     litigation?

20         A.   If you're referencing other physicians

21     that they saw, no.

22         Q.   Have you talked to any other healthcare

23     providers at all about these plaintiffs?

24         A.   No.

Nathan W. Goodyear, MD

```
1              Q.   So with respect -- have you talked to any

2        other experts, expert healthcare providers or

3        doctors about these plaintiffs?

4              A.   Talking to, no.

5              Q.   Have you emailed?

6              A.   No.

7              Q.   Met with?

8              A.   No.

9              Q.   All right.

10             A.   Didn't dream about them, either.

11             Q.   Understood.

12                  So we've got communications with the

13       plaintiff that should be in your records, if there

14       were any outside of your care and treatment.  And I

15       think communication with the Herman firm would be

16       the emails that you'll be producing tomorrow?

17                  MR. KOTT:  No.  That we will discuss

18             tomorrow.

19                  MS. MOORE:  Okay.  We're going to -- well,

20             let's discuss that on a break today.

21                  MR. KOTT:  Yes.

22                  MS. MOORE:  Because that could alter

23             things.  I'm trying to move it along, but --

24             all right.
```

1      BY MS. MOORE:

2          Q.   So I will discuss that --

3               MR. KOTT:   Yeah.

4      BY MS. MOORE:

5          Q.   -- and then we'll have to get back to

6      any -- it's complicated because you're an implanter

7      and you're also an expert, so that's --

8               MR. KOTT:   Kim, I didn't mean to

9          interrupt.  I don't want it to be like I'm

10         agreeing to just give you all --

11              MS. MOORE:   Your objection is noted.

12     BY MS. MOORE:

13         Q.   That is an issue for us, given the unique

14     dual role you're playing.  You're an expert, right?

15         A.   Right.

16         Q.   So you're working on behalf of the

17     plaintiffs, right?

18         A.   Correct.

19         Q.   And you're also someone who treated them?

20         A.   Correct.

21         Q.   And -- let's see.  I think we have covered

22     any conversations.

23              Now, the literature, you did provide for

24     us in your reliance list a list of all the

Nathan W. Goodyear, MD

```
1        literature and other documents that you've reviewed

2        for each of the cases; is that fair to say?

3            A.   That's fair to say.

4            Q.   All right.  And are those reliance lists

5        were attached to -- let's see, do you have it

6        attached to the --

7                 MR. KOTT:  It's a separate copy.

8                 MS. MOORE:  Let's go ahead and attach that

9            for Ms. Shively.  Ms. Shively first.  That

10           will be Exhibit No. 7.  And then Taylor --

11               So the record is clear, the binder that

12           was produced with respect to Charlene Taylor is

13           Exhibit No. 7.  And we'll do the reliance list

14           for Shively as No. 8.  And the reliance list

15           for Taylor as No. 9.

16               (Exhibit No. 8 and No. 9 marked.)

17       BY MS. MOORE:

18           Q.   Now, Doctor, do you have copies of those?

19       I just want to make sure that these are current, the

20       reliance lists.

21               MS. MOORE:  We're going to take just

22           today -- Counsel, we're going to just focus

23           this, we've kind of discussed, on Morrow and

24           Taylor and we'll go with the other two
```

Nathan W. Goodyear, MD

1          tomorrow.

2                MR. KOTT:  No, it's Shively and Taylor.

3          That's okay.

4                MS. MOORE:  It's going to be a long two

5          days.

6                MR. KOTT:  That's okay.  We will

7          repeatedly do that ourselves.

8                MS. MOORE:  Thank you.

9     BY MS. MOORE:

10          Q.  All right.  So with respect to Exhibit

11     No. 8, the Shively reliance -- I'll call reliance

12     list, do you have anything that you need to add to

13     this list?

14          A.  The only thing, there was a -- published

15     in February, late February 2016, a Cochrane review.

16          Q.  And do you have a copy of that?

17          A.  I do not.

18          Q.  And can you tell us the title of that,

19     please?

20          A.  Can I pull out my laptop?

21          Q.  Sure.

22          A.  Okay.

23                MS. MOORE:  Go off the record.

24                VIDEOGRAPHER:  We're going off.  The time

1          is 9:53 a.m.

2                  (Off the record.)

3                  VIDEOGRAPHER:  We're back on the record.

4          The time on the camera is 9:55 a.m.

5                  THE WITNESS:  The title of the article is

6          "Transvaginal Mesh or Grafts Compared with

7          Native Tissue Repair for Vaginal Prolapse,"

8          Cochrane Database Systemic Review, published

9          February 2016.

10    BY MS. MOORE:

11         Q.   And, Doctor, other than that Cochrane

12    review article, did you have any additional

13    references to add to either Shively No. 8 or No. 9?

14         A.   No.

15         Q.   And No. 10 requests the depositions you

16    reviewed, those would be contained in your reliance

17    list?

18         A.   That is correct.

19         Q.   All right.  Any photographs or images or

20    graphics or charts?

21         A.   Not that I brought.

22         Q.   Well, any that you have?

23         A.   No.

24         Q.   Have you prepared any?

Nathan W. Goodyear, MD

```
 1              A.    We brought some.

 2                    MR. KOTT:  Demonstrative.

 3                    MS. KOTT:  Demonstrative.

 4         BY MS. MOORE:

 5              Q.    Did you prepare any demonstratives?

 6                    MR. KOTT:  Not prepared, relied.

 7         BY MS. MOORE:

 8              Q.    And do you have any Ethicon products in

 9         your possession?

10              A.    Not in my possession.

11              Q.    Did you have any at any time that you

12         provided to Mr. Kott?

13              A.    No.

14              Q.    Since you've been retained, have you

15         had an opportunity to look at any Ethicon

16         products?

17              A.    Look at them?  Can you rephrase?

18              Q.    Analyze.

19              A.    Like analyze, personally in hand, no.

20              Q.    And looking at the remaining requested

21         items on Exhibit A, did you rely on any other expert

22         reports?

23              A.    To -- for my expert opinion?

24              Q.    Yes, sir.
```

Nathan W. Goodyear, MD

```
1           A.   No.

2           Q.   And any -- if you'll turn to -- yes, 14,

3      did you rely on any types of adverse event reports

4      or any type of publications referenced in Request

5      No. 14?

6           A.   I think everything related to publications

7      is in there.

8           Q.   Thank you.  And I asked for a complete

9      file, and you brought your complete file

10     except for emails to the Herman firm, correct?

11          A.   Correct.

12          Q.   Back and forth communications?

13          A.   Correct, uh-huh.

14          Q.   As we sit here today, do you have an

15     independent recollection of any of the plaintiffs in

16     this matter?

17          A.   I do.

18          Q.   So you recall Ms. Shively?

19          A.   Yes.

20          Q.   And Ms. Taylor and -- Ms. Taylor?

21          A.   Correct.

22          Q.   Morrow?

23          A.   Yes.

24          Q.   And Ms. Bennett?
```

Nathan W. Goodyear, MD

```
 1            A.    Correct.

 2            Q.    How many meetings have you had with

 3    Counsel since you've been retained?

 4            A.    Are these meetings in person or meetings

 5    otherwise?

 6            Q.    Good point.  Both.

 7            A.    Okay.  Meetings in person, yesterday

 8    evening was our first evening in person.

 9            Q.    Okay.

10            A.    And in terms of meetings otherwise, it's

11    periodic Skype meetings.

12            Q.    Yeah.  I saw that referenced in your

13    invoice, so you've had some Skype meetings.

14                 Who have you worked with in this matter,

15    Mr. Kott and Ms. Kott?

16            A.    Mr. Seymore.  I'm sorry, Moore.  Herman.

17            Q.    Anyone else?

18            A.    No.

19            Q.    And the time it took for you to prepare

20    your report would be reflected in Exhibit No. 4?

21            A.    Yes.

22            Q.    And let's see.  Looking to see if you've

23    specified -- I see references to Taylor, Taylor,

24    Taylor, Moore.
```

Nathan W. Goodyear, MD

```
1              So when you have references in your

2    invoice to just expert opinion report -- for

3    example, December 4th, 2015 -- do you see that?  I

4    think it's right here, sir.

5         A.   Where are you?

6         Q.   December 4th --

7         A.   Okay.

8         Q.   -- 2015.  Expert opinion report?

9         A.   Yes.

10        Q.   What matter were you working on?

11        A.   In terms of specifics of that date, it was

12   in relationship probably to general expert opinion

13   report work.

14        Q.   And tell me about that.  What would you do,

15   what was your process in going about preparing

16   these expert reports?

17        A.   Research, writing, editing, typographical

18   errors.

19        Q.   Research, writing and the usual editing?

20        A.   Uh-huh.

21        Q.   What research did you do?

22        A.   Patients' charts.

23        Q.   So you reviewed your own charts?

24        A.   Correct.
```

Nathan W. Goodyear, MD

```
1              Q.    What else did you do?

2              A.    Articles, journals.

3              Q.    You did research to find the articles

4        referenced --

5              A.    Going back all through these I already

6        had.

7              Q.    Okay.  All of these are articles that you

8        had?

9              A.    As a part of my database.

10             Q.    And do you have a database on -- describe

11       your database for me.

12             A.    Just, you know, any printed out materials

13       that physicians may have to hold records, studies to

14       go back to.

15             Q.    Okay.  And so your database is on what

16       specific?  Is it on pelvic organ prolapse?

17             A.    Wide varieties.

18             Q.    Such as?

19             A.    Such as menopausal symptoms, such

20       gynecological care, such as atrophic vaginitis, such

21       as interstitial cystitis.  Basically trying to stay

22       up to date on the medical literature as it relates

23       to gynecological care.

24             Q.    Okay.  So you have your own database for
```

Nathan W. Goodyear, MD

```
 1      each one.  Do you have a database for pelvic organ

 2      prolapse?

 3              A.   I have a collection, yeah --

 4              Q.   A collection?

 5              A.   Yeah.  I use the word "database."  I'm

 6      talking about a collection of articles.

 7              Q.   All right.  And so you have a collection.

 8      Do you have a collection on mesh?

 9              A.   It's related.  It would be a sub

10      underneath that, yes.

11              Q.   And do you have a collection on Ethicon

12      products?

13              A.   If -- if it was related to the mesh.  I

14      don't have specifically an Ethicon.

15              Q.   And I'm going to request for any and

16      all the information that you have pertaining to

17      mesh and the pelvic organ prolapse articles.

18              A.   Are you talking about journals, articles?

19              Q.   Well, explain to me what you have.

20              A.   Well, a lot of them you just -- I have the

21      titles and I just go online and I read it, so

22      they're all online.  So my database more is of the

23      titles and the authors to give me -- to be able to

24      type them back in and go to them.
```

Nathan W. Goodyear, MD

```
 1              Q.   That's what I'm trying to understand.  Do

 2       you have them -- you had them or do you have just a

 3       listing of them that you can go get?

 4              A.   A listing of them to go get.

 5              Q.   Okay.  So these were articles that you had

 6       the titles -- or you had various titles.  You found

 7       the ones that interested you and then you went and

 8       read them?

 9              A.   Well, yes.

10              Q.   Okay.  All right.  So it's not that you

11       have it in a database right now articles that you

12       could produce for me?

13              A.   No.

14              Q.   When you were asked to prepare the report

15       and before you did your research, what were you

16       asked to do?  What was your objective in preparing

17       these reports?

18              A.   Prepare an honest report of my assessment

19       of these clients.

20              Q.   With respect to the mesh?

21              A.   Just in general care.

22              Q.   General care.  Okay.

23              A.   And if that involved mesh, yes.

24              Q.   And if it didn't, you would comment on
```

Nathan W. Goodyear, MD

1     that as well?

2          A.   Like I said, anything that's in the

3     medical records was a part of my care for my

4     clients, my patients.

5          Q.   So you said you did your research, you

6     did your writing, and then the normal editing?

7          A.   Correct.

8          Q.   And then what you were able to research,

9     and eventually write, are contained in Exhibits No.

10    8, No. 9 and No. 5 and No. 6, your reports?

11         A.   Oh, yes.

12         Q.   All right.  Let's see.  Let me ask you

13    about this particular book here.  I'm going to hand

14    this to you.

15              Could you hold that up for us?

16         A.   To the camera?

17         Q.   Yeah.  Thank you.

18              What is Manboob Nation?

19         A.   It is a book that I self-published.

20         Q.   And tell us about Manboob Nation.

21         A.   It is a book for physicians.  It is an

22    extensive literature review of low testosterone

23    causation in men.  And out of my research in it, I

24    felt the need to put it out there, because it

Nathan W. Goodyear, MD

```
 1        contradicted a lot of standard practice.  And there

 2        are 799 references.

 3            Q.   Okay.  What does the title mean, "Manboob

 4        Nation"?

 5            A.   It is referencing the high estrogen

 6        production from aromatase activity, from androgens

 7        that accelerates breast growth in men.

 8            Q.   And so are you -- I'm trying to

 9        understand.  The title represents what your concerns

10        are, that we have a country where men have boobs?

11                 MR. KOTT:  Objection to the form.

12        BY MS. MOORE:

13            Q.   Or breasts?

14            A.   It's about low testosterone causation.

15        Causation of low testosterone.

16            Q.   I'm just trying to understand the title.

17        So your title references men having breasts?

18            A.   One of the issues with

19        testosterone-to-estrogen conversion, be it high

20        abdominal adiposity, so when men become overweight,

21        especially in the midsection, they increase

22        expression of aromatase, which is an enzyme that

23        will convert androstenedione to estrone and

24        testosterone, to estradiol.  Those are estrogens
```

Nathan W. Goodyear, MD

```
 1      which, in excess production for men, which they

 2      produce very, very small levels, will promote breast

 3      growth.

 4           Q.   And so you were concerned about breast

 5      growth in men?

 6           A.   I'm concerned about the causation of low

 7      testosterone in men and that the literature was not

 8      being followed via standard practice --

 9           Q.   Okay.

10           A.   -- in testosterone management.

11           Q.   And what does that mean, that the

12      literature was not being followed in testosterone

13      practice?

14           A.   The Institute of Medicine did a report

15      in 2001.  They showed that the average physician

16      practices at a level that is 17 years behind

17      the current evidence.  So that's specifically my

18       reference.

19           Q.   And so because you were concerned that the

20      average physician practiced 17 years behind the

21      level, you felt it was important to prepare the

22      Manboob Nation book that addressed your concerns

23      with, I guess, low testosterone in men?

24           A.   It was just simply my findings, and I just
```

Nathan W. Goodyear, MD

1      self-published it with the literature references.

2      So, again, it's more for physicians, in terms of

3      education and a resource for the studies.

4             Q.   Okay.  And have you written any other

5      books?

6             A.   I have not.

7             Q.   Are you in the process of writing any

8      other sequels?

9             A.   Oh, there may be a thought.

10            Q.   But you haven't started working on it?

11            A.   No.

12            Q.   Okay.  And when did you start working on

13     it?  I mean, when was it I guess published?  I think

14     I looked at that, but I can't recall.

15            A.   To be honest, I've slept since then.

16     2013.

17            Q.   Okay.  So when did you start writing it?

18            A.   2012.

19            Q.   And how many books have you sold?

20            A.   I don't know.

21            Q.   Estimate?

22            A.   Maybe a hundred.  It's not something I

23     market.

24            Q.   And how much does it sell for?

Nathan W. Goodyear, MD

```
 1              A.    It's ten dollars, I think.  Recently

 2        lowered it, I can't recall.

 3              Q.    Have you actually presented on the book?

 4              A.    I have.

 5              Q.    And tell me about that.

 6              A.    I just referenced the review of the

 7        literature as it relates to causation of low

 8        testosterone in men.

 9                    Testosterone is not the cause, it's the

10        effect, i.e. stress, weight, medications, head

11        trauma, etcetera.

12              Q.    So how many times have you presented on

13        Manboob Nation?

14              A.    Four times.

15              Q.    And when was the most recent time you

16        presented?

17              A.    That would be, I think, November two years

18        ago.

19              Q.    And I'm looking at a list of your

20        presentations, and it does look like you were

21        presenting at the -- what is the American Functional

22        Medical Association?

23              A.    It's an organization that -- the American

24        Functional Medical Association is -- basically it's
```

Nathan W. Goodyear, MD

1      an approach to medicine that is more of an

2      integrative approach to medicine rather than a

3      management.

4           Q.   And so it's an organization.  You're a

5      member of that organization?

6           A.   I am not.

7           Q.   Okay.  But you were asked to present for

8      that organization?

9           A.   That's correct.  That's correct.

10          Q.   And you've done that on a couple of

11     occasions?

12          A.   Correct.

13          Q.   And what's the conclusion of your book?

14          A.   Well, to say there's one conclusion is

15     really not appropriate.  What it is, is it's simply

16     a review of the literature, what is the causation of

17     low testosterone in men.

18          Q.   And is that a focus -- obviously a focus

19     of yours?

20          A.   Currently?

21          Q.   Yes.

22          A.   It's a part.

23          Q.   Okay.  What are your other current

24     focuses?

Nathan W. Goodyear, MD

```
 1              A.    The majority of my clinical practice right

 2       now is dealing with ladies.

 3              Q.    Okay.  And when you say "dealing with

 4       ladies," what does that mean?

 5              A.    That means it's a primary 60 percent

 6       pelvic gynecological practice.  It's an office-based

 7       practice dealing with weight issues, dealing with

 8       menopausal issues, perimenopausal, PCOS,

 9       infertility, metabolic syndrome, hypertension,

10       diabetes.

11              Q.    Are you doing surgery?

12              A.    No.

13              Q.    Why not?

14              A.    Because my experience with everything

15       involved here with the mesh, I lost faith in the

16       collaboration between the businesses and physicians

17       in terms of honesty, trustworthiness of the

18       information relayed, and so I transitioned out of

19       that aspect of my practice.

20              Q.    Okay.  So you lost faith in the honest --

21       I'm sorry?

22              A.    The ability to give us accurate

23       information as it relates to the literature.  That

24       led to this book, which is I'm not going to take
```

Nathan W. Goodyear, MD

```
 1       others' word for it, I'm going to read it myself.
 2            Q.   Okay.  Do you think that's important, for
 3       a doctor to do his own work and not rely on what
 4       others tell him?
 5            A.   Yes.  I think I quoted you about
 6       that Institute of Medicine, the average physician
 7       doesn't read.
 8            Q.   But over the years, have you done that,
 9       have you kind of blindly followed what you've been
10       told?
11                 MR. KOTT:  Object to the form.
12       BY MS. MOORE:
13            Q.   Or have you taken it upon yourself to
14       read?
15            A.   Taken upon myself to read.
16            Q.   So with respect to no longer doing
17       surgeries, do you do any type of surgery, even
18       without mesh?
19            A.   It's all office-based, no.
20            Q.   And why is that?  Why don't you do any
21       other types of surgery without mesh?
22            A.   Because I just, again, made a move outside
23       that -- that practice.  I just transitioned out of
24       the pelvic organ prolapse, urinary incontinence.
```

Nathan W. Goodyear, MD

1          Q.   I'm sorry, I did not mean to interrupt

2     you.

3          A.   When you -- as a physician, there becomes

4     a point where you either have to decide to do some

5     surgery or no surgery.

6          Q.   Okay.

7          A.   And so I decided to do no surgery.

8          Q.   All right.  So it wasn't strictly

9     related to this concern about faith and honesty

10    from information or was it?

11         A.   No, it -- it was.

12         Q.   Okay.  And help me understand what that

13    means.  You had concerns about faith and honesty

14    with respect to information that you were receiving?

15         A.   That this was a safe product.

16         Q.   Okay.  Now, that's specific with the TVT

17    and the Prolift?

18         A.   Correct.  That's what started my change.

19         Q.   Okay.  And now with respect to any other

20    surgeries that you were doing over the years, you

21    abandoned those, as well?

22         A.   Well, I had to because just from a

23    market-based analysis -- business analysis, you

24    can't -- you can't basically continue just a limited

Nathan W. Goodyear, MD

```
 1        practice doing limited surgical procedures.  You

 2        reach a point, like I said, where you have to make

 3        the decision to continue the high volume surgical

 4        practice or just go office-based.

 5             Q.   So let me make sure I understand.

 6        Because -- your practice --

 7             A.   The majority of my -- okay.  Sorry.

 8             Q.   No, no, no.

 9             A.   I was trying to clarify.

10             Q.   Yeah.

11             A.   The majority of my practice was pelvic

12        floor surgery, prolapse and incontinence.  And so

13        when you -- when I decided to stop those, that left

14        me with very little that I was doing, because that

15        was the majority of my surgical practice.  And so at

16        that point I was left with a clinical office

17        practice.

18             Q.   What surgical options are there for women

19        who need pelvic organ prolapse surgery without mesh?

20             A.   There's a lot.

21             Q.   Okay.  And you chose not to do any of

22        those?

23             A.   That's right.

24             Q.   And why is that?
```

Nathan W. Goodyear, MD

```
 1              A.   I just decided to make the whole move.

 2              Q.   Okay.  So I'm trying to understand, you

 3         had a concern about faith and honesty with

 4         respect to --

 5              A.   These materials --

 6              Q.   These materials being?

 7              A.   -- hurt clients.

 8              Q.   Okay.  And what do you mean by "these

 9         materials"?  You're talking about what specifically,

10         what products and how they hurt clients?

11              A.   The Prolift TVT-O.  And TVT -- TVT-S.

12              Q.   And how do they hurt clients?

13              A.   You want the whole list?

14              Q.   Sure.

15              A.   Okay.  Pelvic pain.  Dyspareunia.

16         Erosion, both vaginal and into other tissue organs;

17         i.e., rectum, i.e. bladder.  Banding, ridging.

18              Q.   What was the last one?

19              A.   Banding, ridging.

20              Q.   Okay.

21              A.   Plate formation.  Chronic inflammation.

22         Anxiety, depression as a result.  Relationship

23         disruption.  Urinary incontinence failure.  Urge

24         incontinence.  Urinary obstruction.  Urgency,
```

Nathan W. Goodyear, MD

```
1        frequency.  Chronic UTIs.  Chronic constipation.

2        Painful bowel movements.  Vaginal discharge, chronic

3        vaginal bleeding.  Pelvic pain.  Vulvar pain.

4        Abdominal pain.  Leg pain.  Inguinal pain.

5            Q.   What was the last one?

6            A.   Inguinal.

7            Q.   Okay.

8            A.   Inner thighs.  Just off the top of my

9        head.

10           Q.   Anything else?

11           A.   There's more published in the literature,

12       but just off the top of my head.

13           Q.   Okay.  I'm just asking what concerns you

14       had about these TVT and the Prolift hurting

15       people. Anything else?

16           A.   In terms of that, the product, that's it,

17       in terms of my recollection.  But there's probably

18       more in the literature, and that's with the

19       references.

20           Q.   So you talked about how -- does this --

21       these concerns that you have apply to any other mesh

22       products?

23           A.   Those were the primary mesh products I

24       used.  I didn't use any other company's products.
```

Nathan W. Goodyear, MD

```
 1              Q.   You've never used any other mesh products?

 2              A.   In residency I may have, but I don't

 3       recall ever using other products in clinical

 4       practice.

 5              Q.   What did you use in residency?

 6              A.   Oh, gosh. Gynemesh.  Bard.  I think Bard

 7       had a product.  I think it's OB Tape.  So we're

 8       going back a few years.  So that's about what I

 9       recall.

10              We used some -- again as a resident, we

11       used some fascial -- we acquired some fascia from

12       the patient and we used that.  But that's not mesh.

13       So that's what I'm recalling.

14              Q.   All right.  And so your concerns that

15       you've articulated, are they specific to

16       Prolift and TVT or are they to all mesh products?

17              A.   Those were my primary products that I

18       used.

19              Q.   So -- but my question is, are they

20       specific to the Prolift and TVT or are they to all

21       mesh products?

22              A.   For me, those are the products I used, so

23       I have to be specific to those products.

24              Q.   And when you decided to no longer do
```

Nathan W. Goodyear, MD

```
 1        surgery because your faith -- help me understand

 2        faith and honesty.  What happened that led you to --

 3        what did -- I'm not sure what you mean by those

 4        terms, "faith and honesty."

 5             A.   As a physician, I felt betrayed.

 6             Q.   And why is that?

 7             A.   Because this -- these products and

 8        procedures were marketed as safe, effective,

 9        minimally invasive, low side effects.

10             Q.   Okay.  Now information is important,

11        right?

12             A.   Yes.

13             Q.   It's important to give accurate

14        information?

15             A.   Correct.

16             Q.   And important to apprize -- for example,

17        when you're dealing with a patient, it's important

18        to give that patient appropriate and accurate

19        information, right?

20             A.   Correct.

21             Q.   Just like you would expect to get

22        appropriate information from companies, a patient

23        would expect to get appropriate information from

24        you?
```

Nathan W. Goodyear, MD

```
 1              A.   Correct.

 2              Q.   And have you ever heard the term "people

 3      who live in glass houses shouldn't throw stones"?

 4              A.   I have no idea.  No, I haven't heard that.

 5              Q.   Yeah.  You haven't?

 6              A.   No.

 7              Q.   Have you ever been sued?

 8              A.   Have I ever been sued?  I was an

 9      obstetrician/gynecologist.  Yes.

10              Q.   What does that commentary mean, that you

11      were an obstetrician/gynecologist?

12              A.   All obstetricians and gynecologists get

13      sued.

14              Q.   And why is that?

15              A.   Because it's a -- with obstetrics, if

16      something goes bad, everybody's move is to want to

17      blame.  And it's an appropriate move.  So most

18      obstetricians are sued.  That's a -- that's a fact

19      as published by ACOG.

20              Q.   And so if something goes wrong, most

21      people want to sue?

22              A.   They want to find somebody to blame.

23              Q.   And what's wrong with that?

24              A.   Oh, nothing wrong with that if there's
```

Nathan W. Goodyear, MD

```
 1          something to blame.

 2              Q.   And if you're sued, does that mean that

 3          something's wrong, that you did something wrong?

 4              A.   Not necessarily.

 5              Q.   So that you don't guarantee outcomes to

 6          your patients?

 7              A.   I don't guarantee.  I quote what the

 8          literature available tells us.

 9              Q.   I'm sorry?

10              A.   I quote what the literature available to

11          us tells us.

12              Q.   The literature available.  And based on --

13          you just -- what's the literature --

14              A.    IFUs, you know, collaboration with

15          representatives from the company.  Scientific

16          literature.  My expertise, my education, etcetera.

17              Q.   Okay.  So you are looking big picture and

18          providing information to your patients.  You're

19          relying on IFUs.  That would be instructions for use

20          you may get from a manufacturer, you rely on what

21          you learn from the manufacturer, you rely on your

22          own experience, you rely on the literature --

23              A.   Uh-huh.

24              Q.   -- and what you learn from colleagues,
```

Nathan W. Goodyear, MD

```
1      correct?

2           A.   Correct.

3           Q.   Now, that's --

4           A.   And further education through CMEs and all

5      those -- yeah.

6           Q.   Absolutely.

7                MR. KOTT:  We've been going a little

8           better than an hour.

9                MS. MOORE:  You want to take a break?

10               MR. KOTT:  Ten minutes, five minutes.

11               MS. MOORE:  Oh, sure.

12               MR. KOTT:  You don't have a question on --

13          if you want to finish this section.

14               MS. MOORE:  I do want to finish this

15          section.

16     BY MS. MOORE:

17          Q.   All right.  So over the years you don't

18     guarantee your results with patients, like when

19     you're doing surgery --

20               MR. KOTT:  Whoa, whoa, whoa, wait.  You've

21          got a question here, give him a chance.

22               THE WITNESS:  Yeah.  Can -- can you better

23          clarify that?

24     BY MS. MOORE:
```

Nathan W. Goodyear, MD

1          Q.    Absolutely.

2                When you're performing surgery, do you

3     guarantee a result?

4          A.    You can't guarantee a result.

5          Q.    Why not?

6          A.    Every person is different.

7          Q.    Well, what do you mean?

8          A.    Well, if I give X treatment to you and I

9     give X treatment to her, your body is an independent

10    environment.  There may be a generalization that can

11    be made about reactivity based on the literature,

12    but each one will have a unique response, i.e., you

13    have a higher inflammatory response to an implant

14    versus her because you're dealing with more chronic

15    inflammation.  So your immune system is already

16    hyperactive.  So then you implant a foreign device,

17    it is going to go crazy compared to somebody

18    that has a balanced immune system. Their immune

19    system will stay quiescent and will not have

20    quite the response that a person with a

21    hyperstimulated immune system will.

22         Q.    And so just because someone may not get

23    the desired outcome doesn't mean that you did

24    anything wrong as a doctor and performed any

Nathan W. Goodyear, MD

```
1      malpractice, correct?

2           A.   Again, all I can say is we can give you

3      the best guidance in terms of counseling that we

4      have based on the literature, IFUs, experience,

5      etcetera.

6           Q.   So to answer my question, if you don't get

7      your desired outcome, the patient that is, that

8      doesn't mean I should be able to sue you, the

9      doctor?

10               MR. KOTT:  Well, I object to the form.

11          You can sue anybody.

12               THE WITNESS:  Yeah, it's a free country.

13     BY MS. MOORE:

14          Q.   It is a free country.

15          A.   Yeah, so you can -- you can sue.

16          Q.   That doesn't mean the doctor should be

17     found responsible, just because of a poor outcome,

18     correct?

19          A.   Correct.

20          Q.   A plaintiff's individual response cannot

21     be predicted, correct?

22          A.   Correct.

23          Q.   And that doesn't mean that mesh -- across

24     the board that mesh is defective, correct?
```

Nathan W. Goodyear, MD

1           A.   I think there are generalizations that can

2      be made in the literature.  But in terms of exactly

3      to what degree that response may occur cannot be

4      applied uniquely and uniformly across every

5      individual.  But there are generalizations that can

6      be made.

7           Q.   And so just with what we were speaking to

8      a minute ago, if a patient doesn't have the desired

9      outcome, and the doctor does the best he can with

10     the material, it doesn't necessarily mean the doctor

11     or the material -- that there's anything wrong with

12     the doctor or the material, correct?

13               MR. KOTT:  Object.  Compound question.

14               THE WITNESS:  The patient has a right to

15          sue.

16     BY MS. MOORE:

17          Q.   Of course.

18          A.   Yeah.

19          Q.   And speaking of right to sue.  You have

20     been sued for battery, correct?

21          A.   What?  Battery?

22          Q.   Performing surgery on a patient without

23     the appropriate consent?

24          A.   I'm not aware of that.

Nathan W. Goodyear, MD

```
 1              Q.   You're not aware of that.  I'm going to

 2        hand you --

 3              MR. KOTT:  You can hand it to me first.

 4              MS. MOORE:  I'll hand it to the witness

 5         and to you, too.

 6   BY MS. MOORE:

 7              Q.   It was a Complaint, Sandra Dykes versus

 8        Edward Kim.  That doesn't ring a bell?

 9              A.   No.

10              MR. KOTT:  Can I please see this document

11         you're referring to?

12              MS. MOORE:  You will in a minute, Counsel.

13   BY MS. MOORE:

14              Q.   You don't remember this lawsuit where a

15        patient sued you, Michelle Potts?

16              MR. KOTT:  Don't answer any further

17         questions, until I see this document.

18         Do you want to show it to me or not?

19              MS. MOORE:  I'm going to ask him based

20         on his recollection.

21              THE WITNESS:  I'm going to tell you "no."

22   BY MS. MOORE:

23              Q.   You don't recall?

24              A.   No.
```

Nathan W. Goodyear, MD

```
 1              Q.   Okay.  Let me ask you about the lawsuits
 2        that have been filed against you over the years.
 3              MR. KOTT:  Hold on one second.
 4              I'm going to object to any questions or
 5              any answers that are on this record in
 6              reference to a lawsuit I'll be questioning about
 7              momentarily named Potts, in which an inference
 8              that my client had been accused of battery was
 9              made, unless I can see this alleged document.
10              And I'm making -- I'll make a motion to strike.
11        BY MS. MOORE:
12              Q.   You can answer.
13              A.   Could you ask the -- I'm sorry.
14              MS. MOORE:  Do you want to read it back,
15              please?
16              (Requested portion read.)
17        BY MS. MOORE:
18              Q.   Have you had any malpractice lawsuits
19        filed against you?
20              A.   Yes.
21              Q.   How many?
22              A.   If I remember correctly -- are we
23        including residency and clinical practice?
24              Q.   Anytime.  Any --
```

Nathan W. Goodyear, MD

```
1            A.   I think the answer is three.

2            Q.   Okay.  And tell me about those.

3            A.   The -- the one in residency, I was simply

4       an intern and I was not even scrubbed and I was in

5       the room.

6            Q.   Okay.

7            A.   I believe there was a towel left following

8       a C-section.  I mean, a -- a sponge --

9            Q.   Left in the patient?

10           A.   -- that was left.  And I was just in the

11      room, in the operating room, not scrubbed.  So I

12      believe that's the first one, if I recall that

13      correctly.

14           Q.   So the first lawsuit, there was an

15      allegation that you left a lap sponge in a patient

16      during a C-section?

17                MR. KOTT:  Object.  Hold on a second.

18                Again, I'm going to make a motion to

19           strike any questioning or responses on these

20           suits, alleged suits, unless I'm given a copy

21           of these materials.

22                Go ahead, Doctor.

23                THE WITNESS:  Okay.  If that's what they

24           allege.  But I was removed from the suit.
```

Nathan W. Goodyear, MD

```
 1    BY MS. MOORE:

 2          Q.   But my question is, were those lawsuits --

 3    there was a lawsuit filed against you as a result of

 4    a lap sponge --

 5          A.   Yeah.

 6          Q.   -- left in a patient during a C-section?

 7          A.   Yes.  You can sue anybody.

 8          Q.   Pardon me?

 9          MR. KOTT:  Same objection.  You don't have

10          to respond.

11    BY MS. MOORE:

12          Q.   Pardon me?

13          A.   Yes, if that's what it says.

14          Q.   You said this is America, right, people

15    can sue?

16          A.   Uh-huh.

17          Q.   Okay.  And then what were the other

18    lawsuits about?

19          A.   There was a lawsuit related to a high risk

20    pregnancy woman that presented without attending to

21    the hospital in Louisiana, and we transported her to

22    -- the -- both surgical ORs were being used.  There

23    was no staff and we had to transport her back to her

24    high risk facility in Shreveport and the baby died.
```

Nathan W. Goodyear, MD

```
1              Q.   Okay.  And --

2              A.   And then there was I think one recently

3       that -- talking about on a C-section, there was a

4       device that was -- that broke off that was retained

5       within the abdomen, discovered years after the fact.

6              Q.   Okay.  Anything else you can remember?

7              A.   No.

8              Q.   All right.

9              MR. KOTT:  Let's take our break now

10             instead of before --

11             MS. MOORE:  No, my questions are pending.

12             Questions are pending.

13             All right.  If we take a break, I'm going

14             to instruct and ask that you do not talk --

15             MR. KOTT:  I don't want to talk to him, I

16             want to go to the bathroom.

17             MS. MOORE:  I'm going to ask that you

18             don't speak to Counsel about the pending

19             questions or the issues.

20             THE WITNESS:  Can I pee?

21             MS. MOORE:  You may.  You may.

22             MR. KOTT:  Okay.  Thank you.

23             VIDEOGRAPHER:  Okay.  We're going off the

24             record.  The time is 10:30 a.m.
```

Nathan W. Goodyear, MD

```
 1                 (Off the record.)

 2                 VIDEOGRAPHER:  Okay.  We're back on the

 3          record.

 4                 Starting disc number two.  The time is

 5          10:45 a.m.

 6    BY MS. MOORE:

 7          Q.  All right.  Doctor, back after a break.

 8                 We were talking about some of the medical

 9    malpractice proceedings against you over the years,

10    and you referenced a couple for us.  I'm going to

11    ask you about a few others.

12                 I'm going to hand you and your Counsel a

13    Complaint by Michelle Potts.

14                 MR. KOTT:  Thank you.

15                 MS. MOORE:  And we'll make that as Exhibit

16          No. 10.

17                 (Exhibit No. 10 marked.)

18    BY MS. MOORE:

19          Q.  It references you and some other doctors.

20    And if you want to look at the entire document,

21    that's absolutely fine.  If you are, let's

22    go off the record and look at the document.

23                 MS. MOORE:  We'll go off the record.

24                 VIDEOGRAPHER:  We're going back off the
```

Nathan W. Goodyear, MD

```
 1              record.  The time is 10:46.

 2                   (Off the record.)

 3                   VIDEOGRAPHER:  Okay.  We're back on the

 4              record.  The time is 10:47.

 5      BY MS. MOORE:

 6              Q.   Doctor, you've had a chance to look at

 7      this Complaint that was filed against you in

 8      the Circuit Court for Knox County, Tennessee.  And

 9      it appears to be a lawsuit, or the allegation

10      against you is that -- if you turn to

11      paragraph seven, that during the procedure that you

12      were performing --

13                   MR. KOTT:  Object to the form.

14      BY MS. MOORE:

15              Q.   Doctor, if you'll read the last sentence.

16                   Well, first of all, you see your name in

17      there.  Let's go through that paragraph.

18                   "On or about September 7th, 2001," do you

19      see that, paragraph seven?

20              A.   I do.

21              Q.   "The plaintiff was a patient at the

22      hospital owned and operated by," and it names a

23      bunch of defendants?

24              A.   Correct.
```

Nathan W. Goodyear, MD

1          Q.   And it mentions you as being Nathan W.

2     Goodyear, resident physician under the control

3     and direction of said defendant, Dr. William

4     Hollis.  Do you see that?

5          A.   Yeah.  I'm the third listed there, yes.

6          Q.   Yes, you are.  And it says that during --

7     the last sentence says, "During said procedure, the

8     lap sponge was left in the abdomen of the Plaintiff

9     and was undetected by x-ray, requiring additional

10    surgery for its removal"?

11         A.   Yes, I read that.

12              MS. MOORE:  I'm going to mark that as

13         Exhibit No. 10.

14              I'm going to also hand you what I'll mark

15         as Exhibit No. 11.

16              Again, we can go off the record if you

17         want to take a look at it, Counsel.

18              VIDEOGRAPHER:  We're going off the record.

19         The time is 10:48.

20              (Off the record.)

21              (Exhibit No. 11 marked.)

22              VIDEOGRAPHER:  We're back on the record.

23         The time is 10:50.

24         BY MS. MOORE:

Nathan W. Goodyear, MD

```
 1           Q.   All right.  I've handed you a Complaint

 2      entitled Sandra Dykes and husband Donnie Dykes

 3      versus, again, a number of defendants, including

 4      yourself, in the Circuit County for Knox County,

 5      Tennessee in 2005; is that fair?

 6           A.   That's what it reads, yes.

 7           Q.   And your note you just wrote?  I'm trying

 8      to understand the note --

 9           A.   Chicken scratch.  It says Dr. Copas did

10      surgery, his private patient.

11           Q.   Okay.  So what does that mean?

12           A.   It means I just held the retractor.

13           Q.   Okay.  So if you turn to the -- this is a

14      lawsuit against you and a number of other doctors,

15      correct?

16           A.   Yes, there are several listed here,

17      correct.

18           Q.   And do you remember the allegations in

19      this particular lawsuit now after having a moment to

20      refresh your recollection?

21           A.   Vaguely.  I believe Dr. Copas did a

22      colpocleisis on her.  But I haven't had a chance to

23      read through all of it.

24           Q.   And what is that?
```

Nathan W. Goodyear, MD

1         A.   Well, a colpocleisis is a non-mesh

2    procedure for typically severe prolapse when the

3    client -- the patient no longer desires a functional

4    vagina and you will basically close it up.

5         Q.   So you did what is known as a complete

6    LeFort colpocleisis?

7              MR. KOTT:  Object to the form.

8              THE WITNESS:  I did not.  I didn't.

9    BY MS. MOORE:

10        Q.   You were involved in the surgery?

11        A.   I held the retractor.

12        Q.   You were named in the lawsuit?

13        A.   Correct.

14        Q.   And if you go further down -- so that

15   means -- is that the complete closing up of the

16   vagina?

17        A.   Correct.

18        Q.   And so the Plaintiff alleges that her --

19   unbeknownst to her, she had signed a consent -- a

20   Dr. Kim recommended a bladder tuck surgery.

21   Consents were signed for the transvaginal tape and

22   anterior repair.  After surgery, the Plaintiff was

23   informed that Dr. Kim was not present.  You were one

24   of the doctors present, and the Plaintiff learned

Nathan W. Goodyear, MD

```
 1         that her vagina had been sewn up and completely

 2         obliterated; is that correct?

 3              A.   She was not my patient.

 4              Q.   You were part of the surgical team?

 5              A.   I was a retractor.

 6              Q.   So you were in the operating room?

 7              A.   I was in the operating room.

 8              Q.   You were in the operating field?

 9              A.   I was in the operating field.

10              Q.   And you're named as a defendant in the

11         Complaint?

12              A.   Yes.

13              Q.   And if you turn to I think it is

14         allegation 37.  Allegation 37, do you see that?

15              A.   Thirty-seven?

16                   MR. KOTT:  Is it paragraph 37 or number

17         37?

18         BY MS. MOORE:

19              Q.   Yes, that's fine.  Number 37.

20                   Do you see that?

21              A.   I do.

22              Q.   What is the first count?

23              A.   Number 37?

24              Q.   The one after that, the first count,
```

1      please.

2              A.   Oh, battery.

3              Q.   Battery.  Okay.

4                   And if you look down, it says that the --

5      would you read 38 into the record, please?

6              A.   "The defendants, Dr. Copas, Goodyear and

7      Saguan, performed a complete colpocleisis on Ms.

8      Dykes without her knowledge, authorization, or

9      consent."

10             Q.   And 39, please, 39 and 40, please

11     read that.

12             A.   "Ms. Dykes did not know that there was a

13     possibility that her vagina would be sewn closed and

14     obliterated or that a complete LeFort colpocleisis

15     procedure might be contemplated, much less

16     performed."

17                  And then number 40, "Ms. Dykes did not

18     authorize and would not have consented to the LeFort

19     colpocleisis procedure or closure of her vagina."

20             Q.   And 41 states she did not know that you'd

21     be assisting in the surgery?

22             A.   That is correct.  Because we were not her

23     physicians.

24             Q.   And she would not have authorized your

Nathan W. Goodyear, MD

1      participation in her surgery?

2          A.   Correct.  She was a private patient of Dr.

3      Copas.

4          Q.   So you performed surgery on a patient

5      without her consent?

6              MR. KOTT:  Object to the form.

7              THE WITNESS:  Do I answer?

8      BY MS. MOORE:

9          Q.   Yes.

10         A.   I did not perform it.

11         Q.   You were in the surgical field?

12         A.   But I did not do any of the procedures

13     other than hold this, move that.

14         Q.   And you were named as a defendant for

15     participating in a surgery without the patient's

16     consent, correct?

17             MR. KOTT:  Object to the form.  That's an

18         allegation.

19             Go ahead and answer.

20             THE WITNESS:  Correct.

21             MS. MOORE:  I'm going to object to the

22         coaching.

23             MR. KOTT:  I'm going to object that it's a

24         misleading question too.

Nathan W. Goodyear, MD

```
 1                    MS. MOORE:  Your witness -- you can object

 2             to the form, but any commentaries, I move to

 3             strike.

 4                    THE WITNESS:  Was I in the room?  Yes.

 5      BY MS. MOORE:

 6             Q.   And you were in the operating field?

 7             A.   Was I in the operating field?  Yes.

 8                  Did I do any surgical procedures?  No.

 9             Q.   By holding a retractor you participated

10      in the surgery, correct?

11             A.   Yes.

12             Q.   Okay.  And what exactly -- once your

13      vagina is sewn shut, are you able to have sex?

14             A.   No.

15             Q.   You're not able to have --

16             A.   In terms of intercourse, no.  Penetrating,

17      no.

18             Q.   Okay.  All right.  And then the next one

19      I'm going to hand you, Exhibit No. 12.

20                    MS. MOORE:  Counsel.

21                    MR. KOTT:  Thank you.

22                    MS. MOORE:  If you want to take a look at

23             this, and we'll go off the record for a second.

24                    VIDEOGRAPHER:  Time is 10:55 on the
```

Nathan W. Goodyear, MD

1          camera.

2                    (Off the record.)

3                    VIDEOGRAPHER:  We're back on the record.

4          And the time is 10:58.

5                    (Exhibit No. 12 marked.)

6     BY MS. MOORE:

7          Q.   Okay.  Doctor, we've given you an

8     opportunity to look at Exhibit No. 12, which is

9     another Complaint against you and others.  It's in

10    the Circuit County for Knox County Circuit

11    Court -- strike that.  Sorry.  Circuit Court for

12    Knox County, Tennessee.  It looks like it's

13    December 18th, 2002 by the stamp on it.  It's Erin

14    R. Huskey and her husband Christopher R. Huskey,

15    again it's against you and University Health Systems

16    and others.

17                   And this particular -- now that you've had

18    a chance to look at this, does it refresh your

19    recollection?

20         A.   It does not.

21         Q.   Okay.  But you are named here as a

22    defendant?

23         A.   Yes.

24         Q.   And the allegation on page two, paragraph

```
1       seven, it says, "Dr. Rodriguez and Dr. Goodyear

2       were selected by the University of Tennessee

3       to" -- I guess missing a word to perform surgery

4       on the plaintiff -- "were the Plaintiff Erin

5       Huskey's doctors"?

6             A.   No.   Dr. Rodriguez was her physician.

7             Q.   I'm asking you what the allegation says.

8             A.   Where does that read?

9             Q.   Look at seven.

10            A.   Yes.

11            Q.   It states that you and Dr. Rodriguez were

12      selected by the University of Tennessee to be

13      Plaintiff Erin Huskey's doctors, correct?

14            A.   Well, here Dr. Rodriguez is the attending,

15      I'm just the on-call second year resident.

16            Q.   And I'm asking you what the allegation

17      says.

18            A.   True, the allegation says that.

19            Q.   Okay.   And I understand that you've

20      got a response for everything I've shown you so far,

21      but I'm asking you what the allegations say.

22            A.   Okay.

23            Q.   And --

24                 MR. KOTT:   Well, you're going to have to
```

Nathan W. Goodyear, MD

```
 1              be clear on each time.  Because when you say

 2              "correct" -- Kim, just listen to me one

 3              minute -- when you say "correct," does it

 4              mean that that the allegation is correct or

 5              that you read it correct?  Would you please --

 6                   MS. MOORE:  Thank you, Counsel.

 7                   MR. KOTT:  Thank you.

 8                   THE WITNESS:  Because -- you're misleading

 9              on here, because these were not my patients.

10      BY MS. MOORE:

11           Q.   All right.  My question to you is, you may

12      not have believed that they were your patients, but

13      obviously as you've told us on a couple of

14      occasions, people have a right to sue, and Ms.

15      Huskey and Mr. Huskey believed you to be their

16      doctor?

17           A.   Okay.

18           Q.   So if we're looking at the allegations,

19      it appears the allegation here under paragraph

20      14, I think it specifically mentions you by

21      name and "Plaintiffs allege defendants Dr.

22      Rodriguez and Dr. Goodyear, were negligent in the

23      treatment of plaintiff Erin Huskey's condition in

24      the following respects," that you negligently
```

Nathan W. Goodyear, MD

1          lacerated her bladder during the laparoscopic

2          surgery?

3               A.   Is that a question?

4               Q.   Yes.

5               A.   It -- it alleges that, but I was not the

6          operating surgeon.

7               Q.   Okay.  But it does make that allegation?

8               A.   Correct.

9               Q.   You participated in the surgery?

10              A.   I scrubbed in as an assistant.

11              Q.   Okay.  So you were assisting in the

12         surgery?

13              A.   Just like the colpocleisis.

14              Q.   All right.  And --

15              A.   Simply there for retraction.

16              Q.   And the other allegations are that the

17         laceration was not discovered in a timely manner,

18         correct?

19              A.   That's an allegation, correct.

20              Q.   And as a result of the negligence that

21         you performed, she had to undergo extensive

22         surgical procedures and permanent injuries?

23                   MR. KOTT:  Object to the form.

24                   THE WITNESS:  Do I answer?

Nathan W. Goodyear, MD

```
  1      BY MS. MOORE:

  2           Q.   Yes.

  3           A.   That's -- that's her allegation.

  4           Q.   Thank you.

  5                All right.  Now, going back to the

  6      questions about malpractice lawsuits.  Have you been

  7      involved in any other lawsuits?

  8           A.   There was a -- I told you about the

  9      obstetrics where the baby died.

 10           Q.   All right.  And that was the baby that

 11      died in Louisiana?

 12           A.   Correct.

 13           Q.   All right.  And was there another one in

 14      Louisiana?

 15           A.   There was -- no, not that I'm aware of.

 16           Q.   All right.  Let me see.

 17                Going back to something you said a little

 18      bit ago.  You're talking about faithful and truthful

 19      information.  You, yourself, have been accused of

 20      not providing truthful information to a patient,

 21      correct?

 22                MR. KOTT:  Object to the form.

 23                THE WITNESS:  Accused, correct.

 24      BY MS. MOORE:
```

Nathan W. Goodyear, MD

```
1              Q.   What facts do you have to support your
2         concerns about not receiving truthful and accurate
3         information from Ethicon?
4                   You're an accuser in the situation, right?
5                   MR. KOTT:  Object to the form.
6                   THE WITNESS:  Number one, minimally
7              invasive.  Let me just pull out that report, my
8              expert report.
9                   MS. MOORE:  Let's go off the record.
10                  VIDEOGRAPHER:  Sure.  We're going off.
11             The time is 11:03.
12                  (Off the record.)
13                  VIDEOGRAPHER:  Time on the camera is
14             11:06.
15        BY MS. MOORE:
16             Q.   All right.  Do I need to repeat my
17        question?
18             A.   Please.
19             Q.   All right.  Basically, you've told us
20        about your concerns that you've not received
21        truthful and accurate information from Ethicon; is
22        that correct?
23             A.   That's correct.
24             Q.   And I said in this particular instance,
```

Nathan W. Goodyear, MD

```
 1        you were like the accuser that has accused you of

 2        not who accused you of not providing accurate

 3        information to them.  So I want to know your

 4        basis for your allegations of not receiving

 5        truthful or accurate information.

 6                  MR. KOTT:  Object to the form.

 7                  Please go ahead and answer.

 8                  THE WITNESS:  The -- the fact that the

 9            Proloft -- Proloft -- Prolift mesh itself is

10            soft and that it was small pore -- I mean large

11            pore.  The fact that it would restore sexual

12            function by restoring normal pelvic anatomy.

13            The fact that many patients would return to

14            normal daily activities within three to four

15            days.

16        BY MS. MOORE:

17            Q.   Okay.

18            A.   Most completely recover within a two- to

19        three-week period.

20            Q.   Wait.  Let me make sure I understand.

21        You're reading from your report.  And what page are

22        you on, sir, if I can follow you?

23            A.   I'm on page nine.

24            Q.   Thank you.
```

Nathan W. Goodyear, MD

```
 1              So you're saying -- and you're looking at

 2      the points under paragraph three, that you

 3      believe that you have not been told accurate

 4      information because the patient brochure says that

 5      Prolift mesh was soft?

 6          A.   Not just the brochure, but the IFU as

 7      well.

 8          Q.   Okay.  And what is it about that, the fact

 9      that the Prolift mesh is soft that is inaccurate or

10      misleading?

11              MR. KOTT:  Wait, wait.  I'm going to

12          object.  Just a moment.

13              You asked for the list of all the things

14          he felt.  And he's still giving his list.  If

15          you want to take that question back and just

16          ask specifics, fine, but -- you do it any way

17          you want, but you had asked for the total list,

18          and I don't want to give the impression that

19          that was the entirety of the list.

20              MS. MOORE:  That's fair enough, Counsel.

21              MR. KOTT:  Do it the way you want to do

22          it.

23              MS. MOORE:  Thank you.  Thank you.  I

24          appreciate that.
```

Nathan W. Goodyear, MD

```
 1    BY MS. MOORE:
 2         Q.   So I had asked you earlier to give me the
 3    basis for your opinions about concerns with respect
 4    to the truthfulness on the Prolift and the TVT
 5    products.
 6         A.   Right.
 7         Q.   And so you had turned your attention to
 8    paragraph three in your report, which I believe --
 9    is this paragraph three in Exhibit No. 3, which is
10    the Shively report, the same paragraph that is in
11    all of your patient reports?
12         A.   Well, it wasn't available.  And so if it
13    wasn't available, I didn't put it there.
14         Q.   Yeah.  Okay.  So, I mean, this paragraph
15    that we're going through now, the reasons that
16    you're concerned, this same information is laid out
17    in the other reports?
18              MR. KOTT:  Yeah, the expert reports.
19    BY MS. MOORE:
20         Q.   No, no, no, no.  It's a confusing
21    question.
22         A.   The expert report.
23         Q.   All right.  So now that we've clarified
24    that.  You were taking me through the particular
```

Nathan W. Goodyear, MD

```
1        concerns that you had and -- would it be fair to say

2        that those concerns are listed under paragraph

3        three, beginning on page nine, going up to the

4        conclusion of paragraph 11?

5            A.   9, 10 and 11, correct.

6            Q.   Okay.  All right.  And we'll come back to

7        that in a few minutes.

8                 Anything else other than what's laid out

9        in here that would support your concerns with

10       respect to being the accuser that --

11               MR. KOTT:  Objection.  Form.

12       BY MS. MOORE:

13           Q.   -- Ethicon is not truthful or has not

14       provided truthful information to you?

15           A.   That's what I included here, correct.

16           Q.   Okay.  All right.  Now, have you ever

17       raised these concerns to anyone before you were

18       hired and paid by the plaintiff lawyers?

19           A.   In terms of some of these potential

20       issues?

21           Q.   Yes, sir.

22           A.   Let me see.

23               MS. MOORE:  Let's go off the record.

24               VIDEOGRAPHER:  Okay.  We're going off.
```

Nathan W. Goodyear, MD

1           The time is 11:10.

2                (Off the record.)

3                VIDEOGRAPHER:  All right.  We're back on

4           the record.  The time is 11:11.

5     BY MS. MOORE:

6           Q.   All right, Doctor.  I was asking you again

7     about the basis for your opinions that Ethicon had

8     not provided you with truthful or accurate information

9     and you pointed us to your reports.

10          A.   Uh-huh.

11          Q.   And I believe you were looking back there,

12    because I asked you -- one of the questions I asked

13    you, was there anything else that supports your

14    concerns?

15          A.   This is -- erosion rate.  The erosion rate

16    in this.

17          Q.   And what do you mean by "the erosion

18    rate"?

19          A.   The incidents or prevalence -- the

20    prevalence of the mesh being exposed, that's a

21    current terminology, into the vagina.

22          Q.   And what was your understanding of the

23    erosion rate?

24          A.   That it was low.

Nathan W. Goodyear, MD

```
1            Q.   And what was that based on?

2            A.   Based on the literature that Ethicon

3       supplied to us through training and materials.

4            Q.   And where is that literature?  Can

5       you point to your reliance list and show me

6       the literature that would support --

7            A.   Some of it --

8            Q.   -- your concerns?

9            A.   Some of it would -- for example, the

10      education, presentations that they presented to us.

11           Q.   Okay.

12           A.   So I don't have that.

13           Q.   I want to know what you have that would

14      support your concern that Ethicon provided you

15      information on training or materials on erosion

16      rates.

17           A.   Well, for example, the literature that

18      they proposed, the TVM studies out of France.

19           Q.   Okay.

20           A.   That was where they had the cutoff rate of

21      20 percent and they exceeded that.

22           Q.   Now, what is this again?  This is a --

23      what study?

24           A.   The TVM study technique out of France.  I
```

Nathan W. Goodyear, MD

```
 1        forget the authors, but they were some of the
 2        original surgeons.
 3             Q.   And they told you that the erosion was
 4        three to seven percent?
 5             A.   It was less than five percent.
 6             Q.   They told you it was less than five
 7        percent?
 8             A.   Uh-huh.
 9             Q.   And when was that?
10             A.   I don't recall the exact dates.
11             Q.   Okay.  Anything else?
12             A.   It would have been in the educational
13        material they gave us, in the presentations and
14        conferences that they presented to us before we went
15        into the cadaver labs, etcetera.
16             Q.   And what did they tell you?  What exactly
17        did they tell you with respect to the erosion rate?
18             A.   Been a few years ago, so I can't remember
19        specifics, but it was low.
20             Q.   All right.  I need you to be specific
21        because you're making a specific allegation.  So to
22        the extent that you can tell us what you recall,
23        that would support this basis.  If you can't recall
24        something, that's fine.  But if you can tell us what
```

Nathan W. Goodyear, MD

1     you're relying on, I need to know.

2          A.   I cannot rely on a specific conversation

3     and a -- remember a conversation where a specific

4     number was quoted that I can recall.

5          Q.   Okay.  So it's just a feeling that you

6     have?

7               MR. KOTT:  Object to the form.

8               THE WITNESS:  It is not just a feeling.

9     BY MS. MOORE:

10         Q.   Okay.  What is it, then?

11         A.   It is a general recollection of the -- the

12    events and the repetition of quoting it to patients.

13         Q.   All right.  Now, the plaintiffs that

14    have sued you relied on just a general recollection,

15    would that be fair?

16              MR. KOTT:  Object to the form.

17              THE WITNESS:  It could be.

18    BY MS. MOORE:

19         Q.   It could be?

20         A.   It could be.

21         Q.   All right.  Now, I want --

22         A.   They may not have all the facts.

23         Q.   I'm sorry?

24         A.   They may not have all the facts.

Nathan W. Goodyear, MD

1       Q.   So you don't have all the facts?

2       A.   I didn't say that.

3            MR. KOTT:  Object to the form.

4    BY MS. MOORE:

5       Q.   All right.  Do you have all the --

6       A.   I didn't say that.

7       Q.   All right.  You're an educated man, right?

8       A.   Correct.

9       Q.   And what time period are we talking about?

10      A.   For what?

11      Q.   When you didn't have the appropriate range

12   of erosion or, I'm sorry, risk of erosion?

13      A.   Now ask that question again.

14      Q.   Yeah.  You were talking about the erosion

15   rate?

16      A.   Correct.

17      Q.   Three to seven percent?

18      A.   Correct.

19      Q.   And you have indicated to us --

20      A.   This was -- this was from the beginning of

21   the launch.

22      Q.   Okay.  And what is the beginning?

23      A.   Of Prolift.

24      Q.   What is the beginning as far as the time?

Nathan W. Goodyear, MD

```
1          A.    Prolift was launched in 2005.

2          Q.    So you're saying --

3          A.    2006.  I can't remember the exact launch

4     date.  But I know I was the second class there.

5          Q.    All right.  Prolift and then TVT?

6          A.    TVT was already on the market, the TVT

7     traditional.  The TVT-O came on prior to the

8     Prolift, very close to the launch of that.

9          Q.    So what I need you to do, if you can, is

10    tell me exactly what you are referring that would

11    substantiate your belief, or your opinion rather,

12    that Ethicon had information about higher erosion

13    rates in the what, what time period are we talking

14    about, 2005?

15         A.    What I'm -- what I'm quoting you on the

16    less than five percent is the erosion rates that

17    they told us we would see based on the studies,

18    which the study they would present to us was that

19    TVM study out of France.

20         Q.    Okay.  Anything else besides that TVM

21    study out of France?

22         A.    There was a -- there was a Salt Lake City

23    roundtable of experts, that they told us that the

24    erosion rates were actually less than five percent.
```

Nathan W. Goodyear, MD

```
 1        The experts said --

 2             Q.   Who are "they"?  I'm sorry to interrupt

 3        you.

 4             A.   Yeah.  I cannot recall.

 5             Q.   Okay.  So you took that to the

 6        bank, what they told you, you disregarded your

 7        own --

 8                  MR. KOTT:  Object to the form.

 9        BY MS. MOORE:

10             Q.   -- experience and knowledge and just

11        believed solely on what Ethicon told you?

12                  MR. KOTT:  Object to the form.

13                  THE WITNESS:  Do I answer?

14                  MR. KOTT:  Yeah.

15                  THE WITNESS:  Okay.

16        BY MS. MOORE:

17             Q.   I'll rephrase.

18                  You believed whatever Ethicon told you and

19        didn't do any independent research?

20             A.   We did not.  In fact, those of us around

21        there questioned that.

22             Q.   So you questioned that?

23             A.   Amongst ourselves.

24             Q.   But decided to put it in your
```

Nathan W. Goodyear, MD

```
 1       consent forms anyway?

 2              MR. KOTT:  Object to the form.

 3              THE WITNESS:  Put what into the consent

 4          forms?

 5     BY MS. MOORE:

 6          Q.   The erosion rates.  You said three to

 7     seven percent?

 8          A.   Correct.

 9               Well, I -- no, I didn't say that.  You

10     said that.  I said five percent or less.

11          Q.   I think your consent forms say --

12          A.   Okay.  So -- okay.

13          Q.   Okay.  Am I right?  What do your consent

14     forms say?

15          A.   If you say that's on my consent form --

16          Q.   We'll get to that.

17          A.   Okay.

18              MR. KOTT:  Wait until you see the

19          document.

20              MS. MOORE:  Well, let's see.  Hand me one

21          of the consent forms.

22              MR. KOTT:  I mean, I don't -- you can get

23          to it what you want.  I just don't want him

24          guessing.
```

Nathan W. Goodyear, MD

```
1    BY MS. MOORE:

2        Q.   No, no, that's fair.  But my point is you

3    questioned what they were telling you about the

4    erosion?

5        A.   As being accurate.

6        Q.   And --

7        A.   Because none of us around there, which had

8    a high degree of surgical volume of these

9    procedures, were coming close to that erosion rate

10   that was quoted to us.

11       Q.   So were you seeing higher erosion rates?

12       A.   All of us were.

13       Q.   Name some of the other doctors that were

14   there with you.

15       A.   I cannot recall those names.

16       Q.   So you can't recall the names and you

17   can't recall the studies?

18       A.   Well, I told you the studies.

19       Q.   You just mentioned one.

20       A.   Yeah, that's the study.

21       Q.   That's the only study?

22       A.   That's pretty much the one they would give

23   us, for Prolift.

24       Q.   For Prolift.
```

Nathan W. Goodyear, MD

```
 1                  Okay.  What about for TVT?

 2          A.   Well, I thought we were talking about

 3     Prolift here.

 4          Q.   You know what, that's a good point, too.

 5     It's going to be challenging as we go forward

 6     because we've got to cover TVT and Prolift.  So I'm

 7     asking you right now for your information on both.

 8     And if you want to tell me TVT first and then

 9     Prolift, however it's best for you.

10          A.   Prolift, TVT, the erosion rates were

11     quoted as lower.  But because it's typically a

12     combined procedure, both involving mesh, you would

13     still use the same range.

14          Q.   Okay.  Because you were the one that

15     separated it now, but you're saying --

16              MR. KOTT:  Object to the form.

17              THE WITNESS:  Well, one can be a

18          standalone procedure.

19     BY MS. MOORE:

20          Q.   Right.  And let's talk about them.  I

21     think in all these cases the Prolift and the TVT are

22     used?

23          A.   Not -- not -- well, there may be a

24     posterior Prolift with a TVT-O, but maybe not
```

Nathan W. Goodyear, MD

```
 1        necessarily an anterior Prolift with a TVT-O.

 2             Q.   The two products, we'll go through them in

 3        detail.  But let's just say for right now, I'm

 4        trying to understand the basis for your opinion that

 5        you were sitting around with some other doctors who

 6        had concerns because your erosion rates were higher

 7        than what you were being told by the company?

 8             A.   Right.  And your question is?

 9             Q.   You don't recall any of the doctors'

10        names?

11             A.   No.

12             Q.   Do you know where they're from?

13             A.   No.

14             Q.   Okay.  But at this point in time you were

15        having higher erosion rates?

16             A.   Correct.

17             Q.   And what were your erosion rates?

18             A.   My erosion rates were exceeding 15 to

19        20 percent.

20             Q.   Okay.  And what time period are we in?

21             A.   Well, in reference to that particular

22        roundtable, we're talking 2007.  Salt Lake City.

23             Q.   Okay.

24             A.   Fall, October 2007.
```

Nathan W. Goodyear, MD

```
1           Q.    Okay.  And so it was your own experience

2     that there were higher erosion  rates than what

3     you were being told by the company?

4           A.    Correct.

5           Q.    And that was what you were hearing from

6     the colleagues there as well?

7           A.    Correct.

8           Q.    How long had you been seeing those types

9     of erosion rates?

10          A.    Within probably the previous six months.

11          Q.    Okay.  All right.  Anything else other

12    than what's listed in paragraph three of your

13    report, beginning on page nine of Exhibit No. 3, and

14    the erosion rates you just discussed that would be

15    supporting your concerns about lack of accuracy or

16    truthfulness?

17          A.    The limited nature of the pelvic pain

18    postoperatively.

19          Q.    Okay.  All right.  So they told you the

20    pelvic pain was limited?

21          A.    It was minimal.

22          Q.    That's what --

23          A.    That's what they said, uh-huh.

24          Q.    Okay.
```

Nathan W. Goodyear, MD

```
 1              A.    In fact, they said complete recovery
 2       within -- I think it said within two to three weeks.
 3              Q.    And what was your experience?
 4              A.    Six weeks or longer.
 5              Q.    Okay.
 6              A.    The -- and I have the references.  The
 7       disruptive anatomy of the vagina.
 8              Q.    Yeah.  Well, let's see.  If it's referenced
 9       in here --
10              A.    Okay.
11              Q.    -- we don't need to go through it again.
12              A.    Okay.
13              Q.    We're going to tackle that in a bit.
14              A.    Okay, okay.
15              Q.    But if it's not in your paragraph three, I
16       want you to tell me about it.
17              A.    Okay.  Yeah, okay.
18              Q.    We covered so far?
19              A.    Yes.
20              Q.    Okay.  Good.  All right.
21                    All right.  Now, let's talk a little bit
22       about your training and your experience.
23                    You're no longer licensed in Louisiana?
24              A.    We moved.
```

Nathan W. Goodyear, MD

```
 1              Q.   Okay.  But are you licensed in Louisiana?

 2              A.   No.

 3              Q.   And why did you move to Tennessee?

 4              A.   Because we enjoy the weather, our church

 5     home is here, we have good friends here.  We love

 6     East Tennessee.

 7              Q.   Okay.

 8              A.   And we love the Vols.  Got to interject.

 9              Q.   We're Peyton Manning fans.

10              A.   Oh, there you go.

11              Q.   So all good.

12              A.   Archie.  Great, great family.

13              Q.   We were driving around looking for his

14     home last night.  I'm kidding.

15              MR. KOTT:  Oh, God.  You're kidding me?

16              MS. MOORE:  I'm kidding.  We talked about

17         it, though.  Strike all comments about Peyton

18         Manning.

19              Off the record.

20              THE WITNESS:  He's got billboards

21         everywhere, so...

22              MS. MOORE:  Why?

23              MR. KOTT:  He promotes.  He's paid to

24         promote products here big time.
```

Nathan W. Goodyear, MD

```
1              MS. MOORE:  Oh, we're not on the record,

2         are we, about that?

3              VIDEOGRAPHER:  Yes.

4              MS. MOORE:  I need my ten seconds back.

5              Back on the record.

6    BY MS. MOORE:

7         Q.   Let's see.  All right.  Tell me briefly

8    your educational background.  It looks like you

9    went to med school in Tennessee?

10        A.   Yeah, I went to medical school at

11   Louisiana -- LSU, Shreveport.

12        Q.   Okay.

13        A.   Then I went and did residency four years

14   of OB/GYN residency, University of Tennessee

15   Knoxville.

16        Q.   Okay.

17        A.   Then went to two years private practice

18   OB/GYN in Columbus, Georgia.  And then left there in

19   2006 and went to private practice in Ruston,

20   Louisiana, and then moved up here in 2013.

21        Q.   All right.  Have you done any additional

22   fellowships?

23        A.   I did a fellowship in metabolic medicine,

24   yes.
```

Nathan W. Goodyear, MD

```
 1          Q.   And where was that done?

 2          A.   That was basically a course -- a traveling

 3      course where we would travel and every few months go

 4      to three, four intensive days that we would take

 5      classes there, classes online at home, and then

 6      basically take our boards thereafter.

 7          Q.   So that was an anti-aging fellowship?

 8          A.   Yeah.  Actually, I think it's called

 9      functional rejuvenative medicine.

10          Q.   And that was in October of 2009 to

11      October 2011?

12          A.   Correct.

13          Q.   And you said it's an online program?

14          A.   Yeah.

15          Q.   And tell me about the A4M, what does that

16      mean?  I think it's -- do you know what I'm

17      referencing?

18          A.   The forearm?

19          Q.   Yeah.  The A4 -- it's the --

20          A.   Where are you seeing that?

21              MS. KOTT:  Do you have an exhibit for him?

22              MS. MOORE:  I will in a minute, Counsel.

23      BY MS. MOORE:

24          Q.   Yeah, I can go to the -- we'll come to
```

Nathan W. Goodyear, MD

```
1        that in a minute.

2                You did your fellowship, though, and you

3        received a fellowship in what specialty?

4                A.   Functional rejuvenative medicine.

5        Anti-aging rejuvenative medicine.

6                Q.   What is that?

7                A.   It's the name they gave to fellowship for

8        functional, or as I described earlier, integrative

9        medicine.

10               Q.   Okay.  And have you done any -- you're

11       actually in the process of getting your MS in

12       functional and rejuvenative medicine?

13               A.   Correct.

14               Q.   And where are you along in that process?

15               A.   Three-quarter's of the way.

16               Q.   When do you expect to have your Master's?

17               A.   A lot of that depends on when they get the

18       courses, you know, how they fall, so I hope within

19       the year.

20               Q.   All right.  Fair to say that's your

21       interest?

22               A.   Yes.

23               Q.   And that's kind of what you hold out to

24       the world in your LinkedIn page as your interest?
```

Nathan W. Goodyear, MD

```
 1            A.   Currently, yes.

 2            Q.   It's like your focus now has really turned

 3       towards the -- how would you describe it, the -- not

 4       the --

 5                 MR. KOTT:  I'm waiting until you finish.

 6       BY MS. MOORE:

 7            Q.   Okay.  Your focus now has turned towards,

 8       I want to use the right term.  Would it be

 9       fair to say anti-aging or rejuvenative medicine?

10                 MR. KOTT:  Object to the form.

11                 THE WITNESS:  Preventative.

12       BY MS. MOORE:

13            Q.   Preventative, okay.  But your current

14       focus is preventative medicine?

15            A.   Correct.

16                 MR. KOTT:  Objection to the form.

17       BY MS. MOORE:

18            Q.   And what is your current focus of

19       medicine?

20            A.   Didn't I just answer that?

21            Q.   Yeah, but I just --

22                 MR. KOTT:  She wants to make a question

23            into a non-leading question.

24                 MS. MOORE:  I can lead, you're an expert
```

Nathan W. Goodyear, MD

```
 1              and an implanter, by the way.  But nonetheless,

 2              you can answer.

 3                   THE WITNESS:  Preventative.

 4    BY MS. MOORE:

 5         Q.   All right.  And what exactly --

 6    preventative is the -- you're studying these courses

 7    and you need your fellowship and now you're trying

 8    to get -- not trying, you will, I assume, get your

 9    Master's?

10         A.   Correct.

11         Q.   And is that an online program at the

12    University of South Florida?

13         A.   It is.

14         Q.   All right.  And so that makes sense then

15    when I saw your LinkedIn page where you kind of talk

16    about your focus.  And I'll give you a copy of that.

17                   MS. MOORE:  This will now be Exhibit No.

18              13.

19                   (Exhibit No. 13 marked.)

20    BY MS. MOORE:

21         Q.   And, Doctor, let's just go through

22    briefly.  Your summary, is that something that you

23    have prepared?

24         A.   Yes, it's something I wrote.
```

Nathan W. Goodyear, MD

```
 1              Q.   It references that you're the founder,

 2        co-owner, and lead physician at Seasons in Farragut,

 3        Tennessee?

 4              A.   Correct.

 5              Q.   Did I pronounce that right?

 6              A.   You did.

 7              Q.   All right.  Your passion for wellness

 8        began with your own 100-pound post-football career

 9        weight loss.  Congratulations.

10              A.   Thank you.

11              Q.   "Dr. Goodyear is dedicated to offering the

12        latest advancements in Wellness medicine with the

13        most holistic approach to treatment possible based

14        in science.  Dr. Goodyear's passion for Wellness

15        extends beyond his clients, to helping his fellow

16        physicians and medical practitioners enjoy the same

17        Wellness medicine."

18                   So it's fair to say this is your passion

19         now?

20              A.   Correct.

21              Q.   And then it goes on to cite your

22        background that we've talked about.  And then it

23        talks about your book.  We've discussed your book.

24        And then it goes down into your experience, correct?
```

Nathan W. Goodyear, MD

```
1              A.   Yes, as a speaker.

2              Q.   As a speaker.

3                   Tell me what that means, as a speaker.

4      What are you speaking on?

5              A.   They call me and ask me to speak.

6              Q.   Okay.  And help me out.  When people call

7      you, what do they want you to speak on?

8              A.   Well, for example, we read your book, we

9      want you to come speak on your book.

10             Q.   Fair.  Okay.  And so when you go speak --

11     it says you've spoken at numerous conferences and

12     symposiums?

13             A.   Correct.

14             Q.   And that you're "providing health and

15     wellness through Season's 5 points of wellness:

16     Nutrition, Exercise, Hormone Balance, Inflammation

17     Control, and Detoxification.  All provided in an

18     individualized and custom wellness approach."

19             A.   Correct.

20             Q.   So that's your niche, your focus right

21     now?

22             A.   Correct.

23             Q.   All right.  And then you presented at --

24     this specialty at various conferences, it looks
```

Nathan W. Goodyear, MD

```
 1        like, over the last couple of years beginning in

 2        2011 in Orlando.  Take a look at that.

 3             A.   Yeah.  On the second page it didn't print

 4        out well, so -- but, yeah.

 5             Q.   So you've presented, it looks like, on the

 6        topic of the book, Manboob Nation, about an

 7        integrative model for low testosterone.  And then

 8        you've also spoke on --

 9             A.   Again, I can't see it.  It didn't print

10        out well.

11             Q.   Oh, I'm sorry.  I apologize.  I'll give

12        you my copy.  Here you go.  I apologize.

13                  Just looking at some of the other

14        conferences where you've presented.

15             A.   Yeah, it even cuts off here, I think.

16             Q.   What is A4M?  That's what I was trying to

17        remember a few minutes ago.

18             A.   You know, I'm not sure what those acronyms

19        stand for.  I think they call it anti-aging

20        medicine, but they -- they actually call it

21        functional medicine rejuvenative.

22             Q.   It says the American Academy of Anti-Aging

23         Medicine?

24             A.   Yes.
```

Nathan W. Goodyear, MD

```
1              Q.    So you were speaking at their conferences?

2              A.    Right.

3              Q.    Okay.  Would it be fair to say that the

4       field of anti-aging medicine is not recognized by

5       established medical organizations such as the

6       American Board of Medical Specialty and the American

7       Medical Association, the AMA?

8                    MR. KOTT:  Object to the form.

9                    THE WITNESS:  I guess they don't.

10      BY MS. MOORE:

11             Q.    And why is that?

12             A.    Because you said it.

13                   MR. KOTT:  Doctor, don't guess, please.

14                   THE WITNESS:  Okay.  I'm sorry.

15                   MR. KOTT:  If you know the answer, give

16      it.  If you don't know the answer, don't give

17      it.  Don't guess.

18                   THE WITNESS:  Okay.

19      BY MS. MOORE:

20             Q.    And are you aware that the activities of

21      the organization, the American Academy of Anti-Aging

22      Medicine, have been challenged and called

23      controversial in the scientific community?

24                   MR. KOTT:  Object to the form.
```

Nathan W. Goodyear, MD

```
 1                 THE WITNESS:  I am aware.

 2       BY MS. MOORE:

 3            Q.   And why is that?

 4            A.   You're changing dogma, you're challenging

 5       science.  You're changing the way things have always

 6       been done, but you're using the literature to

 7       support you.

 8            Q.   So when you say that you're challenging

 9       dogma, why is this whole area controversial?

10            A.   Because you're asking for change based on

11       science.  The way things have been done for 20 years

12       may need to be slightly adjusted based on new

13       knowledge, i.e., the world's not flat, we now know

14       it to be round.

15            Q.   And have you -- are you familiar with the

16       allegations that advocates on behalf of the

17       anti-aging organization have reacted to such

18       criticism that you've just talked about as saying

19       it's a conspiracy perpetuated by the U.S. government

20       and the FDA?

21            A.   I'm not aware of that allegation.

22            Q.   So there is some question in the

23       scientific community about the legitimacy of the

24       anti-aging medicine that you're exploring, correct?
```

Nathan W. Goodyear, MD

1        A.    The organization, correct.

2        Q.    And the medicines themselves?

3        A.    No.

4        Q.    You would disagree with the concept that

5    there is some controversy associated with anti-aging

6    medicines?

7        A.    You referenced the medicines.  I'm

8    referencing the organization.

9        Q.    Okay.  And, yeah, my question is with

10   respect to the medicine.  You've already answered

11   that there is controversy with the organization?

12       A.    There's always controversy in science.

13       Q.    Exactly.

14       A.    There's always disagreements.

15       Q.    Okay.  Good point.

16             But my question to you is, are you aware

17   of the controversy associated with the anti-aging

18   medicine, the controversies in science?

19       A.    Well, you're referencing medicines

20   broadly.  Can you clarify that?

21       Q.    Anti-aging medicines.

22       A.    I don't use that term.

23       Q.    What term do you use?

24       A.    For example, you're deficient in Vitamin

Nathan W. Goodyear, MD

1       D.

2               Q.    Okay.

3               A.    You need Vitamin D.

4               Q.    Okay.

5               A.    You're low in DHEA.  That's hormones.  You

6       need DHEA.

7               Q.    All right.  So any of the concepts --

8       strike that.

9                     The techniques and the medicines that you

10      use and the treatment of patients in the anti-aging

11      spectrum have been known to be controversial,

12      correct?

13              A.    What I mentioned, the Vitamin D, the DHEA,

14      the low testosterone, as you see in the records and

15      the book, it's scientifically validated.

16              Q.    But there are some criticisms about some

17      of the techniques in medicine as being controversial?

18              A.    Yes.

19              Q.    Fair enough?

20              A.    Fair enough.

21              Q.    What memberships and professional

22      organizations, I think you're a member of the

23      Tourism Observatory for Health, Wellness and Spa;

24      Global Wellness; Seasons WC.

Nathan W. Goodyear, MD

```
 1             A.   I don't know about that.

 2             Q.   I think this came from your LinkedIn

 3      profile.

 4             A.   Okay.

 5             Q.   Let's turn back to that.  That would

 6      probably help.

 7             A.   Where do you see that?

 8             Q.   Let's go through -- under -- let's keep

 9      going down under your skills.

10             A.   Okay.

11             Q.   Let's go there for a moment.

12                  Skills on page two.

13             A.   Uh-huh.

14             Q.   These are skills that you selected to

15      highlight for your LinkedIn page?

16             A.   Correct.

17             Q.   This is a current LinkedIn page?

18             A.   Well, I guess depending on when you

19      printed it out, but yeah.

20             Q.   Now, how does it look -- does it look

21      current to you?

22             A.   It looks current.

23             Q.   Anything you want to edit or update?

24             A.   No.  It looks close.
```

Nathan W. Goodyear, MD

```
 1              Q.    Okay.  Now, let's look at the skills that

 2        you've highlighted, right?

 3              A.    Uh-huh.

 4              Q.    It says nutrition?

 5              A.    Yes.

 6              Q.    Wellness, health -- I'm just going to read

 7        them, and if I misspeak, please stop me.

 8              A.    Okay.

 9              Q.    Nutrition, wellness, healthcare, social

10        media, advertising, social media marketing, public

11        speaking, marketing strategy, board certified,

12        online marketing, preventative medicine,

13        entrepreneurship, detoxification, aesthetics,

14        health, business strategy, start-ups, prevention,

15        creative direction, management, medical management,

16        change, management consulting, creative development,

17        utilization management, media planning, patient

18        safety, graphic design, integrated marketing,

19        naturopathy, writing, research, published author,

20        holistic health.

21                    Those are the skills that you've

22        highlighted?

23              A.    I didn't highlight those.  People actually

24        post those.
```

Nathan W. Goodyear, MD

```
1              Q.   Okay.  But you accepted these, you didn't

2        delete them?

3              A.   I don't have any --

4              Q.   You can delete things from your LinkedIn

5        page?

6                   MR. KOTT:  Object to the form.

7        BY MS. MOORE:

8              Q.   Did you delete these?

9              A.   No.

10             Q.   Okay.  And these are skills that you hold

11       yourself out to have?  Would you agree with the

12       skills that are listed here?

13             A.   I will.

14             Q.   Okay.  And you mentioned your

15       certification again as a fellow in metabolic and

16       nutritional medicine?

17             A.   Is that a question?

18             Q.   No, I'm sorry.

19                  And then it goes on to one of the

20       Recommendations says you are recommended as "Dr.

21       Goodyear" -- on page three -- "has an impressive

22       state-of-the-art Wellness Clinic.  He is passionate

23       about finding the best treatments for his patients,

24       brilliant about studying," and it goes on.
```

Nathan W. Goodyear, MD

1           So you're getting good feedback from, it

2      looks like, some of your LinkedIn members; is that

3      fair to say?

4           A.   That's fair to say.

5           Q.   About what you would call your passion?

6           A.   My current passion, yes.

7           Q.   And is it fair to say that in your

8      LinkedIn page, that there is no reference here to

9      any gynecological or urological treatments?

10          A.   It was set up in 2011, post doing those

11     procedures.

12          Q.   Okay.  All right.  So at post 2011, your

13     focus shifted to the wellness and to the

14     preventative medicine that you referenced in your

15     LinkedIn profile?

16          A.   I mentioned that in the transition process

17     that we talked about earlier.

18          Q.   Okay.  All right.

19          MR. KOTT:  Two hours.

20          MS. MOORE:  We've been going two hours?

21          MR. KOTT:  It's a good time to stop.  You

22        offered a document.  Just finish the document.

23          MS. MOORE:  Hold on one second.

24          Has it been going another hour since

Nathan W. Goodyear, MD

```
 1              our last break?

 2                   We need a break.  Absolutely.  We'll take

 3          a break.  No problem.

 4                   VIDEOGRAPHER:  Okay.  We're going off the

 5          record.  The time is 11:39.

 6                   (Off the record.)

 7                   VIDEOGRAPHER:  Okay.  We're back on the

 8          record.  The time is 11:48.

 9      BY MS. MOORE:

10              Q.  All right.  Now --

11                   MR. KOTT:  You realize you haven't gotten

12          to one case specific --

13                   MS. MOORE:  Go off the record for a

14          second.

15                   MR. KOTT:  Go off the record.

16                   VIDEOGRAPHER:  Hang on.

17                   (Off the record.)

18                   VIDEOGRAPHER:  Okay.  We're back on the

19          record.  The time is 11:49.

20      BY MS. MOORE:

21              Q.  All right.  Let's see.

22                   Now, total, how many Ethicon products have

23          you implanted?  How many Prolifts over the years?

24              A.  That's a rough estimate.  A lot.
```

Nathan W. Goodyear, MD

```
1              Q.    100, 200, 300?

2              A.    Above -- if you're including Prolift,

3       Gynemesh, TVT, TVT-O, TVT-S, over 200.

4              Q.    Okay.

5              A.    Probably maybe over 300.

6              Q.    Total?

7              A.    Over 300 --

8              Q.    Okay.

9              A.    -- if we start to include individual.

10             Q.    That would include the Prolift and the

11      TVT?

12             A.    The different varieties of TVTs, the

13      Gynemesh, etcetera.

14             Q.    All right.  Now, over the years, who was

15      the main sales rep that you dealt with, or just the

16      salesperson?

17             A.    There was a lady in Georgia.  There was

18      actually an ex-Tennessee football player when I was

19      in residency --

20             Q.    She was?

21             A.    No, an ex-football player was the TVT rep

22      when I was a resident.  I don't recall his name.

23      There was a lady that was a rep when I was in

24      Georgia, I don't recall her name.  And then there
```

Nathan W. Goodyear, MD

1    was a gentleman when I was in Louisiana, again,

2    don't recall his name.

3         Q.   Now, did these individuals ever mislead

4    you?

5         A.   I don't know.

6         Q.   Okay.  I'm just trying to -- if you had

7    concerns or that they misled you in any way?

8         A.   There was information that I started to

9    question.

10        Q.   Okay.  So did you ask them about the

11   information?

12        A.   I asked them about some of the

13   complications that I was having, yes.

14        Q.   And tell me about those complications.

15   Erosion?

16        A.   The erosion.

17        Q.   And this is, again, just so I -- we're

18   going back to the time you were at that conference

19   in Salt Lake --

20        A.   Uh-huh.

21        Q.   -- and you were being told that the

22   erosion rates were less than five percent at that

23   conference, correct?

24        A.   That's correct.

Nathan W. Goodyear, MD

1          Q.    And that's by the company, by the

2     Ethicon group?

3          A.    That was by the people directing the

4     meetings, the roundtables.

5          Q.    Individuals from Ethicon?

6          A.    Correct.

7          Q.    This time frame, again, was in the 2005

8     time period?

9          A.    The meeting?

10         Q.    Yes.

11         A.    No, 2007.

12         Q.    You did say that.  2007.

13               And you took issue with some of what they

14    were saying and discussed that with some of your

15    other colleagues?

16         A.    Yes, correct, several of us took issues

17    with it.

18         Q.    Because your erosion rates were higher?

19         A.    Correct.

20         Q.    And you'd been seeing this for about, I

21    think you said, six months before the time you

22    appeared at that meeting in 2007?

23         A.    You asked for an estimate, so I --

24         Q.    Yeah, that's fair.

Nathan W. Goodyear, MD

```
 1                 Okay.  So back to my questions about the
 2       reps.  Just I wondered if you had any specific
 3       allegations about any of the reps that you dealt
 4       with doing something that was inappropriate or
 5       misleading you?
 6            A.   Specific, no.
 7            Q.   Okay.  But you did from time to time
 8       challenge them?  If they told you something,
 9       you'd challenge them?
10            A.   Yes.
11            Q.   And, for example, with erosion, and how
12       did they respond?
13            A.   So, for example, I can briefly vaguely
14       remember a conversation where, say, okay, I remember
15       him saying the erosion rates were X.  My erosion
16       rates seemed to be running higher.  What am I doing
17       through my surgical procedure that may do that?  He
18       said, "Nothing.  We send physicians to you to
19       train."
20            Q.   Okay.
21            A.   So --
22            Q.   All right.  Now, you talked about around
23       300 Ethicon procedures that you've done over the
24       years?
```

Nathan W. Goodyear, MD

```
 1          A.    Just --

 2          Q.    Approximately?

 3          A.    It's probably higher if you include

 4    residency in there.  I was sticking at clinical.

 5          Q.    That's fair.  And how many of these were

 6    you -- in how many of those 300 have you had

 7    complications?

 8          A.    That's -- that's hard to say.

 9          Q.    Okay.

10          A.    Because if they didn't follow up, I don't

11    know.

12          Q.    Okay.  Based on those who followed up?

13          A.    Based on those who followed up that I'm

14    aware of?

15          Q.    Yes, sir.

16          A.    Okay.  Well, what's your definition of a

17    complication?

18          Q.    That's a good question.  What is your --

19    let's say complication.  Let's say erosion.

20          A.    As I told you, it's about 15 to

21    20 percent.

22          Q.    And this is, again, in what time period?

23          A.    Basically from really starting in two --

24    talked about 2006 sometime and beyond.
```

Nathan W. Goodyear, MD

```
 1              Q.   All right.  And then any other -- let's

 2      see.

 3                   Did you keep track of these complications,

 4      talking about the erosion right now?

 5              A.   I told the rep about them.

 6              Q.   But did you internally -- do you have any

 7      kind of documentation or objective data that would

 8      verify that?

 9              A.   That's what the medical charts are for.

10              Q.   Right.  Aside from your medical charts, do

11      you have any compilation of the data where you've

12      had a 15 to 20 percent erosion rate beginning in the

13      2006 time period?

14              A.   I didn't do an IRB-approved study, no.

15              Q.   Even outside of an IRB, do you just have

16      some data that you collected?

17              A.   No, I just reported and let them --

18              Q.   And you said "reported."  Did you file

19      adverse event reports?

20              A.   No, I'd just tell the rep about it.

21              Q.   Just told the rep.

22                   Are you aware of any other patients that

23      have filed lawsuits against Ethicon other than the

24      four patients in this matter?
```

Nathan W. Goodyear, MD

```
1              A.   Other patients that have filed?

2              Q.   Yes, sir.

3              A.   I see the TV ads, so I assume, but I don't

4         know any specifics.

5              Q.   All right.  And you're not a regulatory

6         expert, correct?

7              A.   Clarify "regulatory."

8              Q.   FDA expert.

9              A.   No.

10             Q.   And I'm going to go through a series of

11        things and see if -- your thoughts on your expertise

12        in that area.

13                  You're not a biomaterials expert, correct?

14             A.   Correct.

15             Q.   You are not an expert in polymer science?

16             A.   Correct.

17             Q.   You're not an expert in manufacturing?

18             A.   Correct.

19             Q.   Or bioengineering?

20             A.   Correct.

21             Q.   You're not a design expert in the design

22        of mesh pelvic organ prolapse products?

23             A.   Correct.

24             Q.   I asked about testing of mesh.
```

Nathan W. Goodyear, MD

```
 1                    Have you done anything to kind of quantify

 2       the rates of, say, for example, shrinkage?

 3            A.    No, I have not.

 4            Q.    Have you done any measurements, I guess

 5       that falls under quantification, any measurements

 6       before or after implantation of the mesh products?

 7            A.    Not of the mesh products, no.

 8            Q.    Now, let's talk about, again, going back

 9       to your report, getting to Shively.  What kind of

10       information do you rely on in rendering an

11       opinion?  You rely on obviously your experience and

12       treatment?

13            A.    My training, my education.  My clinical

14       experience.  The experience and communication with

15       other experts in the field.  The IFUs.  There's

16       published literature up and available to that point.

17            Q.    Okay.  And, obviously, then you rely on

18       the patient, the history they gave you?

19            A.    Correct.

20            Q.    And your physical exam?

21            A.    Correct.

22            Q.    And test results?

23            A.    Correct.  It's a part of the assessment.

24            Q.    Did you receive any materials from The
```

Nathan W. Goodyear, MD

```
 1          Herman Law Firm?  Did they suggest to you that you

 2          review any particular materials in your rendering of

 3          opinions in these four cases?

 4               A.   Not -- no.

 5               Q.   With respect to company documents, you

 6          selected those company documents?

 7               A.   Talking about the IFUs, those were

 8          presented to me.

 9               Q.   Okay.  That's what I'm trying to ask.

10               A.   Okay.

11               Q.   How did you get any company documents,

12          how did you get them?

13               A.   I received them from -- yes.

14               Q.   Okay.  That's what I'm trying to

15          understand.

16                    What did you -- obviously your experience

17          comes from within?

18               A.   But you've asked two questions.

19               Q.   Okay.  There you go.  Help me out.

20               A.   Well, you asked the question regarding to

21          other expert depositions or other opinions.  Now

22          you're asking about documents.  I'm referencing

23          IFUs, marketing material, etcetera.  So which are we

24          talking about?
```

Nathan W. Goodyear, MD

```
 1          Q.    Both.

 2          A.    Okay.

 3          Q.    So let's start with the company documents

 4     first.

 5          A.    Yes, I did receive those.

 6          Q.    Okay.  And exactly what did you receive

 7     from The Herman Law Firm?

 8          A.    The IFUs, the published marketing ads and

 9     pamphlets that we would have in the office,

10     etcetera.  So that's what I received.

11          Q.    Now, how did they know what documents you

12     had in the office?

13                MR. KOTT:  Object to the form.

14     BY MS. MOORE:

15          Q.    How did The Herman Law Firm know what

16     documents you had in your office?

17                MR. KOTT:  Object to the form.

18                THE WITNESS:  I didn't.  And they didn't.

19          They were just the available marketing material

20          at that time.

21     BY MS. MOORE:

22          Q.    So you can't sit here and say exactly

23     what documentation you had in your office?

24                MR. KOTT:  Object to the form.
```

Nathan W. Goodyear, MD

```
 1                    Go ahead.

 2                    THE WITNESS:  Yeah, I can.

 3          BY MS. MOORE:

 4               Q.   Okay.  What documentation was that?

 5               A.   It was the brochures for the Prolift and

 6          the TVT.

 7               Q.   Okay.  So it's your testimony that you

 8          had all of the brochures for the TVT and the

 9          Prolift in your office?

10                    MR. KOTT:  Object to the form.

11                    Go ahead, Doctor.

12                    THE WITNESS:  I had the ones that were

13               commercially available at that time that had

14               the speed skater in it, or -- no, she was the

15               ice skate -- oh, what's her name, yeah.  I had

16               the ones that were available.

17          BY MS. MOORE:

18               Q.   Okay.  And the plaintiffs' lawyers sent

19          you the remaining company documents for your review?

20                    MR. KOTT:  Object to form.

21                    THE WITNESS:  Correct.

22          BY MS. MOORE:

23               Q.   Let's see.  Let's turn to the Shively

24          report, which I believe is Exhibit No. 3.
```

Nathan W. Goodyear, MD

```
1              All right.  And let's go through --

2              MR. KOTT:  You want to give him a chance

3         to go through it?  Go off for a minute?

4              MS. MOORE:  Absolutely.

5              THE WITNESS:  Sure.

6              MR. KOTT:  Just so I don't have to come in

7         and say he hasn't had time.

8              MS. MOORE:  Yeah, that's no problem.

9              VIDEOGRAPHER:  Okay.  We're off.  The time

10        on the clock is 12:00 o'clock.

11             (Off the record.)

12             VIDEOGRAPHER:  Okay.  We're back on the

13        record.  The time is 12:08.

14    BY MS. MOORE:

15         Q.  All right, Doctor.  We're back on the

16    record after a short break.

17             While I'm thinking about it, we didn't

18    attach your book, but I wanted to attach the cover,

19    and we'll discuss with the court reporter on how

20    we're going to do that.  But we'll attach the

21    book.  You haven't authored any other books

22    other than Manboob Nation, correct?

23         A.  Correct.

24             MS. MOORE:  All right.  We'll label that
```

Nathan W. Goodyear, MD

```
 1              as Exhibit No. 14.

 2                   MR. KOTT:  Well, we object.  We want the

 3              entire book copied because the title is quite

 4              different than the content.

 5                   MS. MOORE:  Okay.  Absolutely.

 6                   MR. KOTT:  I want the entire book copied.

 7                   MS. MOORE:  I have no problem with that.

 8                   MR. KOTT:  Thank you.

 9                   (Exhibit No. 14 marked.)

10         BY MS. MOORE:

11              Q.   All right, Doctor.  So let's turn to then

12         your report that you have in front of you, Exhibit

13         No. 3.  And I believe you testified earlier that the

14         records that you relied on in rendering your report

15         are those produced in Exhibit No. 5?

16              A.   Correct.

17              Q.   All right.  Let's talk about the

18         first time you -- well, actually, when did you

19         prepare this report?  Is that referenced in the

20         invoice?

21              A.   The exact final copy?  I don't know.

22              Q.   Your process and the time you spent

23         preparing this report is referenced in your invoice?

24              A.   Yes.
```

Nathan W. Goodyear, MD

```
1          Q.   And did you type it yourself?

2          A.   Yes.  Parts of it.

3          Q.   Who typed the other parts?

4          A.   It came to me in a general outline.

5          Q.   Okay.  So the outline was prepared --

6          A.   I filled the content.

7          Q.   By the Herman firm?

8          A.   Yes.

9          Q.   All right.  And so they provided you kind

10    of an outline and the topics, then you filled in the

11    blanks?

12              MR. KOTT:  Object to the form.

13              THE WITNESS:  Filled in the content.

14    BY MS. MOORE:

15         Q.   Pardon?

16         A.   Filled in the content.  Just a general

17    outline.

18         Q.   All right.  And so who at the Herman firm

19    prepared the rest of it?

20              MR. KOTT:  Object to the form.

21              THE WITNESS:  What do you mean "prepared

22         the rest of it"?

23    BY MS. MOORE:

24         Q.   You said you prepared part of it.  Who
```

Nathan W. Goodyear, MD

```
1        prepared the rest of it?

2                    MR. KOTT:  Object to the form.

3                    THE WITNESS:  They sent me the general

4             outline and I filled in the content, and that

5             was it.

6     BY MS. MOORE:

7        Q.   Okay.  Who prepared the outline?

8        A.   I don't know.

9        Q.   Did you make any alterations to the

10    outline?

11       A.   I don't recall.

12       Q.   So it looks like from your invoice --

13    and, by the way, we'll just note for the record

14    that we attached the first page of the invoice

15    beginning November 6th, 2015 to the Exhibit

16    No. 4; is that fair to say, Doctor?

17       A.   Correct.

18       Q.   So it looks like you were retained in

19    2015, there was a Skype meeting, and there were

20    numerous chart work.

21                   What chart work were you doing?

22                   THE WITNESS:  I don't see the November --

23                   MR. KOTT:  Oh, he doesn't have a copy.

24                   THE WITNESS:  Okay.  Thank you.
```

Nathan W. Goodyear, MD

```
 1              MR. KOTT:  You're welcome.

 2              THE WITNESS:  Sorry.  Ask me the question

 3      again?

 4   BY MS. MOORE:

 5         Q.   What chart work?  It says "chart work."

 6   What does that mean?

 7         A.   Reviewing their medical records.

 8         Q.   All right.  And to date, you've made close

 9   to 50,000 from your work on these cases?

10              MR. KOTT:  Asked and answered.

11              THE WITNESS:  That's the number, yes.

12   BY MS. MOORE:

13         Q.   All right, sir.  Is it correct that you

14   filed bankruptcy in 2013?

15         A.   That's correct.

16         Q.   And what kind of bankruptcy?

17         A.   Chapter 11.

18         Q.   All right.  And what prompted your

19   bankruptcy?

20         A.   Business failure.

21         Q.   Okay.  And when you say "business

22   failure," what does that mean?

23         A.   Means money not coming in to match my

24   overhead.
```

Nathan W. Goodyear, MD

1          Q.    And what failed in your business in 2011?

2          A.    Obamacare.

3          Q.    Okay.

4          A.    The changing for the reimbursement

5     structure.

6          Q.    All right.  And tell us what you mean by

7     that, that you were no longer getting reimbursed?

8          A.    The amount of money reimbursement

9     decreased and so that basically we have an overhead,

10    you can't match it.  You have a six-month operating

11    capital, you run through it, it goes.  You manage,

12    you seek help.  You can't get help, you have no

13    recourse.

14         Q.    And was this the same time that you

15    stopped doing pelvic organ prolapse surgeries?

16         A.    No.  That was before.

17         Q.    Okay.  So you stopped doing pelvic organ

18    prolapse surgeries in what year?

19         A.    2010.

20         Q.    And then when did you start this new

21    business?

22         A.    New business here?

23         Q.    Yes, sir.

24         A.    I started seeing patients here in 2013.

Nathan W. Goodyear, MD

```
 1           Q.   What did you do during 2000 --

 2           A.   I'm sorry.  Let me correct that.

 3                I saw patients here on a limited basis

 4      prior to 2013.  This became my primary practice in

 5      2013.

 6           Q.   Do you have a partner?

 7           A.   Yes, I do.

 8           Q.   Who's your partner?

 9           A.   Nan Sprouse.

10           Q.   And who is Nan Sprouse?

11           A.   A nurse practitioner.

12           Q.   How many employees do you have working

13      with you now?

14           A.   Five.

15           Q.   All right.  So we're looking at the

16      information that you had at the time you first had

17      an opportunity to treat Ms. Shively.

18           A.   Are you referencing the medical records?

19           Q.   Yes.

20           A.   Okay.

21           Q.   So why don't you take us through that very

22      that very first visit.

23                MR. KOTT:  When you say take you through,

24                do you want him to read this in the record?
```

Nathan W. Goodyear, MD

```
1         You want him to read his report into the

2    record?

3              MS. MOORE:  He can tell me the basic

4    facts.

5              MR. KOTT:  Okay.  You don't want him to

6    put this -- to read this?

7              MS. MOORE:  I'll help you out here.

8              THE WITNESS:  Okay.

9              MR. KOTT:  Hold on a second.  I don't want

10   you to help him out.  I want you to pose a

11   question that he can answer.

12             MS. MOORE:  Okay.  I'm going to object to

13   you interfering.

14             MR. KOTT:  Yeah.  Well, I'm going to

15   object to you trying to say that you're going

16   to help out --

17             MS. MOORE:  Off the record for a second

18   because I think you're eating my time.

19             MR. KOTT:  Go ahead.

20             VIDEOGRAPHER:  Okay.  We're off.  The time

21   is 12:15.

22             (Off the record.)

23             VIDEOGRAPHER:  Okay.  We're back on the

24   record.  The time is 12:15.
```

Nathan W. Goodyear, MD

```
 1

 2      BY MS. MOORE:

 3          Q.   All right.  Doctor, your Counsel was

 4      offended because I said I wanted to help you out.  I

 5      simply wanted to direct you to a certain area of

 6      your report.  So if you will focus your attention on

 7      the history that the client gave you when she first

 8      presented and tell us about the key facts, that

 9      would be helpful.  Thank you.

10              MR. KOTT:  Object to the form of the

11          question.

12              Please answer.

13              THE WITNESS:  When she first presented to

14          me, she came in with complaints of menopausal

15          symptoms and stress urinary incontinence.

16      BY MS. MOORE:

17          Q.   Anything else?

18              MS. MOORE:  Let's go off the record.

19              VIDEOGRAPHER:  Going off the record.  The

20          time is 12:16.

21              (Off the record.)

22              VIDEOGRAPHER:  Okay.  We're back on the

23          record.  The time is 12:22.

24              (Exhibit No. 15 marked.)
```

Nathan W. Goodyear, MD

```
1    BY MS. MOORE:

2         Q.   All right, Doctor.  I've handed you what

3    we've marked as Exhibit No. 15.  And it is your

4    office outpatient visit from March 7th, 2008; is

5    that correct?

6         A.   That's correct.

7         Q.   All right.  And let's just go down first

8    to the history of the present illness.  And if

9    you'll look down, it's where she reports to you that

10   some of the problems that she's had and why she's

11   coming to see you; is that fair?

12        A.   That's fair.

13        Q.   She reports urinary frequency.  She

14   reports daytime frequency to be ten to 12 and

15   nocturia, three to four.  This has been ongoing for

16   about five years.

17        A.   Is that a question?

18        Q.   Yes, sir.

19        A.   Yes.

20        Q.   All right.  So she has had ongoing -- and

21   it's further noted in your next paragraph, "With

22   regards to female stress incontinence, this has been

23   a problem for five years."

24        A.   Yes.
```

Nathan W. Goodyear, MD

```
1          Q.   So this particular problem preceded any
2     involvement with the mesh, correct?
3          A.   Her symptoms?
4          Q.   Yes.
5          A.   Yes.
6          Q.   All right.  And now let's go on.  She's
7     also complaining of constipation?
8          A.   Second paragraph now?  Yes.
9          Q.   Difficulty voiding, reduced stream.  And
10    again the dribbling and the urgency?
11         A.   Correct.
12         Q.   She's got a medical history that's
13    pertinent for genital prolapse, multiple child
14    births, and pelvic surgery?
15         A.   That's correct.
16         Q.   And if you look down, what is her weight
17    at this time?  It looks like she's gained 50 pounds
18    gradual?
19         A.   Oh, okay.  You're talking about
20    constitutional?
21         Q.   Yes, sir.
22         A.   Yes, gradual 50 pounds.
23         Q.   Do you have an exact weight in here?
24         A.   That's what I was looking for.
```

Nathan W. Goodyear, MD

```
1              Q.   Okay.  We'll come to that.  We'll come to
2       that.
3                   Just keep going.  I want to focus in on
4       her gynecological history.  It looks like she's
5       had -- how many times has she been pregnant and how
6       many miscarriages?
7              A.   She's been pregnant three times and had
8       one miscarriage.
9              Q.   All right.  And she has a history of
10      abnormal Pap, and then you go to her surgical
11      history.  Take us through her surgical history,
12      please.
13             A.   1991 -- 1981, she had an appendectomy.
14      2001, she had a cholecystectomy.  In 1995, she had a
15      hysterectomy.  And she had -- with no dates
16      included, D&Cs, or dilation and curettages, four
17      to five times.  Endometrial ablation.  Exploratory
18      laparotomy with BSO -- I'm sorry, exploratory
19      laparotomy, and then a BSO with exploratory
20      laparotomy '98.
21             Q.   Okay.  And the D&C, what necessities
22      one to require a dilation and curettage four to five
23      times?
24             A.   Curettage?
```

Nathan W. Goodyear, MD

```
 1            Q.   Yes, sir.

 2            A.   There could be a variety of reasons.

 3            Q.   Such as?

 4            A.   Heavy bleeding.

 5            Q.   Okay.  And let's see.  Hysterectomy.

 6                 And did -- she also had again the

 7      hysterectomy, heavy bleeding, endometrial ablation.

 8                 So she had a significant number of

 9      abdominal pelvic surgeries at the time she presented

10      to you; is that fair to say?

11            A.   Based on your assessment, it's fair.

12            Q.   It's not my assessment, sir.  It's based

13      on the records she provided to you, right?

14            A.   Well, put it in context, somebody could

15      come in with 20.

16            Q.   I'm sorry?

17            A.   Put it in context, somebody could come in

18      with 20.

19            Q.   Well, yeah, but I'm just saying what she

20      had presented to you.

21            A.   Yeah, she's had numerous.

22            Q.   Okay.  And when you have surgeries like

23      this, based on your experience, it's common to see

24      adhesions from surgery?
```

Nathan W. Goodyear, MD

```
1            A.    It can be.

2            Q.    You can see adhesions?  And what kind of

3       problems can you have with adhesions?

4                  First of all, what is an adhesion?

5            A.    An adhesion is a part of the healing

6       process in a hyper-inflammatory process.  So it

7       basically involves fibrosis of normal and

8       surrounding tissue.

9            Q.    Just scarring?

10           A.    Yes, scarring.  Creating an abnormal

11      anatomical connection attachment.

12           Q.    So these surgeries that Ms. Shively had

13      at least present the opportunity for adhesions and

14      fibrosis and scarring in the abdominal pelvic area,

15      correct?

16           A.    Some of them, yes.

17           Q.    Which ones don't?

18           A.    The endometrial ablation is not going to

19      provide scarring within the pelvis.  That's

20      contained within the uterine cavity.

21           Q.    So there may be, okay, scarring.

22                 Okay.  And let's see.  Let's keep going

23      down.

24           A.    The D&C follows the same.
```

Nathan W. Goodyear, MD

```
1            Q.   And mental health history, bulimia
2     nervosa.  What is that?
3            A.   Bulimia nervosa is a disorder whereby they
4     induce themselves to vomit.  It's a perception
5     disorder.
6            Q.   Okay.  Did you discuss that with her?
7            A.   It was a historical past.  It was no
8     longer a problem for her.
9            Q.   And where's that -- oh, not practicing.
10    Got it.
11               All right.  Then you do the exam.  And it
12    looks like all within normal limits; is that
13    correct?
14           A.   No.
15           Q.   All right.  I note -- let's take me
16    through that.
17           A.   Okay.  The general respiratory,
18    cardiovascular.
19           Q.   I think I'm talking about the genital --
20    genitourinary first.  Let's go there.
21           A.   Okay.
22           Q.   That's within normal?
23           A.   Okay.  Actually, part of it is
24    inappropriately cut down below the psychiatric.  But
```

Nathan W. Goodyear, MD

1    looking at the genitourinary examination, so it's

2    missing part down there that states the pelvic organ

3    prolapse, you see that?  That should be -- it's at

4    the end, just below the psychiatric, that should be

5    actually included underneath the genitourinary.

6        Q.   Okay.  All right.  But aside from that,

7    when you look at genitourinary, external

8    genitalia is normal, you go through all that.  What

9    is normal hair pattern?

10       A.   Just means that she has a normal -- what

11   appears to be a normal hair pattern of the vulva.

12       Q.   Okay.  Without lesions or urethral

13   abnormalities, vagina atrophic.  So there was

14   vaginal atrophy noted?

15       A.   Mild.

16       Q.   And then your assessment was female stress

17   incontinence.  Prolapse of the vaginal vault after

18   hysterectomy.  Urinary frequency.  And symptomatic

19   menopausal or female climacteric state?

20       A.   Climacteric state.

21       Q.   Climacteric.

22       A.   Menopausal symptoms.

23       Q.   Okay.

24       A.   That's based on the coding.

Nathan W. Goodyear, MD

```
 1              Q.   Where did the prolapse diagnosis come

 2       from?

 3              A.   My -- my examination.

 4              Q.   And that would be?

 5              A.   A reference to pelvic -- pelvic organ

 6       prolapse.

 7              Q.   Down under psychiatric?

 8              A.   Yes.

 9              Q.   Now, she again had the multiple -- we

10       talked about the multiple abdominal surgeries.  That

11       did increase her risk of adhesions, correct?

12              A.   Correct.

13              Q.   Adhesions can cause pain?

14              A.   They can.  I don't think she had any

15       reference to pain, though.

16              Q.   But adhesions can cause pain?

17              A.   Right.

18              Q.   Okay.  And the more surgeries a person

19       has, the more likely they are to develop adhesions?

20              A.   Correct.

21              Q.   All right.  Based on your coding, was your

22       assessment any different?

23              A.   Yeah.  Better clarification was enterocele

24       and rectocele, stage two.
```

Nathan W. Goodyear, MD

```
1            Q.   All right.  What does that mean?  Say that
2       again?  I'm sorry.
3            A.   A stage two enterocele and a stage two
4       rectocele.
5            Q.   All right.  So then it looks like she has
6       a urodynamic report that's positive for obstructive
7       voiding.  That's on March 20th, 2008?
8            A.   I have that.
9            Q.   You have that?
10           MR. KOTT:  March 20th?
11      BY MS. MOORE:
12           Q.   Yeah.  But we're not going to -- I'm just
13      kind of commenting on that.
14               But let's go to the next time you have an
15      opportunity to see her, which I believe is actually
16      that same day, March 20th, 2008, but it's a clinic
17      visit.
18           A.   Hold just a second.
19               MS. MOORE:  Off the record for a second.
20               VIDEOGRAPHER:  And we're going off.  The
21               time is 12:32.
22               (Off the record.)
23               VIDEOGRAPHER:  We're back on the record.
24               The time is 12:35.
```

Nathan W. Goodyear, MD

```
 1    BY MS. MOORE:

 2         Q.   Got it.  All right.

 3              We looked at your office visit of

 4    March 20th, 2008, and again your assessment of

 5    that date were the same as earlier: Female

 6     stress incontinence.  Prolapse of the vaginal

 7    vault after hysterectomy.  Urinary frequency.

 8    Symptomatic menopausal or female climacteric state?

 9         A.   Climacteric.

10         Q.   I'm going to get it.  I've got a couple

11    more times to say it.

12         A.   Menopausal symptoms.

13         Q.   So, Doctor, let's go to April 3rd, 2008.

14         A.   Okay.

15         Q.   And again she -- what I'm focusing in on

16    in that particular office visit is she's diagnosed

17    with constipation; and, again, she's unable to

18    clarify how long it's present.  So she's

19    experiencing constipation, and not only the first

20    visit, but she's complaining of it again when she

21    sees you in April of 2008; is that fair to say?

22         A.   Fair to say.

23         Q.   And then you have a plan for her to deal

24    with her stress incontinence and her vaginal
```

Nathan W. Goodyear, MD

```
 1     enterocele.  And your plan, it sounds like you

 2     tell me about your informed consent process.

 3     Do you have a pretty detailed process by which you

 4     talk to your patients and make sure that they are

 5     aware of the potential risks associated with

 6     surgery?

 7          A.   Yeah.  I would describe the procedure

 8     itself, describe what we knew, evidence in terms of

 9     literature-wise at the time.  And then basically

10     talk about the risks and benefits of the procedure.

11          Q.   Okay.  And let's talk about what you had,

12     what you discussed with her on this visit.

13          A.   Where is it at?

14          Q.   On April 8th -- I'm sorry, April 3rd,

15     2008.  Do you see that?

16               MS. MOORE:  I've got a copy here, guys.

17               MR. KOTT:  Yeah, pass that out.

18               MS. MOORE:  Let's go off the record.

19               VIDEOGRAPHER:  We're going off the record.

20          The time is 12:37.

21               (Off the record.)

22               VIDEOGRAPHER:  Okay.  We're back on the

23          record.  The time is 12:39.

24               (Exhibit No. 16 marked.)
```

Nathan W. Goodyear, MD

```
 1     BY MS. MOORE:

 2          Q.   All right.  And I believe we've labeled

 3     the April 3rd, 2008 visit as Exhibit No. 16.

 4               And, Doctor, I was focusing in on your

 5     pre-op plan where you discuss the risks with your

 6     patient.  This is the risks that you would have

 7     discussed in 2008, correct?

 8          A.   Correct.

 9          Q.   And do you discuss at that time -- you

10     discussed with Ms. Shively --

11          A.   Yes.

12          Q.   -- a three to five percent erosion risk?

13          A.   Yes.

14          Q.   Now, you testified earlier that you were

15     aware during this time period that based on your

16     experience, you were seeing erosion of 15 to

17     20 percent.  Why would you tell your patient that

18     there was a three to five percent erosion rate?

19          A.   Because at that time I had every reason to

20     believe that the procedure itself was safe and

21     effective, and the fact that my numbers were

22     different didn't quite add up.

23          Q.   So what you told --

24          A.   Because the company told me it was
```

Nathan W. Goodyear, MD

1      five percent or less.

2           Q.   So instead of telling Ms. Shively, or any

3      of the other patients what your own experience was

4      and your knowledge of an erosion risk, you told them

5      a much lower risk?

6                MR. KOTT:  Object to the form of the

7           question.

8                THE WITNESS:  I was quoting the risk that

9           the -- that Ethicon had listed and that we were

10          told to quote.

11     BY MS. MOORE:

12          Q.   So you did whatever Ethicon told you to

13     do?

14               MR. KOTT:  Object to the form.

15               THE WITNESS:  No.

16     BY MS. MOORE:

17          Q.   Okay.  And you testified pretty clearly

18     earlier that your erosion rate was 15 to 20 percent,

19     and you said around the 2006 time period.  Here it

20     is in 2008 and you're telling patients that the risk

21     is three to five percent.

22          A.   I didn't say 2006.  I said 2007.

23          Q.   Okay.  Six months before?

24          A.   I said six months prior is when I started

Nathan W. Goodyear, MD

```
 1        to notice.

 2             Q.   Okay.  So 2007.  The record will speak for

 3        itself.

 4             A.   Right.

 5             Q.   So 2007 you're at a conference, you are

 6        debating with colleagues and with Ethicon what the

 7        true erosion rate is.  Your experience was 15 to

 8        20 percent.

 9                  MR. KOTT:  Object to the form.

10        BY MS. MOORE:

11             Q.   And now you're telling patients a year

12        later that it's three to five percent.  Is that

13        accurate information?

14                  MR. KOTT:  Object to the form.

15                  THE WITNESS:  Actually, it's not a year

16             later, it's less than six months later.

17        BY MS. MOORE:

18             Q.   Okay.  All right.

19             A.   But --

20             Q.   Is that accurate information?

21                  MR. KOTT:  Whoa.  Stop, please, and let

22             him answer the question.

23                  THE WITNESS:  I had every reason to

24             believe that the procedure and the information
```

Nathan W. Goodyear, MD

```
1              given to me by the company at that point was

2              valid.

3     BY MS. MOORE:

4         Q.   Okay.  So you're disregarding your own

5     experience of 15 to 20 percent of an erosion rate

6     and downplaying that and telling the patient it's

7     only three to five percent?

8              MR. KOTT:  Object to the form.

9              THE WITNESS:  I didn't downplay it.  I

10             basically quoted the literature that they had

11             and I was processing because I believed this

12             procedure to be safe and effective.

13    BY MS. MOORE:

14        Q.   Where is the literature that you're

15    pointing to?

16        A.   I told you earlier, the literature

17    provided by Ethicon, the TVM study.

18        Q.   Is that on your reliance list?

19             MS. MOORE:  Let's go off the record for a

20             second.

21             MR. KOTT:  No, no, you're not going to go

22             off the record.

23             MS. MOORE:  We're going off the record.

24             We're going off the record.  Yes, off the
```

Nathan W. Goodyear, MD

```
1              record.

2                   VIDEOGRAPHER:  We're off.  The time is

3              12:43.

4                   (Off the record.)

5                   VIDEOGRAPHER:  Okay.  We're back on the

6              record.  The time is 12:54.

7    BY MS. MOORE:

8         Q.   All right.  Doctor, we've taken a short

9    break and I've asked the question with respect

10   to what would be the support for your belief

11   that the three to five percent erosion risk in your

12   consent form was something that was given to you by

13   Ethicon.

14        A.   Well, it would be the IFU, and then I

15   referenced the study that's referenced as Ethicon

16   Clinical Assessment of Feasibility Complications and

17   Effectiveness of 12 months, three years and five

18   years of the TVM technique for genital prolapse.

19        Q.   All right.  And that is which number?  Is

20   it numbered or it's on a page --

21        A.   It's not numbered.  It is on -- it's not

22   even numbered.

23        Q.   It's on the reliance list?

24        A.   Yes.
```

Nathan W. Goodyear, MD

1           Q.    And it's --

2           A.    Yes.

3           Q.    All right.  So then let me hand you the

4      Gynecare Prolift Surgeon's Resource Monograph that

5      was used in April of 2007.  It's marked as Ethicon

6      Mesh 03460813 all the way to 853.  Feel free to look

7      at the entire document and we'll go off the record,

8      of course, to accommodate you, but I want to focus

9      your attention in on page eight under Mesh

10     Complications, Erosion, Exposure and Extrusion.

11          A.    Okay.  You're going to have to show me

12     where this is.  Was this right here?

13              MR. KOTT:  No, no, this is a separate

14          document.

15              Do you have another copy that I could be

16          perusing?

17              MS. MOORE:  Yeah, we do.

18              MR. KOTT:  Thank you.

19     BY MS. MOORE:

20          Q.    I'm focusing in, so you know, on page

21     eight.

22          A.    Okay.

23              MR. KOTT:  You need to kind of scan that.

24              MS. MOORE:  Off the record.

Nathan W. Goodyear, MD

```
 1                    (Off the record.)

 2                    VIDEOGRAPHER:  We're going off.  The time

 3              is 12:56.

 4                    (Off the record.)

 5                    VIDEOGRAPHER:  Okay.  We're back on the

 6              record.  The time is 1:01 p.m.

 7                    (Exhibit No. 17 marked.)

 8      BY MS. MOORE:

 9              Q.   All right.  Doctor, we just had an

10      opportunity to review what we've marked as Exhibit

11      No. 17.  And focusing on 65883 -- strike that.

12                    Focusing in on page eight under Mesh

13      Complications, Erosion, Exposure, and Extrusion,

14      this was a document called the Surgeon's Resource

15      Monograph for the Gynecare Prolift, correct?

16              A.   Yes, that's what you presented.

17              Q.   Okay.  And in this particular document

18      that was given to surgeons who attended courses and

19      who performed surgery with the Prolift, this

20      document states in the second sentence -- I'm sorry,

21      the first sentence:  "This is to be contrasted with

22      a known occurrence of simple vaginal mesh exposure.

23      It occurs in approximately three to 17 percent of

24      cases."
```

Nathan W. Goodyear, MD

```
1                     That's what Ethicon was telling you on

2        April 13th, 2007, correct?

3                     MR. KOTT:  Object to the characterization

4            of this document.

5                     Please answer.

6                     THE WITNESS:  Yes.

7        BY MS. MOORE:

8            Q.   So you have this information, you had your

9        own information that you were seeing 15 to

10       20 percent exposure rates, and nonetheless in your

11       consent -- I said exposure, I meant to say

12       erosion -- nonetheless you put three to five percent

13       erosion risk, correct?

14           A.   Those were the numbers that the -- Ethicon

15       told me to put.

16           Q.   And where do you have any documentation

17       where Ethicon is telling you to put three to five

18       erosion risk?

19           A.   I don't have it.

20           Q.   Okay.  So you have no evidence, correct?

21                   MR. KOTT:  Object to the form.

22                   THE WITNESS:  No.

23       BY MS. MOORE:

24           Q.   But we do have the surgical resource
```

Nathan W. Goodyear, MD

```
1      monograph that you received in 2007, which says that

2      mesh erosion exposure is three to 17 percent,

3      correct?

4            A.   Yes, that's what it says.

5            Q.   Does Ethicon instruct you what to put in

6      your consent?

7            A.    No.  But I believed, again, them to be the

8      company to provide safe, effective materials and

9      support to the procedure.  So when I would seek

10     guidance on developing the informed consent, these

11     are the information that they gave me to put in.

12              MS. MOORE:  Let's go ahead and attach

13         that.

14     BY MS. MOORE:

15           Q.   And then we'll go down to the package

16     insert that you referenced.  You said that was the

17     other information that you relied on?

18              MR. KOTT:  He has to look at it.

19              MS. MOORE:  I'm going to.

20              THE WITNESS:  Talking about the IFU?

21     BY MS. MOORE:

22           Q.   Yes, sir.

23           A.   Okay.  Yes.

24              (Exhibit No. 18 marked.)
```

Nathan W. Goodyear, MD

```
 1      BY MS. MOORE:

 2           Q.   IFU.  I call it the package insert.

 3                But why don't you take a look at this

 4      particular document labeled as Exhibit No. 18,

 5      Gynecare Prolift.  And it is again in the

 6      November 2007 time period.

 7                Take a look at the entire document.  We'll

 8      go off record, but I'd like to focus your attention

 9      on the information on the back page under Adverse

10      Reactions.

11                MS. MOORE:  Off the record.

12                VIDEOGRAPHER:  We're going off.  The time

13           on the camera is 1:05 p.m.

14                (Off the record.)

15                (Exhibit No. 19 marked.)

16                VIDEOGRAPHER:  Okay.  We're back on the

17           record.  The time is 1:08 p.m.

18      BY MS. MOORE:

19           Q.   Doctor, we are back on the record, and

20      I've provided you with two exhibits, Exhibit No. 18

21      and No. 19.  And they are the package inserts or the

22      IFUs for the Gynecare -- the Gynecare Prolift and --

23           A.   TVT-S.

24           Q.   -- the TVT-S -- thank you, sir -- and
```

Nathan W. Goodyear, MD

1    those are dated 2007.  And under the adverse

2    reaction section, it does reference and warn of the

3    adverse reaction, potential risk of erosion,

4    correct?

5         A.   It does.

6         Q.   There's no rate provided, correct?

7         A.   That's correct.

8         Q.   Okay.  So can you think of anything else

9    that you were referencing that may provide erosion

10   rates, exposure rates, other than what we've

11   discussed?

12        A.   By these two IFUs?

13        Q.   Or by any information.

14        A.   Sure.  The other studies listed and

15   communications with other experts.

16        Q.   Okay.  I'm trying to find the basis for

17   your three to five percent erosion risk in your

18   consent form.

19        A.   That was numbers that came from Ethicon.

20        Q.   Okay.  But, again, as we sit here today,

21   and you're describing what you relied on or telling

22   the ladies and gentlemen of the jury, you've seen

23   documents from Ethicon during that time period, one

24   said three to 17 percent, two were silent and just

Nathan W. Goodyear, MD

1      say there is that risk?

2          A.   The three to five percent falls within the

3      three to 17 percent.

4          Q.   Right.  But you were complaining

5      earlier that you believe that risk to be

6      underreported to you, and is three to 17 greater

7      than three to five?

8              MR. KOTT:  Object to the form.

9              Go ahead, Doctor.

10             THE WITNESS:  The range is, yes.

11     BY MS. MOORE:

12         Q.   All right.  Let's go then back to

13     your -- let's attach this.

14             Let's go to the other risks that are in

15     your visit on April 3rd.

16         A.   Okay.

17         Q.   And if you want to turn back, I'm just

18     going to quickly try and go through these.

19         A.   That's Exhibit No. 16, correct?  Just to

20     make sure I have the right one in front of me.

21         Q.   Yes, sir.  Thank you for pointing that

22     out.

23             We talked about the three to five percent

24     erosion risk despite that your experience was

Nathan W. Goodyear, MD

```
 1      higher.  Failure of reconstructive support, damage

 2      to bladder and/or bowel, extrusion of graft, death,

 3      conversion to laparotomy, de novo urinary,

 4      irritative voiding symptoms, VTE risks.  Those were

 5      some of the risks for the TVT-O and some of the

 6      similar risks for the Prolift?

 7           A.   Yes.

 8           Q.   And also a note to warn of the potential

 9      for an infection?

10           A.   Yes.

11           Q.   Okay.  Let's look at the actual consent

12      form that you provided Ms. Shively.  And we'll go

13      back -- go off record for a second so you have

14      adequate time to look at them.  I'll provide you

15      with a copy.

16                VIDEOGRAPHER:  Going off the record.  The

17           time is 1:11.

18                (Off the record.)

19                (Exhibit No. 20 marked.)

20                VIDEOGRAPHER:  We're back on the record.

21           The time is 1:12 p.m.

22      BY MS. MOORE:

23           Q.   Dr. Goodyear, I've handed you what I've

24      labeled as Exhibit No. 20.  And this is the consent
```

Nathan W. Goodyear, MD

```
1        that has Ms. Shively, Teri Shively's name on it; is

2        that fair to say?

3            A.   That is fair to say.

4            Q.   And it looks like it's signed and

5        witnessed in the back, April 3rd, 2008?

6            A.   Yes.

7            Q.   And it looks -- appears to be a signature

8        of Ms. Shively?

9            A.   That is correct.

10           Q.   And if you -- now obviously I want you to

11       take your time and look at anything you need.  I

12       think you've done that.

13               There's actually two consents, one for

14       polypropylene mesh and the other is for the TVT-O.

15       Actually, there's three, repair and relaxation of

16       the pelvic organs.

17               So you really spent some time making sure

18       that she was adequately informed with all the

19       potential risks, would that be fair to say?

20           A.   Yes.

21           Q.   So let's look at some of the other things

22       that you discussed with her.  And it looks like you

23       discussed the potential for, as we said,

24       infection -- I'm looking at the second page --
```

Nathan W. Goodyear, MD

```
 1        infection, erosion, extrusion, vaginal discharge

 2        and/or scarring, dyspareunia.

 3                 What is dyspareunia?

 4        A.    Pain with intercourse.

 5        Q.    Okay.  Severe blood loss, failure of

 6        surgical repair, re-exploration and removal, fistula

 7        formation, allergic reaction, rejection or death,

 8        possible injury to bowel, bladder, urethra, or other

 9        pelvic/abdominal structure, fistula formation caused

10        by injury to the bowel, bladder, or urethra.

11        Additional surgery can include, and you list some

12        of the potential surgeries that may be required.

13        Would that be fair to say?

14        A.    Yes.

15        Q.    And you also go on to state that she could

16        have -- or a patient could have lack of improvement,

17        temporary improvement, and/or failure of urine

18        control, prolapse symptoms, possible discomfort in

19        sexual intercourse, and possible formation of blood

20        clots or emboli?

21        A.    Correct.

22        Q.    All right.  And these were risks that were

23        known to you before you did surgery on Ms. Shively;

24        is that fair to say?
```

Nathan W. Goodyear, MD

```
1              A.    That's fair to say.

2              Q.    And these would be risks that you would

3        have learned during your residency and training in

4        med school and thereafter, leading up to the time

5        you would have performed surgery on Ms. Shively or

6        any of the other patients that we're going to be

7        speaking about; is that fair to say?

8              A.    That's fair to say.

9              MS. MOORE:  All right.  Attach that.

10       BY MS. MOORE:

11             Q.    Let's go now to the next time I believe --

12       it looks like you saw her on April 18th.  There's no

13       need to really go into that, except I have a

14       question.  What is endoanal ultrasound, why did you

15       do one on Ms. Shively, April 18th, 2008?

16             A.    I did one because of the stage two, stage

17       three enterocele and the prior vaginal surgeries.

18       Concerning myself, it's common for them to have

19       external anal sphincter or internal anal sphincter

20       defects as a part of just the tears in the process

21       of vaginal delivery or being an episiotomy.

22             Q.    All right.  Looks like you see her again

23       in May of 2008.  And then -- with the same

24       assessment on that date.  And then she returns on
```

Nathan W. Goodyear, MD

1        May 13th, 2008, and you are consenting her again for

2        implant surgery.

3                So why was it important for you to discuss

4        the consents again with Ms. Shively?

5        A.   Where are you referencing?

6        Q.   5/13/2008.

7                MS. MOORE:  Let's go off the record.

8                VIDEOGRAPHER:  We're going off.  The time

9        is 1:16.

10               (Off the record.)

11               (Exhibit No. 21 marked.)

12               VIDEOGRAPHER:  Okay.  We're back on the

13        record.  The time is 1:17 p.m.

14    BY MS. MOORE:

15        Q.   Doctor, you again consented the patient

16    before this surgery; is that correct?

17        A.   Yes.

18        Q.   And the patient verbalized understanding

19    and the desire to proceed?

20        A.   Correct.

21        Q.   Do you recall any questions that she

22    had --

23        A.   I don't.

24        Q.    -- as you sit here today?

Nathan W. Goodyear, MD

```
 1              A.    I don't recall.

 2              Q.    Now, let's go through the surgery.  I

 3       don't need to go through the surgery except for a

 4       couple of things.  Obviously you felt like the

 5       surgery at the time went well?

 6              A.    Yes, I documented that there.

 7              Q.    Okay.  Why was loose tension allowed

 8       using the surgeon's index finger when the cannula

 9       was removed?

10              A.    That's per the instructions that Ethicon

11       gave us.

12              Q.    And what's the purpose of that?

13              A.    Of?

14              Q.    Of allowing the loose tension.

15              A.    To prevent overtightening, overcorrection.

16              Q.    And what happens if you have

17       overcorrection or overtightening?

18              A.    The potential for increased postoperative

19       complications.

20              Q.    Such as?

21              A.    Urgency, urinary tension, etcetera.

22              Q.    What would cause the urgency, urinary

23       retention, etcetera?

24              A.    Overtightening of the placement of the
```

Nathan W. Goodyear, MD

```
 1     mesh.
 2          Q.   And what happens when you over -- I'm
 3     trying to understand the mechanism.  When you
 4     overtighten it, over time what would happen?
 5          A.   Yeah.  You would -- overtightening, you're
 6     basically creating a non-anatomical support.
 7          Q.   And that can that cause contracture?
 8          A.   The pure placement of the mesh could cause
 9     contracture, but the overtightening would not be one
10     of the primary causes of the contracture.
11          Q.   But it could be?
12          A.   It could.
13          Q.   All right.  What was the condition of the
14     mesh when you put it in?
15          A.   As it came out of the kit box.
16          Q.   So no evidence of fraying or roping
17     or folding or any problems that you noted?
18          A.   Not that I can remember when documented
19     here.
20          Q.   And you did place the mesh with loose
21     tension?
22          A.   Correct.
23          Q.   And the sling was placed loosely
24     underneath the mid-urethra?
```

Nathan W. Goodyear, MD

```
1            A.    Correct.

2            Q.    And why did you place that loosely?

3            A.    Because, again, that's per the guidance of

4       the training for Ethicon and the placement of the

5       TVT.

6            Q.    But as the surgeon who did these, what

7       would be the rationale?

8            A.    Well, you don't want to overcorrect.  You

9       want to provide simply a means for the body to

10      correct.

11           Q.    Thank you.

12                 It looks like, as you said, that she went

13      through a successful procedure.

14                 Let's go then to -- she's discharged.  And

15      let's go to 5/28/08.

16           A.    Last one I got here is 5/22.

17                 MS. MOORE:  All right.  Let's go off the

18           record.

19                 VIDEOGRAPHER:  Going off the record.  The

20           time is 1:20 p.m.

21                 (Off the record.)

22                 VIDEOGRAPHER:  Back on the record.  The

23           time is 1:21.

24                 (Exhibit No. 22 marked.)
```

Nathan W. Goodyear, MD

```
 1    BY MS. MOORE:

 2         Q.   If you're looking at 5/28/08, which we've

 3    marked as Exhibit No. 21 (sic), it appears it's two

 4    weeks post-op for Ms. Shively, post-op after

 5    surgery.  She's returning to you.  She's over the

 6    irritation, itching of the yeast infection, but

 7    she's got a really bad discharge?

 8         A.   Correct.

 9         Q.   And her bladder is doing good?

10         A.   Yes, correct.

11         Q.   No evidence of stress urinary

12    incontinence?

13         A.   Correct.

14         Q.   And what do you believe is causing that

15    bad discharge?

16         A.   Vaginal discharge is pretty common during

17    the immediate postoperative period.  So at that

18    point that was my assumption.

19         Q.   Okay.  All right.  Let's go then to the --

20    again, in the 6/4/2008, you note normal post-op

21    vaginal discharge.  That would be again what you

22    were describing, correct?

23         A.   Correct.

24         Q.   And she has good pelvic support at that
```

Nathan W. Goodyear, MD

```
1      time?

2           A.   Correct.

3           Q.   All right.  Let's go then to 6/18/08.  And

4      the patient is complaining of a pinhole opening just

5      the right of midline resection?

6           A.   Yes.

7           Q.   Do you see any complaints of back pain

8      there?

9           A.   In her HPI?

10          Q.   Yes.

11          A.   Yes.

12          Q.   Okay.  Back pain and, what, hip discomfort

13     from positioning?

14          A.   Correct.

15          Q.   Okay.  Let's go down to the clinic visit,

16     and it looks like the next one, 7/3/08, she's doing

17     much better.

18               We don't have to focus on that.  We can

19     keep going.

20               Go to 7/22/08.

21          A.   Okay.

22          Q.   And it looks like her bladder function is

23     great, no problems.  Bowel habits improved,

24     complained of pinkish sometimes bright red spotting,
```

Nathan W. Goodyear, MD

1       right?

2               A.   Correct, yes.

3               Q.   First time we're seeing spotting?

4               A.   That's correct.

5               Q.   All right.  Let's keep going.  The next

6       visit --

7               A.   That's where mine stops.

8                    MS. MOORE:  Off the record.

9                    THE WITNESS:  Off the record.

10                   VIDEOGRAPHER:  1:25.

11                   (Off the record.)

12                   VIDEOGRAPHER:  Okay.  We're back on the

13              record.  The time is 1:25.

14      BY MS. MOORE:

15              Q.   All right, Doctor.  That's the last time

16      you had an opportunity to see Ms. Shively was on

17      July 22nd, 2008?

18              A.   Correct.

19              Q.   And you've never had an opportunity to

20      remove any mesh or excise any mesh from Ms.

21      Shively, correct?

22              A.   Correct.

23              Q.   You're not really in a position to comment

24      on any of that, correct?

Nathan W. Goodyear, MD

```
 1              MR. KOTT:  Object to the form.

 2              THE WITNESS:  I can comment on my opinion,

 3         but did I actually remove, no.

 4    BY MS. MOORE:

 5         Q.   And I do want your comments on your

 6    opinion, but at this -- obviously we want to know,

 7    the basis for all your opinions too.

 8              So with respect to Ms. Shively,

 9    throughout your care and treatment of her, there was

10    no evidence of mesh exposure, extrusion, correct?

11         A.   There was, the pinhole.

12         Q.   Oh, the pinhole.  Okay.

13              Now, let's go back -- now you're treating

14    the post-op visit, the pinhole opening right of the

15    suture line in the vaginal mucosa found posteriorly?

16         A.   That's what I --

17         Q.   That's what you mean?

18         A.   Yeah, that's what I'm referencing.

19         Q.   Okay.  You do not reference mesh

20    there, correct?

21              MS. MOORE:  Let's go off the record.

22              THE WITNESS:  I don't reference it, but it

23         would have been there.

24    BY MS. MOORE:
```

Nathan W. Goodyear, MD

```
1              Q.   Okay.  So you're saying that now, but at

2        the time you --

3                   MR. KOTT:  Are we back on the record?

4                   MS. MOORE:  Yeah.

5                   THE WITNESS:  Correct, I didn't reference

6              it there.

7        BY MS. MOORE:

8              Q.   Okay.

9                   MS. CAPODICE:  I don't think you're on the

10             record.

11                  MS. MOORE:  On the record.

12       BY MS. MOORE:

13             Q.   All right.  So now eight years later

14       you're saying that the pinhole opening to the right

15       of the midline resection was as a result of mesh,

16       yet your record is silent and does not mention mesh,

17       correct?

18             A.   I didn't say as a result of the mesh.  I

19       said the mesh would have been there.

20             Q.   Okay.  My question to you was, was there

21       any evidence of mesh extrusion or exposure?

22             A.   Well, yes, because --

23             Q.   In your records?

24             A.   In my records, there are not.
```

Nathan W. Goodyear, MD

```
 1              Q.    Okay.  Well, it's been a long time

 2        since you saw this particular patient, and the

 3        best evidence is your records, correct?

 4              A.    If you have a mesh, it encompasses the

 5        entire posterior vaginal -- rectovaginal septum.

 6        When you have a pinhole, there will be the presence

 7        of mesh underneath the pinhole.

 8              Q.    Okay.  You're not saying that the mesh was

 9        coming through the pinhole, correct?

10              A.    I did not say that, correct.

11              Q.    Okay.  So you never removed any mesh

12        from Ms. Shively, correct?

13              A.    That is correct.

14              Q.    All right.  Now, were you aware that Ms.

15        Shively testified in her deposition that she did not

16        return to see you because -- let's see, Shively

17        deposition, it was 12/14/2015.  When asked "Why is

18        it that you do not want to go back to see Dr.

19        Goodyear?"

20                    Answer, "I reported some issues, phone

21        calls were not returned, I felt like I felt

22        abandoned."

23                    Were you aware that Ms. Shively felt

24        abandoned and did not want to return to see you?
```

Nathan W. Goodyear, MD

```
1              A.    We had no medical record of that.

2              Q.    Okay.  So you don't have recollection of

3        that being an issue with the patient?

4              A.    We record phone calls, just as we do

5        office visits.

6              Q.    Okay.  So you did know that Ms. Shively

7        felt abandoned by you?

8              A.    That's her opinion, but I don't have any

9        record of that.

10             Q.    Are you aware that Dr. William Porter has

11       also been hired by the plaintiffs to do an exam on

12       Ms. Shively?

13             A.    Yes.

14             Q.    Why didn't you do an exam on Ms. Shively?

15             A.    She didn't come back.

16             Q.    Okay.  You mention that he's proposed

17       another mesh revision in your report, page five?

18             A.    Yes, last sentence.

19             Q.    Isn't it correct that he didn't

20       specifically suggest a revision but discussed all

21       options with Ms. Shively, including the Femsoft

22       inserts versus pessary, vaginal weights, bladder

23       diet, Kegel's?

24             A.    I don't know.  You're inferring what I
```

Nathan W. Goodyear, MD

```
1        heard him say at that time, and I can't do that.

2               Q.   Oh, you heard him?

3               A.   No, I'm saying I cannot infer.  You're

4        asking me to infer what he said to her.

5               Q.   Have you looked at his report?

6               A.   What I have here quoted is what he said,

7        and that's what I put in.  But in terms of you

8        asking me if I was there to listen and infer all

9        those other alternative therapies, I was not.

10              Q.   Okay.  So he may have said other things.

11       Let me ask you this.  Did you look at

12       his report?

13              A.   Yes.

14              Q.   And so if this other information was in

15       his report, why did you not select to put the

16       complete information in your report and only pull

17       out one sentence related to the mesh?

18              A.   To be honest, I can't give you -- I don't

19       know.

20              Q.   You don't know?

21                   So if I was to show you his report and he

22       referenced these other potential options, you would

23       have had an opportunity to look at all those

24       options, correct?
```

Nathan W. Goodyear, MD

```
 1          A.   Yeah, you're going to present every option

 2     possible, despite some of the options really not

 3     being good options.

 4          Q.   But being forthcoming, you did not report

 5     all of what Dr. Porter said in his report; you

 6     only selected one sentence, correct?

 7               MR. KOTT:  Object to the form of that

 8          question.

 9               THE WITNESS:  Again, I'm not -- not aware

10          of everything that he said at that time.  All I

11          can go on is what was written.

12               MS. MOORE:  Okay.  Let's go off the record

13          for a second.

14               VIDEOGRAPHER:  Okay.  We're going off.

15          The time is 1:31.

16               (Off the record.)

17               MS. MOORE:  Back on the record.

18               VIDEOGRAPHER:  13:31.

19     BY MS. MOORE:

20          Q.   All right.  Is it on the reliance list?

21     I'm starting to yell things out at people.

22               MR. KOTT:  I don't know.

23               MS. KOTT:  I'm better off keeping my mouth

24          shut.
```

Nathan W. Goodyear, MD

```
 1                THE WITNESS:  I don't know.

 2      BY MS. MOORE:

 3           Q.   All right.  Doctor, you don't know if it

 4      is or not.

 5                Where did you get the information to

 6      include in your report?

 7           A.   As it relates to Dr. Porter?

 8           Q.   Yes, sir.

 9           A.   From the firm.

10           Q.   Okay.  So the law firm gave you that

11      information?

12           A.   Correct.

13           Q.   All right.  And take a look at that report

14      and look under Plan.  And it -- page four of five.

15           A.   Okay.  Yes.

16           Q.   And under Plan it says risks -- and

17      correct me if I misstate --

18      "Risk/benefits/alternatives discussed with patient

19      options surgery versus observation versus Femsoft

20      Inserts versus pessary, vaginal weights, bladder

21      diet, Kegel's."

22                So those were also potential options

23      discussed with the patient, correct?

24           A.   That he listed there.
```

Nathan W. Goodyear, MD

```
1         Q.   But you didn't include those in your

2    report?

3         A.   In my report of what he had listed here, I

4    did not.

5         Q.   And why not?

6         A.   Again, I told you before, I didn't have --

7    I don't know why.

8         Q.   You didn't have the report?

9         A.   No, I don't know why I didn't include

10   them.

11        Q.   You don't know why?

12             MR. KOTT:  Asked and answered.

13   BY MS. MOORE:

14        Q.   Okay.  The information that you had with

15   respect to Dr. Porter came from The Herman Law Firm,

16   correct?

17        A.   Correct.

18        Q.   Okay.  Have you actually looked at that

19   report?

20        A.   Yes.

21        Q.   But they picked out for you what to put in

22   your report?

23             MR. KOTT:  Object.

24             THE WITNESS:  They didn't pick out
```

1          anything.

2               MR. KOTT:  Object.

3               THE WITNESS:  I read through it and took

4          out the information as a summary.

5    BY MS. MOORE:

6          Q.   Okay.  But you didn't include -- I'm

7    trying to understand why you didn't include the

8    other references to the other options.

9          A.   Well, likewise, I didn't include urine

10   culture and other things.

11         Q.   All right.  Now, with respect to Ms.

12   Shively, one of the specific complaints you said

13   she experienced was the bleeding.  You want to

14   find that in your report?

15              MS. MOORE:  Let's go off the record so you

16         can look for it.

17              VIDEOGRAPHER:  Going off.  The time at

18         1:34.

19              (Off the record.)

20              VIDEOGRAPHER:  Okay.  We're back on the

21         record.  The time is 1:35.

22   BY MS. MOORE:

23         Q.   So, Doctor, since the paragraph on page

24   five talks about "Since placement of mesh products,

Nathan W. Goodyear, MD

```
 1        the patient's developed abdominal pain, pelvic pain,

 2        vaginal pain, intermittent vaginal bleeding, urinary

 3        retention, recurrent stress urinary incontinence,

 4        recurrent prolapse, recurrent UTI," and then you

 5        talk about the periurethral banding and ridging.

 6        And you're attributing all of those to the mesh,

 7        included limited sexual activity and urinary

 8        retention?

 9             A.   That is my opinion and that is her

10        statement, some of those.

11             Q.   Okay.  Now, talking about her statements,

12        again, did you read her deposition?

13             A.   No, not when I created this.

14             Q.   And why not?

15             A.   Because of my expert opinion.

16             Q.   Okay.  Now, would it be important to take

17        into account what the patient says about her

18        underlying conditions?

19             A.   Sure.

20             Q.   Okay.  Because you say you're attributing

21        her bleeding and intermittent vaginal bleeding.

22        Would you be surprised if when asked in her

23        deposition, "Is bleeding something you're currently

24        experiencing?"
```

Nathan W. Goodyear, MD

1               Answer:  "Currently, no."

2               "When is the last time you had trouble

3        with bleeding?"

4               "As I recall, 2012."

5          A.   Again, I wasn't there so I don't have

6        privy to that.  So I don't --

7          Q.   You weren't where?

8          A.   I wasn't there when she made that

9        testimony.

10         Q.   Okay.  So is that something you would like

11       to have before preparing a report?  Wouldn't you

12       want to have all the facts and know what the

13       Plaintiff says about her conditions?

14         A.   Sure.

15         Q.   Okay.  So do you want to modify your

16       report and maybe take out that "intermittent vaginal

17       bleeding"?

18               MR. KOTT:  Objection.

19               THE WITNESS:  At the time I wrote this is

20          what I had to work -- what I had in front of

21          me.

22       BY MS. MOORE:

23         Q.   Okay.  But now you're presented with other

24       information and you're going to stand by something

Nathan W. Goodyear, MD

1      that's incorrect?

2                MR. KOTT:  Object to form.

3                THE WITNESS:  Information I haven't seen.

4      BY MS. MOORE:

5           Q.   Okay.  We'll come back to that.

6                VIDEOGRAPHER:  You have three minutes.

7                MS. MOORE:  All right, sir.

8      BY MS. MOORE:

9           Q.   We'll come back to that.

10               And the other allegations that you

11     attribute to the patient, or to the mesh, abdominal

12     pain.  You talked earlier that she had many

13     surgeries.  Those are additional factors that may

14     cause that abdominal pain and pelvic pain, correct?

15          A.   Correct.  But she had episodes

16     postoperatively with no pain.

17          Q.   Pardon?

18          A.   She had an episode time frame where she

19     was, quote/unquote, good support, doing well as you

20     described, as I wrote there.  She said she was in no

21     pain.

22          Q.   All right.  And that's based on what?

23          A.   My medical records.

24          Q.   And where is that?

Nathan W. Goodyear, MD

```
 1              Where in your report does she report to
 2     you abdominal or pelvic pain?  Name one place.  Name
 3     one place.
 4          A.   In my report?
 5          Q.   Or in your care and treatment.
 6          A.   When I examined her and she felt pain
 7     postoperatively at two weeks -- at two weeks.
 8          Q.   That's two weeks postoperatively?
 9          A.   Yeah.
10          MS. MOORE:  Let's go off the record for a
11          second.
12              Oh, I'm sorry.  Go back on the record.
13     BY MS. MOORE:
14          Q.   I want you to take your time, look at
15     your records for any evidence that would
16     substantiate abdominal pain, pelvic pain, or any of
17     the complaints that you say in your allegations on
18     page five.
19          MS. MOORE:  Off the record.
20          VIDEOGRAPHER:  We're off.  The time is
21          13:38.
22              (Off the record.)
23          VIDEOGRAPHER:  We're back on the record.
24          The time is 1:39.
```

Nathan W. Goodyear, MD

```
 1    BY MS. MOORE:

 2         Q.   All right.  Doctor, have you found places

 3    in your care and treatment records of Ms. Shively

 4    where she has complained of these problems after her

 5    mesh surgery?

 6         A.   Well, on June 18th, she complained of low

 7    back discomfort and hip discomfort.

 8         Q.   Okay.  Anything else?

 9         A.   Nope, that's it.

10         Q.   That's it.  So as you sit here today, you

11    don't have any other complaints from the patient

12    that would substantiate any of the comments or

13    allegations that you attribute to the mesh products?

14              MR. KOTT:  Object to the form.

15              Doctor, answer as best you can.

16              THE WITNESS:  I never saw her after that

17         last visit.

18    BY MS. MOORE:

19         Q.   But I'm talking about from the time you

20    treated her until she was released, you don't have

21    any evidence that she had any of these types of

22    problems, correct?

23              MR. KOTT:  Object to the form.  You can

24         clean it up if you say when you mean released,
```

Nathan W. Goodyear, MD

```
 1              released from whom?  Him, Gomelsky, Porter?

 2              Who are you talking about, released?

 3      BY MS. MOORE:

 4         Q.   I'm talking about your care right now,

 5      sir.

 6              MR. KOTT:  Okay.  Thank you.

 7              THE WITNESS:  The two documented were the

 8         two-week postoperative, and then would have

 9         been June 18th.

10      BY MS. MOORE:

11         Q.   So, I'm sorry, the two documented, and the

12      two week post-op?

13         A.   When I examined her and she had some

14      tenderness in the rectovaginal septum area.

15         Q.   All right.  Now tenderness two weeks

16      post-op is pretty customary, correct?

17         A.   Well, the IFU states two to three weeks'

18      recovery.

19         Q.   And that's two weeks?

20         A.   Yeah.

21         Q.   Okay.  So it's pretty customary, right?

22         A.   It could be.

23         Q.   Okay.  Now, let's talk about the back

24      pain.
```

Nathan W. Goodyear, MD

```
1              A.   The low back discomfort?

2              Q.   The low back discomfort.  Not mention of

3         back pain, right?

4              A.   I'm sorry.  Low back discomfort.

5              Q.   And because of that one complaint,

6         you're saying that all of these other

7         conditions are related to the mesh?  There's no

8         evidence of these conditions.

9                   MR. KOTT:  Object to the form.  Object to

10              the commentary.

11        BY MS. MOORE:

12             Q.   Is there any evidence of these conditions?

13             A.   My opinion --

14             Q.   I know.  I want to know the basis for your

15        opinion --

16             A.   Right.

17             Q.   -- that Ms. Shively experienced these

18        complaints as a result of the mesh surgery involving

19        the TVT and the Prolift.

20             A.   My examination gives everything here that

21        I saw.

22             Q.   Okay.

23             A.   So in terms of my opinion, it's based on

24        experience and other expertise -- and other visits.
```

Nathan W. Goodyear, MD

```
 1            Q.    But --

 2            A.    Because I didn't see her after that time.

 3            Q.    All right.  So you're speculating?

 4            MR. KOTT:  Object to the form.

 5            THE WITNESS:  No, I'm not.

 6     BY MS. MOORE:

 7            Q.    You're making a diagnosis of a patient on

 8     things that aren't in your records?

 9            MR. KOTT:  Object to the form.

10     BY MS. MOORE:

11            Q.    Is that correct?

12            MR. KOTT:  Object to the form.

13            Doctor, don't answer that question.

14            This is objectionable in the fact that you

15            know he has reviewed multiple other doctors'

16            records.

17            MS. MOORE:  Wait, wait, wait.  Don't coach

18            the witness.

19            MR. KOTT:  Come on, Kim.

20     BY MS. MOORE:

21            Q.    I want to know based on your records,

22     based on what you have in front of you, what

23     evidence do you have that she had any of these

24     conditions?
```

Nathan W. Goodyear, MD

```
 1                    MR. KOTT:  Objection to the form.

 2                    What do you mean by in front of him?  The

 3              entirety of what he reviewed, his medical

 4              records?

 5                    MS. MOORE:  Whatever he wants to show me.

 6              Show me.

 7                    MR. KOTT:  Okay.

 8                    THE WITNESS:  I told you, this is based on

 9              everything that I reviewed at the time of my

10              expert opinion as well as the examinations and

11              the follow-up thereafter, which of course, I

12              didn't have privy to Dr. Gomelsky's or Dr.

13              Porter's follow-ups at that time.

14         BY MS. MOORE:

15              Q.   Wouldn't you think it would be important

16         to have that information before you prepared a

17         report and gave a deposition?

18                    MR. KOTT:  Object to the form.  That is

19              patently misrepresenting.  He, in fact, did

20              have all the information and it's on his list.

21              This is getting very --

22                    MS. MOORE:  I object to the coaching.

23                    MR. KOTT:  -- very much out of line and

24              misleading.
```

Nathan W. Goodyear, MD

```
 1    BY MS. MOORE:

 2         Q.   I thought you said you didn't have Dr.

 3    Gomelsky's or Dr. Porter's.  If I misunderstood you,

 4    please --

 5              MR. KOTT:  He never said that.

 6    BY MS. MOORE:

 7         Q.   Did you have Dr. Gomelsky and Dr. Porter's

 8    records?

 9         A.   When I wrote the expert opinion report,

10    those were a part of that, and you can see that in

11    my summary.

12         Q.   All right.  And so okay, then that's

13    fair.  But name one record that substantiates

14    any problem that you've listed --

15              MR. KOTT:  Way over.  Don't answer any

16         further questions.

17              MS. MOORE:  The Court would allow me the

18         courtesy of answering this one question.

19              MR. KOTT:  Uh-unh, we're done.

20              How many minutes is she over?

21              VIDEOGRAPHER:  About three.

22              MR. KOTT:  Okay.

23              MS. MOORE:  I'm going to ask Counsel that

24         you allow this witness to answer the question
```

Nathan W. Goodyear, MD

```
1              that has been posed on the record.

2                   MR. KOTT:  Okay.  What is the question?

3         BY MS. MOORE:

4              Q.   As we sit here today, Doctor, looking at

5         the complaint that you attribute -- strike that.

6                   As we sit here today, Doctor, you have

7         attributed certain complaints to Ms. Shively as a

8         result of her surgery with the Prolift and the TVT,

9         correct?

10             A.   Correct.

11             Q.   Do you have any evidence that she, in

12        fact, has these conditions?  Anything that you can

13        point to in your records before you that would

14        substantiate any of these diagnoses?

15                  MR. KOTT:  Only his records.

16                  MS. MOORE:  Any records.

17                  MR. KOTT:  Oh, Jesus.

18                  MS. MOORE:  I'm entitled to know the basis

19             of his opinions.

20                  MR. KOTT:  And he's trying to tell you,

21             but you keep saying the records in front of

22             him.  Are you talking about his medical

23             records?  Gomelsky's records?  Porter's

24             records?  All of the records?
```

Nathan W. Goodyear, MD

```
 1                    You see what I'm saying?  If you're trying

 2          to get --

 3                    MS. MOORE:  I see exactly what you're

 4          doing.

 5                    MR. KOTT:  If you're trying to get to his

 6          medical records, he's told you, no, that it's

 7          not in there.

 8      BY MS. MOORE:

 9          Q.   Okay.  Where is it?

10                    MR. KOTT:  Okay.

11                    THE WITNESS:  It's in the other expert

12          opinions.

13      BY MS. MOORE:

14          Q.   Okay.  Where?

15          A.   Oh, actually in the medical records of Dr.

16      Gomelsky and Dr. Porter.

17          Q.   Okay.  Can you show me?

18          A.   I don't think I have those in front of me.

19          Q.   You don't have those?

20                    MR. KOTT:  He said in front of him.

21      BY MS. MOORE:

22          Q.   So you're relying on expert opinions --

23                    MR. KOTT:  Stop.  Wait.

24                    MS. MOORE:  Okay.  No further questions.
```

Nathan W. Goodyear, MD

1            I think I get the picture.

2                MR. KOTT:  No, you don't get the picture.

3                MS. MOORE:  I get the picture.

4                MR. KOTT:  I am very disappointed.

5                MS. MOORE:  I am going to reserve my

6            right because all of the documents have not

7            been produced.  I'm going to reserve my right

8            to resume the deposition on Ms. Shively with

9            respect to Dr. Goodyear.

10               MR. KOTT:  And I am going to object to it.

11               MS. MOORE:  Objection noted.

12               VIDEOGRAPHER:  Are we going off the

13           record?

14               MR. KOTT:  Yes.

15               VIDEOGRAPHER:  Okay.  We're off.  The time

16           is 1:46.

17                   (Luncheon recess taken.)

18               VIDEOGRAPHER:  Okay.  We are back on the

19           record.  Starting disc number three.  The time

20           is 2:47 p.m.

21                        EXAMINATION

22       BY MR. KOTT:

23           Q.   Good afternoon, Dr. Goodyear.  As you know

24       I'm Joe Kott and my firm has hired you to review

Nathan W. Goodyear, MD

```
 1        these cases and work with us as an expert; is that

 2        correct?

 3             A.   That is correct.

 4             Q.   Doctor, in the course of our interactions

 5        over the last several months, has anybody from my

 6        firm, including myself, tried to influence your

 7        opinions, direct your opinions or shape your

 8        opinions in any fashion?

 9             A.   No.

10             Q.   Are your opinions as you express in this

11        case yours?

12             A.   They are.

13             Q.   Okay.  Now, Doctor, at all times that you

14        performed surgery on the patients that are subject

15        of our litigation, okay, were you board certified in

16        OB/GYN at all times?

17             A.   Yes.

18             Q.   Okay.  And when you performed those

19        surgeries, you had a very active pelvic floor

20        surgery practice?

21             A.   Yes.

22             Q.   Okay.  Now, today in your current

23        practice, do you still see female patients?

24             A.   I do.
```

Nathan W. Goodyear, MD

```
 1              Q.   What percentage of your practice is female

 2      patients?

 3              A.   Roughly 60 to 70 percent.

 4              Q.   Okay.  In that practice, do you do

 5      OB/GY -- or, excuse me, gynecological exams?

 6              A.   I do.

 7              Q.   And in those patients that you do

 8      gynecological exams, do you do non-surgical

 9      treatment of gynecological conditions that you find

10      on examination?

11                   MS. MOORE:  Object to the form.

12                   THE WITNESS:  I do.

13      BY MR. KOTT:

14              Q.   Okay.  And the non-surgical treatments you

15      do can involve medications, things of that nature?

16              A.   That's correct.

17                   MS. MOORE:  Object to the form.  Leading.

18              Q.   Okay.  Now, Doctor, in your current

19      practice, what do you do when you have a patient

20      that you find has a surgical problem, that needs

21      surgical treatment, a lady comes in, has a

22      gynecological problem, what do you do in that

23      setting?

24              A.   I refer them out.
```

Nathan W. Goodyear, MD

```
 1              Q.   And you have doctors that you refer them

 2        to?

 3              A.   That's correct.

 4              Q.   Now, you were questioned at length about

 5        your CV and your qualifications in this case to give

 6        expert opinions; is that correct?

 7              A.   Yes.

 8              Q.   Were you ever questioned about any

 9        connection you had to Ethicon and your training that

10        was done by Ethicon?

11              A.   No.

12              Q.   Okay.  Were you, in fact, trained by

13        Ethicon in their procedures?

14              A.   I was.

15              Q.   Okay.  In addition to being trained by

16        Ethicon, did Ethicon ever hire you to be an

17        instructor and teach other doctors how to do these

18        procedures?

19              A.   Yes, they did.

20              Q.   Okay.  That's -- I'll withdraw that

21        question.

22              A.   Okay.

23              Q.   Doctor, I'm going to hand to you a

24        document.
```

Nathan W. Goodyear, MD

```
 1                    MR. KOTT:  Do we have another set of

 2              these?  Okay.  I see that.  Thank you.

 3         BY MR. KOTT:

 4              Q.   Doctor, I'm going to show you a

 5         document --

 6              A.   My glasses.  I can see, that's fine.

 7              Q.   If you need your glasses --

 8              A.   Yeah, can we take a minute?

 9                    MR. KOTT:  Go off the record, please.

10                    VIDEOGRAPHER:  Go off the record.  The

11              time is 2:53 (sic).

12                    (Off the record.)

13                    VIDEOGRAPHER:  All right.  We are back on

14              the record.  The time is 2:52.

15                    (Exhibit No. 24 marked.)

16         BY MR. KOTT:

17              Q.   Doctor, would you please identify which

18         record for us or this document for the record?

19              A.   This is a Certificate of Attendance by the

20         Ethicon Endo-Surgery for Advanced Laparoscopic

21         Gynecological Procedures.

22              Q.   Okay.  Would you show that to the

23         videographer, jury and Judge, please?

24                    And who awarded you that certificate?
```

Nathan W. Goodyear, MD

```
1          A.    Ethicon.  Johnson & Johnson.

2          Q.    And what was the date of that?

3          A.    February 3rd, 2003.

4                (Exhibit No. 25 marked.)

5          Q.    Thank you.  Doctor, I'm going to show you

6     yet another example -- another document.  Ask you if

7     you would please identify that document for the

8     record and show it to the Judge and jury.

9          A.    Gynecare TVT-O Obturator System

10    Tension-free Support for Incontinence Professional

11    Education Program.

12         Q.    And who awarded you that certificate?

13         A.    This was with Gynecare Worldwide.

14         Q.    Thank you.  Are these two certificates the

15    same type of surgery that is the subject of the

16    litigation in which you have formed opinions?

17         A.    The laparoscopic and the TVT, they are

18    both advanced procedures, yes; but this was primary

19    vaginal.

20               (Exhibit No. 26 marked.)

21         Q.    And, Doctor, I'm going to show you yet

22    another document.  Ask you if you would identify

23    this document for the record.

24         A.    This is Gynecare Prolift Pelvic Repair
```

Nathan W. Goodyear, MD

```
 1        System Professional Education Program.

 2              Q.   And who granted you that document?

 3              A.   That was Gynecare Worldwide, May 16th,

 4        2015.

 5              Q.   And tell me how did you come to receive

 6        these -- this certificate from Ethicon and J&J,

 7        correct?

 8              A.   Correct.

 9              Q.   How did you come to receive these, what

10        did you do to get these certificates?

11              A.   Went down and listened to the didactic

12        lectures and was active in the cadaver lab.

13              Q.   What is that, the cadaver lab?

14              A.   Well, they would have a pelvis and we

15        would go in there and practice the surgical

16        procedure.  And we would have guidance of that

17        surgical procedure in terms of technique, correct

18        anatomical landmarks, etcetera.

19              Q.   Okay.  And who would instruct you, was

20        this -- withdraw the question.

21              Was this an Ethicon-produced educational

22        system?

23              A.   It was.

24              Q.   Okay.  Did you ever serve as a consultant
```

Nathan W. Goodyear, MD

```
1      for Ethicon?

2           A.   I did.

3                (Exhibit No. 27 marked.)

4           Q.   Let me show you a document that is now

5      marked No. 27.  Would you tell the Judge and jury

6      what this document is?

7           A.   This is a description of activity, Prolift

8      Preceptorship.

9           Q.   What is a preceptorship?

10          A.   Basically teaching somebody how to do a

11     procedure.

12          Q.   And you did that?

13          A.   Yes, I did.

14          Q.   Okay.  And Ethicon paid you to do that?

15          A.   Yes, they did.

16          Q.   Attach this as Exhibit No. 27.

17               Doctor, I'm going to show you a document

18     which we are going to mark as Exhibit No. 28.

19               (Exhibit No. 28 marked.)

20     BY MR. KOTT:

21          Q.   Doctor, this is a document also that I

22     would ask if it was a document provided to you by

23     Ethicon?

24          A.   Yes.
```

Nathan W. Goodyear, MD

```
1              Q.   What does it tell you its purpose

2     was?

3              A.   Ethicon Incorporated Travel Guidelines for

4     J&J Common Expense Reporting Policy.

5              Q.   And that was in connection with your work

6     with Ethicon as a preceptor?

7              A.   That is correct.

8                   (Exhibit No. 29 marked.)

9              Q.   Thank you.  Okay.  Doctor, I'm going to

10    show you yet another document and ask you if you

11    would identify this document, which I believe is

12    Exhibit No. 28?

13             A.   No. 29.

14             Q.   No. 29.  Thank you.

15             A.   Yes.

16             Q.   What is this document?

17             A.   This is a document from Ethicon

18    regarding -- regarding the education, payment, tax,

19    etcetera, taxpayer identification form for the

20    preceptorship.

21             Q.   Okay.  Doctor, are these documents that

22    I've shown you, both where you were being educated

23    in the use of the vaginal mesh by Ethicon, and when

24    you were educating other doctors in its use, are
```

Nathan W. Goodyear, MD

1       these important parts of your credentials as an

2       expert in this case?

3              A.   That is correct.

4                   MS. MOORE:  Object to form.  Belated, but

5              object to the form.

6       BY MR. KOTT:

7              Q.   I want to quickly go through these.  Thank

8       you for offering.

9                   Doctor, I'm going to show you what I

10      believe is a fairly long document.

11                  MR. KOTT:  Or are these multiple

12             documents?

13                  MS. KOTT:  Multiple documents.

14      BY MR. KOTT:

15             Q.   Let me show you an in globo stack of

16      documents for the sake of time.  And ask you to look

17      at these documents, and tell me if these are all

18      documents from Ethicon.

19             A.   They are.

20             Q.   Is Ethicon the manufacturer of the product

21      that is the subject of this litigation?

22             A.   They are.

23             Q.   What are those contracts, what are they

24      about? Just tell the Judge and jury why you have

Nathan W. Goodyear, MD

```
 1        Ethicon contracts in your file.

 2             A.   They were for contracts to be not only

 3        preceptorship, but also master consulting agreement.

 4             Q.   What is a master consulting agreement?

 5             A.   Consultation to help a physician learn how

 6        to do the procedure, manage, and perform side

 7        effects -- or repair side effects that are related

 8        to the complications of the procedure.

 9             Q.   And it's clear from these contracts that

10        Ethicon hired you to do that, correct?

11             A.   Multiple times.

12             MR. KOTT:  Mark this one, please.  This

13             will be marked as No. 30 and attached.

14             (Exhibit No. 30 marked.)

15        BY MR. KOTT:

16             Q.   Doctor -- thank you.  Doctor, have you

17        done, in addition to doing implantations, as you

18        discussed, have you also done revisions where women

19        who had the pelvic mesh implanted, whether you did

20        it or someone else, did you have to come back and

21        reoperate on them for complications?

22             A.   I did.

23             Q.   Okay.  That was part of your practice?

24             A.   That is correct.
```

Nathan W. Goodyear, MD

```
 1            Q.   Now, if you saw such a patient in your
 2       office today and you examined them, what would you
 3       tell that person regarding surgical care?
 4            MS. MOORE:  Object to the form of the
 5       question.
 6            THE WITNESS:  I would refer them out for
 7       revision.
 8   BY MR. KOTT:
 9            Q.   Okay.  Doctor, that you currently don't
10       perform surgical gynecological procedures, you
11       haven't forgotten how to do a pelvic exam, have you?
12            MS. MOORE:  Object to form.
13            THE WITNESS:  No, I have not.
14
15   BY MR. KOTT:
16            Q.   Okay.  You haven't forgotten how to
17       recognize pelvic disease, have you?
18            A.   I have not.
19            MS. MOORE:  Same objection.
20            Q.   You haven't forgotten how to treat
21       non-surgical conditions, have you?
22            MS. MOORE:  Same objection.
23            THE WITNESS:  I have not.
24   BY MR. KOTT:
```

Nathan W. Goodyear, MD

```
 1            Q.   In fact, you haven't forgotten out

 2       to treat them surgically?

 3            A.   I have not.

 4                 MS. MOORE:  Same objection.  Sorry, you

 5            have to give me a chance.

 6       BY MR. KOTT:

 7            Q.   You haven't?

 8            A.   I have not.

 9            Q.   Doctor, you were shown several lawsuits

10       that had been filed with your name on them over the

11       last ten years or so.  Do you recall that?

12            A.   I do.

13            Q.   Of any of the lawsuits that Ms. Moore

14       showed you, did any of them go to trial to a jury?

15            A.   No.

16            Q.   Did you pay one penny in settlement on any

17       of those cases?

18                 MS. MOORE:  Object to the form.

19                 THE WITNESS:  No.

20       BY MR. KOTT:

21            Q.   Did your insurer pay any money on any of

22       those cases?

23                 MS. MOORE:  Object to form.

24                 THE WITNESS:  No.
```

Nathan W. Goodyear, MD

```
1     BY MR. KOTT:

2          Q.   So those were allegations for which you

3     never paid a nickel to anyone; is that correct?

4               MS. MOORE:  Same objection.

5               THE WITNESS:  That is correct.

6     BY MR. KOTT:

7          Q.   In fact, one of them, Doctor, you weren't

8     even scrubbed in the procedure?

9          A.   That's correct.

10              (Exhibit No. 31 marked.)

11         Q.   Do we have those?  Now, Doctor, I'm going

12    to show you yet another document.  And, thank you.

13    This is going to be No. 31.  Deposition Exhibit No.

14    31.

15              I ask you to take a look at this document

16    and tell the Judge and jury what that document is.

17         A.   Ethicon Women's Health and Urology Prolift

18    Pelvic for Repair Systems Cadaver Lab.

19         Q.   Now, is that a -- sort of a flyer for

20    doctors to attend the cadaver lab?

21         A.   Yes, it is.

22         Q.   Who is listed as one of the instructors on

23    that lab?

24         A.   Nathan Goodyear.
```

Nathan W. Goodyear, MD

```
1            Q.   Is that you?

2            A.   That is me.

3            Q.   Is that an Ethicon document?

4            A.   It is.

5            Q.   Is that important in your qualifications

6       as an expert in this case?

7                 MS. MOORE:  Object to the form.

8                 THE WITNESS:  Teaching others, yes.

9       BY MR. KOTT:

10           Q.   Do you recall the date of that when you

11      were instructing those other doctors?

12           A.   I don't recall.

13                MS. MOORE:  Object to the form of the

14           question.

15           Q.   Thank you.  Would you just look at No. 31

16      again and see what the time period was?

17           A.   8:00 a.m., Monday, November 14th, 2005.

18           Q.   Did you actually, in fact, attend

19      that and instruct other physicians?

20                MS. MOORE:  Object to the form.

21                THE WITNESS:  I did.

22                (Exhibit No. 34 marked.)

23      BY MR. KOTT:

24           Q.   Okay.  Thank you.  Doctor, I'm going to
```

Nathan W. Goodyear, MD

```
1       show you another document and ask if you would

2       please look at it and identify that document?

3            A.   Ethicon's Women's Health and Urology

4       Prolift Pelvic Floor Repair Systems Cadaver Lab.

5            Q.   And is that, again, a flyer for other

6       physicians to go to attend this course?

7            A.   It is.

8            Q.   Okay.  What's the date on that document?

9            A.   That is 8:00 a.m., Friday, February 17th,

10      2006.

11           Q.   Is it evident that that is an Ethicon

12      document to you?

13           A.   Very clearly, yes.

14           Q.   Why do you say it's an Ethicon document?

15           A.   It says Ethicon Women's Health and Urology

16      up top.

17           Q.   Thank you.  Are you, again, listed on that

18      document as one of the participants in the

19      educational process?

20                MS. MOORE:  Object to the form.

21                THE WITNESS:  I am.

22      BY MR. KOTT:

23           Q.   What is your title there?

24           A.   Nathan Goodyear, M.D., gynecologist,
```

Nathan W. Goodyear, MD

```
 1      moderator.

 2           Q.   Is that activity important, in your opinion,

 3      regarding your ability to render opinions in this

 4      matter?

 5                MS. MOORE:  Object to form.

 6                THE WITNESS:  It is.

 7                MS. MOORE:  Let me get my objection in.

 8                MR. KOTT:  Kim, if you get one in late,

 9           it's fine.

10      BY MR. KOTT:

11           Q.   Doctor, I'm going to show you one more

12      document along these lines.  And ask if you would

13      look at -- purport to you that this is an email.

14           A.   It is.

15           Q.   And who is that email from?

16           A.   This email is from Robert Zipfel.

17           Q.   Do you recognize that person, his name?

18           A.   I do.

19           Q.   Who is that?

20           A.   Robert worked for Ethicon.

21           Q.   Do you know what capacity he worked in?

22           A.   I can't recall exactly.

23           Q.   And when was that email -- well, let me

24      withdraw that.
```

Nathan W. Goodyear, MD

```
 1                    Who was the email sent to?

 2          A.   The email was sent to me.

 3          Q.   And what did this individual tell you in

 4     that email?

 5          A.   Just listing the list of faculty on

 6     November 14th, 2005.  Prolift Cadaver Lab.

 7          Q.   Were you listed there?

 8          A.   I was.

 9               MS. KOTT:  For the record, the Bates

10          number is cut off at the bottom, it's

11          FMESH00006165.

12               MR. KOTT:  Attach this in continuation

13          No. 32, out of order.  I'm sorry, we had

14          premarked it.

15               THE WITNESS:  I said that email was to me,

16          it was not.

17               (Exhibit No. 32 marked.)

18     BY MR. KOTT:

19          Q.   Who was it sent to?

20          A.   The email was to Greg Prines, Scott

21     Jones, Charles Riedley, but it listed me as a final

22     list of faculty.

23          Q.   Thank you.  What contact did you have, if

24     you can recall, with Mr. Robert Zipfel, do you
```

Nathan W. Goodyear, MD

```
 1      recall any?

 2              A.    Only emails.

 3              Q.    Okay.  Now, Doctor, let's talk a little

 4      bit about this book with the title "Manboob Nation."

 5              A.    Yes.

 6              Q.    You have been questioned about that

 7      before?

 8              A.    Correct.

 9              Q.    Now, Doctor, this book has kind of a

10      grabber name to it, is that fair to say, a layman's

11      name?

12              A.    Fair to say, yes.

13              Q.    Tell me about the content.  Is this a

14      serious medical book for physicians?

15                   MS. MOORE:  Object to the form of the

16              question.

17                   THE WITNESS:  This is a specific review of

18              the literature.  The publication of the

19              literature is for physicians, that is correct.

20      BY MR. KOTT:

21              Q.    And how many references did you use in this

22      book, approximately?

23              A.    799.

24              Q.    And you read those articles in preparation,
```

Nathan W. Goodyear, MD

```
1        or abstracts of them, in preparation for this book?

2            A.    Every one.

3            Q.    So this, in your opinion, is a serious book

4        for doctors, correct?

5                MS. MOORE:  Object to the form.  Leading.

6                THE WITNESS:  Correct.

7        BY MR. KOTT:

8            Q.    Thank you.  Has a kind of layman's name,

9        though, isn't that fair to say?

10           A.    From my six-year-old daughter at the time.

11           Q.    Tell me about that, she gave you the name

12       for the book?

13           A.    We were at Disney World, and she said,

14       Dad, look, look boobs.  We were at the water park at

15       Disney World and I was like I can't believe there's

16       a topless lady down there.  But it was a very large

17       man walking by with --

18           Q.    Man boobs?

19           A.    -- very large man boobs.

20           Q.    Got it.  And that's where the title came

21       from?

22           A.    In a yellow Speedo.  Some things you never

23       forget.

24                MR. KOTT:  Thank you.
```

Nathan W. Goodyear, MD

```
1            MS. MOORE:  Stipulate to that.

2            (Exhibit No. 33 and No. 35 marked.)

3            MR. KOTT:  I'm going to attach at this

4       point several notices of cross reference,

5       Cross Notice of Video Deposition.  And one is

6       No. 35.  And it's a cross notice relating to

7       the deposition today, Exhibit No. 35.

8            MS. KOTT:  Yes, the first deposition.

9            MR. KOTT:  Yes, first dep.  The entirety

10      of the first deposition.  Thank you.  And do

11      you have any more of those or just one?

12           MS. KOTT:  Just one, for now.

13           MR. KOTT:  Thank you.  Do I need to show

14      it to you all?  All right.

15  BY MR. KOTT:

16      Q.   Doctor, let me go to what has been used as

17  Exhibit No. 17 in our questioning by Ms. Moore

18  earlier on in this case.

19      A.   Yes.

20      Q.   And I would like you, if you would,

21  please, to look -- you were questioned about page

22  eight.  I'd like you to go to Bates number --

23  I'll show it to you -- 346084814.  The

24  pages aren't -- I don't think they are.  Let's see,
```

Nathan W. Goodyear, MD

```
 1        maybe this can be done this way.  It's page one.

 2                 All right.  And if you would look at page

 3        one and the first paragraph from the bottom.  You

 4        see that paragraph?

 5             A.   I do.

 6             Q.   Is it correct that this Ethicon document

 7        contains the following:  "A recent study published

 8        in Obstetrics and Gynecology by the Nordic

 9        transvaginal mesh group demonstrates that the rate

10        of perioperative complications with Gynecare Prolift

11        System is very low."

12                 Did I read that properly?

13             A.   Verbatim, yes.

14             Q.   Thank you.  Is that what you were

15        referring to when you said that you could not trust

16        the information retrospectively that was being given

17        by the manufacturer?

18                 MS. MOORE:  Object to the form question.

19                 THE WITNESS:  Yes.

20        BY MR. KOTT:

21             Q.   That's the kind of information that's

22        disturbing to you today as you sit here?

23                 MS. MOORE:  Same objection.

24                 THE WITNESS:  Very much so because it's
```

```
 1              misleading.

 2      BY MR. KOTT:

 3              Q.   And this is the same document that you

 4      were questioned about earlier, correct?

 5              A.   That is correct.

 6              Q.   Item 17.  You were shown, the last

 7      paragraph on page eight, would you please look

 8      at that paragraph again?

 9              A.   I'm there.

10              Q.   Now, you quoted -- you read into the

11      record that the quote rate of mesh exposure was

12      "three to 17 percent," correct, that's what's

13      written here?

14              A.   That's correct.

15              Q.   All right.  And you have also testified

16      you had information, verbal information or some

17      other information, from a French article regarding

18      the rate of exposure?

19                   MS. MOORE:  Object to the form of the

20              question.

21                   THE WITNESS:  It was one of the resources,

22              yes.

23      BY MR. KOTT:

24              Q.   Okay.  Let's go to the next sentence and
```

Nathan W. Goodyear, MD

```
 1        would you read the next sentence into the record?

 2             A.   Beginning with experience?

 3             Q.   Yes, sir.

 4             A.   "Experience in avoiding hysterectomy when

 5        possible will reduce the rate to one to

 6        six percent."

 7             Q.   So you did, in fact, at least see in this

 8        document a rate of one to six percent for mesh

 9        exposure when doing this procedure on patients who

10        haven't had a hysterectomy, correct?

11                  MS. MOORE:  Object to the form of the

12             question.

13                  THE WITNESS:  Correct.

14        BY MR. KOTT:

15             Q.   So you're saying that is not something

16        that's not in your documents, is it?

17                  MS. MOORE:  Same objection.

18                  THE WITNESS:  It's right there.

19                  MR. KOTT:  Okay.  I'm sorry for the okay.

20             Strike the okay.

21        BY MR. KOTT:

22             Q.   Go to the next document, please.  Put that

23        back in the stack.  I'm doing my very best to keep

24        orderly here.  And we have, I believe, two IFUs.
```

Nathan W. Goodyear, MD

```
 1        What does that stand for, Doctor, IFU?

 2             A.   Instructions for use.

 3             Q.   Instructions for use?

 4             A.   Yes.

 5             Q.   Okay.

 6                  MS. MOORE:  And, Counsel, just remind you

 7        of your 30-minute limit.  I don't know how much

 8        time he has.

 9                  MR. KOTT:  Thank you.

10                  VIDEOGRAPHER:  You have got about 12

11        minutes.

12                  MR. KOTT:  Thank you.

13   BY MR. KOTT:

14             Q.   Now, Doctor, you also rendered opinions in

15        this case regarding the use of the mesh in Ms.

16        Shively, correct?

17             A.   Correct.

18             Q.   And I believe we have that exhibit marked

19        as No. 5, correct?

20             A.   Correct.

21                  MS. MOORE:  Counsel, that's --

22                  MR. KOTT:  Is that correct, No. 5?

23                  MS. MOORE:  Yeah, expert report.  No. 3, I

24        believe.
```

Nathan W. Goodyear, MD

```
 1                    THE WITNESS:  Is that five or three?  I
 2           think it's a three.
 3                    MS. MOORE:  I believe it's a three.
 4    BY MR. KOTT:
 5           Q.   Thank you.  All right.  Now, Doctor, I
 6    want you to tell us briefly the methodology that you
 7    used in evaluating this particular case for your
 8    opinions that you rendered.
 9           A.   First was the --
10                    MS. MOORE:  Object to the form.  Leading.
11           Q.   Did you use a methodology in this case?
12           A.   I did.
13           Q.   Would you tell us that methodology?
14           A.   First I determined if there was any
15    application I had actually in these cases, first.
16                    Second, was based on my residential
17    experience and training.
18                    Third, was the training and experience and
19    education through the provided Ethicon teaching
20    instruction classes.  And then the application of
21    that to the patient in this case, as well as a
22    review of the literature up to that point relating
23    to mesh vaginal surgery, pelvic organ prolapse and
24    urinary incontinence.
```

Nathan W. Goodyear, MD

```
1           Q.    Thank you.  Did you include in your

2     report -- if we were to go to your report, on page

3     five, six and partially seven, did you do a

4     differential diagnosis and record your differential

5     diagnosis in Ms. Teri Shively's case?

6           A.    I did.

7           Q.    Now, Doctor, in your opinion, would you

8     read opinion number one into the record just for

9     complications?

10          A.    Teri Shively's injuries were caused by the

11    implanted Prolift and TVT-O devices.

12          Q.    Doctor, is that opinion to a reasonable

13    degree of medical certainty?

14          A.    Absolutely.

15          Q.    Thank you.  And did you go on into your

16    report to give the basis for that opinion?

17          A.    I did.

18          Q.    Thank you.  Would you please go to your

19    second opinion?

20          A.    I'm there.

21          Q.    Would you read that into the record?

22          A.    The Prolift and TVT-O devices implanted in

23    Teri Shively were unreasonably dangerous due to the

24    lack of adequate warning.
```

Nathan W. Goodyear, MD

```
 1            Q.   Thank you.  Doctor, did you go into the

 2       basis for that opinion on page eight and partially

 3       nine?

 4                 MS. MOORE:  Object to form.

 5                 THE WITNESS:  I did.

 6       BY MR. KOTT:

 7            Q.   And you gave your basis and your reasons

 8       in that report, correct?

 9            A.   I did.

10                 MS. MOORE:  Same objection.

11            Q.   Doctor, do you swear by this particular

12       report that those, in fact, are your opinions and

13       that the basis for them are contained therein?

14                 MS. MOORE:  Objection.

15                 THE WITNESS:  Yes.

16       BY MR. KOTT:

17            Q.   Thank you.  And all the opinions that you

18       rendered here, are they to a reasonable degree of

19       medical certainty?

20            A.   Yes.

21            Q.   Would you please go to the next opinion,

22       if you could, please?

23            A.   I'm there.

24            Q.   Page three -- I mean page nine.  Would you
```

Nathan W. Goodyear, MD

```
 1      please read into the record the third opinion you

 2      rendered in Ms. Shively's case?

 3           A.   The Prolift and TVT-O implanted in Teri

 4      Shively were unreasonably dangerous because they did

 5      not conform to the manufacturer's express

 6      warranties.

 7           Q.   Thank you.  Now, Doctor, would you please

 8      go down on that same page and say you have recorded

 9      there letters A through E and then going on into

10      page ten, you have more items listed; is that

11      correct?

12           A.   That is correct.

13           Q.   Are those items listed in your report,

14      those assertions by the company that you felt made

15      the product not conform with these assertions?

16                MS. MOORE:  Object to the form.

17                THE WITNESS:  Yes.

18      BY MR. KOTT:

19           Q.   Thank you.  And, again, those opinions are

20      to a reasonable degree of medical certainty,

21      correct?

22           A.   Yes.

23           Q.   All right.  Now, Doctor, I want you please

24      to go back to your report on page eight.  At the
```

Nathan W. Goodyear, MD

```
 1      time that you performed surgery on Ms. Shively,

 2      and, in fact, any of the times you performed this

 3      type of surgery, the TVTs, all the transvaginal mesh

 4      implantation, did you believe that you had the best

 5      information available from the manufacturer?

 6                  MS. MOORE:  Object to the form of the

 7            question.

 8                  THE WITNESS:  Yes.

 9      BY MR. KOTT:

10            Q.  Have you subsequently found out that that

11      was incorrect?

12                  MS. MOORE:  Same objection.

13                  THE WITNESS:  Yes.

14      BY MR. KOTT:

15            Q.  Do you feel that the manufacturer did not

16      give you adequate information regarding their

17      products?

18                  MS. MOORE:  Same objection.

19                  THE WITNESS:  Yes.

20      BY MR. KOTT:

21            Q.  Do you feel that lack of adequate

22      information made the product unreasonably dangerous?

23                  MS. MOORE:  Same objection.

24                  THE WITNESS:  Yes.
```

Nathan W. Goodyear, MD

```
 1     BY MR. KOTT:

 2          Q.   Do you feel like the lack of compliance

 3     with the warranties given by the manufacturer made

 4     this product unreasonably dangerous?

 5               MS. MOORE:  Objection.

 6               THE WITNESS:  Yes.

 7     BY MR. KOTT:

 8          Q.   Were the injuries suffered by Ms. Shively

 9     the result of the mesh implantation?

10               MS. MOORE:  Objection.

11               THE WITNESS:  Yes.

12     BY MR. KOTT:

13          Q.   Were those injuries suffered by her as a

14     result of you implanting this product without

15     adequate information from the manufacturer?

16               MS. MOORE:  Same objection.

17               THE WITNESS:  Yes.

18     BY MR. KOTT:

19          Q.   Doctor, were there alternative therapies

20     that could have been done for Ms. Shively at the

21     time she had the Prolift implants?

22          A.   Yes.

23          Q.   What were those alternative therapies?

24          A.   Nothing.  Pessaries.  More traditional
```

Nathan W. Goodyear, MD

```
 1     anterior colporrhaphy.  Posterior colporrhaphy.

 2          Q.   Now, if you had known about the actual

 3     risks and the actual dangers of this particular

 4     product, would you have used them in 2008 at the

 5     time that you implanted them?

 6               MS. MOORE:  Object to the form of the

 7               question.  And leading.

 8               THE WITNESS:  I would not have used the

 9               Prolift and the TVT-O.

10               MR. KOTT:  Thank you.  Let's go off the

11               record, please.

12               VIDEOGRAPHER:  The time is 3:20 p.m.

13               (Off the record.)

14               MR. KOTT:  We are back on the record.  The

15               time is 3:29.

16     BY MR. KOTT:

17          Q.   Doctor, we were on a break a moment ago.

18     Did you look at some medical records during that

19     break?

20          A.   I did.

21          Q.   Would you tell us what records you looked

22     at?

23          A.   These are medical records related to Teri

24     Shively.
```

Nathan W. Goodyear, MD

```
 1              Q.   And whose records are they?

 2              A.   Alex Gomelsky, Green Clinic.  Green Clinic

 3      Jonesborough.  Shane McVey and William Slusher.

 4              Q.   Doctor, did you review all of those

 5      records in forming your opinions expressed in this

 6      case?

 7              A.   I did.

 8              Q.   Anything to the contrary would be

 9      erroneous?

10              MS. MOORE:  Object to the form of the

11              question.

12              THE WITNESS:  Correct.

13              (Exhibit No. 37 marked.)

14      BY MR. KOTT:

15              Q.   And you also looked at Dr. Porter's

16      medical records; is that correct?

17              A.   That is correct.

18              MS. MOORE:  Objection.  Leading.

19              Q.   Thank you.  And you have those too?  We

20      have that.

21              And, Doctor, everything that was listed on

22      your list of reference materials, you also included

23      those in your study to form opinions in this case?

24              A.   Correct.
```

Nathan W. Goodyear, MD

```
1                MR. KOTT:  Thank you, Doctor.

2                How many seconds?

3                VIDEOGRAPHER:  You're over.

4                MR. KOTT:  Thank you very much.

5                VIDEOGRAPHER:  And we are going off.  The

6          time is 3:30.

7             (Deposition concluded at 3:30 p.m.)

8                      ********

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Nathan W. Goodyear, MD

```
 1                     -   -   -   -   -   -

 2                       E  R  R  A  T  A

 3                     -   -   -   -   -   -

 4

 5        PAGE   LINE   CHANGE

 6        ____   ____   _____

 7            REASON:   _____

 8        ____   ____   _____

 9            REASON:   _____

10        ____   ____   _____

11            REASON:   _____

12        ____   ____   _____

13            REASON:   _____

                 ____   ____   _____

14            REASON:   _____

15        ____   ____   _____

16            REASON:   _____

17        ____   ____   _____

18            REASON:   _____

19        ____   ____   _____

20            REASON:   _____

21        ____   ____   _____

22            REASON:   _____

23        ____   ____   _____

24            REASON:   _____
```

Nathan W. Goodyear, MD

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3                  I,_____, do

 4      hereby certify that I have read the

 5      foregoing pages, and that the same is

 6      a correct transcription of the answers

 7      given by me to the questions therein

 8      propounded, except for the corrections or

 9      changes in form or substance, if any,

10      noted in the attached Errata Sheet.

11

12

13      _____

14       NATHAN W. GOODYEAR, M.D.          DATE

15

16

17      Subscribed and sworn

18      to before me this

19      _____ day of _____, 20_____.

20      My commission expires:_____

21

22      _____

23      Notary Public

24
```

Nathan W. Goodyear, MD

```
 1                    REPORTER CERTIFICATE

 2      STATE OF TENNESSEE

 3      COUNTY OF KNOX

 4           I, Michele Faconti, RPR, Licensed Court

 5      Reporter, LCR #667, in and for the State of

 6      Tennessee, do hereby certify that the deposition of

 7      Nathan W. Goodyear, M.D., taken on March 3rd, 2016,

 8      was reported by me and that the foregoing

 9      transcript, pages 1 through 236, inclusive, is a

10      true and accurate record to the best of my

11      knowledge, skills and ability.

12           I further certify that I am not related to, nor

13      an employee or counsel of any of the parties to the

14      action as defined under T.C.A. Section 24-9-136, nor

15      am I financially interested in the outcome of this

16      case.  Reading and signing not waived.

17           In witness thereof, I have hereunto set my hand

18      on this 14th day of March, 2016.

19

20                                     _____

                                       Michele Faconti: 03/14/16

21                                     22:32:01 AM; Knoxville

22                                     Tennessee; TN LCR 667

                                       expires: 6-30-2016

23

24
```