# EXHIBIT E

0   01


2                    UNITED STATES DISTRICT COURT

                SOUTHERN DISTRICT OF WEST VIRGINIA

3                         AT CHARLESTON

4    RE: ETHICON, INC, PELVIC,      )  Master File No.

     REPAIR SYSTEM PRODUCTS         )  2:12-MD-02327

5    REPAIR SYSTEM PRODUCTS         )  JOSEPH R. GOODWIN

     LIABILITY LITIGATION           )  U.S. DISTRICT JUDGE

6    _____)

7    THIS DOCUMENT RELATES TO THE

     FOLLOWING CASES IN THE WAVE 1

8    OF MDL 200:

9    CHARLENE LOGAN TAYLOR,         )  Case No.

                                    )  2:12-cv-00376

10           Plaintiffs,            )

     vs.                            )

11   ETHICON, INC., ET AL.,         )

             Defendants.            )

12   _____/

13    VIDEOTAPED DEPOSITION OF NATHAN W. GOODYEAR, M.D.

14

15

16                      March 3, 2016

17                 3:50 p.m. to 7:39 p.m.

18

19                     TRACY IMAGING

20                 KNOXVILLE, TENNESSEE

21

22

23          Michele Faconti, RPR, LCR (667)

24

Nathan W. Goodyear, MD

```
 1                APPEARANCES OF COUNSEL

 2

      On behalf of the Plaintiffs:
 3             JOSEPH KOTT, ESQUIRE
               MIKALIA M. KOTT, ESQUIRE
 4             Herman, Herman & Katz
               820 O'Keefe Avenue
 5             New Orleans, LA 70113
               504-581-4892
 6             jkott@hhklawfirm.com
               mkott@hhklawfirm.com
 7

 8     On behalf of Defendants:
               KIM E. MOORE, ESQUIRE
 9             CAMALA E. CAPODICE, ESQUIRE
               Irwin, Fritchie, Urquhart & Moore, LLC
10             400 Poydras Street, Ste. 2700
               New Orleans, LA 70130
11             504-310-2100
               kmoore@irwinllc.com
12

13

14

15

16     Also Present:  Ernie Tracy, Videographer

17

18

19

20

21

22

23

24
```

Nathan W. Goodyear, MD

```
 1                    INDEX OF EXAMINATION

 2                                                    Page

 3   WITNESS:  NATHAN W. GOODYEAR, M.D.

 4   Examination by Ms. Moore                            7

     Examination by Mr. Kott                           129

 5   Examination by Ms. Moore                          158

 6

 7                    INDEX TO EXHIBITS

 8                                                    Page

 9   Exhibit No. 38,

           Rule 26 Expert Report (Taylor)              13

10

     Exhibit No. 39,

11         8-1-08 Office Visit (not attached)          43

12   Exhibit No. 40,

           Reliance List                               44

13

     Exhibit No. 41,

14         Bates No. TAYLORC_NOLMC_MDR00039-40          50

15   Exhibit No. 42,

16         Bates No. TAYLORC_NOLMC_MDR00037-38          50

17   Exhibit No. 43,

           Bates No. TAYLORC_NOLMC_MDR00041-42          50

18

     Exhibit No. 44,

19         Bates No. TAYLORC_PSR_00110-114              88

20   Exhibit No. 45,

           Bates No. TAYLORC_PSR_00046-49

21

     Exhibit No. 47,

22         Bates No. 000174-177                        117

23   Exhibit No. 48,

           Bates No. DFS-CHARLENELOGANTAYLOR-0001-36   129

24
```

Nathan W. Goodyear, MD

```
1                    INDEX TO EXHIBITS

2                                                    Page

3       Exhibit No. 49,

            Bates No. LSU Health 000003-attachments    140

4

        Exhibit No. 50,

5           Dr. Galloway Bates No. 000001-11           140

6       Exhibit No. 51,

            Cross Notice Video Deposition              155

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Nathan W. Goodyear, MD

```
 1                    STIPULATION

 2        The deposition of Nathan W. Goodyear, M.D.,

 3   called as a witness by the Defendants, pursuant to

 4   all applicable rules of the 3rd day of March, 2016,

 5   at the offices of Tracy Imaging, Knoxville,

 6   Tennessee, before Michele Faconti, RPR, Licensed

 7   Court Reporter and Notary Public in and for the

 8   State of Tennessee.

 9        It being agreed that Michele Faconti, a

10   Tennessee Licensed Court Reporter, may report the

11   deposition in machine shorthand, afterwards reducing

12   the same to typewritten form.  All objections,

13   except as to the form of the question, are reserved

14   to on or before the hearing.

15        It being further agreed that all formalities as

16   to notice, caption, certificate, transmission,

17   etcetera, are expressly waived, EXCLUDING the

18   reading of the completed deposition by the witness,

19   and the signature of the witness.

20

21

22

23

24
```

Nathan W. Goodyear, MD

```
1      (03:50 P.M.)

2                 VIDEOGRAPHER:  We are on the record.

3          Today's date is March 3rd, 2016.

4                 My name is Ernie Tracy, I'm the

5          videographer for Golkow Technologies.

6                 The time is 3:50 p.m.  And this is in the

7          matter of Taylor v. Ethicon.

8                 The deponent today is Dr. Nathan Goodyear,

9          M.D.  And the attorneys will now identify

10         themselves for the record.

11                MS. MOORE:  Kim Moore on behalf of the

12         defendants.

13                MS. CAPODICE:  Cami Capodice on behalf of

14         the defendants.

15                MS. KOTT:  Mikalia Kott on behalf of the

16         plaintiffs Charlene Taylor and Tina Morrow,

17         Dina Bennett and Teri Shively.

18                MR. KOTT:  My name is Joseph Kott.  I

19         represent the same plaintiffs identified by my

20         Colleague moments ago.

21     WHEREUPON,

22                Nathan W. Goodyear, M.D.,

23     having been first duly sworn, as hereinafter

24     certified, testified as follows:
```

Nathan W. Goodyear, MD

```
 1              DR. GOODYEAR:  I do.

 2                      EXAMINATION

 3   BY MS. MOORE:

 4          Q.   Good afternoon, Doctor.

 5          A.   Good afternoon.

 6          Q.   As I previously introduced myself, I'm Kim

 7   Moore.  I'm here on behalf of the defendants.  Going

 8   to ask you some additional questions about your care

 9   and treatment of the plaintiff, Charlene Logan

10   Taylor.

11              And let me just say as a side, I know we

12   spent time together this morning going over your

13   background sections and discussing all that

14   testimony.  I am going to do my best not to retread

15   any of that territory.  There may be a few things

16   that we go into by the virtue of your opinions in

17   each case.  We'll try to do our best to streamline

18   things.  I know we have time left -- I have three

19   hours in this deposition.

20              MS. MOORE:  Is that correct, Counsel?

21              MR. KOTT:  I think that's correct.

22              MS. MOORE:  I used three, got three left

23       for each case.

24              MR. KOTT:  You don't have to use all of
```

Nathan W. Goodyear, MD

1          it.

2                    MS. MOORE:   I understand.

3     BY MS. MOORE:

4          Q.   We'll begin with the attachment of Exhibit

5     No. 33, which is a document I know you're a little

6     familiar with, and that is the Notice of Deposition.

7     And we spent some time this morning talking about

8     the attachment that is accompanying that particular

9     request.

10                   And safe to say that your responses that

11    you gave us for that particular Notice of Deposition

12    in Mrs. Shively's case are the same responses that

13    you have in this case?

14         A.   Correct.

15         Q.   Now, we did identify -- or you identified

16    some documents that I believe would be responsive to

17    the request for medicals in Ms. Taylor's case?

18         A.   Can you recollect my memory?

19         Q.   Sure.  Do you have a binder there for Ms.

20    Taylor?  I think you had a binder of medical for

21    Taylor.  This right there, sir?

22         A.   Right here.

23         Q.   Take your time and just let me see if that

24    is correct.

1        A.   Exhibit No. 7?

2        Q.   Yes.  Take your time and look at that and

3    if you'll identify that for the record?

4        A.   This is Exhibit No. 7.

5        Q.   We discussed how that particular binder

6    has medical records pertaining to Ms. Taylor, but

7    does not have the medical bills; is that fair to

8    say?

9        A.   That is fair to say.

10        Q.   And one of the other items that we

11    discussed earlier would be correspondence -- any and

12    all correspondence or emails or any type of

13    communication pertaining to the Taylor case.  My

14    understanding is you have some emails with the

15    Herman Firm, and those will be produced --

16        MR. KOTT:  Well, those will be considered

17        for production.

18        MS. MOORE:  We're going to request that

19        those be produced.  On the next break make sure

20        we talk about that.  Because I would want to

21        knock that out tomorrow, so we don't have to

22        come up here for another deposition, if the

23        Court so determined that that was appropriate.

24

Nathan W. Goodyear, MD

```
 1    BY MS. MOORE:

 2         Q.   We'll discuss that, you don't need to

 3    worry about that right now, Doctor.  But with

 4    respect to Ms. Taylor, are there any other documents

 5    that you have in your possession that we have not

 6    already covered today?

 7         A.   Everything that I have is right here.

 8         Q.   Thank you.  I think you mentioned earlier

 9    that you have an independent recollection of Ms.

10    Taylor?

11         A.   Well, the first deposition was with

12    regards to Mrs. Shively.

13         Q.   Mrs. Shively.  Yes.  And I thought --

14    well, do you have an independent recollection of Ms.

15    Taylor?

16         A.   Vaguely.

17         Q.   And what does that mean?

18         A.   Very little.

19         Q.   And what do you remember about her?

20         A.   Basically the memory is basically jogged

21    by what I see in the medical records.

22         Q.   Fair enough.  My records indicate that the

23    first time you saw her was actually June of 2008,

24    and the exact date is June 18th, 2008.  Do you have
```

Nathan W. Goodyear, MD

```
1      that visit, sir?

2            A.   I do.

3            Q.   And what I'd like to do is, however you

4      take me through, the history that she gave you on

5      that visit.  She's 54 years old?

6            A.   That is correct.

7            Q.   She had complaints of fatigue, waking up

8      feeling tired, lack of motivation?

9            A.   Correct.

10           Q.   You commented that she's there concerning

11     malaise and fatigue, and the fatigue is moderate?

12           A.   Correct.

13           Q.   All right.  And then you do a review of

14     symptoms and you find again just positive for

15     fatigue, night sweats, and unintentional weight

16     gain?

17           A.   Correct.

18           Q.   Where is her weight?  I do notice down

19     under objective -- oh, I see it.  Pardon me.  Under

20     objective she's 69 inches tall, 281 pounds and her

21     BMI is 41.5?

22           A.   That's correct.

23           Q.   And how would you characterize her BMI?

24           A.   Morbid obesity.
```

Nathan W. Goodyear, MD

```
 1              Q.   Back up to your assessment of her symptoms
 2       she -- gastrointestinal.  She's positive for
 3       constipation?
 4              A.   Correct.
 5              Q.   No abdominal pain.  Acid reflux, nausea,
 6       vomiting.  Genitourinary:  She has no lesions,
 7       hematuria, menstrual problems, polyuria, abnormal
 8       vaginal bleeding, and vaginal discharge?
 9              A.   Correct.  Just a review of symptoms.
10              Q.   And then she has some -- looks like some
11       musculoskeletal complaints?
12              A.   Yes.
13              Q.   With respect to her gynecological history,
14       you want to tell us what was significant there?
15       She's pregnant twice with two children, vaginal
16       deliveries?
17              A.   Correct.
18              Q.   And so at this point, you do a Pap smear
19       and you find or diagnose a small fissure of the
20       right labia majora.  And then you diagnose -- in the
21       vagina you diagnose rectocele and enterocele.  And
22       she does not have a uterus, right?
23              A.   That is correct.
24              Q.   She's had a hysterectomy?
```

Nathan W. Goodyear, MD

```
 1          A.    That's correct.

 2          Q.    Do you have anything in your records

 3     indicating when she had a hysterectomy?

 4          A.    Under surgical history it says at age 26.

 5          Q.    All right.  Do you have any additional

 6     records that would indicate the cause of some of her

 7     musculoskeletal problems?  Did you have any

 8     additional information at that time?

 9          A.    I did not.

10          Q.    I would like to turn now to your expert

11     report that we have previously marked.  We are about

12     to mark.  And that's going to be No. 38?

13          MS. MOORE:  Let's go off the record for a

14        minute.

15          VIDEOGRAPHER:  The time is 15:58.

16          (Off the record.)

17          VIDEOGRAPHER:  It's 4:00 o'clock.

18          (Exhibit No. 38 marked.)

19     BY MS. MOORE:

20          Q.    Exhibit No. 38, Doctor, has been marked as

21     your Rule 26 Expert Report, and in Ms. Taylor's

22     matter.  And I'd like to turn your attention to the

23     second page.  And you reference in -- under clinical

24     summary, patient first seen on 6/18/2008.  That's
```

Nathan W. Goodyear, MD

1    what we were discussing just a moment ago, correct?

2         A.   Correct.

3         Q.   You say patient was initially seen for

4    fatigue, weight gain, constipation.  You have

5    discussed all those things that were in your note,

6    correct?

7         A.   Correct.

8         Q.   And then you say stress urinary

9    incontinence.  I did not see a diagnosis of stress

10   urinary incontinence on that particular visit in

11   June of 2008?

12        A.   That is correct.

13        Q.   Okay.  So can we just take that out, there

14   was no diagnosis of it at that point in time?

15        A.   At that time, no.

16        Q.   All right.  Now, as in the other cases --

17   strike that.

18             As in Mrs. Shively's case or -- have you

19   had a chance to review the deposition of the

20   plaintiff in this case, Ms. Taylor?

21        A.   Ms. Charlene Taylor, I have not.

22        Q.   And have you reviewed the deposition of

23   the plaintiff in any of these cases?

24        A.   I have not.

Nathan W. Goodyear, MD

1       Q.   So would it surprise you if Ms. Taylor

2   testified that she did not have any pelvic or

3   gynecological problems until you did a pelvic exam

4   on her?

5           MR. KOTT:   Objection.

6           THE WITNESS:   I haven't seen that if

7       that's her testimony.

8   BY MS. MOORE:

9       Q.   Pardon?

10      A.   I haven't seen that, if that's her

11  testimony.

12      Q.   So if she did not have symptoms of any

13  pelvic or stress urinary incontinence problems at

14  the time she first saw you --

15      A.   Constipation.

16      Q.   She had constipation.  But she did not

17  have any other problems, correct, based on your

18  records?

19      A.   Correct.

20      Q.   Is constipation a common finding for -- in

21  your patients' population?

22      A.   It's a common finding for most.

23      Q.   And why is that?  Just due to diet or

24  number of factors?

Nathan W. Goodyear, MD

```
 1              A.    There's a lot of different causes.

 2              Q.    Could you tell the ladies and gentlemen of

 3      the jury some of the factors for constipation?

 4              A.    For example in this case, prolapse

 5      particularly of rectocele or enterocele, especially

 6      of this degree.  Dehydration, so not enough fluid

 7      intake.  Not enough fiber intake, i.e. vegetables,

 8      fruit, etcetera.

 9              Q.    Did you detect any prolapse on this visit?

10              A.    I did.

11              Q.    And where is that?

12              A.    That is under exams.  Genitourinary.  When

13      you come in on a small fissure of the right labia

14      major and it said rectocele, enterocele.

15              Q.    All right.  Thank you.  And the cervix is

16      absent.  Uterus absent.  Okay.  Thank you.

17              Did she have any -- do you believe the

18      constipation was a symptom of the rectocele or the

19      enterocele?

20              A.    Yes.

21              Q.    Which one?

22              A.    Both.

23              Q.    Any other symptoms of the rectocele or the

24      enterocele?
```

Nathan W. Goodyear, MD

```
1          A.    That she had that was related to it?

2          Q.    Yes, sir, on that particular visit.

3          A.    No.

4          Q.    It looks like she returns back to see you.

5    There are a couple of visits.  I'm not going to go

6    through each and every one of them, but I will go

7    through the ones that are a little more detailed.

8               So let's turn now to July 15th, 2008.

9          A.    Okay.

10         Q.    And, again, there's the history and

11   physical.  Chronic constipation, splinting required

12   for evacuation, pelvic pressure and pain noted.

13   What -- would you explain -- what is splinting

14   required for evacuation, what does that mean?

15         A.    Because she had a very large enterocele

16   and rectocele, basically what happens is the

17   Valsalva pressures instead of pushing the feces out

18   the anus, it actually goes into the weakness of the

19   rectocele, enterocele, protruding thus into the

20   vagina since it's the path of least resistance.  So

21   with splinting what's required is where they have to

22   actually push up inside the vagina to offset that.

23         Q.    Now, this is something we really haven't

24   touched on, but this condition, these rectoceles,
```

Nathan W. Goodyear, MD

1    this enterocele prolapse.  They are types of

2    prolapses?

3           A.    Correct.

4           Q.    For women, of course?

5           A.    Correct.

6           Q.    And they would be under the umbrella of

7    pelvic organ prolapse?

8           A.    Correct.

9           Q.    And these types of conditions can be

10   serious conditions for women, would that be fair to

11   say?

12          A.    They can.

13          Q.    And in some instances they can be life

14   altering?

15          A.    Yes.

16          Q.    And in an instance like this where a woman

17   has to actually use her hand to assist in having a

18   bowel movement, that would be pretty severe?

19          A.    Yes.

20          Q.    And throughout your practice, have you

21   seen other instances where pelvic organ prolapse has

22   affected a woman's ability to have an enjoyable

23   life?

24          A.    Yes.

Nathan W. Goodyear, MD

```
 1              Q.   And could you tell the ladies and
 2        gentlemen of the jury some examples?
 3              A.   The pressure.  Pelvic pressure,
 4        particularly with standing, ambulation, walking,
 5        etcetera.  So standing up all day with your work,
 6        the pressure there.  Other issues would be related
 7        to the chronic constipation and the bloating,
 8        etcetera, that accompanies that, because of the
 9        inappropriate movement of the feces.  There can be
10        issues related to pain that radiates down the leg,
11        into the labia.  There can also be pain with
12        intercourse that goes along with that.
13              Q.   And could you also have just embarrassment
14        issues, altering or affecting how you interact or
15        perceive yourself in social settings?
16              A.   Yes.
17              Q.   And problems with sexual relations with a
18        spouse or a partner?
19              A.   I gather it could be.
20              Q.   When you say -- I'm just trying to
21        understand from your perspective.
22              A.   Yes.
23              Q.   And I, obviously, don't want to go into
24        specifics of your patients, other than, of course,
```

Nathan W. Goodyear, MD

1    what we are talking about with Ms. Taylor.

2         A.   It wouldn't necessarily make intercourse

3    impossible, it would just make it less pleasant.

4         Q.   And for some women when you have an organ

5    prolapsing, it can alter their feelings about

6    participating and enjoying sexual activities?

7         A.   You're asking me to jump into somebody's

8    head, but I can see how that would be possible.

9         Q.   Right.  I don't want you to do that.  I

10   just want you to speak to what you know from your

11   experience treating women with these types of

12   conditions.

13        A.   It affects them emotional.

14        Q.   That's what I was trying to understand.

15        A.   Yes.

16        Q.   And why?

17        A.   Because -- usually it's because of their

18   ability to relate to being a woman in a sexual

19   relationship.

20        Q.   And the same type of question with respect

21   to stress urinary incontinence, can that affect a

22   woman's ability to lead a normal life?

23        A.   They can lead a normal life with stress

24   urinary incontinence, yes.  A lot of women do.

Nathan W. Goodyear, MD

1    Q.   And are there some women who it interferes

2    with their ability to lead a normal life?

3    A.   Yes.

4    Q.   And can you based on your -- do you have

5    any experiences or in your experience, do women lead

6    normal lives with stress urinary incontinence?

7    A.   They can lead a normal functional life.

8    It's a quality of life issue.

9    Q.   Okay.  And what do you mean by "quality of

10   life issue"?

11   A.   For example, whether they would be

12   comfortable wearing a pad with jogging or not.

13   That's obviously not going to be conducive to an

14   early mortality, but it's a quality issue as it

15   relates to having to wear a pad because of exercise.

16   Q.   Are there some women in your experience

17   who are hesitant to go out in public because of the

18   concerns of having urinary issues, stress urinary

19   incontinence, or other urinary issues?

20   A.   I don't know that's stretching it to going

21   out in public, but maybe limiting certain

22   activities.

23   Q.   Such as?

24   A.   Such as making sure they don't drink a lot

Nathan W. Goodyear, MD

1    before they go walking.  A lot of water.  It doesn't

2    inhibit them from walking, but they make sure they

3    don't drink a lot of water before they go out.

4         Q.   Have you had instances where patients have

5    described to you accidents that they have had in

6    public?

7         A.   Yes.

8         Q.   That's embarrassing, correct?

9         A.   Yes.

10        Q.   It can be?

11        A.   Yes.

12        Q.   Going back to your office visit on

13   July 15th of 2008.  You talked about in your

14   records; that is, that she has a medical history for

15   depression, hypothyroidism, and sleep apnea?

16        A.   Yeah, that's what she told us.

17        Q.   And she was taking an antidepressant.  One

18   of her stressors -- recent stressors was work?

19        A.   Looking for the medication list.

20        Q.   I think this is under medical history.

21   Got it?  This is before gastrointestinal.

22        A.   Is this back on the initial visit?

23        Q.   The July 15th, 2008.  After the history

24   and physical where it talks about the depression.

Nathan W. Goodyear, MD

```
 1          A.   Yeah, I see the past medical history, but

 2     you referenced the medications.

 3          Q.   Not the specifics, but she's taking the

 4     antidepressant.  It doesn't give a specific.

 5          A.   Yes, I see it.  Sure, she's taking an

 6     antidepressant, yes.

 7          Q.   And her most recent stressor at that time

 8     was her work?

 9          A.   Yes, that's what she stated.

10          Q.   And, again, under the gastrointestinal

11     section, she's positive for constipation, correct?

12          A.   That is correct.

13          Q.   And then genitourinary, what did you find

14     that -- there's negatives there, what did you find

15     that was significant there?

16          A.   I found that she had polyuria, so

17     frequency during the day.

18          Q.   What does that mean, for the ladies and

19     gentlemen of the jury?

20          A.   She was peeing a lot.  Not volume, but

21     frequency.

22          Q.   Meaning constantly having to go to the

23     bathroom?

24          A.   Yes.
```

Nathan W. Goodyear, MD

```
 1              Q.   And she had some abnormal vaginal bleeding

 2       and vaginal discharge?

 3              A.   She had some blood in her urine.  She had

 4       some vaginal bleeding and some vaginal discharge,

 5       that is correct.

 6              Q.   What causes vaginal bleeding?

 7              A.   There can be a wide spectrum.  She's had a

 8       fissure, so that's the most likely cause in that

 9       clinical finding.

10              Q.   Anything else in a postmenopausal woman?

11              A.   There could be atrophic vaginitis.  There

12       could be vaginal cancer.  There could be

13       postmenopausal uterine bleeding.  There could be

14       coming from a bladder infection.  Could be coming

15       from a wide spectrum in that area.

16              Q.   And the discharge, what do you believe is

17       causing her vaginal discharge here?

18              A.   I did not comment on what I thought it

19       was, so just noted vaginal discharge.

20              Q.   What causes a vaginal discharge in woman

21       like Mr. Taylor?

22              A.   Usually it's a bacterial imbalance.

23              Q.   For the ladies and gentlemen of the jury,

24       that would be some kind of infection?
```

Nathan W. Goodyear, MD

```
1            A.   Not necessarily, no.

2            Q.   All right.  Can you describe what a

3      bacterial imbalance is then?

4            A.   There is normal bacteria in the vagina and

5      there is a normal balance that we are aware of via

6      through the literature, and they can become

7      imbalanced.  Say via antibiotics.

8            Q.   Did you have an opinion at this point in

9      time what may have caused Ms. Taylor's vaginal

10     discharge?

11           A.   I did not.

12           Q.   Is that something that's common, you see

13     vaginal discharge in women?

14           A.   Yes.  It's common throughout the normal

15     cycle of a menstruating woman, yes.

16           Q.   How about a postmenopausal woman?

17           A.   It can be also present, yes.

18           Q.   Can it also be common?

19           A.   I guess it depends on how you define it,

20     yes.

21           Q.   How do you define "yes"?

22           A.   Common.

23           Q.   Okay.  Is it something that you frequently

24     see?
```

Nathan W. Goodyear, MD

1          A.   Yes.

2          Q.   Looks like you did an exam next.  And this

3     is something I did not quite understand, and I

4     wanted you to take us through, pelvic organ

5     prolapse, stage three.  What -- how do you -- is

6     that a grading system, staging, phasing system; and

7     if so, could you explain that for us?

8          A.   The POP-Q system is basically agreed upon

9     by ICS, AUS, SGS.

10         Q.   And those organizations are?

11         A.   International Continence Society.  The

12    American Urogynecological Society and the Society

13    for Gynecological Surgeons.

14         Q.   And are you a member of those

15    organizations?

16         A.   I'm not currently.

17         Q.   And why is that?

18         A.   Because I no longer practice pelvic --

19    gynecological, pelvic organ prolapse, urinary

20    incontinence.

21         Q.   Now, these pelvic -- take me through

22    pelvic organ prolapse and how would you stage a

23    prolapse?

24         A.   Do you want me to go through the entire

Nathan W. Goodyear, MD

 1    exam?

 2         Q.   If it's possible, yes.   Thank you.

 3         A.   So come into the examination room with a

 4    nurse.   Have them get up on the bed, lie supine.

 5         Q.   Lie supine?

 6         A.   Flat on your back.   Then I would first

 7    examine her belly.   Okay.   So feel for any masses.

 8    Any tenderness.   Listen to her belly.   Listen for

 9    any, you know, hypo-functioning bowel sounds.   Look

10    for any type of issues there.

11              Then I would let her know that I'm now

12    going to examine her vulva.   So I would let her know

13    that I'm putting on gloves and I'm going to touch

14    her.   So first thing I'm going to do is examine her

15    external vulva.   The labia majora, labia minora.

16    And then her anus, just be a visual inspection.

17    Then I would ask her when was the last time you

18    voided.   And then I would have her cough and bear

19    down.   At that point then what I would do, is would

20    measure her total vaginal length.   I would insert a

21    speculum so as to inspect the cervic, the vaginal

22    walls, anterior, posteriorly.   Then I would proceed

23    to a bi-manual exam.   Where I would then insert my

24    right hand, because I'm right-handed, to manipulate

Nathan W. Goodyear, MD

```
1    the cervix.  My left hand would be on the fundus of

2    the uterus, that would allow me to feel the

3    fallopian tubes, the ovaries, as well to evaluate

4    her pelvic floor for any asymmetries or obvious

5    defects.

6              At that point if I had discovered prolapse

7    of any degree, I would then proceed with a POP-Q

8    examination.  Which is basically a measured system

9    to objectively measure the degree of prolapse and

10   the location of the prolapse.  So at that point I

11   would focus on the anterior measurements, which

12   would be AA and BA, and CC.  Which would be cervix.

13   Okay.  And those measurements, as agreed upon by

14   those organizations, is basically from the hymen,

15   the vaginal opening.  Then at that point, I would

16   also measure the posterior measurements.  A and B as

17   well.  And also if they had a cervic, D would be

18   included in here.  But according to this, D is

19   negative, meaning there was no cervic.  And also

20   measuring the general hiatus, which is from the

21   middle aspect of the urethra opening to the

22   posterior fourchette, which is the posterior aspect

23   of the vaginal opening.  And then the perineal body,

24   which goes from that posterior fourchette, or
```

Nathan W. Goodyear, MD

1    vaginal opening, back down to the middle aspect of

2    the anus.  And then the total vaginal length was

3    already determined at that point.  I would then

4    document that point.

5         I would change gloves and I would then

6    move to do a rectal.  So I put on new gloves so as

7    to palpate for any rectal defects, via digital exam.

8    I would also assess the tone of the external and

9    internal anal sphincter defect.

10        Q.   What is that?

11        A.   The external and internal anal sphincter

12   muscle complex.  For which we did the endoanal

13   ultrasound, if you remember.

14        Q.   Yes.

15        A.   And at that point then I would change

16   gloves, and then I would actually perform the same

17   exam with her standing up so as to assess the

18   pressures of the vulva standing up and to see for

19   the difference objectively between laying and

20   standing.

21        Q.   And based on that examination, your

22   findings for Ms. Taylor were what?

23        A.   That she had a stage three enterocele,

24   rectocele with a prolonged perineal body

Nathan W. Goodyear, MD

```
 1    measurement.

 2         Q.   I wasn't quite sure -- the prolonged

 3    perineal body measurement, what is the significance

 4    of prolonged perineal body measurement, if any?

 5         A.   Well, for her she's got enterocele,

 6    rectocele, so her proximal connected tissue

 7    attachments to the cervic has allowed -- think of it

 8    as a pendulum.  It has allowed her perineal body,

 9    which should only be about three, to basically

10    prolong because of the anterior detachment and so it

11    prolongs.  So the vagina will move down and get

12    stretched.  And so the perineal body gets stretched.

13    Or the perineal body measurement gets stretched.

14    But the detachment is proximal in the vagina.

15         Q.   What's the significance of a stage three

16    finding of an enterocele and rectocele?

17         A.   It's simply based on the number evaluation

18    finding on the POP-Q.

19         Q.   So there's a stage one through --

20         A.   Two, three, and four.

21         Q.   And four being most severe?

22         A.   Four being complete avulsion.

23         Q.   Complete avulsion?

24         A.   Yes.
```

Nathan W. Goodyear, MD

1    Q.   Are there any type of recommendations for

2  when surgery would be recommended?  For example,

3  with a stage three, do you automatically have

4  surgery or is that at stage two or does it vary

5  according to the patient?

6    A.   It varies according to the patient.  Their

7  symptoms that are associated.

8    Q.   So you look for the pelvic organ prolapse

9  stage plus symptoms?

10   A.   Correct.

11   Q.   And what kind of symptoms do you look for?

12   A.   For stage -- as you progress --

13   Q.   The trigger to the point where you would

14  say to a patient like Ms. Taylor, "I think you need

15  surgery and here's why"?

16   A.   The mere presence of the symptoms.  Also

17  understand sometimes the prolapse is so severe that

18  the symptoms actually are no longer there because

19  nerves damaged.

20   Q.   And what -- you said the "mere presence of

21  symptoms," what symptoms are you referring to, just

22  having them would be enough for you to say to your

23  patient, "I really think you need surgery"?

24   A.   Just the mere presence of the symptoms

Nathan W. Goodyear, MD

1    shows that the prolapse is, indeed, symptomatic.

2         Q.   But I'm trying to find out what the

3    symptoms are.

4         A.   For her it's constipation.

5    Constipation -- the splinting required for

6    evacuation, the pelvic pressure, and pain.

7         Q.   And -- okay.  So you look at the symptoms

8    of the patient, plus their pelvic organ prolapse

9    stage in determining what advice or recommendations

10   you would make to a patient?

11        A.   Yes.

12        Q.   Continuing on that same date looking at

13   the genitourinary.  And it looks like everything is

14   normal.  You have vagina atrophic mucosa.  What is

15   that?

16        A.   Atrophic mucosa?

17        Q.   Yes, sir.

18        A.   It is a thinning of the vaginal wall.

19        Q.   And what causes that?

20        A.   Classically low estrogen.

21        Q.   And what causes that?

22        A.   Classically postmenopausal state.

23        Q.   And what can a woman do to -- first of

24   all, is that problematic?  Does that present any

Nathan W. Goodyear, MD

```
1    type of symptoms when your vagina -- atrophic means

2    what?  Drying up?  Shrinking?

3         A.   It's dry.  The vaginal tissue is typically

4    a very moist tissue, and it's typically very dry.

5    It lacks rogation, which is the folds, becomes very

6    thin and flat.

7         Q.   So the mucosa is the layer --

8         A.   The vaginal mucosa, yes, the layer you see

9    visibly.

10        Q.   That you would see, the doctor?

11        A.   Correct.

12        Q.   But that layer is somehow --

13        A.   It just doesn't look as healthy.

14        Q.   And aside from just a physical, is there a

15   quality, it's changed, it's deteriorating in some

16   capacity?

17        A.   For some clients it would be, for some no.

18        Q.   Okay.  So you say, "vagina atrophic mucosa

19   mild"; is that right?

20        A.   Yes.

21        Q.   All right.  So that -- and what kind of

22   problems can you have if you have atrophic vagina?

23        A.   Typically they may complain of some

24   irritation.  Vaginal dryness is a classic symptom
```

Nathan W. Goodyear, MD

1     complaint.

2          Q.   Can you have pain with sexual relations,

3     with intercourse?

4          A.   It can.  It's usually with more severe

5     forms, but it can occur.

6          Q.   That's also, I think we said at one point,

7     that's also known as dyspareunia?

8          A.   That's the medical term, yes.

9          Q.   Then you go on and you talk about

10    rectocele, enterocele, and you have diagrams below.

11    Would you tell the ladies and gentlemen of the jury

12    what is a rectocele and what is an enterocele and

13    where is that in the body?  We talked a little bit

14    about pelvic organs and the pelvic organ floor,

15    what's happening here when you see these conditions?

16         A.   When you look at the pelvis, you basically

17    -- the vagina, excuse me, you're looking at, just

18    imagine, basically two walls.  On top of the wall

19    would be the bladder.  You have the top of the wall

20    of the vagina.  The vaginal space.  The posterior

21    wall of the vagina.  And then behind it the rectum.

22    Okay.  And so rectocele is reference to the rectum,

23    which is the most distal portion of the colon, which

24    is actually a reservoir for holding until removal or

Nathan W. Goodyear, MD

1   elimination at an opportune time socially.

2        Q.   You mean a bowel movement?

3        A.   Exactly.  An enterocele is reference to

4   more of the upper -- above the rectum, colon

5   prolapsing down in.  Okay.  So we are talking two

6   anatomical events occurring in the same general

7   vicinity.

8        Q.   And what causes this?

9        A.   Enterocele and rectocele.  There's

10  typically fascial injuries.  There can be issues

11  related to birth.  It can be simply related to

12  genetics, aging.  There can be issues related to

13  surgery.

14       Q.   So how common is it to have pelvic organ

15  prolapse for women in their menopausal age?

16       A.   Well, probably -- it's a hard question to

17  answer.  Because a lot of women have it and

18  symptomatically they don't know they have it.

19       Q.   Or a lot of women have it and live with

20  it?

21       A.   Yeah, they don't know it's a problem so

22  they live with.

23       Q.   Or they live with it?

24       A.   That's possible, yes.

Nathan W. Goodyear, MD

```
1          Q.    So based on your knowledge, how

2    significant is this as a problem for that particular

3    patient population, women of a menopausal age?

4          A.    It can be a big issue.

5          Q.    How predominant?

6          A.    I'd say 30, 40 percent.

7          Q.    All right.  You have drawn a diagram here

8    for us, and if you could explain your diagram?   I

9    think it's what you took us through a few minutes

10   ago.  I'm looking at your expert -- I apologize.  I

11   am looking at your office visit record on July 15th,

12   2008.  Do you see that?

13         A.    I know what I'm looking for, but I'm just

14   not seeing it in here.

15         Q.    I can give you a copy.  While we are

16   looking for that, do you see on that record another

17   section talking about vaginal enterocele and you're

18   discussing future testing, cystoscopy and

19   urodynamics?

20         A.    In plan?

21         Q.    Yes.  And you talk about counseling, risk

22   factors?

23         A.    Yes.  Testing in office for cystoscopy.

24         Q.    The counseling risk factors; female,
```

Nathan W. Goodyear, MD

1      causation, genetics, multiparity, postmenopausal

2      age, obstetrical injury, prior pelvic surgery.

3      What's the significance of that finding, counseling

4      risk factors, what does that mean?

5          A.   It's really just helping to identify

6      causation or causes.

7          Q.   For the problems -- bless you -- she was

8      having?

9          A.   Yes.

10         Q.   The number of children you have can play a

11     factor in pelvic organ prolapse in some women?

12         A.   It can, but prolapse can occur for women

13     who have never been pregnant.

14         Q.   And does the type of delivery you have

15     play a factor, a vaginal versus forceps or versus

16     cesarean?

17         A.   Again, it can.  The more operative vaginal

18     delivery, the more risk.

19         Q.   More operative meaning?

20         A.   Vacuum, forceps, etcetera.  The more

21     opportunity there is for damage.

22         Q.   Because damage to the pelvic organ floor

23     can weaken the tissues that can lead to prolapse?

24         A.   Correct.

Nathan W. Goodyear, MD

```
1          Q.   Let's go down to July 31st, 2008.  It's a

2     quick -- strike that.

3               I just want to focus in quickly on the

4     assessment.  Looks like she showed up for

5     urodynamics?

6          A.   That's correct.

7          Q.   And there were findings of abnormal

8     voiding.  I could not read all of that.  Marginal --

9     something marginal flow.  Do you see that?  And

10    then, of course, your diagnosis; retention,

11    prolonged voiding phase, obstructive voiding.

12         A.   Where are you looking?

13         Q.   I am on -- it's probably the report of the

14    urodynamic report, I apologize.

15         A.   Oh, okay.

16         Q.   Yeah, I'm going to go back to that in a

17    minute, hold that.  I was jumping ahead to the

18    actual report, which I think was the basis of your

19    assessment in your July 31st, 2008 report.

20         A.   Okay.  The POP-Q, I don't see that.

21         Q.   Here you go, Doctor, you're free to look

22    at whatever you would like.  I just want to focus on

23    the findings and the diagnosis.

24               MS. MOORE:  Here you go?
```

1          MR. KOTT:   Thanks.

2     BY MS. MOORE:

3          Q.   Ready?

4          A.   Yeah.

5          Q.   All right.  What were the findings?

6          A.   Findings were leak point pressure of zero.

7     Max flow rate of 11.8 mils per second.  Maximum

8     attrition (sic) pressure at max flow, 18 centimeters

9     per water.  Maximum attrition pressure 28

10    centimeters of water.  Voided volume, 306.  Residual

11    bladder volume, 105 out to nine ccs.  Urethra

12    pressure measurement was 53 centimeters of water.

13    Mean functional length, 65 millimeters.  In

14    incontinent area, 244 millimeters of water.

15    Diagnosis, marginal attrition pressure.  Marginal

16    flow.  Obstructive voiding.  Diagnosis, retention to

17    prolong voiding phase.  Three, obstructive voiding.

18         Q.   And based on that urodynamic clinical

19    report, you took that into account in your

20    assessment of Ms. Taylor on that same date,

21    July 31st, 2008, correct?

22         A.   Correct.

23         Q.   And your findings; female stress

24    incontinence, vaginal enterocele -- enterocele,

Nathan W. Goodyear, MD

1     female stress incontinence; is that correct?

2          A.   That's correct.

3          Q.   Let's keep going.  Looks like you're doing

4     a cystostomy about a week later, August 8th, 2008.

5               Would you tell the ladies and gentlemen,

6     what is a cystostomy?

7          A.   A cystostomy is using a scope like you

8     would with a laparoscope to actually go up inside,

9     although it's much smaller, into the bladder through

10    the urethra to visualize the bladder and the

11    urethra.

12         Q.   And based on your findings, you diagnosed

13    again female stress incontinence and she also had a

14    Vitamin D deficiency?

15         A.   Vitamin D deficiency was with a blood

16    draw, so not determined by the cystoscopy.

17         Q.   August 12th, she returns?

18         A.   Correct.

19         Q.   And she's -- looks like she's there for

20    uro and cysto results?

21         A.   Correct.

22         Q.   She's still having polyuria, abnormal

23    bleeding, and vaginal discharge?

24         A.   Correct.  Symptoms, they hadn't changed.

Nathan W. Goodyear, MD

1      No new symptoms.

2           Q.   So continuing?

3           A.   Yes, continues.

4           Q.   Your plan at this point was you gave her

5      extensive counseling on options.  It looks like you

6      talked about the etiology of incontinence.  What is

7      the etiology of incontinence, what causes it.  And

8      you talked to her also about the expected

9      progression, treatment options, and types of

10     incontinence.

11          A.   Etiology is getting to the causation, what

12     caused or has led to the causes of the incontinence.

13          Q.   And in her instance, what did you believe

14     was the etiology or the cause of her incontinence?

15          A.   Her hysterectomy, her two vaginal births,

16     her postmenopausal state, her weight.

17          Q.   All of those are factors in causing

18     incontinence because they are putting pressure on

19     the pelvic floor?

20          A.   They all contribute to it.

21          Q.   What was your expected progression for

22     Ms. Taylor, that it could get worse?

23          A.   Yes.

24          Q.   And why is that, because as you age you

Nathan W. Goodyear, MD

1    kind of get weak -- your tissue becomes weaker?

2         A.   Correct.

3         Q.   So you discussed with her options and

4    types of incontinence?

5         A.   Yes.

6         Q.   Greater than 50 percent of your time was

7    spent in face-to-face counseling?

8         A.   Correct.  Yeah, because when you talk

9    about causation, you will often be questioned.

10        Q.   And that's an important part, having that

11   face-to-face opportunity -- face-to-face discussion

12   with a patient and having a chance to answer the

13   questions, correct?

14        A.   Correct.

15        Q.   Bladder physiology discussed.  What does

16   that mean?  Just the actual anatomy and how it

17   works?

18        A.   The functional aspect related to her

19   findings.

20        Q.   And then you go into preoperative plan.

21   And so you had a detailed discussion of risk for

22   treating her stress incontinence?

23        A.   Correct.

24        Q.   And you were discussing with her on this

Nathan W. Goodyear, MD

```
 1      particular visit an option of having surgery with

 2      mesh and particularly with a TVT-O, correct?

 3           A.   Yes.  As part of the sling, yes.

 4                (Exhibit No. 39 marked.)

 5      BY MS. MOORE:

 6           Q.   And the risks that you discussed is

 7      outlined here in your office visit.  And I want to

 8      mark this particular visit, August 12th, 2008, as

 9      Exhibit No. 39.  And the risk that you discussed on

10      that particular day include; infection, hemorrhage,

11      blood product transfusions, 3 to 5 percent erosion

12      risk, failure of reconstructive support, damage to

13      bladder or bowel, excursion of graft, graft

14      infection, death, conversion to a laparotomy, de

15      novo urinary irritative voiding symptoms.  And VTE

16      risks.  Failure of urinary retention.  Those were

17      the risks?

18           A.   Correct.

19           Q.   And these risks that you discussed with

20      Ms. Taylor were risks that you knew based on various

21      sources, including your own experience, training,

22      and what you received from I think other sources,

23      correct?

24           A.   Correct.  Including Ethicon.
```

Nathan W. Goodyear, MD

1          Q.   Including Ethicon.  Now, I believe earlier

2     you referenced --

3          A.   Excuse me, again.

4               MR. KOTT:  The exhibits are to your left,

5          if you have to look through that stack.

6               MS. MOORE:  Bear with me one moment.

7          Let's go off the record for a second.

8               VIDEOGRAPHER:  Sure.  We're going off.

9          It's 4:39.

10              (Off the record.)

11              VIDEOGRAPHER:  We are back on the record.

12         The time is 4:50 p.m.

13              (Exhibit No. 40 marked.)

14    BY MS. MOORE:

15         Q.   All right.  Doctor, earlier when being

16    questioned about the 3 to 5 percent erosion risk

17    listed in your counseling sessions with your

18    patients, including Ms. Taylor, you referenced a

19    particular study.  I'm going to hand you what I've

20    marked as Deposition Exhibit No. 40.  Please feel to

21    look at whatever you would like, and then I'm going

22    to point you in the direction of page 48.

23              Where is my yellow tab?

24              MR. KOTT:  Do we get one?

Nathan W. Goodyear, MD

```
 1                MS. KOTT:  You don't have another copy?

 2                MS. MOORE:  Give me a minute and I'll give

 3         it to you.  Hold on.

 4                MR. KOTT:  If I could get a copy of that.

 5         Off the record.

 6                MS. MOORE:  Know what we can do, just to

 7         keep going -- go off the record.

 8                VIDEOGRAPHER:  Hang on.

 9                (Off-the-record.)

10                VIDEOGRAPHER:  Go right ahead.  16:52.

11         Excuse me 4:52.

12    BY MS. MOORE:

13         Q.   Doctor, we will discuss in a few minutes

14    your information -- the information you had with

15    respect to the erosion risks you discussed with

16    Ms. Taylor.

17                With respect to the other risks that you

18    discussed with her, these are risks that you knew

19    from your surgical training, your experience as a

20    doctor and from the literature and from discussions

21    with colleagues and from your meetings and sessions

22    with the Ethicon team?

23         A.   Correct.

24         Q.   The risks that are outlined in this report
```

Nathan W. Goodyear, MD

```
 1      of August 12th, 2008, I think I marked as exhibit --
 2      I did hand you a copy of that, Doctor, I apologize?
 3           A.   Of what?
 4           Q.   August 12th, 2008.
 5           A.   Yes.
 6           Q.   All right.  And that exhibit is exhibit
 7      number --
 8           A.   No. 38.
 9           Q.   The risks that are listed, and that we
10      have discussed on a couple of patients, are risks
11      that you would also see with non-mesh surgery; is
12      that correct?
13           A.   Some of them.
14           Q.   Well, let's go through them.  In fact, you
15      can see in any other kind of surgery, correct?
16           A.   Correct.
17           Q.   Hemorrhage, bleeding?
18           A.   Correct.
19           Q.   Blood product transfusions?
20           A.   Correct.
21           Q.   We'll talk in detail about the percentage
22      of erosion, but isn't it correct that erosions are
23      seen with other types of surgeries involving
24      cadaver, porcine, or sutures?
```

Nathan W. Goodyear, MD

1           A.    This is particular to the synthetic mesh

2     here so --

3           Q.    I understand the percentages, but the

4     concept of erosion occurring?

5           A.    Anything foreign, yes.

6           Q.    Pardon?

7           A.    Anything foreign implanted, yes.

8           Q.    Absolutely.  So that's something that

9     could occur with other surgeries?

10          A.    Correct.

11          Q.    Failure of constructive support.  With or

12    without mesh, you can have the failure of the

13    support?

14          A.    Correct.

15          Q.    Damage to the bladder or bowel.  You can

16    have that with any surgery in that area, correct?

17          A.    Correct.

18          Q.    Extrusion of the graft.  You can have that

19    with cadaver, porcine, or other grafts?

20          A.    Correct.

21          Q.    Graft infections, you can certainly have

22    that with cadaver or all types of grafts, correct?

23          A.    Correct.

24          Q.    Death unfortunately is seen across the

Nathan W. Goodyear, MD

1    board, and can be seen with any type of surgery,

2    including non-mesh surgeries?

3         A.   Correct.

4         Q.   Conversion to a laparotomy?

5         A.   Correct.

6         Q.   Also seen with those surgeries?

7         A.   Correct.

8         Q.   The de novo urinary irritant voiding

9    symptoms.  That can occur just as a result of

10   surgery in that area, correct?

11        A.   Correct.

12        Q.   And so the jury understands, that when

13   you're in that area doing surgery on a woman, there

14   are potential risks that can occur and one of them

15   would be de novo urinary irritative voiding

16   symptoms.  What does that term mean, de novo?

17        A.   New.

18        Q.   So you were making sure that Ms. Taylor

19   were aware of all these risks, including a VTE,

20   could happen anytime you do surgery?

21        A.   Correct.

22        Q.   And a failure of urinary retention?

23        A.   Correct.

24        Q.   So these are risks that are seen and well

Nathan W. Goodyear, MD

```
 1     known to you long before you did surgery on

 2     Ms. Taylor or any of the other -- or even Mrs.

 3     Shively, correct?

 4          A.   Correct.

 5          Q.   And, in fact, if -- I think these -- not

 6     only did you go in great detail through the risks

 7     with her on August 12th, 2008, it looks like you

 8     took her through a very detailed consent process

 9     with the Prolift, with the TVT-O, and what you

10     called a mesh consent?

11               MS. KOTT:  I'm sorry.  I think you did

12          said Shively just now.  I just want to be clear

13          who we are talking about, which, good luck.

14     BY MS. MOORE:

15          Q.   So the record is clear, I was referring to

16     Ms. Taylor.  And I want to make sure that I'm

17     referencing the consent that Dr. Goodyear went

18     through with Ms. Taylor on August 12th, 2008

19     regarding the Prolift, in TVT-O, and the mesh.

20               MS. MOORE:  And thank you, Counsel.

21               MS. KOTT:  Thank you.

22     BY MS. MOORE:

23          Q.   My question is, you have specific consents

24     for the Prolift and the TVT, why did you also go the
```

Nathan W. Goodyear, MD

```
 1      extra step and have a mesh consent?

 2           A.   That was under guidance from Ethicon.

 3           Q.   Ethicon recommended that?

 4           A.   Yes.

 5           Q.   And where is that?  Meaning where is -- is

 6      there some type of report that you received saying

 7      it's important to have mesh consent?

 8           A.   No.

 9           Q.   Tell me about that, I need to understand.

10           A.   When I created these operative risk

11      assessments, I then gave them to an Ethicon rep to

12      oversee and make sure I was not -- I was stating the

13      risks appropriately.

14           Q.   So you gave --

15           A.   And that's when they recommended there be

16      one for each.

17                (Exhibits No. 41, No. 42 and No. 43

18           marked.)

19      BY MS. MOORE:

20           Q.   Okay.  And I'm going to hand you what I

21      have identified as Exhibit No. 42, 43 -- 41

22      pertaining to Ms. Taylor.  And ask you to take a

23      look at that.  Counsel, we'll get you that.

24           A.   Excuse me?
```

Nathan W. Goodyear, MD

1          Q.   And give you a moment to look at those.

2          A.   Yes.

3          Q.   So, Doctor, you testified that you gave

4     these -- all three consents or just the mesh consent

5     you gave to Ethicon?

6          A.   These were all given to the patient, but

7     yes, when I created these, I wanted -- I gave them

8     to the rep to basically look at and say, "Yes,

9     that's correct."

10         Q.   And who is the rep?

11         A.   I can't remember his name.

12         Q.   So when did this happen, because we did

13    not talk about this earlier today?

14         A.   This would have been in Louisiana, so

15    whoever the rep was in Louisiana.

16         Q.   So you did not do that with Mrs. Shively,

17    you just did this with Ms. Taylor?

18         A.   No, these are all uniform.

19         Q.   And this morning when I asked you details

20    about the consent, you did not --

21         A.   Yeah.  You did not ask about it.

22         Q.   I asked you about -- well, I asked you in

23    detail about conversations with any rep.

24         A.   But you did not ask me the generation of

Nathan W. Goodyear, MD

1     this consent form.

2          Q.   And I asked you in detail about

3     conversations with a rep.  So why don't you just

4     take us through --

5               MR. KOTT:  Object to form.

6     BY MS. MOORE:

7          Q.   -- the rep that you spoke to.

8               MR. KOTT:  Go ahead.  Do the best you can.

9               THE WITNESS:  Just created the consent

10              form per my training, experience, education,

11              etcetera, and the guidance by Ethicon.  And I

12              then handed it to the rep to just read over

13              real quick to make sure it was appropriate.

14              That's fine or changes.

15     BY MS. MOORE:

16          Q.   What did the rep change?

17          A.   No changes.  "Is this okay?  Does this

18     meet what you guys taught me so that I do not

19     overstate?"  And that's fine.  And that's what was

20     happening.

21          Q.   So you wanted to make sure that you were

22     telling your patients not what you knew, but what

23     Ethicon was saying?

24              MR. KOTT:  Object to the form.

Nathan W. Goodyear, MD

```
 1            THE WITNESS:  As I said, I used my

 2       experience, my education, the training and then

 3       get his eyes on it, as well.

 4    BY MS. MOORE:

 5       Q.   And who is this mysterious rep that's

 6    appeared?

 7            MR. KOTT:  Hold on a second.  Object to

 8       the form.

 9    BY MS. MOORE:

10       Q.   Who is the rep?

11       A.   I don't remember his name.

12       Q.   What did he look like?

13       A.   I can't remember.

14       Q.   You can't give us any description of him?

15       A.   Probably dressed different different days.

16       Q.   I'm sorry?

17       A.   He probably dressed different different

18    days.

19       Q.   Of course, I would hope he would, but --

20       A.   I can't recall what he looked like.  That

21    was 2008.

22       Q.   You have no recollection of him or his

23    name, but you do recall --

24       A.   I have a vague recollection in the
```

Nathan W. Goodyear, MD

```
 1      operating room, my office, where he is coming after

 2      me after a Bard rep comes in, he says, "You're not

 3      going to use their product, are you?"  Why would I

 4      have a recollection of who this is?

 5           Q.   Describe him, please.

 6           A.   I can't describe him.

 7           Q.   Can't describe him?

 8           A.   No.

 9           Q.   You can't describe him, you don't know his

10      name, but you do remember that he took the time to

11      look very carefully over these consent forms?

12                MR. KOTT:  Object to the form.

13                THE WITNESS:  Absolutely.

14      BY MS. MOORE:

15           Q.   Okay.  And were there changes he made?

16           A.   I don't recall that.

17           Q.   You don't recall that, either?

18           A.   No.

19           Q.   Anything else that you recall?

20           A.   As it relates to --

21           Q.   Well, let's think long and hard on these

22      consent forms.  I want to make sure we don't go

23      through this again.

24                MR. KOTT:  Object to the form.
```

Nathan W. Goodyear, MD

```
 1    BY MS. MOORE:
 2         Q.   Is there anything else that you haven't
 3    told me with respect to the preparation of your
 4    consent forms?
 5         A.   No.
 6         Q.   Okay.  So the record is clear -- and
 7    you're under oath, right?
 8         A.   Yes.
 9         Q.   And you haven't had a discussion with your
10    Counsel on a break about the consent forms?
11         A.   No.
12         Q.   You haven't had a discussion during lunch
13    about the consent forms?
14         A.   No.
15         Q.   So we are going to make sure we are on the
16    same page.
17              MR. KOTT:  Object to the form.
18    BY MS. MOORE:
19         Q.   You have these consent forms here that you
20    created based on your experience and training,
21    correct?
22         A.   Correct.
23         Q.   And in your experience and training, you
24    were seeing erosion rates close to 15 to 20 percent,
```

Nathan W. Goodyear, MD

```
 1      correct?
 2           A.   I told you that was the erosion rate that
 3      I was seeing when I was at the conference.
 4           Q.   Yes.  That was six months before 2007?
 5           A.   That was in --
 6                MR. KOTT:  Objection.
 7                THE WITNESS:  The conference was in 2007.
 8      BY MS. MOORE:
 9           Q.   Okay.  Sometime in 2007 or before, six
10      months or so, you started seeing erosion rates of 15
11      to 20 percent?
12           A.   In that ballpark, yes.
13           Q.   Well now, is it in that ballpark or is it
14      15 to 20 percent?  Earlier it was 15 to 20?
15           A.   You asked me if I've done a study on it.
16                MR. KOTT:  Objection.  Argumentative.
17           Interrupting the witness.  Not permitting him
18           to answer.  Please get control.  I know it's
19           late and we are tired.  Please let him finish
20           his answer.  Please don't interrupt.
21                THE WITNESS:  You asked for an estimate,
22           and that's what I gave you.
23      BY MS. MOORE:
24           Q.   So it's 15 to 20?
```

Nathan W. Goodyear, MD

1      A.   Yes.

2      Q.   I just want to make sure.  You want to

3   think about it for a moment?

4           MR. KOTT:  Objection.  Commentary.

5   BY MS. MOORE:

6      Q.   Fifteen to 20 percent, that's what we are

7   going with?

8      A.   Yes.

9      Q.   All right.  So you have this erosion rate

10   that you have seen, and you were at a conference and

11   you -- not only did you discuss this, but you were

12   raising this with some other colleagues to Ethicon?

13      A.   I did not raise it to Ethicon.  I raised

14   it to the colleague sitting next to me.

15      Q.   And what did they say?

16           MR. KOTT:  Object to the form.  He said

17           "colleague."  "They" is plural.  "Colleague" is

18           singular.

19   BY MS. MOORE:

20      Q.   I think the record will reflect he said

21   colleagues on many occasions.  But if you'd like to

22   correct that now, please.  Was it a colleague or --

23      A.   The colleague sitting next to me.

24      Q.   So now it's one colleague.

Nathan W. Goodyear, MD

```
 1              MR. KOTT:  Object to the form.

 2    BY MS. MOORE:

 3         Q.   Well, let's just be clear.  Is it one

 4    colleague or colleagues?

 5         A.   The specific conversation I remember

 6    having was the colleague next to my left.  But as

 7    conversations typically go, one conversation joins

 8    two, joins three.

 9         Q.   Okay.  So does that mean -- what does

10    that -- help me out here.  What does that mean?

11    One, two or three conversations with three different

12    people or three different conversations with one

13    colleague to your left?

14         A.   This was a round table, which means it was

15    meant for discussion.

16         Q.   And that helps.  Now we are at a round

17    table and we are discussing erosion rates, is that

18    what you're saying?

19         A.   No, that's what you're leaning to what we

20    are saying.

21         Q.   You tell me, you're at a round table,

22    explain.  You're at a round table and what happened?

23         A.   I've answered you already and you mislead

24    what I said.
```

Nathan W. Goodyear, MD

```
1            Q.   Try again so that we can understand.  Your
2       answers are a little confusing.
3            A.   No.  I say it once and you don't like it
4       so you ask it again.
5            Q.   I'm going to move to strike the comments,
6       Counsel.  I'm here to ask the questions and you may
7       not like them, but that doesn't give you the right
8       to make those kind of comments.
9            A.   They don't bother me.
10           Q.   Well, you are on video.
11           A.   That's fine.
12                MR. KOTT:  So are you.  You're being
13           recorded, you should think about that.
14                MS. MOORE:  I am absolutely fine with my
15           recording.
16                THE WITNESS:  I'm smiling.
17      BY MS. MOORE:
18           Q.   I can tell.  Thank you.  The round table.
19      You're at a round table and at the round table are
20      you discussing erosion?
21           A.   I will describe it for you.
22           Q.   Please.
23           A.   There's a professor standing.  There's a
24      horseshoe.  There's a colleague to my left.  The
```

Nathan W. Goodyear, MD

1    professor that is discussing complications of the

2    Prolift mentions the erosion rate he's, again, in

3    the middle of the midst of the horseshoe.  Talks

4    about his erosion rate.  I lean to the colleague

5    next to me and say, "Wow, that's much lower than

6    anything I've ever seen, let alone mine."  And he

7    goes, "Me, too."

8         Q.   So any other discussions with any other

9    colleagues about erosion rates?

10        A.   That's the specific discussion I remember.

11        Q.   Do you remember the colleague's name?

12        A.   No, I don't.

13        Q.   Do you remember the name of any colleague

14   sitting at the round table?

15        A.   Colleagues, no.  I do remember the

16   lecturer, Dr. Lucente.

17        Q.   You remember the lecturer?

18        A.   Dr. Lucente.

19        Q.   So he was the one that presented and said

20   that the erosion rates were what, 3 to 5 percent?

21        A.   No.  He mentioned his percentage was less

22   than 1 percent.

23        Q.   Okay.  So if we asked Dr. Lucente, and

24   asked the other participants there, he would say

Nathan W. Goodyear, MD

```
 1      that the erosion rate he spoke of on that day was

 2      less than 1 percent?

 3                  MR. KOTT:  Object to the form.  How would

 4          he know what he's going to say?

 5                  THE WITNESS:  I don't know what he will

 6          say.

 7      BY MS. MOORE:

 8          Q.   I'm asking you what he said.

 9          A.   I'm telling you what I remember.

10          Q.   And what you remember is he said that his

11      erosion rates were less than 1 percent?

12          A.   Yeah.

13          Q.   And despite your experience being

14      different, and your colleague to the left being

15      different, you deferred your medical judgment and

16      told your patients it was what Ethicon said?

17                  MR. KOTT:  Object to the form.

18      BY MS. MOORE:

19          Q.   Is that fair?

20                  MR. KOTT:  Object to the form.

21      BY MS. MOORE:

22          Q.   Because if I'm wrong, let me know.

23          A.   I did not defer my judgment.

24          Q.   Well, whose judgment is here?
```

Nathan W. Goodyear, MD

```
 1              MR. KOTT:  Hold on.  Please don't

 2         interrupt the witness.  My goodness.

 3              MS. MOORE:  You don't need to raise your

 4         voice.

 5              MR. KOTT:  That's so basic.

 6              MS. MOORE:  You don't need to raise your

 7         voice.  That's so basic.

 8              MR. KOTT:  It's so basic to let him finish

 9         his answer.  I'm sorry, I will not raise my

10         voice.

11              MS. MOORE:  I agree.  And I apologize if I

12         interrupted.

13              MR. KOTT:  Thank you.  And I apologize if

14         I raised my voice.

15    BY MS. MOORE:

16         Q.   Start over.

17         A.   There is no study that shows the same

18    erosion rate, the same number of erosions, the same

19    complications.  They each present different erosion

20    rates, that's why your training, the education, your

21    experience, the multitude of the journal articles

22    involved help you to create a range.

23         Q.   Thank you.  And it was based on that

24    information that you put three to five percent?
```

Nathan W. Goodyear, MD

1        A.   Yes.

2        Q.   So that wasn't -- the three to

3    five percent that you have warned your patients

4    about was not based upon your own experience, but

5    what you had gathered from others; is that fair to

6    say?

7        A.   Again, I said it was with my experience,

8    my education, the reading of the journals, along

9    with the other education, experts, etcetera.

10       Q.   All right.  And so was your experience

11   three to five percent or 15 to 20 percent?  Because

12   what did you put anything other than your experience

13   in a warning to a patient?

14            MR. KOTT:  Objection to the form.

15            THE WITNESS:  Ma'am, I told you when I

16       presented these consent forms, I wanted to

17       present them as accurate as possible to my

18       clients.  And these were given to the Ethicon

19       rep to say, "yep, that is correct."

20   BY MS. MOORE:

21       Q.   And you defer to an Ethicon rep -- is the

22   Ethicon rep a doctor?

23       A.   No.

24       Q.   You're going to let that Ethicon rep

Nathan W. Goodyear, MD

1    proceed your judgment on the risks for erosion that

2    you're going to tell a patient?

3              MR. KOTT:  Objection to form.

4              THE WITNESS:  He did not change anything.

5         My review of the literature and my expertise

6         and the training by Ethicon and the

7         recommendations by Ethicon was to put those

8         numbers there.  And that's what I did.  I did

9         not pull those numbers out of thin air.

10   BY MS. MOORE:

11        Q.   Where are the numbers?

12        A.   There are numbers in every study that's

13   different.

14        Q.   And I appreciate that, sir.  But where --

15   can you point to anything?  Because everything you

16   showed us, where is one document showing 3 to

17   5 percent, name one?

18        A.   Okay.  The document that was brought up in

19   cross examination, which is the hysterectomy, 1 to 6

20   percent.  Reduces the erosion rate to 1 to

21   6 percent.

22        Q.   Let's talk about that for a second.  Okay.

23   We'll pull that document out.  First -- so the

24   record is clear, while we are getting that, why

Nathan W. Goodyear, MD

```
1     wouldn't you pick a set of numbers and include the
2     upper and lower limits when warning your patients?
3     Why wouldn't you -- instead of going 3 to 5, why
4     wouldn't you say 3 to 20 --
5               MR. KOTT:  Objection.
6     BY MS. MOORE:
7          Q.   -- if that's what you're hearing?
8               MR. KOTT:  Object to the form.
9     BY MS. MOORE:
10         Q.   Because that would have captured your
11    experience and what you're hearing from Ethicon, and
12    as you said the numbers were all over the place,
13    right?
14         A.   I did not hear 20.
15         Q.   I thought you said your experience was 15
16    to 20?
17         A.   I said mine was, but I did not hear that.
18         Q.   Okay.  It's more important what you know
19    in your experience or what you're told by others?
20              MR. KOTT:  Objection to the form.
21              THE WITNESS:  Everything collectively
22         together to make sound judgment.
23    BY MS. MOORE:
24         Q.   And you believe now you made sound
```

Nathan W. Goodyear, MD

```
 1      judgment?

 2           A.   I do.  On the information I had available

 3      from Ethicon at the time, based on the studies that

 4      they provided to us.

 5           Q.   Okay.  You're going to defer to a sales

 6      rep for approval of a patient consent form?

 7                MR. KOTT:  Object to form.  Repetitive.

 8                THE WITNESS:  I said I did not defer to

 9           him.

10      BY MS. MOORE:

11           Q.   But you asked for his approval?

12                MR. KOTT:  Object to the form.

13                THE WITNESS:  I asked for him to look it

14           over and make sure that the writings I had

15           there was accurate.

16      BY MS. MOORE:

17           Q.   You had the final say, though, didn't you,

18      sir?

19           A.   Yes.

20           Q.   You're the doctor?

21           A.   Yes.

22           Q.   The buck stops with you?

23                MR. KOTT:  Object to the form.

24
```

Nathan W. Goodyear, MD

```
 1     BY MS. MOORE:
 2          Q.   You're the captain of the ship?
 3               MR. KOTT:   Stop this.  Object to the form.
 4          There's no captain of the ship theory of law in
 5          this state at this point in time.
 6     BY MS. MOORE:
 7          Q.   Who practices medicine in your practice?
 8     I mean --
 9          A.   Can you rephrase the question?
10          Q.   No.  I'll withdraw the question.
11               Ethicon was not the only source that you
12     had, so why did you defer to just to that source?
13     You talked about all these sources, and yet you
14     deferred to just one, why?
15          A.   I didn't say I just deferred to just one.
16     You're saying that I would just defer to one study.
17     I did not defer to one study.  I did not defer to
18     one expert.  I did not defer to one rep.  I did not
19     defer to one surgical procedure, experience or
20     residency.
21          Q.   All right.  Here we go.  Let's go first to
22     I believe I hand -- did we give this to them yet?
23               If you will look at what we previously
24     marked as No. 40.  And, sir, if you will turn --
```

Nathan W. Goodyear, MD

```
1              A.   I don't have this.

2              Q.   You don't have No. 40?  If you want to

3       take a moment to look at it?

4                   MR. KOTT:  Better go off the record, if

5              you want to conserve your time.

6                   MS. MOORE:  Thank you.

7                   MR. KOTT:  You want to reference a page?

8              If you did already, I forget what it was.

9                   MS. MOORE:  I think I'm focusing on

10             page --

11                  MR. KOTT:  Page 48?

12                  MS. MOORE:  Yes, sir.

13                  MR. KOTT:  These things cut both ways,

14             these documents.  No. 48.  Page 48.

15                  How much time do we have left?

16                  VIDEOGRAPHER:  An hour and 20 minutes.

17                  MR. KOTT:  An hour and 20 minutes.  Okay.

18                  THE WITNESS:  Are you waiting on me?

19      BY MS. MOORE:

20             Q.   We are back on the record.

21                  And, Doctor, I believe you had an

22      opportunity to look at what we have marked as

23      Exhibit No. 40.  Turn to page 48 on the mesh

24      exposure operation.
```

Nathan W. Goodyear, MD

1              Now, when I was asking you questions

2       earlier about the basis for your opinion of the 3 to

3       5 percent erosion risk, you referenced this

4       particular study.  And I want to make sure what in

5       the study would support your recommendation to your

6       patients of warning them about a 3 to 5 percent

7       erosion risk?

8              A.   Again, this was one reference.  You asked

9       me for a reference, you were particularly talking

10      about the TVM.  This was one reference to meet that.

11             Q.   I'm asking for any reference at all that

12      you have with respect to 3 to 5 percent erosion

13      risk.

14             A.   But you're implying that this is the only

15      reference I'm making.

16             Q.   I'm sorry.  Please tell me all the

17      references, I'm sorry.

18             A.   The references we have included.

19             Q.   Where are they?  Okay.  We'll go through

20      that in a minute.  But this was one you specifically

21      looked at, and you said this supported your

22      statement that Ethicon provided you information

23      showing that the erosion risk was 3 to 5 percent.

24      And I'm asking you, we have the document in front of

Nathan W. Goodyear, MD

```
 1      us, where does it say that?

 2            A.   It doesn't say 3 to 5 percent.

 3            Q.   All right.  Now, do we need to go off

 4      record and let you look at the reference list?  I'm

 5      looking for that document.  So if you want to go off

 6      record, take a few moments to look through your

 7      reference list?

 8            A.   Okay.

 9            MS. MOORE:  Let's go off the record.

10            VIDEOGRAPHER:  The time is 5:19.

11            (Off the record.)

12            VIDEOGRAPHER:  Okay.  We are back on the

13      record.  The time is 5:21.

14      BY MS. MOORE:

15            Q.   And, Doctor, I'm going to ask you to look

16      through the reference list, and not your Counsel.

17            A.   Understood.

18            Q.   Okay.  So --

19            A.   One thing when you average these four

20      together, it's 4 percent.

21            Q.   Okay.  That's fine.  But you have 3 to 5

22      in your consent.  And --

23            A.   1 to 6 percent was per that other one we

24      referenced.
```

Nathan W. Goodyear, MD

```
 1              Q.   Let's look at that one then.  That's in

 2      the monograph, if you want to pull that, I believe

 3      it's exhibit --

 4              MR. KOTT:  It should be in the exhibit

 5         pile marked.

 6              MS. MOORE:  I believe you're right.

 7              MS. CAPODICE:  It's No. 17.

 8              MR. KOTT:  It's No. 17.

 9              MS. MOORE:  Seems like a lifetime ago,

10         doesn't it?  Let's turn to that reference.

11              MS. KOTT:  Page eight.

12      BY MS. MOORE:

13              Q.   You have a good memory.  Let's look at

14      that sentence, it says, "Experience and avoiding

15      hysterectomy when possible will reduce the rate to 1

16      to 6 percent."  So this -- strike that.  I

17      apologize.  Let me begin.

18              The paragraph is, "This is to be

19      contrasted with the known occurrence of simple

20      vaginal mesh exposure.  It occurs in approximately 3

21      to 17 percent of cases.  Experience and avoiding

22      hysterectomy when possible will reduce the erosion

23      rate to 1 to 6 percent."  So that's a specific

24      subpopulation, correct?
```

Nathan W. Goodyear, MD

1          A.   It means if you do it at the time of a

2     hysterectomy, it expands your risk.  If you do it

3     not at the time of hysterectomy, it's more.

4          Q.   Right.  And that's a subpopulation?  We

5     are not talking about that.  You weren't doing a

6     hysterectomy --

7               MR. KOTT:  Object to the form.

8               THE WITNESS:  It's saying when a

9          hysterectomy is not done or has been done.

10    BY MS. MOORE:

11         Q.   It's a subpopulation, correct?

12    "Experience and avoiding hysterectomy when possible

13    will reduce the rate to 1 to 6 percent," correct?

14         A.   Yeah, if she had already had a

15    hysterectomy.

16         Q.   And that's the population, right?

17         A.   That she's in the 1 to 6 percent.

18         Q.   And if you look at -- how come you're

19    willing to accept that, but the sentence right

20    before says, "it occurs in approximately 3 to 17

21    percent of cases"?  3 to 17 is overall?

22         A.   That's a wide range.  3 to 5 percent is

23    what I quoted.

24         Q.   Sir, have you heard of cherrypicking?

Nathan W. Goodyear, MD

```
 1                    MR. KOTT:  Object to the form.

 2                    THE WITNESS:  I've heard of the term, yes.

 3          BY MS. MOORE:

 4               Q.   You have information here that was

 5          available to you before you did surgeries on the

 6          patients at issue today, correct?

 7               A.   Does not 3 to 5 percent fit in both of

 8          those?

 9               Q.   Sir, this information was available to you

10          before you did surgery on the patients?

11               A.   Correct.

12               Q.   You had the opportunity to review the

13          monograph?

14               A.   Correct.

15               Q.   And the document that you had in your

16          possession, that you read says under, "Mesh

17          Complications: Erosion, Exposure and Extrusion.

18          This is to be contrasted with the known occurrence

19          of simple vaginal mesh exposure.  It occurs in

20          approximately 3 to 17 percent of cases," correct?

21               A.   That's --

22                    MR. KOTT:  When you say correct, you mean,

23               "Am I reading it correctly?"

24                    MS. MOORE:  Yes.
```

Nathan W. Goodyear, MD

```
1    BY MS. MOORE:

2         Q.   Am I reading that correctly?

3         A.   Yes, you are reading that correctly.

4         Q.   "Experience and avoiding hysterectomy when

5    possible will reduce the rate to 1 to 6 percent,"

6    correct?

7         A.   That is correct as you read it.

8         Q.   And you chose -- you selected only what

9    fit your theory; and not again, the complete

10   picture, correct?

11            MR. KOTT:  Objection.

12            THE WITNESS:  No.  Not theory --

13   BY MS. MOORE:

14        Q.   Why did you reference 1 to 6 and not 3 to

15   17?  That was closer to your experience.  3 to 17 is

16   closer to 15 to 20, which is your experience.

17            MR. KOTT:  Objection.

18   BY MS. MOORE:

19        Q.   Wouldn't it be safer to tell a patient a

20   higher potential risk than a lower?  Why were you

21   saying the lower risk?

22            MR. KOTT:  Objection.  You're asking

23        compound questions now.

24            THE WITNESS:  And, again, as I told you,
```

Nathan W. Goodyear, MD

```
 1              this is one reference for many that go into the

 2              generation of this range.

 3        BY MS. MOORE:

 4              Q.   And where are the other references?

 5                   MS. MOORE:  Off the record.

 6                   VIDEOGRAPHER:  Okay.  We are going off.

 7        The time is 5:25.

 8                   (Off the record.)

 9                   VIDEOGRAPHER:  We are back on the record.

10        The time is 5:26.

11        BY MS. MOORE:

12              Q.   Doctor, earlier you testified that the

13        representation to your patients of a 3 to 5 percent

14        erosion risk came from information you received from

15        Ethicon, correct?

16              A.   In addition and as a part.  In addition,

17        there were journals, articles, that were included in

18        that as well.

19              Q.   Okay.  So now it wasn't solely from

20        Ethicon?

21              A.   I didn't say that.

22              Q.   Oh.  So what information came from

23        Ethicon?  The information that we just referenced in

24        the monogram?
```

Nathan W. Goodyear, MD

1          A.   That was one part of the studies and

2     information that I used to bring together my

3     opinion.

4          Q.   So that was one part, anything else from

5     Ethicon?

6          A.   As I told you, I also then wrote it, and

7     just to make sure that the literature supported what

8     I was writing there, got the eyes of the rep.

9          Q.   Okay.  But I want to know, is there

10    anything else on your reference list or that you

11    have relied on from Ethicon that would support your

12    representation to patients of an erosion risk of 3

13    to 5 percent?

14         A.   What's listed here is the studies that I

15    used to generate that.

16         Q.   So if it's -- strike that.

17              As you sit here today, though, you can't

18    point to anything else on your list?

19              MR. KOTT:  Other than what he's already

20         pointed to?

21    BY MS. MOORE:

22         Q.   Other than the monograph.  And then you

23    referenced this -- let me make sure I understand.

24    You referenced what we marked as --

Nathan W. Goodyear, MD

1          A.    The TVM study.

2          Q.    -- Exhibit No. 40.  And then that

3     particular study, Doctor, you said that the average

4     number here is 6.  But you can't average, because

5     they are not the same samples, correct?

6          A.    Some are actually lower.

7          Q.    So you're mixing the populations here and

8     choosing to interpret this to your benefit?

9               MR. KOTT:  Object to the form.

10    BY MS. MOORE:

11         Q.    Would you say that the discussions you

12    have -- the informed consent discussions that you

13    have are important discussions with patients?

14         A.    Yes.

15         Q.    And especially in light of accusations

16    that you've had in the past of not giving proper

17    consent?

18              MR. KOTT:  Object to the form.

19              THE WITNESS:  You did not finish.

20    BY MS. MOORE:

21         Q.    With the background -- with your

22    experience of being sued for not giving -- for a

23    patient not having appropriate consent?

24         A.    I don't know where you're coming up with

Nathan W. Goodyear, MD

1      that.

2          Q.   You don't?  Well, because you went through

3      a lawsuit where it was alleged that the patient did

4      not have appropriate consent, and there was a

5      surgery that occurred.  Do you remember that?

6              MR. KOTT:  Object to the form.

7              THE WITNESS:  I think that was clear

8          enough I didn't give the consent.  I didn't do

9          the surgery.  I was named because I was in the

10         operating room.

11     BY MS. MOORE:

12         Q.   I understand that's what you're saying

13     now.  All I'm saying is that you were sued in the

14     Complaint?

15         A.   I'm not saying that's what happened.

16         Q.   And that's fine, the Complaint says

17     something else?

18         A.   Yes, it did.

19         Q.   And you said earlier people have a right

20     to sue?

21         A.   As it was brought up, there was no

22     verdict, there was no money paid, and it ended.

23         Q.   And there was an allegation, though, that

24     you performed a battery on a patient because you did

Nathan W. Goodyear, MD

```
1      surgery without an informed consent, correct?
2              MR. KOTT:  Objection.
3              THE WITNESS:  And proved not to be the
4          case.
5      BY MS. MOORE:
6          Q.  That's your opinion?
7          A.  No, that's the final verdict.
8          Q.  Well, there was an allegation, right?  And
9      we're talking today of allegations, right?  You're
10     throwing out allegations here, so I want to make
11     sure in the informed consent process -- that's an
12     important process, right?
13             MR. KOTT:  Objection to the commentary, to
14         the statements, argumentative nature of what is
15         being purported to be questioning.  So please
16         keep that in mind and pose the question to
17         him -- a question that he can answer as opposed
18         to soliloquy.
19     BY MS. MOORE:
20         Q.  Informed consent is a very important
21     process with a patient, correct?
22         A.  Correct.
23         Q.  And if you're going to tell a patient
24     about risks, why would you error on the low side
```

Nathan W. Goodyear, MD

1      when your experience shows otherwise?

2           A.   I erred on the side of --

3                MR. KOTT:  Objection.  Let him answer,

4           please.

5      BY MS. MOORE:

6           Q.   Please answer, I'm sorry.  I do want to

7      hear the answer.

8           A.   The information available at the time is

9      what was used.

10          Q.   You allowed information available at the

11     time to override your own personal experience of a

12     higher risk?

13               MR. KOTT:  Object to the form.

14               THE WITNESS:  The experience includes

15          studies, operative experience, surgical

16          experience included.  All of that is included.

17     BY MS. MOORE:

18          Q.   But, Doctor, those other people weren't

19     doing the surgery, you were doing it and it was your

20     track record?

21               MR. KOTT:  Objection to the soliloquy.

22          There is no question.  This is argumentative.

23          Either put a question before him or don't

24          respond to the soliloquy.

Nathan W. Goodyear, MD

1    BY MS. MOORE:

2        Q.   Let me ask you this.  If you were having

3    surgery, would you want the doctor to tell you what

4    the literature report was on the success rates or

5    the doctor's own experience?

6        A.   I would want a wide-spectrum analysis of

7    the risks.

8        Q.   And if you don't, you lowballed it, how

9    would that be?

10           MR. KOTT:  Objection to the form.

11           MS. MOORE:  We'll move on.

12           MR. KOTT:  Thank you.

13   BY MS. MOORE:

14       Q.   Let's keep going.  Let's see.  Let's turn

15   to October 7th, 2008.

16       A.   Okay.

17       Q.   Looks like the patient is there for bowel

18   prep instructions.  And, again, you go through the

19   risks again with her.  Is there a reason that you

20   felt it was necessary to go through the risks again?

21       A.   That was probably just something we did at

22   that point.  I don't recall the relationship to

23   that.

24       Q.   Okay.  And, again, you talked about the

Nathan W. Goodyear, MD

```
 1    same risks.  And, obviously, she -- all right.  It

 2    looks like the next visit -- well, there's your

 3    operation of the patient on October 21st.  And you

 4    want to take a moment and look at that particular

 5    report?

 6         A.   Yes.

 7         Q.   And tell me when you please have it in

 8    front of you.

 9         A.   I have it right now.

10         Q.   Pre-op diagnosis was a 52-year-old with

11    stage two enterocele and rectocele.  Is that what

12    you see?

13         A.   That's what I see.

14         Q.   Now, I thought we saw stage three

15    enterocele and rectocele earlier?

16         A.   That is correct.

17         Q.   So this is a pre -- when did it change?

18         A.   It didn't.

19         Q.   So help me here.

20         A.   It's stage three.

21         Q.   But the record says stage two?

22         A.   Yeah.

23         Q.   Why is that?

24         A.   Probably a misstating in the operative
```

Nathan W. Goodyear, MD

1      report.

2              Q.   But it is a stage three?

3              A.   Yes, it is.

4              Q.   How do you know?

5              A.   Based on the POP-Q examination.

6              Q.   And you did a posterior Prolift and a

7      TVT-O.  Your findings, a large enterocele,

8      rectocele, high-mid and low.  What does high-mid and

9      low mean?

10             A.   Implying the anatomical sites of where

11     this is occurring.  So in terms of the rectocele,

12     it's low and it's high in the rectum.  And then

13     enterocele is high posterior vaginal.  It's really

14     giving anatomical site to the posterior vagina.

15             Q.   All right.  Let's go then -- your post --

16     let's look at your post procedure note, 10/21/08.

17             A.   I see November 4th.

18             Q.   I'm looking at --

19             A.   Operative report was 10/21.

20             Q.   Right.  And the post procedure -- bear

21     with me one moment.  Okay.  Under -- do you have

22     this copy here, sir?

23             A.   Yes.

24             Q.   All right.  Let's look at that.  This is a

Nathan W. Goodyear, MD

```
1     post procedure note.  What's a post procedure note?

2          A.   It's a procedure note to -- it's different

3     than the operative note, just to be simple and

4     concise.

5          Q.   And reporting on what took place in the

6     surgery?

7          A.   Yes.

8          Q.   And that's your signature?

9          A.   It is.

10         Q.   And it says pre -- post procedure

11    diagnosis, stage two enterocele and rectocele.  Post

12    procedure same?

13         A.   Same.

14         Q.   Same?

15         A.   Stage two enterocele, rectocele TVT.  It

16    does say the same, yes.

17         Q.   Right.  And so was it stage two or stage

18    three?

19         A.   It was stage three.  Stage three is plus

20    one or higher.

21         Q.   But you said stage two in pre-op and now

22    in post-op you're saying -- after the surgery you're

23    saying stage two?

24         A.   As I mentioned, that was an error.
```

Nathan W. Goodyear, MD

```
1      Because the POP-Q confirmed it's a stage three.

2           Q.   The POP-Q was on the physical exam?

3           A.   That's correct.

4           Q.   Let's see go --

5                MR. KOTT:  Are we at a point we can take

6           five?

7                MS. MOORE:  Of course.

8                VIDEOGRAPHER:  We are going off the

9           record.  The time it 5:36.

10               (Off the record.)

11               VIDEOGRAPHER:  We are back on the record.

12          The time is 5:41 p.m.

13     BY MS. MOORE:

14          Q.   Okay, Doctor, we are back.  It's been a

15     long day.  I'm going to try to move quickly.  We

16     have gone through a lot.  I'm going to try to work

17     through the records.  And I think you have them in

18     front of you, so that should help facilitate.

19               Let's look quickly, obviously take as much

20     time as you would like, but look at November 4th,

21     2008.  And this is an office visit, follow-up visit

22     from surgery.  And it indicates under genitourinary.

23     My question is, there was a reference of a likely

24     hematoma?
```

Nathan W. Goodyear, MD

1           A.    There is.

2           Q.    And what is that about?

3           A.    It was a -- a hematoma is a collection of

4      blood underneath.

5           Q.    And what can cause a hematoma?

6           A.    Operation.

7           Q.    That's just a risk of surgery with and

8      without mesh, correct?

9           A.    Correct.

10          Q.    And does it -- that's not related to the

11     mesh surgery or to your technique?

12          A.    I'm sorry, can you restate?

13          Q.    Is that hematoma related to your

14     technique?

15          A.    No.  Because my technique was as Ethicon

16     taught.

17          Q.    I did not understand.

18          A.    My technique was as Ethicon taught.  As,

19     A-S.

20          Q.    The hematoma wasn't related to your

21     technique, because you were trained as Ethicon

22     taught?

23          A.    You asked me if it was my technique; and I

24     said no, I did the technique as Ethicon taught it.

Nathan W. Goodyear, MD

1       Sorry.

2            Q.   How much does your professional judgment

3       come in when you're treating a patient?  Do you do

4       what you think is best, or do you listen to what you

5       have been told by others?

6                 MR. KOTT:  Objection.  Asked and answered

7            50 times.

8                 THE WITNESS:  I'm doing what I think is

9            best for the client at that time.

10      BY MS. MOORE:

11           Q.   And so what do you think caused the

12      hematoma in the client?

13           A.   Related to the surgery.

14           Q.   And can a hematoma interfere with normal

15      healing?

16           A.   It usually doesn't interfere, it just

17      causes the healing to be a little more prolonged.

18           Q.   There is literature indicating it can

19      interfere -- indicate with normal healing, correct?

20           A.   Yeah, it can prolong it.

21           Q.   And it can also increase the risk of mesh

22      exposure, correct?

23           A.   Correct.  Can increase complications.

24           Q.   So even with adequate training things can

Nathan W. Goodyear, MD

```
 1      happen during a procedure that can lead to a

 2      hematoma, unknown risk factor, correct?

 3          A.   Correct.

 4          Q.   And even in surgery, things like hematomas

 5      can occur that can increase the risk of mesh

 6      exposure, correct?

 7          A.   Correct.

 8          Q.   Let's look at the next visit, it's

 9      11/19/08.  She appears to be doing well without any

10      significant symptoms.  You see that, sir?

11          A.   I see 11/19.  But I'm looking for the

12      statement you made.

13          Q.   11/19/08.  It would be under history and

14      physical.

15          A.   Am I missing the history on this?

16          Q.   And it's down -- I'm sorry, top paragraph

17      under HPI beginning with additionally.  And it is

18      the third sentence from the end, currently.

19          A.   I go from November 4th, and I'm obviously

20      missing that page.

21          Q.   I'll be happy to give you a copy, and your

22      Counsel.  This is going to be Exhibit No. 44.

23               (Exhibit No. 44 marked.)

24               MR. KOTT:  Thank you.
```

Nathan W. Goodyear, MD

```
 1    BY MS. MOORE:

 2         Q.   And this is again referenced as the

 3    November 19th, 2008 visit.  And do you see where I

 4    am about, "currently, she's doing well," that's in

 5    the second paragraph under HPI?

 6         A.   I do.

 7         Q.   She's doing well without any significant

 8    effective symptoms?

 9         A.   Vaginal bleeding has stopped.  Feeling

10    much better, correct.

11         Q.   And under genitourinary it's negative for

12    genital lesions, hematuria, menstrual problems,

13    polyuria, abnormal vaginal bleeding, and vaginal

14    discharge.

15              MR. KOTT:  The review of systems.

16              THE WITNESS:  Okay.  Review of systems.

17         Yes, correct.  I thought you were in physical

18         exam.

19    BY MS. MOORE:

20         Q.   No worries.  And, Doctor, if you would

21    look at page three of your report.  So let's keep

22    that in front of you, what we just read under

23    symptoms, as your Counsel pointed out.  And let's

24    look at page three.
```

Nathan W. Goodyear, MD

1          MR. KOTT:  No, it was under review of

2      systems is what Counsel pointed out.

3          MS. MOORE:  Thank you, Counsel.

4      Appreciate the clarification.

5   BY MS. MOORE:

6      Q.  If you would turn to page three of your

7   report.  And let's look under that particular visit.

8   Let's go down under -- it's the second paragraph --

9   full paragraph.  The patient has complained, do you

10  see that?

11     A.  Page three, second paragraph.  Okay.  Yes.

12     Q.  "Patient complained of persistent vaginal

13  bleeding from the immediate post-op period following

14  her 2008 implant surgery to current."  And you're

15  referencing exam on 11/5/15.  I'm sorry.  You're

16  referencing, October 2008.  Implant surgery to

17  current.  Correct?

18     A.  Correct.

19     Q.  And she's not having any bleeding problems

20  on this particular visit, and as your record

21  indicates, she hasn't had persistent vaginal

22  bleeding from the immediate post-op following her

23  October 2000 (sic) implant surgery to current?

24     A.  Well, I said she had no bleeding at that

Nathan W. Goodyear, MD

1    point, it had stopped.

2          Q.   But your report indicates, does it not,

3    that the patient has complained of persistent

4    vaginal bleeding from the immediate post-op period

5    from the October 2000 (sic) implant surgery to

6    current.  Is that what your report says?

7          A.   That is correct.

8          Q.   And is that accurate based on your own

9    records?

10         A.   Here at this point, there was no bleeding.

11         Q.   But your records -- your report rather

12   indicates persistent vaginal bleeding from immediate

13   post-op following October 2008, implant surgery to

14   current?

15         A.   Correct.  But when you look at Dr. Winters

16   and you look at Dr. Galloway, you see that there was

17   vaginal bleeding.

18         Q.   I'm not asking about their experience.

19   I'm asking about your care and treatment of the

20   patient.

21         A.   I can tell you what we are looking at

22   right there is simply I'm saying there was no

23   bleeding at that exam point.

24         Q.   Well, you actually say a little bit more

Nathan W. Goodyear, MD

```
 1      than that, don't you?

 2            A.   I said vaginal bleeding had stopped.

 3            Q.   And so if there's no vaginal bleeding,

 4      it's not persistent?

 5            A.   There's no vaginal bleeding at that

 6      moment.

 7            Q.   Does that mean it's persistent?  Help me

 8      out here.

 9                 MR. KOTT:  Object to the form.  Object to

10            form.

11                 MS. MOORE:  I'll withdraw that question.

12      BY MS. MOORE:

13            Q.   Doctor, what is persistent bleeding?

14            A.   Persistent bleeding means regular

15      bleeding.

16            Q.   And she wasn't bleeding on that particular

17      visit, was she?

18            A.   At that visit she was not.

19            Q.   Let's go now to December 15th, 2008.

20            A.   Okay.

21            Q.   You have got under genitourinary --

22            A.   Under review of symptoms?

23            Q.   Yeah.  Genitourinary.  External genitalia.

24      Trocar sites well healed.  Vagina good pelvic
```

Nathan W. Goodyear, MD

1    support.  Small exposure, probably site of hematoma.

2         A.   No.

3         Q.   I'm sorry, it's under physical exam.

4         A.   Physical exam, yes.

5              MR. KOTT:  ROS is review of systems.

6         Okay.  That's just general questions for all

7         the body.  Now, where are we?  Physical exam,

8         okay.

9    BY MS. MOORE:

10        Q.   You see that?

11        A.   Yes, I do.

12        Q.   Okay.  Probably site of hematoma, about

13   one centimeter from the vault?

14        A.   Yes.  Correct.

15        Q.   And so it was your belief at this point

16   that there was some type of exposure -- a small

17   exposure, but that was probably where the hematoma

18   was; is that correct?

19        A.   That's correct.

20        Q.   And we talked about hematomas interfering

21   with healing, correct?

22        A.   Correct.

23        Q.   Talked about hematomas contributing to

24   erosions, correct?

Nathan W. Goodyear, MD

```
1              A.   Correct.

2              Q.   Let's continue on to the -- go down to

3         the -- let's see.

4                   The January 13th, 2009 office visit.  I'm

5         sorry.  I'll let you get that.  Tell me when you're

6         ready.

7              A.   Yes, January 13th.

8              Q.   I'm curious about the muscle disuse

9         atrophy under your assessment.

10             A.   Uh-huh.

11             Q.   And what --

12             A.   Where are you referencing that?

13             Q.   Under assessment, 1/13/09, office visit.

14        It's under procedure assessment.  If you're looking

15        at the paragraph halfway down, assessment.

16             A.   You're talking about the procedures.

17        Okay.  Halfway down.  Assessment, muscle disuse

18        atrophy.

19             Q.   What does that mean, what is a diagnosis

20        of muscle disuse atrophy?

21             A.   Means you have got declining pelvic pulled

22        muscles.

23             Q.   So they are weak?

24             A.   Yes.
```

Nathan W. Goodyear, MD

1        Q.   What's the potential complication of a

2   weak pelvic pulled muscle?

3        A.   As it relates to?

4        Q.   What kind of complications could one have

5   as a result of that diagnosis?

6        A.   You could have prolapse.

7        Q.   And you recommended then pelvic floor

8   therapy treatment?

9        A.   Correct.

10       Q.   Let's go down under -- 2/10/09?

11       A.   2/10/09.

12       Q.   Okay.  Ready?

13       A.   2/10.

14       Q.   Yes, sir.

15       A.   Yes.

16       Q.   Constipation worse as of late.  Prolapse

17   is better -- doing better.  Do you see that?

18       A.   Yes, I do.

19       Q.   Under genitourinary, negative for genital

20   lesions, hematuria, menstrual problems, polyuria,

21   abnormal vaginal bleeding, and vaginal discharge.

22   So she's not having --

23       A.   Are we in review of symptoms, HPI or exam?

24       Q.   We are in review of symptoms.

Nathan W. Goodyear, MD

1          A.    Yes.

2          Q.    And these are complaints that she, being

3     Ms. Taylor, would have shared with you on that

4     particular visit?

5          A.    That is correct.

6          Q.    And so she's telling you that she's not

7     having any vaginal -- abnormal vaginal bleeding?

8          A.    Correct.  But she had had some previously

9     too documented.

10         Q.    Okay.  We are talking about this

11    particular visit.  It's not persistent?

12         A.    Not this visit.

13         Q.    Again, it's not persistent, right?

14               MR. KOTT:  Object to the form.

15               THE WITNESS:  It's not present that day.

16    BY MS. MOORE:

17         Q.    This is another time.  We did not see it

18    in the last visit, either?  You want to go back and

19    look at that?

20               MS. MOORE:  Let's go off the record for a

21         second.

22               VIDEOGRAPHER:  Okay.  We are going off.

23         The time is 5:53.

24               (Off the record.)

Nathan W. Goodyear, MD

1            VIDEOGRAPHER:  Going back on the record.

2        The time is 5:56.

3    BY MS. MOORE:

4        Q.   Okay.  Doctor, you've had an opportunity

5    to look carefully at your notes.  And isn't it

6    correct that throughout the visits that we

7    discussed -- I know we discussed in detail the visit

8    on November 19th, 2008, the subsequent visits on

9    12/15/08, 1/6/09, 1/13/09, 1/20/09, 2/3/09 and

10   2/10/09, and 5/11/09, do not discuss or are negative

11   for abnormal bleeding or vaginal discharge?

12       A.   Well, you're throwing those numbers out

13   there, and I'm just not going right back to them.

14           MS. MOORE:  Let's go off the record and

15       let you get comfortable with what I've asked.

16           VIDEOGRAPHER:  Time is 5:57.

17           (Off the record.)

18           VIDEOGRAPHER:  It's on.

19   BY MS. MOORE:

20       Q.   You know what, I'm going to go off the

21   record and just let you look at the records, because

22   I can't eat up the time.

23           VIDEOGRAPHER:  Sure.

24           (Off the record.)

Nathan W. Goodyear, MD

```
 1              VIDEOGRAPHER:  We are back on the record.
 2         The time is 5:59.
 3    BY MS. MOORE:
 4         Q.   All right.  Doctor, you've had a chance to
 5    look through your records?
 6         A.   Yes.
 7         Q.   And have you seen any indication of
 8    vaginal bleeding or vaginal discharge?
 9         A.   On the dates you mentioned?
10         Q.   Yes, sir.
11         A.   I did not see any.
12         Q.   And -- okay.  So there's no evidence of
13    persistent vaginal bleeding, correct?
14         A.   Not on --
15              MR. KOTT:  Object to the form.
16              THE WITNESS:  Not on those dates that you
17         mentioned.
18              MR. KOTT:  That's the answer.
19              MS. MOORE:  Move to strike comments of
20         Counsel.
21              MR. KOTT:  I move to strike it, also.  I
22         move to strike it, also.  I concur with the
23         stricken comment.  What I meant by that, that
24         is --
```

Nathan W. Goodyear, MD

1           MS. MOORE:  It sounded great, though.

2      That's the answer.

3           MR. KOTT:  Yes.  In other words, the

4      persistent bleeding starts later.  I think it's

5      evident.

6           MS. MOORE:  I know it's late, and we are

7      all tired.

8           MR. KOTT:  You're right, I'm sorry.

9           THE WITNESS:  Okay.

10  BY MS. MOORE:

11      Q.   Let's go back on the record.  And going

12  now to 2/10/09.  And at this point in time, again

13  there's no evidence of vaginal bleeding or vaginal

14  discharge, correct?

15      A.   Not that's listed here.

16      Q.   Okay.  You do note a very small exposure

17  left from the prior trimming.  Easily removed.  No

18  further exposure noted.  Did you trim the mesh on

19  this visit, February 10th, 2009?

20      A.   Correct.

21      Q.   And this mesh that you trimmed, was this

22  in the location of the hematoma?

23      A.   Correct.

24      Q.   And now you're seeing her again, a second

Nathan W. Goodyear, MD

```
 1      time on 2/10/09 for an office excision, correct?

 2          A.   I see February 10th, 2009.  You said

 3      office excision?

 4          Q.   I'm asking you -- well, it's your -- under

 5      the exam.  There's a very small exposure left from

 6      the prior trimming, it was removed.

 7          A.   Yeah.  I thought we just went over that.

 8          Q.   February 10th, 2009.  We did.  Your

 9      report -- let's look at your report on that date.

10      You talk about the patient -- I apologize.  If you

11      look at clinical summary, kind of down more than

12      halfway in the paragraph, page two.  You with me?

13          A.   I'm with you.

14          Q.   "Patient presented 14 months later with

15      repeated posterior erosion, incomplete bladder

16      emptying, urinary frequency, urinary urgency, and

17      continued constipation with required splinting."

18               Where is that referenced in your records?

19      I know we did see the constipation appearing again

20      and we have seen some trimmings.  Where is any

21      reference to incomplete bladder emptying?

22          A.   On the February 10th note.

23          Q.   Well, you -- February 10th or -- let's

24      look anytime.  May 11th.  I'm just trying to see
```

Nathan W. Goodyear, MD

```
1      where that -- where you got that information.  I've
2      not seen that.
3              A.   Constipation had improved.
4              Q.   Okay.  It's improving, but your report
5      indicates she's presenting 14 months later, meaning
6      after your October 2008 surgery, with repeat
7      posterior erosion, incomplete bladder emptying,
8      urinary frequency, urinary urgency, and continued
9      constipation with required splinting.
10             MR. KOTT:  What's that date again?
11             MS. MOORE:  Absolutely.  His report says,
12         14 months later from, and I believe that's
13         referencing the October 21st, 2008 surgery.
14             THE WITNESS:  Constipation wasn't better.
15     BY MS. MOORE:
16             Q.   The constipation wasn't better?
17             A.   No.
18             Q.   Okay.  And I did not see where it was
19     requiring splinting?
20             A.   Well, constipation wasn't better, so thus
21     the splinting wouldn't have changed.
22             Q.   Okay.  That's not in your records, but you
23     remember that?
24             A.   Yes.
```

Nathan W. Goodyear, MD

```
1          Q.   Okay.  And how about the incomplete
2     bladder emptying, where is that?
3          A.   It's right here in the clinical summary.
4     "Patient presented 14 months later with repeated
5     posterior erosion, incomplete bladder emptying."
6          Q.   I see it's in your report.
7          A.   Okay.
8          Q.   I'm looking for the basis for that
9     statement in your records?
10         A.   For February 10th, it's not listed there.
11         Q.   Is it listed on May 11th?
12         A.   The same year?
13         Q.   Yes, sir.
14         A.   May 11th of 2009?
15         Q.   Yes, sir.
16              MS. MOORE:  And let's go off the record,
17         just so you can take your time and --
18              VIDEOGRAPHER:  Okay.  We are going off the
19         record.  The time is 6:06.
20              (Off the record.)
21              VIDEOGRAPHER:  Okay.  We are back on the
22         record.  The time is 6:11 p.m.
23              MS. MOORE:  Do we know what year we are?
24              VIDEOGRAPHER:  You did have 50 minutes
```

Nathan W. Goodyear, MD

1          left.

2     BY MS. MOORE:

3          Q.   All right.  Sir, we went on break off the

4     record.  Doctor, I'll remind you to look at your

5     records.  I was trying to understand the basis for

6     the opinion in your report on page two that "The

7     patient presented 14 months later with repeat

8     posterior erosion, incomplete bladder emptying,

9     urinary frequency and urinary urgency and continued

10    constipation that required splinting."  We have seen

11    references to the constipation.  And we talked about

12    the posterior erosion.  We'll talk a little bit more

13    about that.  But I just want to make sure I

14    understand.  What is the basis for the statement of

15    an observation of incomplete bladder emptying,

16    urinary frequency, and urinary urgency?

17         A.   That would be based on urinary retention.

18         Q.   And where is that?

19         A.   It's not in what I reviewed here, based on

20    my visits.

21         Q.   And help me understand.  So you're basing

22    your opinion that Ms. Taylor was having incomplete

23    bladder emptying, urinary frequency, urinary urgency

24    because of urinary retention?

Nathan W. Goodyear, MD

```
 1          A.   That's what would cause incomplete bladder

 2     emptying.

 3          Q.   Where is that?  Did she ever tell you that

 4     was a problem she was experiencing?

 5          A.   Not in the notes where she saw me.

 6          Q.   All right.  And let's first stay within

 7     your notes.  You don't have any indication of those

 8     complaints, correct?

 9          A.   Not at that point, no.

10          Q.   Well, you've taken some time to look at

11     your records?

12          A.   Yes.

13          Q.   And you don't have any indication of those

14     complaints, correct?

15          A.   Uh-uh.

16          Q.   Now, let's move outside of your notes.

17     From any other information that you may have

18     reviewed, have you seen anything in anyone else's

19     records with respect to what you call urinary

20     retention?

21          Q.   You want to go off the record so you can

22     check?

23          A.   I had it just for a second.  Yeah, please.

24               MS. MOORE:  Off the record.
```

Nathan W. Goodyear, MD

```
 1              VIDEOGRAPHER:  You want to go off the

 2        record?

 3              THE WITNESS:  Yeah.

 4              VIDEOGRAPHER:  We are going off.  The time

 5        is 8:13 (sic).

 6              (Off the record.)

 7              VIDEOGRAPHER:  We are back on the record.

 8        The time is 6:16.

 9   BY MS. MOORE:

10        Q.   All right.  Doctor, I was asking you to

11   review your records to see if you have any basis for

12   the statement and your report about the patient,

13   Ms. Taylor, presenting 14 months later with

14   incomplete bladder, urinary frequency, urinary

15   urgency.  And you have been unable to locate

16   anything in your records that would substantiate

17   that statement, correct?

18        A.   In my records, but additional records.

19        Q.   In your records, correct?

20        A.   Correct.

21        Q.   And I know you were looking for some other

22   records that may substantiate that?

23        A.   Yes.

24        Q.   And do you have something?
```

Nathan W. Goodyear, MD

```
1          A.    I do.

2          Q.    You want to tell us what that is?

3          A.    The location would have been medical

4     center where she had hesitancy, urgency, and urinary

5     frequency.xxxcheck25thmarch

6          Q.    And when was that?

7          A.    That is March 25th.

8          Q.    What year, please?

9          A.    2011.

10         Q.    2011.  So do you know what you were

11    referencing -- you're not sure what you were

12    referencing in this statement, correct?

13         A.    That's not my statement.  Oh, that right

14    there?

15         Q.    Yes, sir.

16         A.    I'm referencing obstructive voiding

17    symptoms.

18         Q.    Right.  And you say patient "presented 14

19    months later."  What did you mean by "14 months

20    later"?

21         A.    I believe it was 14 months from the

22    operative time.

23         Q.    Okay.  That's what I thought.  And based

24    on the records, I know you --
```

Nathan W. Goodyear, MD

```
1          A.    Where is that?

2                MS. MOORE:  Go off the record.

3                MR. KOTT:  He's just looking back.

4                MS. MOORE:  I know, but off the record.

5                (Off the record.)

6                THE WITNESS:  The way I read this is it's

7          14 months roughly from the seven week post-op

8          period.

9    BY MS. MOORE:

10         Q.   So -- but that wouldn't put you into 2011,

11   would it?

12         A.   I'm just saying that's the way I read

13   that.

14         Q.   I understand.  And then you found a

15   reference to a March 25th, 2011 visit, that wouldn't

16   put you at 14 months out, right?

17               MR. KOTT:  Out from what?

18               MS. MOORE:  He just said he believed he

19         was referencing seven months -- seven weeks

20         post-op.  So 14 months from seven weeks

21         post-op, would be about 16 months from the

22         October 21st, 2008 surgery, which would put you

23         into about February of 2009 or so.

24               THE WITNESS:  Right.  14 months.
```

Nathan W. Goodyear, MD

```
 1              MR. KOTT:  Don't agree with that, think it
 2        through.
 3              MS. MOORE:   2010.
 4              MR. KOTT:  2010 surgery.  I'm sorry.  I'm
 5        very sorry.  Somebody who is willing and thinks
 6        they can and state it correctly.  Is there
 7        anyone here?
 8              MS. MOORE:  Wait.  Joe, I have an idea.
 9              VIDEOGRAPHER:  Okay.
10              (Off the record.)
11              VIDEOGRAPHER:  Back on the record.
12   BY MS. MOORE:
13        Q.   Seven months -- seven weeks from
14   10/21/2008, would be about December 2008 and then 14
15   more months --
16        A.   That would be actually seven weeks.  That
17   would be actually into January.
18        Q.   Right.  Of 2010?
19        A.   That would be January -- seven weeks from
20   10/21/2008, would be January 2009.  At the seven
21   week post-op visit.
22        Q.   Seven weeks -- well, seven weeks from
23   October?
24        A.   I'm sorry.  December.
```

Nathan W. Goodyear, MD

```
1          Q.   It's February 2010?

2          A.   December.

3          Q.   Do you have anything that would

4     substantiate what you meant in this particular

5     statement in that time period?

6               MS. MOORE:  I have to go off the record.

7               VIDEOGRAPHER:  Sure.  We are going off the

8          record.  And the time is 6:20.

9               (Off the record.)

10              VIDEOGRAPHER:  Back on the record.

11    BY MS. MOORE:

12         Q.   Okay.  We have spent a lot of time on

13    trying to understand the basis for your opinion that

14    there was incomplete bladder emptying, urine

15    frequency, and urinary urgency in the report on page

16    two.  And as we sit here today, in your records, you

17    don't have anything that would support that,

18    correct?

19         A.   The visit I'm referencing is this one with

20    Vincent Grigsby, that's the first set of symptoms.

21         Q.   And when would those first set of symptoms

22    be?

23         A.   Those are 2011.

24         Q.   That's more than 14 months or so?
```

Nathan W. Goodyear, MD

```
 1          A.   That is correct.

 2          Q.   So the record is clear that you have

 3     symptoms that may support that, but that wasn't

 4     until what day?

 5          A.   That was March 27th, 2011.

 6          Q.   Okay.  All right.  Let's keep going.  I

 7     think that if you can just quickly turn to 5/11/09.

 8     It looks like she's doing well, other than her

 9     weight.

10          A.   5/11/09?

11          Q.   Yes, sir.

12               MS. MOORE:  Let's go off the record.

13               VIDEOGRAPHER:  Okay.

14               (Off the record.)

15               VIDEOGRAPHER:  We are back on the record.

16     BY MS. MOORE:

17          Q.   So, Doctor, 5/11/09, there's no complaints

18     of vaginal bleeding, abnormal vaginal bleeding or

19     vaginal discharge, correct, under genitourinary?

20          A.   Yeah.  I was just reading through my HPI

21     too.  That's correct.

22          Q.   And she's doing well except for her

23     weight?

24          A.   She had gained five pounds at that point.
```

Nathan W. Goodyear, MD

```
 1        She still had the constipation.

 2             Q.   All right.  But she was doing well?

 3             A.   Constipation and abdominal cramping.

 4             Q.   I think you -- and then August 11th, 2010.

 5             A.   Okay.

 6             Q.   It looks like there's a -- you have

 7        noticed a piece of exposed, I believe, mesh with

 8        spotting under the history and physical?

 9             A.   Correct.

10             Q.   And that's two years post-op, posterior

11        repair?

12             A.   Right.

13             Q.   And you did a -- you said there's a

14        very -- first of all -- strike that.

15             You say vagina, good pelvic support?

16             A.   Yes.

17             Q.   So the --

18             A.   With a small piece of mesh.

19             Q.   Right.  But you are getting the support

20        that you needed from the Prolift at this point in

21        time, that's documented in your records?

22             A.   Correct.

23             Q.   You have a small piece of the mesh, that

24        was with us again, in the site of it -- this was in
```

Nathan W. Goodyear, MD

```
1      the site of the previous post-op hematoma?

2           A.   Correct.

3           Q.   And so that exposure was caused by that

4      hematoma?

5                MR. KOTT:   Object to the form.

6                THE WITNESS:   Exposure was a part of that

7           hematoma increased risk.

8      BY MS. MOORE:

9           Q.   I'm sorry?

10          A.   Hematoma will increase the risk.

11          Q.   Let's go then to your visit on -- let's

12     see.  Again on December 13th, 2010.  Looks like --

13          A.   Hold on a second.

14          Q.   I apologize.

15          A.   Okay.

16          Q.   And there's another procedure.  No

17     indication of abnormal vaginal bleeding, vaginal

18     discharge, and no mention of incomplete bladder

19     emptying, urinary frequency or urinary urgency?

20          A.   Correct.

21          Q.   And there's a vaginal enterocele.  Very

22     small extrusion is vastly removed.  Small area

23     persistent, was difficult to see.  This was trimmed,

24     removed successfully?
```

Nathan W. Goodyear, MD

```
1            A.   That's correct.

2            Q.   And that's in the same area we have been

3       focusing on with the hematoma?

4            A.   Correct.

5            Q.   And then it appears around this time she

6       returns back to see you, I believe -- is this the

7       last time you see her before your examination most

8       recently, 2/1/11?

9            A.   I believe that's correct.

10           Q.   Okay.  And, again, at that time on 2/1/11

11      you don't have -- strike that.

12                2/1/11 she's 263 pounds, correct?

13           A.   2/1/11, so February 1st, 2011?

14           Q.   Yes, sir.

15           A.   I'm sorry, just jumping around.

16                MS. MOORE:  Want to go off the record?

17                VIDEOGRAPHER:  6:29.

18                (Off the record.)

19                VIDEOGRAPHER:  We are back on the record.

20      The time is 6:31.

21      BY MS. MOORE:

22           Q.   All right.  Doctor, that particular visit,

23      I misspoke earlier, that's not your last visit, but

24      in that particular visit, again, there's no evidence
```

Nathan W. Goodyear, MD

```
 1      of the Plaintiff telling you at least that she was

 2      experiencing any type of vaginal problems?

 3              MS. KOTT:  Objection.  Form.

 4   BY MS. MOORE:

 5          Q.   I mean, she doesn't have any complaints,

 6      right?

 7          A.   Yeah, that's correct.

 8          Q.   I mean she had no complaints, right?

 9          A.   That visit right there, no.

10          Q.   So that --

11          A.   Not related to the vaginal surgery.

12          Q.   Right.  Just concerns about her weight?

13          A.   She had other complaints.

14          Q.   But nothing before the vaginal surgery.

15      So there's no evidence here of --

16          A.   This visit was actually for a different

17      reason, though.

18          Q.   Nonetheless you did a genitourinary review

19      of symptoms?

20          A.   Correct.

21          Q.   And she did not report any?

22          A.   Correct.

23          Q.   So you must have been pleased with her

24      progress at this point?
```

Nathan W. Goodyear, MD

```
 1          A.   At that point that's what I had, yeah.

 2          Q.   Let's go then to your visit of October of

 3     13th, '11.

 4          A.   October 13th of 2011?

 5          Q.   Do you have that, sir?

 6          A.   No, I do not.

 7               MS. MOORE:  Let's go off the record.

 8               VIDEOGRAPHER:  We went off at 6:32.

 9               (Off the record.)

10     BY MS. MOORE:

11          Q.   And she is reporting to you in October of

12     2011, she was concerned about the recurrence and

13     feels mesh.  You say she had the Prolift in 2008,

14     did well until presenting with an erosion in 2010.

15     Splinting resolved for about two years and now this

16     has returned.  And in addition she's concerned about

17     intercourse, correct?

18          A.   That's how it reads, yes.

19          Q.   Your plan, vaginal enterocele referral

20     initiated to Dr. Pizarro in Shreveport to evaluate

21     for mesh removal and resupport for enterocele, if

22     needed, correct?

23          A.   Correct.

24          Q.   All righty.  You did see the mesh -- I
```

Nathan W. Goodyear, MD

```
 1      think you record exam shows erosion of mesh

 2      approximately 3 to 4 centimeters posteriorly in the

 3      suture line?

 4           A.   That's how it reads, correct.

 5           Q.   Again, this is in the area where you

 6      observed the hematoma?

 7           A.   It doesn't say that.

 8           Q.   Okay.  Hematoma, as you said, is a reason

 9      or can cause erosion?

10                MR. KOTT:  Objection.

11                THE WITNESS:  It can increase the risk of

12           erosion.

13      BY MS. MOORE:

14           Q.   And erosion is something that you knew

15      that could occur with mesh before you did surgery

16      with Ms. Taylor, correct?

17           A.   Correct.

18           Q.   Let's turn now to your office visit in

19      November of last year?

20           A.   November 5th?

21           Q.   Yes.

22           A.   I actually have that.

23                MS. MOORE:  Mark that as 2007 -- strike

24           that.  I'm sorry.
```

Nathan W. Goodyear, MD

1                    MR. KOTT:  What number are you marking it?

2                    MS. MOORE:  No. 47.

3                    (Exhibit No. 47 marked.)

4      BY MS. MOORE:

5           Q.   All right, Doctor.  How did Ms. Taylor

6      come to see you on this particular day?

7           A.   She came to see me for review of her

8      pelvis postoperatively.

9           Q.   And was that at the recommendation of her

10     Counsel?

11          A.   It was.

12          Q.   And you performed an exam on her?

13          A.   I did.

14          Q.   And what were her complaints on that day?

15     Let's see if we can move this pretty quickly.  She

16     had some postmenopausal vaginal bleeding?

17          A.   She said vaginal bleeding had persisted

18     and worsened in the last two to three years.  This

19     required continuous use of pads and frequent

20     changes.  She can feel the mesh and the exposed mesh

21     irritates her bladder and urethra.  She also notices

22     an odor with the vaginal discharge.  She has noticed

23     that the pain moved from a localized vaginal pain

24     and intermittent to now constant pelvic inguinal

Nathan W. Goodyear, MD

1    pain.

2              She's developed low back pain and this has

3    now migrated down to her anterior thighs.  She's not

4    sexually active, but she didn't know it would be

5    painful and impossible for her.  She said this

6    created sadness and she gave up in relationships,

7    says, "Why would any man marry me?"

8              She also notices anxiety, worsening

9    fatigue, worse than anything before, chills, fevers,

10   painful walking, decline in quality of life since

11   the mesh was inserted.  Social activities and

12   relationships have significantly declined due to the

13   vaginal bleeding.  Wears the pad continuously, pain

14   and odor.

15             She defines the mesh as a negative turning

16   point for her.  She now just tries to get through

17   the day.  Bladder symptoms include emptying,

18   frequency, and urgency.  Constipation remains.

19   Splinting still required.

20        Q.   Okay.  She had filed a lawsuit against

21   Ethicon by this point, correct?

22        A.   Yes.

23        Q.   Under your history and physical, going

24   back up, you then talk about she presents for

Nathan W. Goodyear, MD

```
1      postmenopausal vaginal bleeding, saying it started

2      following her surgery in October of 2008.  It didn't

3      start -- there was quite a long period of time when

4      you treated Ms. Taylor where she had no evidence of

5      postmenopausal bleeding, correct?

6            A.   Correct.

7            Q.   And we talked about the hematoma.  We did

8      not talk about the estrogen, but you had prescribed

9      that to improve her atrophic vaginitis?

10           A.   To improve the healing.

11           Q.   But you say to improve the atrophic

12     vaginitis, correct?

13           A.   Where are you reading that?

14           Q.   That is under your HPI.

15           A.   Yes.  That is correct.  It does read that

16     way.

17           Q.   Okay.  So you did put her on estrogen to

18     improve the atrophic vaginitis?

19           A.   Correct.

20           Q.   And that, as you told us earlier, can

21     cause abnormal bleeding and cause difficulties,

22     painful sex?

23                MR. KOTT:  Object to the form.  You mean

24           the estrogen or atrophic vaginitis?
```

Nathan W. Goodyear, MD

```
 1                THE WITNESS:  Clarify, please.

 2       BY MS. MOORE:

 3            Q.   Can estrogen cause painful sex?

 4            A.   No.

 5            Q.   Atrophic vaginitis can cause it?

 6            A.   It can.

 7            Q.   And then you talked about the suture lines

 8       and the repeated erosions.  Has she had surgery with

 9       Dr. Winters?

10            A.   To this date?

11            Q.   Yes, sir.

12            A.   Yes.

13            Q.   And you have had a chance to review those

14       reports?

15            A.   Yes.

16            Q.   All right.  What you did -- let's see.

17       You did an exam and tell me your findings.

18            A.   My exam on November 5th, 2015.  To

19       genitourinary?

20            Q.   Let's see.  You noted a vaginal discharge?

21            A.   Vaginal discharge noted.  Posterior

22       erosion noted.  Seeing distally and midline.

23       Significant granulation tissue presents along the

24       suture line posteriorly with hard ridge in posterior
```

Nathan W. Goodyear, MD

```
 1      vagina.  Tenderness along posterior granulation

 2      line.  Tight band right arm of mesh in upper right

 3      corner of vagina, very tender to touch.  No rectal

 4      erosion is palpable or palpated.

 5           Q.   Thank you.  And let's take them one by

 6      one.  Vaginal discharge could be caused by many

 7      things, correct, as you have discussed earlier?

 8           A.   It can.

 9           Q.   We talked about the posterior erosion that

10      you observed on a couple of occasions and now you're

11      seeing it again at this particular visit; is that

12      correct?

13           A.   Correct.

14           Q.   You are also noting some granulation

15      tissue?

16           A.   Correct.

17           Q.   We talked earlier on about the -- I think

18      you described granulation is -- strike that.

19                What causes granulation?

20           A.   It's an inflammatory healing process.

21           Q.   Does it vary, the degree of granulation

22      seen varies from patient to patient?

23           A.   It does.

24           Q.   Is it seen with and without mesh surgery?
```

Nathan W. Goodyear, MD

1          A.   It is.

2          Q.   Can you have tenderness with and without

3     mesh tenderness?

4          A.   You can.  Time frame here is a little bit

5     different.  The time frame is different.

6          Q.   Well, with a complicated scenario, you can

7     still have tenderness, correct?

8          A.   Correct.  But if there's no mesh placed,

9     there's no source.  It's just autologous tissue.

10         Q.   What if there is scarring or fibrous

11    tissue?

12         A.   If there is scarring, correct.

13         Q.   You can have tenderness?

14         A.   Correct.

15         Q.   The scarring can cause a feeling of tight

16    banding?

17              MR. KOTT:  Objection.

18              THE WITNESS:  It could.

19    BY MS. MOORE:

20         Q.   So that's something else you could see

21    with and without mesh?

22              MR. KOTT:  Objection.

23              THE WITNESS:  More with mesh than without.

24

Nathan W. Goodyear, MD

1    BY MS. MOORE:

2         Q.   But my question is, you can still see

3    banding with scarring and fibrosis?

4              MR. KOTT:  Objection.

5              THE WITNESS:  Yes.

6    BY MS. MOORE:

7         Q.   Your plan was postmenopausal vaginal

8    bleeding.  What was your recommendation for her?

9         A.   I did not have a recommendation for her.

10        Q.   I'm sorry?

11        A.   I did not have a recommendation for her.

12   She already had a follow up with Dr. Winters.

13        Q.   Were you aware that -- I think you

14   referenced some low back pain?

15        A.   Referenced super pubic pain.  Did I

16   reference that or did she say that and I recorded

17   that?

18        Q.   I believe you recorded that based on what

19   she told you.

20        A.   Yes.

21        Q.   As we sit here today, you're not in a

22   position to attribute the back pain to any

23   particular aspect of the mesh?

24             MR. KOTT:  Objection to the form.

Nathan W. Goodyear, MD

```
 1    BY MS. MOORE:

 2         Q.   Would that be fair to say?

 3         A.   I was just reporting what she told me.

 4         Q.   Right.  And back pain can be caused by

 5    many things?

 6         A.   Correct.

 7         Q.   And someone with a history of anxiety

 8    and -- now that they are still presenting with that

 9    particular complaint, you're not attributing to her

10    her ongoing of -- her ongoing anxiety to any

11    specific thing with the mesh surgery, correct?

12              MR. KOTT:  Objection to the form.

13              THE WITNESS:  Her medical history was of

14         depression.

15    BY MS. MOORE:

16         Q.   If she had a history of anxiety dating

17    back to 1989 --

18         A.   I'm just going on her first visit to see

19    me.

20         Q.   Okay.  So if she has an ongoing,

21    preexisting history of anxiety dating to 1989, that

22    could all be related to the same underlying anxiety,

23    correct?

24         A.   It could.
```

Nathan W. Goodyear, MD

1      Q.   She's got painful walking as she's telling

2      you.  Could that be related to lumbago, degenerative

3      joint disease and poor conditioning?

4      A.   It could be.

5      Q.   So she's seeing a doctor, a chiropractor,

6      in 2013 who is diagnosing that condition.  Would you

7      defer to him on what may be causing any problems

8      with her pain, fullness in walking?

9      A.   As it relates to his area of expertise,

10     yes.

11     Q.   So you're not opining today on what may be

12     causing the pain in her legs or her painful walking,

13     are you?

14          MR. KOTT:  Object to the form.

15          THE WITNESS:  I'm just stating what she

16          told me as it relates to my physical exam.

17     BY MS. MOORE:

18     Q.   I understand.  But you're not opining on

19     what caused this pain when she walks?

20          MR. KOTT:  Object to form.

21          THE WITNESS:  Not with what I am recording

22          here.

23     BY MS. MOORE:

24     Q.   Thank you.  Also just for your

Nathan W. Goodyear, MD

```
 1      edification, she had a spinal stenosis in 2015.  You

 2      weren't aware of that, correct?

 3           A.   I was not.

 4           Q.   Were you aware she had been diagnosed with

 5      fibromyalgia and Pickwickian syndrome?

 6           A.   No.

 7           Q.   What is Pickwickian syndrome?

 8                MR. KOTT:  Object to the form.

 9                THE WITNESS:  I don't know.

10      BY MS. MOORE:

11           Q.   What is fibromyalgia?

12           A.   It's a chronic inflammatory condition of

13      which they have a fatigue, joint aches, and poor

14      sleep.

15           Q.   That may be causing or contributing to the

16      fatigue she's feeling if she is, in fact, diagnosed

17      with fibromyalgia?

18           A.   I did not have that here so, I can't say.

19           Q.   I think she's using a CPAP.  Does a CPAP

20      interfere with sexual function?

21           A.   A CPAP?

22           Q.   For sleep apnea.

23           A.   No.

24           Q.   It doesn't?
```

Nathan W. Goodyear, MD

1          A.    Depends on where you're having sex, I

2      guess.

3          Q.    If she notes that sleep problems disturb

4      her sex life, you wouldn't be able to comment one

5      way on the use of a CPAP, correct?

6          A.    Well, if she doesn't sleep well, she's

7      tired.

8          Q.    Pardon?

9          A.    If she's doesn't sleep well, she's tired.

10     So if you're tired, interest goes down.

11         Q.    All right.  So I want to make sure -- you

12     also talked about a vaginal discharge with odor.

13     And we went through your records and you did not

14     document vaginal discharge with odor until November

15     15th.

16              MR. KOTT:  Of?

17     BY MS. MOORE:

18         Q.    November 5th of 2015.

19              MR. KOTT:  Thank you.

20     BY MS. MOORE:

21         Q.    And there were ten other visits with no

22     reference to vaginal discharge from November 19th,

23     2008 all the way up to November 15th, 2015?

24              MR. KOTT:  Object to the form of that

Nathan W. Goodyear, MD

```
 1              statement.
 2        BY MS. MOORE:
 3              Q.   Can you show us the basis for your opinion
 4        that she has vaginal discharge with odor, other than
 5        that November 5th, 2015 visit?
 6                   MS. MOORE:   Let's go off the record.
 7                   VIDEOGRAPHER:   Sure.   The time is 6:48.
 8                   (Off the record.)
 9                   VIDEOGRAPHER:   Back on the record.
10        BY MS. MOORE:
11              Q.   We have taken a break, and I've given you
12        an opportunity to look at your records.   Have you
13        been able to --
14              A.   There was some bloody discharge on
15        November 4th, 2008.
16              Q.   And that was right after the surgery,
17        right?
18              A.   That was in the immediate post-op.   You
19        asked me if there was any recording of any
20        discharge.
21              Q.   Right.   Other than something immediately
22        in the postoperative period, do you have any
23        documentation of vaginal discharge with odor?
24                   MR. KOTT:   In his records?
```

Nathan W. Goodyear, MD

```
 1              THE WITNESS:  In my records, I don't have

 2         anything of those dates from there to there.

 3              MS. MOORE:  I'm going to conclude my

 4         questioning for now.  Reserve the time that I

 5         have left until after Opposing Counsel has had

 6         a chance to ask questions.  Thank you for your

 7         time.

 8              MR. KOTT:  How much time is left?

 9              VIDEOGRAPHER:  Nine minutes.

10              (Off the record.)

11              VIDEOGRAPHER:  We are on.

12                        EXAMINATION

13    BY MR. KOTT:

14         Q.   Good evening.

15         A.   Good evening.

16         Q.   Dr. Goodyear, as you know I'm Joe Kott,

17    and I represent the Plaintiff in this particular

18    case.  And this is your second phase of the

19    depositions today; is that correct?

20         A.   Correct.

21         Q.   And this deposition was taken in reference

22    to Ms. Taylor; is that correct?

23         A.   That is correct.

24              (Exhibit No. 48 marked.)
```

Nathan W. Goodyear, MD

```
 1              Q.    Okay.  Doctor, I showed you a document

 2     moments ago, Bates number 48, excuse me, No. 48

 3     exhibit number?

 4              A.    Correct.

 5              Q.    Doctor, we previously marked No. 30.  With

 6     the exceptions of that set of documents being Bates

 7     numbered, are they identical to Exhibit No. 30?

 8              A.    Yes.

 9              Q.    Thank you very much.  Doctor, in your

10     prior deposition, we went through a number of

11     documents, they are 24 -- they have been marked as

12     24, 25, 26, 27, 28, 29, 31, 32, 34, and 37.  I'm

13     going to show you these documents.  Each one of them

14     that have been marked and identified.  Ask you to

15     quickly look through them and then I have a solitary

16     question for you regarding them.

17              A.    Okay.

18              Q.    Have you reviewed those?

19              A.    I have.

20              Q.    Doctor, are those the same documents

21     numbered that we questioned you about during your

22     prior deposition?

23              A.    They were.

24              Q.    And if I were to question you on those
```

Nathan W. Goodyear, MD

1    documents again, that have been numbered and

2    identified, would your testimony be the same in this

3    deposition?

4         A.   They would.

5         Q.   Thank you.

6              MS. MOORE:  Same objections I noted in the

7         earlier deposition.

8    BY MR. KOTT:

9         Q.   Doctor, you prepared a report dated

10   November 5th, 2015.  I believe you have that in

11   front of you?

12        A.   I do.

13        Q.   And I believe that you were questioned

14   earlier about having put in your report, which is

15   exhibit number -- do you have the exhibit number on

16   the report?

17             MR. KOTT:  Let's go off the record.

18             VIDEOGRAPHER:  We are off.

19             (Off the record.)

20             VIDEOGRAPHER:  Go right ahead.  Seven

21        minutes.

22             MR. KOTT:  Yes, sir.

23   BY MR. KOTT:

24        Q.   Now, Doctor, if you would go to page two

Nathan W. Goodyear, MD

1     of your report that's been prepared as an expert.

2     There was a lengthy questioning regarding a

3     statement that you made, "Patient presented 14

4     months later with repeat posterior erosion,

5     incomplete bladder, urinary frequency, urinary

6     incontinence, continued constipation which required

7     splinting."  Do you remember being questioned about

8     that?

9          A.   I do.

10         Q.   Doctor, is it, in fact, that those

11    symptoms when you look further into the medical

12    records occurred sometime later than 14 months after

13    the surgery?

14         A.   That is correct.

15         Q.   Okay.  But they did occur based on your

16    review of the additional medical records, correct?

17              MS. MOORE:  Object to the form of the

18         question.

19              THE WITNESS:  Correct.

20    BY MR. KOTT:

21         Q.   Now, there was also questioning regarding

22    persistent vaginal bleeding, postoperative period

23    following her October 2008 implant surgery to the

24    current; is that correct?

Nathan W. Goodyear, MD

```
 1            A.   That is correct.
 2            Q.   Doctor, if you would please look at your
 3      note from November 5th, 2015, when you did a history
 4      and physical.  If you would look at the first -- and
 5      this is -- the exhibit number is --
 6            A.   No. 47.
 7            Q.   No. 47.  When you look at the first
 8      sentence of the history and physical, second
 9      paragraph, would you read that into the record?
10            A.   "Vaginal bleeding has persisted and
11      worsened over the last two to three years."
12            Q.   And that would be beginning in -- sometime
13      in 2014 and 2013, in that area, two to three years?
14            A.   Two to three years, could even be 2012.
15            Q.   2012.  Again, in your report, expert
16      report, when you said the patient had persistent
17      complaint -- complained of persistent vaginal
18      bleeding following the 2008 implant to current, is
19      it more accurate to say that the persistent vaginal
20      bleeding actually began sometime in 2012 or 2013?
21            MS. MOORE:  Object to the form of the
22            question.  And leading.
23            THE WITNESS:  Correct.
24
```

Nathan W. Goodyear, MD

```
1    BY MR. KOTT:
2         Q.   Okay.  Now, Doctor, you also in -- you
3    also reviewed records that weren't covered in your
4    exam by Ms. Moore; is that correct?
5         A.   That's correct.
6         Q.   You reviewed records that were prepared by
7    Dr. Winters, correct?
8         A.   That is correct.
9         Q.   And Dr. Winters' records according -- you
10   reviewed these before preparing your report; is that
11   correct?
12             MS. MOORE:  Again, I'm going to object to
13        the leading nature of the questions.  This is
14        your expert and you're not entitled to ask
15        leading questions.
16   BY MR. KOTT:
17        Q.   When did you prepare -- before preparing
18   your report did you, in fact, review any medical
19   records other than your own?
20        A.   I did.
21        Q.   Did you review Dr. Winters' records?
22        A.   I did.
23        Q.   Okay.  And in reviewing Dr. Winters'
24   records, did Dr. Winters recommend that she have
```

Nathan W. Goodyear, MD

1     surgery for the problems -- for problems related to

2     the mesh?

3              MS. MOORE:  Object to the form of the

4         question.

5              THE WITNESS:  He did.

6     BY MR. KOTT:

7         Q.   Okay.  And when Dr. Winters did a history

8     and physical exam and recorded those results, did

9     his findings comport with your findings of your exam

10    on March 25th -- excuse me, November 5th, 2015?

11        A.   They did.

12             MS. MOORE:  Same objection.

13    BY MR. KOTT:

14        Q.   Doctor, are these records that you

15    reviewed from Dr. Winters' records?

16        A.   Yes.

17             MS. MOORE:  Can I have a copy?

18             MS. KOTT:  Yep.

19    BY MR. KOTT:

20        Q.   And did Dr. Winters find that Ms. Taylor

21    had recurrent prolapse?

22             MS. MOORE:  Object to the form of the

23        question.  Leading.

24             MR. KOTT:  I'll withdraw the question.

Nathan W. Goodyear, MD

```
 1    BY MR. KOTT:

 2         Q.   What were Dr. Winters' conclusions?

 3         A.   She is now re-experiencing symptoms of

 4    rectal bulging and pressure.  That's a recurrence of

 5    the prolapse.  She's also experiencing bladder

 6    bulging and occasional difficulty urinating.

 7    Insofar as her continence concern, she has mild

 8    leakage.

 9              His physical exam found that she had a

10    linear exposure approximately halfway up the

11    posterior compartment.  Linear granulation tissue.

12    One can probably see the arm band of the Prolift.

13    There is subvaginal area which is clearly mesh.

14    Does not elicit much pain, but as you extend to the

15    left side, the mesh arm does seem to elicit some

16    discomfort.

17              He concludes that there's a painful scar

18    band on the left, which corresponds to the Prolift

19    arm.  She has exposure four to five centimeters in

20    length.  She has this other mesh, which is palpable

21    on exam, but unable to elicit symptoms today.  She

22    does have an anterior stage two cystocele.

23         Q.   Okay.  Now, Doctor, that -- does that --

24    we have already established, correct, that this
```

Nathan W. Goodyear, MD

```
 1       comports with your findings in November of '15?

 2                MS. MOORE:  Objection.  Leading.

 3                THE WITNESS:  Correct.

 4       BY MR. KOTT:

 5          Q.   Also, what you read as a description of

 6       the findings of Dr. Winters, are they in any way

 7       related to the site that you saw the hematoma way

 8       back in 2009, 2008?

 9                MS. MOORE:  Object to the form of the

10           question.  Leading.

11                THE WITNESS:  Yes.

12       BY MR. KOTT:

13          Q.   Okay.  Now, are they into the arms now, do

14       you have now issues into the arms of the mesh found

15       by Dr. Winters?

16                MS. MOORE:  Same objection.

17                THE WITNESS:  As Dr. Winters described,

18           yes.

19       BY MR. KOTT:

20          Q.   Is that related to the hematoma?

21          A.   That is not.

22          Q.   Okay.  And is the tenderness there that he

23       described related to the hematoma that you saw?

24          A.   It is not.
```

Nathan W. Goodyear, MD

```
1              Q.    Okay.  Now, in fact, the hematoma, based

2        on your records that we have, your own records,

3        okay, it seems that that healed.  All the

4        symptomatology went away multiple times, correct?

5              A.    Right.

6                    MS. MOORE:  Object to the form of the

7              question and to leading.  This is your expert,

8              sir.

9                    THE WITNESS:  That is correct.

10       BY MR. KOTT:

11             Q.    Well, I'm not going to use my time over

12       that.  That is correct that the hematoma resolved?

13                   MS. MOORE:  Same objection.

14                   THE WITNESS:  Yes.

15       BY MR. KOTT:

16             Q.    So when a person develops mesh erosion

17       secondary to issues with the mesh, okay, are they --

18       is the onset immediately after surgery or at some

19       time later after the surgery?

20                   MS. MOORE:  Object to the form of the

21             question.  Calls for speculation.

22                   THE WITNESS:  Typically delayed.

23       BY MR. KOTT:

24             Q.    And the fact that your examinations on
```

Nathan W. Goodyear, MD

```
 1    multiple occasions immediately after the surgery,

 2    after you tended to certain problems, seemed to

 3    resolve; is that fair to say?

 4              MS. MOORE:  Same objection.

 5              THE WITNESS:  Yes.

 6    BY MR. KOTT:

 7         Q.   And is it also based on Dr. Winters and

 8    Dr. Galloway -- did you also review Dr. Galloway's

 9    report?

10         A.   I did.

11         Q.   Medical records?

12         A.   Yes.

13         Q.   And based on those two sets of records

14    that you reviewed, that are on your list of

15    documents you reviewed, did the more significant

16    mesh issues develop later on in the course of Ms.

17    Taylor's medical history?

18              MS. MOORE:  Object to the form.

19              THE WITNESS:  That is correct.

20    BY MR. KOTT:

21         Q.   And that comports with issues with mesh,

22    doesn't it?

23              MS. MOORE:  Same objection.  Leading.

24              THE WITNESS:  That is correct.
```

Nathan W. Goodyear, MD

1          MR. KOTT:  I'm sorry, put your answer on

2     the record.

3          THE WITNESS:  That is correct.

4          MR. KOTT:  I'm going to mark Dr. Winters'

5     records as No. 49 in globo.  And this runs from

6     Bates number 49.

7          (Exhibit No. 49 marked.)

8   BY MR. KOTT:

9     Q.   And also would you please look for me,

10    Doctor, at Exhibit No. 50.  And I'll purport to

11    you -- these are Bates numbered one through 11.

12    Tell me if you have seen those medical records

13    before.

14    A.   I have.

15    Q.   And whose records are those?

16    A.   These are Dr. Galloway.

17    Q.   Does Dr. Galloway's examinations and

18    conclusions comport with what you found in 2015 when

19    you examined Ms. Taylor?

20         MS. MOORE:  Object to the form of the

21    question.  And the leading nature of the

22    question.

23         THE WITNESS:  They do.

24         (Exhibit No. 50 marked.)

Nathan W. Goodyear, MD

```
1      BY MR. KOTT:
2           Q.   Thank you.  Now, Doctor, let's go to your
3      report, if we could.  Well, I'll withdraw that
4      question for now.
5                Doctor, let's go, please, to Exhibit No.
6      17, which it this final Prolift Surgeon's Resource
7      Monograph.
8           A.   Yes.
9           Q.   Doctor, I would like you, please, again to
10     focus your attention on paragraph eight where it
11     says one to six percent --
12          A.   Correct.
13          Q.   -- erosion.  You see that?
14          A.   Yes.  "Experiencing and avoiding
15     hysterectomy when possible will reduce the rate to 1
16     to 6 percent."
17          Q.   Okay.  And that's a number that is in the
18     document, it's clearly not a number you created,
19     correct?
20          A.   That's correct.
21          Q.   Thank you.  And also, clearly it occurs in
22     approximately 3 to 17 percent is listed, erosion,
23     you see that?
24          A.   I do.
```

Nathan W. Goodyear, MD

```
 1              Q.   That doesn't tell a doctor much at all,

 2      does it, that's such a wide range?

 3              MS. MOORE:  Object to the form of the

 4         question.

 5              THE WITNESS:  Correct.  It's just a range.

 6              MR. KOTT:  Yeah.

 7              MS. MOORE:  Move to strike comments of

 8         Counsel.

 9              MR. KOTT:  I will do that, I apologize.

10      BY MR. KOTT:

11              Q.   Okay.  Let's go to your report, Doctor.

12      If you would go to page four of your report.

13              VIDEOGRAPHER:  Nine minutes.

14              MS. KOTT:  Thirty minutes.  We have 30

15         minutes.

16              VIDEOGRAPHER:  I said he's got nine

17         minutes.

18              MR. KOTT:  Thank you.  That means I've got

19         21 left.

20              MS. KOTT:  Let's go off the record and

21         figure out how much time I have left.

22              MR. KOTT:  Yes, if we could.  I think it's

23         21 minutes.

24              VIDEOGRAPHER:  That's correct.  But you
```

Nathan W. Goodyear, MD

```
 1              had 30 minutes.

 2                   MR. KOTT:  Let's go to page four of your

 3              report.

 4                   MS. MOORE:  We started at what time?

 5                   MR. KOTT:  If we are going to talk, I've

 6              got to stop the clock.

 7                   MS. MOORE:  You can stop the clock.

 8                   MR. KOTT:  Stop the clock.

 9                   (Off the record.)

10                   VIDEOGRAPHER:  You are now, yes, sir.

11         BY MR. KOTT:

12              Q.   On page four of your report, Expert Report

13         of Nathan W. Goodyear, M.D. in the Taylor matter,

14         correct?

15              A.   Correct.

16              Q.   You used a methodology to analyze this

17         case?

18              A.   That's correct.

19              Q.   And that methodology goes from page four

20         and part to page five, correct?

21                   MS. MOORE:  Object to the form of the

22              question.

23                   THE WITNESS:  That is correct.

24
```

Nathan W. Goodyear, MD

```
1    BY MR. KOTT:

2         Q.   How far does the methodology go from, what

3    pages?

4         A.   Page four to page five.

5         Q.   Thank you.  Doctor, if I were to question

6    you regarding the methodology that's used in this

7    case, would your answers be the same as the

8    responses you gave to me in the prior deposition

9    earlier today?

10        A.   Correct.

11             MS. MOORE:  And --

12             MR. KOTT:  Same objection.

13             MS. MOORE:  Thank you, Counsel.

14   BY MR. KOTT:

15        Q.   All right.  Let's go next to the section

16   where you register your opinions.  Okay.  And in

17   this document, again, you have your opinions or to a

18   reasonable degree of medical probability, is that

19   recorded at the top of the page?

20        A.   Correct.

21        Q.   Can we also say that they are to a

22   reasonable degree of medical certainty?

23        A.   Correct.

24        Q.   Thank you.  What is the opinion you came
```

Nathan W. Goodyear, MD

1    to in this case?

2         A.   "Charlene Taylor's injuries were caused by

3    the implanted Prolift and TVT-O devices."

4         Q.   Okay.  Now, the injuries that you feel

5    were caused by these devices, are what?

6              MS. MOORE:  Object to the form of the

7              question.  You may answer.

8    BY MR. KOTT:

9         Q.   What injuries do you believe were caused

10   by the device?

11        A.   The vaginal mesh erosion.

12        Q.   Any others?

13        A.   The vaginal bleeding, the odor, the pelvic

14   pain, the inguinal pain, the anxiety, the

15   dyspareunia, and decrease sexual intercourse.  The

16   anxiety relationships related to that.  The pain

17   with movement.  The decrease in physical activity,

18   which compromised her metabolic issues and increased

19   the weight gain.

20        Q.   Thank you.  Now, I -- you were asked

21   questions about possibilities, other possibilities

22   that could cause all of these problems earlier in

23   this deposition; is that correct?

24        A.   That's correct.

Nathan W. Goodyear, MD

1          Q.   Okay.  When you remove mere possibilities,

2     and go into probability, is it your opinion as

3     expressed in item one?

4               MS. MOORE:  Object to the form of the

5          question.

6               THE WITNESS:  It's probability and

7          certainty, not possibility.

8     BY MR. KOTT:

9          Q.   Okay.  But to the things that you answered

10    to earlier what it could have been or might have

11    been, those were possibilities, correct?

12         A.   Correct.

13         Q.   And, Doctor, you list several paragraphs

14    after item one to support your position; is that

15    correct?

16         A.   That is correct.

17         Q.   Do you believe and swear here under oath

18    that if you were to testify at this moment that you

19    would cite that materials (sic) to the Court?

20         A.   I would.

21         Q.   Now, let's go to item number two.  Would

22    you please read your opinion on item number two?

23         A.   "The Prolift and TVT-O devices implanted

24    in Charlene Taylor were unreasonably dangerous due

Nathan W. Goodyear, MD

1    to the lack of adequate warning."

2        Q.   Now, Doctor, following that, you have

3    several paragraphs supporting that opinion; is that

4    correct?

5        A.   That is correct.

6        Q.   Doctor, if I were to take you through each

7    one of those paragraphs here in this setting, would

8    you testify under oath that those positions support

9    your conclusion in opinion two?

10        MS. MOORE:   Object to the form of the

11        question.

12        THE WITNESS:   Yes.

13   BY MR. KOTT:

14        Q.   Item number three is a third opinion,

15   Doctor.  Would you read that third opinion into the

16   record?

17        A.   "The Prolift and TVT-O implanted in

18   Charlene Taylor were unreasonably dangerous because

19   they did not conform to the manufacturer's expressed

20   warranties."

21        Q.   Is that opinion, like the other two, to a

22   reasonable degree of medical probability and, in

23   fact, certainty?

24        MS. MOORE:   Same objection.

Nathan W. Goodyear, MD

```
 1                THE WITNESS:  Yes.

 2      BY MR. KOTT:

 3           Q.   Okay.  Now, Doctor, you go on after that

 4      on page eight and page nine to discuss what express

 5      warranties you reference in opinion three; is that

 6      correct?

 7           A.   That is correct.

 8           Q.   If I were to take you through each and

 9      every one of those items on pages eight and nine

10      under the subtitle opinion three, would you testify

11      under oath to the Court that those are the basis for

12      your opinion as expressed in item number three?

13                MS. MOORE:  Object to the form.

14                THE WITNESS:  Correct.

15      BY MR. KOTT:

16           Q.   Doctor, did the characteristics -- did the

17      unreasonable characteristics cited -- sorry.

18                Were the unreasonably dangerous

19      characteristics cited in number two and number three

20      causative factors in the injuries sustained from the

21      mesh by Ms. Taylor?

22                MS. MOORE:  Object to the form of the

23           question.

24                THE WITNESS:  Yes.
```

Nathan W. Goodyear, MD

```
1    BY MR. KOTT:

2         Q.   Is that to a reasonable degree of medical

3    probability?

4         A.   Yes.

5         Q.   Certainty?

6         A.   Certainty, yes.

7         Q.   Now, Doctor, were -- at the time you did

8    this surgery, were there safer alternatives

9    available to do -- to perform treatment in some

10   fashion on Ms. Taylor other than using these

11   products?

12             MS. MOORE:   Object to the form.

13             THE WITNESS:   There were.

14   BY MR. KOTT:

15        Q.   And those were?

16        A.   Observation, pessaries, posterior

17   colporrhaphy, sacrospinous fixations, abdominal

18   sacral colpopexy.

19        Q.   Were there non-surgical treatments, too?

20        A.   Observation, pessaries, yes.

21        Q.   Now, Doctor, had you known about the

22   unreasonably dangerous aspect of the products cited,

23   both Prolift and TVT-O, used on Ms. Taylor, would

24   you have used them at the time you performed surgery
```

Nathan W. Goodyear, MD

```
 1    on her?

 2              MS. MOORE:  Object to the form of the

 3         question.

 4              THE WITNESS:  I would not have used them.

 5              MR. KOTT:  Let's stop a minute, please, go

 6         off the record, so I can check with my esteemed

 7         colleague.

 8              VIDEOGRAPHER:  We are off.

 9              (Off the record.)

10              VIDEOGRAPHER:  We are back on the record.

11    BY MR. KOTT:

12         Q.   Dr. Goodyear, I'm going to show you

13    Exhibit No. 18.  Just identify it quickly, please.

14         A.   Gynecare Prolift IFU.

15         Q.   Doctor, do you recall that document from

16    your prior deposition this morning?

17         A.   I do.

18         Q.   Doctor, if I were to ask you questions

19    about that document, the same questions I asked you

20    this morning, would your answer -- if I did ask you

21    any questions about that this morning, would your

22    answers be the same?

23              MS. MOORE:  Same objection.

24              THE WITNESS:  They would be the same.
```

Nathan W. Goodyear, MD

```
1    BY MR. KOTT:

2         Q.   Thank you.  Doctor, I have another

3    document here, would you please read that?  It is

4    No. 19.  Exhibit No. 19, I believe.

5         A.   Gynecare TVT Obturator System.

6         Q.   Right.  Doctor, do you recall seeing that

7    in your deposition this morning?

8         A.   I do.

9         Q.   Doctor, if I were to ask you the same

10   questions that you were asked this morning in the

11   deposition regarding that particular document, would

12   your answers be the same?

13            MS. MOORE:  Same objection.

14            THE WITNESS:  They would.

15   BY MR. KOTT:

16        Q.   Thank you.  Now, Doctor, you were shown --

17   thank you -- Exhibit No. 40 during a portion of your

18   deposition this evening.  Do you recall this

19   document?

20        A.   I do recall that.

21            MR. KOTT:  I have another copy of this

22            document somewhere.

23            MS. KOTT:  It's an exhibit.  That's our

24            copy.  Off the record, please.
```

Nathan W. Goodyear, MD

```
 1                    VIDEOGRAPHER:  We are off.

 2                    (Off the record.)

 3                    VIDEOGRAPHER:  We are on.

 4      BY MR. KOTT:

 5           Q.   Doctor, if you would please go to page

 6      five of deposition 40 -- Deposition Exhibit No. 40.

 7           A.   I'm there.

 8           Q.   You saw this document earlier today?

 9           A.   I did.

10           Q.   Okay.  The -- and we are on page five of

11      that document.  Are you there, it's Bates 12013?

12           A.   Yes.

13           Q.   Would you read into the record that

14      paragraph that starts in conclusion?

15           A.   "In conclusion, while this study did

16      not" --

17           Q.   Slow down.  Just read it slow.

18           A.   "In conclusion, while this study did not

19      meet the stringent predefined statistical criteria

20      in terms of demonstrating an incidence of prolapse

21      recurrence at 12 months or below 20 percent, the

22      absolute rate of 18.4 percent demonstrates the

23      invaluable role of TVM in treating patients with

24      vaginal prolapse in terms of reasonable success
```

Nathan W. Goodyear, MD

1    rates and a lower rate of recurrence, re, operation

2    compared to other published studies."

3         Q.   That's good.  You can stop.

4              Doctor, in the conclusion you just read,

5    Ethicon reports in this document, this study, that

6    it did not meet the requirements -- the stringent

7    requirements that they had predefined with reference

8    to recurrence; is that correct?

9              MS. MOORE:  Object to the form of the

10        question.

11             THE WITNESS:  Correct.

12   BY MR. KOTT:

13        Q.   Okay.  You were never shown this document

14   by Ethicon prior to the surgeries you performed on

15   your clients, were you?

16             MS. MOORE:  Same objection.

17             THE WITNESS:  No.

18   BY MR. KOTT:

19        Q.   Would you please go to page 48 of the same

20   document?

21        A.   I'm there.

22        Q.   Yes, sir.  You had never seen this

23   document before today; is that correct?  Excuse me.

24             You hadn't seen this document before the

Nathan W. Goodyear, MD

1    institution of the litigation?  Thank you.  I'm

2    tired.

3         A.   Correct.

4              MS. MOORE:  Object to the form.

5         Q.   Is that correct?

6         A.   Correct.

7         Q.   So no one ever produced this document to

8    you when they were training you to use this product?

9         A.   That's correct.

10             MS. MOORE:  Same objection.

11        Q.   Now, Doctor, when you inquired to the

12   manufacturer's rep about whether you were accurate

13   in the 3 to 5 percent in your consent forms -- you

14   did that, correct?

15        A.   Correct.

16        Q.   Did he at any point in time say, you know,

17   you really ought to go take a look at this study

18   that was done in 2006, because they report failure

19   rate of 10 percent?

20             MS. MOORE:  Object to the form of the

21        question.

22             THE WITNESS:  He did not.

23   BY MR. KOTT:

24        Q.   Did anybody ever come tell you that from

Nathan W. Goodyear, MD

```
 1       Ethicon?

 2           A.   No.

 3           Q.   Or Johnson & Johnson?

 4           A.   No.

 5           Q.   You would have liked to have known that?

 6           A.   That would have been important in the

 7       decision making, yes.

 8                MS. MOORE:  Object to the form of the

 9           question.

10           Q.   It would have been important in your

11       decision whether to use this product or not,

12       correct?

13           A.   I would not have used it.

14                MS. KOTT:  I just want to attach --

15                MR. KOTT:  Okay.  This is the same thing.

16           The cross notice.  This is Deposition Cross

17           Notice No. 51.

18                And can we go off the record for a moment,

19           please?  And can you tell me how much time I

20           have?

21                VIDEOGRAPHER:  One minute.

22                (Exhibit No. 51 marked.)

23                (Off the record.)

24                VIDEOGRAPHER:  We are back on the record.
```

Nathan W. Goodyear, MD

```
1     BY MR. KOTT:

2         Q.   Now, Doctor, you were asked at length

3     about the severity -- potential severity of pelvic

4     organ prolapse.  Do you recall that?

5         A.   I do.

6         Q.   How severe it can be?

7         A.   Correct.

8         Q.   Not all the patients that you see are that

9     severe?

10        A.   That's correct.

11        Q.   Some of these cases are mild to moderate

12    cases, correct?

13        A.   That's correct.

14        Q.   Thank you.  I don't mean to do that.

15    Thank you.  I really don't.

16             You were examined for three hours prior --

17    no, not three.  Three hours, nine minutes earlier

18    today by Ms. Moore, correct?

19        A.   Correct.

20        Q.   During the course of that examination, in

21    all the documents she showed you and all the

22    questions that were asked to you, did any of those

23    questions change the opinions that you expressed in

24    your report on Ms. Taylor?
```

Nathan W. Goodyear, MD

```
 1          A.   No.

 2               MS. MOORE:  Object to the form.  That's

 3          it.  Time.

 4               MR. KOTT:  What time is it?  It's done?

 5               VIDEOGRAPHER:  It's done.

 6               MR. KOTT:  I think the Judge would let me

 7          have one more question.

 8               MS. MOORE:  I think the Judge would let

 9          you have one.

10               MR. KOTT:  Thank you.  We are done.

11               MS. MOORE:  I have ten minutes.

12               MR. KOTT:  Why do you have ten minutes?

13               MS. KOTT:  She reserved nine.

14               MR. KOTT:  She reserved nine, so why do

15          you get ten?  Because the Judge would let you

16          have ten, right?  If you take ten minutes --

17               MS. MOORE:  Can we just stay?

18               MR. KOTT:  You want -- you just come over.

19               VIDEOGRAPHER:  Off the record.

20               (Off the record.)

21               VIDEOGRAPHER:  We are on the record.

22                         EXAMINATION

23     BY MS. MOORE:

24          Q.   All right.  The light at the end of the
```

Nathan W. Goodyear, MD

```
 1      tunnel, Doctor.

 2              You were asked about the time period in

 3      which you treated Ms. Taylor, and asked questions

 4      about that, perhaps some of the complications that

 5      she is experiencing would not appear until later on

 6      after the surgery, correct?

 7          A.   Correct.

 8          Q.   And you treated her from June of 2008

 9      until around October of 2011, correct?

10          A.   Correct.

11          Q.   About three years, a little more than

12      three years?

13          A.   2008 to October -- correct.

14          Q.   And during that time, we saw some

15      improvement in her condition, correct?

16          A.   What would you define as her condition?

17          Q.   You defined good support with respect to

18      the pelvic wall?

19          A.   Pelvic floor.

20          Q.   Pelvic floor?

21          A.   Correct.

22          Q.   You did not see evidence of vaginal

23      bleeding except for post-op -- during the post-op

24      period?
```

Nathan W. Goodyear, MD

1        A.    Correct.

2        Q.    You did not see evidence of the vaginal

3    discharge or odor?

4        A.    Correct.

5        Q.    You did not see evidence of the urinary

6    urgency and other urinary problems?

7        A.    That would be symptoms, and I did see

8    those in 2015.

9        Q.    You're right in 2015.  But, again, I'm

10   staying within the window of June 2008 to October

11   2011.

12       A.    Correct.

13       Q.    And she did not complain to you of back

14   pain?

15       A.    Correct.

16       Q.    No complaints of leg pain?

17       A.    Correct.

18       Q.    No complaints of dyspareunia?

19       A.    Correct.

20       Q.    And you did see some evidence of the mesh,

21   correct?

22       A.    On numerous occasions, correct.

23       Q.    That you trimmed as appropriate?

24       A.    Correct.

Nathan W. Goodyear, MD

1      Q.   And then she returns to see you in 2015

2   with more significant complications, correct?

3      A.   Correct.

4      Q.   And at this point in time she is now

5   involved in litigation, correct?

6      A.   Correct.

7      Q.   And since she has retained the lawyer and

8   filed a lawsuit, she has at least reported to you

9   that she's having more complications?

10     A.   The complications she states are since my

11  last visit with her in 2011.

12     Q.   Right.  And during that time, she's

13  retained a lawyer and filed a lawsuit, correct?

14          MR. KOTT:  Object to the form.

15          THE WITNESS:  Correct, correct.

16  BY MS. MOORE:

17     Q.   So as we sit here today, you know, you

18  talked a lot about your methodology and all, you

19  can't rule out what portions, if any, of

20  Ms. Taylor's complaints may be partly or whole or in

21  whole related to the litigation concerns she has?

22          MR. KOTT:  Object to the form.

23          THE WITNESS:  You're asking me to jump in

24          her head.  I cannot do that.

Nathan W. Goodyear, MD

```
 1    BY MS. MOORE:

 2        Q.   I'm asking you that -- strike that.

 3            She did not have significant complaints

 4    related to the mesh until after she retained a

 5    lawyer and filed a lawsuit against Ethicon and

 6    returned to you in 2015, correct?

 7            MR. KOTT:  Object to the form.

 8            THE WITNESS:  I don't know that, because

 9        the last time I saw her was in 2011.

10    BY MS. MOORE:

11        Q.   But during that window, three plus years,

12    she did not have significant complaints?

13            MR. KOTT:  Object to the form.

14            THE WITNESS:  I did not see her during

15        that time frame, so I do not know.

16    BY MS. MOORE:

17        Q.   You did not see her from June 2008 to

18    October --

19        A.   I thought you said 2011 to 2015.

20        Q.   Okay.  If I did, I misspoke and I

21    apologize.

22            During the June 2008 to October 2011 time

23    period that you saw her, three plus years, she did

24    not have significant complaints related to the mesh,
```

Nathan W. Goodyear, MD

1      correct?

2             A.   Other than the erosion.

3             Q.   Other than the erosion?

4             A.   Correct.

5             Q.   You treated that appropriately inpatient,

6      correct?

7             A.   Correct.

8             Q.   You did the trimmings?  She was able to

9      leave that day?

10            A.   Correct.

11            Q.   Did not go under general anesthesia?

12            A.   Correct.

13            Q.   And reported to you that she was doing

14      better?

15            A.   Correct.

16            Q.   The erosion -- we can debate the risk of

17      erosion that was prevalent during the time you

18      treated Ms. Taylor, and during the time you did her

19      surgery, but you will acknowledge that you knew it

20      was a risk?

21            A.   What was a risk?

22            Q.   The risk of erosion.

23            A.   With the surgery?

24            Q.   Yes, sir.

Nathan W. Goodyear, MD

```
 1            A.    Yes.

 2            Q.    Okay.  So whether the risk was 10 percent

 3       or 15 percent, it was a risk you were aware of and

 4       you took?

 5            MR. KOTT:  Object to the form.

 6       BY MS. MOORE:

 7            Q.    Correct?

 8            A.    Correct.

 9            Q.    And, in fact, your own experience was a

10       higher risk, higher than even what we have seen in

11       any documents today, correct?

12            A.    Correct.

13            MS. KOTT:  You're over.

14            MS. MOORE:  Am I?  The Judge would allow

15       me --

16            MR. KOTT:  One question.  One question.

17            THE WITNESS:  I'm not sure my wife would.

18            MS. MOORE:  One question.  Do I really

19       have to pick?  I'm just kidding.

20            MR. KOTT:  I don't think you can ask one

21       question.

22            MS. MOORE:  It's hard.  I have to admit,

23       you guys are really ruining my day.

24
```

Nathan W. Goodyear, MD

```
 1    BY MS. MOORE:

 2         Q.   Doctor, the site of the hematoma, even if

 3    healed, is going to be at an increased risk of

 4    erosion because the tissue in that area is not

 5    normal?

 6              MR. KOTT:  Object to the form.

 7              THE WITNESS:  Correct.  It's a blood clot.

 8              MS. MOORE:  Okay.  No further questions.

 9         Thank you.

10              MR. KOTT:  Thank you.

11              MS. MOORE:  Good night.

12              VIDEOGRAPHER:  You want me to go off the

13         record?

14              MS. CAPODICE:  Let's go off the record

15         first and then let's go to the exhibits and

16         then go back on and specify.  Is that okay?

17              MR. KOTT:  Yes.

18         (Deposition concluded at 7:39 p.m.)

19                        ********

20

21

22

23

24
```

Nathan W. Goodyear, MD

```
 1               -   -   -   -   -   -

                     E  R  R  A  T  A

 2               -   -   -   -   -   -

 3

 4        PAGE   LINE   CHANGE

 5        _____  _____  _____

 6          REASON:    _____

 7        _____  _____  _____

 8          REASON:    _____

 9        _____  _____  _____

10          REASON:    _____

11        _____  _____  _____

12          REASON:    _____

13        _____  _____  _____

14          REASON:    _____

15        _____  _____  _____

16          REASON:    _____

17        _____  _____  _____

18          REASON:    _____

19        _____  _____  _____

20          REASON:    _____

21        _____  _____  _____

22          REASON:    _____

23        _____  _____  _____

24          REASON:    _____
```

Nathan W. Goodyear, MD

```
 1

 2              ACKNOWLEDGMENT OF DEPONENT

 3

 4              I,_____, do

 5    hereby certify that I have read the

 6    foregoing pages, and that the same is

 7    a correct transcription of the answers

 8    given by me to the questions therein

 9    propounded, except for the corrections or

10    changes in form or substance, if any,

11    noted in the attached Errata Sheet.

12

13

14    _____

15     NATHAN W. GOODYEAR, M.D.          DATE

16

17

18    Subscribed and sworn

      to before me this

19    _____ day of _____, 20_____.

20    My commission expires:_____

21

      _____

22    Notary Public

23

24
```

Nathan W. Goodyear, MD

```
 1                    REPORTER CERTIFICATE

 2    STATE OF TENNESSEE

 3    COUNTY OF KNOX

 4          I, Michele Faconti, RPR, Licensed Court

 5    Reporter, LCR #667, in and for the State of

 6    Tennessee, do hereby certify that the deposition of

 7    Nathan W. Goodyear, M.D., taken on March 3rd, 2016,

 8    was reported by me and that the foregoing

 9    transcript, pages 1 through 166, inclusive, is a

10    true and accurate record to the best of my

11    knowledge, skills and ability.

12          I further certify that I am not related to, nor

13    an employee or counsel of any of the parties to the

14    action as defined under T.C.A. Section 24-9-136, nor

15    am I financially interested in the outcome of this

16    case.  Reading and signing not waived.

17          In witness thereof, I have hereunto set my hand

18    on this 14th day of March, 2016.

19

20

21                            _____

22                            Michele Faconti: 03/14/16

                              22:32:01 AM; Knoxville

23                            Tennessee; TN LCR 667

                              expires: 6-30-2016

24
```