# EXHIBIT I

Konstantin Walmsley, M.D.

```
 1            IN THE UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                      AT CHARLESTON
 4                        -  -  -
 5
      IN RE:  ETHICON, INC.,      :  MASTER FILE NO.
 6    PELVIC REPAIR SYSTEM        :  2:12-MD-02327
      PRODUCTS LIABILITY          :  MDL 2327
 7    LITIGATION                  :
                                  :  JOSEPH R. GOODWIN
 8                                :  U.S. DISTRICT JUDGE
      ------------------------------- ---------------------
 9    SHERRY FOX and ROY FOX, JR.  :
             Plaintiffs,          :
10                                :
             v.                   :  CASE NO.
11                                :  2:12-CV-00878
      JOHNSON & JOHNSON, INC. and  :
12    ETHICON, INC.,              :
             Defendants.          :
13
                        -  -  -
14
                   March 23, 2016
15
                        -  -  -
16
17            Oral deposition of KONSTANTIN
      WALMSLEY, MD taken pursuant to notice, was held at
18    the law offices of Mountainside Hospital, 1 Bay
      Avenue, Montclair, New Jersey, beginning at 12:23
19    p.m., on the above date, before Ann Marie Mitchell,
      a Federally Approved Certified Realtime Reporter,
20    Registered Diplomate Reporter and Notary Public.
21
                        -  -  -
22
23            GOLKOW TECHNOLOGIES, INC.
           877.370.3377 ph | 917.591.5672 fax
24                 deps@golkow.com
25
```

Konstantin Walmsley, M.D.

```
 1    APPEARANCES:

 2

 3           TRACEY & FOX
             BY:  CLINTON J. CASPERSON, ESQUIRE
 4           440 Louisiana Street
             Suite 1901
 5           Houston, Texas 77002
             (713) 925-7216
 6           ccasperson@traceylawfirm.com
             Representing the Plaintiffs
 7

 8
             ROERIG, OLIVEIRA & FISHER, LLP
 9           BY:  DAVID G. OLIVEIRA, ESQUIRE
             10225 North Tenth Street
10           McAllen, Texas 78502
             (956) 393-6300
11           doliveira@rofllp.com
             Representing the Defendants
12

13

14                       -  -  -

15

16

17

18

19

20

21

22

23

24

25
```

Konstantin Walmsley, M.D.

```
 1                      -  -  -
 2                  I N D E X
 3                      -  -  -
 4
 5   Testimony of:  KONSTANTIN WALMSLEY, MD
 6        By Mr. Oliveira              5, 73
          By Mr. Casperson             71
 7
 8                      -  -  -
 9              E X H I B I T S
10                      -  -  -
11
```

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Fox-Walmsley-1 | Amended Notice to take video deposition of Konstantin Walmsley | 5 |
| Fox-Walmsley-2 | Rule 26 Expert Report of Konstantin Walmsley, MD | 5 |
| Fox-Walmsley-3 | Fox, Sherry Encounter Summary, 12/04/2015 | 8 |
| Fox-Walmsley-4 | Binder | 9 |
| Fox-Walmsley-5 | AUGS Position Statement on Mesh Midurethral Slings for Stress Urinary Incontinence | 30 |
| Fox-Walmsley-6 | PT Progress Note | 71 |

```
24              (Exhibit Fox-Walmsley-4 was retained
           by the witness and is not attached to the
25         transcript.)
```

Konstantin Walmsley, M.D.

```
 1                        -  -  -

 2              DEPOSITION SUPPORT INDEX

 3                        -  -  -

 4

 5          Direction to Witness Not to Answer

 6                      Page Line

 7

 8

 9          Request for Production of Documents

10                      Page Line

11

12

13

                          Stipulations
14
                          Page Line
15

16

17

18

                        Question Marked
19
                          Page Line
20

21

22

23

24

25
```

Konstantin Walmsley, M.D.

```
 1                      -  -  -
 2              (Deposition Exhibit No.
 3         Fox-Walmsley-1, Amended Notice to take
 4         video deposition of Konstantin Walmsley,
 5         and Deposition Exhibit No. Fox-Walmsley-2,
 6         Rule 26 Expert Report of Konstantin
 7         Walmsley, MD, was marked for
 8         identification.)
 9                      -  -  -
10              KONSTANTIN WALMSLEY, MD, after having
11         been duly sworn, was examined and
12         testified as follows:
13                      -  -  -
14                   EXAMINATION
15                      -  -  -
16  BY MR. OLIVEIRA:
17         Q.     I started to say good morning,
18  Dr. Walmsley, but I realized it's afternoon now.
19              Good afternoon.  How are you doing?
20         A.     I'm well.
21         Q.     We met earlier?
22         A.     We did.
23         Q.     I believe I told you I represent
24  Ethicon in this case involving Sherry Fox.  And so I
25  guess I'm a little confused, because my
```

Konstantin Walmsley, M.D.

1    understanding, you're here to offer case-specific

2    opinions today; is that correct?

3             A.        Yes, sir.

4             Q.        Okay.  Because I also saw that you

5    had some general opinions in your report?

6             A.        In the Fox report?

7             Q.        Yes.

8             A.        General opinions that are applicable

9    to the case, I suppose, would be the way I would

10   interpret it.

11            Q.        Okay.  That's fine.

12            A.        Yeah.

13            Q.        But you're not here to offer -- well,

14   let me ask you this:  The general opinions, you say

15   they're related to the facts of this particular case

16   and that's why you've offered them?

17            A.        Yes, sir.

18            Q.        Okay.  Let me show you what's been

19   marked as Fox-Walmsley -- I'll just call it Exhibit

20   Number 1.  I'm not going to say that every time.

21                      I'll relate to you it's a notice to

22   take your deposition.

23                      Do you see that?

24            A.        Yes, sir.

25            Q.        Have you seen that before?

Konstantin Walmsley, M.D.

1      A.      I have.

2      Q.      There's a Document A that's attached

3  to it that has asked you to bring a number of

4  documents.

5              Did you bring any documents

6  responsive to those?

7      A.      I did.

8      Q.      And what did you bring?

9      A.      I brought -- actually brought

10 Ms. Fox's IME report, and I also brought a list of

11 my prior testimonies.

12     Q.      Had you produced that IME report

13 before?  Does your lawyer have a copy?

14     A.      He received a copy yesterday evening.

15 Yes, sir.

16     Q.      Okay.  Because I was going to say, I

17 don't think I've seen one.  Let's -- I'm sorry.

18             MR. CASPERSON:  We also have some

19 stuff here that -- that's another copy of the IME

20 report, and there's also a thumb drive which has

21 some prior depositions of Dr. Walmsley, some prior

22 reports that he's done in some other pelvic mesh

23 cases, and some invoices, including an invoice for

24 this case.

25             MR. OLIVEIRA:  Okay.  I hate these

Konstantin Walmsley, M.D.

```
 1   things because I always lose them.
 2   BY MR. OLIVEIRA:
 3        Q.      Well, let's start with the IME
 4   report.
 5              Let's mark that as -- I've already
 6   got one premarked as 2.  So we'll mark that one as
 7   3.
 8                      -   -   -
 9              (Deposition Exhibit No.
10          Fox-Walmsley-3, Fox, Sherry Encounter
11          Summary, 12/04/2015, was marked for
12          identification.)
13                      -   -   -
14   BY MR. OLIVEIRA:
15        Q.      And then it looks like you also have
16   a binder --
17        A.      Yes, sir.
18        Q.      -- that you brought.
19              And can you tell me what's in that
20   binder?
21        A.      This binder is a table of contents,
22   articles and materials that I've relied upon in part
23   to create my opinion.  There's some deposition
24   testimony in here as well as medical records.  And
25   then some Rule 26 expert reports.
```

Konstantin Walmsley, M.D.

```
1           Q.       And we'll go ahead and mark that as

2    Exhibit Number 4.

3                           -  -  -

4                 (Deposition Exhibit No.

5            Fox-Walmsley-4, Binder, was marked for

6            identification.)

7                           -  -  -

8                 THE WITNESS:  I should also mention,

9    if I may, in addition I added some abstracts, three

10   separate abstracts to the binder as well.

11   BY MR. OLIVEIRA:

12          Q.       And what abstracts are those?

13          A.       These are abstracts that specifically

14   talk to suburethral slings and autologous fascial

15   slings.  They're abstracts from three separate

16   articles.

17          Q.       Is this something that you just

18   pulled in the last couple of days, or --

19          A.       In the last week or so as I was

20   getting ready for the deposition, I thought it might

21   be helpful just to look at some of the materials

22   that Dr. Irwin in part relied upon to form her

23   report.

24          Q.       Did you -- you also produced a report

25   in this case?
```

Konstantin Walmsley, M.D.

```
 1        A.      Yes, sir.

 2        Q.      I'm going to show you what we'll

 3   mark -- that we have marked.  It's been marked as

 4   Exhibit Number 2 and ask you if that's your report?

 5        A.      Yep.  This is my report.

 6        Q.      When was -- when did you draft that

 7   report?

 8        A.      Oh, I would reckon two months ago,

 9   give or take.

10        Q.      I don't see a date on it.

11                Do you date your reports?

12        A.      I have in the past.  Sometimes I do.

13   Sometimes I do not.

14        Q.      Do you see anywhere in this report

15   where it's been dated?

16        A.      It's not been dated in this report.

17        Q.      And so you say you believe you

18   prepared it two months ago?

19        A.      Yes.  Roughly.

20        Q.      Do you have any idea, do you have any

21   indication, any e-mails or anything that would

22   clarify when you sent this report to your attorney?

23        A.      I do, yeah.

24        Q.      You do.  Do you have them with you?

25        A.      It's in my computer downstairs.  I
```

Konstantin Walmsley, M.D.

1    can --

2         Q.      On a break I may ask you to go look

3    for the date of -- the date I guess you drafted and

4    the date that you sent it to your lawyer?

5         A.      I'm happy to.

6         Q.      And while you're down there, if you

7    could also do it for the Ridgley case, I would

8    appreciate it.

9         A.      I would be happy to.

10        Q.      There may be a date on that one.  I'm

11   not sure there is.

12               When were you first retained by the

13   plaintiffs to provide or to serve as an expert in

14   this case?

15        A.      In the late summer/early fall of

16   2015.

17        Q.      And who was it that contacted you?

18        A.      Mr. Casperson.

19        Q.      And what did he ask you to do in this

20   case?

21        A.      He asked me to review medical records

22   relating to the care of Sherry Fox.

23        Q.      And did he send you medical records?

24        A.      Yes, sir.

25        Q.      And do you recall which medical

Konstantin Walmsley, M.D.

```
 1   records those were?

 2           A.      They're listed in the report and also

 3   in the binder, yes.

 4           Q.      Have you ever been retained by

 5   Mr. Casperson or his firm in any previous case?

 6           A.      I have been, yes.

 7           Q.      You have been?

 8           A.      Yes, sir.

 9           Q.      When was the first time they retained

10   you in a case?

11           A.      2014.

12           Q.      Was it involving the mesh litigation?

13           A.      Yes, sir.

14           Q.      Do you recall which case it was?

15           A.      One was Boston Scientific, the other

16   is Bard.

17           Q.      No previous Ethicon cases prior to

18   this, these two cases?

19           A.      No, not with Mr. Casperson, no.

20           Q.      How about with any other plaintiffs'

21   firm?  Have you been hired by other plaintiffs'

22   firms to provide expert testimony in any mesh cases?

23           A.      I have, yes.

24           Q.      What other firms are you dealing with

25   right now?
```

Konstantin Walmsley, M.D.

1    A.        There's one case relating to a

Prolift case.  That was actually a med mal case.

And then I also served as an expert witness for

Boston Scientific and Bard for Perdue & Kidd.

5    Q.        When you say you served as an expert

for Boston Scientific, you weren't retained by

Boston Scientific.  Correct?

8    A.        No, sir.  I was retained -- it was in

that litigation.

10   Q.        But you were retained by the Perdue

firm from Houston?

12   A.        Yes, sir.

13   Q.        What was the first year, I guess,

when were you first retained to do any -- provide

any expert testimony in any of these mesh cases?

16   A.        That would be 2013.

17   Q.        Do you know how many cases, mesh

cases, you've been retained on to date?

19   A.        I would give a fairly reliable

estimate of eight to ten.

21   Q.        Do you think it could be more?

22   A.        No.

23   Q.        Do you know how much you've billed in

all those cases?

25   A.        All combined?

Konstantin Walmsley, M.D.

1      Q.      Yes.

2      A.      Probably in the order of 50- to

3   $75,000.

4      Q.      You said you generated an invoice,

5   and I got your attorney handing me a thumb drive,

6   and I can't open it right now.

7              But do you know how much you've

8   billed on the Fox case?

9      A.      I'd have to give you a ballpark

10  estimate, in the range of 6- to $7,000.

11     Q.      And how many hours does that involve?

12     A.      That involves about 13 hours, 13-plus

13  hours of work.

14     Q.      Does that include preparation for

15  this depo?

16     A.      No.  No, sir.

17     Q.      How much time have you spent

18  preparing for this deposition today?

19     A.      I received some -- well, I reviewed

20  Irwin's report, and I also reviewed some additional

21  records, so probably in the order of four to six

22  hours.  I have it written down, but I haven't billed

23  yet for this.

24     Q.      Have you -- prior to I guess

25  providing expert testimony in the mesh cases, and I

Konstantin Walmsley, M.D.

1  think you told us about one malpractice case, have

2  you served as an expert before in other litigation?

3          A.      I have, yes, sir.

4          Q.      About how many cases?

5          A.      I'd guess I'd have to ask, when you

6  say serving as an expert witness, are you speaking

7  in terms of these going to testimony or just all the

8  cases I've given --

9          Q.      Just where you've been retained to

10  provide expert testimony.

11          A.      I probably review -- as far as giving

12  prior testimony, probably in the order of 15 to 20.

13          Q.      And how many times have you been

14  deposed?

15          A.      As an expert witness, I've been

16  deposed perhaps ten times.

17          Q.      So then -- and I forgot to bring this

18  up in the beginning.  So then you know the basic

19  rules of a deposition.  We have this lovely young

20  lady over here taking down everything we say, and if

21  we speak over each other, we'll drive her crazy.  So

22  I'll do my best not to interrupt you, and if you can

23  wait until I finish my question, it will help her

24  out a lot.

25          A.      Yes, sir.

Konstantin Walmsley, M.D.

```
 1          Q.       Okay.  Thanks.  And you you've done

 2    fine so far.  It's something I neglected to say

 3    earlier.

 4                    If you can turn to your report, which

 5    is Exhibit Number 2, I believe.

 6                    You have that in front of you?

 7          A.       Yes.

 8          Q.       Did you include all of your opinions

 9    in this report that you intend to testify about in

10    this case?

11          A.       Yes.

12          Q.       Okay.  And as you sit here today,

13    have you received any additional information that

14    you didn't have when you prepared this report?

15          A.       Yes.

16          Q.       And what additional information is

17    that?

18          A.       Some additional medical records

19    relating to physical therapy received by the patient

20    and some additional depositions, one of Dr. Irwin's

21    and the other, Dr. Thames.

22          Q.       What deposition did you see of

23    Dr. Irwin's?

24          A.       Dr. Irwin provide -- I'm sorry.  It

25    wasn't a deposition.  Excuse me.  It was a Rule 26
```

Konstantin Walmsley, M.D.

```
 1   report.  Pardon.  As was Dr. Thames a Rule 26

 2   report.

 3          Q.      Was it a Rule 26 report regarding

 4   this case, regarding the Fox case?

 5          A.      Yes.

 6          Q.      And you received those all after you

 7   did your report?

 8          A.      Yes.

 9          Q.      Now that you've gotten this

10   additional -- and let me ask you, is there any other

11   additional information that you've gotten that you

12   didn't have when you drafted this report?

13          A.      No.

14          Q.      Is any of this additional

15   information, is that going to require you to

16   supplement your report or revise your report in any

17   way?

18          A.      No.

19          Q.      I believe you just told me you

20   performed a physical examination of Mrs. Fox in this

21   case?

22          A.      Yes, sir, I did.

23          Q.      And when did that take place?

24          A.      That occurred on December 4, 2015.

25          Q.      Did you request that?
```

Konstantin Walmsley, M.D.

1       A.      Mr. Casperson requested that.

2       Q.      And where did you examine her?

3       A.      I examined her in my office.

4       Q.      Your office here in New Jersey?

5       A.      Yes, sir.

6       Q.      So she flew up to -- for that visit?

7       A.      Yes.

8       Q.      Let me ask you, other than -- well,

9    strike that.

10              Let me ask you, what did you review

11   before drafting your report, your final report?

12   What did you rely on to draft your report?

13      A.      So I relied upon the medical records

14   that are stated in the report.  There were a handful

15   of articles that I used as references in terms of

16   forming my opinion.  I had the IFU for the TVT

17   device that dated back to the time that it was

18   implanted.  And also an informed consent document

19   produced by the AMA.

20              There were several depositions that I

21   relied upon, that of Mrs. Fox, Dr. Warner, Dr.

22   Villa-Olvera, Dr. Haverkorn and then of course my

23   IME as well.

24      Q.      And the medical records that you said

25   you've relied on, are all those contained in the

Konstantin Walmsley, M.D.

1    binder that's been marked as -- I believe as -- did

2    we mark them Exhibit 4, I believe?

3         A.      Yes.  And the answer to that is yes.

4         Q.      How many studies did you rely on?

5         A.      Many.

6         Q.      They're all listed there?  Do you

7    have them numbered or --

8         A.      They're all -- they're all provided

9    here numerically and with a bibliography, and there

10   are a total of over 20 of them.

11               And I guess as we were alluding to

12   before, this is a case-specific report.  I've read

13   hundreds of articles that relate to pelvic mesh

14   and -- both in the world of slings and pelvic organ

15   prolapse repair.  But these were the ones of

16   significance that I really relied upon in the

17   formation of my opinion here.

18        Q.      And I'm looking at your binder, and

19   it looks like it has 34 tabs in it?

20        A.      Correct.  Yeah.

21        Q.      Besides -- is each one tabbed

22   separately, or are they --

23        A.      The articles are all tabbed

24   separately, and the articles run from tab 3 to tab

25   22.

Konstantin Walmsley, M.D.

1      Q.      And then after tab 22, do you have an

2   index there?

3      A.      Yes, sir.

4              After tab 22, there are four

5   depositions, 23 to 26.  The medical records

6   encompass tabs 27 to tab 31.  And then there are

7   three additional documents, two Rule 26 expert

8   reports that I alluded to before, and then 34 is

9   photos of the pathology specimen from Mrs. Fox's

10  mesh explant.

11     Q.      Is there anything other than what

12  you've showed us in your binders, anything -- and

13  then I guess the IME report, is there anything else

14  that you relied on in formulating your opinions for

15  your report?

16     A.      No, sir.

17             MR. CASPERSON:  Objection to form.

18  BY MR. OLIVEIRA:

19     Q.      Have you ever implanted midurethral

20  slings in patients?

21     A.      I have, yes.

22     Q.      Do you know how many?

23     A.      I could give you a ballpark estimate.

24  I've been in practice since 2004.  Between 2003 and

25  2004, during my fellowship, I implanted roughly 50

Konstantin Walmsley, M.D.

1    implants.  And then in practice, I implanted --

2    during the early part of my career, I probably

3    implanted between 30 and 40 implants a year.  Now

4    I'm implanting about 20 or so per year.  So I would

5    give an estimate of several hundred.  I mean,

6    certainly over 250 and probably more on the order of

7    300 to 400.

8           Q.      Okay.  Have you ever implanted a TVT

9    device like the one that was implanted in Mrs. Fox

10   in this case?

11          A.      I have.

12          Q.      And when did you -- when was the last

13   time that you did one of those?

14          A.      Primarily during my fellowship years.

15          Q.      And did you receive training, I

16   guess, from Ethicon, some kind of training before

17   you began implanting their products?

18          A.      Actually, most of my training

19   occurred both during my residency and then in my

20   fellowship with a Dr. Steven Kaplan.

21                  I did receive training in private

22   practice on the TVT SECUR device.  But as far as the

23   classic TVT device, I learned primarily during my

24   training years.

25          Q.      And you say you still implant

Konstantin Walmsley, M.D.

1  midurethral slings?

2       A.      I do.

3       Q.      And 20 to 25 a year?

4       A.      Roughly, yes.

5       Q.      Do any of those include Ethicon

6  products or --

7       A.      No.  No, sir.

8       Q.      What primarily, what products do you

9  use?

10      A.      Three main products, a Bard product,

11 a Coloplast product and occasionally an AMS product.

12      Q.      Have you ever taken a part or have

13 you ever done any studies yourself involving the

14 treatment of stress urinary incontinence surgically

15 or the surgical treatment, I guess, of stress

16 urinary incontinence?

17      A.      I've not published any articles in

18 that arena, no.

19      Q.      How about any studies involving the

20 TVT product that was used in this case?

21      A.      No, sir.

22      Q.      I looked at your reliance list or the

23 studies I guess that you looked at earlier.  And one

24 of the studies I noticed you listed in your list is

25 the Nilsson study?

Konstantin Walmsley, M.D.

```
 1           A.      Yes.

 2           Q.      And that was a study done by

 3   Dr. Nilsson in 2013.  Correct?

 4           A.      Yes, sir.

 5           Q.      And it's called the "Seventeen years'

 6   follow-up of the tension-free vaginal tape procedure

 7   for female stress urinary incontinence"?

 8           A.      Yes.

 9           Q.      And it looks like, since you listed

10   it, I assume, then, that you considered that as

11   part of your -- considered that study in formulating

12   your opinions in this case?

13           A.      Yes.

14           Q.      That study, you would agree with me

15   that study was done by a reputable author in a

16   peer-referenced journal.  Correct?

17                   MR. CASPERSON:  Form.

18                   THE WITNESS:  Yes.

19   BY MR. OLIVEIRA:

20           Q.      And did you review any other studies

21   that showed that polypropylene-based midurethral

22   slings like the TVT have low compliance -- or low

23   complications rate?

24                   Let me rephrase that because I kind

25   of jumped ahead.
```

Konstantin Walmsley, M.D.

1    A.    Uh-huh.

2    Q.    This study I guess shows -- the

3 results were that it showed that polypropylene-based

4 midurethral slings had low complications rate.

5 Correct?

6    A.    The Nilsson study did demonstrate a

7 fairly low complication rate.

8    Q.    And they showed that they were safe

9 and reliable?

10         MR. CASPERSON:  Form.

11         THE WITNESS:  I mean, those terms

12 were not used in the report, but his conclusion was

13 that it was a durable procedure with a high

14 satisfaction rate.

15 BY MR. OLIVEIRA:

16    Q.    When you said a low complications

17 rate, do you remember what the complications rate

18 was?  Or do you have that in front of you?

19    A.    Well, of his report, a little under

20 80 percent were reachable via telephone interview.

21 So it's -- you know, given the fact that over

22 20 percent were not really followed up on, I think

23 that's a fair critique of the follow-up.  These were

24 retrospective phone-based interviews of which only

25 half the patients were visiting the clinic.  So the

Konstantin Walmsley, M.D.

```
1   20 of them, over 20 were lost to follow-up.  12 were

2   interviewed via phone.  So, in essence, only half

3   the patients really were examined in a comprehensive

4   enough fashion that I think that that would be a way

5   to really look at complications.

6               MR. OLIVEIRA:  Objection, form.

7   BY MR. OLIVEIRA:

8        Q.     My question is, what was the

9   complication rate?  What was the rate, the result

10  that they reached that this study showed?

11              MR. CASPERSON:  Object to the form of

12  the question.

13              THE WITNESS:  You know, this report

14  didn't necessarily look at complications as much as

15  success or cure rates, to my mind.  So it's hard to

16  answer that question.

17  BY MR. OLIVEIRA:

18       Q.     So let me ask you this.

19       A.     Yes.

20       Q.     What was the success rate, I guess?

21       A.     He -- the conclusion was that over

22  90 percent of the women were objectively continent,

23  and 87 percent were significantly cured or improved

24  of the patients who were available to be questioned.

25       Q.     Doctor, would you agree with me that
```

Konstantin Walmsley, M.D.

```
 1    stress urinary incontinence is a life -- or can be a

 2    life-altering condition for women?

 3            A.      Yes.

 4            Q.      And for many women with this

 5    condition, it can seriously restrict their everyday

 6    activities?

 7            A.      Yes.

 8            Q.      Exercising, working, if it's serious

 9    enough.  Correct?

10            A.      I agree.

11            Q.      And I think you testified previously

12    in other cases that polypropylene mesh --

13    polypropylene-based mesh slings like the TVT are the

14    standard of care for midurethral slings.  Correct?

15    Do you recall that?

16            A.      I recall saying something to that

17    effect.

18            Q.      Do you recall also saying previously

19    that polypropylene slings like the TVT are the gold

20    standard for surgical treatment of SUI?

21            A.      No.  That I specifically recall

22    refuting, actually.

23            Q.      Okay.  So you don't think you said

24    that in a previous deposition?

25            A.      If I did, I think what I was probably
```

Konstantin Walmsley, M.D.

1  alluding to was the fact that they're still done.

2  And for most of us, it is considered the standard of

3  care.  But I recall, frankly, disputing the concept

4  of gold standard.

5       Q.       Fair enough.  In 2002 when Mrs. Fox

6  had a TVT implanted to treat SUI, would you agree at

7  that time it was the standard of care for surgical

8  treatment of SUI?

9            MR. CASPERSON:  Objection to form.

10            THE WITNESS:  No, I would not.

11  BY MR. OLIVEIRA:

12       Q.       In 2002 it would not be the standard

13  of care?

14       A.       Not in my practice and training at

15  that time.

16       Q.       Can you cite me to I guess any

17  studies that would say -- that would show that it

18  was not considered the standard of care in 2002 when

19  Mrs. Fox had hers implanted?

20       A.       I could.

21       Q.       And what studies are those?

22       A.       Part of my training at Cornell

23  involved mentorship under a Jerry Blaivas, who is a

24  major proponent of the autologous fascial sling.

25            In 2002, over 80 percent of the

Konstantin Walmsley, M.D.

1    slings that I implanted were of the autologous

2    fascial variety.  Dr. Blaivas, even as late as 2011,

3    has published articles in which he opines that the

4    autologous fascial sling is the gold standard of

5    care for the treatment of stress urinary

6    incontinence.

7              MR. OLIVEIRA:  Object to form.

8    BY MR. OLIVEIRA:

9         Q.    But my question was when Mrs. Fox had

10   this implanted in 2002, would the TVT that was

11   implanted, would it be considered the standard of

12   care -- I didn't say the gold standard -- for

13   surgical treatment of SUI?

14        A.    No.

15        Q.    And you believe, then, that the

16   implanting physician, then, violated the standard of

17   care by implanting that device in 2002?

18        A.    No.  I wouldn't say that.

19        Q.    Okay.  Then how do you recognize that

20   you -- when you make the statement that it was not

21   the standard of care?

22        A.    I would reconcile that by stating

23   that oftentimes we provide surgical care where we

24   utilize techniques or devices that may not

25   necessarily be recognized as either the standard of

Konstantin Walmsley, M.D.

1    care or the gold standard of care.

2         Q.      But your position as you sit here

3    today is that in 2002, implanting the TVT device

4    would not have been the standard of care?

5         A.      Not yet.

6         Q.      When did it become the standard of

7    care?

8         A.      That's a difficult question to ask,

9    but I would opine that it became the standard of

10   care probably in the latter part of the first decade

11   of the 21st century, in the 2005 to 2007 arena.

12        Q.      Were people -- I mean, were

13   gynecologists and urogynecologists implanting --

14   obviously there were people implanting midurethral

15   slings prior to that time.  Correct?

16        A.      Urologists too, yes.

17        Q.      Okay.  And so it was an acceptable

18   procedure prior to 2005-2006?

19        A.      Yes.

20        Q.      And it was one that was used widely

21   in your profession for the treatment of SUI?

22        A.      Starting to at that time, yes.

23        Q.      Mark the next exhibit.

24                        -  -  -

25                (Deposition Exhibit No.

Konstantin Walmsley, M.D.

```
 1              Fox-Walmsley-5, AUGS Position Statement on
 2              Mesh Midurethral Slings for Stress Urinary
 3              Incontinence, was marked for
 4              identification.)
 5                         -  -  -
 6   BY MR. OLIVEIRA:
 7        Q.      I'm going to hand you Exhibit
 8   Number 5, which I will tell you is the AUGS and SUFU
 9   position statement on mesh midurethral slings for
10   stress urinary incontinence.
11        A.      Thank you.
12        Q.      Are you familiar with this statement?
13        A.      I am.
14        Q.      And so the jury's clear, SUI -- or
15   AUGS stands for Advanced -- I'm sorry, the
16   Association of Urogynecologists Society?  Or is that
17   right?  Or Advanced Urogynecology --
18        A.      I think it's the Association of
19   Urogynecological Surgeons.
20        Q.      Surgeons.  Thank you.
21        A.      Yes, sir.
22        Q.      And then is SUFU it looks like is the
23   Society of Urodynamics, Female Pelvic Medicine &
24   Urogenital Reconstruction; is that correct?
25        A.      Yes, sir.
```

Konstantin Walmsley, M.D.

```
 1          Q.      And are these two reputable,
 2    recognized societies?
 3          A.      Yes, sir.
 4          Q.      The top statement in the paper -- let
 5    me see where I can find this.  My other copy had it
 6    highlighted.
 7                  There's a portion in there, I'll read
 8    it to you, it says, "The polypropylene mesh
 9    midurethral sling is the recognized worldwide
10    standard of care for the surgical treatment of SUI."
11                  It goes on to say, "The procedure is
12    safe, effective, and has improved the quality of
13    life for millions of women."
14                  MR. CASPERSON:  Is it under
15    conclusions?
16                  MR. OLIVEIRA:  It might be.  Let me
17    see.
18                  THE WITNESS:  Yes.
19    BY MR. OLIVEIRA:
20          Q.      Did you find it?
21          A.      Yes.  It's in two separate locations,
22    but yes.
23          Q.      Where is the first location that you
24    find it?
25          A.      Page 2, bold, bold number 3, it
```

Konstantin Walmsley, M.D.

```
 1   states, "Polypropylene mesh midurethral slings are

 2   the standard of care for the surgical treatment of

 3   SUI."

 4                   And then your other comment is the

 5   first page -- is the first sentence of the

 6   conclusion section on page 3.

 7                   MR. OLIVEIRA:  Okay.  Let's go off

 8   the record for a second.

 9                   MR. CASPERSON:  Okay.  Off the

10   record.

11                        -  -  -

12                   (A recess was taken from 12:53 p.m.

13        to 12:54 p.m.)

14                        -  -  -

15   BY MR. OLIVEIRA:

16        Q.      So, Doctor, I think when we were --

17   when I previously asked you about that statement,

18   you said I guess you found it on page 2 and it looks

19   like on number 3?

20        A.      Yes.

21        Q.      So it says, "Polypropylene mesh

22   midurethral slings are the standard of care for the

23   surgical treatment of SUI and represent a great

24   advance in the treatment of this condition for our

25   patients."
```

Konstantin Walmsley, M.D.

1              Do you agree with that statement?

2              MR. CASPERSON:  Form.

3              THE WITNESS:  I think in part I do,

4    yes.

5    BY MR. OLIVEIRA:

6         Q.    And then I think the second part that

7    talks about the procedure is safe -- well, let me

8    ask you this because you said in part.  I should ask

9    you.

10        A.    Yeah.

11        Q.    What part do you not agree with?

12        A.    I think it's become the standard of

13   care for the surgical treatment of SUI.  I think it

14   is a mild to moderate advance in the treatment of

15   this condition for our patients, in part because it

16   has shown -- certain elements have been shown to be

17   superior to the other treatments that we offer.

18   However, there are potential complications that can

19   arise from the use of mesh for pelvic slings -- or

20   for urethral slings, excuse me.

21        Q.    Doctor, isn't it true there's also

22   complications with nonmesh procedures for the

23   treatment of SUI?

24        A.    Yes.  Certainly.

25        Q.    I think the second part says, "The

Konstantin Walmsley, M.D.

1    procedure is safe, effective and has improved the...

2    life for millions of women."

3              And you said you found that I guess

4    on the third page or --

5         A.    On the third page, the first sentence

6    of the conclusion states it has helped millions of

7    women, although I don't see the safe, effective part

8    of that comment.

9         Q.    I think the next sentence has it,

10   where it says "acknowledged safety and efficacy it

11   has created in an environment for a much larger

12   number of women."

13        A.    Right.

14        Q.    My question is, do you agree with

15   that statement?

16              MR. CASPERSON:  Objection, form.

17              THE WITNESS:  I don't.

18   BY MR. OLIVEIRA:

19        Q.    And why don't you agree with that

20   statement?

21        A.    You know, in part because there are

22   questions as to the safety of slings and because the

23   efficacy over longer periods of time isn't

24   necessarily as high as one would expect it to be,

25   certainly, for example, to call it a gold standard

Konstantin Walmsley, M.D.

```
 1    type of procedure.

 2         Q.       What about the Nilsson 17-year study

 3    that we talked about earlier?  Doesn't that show

 4    that over a long period of time, it was effective?

 5         A.       I think in his study, of 50 percent

 6    or so of patients that he actually was able to have

 7    physical contact with, it showed a high rate of

 8    success.

 9         Q.       Well, you gave me your reasons I

10    guess why you question the safety and efficacy, but

11    the first statement, it says it "has helped millions

12    of women with SUI regain control of their lives."

13              Would you agree with that?

14         A.       I think that's a true comment, yes.

15         Q.       Let's look at, I guess, the second

16    page now.

17              The first statement says,

18    "Polypropylene material is safe and effective as a

19    surgical implant."

20              Do you agree with that statement?

21              MR. CASPERSON:  Objection, form.

22              THE WITNESS:  Is that comment number

23    2?

24    BY MR. OLIVEIRA:

25         Q.       I think it's number 1.
```

Konstantin Walmsley, M.D.

1  "Polypropylene material is safe and effective as a

2  surgical implant."

3          A.      Yes.  I think that's a nebulous

4  statement, so I think it could be worded

5  differently.

6          Q.      Worded as is, would you agree with

7  that?

8          A.      I would say polypropylene material is

9  safe and effective as a surgical implant for the

10 repair of hernias, for example, for example, for the

11 repair of abdominal wall hernias or for an

12 application in sacrocolpopexy, but I would question

13 that comment in the context of pelvic mesh.

14         Q.      You've told us you continue to use

15 polypropylene materials in the treatment of SUI, and

16 you continue to implant them.  Correct?

17         A.      This is true.

18         Q.      And so you do that even though you're

19 questioning the safety and effectiveness of it?

20         A.      You know, in 2016, I'm able to

21 counsel my patients differently about sling surgery.

22 And there's a reason I implant less slings than I

23 did five, ten years ago.

24         Q.      But you still implant them?

25         A.      I do.

Konstantin Walmsley, M.D.

1          Q.      And you haven't quit implanting

2    surgical mesh, have you?

3          A.      I have not, no.

4          Q.      What about, do you agree that --

5    well, let me ask you this:  You do implant

6    polypropylene materials -- you currently still do

7    it, so would you agree with me, then, that you

8    wouldn't do it if it wasn't a safe and effective

9    alternative for the treatment of SUI, would you?

10                  MR. CASPERSON:  Objection, form.

11                  THE WITNESS:  I'm sorry.  Could you

12   rephrase that question?  I'm sorry.

13   BY MR. OLIVEIRA:

14         Q.      No, it's okay.  It's my fault.

15                  You've told us that you still implant

16   polypropylene mesh.  And so is it fair to say, then,

17   that you believe that it's safe for your patients to

18   have these implants and that it is safe -- that it's

19   effective for the treatment of SUI?

20         A.      I believe that it's -- after an

21   informed consent has been given for some of my

22   patients, it's a safer and more effective form than

23   other treatments.

24         Q.      And then number 3 says,

25   "Polypropylene mesh midurethral slings are the

Konstantin Walmsley, M.D.

```
 1   standard of care for the surgical treatment of SUI

 2   and represents a great" advantage "in the treatment

 3   of this condition for our patients."

 4               Do you see that?

 5     A.      I do.

 6     Q.      And do you agree with that statement?

 7               MR. CASPERSON:  Objection, form.

 8               THE WITNESS:  It says "great advance"

 9   instead of "advantage."

10   BY MR. OLIVEIRA:

11     Q.      I'm sorry.

12     A.       I think I answered the question

13   before that I didn't agree with it in whole.

14     Q.      And remind me again what your -- what

15   you disagreed with.

16     A.       My comment is that -- my comment

17   before was that I felt that it was -- the

18   terminology "great advance" I think kind of

19   overstates the utility of slings, and certainly in

20   the armamentarium to treat stress urinary

21   incontinence, it's become a very commonly utilized

22   procedure.  Whether it's truly a great advance in

23   the treatment of this condition, I think to some

24   degree remains to be seen.

25     Q.       Have you ever belonged to AUGS or
```

Konstantin Walmsley, M.D.

```
 1    SUFU?
 2          A.      I've not.
 3          Q.      Do you practice with other
 4    urogynecologists or urologists who belong to either
 5    of those organizations?
 6          A.      I do.
 7          Q.      Are you familiar also with the
 8    American Urogynecological Association, the AUA,
 9    position statement on the use of vaginal mesh for
10    surgical treatment of SUI?
11          A.      I've seen it before.
12          Q.      And I think -- and I don't have a
13    copy of that, but do you agree with the statement it
14    makes in there that extensive data exists to support
15    the use of polypropylene mesh suburethral slings for
16    the treatment of female SUI with minimal morbidity
17    compared to alternative surgeries?
18                  MR. CASPERSON:  Objection to form.
19                  THE WITNESS:  I agree for the most
20    part with the exception of the minimal morbidity.
21    BY MR. OLIVEIRA:
22          Q.      So you disagree that there's minimal
23    morbidity?
24          A.      I think the morbidity occurs in a
25    small subset of patients; however, that morbidity
```

Konstantin Walmsley, M.D.

1    can be more than minimal for those patients.

2          Q.      It goes on to say that advantages

3    include shorter operation time.  I'll break it down

4    so that I can give you a chance to...

5                  Do you agree with the statement that

6    one of the advantages include a shorter operation

7    time?

8          A.      Yes, sir.

9          Q.      I guess reduced surgical pain?

10                 MR. CASPERSON:  Objection, form.

11                 THE WITNESS:  Not necessarily, but

12   possibly.

13   BY MR. OLIVEIRA:

14         Q.      Reduced hospitalization?

15                 MR. CASPERSON:  Objection, form.

16                 THE WITNESS:  Yes.

17   BY MR. OLIVEIRA:

18         Q.      And then I guess another advantage

19   they list is voiding dysfunction?

20                 MR. CASPERSON:  Objection to form.

21   BY MR. OLIVEIRA:

22         Q.      Reduced voiding dysfunction I guess

23   would be --

24         A.      In the short term, yes.  In the long

25   term, no.

Konstantin Walmsley, M.D.

```
1          Q.      It goes on to say, mesh-related
2   complications can occur following polypropylene
3   sling replacement, but the rate of complications is
4   acceptably low.
5                  Do you agree with that statement?
6                  MR. CASPERSON:  Objection, form.
7                  THE WITNESS:  I think from a
8   quantitative statement, that's a true comment.
9                  MR. OLIVEIRA:  Doctor, if you don't
10  mind, let's take a little break, and we'll move into
11  phase 2.
12                 THE WITNESS:  Thank you.
13                      -  -  -
14                 (A recess was taken from 1:04 p.m. to
15        1:21 p.m.)
16                      -  -  -
17  BY MR. OLIVEIRA:
18         Q.      If you could I'd ask you to turn to
19  your report, which we have marked as -- I believe as
20  Exhibit 2 in this case.
21         A.      Yep.
22         Q.      It looks like the first four or five
23  pages of your report are kind of background
24  information and mentions, I guess, the medical
25  records and depositions that you reviewed, along
```

Konstantin Walmsley, M.D.

1    with the medical literature and other documents that

2    you reviewed.  Correct?

3         A.      Yes.

4         Q.      And then you do -- at some point you

5    have a clinical history where you -- it looks like a

6    little chronology where you list a number of

7    different things in her medical history, I guess,

8    that you believe were significant?

9         A.      Yes, sir.

10        Q.      Then after that, you get into what

11   looks like the couple of general opinions?

12        A.      Yes, sir.

13        Q.      And then five case-specific opinions

14   or -- yes, it looks like it's five.  Is that

15   correct?

16        A.      Yes.

17        Q.      So let me ask you about your first

18   opinion.

19               Your first general opinion, you state

20   there at the bottom that it's your opinion "the IFU

21   for the TVT in 2002 was not sufficient to enable

22   informed consent from the patient."

23               What do you base that on?

24        A.      I base that on my clinical experience

25   with TVT and, for that matter, other polypropylene

Konstantin Walmsley, M.D.

1    mesh slings and the IFU that I reviewed that dated

2    back to the time when this sling was implanted.

3         Q.       And what do you believe is missing

4    from this IFU that you would put in it?

5         A.       Well, there are a lot of potential

6    complications that were not mentioned in the IFU

7    that I've listed in my report.

8         Q.       Doctor, would you agree with me that

9    generally, that IFUs typically don't include every

10   potential adverse reaction or complication?  Isn't

11   that correct?

12        A.       Not necessarily.

13        Q.       So you believe that they should have

14   every adverse reaction or every possible reaction to

15   the product?

16        A.       I think they should have the majority

17   of them, the ones that are the most likely to occur.

18               For those that are case-report like

19   complications or case-report like findings, I would

20   agree with you, those don't necessarily need to be

21   in the IFU.  But certainly the ones that you see

22   with even some regularity or occasional regularity

23   should be mentioned.

24        Q.       So tell me, then, which ones do you

25   believe should be in there?

Konstantin Walmsley, M.D.

1          A.      Well, first, as far as complications

2    to be mentioned, mesh contraction would be one.

3    Dyspareunia.  Mesh shrinkage.  Scar plate formation.

4    The difficulty in removing mesh.

5          Q.      Are those all the ones you feel

6    should be in there?

7          A.      That's the majority of them, yes.

8          Q.      You would agree with me that a doctor

9    not only has to rely on the IFU for explaining, I

10   guess, the adverse reactions and possible side

11   effects to a plaintiff.

12                  Would you agree with that?

13         A.      I'm sorry.  Could you repeat that

14   question?

15         Q.      Well, can doctors also rely, don't

16   they also rely on their experience, their clinical

17   experience in implanting mesh or in this particular

18   case, to rely on -- in providing an informed consent

19   to the plaintiff?

20         A.      I think that's a true comment, yes.

21         Q.      And do you do that in your practice?

22         A.      I do.

23         Q.      And do you include things when you go

24   over your informed consent that are not necessarily

25   included in the IFU?

Konstantin Walmsley, M.D.

1        A.      To some degree.

2        Q.      Do you believe that most doctors do

3   that?

4        A.      Well, it's hard for me to comment on

5   that.  I'm not necessarily sure what all doctors do,

6   but I think that's the standard of care.

7        Q.      The standard of care is that they

8   should --

9               Well, let me ask you this:  Is it

10  your understanding -- is the IFU intended to be a

11  substitute for a surgeon's knowledge or expertise in

12  a case?

13       A.      In terms of providing clinical

14  consent you mean?

15       Q.      Yes.

16       A.      No.  I think there are two elements

17  to the informed consent:  One provided by the IFU,

18  and to your point, I think the other provided by a

19  surgeon's experience, assuming he or she has

20  clinical experience.

21       Q.      And the IFU is not intended to be a

22  substitute for a surgeon's responsibility to

23  adequately counsel a patient regarding the risk and

24  benefits of treatment options.  Correct?

25       A.      I don't think it's a substitute, but

Konstantin Walmsley, M.D.

```
1    I think it's something that's a necessary adjunct.

2    I mean, for example, for someone who's performing

3    their first 10 to 15 slings, I would imagine those

4    individuals would rely in large part on the IFU to

5    counsel patients appropriately.

6            Q.      But wouldn't they also rely on any

7    training they received?

8            A.      True.

9            Q.      And wouldn't most people, most

10   doctors that are doing those first 10 or 15 slings

11   would have learned from somebody else or would have

12   been trained by somebody else prior to them

13   inserting or implanting those slings.  Correct?

14           A.      I would hope so.

15           Q.      I lost my place in your report.

16                   And then in general opinion number 2,

17   it looks like you're -- what is your general opinion

18   number 2?  I'm not sure --

19           A.      General opinion number 2 is that

20   "Safer alternatives designs and procedures existed

21   in 2002 that have a lesser risk of erosion and

22   dyspareunia with substantially equivalent efficacy."

23           Q.      Which procedures in particular are

24   you referring to?

25           A.      The autologous fascial sling.
```

Konstantin Walmsley, M.D.

1      Q.      What else?

2      A.      Primarily that procedure in my

3   experience, but certainly nonsynthetic mesh-based

4   repairs were alternatives.

5      Q.      But the autologous procedure doesn't

6   come without risk either, does it?

7      A.      That's correct.

8      Q.      I mean, it has risks?

9      A.      That's correct.

10     Q.      And it has complications?

11     A.      True.

12     Q.      And hasn't it also proven to be less

13  effective than midurethral slings in treating stress

14  urinary incontinence?

15     A.      Not in my practice, no.

16     Q.      Have you seen studies that indicate

17  that midurethral slings have a higher success rate

18  in treating stress urinary incontinence?

19     A.      I've seen some studies that provide

20  that opinion.

21     Q.      What else do you -- you say "safer

22  alternatives designs and procedures existed in

23  2002."

24              Other than the autologous sling that

25  you told us about, what else existed back then?

Konstantin Walmsley, M.D.

```
1         A.       There were biological graft slings
2   that were available at that time using porcine
3   dermis, for example.  The Burch colposuspension
4   procedure was available.
5         Q.       Have you ever used any of those
6   procedures?
7         A.       I have.  Not -- well, let me amend
8   that.  The Burch colposuspension procedure I did in
9   my training, but I did not utilize that in my
10  private practice.
11        Q.       Why is that?
12        A.       You know, because I started utilizing
13  the autologous fascial sling at the tail end of my
14  training, and that replaced my utilization of the
15  Burch colposuspension procedure.
16        Q.       And what other -- and you mentioned,
17  I guess -- what was the other procedure that you
18  mentioned was safer?
19        A.       The use of a biological graft sling
20  using basically porcine dermis, pigskin.
21        Q.       Did you ever use that in your
22  practice?
23        A.       I did.
24        Q.       Do you use it?
25        A.       I don't use it any more because it's
```

Konstantin Walmsley, M.D.

```
 1   not marketed anymore, in fact.

 2        Q.      When was the last time you used that?

 3        A.      2008, 2009, in that range.

 4        Q.      Let me ask you, also you say "safer

 5   alternatives designs."

 6                You're not going to offer any

 7   opinions here today on -- you're not being offered

 8   as a design expert, are you?

 9        A.      I'm not, no.

10        Q.      Okay.  And so other than these

11   procedures that you just listed, what other

12   procedure have you not told us about that is safer?

13        A.      Well, one procedure that would be

14   safer would involve urethral bulking, the use of

15   either collagen or another substance to bulk up the

16   external sphincter of the female urethra.

17        Q.      Do you use that procedure?

18        A.      Occasionally I do.

19        Q.      Do you use it in your practice today?

20        A.      I do.

21        Q.      Anything else you haven't told us

22   about?

23        A.      With regards to what I was using back

24   in 2002, no.

25        Q.      And those are all the general
```

Konstantin Walmsley, M.D.

1    opinions that you've given that relate to, I guess,

2    Mrs. Fox in this case, just those two?

3         A.      The only one other thing I think is

4    worth mentioning is -- dates back -- or goes back to

5    the general opinion number 1 with regards to the

6    IFU, which is the, in my opinion, inappropriate use

7    of the term "transitory."

8         Q.      And why is it inappropriate?

9         A.      Because in the 2000 -- in the IFU

10   that would have been available in 2002, the word

11   "transitory" was used in two contexts, one being

12   "transitory local irritation at the wound site" and

13   the next being "transitory foreign body response may

14   occur."

15             And as stated in the report, the use

16   of transitory really defines a condition that is

17   temporary, when, in fact, a thing such as foreign

18   body response and irritation at the wound site are

19   quite the contrary.  They're chronic events.

20        Q.      And so you would disagree with that

21   because of the reasons you just stated?

22        A.      Yes, sir.

23        Q.      Anything else with regards to number

24   1, general opinion number 1?

25        A.      No, sir.  That's it.

Konstantin Walmsley, M.D.

```
 1          Q.      Then we go to your case-specific

 2   opinions, and your first one is that "Mrs. Fox

 3   suffered vaginal sling extrusion, contraction, scar

 4   plate formation, and failure of the TVT to

 5   incorporate, as a result of the physical properties

 6   of the TVT device."

 7                  Let's start with the first one.

 8          A.      Okay.

 9          Q.      How did you determine she had

10   extrusion?

11          A.      Based on my review of the medical

12   records, and to some degree the deposition of

13   Dr. Olvera specifically.

14          Q.      And what in particular did you see in

15   Dr. Olvera's report that led you to believe there

16   was extrusion?

17          A.      She describes an edge of the TVT

18   located near the urethra that she specifies as an

19   erosion.

20          Q.      Anything else that supports your

21   belief that there was an extrusion?

22          A.      Other than her identifying mesh

23   within the vagina, no.

24          Q.      Did you see any evidence of erosion

25   in any medical records?
```

Konstantin Walmsley, M.D.

1                    MR. CASPERSON:  Object to the form.

2                    Let me clarify the basis.  Because

3     the records go back and forth, I think we need to

4     clarify that for the record, which is which.

5                    THE WITNESS:  I mean, I think --

6     yeah.  I think of erosion and extrusion as occurring

7     along a continuum.  There are some doctors that

8     believe that erosion really specifies mesh eroding

9     into an organ, for example, the bladder or the

10    rectum.  There are others that would identify

11    exposure, if you will, of mesh into the vagina as an

12    extrusion event.  I think an extrusion is a minor

13    erosion.  And an erosion is a major extrusion, if

14    you will.

15    BY MR. OLIVEIRA:

16         Q.     Okay.

17         A.     So I think of them as really one and

18    the same with an extrusion essentially being a minor

19    erosion event.

20         Q.     My question, I guess, is, do you see

21    in any of her medical records where any of her

22    doctors said there was an erosion -- they described

23    it as an erosion as opposed to an extrusion?

24         A.     The doctor says two different things.

25    Dr. Haverkorn uses extrusion more commonly, and

Konstantin Walmsley, M.D.

```
1    Dr. Olvera initially states an erosion of the edge

2    of the TVT near the urethra when, in fact, I think

3    it's semantically one and the same.

4         Q.    So your belief it's one and the same,

5    but you recognize that some

6    urologists/urogynecologists believe there is a

7    difference, and some doctors believe there is a

8    difference?

9         A.    I think that's a fair comment.

10        Q.    Let's go on, because you've got some

11   other -- we've just covered extrusion.

12              You also mention contraction.

13        A.    Yes, sir.

14        Q.    What's your basis for finding

15   contraction?

16        A.    I think mesh contraction in the case

17   of Sherry Fox was primarily identified not only by

18   her clinical course but also by Dr. Haverkorn's

19   findings.

20        Q.    That mesh contraction was?

21        A.    Correct.

22        Q.    And that Dr. Haverkorn, you're saying

23   in her findings and her report, found mesh

24   contraction?

25        A.    I think her medical records indicated
```

Konstantin Walmsley, M.D.

1    that, and then she supported that in her deposition.

2        Q.      Do you have that in front of you,

3    where she says that mesh contraction?

4        A.      Yes.  It's at the bottom of where you

5    see my specific opinion on contraction and

6    shrinkage.  I state that "Mrs. Fox's TVT contracted

7    post implantation.  Dr. Haverkorn testified

8    generally regarding mesh contraction or shrinkage as

9    follows," where she's asked in her deposition about

10   mesh shrinkage.  And she describes mesh shrinkage as

11   something that occurs.

12       Q.      Something that occurs, but does she

13   say that it occurred in Mrs. Fox?

14       A.      She does.

15       Q.      Okay.

16       A.      Yeah, on page 40 of her deposition,

17   there is language that supports that concept where

18   the mesh was present and was taut.

19       Q.      What about on the -- you also in your

20   case-specific, you mentioned the failure of the TVT

21   to incorporate.

22       A.      Correct.

23       Q.      On what basis do you make that

24   statement?

25       A.      Primarily on the basis of there being

Konstantin Walmsley, M.D.

1    a mesh erosion or extrusion, as the case may be,

2    where de facto one is seeing a piece of mesh that is

3    not incorporated into the host tissues.

4                    Dr. Villa-Olvera in her records

5    visually, but also in her deposition, describes

6    clear white mesh on the surface of the vagina that

7    was not incorporated into any of the host tissues,

8    Mrs. Fox's vaginal tissues specifically.

9        Q.      And I'm sorry.  She says that in her

10   deposition?

11       A.      Yes, sir.

12       Q.      Can you point that out to me?  Is

13   that something that you've listed in your report --

14       A.      It's in my report under "D. Failure

15   to Incorporate."  And that is further along, I

16   think, where you're looking at currently.

17                    After the picture of the removed

18   portion of the TVT mesh, there's comments related to

19   the deposition.

20       Q.      Okay.

21       A.      Yes, sir.

22       Q.      Okay.  Where she describes it as not

23   being incorporated into the --

24       A.      Yeah.

25       Q.      Okay.  Anywhere else that you saw

Konstantin Walmsley, M.D.

```
 1   that?
 2        A.      Other than the medical records and
 3   what was stated in the deposition, no.
 4                Well, I shouldn't say that.  I stand
 5   corrected.  Dr. Haverkorn's operative report speaks
 6   to a mesh exposure which would support a failure to
 7   incorporate.
 8        Q.      Let's turn to your case-specific
 9   opinion number 2.
10                You state, "Mrs. Fox's extrusion in
11   2012 was caused by the physical properties of the
12   TVT -- specifically, the mechanically cut edge of
13   the TVT."
14                What do you mean -- what do you mean
15   there?  What's your basis for saying that?
16        A.      My basis for saying that, at least
17   from a case-specific standpoint, speaks to the
18   nature of her extrusion/erosion, namely, the fact
19   that the mesh extrusion or erosion, if you will,
20   occurred at the edge of the TVT sling.
21                In addition, I do have some
22   understanding based on my training and experience
23   that there is a difference between -- there's a
24   difference in terms of causes of exposure or
25   erosion.  For example, occasionally I've seen mesh
```

Konstantin Walmsley, M.D.

1    erosion or extrusion events occur in the context of

2    a fraying or roping of the mesh.  So at the time of

3    surgery, I'll find that myself.

4              In this particular instance, given

5    the location of the erosion, it being at the edge, I

6    would conclude it was based on the mechanically cut

7    edge of the TVT.

8              MR. OLIVEIRA:  Object to the form.

9    BY MR. OLIVEIRA:

10        Q.    Did you see any evidence of

11   degradation of the mesh or have you seen any

12   evidence anywhere in any of the reports of

13   degradation of the mesh or...

14             MR. CASPERSON:  Object to the form.

15             THE WITNESS:  Not in Mrs. Fox's case

16   I did not.

17   BY MR. OLIVEIRA:

18        Q.    Any evidence of chronic inflammation?

19        A.    I believe so, yes.

20        Q.    Where did you see that?

21        A.    Well, I think the premise to this

22   answer lies in the fact that when a suburethral

23   polypropylene sling is placed, part of the

24   properties of its success, if you will, delve into a

25   chronic inflammatory process whereby a scar plate is

1    generated that allows the mesh to have or provide a

2    backboard of support to prevent incontinence.

3              Certainly looking at the picture of

4    the mesh explant, there's a significant amount of

5    fibrotic tissue in addition to the exposed part of

6    the mesh that would support the concept of chronic

7    inflammation.

8         Q.    Did you consider vaginal atrophy as a

9    possible cause of Mrs. Fox's extrusion in 2012?

10        A.    I did.

11        Q.    And did you rule that out?

12        A.    Yes, sir, I did.

13        Q.    Is vaginal atrophy something that

14   could cause or lead mesh to extrude in a patient?

15        A.    It could certainly increase the

16   complication of that, yes.

17        Q.    And then your case-specific opinion

18   number 3 is that her "vaginal pain and dyspareunia

19   (from July 2011 to March 2012) was caused by her

20   sling extrusion, contraction of the TVT device, and

21   scar plate formation."

22              Is that your third opinion?

23        A.    Yes, sir.

24        Q.    Isn't it true that dyspareunia and

25   pain following TVT surgery are pretty uncommon?

Konstantin Walmsley, M.D.

```
 1              MR. CASPERSON:  Objection, form.
 2              THE WITNESS:  They're fairly
 3  uncommon.
 4  BY MR. OLIVEIRA:
 5       Q.      Have you seen the Tommaselli 2015
 6  systematic review and analysis?
 7       A.      Is this the Cochran review that
 8  you're referring to?
 9       Q.      I think this one was Tommaselli.  I'm
10  not sure if Cochran was a co-author, but it's a
11  2015 -- I'll tell you this:  This study found that
12  only 13 patients out of 3,974 who had had
13  suburethral slings implanted had persistent or
14  chronic pain.
15              Have you seen that study?
16       A.      I may be aware of that study, but off
17  the top of my head, I'm not fully aware of it.
18       Q.      And I'll tell you, it was only 13 out
19  of 3,974 patients, and that's a rate of 0.3 percent.
20              Would you agree that's a pretty low
21  rate of dyspareunia and pain following TVT surgery?
22              MR. CASPERSON:  Objection, form.
23              THE WITNESS:  Based on his
24  experience, that's certainly lower than what I see
25  in my practice and what I would counsel patients
```

Konstantin Walmsley, M.D.

1    towards.

2    BY MR. OLIVEIRA:

3        Q.      Can you point me to any studies that

4    you've done that would -- that you conducted

5    yourself that would show a higher rate?

6        A.      Well, my experience is just based on

7    my clinical practice using TVT.

8        Q.      But you haven't published any studies

9    or you haven't conducted any level 1 -- or you

10   haven't taken part in any level 1 studies that

11   studied this issue, have you?

12       A.      I've not.

13       Q.      Okay.

14       A.      I'm not fully familiar with the study

15   that you've quoted to me, but...

16       Q.      What is Lichens sclerosis?

17       A.      Well, Lichens sclerosis is a

18   dermatological condition that entails the

19   development of whitish plaques that can typically

20   cause an itching type of a discomfort on the

21   external genitalia amongst other locations.

22       Q.      Is it something that can become a

23   serious problem for women?

24       A.      It can become a serious problem for

25   women and men.

Konstantin Walmsley, M.D.

```
1            Q.      For men too?

2            A.      Yeah.

3            Q.      Is that something that could be

4    responsible for or could cause the uncomfortableness

5    that Mrs. Fox notes, I guess, in sitting down for

6    periods of time?  Could that be a reason?

7            A.      That is sometimes described as being

8    an issue for Lichens sclerosis, yeah.

9            Q.      Is Lichens sclerosis, isn't one of

10   the side effects also dyspareunia?

11           A.      There are instances where there is

12   external dyspareunia with Lichens sclerosis, yes.

13           Q.      What about her diagnosis of

14   superimposed vulvodynia, are you familiar with that?

15                   MR. CASPERSON:  Objection.

16                   THE WITNESS:  Yes.

17   BY MR. OLIVEIRA:

18           Q.      Did you consider that in considering

19   her vaginal pain and dyspareunia?

20           A.      I did, yes, sir.

21           Q.      And did you rule that out also?

22           A.      I did, yes, sir.

23           Q.      Let's go to your case-specific

24   opinion number 4.

25                   It looks like your opinion there is
```

1    that she "continues to have dyspareunia presently"?

2         A.    Correct.

3         Q.    And what do you base that on?

4         A.    In large part on my independent exam,

5    but also based on -- well, I should say because of

6    presently, I would say it's in large part on the

7    basis of my medical exam which was performed on

8    December 4, 2015.

9         Q.    And this is the report that you

10   handed me earlier that, I guess, we've marked as

11   Exhibit Number 3, it looks like?

12        A.    Yes.

13        Q.    What was the result of that exam?

14   What did you find?

15        A.    Well, in part, besides taking a

16   clinical history during which time she explained to

17   me that she had dyspareunia, on questioning her and

18   talking about the type of dyspareunia she had, she

19   related her dyspareunia to in part being an internal

20   dyspareunia, where on exam I could palpably

21   reproduce pain upon palpation somewhat deep in the

22   vagina but up in what's called the right vaginal

23   sulcus of the vagina, which is the location of

24   her -- near the location of her erosion event or

25   extrusion event, as the case may be.

Konstantin Walmsley, M.D.

1     Q.      What else in her physical exam led
2  you to believe she continues to have dyspareunia?
3     A.      I think to be fair, you know, we have
4  to premise the answer or I have to premise the
5  answer by saying dyspareunia, which is discomfort
6  with intimacy, is premised on attempts at intimacy.
7  And to be fair, because of her dyspareunia, she's
8  only attempting to have intercourse on a somewhat
9  infrequent basis.
10            That being said, in discussing with
11 her her dyspareunia, she attributes the dyspareunia
12 to a specific location within her vaginal area.
13            On my exam, when I examined her, at
14 least, her -- the majority of her pain on exam
15 occurred in an area of vagina near the right vaginal
16 sulcus, internally in an area where I could palpate
17 scar tissue and an area where her mesh or perhaps at
18 least an edge of mesh may have been located from her
19 prior surgery with Dr. Haverkorn.
20     Q.      Did you recommend any course of
21 treatment for her after your examination?
22     A.      The one thing I did recommend for her
23 was based primarily on her having an elevated
24 post-void residual and talked about ceasing her
25 VESIcare and considering Kegel exercises and/or

Konstantin Walmsley, M.D.

```
 1    biofeedback to help her with her incontinence.

 2           Q.      Mrs. Fox also suffered from stress

 3    urinary incontinence prior to the implantation of

 4    the mesh.  Correct?

 5           A.      Yes, sir.

 6           Q.      That was the reason for having the

 7    mesh implant?

 8           A.      Yes.

 9           Q.      And do you remember her description

10    of her SUI?

11           A.      Based on my report, her complaint was

12    of losing urine -- at least when she presented to

13    Dr. Warner initially or at the women's clinic, I

14    should say, complained of losing urine for the

15    previous year when jumping or sneezing.

16           Q.      This had become a serious problem for

17    her.  Correct?

18                   MR. CASPERSON:  Object to the form.

19                   THE WITNESS:  It was serious enough

20    for her to seek out treatment, yes, sir.

21    BY MR. OLIVEIRA:

22           Q.      It was a life-altering condition

23    because she couldn't exercise anymore without

24    urinating?

25           A.      Or sneeze, for that matter.
```

Konstantin Walmsley, M.D.

```
 1              Q.      Or sneeze, for that matter.

 2                      Are you aware that it appears she got

 3      complete relief from her SUI for at least ten years?

 4              A.      This is a true comment, yes.

 5              Q.      Dr. Walmsley, also in your report,

 6      you note that a -- I guess a photograph of the

 7      portion of the TVT explanted from Mrs. Fox depicts

 8      scar tissue that had become adhered to the TVT as a

 9      result of a chronic foreign body response.

10                      What evidence do you have or what

11      basis do you have to support that statement?

12                      MR. CASPERSON:  What page are you on?

13                      MR. OLIVEIRA:  I have to find it.  It

14      was in my notes, but I know it's in his report.

15                      I think the scarring is under -- I'm

16      sorry.  We may have to jump back to 3.

17                      MR. CASPERSON:  Are you talking about

18      the picture, scar plate?

19                      MR. OLIVEIRA:  Yeah.

20                      MR. CASPERSON:  Okay.

21                      MR. OLIVEIRA:  That's on page --

22                      MR. CASPERSON:  That's a good

23      question.  It's not numbered.

24                      MR. OLIVEIRA:  It's not numbered.

25                      MR. CASPERSON:  It's the picture of
```

Konstantin Walmsley, M.D.

1    the scar plate, Doctor.  That's what he's referring

2    to.

3                    MR. OLIVEIRA:  Yeah, and I just saw

4    it.  I passed it up.  Yeah, that's the difficulty.

5    That's why I didn't have it on my --

6                    MR. CASPERSON:  I should say the

7    picture of what we allege to be a scar plate.

8                    THE WITNESS:  Oh, right.

9    BY MR. OLIVEIRA:

10        Q.       Did you find that?

11        A.       I did, yes.

12        Q.       Okay.  And so my question was, on

13    what basis you made the statement -- let's see.

14                    MR. OLIVEIRA:  I'm sorry.  Can you

15    read back my question, because I lost my place?

16                         -  -  -

17                    (The court reporter read the

18            pertinent part of the record.)

19                         -  -  -

20                    THE WITNESS:  There are a couple of

21    elements to the answer.

22                    The first is, I've experienced

23    patients of mine who have had mesh erosion or

24    extrusion events where I've explanted mesh.  And

25    unlike in this case where it was submitted to a

Konstantin Walmsley, M.D.

1    pathology off campus, I've submitted it to

2    pathologists here in the hospital and actually

3    looked at the slides with my colleagues and seen

4    chronic inflammation and a foreign body response.

5    That's a fairly classic response to polypropylene

6    mesh.

7              In addition, I've also in my

8    bibliography have used reports or read reports that

9    describe the response to placement of polypropylene

10   mesh, which inherently is designed to create an

11   inflammatory response and scar tissue in order to

12   provide its desired effect.

13             Obviously in this instance, the

14   scarring perhaps led to a negative outcome insofar

15   as there was a subsequent complication requiring

16   removal.

17   BY MR. OLIVEIRA:

18        Q.      In fact, I think you testified, scar

19   tissue formation is a kind of necessary, I guess,

20   for the -- to provide, I guess, integration through

21   the mesh pores.  It's a necessary part of the TVT

22   procedure?

23        A.      That's correct.

24        Q.      What's your position -- what's your

25   personal position -- and I believe you testified

Konstantin Walmsley, M.D.

```
 1    before that you have excised or you've removed mesh

 2    yourself before.  Correct?

 3         A.      I have.  Yes, sir.

 4         Q.      What's your position regarding

 5    partial excision as opposed to total recision or

 6    removal?

 7         A.      I think the majority of revision or

 8    excision of mesh procedures are partial, in part

 9    because it's extremely difficult to remove all of

10    the mesh.  That ends up requiring a significant

11    amount of dissection to do so.  And sometimes one

12    can resolve mesh complications with partial

13    excisions.

14         Q.      And do you perform partial excisions?

15         A.      The only mesh excisions I've done

16    have been partial, in fact.

17         Q.      And finally, your last opinion is

18    that "Mrs. Fox's future prognosis as it relates to

19    her pelvic pain, dyspareunia, and voiding

20    dysfunction is guarded."

21              What's your basis for saying that?

22         A.      Well, I think there are several

23    things.  First off, there's still residual pelvic

24    mesh within her body.  And there will be ongoing

25    fibrosis and chronic inflammation relating to that.
```

Konstantin Walmsley, M.D.

```
 1    Even if the mesh were to be removed in its entirety,
 2    that would be an extensive type of surgical
 3    procedure, probably restricted to an academic type
 4    of center.
 5              Of interest to me during the IME was
 6    the amount of discomfort she had when I palpated the
 7    area of mesh excision, which supports to me that
 8    even in the process of removing mesh, when one is
 9    trying to resolve a problem, there are inherent
10    complications of scarring and fibrosis with the
11    partial excision itself.
12         Q.      And what evidence -- when you talk
13    about voiding dysfunction, what evidence of voiding
14    dysfunction have you seen in the medical records?
15         A.      In her particular instance, besides
16    the recurrence of her incontinence, it appears that
17    her incontinence now is not just stress
18    incontinence, it's what we called mixed urinary
19    incontinence, which is a combination of stress
20    incontinence and urgency urinary incontinence.
21    Typically we see that in patients with overactive
22    bladder.  She was treated with VESIcare.  When I saw
23    her in my office in December, she was on VESIcare,
24    which is an anticholinergenic drug used to treat
25    overactive bladder.
```

```
1                    She had had some partial resolution

2    with the VESIcare with relation to her urgency, but

3    not only was the urgency not completely ameliorated,

4    but she had an elevated post-void residual.  It was

5    quite high in my office, which supports to me,

6    number one, that the VESIcare is providing perhaps

7    too much of a bladder relaxation effect, number one.

8    And number two, that she is incomplete emptying,

9    which could be related to scarring from her sling

10   procedure or possibly might be related to the

11   VESIcare effect or, thirdly, could be related to

12   some sort of functional disorder of the bladder.

13                    MR. OLIVEIRA:  Object to the form.

14   BY MR. OLIVEIRA:

15        Q.     We've gone through your two general

16   opinions and your five specific opinions in this

17   case.

18                    As we sit here today, do you have any

19   other opinions that you haven't already mentioned or

20   you haven't testified about or that are not

21   contained in your report?

22        A.     No, sir.

23                    MR. OLIVEIRA:  I'm going to pass the

24   witness.  I know your attorney probably has a few

25   questions, and then I'll -- I'll pass if you have a
```

Konstantin Walmsley, M.D.

```
 1   few questions.  If not...

 2                   MR. CASPERSON:  We'll reserve for

 3   trial.

 4                   MR. OLIVEIRA:  Okay.  Then I will

 5   actually recess and just let me look through my

 6   notes and make sure.  I was going to do that while

 7   you were questioning to save some time.  I'll do

 8   that, so just give me a few minutes.

 9                   MR. CASPERSON:  Off the record.

10                             -  -  -

11                   (A recess was taken from 2:03 p.m. to

12           2:03 p.m.)

13                             -  -  -

14                   (Deposition Exhibit No.

15           Fox-Walmsley-6, PT Progress Note, was

16           marked for identification.)

17                             -  -  -

18                       EXAMINATION

19                             -  -  -

20   BY MR. CASPERSON:

21       Q.      Dr. Walmsley, I'm handing you what's

22   marked as Exhibit 6 to your deposition.

23                   These are the physical therapy

24   records related to Ms. Fox.

25                   Does that appear to be correct?
```

Konstantin Walmsley, M.D.

1          A.     Yes, sir.

2          Q.     Is this something that you received

3    after your original Rule 26 report was sent?

4          A.     Yes.

5          Q.     Have you had a chance to review

6    those?

7          A.     I did review these, yeah.

8          Q.     Were there any findings in those

9    physical therapist records that are significant in

10   forming your opinions here today?

11         A.     Yes.

12         Q.     What are those findings that you

13   think carry some significance as part of helping you

14   form your opinions?

15         A.     Well, I mean, first off, she

16   continues to have pelvic and vaginal pain.

17                Secondly, the physical therapist

18   during her exam, while performing a digital exam of

19   the vaginal space, was able to identify discomfort

20   and tenderness in the right aspect of her vagina,

21   consistent with what I found in my IME exam.

22         Q.     Do you believe that to be the same

23   area that you palpated during your IME with Ms. Fox?

24                MR. OLIVEIRA:  Objection, form.

25                THE WITNESS:  Yeah.  The same exact

Konstantin Walmsley, M.D.

```
 1    area.  Yes.

 2                 MR. CASPERSON:  I'll pass the

 3    witness.

 4                 MR. OLIVEIRA:  Let me look at those

 5    records real quick.

 6                       -   -   -

 7                 (A recess was taken from 2:05 p.m. to

 8          2:07 p.m.)

 9                       -   -   -

10                 EXAMINATION

11                       -   -   -

12    BY MR. OLIVEIRA:

13          Q.    Doctor, Exhibit Number 6 that your --

14    Mr. Casperson just questioned you about, these are

15    physical therapy records from a -- it looks like a

16    physical therapy clinic in San Antonio?

17          A.    Yes, sir.

18          Q.    And did it appear to you that -- I

19    guess these are the -- this is just the first

20    segment of treatment that she's going to be getting

21    or first segment of physical therapy?

22          A.    I'm not sure how many segments of

23    physical therapy she's going to receive, but I know

24    she's getting a series of them, yes.

25          Q.    But this doesn't seem to represent a
```

Konstantin Walmsley, M.D.

1  complete -- that she's completed her whole physical

2  therapy regime here, has she?

3      A.      I don't believe so, no.

4      Q.      So there's a possibility that after

5  she completes however many sessions she's scheduled

6  for -- it looks like it's physical therapy one time

7  a week for 12 weeks -- wouldn't that be a better

8  indication of whether the physical therapy has been

9  helpful?

10      A.      I think it would be helpful for her

11  to complete, yeah, her physical therapy and then to

12  reassess that area.

13      Q.      And wouldn't that be, I guess, a more

14  accurate assessment of what her condition is after

15  she completes the physical therapy?

16      A.      I mean, I hate to be a pessimist.  I

17  don't believe there will be much improvement, but

18  there might be some, without question.

19      Q.      Did you see -- going back to the

20  voiding dysfunction, prior to the mesh removal, did

21  you see any mention anywhere in the medical records

22  of voiding dysfunction or urinary incontinence?

23      A.      I did not.

24      Q.      Did you also see that Mrs. Fox

25  reported to Dr. Haverkorn that the SUI, I guess,

Konstantin Walmsley, M.D.

```
1    she's currently -- has returned but it's not

2    bothersome and that the urgency/frequency is only

3    occasional?

4              MR. CASPERSON:  Object to the form.

5              THE WITNESS:  Her last appointment on

6    April 17th states that she has occasional overactive

7    bladder symptoms with occasional stress

8    incontinence.  And at that time she's not on

9    VESIcare.

10   BY MR. OLIVEIRA:

11        Q.    So that suggests that it hasn't

12   returned to the level it was prior to the surgery,

13   the implantation in 2002.  Correct?

14        A.    As far as stress urinary

15   incontinence, yes.

16        Q.    Yes.  And that you also are aware

17   that Mrs. Fox has testified that she had complete

18   relief from SUI for the ten years that she had the

19   implant?

20        A.    Correct.

21              MR. OLIVEIRA:  Doctor, I think those

22   are all the questions I have regarding Mrs. Fox.

23   Thank you for your time.

24              THE WITNESS:  Thank you.

25              (Witness excused.)
```

Konstantin Walmsley, M.D.

```
1                    (Deposition concluded at

2           approximately 2:11 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Konstantin Walmsley, M.D.

1

2                        CERTIFICATE

3

4

5              I HEREBY CERTIFY that the witness was

6    duly sworn by me and that the deposition is a true

7    record of the testimony given by the witness.

8

9              It was requested before completion of

10   the deposition that the witness, KONSTANTIN

11   WALMSLEY, MD, have the opportunity to read and sign

12   the deposition transcript.

13

14

15

16

17   _____

18           ANN MARIE MITCHELL, a Federally Approved

             Certified Realtime Reporter, Registered

19           Diplomate Reporter and Notary Public

20

21

22              (The foregoing certification of this

23   transcript does not apply to any reproduction of the

24   same by any means, unless under the direct control

25   and/or supervision of the certifying reporter.)

Konstantin Walmsley, M.D.

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4   carefully and make any necessary corrections.  You

 5   should state the reason in the appropriate space on

 6   the errata sheet for any corrections that are made.

 7              After doing so, please sign the

 8   errata sheet and date it.  It will be attached to

 9   your deposition.

10              It is imperative that you return the

11   original errata sheet to the deposing attorney

12   within thirty (30) days of receipt of the deposition

13   transcript by you.  If you fail to do so, the

14   deposition transcript may be deemed to be accurate

15   and may be used in court.

16

17

18

19

20

21

22

23

24

25
```

Konstantin Walmsley, M.D.

1                    - - - - - -

                  E R R A T A

2                    - - - - - -

3    PAGE  LINE  CHANGE

4    ____  ____  _____

5          REASON  _____

6    ____  ____  _____

7          REASON  _____

8    ____  ____  _____

9          REASON  _____

10   ____  ____  _____

11         REASON  _____

12   ____  ____  _____

13         REASON  _____

14   ____  ____  _____

15         REASON  _____

16   ____  ____  _____

17         REASON  _____

18   ____  ____  _____

19         REASON  _____

20   ____  ____  _____

21         REASON  _____

22   ____  ____  _____

23         REASON  _____

24   ____  ____  _____

25         REASON  _____

```
 1

 2                    ACKNOWLEDGMENT OF DEPONENT

 3

 4              I,_____, do hereby

 5   certify that I have read the foregoing pages, 1 -

 6   81, and that the same is a correct transcription of

 7   the answers given by me to the questions therein

 8   propounded, except for the corrections or changes in

 9   form or substance, if any, noted in the attached

10   Errata Sheet.

11

12

13   _____

14    KONSTANTIN WALMSLEY, MD                   DATE

15

16

17   Subscribed and sworn

     to before me this

18   _____ day of _____, 20_____.

19   My commission expires:_____

20

     _____

21   Notary Public

22

23

24

25
```

Konstantin Walmsley, M.D.

```
 1                      LAWYER'S NOTES

 2    PAGE   LINE

 3    _____  _____  _____

 4    _____  _____  _____

 5    _____  _____  _____

 6    _____  _____  _____

 7    _____  _____  _____

 8    _____  _____  _____

 9    _____  _____  _____

10    _____  _____  _____

11    _____  _____  _____

12    _____  _____  _____

13    _____  _____  _____

14    _____  _____  _____

15    _____  _____  _____

16    _____  _____  _____

17    _____  _____  _____

18    _____  _____  _____

19    _____  _____  _____

20    _____  _____  _____

21    _____  _____  _____

22    _____  _____  _____

23    _____  _____  _____

24    _____  _____  _____

25    _____  _____  _____
```