# EXHIBIT J

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                     CHARLESTON DIVISION
 3     ------------------------------
       IN RE ETHICON, INC., PELVIC   :Master File NO.
 4     REPAIR SYSTEM PRODUCTS         :2:21-MD-02327
       LIABILITY LITIGATION          :
 5                                    :MDL 2327
       THIS DOCUMENT RELATES TO THE   :
 6     FOLLOWING CASE IN WAVE 2 OF    :
       MDL 200                       :
 7     ------------------------------
       PAMELA BAILEY AND             :
 8     HOUSTON BAILEY,               :
                                     :JOSEPH R. GOODWIN
 9           Plaintiffs,            :U.S. DISTRICT JUDGE
       v.                           :
10                                   :
       ETHICON, INC., et al.,        :
11                                   :Case No.
           Defendants.              :2:12-CV-01700
12     ------------------------------
13                    June 6, 2016
14
15                    Videotaped deposition of
16         KONSTANTIN WALMSLEY, M.D., held at COURTYARD
17         MARRIOTT WEST ORANGE, 8 Rooney Circle, West
18         Orange, New Jersey, before Margaret M. Reihl,
19         RPR, CCR, CRR, CLR and Notary Public, on the
20         above date, commencing at 10:59 a.m.
21
22
               GOLKOW TECHNOLOGIES, INC.
23         877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
24
```

Konstantin Walmsley, M.D.

```
 1   A P P E A R A N C E S:

 2

     MOTLEY RICE LLC
 3   BY:  FRED THOMPSON, III, ESQUIRE
     28 Bridgeside Boulevard
 4   Mount Pleasant, South Carolina  29464
     (843) 216-9118
 5   fthompson@motleyrice.com
     Representing Plaintiff
 6

 7   FRIDAY ELDREDGE & CLARK LLP
     BY:  WILLIAM MELL GRIFFIN, III, ESQUIRE
 8   400 West Capitol Avenue
     Suite 2000
 9   Little Rock, Arkansas  72201
     (501) 370-1515
10   griffin@fridayfirm.com
     Representing Johnson & Johnson and Ethicon
11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    I N D E X

 2   WITNESS:                                    Page

 3   KONSTANTIN WALMSLEY, M.D.

 4           By Mr. Griffin                      4, 64

             By Mr. Thompson                     61

 5                      — — —

 6

                     E X H I B I T S

 7

     WALMSLEY-BAILEY DEPOSITION EXHIBITS         MARKED

 8

     No. 1    Notice of Deposition of

 9            Konstantin Walmsley, M.D.          4

10   No. 2    Rule 26 Expert Report of

              Konstantin Walmsley, M.D.          6

11

     No. 3    IME exam notes of Dr. Walmsley

12            date of exam:  5/3/16              6

13   No. 4    Exam notes of Dr. Osterloh

              date of exam:  6/28/11             19

14

15                      — — —

16

17

18

19

20

21

22

23

24
```

Konstantin Walmsley, M.D.

```
 1                 ... KONSTANTIN WALMSLEY, M.D., having

 2            been duly sworn as a witness, was examined and

 3            testified as follows ...

 4   BY MR. GRIFFIN:

 5            Q.    Dr. Walmsley, my name is Will Griffin.

 6   I represent Johnson & Johnson, and I'm here to ask you

 7   questions regarding Pamela Bailey.

 8                 Have you been hired in a case styled

 9   Pamela Bailey versus Ethicon to testify on behalf of

10   Pamela Bailey?

11            A.    I have.

12            Q.    Okay.  Could you give us your full name.

13            A.    Konstantin Walmsley.

14            Q.    And, Dr. Walmsley, where do you

15   practice?

16            A.    New Jersey.

17            Q.    And you've been kind enough to tell me

18   during an earlier deposition, you are a urologist,

19   correct?

20            A.    Yes, sir.

21                 (Document marked for identification as

22            Walmsley-Bailey Deposition Exhibit No. 1.)

23   BY MR. GRIFFIN:

24            Q.    I'm going to show you what's marked as
```

Konstantin Walmsley, M.D.

1   Exhibit 1 to your deposition in this case, which is a

2   Notice of Deposition.

3                    Were you provided that?

4          A.      I was.

5          Q.      Did you bring the documents that were

6   requested in that Notice of Deposition?

7          A.      I have them, the majority of them

8   electronically with me today.

9          Q.      But have you brought me a thumb drive or

10  anything like that?

11         A.      I have not.

12         Q.      Okay.  Have you brought any of them in

13  paper form?

14         A.      I have not.

15         Q.      Okay.  And the only thing -- as I

16  understand it, the only thing you have brought with you

17  is your report that's in paper form; is that true?

18         A.      In paper form, this is true, yes.

19         Q.      Have you even brought your examination

20  notes?

21         A.      I have them electronically.

22         Q.      Okay.

23                   MR. GRIFFIN:  We'll mark this as

24         Exhibit 2.

Konstantin Walmsley, M.D.

```
1               (Document marked for identification as
2          Walmsley-Bailey Deposition Exhibit No. 2.)
3    BY MR. GRIFFIN:
4          Q.     I'm going to show you what was marked as
5    Exhibit 2 and make sure I haven't drawn all over it.
6                 I'm going to show you what's marked as
7    Exhibit 2.  Could you identify that?
8          A.     Yes.  This is a Rule 26 expert report on
9    Pamela Bailey.
10         Q.     Did you -- is that your report?
11         A.     Yes, sir.
12         Q.     Did you draft it?
13         A.     I did.
14               (Document marked for identification as
15          Walmsley-Bailey Deposition Exhibit No. 3.)
16   BY MR. GRIFFIN:
17         Q.     Okay.  I'm going to show you Exhibit 3
18   and ask if you can identify that?
19         A.     This is my independent medical
20   examination of Pamela Bailey dated May 3rd, 2016.
21         Q.     Okay.  Dr. Walmsley your report
22   indicates the various medical records you reviewed.
23   Did you review any depositions?
24         A.     Yes, I did.
```

Konstantin Walmsley, M.D.

1          Q.      What depositions?

2          A.      I believe I reviewed the deposition --

3    not believe -- I reviewed the deposition of Dr. Adam

4    and Ms. Bailey.

5          Q.      Did you review Dr. Perlow's deposition?

6          A.      I don't recall reviewing Dr. Perlow's

7    deposition.  It may have been sent to me.  I don't

8    believe I had the time to review it.

9          Q.      So, as we sit here today, you do not

10   have any knowledge of what Dr. Perlow did know or did

11   not know regarding risks and complications of pelvic

12   mesh procedures?

13         A.      I do not.

14         Q.      So you do not intend to offer an opinion

15   that Dr. Perlow was unaware of the potential risk and

16   complications of the TVT procedure, true?

17         A.      The only shortcoming, once again, to his

18   informed consent was based on his knowledge or lack

19   thereof based on the IFU.

20         Q.      But an IFU doesn't include all the

21   risks -- your opinion is that the IFU doesn't include

22   all the risks that would allow a doctor to give

23   adequate informed consent?

24         A.      Yes, this report speaks to that.

Konstantin Walmsley, M.D.

1        Q.      Okay.  And I guess the basis of that is

2   that a physician has to know of the potential risks and

3   complications to give an adequate informed consent,

4   correct?

5        A.      That's correct.

6        Q.      And you would agree physicians may

7   become aware of risk and complications of a TVT

8   procedure by means other than an IFU, true?

9        A.      This is in part true.

10       Q.      They might obtain it from their

11   training, true?

12       A.      Yes.

13       Q.      Experience, true?

14       A.      Yes.

15       Q.      Literature, true?

16       A.      Correct.

17       Q.      Colleagues?

18       A.      Yes.

19       Q.      Seminars?

20       A.      True.

21       Q.      And from what I understand from your

22   earlier answers, you have no knowledge of what

23   Dr. Perlow had obtained in terms of knowledge from his

24   training, experience, literature, discussions with

Konstantin Walmsley, M.D.

```
1    colleagues, seminars, things of that sort, correct?

2         A.     Not from my evaluation of the medical

3    records, no.

4         Q.     And so, as we sit here today, you are

5    not offering an opinion that Dr. Perlow did not have

6    sufficient knowledge of the risk and complications of

7    the TVT procedures to advise the patient, correct?

8                   MR. THOMPSON:  Object to the form.

9                   THE WITNESS:  I am offering that

10          opinion.

11   BY MR. GRIFFIN:

12        Q.     And you are offering that opinion

13   despite the fact that you have absolutely no knowledge

14   of what information Dr. Perlow had in his possession at

15   the time of the surgery of Ms. Bailey that he may have

16   obtained from his training, experience, literature,

17   discussions with colleagues and seminars, correct?

18        A.     Well, I do have knowledge of one of the

19   elements required from the informed consent that

20   Dr. Perlow had at the time of that surgery.

21        Q.     That was the IFU?

22        A.     That's correct.

23        Q.     But that wasn't my question.

24                   You have absolutely no knowledge of what
```

Konstantin Walmsley, M.D.

1    information Dr. Perlow had in his possession at the

2    time of the surgery of Ms. Bailey that he may have

3    obtained from his training, experience, literature,

4    discussions with colleagues and seminars, correct?

5            A.    Well, I would disagree with that

6    comment.

7            Q.    Did you read his deposition to attempt

8    to obtain that knowledge?

9            A.    I have not read his deposition.

10           Q.    So you do not know what Dr. Perlow knew

11   or didn't know at the time of Ms. Bailey's procedure,

12   true?

13           A.    I'm not aware of what he shared in his

14   deposition regarding what he knew or didn't know.

15           Q.    And if you're not aware of that, then

16   you don't know what he knew in terms of risk and

17   complications at the time of the surgery of Ms. Bailey,

18   correct?

19           A.    That's not entirely true, but in part

20   true.

21           Q.    Well, the only thing that you're aware

22   of is the IFU, and you don't even know whether he

23   reviewed the IFU before he performed this procedure,

24   true?

Konstantin Walmsley, M.D.

1         A.      I would assume he would have reviewed

2    it, but it's possible he did not review it.

3         Q.      So the answer is you don't know, true?

4         A.      I don't know if he reviewed the IFU.

5         Q.      Do you know whether Dr. Perlow addressed

6    the issue of whether additional information in the IFU

7    would have changed his mind in recommending the

8    procedure?

9         A.      I'm not aware of that.

10        Q.      In your -- you have a Case Specific

11   Opinion 1.  Let me ask you this, let me go to your

12   General Opinion 2 since it's in this report.

13        A.      Sure.

14        Q.      You do agree that there are risks of

15   dyspareunia with your autologous fascial slings,

16   correct?

17        A.      Yes.

18        Q.      So even the, quote, safer alternative

19   designs that you say existed in 2001 carried the risk

20   of dyspareunia, true?

21        A.      Yes.

22        Q.      And there's no way for you to predict in

23   advance which particular patient may have dyspareunia

24   and which may not, correct?

Konstantin Walmsley, M.D.

1        A.      Not entirely true.

2        Q.      What?

3        A.      Not entirely true.

4        Q.      Fill me in.

5        A.      Well, I mean, if patients have

6    conditions that might otherwise increase their risk of

7    dyspareunia, you can sometimes counsel patients that

8    they might have a higher risk of dyspareunia because of

9    prior surgery, et cetera.

10        Q.      I get what you're saying, but the point

11   is you don't know which patients are going to develop

12   dyspareunia and which patients are not, correct?

13        A.      Not with 100% accuracy, no.

14        Q.      Have you had patients develop

15   dyspareunia?

16        A.      After surgery you mean?

17        Q.      Yes.

18        A.      I have.

19        Q.      In what kind of procedures?

20        A.      Certainly after sling surgery.

21        Q.      Autologous?

22        A.      Rarely, but yes.

23        Q.      So the autologous fascial slings, you

24   have personal experience with patients who have

Konstantin Walmsley, M.D.

```
 1   developed dyspareunia, correct?

 2          A.      I have.

 3          Q.      And you have had patients with mesh

 4   procedures who have developed dyspareunia as well,

 5   correct?

 6          A.      That's correct.

 7          Q.      As I understand it, you do not use the

 8   Ethicon products, though, correct?

 9          A.      Not in my private practice.

10          Q.      You use the Bard Coloplast and AMS

11   devices?

12          A.      The answer to that is yes.

13          Q.      And using those devices you have had

14   patients develop dyspareunia as well?

15          A.      I have.

16          Q.      Your Case Specific Opinion Number 1 in

17   the Bailey case, you indicate that recognized causes of

18   sling erosion include and number one is surgical error

19   in implantation technique; is that correct?

20          A.      Yes.

21          Q.      And what would the surgical error be?

22   Would that be making it taut rather than tension free?

23          A.      That might be one of the ways.

24          Q.      So if the surgeon made the TVT sling
```

Konstantin Walmsley, M.D.

1    taut rather than leaving it tension free, that would

2    be -- cause the potential for vaginal sling erosion?

3           A.     That could happen.

4           Q.     Do you know what Dr. Perlow's

5    complication rate was in terms of over tensioning these

6    devices?

7           A.     I'm not aware of that.

8           Q.     What is the complication rate for over

9    tensioning a TVT?

10          A.     Well, it depends on where you're trying

11   to extract that information, so it's very hard to

12   answer that question with much accuracy.

13          Q.     What's your understanding, generally?

14          A.     Probably on the order of single digit

15   percentage points.

16          Q.     Something less than 10%?

17          A.     Yeah, I would conjecture that's about

18   right.

19          Q.     If a physician is having double that,

20   then the physician may have -- may be having a problem

21   with figuring out how to implant the device, correct?

22          A.     Possibly.

23          Q.     Well, not just possibly, more likely

24   than not, correct?

Konstantin Walmsley, M.D.

```
 1                  MR. THOMPSON:  Object to the form.

 2                  THE WITNESS:  To some degree, you know,

 3           the variable could also be patients as well and

 4           also might also be related to how one defines

 5           over tensioning.

 6    BY MR. GRIFFIN:

 7           Q.     What would it tell you if Dr. Perlow

 8    testified that he had a problem with over tensioning

 9    these devices?

10           A.     That would tell me that perhaps he had a

11    learning curve.

12           Q.     If you're over tensioning the device,

13    you're pulling it taut, correct?

14           A.     Possibly.

15           Q.     What you want to do is leave it tension

16    free, correct?

17           A.     That's the goal of the procedure, yes.

18           Q.     Did you make a determination as to

19    whether Dr. Perlow did, I guess, over tension the

20    device?

21           A.     I did formulate an opinion regarding

22    that.

23           Q.     So you have the Case Specific Opinion

24    Number 1 that there was vaginal sling erosion which was
```

Konstantin Walmsley, M.D.

```
 1   caused by shrinkage of the mesh, true?

 2          A.      Retraction and shrinkage of the mesh.

 3          Q.      Right.  And in coming to that opinion,

 4   you ruled out surgical error on implantation, correct?

 5          A.      Correct.

 6          Q.      And the way you ruled that out was how?

 7          A.      Dr. Perlow's operative dictation and

 8   Mrs. Bailey's postoperative treatment course.

 9          Q.      So there's two things there, one would

10   be his operative report?

11          A.      Correct.

12          Q.      And in the operative report it indicates

13   he left it tension free, true?

14          A.      Yes.

15          Q.      In other words, he didn't pull it taut,

16   correct?

17          A.      He specifically used a spacer, a pair of

18   scissors as a spacer to ensure tension-free placement.

19          Q.      And if you do that, you're not going to

20   pull it taut, right?

21          A.      Should not.

22          Q.      And if you're pulling the sling taut,

23   you run the risk of over tensioning the device,

24   correct?
```

Konstantin Walmsley, M.D.

```
1              A.      That may be one reason to do that -- or
2    one way to do that.
3              Q.      And your understanding was that
4    Dr. Perlow did not do that, correct?
5              A.      In the setting of using a spacer, such
6    as a Metzenbaum scissors, it's hard even in the setting
7    of a taut pull to set it too tight.
8              Q.      I'm going to show you Bailey WellStar
9    Windy Hill Hospital, Page 7 of the MDR.
10             Does Dr. Perlow indicate that the
11   vaginal tape was pulled tight, that it was taut, so
12   that it would suspend the urethra?
13             A.      It states, vaginal tape was pulled taut
14   so that it would suspend the urethra, and Metzenbaum
15   scissors was used as a spacer.
16             Q.      That's not what you would expect to find
17   in operative dictation for placement of a TVT, correct?
18             A.      Possibly, but not necessarily.
19             Q.      You've never seen a physician indicate
20   that they pulled it taut, have you?
21             A.      I don't know if I would say that
22   necessarily.
23             Q.      Can you remember a single case you've
24   reviewed or where you, yourself have done it where
```

Konstantin Walmsley, M.D.

1    you've used the words pulled the TVT or the similar

2    device taut?

3         A.    Well, when one is setting a TVT sling,

4    you're removing spacers, plastic sheaths that are

5    around the sling.  Oftentimes there is a tendency when

6    removing those sleeves to create some tension.

7    However, if you have a spacer in place, that more or

8    less protects that pulling of sheath out phenomenon

9    from over tensioning.

10              So even though his operative note

11   memorialized a taut pull of the sling, the presence of

12   the scissors as a spacer should ensure a tension-free

13   placement.

14        Q.    Doctor, if he says he pulled it taut in

15   the operative report and he indicated he had a 20%

16   complication rate of over tensioning these devices,

17   does that tell you that there's the potential in this

18   particular case, Pamela Bailey's case, that the TVT was

19   initially over tensioned?

20              MR. THOMPSON:  Object to the form.

21              THE WITNESS:  I would disagree with

22        that.

23   BY MR. GRIFFIN:

24        Q.    And is that because of your finding that

Konstantin Walmsley, M.D.

1    she did not indicate any problems of emptying her

2    bladder initially after the surgery?

3              A.      Correct.

4              Q.      That would be the only reason, correct?

5              A.      That would be my main reason.

6              Q.      You can't think of any other reason, as

7    we sit here, true?

8              A.      Well, the only other reason would be the

9    use of a spacer.

10             Q.      If she did have symptoms of trouble

11   emptying her bladder from the time of the surgery, that

12   would be indicative of the sling being placed too

13   tightly, correct?

14             A.      Not necessary.

15             Q.      Didn't you just tell me that?

16             A.      Well, it depends on the chronology with

17   which her obstructive symptoms presented.

18             Q.      Okay.  If she had the symptoms of

19   inability to empty her bladder from the time of the

20   surgery itself, that would be indicative that the sling

21   was possibly placed too tightly, correct?

22             A.      That would be a possibility.

23                     (Document marked for identification as

24                     Walmsley-Bailey Deposition Exhibit No. 4.)

Konstantin Walmsley, M.D.

```
 1    BY MR. GRIFFIN:

 2          Q.     Let me show you Exhibit 4 and ask you if

 3    she told Dr. Osterloh that she had had trouble emptying

 4    her bladder from the time of her surgery?

 5          A.     That's what's stated on this note.

 6          Q.     And if that is, in fact, true, that is a

 7    potential sign that the midurethral sling placed by

 8    Dr. Perlow was placed too tight or in a nontension free

 9    manner, correct?

10          A.     Once again, I would disagree with that

11    strictly on the basis of a sling in my practice that's

12    been over tensioned too tightly will literally present

13    with retention almost immediately to the point that a

14    patient requires catheterization to empty her bladder.

15                 One thing that can happen following

16    sling surgery, even if it's placed in a tension-free

17    fashion, is that patients can suffer symptoms of

18    incomplete emptying that are more related on swelling

19    and inflammation post sling implantation that then can

20    resolve over time.  The other possibility is that a

21    sling that's placed in a tension-free fashion can,

22    through the formation of scar plate or contraction,

23    develop an obstructive symptomatology.

24                 So the presence of a note ten years
```

Konstantin Walmsley, M.D.

```
1    after the sling that speaks to that raises the

2    possibility, of course, but doesn't necessarily rule

3    that in with the highest degree of certainty, only

4    insofar as this patient did not require catheter or

5    catheterization following her surgery.

6            Q.    So it raises the possibility -- the

7    patient's statement that she had trouble emptying her

8    bladder after her TVT procedure raises the possibility

9    that the device was placed too tautly; is that correct?

10                 MR. THOMPSON:  Object to the form.

11                 THE WITNESS:  I'm not offering that

12           opinion, only because if that were the case,

13           she would literally require a catheter to drain

14           her bladder.  That's typically the complication

15           of over tensioning is urinary retention

16           requiring a catheter, that in 2016, for

17           example, typically requires -- the standard of

18           care calls for a revision of the sling within a

19           few weeks because of that phenomenon.

20                 So maybe I'm defining over tensioning in

21           a different way.  Obviously, the sling did

22           ultimately become too tight because of the

23           findings discovered later on.  That being said,

24           the fact that there's the description of taut
```

Konstantin Walmsley, M.D.

1          in an operative dictation to me is put in the

2          proper context of a spacer being used doesn't

3          suggest over tensioning.

4          Q.      Okay.  The one possibility for a patient

5    experiencing the inability to completely void or empty

6    the bladder is the fact that a TVT may have been placed

7    in too tight a manner, correct?

8          A.      Depending upon the chronology with which

9    you're posing that question, that's possible.

10          Q.      Okay.  Not every TVT that is placed too

11    tightly requires the placement of a catheter, correct?

12          A.      That would be incorrect.

13          Q.      Are you saying every TVT that is placed

14    too tightly requires the use of a catheter?

15          A.      Almost invariably, yes.

16          Q.      Some patients simply have the inability

17    to void or feel like they have completely voided, true?

18          A.      Not true to my -- no, I would disagree

19    with that.

20          Q.      You don't have that understanding based

21    on the literature you've reviewed, correct?

22          A.      Based on the literature that I reviewed

23    and my own clinical experience, over tensioning of the

24    sling is a phenomenon that presents with the immediate

Konstantin Walmsley, M.D.

1   need for a catheter, a catheter to drain one's bladder

2   and sometimes can be related to a voiding dysfunction

3   that you see immediately following surgery as well.

4        Q.     You indicate that there was mesh

5   erosion, not mesh exposure.  Do you make a distinction

6   between those two terms?

7        A.     I think of them along a continuum.

8        Q.     Okay.

9        A.     In other words, first off, an erosion

10   event can include eroding into spaces or organs other

11   than the vagina.  Whereas an extrusion event really is

12   an erosive event into the vaginal space.  I think of an

13   extrusion as a mini vaginal erosion.  That's how I

14   would define it, an exposure being another means of

15   defining an erosion of mesh into the vaginal space.  So

16   I guess extrusion and exposure are subsets of an

17   erosion condition.

18        Q.     Did you read Dr. Adam's testimony on

19   that?

20        A.     I did.

21        Q.     Okay.  Did Dr. Adam remove the mesh in

22   this particular case?

23        A.     Partial mesh removal.

24        Q.     Did he find evidence of degradation of

Konstantin Walmsley, M.D.

1    the mesh?

2           A.      I don't recall seeing that.

3           Q.      You don't recall seeing that, or did he

4    not find that?

5           A.      I don't recall him mentioning that he

6    found that.

7           Q.      You know he was asked that specifically,

8    true?

9           A.      He was.

10          Q.      And he said he did not see that, true?

11          A.      Well, that's -- yes.

12          Q.      I just want to make sure you're not

13   recalling it versus --

14          A.      That's fair.

15          Q.      That's what he said?

16          A.      Yeah.

17          Q.      You would agree that Dr. Adam did not

18   find evidence of degradation, curling, fraying or

19   roping of the mesh when he took out a portion of the

20   mesh, true?

21          A.      This is true.

22          Q.      You make the statement or you give the

23   opinion that Dr. Perlow placed it tension free,

24   correct?

Konstantin Walmsley, M.D.

```
 1         A.      That's correct.

 2         Q.      You have no way of knowing, in fact,

 3  whether he did or didn't, other than the statement that

 4  he used the Metzenbaum scissors and your belief that

 5  she would have needed to be catheterized, correct?

 6         A.      I believe I also have a way of knowing

 7  in light of my having performed an IME on this patient

 8  as well.

 9         Q.      Before we get to the IME, you made the

10  statement that the mesh was placed tension free without

11  reading the deposition of Dr. Perlow, true?

12         A.      That's correct.

13         Q.      And when you made the statement, in your

14  opinion, which I think is Exhibit 2; is that right?

15         A.      Yes, sir.

16         Q.      You were unaware of what Dr. Perlow's

17  complication rate was with over tensioning of devices

18  and what his testimony was regarding over tensioning of

19  devices, correct?

20         A.      That's correct.

21         Q.      Did Dr. Adam testify that he found that

22  the mesh had shrunk?

23         A.      I don't believe he used that language.

24         Q.      Did he use any language that would be a
```

Konstantin Walmsley, M.D.

```
 1   synonym for shrunk?

 2            A.     I think his medical records speak

 3   towards a significant compression of the urethra, which

 4   is consistent with shrinkage.

 5            Q.     The compression of the urethra could

 6   happen as a result of scarring, correct?

 7            A.     True.

 8            Q.     It could happen as a result of over

 9   tensioning, correct?

10            A.     Theoretically.

11            Q.     And you contend that it could happen as

12   a result of the mesh itself shrinking, correct?

13            A.     That's correct.

14            Q.     Do you know whether it occurred in this

15   case due to mesh contracting or scarring?

16            A.     I believe it was probably both of those

17   issues.

18            Q.     Do you know -- I assume you don't know

19   the percentages of each, correct?

20            A.     I think it would be difficult to put

21   forth an opinion on that.

22            Q.     It may be all scarring, true?

23            A.     Possibly.

24            Q.     And does scarring result -- is there
```

Konstantin Walmsley, M.D.

1    scarring with any SUI procedure, surgical procedure?

2            A.      To some degree.

3            Q.      In your Case Specific Opinion Number 2,

4    you indicate the various causes of dyspareunia that you

5    rule in and rule out, true?

6            A.      Yes.

7            Q.      I want to ask you, what is your

8    understanding of when the dyspareunia was worse, after

9    Dr. Perlow's surgery, after Dr. Adam's surgery, or has

10   it remained the same?

11           A.      When I interviewed the patient, she

12   started having dyspareunia about three months after her

13   2001 surgery.

14           Q.      Has it remained the same or was it

15   better or worse as a result of the surgery by Dr. Adam?

16           A.      Dr. Adam's surgery was not -- certainly

17   not curative of the problem, and I'm not convinced it

18   changed very much with it.

19           Q.      How often were they having sex before --

20   or after Dr. Perlow's surgery?  Was it your

21   understanding they were unable to or could not?

22           A.      I asked her that question specifically

23   when I examined her, and she claimed that she used to

24   be sexually active every day.  When I examined -- when

Konstantin Walmsley, M.D.

1    I discussed this with her in April -- pardon me -- in

2    May of 2016, she described being sexually active every

3    three to four months with pain.

4            Q.    Do you know how often she was having it

5    after Dr. Perlow's surgery before Dr. Adam's surgery?

6            A.    Somewhere between three to four times a

7    year and every day.  I don't recall the exact amount.

8            Q.    That's a pretty big gap.

9            A.    I know it is.  I apologize.

10           Q.    Was it your understanding after

11   Dr. Perlow's surgery, she was not sexually active due

12   to dyspareunia?

13           A.    Well, I do recall that, yes.

14           Q.    She certainly was not having sex two to

15   three times a week after Dr. Perlow's surgery, true?

16           A.    No, that's true.

17           Q.    Because if she was having sex two to

18   three times a week after Dr. Perlow's surgery, that's

19   inconsistent with dyspareunia, correct?

20               MR. THOMPSON:  Object to the form.

21               THE WITNESS:  I'm not sure if I

22           understand that question.

23   BY MR. GRIFFIN:

24           Q.    If she was having sex two to three times

Konstantin Walmsley, M.D.

1    a week after Dr. Perlow's surgery, that's inconsistent

2    with severe dyspareunia, correct?

3           A.     Well, it's a little bit of a different

4    question than you posed before in terms of the use of

5    the word severe, and I guess I would offer an opinion

6    that one can still be sexually active and have

7    dyspareunia.  I mean, in other words, in having

8    dyspareunia doesn't mean I cannot have sex, it just

9    means one has sex and has discomfort doing so.

10          Q.     Right.  And she indicated to you she was

11   having it three to four times a year, correct?

12          A.     In 2016, that's what she told me.

13          Q.     Which would be severe dyspareunia, as

14   far as your understanding, true, or a lack of desire, I

15   guess?

16          A.     I think it would be, you know, possibly

17   consistent with dyspareunia, yes.

18          Q.     Okay.  Two to three times a week is not

19   consistent with your experience with patients claiming

20   dyspareunia, correct?

21          A.     Possibly, but not necessarily.

22          Q.     Based on your experience, patients who

23   are having dyspareunia are not having sex two to three

24   times a week, correct?

Konstantin Walmsley, M.D.

```
 1          A.      If it were severe, that would be a

 2   surprise to me.

 3          Q.      And she had severe dyspareunia, based

 4   upon what she told you, true?

 5          A.      Well, in 2016 she was having severe

 6   dyspareunia and made fairly descriptive comments

 7   regarding what it was like.

 8          Q.      Right, and she's told you that she had

 9   had dyspareunia all the way back to Dr. Perlow's

10   surgery, true?

11          A.      Starting about three months after

12   Dr. Perlow's surgery, correct.

13          Q.      And it had been severe the entire time,

14   true?

15          A.      I don't recall her using the word

16   severe, but suffice it to say, I know that she had had

17   it ever since that surgery.

18          Q.      Well, the description she gave you would

19   equal severe.  She may not have used that word severe,

20   but the description she gave you, you would consider

21   that severe dyspareunia back to the time Dr. Perlow was

22   treating the patient, true?

23                  MR. THOMPSON:  Object to the form.

24                  THE WITNESS:  I'm not sure I could
```

Konstantin Walmsley, M.D.

```
1           answer that question with a great deal of

2           confidence.

3    BY MR. GRIFFIN:

4           Q.    But your understanding was three to four

5    times a year, basically, since Dr. Perlow's surgery,

6    true?

7           A.    No.  When I asked her that question,

8    that was really more of a question over the last couple

9    of years, so I didn't ask her specifically, you know,

10   how often she was having sex, let's say, in 2002 or

11   2006, so forth.  I know it was an ongoing complaint,

12   obviously.

13          Q.    Right.

14                Do you have patients with severe

15   dyspareunia having sex two and three times a week with

16   their spouse?

17          A.    Actually, I do.  I'm embarrassed to

18   bring this up, but it's not vaginal intercourse,

19   necessarily.

20          Q.    I'm talking about vaginal intercourse,

21   sexual intercourse.

22          A.    I do not have patients in my practice

23   with severe dyspareunia that have penetrating

24   intercourse two to three times a week, unless their
```

Konstantin Walmsley, M.D.

```
 1    husband maybe is -- I mean, there are instances in

 2    which I have patients with severe dyspareunia that

 3    still have sex.

 4            Q.      Sexual abuse type situations almost,

 5    correct?

 6            A.      No.  It's, you know, more borne out of a

 7    patient's interest in keeping their husband fulfilled,

 8    and, I mean, I have patients that suffer to have sex so

 9    that their husband won't leave them.  I mean, this is

10    the truth.

11            Q.      Tell me after Dr. Adam did his surgery,

12    has there been any evidence of mesh exposure?

13            A.      No, sir.

14            Q.      Did you see any evidence of mesh

15    exposure when you examined the patient, whether you

16    call it exposure or extrusion?

17            A.      I did not.

18            Q.      You indicate in your report that you

19    documented tenderness in the right periurethral area?

20            A.      Yes.

21            Q.      And your report indicates "tenderness

22    along right periurethral area (? mesh vs. scar)."

23                    Did I read that correctly?

24            A.      That's correct.
```

Konstantin Walmsley, M.D.

```
 1          Q.      Is that because you don't know whether

 2   that is due to a scar or due to mesh?

 3          A.      I think it may be somewhat similar to a

 4   discourse that you and I had had prior regarding

 5   palpating scar tissue and not being able to determine

 6   if there might be some mesh underneath the scar tissue.

 7   There's no erosion, exposure, extrusion, et cetera, but

 8   there is a palpable thickening of the tissue that might

 9   have mesh underneath it.

10          Q.      But you don't know whether there's mesh

11   at that site, correct?

12          A.      Correct.

13          Q.      So the tenderness along the right

14   periurethral area may be caused by the scar itself,

15   correct?

16          A.      You know as an indirect consequence of

17   her surgeries, yes.

18          Q.      And it could be as a result of the

19   initial scar itself, correct?

20          A.      That's hard to answer that question

21   having not examined her between 2001 and 2005.  It's a

22   possibility.

23          Q.      Well, she actually had what she

24   described as dyspareunia before there was ever exposure
```

Konstantin Walmsley, M.D.

1    of the mesh, correct?

2          A.     This is true.

3          Q.     Okay.  Which would give an indication

4    that the scar itself from the placement of the mesh may

5    have been the potential cause for her dyspareunia,

6    correct?

7          A.     Possibly.

8          Q.     And that is, of course, a complication

9    of placement of a TVT or placement of a autologous

10   fascial graft, correct?

11         A.     You are speaking of just the generalized

12   presence of dyspareunia?

13         Q.     The scar, a scar can cause that?

14         A.     Any scar can cause that.

15         Q.     And I guess when you place an autologous

16   fascial sling, you have to make an incision in the

17   vagina as well, correct?

18         A.     That's correct.

19         Q.     And that scar can lead potentially to

20   dyspareunia, correct?

21         A.     If it's located in the midline, that

22   would be plausible.

23         Q.     Do you ever locate them in the midline?

24         A.     On occasion.

Konstantin Walmsley, M.D.

1        Q.      Do you have patients that you have

2    implanted autologous fascial slings in who have pain

3    from the scar, dyspareunia that you attribute to the

4    scar from the placement of the fascial sling?

5        A.      This can happen in uncommon instances,

6    yes.

7        Q.      Do you have patients who that has

8    happened to?

9        A.      One or two, I do.

10       Q.      You indicated that you excluded pelvic

11   floor dysfunction.  What did you mean by pelvic floor

12   dysfunction?

13       A.      Pelvic floor dysfunction usually speaks

14   to issues such as pelvic floor muscle spasm or levator

15   spasm, as it's sometimes called.  This can typically be

16   diagnosed not only through history taking but through a

17   physical exam where you can actually document tightness

18   or spasm of the levator muscles during an examination.

19       Q.      Did you do that in your examination?

20       A.      I did.

21       Q.      Is that documented in your record?

22       A.      As part of my examination of the female

23   genitalia, that's something I typically do.  It's not

24   something that's present, I don't necessarily write no

Konstantin Walmsley, M.D.

1    levator spasm or things to that nature.

2         Q.     Did you write anything regarding that

3    test?

4         A.     It's just part of my vaginal exam when

5    I'm doing a bimanual exam to assess for the presence or

6    absence of that, and, typically, because this is a

7    template, the template doesn't include absent levator

8    spasm.  It's usually something that's provided if the

9    finding is there.

10        Q.     Did you document that anywhere in this

11   report, the absence of levator spasm?

12        A.     Well, I guess what I didn't document was

13   the presence of levator spasm, thereby implying that

14   there was no levator spasm.

15        Q.     Well, in your examinations you

16   specifically make references to things you don't find,

17   correct?

18        A.     I specifically make references using an

19   electronic health record generated template.

20        Q.     Well, you specifically state that you

21   found tenderness, right?

22        A.     Correct.

23        Q.     You stated that you found no masses,

24   atrophy or lesions, correct?

Konstantin Walmsley, M.D.

1          A.      That's correct.

2          Q.      You state you found no urethral

3    discharge or mass, true?

4          A.      In fact, one thing that's very helpful

5    with electronic health resources is when there is a

6    specific pertinent, positive finding, it's bolded, as

7    you can see, relating to the tenderness comment.

8          Q.      Is there anything in here that says no

9    levator spasm?

10         A.      There was none found during my exam, so

11   I didn't provide that, given the fact that it wasn't

12   part of the template.

13         Q.      So it just depends on what's in the

14   template as to what ends up in the report?

15         A.      No, that's not true.  What ends up in

16   the template is generated by the electronic health

17   resource, but in my examination, if I find something

18   that's relevant and pertinent, I'll add that.

19         Q.      Well, you specifically said that it was

20   relevant and pertinent in the opinions you were giving

21   in this case that there was no pelvic floor

22   dysfunction, correct?

23         A.      There is no pelvic floor dysfunction in

24   any of the medical records, including my IME, that's

Konstantin Walmsley, M.D.

```
1    correct.

2            Q.      And you state that --

3            A.      In fact -- I'm sorry.

4            Q.      Go ahead.

5            A.      I was just going to say Dr. Adam made

6    mention of the fact that in his examination in 2005,

7    her levator ani were normal.

8            Q.      And you say there's an absence of

9    documented tenderness to the pelvic floor musculature

10   by multiple consultants, correct?

11           A.      That's correct.

12           Q.      Who are these multiple consultants?

13           A.      Dr. Adam, Dr. Sward.

14           Q.      Dr. Adam, 2005?

15           A.      Yeah.  Dr. Sward in 2004.  Myself.

16   There's no mention in Dr. Osterloh, if I'm saying her

17   name right, in her findings of such.

18           Q.      She doesn't do a pelvic exam, does she?

19           A.      This is true.

20           Q.      Has a single pelvic exam been done on

21   this patient since 2005 until the time you saw her in

22   2016?

23           A.      I have no evidence of such.

24           Q.      So as far as you can tell from your
```

Konstantin Walmsley, M.D.

1   review of the records, for 11 years she did not have a

2   single vaginal examination?

3          A.      Not that I have seen, no.

4          Q.      Did you see any complaints to any

5   physicians from 2005 to the time you saw her

6   complaining about dyspareunia?

7          A.      I did not.

8          Q.      Did you find any complaints of

9   dyspareunia that occurred before she -- from 2005 until

10  after she filed this lawsuit?

11         A.      I did not.

12         Q.      Does she suffer from incontinence

13  currently?

14         A.      Not currently, no.

15         Q.      Did she have incontinence before the

16  procedure performed by Dr. Perlow?

17         A.      Yes, sir, she did.

18         Q.      So would it be your conclusion that the

19  TVT has corrected her incontinence?

20         A.      No.

21         Q.      And that's because?

22         A.      Well, she's required multiple surgeries

23  since her TVT to resolve her incontinence.

24         Q.      What are the multiple surgeries?

Konstantin Walmsley, M.D.

1          A.      Well, firstly, she had collagen

2    injections following her SUI surgery, the TVT-O

3    placement.

4          Q.      Those had a temporary effect, correct?

5          A.      That had a temporary benefit.

6          Q.      Okay.  That's not surgery, is it?  I

7    guess it depends on your definition.

8          A.      Well, it depends how one defines it.

9    It's a minor surgery or a minor procedure, if you will.

10         Q.      Okay.

11         A.      Sometimes those are done in the office,

12   sometimes those are done in a hospital setting, so I

13   think it's hard to say whether you call it surgery or

14   otherwise.

15         Q.      The only other true surgery was the

16   excision of the mesh, correct?

17         A.      Yeah, and along those lines, when she

18   originally presented to Dr. Adam in February of 2005,

19   her urinary incontinence was ongoing.

20         Q.      But by the time you see her, there is no

21   urinary incontinence?

22         A.      This is true.

23         Q.      Did it self-heal?

24         A.      Following Dr. Adam's surgery, her

Konstantin Walmsley, M.D.

```
 1    incontinence resolved.  When she last saw Dr. Adam,

 2    July 14, 2005, a little over four months

 3    postoperatively, she was still leaking occasionally.

 4    By the time I saw her, she was no longer having

 5    incontinence.

 6            Q.      So Dr. Adam removed a portion of the

 7    sling?

 8            A.      That's correct.

 9            Q.      And by removing a portion of the sling,

10    the patient -- it resolved the patient's incontinence?

11            A.      Ultimately, that surgery proved to be

12    successful in that regard, yes.

13            Q.      But the TVT, a portion of it remains in

14    place, correct?

15            A.      That's correct.

16            Q.      So the remaining portion is what is I

17    guess taking care of her incontinence?

18            A.      Not exactly, no.

19            Q.      What is?

20            A.      Well, one of the premises around which

21    mesh-based slings work is their ability to create an

22    inflammatory response and scar tissue.  One of the

23    reasons you can see mesh-related complications is in

24    part related to the inflammation and scar tissue that
```

Konstantin Walmsley, M.D.

1   results.

2              If you can imagine, at least when I

3   examined Ms. Bailey, what she had was one piece of mesh

4   on the right side, one piece of mesh on the left side

5   and then a scar bridge between those two pieces of

6   mesh.  So really her continent mechanism is not only in

7   part related to the mesh but the very inflammatory

8   response and scar tissue formation that one expects

9   from the mesh.  That's one of the reasons you don't

10  have to suture mesh in place.  It self-affixes by

11  virtue of the inflammatory response it creates.

12          Q.    So the effect of the TVT in causing scar

13  tissue is what has solved her incontinence, would that

14  be a fair way to say it?

15              MR. THOMPSON:  Object to the form.

16              THE WITNESS:  I think it's a combination

17          of both.  In other words, in instances where

18          you removed more of the mesh, the scar tissue

19          doesn't necessarily provide all of the support

20          needed to provide continence.  In this

21          instance, obviously, whether it's scar tissue

22          or the actual mesh itself, it succeeded in

23          doing so.

24  BY MR. GRIFFIN:

Konstantin Walmsley, M.D.

1          Q.      So you believe that there's a

2     combination of the mesh and the scar tissue that was

3     caused by the implantation of the mesh that is -- has

4     cured her incontinence; would that be a fair way to say

5     it?

6                       MR. THOMPSON:  Object to the form.

7                       THE WITNESS:  I would add to that and

8               say as well as the additional surgery scarring

9               that has done that, yes.

10    BY MR. GRIFFIN:

11         Q.      So the dyspareunia which she currently

12    has could be caused by the incisional scar alone,

13    correct?

14         A.      Not correct.  Not based on my evaluation

15    and examination where -- well, couple of points to

16    make.  First off, the majority of her tenderness that

17    she described as being what she felt when she had

18    dyspareunia is on the right side of her vaginal space

19    so that periurethral space, number one.

20         Q.      Was there an incision in that area where

21    the mesh was removed?

22         A.      Not necessarily, but possibly.  I think

23    to really formulate a better opinion on that, I really

24    have to relook at Dr. Adam's operative note to make a

Konstantin Walmsley, M.D.

1    comment to that effect, and the reason I say that is

2    because typically in the setting of a partial mesh

3    excision, one will typically make a midline incision

4    and then access the eroded mesh from that midline

5    incision by dissecting underneath the vaginal space to

6    access the mesh.

7                    And, as I sit here today, I'm not

8    specifically recalling if Dr. Adam made that approach

9    towards removing the mesh, in other words, a midline

10   incision, or whether he incised transversely, if you

11   will, under the mesh to deliver it, in which case your

12   question and your theory would be plausible.

13        Q.    Did you indicate that the patient

14   currently has incomplete bladder emptying?

15        A.    My comment made was that she has to

16   strain to urinate.

17        Q.    So that's a voiding dysfunction, in

18   essence, correct?

19        A.    Yes, sir.

20        Q.    Did you do any post void residual

21   testing on her?

22        A.    I did not.

23        Q.    And what would you be looking for in

24   that kind of testing?

Konstantin Walmsley, M.D.

```
 1              A.     Well, there are two ways to assess for

 2    incomplete bladder emptying from an objective

 3    standpoint.  Certainly one of the best is to scan the

 4    bladder after urination and assess their post void

 5    residual.  Oftentimes you can get a sense of their

 6    emptying ability on the basis of a physical

 7    examination, where you palpate over the suprapubic area

 8    in the location of the bladder to sense, number one, if

 9    you can palpate their bladder and/or, number two, if

10    they feel a desire to urinate upon that palpation.

11              Q.     Did you do that?

12              A.     I did.

13              Q.     What did you find?

14              A.     I didn't clinically suspect her of

15    having incomplete bladder emptying based on my physical

16    examination in the absence of a bladder scan.

17              Q.     Was that inconsistent or consistent with

18    her continued voiding dysfunction?

19              A.     Well, I think that you have to take into

20    account that the diagnosis of incomplete bladder

21    emptying can be a subjective one as well as an

22    objective one.  Certainly, the fact that she is

23    straining to void suggests that she has some sort of

24    bladder outlet obstruction.  Whether that's manifesting
```

Konstantin Walmsley, M.D.

1    with an actual objective finding of elevated post void

2    residuals or a true objective incomplete bladder

3    emptying doesn't necessarily mean a patient can't have

4    that feeling.

5            Q.      When was the last post void residuals

6    done on this patient?

7            A.      From my recollection, July 14th, 2005.

8            Q.      And what were the results of that?

9            A.      It was 10 CCs.

10           Q.      That's pretty small, isn't it?

11           A.      Yes.

12           Q.      That would not support incomplete

13   bladder emptying, correct, objectively?

14           A.      I would agree with that.

15           Q.      So that would be inconsistent with

16   voiding dysfunction?

17           A.      Well, I think the fact that someone is

18   complaining about having that, yet doesn't have that,

19   to me is part of the syndrome of voiding dysfunction.

20           Q.      She has complained specifically of

21   incomplete bladder emptying, correct?

22           A.      Having that feeling, yes.

23           Q.      All objective testing that's been done

24   by you and by Dr. Adam in 2005 doesn't support that,

Konstantin Walmsley, M.D.

```
 1   true?

 2          A.      That's correct.

 3                  MR. GRIFFIN:  Take a break for a minute.

 4                  (Brief recess taken at 12:03 p.m.)

 5                  (Deposition resumes at 12:09 p.m.)

 6   BY MR. GRIFFIN:

 7          Q.      Dr. Walmsley, you stated that you felt

 8   it was an induration or was it just tenderness in the

 9   right periurethral area?

10          A.      Well, it was both based on the comment

11   made following that question, mesh versus scar.

12          Q.      Okay.  Is it your understanding where

13   you felt that tenderness, that was where the mesh was

14   excised?

15          A.      Possibly, yes.

16          Q.      So necessarily an incision would have

17   been made where the mesh was excised, correct?

18          A.      Well, as I alluded to before, sometimes

19   the surgical technique involves making a midline

20   incision and then tracking underneath the vaginal

21   lining to the area of the mesh erosion.  Other

22   instances involve making incision adjacent to the mesh

23   erosion.  Suffice it to say, the area of her mesh

24   erosion and subsequent removal was certainly in the
```

Konstantin Walmsley, M.D.

1   area where my examination would indicate that that

2   surgery was done.

3        Q.     And that one of the ways you would

4   remove that mesh is to make your incision just proximal

5   to the area where the mesh was exposed, correct?

6        A.     Yeah, and that's my understanding as to

7   what Dr. Adam did.

8        Q.     Okay.  And that would not be midline

9   based upon your findings in 2016, correct?

10       A.     Neither based on my findings or the

11  location of the actual erosion based on Dr. Adam's

12  records.

13       Q.     So there was an actual incision and scar

14  tissue in that area probably from the surgery itself,

15  correct?

16       A.     The incision I think was proximal to

17  that area, but close to it.

18       Q.     And your point in your examination is

19  that that tender area may be the scarring itself from

20  the incision or scarring from mesh, correct?

21       A.     No, that was not my insinuation from the

22  exam.  My insinuation from the exam was that that

23  tenderness could be relating to the mesh itself or to

24  scar tissue.  I wasn't attributing it to the incision

Konstantin Walmsley, M.D.

1   per se.

2          Q.     Well, the incision created scar tissue

3   itself, correct?

4          A.     Yes, to some degree this is true, yes.

5          Q.     And that scar tissue could be causing

6   the tenderness and dyspareunia, correct?

7          A.     I guess for the purposes of specificity,

8   are you talking about the incision from Dr. Adam's

9   procedure or the incision from Dr. Perlow's procedure?

10         Q.     Well, it could be the incision from

11  Dr. Adam's procedure, correct?

12         A.     Well, the only reason I have to take

13  issue with that is because when Dr. Adam examined her

14  prior to his surgery, he was able to elicit tenderness

15  in that area prior to his own incision.

16         Q.     Right.

17                There was mesh exposure at that time,

18  true, when Dr. Adam saw the patient?

19         A.     Yes, sir.

20         Q.     And there was tenderness in the area of

21  the mesh exposure, true?

22         A.     True.

23         Q.     And Dr. Adam -- and up until that point

24  in time, the patient was having sex two to three times

Konstantin Walmsley, M.D.

1    a week, correct?

2              A.      That is true.

3              Q.      So up until the time Dr. Adam operated

4    on this patient, she was having sex with her husband

5    two to three times a week, true?

6              A.      Yes.

7              Q.      And then after Dr. Adam operated on the

8    patient, how often was she able to have sex?

9              A.      To my mind, less frequently than that.

10             Q.      And is it your understanding from

11   reading the fact witness depositions that everything

12   went downhill as far as their sex lives after

13   Dr. Adam's procedure?

14             A.      I wouldn't read it as such, no.

15             Q.      How did you read it?

16             A.      Well, I felt like the problem started

17   after her sling surgery was done and were not

18   ameliorated by Dr. Adam's procedure.

19             Q.      So you did not have the understanding

20   that everything went downhill after Dr. Adam's

21   procedure as far as their sex life?

22             A.      I think things worsened after that

23   procedure, but they weren't in tip-top shape going into

24   that procedure either.

Konstantin Walmsley, M.D.

1        Q.      Well, they were in pretty good shape if

2   she was having sex two to three times a week, weren't

3   they?

4        A.      Well, once again, I think you have to

5   qualify the enjoyment of that process.  I mean, for

6   better or for worse, as my understanding goes, she was

7   having discomfort during sex but was doing so

8   regardless.

9        Q.      Where did you read that?

10       A.      This is based on my discussions with

11  her.

12       Q.      And that's what she told you, she was

13  having sex despite being in pain?

14       A.      She used words -- both her and her

15  husband expressing feelings of guilt to the point that

16  he felt guilty about doing it now because of the fact

17  that he knew how uncomfortable it was for her, but that

18  flavor was insinuated to their sex life after the TVT-O

19  sling was placed as well, that it wasn't necessarily a

20  comfortable act for her.

21       Q.      Did you read Houston Bailey's

22  deposition, her husband's deposition?

23       A.      I did not.

24       Q.      So when you offered these opinions

Konstantin Walmsley, M.D.

1    regarding when the dyspareunia was worse, when the

2    dyspareunia was better, you had not had the opportunity

3    to review Houston Bailey's deposition?

4            A.      I hadn't read his.

5            Q.      You had not?

6            A.      I had not read that deposition.

7            Q.      As I understand it, if a patient has

8    exposure of the mesh into the vagina, her partner may

9    feel a scratching sensation or a prickling sensation,

10   correct?

11           A.      That's described often, yes.

12           Q.      Okay.  When you saw the patient in 2015,

13   did they have exposure of the mesh?

14           A.      It was in 2016.

15           Q.      2016, there was no exposure of mesh?

16           A.      I did not appreciate such.

17           Q.      You did not feel a slicing or a cutting

18   of your finger or anything of that sort when you

19   conducted your manual examination, correct?

20           A.      I just felt palpable scar.

21           Q.      There was nothing that would be causing

22   a scratching or cutting or scraping of the penis,

23   correct?

24           A.      Possibly scar tissue, but, certainly, I

Konstantin Walmsley, M.D.

1    wouldn't attribute that to a mesh exposure phenomenon.

2           Q.    And you didn't feel that type of

3    scratching sensation when you conducted your

4    examination of the patient manually, correct?

5           A.    Well, using my gloved finger I did not,

6    no.

7           Q.    Are you currently using midurethral

8    sling procedures?

9           A.    I am.

10          Q.    Do you read the IFU before you do every

11   midurethral sling procedure?

12          A.    I try to stay up-to-date with the IFUs,

13   yes.

14          Q.    Do you read the IFU every time you do a

15   midurethral sling procedure?

16          A.    I tend to look at the IFUs about once a

17   year, so if you're saying before each individual

18   procedure do I pull out the IFU and look at it, the

19   answer to that would be no.  Sometimes if there's

20   turnover time, you've got nothing better to do, you

21   might take a glimpse at it and just make sure nothing

22   has really changed.

23          Q.    And in doing your informed consent with

24   the patient, you do not rely only on the IFU, do you?

Konstantin Walmsley, M.D.

```
 1            A.      I use it as part of my informed consent,
 2    that's true.
 3            Q.      Right.  And what are the other things
 4    you use as part of your informed consent?
 5            A.      My training, as it relates to
 6    transvaginal mesh, some of the workshops I have
 7    attended.
 8            Q.      What you've read?
 9            A.      To some degree, yes.
10            Q.      What you'd experienced in your own
11    practice?
12            A.      This is true.
13            Q.      I don't know if workshops included this,
14    but whatever seminars you may have attended or cadaver
15    labs, things like that?
16            A.      A lot of the workshops had didactic
17    sessions, not only talking about the history of mesh,
18    but the design of the mesh and what perhaps made it
19    different from other products and so forth.
20            Q.      And all of that information goes into
21    the informed consent that you give a patient, correct?
22            A.      Would be very helpful.
23            Q.      You don't simply rely on reading the IFU
24    to the patient, do you?
```

Konstantin Walmsley, M.D.

1      A.      I never read the IFU to the patient per

2  se, but I do use it as a framework or a foundation, if

3  you will, in terms of counseling a patient.

4      Q.      You don't have the IFU in your hands

5  when you counsel a patient, do you?

6      A.      I do not.  That might make a patient a

7  little nervous.

8      Q.      Do you show the patient the mesh?

9      A.      In certain instances I have, but not

10  all.

11      Q.      And when you give the informed consent,

12  you counsel a patient on what your personal experience

13  has been, correct?

14      A.      I do.

15      Q.      And so a physician cannot simply rely on

16  the IFU alone, they should also tell the patient

17  information they know of that's based on their

18  experience, their learning, reading, things of those

19  sorts, correct?

20            MR. THOMPSON:  Object to the form.

21            THE WITNESS:  I think that can be very

22        helpful in facilitating a proper informed

23        consent.

24  BY MR. GRIFFIN:

Konstantin Walmsley, M.D.

1      Q.      Are polypropylene mesh slings like the

2  TVT the standard of care for surgical treatment of SUI?

3      A.      Not necessarily.

4      Q.      Is it within the standard of care for a

5  physician to use a TVT for the surgical treatment of an

6  SUI?

7      A.      I believe with proper informed consent,

8  this is true.

9      Q.      Was it within the standard of care for

10  Dr. Perlow to recommend the polypropylene mesh sling

11  like the TVT for Ms. Bailey?

12          MR. THOMPSON:  Object to the form.

13          THE WITNESS:  Based on the available

14      fund of knowledge available to him at that

15      time, I do believe it was the standard of care.

16  BY MR. GRIFFIN:

17      Q.      And you've not had the opportunity to

18  review his knowledge, so you don't know what he had in

19  his head to tell her, correct?

20      A.      The only fund of knowledge that I would

21  have known he would have possibly been in receipt of,

22  if you will, was the IFU at that time.

23      Q.      And as you've already pointed out, a

24  physician shouldn't rely on just the IFU, they should

Konstantin Walmsley, M.D.

1    also use the fund of knowledge that they obtain from

2    other sources in providing informed consent, correct?

3         A.     To some extent, this is true.

4         Q.     I mean, that is the standard of care,

5    isn't it?

6         A.     Well, the issue, once again, based on

7    what I determine to be the standard of care is that the

8    IFU is the framework, it's the foundation, it's the

9    foundation on which key opinion leaders, literature and

10   other things that formulate an informed consent depend

11   upon.

12        Q.     So as long as appropriate informed

13   consent is given, you're of the opinion that the

14   midurethral polypropylene slings are a safe and

15   effective form of SUI treatment, correct?

16               MR. THOMPSON:  Object to the form.

17               THE WITNESS:  Well, I wouldn't offer

18          that opinion.  I would offer the opinion that

19          it's effective.  I think one has to refine what

20          one -- the term "safe."  The fact that I'm

21          still doing it certainly would infer that I

22          believe it's appropriate for a subset of

23          patients with proper informed consent who

24          understand the ramifications, both good and

Konstantin Walmsley, M.D.

```
 1            bad, to utilizing transvaginal mesh.
 2    BY MR. GRIFFIN:
 3            Q.    Is it true that after an appropriate
 4    informed consent has been given for some of your
 5    patients, you believe it is a safer and more effective
 6    form of stress urinary incontinence treatment than
 7    other treatments?
 8            A.    For certain patients, this is true.
 9            Q.    And do you agree that polypropylene mesh
10    midurethral slings are the standard of care for the
11    surgical treatment of SUI?
12            A.    I think they're one of the standards of
13    care that we rely upon in our armamentarium to treat
14    the condition.
15            Q.    So one of the standards of care?
16            A.    I would opine that for select patients
17    it would be an appropriate procedure.
18            Q.    You indicated one of the alternative
19    procedures was the autologous sling?
20            A.    Yes, sir.
21            Q.    Does that require hospitalization?
22            A.    It does.
23            Q.    Does that require overnight stay?
24            A.    Usually it does.
```

Konstantin Walmsley, M.D.

```
1            Q.      Does the mesh TVT type procedures have a

2     reduced hospitalization as compared to the autologous

3     sling?

4            A.      Insofar as hospital stay, this is true.

5            Q.      And does it have reduced surgical pain,

6     the TVT type midurethral slings?

7            A.      Sometimes it does, yes.

8            Q.      And it's your understanding that

9     mesh-related complications can occur following

10    polypropylene sling placement, but the rate of

11    complications is acceptably low?

12           A.      Well, I would disagree with that.

13           Q.      From a quantitative point, do you

14    believe it's acceptably low?

15           A.      From a quantitative point of view, it's

16    relatively low.

17           Q.      And if it were too high, you wouldn't be

18    recommending it, correct?

19           A.      Well, that's exactly true.

20                   MR. THOMPSON:  Mr. Griffin, I hate to

21           interrupt, because I do want to let you go

22           forward, but are you making reference to an

23           earlier deposition of Dr. Walmsley?

24                   MR. GRIFFIN:  Yes.
```

Konstantin Walmsley, M.D.

```
 1                    MR. THOMPSON:  Well, is this the

 2          deposition that was on Friday?

 3                    MR. GRIFFIN:  No.

 4                    MR. THOMPSON:  Okay.  All right, thanks.

 5                    MR. GRIFFIN:  I wasn't here Friday,

 6          fortunately neither were you.

 7                    MR. THOMPSON:  Then that's fair game.

 8          Thank you.

 9                    MR. GRIFFIN:  No, I'm not repeating what

10          was done on Friday, because I have no idea what

11          was done on Friday because I wasn't here.

12  BY MR. GRIFFIN:

13          Q.    What type of device do you currently use

14  that is like the TVT?

15          A.    Currently I use a Coloplast Aris sling.

16          Q.    And what is the difference between that

17  and the TVT type?

18          A.    The mesh is somewhat different.  It's

19  somewhat less -- it has somewhat less elasticity, if

20  you will.

21          Q.    The Coloplast has less elasticity?

22          A.    It doesn't stretch as readily as the TVT

23  sling.

24          Q.    More rigid?
```

Konstantin Walmsley, M.D.

```
1              A.     I don't know if I would offer the term

2     "rigid."  It just doesn't stretch as readily.

3              Q.     So was it appropriate for Dr. Perlow to

4     recommend the TVT procedure for Ms. Bailey's

5     incontinence in this case?

6                     MR. THOMPSON:  Object.

7                     THE WITNESS:  Based on his fund of

8              knowledge, I agree.

9     BY MR. GRIFFIN:

10             Q.     And to this date, 2016, that's still one

11    of the options you offer your patients, correct, the

12    TVT midurethral sling type procedures?

13             A.     In select patients with proper informed

14    consent, this is true.

15                    MR. GRIFFIN:  I'll reserve the rest of

16             my time.

17    BY MR. THOMPSON:

18             Q.     Doctor, earlier in your testimony you

19    had talked about that autologous grafts had risk of

20    dyspareunia and other complications the same as slings

21    did.

22                    Do you recall that portion of the

23    testimony?

24             A.     If I had said it that way, I stand
```

Konstantin Walmsley, M.D.

1  corrected, but I do recall us discussing the fact that

2  autologous fascial slings do run the risk of

3  dyspareunia, yes.

4        Q.    In terms of assessing the risk and

5  efficacy of the various modes of treatment, is it

6  important to know and understand the frequency of

7  complications as between the two or between the

8  multiple procedures?

9              MR. GRIFFIN:  Object to form, leading.

10             THE WITNESS:  Yeah, I think that's very

11        helpful.

12  BY MR. THOMPSON:

13        Q.    Is it a part of informed consent to

14  advise patients as to the frequency of complications?

15        A.    Yes.

16        Q.    Is it a part of informed consent that

17  you advise patients of the severity of those

18  complications?

19             MR. GRIFFIN:  Object to form.

20             THE WITNESS:  Yes.

21  BY MR. THOMPSON:

22        Q.    Is it part of informed consent that you

23  advise patients as to what complications may be

24  permanent as opposed to what complications may be

Konstantin Walmsley, M.D.

```
1    transient?

2           A.     Yes.

3           Q.     And is it a part of informed consent to

4    advise patients as to the ease or the impossibility of

5    correcting complications?

6           A.     Yes.

7           Q.     Okay.  Doctor, you've had an opportunity

8    to hear some additional information and to review it

9    today, and also you've heard that there may be

10   depositions that you have not yet considered.

11              Do any of these additional facts or any

12   additional information cause you to retract the

13   opinions that you've expressed in your report?

14          A.     No.

15          Q.     Doctor, I note in your report, you

16   signed the report, do the opinions that you've

17   expressed in the report and the opinions that you've

18   expressed -- that you've been examined upon today, do

19   you hold these opinions to a reasonable degree of

20   medical certainty?

21          A.     I do.

22          Q.     At one point in your deposition, you had

23   indicated that you couldn't differentiate between the

24   extent of the mesh itself and the scarring as causing
```

Konstantin Walmsley, M.D.

```
 1    Ms. Bailey's symptoms.

 2              Do you recall that?

 3         A.     I do.

 4         Q.     In any event, even if you're not able to

 5    ascertain the exact amount or proportion, can you say

 6    that the mesh participated in the symptoms that

 7    Ms. Bailey suffered and suffers today?

 8              MR. GRIFFIN:  Object to form.

 9              THE WITNESS:  Yes, I can.

10    BY MR. THOMPSON:

11         Q.     Can you say that the mesh was a

12    substantial contributing factor in the symptoms that

13    Ms. Bailey has suffered and suffers from today?

14         A.     Yes.

15              MR. THOMPSON:  Thank you, Doctor.

16         That's all I have.

17    BY MR. GRIFFIN:

18         Q.     And would you agree that the scarring

19    was a substantial contributing factor to the symptoms

20    Ms. Bailey has suffered and suffers from today?

21         A.     Are you speaking about --

22         Q.     Incisional scarring.

23         A.     Oh, incisional?

24         Q.     Yes.
```

Konstantin Walmsley, M.D.

1          A.     Not so much as the mesh-induced

2    scarring, I wouldn't offer that opinion.

3          Q.     But you don't know at this point, do

4    you?

5          A.     Well, what I know is that the incision

6    would have been -- not have been there had the mesh not

7    have been there.

8          Q.     The mesh was taken out because of

9    dyspareunia; is that correct?

10         A.     Not completely.

11         Q.     It was also because of exposure,

12   correct?

13         A.     That was part of it, yes.

14         Q.     And once the exposed mesh was trimmed,

15   there has been no additional exposure, to your

16   knowledge, correct?

17         A.     No.

18         Q.     But the patient continues to complain of

19   dyspareunia at least as of the time you saw her?

20         A.     Correct.

21         Q.     But we have no medical -- or complaints

22   to physicians for 11 years or so, correct, of

23   dyspareunia?

24         A.     She's had no evidence in the medical

Konstantin Walmsley, M.D.

1   records since 2006.

2           Q.      2005?

3           A.      Was it 2005?  Correct, July 14, 2005, I

4   haven't seen any medical records of any kind since that

5   time.

6           Q.      That evidence any complaints of

7   dyspareunia, correct?

8           A.      That's correct.

9           Q.      But that was one of the primary

10  complaints she made to you, true?

11          A.      She had several complaints, that was one

12  of them, yes.

13          Q.      It was one of the primary ones, wasn't

14  it?

15          A.      Well, she talked also about her voiding

16  dysfunction.

17          Q.      Were those the two issues?

18          A.      That's correct.

19          Q.      Okay.  And when these patients come to

20  you for examination, the ones where you've been

21  retained as an expert, do you explain to them that

22  you're examining them on behalf of their -- their

23  lawyers hired you to examine them?

24          A.      I do.

Konstantin Walmsley, M.D.

```
 1                   MR. THOMPSON:  Object to the form.

 2   BY MR. GRIFFIN:

 3        Q.     And you're working with their lawyer on

 4   their case and that they should give you a full

 5   history?

 6        A.     I don't really get too involved with

 7   discussing with them the role of attorneys in this.  I

 8   really try to keep it between patient and myself.  I

 9   want to keep it as independent as possible, if you

10   will.

11        Q.     But you explain to them that you're not

12   a treating physician, correct?

13        A.     What I do is I explain to them that

14   they're coming here as part of an independent medical

15   exam, and I want to gather information about them and

16   examine them, and that's essentially the gist of it.

17        Q.     But you explain to them your

18   involvement, though, that you've been retained by their

19   lawyer, right?

20        A.     I mean, I usually don't, mostly because

21   I feel like they probably know that already.

22        Q.     Probably get that, right?

23        A.     Yeah.  Once again, I mean, I really try

24   to keep it as objective and dispassionate, if you will,
```

Konstantin Walmsley, M.D.

1   as possible.

2        Q.     Based upon your review of these medical

3   records and your discussions with Ms. Bailey, when did

4   she become aware that she had a problem with the mesh?

5        A.     Well, it really wasn't until the time

6   that she saw Dr. Adam.

7        Q.     So that would have been when?

8        A.     February 2nd, 2005.

9        Q.     And at that point is it your

10  understanding that she became aware that there was a

11  problem with the mesh?

12       A.     Well, I'm not sure if she really

13  understood the nature of the mesh problem.  I mean,

14  Dr. Adam brought to her attention that there was mesh

15  exposed and that obviously there was tenderness in the

16  context of finding that.

17       Q.     And he actually told her he was going to

18  operate to remove some of the mesh, correct?

19       A.     He suggested that he do that.  I think

20  this is after the urodynamics test is -- well, a couple

21  of months after that is when the operation took place.

22       Q.     Right.  So at least as of that point in

23  time, she was made aware that there was a problem with

24  the mesh and that a portion of it would need to be

Konstantin Walmsley, M.D.

1    removed?

2           A.      Correct.

3           Q.      And that time period is 2005?

4           A.      That's correct.

5           Q.      You indicated one of the alternative

6    treatments was collagen injections; is that true?

7           A.      Yes.

8           Q.      And did she benefit from those for any

9    length of time?

10          A.      Well, after the sling she did have a

11   series of collagen injections that were helpful for a

12   couple of months.  I think I said two to three months

13   in my IME.

14          Q.      Apparently not a permanent solution to

15   her problems?

16          A.      Not a permanent solution to her

17   problems, this is true.

18          Q.      Did you find a cystocele or a rectocele

19   when you examined the patient?

20          A.      I did not.

21          Q.      Did Dr. Adam document that he saw both

22   or one or the other?

23          A.      He described findings of mild prolapse,

24   mild rectocele and cystocele.

Konstantin Walmsley, M.D.

1      Q.      So there was a finding of pelvic

2   prolapse, correct?

3      A.      Certainly not one of clinical relevance,

4   but he makes documentation of such.

5      Q.      But as of the time you saw the patient,

6   there was no evidence of even mild pelvic prolapse?

7      A.      I didn't find anything, no.

8      Q.      What happens anatomically for it to go

9   away between the examinations?

10     A.      Well, I think to some degree, there is

11  perception on part of the eye of the beholder, if you

12  will.  I think when it comes to a mild prolapse, that

13  mild might be so mild as to be perhaps imperceptible or

14  not felt to be clinically relevant, and I certainly

15  think in Dr. Adam's instance, if the prolapse were one

16  that were clinically relevant, he probably would have

17  repaired them, yet he did not.

18             All I can tell you is that in my exam I

19  did not find any significant findings of pelvic

20  prolapse.

21     Q.      So when you say eye of the beholder,

22  this may have been something Dr. Adam saw that you

23  didn't appreciate; is that what you're saying?

24     A.      I mean, I can't speak for the nature in

Konstantin Walmsley, M.D.

```
 1    which Dr. Adam does his pelvic exams.  You know, when I
 2    do my pelvic exams, I place patients into what's called
 3    a frog leg position and have them strain or bear down.
 4    It's possible that he might have examined the patient
 5    standing.  He may have examined the patient in
 6    stirrups.  He may have had her bear down a little
 7    harder to generate some sort of prolapse.  In my
 8    instance, with the way that I do my exam, I didn't come
 9    across any significant findings of prolapse.
10           Q.    What is Stage 2 AP/PP pelvic organ
11    prolapse?
12           A.    That you may be referring to what's
13    called the POP-Q description of prolapse.  Stage 2 is
14    related finding some mild prolapse.
15           Q.    Is that what he found?
16           A.    I believe that's what he documented in
17    his medical records.
18           Q.    What's Stage 1?
19           A.    Stage 1 is a different degree of
20    prolapse.  That's probably less.
21           Q.    Is that less?
22           A.    Yes.
23           Q.    So would that be mild also?
24           A.    Well, once again, I mean mild, moderate,
```

Konstantin Walmsley, M.D.

1    severe, what I rely upon, besides my own IME, is does

2    the functional or anatomical findings correlate to any

3    significant symptoms or treatment thereof, and,

4    certainly, in his instance, whether it was Grade 1, 2,

5    3 or 4, he didn't see it necessary to repair it or

6    address it in his surgery.

7         Q.    So your point is that the pelvic

8    prolapse that he saw didn't -- it doesn't go way, it

9    just may not have been appreciated by you; is that

10   right?

11             MR. THOMPSON:  Object to form.

12             THE WITNESS:  I'd be hard pressed to

13             imagine it going away.  There is a certain

14             subjectivity to physical examinations,

15             especially with pelvic exams, that relate to a

16             variety of different conditions, one being the

17             positioning of the patient, the next being the

18             degree to which a patient strains or what we

19             call Valsalvas to generate a dropping.

20             What I can tell you is that in my exam

21             asking this patient to bear down, lying supine

22             in a frog leg position, I did not appreciate

23             any significant pelvic prolapse.

24   BY MR. GRIFFIN:

Konstantin Walmsley, M.D.

```
1          Q.     You described that sometimes during your

2    examinations, you find a, quote, induration; is that

3    right?

4          A.     That's correct.

5          Q.     And that's the wording you used in your

6    opinion letter?

7          A.     That's correct.

8          Q.     And induration implies, what, a

9    hardening of the tissue, in essence?

10         A.     Perhaps a combination of thickening and

11   hardening, yes, what one might expect to see, for

12   example, with scar tissue or inflamed tissue.

13         Q.     And I was looking at your -- I guess

14   it's called an encounter summary, your notes of your

15   examination of Ms. Bailey.

16         A.     Yes.

17         Q.     And did you use that word induration or

18   thickening of scar tissue?

19         A.     I used scar in place of induration.

20         Q.     That's in the parentheses with the

21   question mark, correct?

22         A.     That's correct.

23         Q.     Anywhere else, or do you just say

24   tenderness?
```

Konstantin Walmsley, M.D.

1          A.     Tenderness is one of the findings that I

2    encountered during the exam, along with this area of

3    scar and/or induration.

4                 The reason I placed mesh versus scar in

5    parentheses is because to the point of our discussions

6    beforehand, it's unclear to me as to whether or not

7    there is actual mesh underneath that scar tissue

8    underneath that area of induration that is tender.

9          Q.     Just so I'm clear, you do not use the

10   term induration in your actual examination of this

11   patient, true?

12         A.     I did not use the word induration in my

13   verbiage here.  If it was there and you were to ask me

14   if that was true, I'd say, yes, this is true.

15         Q.     In your experience, is dyspareunia a

16   frequent complaint you encounter in patients?

17         A.     I see a reasonable percentage of my

18   female patients, yes.

19         Q.     What percentage of your female patients

20   have dyspareunia?

21         A.     That's a tough question to answer,

22   because in a lot of instances when I'm seeing a

23   patient, if, for example, they're coming to me with

24   complaints of hematuria, I'm not always asking about

Konstantin Walmsley, M.D.

1    dyspareunia.  So to some degree it depends on how

2    interested I am in sussing out that condition, but if I

3    had to give you a ballpark estimate, I would say maybe

4    10% of my patients.

5           Q.    So of the patients you ask, about 10% or

6    is it more than 10%?

7           A.    Well, it might be more than 10%, only

8    because I'm not necessarily asking that question if I'm

9    seeing a patient, for example, who has a kidney stone,

10   I'm not going to start talking about sex, necessarily.

11          Q.    I get what you're saying.  It may just

12   be 10% because you're not asking a certain portion of

13   the patients, correct?

14          A.    Correct, yes.

15          Q.    But of those patients you ask and

16   discuss dyspareunia, it's probably a higher percentage

17   than 10%, true?

18          A.    It may very well be.

19          Q.    And it may be more along the lines of 20

20   plus percent, correct, of your patients that you talk

21   to about dyspareunia?

22                MR. THOMPSON:  Object to form.

23                THE WITNESS:  That's a bit of a robust

24          number.  I don't know if I'd necessarily agree

Konstantin Walmsley, M.D.

```
 1          with that.

 2   BY MR. GRIFFIN:

 3          Q.     So somewhere between 10 and 20%?

 4          A.     I'm thinking between 10 and 15%, but,

 5   once again, it's a little bit of a conjecture.  I don't

 6   ask every patient about that complaint.

 7          Q.     Do all those patients have transvaginal

 8   mesh, midurethral slings, anything of that sort?

 9          A.     Some do, some don't.

10                 MR. GRIFFIN:  No further questions.

11                 (Witness excused.)

12                 (Deposition concluded at 12:50 p.m.)

13                           -  -  -

14

15

16

17

18

19

20

21

22

23

24
```

Konstantin Walmsley, M.D.

```
 1            C E R T I F I C A T I O N

 2                I, MARGARET M. REIHL, a Registered

 3       Professional Reporter, Certified Realtime

 4       Reporter, Certified Shorthand Reporter,

 5       Certified LiveNote Reporter and Notary Public,

 6       do hereby certify that the foregoing is a true

 7       and accurate transcript of the testimony as

 8       taken stenographically by and before me at the

 9       time, place, and on the date hereinbefore set

10       forth.

11                I DO FURTHER CERTIFY that I am

12       neither a relative nor employee nor attorney

13       nor counsel of any of the parties to this

14       action, and that I am neither a relative nor

15       employee of such attorney or counsel, and that

16       I am not financially interested in the action.

17

18

19                -------------------------------

                  Margaret M. Reihl, RPR, CRR, CLR
20                CSR #XI01497  Notary Public

21

22

23

24
```

Konstantin Walmsley, M.D.

```
 1                      -  -  -  -  -  -

 2                      E R R A T A

 3                      -  -  -  -  -  -

 4    PAGE   LINE   CHANGE

 5    _____  _____  _____

 6    REASON:  _____

 7    _____  _____  _____

 8    REASON:  _____

 9    _____  _____  _____

10    REASON:  _____

11    _____  _____  _____

12    REASON:  _____

13    _____  _____  _____

14    REASON:  _____

15    _____  _____  _____

16    REASON:  _____

17    _____  _____  _____

18    REASON:  _____

19    _____  _____  _____

20    REASON:  _____

21    _____  _____  _____

22    REASON:  _____

23    _____  _____  _____

24    REASON:  _____
```

Konstantin Walmsley, M.D.

```
 1                ACKNOWLEDGMENT OF DEPONENT

 2

 3            I, KONSTANTIN WALMSLEY, M.D., do hereby

 4        certify that I have read the foregoing pages,

 5        and that the same is a correct transcription of

 6        the answers given by me to the questions

 7        therein propounded, except for the corrections

 8        or changes in form or substance, if any, noted

 9        in the attached Errata Sheet.

10

11

12

     _____

13   KONSTANTIN WALMSLEY, M.D.        DATE

14

     Subscribed and sworn to before me this

15

     _____ day of _____, 2016.

16

     My commission expires:_____

17

18   _____

     Notary Public

19

20

21

22

23

24
```