# Exhibit B

Joye Lowman, M.D.

1              IN THE UNITED STATES DISTRICT COURT

               SOUTHERN DISTRICT OF WEST VIRGINIA

2                        AT CHARLESTON

3

4    IN RE:  ETHICON, INC.,          MASTER FILE NUMBER

     PELVIC REPAIR SYSTEM            2:12-MD-02327

5    PRODUCTS LIABILITY

     LITIGATION                      MDL 2327

6

                                     JOSEPH R. GOODWIN

7                                    U.S. DISTRICT JUDGE

     _____

8

     GENERAL TVT OPINIONS

9    OF JOYE LOWMAN, M.D.

10

11

12

13                   DEPOSITION OF

14                 JOYE LOWMAN, M.D.

15

16                   June 24, 2016

17                     9:10 a.m.

18

19            600 Peachtree Street, NE

20                   Suite 5300

21              Atlanta, Georgia 30308

22

23       Thomas R. Brezina, CRR, RMR, CCR-B-2035

24

Joye Lowman, M.D.

---

Page 2

1  APPEARANCES OF COUNSEL:
2  On behalf of the Plaintiffs Bailey and Bishop:
3      FRED THOMPSON, III, ESQUIRE
       Motley Rice LLC
4      28 Bridgeside Boulevard
       Mount Pleasant, South Carolina 29464
5      (843) 216-9000
       fthompson@motleyrice.com
6
7      PAIGE BOLDT, ESQUIRE
       (present via speakerphone)
8      Watts Guerra, LLP
       4 Dominion Drive
9      Building 3, Suite 100
       San Antonio, Texas 78257
10     (210) 447-0500
       pboldt@wattsguerra.com
11
12 On behalf of the Defendants:
13     ERIC RUMANEK, ESQUIRE
       SHAWN N. SKOLKY, ESQUIRE
14     Troutman Sanders LLP
       Bank of America Plaza
15     600 Peachtree Street, NE
       Suite 5200
16     Atlanta, Georgia 30308
       (404) 885-3000
17     eric.rumanek@troutmansanders.com
       shawn.skolky@troutmansanders.com
18
19          - - -
20
21
22
23
24

---

Page 3

1          INDEX OF EXAMINATIONS
2                              Page
3  Examination by Mr. Thompson ..................... 5
4  Examination by Mr. Rumanek  ................... 110
5  Further Examination by Mr. Thompson ............ 112
6
7          INDEX OF EXHIBITS
8  Plaintiffs'     Description          Page
9  Exhibit P-1      Notice to Take Deposition      5
                    of Joye K. Lowman, MD
10                  dtd June 22, 2016
11 Exhibit P-2      Case Specific Expert           8
                    Report of Joye K. Lowman,
12                  MD, MPH
13 Exhibit P-3      Curriculum Vitae of            8
                    Joye K. Lowman, MD, MPH
14
   Exhibit P-4      Reliance List in Addition      8
15                  to Materials Referenced
                    in Report Pamela Bailey
16
   Exhibit P-5      Supplemental Reliance List     9
17                  in Addition to Materials
                    Referenced in Report
18                  Pamela Bailey
19 Exhibit P-6      Printout from AUGS website    10
                    entitled, "Organizations
20                  Lend their Support to
                    Mid-urethral Slings"
21
   Exhibit P-7      AUGS Position Statement       10
22                  on Mesh Midurethral Slings
                    for Stress Urinary
23                  Incontinence
24

---

Page 4

1          INDEX OF EXHIBITS
2  Plaintiffs'     Description         Page
3  Exhibit P-8      Clinical Expert Report    73
                    Bates stamped
4                   ETH.MESH.000167104 through
                    ETH.MESH.000167110 and
5                   photocopies of slides
                    dtd April 18, 2006
6
   Exhibit P-9      TVT IFU Bates stamped     78
7                   ETH.MESH.02340306
                    through ETH.MESH.02340369
8
9  Exhibit P-10     Document entitled,        87
                    "Gynecare TVT Obturator
10                  System"
11 Exhibit P-11     One-page spreadsheet      95
                    entitled, "Dr. Lowman
12                  case hours"
13 Exhibit P-12     AUGS Position Statement   100
                    on Mesh Midurethral
14                  Slings for Stress
                    Urinary Incontinence
15
   Exhibit P-13     Three pages of            112
16                  handwritten notes of
                    Dr. Lowman
17
18
19
20
21
22
23
24

---

Page 5

1          JOYE LOWMAN, MD.,
2  having been produced and first duly sworn as a
3  witness, testified as follows:
4          EXAMINATION
5  BY MR. THOMPSON:
6      Q     Doctor, my name is Fred Thompson.  Before
7  we start asking questions I would need to make a
8  couple of statements on the record.  Our subpoena
9  duces tecum, actually as do most of these, has a
10 lengthy list of items asking you to bring them to the
11 deposition.  Let me go ahead and make this as
12 Deposition Exhibit Number 1.
13         (Plaintiffs' Exhibit Number P-1 was
14         marked for identification.)
15 BY MR. THOMPSON:
16     Q     And let me just hand that to you really
17 quickly.
18     A     Uh-huh.
19     Q     Now, Doctor, do the -- apparently the
20 times and the parties are not exactly correct as we
21 get further down the page, but this morning we're
22 going to be taking a deposition with regard to some
23 general opinions that you have expressed in your
24 report, and then we're going to take a deposition with

---

Joye Lowman, M.D.

| Page 6 |
| --- |

1  regard to Miss Bailey, and both of those are time
2  limited.
3         As part of that deposition we had an
4  attachment where we asked you bring certain documents
5  with you, certain documents that you relied upon or
6  that were provided to you or that you found as a
7  result of your investigation, and I see -- and I've
8  had an opportunity to look at, I believe it's seven or
9  eight Bankers Boxes of documents that were brought to
10 the deposition room with you. Are those the documents
11 -- oh, and in addition I've been provided with two
12 thumb drives of documents which are responsive to this
13 request as well.
14        Are there any other documents that you
15 have in your possession or within your control that
16 have not been provided here today?
17        MR. RUMANEK: And let me just interject
18 really quickly before she answers the question.
19 So just for the record, Plaintiffs' Exhibit 1
20 is a deposition notice that was filed on
21 June 22, which was just two days ago, and we
22 have not filed objections to that notice of
23 deposition yet, but we will be objecting, and
24 under the rules we have ten days to do so, so

| Page 7 |
| --- |

1  with that, I think you can answer the question.
2         THE WITNESS: So in addition to the
3  recent update to the position statement on
4  mid-urethral slings that was brought today, I
5  have everything that I considered in
6  formulating this report.
7  BY MR. THOMPSON:
8    Q    Now, we have identified a couple of
9  binders that I believe that I'm going to make
10 reference to during the deposition, but in the sense
11 of keeping the court reporter from lugging eight boxes
12 out of here, what I would like to have with the
13 defendant is an agreement that either you or the
14 defendants' attorney can remain in possession of these
15 documents and that they will not be destroyed and will
16 be available in the future if proper notice and proper
17 need is shown to review them.
18        MR. THOMPSON: Is that an agreement that
19 we can have?
20        MR. RUMANEK: Yeah. I think that's fine,
21 and we'll respond accordingly at the
22 appropriate time if such a request is made.
23        MR. THOMPSON: All right.
24        MR. RUMANEK: And the only other thing I

| Page 8 |
| --- |

1  want to say on the record just so that it's
2  clear, some of the boxes and some of the
3  binders of material within the boxes are not
4  specific to her TVT opinions or the Bailey
5  case. I think she brought everything that she
6  had that would be relevant and responsive to
7  all of the depositions that she is giving over
8  the next couple of days, so just so that is
9  clear.
10        MR. THOMPSON: All right.
11 BY MR. THOMPSON:
12   Q    Let me turn to the report, the reliance
13 list, and the CV.
14        MR. THOMPSON: If we could mark these as
15 two, three, and four.
16        (Plaintiffs' Exhibits Numbers P-2, P-3,
17 and P-4 were marked for identification.)
18 BY MR. THOMPSON:
19   Q    Dr. Lowman, I'm going to hand you two,
20 three, and four, which I believe are copies of the
21 report, the CV, and the reliance materials that you
22 served in the Bailey case.
23   A    Okay.
24        MR. RUMANEK: Fred, let me --

| Page 9 |
| --- |

1  BY MR. THOMPSON:
2    Q    I noticed that you brought with you --
3  I'm sorry.
4         MR. RUMANEK: No. I just wanted to note
5  that I believe there has been a supplemental
6  reliance list that's been served. I've not
7  compared what's on the reliance list to the
8  supplemental one, but I do have a copy of the
9  supplemental one if you want to mark that --
10        MR. THOMPSON: Yeah, please.
11        MR. RUMANEK: -- just for completion
12 sake.
13        MR. THOMPSON: Okay. I'd note for the
14 record that it's twice as big as the original
15 one.
16        MR. RUMANEK: I don't know if it's double
17 sided or --
18        MR. THOMPSON: How about make this the
19 next one.
20        (Plaintiffs' Exhibit Number P-5 was
21 marked for identification.)
22 BY MR. THOMPSON:
23   Q    And I will hand you this supplemental.
24        MR. THOMPSON: And then let's just go

Joye Lowman, M.D.

Page 10

1  ahead so that we have everything in one place
2  at one time -- I believe last night and this
3  morning the supplemental list was supplemented
4  with an additional statement from, it looks
5  like a letter from the AUGS president and a
6  position statement of AUGS, so let's mark those
7  as the next two exhibits.
8      MR. RUMANEK:  And I will just say on the
9  record, I don't know if your characterization
10  is correct about a supplemental reliance list
11  adding those two.  To the extent that there was
12  a supplemental reliance list that was served by
13  Butler Snow yesterday evening, I can't confirm
14  or deny whether it added only those two
15  documents.
16      (Plaintiffs' Exhibits Numbers P-6 and P-7
17  were marked for identification.)
18      MR. RUMANEK:  I didn't see a supplemental
19  reliance list that was served as to Dr. Lowman.
20      MR. THOMPSON:  The supplemental was the
21  giant list that you just sent me, so --
22  BY MR. THOMPSON:
23      Q      Well, let me go ahead and hand you
24  Plaintiffs' Exhibit 6 and 7 as well.

Page 11

1      A      Okay.
2      Q      And, Doctor, these are two documents that
3  your counsel brought with you to the room this morning
4  and said that those were additional reliance materials
5  that you incorporate into your views and opinions in
6  this case.  Is that correct?
7      A      That's correct.
8      Q      Since those are the only copies I have,
9  let's put them back in the middle of the page.  Now,
10  with regard to the report, I note that you brought a
11  copy of the report with you.
12      A      Uh-huh.
13      Q      And if, in fact, you have -- if you're
14  comfortable using yours, feel free to do that.  I've
15  simply marked these so that the record will have an
16  exhibit that people six months, a year, two years,
17  heaven knows, will have a reference so that they can
18  have a copy of the exhibit when they review the
19  transcript, but feel free to use your copy if you are
20  more comfortable with that.  Okay?
21      A      All right.
22      MR. RUMANEK:  Fred, can we go off the
23  record just a second?
24      MR. THOMPSON:  Yeah.

Page 12

1      (Discussion ensued off the record.)
2  BY MR. THOMPSON:
3      Q      Let's go straight to -- Doctor, what is
4  your specialty?
5      A      Female pelvic medicine and reconstructive
6  surgery.
7      Q      And you have an MD degree; is that
8  correct?
9      A      MD and a master's in public health as
10  well.
11      Q      Doctor, I note that you work at Kaiser
12  Permanente; is that correct?
13      A      That's correct.
14      Q      And that is a -- back in the old days we
15  would call that an HMO, but what is that?  What is
16  Kaiser Permanente?
17      A      I think that's an accurate
18  characterization:  Health management organization.
19      Q      I'm very familiar with Kaiser in
20  California.
21      A      Uh-huh.
22      Q      I'm not so familiar with Kaiser in other
23  states.  What is your enrollment in Georgia?
24      A      Approximately 250,000 members when I

Page 13

1  started.  That number has gone a little bit up and
2  then a little bit down and then a lot up over the past
3  year and a half or so, so I would have to guesstimate
4  maybe 260,000 or so.
5      Q      Now, tell me your position within Kaiser.
6      A      I started the urogynecology department,
7  so I'm the lead of the urogynecology department.
8      Q      And is that for the entire patient
9  population?
10      A      It is.
11      Q      And do you have -- if there is a
12  hierarchy, are you the person in charge of OB-GYNs
13  that are -- or gynecologists that perform services for
14  Kaiser Permanente patients?
15      A      I am not in charge of women's services,
16  so I'm not the chief of the OB-GYN department, but I'm
17  the lead of the urogynecology services.
18      Q      I see.  Now, does that include you making
19  policy and you making decisions that are reflected in
20  protocols and directives that have to be followed?
21      MR. RUMANEK:  Objection to form.
22      THE WITNESS:  Somewhat.  That has to be
23  done in consultation with the chief of women's
24  services, with our risk management department,

Joye Lowman, M.D.

Page 14

1    and with a whole host of administrators.
2  BY MR. THOMPSON:
3    Q    Now, do those instructions or protocols
4  or -- maybe I'm being too authoritarian, but the way
5  in which you manage the people who are within your
6  department, are those kept in sort of a permanent
7  source material that's referred to?  If somebody has a
8  question, that they can go and look it up?
9         MR. RUMANEK:  Objection to form.
10        THE WITNESS:  Do we have protocols?
11    You're talking about clinical practice
12    guidelines?
13  BY MR. THOMPSON:
14    Q    Yes, ma'am.
15    A    We don't in general.  Well, let me think
16  about that.  I don't believe that we actually have
17  clinical practice guidelines that are issued by
18  Kaiser.  Now, we have sort of monthly department
19  meetings where we discuss issues that might be coming
20  up within the department, and the chief will sort of
21  suggest changes to sort of the -- what they call work
22  flows, the way we sort of usually do things commonly
23  in the department.
24        But in general we base our practice on

Page 15

1  guidelines that are issued by the American College and
2  the American Urogynecologic Society and that kind of
3  thing, so Kaiser does not usually issue practice
4  guidelines, per se, for the department.
5    Q    I see.  Okay.  Doctor, I think you went
6  to work for Kaiser in, is it 2007?
7    A    2008.
8    Q    And you finished your residency in 2008?
9    A    2005.  I did a fellowship between 2005
10  and 2008.
11    Q    Well, okay.  The fellowship at Indiana?
12    A    Indiana University.
13    Q    And then you left Indiana and you came
14  to?
15    A    Kaiser.
16    Q    To Kaiser?
17    A    Uh-huh.
18    Q    So this is the only way you've ever
19  practiced medicine; is that correct?
20        MR. RUMANEK:  Objection to form.
21        THE WITNESS:  No.  I've practiced
22    medicine in -- differently in residency.  I've
23    practiced medicine differently in fellowship.
24    In residency we were in a community-based

Page 16

1    academic practice.
2  BY MR. THOMPSON:
3    Q    I see.
4    A    In fellowship it was academic, sort of,
5  but it was a private practice sort of situated within
6  a university setting, and now Kaiser is very different
7  because it's not considered an academic institution.
8    Q    Yes.
9    A    It's, you know, an HMO, so all of those
10  practice settings have actually been quite different.
11    Q    I see.  But since 2008 --
12    A    Yes.
13    Q    -- since you left your fellowship, Kaiser
14  has been your employer?
15        MR. RUMANEK:  Let me just remind for the
16    record, and I don't mean to interrupt your
17    question, but you may anticipate what he's
18    going to say, but make sure you let him finish
19    the question before you start your answer just
20    so you're not talking -- I've noticed that a
21    couple of times.  Just a reminder.
22        THE WITNESS:  Okay.
23  BY MR. THOMPSON:
24    Q    Now, you may have noticed that that

Page 17

1  doesn't bother me at all.
2        MR. RUMANEK:  I'm trying --
3  BY MR. THOMPSON:
4    Q    -- because I just love to have a chat
5  with you, but your lawyer is correctly telling you
6  that I'm not on your side.  Okay?  All right.
7        MR. RUMANEK:  I don't know that she
8    answered your question, so I think I
9    interrupted you, so I apologize for that.
10  BY MR. THOMPSON:
11    Q    Well, the question is, since you left
12  your fellowship in 2008, you've been continuously
13  employed by Kaiser?
14    A    That's correct.
15    Q    Like I say, I'm familiar with Kaiser in
16  California, and they have a giant patient population.
17  I think it's between one and 2 million patients, and
18  Kaiser may well be the best recordkeeper of -- private
19  recordkeeper of patient histories, patient treatments,
20  patient modalities of any organization in the country.
21  Here's my question.  That's a preface.
22        The question is, does Kaiser keep a
23  database on its 250,000 patients in Georgia?
24    A    No, not exactly.  We do have electronic

Joye Lowman, M.D.

Page 18

1 medical records.

2    Q    Yes.

3    A    So we have data that could be made into a
4 database, if you will.  I mean, we have --

5    Q    Yeah.

6    A    -- you know, an electronic medical record
7 that can be referenced, but we don't have databases,
8 no.

9    Q    I guess my question is, for example,
10 since -- let's just talk about the one I'm interested
11 in.  If you wanted to, you could go and find every
12 single person that's had a Prolift device inserted in
13 them, and if they're still enrolled, you could find
14 out what's going on with them?

15        MR. RUMANEK:  Objection to form.

16 BY MR. THOMPSON:

17    Q    Isn't that right?

18    A    No.  Actually, I can't do that just
19 because I want to do that.  I have to actually request
20 IRB approval, and they -- Kaiser's IRB department,
21 their institutional review board, has to approve to
22 allow me to conduct that human subjects research, and
23 I've actually tried.

24    Q    Well, yeah.  I'm not talking about doing

Page 19

1 clinical trials.  I'm simply talking about mining the
2 data --

3    A    That's considered --

4    Q    -- that you already have.

5    A    That's --

6    Q    That's sensitive data under, like, HIPAA
7 and stuff?

8    A    Absolutely.

9    Q    Now, why would they decline to let you do
10 that if you said, I'm going to protect their
11 confidentiality and I'm going to assign a random
12 number for each patient and I'm going to address all
13 of these problems?  Why would they not -- why did they
14 not approve your request?

15        MR. RUMANEK:  Objection to form.

16        THE WITNESS:  I don't know the answer to
17    that.  My suspicion is that they don't want to
18    risk liability.

19 BY MR. THOMPSON:

20    Q    I see.  Okay.  The next question I have
21 is, does Kaiser conduct group purchases from medical
22 device companies?  Do they negotiate prices and
23 products with medical device companies on behalf of
24 the HMO?

Page 20

1        MR. RUMANEK:  Objection to form.

2        THE WITNESS:  Not to my knowledge.

3 BY MR. THOMPSON:

4    Q    Is there a formulary that has approved
5 devices for your employees to use?

6    A    Not to my knowledge.

7    Q    Is there any reason why Kaiser would not
8 use its market power to try to get a better deal from
9 these companies?

10        MR. RUMANEK:  Objection to form to the
11    extent you're asking her to testify as to what
12    Kaiser --

13 BY MR. THOMPSON:

14    Q    Well, I'm assuming that you are a high --
15 that you are like a muckety-muck, that you are high
16 up, and if that's just above your pay grade, just tell
17 me, and then we'll move on to something else, but why
18 would they not have a formulary and negotiate better
19 deals?

20        MR. RUMANEK:  Objection to form and the
21    characterization.

22        THE WITNESS:  Well, it is above my pay
23    grade, actually.  I mean, that's an
24    administrative issue.  In general Kaiser

Page 21

1    doesn't like to align themselves with companies
2    and sort of appear to possibly have conflicts
3    of interest, and so they don't -- other than --
4    they -- they obviously negotiate for
5    pharmaceutical costs and things like that, but
6    in terms of aligning themselves with certain
7    devices, that would not be within their sort of
8    philosophy.

9 BY MR. THOMPSON:

10    Q    Is there any committee or any person
11 within Kaiser that conducts comparative research?  For
12 example, head-to-head between the Advantage Fit versus
13 a TVT or, you know, a Pinnacle versus a Prolift?  Is
14 there any organization within Kaiser that looks into
15 that and makes those kinds of judgments on behalf of
16 patients?

17    A    No.

18    Q    Is it left to the individual treating
19 physician at Kaiser to determine which medical device
20 he or she might select to implant in a patient?

21    A    Yes.

22    Q    When, for example, in April of 2012 the
23 FDA required 522 studies for various pelvic floor
24 products and the response from most companies was to

Joye Lowman, M.D.

Page 22

1  withdraw those products from the market -- you're
2  familiar with that; right?
3        MR. RUMANEK:  Objection to form.
4        THE WITNESS:  The vaginal mesh products,
5     yes.
6  BY MR. THOMPSON:
7     Q     Was there any organized internal response
8  at Kaiser?  Were there any committee meetings or any
9  discussions as to what should be done for or on behalf
10  of patients as a result of those withdrawals of those
11  pelvic floor products?
12        MR. RUMANEK:  Fred, can I have just a
13     continuing objection to you asking her about
14     what went on within Kaiser?  It may be beyond
15     what she knows.  You're saying, were there any
16     meetings at Kaiser?
17        MR. THOMPSON:  Well, okay.  Well, let me
18     be instructed by that.
19  BY MR. THOMPSON:
20     Q     Were you either in attendance or were
21  aware of any meetings where a firm-wide response or a
22  uniform firm response was considered as a result of
23  the withdrawal of those pelvic floor products?
24     A     No.  Not in response to withdrawal of

Page 23

1  those products, no.
2     Q     Was there any organized discussion as to
3  what the appropriate or what would be the best
4  alternative means of treatment for patients as a
5  result of those withdrawals?
6        MR. RUMANEK:  Objection to form.
7        THE WITNESS:  No.
8  BY MR. THOMPSON:
9     Q     Doctor, in your report you indicated that
10  you have placed approximately 800 TVT and TVT-O
11  devices.  Is that correct?  I'm at page 2.
12     A     Yes.
13     Q     And do you use both TVT and TVT-O?
14     A     No.
15     Q     What do you use --
16     A     The TVT.
17     Q     -- currently?  Did you ever use TVT-O?
18     A     I have used it before, yes.
19     Q     And is there a reason why you exclusively
20  use TVT today?
21        MR. RUMANEK:  Objection to form.
22        THE WITNESS:  Yes.  The retropubic route
23     has a lower risk of pelvic pain and groin pain
24     and has a higher success rate --

Page 24

1  BY MR. THOMPSON:
2     Q     I see.
3     A     -- than obturator slings.
4     Q     And was there a date that you can point
5  to that that was the date that you felt that the
6  evidence that you have just recited was sufficient for
7  you to not use TVT-O anymore?
8        MR. RUMANEK:  Objection to form.
9        THE WITNESS:  No.
10  BY MR. THOMPSON:
11     Q     That was just over -- if I went to 2010,
12  were you still using both?
13     A     No.
14     Q     If I went to 2008?
15     A     No.
16     Q     I see.  So while you were either in
17  residency or fellowship, you made that determination?
18     A     That's correct.
19     Q     And are you -- like I say, you described
20  your position as an -- and in my mind I have sort of a
21  supervisory thought process, but I guess the question
22  is, your personal decision that the TVT is superior to
23  the TVT-O, is that transmitted to other physicians who
24  may be within your department?  I mean, is this a --

Page 25

1  strike that.  I'm asking a compound question.
2        Was your decision given any
3  organizational imprimatur?
4     A     No.
5     Q     So that remains a personal decision of
6  the doctors within your organization?
7     A     That's correct.
8     Q     How does Kaiser make sure that the
9  doctors who are doing mesh surgery are competent to do
10  it?
11        MR. RUMANEK:  Objection to form, again to
12     the extent that you are asking her to testify
13     about Kaiser generally.
14        THE WITNESS:  The only organizational
15     sort of check and balance, if you will, I would
16     say, is the peer review committee.
17  BY MR. THOMPSON:
18     Q     I see.
19     A     So hospitals in general credential
20  physicians to be able to perform procedures where they
21  have privileges.
22     Q     Yes.
23     A     Kaiser doesn't.  That's not their job,
24  per se.  But we do have a peer review committee that I

Joye Lowman, M.D.

Page 26

1  currently serve on that reviews sort of maloccurrences
2  and outcomes that might be considered outside the
3  standard of care to see whether or not someone is --
4  is -- may need some, you know, additional support or
5  if we need -- if we have a systems issue that might be
6  -- that need to be addressed, something like that.
7      Q      I see.  Now, and I don't want to get
8  ahead of myself, but you criticized Dr. Perlow because
9  he was having a ten to 20 percent, I believe,
10  complication rate.
11         MR. RUMANEK:  Objection to form of the
12    question.
13  BY MR. THOMPSON:
14     Q      Is that right?
15     A      I didn't criticize him, per se.  I said
16  his -- his rate of voiding dysfunction was higher than
17  what is typically seen with mid-urethral slings.
18     Q      Now, if I flip on forward in your report,
19  if I get to -- where am I?  There we go.  If I get to
20  page 10 of your report --
21     A      Uh-huh.
22     Q      -- you state, "I have not had a single
23  patient report dyspareunia, pelvic pain, or mesh
24  erosion with a TVT in over 800 cases."

Page 27

1      A      That's correct.
2      Q      Now, the 800, that's the same 800 that
3  you refer to, so what I'm reading here is that you
4  have never had a single patient suffer from
5  dyspareunia, pelvic pain, or mesh erosion.  Is that
6  right?
7      A      That's correct.
8      Q      And further down the page it says, "My
9  patients go home the same day catheter-free, resume
10  usual activities in 48 hours, and have immediate
11  long-lasting cure."
12         Do you see that?
13     A      I do.
14     Q      So what I hear when I hear this is that
15  in your view proper technique results in a -- in your
16  case, at least, a perfect record of objective and
17  subjective success --
18         MR. RUMANEK:  Objection --
19  BY MR. THOMPSON:
20     Q      -- in your patients.  Is that right?
21         MR. RUMANEK:  Objection to form.
22         THE WITNESS:  I would say that technique
23    plays a significant part in determining the
24    patient's success and their risk of

Page 28

1  complication, yes.
2  BY MR. THOMPSON:
3      Q      Are you familiar with the literature
4  where the first 50 mesh cases has a much higher
5  incidence of complication per -- if the surgeon begins
6  using mesh, that his first 50 cases have a much higher
7  percentage of complication?
8         MR. RUMANEK:  Objection to the form of
9    the question to the extent that you are
10    referencing medical literature and not showing
11    it to the witness.
12         THE WITNESS:  I'm not familiar with the
13    medical literature that you're referencing, but
14    I would -- I would agree that that's probably
15    the case, yes.
16  BY MR. THOMPSON:
17     Q      Now, the difference in technique is known
18  to -- let me strike that.  Okay.  Now, you recite in
19  your report at page -- where am I?  At page 10
20  you actually recite to the Schimpf 2014 systematic
21  review as one of your case authorities.
22     A      Yes.
23     Q      And you said, "Overall the data show that
24  rates of mesh exposure with TVT around one to two and

Page 29

1  a half percent and are manageable"; correct?  That's
2  what you said.
3      A      That's correct.
4      Q      Now, unfortunately I have only one copy
5  of the Schimpf report with me, but hopefully you can
6  -- well, I have not even thought of that.  Maybe you
7  brought it with you.  Can you put your hand on it
8  really quickly, or is that going to take too much
9  time?
10     A      I think --
11         MR. RUMANEK:  It will not take some time.
12         MR. THOMPSON:  Super.
13  BY MR. THOMPSON:
14     Q      Now, this is an article.  It is entitled
15  "Sling Surgery For Stress Urinary Incontinence In
16  Women:  A Systematic Review and Meta-analysis" --
17     A      Uh-huh.
18     Q      -- correct?
19     A      Correct.
20     Q      Now, this is not a clinical trial, is it?
21     A      It is not.
22     Q      This is a -- in essence, it's a
23  compilation and analysis of lots and lots of studies;
24  correct?

Joye Lowman, M.D.

Page 30

1    A    Most that are clinical trials.

2    Q    Yes.  But this paper itself is sort of a

3  meta-analysis of the outcomes of those earlier

4  studies?

5    A    That's correct.

6    Q    Now, the Schimpf in 2014, if I go to

7  page 1 dot E11, do you see that?  Where they actually

8  write -- they say, "MUS versus Burch urethropexy"?

9    A    One dot E1?  I'm sorry.

10    Q    One dot E11.

11    A    One dot E1 is what I see, and --

12    Q    The top of the page is table four.  Okay.

13  It's about the --

14        MR. SKOLKY:  It's the 11th page.

15  BY MR. THOMPSON:

16    Q    Yes, the 11th page.  Good one.

17    A    Okay.

18    Q    And you see down in the discussion at the

19  bottom it's MUS, and that would be mid-urethral sling;

20  right?

21    A    Yes.

22    Q    Versus Burch urethropexy?

23    A    Yes.

24    Q    And it's hard to know what's taking

Page 31

1  things out of context and what is surplusage, so let

2  me just read the part that caught my eye, and that's

3  the second paragraph under that subtopic.

4        It says, "The evidence review did not

5  support a difference between the two surgeries with

6  regard to objective cure, subjective cure, quality of

7  life, or sexual function outcomes.  While eight

8  studies provided data about cure outcomes, there were

9  fewer studies evaluating quality of life and sexual

10  function.  Meta-analysis of objective cure did not

11  show a significant difference for sling compared to

12  Burch."

13        And it goes on from there, but as of 2014

14  it appears from this study, at least, that -- and this

15  study, like I say, is sort of a meta-analysis of all

16  the preceding studies.  It looks like there is no

17  change or difference in efficacy between the

18  traditional correction and the mid-urethral sling; is

19  that right?

20        MR. RUMANEK:  I'm going to object to the

21    form of that question, which I think was about

22    three pages long, probably.

23        THE WITNESS:  Give me a second.

24        MR. RUMANEK:  Can you restate the

Page 32

1    question just so that it's clear on the record?

2  BY MR. THOMPSON:

3    Q    Here is what I will do.  Let me give you

4  another question.

5    A    No.  I can answer that question.  What I

6  am looking for is the follow-up time that was reported

7  in this paper because in the short-term the Burch and

8  mid-urethral slings do have equivalent efficacy.  It's

9  long-term where they differ.  In the five-year success

10  rate of a Burch is 24 percent as evidenced by the

11  SISTEr trial.  So short-term they are equivalent.

12  Long-term they are not.

13    Q    The SISTEr trial was in 2007; is that

14  right?

15    A    I don't remember.

16    Q    Let's see.

17    A    But even beyond that, the totality of the

18  evidence and data supports the fact that the Burch has

19  a lower success rate than mid-urethral slings, which

20  is why that was a summary statement in the American

21  College and American Urogynecologic joint positions --

22  not position statement; practice bulletin about the

23  treatment of stress incontinence in women where they

24  state that a retropubic colposuspension has a greater

Page 33

1  risk of voiding dysfunction and a lower long-term

2  success rate than mid-urethral slings, and that's

3  supported by level A evidence.

4    Q    I'm trying to find the -- I'm still back

5  trying to find this study that you have referred to.

6  Is it in -- I thought it was in your -- I thought it

7  was in your report, but I'm not seeing it.  Which --

8  tell me the name of it again.  The 24 percent one?

9    A    Oh, SISTEr.

10    Q    SISTEr.  All right.  Well, is it in your

11  report and I'm just not seeing it?

12    A    It is, somewhere.

13    Q    Help me get on it.

14    A    It might be before where we are.  The

15  Burch review.  Retropubic -- the Burch procedure.

16    Q    I'm at the point where I would have

17  expected to find it.  This is the urethral suspension,

18  although effective in the short-term, proven to have

19  miserable long-term cure rates; Brubaker?

20    A    Yes.

21    Q    And Albo, but I don't see SISTEr.  Okay.

22    A    I just saw it this morning, I thought.

23  I'm not finding it either, and I forget the title.

24  SISTEr is not in the title of the paper.

Joye Lowman, M.D.

Page 34

1  Q    I see.  You think it might be Brubaker
2  here?
3  A    It's Brubaker.  Where is that?
4  Q    So that is 2006.
5  A    Where?  What page are you on?
6  Q    I'm on page 6.  Brubaker --
7       MR. RUMANEK:  Can we go off the record
8    just a second?
9       (Discussion ensued off the record.)
10      MR. RUMANEK:  Let's go -- are we back?
11 BY MR. THOMPSON:
12  Q    You refer to Albo right here on page 6.
13 It's right under Brubaker.  Albo, Burch,
14 colposuspension versus fascial sling to reduce urinary
15 stress incontinence --
16  A    Yes.
17  Q    -- 2007; right?
18  A    That's correct.
19  Q    And so that also was seven years earlier
20 than the Schimpf meta-analysis; correct?
21  A    That's correct.
22  Q    Let's get back on track.  Those are the
23 sort of off-line questions that I had.  Doctor, you've
24 commented and criticized several positions of

Page 35

1  plaintiffs in this case, and I want to go through and
2  look at them one by one, if I can.  Okay?
3  A    Okay.
4  Q    And we've actually talked about the first
5  one and that is, we've looked at Schimpf and we see
6  that the objective and subjective cures of SUO, of
7  mid-urethral slings, is, according to the studies,
8  that there is no effective -- there is no difference
9  between the two, and you've stated, and that's over
10 the short run.  Over the long run there is a
11 difference; correct?
12      MR. RUMANEK:  Objection to form.
13      THE WITNESS:  That's correct.
14 BY MR. THOMPSON:
15  Q    Are there any follow-up studies that you
16 are aware of that continue to look at the long-term
17 outcomes of native tissue repair as opposed to a
18 mid-urethral sling?
19  A    When you say native tissue, you are
20 referring to a Burch?
21  Q    Yes, ma'am.
22  A    No.  There is no comparison studies that
23 looks long-term that I'm aware of.
24  Q    Now, you've recited and you've looked and

Page 36

1  you've recited to Schimpf that shows an overall
2  exposure, mesh exposure of between one and two and a
3  half percent.
4  A    What page are you looking at?
5  Q    I'm looking at page 10, but I'm also
6  making reference to Schimpf as well.  At the middle
7  of --
8  A    Yes.
9  Q    -- the page it says, "Overall the data
10 shows rates of mesh exposure" --
11  A    Right.
12  Q    -- "around one to 2.5 percent and are
13 manageable."
14  A    Yes.
15  Q    Okay?
16  A    Yes.
17  Q    Now, if I put the denominator for you at
18 800 and I put the numerator for you at zero, then
19 you're dragging down that one to two and a half
20 percent.  Is somebody else out there having twice or
21 three times the number that is this average, or is
22 this expected?
23      MR. RUMANEK:  Objection to the form of
24    the question.

Page 37

1       THE WITNESS:  No.  But I think a lot of
2    that goes to what you were getting at
3    earlier --
4  BY MR. THOMPSON:
5  Q    Yes.
6  A    -- in terms of experience --
7  Q    Yes.
8  A    -- and having better success --
9  Q    Yeah.
10  A    -- the longer that you do something.  I
11 started doing slings when I was a resident, so I've
12 been doing them now for 16 years.
13  Q    Yes.
14  A    So this -- these, you know, 800 cases
15 include mostly that latter part.  You know, there may
16 be 20 or 30 cases in residency and fellowship, but
17 even then at least while I was in residency and
18 fellowship, I didn't see any patients that had mesh
19 erosion or dyspareunia.  But part of that I believe
20 too is because I've been trained.  I've trained in
21 residency conditions and trained by the person that
22 did the first TVT in the country, trained at one of
23 the best surgical training programs in the country, so
24 I think that makes a difference.

Joye Lowman, M.D.

Page 38

1    Q    Would you say that the competence, skill,
2  and experience of the implanting doctor is important
3  to the successful outcome of the procedure?
4    A    Yes.
5    Q    Have you ever served as a faculty member
6  at any of these medical device company trainings?
7    A    No.
8    Q    I mean, has Ethicon ever come to you and
9  said, oh, we want you to fly out to Las Vegas and do
10  our 24-hour cadaver training for 12 people?
11    A    I may have been approached at some point
12  in my career, but I've never actually served as a
13  proctor, no.
14    Q    Have you ever actually attended one of
15  these training sessions?
16    A    For the TVT?
17    Q    Yes, ma'am.
18    A    No, not that I recall.
19    Q    Well, how about for something else, then?
20    A    Oh, yes.
21    Q    And what?  What were the other products
22  that you have attended a training for?
23         MR. RUMANEK:  Any product generally, or
24    are you talking --

Page 39

1         MR. THOMPSON:  Yes.
2         MR. RUMANEK:  -- about Ethicon
3    specifically?
4         MR. THOMPSON:  Well, any product
5    generally.
6         THE WITNESS:  Oh, wow.  I've been to a
7    cadaver lab for Elevate, which is a vaginal
8    mesh procedure.
9  BY MR. THOMPSON:
10    Q    Yes.
11    A    I've been to a cadaver lab for -- what
12  was the name of that?  The Boston Scientific product.
13  The -- Uphold, I believe it was called.
14    Q    Yes.
15    A    And I have been to a cadaver lab on -- I
16  forget what it's called.  I think it's called Altis,
17  the mini sling, single-incision sling.
18    Q    After you attended those did you utilize
19  those products in your practice on your patients?
20    A    No.
21    Q    Why not?
22    A    I felt like there were weaknesses in --
23  that I -- I didn't feel like they were as
24  comprehensive.  I'd been using the Prolift, and I was

Page 40

1  looking for an alternative to the Prolift once that
2  was taken off the market.
3    Q    Yes.
4    A    And I felt it was important to have
5  apical and distal suspension.  I felt like it was
6  important to not draw the anterior vaginal wall down
7  with a sacrospinous fixation, so I felt like what I
8  was seeing wasn't as optimal as what I had been using.
9    Q    Did you feel like after you went to the
10  cadaver lab, that you were competent to go and perform
11  those procedures?
12    A    I -- I do.  It wasn't necessarily just
13  the cadaver lab, but my background as well.  I had
14  been doing those dissections.  I'd been trained to do
15  vaginal mesh implantation, trained to do mid-urethral
16  slings, and so the dissections really aren't that
17  different.  So I have a lot of experience coming to
18  that cadaver lab that others may not and -- but I did
19  feel pretty confident.
20         But I would still probably want someone
21  who was very comfortable with those procedures to, you
22  know, kind of come and, you know, go see them and make
23  sure that I'm comfortable with everything.  Everything
24  has a little bit of nuance to it.

Page 41

1    Q    I see.  Do you serve as a mentor or a
2  proctor for doctors at Kaiser who are new to a
3  procedure?
4    A    I have.
5    Q    And is that the way you think it ought to
6  go?  That you -- somebody sits in with you and
7  observes you or assists you and --
8         MR. RUMANEK:  Objection to form.
9  BY MR. THOMPSON:
10    Q    -- gains confidence and competence?
11         MR. RUMANEK:  Objection to the form of
12    the question.
13         THE WITNESS:  Oh, in -- I guess I'm not
14    sure about if you're -- are you asking, do I
15    think that should be regulated?  Do I think it
16    should be mandated?  Or what do you mean by do
17    you think I --
18  BY MR. THOMPSON:
19    Q    Well, let's start with, is it a good
20  idea?
21    A    I think that's up to the surgeon and the
22  surgeon's level of comfort.
23    Q    And so you've actually answered the
24  second question.  That is, should it be dictated or

Joye Lowman, M.D.

Page 42

1 regulated?  You would leave that to the surgeon's
2 comfort; is that right?
3     A     That's correct.  Outside of normal
4 credentialing, yes.
5     Q     Now, Doctor, you were not -- you've given
6 an opinion with regard to the -- within your report
7 about the polypropylene itself.  Do you intend at
8 trial to give an opinion on the characteristics of
9 polypropylene in the body?
10    A     If I'm asked.
11    Q     And here I guess these are going to be my
12 questions, then.  Are you a materials scientist?
13    A     I'm a scientist, and so I'm able to
14 evaluate published literature, whether it's about
15 materials or whether it's about clinical outcomes or
16 something else.
17    Q     And have you worked with polymer
18 chemicals in your career in terms of analyzing them,
19 analyzing their characteristics, their strengths,
20 their weaknesses?
21    A     No.
22    Q     Have you conducted any tests on the
23 polypropylene materials that constitute or that make
24 up a TVT device?

Page 43

1         MR. RUMANEK:  Objection to the form of
2      the question.
3         THE WITNESS:  No.
4 BY MR. THOMPSON:
5     Q     Have you -- oh, let me ask it this way.
6 Have you participated in explanting polypropylene mesh
7 from your patients?
8         MR. RUMANEK:  Objection to form.
9         THE WITNESS:  Yes.
10 BY MR. THOMPSON:
11    Q     And certainly you are not explanting your
12 own patients because none of them have ever needed it
13 explanted, but how would that patient come to you?
14    A     Usually it's a patient who has either
15 switched insurances or is no longer seeing the doctor
16 that did their implant, so they come to me with the
17 desire to resolve their complications.
18    Q     And are there patients that have come to
19 you with erosions or exposures?
20         MR. RUMANEK:  Object to the form.  Are
21      you talking specifically about TVTs, or are you
22      talking about across the board?
23         MR. THOMPSON:  Well, actually let's talk
24      about all polypropylene mesh.

Page 44

1 BY MR. THOMPSON:
2     Q     Have you had patients that have come to
3 you with exposure or erosions?
4     A     Yes.
5     Q     And have you diagnosed and formed a plan
6 of treatment that includes resection or removal of the
7 mesh?
8     A     Sometimes.
9     Q     And do you perform that surgery yourself?
10    A     I do.
11    Q     How many resections or revisions have you
12 performed?
13    A     I would have to guess.  Approximately
14 six, maybe.
15    Q     Have you ever revised or resected a TVT
16 mesh?
17    A     Not that I can recall.  I have resected
18 mid-urethral slings, but none of them have been the
19 TVT.
20    Q     I see.  And can you recall the symptoms
21 that were being displayed by the patient that required
22 the resection or the revision?
23    A     Usually it's vaginal spotting or bleeding
24 or male partner dyspareunia, and sometimes voiding

Page 45

1 dysfunction and irritative symptoms.
2     Q     When you perform the resection do you
3 remove the entire polypropylene device?
4     A     Not usually, no.
5     Q     And what happens to the remnants of the
6 device or what's left after you resect what you are
7 going to resect?
8     A     It just remains in place.
9     Q     Now, when you resect the device, is there
10 innervation by living material into the mesh?
11        MR. RUMANEK:  Objection to the form of
12      the question.
13 BY MR. THOMPSON:
14    Q     I mean, is there a -- let me strike that.
15 Is there ingrowth?  Has the living tissue grown into
16 and through the pores of the mesh?
17        MR. RUMANEK:  Objection to form.
18        THE WITNESS:  Yes.
19 BY MR. THOMPSON:
20    Q     And of course that's the way it's
21 designed; right?  It's designed to encourage an
22 inflammatory response, which causes ingrowth through
23 the pores --
24        MR. RUMANEK:  Objection --

Joye Lowman, M.D.

Page 46

BY MR. THOMPSON:

1 BY MR. THOMPSON:
2    Q    -- isn't that right?
3    A    It encourages fibroblast and collagen
4 ingrowth and deposition.
5    Q    So when you go to remove it, you're not
6 simply sliding -- you're not sliding that mesh out
7 like unsheathing a sword?  You're having to cut it
8 out; isn't that right?
9    A    That's correct.
10   Q    And do you stitch it after you cut it, or
11 is it simply left to grow back together again by
12 contact between the two sides?
13        MR. RUMANEK:  Objection to form of the
14    question.
15        THE WITNESS:  It doesn't grow back
16    together again.
17 BY MR. THOMPSON:
18   Q    Yes.
19   A    When the sling is placed, it -- we call
20 it a Velcro effect.  Once the plastic sheath is
21 removed, it stays in place and the tissue grows into
22 it where it is, so when you are cutting or excising a
23 portion of it, the part that remains, stays in its
24 original position pretty much.

Page 47

1    Q    I see.  I see.  Now, if there was a
2 portion of the sling that was causing discomfort,
3 that's the part that has to come out; right?
4        MR. RUMANEK:  Objection to the form of
5    the question.
6        THE WITNESS:  If there is a portion of
7    the sling causing discomfort, is that the part
8    that has to come out?  That's not really a
9    yes-or-no question.  Most of the time if
10   patients are having pain from mesh
11   augmentation, whether it be a sling or vaginal
12   mesh, it's because the mesh is on tension, and
13   relieving the tension usually relieves the
14   pain.
15 BY MR. THOMPSON:
16   Q    I see.  When you go -- in these six
17 revision operations that you have performed, when you
18 performed those six operations was the mesh or the
19 scar plate with the mesh sort of encased in it, did it
20 show evidence of contracture?
21        MR. RUMANEK:  Objection to the form of
22    the question and the characterization.
23        THE WITNESS:  Type one polypropylene mesh
24    to my knowledge, doesn't cause scar plate

Page 48

1    formation.
2 BY MR. THOMPSON:
3    Q    Yes.
4    A    I don't usually see a scar plate in what
5 I would think that to be, so no.
6    Q    And when you take the part, the section
7 out, do you participate in the pathology analysis of
8 the removed section?
9        MR. RUMANEK:  Objection to form.
10        THE WITNESS:  I don't.
11 BY MR. THOMPSON:
12   Q    You don't participate either in the gross
13 or the microscopic inspection of the removed section;
14 is that right?
15        MR. RUMANEK:  Objection to form.
16        THE WITNESS:  That's correct.
17 BY MR. THOMPSON:
18   Q    Now, have you done any work on the
19 properties of the polypropylene itself?  For example,
20 rates of oxidation or degradation?
21        MR. RUMANEK:  Objection to form.  Are you
22    limiting it those things?
23        MR. THOMPSON:  Yes, sir.
24        THE WITNESS:  When you say work, what do

Page 49

1    you mean?
2 BY MR. THOMPSON:
3    Q    I mean have you performed any testing?
4    A    No.
5    Q    Have you participated in any kind of
6 trials in which you would implant polypropylene
7 material and then excise it and look and see what had
8 happened --
9        MR. RUMANEK:  Object --
10 BY MR. THOMPSON:
11   Q    -- while it was implanted?
12        MR. RUMANEK:  Objection to the form of
13    the question.
14        THE WITNESS:  No.  But I don't need to,
15    to be able to read the results of the people
16    that have --
17 BY MR. THOMPSON:
18   Q    Right.
19   A    -- and those results have been
20 published --
21   Q    So --
22   A    -- for the community to evaluate, and
23 there has not been any significant clinical data to
24 support degradation or oxidation or scar plating or

Joye Lowman, M.D.

Page 50

1  anything like that with macroporous type one
2  polypropylene mesh.
3          THE REPORTER: I'm sorry. With the?
4          THE WITNESS: With macroporous.
5  BY MR. THOMPSON:
6      Q      And what do you define macroporous as?
7      A      There have been two definitions that have
8  been used.
9      Q      Right.
10     A      Over 75 micrograms is what we classify as
11 macroporous as it relates to infection risk. Over one
12 millimeter is what we refer to in terms of -- what's
13 the right word? -- stiffness.
14     Q      Now, both of those numbers, you have
15 derived them by reading them; is that right?
16          MR. RUMANEK: Objection to form.
17          THE WITNESS: That's correct.
18 BY MR. THOMPSON:
19     Q      You have not done any experimentation on
20 the proper pore size to encourage ingrowth, have you?
21          MR. RUMANEK: Objection.
22          THE WITNESS: I have not.
23 BY MR. THOMPSON:
24     Q      Now, with regard -- there is a phenomenon

Page 51

1  known as roping. Are you familiar with roping?
2      A      I think I know what you're talking about
3  with roping.
4      Q      Well, let me say it in another way. If
5  you tug on a polypropylene mesh, it decreases in
6  diameter and forms a more solid or a thinner lining
7  all the way down to where if you actually pull on it
8  pretty good, you end up with a single edge, and that
9  phenomenon is known as roping. Are you familiar with
10 that, where it loses diameter?
11     A      I've read that.
12     Q      Have you performed any experiments
13 yourself on that phenomenon?
14          MR. RUMANEK: Objection to form.
15          THE WITNESS: No.
16          MR. RUMANEK: Fred, we've been going for
17     an hour.
18          MR. THOMPSON: Yes.
19          MR. RUMANEK: Want to take a couple of
20     minutes to --
21          MR. THOMPSON: That would be great.
22          MR. RUMANEK: -- and stretch legs.
23          MR. THOMPSON: That would be great.
24          (A recess was taken.)

Page 52

1  BY MR. THOMPSON:
2      Q      Now, with regard to -- we've talked about
3  the 75. How about, Doctor, have you done any research
4  into whether polypropylene is inert in the human body?
5      A      What do you mean by research?
6      Q      I mean, have you performed any --
7  performed any research in which you physically tested
8  the reactivity or the inertness of polypropylene in
9  the human body?
10     A      No.
11     Q      And so your information with regard to
12 the inertness or reaction would be a result of your
13 reading the literature on it; is that right?
14          MR. RUMANEK: I don't think that's a fair
15     characterization. Objection to form.
16          THE WITNESS: My opinion about that is
17     based on my review of the literature, my
18     clinical experience with my 800 sling patients,
19     my clinical experience with the 1,200 patients
20     or so that I have implanted polypropylene mesh,
21     and the literature that states that 3 million
22     women have been implanted with mid-urethral
23     slings and have had excellent success --
24 BY MR. THOMPSON:

Page 53

1      Q      All right.
2      A      -- with minimal maleffects, and the fact
3  that polypropylene is standard of care for fascial
4  replacement, not just with female pelvic
5  reconstructive surgery, but with general surgery, with
6  otolaryngology, with any surgical procedure where
7  fascia has to be replaced with a synthetic,
8  polypropylene is that -- is that choice, in addition
9  to the fact that we have been using Prolene suture for
10 50-plus years, et cetera.
11     Q      Well, now, your clinical experience,
12 you've put it in 800 plus 1,300 -- you put it in 2,100
13 times, but you've only taken it out six; is that
14 right?
15     A      That's correct.
16     Q      So you have only seen six of them after
17 they've been in the body; isn't that right?
18          MR. RUMANEK: Objection to the form of
19     the question.
20 BY MR. THOMPSON:
21     Q      I guess I'm exploring what you mean by
22 clinical experience.
23     A      My clinical experience using the product,
24 using polypropylene.

Joye Lowman, M.D.

Page 54

1   Q    Yes.  Okay.  But like I say, what you are
2   saying is that I've put it in 800 plus 1,300 times and
3   I'm unaware of what -- it must work because I haven't
4   had any complaints about it.  That's your clinical
5   experience?
6           MR. RUMANEK:  Objection to form.
7           THE WITNESS:  That's not -- I don't just
8       put it in and walk away.  I see my patients
9       back in postop follow-up.  They come to see me
10      at two weeks, six weeks, six months, three
11      months.  You know, I see them and follow them,
12      their course and how they tolerate the
13      polypropylene, and they do very well.
14  BY MR. THOMPSON:
15      Q    So you are seeing -- you're getting a
16  sense of the -- how they're tolerating it by their
17  symptoms and by your external examination; is that
18  right?
19      A    That's correct.
20      Q    So with regard to whether it's oxidizing
21  or reacting, your source for that would be if somebody
22  complained about it; is that right?
23          MR. RUMANEK:  Are you limiting that to
24      clinically, her clinical experience?

Page 55

1   BY MR. THOMPSON:
2       Q    Well, yeah because I thought we were
3   dealing with her reading the literature, which I'm
4   perfectly happy for you to answer that, but you're
5   saying that your clinical experience is one of the
6   bases for that opinion, and I need to understand the
7   extent of your clinical experience.  I think I
8   understand it, but I just want to make sure.  I mean,
9   you don't --
10      A    I --
11      Q    -- go to them and say, oh, you're doing
12  fine, so let me go in and biopsy the polypropylene so
13  that I can test it?  I mean, nobody has ever done
14  that, have they?
15      A    That's correct.
16      Q    So you see your patients on follow-up,
17  and if they're doing fine, then you extrapolate from
18  that, that the polypropylene is intact and doing its
19  job; correct?
20      A    That's correct.
21      Q    But as far as you actually performing
22  tests on whether it's inert or whether it's oxidizing
23  or whether it's reacting to certain types of agents
24  within the body, your source for that is your review

Page 56

1   of the literature; isn't that right?
2           MR. RUMANEK:  Along with the other things
3       that she mentioned when she answered a few
4       minutes ago.
5   BY MR. THOMPSON:
6       Q    Well, as I understand it, the other
7   things were also literature.  It's position papers and
8   things like that.  I mean, it's all from what you have
9   read and you've --
10      A    I guess what I am trying to communicate
11  is that if there was a condition that was affecting
12  the mesh that would cause a complication, whether that
13  be oxidation, degradation, or any of those things,
14  that I would have some clinical evidence of that in my
15  patients.
16      Q    I see.  Well, okay.  All right.  Your
17  statement that there is no reliable scientific data
18  that shows that increasing the pore size of TVT would
19  increase efficacy or lower complications without
20  impairing the utility of the TVT?
21          MR. RUMANEK:  Fred, what page are you on?
22          MR. THOMPSON:  I'm on page 14.  I'm
23      sorry.  The final paragraph.  I think this is
24      opinion Number 3.  Actually, that's just my own

Page 57

1   wording.
2   BY MR. THOMPSON:
3       Q    And here again I think this is a little
4   bit plowing the same ground again, but the pore size,
5   your source of information that forms the basis of
6   your opinion is your review of the literature; is that
7   right?
8           MR. RUMANEK:  Object to form.  I don't
9       think that's consistent with the way she
10      testified.
11          MR. THOMPSON:  Well, no.  Now I'm talking
12      about pore size.
13          MR. RUMANEK:  Well, okay.
14          THE WITNESS:  So --
15  BY MR. THOMPSON:
16      Q    No.  Let me make sure because I'm often
17  not descript -- we were just talking about oxidation,
18  and you talked about one of the bases for your opinion
19  was clinical experience --
20      A    Yes.
21      Q    -- and we went through that.  I'm now
22  asking specifically about pore size, your statement
23  that there is no evidence that increasing the pore
24  size would create a safer or more efficacious product,

Joye Lowman, M.D.

Page 58

1 and that's how I'm reading this third opinion here.
2 And my question is, the basis -- I'm exploring the
3 basis for that opinion, and all I'm reading within
4 your report is that you have reviewed the literature
5 and concluded that that is what is supported by the
6 literature.
7     MR. RUMANEK:  Well, why don't you ask her
8     the basis for her opinion?
9     MR. THOMPSON:  Well, that's what I was
10    leading up to.
11 BY MR. THOMPSON:
12    Q    Do you have any other basis other than
13 your review of the literature, for making the
14 statement that there is no evidence that increasing
15 the pore size would help safety or efficacy?
16    A    Yes.
17    Q    What is that?
18    A    So again, my clinical experience, the
19 experience of my colleagues, the experience of the
20 international community has been that the TVT in its
21 current shape and form is extremely effective and well
22 tolerated with a mesh erosion rate of one to
23 two percent, dyspareunia rate of three to
24 four percent.  I mean, the incidence of complications

Page 59

1 is already so low, it would be difficult to improve on
2 that.
3    Q    Yes.
4    A    So that's Number 1.  Number 2, when we
5 have looked at larger pore-sized meshes like Vypro
6 when they have been utilized in pelvic reconstructive
7 surgery, they have had sometimes more complications
8 than meshes of smaller pore size, so we don't have any
9 evidence to suggest that increasing the pore size of
10 the TVT would make it more effective or decrease its
11 complication rate.
12    Q    I see.  Now, when you talk about the
13 complication rate being low, are you aware that there
14 is actually a nomenclature for complication rates in
15 pharmaceutical arenas?
16    MR. RUMANEK:  Objection to form.
17 BY MR. THOMPSON:
18    Q    That the words that we use in lay
19 parlance actually have an epidemiological aspect to
20 them.  Are you aware of that?
21    A    Not as it relates to pharmaceuticals, no.
22    Q    Well, for example, if there is a
23 complication that happens more than once every 100
24 times, it's referred to as common.  If it happens

Page 60

1 between 100 and a thousand times, once in a 100 to a
2 thousand, it's referred to as not uncommon, and if
3 it's between 1,000 and 10,000, it uncommon, and over
4 10,000 it's rare.  Have you ever heard that?
5    A    I haven't.
6    Q    Well, then we'll move on.  But the rates
7 that you're describing, one to two percent and two to
8 four percent, to somebody who's never had a bad one,
9 aren't those high to you?
10    MR. RUMANEK:  Objection --
11 BY MR. THOMPSON:
12    Q    I mean, doesn't that mean that there is
13 somebody out there not doing a good job?
14    MR. RUMANEK:  Objection to form.
15    THE WITNESS:  No, that's not high to me.
16 BY MR. THOMPSON:
17    Q    Oh, okay.  But to somebody who's perched
18 on zero complications, one to two plus two to four, I
19 guess we're talking about three to six percent
20 total --
21    A    These are international rates, in the
22 hands of all comers.  That's exceedingly low.  I'm a
23 board-certified fellowship-trained female pelvic
24 reconstructive surgeon, so I have specific expertise,

Page 61

1 and this is all I do.  That -- those numbers are the
2 case for gynecologists, urologists, people that may
3 not have been fellowship trained.  So to have, you
4 know, numbers that we ascertain from 81 randomized
5 control trials and 12,000 patients, to have a rate of
6 one percent, I think that's very low.
7    Q    I guess I continue to be fascinated by
8 this.  How does the poor patient out in the community
9 know that if she comes to you she's getting a person
10 with a complication rate of zero and if she goes to
11 poor old Dr. Perlow she's getting a complication rate
12 of 20 percent?  I mean, that's just potluck?
13    MR. RUMANEK:  Objection to form.
14    THE WITNESS:  I mean, it is what it is.
15    That's the way it is.  I mean --
16    MR. RUMANEK:  I don't even understand
17    what the question is.  What is your question?
18 BY MR. THOMPSON:
19    Q    My question is, does -- well, let me just
20 ask it this way.  In the middle of all of these
21 position papers and statements have you ever seen a
22 statement by AUGS that patients should be advised of
23 the complication rate of the surgeon and should be
24 directed to competent fellowship-trained surgeons for

Joye Lowman, M.D.

Page 62

1 performing this operation? Have you ever seen any
2 statement by these guys that that's what should --
3 that's what patients should be entitled to?
4         MR. RUMANEK: It's a very specific --
5     objection to the form of the question;
6     compound.
7         THE WITNESS: AUGS has actually issued a
8     patient tool kit as it relates to vaginal mesh
9     and have given them a list of questions to ask
10    their surgeon, and that list of questions does
11    include how many of these cases have you done?
12    What are your complications rates? And if I
13    were to have a complication would you be
14    handling it or would somebody else be handling
15    it? So they have, you know, encouraged
16    patients to ask those questions.
17 BY MR. THOMPSON:
18    Q     Well, is there any activity by AUGS to
19 police its ranks to ensure that patients get good
20 surgeons and not bad surgeons?
21         MR. RUMANEK: Objection to form, the
22    characterization.
23         THE WITNESS: No, and that's not their
24    job to do that. I think what the evidence

Page 63

1     supports is that in the hand of all surgeons
2     the mid-urethral sling is safe and effective.
3 BY MR. THOMPSON:
4    Q     If Dr. Perlow is having a ten to
5 20 percent complication rate, is that TVT for Miss
6 Bailey safe and effective?
7         MR. RUMANEK: Objection to form of the
8     question.
9         THE WITNESS: Mrs. Bailey suffered
10    voiding.
11        MR. RUMANEK: Well, hold on just a
12    second. Are you asking a question specifically
13    about Miss Bailey, or is this a general -- I
14    mean --
15 BY MR. THOMPSON:
16    Q     Well, I'm using Miss Bailey as an
17 example. Let's say Dr. X has a complication rate of
18 20 percent. Is your statement that the TVT is safe
19 and effective when used on patient Y by Dr. X, or do
20 you still stand by that statement?
21    A     Absolutely.
22    Q     And is she just collateral damage? Is
23 she chopped liver?
24        MR. RUMANEK: Objection to form of the

Page 64

1 question. Are you asking her about the TVT?
2         MR. THOMPSON: Yes.
3         THE WITNESS: Mrs. Bailey --
4         MR. RUMANEK: Hold it. I don't think
5     he's asking you about Miss Bailey anymore. I
6     just want to make sure you-all two are on the
7     same page.
8         THE WITNESS: So when we say safe and
9     effective, we're saying that the patient had a
10    procedure that didn't cause hemorrhage, that
11    didn't cause pulmonary embolism, that did not
12    cause her any major morbidity. Mrs. Bailey had
13    that. She had a procedure that was effective
14    at treating her stress incontinence. She
15    doesn't have stress incontinence. Did she have
16    a maloccurrence with voiding dysfunction? Yes,
17    she did. Was that corrected? Yes, it was. So
18    did Miss Bailey have a safe and effective
19    procedure? Yes.
20 BY MR. THOMPSON:
21    Q     We keep coming back to Miss Bailey.
22 That's because --
23        MR. RUMANEK: I'm trying not to. I think
24    the question is --

Page 65

1         MR. THOMPSON: Well, that's the only one
2     that I'm interested in is Miss Bailey, so I'm
3     not unhappy with that, but Eric is exactly
4     right: We are a little bit premature talking
5     about Miss Bailey.
6         THE WITNESS: Okay.
7 BY MR. THOMPSON:
8    Q     But here is my question. Let's ask it
9 this way. Say you have a nail gun. Are you familiar
10 with what a nail gun is?
11    A     Yes.
12    Q     And say there is a device on that nail
13 gun that requires every time you pull the trigger,
14 that one nail comes out and it requires you to pull
15 the trigger; right?
16    A     Uh-huh.
17    Q     In the hands of a competent roofer, that
18 is an impediment, and what the competent roofer really
19 wants to do is to use it in an automatic mode, where
20 it can fire multiple times every time you hit it.
21 Okay?
22    A     Okay.
23    Q     Are you familiar with that?
24    A     No.

Joye Lowman, M.D.

Page 66

1    Q    Well, and so 98 times out of 100 -- 98
2  roofers out of 100 are out there having a great time
3  because they have a brand of nail gun that allows them
4  to fire at an infinite rate and they can work very
5  quickly and very efficiently.  Two guys out of 100
6  shoot themselves in the hand.  Okay?  Here is my
7  question.  Is the nail gun defective, or is the nail
8  gun just effective but used by incompetent roofers?
9         MR. RUMANEK:  Just a second.  I need to
10       object to the form of that question, the
11       characterizations that call for legal
12       conclusions.  It's a completely improper
13       hypothetical question.
14       THE WITNESS:  You lost me.
15 BY MR. THOMPSON:
16   Q    Here is my question.  If a company knows
17 that its device needs to be used by competent,
18 well-trained physicians in order to be safe and
19 effective, does not the company have the obligation to
20 make sure that its product is used by competent,
21 well-trained physicians?
22       MR. RUMANEK:  I'm going to object to the
23       form of the question.  It calls for a legal
24       conclusion; calls for her to speculate about

Page 67

1     the obligation a hypothetical company has.
2       THE WITNESS:  No.
3  BY MR. THOMPSON:
4    Q    What if the company actually goes out and
5  solicits and attempts to attract physicians who may
6  not have the competence or training to properly
7  install its device?  Does that change your thought at
8  all?
9       MR. RUMANEK:  Objection to the form of
10      the question on the same grounds.
11      THE WITNESS:  Could you repeat the
12      question?
13 BY MR. THOMPSON:
14   Q    What if the company actually goes out and
15 recruits physicians that may not have proper training
16 or background to properly install the device?
17      MR. RUMANEK:  A --
18 BY MR. THOMPSON:
19   Q    Does that change your mind with regard to
20 the company's obligation?
21      MR. RUMANEK:  Objection to the form of
22      the question to the extent that the question is
23      asking for her to speculate about what a
24      company's obligation is with respect to

Page 68

1     physicians and medical devices.
2       THE WITNESS:  Okay.  Let me just repeat
3       the question to make sure I understand what you
4       are asking me.  Should a company go out and
5       recruit incompetent people?
6  BY MR. THOMPSON:
7    Q    Sure.  That's a good --
8    A    Yeah -- no.
9    Q    -- start.  Should a company go out and
10 recruit people who have no background and undertake to
11 train them?
12      MR. RUMANEK:  Objection to the form of
13      the question to the extent -- same basis.
14      THE WITNESS:  Well, what do you mean by
15      no background?
16 BY MR. THOMPSON:
17   Q    If they have not performed mesh surgery
18 before and now they undertake to train them to perform
19 mesh surgery.
20   A    I don't think a company can determine who
21 is competent or not competent to perform procedures.
22 They have to make sure that their procedure is safe
23 and effective in the general population, and it's up
24 to the surgeon to decide what they're competent at

Page 69

1     doing.
2    Q    Doctor, if I go to page 16, I see that
3  you have stated it's speculation that -- or not spec
4  -- that's Freudian.  An opinion that it's my
5  understanding that there has been a claim that the
6  particles from the mechanically cut mesh can lead to
7  complication like pain and erosion.
8       Now, I guess my question is, I'd like to
9  explore the basis for that opinion.  Is that a review
10 of literature, or what?  What is your basis for that
11 opinion?
12      MR. RUMANEK:  That it's her understanding
13      that that's been claimed in the litigation?
14      What?  Sorry.  I just want to make sure.  I
15      don't know what opinion you're asking about.
16      MR. THOMPSON:  I guess I should have read
17      that.
18 BY MR. THOMPSON:
19   Q    Your opinion is, this is speculation
20 without scientific support, and my searches and review
21 of the clinical literature and my attendance at
22 specialty meetings and conferences, this is not a
23 concern, and particle loss has not been identified by
24 any reliable scientific clinical studies as a cause of

Joye Lowman, M.D.

Page 70

1  a complication.
2       Is your source for that, your review of
3  the literature and your attendance at these scientific
4  meetings?
5      A    And my clinical experience and the fact
6  that these slings are supported by the American
7  Urogynecologic Society, the Society of Gynecologic
8  Surgeons.
9      Q    But I guess my question is, you have not
10  performed any kind of testing on particle loss or
11  things like that?
12       MR. RUMANEK:  I just object to the form.
13  BY MR. THOMPSON:
14      Q    You have not performed any testing
15  yourself?
16      A    I have not.
17      Q    And then if we go down to the
18  mechanically cut mesh --
19       MR. RUMANEK:  Are you on the same page?
20       MR. THOMPSON:  Yes.
21  BY MR. THOMPSON:
22      Q    At the bottom of 16.  Now we're talking
23  about mechanically cut mesh and literature from before
24  and after 2007 when laser-cut mesh became available do

Page 71

1  not demonstrate a difference in clinical effect based
2  on whether the mesh is cut mechanically or with a
3  laser.
4       Do you see that?
5      A    I do.
6      Q    Now, is your basis for that, a literature
7  review and your clinical -- the same things as
8  earlier?
9      A    That's correct.
10      Q    You have not done any special testing on
11  that?
12      A    That's correct.
13      Q    Have you seen any work that points to
14  differences between the two, mechanically cut versus
15  laser cut?
16      A    I have not.
17       MR. RUMANEK:  I just object to the form
18       of the question.
19  BY MR. THOMPSON:
20      Q    Well, have you seen any documents that
21  purport to show differences between the two?
22       MR. RUMANEK:  What do you mean by
23       differences?  I mean, obviously there is a
24       different cut.

Page 72

1  BY MR. THOMPSON:
2      Q    Well, I mean difference in reaction;
3  difference in -- I mean, have you seen anything on the
4  other side of this issue --
5       MR. RUMANEK:  Objection to form.
6  BY MR. THOMPSON:
7      Q    -- that would cause you to pause or cause
8  you to rethink your opinion on this issue?
9      A    I'm sorry.  Could you ask that question
10  again?
11      Q    I guess my question is, in your
12  literature search have you found any documents that
13  show that there is a difference between mechanically
14  cut and laser cut TVT material?
15      A    In terms of -- a difference in terms of
16  what?
17      Q    A difference in terms of the properties
18  of the mesh under tension, under insertion, in any
19  way; any differences.
20      A    I have not seen any literature to state
21  that, no.
22       MR. RUMANEK:  Objection to form of the
23       question.
24       THE WITNESS:  I'm assuming that you meant

Page 73

1  scientific literature.
2  BY MR. THOMPSON:
3      Q    Yes.
4       MR. THOMPSON:  Here we go.  This is the
5       only one I have, so let's go ahead and mark
6       that.
7       (Plaintiffs' Exhibit Number P-8 was
8       marked for identification.)
9  BY MR. THOMPSON:
10      Q    Let me identify it.  This is something
11  called a clinical expert report laser-cut mesh for
12  Gynecare TVT, April 18th, 2006.  Doctor, have you
13  seen that before?  That's an Ethicon internal
14  document.
15      A    I don't believe so.
16      Q    Well, take a minute and have a look at
17  it.
18       MR. RUMANEK:  Do you want her to read it?
19       MR. THOMPSON:  You know, I'm not going to
20       ask her many questions about it, but having put
21       it in front of her, she has a right to read it,
22       so --
23       MR. RUMANEK:  You don't have another copy
24       of that?

Page 74

1    MR. THOMPSON:  No.  That is the only one
2  I brought with me.
3    MR. RUMANEK:  Sorry.  We may have a copy
4  of it.  I don't know.  7104 are the last four
5  digits.  Did you highlight this?  This
6  highlighting, is that yours?
7    MR. THOMPSON:  I don't know where that
8  came from.  That is pulled down off the machine
9  from Crivella.
10    THE WITNESS:  Okay.
11  BY MR. THOMPSON:
12    Q    And if you flip even further back, there
13  are some pictures that are kind of neat.
14    MR. RUMANEK:  Let me just object to the
15    -- before you start asking questions I'll just
16    object to any questions asked about this
17    document to the extent that the witness has
18    said that she never has seen it and doesn't --
19    there has been no foundation laid for what this
20    is, and it appears even to be perhaps an
21    incomplete document, unfinished, nonfinal
22    document.
23    THE WITNESS:  Okay.
24  BY MR. THOMPSON:

Page 75

1    Q    Doctor, you've already testified that you
2  have not seen that before, and Eric is exactly
3  right --
4    A    Uh-huh.
5    Q    -- it's not fair to question you about
6  the contents of it, but let me ask it this way.
7    A    Okay.
8    MR. THOMPSON:  This stack right here?
9    MR. RUMANEK:  Can I see it?
10    MR. THOMPSON:  Yeah.
11  BY MR. THOMPSON:
12    Q    If you became aware of internal Ethicon
13  documents that purported to test the mechanical versus
14  the laser cut --
15    A    Yes.
16    Q    -- and that document showed various
17  differences and various similarities --
18    A    Yes.
19    Q    -- would you wish to incorporate that
20  into your opinion, or would you -- well, strike that.
21  If you became aware of internal Ethicon testing
22  between laser cut and mechanical cut and there were
23  various tests that were run, various outcomes that
24  were set out, would you incorporate that document into

Page 76

1  your opinion with regard to whether there was any
2  difference between laser and mechanical cut?
3    MR. RUMANEK:  Objection to form to the
4    extent --
5  BY MR. THOMPSON:
6    Q    TVT?
7    MR. RUMANEK:  -- she's not been offered
8    as an expert on what Ethicon knew internally.
9    Her opinions are not based on that.
10  BY MR. THOMPSON:
11    Q    Well, I'm specifically going to -- you
12  have expressed in your report an opinion that there is
13  no difference, that it's speculative as between
14  differences between mechanical versus laser cut, and
15  I'm simply asking if you became aware that there were
16  internal Ethicon documents that tested those two
17  against each other, would you wish to incorporate
18  those into your opinion?
19    A    Not necessarily, no, and on this page --
20    MR. RUMANEK:  I think you answered.
21    THE WITNESS:  Well, but it says there is
22    no difference.  On page 5 it says, "While the
23    elongation properties of laser-cut mesh and
24    mechanically cut mesh are not exactly the same,

Page 77

1  they're very close and not thought to have any
2  clinical implications."
3    So that's mostly what I am interested in
4  is the clinical relevance.
5  BY MR. THOMPSON:
6    Q    Well, now, you've now made me very happy
7  because it sounds like you've had an opportunity to
8  read and apprehend that document.
9    A    No.  I just looked at.  You just gave it
10  to me.
11    Q    Well, no.  But, I mean, you just quoted
12  from it, so it's clear --
13    A    I've just --
14    Q    -- that you've now found some familiarity
15  with it.  Are you aware that, in fact, there were --
16  that this document was created for the purpose of
17  trying to ascertain whether or not they were required
18  to get a five, 10-K approval for the laser cut versus
19  the mechanical cut?
20    MR. RUMANEK:  Objection to the form of
21    the question, the characterization.
22    THE WITNESS:  I've never seen this
23    document before.  I'm not sure what context it
24    was created in, so no.

Joye Lowman, M.D.

Page 78

BY MR. THOMPSON:

1 BY MR. THOMPSON:
2   Q     Now, the next source that I want to talk
3 about is you have given an opinion with regard to the
4 adequacy of the warnings and adverse events in the IFU
5 regarding TVT --
6   A     Uh-huh.
7   Q     -- correct?  Now, here is the -- this is
8 unfortunate.  I actually have the TVT form, but the
9 TVT form that I have is reproduced as the actual size,
10 and the one that I have that I could put in front of
11 you is the TVT obturator, which I may not want to do
12 that.  I may want to actually use the TVT.
13       MR. THOMPSON:  All right.  Here's what
14   we're going to do.  Mark this one as the next
15   plaintiffs' exhibit.
16       (Plaintiffs' Exhibit Number P-9 was
17       marked for identification.)
18 BY MR. THOMPSON:
19   Q     I'm going to hand you Plaintiffs'
20 Exhibit 9, and I'm actually going to fold it back to
21 the -- because it actually has multiple languages, and
22 you're free to look at the whole document if you want.
23       MR. RUMANEK:  Let me just say on the
24   record just so it's clear, so what's been

Page 79

1   marked as Plaintiffs' Exhibit 9 is Bates
2   Numbered Eth mesh 02340306, and it appears that
3   the English version begins on page Eth mesh
4   02340331.
5       MR. THOMPSON:  Now, having done that, I'm
6   going to ask Eric, Eric, how about have a look
7   at these two obturator ones, which I believe we
8   can agree are actually identical in terms of
9   the actual verbiage, and it might be easier on
10   her and everybody else to use one that has a --
11   that can be seen.
12       MR. RUMANEK:  Can you read that?
13       THE WITNESS:  I can.  It's small, but --
14       MR. RUMANEK:  You can?
15       THE WITNESS:  I can.
16       MR. RUMANEK:  So she can read it.  I'm
17   happy if you want to use this.  I just -- I
18   don't want to make any representations about
19   them being identical unless I sit here and do
20   that comparison.
21 BY MR. THOMPSON:
22   Q     Doctor, can you identify that as the TVT
23 IFU that was -- I believe it's dated from 2005.
24   A     I don't see a date here.  It is the TVT

Page 80

1 IFU.  I don't see a date.
2   Q     Now, Doctor, if I go down to the adverse
3 reactions, do you see that?
4   A     Uh-huh.  Yes, I do.
5   Q     There are four bullet points under
6 adverse reactions.  Do you see that?
7   A     Yes.
8   Q     The first one, "Punctures or lacerations
9 of vessels, nerves, bladder, urethral bowel may occur
10 during needle passage and may require surgical
11 repair"; correct?
12   A     Correct.
13   Q     Now, that bullet point refers to the
14 insertion process, does it not?
15   A     It does.
16   Q     It actually specifically refers to "may
17 occur during needle passage"; correct?
18   A     Correct.
19   Q     Bullet point two, "Transitory local
20 irritation at the wound site and a transitory foreign
21 body response may occur.  This response could result
22 in extrusion, erosion, fistula formation, or
23 inflammation."
24       I read that correctly?

Page 81

1   A     You did.
2   Q     Now, local irritation and transitory
3 indicate that these conditions are going to be early
4 and temporary?  Is that not right?
5   A     Transitory?  I would agree that it would
6 at least implicate that it may -- that it should be
7 temporary.
8   Q     The third one is, "As with all foreign
9 bodies, Prolene may potentiate an existing infection.
10 The plastic sheaths initially covering the Prolene
11 mesh are designed to minimize the risk of
12 contamination."
13       Do you see that?
14   A     I do.
15   Q     Now, in fact, I think in your report you
16 say you've never had a case of infection.  Is that
17 right?
18   A     That's correct.
19   Q     So this is an adverse reaction that may
20 have been suffered by somebody else but not by you;
21 correct?
22       MR. RUMANEK:  That may be the case for
23   all the others as well.
24       THE WITNESS:  That's correct.

Joye Lowman, M.D.

Page 82

BY MR. THOMPSON:

1
2    Q    Well, if it's never been suffered by
3  anybody, it should not be in an IFU, should it?
4        MR. RUMANEK:  Objection to form.
5  BY MR. THOMPSON:
6    Q    I mean, the purpose of the IFU is to
7  apprise learned intermediaries of the adverse
8  reactions that they may encounter?
9        MR. RUMANEK:  Objection to the form and
10      the characterization by counsel.
11 BY MR. THOMPSON:
12   Q    Correct?
13   A    I would say not necessarily.  In a
14 perfect world in my opinion what you are stating
15 should be true.
16   Q    Yes.
17   A    But I think many times, in the same way
18 that hospitals put things on their consent forms that
19 in all likelihood would -- have never happened -- much
20 of what goes on a consent form or an IFU is to protect
21 oneself from the litigation, to make sure that they've
22 sort of warned about everything that they've been told
23 they should warn about.
24   Q    And if that's the purpose, then the --

Page 83

1    A    I'm not saying that's the purpose.
2        MR. RUMANEK:  Objection to the
3      characterization.
4  BY MR. THOMPSON:
5    Q    Well, if you're --
6    A    I'm just saying it's not necessarily true
7  that everything that they put in the IFU has been
8  experienced by someone.  That's what I am saying.
9    Q    Well, would you think that a physician
10 who receives the IFU could rely that all of the
11 adverse reactions that he or she may encounter are
12 going to be included?
13       MR. RUMANEK:  Objection to form.
14       THE WITNESS:  No.
15 BY MR. THOMPSON:
16   Q    The fourth one is overcorrection; i.e.,
17 too much tension applied to the tape may cause
18 temporary or permanent lower urinary tract
19 obstruction.  Okay?
20   A    Uh-huh, yes.
21   Q    And overcorrection, which is too much
22 tension applied to the tape, here again, that is a
23 problem -- the tension is applied at the time of
24 insertion; isn't that right?

Page 84

1        MR. RUMANEK:  Objection to form.
2        THE WITNESS:  That's correct.
3  BY MR. THOMPSON:
4    Q    When would you expect to get urinary
5  symptoms from overtensioning the tape?
6        MR. RUMANEK:  Objection to the form of
7      the question.
8        THE WITNESS:  It's variable.
9  BY MR. THOMPSON:
10   Q    Yes.  I mean, would you expect it to take
11 three months for it to show up?
12   A    It depends on the severity of the
13 obstruction.
14   Q    Wouldn't, in fact, you expect the
15 overtensioning to be immediately symptomatic?
16   A    It depends on the severity of the
17 obstruction.
18   Q    Have you ever had a -- well, have you in
19 your 800 TVTs, ever overtensioned a TVT?
20   A    I have.
21   Q    I'm sorry.
22   A    Yes.
23   Q    And what did you -- how did you -- I
24 assume that you corrected it; correct?

Page 85

1    A    Correct.
2    Q    And I assume that you viewed it as not a
3  serious correction?
4    A    Correct.
5        MR. RUMANEK:  Objection to form.
6  BY MR. THOMPSON:
7    Q    You did it pretty easily; is that right?
8    A    That's right.
9    Q    But if you wait ten days when this stuff
10 starts growing back through the pores, then it becomes
11 not so easy to do anymore; isn't that right?
12       MR. RUMANEK:  Objection to form.
13       THE WITNESS:  No.
14 BY MR. THOMPSON:
15   Q    I'm not right?
16   A    That's not right.
17   Q    Well, when did you do the correction on
18 the ones that you overtensioned?
19   A    I try to wait until they're at least 12
20 weeks postop because we have data that suggests that
21 that is the optimal time that gives you the best
22 chance of maintaining continence and avoiding
23 long-term irritating voiding symptoms.
24   Q    Oh, I see.  So an immediate correction is

Joye Lowman, M.D.

Page 86

1  not supported by the data; is that right?
2      MR. RUMANEK: Objection to form.
3      THE WITNESS: When you say immediate, you
4    mean within ten days?
5  BY MR. THOMPSON:
6    Q    Right.
7    A    Correct.
8    Q    How does it show up that it's
9  overtension? The person can't void and they have to
10 use the catheter? Is that how it shows up?
11   A    It varies. As I have stated in my
12 report, it depends on a number of factors. The
13 patient's ability to overcome the obstruction in
14 addition to the severity of the obstruction. Some
15 patients do present with immediate postop voiding
16 dysfunction or retention and need to have a catheter
17 or perform clean intermittent subcatheterization.
18 Some patients just have recurrent urinary tract
19 infections and a slow urinary stream. Some patients
20 will report position changes or an interrupted stream.
21 So the presentation varies.
22   Q    Doctor, are you aware of whether that IFU
23 has ever been revised by Ethicon?
24   A    I believe it has.

Page 87

1    Q    And are you familiar with the revision?
2    A    I can't quote it off the top of my head,
3  no.
4    Q    Well, that's one I do not have, so I'm
5  going to go ahead and -- just go ahead and mark that
6  one.
7        (Plaintiffs' Exhibit Number P-10 was
8      marked for identification.)
9        MR. RUMANEK: That one.
10       THE WITNESS: Okay.
11       MR. RUMANEK: Do you have another copy?
12       MR. THOMPSON: Yes. Here.
13 BY MR. THOMPSON:
14   Q    Doctor, this is the TVT obturator, and
15 we're just going to have to use that. Go to page 7,
16 and I'm going to ask you from your memory, and we
17 probably could piece through your reliance material
18 and find it, but I don't want to take the time to do
19 it. From your memory can you say that the TVT-O
20 adverse reactions is substantially the revised adverse
21 reactions that you recall from the TVT?
22       MR. RUMANEK: What was the question? I'm
23     sorry.
24       MR. THOMPSON: I'm just trying to save

Page 88

1      time by just using the adverse reaction section
2    of the TVT-O to ask questions about the TVT.
3        MR. RUMANEK: And what was the question?
4        THE WITNESS: Yeah. I don't --
5  BY MR. THOMPSON:
6    Q    The question is, from your memory can you
7  recall that these are substantially the same?
8        MR. RUMANEK: Objection to form and
9      characterization "substantially the same."
10       THE WITNESS: I don't remember.
11 BY MR. THOMPSON:
12   Q    Well, Doctor, if we take the 2005 TVT and
13 we look at the 2015 revision, we note that the adverse
14 reactions, there are substantially a higher number of
15 adverse reactions; isn't that right?
16       MR. RUMANEK: Objection to the use of the
17     term "substantially higher."
18 BY MR. THOMPSON:
19   Q    There are 15 as opposed to four; is that
20 right? Whoops. I think it's 14.
21   A    Yes.
22   Q    My --
23   A    There are 14 bullets.
24   Q    Fourteen instead of four. Okay. Would

Page 89

1  you say that the additional adverse reactions are
2  included because there are reports back of
3  substantially different adverse reactions out in the
4  community in practice?
5        MR. RUMANEK: Objection to the form and
6      the characterization.
7        THE WITNESS: Let me read them quickly.
8        MR. RUMANEK: Wait. I just want to make
9      sure you know the question that's been asked so
10     that you can answer the question. Could you
11     read it back?
12       (Thereupon, the court reporter read
13       the pertinent portion of the record.)
14       MR. RUMANEK: And note my objection.
15       THE WITNESS: My answer to that would be
16     no.
17 BY MR. THOMPSON:
18   Q    If a physician was relying on the IFU to
19 give him information regarding potential adverse
20 reactions, would the earlier pre2015 adverse reactions
21 properly give him notice of the full range of
22 potential adverse reactions that his patient might
23 face?
24       MR. RUMANEK: Objection to the form of

Joye Lowman, M.D.

Page 90

1 the question.
2         THE WITNESS: My answer to that is that
3 physicians don't get their information in terms
4 of what complications result from a procedure,
5 from the IFU. Most of the things, from what I
6 have read, are things that were commonly known,
7 like acute inner chronic pain and voiding
8 dysfunction. That's just another way of saying
9 obstruction, which they already said in the
10 initial IFU. So the question is, is the
11 initial IFU sufficient? I would say yes.
12 BY MR. THOMPSON:
13     Q     If the doctor was using the IFU
14 information to advise or to counsel with his patient
15 or her patient as to the risks that she might undergo
16 with regard to this, is it your testimony that the
17 information on adverse events included in the pre2015
18 IFU sufficient to permit that informed discussion?
19         MR. RUMANEK: Objection to the form of
20 the question.
21         THE WITNESS: Ask that question one more
22 time.
23 BY MR. THOMPSON:
24     Q     If the physician was going to use and

Page 91

1 incorporate the information communicated in the IFU in
2 his discussions or her discussions with his or her
3 patient as to the risks that the patient might
4 undergo, is it your testimony that the pre2015 IFU
5 sufficient?
6         MR. RUMANEK: Objection to the form of
7 the question.
8         THE WITNESS: Yes. Assuming that the
9 physician is a practicing surgeon, yes.
10 BY MR. THOMPSON:
11     Q     Are adverse reactions included in the
12 post -- the 2015 adverse reactions that occur and are
13 suffered outside of the installation surgical process?
14         MR. RUMANEK: Objection to the form of
15 the question.
16         THE WITNESS: You're asking, does the
17 adverse reactions discuss things that happened
18 after surgery?
19         MR. RUMANEK: If you don't understand --
20         MR. THOMPSON: Yes.
21         MR. RUMANEK: -- it, just let him reask
22 the question.
23         THE WITNESS: Okay. But, yes. You're
24 asking me, is that what is listed here?

Page 92

1 BY MR. THOMPSON:
2     Q     Right.
3     A     Yes, they do.
4     Q     And the pre2015 adverse reaction does
5 not; isn't that right?
6         MR. RUMANEK: Objection to the form of
7 the question; misstates her prior testimony.
8         THE WITNESS: Transitory local irritation
9 at the wound site is something that happens
10 after the surgery. Infection would be
11 something that happens after the surgery, so I
12 would say it does.
13 BY MR. THOMPSON:
14     Q     Now, Doctor, you've never designed any
15 mesh products, have you?
16     A     I have not.
17     Q     Have you ever participated in any kind of
18 focus or feedback group with regard to a mesh product?
19         MR. RUMANEK: Objection to form.
20         THE WITNESS: What do you mean by focus?
21 BY MR. THOMPSON:
22     Q     If a company or an inventor is designing
23 a product, sometimes they'll seek input from
24 practitioners about the safety or efficacy of it.

Page 93

1 Have you ever participated in that kind of process?
2     A     Yes, I have.
3     Q     And do they have to do with mesh
4 products?
5     A     It did.
6     Q     Tell me about that.
7     A     I was asked to give my opinion about a
8 disposable design for a mid-urethral sling by Boston
9 Scientific.
10     Q     Yes.
11     A     I think that was two years ago, two or
12 three years ago. To be used internationally, where
13 they can't afford the products that we currently use.
14         MR. RUMANEK: Let me just -- I just
15 want -- no. I just want to make sure that
16 there are not any sort of confidentiality
17 issues that would preclude you from discussing
18 that. I'm not saying that there are. I just
19 want to make sure.
20         MR. THOMPSON: Well, let's do this: How
21 about, Mr. Court Reporter, can you mark that
22 section, and we'll make sure that is -- I guess
23 the whole thing will be labeled confidential.
24         MR. RUMANEK: Well, and I'm not saying we

Joye Lowman, M.D.

Page 94

1    need to.  I just don't want her to say -- and
2    just respond to your question, to violate any
3    sort of -- I don't know whether --
4        THE WITNESS:  Maybe I could --
5        MR. RUMANEK:  -- there is or is not.
6        THE WITNESS:  -- cross the Boston
7    Scientific part.
8    BY MR. THOMPSON:
9    Q    Well, let me tell you this:  I would not
10   rely on Boston Scientific to be friendly about
11   anything.  Okay?  So I think Eric's advice is probably
12   good.  I will not inquire any further about that.
13   All right.  And of course you're not a chemist?
14       MR. RUMANEK:  Objection to form.
15       THE WITNESS:  I'm not.
16   BY MR. THOMPSON:
17   Q    Doctor, in your report you relate that
18   you're being paid by the hour to be an expert in these
19   matters; is that right?
20   A    That's correct.
21   Q    Do you have with you some sort of a
22   summary or invoice showing the amount of time that you
23   have spent on a -- I am particularly interested in the
24   Bailey case, but I know that the later cases today are

Page 95

1    also going to be interested in that as well.  Do you
2    have that?
3        MR. RUMANEK:  I have that.
4        MR. THOMPSON:  There is a little bit of
5    Kabuki theater going on here.  Eric and I
6    already talked about this earlier.
7        MR. RUMANEK:  And let's go off the record
8    just for a second.
9        (Discussion ensued off the record.)
10       THE REPORTER:  Are we back on the record?
11       MR. THOMPSON:  Please.
12       (Plaintiffs' Exhibit Number P-11 was
13       marked for identification.)
14       MR. RUMANEK:  And, Fred, the only thing I
15       want to note on the record, I think you asked
16       her if she is being paid hourly.  Her report
17       notes that she is being paid hourly, but for
18       depositions she has a fee per day, so I just --
19       it is a very minor point, but I just wanted to
20       make sure that was clear on the record.
21       MR. THOMPSON:  All right.
22   BY MR. THOMPSON:
23   Q    Doctor, handing you this prepared
24   document, I noticed that the first entry is in

Page 96

1    April --
2    A    Yes.
3    Q    -- correct?
4    A    That's correct.
5    Q    Now, you've actually given some
6    deposition testimony, and I think you even gave court
7    testimony in Philadelphia; is that right?
8    A    Video deposition.
9    Q    In that video deposition what -- was that
10   part of a lawsuit that was -- has it been tried, or do
11   you know?
12   A    It was, I believe, yes.
13   Q    But you didn't appear in Philadelphia?
14   You appeared by video deposition?
15   A    I did appear in Philadelphia, but it was
16   by video.  I didn't testify in court.
17   Q    You didn't physically go to the
18   Philadelphia county courthouse and testify in person?
19   A    That's correct.
20   Q    Is that type of activity included in
21   this?
22       MR. RUMANEK:  Let's go back off the
23       record just a second.
24       MR. THOMPSON:  Yes.

Page 97

1        (Discussion ensued off the record.)
2        THE REPORTER:  Back on?
3        MR. THOMPSON:  Yes, please.
4    BY MR. THOMPSON:
5    Q    Doctor, this prepared document is an
6    invoice that shows your activity in reviewing and
7    preparing the reports for wave two in Ethicon; is that
8    right?
9    A    That's correct.
10       MR. RUMANEK:  Up through --
11       MR. THOMPSON:  There is --
12       MR. RUMANEK:  -- May 31.
13       MR. THOMPSON:  Up through May 31.
14   BY MR. THOMPSON:
15   Q    And so you have additional time that you
16   will invoice, and you hope that Ethicon is good for
17   it?
18   A    That Troutman & Sanders is, yes.
19   Q    Oh, okay.  They're good for it, but you
20   hope that they get reimbursed by J & J?
21       MR. RUMANEK:  Objection to form.
22   BY MR. THOMPSON:
23   Q    See if I can make him object to that.
24   Okay.

Joye Lowman, M.D.

Page 98

1    (Discussion ensued off the record.)
2  BY MR. THOMPSON:
3    Q    But you have given other -- you've given
4  a video testimony in Philadelphia?  You've given other
5  depositions before today; is that correct?
6    A    That's correct.
7    Q    In other cases?  In other Ethicon TVT
8  cases or Ethicon -- strike all that.  In other Ethicon
9  cases; correct?
10   A    That's correct.
11   Q    And you have actually been retained and
12 have provided expert reports on Prolift devices as
13 well; is that correct?
14   A    That's correct.
15   Q    And in each of those instances where you
16 either gave a report and signed it or you gave
17 deposition testimony or where you gave courtroom
18 testimony by videotape, you understand that in each of
19 those instances you had an obligation to be of candor
20 and truth telling?
21       MR. RUMANEK:  Objection to form.
22 BY MR. THOMPSON:
23   Q    Do you understand that?
24       MR. RUMANEK:  Objection to form.

Page 99

1        THE WITNESS:  Yes.
2  BY MR. THOMPSON:
3    Q    And so is there anything that, on
4  reflection, since you've given those reports or those
5  depositions or that courtroom testimony, that you have
6  realized that you have a different opinion or a
7  different statement, or do you stand by all of your
8  testimony?
9        MR. RUMANEK:  Hold on just a second.  I'm
10       going to object to the form to the extent
11       you're asking her whether she stands by
12       testimony that occurred months and maybe even a
13       year ago.  If you want to show her that
14       testimony and have her reread it --
15       MR. THOMPSON:  Well, I don't -- I'm
16       satisfied that the answer to this is going to
17       be yes.  I don't have any great smoking gun.
18 BY MR. THOMPSON:
19   Q    I just want to make sure that the whole
20 body of your testimony is available as we go forward,
21 that there is nothing that you repudiate.
22   A    That's correct.
23   Q    Doctor, let me ask you about the AUGS
24 statement, and this one is a new one, but you make

Page 100

1  reference to the earlier, I think 2014 AUGS statement.
2  Let's see if I can get it here.  Here we go.
3        MR. THOMPSON:  Let me mark that.
4        (Plaintiffs' Exhibit Number P-12 was
5        marked for identification.)
6  BY MR. THOMPSON:
7    Q    I'm going to hand that to you.
8    A    Uh-huh.
9    Q    That's a statement that you made
10 reference to several times in your report; is that
11 correct?
12   A    That's correct.
13   Q    Now, Doctor, is there any effort in that
14 report to include a fair and balanced bibliography
15 that shows articles and information that show problems
16 with the procedures?
17       MR. RUMANEK:  Objection to form.  What do
18       you mean by -- I just want to make sure of the
19       question.  What do you mean by shows problems?
20 BY MR. THOMPSON:
21   Q    That indicate that the polypropylene
22 devices are not safer or more efficacious than a
23 native tissue repair or that there are rates of
24 erosion or other complications that require further

Page 101

1  attention.
2        MR. RUMANEK:  Objection to the form of
3        the question.  Misstates the statement.
4        THE WITNESS:  This is a position
5        statement on mesh mid-urethral slings and the
6        treatment of stress incontinence.  It's not a
7        paper about complications.
8  BY MR. THOMPSON:
9    Q    Yes.
10   A    So no, they don't talk about any data
11 that -- that references complications other than the
12 fact that mid-urethral slings are safe and
13 efficacious, and they do reference data to support
14 their statements.
15   Q    And is there anything within the body of
16 that statement that talks about risks and
17 complications and adverse events that have been
18 suffered by patients?
19   A    Let me read it.
20       MR. RUMANEK:  Yeah.  Read the statement,
21       yes.
22       THE WITNESS:  Okay.  Could you ask the
23       question again?
24 BY MR. THOMPSON:

Joye Lowman, M.D.

Page 102

1    Q    I guess the question is, is there any
2  discussion there about risks, adverse events, and
3  complications that are suffered by patients and means
4  and modalities of caring for them?
5    A    The paper doesn't go into detail about
6  specific complications, but it says that the
7  mid-urethral sling is associated with less pain,
8  shorter hospitalization, faster return to usual
9  activities, and reduced cost.  So they talk about the
10  fact that there are, you know, things that you have to
11  consider in terms of pain and that kind of thing, but
12  it's less with the mid-urethral sling than it is with
13  traditional repairs, and they reference a paper.  They
14  reference citation Number 13.
15    Q    So the passage you just read, is it wrong
16  for me to characterize that as an advocacy position?
17       MR. RUMANEK:  Objection to form.
18       THE WITNESS:  No.  I don't think that's
19    wrong.
20  BY MR. THOMPSON:
21    Q    In fact, that position statement is
22  advocating TVTs or mid -- I shouldn't say TVTs;
23  mid-urethral slings -- as a means for treating stress
24  incontinence?

Page 103

1    A    Absolutely.
2    Q    If the AUGS is not the body that sets out
3  objectively risks, complications, and other factors to
4  be considered by patients in deciding whether or not
5  to have a mesh surgery, who is?
6       MR. RUMANEK:  Objection to form.
7       THE WITNESS:  Could you ask that question
8    again?
9  BY MR. THOMPSON:
10    Q    If the AUGS is not the group that sets
11  out the risks and benefits, complication potential to
12  assist patients in making an informed decision as to
13  whether or not to have the surgery, then who is?
14       MR. RUMANEK:  Objection to form.
15       THE WITNESS:  The American Urogynecologic
16    Society makes position statements, practice
17    bulletins, different peer articles -- peer --
18    what is the right word?  Different -- they put
19    together different statements and practice
20    bulletins to educate surgeons about what they
21    think is the best clinical practice.  That is
22    based on scientific evidence, and that's true
23    for all medical societies.  The American
24    College of Obstetrics and Gynecology does the

Page 104

1  same thing.  The Society of Gynecologic
2    Surgeons does the same thing.  The American
3    Urologic Association does the same thing.
4       So their job is to support physicians and
5    research in the communities that they serve but
6    also to educate about what they think are best
7    practices.  It's the surgeon's job to educate
8    patients about what they think is the best
9    option for that individual patient.
10  BY MR. THOMPSON:
11    Q    Is it any part of the AUGS to make their
12  surgeons, their members aware that poorly performing
13  implanters are causing complications for their
14  patients?
15       MR. RUMANEK:  Objection to the form of
16    the question to the extent that now you're
17    asking her to testify about what AUGS should
18    do.
19       THE WITNESS:  Could you repeat the
20    question?
21  BY MR. THOMPSON:
22    Q    I'm fascinated by the fact that nobody
23  owns up to the fact that in the hands of a competent
24  and well-trained surgeon, that the complication rate

Page 105

1  for this device seems low or, in your case, zero.
2  Whereas --
3    A    Well --
4    Q    -- in other people --
5    A    -- that's not exactly true.
6    Q    Well, in other people it's 20, 30
7  percent.  There are surgeons out there who are doing
8  terrible things, and yet I don't see a single
9  organization that speaks up for that and says, we've
10  got to do something about that.  It's like giving a
11  formula one car to a 15-year-old.  I mean, there is a
12  problem, and I don't see anybody stepping up to it.
13  That's my question.
14       MR. RUMANEK:  I'll object.  That's a
15    narrative, not a question, and I have no clue
16    what the question is.
17  BY MR. THOMPSON:
18    Q    The question is, who does that?
19       MR. RUMANEK:  Objection.
20       THE WITNESS:  So -- first of all, you're
21    overstating the risks, so if we talk about a
22    case like Bailey, for instance, where that
23    physician had a higher voiding dysfunction rate
24    than average, than what's quoted

Joye Lowman, M.D.

Page 106

1  internationally in the literature, please
2  understand that that rate is still equivalent
3  to the Burch; right?  So she's still getting a
4  very successful procedure with a voiding
5  dysfunction rate that's actually still even
6  lower than the Burch.  I mean, the voiding
7  dysfunction with the Burch can be up to
8  34 percent.
9      So if you are saying that we should make
10  sure that every surgeon is perfect before we
11  allow them to do mid-urethral slings, that's
12  not realistic, but even in the most imperfect
13  hands usually the success rate and risks of
14  complications is less than what we were doing
15  before the sling was invented, so that's part
16  of it.
17      The second thing is, we do acknowledge
18  and have been studying the fact that surgeon
19  volume is related to patient outcomes, and, in
20  fact, in a recent paper by -- I think the
21  author's last name is Welk out of Canada, it
22  was a great paper that illustrated that
23  high-volume surgeons, those that are in the
24  75th percentile, have less complication rates

Page 107

1  than those are in the less than the 75th
2  percentile.
3      It is unreasonable, however, to assume --
4  to try to create conditions where every surgeon
5  is going to do 400 TVTs a year.  It's just not
6  possible.  So our best option is to go with the
7  best option, and that's the mid-urethral sling.
8  BY MR. THOMPSON:
9  Q      Your answer makes sense only in a world
10  where it's important to keep the poorest-performing
11  surgeons well compensated; isn't that right?
12      MR. RUMANEK:  Objection to the form of
13  the question.
14      THE WITNESS:  No.
15  BY MR. THOMPSON:
16  Q      If Kaiser Permanente had a surgeon who
17  had a complication rate like Dr. Perlow, what would
18  you do --
19      MR. RUMANEK:  Objection to form.
20  BY MR. THOMPSON:
21  Q      -- as the medical director?
22  A      To have someone who has voiding
23  dysfunction after mid-urethral sling is a known
24  potential complication after any suspension procedure

Page 108

1  for stress incontinence.  Again, 20 percent is
2  acceptable.  Is it optimal?  Maybe not, but it's
3  acceptable.
4      MR. THOMPSON:  Doctor, as you can tell,
5  I'm endlessly fascinated by that subject, but I
6  would like to, if we could, maybe move on to
7  Miss Bailey and do that before lunch.  Is that
8  a -- I mean, you surgeons have been up since
9  5 a.m., so this may well be a very important
10  lunchtime, but I would almost like to, if we
11  could press through, that would be great.  I
12  don't intend to take that huge amount of time.
13      MR. RUMANEK:  So the only question I
14  would have for Dr. Lowman is, does she want to
15  take a couple of minutes to regroup, to reread
16  the Bailey reports since we've been talking
17  about the TVT, if that's needed, or we can just
18  transition right on to --
19      MR. THOMPSON:  Actually, what that does
20  that allows me -- I'd asked my lady over the
21  telephone --
22      MR. RUMANEK:  Yes.
23      MR. THOMPSON:  It gives me some
24  opportunity for her before I close the record,

Page 109

1  to ask a question if she thinks that I need to
2  ask it.
3      MR. RUMANEK:  And I need to look back at
4  my notes to see if I have anything that I want
5  to follow up on, so why don't we take a little
6  break?
7      MR. THOMPSON:  Yes.  That would be great.
8  Thank you.
9      MR. RUMANEK:  Paige, are you going to
10  have anything?
11      THE REPORTER:  Are we off the record?
12      MR. RUMANEK:  Yes.
13      (A recess was taken.)
14      THE REPORTER:  Mr. Thompson?  I have that
15  they want this transcribed within three days.
16  Do you know if that's what you-all wanted was
17  three-day delivery?
18      MR. THOMPSON:  Yes.  That would be great.
19      THE REPORTER:  So by Wednesday or so, and
20  I believe that as part and parcel of the
21  realtime, we send you a rough draft the next
22  day or so?
23      MR. THOMPSON:  Yes.  That would be great.
24  /

Joye Lowman, M.D.

| Page 110 |
|---|

1          EXAMINATION

2 BY MR. RUMANEK:

3     Q     Dr. Lowman, I have just a few questions

4 for you.  You testified earlier about your decision to

5 use the TVT over the TVT-O.  Do you recall that

6 testimony?

7     A     I do.

8     Q     Do you have an opinion as to whether the

9 complication rates for the TVT-O are acceptably low?

10     A     They are.

11     Q     Based on your experience and review of

12 the medical literature, is it your opinion that the

13 TVT-O is safe and effective for treatment of stress

14 urinary incontinence?

15     A     It is.

16     Q     Is that opinion shared -- is that opinion

17 reflected in the AUGS/SUFU statement that was marked

18 as Plaintiffs' Exhibit 12 as well?

19     A     Yes, it is.

20     Q     And --

21     A     It is.

22     Q     And do you have any reason to disagree

23 with the position statement from AUGS and SUFU as it

24 relates to use of transobturator slings?

| Page 111 |
|---|

1     A     I don't.

2     Q     In response to questions by Mr. Thompson,

3 he asked you whether you believe the AUGS/SUFU

4 statement was advocacy.  Do you recall that question?

5     A     I do.

6     Q     What did you mean when you referred to

7 you -- you agreed that it was advocacy?

8     A     What I am stating is that the American

9 Urogynecologic Society and the Society of Urodynamics

10 in Female Pelvic Medicine and Urogenital

11 Reconstruction are compiling a statement in support of

12 the use of the mid-urethral sling in treating stress

13 urinary incontinence.

14          So if you characterize that as advocacy,

15 I would agree that that's what that is, but it's based

16 on the scientific evidence, the totality of the

17 scientific evidence, and furthermore, it's not just

18 AUGS and SUFU; it's now the American Association of

19 Gynecologic Laparoscopists, the American Urologic

20 Association, the Society of Gynecologic Surgeons, the

21 National Association for Continence, the -- what was

22 the other one?  Women's Health Foundation.

23          So basically every organization in this

24 country that has any skin in the game, if you will, in

| Page 112 |
|---|

1 terms of women's health, is supporting this statement

2 that was initially drafted by AUGS and SUFU.

3          MR. RUMANEK:  That's all the questions I

4     have.

5               FURTHER EXAMINATION

6 BY MR. THOMPSON:

7     Q     Doctor, let me see your little

8 handwritten notes here.  These are your handwriting?

9     A     Yes, it is.  Can't read it, can you?

10     Q     Well, I'm fascinated.  Did you write this

11 as we went --

12     A     No.

13     Q     -- today, or you brought these in with

14 you --

15     A     I brought them --

16     Q     -- as sort of a reference?

17     A     Uh-huh.  I knew I wasn't going to be able

18 to remember every society that's supporting that

19 position statement.

20          MR. THOMPSON:  Well, let's go ahead.  We

21     can mark these.  If you mark that as a single

22     exhibit, it is fine with me.

23          (Plaintiffs' Exhibit Number P-13 was

24     marked for identification.)

| Page 113 |
|---|

1 BY MR. THOMPSON:

2     Q     A couple of questions.  With regard to

3 patients, Doctor, do you believe that a patient must

4 give informed consent before a surgical procedure is

5 performed on them?

6          MR. RUMANEK:  Objection to form of the

7     question.

8          THE WITNESS:  Yes.

9 BY MR. THOMPSON:

10     Q     Do you believe that informed consent

11 contains a complete description of the benefits and

12 the risks that are entailed by that surgery?

13          MR. RUMANEK:  Objection to form.

14          THE WITNESS:  I think informed consent

15     should contain information that's clinically

16     relevant and helpful in helping the patient

17     make a decision that's reasonable.

18 BY MR. THOMPSON:

19     Q     And that includes a discussion of risks

20 and potential complications; isn't that right?

21          MR. RUMANEK:  Objection to form.

22          THE WITNESS:  That's correct.

23 BY MR. THOMPSON:

24     Q     Doctor, prior to the 2015 -- well, 2014

Joye Lowman, M.D.

Page 114

1 revision of the TVT and TVT-O IFU, do you believe that
2 a patient would have received sufficient information
3 regarding the implanting of the TVT in order to make
4 an informed decision as to whether or not to have that
5 implant?
6          MR. RUMANEK:  Objection to the form.
7          THE WITNESS:  Yes.
8 BY MR. THOMPSON:
9    Q     Does a discussion between the doctor and
10 a patient with regard to risk and benefits of a
11 surgery, include a discussion as to rates of
12 complication?
13          MR. RUMANEK:  Objection to the form.
14          THE WITNESS:  Not always.
15 BY MR. THOMPSON:
16    Q     Does a discussion between a doctor and
17 patient as to the risk and benefits of a procedure,
18 include a discussion as to the severity of
19 complications?
20          MR. RUMANEK:  Objection to form.
21          THE WITNESS:  Not always.
22 BY MR. THOMPSON:
23    Q     Does the discussion between doctor and
24 patient include a discussion as to the difficulty of

Page 115

1 repair or difficulty of treating a complication?
2          MR. RUMANEK:  Objection to form.
3          THE WITNESS:  Not always.
4 BY MR. THOMPSON:
5    Q     If I relate the questions, the three
6 previous questions, specifically to the implantation
7 of a TVT or TVT-O device, would you believe that that
8 discussion should include the rate of complication
9 with regard to a TVT, TVT-O?
10          MR. RUMANEK:  Objection to form.
11          THE WITNESS:  That would be optimal, yes.
12 BY MR. THOMPSON:
13    Q     And how about the severity of potential
14 complications?
15          MR. RUMANEK:  Objection to form.
16          THE WITNESS:  That would be optimal also.
17 BY MR. THOMPSON:
18    Q     And the difficulty in correcting a
19 complication?
20          MR. RUMANEK:  Objection to form.
21          THE WITNESS:  Yes.
22          MR. THOMPSON:  That's all the questions I
23 have on that.  Let's move on to Miss Bailey.
24          MR. RUMANEK:  Fred, let me just say one

Page 116

1 thing.  We can go off the record.
2          (Discussion ensued off the record.)
3          THE REPORTER:  Mr. Rumanek?  They want
4 this on a three-day delivery, by Wednesday, the
5 final transcript.  Is that what you-all wanted,
6 or did you want regular, or what --
7          MR. RUMANEK:  Yeah, that's fine.
8          THE REPORTER:  Three day.
9          MR. RUMANEK:  I need a rough.
10          (Deposition concluded at 12:09 p.m.)
11          (Pursuant to Rule 30(e) of the Federal
12 Rules of Civil Procedure, signature of the witness has
13 been reserved.)

Page 117

1          C E R T I F I C A T E
2
3 STATE OF GEORGIA   )
4 COUNTY OF GWINNETT )
5
6          I hereby certify that the foregoing
7 transcript was taken down, as stated in the
8 caption, and the proceedings were reduced to
9 typewriting under my direction and control.
10          I further certify that the transcript
11 is a true and correct record of the evidence
12 given at the said proceedings.
13          I further certify that I am neither a
14 relative or employee or attorney or counsel to
15 any of the parties, nor financially or
16 otherwise interested in this matter.
17          This the 28th day of June,
18 2016.
19
20
21
22
23 _____
          THOMAS R. BREZINA, B-2035
24

Page 118

```
1
2        ACKNOWLEDGMENT OF DEPONENT
3
4        I,_____, do
5   hereby certify that I have read the
6   foregoing pages, and that the same is
7   a correct transcription of the answers
8   given by me to the questions therein
9   propounded, except for the corrections or
10  changes in form or substance, if any,
11  noted in the attached Errata Sheet.
12
13
14  _____
15  JOYE LOWMAN, M.D.          DATE
16
17
18  Subscribed and sworn
    to before me this
19  _____ day of _____, 20_____.
20  My commission expires:_____
21
22  _____
22  Notary Public
23
24
```

Page 120

```
1        - - - - - -
         E R R A T A
2        - - - - - -
3
4   PAGE LINE  CHANGE
5   ____ ____ _____
6        REASON: _____
7   ____ ____ _____
8        REASON: _____
9   ____ ____ _____
10       REASON: _____
11  ____ ____ _____
12       REASON: _____
13  ____ ____ _____
14       REASON: _____
15  ____ ____ _____
16       REASON: _____
17  ____ ____ _____
18       REASON: _____
19  ____ ____ _____
20       REASON: _____
21  ____ ____ _____
22       REASON: _____
23  ____ ____ _____
24       REASON: _____
```

Page 119

```
1        - - - - - -
         E R R A T A
2        - - - - - -
3
4   PAGE LINE  CHANGE
5   ____ ____ _____
6        REASON: _____
7   ____ ____ _____
8        REASON: _____
9   ____ ____ _____
10       REASON: _____
11  ____ ____ _____
12       REASON: _____
13  ____ ____ _____
14       REASON: _____
15  ____ ____ _____
16       REASON: _____
17  ____ ____ _____
18       REASON: _____
19  ____ ____ _____
20       REASON: _____
21  ____ ____ _____
22       REASON: _____
23  ____ ____ _____
24       REASON: _____
```

Page 121

```
1        LAWYER'S NOTES
2   PAGE LINE
3   ____ ____ _____
4   ____ ____ _____
5   ____ ____ _____
6   ____ ____ _____
7   ____ ____ _____
8   ____ ____ _____
9   ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____
```