# Exhibit D

```
 1            IN THE UNITED STATES DISTRICT COURT

              SOUTHERN DISTRICT OF WEST VIRGINIA

 2                     AT CHARLESTON

 3

 4   IN RE:  ETHICON, INC.,           MASTER FILE NUMBER

     PELVIC REPAIR SYSTEM             2:12-MD-02327

 5   PRODUCTS LIABILITY

     LITIGATION                       MDL 2327

 6

                                      JOSEPH R. GOODWIN

 7                                    U.S. DISTRICT JUDGE

     _____

 8

     PAMELA BAILEY AND HOUSTON        CASE NUMBER

 9   BAILEY,                          2:12-CV-01700

10          Plaintiffs,

11   vs.

12   ETHICON, INC., et al.,

13          Defendants.

14

15                  DEPOSITION OF

16               JOYE LOWMAN, M.D.

17

18                 June 24, 2016

19                  12:17 p.m.

20

21            600 Peachtree Street, NE

22                  Suite 5300

23             Atlanta, Georgia 30308

24       Thomas R. Brezina, CRR, RMR, CCR-B-2035
```

Joye Lowman, M.D.

Page 2

1 APPEARANCES OF COUNSEL:
2 On behalf of the Plaintiffs Bailey and Bishop:
3     FRED THOMPSON, III, ESQUIRE
      Motley Rice LLC
4     28 Bridgeside Boulevard
      Mount Pleasant, South Carolina 29464
5     (843) 216-9000
      fthompson@motleyrice.com
6
7 On behalf of the Defendants:
8     ERIC RUMANEK, ESQUIRE
      SHAWN N. SKOLKY, ESQUIRE
9     Troutman Sanders LLP
      Bank of America Plaza
10    600 Peachtree Street, NE
      Suite 5200
11    Atlanta, Georgia 30308
      (404) 885-3000
12    eric.rumanek@troutmansanders.com
      shawn.skolky@troutmansanders.com
13
14            - - -
15
16
17
18
19
20
21
22
23
24

Page 3

1              INDEX OF EXAMINATIONS
2                                   Page
3 Examination by Mr. Thompson ..................... 4
4              INDEX OF EXHIBITS
5 Plaintiffs'   Description              Page
6 Exhibit P-1      Document entitled,    20
                "Surgeon's Resource
7               Monograph: A Report of
                the June 2000 Summit
8               Meeting, 17-Surgeon Panel
                Representing More Than
9               1200 Cases" Bates numbered
                ETH.MESH.10027307 through
10              ETH.MESH.10027328
11 Exhibit P-2     WellStar Windy Hill    27
                Hospital medical records
12              Bates stamped
                BAILEYP_WWHH_MDR00001 through
13              BAILEYP_WWHH_MDR00040
14 Exhibit P-3     Article entitled, "Does    59
                the Prolift System Cause
15              Dyspareunia?" Bates stamped
                ETH.MESH.01212172 through
16              ETH.MESH.01212177
17 Exhibit P-4     Printout from AUGS website   67
                entitled, "Organizations
18              Lend their Support to
                Mid-urethral Slings"
19
   Exhibit P-5     AUGS Position Statement    67
20              on Mesh Midurethral
                Slings for Stress
21              Urinary Incontinence
22
23
24

Page 4

1              JOYE LOWMAN, M.D.,
2    having been produced and first duly sworn as a
3    witness, testified as follows:
4              EXAMINATION
5 BY MR. THOMPSON:
6     Q    Dr. Lowman, we're now going to move to a
7 deposition where I question you about Miss Bailey.
8 Now, I've actually used her as an example all the way
9 through the sort of general questions, the general
10 opinions that you had, so some of this is going to
11 sound a little bit like plowing the same ground, but
12 there is -- rather than be very sophisticated about
13 it, I think we'll actually move more quickly if we
14 just plow the same ground, so I'm going to go forward
15 as we go.
16         Doctor, when were you communicated Miss
17 Bailey's records?  When were they sent to you?
18     A    I don't remember exactly.
19     Q    Is that reflected on the invoice sheet?
20 Would that be of help to you?
21     A    Unfortunately, no.
22     Q    Is it recently?  Is it --
23     A    What is this?  June.  I've been working
24 on wave two, I believe since January.  Does that -- or

Page 5

1 February?  I'm not sure.
2     Q    You know, it's not that important.
3     A    Good.
4     Q    But what I mean to say is that you have
5 not been -- you were never involved in the care and
6 treatment of Miss Bailey; is that right?
7     A    That's right.
8     Q    And you have not performed an independent
9 medical examination on Miss Bailey, have you?
10     A    I have not.
11         MR. RUMANEK:  And I'll just note for the
12     record that there was an agreement amongst
13     counsel that that could be deferred until the
14     trial.
15 BY MR. THOMPSON:
16     Q    Is an IME an important part of your
17 opinion, or are you prepared -- I mean, you've written
18 a pretty substantial opinion.  Do you feel like you
19 have enough information to state opinions with
20 finality?
21     A    According to the information that I
22 currently have, yes.  If something develops
23 differently, if someone else does an IME and finds
24 something that is inconsistent with what I currently

Joye Lowman, M.D.

Page 6

1 have, then that might change.
2    Q    Now, Miss Bailey had a TVT implanted in
3 2001; correct?
4    A    Let me check.  I believe that's correct,
5 yes.
6    Q    And I'm going to ask you to go to the --
7 just to have it in front of you, the Windy Hill
8 records.
9    A    Okay.  That's this; right?
10    Q    Yes.  Do the records reflect the reason
11 for her TVT?
12    A    They do.
13    Q    And what was the reason?
14    A    Stress incontinence.
15    Q    Were there any other presenting symptoms
16 that Miss Bailey had that you would find remarkable?
17        MR. RUMANEK:  Objection to form.  Do you
18    want her to look through all the records?
19        THE WITNESS:  Not that I'm aware of.
20 BY MR. THOMPSON:
21    Q    Now, Miss Bailey at the time of this
22 implantation was heavy; is that right?
23    A    That's correct.
24    Q    I believe that there is a record in here

Page 7

1 that says she was five-four and about 180-something
2 pounds.  Does that sound right?
3        MR. RUMANEK:  Objection to form.
4        THE WITNESS:  That looks right.
5 BY MR. THOMPSON:
6    Q    Let's just find it rather than me trying
7 to remember it.
8        MR. RUMANEK:  Do you have that?
9        THE WITNESS:  On page 5.
10 BY MR. THOMPSON:
11    Q    Look to page 11.
12    A    On page 5 as well, the --
13    Q    Right.  There we go.  Five -- oh, I was
14 giving her an extra inch.  Five-three, 180 pounds.
15 Okay.  Now, there is no contraindication for a TVT for
16 weight, is there?
17    A    There is not.
18    Q    Does the record reflect whether or not
19 she's a smoker?  If I look up at the top, it says,
20 "Past medical HX."
21        MR. RUMANEK:  What page are you on?
22        MR. THOMPSON:  I am still on page 5.
23        THE WITNESS:  Yeah.  I'm not sure what
24    that -- six to seven packs per day sounds

Page 8

1    extremely heavy.  I'm not -- that doesn't --
2    that might be pads per day.
3 BY MR. THOMPSON:
4    Q    Where are we at?
5    A    You're looking at the history of present
6 illness?
7    Q    Yes.  I was actually looking at Number
8 14, tobacco.  It wasn't checked.
9    A    Oh, Number 14.  Oh, okay.  Yes.  So it
10 doesn't look like that was checked.
11    Q    So this is -- and I think we're probably
12 in agreement that it is six or seven pads per day.
13    A    Right.
14    Q    That would be somebody who has -- is
15 there any characterization for the degree of
16 incontinence that that would represent, or that's just
17 a --
18    A    Nothing objective, but subjectively
19 that's significant.
20    Q    Now, she was 33 years old at the time; is
21 that right?
22    A    That's correct.
23    Q    That's kind of young to be getting a
24 mid-urethral sling --

Page 9

1        MR. RUMANEK:  Objection to form.
2 BY MR. THOMPSON:
3    Q    -- isn't it?  Or is it not?
4    A    No.
5    Q    That's not remarkable of itself?
6    A    No.
7    Q    But it would be something that would fit
8 into if -- there was some question as to whether or
9 not her problems might be caused by, say, vaginal
10 atrophy.  Her age would militate against that,
11 wouldn't it?
12    A    Yes.
13    Q    Is there anything in her record that you
14 would see that would make her not a candidate for a
15 TVT?
16    A    No.
17    Q    In your opinion was she a prior -- was a
18 diagnosis and a prescription for a TVT, an appropriate
19 medical decision?
20    A    Yes.
21    Q    If I go all the way to the last two pages
22 of this, 39 and 40, do you see that?
23    A    I do.
24    Q    And the thing we have to do, as we look

Page 10

1 at this, we have to keep reminding ourselves that this
2 is in 2001; right?
3     A     Okay.
4     Q     Now, you were in medical school in 2001;
5 right?
6     A     I -- I was, yes.
7     Q     So you were not installing or thinking
8 about TVTs, per se, in 2001; correct?
9         MR. RUMANEK: Objection to form.
10        THE WITNESS: Correct.
11 BY MR. THOMPSON:
12    Q     And unfortunately for me, in 2001 I was
13 probably already old, but Eric here was probably like
14 four years old. But anyway, we have to keep reminding
15 ourselves that we're dealing with the medical
16 knowledge, medical decisions as existed in 2001;
17 correct?
18    A     Correct.
19    Q     If I look at this informed consent, this
20 is a preprinted form that has no additional material
21 risk placed in it.
22        MR. RUMANEK: Objection to form.
23 BY MR. THOMPSON:
24    Q     Isn't that right?

Page 11

1     A     It looks that way, uh-huh.
2     Q     Now, if you were doing a procedure for a
3 TVT today, does Kaiser Permanente have a preprinted
4 TVT informed consent form?
5     A     They don't.
6     Q     Do you have a form in which you fill out
7 the elements of discussion that you had with the
8 patient and the risks that you communicated to the
9 patient?
10        MR. RUMANEK: Objection to form.
11        THE WITNESS: We use preprinted forms.
12     They're just not from Kaiser, so --
13 BY MR. THOMPSON:
14    Q     Yes.
15    A     -- most of the hospitals do have
16 preprinted consent forms.
17    Q     And the preprinted consent form is for a
18 particular type of procedure; is that right?
19    A     It depends on the hospital.
20    Q     Well, how about the hospital where you
21 perform your TVT?
22    A     Well, I operate at four hospitals.
23    Q     Oh, okay.
24    A     At Northside they have specific forms for

Page 12

1 specific procedures. At Piedmont they don't. At
2 Gwinnett -- I can't remember. I think that they do.
3     Q     Do you do any TVT surgeries as an office
4 procedure?
5     A     No.
6     Q     And in any event, looking at this consent
7 form, this consent form does not have any particular
8 or discrete recitation of risks unique to vaginal tape
9 procedure, does it?
10    A     What do you mean by that?
11    Q     I mean, does it talk about potential for
12 erosion or exposure?
13        MR. RUMANEK: In the form?
14        MR. THOMPSON: Within the form, right.
15        THE WITNESS: It does not.
16 BY MR. THOMPSON:
17    Q     And does it talk about the risk for, I
18 don't know, voiding disorders --
19    A     That's not --
20    Q     -- within the form?
21    A     That's not listed, no.
22    Q     Dyspareunia or painful sex?
23    A     That's not listed either.
24    Q     How about pelvic pain?

Page 13

1     A     That's not listed on the preprinted form.
2     Q     And I don't mean to go through everything
3 exhaustively, but simply to say that in 2001 this form
4 did not contain a lengthy list of specific adverse
5 events that could be suffered as a result of a TVT
6 implantation --
7         MR. RUMANEK: Objection to form.
8 BY MR. THOMPSON:
9     Q     -- does it?
10    A     It doesn't, but it does allow for that
11 discussion because it says, "In addition to these
12 material risks there may be other possible risks
13 involved in this procedure, including but not limited
14 to," and there is nothing written there, and then it
15 says, "I understand and acknowledge that by signing
16 this form I've been fully informed to my satisfaction
17 in general terms of the following: The diagnosis, the
18 nature and purpose of the procedure, the material
19 risks of the procedure."
20        So it's specific to the procedure.
21        MR. RUMANEK: Just slow down a little bit
22     just --
23        THE WITNESS: Sorry.
24        MR. RUMANEK: -- so he can keep up with

Joye Lowman, M.D.

Page 14

1   you.
2       THE WITNESS:  "Likelihood of success of
3   the procedure, alternatives."  So it gives, you
4   know, grounds for that more specific
5   discussion, but those preprinted -- are those
6   things specifically preprinted on this form?
7   No.
8   BY MR. THOMPSON:
9       Q       Now, did Dr. Perlow sign this form?
10      A       I don't see his signature here.
11      Q       Let's go back to the beginning and just
12  find his -- I guess, let's go to page 7, which is his
13  operative note.
14      A       Okay.
15      Q       Is there any discussion in there that he
16  had a discussion about risks or complications?  Within
17  the operative note?
18      A       No.
19      Q       Let's look through this together and just
20  see if we can find one, because that's what I am
21  doing, so you help me out.
22      A       A discussion of risks to --
23      Q       Yes, ma'am.
24      A       Those are all -- these look to be all

Page 15

1   hospital notes, so I wouldn't expect them to document
2   a discussion sort of after the fact.
3       Q       Oh, okay.  Okay.  So what we can say is
4   that we don't see any, but that doesn't mean they
5   don't exist?
6       A       Right.
7       Q       Let's don't spend any more time on that
8   because I did want to talk about the operative note
9   itself.  Do you have any information about how
10  Dr. Perlow learned to do a TVT procedure?
11      A       I don't.
12      Q       Do you know when the TVT was first
13  available in America?
14      A       In the late 1990s.
15      Q       Now, in your opinion Number 1 in your
16  report you fault not the TVT device, but you say that
17  Miss Bailey's problem was caused by overtensioning the
18  TVT at implantation; is that right?
19      A       That's correct.
20      Q       And the key word that you have used, and
21  you quoted it several times here at the bottom of
22  page 7 -- no, that's not right.
23              MR. RUMANEK:  I'm just going to object to
24      the extent you're characterizing any words that

Page 16

1       she used as being key, that phrase, whatever
2       you used.
3   BY MR. THOMPSON:
4       Q       Well, all right.  Then let me withdraw
5   that since what I am looking at is the last paragraph
6   on page 7, which is page 1 of 2 of the operative note.
7       A       Okay.
8       Q       Now, you quote in your report, the
9   section of this report where it says that he pulled --
10  vaginal tape was pulled taut --
11      A       Uh-huh.
12      Q       -- correct?
13      A       Correct.
14      Q       Now, the entire sentence there is,
15  "Vaginal tape was pulled taut so that it would suspend
16  the urethra, period.  A Metzenbaum scissors was used
17  as a spacer."
18              Correct?
19      A       That's correct.
20      Q       Now, from that, you -- is there anything
21  else that goes into your opinion that this device --
22  that Miss Bailey's problems were caused by
23  overtensioning?
24      A       Yes.  He also remarks that she was asked

Page 17

1   to cough and there was no leakage noted.  When the
2   sling is optimally placed, there is a little bit of
3   leakage noted, so that's an indication too that it was
4   too tight.
5       Q       If it was too -- if there was no leakage
6   noted, would she have had voiding problems or would
7   she have had trouble voiding postoperatively?
8               MR. RUMANEK:  Objection to form.
9               THE WITNESS:  You can't necessarily tell
10      just from the lack of leakage with cough or
11      Crede maneuver or however you're testing the
12      sling.  But what he describes in addition to
13      that notation that she didn't have any
14      leakage -- which we usually want a drop or two
15      of leakage.  In addition to her -- the
16      urodynamic testing that she had that, you know,
17      demonstrated that she had obstruction, I mean,
18      those things together show that she had
19      obstructive voiding.
20  BY MR. THOMPSON:
21      Q       When was the urodynamic testing?
22      A       Whenever she saw Dr. Adam.
23      Q       Now, that was in 2005; right?
24      A       Let's see.  Yes.

Joye Lowman, M.D.

Page 18

1    Q      And she was complaining of having some
2  retention or trouble voiding when she presented with
3  Dr. Adam; is that right?
4    A      Uh-huh, yes.
5    Q      Well, I guess what I am more interested
6  in is if I look at the immediate aftermath of the
7  implantation on 4/19 of 2001, the nurse's notes and
8  the recovery process notes, that she has -- urine flow
9  has returned, doesn't it?
10       MR. RUMANEK:  Do you want to reference
11    the specific --
12       THE WITNESS:  What page?
13  BY MR. THOMPSON:
14    Q      Let's look at it.  I guess page 33 is a
15  good page to look at.  If I look on 4/20/01, see down
16  that right side?  I'm not sure if this is a nurse's
17  note or what exactly it is, but it looks like a
18  periodic input by a professional.  Do you see what I
19  am looking at?
20    A      I think so.  These handwritten notes on
21  this side?
22    Q      Yes.  4/20 of 2001, "Resting quietly at
23  this time; will" -- I'm not sure -- something "as
24  needed"?

Page 19

1    A      "Assist."
2    Q      "Assist as needed.  Vaginal packing
3  removed.  Foley" something.
4    A      "Foley removed."  She was only able to
5  void 50 CCs.
6    Q      "Patient able to void 50 CCs; will try
7  again."  Something "became nauseated."
8    A      Right.
9    Q      Something, something.  Okay?
10    A      So that's not a normal void.
11    Q      But it's actually part of Ethicon's
12  instructions that sometimes people can't void for 48
13  hours and you have to send them home on a catheter.  I
14  mean, isn't that within the range of outcomes that are
15  expected?
16       MR. RUMANEK:  Objection to form to the
17    extent you characterized that as Ethicon's
18    instructions.
19       THE WITNESS:  It's well known that
20    patients can have voiding dysfunction right
21    after surgery.  It's also well known that they
22    can have voiding dysfunction from the sling
23    being too tight, so yes.
24  BY MR. THOMPSON:

Page 20

1    Q      So it could be one or the other?
2    A      It could be.
3    Q      Or it could be something else?
4    A      Well, we know she's got voiding
5  dysfunction.
6    Q      Well, except what we do know is that she
7  eventually went home and made no more complaints for a
8  while; isn't that right?
9    A      That doesn't mean she doesn't have
10  voiding dysfunction, but she did go home, yes.
11    Q      I have only one of these.  I'm sorry.
12  How about let's go and make this a copy.  Here again,
13  it's all -- I'm talking while asking you --
14       (Discussion ensued off the record.)
15       (Plaintiffs' Exhibit Number P-1 was
16    marked for identification.)
17  BY MR. THOMPSON:
18    Q      Let me hand you this.  This is a document
19  that's actually entitled, "Surgeon's Resource
20  Monograph:  A Report of the 2000 Summit Meeting,
21  17-Surgeon Panel Representing More Than 1200 Cases,"
22  written by Gynecare, and I'm going to hand that to
23  you --
24    A      Okay.

Page 21

1    Q      -- since it's the only one I have.  Now,
2  have you seen that before?
3    A      I have.
4    Q      If I look back to the section on -- and
5  here again I've helped you out a little bit by putting
6  the little yellow stickies on it.
7    A      Okay.
8    Q      If I look back to the installation
9  portion where they discuss using an instrument between
10  the urethra and the tape, do you see that?
11    A      That, I do.
12    Q      And if I turn to the next page, I'm not
13  sure why I have marked the next page, but there is
14  something that's obviously very important to me on the
15  next page as well.
16       MR. RUMANEK:  Do you want to hand it
17    back?  Hand it back to you?
18  BY MR. THOMPSON:
19    Q      Oh, here.  It'll be on the next page
20  after that.  It says, "Patient cannot void."
21       Do you see that?
22    A      Okay.
23    Q      Doctor, by putting the instrument between
24  the urethra and the TVT mesh, Dr. Perlow was following

Joye Lowman, M.D.

Page 22

1  or complying with the instructions that are included
2  in the Ethicon monograph, is he not?
3       MR. RUMANEK:  Objection to form.
4       THE WITNESS:  No.
5  BY MR. THOMPSON:
6    Q    And in what way is it your view that he
7  is deviating?
8    A    That's not the only part of what they're
9  instructing there.  They say, "To prevent
10 overcorrection, a blunt instrument is placed between
11 the tape and the urethra, remembering looser is better
12 than tighter."
13      So part of it is having a spacer, but you
14 also have to be cognizant of the amount of tension
15 that you are applying to the sling as you remove the
16 sheath from the sling.  So he did place the spacer,
17 but he pulled the sling too tight.  He pulled it taut
18 is what he said, and what they're saying is looser is
19 better than tighter.
20      And then on the other side, when you are
21 talking about the patient cannot void, they say,
22 "Ideally prevention of this complication is the goal.
23 This is determined in the OR by ensuring that the
24 Gynecare TVT mesh is positioned loosely, without

Page 23

1  tension."
2    Q    And you're faulting him because you're
3  saying it was too tight --
4       MR. RUMANEK:  Same objection.
5  BY MR. THOMPSON:
6    Q    -- and -- yeah, go ahead.
7       MR. RUMANEK:  No.  Finish the question.
8  BY MR. THOMPSON:
9    Q    You're faulting him because you're saying
10 it was too tight, and that means that it needed to be
11 loosened; isn't that right?
12      MR. RUMANEK:  Objection to the form of
13   the question to the extent you're
14   characterizing her testimony as faulting him.
15      THE WITNESS:  No.  What I am saying is,
16   he should have placed it without tension.  Not
17   necessarily dictating what he should have done
18   after he had --
19 BY MR. THOMPSON:
20   Q    Yeah.
21   A    -- placed the sling, but during the
22 placement he should have ensured that it was placed
23 loosely as opposed to trying to pull it taut.
24   Q    Now, if he pulled it too taut -- well,

Page 24

1  let me strike that.  If it had too much tension,
2  Gynecare advised him to do what to correct it?
3       MR. RUMANEK:  Objection to form.
4       THE WITNESS:  Well, they give options, so
5    they said that within the first five to ten
6    days outlet obstruction can be relieved by
7    opening the vaginal incision, grasping the
8    tape, and pulling it downward.  After ten days
9    it's not possible to pull it downward.  At that
10   point the outlet obstruction can be relieved by
11   making a vaginal incision under local
12   anesthesia and dividing the tape in the
13   midline.
14 BY MR. THOMPSON:
15   Q    Now, she was voiding within 24 hours of
16 the procedure; is that right?
17   A    I'm not sure.
18   Q    Well, we've looked at this note in the
19 recovery room.
20   A    Yes.  Fifty CCs is not a normal void.
21 I'm not sure if she required catheterization or not.
22   Q    Well, I guess that's my question.  Did
23 she require catheterization, according to the records
24 you've reviewed?

Page 25

1    A    I don't remember.  I didn't have that --
2  that part of her record.
3    Q    Assuming that she did not have symptoms
4  for a period of time after the procedure, is that --
5  well, if we make that assumption, would that impact
6  your view that the TVT was overtensioned?
7       MR. RUMANEK:  Objection to form.
8       THE WITNESS:  No.
9  BY MR. THOMPSON:
10   Q    You'd earlier -- and let me make sure I
11 understand and can reconcile it in my own mind.  You'd
12 earlier said that you have, on occasion, overtensioned
13 a TVT device; is that right?
14   A    That's correct.
15   Q    And on those occasions you've waited 12
16 weeks because that is the optimum time to effect a
17 proper adjustment --
18      MR. RUMANEK:  Objection --
19 BY MR. THOMPSON:
20   Q    -- is that right?
21      MR. RUMANEK:  Objection to form.
22      THE WITNESS:  Yes.  But let me qualify
23   that by, I don't see patients in complete
24   retention, so -- complete retention is where

Joye Lowman, M.D.

Page 26

1    they're not voiding at all or maybe voiding 20
2    or 30 CCs with residuals of 300, 400, et
3    cetera.
4         It may behoove you to adjust that sling
5    sooner and possibly to consider repeating the
6    sling if there is -- voiding dysfunction is
7    that severe.  So I usually see mild voiding
8    dysfunction -- the patient is not, you know,
9    suffering with a catheter and that kind of
10   thing for three months -- and so it's more
11   reasonable to wait three months in that
12   situation, and that's what I customarily do.
13   BY MR. THOMPSON:
14   Q    I see.  Your procedure, based on your
15   experience and expertise and based on the evidence,
16   differs from the advice that Gynemesh was giving to
17   surgeons in 2000; is that right?
18        MR. RUMANEK:  Objection to form.
19        THE WITNESS:  What I currently do is
20   different than what is listed here, yes.
21   BY MR. THOMPSON:
22   Q    Have you read Miss Bailey's deposition?
23   A    I did.
24   Q    And I think Dr. Perlow gave a deposition.

Page 27

1    Did you read that?
2    A    I did.
3    Q    Let's go forward to 2005.  What I want to
4    do, I want to go ahead and mark this as an exhibit so
5    we have it.  Since it's my only copy, I'm going to go
6    ahead and mark it now.  This is a -- well, let's --
7    let me be --
8         MR. RUMANEK:  Do you want to mark the
9    copy -- is that Windy Hill?
10        MR. THOMPSON:  Yes.
11        MR. RUMANEK:  Do you want to mark the
12   copy that I gave her so you can keep your copy?
13        MR. THOMPSON:  Is that okay with you?
14        MR. RUMANEK:  Yes.
15        MR. THOMPSON:  Okay.  That would be
16   super.
17        MR. RUMANEK:  I aim to please.
18        MR. THOMPSON:  You what?
19        MR. RUMANEK:  I aim to please.  Full
20   service here.
21        (Plaintiffs' Exhibit Number P-2 was
22   marked for identification.)
23   BY MR. THOMPSON:
24   Q    Let me just identify it.  Just for the

Page 28

1    record, what I marked as Plaintiffs' Exhibit Number 2
2    is a document consisting of 40 pages, which is the
3    result of a search request of Windy Hill Hospital, and
4    it's Bates numbered MDR0001 through 00040, and this is
5    the document that we've been making some reference to
6    over the last few minutes of deposition.  Right there.
7    All right.
8         Doctor, let's go to your report, and
9    let's see -- and now I'm going to actually go back a
10   little bit from opinion Number 1.  I'm going to go
11   back to your chronology and say, when is the next time
12   that you have reviewed records that show healthcare
13   sought by Miss Bailey?
14        MR. RUMANEK:  Let me just make sure.  Are
15   you asking after the implant?
16        MR. THOMPSON:  Yes, after the implant.
17        MR. RUMANEK:  When was the next time that
18   she sought healthcare, or what's reflected in
19   the chronology?  Those may be different.
20        MR. THOMPSON:  Well, let me ask it this
21   way.
22   BY MR. THOMPSON:
23   Q    Doctor, you've included a chronology for
24   Miss Bailey starting on page 18 --

Page 29

1    A    That's correct, yes.
2    Q    -- of your report?  In doing this
3    chronology have you included the healthcare encounters
4    that you believe are relevant and material to your
5    opinion of Miss Bailey?
6         MR. RUMANEK:  I object to the extent she
7    may differ in terms of what is relevant as you
8    characterized it.
9         THE WITNESS:  I included all of the
10   encounters that were in the sort of key medical
11   records that I was given.  I'm not sure if
12   there are other medical records that are
13   relevant that I didn't see, but in terms of
14   what I thought was important, that's what I
15   have included here.
16   BY MR. THOMPSON:
17   Q    Well, actually let me do it in the form
18   of leading questions and just get through this really
19   quickly.
20   A    Okay.
21   Q    You recite that on 5/28 of '02 Miss
22   Bailey was seen by Dr. Reker for complaints of
23   obesity; correct?
24   A    That's correct.

Joye Lowman, M.D.

---

Page 30

1  Q    Now, have you reviewed any documents
2  between her release from the hospital on April 20th,
3  2001, and May 28, 2002?
4  A    I may have.  I don't remember
5  specifically.
6  Q    There is nothing in your report that
7  indicates any complaint with regard to voiding
8  dysfunction by Miss Bailey between 4/19 of '01 -- I'm
9  sorry; 4/20/2001 and 5/28/02 --
10  MR. RUMANEK:  Object --
11 BY MR. THOMPSON:
12  Q    -- is that right?
13  MR. RUMANEK:  Objection to form to the
14  extent that that mischaracterizes Miss Bailey's
15  testimony at deposition.
16  THE WITNESS:  That's correct.
17 BY MR. THOMPSON:
18  Q    Well, I mean, you've read her deposition
19  where she does talk about having trouble with voiding;
20  correct?
21  A    I have.
22  Q    But what I am asking very specifically
23  is, is there any notation in a medical record that you
24  have reviewed that shows a complaint of voiding

---

Page 31

1  dysfunction between 4/20/01 and 5/28 of '02?
2  A    I don't believe so.  I think if I'd seen
3  that, I would have noted it.
4  Q    And so on May 28, '02, why did she go see
5  Dr. Reker?  Or Reker.
6  A    It's --
7  MR. RUMANEK:  That record there.  You can
8  go to the record if you need to.
9  THE WITNESS:  According to my report, she
10  was complaining of obesity.  She was
11  complaining of difficulty exercising because of
12  foot, knee, and back pain.  She was complaining
13  of incontinence despite having the TVT done.
14  She was requesting to be referred for gastric
15  bypass surgery.
16 BY MR. THOMPSON:
17  Q    I guess we do need to have a look at that
18  record because the question I have for you is, was it
19  incontinence coupled with not being able to pee, or
20  was it incontinence?
21  A    She did not complain of difficulty
22  urinating.
23  Q    So let's go forward to May 1, '03.  Your
24  report notes that she was seen by Dr. Osterloh for

---

Page 32

1  follow-up on obesity.
2  A    Okay.
3  Q    Let's have a quick look at that and see
4  if she made any complaints with regard to voiding or
5  urination at that time.
6  A    She did not.
7  Q    And then on October the 13th of 2003 she
8  did complain of an increased urination; is that right?
9  A    Urinary frequency, yes.
10  Q    And she at least -- either she or the
11  doctor ascribed it to a side effect of hypertension
12  and maybe even some sort of anxiety or tense; is that
13  right?
14  MR. RUMANEK:  Objection to form.
15  THE WITNESS:  Where are you getting that
16  from?
17 BY MR. THOMPSON:
18  Q    I'm getting that --
19  A    I'm looking at the assessment.
20  Q    Yeah.  I'm actually reading that off your
21  report.
22  A    From this -- what date is this?
23  Q    This is October --
24  A    Maybe I'm looking at a different --

---

Page 33

1  Q    -- October 13th --
2  A    Oh --
3  Q    -- 2003.
4  A    -- I'm looking at the wrong thing here.
5  Where is October 13th?  October 13th, 2003.  Okay.
6  Could you ask the question again?
7  Q    Just that she has increased urination,
8  but somebody ascribes it to a side effect of
9  hypertension and anxiety.
10  A    Uh-huh.  Let me see what I wrote here.
11  Oh, right.  She says that she has been compliant with
12  the Diovan and her only side effect has been increased
13  urination, so she complained of that.
14  Q    And so she doesn't -- and she's not -- on
15  10/13 of '03 she's not looking to and blaming the TVT
16  as any cause of her present condition, is she?
17  MR. RUMANEK:  Objection to form.
18  THE WITNESS:  She isn't --
19  MR. RUMANEK:  Based on the medical
20  record?
21  MR. THOMPSON:  Based on the medical
22  record.
23  THE WITNESS:  Based on the medical
24  record, no.

---

Joye Lowman, M.D.

1  BY MR. THOMPSON:

2      Q      And Eric is exactly right.  I mean to

3  say, does the medical record reflect that she has

4  complained that the TVT is causing any part of her

5  problem?

6      A      She does not.

7      Q      You then look to 12/3 of 2004.  She was

8  seen by Dr. Sward.

9      A      Uh-huh, yes.

10     Q      And he diagnosed her with a UTI and

11 referred her to a urologist for further evaluation; is

12 that right?

13     A      That's correct.

14     Q      Then on 12/10 of 2004 Miss Bailey was

15 seen by a urologist, Dr. Schrum, who had a -- he

16 reported that Miss Bailey had complex urinary

17 incontinence at baseline and her incontinence has

18 worsened after TVT and collagen injections; right?

19     A      That's correct.

20     Q      Then he referred her to Emory, and that's

21 where we pick up Dr. Adams -- I am sorry; Adam -- is

22 that right?

23     A      That's correct.

24     Q      Now, this here is some -- now, did

1  Dr. Adam note that there was a mesh exposure?

2      A      He did.

3      Q      And did he record her -- a history that

4  she gave?

5      A      He did.

6      Q      And what was that history?

7      A      Do you want me to just --

8             MR. RUMANEK:  Look at it.

9  BY MR. THOMPSON:

10     Q      Yes, ma'am.  That would be great.

11     A      "This is a 37-year-old P1 001 with a

12 history of anterior compartment prolapse, status post

13 previous surgery that the patient describes as a

14 vaginal bladder tack with a mesh sling in 1999

15 followed by a collagen injection in 2000.  She was

16 referred here by Dr. Forrest Schrum for urinary

17 incontinence.  She reports leaking with standing and

18 bending to sit down.

19            She does not particularly notice leaking

20 with coughing or sneezing.  She states that she leaks

21 usually without warning.  She denies any significant

22 urgency.  However, she does report frequent urination

23 and also has a problem with incomplete emptying of the

24 bladder and difficulty initiating her voids as well as

1  a slow stream.  She reports nocturia two to three

2  times per night.

3             She wears pads for most of the day.  She

4  denies any pressure symptoms, but she does report

5  difficulty during intercourse.  She said her partner

6  can feel something inside the vagina.  She denies any

7  excessive consumption of caffeine or coffee.  She

8  reports normal bowel movements and denies any

9  constipation or incontinence of stool.  She reports no

10 improvement after her first surgery.  After her

11 collagen injection in 2000, she did report some

12 improvement for only two months.

13            She previously tried Ditropan and Detrol,

14 and she states these medications do not help her.

15 More recently the doctor who saw her thought that the

16 mesh from her previous surgery may have caused some

17 erosion, and she was told that she had blood present

18 in the urine.  She denies any dysuria currently and

19 denies any abnormal vaginal bleeding."

20     Q      Now, did he formulate a plan of action or

21 a treatment plan?

22     A      Yes, he did.  He did a physical exam, and

23 then his assessment and plan was, "37-year-old female

24 status post anterior prolapse surgery with vaginal

1  erosion of mesh on exam today.  Also with a history of

2  hematuria, dyspareunia, stress incontinence versus

3  overactive bladder.  Possible sensory abnormality with

4  feeling of fullness and small capacity.  No evidence

5  of overflow incontinence."

6             MR. RUMANEK:  Just, there is another

7        paragraph.  I don't know if you want her to

8        read it or not.

9             THE WITNESS:  "She was instructed to

10       obtain her operative reports from her prior

11       surgeries.  She was given a uro-log and hat to

12       complete.  She was scheduled for urodynamics.

13       She made need a future cystourethroscopy and

14       exam under anesthesia to rule out urethral

15       erosion.  She is to follow up in the office

16       after her urodynamics are completed."

17 BY MR. THOMPSON:

18     Q      Now, if she reported that her mesh

19 surgery was in 1999 and she had collagen -- maybe I

20 have that backwards.  Mesh in 1999 and collagen in

21 2000, can we say from the medical records that you

22 have reviewed, that Miss Bailey is not the best

23 reporter of her medical history or that at least in

24 some parts her memory is at odds with the medical

Joye Lowman, M.D.

1  records?

2        MR. RUMANEK:  Objection to form to the

3    extent that you're asking Dr. Lowman to

4    characterize something beyond what's reflected

5    in that particular record.

6        THE WITNESS:  In terms of the dates, she

7    was incorrect with the dates.

8  BY MR. THOMPSON:

9    Q      And did Dr. Adam perform a partial

10  excision of the TVT?

11    A      He did.

12    Q      And the purpose for his surgery was what?

13    A      To relieve her obstruction.

14    Q      And did that succeed?

15    A      I believe it was his opinion that it did,

16  yes.

17    Q      Do you know how much mesh was removed?

18    A      I believe we -- I commented about that.

19  She should have a path report here.  I will just look

20  at my report.  I believe it was three centimeters.

21    Q      Here is -- what I should do is refer you

22  to this operative report.  I'm sorry.  And for some

23  reason this is not a Bates-numbered form.

24    A      This is the op report.  Yes,

1  three-centimeter segment.

2        THE REPORTER:  Sorry, Doctor.  Could you

3    keep your voice up?

4        THE WITNESS:  I'm sorry.  I'm sort of

5    talking to myself.  The three --

6        MR. RUMANEK:  Hold on just a second.

7    Let's go off the record one second.

8        (Discussion ensued off the record.)

9        MR. RUMANEK:  We can go back on the

10    record.

11  BY MR. THOMPSON:

12    Q      Tell me the Bates number that you're

13  looking at for the op report.

14        MR. RUMANEK:  It's Bailey P, underscore,

15    PSR, underscore, 00140 through 142.

16        MR. THOMPSON:  All right.  I have a giant

17    stack.  Let's just take you up on your offer.

18        MR. RUMANEK:  Do you need that, or --

19  BY MR. THOMPSON:

20    Q      Well, just if you have it in front of

21  you, let me just ask you some questions about it.

22    A      Okay.

23    Q      If I look at the document that's

24  entitled, "Emory Healthcare, Bailey Pamela, admit

1  date, 6/20 of 2005" --

2    A      Okay.

3    Q      Yeah.  All right?  I have, "The risks and

4  benefits of the procedure were discussed at length

5  with the patient by Dr. Adam on May 19th, 2005, and

6  again by myself at her preoperative visit on June 15.

7  She states she has no questions."

8        MR. RUMANEK:  Where are you reading from?

9        THE WITNESS:  He's reading from the top.

10        MR. RUMANEK:  Oh, okay.  From the top.

11    Oh, okay.

12  BY MR. THOMPSON:

13    Q      So that's -- now, if I go to the

14  operative record itself, which is page 12 and page 13

15  of the operative report, it looks as though you're

16  exactly right.  It looks like he removed approximately

17  a three-centimeter segment of mesh.  Is that correct?

18  On page 13?

19    A      Yes.

20    Q      And when he opened her up, did he find

21  what he calls eroding through the vaginal mucosa?

22        MR. RUMANEK:  Objection to form.

23  BY MR. THOMPSON:

24    Q      Look to the first full paragraph on

1  page 13.

2    A      The mesh, which was tinting up the

3  urethra was --

4        THE REPORTER:  Sorry, Doctor.

5        THE WITNESS:  I'm just reading to myself.

6    I'll read it out.

7        MR. RUMANEK:  Out loud.  Just read it to

8    yourself.

9        THE WITNESS:  Okay.

10        MR. RUMANEK:  Is the question, did he

11    observe erosion after he opened her up?  Is

12    that what you are asking?

13        MR. THOMPSON:  That was my question, yes.

14        THE WITNESS:  I don't see him documenting

15    that.  Oh, yes, I do.  Yes, he did.

16  BY MR. THOMPSON:

17    Q      And he did not note -- and we in the mesh

18  field would call that an exposure.  Is that right?

19    A      That's correct.

20    Q      And he did not note an erosion into the

21  urethra; is that right?

22    A      That's correct.

23    Q      What does tinting mean?

24    A      That it is elevating the urethra as

Joye Lowman, M.D.

Page 42

1  opposed to just lying flat under the urethra.
2  Q    I see.  Is that a function of tension?
3  A    Yes.
4  Q    Doctor, this is four years postsurgery;
5  correct?
6  A    That's correct.
7  Q    Is it within the range of potential that
8  what was noted by Dr. Adam was a contraction of the
9  TVT from the time of implanting until the time that he
10 excised it?
11 A    That would be unlikely.
12 Q    Is it within the list of possibilities?
13 A    If I have to answer yes or no, I'd have
14 to say no.  I'm not aware of any evidence that mesh
15 that is not attached or anchored, contracts.
16 Q    If the form by which the mesh is
17 innervated or ingrown results in a shrinkage of the
18 footprint of the mesh, is that a possibility?  That
19 the tinting could have been caused by the contraction
20 of the mesh during the ingrowing process?
21 A    No.
22 Q    When he removed the mesh, what did he
23 leave?
24      MR. RUMANEK:  Objection to form.

Page 43

1      THE WITNESS:  He describes that once the
2      mesh was freed, it was excised bilaterally at
3      its entrance into the pelvic diaphragm, so he
4      left the abdominal portion of the sling.
5  BY MR. THOMPSON:
6  Q    The abdominal portion, and here again --
7  A    The retropubic portion.
8  Q    Here again, the risk that you always --
9  you don't run this risk, but I always run this risk is
10 disclosing how little I understand about anatomy.  Did
11 he leave both sides?
12 A    Yes.
13 Q    Doctor, do you have any complaints or in
14 reviewing this record do you have any criticisms of
15 Dr. Adam, of his procedure or technique?
16 A    No.
17 Q    With regard to his decision to excise the
18 portion of the mesh, do you have any criticism of that
19 medical decision?
20 A    No.
21 Q    Do you think that was the right decision?
22 A    I think it was acceptable, yes.
23 Q    Now, Doctor, if I go to July 14 of 2005,
24 which is a four-week postop check -- do you see that?

Page 44

1  A    I do.
2  Q    Do you see where she reports she feels
3  like she has a full bladder and voided only 63 CCs?
4  Do you see that?
5  A    Yes.
6  Q    And she reports having the urgency to
7  urinate even after voiding?
8  A    Yes.
9  Q    Now, if we go way back to April 20, 2001,
10 if you remember, she was voiding 50 CCs at that time.
11 Would the removal of that section of the TVT -- would
12 that removal have relieved the pressure on her and
13 allowed her to void more freely?
14      MR. RUMANEK:  Objection to form.
15      THE WITNESS:  Yes.
16 BY MR. THOMPSON:
17 Q    And why do you think it didn't?
18 A    It did.  She voided 63 CCs with a
19 postvoid residual of 10 CCs, so she emptied her
20 bladder volume normally.  The abnormal thing is that
21 she still feels like she needs to go, which is just a
22 sign of overactive bladder.
23 Q    I see.  Do you think she's had overactive
24 bladder all along?

Page 45

1  A    She may have had overactive bladder
2  preoperatively from the TVT is what you are asking?
3  Q    Well, from the TVT, unrelated to the TVT.
4  Just, did she have overactive bladder?
5  A    It wasn't documented.  I mean, her -- the
6  indication for her TVT was stress incontinence.  It
7  wasn't mixed incontinence.  When she saw -- I forget
8  who it is now that said that she had complex
9  incontinence --
10 Q    Yeah.
11 A    -- that's a suggestion that maybe she had
12 mixed incontinence, but certainly her symptoms seemed
13 to worsen after the TVT in terms of the overactive
14 bladder symptoms.
15 Q    Now, Doctor, at that visit on 7/14 of
16 '05, whatever was said back and forth, she was
17 prescribed a follow-up for three months later.  Do you
18 see that?
19 A    Yes.  She was prescribed medication for
20 overactive bladder and then asked to follow up in
21 three months.
22 Q    So whatever was said, does the
23 three-month follow-up indicate that the medical
24 professionals who were following her, considered her

Joye Lowman, M.D.

Page 46

1  to be nonemergent?
2       MR. RUMANEK:  Objection to form.
3       THE WITNESS:  Yes.
4  BY MR. THOMPSON:
5    Q    That they were willing to -- they saw her
6  as someone who could, in essence, resume a normal
7  routine?
8       MR. RUMANEK:  Objection to form.
9       THE WITNESS:  Yes.
10  BY MR. THOMPSON:
11    Q    Now, I see there is a visit for low back
12  pain on August 30th, 2005.
13    A    Yes.
14    Q    And at that point -- she doesn't complain
15  of incontinence at that point; is that right?
16    A    That's correct.
17    Q    Now, the next record that any of us have
18  seen is on June 28th, 2011.  Is that a fair statement?
19       MR. RUMANEK:  Objection to form.
20       THE WITNESS:  Yes.
21  BY MR. THOMPSON:
22    Q    Now, Doctor, in looking through the
23  records in 2005 do we find within the medical records,
24  any indication by any medical professional that the

Page 47

1  problems that Miss Bailey suffered from were caused by
2  a defect in the TVT mesh that she had been implanted
3  with?
4    A    Not to my knowledge, no.
5    Q    In fact, as we sit here today in 2016,
6  we've spent now going on four and a half hours in
7  which your opinion is that there is no defect in the
8  TVT; isn't that right?
9    A    That's correct.
10    Q    In 2005 had Miss Bailey sought
11  information relating to the defect or whether the TVT
12  was defective or had any kind of problems, she could
13  not have found that information, could she?
14       MR. RUMANEK:  Objection to form.
15       THE WITNESS:  If you are asking if she
16    could find out the risks associated with the
17    TVT, she could.
18  BY MR. THOMPSON:
19    Q    I'm talking about if the suggestion that
20  the risks presented by the TVT were a result of some
21  defective design or defective material of the TVT
22  device.
23    A    I think I'm confused about what you are
24  asking.

Page 48

1    Q    My question is, if Miss Adams -- I'm
2  sorry.  Now I'm confused.  If Miss Bailey had gone
3  looking in 2005 and said, oh, gosh, what's happened to
4  me; I need to investigate and find out more about
5  this, she could not have found from any source, a
6  suggestion that the TVT device itself was defective --
7       MR. RUMANEK:  Objection to form.
8  BY MR. THOMPSON:
9    Q    -- would she?
10    A    No, because it's not true.
11    Q    I'm sorry.
12    A    There was no evidence to --
13       MR. RUMANEK:  Just let me just object.
14    Objection to the extent you're asking her to
15    testify as to what Miss Bailey could or could
16    not have found in 2005.  She can testify as to
17    what she knows, but not what Miss Bailey could
18    or could not have found.
19       MR. THOMPSON:  All right.
20  BY MR. THOMPSON:
21    Q    In 2005 upon your graduation from med
22  school if you had gone looking, could you have found
23  information that would have provided you with proof
24  that would put you on notice that the TVT was

Page 49

1  defective?
2       MR. RUMANEK:  Objection to the form of
3    the question.
4       THE WITNESS:  No.
5  BY MR. THOMPSON:
6    Q    Now, there is no doubt that the -- not
7  erosion but exposure that Miss Bailey suffered, was
8  caused physically by the mesh; isn't that right?
9       MR. RUMANEK:  Objection to form.
10       THE WITNESS:  It was associated with the
11    mesh, yes.
12  BY MR. THOMPSON:
13    Q    Now, Miss Bailey also complains of
14  various things:  Pelvic pain, I think, and she
15  complains of dyspareunia.  Doctor, is it your opinion
16  that the mesh substantially contributed to those
17  complaints?
18       MR. RUMANEK:  Objection to form.
19       THE WITNESS:  I think that's unlikely.
20  BY MR. THOMPSON:
21    Q    Now, as you go through and look at, say,
22  for example, the dyspareunia complaint of Miss Bailey,
23  how do you approach her complaint in terms of
24  diagnosing it and in terms of ascertaining the source

Joye Lowman, M.D.

Page 50

1 of her complaint?  How do you approach that as an
2 expert?
3      A     You have to consider the patient's
4 symptoms, what they are describing, the timing of
5 their description, their age and other potential risk
6 factors.  She had other surgeries, including collagen
7 injections, which can be associated with tenderness.
8 The risk of dyspareunia with the TVT is very low,
9 one percent or less, and she -- I'm not -- if I
10 remember correctly, her complaints of dyspareunia are
11 more recent than -- you know, she had this done ten
12 years ago.
13           But now we were alluding to the fact that
14 vaginal atrophy would not have been an issue at the
15 time of her implantation most likely but certainly
16 could be an issue now, and I think that her
17 dyspareunia is a current complaint, so in my mind it's
18 more likely to be things that have a higher incidence
19 of dyspareunia associated with them, like vaginal
20 atrophy, for instance, rather than a TVT who -- a TVT
21 that has a very low risk of causing dyspareunia, and
22 in particular, since most of the vaginal portion of
23 the TVT has been excised.
24      Q     Now, have you ever conducted a survey or

Page 51

1 a study with regard to the remnant sections of a TVT?
2 I mean, after the -- sort of the central portion has
3 been revised or removed and there are these remaining
4 two arms, do those two arms participate in pelvic pain
5 or dyspareunia?
6      A     They should not, no.
7      Q     Now, what you told me about dyspareunia
8 is that you've looked at her record.  Is there any
9 process by which you rule out alternative causes?
10 Have you sort of systematically gone and sort of made
11 a differential and ruled out alternative causes of her
12 dyspareunia?
13      A     It's hard to do that with such a scarce
14 record.
15      Q     I see.
16      A     But yes, I have attempted to do that with
17 what I have been -- am given, and it appears to me
18 from the record that she had some tenderness at the
19 site of the vaginal mesh erosion or she was
20 complaining of dyspareunia when she had a mesh
21 erosion, which is not uncommon, and now that that has
22 been resolved, it would be likely that if dyspareunia
23 was related to that, that that would be resolved as
24 well.

Page 52

1           Certainly she could have, you know,
2 vaginal atrophy.  She had collagen injections that can
3 sometimes cause pelvic pain as well, so there are
4 other potential risks that could be contributing to
5 dyspareunia if it is present currently, but it would
6 be unlikely that if her dyspareunia was due to the
7 mesh erosion or due to the sling, that after excising
8 the vaginal portion of the sling, that she would still
9 have dyspareunia due to the sling.
10      Q     I guess I'm at a little bit of a
11 disconnect here.  What I am hearing is that you go in
12 and you excise the portion and then it's gone, and so
13 what is -- there is nothing there to hurt.  Is that
14 what I am hearing?
15      A     Yes.  In the vaginal compartment, yes.
16      Q     But here is my question.  I mean, the TVT
17 was implanted for four years.  The whole theory of a
18 TVT device is that there will be ingrowth of some form
19 of fibrous material, some scar or, you know,
20 vascularity in her nerves; giant cells.  All of those
21 things, the whole design of this product, is to allow
22 ingrowth; isn't that right?
23           MR. RUMANEK:  Object to the
24      characterizations within the question.

Page 53

1           THE WITNESS:  Tissue ingrowth in terms of
2      fibroblast and collagen, yes.
3 BY MR. THOMPSON:
4      Q     So when you excise the mesh, it's not
5 like you're slipping a little card out of your camera?
6 You actually are cutting away material, which includes
7 living material; isn't that right?
8      A     I'm not sure what you mean by living
9 material.
10      Q     I mean, the stuff that grows in through
11 the inflammatory process is alive, isn't it?
12           MR. RUMANEK:  Object to the
13      characterization of the question.
14           THE WITNESS:  I'm not sure what you mean
15      by that.
16 BY MR. THOMPSON:
17      Q     I mean, these are living cells that grow
18 into the mesh material?
19      A     There is tissue ingrowth, yes.
20      Q     So when you cut out the mesh, you're
21 cutting out that tissue with it?  I mean, that's just
22 how you resect it; isn't that right?
23      A     Not exactly.  I mean, you dissect the
24 sling out, so you do some separation of the sling from

Joye Lowman, M.D.

Page 54

1 the surrounding tissue and then remove the sling.
2 There should -- there probably is some tissue that
3 gets removed with the sling.
4    Q    I guess my question is, why would it be
5 not just as likely that the removal of the sling would
6 result in some inflammatory response that could cause
7 either a continuing pain or even enhanced pain as a
8 result of that removal operation?  Wouldn't that have
9 to be on your differential?
10       MR. RUMANEK:  Objection to form.  That's
11    different than what you were asking.
12       THE WITNESS:  That's a possibility.  It's
13    just unlikely.
14 BY MR. THOMPSON:
15    Q    I see.
16    A    That's not what we see most often in
17 clinical practice, but that is possible.
18    Q    I see.  I see.  With regard to Miss
19 Bailey -- well, let me strike that.  Dr. Adam in
20 his operative report, does he make reference to
21 encountering bulking agents?
22    A    He would not.  The bulking agents are
23 upon the urethra itself.
24    Q    I see.  Okay.  So when he noted that the

Page 55

1 urethra was not eroded, then he would not have
2 investigated that further; is that right?
3       MR. RUMANEK:  Objection to form.
4       THE WITNESS:  He -- he may have seen
5    bulking agents with a cystoscopy, but he would
6    not have noted but -- the material with
7    dissection.
8 BY MR. THOMPSON:
9    Q    I see.  Didn't he perform a cystoscopy?
10    A    He did.
11    Q    Let's find that record because that just
12 jumped into my mind that I don't know the answer to
13 that.
14       MR. RUMANEK:  While you-all are looking
15    for that, can we take a couple-of-minute break?
16       MR. THOMPSON:  Certainly.
17       (A recess was taken.)
18 BY MR. THOMPSON:
19    Q    And are you ready?  Doctor, what does the
20 report say at cystoscopy about the bulking agents?
21    A    It doesn't mention them.
22    Q    But you say he would have seen them on a
23 cystoscopy?
24    A    He might have seen them on cystoscopy.

Page 56

1 If he did see them, that's where he would have seen
2 them:  On cystoscopy, not vaginal dissection.
3    Q    But we can say that the record has no
4 observation of bulking agents?
5    A    It -- it talks about there being a
6 shelf --
7    Q    Yes.
8    A    -- that there was -- it was difficult to
9 insert the cystoscope, but he does not say that that
10 was due to the urethral bulking agents.
11    Q    I've gotten bogged down with some
12 interest.  Let me go through these additional
13 opinions, and I'm going to try to be -- I know you
14 will not believe this, but I'm going to try to be
15 disciplined about it.  Okay?  Let's go to Number 4,
16 your opinion Number 4 at page 28.
17    A    Yes.
18    Q    I think I -- well, let me ask it this
19 way.  In your report you say, "I do not have any
20 records documenting Miss Bailey's urinary symptoms
21 prior to the placement of her TVT sling," and the
22 question that I have is that given the absence of any
23 records prior to the placement of the TVT sling and
24 given the state of her records, can you say to

Page 57

1 reasonable medical certainty that she still has an
2 overactive bladder syndrome, or is this simply a
3 possibility?
4       MR. RUMANEK:  Objection to form.
5       THE WITNESS:  I can say with --
6       MR. RUMANEK:  Are you talking about prior
7    to the TVT sling placement, or are you talking
8    about --
9       MR. THOMPSON:  No.  I'm talking about her
10    opinion Number 4.
11 BY MR. THOMPSON:
12    Q    Miss Bailey may still have overactive
13 bladder symptoms?
14    A    Yes.  I can say that with a reasonable
15 degree of medical certainty.
16    Q    And your basis for that is what?
17    A    Her sensation of urgency, the sensation
18 of a full bladder when her bladder is not full, and
19 improvement in her incontinence with the treatment of
20 Ditropan.
21    Q    Let's go to Number 5.  Dr. Adam noted
22 vaginal scarring, which is a known risk of any
23 surgical procedure to treat stress incontinence.  All
24 right.  I guess your opinion is that the scarring he

Joye Lowman, M.D.

Page 58

1 noted was simply a known risk of any surgical
2 procedure?
3     A     Yes.
4     Q     I think that's self-explanatory.
5     "Miss Bailey's dyspareunia is most likely
6 not caused by her TVT, as she described that her
7 dyspareunia was the same in severity and location as
8 prior to Dr. Adam's revision procedure."
9         Okay.  Now, Doctor, we've actually kind
10 of talked about whether or not the revision would cure
11 and, in essence, deaden any kind of pain point that
12 Miss Bailey would have suffered from.  We've already
13 discussed that enough, but you make a point that she
14 should have been describing her dyspareunia as
15 tenderness at the mouth of the vagina or as
16 penetration occurred and not deep.
17         Am I getting that right?
18         MR. RUMANEK:  Objection to form --
19         THE WITNESS:  Yes.
20         MR. RUMANEK:  -- to the extent it
21     mischaracterizes her report.
22 BY MR. THOMPSON:
23     Q     Well, I guess that's -- my question is,
24 you think that some of her reporting is inconsistent

Page 59

1 with dyspareunia caused by a TVT device; is that
2 right?
3     A     That's correct.
4     Q     And that's because you would expect the
5 discomfort to be at the opening of the vagina as
6 opposed to deep; is that right?
7     A     That's correct.
8     Q     Now, you actually wrote on this, didn't
9 you?  Where was that?  It's somewhere.  We have a --
10 well, I'm sure that I've read this somewhere.  Here we
11 go.
12         MR. THOMPSON:  Let's mark that.
13         (Plaintiffs' Exhibit Number P-3 was
14     marked for identification.)
15 BY MR. THOMPSON:
16     Q     This is an article that you wrote.
17 You're the primary author.  "Does the Prolift System
18 Cause Dyspareunia?"  We've marked this as Plaintiffs'
19 Exhibit 3, and I will say this.  We're talking about
20 TVTs and not Prolift.  I'm slow, but even I figured
21 that out.  But here is my question to you, and I'm
22 going to -- since you're familiar with this paper, I
23 am going to send you directly to table Number 2.
24         Now, with regard to the Prolift, at

Page 60

1 least, it looks like there are some ladies who
2 responded to your survey and said, oh, shallow
3 penetration only.  Nobody reported deep penetration
4 only.  But then the others reported some shallow, some
5 deep, and then some what they describe as total.
6         Now, is the Prolift unique and different
7 in presentation of dyspareunia from the TVT?
8     A     Oh, absolutely.
9     Q     Oh, okay.  So the first thing you would
10 tell me is that this has nothing to do with the TVT;
11 is that right?
12     A     That's correct.
13     Q     Understanding that, it's interesting to
14 know your methodology, that you have a shallow, a
15 deep, a mixed, and a total.  Would you say that that
16 gridding is valid for characterizing all sorts of
17 dyspareunia?
18         MR. RUMANEK:  Objection to form.
19         THE WITNESS:  Yes.  But the Prolift is
20     total vaginal mesh.
21 BY MR. THOMPSON:
22     Q     Right.
23     A     So the Prolift is located deeply; it's
24 located shallowly.  It's in those physical positions,

Page 61

1 and so it's more common to see various presentations
2 for dyspareunia, in particular in association with a
3 mesh that's in those various locations, whereas the
4 sling is located just distally.
5     Q     Has anybody ever done a study like you
6 did on the Prolift?  Has anybody ever done one for
7 TVT?
8     A     Not that I'm aware of.
9     Q     Well, now, one of the occasional and, in
10 your view, very occasional, but one of the occasional
11 adverse reactions is dyspareunia; isn't that right?
12     A     That's been reported, yes.
13     Q     But you're telling me that nobody
14 actually knows the answer to deep, shallow, mixed,
15 total, all that stuff?
16         MR. RUMANEK:  Objection to the form of
17     the question to the extent --
18 BY MR. THOMPSON:
19     Q     I mean, nobody's studied it?
20         MR. RUMANEK:  That's a very difficult
21     question.  Can you repeat your question just so
22     it's clear on the record?
23 BY MR. THOMPSON:
24     Q     Nobody has studied that differential

Joye Lowman, M.D.

Page 62

1 effect of dyspareunia on TVTs, have they?

2    A    Not in this way, no.

3    Q    So when you are relating your opinion,

4 you're relating your anecdotal clinical experience;

5 isn't that right?

6        MR. RUMANEK: Objection to the form to

7    the extent it mischaracterizes the testimony.

8    She talked about anatomical as well as her own

9    clinical.

10 BY MR. THOMPSON:

11   Q    Are you going to adopt Eric's answer, or

12 should I just ask another question?

13       MR. RUMANEK: Well, I'm sorry. You're

14    mischaracterizing the testimony.

15       MR. THOMPSON: So that's your objection?

16    Let me just withdraw the question because it

17    sounds like it was a bad question.

18 BY MR. THOMPSON:

19   Q    The basis for your opinion that Miss

20 Bailey's dyspareunia is unrelated to her TVT, is your

21 clinical experience; is that right?

22   A    That and the fact that mid-urethral

23 slings have a very low incidence of dyspareunia. When

24 I have seen dyspareunia in patients that have

Page 63

1 mid-urethral slings, they have been in the area and

2 location of the sling, which is distal in the vagina.

3    Q    And so you have related that back also to

4 your clinical experience; correct?

5    A    That's correct.

6    Q    Have you ever, like, gone to the database

7 and checked on your 800 people to find out if any of

8 them have ever complained of dyspareunia?

9    A    We don't have a database.

10   Q    I mean, could you track down the 800

11 people that you've installed TVTs in?

12   A    I could look at their electronic medical

13 records to see what visits they've had and whether or

14 not they've complained, follow-up visits, about

15 painful intercourse if they've, you know, followed up

16 at Kaiser.

17   Q    And that would require you to go and

18 formulate a plan that would pass the IRB. Any effort

19 to pull up individual patients that you were not

20 actively treating, invokes a HIPAA; is that right?

21   A    That's right. But the unique thing about

22 my situation is that Kaiser patients are required to

23 see Kaiser doctors, so if there were a patient who had

24 painful intercourse after having a sling that I

Page 64

1 placed, they would almost be required to see me before

2 going outside of the organization, so it would be

3 likely that I would be aware of it or have some

4 Gestalt.

5    Q    I see. And then seven, "It is unlikely

6 Miss Bailey will suffer any further complications from

7 her TVT." Your first sentence is, "It would be

8 speculative to suggest that Miss Bailey will suffer

9 any further complications"; is that correct?

10   A    That's correct.

11   Q    And it's also speculative to suggest that

12 she will not suffer further complications; isn't that

13 right?

14       MR. RUMANEK: Objection to form.

15       THE WITNESS: No. We have a significant

16    amount of evidence and data that supports the

17    fact that the incidence of complications with

18    mid-urethral slings, including the TVT, is very

19    low, and that certainly includes TVTs that have

20    been revised or excised as well, partially

21    excised.

22 BY MR. THOMPSON:

23   Q    I guess my point would be that you really

24 have no idea about Mrs. Bailey's prognosis as we sit

Page 65

1 here today, do you?

2        MR. RUMANEK: Objection to form of the

3    question to the extent it mischaracterizes her

4    testimony and what is contained in the report.

5        THE WITNESS: No. Actually, I do. We

6    have -- you know, 3 million women have been

7    implanted with mid-urethral slings, and we have

8    great -- large randomized control trials, the

9    Cochrane Review that includes 12,000 women that

10    gives us an indication and actual incidence

11    rates of complications with mid-urethral

12    slings.

13 BY MR. THOMPSON:

14   Q    Well, you know, this message from the

15 president that I was handed this morning, it has an

16 interesting line in it, and I'm going to read it to

17 you. It says, "The mid-urethral sling is the most

18 studied procedure for SUI medical literature.

19 However, the majority of that data is from outside the

20 United States, and there remains gaps in the

21 literature around longer-term outcomes.

22       The board has approved the development of

23 an SUI surgery registry to track physician-reported

24 process and outcome measures as well as

Joye Lowman, M.D.

Page 66

1  patient-reported outcomes. It's our hope that this
2  US-based registry will be used by AUGS members as a
3  way to track their outcomes, which will contribute to
4  the medical literature on the value of all SUI
5  surgical options."
6        Did you read that when it came in?
7    A    I did.
8    Q    So, I mean, are you in agreement that
9  most of the literature or most of the data is from
10 outside the United States?
11   A    I'm not aware of that. I don't have any
12 evidence necessarily to refute that. I understand
13 that there are 81 randomized control trials. Where
14 they come from, I don't know, but we do have -- you
15 know, they're summarizing the data, including all
16 mid-urethral slings. The TVT is somewhat unique in
17 that it was the first that was developed, so we do
18 have long-term data on the TVT.
19   Q    Well, you're referring to Dr. Nielsen and
20 his 17-year study?
21   A    Dr. Nielsen's study is one, yes.
22   Q    Now, he's in Finland, isn't he?
23   A    I don't know where Dr. Nielsen is.
24   Q    Here is my question.

Page 67

1        MR. THOMPSON: We probably ought to go
2    ahead and just mark these since they're in the
3    case.
4        (Discussion ensued off the record.)
5  BY MR. THOMPSON:
6    Q    We are just going to include those. We
7  don't need to talk about that anymore.
8        (Plaintiffs' Exhibits Numbers P-4 and P-5
9    were marked for identification.)
10 BY MR. THOMPSON:
11   Q    Has your discussion with your patients
12 with regard to risks and benefits and potential
13 complications, has it changed since you've started at
14 Kaiser in 2008 to the present? Do you do more
15 consulting or talking with your patients than you did
16 in 2008?
17   A    Yes.
18   Q    And why is that?
19   A    Because patients are very hesitant now.
20 They always ask the question, well, isn't that, that
21 mesh that they talk about on TV? So I have to explain
22 the FDA public health notification. I have to discuss
23 the AUGS position statement. There is more that has
24 to be explained to give them some reassurance that

Page 68

1  it's a safe and effective procedure, so yes.
2    Q    All of these 81 studies that you are
3  talking about, and let's look at Dr. Nielsen with his
4  17-year study where he's followed these ladies in
5  Finland. All of these studies are performed by folks
6  like you, aren't they?
7        MR. RUMANEK: Objection to form.
8  BY MR. THOMPSON:
9    Q    University trained, intensive fellowship,
10 fellow positions, maybe even academic positions. All
11 of these people fall into this category of highly
12 trained, highly competent surgeons, don't you agree?
13       MR. RUMANEK: Objection to form.
14       THE WITNESS: Well, usually the principal
15    investigator is not the only surgeon that's
16    included in the -- the randomized control
17    trials that they're sort of overseeing, so
18    typically they will involve surgeons in the
19    community as well, so not everyone is as well
20    trained as, you know, possibly the principal
21    investigator is.
22 BY MR. THOMPSON:
23   Q    Well, you know where I'm going to now,
24 and that is, if these safety studies are being run by

Page 69

1  either academic settings or settings with tertiary,
2  highly specialized, highly competent folks, how do you
3  gather the data on women who are going to storefront
4  stand-alone OBs who have gone and taken a cadaver
5  course and are implanting? How do you capture the
6  data on those people, on those ladies?
7        MR. RUMANEK: Object to the form of the
8    question; characterization.
9        THE WITNESS: In most randomized control
10    trials they do include surgeons in the
11    community. It's not just expert surgeons that
12    are included in randomized control trials. It
13    would be very difficult to do that on -- you
14    know, with 12,000 patients, so the larger the
15    number of patients that are included, the more
16    representative the research is in terms of how
17    that exposure --
18 BY MR. THOMPSON:
19   Q    Yes.
20   A    -- is experienced in the community, which
21 is why Cochrane Reviews are so important or
22 meta-analyses like what we talked about before with
23 Schimpf: Because they include multiple studies under
24 multiple conditions --

Joye Lowman, M.D.

Page 70

1  Q    Yes.
2  A    -- not just the top university centers,
3 but multiple practicing physicians, and we can
4 summarize that data and get a better -- or a more
5 reliable picture of how that surgery or exposure or
6 whatever it is that you are looking at, is experienced
7 by the general population.
8  Q    Yeah.
9  A    We can't know how it's experienced by
10 every single surgeon and every single patient, but the
11 goal is to try to approximate the experience as best
12 we can, and the best way to do that is with large
13 randomized control trials and large meta-analyses.
14  Q    Well, I understand that, but let's go
15 back to Kaiser. I mean, you have 2 million folks out
16 in California. You have 260,000 folks here. Isn't
17 the best way nowadays would be to do some
18 epidemiological study and see the impact of this on
19 the population, not as a prospective clinical trial
20 but as a registry of the outcomes?
21      MR. RUMANEK: Objection to form.
22 BY MR. THOMPSON:
23  Q    I mean, isn't that a better way to look
24 at it?

Page 71

1  A    No because you can't assess incidence
2 with registries. You have to be able to evaluate
3 things prospectively and randomly to assess for -- or
4 to account for bias. It has to be systematic or you
5 expose yourself to bias.
6  Q    And if I look at the report -- I think
7 I've now put it into evidence, but if I look at the
8 Schmidt -- is that right?
9      MR. RUMANEK: Schimpf.
10      THE WITNESS: Schimpf. Sorry.
11 BY MR. THOMPSON:
12  Q    If I look at that, if I go down and I run
13 my finger down the end number for the number of
14 patients in all of those many reports, usually those
15 trials are very small numbers; is that right?
16  A    Right. That's the purpose of
17 meta-analyses is to be able to combine the numbers to
18 give you greater reliability of the outcome data.
19  Q    Well, is it your view as an expert that
20 the combining many, many low-number studies increases
21 the power of the meta study?
22      MR. RUMANEK: Objection to form.
23      THE WITNESS: Yes.
24      MR. THOMPSON: Eric, I'm going to stop

Page 72

1 asking questions. I think the rule is that I
2 should say I reserve.
3      MR. RUMANEK: I'm going to look at my
4 notes. I don't think I'm going to have any
5 questions. Give me a couple of minutes.
6      (Discussion ensued off the record.)
7      MR. RUMANEK: I can go on and say I don't
8 have any questions. I have no questions for
9 witness.
10      MR. THOMPSON: All right. Thank you very
11 much.
12      (Deposition concluded at 2:08 p.m.)
13      (Pursuant to Rule 30(e) of the Federal
14 Rules of Civil Procedure, signature of the witness has
15 been reserved.)
16
17
18
19
20
21
22
23
24

Page 73

1      C E R T I F I C A T E
2
3 STATE OF GEORGIA  )
4 COUNTY OF GWINNETT )
5
6      I hereby certify that the foregoing
7 transcript was taken down, as stated in the
8 caption, and the proceedings were reduced to
9 typewriting under my direction and control.
10      I further certify that the transcript
11 is a true and correct record of the evidence
12 given at the said proceedings.
13      I further certify that I am neither a
14 relative or employee or attorney or counsel to
15 any of the parties, nor financially or
16 otherwise interested in this matter.
17      This the 28th day of June,
18 2016.
19
20
21
22
23
      _____
      THOMAS R. BREZINA, B-2035
24

Page 74

1
2        ACKNOWLEDGMENT OF DEPONENT
3
4         I,_____, do
5    hereby certify that I have read the
6    foregoing pages, and that the same is
7    a correct transcription of the answers
8    given by me to the questions therein
9    propounded, except for the corrections or
10   changes in form or substance, if any,
11   noted in the attached Errata Sheet.
12
13
14   _____
15   JOYE LOWMAN, M.D.          DATE
16
17
18   Subscribed and sworn
     to before me this
19   _____ day of _____, 20____.
20   My commission expires:_____
21

     _____
22   Notary Public
23
24

Page 75

1           - - - - - -
              E R R A T A
2           - - - - - -
3
4    PAGE  LINE  CHANGE
5    ____  ____  _____
6        REASON: _____
7    ____  ____  _____
8        REASON: _____
9    ____  ____  _____
10       REASON: _____
11   ____  ____  _____
12       REASON: _____
13   ____  ____  _____
14       REASON: _____
15   ____  ____  _____
16       REASON: _____
17   ____  ____  _____
18       REASON: _____
19   ____  ____  _____
20       REASON: _____
21   ____  ____  _____
22       REASON: _____
23   ____  ____  _____
24       REASON: _____

Page 76

1           - - - - - -
              E R R A T A
2           - - - - - -
3
4    PAGE  LINE  CHANGE
5    ____  ____  _____
6        REASON: _____
7    ____  ____  _____
8        REASON: _____
9    ____  ____  _____
10       REASON: _____
11   ____  ____  _____
12       REASON: _____
13   ____  ____  _____
14       REASON: _____
15   ____  ____  _____
16       REASON: _____
17   ____  ____  _____
18       REASON: _____
19   ____  ____  _____
20       REASON: _____
21   ____  ____  _____
22       REASON: _____
23   ____  ____  _____
24       REASON: _____

Page 77

1        LAWYER'S NOTES
2    PAGE  LINE
3    ____  ____  _____
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____