# EXHIBIT D

Confidential - Attorneys' Eyes Only

Page 603

SUPERIOR COURT OF NEW JERSEY

LAW DIVISION

ATLANTIC COUNTY

MASTER CASE 6341-10

CASE NO. 291 CT

- - -

IN RE:

PELVIC MESH/GYNECARE

LITIGATION

- - -

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Friday, December 20, 2013

VOLUME III

- - -

Continued videotaped deposition of JAMES
C. HART, M.D., held at RIKER DANZIG, SCHERER, HYLAND
& PERRETTI, L.L.P., Headquarters Plaza, One Speedwell
Avenue, Morristown, New Jersey, commencing at
approximately 9:54 a.m., before Rosemary Locklear, a
Registered Professional Reporter, Certified Realtime
Reporter, Certified Court Reporter (NJ License No.
30XI00171000), and Notary Public.

- - -

GOLKOW TECHNOLOGIES, INC.

877.370.3377 ph|971.591.5672 Fax

deps@golkow.com

Confidential - Attorneys' Eyes Only

Page 604

```
 1   APPEARANCES:
 2
 3        MAZIE SLATER KATZ & FREEMAN, L.L.C.
          BY:  ADAM M. SLATER, ESQUIRE
 4        aslater@mskf.net
          103 Eisenhower Parkway, 2nd Floor
 5        Roseland, New Jersey 07068
          (973) 228-9898
 6             and
          HANLY CONROY BIERSTEIN SHERIDAN FISHER HAYES,
 7        L.L.P.
          BY:  THOMAS I. SHERIDAN, III, ESQUIRE
 8        tsheridan@hanlyconroy.com
          112 Madison Avenue
 9        New York, New York 10016-7416
          (215) 784-6446
10             and
          FREESE & GOSS, P.L.L.C.
11        BY:  JOHN P. HARLOE, J.D., Ph.D. (via telephone
          and realtime stream)
12        3031 Allen Street, Suite 200
          Dallas, Texas 75204
13        (215) 761-6610
          Appearing on behalf of the Plaintiffs
14
15
          BUTLER, SNOW, LLP
16        BY:  NILS B. (BURT) SNELL, ESQUIRE
          burt.snell@butlersnow.com
17        500 Office Center Drive, Suite 400
          Fort Washington, Pennsylvania 19034
18        (267) 513-1884
          Appearing on behalf of the Defendants Johnson &
19        Johnson and Ethicon
20
          SANDBERG PHOENIX & VON GONTARD, P.C.
21        BY:  JENNIFER MILLER-LOUW, ESQUIRE
          (via telephone)
22        jmiller@sandbergphoenix.com
          2015 West Main Street, Suite 109
23        Carbondale, Illinois 62901
          (618) 351-7200
24        Appearing on behalf of the Defendants Dr.
          Elisabeth G. Beyer-Nolen and Heartland Women's
25        Healthcare, Ltd.
```

Confidential - Attorneys' Eyes Only

Page 605

1   ALSO PRESENT:

2

3        CHRISTOPHER CAMPBELL, Video Operator

4

5

6                    - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Attorneys' Eyes Only

Page 606

```
 1                    I N D E X
 2
 3   WITNESS                              PAGE
 4
 5   JAMES C. HART, M.D.
 6
 7              By Mr. Slater      612, 918, 970
 8              By Mr. Sheridan             809
 9              By Mr. Snell       810, 961, 979
10
11                   - - -
12
13              EXHIBIT INDEX
14   NUMBER                             MARKED
15
16   T-1340A    2-page copy of document dated    628
                3/22/10 entitled "Appendix 6,
17              Amendment and Administrative
                Change Approval Form,"
18              ETH.MESH.00408092 -
                ETH.MESH.00408093
19
     T-1341A    55-page copy of document dated   628
20              3/22/10 entitled "A Prospective,
                Multi-centre Study to Evaluate
21              the Clinical Performance of the
                GYNECARE PROLIFT+M Pelvic Floor
22              Repair System as a Device for
                Pelvic Organ Prolapse,"
23              ETH.MESH.00408099 -
                ETH.MESH.00408153
24
25
```

Confidential - Attorneys' Eyes Only

Page 607

```
 1              EXHIBIT INDEX (Continued)
 2   NUMBER                                   MARKED
 3
 4   T-1342A    3-page copy of document entitled   654
                "Final Protocol,"
 5              ETH.MESH.00408351 -
                ETH.MESH.00408353
 6
     T-1343A    51-page copy of document dated     654
 7              8/10/07 entitled "A Prospective,
                Multi-centre Study to Evaluate
 8              the Clinical Performance of the
                GYNECARE PROLIFT+M Pelvic Floor
 9              Repair System as a Device for
                Pelvic Organ Prolapse,"
10              ETH.MESH.00408354 -
                ETH.MESH.00408404
11
     T-1344A    6-page copy of document entitled   661
12              "Gynecare TVT,"
                ETH.MESH.03427878 -
13              ETH.MESH.03427883
14   T-1345A    2-page copy of memo dated          674
                12/2/99 to R. Rousseau from
15              Thomas A. Barbolt, Ph.D.,
                D.A.B.T., ETH.MESH.00220335 -
16              ETH.MESH.00220336
17   T-1346A    1-page copy of document dated      675
                5/14/01 entitled "Target Sheet,"
18              ETH.MESH.00220297
19   T-1347A    6-page copy of document entitled   752
                "Gynecare TVT,"
20              ETH.MESH.00339437 -
                ETH.MESH.00339442
21
     T-1348A    8-page copy of document entitled   761
22              "The Leader in Midurethral Sling
                Devices for the Treatment of
23              SUI," ETH.MESH.00658058 -
                ETH.MESH.00658065
24
25
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Attorneys' Eyes Only

Page 608

```
 1                EXHIBIT INDEX (Continued)
 2   NUMBER                                         MARKED
 3
 4   T-1349A    5-page copy of document entitled    769
                "Make Data and Safety Your
 5              Choice," ETH.MESH.01186068 -
                ETH.MESH.01186072
 6
     T-1350A    2-page copy of document entitled    779
 7              "Gynecare TVT Family of Products
                Tension-free Support for
 8              Incontinence," ETH.MESH.02237103
                - ETH.MESH.02237104
 9
     Hart D-1   56-page copy of document            840
10              entitled "Placeholder,"
                ETH.MESH.03361293
11
     Hart D-2   9-page copy of article dated        846
12              1/12 entitled "One-Year
                Objective and Functional
13              Outcomes of a Randomized
                Clinical Trial of Vaginal Mesh
14              for Prolapse"
15
16
17
18
                         - - -
19
20
21
22
23
24
25
```

Confidential - Attorneys' Eyes Only

Page 609

1            EXHIBITS PREVIOUSLY REFERENCED

2

3    NUMBER    PAGE                   NUMBER    PAGE

4

5     243      613

6     T-1225    616

7     T-3142    691

8     T-1338    734

9     T-1333    737

10    T-1312    835

11    T-1311    837

12    T-1317    850

13    T-858     858

14    T-1324    868

15    T-1323    863

16    409      873

17    T-1303    893

18    T-1329    898

19    T-1337    901

20    T-1330    915

21    T-1331    915

22    T-1332    915

23    858      966

24

25

Confidential - Attorneys' Eyes Only

Page 610

1                    CONFIDENTIAL DESIGNATION INDEX

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Attorneys' Eyes Only

Page 611

1                  CONFIDENTIAL DESIGNATION INDEX

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Attorneys' Eyes Only

Page 612

1               VIDEO OPERATOR:  We are now on the record.

2          My name is Christopher Campbell.  I'm a

3     videographer for Golkow Technologies.

4               Today's date is December 20th, 2013, and

5     the time is 9:54.  This deposition is being held in

6     Morristown, New Jersey, In Re:  Pelvic Repair

7     Systems, for the Superior Court of New Jersey,

8     Atlantic County.  The deponent is Dr. James Hart.

9               Counsel will be noted on the stenographic

10    record.  Our court reporter is Rosemary Locklear, and

11    she will now swear in the witness.

12              JAMES C. HART, M.D., having been duly

13    sworn, was examined and testified as follows:

14                    EXAMINATION (Continued)

15    BY MR. SLATER:

16         Q.    All right.  Good morning, Dr. Hart.

17         A.    Morning.

18         Q.    I gave you some instructions and

19    explanation about a deposition proceeding when we

20    started this deposition.  Any need for me to go over

21    any of that with you?

22         A.    No.

23         Q.    Terrific.  In front of you is Exhibit --

24    let me start over.

25              In front of you is an exhibit which was

Confidential - Attorneys' Eyes Only

Page 613

1   marked as Exhibit 243, titled "biocompatibility is

2   the science of living better."

3                MR. SLATER:  All clipped?  I'll start

4   over.

5   BY MR. SLATER:

6        Q.    In front of you is Exhibit Number 243,

7   which is a sales aid titled "biocompatibility is the

8   science of living better" and has to do with the

9   Prolift+M.

10               Do you see that in front of you?

11       A.    I do.

12       Q.    Right at the very bottom of the first page

13  there's a sentence that says, designed for improved

14  patient comfort, Prolift+M gives you a more advanced

15  graft so your patient gets more with less.

16               Do you see that?

17       A.    I do.

18       Q.    If you could now turn to the page that's

19  actually third from the end.  There's an 84 at the

20  end of the Bates number.

21       A.    Uh-huh.

22       Q.    This says at the top, Prolift+M, the graft

23  that keeps caring for your patient after surgery.

24               See that?

25       A.    I do.

Confidential - Attorneys' Eyes Only

Page 614

1      Q.     And then if you go further down, there's a
2  paragraph that starts out, using the new Gynecare
3  Prolift+M pelvic floor repair system.
4             You see that paragraph?
5      A.     Uh-huh.
6      Q.     And it talks about demonstrated excellent
7  results with this device.  Do you see that?  At the
8  very end of that paragraph it says, have demonstrated
9  excellent results.
10            Do you see that?
11     A.     Yeah.
12     Q.     And then it talks about what those
13 excellent results have been and there's three bullet
14 points.  I'd like to go through them one at a time
15 with you.
16            The first one, a pronounced reduction in
17 inflammation and improved integration into
18 surrounding tissue; the second one, reduced foreign
19 body response; and the third one, less fibrosis than
20 traditional grafts.
21            See where I'm reading?
22     A.     I do.
23     Q.     And, in essence, in this sales aid that
24 would be provided to physicians the doctors are being
25 told that with the Prolift+M they can expect these

Confidential - Attorneys' Eyes Only

Page 615

1    improved characteristics.

2              That's what the words say; correct?

3    A.    Designed for, yeah.

4    Q.    If you go to the next page, at the top it

5    talks about, again, the material science now and at

6    the top it talks about in your hands, talking to the

7    physician, and then it talks about in your patient's

8    body what it's designed to do.

9              Do you see that on the top right?

10   A.    Yes.

11   Q.    And in the patient's body the doctors are

12   told, resist wound contraction, otherwise known as

13   shrinkage, offer improved tissue integration, result

14   in softer, more supple tissue.

15             See that?

16   A.    Yes.

17   Q.    And, again, this type of a document would

18   be reviewed by medical affairs to make sure that any

19   of the representations that are made as to the

20   clinical attributes of the device are accurate;

21   correct?

22   A.    Correct.

23   Q.    And medical affairs is required to make

24   sure that claims are not made in a document like this

25   unless they can be verified by data; correct?

Confidential - Attorneys' Eyes Only

Page 616

1          MR. SNELL:  Form.

2          THE WITNESS:  Oftentimes, will refer to

3    data.  But they -- they are held accountable to

4    review for accuracy and scientific accuracy.

5    BY MR. SLATER:

6      Q.    So, in other words -- well, I'll rephrase.

7          And medical affairs as part of its

8    oversight responsibilities has to make sure that any

9    claims made in this type of a document have

10   scientific accuracy; correct?

11     A.    Yeah, that's their job.  Yeah.

12     Q.    Okay.  Let's go to the next document,

13   which -- and we're done with that one.

14          What I've -- what I've handed you is a

15   document titled "Postmarket Surveillance Study," and

16   it was marked at previous depositions as Plaintiffs'

17   Exhibit 1225 and also at Brian Kanerviko's deposition

18   as Exhibit 8.  You can see the little copies of the

19   stickers there.

20          Do you see that at the bottom?

21     A.    I do.

22     Q.    And what this is is Ethicon's response to

23   the FDA in response to the 522 Order for the Prolift

24   and Prolift+M.

25          And that's a process you were involved

Confidential - Attorneys' Eyes Only

Page 617

1    with, to some extent; correct?

2         A.    I had visibility to, yeah.

3         Q.    And what I'd like you to do now is I'd

4    like to ask you to turn to Page 19.  Page 19, there's

5    a table which provides information about mesh

6    exposures seen in patients that went through the

7    Prolift+M clinical study.

8              Do you see that in front of you?

9         A.    Let me just have a look here.

10             Okay.  Yes.

11        Q.    The table actually is titled "Table 2.e:

12   Mesh exposure rate and severity of incidence over

13   time," and it then gives information about the

14   various patients who had exposures and what treatment

15   was provided and essentially when these occurred.

16             Do you see that?

17        A.    Yeah.  Uh-huh.

18        Q.    The table shows that there were a total of

19   19 mesh exposures, and it talks about what treatment

20   the patients had.  It says three of them had medical

21   treatment.

22             That would mean estrogen cream or

23   something non-surgical, non-procedural; correct?

24        A.    I would assume so, yeah.

25        Q.    Then it talks about minor outpatient

Confidential - Attorneys' Eyes Only

Page 618

1    surgery.  That would be -- there's actually an

2    asterisk.  It says, not possible to differentiate

3    between intra-office and outpatient surgery.

4              But it means somebody was not actually

5    admitted to the hospital, even though a surgical

6    procedure was performed; correct?

7        A.    Correct.

8        Q.    And it says 10 of the 19 mesh exposures

9    were treated surgically, whether in the office of the

10   doctor or at a hospital; correct?

11             MR. SNELL:  Form.  You meant 11.

12             MR. SLATER:  I'll ask it differently.

13             MR. SNELL:  You miscounted.  That's the

14   only reason why.  It's 11, not 10.

15             MR. SLATER:  It says 10 right there.

16             MR. SNELL:  Okay.  I heard you.

17             MR. SLATER:  I'll ask the question again.

18   BY MR. SLATER:

19       Q.    So what this is basically -- rephrase.

20             So this is telling us that 10 of the

21   people who had exposures had a surgical procedure,

22   whether it was in the office or in the hospital on an

23   outpatient basis, to treat their exposures.  That's

24   what this table shows us; correct?

25       A.    Yes.  It didn't necessarily have to be a

Confidential - Attorneys' Eyes Only

Page 619

1    hospital but they -- they had surgical procedures in
2    the office or another facility.
3         Q.    It could be a hospital, it could be a
4    surgicenter, something like that.
5         A.    Correct.
6         Q.    That's what you're referring to?
7         A.    Yes.
8         Q.    Okay.  Four of the patients had inpatient
9    surgery.  And that would mean the patient was
10   actually admitted to a hospital to have a procedure,
11   an operative procedure, to treat the exposure;
12   correct?
13        A.    That would seem reasonable.  I presume
14   that's what they meant.
15        Q.    That would seem reasonable because the
16   other outpatient surgery means they were on an
17   outpatient basis.  The only one left is inpatient,
18   and that's when you're admitted; correct?
19        A.    Yes.
20        Q.    Okay.  So we know that 14 of the 19 were
21   treated either in an office or in an outpatient basis
22   or in a hospital as an inpatient with a surgical
23   procedure for their exposures.
24              That's what this documents; correct?
25        A.    Yes.

Confidential - Attorneys' Eyes Only

Page 620

1          Q.    And any patient who had a surgical

2     procedure, whether in a doctor's office, whether in

3     an outpatient setting, whether as an inpatient in a

4     hospital, none of those would be characterized as

5     mild, by definition, because a procedure was actually

6     performed to treat the exposure; correct?

7                    MR. SNELL:  Form.

8                    THE WITNESS:  Mild what?  I don't --

9     BY MR. SLATER:

10         Q.    You would not refer to an exposure as a

11    mild exposure if it required a surgical procedure,

12    whether in a doctor's office, at a surgicenter or at

13    a hospital; correct?

14                   MR. SNELL:  Same objection.

15                   THE WITNESS:  Not necessarily, I don't

16    think.

17                   I mean, I would just -- it's a -- it's a

18    spectrum of how do you want to characterize.  I think

19    it's better rather than using an adjective that's so

20    nonspecific like "mild," I would say they -- they

21    required surgical intervention for their treatment

22    and --

23    BY MR. SLATER:

24         Q.    If someone -- well, rephrase.

25                   As I'm asking you now, if you were given

Confidential - Attorneys' Eyes Only

Page 621

1    the option to describe these exposures where an

2    operative procedure was performed to treat them as

3    either mild, moderate or severe, you would not choose

4    the word "mild," in light of the fact that they had

5    a --

6           A.    Well, I'm not sure --

7           Q.    -- operative procedure; correct?

8           A.    I'm not sure that that's true.  If they had

9    a -- if they had a tiny erosion but that was -- the

10   physician felt it was best treated with a minor

11   procedure best done in a facility, then it still

12   could be, in my opinion, a mild complication.  I

13   mean, it's -- it's -- you know, it's just a

14   definition.  How do you want to define mild?

15          Q.    Are you aware that you've already

16   testified that if a mesh exposure occurs and there's

17   a revision procedure, that that's a serious adverse

18   event?

19          A.    It is a serious adverse event.  It's a

20   different -- that's a definition based on sort of

21   clinical research definitions.

22          Q.    Turn to the prior page, if you could.

23                At the bottom of the table on the

24   cumulative rate and severity of adverse events from

25   this Prolift+M study at the very bottom there are

Confidential - Attorneys' Eyes Only

Page 622

1   definitions of mild, moderate and severe.

2            Do you see that?

3       A.   So, again, that's -- so that --

4       Q.   I'm only asking, do you see those

5   definitions that your company supplied in this

6   document?

7       A.   Yes.

8       Q.   Okay.  And it defines mild -- rephrase.

9            This set of definitions defines mild as

10  awareness of a sign or symptom that does not

11  interfere with the subject's usual activity or is

12  transient, resolved without treatment and with no

13  sequelae.

14           Do you see that?

15      A.   I do.

16      Q.   So, by definition, if you needed to have

17  an operative procedure, it would not be mild.

18      A.   So in a -- in the -- in the realm of

19  clinical research, when you define adverse events

20  as -- so there's mild, moderate and severe.  That's

21  different than serious and non -- and not serious.

22  Those are two different kinds of definitions.  And,

23  yes, in clinical research this definition applies for

24  the -- for the -- or this definition of mild is

25  accurate.

Confidential - Attorneys' Eyes Only

Page 623

1      Q.    So under the definition of mild that's
2  used in the clinical research context, a -- a mesh
3  exposure would not be termed mild if an operative
4  procedure was performed to treat it; correct?
5           MR. SNELL:  Form.
6           THE WITNESS:  So it would not be
7  considered mild but not because it required an
8  operative procedure but, rather, it fit this
9  definition.
10          Serious is because it requires -- you
11 would call it serious because it required an
12 intervention.
13 BY MR. SLATER:
14     Q.    This is what I'm asking you.  Because
15 you've talked about adverse events being a different
16 area, so I'm going to -- I'm not talking about that
17 anymore.
18     A.    Okay.
19     Q.    In clinical research, which this document
20 is talking about clinical research, when an adverse
21 event in the context of a clinical research study is
22 described --
23     A.    Right.
24     Q.    -- you would not describe that adverse
25 event as mild if an operative procedure was performed

Confidential - Attorneys' Eyes Only

Page 624

1  to treat the complication, in this case, a mesh

2  exposure.

3           MR. SNELL:  Form.

4           THE WITNESS:  I think that's broadly true.

5           MR. SLATER:  Okay.

6  BY MR. SLATER:

7      Q.    Now, what I'd like to do is go back now to

8  the table that we talked about earlier on Page 19.

9           On Page 19 just above the table where we

10  established 14 of 19 mesh exposures were treated with

11  an operative procedure -- right?

12     A.    Uh-huh.

13     Q.    Just above that it says, the overall

14  incidence of mesh exposure to 36 months was 14.8

15  percent, with the majority of the mesh exposures

16  occurring in the first 12 months.  And then it says,

17  and with the exception of two exposures, all were

18  considered to be mild in nature.

19          Do you see that?

20     A.    Uh-huh.

21     Q.    Based on the definition we've discussed in

22  a clinical study like this, you would not want to

23  describe a mesh exposure as mild where an operative

24  procedure had to be performed to treat it; correct?

25     A.    So I think --

Confidential - Attorneys' Eyes Only

Page 625

1          MR. SNELL:  Form.

2          THE WITNESS:  I think they're talking

3    about two different things.  They're talking about

4    sort of the -- the severity of the exposure, so there

5    was an exposure so, therefore, it's a serious adverse

6    event, and you would not classify it in clinical

7    research as a mild adverse event.

8          You -- they're just -- I think they're

9    just putting an adjunct against what was the level of

10   concern or how -- how bad did the -- did the

11   physician think the exposure was as an exposure.

12   That's -- I think it's a different thing.

13   BY MR. SLATER:

14        Q.   Well --

15        A.   But I --

16        Q.   -- let me ask it this way:  Four of the

17   women had to be admitted to a hospital to have an

18   operative procedure in the hospital.

19          Nobody could reasonably describe those as

20   mild exposures, when a woman had to be admitted to a

21   hospital; correct?

22        A.   I don't know.  It depends on why they had

23   to be admitted.

24        Q.   Let's come back to what you said, Dr.

25   Hart.

Confidential - Attorneys' Eyes Only

Page 626

1           We've already established that in the
2    clinical study context --
3        A.     Right.
4        Q.     And this is the clinical study context;
5    right?
6        A.     This table is, yes.
7        Q.     You would not want to describe a mesh
8    exposure as mild if a surgical procedure had to be
9    performed to treat it; correct?
10           MR. SNELL:  Form.
11           THE WITNESS:  I don't know that to be
12    true.  I mean, depends on -- I mean, within the
13    clinical research definition of mild, it's not mild.
14    I agree to that.  No question.
15           If you -- if you talk to a urogynecologist
16    who's taking care and intervening upon a particular
17    erosion or exposure, you know, you would say was that
18    a mild, moderate or severe exposure, they would
19    probably not -- they're not going to be thinking in
20    clinical research definition terms, I don't think.
21           So they -- if you -- if you had a woman
22    that required a relatively minor procedure but she
23    had other co-morbidities, you may want to admit her
24    to the hospital.  I don't know why they were
25    admitted.  So I don't think it necessarily correlates

Confidential - Attorneys' Eyes Only

Page 627

1   with the severity or the -- you know, the difficulty

2   of the exposure or the care of the exposure.

3            MR. SLATER:  Rosemary, could you just read

4   me his answer slowly and I'll tell you when to stop

5   and I'll tell you where I'm moving to strike from.

6            (The court reporter read the requested

7   portion of the record.)

8            MR. SLATER:  You could stop.

9            Move to strike from "if you talk" forward.

10  BY MR. SLATER:

11       Q.    The context of this presentation and this

12  information is clinical research; right?  The

13  Prolift+M study was a clinical research study?

14       A.    It was.

15       Q.    And in that context, as the term "mild" is

16  defined, you would not define a mesh exposure as mild

17  if a surgical procedure had to be performed to treat

18  it; correct?

19       A.    Correct.

20            MR. SNELL:  Form.

21  BY MR. SLATER:

22       Q.    And this was information that your company

23  provided to the FDA in response to the 522 Order;

24  correct?

25       A.    I believe so, yes.  Yes, it is.

Confidential - Attorneys' Eyes Only

Page 628

1      Q.    Okay.  Okay.  We can put that aside.

2            (Exhibit T-1340A was marked for

3   identification.)

4            (Exhibit T-1341A was marked for

5   identification.)

6            MR. SLATER:  Burt, this is for Dr. Hart.

7            MR. SNELL:  Thank you.

8            MR. SLATER:  This is for you.

9            MR. SNELL:  Thank you.

10           MR. SLATER:  Thomas.  Okay.

11  BY MR. SLATER:

12     Q.    Dr. Hart, what I've provided you is two

13  exhibits, and they go together.

14           Exhibit 1340 is a set of signatures and

15  1341 is the document to which the signatures apply,

16  which is the final, final version of the protocol for

17  the Prolift+M clinical study.

18           Do you see those documents in front of

19  you?

20     A.    Uh-huh.  Yes.

21     Q.    And you see that on Exhibit 1340, the list

22  of signatures, you actually signed off on the

23  protocol as vice-president of medical affairs in

24  Ethicon; correct?

25     A.    Correct.

Confidential - Attorneys' Eyes Only

Page 629

1      Q.     Now, if you could, tell me in simple terms
2   the purpose of the protocol that we've marked as
3   Exhibit 1341.  In just simple, general terms, what is
4   the purpose of this document?
5      A.     So the -- a protocol within a clinical
6   research effort would be the document that describes
7   the -- the nature of the experiment, if you will,
8   that's to be undertaken and the methodology or the --
9   yeah, the methodology by which the experiment will be
10  run.
11     Q.     When this document was written -- and it's
12  actually signed -- well, rephrase.
13            If you turn to the second page of it,
14  there's actually a signature by David Robinson, the
15  medical director?
16     A.     Yes.
17     Q.     What's the purpose of having David
18  Robinson sign this document?
19     A.     As the medical director, he has -- he has
20  reviewed it and has agreed with its form.
21     Q.     As a medical director, he has read this
22  document, presumably, every word, and he's confirming
23  with his signature that everything stated in this
24  document is accurate; correct?
25     A.     Yes.

Confidential - Attorneys' Eyes Only

Page 630

1          Q.    Let's turn, if we could --

2                MR. SNELL:   Excuse me.

3     BY MR. SLATER:

4          Q.    -- to Page 8.  Actually, let me -- let me

5     take a step back.  Let's turn to Page 7, if we could.

6                Page 7 provides a synopsis of the

7     protocol.  That's what it's titled there; right?

8          A.    Yes.

9          Q.    Synopsis would just be a summary of some

10    key points?

11         A.    Yes.

12         Q.    And it points out at the top what the

13    objectives are and then it goes through the study

14    design and then the study population as you go down;

15    correct?

16         A.    Yes.  Uh-huh.

17         Q.    The study population, it indicates, in

18    order for a woman to be included in this study, she

19    must have symptomatic pelvic organ prolapse of ICS,

20    which would be the International Continence Society,

21    POPQ Stage 3 or 4, suitable for surgical repair.

22               Do you see that?

23         A.    I do.

24         Q.    And when it says that a woman must meet

25    the following inclusion criteria, what's the

Confidential - Attorneys' Eyes Only

Page 631

1  significance of that in terms of a clinical study

2  like this?

3       A.    It's -- the inclusion criteria and the

4  exclusion criteria would be the criterion -- the

5  criteria by which you define the study population,

6  who -- what is -- what is the population of patients

7  or subjects that you want to study.

8       Q.    Why is an exclusion criteria established

9  for a study like this?

10      A.    Well, to -- you want -- you're -- well,

11  there could be a lot of reasons, but you're trying to

12  homogenize the population so that the experiment

13  can -- you can reduce confounding variables.  You're

14  trying -- you're trying to isolate so you can study

15  and test your hypothesis.

16             Exclusion could also be in place if you

17  think -- if you think there are subjects who should

18  not be included for medical reasons or -- I mean,

19  they're people who should be excluded because they

20  won't contribute to the experiment.

21      Q.    And let's look to the next page.  On Page

22  8 there's a heading that says, subjects who meet any

23  of the following criteria will be excluded from

24  participating in the study.

25             So these are categories of women that your

Confidential - Attorneys' Eyes Only

Page 632

1    company decided should not be studied; correct?

2         A.    Should not be part of this study, yeah.

3         Q.    Item Number 2 of the exclusion criteria

4    says, previous repair of pelvic organ prolapse

5    involving insertion of mesh.

6               Do you see that?

7         A.    I do.

8         Q.    So your company decided that if a woman

9    had previously had mesh inserted for a repair of some

10   form of pelvic organ prolapse, she should not be

11   included in this study; correct?

12        A.    Correct.

13        Q.    Let's go down further.  Item -- let me --

14   let me start over.

15              Item Number 7 in the exclusion criteria

16   says, history of any pelvic radiation therapy.

17              Why was that an exclusion criteria?

18        A.    Again, if you're -- if you're studying the

19   output of surgery or the -- the outcome of surgery,

20   in this particular case pelvic floor surgery, they

21   wanted to exclude any confounding influence that

22   radiation may have had on -- on the outcome.

23        Q.    Was your company also aware that a woman

24   who had undergone pelvic radiation therapy may have

25   issues with being able to heal or whether or not

Confidential - Attorneys' Eyes Only

Page 633

1   she'd be compatible with having polypropylene

2   implanted in her body?

3        A.   I don't think it has anything to do with

4   whether -- whether she had polypropylene put in her

5   body, but certainly radiation is a known risk factor

6   for adequacy of healing or robustness of healing.

7        Q.   Let me ask you this:  Did your company

8   ever study what would happen with a woman who had

9   pelvic mesh put in her body, any of your pelvic mesh

10  devices, and then later would develop cancer or a

11  similar disease and need to undergo either radiation

12  or chemotherapy or something like that?

13       A.   Not --

14       Q.   Did you ever -- did your company ever look

15  at that issue?

16       A.   Not that I'm aware of.

17       Q.   You would certainly agree with me that if

18  a woman has one of your pelvic mesh devices in her

19  body and then develops cancer and undergoes

20  radiation, chemotherapy, similar oncologic cancer

21  type treatments, that could have an impact on the --

22  the mesh within her body; correct?

23            MR. SNELL:  Form.

24  BY MR. SLATER:

25       Q.   Or her body's ability to tolerate the

Confidential - Attorneys' Eyes Only

Page 634

1    mesh.

2             MR. SNELL:  Form and foundation.

3             THE WITNESS:  No, I'm not aware of that

4    connection.

5    BY MR. SLATER:

6        Q.    Did you ever look at that subject?

7        A.    No.

8        Q.    The Exclusion Criteria Number 10 says,

9    current evaluation or treatment for chronic pelvic

10   pain.  For example -- example, interstitial cystitis,

11   endometriosis, coccydynia or vulvodynia.

12            That's one of the exclusion criteria for

13   this study; correct?

14       A.    It is, uh-huh.

15       Q.    And when it talks about current

16   evaluation, that would be if a woman is being

17   examined and they're considering maybe she has

18   interstitial cystitis, for example, she would meet

19   the exclusion criteria; right?

20       A.    Yeah.  So if she was being thought of as a

21   potential candidate for this study and her physician

22   said I believe she has one of these conditions, then

23   she would not be eligible.

24       Q.    Well, if somebody is going to be evaluated

25   for one of these conditions, it doesn't necessarily

Confidential - Attorneys' Eyes Only

Page 635

1    mean it's been established they have it, it just

2    means that it's being entertained as a possible

3    diagnosis and an evaluation is ongoing.

4          A.    Yeah.  So -- so the evaluation would imply

5    that she does have pelvic pain.  It may or may not

6    have been established what the reason for the pain

7    is.

8          Q.    So if a doctor -- and I'm just taking the

9    first one in the list --

10         A.    Uh-huh.

11         Q.    -- entertains the possibility that a woman

12   had interstitial cystitis and part of his treatment

13   of her included some sort of an evaluation to

14   determine one way or the other, she would be excluded

15   from this study; correct?

16         A.    I think if she had pelvic pain and

17   interstitial cystitis was being considered as part of

18   the differential diagnosis, she would have been --

19   she should have been excluded, yes.

20         Q.    Okay.  If you could, go to Page 14.

21         A.    Okay.

22         Q.    Page 14 of the Prolift+M clinical study

23   protocol is the introduction section; right?

24         A.    Correct.

25         Q.    What is the purpose of this section in

Confidential - Attorneys' Eyes Only

Page 636

1    this protocol?

2         A.    I think all clinical protocols driven by

3    relevant standards call for an introduction section

4    just to -- to frame up the -- the clinical condition

5    for which the experiment is being undertaken.

6         Q.    Would the purpose include setting the

7    context for why the study is being performed?

8         A.    Sure.  Yeah.

9         Q.    If you could, turn to Page 15, the second

10   page of the introduction.

11             It says at the top, synthetic meshes,

12   first used for abdominal wall hernia repairs, are

13   often produced from materials originally used for

14   sutures.

15             And that's just a statement of fact that

16   originally sutures were used, then people began to

17   create meshes and began to use those meshes to treat

18   hernia.  That's just a historical fact in terms of

19   the progression; right?

20             MR. SNELL:  Form.

21             THE WITNESS:  Can you just restate that?

22   Because I have one question about it.

23             MR. SLATER:  Sure.

24             You know, it doesn't matter.

25             VIDEO OPERATOR:  Doctor.

Confidential - Attorneys' Eyes Only

Page 637

1    BY MR. SLATER:

2         Q.    Dr. Hart --

3         A.    Yeah.

4         Q.    -- you're covering your mic.

5         A.    Oh, I'm sorry.

6         Q.    Okay.  The second sentence -- well,

7    rephrase.

8              The second sentence here on Page 15 points

9    out that synthetic meshes are able to provide support

10   where autologous tissues are not adequate.

11             Autologous tissues would be the woman's

12   own natural tissue; correct?

13        A.    Correct.

14        Q.    But they -- rephrase.

15             It's pointed out here that synthetic

16   meshes are able to provide support where autologous

17   tissues, which is the woman's own natural tissue, are

18   not adequate but they do add the risks of erosion and

19   rejection.

20             And that's just a statement of fact;

21   correct?

22        A.    It is.  I don't -- I don't agree with it,

23   but it is a statement of fact there.

24             So I -- I -- I would think rejection is

25   something different.  Rejection to me is a

Confidential - Attorneys' Eyes Only

Page 638

1  immunologic reaction to a transplanted tissue.

2  That's -- to me, that's rejection.  But certainly

3  erosion.

4      Q.    Do you know why the term "rejection" was

5  used here?

6      A.    No.  It's -- I think -- my opinion, it's a

7  common mistake that's in the literature when they

8  call this rejection.  I don't think it's really

9  rejection.

10     Q.    When the literature or even your own

11 internal documents refer to rejection of the mesh,

12 what is it that they are saying?  Because, obviously,

13 they're not talking about an immunologic rejection,

14 as you've described it --

15     A.    Right.

16     Q.    -- so what is the intended definition?

17     A.    So I'm -- I'm -- I'm speculating because I

18 don't -- I didn't write this and I don't use that

19 word in this context, but I believe they -- they -- I

20 speculate that they could mean the body could have,

21 some people's reaction could be stronger than others'

22 in terms -- and foreign body reaction.  I mean, I

23 speculate that could be what they're talking about.

24     Q.    Are you referring to the fact there are

25 some women that just respond more negatively than

Confidential - Attorneys' Eyes Only

Page 639

1    other women?  It's just known that there's high

2    responders, lower responders?  Is that --

3         A.    Yeah.

4         Q.    Is that what you're talking about?

5         A.    Yeah, there's -- that's true of sort of all

6    responses to body insult, if you will.  And there's

7    variability in biologic response to anything,

8    including medicines and whatever.  Yeah.

9         Q.    This introduction at the top of Page 15

10   points out that synthetic meshes can provide support

11   where the woman's own natural tissue is not adequate

12   but the tradeoff is it adds the risks of erosion and

13   rejection.

14             That's what it says here; correct?

15             MR. SNELL:  Form.

16             THE WITNESS:  It does.

17   BY MR. SLATER:

18        Q.    And that was --

19             MR. SLATER:  I'm sorry.  What's your

20   objection?

21             MR. SNELL:  Form.  Asked and answered.

22   He's already -- you've already -- this is the second

23   time you've covered that.

24             MR. SLATER:  It's a different objection.

25   It's not form.

Confidential - Attorneys' Eyes Only

Page 640

1              MR. SNELL:  No.  No.  No.  Asked and

2    answered is a form objection.

3              MR. SLATER:  Don't get excited.  I don't

4    want you coughing.

5              MR. SNELL:  I know.

6              MR. SLATER:  Go ahead.  Take a Luden's.

7    You'll be okay.

8              MR. SNELL:  Go ahead.

9              MR. SLATER:  Okay.

10   BY MR. SLATER:

11       Q.    David Robinson, we already established,

12   signed off on this for medical affairs; correct?

13       A.    That's correct, yeah.

14       Q.    And you signed off as well; correct?

15       A.    Uh-huh.

16       Q.    Did you have an understanding of what the

17   word "rejection" was referring to, as used in this

18   document, when you signed off?

19       A.    Yeah.  I can't recall reading this -- this

20   word in this document that many years ago so --

21   however, when I read "rejection" in this context, I

22   have my own reaction to it.  Every time is I don't

23   think that's the right word but...

24       Q.    Let's go to the next page.

25              On the third page of the introduction,

Confidential - Attorneys' Eyes Only

Page 641

1    which is Page 16 of the protocol, there is discussion
2    of the transvaginal mesh procedure and the Prolift;
3    correct?
4          A.    I'm sorry.  Where?
5          Q.    Right at the top of the page under the
6    table it says --
7          A.    Under the table.
8          Q.    -- the longest-term followup data is with
9    the precursor to the Prolift system, known as
10   transvaginal mesh.
11             See that?
12         A.    Yes, I do.
13         Q.    So there's a discussion about essentially
14   the -- well, rephrase.
15             So this now discusses on Page 16 the TVM
16   procedure and then talks about the Prolift; correct?
17         A.    It does, yeah.
18         Q.    And the reason to discuss the Prolift is
19   obviously because the Prolift+M is essentially the
20   same thing, just you're changing the mesh material.
21         A.    Yes.
22         Q.    Okay.  And in this document, which was
23   signed by David Robinson, the Prolift is discussed in
24   this paragraph on Page 16, the second paragraph.
25             Do you see that?

Confidential - Attorneys' Eyes Only

Page 642

1     A.     Uh-huh.

2     Q.     And what it says is, although the Prolift

3  significantly reduces recurrences compared to

4  traditional POP repairs -- and I want to stop there.

5            He's making that statement based on,

6  presumably, data that he had available to him?

7     A.     Yes.

8     Q.     Do you know what data he was relying on to

9  say that?

10    A.     No.

11    Q.     It's pointed out here that the Prolift

12 significantly reduces recurrences compared to

13 traditional repairs.  Well, rephrase.

14           It's pointed out here that the Prolift can

15 lead to complications such as mesh exposure and mesh

16 retraction.

17           Do you see that?

18    A.     I do.

19    Q.     And the document goes on, mesh exposure is

20 a common complication.  And I want to stop there.

21           In this document, which David Robinson

22 signed off on, he characterizes mesh exposure as a

23 common complication; correct?

24    A.     He did.

25    Q.     And this is a document you also signed off

Confidential - Attorneys' Eyes Only

Page 643

1    on; correct?

2            A.    Uh-huh.

3            Q.    You just have to say yes just --

4            A.    Yes.  Yes.

5            Q.    -- for our formality.  Thank you.

6                  If you go to the next sentence, it says,

7    mesh retraction, shrinkage, is less common but is

8    considered more serious.

9                  So it's saying mesh retraction happens

10   less commonly than mesh exposure?

11           A.    It does.

12           Q.    It --

13           A.    Yes.

14           Q.    The protocol points out that mesh

15   retraction can cause vaginal anatomic distortion,

16   which may eventually have a negative impact on sexual

17   function.

18                 That's one of the potential consequences

19   of mesh retraction with a Prolift; correct?

20           A.    Yes.

21           Q.    Further discussing the Prolift's

22   complications, this says, its treatment is -- well,

23   rephrase.

24                 And then it's pointed out, its treatment

25   is difficult, again talking about mesh retraction.

Confidential - Attorneys' Eyes Only

Page 644

1  Treating that is difficult; correct?  That's what it
2  says here.
3      A.    Well, I -- I presume they're referring to
4  the -- the sentence exactly preceding, eventually
5  have negative impact on sexual function.  Its
6  treatment is difficult.  Yeah.
7      Q.    This indicates further, the next
8  sentence -- rephrase.
9            In discussing the Prolift complications
10  this next says, additionally, the scar plate that
11  forms with ingrowth of tissue into the mesh can cause
12  stiffness of the vagina that further impacts sexual
13  function in a negative manner.
14            And that's a statement of a complication
15  that can occur with a Prolift; correct?
16      A.    Correct.
17      Q.    Finally, at the end of this sentence it's
18  pointed out, in an effort to minimize these
19  complications, a lighter-weight alternative mesh for
20  Prolift has been introduced.
21            And that's a statement of what your
22  company hoped would be the result of the use of the
23  Prolift+M, that these complications described here
24  could be reduced; correct?
25      A.    It was a hypothesis.

Confidential - Attorneys' Eyes Only

Page 645

1        Q.     It had not been proven; correct?

2        A.     Correct.

3        Q.     And even when the Prolift+M went on the

4    market, it still had not been proven; correct?

5        A.     Correct.

6        Q.     And, in fact, over the entire course of

7    time the Prolift+M was on the market it turned out it

8    did not reduce those complications; correct?

9        A.     I believe that to be true.  I don't have

10   the data, you know, solid in my head.

11       Q.     But from everything you can think of

12   now --

13       A.     I -- yeah, I don't --

14       Q.     -- that's a true statement; right?

15       A.     I can't -- I don't have evidence in my head

16   that says that's not a true statement.  Yeah.

17       Q.     Okay.  Go to the next page, if you could,

18   Page 17.

19              On Page 17 at the top there's a discussion

20   about Ultrapro, which is the trade name of the

21   partially absorbable material that your company began

22   to use with the Prolift and called it the Prolift+M;

23   right?

24       A.     Right.

25       Q.     In the second sentence it talks about the

Confidential - Attorneys' Eyes Only

```
                                          Page 646
 1   history of the use of Ultrapro.  Well, rephrase.
 2              This section talks about the fact that
 3   Ultrapro was currently indicated to treat hernias,
 4   stabilization of the abdominal wall; correct?
 5              MR. SNELL:  Where are you at?  I'm sorry.
 6              MR. SLATER:  Very top of the page.
 7              MR. SNELL:  Oh, you're on 17.  I'm sorry.
 8              THE WITNESS:  Yeah.
 9              MR. SNELL:  I was on the wrong page.
10              THE WITNESS:  Yes.
11              MR. SNELL:  Go ahead.
12              MR. SLATER:  I'll just ask it again just
13   because I don't want to make Burt a star.
14              MR. SNELL:  No.  That's my bad.  Sorry.
15              MR. SLATER:  That's okay.  No big deal.
16              MR. SNELL:  I was on the wrong page.
17              MR. SLATER:  That's fine.
18   BY MR. SLATER:
19        Q.   At the very top of Page 17, in discussing
20   the history with Ultrapro it points out, first of
21   all, that its current indication was to treat
22   hernias; right?  That's essentially what that first
23   sentence is saying; right?
24        A.   Yes.
25        Q.   Then it says, however, some gynecologists
```

Confidential - Attorneys' Eyes Only

Page 647

1  have used it for prolapse repair, though the
2  information gathered from these cases is limited due
3  to the small number of cases, the mesh was placed
4  from an abdominal rather than vaginal approach, the
5  size of mesh used was small relative to the current
6  intended use.
7           And that's just your company's overview of
8  what information you had from whatever doctors were
9  trying to use Ultrapro to treat prolapse up until
10  this point; fair?
11      A.    Fair.
12      Q.    And then if you go to the next sentence,
13  next section, it says, the rationale for the clinical
14  evaluation.  And that's essentially what, when we say
15  the rationale?
16      A.    So why is it that we want to undertake this
17  experiment.
18      Q.    And at the very bottom of that paragraph
19  it says, the purpose of this clinical study is to
20  evaluate the clinical performance of the Prolift
21  system with the new, lighter-weight mesh.
22           And that, in a nutshell, is the reason why
23  the Prolift+M clinical study was performed; correct?
24      A.    Yes.
25      Q.    If you could, let's go to Page 30.

Confidential - Attorneys' Eyes Only

Page 648

1    Actually, Page 31.  Okay.

2              Looking at Page 31, there's a Section 10.6

3    that says, anticipated adverse device effects.

4              What does that mean?

5         A.    So as part of a clinical protocol you would

6    want to define up front what adverse events might you

7    expect, based on your current knowledge of this --

8    this procedure or these materials and so forth, so

9    there -- there would be a set of potential

10   complications or adverse effects that are related to

11   device use that you might anticipate going into the

12   trial.

13        Q.    And in this case, as you look through

14   this, this is actually a bullet-pointed description

15   of what we had read before as the adverse events that

16   were known to occur with the Prolift, basically;

17   correct?

18             MR. SNELL:  Form.

19             THE WITNESS:  Oh, and any other surgery

20   in -- in that area for this condition, but yes.

21   BY MR. SLATER:

22        Q.    Well, if you were to compare what's on

23   Page 31, those bullet points --

24        A.    Uh-huh.

25        Q.    -- to the paragraph on Page 16 in the

Confidential - Attorneys' Eyes Only

Page 649

1    introduction that discussed the complications known

2    with the Prolift, it's the same information.

3          A.    Yes.

4          Q.    Okay.  So --

5          A.    Well, hang on one second.  Sorry.

6                So the last bullet on Page 31 is not

7    included in 16.  I think the punctured lacerations,

8    vessels, nerves, et cetera, I don't think is on Page

9    16.

10         Q.    As we look at 10.6, the anticipated

11   adverse device effects, these anticipated

12   complications are complications that were known to

13   occur with the Prolift and that's why it was

14   anticipated they would occur to some of the patients

15   with the Prolift+M; correct?

16         A.    Correct.

17         Q.    And if we go through this table, the first

18   one is, mesh exposure is a common complication, which

19   can be managed by excision and closure.

20               Do you see that?

21         A.    Uh-huh.  Yes.

22         Q.    The second one, mesh retraction or

23   shrinkage is less common but is considered more

24   serious than mesh exposure.  It can cause vaginal

25   anatomic distortion, which may eventually have a

Confidential - Attorneys' Eyes Only

Page 650

1    negative impact on sexual function.  Shrinkage of the

2    mesh is expected under normal circumstances; however,

3    excessive shrinkage resulting in pain is not a common

4    finding.

5            That's the second adverse event that was

6    anticipated.

7        A.    Yes.

8        Q.    The third one, the scar plate that forms

9    with ingrowth of tissue into the mesh can cause

10   stiffness in the vagina that further impacts sexual

11   function in a negative manner.

12           That's another adverse event that was

13   anticipated with the Prolift+M; correct?

14       A.    Correct.

15       Q.    And the last one, punctures or lacerations

16   of vessels, nerves, bladder, urethra or bowel may

17   occur during Gynecare Prolift guide passage and may

18   require surgical repair.

19           That's the last one listed; correct?

20       A.    It is.

21       Q.    Now, I want to ask you a question about

22   the mesh retraction that was anticipated.

23           MR. SLATER:  Do you want to just tell me

24   something?

25           We'll do it the break.

Confidential - Attorneys' Eyes Only

Page 651

1    BY MR. SLATER:

2        Q.    I want to ask you about the mesh

3    retraction here.  It talks about shrinkage and says,

4    shrinkage of the mesh is expected under normal

5    circumstances.

6            And that's just a statement that with any

7    polypropylene mesh there's going to be some shrinkage

8    by nature of the fact that there's going to be some

9    fibrotic formation around it and it's going to cause

10   a shrinkage of the mesh when the scar tissue grows

11   into and around the mesh.  That's -- that happens, to

12   some extent, in any person at any time; correct?

13           MR. SNELL:  Form.

14           Go ahead.

15           THE WITNESS:  So, as I said, I think,

16   whenever it was, a few months ago, I don't -- I don't

17   think the mesh shrinks.  I think there's scar around

18   it and it does contract, and it retracts to a

19   variable extent in different people but it -- it's --

20   yes.

21           MR. SLATER:  Let me ask it again.  I

22   actually was trying to say that but probably not

23   clear enough for you, which -- which I can

24   understand.  So let me try to say that again.

25   BY MR. SLATER:

Confidential - Attorneys' Eyes Only

Page 652

1      Q.    Here in the second bullet point it says,
2    shrinkage of the mesh is expected under normal
3    circumstances.
4           Is that just a recognition that in any
5    woman who has polypropylene pelvic mesh from your
6    company in her body, when the scar tissue forms
7    around it, to some extent, the scar tissue is going
8    to push down and grow into the mesh and cause the
9    mesh to, we call it mesh contraction, but just
10   squeeze it down somewhat?
11     A.    Yeah, it's scar contraction, and so the
12   area covered by mesh does get smaller.
13     Q.    And that's something that your company
14   looks at, as described here, as something that
15   occurs, it's going to occur to everybody, and anybody
16   would know that.
17     A.    So it's -- I -- I don't know about
18   everybody, but it's a very common --
19     Q.    Let me rephrase it.
20     A.    Yeah.
21     Q.    Let me rephrase it.
22           So that part of this sentence is saying
23   this, quote, unquote, shrinkage, which we've defined,
24   is -- is going to happen and under normal
25   circumstances it's probably not something to be that

Confidential - Attorneys' Eyes Only

Page 653

1    concerned about; is that --

2         A.    Correct.

3              MR. SNELL:  Form.

4              MR. SLATER:  Okay.

5    BY MR. SLATER:

6         Q.    Then it says, however, excessive shrinkage

7    resulting in pain is not a common finding.

8              So that's basically saying, in some women

9    there's going to be more shrinkage and it's going to

10   lead to pain and that's not the normal.  That's not

11   what's expected in all women.

12        A.    Correct.  It's less common.

13        Q.    Okay.  And that's the -- that's the

14   severe -- rephrase.

15             That's the -- the shrinkage that is of

16   concern because once a woman has pain from the

17   shrinkage or the retraction, then you have a very

18   serious problem because treatment can be very

19   difficult --

20        A.    Yeah.

21        Q.    -- in some circumstances.

22        A.    I'm not an expert in this space.

23             MR. SNELL:  Object to form.

24             THE WITNESS:  My understanding is it's --

25   it can be more difficult to treat.

Confidential - Attorneys' Eyes Only

Page 654

1           MR. SLATER:  Okay.

2           Let's take a break.

3           VIDEO OPERATOR:  Time is now 10:37.

4           This is the end of Disk Number 1.  We're

5   going off the record.

6           (Recess, 10:37-10:45 a.m.)

7           (Exhibits T-1342A and T-1343A were marked

8   for identification.)

9           VIDEO OPERATOR:  The time is now 10:45.

10          This is the beginning of Disk Number 2.

11  We are back on the record.

12  BY MR. SLATER:

13      Q.    What we just went through was the final

14  version of the protocol, March 22, 2010, and it

15  actually says that it's Protocol Amendment 4, and

16  that's been identified to us as the final, final

17  version of the -- of the protocol.

18          Now what I'm showing you is 1342 and

19  1343, which is the --

20      A.    Can I -- can I just --

21      Q.    Sure.

22      A.    So I don't know that this -- so this says

23  Final Version Number 1, this says Final Version

24  Number 5.  I don't know myself that this is final

25  version, final, final, final version.  I don't know

Confidential - Attorneys' Eyes Only

Page 655

1    that.

2         Q.    Okay.  We were told that -- is that

3    Exhibit 1340 --

4         A.    1.

5         Q.    -- Exhibit 1341, that that's the

6    signatures for and the actual final version of the

7    final version.

8         A.    Okay.

9         Q.    Because I guess the final version got

10   amended multiple times --

11        A.    At least it must have.

12        Q.    -- to end up in March of 2010.

13        A.    Yeah.

14        Q.    That's what we were told --

15        A.    Okay.

16        Q.    -- that this is the last version of it.

17   Best I can tell you.

18        A.    Okay.

19        Q.    And what I've been told is that Exhibit

20   1342 and '43 is the first iteration --

21        A.    Uh-huh.

22        Q.    -- of the final version --

23        A.    Uh-huh.

24        Q.    -- of the protocol for the Prolift+M

25   study.

Confidential - Attorneys' Eyes Only

Page 656

1             And you see that you actually --

2       A.    Yeah, this is same study.

3       Q.    -- signed that.

4       A.    I did.  Uh-huh.  I see that.

5       Q.    And I can tell you we also -- I didn't

6  bring them, but there are draft versions before the

7  August 10, 2007, Final -- Final Version 1.

8       A.    I'm sure, yeah.  That's normal routine.

9       Q.    Now, all I want to confirm is that --

10      A.    I guess I need to be able to compare.

11      Q.    It's basically a comparison of a couple

12  pages.

13            If you look at the -- the final version of

14  the protocol, I'm going to call that --

15      A.    '43.

16      Q.    -- March 2010 version --

17      A.    Yes.

18      Q.    -- the final version of the protocol, on

19  Page 15 there's a paragraph that describes Prolift

20  complications and --

21      A.    Uh-huh.

22      Q.    -- the effort to minimize those

23  complications with the Prolift+M.

24      A.    That would be on Page 16.

25      Q.    Exactly.

Confidential - Attorneys' Eyes Only

Page 657

1            And I just want to match them up to show

2    that in August of 2007 the same language was in this

3    protocol.

4            MR. SNELL:  Excuse me.

5            THE WITNESS:  That's not 16.

6            MR. SLATER:  It is.  Page 16 in March of

7    2010, Page 15 in August of 2007.

8            THE WITNESS:  I'm not getting the right

9    one on this.  This is 2007.

10           MR. SLATER:  Yeah.

11   BY MR. SLATER:

12       Q.   If you go to Page --

13       A.   And you say which page?

14       Q.   Page 15.

15       A.   15.  Okay.  I got that.

16       Q.   And it's the second paragraph.

17       A.   Got it.

18       Q.   And if you go to the other one, Page 16.

19       A.   Okay.  I had them backwards.

20       Q.   Okay.  So I'll start over.

21       A.   Yeah.  I've got it.

22       Q.   If you compare the March 2010 final, final

23   version of the Prolift+M protocol and you compare

24   that to the first version of the final protocol from

25   August of 2007, almost three years earlier, if you

Confidential - Attorneys' Eyes Only

Page 658

1    match up the paragraphs about the Prolift and its

2    complications in the introduction sections, they're

3    the same; correct?

4         A.    Yes.

5         Q.    Okay.  Now, in the August 2007, if you'd

6    turn to Page 28 --

7         A.    Got it.

8         Q.    -- and you compare that to Page 31 of the

9    March 2010 version, what I want to do is compare this

10   and I want to ask you a question because there are a

11   little bit of a difference.

12              If you look at the August 2007 version of

13   the final protocol for the Prolift+M study and you

14   look at Section 10.6, these are the anticipated

15   adverse device effects, it lists what were

16   anticipated.

17              Do you see that?

18        A.    I do.

19        Q.    And if you compare that to what was in the

20   final version of this document signed in March of

21   2010, I want to go through it and then point out to

22   you something that's different and ask you a question

23   about that.  Okay?

24        A.    Okay.

25        Q.    The first bullet point in each is the

Confidential - Attorneys' Eyes Only

1    same.

2         A.    Uh-huh.

3         Q.    Correct?

4               Talking about mesh exposure.

5         A.    Yes.

6         Q.    The second one, mesh retraction, the first

7    sentence is the same in both; right?

8         A.    Yes.

9         Q.    The second sentence is the same; correct?

10        A.    Yes.

11        Q.    Talking about vaginal anatomic distortion?

12        A.    Yes.

13        Q.    The March 2010 version adds a sentence.

14   It adds that, shrinkage of the mesh is expected under

15   normal circumstances; however, excessive shrinkage

16   resulting in pain is not a common finding.

17              Do you see that?

18        A.    I do.

19        Q.    And do you know why that language was

20   added?

21        A.    I don't.

22        Q.    Okay.  The third bullet point is the same

23   between the two; correct?

24        A.    Yes.

25        Q.    And the fourth bullet point is the same;

Confidential - Attorneys' Eyes Only

Page 660

1    correct?

2         A.    Yes.

3         Q.    Okay.  You could put that aside.

4               Well, let me ask you one question,

5    actually.  I'm sorry.  I said put it aside, but I

6    don't know if you'll need it.

7               The August 2007 version of the final

8    protocol for the Prolift+M study was also signed --

9    was signed by -- rephrase.

10              The August 2007 version of the final

11   protocol for the Prolift+M study was signed on August

12   14, 2007, by David Robinson; correct?

13        A.    Correct.

14        Q.    And David Robinson also signed the March

15   2010 version, which we've been told is the final,

16   final iteration.  And he signed that as well;

17   correct?

18        A.    Correct.

19        Q.    So, presumably, with regard to that one

20   additional sentence added to the protocol about mesh

21   retraction, David Robinson, whether he made the

22   decision, he certainly signed off on adding that

23   additional language; correct?

24        A.    Correct.

25        Q.    Okay.  Okay.

Confidential - Attorneys' Eyes Only

                                              Page 661

 1              MR. SLATER:  I don't know, Burt.  You're

 2    dealing out those Luden's.

 3              MR. SNELL:  They come from Mary Ellen

 4    so --

 5              MR. SLATER:  Mary Ellen is the -- she's

 6    the top source for the Luden's around here?

 7              MR. SNELL:  Yeah.

 8              MR. SHERIDAN:  She's the Luden

 9    intermediary.

10              MR. SNELL:  Yes.

11              Thanks.

12              (Exhibit T-1344A was marked for

13    identification.)

14              MR. SNELL:  Wait.  I think that one is

15    mine.

16              That's 1344?

17              MR. SLATER:  1344.

18    BY MR. SLATER:

19         Q.   Dr. Hart, what I've provided you is

20    Exhibit 1344, which is, according to what the

21    attorneys for Johnson & Johnson have told us, is the

22    current version of the TVT IFU that has been in use

23    since November 29, 2010.  Just so you know what we've

24    been told this document is, that's what has been

25    represented to us.

Confidential - Attorneys' Eyes Only

Page 662

1    A.    Okay.

2    Q.    And what I want to ask you about is on the

3  second page, there's a -- a description of the

4  Gynecare TVT device and in the second paragraph it

5  talks about the fact that it's -- in the second

6  paragraph under the Gynecare TVT device -- rephrase.

7          In the second paragraph under Gynecare TVT

8  device it says, Prolene mesh is constructed of

9  knitted filaments of extruded polypropylene strands

10 identical in composition to that used in Prolene

11 polypropylene non-absorbable surgical sutures.  I

12 want to ask you a couple of questions about that

13 sentence and then go through this paragraph a little

14 with you.

15         First of all, Prolene mesh is the material

16 for the TVT mesh; correct?

17   A.    Correct.

18   Q.    And what this is pointing out is that the

19 strands that make up the mesh are exactly the same as

20 what you would find in a Prolene suture.  It's the

21 same material; correct?

22   A.    That's what it says, yes.

23   Q.    And, in fact, what ultimately happens is

24 you're essentially taking Prolene sutures and they

25 get woven together through a process that probably

Confidential - Attorneys' Eyes Only

Page 663

1  neither of us understands that well, or certainly I

2  don't, and -- and they take a lot of sutures and they

3  build the mesh with that through a knitting process.

4           Let me ask the question differently

5  because I threw in the thing about not understanding,

6  and that's sloppy lawyering.

7           If I'm -- if I'm correct -- and tell me if

8  I'm wrong -- essentially, what happens is there's a

9  process whereby Prolene sutures are taken and they're

10  knitted together through some process and ultimately

11  they're combined and knitted together and it creates

12  the mesh.

13      A.   I don't -- I don't know that it's actually

14  suture that is used to -- to -- I don't think -- I

15  don't know that the strands are extruded exactly in

16  the same run, in the same machine.  It's the same

17  material and the strands would be extruded in a

18  similar -- with the similar or the same process, but

19  I don't think you can say you take a suture and then

20  turn it into a mesh.

21      Q.   Okay.  Let me ask it differently, then.

22           It indicates that the mesh is constructed

23  of knitted filaments of extruded polypropylene

24  strands that are identical in composition to what is

25  used in Prolene sutures, so it's the same material

Confidential - Attorneys' Eyes Only

Page 664

1    but what is knitted into the mesh are strands that
2    are knitted together and that creates the mesh.
3         A.    True.
4         Q.    Okay.  It points out that the mesh is
5    approximately .027 inches thick.  So now we know how
6    thick it is.
7              That's what that tells us; right?
8         A.    Uh-huh.
9         Q.    This then indicates, this material when
10   used as a suture has been reported to be non-reactive
11   and to retain its strength indefinitely in clinical
12   use.
13             Do you see that?
14        A.    I do.
15        Q.    Now, that would be information that
16   medical affairs would have confirmed was accurate;
17   right?
18        A.    As part of a team approving the IFU, yes.
19        Q.    But certainly medical affairs would have
20   had to sign off and say yes, that is a true statement
21   that can be relied on by physicians; right?
22        A.    Right.
23        Q.    And I want to ask you a few questions
24   about that and talk to you specifically about Prolene
25   suture.

Confidential - Attorneys' Eyes Only

Page 665

1          Prolene suture is something that's been in
2    use for a long time for various surgeries within the
3    body; correct?
4          A.    Correct.
5          Q.    In fact, Prolene suture is something you
6    used when you were performing surgery in the chest.
7          A.    For decades.
8          Q.    For decades.
9                In terms of the literature that exists
10   with regard to Prolene sutures, does the literature
11   describe any serious risks from the use of a Prolene
12   suture?
13         A.    I can't say that I have direct knowledge of
14   the entire body of literature of the use of
15   polypropylene sutures, so I would be relying on my --
16   my personal experience of 30-some years, I guess.
17         Q.    Well, let me ask it this way:  You worked
18   as a -- as a heart surgeon for a long time; right?
19         A.    I did.
20         Q.    You worked with Prolene suture on a daily
21   basis, pretty much; right?
22         A.    Uh-huh.
23         Q.    You certainly were familiar with the
24   medical literature with regard to sutures.  It's
25   something that you would have been aware of.

Confidential - Attorneys' Eyes Only

Page 666

1        A.     No.  No, I wouldn't have reviewed

2     literature around sutures.

3        Q.     Well, let me ask you this:  In your

4     position as -- well, rephrase.

5             From your perspective, based on all of the

6     information that's available to you, and that

7     includes, obviously, for any medical affairs

8     director, their -- their own personal experience --

9        A.     Right.

10       Q.     -- and background plus what they've

11    learned and seen while working for Johnson & Johnson

12    or Ethicon --

13       A.     Uh-huh.

14       Q.     -- are you aware of serious adverse events

15    connected to the use of Prolene suture in the body?

16       A.     Yes.

17       Q.     What?

18       A.     We have had -- we have had over the years

19    complaints of either breakage or knot slippage.

20    Those -- those are the ones that come to mind

21    immediately.

22       Q.     When you say "breakage," what does that

23    mean?

24       A.     The suture fragments, breaks.

25       Q.     What is knot slippage?

Confidential - Attorneys' Eyes Only

Page 667

1      A.    A -- a surgeon would tie a knot to hold two
2   strands of suture together and -- and the knot comes
3   unraveled and untied.
4      Q.    What you need is a Navy guy to tie the
5   knot because they tie really good knots.
6      A.    Probably true.
7      Q.    Salute to your counsel.
8            In terms of the biocompatibility of
9   Prolene suture, are there serious adverse events that
10  you're aware of with regard to the use of Prolene
11  suture in the human body?
12     A.    No.
13     Q.    If one takes the -- well, let me ask you
14  this:  I've seen reference in some places to a suture
15  erosion, that that's something that can occur, a
16  suture can erode.
17           Is that considered a serious problem or is
18  that something that's considered to be easily
19  treated?
20     A.    I think it would depend on what the suture
21  was and what it eroded into, I guess.
22           I mean, again, having used it for decades,
23  I can't think of a single case where I actually had a
24  patient who had a problem because one of my
25  polypropylene sutures eroded into something.

Page 668

1      Q.    Okay.  From your -- well, rephrase.

2            To the extent of your knowledge and your

3    experience and what you know as you sit here now,

4    you're not familiar with a suture erosion causing --

5    causing a serious problem for a patient.

6            MR. SNELL:  Form.

7    BY MR. SLATER:

8      Q.    And I'm not just talking about your own

9    personal experience but just what you've seen --

10     A.    Yeah.

11     Q.    -- working as a medical affairs

12   director --

13     A.    Yeah.

14     Q.    -- vice-president and chief medical

15   officer.

16     A.    I can't -- I can't recall during my time at

17   Ethicon having been involved with an analysis or

18   becoming aware of a complaint through our normal

19   complaint system regarding a suture erosion causing

20   an adverse event.  I don't see all of those.

21     Q.    Certainly nothing you've ever been made

22   aware of?

23     A.    Not that I can recall, no.

24     Q.    It's my understanding that a suture will,

25   just like any foreign body, will create some sort of

Confidential - Attorneys' Eyes Only

Page 669

1    a foreign body reaction and some fibrotic tissue will

2    grow along the suture.

3            That's normal and expected; right?

4    A.    Yes.

5    Q.    To your knowledge, is there any serious

6    adverse event associated with that?

7    A.    Again, in my personal experience of

8    however -- I don't know how many thousands and

9    thousands of patients I took care of with Prolene

10   sutures and -- and re-operated on many of them, or

11   not my patients, probably somebody else's, but

12   re-operations where Prolene sutures had been used

13   prior, I certainly -- I certainly encountered the

14   mild, I saw the mild fibrotic reaction that could

15   occur around a Prolene suture but I can't remember a

16   single case as I sit here that say, oh, this patient

17   had a problem because there was this reaction around

18   this suture.

19   Q.    In all the time you've been with Ethicon

20   and Johnson & Johnson has any issue ever been brought

21   to your attention where the -- where some fibrosis on

22   a suture led to any problem for a patient anywhere in

23   the body, including the pelvis, the vagina, anything?

24   A.    Polypropylene suture?

25   Q.    Yeah.

Confidential - Attorneys' Eyes Only

1     A.     Not that I can recall.

2     Q.     Okay.  And tell me if I'm wrong or if I'm

3  right:  Your company in evaluating the mesh that your

4  company has used in its pelvic mesh devices has

5  relied, to some extent, on the history of the use of

6  sutures within the human body as a predictor or as

7  some evidence of whether or not it would be safe.

8     A.     Polypropylene, yes.

9     Q.     Okay.  Now, would you agree with me that

10  the profile of risks with Prolene suture,

11  polypropylene, which is made of polypropylene, is

12  different from the profile of risks with the

13  polypropylene meshes that your company sells for

14  implantation into the female pelvis?

15          MR. SNELL:  Form.

16          THE WITNESS:  Can I ask a --

17  BY MR. SLATER:

18     Q.     Do you understand what I'm getting at?

19     A.     I can ask you a clarifying question?

20     Q.     Sure.

21     A.     Are you talking about are there different

22  risks associated with the mesh than there are with a

23  suture when the -- when mesh is used?

24     Q.     Let me ask you this:  If you compare the

25  risks as between Prolene suture as compared to the

Confidential - Attorneys' Eyes Only

Page 671

1   risks with your pelvic mesh devices, is there a

2   difference in the risks and the severity and the

3   treatability of the risks?  In terms of the risk

4   profiles, are there different?

5            MR. SNELL:  Can you read that back,

6   actually?  Thank you.

7            (The court reporter read the requested

8   portion of the record.)

9            MR. SNELL:  Form objection.

10           THE WITNESS:  Well, I think if you -- if

11   you're not implanting mesh, you can't have mesh

12   exposure, I think, so that's different.

13   BY MR. SLATER:

14       Q.    Anything else?

15       A.    Yeah.  I think -- I think if we're talking

16   about mesh contracture but not shrinkage, which I

17   don't ascribe to, I don't -- I don't have direct

18   knowledge that we would talk about scar contracture

19   causing a problem with an individual suture in place

20   as compared to a mesh.

21       Q.    Tell me if I understand this:  In terms of

22   your company's representations regarding the safety

23   and effectiveness of the TVT and the other pelvic

24   mesh devices, one of the things that's relied on is

25   the history of clinical use of polypropylene sutures

Confidential - Attorneys' Eyes Only

Page 672

1   in the human body.

2              That's one of the things that's relied on;

3   correct?

4        A.   Yes.

5        Q.   And that's -- rephrase.

6              And the history of the clinical use of

7   sutures is also something that's relied on, in part,

8   with regard to Prolene Soft mesh, which is what was

9   used in the Prolift and also for Ultrapro; correct?

10       A.   Yes.

11       Q.   Okay.  To your knowledge, does the

12  literature contain reports of serious -- rephrase.

13             To your knowledge, does the medical

14  literature contain reports of severe, life-altering

15  complications being suffered by women as a result of

16  sutures, polypropylene suture, in the body?

17       A.   I suspect it does with regard to suture

18  breakage.  I don't -- I don't have direct knowledge

19  of what that looks like, but there's got to be a case

20  report somewhere that talks about a polypropylene

21  suture fracturing and causing a severe adverse event.

22       Q.   Are you thinking about that in the context

23  of a cardiac-type procedure or --

24       A.   Or anyplace else it was used, but yeah.  So

25  if you lose mechanical integrity.

Confidential - Attorneys' Eyes Only

Page 673

1    Q.    Is there any specific instance you can

2    think of now where there's a report of a loss of

3    mechanical integrity where a suture broke and that

4    led to a serious, a severe, life-altering

5    complication?

6    A.    I can't cite it but I'm sure -- I know it's

7    there.

8    Q.    Is there an example you can give me where

9    you know that that's happened at some point?

10   A.    Sure.  In my own lifetime I had -- I had a

11   suture or two break that caused a -- early that

12   caused a disruption to a vascular anastomosis, and

13   we -- and so we do get complaints regarding that from

14   time to time in our -- in our normal, everyday

15   post-market surveillance.

16   Q.    Are you familiar with anything in the

17   literature pointing to a polypropylene suture leading

18   to a chronic, untreatable pain condition?  Is that

19   something you're aware of ever being reported?

20   A.    Not -- no, not -- not as a direct reaction

21   to the suture.  But if the suture failed, it could

22   cause a problem and that problem could lead to

23   chronic pain, I presume.

24   Q.    But you only can tell me that in a general

25   sense, not with specificity, like a specific

Confidential - Attorneys' Eyes Only

Page 674

1    situation?

2         A.    Say that again.

3         Q.    I'll rephrase.

4               When you say that, you're saying just in a

5    general sense, you can imagine that could occur but

6    there's not a specific example you could point to me

7    right now?

8         A.    Correct.

9               MR. SLATER:  Oh, you switched during the

10   break?  Okay.  Great.

11   BY MR. SLATER:

12        Q.    This paragraph in the TVT IFU about the

13   Prolene mesh says, this material when used as a

14   suture has been reported to be non-reactive.

15              What does that mean, to be non-reactive?

16        A.    I think -- I think it implies that when

17   implanted in the body as a suture, the polypropylene

18   has a limited and probably insignificant tissue

19   reaction.

20        Q.    When you talk about the tissue reaction,

21   would that be, in other words, a limited,

22   insignificant foreign body reaction?

23        A.    Uh-huh.  Yes.

24        Q.    Okay.

25              (Exhibit T-1345A was marked for

Page 675

1    identification.)

2            MR. SNELL:   Thank you.

3    BY MR. SLATER:

4        Q.    What I've handed you as Exhibit 1345 is a

5    document that comes from the design history file for

6    Gynemesh Prolene Soft mesh, just so you know its

7    origin.  And I can actually give you, might as well

8    mark it.  There's no downside to marking this, in

9    fairness.

10            (Exhibit T-1346A was marked for

11    identification.)

12    BY MR. SLATER:

13        Q.    I've marked as Exhibit 1346 what was

14    provided to me as identifying where it came from.

15    It's attached to that.

16            MR. SHERIDAN:   Yeah, I have it.

17    BY MR. SLATER:

18        Q.    1345 is a December 2, 1999,

19    biocompatibility risk assessment for soft Prolene

20    mesh, which, according to Exhibit 1346, came from the

21    design history file.

22            Do you see that?

23        A.    I do.

24        Q.    And you understand that one of the

25    standard things to do as part of a design history

Confidential - Attorneys' Eyes Only

Page 676

1    file is to document a biocompatibility risk

2    assessment for a mesh device?

3            A.    Yes.

4            Q.    Okay.  This -- well, let me ask you this:

5    What is the purpose -- rephrase.

6                  What is the purpose of the

7    biocompatibility risk assessment in this context?

8            A.    Well --

9            Q.    Why is that done?

10                 MR. SNELL:  Just give him a chance to read

11   it.

12                 Have you ever seen this?

13                 THE WITNESS:  Yeah.

14   BY MR. SLATER:

15           Q.    I'm asking -- I'm asking, in a general

16   sense, why is a biocompatibility risk assessment

17   performed?

18           A.    Yeah.  So not a design history expert nor

19   am I a toxicologist, obviously, but my understanding

20   would be that during -- during development one needs

21   to consider if you're going to have an implant what

22   the potential impact and reaction within the body

23   might be.  High level, very generally.

24           Q.    Okay.  The first paragraph of this risk

25   assessment says, the raw material used for the

Confidential - Attorneys' Eyes Only

Page 677

1    manufacture of soft Prolene mesh will be the same
2    material used for current Prolene polypropylene mesh
3    as well as natural, uncolored polypropylene suture.
4              So that's telling us at the very basic
5    level the same material as in polypropylene sutures,
6    Prolene mesh and Prolene Soft mesh; correct?
7         A.    Yes.
8         Q.    It then -- rephrase.
9              This then points out that in the Prolene
10   Soft mesh the filaments that are used to weave the
11   mesh have a smaller diameter than what is in Prolene
12   mesh.
13             That's what it says in the next sentence,
14   basically; correct?
15        A.    Let me read, please.  Okay?
16        Q.    Sure.
17        A.    Yes.
18        Q.    In the second paragraph, the very bottom
19   of that paragraph, it says, however, there is an
20   extensive history of safe clinical use with
21   polypropylene, specifically Prolene mesh and
22   natural -- natural and blue Prolene suture, that
23   demonstrates that this material is one of the most
24   inert biomaterials available for implantation.
25             Do you see that?

Confidential - Attorneys' Eyes Only

Page 678

1        A.     I do.

2        Q.     When your company refers to an extensive

3   history of safe clinical use with polypropylene, that

4   would be a reflection of somebody's judgment that in

5   looking at the data available about how this material

6   is actually reacted in the human body, it's being

7   described as safe here.

8        A.     I'm going to read the whole paragraph.  So

9   one sec.

10              Okay.  I'm sorry.  Can you ask it again?

11  I've read it.

12       Q.     Yeah.  I'm going to -- I'm going to ask a

13  different question.

14              In -- in essence, a comparison is being

15  made here, and -- and what we're hearing is that

16  because there's some judgment by somebody named Tom

17  Barbolt, who wrote this document, that there's an

18  extensive history of safe clinical use with Prolene

19  mesh and Prolene suture, this material, the

20  polypropylene, is one of the most inert materials

21  available.

22              So he's basically saying I'm drawing on

23  what we know from the clinical history to make this

24  statement.

25       A.     As a starting point, yeah.

Confidential - Attorneys' Eyes Only

Page 679

1       Q.    Okay.  You would agree with me that in
2    evaluating Prolene mesh you would want to evaluate
3    ultimately -- well, rephrase.
4             You would agree with me that if you're
5    going to do a -- an evaluation of the
6    biocompatibility of a specific mesh material, in this
7    case Prolene Soft mesh, you would ultimately want to
8    do the full evaluation on that material in order to
9    do a full biocompatibility assessment, from a medical
10   affairs perspective; correct?
11            MR. SNELL:  Form.
12            THE WITNESS:  From -- so, again, from a
13   medical affairs perspective, not being a
14   toxicologist, I -- I would expect the toxicology
15   folks who are making the biocompatibility evaluation
16   and recommendation to draw on what they already know
17   and then, according to best toxicology ISO standards
18   and so forth, do the testing that's required.
19            MR. SLATER:  Okay.
20   BY MR. SLATER:
21       Q.    And if we look just above, and I think you
22   probably just read that language before we -- before
23   you answered that, there's an ISO standard --
24            That would be the International Standards
25   Organization?

Confidential - Attorneys' Eyes Only

Page 680

1      A.      Correct.

2      Q.      -- and the guideline that says that

3  pursuant to that standard, a number of

4  biocompatibility tests need to be addressed, and

5  they're listed there; right?

6      A.      Yes.

7      Q.      And one of them is cytotoxicity.  That's

8  the first one listed; right?

9      A.      Yes.

10      Q.      Do you know what cytotoxicity is?

11      A.      Again, high level.  Cytotoxicity would be

12  whether or not a particular material would be, have

13  adverse impact on cells.  Cyto- means cells.

14      Q.      It's my understanding that cytotoxicity

15  testing in the context of biocompatibility is to

16  determine whether or not contact between the material

17  and tissue causes damage or destruction of the cells

18  in the tissue.

19              Is that consistent with your

20  understanding?

21      A.      Yeah.

22              MR. SNELL:  Form.

23              THE WITNESS:  Does it have the potential

24  to do so, based on testing.

25              MR. SLATER:  Okay.

Confidential - Attorneys' Eyes Only

Page 681

1    BY MR. SLATER:

2         Q.    If you go to the third paragraph here, I

3    want to ask you about -- well, rephrase.

4              The third paragraph of this document says,

5    in accordance with the FDA guidance document entitled

6    "Guidance For the Preparation of a Premarket

7    Notification Application For a Surgical Mesh," it is

8    considered that the extensive clinical experience

9    with these devices precludes the need to conduct

10   cytotoxicity.  And there's a list of other studies

11   that it's saying we don't have to do those because of

12   the extensive clinical experience with the devices

13   listed above, which were Prolene mesh and Prolene

14   suture.

15             That's what's stated here; correct?

16        A.    Yes, it -- it says, in accordance with the

17   FDA guidance, this toxicologist's opinion was, given

18   the extensive track record and understanding of -- of

19   the biocompatibility of polypropylene -- what are his

20   words -- precludes the need to conduct those -- those

21   studies.

22        Q.    Let me ask you a question:  When -- when

23   Prolene mesh or Prolene Soft mesh erodes through

24   tissue, it is causing damage to the adjoining,

25   adjacent tissue; correct?

Confidential - Attorneys' Eyes Only

Page 682

1              MR. SNELL:  Form.

2              THE WITNESS:  I don't -- I don't know that

3    it's causing damage but the tissue is damaged and

4    the -- and the -- and the -- and the mesh is either,

5    as you say it, eroded or exposed, two different

6    things.  So it's either -- it's visible in -- in a

7    lumen or transmucosally.

8    BY MR. SLATER:

9         Q.    During the process of mesh erosion or mesh

10   exposure the adjoining tissue is damaged; correct?

11        A.    Yeah, I guess -- there's -- there's tissue

12   disruption if -- yeah.

13        Q.    Now, would medical affairs -- well,

14   rephrase.  Let me take that back.  Do you know

15   what -- well, rephrase.

16              Do you know whether or not cytotoxicity

17   testing had been performed on Prolene mesh at any

18   time?

19        A.    I don't know.

20        Q.    Do you know whether cytotoxicity testing

21   was performed by your company with regard to Prolene

22   suture?

23        A.    I believe so.

24        Q.    Do you know what the results were?

25        A.    If my recollection serves me -- and it may

Confidential - Attorneys' Eyes Only

Page 683

1    or may not -- that the results were mixed.

2         Q.    Tell me what you mean by that.

3         A.    That -- that one study suggested

4    cytotoxicity and one did not.

5         Q.    With the Prolene suture?

6         A.    Well, Prolene.  I don't know if it's

7    Prolene suture, but it was polypropylene.

8         Q.    Well, my question is specific.  I want to

9    be -- because I want to differentiate --

10        A.    Okay.

11        Q.    -- so let me ask it clean.  Are you aware

12   of testing performed by your company -- rephrase.

13             Are you aware of testing by your company

14   to determine whether there is cytotoxicity with

15   Prolene suture?

16        A.    I don't know that.

17        Q.    Do you know whether your company performed

18   cytotoxicity testing with Prolene mesh?

19        A.    I don't know that.

20        Q.    Would you agree with me, if your company

21   had performed cytotoxicity testing with Prolene

22   suture or Prolene mesh and that testing had shown

23   cytotoxicity, that you would have wanted to -- from a

24   medical affairs perspective, would have wanted to

25   have Prolene Soft mesh tested to see what the result

Confidential - Attorneys' Eyes Only

Page 684

1    is, as opposed to saying, well, even though there's

2    cytotoxicity that's been proven with one or both of

3    these precursors, we're going to say, well, there's a

4    clinical history that says we don't have to test it?

5    From a medical affairs perspective, you would say,

6    no, you should do the testing on this mesh in that

7    circumstance; correct?

8         MR. SNELL:  Form.

9         THE WITNESS:  Not necessarily correct, no.

10   I would listen to the advice of the toxicologists and

11   try to understand what they're saying.

12   BY MR. SLATER:

13        Q.   Now, the toxicologists in preclinical --

14   that's who your talking about; right?

15        A.   Yeah.

16        Q.   The toxicologists in the preclinical

17   department are not experts on the clinical

18   significance of their findings.  That's not what they

19   are expert in; correct?

20        A.   Well, I think they certainly have some

21   expertise but that's not their main area of focus,

22   no.

23        Q.   And as your company functions, it's

24   medical affairs that has the -- is looked to for the

25   clinical expertise to say, okay, these are your

Confidential - Attorneys' Eyes Only

Page 685

1   preclinical findings but we decide in medical affairs
2   the clinical significance of your findings.  Is that
3   a -- is that a correct statement?
4        A.    Yeah.  It's collaborating with -- with the
5   scientists who understand what -- what the test means
6   when they do them, yeah.
7        Q.    So to the extent that Thomas Barbolt from
8   the preclinical department drew any conclusions about
9   whether or not testing was needed or what the
10  clinical significance would be of any testing results
11  that were available, medical affairs would need to
12  look at that and make a decision, well, you know,
13  that's -- we see your opinion but medical affairs has
14  to make an independent judgment on this; correct?
15             MR. SNELL:  Form.
16             THE WITNESS:  Yeah, I would -- I would
17  expect that those two -- those two functions would
18  work collaboratively around what's -- what's
19  required.
20  BY MR. SLATER:
21       Q.    You would expect that the final decision,
22  for example, on whether or not to do cytotoxicity
23  testing on Prolene Soft mesh, that final decision
24  would not be made by somebody in the preclinical
25  department, for example, Tom Barbolt, alone.

Confidential - Attorneys' Eyes Only

Page 686

1           You expect that if that decision was made,

2    medical affairs would need to also agree to that

3    decision.

4           MR. SNELL:  Form.

5           THE WITNESS:  That's an absolute so I --

6    could there be -- could there be times when it's

7    perfectly appropriate for the preclinical person to

8    make such a decision?  I think yes, based on their

9    expertise and understanding of what it is they

10   have -- that they're trying to accomplish with their

11   testing.

12          I think if there were questions around the

13   clinical relevance of findings that -- of -- sure,

14   that medical affairs would be involved with those

15   discussions.  And if medical affairs felt like this

16   is an unacceptable risk, then they -- they -- they

17   would block the -- the progress.

18          MR. SLATER:  Okay.

19   BY MR. SLATER:

20       Q.   In this circumstance -- I understand that

21   was a -- I understand generally what you said.

22       A.   Yeah.

23       Q.   I want to ask a specific question.  With

24   regard to Prolene Soft mesh, according to this

25   document, Thomas Barbolt concluded that there was no

Confidential - Attorneys' Eyes Only

Page 687

1    necessity to perform cytotoxicity testing.

2              In this context, would you expect that

3    medical affairs would have needed to agree to that

4    decision in order for that testing not to be

5    performed?

6         A.    Not necessarily.

7         Q.    Let's look at the -- let's look at the

8    conclusion by Thomas Barbolt with regard to Prolene

9    Soft mesh.

10             In summary, the preclinical study

11   results -- and I want to stop there.

12             As we know from what we saw above, the

13   preclinical study results do not include cytotoxicity

14   testing of Prolene Soft mesh because he concluded

15   that didn't need to be done; correct?

16        A.    That's what that --

17             MR. SNELL:  Form.

18             THE WITNESS:  That's what that statement

19   says.

20             MR. SNELL:  I don't see what you're

21   talking about.

22             MR. SLATER:  Well, I'll just -- I'm happy

23   to clarify with you, Counsel.

24             I've had people search every document

25   produced by your company incessantly for the last few

Confidential - Attorneys' Eyes Only

Page 688

1    weeks.  Nobody has been able to find any cytotoxicity

2    testing ever performed by your company on Gynemesh

3    Prolene Soft mesh or on Prolene Soft mesh, and what

4    we find -- we have is this document which says that

5    decision was made not to perform that testing.

6              If you can tell me that that testing

7    actually was performed, I'm more than happy to look

8    at it, but this document says the testing was not

9    going to be performed and it provides a rationale and

10   nobody can find it.  So unless you have information

11   to the contrary, I don't really understand your

12   objection.

13             MR. SNELL:  My objection was I thought

14   your question, you actually said that cytotoxicity

15   wasn't done with Prolene mesh.  You didn't specify

16   Prolene Soft.

17             Now, if I misheard you, I misheard you.

18   As to your statement that, to your understanding,

19   regarding Prolene Soft that these weren't done and

20   you haven't found it in the documents, I mean, I

21   can't really comment on that.  So I thought I heard

22   you say Prolene mesh, which is a misstatement.

23             MR. SLATER:  It is a miss -- that would be

24   a misstatement.  We're going to get to that.

25             MR. SNELL:  Okay.

Confidential - Attorneys' Eyes Only

Page 689

1              MR. SLATER:  But that's not what I said.

2              MR. SNELL:  Okay.

3              MR. SLATER:  I just want to make clear,

4    you're not representing that you're aware --

5              MR. SNELL:  I'm not representing anything.

6    I thought I heard you say Prolene mesh.

7              MR. SLATER:  No.  Slow down.  Slow down.

8    I just want to make sure for the record because other

9    people are going to look at this and they're going to

10   rely on this, you're not aware, to the extent this is

11   something we can rely on, obviously, you can go back

12   and say, hey, I found something, you know, it's

13   obviously something you want to look at, but as you

14   sit here now, you're not aware of cytotoxicity

15   testing on Prolene Soft mesh.

16             MR. SNELL:  As I sit here now, I haven't

17   searched for that so I can't tell you one way or the

18   other.

19             MR. SLATER:  Okay.  Okay.  Now I have to

20   try to remember my question.

21             Great distraction maneuver, Navy man.

22   Okay.

23   BY MR. SLATER:

24        Q.   We know, based on this document, that a

25   decision was made not to perform cytotoxicity testing

Confidential - Attorneys' Eyes Only

Page 690

1    on Prolene Soft mesh and a rationale was provided in

2    this document; correct?

3        A.    Correct.

4        Q.    There was cytotoxicity testing performed

5    on Prolene mesh in connection with the 510(k) for the

6    TVT, and that did actually show on two different

7    cytotoxicity tests, on one marked cytotoxicity, on

8    another severe cytotoxicity.

9             You're aware of that; right?

10       A.    Not specifically, no.

11       Q.    Is that some -- I got the sense from one

12   of your earlier answers that you were familiar with

13   those test results.

14       A.    I couldn't have told you which product it

15   was related to.

16       Q.    Okay.  I have it, I'll show it to you, and

17   that way I don't want you to have to take my word for

18   anything.

19       A.    Okay.

20            MR. SLATER:  Got too big for my briefcase.

21            MR. SNELL:  Thanks.

22            MR. SLATER:  Give me one second.  I'll

23   pick out the page.  Okay.

24   BY MR. SLATER:

25       Q.    What I've handed you is the actual 510(k)

Confidential - Attorneys' Eyes Only

Page 691

1    that -- notification that was filed with the FDA

2    regarding the TVT, and it's been marked as Exhibit

3    T-3142 is what I believe it says, at a deposition on

4    August 20, 2013.  I'm familiar with it because it was

5    during Mr. Cecchini's deposition that I was involved

6    in.

7              What I want to do is just take you to two

8    specific pages.  If you look at the Bates numbers --

9         A.    Uh-huh.

10        Q.    -- it's 310 and 311 on the bottom right.

11   Those are the last three digits.

12        A.    310?

13        Q.    Yeah.  There's a number -- there's a Page

14   59 and then the next one is Page 60.  Okay.

15             What I'm showing you is cytotoxicity

16   testing on the Prolene mesh.  And if you look at this

17   testing, which it says it's using the ISO elution

18   method, at the bottom it says that under the

19   conditions of this study the MEM test extracts were

20   moderately cytotoxic and failed this ISO test.

21             You see that?

22        A.    I do.

23        Q.    And if you turn to the next page, is the

24   result of another cytotoxicity test of the Prolene

25   polypropylene mesh and the conclusion points out,

Confidential - Attorneys' Eyes Only

Page 692

1    under the conditions of this study, the MEM test

2    extracts were severely cytotoxic and failed this ISO

3    test.

4              Do you see that?

5        A.    Yes.

6        Q.    Okay.  And you see who the person is who

7    signed off on both of these in October of 1997?

8        A.    Yes.

9        Q.    Thomas Barbolt; right?

10       A.    Uh-huh.  Correct.

11       Q.    The same person who signed off on the

12   Prolene Soft mesh biocompatibility risk assessment;

13   correct?

14       A.    Correct.

15       Q.    And if we look again at the conclusion by

16   Mr. Barbolt, he says, in summary, the preclinical

17   study results -- and I'm going to stop there.

18              According to this document, he decided not

19   to do cytotoxicity testing on Prolene Soft, so that

20   would not be one of the test results available;

21   correct?

22       A.    I think it implies that, yes.

23       Q.    And I've just shown you the cytotoxicity

24   testing for the Prolene mesh that was submitted to

25   the FDA with the TVT 510(k) that showed on two

Confidential - Attorneys' Eyes Only

Page 693

1    different tests moderate and severe cytotoxicity for

2    Prolene mesh.

3                 You see that?

4         A.    I do.

5         Q.    Okay.  So he knew that Prolene mesh, based

6    on the result he signed off on, had been found to be

7    cytotoxic; right?

8                 MR. SNELL:  Form.

9    BY MR. SLATER:

10        Q.    That's what the document shows.

11        A.    It says, under the conditions of this test,

12   yes.

13        Q.    Okay.  So let's go further now.

14                In summary, the preclinical study

15   results -- we've talked about that -- and the

16   extensive clinical experience with current Prolene

17   mesh -- and that would be in 1999 the extensive

18   clinical experience with current Prolene mesh, that

19   would be hernia, use for hernia treatment; correct?

20        A.    I presume that's what he's relating to.

21        Q.    There's not extensive clinical experience,

22   to your knowledge, as of 1999 regarding the use of

23   Prolene mesh --

24        A.    Right.

25        Q.    -- in the pelvis; correct?

Confidential - Attorneys' Eyes Only

Page 694

1          A.     Correct.

2          Q.     And then he goes further in talking about

3    the extensive clinical experience with Prolene suture

4    is another aspect he's relying on; right?

5          A.     Uh-huh.

6          Q.     And we can agree, however, that the

7    clinical experience with Prolene suture would not be

8    strongly determinative of what you would expect to

9    happen with the mesh.  You would expect that you need

10   to test the mesh separately.

11         A.     From a cyto -- I'm not sure that I agree

12   with that from a cytotoxicity standpoint.  I -- I

13   would rely on them to say, does the physical

14   construct have anything at all to do with -- with

15   cytotoxicity.

16         Q.     I think we spoke about this earlier.  To

17   your knowledge, you're not familiar with your company

18   studying Prolene suture with regard to cytotoxicity?

19         A.     I don't know, yes or no.

20         Q.     Okay.  If the testing of Prolene suture

21   showed cytotoxicity on some tests that your company

22   had available to it, that would be something that

23   would, from a medical affairs perspective, militate

24   towards, hey, we should be doing testing on this new

25   mesh; right?

Confidential - Attorneys' Eyes Only

Page 695

1            MR. SNELL:  Form.

2            Go ahead.

3            THE WITNESS:  I'm sorry.  Please, one more

4    time.

5            MR. SLATER:  Sure.

6    BY MR. SLATER:

7        Q.    If testing had been done on the suture --

8        A.    Yes.

9        Q.    -- Prolene suture --

10       A.    Okay.

11       Q.    -- for cytotoxicity, if the testing was

12   negative and showed no cytotoxicity, that, from a

13   medical affairs perspective, could have one meaning

14   to you and if cytotoxicity testing of Prolene suture

15   had shown some cytotoxicity, that could have -- lead

16   you to a different conclusion, potentially.

17       A.    So --

18       Q.    In general terms; right?

19            MR. SNELL:  Form.

20            THE WITNESS:  -- if the testing had been

21   done in 1960-something, when -- when Prolene came,

22   you know, around as a suture material, you know,

23   the -- the 30- or 40-year history or whatever it had

24   been of clinical use of polypropylene suture in very

25   delicate tissues and in -- in extenuating

Confidential - Attorneys' Eyes Only

Page 696

1   circumstances, had it been cytotoxic, I would have

2   known about it.

3   BY MR. SLATER:

4        Q.    Your feeling is, from all that you know

5   about Prolene sutures, is that to the extent there's

6   any cytotoxicity that might be shown on a test, in --

7   in the clinical world, it would not be causing any

8   significant issues for any patients.

9        A.    Yes.

10       Q.    Okay.   What Thomas Barbolt, if we continue

11   through this conclusion, after he talks about the

12   preclinical study results, to the extent they

13   existed, the extensive clinical experience, as he

14   calls it, with current Prolene mesh, which we've just

15   talked about, and the clinical experience with

16   Prolene suture, those factors lead him to conclude

17   that they're intrinsically safe and without

18   significant adverse effects for patients.

19            Do you see that?

20       A.    Yes.

21       Q.    Now, the decision as to whether or not

22   Prolene mesh is intrinsically safe and without

23   significant adverse effects for patients, that is not

24   a conclusion for a preclinical person to be drawing,

25   that's a conclusion for medical affairs to be

Confidential - Attorneys' Eyes Only

Page 697

1    drawing; correct?

2        A.    I -- I think -- I think they each could

3    make -- could draw their conclusions.

4             I mean, Tom Barbolt with his long history

5    with this material and awareness working in the

6    medical device area for so many years would have a --

7    would have a sense as to whether this was

8    clinically -- had -- had -- had functioned in a

9    clinically safe manner.

10       Q.    Let me change the question a little bit.

11            Thomas Barbolt can draw that conclusion

12   but that -- the analysis within your company should

13   not end there.  Medical affairs --

14       A.    Yeah.

15       Q.    -- would also need to draw the same

16   conclusion for that to become the conclusion of your

17   company; correct?

18       A.    If there was a difference in opinion, you

19   bet, medical affairs should -- from a medical safety

20   or performance standpoint, they should have the --

21   the trump card, if you will.

22       Q.    Well, what I'm asking is, Thomas Barbolt's

23   opinion should not be the only opinion that is

24   documented on this issue.  Medical affairs would also

25   need to weigh in and -- and confirm that it also

Confidential - Attorneys' Eyes Only

Page 698

1  holds that conclusion if decisions are going to be

2  made based on that conclusion; correct?

3       A.    I don't know that the process would --

4             MR. SNELL:  Form.

5             Go ahead.

6             THE WITNESS:  -- would bring medical

7  affairs in at that stage.

8  BY MR. SLATER:

9       Q.    Well, let me ask you this:  In your

10  company decisions as to whether or not a mesh

11  material is intrinsically safe and without

12  significant adverse effects for actual patients in

13  the actual clinical world, that's a decision medical

14  affairs ultimately needs to make.

15            There can be input from preclinical --

16       A.    Right.

17       Q.    -- there can be input from other people

18  but the ultimate decision that your company is going

19  to rely on, medical affairs has to make that final

20  decision; correct?

21       A.    Yeah, for any -- any product in development

22  before it can go out the door, medical affairs would

23  have to sign off on essentially a benefit-risk

24  analysis, and this would be one of the inputs.

25            I don't think they would sign -- I'm sure

Confidential - Attorneys' Eyes Only

Page 699

1    they don't sign off on a -- on a preclinical or

2    biocompatibility of a next-generation plan, if you

3    will.

4         Q.    Just --

5         A.    But they --

6              MR. SLATER:  Move to strike from "I'm

7    sure" forward.

8              Went a little beyond what I was talking

9    about but I understand what you're saying.

10   BY MR. SLATER:

11        Q.    Tell me if I understand.  Preclinical will

12   make its own decisions in the first instance about

13   what testing is needed and what conclusions can be

14   drawn from the perspective of the preclinical people.

15        A.    Correct.

16        Q.    The significance of those conclusions for

17   actual patient and benefit-risk analysis and whether

18   or not something is actually going to be safe and

19   acceptable in use of a patient, that ultimate

20   decision is medical affairs'; correct?

21        A.    Uh-huh.  That's correct.

22        Q.    Tom Barbolt concluded, it is considered

23   that soft Prolene mesh manufactured with a portion of

24   blue filaments will result in the same level of

25   safety demonstrated by the currently marketed

Confidential - Attorneys' Eyes Only

Page 700

1    products and no further clinical -- preclinical

2    testing is necessary.

3              That was his final conclusion; right?

4         A.   Right.

5         Q.   He was relying on the first part of that

6    paragraph, obviously, where he's relying on the

7    clinical experience with the use of Prolene mesh and

8    Prolene suture; correct?

9         A.   In part, yeah.

10        Q.   So you would agree with me that to make

11   that decision that further preclinical testing is not

12   needed, based on what's happened in the clinical

13   world, medical affairs would also need to confirm,

14   yes, you can draw that conclusion, we confirm that

15   this is what's going on in the real clinical world

16   and that is reliable to say we don't have to do any

17   more testing.

18        A.   So as a matter of process, during

19   development, the -- the -- you know, the -- the risk

20   management program would include medical affairs at

21   every stage along the way saying, yes, I believe that

22   we're on track with -- with producing a safe and

23   effective product.

24             I don't believe they would necessarily

25   individually have to sign off on a document saying I

Confidential - Attorneys' Eyes Only

Page 701

1    agree with that conclusion but at the -- at the end
2    of the day, there is a -- a final sign-off where the
3    physician would have to say, given all the
4    information we have, I believe that we have a safe
5    and effective product and we should move forward, the
6    benefit-risk is satisfactory or appropriate.
7         Q.    You would certainly agree with me that in
8    the context of this document and the ultimate
9    sign-off on Prolene Soft mesh, that medical affairs
10   would have needed to be aware of this analysis by
11   Thomas Barbolt and would have needed to be in
12   agreement in order to go forward in reliance on his
13   opinion.
14        A.    Yeah, I think they would have had some
15   visibility and been in alliance.  Yeah.
16        Q.    If medical affairs didn't see this and
17   wasn't aware of it, that would be -- that would be a
18   bad miss; right?
19             MR. SNELL:  Form.
20   BY MR. SLATER:
21        Q.    Let me rephrase it because that's a little
22   too colloquial for us.
23             If medical affairs never saw this
24   document, that would be -- that would be a breakdown
25   in how the system is supposed to work because medical

Confidential - Attorneys' Eyes Only

Page 702

1    affairs is supposed to be aware of this document?

2            MR. SNELL:  Form.

3            THE WITNESS:  I don't know about being

4    aware of the document.  They would certainly be part

5    of the discussions, be aware of the decision, I would

6    think.  I don't know about the document.

7    BY MR. SLATER:

8        Q.    Let me ask it more directly, then.  The

9    way the system works, medical affairs would need to

10   know that this decision was made by Tom Barbolt and

11   medical affairs would need to agree with that

12   decision for the company to rely on that decision.

13       A.    Yeah.

14       Q.    Correct?

15       A.    Yeah.

16       Q.    Okay.

17            MR. SLATER:  Why don't we take a break.  I

18   need a drink and probably a good time.

19            VIDEO OPERATOR:  The time is now 11:41.

20            This the end of Disk Number 2.

21            We are going off the record.

22            (Recess, 11:41-12:03 p.m.)

23            VIDEO OPERATOR:  The time is now 12:03.

24            This is the beginning of Disk Number 3.

25            We are back on the record.

Confidential - Attorneys' Eyes Only

Page 703

1   BY MR. SLATER:

2       Q.    Dr. Hart, to your knowledge, has anybody

3   in Ethicon medical affairs ever tried to correlate

4   cytotoxicity testing of Prolene Soft mesh with the

5   clinical risk-benefit profile for Prolene Soft mesh?

6   Did that ever happen, to your knowledge?

7       A.    I don't know.

8       Q.    Did you ever hear of that happening?  Are

9   you aware of it ever happening?

10      A.    No.

11      Q.    In all the time that you've been with

12  Ethicon -- and I'm talking now with regard to Prolene

13  Soft mesh, Gynemesh PS, the Prolift, the Prolift+M,

14  the Prosima, all of the pelvic mesh devices for

15  prolapse -- was there ever any discussion or

16  documentation you're aware of where the subject of

17  cytotoxicity was even mentioned?

18      A.    I don't know yes or no.

19      Q.    Okay.

20      A.    I mean I --

21      Q.    Nothing you're aware of.

22      A.    No.

23      Q.    Okay.  Now, what I'd like to do -- let me

24  ask you this, a more narrow question:  With regard to

25  the Prolift, to your knowledge, has anybody in

Confidential - Attorneys' Eyes Only

Page 704

1  Ethicon medical affairs ever considered the subject

2  of whether or not the material is cytotoxic, to your

3  knowledge?

4       A.    I don't know yes or no.

5       Q.    Nothing you're aware of.

6       A.    Correct.

7       Q.    Okay.  If you could look back at the TVT

8  510(k), I have a -- I want to ask you about

9  something.  There are page numbers in the bottom

10  right, and I'll go by the page number.  It's Page 40.

11      A.    Okay.  Not okay.

12      Q.    At the top of the page in the left margin

13  it shows that this section of the 510(k) addresses

14  biocompatibility testing.

15            You see that?  Left column.

16      A.    Yes.

17      Q.    At the very bottom of the page it says,

18  the long clinical experience with Prolene mesh

19  indicated that the cytotoxicity testing would be

20  sufficient to support biocompatibility of this

21  component.

22            And so that's talking about the mesh

23  there; right?

24      A.    I don't quite understand the sentence.  A

25  long --

Confidential - Attorneys' Eyes Only

Page 705

1     Q.    One of the components -- let me ask it

2   differently:  One of the components of the TVT is the

3   mesh.

4     A.    Yes.

5     Q.    Okay.  And this indicates, the long

6   clinical experience with Prolene mesh indicated the

7   cytotoxicity testing would be sufficient to support

8   biocompatibility of this component.

9             That's what it states here in the 510(k);

10  right?

11    A.    Yes.

12    Q.    So what this is saying is, your company

13  took into account the long clinical experience with

14  Prolene mesh.  I want to stop there.

15            That would be with Prolene mesh for use

16  for hernia because as of the time that this was

17  submitted in October 1997, there was no long clinical

18  history of using Prolene mesh in the female pelvis;

19  right?

20            MR. SNELL:  Form.

21            THE WITNESS:  I guess we have to define

22  what long term would mean, but certainly had been

23  used in -- in female surgery before -- this is 1998?

24            MR. SLATER:  It was filed in 1997 --

25            THE WITNESS:  Yeah.

Confidential - Attorneys' Eyes Only

Page 706

1          MR. SLATER:  -- and cleared in early 1998.

2          THE WITNESS:  Yeah.

3          So we know that the -- the company that

4     was -- was developing TVT had data, longer than --

5     not five-year data but that was used in the female

6     pelvis, yes.

7     BY MR. SLATER:

8          Q.   Based how you would define a long clinical

9     experience, there was not a long clinical experience

10    using Prolene mesh to treat pelvic floor conditions

11    as of 1997, 1998; correct?

12          MR. SNELL:  Form.

13          Go ahead.

14          THE WITNESS:  How I would define long-term

15    use.  Certainly -- certainly, we've seen, quote,

16    long-term results stated at a year or two years.

17    Certainly, there was not five-year data.

18    BY MR. SLATER:

19          Q.   The long clinical experience with Prolene

20    mesh was overwhelmingly hernia.  There might have

21    been some usage in the female pelvis but the vast,

22    vast majority of that would have been hernia;

23    correct?

24          A.   I don't know the numbers, but yes.

25          Q.   Okay.  And what this is saying is --

Confidential - Attorneys' Eyes Only

Page 707

1    rephrase.

2              What this is saying is that, based on the

3    long clinical experience with Prolene mesh, whatever

4    that experience was, the decision was made to do

5    cytotoxicity testing and that would establish the

6    biocompatibility; right?

7    A.    I'm -- I actually don't know.  I'd have to

8    read a lot more, I think, to understand what it is

9    he's exactly saying or the --

10   Q.    Well, this statement in and of itself is

11   indicating that, based on the clinical experience

12   with Prolene mesh, we've made a decision to do

13   cytotoxicity testing to determine the

14   biocompatibility.

15             That's what it says; right?

16   A.    That's what it -- that's what it looks

17   like, yeah.

18   Q.    I've shown you cytotoxicity test results

19   showing in one test severe cytotoxicity.

20             I showed you those a few moments ago;

21   right?

22   A.    You did.

23   Q.    Go to the next page, Page 41.  At the very

24   bottom of the page it indicates, however -- well,

25   rephrase.

Confidential - Attorneys' Eyes Only

Page 708

1          At the bottom of Page 41 now, still in the

2    biocompatibility testing section, it indicates that

3    the mesh was cytotoxic on the elution test,

4    suggesting cytotoxic potential in the sensitive test

5    system.

6          See that?

7    A.    No, not yet.

8    Q.    It's the very bottom of the page.

9    A.    Okay.

10   Q.    The last paragraph.

11   A.    I'm going to read the whole way down.

12         Okay.

13   Q.    Okay.  Not even sure what I asked so I'll

14   ask a new question.

15         At the bottom of Page 41 it indicates that

16   cytotoxicity testing was positive on one of the

17   tests, the elution test; right?

18   A.    Yes.

19   Q.    And I showed you that a little while ago;

20   right?

21   A.    Uh-huh.

22   Q.    And then he says, however, the long

23   history of safe clinical use of polypropylene as mesh

24   and suture products suggests strongly that this

25   material is inherently biocompatible and that the

Confidential - Attorneys' Eyes Only

Page 709

1    potential cytotoxicity observed is self-limiting and

2    minimal when compared to the implantation procedure

3    itself.

4              So that was what was concluded here;

5    right?

6         A.    Yes.

7         Q.    Now, what we basically have here, though,

8    if you -- if you combine what was at the bottom of

9    Page 40 with the bottom of Page 41 is a decision was

10   made, based on the long clinical experience with

11   Prolene mesh, we think that cytotoxicity testing is

12   what we should use to determine biocompatibility.

13             That's what it says on Page 40; right?

14        A.    Uh-huh.

15        Q.    Then we turn to the bottom of Page 41 and

16   they say, well, the cytotoxicity testing that we

17   performed actually showed moderate and severe

18   cytotoxicity.

19             I showed you those documents earlier;

20   right?

21        A.    Yes.

22             MR. SNELL:  Form.

23             Go ahead.

24   BY MR. SLATER:

25        Q.    But we're going to say, because of the

Confidential - Attorneys' Eyes Only

Page 710

1   long clinical experience, we can discount those tests

2   and determine that this will actually be a

3   self-limiting and minimal issue.

4           That's the -- what's finally concluded

5   here; right?

6       A.    Well, I think they -- they clarify it above

7   a little bit more than that by saying the

8   polypropylene mesh component is sterile TVT device

9   was cytotoxic only in the elution testing because

10  they describe up above here some other -- other

11  testing that was less with -- with different results.

12      Q.    If you go to the very top, there were two

13  types of cytotoxicity testing, and on the elution

14  testing it showed polypropylene mesh to be moderate

15  to severe cytotoxicity.

16          Do you see that?

17      A.    Yes.

18      Q.    So what ultimately happened here is, the

19  document shows that your company said, okay, we have

20  a history of use of the Prolene mesh, based on that

21  clinical history, we think we need to do cytotoxicity

22  testing to determine biocompatibility.

23      A.    Uh-huh.

24      Q.    The testing is done and on one set of

25  tests showed cytotoxicity that's described as severe

Confidential - Attorneys' Eyes Only

Page 711

1    on one of the tests, which would indicate questions

2    or issues with biocompatibility in and of itself;

3    right?

4                MR. SNELL:  Form.

5                Go ahead.

6                THE WITNESS:  I think you'd have to

7    interpret the results of that test in the total

8    context but, yeah, that's part of the input when you

9    make the biocompatibility determination.

10   BY MR. SLATER:

11        Q.    And then he comes all the way full circle

12   and says, well, we're going to discount that finding

13   because of the history of clinical use of the mesh.

14                Isn't that circular?

15        A.    No.  Because I think he talks about this

16   only in this sensitive test.  He describes other

17   tests up here where cytotoxicity was not demonstrated

18   and he's -- I believe he's concluding with the long

19   clinical use, history of use, and my understanding of

20   his understanding of these tests, he feels that it's

21   biocompatible.

22        Q.    Medical affairs would need to weigh in on

23   that type of a decision; right?

24                MR. SNELL:  Form.

25                THE WITNESS:  Medical affairs would be --

Confidential - Attorneys' Eyes Only

Page 712

1   yeah, would -- would see a -- a 510(k) submission.

2   BY MR. SLATER:

3       Q.    Medical affairs would need to agree that

4   you could discount the cytotoxicity test results

5   based on the clinical history.

6             That would -- that -- medical affairs

7   would need to sign off on that type of a decision;

8   right?

9       A.    Medical affairs would have to, yes, work

10  with the toxicologist to understand the implications

11  of the testing that was done, put it in perspective

12  and say, yes, I believe that the 510(k) submission

13  supports safe and effective use.

14      Q.    If medical affairs didn't do that, that

15  would be a breakdown in the system, to that extent,

16  if medical affairs didn't review this finding and

17  agree with it before this was submitted; right?

18            MR. SNELL:  Form.

19            THE WITNESS:  If medical affairs wasn't

20  part of the team submitting the 510(k) -- medical

21  affairs is part of the team submitting the 510(k).

22  BY MR. SLATER:

23      Q.    My question is this:  If medical affairs

24  didn't actually review this finding and agree with

25  it, your company should not have been going forward

Confidential - Attorneys' Eyes Only

Page 713

1    in reliance on this without medical affairs actually

2    being in agreement.

3        A.    Yeah, as part of the overall risk

4    evaluation of the product, they would have visibility

5    to this information.  Yes.

6        Q.    Now, in terms of cytotoxicity -- I think

7    we talked about this earlier -- one manifestation of

8    cytotoxicity in a clinical environment with Prolene

9    mesh would be if the mesh eroded through the vaginal

10   wall and was exposed; right?

11             MR. SNELL:  Form.

12             Go ahead.

13             THE WITNESS:  Yeah.  I'm sorry.  Just

14   answer -- ask it one more time, please.

15             MR. SLATER:  Sure.

16   BY MR. SLATER:

17       Q.    One clinical example of a clinical

18   manifestation of cytotoxicity would be if Prolene

19   mesh were to erode through the vaginal wall and be

20   exposed into the vagina; right?

21             MR. SNELL:  Form.

22             THE WITNESS:  If a material is implanted

23   and it is cytotoxic, it could result in tissue damage

24   such that it would be exposed.

25   BY MR. SLATER:

Confidential - Attorneys' Eyes Only

Page 714

1    Q.    Now, if you could, turn to Page 87.  Well,
2  actually, first turn to Page -- because I want you to
3  see what you're reading -- Page 83.
4          Page 83 is the clinical report for the
5  clinic, the Scandinavian multi-center study of the
6  TVT which was performed by Medscan, Dr. Ulmsten, et
7  cetera; correct?
8    A.    Yes.
9    Q.    And if you turn now to Page 87 within the
10  document, where they're talking about the results,
11  the third paragraph I want to ask you about.  It says
12  that there was a patient who required surgical
13  intervention with resection of exposed mesh.
14          Do you see that?  Third paragraph, very
15  bottom.
16    A.    Yes.
17    Q.    Would an erosion of the mesh through the
18  vaginal wall such that it was exposed be considered
19  an example of impaired wound healing as a result of
20  the interaction of the mesh and the tissue?
21    A.    Oh, it certainly would be an example of --
22  of impaired wound healing.  I don't know that you
23  could logically or immediately draw the conclusion it
24  was an interaction between the mesh and the tissue
25  that caused that.

Confidential - Attorneys' Eyes Only

Page 715

1      Q.      The mesh in the TVT causes a foreign body

2   reaction with the tissue around it; correct?

3      A.      Yes.

4      Q.      And overt evidence of that foreign body

5   reaction would be if you looked at pathology slides

6   and saw inflammatory cells; correct?

7      A.      Yeah, that -- that would be a finding of a

8   foreign body reaction.  Yes.

9      Q.      Overt clinical evidence of a foreign body

10  reaction would be if the mesh actually eroded through

11  the vaginal wall and was exposed into the vagina;

12  correct?

13     A.      No.

14     Q.      You don't -- you don't believe that

15  erosions occur, in part, as a result of the foreign

16  body reaction?

17     A.      I don't think it's necessarily one leads to

18  the other.

19     Q.      You would agree with me that, I'm not

20  going to come up with percentages with you, but there

21  are instances known and your company would agree and

22  you would agree that erosions can occur as a result

23  of the foreign body reaction leading to the mesh

24  eroding and exposing through the vaginal wall;

25  correct?

Confidential - Attorneys' Eyes Only

Page 716

1      A.     No, I don't know that I know that, that
2  it's the foreign body reaction that causes erosion.
3  I don't know that.
4      Q.     Okay.  If a woman has inflammation -- has
5  a foreign body reaction -- well, rephrase.
6             Overt evidence of the foreign body
7  reaction between the TVT mesh and the tissue around
8  it would be the inflammation, the forming of
9  fibrosis, and in some women contraction of the mesh
10  by the scar tissue that forms; correct?
11             MR. SNELL:  Form.
12             THE WITNESS:  Correct.
13  BY MR. SLATER:
14      Q.     Other overt evidence would be if that were
15  to occur and lead to pain and the patient actually
16  felt pain; correct?
17      A.     Could -- yeah, the pain could be related to
18  the contraction.
19      Q.     If you could, turn back to Page 42.
20             MR. SNELL:  Page 42, you said?
21             MR. SLATER:  Yes.
22  BY MR. SLATER:
23      Q.     This is -- again, this is the last page of
24  the biocompatibility testing results section of the
25  510(k) for the TVT.

Confidential - Attorneys' Eyes Only

Page 717

1        A.      Okay.

2        Q.      And this is discussing clinical data with

3    regard to the TVT at the very top.

4                Do you see that?  I just want to make sure

5    we're oriented to the same location.

6        A.      42 says, biocompatibility testing results

7    continued, on the upper left?

8        Q.      Yeah.  Yes.

9                Now, at the very top it says that the use

10   of the TVT device, which includes the implanted

11   polypropylene mesh, has fewer complications in terms

12   of tissue reaction than other comparable devices.

13               Do you see that?

14       A.      I do.

15       Q.      Do you know -- do you have any idea what

16   other comparable devices are being referred to here?

17       A.      I don't.

18       Q.      Knowing the history of the use of

19   polypropylene mesh in the TVT and what other devices

20   were available, was there another comparable device

21   at that time that you're aware of?

22       A.      I won't -- I won't present -- pretend to

23   know that explicitly, no.

24       Q.      I will tell you, the predicate device for

25   the TVT, as stated in this 510(k), was a Boston

Confidential - Attorneys' Eyes Only

Page 718

1    Scientific urinary incontinence, stress urinary

2    incontinence, product called the ProteGen Sling.

3              Are you aware of that?

4        A.    Vaguely, yes.

5        Q.    Would that be one of the comparable

6    devices or do you not know?

7        A.    I -- I don't know what they were referring

8    to here.

9        Q.    It says here a little further down,

10   implantation -- let me just reorient.

11             Here on the -- on Page 42, the last page

12   of the biocompatibility testing results section, it

13   states, implantation of a potentially cytotoxic

14   material would be expected to cause impaired wound

15   healing, resulting in non-healing ulcerations and

16   overt evidence of foreign body reaction.

17             Do you see that?

18       A.    I do.

19       Q.    And I think we just established a few

20   moments ago that there are examples of overt evidence

21   of foreign body reaction with the TVT; correct?

22       A.    Well, so I don't know.  I mean, I just

23   don't know.  Do we have -- do we have clinical

24   histologic evidence of overt -- what do they call it?

25   Overt -- where is it?  Overt evidence of foreign body

Confidential - Attorneys' Eyes Only

Page 719

1    reaction from a TVT device?  I just don't know that.

2         Q.    Well, you agree with me that if you could

3    see on pathology slides chronic inflammation, that

4    would be overt evidence of the foreign body reaction;

5    correct?

6         A.    I don't know what overt evidence it would

7    be, but yes, inflammatory cells in and around a

8    foreign body is part of a foreign body reaction, yes.

9         Q.    And we talked about a few other examples a

10   few moments ago where the scar tissue formed would

11   lead to a contraction of the mesh and it could also

12   lead to pain.

13              That would be overt evidence; correct?

14              MR. SNELL:  Well, form.

15              THE WITNESS:  So --

16   BY MR. SLATER:

17        Q.    We just established that a few moments

18   ago; right?

19              MR. SNELL:  Form.

20              THE WITNESS:  Scar contracture --

21              MR. SNELL:  Go ahead.

22              THE WITNESS:  Scar contracture -- I mean,

23   the -- the development of scar tissue or fibrotic

24   tissue is a later-stage event in a foreign body

25   reaction and, indeed, we're aware that scars

Page 720

1  contract, and if the scar is and fibrotic tissue is

2  enveloping a foreign body that is compressible, it

3  can be compressed.

4  BY MR. SLATER:

5      Q.    According to what it states here in the --

6  in the 510(k) for the TVT, that would be consistent

7  with the cytotoxic property of the material leading

8  to tissue damage --

9      A.    Well --

10      Q.    -- and a tissue reaction; correct?

11              MR. SNELL:  Form and foundation.

12              THE WITNESS:  I don't understand your

13  question.  Sorry.  I missed it.

14  BY MR. SLATER:

15      Q.    Based on what it states here, the -- this

16  overt evidence of a foreign body reaction is what one

17  would expect to see as a result of a cytotoxic

18  material.

19              That's what it states --

20      A.    Yeah.

21      Q.    -- right here; right?

22      A.    Yeah.  So --

23              MR. SNELL:  Form.

24              Go ahead.

25              THE WITNESS:  -- a cytotoxic material

Confidential - Attorneys' Eyes Only

Page 721

1    implanted in the body and that examined

2    histologically, I would expect a foreign body

3    reaction to be part of the findings.

4    BY MR. SLATER:

5         Q.    The other example that's provided here is

6    impaired wound healing, resulting in a non-healing

7    ulceration.

8             When the TVT mesh erodes through the

9    vaginal wall, that's an example of impaired wound

10   healing, resulting in a non-healing ulceration

11   because the mesh is coming through; correct?

12        A.    So if you -- if you had a material that was

13   clinically relevantly cytotoxic and you implanted it

14   and that cytotoxicity was of a magnitude that could

15   impair wound healing, then yes, you could have -- you

16   could have loss of tissue over that implant.

17        Q.    That's what happens when the mesh of the

18   TVT erodes through the vaginal wall; correct?

19        A.    As I said before, I don't know that that's

20   what -- I don't know that that erosion is directly

21   related to a foreign body reaction.

22        Q.    Well, you would agree -- I think what

23   you're saying is in all instances you can't say that?

24        A.    Well, in all instances I know that's not

25   true.

Confidential - Attorneys' Eyes Only

Page 722

1      Q.    Okay.  You would agree with me that in

2  some instances of TVT erosions through the vaginal

3  wall that that is what occurs; correct?

4            MR. SNELL:  Form.

5            THE WITNESS:  No.  I think you're trying

6  to get me to say that it's cytotoxic and, therefore,

7  causes erosion, and I'm not agreeable to that.

8  BY MR. SLATER:

9      Q.    What I'm -- what I'm asking you to agree

10 to is, in some patients the mesh erodes through the

11 vaginal wall and it would be accurately described as

12 an impaired wound healing situation, resulting in a

13 non-healing ulceration.

14     A.    That's true.

15     Q.    Okay.  If it was the conclusion of the

16 people who handled this situation -- well, rephrase.

17            If it was the conclusion of your company

18 at the time the TVT was being developed and clearance

19 was being sought that they didn't have to be

20 concerned about the cytotoxicity test results and

21 they were basing that on some assumption that the TVT

22 mesh would not erode through the vaginal wall and

23 become exposed into the vagina, if that was one of

24 the assumptions that supported that decision, that

25 would be poor logic because that's something that's

Confidential - Attorneys' Eyes Only

Page 723

1    known to occur; correct?

2                MR. SNELL:  Form.

3                THE WITNESS:  You've got to do that one

4    again.  Sorry.

5                MR. SLATER:  I'm so glad you said that

6    because I don't even know what I'm --

7    BY MR. SLATER:

8        Q.    If medical affairs -- well, rephrase.

9                If the people who decided that the

10   cytotoxicity testing didn't -- didn't have to be a

11   concern were relying, in part, on an assumption that

12   the TVT mesh would not erode through the vaginal wall

13   to be exposed into the vagina, if they actually drew

14   that assumption to support that decision, you would

15   disagree with the assumption and you would disagree

16   with the decision; correct?

17               MR. SNELL:  Form.

18               Go ahead.

19               THE WITNESS:  Well, what -- what's the

20   assumption?

21               MR. SLATER:  Okay.  I'm going to ask it

22   again.

23   BY MR. SLATER:

24       Q.    It would not be accurate to assume that

25   the TVT mesh does not in some women erode through the

Page 724

1    vaginal wall and become exposed into the vagina;

2    right?

3         A.    It would not be accurate to say that

4    that -- that the TVT tape implanted could not ever

5    become exposed.

6         Q.    Okay.  If somebody did assume that or your

7    company assumed that at the time the TVT was being

8    developed and first marketed and that that assumption

9    was the basis to say we don't have to worry about the

10   cytotoxicity testing, from a medical affairs

11   perspective, you would criticize the assumption and

12   you would say that that is not a sound basis on which

13   to discount the cytotoxicity.

14              MR. SNELL:  Form.

15              THE WITNESS:  I think that's accurate.

16              MR. SLATER:  Okay.

17              Do you know what time it is?

18              THE WITNESS:  Lunchtime.

19              MR. SLATER:  I promised that, so okay,

20   let's take a break.

21              VIDEO OPERATOR:  Time is now 12:29.

22              We're going off the record.

23              (Luncheon recess, 12:29-1:44 p.m.)

24                 AFTERNOON SESSION

25              VIDEO OPERATOR:  The time is now 1:44.

Confidential - Attorneys' Eyes Only

Page 725

1            We are back on the record.

2            MR. SLATER:  Okay.

3    BY MR. SLATER:

4        Q.    If you could, turn in the 510(k) to Page

5    87, which is the conclusion to the multi-center trial

6    on the TVT prototype by Medscan.

7        A.    Got these upside down.  Okay.  87?

8        Q.    87, the very bottom of the page, there's

9    conclusions and discussion.

10       A.    Uh-huh.

11       Q.    At the very bottom of the page it says --

12   rephrase.

13            In the conclusion and discussion to the

14   Medscan multi-center study they say, also noteworthy

15   is the fact that no cases of graft rejection was seen

16   in this series.  Normally, one would expect on the

17   order of a 3 percent rejection rate with traditional

18   slings, as evidenced by vaginal urethral erosion.

19            Do you see where I'm reading?

20       A.    Yes.

21       Q.    So in terms of how the term "rejection" is

22   being used in this study, apparently, that's being

23   equated to some sort of a reaction between the mesh

24   and the tissue that leads to an erosion either

25   through the vagina or into the urethra or another

Confidential - Attorneys' Eyes Only

Page 726

1    part of the body.

2              That's what it seems to be saying there;

3    right?

4        A.    No.  I think it's saying that -- that

5    when -- when devices like this are used in that

6    setting, they can't -- I don't think it's necessarily

7    a reaction, but this procedure with these devices in

8    place can result in an erosion or in an exposure.

9        Q.    Okay.  I want to start off with the -- the

10   concept of graft rejection.

11             They are saying here -- it seems to me

12   they're saying when a rejection, however they define

13   that, occurs, the evidence of it would be an erosion

14   either through the vagina, the urethra or someplace

15   else in the pelvis.

16       A.    That's what it sounds like when they --

17   yeah, they way they write it.  Uh-huh.

18       Q.    Okay.  They say here that, in the very

19   beginning of that paragraph, there were no cases of

20   that occurring; right?

21       A.    Yes.

22       Q.    If you go back up just above the

23   conclusions and discussion -- we talked about this

24   earlier -- they talk about resection of exposed mesh.

25             So that would actually have been an

Confidential - Attorneys' Eyes Only

Page 727

1   erosion through the vaginal wall that led to exposure

2   and led to the need to resect it; correct?

3                   MR. SNELL:  Form.  Foundation and form on

4   that.

5                   THE COURT REPORTER:  I'm sorry, Burt.

6                   MR. SNELL:  Foundation as well on that.

7                   THE WITNESS:  Well, they describe this --

8   this particular incident as an infection and that

9   required for its treatment, I presume, surgical

10  intervention with resection of exposed mesh.

11  BY MR. SLATER:

12       Q.    They talk about the fact in the last

13  paragraph -- well, rephrase -- in the second

14  paragraph of the conclusion that there were no cases

15  of vaginal or urethral erosions; right?

16       A.    They just say nowhere there's -- in fact,

17  there were no cases of graft rejection seen in this

18  series.

19       Q.    They say there were no cases of graft

20  rejection which would have been evidenced by vaginal

21  and urethral erosion.

22       A.    So they're clearly -- they're clearly

23  blaming this erosion that they talk about up above on

24  an infection.

25       Q.    We're going to get to that.  We're going

Confidential - Attorneys' Eyes Only

Page 728

1    to get to the logic of that, but I just want to start
2    by defining what they are saying.
3              In the second paragraph of the conclusion
4    here Dr. Eriksson, who signed the document for
5    Medscan, says there were no cases of graft rejection
6    and in the second -- in the next sentence says
7    evidence of a graft rejection would have been a
8    vaginal or urethral erosion; correct?
9         A.    As evidenced by a vaginal -- so yes.  So
10   he's saying --
11        Q.    He's saying that didn't happen.
12        A.    He's saying they didn't have a rejection
13   that resulted in a vaginal or urethral erosion.
14   That's what they're -- that's my read.
15        Q.    We can agree that just above the
16   conclusion there is documentation that mesh had
17   eroded through the vaginal wall and become exposed.
18              That's documented right there; correct?
19              MR. SNELL:  Form.
20              THE WITNESS:  In the patient that had the
21   infection, yes.
22              MR. SLATER:  Move to strike.
23   BY MR. SLATER:
24        Q.    That is documented there; correct?
25              MR. SNELL:  Same objection.

Page 729

1   BY MR. SLATER:

2       Q.    I'm not asking about the -- we're going to

3   get to that.

4             My question is limited to this:  Just

5   above the conclusion it's documented that there was

6   mesh that eroded through the vaginal wall, was

7   exposed and had to be resected.

8       A.    Yes.

9       Q.    Now, the authors of this study -- and Dr.

10  Eriksson signed it -- claim that there was a vaginal

11  infection that required surgical intervention with

12  resection of exposed mesh; right?

13      A.    Right.

14      Q.    You know, in fact, that when you have mesh

15  that's exposed into the vagina and is infected,

16  that's something that can happen with a vaginal

17  erosion.

18            MR. SNELL:  Form.

19            THE WITNESS:  Yes.

20  BY MR. SLATER:

21      Q.    When you put all this together, when the

22  authors suggest that there were no cases of graft

23  rejection, which they say would have been evidenced

24  by a vaginal erosion, when you look at just above the

25  conclusions, that does not seem to be consistent with

Confidential - Attorneys' Eyes Only

Page 730

1  what it says actually occurred to one patient; right?

2      A.   I don't agree with that.  I think clearly

3  when I read this, whoever authored it is saying that

4  one patient had an infection and also as a result of

5  the infection had an erosion.  He's -- they're --

6  they're claiming here that there weren't any, quote,

7  rejections that resulted in erosion.  They're

8  implying two mechanisms for exposure.

9      Q.   Okay.  Let's put aside the word

10 "rejection" for a second.

11          You would agree with me that, based on

12 what you're reading right here on this last -- these

13 last two pages of this report of this study by

14 Medscan, there was a vaginal erosion that led to

15 exposure of the mesh into the vagina.  That's

16 documented.

17     A.   There was --

18          MR. SNELL:  Form.  No.  Form.

19          THE WITNESS:  There was a vaginal

20 infection and as part of that there was an erosion,

21 according to their -- their opinion.

22 BY MR. SLATER:

23     Q.   Frankly, it doesn't matter why the erosion

24 occurs, it just matters that it occurred; right?

25     A.   I suspect there are differences in -- in --

Confidential - Attorneys' Eyes Only

Page 731

1   in causation that could imply or could impact
2   treatment but an erosion is an -- or an exposure is
3   an exposure, yes, so we --
4        Q.   And, in fact, there would really be no way
5   for these doctors to know, did the infection occur
6   before the erosion or did it occur after the erosion.
7   There's no way to know that.
8             MR. SNELL:  Form.  Objection.  Foundation.
9             THE WITNESS:  Well, I don't know the
10  circumstances, but I would disagree.
11            If you were following a patient and you
12  saw a wound infection that had subsequently broke
13  down and became an exposure, then their opinion would
14  be the infection came first.
15  BY MR. SLATER:
16       Q.   A -- rephrase.
17            An erosion of TVT mesh can occur in the
18  setting of an infection; right?
19       A.   They claim so, yeah.  Claim so right here,
20  yeah.
21       Q.   And you would agree with that; right?
22  That can occur; right?
23       A.   I would think so, yeah.
24       Q.   One -- one question about something we
25  talked about earlier.  Well, rephrase.  Let me ask

Confidential - Attorneys' Eyes Only

Page 732

1    you this:  You would count -- rephrase.

2                If you were asked, is this adverse event

3    that's being described here a vaginal mesh erosion

4    with exposure, would you agree with that?

5         A.    I would agree with it -- there was -- this

6    patient had exposed mesh, yes, as part of her

7    clinical course.

8         Q.    We spoke a little bit earlier about the

9    reliance by your company on the history of the use of

10   Prolene mesh for hernia treatment.  We talked about

11   that a little earlier?

12        A.    We did.

13        Q.    I've seen documents in various PowerPoints

14   from your company that medical affairs were involved

15   in where they actually say the vagina is not the

16   abdomen nor is it similar to any other surgical

17   environment.

18                Are you familiar with those statements?

19        A.    Not off the top of my head, no.

20        Q.    You would agree with that premise;

21   correct?

22        A.    Yes.

23        Q.    So when -- so rephrase.

24                In terms of looking at the history of the

25   use of Prolene mesh in order to get some idea of what

Confidential - Attorneys' Eyes Only

Page 733

1  can we expect to happen when we use this mesh in the
2  vagina, you can, your company can look at what occurs
3  and what's known about what occurs in hernia
4  applications but, ultimately, medical affairs and
5  your company would also know, hey, we have to do our
6  own evaluation of what happens in the vagina because
7  it's a very different environment and we cannot
8  expect everything that occurs in abdominal treatment
9  to translate directly to vaginal and pelvic
10  treatment.  Is that a fair statement?
11         MR. SNELL:  Form.
12         Go ahead.
13         THE WITNESS:  I would certainly agree
14  that -- so the -- the experience in the abdomen or
15  in -- in abdominal wall surgery is relevant but
16  not -- but not necessarily completely predictive
17  because they are two different anatomic areas.
18         MR. SLATER:  I think there's a fair chance
19  that I'm not going to pull out the 510(k) again.  I
20  think we've gone through that part of the
21  questioning.
22         THE WITNESS:  I'm sure I have the pages
23  out of order by now, by the way, so -- if anybody
24  cares.
25         MR. SLATER:  Well, you know it's a good

Confidential - Attorneys' Eyes Only

Page 734

1  document because it contains a lot of data and a lot

2  of other important documents, so rather than bringing

3  them all, I figured bring the big one, bring the

4  honcho.  Okay.

5  BY MR. SLATER:

6      Q.    I'll hand you, and I have one for

7  counsel -- I just handed you Exhibit T-1338.  This is

8  an E-mail that was written by a marketing person

9  within Ethicon, Barbara McCabe, dated April 13, 2005.

10          Do you see that in front of you?

11     A.    I do.

12     Q.    I want to ask you about a little bit of

13 the language of this E-mail in the first paragraph.

14 She's talking about what she calls a one-pager.  That

15 would be a one-page sales aid, something to give to

16 doctors.

17          You see that?

18     A.    I do.

19     Q.    And she says -- rephrase.

20          And she's talking about in this instance

21 the introduction of a new sheath that they want to

22 promote to doctors through this sales tool, through

23 this one-pager; right?

24     A.    Yes.

25     Q.    And she says the following:  The idea is

Confidential - Attorneys' Eyes Only

Page 735

1   to really play up this change and make it sound like

2   a major improvement without actually having any data

3   to prove this, thus, my deliberate use of the words

4   "designed to."  This language just means that it was

5   designed to do something, not that it actually does

6   something.  And then she says in parentheses,

7   typically, I use this when there is no data, with two

8   exclamation points.  I've gotten this through legal

9   before.

10               Do you see where I just read?

11        A.    I do.

12        Q.    And this E-mail was forwarded to multiple

13   people in marketing, including Dharini Amin, Kevin

14   Mahar and some others there.

15               Do you see that?

16        A.    Yes.

17        Q.    If you could, can you turn now again to

18   Exhibit 243, the sales aid from the Prolift+M.

19        A.    Okay.

20        Q.    And if you look at the second-to-last

21   page, I want to ask you a question.  On the

22   second-to-last page of this sales aid for physicians

23   it talks about the Gynecare Prolift+M and then it

24   says, in your hands, and it uses the phrase "designed

25   to."

Confidential - Attorneys' Eyes Only

Page 736

1              Do you see that?

2         A.    Uh-huh.

3         Q.    And that's the phrase that was being

4    described by Barbara McCabe in her E-mail, from

5    marketing; right?

6         A.    Yes.

7         Q.    And she talks about the Prolift+M designed

8    to resist wrinkling and folding, provide anatomic

9    coverage, offer patient-specific adjustability.

10             Do you see that?

11        A.    I do.

12        Q.    And then on the right-hand side it says,

13   in your patient's body designed to.

14             And, again, that's the language that

15   Barbara McCabe from marketing had talked about in

16   that E-mail; right?

17        A.    Right.

18        Q.    And she says it's designed to resist wound

19   contraction or shrinkage, offer improved tissue

20   integration, result in softer, more supple tissue.

21             That's what it says; right?

22        A.    Yes.

23        Q.    And if you turn to the front page, the

24   very front page of this marketing document, the

25   second sentence right at the bottom says, designed

Confidential - Attorneys' Eyes Only

Page 737

1    for improved patient comfort.  Prolift+M gives you a

2    more advanced graft so your patient gets more with

3    less.

4              Do you see that?

5        A.    I do.

6        Q.    And it's a little different but pretty

7    close to what she's talking about in her E-mail as

8    opposed to saying designed to, designed for.

9              Do you see that?

10       A.    Yes.

11       Q.    Okay.  I promise I'm not going to ask you

12   a lot about this but I want to spend five or ten

13   minutes with this document that I know you were asked

14   about previously.  This is Exhibit T-1333.

15             You have in front of you Exhibit T-1333,

16   which is the Johnson & Johnson Worldwide medical

17   device and diagnostics policy for investor --

18   investigator-initiated studies.  It says clinical

19   studies; right?

20       A.    Right.

21       Q.    And we established earlier that this was

22   put into effect in 2009?

23       A.    Yes.

24       Q.    I just want to go through a little bit of

25   the language of it for a few moments.

Confidential - Attorneys' Eyes Only

Page 738

1          At the very beginning in the introduction

2    it says, this document sets forth the policy by which

3    Johnson & Johnson medical devices and diagnostics

4    affiliates worldwide will develop and implement

5    programs to provide support for clinical

6    investigator-initiated studies, which are abbreviated

7    as IISs; correct?

8          A.    Correct.

9          Q.    And Johnson & Johnson medical devices and

10   diagnostics affiliates worldwide would include

11   Ethicon; right?

12         A.    Yes.

13         Q.    In the next paragraph it talks about the

14   fact that this is establishing standards of conduct

15   to apply to those responsible for medical aspects of

16   research and development and it talks about the

17   principles that guide ethical decision-making that

18   will promote the appropriate use of our products and

19   the best interests of our patients, their families

20   and their health-care providers.

21              See that?

22         A.    Yes.

23         Q.    And you would agree with me that it's a

24   good thing to have a policy like this but ultimately

25   the most important thing is to adhere to the policy;

Confidential - Attorneys' Eyes Only

Page 739

1    right?

2         A.    Correct.

3         Q.    And let's talk about a little bit of what

4    they say that the aspects of this ethical

5    decision-making is.

6               And there's some bullet points.  Do you

7    see those?

8         A.    I do.

9         Q.    It talks about the well-being of the

10   subject is first.

11              That would be the patient comes first;

12   right?

13        A.    Yes.

14        Q.    Credo-based values should be applied in

15   the design and conduct of studies.

16              That's referring to the Johnson & Johnson

17   credo to put the patient first; correct?

18        A.    Correct.

19        Q.    It is our responsibility to adhere to the

20   principles of good clinical practice.  Product

21   information is relevant, accurate, fair and balanced.

22              It's talking about making sure that the

23   truth and the whole truth is being told, not just one

24   side of the story; right?

25        A.    Right.

Confidential - Attorneys' Eyes Only

Page 740

1        Q.    Cross-cultural differences are accounted

2    for.  And, last, we must vigorously raise and vet

3    medical and ethical concerns; right?

4        A.    Right.

5        Q.    And then it says, IISs supported by the

6    Johnson & Johnson family of companies should be

7    conducted with these same rigorous scientific and

8    ethical standards.

9             And that's essentially the -- the broad

10   scope of what this policy is supposed to achieve;

11   correct?

12       A.    Yes.

13       Q.    If you could, turn to Page 7.

14             On Page 7 is Section 5.1.3 titled

15   "Conflict of Interests."

16             Do you see that in front of you?

17       A.    Uh-huh.  Yes.

18       Q.    And it talks about the fact that the

19   supporting medical device and diagnostics company,

20   which in the case of studies promoted or -- or paid

21   for by Ethicon, that would be Ethicon; right?

22       A.    Right.

23       Q.    The supporting MD&D company will give

24   enhanced scrutiny to managing conflicts of interest

25   in clinical research.

Confidential - Attorneys' Eyes Only

Page 741

1          See that?

2     A.     Uh-huh.

3     Q.     And I --

4     A.     Yes.

5     Q.     And I think you would agree with me that's

6     a very important thing to do, to make sure that any

7     potential conflicts of interest are carefully

8     managed; right?

9     A.     Right.

10     Q.     And the reason being because if someone

11     has a conflict of interest when they're running a

12     study, that can have impacts in all different aspects

13     of how the study is designed, conducted, reported.

14     It all can be influenced by a conflict of interest,

15     potentially.

16     A.     Potentially is correct.

17     Q.     And in the body of the paragraph under

18     here it points out, in part, however, once an

19     individual has an ownership interest in a medical

20     device and diagnostics company product, that

21     individual will not be considered for future support

22     of investigator-initiated studies in which the safety

23     or effectiveness of that product is under

24     investigation.

25          See that?

Confidential - Attorneys' Eyes Only

Page 742

1      A.    Yes.

2      Q.    And that would exclude, for example, if

3   Dr. Ulmsten and Dr. Eriksson were to approach Ethicon

4   today and say we want to do a study and we want you

5   to help support this study, we're going to study the

6   TVT, knowing that they own a part of the company that

7   developed the device and they have an ownership

8   interest, per this policy, that could not happen.

9      A.    Yeah.

10          MR. SNELL:  Foundation, form.

11          THE WITNESS:  I don't know that they have

12   -- so I don't know what their business relationship

13   is, but if an investigator does -- so I agree with

14   this policy.

15          MR. SLATER:  Okay.

16   BY MR. SLATER:

17      Q.    If, in fact, Dr. Ulmsten and Dr. Eriksson

18   have a ownership interest in the TVT --

19      A.    Right.

20      Q.    -- at a point when they approach the

21   company, if this policy is in effect, they can't be

22   funded through an IIS grant; right?

23      A.    Right.

24      Q.    Let's go now to Page 10.  Page 10, there's

25   a section on publications.

Confidential - Attorneys' Eyes Only

Page 743

1          A.     Sorry.  Yeah.

2          Q.     And it says, this section states the

3   minimum requirements for the review and acceptance of

4   the publication deliverables from supported IISs and

5   to the policy regarding support of publications.

6                 That's just generally saying this is what

7   this covers; right?

8          A.     Yes.

9          Q.     The second paragraph under publications

10  says, each medical device and diagnostics company

11  will institute a process for the review and

12  acceptance of the publication deliverables with the

13  objective of confirming that the deliverables, and

14  then they have a list of things that need to be

15  confirmed, that they fulfill the contractual

16  requirements, accurately represent the findings of

17  supported IISs and, three, do not jeopardize

18  intellectual property submissions.

19                Do you see that?

20         A.     I do.

21         Q.     What is a publication deliverable, in

22  general terms?

23         A.     Let me read this for one sec.

24                Yeah.  So my -- my understanding of this

25  would be we do as of that -- the -- the establishment

Confidential - Attorneys' Eyes Only

Page 744

1   of this document or guideline have a policy whereby

2   when we do research, it should be published.

3   Certainly, for our own -- our own company-sponsored

4   studies, that's absolutely the case.

5           So we would not -- we would not do research

6   and then have a finding that was other than what we

7   wanted and then not publish it because that goes

8   against publication ethics or scientific publication

9   ethics.

10          Similarly, when we evaluate a -- a request

11  for an investigator-initiated study and have a

12  contract with them, the same expectation -- we

13  can't -- we can't write the publication, we can't

14  submit it, but our -- but our contract would call for

15  them to do so, so make public their findings.  So

16  that would be a publication deliverable.  That's my

17  understanding.

18      Q.    Okay.  Let me ask you one thing you said

19  earlier.  I just want to break it out and understand

20  it.

21          Am I correct that, from your perspective,

22  if a study is performed by your company or your

23  company funds a study, as an ethical matter, you

24  believe the results should be published, regardless

25  of the results?

Confidential - Attorneys' Eyes Only

Page 745

1      A.    Yes, that's part of the publication policy,
2   at least currently.
3      Q.    Okay.  Even before this policy was in
4   effect, from a medical and a clinical study
5   perspective, you would have said to me, yes,
6   ethically, if our company conducts a study or funds a
7   study, the results should be published, regardless of
8   whether the -- the results are favorable or
9   unfavorable to our company.
10      A.    Yeah, I adhere to that philosophy.
11      Q.    Let's look under the publications, halfway
12   down, it says -- there's a paragraph that starts with
13   the word "note."
14      A.    Uh-huh.
15      Q.    And I want to just ask you about the last
16   sentence there.  It says, any review or support
17   provided by the medical device and diagnostic company
18   must in no way interfere with the investigator's
19   primary role in interpreting the study results and
20   drawing conclusions in a manner consistent with the
21   scientific method.
22           Do you see that?
23      A.    Yeah.  I -- I was reading from the top so
24   let me catch up to you.  But yes.
25      Q.    Does that, in essence, mean we can review

Confidential - Attorneys' Eyes Only

Page 746

1   the study results, we can review the manuscript, but

2   we should not be making any effort to either

3   implicitly or explicitly influence how the

4   investigator is interpreting the study results or to

5   influence the conclusions that the investigator is

6   drawing?

7        A.    So my -- my understanding of this paragraph

8   is and our -- our contract would call for, we -- we

9   do have the right to see the information, the data,

10  we do have a right to review the -- the manuscript of

11  whatever the publication form is and we are able to

12  offer comments but we can't -- there's no -- we have

13  no final say.  The -- the investigator himself or

14  herself has the final determination of what goes into

15  the manuscript but it's -- but we are able to provide

16  comment.

17       Q.    In providing the comments, based on this

18  policy, would it be fair to say that the comments

19  have to be provided in a neutral way, not in a

20  coercive way, where it's being made clear to the

21  investigator, hey, this could, in fact -- this could

22  impact on our company so we'd really rather you say

23  it differently?

24            That would be inappropriate, under this

25  policy; right?

Confidential - Attorneys' Eyes Only

Page 747

1          MR. SNELL:  Form.

2          THE WITNESS:  My expectation would be that

3  the -- the company representatives that are reviewing

4  and providing comments would be adding their thoughts

5  relative to the scientific integrity of the report.

6  BY MR. SLATER:

7      Q.    It would be inappropriate for those from a

8  Johnson & Johnson company to make comments as part of

9  the review that would be designed to change

10  conclusions, for example, drawn by the investigator

11  if they were concerned that that conclusion that the

12  investigator had drawn initially could be harmful to

13  Johnson & Johnson's business.

14      A.    Unless our scientific interpretation of the

15  data were such that we didn't agree with the

16  conclusions, even though they were harmful, we would

17  have the ability to make comments and say we don't

18  agree with the -- the conclusions being drawn or we

19  would suggest thinking, you know, whatever.

20      Q.    If your reviewers from your company were

21  to feel that there was something about the

22  interpretation that was inaccurate, objectively

23  inaccurate, it would be important to explain that as

24  part of the feedback to the investigator to say,

25  look, you know, you've said this, we think you missed

Page 748

1    this on the analysis, so if you look at it this way,

2    please consider maybe there's a different way to

3    analyze this?  That type of thing you're saying would

4    be okay.

5         A.    Yes.

6         Q.    If the investigator drew a conclusion, for

7    example, saying, look, based on this data, you know,

8    I think that more rigorous testing should be done on

9    these types of devices, for example, would it be

10   appropriate for the reviewers to say, hey, you know,

11   we'd rather you not say that because that could

12   actually impact on our ability to get things to

13   market?

14             MR. SNELL:  Form.

15             THE WITNESS:  I would not expect the

16   scientists to directly link their review of the

17   publication to a commercial outcome.

18   BY MR. SLATER:

19        Q.    Let's look at the last part of the

20   publications section.  It says at the very bottom,

21   all material support and editorial contributions by

22   medical device and diagnostics company personnel will

23   be acknowledged in any presentation or manuscript

24   that arises from the supported research according to

25   the ICMJE uniform requirements, Reference 10.2, and

Page 749

1    the requirements of the journal to which the

2    manuscript is submitted.

3            Do you see that?

4    A.    I do.

5    Q.    Would one aspect of that provision be that

6    if your company not only reviewed a manuscript but

7    had editorial input as part of the review, making

8    suggestions, you should change the article in this

9    way or that way, that that should be acknowledged in

10   the article?  And I'm looking where it says,

11   editorial contributions.

12   A.    Right.  Yeah, the policy would say, for

13   sure.  I mean, the -- the manuscript should reflect

14   support, whether it's money, product or whatever, and

15   editorial contributions, I guess that would be to say

16   the company had visibility to the manuscript or

17   something like that.  So I don't find anything wrong

18   with that.

19   Q.    What I'm asking is this:  Based on this

20   provision, if people from your company review the

21   manuscript, for example, before it was submitted to a

22   journal and had editorial input, for example, delete

23   this, change the wording of that and actually had

24   input as opposed to just reviewing it and saying,

25   okay, we've read it and didn't give any input, those

Page 750

1    editorial contributions should be recognized in the

2    article, correct, according to this provision?

3              MR. SNELL:  Form.

4              THE WITNESS:  Yeah.  Yeah.  I'm not

5    positive I understand what's meant by editorial --

6    editorial contribution.  Is that what it says?  Yeah,

7    editorial contributions.  But I -- I think it is

8    for -- in terms of transparency, important for

9    readers to understand who had -- who contributed to

10   authorship and -- and construction of the manuscript.

11   BY MR. SLATER:

12        Q.    And you would agree with me that editorial

13   input is a contribution to the ultimate final

14   product; right?

15        A.    Yes.

16        Q.    These -- the policies set forth in this

17   document, were these policies in effect within your

18   company as a matter of policy even though they

19   weren't documented in such a document, in an

20   unwritten form?  Meaning, was it expected that your

21   company would adhere to these types of principles

22   even before it was documented in this policy?

23             MR. SNELL:  Form.

24             Go ahead.

25             THE WITNESS:  I don't know that -- I don't

Confidential - Attorneys' Eyes Only

Page 751

1    know that we had any sort of formal policy above and
2    beyond or preceding this one.
3              I think there may have been an older MD&D
4    publication policy.  And in Ethicon, you know, our
5    publication policy was largely around a process by
6    which publications would be produced, reviewed and
7    approved.  So I can't swear to it.  I -- I think
8    there was a publication policy in place in MD&D prior
9    to this one.  I think that's the case.
10   BY MR. SLATER:
11        Q.    On the very first page of this it talked
12   about the genesis or the -- the foundational source
13   for these policies being things like the Johnson &
14   Johnson credo and medical and ethical --
15        A.    Yeah.
16        Q.    -- considerations and good clinical
17   practice, things like that.
18        A.    Yep.
19        Q.    The -- the specific provisions that I've
20   discussed with you --
21        A.    Yeah.
22        Q.    -- would you agree that even before this
23   policy was formally adopted, that those were things
24   that Johnson & Johnson medical device and diagnostics
25   company should have been doing as an ethical matter

Confidential - Attorneys' Eyes Only

Page 752

1  anyway?

2       A.    Yeah, those are consistent, in my world or

3  in my view, with GCP, to start with.

4             (Exhibit T-1347A was marked for

5  identification.)

6  BY MR. SLATER:

7       Q.    When you say GCP, you're talking about

8  good clinical practice; right?

9       A.    Yes, I am.

10      Q.    Okay.  What I've handed you as Exhibit

11 1347 is a TVT marketing sales aid for doctors.

12            Do you see this?

13      A.    I do.

14      Q.    What I'd like to do now is turn to the

15 second page, and in the right-hand column -- well,

16 rephrase.

17            On the second page of this after the cover

18 the title says, long-term data and clinical

19 experience prove exceptional efficacy and safety.

20 And then it says, five years of exceptional efficacy,

21 and then on the right-hand side right under that,

22 cured/improved success rate and studies evaluating 50

23 or more patients.

24            Do you see that?

25      A.    I do.

Confidential - Attorneys' Eyes Only

Page 753

1      Q.    And it then lists the studies with rates

2   of cured or improved patients in those studies.

3            See that?

4      A.    I do.

5      Q.    And it includes studies by Ulmsten;

6   correct?

7      A.    It does.

8      Q.    And, in fact, if you look to the -- the

9   end of this document, the references, Reference 1 is

10  a study in which Ulmsten participated with Dr.

11  Nilsson and others, Reference 4 is Ulmsten, a

12  three-year followup of tension-free vaginal tape for

13  surgical treatment of female stress urinary

14  incontinence, and Number 5 is Ulmsten and other

15  authors, a multi-center study of tension-free vaginal

16  tape for surgical treatment of stress urinary

17  incontinence.

18            See those?

19     A.    I do.

20     Q.    And, in fact, Reference 5 is the published

21  article from the multi-center study that was

22  submitted in report form to the FDA with the 510(k);

23  correct?

24     A.    I believe that's right.

25     Q.    Exhibit 5 -- rephrase.

Confidential - Attorneys' Eyes Only

Page 754

1          Reference 5 is the study that was

2     performed -- in the internal documents it's the

3     Medscan study but -- but Ulmsten was the first listed

4     author on that, correct, the multi-center trial?

5          MR. SNELL:  Form.

6          I'm sorry.  I totally didn't understand

7     that question.

8          MR. SLATER:  I'll ask it again.  That's

9     fine.  I probably was talking too quick or too low or

10    too garbled.  Okay.  Let me -- let me ask again.

11    BY MR. SLATER:

12         Q.   Reference 5 in this document is a study in

13    which Ulmsten is the first listed author, and that is

14    the multi-center study that was conducted by Medscan.

15         A.   I think that's right, yeah.

16         Q.   And we've -- we've talked earlier about

17    the provisions in the Agreement between Johnson &

18    Johnson and Medscan, the -- the provisional payment,

19    et cetera.

20         A.   Right.

21         Q.   We've talked about that.

22         A.   Right.

23         Q.   Is -- I don't see anywhere in this

24    document any disclosure of that financial provision

25    and, you know, I would ask you if you see anything

Confidential - Attorneys' Eyes Only

Page 755

1  that would indicate that it was disclosed to doctors

2  that that study had a provision like that in it.

3              MR. SNELL:  Well, form.

4              THE WITNESS:  Yeah.  That study what?

5              MR. SLATER:  Had that provision, the

6  provision which said the $400,000 payment will only

7  be made if there is no significant difference in the

8  adverse events as compared to Ulmsten's original

9  study.

10             There's no disclosure that such a

11 provision existed, even though that study is actually

12 cited as support for exceptional efficacy and safety.

13             MR. SNELL:  Form.

14 BY MR. SLATER:

15    Q.    Correct?  Unless you see something that

16 I'm missing.

17    A.    I mean, I have to look, because I've never

18 seen this before.

19    Q.    Fair enough.

20    A.    I don't -- no, I don't see a reference or a

21 notation.

22    Q.    This document, this marketing aid

23 regarding the TVT, at the end of the document has

24 a -- very bottom left corner of the last page, it

25 says 2002, so that gives us some idea of the time

Confidential - Attorneys' Eyes Only

Page 756

1    period when it was put into effect, probably; right?

2         A.    Right.

3         Q.    Now, let's go, if we could, to the next

4    page, the third page of this, where it says, all the

5    tools for success.

6              Do you see that?

7         A.    I do.

8         Q.    The first thing it says, unique mesh with

9    exceptional clinical performance, and then it gives

10   the basis for that claim, and the first one, proven

11   biocompatibility.  Composed of Prolene polypropylene

12   material used in Ethicon sutures.

13             Do you see that?

14        A.    Yep.  Yes.

15        Q.    So one of the things doctors are being

16   told is the biocompatibility of this mesh has been

17   proven, in part, by the biocompatibility of sutures;

18   correct?

19        A.    Yeah.

20        Q.    And you would certainly agree with me that

21   the profile of risks with Prolene sutures is

22   different than the profile of risks with Prolene

23   mesh; correct?

24             MR. SNELL:  Form.

25             THE WITNESS:  Yes, the -- the risks of

Confidential - Attorneys' Eyes Only

Page 757

1  that -- of the TVT procedure includes the risk for

2  mesh exposure, which can't occur if you don't put a

3  mesh in.

4  BY MR. SLATER:

5       Q.    In terms of the profile of risks as

6  between Prolene suture and Prolene mesh, for example,

7  in the TVT, if you just look at the mesh itself

8  versus the -- the suture, there are significant risks

9  with the mesh that don't exist with the suture, one

10  of them being erosion or exposure; correct?

11            MR. SNELL:  Form.

12            THE WITNESS:  Yeah.

13  BY MR. SLATER:

14       Q.    Another would be contraction due to scar

15  tissue; correct?

16       A.    Yes.

17       Q.    Another would be the consequences of

18  either erosion or contraction, and you could list

19  those, the need for surgery to remove contracted or

20  eroding mesh; right?

21       A.    Right.

22       Q.    Also, pain that can be suffered as a

23  result; correct?

24       A.    Correct.

25       Q.    Look down, if you could.  Below the second

Confidential - Attorneys' Eyes Only

Page 758

1    bullet point there's a -- the third thing that's --

2    rephrase.

3                 Under the section that says, unique mesh

4    with exceptional clinical performance, towards the

5    bottom of that section it says, no foreign body

6    reaction after Prolene mesh implantation.

7                 Do you see that?

8         A.    I do.

9         Q.    You know and would agree with me that

10   there is a foreign body reaction with Prolene mesh;

11   right?

12        A.    Yes.

13        Q.    So this statement is inaccurate, based on

14   your knowledge of the biocompatibility of Prolene

15   mesh; correct?

16               MR. SNELL:  Form.

17               THE WITNESS:  It's incorrect to say

18   there's no foreign body reaction for any implant.

19   BY MR. SLATER:

20        Q.    If you could, turn to the second-to-last

21   page.  It says that, Gynecare TVT works the way you

22   do.  And the fourth bullet point there says, broad

23   application.

24               Are you with me?

25        A.    I am now.  Sorry.  I wanted to look at

Confidential - Attorneys' Eyes Only

Page 759

1    the --
2          Q.    No problem.
3          A.    I wanted to remind myself of the date.
4          Q.    It's fine.  I'll start over.
5                Here on the second-to-last page of this
6    document it says about a third of the way down,
7    Gynecare TVT works the way you do.  And it says,
8    broad application.  May be performed under local,
9    regional or general anesthesia.
10               Do you see that?
11         A.    I do.
12         Q.    There's no disclosure that the efficacy
13   rate -- rephrase.
14               There's no disclosure that there is a
15   reduction in efficacy, meaning it's not as good
16   outcomes, when general anesthesia is used as opposed
17   to other local or regional anesthesia.
18               That's not disclosed; correct?
19         A.    It doesn't say --
20               MR. SNELL:  Form and foundation.
21               Go ahead.
22               THE WITNESS:  Yeah.  It doesn't say that
23   here, no.
24   BY MR. SLATER:
25         Q.    And you're aware that with general

Page 760

1    anesthesia the efficacy rates drop with the TVT.

2         A.    I'm not aware.

3         Q.    You've never been told that?

4         A.    (Witness shakes head.)

5         Q.    If one of the medical affairs directors

6    who was responsible for the TV -- TVT testified that

7    with general anesthesia there is a reduction in

8    efficacy because you can't do a cough test, you

9    wouldn't argue with that, would you?

10              MR. SNELL:  Form.

11              THE WITNESS:  I would actually ask for the

12   data.

13   BY MR. SLATER:

14        Q.    And if -- if a medical affairs director

15   testified that there was data available that showed

16   that, do you have any reason as you sit here now to

17   say, well, I know something different?

18        A.    No.

19        Q.    Okay.  You would agree with me that if

20   your company was aware that efficacy was lower with

21   the TVT or any SUI device when general anesthesia

22   would be used, as opposed to local, that's something

23   doctors would need to be told.

24        A.    If it was a well-established fact, yes.

25        Q.    You would agree that's the kind of thing

Confidential - Attorneys' Eyes Only

Page 761

1  that could actually be very significant to a
2  physician and a patient in deciding whether to have
3  that treatment provided or how the treatment should
4  be given; correct?
5      A.   It sure --
6           MR. SNELL:  Form.
7           Go ahead.
8           THE WITNESS:  It would be an input, sure.
9           (Exhibit T-1348A was marked for
10  identification.)
11          MR. SLATER:  We're up to 1348.
12          Just so you know, I'm down to like two or
13  three exhibits so I'll probably take a break after
14  these couple more exhibits, check my notes, and then
15  other than maybe a few clean-up questions, and I
16  don't really have any notes so I'll probably -- I'll
17  probably be handing it off soon.  Then Burt has about
18  a ten-hour Direct.  So we're going to bed down --
19          MR. SNELL:  I've got a little bit.
20          MR. SLATER:  -- light a fire.  Okay.
21  BY MR. SLATER:
22      Q.   Exhibit 1348 is a TVT marketing document,
23  and if you look at the last page, it has a copyright
24  date of 2004.
25      A.   Okay.

Confidential - Attorneys' Eyes Only

Page 762

1        Q.    That would tell us it was probably used

2    around 2004 or so; right?

3        A.    I -- yep.  I would assume so.

4        Q.    Okay.  And right on the cover of this

5    marketing document it's titled "Only Gynecare TVT Has

6    Long-Term Results You Can See and Believe."

7              See that?

8        A.    I do.

9        Q.    So they're telling doctors, there are

10   long-term results that have been documented, that you

11   can believe them, you can rely on them; right?

12       A.    Yes.

13       Q.    Let's go to the second page.  It says,

14   only Gynecare TVT has seven years of proven clinical

15   efficacy data.  And right in the first bullet point

16   it says, the success of Gynecare TVT has been proven

17   in multiple studies evaluating 50 or more patients.

18             Do you see that?

19       A.    I do.

20       Q.    And if you look at what the citation is,

21   the references are 2 to 12, and you go to the end,

22   that includes Reference 2, which is an Ulmsten

23   article, Reference 3, which is Ulmsten, the Medscan

24   multi-center trial --

25       A.    I'm not there yet so --

Confidential - Attorneys' Eyes Only

Page 763

1          Q.     -- that we've discussed previously;

2    correct?  It's the second-to-last page.

3          A.     Okay.  Which ones?  I see --

4          Q.     Two and three.

5          A.     Yes.

6          Q.     I see no disclosure of any financial

7    conflict of interests with regard to those studies

8    anywhere in this document.  Do you?

9          A.     No, I don't.  Well, wait.  Another page or

10   two.  No, I don't.

11         Q.     And if you go down to the next bullet

12   point on this second page, it talks about the fact

13   there's more clinical data than any other

14   mid-urethral sling device and then it gives certain

15   aspects of that and, again, there are citations to

16   those references, and it talks about the retention

17   rate and cites to References 2 to 6, which would

18   include the Ulmsten study, and 2 to 12 for the next

19   point about no reported urethral erosions.

20              So that -- that -- those studies by

21   Ulmsten and Medscan are to be relied on to give

22   positive claims to doctors; right?

23         A.     Right.

24         Q.     At the very bottom of this page it says,

25   proven in different patient types.

Confidential - Attorneys' Eyes Only

Page 764

1            So that's saying that the safety and

2       efficacy of the TVT has been proven in various

3       different patients and we're given some examples

4       there.

5                  Do you see that?

6       A.       I do.

7       Q.       Advanced elderly women?

8                  They're saying to doctors it's been proven

9       safe and effective for advanced elderly women; right?

10      A.       Yes.  Yeah.

11      Q.       It says, obese women.

12                 So that's telling doctors the TVT has been

13      proven safe and effective in obese women; correct?

14      A.       Correct.

15      Q.       And it says, women with prior

16      peri-urethral collagen injection.

17                 And it's saying that women who meet that

18      standard, also, it's been proven safe and effective

19      for them; correct?

20      A.       Correct.

21      Q.       If you go to the -- go a couple pages

22      later, it says, only Gynecare TVT uses Prolene

23      polypropylene mesh, the same material used in Ethicon

24      sutures.

25                 See that page?

Confidential - Attorneys' Eyes Only

Page 765

1        A.     I do.

2        Q.     So your company is saying to doctors in

3    this marketing document, you can rely on the fact

4    that Ethicon Prolene sutures are safe and you should

5    expect safety of this Prolene mesh just as much;

6    right?

7        A.     No.  I think they're just saying it's made

8    of the same material and well-established use in

9    humans.

10       Q.     Let me ask the question differently, in a

11   way that actually makes some sense, hopefully.

12              Doctors are being told here that the

13   material used in the mesh for the TVT is the same

14   material used in Ethicon's sutures and they're being

15   told that's something that they can rely on as

16   contributing to the safety of this material; right?

17       A.     Doesn't actually say that.  It just -- I

18   mean, it only says it's made of the same material.

19       Q.     The reason to say that in the marketing

20   document like this is to imply that it's a positive

21   attribute; right?

22              That's what your marketing people want to

23   do is convince doctors, hey, buy our device so,

24   presumably, they're going to say things that are

25   going to help doctors to feel comfortable with using

Page 766

1    it; right?

2        A.    Yeah.  I mean, I wasn't there when they put

3    it together, but it's the same material and -- and

4    physicians would have recognition for what that

5    means.

6        Q.    Toward the bottom of this page it says,

7    continence occurs because Gynecare TVT mesh, and then

8    the first bullet point, reinforces the dysfunctional

9    pubourethral ligaments.

10            Do you see that?

11       A.    I do.

12       Q.    And I've seen somewhere -- and tell me if

13   I understand this right -- that what the TVT is, it

14   acts essentially as a ligament or in a ligamentous

15   capacity to support the urethra; is that correct?

16            MR. SNELL:  Form.  Form.

17            THE WITNESS:  So strict definition of a

18   ligament would be bone-to-bone connective tissue

19   providing mechanical support of some sort.  So I

20   don't know what you'd call -- I don't know if you can

21   call a device a ligament but --

22   BY MR. SLATER:

23       Q.    The TVT is intended to function similarly

24   to a ligament; correct?

25       A.    I don't know -- I don't know that I can say

Confidential - Attorneys' Eyes Only

Page 767

1    that with certainty.

2         Q.    Have you ever seen information or

3    documentation or been involved in discussions where

4    that was recognized?

5         A.    No.  No.

6         Q.    Okay.  At the bottom of this page, the

7    page that talks about the same material being used in

8    the Prolene mesh that's used in Ethicon sutures,

9    there's a quote from Dr. Nilsson that the TVT

10   procedure seems to result in good long-term cure with

11   cure rates similar to the best traditional

12   incontinence operations.

13            Do you see that?

14       A.    I do.

15       Q.    Dr. Nilsson was a paid consultant to your

16   company and was paid in connection with the studies

17   performed by Dr. Nilsson; correct?

18            MR. SNELL:  Form.

19            THE WITNESS:  I don't know that, no.

20            MR. SNELL:  Foundation.  Sorry.

21            You can go ahead.

22            MR. SLATER:  I'm sorry.  You're objecting

23   to the foundation?  You don't think Dr. Nilsson --

24            MR. SNELL:  On the studies.  On the

25   studies.

Confidential - Attorneys' Eyes Only

Page 768

1          Go ahead.

2          MR. SLATER:  You don't think Dr. Nilsson

3    was paid in connection with the studies that Dr.

4    Nilsson performed?  Are you saying that's an

5    inaccurate statement?  Is that your objection?

6          MR. SNELL:  I'm saying, foundation.  Yes.

7    That has not been established, to my knowledge.

8          MR. SLATER:  Well, you understand that

9    it's one thing to say that has not been established,

10   to my knowledge, but it's a different thing to say

11   that is an untrue factual assumption unless the

12   foundation is inaccurate.

13          Are you saying the latter?  Are you saying

14   Dr. Nilsson was actually not paid in connection with

15   Dr. Nilsson's studies?  Because that -- you could

16   make that objection if you know that to be true but

17   otherwise it's not appropriate to object to the

18   foundation of my question.  And I want to make a

19   record of this because it could be important at a

20   later date.

21          MR. SNELL:  You know, I might not be the

22   best person to ask for that.  How about I change it

23   to it assumes facts not yet into evidence?

24          MR. SLATER:  I would have the same

25   response so --

Confidential - Attorneys' Eyes Only

Page 769

1          MR. SNELL:  Well, that's where I'm at.

2          MR. SLATER:  So at the time that that

3    objection is argued that -- that will be clear, that

4    the objection was made without actually knowing

5    whether or not my statement was accurate but there's

6    no reason for you to say it isn't.  Okay.

7          Let's go now --

8          (Exhibit T-1349A was marked for

9    identification.)

10         MR. SNELL:  I thought Axel Arnaud

11   testified on that, in line with my objection.

12   Perhaps I'm wrong or perhaps he'll be -- he'll be

13   deposed and he'll tell you that soon enough.

14         MR. SLATER:  Are you offering Axel Arnaud

15   for more deposition testimony?  He will not be happy.

16         THE WITNESS:  I'll hear about it.

17         MR. SNELL:  I love Axel.

18         MR. SLATER:  If you guys have anyone

19   listening, your phone is going to start ringing.

20   Kristy is going to be calling you up saying, hey.

21         Okay.

22         MR. SNELL:  1349?

23         MR. SLATER:  Yes.

24         I just want to get all the Snapple off my

25   copy.

Confidential - Attorneys' Eyes Only

Page 770

1    BY MR. SLATER:

2         Q.    Exhibit 13 -- I'm sorry.

3               Exhibit 1349 is a TVT marketing document

4    and it actually addresses the TVT, the TVT-O and

5    TVT-Secur, and it has a copyright date on the

6    second-to-last page, it looks like 2009.

7         A.    Where?

8         Q.    All the way to the bottom right of all

9    that really, really large print that you're looking

10   at.

11        A.    Yes, it does look like 2009.  It wasn't

12   immediately obvious.

13        Q.    Okay.  This document, this marketing

14   document, which appears to have a date of 2009, says,

15   make data and safety your choice.  Demand the most

16   proven technology when selecting a mid-urethral

17   sling.

18              That's the title of this marketing

19   document for doctors; correct?

20        A.    Correct.

21        Q.    The first thing I'd like to do is turn to

22   the third page.  It says, proprietary mesh, and

23   points out that not all meshes are created equal, et

24   cetera, and then there's a quote from Dr. Nilsson on

25   the left-hand side kind of angled along.

Confidential - Attorneys' Eyes Only

Page 771

1          Do you see that?

2     A.    Yeah.

3     Q.    And Dr. Nilsson's quote says, you cannot

4  transfer results from one procedure with a certain

5  design and material to another one that looks alike

6  but has some differences.

7          Do you see that statement?

8     A.    I do.

9     Q.    Do you agree with that statement?

10    A.    Yeah, broadly.

11    Q.    In essence, if you have a procedure that

12 is similar to another procedure but there are

13 differences, you can't just transfer the results from

14 one and say, well, that's what you can expect with

15 the other.

16    A.    Yeah.  Without understanding the nature and

17 magnitude of the differences and, you know, using

18 your -- your knowledge base to say does this really

19 matter or doesn't it.

20    Q.    As a general matter, the results with one

21 procedure with a certain design will not necessarily

22 transfer to another procedure with some differences;

23 correct?

24          MR. SNELL:  Form.

25          THE WITNESS:  Well, not necessarily.

Confidential - Attorneys' Eyes Only

Page 772

1   Right.

2   BY MR. SLATER:

3        Q.    And I'll give you a concrete example.  For

4   example, the TVT-Secur, one could not say that you

5   could look at the results with the TVT or the TVT-O

6   and expect the same results because there are some

7   significant differences between and among those

8   devices, the Secur versus the O and the TVT; correct?

9        A.    Yeah, you would want to understand, okay,

10  what -- what's the -- what's the potential impact of

11  these differences in terms of performance.

12       Q.    You wouldn't want to say to doctors that

13  they can expect a certain level of safety and

14  efficacy with the TVT-Secur based on the data with

15  the TVT or the TVT-O because there are some

16  significant differences to preclude you from saying

17  one will predict the other; correct?

18            MR. SNELL:  Form.

19            THE WITNESS:  Yeah.  Not the data in its

20  entirety, so you can't just sort of transfer all over

21  necessarily.

22  BY MR. SLATER:

23       Q.    If you could, turn to the second-to-last

24  page.  It has a review of published clinical data and

25  RCTs.  And it says with regard to the Gynecare

Confidential - Attorneys' Eyes Only

Page 773

1    TVT-Secur, longer followup of one year as compared to

2    another manufacturer's similar device with a 94

3    percent objective success rate.

4              Do you see that?

5         A.    We're talking about Secur.  Okay.  I

6    just -- I just now got there.  So let me just look at

7    it.

8              MR. SNELL:  Can you read that back?

9    Because I thought you added something in there, Adam.

10             MR. SLATER:  I'll ask it again.

11   BY MR. SLATER:

12        Q.    On the second-to-last page of this

13   marketing document from 2009 that says, make data and

14   safety your choice, there's a description of a study

15   with the TVT-Secur.

16             Do you see that?

17        A.    Yes.

18        Q.    And it says that -- with the TVT-Secur

19   that with one-year followup there was a 94 percent

20   objective success rate.

21        A.    I see that.

22        Q.    Okay.  From your perspective, did your

23   company ever obtain enough data to be able to say to

24   doctors across the board, you can expect a 94 percent

25   objective success rate in terms of efficacy with the

Confidential - Attorneys' Eyes Only

Page 774

1    TVT-Secur?

2        A.    I'm not familiar enough with the

3    information to know what they based it on, and I

4    certainly can't read the reference with this font.

5        Q.    In -- in order to be fair and balanced in

6    presenting to doctors what they can expect to occur

7    with the TVT-Secur, your company would have to tell

8    what the positive results were that were known to

9    your company as well as negative results that were

10   known to your company so doctors would know both

11   sides of the story; right?

12                MR. SNELL:  Form.

13                THE WITNESS:  I think -- I think there --

14   the obligation would be to be fair and balanced in

15   what you present.

16   BY MR. SLATER:

17       Q.    To the extent that your company presents

18   data or has presented data with the TVT-Secur saying

19   you can expect a certain level of efficacy of success

20   with the TVT-Secur in curing stress urinary

21   incontinence, to the extent your company knew that

22   there were doctors who were not just isolated doctors

23   but doctors around the world who were reporting

24   variable efficacy with very low rates, in many cases

25   under 50 percent, you would need to tell that side of

Confidential - Attorneys' Eyes Only

Page 775

1    the story as well to be fair and balanced; right?

2                 MR. SNELL:  Form and foundation.

3                 THE WITNESS:  I think you would need to

4    understand what the information received meant, you

5    know, what are you seeing, and as a part of a

6    promotional piece to be fair and balanced in what you

7    describe.

8    BY MR. SLATER:

9         Q.    It's not for --

10        A.    I don't --

11        Q.    I'm sorry.  I didn't mean to --

12        A.    Depends on a level-of-evidence kind of

13   thing.

14        Q.    It's not for your company to say, okay,

15   well, we have this good data here that has good --

16   this study came out with good results and we have

17   these other reports to our company of people that we

18   think are very good surgeons getting very different,

19   very poor efficacy, it's not for your company to say,

20   well, but we -- we can discount that and to come up

21   with a reason to say we don't need to tell anybody

22   that.  It's not for your company to do that.  It's

23   your company's obligation to give that information to

24   doctors in the community and let them decide the

25   significance; correct?

Confidential - Attorneys' Eyes Only

Page 776

1           MR. SNELL:  Form.

2           THE WITNESS:  I would agree to that as

3   long -- as long as the data regarding less effective

4   performance was understood well enough to say this --

5   this is informative to the physicians.

6   BY MR. SLATER:

7      Q.    With regard to the TVT-Secur, the data

8   that your company was receiving regarding variable

9   efficacy and low levels of efficacy for some doctors

10  that your company had great respect for was taken so

11  seriously that Axel Arnaud was actually charged with

12  preparing what he's referred to as a, quote, unquote,

13  cookbook to give more specific information to

14  surgeons to try to get more consistent efficacy.

15          That would be a signal that your company

16  believed those reports of variable efficacy were

17  important enough to take concrete action; right?

18     A.    Yeah, to -- to understand root cause and

19  correct it.

20     Q.    And in that case, that variable efficacy

21  should be presented to physicians out in the

22  community or -- this is being marketed to; correct?

23     A.    Or -- so, you know, your obligation is to

24  fair -- in a fair and balanced manner inform the

25  physicians with respect to the performance of the

Confidential - Attorneys' Eyes Only

Page 777

1  product.

2         And, again, if you had some -- some cites

3  or some anecdotal information that there was less

4  positive performance and you undertake a mitigation

5  activity and say, you know what, they weren't using

6  it properly, then you have to say, all right, what's

7  your -- what's -- what's the right thing to do?

8  We've got to make sure everybody is using it

9  properly.  I think -- I believe that's what was

10  occurring.

11     Q.    The most important thing would be -- well,

12  rephrase.

13         Let me ask you this:  A doctor is given

14  information by a sales representative or through your

15  company about the TVT-Secur, here's what you can

16  expect from a safety perspective, here's what you can

17  expect from an efficacy perspective, and the doctor

18  is not told anything about the reports of variable

19  efficacy that were coming in to your company that led

20  to Axel Arnaud being charged with creating the

21  cookbook and the doctor has no knowledge of that at

22  all.  That doctor has not been given a fair and

23  balanced presentation; correct?

24         MR. SNELL:  Form.  Hypothetical.

25         THE WITNESS:  Again, I -- I -- I think

Page 778

1    that's true.  If -- if the -- and I don't know what

2    occurred then, but that's true if you have enough --

3    what would be the word?  If you have enough faith

4    in -- in the less than ideal or the -- not faith in

5    the data, in the -- in the -- in the less-than-ideal

6    outcomes that it actually reflects performance of the

7    product in the field, then that has to be part of a

8    fair-and-balanced statement.

9    BY MR. SLATER:

10        Q.    And in this case your company --

11        A.    Yeah.

12        Q.    -- felt that that data was reliable enough

13   that your company took concrete -- concrete internal

14   action in response; right?

15        A.    I don't know the details behind what all

16   occurred then.  I wasn't -- that wasn't visible to

17   me.  But clearly, clearly, if we -- you know, the

18   usual reaction would be, if we have reports from --

19   anecdotal reports from the field about

20   underperforming centers or doctors or whatever, we

21   would want to try to help and understand what's

22   different and try to correct that.  So yeah, they

23   took it seriously.

24        Q.    And when it's taken seriously like that,

25   it needs to be communicated to doctors who the

Page 779

1    product is being marketed to; right?

2              MR. SNELL:  Form.

3              THE WITNESS:  Yeah.  Well, if you -- if

4    you have the knowledge now in your -- in your

5    possession to say we know what's going on and we know

6    what happened and here's how to mitigate it,

7    absolutely, we need to tell them how to do so.

8    BY MR. SLATER:

9         Q.    Well, even if your company didn't feel

10   like it had the knowledge as to why it's happening or

11   how to mitigate it, you still need to tell doctors in

12   the field who are considering using the device, hey,

13   we have this issue, in that case, we don't -- we

14   can't even explain why it's happening, you just need

15   to know this issue is out there; right?

16        A.    Yeah.  If you don't know what's going on, I

17   think you're even more compelled.

18        Q.    Okay.

19              (Exhibit T-1350A was marked for

20   identification.)

21              MR. SLATER:  I'm sorry.  I overestimate my

22   reach.

23              THE WITNESS:  Whoops.  I have it.

24              MR. SLATER:  I got a lot of going over the

25   back fouls in basketball.  My problem.

Confidential - Attorneys' Eyes Only

Page 780

1            MR. SNELL:  1350?

2            MR. SLATER:  1350.

3            And when you Redirect, you expect to go

4    through all 1,350 exhibits; right?  I just want to

5    plan whether I'm getting back home on Monday or

6    Tuesday.

7            MR. SNELL:  No, I'm not going through all

8    of them.

9            MR. SLATER:  Okay.

10   BY MR. SLATER:

11       Q.    Exhibit 1350 is a sales aid that has a

12   copyright date of 2010.

13            Do you see that?

14       A.    I do.  Well, actually, I don't.

15            Now I do.

16       Q.    The title of it is, dependability,

17   Gynecare TVT family of products, tension-free support

18   for incontinence.

19            Do you see that?

20       A.    Uh-huh.  Yes.

21       Q.    And this apparently pertains to all three

22   of your primary SUI devices, the TVT, the TVT-O and

23   the TVT-Secur, and they're pictured right across the

24   top of the front page; right?

25       A.    Right.

Confidential - Attorneys' Eyes Only

Page 781

1        Q.    And the first section talks about it being

2    the first and most widely implanted SUI mesh and then

3    there are some bullet points talking about that.

4              Do you see that?

5        A.    I do, yes.

6        Q.    The third bullet point says, in a clinical

7    study at an average of 11.5 years of followup not a

8    single case of tape erosion, tissue reactions or

9    other adverse effects of the tape were found.

10             Do you see that?

11       A.    Yes.

12       Q.    And if you look at the reference, that's a

13   reference to Nilsson's study, and at that point it

14   was the 11-year prospective followup of the

15   tension-free vaginal tape procedure for treatment of

16   stress urinary incontinence.

17             Do you see that?

18       A.    Not yet.  Oh, I was looking at the wrong

19   one.

20             Yes.

21       Q.    Now, are you aware that the study by Dr.

22   Nilsson that has been reported all the way up to

23   recently 17 years actually did not utilize the TVT as

24   your company marketed it?

25             MR. SNELL:  Form, foundation.

Confidential - Attorneys' Eyes Only

Page 782

1          MR. SLATER:  I'm sorry.  What's the

2     objection to that?

3          MR. SNELL:  That's not a true statement.

4          MR. SLATER:  Is it your position, Counsel,

5     that --

6          MR. SNELL:  Yes, it is my position that --

7          MR. SLATER:  You don't have to get angry.

8     I have to make a record.

9          MR. SNELL:  It's the same -- I'm about to

10    tell you my position.  It's the same --

11         MR. SLATER:  Why are you getting angry?

12         MR. SNELL:  It's the same TVT.  It's the

13    same TVT mesh, sheath --

14         MR. SLATER:  I'm going to make it very

15    clear.

16         MR. SNELL:  -- needle.

17         MR. SLATER:  Okay.  Don't -- don't --

18    we're all really having a nice time here.  You don't

19    have to get annoyed.  Come on.  It's Christmastime.

20         I just want to understand, Counsel, are

21    you saying that the device and procedure used by

22    Nilsson is the TVT marketed by Ethicon?

23         MR. SNELL:  Yes, it's the device marketed

24    by Ethicon.

25         MR. SLATER:  Okay.  And, Counsel, you're

Confidential - Attorneys' Eyes Only

Page 783

1    aware the study actually began before Ethicon even

2    sought regulatory approval for the TVT, thus, the TVT

3    was not even being marketed yet; correct?

4              MR. SNELL:  I'm not the one under

5    examination here.

6              MR. SLATER:  That's fine.

7              MR. SNELL:  I know that study says it uses

8    the same Prolene and TVT as used, currently marketed

9    today.

10             MR. SLATER:  Okay.

11             MR. SNELL:  And it describes a device

12   that's just like the one used today.

13   BY MR. SLATER:

14        Q.   Dr. Nilsson -- well, rephrase.

15             There is no statement of any conflict of

16   interest with Dr. Nilsson in this document; correct?

17        A.   I don't see one.

18        Q.   According to this statement in this

19   marketing document from your company, Dr. Nilsson's

20   study proved that at an average of 11 and a half

21   years of followup among whatever number of patients

22   were in that study there was not one case of a tape

23   erosion, meaning not one case of TVT mesh eroding

24   anywhere, whether within tissue or through the

25   vagina.

Confidential - Attorneys' Eyes Only

Page 784

1          That's saying that it never happened;

2    correct?

3               MR. SNELL:  Form.  Form.

4               THE WITNESS:  That's how I read it.

5    BY MR. SLATER:

6         Q.    Knowing what you know about the TVT, do

7    you think that it is reasonable to expect that in a

8    study of more than just a few patients that over the

9    course of 11 and a half years not one patient would

10   have any sort of an erosion of mesh?

11        A.    Obviously depends on the -- the number of

12   patients, but if you had a small enough number of

13   patients and they didn't have any erosions in the

14   first year or two, it's reasonable of me -- for me to

15   think that it could go on out to 11 years and not

16   have any appear after that.

17        Q.    If it was more than 50 patients, do you

18   think it's reasonable to expect that none of them

19   would have any type of an erosion or an exposure at

20   all?

21        A.    I'd want to sit down with a statistician

22   and say, what -- what is the known rate and what are

23   the relative probabilities?

24        Q.    You'd also --

25        A.    50 is a small number.

Confidential - Attorneys' Eyes Only

Page 785

1          Q.    I'm sorry.  You'd also want to know, how
2    did you define an erosion; right?
3          A.    Yes, I would.  Yeah.
4          Q.    One of the very important things in a
5    study like this is what were the investigators
6    defining the adverse event as because you could
7    create a definition so narrow that you could
8    essentially exclude what other people would generally
9    consider to be that adverse event; correct?
10         A.    Yeah.  So if you're -- if you -- if you're
11   reading a study, you would want to know exactly what
12   they're talking about, so a definition regarding
13   what -- what -- what counted as a yes or no for an
14   adverse event would be informative and important.
15         Q.    This statement by your company also --
16   rephrase.
17              This statement by your company about the
18   Nilsson clinical study says that in an average of 11
19   and a half years of followup not only was there not a
20   single case of an erosion, there was -- there was not
21   a single case of a tissue reaction or other adverse
22   effects of the tape.
23              Do you see that?
24         A.    I do.
25         Q.    Now, you would certainly agree with me,

Confidential - Attorneys' Eyes Only

Page 786

1    knowing what you know, by definition, there was a

2    foreign body reaction so there has to be a tissue

3    reaction with each patient; correct?

4         A.    Yeah, there would be -- there would be a

5    tissue reaction or a histologic reaction to any

6    implant.

7         Q.    There would also be some level of fibrosis

8    forming at and around the mesh; right?

9         A.    Right.

10        Q.    So there's no way for this to be a

11   truthful statement because you can't truthfully say

12   that a doctor -- well, rephrase.

13              You would agree with me that your company

14   could not truthfully say that with a TVT over the

15   course of 11 and a half years you should not expect

16   any tissue reaction or any adverse effect of the

17   mesh.

18              You would agree with me; right?

19              MR. SNELL:  Form.

20              Go ahead.

21              THE WITNESS:  Literally, yes.

22              MR. SLATER:  Let's take a break.

23              VIDEO OPERATOR:  The time is now 2:57.

24              This is the end of Disk Number 3.

25              We're going off the record.

Confidential - Attorneys' Eyes Only

Page 787

1              (Recess, 2:57-3:37 p.m.)

2              VIDEO OPERATOR:  The time is now 3:37.

3              This is the beginning of Disk Number 4.

4              We are back on the record.

5    BY MR. SLATER:

6         Q.    Doctor, looking at Exhibit 1350 still --

7         A.    Okay.

8         Q.    -- in this bullet point that says there

9    was not a single case of tape erosion if within the

10   article itself it said there were no tape rejections

11   or no tape material rejections, would you equate that

12   to no tape erosions?

13        A.    I have to read it in the whole context of

14   the article, I think, to understand what -- you know,

15   how one equated to the other.

16        Q.    If there was no discussion -- well,

17   rephrase.

18              Just in the abstract, would you equate a

19   rejection of a TVT to an erosion of a TVT?

20              MR. SNELL:  Form.

21              Go ahead.

22              THE WITNESS:  I don't think you could do

23   it with the abstract.  I would want to read and say

24   what -- what are they implying or what are they

25   actually describing?

Page 788

1    BY MR. SLATER:

2        Q.    This is what I want to ask you:  In terms

3    of your own vocabulary, you would not equate a tape

4    rejection and a tape erosion in all instances?

5        A.    No, I wouldn't.

6        Q.    We've talked about within various TVT

7    marketing documents citations to data from Nilsson

8    and from Ulmsten; correct?

9        A.    Correct.

10       Q.    If a particular study, for example, by Dr.

11   Nilsson were cited with regard to efficacy --

12   efficacy data and each of the patients was treated

13   under local anesthesia with a cough test, would you

14   agree that would be important information to provide

15   context to the efficacy data so doctors would

16   understand that that's how the procedure was

17   performed --

18            MR. SNELL:  Form.

19   BY MR. SLATER:

20       Q.    -- in order to get those numbers?

21            MR. SNELL:  Form.

22            Go ahead.  Foundation.

23            THE WITNESS:  No.  I think -- I think

24   the -- if the citation -- I mean, if it's cited and

25   the doctor -- if I was -- if I was reading as a

Confidential - Attorneys' Eyes Only

Page 789

1    physician, I would want to know how was this done and
2    how they get those results, I would -- I would go
3    look at that and -- now, I don't think in a sales
4    piece you're going to be encyclopedic and describe
5    how every procedure is done in 20 references or
6    whatever.
7    BY MR. SLATER:
8        Q.    If your company knew that, for example,
9    the efficacy data for -- from Nilsson were achieved
10   with local anesthesia and a cough test with all
11   patients and your company knew that the cough test is
12   not stated to be mandatory in the TVT, it's just
13   stated as optional, so you know some doctors will not
14   utilize the cough test, under that circumstance,
15   isn't it important to tell doctors, look, we're
16   giving you this data but this data may not translate
17   to all ways of doing the procedure so don't -- if
18   you're not somebody who's using a cough test and
19   local anesthesia, you can't necessarily expect this
20   efficacy with your patients?
21       A.    Yeah.  I would expect --
22             MR. SNELL:  Form.
23             Go ahead, Doctor.
24             THE WITNESS:  I would expect the surgeon
25   receiving the information to -- to understand from

Confidential - Attorneys' Eyes Only

Page 790

1   their own experience what -- what the implications

2   are of one technique versus another.

3   BY MR. SLATER:

4       Q.    Well, let's talk about a doctor who is

5   adopting the TVT --

6       A.    Uh-huh.

7       Q.    -- and doesn't have a large body of

8   experience with it so they're relying on what your

9   company is telling them they should expect and

10  doesn't have time to go and read all the articles and

11  trusts that your company cites the articles in a fair

12  and balanced way.  That doctor would be at a

13  disadvantage if the doctor doesn't know, well, the

14  efficacy data we're giving you is only obtained when

15  the procedure is performed in a particular way;

16  correct?

17      A.    So I would --

18            MR. SNELL:  Object to form, foundation.

19            Go ahead.

20            THE WITNESS:  Yeah, I would expect that

21  that surgeon from a sales aid wouldn't -- wouldn't

22  make their determination about how they're going to

23  do their procedures but would, rather, draw on

24  whatever training they obtained and -- and -- and

25  then their own experience about which way to go.

Confidential - Attorneys' Eyes Only

Page 791

1   BY MR. SLATER:

2       Q.    If your company knew and had solid data to

3   prove that efficacy is materially better with the TVT

4   when a cough test is used and local anesthesia is

5   used, that is something that your company should tell

6   doctors right in the IFU; correct?

7           MR. SNELL:  Form.

8           THE WITNESS:  Well, again, surgeons don't

9   learn their -- their procedures right from the IFU

10  and -- and between prof. ed. and proctoring and --

11  and sales training, even.  They have other ways to --

12  to understand what -- what particular methods are

13  available and what the outcomes are.

14          MR. SLATER:  Move to strike.

15  BY MR. SLATER:

16      Q.    Here's my question:  If your company had

17  evidence your company deemed reliable and persuasive

18  that efficacy with the TVT is superior in a material

19  way and to a -- to a material extent when local

20  anesthesia and a cough test is used, when your

21  company described the procedure in the IFU, it would

22  be incumbent on your company to tell doctors that

23  they can expect better results if they use the local

24  anesthesia and the cough test; right?

25          MR. SNELL:  Form and foundation.

Confidential - Attorneys' Eyes Only

Page 792

1           THE WITNESS:  I -- I -- you know, within

2    the IFU I would -- I would think that would depend on

3    the -- the magnitude of the evidence, the reliability

4    of the evidence and, you know, sort of the level of

5    evidence.  But not having that in my head right now,

6    it's hard for me to judge.

7    BY MR. SLATER:

8           Q.    If the evidence was of a magnitude where

9    your medical affairs people that work for you deemed,

10   yes, we acknowledge that there is a material

11   difference in efficacy and it's better, to a material

12   extent, when you use local anesthesia and a cough

13   test, that information should be provided in the IFU

14   when doctors are told in the IFU this is how to do

15   the procedure; right?

16           MR. SNELL:  Form.

17           THE WITNESS:  Again, it's only -- it's

18   only one of the places they learn how to do it and

19   it's hard to tell whether it goes in the IFU, sales

20   training, prof. ed. and so forth.  But it's --

21   it's -- again, depending on the level of evidence and

22   the magnitude of the difference, the options ought to

23   be made available and surgeons and patients would

24   make the decision about do I want to have this under

25   local or do I want to have it under regional --

Confidential - Attorneys' Eyes Only

Page 793

1          MR. SLATER:  Move to strike.

2          THE WITNESS:  -- or others.

3          MR. SLATER:  Move to strike.

4   BY MR. SLATER:

5      Q.    If your medical affairs people, the people

6   working for you, knew that the results are materially

7   better in terms of efficacy with local anesthesia and

8   a cough test with the TVT, that information should be

9   provided in the IFU not only to make sure that the

10  doctor knows that but so that the doctor can also

11  tell the patient that as part of the consenting

12  discussion so the doctor and the patient in deciding

13  how the procedure is going to be performed understand

14  the alternatives and what the company, your company,

15  knows are the likely outcomes; right?

16          MR. SNELL:  Form and foundation.

17          THE WITNESS:  I don't see how that's

18  different than the last time I answered the question.

19  It's not any different than the last one I answered.

20  BY MR. SLATER:

21     Q.    Is the answer to that question yes?

22          MR. SNELL:  Form and foundation.

23          THE WITNESS:  No.  My answer was there are

24  a variety of ways in which we train our physicians

25  and the IFU is never encyclopedic, and I would have

Confidential - Attorneys' Eyes Only

Page 794

1  to have -- I would have to make a judgment call, does

2  it belong in the IFU, sales training or just where,

3  I -- I personally would need more information about

4  the magnitude and the reliability of that.

5  BY MR. SLATER:

6       Q.    What would the magnitude and reliability

7  of your company's knowledge that local anesthesia and

8  a cough test has a material impact on efficacy, what

9  would that have to rise to for you to say, yes,

10 include that in the IFU?

11      A.    I don't know how to quantitate that.

12 That's a judgment call when you have all the

13 information in front of you.

14      Q.    If the medical affairs people in your

15 company deemed the data sufficient to say, we are

16 convinced that across the board if you use local

17 anesthesia and a cough test, to a material extent,

18 the efficacy results are better, if your medical

19 affairs directors that worked for you affirmatively

20 could make that statement, then that should be

21 disclosed in the IFU; correct?

22           MR. SNELL:  Form and foundation.

23           THE WITNESS:  How did you start that

24 sentence?  I'm just being careful about -- you

25 started it with -- yeah.

Confidential - Attorneys' Eyes Only

Page 795

1           MR. SLATER:  Could you read it back,

2    please.

3           (The court reporter read the requested

4    portion of the record.)

5           THE WITNESS:  I think it should be part of

6    the training of the surgeons, and the IFU is one

7    place that could occur.

8    BY MR. SLATER:

9      Q.   Well, the one thing that you know that the

10   surgeon is going to see is the IFU.  You have no idea

11   whether and no way to confirm a doctor is going to

12   take your training at all; right?

13          MR. SNELL:  Well, form, foundation.

14          Go ahead.

15   BY MR. SLATER:

16     Q.   I'll ask the question again.  Your

17   company -- well, rephrase.

18          You understand the IFU is the primary

19   source of material information about safety and

20   efficacy; right?

21          MR. SNELL:  Foundation.

22          THE WITNESS:  For a surgeon in practice?

23   BY MR. SLATER:

24     Q.   In terms of regulatory and medical

25   affairs' understanding of what that document's role

Confidential - Attorneys' Eyes Only

Page 796

1    is for a medical device company, the IFU is the

2    primary document; right?

3              MR. SNELL:  Foundation and form.

4              MR. SLATER:  I'm sorry.  What -- what is

5    your objection?  Are you saying the IFU is not the

6    primary --

7              MR. SNELL:  Yes.  I'm saying --

8              MR. SLATER:  -- regulatory document?

9              MR. SNELL:  Yes.  I'm saying there is no

10   foundation on that.  You're throwing that out there

11   like there's foundation on it.

12             MR. SLATER:  What are you saying is wrong

13   about it?

14             MR. SNELL:  That the IFU is the primary

15   one?

16             MR. SLATER:  You don't know how many

17   witnesses from your company have testified --

18             MR. SNELL:  Do you know how doctors --

19             MR. SLATER:  I'm sorry.

20             MR. SNELL:  -- testify they don't even

21   read the IFU?

22             MR. SLATER:  Listen to me.  I have been

23   very, very cordial to you.  Between --

24             MR. SNELL:  I have been cordial to you,

25   Adam.

Confidential - Attorneys' Eyes Only

Page 797

1          MR. SLATER:  No, you're not.  You're
2    raising your voice.

3          MR. SNELL:  No, I'm not.

4          MR. SLATER:  Listen to me.  You're raising
5    your voice, you're interrupting me.

6          MR. SNELL:  You're asking me questions.
7    I'm telling -- answering you.

8          MR. SLATER:  Yes.  You know what?  I'll
9    tell you what I'm doing, Burt.  You're making
10   ridiculous objections about foundation when you don't
11   even know the testimony that's been taken in this
12   case, apparently.  You have multiple --

13         MR. SNELL:  I --

14         MR. SLATER:  Just listen.  There are
15   multiple witnesses in this case who have testified
16   that the IFU is the primary regulatory document with
17   regard to any medical device.  If you dispute that,
18   then you should go talk to a judge about your pro hac
19   admission in this litigation.

20         MR. SNELL:  Guess what, Adam?  Your
21   question went beyond the regulatory facts --

22         MR. SLATER:  And medical affairs.

23         MR. SNELL:  -- and went into medical
24   affairs.

25         MR. SLATER:  They know that too.  They've

Confidential - Attorneys' Eyes Only

Page 798

1    all admitted it also.

2              MR. SNELL:  No, they haven't.  Now

3    you're -- now you're making statements --

4              MR. SLATER:  You think so?

5              MR. SNELL:  -- beyond that.  Yes.

6              MR. SLATER:  You think so?

7              MR. SNELL:  Yes.

8              MR. SLATER:  I've taken every deposition

9    and I'm telling you yes.  But you know what?  Keep

10   your frivolous objection.

11             MR. SNELL:  It's not a frivolous

12   objection.

13             MR. SLATER:  You know what?  Doctor, I

14   apologize to you.  This deposition is going to go a

15   lot longer now.

16             And I'll tell you another thing --

17             MR. SNELL:  Why don't you just --

18             MR. SLATER:  -- when your counsel starts

19   asking you questions, I'm going to follow up on every

20   one of them, and you're going to regret you did it

21   like every time you do it.

22             Now you set me off.  You shouldn't have

23   done it.  Now we're going to get serious.  I'm going

24   to continue.

25             MR. SNELL:  That's fine.  I wasn't trying

Confidential - Attorneys' Eyes Only

Page 799

1    to stop you.

2              MR. SLATER:  I'm sorry.  I'm talking to

3    your witness.

4              MR. SNELL:  You asked me a question, I

5    answered you.

6              MR. SLATER:  I'm sorry.  I'm not talking

7    to you right now.

8              MR. SNELL:  All right.  Go ahead.

9    BY MR. SLATER:

10        Q.    Doctor, the only -- rephrase.

11             Do you understand the purpose of the IFU?

12        A.    Yes.  It's a regulatory -- it's a

13   regulatory document that's placed in the product

14   packaging to provide users with a description of the

15   product and its use.

16        Q.    Take a look at Exhibit 1350, the one

17   that's right in front of you.

18             See on the bottom left corner, the front

19   page, it says, for complete indications,

20   contraindications, warnings, precautions and adverse

21   reactions please reference the full package insert.

22             Do you see that?

23        A.    I do.

24        Q.    The package insert is the IFU; right?

25        A.    It is.

Confidential - Attorneys' Eyes Only

Page 800

1       Q.      And the purpose of the IFU is to provide a

2    surgeon, for example -- well, rephrase.

3               And the purpose of the IFU is to provide a

4    complete statement of what the company knows with

5    regard to the indications, the contraindications, the

6    warnings, the precautions and the adverse reactions

7    for the device; correct?

8       A.      Correct.

9       Q.      Therefore, if your company, your medical

10   affairs people, knew that using a cough test and

11   local anesthesia would have a material impact on the

12   efficacy that could be expected with the use of the

13   TVT, that needed to be warned about in the IFU;

14   correct?

15              MR. SNELL:  Form.

16              Go ahead.

17              THE WITNESS:  It -- it needed to be --

18   that information should be provided as training for

19   the surgeon and an IFU is a place where it could go,

20   yeah.

21              MR. SLATER:  Move to strike.

22   BY MR. SLATER:

23      Q.      The answer to my question is, if what I

24   just asked you is accurate, that information needs to

25   be in the IFU; correct?

Confidential - Attorneys' Eyes Only

Page 801

1              MR. SNELL:  Form.  Asked and answered

2       three times.

3              THE WITNESS:  I still have the same

4       answer, that if it's materially to the -- to the

5       surgeon's use, then they need to be informed and

6       trained on it.

7       BY MR. SLATER:

8          Q.    You don't know if a doctor is going to do

9       your training; right?

10         A.    I don't know.

11         Q.    You know that if a doctor opens the

12      package, the IFU is going to be there; right?

13         A.    Yes.

14         Q.    If your company knew that the use of local

15      anesthesia and a cough test would have a material

16      impact on the efficacy with the TVT, it would not be

17      acceptable to omit that information from the IFU;

18      correct?

19             MR. SNELL:  Form.

20             THE WITNESS:  If -- so I keep saying the

21      same thing:  If the information is reliable and

22      accepted and it -- and it -- the magnitude of what --

23      of the -- the difference in performance that we're

24      talking about, the IFU is a very logical place to put

25      it.

Confidential - Attorneys' Eyes Only

Page 802

1    BY MR. SLATER:

2        Q.    In fact, under your understanding of

3    what's required and, for example, what it says right

4    here on this marketing document, to give a complete

5    statement of the warnings, precautions, et cetera,

6    that information would need to be in the IFU;

7    correct?

8              MR. SNELL:  Form.

9              THE WITNESS:  Again, very logical place to

10   put it, yes.

11   BY MR. SLATER:

12       Q.    Based on your understanding of how the

13   regulatory world impact -- rephrase.

14             Based on your understanding of the

15   regulatory framework, it would be required that that

16   information would be in the IFU; correct?

17             MR. SNELL:  Form.

18             THE WITNESS:  I -- you know, I would -- I

19   would consult with the regulatory professional and

20   say, here's what we know, where does this belong,

21   from a regulatory standpoint.

22   BY MR. SLATER:

23       Q.    And based on your understanding of what

24   belongs in an IFU, if the information reached that

25   magnitude and your company knew what we just

Confidential - Attorneys' Eyes Only

Page 803

1    discussed, it should be in the IFU; right?

2                MR. SNELL:  Form.

3                THE WITNESS:  That still is -- that's

4    still the same question, it's still the same answer,

5    that -- that I believe the company has the duty to

6    inform and -- and then the team should sit with the

7    regulatory professionals or whoever and say, hey,

8    where does this go, how do we teach it, what's the

9    most reliable way to get this into the user's

10   knowledge base?

11   BY MR. SLATER:

12       Q.    Based upon your understanding of how

13   information gets to doctors through medical device

14   information from your company, if information is

15   deemed critical, one place it needs to be is in the

16   IFU; right?

17       A.    Yeah.  Yes.

18       Q.    And you would agree with me, if your

19   company knew that the efficacy with the TVT was

20   materially better if one used local anesthesia and a

21   cough test, that would be critical information to

22   tell a surgeon; right?

23                MR. SNELL:  Form.

24                THE WITNESS:  Again, it would come back to

25   magnitude and -- and level of evidence --

Confidential - Attorneys' Eyes Only

Page 804

1    BY MR. SLATER:

2        Q.    And if it --

3        A.    -- but they're certainly --

4        Q.    And if it was something your medical

5    affairs people were convinced was accurate, it would

6    be critical to put that information in the IFU;

7    right?

8        A.    I can certainly think that that could be,

9    yes.

10       Q.    If that information was understood by your

11   medical affairs people to reach that level of

12   magnitude, that would be deemed critical information

13   to get to a surgeon; correct?

14             MR. SNELL:   Form.

15             THE WITNESS:   So if it was a critical

16   difference and the magnitude or the reliability of

17   information and so forth level of evidence was

18   sufficient, then it's -- it would be important for

19   the surgeons to have that information, yes.

20   BY MR. SLATER:

21       Q.    Would be critical; right?

22       A.    You can call it critical, yeah.

23       Q.    If there was -- rephrase.

24             If your medical affairs people that worked

25   for you were aware of somewhere on the order of a 10

Confidential - Attorneys' Eyes Only

Page 805

1    to 15 percent difference in efficacy with local

2    anesthesia and a cough test, meaning if you don't use

3    those two steps, you have a 10 to 15 percent worse

4    rate of efficacy?

5         A.    Yeah.  I think you've got level 1-A

6    evidence that that -- that that existed but that's a

7    substantial difference that should be -- that

8    physicians should be informed, yes.

9         Q.    In the IFU; correct?

10        A.    It's a good place to put it, yeah.

11        Q.    The right place to put it; right?

12        A.    It's --

13             MR. SNELL:  Form.

14             That's a question you've asked him 20

15    times.

16             MR. SLATER:  I don't really care,

17    honestly, what you have to say.

18             MR. SNELL:  In fact, you just want him to

19    change his answer.

20             MR. SLATER:  No.  What I'm doing is --

21             MR. SNELL:  It's been asked and answered

22    10 times.

23             MR. SLATER:  Burt, let me tell you what's

24    happening here.

25             MR. SNELL:  Go ahead.  I'm just making a

Confidential - Attorneys' Eyes Only

Page 806

1    record.

2              MR. SLATER:  I'm actually going to be

3    involved in the trial, not sitting in the fourth row,

4    so can I continue?

5              MR. SNELL:  Go ahead.  I'm just making my

6    record.  Asked and answered for about the tenth time.

7              MR. SLATER:  That's great.

8    BY MR. SLATER:

9         Q.    Under those circumstances, that

10   information must be put in the IFU; right?

11             MR. SNELL:  Form.

12             THE WITNESS:  I can't go to "must."  I

13   would -- again, I would be -- I would be part of a

14   regulatory -- or part of a team including the

15   regulatory professionals and medical professionals

16   saying what have we got, where are we going to put

17   it, how are we going to teach it?  And an IFU is an

18   absolutely reasonable place for it to be as -- one

19   place for it to be.

20   BY MR. SLATER:

21        Q.    If that information was considered to be

22   valid -- rephrase.

23             If your company knew that there was a 10

24   to 15 percent worse efficacy rate when a local

25   anesthesia and a cough test was not used, you could

Confidential - Attorneys' Eyes Only

Page 807

1    never justify failing to include that information in

2    the IFU for the TVT; correct?

3         A.    When you say if you knew it --

4         Q.    Right.  If you knew.  If your company,

5    based on the evidence available to it, was convinced

6    within medical affairs that that is a valid,

7    clinically supported statement, that needs to be in

8    the IFU; right?

9              MR. SNELL:  Form.

10             THE WITNESS:  So as soon as you say knew,

11   that means to me -- to me that it's the truth in the

12   universe.  If it's the truth in the universe and you

13   know it, then I think an IFU statement would be

14   appropriate.

15   BY MR. SLATER:

16        Q.    The things that are stated in your IFU are

17   based on the best knowledge available to medical

18   affairs at the time the document is put out for

19   doctors to read; right?

20        A.    Yeah.

21        Q.    And if medical affairs' knowledge with

22   regard to materially better efficacy to the tune of

23   10 to 15 percent when local anesthesia and a cough

24   test was used met that standard, then it should be in

25   the IFU; right?

Confidential - Attorneys' Eyes Only

Page 808

1          MR. SNELL:  Form.

2          THE WITNESS:  So I said if they knew it.

3    If that's the truth in the universe, then I think

4    it -- it would be included in the IFU.

5    BY MR. SLATER:

6     Q.    Let me ask you something about the IFU.

7    It says there's a risk of -- well, rephrase.  I'll

8    withdraw that.

9          The foreign body reaction with the TVT is

10   chronic, it is not transitory or short term; right?

11    A.    So for any -- any foreign body reaction

12   does have -- in the presence of, obviously, a foreign

13   body does have a -- a time scale to it, yes, and

14   it -- so does it ever go away?  I don't think so.

15    Q.    The risk of erosion as a result of --

16   rephrase.

17         The risk of erosion with the TVT is not

18   just a transitory, short-term risk, it's a risk for

19   the entire time the person is alive while they have

20   the TVT in their body; right?

21    A.    Yeah.  I would -- I would refer back to

22   my -- to my medical affairs experts in the field.

23         My understanding is the risk is mostly

24   front loaded, but could you say there's never going

25   to be an erosion late?  No, you couldn't say that.

Confidential - Attorneys' Eyes Only

Page 809

1          MR. SLATER:  Okay.  I am going to hand off

2     the questioning to your counsel now.

3          MR. SNELL:  Did you have any or are you

4     not going to --

5          MR. SHERIDAN:  Yeah, I am going to ask a

6     few questions.

7          MR. SNELL:  That's fine.  After you get

8     done, I'm just going to take a break and get

9     organized.

10                    EXAMINATION

11    BY MR. SHERIDAN:

12        Q.   Good afternoon, Doctor.

13        A.   Good afternoon.

14        Q.   Nice to see you again.  I just have a few

15    questions for you.

16              First of all, the IFU that you have in

17    front of you instructs doctors to use a cough test

18    to -- to get the right tension for the TVT; right?

19        A.   I don't --

20             MR. SLATER:  Stop.

21             I object to the question.

22             MR. SNELL:  Yeah.  I'm about to --

23             MR. SLATER:  Can I talk to you for a

24    second?

25             MR. SNELL:  Look at the entire document

Confidential - Attorneys' Eyes Only

Page 810

1    before they start making a representation.

2              VIDEO OPERATOR:  The time is now 3:59.

3              We are going off the record.

4              (Discussion off the record.)

5              MR. SHERIDAN:  I'm withdrawing my

6    question, and I have no questions of the witness.

7              MR. SNELL:  Awesome.

8              (Recess, 4:00-4:31 p.m.)

9              VIDEO OPERATOR:  The time is now 4:31.

10             We are back on the record.

11                     EXAMINATION

12   BY MR. SNELL:

13        Q.    Good afternoon, Dr. Hart.

14        A.    Good afternoon.

15        Q.    I'll ask you, even though I'm sitting

16   aside from you, please focus more towards the camera

17   so the jury can see you.

18             Plaintiffs' counsel has asked you some

19   questions over the past three days of your

20   deposition; correct?

21        A.    Correct.

22        Q.    And I would just like to follow up on some

23   of those questions, obviously, I'm not going to cover

24   everything that's been discussed with you in three

25   days, and ask you some questions about some of the

Confidential - Attorneys' Eyes Only

Page 811

1    exhibits as well that plaintiffs' counsel has shown

2    to you.

3              Is that okay?

4         A.   Yes.

5         Q.   Plaintiffs' counsel asked you some

6    questions about your background so I won't rehash it

7    but, for the jury's sake, can you tell them what type

8    of surgeon you are?

9         A.   I was Board-certified first in general

10   surgery, then cardiothoracic surgery, and then

11   practiced not general surgery but practiced

12   cardiovascular and thoracic surgery.

13        Q.   Okay.  And when was it that you came to

14   work for Ethicon?

15        A.   2003.  July of 2003.

16        Q.   And you were an Ethicon employee since

17   that time?

18        A.   Yes.

19        Q.   Now, I believe you testified to one of

20   plaintiffs' counsel about your role as vice-president

21   of medical operations at Ethicon between the May 2005

22   and the January 2007 time period?

23        A.   Yes.

24        Q.   What was your role in that position in

25   that 2005 to January 2007 time period?

Confidential - Attorneys' Eyes Only

Page 812

1       A.      Yeah.  So as -- as vice-president of

2    medical operations, I was charged with organizing a

3    medical affairs department.

4               We had -- we had Medical Doctors working at

5    Ethicon and, in fact, they were called -- it was

6    called medical affairs but there -- there was an

7    anticipated need or a recognized need to more

8    formally organize under a set of common systems and

9    processes those work streams so that they could be,

10   number one, more efficient.  And so my focus at that

11   time was really just building the department and

12   standardizing how we carried out certain work

13   streams.

14      Q.      I believe you earlier testified that one

15   of the things that you were responsible for was

16   standardizing certain processes that needed to be

17   standardized; is that correct or not?

18      A.      Medical affairs processes, yes.

19      Q.      And during this time period of 2005 to

20   January 2007 did you sit regularly on quality boards?

21      A.      No, not -- not as the medical

22   decision-maker.

23      Q.      Now, for some point in time Dr. Rami

24   Mahmoud was your boss.

25      A.      That's true.

Confidential - Attorneys' Eyes Only

Page 813

1      Q.    Okay.  During the time he was your boss

2  did he sit on the quality boards regularly or did you

3  sit on them in his place?

4      A.    He did.

5      Q.    Who reported to you beginning in January

6  2007?

7      A.    Well, I don't think I can reproduce the

8  exact slate as we sit here.

9      Q.    Let me -- let me make it more simple.

10          Did you have different Ethicon companies'

11  medical affairs professionals reporting to you?

12      A.    Yes.

13      Q.    Such that not only would Women's Health

14  report to you but also Ethicon women's products?

15      A.    Ethicon products.

16      Q.    Strike that.  Strike that.  Yeah.  That's

17  a bad question.

18          Besides Ethicon Women's Health -- and they

19  reported to you; correct?

20      A.    Yes.

21      Q.    Ethicon products' medical affairs folks

22  would report to you as well.

23      A.    Yes.

24      Q.    All right.  And in your role, 2007 coming

25  forward, did you rely on the urogynecologists like

Confidential - Attorneys' Eyes Only

Page 814

1    Dr. Piet Hinoul and Dave Robinson?

2        A.    Yes.

3              MR. SLATER:   Objection.

4    BY MR. SNELL:

5        Q.    Did -- did Dr. Piet Hinoul report to you?

6        A.    Eventually.

7        Q.    Did Dave Robinson report to you?

8        A.    Yes.

9        Q.    Did you rely on those --

10       A.    So I'm going to go back.

11             MR. SLATER:   Doctor, just one thing I'd

12   just ask you to do is give a little pause before you

13   answer because I may have to object to some of the

14   questions, just give me a chance, then I won't have

15   to speak over you.

16             THE WITNESS:   Okay.

17             MR. SHERIDAN:   And do we have an agreement

18   that an objection for one is an objection for all?

19             MR. SNELL:   Yeah.   Yeah.

20             MR. SHERIDAN:   So I don't have to repeat

21   and waste --

22             MR. SNELL:   Yeah.   You don't have to say

23   anything.

24             MR. SLATER:   Yeah.   Once one attorney

25   objects, it covers everyone.

Confidential - Attorneys' Eyes Only

Page 815

1          MR. SHERIDAN:  I just wanted to make sure.

2          THE WITNESS:  So during that 2005 to 2007

3    period Piet Hinoul did not report to me.  I don't

4    think he was part of the company then.

5          MR. SNELL:  All right.

6    BY MR. SNELL:

7        Q.    At the time Piet Hinoul joined the company

8    did he report up through you?

9        A.    Up through me, yes.

10       Q.    And did you rely on the expertise of Dr.

11   Hinoul?

12         MR. SLATER:  Objection.

13         THE WITNESS:  Yes.

14   BY MR. SNELL:

15       Q.    Did you rely on the expertise of Dr.

16   Robinson?

17         MR. SLATER:  Objection.

18         THE WITNESS:  Yes.

19   BY MR. SNELL:

20       Q.    Was there a Dr. Aaron Kirkemo who was

21   also -- who also reported up through you at some

22   point?

23       A.    Yes.

24         MR. SLATER:  Objection.

25   BY MR. SNELL:

Confidential - Attorneys' Eyes Only

Page 816

1    Q.    Who is Dr. Aaron Kirkemo?

2    A.    Aaron -- Aaron was a urologist that came on

3    board and was first, I think, an associate medical

4    director reporting to Dave Robinson.  Can't remember

5    for sure whether he was ever promoted to -- to

6    medical director as opposed to associate medical

7    director.

8    Q.    Did you rely on Aaron Kirkemo?

9    A.    Yes.

10         MR. SLATER:  Objection.

11   BY MR. SNELL:

12   Q.    Was that a yes or a no?

13   A.    Yes, sir.

14   Q.    Who is Axel Arnaud?

15   A.    Axel Arnaud is a general surgeon, he would

16   say digestive surgeon, based in Paris who has been

17   part -- part -- so for part of his tenure he's been

18   part of medical affairs at Ethicon.

19   Q.    Are you aware of whether or not Dr. Arnaud

20   had involvement in the TVT product that you've

21   discussed during your deposition?

22   A.    Yes.

23   Q.    What about the --

24   A.    He did.

25   Q.    What about the trans -- strike that.

Confidential - Attorneys' Eyes Only

Page 817

1          Did Dr. Arnaud have involvement in the

2     transvaginal mesh product for prolapse?

3          A.    Yes.

4          Q.    In February 2011 I believe you testified

5     to plaintiffs' counsel your position changed to that

6     of vice-president, evidence-based medicine; is that

7     correct?

8          A.    Yeah.  And I can't -- I don't know the

9     exact date, but yes, that was the next position.

10         Q.    How do you determine what level and type

11    of evidence is needed for a product --

12                MR. SLATER:  Objection.

13    BY MR. SNELL:

14         Q.    -- when deciding to bring it to market?

15         A.    Well, we have a new product development

16    process that brings together cross-functional teams

17    from R&D, regulatory, clinical, medical and others,

18    and depending on the regulatory classification of the

19    product and our understanding of its intended use

20    and -- and characteristics or attributes, we would

21    expect to be able to support a regulatory filing

22    in -- in the countries where we intend to market the

23    product with -- with the team's assessment, including

24    medical affairs, that the product met whatever

25    regulatory requirements were in place.

Confidential - Attorneys' Eyes Only

Page 818

1      Q.    And is it correct or not that medical

2  affairs does the medical assessment of -- on the

3  safety and efficacy of the device?  Let me -- let me

4  take that -- retract that.

5            Is it correct or not that medical affairs

6  does the medical assessment as to the risk-benefit

7  profile of the device?

8      A.    Yes.

9      Q.    Plaintiffs' counsel showed you some

10  post-marketing surveillance documents earlier in your

11  deposition.

12            Do you recall those, in general?

13      A.    In general, yes.

14      Q.    What is post-marketing surveillance?

15      A.    Post-market surveillance is a process

16  within the quality organization that receives

17  information or inputs regarding the performance of

18  products in the marketplace and, you know,

19  categorizes, analyzes those data and then, of course,

20  on an ongoing basis sort of benefit-risk evaluations

21  will be undertaken.

22      Q.    Earlier in your deposition plaintiffs'

23  counsel asked you questions about some of these

24  quality documents and whether a certain word was or

25  was not included explicitly in the document.

Confidential - Attorneys' Eyes Only

Page 819

1          Do you, in general, recall that line of

2     questioning?

3               MR. SLATER:  Objection.

4               THE WITNESS:  Yeah, in general.  Yeah.

5     BY MR. SNELL:

6          Q.    Regardless of whether a certain word is

7     set forth explicitly in a quality document, would

8     that mean that a product is not safe and effective?

9               MR. SLATER:  Objection.

10               MR. SHERIDAN:  Objection.

11               THE WITNESS:  No.

12     BY MR. SNELL:

13          Q.    Now, let's turn to Exhibit 1345.

14          A.    I have it.

15          Q.    This is the December 2nd, 1999,

16     biocompatibility risk assessment for the Prolene Soft

17     mesh; correct?

18          A.    Correct.

19          Q.    And it was done by Thomas Barbolt, Ph.D.,

20     D.A.B.T.?

21          A.    Correct.

22          Q.    Who is Dr. Thomas Barbolt?

23          A.    Tom Barbolt is a toxicologist who worked at

24     Ethicon for a very long period of time, and I knew

25     him as -- as part of the preclinical team in

Confidential - Attorneys' Eyes Only

Page 820

1   toxicology with specific -- well, maybe not specific
2   but certainly a broad-based knowledge around our
3   suture platform.  But then I worked with him,
4   actually, for probably two or three years in a
5   completely different capacity or different --
6   different type of product so I got to know him very
7   well under that -- that circumstance.
8        Q.    And did you come to value his experience?
9              MR. SLATER:  Objection.
10             MR. SHERIDAN:  Objection.
11             THE WITNESS:  I did.
12   BY MR. SNELL:
13       Q.    Do you believe that he was qualified for
14   the job that he performed?
15             MR. SLATER:  Objection.
16             MR. SHERIDAN:  Objection.
17             THE WITNESS:  Yes.
18   BY MR. SNELL:
19       Q.    Did he at any times report up to you?
20       A.    No.
21       Q.    Now, plaintiffs' counsel --
22       A.    Oh, wait.  Hang on.  Hang on.
23             During the period of time that I was VP of
24   evidence-based medicine I did oversee preclinical,
25   and I can't remember whether Tom had retired by then

Confidential - Attorneys' Eyes Only

Page 821

1  or not.  I think he had.

2       Q.    Okay.  Now, plaintiffs' counsel read or

3  had you read some of the parts of this two-page

4  document.

5            Do you recall that?

6       A.    I do.

7       Q.    I'd like to ask you to read a couple

8  things and comment on them.

9            First, what was the reason behind this

10  biocompatibility risk assessment?

11      A.    Well, this would be a standard activity

12  during early development or during development of a

13  new product.  And the purpose would be to do a

14  risk -- as it says, a biocompatibility risk

15  assessment based on what we know in the material

16  already and/or what Dr. Barbolt knew already and

17  against various standards and regulations.

18      Q.    And here all that they were doing was

19  comparing the new construction, which was going to

20  use a smaller-diameter polypropylene filament.

21            MR. SLATER:  Objection.

22            THE WITNESS:  That's how I read it, yes.

23  BY MR. SNELL:

24      Q.    Now, plaintiffs' counsel asked you some

25  questions about your experience as a surgeon and

Confidential - Attorneys' Eyes Only

Page 822

1    whether you had used Prolene sutures.

2              Do you recall those questions?

3    A.    I do.

4    Q.    The sentence states in the second

5    paragraph, there is an extensive history of safe

6    clinical use with polypropylene, specifically Prolene

7    mesh and natural and blue Prolene suture, that

8    demonstrates that this material is one of the most

9    inert biomaterials available for implantation.

10             Did I read that correctly?

11   A.    You did.

12   Q.    Now, is that consistent or inconsistent

13   with your experience as a surgeon using Prolene?

14   A.    Absolutely consistent.

15   Q.    Plaintiffs' counsel asked you some

16   questions about cytotoxicity, which is referenced in

17   this document.

18             Do you recall those?

19   A.    I do.

20   Q.    In your experience, is Prolene cytotoxic?

21             MR. SHERIDAN:  Objection.

22             MR. SLATER:  Objection.

23             THE WITNESS:  No.  So my personal

24   experience as a surgeon, obviously, in cardiovascular

25   patients for 10 years of training, 30 -- and 20 years

Confidential - Attorneys' Eyes Only

Page 823

1    of practice, used it all day, every day -- I don't

2    think I could accurately estimate how much Prolene I

3    used in cardiovascular procedures, including many

4    procedures where patients had to be re-operated on,

5    and so I would see evidence or I would see those

6    sutures again -- and my experience was of all the

7    sutures that I encountered on a second or third

8    operation, Prolene, on average, significantly was

9    less encased with fibrotic scars than other sutures

10   which would be braided or otherwise.

11           So my -- you know, my clinical experience

12   was that in those cardiovascular tissues and others

13   where I used them I had no evidence for cytotoxicity

14   or any other untoward problem.

15   BY MR. SNELL:

16       Q.    There was an objection so I'm going to

17   just ask you a basic question:  What was your

18   experience with Prolene sutures?

19       A.    Well, as a cardiovascular surgeon for

20   decades, it's been the gold standard for vascular

21   anastomoses so I would -- I would estimate that, you

22   know, 90 or 95 percent of my experience with Prolene

23   sutures was in that setting, and it ranged from

24   coronary bypass surgery, where, you know, on average,

25   a patient would have three bypass grafts placed,

Confidential - Attorneys' Eyes Only

Page 824

1   which would equate to, on average, five vascular

2   anastomoses and would also be used at other parts of

3   the operation on cardiovascular tissue.   In

4   peripheral vascular surgery, similarly, to construct

5   vascular anastomoses.

6              One of the -- you know, one of the more

7   attractive or attractive attributes was its long-term

8   durability.   I mean, operating on people for a second

9   time.

10              So I always go back to in the -- in the

11   '50s or '60s, when abdominal aortic aneurysms were

12   first being repaired with synthetic grafts or

13   polyester grafts, they were implanted with -- with,

14   typically, silk sutures.   In that day and age, silk

15   sutures were felt to be non-absorbable or permanent

16   and, indeed, they're not, and so a number of patients

17   would come back in -- so that a polyester graft never

18   heals to the aorta or to the recipient vessel and

19   requires mechanical attachment permanently because if

20   the mechanical attachment is lost and there's not --

21   and there is no real healing between polyester and

22   the aorta, the two vessels actually separate in

23   some -- in some patients.   Now, they don't do it

24   acutely so they don't, you know, exsanguinate, but

25   you would get a fibrous capsule in between there that

Confidential - Attorneys' Eyes Only

Page 825

1    would actually become aneurysm.  I operated on a

2    number of people -- a number of people in the, I

3    guess '80s -- '70s and '80s.

4              That just doesn't occur with Prolene.  You

5    re-operate on somebody -- my most poignant experience

6    was -- and I've -- I've told this to a lot of

7    people -- the first week I was in practice or the

8    second week I was in practice, I think 1983, I did a

9    coronary bypass on a patient who showed up 20 years

10   later about a week before I left practice and needed

11   a second operation.

12             I first declined to operate on him.  I

13   said, you know, Mr. So and So, I'll be leaving

14   practice in a week or so and -- and -- but he

15   convinced me to do so, and I left him under the care

16   of my partners.

17             But I remember distinctly because I knew I

18   was coming to Ethicon in a few days or a week, and

19   when I dissected his heart free so I could do his new

20   bypasses, one of the bypasses, which was still

21   working or was not working, I should say, you know, I

22   came to that Prolene suture, I needed to remove it to

23   continue with the dissection, and I remember cutting

24   it out and holding it up and saying, oh, my gosh, you

25   know, this is exactly the way it looked 20 years ago

Confidential - Attorneys' Eyes Only

Page 826

1  and I'm going to this company in a week.  It isn't --
2  I just -- it was striking to say that it's, you know,
3  remarkable material.
4            So my experience was it -- it was the best
5  and absolute gold standard for vascular anastomoses
6  for decades and continues to be so to this day.
7       Q.    You mentioned vascular anastomoses.
8       A.    Oh.
9       Q.    What is that?  Can you explain that to the
10  jury so --
11       A.    I can.
12       Q.    Put that in a laymen's terms.
13       A.    Yeah.  If you have to connect two blood
14  vessels so that blood flow can come down through one
15  blood vessel into another one, you have to attach
16  them and sew them together either end to end or
17  what's called end to side, so it's that attachment
18  that's called the anastomosis.
19       Q.    And did the Prolene -- in your experience,
20  did the Prolene respond to the stresses put on it by
21  the body?
22            MR. SLATER:  Objection.
23            THE WITNESS:  Yes.
24  BY MR. SNELL:
25       Q.    How so?

Confidential - Attorneys' Eyes Only

Page 827

1        A.    Well, so -- so think about that when
2   you're -- when you're attaching a polyester or Dacron
3   graft to the aorta and it has to work forever and
4   you've got the suture line with the anastomosis, your
5   pulse pressure is one -- one beat or 80 beats per
6   minute times however many minutes there are in an
7   hour, times 20 years, and they do respond and stay
8   with mechanical or their -- their mechanical
9   integrity stays intact.
10       Q.    Now, besides some of the testing that
11  plaintiffs had you read into the record from this
12  document, I'd like to go over some of the other
13  testing set forth.
14             It states, the chronic systemic toxicity
15  and carcinogenicity of this material was evaluated
16  using natural and blue Prolene suture in the rat and
17  dog.
18             Did I read that correctly?
19       A.    You did.
20       Q.    And carcinogenicity is what, Doctor?
21       A.    That's the propensity for a material or a
22  chemical or something to cause cancer.
23       Q.    And it states, it indicates that this
24  material was well tolerated and non-carcinogenic?
25       A.    Non-carcinogenic.

Confidential - Attorneys' Eyes Only

Page 828

1      Q.    Non-carcinogenic.  Thank you.

2      A.    It does say that.

3      Q.    It states, this negative carcinogenicity

4  result and long-term clinical experience preclude the

5  need to conduct genotoxicity testing.

6            MR. SLATER:  Objection.

7  BY MR. SNELL:

8      Q.    Did I read that correctly?

9            MR. SLATER:  Objection.

10            THE WITNESS:  You did.

11  BY MR. SNELL:

12      Q.    And then it goes on to talk about a number

13  of other intramuscular and ophthalmic implantation

14  studies have been conducted as well.

15            MR. SLATER:  Objection.

16  BY MR. SNELL:

17      Q.    Is that correct or not?

18            MR. SLATER:  Objection.

19            THE WITNESS:  It does say that.

20  BY MR. SNELL:

21      Q.    It states, the results indicated that this

22  gold-standard material was well tolerated and without

23  adverse effects.

24            Did I read that correctly?

25            MR. SLATER:  Objection.

Confidential - Attorneys' Eyes Only

Page 829

1                THE WITNESS:  Yes.

2    BY MR. SNELL:

3        Q.    And is that consistent or inconsistent

4    with your experience?

5        A.    It's consistent.

6        Q.    It says, in addition, an intramuscular

7    tissue reaction study was conducted in rats where

8    Prolene mesh was used as the control article.  The

9    results indicated that the tissue reaction was

10   generally mild and the presence of the mesh did not

11   impair the healing response.

12               Did I read that correctly?

13               MR. SLATER:  Objection.

14               THE WITNESS:  You did.

15   BY MR. SNELL:

16       Q.    Is that consistent or inconsistent with

17   your experience with Prolene?

18       A.    Consistent.

19               MR. SLATER:  Objection.

20   BY MR. SNELL:

21       Q.    Turn, if you would, to the TVT 510(k)

22   plaintiffs' counsel asked you about.  It's been

23   marked as Exhibit T-3142.

24               MR. SNELL:  Bless you.

25               THE WITNESS:  Yeah.

Confidential - Attorneys' Eyes Only

Page 830

1  BY MR. SNELL:

2     Q.    And plaintiffs' counsel pointed out the

3  results of one of the cytotoxicity testings that were

4  positive.

5           Do you recall that?

6     A.    Yes.

7     Q.    And are cytotoxic --

8           MR. SLATER:  Objection to the form of the

9  question.

10  BY MR. SNELL:

11    Q.    Are cytotoxic -- are the cytotoxic tests

12  that plaintiffs' counsel pointed out to you, are

13  those conducted in people?

14    A.    No.

15    Q.    Well, what are they conducted in?

16    A.    Cell -- cell culture, I believe.  But --

17  but -- but individual cells or -- yeah, individual

18  cells in -- in preclinical benchtop testing in

19  glassware, I presume.

20    Q.    Petri dish?

21          MR. SLATER:  Objection.

22  BY MR. SNELL:

23    Q.    Is that the type of --

24    A.    Yeah.

25    Q.    -- testing --

Confidential - Attorneys' Eyes Only

Page 831

1       A.    Yeah.

2       Q.    -- medium that these types of --

3       A.    I wouldn't say --

4       Q.    -- cell lines would be --

5       A.    It wouldn't necessarily be Petri medium but

6    it would be in glassware in solution, I believe.

7       Q.    Okay.  Turn to Page 41.  The Bates number

8    is 286.

9       A.    Okay.

10            MR. SLATER:  What Page?

11            MR. SNELL:  Sure.  41.  286.

12   BY MR. SNELL:

13      Q.    This is a section about biocompatibility

14   testing plaintiffs' counsel asked you some questions

15   about.

16      A.    Okay.

17      Q.    One of the things I believe plaintiffs'

18   counsel pointed out was that for this ISO elution

19   test there was moderate to severe cytotoxicity; is

20   that correct?

21      A.    Yes.

22      Q.    The results, it states, of the ISO agarose

23   diffusion test were non-cytotoxic.

24            Did I read that correctly?

25            MR. SLATER:  Objection.

Confidential - Attorneys' Eyes Only

Page 832

1               THE WITNESS:  Yes.

2     BY MR. SNELL:

3          Q.    Now, would medical affairs or preclinical

4     be the ones doing these types of tests?

5          A.    No.  Oh, preclinical.  Sorry.

6          Q.    Okay.  Down at the last paragraph,

7     plaintiffs' counsel had you read the part where it

8     says, the polypropylene mesh component of the sterile

9     TVT device was cytotoxic in only the elution test,

10    suggesting cytotoxic potential in this sensitive test

11    system.

12               Do you recall that?

13               MR. SLATER:  Objection.

14               THE WITNESS:  I -- I do.

15    BY MR. SNELL:

16         Q.    I'd like you to -- can you read the next

17    sentence, please.

18         A.    Aloud?

19         Q.    Sure.

20         A.    However, the long history of safe clinical

21    use of polypropylene as mesh and suture products

22    suggests strongly that this material is inherently

23    biocompatible and that potential -- and that the

24    potential toxicity -- cytotoxicity observed and is

25    self-limiting and -- is self-limiting and minimal

Confidential - Attorneys' Eyes Only

Page 833

1    when compared to the implantation procedure itself.

2              MR. SHERIDAN:  Object to the question.

3    Sorry for the late objection.

4              MR. SLATER:  Didn't I -- I objected to

5    that question; right?  Oh, I thought I did.

6    BY MR. SNELL:

7         Q.    Turn to the next page.  It states, there

8    is abundant clinical data, about 500 patients,

9    including over 200 documented cases, which

10   demonstrates that the use of the TVT device, which

11   includes the implanted polypropylene mesh tape, has

12   fewer complications in terms of tissue reaction than

13   other comparable devices.

14             First of all, did I read that correctly?

15             MR. SLATER:  Objection.

16             THE WITNESS:  Yes.

17   BY MR. SNELL:

18        Q.    Are you aware about -- strike that.

19             Are you aware of whether other types of

20   mesh like Gore-Tex have been tried before Prolene by

21   Professor Ulmsten?

22        A.    I have some awareness, yes.

23        Q.    And do you know whether the reported rates

24   of rejection or mesh complications were higher with

25   the other meshes before the Prolene?

Confidential - Attorneys' Eyes Only

Page 834

1      A.    I think that's -- yes, I think the

2  publication states that it was higher.

3      Q.    I believe plaintiffs' counsel asked you

4  questions about whether cytotoxicity would cause mesh

5  exposures.

6           Do you recall, in general, that topic?

7      A.   Yes.

8           MR. SLATER:  Objection to the form of the

9  question.

10          MR. SNELL:  Let me back up, then.

11  BY MR. SNELL:

12     Q.    Is the Prolene mesh cytotoxic, in your

13  opinion?

14          MR. SLATER:  Objection.

15          THE WITNESS:  No.

16  BY MR. SNELL:

17     Q.    Are Prolene sutures cytotoxic, in your

18  opinion?

19     A.   No.

20          MR. SLATER:  Objection.

21          THE WITNESS:  No.

22  BY MR. SNELL:

23     Q.    To your understanding or knowledge, are

24  mesh exposures due to alleged cytotoxicity?

25          MR. SLATER:  Objection.

Confidential - Attorneys' Eyes Only

Page 835

1                THE WITNESS:  Can you say it one more

2     time?  Sorry.

3                MR. SNELL:  Sure.

4     BY MR. SNELL:

5        Q.    Are -- are mesh exposures due to alleged

6     cytotoxicity?

7                MR. SLATER:  Objection.

8                THE WITNESS:  I don't -- I can't say

9     that's true.

10    BY MR. SNELL:

11       Q.    Do you have Exhibit 1312 in front of you?

12       A.    Uh-huh.  Yes.

13       Q.    This is the post-market surveillance

14    report for Prolift that plaintiffs' counsel showed

15    you?

16               MR. SHERIDAN:  Could you just say the

17    Bates number for the record?

18               MR. SNELL:  Yes.  ETH.MESH.04121282.

19               MR. SHERIDAN:  Okay.

20               MR. SLATER:  Do you have another copy of

21    that?

22               MR. SNELL:  Let me see.

23               Let's go off the record.  I'm going to

24    have to look through here.

25               VIDEO OPERATOR:  The time is now 5:00.

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Attorneys' Eyes Only

Page 836

1           We are going off the record.

2           (Discussion off the record.)

3           VIDEO OPERATOR:  The time is now 5:05.

4           We are back on the record.

5  BY MR. SNELL:

6       Q.   Dr. Hart, did Ethicon Women's Health &

7  Urology medical affairs perform risk-benefit

8  evaluations on its products?

9           MR. SLATER:  Objection.

10          THE WITNESS:  Yes.

11  BY MR. SNELL:

12      Q.   You were asked some questions about when a

13  device could be put on the market.

14          In general, do you recall those types of

15  questions?

16      A.   No.  Is that from weeks ago?

17      Q.   It was from months ago.

18          Let me ask you this, then:  You were asked

19  about different women's health products over the

20  course of your deposition; correct?

21      A.   Correct.

22      Q.   Do you recall questions about, for

23  instance, the Prolift and whether or not it should

24  have been brought to market?

25      A.   Generally, yeah.

Confidential - Attorneys' Eyes Only

Page 837

1        Q.    Okay.  If there is reasonable assurance of
2   safety and effectiveness, is it okay to put a product
3   on the market?
4              MR. SLATER:  Objection.
5              THE WITNESS:  So you would -- you would
6   line up the level of evidence against the regulatory
7   requirements for whatever classification of device
8   you were talking about.  But, yeah, that would be --
9   that would be a standard on the device side or a
10  regulatory standard.
11  BY MR. SNELL:
12       Q.    I'd like to -- I'm just going to give you
13  my copy of Exhibit T-1311.  It was the November 2nd,
14  2010, Prolift post-market surveillance report review
15  session that plaintiffs' counsel asked you questions
16  about, and I believe you pointed out that Dave
17  Robinson from medical affairs was present.
18       A.    Okay.
19       Q.    I'd just like you to read the very last
20  bullet point that's under Section MM-7 about whether
21  or not the Prolift device at that time was performing
22  as expected.
23             MR. SHERIDAN:  Objection.
24             MR. SLATER:  Objection.
25             THE WITNESS:  So I can read it --

Confidential - Attorneys' Eyes Only

Page 838

1              MR. SLATER:  I've got it.

2              MR. SHERIDAN:  Oh, okay.  Sorry.  We'll

3    have the reporter --

4              MR. SLATER:  She got it.

5              THE WITNESS:  Read it out loud?

6              MR. SNELL:  Yes, please.

7              THE WITNESS:  Yeah.  Prolift is performing

8    as intended and is a safe and effective approach for

9    the surgical treatment of pelvic organ prolapse.

10   BY MR. SNELL:

11        Q.   Now, plaintiffs' counsel, I believe,

12   marked as an exhibit the Iglesia study that concerned

13   the Prolift device.

14              Do you recall that?

15        A.   I do.

16        Q.   And after the Iglesia study came out did

17   Ethicon investigate the safety and effectiveness of

18   Prolift?

19              MR. SLATER:  Objection.

20              THE WITNESS:  Yes.

21   BY MR. SNELL:

22        Q.   I believe you testified at the first day

23   of your deposition that Dr. Piet Hinoul did an

24   analysis and review and presentation to you and some

25   others.

Confidential - Attorneys' Eyes Only

Page 839

1      A.     Correct.

2      Q.     Okay.

3             MR. SNELL:  Do you have exhibit stickers?

4             I don't think I've marked this, Adam.  I

5      don't think somebody marked this.

6             MR. SLATER:  I'm looking for something

7      else.

8             MR. SNELL:  I'm just going to mark it.

9             MR. SLATER:  You're marking new exhibits?

10            MR. SNELL:  I'm just going to mark it.

11     Yeah.  It was discussed but it wasn't marked.

12            MR. SLATER:  Sweet.

13            MR. SHERIDAN:  What's our number?

14            MR. SNELL:  I'm going to just call it Hart

15     D-1.

16            MR. SHERIDAN:  Wait.  Wait.  What number?

17            MR. SNELL:  Hart D-1.

18            MR. SLATER:  That's fine.  Don't worry

19     about it.  It all comes up on Golkow's site anyway.

20            MR. SNELL:  Yeah.

21            MR. SLATER:  Hart D-1?

22            MR. SNELL:  Yes.

23            MR. SLATER:  With the placeholder first

24     and then the document?

25            MR. SNELL:  Yes.

Confidential - Attorneys' Eyes Only

Page 840

1          MR. SLATER:  Is that how you marked it?

2          MR. SNELL:  Yeah.

3          MR. SLATER:  Excellent.  Well done.

4          (Exhibit Hart D-1 was marked for

5     identification.)

6     BY MR. SNELL:

7          Q.   Can you identify what Exhibit D-1 is,

8     Doctor?

9          A.   I believe this is the presentation that

10    Piet made that you just -- at the meeting or the --

11    yeah, at the meeting that you just referenced.

12         Q.   And, in general, can you tell me what the

13    presentation encompassed?

14         A.   My recollection was -- and I haven't looked

15    at all these slides in a long time -- that Piet was

16    asked and produced this document that would be, you

17    know, sort of a re-review of the available -- first

18    of all, review of the sort of the -- the disease

19    states and background of the procedures historically

20    and current and then to review what's known in the

21    literature and from elsewhere, but mostly the

22    literature, I guess, regarding performance of,

23    relative performance, I guess, of some of the

24    procedures that are available, including the -- the

25    mesh repairs.

Confidential - Attorneys' Eyes Only

Page 841

1          Q.     And in the presentation did Dr. Hinoul

2     cover clinical studies pertaining to the Prolift

3     device?

4                 MR. SLATER:  Objection.

5                 THE WITNESS:  Yes.  I mean, yeah.  Excuse

6     me.  Yes.

7     BY MR. SNELL:

8          Q.     Did he -- did he address -- strike that.

9                 Did Dr. Hinoul's November 2010 analysis

10    also look at exposure and erosion rates?

11                MR. SLATER:  Objection.

12                THE WITNESS:  Yes.

13    BY MR. SNELL:

14         Q.     Did Dr. Hinoul's November 2010 analysis

15    address other complications, such as bleeding

16    complications?

17         A.     Yes.

18                MR. SLATER:  Objection.

19                THE WITNESS:  Yes.

20    BY MR. SNELL:

21         Q.     Visceral injury?

22         A.     Yes.

23         Q.     Fistulas?

24                MR. SLATER:  Objection.

25                MR. SHERIDAN:  Objection.

Confidential - Attorneys' Eyes Only

Page 842

1                THE WITNESS:  Yes.

2                MR. SLATER:  Objection.

3                My intention was to object to each

4      question.  It's hard to get them all out before the

5      answers.

6      BY MR. SNELL:

7           Q.    Did Dr. Hinoul analyze pain

8      postoperatively?

9                MR. SLATER:  Objection.

10                THE WITNESS:  Yes.

11      BY MR. SNELL:

12           Q.    Did Dr. Hinoul evaluate mesh retraction?

13                MR. SLATER:  Objection.

14                THE WITNESS:  I presume.  I'd have to see

15      it on the page.

16      BY MR. SNELL:

17           Q.    Turn to the -- the header slide that says,

18      pain, IUGA, 2001 to 2008.

19           A.    Yeah.  Yes.

20           Q.    So we're on the page that says, pain,

21      IUGA, 2001 to 2008.

22                Are you there?  Are you there?

23           A.    Yes, I am.  I'm sorry.

24                MR. SLATER:  Can you give me one second?

25                MR. SNELL:  Absolutely.

Confidential - Attorneys' Eyes Only

Page 843

1           MR. SLATER:  What page is it?

2           MR. SNELL:  It says, pain, IUGA, '01 to

3      '08.

4           THE WITNESS:  Yeah.  Unfortunately,

5      they're not numbered.

6           MR. SLATER:  Yeah.  I'm trying to figure

7      out -- here it is.  Got it.

8           MR. SNELL:  Got it?

9      BY MR. SNELL:

10         Q.    So the bottom column states, mesh

11     retraction?

12         A.    Yes.

13         Q.    Did Dr. Hinoul assess mesh retraction?

14          MR. SLATER:  Objection.

15          THE WITNESS:  Yes.

16     BY MR. SNELL:

17         Q.    Turn to the next page.  Title of this

18     slide is, dyspareunia; correct?

19         A.    Correct.

20         Q.    Did Dr. Hinoul look at the literature with

21     regard to dyspareunia after prolapse surgery?

22         A.    Yes.

23          MR. SLATER:  Objection.

24          MR. SHERIDAN:  Object.

25     BY MR. SNELL:

Confidential - Attorneys' Eyes Only

Page 844

1        Q.      Did Dr. Hinoul look to the literature with

2   regard to de novo dyspareunia after prolapse surgery?

3               MR. SLATER:   Objection.

4               THE WITNESS:   Yes.

5   BY MR. SNELL:

6        Q.      And this was a presentation made, in part,

7   to you; correct?

8        A.      Correct.

9        Q.      And for the de novo dyspareunia rates

10  reported here across the different prolapse surgeries

11  how did Prolift's de novo dyspareunia rate compare?

12              MR. SHERIDAN:   Objection.

13              THE WITNESS:   Favorably.

14  BY MR. SNELL:

15       Q.      It says, 2010 PubMed update, on the next

16  slide.

17       A.      Uh-huh.

18       Q.      And the slides that follow that.  And is

19  that correct?

20       A.      That's correct.

21       Q.      What is PubMed?

22       A.      PubMed is a searchable database where

23  you -- a person can go in and enter search terms and

24  the -- the -- the program will -- will search medical

25  literature, basically.

Confidential - Attorneys' Eyes Only

Page 845

1     Q.    Did Dr. Hinoul do a PubMed search?

2     A.    Yes.

3     Q.    The next page or series of pages talks

4  about the Iglesia study, which plaintiffs' counsel

5  marked and showed to you; correct?

6     A.    Correct.

7     Q.    And it says that the subjective cure of

8  bulge symptoms in the mesh arm was 93.3 percent.

9           Did I read that correctly?

10          MR. SLATER:  Objection.

11          THE WITNESS:  You did.

12 BY MR. SNELL:

13    Q.    And as plaintiffs' counsel, I believe,

14 pointed out, there were five vaginal mesh exposures

15 in the Iglesia study?

16    A.    Yes.

17    Q.    Do you know whether there were suture

18 erosions in the non-mesh arm of the Iglesia study?

19    A.    Yes.

20    Q.    Do you remember how many suture erosions

21 occurred in the Iglesia study?

22    A.    My recollection is similar in incidence.

23    Q.    Five mesh exposures, five suture erosions?

24          MR. SLATER:  Objection.

25          THE WITNESS:  Yeah.

Confidential - Attorneys' Eyes Only

Page 846

1          MR. SNELL:  We'll look at it in a moment.

2   BY MR. SNELL:

3      Q.    At the conclusion of this mesh platform

4   review in November 2010, was a determination made by

5   Ethicon medical affairs as to whether the Prolift was

6   safe and effective?

7          MR. SLATER:  Objection.

8          THE WITNESS:  Yes.

9   BY MR. SNELL:

10     Q.    What was that determination?

11     A.    That it was safe and effective.

12     Q.    And had Ethicon medical affairs prior to

13  that already determined that Prolift was safe and

14  effective?

15         MR. SLATER:  Objection.

16         THE WITNESS:  Yes.

17         (Exhibit Hart D-2 was marked for

18  identification.)

19  BY MR. SNELL:

20     Q.    Doctor, I'm handing you Exhibit Hart D-2.

21  Let me -- hold on.  Let's back up, make sure I didn't

22  give you a highlighted copy.

23         MR. SNELL:  Here you go, Adam.

24  BY MR. SNELL:

25     Q.    I've handed you Hart Exhibit D-2.

Confidential - Attorneys' Eyes Only

Page 847

1          Do you recognize this study to be the

2    followup to the Iglesia study?

3          A.    I do.

4          Q.    The lead author in this publication is

5    Andrew I. Sokol.

6          Do you see that?

7          A.    I do.

8          Q.    Turn -- let's go pretty much to the very

9    back, Page E-6.

10         A.    E-6.  Okay.

11         Q.    This is an electronic printout but, as

12   plaintiffs' counsel pointed out, of the 32 mesh

13   subjects, five women had mesh exposures; correct?

14         A.    Correct.

15         Q.    Look over at the next column on the right.

16         How many of the non-mesh participants had

17   suture exposures?

18         A.    Five.

19         Q.    And those were apical Gore-Tex suture

20   exposures, it states; correct or not?

21         A.    Correct.

22         Q.    And two of those five women had some

23   complaints that they required suture removal at six

24   and nine months after the procedure; is that correct

25   or not?

Confidential - Attorneys' Eyes Only

Page 848

1       A.      That's correct.

2       Q.      So the same number of women in the Prolift

3   arm of the study had a mesh exposure as the women in

4   the non-mesh arm had a suture exposure.

5               MR. SLATER:  Objection.

6               THE WITNESS:  Correct.

7   BY MR. SNELL:

8       Q.      Turn to the next page, Table 4,

9   dyspareunia.

10              Do you see that?

11      A.      I do.

12      Q.      Now, 12 months after the operation, in the

13  Prolift mesh group the dyspareunia percentage was 6.7

14  percent in the Prolift arm; correct?

15              MR. SLATER:  Objection.

16              THE WITNESS:  Correct.

17              MR. SNELL:  Strike that.

18  BY MR. SNELL:

19      Q.      What was the dyspareunia percentage in the

20  Prolift arm?

21      A.      6.7 percent.

22      Q.      And what was the dyspareunia percentage in

23  the no-mesh arm at 12 months after the operation?

24      A.      18.8 percent.

25      Q.      Now, those two were not statistically

Confidential - Attorneys' Eyes Only

Page 849

1   significantly different; is that correct or not?

2            A.    That's correct.

3            Q.    Numerically, the dyspareunia was lower in

4   the Prolift arm than in the no-mesh arm in the Sokol

5   paper; is that correct or not?

6                 MR. SLATER:  Objection.

7                 THE WITNESS:  That's correct.

8   BY MR. SNELL:

9            Q.    And the Iglesia/Sokol study had a small

10  number of patients involved.

11                MR. SLATER:  Objection.

12                THE WITNESS:  Yes.

13  BY MR. SNELL:

14           Q.    Well, let me just ask it this way:  What

15  is your opinion as to the number of patients involved

16  in the Iglesia study?

17                MR. SLATER:  Objection.

18                THE WITNESS:  It's a small number, about

19  15 or 16 in each arm, after one-year followup.

20  BY MR. SNELL:

21           Q.    Those -- that were assessed for

22  dyspareunia?

23           A.    Uh-huh.

24           Q.    You have to say yes or no.

25           A.    Yes.

Confidential - Attorneys' Eyes Only

Page 850

1            MR. SLATER:  Objection.

2   BY MR. SNELL:

3       Q.    Do you have Exhibit T-1317, the April

4   21st, 2011 --

5       A.    I do now.

6       Q.    -- PowerPoint?

7            MR. SLATER:  Do you have it for me?

8            MR. SHERIDAN:  What are the Bates numbers?

9            MR. SNELL:  Let's see.

10            MR. SLATER:  Well, if you're going to go

11   through a big PowerPoint, I'm going to have to have

12   it in front of me.

13            MR. SNELL:  Okay.

14            MR. SLATER:  And, listen, no -- no joking

15   around, I'm not trying to be facetious, we're going

16   to be here a long time.  This -- this PowerPoint

17   alone I could be 45 minutes with.

18            MR. SNELL:  I could be an hour with it

19   but, I mean, I'm just going to ask him a couple

20   questions.

21            MR. SLATER:  I don't really -- I'm just

22   telling you flat-out --

23            MR. SNELL:  I don't know if I have -- see,

24   I've got my comments.  I would give you mine but I've

25   got stuff all over it.

Confidential - Attorneys' Eyes Only

Page 851

1          MR. SLATER:  Well, I mean, look, if you're

2    going to question Dr. Hart on a -- on a lengthy

3    PowerPoint, I'm sorry, but I need a copy of it.  I

4    just can't remember all the stuff myself.  I'm not

5    that good.

6          MR. SNELL:  Let's go off the record for a

7    minute.

8          MR. SLATER:  Okay.  Off the record.

9          VIDEO OPERATOR:  The time is now 5:24.

10          Off the record.

11          (Recess, 5:24-5:40 p.m.)

12          VIDEO OPERATOR:  Time is now 5:40.

13          We are back on the record.

14    BY MR. SNELL:

15    Q.    Doctor, we're looking at Exhibit T-1317,

16    the April 21st, 2011, PowerPoint from the meeting

17    with the FDA.

18          It was early marked -- earlier marked in

19    your deposition; is that correct?

20    A.    Yes.

21    Q.    And this -- I believe you testified to

22    plaintiffs' counsel that this was the meeting you

23    attended in person?

24    A.    I did.

25    Q.    Okay.  And in preparation for this meeting

Confidential - Attorneys' Eyes Only

Page 852

1    did Ethicon medical affairs do a risk-benefit

2    assessment of its pelvic floor repair products?

3                MR. SLATER:  Objection.

4                MR. SHERIDAN:  Objection.

5                THE WITNESS:  Yes, as part of putting this

6    material together.

7    BY MR. SNELL:

8        Q.    As part of putting this material together,

9    did Ethicon medical affairs do a risk-benefit

10   assessment of its stress urinary incontinence

11   products?

12               MR. SHERIDAN:  Objection.

13               MR. SLATER:  Objection.

14               THE WITNESS:  Yes.

15   BY MR. SNELL:

16       Q.    And what was Ethicon medical affairs'

17   assessment with regard to its pelvic floor repair

18   products?

19       A.    Same conclusion as from the previous 2010

20   review, safe -- that the products were safe and

21   effective -- and effective.

22       Q.    And what was Ethicon medical affairs'

23   assessment of its stress urinary incontinence

24   devices --

25       A.    Same.

Confidential - Attorneys' Eyes Only

Page 853

1        Q.    -- at this time?

2        A.    Same.

3        Q.    Which is?

4        A.    Products were -- were performing safely and

5    effectively.

6        Q.    On Page 3, third bullet point, it states,

7    Ethicon is the industry leader in women's health.

8              Did I read that correctly?

9        A.    Yes.

10             MR. SLATER:  Objection.

11   BY MR. SNELL:

12       Q.    Most research products and published

13   literature.

14             Did I read that correctly?

15             MR. SLATER:  Objection.

16             THE WITNESS:  Yes.

17   BY MR. SNELL:

18       Q.    Plaintiffs' counsel asked you some

19   questions about the Ethicon TVT device?

20       A.    Yes.

21       Q.    Do you know how many, approximately how

22   many randomized, controlled trials have been done

23   concerning the Ethicon TVT device?

24       A.    I think it's on the order of between 150

25   and 200.

Confidential - Attorneys' Eyes Only

Page 854

1          Q.    And does that include the TVT retropubic,

2    the TVT obturator and the TVT -- strike that.

3                Does that include those two mid-urethral

4    slings?

5          A.    Yes.

6                MR. SLATER:  Objection.

7    BY MR. SNELL:

8          Q.    The -- I think about the seventh page has

9    a clinical overview, Piet Hinoul, M.D., Ph.D., page.

10               Do you see that?

11               MR. SLATER:  What page did you say?

12               MR. SNELL:  I think it's about the

13   seventh.  Again, these aren't numbered.  Well,

14   actually, they are.

15               THE WITNESS:  Some of them are numbered

16   but I do -- it's -- it's --

17   BY MR. SNELL:

18         Q.    So it would be Number 9.  Let me re-ask

19   it.

20               If you flip through the PowerPoint, the

21   ninth page begins, the clinical overview by Piet

22   Hinoul; is that correct or not?

23         A.    It is.

24         Q.    Okay.  And turn back, if you would, to

25   Page 33 --

Confidential - Attorneys' Eyes Only

Page 855

1      A.    Uh-huh.

2      Q.    -- the Prolift PubMed update, February

3  2011.

4            Do you see that?

5      A.    Uh-huh.  Yes.

6      Q.    And did Ethicon medical affairs do an

7  update on its PubMed search regarding Prolift in lieu

8  of this meeting?

9            MR. SLATER:  Objection.

10           THE WITNESS:  Yes.

11 BY MR. SNELL:

12     Q.    During the deposition plaintiffs' counsel

13 had asked you questions about the complications of

14 mesh exposure and mesh erosion; is that correct?

15     A.    That's correct.

16     Q.    Turn to Page 32.

17           Now, what are these photos on Page 32?

18     A.    They're titled, mesh exposure versus

19 erosion.  And the -- the photo -- the photo on the

20 left would be an example of a mesh exposure

21 intravaginally and the photo on the right would be

22 some mesh exposed intraluminally in what appears to

23 be the GI tract but...

24     Q.    Is there a difference between mesh

25 exposures and mesh erosion, to your understanding?

Confidential - Attorneys' Eyes Only

Page 856

```
 1        A.    Well, as I -- as I currently use the words
 2    and many do, yes.
 3        Q.    Okay.
 4        A.    Sorry.  I bumped my --
 5        Q.    That's all I have on that.
 6              Plaintiff asked you some questions about
 7    the Altman 2011 Prolift versus anterior colporrhaphy
 8    randomized, controlled trial.
 9              Do you recall that?
10        A.    Previously; right?  Yes.
11        Q.    Yeah.  Do you have a general recollection
12    of how Prolift performed, compared to colporrhaphy
13    anatomically?
14        A.    I would want to be refreshed if I was going
15    to answer.
16        Q.    Okay.
17              MR. SLATER:  Do you seriously want to go
18    through the results of the Altman study?
19              MR. SNELL:  Yeah.  Well, you asked him
20    about the complications.  I'm going to ask him just a
21    few questions about it.
22              MR. SLATER:  Listen, do whatever you want.
23              MR. SNELL:  That's fine.  I'm only going
24    to ask him a couple of questions about it.
25              MR. SLATER:  That's fine.  I'm, obviously,
```

Confidential - Attorneys' Eyes Only

Page 857

1   going to follow up with all the other data and it's

2   going to get us into a -- we'll be on the

3   merry-go-round.

4              MR. SNELL:  I'm going to give him my copy,

5   if that's okay, just ask him about Table 2.  Is that

6   okay?

7              MR. SLATER:  I -- I'm not here -- I'm not

8   the teacher.  I'm the bad student who keeps getting

9   kicked out of the room.

10  BY MR. SNELL:

11       Q.   Doctor, I'm handing you Table 2 of the

12  Altman study.

13             MR. SHERIDAN:  What exhibit is it?

14             MR. SNELL:  It was previously marked --

15  look at the front page, Doctor.

16             THE WITNESS:  858.

17             MR. SLATER:  It wasn't marked during this

18  deposition.  It wasn't used during this deposition.

19             MR. SNELL:  No.  It was used during this

20  deposition.

21             MR. SLATER:  The actual study?

22             MR. SNELL:  Yes, the actual study.

23             MR. SLATER:  Are you sure about that?

24             MR. SNELL:  I can tell you exactly what

25  was read into the record.

Confidential - Attorneys' Eyes Only

Page 858

1          MR. SLATER:  Hey, I take your word for it.

2    It's okay.  I'm not trying to stop you.

3          MR. SHERIDAN:  T-858?

4          MR. SNELL:  It's the -- it's one Adam

5    marked, 858.  It's been around for a long time.

6          MR. SLATER:  Oh, it's -- it's been around.

7          MR. SNELL:  Yeah.

8          MR. SLATER:  That's all right.  I've got

9    my outline here.

10          MR. SNELL:  Yeah.

11          MR. SLATER:  Yeah, I showed it to him.

12    Page 137, Line 11.

13          I'm not doubting you.  Never would.

14          MR. SNELL:  I have you -- somebody showed

15    him the front too but, anyhow, I just have a question

16    about Table 2.

17    BY MR. SNELL:

18          Q.    Doctor, I've handed you the Altman study,

19    and I'm asking you just to look at Table 2, which

20    reports the anatomic and subjective results, to

21    refresh your memory.

22          A.    Yes.  Uh-huh.

23          Q.    And how did Prolift compare to the

24    anterior colporrhaphy on the primary end point?

25          A.    At one year.

Confidential - Attorneys' Eyes Only

Page 859

1        Q.    At one year.

2        A.    At one year.

3              Colporrhaphy group, which is a non-mesh

4    repair, success was 34.5 percent and the mesh repair

5    group, 60.8 percent.

6        Q.    How did the Prolift compare in the Altman

7    study of one year to colporrhaphy on the anatomic

8    improvement of prolapse?

9        A.    At 12 months, colporrhaphy, 47.5 percent,

10   and mesh repair group, 82.3 percent.

11       Q.    How did the Prolift compare to the

12   colporrhaphy at 12 months in the Altman study with

13   regard to whether the women had a sensation of a

14   bulge?

15       A.    Colporrhaphy group, 62.1 percent, and mesh

16   repair group, 75.4 percent, meaning absence of

17   sensation, I guess.

18       Q.    Okay.  And was that significant?

19       A.    Yes.

20             MR. SLATER:  Objection.

21   BY MR. SNELL:

22       Q.    So in the mesh group, the Prolift group,

23   more women had an absence of a sense of a bulge

24   compared to colporrhaphy; is that correct or not?

25             MR. SLATER:  Objection.

Confidential - Attorneys' Eyes Only

Page 860

1          THE WITNESS:  Correct.

2    BY MR. SNELL:

3          Q.    Was that result statistically significant?

4          A.    Yes.

5          MR. SLATER:  Objection.

6    BY MR. SNELL:

7          Q.    Plaintiffs' counsel -- do you have

8    Exhibit -- that's all I have on that.  Actually, I

9    have one other question.

10          Plaintiffs' counsel, I believe, asked you

11   about whether you were aware if there was a

12   correction published in The New England Journal of

13   Medicine regarding the Altman study?

14          Do you recall that?

15         A.    Yes.

16         Q.    Do you know whether or not there was a

17   correction?

18         A.    My understanding is yes.

19         Q.    Okay.  And what is your understanding of

20   the extent of the correction issue?

21          MR. SLATER:  Objection.

22          THE WITNESS:  So I believe it was related

23   to referencing the fact or acknowledging --

24   acknowledging the fact that -- that the -- we weren't

25   the sponsor, we weren't the regulatory sponsor,

Confidential - Attorneys' Eyes Only

Page 861

1    because it was an IIS, but the company had visibility

2    to the data and the manuscript and had comments.

3    BY MR. SNELL:

4         Q.    Okay.

5         A.    I think that's what I remember.

6         Q.    And do you recall if The New England

7    Journal made any changes to the data in the study --

8         A.    Not to my knowledge.

9         Q.    -- as opposed to changing the disclosure

10   that Ethicon had some visibility to the study and had

11   provided comments?

12        A.    Not that I recall.

13        Q.    Okay.  Exhibit 1324 is a committee

14   opinion, December 2011, by the American College of

15   Obstetricians and Gynecologists that plaintiffs'

16   counsel showed you.

17               Do you have a copy --

18        A.    I don't think so.

19        Q.    -- of that?

20               MR. SLATER:  Do you have copies of these?

21   I'm going off memory.  And you know what?  Also, it

22   would save me time later if you can -- if you're done

23   with the Altman article, if you can give it to me so

24   I can prep my follow-up questioning.

25               MR. SNELL:  Okay.

Confidential - Attorneys' Eyes Only

Page 862

1          Do you have Altman?

2          MR. SHERIDAN:  I think he just flipped it

3    over on the stack.

4          MR. SNELL:  No.  This is my Altman.

5          MR. SHERIDAN:  He was using it.

6          MR. SNELL:  That's what I said, I'm going

7    to give him my copy of Table 2.  I'll go get somebody

8    to print it out.

9          MR. SLATER:  You actually think your

10   highlighting is going to be a big assistance to me?

11         MR. SNELL:  No, I don't think so.  Oh.

12   Oh.  I see what you're saying.  No.  No.  No.  I

13   thought you meant --

14         MR. SLATER:  Most likely, I'm going to ask

15   you about something he didn't highlight.  The odds

16   are.

17         MR. SNELL:  Well, then give me that back

18   if you're going to go there.  I thought we'd be

19   gentlemen on that.

20         MR. SLATER:  We are gentlemen.

21         MR. SNELL:  I'll go get you -- I'll go --

22         MR. SLATER:  It has nothing to do with the

23   highlighting.  I know what I'm looking for.  I just

24   want to find the right section --

25         MR. SNELL:  Okay.

Confidential - Attorneys' Eyes Only

Page 863

1          MR. SLATER:  -- to save time.  If you
2     don't want me to do it, I'm --
3          MR. SNELL:  No.  No.
4          MR. SLATER:  I could write your -- I could
5     write your Direct.
6          MR. SNELL:  We're going to have this
7     issue, though.  I mean --
8          MR. SLATER:  Off the record.
9          Do you have a lot more to go?
10         MR. SNELL:  Huh?
11         MR. SLATER:  Do you have a lot more
12    documents to go?
13         MR. SNELL:  A few, not many.
14         MR. SLATER:  So you're like another 20
15    minutes to a half hour.
16         MR. SNELL:  We're off the record.
17         Let's go off the record.
18         VIDEO OPERATOR:  The time is now 5:52.
19         This is the end of Disk Number 4.
20         We're going off the record.
21         (Recess, 5:52-6:12 p.m.)
22         VIDEO OPERATOR:  The time is now 6:12.
23         This is the beginning of Disk Number 5.
24         We are back on the record.
25    BY MR. SNELL:

Confidential - Attorneys' Eyes Only

Page 864

1       Q.    Dr. Hart, I've handed you Exhibit T-1323,

2  which was marked earlier in your deposition.  It is

3  Dr. Piet Hinoul's benefit-risk profile of

4  transvaginal mesh products.

5            MR. SLATER:  Which exhibit do you want

6  now?  I thought you were doing the other thing.  I

7  guess you --

8            MR. SNELL:  I'm going to -- I'm going to

9  go here, then there.  So 1323.

10           MR. SLATER:  Is this in this pile?

11           MR. SNELL:  No.  It's in the earlier pile

12  I gave you.

13           MR. SLATER:  What earlier pile?

14           MR. SNELL:  When I gave you the copy of

15  the FDA 2011.  That's the mesh part.  Look at the

16  back of that.  It's Piet's risk-benefit analysis from

17  2012.

18           MR. SLATER:  It's attached.  Let me just

19  get it out.

20           All right.  Sorry about that.

21           MR. SNELL:  Oh, no problem.  Do it again.

22  BY MR. SNELL:

23       Q.    Dr. Hart, I've handed you Exhibit T-1323,

24  which was marked earlier in your deposition, the June

25  2012 benefit-risk profile of transvaginal mesh

Page 865

1   products used for the treatment of pelvic organ

2   prolapse by Piet Hinoul.

3           Do you have that in front of you?

4       A.    I do, yes.

5       Q.    And what is this document?

6       A.    This -- I believe this was a document that

7   was used and provided to the MHRA, one of the

8   European health authorities, when discussing the

9   benefit-risk profile for these -- these products.

10      Q.    On Page 3, the first paragraph under

11  summary, the fifth line down says that Ethicon,

12  Inc.'s review by medical affairs has confirmed that

13  the evidence demonstrates an acceptable benefit-risk

14  profile for these products when placed in

15  appropriately selected patients by experienced

16  surgeons.

17          Did I read that correctly?

18          MR. SLATER:  Objection.

19          THE WITNESS:  Yes.

20  BY MR. SNELL:

21      Q.    Had Ethicon Women's Health medical affairs

22  group done a benefit-risk analysis in 2012 on its

23  prolapse products?

24      A.    Yes.

25      Q.    Did Ethicon Women's Health & Urology do a

Confidential - Attorneys' Eyes Only

Page 866

1  benefit-risk assessment on its stress urinary

2  incontinence products in 2012?

3       A.    Yes.

4       Q.    And what were the determinations from

5  those benefit-risk analyses?

6       A.    There was continued evidence that supported

7  a -- a -- an appropriate and positive benefit-risk

8  profile for the products, similar to the others that

9  we discussed.

10      Q.    Now, I believe you were asked a question

11 earlier in your deposition about whether

12 reasonable -- reasonable opinions could differ that

13 Prolift should be on the market.

14            Do you recall a question similar to that?

15            MR. SLATER:  Objection to the form.

16            THE WITNESS:  I -- I recall a question

17 similar to that.  I didn't -- I don't remember it

18 being should the product be on the market but...

19 BY MR. SNELL:

20      Q.    Would it be a reasonable opinion that

21 Prolift -- strike that.

22            Based on everything you've seen in all the

23 risk assessments, would you think it would be a

24 reasonable opinion that Prolift should not have been

25 brought to the market, based on its safety profile?

Confidential - Attorneys' Eyes Only

Page 867

1            MR. SLATER:  Objection.

2            THE WITNESS:  No.

3   BY MR. SNELL:

4       Q.    Now, can surgeons choose whether or not to

5   use a mesh product?

6       A.    Yes.  Sure.

7       Q.    Is that totally within the surgeon's

8   discretion?

9       A.    Yes.

10           MR. SLATER:  Objection, belated.  And I'll

11  tell you the basis of it:  The doctor doesn't decide

12  100 percent what happens.  The patient also has

13  input.

14  BY MR. SNELL:

15      Q.    Dr. Hinoul's 2012 risk-benefit analysis at

16  Page 5 references, among other things, the American

17  College of Obstetricians and Gynecologists and the

18  American Urogynecologic Society; correct?

19           It's on Page 5 in the conclusions section

20  plaintiffs' counsel pointed you to.

21      A.    Yes.

22      Q.    If you turn to the next page, Page 6, what

23  are these studies in Table 1?

24      A.    The title says randomized, controlled

25  trials comparing polypropylene mesh to traditional

Confidential - Attorneys' Eyes Only

Page 868

1    native vaginal tissue repairs.

2         Q.    And what, overall, is your impression from

3    Table 1 as to how polypropylene mesh compares to

4    traditional native vaginal tissue repairs?

5              MR. SLATER:  Objection to the form.

6              THE WITNESS:  Well, it -- you know, if you

7    go down column anatomic cure for mesh versus anatomic

8    cure for traditional, in each instance the results

9    were in favor of cure with mesh as compared to

10   traditional methods and at least all but one appear

11   to be statistically significant.

12   BY MR. SNELL:

13        Q.    The one that wasn't was the Sokol paper

14   that we've discussed earlier?

15        A.    Yes.

16        Q.    And is that -- do you know whether or not

17   that has anything to do with the small number of

18   patients in the Sokol study?

19             MR. SLATER:  Objection.

20             THE WITNESS:  Well, it is a small number

21   of patients in that study and that limits its power

22   to detect a significant difference.

23             MR. SNELL:  Okay.

24   BY MR. SNELL:

25        Q.    I'd like you to look at Exhibit T-1324,

Confidential - Attorneys' Eyes Only

Page 869

1    which plaintiffs' counsel pointed you toward earlier

2    in your deposition.

3              MR. SHERIDAN:  It's not me.

4              MR. SNELL:  I know.

5              THE WITNESS:  Not me.

6              MR. SNELL:  Sounds like some phone in the

7    wall.

8              VIDEO OPERATOR:  Might be outside in the

9    hallway.

10   BY MR. SNELL:

11        Q.    Doctor, do you have in front of you

12   Exhibit T-1324, the December 2011, committee opinion

13   that plaintiffs' counsel marked earlier in your

14   deposition?

15        A.    Yes.

16        Q.    And do you recall plaintiffs' counsel had

17   you read one of the bullet points on Page 5 that

18   discussed pelvic organ prolapse, vaginal mesh repair

19   should be reserved for high-risk individuals?

20              MR. SLATER:  Objection.

21   BY MR. SNELL:

22        Q.    Do you recall plaintiffs' counsel asking

23   you to read that or not?

24        A.    I remember -- yeah, I remember that

25   question.

Confidential - Attorneys' Eyes Only

Page 870

1      Q.     I'd like to ask you about a couple other

2   things.

3              First of all, on the front page --

4              MR. SLATER:  So now we're not on Page 5

5   anymore?  We're on the front page now?

6              MR. SNELL:  Yeah.  But it pertains to Page

7   5.

8   BY MR. SNELL:

9      Q.     It says in the top, the information should

10  not be construed as dictating an exclusive course of

11  treatment or procedure to be followed.

12             Did I read that correctly?

13             MR. SLATER:  Objection.

14             THE WITNESS:  You did.

15  BY MR. SNELL:

16     Q.     That wasn't something plaintiffs' counsel

17  had you read earlier; correct?

18             MR. SLATER:  Objection.

19             THE WITNESS:  Not that I recall.

20  BY MR. SNELL:

21     Q.     Turn to the third page, the bottom left

22  column.  It says, pelvic pain, groin pain and

23  dyspareunia can occur with pelvic reconstructive

24  surgery regardless of the use or non-use of mesh.

25             Did I read that correctly?

Confidential - Attorneys' Eyes Only

Page 871

1          MR. SLATER:  Objection.

2          THE WITNESS:  You did.

3    BY MR. SNELL:

4        Q.   Do you have an understanding as to whether

5    dyspareunia can occur with pelvic reconstructive

6    surgery regardless of the use or non-use of mesh?

7          MR. SLATER:  Objection.

8          THE WITNESS:  Yes.

9    BY MR. SNELL:

10       Q.   What is your understanding?

11       A.   Well, that -- that pelvic reconstructive

12   surgery with or without the use of mesh could result

13   in pelvic pain or dyspareunia.

14       Q.   It says, however, a complication unique to

15   mesh is erosion, also described as exposure or

16   extrusion; correct?

17       A.   Yes.

18       Q.   And had Ethicon warned of the risk of mesh

19   exposure with its products?

20         MR. SLATER:  Objection.

21         THE WITNESS:  Yes.

22   BY MR. SNELL:

23       Q.   Is the risk of mesh exposure a risk that

24   would be known to the types of surgeons for whom the

25   mesh products would be used?

Confidential - Attorneys' Eyes Only

Page 872

1          MR. SLATER:  Objection.

2          THE WITNESS:  Yes.

3     BY MR. SNELL:

4          Q.    I believe plaintiffs' counsel asked you a

5     question earlier today about mesh being used in the

6     pelvic space in or around the time of 1998 and I

7     believe your testimony was, obviously, that there had

8     been some usage for the TVT mesh; is that correct?

9          MR. SLATER:  Objection.  Not only do I

10    object to the question, the entire line, because of

11    the way that it's being introduced in such a leading

12    fashion, so any testimony on this line, I object to

13    the entire line.

14         MR. SNELL:  How about this?

15         MR. SLATER:  Do what you want --

16         MR. SNELL:  Well, that's what he's

17    testified to.

18    BY MR. SNELL:

19         Q.    Was the TVT mesh used in the 1990s?

20         A.    Yes.

21         Q.    All right.  Do you know if mesh was used

22    in abdominal sacrocolpopexy in the 1990s --

23         A.    Yes.

24         Q.    -- in the pelvic space?

25         A.    Yes.

Confidential - Attorneys' Eyes Only

Page 873

1          Q.    And would that be information that

2     urogynecologists would know of?

3                MR. SLATER:  Objection.

4                THE WITNESS:  Yes.

5     BY MR. SNELL:

6          Q.    Would that be information that urologists

7     focusing on pelvic reconstructive medicine would know

8     of?

9                MR. SLATER:  Objection.

10               THE WITNESS:  Yes.

11    BY MR. SNELL:

12         Q.    Do you have Exhibit 409?

13         A.    409?

14         Q.    Yes.

15               MR. SLATER:  Do you know what it is?

16               MR. SNELL:  I think it was --

17               THE WITNESS:  What does it look like?

18               MR. SLATER:  Did we get gypped at the

19    drive-through?

20               MR. SNELL:  What's that?

21               MR. SLATER:  I said, did we get gypped at

22    the drive-through?

23               MR. SNELL:  Oh, my God.

24               You don't have it?

25               MR. SLATER:  I don't think so.

Confidential - Attorneys' Eyes Only

Page 874

1           MR. SNELL:  Adam, do they have --

2           VIDEO OPERATOR:  The time is now 6:26.

3           We're going off the record.

4           (Recess, 6:26-6:31 p.m.)

5           VIDEO OPERATOR:  The time is now 6:31.

6           This is -- we are back on the record.

7    BY MR. SNELL:

8       Q.    Dr. Hart, do you have Exhibit 1344 --

9       A.    Don't know.

10      Q.    -- the TVT instructions for use that

11   plaintiffs' counsel marked with you earlier today?

12      A.    Yes.

13      Q.    Turn to the first page, if you would.

14   Under "Important," it says, the device should be used

15   only by physicians trained in the surgical treatment

16   of stress urinary incontinence and specifically in

17   implanting the Gynecare TVT device.

18           Did I read that correctly?

19           MR. SLATER:  Objection.

20           THE WITNESS:  Yes.

21   BY MR. SNELL:

22      Q.    It also states, these instructions are

23   recommended for general use of the device.

24   Variations in use may occur in specific procedures

25   due to the individual technique and patient anatomy.

Confidential - Attorneys' Eyes Only

Page 875

1              Did I read that correctly?

2              MR. SLATER:  Objection.

3              THE WITNESS:  Yes.

4    BY MR. SNELL:

5         Q.   Now, plaintiffs' counsel asked you

6    questions about the use of TVT -- strike that.

7              Plaintiffs' counsel asked you questions

8    about the implantation of TVT under local as compared

9    to regional or general anesthesia.

10             Do you recall those questions?

11        A.   Yes.

12        Q.   Turn to the very next page in the

13   instructions for use.

14             Number 1, what does that state?

15        A.   The procedure can be carried out under

16   local anesthesia but it can also be performed using

17   regional or general anesthesia.

18        Q.   Did professional education on the TVT

19   discuss the different types of anesthesia use?

20             MR. SLATER:  Objection.

21             MR. SHERIDAN:  Objection.

22             THE WITNESS:  Yes.

23   BY MR. SNELL:

24        Q.   Do you know whether or not the TVT

25   surgeons' monograph discussed the different types of

Confidential - Attorneys' Eyes Only

Page 876

1    anesthesia for TVT?

2              MR. SLATER:  Objection.

3              THE WITNESS:  I do.

4    BY MR. SNELL:

5         Q.    And was it discussed?

6         A.    Yes.

7              MR. SLATER:  Objection.

8              That was too quick for me to object in

9    between.

10   BY MR. SNELL:

11        Q.    Now, I believe in response to plaintiffs'

12   counsel's questions about this you mentioned wanting

13   to see or your answers depending upon level-one

14   evidence?

15             MR. SLATER:  Objection.

16             THE WITNESS:  That was in a hypothetical

17   for instance.  Yes.

18   BY MR. SNELL:

19        Q.    What is level-one evidence?

20        A.    So it would be considered the highest

21   evidence available upon which in an evidence-based

22   medicine sort of practice philosophy would be

23   considered the highest-level evidence to help guide

24   surgeons in -- in -- in decision-making.

25        Q.    Plaintiffs' counsel asked you

Confidential - Attorneys' Eyes Only

Page 877

1    hypotheticals pertaining to the claim that TVT

2    implanted via local anesthesia would be 10 to 15

3    percent more efficacious than otherwise.

4            My question to you is, did plaintiffs'

5    counsel show you in any significant number of the

6    over 100 RCTs for TVT that you earlier testified to

7    which actually demonstrate that there is a

8    significant difference for TVT's efficacy depending

9    upon the anesthesia used?

10           MR. SLATER:  Objection.

11           THE WITNESS:  No.

12   BY MR. SNELL:

13       Q.   Do you know whether the types of surgeons,

14   as mentioned on the first page, those trained in

15   surgical treatment of stress urinary incontinence,

16   would have experience using regional anesthesia?

17           MR. SHERIDAN:  Objection.

18           MR. SLATER:  Objection.

19           THE WITNESS:  Yes.

20   BY MR. SNELL:

21       Q.   And would they?

22       A.   Yes, they would.

23           MR. SLATER:  Objection.

24   BY MR. SNELL:

25       Q.   And the types of surgeons mentioned on the

Confidential - Attorneys' Eyes Only

Page 878

1    first page of the IFU, those trained in the surgical

2    treatment of stress urinary incontinence, would they

3    have experience using general anesthesia?

4               MR. SLATER:  Objection.

5               THE WITNESS:  Yes.

6               MR. SLATER:  You've got to read faster,

7    dude.

8               MR. SHERIDAN:  I read too slowly.

9               MR. SLATER:  No, no one touches my phone.

10   I don't want your germs.  Coughing in your hand

11   before, for the record.

12              MR. SHERIDAN:  Okay.

13   BY MR. SNELL:

14       Q.    The evidence that you're aware of, do you

15   believe anything that should be in the IFU about any

16   alleged decrease in efficacy if the TVT is not placed

17   via local anesthesia?

18              MR. SLATER:  Objection.

19              THE WITNESS:  Not evidence that I'm aware

20   of, no.

21   BY MR. SNELL:

22       Q.    Do you know whether surgeons can work with

23   anesthesiologists to time anesthesia such that a

24   patient can be responsive during a surgery?

25              MR. SLATER:  Objection.

Confidential - Attorneys' Eyes Only

Page 879

1              THE WITNESS:  Yes.

2    BY MR. SNELL:

3         Q.    Do you recall that being discussed in the

4    surgeons' monograph?

5         A.    It is.

6              MR. SLATER:  Objection.

7    BY MR. SNELL:

8         Q.    Do you recall it being discussed in the

9    professional education for TVT?

10             MR. SLATER:  Objection.

11             THE WITNESS:  Yes.

12   BY MR. SNELL:

13        Q.    Plaintiffs' counsel showed you some

14   different sales aids regarding TVT and TVT-O and

15   TVT-Secur today; correct?

16        A.    Correct.

17        Q.    I have just a few questions about them.

18             Turn to Exhibit 1350, "Gynecare TVT Family

19   of Products, Tension-Free Support For Incontinence."

20        A.    Okay.

21        Q.    You were asked some questions about the

22   first page, particularly the third bullet point about

23   the clinical study in an average of 11.5 years.

24             Do you recall those questions?

25        A.    Yes.

Confidential - Attorneys' Eyes Only

Page 880

1          Q.    If a surgeon wants to read those studies,

2    can he or she read them?

3               MR. SLATER:  Objection.

4               THE WITNESS:  Yes.

5    BY MR. SNELL:

6          Q.    Plaintiffs' counsel asked you about the

7    fact that there was not a single case of tissue

8    reaction, as mentioned on the third bullet point.

9               Do you recall that?

10         A.    Yes.

11              MR. SLATER:  Objection.

12   BY MR. SNELL:

13         Q.    Do you believe that Ethicon is saying in

14   that bullet point that there's no foreign body

15   reaction with TVT?

16         A.    No.

17              MR. SLATER:  Objection.

18   BY MR. SNELL:

19         Q.    What is your interpretation of that bullet

20   point?

21         A.    I would interpret it as to mean in this

22   particular clinical study the investigators or the

23   reporters did not report a single -- as it says, a

24   single case of tape erosion, tissue reactions or

25   other adverse effects on the tape were found, and to

Confidential - Attorneys' Eyes Only

Page 881

1   me that would imply adverse tissue reaction of some

2   sort that led to a clinically significant outcome if

3   I -- you know, if I read this as a surgeon.

4          Q.      And this was the Nilsson 11.5-year study?

5          A.      Yes.

6          Q.      Do you know whether or not there are other

7   studies that are ten years of duration or longer on

8   TVT?

9          A.      Yes.

10          Q.      And what is your opinion with regard to

11   the consistency, if any, of those studies --

12          A.      Well, I --

13              MR. SLATER:  Objection.

14              THE WITNESS:  You know, my --

15   BY MR. SNELL:

16          Q.      -- to the Nilsson 11-year, 11.5-year

17   study?

18              MR. SLATER:  Still object.

19              THE WITNESS:  My -- my assessment and

20   my -- my knowledge is that they're broadly

21   consistent.

22   BY MR. SNELL:

23          Q.      Turn to Exhibit 243.

24              MR. SHERIDAN:  Was that one used today?

25              MR. SNELL:  Yes.

Confidential - Attorneys' Eyes Only

Page 882

1                THE WITNESS:  Got it.

2    BY MR. SNELL:

3        Q.    The Prolift+M sales aid.

4        A.    Okay.

5        Q.    Let me ask you, what is medical affairs'

6    role in reviewing these sales aids, if any?

7        A.    So as part of the copy approval

8    cross-functional team, they would review their --

9    their -- they do review the pieces and their input

10   would be with regard, obviously, to, from a medical

11   standpoint, that the -- that the information

12   presented is -- is scientifically accurate and fair

13   and balanced.  That's a high level.

14       Q.    Okay.  Are surgeons trained that there is

15   a foreign body reaction whenever you put a foreign

16   body in during their medical school or surgical

17   training?

18                MR. SLATER:  Objection.

19                THE WITNESS:  Yes.

20   BY MR. SNELL:

21       Q.    When -- when is that type of training --

22   strike that.

23                When is the foreign body response covered

24   with surgeons during their medical school or later

25   training?

Confidential - Attorneys' Eyes Only

Page 883

1              MR. SLATER:  Objection.

2              THE WITNESS:  Well, when they're in

3    medical school, they're not surgeons yet and may

4    not -- may or may not know that they want to be

5    surgeons at that stage, but during their pathology

6    courses or even during their surgery rotations,

7    they -- they would have that kind of training.

8              MR. SNELL:  Okay.

9              THE WITNESS:  And then subsequent, if

10   you -- if you go into surgical training, same thing,

11   you would -- you would have ongoing training and

12   understanding about the tissue response or foreign

13   body reaction to implanted materials.

14   BY MR. SNELL:

15        Q.    Turn to Exhibit 1347, the TVT.

16        A.    Saw that recently.

17              MR. SLATER:  What have you got there?

18              MR. SNELL:  1347, the TVT.

19              MR. SLATER:  I've got it.

20              MR. SNELL:  2002 copyright.

21   BY MR. SNELL:

22        Q.    So, Dr. Hart, do you have in front of you

23   Exhibit T-134 -- strike that.

24              Dr. Hart, do you have in front of you

25   Exhibit T-1347, the 2002 copyright Gynecare TVT?

Confidential - Attorneys' Eyes Only

Page 884

1       A.    Yes.

2       Q.    This was an exhibit marked earlier today

3  in your deposition; correct?

4       A.    Yes.

5       Q.    The second page there is the first section

6  that plaintiffs' counsel pointed you to about the

7  cured/improved success rates in studies evaluating 50

8  or more patients.

9            Do you recall that?

10      A.    Yeah.  Yes.

11      Q.    The first two studies are by Professor

12  Ulmsten, as plaintiffs' counsel pointed out; correct?

13      A.    Correct.

14      Q.    But are there other studies besides Dr.

15  Ulmsten?

16           MR. SLATER:  Objection.

17           THE WITNESS:  Yes.

18  BY MR. SNELL:

19      Q.    Are there numerous other studies besides

20  Dr. Ulmsten?

21           MR. SLATER:  Objection.

22           THE WITNESS:  Nine others that I count.

23  BY MR. SNELL:

24      Q.    And are those studies by surgeons,

25  physicians other than Dr. Ulmsten consistent or

Confidential - Attorneys' Eyes Only

Page 885

 1   inconsistent with the results of Dr. Ulmsten's

 2   studies?

 3              MR. SLATER:  Objection.

 4              THE WITNESS:  Consistent with the Ulmsten

 5   studies.

 6   BY MR. SNELL:

 7        Q.    And based on your review of additional

 8   literature, including, as you testified to,

 9   additional ten-plus-year studies with TVT, are these

10   data consistent or inconsistent with Dr. Ulmsten's

11   results for the TVT as to its ability to either cure

12   or improve a woman's stress urinary incontinence?

13        A.    Yeah.

14              MR. SLATER:  Objection to the form.

15              THE WITNESS:  Yeah, I believe that my

16   recollection is that they are consistent.

17   BY MR. SNELL:

18        Q.    Now, Professor Ulmsten was one of the ones

19   who came up with the TVT concept; correct?

20        A.    That -- my understanding, yes.

21        Q.    And there's peer-review papers about

22   Professor Ulmsten and his involvement with TVT;

23   correct?

24              MR. SLATER:  Objection.

25              THE WITNESS:  What do you mean there?  Say

Confidential - Attorneys' Eyes Only

Page 886

1   that again?

2              MR. SNELL:  Sure thing.

3   BY MR. SNELL:

4       Q.    There are publications concerning

5   Doctor -- Professor Ulmsten and his use of the TVT.

6       A.    Well, there are publications wherein he

7   describes these, yes.  Is that what you're asking?

8       Q.    Right.  Yeah.

9       A.    Yes.

10      Q.    And the TVT is an Ethicon product;

11  correct?

12      A.    Correct.

13      Q.    Would surgeons, the types of whom who

14  would use TVT, pelvic floor surgeons, would they know

15  that Professor Ulmsten was involved in the TVT

16  development?

17             MR. SLATER:  Objection.

18             THE WITNESS:  I would expect so.

19  BY MR. SNELL:

20      Q.    One of the papers in the 510(k) that

21  plaintiffs' counsel pointed to earlier discussed how

22  Professor Ulmsten tried different meshes before he

23  began trying Prolene mesh in the TVT; correct?

24      A.    Correct.

25             MR. SLATER:  Objection.

Confidential - Attorneys' Eyes Only

Page 887

1    BY MR. SNELL:

2         Q.    On the third page of the 2002 pamphlet

3    plaintiffs' counsel asked you about the bullet point

4    where it says, no foreign body reaction after Prolene

5    mesh implantation.

6              Do you recall that?

7         A.    Yeah.

8         Q.    Now, what is your interpretation of what

9    that statement means, as a surgeon?

10        A.    Well, it references --

11             MR. SLATER:  Objection.

12             THE WITNESS:  It references or it cites a

13   Citation Number 22 that I'm not familiar with,

14   "Influence on Differing Sling Materials on Connective

15   Tissue Metabolism in Stress Urinary Incontinent

16   Women," and I don't have familiarity with that

17   publication, but it obviously is referring to some

18   statements that were made in -- in that publication.

19   BY MR. SNELL:

20        Q.    What's the significance, if any, of the

21   citations to different articles and studies in these

22   sales aids?

23             MR. SLATER:  Objection.

24             THE WITNESS:  They would form the basis by

25   which statements would be made.

Confidential - Attorneys' Eyes Only

Page 888

1    BY MR. SNELL:

2         Q.    Is Ethicon saying that there's no foreign

3    body reaction with Prolene mesh?

4         A.    No.  They're -- they're stating that --

5    that a Publication Number 22 indicates, however they

6    define it, no foreign body reaction to Prolene mesh

7    implantation.

8         Q.    And as a surgeon, how would you interpret

9    that?

10         A.    I would go read the article.

11              MR. SLATER:  Objection.

12              THE WITNESS:  I would go read the article.

13    As a surgeon, knowing that there is some foreign body

14    reaction to an implant, I would want to know, what

15    are they referring to.

16    BY MR. SNELL:

17         Q.    Turn to Exhibit 1348.  It's another sales

18    aid referenced today regarding TVT.

19              Are you there?

20         A.    Yeah.

21         Q.    Okay.  It talks about the success of

22    Gynecare TVT has been proven in multiple studies

23    evaluating 50 or more patients and it cites to

24    footnotes -- I'm sorry -- References 2 to 12; is that

25    correct?

Confidential - Attorneys' Eyes Only

Page 889

1        A.      That's correct.

2                MR. SLATER:  Objection.

3   BY MR. SNELL:

4        Q.      And are all of those references studies by

5   Professor Ulmsten?

6        A.      I don't think so, no.

7        Q.      It states, more clinical data than any

8   other mid-urethral sling device; correct?

9        A.      Correct.

10       Q.      Do you know whether or not that's a

11  correct statement?

12               MR. SLATER:  Objection.

13               THE WITNESS:  It's my -- yeah, it's -- it

14  is my understanding that there's -- there's more

15  literature on the use of this device than others.

16               MR. SLATER:  Just for the record, I had

17  intended to but did not object to the question before

18  that, again, on the form.

19  BY MR. SNELL:

20       Q.      Turn back to the page that says, only

21  Gynecare TVT uses Prolene polypropylene mesh.

22       A.      Okay.

23       Q.      Do you recall plaintiffs' counsel asked

24  you questions about this page, particularly at the

25  bottom, the statement by --

Confidential - Attorneys' Eyes Only

Page 890

1        A.      Yes.

2        Q.      -- Nilsson?

3        A.      Yes.

4                MR. SLATER:  Objection.

5    BY MR. SNELL:

6        Q.      Nilsson writes, the TVT procedure seems to

7    result in good long-term cure with cure rates similar

8    to the best traditional operations.

9                Did I read that correctly?

10               MR. SLATER:  Objection.

11               THE WITNESS:  Yes.

12   BY MR. SNELL:

13       Q.      This is something plaintiffs' counsel

14   asked you about; correct?

15       A.      Correct.

16       Q.      Based on your review and analyses, do you

17   agree or disagree with that statement by Professor

18   Nilsson?

19               MR. SLATER:  Objection.

20               THE WITNESS:  I agree.

21   BY MR. SNELL:

22       Q.      Turn to Exhibit 1349.  It's another sales

23   aid referenced by plaintiffs' counsel.

24               On the -- this is a document that

25   plaintiffs' counsel asked you about today; correct?

Confidential - Attorneys' Eyes Only

Page 891

1        A.      Yes.

2        Q.      Did the TVT-Secur use the same mesh as the

3   TVT and TVT transobturator?

4               MR. SLATER:  Objection.

5               THE WITNESS:  To my knowledge, yes.

6               MR. SNELL:  Okay.

7   BY MR. SNELL:

8        Q.      Turn to the first page.  It says, the

9   Gynecare TVT family of products has the most

10  level-one evidence of any mid-urethral sling and has

11  treated over 1.5 million patients.

12              Did I read that correctly?

13              MR. SLATER:  Objection.

14              THE WITNESS:  You did.

15  BY MR. SNELL:

16       Q.      And as plaintiffs' counsel pointed out,

17  this was copy written back in 2009; correct?

18       A.      Well, I don't remember that.

19       Q.      At the very last page, the small print.

20       A.      Oh, this small print, yeah.

21              Yes, that's right.

22       Q.      Is that statement that we read about the

23  TVT family of products having the most level-one

24  evidence consistent or inconsistent with your

25  knowledge?

Confidential - Attorneys' Eyes Only

Page 892

1              MR. SLATER:  Objection.

2              THE WITNESS:  Consistent.

3    BY MR. SNELL:

4         Q.    And the sling has treated over 1.5 million

5    patients, is that consistent or inconsistent with

6    your knowledge?

7              MR. SLATER:  Objection.

8              THE WITNESS:  Consistent.

9              MR. SLATER:  All right.  Listen, I've got

10   to know what your plan is because I'm ready to go to

11   dinner.  It's 7:00 at night.  We ate lunch at 12:30.

12             MR. SNELL:  Do you want to break for

13   dinner?

14             MR. SLATER:  No.  Listen.  Listen.

15             MR. SNELL:  I don't know --

16             VIDEO OPERATOR:  Do you want to go off the

17   record?

18             MR. SLATER:  You can go off the video, you

19   can go off the record.  I don't care.

20             VIDEO OPERATOR:  Time is now 6:55.

21             We're going off the record.

22             (Recess, 6:55-7:01 p.m.)

23             VIDEO OPERATOR:  The time is now 7:01.

24             This is the -- we are back on the record.

25   BY MR. SNELL:

Confidential - Attorneys' Eyes Only

Page 893

1        Q.    Dr. Hart, on the first day of your

2    deposition you were asked some questions about

3    polypropylene mesh and cancer.

4              Do you, in general, recall covering that

5    subject?

6        A.    We -- yes.

7        Q.    Based on everything you've seen, have you

8    seen any substantial evidence demonstrating a causal

9    relationship between polypropylene mesh and cancer?

10             MR. SLATER:  Objection.

11             THE WITNESS:  No.

12   BY MR. SNELL:

13       Q.    Take a look at Exhibit T-1303, a paper

14   marked by plaintiffs' counsel by Birolini.

15       A.    Don't know that I have it.

16             MR. SNELL:  A copy of that one.

17             THE WITNESS:  Okay.

18   BY MR. SNELL:

19       Q.    Now, these are two case reports; is that

20   correct or not?

21       A.    That's correct.

22       Q.    Are case reports clinical studies?

23             MR. SLATER:  Objection.

24             THE WITNESS:  I didn't -- I didn't --

25   BY MR. SNELL:

Confidential - Attorneys' Eyes Only

Page 894

1        Q.    Are case reports clinical studies?

2        A.    No.

3        Q.    What is anecdotal evidence?

4        A.    That just means sort of almost, I guess,

5    word of mouth.  A physician or a scientist would --

6    would provide information regarding observations that

7    he or she would make -- had made outside of a

8    clinical study.

9        Q.    Are these case reports anecdotal evidence?

10        A.    They're anecdotal, for sure, yes.

11        Q.    Now --

12              MR. SLATER:  Objection.

13    BY MR. SNELL:

14        Q.    -- did these --

15              MR. SLATER:  I just want you to know, it

16    went quicker, I'm objecting to the question.

17              MR. SNELL:  Okay.

18              MR. SLATER:  So you know that, for the

19    record.

20    BY MR. SNELL:

21        Q.    Now, did these two case reports concern

22    polypropylene mesh?

23        A.    No.

24        Q.    What type of mesh had been implanted in

25    these two case reports?

Confidential - Attorneys' Eyes Only

Page 895

1      A.    As I recall, polyester, but let me be sure.

2      Q.    On the third page above Figure 5 it talks

3  about exposed pieces of polyester mesh.

4            Do you see that in the first column on the

5  left?

6            MR. SLATER:  Objection.

7            THE WITNESS:  Yes.

8  BY MR. SNELL:

9      Q.    Case 2 on the right side of that same

10  page, that person developed an incisional hernia that

11  was treated with polyester mesh reinforcement.

12            Did I read that correctly?

13      A.    Yes.

14      Q.    Is polyester the same as polypropylene?

15      A.    No.

16      Q.    If you turn to the last page, the

17  discussion, can you read the second sentence that

18  begins, in both patients?

19      A.    Yeah.  In both patients the infection took

20  place over a bridged polyester mesh that got infected

21  and unincorporated.  It is -- oh, that's the

22  sentence.

23      Q.    That's fine.

24            And it goes on to say, it is our

25  impression that the mesh itself did not clearly --

Confidential - Attorneys' Eyes Only

Page 896

1    did clearly not cause it.

2                Did I read that correctly?

3                MR. SLATER:  Objection.

4                THE WITNESS:  You did.

5    BY MR. SNELL:

6         Q.    So this isn't even a case report about

7    polypropylene mesh and cancer.  This was about

8    polyester mesh and cancer.

9                MR. SLATER:  Objection.

10   BY MR. SNELL:

11        Q.    Is that correct or not?

12        A.    Correct.

13        Q.    Actually, what type of mesh did these

14   surgeons turn to to repair the defects after the

15   cancer was discovered?

16        A.    Polypropylene.

17        Q.    At the bottom of that page it says, a

18   heavyweight, large-pore onlay polypropylene mesh was

19   used to reinforce a primary closure of the midline in

20   this patient.

21                Did I read that correctly?

22                MR. SLATER:  Objection.

23                THE WITNESS:  Yes.

24   BY MR. SNELL:

25        Q.    The big gap after tumor resection in Case

Confidential - Attorneys' Eyes Only

Page 897

1    2 required the use of Proceed mesh to bridge the

2    resulting defect.

3              Did I read that correctly?

4              MR. SLATER:  Objection.

5              THE WITNESS:  Yes.

6    BY MR. SNELL:

7        Q.    The next paragraph at the bottom says, we

8    strongly recommend a single-stage operation with

9    removal of the infected mesh, primary restoration of

10   the midline and onlay reinforcement with

11   polypropylene mesh in such patients.

12             Did I read this correctly --

13             MR. SLATER:  Objection.

14   BY MR. SNELL:

15       Q.    -- in the study plaintiffs' counsel showed

16   you?

17       A.    You did.

18             MR. SLATER:  Hey, let me ask you, what's

19   your point?  It's a case report that's anecdotal,

20   that nobody should look to, or are you saying it's an

21   important study, that everyone should listen to it.

22   Make up your mind, man.

23             MR. SNELL:  What do you mean?

24             MR. SLATER:  You're all over the place.

25   Make up your mind.  Make a point.

Confidential - Attorneys' Eyes Only

Page 898

1            MR. SNELL:  I did.

2            MR. SLATER:  You're just scattering

3   shotgun pellets all over the field.  You're not

4   hitting anything.

5            MR. SNELL:  Okay.  Okay.

6   BY MR. SNELL:

7       Q.    Based on everything you've seen as -- was

8   there any need for Ethicon to warn about a alleged

9   association with cancer?

10           MR. SLATER:  Objection.

11           THE WITNESS:  No.

12   BY MR. SNELL:

13      Q.    Exhibit -- let's move to Exhibit 1333.

14   It's the Johnson & Johnson investigator-initiated

15   studies policy plaintiffs' counsel discussed with

16   you.

17      A.    Got it.

18      Q.    And this was discussed in the context of a

19   study done by Professor Ulmsten back in the 1990s as

20   well?

21           MR. SLATER:  Objection.

22           THE WITNESS:  Yes.

23   BY MR. SNELL:

24      Q.    Turn to Exhibit 1329, the License and

25   Supply Agreement plaintiffs' counsel marked earlier

Confidential - Attorneys' Eyes Only

Page 899

1    in your deposition.

2              A.    I may not have that.

3              Q.    Find it?

4              A.    No, not yet.  I don't think I saw it.

5              MR. SHERIDAN:  It's not in that record.

6              MR. SNELL:  I know I -- I thought I gave

7    it to you.  I know I gave Adam a copy of it because I

8    used the copy I have for you.

9              Just look through this stack over here.

10             THE WITNESS:  Here we go.  Is this it?

11             MR. SNELL:  Yeah, that's it.

12             THE WITNESS:  Yes, I have it.  Sorry about

13   that.

14   BY MR. SNELL:

15             Q.    You have a huge pile over there.  Sorry.

16   Ready?

17             A.    Yeah.

18             Q.    So you have Exhibit T-1329 in front of

19   you?

20             A.    Uh-huh.

21             Q.    Correct?

22             A.    Correct.

23             Q.    Now, what is this document that

24   plaintiffs' counsel marked with you earlier in your

25   deposition?

Confidential - Attorneys' Eyes Only

Page 900

1      A.    This is a -- as it says here, License and

2  Supply Agreement between two parties, Johnson &

3  Johnson International and Medscand, regarding the

4  acquisition of license and supply by Johnson &

5  Johnson from Medscand.

6      Q.    Is this a study contract?

7      A.    No.

8      Q.    Is this a study agreement?

9      A.    No.

10           MR. SLATER:  Objection.

11  BY MR. SNELL:

12      Q.    Is this a study protocol?

13      A.    No.

14      Q.    Is this an investigator-initiated study,

15  similar to those referenced in the policy plaintiffs'

16  counsel discussed with you that's been marked as

17  Exhibit T-1333?

18           MR. SLATER:  Objection.

19           THE WITNESS:  No.

20  BY MR. SNELL:

21      Q.    Plaintiffs' counsel -- if you go to Page 7

22  and 8, plaintiffs' counsel mentioned that this was

23  concerning Section 3.6, milestone payments.

24      A.    Okay.

25      Q.    And I believe plaintiffs' counsel pointed

Confidential - Attorneys' Eyes Only

Page 901

1   to Milestone B about the payment of the amount of

2   $400,000 --

3               MR. SLATER:  Objection to the form of the

4   question.

5   BY MR. SNELL:

6       Q.    -- concerning the clinical trial as

7   specified in Exhibit C?

8               MR. SLATER:  Objection to the form of the

9   question.

10              THE WITNESS:  Yes.

11  BY MR. SNELL:

12      Q.    And are milestone payments common in the

13  industry in licensing and supply agreements?

14              MR. SLATER:  Objection.

15              THE WITNESS:  Yes.

16  BY MR. SNELL:

17      Q.    And what's your understanding as to --

18  withdrawn.

19              So just to be clear, would this policy

20  that's been marked as Exhibit T-1333 apply to a

21  $400,000 milestone payment, as reflected in the

22  License and Supply Agreement from 1997?

23              MR. SLATER:  Objection.

24              THE WITNESS:  No.

25  BY MR. SNELL:

Confidential - Attorneys' Eyes Only

Page 902

1      Q.   Do you have Exhibit T-1337?  It's

2  TVT-Secur --

3      A.   I haven't seen that one recently.

4           MR. SHERIDAN:  1317?

5           MR. SNELL:  1337.

6           MR. SHERIDAN:  Okay.

7           THE WITNESS:  I said no last time and I

8  was wrong so --

9           MR. SNELL:  It looks like this

10  (indicating).

11           THE WITNESS:  I'm still saying no.

12           MR. SLATER:  What are you looking for?

13           MR. SNELL:  1337.

14           THE WITNESS:  I think no is still the

15  answer for this one.  I don't have it.

16           MR. SNELL:  Did I give you two of those,

17  Adam?  Because I made copies of it.  Do you have the

18  quality board followup?

19           MR. SLATER:  One copy.

20           MR. SNELL:  Here.  Let me help you.

21           THE WITNESS:  There it is, yeah.

22           MR. SNELL:  Okay.  Yeah, I thought I gave

23  it to you.

24           THE WITNESS:  Must be -- I'm sorry.

25  BY MR. SNELL:

Confidential - Attorneys' Eyes Only

Page 903

1        Q.    Now, we're going; right?

2        A.    Yeah.

3        Q.    Actually, before we go there, actually, I

4    want to ask you a question.

5              So we were just looking at the License and

6    Supply Agreement regarding TVT from 1997; correct?

7        A.    Correct.

8        Q.    Is TVT still being marketed today?

9        A.    Yes.

10       Q.    Plaintiffs' counsel showed you

11   professional organizational statement about mesh for

12   prolapse, correct, from 2011?

13       A.    Showed me what?

14       Q.    A professional organizational statement

15   regarding prolapsed mesh from December 2011.

16       A.    Yeah.  Yeah.

17             MR. SLATER:  Objection.

18   BY MR. SNELL:

19       Q.    Have you seen professional organization

20   statements regarding TVT mesh?

21             MR. SLATER:  Objection.

22             THE WITNESS:  I believe so.

23   BY MR. SNELL:

24       Q.    Have you seen AUGS, the American

25   Urogynecology Association -- strike that.

ts- Attorneys' Eyes Only

Page 904

1        Have you seen AUGS's, the American
2   Urogynecology Society's, statement regarding TVT?
3        A.   Yes.
4             MR. SLATER:  Objection.
5   BY MR. SNELL:
6        Q.   How is TVT referred to by AUGS?
7             MR. SLATER:  Objection.
8             THE WITNESS:  I can't quote it verbatim
9   but -- but essentially gold standard kind of
10  language.
11  BY MR. SNELL:
12       Q.   Now, have you heard of TVT referred to as
13  the standard of care?
14       A.   Yes.
15            MR. SLATER:  Objection.
16  BY MR. SNELL:
17       Q.   Have you seen a similar statement by the
18  American Urology Association --
19            MR. SLATER:  Objection.
20            THE WITNESS:  Yes.
21  BY MR. SNELL:
22       Q.   -- regarding TVT?
23            Have you seen a similar statement
24  regarding TVT and TVT-O mid-urethral slings as being
25  the first-line surgical option for stress urinary

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Attorneys' Eyes Only

Page 905

1    incontinence?

2              MR. SLATER:  Objection.

3              THE WITNESS:  Yes.

4    BY MR. SNELL:

5         Q.    I believe plaintiffs' counsel -- strike

6    that.

7              I believe plaintiffs' counsel asked you

8    questions about the de-commercialization of certain

9    prolapse products earlier in your deposition.

10             Do you recall that?

11        A.    Yep.  Vaguely.

12        Q.    Were those products decommissioned?

13   Strike that.

14             Were those products de-commercialized

15   because of safety concerns?

16             MR. SLATER:  Objection.

17             THE WITNESS:  No.

18   BY MR. SNELL:

19        Q.    Who, if anyone, did an assessment as to

20   the risk-benefit and safety profile of those products

21   before the decisions were made?

22        A.    Piet Hinoul, Aran Maree and myself, led by

23   Piet.

24        Q.    And what was the determination, as led by

25   Dr. Hinoul?

Confidential - Attorneys' Eyes Only

Page 906

1        A.     Similar to the others that we've discussed,

2    that the benefit-risk evaluations continued to

3    support safe and effective use.

4        Q.     Now, have you looked at the Prolift label

5    from the time of launch and the updated label?

6        A.     Yes.

7        Q.     Do you believe that those labels

8    adequately disclosed the risks?

9               MR. SLATER:  Objection.

10              THE WITNESS:  Yes.

11   BY MR. SNELL:

12       Q.     Now, would you --

13              MR. SLATER:  Do you -- wait.

14              Do you seriously think this is getting

15   played to anybody?

16              MR. SNELL:  I don't know.  You asked him

17   about it so --

18              MR. SLATER:  I --

19   BY MR. SNELL:

20       Q.     Would you also rely -- would you rely on

21   Dr. Piet Hinoul's assessment of the adequacy of the

22   risks?

23       A.     Yes.

24              MR. SLATER:  Objection.

25              You've got to give me a second to object.

Confidential - Attorneys' Eyes Only

Page 907

1            MR. SNELL:  That's fine.

2    BY MR. SNELL:

3        Q.     For the Prolift.

4            MR. SLATER:  Objection.

5            MR. SNELL:  Let me just redo it, then you

6    object, because we're chopping.

7    BY MR. SNELL:

8        Q.     Would you rely on Dr. Piet Hinoul's

9    assessment as to the risk-benefit analysis regarding

10   Prolift?

11           MR. SLATER:  Objection.

12           THE WITNESS:  Yes.

13   BY MR. SNELL:

14       Q.     Would you rely on Dr. Piet Hinoul's

15   assessment as to whether the risks were adequately

16   conveyed on the Prolift?

17           MR. SLATER:  Objection.

18           THE WITNESS:  Yes.

19   BY MR. SNELL:

20       Q.     And besides the instructions for use, can

21   risks also be conveyed in other manners?

22           MR. SLATER:  Objection.

23           THE WITNESS:  Yes.

24   BY MR. SNELL:

25       Q.     One of the things you mentioned was

Confidential - Attorneys' Eyes Only

Page 908

1    professional education regarding the Ethicon

2    products.

3              Can risk information be conveyed in

4    professional education?

5              MR. SLATER:  Objection.

6              THE WITNESS:  Yes.

7    BY MR. SNELL:

8        Q.    Are RFUs meant to reteach surgery?

9              MR. SLATER:  Objection.

10             THE WITNESS:  Please -- please say it

11   again?

12             MR. SNELL:  Yeah.

13             MR. SHERIDAN:  I didn't hear the first

14   part.

15   BY MR. SNELL:

16       Q.    Are instructions for use meant to teach

17   the risks of surgery?

18             MR. SLATER:  Objection.

19             THE WITNESS:  No.

20   BY MR. SNELL:

21       Q.    Are they meant to re-educate and train a

22   physician, who would learn about surgical risks

23   during his or her medical school, residency,

24   internship and fellowship, should he or she progress

25   that far?

Confidential - Attorneys' Eyes Only

Page 909

 1            MR. SLATER:  Objection.

 2            THE WITNESS:  No.

 3   BY MR. SNELL:

 4       Q.    You were asked, I believe, about the

 5   TVT-Secur quality boards, and the PowerPoint

 6   plaintiffs' counsel marked was Exhibit T-1337.

 7            Do you have it in front of you?

 8       A.    I do.

 9       Q.    And this -- in fairness, this is the

10   second quality board; correct?

11       A.    It says quality board followup so I presume

12   that's accurate.

13       Q.    Now, what is a quality board?

14       A.    In our -- in our -- in the Ethicon quality

15   system it is the sort of final determining committee

16   to understand a product quality or safety or other

17   issue to help determine what, if any, action should

18   or should not be undertaken.

19       Q.    And I'm not going to go back on to the

20   other exhibits plaintiffs' counsel marked, but one of

21   them, I believe, concerned complaints that Dr. Aran

22   Maree had received in Australia which got forwarded

23   up to Ethicon regarding TVT-Secur?

24       A.    Yes.

25       Q.    And you -- you were made aware of that at

Confidential - Attorneys' Eyes Only

Page 910

1    some point?

2        A.    Yes.

3        Q.    And the quality boards that were convened,

4    were they convened to investigate that matter?

5        A.    I -- I can't recall whether that was the

6    only or specific matter, to be honest, but I believe

7    so.

8        Q.    Well, this Exhibit 1337 on the followup

9    quality board, if you look at it, different complaint

10   reviews were done, as indicated in numerous pages

11   beginning with Page 3; is that correct or not?

12              MR. SLATER:  Objection.

13              THE WITNESS:  Yes.

14   BY MR. SNELL:

15       Q.    Page 9 says, global complaint review,

16   Australia.

17              Let me know if you get there.

18       A.    I'm there.

19       Q.    The third bullet says, Australian

20   experience is not similar to U.S.A.

21              Did I read that correctly?

22              MR. SLATER:  Objection.

23              THE WITNESS:  You did.

24   BY MR. SNELL:

25       Q.    Do you recall whether any changes or

Confidential - Attorneys' Eyes Only

Page 911

1    additions were made to the professional education

2    regarding TVT-Secur following this safety -- this

3    quality board?

4        A.    I can't recall that specifically.  What I

5    can recall is that it was felt that education was the

6    appropriate response so I -- I mean, I don't remember

7    that we said we're going to change the prof. ed.

8    decks or something.

9        Q.    Is professional education one of the

10   options, an option, to address any issues that come

11   up in the use of product?

12             MR. SLATER:  Objection.

13             THE WITNESS:  Yes.

14   BY MR. SNELL:

15       Q.    I want to go back to your experience that

16   plaintiffs' counsel asked you about.

17             In your experience, is the Prolene

18   polypropylene biocompatible?

19             MR. SLATER:  Objection.

20             THE WITNESS:  Yes.

21   BY MR. SNELL:

22       Q.    Is the Prolene polypropylene safe and

23   effective?

24             MR. SLATER:  Objection.

25             THE WITNESS:  Yes.

Confidential - Attorneys' Eyes Only

Page 912

1   BY MR. SNELL:

2       Q.    Plaintiffs' counsel asked you hypothetical

3   questions about if complaints came in on a product,

4   particularly TVT-Secur, about its decreased efficacy

5   in the hands of some surgeon, should that be --

6   information be made available to all surgeons.

7               MR. SLATER:  Objection.

8   BY MR. SNELL:

9       Q.    Do you recall, in general, those

10  hypothetical questions?

11      A.    Yes.

12              MR. SLATER:  Object to the

13  characterization of multiple other aspects of that

14  improper question.

15              MR. SNELL:  Okay.

16              MR. SLATER:  Just for the record, are you

17  suggesting that Ethicon wasn't being advised that

18  doctors in various countries couldn't get consistent

19  efficacy?

20              You don't have to answer the question.

21  You can continue.  Go ahead.

22              MR. SNELL:  We've already -- we've already

23  covered that.

24              MR. SLATER:  Go ahead.  I didn't want an

25  answer to that question.

Confidential - Attorneys' Eyes Only

Page 913

1          MR. SNELL:  Yeah.  I mean, if you want me

2    to answer it, I'll answer it, because I'll tell you I

3    know the data, and a lot of doctors get good results.

4          MR. SLATER:  That's really good.

5    Continue.

6          MR. SNELL:  Yeah.

7          MR. SLATER:  Go ahead.

8          MR. SNELL:  Don't ask me questions that

9    you don't want an answer to.

10          MR. SLATER:  No.  That's great.  You know

11    what?

12          MR. SNELL:  Come on, Adam.  You're

13    smiling, I'm smiling.  All right.

14          MR. SLATER:  I love hearing a product

15    that's been pulled off the market getting defended.

16          Go ahead.  Continue.

17    BY MR. SNELL:

18        Q.    For example, you know, you're aware that a

19    few of the Australian surgeons had some complaints

20    about the efficacy of TVT-Secur.

21          MR. SLATER:  Objection.

22    BY MR. SNELL:

23        Q.    Correct?

24        A.    Yes.

25        Q.    Did that -- did those E-mails need to go

Confidential - Attorneys' Eyes Only

Page 914

1    to all the surgeons?

2              MR. SLATER:  Objection.

3              THE WITNESS:  No.

4    BY MR. SNELL:

5        Q.    Is Ethicon's investigatory process

6    regarding those complaints a better way to handle

7    them?

8              MR. SLATER:  Objection.

9              THE WITNESS:  That's how they're handled,

10   yes.

11   BY MR. SNELL:

12       Q.    And if changes are deemed to be needed or

13   additions are deemed to be needed in professional

14   education, is that an appropriate way of transmitting

15   information to other surgeons?

16             MR. SLATER:  Objection.

17             THE WITNESS:  Yes.

18   BY MR. SNELL:

19       Q.    Doctor, do you recall that the -- towards

20   the end of the second day of your deposition you were

21   shown some certificates regarding different surgeons

22   who had underwent -- strike that.

23             Do you recall towards the end of your

24   second day of your deposition you were shown some

25   certificates by surgeons who had undergone some

Confidential - Attorneys' Eyes Only

Page 915

1    training on Ethicon Women's Health products?

2         A.    Yes.

3         Q.    Okay.

4              MR. SLATER:  Objection.

5              MR. SNELL:  Oh, here we go.

6    BY MR. SNELL:

7         Q.    Exhibit 1330, 1331, 1332, a Dr. John

8    McNabb, do you recall, in general, being questioned

9    about these exhibits by plaintiffs' counsel?

10        A.    Yes.

11        Q.    These certificates say at the bottom, this

12   certificate in no way certifies the competency of

13   this physician, who may wish to perform the

14   procedures taught in this course; correct?

15             MR. SLATER:  Objection.

16             THE WITNESS:  Correct.

17   BY MR. SNELL:

18        Q.    Does Ethicon certify physicians'

19   competency to perform pelvic floor surgery?

20        A.    No.

21        Q.    Does Ethicon credential surgeons to

22   perform pelvic floor surgery?

23        A.    No.

24        Q.    Is that why surgeons go to medical school,

25   residency, internships and fellowships?

Confidential - Attorneys' Eyes Only

Page 916

1            MR. SLATER:  Objection.

2            THE WITNESS:  Yes.

3    BY MR. SNELL:

4        Q.    Plaintiffs' counsel asked you questions

5    about chronic pain.

6            My question to you is this:  Is chronic

7    pain a risk of any surgery?

8            MR. SLATER:  Objection.

9            THE WITNESS:  Well, any surgery is a --

10   that's a big ticket, but certainly the preponderance

11   of surgery.  I think you could probably find a minor

12   enough procedure that you wouldn't have chronic pain,

13   but for a -- for a substantive surgical procedure,

14   yeah, the risk of chronic pain exists.

15   BY MR. SNELL:

16       Q.    Is chronic pain a risk of pelvic floor

17   surgery?

18           MR. SLATER:  Objection.

19           THE WITNESS:  Yes.

20   BY MR. SNELL:

21       Q.    As to the current -- strike that.

22           In your current position do you have

23   products that fall under your umbrella of

24   responsibility that are those beyond the women's

25   health products?

Confidential - Attorneys' Eyes Only

Page 917

1        A.     Yes.

2        Q.     Approximately how many products do you

3    have under your responsibility?  And you can -- if

4    it's more than a hundred or less than --

5        A.     It's way more than a hundred.  It's ten

6    companies.

7        Q.     Okay.  Who, if anyone, do you rely on to

8    assess the Ethicon Women's Health products from a

9    medical affairs standpoint?

10       A.     The medical directors for that business

11   unit.

12              MR. SNELL:  That's all I have.

13              Thank you.

14              MR. SLATER:  Do you want me to proceed or

15   do you need a couple minutes?

16              MR. SNELL:  Let's take a minute.  I need

17   to go to the bathroom.

18              THE WITNESS:  I wouldn't mind moving

19   around a little while I still can.

20              VIDEO OPERATOR:  The time is now 7:36.

21              This is the end of Disk Number 5.

22              We're going off the record.

23              (Recess, 7:36-7:43 p.m.)

24              VIDEO OPERATOR:  The time is now 7:43.

25              This is the beginning of Disk Number 6.

Confidential - Attorneys' Eyes Only

Page 918

1            We are back on the record.

2

3                    EXAMINATION

4    BY MR. SLATER:

5        Q.    Dr. Hart, I see you have the Prolift+M

6    clinical study protocol in front of you?

7                MR. SNELL:  What exhibit is that, Adam?

8                MR. SLATER:  It's -- 1340 is the final

9    protocol.

10               MR. SNELL:  Oh, okay.

11               MR. SLATER:  1341.

12               THE WITNESS:  '41.

13               MR. SLATER:  Okay.

14               MR. SNELL:  Is that one of them that I

15   covered?

16               MR. SLATER:  No, you didn't.

17   BY MR. SLATER:

18       Q.    Do you have that in front of you?

19       A.    I do.

20               MR. SNELL:  Just give me a second to get

21   to it, man, because I -- I separated them.

22               MR. SLATER:  Well, I'm going to ask a

23   leading question while you find it.

24   BY MR. SLATER:

25       Q.    Doctor, counsel asked you a little while

Confidential - Attorneys' Eyes Only

Page 919

1    ago if -- if you believed the Prolift was performing

2    as intended and you said yes.

3              Remember you said that?

4              MR. SNELL:  Form.  I'm not sure if that's

5    my question.

6              THE WITNESS:  I don't remember the exact

7    words but I did -- I do remember that we talked about

8    the pelvic floor meshes, in general, performing as

9    expected and continuing to have safe and effective

10   profile.  I think that's what I said.

11   BY MR. SLATER:

12        Q.    If you could, turn in the profile -- in

13   the protocol for the Prolift+M to the -- to Page 31.

14        A.    Uh-huh.

15        Q.    And just so I understand, and confirm this

16   to me, the Prolift performing as intended in a safe

17   and effective way means for you that the adverse

18   events with the Prolift would include mesh exposure,

19   which -- which is described as a common complication.

20              That's the first one listed there; right?

21        A.    It is.

22              MR. SNELL:  Form.

23   BY MR. SLATER:

24        Q.    Would also include mesh retraction, which

25   can cause vaginal anatomic distortion, which may

Confidential - Attorneys' Eyes Only

Page 920

1  eventually have a negative impact on sexual function

2  and this can also lead to pain and, in fact, chronic

3  pain; right?

4          That's another adverse event that can

5  occur from the Prolift; right?

6      A.    Yes.

7      Q.    Also, the scar plate that forms with

8  ingrowth of tissue into the mesh can cause stiffness

9  in the vagina that further impacts sexual function in

10  a negative manner.

11          That's another part of the Prolift

12  performing as intended in a safe and effective way?

13  Is that your testimony to this jury?

14      A.    No.  No.  These are anticipated adverse

15  device effects that could occur at a certain rate.

16  And when you do the -- when you do the benefit-risk

17  analysis, you would balance the observed rates versus

18  the -- the benefit achieved and make your

19  benefit-risk judgment based on that.

20      Q.    In deciding that the Prolift is safe, your

21  company believed that the occurrence of these types

22  of complications and the other ones that I've asked

23  yourself about and other medical affairs people, that

24  all still, even though all that was known to your

25  company, you say, oh, Prolift was still safe; is that

Confidential - Attorneys' Eyes Only

Page 921

1    right?

2         A.    That's correct.  Based on the observations

3    and the clinical data that was -- or the clinical

4    research that was done and looking at the observed

5    rates.

6         Q.    Well, in fact, your company never studied

7    and tried to determine what the rates were of the

8    most serious complications with the Prolift.  It's

9    something your company never studied.

10        A.    It was --

11             MR. SNELL:  Form, foundation on that.

12             THE WITNESS:  They were -- they were

13   collected as adverse events in the clinical research

14   that had -- that was done.

15   BY MR. SLATER:

16        Q.    What I'm saying is this:  There is no

17   study your company ever performed to try to assess

18   and determine the rates of the most serious

19   complications that were occurring with the Prolift.

20   It's not something you studied.

21             MR. SNELL:  Form and foundation.

22             THE WITNESS:  It's part of every clinical

23   research study that's done.

24   BY MR. SLATER:

25        Q.    Can you point to me one paper or study

Confidential - Attorneys' Eyes Only

Page 922

1    that was devoted to studying the rates of the most

2    serious complications with the Prolift?

3            A.    As a primary end point?

4            Q.    Yes.

5            A.    No.

6            Q.    Prolene Soft mesh is the name of the mesh

7    material that is in the Prolift; correct?

8            A.    Yes.

9            Q.    We spoke earlier about information and

10   whether it should be placed in the IFU and counsel

11   asked you some questions about that as well in

12   followup to my questioning; right?

13           A.    Right.

14           Q.    Tell me if I understand correctly.

15   Ultimately, it's from your viewpoint and knowing how

16   things work in your company, medical affairs has

17   information about the benefits and risks but

18   regulatory ultimately makes the final determination

19   as to what would be placed into the IFU because

20   that's a regulatory document.

21                 Do I understand that correctly?

22           A.    It's a -- yeah, it's a regulatory document

23   that medical affairs has absent -- you know, has

24   input to, yes.

25           Q.    Medical affairs has input but regulatory

Confidential - Attorneys' Eyes Only

Page 923

1   makes the decision about what actually has to be

2   placed into the document and how it should be worded.

3           Am I -- do I understand that correctly?

4       A.   So -- so the IFU is developed as a team

5   effort with a -- with a number of cross-functional

6   team or members and all of those have input and --

7   and the ability to -- to change.  So are you asking

8   me, would a regulatory person overrule something

9   about -- from a medical standpoint?  Is that what

10  you're asking?

11      Q.   What I'm asking is --

12      A.   They -- they -- they own the document and

13  they submit it to the agency.

14      Q.   The -- the regulatory affairs

15  professionals in your company are the ones who are

16  looked to for the ultimate expertise on what types of

17  information has to be in an IFU, for example, and how

18  it should be phrased to comply with the regulations

19  that govern that type of a document.

20      A.   I don't know about --

21           MR. SNELL:  Form.

22           THE WITNESS:  I don't know about the

23  phrasing, no.

24  BY MR. SLATER:

25      Q.   Regulatory affairs would know what's

Confidential - Attorneys' Eyes Only

Page 924

1  required by the FDA regulations and what type of

2  information would need to be included.  They would

3  look to medical affairs to give them the information

4  so they could then determine what gets put in the

5  IFU?

6       A.    Yeah.  Yeah.  I mean, that's a -- that's a

7  simplification, I would say.

8       Q.    But an accurate simplification?

9       A.    So regulatory -- yes, regulatory affairs

10  would own the document, would have -- be advising the

11  entire cross-functional team about what sort of

12  information is needed, the team would provide that

13  information, and then as a group they would author

14  the IFU.

15      Q.    Have you or anyone, to your knowledge,

16  actually studied the question of whether or not the

17  cytotoxicity of any of your pelvic mesh devices

18  causes erosions or exposures in actual clinical use?

19            MR. SNELL:  Foundation.

20            THE WITNESS:  No.

21  BY MR. SLATER:

22      Q.    With regard to whether or not any of your

23  company's pelvic mesh devices can cause cancer, you

24  would agree with me that it is possible that over the

25  long term, perhaps 20 or 30 years, it can turn out,

Confidential - Attorneys' Eyes Only

Page 925

1  yes, in fact, they do cause cancer or increase the

2  risk of cancer.

3          You have no way to exclude that; right?

4          MR. SNELL:  Form.

5          THE WITNESS:  I can't exclude it.

6  BY MR. SLATER:

7      Q.    Is Johnson & Johnson in the business of

8  withdrawing safe and effective medical devices from

9  the market?

10     A.    Yes.

11     Q.    Can you tell me why that is done?

12     A.    Yeah.  As -- so as J&J looks at its -- so I

13 can only speak on the device side, I haven't worked

14 on the pharma side, but J&J looks at its portfolio of

15 products because the MD&D businesses, they will --

16 so -- so it's a zero-sum gain.  They will prioritize

17 programs and make determinations sometimes to -- to

18 divest a company or withdraw products from the

19 marketplace even though they're safe and effective

20 just so -- just as a matter of a business decision.

21     Q.    If you could, look at the document 1317.

22 It's the PowerPoint from the meeting with the FDA.

23     A.    Which stack?  This stack?  Okay.

24     Q.    If you could, go to Page 48.

25     A.    Okay.

Confidential - Attorneys' Eyes Only

Page 926

1            MR. SNELL:  Which one now?  1317, you

2    said?

3    BY MR. SLATER:

4        Q.    Again, this is the PowerPoint that was

5    actually utilized in the presentation to the FDA;

6    correct?

7        A.    I believe so, yes.

8        Q.    And on Page 48 there's a slide that was

9    presented to the FDA that says, surgeon- and

10   science-based development, and gives them an overview

11   of all the different things your company does to

12   determine safety of your devices; right?

13       A.    I need -- I need to study this.  I'm not

14   familiar with this slide at this point.

15            Yeah.  So what was your question then?

16            MR. SLATER:  Read it back, please.

17   Actually, I'll re-ask it.  I'll ask it differently.

18   BY MR. SLATER:

19       Q.    Here on Page 48 the FDA was presented with

20   things that your company does in developing pelvic

21   mesh devices; right?

22       A.    Yeah.  It looks like a high-level kind of

23   summary.

24       Q.    One of the things that is listed is

25   preclinical testing for biocompatibility; right?

Confidential - Attorneys' Eyes Only

Page 927

1        A.      Right.

2        Q.      Did you or anybody on the team of people

3    that met with the FDA tell the FDA that cytotoxicity

4    testing of any of your pelvic mesh had shown marked

5    or severe cytotoxicity?  Was that disclosed to the

6    FDA?

7        A.      At this meeting?  No.

8        Q.      Was that ever disclosed?  Well, rephrase.

9    Withdrawn.

10              MR. SNELL:  I'll -- I'll --

11              MR. SLATER:  Burt.

12              MR. SNELL:  What?

13              MR. SLATER:  Oh, my gosh.

14              Okay.  Let's go to the other PowerPoint,

15    the mesh platform review, November 2010.

16    BY MR. SLATER:

17        Q.      This is the review that took place after

18    the Iglesia study was published?

19        A.      Yeah.  Got it.

20        Q.      Were you aware that there was an exchange

21    of E-mails between your medical affairs department

22    and Dr. Sokol, one of the authors?

23        A.      I don't think so.

24              MR. SHERIDAN:  What's the exhibit number?

25    Do you know what the exhibit number is?

Confidential - Attorneys' Eyes Only

Page 928

1              MR. SNELL:  I don't know which one you're

2      talking about.

3              MR. SLATER:  Hart D-1.

4              MR. SNELL:  Oh, okay.

5      BY MR. SLATER:

6         Q.    If you'd turn about halfway along --

7              MR. SNELL:  Give me a second.  Thank you.

8      BY MR. SLATER:

9         Q.    -- you were asked about a page that says,

10     pain, IUGA, '01 to '08?

11        A.    I have it.

12        Q.    And what this slide is showing is reports

13     of various complications --

14        A.    Oh, wait.

15        Q.    -- that would cause pain in a patient;

16     correct?

17        A.    I'm sorry.  I don't have the right page.  I

18     have erosion rates.  Is it before that?

19        Q.    It was after.  It's after the erosion

20     rates.  This is a page counsel actually asked you

21     about.

22        A.    Okay.

23        Q.    Counsel asked you about this slide, pain,

24     IUGA, '01 to '08.

25        A.    Uh-huh.

Confidential - Attorneys' Eyes Only

Page 929

1      Q.    Right?

2            And this chart talks about what the study

3      showed with regard to complications on the left that

4      lead to pain.

5            That's what this is laying out; right?

6      A.    Yeah.

7      Q.    And the last column is, mesh retraction,

8      and it's pointing out that for the Prolift there's a

9      12.3 percent painful mesh retraction rate, per

10     whatever studies are, 30 studies are being looked at

11     there; right?

12           MR. SNELL:  Form --

13           THE WITNESS:  Yeah.

14           MR. SNELL:  -- and foundation.

15           Go ahead.

16           THE WITNESS:  Yeah.  I don't know that

17     this is related to -- I understand it says pain on

18     the top, and I don't know that this is painful mesh

19     retraction rates, but it says mesh retraction rates.

20     BY MR. SLATER:

21     Q.    This is a page devoted to pain.

22     A.    Right.

23     Q.    It would make sense that this is mesh

24     retraction that is considered to be painful,

25     otherwise, why list it on a page that's devoted to

Confidential - Attorneys' Eyes Only

Page 930

1    pain?

2         A.    Because it's recognized that that's at

3    least a contributing factor and could be.  So I don't

4    know that all 12.3 percent of these people had

5    painful contraction.

6         Q.    Well, on this page that is titled pain, 30

7    Prolift studies were looked at and came up with a

8    12.3 percent mesh retraction rate; right?

9         A.    Right.

10        Q.    And for the TVM study it says 13.2 percent

11   mesh retraction.

12             You see that?

13        A.    Yes.

14        Q.    And it says 11 out of 90 and then 6 out of

15   39.

16             Do you see that?

17        A.    I do.

18        Q.    Are you aware that in the TVM study that

19   the U.S. arm of the study did not actually look for

20   mesh retraction?  It wasn't an end point to be

21   documented in the patient case report forms?

22             MR. SNELL:  Form.

23             THE WITNESS:  I -- I can't say that I'm

24   aware, yes or no.

25   BY MR. SLATER:

Confidential - Attorneys' Eyes Only

Page 931

1        Q.    Go to the -- were you -- rephrase.

2              Were you aware that in a study performed

3    by Professor Jacquetin, Dr. Fatton that they made a

4    presentation to IUGA and had shown a 19.6 percent

5    painful mesh contraction rate with the Prolift?

6              MR. SNELL:  Foundation.

7              THE WITNESS:  Not as I sit here, no.

8    BY MR. SLATER:

9        Q.    No one in medical affairs told you they

10   were aware of that, did they?

11       A.    I don't know.  I mean, I don't recall it

12   right now.

13       Q.    You were asked about suture erosions in

14   the Iglesia study.  Remember that?

15       A.    Yes.

16       Q.    Those -- those -- rephrase.

17             Those suture erosions, like any suture

18   erosion, were easily treated.  The suture was removed

19   and the patient healed and that was the end of that;

20   right?

21       A.    I don't know that.  They did say they

22   removed some of them.

23       Q.    We had --

24       A.    I don't know about the -- I don't know the

25   outcome but they --

Confidential - Attorneys' Eyes Only

Page 932

1      Q.    I was reading through the -- and I'm

2  trying to save time but you can look at it.  I read

3  through the paper as the questioning was going on.

4            MR. SNELL:  You should look at it.

5            Let him look at it.

6            MR. SLATER:  You know, I'm going to ask

7  the question --

8            MR. SNELL:  Okay.

9            MR. SLATER:  -- and then Dr. Hart will do

10  what he's going to do but --

11            MR. SNELL:  Okay.

12            MR. SLATER:  -- you know, I know you want

13  to be here all night.  Everyone else wants to

14  actually go home.

15  BY MR. SLATER:

16      Q.    Let me ask you this.

17            MR. SNELL:  I object to that.

18  BY MR. SLATER:

19      Q.    You understand that a suture erosion is

20  different in magnitude, in treatability, and in many

21  significant ways from Prolift mesh erosion.

22      A.    Exposure?

23      Q.    Yes.

24            MR. SNELL:  Form.

25  BY MR. SLATER:

Confidential - Attorneys' Eyes Only

Page 933

1    Q.    As a general proposition, you're talking
2  about, basically, two different things.
3    A.    They're two different things.
4    Q.    And in terms of treatability, there may be
5  some mesh exposures with the Prolift that can be
6  treated expeditiously but we know that there are some
7  patients for whom they end up with complex mesh
8  erosions that are treated repeatedly and the patient
9  never actually is successfully treated; right?
10          MR. SNELL:  Foundation, form.
11          THE WITNESS:  Yes.  But I'm also aware
12  that there can be difficult suture exposures as well.
13          MR. SLATER:  Move to strike from "but"
14  forward.
15  BY MR. SLATER:
16    Q.    Are you familiar with any literature that
17  points out patients with a suture erosion that led to
18  permanent, life-altering pain for a patient?
19    A.    So my -- my experience would be personal
20  and in -- and in surgery where we had a number of
21  people that would -- that would develop suture
22  erosions over their sternum and could end up with a
23  chronic osteomyelitis that was painful for a long
24  time.  Not common, but I certainly had the
25  experience.

Confidential - Attorneys' Eyes Only

Page 934

1      Q.    Are you aware of any literature that talks
2   about a suture erosion in a vagina or pelvis leading
3   to chronic, permanent, life-altering pain?
4      A.    Not as we sit here, no.
5      Q.    If you'd turn forward several pages,
6   there's a page that says, submitted IIS Altman, et
7   al, paper.
8      A.    Trying to see roughly how deep you are in
9   the deck.
10     Q.    Maybe ten pages.
11     A.    Ten in?
12     Q.    Yeah, maybe ten pages.
13     A.    Ten in.
14           MR. SHERIDAN:  In from the back.
15   BY MR. SLATER:
16     Q.    Ten further.  Ten further to the back.
17     A.    Yes.
18     Q.    It says, submitted IIS Altman paper.  And
19   as part of this presentation, you and others who this
20   was presented to were told about this study that
21   Altman had done and that was submitted to The New
22   England Journal of Medicine, and that was going to be
23   an important part of trying to answer the Iglesia
24   study; right?
25     A.    I don't know if it's an important part of

Confidential - Attorneys' Eyes Only

Page 935

1   answering it but would be another bolus of

2   information to be evaluated.

3       Q.    At the very bottom they're -- well,

4   rephrase.

5           This page is talking about findings in the

6   Altman study.  And you see the last point, it says,

7   the rate of dyspareunia was 34 percent in the

8   colporrhaphy group compared to 51 percent in the mesh

9   group.

10      A.    A different page?

11      Q.    There are several pages that say,

12  submitted IIS Altman paper.

13      A.    Uh-huh.

14      Q.    What I just read is right here at the

15  bottom of the page, the rate of dyspareunia.

16      A.    Yes.

17      Q.    Now, you can hold that page, and then do

18  you have -- do you have the Altman actual article?

19          MR. SNELL:  Is that my copy, Adam, or

20  yours?

21          MR. SLATER:  It's your copy.

22          MR. SNELL:  So I'm going to need it back.

23          MR. SLATER:  That's fine.

24          THE WITNESS:  Not in today's group, huh?

25          MR. SLATER:  It is.  You were asked about

Confidential - Attorneys' Eyes Only

1    it by counsel.

2             THE WITNESS:  Yeah.  But --

3             MR. SNELL:  I don't think I showed it to

4    him.  I just asked him.

5             MR. SLATER:  You did.  He was going

6    through the charts and everything.

7             MR. SNELL:  You're right.  You're right.

8    I did.  I take it back.

9             MR. SLATER:  You shouldn't have.  You

10   shouldn't have but you did.

11            MR. SNELL:  Come on now.  You shouldn't go

12   there because you know where I'm going to go.

13            MR. SLATER:  Burt, I've got to tell you, I

14   don't really care where you go.

15            THE WITNESS:  Oh.

16            That's not it.

17            MR. SLATER:  Can you give him a hand

18   looking for it, Burt?  You're sitting there.

19            MR. SNELL:  I don't have it.  I don't have

20   an extra copy.  That's why I had to give him that

21   one.

22            MR. SLATER:  You gave a copy of Doctor --

23            MR. SNELL:  No.  No.  That's why I had to

24   give him my copy.  Remember?

25            MR. SLATER:  Oh.  There's no other copy in

Confidential - Attorneys' Eyes Only

Page 937

1    existence in this room?

2              MR. SNELL:  No.

3              MR. SLATER:  All right.  Then this is what

4    I'm going to do:  If this is the only copy, you're

5    wasting your time.  I didn't even know that.

6              MR. SNELL:  Yeah, that's another problem.

7              MR. SLATER:  Let me just make a note here.

8              MR. SNELL:  They didn't print out copies

9    of the older exhibits that were marked during Days 1

10   and 2, only the new ones.

11             THE WITNESS:  I didn't know you could have

12   a third wind.

13             MR. SLATER:  Oh, I'm good.

14             THE WITNESS:  No.  I'm talking about me.

15   I didn't know I could have a third wind.

16             MR. SLATER:  Oh, you're doing good too.

17             This is the copy, this is the counsel's

18   copy.

19             MR. SNELL:  Okay.

20             THE WITNESS:  Okay.

21             MR. SLATER:  Let me start over.

22   BY MR. SLATER:

23        Q.    Now, Doctor, I've handed you the actual

24   article that was published in The New England Journal

25   of Medicine for the Altman study.

Confidential - Attorneys' Eyes Only

Page 938

1          See that?

2     A.    I do.

3     Q.    And this is what I want to ask you:  Can

4 you show me where in that article it discloses that

5 the rate of dyspareunia was 34 percent in the

6 colporrhaphy group and it was 51 percent in the mesh

7 group?

8          Can you show me where those percentages

9 are actually stated in that article?  I -- and I'm

10 going to tell you, I read through it multiple times

11 and I can't find those numbers but --

12     A.    Well, for me to say no I guess I have to

13 read it.

14     Q.    Take a look.  Dyspareunia is -- is

15 discussed in a few different places.  It's discussed

16 at the top of Page 1834.  They just say it's a higher

17 rate but they don't give the percentages.

18          I don't see anywhere where those numbers

19 are actually reflected in the article.  If they are,

20 please show it to me.

21     A.    Whoops.  I thought I had marked it.  No.

22     Q.    So just to be clear, in November of 2010 a

23 presentation was made by medical affairs regarding

24 the Iglesia study and in that context the Altman

25 study, which had been submitted to The New England

Confidential - Attorneys' Eyes Only

Page 939

1   Journal of Medicine, was discussed and on this one

2   page here we see that your company was aware of the

3   rate of dyspareunia was 34 percent in the

4   colporrhaphy group compared to 51 percent in the mesh

5   group; correct?

6           A.    It says that here, yes.

7           Q.    And I've just given you as much time as

8   you needed to go through the actual published article

9   in The New England Journal of Medicine and those

10  statistics of 34 percent versus 51 percent are not

11  found in the article; right?

12          A.    I do not see that.

13          Q.    Are you aware that when David Robinson was

14  provided a draft -- well, rephrase.

15                Are you aware that when your company's

16  medical affairs people, including David Robinson,

17  looked at the manuscript draft, that David Robinson

18  showed alarm at those numbers and communicated to Dr.

19  Altman that that was a serious concern of his?

20          A.    No, I'm not aware.

21          Q.    If, in fact, David Robinson's showing of

22  concern at those numbers, which he referred to as --

23  I'm paraphrasing -- very high numbers, led Dr. Altman

24  to remove those numbers from the study, that would be

25  a real serious issue, wouldn't it?

Confidential - Attorneys' Eyes Only

Page 940

1          MR. SNELL:  Foundation.  Form.

2          MR. SLATER:  I'm sorry.  One second.

3          What's your objection?

4          MR. SNELL:  Yeah.  If -- if -- if --

5   foundation.  You haven't laid a foundation that that

6   had any bearing whatsoever on Dr. Altman or any of

7   his other 52 investigators' decision about what to do

8   on that manuscript.  That's the foundation.

9          MR. SLATER:  Okay.

10          MR. SNELL:  Form is vague.

11          Go ahead.

12          MR. SLATER:  Okay.

13  BY MR. SLATER:

14     Q.    You can answer the question.

15     A.    Say -- I'm sorry.  One more time.

16     Q.    I'll ask it again.

17     A.    Uh-huh.

18     Q.    David Robinson, as a medical affairs

19  director in Ethicon, should not have been attempting

20  to influence Dr. Altman to remove those statistics

21  from the manuscript.

22          That's something he -- he should not be

23  doing; correct?

24          MR. SNELL:  Foundation.

25          THE WITNESS:  Not -- not knowing the

Confidential - Attorneys' Eyes Only

Page 941

1    protocol and -- and -- and the definitions and all

2    that sort of thing, I would want to know more about

3    what does this -- what does this mean, how was it

4    defined, and when was it measured and all that sort

5    of stuff, but I don't think -- I would not expect

6    medical affairs to try to influence the scientific

7    dis -- evidence or dissemination of -- of important

8    scientific information.

9    BY MR. SLATER:

10       Q.    And, again, as you sit here now, you're --

11   have you ever -- well, let me ask you this:  Have you

12   ever looked at the documents, your internal

13   documents, with the commentary -- the comments and

14   the editing by Piet Hinoul, David Robinson, Aaron

15   Kirkemo and Judi Gauld into the Altman draft

16   manuscript which was then sent back to Dr. Altman?

17       A.    I don't think so.

18       Q.    So as I'm -- as you sit here now, you're

19   hearing this for the first time from me that David

20   Robinson showed serious concern about those numbers

21   and expressed that to Dr. Altman.

22       A.    I can't remember --

23            MR. SNELL:  Form.

24            THE WITNESS:  I can't remember if we

25   talked about it two weeks or two months ago or not

Confidential - Attorneys' Eyes Only

Page 942

1   but...

2   BY MR. SLATER:

3       Q.    We went through the IIS protocol that went

4   into effect as of 2009.

5           If the interaction between David Robinson

6   and the other medical affairs and clinical affairs

7   person happened with Dr. Altman after that time, then

8   they certainly were duty bound not to make any effort

9   or say anything that might influence the reporting of

10  the data, for example, that could have influenced Dr.

11  Altman to remove those numbers.

12          That's not what they're supposed to be

13  doing; right?

14          MR. SNELL:  Form.  Foundation.

15          THE WITNESS:  So I -- again, my -- my --

16  it's the same question, same answer.

17          If -- it would not be expected that the

18  medical affairs team would interfere with

19  important -- or dissemination of important scientific

20  information.

21  BY MR. SLATER:

22      Q.    You would agree there's a big difference

23  between saying that the rate of dyspareunia with the

24  Prolift was higher than the rate of dyspareunia with

25  the colporrhaphy, on the one hand, versus actually

Confidential - Attorneys' Eyes Only

Page 943

1   giving these numbers to people who would read the

2   article and telling them that the difference is 34

3   percent to 51 percent.

4           There's a -- there's a qualitative

5   difference; correct?

6       A.   Yeah, it's more informative with the

7   numbers.

8           MR. SLATER:  Off the record for a second.

9           VIDEO OPERATOR:  Time is now 8:17.

10          We're going off record.

11          (Discussion off the record.)

12          VIDEO OPERATOR:  Time is now 8:18.

13          We are back on the record.

14  BY MR. SLATER:

15      Q.   Doctor, you said that you were not aware

16  of any evidence of a relationship between

17  polypropylene mesh and cancer.

18          Remember you said that?

19      A.   That --

20          MR. SNELL:  That misstates form.

21          Go ahead.

22          THE WITNESS:  Yes.

23  BY MR. SLATER:

24      Q.   You remember seeing the Material Safety

25  Data Sheet for the -- the Prolene material that goes

Confidential - Attorneys' Eyes Only

Page 944

1    into the polypropylene?

2         A.    Yes.

3         Q.    Let me ask it differently.  I mixed the

4    two terms.

5              Do you remember we showed you the Material

6    Safety Data Sheet for the -- the raw polypropylene

7    material that goes into the Prolene?

8         A.    Yes.

9         Q.    And it showed that testing had shown that

10   exposure to the material had caused sarcomas in rats?

11             MR. SNELL:  Foundation.

12             THE WITNESS:  Rodents or rats, yes.

13   BY MR. SLATER:

14        Q.    That's cancer; right?

15        A.    Yes.  It's sarcoma.  It's not carcinoma,

16   it's sarcoma.

17        Q.    Sarcoma.  But that's -- that's cancerous;

18   correct?

19             MR. SNELL:  Form, foundation.

20             THE WITNESS:  It's malignancy.

21   BY MR. SLATER:

22        Q.    It's an indication that the material can

23   cause cancer; correct?

24             MR. SNELL:  Same objection.

25             THE WITNESS:  Sarcoma in a rat in -- in --

Confidential - Attorneys' Eyes Only

Page 945

1    in a -- in that mechanical or -- yeah, mechanical

2    form or, you know what I mean, in disk form.

3    BY MR. SLATER:

4         Q.    The answer is yes, that's an indication

5    that the material can be cancerous?

6         A.    In rats.

7              MR. SNELL:  Form.

8    BY MR. SLATER:

9         Q.    Well, the reason they test it in rats is

10   because they think that that gives an indication of

11   what would happen in a human being.

12             That's why they do the testing in the

13   rats; right?

14             MR. SNELL:  Foundation.

15             THE WITNESS:  That's one of the tests that

16   can be done, yes.

17   BY MR. SLATER:

18        Q.    You were asked by counsel about statements

19   by AUGS and AUA regarding their viewpoint on the TVT.

20             Remember that?

21        A.    I do.

22        Q.    Do you know which doctors within the

23   professional organizations wrote those position

24   statements?

25        A.    No.

Confidential - Attorneys' Eyes Only

Page 946

1   Q.  Do you know whether those doctors had

2 financial relationships with medical device or

3 pharmaceutical companies?

4   A.  No.

5   Q.  Do you know if medical device or

6 pharmaceutical companies had input behind the scenes

7 into those position statements?

8   A.  No, not directly.

9   Q.  Did your company share all of its internal

10 documents regarding TVT with those professional

11 organizations so they would not only know what was

12 publicly available but also know all of the internal

13 knowledge that your company had before they issued

14 those position statements?

15   A.  Not that I'm aware of.

16   Q.  Did your company tell those professional

17 organizations that testing of the Prolene mesh had

18 shown that it was cytotoxic?

19     MR. SNELL:  Form.

20     THE WITNESS:  No, not that I know of.

21 BY MR. SLATER:

22   Q.  One of the bases for your company to

23 conclude that TVT Prolene mesh would be safe and

24 effective was the history of the use of Prolene

25 hernia mesh; correct?

Confidential - Attorneys' Eyes Only

Page 947

1          A.      Yeah, that experience was an input.

2          Q.      Now, let me ask you a question about a

3    process:  When your company seeks clearance for a

4    product or a device from the FDA under the 510(k) and

5    says, well, this is -- these are the predicate

6    devices -- you understand what a predicate device is;

7    right?

8          A.      High level, yes.

9          Q.      Okay.  Basically, you say, we want to get

10   clearance for this device because it's substantially

11   equivalent to this other device, and that would be

12   the predicate.

13              You understand that; right?

14         A.      Yes.

15         Q.      And if your company is going to rely on a

16   predicate device, your company should have an

17   understanding of whatever information is available

18   regarding the safety and effectiveness of the

19   predicate.

20              Stands to reason; right?

21         A.      Right.

22         Q.      And are you aware that for Prolene hernia

23   mesh the predicate or one of the predicates was Bard

24   Marlex hernia mesh?

25         A.      Not aware, no.

Confidential - Attorneys' Eyes Only

Page 948

1          Q.    I'm going to -- I'm going to tell that you
2     as a statement of fact.  It's been established
3     through deposition testimony.
4                MR. SNELL:  You mean a regulatory
5     predicate?
6     BY MR. SLATER:
7          Q.    I'm going to tell you as a statement
8     because I don't have the documents here, but in the
9     deposition of Peter Ciccini this was established for
10    the record that one of the predicates for Prolene
11    hernia mesh was Bard Marlex hernia mesh.  Okay?
12         A.    Okay.
13         Q.    So your company would have needed to be
14    aware of whatever information was available regarding
15    safety and effectiveness of the Bard Marlex hernia
16    mesh; right?
17               MR. SNELL:  Form, foundation.
18    BY MR. SLATER:
19         Q.    Correct?
20         A.    Yeah.
21         Q.    And your company, for example, would have
22    needed to be aware of if there was information
23    indicating that this predicate device, that a warning
24    had been provided by the manufacturer of the raw
25    material that it should not be used in the human body

Confidential - Attorneys' Eyes Only

Page 949

1    as a medical device.

2            That's something your company would need

3    to know in that context; right?

4            MR. SNELL:  Foundation, form.

5            THE WITNESS:  Certainly would want to know

6    it and then evaluate what it meant.

7    BY MR. SLATER:

8        Q.   And as you sit here now, you don't know if

9    medical affairs in your company knew that or not.

10       A.   I don't know that.  Preceded me by a long

11   shot.

12       Q.   And, in fact, now, if we take the chain

13   back, your company is basic -- has basically said,

14   look -- well, rephrase.

15           If we take the chain back, your company

16   said, okay, one of the bases to say TVT Prolene mesh

17   will be safe is we have this Prolene hernia mesh over

18   there.

19           If you take the chain back, that was

20   marketed based, in part, on reliance on Bard Marlex

21   hernia mesh.  And if you take the chain back, that

22   MSDS for the raw Marlex material would be something

23   that your company would need to take into account

24   when saying that those Prolene meshes are safe and

25   effective; correct?

Confidential - Attorneys' Eyes Only

Page 950

1           MR. SNELL:  Foundation and form.

2    BY MR. SLATER:

3           Q.    You can answer.

4           A.    I would think -- I would think it would be

5    one of the inputs, and you would evaluate it in

6    context, yes.

7           Q.    And, to your knowledge, that did not

8    occur, as far as you know.

9           A.    I don't know, yes or no.

10          Q.    Let's go to -- see what you have close by.

11                You were asked a question by counsel,

12   well, your company cited certain statements --

13   rephrase.

14                In these marketing documents we went

15   through your company made certain statements and

16   referenced certain medical literature for the -- as

17   support to make those statements; right?

18          A.    Right.

19          Q.    And I think counsel asked you and you

20   said, well, you know, doctors can read the articles;

21   right?

22                Remember that?

23          A.    They certainly can, yes.

24          Q.    You certainly want doctors to read a

25   marketing document from your company that summarizes

Confidential - Attorneys' Eyes Only

Page 951

1    medical literature and believe that your company is

2    accurately and in a fair and balanced way summarizing

3    that medical literature; right?

4         A.    Right.

5         Q.    And you want doctors to feel that they

6    have so much confidence in your company that they can

7    trust that when something is stated in a marketing

8    document and there's a reference, they don't need to

9    read the article, they can trust that your company is

10   telling them the truth about what that article says;

11   right?

12        A.    Well, I believe that the marketing

13   materials are typically pretty -- pretty brief and,

14   you know, succinct and the -- the references are

15   there for -- for clarity or for more information for

16   the physician.

17             MR. SLATER:  Move to strike.

18             THE WITNESS:  Just another way for them

19   to -- to understand what the pieces means.

20             MR. SLATER:  Move to strike.

21             Can you just read the question back?

22             I'd just ask you to try to answer the

23   direct question, if we could.  And I'm actually going

24   to try to wrap it up, despite our little spat, and

25   maybe counsel will reconsider and not keep going

Confidential - Attorneys' Eyes Only

Page 952

1    around this bush.

2              MR. SNELL:  Did you move to strike that?

3              MR. SLATER:  Yeah, I did.

4              MR. SNELL:  Mark that, because I want that

5    in the record.

6              Go ahead.

7              MR. SLATER:  Determination.  One of the

8    five D's.

9              MR. SNELL:  Don't give up.

10             MR. SLATER:  Read the question back.

11             (The court reporter read the requested

12   portion of the record.)

13             THE WITNESS:  Oh, I thought -- I thought

14   you were striking something forward or something.

15             MR. SLATER:  No.  I'm asking you, can you

16   answer that question?

17             THE WITNESS:  I did.

18             MR. SNELL:  Yeah, he did.

19             MR. SLATER:  Well, I'm asking for a yes or

20   no answer.

21             MR. SNELL:  Form, asked and answered twice

22   now.

23             THE WITNESS:  I'm really sorry.

24             MR. SLATER:  We're about to -- she's going

25   to read the -- the court reporter will read the

Confidential - Attorneys' Eyes Only

Page 953

1  question back to you again.

2           I'm asking you, can you answer the

3  question with a yes or no answer?

4           THE WITNESS:  Well, I'll see if I can or I

5  can't.

6           MR. SLATER:  Fair enough.

7           MR. SNELL:  And I'm going to object to

8  form as asked and answered.

9           MR. SLATER:  You have your objection.  You

10  don't have to keep saying it.

11           Please read it back.

12           (The court reporter read the requested

13  portion of the record.)

14           THE WITNESS:  No.  And I'm -- and I'll

15  explain.  I -- I believe that a marketing piece

16  will -- well, a bug.

17  BY MR. SLATER:

18       Q.    Go ahead.

19       A.    With a -- with references is -- is there

20  for a reason, to provide the opportunity for the

21  surgeon to get more clarity on a very brief

22  statement.

23           MR. SLATER:  Move to strike after "no."

24  BY MR. SLATER:

25       Q.    Your company in a marketing document makes

Confidential - Attorneys' Eyes Only

Page 954

1   claims, makes statements --

2        A.     Uh-huh.

3        Q.     -- and provides references, and what

4   you're saying to a doctor is, we have support for

5   what we're saying.  Here's the support and this is

6   what that -- in this case, this is what that medical

7   article says.  Right?

8        A.     Yes.

9        Q.     And you want doctors to believe you when

10  you make that representation; right?

11       A.     Yes.

12       Q.     You wouldn't criticize a doctor for

13  believing what you say in your marketing documents,

14  would you?

15       A.      If they didn't have any -- if they -- if

16  they didn't have questions.

17       Q.      I mean, you wouldn't say, for example, if

18  a doctor were to testify at trial, well, I believed

19  this representation and that was the reason I used

20  this device, and if I had known that the answer was

21  different or if I had known this other information, I

22  wouldn't have used it, you wouldn't say back to that

23  doctor, well, you were -- you believed what we said

24  in this marketing document, you didn't go back and

25  read the reference to see that we didn't really

Confidential - Attorneys' Eyes Only

Page 955

1  represent accurately what it was, well, shame on you.

2              That wouldn't be your response, would it?

3              MR. SNELL:  Foundation and form.

4              Go ahead.

5              THE WITNESS:  No.

6  BY MR. SLATER:

7      Q.    You were asked about the IFU.  I want to

8  ask you a question about this in terms of you were

9  asked about what type of information would be in

10  there.

11             The standard is not that you need

12  level-one evidence that an adverse reaction exists

13  before you'll put it in the IFU.  That's not the

14  standard; right?

15     A.    No, not all the time.

16     Q.    Oftentimes, information is put into an IFU

17  based on anecdotal feedback to the company.

18             That happens; right?

19     A.    Anecdotal feedback.

20     Q.    Yeah.  Where, for example, surgeons in

21  meetings with medical affairs or with marketing

22  people are providing information about an adverse

23  event that they're seeing, your company will at times

24  use that as the basis to give a warning in an IFU.

25     A.    I'm not aware of that.  I think

Confidential - Attorneys' Eyes Only

Page 956

1  observational study or more -- more substantial

2  information than just a -- just a casual anecdote

3  from a surgeon.

4       Q.   Well, your company does not need a

5  published article --

6       A.   No.

7       Q.   -- finding that an adverse event occurs

8  before you'll put it into an IFU.

9            That's not the standard; right?

10      A.   That's correct.

11      Q.   The marketing document that looks like

12 this, Exhibit 1348, counsel asked you about, I have a

13 question about that.  It's not part of that document.

14      A.   Right.

15      Q.   You got it.  You're -- you're two away.

16      A.   Let me see the front it.  Is that it?

17      Q.   Next one.

18      A.   Next one.

19      Q.   1348.

20      A.   Yeah.

21      Q.   Exhibit 1348, look at the fourth page, the

22 one that says -- that counsel asked you about -- only

23 Gynecare TVT uses Prolene polypropylene mesh.

24            You see that?

25      A.   I do.

Confidential - Attorneys' Eyes Only

Page 957

1     Q.    Just above the picture it says, tissue

2   incorporation.  Large pores result in good

3   incorporation.

4           Do you see that?

5     A.    I do.

6     Q.    In fact, Prolene mesh is a microporous, a

7   small-pore mesh, not a large-pore mesh; correct?

8           MR. SNELL:  Foundation.

9           MR. SLATER:  I'm sorry.  Are you okay?

10  You have a very pained look on your face.

11          MR. SNELL:  Yeah.  That's --

12          MR. SLATER:  You actually think Prolene

13  mesh is macroporous?

14          MR. SNELL:  Of course, it is.

15          MR. SLATER:  Okay.

16          MR. SNELL:  Of course, it is.

17          MR. SLATER:  You should honestly --

18          MR. SNELL:  Foundation on that all day

19  long.

20          Go ahead.

21  BY MR. SLATER:

22    Q.    Doctor, you -- rephrase.

23          This document says that large pores result

24  in good incorporation.

25          Are you aware of the fact that Prolene

Confidential - Attorneys' Eyes Only

Page 958

1    mesh, the mesh used in the TVT, is considered a

2    heavyweight, small-pore mesh?

3              MR. SNELL:  Foundation.

4              THE WITNESS:  No.

5    BY MR. SLATER:

6         Q.    You don't know that?

7         A.    No.

8         Q.    Do you believe it to be a lightweight

9    mesh?

10        A.    No.  It's -- it's the Prolene.  No, it's

11   not the same as Ultrapro.

12        Q.    You're aware that TVT mesh, the mesh in

13   that device, is heavyweight; right?

14        A.    I'm aware it's the -- the predecessor, it's

15   Prolene mesh.  I mean, that's -- it came from Prolene

16   mesh.

17        Q.    And in terms of the gradation, it's

18   considered a heavyweight mesh; right?

19        A.    I don't know that myself personally, no.

20        Q.    Are you aware that the Prolene mesh in the

21   TVT is considered a small-pore mesh?

22              MR. SNELL:  Foundation.

23              THE WITNESS:  No.

24   BY MR. SLATER:

25        Q.    Do you know whether or not -- do you know

Confidential - Attorneys' Eyes Only

1    one way or the other?

2         A.    I know it's different than the Ultrapro.

3    That's what I know.

4         Q.    Well, Ultrapro --

5         A.    And I don't know if it would be categorized

6    as heavyweight mesh.

7         Q.    Let me ask you this question:  If, in

8    fact, Prolene mesh is known by your company to be a

9    small-pore mesh, your company should not have

10   represented that it had large pores.

11            You would agree with that statement;

12   right?

13            MR. SNELL:  Foundation.

14            THE WITNESS:  Yes.

15            MR. SLATER:  At my peril, I am cutting out

16   about 35 minutes of questions in the hope that your

17   counsel will see the light.

18            MR. SNELL:  I just have a few.

19            MR. SLATER:  Oh, I do have one more

20   question, and I'm -- and it's mainly for the other

21   attorney who came in the room, who I think will enjoy

22   the question.

23   BY MR. SLATER:

24        Q.    You talked about the fact that the

25   advice -- led by Piet Hinoul was Piet Hinoul felt

Confidential - Attorneys' Eyes Only

Page 960

1    Prolift is fine, keep it on the market, it's safe and
2    effective; right?
3         A.    Yes.
4         Q.    Did you ever watch the movie "Animal
5    House"?
6         A.    Many years ago.
7         Q.    Remember --
8              MS. SCALERA:  I'm going to -- I'm going to
9    object.
10             Go ahead.
11   BY MR. SLATER:
12        Q.    Do you remember -- do you remember the
13   scene at the end when they disrupt the parade?
14        A.    No.
15        Q.    Do you remember when Kevin Bacon is the
16   ROTC solder and they disrupt the parade and everybody
17   is in mayhem, running and chaos and fear --
18        A.    I don't.
19        Q.    -- and he's standing there saying, all is
20   well, everything is fine, all is well?
21             Do you see a parallel between Kevin Bacon
22   in "Animal House" in that scene and Piet Hinoul
23   saying the Prolift was a safe and effective device?
24        A.    Well, I don't --
25             MR. SNELL:  Hold on.  Hold on.  Hold on.

Confidential - Attorneys' Eyes Only

Page 961

1              Foundation and form.  That's argumentative
2      and nonsense.
3              Go ahead.
4              THE WITNESS:  I don't know the scene, but
5      I'm sure I would disagree with you.
6              MR. SLATER:  Good answer.
7              Now I'm going to hand off the questioning
8      to Mr. Snell.  And I -- and I'm saying in all good
9      faith, aside from the kidding around and everything
10     else, I just cut my questioning very short in an
11     effort to try to end this.  I'm hoping that counsel
12     will --
13             MR. SNELL:  I'm -- I just have a few.
14             MR. SLATER:  -- understand that.
15             MR. SNELL:  I just have a few.
16                     EXAMINATION
17     BY MR. SNELL:
18         Q.   Make sure to look at the camera.  That's
19     okay.
20             Plaintiffs' counsel just asked you a
21     question about whether the Prolene mesh was
22     macroporous or large-pore mesh.
23             Do you recall that question?
24         A.   I do.
25             MR. SLATER:  Objection.

Confidential - Attorneys' Eyes Only

Page 962

1   BY MR. SNELL:

2        Q.    Will you defer to Dr. Piet Hinoul as to

3   whether the Prolene mesh used in TVT is macroporous?

4        A.    Yes.

5        Q.    I believe you told plaintiffs' counsel, to

6   your knowledge, there wasn't a Prolift clinical study

7   with a primary end point that assessed mesh exposure;

8   correct?

9              MR. SLATER:  Objection to the form of the

10  question.

11             MR. SNELL:  Did I get that wrong?  Because

12  I want to get it right.

13             How about this?  I'll take that off the

14  table.

15  BY MR. SNELL:

16       Q.    Did Prolift studies assess safety?

17       A.    Yes.

18       Q.    Did Prolift studies assess complication

19  rates?

20             MR. SLATER:  Objection.

21             THE WITNESS:  Yes.

22  BY MR. SNELL:

23       Q.    Did the risk-benefit analyses, which you

24  have testified to were done multiple times, consider

25  complications?

Confidential - Attorneys' Eyes Only

Page 963

1      A.    Yes.

2            MR. SLATER:  Objection.

3            Just got to give me one beat.  I know we

4   all want to get out of here.  I've just got to have a

5   chance to object.  I'm trying to pack up because I'm

6   one foot out the door right now.

7   BY MR. SNELL:

8      Q.    In fact, plaintiffs' counsel pointed you

9   to the November 2010 --

10     A.    Yes.

11     Q.    -- mesh platform review, for instance, the

12  page on pain.  And does that page identify clinical

13  studies that ascertained different safety end points?

14     A.    Yes.

15     Q.    Plaintiffs' counsel asked you about

16  dyspareunia.

17           Does that page report out of 30 studies

18  that the rate of dyspareunia was 7 percent?

19           MR. SLATER:  Objection.

20           THE WITNESS:  Yes.

21  BY MR. SNELL:

22     Q.    So there's no question -- is there any

23  question in your mind that the Prolift clinical

24  studies analyzed and assessed safety?

25           MR. SLATER:  Objection.

Confidential - Attorneys' Eyes Only

Page 964

1              THE WITNESS:  No.

2    BY MR. SNELL:

3        Q.    I just want to make sure it's clear.

4              Regardless of what some testing glass

5    showed regarding an ISO cytotoxicity, what is your

6    opinion, based on your experience and everything

7    you've read about the TVT mesh, as to whether or not

8    it is cytotoxic?

9              MR. SLATER:  Objection.

10             THE WITNESS:  I don't believe that it's

11   cytotoxic.

12   BY MR. SNELL:

13       Q.    And would a cytotoxic mesh perform as well

14   as TVT mesh has performed in over 100 randomized,

15   controlled trials?

16             MR. SLATER:  Objection.

17             THE WITNESS:  Well, there are obviously

18   gradations of cytotoxicity but a -- a significantly

19   cytotoxic one I would not expect to behave that way

20   or perform that way.

21   BY MR. SNELL:

22       Q.    Can -- plaintiffs' counsel asked you about

23   suture erosions.

24             Can there be difficult-to-treat suture

25   erosions?

Confidential - Attorneys' Eyes Only

Page 965

1      A.    Yes.

2            MR. SLATER:  Objection.

3  BY MR. SNELL:

4      Q.    Plaintiffs' counsel asked you about the

5  dyspareunia referenced in the Altman 2011 study

6  slide.

7            Do you recall that?

8      A.    I do.

9      Q.    Just get to it.

10           And that slide, it doesn't say this is the

11  de novo dyspareunia rate, does it?

12     A.    Does not.

13           MR. SLATER:  Objection.

14  BY MR. SNELL:

15     Q.    Does this state that the -- that rate of

16  dyspareunia was de novo?

17           MR. SLATER:  Objection.

18           THE WITNESS:  Does not.

19           MR. SNELL:  Where's the Altman study?

20           MR. SLATER:  Gave it back to you.

21           And I want to thank you.  I forgot to ask

22  some questions on one of the documents.  You never

23  learn, man.

24           I don't have it.  I gave it back to you

25  guys.

Confidential - Attorneys' Eyes Only

Page 966

1              MR. SNELL:  Okay.

2    BY MR. SNELL:

3         Q.    Table 4 in the Altman study looks at,

4    among other things, pelvic or genital pain as

5    compared between colporrhaphy and the mesh repair

6    group.

7              Do you see that?

8              MR. SLATER:  Objection.

9              THE WITNESS:  Yes.

10   BY MR. SNELL:

11        Q.    And was there a significant difference

12   between Prolift and the colporrhaphy on pelvic and

13   genital pain?

14        A.    Genital pain, no.

15             MR. SLATER:  Objection.

16   BY MR. SNELL:

17        Q.    Turn to the next page, the longer results,

18   from 2 to 12 months.

19             Was there any difference between Prolift

20   and colporrhaphy in pelvic and genital pain?

21             MR. SLATER:  Objection.

22             THE WITNESS:  No.

23   BY MR. SNELL:

24        Q.    And just for the record, we were looking

25   at the Altman study, Page 8.  I'm sorry.  Exhibit

Confidential - Attorneys' Eyes Only

Page 967

1    858.

2              Plaintiffs' counsel asked you about

3    whether a potential risk of cancer could be excluded

4    at some point way down in the future.

5              Do you recall that question?

6              MR. SLATER:  Objection.

7              THE WITNESS:  Yes.

8    BY MR. SNELL:

9        Q.    Do the current data show a link between

10   polypropylene, Prolene polypropylene mesh, and

11   cancer?

12             MR. SLATER:  Objection.

13             THE WITNESS:  No.

14   BY MR. SNELL:

15       Q.    Are sarcomas the same as carcinomas?

16       A.    No.

17       Q.    Are you an oncologist?

18       A.    No.

19       Q.    Are you a gynecologic pathologist who has

20   particular expertise in gynecologic cancer?

21       A.    No.

22             MR. SLATER:  I don't know why you're

23   smirking at me.  I've been talking to women with

24   bladder cancer, so I wouldn't be laughing so hard.

25             MR. SNELL:  I'm not smirking at you.

Confidential - Attorneys' Eyes Only

Page 968

1            MR. SLATER:  Yeah.  Well, it's not funny.

2            MR. SNELL:  What are you talking about?

3    I'm not smirking at you.

4            MR. SLATER:  Just don't play gotcha games

5    when you're talking about cancer.  Okay?  There's a

6    lot of women out there with pelvic cancers.

7            MS. SCALERA:  I think we should strike

8    that entirely.

9            MR. SLATER:  You know what?  You're not a

10   part of this deposition.  We don't need your input,

11   please.

12           MR. SNELL:  We can strike it.

13           MR. SLATER:  You walk in after nine or ten

14   hours and start talking?  Please.

15           MS. SCALERA:  I'm an attorney in this

16   case --

17           MR. SLATER:  I don't care.  We didn't --

18           MS. SCALERA:  -- and I'm saying that you

19   should strike that from the record, but that's up to

20   you.

21           MR. SLATER:  It's not being stricken from

22   the record.

23           MR. SNELL:  It will be stricken because

24   it's attorney comment, it's not testimony nor is it a

25   question.

Confidential - Attorneys' Eyes Only

Page 969

```
 1              MR. SLATER:  There's nothing to strike.
 2              Could you just continue, please?  Some
 3    minimal level of competency in this room, and let's
 4    get going.
 5    BY MR. SNELL:
 6        Q.    And what may or may not be seen in a rat
 7    upon solid-state insertion of a disk is not
 8    transferrable to humans; is that correct or not?
 9              MR. SLATER:  Objection.
10              THE WITNESS:  That's my understanding.
11    BY MR. SNELL:
12        Q.    Plaintiffs' counsel asked you whether the
13    cytotoxicity or the certain ISO tests were ever
14    disclosed to the FDA.
15              My question to you is, were they?
16              MR. SLATER:  Objection.
17              THE WITNESS:  Yes.
18    BY MR. SNELL:
19        Q.    You've seen the 510(k) for the TVT.
20              Did Ethicon disclose the cytotoxicity test
21    results to the FDA?
22        A.    Yes.
23        Q.    They did that way back before the FDA --
24    strike that.
25              Was that done before the FDA cleared TVT?
```

Confidential - Attorneys' Eyes Only

Page 970

1          MR. SLATER:  Objection.

2          THE WITNESS:  Yes.

3          MR. SNELL:  All right.

4          Thanks.  No further.

5                   EXAMINATION

6    BY MR. SLATER:

7       Q.    Are you aware that in the 510(k) process

8    the FDA is not assessing safety and effectiveness,

9    and is only assessing substantial equivalence to the

10   predicate device?

11          MR. SNELL:  Foundation.

12          THE WITNESS:  As -- as can be evidenced by

13   performance in some cases, yes, I am aware.

14   BY MR. SLATER:

15      Q.    In the Altman study on Page 1832, lower

16   right-hand part of the page --

17      A.    I need it back.

18      Q.    -- it points out that in assessing pain

19   with intercourse, 2 percent of the women with

20   colporrhaphy had pain with intercourse, 7.3 percent

21   had pain with intercourse with -- where they had mesh

22   put in their body, the Prolift in their body;

23   correct?

24          MR. SNELL:  Why don't you get the paper

25   out.  That misstates.  Foundation.

Confidential - Attorneys' Eyes Only

Page 971

1              THE WITNESS:  I think -- I think you have

2     it.

3              MR. SNELL:  Oh, I have it here.  Give it

4     to him.  Because you're leaving out things.

5              MR. SLATER:  You know what?

6              MR. SNELL:  Hold on.  Altman.  I think I

7     might have stuck it under here.

8              There you go.

9              MR. SLATER:  Give me the article.

10             MR. SNELL:  Yeah.

11             No foundation, misstates the document.

12    BY MR. SLATER:

13       Q.   I'm going to read something and hand it to

14    you, okay, because we only have one copy?

15             On Page 1832 of the Altman study, in

16    talking about pain with intercourse it says, pain

17    during sexual intercourse was reported to occur

18    usually or always by 2 percent of the women after

19    colporrhaphy and by 7.3 percent after transvaginal

20    mesh surgery.

21             MR. SNELL:  Let me see that.

22    BY MR. SLATER:

23       Q.   That's reported in the lower right-hand

24    corner.

25             You can tell me if that's a correct

Confidential - Attorneys' Eyes Only

Page 972

1  reading of what was reported on that specific topic.

2          MR. SNELL:  Can you read back his

3  question?  I just want to make sure that he said --

4          MR. SLATER:  Why don't you give it to the

5  witness and let him read along --

6          MR. SNELL:  Okay.

7          MR. SLATER:  -- since he's, by far, the

8  smartest person in the room.

9          MR. SNELL:  I just want to make sure you

10  included the usually or always.

11          MR. SLATER:  Keep making sure.

12          MR. SNELL:  Can you read back his

13  question?

14          THE WITNESS:  His question was, did I read

15  that correctly?

16          MR. SNELL:  No.  No.  But I want to know

17  if he read it correctly.

18          THE WITNESS:  Oh.  Oh.  Oh.

19          MR. SNELL:  You should read along while

20  she repeats his question.

21  BY MR. SLATER:

22      Q.    How about this?  Do me a favor:  The

23  phrase that I just read, can you read it for the

24  record, what the article says about pain with

25  intercourse?

Confidential - Attorneys' Eyes Only

Page 973

```
 1        A.     When we analyzed individual outcomes that
 2   might be affected differently after the two types of
 3   interventions, pain during sexual intercourse was
 4   reported to occur usually or always by 2 percent of
 5   the women after colporrhaphy and by 7.3 percent after
 6   trans-mesh -- transvaginal mesh surgery, P equals
 7   .07.
 8        Q.     Okay.  Thank you.
 9               Now, do you have the -- the License and
10   Supply Agreement with Medscand?
11        A.     Somewhere.
12        Q.     This is what I forgot to ask you about
13   before but while counsel was questioning you I found
14   it in a pile and now I have to ask you a couple of
15   questions that never would have been asked if counsel
16   had just stopped.
17        A.     I have it.
18        Q.     There you go.
19               Let me ask you --
20               MR. SNELL:  Let me get there real quick.
21               Go ahead.
22   BY MR. SLATER:
23        Q.     Okay.  I'm now asking you about the
24   License and Supply Agreement with Medscand that
25   counsel asked you about a few moments ago.
```

Confidential - Attorneys' Eyes Only

Page 974

1          MR. SNELL:  Just let me get to it real

2     quick, Adam.

3          Okay.  Thank you.

4     BY MR. SLATER:

5          Q.    In looking at the License and Supply

6     Agreement with Medscand that counsel asked you about

7     a few moments ago, this is a contract between Johnson

8     & Johnson and Medscand Medical and it -- and it deals

9     with the terms and conditions under which the device

10    or the procedure that was the prototype for the TVT

11    would be transferred to the ownership of Johnson &

12    Johnson; right?

13         MR. SNELL:  Form.

14         THE WITNESS:  Yeah.  I'm not sure what's

15    the difference between license and acquisition, but

16    yeah.

17         MR. SLATER:  Beats me.

18    BY MR. SLATER:

19         Q.    Let me ask you what I wanted to get to.

20    Okay?

21         Counsel asked you if milestone payments

22    are common in these types of agreements and you said

23    yeah; right?

24         A.    I did.

25         Q.    Is it common for milestone payments to be

Confidential - Attorneys' Eyes Only

Page 975

1    tied directly to whether or not adverse events are

2    reported in the study?

3         A.    So I'm certainly aware of instances where

4    in licensing agreements -- whoops -- milestone

5    payments are agreed to or agreed upon depending upon

6    certain outcomes from clinical research and could

7    include establishment of health authority approval or

8    clearance or whatever, yeah.

9         Q.    Well --

10        A.    So it certainly can depend on clinical

11   outcome.

12        Q.    In this Agreement the milestone payments

13   were contingent on the results of the clinical trials

14   will be considered acceptable if, first, they do not

15   differ significantly from the results published in

16   the original article published in the International

17   Urogynecology Journal in 1996 by Dr. Ulmsten, et al.,

18   regarding the following items, and then lists safety,

19   efficacy, long-term results and intraoperative

20   complications or procedural -- procedure-related

21   complications.

22              See that?

23              MR. SNELL:  Form and foundation.

24              THE WITNESS:  Where is it?

25              MR. SLATER:  It's on -- it says 996, the

Confidential - Attorneys' Eyes Only

Page 976

1    last three digits.

2              MR. SNELL:  Form and foundation.

3              Adam, I think you said the milestone,

4    plural.  Milestone.

5              MR. SLATER:  I'll ask the question again.

6              MR. SNELL:  I just want to make sure you

7    clean it up.

8              MR. SLATER:  It's fine.

9              MR. SNELL:  I think you said milestone.

10   Because you know there's three of them.  That's my

11   foundation.

12   BY MR. SLATER:

13      Q.    Exhibit C presents the criteria for the

14   $400,000 milestone payment to be paid.

15              Do you see Exhibit C?

16      A.    I do.

17      Q.    And that was tied directly to the results

18   being considered acceptable, and that's defined as

19   not differing significantly from the results

20   published in the original article published by Dr.

21   Ulmsten in 1996; right?

22      A.    Right.

23      Q.    And then it talks about the items that are

24   actually captured within that category includes

25   postoperative complications like infection and/or

Confidential - Attorneys' Eyes Only

Page 977

1    rejection of the material, defect healing, slight

2    postoperative voiding problems and chronic voiding

3    problems.

4              Do you see that?

5         A.    I do.

6         Q.    And then there's some efficacy statements,

7    long-term results and procedural-related

8    complications.

9              All of those were conditions that had to

10   be met that there would be no significantly different

11   frequency or severity of those complications; right?

12        A.    Right.

13        Q.    Therefore, there was a significant

14   incentive for the investigators not to report such

15   findings because that would have caused them not to

16   get $400,000; right?

17             MR. SNELL:  Foundation.

18             THE WITNESS:  So in any of these licensing

19   agreements when you have a milestone that's based on

20   a clinical outcome, it's -- it's incumbent upon those

21   of us that are paying for the product and the product

22   becomes more valuable when -- when studies are

23   corroborated.

24             So I know for sure this -- the intent here

25   was to say, is this reproducible outside of one

Confidential - Attorneys' Eyes Only

Page 978

1  person's hands and is there incentive for them to --

2  say that -- so say the question again.  I'm sorry.  I

3  forget the words.

4  BY MR. SLATER:

5      Q.    The incentive is to not report

6  complications or adverse events that would cause that

7  milestone payment not to be paid under Exhibit C.

8      A.    Which would be an egregious breach of good

9  clinical practice.

10      Q.    Yes, it would, wouldn't it?

11      A.    It would be incumbent upon the company

12  that's paying the money to -- to have visibility to

13  how the data were collected and so forth.

14      Q.    Do you know whether your company actually

15  even looked at the data?

16      A.    I don't know.  I wasn't -- no.

17      Q.    In this type of a situation it would be

18  incumbent on Johnson & Johnson to actually, when you

19  say have visibility to the data, to look at the

20  actual patient-level data to make sure it's being

21  accurately reported; right?

22            MR. SNELL:  Foundation.

23            Go ahead.

24            THE WITNESS:  They have some level of due

25  diligence that -- that they would undertake to

Page 979

1    understand the -- the integrity of the data.  I

2    don't -- I don't know what they -- you know, what

3    level that was.

4    BY MR. SLATER:

5        Q.    If nothing was done to directly evaluate

6    the integrity of the data, that would be a problem;

7    right?

8              MR. SNELL:  Foundation.

9              THE WITNESS:  Yeah, I -- I just believe,

10   again, that the -- the paying company, it's --

11   it's -- it's -- it's -- they need -- they need to

12   have the satisfaction that the data represents what

13   happened in the trial because they're paying for it.

14   I mean, they're -- they're -- they need the data to

15   be good.

16   BY MR. SLATER:

17       Q.    When you say good, you mean valid; right?

18       A.    Yeah, that -- yeah.

19       Q.    And you need to confirm it's valid

20   independently; right?

21       A.    You need to be assured of it in your own

22   mind, yes.

23             MR. SLATER:  I don't have any other

24   questions.

25                      EXAMINATION

Confidential - Attorneys' Eyes Only

Page 980

1    BY MR. SNELL:

2        Q.    Was Ulmsten's study data confirmed time

3    and time again in numerous clinical studies in these

4    documents plaintiffs' counsel has shown to you?

5                MR. SLATER:  Objection.

6                THE WITNESS:  Yes.

7                MR. SNELL:  No further questions.

8                VIDEO OPERATOR:  The time is now 8:53.

9                This is the end of Disk Number 6.  This

10   concludes today's deposition.

11               We are going off the record.

12               (Whereupon the deposition concluded at

13   8:53 p.m.)

14                    TESTIMONY CLOSED

15

16

17

18

19

20

21

22

23

24

25

Confidential - Attorneys' Eyes Only

Page 981

1                    CERTIFICATE

2

3          I HEREBY CERTIFY that the witness was duly

4   sworn by me and that the deposition is a true record

5   of the testimony given by the witness.

6          It was requested before completion of the

7   deposition that the witness, JAMES C. HART, M.D.,

8   have the opportunity to read and sign the deposition

9   transcript.

10

11

12          _____

13          ROSEMARY LOCKLEAR
            REGISTERED PROFESSIONAL REPORTER
14          CERTIFIED COURT REPORTER (NJ)
            30XI00171000
15          CERTIFIED REALTIME REPORTER
            NOTARY PUBLIC
16          Dated:  01/09/2014

17

18

19

20          (The foregoing certification of this

21   transcript does not apply to any reproduction of the

22   same by any means, unless under the direct control

23   and/or supervision of the certifying reporter.)

24

25

Confidential - Attorneys' Eyes Only

Page 982

1                    INSTRUCTIONS TO WITNESS

2

3

4              Please read your deposition over carefully

5      and make any necessary corrections.  You should state

6      the reason in the appropriate space on the Errata

7      Sheet for any corrections that are made.

8              After doing so, please sign the Errata

9      Sheet and date it.

10             You are signing same subject to the

11     changes you have noted on the Errata Sheet, which

12     will be attached to your deposition.

13             It is imperative that you return the

14     original Errata Sheet to the deposing attorney within

15     thirty (30) days of receipt of the deposition

16     transcript by you.  If you fail to do so, the

17     deposition transcript may be deemed to be accurate

18     and may be used in court.

19

20

21

22

23

24

25

Confidential - Attorneys' Eyes Only

Page 983

1                    E R R A T A

2                    - - - - - -

3

4    PAGE  LINE  CHANGE

5    ____  ____  _____

6    REASON:_____

7

8    PAGE  LINE  CHANGE

9    ____  ____  _____

10   REASON:_____

11

12   PAGE  LINE  CHANGE

13   ____  ____  _____

14   REASON:_____

15

16   PAGE  LINE  CHANGE

17   ____  ____  _____

18   REASON:_____

19

20   PAGE  LINE  CHANGE

21   ____  ____  _____

22   REASON:_____

23

24

25

Confidential - Attorneys' Eyes Only

Page 984

1           ACKNOWLEDGEMENT OF DEPONENT

2

3

4         I, _____, do hereby

5 certify that I have read the foregoing pages, and

6 that the same is a correct transcription of the

7 answers given by me to the questions therein

8 propounded, except for the corrections or changes in

9 form or substance, if any, noted in the attached

10 Errata Sheet.

11

12

13

14 _____

15 JAMES C. HART, M.D.                DATE

16

17 Subscribed and sworn

18 to before me this

19 _____ day of _____, 20_____.

20

    My commission expires:_____

21

22 _____

    Notary Public

23

24

25

Confidential - Attorneys' Eyes Only

Page 985

1                    LAWYER'S NOTES

2     PAGE LINE

3     _____   _____   _____

4     _____   _____   _____

5     _____   _____   _____

6     _____   _____   _____

7     _____   _____   _____

8     _____   _____   _____

9     _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____

25    _____   _____   _____