# Exhibit F

Brian J. Flynn, M.D.

<pre>
 1          UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF WEST VIRGINIA
 2             CHARLESTON DIVISION
 3                 -   -   -
 4
    IN RE: ETHICON, INC.   :  Master File
 5  PELVIC REPAIR SYSTEM    :  No.
    PRODUCTS LIABILITY      :  2:12-MD-02327
 6  LITIGATION              :
    _____ :  MDL NO. 2327
 7                          :
    MARY K. BURNETT         :  JOSEPH R. GOODWIN
 8                          :  U.S. DISTRICT JUDGE
          v.                :
 9                          :
    ETHICON, INC., et al.   :  CASE NO.
10                          :  2:12-cv-01795
11
                  -   -   -
12
                July 21, 2016
13
                  -   -   -
14
15          Expert deposition of BRIAN
    J. FLYNN, M.D., taken pursuant to notice,
16  was held at Butler Snow LLP, 500 Office
    Center Drive, Suite 400, Fort Washington,
17  Pennsylvania, beginning at 9:36 a.m., on
    the above date, before Kimberly A.
18  Cahill, a Federally Approved Registered
    Merit Reporter and Notary Public.
19
20
                  -   -   -
21
22        GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph| 917.591.5672
23            deps@golkow.com
24
</pre>

Brian J. Flynn, M.D.

```
 1   APPEARANCES:
 2
 3      MOTLEY RICE LLC
        BY:  ROBERT J. McCONNELL, ESQUIRE
 4      (via telephone)
        321 South Main Street
 5      Providence, Rhode Island 02903
        (401) 457-7703
 6      bmcconnell@motleyrice.com
        Representing the Plaintiff
 7
 8      BUTLER SNOW LLP
        BY:  NILS B. SNELL, ESQUIRE
 9      500 Office Center Drive
        Suite 400
10      Fort Washington, Pennsylvania  19034
        (267) 513-1885
11      Burt.Snell@butlersnow.com
        Representing the Defendants Johnson
12      & Johnson and Ethicon
13
14
15
16                 -   -   -
17
18
19
20
21
22
23
24
```

Brian J. Flynn, M.D.

```
 1                    -   -   -
 2                  I N D E X
 3                    -   -   -
 4
 5   Testimony of:  BRIAN J. FLYNN, M.D.
 6     By Mr. McConnell              5
       By Mr. Snell                 71
 7     By Mr. McConnell             85
 8
                      -   -   -
 9
                  E X H I B I T S
10
                      -   -   -
11
12   NO.              DESCRIPTION           PAGE
13
     Flynn-          "Dr. Flynn's          10
14   Burnett-1       Case-Specific
                     Plaintiff Mary
15                   Burnett" Black
                     Binder Containing
16                   Reports, Records,
                     and "Flynn, July
17                   14th, 2016
                     Deposition, Burnett
18                   Materials" USB
19   Flynn-          Curriculum Vitae of   11
     Burnett-2       Brian J. Flynn,
20                   M.D. Updated
                     6/28/16
21
     Flynn-          6/16 Invoice          12
22   Burnett-3
23   Flynn-          AUGS Position         12
     Burnett-4       Statement
24
```

Brian J. Flynn, M.D.

```
 1                    -   -   -

 2            DEPOSITION SUPPORT INDEX

 3                    -   -   -

 4

 5   Direction to Witness Not to Answer

 6   Page Line     Page Line      Page Line

 7

 8   Request for Production of Documents

 9   Page Line     Page Line      Page Line

10    14  22

11

     Stipulations

12

     Page Line     Page Line      Page Line

13

14

15   Question Marked

16   Page Line     Page Line      Page Line

17

18

19

20

21

22

23

24
```

Brian J. Flynn, M.D.

```
 1                    -   -   -
 2              BRIAN J. FLYNN, M.D., after
 3        having been duly sworn, was
 4        examined and testified as follows:
 5                    -   -   -
 6              EXAMINATION
 7                    -   -   -
 8   BY MR. McCONNELL:
 9        Q.    Good morning, Dr. Flynn.  My
10   name is Bob McConnell.  I'm one of the
11   lawyers for the Motley Rice law firm and
12   we represent Mary Burnett.  I'm here to
13   take your deposition today.
14              We're on the phone -- I'm
15   not going to go through a list of
16   instructions, but we're on the phone, so
17   we should just be cognizant of waiting
18   for me to finish my question and I'll try
19   to wait for you to finish your answer,
20   and I think we can get through this
21   fairly easily.
22              Could you state your name
23   and your occupation for the record,
24   please?
```

Brian J. Flynn, M.D.

```
 1              A.    Yes.  I'm Dr. Brian J.

 2    Flynn.  My occupation is, I'm a urologist

 3    and specialist in female pelvic medicine

 4    and reconstructive surgery.  I'm a

 5    professor of surgery and urology at the

 6    University of Colorado in Aurora,

 7    Colorado.

 8              Q.    And what's your business

 9    address?

10              A.    My business address is 1635

11    North Aurora Court, Aurora, Colorado

12    80045.

13              Q.    And on the Mary K. Burnett

14    case, when were you first contacted to do

15    work on this case?

16              A.    Sometime in maybe January or

17    February of this year.

18              Q.    Okay.

19                    And what were you asked to

20    do?

21              A.    I was asked to serve as an

22    expert witness on the behalf of Ethicon

23    in this case.

24              Q.    And what specifically did
```

Brian J. Flynn, M.D.

1  that entail or what did you then go about

2  to do?

3          A.    They asked me to prepare an

4  expert report and to perform an IME on

5  Mrs. Burnett, so in order to do that,

6  that included review of the medical

7  records, preparation of a report,

8  physically performing the independent

9  medical evaluation.

10          I had already completed a

11  general report on TVT Secur, so that was

12  submitted, but that had been prepared

13  previously.

14          Q.    Now, you looked at Mrs.

15  Burnett's medical records, I take it.

16  What else did you review, if anything,

17  document-wise?

18          A.    Yes.  I reviewed expert

19  depositions of the physicians that are on

20  the plaintiff's team, Dr. Jerry Blaivas'

21  expert deposition.  I also looked at all

22  the pertinent medical records, looked at

23  some company documents, including the

24  IFU, patient brochures.  That's primarily

Brian J. Flynn, M.D.

1   what I did.

2        Q.    Did you look at any

3   depositions of treating physicians, Mrs.

4   Burnett's treating physicians?

5        A.    I did.  I looked at the

6   expert deposition of Dr. Gerald Shirk;

7   Dr. Ann Metzger; and also of one other

8   treater, Dr. Mindrup.

9        Q.    Okay.

10            And did you also look at

11  Mrs. Burnett's deposition?

12       A.    I believe I did look at that

13  deposition.  I don't remember that as

14  well, but I'm fairly certain I did look

15  at that.

16       Q.    And what documents have you

17  brought with you to the deposition?  Can

18  you describe those for the record,

19  please?

20       A.    So I have a large binder,

21  black binder, labeled "Dr. Flynn's

22  Case-Specific Plaintiff Mary Burnett."

23  And this is, you know, a medium-size

24  binder with at least 30 tabs in it.

Brian J. Flynn, M.D.

1                In the binder, that would

2     include my case-specific report, my IME

3     report, some pertinent medical records,

4     and then my reliance list.

5                In the front envelope in

6     that binder, there is a USB that's blue

7     and it has a tag on it.  It says "Flynn,

8     July 14th, 2016 Deposition, Burnett

9     Materials."

10          Q.    Okay.

11          A.    So that -- that's one item.

12     Would you like me to continue?

13          Q.    Well, you know, why don't we

14     -- for the record, I'd like to have that

15     marked as Exhibit 1 in its entirety.  And

16     I'm going to ask you about the -- your

17     expert opinions and also the examination

18     you did, so just so you know, those will

19     be the two documents specifically I'm

20     going to inquire on.

21                But I'd like to have that

22     binder that you just described marked as

23     Exhibit 1, including the USB device.  And

24     that's it for that binder, Doctor.

Brian J. Flynn, M.D.

```
1                    -   -   -
2              (Deposition Exhibit No.
3         Flynn-Burnett-1, "Dr. Flynn's
4         Case-Specific Plaintiff Mary
5         Burnett" Black Binder Containing
6         Reports, Records, and "Flynn, July
7         14th, 2016 Deposition, Burnett
8         Materials" USB, was marked for
9         identification.)
10                   -   -   -
11             MR. McCONNELL:  What else
12        did you bring?
13             THE WITNESS:  I have an
14        updated C.V. that was updated on
15        June 28th, 2016.
16             MR. McCONNELL:  Okay.
17             THE WITNESS:  I have an
18        invoice that had been prepared and
19        submitted in June of this year.
20             And I also have the AUGS
21        position statement in regards to
22        mid-urethral mesh slings for
23        stress urinary incontinence.
24   BY MR. McCONNELL:
```

Brian J. Flynn, M.D.

1        Q.    Anything else?

2        A.    That is it.

3              I have given a number of

4   depositions similar to this, so I

5   previously have submitted a list of

6   deposition and trial history.  I've

7   submitted a fee schedule in the past.

8   I've submitted e-mails in regards to

9   communications I've had with Ethicon in

10  these cases, so I didn't bring those

11  items, as I've submitted them in with

12  wave 1 depositions.

13             MR. McCONNELL:  For the

14        record, why don't we mark the

15        updated exhibit -- I'm sorry --

16        updated C.V. as Exhibit 2.

17                   -  -  -

18             (Deposition Exhibit No.

19        Flynn-Burnett-2, Curriculum Vitae

20        of Brian J. Flynn, M.D. Updated

21        6/28/16, was marked for

22        identification.)

23                   -  -  -

24  BY MR. McCONNELL:

Brian J. Flynn, M.D.

```
1              Q.    Doctor, I just can't read my
2     note.  For Exhibit 3, what was the next
3     thing you said after the C.V.?
4              A.    Invoice.
5                    MR. McCONNELL:  Okay.  We'll
6              do, the invoice will be 3.  And
7              the AUGS document will be 4.
8                          -   -   -
9                    (Deposition Exhibit No.
10             Flynn-Burnett-3, 6/16 Invoice, was
11             marked for identification.)
12                         -   -   -
13                   (Deposition Exhibit No.
14             Flynn-Burnett-4, AUGS Position
15             Statement, was marked for
16             identification.)
17                         -   -   -
18    BY MR. McCONNELL:
19             Q.    Doctor, I don't have the
20    invoice in front of me.  How many hours
21    have you spent on this -- on the Burnett
22    case?
23             A.    Let's see.  I've spent 18
24    hours.
```

Brian J. Flynn, M.D.

1    Q.    And what is your hourly

2    charge?

3    A.    It depends on the activity,

4    but it would range from $400 for record

5    review, $500 for preparation of the

6    report, IME at $550 an hour.

7    Q.    Okay.  And how about

8    deposition time?

9    A.    That's not included in this

10   report, but the hourly rate for that is

11   $600.

12   Q.    And I'm sorry.  Did you say

13   you've spent to date 18 hours?

14   A.    18 hours up until May 31st.

15   Q.    And since May 31st, which

16   was a month and a half ago, can you

17   ballpark how much time, if any, you've

18   spent on this case?

19   A.    Yes.  I've spent

20   approximately ten hours since then.

21   Q.    And what have you done in

22   those ten hours?

23   A.    I've reviewed depositions,

24   the ones I mentioned earlier, from Dr.

Brian J. Flynn, M.D.

1  Blaivas and others as they've come in,

2  and I have reviewed the medical records

3  once again, reviewed my report and my

4  IME.  I have met with Mr. Snell.

5          This deposition was going to

6  occur, I believe, last Thursday and so I

7  had prepared for that, but -- so those

8  were the activities.

9          Q.    You wrote out a formal

10  report and a formal IME.  Have you

11  written any other document as it pertains

12  to the Burnett case, including

13  handwritten notes or anything of that

14  nature?

15          A.    I had handwritten notes for

16  the IME on Mrs. Burnett.  I didn't bring

17  them.  I'm not in my home office.  I'm in

18  Philadelphia, as you know.

19          So I do have those.  I could

20  submit them at another date, but I didn't

21  bring that today.

22          MR. McCONNELL:  Okay.  I

23      think we -- I think for

24      completeness sake, we'd request

Brian J. Flynn, M.D.

1              that you do submit those to

2              counsel and they'll provide them

3              to us, I'm sure.

4    BY MR. McCONNELL:

5         Q.    Any other handwritten or --

6    any other writings that you've done on

7    this case that you haven't described or

8    aren't contained in Exhibit 1?

9         A.    No.

10        Q.    Doctor, can you turn to your

11   -- the document entitled "Independent

12   Medical Exam of Mary Burnett" with date

13   May 18, 2016, which I assume is included

14   in Exhibit 1?

15        A.    Yes.

16        Q.    Do you have that in front of

17   you?

18        A.    I do.

19        Q.    Okay.  I'm going to have a

20   series of questions about that.  The

21   first question I had was, the location is

22   office of Dr. Steven Geraghty.  Is that

23   your business address as well?

24        A.    No, that's Dr. Geraghty's

Brian J. Flynn, M.D.

1    business address.

2           Q.    Why did you perform your

3    exam of Mrs. Burnett at Dr. Geraghty's

4    office?

5           A.    Bowman and Brooke had

6    arranged for me to perform the IME there.

7    I don't have the exact question --

8    answer, but that's where I've done all

9    the IMEs that I've performed in this

10   litigation.

11          Q.    Is your office not capable

12   of holding an IME exam?

13          A.    No, they're not capable.

14          Q.    Why is that?

15          A.    It's not part of the

16   ordinary practice, so it's very difficult

17   to schedule there and to accomplish an

18   IME there.

19          Q.    Who is Dr. Steven Geraghty?

20          A.    I don't know him personally.

21   He's a family physician, family

22   practitioner, in Centennial, Colorado.

23          Q.    Now, did you interview Mrs.

24   Burnett as part of your medical exam?

Brian J. Flynn, M.D.

1           A.    I did.  That was the

2   majority of time spent with her, was

3   during the face-to-face encounter.

4           Q.    And approximately how long

5   was that interview?

6           A.    Well, the entire IME was one

7   hour, of which the interview part of that

8   was 80 percent of the time, so 50

9   minutes.

10          Q.    Okay.

11                Did you take any -- are

12  those the notes you referred to, the

13  handwritten notes?

14          A.    That's correct.

15          Q.    So you have handwritten

16  notes from that interview?

17          A.    Yes.  What I do is, with any

18  of the patients I see in my practice or

19  in the IME, I have a template, you know,

20  that has the key areas of the history and

21  physical, and then I fill in the blanks

22  with my handwritten notes and then after

23  that prepare the electronic note.

24          Q.    Was anyone else with you and

Brian J. Flynn, M.D.

1    Mrs. Burnett while you interviewed her?

2           A.    Yes, there was a medical

3    assistant from Dr. Geraghty's office.

4           Q.    And what was her role during

5    the face-to-face interview?

6           A.    She was there at the request

7    of the plaintiff.  Ordinarily, the

8    medical assistant would be there just for

9    the physical examination, but there was a

10   request made for her to be there for the

11   entire IME, so we honored that request.

12          Q.    And who specifically made

13   that request?

14          A.    I believe it came from Mrs.

15   Burnett's attorneys.

16          Q.    Now, as part of your

17   discussion or interview of Mrs. Burnett,

18   did she discuss any concerns she had

19   about further surgery with you?

20          A.    Yeah, we discussed the

21   surgeries that she had and what her

22   future prognosis or surgery -- you know,

23   what sort of things she would need to

24   have done.

Brian J. Flynn, M.D.

1          Q.    Did she say that she was

2   concerned or anxious or worried at all

3   about further surgery?

4          A.    Yes.

5          Q.    And what did you -- did you

6   have a reply to her about that or did you

7   have a discussion with her about that?

8          A.    I did.

9          Q.    And what did you say?

10         A.    I said that it wasn't part

11  of the IME for me to share with her my

12  opinions and prognosis and make

13  recommendations to her, so I informed her

14  that I wasn't going to discuss that with

15  her.

16         Q.    Did she bring that up to you

17  or did -- how did that topic even get

18  raised then?

19         A.    At the very end of the

20  encounter, similar to what would happen,

21  you know, in my everyday practice, she

22  asked what was wrong with her and what

23  needed to be done in order to address her

24  concerns.

Brian J. Flynn, M.D.

```
1          Q.    Did she discuss any concern

2    that she had about mesh potentially

3    causing damage to a partner in a sexual

4    way?

5          A.    We discussed her sexual

6    habits and her love life.  I don't

7    remember her specifically asking me if

8    there would be concerns about her

9    partner.

10          Q.    Well, what I asked was, did

11    she say she had concerns that the mesh

12    could do some damage to her partner in a

13    sexual encounter.

14          A.    I don't recall her asking me

15    that question.

16          Q.    And what do you recall about

17    your discussion of her sexual habits and

18    love life?

19          A.    She mentioned to me that she

20    was married three times; that she was

21    currently widowed; that her most recent

22    husband had died of bladder cancer and he

23    had his bladder removed.  He had a

24    urostomy.  And after that surgery, he was
```

Brian J. Flynn, M.D.

```
 1    unable to perform sex.  He was impotent.

 2              And she had not had a sexual

 3    encounter since 1993, and she is not

 4    dating anybody currently since the death

 5    of her third husband.

 6         Q.   How old is Mrs. Burnett?

 7         A.   Mrs. Burnett at the time I

 8    met her was 65 years of age.  It looks

 9    like she had a birthday ███████ after

10    I had met her, so she's 66, I believe, at

11    the time -- currently.

12         Q.   Can you turn to page 4,

13    Doctor, of your medical report or medical

14    exam?

15         A.   (Witness complies.)  Yes.

16         Q.   And in that, you list

17    various categories of examination that

18    you did under "Genitourinary"?  It's at

19    the top of the page.

20         A.   Yes.

21         Q.   What is estrogenization?

22    Where you say severe atrophy, what is

23    estrogenization?

24         A.   That's a comment that I make
```

Brian J. Flynn, M.D.

1   when examining the effects of estrogen on

2   the genitalia and on the vagina.

3             So, you know,

4   estrogenization would imply that there's

5   estrogen in the tissue, making the tissue

6   soft and supple, versus atrophic or dry

7   on the opposite end, and then there's

8   some patients that are in between.

9             So it's a comment reflecting

10  the -- my visualization of the effects on

11  estrogen on the female genitalia.

12        Q.   And severe atrophy, I'm

13  sorry, means what?

14        A.   Well, atrophy means a

15  shrinking of the tissue, and severe would

16  mean that -- you know, I would say mild,

17  moderate, and severe are the categories

18  that I would use, so that's a reflection

19  of genitalia that has not seen the

20  effects of estrogen in a very long time.

21        Q.   And further down, under

22  "Vagina," you make some findings.  There

23  was blue mesh exposed that -- and various

24  findings.  There's a paragraph of

Brian J. Flynn, M.D.

1    findings there.

2              And I guess my general

3    question is, can you describe how you

4    performed this examination and how did

5    you go about seeing things?  Did you

6    physically measure things?

7              Just basically describe the

8    process you took on this examination,

9    please.

10             MR. SNELL:  Object; form.

11             Go ahead.

12             THE WITNESS:  So after I

13        performed the history, then we

14        went into the physical exam

15        portion.  Specific to the

16        genitourinary exam portion of the

17        procedure, the patient is in a

18        lithotomy position, meaning she's

19        lying on her back with her legs in

20        stirrups.  The medical assistant

21        is standing next to me.  There's a

22        sheet overlying the patient's

23        thighs and knees, and I'm sitting

24        down.

Brian J. Flynn, M.D.

1            Initially, I will inspect

2      the external genitalia just with

3      my eyes and manually manipulate

4      the tissue; and then once the

5      external genitalia is inspected, I

6      will then ask permission to insert

7      a speculum or a finger into the

8      vagina to palpate, to feel the

9      tissue.  So the vagina part of the

10     examination is both with a clear

11     plastic speculum as well as

12     manually or digitally.

13            During that time, I'll ask

14     the patient to cough, to strain,

15     meaning a Valsalva maneuver, what

16     we call a cough stress test.

17     While I'm looking with the clear

18     speculum, I'm looking for any kind

19     of vaginal foreign body.  I'm

20     looking for the effects of

21     estrogen.  I'm looking for pelvic

22     organ prolapse, looking to see if

23     there's any evidence of any

24     malignancy.  I'm looking to see if

Brian J. Flynn, M.D.

1          there's a cervix.

2              So that's what I'm primarily

3          performing during that portion of

4          the examination.

5    BY MR. McCONNELL:

6          Q.    Okay.

7              Now, you noted, in that

8    paragraph, blue mesh.  What, if anything,

9    did that indicate to you?

10         A.    So mesh comes in a variety

11   of different colors, primarily clear mesh

12   or blue mesh.  I like to distinguish

13   whether it was a clear mesh or blue mesh.

14             Occasionally, we don't know

15   what type of mesh was implanted and so we

16   could infer from the color of the mesh

17   what type of mesh it is.

18             So I could clearly see that

19   it was blue and that it was a mesh.  I

20   could see that it was not a stitch.  I

21   can see that there was a knit of fibers.

22   I didn't use a ruler to measure the 5 by

23   9 millimeter exposure, but I know that

24   the width of my thumb is 10 millimeters

Brian J. Flynn, M.D.

1    in width, so sometimes that's a -- just

2    an easy way for me to use as a measuring

3    stick, so it was just slightly less than

4    the width of my thumb in its greatest

5    dimension, 9 millimeters; and then in the

6    opposite direction, it was half of that,

7    so 5 millimeters.

8            Q.    And what does the blue mesh

9    infer to you?

10           A.    The blue mesh, that it could

11   be a mesh from -- it could be an Ethicon

12   mesh.  Some of the Ethicon meshes are

13   blue.  Some of the original meshes, like

14   the original TVT, was clear, but TVT

15   Exact or TVT Secur are blue.  Boston

16   Scientific has blue meshes, so it

17   possibly could be a Boston Scientific

18   device.

19                American Medical Systems and

20   Bard Urology, Coloplast, others, the

21   majority of the other meshes are clear

22   meshes.  Some of the meshes may have more

23   than one color.  Maybe they have a blue

24   and clear fiber weave, so I'm just

Brian J. Flynn, M.D.

1    referring to simply the color of the

2    mesh.

3           Q.    And you also made a finding

4    of no pain.  How did you measure that?

5           A.    I used the pain scale that's

6    commonly utilized called the visual

7    analogue pain scale.  It's a widely

8    recognized score that physicians use when

9    assessing pain with patients.

10               I explained to the patient

11   ahead of time I'm going to assess your

12   pain.  Zero would mean no pain.  Ten

13   would mean the worst pain imaginable; and

14   then as I examine, I ask them to grade

15   the pain.

16          Q.    And 0 over 10, does that

17   indicate that Mrs. Burnett exhibited no

18   pain or relayed to you no pain during any

19   of your exam?

20          A.    That's correct.

21          Q.    Can you turn to page 5 under

22   "Assessment and Opinions," please?

23          A.    (Witness complies.)

24                Okay.

Brian J. Flynn, M.D.

1      Q.    Under "Vaginal Mesh

2  Exposure," you say that this would be

3  classified as a grade 2 complication.

4  What are the -- what are the range of

5  grade complications?

6      A.    I believe the grading system

7  goes from 1 to maybe 8.  The ones that I

8  commonly see in my practice would be 1,

9  2, 3, and 4.

10           So I'm familiar with the

11  grade 1 complication would be a patient

12  that had pain that was palpable over

13  their mesh, but there was no actual

14  exposure of the mesh.

15           A grade 2 would be that

16  there was an exposure of the mesh that

17  was less than 1 centimeter.  Grade 3

18  would be more than 1 centimeter.  Grade 4

19  is a mesh perforation into the lower

20  urinary tract, including the urethra and

21  the bladder.

22           Grade 5, 6, 7, 8, I'm less

23  familiar with as I don't really see those

24  in my practice.

Brian J. Flynn, M.D.

1       Q.    Are those -- is 5, 6, 7, 8

2    on the more severe end?

3       A.    Yeah.  So the grading system

4    goes from the least severe to the most

5    severe.

6       Q.    The -- now, you say, this is

7    easily treated with partial transvaginal

8    mesh excision.  What is the basis for

9    your opinion that this exposure is easily

10   treated?

11      A.    That would be based on my

12   education, based on my experience in

13   practice treating similar patients.  That

14   would be based on my review of the

15   medical literature.

16      Q.    But what specifically can

17   you point to as part of your examination

18   of Mrs. Burnett that allows you to reach

19   that conclusion?

20      A.    So if we go back to the

21   grading system, the lower the grade, the

22   easier to treat.  If the mesh, say, for

23   instance, was a grade 4 into the lower

24   urinary tract and you removed it, you

Brian J. Flynn, M.D.

1    would then have to repair the urinary

2    tract, in other words, you know, place

3    sutures in the urethra or the bladder to

4    fix a hole or opening.

5              Those are more time

6    consuming.  They require a catheter

7    afterwards.  There's a greater likelihood

8    of them developing stress urinary

9    incontinence afterwards.

10             Obviously, if it's eroding

11   or perforating into the GI tract, the

12   intestinal tract, that would be a much

13   harder one to fix.

14        Q.    Okay.

15        A.    So, you know, a vaginal wall

16   mesh exposure tends to be the simplest of

17   all the complications to treat.

18        Q.    And have you treated grade 2

19   complications in the past?

20        A.    I have.

21        Q.    And have they all been

22   easily treated?

23        A.    The overwhelming majority of

24   them.

Brian J. Flynn, M.D.

1        Q.    What are some examples of

2    grade 2 complications that aren't easily

3    treated?  What happened?

4        A.    That would be a patient that

5    had a recurrence of the exposure.  That

6    would be a patient that, you know, had

7    injury to the lower urinary tract during

8    the removal or had bleeding that

9    occurred.  Those things are more likely

10   to occur when removing larger pieces of

11   mesh or attempts at, you know, total or

12   complete mesh removal.

13            So the potential

14   complications depend a lot on how the --

15   how the surgery's done.

16       Q.    Now, did Mrs. Burnett have a

17   recurrence of exposure during any of her

18   treatment?

19       A.    I believe she initially had

20   an in-office mesh excision with Dr. Shirk

21   in 2008, so this would be considered a

22   recurrent mesh exposure.

23       Q.    And those fall into a

24   category of potentially not so easily

Brian J. Flynn, M.D.

1    treated, correct, or a complication?

2          A.     That's not correct.

3          Q.     Okay.

4                 Well, I think I asked you

5    previously what would be potential

6    complications and you said a recurrence

7    of exposure; correct?

8                 MR. SNELL:  Object;

9          misstates.

10                Go ahead.

11                THE WITNESS:  What you asked

12         me was, can you give me some

13         examples of which ones would be,

14         you know, harder to treat, that

15         would not be easy.  And that's a

16         big category.  Each one of those

17         is different.

18                Most physicians have moved

19         away from in-office mesh excision

20         or what's known as trimming

21         because that has been shown to be

22         ineffective.

23                So it depends on how the

24         initial patient was managed.  I

Brian J. Flynn, M.D.

1        know at least in my practice, the

2        overwhelming majority of the

3        patients have one excision and

4        don't require subsequent

5        excisions.

6               So this patient, if I

7        managed her, I could do this in a

8        one-hour outpatient procedure and

9        I would expect that there would be

10       less than a 5-percent chance of

11       her having a subsequent exposure.

12  BY MR. McCONNELL:

13       Q.    But, in fact, she has had a

14  subsequent exposure already in this case;

15  correct?

16       A.    Correct, or possibly

17  persistence.  I don't know if the problem

18  was ever, you know, managed in 2008.

19       Q.    And you also later on in

20  that paragraph decide that she may also

21  choose to live with chronic mesh

22  exposure; correct?

23       A.    Correct.

24       Q.    What are the risks of living

Brian J. Flynn, M.D.

```
 1   with chronic mesh exposure?
 2         A.    The main risk is, if there's
 3   symptoms that are attributable to the
 4   exposure, that they would continue.
 5         Q.    And what are those symptoms
 6   -- in Mrs. Burnett's case, what are those
 7   symptoms?
 8         A.    In Mrs. Burnett's case, she
 9   doesn't have any symptoms.  There's no
10   symptoms of the mesh exposure.
11         Q.    What if she were to become
12   sexually active?
13              MR. SNELL:  Object; form,
14         hypothetical.
15              Go ahead.
16              THE WITNESS:  If she would
17         become sexually active, there's a
18         possibility that either her or her
19         partner would experience
20         discomfort during sexual
21         intercourse.
22   BY MR. McCONNELL:
23         Q.    Okay.
24              In paragraph 2, "Recurrent
```

Brian J. Flynn, M.D.

1   Mixed Urinary Incontinence," do you see

2   that?

3           A.    I do.

4           Q.    About the third sentence in,

5   third or fourth sentence in, you say,

6   "Her SUI has been present since 2007, one

7   year before her TVT Secur procedure."

8                Now, is that a typo, Doctor?

9           A.    I don't believe so.  I

10  probably could have stated it a little

11  more clearly, but what I'm saying there

12  is that her SUI began a year before she

13  elected to have surgery for it.

14          Q.    And I may be reading it

15  wrong, but didn't -- wasn't her surgery

16  in 2007, in January?

17          A.    In January of 2007, she had

18  her surgery, so -- so, yeah, it should be

19  her SUI has been present since 2006, so

20  you were reading it correctly.  I should

21  have said her SUI's been present since

22  2006.

23          Q.    Okay.

24                You can point -- so that's a

Brian J. Flynn, M.D.

1    -- that is a typo.

2         A.    That would be a typo.

3         Q.    Okay.

4               And you can point to

5    something in her record that indicates

6    her SUI began in 2006?

7         A.    I would have to go back and

8    look at Dr. Shirk's notes, but I believe

9    he had been seeing her and Dr. Ann

10   Metzger had been seeing her prior to

11   January of 2007, so there would have been

12   an evaluation period leading up to the

13   surgery.

14        Q.    But under any circumstance,

15   we both agree her surgery for the mesh

16   implant was in January of 2007; correct?

17        A.    I'm going through the

18   medical records just to confirm the

19   surgery date, but I believe that that was

20   the date when I -- I reviewed the records

21   last.

22               So I'm looking at an

23   operative report here.  This is in my

24   binder under the first tab, TVT Secur,

Brian J. Flynn, M.D.

1  Gerald Shirk, January 26, 2007.  So,

2  yeah, that's the date of the surgery,

3  January 26, 2007.

4        Q.    So with that in mind, how

5  would you amend that statement, if at

6  all?

7        A.    The simplest way to amend it

8  was that she had incontinence that

9  existed sometime before 2007.

10       Q.    Now, later on in that

11 paragraph -- or the bottom of that

12 paragraph -- excuse me -- you say:

13 Surgical therapy may include

14 transurethral bulking agent, mid-urethral

15 sling, or pubovaginal sling.

16             Correct?

17       A.    Correct.

18       Q.    Now, are you recommending

19 Mrs. Burnett undergo additional surgery

20 after having spoken to her for an hour

21 about her concerns about future surgery?

22             MR. SNELL:  Object; form.

23             THE WITNESS:  No, I didn't

24       make recommendations to her.  What

Brian J. Flynn, M.D.

```
1           I recommended was that she have
2           her urodynamics repeated.  I don't
3           believe that that's been done
4           since in the preoperative
5           evaluation before her 2007
6           surgery.
7                So what I'm recommending is
8           that when you have a mixed
9           picture, meaning some complaints
10          of stress incontinence and some
11          complaints of urgency
12          incontinence, in a patient that's
13          had prior antiincontinence
14          surgery, what the AUA guidelines
15          would recommend is that this
16          patient undergo a urodynamic
17          evaluation to assess the type of
18          incontinence in order to
19          appropriately direct future
20          therapy.
21      BY MR. McCONNELL:
22          Q.    But you do list as a future
23      treatment option potentially surgical
24      therapy, including mesh -- mesh slings.
```

Brian J. Flynn, M.D.

1          A.     Yeah, I listed transurethral

2     bulking agents, mid-urethral sling which

3     is synonymous with mesh slings, and

4     pubovaginal sling.

5          Q.     Okay.  And you do list that

6     as a future option, even though you are

7     aware of Mrs. Burnett's concerns about

8     the mesh and future surgeries; correct?

9          A.     These are future options

10     that exist for patients with mixed

11     urinary incontinence, including Mrs.

12     Burnett.  It would require informed

13     discussion, reviewing the options with

14     her.  You'd have to look at how her

15     existing mesh exposure was managed.  All

16     of those things would have to come into

17     consideration.

18          Q.     But if she were your

19     patient, knowing her feelings, would you

20     still recommend future mesh surgery for

21     this patient?

22               MR. SNELL:  Object; form.

23               THE WITNESS:  It would

24          depend on how she would elect to

Brian J. Flynn, M.D.

1              have her existing exposure

2              managed.  That's the first

3              decision point.

4                   So I can't say what future

5              decisions I would make until --

6              the first issue listed in the

7              assessment/opinions number 1 would

8              need to be addressed before you

9              can make recommendations on number

10             2.

11   BY MR. McCONNELL:

12             Q.    In paragraph 3, you say in

13   the third or fourth sentence down, middle

14   of the paragraph:  Her UTIs are not

15   caused by the TVT Secur mesh or vaginal

16   mesh exposure.

17                  Do you see that?

18             A.    I do.

19             Q.    And can you give me the

20   basis for that statement?

21             A.    The basis for that statement

22   is, I don't see anything in the medical

23   record to support the TVT mesh being the

24   cause of her urinary tract infections.

Brian J. Flynn, M.D.

1     Q.    And what led you -- what

2   specifically leads you to that

3   conclusion?  You didn't see anything in

4   the medical records.  What do you mean by

5   that?

6     A.    I didn't see any information

7   on culture of the mesh or culture of the

8   urine that would implicate that the mesh

9   was the cause.

10           So, for instance, if the

11   urinary tract infections were always E.

12   Coli and someone had cultured the mesh

13   and that was E. Coli, well then, that

14   would suggest that possibly the mesh is a

15   cause.

16           If the mesh was perforating

17   into the lower urinary tract, that would

18   be more likely a cause.  That's not

19   what's occurring in this case.

20           So those opinions are based

21   on the type of IUGA complication.  So

22   this is a grade 2, so for grade 1, 2, and

23   3, I think it's much -- it's unlikely

24   that that would be the cause of the UTI.

Brian J. Flynn, M.D.

1                    If it's perforating into the

2    lower urinary tract, then that would be

3    more suggestive that that's the cause of

4    the UTI.

5                    Other considerations is, if

6    the mesh was causing urethral obstruction

7    and bladder incomplete emptying and a

8    need for clean intermittent

9    catheterization, then that story would be

10   more suggestive as being a cause.  That's

11   not occurring in this case; and I believe

12   when she saw Dr. Blaivas, he's ruled out

13   urethral obstruction as being a cause.

14                   So people that I see with

15   recurrent urinary tract infections due to

16   prior antiincontinence surgery, it's

17   usually someone that's using a catheter

18   or someone with a perforation into the

19   lower urinary tract, and she doesn't have

20   either of those.

21        Q.    Okay.

22                   Can you turn to your

23   opinions regarding Mary Burnett?  It's a

24   separate document.

Brian J. Flynn, M.D.

```
 1              A.    (Witness complies.)  Okay.

 2              Q.    On number 12 -- these are

 3    all numbered, the paragraphs -- paragraph

 4    number 12, you state that mesh exposure

 5    at three months' postop is most likely

 6    due a technical error and not a product

 7    defect.

 8                    Do you see that?

 9              A.    I do.

10              Q.    And what do you mean by a

11    technical error in that statement?

12              A.    Technical error would imply

13    that there's wound failure, so her wound

14    failed or what we call healing

15    abnormalities.

16                    But what I see ordinarily in

17    my surgical practice, regardless of the

18    location of the incision, when the

19    incision breaks down and the underlying

20    tissue or foreign body becomes exposed,

21    then that's usually related to a stitch

22    breaking or not enough stitches being

23    placed or tension on the incision.  All

24    of these things would fall under the
```

Brian J. Flynn, M.D.

1    broad category of wound failure or

2    technical failures.

3         Q.    Did you see any of that in

4    Mrs. Burnett's case?

5         A.    I believe when Dr. Gerald

6    Shirk had performed the postop

7    examination early on, he immediately

8    noted a mesh exposure, so, yes, I think

9    he saw that the wound had separated and

10   the mesh was exposed.

11        Q.    And the mesh exposure was

12   caused by the mesh implant; correct?

13             MR. SNELL:  Object; form.

14             THE WITNESS:  No, that's not

15        correct.

16   BY MR. McCONNELL:

17        Q.    Well, if there had been no

18   mesh implant, would there be a mesh

19   exposure?

20        A.    The word mesh exposure,

21   yeah, you have to have mesh to have an

22   exposure.  But there's many causes of

23   mesh exposure, not just the mesh so --

24        Q.    Right.  But to start at the

Brian J. Flynn, M.D.

1    beginning, if there's no mesh, there's

2    not going to be any mesh exposure.  You'd

3    agree with me on that; correct?

4          A.    Correct.

5          Q.    Now, did you agree with Dr.

6    Shirk that Mrs. Burnett was an

7    appropriate candidate for a mesh implant?

8          A.    There are a few things in

9    the medical record that aren't clear

10   preoperatively, but at least from what

11   was available to me or what was performed

12   by Dr. Shirk, it did seem like she was a

13   reasonable candidate.

14         Q.    And do you agree that Dr.

15   Shirk followed proper surgical procedure

16   in implanting the mesh into Mrs. Burnett?

17         A.    Let me flip to his operative

18   report here.

19         Q.    Okay.

20         A.    I don't recall reading

21   anything unusual in the operative report.

22   It's a one-paragraph report.

23               He made a 1 1/2 inch

24   incision into the vaginal mucosa.  He

Brian J. Flynn, M.D.

```
1    created a dissection plane 2 centimeters

2    deep.

3              There's not a lot of detail

4    on how he placed the TVT Secur.  It just

5    says the Secur was placed in the U

6    position.

7              I don't see anything that's

8    standing out at me, but without having

9    been there, there's just not a whole lot

10   of detail in this report.

11        Q.   So you have no reason to

12   opine that Dr. Shirk did not follow

13   proper surgical procedure in this

14   implant; is that correct?

15        A.   That's correct.

16        Q.   Number 13, paragraph 13, Dr.

17   Flynn --

18        A.   Yes.

19        Q.   -- now, do you recall -- you

20   mentioned Dr. Metzger feeling a sharp

21   edge.  And you reviewed her deposition;

22   correct?

23        A.   I did.

24        Q.   Do you recall her reaction
```

Brian J. Flynn, M.D.

```
1    to how -- to when she felt the mesh?

2              MR. SNELL:  Object; form.

3              THE WITNESS:  Recall her

4         reaction?  I believe that, you

5         know, she made Mrs. Burnett aware

6         of what she felt.  I believe that

7         she had said in her deposition

8         that it cut her glove, is a

9         comment that I read in one of the

10        depositions, I believe.

11   BY MR. McCONNELL:

12        Q.    And that she found the

13   sharpness of the mesh alarming?  Do you

14   recall that?

15        A.    I do.

16        Q.    Does any of that testimony

17   of Mrs. Burnett's treating physician

18   factor into your opinion as to -- or any

19   of your opinions in this case?

20        A.    Well, certainly I reviewed

21   Dr. Metzger's notes in detail and her

22   deposition and her interactions with Mrs.

23   Burnett, so, yes, that affects my

24   opinions.  Dr. Metzger has been seeing
```

Brian J. Flynn, M.D.

1    this patient for a number of years.

2         Q.    And in what way does it

3    affect your opinion?

4         A.    It affected my opinion to

5    the point that I included this in my

6    report.  You know, paragraph number 13

7    describes that finding that she made, so

8    it was significant enough that I elected

9    to put it in my report.

10        Q.    Did it affect your opinion

11   in this case in any other way other than

12   what you've described in paragraph 13?

13        A.    I struggled a little bit

14   with her description of the location.

15   Maybe she misstated or corrected this in

16   her deposition, but at least in her

17   medical record, she said 9 o'clock in the

18   vaginal vault.

19             The vaginal vault is what we

20   would consider the apex of the vagina

21   where the cervix was.  That's some 13

22   centimeters from the vaginal introitus.

23             So, typically, a mesh at the

24   mid-urethra would be no more than 2

Brian J. Flynn, M.D.

1  centimeters from the urethral meatus, so

2  I was especially surprised by the

3  location when she said that she felt

4  something sharp at the vaginal vault.

5  That would lead me to believe that maybe

6  she was feeling the vaginal cuff scar or

7  that she was feeling something else.

8           She said it felt like mesh,

9  but she didn't definitively say it was

10  mesh.  She didn't call it a blue mesh.

11  She didn't comment on the color of the

12  mesh.  She didn't mention if she can

13  visualize it with a speculum.

14           So I -- that's what was

15  surprising to me, is just the location.

16       Q.    But you don't have any doubt

17  that what she felt was the mesh; correct?

18           MR. SNELL:  Object;

19       misstates.

20           THE WITNESS:  That's

21       incorrect.  I do have some doubts,

22       because I believe she was feeling

23       the vaginal cuff; and unless the

24       mesh was placed at the vaginal

Brian J. Flynn, M.D.

```
 1            cuff, which would have to have
 2            been a surgical error by Dr.
 3            Shirk, the mesh can't move from
 4            the mid-urethra to the vaginal
 5            cuff.
 6                 So either Dr. Metzger meant
 7            to say the anterior vaginal wall
 8            when she said vaginal vault or Dr.
 9            Shirk placed the mesh at the
10            vaginal apex, which I know he
11            didn't because when I examined
12            Mrs. Burnett, I can see the mesh 1
13            centimeter from the urethra.  I
14            commented on that in my IME.
15                 So I know if you're 1
16            centimeter from the urethra, you
17            can't be at the vaginal vault at
18            the same time.
19     BY MR. McCONNELL:
20            Q.   So with that explanation,
21     what do you think it is most likely about
22     what Dr. Metzger felt?
23                 MR. SNELL:  Object; form,
24            asked and answered.
```

Brian J. Flynn, M.D.

```
 1              THE WITNESS:  I'm not
 2         certain.  I know that she's
 3         feeling some scar tissue -- that
 4         could be scar tissue from her
 5         hysterectomy -- or she didn't
 6         document in the record correctly
 7         where she was feeling the mesh or
 8         -- I don't remember what she said
 9         in her deposition about that
10         comment.  I'd have to go back and
11         reread that.
12   BY MR. McCONNELL:
13         Q.   Well, scar tissue wouldn't
14   almost cut her -- or wouldn't cut her
15   glove, would it?
16         A.   Could scar tissue cut a
17   glove?  No, I don't believe so.
18         Q.   Could mesh cut a glove?
19         A.   I think that's extremely
20   unlikely.  It's never happened to me.
21         Q.   Of the two, what would be
22   more likely to cut a glove, scar tissue
23   or mesh?
24         A.   I think they would be
```

Brian J. Flynn, M.D.

1    equally -- both of them would be equally

2    unlikely.

3              Q.    But of the two, which would

4    be more likely to cut a glove?

5              MR. SNELL:  Object; asked

6         and answered.

7              THE WITNESS:  I think it's a

8         tie.  I think -- either scenario

9         has never happened to me in

10        thousands of pelvic exams.  And

11        I've examined a number of women

12        with mesh exposures.  I've

13        surgically removed exposed mesh.

14        I've never had a glove cut from

15        mesh.

16   BY MR. McCONNELL:

17             Q.    But Dr. Metzger did;

18   correct?

19             MR. SNELL:  Object; form,

20        foundation now.

21             MR. McCONNELL:  At least

22        according to her testimony.

23             MR. SNELL:  Same objections.

24             THE WITNESS:  I'm not going

Brian J. Flynn, M.D.

1          to agree to that.  She stated that

2          she cut her glove, but I'm not

3          certain she was feeling mesh.

4   BY MR. McCONNELL:

5          Q.    But you don't know what she

6   was feeling; is that what you're saying?

7          A.    If it was at the vaginal

8   apex, she was not feeling the mesh.  So,

9   you know, I'd have to hear her answer to

10  that question to know what she was

11  feeling, but at least according to the

12  medical record, it states that she was

13  feeling at the vaginal vault.

14          That's not the location of

15  the mesh.  Based on my exam, based on Dr.

16  Blaivas' exam, based on Dr. Shirk's, Dr.

17  Mindrup's, the mesh has never been at the

18  vaginal vault.

19          Q.    But you know according to

20  her testimony which -- you said that she

21  felt -- she was describing the mesh and

22  she felt it was alarming that the mesh

23  cut her glove; correct?

24          MR. SNELL:  Object; lacks

Brian J. Flynn, M.D.

1              foundation, form.

2                   THE WITNESS:  That's what

3              she stated in the deposition, but

4              I don't believe she's ever

5              reconciled that with the statement

6              of being at the vaginal vault.

7    BY MR. McCONNELL:

8         Q.     In numbered paragraph 32,

9    you state in the middle of that paragraph

10   that Dr. Blaivas hypothesizes that there

11   could be mesh perforation into the

12   bladder or urethra; correct?

13        A.     Correct.

14        Q.     Did Dr. Blaivas in his

15   report or deposition say he was

16   hypothesizing?

17        A.     I don't believe he used the

18   word "hypothesis," but he implied that

19   the mesh could be inside the lower

20   urinary tract, and there's no foundation

21   for that.  That's speculation.

22        Q.     Well, according to you, why

23   does he -- in his opinion, why does he

24   believe there could be mesh perforation

Brian J. Flynn, M.D.

1    into the bladder or urethra?

2              MR. SNELL:  Object; form.

3              THE WITNESS:  I don't

4         believe that was his opinion.  I

5         believe he was listing a

6         differential diagnosis of all the

7         things that could possibly be

8         occurring, but I don't believe

9         that he was implying that.

10             What we do know is that her

11        most recent cystoscopy, less than

12        two years ago, performed by Dr.

13        Mindrup, her urologist, had showed

14        that there was no perforation into

15        the lower urinary tract.

16   BY MR. McCONNELL:

17        Q.    In paragraph 34, you say you

18   reviewed Dr. Rosenzweig's report and you

19   disagree with his opinions that TVT Secur

20   and laser cut mesh are defective

21   products.  And you say:  Laser cut mesh

22   mid-urethral slings are commonly used

23   today by myself and most pelvic surgeons.

24             Did I read that correctly?

1         A.     You did.

2         Q.     Therefore, are you saying

3    that a product can't be defective because

4    it's commonly used?

5         A.     There's two statements

6    there.  It says, laser cut mid-urethral

7    slings are used commonly today by myself

8    and most pelvic surgeons.  So I think

9    that statement is very straightforward.

10   And that's true.  If you look at the AUGS

11   statement that I brought, if you look at

12   surveys of their members, if you ask me

13   questions about what I use in my

14   practice, most pelvic floor surgeons

15   continue to perform mid-urethral slings.

16   Most mid-urethral slings 2016 are laser

17   cut.

18              The first statement reflects

19   to -- just that laser cut mesh is

20   defective, and I don't believe laser cut

21   mesh is defective.

22        Q.     But the second statement

23   comes after the first statement and my

24   question is, is it your opinion that a

Brian J. Flynn, M.D.

1    product can't be defective because it's

2    being commonly used?  Is that what you

3    meant to say there?

4                   MR. SNELL:  Object; form.

5                   Go ahead.

6                   THE WITNESS:  That's not

7           what I meant to say and that's not

8           what I said.  It's not a

9           compounded sentence.  There are

10          two independent statements.  So --

11   BY MR. McCONNELL:

12          Q.    One following the next in

13   the same paragraph.

14          A.    Yeah.  If a mesh is used

15   commonly, I would say it's very unlikely

16   to be defective if it's been on the

17   market for many years and used by 95

18   percent of AUGS members who have, you

19   know, tens of thousands of years of

20   combined experience using these products,

21   performing these surgeries.

22                   So, you know, I would say

23   that it's a lot less likely compared to,

24   say, a new product that we have little or

Brian J. Flynn, M.D.

1    no information on.

2         Q.    Okay.

3              In paragraph 35, you discuss

4    -- you attribute the exposure to

5    estrogen/hormonal deficiency; correct?

6         A.    Correct.

7         Q.    Doctor, do most women as

8    they age experience vaginal atrophy?

9         A.    Most postmenopausal women

10   experience vaginal atrophy.

11        Q.    And that's a natural

12   occurrence?

13        A.    That's a natural occurrence

14   with aging.

15        Q.    And the mesh implant is a

16   permanent implant?

17        A.    It's meant to be permanent,

18   yes.

19        Q.    Would you therefore expect

20   that mesh exposure in most women with

21   this type of permanent implant as they

22   age?

23              MR. SNELL:  Object; form.

24              THE WITNESS:  Not

Brian J. Flynn, M.D.

1          necessarily, no.

2   BY MR. McCONNELL:

3          Q.    And why not, presuming --

4   with the understanding that vaginal

5   atrophy occurs in most women naturally

6   and that the mesh is a permanent implant?

7          A.    Well, if you look at the

8   exposure rate in the medical literature

9   for the TVT Secur device, most would

10  agree that it's less than 5 percent,

11  other reports that it's even lower than

12  that, 1.5 percent.

13              And so if you just look at

14  the body of literature that's out there,

15  most women are not experiencing mesh

16  exposures, and a large percentage of the

17  women that have mesh implanted are

18  postmenopausal.

19         Q.    Are you saying to a

20  reasonable degree of medical certainty

21  that mesh exposure, in Mrs. Burnett now,

22  is not caused by a defect in the TVT

23  Secur mesh?

24         A.    That's correct.

Brian J. Flynn, M.D.

1          Q.    On the next page, paragraph

2    37, you say Mrs. Burnett -- Mrs. Burnett

3    has no symptoms directly attributed to

4    the TVT Secur mesh exposure.

5               But what about her anxiety

6    or stress that she expressed to you?

7    Would you consider that to be a symptom

8    of the mesh exposure?

9          A.    I don't recall her voicing a

10   significant amount of anxiety to me

11   during the IME.  I don't believe she's on

12   any antianxiety pills or seeking

13   treatment for anxiety, so I'm not clear

14   on the anxiety that you're talking about.

15         Q.    Well, having interviewed

16   her, did she have any concern whatsoever

17   about having mesh exposure in her body?

18   Was it your recollection she stated

19   anything of that nature?

20         A.    She had concern.  That's

21   very different than anxiety.

22         Q.    What was her concern?

23         A.    Her concern would be what

24   the future holds for her and what

Brian J. Flynn, M.D.

1    treatment options are available to her.

2           Q.    Would you consider that

3    concern to be a symptom attributed to her

4    TVT Secur mesh exposure?

5           A.    No, I don't.  Symptoms -- I

6    describe symptoms as physical symptoms,

7    so vaginal discharge, vaginal bleeding,

8    burning, dyspareunia, those are what

9    would be considered local symptoms,

10   symptoms located where the complaint is.

11              And then there's what we

12   refer to as systemic symptoms, that is,

13   the system's response to the exposure,

14   fever, chills, nausea, vomiting.  Those

15   things are things that we describe as

16   systemic symptoms.

17              I don't think people -- a

18   concern is a reaction.  That's not a

19   symptom, so that's the way the patient

20   processes the information at hand.

21          Q.    Well, then you'd agree that

22   Mrs. Burnett has a reaction that can be

23   directly attributed to the TVT Secur mesh

24   exposure; correct?

Brian J. Flynn, M.D.

1   A.   I believe that she has

2 concern about it.  She's been through a

3 number of IMEs.  She's seen a number of

4 experts.  She's met with her primary care

5 doctor about it.

6   But I don't believe she's

7 voiced any anxiety to Dr. Metzger, her

8 long-term physician, or to Dr. Mindrup,

9 her urologist.  She's never been

10 insistent that she requires surgery.

11   To me, she seems to be

12 behaving appropriately based on the local

13 complaints that she has.

14   Q.   In paragraph 38A, you say:

15 Mesh exposure has been estimated to occur

16 in only 2.0 to 4.7 percent of patients

17 receiving the TVT Secur.  And you

18 reference an article on that.

19   In those situations or in

20 those circumstances, what is the reason

21 for the mesh exposure?

22   A.   I don't believe the authors

23 in a meta-analysis or systematic review

24 give a reason.  They may mention in the

Brian J. Flynn, M.D.

1    discussion some of the potential causes,

2    but each one of these is different, so I

3    wouldn't say there's one reason why

4    there's a mesh exposure.  There's

5    multiple reasons why mesh can be exposed.

6           Q.    Now, is Ms. Burnett

7    complaining about dyspareunia?

8           A.    She's not.

9           Q.    But that's -- you cite that

10   or you list dyspareunia in 38B; correct?

11          A.    I do.

12          Q.    And why do you do that?

13          A.    Because she claims that she

14   had the following injuries:  vaginal mesh

15   exposure, stress urinary incontinence,

16   urinary tract infections.

17                And I think that oftentimes

18   plaintiffs will complain of dyspareunia

19   as a result of their mesh exposure, so

20   although she hasn't complained about

21   that, it doesn't mean that she won't in

22   the future.

23          Q.    Did you list any other

24   problems that she may encounter in the

Brian J. Flynn, M.D.

1    future in your report?

2         A.    De novo overactive bladder

3    is listed, vaginal scarring, I listed.

4    So there was a few others beyond the

5    three that were on her complaint form.

6         Q.    In paragraph 39 on the next

7    page, you state:  I disagree with Dr.

8    Blaivas on the cause of plaintiff's

9    complaints as the published medical

10   literature on the use of polypropylene as

11   a whole refutes his opinion.

12              And can you give me a basis

13   for that statement?  What literature are

14   you referring to?

15        A.    I'm referring to the Schimpf

16   meta-analyses.  There's multiple

17   meta-analyses that he has performed.  The

18   TVT Secur registry, the professional

19   statements from the various medical

20   societies, the Cochran reviews.

21              There's well over a hundred

22   RCTs based on TVT mesh that really do not

23   support Dr. Blaivas' opinions that the

24   mesh is defective.

Brian J. Flynn, M.D.

1      Q.    And you further on in that

2  paragraph list, there's no indication of

3  degradation, roping, curling, particle

4  loss, fraying, contraction, or any other

5  defect alleged by Dr. Blaivas.

6           Do you see that?

7      A.    I do.

8      Q.    And you say there was no

9  evidence in your exam of such things?

10     A.    Correct.

11     Q.    And what, if anything, in

12 addition to how you -- what you've

13 already described as your exam did you do

14 to rule out or to not find any of those

15 such things?

16     A.    Well, I reviewed Dr.

17 Blaivas' IME and I reviewed Dr. Ann

18 Metzger's medical records, Dr. Shirk's

19 medical records, Dr. Mindrup's medical

20 records.  So in addition to my own IME, I

21 looked at plaintiff expert reports and I

22 looked at treating physician reports, and

23 none of the physicians mention

24 degradation, roping, curling, or particle

Brian J. Flynn, M.D.

1  loss, or fraying, or contracture in their

2  physical exams or in their operative

3  reports.

4            There's no pathology report

5  that I'm aware of in this case.  There

6  was office trimming that was performed,

7  so there was no actual mesh explantation.

8  So that's what that's based on.  There's

9  no pathology report.  There's no picture.

10  There's nothing documenting any of these

11  alleged product defects.

12       Q.    Now, you're not an expert on

13  warnings; correct?

14            MR. SNELL:  Object; form.

15            MR. McCONNELL:  I'm sorry?

16            THE WITNESS:  I have

17       expertise in looking at warnings

18       in IFUs, patient brochures.

19  BY MR. McCONNELL:

20       Q.    I'm sorry, Doctor.  You have

21  expertise in -- can you repeat that

22  answer?  I --

23       A.    Yeah, I have expertise in

24  reviewing warnings, such as the FDA

Brian J. Flynn, M.D.

1   warning, which would be more properly

2   stated as a public health notification

3   that occurred in 2008.  I wrote a

4   response; that the AUA asked me to write

5   a response on their behalf in 2008 in

6   their update series.  So I believe that I

7   have expertise in warnings.

8           I've looked at what the FDA

9   documents had shown.

10      Q.    Well, you haven't done any

11  academic study or you haven't written any

12  literature on the history of warnings on

13  medical products or on any type of device

14  or product, have you?

15          MR. SNELL:  Object; form.

16          THE WITNESS:  In my 2008 --

17          2010 -- excuse me -- AUA update,

18          there's a number of paragraphs on

19          how products are cleared by the

20          FDA, what the 510(k) approval

21          process is.  I have -- I'm very

22          familiar with that process.

23          I didn't have a separate

24          publication, but there's a whole

Brian J. Flynn, M.D.

1              section on reviewing how the FDA

2              clears products, and I have been

3              very familiar with documents that

4              the FDA uses as guidelines for

5              clearing products.

6    BY MR. McCONNELL:

7          Q.    And how did you come about

8    that?  Did you do any -- did you take any

9    courses?  Did you do any academic

10   studying?  Did you do any literature

11   research or how did you come up with

12   those paragraphs that you reference in

13   the year 2010 response?

14         A.    Well, Ryan Terleki, who was

15   my fellow at the time, him and I wrote

16   the article together.  We had

17   communication with the FDA about the

18   warning and they immediately corrected us

19   and said they didn't put out a warning,

20   it was a public health notification.

21              And then through our

22   literature review on PubMed, we came up

23   with articles that we cited in the

24   update, and so we looked at those

Brian J. Flynn, M.D.

1   articles on how medical devices are

2   cleared.

3           I have prepared lectures on

4   this topic, so I've been reviewing this

5   for a number of years.  I've shared the

6   FDA public health notifications with my

7   patients.  I've looked at position

8   statements from IUGA and AUGS,

9   round-table discussions of experts in

10  regards to the implications of the FDA

11  public health notification.

12          So I feel I've done my

13  research on this topic.

14      Q.    And those are your criteria

15  for calling yourself an expert on

16  warnings.  Am I right?

17      A.    That's correct.

18      Q.    At the end of -- on page 6,

19  towards the end of paragraph 42, you say:

20  The IFU did not in my opinion need to

21  warn about the management of

22  complications or, quote, the difficulty

23  and risks involved in removing the

24  device, because those are also well-known

Brian J. Flynn, M.D.

1    to pelvic floor surgeons.

2              Do you see that?

3         A.    I do.

4         Q.    Is it your opinion, Doctor,

5    that there is no need to warn when people

6    are generally aware of a risk?

7         A.    It's my opinion and it's

8    also the opinion of the FDA.  The FDA has

9    guidelines for manufacturers looking at

10   prescription devices that they

11   specifically itemize when you need to

12   warn.

13             And if something is

14   considered public knowledge that a

15   reasonable physician would know and be

16   aware of, that you don't need to warn of

17   that because it's not unique to the

18   product.

19             MR. McCONNELL:  Give me one

20        minute.

21             (Pause.)

22             MR. McCONNELL:  Doctor, I

23        think those are all the questions

24        I have.  Thank you very much.

Brian J. Flynn, M.D.

1              THE WITNESS:  Thank you.

2                    -   -   -

3                  EXAMINATION

4                    -   -   -

5    BY MR. SNELL:

6         Q.    Doctor, I just have a few

7    follow-up questions, and I'm going to

8    start from the back and work -- work

9    backwards actually.

10             You just mentioned

11   regulations that you're aware of

12   concerning no need to warn when a

13   reasonable physician would have the

14   awareness or knowledge of something that

15   was common across different surgeries or

16   devices; is that correct?

17        A.    That's correct.

18        Q.    And part of what you're

19   relying on, is that the CFR, the Code of

20   Federal Regulations, on labeling, 801.109

21   - Prescription Devices, where it

22   discusses information that may be omitted

23   from the labeling if the information is

24   commonly known to practitioners licensed

Brian J. Flynn, M.D.

1    by law to use the device?

2                    MR. McCONNELL:  I'll object.

3                    THE WITNESS:  That's

4          correct.

5    BY MR. SNELL:

6          Q.    And the practitioners

7    licensed to use this device, TVT Secur,

8    would that be talking about pelvic floor

9    surgeons like yourself?

10         A.    Yes.

11         Q.    You were asked questions --

12   and let's turn, if you would, to your

13   report, page 13 -- I'm sorry -- your

14   report at page 1, paragraph 13.

15         A.    (Witness complies.)

16         Q.    Do you recollect discussing

17   with plaintiff's counsel the issue about

18   Dr. Metzger who claimed she felt a sharp

19   edge in the vaginal vault which felt like

20   mesh?

21         A.    I do recall.

22         Q.    Now, I have Dr. Metzger's

23   testimony here.  And beginning at page

24   22, line 23, she's asked about that

Brian J. Flynn, M.D.

1    bimanual examination.

2              Do you see that?

3         A.    I do.

4         Q.    And did she say that she

5    found that sharp edge down at the

6    mid-urethra portion of the vagina or at

7    the vaginal vault?

8         A.    It says:  A very, very sharp

9    edge at the 9 o'clock in the vaginal

10   vault that felt like mesh, and I remember

11   I almost cut my finger and I took my

12   glove off to look.

13        Q.    And then she was asked again

14   about whether this feeling was at the

15   vaginal vault or somewhere else.  And

16   what did she testify as to whether it was

17   at 9 o'clock at the vaginal vault, page

18   23, line 6?

19        A.    It says:  You said it was at

20   the 9 o'clock in the vaginal vault.

21   Answer:  That's what it felt like, yes.

22             So she's agreeing to the

23   question that it was at 9 o'clock and at

24   the vaginal vault.

Brian J. Flynn, M.D.

1          Q.    And then they asked her --

2    at page 23, lines 17 down through 20,

3    does she describe essentially how large

4    of an area this was?

5          A.    She did.  She said:  I think

6    it felt like almost 2 centimeters.

7          Q.    And on that topic of whether

8    she thought it was mesh, she was asked:

9    Have you felt mesh exposure before?

10              And line 25, she says:  I

11   don't recall actually ever feeling mesh

12   like -- or, you know, there could be

13   maybe one person, but it was just kind of

14   intertwined within the vaginal vault, but

15   never something this sharp.

16              Do you see that?

17         A.    I do.

18         Q.    Page 25, lines 14 down --

19              MR. McCONNELL:  Counsel, for

20         completion, can you just read up

21         the page to line 11 on page 25?

22              MR. SNELL:  No, I mean, you

23         can do that, counsel.  I'm just

24         asking him about the vaginal

Brian J. Flynn, M.D.

1           vault.

2    BY MR. SNELL:

3           Q.    Page 25, beginning at line

4    14, she was asked the question and does

5    she state whether or not she was actually

6    cut that day?

7           A.    She said:  No, I mean -- I

8    mean, I just remember I was not cut that

9    day, but it was sharp, so I thought I

10   was.

11          Q.    And then at page 61 -- this

12   was the examination by one side -- so so

13   far, where exactly was this feeling

14   located, at the area where the sling

15   would be or at the vaginal vault?

16          A.    Are you referring to my exam

17   or Dr. Metzger's exam?

18          Q.    Dr. Metzger's exam, as well

19   as her testimony, sworn testimony, about

20   where this feeling was based on her exam.

21               MR. McCONNELL:  Objection.

22               THE WITNESS:  So based on

23          her exam and her testimony, she

24          says that it was at the vaginal

Brian J. Flynn, M.D.

1          vault.

2     BY MR. SNELL:

3          Q.    At page 61, now she was

4     asked again about the conversation she

5     had with Mrs. Burnett about the findings

6     of the sharp edge in the vaginal vault.

7     Do you see that?

8          A.    I do.

9          Q.    And the answer was:  Uh-huh.

10               Is that correct?

11         A.    That's correct.

12               MR. McCONNELL:  Objection.

13    BY MR. SNELL:

14         Q.    So the evidence in this

15    case, Doctor, can you tell us whether Dr.

16    Metzger, based on her exam, her record,

17    and her testimony, indicates that she

18    found this area -- where it was within

19    the vagina?

20         A.    Based on Dr. Metzger's exam

21    and testimony, it was at the vaginal

22    vault.

23         Q.    And you testified that the

24    sling is very far distance away from the

Brian J. Flynn, M.D.

1    vaginal vault; is that correct?

2         A.    That's correct.

3              MR. McCONNELL:  Objection.

4              THE WITNESS:  Yes, that's

5         correct.

6    BY MR. SNELL:

7         Q.    Based on your exam of the

8    plaintiff, where was the sling?

9         A.    The sling was 1 centimeter

10   to the right of the urethral -- of the

11   urethra.  I felt a 5 by 9 millimeter

12   exposure on the right side.  That's on

13   the anterior vaginal wall, underneath the

14   urethra, the bladder.

15             It's certainly not the

16   vaginal vault.

17        Q.    And do you have an opinion

18   as to whether whatever it was that Dr.

19   Metzger felt at the vaginal vault,

20   whether that was mesh from the TVT Secur?

21        A.    I do.

22        Q.    And what is that opinion?

23        A.    That it was not TVT mesh.

24   That was just a vaginal cuff scar.

Brian J. Flynn, M.D.

1      Q.    And, anatomically, is it

2  even possible that -- based upon your IME

3  exam, that the TVT Secur mesh could have

4  been up in the vaginal vault at the time

5  Dr. Metzger reported finding this

6  sensation?

7      A.    Yeah, it's not possible

8  based on my exam, based on Dr. Blaivas'

9  exam, Dr. Mindrup, and Dr. Shirk.  None

10  of the other treaters or experts had ever

11  noted the mesh to be at the vaginal

12  vault.

13      Q.    And because I believe

14  plaintiff's counsel represented that the

15  glove was actually cut, based upon Dr.

16  Metzger's sworn testimony, did she

17  actually have her finger or glove cut?

18      A.    She mentioned that she was

19  concerned, so she took her glove off to

20  see if her finger was cut and, in fact,

21  it was not.

22          MR. McCONNELL:  And I'm

23          going to object to plaintiff's

24          counsel's representation.  I was

Brian J. Flynn, M.D.

1          repeating what Dr. Flynn said for

2          the record.

3    BY MR. SNELL:

4          Q.    Now, you mention that you've

5    done a general TVT Secur report?

6          A.    I have.

7          Q.    Do you incorporate that and

8    the bases and data set forth in that

9    report into your case-specific report in

10   this case?

11         MR. McCONNELL:  I'm going to

12         object.  This is a case-specific

13         deposition, not a general

14         deposition.

15         MR. SNELL:  You can answer.

16         THE WITNESS:  Yes, I

17         mentioned that when I went on the

18         record earlier in the deposition,

19         in terms of the number of hours I

20         worked on this case, I had

21         prepared a TVT Secur report.

22              I didn't include those hours

23         in preparing this report, but

24         certainly it affected my opinions

Brian J. Flynn, M.D.

```
1              in this report, especially in

2              response to the complaints against

3              the device alleged by Dr.

4              Rosenzweig and Dr. Blaivas.

5    BY MR. SNELL:

6              Q.    And at page 43 -- I'm sorry.

7    I keep getting those pages and numbers --

8    at page 6, paragraph 43, where you talk

9    about your opinions and the bases and

10   whatnot, do you not state:  I hereby

11   incorporate in this report the opinions

12   set forth in my general report regarding

13   TVT Secur device?

14             A.    I do.

15             MR. McCONNELL:  Objection.

16   BY MR. SNELL:

17             Q.    Have you already sat for a

18   general deposition on those opinions?

19             A.    I have.

20             Q.    Did you do professional

21   education on mesh products?

22             A.    I have.

23             Q.    And as part of --

24             MR. McCONNELL:  Objection.
```

Brian J. Flynn, M.D.

```
1    BY MR. SNELL:
2         Q.    As part of that --
3              MR. McCONNELL:  This is not
4         a general exam.
5              MR. SNELL:  No, it's not.
6         I'm about to tie it to what you
7         asked him about.
8              MR. McCONNELL:  Okay.
9    BY MR. SNELL:
10        Q.    And when you did
11   professional education on those mesh
12   products, besides talking about the
13   devices or their surgical implantation,
14   did you also cover the IFU steps and the
15   material identified in the IFU?
16        A.    Yes.
17        Q.    And is that a --
18              MR. McCONNELL:  Objection.
19   BY MR. SNELL:
20        Q.    And plaintiff's counsel
21   asked you about your expertise on
22   warnings.  Is that a further basis for
23   your expertise and experience with regard
24   to IFUs and warnings --
```

Brian J. Flynn, M.D.

1              MR. McCONNELL:  Objection.

2   BY MR. SNELL:

3         Q.    -- for a device like TVT

4   Secur?

5         A.    Yes, it is.

6         Q.    Do you recall being asked

7   about the urinary tract infections that

8   Mrs. Burnett had?

9         A.    I do.

10        Q.    And you opine that you do

11  not believe that the TVT Secur caused the

12  urinary tract infections.

13              Let me ask you this

14  question:  In paragraph 3, you noted that

15  plaintiff had been treated for at least

16  three urinary tract infections before her

17  TVT Secur implant.

18        A.    That's correct.

19        Q.    And then after TVT Secur,

20  paragraph 8, I only see one urinary tract

21  infection that was referenced.

22        A.    Correct.

23              MR. McCONNELL:  Objection.

24  BY MR. SNELL:

Brian J. Flynn, M.D.

1          Q.    And then you state at

2    paragraph 15, in 2008, she underwent the

3    laparoscopic Burch procedure; correct?

4          A.    Correct.

5          Q.    And after she underwent the

6    Burch, did she have urinary tract

7    infections?

8          A.    She did.  She had, I

9    believe, three urinary tract infections

10   in a short time period following the

11   Burch.

12         Q.    And does that chronology of

13   urinary tract infections, the fact that

14   she had three before TVT Secur at least,

15   one while on TVT Secur, and at least

16   three after the laparoscopic Burch, is

17   that supportive or not supportive of your

18   opinion that TVT Secur did not cause her

19   urinary tract infections?

20              MR. McCONNELL:  Objection.

21              THE WITNESS:  That supports

22         my opinion that TVT Secur did not

23         cause her urinary tract

24         infections.  The time course makes

Brian J. Flynn, M.D.

```
 1            no sense.  She had three UTIs

 2            before she ever had Secur.  She

 3            had one UTI immediately following

 4            and then had three after her

 5            Burch.

 6                 She eventually had to see

 7            Dr. Mindrup for recurrent UTIs, a

 8            urologist.  Dr. Mindrup's opinion

 9            was that the mesh is not causing

10            her UTIs.  He stated that in one

11            of his office notes.

12                 He put her on antibiotics

13            for six months and afterwards was

14            able to stop the antibiotics and

15            has not had an infection since

16            that time.

17                 So I don't believe the TVT

18            Secur or the TVT Secur mesh

19            exposure is the cause of her

20            recurrent urinary tract

21            infections.

22                 MR. SNELL:  That's all I

23            have.  Thank you.

24                 MR. McCONNELL:  I just have
```

Brian J. Flynn, M.D.

1        a couple follow-ups.

2                 -  -  -

3                 EXAMINATION

4                 -  -  -

5    BY MR. McCONNELL:

6        Q.    Dr. Flynn, didn't Dr.

7    Metzger refer Mrs. Burnett back to Dr.

8    Shirk after her examination?

9        A.    She did.

10       Q.    And didn't Dr. Shirk at that

11   point perform the excision of mesh in his

12   office on Mrs. Burnett?

13       A.    That's correct.

14       Q.    And wouldn't common sense

15   indicate to you that what Dr. Metzger was

16   feeling was the mesh that Dr. Shirk

17   thereafter excised in his office?

18            MR. SNELL:  Object; form.

19            THE WITNESS:  No, I

20       disagree.

21   BY MR. McCONNELL:

22       Q.    Why?

23       A.    Again, the location of what

24   she described on her exam and her dep --

Brian J. Flynn, M.D.

1    and in her deposition, it just doesn't

2    make any sense.

3              So -- Dr. Shirk is, you

4    know, more qualified to do examinations.

5    I think that he had concerns about a mesh

6    exposure and he excised the mesh

7    exposure.  This was a decision that Dr.

8    Shirk made independent of Dr. Metzger.

9              Q.    So your testimony under oath

10   this morning is that a treating physician

11   who felt alarmed at feeling something

12   sharp and thought she may have cut her

13   glove, who therefore then sent her back

14   to the implanting physician who

15   immediately performed an excision of mesh

16   in his office, that your opinion under

17   oath is that you don't believe that what

18   that treating physician felt and was

19   alarmed by was mesh; is that what you're

20   telling the jury?

21             A.    That's what I'm telling the

22   jury, yes.

23             MR. McCONNELL:  Okay.

24             Thanks very much.

Brian J. Flynn, M.D.

1                    THE WITNESS:  All right.

2          Thank you.

3                    (Witness excused.)

4                    (Deposition concluded at

5          approximately 11:10 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Brian J. Flynn, M.D.

1

2                          CERTIFICATE

3

4

5              I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.

7

               It was requested before
8  completion of the deposition that the
   witness, BRIAN J. FLYNN, M.D., have the
9  opportunity to read and sign the
   deposition transcript.

10

11

12

13        _____

          KIMBERLY A. CAHILL, a
14        Federally Approved Registered
          Merit Reporter and Notary Public
15        Dated:  July 23, 2016

16

17             (The foregoing certification
18  of this transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying reporter.)

22

23

24

Brian J. Flynn, M.D.

```
 1                INSTRUCTIONS TO WITNESS

 2

 3                Please read your deposition

 4     over carefully and make any necessary

 5     corrections.  You should state the reason

 6     in the appropriate space on the errata

 7     sheet for any corrections that are made.

 8                After doing so, please sign

 9     the errata sheet and date it.

10                You are signing same subject

11     to the changes you have noted on the

12     errata sheet, which will be attached to

13     your deposition.

14                It is imperative that you

15     return the original errata sheet to the

16     deposing attorney within thirty (30) days

17     of receipt of the deposition transcript

18     by you.  If you fail to do so, the

19     deposition transcript may be deemed to be

20     accurate and may be used in court.

21

22

23

24
```

Brian J. Flynn, M.D.

1                        _   _   _   _   _   _

                         E  R  R  A  T  A

2                        _   _   _   _   _   _

3    PAGE    LINE    CHANGE

4    _____   _____   _____

5    _____   _____   _____

6    _____   _____   _____

7    _____   _____   _____

8    _____   _____   _____

9    _____   _____   _____

10   _____   _____   _____

11   _____   _____   _____

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21   _____   _____   _____

22   _____   _____   _____

23   _____   _____   _____

24   _____   _____   _____

Brian J. Flynn, M.D.

```
1

2              ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____, do

5     hereby certify that I have read the

6     foregoing pages, 1 - 92, and that the

7     same is a correct transcription of the

8     answers given by me to the questions

9     therein propounded, except for the

10    corrections or changes in form or

11    substance, if any, noted in the attached

12    Errata Sheet.

13

14

15    _____

16    BRIAN J. FLYNN, M.D.          DATE

17

18

19    Subscribed and sworn
      to before me this

20    _____ day of _____, 20_____.

21    My commission expires:_____

22

      _____

23    Notary Public

24
```

Brian J. Flynn, M.D.

```
 1                          LAWYER'S NOTES

 2      PAGE   LINE

 3      _____  _____   _____

 4      _____  _____   _____

 5      _____  _____   _____

 6      _____  _____   _____

 7      _____  _____   _____

 8      _____  _____   _____

 9      _____  _____   _____

10      _____  _____   _____

11      _____  _____   _____

12      _____  _____   _____

13      _____  _____   _____

14      _____  _____   _____

15      _____  _____   _____

16      _____  _____   _____

17      _____  _____   _____

18      _____  _____   _____

19      _____  _____   _____

20      _____  _____   _____

21      _____  _____   _____

22      _____  _____   _____

23      _____  _____   _____

24      _____  _____   _____
```