# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
# CHARLESTON DIVISION

| | |
|---|---|
| IN RE:  ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | Master File No. 2:12-MD-02327<br><br>MDL 2327 |
| **THIS DOCUMENT RELATES TO:**<br><br>*Cutter v. Ethicon, Inc.*   2:12-cv-01790;<br>*Bates v. Ethicon, Inc.*   2:12-cv-02020;<br>*Daugherty v. Ethicon, Inc.*   2:12-cv-02076;<br>*Morrison v. Ethicon, Inc.*   2:12-cv-02141; and<br>*Miller v. Ethicon, Inc.*   2:12-cv-02187 | **HON. JOSEPH R. GOODWIN<br>U.S. DISTRICT JUDGE** |

### DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF MICHAEL KARRAM, MD

Defendants Ethicon, Inc. and Johnson & Johnson (collectively "Ethicon") submit this response in opposition to Plaintiffs' motion to exclude expert testimony of Michael Karram, MD, FACOG, FPMRS (Doc 2446).

### INTRODUCTION

Dr. Karram is a urogynecologist nationally and internationally known in the field of gynecologic surgery and advanced pelvic surgery, with a subspecialty in the field of Female Pelvic Medicine and Reproductive surgery. Karram Expert Report Doc. 2446-3 at 1, 3 (Ex. 2 to Plaintiffs' Motion). He is board-certified in obstetrics and gynecology since 1986 and female pelvic medicine and reconstructive surgery since 2014. *Id.* Dr. Karram has been in private practice since 1984, currently serving as the Director of Urogyecology at Seven Hills Women's Health Centers in Cincinnati, Ohio (since 1998), Director of Fellowship Minimally Invasive Gynecologic Surgery at Christ Hospital in Cincinnati (sic) (since 2013), and the Medical

1339176

Director of Pelvic Floor Center at Mercy West Hospital in Cincinnati (since 2015). *Id.* at 2. He is a member of the American Urogynecologic Society (AUGS), International Urogynecologic Association (IUGA), and the American Association of Gynecologic Laparoscopists (AAGL). *Id.* He has worked as a consultant, proctor, preceptor, and trainer for pharmaceutical companies, including for Ethicon for TVT and Prolift. *Id.* at 2, 19-21.

In 2010, Dr. Karram gave up obstetrics to focus exclusively on gynecology and has expertise in advanced pelvic surgery, minimally invasive surgery, pelvic organ prolapse, and bladder conditions including incontinence and voiding abnormalities. *Id.* at 1. He is an expert in treating both stress urinary incontinence and pelvic organ prolapse, with extensive experience using both native tissue and augmented repairs. *Id.* at 3. He began using TVT in 1998 and has performed over 2,000 synthetic sling procedures and used over 500 mesh kit repairs in the treatment of pelvic organ prolapse. *Id.* He has used Gynemesh PS, anterior and posterior Prolift, apogee and perigee, and anterior and posterior Elevate. *Id.*

In these cases, Dr. Karram intends to offer opinions generally addressing the utility and safety of various mesh devices, including Prolift and TVT-O. His opinions are based upon his education, medical training, clinical experience, extensive review of medical literature, position statements, guidelines, practice patterns, curricula, and various other materials reflected in his reliance list. *Id.*; Karram Expert Report Reliance List (attached as Ex. A). He is qualified to opine on these topics and, as detailed below, his opinions are supported by reliable methodology.

Plaintiffs have challenged certain aspects of Dr. Karram's opinions, and, as set forth below, Plaintiffs' arguments lack merit and should be denied.

**ARGUMENT**

Defendants incorporate by reference the standard of review for *Daubert* motions as articulated by the court in *Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 691, 701 (S.D. W. Va. 2014).

I. **Dr. Karram is qualified to render opinions regarding the safety and efficacy of Prolift.**

As described above, Dr. Karram is a highly qualified urogynecologist with extensive experience as a surgeon and educator/trainer. Nonetheless, Plaintiffs challenge Dr. Karram's qualifications to opine about aspects of the Prolift device's safety and efficacy. Specifically, Plaintiffs argue that Dr. Karram failed to consider or rely on a few hand-picked data and conclusions found in sources reviewed by Dr. Karram, which, according to Plaintiffs, reflect a flawed methodology. This argument misses the mark. First and foremost, the argument inaccurately portrays the opinions and testimony of Dr. Karram, who not only reviewed the data and conclusions identified by Plaintiffs when forming his opinions, but provided reasons for disagreeing with or not relying on the data and conclusions. Additionally, challenges to reasons Dr. Karram offers for not relying on certain studies or data points go to the weight of his testimony, not the admissibility of his opinions. *See Trevino v. Boston Scientific Corp.*, No. 2:13-cv-01617, 2016 WL 2939521, at *8 (S.D. W. Va. May 19, 2016).

A. **Dr. Karram's opinions regarding the low-level rate of complications associated with Prolift are well-supported and reliable.**

In his report, Dr. Karram states that the more than 200 studies on Prolift since 2005 overwhelmingly and consistently "show the success of Prolift at achieving long-lasting anatomic cure with a low-level rate of complications." Karram Expert Report Doc. 2446-3 at 17 (Ex. 2 to Plaintiffs' Motion). Plaintiffs argue that Dr. Karram failed to account for *one* specific review with higher reported rates of *one* specific complication – mesh exposure – and *one* opinion

3

statement by an ACOG committee, making his methodology flawed. It is Plaintiffs' argument that is flawed, however.

Dr. Karram states in his report that "[a]n overall mesh exposure rate of 3%-8% is an acceptable rate by today's standards." *Id.* at 19. In his deposition, Dr. Karram acknowledged that the 2016 Maher Cochrane Review reported a 12% rate of mesh exposure. Karram Dep. at 102:20-23 (Ex. 3 to Plaintiffs' Motion). Plaintiffs argue that because this one review shows rates of one specific potential complication – exposure – at levels higher than Dr. Karram's preferred 3-8% threshold, Dr. Karram's safety and efficacy opinion is based on outdated and inaccurate data. When asked if he would like to update his opinion on the 3-8% exposure rate, Dr. Karram responded by explaining that his opinion was based not on one source but on an overall evaluation of the medical literature and that "most of the randomized trails and most of the experts in the field think that a 3 to 8 percent is acceptable in today's standards." *Id.* at 105:1-8.

Dr. Karram's opinion based on his overall review of results of over 200 studies on Prolift is not outdated by Plaintiffs' hand-picked data point falling outside of Dr. Karram's preferred range. In fact, Dr. Karram was able to point to three studies on the spot with much lower rates – the Aultman study at 3.2%, De Landsheere study at 2.5%, and the Benbouzoid study at 5.3% -- providing a solid basis for his opinions. Karram Dep. at 129:18-130:3 (Ex. 3 to Plaintiffs' Motion).

Plaintiffs also mistakenly argue that because Dr. Karram disagrees with an opinion statement made by an ACOG Committee, his opinion is flawed. Dr. Karram provided a thorough basis for disagreeing with a particular statement in the ACOG Committee Opinion – this is no basis at all for claiming his Prolift opinions are unreliable. In particular, Dr. Karram explained that he disagrees with the statement that patients "experience permanent and life-

4

altering sequelae" following mesh augmented repairs based not only on his experience treating patients, education, and training, but also on the fact that there is no definition of "life-altering," a term that could mean different things to different people. *Id.* at 82:3-12; 84:9-13. Furthermore, Dr. Karram clarifies that this statement was made not in "medical literature," which is "meta-analysis, randomized control trial, prospective cohort," etc., but in a committee *opinion*. *Id.* at 82:21-83:1. It does not even carry the weight of a position statement. *Id.* at 83:5-6.

Dr. Karram did not simply ignore or cherry-pick information from his sources, but rather provided a reasonable basis for disagreeing with this statement. Moreover, the statement that a "*small* but significant group of patients" experience allegedly serious complications does not on its face even contradict Dr. Karram's opinions that mesh presents low rates of complication. Dr. Karram does not deny completely the existence of potential risks of mesh procedures, risks common to all surgeries for stress urinary incontinence and pelvic organ prolapse. *See* Karram Expert Report Doc. 2446-3 at 20 (Ex. 2 to Plaintiffs' Motion).

By simply hand-picking two examples of data or statements which allegedly contradict Dr. Karram's opinions, Plaintiffs fail to show any shortcomings in the overall methodology employed by Dr. Karram in forming his opinions. Rule 702 does not require that all published data be in complete agreement on a topic. Furthermore, the ACOG Committee Opinion does not even on its face contradict Dr. Karram's opinions. Plaintiffs' argument that one report falling outside of Dr. Karram's preferred rate of mesh exposure and one opinion that a *small* number of patients experience significant sequelae undermines his opinion that mesh overall displays a low rate of complications at best goes to the weight of Dr. Karram's testimony, not the admissibility, and is not appropriate for Plaintiff's Motion. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993).

### B. Dr. Karram's opinions on the benefits of Prolift are well-supported, reliable, and uncontradicted by his personal practice.

In his Report, Dr. Karram cites to numerous studies supporting his opinion that "[f]ailure rates have been shown to be extremely high for native tissue repairs." Karram Expert Report Doc. 2446-3 at 10 (Ex. 2 to Plaintiffs' Motion) (citing "Benson 1996, Lovatis 2003, Hardiman 1996, Whiteside 2004, and Aultman 2011"). Plaintiffs argue that Dr. Karram ignored a recent reanalyzation of the data in *one* study, the 2011 Weber study, undermining his opinion. Again, this narrow argument fails to take into account Dr. Karram's extensive review of medical literature. Furthermore, Dr. Karram explained in his deposition that the reanalysis of the Weber study does not impact his opinion because the study included surgeons at only one location, the Cleveland Clinic, and "you can't extrapolate that to the general population. Native tissue repairs are all done differently." Karram Dep. at 87:21 – 88:10 (Ex. 3 to Plaintiffs' Motion). Due to the lack of standardization of procedures, as Dr. Karram explains in his Report, it is difficult to compare results in native tissue studies. Karram Expert Report Doc. 2446-3 at 10 (Ex. 2 to Plaintiffs' Motion). Therefore, higher success rates found in one study does little to undermine his opinion based on a vast review of many studies.

Despite Plaintiffs' argument, Dr. Karram did not in any way admit that his safety and efficacy opinions on Prolift were based on unreliable, outdated data. Dr. Karram admitted that his reference to the 2013 Cochrane Review as the "most recent" Cochrane review was incorrect, perhaps a "typing error" that should be corrected. Karram Dep. at 94:5-16 (Ex. 3 to Plaintiffs' Motion). He did not, however, admit that this should impact his opinions, and, in fact, Dr. Karram relied on the 2016 Cochrane Report in his Report elsewhere, evidencing that he reviewed and evaluated the more recent report while forming his opinions. *See* Karram Expert Report Doc. 2446-3 at 18-19 (Ex. 2 to Plaintiffs' Motion). Plaintiffs also mischaracterize Dr.

6

Karram's testimony regarding ACOG review. Although Dr. Karram agreed that the review stated that the total rate of reoperation for mesh kits was higher than that for native tissue, he clarified that this was because the statement was based on a study where small office procedures were counted as "reoperations," not distinguishing them from more serious surgical procedures. Karram Dep. at 75:14 – 76:21 (Ex. 3 to Plaintiffs' Motion).

Finally, Plaintiffs argue that Dr. Karram's personal experience and practice contradicts his opinions. Again, this argument must fail. Dr. Karram does not opine that native tissue repairs are per se ineffective, only that they have high recurrence rates. Karram Expert Report Doc. 2446-3 at 10 (Ex. 2 to Plaintiffs' Motion). His testimony that he has had success with native tissue repair "depend[ing] on the procedure and anatomy we're dealing with" simply does not contradict the existence of a high recurrence rate in native tissue repairs. *See* Karram Dep. at 26:1-6 (Ex. 3 to Plaintiffs' Motion).

Dr. Karram has made no admissions that his opinions are based on outdated data or that his practice contradicts his opinions. Moreover, Plaintiffs' emphasis on the ultimate efficacy of native tissue repairs is misplaced. Native tissue repair, a non-mesh alternative surgical procedure, is not the subject of this litigation.[1] Again, Plaintiffs' arguments that these studies or quotes contradict Dr. Karram's opinions may perhaps go to the weight of Dr. Karram's testimony, but not the admissibility, and are not appropriate for Plaintiff's Motion. *See Daubert*, 509 U.S. at 596.

---

[1] Nor is it relevant to an alternative design argument by Plaintiffs. *See Schmidt v. C.R. Bard, Inc.*, 2013 WL 3802804, at *2 (D. Nev. 2013) ("non-mesh repair is not an alternative design").

**II.     Dr. Karram's opinions regarding the adequacy of Ethicon's warnings for the Prolift and TVT-O devices are well supported by reliable methodology and are, therefore, admissible.**

Despite Plaintiff's argument to the contrary, Dr. Karram is qualified to opine about Defendants' IFUs and warnings, and his opinions are well supported by reliable methodology. "[D]octors are fully qualified to opine on the medical facts and science regarding the risks and benefits of drugs and to compare that knowledge with what was provided in the text of labeling and warnings." *Winebarger v. Boston Sci. Corp.*, No. 2:13-CV-28892, 2015 WL 1887222, at *15 (S.D.W. Va. Apr. 24, 2015) (quoting *In re Yasmin & Yaz (Drospirenone) Prods. Liab. Litig.*, No. 3:09–md–02100, 2011 WL 6301625, at *11 (S.D. Ill. Dec. 16, 2011)). The important question here is whether Dr. Karram's testimony was consistent with the law to be applied to the case, and not whether he himself could articulate the governing legal standard. Dr. Karram is not making any such attempt with his opinions on Defendants' IFUs and warnings, and in fact, admitted that he is not a regulatory expert. Karram Expert Report Doc. 2446-3 at 22 (Ex. 2 to Plaintiffs' Motion).

Dr. Karram's testimony on Defendants' IFUs and warnings is consistent with the governing legal standard and should therefore be admitted in its entirety. The legal principle that controls here is that a device manufacturer's duty to warn of adverse events does not include a duty to warn of risks commonly known to the surgeons who use the device. As stated generally in the RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY §2, cmt. j, a product seller "is not subject to liability for failing to warn or instruct regarding risks and risk-avoidance measures that should be obvious to, or generally known by, foreseeable product users." *See also* RESTATEMENT (SECOND) OF TORTS §§388(b), 402A, cmt. j; *Roney v. Gencorp*, 654 F. Supp. 2d 501 (S.D. W. Va. 2009) (adopting "sophisticated user" defense in §388). The test is an objective

8

test that depends on the knowledge of foreseeable users generally, and not on the knowledge of the person whose use is at issue in the particular case. *Johnson v. American Standard, Inc*., 179 P.3d 905, 914 (Cal. 2008) (sophisticated user "knew or should have known" of the danger).

This limitation on the duty to warn is recognized in medical cases as well. There is no duty to warn of risks commonly known to implanting surgeons. *See Brooks v. Medtronic, Inc*., 750 F.2d 1227, 1230 (4th Cir. 1984) (duty to warn only of dangers "not well known to the medical community"). In fact, the FDA device regulations say that information may be omitted from labeling:

> if, but only if, the article is a device for which directions, hazards, warnings and other information are commonly known to practitioners licensed by law to use the device.

21 C.F.R. §801.109(c) (emphasis added). *See also Wright ex rel. Trust Co. of Kansas v. Abbot Laboratories, Inc*., 259 F.3d 1226, 1234 (10th Cir. 2001) (drug company had no duty to warn hospital of the danger of stocking different concentrations of saline solution in the same place); *Brown v. Drake-Willock Intern. Ltd*., 530 N.W. 2d 510, 516 (Mich. App. 1995) (physician was sophisticated user of dialysis machine).

The IFUs at issue here restrict the class of surgeons who are to use the devices. They contemplate that users will be familiar with traditional surgical techniques used to treat stress urinary incontinence and pelvic organ prolapse. The TVT-O IFU says it should be used "only by physicians trained in the surgical treatment of stress urinary incontinence and specifically in implanting the Gynecare TVT Obturator device." (ETH.MESH.02340830 (excerpts attached as Ex. B)). The Prolift IFU states that "[u]sers should be familiar with surgical procedures and techniques involving pelvic floor repair and synthetic meshes before employing the Gynecare Prolift Systems." (ETH.MESH.02341659 (excerpts attached as Ex. C)). So the important

question with respect to the plaintiffs' failure to warn claim is what "hazards" were "commonly known" to surgeons familiar with traditional non-mesh SUI and POP surgery and mesh surgery before TVT-O and Prolift were introduced.

Dr. Karram's opinion rests not only on his own education, training, and extensive experience treating SUI and POP with both native tissue and mesh procedures, including TVT-O and Prolift, but on his review of the medical literature and years of experience in teaching other pelvic floor surgeons in treating POP with the Prolift system and other transvaginal mesh products and SUI with TVT and TVT-O. Karram Expert Report Doc. 2446-3 at 22 (Ex. 2 to Plaintiffs' Motion); Karram TVT & TVT-O Expert Report, at 24 (attached as Ex. D). This makes him well-qualified to testify as to what is "commonly known" to those surgeons. And that is an essential fact necessary when evaluating the "adequacy" of the IFU.

### III. Dr. Karram's opinions regarding the safety and efficacy of Prolift are well supported by reliable methodology and are, therefore, admissible.

Despite Plaintiffs' arguments to the contrary, Dr. Karram's opinions on the biocompatibility and properties of Prolene mesh are based on sound methodology and are, therefore, admissible. Plaintiffs' argument that Dr. Karram's opinions are based solely on studies involving mid-urethral sling devices and not specifically on Prolift, overlooks much of Dr. Karram's report and testimony. While Dr. Karram does rely on and cite to studies specifically looking at mid-urethral sling devices, he does so in regard to the properties of Prolene mesh – mesh which is used both in these slings and the Prolift device. During his deposition, Dr. Karram also clarified that his opinions were formed "after reviewing a multitude of meta-analysis and randomized control trials relating to both TVT and Prolift," after which, he found no meta-analysis of Prolene mesh, randomized control trial, or any other type of medical literature concluding that Prolene degraded in any clinically meaningful way. Karram Dep. at

10

134:8-135:10 (Ex. 3 to Plaintiffs' Motion). Furthermore, his opinions are based on his practice and significant experience in treating thousands of women with mesh products, during which he has seen no degradation of Prolene causing any clinically significant outcomes. *Id.*; Karram Expert Report Doc. 2446-3 at 24 (Ex. 2 to Plaintiffs' Motion).

Plaintiffs' attack on Dr. Karram's testimony regarding foreign body reactions also fails. Dr. Karram testified in his deposition that any foreign body reaction caused by mesh stops around six to eight weeks following implantation, only after Plaintiffs' counsel specifically asked him if he "think[s] the foreign-body reaction, at some point, stops." Karram Dep. at 107:18-20 (Ex. 3 to Plaintiffs' Motion). Dr. Karram's opinions are based on extensive and ongoing review of medical literature as well as his own extensive and ongoing experience. Dr. Karram's inability to identify, on the spot, a study supporting a very specific opinion not addressed in his report provides no basis for an argument that the methodologies used to form the opinions in his report are unreliable.

Dr. Karram's opinions on the biomechanical aspects of Prolift are based on the sound methodology of review of medical literature and reliance on education, training, and experience. Although Plaintiffs broadly state that Dr. Karram fails to account for contrary evidence regarding the properties of Prolift mesh, Plaintiffs fail to identify a single piece of medical literature contrary to Dr. Karram's opinions in their motion. Plaintiffs' arguments are grasping at straws and fall short. In the end, Dr. Karram's opinions are reliable and, therefore, admissible.

## CONCLUSION

For the forgoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion to exclude the testimony of Dr. Karram regarding the safety and efficacy of the TVT-O and Prolift products.

Respectfully submitted,

ETHICON, INC. AND JOHNSON & JOHNSON

*/s/ David B. Thomas*
David B. Thomas (W. Va. Bar No. 3731)
Thomas Combs & Spann, PLLC
300 Summers Street, Suite 1380
P.O. Box 3824
Charleston, WV 23558-3824
(304) 414-1800

*/s/ Christy D. Jones*
Christy D. Jones
Butler Snow LLP
1020 Highland Colony Parkway
Suite 1400 (39157)
P.O. Box 6010
Ridgeland, MS 39158-6010
(601) 985-4523

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE:  ETHICON, INC. PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*Cutter v. Ethicon, Inc.*   2:12-cv-01790;<br><br>*Bates v. Ethicon, Inc.*   2:12-cv-02020;<br><br>*Daugherty v. Ethicon, Inc.*   2:12-cv-02076;<br><br>*Morrison v. Ethicon, Inc.*   2:12-cv-02141; and<br><br>*Miller v. Ethicon, Inc.*   2:12-cv-02187 | Master File No. 2:12-MD-02327<br>MDL No. 2327<br><br>**JOSEPH R. GOODWIN<br>U.S. DISTRICT JUDGE** |

**CERTIFICATE OF SERVICE**

I, Christy D. Jones, certify that on this date, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

*/s/ Christy D. Jones*
Christy D. Jones
Butler Snow LLP
1020 Highland Colony Parkway
Suite 1400 (39157)
P.O. Box 6010
Ridgeland, MS  39158-6010
(601) 985-4523
christy.jones@butlersnow.com

32274121v1

13