# EXHIBIT A

Kimberly Kenton, M.D.

Page 210

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE: ETHICON, INC., ) | |
| PELVIC REPAIR SYSTEM ) | |
| PRODUCTS LIABILITY ) | Master File No. |
| LITIGATION ) | 2:12-MD-02327 |
| ) | MDL 2327 |
| ) | |
| ) | JOSEPH R. GOODWIN |
| ) | U.S. DISTRICT JUDGE |
| THIS DOCUMENT RELATES TO: ) | |
| THE CASES LISTED BELOW ) | |
| ) | |
| Mullins, et al. V. ) | 2:12-cv-02952 |
| Ethicon, Inc., et al. ) | |
| ) | |
| Sprout, et al. V. ) | 2:12-cv-07924 |
| Ethicon, Inc., et al. ) | |
| ) | |
| Iquinto v. Ethicon, Inc., ) | 2:12-cv-09765 |
| et al. ) | |
| ) | |
| Daniel, et al. V. ) | 2:13-cv-02565 |
| Ethicon, Inc., et al. ) | |
| ) | |
| Dillon, et al. V. ) | 2:13-cv-02919 |
| Ethicon, Inc., et al. ) | |
| ) | |
| Webb, et al. V. Ethicon, ) | 2:13-cv-04517 |
| Inc., et al. ) | |
| ) | |
| Martinez v. Ethicon, ) | 2:13-cv-04730 |
| Inc., et al. ) | |
| ) | |
| McIntyre, et al. V. ) | 2:13-cv-07283 |
| Ethicon, Inc., et al. ) | |

CONTINUED VIDEOTAPED DEPOSITION OF KIMBERLY KENTON, M.D.
Friday, February 19, 2016, 8:10 a.m.

Page 219

1  Q. Okay. And I think you said yesterday
2  that you don't rely on anecdotal information to
3  reach your opinions about the TVT mechanically-cut?
4  A. I try not to.
5  Q. Okay. And you don't rely on information
6  from Ethicon, the manufacturer of the device, is
7  that correct?
8  A. That's correct.
9  Q. And you don't rely on the information
10 that is contained in the Instructions for Use, or
11 the IFU, that accompanies the TVT mechanically-cut,
12 is that right?
13 A. That's correct.
14 Q. Now, yesterday when I looked back at
15 your testimony you said that one of the reasons
16 that you had agreed to testify in the case was that
17 you didn't believe that midurethral slings should
18 be taken off the market or something to that
19 effect. Do you remember that?
20 A. I do.
21 Q. Is that your opinion? Is that a correct
22 statement of your opinion?
23 A. Yes.
24 Q. Okay. Who told you that this lawsuit

Page 220

1  was about taking all polypropylene midurethral
2  slings off the market?
3  A. Nobody.
4  Q. You understand that's not what this
5  lawsuit is about, correct?
6  A. I do understand.
7  Q. Okay. And if the TVT mechanically-cut
8  device was taken off the market, it wouldn't affect
9  your ability to offer surgical options to women for
10 the treatment of stress urinary incontinence,
11 correct?
12 A. Can you please clarify.
13 Q. Sure. If Ethicon stopped selling the
14 TVT that's mechanically-cut, you would still be
15 able to implant the TVT Exact into women, correct?
16 A. Correct.
17 Q. And you'd still be able to implant the
18 Boston Scientific Advantage that you use into
19 women, correct?
20 A. Correct.
21 Q. So, taking the TVT mechanically-cut off
22 the market, even if that's what this case is about,
23 wouldn't affect your ability to offer women a
24 surgical treatment for SUI that included a

Page 221

1  polypropylene midurethral sling, correct?
2  A. That's correct, although much of the
3  data that we rely upon is based upon
4  mechanically-cut.
5  Q. Okay. Let me talk to you about that a
6  little bit. You must have read my mind.
7      How many RCTs exist establishing the
8  efficacy of the TVT mechanically-cut specifically?
9  A. I don't think I can give you an exact
10 number without going back to some, probably doing a
11 PubMed search and giving you an exact number,
12 because it would even -- even the Cochrane reports
13 and the meta-analyses may miss some.
14     But the Ward-Hilton data is all
15 mechanically-cut. The better part of the SISTEr is
16 mechanically-cut. There is a Barber paper looking
17 at I think transobturator versus retropubic. And
18 based on the timing of that, I couldn't tell you
19 for sure, but I think it's probably that reflects
20 mechanically-cut.
21 Q. Okay. When you say "the timing," why is
22 the timing of the article important to you when
23 discussing the mechanically-cut versus the
24 laser-cut?

Page 222

1  A. Because my understanding is that the
2  laser-cut came out later. So, only
3  mechanically-cut was available for a long time.
4  Q. Okay. And what year is it your
5  understanding that the laser-cut came on the
6  market?
7  A. I'm not sure.
8  Q. So, you believe that the Ward-Hilton,
9  some of the SISTEr study and the Barber paper deals
10 solely with mechanically-cut, is that right?
11 A. I didn't say solely. I said majority of
12 SISTEr was mechanically-cut. There is no way to
13 know when people switched over.
14 Q. Okay. So, would you agree with me that
15 in the SISTEr study there is no way of really
16 knowing how many of those devices were
17 mechanically-cut and how many of those devices were
18 laser-cut?
19 A. That's correct. But having
20 participated, we were well into the trial before
21 laser-cut was even being introduced into the
22 equation, at least in our sites.
23 Q. Okay. So, for your site you know that
24 there is --

Page 227

1  A. It's easier for me to --
2  Q. That's fine.
3  A. Oddly, I don't have it in the right
4  file.
5      I can pull it out of here. So much for
6  my filing system.
7      I will see if I can pull it up.
8  THE WITNESS: Can we connect to the Internet
9  here?
10  MR. SNELL: Yeah. It's DBR WiFi.
11  THE WITNESS: Might just be faster to PubMed
12  it.
13  MS. FITZPATRICK: It's why they call it the
14  Windy City I guess. The windows shake.
15      (WHEREUPON, discussion was had off
16      the record.)
17  THE WITNESS: I apologize for not being able
18  to put my hand on this.
19  BY MS. FITZPATRICK:
20  Q. That's okay. If you don't have it, we
21  can move on.
22  A. Yeah. Like I can find it for you at
23  some point, but I -- it's in this pile somewhere.
24  Q. Okay. That's fine.

Page 228

1      So, it's your recollection that there is
2  one RCT that compares the laser-cut TVT Retropubic
3  to the mechanically-cut TVT Retropubic?
4  A. I think it's an RCT. Like I said, I
5  can't recall the paper --
6  Q. Okay.
7  A. -- specifically, but I -- there is -- I
8  came across one comparator that I can remember.
9  Q. Okay. And I think you said that you
10  believe that that was an underpowered study where
11  they couldn't confirm their conclusions --
12  A. Yes.
13  Q. -- is that right?
14  A. I would -- I would rather than perhaps
15  inaccurately cite the paper, I'd rather find the
16  paper.
17  Q. Okay.
18  A. I didn't -- I didn't feel that it made a
19  cogent argument that compelled me to lean one way
20  or the other.
21  Q. Okay. Why don't maybe at a break we can
22  take a look for that. But I know that you have a
23  time limitation today.
24  A. Yeah.

Page 229

1  Q. So, we can -- we can move on.
2      Of the RCTs that you have looked at for
3  mechanically-cut TVT, how many of those had a
4  primary endpoint of safety?
5  A. In general, you're never going to have a
6  primary endpoint of safety for doing a randomized
7  controlled trial in something that has a rare
8  outcome because you would have to enroll
9  millions -- like thousands of women. So, usually
10  you have to -- you primary on an efficacy outcome.
11  Q. Okay. So, you're not --
12  A. Unless something is a common
13  complication, and then who would -- had high
14  complication rates and then who would be doing an
15  RCT? It would be unethical.
16  Q. Okay. So, none of them have a primary
17  endpoint of safety for the reasons that you have
18  just discussed, is that right?
19  A. You -- it's not a feasible trial design.
20  You have to use a different type of study to
21  evaluate that. That's where systematic reviews and
22  meta-analyses become powerful.
23  THE VIDEOGRAPHER: Excuse me, Doctor, if
24  you're not using the laptop, could you move it

Page 230

1  away. That's fine. Thank you.
2  BY MS. FITZPATRICK:
3  Q. Now, Doctor, you offered an opinion
4  yesterday that you believed that the laser-cut
5  TVT Retropubic performed the same as the
6  mechanically-cut TVT Retropubic. Do you recall
7  that?
8  A. I do.
9  Q. And is that an opinion that you hold
10  today?
11  A. It is.
12  Q. Is that based on any data that is
13  available in the literature to support that
14  opinion?
15  A. The only small study that I recall
16  coming across didn't -- wasn't compelling to
17  support one versus the other.
18  Q. So, what is the basis for your --
19  A. And my clinical experience has not been
20  that there's a difference.
21  Q. I'm --
22  A. My clinical experience hasn't been that
23  there is a difference as well.
24  Q. And your clinical experience, that would

6 (Pages 227 to 230)

Kimberly Kenton, M.D.

Page 231

1  be the anecdotal experience that we had talked
2  about yesterday and this morning, correct?
3      A.  That would be --
4      MR. SNELL:  Objection.
5  BY THE WITNESS:
6      A.  That would be every surgeon who is
7  giving their overall clinical experience.  I would
8  say in general my experiences are probably slightly
9  less anecdotal because I do report outcomes.
10 BY MS. FITZPATRICK:
11     Q.  Have you reported outcomes comparing the
12 laser-cut to the mechanically-cut?
13     A.  As I've said, I'm only familiar with one
14 paper in the literature that directly compares
15 those two, for that purpose.
16     Q.  Okay.  I understand that, but you said
17 that you believe your experiences are probably
18 slightly less anecdotal because you do report
19 outcomes, correct?
20         So, what I am asking is have you
21 reported outcomes that compare the TVT
22 mechanically-cut versus the TVT laser-cut?
23     A.  I have not.
24     Q.  Okay.  And you don't track that actually

Page 232

1  in either your academic work or in your clinical
2  work, correct?
3      A.  No, actually, we actually do track our
4  outcomes.
5      Q.  Okay.  Do you track your outcomes in
6  your clinical work?
7      A.  I do.  As I said, we see our patients
8  back yearly.
9      Q.  Okay.  I'm asking you something a little
10 different.
11         Do you track outcomes for patients
12 looking at mechanically-cut versus laser-cut?
13     A.  Well, if you tracked -- the only way you
14 can track that type of an outcome is if you're
15 going to retrospectively look at the patients
16 who've had implanted, and we do -- we do keep those
17 data and we see people back yearly.
18     Q.  Okay.  You keep the data on who's had a
19 mechanically-cut versus who's had a laser-cut, is
20 that right?
21     A.  Well, for me it's been rather simple
22 because I practice at one institution and everyone
23 got a mechanically-cut TVT because that was the
24 device that I was using.  And then I came here and

Page 233

1  I came -- I transferred institutions and we are
2  using exclusively laser-cut.
3      Q.  Okay.  But I have a slightly different
4  question than that.
5      A.  Okay.
6      Q.  Post-2006 how did you know whether you
7  were implanting a mechanically-cut or a laser-cut
8  into women?
9      A.  That's a fair point.
10     Q.  So, at your prior -- so, before
11 laser-cut hit the market, you know that you
12 implanted only mechanically-cut, correct?
13     A.  That's correct.
14     Q.  You didn't start to implant the TVT
15 until the mid-2000s, correct?
16     A.  Right.  So, the only way I would know
17 which one I was using is to go back and pull the
18 records.
19     Q.  Okay.  Which you haven't done?
20     A.  I have not done.
21     Q.  Okay.  Have you -- do you know who
22 Dr. Nilsson is?
23     A.  Nilsson that has published the papers?
24     Q.  Yes.

Page 234

1      A.  I don't know him personally.
2      Q.  Do you know who he is?
3      A.  I know his work.
4      Q.  Okay.  Do you consider that work to be
5  reliable?
6      A.  I think that for the -- yes.  I mean,
7  it's observational cohort data, so it's not as good
8  as RCT data.  But you're never going to be able to
9  do a randomized controlled trial and follow women
10 for 10 or 20 years because no one is going to pay
11 for it.
12         And as the SISTEr trial showed, women
13 that are happy and incontinent tend to not enroll
14 in long-term follow-up.
15     Q.  So, Doctor -- but you are familiar with
16 Dr. Nilsson's work, is that right?
17     A.  I am.
18     Q.  Are you familiar with any of
19 Dr. Nielsen's opinions about the differences, if
20 any, between laser-cut and mechanically-cut mesh?
21     A.  No.
22     Q.  Has anyone from Ethicon ever shared that
23 information with you?
24     A.  If they have, I don't recall it.

7 (Pages 231 to 234)

Page 415

1  MS. FITZPATRICK: Burt, can I just do one
2  thing superquick.
3  MR. SNELL: What?
4  BY MS. FITZPATRICK:
5  Q. This CV that you have, is that your most
6  up-to-date copy of your CV that was attached to
7  your report?
8  A. I update it like every probably monthly.
9  So, it's probably a month or so out of date.
10  MS. FITZPATRICK: If I can just get the most
11  recent copy of her CV, then we're all set. Thank
12  you.
13  BY THE WITNESS:
14  A. It's not wildly different.
15        EXAMINATION
16  BY MR. SNELL:
17  Q. Dr. Kenton, Burt Snell representing
18  Ethicon and Johnson & Johnson. I just want to
19  follow-up on a couple quick topics.
20  We talked primarily about the Schimpf
21  systematic review today. Did you cite to other
22  systematic reviews and meta-analyses in support of
23  your opinions and your report?
24  A. I did.

Page 416

1  Q. Would you turn to page 36 for the
2  American Urologic Association's systematic review
3  and guideline.
4  You were asked some questions about pain
5  and sexual dysfunction and rates, how they compare
6  amongst the different options.
7  Did you assess those issues on page 36
8  and 37 of your report?
9  A. I did.
10  Q. How does the midurethral sling compare
11  to the autologous pubovaginal sling and the Burch?
12  A. For what?
13  Q. For pain and sexual dysfunction.
14  A. Do you want me to recite the actual
15  percentages that I gave?
16  Q. What is your assessment of what those
17  percentages show? Was midurethral sling less than
18  the other procedures --
19  A. Yeah.
20  Q. -- or more than?
21  A. Less than, which is consistent with.
22  Q. You were asked some questions about
23  voiding dysfunction and retention. Do some of the
24  other systematic reviews, if any, like Ogah, the

Page 417

1  Cochrane review or others, show a lower rate of
2  those complications with the TVT as compared to --
3  A. Yes.
4  Q. -- the autologous or the Burch?
5  You were asked about mesh exposure.
6  A. As does the SISTEr and TOMUS trials.
7  Q. You were asked about mesh exposure and
8  you also talked about suture erosions. Do you
9  classify those as wound complications?
10  A. Yes.
11  Q. Did -- were wound complications assessed
12  in both the SISTEr and TOMUS trials?
13  A. They were and they were similar. They
14  were just different places that the wound
15  complication occurred.
16  Q. And do you recall whether for wound
17  complications not requiring surgical intervention,
18  whether there was a higher rate with autologous
19  pubovaginal sling, Burch or --
20  A. Wound complications not requiring
21  reoperation was higher in the autologous fascial
22  sling arm. Wound complications requiring
23  reoperations were similar.
24  Q. You were asked some questions about

Page 418

1  mechanical-cut versus laser-cut. Now, and there
2  were questions about certain randomized controlled
3  trials, and I think you testified that the earlier
4  data and the longer-term data are for the
5  mechanical-cut TVT, is that right?
6  A. Yes.
7  Q. If you look at Table 1 of Schimpf.
8  A. Okay.
9  Q. You were saying that one could look at
10  the years when those studies were performed to
11  assess whether they were mechanical-cut or came
12  later after 2007 for --
13  A. Correct.
14  Q. -- laser-cut.
15  So, in Table 1 for the various TVT
16  studies, do the majority of those appear to be
17  mechanical-cut?
18  A. They do.
19  Q. At page 11 and 12 of your expert report
20  you were asked some questions about are there any
21  specific studies that reference a difference, if
22  any, in complications for laser or mechanical-cut
23  TVT?
24  A. Oh, there it is.

53 (Pages 415 to 418)

Page 419

1  Q. My question to you is: Did you identify
2  those particular studies where there was commentary
3  on laser versus mechanical-cut --
4  A. I did.
5  Q. -- that you found on your PubMed
6  searching?
7     You cite to a study in 2006 comparing
8  laser-cut to mechanical-cut TVT-O and you say which
9  is the same material as mechanically-cut TVT.
10    Did the mechanical-cut tape have any
11 higher rate of complication for mesh exposures?
12 A. It had lower.
13 Q. On the next page you cite to another
14 randomized trial with mechanically-cut TVT tape in
15 the TVT-O and then a TVT-Secur which you identify
16 as laser-cut.
17    Did the mechanical-cut TVT tape have a
18 higher rate of dyspareunia than the laser-cut?
19 A. No.
20 Q. Have you continually looked at the
21 medical literature and studies before 2007 when
22 laser-cut mesh became available as well as after?
23 A. I have.
24 Q. Have you seen any clinically significant

Page 420

1  difference in the rates of complications with TVT
2  that were reported before 2007 as opposed to after?
3  A. Definitely not.
4  Q. Are the rates in the large systematic
5  reviews and Cochrane reviews like 4 Tommaselli, are
6  the rates of complications, particularly let's take
7  exposure, consistent or inconsistent with the rates
8  reported before 2007?
9  A. Consistent.
10 Q. You were asked questions about the mesh
11 folding or curling. In your analysis did you see
12 any Level 1 data that attributed mesh folding,
13 curling or roping to a complication?
14 A. No.
15 Q. You were asked about voiding
16 dysfunction. Have you assessed the voiding
17 dysfunction and the rate for surgery needed to
18 address voiding dysfunction in SISTEr and TOMUS
19 studies?
20 A. We did.
21 Q. And what is your opinion as to what
22 those show, if anything, with regard to a
23 difference in the rates between the autologous
24 pubovaginal slings you were asked about and the

Page 421

1  TVT?
2  A. I would like to get the actual numbers.
3     Can you ask something else while I look?
4  Q. Yes. You were asked questions about
5  whether there could be prolonged pain or death with
6  the autologous pubovaginal sling, and I think you
7  stated that off the top of your head you couldn't
8  point to or recall a specific article in the
9  literature that reported those complications.
10    Do you recall giving that testimony?
11 A. I do recall that.
12 Q. Do you recall actually one of the
13 studies, it may have been mentioned, I thought it
14 was, by lead author Chaikin regarding pubovaginal
15 fascial slings?
16 A. Yeah, that was in Dr. Blaivas' report.
17 Q. Okay. If you look at Table 4,
18 "Complications," do they in fact report a death as
19 well as prolonged pain with the autologous
20 pubovaginal sling?
21 A. They do.
22 Q. Do they also state that since there is
23 no exact method of determining how much tension to
24 put on that sling during surgery, one must rely on

Page 422

1  experience to make judgments?
2  A. Yes.
3  Q. Now, is that consistent or inconsistent
4  with your opinion about how you tension TVT slings?
5  A. That's consistent with what I've said --
6  Q. Is that consistent --
7  A. -- yesterday.
8  Q. Is that consistent or inconsistent with
9  what you said as a basis for your use of TVT that
10 you had already been trained and experienced in
11 fascial slings?
12    MS. FITZPATRICK: I'm going to object at this
13 point to not only is this leading, Mr. Snell, you
14 are basically testifying for the witness in an
15 attempt to change her testimony from before and
16 what she did and it's completely improper.
17    MR. SNELL: It's not. I'm asking. This is
18 perfectly good, solid questioning.
19    MS. FITZPATRICK: Completely leading.
20    MR. SNELL: Actually, consistent or
21 inconsistent, if you look, is not leading. All
22 right. So that's the question. She can answer any
23 way she wants to. Is it consistent or
24 inconsistent.

54 (Pages 419 to 422)

Page 423

1  MS. FITZPATRICK: You want to spend your
2  witness' time acting like this, you go right ahead.
3  THE WITNESS: So --
4  MS. FITZPATRICK: But maybe it's better to let
5  her answer the questions and get out.
6  BY THE WITNESS:
7  A. Voiding dysfunction leading to surgical
8  revision after a pubovaginal sling in RCTs was 6%
9  compared to 2.7% after retropubic midurethral.
10 BY MR. SNELL:
11 Q. And you are referencing voiding
12 dysfunction in the SISTEr and TOMUS trials?
13 A. I am.
14 Q. And, so, my question then -- I think I
15 have just two more.
16     When you mentioned that you were trained
17 on the autologous sling and learned how to tension
18 slings and then you transitioned to TVT and it was
19 not a significant difference in your opinion, is
20 that consistent or inconsistent with the statement
21 in the Chaikin paper that since there is no exact
22 method of determining tension to put on an
23 autologous sling, one must rely on experience?
24 A. That's consistent.

Page 424

1  Q. You were shown the IFU and asked
2  questions that seem to imply that there was a
3  discrepancy in the language about tensioning. Do
4  you recall that?
5  MS. FITZPATRICK: Objection; misrepresents the
6  statement, the question.
7  BY MR. SNELL:
8  Q. Do you recall in general the discussion
9  with --
10 A. I do recall --
11 Q. -- Ms. Fitzpatrick?
12 A. -- about the IFU discussion.
13 Q. I want to read something from the IFU to
14 you. It says -- that you weren't read -- "This
15 device should be used only by physicians trained in
16 the surgical treatment of stress urinary
17 incontinence. These instructions are recommended
18 for general use of the device. Variations in use
19 may occur in specific procedures due to individual
20 technique and patient anatomy."
21     My question to you is: Is that
22 consistent or inconsistent with your opinions on
23 how you in fact tension TVT for your different
24 patients?

Page 425

1  A. I believe that's consistent with my
2  testimony that it should be individualized.
3  MR. SNELL: Thank you. That's -- is there
4  anything else?
5      I'm just going to mark for the record --
6  let's mark these as the next two in line.
7  BY MR. SNELL:
8  Q. A question was raised, Doctor, about --
9  Ms. Fitzpatrick gave you a sheet of paper that
10 seemed to suggest that there may be a $5,000
11 contract with you between you and Ethicon.
12     I'm going to mark for the record
13 additional Ethicon documents that you weren't shown
14 which on their face state --
15 A. This is the one from 2007?
16 Q. Yes. Which on their face state that
17 there was no payment made, zero dollars. Just for
18 the record.
19 A. Good.
20 MR. SNELL: We will mark those seriatim.
21 BY THE WITNESS:
22 A. Then my recollection was correct.
23     (WHEREUPON, certain documents were
24      marked Kenton Deposition Exhibit

Page 426

1      No. 21, Ethicon document, "All
2      active contracts for 2008 through
3      Nov. 19, 2008"; Bates No.
4      Eth.Mesh.05013617, and No. 22,
5      11/11/2010 Ethicon document re
6      contracts; no Bates numbers.)
7  MR. SNELL: That's it.
8  MS. FITZPATRICK: Are you done testifying,
9  Mr. Snell?
10 MR. SNELL: I'm not testifying. I was
11 questioning.
12     FURTHER EXAMINATION
13 BY MS. FITZPATRICK:
14 Q. Turn to page 11 of your report.
15     You don't cite this 2006 study. What is
16 it?
17 A. What do you mean I don't cite it?
18 Q. I don't see a footnote that tells me
19 what study --
20 A. I didn't put the reference in?
21 Q. No. What study is it?
22 A. I mean, if I did have the reference,
23 I'll have to go back and pull it from my file.
24 Q. Do you believe that it's -- it would be

Page 427

1 appropriate for me to use data on complication
2 rates related to the ObTape and as a basis for what
3 I can expect out of complications from a TVT
4 device?
5    A.  I believe that ObTape has higher erosion
6 rates than TVT.
7    Q.  Okay.  So, why would you use a paper
8 that's comparing the erosion rates of an ObTape
9 laser-cut to a TVT-O mechanical-cut to support your
10 opinion that there is no difference between the
11 TVT Retropubic mechanically-cut and the TVT
12 laser-cut?
13    A.  Because there are very few data about
14 actually mechanically-cut versus laser-cut, and
15 that's about as good as the data is going to get.
16    Q.  That's the best you can get.  But you
17 agree with me, that's not a very good comparison,
18 is it?
19    A.  It's not any better than the -- it's --
20 to me it's not better or worse than the theories
21 that an engineer who has never touched a patient
22 has.
23    Q.  Is that sufficient data for you as a
24 surgeon to rely on to make the determination that

Page 428

1 there is no difference between the mechanically-cut
2 TVT-R and the mechanically-cut -- or the laser-cut
3 TVT-R?
4    A.  As I've testified numerous times, most
5 of the data on which I made my decision to
6 transition to midurethral sling as well as a good
7 portion of the outcome data is on mechanically-cut.
8       So, I make my decisions not based on a
9 little itemized study but, rather, on the multitude
10 of the outcome data.
11    Q.  Dr. Kenton, if we focus on what I'm
12 asking you, you're going to get out of here really
13 fast.
14    A.  Great.
15    Q.  TVT laser-cut versus TVT
16 mechanically-cut.
17    A.  There is no --
18    Q.  Is there any data that supports your
19 opinion that there is no difference between the
20 clinical performance of the TVT-R mechanically-cut
21 and the TVT-R laser-cut?
22    MR. SNELL:  Asked and answered.
23 BY THE WITNESS:
24    A.  There is no data to support that there

Page 429

1 is a difference, and there is a propensity of data
2 to support the mechanically-cut TVT is safe.
3 BY MS. FITZPATRICK:
4    Q.  Okay.  Do you believe that a study
5 comparing an ObTape laser-cut group to a
6 mechanically-cut TVT-O group is an appropriate
7 comparator or data to use when trying to determine
8 the clinical performance differences between the
9 TVT-R mechanical-cut and the TVT-R laser-cut?
10    MR. SNELL:  Objection; form, asked and
11 answered.
12 BY THE WITNESS:
13    A.  I don't believe that there are any
14 compelling data to use to compare those two.
15 BY MS. FITZPATRICK:
16    Q.  Okay.  Including this 2006 study that
17 you cite, correct?
18    A.  Correct.  It's the only thing that's out
19 there --
20    Q.  Thank you.
21    A.  -- which is why I included it.
22    MS. FITZPATRICK:  Nothing further.
23    THE VIDEOGRAPHER:  Okay.
24    MR. SNELL:  That's it.  Thank you.

Page 430

1    THE VIDEOGRAPHER:  The time is 12:15 p.m.
2 This is the end of the deposition, Volume 2 of the
3 deposition of Dr. Kimberly Kenton, and we're going
4 off the video record.
5       (Time Noted:  12:15 p.m.)
6       FURTHER DEPONENT SAITH NAUGHT.

Kimberly Kenton, M.D.

Page 431

 1    I, CORINNE T. MARUT, C.S.R. No. 84-1968,
 2  Registered Professional Reporter and Certified
    Shorthand Reporter, do hereby certify:
 3       That previous to the commencement of the
    examination of the witness, the witness was duly
 4  sworn to testify the whole truth concerning the
    matters herein;
 5       That the foregoing deposition transcript
    was reported stenographically by me, was thereafter
 6  reduced to typewriting under my personal direction
    and constitutes a true record of the testimony
 7  given and the proceedings had;
         That the said deposition was taken
 8  before me at the time and place specified;
         That the reading and signing by the
 9  witness of the deposition transcript was agreed
    upon as stated herein;
10       That I am not a relative or employee or
    attorney or counsel, nor a relative or employee of
11  such attorney or counsel for any of the parties
    hereto, nor interested directly or indirectly in
12  the outcome of this action.
         It was requested before completion of
13  the deposition that the witness, KIMBERLY KENTON,
    M.D., have the opportunity to read and sign the
14  deposition transcript.
15
    _____
16    CORINNE T. MARUT, Certified Reporter
17
         (The foregoing certification of this
18  transcript does not apply to any
    reproduction of the same by any means, unless under
19  the direct control and/or supervision of the
    certifying reporter.)
20
21
22
23
24

Page 432

 1        INSTRUCTIONS TO WITNESS
 2
 3        Please read your deposition over
 4   carefully and make any necessary corrections. You
 5   should state the reason in the appropriate space on
 6   the errata sheet for any corrections that are made.
 7        After doing so, please sign the errata
 8   sheet and date it.
 9        You are signing same subject to the
10   changes you have noted on the errata sheet, which
11   will be attached to your deposition.
12        It is imperative that you return the
13   original errata sheet to the deposing attorney
14   within thirty (30) days of receipt of the
15   deposition transcript by you. If you fail to do
16   so, the deposition transcript may be deemed to be
17   accurate and may be used in court.
18
19
20
21
22
23
24

Page 433

 1        - - - - - -
            E R R A T A
 2        - - - - - -
 3
 4   PAGE LINE CHANGE
 5   ____ ____ _____
 6        REASON: _____
 7   ____ ____ _____
 8        REASON: _____
 9   ____ ____ _____
10        REASON: _____
11   ____ ____ _____
12        REASON: _____
13   ____ ____ _____
14        REASON: _____
15   ____ ____ _____
16        REASON: _____
17   ____ ____ _____
18        REASON: _____
19   ____ ____ _____
20        REASON: _____
21   ____ ____ _____
22        REASON: _____
23   ____ ____ _____
24        REASON: _____

Page 434

 1
 2        ACKNOWLEDGMENT OF DEPONENT
 3
 4        I, KIMBERLY KENTON, M.D., do hereby
 5   certify under oath that I have read the foregoing
 6   pages, and that the same is a correct transcription
 7   of the answers given by me to the questions therein
 8   propounded, except for the corrections or changes
 9   in form or substance, if any, noted in the attached
10   Errata Sheet.
11
12
13        _____
14        KIMBERLY KENTON, M.D.          DATE
15
16
17   Subscribed and sworn
     to before me this
18   _____ day of _____, 20____.
19   My commission expires:_____
20
     _____ Notary Public
21
22
23
24

57 (Pages 431 to 434)