# EXHIBIT B

```
 1          IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                   CHARLESTON DIVISION
 3   IN RE: ETHICON, INC.            Master File No.
     PELVIC REPAIR SYSTEMS              2:12-MD-02327
 4   PRODUCTS LIABILITY LITIGATION    MDL NO. 2327
     _____
 5
       Mary Shelton, et al.,       JOSEPH R. GOODWIN
 6                                 U.S. DISTRICT JUDGE
               Plaintiffs,
 7   v.                            Case No. 2:12-cv-01707
 8   Ethicon, Inc., et al.,
 9             Defendants.
10
11              ORAL DEPOSITION OF
12            CHRISTINA PRAMUDJI, M.D.
13             Tuesday, July 12, 2016
14
15
16
17
18
19
20
21
22         GOLKOW TECHNOLOGIES, INC.
23      ph 877.370.3377  |  fax 917.591.5672
24              deps@golkow.com
```

Page 50

1  erosion.
2  Q. What's the basis of that
3  opinion?
4  A. Because an exposure is more
5  after -- immediately after the surgery, when
6  the wound doesn't come together well. An
7  erosion is further down the line where the
8  tissue is compromised and breaks down. In
9  her case, it was compromised by the atrophy.
10  Q. Other than the atrophy, the
11  diabetes and the hysterectomy, do you believe
12  that there's anything that Mary Shelton did
13  herself to cause or contribute to the
14  exposure or erosion that she experienced?
15  A. No.
16  Q. I've seen in some of the
17  records a diagnosis of diverticulosis. Do
18  you recall that?
19  A. I don't remember off the top of
20  my head.
21  Q. Is there anything about that
22  diagnosis, assuming it exists, that would
23  have caused or contributed to Mary Shelton's
24  mesh erosion or exposure?

Page 51

1  A. No.
2  Q. And I think I've also seen a
3  diagnosis of or treatment for basal cell
4  carcinoma on her chin. Do you recall seeing
5  that?
6  A. I don't remember that.
7  Q. Assuming that it's there, do
8  you believe that that would cause or
9  contribute to her mesh erosion or exposure?
10  A. No.
11  MS. COPELAND: How long have we
12  been going?
13  THE REPORTER: I can tell you.
14  57 minutes.
15  BY MS. COPELAND:
16  Q. You know what I want to do? I
17  would like to take a break right now if it's
18  okay with you.
19  A. Sure.
20  Q. Because I've been kind of
21  jumping all over the place, and then see if I
22  can pull it all together and wrap it up --
23  A. Sure.
24  Q. -- well in advance of two

Page 52

1  hours.
2  A. Sure.
3  (Recess taken, 6:59 p.m. to
4  7:09 p.m.)
5  BY MS. COPELAND:
6  Q. Let's go back to page 5 of your
7  report, which is Exhibit 2.
8  A. Okay.
9  Q. You indicate at number 5 or you
10  note at number 5 that Mrs. Shelton continues
11  to have mild urinary incontinence.
12  Do you see that?
13  A. Yes.
14  Q. And you say it's common at her
15  age and it is multifactorial. It does not
16  represent a failure or defect of the mesh.
17  My question to you is: A
18  failure or a defect of a mesh, is it a
19  possibility of her -- a possible cause of her
20  recurrent incontinence?
21  A. No, I don't believe so, no.
22  Q. So when you indicate that the
23  urinary incontinence is multifactorial, what
24  do you mean?

Page 53

1  A. Well, as women age, urinary
2  incontinence becomes more common and it's due
3  to urogenital atrophy, it's due to anatomical
4  changes. There's numerous causes that can
5  occur. The diabetes is a factor that can
6  cause urinary incontinence.
7  So there's many reasons why she
8  has urinary incontinence.
9  Q. But mesh is not one of them?
10  A. Correct.
11  Q. You're aware of literature out
12  there that supports at least the possibility
13  that mesh or mesh failure can be a cause of
14  recurrent stress incontinence, correct?
15  MR. SNELL: Form and
16  foundation.
17  A. I don't believe that the mesh
18  causes it, but I believe that the anatomy can
19  change over time and the mesh cannot overcome
20  those changes in anatomy.
21  BY MS. COPELAND:
22  Q. I'm not sure if I asked you
23  this earlier, and I apologize if I did. Is
24  there anything about Mary Shelton's medical

Page 54

1  history, medical condition in 2002, at the
2  time of her implant, to suggest she was not a
3  proper candidate for either of the mesh
4  products implanted in her body?
5      A.   No.
6      Q.   There was no warning or
7  contraindication that you're aware of in
8  either of the IFUs to suggest that those
9  products should not have been implanted in
10 her body, correct?
11     A.   Correct.
12     Q.   I saw somewhere that you had
13 done some work with Ethicon beyond serving as
14 an expert offering opinions on their behalf,
15 and what I noted was that you had done some
16 preceptorship work for Ethicon?  Is that
17 right?
18     A.   Correct.
19     Q.   And that involves teaching
20 other physicians about the Ethicon
21 products --
22     A.   Correct.
23     Q.   -- and how to implant them,
24 right?

Page 55

1      A.   Yes.
2      Q.   And how to decide what types of
3  patients are appropriate and which ones are
4  not appropriate, correct?
5      A.   Correct.
6      Q.   Have you done any preceptorship
7  work since -- on behalf of Ethicon since you
8  have been hired to serve as an expert on
9  their behalf?
10     A.   No.
11     Q.   I noticed -- noted that you had
12 also served on some advisory panels for
13 Ethicon.
14     A.   Yes, that's correct.
15     Q.   Have you been on any advisory
16 panels since you began working as an expert
17 on their behalf?
18     A.   No.
19     Q.   And appearing at or moderating
20 meetings or booths or a booth at AUA, have
21 you done that since you've been hired as an
22 expert?
23     A.   No.
24     Q.   Other than serving as an

Page 56

1  expert, preceptorship work, advisory panels
2  and moderating meetings or booths at AUA,
3  have you done any other paid work on behalf
4  of Ethicon, ever?
5           MR. SNELL:  Object, form.
6      Covered in prior depositions.
7           Go ahead.
8      A.   Not that I can recall.
9  BY MS. COPELAND:
10     Q.   Okay.  And that's all -- I'm
11 just trying to get current, you know, so
12 maybe something has changed since then, but
13 thank you.
14          MR. SNELL:  I have no problem
15     with current questions in that regard,
16     if that's what you're asking.
17          MS. COPELAND:  Yeah, yeah.  I'm
18     just looking for anything new.
19          MR. SNELL:  Yeah, I have no
20     issue with current.  I just thought I
21     heard prior, sorry.
22          MS. COPELAND:  And I could have
23     said it.  Thank you.
24 BY MS. COPELAND:

Page 57

1      Q.   What I think that I'm going to
2  do is I want to take -- the only thing that
3  you brought that causes me any concern would
4  be the drives, since I can't see them.
5           MR. SNELL:  They just have -- I
6      mean, I'll put it on the record.  I'll
7      make a representation.  They just have
8      the medical records, all the medical
9      records and the depositions that would
10     have been accumulated at that point.
11          MS. COPELAND:  Case-specific
12     only?
13          MR. SNELL:  Case-specific,
14     yeah, yeah, yeah.
15          MS. COPELAND:  Okay.
16          MR. SNELL:  Let me plug it in.
17          MS. COPELAND:  And then I'm not
18     sure what the position is or it's
19     going to be, but what I would like to
20     do is I'm going to stop, but I want to
21     at least put it on the record, a
22     reservation of my right to finish off
23     any untaken time to depose you on a
24     medical examination if you perform

Page 58

1  one.
2       I don't know that you can agree
3  or disagree, but I want to reserve my
4  right to do that.
5       THE REPORTER: Are we still on
6  the record? Is there anything
7  further?
8       MR. SNELL: I'm just looking --
9  I'm sorry.
10       MS. COPELAND: Yeah, let's stay
11  on the record for a few minutes.
12       MR. SNELL: So, Counsel, my
13  representation is accurate. I'm
14  opening up the thumb drive, and all
15  that are on it are case-specific
16  medical records and transcripts from
17  depositions.
18       MS. COPELAND: In this case.
19       MR. SNELL: In this case.
20       MS. COPELAND: Yeah, you said
21  case-specific.
22       MR. SNELL: And they would be
23  contained and set forth, itemized in
24  the back of the materials list that

Page 59

1  you discussed with the doctor earlier.
2       MS. COPELAND: Great. Okay.
3  Then with the noting on the record of
4  my reservation to continue this
5  deposition if a medical examination is
6  taken or performed on Mary Shelton, I
7  will pass the witness.
8            EXAMINATION
9  BY MR. SNELL:
10       Q.   Dr. Pramudji, I just have a few
11  follow-up questions.
12            You mentioned the rough draft
13  of Dr. Pizarro and that you had not had a
14  chance to read that yet? Am I correct in
15  that regard?
16       A.   That's correct.
17       Q.   Do you plan to review that
18  deposition?
19       A.   Yes.
20       Q.   Do you plan to review any other
21  depositions or medical records that become
22  available between now and the time of trial?
23       A.   Yes.
24       Q.   And if you review any of those

Page 60

1  and it changes or augments or change -- or
2  affects your opinion, will you let me know so
3  I can let plaintiffs' counsel know?
4       A.   Yes.
5       MR. SNELL: Counsel, I believe
6  there was an updated or a supplemental
7  reliance list that was served a week
8  or so ago.
9       MS. COPELAND: Oh, yeah? Okay.
10       MR. SNELL: I don't know if you
11  have it or if you want to attach it,
12  but I will put that on the record.
13       MS. COPELAND: Can we go ahead
14  and just mark that as Exhibit 3?
15       MR. SNELL: Yeah.
16       MS. COPELAND: Why don't we
17  just do that.
18       MR. SNELL: Okay. I don't have
19  a copy of it, but I assume --
20       MS. COPELAND: We'll get one.
21       MR. SNELL: Okay.
22       (Whereupon, Exhibit
23  Pramudji-Shelton-3, Supplemental
24  Reliance List in Addition to Materials

Page 61

1  Referenced in Report Re Mary Shelton,
2  was marked for identification.)
3  BY MR. SNELL:
4       Q.   You were asked a question about
5  whether all of the general materials in your
6  prior general report are the entire scope of
7  your general opinions.
8            Do you recall a question
9  somewhat along those lines?
10       A.   Yes.
11       Q.   I'm paraphrasing because
12  plaintiffs' counsel's question was much more
13  articulate than that one.
14       MS. COPELAND: One of them.
15  BY MR. SNELL:
16       Q.   My question to you is this,
17  Doctor: Have you, since the time of your
18  most recent general Gynemesh Prolift report,
19  continued to review the literature with
20  regard to those products?
21       A.   Yes.
22       Q.   And have you, in prior
23  depositions, noted the additional materials
24  that you have reviewed that don't change your

Page 62

1  opinion but are just further supportive of
2  your opinions?
3       A.   Yes.
4       Q.   Such as the recent AUGS, SUFU,
5  AUA, SGS, National Incontinence Group,
6  position statement that was just released on
7  midurethral slings?
8       A.   Yes.
9       Q.   The paper to be presented at
10 IUGA on the lack of support for a degradation
11 theory showing that the correct material is
12 instead a biologic proteinaceous material?
13      A.   Yes.
14           MS. COPELAND:  Objection, form.
15 BY MR. SNELL:
16      Q.   Do you recall the questions
17 about the mesh erosion, in particular where
18 it was located?
19      A.   Yes.
20      Q.   I believe you testified it was
21 reported in the records to be 1-point --
22 strike that.
23           The mesh exposure or erosion
24 was reported to be approximately

Page 63

1  1-by-1 centimeters at the apex?  Do you
2  recollect giving that testimony?
3       A.   Yes.
4       Q.   Was the mesh erosion at the
5  site of the TVT, or was that the prolapsed
6  mesh?
7       A.   That would be the prolapsed
8  mesh.
9       Q.   Do you recall being asked about
10 whether or not generally mesh is supposed to
11 erode?
12      A.   Yes.
13      Q.   Is erosion a potential risk of
14 utilizing sutures?
15      A.   Yes.
16      Q.   Is it a potential risk of using
17 biologic materials?
18      A.   Yes, it is.
19      Q.   Is it a potential risk of using
20 autologous material?
21      A.   Yes.
22      Q.   Is that all set forth in your
23 general report?
24      A.   Yes.

Page 64

1       Q.   Do you recall being asked about
2  the plaintiff's shortened and narrowed
3  vagina?
4       A.   Yes.
5       Q.   Was that a preexisting
6  condition she had even before her 2002
7  surgeries with the Prolene and TVT?
8       A.   Yes, that's correct.
9       Q.   Did you consider that in
10 formulating your differential diagnoses?
11      A.   Yes.
12      Q.   Was dyspareunia a preexisting
13 medical condition?
14      A.   Yes, it was.
15      Q.   And when I say "preexisting,"
16 I'm asking, did it preexist as well the
17 mesh-based repairs from 2002?
18      A.   Yes.
19      Q.   And did she have the
20 dyspareunia at the same time she had the
21 shortened and narrowed vagina before the 2002
22 mesh-based repair surgeries with the TVT and
23 Prolene?
24           MS. COPELAND:  Form.

Page 65

1       A.   Yes.
2  BY MR. SNELL:
3       Q.   Did you consider that in
4  formulating your differential diagnosis?
5       A.   Yes.
6       Q.   You were asked a question about
7  the recurrence noted in 2010 and plaintiff's
8  complaint of recurrent prolapse.  My question
9  to you is this:  I believe in your report you
10 note that the prolapse in 2010 was at a
11 rectocele and enterocele?
12      A.   That's correct.
13      Q.   Where was the Prolene mesh used
14 back in 2002?
15      A.   The Prolene mesh was used in
16 the anterior compartment of the vagina to
17 repair a cystocele, so it's a different wall
18 of the vagina.
19      Q.   Would the rectocele/enterocele
20 noted in 2010 be a recurrence of that
21 anterior colporrhaphy/replacement of Prolene
22 mesh performed in 2002?
23           MS. COPELAND:  Objection, form.
24      A.   No.

Page 66

1  BY MR. SNELL:
2    Q.  As far as that rectocele
3  recurring, when did she first actually have
4  her initial rectocele repair?  And I'm
5  looking at your report at the top of page 2.
6    A.  1986.
7    Q.  And then between 1986 and 2002,
8  she also had numerous other rectocele
9  repairs?
10   A.  That's correct.
11   Q.  And then in 2010, she had
12 another rectocele noted?
13   A.  That's correct.
14   Q.  And would that be a recurrence
15 of her earlier rectocele repairs and
16 preexisting history of a rectocele?
17       MS. COPELAND:  Objection, form.
18   A.  Yes, that's correct.
19 BY MR. SNELL:
20   Q.  Was the rectocele a documented
21 preexisting medical condition that she had
22 before the 2002 surgeries with the TVT and
23 the Prolene mesh for anterior repair?
24       MS. COPELAND:  Objection, form.

Page 67

1    A.  Yes, that's correct.
2  BY MR. SNELL:
3    Q.  You were asked about the
4  defecatory dysfunction also that she reported
5  at the same time as her rectocele in 2010.
6        Do you recall that?
7    A.  Yes.
8    Q.  And you testified it was not
9  from the mesh.  Do you recall that?
10   A.  Yes.
11   Q.  What, if anything, do you
12 believe that that defecatory dysfunction was
13 from?
14       MR. SNELL:  Objection, form.
15   A.  I believe that was from the
16 recurrent rectocele.
17 BY MR. SNELL:
18   Q.  Okay.  You were asked a
19 question about the IFUs and what it said or
20 didn't say.
21       Do you recall that?
22   A.  Yes.
23   Q.  Did the Prolene and TVT IFUs
24 warn of the risk of erosion, extrusion?

Page 68

1        MS. COPELAND:  Objection, form.
2    A.  Yes.
3  BY MR. SNELL:
4    Q.  Did they warn of the risk of
5  inflammation?
6    A.  Yes.
7    Q.  Based on your review of the
8  literature -- strike that.
9        Plaintiffs' counsel asked you
10 questions about your various professional
11 education activities with Ethicon on their
12 products.  Do you recall that?
13   A.  Yes.
14   Q.  Does the IFUs also recommend a
15 surgeon undergo training?
16   A.  Yes.
17   Q.  Does that professional
18 education and training also warn or advise of
19 the risk of erosion, extrusion, inflammation?
20       MS. COPELAND:  Objection, form.
21   A.  Yes.
22 BY MR. SNELL:
23   Q.  Does it warn of other risks?
24       MS. COPELAND:  Objection, form.

Page 69

1    A.  Yes.
2  BY MR. SNELL:
3    Q.  Page 4 of your report, you cite
4  to a paper by Iglesia regarding the use of
5  mesh in gynecologic surgery published in
6  1997.  Do you see that?
7    A.  Yes.
8    Q.  And you state, "As noted in my
9  general report, wound complications, scarring
10 and dyspareunia are risks of all prolapse
11 surgeries that have been long reported in the
12 literature."  Is that correct?
13       MS. COPELAND:  Objection, form.
14   A.  Yes.
15 BY MR. SNELL:
16   Q.  "And are a basic part of pelvic
17 floor surgeon training."  Do you recall that?
18   A.  Yes.
19   Q.  Through your review of the
20 literature over the years and your medical
21 education and training, are you aware of what
22 risks or complications would be commonly
23 known to the intended users of these devices?
24       MS. COPELAND:  Objection, form.

Page 70

1  A.  Yes.
2  BY MR. SNELL:
3  Q.  And would mesh
4  erosion/exposure, dyspareunia, scarring, are
5  those risks that would be commonly known to
6  the intended user of these devices at the
7  time of Mrs. Shelton's surgery?
8      MS. COPELAND:  Objection, form.
9  A.  Yes.
10 BY MR. SNELL:
11 Q.  Is that based on your review of
12 the literature over decades as well as your
13 experience and education as well as
14 professional education, teaching and training
15 activities with the Ethicon products?
16     MS. COPELAND:  Objection, form.
17 A.  Yes.
18     MR. SNELL:  That's all I have.
19     FURTHER EXAMINATION
20 BY MS. COPELAND:
21 Q.  It's not your opinion that the
22 size 0 Ethibond sutures utilized in
23 Mrs. Shelton at the time of her prolapse
24 surgery with mesh was a cause or contributing

Page 71

1  factor to her erosion or exposure, is it?
2  A.  No.
3  Q.  Do you believe that there is
4  any biologic material that's ever been
5  implanted in Mrs. Shelton that caused or
6  contributed to her erosion or exposure?
7  A.  No.
8  Q.  What about autologous material?
9  Do you believe that there's any autologous
10 material that's ever been used in any of her
11 surgeries that caused or contributed to her
12 exposure or erosion?
13 A.  No.
14 Q.  And then on page 4 of your
15 report, going back to that citation to the
16 Iglesia article, you would agree with me --
17 let me back up and just get this right.
18     You note that wound
19 complications, scarring and dyspareunia are
20 risks of all prolapse surgeries that have
21 long been reported in the literature,
22 correct?
23 A.  Correct.
24 Q.  You would agree with me that

Page 72

1  mesh is also one of the prolapse surgeries to
2  which you refer, correct?
3  A.  Correct.
4  Q.  So you would agree with me that
5  wound complications are a risk of mesh
6  prolapse surgery, correct?
7      MR. SNELL:  Object, form.
8      Go ahead.
9  A.  Correct.
10 BY MS. COPELAND:
11 Q.  And scarring is a risk
12 associated with mesh prolapse surgery,
13 correct?
14 A.  Correct.
15 Q.  And finally, dyspareunia is a
16 risk associated with mesh prolapse surgery,
17 correct?
18 A.  Correct.
19     MS. COPELAND:  That's all I've
20 got.  Thank you.
21     THE WITNESS:  Okay.  Thank you.
22     MR. SNELL:  That's all I have.
23     THE REPORTER:  The reporter
24 will put the elapsed time on the

Page 73

1  record, and we are off the record at
2  7:31.
3      (Deposition recessed at
4  7:31 p.m.)
5      REPORTER'S NOTE:  Examination
6  time used by counsel is as follows:
7  BY MS. COPELAND:  01:07:14
8  BY MR. SNELL:     00:12:36
9          --oOo--

Page 74

1  CERTIFICATE
2
3  I, SUSAN PERRY MILLER, Registered Diplomate Reporter, Certified Realtime
4  Reporter, Certified Court Reporter and Notary Public, do hereby certify that prior to the
5  commencement of the examination, CHRISTINA PRAMUDJI, M.D. was duly sworn by me to
6  testify to the truth, the whole truth and nothing but the truth;
7
8  That pursuant to Rule 30 of the Federal Rules of Civil Procedure, signature of the witness was not reserved by the
9  witness or other party before the conclusion of the deposition;
10
11  That the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the
12  time, place and on the date hereinbefore set forth, to the best of my ability.
13
14  I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this
15  action, and that I am neither a relative nor employee of such attorney or counsel, and
16  that I am not financially interested in the action.
17
18
19  _____
    Susan Perry Miller
    CSR-TX, CCR-LA, CSR-CA
20  Registered Diplomate Reporter
    Certified Realtime Reporter
21  Certified Realtime Captioner
    NCRA Realtime Systems Administrator
22  Notary Public, State of Texas
    My Commission Expires 03/30/2016
23
24  Dated: 18th of July, 2016

Page 75

1  — — — — — —
2  LAWYER'S NOTES
   — — — — — —
3
4  PAGE   LINE
5  ____   ____   _____
6  ____   ____   _____
7  ____   ____   _____
8  ____   ____   _____
9  ____   ____   _____
10 ____   ____   _____
11 ____   ____   _____
12 ____   ____   _____
13 ____   ____   _____
14 ____   ____   _____
15 ____   ____   _____
16 ____   ____   _____
17 ____   ____   _____
18 ____   ____   _____
19 ____   ____   _____
20 ____   ____   _____
21 ____   ____   _____
22 ____   ____   _____
23 ____   ____   _____
24 ____   ____   _____