# EXHIBIT C

```
 1              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT WEST VIRGINIA
 2                   CHARLESTON DIVISION
 3                              ) Master File
    IN RE:  ETHICON, INC.,      ) No. 2:12-MD-02327
 4  PELVIC REPAIR SYSTEM        ) MDL No. 2327
    PRODUCTS LIABILITY          )
 5  LITIGATION                  ) JOSEPH R. GOODWIN
    _____ ) U.S. DISTRICT JUDGE
 6                              ) _____
    THIS DOCUMENT RELATES TO    )
 7  PLAINTIFFS:                 )
                                )
 8  Donna Bihlmeyer, et al v.   )
    Ethicon, Inc., et al        )
 9                              )
    Case No. 2:12-cv-02159      )
10
11  ****************************************************
12                   VIDEO DEPOSITION OF
13             CHRISTINA KLEIN PRAMUDJI, M.D.
14                     June 9, 2016
15  ****************************************************
16
17
18
19
20
21
22
23
24
```

Page 94

1  scarring that led to the vaginal stenosis. Was that
2  scarring worse in the native tissue arm than the
3  Prolift arm?
4     A. Yes, it was.
5         MR. DARLEY: Object to form. Burt, can
6  we ask some non-leading questions here? I think that
7  would be appropriate.
8     Q. (By Mr. Snell) Plaintiff's counsel asked you
9  some questions about the early Prolift IFU. Do you
10 recollect that?
11    A. Yes.
12    Q. And I believe you testified it was your
13 opinion that this IFU was adequate?
14    A. Yes.
15    Q. And you identified to Plaintiff's counsel
16 that the IFU points to things like infection,
17 adhesions, scarring --
18        MR. DARLEY: Object to form.
19    Q. (By Mr. Snell) -- and contraction. Is that
20 correct or not?
21    A. Yes, that's what I -- that's what I pointed
22 to.
23    Q. And why is it your opinion that a pelvic
24 floor surgeon would understand that dyspareunia could

Page 95

1  flow from any of those complications?
2     A. Because we are trained to know that scarring
3  in the vagina and inflammation in the vagina will or
4  can, it may not, but it can cause dyspareunia. So
5  that is something that is a fundamental part of
6  training to pelvic floor surgeons.
7     Q. Is that -- do you know whether or not the
8  potential risk of dyspareunia from Prolift surgery,
9  whether or not that was something that was commonly
10 known in your field before Prolift came out in 2005?
11        MR. DARLEY: Object to form.
12    A. Yes, that was commonly known to occur just
13 with the most fundamental surgery, such as an anterior
14 and posterior repair or a hysterectomy, which can be a
15 form of reconstruction if they have prolapse.
16    Q. (By Mr. Snell) And in your general report
17 and in your materials list, do you point to any of the
18 medical literature that supports that opinion?
19    A. Yes.
20    Q. I'd like to hand you a paper from one of the
21 boxes. Can you identify this for the record?
22    A. Yes. This is a study dating back to 1961.
23 The first author is Winifred Francis and the title of
24 the study is Dyspareunia Following Vaginal Operations.

Page 96

1     Q. And what is the significance, if any, of that
2  study?
3         MR. DARLEY: Object to outside the scope
4  of direct.
5     A. This study shows that, going back over 50
6  years, that pelvic floor surgeons are aware that
7  dyspareunia -- and I'm reading from the study -- are
8  well accepted complications of operations which
9  involve incision and suture of the vagina, that there
10 is tenderness of scars in the vaginal walls,
11 shortening of the vagina, especially following vaginal
12 hysterectomy is an important factor, but the most
13 important cause -- obvious cause is narrowing of the
14 introitus and the vagina, which results from removal
15 of tissue as part of the cure of prolapse.
16    Q. (By Mr. Snell) And does this study support
17 your opinion with regard to the adequacy of the IFU
18 for Prolift?
19    A. Yes, this shows that this is part of the
20 common knowledge and literature of pelvic floor
21 surgery, vaginal surgery.
22    Q. And you -- I believe you mentioned in
23 response to Plaintiff's counsel's questions, you
24 mentioned the surgeon's monograph. Did I hear you

Page 97

1  correctly?
2     A. Yes, I did.
3     Q. Well, let me ask you this: Is the surgeon's
4  monograph part of professional education for Prolift?
5     A. Yes, it is.
6     Q. How do you know that?
7     A. Well, I was -- I did professional education
8  for Ethicon for many years, so I'm familiar with the
9  -- what was supplied during the education sessions,
10 the monograph, IFU, the slide presentations that were
11 -- that were given, because I was directly involved in
12 educating other surgeons.
13    Q. Did you do any professional education on
14 Prolift?
15    A. Oh, yes, I did, quite a bit.
16    Q. During your professional education of the
17 Ethicon devices, did you cover the instructions for
18 use?
19    A. Yes.
20    Q. And is that a form -- strike that.
21        Is that part of the foundation of your
22 opinions about the adequacy of the IFU?
23    A. Yes.
24    Q. And if you look at the very first page of the

Page 98

1  Prolift IFU that Plaintiff's counsel asked you about,
2  it says: Training on the use of Gynecare Prolift
3  Pelvic Floor Repair Systems is recommended and
4  available.
5       Do you see that?
6    A. Yes.
7    Q. And would a pelvic floor surgeon going to the
8  Prolift professional education be informed about risk
9  of scarring, pain and dyspareunia, among others?
10       MR. DARLEY: Object to form.
11   A. Yes, we would definitely educate the other
12  physicians about that.
13   Q. (By Mr. Snell) And what is the basis of that
14  statement?
15   A. That's based on my experience and also just
16  going back and reviewing the slide presentations and
17  the monograph and everything that was provided to the
18  surgeons.
19   Q. I'm going to hand you the Prolift monograph
20  that I believe you referenced. Can you tell us
21  whether that -- whether or not the Prolift monograph
22  supports your opinion that the IFU is adequate?
23       MR. DARLEY: Object to form. Leading.
24   A. Yes, it --

Page 99

1        MR. SNELL: Well, it's a whether or not,
2  so it's one way or the other.
3    Q. (By Mr. Snell) Go ahead.
4    A. Yes, it does support my opinion.
5    Q. Can you tell us why, if at all?
6    A. Yes. The monograph goes into great detail in
7  the risks of dyspareunia and vaginal pain with the
8  Prolift System. It has almost a full page of
9  information regarding that provided to the surgeons.
10  It has a graph and it has literature articles to cite
11  back to if the surgeons wanted more information.
12   Q. You were asked some questions about
13  Dr. Galloway's recent IME of the Plaintiff. Do you
14  recollect that?
15   A. Yes.
16   Q. Do you have an understanding as to when
17  Dr. Galloway did his IME?
18   A. Yes. It was last week, June 3rd, 2016.
19   Q. Do you put much weight on Dr. Galloway's IME
20  considering what -- considering his inability to do an
21  adequate exam that you mentioned on numerous
22  occasions?
23   A. No, I don't.
24   Q. And I think you made it clear to Plaintiff's

Page 100

1  counsel that you would like to do an IME since
2  Dr. Galloway was afforded that opportunity last week?
3    A. Yes, I believe I provided dates two or three
4  weeks ago to open up for an IME, but she was not made
5  available for that. I would still like that
6  opportunity.
7        MR. DARLEY: Object to form. Move to
8  strike that. Go ahead, Burt.
9        MR. SNELL: Now, I don't -- Counsel, you
10  can correct me if I'm wrong, but I don't believe
11  Dr. Galloway has been deposed yet or maybe he's being
12  deposed pretty soon.
13       MR. DARLEY: I think today, actually.
14       MR. SNELL: Okay.
15   Q. (By Mr. Snell) Dr. Pramudji, do you intend
16  to review and comment about Dr. Galloway's deposition
17  testimony, if at all?
18   A. Yes.
19   Q. Okay. Given the data cited in your report at
20  Page 6 and 7 and the randomized control trials you've
21  referenced, are you able to rule out the mesh as being
22  a cause of her dyspareunia and pelvic pain?
23   A. Yes.
24       MR. DARLEY: Object to form.

Page 101

1    Q. (By Mr. Snell) What do you believe to be the
2  cause of her pelvic pain and dyspareunia?
3        MR. DARLEY: Object to form.
4    A. I believe that her pelvic pain and
5  dyspareunia is due to scarring from the hysterectomy
6  and the pelvic floor reconstruction and in recent
7  months or years is due to the vaginal atrophy that she
8  has developed over the last few years.
9    Q. (By Mr. Snell) And for the vaginal atrophy
10  that you mentioned, is that a treatable condition?
11   A. Yes, it is.
12   Q. How, if at all, would you recommend
13  Mrs. Bihlmeyer consider treating the atrophy?
14   A. I would recommend that she use either a
15  vaginal cream, like Premarin cream or Estrace cream,
16  she could use a vaginal tablet, such as Vagifem or she
17  could use Osphena, which is an oral tablet. And any
18  of those treatments would improve her vaginal wall
19  health and the sensations would improve.
20       MR. SNELL: That's all I have. Thank
21  you.
22          EXAMINATION
23  QUESTIONS BY MR. DARLEY:
24   Q. Dr. Pramudji, I've just got a couple more

Christina Klein Pramudji, M.D.

Page 106

1  I, CHRISTINA KLEIN PRAMUDJI, M.D, have read the foregoing deposition and hereby affix my signature
2  that same is true and correct, except as noted above.
3
4
5  _____
   CHRISTINA KLEIN PRAMUDJI, M.D
6
7
   THE STATE OF _____)
8  COUNTY OF _____)
9     Before me, _____, on this day personally appeared CHRISTINA KLEIN PRAMUDJI, M.D,
10 known to me (or proved to me under oath or through _____) (description of identity
11 card or other document) to be the person whose name is subscribed to the foregoing instrument and
12 acknowledged to me that they executed the same for the purposes and consideration therein expressed.
13    Given under my hand and seal of office this _____ day of _____,
14 _____.
15
16
17 _____
   NOTARY PUBLIC IN AND FOR
18 THE STATE OF _____
   COMMISSION EXPIRES: _____
19
20
21
22
23
24

Page 107

1  THE STATE OF TEXAS:
   COUNTY OF FT. BEND:
2
       I, Tamara Vinson, a Certified Shorthand
3  Reporter and Notary Public in and for the State of Texas, do hereby certify that the facts as stated by
4  me in the caption hereto are true; that the above and foregoing answers of the witness, CHRISTINA KLEIN
5  PRAMUDJI, M.D., to the interrogatories as indicated were made before me by the said witness after being first duly
6  sworn to testify the truth, and same were reduced to typewriting under my direction; that the above and
7  foregoing deposition as set forth in typewriting is a full, true, and correct transcript of the proceedings
8  had at the time of taking of said deposition.
9     I further certify that I am not, in any capacity, a regular employee of the party in whose
10 behalf this deposition is taken, nor in the regular employ of his attorney; and I certify that I am not
11 interested in the cause, nor of kin or counsel to either of the parties.
12
       GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
13 this, the ____ day of June, 2016.
14
15
16
17 _____
   Tamara Vinson, Texas CSR No. 3015
18 Expiration Date: 12-31-2016
19
20 GOLKOW TECHNOLOGIES, INC.
   Texas CRCB Registration #690
21 440 Louisiana, Suite 910
   Houston, Texas 77002
22 www.golkow.com
23
24