# Exhibit B

Peter L. Rosenblatt, M.D.

```
1              UNITED STATES DISTRICT COURT
2           SOUTHERN DISTRICT OF WEST VIRGINIA
3                  CHARLESTON DIVISION
4
5     * * * * * * * * * * * * * *
6    IN RE:  ETHICON, INC.      * Master file No.
7    PELVIC REPAIR SYSTEM       * 2:12-MD-02327
8    PRODUCTS LIABILITY         * MDL NO. 2327
9    LITIGATION                 * JOSEPH R. GOODWIN
                                 U.S. DISTRICT JUDGE
10    * * * * * * * * * * * * * *
11   THIS DOCUMENT RELATES TO PLAINTIFFS:
12   Toni Hernandez
     2:12-cv-02073
13
     Karen Doucette
14   2:12-cv-02125
15   Sheryl & Kevin E. Lary
     2:12-cv-02136
16
     Teresa Scott
17   2:12-cv-02100
18       DEPOSITION OF PETER L. ROSENBLATT, M.D.
                    GYNEMESH PS
19             COURTYARD BY MARRIOTT
20              777 Memorial Drive
21           Cambridge, Massachusetts
22          July 1, 2016    9:00 a.m.
23
24          Maryellen Coughlin, RPR/CRR
25
```

Peter L. Rosenblatt, M.D.

Page 2

1  APPEARANCES:
2  Representing the Plaintiffs:
3      MOSTYN LAW
4      3810 W. Alabama Street
5      Houston, Texas 77027
6      BY: Jeff D. Crawford, Esq.
7      713-714-0000
8      Jeff@mostynlaw.com
9  Representing the Defendants:
10     BUTLER SNOW LLP
11     1010 Highland Colony Parkway
12     Ridgeland, Mississippi 39157
13     BY: Paul S. Rosenblatt, Esq.
14     601-985-4596
15     paul.rosenblatt@butlersnow.com
16
17
18
19
20
21
22
23
24
25

Page 4

1      EXHIBITS CONTINUED
2  NO.       DESCRIPTION            PAGE
3  9    "Current Controversies Regarding    189
4      Oncologic Risk Associated with
5      Polypropylene Midurethral
6      Slings" by King, et al
7  10   "Polypropylene as a             191
8      reinforcement in pelvic surgery
9      is not inert: comparative
10     analysis of 100 explants" by
11     Clavé
12 11   "Long-Term Results of Burch    192
13     Colposuspension" by Demirci
14 12   "Biocompatibility of prosthetic    193
15     meshes in abdominal surgery" by
16     Binnebösel
17 13   "Does the tension-free vaginal    194
18     tape stay where you put it?" by
19     Dietz
20 14   "Ultrasound Assessment of       195
21     Mid-Urethra Tape at Three-Year
22     Follow-Up after Tension-Free
23     Vaginal Tape Procedure" by Lo,
24     et al
25

Page 3

1              I N D E X
2  EXAMINATION               PAGE
3  BY MR. CRAWFORD                    6
4  BY MR. ROSENBLATT                144
5  BY MR. CRAWFORD                  186
6  BY MR. ROSENBLATT                232
7              EXHIBITS
8  NO.       DESCRIPTION          PAGE
9  1    General Prolene, Gynemesh PS and    7
10     Prolift Expert report of Peter
11     Rosenblatt, M.D.
12 2    Rule 26 Expert Report of Bruce    16
13     Rosenzweig, M.D.
14 3    Notice to Take Deposition of    22
15     Dr. Peter Rosenblatt
16 4    Invoice #2          24
17 5    Invoice #1          24
18 6    Presentations         27
19 7    "Influence of implantation    187
20     Interval on the long-term
21     biocompatibiity of surgical
22     mesh" by Klosterhalfen, et al
23 8    "Histopathology of excised    188
24     midurethral sling mesh" by Hill,
25     et al

Page 5

1      EXHIBITS CONTINUED
2  NO.       DESCRIPTION           PAGE
3  15   "Mesh contraction: myth or    196
4      reality?" by Dietz, et al
5  16   "Basic science and clinical    197
6      aspects of mesh infection in
7      pelvic floor reconstructive
8      surgery" by de Tayrac, et al
9  17   "The Myth: In Vivo Degradation    198
10     of Polypropylene Meshes" by Ong
11     et al
12 18   "Purely Transvaginal/Perineal    199
13     Management of Complications From
14     Commercial Prolapse Kits
15     Using a New Prostheses/Grafts
16     Complication Classification
17     System" by Firooz, et al
18 19   Material Safety Data Sheet for    200
19     polypropylene
20 20   Frequently Asked Questions by    200
21     Providers Mid-urethral Slings
22     for Stress Urinary Incontinence
23 21   AUGS position statement    232
24
25

Peter L. Rosenblatt, M.D.

Page 6

1     P R O C E E D I N G S
2
3         PETER L. ROSENBLATT, M.D.,
4   having been first duly sworn, was examined
5   and testified as follows:
6
7           EXAMINATION
8   BY MR. CRAWFORD:
9       Q.    Good morning, Doctor. My name is
10  Jeff Crawford, and I'm here this morning to ask
11  you some questions about the opinions you have
12  rendered in this case.
13          Do you understand that?
14      A.    Yes.
15      Q.    Would you state your full name for
16  the record, please?
17      A.    Peter Rosenblatt.
18      Q.    How would you describe your role in
19  this case?
20      A.    I am -- I was asked by counsel to
21  render my opinion about various aspects of mesh
22  in the cases that were involved here.
23
24
25

Page 7

1   (Whereupon, Deposition Exhibit 1,
2     General Prolene, Gynemesh PS and Prolift
3     Expert report of Peter Rosenblatt, M.D.,
4     was marked for identification.)
5   BY MR. CRAWFORD:
6       Q.    Okay. Do you recognize the
7   document that's been marked as Exhibit No. 1?
8       A.    So this a little bit different
9   format than when I presented it, but it looks
10  like this is my general report.
11      Q.    What do you mean a different format
12  than when you presented it?
13      A.    I think when I --
14          MR. ROSENBLATT: I'll just
15  represent we added the cover page with the case
16  style to it.
17      A.    Yeah. And, actually, when I sent
18  it, I think it was maybe a different font or
19  different size font, but this is my report.
20      Q.    So originally you drafted an expert
21  report, a general causation expert report, and
22  you submitted it to someone?
23      A.    I -- right, I did a report, and I
24  sent it in a Word format. I think maybe like the
25  reason that I took a minute is because I'm not

Page 8

1   sure it was doubled spaced the way it is. So it
2   just looked a little bit different than when I
3   sent it in, but this is the report.
4       Q.    Who did you send it to?
5       A.    I sent it to counsel.
6       Q.    What counsel?
7       A.    Mr. Rosenblatt.
8       Q.    And Mr. Rosenblatt's with what
9   firm?
10      A.    With Butler Snow.
11      Q.    Representing Ethicon?
12      A.    Representing Ethicon.
13          MR. ROSENBLATT: And, Jeff, I'll
14  state on the record, I don't know if you're going
15  to ask, there's no familial connection.
16          MR. CRAWFORD: That's interesting
17  to know.
18          Where's the original that you
19  submitted to defense counsel?
20          MR. ROSENBLATT: And I will just
21  object that under Rule 26 drafts are not
22  discoverable.
23          THE WITNESS: Can I answer or?
24          MR. ROSENBLATT: I mean, if it's on
25  your computer, you can say it's on your computer.

Page 9

1       A.    It's on my computer.
2       Q.    The one that's in front of you
3   right now as Exhibit No. 1, have you ever seen it
4   in that form, specifically in that font and
5   format?
6       A.    Yes, I have. Just different than
7   the Word format that I sent. But I just -- when
8   you asked me, I wanted to make sure that this was
9   my report, and I've gone through it, and this is
10  my report.
11      Q.    Does that document, Exhibit No. 1,
12  contain all the opinions that you hold in this
13  case?
14      A.    You know, I'm happy to answer any
15  questions that you have if there are additional,
16  but I tried to put into the report all my
17  opinions, but if there are others that you want
18  to ask about today, I'm happy to answer that.
19      Q.    Sure. But when you drafted
20  Exhibit No. 1, it was your intention to include
21  in that document all the opinions that you hold
22  in this case?
23      A.    Yeah, I did the best I could with
24  respect to that.
25      Q.    Since you've written it, between

Peter L. Rosenblatt, M.D.

**Page 10**

1 that time and today, are there any opinions that
2 you've -- that you've come up with that aren't in
3 that report?
4 A. Not that I can think of.
5 Q. When were you retained by Ethicon?
6 A. I was not retained by Ethicon. I
7 have had no discussions with Ethicon. I was
8 asked by Attorney Rosenblatt and his firm to
9 review the materials I think back maybe in March
10 or April of this year.
11 Q. Approximately March or April of
12 2016 is when you were first approached or
13 contacted by an attorney with Butler Snow about
14 becoming involved in this case?
15 A. Yeah, if I remember correctly, I
16 think that actually Attorney Rosenblatt contacted
17 me sometime in 2015, but then nothing happened at
18 that point, and it was only when I was contacted
19 earlier this year when, you know, I started to
20 review materials.
21 Q. When did you start to review
22 materials?
23 A. I think it was about March or
24 April.
25 Q. Had you ever done any work for or

**Page 11**

1 work with or for Butler Snow prior to being
2 contacted in regards to this Ethicon case?
3 A. No.
4 Q. We are here today to talk to you
5 about your general causation report, right?
6 A. Yes.
7 Q. To be clear, you have generated a
8 general causation report about mesh in general,
9 and then you've also been retained as an expert
10 witness on specific cases; is that fair?
11 A. Yes.
12 Q. How many specific cases are you
13 also retained for?
14 A. I believe it was -- I believe it
15 was five cases.
16 Q. Do you know the names of them off
17 the top of your head?
18 A. Yeah, I remember there's Hernandez,
19 Lary, L-A-R-Y, Loomis. I can't think of the
20 others right now.
21 Q. Are those approximately --
22 A. Ah, Doucette is another one,
23 D-O-U-C-E-T-T-E. Yeah.
24 Q. Okay.
25 A. And I think there's one more.

**Page 12**

1 Q. Are those approximately five cases
2 that you're involved in now the only Ethicon
3 transvaginal mesh cases you've ever been involved
4 with?
5 A. In terms of reviewing for the
6 purposes of --
7 Q. Yes, sir.
8 A. -- this litigation.
9 Q. Yes, sir.
10 A. Yes. No, I think there was
11 actually one other. One other, and I don't
12 remember the name of that one, but apparently,
13 that's for some reason not going forward.
14 Q. There's a difference between
15 reviewing cases and writing reports on cases,
16 correct?
17 A. I suppose so, but I don't know what
18 the difference is.
19 Q. Well, some of them you review and
20 send back and then others you review and actually
21 write a report and submit a report on, right?
22 MR. ROSENBLATT: Object to form.
23 A. So of the four or five, whatever it
24 was that were sent to me, I reviewed the cases
25 and wrote reports on each of the ones that I was

**Page 13**

1 asked to report on.
2 Q. Okay. Have you been -- have any of
3 the cases been submitted to you by Butler Snow
4 that you didn't write reports on?
5 A. There was -- you know, I was sent,
6 and actually, it's probably in these boxes.
7 There was I think one other that was sent to me
8 but within a day I received a message that one of
9 the cases I did not need to even look at, so I
10 never actually, you know, looked at that case.
11 Q. And who did that message come from?
12 A. Someone at Butler Snow. I don't
13 know if it was Attorney Rosenblatt or someone
14 that he works with.
15 MR. ROSENBLATT: And, Jeff, I will
16 represent, if I remember correctly, I think it
17 was a case that was either dismissed or -- it
18 went away.
19 Q. What did you do specifically to
20 prepare for this general causation deposition?
21 A. In addition to reviewing the
22 records that were sent to me and writing the
23 report and, you know, reviewing some of the
24 literature, re-reviewing some of the literature,
25 and reading through some of the other records

Peter L. Rosenblatt, M.D.

Page 14

1 that I had in terms of the IFUs and some internal
2 e-mails within Ethicon, that's general -- and
3 discussions with Attorney Rosenblatt.
4      Q.    I'm particularly interested in the
5 literature that you re-reviewed just prior to
6 coming to your deposition.
7           Can you identify that literature
8 for me, please?
9           MR. ROSENBLATT:  Object to form.
10     A.    I would have a tough time
11 mentioning which ones because I just -- you know,
12 my mind doesn't work that way.  But I looked at
13 some of the RCTs for both, you know, Prolift and
14 Gynemesh, and I re-reviewed the, you know,
15 Cochrane review and systematic reviews.
16     Q.    Do you know what systematic
17 reviews?
18     A.    The one I remember was the SGS
19 systematic review from several years ago.
20     Q.    So as I understand it, as a general
21 causation expert in this case, you've reviewed a
22 lot of literature, fair to say?
23     A.    Well, right.  I mean, I've reviewed
24 it in connection with this, but I've also -- I've
25 known this literature from when it was published.

Page 15

1      Q.    Right.  And of all of the
2 literature that you've reviewed over the years
3 concerning transvaginal mesh, you chose to review
4 three particular pieces of literature in
5 preparation for this deposition; is that fair?
6           MR. ROSENBLATT:  Object to form.
7 Mischaracterizes the testimony.
8      A.    Right, what I felt was most
9 important was to review what I thought was the
10 most important Level I evidence.
11     Q.    And what is in your opinion the
12 most important Level I evidence in this case?
13     A.    Well, that would be -- you know,
14 the Level I evidence was what I just mentioned,
15 systematic reviews, the Cochrane meta-analysis
16 and RCTs.
17     Q.    Is there a group of evidence that
18 you categorize yourself as Level II evidence in
19 this case?
20     A.    Yes.
21     Q.    What is Level II evidence?  What is
22 the Level II evidence comprised of?
23     A.    I wouldn't be able to name it off
24 the top of my head but, you know, non-randomized
25 studies, so prospective cohort studies and some

Page 16

1 large retrospective studies.
2      Q.    Is there a Category III?  Is there
3 a Level III category of evidence in your mind?
4      A.    Yes.
5      Q.    What does that consist of?
6      A.    You know, either, either case
7 reports or opinions, expert opinions.
8      Q.    Would that include the expert
9 opinion of Dr. Rosenzweig?
10     A.    Well, I've read -- I've read
11 Dr. Rosenzweig's -- I'm trying to remember what
12 I've read from him.  I know I've read an expert
13 report in connection with this case, you know,
14 one of the cases, and I don't remember if I read
15 anything in the medical literature from
16 Rosenzweig specifically in connection with the
17 mesh literature.
18     (Whereupon, Deposition Exhibit 2,
19     Rule 26 Expert Report of
20     Bruce Rosenzweig, M.D.,
21     was marked for identification.)
22 BY MR. CRAWFORD:
23     Q.    I'm going to hand you what's marked
24 as Exhibit No. 2 to your deposition.  Do you
25 recognize that document?

Page 17

1      A.    Yes.
2      Q.    What is that?
3      A.    This is Dr. Rosenzweig's expert
4 report.
5      Q.    Is that his general causation
6 report?
7           MR. ROSENBLATT:  For TVT?
8      A.    Can you show me where this says
9 exactly what this is about?  I'm happy to read it
10 all, if you want.
11     Q.    If you'll just peruse it briefly
12 and tell me how you would describe that report.
13 It doesn't appear to be specific to any one
14 particular case, does it?
15     A.    It does not.  It appears to be
16 about TVT.
17     Q.    Did you review Exhibit No. 2 in
18 preparation for this deposition?
19     A.    I remember seeing a report by
20 Rosenzweig.  I assume that this is it.  I can't
21 say for certain, but I did see -- and if this is
22 the one that I reviewed, then I did.  I didn't
23 review it specifically for this deposition, but
24 I've read through a lot of reports in the last
25 three months, and I believe this is one of them.

Peter L. Rosenblatt, M.D.

1    Q.    When was the first last time that
2  you reviewed a Rosenzweig report?
3    A.    It's got to be over a month ago.
4  Probably more like two months ago.
5    Q.    There's reference to literature in
6  his report, correct?
7    A.    There appears to be, yes.
8    Q.    When you reviewed Dr. Rosenzweig's
9  report, did you pull any of the literature that's
10  cited or referenced in that report?
11    A.    Can you tell me which ones you're
12  referring to?
13    Q.    Any of it.
14    A.    Oh.
15    Q.    For example, do you recall when
16  reviewing Dr. Rosenzweig's report reading any
17  footnotes or anything contained in that report
18  and looking up the literature that's referenced
19  therein?
20    MR. ROSENBLATT:  And I'll just
21  represent he was not retained to offer opinions
22  on TVT.
23    A.    So I don't recall specifically, but
24  I'm happy -- you know, if there is a reference
25  you want me to tell you -- you know, if you want

1  to point to a reference, then I'll be happy to
2  tell you if I read that.  But did I go through
3  his reference list and look all these articles
4  up, no.
5    Q.    Yes, sir, that's what I was asking.
6    A.    No, I couldn't do that.  Time did
7  not permit it.
8    Q.    Do you recall looking any of them
9  up?
10    A.    No, I guess what I'm saying is that
11  there are -- oh, here we go.  It's here at the
12  bottom.
13    MR. ROSENBLATT:  I think it's
14  mostly company testimony, but he might have --
15    THE WITNESS:  That's what it looks
16  like.
17    MR. ROSENBLATT:  -- a couple
18  literature references in there.
19    A.    So that is correct.  So I have no
20  idea about these company references.  Like, for
21  instance, Reference 246 is an article from
22  de Tayrac in 2004, you know, that I've seen.  And
23  there is another reference -- it actually doesn't
24  have a number by Jacquetin that I have seen, and
25  some of these reference videos which I have not

1  seen.
2    Q.    Are there types of evidence that
3  you consider Level IV evidence?
4    A.    If you could tell me what Level IV
5  is.  I don't recall.
6    Q.    I don't know.  I was asking you.
7  Do you know --
8    A.    I can't remember if there is a
9  Level IV evidence.  Yeah, for example, No. 11,
10  Clavé, I've read through that as well.
11    Q.    In addition to what you've
12  identified as Level I, Level II and Level III
13  evidence, you've also reviewed internal e-mails
14  in preparation for this deposition, correct?
15    A.    Well, I have read through them but,
16  you know, not specifically for this, in
17  preparation for this.  I read them before I wrote
18  my report.  Probably the last time I read through
19  internal documents was maybe, you know, four
20  weeks ago.
21    Q.    Do any particular internal e-mails
22  that you reviewed approximately four weeks ago
23  come to mind?
24    A.    Not specifically.
25    Q.    There's an attorney sitting to your

1  left, correct?
2    A.    Yes.
3    Q.    He's from Butler Snow?
4    A.    Yes.
5    Q.    Did you have an opportunity to meet
6  with him prior to this deposition?
7    A.    I did.
8    Q.    Where did that meeting take place?
9    A.    We met for the last hour and a
10  half, two hours in the hotel.
11    Q.    Your deposition is being taken in a
12  hotel?
13    A.    Yes.
14    Q.    In Cambridge, Massachusetts?
15    A.    Yes.
16    Q.    And for approximately an hour and a
17  half or so you were able to meet with defense
18  counsel prior to walking into this conference
19  room?
20    A.    Correct.
21    Q.    Did you take any notes during that
22  meeting?
23    A.    No.
24
25

Peter L. Rosenblatt, M.D.

Page 22

1   (Whereupon, Deposition Exhibit 3,
2   Notice to Take Deposition of
3   Dr. Peter Rosenblatt,
4   was marked for identification.)
5   BY MR. CRAWFORD:
6       Q.    No. 3 is a deposition notice for
7   today's deposition.  Do you recognize that?
8       A.    I do.
9       Q.    Have you looked at Exhibit A to
10  that deposition notice or I should say Schedule
11  A?
12      A.    Yes, I have.
13      Q.    Schedule A is a list of documents
14  and tangible items that you were requested to
15  bring with you to your deposition today; is that
16  true?
17      A.    Do you know -- can you take a look
18  at this, 'cause I don't think -- it's missing
19  some pages.  I don't think it actually says
20  Schedule A anywhere.
21          MR. ROSENBLATT:  The version I have
22  cuts off at page 7.
23          THE WITNESS:  Oh, is it on the back
24  pages maybe.
25          MR. ROSENBLATT:  I think you maybe

Page 23

1   tried to print double-sided but it --
2       Q.    That one's double-sided.
3       A.    Okay.  What was the question again?
4       Q.    Did you have an opportunity to
5   review Schedule A?
6       A.    I have, yes.
7       Q.    And have you brought documents and
8   tangible items with you today that are responsive
9   to Schedule A?
10          MR. ROSENBLATT:  And I'll just note
11  for the record that I think we filed objections
12  but if we haven't, they will be filed, but you
13  can answer.
14      A.    Right.  So that was one of the
15  reasons we met earlier, is that Attorney
16  Rosenblatt brought things that I had provided to
17  him, and so we went over those, which are sitting
18  in front of me.
19      Q.    Okay.
20      A.    It's all yours (indicating).
21      Q.    There's a large number of, in my
22  opinion, a large number of -- several folders
23  containing documents sitting in front of me here
24  at this conference table.
25          Can you make an effort to summarize

Page 24

1   what's contained here?
2       A.    Sure.  So first are my billing
3   records for work done in these cases.
4       Q.    Okay.  I'm going to mark that as
5   Exhibit No. 4.  Bear with me just a second.
6       A.    Yeah.
7       Q.    Actually, it appears to be two
8   different documents; is that right?
9       A.    Correct.
10      Q.    Okay.  I will mark the first one as
11  Exhibit No. 4 and the second as Exhibit No. 5.
12          (Whereupon, Deposition Exhibit 4,
13          Invoice #2,
14          was marked for identification.)
15          (Whereupon, Deposition Exhibit 5,
16          Invoice #1,
17          was marked for identification.)
18  BY MR. CRAWFORD:
19      Q.    And, again, for purposes of the
20  record, Exhibits 4 and 5 are documents that
21  relate to the work you've done on these files or
22  on this case and the amount charged, correct?
23      A.    Correct.
24      Q.    While we have them out in front of
25  us, there appears to be one invoice, specifically

Page 25

1   Invoice No. 1.  It's dated June 12th, 2016.
2   That's Exhibit No. 5; is that right?
3       A.    Yes.
4       Q.    And that invoice is for a total of
5   $63,200.
6       A.    Correct.
7       Q.    Then there's a second invoice
8   that's marked as Exhibit No. 4, and that invoice
9   is dated --
10      A.    Somehow that did not get translated
11  properly.
12      Q.    So the invoice marked as
13  Exhibit No. 4 doesn't have a date.  However, it
14  does have a --
15      A.    It was sometime after this date
16  (indicating).
17      Q.    The invoice marked as Exhibit No. 4
18  doesn't have a date at the top, but you believe
19  that invoice was generated at sometime after
20  June 11th, 2016?
21      A.    Probably after June 12th.
22      Q.    Okay.  And the amount for that
23  invoice is $21,200?
24      A.    Correct.
25      Q.    So to date, you've billed

Peter L. Rosenblatt, M.D.

Page 26

1 approximately $84,400 for your services as an
2 expert witness in this case?
3     A.    Correct.
4     Q.    Does that include your time as a
5 general causation expert only or is that also
6 charges for the work you've done as a
7 case-specific expert?
8     A.    Both.
9     Q.    Okay, let's turn to the next
10 document or set of documents that you brought in
11 response to Schedule A to your deposition notice.
12     A.    Well, there are a number of folders
13 where there are PowerPoint presentations that
14 have been printed out, and the first set is
15 labeled TVT-O. The second set is labeled TVT-S.
16 The third group is referred to as additional
17 slides. The next are presentations labeled TVT
18 Exact. The next are presentations labeled TVT.
19 The next are presentations, yup, labeled
20 Prosima™. And the next are a group of
21 presentations labeled Ethicon.
22     MR. ROSENBLATT: Jeff, I'll just
23 represent there are two copies of each
24 presentation or there should be two copies of
25 each presentation in there.

Page 27

1     THE WITNESS: My phone is on
2 vibrate, but I may be getting a text just 'cause
3 one of my partners has a patient who has a
4 significant problem, and I may get a text about
5 it, and I'll try not to let this interfere with
6 the deposition, but I just want to let you know
7 I'm not being rude if I check a text.
8     Q.    Of course. I completely
9 understand.
10     I ran into one I got confused on.
11 Let's go off the record?
12     (Discussion off the record.)
13     (Whereupon, Deposition Exhibit 6,
14     Presentations, was marked
15     for identification.)
16 BY MR. CRAWFORD:
17     Q.    Doctor, we've finagled with some
18 exhibits and documents. I'm holding in my hand
19 Exhibit No. 6 to your deposition, correct?
20     A.    Okay.
21     Q.    What is this?
22     A.    These are presentations that I've
23 given in the past that are related to the topics
24 that we're discussing.
25     Q.    And are the documents contained in

Page 28

1 Exhibit No. 6 documents and things that you've
2 reviewed just prior to coming to your deposition
3 in preparation for this deposition?
4     A.    I honestly just scanned through
5 those to make sure those were the ones that I had
6 sent. But have I read all the slides, absolutely
7 not.
8     Q.    Of all the documents, the things
9 that you've reviewed in conjunction with being an
10 expert on transvaginal mesh, is there any
11 particular reason you chose these documents
12 marked as Exhibit No. 6 to refresh yourself on
13 and look at just prior to your deposition?
14     A.    They were not to refresh my memory.
15 They were just in response to Schedule A I guess
16 it is. Yeah, Schedule A. Any presentations that
17 had to do with the topics that we're discussing.
18     Q.    Returning to -- our attention to
19 Schedule A of your deposition notice, did you
20 bring with you a current copy of your curriculum
21 vitae?
22     MR. ROSENBLATT: And I'll just
23 represent I think the current version was
24 attached as an exhibit to his general deposition.
25     Q.    Is that true, Doctor?

Page 29

1     A.    Yes, it is.
2     Q.    No. 2 of Schedule A requires you or
3 requests you to bring with you any and all
4 documents in your possession including but not
5 limited to correspondence, notes, videos, CVs,
6 DVDs, flash or USB drives, photographs, databases
7 or materials in other form provided to you or
8 created by you which you relate to your opinions,
9 expected testimony or development of your
10 opinions in this litigation.
11     Have you brought those with you
12 today?
13     A.    Anything that I thought was
14 relevant that I brought that I knew was
15 accessible.
16     Q.    Is that contained in Exhibit No. 6
17 or are there other documents that are responsive
18 to that particular request that aren't contained
19 in Exhibit No. 6?
20     MR. ROSENBLATT: And, Jeff, I will
21 just again note for the record we have filed
22 objections to the notice and Schedule A.
23     MR. CRAWFORD: I understand.
24     A.    Anything I thought that was
25 relevant that I could get my hands on are there.

Peter L. Rosenblatt, M.D.

Page 30

1    You know, what comes to mind, for
2 instance, is there may be like marketing DVDs
3 that I received 15 years ago that I have no idea
4 where they exist.  So I made the best effort I
5 could to bring what, you know, was asked of me.
6    Q.    Very good.  Referring to No. 5,
7 have you reviewed any deposition testimony in
8 preparation for this deposition today?
9    A.    I've seen some depositions from
10 other experts that I have scanned through that
11 I've tried to read, and I briefly looked through
12 a deposition that I did for a Bard litigation
13 which was I think about two years ago.
14    Q.    How long ago did you review the
15 deposition testimony of other experts?
16    A.    It's varied over a number of weeks.
17 Well, I did look at one within the last two or
18 three days as well.
19    Q.    Which one was that?
20    A.    There was one -- I'm going to say
21 his name wrong.  Sepulveda.
22    Q.    Okay.
23    A.    And Tomezsko.  And there may have
24 been one other.  Toglia.
25    Q.    Are those the only deposition

Page 31

1 transcripts you can think of right now?
2    A.    Off the top of my head, yes.
3    Q.    Schedule A requests you to bring
4 with you those deposition transcripts.  Did you
5 do that?
6    MR. ROSENBLATT:  I'm just going to
7 object, Jeff.  No, he didn't bring them with him.
8    Q.    Did you review any pleadings in
9 connection with preparing for this deposition?
10    A.    I guess I'm not familiar with that
11 term exactly.  I've heard the term, but I don't
12 know if I've seen pleadings.
13    Q.    Have you seen anything that you
14 think looks like it has been filed with the
15 court?
16    A.    Not that I recall.
17    Q.    You haven't brought any pleadings
18 with you today, have you?
19    A.    I guess not.
20    Q.    If you don't know what they are,
21 you haven't brought them then.
22    Do you have any photographs of any
23 of the case-specific plaintiffs that you're
24 involved in?
25    A.    I don't recall if any photographs

Page 32

1 were sent to me about those specific cases.
2    Q.    Do you know off the top of your
3 head whether you've seen a photograph of Toni
4 Hernandez?
5    A.    I would be happy to look at
6 anything and tell you if I have seen it.  I just
7 don't remember off the top of my head.
8    Q.    As you sit here right now, you
9 don't recall ever seeing a photograph of Toni
10 Hernandez?
11    A.    I may have, but I don't want to
12 state that I did or didn't.  I just don't
13 remember.  But I'd be happy to look at a
14 photograph and -- if you showed me a photograph,
15 I would definitely be able to tell if I saw it
16 before.
17    Q.    The invoices marked as Exhibits No.
18 4 and No. 5 to your deposition, do those include
19 any time sheets, invoices, time records or
20 billing records that record or document the work
21 you've performed in this case?
22    A.    I'm not sure I --
23    MR. ROSENBLATT:  Object to form.
24    A.    Yeah.  I'm not sure I understand.
25 Sorry.  I'm not sure I understand the question.

Page 33

1    Q.    Do you have any other time sheets
2 or any other documents that reflect the specific
3 work you've done on this case, other than the
4 invoices that are marked as Exhibits No. 4 and
5 No. 5?
6    A.    No.  Everything I've done, that's
7 how I record it, and then I generate an invoice
8 based on that.
9    Q.    Are there other documents other
10 than 4 and 5 that contain information that was
11 used to generate Exhibits No. 4 and 5?
12    A.    No.
13    Q.    Do you prepare these invoices
14 yourself?
15    A.    I do.
16    Q.    Using what software?
17    A.    Word.  I don't mean that like when
18 my son says word.  I mean "Word."
19    Q.    I noticed you didn't flash any gang
20 signs when you said that, so.
21    A.    I felt funny when I said that.
22 Microsoft Word.
23    Q.    There we go.  The point is you
24 don't generate time sheets and then hand them to
25 someone who then uses that information to compile

Peter L. Rosenblatt, M.D.

Page 34

1  or generate these invoices?
2      A.    No.
3      Q.    Something tells me you didn't bring
4  with you copies of your Schedule C and Form 1099
5  of your tax records for the preceding five years.
6          MR. ROSENBLATT:  You don't need to
7  answer that.  No, we're not producing that.
8      Q.    No. 14 requests that you produce
9  all documents related to your involvement with
10 Ethicon's professional education, including, but
11 not limited to any and all PowerPoints, course
12 materials, outlines, videos or presentations,
13 live surgical presentations, marketing
14 evaluations created by or provided to you related
15 to any pelvic mesh product sold by Ethicon.
16         Do you have any materials or items
17 that fit that description other than what you
18 have already produced and has been marked as
19 Exhibit No. 6 to your deposition?
20     A.    The only thing I could think of
21 besides what's already been produced is I did --
22 I did personally create a video that was used by
23 Ethicon for tensioning slings, and we can make
24 that available.  It's a short video on how to
25 tension a sling.

Page 35

1      Q.    When was that video created?
2      A.    Oh, it's got to be ten years ago.
3      Q.    Where is it right now?
4      A.    It's -- where's the video?
5      Q.    Yes, sir.
6      A.    I mean, they made it into DVDs, and
7  I most likely have a copy of the video on my
8  computer.
9      Q.    Yes, sir, I would appreciate it if
10 you'd produce that.
11         Are we in agreement on that?
12         MR. ROSENBLATT:  If he's able to
13 find it and send it to me, I'll pass it along to
14 you.
15     Q.    Is there any particular reason you
16 didn't bring that with you today?
17     A.    No.  I'm happy to provide it,
18 though.
19     Q.    Do there exist any transcripts or
20 statements between you and any governmental
21 agency regarding any pelvic mesh product used for
22 treatment of stress urinary incontinence or
23 pelvic organ prolapse?
24     A.    I don't believe so.
25     Q.    No. 18 requests that you produce or

Page 36

1  bring with you any and all documents relating to
2  any presentations, PowerPoints or lectures
3  regarding any female pelvic mesh product used for
4  treatment of stress urinary incontinence or
5  pelvic organ prolapse.
6          Have you brought those with you?
7          MR. ROSENBLATT:  And I'll just note
8  our objection to being overbroad and vague.
9      A.    Well, I was going to ask you, are
10 you talking about Ethicon products there?
11     Q.    The request specifically says any
12 female pelvic mesh product used for treatment of
13 stress urinary incontinence or pelvic organ
14 prolapse.
15     A.    So I know that there are other
16 presentations.  I did not bring them.  And with
17 permission from counsel, I would be perfectly
18 willing to provide those to you.
19     Q.    As you sit here today, what
20 presentations are you aware of that you're in
21 possession of that weren't brought with you
22 today?
23     A.    Well, what comes to mind is that I
24 in the last several years have been doing some
25 teaching for Boston Scientific as well as some,

Page 37

1  you know, presentations that I've done on my own
2  not in connection with Boston Scientific that
3  have included the Uphold mesh device and before
4  that Pinnacle.
5          I think when I read this -- I'm
6  only now seeing that it was just any treatment,
7  and I was thinking about Ethicon and that's why I
8  produced those.
9      Q.    If it had said Ethicon
10 specifically, have you satisfied that requirement
11 as set forth in No. 18?
12     A.    Yes.
13     Q.    We're through with the notice.  Do
14 you want to take a break?
15         (A break was taken.)
16 BY MR. CRAWFORD:
17     Q.    Doctor, is it fair to say that the
18 risks of you using mesh in pelvic reconstructive
19 surgery are well-known?
20     A.    Yes.
21     Q.    And they've been well-known for a
22 long time?
23     A.    Right, decades.
24     Q.    Some risks are common with pelvic
25 reconstructive surgery regardless of whether mesh

Peter L. Rosenblatt, M.D.

Page 38

1 is used?
2    A.    Correct.
3    Q.    Such as bleeding, infection, injury
4 to adjacent organs, scarring and dyspareunia?
5    A.    Correct.
6    Q.    Then there's some risks that are
7 unique to surgeries that involve the use of mesh,
8 including mesh erosion into the surrounding
9 organs?
10    A.    So when you put it that way, you
11 know, erosion into surrounding organs can happen
12 with any permanent material like suture.  But
13 when you say, quote/unquote, mesh erosion, you
14 can't get -- you can't get erosion of mesh unless
15 you use mesh.  But we certainly see erosions of
16 permanent sutures, for instance, into surrounding
17 organs or into the vagina.
18    Q.    I understand that.  I appreciate
19 that clarification.
20          But mesh erosion is unique to
21 surgeries that involve the use of synthetic mesh?
22    A.    Correct.
23    Q.    Mesh erosion into surrounding
24 organs such as the bladder and the urethra and
25 the rectum are a known risk associated with

Page 39

1 Prolene® mesh, fair?
2    A.    Well, no.  When you say Prolene®
3 mesh -- Prolene® mesh is a trade name, right --
4    Q.    Sure.
5    A.    -- so it can happen with any
6 polypropylene mesh.  Fortunately mesh erosion
7 into a surrounding organ is exceedingly rare as
8 opposed to mesh exposures.
9    Q.    But it is a known risk.  Whether
10 it's rare or not it's a known risk?
11    A.    It is a known risk.
12    Q.    And for clarification, Prolene®
13 mesh is a synthetic polypropylene mesh?
14    A.    It's one of the -- it's one type of
15 polypropylene mesh.
16    Q.    And in October of 2008, the FDA
17 issued a pelvic health notification regarding
18 transvaginal mesh.
19    A.    Correct.
20    Q.    That would include Ethicon's
21 Prolene® mesh, right?
22    A.    Correct.
23    Q.    The FDA stated that surgeons and
24 patients should be aware of what's termed
25 "serious complications" associated with surgical

Page 40

1 mesh placed through the vagina, including mesh
2 erosion and exposure?
3          MR. ROSENBLATT:  And, Jeff, do you
4 have a copy to show him or do you plan on marking
5 that as an exhibit?
6          MR. CRAWFORD:  I don't.  I'm making
7 reference to it as it was described in his
8 report.
9    A.    Just one second.
10          (Discussion off the record.)
11    A.    I'm sorry, did you say that we did
12 have a copy of the 2008 FDA Public Health
13 Notification?
14          MR. ROSENBLATT:  I think he said he
15 was just referring to your report.
16    A.    Okay, got it.
17    Q.    You're pretty familiar with that --
18    A.    Yes, I am.
19    Q.    -- aren't you?
20    A.    Yeah, I just wanted to know if Paul
21 wanted to have it in front of me, but yes, I am.
22    Q.    I'll re-ask the question.
23    A.    Thank you.
24    Q.    The FDA stated that surgeons and
25 patients should be aware of what it termed

Page 41

1 "serious complications" associated with surgical
2 mesh placed through the vagina including mesh
3 erosion and exposure; is that right?
4    A.    That's correct.
5    Q.    And that would include Ethicon's
6 Prolene® mesh as indicated?
7    A.    Yes.
8    Q.    In 2008, did the FDA warn the
9 public that over the previous three years it
10 received over 1,000 reports of complications that
11 were associated with surgical mesh devices used
12 to repair pelvic organ prolapse and stress
13 urinary incontinence?
14    A.    That is correct.
15    Q.    And those devices also included
16 those made with Ethicon Prolene® mesh, true?
17    A.    That is correct.
18    Q.    Was it noted by the FDA that the
19 most frequent complications include exposure of
20 the mesh through the vagina -- through the
21 vaginal epithelium, infection, pain, urinary
22 problems and recurrence of either prolapse or
23 incontinence?
24    A.    Well, if I remember correctly, the
25 most common was the mesh exposure, but those

Peter L. Rosenblatt, M.D.

Page 42

1  others that you mentioned are also potential
2  risks but not necessarily related specifically to
3  mesh, but with any -- you know, infection can
4  happen, scarring can happen with any pelvic
5  surgery.
6      Q.     Did the FDA in 2008 stress the need
7  for adequate informed consent and specialized
8  training for specific mesh kits?
9      A.     Yes, they did.
10     Q.     And did the FDA also stress the
11  need to be vigilant for mesh complications
12  including erosion and infection as well as
13  complications associated with the tools used in
14  the placement of transvaginal mesh?
15     A.     Yes, they did.
16     Q.     In 2008 did the FDA also recommend
17  that surgeons inform their patients that the
18  implantation of surgical mesh is to be considered
19  permanent and that some complications associated
20  with the mesh may require additional surgery?
21     A.     Yes, they did.
22         MR. ROSENBLATT:  It's on page 13
23  and 14.
24         THE WITNESS:  Thank you.
25     Q.     Finally, did the FDA in 2008 also

Page 43

1  encourage surgeons to inform their patients about
2  potentially serious complications affecting their
3  quality of life including pain during intercourse
4  and vaginal scarring?
5      A.     Yes, they did.
6      Q.     In 2011, the FDA issued an update
7  of that 2008 notification based on a continuing
8  analysis of adverse events that had been reported
9  to the FDA between 2008 and 2011.
10     A.     Correct.
11     Q.     While basically reiterating the
12  information from the 2008 public health notice,
13  the FDA went further in 2011 stating that the
14  complications noted in the 2008 notice were not
15  rare?
16     A.     That's what they reported, correct.
17     Q.     In fact, from January 1st, 2008,
18  through December 31st, 2010, the FDA had received
19  2,874 additional reports of complications
20  associated with surgical mesh devices used to
21  treat pelvic organ prolapse and stress urinary
22  incontinence?
23     A.     Correct.
24     Q.     Those devices would include the
25  devices made with Ethicon Prolene® mesh?

Page 44

1      A.     Presumably, yes.
2      Q.     Do you think that it was wrong for
3  the FDA to have told the public that
4  complications associated with transvaginal mesh
5  are not rare?
6      A.     I think it was wrong of the FDA.
7      Q.     Why?
8      A.     As stated in my report, there were,
9  you know, 1503 reports to the FDA about
10  complications associated with mesh, and in the --
11  in I believe it's the white paper that was
12  associated with the safety update, they talk
13  about that there were approximately 75,000
14  transvaginal mesh cases done in the United States
15  per year.  And if you do the math, over that
16  three-year period, that's over 200,000 cases, and
17  you've got 1503 reports.  So if you do the math,
18  it comes down to .06 percent which in my mind --
19  if a doctor was operating on me and said your
20  chance of a serious complication was about a half
21  a percent, I would consider that pretty rare,
22  personally.
23     Q.     Do you criticize the FDA for
24  opening the door to plaintiffs attorneys who've
25  now filed tens of thousands of cases against

Page 45

1  medical device manufacturers for transvaginal
2  mesh?
3      A.     I think that's part of the
4  situation.  I don't think it rests solely with
5  the FDA, but I think that contributed to it.
6      Q.     What else do you believe
7  contributes to it?
8         MR. ROSENBLATT:  Object to form.
9      A.     I believe the fear mongering with
10  all the plaintiff ads on TV have done a real
11  disservice to women throughout this country.
12     Q.     Anything else?
13     A.     The only thing that comes to mind
14  are, you know, I recall seeing an article in
15  Reuters about medical lenders who are also taking
16  advantage of, I believe, the situation and taking
17  advantage of women who may have problems with
18  mesh.
19     Q.     In what ways are they taking
20  advantage?
21     A.     By lending patients money and
22  jacking up the bills artificially so that when
23  women get their settlements most of the
24  settlement money goes to the entrepreneurs and
25  not to the patients who have been hurt by these,

Peter L. Rosenblatt, M.D.

Page 46

1  potentially hurt by these procedures.
2      Q.    What evidence do you have that
3  that's going on?
4      A.    Just an article that I read in
5  Reuters about this.
6      Q.    Do you have any personal knowledge
7  regarding that going on?
8      A.    Yes, my personal knowledge is my
9  discussions with a urogynecologist colleague of
10 mine named Dr. Cassidenti in the Los Angeles area
11 who was contacted by one of these medical lenders
12 and was asked to remove mesh in women and would
13 be paid cash to do this.
14     Q.    Any other evidence?
15     A.    Not that I can think of.
16     Q.    Have you yourself been approached
17 by any such lenders?
18     A.    I have not.
19     Q.    You perform around 300 surgeries
20 for prolapse and incontinence every year?
21     A.    Roughly.
22     Q.    Approximately how many of those 300
23 surgeries that you perform each year involve the
24 use of Ethicon Prolene® mesh?
25            MR. ROSENBLATT:  Object to form.

Page 47

1  Jeff, are you referring specifically to Prolene®
2  or are you using Prolene® more broadly?  Just --
3            MR. CRAWFORD:  I want to know
4  Prolene®, how often does he use Ethicon's
5  Prolene® mesh.  And my next question will be in
6  how many of those procedures do you use synthetic
7  mesh that's not Ethicon Prolene® mesh?
8            MR. ROSENBLATT:  Jeff, I'm not
9  trying to be difficult but Gynemesh® PS is also
10 made from Prolene.  So I'm just wondering are you
11 asking about Prolene® or Prolene in general.
12     Q.    Prolene in general.
13     A.    So it varies per year, but if you
14 want to know currently --
15     Q.    Yes, sir.
16     A.    So I'm still using TVT-O, and
17 occasionally Gynemesh®.  I think those are the
18 only two products that I'm currently using.
19     Q.    Were you using those last year?
20     A.    Yes.
21     Q.    And last year you performed
22 approximately 300 surgeries?
23     A.    Correct, but that wasn't the --
24 that wasn't the only sling type that I was using.
25     Q.    And that's what I'm getting at.

Page 48

1            What percentage of your surgeries
2  last year involved Ethicon mesh, those two
3  products that you just referred to?
4      A.    I would say of the -- I probably do
5  roughly 100 sling operations a year, maybe 100 to
6  125, and percentage-wise, probably 40 percent of
7  them are TVT-O, but that's been decreasing over
8  the last couple years.  So maybe this year it's
9  probably more like 30 percent or 25 percent.
10     Q.    So last year approximately 40
11 percent of your 100 sling operations involved the
12 use of Ethicon products?
13     A.    I believe that's correct.
14     Q.    And that number has decreased this
15 year?
16     A.    Correct.
17     Q.    Why?
18     A.    Only because I'm using more of a
19 different transobturator sling.  I still do a lot
20 of transobturator slings, but I'm using more of
21 the Boston Scientific slings at this point.
22     Q.    Why did you switch?
23     A.    Well, I haven't switched, but my
24 fear is that over the past --
25     Q.    And I'm sorry to cut you off.  Let

Page 49

1  me rephrase the question so you don't have to
2  answer twice.
3      A.    Sure.
4      Q.    Why have you -- I don't mean to be
5  rude.  I'm just trying to save you the time.
6      A.    Are you talking to me?
7      Q.    Yeah.
8      A.    Okay.
9      Q.    What is the reason that you've
10 decreased your use of Ethicon products and
11 increased your use of Boston Scientific products?
12     A.    Right.  So if I thought that I
13 could use the Ethicon products from now until the
14 day I retire, I would, but over the last couple
15 years, Ethicon has dropped their sales force, and
16 there are rumors that they may stop manufacturing
17 altogether.  So I wanted to get prepared for that
18 day, and so I started looking at other sling
19 products from companies that I believe will
20 continue to be around for the long term, and
21 that's why I have transitioned myself slowly to
22 Boston Scientific.
23     Q.    When did you begin that transition?
24     A.    I would say not long after they
25 dropped their sales force.

Peter L. Rosenblatt, M.D.

Page 50

1    Q.    When was that?
2    A.    I don't remember precisely, but I'm
3 going to say about three years ago.
4    Q.    Approximately 2013?
5    A.    I believe so.
6    Q.    In 2013, were you still performing
7 approximately 100 sling procedures?
8    A.    100 to 125, yeah.
9    Q.    Back then what percentage of your
10 sling procedures involved the use of Ethicon
11 mesh?
12    A.    I believe it was 100 percent.
13    Q.    And today, three years later,
14 that's down to approximately 30 percent?
15    A.    Correct.
16    Q.    What's the BSC product that's
17 comparable to the Ethicon product you're
18 replacing it with?
19    A.    Yeah, it's not really comparable,
20 but it's an outside-in as opposed to the
21 inside-out transobturator sling, and it's called
22 the Obtryx II.  Roman numeral II, O-B-T-R-Y-X.
23    Q.    Back to the FDA.  In conjunction
24 with its 2011 update, did the FDA conduct a
25 systematic review of the published scientific

Page 51

1 literature to evaluate the safety and efficacy of
2 transvaginal mesh for pelvic organ prolapse?
3    A.    Yes.
4    Q.    Did that systematic review
5 demonstrate that transvaginal mesh repairs do not
6 improve symptomatic results or qualify -- strike
7 it.
8         Did that systematic review
9 demonstrate that transvaginal mesh repairs do not
10 improve symptomatic results or quality of life
11 over traditional non-mesh repair?
12         MR. ROSENBLATT:  Object to form.
13    A.    That's what they stated.
14    Q.    Did the literature review conducted
15 by the FDA reveal that mesh used in transvaginal
16 repairs introduces risks not present in non-mesh
17 surgery for pelvic organ prolapse?
18    A.    That is what the FDA said.
19    Q.    Did the FDA discover in 2011 that
20 there was no evidence that transvaginal repair to
21 support the top of the vagina or the back wall of
22 the vagina with mesh provided any added benefits
23 compared with traditional surgery that did not
24 use mesh?
25    A.    That is what the FDA stated.

Page 52

1    Q.    Is it fair to say that you
2 recommend for the use of transvaginal mesh --
3 strike that.
4         Is it fair to say you recommend the
5 use of transvaginal mesh in pelvic reconstructive
6 surgery?
7    A.    Not as a general statement, but in
8 select cases, I do.
9    Q.    You're not suggesting that mesh is
10 recommended for all patients who are in need of
11 surgical repair?
12    A.    Absolutely not.
13    Q.    There are alternatives to using
14 synthetic mesh in pelvic reconstructive
15 surgeries?
16    A.    There are.
17    Q.    Sometimes transvaginal mesh is the
18 best option but sometimes an alternative may be
19 the best option?
20    A.    That is correct.
21    Q.    Do you believe the FDA in its
22 public health notices of 2008 and 2011 presented
23 a biased view of transvaginal mesh?
24    A.    Yes.
25    Q.    Why?

Page 53

1    A.    For the reasons I already stated,
2 that their interpretation of the -- whether or
3 not serious complications were rare is based on
4 their interpretation of the data.  And, also, I
5 think the bias is that any return trip to the
6 operating room is considered a serious
7 complication by the FDA but that return to the
8 operating room may be a minor procedure such as
9 excision of a few fibers of mesh that have been
10 exposed in the vagina, and coupled along with
11 that is that if a patient fails a prolapse repair
12 with native tissue and has to go back to the
13 operating room to have a whole another procedure
14 done for her prolapse, that is not considered a
15 serious AE, or adverse event, by the FDA, but
16 it's a much bigger operation.  So that, to me,
17 demonstrates an inherent bias in their
18 notifications.
19    Q.    Generally speaking, do you believe
20 that a complication that requires a woman to go
21 to the operating room for surgical repair of that
22 complication is considered a serious
23 complication?
24         MR. ROSENBLATT:  Object to form.
25    A.    So that is how the FDA sets up what

Peter L. Rosenblatt, M.D.

Page 54

1 they consider a serious adverse event, is a
2 return trip to the operating room, and I'm not
3 taking that lightly at all. But from a clinical
4 standpoint, I would much rather -- if I had to
5 choose between taking someone back for a small
6 mesh exposure incision under local anesthesia
7 versus an entirely new operation to repair
8 recurrent prolapse with the inherent scarring
9 and... I would much rather, if I had to choose,
10 take the former rather than the latter.
11     Q.    If I were to tell someone the
12 complication Woman A had is a serious
13 complication, and I know it was a serious
14 complication because it required her to go to the
15 emergency room to repair it, do you agree with
16 that statement?
17         MR. ROSENBLATT: Object to form.
18     A.    I guess I'm not sure what you're
19 talking about in terms of going to the emergency
20 room.
21     Q.    I meant operating room. I'm sorry.
22 I got to re-ask it.
23     A.    Please.
24     Q.    If I were to tell someone Ms. Smith
25 has a serious complication with her transvaginal

Page 55

1 mesh, and the reason I know it's a serious
2 complication is because she had to go to the
3 operating room to have it repaired, do you think
4 I'm making a fair statement?
5     A.    I guess what I'm saying is I don't
6 think that's unreasonable. What I'm saying is to
7 consider that a serious complication but not to
8 consider a recurrent prolapse requiring a whole
9 new operation for prolapse, not considering that
10 a serious complications is somewhat hypocritical.
11     Q.    I understand. And I don't mean to
12 belabor the point, but is it fair to say that by
13 it's very def- -- strike it.
14         Is it fair to say that a
15 complication that requires a woman to go to the
16 operating room for a surgical repair that by its
17 very nature should be considered a serious
18 complication?
19         MR. ROSENBLATT: Object to form.
20 Asked and answered.
21     A.    I think that that is reasonable,
22 but there are different degrees of serious
23 adverse events. And if the FDA wishes to
24 categorize that as a serious adverse event
25 because it's a return to the operating room, I

Page 56

1 don't disagree with that. I'm talking about the
2 hypocrisy about not considering a return trip to
3 the operating room for recurrent prolapse not a
4 serious adverse event, that's all.
5     Q.    Do you have any reason to believe
6 that what you consider to be a misrepresentation
7 of the data by the FDA was intentional on the
8 FDA's part?
9         MR. ROSENBLATT: Object to form.
10     A.    I have no reason to believe that.
11     Q.    For example, do you believe that
12 the FDA has some kind of a vendetta against
13 synthetic mesh manufacturers?
14     A.    No, I don't believe that is true at
15 all.
16     Q.    Can you imagine any reason why
17 anyone at the FDA would want to mislead the
18 public with a biased view of risks associated
19 with the use of transvaginal mesh to treat
20 women's health issues?
21     A.    I can't think of any reason why
22 they would want to do that.
23     Q.    Two risks unique to transvaginal
24 mesh include mesh exposure through the vaginal
25 wall and also erosion, which is the migration of

Page 57

1 the mesh, into other organs. Is that right?
2     A.    Right.
3     Q.    Do you hold the opinion that most
4 cases of mesh exposure are minor complications
5 and are even asymptomatic?
6     A.    That's true much of the time,
7 correct.
8     Q.    On what studies or peer-reviewed
9 medical literature is that opinion based?
10     A.    It's actually based on many studies
11 throughout the literature that many of the mesh
12 exposures are asymptomatic and that many mesh
13 exposures require either just an in-office
14 procedure or just observation or treatment with
15 estrogen cream. And, in addition, that's been my
16 experience for the past, you know, 15 years or so
17 in my clinical practice, that most of the mesh
18 exposures are either asymptomatic or minimally
19 bothersome to a patient.
20     Q.    And by most, you mean the majority?
21     A.    The majority, correct.
22     Q.    Can you identify off the top of
23 your head any particular peer-reviewed literature
24 that supports that opinion?
25     A.    Yes. I'd have to look to

Peter L. Rosenblatt, M.D.

Page 58

1 specifically mention names, but a number of the
2 RCTs on Prolift. I believe Hiltunen. I believe
3 Nieminen. I'm probably saying that wrong. Talk
4 about how often mesh exposures are asymptomatic.
5     Q.    Any others off the top of your
6 head?
7     A.    No, but I'd be happy to look at
8 any, and there are many. It's throughout the
9 literature.
10     MR. ROSENBLATT: Did you want him
11 to go through his expert report and pull out any
12 references for you?
13     MR. CRAWFORD: No, I don't need
14 that. I just wanted to know what he could think
15 of off the top of his head. Thank you, though.
16     Do you hold the opinion that
17 there's a significantly higher rate of recurrent
18 prolapse with native tissue repair as compared to
19 use of transvaginal mesh.
20     A.    Yes.
21     Q.    On what studies or peer-reviewed
22 medical literature is that opinion based?
23     A.    On many. I mean, even the RCTs
24 such as Altman and several others that, you know,
25 I'm familiar with but just don't come to mind,

Page 59

1 but I've read many, many RCTs as well as -- well,
2 the RCTs, that the rate of recurrent prolapse is
3 much higher with native tissue repairs.
4     Q.    For the benefit of a jury, what is
5 an RCT?
6     A.    Oh, RCT. It's a randomized
7 controlled trial.
8     Q.    Do you agree that there's no chance
9 of mesh erosion or exposure with a native tissue
10 repair?
11     MR. ROSENBLATT: Object to form.
12     A.    That's true when you use the word
13 mesh, but it's certainly not true with native
14 tissue repairs that use permanent synthetic
15 materials where there's a risk of erosion. And,
16 you know, in fact, just that you mentioned it,
17 the one that leaps off my mind is the Iglesia RCT
18 comparing Prolift to native tissue repair that
19 was stopped during an interim analysis because
20 the mesh exposure rate was over 15 percent, which
21 was a predetermined percentage at which they
22 would stop the procedure, but in the same
23 article, they talk about the native tissue
24 repairs showing a GORE-TEX exposure rate of over
25 15 percent as well, but they don't -- you know,

Page 60

1 they don't talk about cancelling the native
2 tissue repairs because of over 15 percent
3 exposure rate.
4     Q.    You say in your report that the
5 Gynemesh® PS mesh used in Prolift is not
6 defective just because a small percentage of
7 patients may experience exposures or other
8 well-known and acceptable complications.
9     A.    Correct.
10     Q.    In your opinion, what percentage of
11 Prolift patients would have to experience mesh
12 exposures for you to consider the Prolift device
13 defective?
14     MR. ROSENBLATT: Object to form.
15     A.    So I don't think there's a specific
16 number, and different studies show different
17 exposure rates. So I think a lot of it has to do
18 with technique, surgeon technique, as well as,
19 you know, the factors associated with the
20 patient. You know, clinical factors, like age
21 and estrogenization and menopausal status,
22 obesity, comorbidities like diabetes. But, to
23 me, that does not, a specific percentage does not
24 denote a defect in the product itself.
25     Q.    So there is no particular specific

Page 61

1 percentage at which you would say this is a
2 defective product?
3     MR. ROSENBLATT: Object to form.
4 Asked and answered.
5     A.    No, only in that different
6 studies -- you know, I've seen exposure rates as
7 high as 20 percent. I've seen exposure rates of
8 5 percent or 2 percent. So, you know, every
9 study is different, and you're going to have
10 different exposure rates.
11     Q.    Your report says the medical
12 literature commonly reports that eight or nine
13 out of ten women who have Prolift report that the
14 Prolift surgery improved their quality of life,
15 correct?
16     A.    Correct.
17     Q.    What medical literature are you
18 referring to or relying upon to make that
19 statement?
20     A.    Can I take a look at --
21     MR. ROSENBLATT: I think you've got
22 it.
23     THE WITNESS: Oh, I do?
24     Q.    Page 46. The very first sentence
25 on page 46.

Peter L. Rosenblatt, M.D.

Page 62

1    A.    Oh, thank you.  You know, as an
2  example, the article I quote with Feiner from
3  2010 shows that despite some patients developing
4  de novo dyspareunia, the overwhelming majority,
5  in this case 94 percent of women, say they
6  would have had the same surgery again, and over
7  90 percent would recommend it to a friend.
8    Q.    Is there anything other than the
9  Feiner report in 2010 on which you base your
10  opinion that the medical literature commonly
11  reports that eight or nine out of ten women who
12  have Prolift report that the Prolift surgery
13  improved their quality of life?
14    A.    I believe that there -- there is
15  other literature, and I'm trying to remember.  I
16  believe possibly Lowman, L-O-W-M-A-N, discusses
17  that as well.  That they specifically looked at
18  dyspareunia rates, but that most women were very
19  satisfied with the procedure, and that even the
20  dyspareunia was considered mild for most women.
21    Q.    Are there any other studies?
22    A.    There are --
23         MR. ROSENBLATT:  Object to form.
24    A.    -- but nothing that comes to mind.
25    Q.    What year was the Lowman study?

Page 63

1    A.    What year was the Lowman study?
2    Q.    Yes.  Do you recall?
3    A.    I don't recall off the top of my
4  head.
5    Q.    Okay.
6    A.    2008.
7    Q.    Thank you.  What's your
8  understanding of Bruce Rosenzweig's role in this
9  case?
10         MR. ROSENBLATT:  Object to form.
11    A.    I know that Dr. Rosenzweig has been
12  identified as an expert for the plaintiff.
13    Q.    Do you know anything beyond just
14  the fact that he is an expert for the plaintiff?
15  Do you know what he is an expert in?
16         MR. ROSENBLATT:  Object to form.
17  Assumes facts not in evidence.
18    Q.    Let me rephrase.
19         Do you know what subjects Bruce
20  Rosenzweig is held out to be an expert by the
21  plaintiffs' lawyers in this case?
22    A.    Not specifically, although I've
23  read his report and I believe he discusses the
24  specific qualities of mesh, mesh properties.
25    Q.    And do you know his specialty?

Page 64

1    A.    I believe he's a urogynecologist.
2    Q.    Do you know Dr. Rosenzweig
3  personally?
4    A.    I may have met him many, many years
5  ago.
6    Q.    Do you have any specific
7  recollection of that?
8    A.    Yeah, I remember he taught at a
9  course I attended in the late 1990s.  I believe
10  it was actually in Frisco, Colorado.  And then he
11  sort of disappeared off the grid for a number of
12  years before he resurfaced.
13         MR. CRAWFORD:  I will respectfully
14  object to the non-responsive portions of that
15  answer.
16         MR. ROSENBLATT:  I think he's
17  referring to his skiing videos.
18  BY MR. CRAWFORD:
19    Q.    Was there anything -- I mean, no
20  offense, but the late 1990s has been a while.
21         Is there any particular reason you
22  recall meeting Dr. Rosenzweig at that conference?
23    A.    No, just that I remember him
24  lecturing at a conference I attended out there.
25    Q.    Do you recall what topic or subject

Page 65

1  he lectured on?
2    A.    No.
3    Q.    What do you know about
4  Dr. Rosenzweig's reputation in the medical
5  community?
6    A.    Only that he is -- I've seen his
7  name in connection with a number of legal cases
8  as a plaintiff expert.  Not just limited to
9  Ethicon but in a number of cases.
10    Q.    Anything else?
11    A.    No.
12    Q.    Do you have any reason to believe
13  Dr. Rosenzweig is a biased witness in this case?
14    A.    I have no knowledge about anything
15  like that.
16    Q.    Dr. Rosenzweig has opined that
17  Ethicon's Prolene® mesh is not suitable as a
18  permanent implant for pelvic reconstructive
19  surgery because the pores are too small.  Do you
20  agree with that?
21    A.    No.
22    Q.    Why not?
23    A.    So the Prolene® mesh, you know, has
24  been used in literally, you know, millions of
25  sling cases with phenomenal results.

Peter L. Rosenblatt, M.D.

Page 66

1    I mean, if anything, you know, the
2 TVT products have revolutionized the field of
3 urogynecology, and that's not just from my
4 personal experience, which it is, but it's also
5 from, you know, hundreds of peer-reviewed, if not
6 thousands of peer-reviewed, articles about the
7 success of the material.
8    Q.    I understand that you're an
9 advocate of the mesh, the synthetic mesh and the
10 use of synthetic mesh in pelvic reconstructive
11 surgery, but my question is a little more narrow,
12 and that is do you agree with the opinion that
13 the pores are too small in the Ethicon Prolene®
14 mesh?
15    MR. ROSENBLATT:  Object to form.
16    A.    Right, I don't agree with that.
17 And the reason is that the Prolene® mesh is a
18 macroporous Type 1 monofilament material that
19 undergoes excellent integration into patients'
20 tissues, which I have seen on countless cases,
21 and I think it's completely appropriate and
22 probably the most appropriate in that it also has
23 great qualities in terms of being tension free
24 and not moving and incorporating well into
25 tissue.

Page 67

1    Q.    You said that it has a history of
2 excellent integration into human tissue?
3    A.    Correct.
4    Q.    Does that happen 100 percent of the
5 time?
6    A.    What I have seen in my own clinical
7 practice is that it does.  I mean, can you get
8 exposures, yeah, that's possible.
9    Fortunately, you know, Prolene®
10 mesh which is used for slings such as TVT and
11 TVT-O has an extremely low exposure rate of about
12 1 percent, and so, you know, I guess those are
13 the exceptions when you don't get tissue
14 integration.  But for the vast majority of cases,
15 there's excellent integration with the tissue.
16    Q.    But there are cases where that
17 doesn't occur?
18    A.    But that can also occur with
19 Prolene® suture, and there are, you know, mesh --
20 you know, suture exposures in the vagina that
21 happen with suture, and the suture has been
22 around for over five decades.
23    So, yes, there are always going to
24 be exceptions, but when you think of the 99
25 percent of women whose lives have been improved

Page 68

1 from this one device, there's no comparison.
2 There's no other procedure that's been as
3 successful to help women with these problems.
4    Q.    I'll respectfully object to the
5 non-responsive portions of the answer other than,
6 yes, there are exceptions.
7    MR. ROSENBLATT:  Doctor, you can
8 answer however you see fit.
9    Q.    And you know I mean no disrespect
10 by those objections.
11    A.    I understand.  I appreciate that.
12    Q.    I have to respectfully move to
13 strike portions of your answers that I don't
14 believe are responsive to my questions.
15    You understand that, right?
16    A.    I do understand that.
17    Q.    You've been deposed before, haven't
18 you?
19    A.    I have.
20    Q.    That doesn't hurt your feelings,
21 does it?
22    A.    No, not all.  Thank you for saying
23 that.
24    Q.    I'll represent to you that
25 Dr. Rosenzweig also holds the opinion that

Page 69

1 polypropylene mesh is not suitable as a permanent
2 implant due to its heavy weight.
3    Does the weight of polypropylene
4 mesh have a bearing on whether or not it's
5 suitable for use in pelvic reconstructive
6 surgery?
7    A.    So I respectfully disagree with his
8 opinion that it's a heavy weight mesh.  It is
9 considered a lightweight mesh by the -- you know,
10 by classifications in the urogynecologic
11 literature.
12    Q.    Is there something known as old
13 mesh as opposed to new mesh?
14    MR. ROSENBLATT:  Object to form.
15    A.    I haven't heard that specifically,
16 those terms.
17    Q.    You've never seen the internal
18 Ethicon documents where Ethicon representatives
19 refer to some types of Ethicon mesh as old mesh?
20    MR. ROSENBLATT:  Object to form.
21 Mischaracterization of the documents.
22    A.    I don't recall seeing that, but I'd
23 be happy to look at any documents you want me to
24 look at.
25    Q.    The notion that there's a old mesh

Peter L. Rosenblatt, M.D.

Page 70

1 and a new mesh, that's a foreign concept to you
2 as you sit here today?
3     A.     Well, I can imagine what you're
4 referring to.
5          You know, for instance, I think
6 of -- you know, polypropylene mesh is like
7 Marlex® mesh, being a heavier mesh than the
8 current meshes, but I would consider Prolene®
9 mesh, which is the mesh used for TVT and TVT-O
10 and TVT Abbrevo, for instance, and TVT Secur as
11 being a newer lightweight Type 1 macroporous
12 monofilament mesh.
13     Q.     Okay.  That stated, do you believe
14 that the weight of a mesh, synthetic mesh, would
15 have a bearing upon whether or not it's suitable
16 for pelvic reconstructive surgery?
17     A.     So taking with what I said that
18 these are considered lightweight meshes, I
19 suppose that you could have heavier meshes than
20 what we're talking about that may not be
21 appropriate, but I'd have to know exactly which
22 meshes you're referring to.
23     Q.     Well, in what ways can you conceive
24 of that a heavier mesh would be inappropriate for
25 an implant?

Page 71

1          MR. ROSENBLATT:  Object to form.
2     A.     Well, bearing in mind that we're
3 not talking about the meshes that I just
4 described, you know, if you had a mesh which had
5 extremely limited pore size, that might affect
6 the ability of the mesh to incorporate.  And in
7 my mind, you know, I'm not thinking about
8 specifically Ethicon meshes, but I think of other
9 meshes that are, for instance, woven, like the
10 IVS mesh or the ObTape which are much less
11 porous, and so I guess I'm thinking about those
12 being heavier meshes which did have issues with
13 them.
14     Q.     The heavier the mesh, the smaller
15 the pore size?
16          MR. ROSENBLATT:  Object to form.
17     A.     Not necessarily, right?  You can
18 have a very wide open weave with, depending on
19 what the weave is, with a heavier mesh, with a
20 heavier diameter of the strands.  So I don't
21 think there's a direct correlation between the
22 diameter of the strands and the pore size.
23     Q.     Do you believe that the smaller the
24 pore size, the more problems it can create for
25 the woman?

Page 72

1          MR. ROSENBLATT:  Object to form.
2     A.     No, I think what the literature
3 shows and mesh science shows is that if you have
4 microporous mesh it's possible that you may
5 not -- for instance, you may not get good tissue
6 integration throughout the mesh, but also, the
7 possibility that bacteria could get into the
8 interstices of the mesh and the body's ability to
9 fight those bacteria with macrophages might be
10 compromised, but I don't think that has anything
11 to do with the Prolene® mesh that we're talking
12 about.
13     Q.     I'll represent to you that
14 Dr. Rosenzweig holds the opinion that
15 polypropylene is not suitable as a permanent
16 implant because it causes chronic foreign body
17 reactions.
18          Do you agree with that?
19     A.     No.
20     Q.     Why not?
21     A.     There are many implants that are
22 used throughout surgical interventions, including
23 anything from artificial hips to pacemakers to
24 mesh, to hernia mesh, which incite a foreign body
25 reaction.  That's a normal response of the body

Page 73

1 to a foreign object.  That doesn't translate --
2 there's no correlation between that and the
3 development of problems such as, you know, pelvic
4 pain or dyspareunia.  So it's sort of apples and
5 oranges.  Just because you may get a foreign body
6 reaction does not mean that's an untoward effect
7 toward the implant.
8     Q.     Is there a difference between a
9 transitory foreign body reaction and a chronic
10 foreign body reaction?
11     A.     I believe it is possible to get a
12 transient versus a permanent, a foreign body
13 reaction, but that again doesn't translate into a
14 clinically significant problem.
15     Q.     What is the difference between --
16 I'm using the word transitory, and you said
17 transient.  Am I calling it the wrong thing?
18     A.     I believe that those are
19 synonymous.
20     Q.     Okay.  I'm just going to say
21 transitory because that's how I know it.
22     A.     Okay.
23     Q.     Is there a difference between a
24 transitory foreign body response and a chronic
25 foreign body response?

Peter L. Rosenblatt, M.D.

Page 74

1    A.    Well, I think the way you're using
2  it and the way I'm using it I believe that one
3  with time it tends to go away, and one would be
4  sort of a permanent reaction, but I'm not aware
5  of any literature that shows that that translates
6  into a clinical difference for the patient.
7    Q.    When you're talking about foreign
8  bodies inserted into a woman's vagina, is the
9  difference between a transitory foreign body
10  response and a chronic foreign body response a
11  significant distinction to make?
12    A.    From a clinical standpoint, I don't
13  believe that's true.
14    Q.    Why not?
15    A.    Because I don't know any literature
16  that has shown that to be the case.
17    Q.    You don't know of any literature
18  that shows that synthetic transvaginal mesh
19  causes chronic foreign body reactions?
20    A.    That's not what I said.  What I'm
21  saying is that has not translated into a
22  clinically significant difference, whether it's
23  chronic or transitory.
24    MR. ROSENBLATT:  Once you finish
25  this line of questioning, if we could take a

Page 75

1  break.
2    Q.    Help us understand what you mean by
3  clinical difference.
4    A.    In other words, what is the
5  difference for the patient, that's what I mean by
6  clinical difference.
7    In other words, if you take
8  biopsies and you show that there's a chronic
9  versus a transitory or transient foreign body
10  response, that doesn't translate or correlate
11  with a patient's symptoms, so it may be
12  inconsequential, even though on a pathological
13  report you may see a chronic foreign body
14  response versus one that's transitory.
15    Q.    So you don't think it's a more
16  serious issue for a woman to be facing a chronic
17  foreign body response than it is to be facing a
18  transitory foreign body response?
19    A.    I have not seen literature that
20  suggests that a chronic foreign body response
21  translates to a clinical difference for a
22  patient.
23    Q.    Well, a chronic foreign body
24  response could be recurrent infections for a
25  woman who's having foreign body response to

Page 76

1  something that's been implanted into her vagina?
2    A.    Right, so fortunately infection of
3  mesh that we use in the vagina for either slings
4  or prolapse is exceedingly rare, and I can think
5  of -- of the over 2,000 slings or mesh that I've
6  put into a woman, I can think of one case where
7  an infection required me to remove the mesh.
8  That's a very low percentage.
9    Q.    You have had a patient who had a
10  chronic foreign body response to transvaginal
11  synthetic mesh that required you to go in and
12  remove the mesh because it caused recurrent
13  infections?
14    MR. ROSENBLATT:  Object to form.
15  Misstates the testimony.
16    A.    Yeah, that's not what I'm saying at
17  all.
18    Q.    I'm trying.  I'm trying.
19    A.    Okay.  It actually wasn't recurrent
20  infections.  It was a patient who had a TVT-O
21  obturator sling who within the first week of
22  surgery developed a serious infection which
23  required me to remove the mesh probably within
24  four days of the insertion.
25    Q.    What caused that infection?

Page 77

1    A.    The causative agent was I believe
2  Group A Strep which is a very serious infection.
3    Q.    Do you have any idea how that mesh
4  got infected with the Strep?
5    A.    No.
6    Q.    Based upon a reasonable degree of
7  medical probability, did it occur as the mesh was
8  being inserted into her vagina?
9    A.    I think that's a reasonable
10  assumption.
11    Q.    In other words, did it pick up some
12  Strep on its way in?
13    A.    I believe that's reasonable, but
14  that's exceedingly rare.
15    MR. CRAWFORD:  You want to take a
16  break?
17    MR. ROSENBLATT:  Yeah.
18    (A break was taken.)
19  BY MR. CRAWFORD:
20    Q.    Doctor, we are back from a break.
21  At the risk of beating a dead horse, we have to
22  talk just a little bit longer about this
23  transitory versus chronic, okay?
24    A.    Sure.
25    Q.    To let you know where I'm coming

Peter L. Rosenblatt, M.D.

Page 78

1  from, I'll represent to you the plaintiffs in
2  this case are going to criticize Ethicon for
3  warning physicians that their synthetic mesh
4  could cause a transitory foreign body response
5  but not going that extra step and advising it
6  could cause a chronic foreign body response.
7        Do you follow me so far?
8    A.    Yes.
9    Q.    I gather from your testimony that
10  you don't think that's a fair criticism.
11    A.    I agree.
12    Q.    Why?
13    A.    From what I've already stated,
14  which is that that does not -- I've never seen
15  any literature or in my personal experience doing
16  this for, you know, 20 years that any kind of
17  response to a foreign material translates into a
18  clinically significant problem, and I'll give you
19  an example.  We implant -- we implant pacemakers.
20  I'm not talking about cardiologists.  I'm talking
21  about urogynecologists implant pacemakers for
22  overactive bladder, for fecal incontinence, for
23  urinary retention.  That's a foreign body.  The
24  body responds to that by walling off the device,
25  and I guarantee you a metal pacemaker is not

Page 79

1  porous.  So you get a walled off -- you know,
2  that's one response to a foreign body.  You may
3  do pathologic studies, if you want, and show that
4  you may have a chronic foreign body response
5  'cause the body sees that has a foreign body.
6  Patients are asymptomatic.  It's irrelevant what
7  the body is doing as long as the patient doesn't
8  have a bad reaction to it, clinically.
9    Q.    And I think that's the point is --
10  I think what we're doing is equating chronic
11  foreign body responses to chronic recurrent
12  infections in women.
13    A.    When you say "we," who are you
14  talking about?
15        MR. ROSENBLATT:  Object to form.
16    Q.    Is it fair to equate chronic
17  foreign body responses to chronic recurrent
18  infections in these women?
19    A.    No, it's not fair because a foreign
20  body response has nothing to do with infection.
21  That would be a chronic infection.  That's not
22  the same thing as a chronic body reaction.
23    Q.    The body's reaction to a foreign
24  body is inflammation, right?
25    A.    Usually initially.

Page 80

1    Q.    And what else?  Strike that.
2        How does the body respond to a
3  foreign body?
4    A.    In many different ways, but often
5  it's with fibrosis, but you know, you get
6  fibrosis just with any surgery in the body.  You
7  know, think of a scar on your arm if you cut
8  yourself or a keloid, that's scar tissue.  So
9  that's a normal response to healing.
10        Another normal response in this
11  case to a foreign body is to try to wall off the
12  foreign body or try to cause scarring or fibrosis
13  around the foreign body, and that is a foreign
14  body response.  That doesn't mean it's a bad
15  response.  That's a pathologic diagnosis.  But we
16  know, and in this case, we have literally
17  millions of women who've had the surgery, and
18  it's done -- you know, and it's been so
19  beneficial for these women.  So having a foreign
20  body does not mean that it's a bad response of
21  the body to a foreign material.
22    Q.    Move to strike the non-responsive
23  portions of that answer.
24        A foreign body response is not
25  necessarily a bad thing, correct?

Page 81

1    A.    Right, and also, it doesn't equate
2  to infection.
3    Q.    A foreign body response is not a
4  bad thing, correct?
5    A.    Correct.
6    Q.    Unless it creates symptoms for the
7  woman.
8        MR. ROSENBLATT:  Object to form.
9    A.    Well, I think there's -- I have to
10  disagree.
11    Q.    Okay.
12    A.    There's a foreign body response,
13  but then there are possibly effects that are
14  separate from that foreign body response such as
15  exposure.  Exposure of mesh which can occur
16  doesn't mean that it happened because of a
17  foreign body response.  Exposures can be caused
18  by other things like a hematoma or a suture line
19  that opened up.  So I think what you're doing is
20  equating a foreign body response with chronic
21  infection, and that's just not -- that's just not
22  how it happens.
23    Q.    What about -- what about equating a
24  chronic foreign body response to chronic symptoms
25  such as pain, dyspareunia, and -- go ahead.

Peter L. Rosenblatt, M.D.

Page 82

1    MR. ROSENBLATT: Object to form.
2    A.    So I'm glad you brought that up.
3  And there was -- there are studies that have
4  looked at this.  I can't remember what the first
5  author's name is, but there was one study which
6  was a great idea.  They removed pieces of mesh
7  from women who needed a revision of their slings,
8  which is not that unusual, right?
9        So someone who develops urinary
10 retention or overactive bladder or some other
11 type of voiding dysfunction occasionally -- you
12 know, I do these surgeries -- we have to bring
13 women back for revision of the mesh which is
14 usually just cutting the mesh.
15       What these researchers did was to
16 take out a portion of the mesh and look at it
17 under the microscope, send it to pathology.  And
18 they actually found that the women who had their
19 mesh removed for voiding dysfunction had more
20 foreign body reaction than the women that had
21 pain.  So there was no correlation between
22 foreign body reaction and pain.  There was
23 actually more foreign body reaction with voiding
24 dysfunction.  So you cannot equate pain with
25 foreign body reaction.

Page 83

1    Q.    You cannot equate pain with a
2  foreign body response to synthetic mesh?
3    A.    Correct.
4    Q.    What study were you just referring
5  to?
6    A.    I don't remember the first author,
7  but I'm happy to --
8    Q.    Well, there's been several times
9  where I've said, nah, you don't have to look that
10 up, but that was a pretty significant answer, so
11 I'd like to know the name of that study.
12   A.    Okay.
13       MR. ROSENBLATT:  We can try to get
14 it during a break.
15       MR. CRAWFORD:  Okay, that sounds
16 good.
17   A.    I'll make a note.
18   Q.    Dr. Rosenswine -- excuse me.
19 Dr. Rosenzweig --
20   A.    Is that a Freudian slip?
21   Q.    Dr. Rosenzweig opines that
22 Ethicon's Prolene® mesh is not suitable for
23 permanent implant because the material safety
24 data sheet for polypropylene resin used to make
25 polypropylene states that it's incompatible with

Page 84

1  strong oxidizers such as peroxides which are
2  readily found in the vagina.
3        Is he wrong about that?
4    A.    I don't agree with his statement at
5  all for several reasons.
6        One is that Prolene® mesh is simply
7  made up of polypropylene fibers which we've been
8  using for over 50 years.  I've gone back in on a
9  personal, you know, anecdotal level, and I've
10 seen Prolene® sutures that have been placed a
11 decade before I've been there, and I've seen no
12 evidence of any degradation of the Prolene®.
13 I've removed Prolene® mesh before and have not
14 seen any degradation of the mesh.
15       And in addition, and I can't speak
16 for all polypropylene, but I know with Prolene®
17 that there are specifically antioxidants that are
18 proprietary that resist oxidation.
19   Q.    So the basis for your opinion --
20 strike that.
21       The basis for you disagreeing with
22 Dr. Rosenzweig's opinion is that you've seen
23 polypropylene sutures in women that have been
24 there for a long time and they hadn't oxidized or
25 degraded, therefore other synthetic meshes

Page 85

1  shouldn't oxidize or degrade; is that right?
2        MR. ROSENBLATT:  Objection to form.
3    A.    No, that's one example, but also,
4  I'm familiar with the literature that has looked
5  at this.  I'm familiar with the scanning electron
6  microscopy which in some people's eyes has looked
7  like it has shown evidence of cracking and
8  degradation, but I'm also familiar with other
9  studies that have shown that that's a biofilm,
10 that the cracking is not in the polypropylene
11 itself, and if you wash it away, you get pristine
12 polypropylene.  So I am not aware of any
13 definitive literature in humans that has shown
14 that there's degradation from oxidation of
15 Prolene® mesh.
16   Q.    I got to go back and clean that up
17 a bit.
18       Dr. Rosenzweig opines that
19 Ethicon's Prolene® mesh is not suitable for
20 permanent implant because the material safety
21 data sheet for polypropylene resin used to make
22 the mesh said it's incompatible with strong
23 oxidizers such as peroxides which are readily
24 found in the vagina.  And you disagree with that
25 opinion, correct?

Peter L. Rosenblatt, M.D.

Page 86

1    A.    Correct.
2    Q.    And one of the reasons that you
3  disagree with that opinion is because you're
4  unaware of any medical literature that indicates
5  degradation due to oxidation of polypropylene
6  mesh?
7    A.    No, I said of Prolene® mesh.
8    Q.    I'm sorry.  Prolene® mesh.
9    A.    Correct.
10   Q.    The other reason that you disagree
11 with Dr. Rosenzweig's opinion on that is because
12 you, yourself, have seen Prolene® sutures in
13 patients of yours that have been there for years,
14 if not over a decade, and they weren't oxidized
15 or degraded?
16   A.    So not only Prolene® sutures but
17 also Prolene® mesh.
18   Q.    Used to treat?
19   A.    Stress incontinence.
20   Q.    What does it mean for something to
21 be cytoxic?  Cytotoxic.  Excuse me.
22         What does it mean for something to
23 be cytotoxic?
24   A.    My understanding is that it would
25 be toxic to cells.

Page 87

1    Q.    If a material is cytotoxic, does
2  that mean it can cause cell death and
3  complications?
4         MR. ROSENBLATT:  Object to form.
5    A.    I believe the definition of
6  cytotoxicity is death to cells.
7    Q.    Dr. Rosenzweig opines that
8  Ethicon's Prolene® mesh is not suitable for
9  permanent implant in women because it's
10 cytotoxic.  Do you agree with that?
11   A.    I have not seen any literature that
12 would substantiate that claim.
13   Q.    If there was credible scientific
14 evidence that polypropylene is cytotoxic, would
15 that render it not suitable for permanent
16 implants in women?
17         MR. ROSENBLATT:  Object to form.
18   A.    No, I think it would have to have
19 some clinical significance.
20         And again, let's go back and state,
21 as I did earlier, that we've been using
22 polypropylene and Prolene® sutures for decades,
23 and I'm not aware of any untoward effects that
24 that might have of any clinical significance, and
25 you know, you've got -- you've got several

Page 88

1  million women that have benefited greatly from
2  this technology over a period of, you know, over
3  17 years, probably more like 20 years at this
4  point including Europe, and I think that's sort
5  of a ridiculous statement because we just don't
6  see that clinically.
7    Q.    Move to strike after the first
8  reference to clinical significance.
9         MR. ROSENBLATT:  Doctor, you can
10 answer however you see fit.
11   Q.    What condition is the Burch
12 procedure designed to treat?
13   A.    Stress urinary incontinence.
14   Q.    Do you agree that although the
15 Burch procedure may take longer and require a
16 short hospitalization, it's a safer procedure
17 than synthetic slings?
18         MR. ROSENBLATT:  Object to form.
19   A.    I disagree with that statement.
20   Q.    Why?
21   A.    First of all, I do Burch
22 procedures.  I've been doing laparoscopic Burch
23 procedures since 1993.  I think it's a very good
24 procedure to treat stress incontinence, but the
25 long-term results are not as good as with

Page 89

1  midurethral slings, and you open up a whole host
2  of other potential complications that are not
3  seen with midurethral slings.
4    Q.    What are those?
5    A.    Well, there's, you know, in general
6  the risk of general anesthesia.  So if you do a
7  laparoscopic Burch, you really need to use
8  general anesthesia, so that increases the risk
9  compared to doing a midurethral sling under local
10 anesthesia with conscious sedation.
11         Now, you're also getting
12 intraperitoneal with a laparoscopic Burch or an
13 open Burch, so there's the potential of major
14 vascular injury.  There's the potential of a
15 bowel injury.  And although, you know,
16 theoretically you could get a bowel injury with a
17 midurethral sling, it's exceedingly rare.  It's
18 an incredibly low number.
19         And, you know, any time you do
20 general anesthesia and you take longer, there are
21 always going to be inherent risks of DVTs and,
22 you know, aspiration and et cetera.
23         So I think midurethral slings have
24 been shown to be a much safer alternative than
25 the Burch.  That said -- may I continue?

Peter L. Rosenblatt, M.D.

Page 90

1    Q.    Of course.
2    A.    I'm doing some more of them these
3  days just because of all the, again, fear
4  mongering, that women come in and have a --
5  they're afraid of mesh.  And so even after
6  talking to them, some women will prefer,
7  honestly, to have the old-fashion Burch, which is
8  a very good procedure, but I don't think it's as
9  good as a midurethral sling.
10    Q.    Move to strike the reference to
11  fear mongering.
12    A.    I like that.
13    Q.    Me, not so much.
14          The Burch procedure is a very good
15  procedure to treat stress urinary incontinence,
16  correct?
17    A.    Yes.
18    Q.    You perform Burch procedures to
19  this day, correct?
20    A.    Correct.
21    Q.    In fact, you perform more Burch
22  procedures now than you use to.
23    A.    No.
24    Q.    No?
25    A.    No.  You know, back in 1995 when I

Page 91

1  first started my practice, that was -- 90 percent
2  of my anti-incontinence operations were
3  laparoscopic Burch.
4    Q.    You're performing more Burch
5  procedures in recent years than you use to,
6  correct?
7    A.    Slightly more, yes.
8    Q.    The reason you're performing more
9  Burch procedures in recent years is due to fear
10  of complications by the general public concerning
11  the use of polypropylene mesh slings, true?
12    A.    No.  It's because of patient's
13  anxiety seeing ads on TV and what they read in
14  the internet about transvaginal mesh, and they
15  equate midurethral slings with transvaginal mesh,
16  and some women will come in with an attitude,
17  please do not talk to me about using any mesh in
18  the vagina.
19    Q.    Does that irritate you when that
20  happens?
21    A.    I think irritate's the wrong word.
22  I think -- you know, I'm -- I think it's a shame
23  that women have -- you know, that women are being
24  exposed to this because first and foremost my
25  goal is to take care of my patients and to offer

Page 92

1  them the best treatment possible.
2          Although I think a Burch is a good
3  procedure, I don't think it's the best treatment
4  possible, and I think what we're going to be
5  seeing are more patients coming back with
6  recurrences of their stress incontinence, and you
7  know, I hope that's not the case, but I do know
8  it's the case just if you look at the literature.
9  Ultimately there is a decrease in the efficacy of
10  a Burch procedure over time.
11    Q.    Over what period of time?
12    A.    Well, certainly, you know, the
13  early studies on comparing Burch with TVT are
14  similar, but as you get out to about five years,
15  seven years, there's a significant decline, and
16  there are studies even going out 15 years that --
17  you know, whereas when you do a midurethral
18  sling, it's pretty rare for a patient to come
19  back and say, you know, that sling worked for a
20  couple of years and now it's not working.  It
21  really is consistent.  But with Burchs, I'm
22  seeing patients I operated on 20 years ago who
23  are coming back saying, yeah, I got that stress
24  incontinence again, what can you do for me now?
25    Q.    Do you agree that if complications

Page 93

1  do occur following a Burch procedure they're
2  rarely long-term and they're easy to treat?
3    A.    Well, again, if you consider
4  failure, you're talking about a whole another
5  operation for their stress incontinence.  I've
6  seen ureteral injuries.  In fact, I've published
7  on a ureteral injury after a Burch, where I've
8  never seen a ureteral injury after a midurethral
9  sling.  In fact, I'm not even aware that it's
10  ever been -- I'm not sure if it's ever been
11  reported, but certainly I've never had that
12  experience.  But failure is not to be taken
13  lightly, and to me, that is a complication
14  because it requires the patient undergo another
15  operation.
16          I've also seen urinary retention
17  after a Burch, although, you know, obviously you
18  can see that after any anti-incontinent
19  operation, but to relieve urinary retention after
20  a sling is much easier than to relieve urinary
21  retention after a Burch.
22    Q.    What's the most common complication
23  resulting from a Burch procedure?
24    A.    I would have to say voiding
25  dysfunction.

Peter L. Rosenblatt, M.D.

Page 94

1    Q.    Is that easy to treat?
2    A.    Well, sometimes it will manifest --
3  it can be treated just with time and with
4  catheterization, but occasionally you have to go
5  back in and remove the stitches, and that would
6  require another general anesthesia, entry into
7  the space of Retzius and literally cutting the
8  sutures, and I've had to do that a couple times.
9    Q.    And that's what you would consider
10 a complete fail, a complete failure of the Burch
11 procedure?
12   A.    I mean, to me -- in my mind, a
13 failure of the Burch is when it doesn't treat the
14 stress incontinence which is about 15 percent of
15 the time, so.  Yeah, about 15 percent of the
16 time.  As opposed to a failure versus a
17 complication.  So I look at them differently, you
18 know, yeah.
19   Q.    What percentage of Burch procedure
20 patients require another surgery?
21        MR. ROSENBLATT:  Jeff --
22   Q.    Strike that.  What percentage of
23 Burch patients have their procedure fail thus
24 requiring another surgery?
25        MR. ROSENBLATT:  Are we going to

Page 95

1  count this as his TVT general depo as well?
2        MR. CRAWFORD:  Sure.
3        MR. ROSENBLATT:  All right.
4    A.    So what most people will quote in
5  the literature is that the success rate, meaning,
6  you know, successful treatment of stress
7  incontinence, is about 85 percent with a Burch
8  whether it's done open or laparoscopic.
9    Q.    When Burch procedures fail
10 completely, typically how long after the surgery
11 does that occur?
12   A.    It's variable.  So it can occur
13 immediately if you don't tension the sutures
14 correctly, and that's really done by surgeon
15 judgment.  You know, it's a kind of -- Gestalt.
16 I don't know how to spell Gestalt.  Anyways.  But
17 over time because we're just dealing with
18 sutures, that can tear through.
19        And by the way, we are talking
20 about permanent sutures, whether they're Prolene®
21 or GORE-TEX, but there is a -- you know, if you
22 look at like a Kaplan-Meier survival curve.  So
23 that when you start out with all the patients
24 that are successful over time, the survival
25 curve, meaning, you know, failure, does continue

Page 96

1  to grow with advancing time up to, you know, 15,
2  20 years.
3    Q.    And I understand there's variables
4  and there's a range, but if a woman were to peek
5  her head in the door right now and say, Doctor,
6  I've got stress urinary incontinence, I want to
7  undergo a Burch procedure, if it fails typically
8  how long after the surgery will it fail?
9    A.    So it can either be immediate,
10 right, because of 85 percent success, and 15
11 percent of women will come back and say, you
12 know, it just -- it isn't working.  I mean, this
13 to me, it's like Goldilocks, right.  So it's
14 either too tight, which puts you into retention.
15 Too loose, and you're in the 15 percent that
16 have, you know, quote/unquote, failed.  Or it's
17 just right, which is, you know, the 85 percent
18 range.  But typically, in my experience, that we
19 may see people five years out, seven years out
20 who are coming back saying it worked, but you
21 know, now I've got stress incontinence again.
22   Q.    But would it be fair to say the
23 majority of women whose Burch procedure fails,
24 they know it immediately.  You know right away
25 you're not the Goldilocks.

Page 97

1    A.    So that is a -- I don't know what
2  the breakdown would be, but that can happen, but
3  I've also seen women who after a year or two or
4  three come back with complaints of symptoms, and
5  I think it has to do with not just the way the
6  procedure is performed, but it has to do with the
7  patient's lifestyle, if she's a woman who has
8  chronically increased intra-abdominal pressure,
9  she's an asthmatic, she's a nurse and she lifts
10 patients, she goes to the gym a lot, she's
11 constipated.  You know, there are lifestyle
12 issues that can affect the long-term success, so
13 it is very variable.
14   Q.    Do you agree with Dr. Rosenzweig
15 that polypropylene is chemically reactive and not
16 inert?
17   A.    I do disagree with that.
18   Q.    Why?
19   A.    I think most -- the literature that
20 I've read, quality of literature, suggests that
21 polypropylene is for all intents and purposes
22 biologically inert.
23   Q.    What quality literature are you
24 referring to?
25   A.    I've read a number of studies about

Peter L. Rosenblatt, M.D.

Page 98

1 polypropylene or Prolene® mesh. I can't quote
2 for you the names, but that discuss the fact that
3 it is biologically inert, and also, in the
4 clinical literature, it is referred to as
5 biologically inert, and I've never seen anything
6 either in literature or in my personal experience
7 that suggests that it's not inert.
8     Q.     I'm really interested to see what
9 quality literature you're referring to that shows
10 that it's inert.  Can we look that up on the next
11 break?
12     A.     Yes.
13     Q.     What does inert mean?
14     A.     Non-immunogenic.
15     Q.     What does non-immunogenic mean?
16     A.     Doesn't elicit a immune response of
17 any clinical significance from the host.
18     Q.     In layman's terms, does that mean
19 the body doesn't attack it?
20     A.     Not really.  I mean, you know, we
21 talked about foreign body response, but it isn't
22 seen as something that you could -- like a kidney
23 transplant, you know, something that you would
24 develop a severe immune response to that would
25 elicit a severe immune response, basically.

Page 99

1     Q.     Do you agree with Dr. Rosenzweig
2 that polypropylene can degrade and release toxic
3 compounds into pelvic tissues?
4     A.     No, I don't agree with that.
5     Q.     Why not?
6     A.     Well, I've never seen any evidence
7 that there's any clinical significance that there
8 are any toxins released.  I'm not aware of any
9 literature that I've reviewed that suggests that.
10     Q.     I think we may have touched on this
11 already, but it will only take a second.
12         Do you agree with Dr. Rosenzweig
13 that polypropylene mesh can oxidize inside the
14 vagina thus causing the mesh to degrade, crack
15 and break apart?
16         MR. ROSENBLATT:  Object to form.
17     A.     So are we talking about
18 polypropylene or Prolene®, first?
19     Q.     Polypropylene.
20     A.     So I have not seen evidence of
21 that, and I've read the literature, you know, the
22 biochemistry, as we've discussed, some people
23 suggesting that there's cracking, surface
24 cracking, but other excellent evidence that I've
25 seen that shows that that's a biofilm, that's an

Page 100

1 artifact of the preparation of the material, and
2 that if you do a proper washing of that, you'll
3 seen pristine polypropylene without any evidence
4 of degradation or oxidation.  And in addition,
5 you know, with the mesh that we're talking about
6 here, which is Prolene®, has additives that are
7 antioxidants.
8     Q.     Are you aware of any literature
9 that indicates polypropylene mesh can oxidize
10 inside the vagina, thus causing mesh to degrade
11 and crack and break apart?
12     A.     So I have seen literature, but
13 there seems to be two schools of thought, and
14 the, quote/unquote, artifacts that I've seen with
15 scanning electron microscopy, appear to be just
16 that, where it's not the cracking of the
17 polypropylene material but of a biofilm that is
18 on top of the polypropylene.
19     Q.     To be clear, you have seen
20 literature that indicates polypropylene mesh can
21 oxidize inside the vagina, thus creating or thus
22 causing it to degrade, crack and break apart?
23         MR. ROSENBLATT:  Object to the
24 form.
25     A.     The literature I've seen is

Page 101

1 interpretation of scanning electron microscopy
2 but not that proves that degradation or cracking
3 exists.
4     Q.     Are you aware of any changes
5 Ethicon has made to Prolene® mesh since it was
6 introduced to the market?
7     A.     Are we talking about Prolene®
8 suture or Prolene® mesh?
9     Q.     Mesh.
10     A.     The only thing that I'm aware of is
11 the way that it's, the Prolene® mesh, is cut.
12     Q.     What change was made?
13     A.     Well, it was being offered
14 initially as mechanically cut, and then it was
15 being offered both as mechanically -- mechanical
16 or laser cut.  I'm not aware of any other
17 changes.
18     Q.     Which came first, mechanically cut
19 mesh or laser cut mesh?
20     A.     I believe mechanically cut.
21     Q.     Do you know why they started making
22 it laser cut as opposed to mechanically cut?
23     A.     I believe it was -- it simplified
24 the manufacturing process, I believe.  I believe
25 I heard that.

Peter L. Rosenblatt, M.D.

Page 102

1  Q.   Are you aware of any reasons why
2  Ethicon began to cut its polypropylene mesh using
3  lasers, as opposed to mechanically, other than
4  because it simplified the manufacturing process?
5      A.   No, I'm not aware.
6      Q.   You've never heard it said that
7  laser cut polypropylene mesh is safer than
8  mechanically cut polypropylene mesh?
9      A.   No.
10     Q.   You never heard it said that
11 laser -- there's less complications with the use
12 of laser cut mesh as opposed to mechanically cut
13 mesh?
14     A.   No.  You know, that may have been
15 said by a plaintiff expert opinion, but you know,
16 I've had experience with both.  I can tell you
17 from my personal experience I've not noticed any
18 difference, and I haven't had, you know, any
19 change in complications going from one type of
20 cut to another.  Nor am I aware of any literature
21 that shows there's a difference.
22     Q.   Is another way of saying that
23 you're unaware of any clinical difference between
24 the use of mechanically cut mesh and laser cut
25 mesh?

Page 103

1      A.   Correct.
2      Q.   Are you aware of any internal
3  studies performed by Ethicon in which scientists
4  working for Ethicon concluded that Prolene® can
5  degrade while implanted in the human body?
6          MR. ROSENBLATT:  Object to form.
7      A.   I am not aware of any such studies.
8  Is that the word you used?
9      Q.   Yes, sir.
10     A.   No.
11     Q.   You're unfamiliar with a study in
12 1987 where Ethicon scientists found that Prolene®
13 degrades?
14         MR. ROSENBLATT:  Object to form.
15     A.   I have not seen that study.
16         MR. ROSENBLATT:  Do you want to
17 show it to him to see if he's seen it?
18     Q.   Do you know whether Ethicon was
19 advised by an outside consulting group in June of
20 2011 that an animal study showed polypropylene
21 can degrade following an implant?
22     A.   Did you say an animal study?
23     Q.   Yes, sir.
24     A.   I don't recall seeing that, but I'm
25 not sure what significance that has coming from

Page 104

1  an animal study.
2      Q.   Move to strike after "don't recall
3  seeing that."
4          Are you aware of a 2009
5  presentation in which Ethicon Medical Director
6  Piet Hinoul stated that meshes are not
7  biologically inert?
8          MR. ROSENBLATT:  Object to form.
9      A.   I may have seen something to that
10 effect, but I don't agree with that.  And are we
11 talking about in humans or in animals?
12     Q.   Have you ever opened an Ethicon
13 mesh product and found that synthetic mesh inside
14 is broken, cracked or brittle?
15     A.   No.
16     Q.   Doctor, I'm referring to
17 Exhibit No. 2, specifically page 43 of
18 Dr. Rosenzweig's report, and this particular page
19 bears two images of what appear to be blue mesh.
20         Do you see those?
21     A.   Yes.
22         MR. ROSENBLATT:  And this is
23 Rosenzweig's TVT report?
24         MR. CRAWFORD:  Yes, it is.
25         Do those images appear to reveal

Page 105

1  particles of the mesh that have begun to break
2  off inside the package.
3          MR. ROSENBLATT:  Object to form.
4  Lack of foundation.
5      A.   So I don't know what you mean by
6  broken off, but it looks like there are small
7  pieces of polypropylene fibers that are separate
8  from the body of the mesh.
9      Q.   Have you ever opened an Ethicon
10 product and seen mesh that looks like that?
11     A.   I don't recall ever seeing that,
12 but if I did see that, that wouldn't bother me at
13 all.
14         MR. CRAWFORD:  Move to strike after
15 I don't believe I've ever seen that.
16         Well, let me ask you, if you were
17 to open a package of Ethicon mesh and it were to
18 look at that, would that bother you?
19     A.   Not at all.
20     Q.   Why?
21     A.   We leave sutures in people's
22 bodies, permanent sutures, all the time.  We've
23 done it for decades.  We leave surgical metal
24 clips in people's bodies all the time.  There's
25 no evidence that I'm aware of that small pieces

Peter L. Rosenblatt, M.D.

Page 106

1 of suture, basically that's what that is, would
2 cause any untoward effects.
3         So to me that looks like an
4 artifact of the cutting process, that when you
5 cut it either -- I don't know if that's laser or
6 mechanical, but there will be little pieces of
7 suture that may be inside the body.  Obviously,
8 those pieces have fallen off, and they're not
9 going to be implanted.  But even if a mesh did
10 that and little pieces came off, it would be
11 inconsequential.  That wouldn't affect anything.
12     Q.     100 percent of the time?
13     A.     100 percent of the time.
14     Q.     All right.  Did you say there's
15 been other operative procedures where you've left
16 things, foreign bodies, in people's body?
17     A.     Yes.  Not me, every surgeon.
18     Q.     What kind of stuff?
19     A.     Surgical titanium clips, float
20 rings, which are, you know, for tubal ligation,
21 sutures.  That's a part of doing surgery.
22     Q.     And you've never heard of anyone --
23 you've never heard of an instance where a surgeon
24 has inadvertently left a foreign body in someone
25 after a surgery and it caused horrible

Page 107

1 complications?
2     A.     I didn't see that.  I mean, you
3 wouldn't like to leave like a clamp inside
4 someone's body.  You wouldn't want to leave a
5 sponge inside a body or a retractor.  All those
6 things have been left in people's bodies.  But
7 things that we just talk about like suture that
8 are covered inside the vagina or inside the body
9 are inconsequential.
10     Q.     100 percent of the time?
11     A.     Well, I just gave you an example of
12 things that you wouldn't want to leave inside the
13 body, but I don't see any issue with a piece of
14 mesh or, I'm sorry, a piece of suture of that
15 magnitude causing any problems.  I've never ever
16 seen that in 20, 21 years of practice.
17     Q.     How many times over the course of
18 your practice have you seen a suture
19 inadvertently left in someone's body following a
20 surgery?  Not a suture.  What else did you say
21 was inconsequential?  You likened the suture
22 to --
23     A.     Clips.
24     Q.     Clips.  Thank you.  How many times
25 over the course of your career have you seen

Page 108

1 clips inadvertently left in someone's body and
2 there be no consequence?
3     A.     When you say inadvertently, you're
4 saying not on purpose.
5     Q.     Yes, sir.
6     A.     Oh, that's not what I'm talking
7 about.  I'm talking about clips for bleeding.  So
8 they're not inadvertently.  They're done on
9 purpose.  But they're left.  And if you take a
10 x-ray of countless women, you'll see little metal
11 clips throughout their body.  You know, that's a
12 common occurrence.  And most surgeons don't even
13 tell their patients that they have these clips in
14 them.  That's just sort of a -- you know, that
15 goes along with having surgery.  Excuse me, one
16 second.  Okay.  And, you know, I've not seen that
17 cause any untoward effect.
18     Q.     Hypothetically speaking, if there
19 were credible scientific evidence that Ethicon
20 Prolene® mesh degrades in the human body, would
21 that make it unsuitable as a permanent implant
22 for stress urinary incontinence?
23         MR. ROSENBLATT:  Object to form.
24     A.     I guess, again, you'd have to look
25 at, you know, whether it's clinically

Page 109

1 significant.  In other words, let's say you used
2 absorbable material for a sling, like, you know,
3 polyglactin.  That is meant to degrade.  It's
4 meant to be hydrolyzed and get absorbed.  But if
5 the woman were continent afterwards, it would be
6 inconsequential.  But, you know, I've not seen
7 evidence of degradation of the Prolene® mesh, but
8 if it did degrade but it wasn't clinically
9 significant, it wouldn't matter.
10     Q.     If Ethicon became aware of credible
11 scientific evidence that polypropylene has the
12 potential to degrade, would you, as a practicing
13 physician, expect them to conduct relevant
14 testing to determine if naturally occurring
15 conditions in the vagina could cause
16 polypropylene degradation?
17         MR. ROSENBLATT:  Object to form.
18     A.     I guess it would have to be --
19 there would have to be some clinical significance
20 associated with it.  It would have to -- to me it
21 would have to cause some harm to the patient, and
22 without that, it would be inconsequential.
23     Q.     A recurring theme that I'm hearing
24 and correct me if I am wrong, but a recurring
25 theme I keep hearing in your testimony is that it

Peter L. Rosenblatt, M.D.

Page 110

1  doesn't matter if the polypropylene degrades
2  inside the human body if there's no symptoms due
3  to it.  Is that fair?
4      MR. ROSENBLATT:  Object to form.
5  Misstates the testimony and assumes that
6  degradation does occur.
7      A.     Well, I was actually going to say
8  exactly that which is, you know, I don't see any
9  credible scientific evidence that there is any
10 degradation of Prolene®.  And again, which we
11 have already talked about, Prolene® mesh is just
12 made up of Prolene® fibers that have been woven
13 together, and we have literally a half a century
14 or more of data and clinical experience with
15 Prolene®.  So I'm very comfortable that it
16 doesn't degrade.  But there would have to be some
17 clinical significance for it to be reportable to
18 physicians.  And, you know, what we've seen with
19 TVT slings is an operation that is better than
20 any other operation known to mankind in the
21 history of man -- in the history of women for
22 treating stress incontinence.  There is nothing
23 better.  It has revolutionized the field of
24 urogynecology, that's a fact.  And our world
25 changed in 1999 or 1998 in the United States when

Page 111

1  that technology came here, and I'm not being --
2  I'm not speaking with hyperbole.  That was one of
3  the greatest things that have happened in the
4  field of urogynecology for our patients.  So I
5  don't see any evidence of there being a problem
6  with it.
7      MR. CRAWFORD:  Objection as
8  non-responsive and move to strike.
9      Is there a difference between pores
10 in the mesh and interstices?
11     A.     There is.  Pores usually refer to
12 the large holes, for lack of a better word, that
13 you can see with the naked eye, where interstices
14 refers to the smaller holes within the weaving of
15 mesh.
16     Q.     Does the weave of Ethicon's
17 Prolene® mesh produce very small interstices that
18 allow bacteria to enter and hide from the natural
19 body defenses that are designed to eliminate
20 them?
21     MR. ROSENBLATT:  Object to form.
22 Lack of foundation.
23     A.     Yeah, fortunately -- no, it's not
24 true, in that, and I think it is because of the
25 fact that polypropylene is a monofilament, that

Page 112

1  even the smaller interstices are large enough to
2  allow macrophages to get in between where
3  bacteria potentially are, and that's evidenced by
4  the fact that we don't see infections, you know,
5  we don't see -- we don't commonly see infections
6  in this mesh even when it's placed
7  transvaginally.
8      Q.     Does bacteria that's caught up in
9  transvaginal placed pelvic mesh secrete a slimy
10 biofilm that serves to protect and shield the
11 bacteria from destruction by white blood cells?
12     MR. ROSENBLATT:  Object to form.
13     A.     I don't know if that's a -- I
14 actually -- I'm actually not sure where the
15 biofilm comes from, if that's secreted by
16 bacteria or it's from the host response, yeah.
17     Q.     Following the placement of
18 transvaginally placed pelvic mesh, does there
19 appear a slimy biofilm that serves to shield the
20 bacteria from destruction by white blood cells?
21     MR. ROSENBLATT:  Object to form.
22     A.     I think it's been shown that there
23 can be a biofilm.  I don't know if that happens
24 all the time.  And, you know, again, we have to
25 come back to it being -- whether or not it's

Page 113

1  clinically significant, and for someone who has
2  placed over 2,000 slings, and I've only had one
3  serious infection, I think Prolene® mesh is
4  incredibly resistant to infection.
5      MR. CRAWFORD:  Objection as
6  non-responsive.  Move to strike everything after
7  "happens all the time."
8      Does the biofilm that surrounds the
9  pelvic -- strike that.
10     Does the biofilm that surrounds the
11 transvaginally placed pelvic mesh increase the
12 foreign body reaction?
13     MR. ROSENBLATT:  Object to form.
14 Lack of foundation.
15     A.     I am not aware of that.
16     Q.     Can you say one way or the other
17 whether it does?
18     A.     No.
19     Q.     Do you agree with Dr. Rosenzweig
20 when he says fibrotic bridging occurs when the
21 fiber surrounding the mesh -- strike that.
22     Do you agree with Dr. Rosenzweig
23 when he says the fibrotic bridging occurs -- God
24 dang.  It's getting later.  Strike it.
25     Do you agree with Dr. Rosenzweig

Peter L. Rosenblatt, M.D.

Page 114

1 when he says fibrotic bridging occurs when the
2 fibers surrounding the pores of the mesh are too
3 close together to allow the tissue in the pore
4 space enough room to recover from the trauma of
5 tissue damage due to implanting a surgical
6 prosthetic device?
7         MR. ROSENBLATT:  Object to form.
8     A.    I'm not actually sure what he's
9 referring to because there -- though I'm very
10 familiar with the concept of fibrotic bridging, I
11 haven't heard of that being an explanation of
12 recovering from the inflammation.  I just haven't
13 heard that argument, nor have I seen that, you
14 know, clinically.
15     Q.    Dr. Rosenzweig opines that small
16 mesh pores that cause fibrotic bridging turn the
17 mesh into a solid sheet of scar tissue, then
18 there's no room for the tissue to grow into the
19 mesh.  Do you agree with that?
20     A.    I don't agree with that.
21     Q.    Why not?
22     A.    Well, if the mesh is placed
23 correctly, which is in a tension-free fashion,
24 there's plenty of space between the pores to
25 prevent fibrotic bridging.

Page 115

1     Q.    Have you ever seen a video of
2 Ethicon consultant Todd Heniford saying, quote,
3 there's no excuse for using heavy weight, small
4 pore meshes in the human body, closed quote?
5         MR. ROSENBLATT:  Object to form,
6 lack of foundation.
7     A.    I have not seen that video, but I
8 can't imagine why that would ever have any
9 relevance to what we're talking about and the
10 types of meshes that we're talking about today.
11         MR. ROSENBLATT:  Just so you know,
12 Jeff, that video was not any of Ethicon's meshes.
13         MR. CRAWFORD:  I'll object to
14 non-responsive and move to strike after "have not
15 seen it."
16         Thanks, Paul.
17         Do you agree with Dr. Rosenzweig
18 that polypropylene mesh is known to contract or
19 shrink once it's put into the human body?
20         MR. ROSENBLATT:  Object to form.
21     A.    So in my experience, I have not
22 seen that clinically in my patients.
23     Q.    To be clear, you've never once in
24 all of your years of clinical practice seen a
25 patient where their polypropylene mesh had

Page 116

1 contracted or shrank inside their body?
2     A.    So no.  I have seen patients who
3 have come in where -- in patients who have had
4 mesh placed with someone else where it seemed
5 like the mesh had a smaller surface area than
6 what you'd expect to see.  But there are a couple
7 of issues there.  One is that mesh does not
8 shrink.  There's no contractile elements within a
9 mesh.  The body reacts to surgery and could react
10 around a mesh to contract, that's why even native
11 tissue repairs you get some vaginal
12 foreshortening and you get vaginal scarring,
13 that's a natural occurrence.  And if the mesh
14 happens to be there, it will take up less space.
15 But what I've experienced would be, you know,
16 with hundreds and hundreds of transvaginal
17 meshes, is that there's no clinically significant
18 shrinkage that occurs when a mesh is placed
19 correctly.
20     Q.    Since you are of the opinion that
21 mesh does not shrink, am I safe to assume you
22 dispute that shrinkage was known by Ethicon as
23 early as 1998 in published works by Ethicon's
24 many consultants, Uwe Klinge and Bernd
25 Klosterhalfen?

Page 117

1     A.    So I am aware of that, and I have
2 seen those reports, but the first part of your
3 statement was that I don't believe that mesh
4 shrinks, and mesh does not shrink.  There's no
5 such thing as mesh shrinking.  It's not like you
6 put it in a dryer like, you know, a shirt in a
7 dryer and it gets smaller.  It's the fibrosis
8 that occurs as a natural healing process of
9 surgery that causes shrinkage.  Because as I
10 said, native tissue repairs you can get stenosis
11 of the vagina, you can get foreshortening of the
12 vagina.  Mesh does not shrink.  So if there is
13 any decrease in the surface area of the mesh,
14 it's not from the mesh itself.  It's the tissue
15 around the mesh.
16         MR. CRAWFORD:  Object and move to
17 strike the non-responsive portions of that
18 answer.
19         You are familiar with the Klinge
20 and the Klosterhalfen study.
21     A.    Yes.
22     Q.    And you're aware that they noted in
23 their paper that polypropylene mesh shrinks 30 to
24 50 percent; is that right?
25         MR. ROSENBLATT:  Object to form.

Peter L. Rosenblatt, M.D.

Page 118

1  If you have the paper and you want to put it in
2  front of him, he can take a look at it.
3      A.    Yeah, I was about to say I'd like
4  to see the paper 'cause I want to see if that was
5  from an animal study.  I am familiar with the
6  so-called, you know, quote/unquote, shrinkage or
7  contracture in hernia meshes, but I'm almost
8  familiar with literature -- the one that comes to
9  mind is Dietz -- I think it's D-E-I-T-Z or
10  D-I-E-T-Z -- that shows using ultrasound that
11  there is no shrinkage of mesh implanted in
12  humans.  So I think that is debatable and
13  controversial.
14      Q.    Do you agree that if there is
15  credible scientific evidence that polypropylene
16  mesh shrinks 30 to 50 percent and as a result
17  there's an adverse clinical effect on the
18  patient, then it's not suitable for its intended
19  application as a permanent prosthetic implant in
20  women?
21          MR. ROSENBLATT:  Object to form.
22  Lack of foundation, compound.
23      A.    What you're suggesting is not the
24  case.  You know, and the reason I say that and
25  I'm comfortable saying that is I've been

Page 119

1  implanting mesh transvaginally for 15 years, and
2  I do not see that clinically.
3          Could a particular woman have a
4  fibrotic reaction where she would have had a
5  fibrotic reaction and scarring with a native
6  tissue repair?  Yeah, that can happen, and there
7  might be mesh there, but I do not see that --
8  when you say, you know, if you could show that
9  mesh -- mesh does not shrink.  So it doesn't make
10  a lot of sense to me to assume that, you know,
11  mesh shrinks 'cause it doesn't shrink.
12          MR. CRAWFORD:  Objection.
13  Non-responsive, move to strike.
14          I understand that you've opined
15  mesh doesn't shrink.  I'm asking you a
16  hypothetical question, and I'll pose a
17  hypothetical question to you.
18          If there's -- strike it.
19          Hypothetically speaking if there's
20  credible scientific evidence that polypropylene
21  mesh shrinks 30 to 50 percent in the human body
22  and that shrinkage results in a clinically
23  adverse effect upon the patient, then it's not
24  suitable for application as a permanent
25  prosthetic implant in a woman.

Page 120

1          MR. ROSENBLATT:  Object to form.
2  Compound, incomplete hypothetical.
3      A.    So I think that you said if there
4  is credible scientific evidence.  I'd want to
5  weigh all the evidence, right.  I mean, so you
6  can't cherry pick, and what I mean by that is
7  just -- you know, like, for instance, when I
8  started, and don't object to this, please, but
9  when I started -- hear me out.
10          When I started doing this work for
11  Butler Snow, I asked them to send me all -- you
12  know, I did my own searches, PubMed search, but
13  they have pretty good resources, too, and I said
14  send me the literature, the good and the bad.
15  Send me the literature that -- for instance, in
16  this topic, this particular topic, if there's
17  literature that shows that there's no shrinkage,
18  like the Dietz article, I want to see the
19  literature that seems to suggest there is
20  shrinkage, and I want to evaluate it.  I looked
21  at all of it.  I didn't cherry pick to say, okay,
22  that article supports my theory and that's all
23  I'm going to look at.  I looked at it all.  So
24  there may be an article out there that you're
25  referring to, and I'd be happy to see it, that

Page 121

1  suggests that mesh shrinks, but I would want to
2  look at all the data.  And if the preponderance
3  of data show that mesh shrinks, then I would have
4  a different opinion, but I don't.
5          MR. CRAWFORD:  Objection.
6  Non-responsive, move to strike.
7          MR. ROSENBLATT:  Want to take
8  another quick break?
9          MR. CRAWFORD:  Yeah.
10          (A break was taken.)
11  BY MR. CRAWFORD:
12      Q.    Dr. Rosenzweig has opined that in
13  addition to fraying and particle loss
14  mechanically cut synthetic polypropylene mesh has
15  been shown to rope, curl and deform when it's
16  under tension.  Do you have an opinion on that?
17      A.    So maybe I missed the first part of
18  this.  Which mesh are we talking about?
19      Q.    Let's go with Prolene® mesh.
20      A.    Prolene®.  So I do have an opinion
21  on that and that is under normal clinical
22  conditions you would never put Prolene® mesh,
23  like in TVT or any of those products, under that
24  kind of tension that would cause roping or
25  curling.

Peter L. Rosenblatt, M.D.

Page 122

1    If you take a piece of Prolene®
2  sling mesh and pull it really hard, it will turn
3  into a cord, no question about it.  You would
4  never ever do that clinically.  It just -- it
5  doesn't make any sense.  So whether that happens
6  in a bench or you do that in a cadaver, it's
7  clinically insignificant.
8      Q.    To summarize your testimony, it
9  doesn't matter whether Prolene® mesh frays or has
10  particle loss and has been shown to rope, curl
11  and deform when it's under tension because in
12  real-life situations it's never going to be under
13  that kind of tension; is that fair?
14      MR. ROSENBLATT:  Object to form.
15      A.    Not if it's done using the
16  instructions for use the way peer to peer,
17  surgeon to surgeons teach how to perform a
18  procedure, that is not clinically relevant.
19      Q.    Dr. Rosenzweig has opined that
20  characteristics of Ethicon's mesh including
21  particle loss, fraying, roping and curling make
22  it improper for use in the vaginal canal.  Do you
23  agree with that?
24      A.    So, again, you mentioned mesh, and
25  just so I know which mesh we're talking about --

Page 123

1      Q.    Prolene®.
2      A.    Prolene® mesh like in TVT?
3      Q.    Yes, sir.
4      A.    I disagree with it because I think
5  it's completely appropriate for use in the
6  vagina, and that's been borne out after millions
7  of cases.
8      Q.    Do you agree that particle loss and
9  fraying of synthetic mesh can lead to an
10  increased inflammatory response?
11      MR. ROSENBLATT:  Object to form.
12      A.    Again, maybe I'm missing the point,
13  but I think it's my same answer, which is that
14  under normal conditions you would never pull mesh
15  tight enough to cause roping or fraying, and so
16  it's sort of irrelevant.  But even if you did
17  have particle loss, those particles are
18  inconsequential clinically.
19      MR. CRAWFORD:  Objection as
20  non-responsive.  Move to strike everything other
21  than "if you did have particles" and thereafter.
22      If synthetic polypropylene mesh
23  were to rope or curl, would that lead to a loss
24  of pore size?
25      MR. ROSENBLATT:  Object to form.

Page 124

1      A.    Yes, it's possible that if you pull
2  on mesh, which you shouldn't do because -- and
3  it's not just in the instructions, but you know,
4  this is how it's taught, is that you leave these
5  meshes, whether it's prolapse mesh or sling mesh
6  for stress incontinence, in a tension-free
7  manner, then you don't get that reduction in pore
8  size, and you get good -- excellent tissue
9  ingrowth.
10      MR. CRAWFORD:  Objection.
11  Non-responsive, move to strike.
12      I'm just going to ask you a
13  yes-or-no question.
14      Do you agree that roping or curling
15  of the mesh, that is the synthetic polypropylene
16  transvaginal mesh, can lead to a loss of pore
17  size?
18      MR. ROSENBLATT:  Object to form.
19  Asked and answered, broad.
20      A.    And I can't answer that yes or no
21  without saying that's clinically irrelevant
22  because you would never pull on it like that, but
23  obviously, if you pull on mesh inappropriately,
24  you will reduce the pore size, depending on the
25  configuration of the mesh.

Page 125

1      Q.    If a certain amount of tension is
2  put on synthetic polypropylene mesh, can that
3  lead to a loss of pore size.
4      MR. ROSENBLATT:  Object to form.
5      A.    If you put inappropriate tension on
6  a mesh, depending on the configuration of the
7  mesh, the way it's woven, it can lead to a
8  decrease in pore size, that is correct.
9      Q.    I think attached to your report,
10  which is Exhibit No. 1, there's a reliance list.
11  Can you pull that out?
12      A.    This one doesn't have it.
13      Q.    I know I have it in here somewhere.
14      Were you able to get your hands on
15  your reliance list?
16      A.    Yes.
17      Q.    What is this?  What does this list
18  represent?
19      A.    This list represents all the
20  documents and medical literature and other
21  materials that I have relied on for my opinions
22  in my report.
23      Q.    Should someone who is considering
24  your report look at this reliance list and assume
25  that before you wrote your report that you

Peter L. Rosenblatt, M.D.

Page 126

1  submitted in this case you sat down and read each
2  and every single one of these documents and
3  watched every single one of these videos in
4  conjunction with writing your report?
5       MR. ROSENBLATT:  Object to form.
6    A.    So many of these articles I've been
7  reading about for the last 15 years.  There were
8  some materials in this reliance report that were
9  documents that I scanned that I didn't read every
10  word.  There's no way I could have.  And there
11  were articles where I scanned but I read the
12  abstracts, but yes, this is all the material
13  that's in there, and I went through it to come up
14  with my opinions.
15    Q.    Turn to the -- shoot, I don't know
16  what page this is.  Man, I wish this had page
17  numbers on it.
18    A.    Good point.
19    Q.    I'll start from the back.  Flip,
20  one, two, three, four pages, and there will be a
21  list that's got a bunch of videos.  It's going to
22  be on this side, I believe.  Yeah, right here.
23    A.    Okay.
24    Q.    There's a list of videos that
25  begins with ETH.MESH.PM.000001, Prolift

Page 127

1  Professional Education Videos.  Do you see that?
2    A.    Yes.
3    Q.    I have counted 33 videos in that
4  list.  Do you have any reason to dispute that's
5  about how many there were there?
6    A.    No, I will take your word for it.
7    Q.    When was the last time you watched
8  any of those videos?
9    A.    I don't remember exactly when, but
10  some of these videos I had seen in the past and
11  was familiar with them, but you know, what I did
12  with these videos is, and I couldn't tell you
13  which one is which, but I would take the cursor
14  and move along and just familiarize myself with
15  the videos.
16    Q.    Okay.  When's the last time you did
17  that with any of these videos?
18    A.    Probably two weeks ago.
19    Q.    And did you do that with all the
20  videos?
21    A.    If they're listed there, yeah.  I
22  don't remember exactly when.  Some of them I may
23  have seen a long time ago, but I remember videos.
24    Q.    When you say a long time ago, how
25  long are we talking?

Page 128

1    A.    Oh, it could have been years ago.
2    Q.    As long as ten years back?
3    A.    It might have been.  It might have
4  been five years.
5    Q.    Turn to the last page, please.
6  Actually, it's going to be the second-to-last
7  page.  I've counted 30 notations of deposition
8  testimony.  Does that look about right?
9    A.    Yes.
10    Q.    Okay.  Do those represent -- does
11  each one of those represent an entire deposition
12  transcript?
13    A.    I believe so.
14    Q.    Okay.  So there's -- we know
15  there's 30 deposition transcripts that you've
16  read front to back in preparation for drafting
17  your report in this case?
18    A.    I scanned some of these.  You know,
19  just kind of like going in looking for words that
20  I, you know, cared about.  Did I read them word
21  for word, no, no.  There was not enough time to
22  do that.
23    Q.    Yeah, that's kind of what I was
24  thinking?
25    A.    Yeah.  It's a lot.

Page 129

1    Q.    It is a lot.  Where did you obtain
2  all the deposition testimony that's listed in
3  your reliance list?
4    A.    From counsel.
5    Q.    From the attorneys representing
6  Ethicon in this case?
7    A.    Yes.
8    Q.    When you received deposition
9  testimony from the attorneys working for Ethicon,
10  did you get entire deposition transcripts, or did
11  you just get excerpts, certain pieces of the
12  testimony?
13    A.    I would have to look.  I don't know
14  for sure.  I assume they were all complete.  I
15  assume they were all complete.
16    Q.    Well --
17    A.    I can't tell you for sure.
18    Q.    -- you just got involved in this
19  case about three months ago.
20    A.    That's right.
21    Q.    Can you remember back about three
22  months to tell us whether or not you received
23  from Ethicon's attorneys full transcripts of
24  these depositions or just excerpts?
25    A.    So when I would get a transcript --

Peter L. Rosenblatt, M.D.

Page 130

1 just let me answer it this way -- you know, it's
2 usually like four pages on a page, right?  And I
3 wouldn't check the page number.  I would just
4 kind of scan.  So I'm not paying attention to the
5 actual page number, but I'm just scanning it to
6 see what's important to me.  Did I read word for
7 word?  No, I couldn't have.  But no, it didn't
8 seem -- to me, it did not seem ever that it was,
9 like, okay, cherry picking, this is a good thing
10 for you to read.  No, it was the transcript, I
11 believe.
12        MR. CRAWFORD:  Objection.
13 Non-responsive to the cherry picking part.
14        When you received deposition
15 testimony from the attorneys for Ethicon, was it
16 highlighted.
17    A.    No.
18    Q.    Having reviewed the deposition
19 testimony that's listed on your reliance list,
20 did you then ask for additional testimony from
21 any of these witnesses?
22    A.    I didn't know that there was
23 additional testimony, if there was any.
24    Q.    Did you read any of these
25 deposition excerpts and request -- and say, "Hey,

Page 131

1 I need to learn a little bit more about what was
2 said in this deposition.  Do you have A, B or C?"
3 Did that ever happen?
4    A.    So I object because you used the
5 word "excerpt," and I don't think that we decided
6 that there were excerpts.
7    Q.    Objection overruled.
8    A.    But, no, I did not request anything
9 else.
10        MR. ROSENBLATT:  He's doing my job
11 for me.
12    Q.    To clarify, this reliance list
13 includes articles, literature, videos and a
14 variety of other documents and materials that
15 relate to issues in this case that you have seen
16 or reviewed over the course of your career --
17    A.    Correct.
18    Q.    -- going years back?
19    A.    Correct.
20    Q.    These are not -- strike that.
21        This is not a list of materials and
22 documents that you have reviewed in their
23 entirety since becoming involved in this case in
24 March or April of 2016?
25        MR. ROSENBLATT:  Object to form.

Page 132

1    A.    I agree to an extent in that, as
2 you mentioned, many of these go back many years,
3 and that's what I do, right?  I mean, I review
4 literature on a weekly basis.  I mean, there are
5 always new studies that come out.  But I thought
6 it would be important to list the total, again
7 good or bad, that my opinions that have formed
8 over the course of 25 years should be in here in
9 case I need to reference it.  But, you know, did
10 I read every word that's here in the last three
11 months, no.
12    Q.    I'm just -- I'm just trying to
13 clarify.  It would be incorrect for a juror or
14 anyone else to look at this long reliance list
15 and assume that you have done a comprehensive
16 review and exam of everything in this list since
17 becoming involved in this case three months ago?
18        MR. ROSENBLATT:  Object to form.
19 Asked and answered.
20    A.    So, right, as I said, my opinions
21 that are in my report are based on 25 years of
22 experience, and many of those articles that have
23 shaped my opinion are listed here in the reliance
24 list.
25    Q.    Okay.  What, if any, Ethicon

Page 133

1 internal documents did you review in conjunction
2 with generating your general causation report in
3 this case?
4        MR. ROSENBLATT:  Object to form.
5 It's on the reliance list.
6    A.    Right, so it includes -- it can't
7 be exclusive or else I can't -- my mind doesn't
8 think that way, but it includes certainly
9 e-mails.  It includes design specifications of
10 failure mode analysis, discussions, you know,
11 animal studies, the IFUs.  Those are the types of
12 internal documents that I reviewed.
13    Q.    If there are any internal
14 documents -- strike that.
15        If there are any Ethicon internal
16 documents you reviewed in conjunction with
17 generating your report, they're contained in this
18 reliance list that's included with Exhibit --
19        MR. ROSENBLATT:  I don't know if
20 you marked it to be honest.
21    Q.    -- No. 1 of your deposition.  That
22 (indicating).
23        Is that correct, Doctor?
24    A.    I did the best I could to make sure
25 that what's listed in the reliance list

Peter L. Rosenblatt, M.D.

Page 134

1 represents the documents that I reviewed for my
2 general report. Is that what the question was?
3     Q.    Yeah, pretty much.
4         Are you aware of any Ethicon
5 internal documents that you reviewed in
6 conjunction with generating your report that are
7 not in your reliance list?
8     A.    Not that I'm aware of.
9     Q.    Are the 30 depositions -- strike
10 that.
11         Are the 30 or so depositions that
12 are listed at the tail end of your reliance list
13 included in those boxes over there?
14     A.    I'm not sure, and I'll tell you why
15 I'm not sure. Some material was sent to me by
16 e-mail or -- not Dropbox but some other. And so
17 some of -- and there were redundancies. So there
18 are some things that are there, some things that
19 I have, and I kind of went between the two when I
20 reviewed them.
21     Q.    So you don't know?
22     A.    I don't know. Can I just say
23 something?
24     Q.    Yeah.
25     A.    I got kind of tired of lugging

Page 135

1 around those boxes between my house and my
2 office, that's the truth. You have no idea.
3     Q.    Oh, I do. I do.
4     A.    Oh, my God.
5     Q.    How many times have you been
6 deposed over the course of your career?
7     A.    I don't keep a list, but it has got
8 to be about 25 to 30 times, I guess.
9     Q.    Any idea of how many of those were
10 depositions involving synthetic mesh litigation?
11     A.    No. At least, at least a handful.
12 At least, you know, five or ten.
13     Q.    Have you ever testified in a trial
14 of a synthetic mesh case?
15     A.    I don't know for sure. I know I
16 once was -- it was sort of like a -- maybe you
17 know what it's called. It was like a video
18 deposition, but it was going to be used at trial,
19 right, and it was actually a plaintiff case
20 involving TVT. I was a plaintiff expert. But I
21 don't think it actually went to trial, so.
22     Q.    Okay. You've never gone to the
23 courthouse and taken the witness stand and
24 testified in front of a judge and jury?
25     A.    Sure I have.

Page 136

1     Q.    Okay. How many times?
2     A.    Maybe about a dozen.
3     Q.    When was the most recent?
4     A.    Oh, it's got to be -- definitely
5 within the last year. You know, I could get that
6 information for you. In fact, I think I -- we
7 produced something I believe in my report
8 about -- I think about trials that I've testified
9 in in the last four years.
10     Q.    Is it in your CV?
11     A.    No. In the CV? No, it wouldn't be
12 in the CV.
13     Q.    Okay. I saw some stuff in your
14 report about it.
15     A.    Where?
16     Q.    I've seen some things in your
17 report.
18     A.    Yeah, I thought so, too.
19     Q.    It's on page 4.
20     A.    Oh. That's it.
21     Q.    "Within the last four years I have
22 testified as an expert in the cases of Hayes v.
23 Jordan; Vercher, Bryant, Smith v. Milhorat; Banks
24 v. Witkowski; Watts v. Davidson; and Taylor-Ricci
25 v. Coutinho and Staffer;" is that right?

Page 137

1     A.    Yes.
2     Q.    Are any of those cases involving
3 synthetic mesh?
4     A.    I don't remember. I believe -- I
5 don't remember. I don't remember.
6     Q.    Well, which one of those cases is
7 the one you testified at trial in within the past
8 year?
9     A.    Oh. I'd have to look. I just
10 don't remember.
11     Q.    It's one of these that's listed,
12 though?
13     A.    I believe so. I don't remember.
14     Q.    Do you keep anywhere a log of your
15 experience testifying whether it be in deposition
16 or in trials?
17     A.    No. I know I had to put together a
18 list at one point, and I thought I did a couple
19 years ago with -- when I did some work for Bard.
20 Not for Bard. I was working with Greenberg
21 Traurig in Bard litigation for mesh, and I think
22 I had to put together a list for that, and I
23 thought that's where this came from. I don't
24 keep track per se of my depositions. I'm sure I
25 could find out if you need that information, like

Peter L. Rosenblatt, M.D.

Page 138

1 when was the last time I testified. I just don't
2 remember.
3      Q.     Have you ever been retained as an
4 expert witness by Bard?
5      A.     Not by Bard. By Greenberg Traurig,
6 and they represent Bard.
7      Q.     Okay. Have you ever been hired as
8 an expert witness aligned with the defense of
9 Bard?
10      A.     Isn't that what we just said?
11      Q.     You know what I'm asking you.
12      A.     I do, but what I'm saying is, and I
13 think it's important to make the distinction,
14 honestly, is that when -- just like in this case,
15 they asked me -- they didn't say, you know, we're
16 hiring you to defend Ethicon or we're hiring you
17 to defend Bard. They're, like, here's the
18 information. We want your honest opinion.
19 Whether you think something, you know, is going
20 on here that we should know about, you know,
21 whether it's good or bad, what's your honest
22 opinion, and that's what I always do whenever I
23 do any kind of legal work.
24           MR. CRAWFORD: Objection.
25 Non-responsive, move to strike.

Page 139

1           Have you ever been involved in any
2 cases involving Bard?
3      A.     When you say involving Bard, what
4 do you mean.
5      Q.     Like women suing Bard.
6      A.     Well, I guess -- well, so put it
7 this way, I know I've been -- I've been involved
8 in cases where Board products have been used, and
9 I've been retained by attorneys representing
10 physicians, but then, I think it's probably two
11 years ago, I was retained by Greenberg Traurig as
12 part of the MDL, you know, to give my opinion
13 about a number of cases. And, again, similar to
14 this, general report about Bard products and then
15 a number of cases of women who were involved in
16 the MDL against Bard. Does that answer your
17 question?
18      Q.     Yeah, I'm trying to figure out how
19 I can ask it in a way where you can answer it.
20      A.     Okay.
21      Q.     Have you ever been hired by
22 attorneys representing Bard in litigation that
23 involves transvaginal mesh?
24      A.     Yes.
25      Q.     Have you ever been hired by

Page 140

1 attorneys representing Boston Scientific
2 Corporation in cases involving transvaginal mesh?
3      A.     No.
4      Q.     Have you ever been hired by
5 attorneys representing American Medical Systems
6 or AMS in cases involving transvaginal mesh?
7      A.     No.
8      Q.     Have you been hired by attorneys
9 representing any other transvaginal mesh
10 manufacturer other than Ethicon and Bard?
11      A.     No.
12      Q.     When you were hired by the
13 attorneys representing Bard, did you generate a
14 general causation report?
15      A.     Yes.
16      Q.     Did you also generate case-specific
17 expert opinions?
18      A.     Yes.
19      Q.     On how many different individual
20 cases?
21      A.     I think it was -- oh, I think it's
22 about 20.
23      Q.     How long ago was that?
24      A.     Maybe a year and a half or two
25 years ago.

Page 141

1      Q.     Did any of those Bard cases go to
2 trial?
3      A.     Not that I'm aware of. Not that
4 anyone made me aware of.
5      Q.     You teach for Boston Scientific
6 Corporation?
7           MR. ROSENBLATT: Object to form.
8      A.     I don't teach for them, but they
9 have asked me to be an instructor at courses on
10 various topics, transvaginal mesh, slings,
11 laparoscopic sacrocolpopexy.
12      Q.     Have you taught similar courses for
13 Ethicon?
14      A.     I have.
15      Q.     When was the last time?
16      A.     Going back quite a long time ago.
17 It's probably been, oh, gosh, maybe, you know,
18 seven years, I would guess. Seven or eight
19 years.
20      Q.     Do you know what course it was?
21      A.     There were a number of courses.
22 You know, there was a number of cadaver labs
23 for -- you know, going back to the early 2000s,
24 you know, TVT, TVT-O, Prolift, and I believe
25 early on maybe even involved TVT Secur. I don't

Peter L. Rosenblatt, M.D.

Page 142

1  think there were any other products that I taught
2  on, I don't think.  Yeah.
3      Q.    Did I hear you say earlier that
4  whenever you were contacted by Butler Snow who
5  represents Ethicon in this litigation you asked
6  Butler Snow to provide you with literature and
7  research materials for you to review in
8  conjunction with generating your report?
9      A.    In addition to research I did
10  myself, yes.
11      Q.    Percentage-wise when we look at
12  your reliance list, what percentage of the
13  materials on that list are things that you came
14  up with yourself as opposed to being provided by
15  Butler Snow?
16      MR. ROSENBLATT:  Object to form.
17  Asked and answered.
18      A.    Yeah.  I mean -- by the way, excuse
19  me, it's difficult to answer that just because so
20  many of the things that I had in my possession
21  they sent me duplicates of, including abstracts,
22  papers.
23      So, you know, maybe, maybe 20
24  percent of the studies, you know, that I hadn't
25  seen before, but then, you know, obviously, I'd

Page 143

1  never seen any of the internal documents.
2  Obviously, I had seen the IFUs, you know, and I
3  had seen videos that I had from years ago.  So
4  it's difficult to say.
5      Q.    Some of the videos that appear on
6  your reliance list were provided to you by Butler
7  Snow?
8      A.    Yes.
9      Q.    A couple of breaks ago you were
10  going to look up the literature that supports
11  your opinion that polypropylene is inert and not
12  chemically reactive.  Have you had an opportunity
13  to do that?
14      MR. ROSENBLATT:  If we could take a
15  more extended break --
16      MR. CRAWFORD:  Sure.  I'm honestly
17  asking if he had a chance to grab it yet.
18      MR. ROSENBLATT:  I don't think so.
19  We weren't sure how long you were going to go.
20  If you want to take a lunch break, we can try to
21  do it over lunch.
22      MR. CRAWFORD:  No, we're on the
23  tail end of this.
24      THE WITNESS:  We can pull it in a
25  very short period of time.

Page 144

1      MR. CRAWFORD:  Do you have any
2  questions, Paul?
3      MR. ROSENBLATT:  Yeah, I'll have
4  some.  And if you want to give me a little bit of
5  time with the Doctor, we'll try to pull the
6  studies that you asked for.
7  BY MR. CRAWFORD:
8      Q.    And there was another one, too,
9  right?
10      A.    Yeah, the dyspareunia -- the path
11  reports with the resection of the mesh, right?
12      Q.    Okay.
13      A.    Chronic pain versus voiding
14  dysfunction.  Yeah, that's it.
15      Q.    Okay.  For the time being I'll pass
16  the witness.
17      (A break was taken.)
18
19      EXAMINATION
20  BY MR. ROSENBLATT:
21      Q.    Dr. Rosenblatt, my name is Paul
22  Rosenblatt from Butler Snow representing Ethicon
23  and Johnson & Johnson.
24      You were asked some questions today
25  about Dr. Rosenzweig's report.  Do you recall

Page 145

1  that?
2      A.    Yes.
3      Q.    And, in fact, that report was
4  Dr. Rosenzweig's TVT report, right?
5      A.    Correct.
6      Q.    And you were asked a significant
7  number of questions about TVT in this deposition?
8      A.    Yes.
9      Q.    And stress urinary incontinence
10  procedures?
11      A.    Yes.
12      MR. ROSENBLATT:  And, Counsel, I
13  think you'll stipulate that this deposition will
14  also satisfy as the TVT general deposition?
15      MR. CRAWFORD:  I don't know that
16  I'm qualified to make any sort of stipulation
17  like that.
18      MR. ROSENBLATT:  Don't sell
19  yourself short like that.
20      Would it be fair to say, Doctor,
21  that in addition to reviewing -- strike that.
22      Would it be fair to say, Doctor,
23  that you considered not only Dr. Rosenzweig's
24  report but also the reports from other
25  plaintiffs' experts regarding Ethicon's prolapse

Peter L. Rosenblatt, M.D.

Page 146

1  and SUI products.
2      A.    Yes.
3      Q.    And, in fact, you mentioned that
4  you asked for the good and bad.  Did you in fact
5  review a significant number of the materials
6  cited in plaintiffs' experts reports?
7          MR. CRAWFORD:  Objection to form.
8      A.    Yes.
9      Q.    And that would include internal
10  documents and medical literature that plaintiffs'
11  experts referred to?
12      A.    Yes.
13      Q.    And did reviewing any of those
14  materials change your opinions about the safety
15  and efficacy of Ethicon's prolapse and
16  incontinence products?
17      A.    I took it into consideration, but
18  it didn't change my opinions.
19      Q.    And in addition to our law firm
20  providing you with some of the materials
21  referenced in your reliance list, would it be
22  fair to say that a significant number of those
23  materials you had already seen previously?
24      A.    Yes.
25      Q.    And, in fact, that's part of your

Page 147

1  job as a physician, is to continuously review the
2  medical literature?
3      A.    It's my job as a physician, and
4  it's also my job as an educator.  You know, I
5  have residents and medical students and fellows
6  that I teach.  I do a lot of teaching around the
7  country and around the world, and I feel it's
8  important to stay up on the literature.
9      Q.    And where do you -- just so we have
10  an understanding -- I know we could run through
11  your CV, but Doctor, where do you teach?
12      A.    Primarily at Mount Auburn Hospital
13  which is a community teaching hospital of Harvard
14  Medical School.
15      Q.    And in addition to teaching
16  residents and fellows at Harvard, are you also
17  teaching continuing medical education across the
18  country?
19          MR. CRAWFORD:  Objection to form.
20      A.    Yes.
21      Q.    And are you -- strike that.
22          If you could just describe some of
23  your experience teaching professional education
24  for the Ethicon products?
25      A.    So in addition to, you know, CME

Page 148

1  courses, and I teach quite a bit of CME courses
2  here and regionally and nationally, and I also
3  present quite a bit at national and international
4  meetings.  But specifically with Ethicon products
5  I started doing some teaching probably back in
6  the year, I would imagine, 2000, and I've done a
7  number of -- many cadaver courses educating
8  surgeons on proper use of Ethicon products which
9  started out, you know, with TVT but then TVT-O
10  and Prolift as well.
11      Q.    Did you ever feel like you were
12  being influenced by Ethicon to promote their
13  products?
14      A.    Absolutely not.  It has always been
15  very important to me to offer my patients the
16  best treatment.  So, you know, I never wanted to
17  be seen that I was working for one company.  I
18  use the products on my patients that I think are
19  the best.  I've used products from various
20  companies, and as well as just, you know, not
21  always products, right?  I mean, you know,
22  techniques and, you know, custom-made pieces of
23  mesh.  And if I believe in a product like I
24  believe in, you know, TVT or Prolift, then I
25  would agree to, you know, to instruct surgeons on

Page 149

1  the correct use.  But there were times I've been
2  asked to, you know, teach for products that I
3  wasn't -- that I didn't believe in, that I didn't
4  use, and I wouldn't teach those products.
5      Q.    And Doctor, were you paid for your
6  time to teach professional education?
7      A.    Yes.
8      Q.    And how did -- the amount that you
9  were paid for your time teaching or strike that.
10          Doctor, what was the opportunity
11  cost of you teaching professional education as
12  far as --
13      A.    So let's clarify that for a moment.
14  So when I teach a CME course, most often it
15  doesn't involve any payment to me.  That's
16  something that I do 'cause I really enjoy
17  teaching, and I think it's a really important
18  thing for some surgeons who are dedicated to do
19  that type of work.  But when it involved a
20  specific company like Ethicon, they were often,
21  you know, taking time away from my practice, and
22  so, you know, I think I was compensated fairly
23  for that because that's the opportunity cost.
24  I'm not seeing patients in the office, and I'm
25  not doing surgery on those days.  But there's

Peter L. Rosenblatt, M.D.

Page 150

1 also teaching in the evenings and teaching on
2 weekends that took me away from my family, but I
3 really enjoyed the teaching, and I think I was
4 compensated, you know, appropriately for that.
5     Q.    So did you teach professional
6 education because you wanted the money?
7     A.    It was not -- it's never been about
8 the money.  It's been about teaching proper use
9 of devices.  And I've always seen it as not the
10 responsibility of the companies themselves to do
11 the teaching but of the surgeons who are thought
12 leaders in our industry to properly instruct
13 other surgeons on how to use products
14 appropriately.
15    Q.    And I think that's what you
16 referred to earlier as, what, peer-to-peer
17 teaching?
18    A.    Correct.
19    Q.    And, Doctor, in addition to the
20 material -- well, the materials referenced in
21 your report, would it be fair to say that not
22 only have you reviewed a significant number of
23 those materials prior to becoming involved in the
24 litigation but that you in addition to reviewing
25 those materials performed your own PubMed

Page 151

1 searches to satisfy yourself of the medical
2 literature?
3     A.    Yes.
4     Q.    And when you were asked questions
5 about the levels of evidence, if you could just
6 explain why Level I and Level II evidence is
7 significant to you?
8     A.    Yeah.  So there are many -- there
9 are many reports out in the literature, and they
10 vary in terms of their quality, and it's
11 generally recognized that the highest quality
12 studies are randomized prospective studies or
13 RCTs, randomized controlled trials, and
14 obviously, there are other Level I evidence or
15 ways to kind of synthesize all the data that's
16 put together which is referred to as a
17 meta-analysis.  And a meta-analysis is a
18 statistical form where you can pool data from
19 high level studies to try to make sense on a
20 grander scale of the significance.  And then also
21 systematic reviews where you have a, you know, a
22 question that you want answered and you look at
23 all the high quality evidence, and it's a matter
24 of, you know, throwing out studies that aren't as
25 useful.  You know, there are still studies like

Page 152

1 prospective studies or even retrospective cohort
2 studies that provide some use and are considered
3 generally Level II evidence, but they're not as
4 high as the Level I evidence.  So we tend to in
5 general in all of medicine, not just in surgery
6 but also in medicine looking at, you know, drugs,
7 et cetera, that Level I evidence is the most
8 important.
9     Q.    And when you look at that Level I
10 evidence, for example, the randomized controlled
11 trials for prolapse meshes involving
12 polypropylene and specifically Ethicon's
13 Gynemesh® PS and Prolift, what is the statistical
14 significance, if any, when those RCTs compare
15 native tissue repairs to mesh repairs for
16 prolapse?
17    A.    Well, there are a couple of ways of
18 looking at it.  And when you look at objective
19 success, in other words, based on pelvic
20 examination, across the board the success rate is
21 significantly higher for transvaginal mesh.  It's
22 become widely accepted in our field that it's
23 important to look at subjective outcome as well
24 and coming up with like a composite score.  And
25 there's good Level I evidence as well that

Page 153

1 subjective outcome is either improved or not
2 significantly different from native tissue
3 repair, but in total, you're going to prevent
4 recurrences from happening with transvaginal mesh
5 compared to native tissue repairs.
6     Q.    And when you look at the randomized
7 controlled trials for transvaginal mesh to treat
8 prolapse versus native tissue repairs, is there
9 any statistical significance regarding de novo
10 dyspareunia?
11    A.    You know, that's something we talk
12 about as, you know, mesh and dyspareunia, but
13 when you look at the randomized controlled
14 trials, there is no statistically significant
15 difference in the highest level studies.  In
16 fact, there are studies that show less de novo
17 dyspareunia with transvaginal mesh compared to
18 native tissue repair.
19    Q.    And I believe in your expert report
20 you referred to specifically the Withagen study
21 to support that?
22    A.    Correct.
23    Q.    Okay.  And would the same be true,
24 Doctor, for pelvic pain and just general quality
25 of life?

Peter L. Rosenblatt, M.D.

Page 154

1     A.    Those are -- those as well.
2 There's no statistically significant difference
3 between native tissue repairs and transvaginal
4 mesh when you look at those.
5     Q.    And it's important to look at those
6 subjective factors in the context of a randomized
7 controlled trial to make sure you're not
8 comparing apples and oranges but that you're
9 comparing apples to apples; is that fair?
10     A.    That's correct.
11     Q.    Doctor, two of your invoices were
12 marked as I believe Exhibits 4 and 5. Would it
13 be fair to say that you charged for your time in
14 performing the research and rendering your
15 opinions in this litigation?
16     A.    As best I can, yes.
17     Q.    And, in fact, there was a charge of
18 your deposition rate that you submitted on your
19 invoice because -- not because of counsel's fault
20 but your deposition was originally scheduled
21 several weeks ago and was cancelled at the last
22 minute; is that fair?
23     A.    I remember distinctly. The
24 deposition was scheduled for a Monday, and I
25 found out that the deposition was cancelled on a

Page 155

1 Saturday. And Monday is -- Mondays and Wednesday
2 are my primary surgical days, and I have block
3 time, and that day would have been filled with,
4 you know, three to six cases, and a week before
5 the block time, the block gets released, and
6 there's no way to -- so that was a wasted day, a
7 completely wasted day.
8     Q.    And, Doctor, we talked a little bit
9 about some of your teaching experience contained
10 on your CV, but would it be fair to say that
11 you've published a significant number of studies
12 in the medical literature on incontinence and
13 prolapse?
14     A.    Right, primarily my field of
15 interest is prolapse, urinary incontinence and
16 fecal incontinence.
17     Q.    And are you involved in any
18 editorial activities such as reviewing for
19 medical journals?
20     A.    Yes, I'm a peer reviewer for a
21 number of journals, and I've been on the
22 editorial board of the Gold journal which is the
23 Journal of Female Pelvic Medicine Reconstructive
24 Surgery and also the JMIG which is more of the
25 minimally invasive gynecologic surgery.

Page 156

1     Q.    And you mentioned Female Pelvic
2 Medicine Reconstructive Surgery, that would be
3 abbreviated FPMRS?
4     A.    Right.
5     Q.    Is that a subspecialty in your
6 field?
7     A.    Correct.
8     Q.    And that would be a board
9 certification?
10     A.    Correct, it became a board
11 certification I think it was 2013.
12     Q.    And so if Dr. Rosenzweig has not
13 sat for the FPMRS board, then he would not be a
14 board-certified urogynecologist?
15     A.    That's right.
16     Q.    You are, though, right?
17     A.    I am.
18     Q.    And are you in fact an examiner for
19 the FPMRS exam?
20     A.    Yeah, I'm actually a board examiner
21 for the general boards, but I just transitioned
22 to being a board examiner for the subspecialty of
23 FPMRS.
24     Q.    So it would be fair to say, then,
25 Doctor, that you would have a good understanding

Page 157

1 of what fellows and surgeons are expected to know
2 in your field about procedures and risks
3 associated with those procedures including pelvic
4 mesh, correct?
5     MR. CRAWFORD: Objection to form.
6     A.    No, that's correct. That's -- you
7 know, what we do as board examiners is -- I'm
8 very familiar with the standard of care, and we
9 are making sure that people who are quali- -- you
10 know, that the only people who become board
11 certified are qualified to do so and are
12 performing within the standard of care.
13     Q.    And, for example, would you test
14 fellows and surgeons on their knowledge of
15 potential complications of mesh-based repairs for
16 incontinence and prolapse?
17     A.    Yes.
18     Q.    And how to manage those
19 complications that may occur?
20     A.    Correct.
21     Q.    And the same would be true for
22 native tissue repairs for stress urinary
23 incontinence and pelvic organ prolapse?
24     A.    Correct.
25     Q.    Doctor, you were asked some

Peter L. Rosenblatt, M.D.

Page 158

1  questions about whether or not mesh exposure was
2  a serious complication. Do you recall that line
3  of questioning?
4      A.   Yes.
5      Q.   In your experience, are mesh
6  exposures typically considered serious
7  complications?
8      A.   So the vast majority of them are
9  not from a clinical standpoint considered serious
10  complications. Could there be a mesh erosion?
11  Let's take away exposures. Could there be a mesh
12  exposure that's serious? Yeah, it could happen.
13  You know, I've seen a couple examples in 15 years
14  of patients who have developed hematomas who have
15  opened their incision and have large mesh
16  exposures but the vast majority, I'm talking
17  about over 95 percent of them, are usually minor
18  mesh exposures that can either be taken care of
19  in the office or can be taken care of in an
20  operating room under local anesthesia with
21  conscious sedation. So how we look at them as
22  clinicians versus how the FDA classifies them
23  because it's a return trip to the OR, there's a
24  disparity there.
25      Q.   And if there is a complication

Page 159

1  associated with a native tissue repair, does that
2  get reported to a MAUDE database?
3      A.   No, because it doesn't involve --
4  as far as I know, it doesn't involve a device, so
5  no one would report it to a MAUDE database.
6      Q.   And so when you were seeing you
7  didn't necessarily agree with the FDA's 2011
8  public health notice description as complications
9  are not rare, was that in part because they did
10  not consider the complications that occur with
11  native tissue repairs?
12      A.   Correct.
13      Q.   And was that also in part because
14  when you performed the mathematical calculation
15  as you described, 0.6 percent would in fact be
16  rare?
17      A.   In my book, that's very rare.
18      Q.   Doctor, if we look at your expert
19  report, starting on page 33.
20      A.   Yes.
21      Q.   In the middle of the page, you cite
22  to the Damoiseaux 2015 RCT. Do you see that?
23      A.   Yes.
24      Q.   A little further down they describe
25  a mesh exposure rate, but then, even though there

Page 160

1  were some mesh exposures with the mesh group, did
2  that translate into any statistical significant
3  difference with respect to dyspareunia or pelvic
4  pain?
5          MR. CRAWFORD: Objection to form.
6      A.   No, it did not.
7      Q.   And if you look on the next page,
8  34, you cite to the Heinonen 2016 study.
9      A.   Yes.
10      Q.   And although you describe here that
11  the authors reported a 23 percent mesh exposure
12  rate, you note that the exposures were
13  asymptomatic in 24 of 32 or 66.7 percent of
14  patients. Do you see that?
15      A.   That's correct.
16      Q.   So, if you could, just describe
17  whether or not an asymptomatic mesh exposure
18  would be of any clinical concern?
19      A.   So it depends on the situation but,
20  you know, many women do have small mesh exposures
21  and are not aware of it, and it doesn't pose any
22  danger to the patient, and there's no reason to
23  treatment an asymptomatic mesh exposure. And
24  when I say asymptomatic, I'm talking about for
25  the patient, and if the patient is sexually

Page 161

1  active, to her partner. So, obviously, if the
2  patient didn't have symptoms but her partner had
3  symptoms, then that would be symptomatic, but the
4  majority of these mesh exposures are asymptomatic
5  to the patient and her partner.
6      Q.   And, Doctor, I don't want to rehash
7  everything that's already in the report, but
8  would it be fair to say if you continue flipping
9  the pages that you describe a significant number
10  of studies and the reported outcomes to include
11  success rates and complications of those studies
12  involving Prolift and Gynemesh® PS?
13      A.   Yes.
14      Q.   And I do want to look at one in
15  particular on page 37. Towards the bottom you
16  cite to De Landsheere and Cosson in 2011 which
17  was a three-year follow-up study of 524 patients,
18  and then on the next page, could you just
19  describe some of the complications that were
20  noted in this large patient study?
21          MR. CRAWFORD: Objection to form.
22      A.   So in that study, which I believe
23  was a cohort study -- it was not one of the
24  randomized controlled trials, but it was a very
25  large study because it had, you know, so many

Peter L. Rosenblatt, M.D.

Page 162

1 patients in it -- the total mesh-related
2 complications was 3.6 percent with a mesh
3 exposure rate of 2.7 percent which is relatively
4 low. And the other important part about this
5 study was that most of the mesh exposures
6 occurred in the first year of the study, so we're
7 not seeing mesh exposures that are continually
8 coming out. It's usually during the healing
9 process when you see a mesh exposure.
10    Q.    Is that supported by additional
11 studies that you've seen in the medical
12 literature?
13    A.    Yes.
14    Q.    And would that also be supported by
15 your clinical experience?
16    A.    Yes.
17    Q.    Would that also be supported by
18 your discussions with colleagues?
19    A.    Yes.
20    Q.    And what did the De Landsheere
21 study find with respect to severe symptomatic
22 mesh retractions?
23    A.    That it was found in an extremely
24 low number of patients of less than half a
25 percent.

Page 163

1    Q.    And would that be consistent with
2 what you would expect from Prolift?
3    A.    Yes.
4    Q.    Doctor, you were describing some
5 factors that could contribute to mesh exposures
6 earlier. Do you recall that testimony?
7    A.    Yes.
8    Q.    And I believe you mentioned surgeon
9 technique and other patient factors. So would it
10 be fair to say that there are factors unrelated
11 to the mesh itself that contribute to mesh
12 exposures?
13    A.    Yes, that's widely accepted.
14    Q.    And I believe you also testified
15 that exposure or erosion is not necessarily
16 unique to mesh because you can also have a suture
17 erosion or exposure; is that correct?
18    A.    Correct.
19    Q.    Okay. Would that be true for any
20 foreign body implant?
21    A.    Absolutely.
22    Q.    Do you implant urethral sphincters?
23    A.    I do not.
24    Q.    Do you know if urologists in your
25 field do?

Page 164

1    A.    Mm-hmm, yes.
2    Q.    Do you know if there's literature
3 to suggest that urethral sphincters can erode?
4    A.    Urethral sphincters, anal
5 sphincters, anything in that area can erode.
6    Q.    And, Doctor, you were asked a
7 number of questions regarding Dr. Rosenzweig's
8 TVT report and whether or not you agreed or
9 disagreed with those opinions. Do you recall
10 that?
11       MR. CRAWFORD: Objection to form.
12    A.    Yes.
13    Q.    And a lot of those questions dealt
14 with properties of the mesh and potential
15 complications of mesh; is that fair?
16    A.    Yes.
17    Q.    If you could, just -- I know you
18 have a lot of that in your expert report, but if
19 you could just briefly describe your experience
20 with mesh design and mesh properties?
21       MR. CRAWFORD: Objection to form.
22    A.    Well, I've actually -- I personally
23 have been -- besides reading the literature,
24 which I'm very familiar with, but I've also had
25 the opportunity to work with a number of

Page 165

1 companies on mesh designed. And so I've worked
2 with engineers on some of my own products and
3 some with companies and some completely
4 independent.
5       So, you know, I've approached --
6 for instance, there's a company in Rhode Island
7 called Biomedical Structures that I, right
8 outside of Providence, that I worked with them on
9 some of my own mesh designs. So I'm very
10 familiar with design of polypropylene mesh.
11       I've also worked, again,
12 personally, not with a company, with a mesh
13 manufacturer in Ireland called Proxy Medical that
14 actually does make some mesh for some companies
15 in the United States, including Boston
16 Scientific, on devices that I've designed. So
17 I've worked with engineers, design engineers, on
18 mesh design.
19       MR. CRAWFORD: Objection.
20 Non-responsive.
21    Q.    And would it be fair to say that
22 you also have -- strike that.
23       Doctor, could you describe your
24 experience, if any, with respect to taking a new
25 product through the regulatory cycle and drafting

Peter L. Rosenblatt, M.D.

Page 166

1  IFUs?
2        MR. CRAWFORD:  Objection to form.
3     A.     Yeah, so I've been very fortunate
4  that I've taken -- there was one device that I
5  worked on -- that I've been working on since 2004
6  which is a mesh device, very similar to the
7  Prolene® mesh.  It was actually with American
8  Medical Systems.  It was actually very similar to
9  the SPARC mesh that they use, but it was
10  different.  It had additional fibers added to it.
11  And that's something I worked with them from 2007
12  'til this year on designing the mesh, working on
13  the device of the IFUs and other materials,
14  including, you know, animations and online
15  training, et cetera.
16        So I've taken that product from the
17  beginning through IDE studies, investigational
18  device exemption studies, and the PMA process,
19  premarket approval I think it stands for.  So
20  I've been very involved in that type of design.
21  Plus, I wrote much of the instructions for use,
22  the IFUs, for that device.
23        MR. CRAWFORD:  Objection.
24  Non-responsive.
25     Q.     And, Doctor, as part of your

Page 167

1  experience teaching professional education, would
2  you teach on the IFUs?
3     A.     Right.  So when we teach, what
4  we're doing is sort of summarizing the IFUs,
5  because, you know, the IFUs come with the device,
6  right?  So when you open up a package in the
7  operating room, you're really not going to sit
8  there while the patient's under anesthesia and
9  read the instructions like you're programming a
10  VCR.  I don't know if people know what a VCR is
11  anymore.
12     Q.     Good lord.
13     A.     Yeah, I shouldn't have said that.
14  I meant a Beta max.  Yeah, I got to rethink that.
15        Anyway, so I think the way most
16  surgeons learn how to use a device is by, or
17  should learn how to use a device, is by going to
18  professional education conferences and learning
19  from PowerPoint presentations, animations,
20  cadaver dissections, procedural videos.  That's
21  how people really learn.
22     Q.     By medical literature?
23        MR. CRAWFORD:  Objection.
24  Non-responsive.
25     A.     And medical literature.  And that

Page 168

1  is basically encompassing what is in an IFU.
2     Q.     And if you had any concerns about
3  Ethicon's IFUs for the TVT products or the
4  Gynemesh® PS or the Prolift devices as being
5  inadequate, would you have voiced your concerns?
6     A.     Yes.
7     Q.     And in your opinion, are those
8  IFUs, all the versions that you've reviewed,
9  adequate?
10        MR. CRAWFORD:  Objection to form.
11     A.     Yes, they are.
12     Q.     And you were asked some questions
13  about your legal work, Doctor.  Would it be fair
14  to say that you have been an expert for both
15  sides, both plaintiffs and defendants?
16     A.     Yes, I have.  I would say more so
17  for defense, but I have done plaintiff work as
18  well.
19     Q.     Doctor, you were asked about
20  shrinkage and whether or not -- I believe it was
21  couched just in broad terms about mesh shrinkage.
22  Do you recall those questions?
23     A.     Yes.
24     Q.     I believe one of the documents that
25  you cited to was the Dietz paper.

Page 169

1     A.     Yes.
2     Q.     And what does the Dietz paper
3  regarding TVT describe about whether or not TVT
4  contracts or shrinks?
5     A.     So this is one of the studies that
6  I relied on, and Dr. Dietz is very well for his
7  work on transvaginal ultrasound, and this study
8  shows that the TVT does not seem to contract or
9  shorten over a period of over a year and a half.
10        MR. CRAWFORD:  Objection.
11  Non-responsive.
12     Q.     And in another study by Lo, which
13  was an ultrasound study, what did Lo and
14  colleagues find about whether or not ultrasound
15  assessment found any shrinkage or contraction
16  with TVT?
17     A.     They also -- and, again, both of
18  these researchers are very well-known.  Lo is in
19  Taiwan, and showed that TVT does not show any
20  shrinkage.  And if -- and there's actual clinical
21  data to support that, in that if shrinkage did
22  occur you'd expect to see patients who were
23  initially voiding.  If shrinkage occurred, they'd
24  go into retention, and we just don't see that
25  happening.

Peter L. Rosenblatt, M.D.

Page 170

1 MR. CRAWFORD: Objection.
2 Non-responsive.
3 Q. And do you recall in the 17-year
4 Nelson study whether or not they noticed any
5 shrinkage of TVT?
6 A. They did not notice any shrinkage
7 of TVT.
8 Q. And would that be consistent with
9 your medical practice?
10 A. Yes.
11 Q. Would that be consistent with your
12 discussions with colleagues?
13 A. Yes.
14 Q. And would that be consistent with
15 your general review of the medical literature?
16 A. Correct.
17 Q. And additionally, another Dietz
18 paper that I believe you referred to looked at
19 prolapse meshes. I believe in particular the AMS
20 Perigee. Do you recall that paper?
21 A. Yes.
22 Q. Is the Perigee similar to the
23 Prolift?
24 MR. CRAWFORD: Objection to form.
25 A. It's similar in that it is a Type 1

Page 171

1 macroporous monofilament polypropylene mesh.
2 Q. And what was Dietz's conclusion in
3 this paper from 2011 about whether or not Perigee
4 or transvaginal mesh for prolapse contracted?
5 A. Yeah, there was no evidence on
6 ultrasound examination of any mesh contraction in
7 this study.
8 Q. And, Doctor, you were asked some
9 questions about biocompatibility and inertness.
10 I want to show you a paper that I believe you
11 reviewed by Binnebösel. If you could, just
12 describe what they noted about mesh integration.
13 A. So they stated that these materials
14 are physically and chemically inert, stable and
15 non-toxic.
16 Q. And they're referring to
17 polypropylene meshes?
18 A. Yes, they are.
19 Q. Doctor, you were asked some
20 questions about the Burch procedure. When you
21 were describing your experience with the Burch,
22 were you describing the open Burch or the
23 laparoscopic Burch?
24 A. Both.
25 Q. And do you primarily -- do you

Page 172

1 still perform open Burchs on a regular basis?
2 A. No, I use to, but I haven't done an
3 open Burch in probably 20 years.
4 Q. And why is that?
5 A. Oh, just because we can do the
6 exact same procedure in a minimally invasive
7 fashion.
8 Q. So would it be fair to say that the
9 Burch is a -- the open Burch is a more invasive
10 procedure than, for example, a midurethral sling?
11 A. Significantly more invasive.
12 Q. And what are some of the -- strike
13 that.
14 Now, with regard to the Burch, are
15 you familiar with an article by Demirci
16 describing the long-term results of the Burch?
17 A. Yes.
18 Q. And what did this paper by Demirci
19 find about the rates of dyspareunia and growing
20 pain as late complications of the Burch?
21 A. Yeah, so these are potential
22 complications in a Burch procedure, and you know,
23 dyspareunia occurred in 6 patients out of the
24 220, groin or suprapubic pain in 15, which is
25 probably about, you know, 7 percent or so, but

Page 173

1 there were also other complications including
2 enteroceles in over 10 percent of patients and
3 rectoceles, and it's felt that the change in the
4 axis of the vagina predisposes to posterior,
5 which would be rectocele and enteroceles,
6 prolapse.
7 Q. And would that be a complication
8 that would occur more frequently after a Burch
9 than after a midurethral sling?
10 MR. CRAWFORD: Objection to form.
11 A. Yes.
12 Q. And it would be fair to say,
13 Doctor, that complications such as dyspareunia
14 and pain, whether it's short term or chronic, are
15 well-known complications of any vaginal
16 procedure?
17 A. That's correct.
18 Q. You were asked some questions about
19 degradation, and I believe you referred
20 specifically to the Clavé paper.
21 A. Yes.
22 Q. What did the authors conclude about
23 their hypotheses concerning degradation,
24 specifically oxidation degradation?
25 A. They brought up these as

Peter L. Rosenblatt, M.D.

Page 174

1  hypotheses, but they stated that none of their
2  hypotheses, and in particular direct oxidation,
3  could be confirmed by the study.
4     Q.   So, Doctor, when you said you were
5  not familiar with the literature that described
6  in vivo degradation, would it be fair to say that
7  scientists have tried to study that issue but
8  have not been able to confirm in vivo
9  degradation?
10        MR. CRAWFORD:  Objection to form.
11    A.   That's correct.
12    Q.   And you were asked some
13 hypotheticals, Doctor.  Hypothetically if
14 degradation did occur, what in your opinion,
15 based on your clinical experience and your review
16 of the medical literature, would be the clinical
17 significance of degradation if it hypothetically
18 did occur?
19    A.   So when it came to like slings, you
20 would expect to see failures, and we're not
21 seeing that.  And when it comes to prolapse, then
22 you'd expect over time to see degradation would
23 lead to disappearance of the mesh and failures,
24 and that's just not what we're seeing clinically.
25    Q.   And, Doctor, AUGS and SUFU released

Page 175

1  a Frequently Asked Questions by Providers
2  regarding midurethral slings for stress urinary
3  incontinence.  Have you seen this document
4  before?
5     A.   Yeah, I use that with my patients,
6  too.
7     Q.   And one of the questions that they
8  ask is does the midurethral sling made of
9  polypropylene degrade over time.  Could you just
10 summarize what their response was in this
11 document?
12        MR. CRAWFORD:  Objection to form.
13    A.   So AUGS and SUFU are the leading
14 organizations for surgeons and patients in
15 urogynecology and female reconstructive surgery,
16 and it's stated here that polypropylene is a
17 stable and well-accepted biomaterial with, as we
18 mentioned, a history of over five decades in
19 use -- of use in mesh implants.  And though
20 people have raised the issue of possible
21 degradation, including what we talked about like
22 cracked surfaces, that there's no evidence that
23 that is actually happening.
24    Q.   And Doctor, one of the other
25 studies that I believe you relied on was a 2011

Page 176

1  study by de Tayrac which followed the Clavé
2  study, and you noted earlier this biofilm when
3  you wash it off the mesh wasn't degraded.  Could
4  you just describe what the authors found in this
5  study --
6         MR. CRAWFORD:  Objection.
7     Q.    -- in 2011?
8         MR. CRAWFORD:  Objection to form.
9     A.   So what these authors showed is
10 that when you properly washed the material with,
11 in this case, DMSO which is a solvent -- it's
12 actually a byproduct of the wood industry -- and
13 you also used ultrasonic shock, that after the
14 biofilm was removed there is absolutely no
15 polymer degradation, and you know, according to
16 this, scanning electron microscopy image, to my
17 eyes and anyone who would read this, it looks
18 like it's pristine material.
19        MR. CRAWFORD:  Objection.
20 Non-responsive.
21    Q.   And, Doctor, I believe one of the
22 other studies you were relying on was a recent
23 study from the International Urogynecology
24 Journal by Ong.  Do you recall that?
25    A.   Yes.

Page 177

1     Q.   What did this study conclude about
2  explanted Prolene® meshes and whether or not they
3  underwent any clinically significant degradation?
4     A.   Well, they concluded something very
5  similar in that these explanted Prolene® meshes
6  did not undergo any meaningful or harmful
7  degradation in vivo but that the, you know,
8  quote/unquote, cracked layer was actually
9  composed of protein coatings arising from a
10 well-established phenomenon occurring immediately
11 upon implantation which is what we referred to
12 earlier as a biofilm.
13    Q.   And, Doctor, you were asked some
14 questions about the MSDS.  I represent to you
15 this is the Sunoco MSDS for Ethicon's Prolene®.
16    A.   Yes.
17    Q.   Would it be fair to say that MSDS,
18 material safety data sheets, are under the
19 purview of OSHA and not the FDA?
20        MR. CRAWFORD:  Objection to form.
21    A.   That is correct.
22    Q.   And so in your opinion would this
23 document have anything to do with the safety of
24 an implantable medical device outside of the
25 context of employees working with various

Peter L. Rosenblatt, M.D.

Page 178

1 chemicals?
2        MR. CRAWFORD: Objection to form.
3    A.    Right, so the MSDS, as you
4 mentioned, is under the purview of OSHA to
5 protect workers who are handling materials, but
6 we're talking about raw materials. We're not
7 talking about devices that are then -- you know,
8 this refers to, for instance, like the
9 polypropylene pellets and when they're heated up
10 and extruded, but that has nothing to do with
11 when it's implanted into a human.
12    Q.    And one of the references I believe
13 Dr. Rosenzweig was citing to under
14 incompatibility was strong oxidizers such as
15 chlorine, peroxides, et cetera, and you were
16 asked questions about whether or not mesh would
17 undergo oxidative degradation due to peroxides in
18 the vagina. Do you recall those questions?
19        MR. CRAWFORD: Objection to form.
20    A.    Yes.
21    Q.    In your opinion, is that a
22 realistic possibility?
23        MR. CRAWFORD: Form.
24    A.    No, there's no evidence of that.
25 In addition, you know, again, this is the MSDS

Page 179

1 for polypropylene, but then there are additives
2 in Prolene® mesh which are antioxidants.
3        MR. CRAWFORD: Objection.
4 Non-responsive.
5    Q.    Doctor, if you were going to offer
6 the opinion in a court of law that polypropylene
7 mesh was incompatible in the human body because
8 of an MSDS sheet, in your opinion would that be
9 relying on sound evidence-based medicine?
10        MR. CRAWFORD: Objection to form.
11    A.    Absolutely not.
12    Q.    Doctor, are you familiar with a
13 paper by Ashley King and Howard Goldman regarding
14 whether or not polypropylene causes cancer or
15 could be cytotoxic?
16    A.    Yes.
17    Q.    What did those authors conclude
18 about whether or not that was a concern of
19 polypropylene midurethral slings?
20    A.    So they concluded that there's
21 absolutely no evidence in the medical literature
22 that polypropylene slings are associated with a
23 risk of malignancy.
24    Q.    And, Doctor, you were asked about
25 chronic inflammatory responses, and I want to

Page 180

1 show you a paper I believe you relied on by
2 Firoozi and Goldman at the Cleveland Clinic.
3    A.    Yes.
4    Q.    And this study involves a total of
5 23 patients involving removal of mesh, prolapse
6 mesh, including Ethicon's Prolift. Do you recall
7 that?
8    A.    I do.
9    Q.    And, if you could, just describe
10 whether or not their removal procedure was
11 successful without removing the arms of the mesh?
12        MR. CRAWFORD: Objection to form.
13    Q.    In terms of curing the patient's
14 pain?
15    A.    Well, I think one of the most
16 important parts of this study was that they were
17 able to show that patients who had pain where
18 they determined they wanted to remove the mesh
19 that they could remove the mesh safely.
20        MR. CRAWFORD: Objection.
21 Non-responsive.
22    Q.    And, Doctor, is that consistent
23 with your clinical experience?
24    A.    It is.
25    Q.    And if there's an instance where

Page 181

1 you need to leave the mesh in place or it's not
2 easily accessible, do you generally have any
3 concerns, based on your experience and review of
4 the literature and your review of patients, as to
5 leaving mesh in that patient if they don't have
6 any significant complaints?
7    A.    So, first of all, it is extremely
8 rare in my experience and in the medical
9 literature to have to remove mesh totally. And
10 in my experience, patients who do present with
11 pain after prolapse operations such as, you know,
12 armed transobturator mesh systems, if you just
13 relieve the tension on the mesh arm the pain will
14 go away. Mesh itself does not cause pain, but it
15 can cause pain where it inserts into the pelvic
16 floor muscles. And there are techniques that
17 have been described. In fact, one was described
18 by one of my former fellows, and I've shown this
19 in videos, of getting into the space of Retzius
20 laparoscopically and just relieving the tension
21 on the mesh arms and successfully treating women
22 with pelvic pain.
23    Q.    And so would it be fair to say that
24 you're able to successfully treat women who may
25 have some pain after a mesh procedure without

Peter L. Rosenblatt, M.D.

Page 182

1  performing significant dissection?
2      A.    Correct.
3      Q.    And in terms of severity of pain,
4  is it an accurate statement that any mesh -- any
5  patient who has mesh undergoes more severe pain
6  or dyspareunia than a patient who had a native
7  tissue repair for prolapse?
8          MR. CRAWFORD:  Objection to form.
9      A.    That is not true.
10     Q.    And is that based on your clinical
11 experience, Doctor?
12     A.    That's based on my clinical
13 experience, but it's also based on the
14 literature, that patients with native tissue
15 repairs can have significant pain.  The one that
16 comes to mind is posterior repairs went anywhere
17 from 19 to 32 percent of women with undergoing
18 levator plication can have significant
19 dyspareunia, and there is -- so pain and
20 dyspareunia can happen with any native tissue
21 repair.
22     Q.    So would it be fair to say that
23 pain and dyspareunia are not unique to mesh?
24     A.    That is correct.
25     Q.    And counsel asked you to look

Page 183

1  during a break for a study to support your
2  opinion about inflammatory response and whether
3  or not a chronic inflammatory response correlated
4  to chronic pain.  Could you just describe that
5  article that you were able to find?
6      A.    Right.  So this is an article by
7  Audra, A-U-D-R-A, Jolyn, J-O-L-Y-N, Hill in the
8  International Urogynecology Journal from 2015
9  where they excised portions of mesh for both
10 voiding dysfunction as well as pain and
11 interestingly found that mesh excised for voiding
12 dysfunction demonstrated elevated levels of
13 inflammation compared to mesh that was excised
14 for pain and/or exposure.
15     Q.    And what else did they conclude or
16 how else did they summarize that?
17     A.    Well, basically in their summary
18 they stated that vaginally placed midurethral
19 slings that are excised for voiding dysfunction
20 demonstrated elevated levels of inflammation
21 compared to mesh that was excised for pain or
22 exposure.
23     Q.    So does this study in addition to
24 your clinical experience and review of other
25 medical literature support your opinion that a

Page 184

1  chronic inflammatory response is not indicative
2  or causally related to chronic pain?
3      A.    That is correct.
4      Q.    And, in fact, if you look at
5  another study by two of plaintiffs' experts,
6  Dr. Klosterhalfen and Dr. Uwe Klinge from 2002,
7  what did they conclude in this paper about
8  describing the long-term biocompatibility of
9  surgical mesh?
10     A.    They concluded that long-term
11 incorporation of polypropylene mesh in humans has
12 a more favorable tissue response with increasing
13 implantation interval.
14     Q.    And similar to the Hill article,
15 what did Klosterhalfen and Klinge note about any
16 correlation between an inflammatory response and
17 chronic pain?
18          MR. CRAWFORD:  Objection to form.
19     A.    So they concluded that, and they
20 mentioned it was striking that there was very
21 little difference in inflammatory response in
22 mesh removed for recurrence or for chronic pain.
23     Q.    And, Doctor, counsel asked you a
24 number of questions about what specific internal
25 documents can you recall reviewing off the top of

Page 185

1  your head.  Do you recall that?
2      A.    Yes.
3      Q.    Would it be fair to say that you
4  showed up here with five banker's boxes worth of
5  documents in addition to a flash drive that we'll
6  provide to counsel?
7      A.    Yes.
8      Q.    And those would be materials that
9  you reviewed in some shape or form?
10     A.    Yes.
11     Q.    And while you may not have been
12 able to read every single word of every document,
13 were you at least able to skim through to
14 determine whether or not there was something that
15 caught your eye --
16     A.    Yes.
17     Q.    -- that you wanted to read more
18 closely?
19     A.    That's correct.
20     Q.    And, again, just -- I think I asked
21 you about this, but I want to make sure.  When
22 you asked us to provide with the good and the
23 bad, we did in fact provide you with the
24 documents and literature referenced in the body
25 of plaintiffs' expert reports, correct?

Peter L. Rosenblatt, M.D.

Page 186

1      MR. CRAWFORD:  Objection to form.
2      A.      That is correct.
3      Q.      Doctor, are all the opinions that
4  you've offered in your expert report and today in
5  your general TVT, Prolene®, Gynemesh® PS and
6  Prolift deposition held to a reasonable degree of
7  medical certainty?
8      A.      Yes, they are.
9      MR. ROSENBLATT:  I have no further
10 questions at this time.
11
12      FURTHER EXAMINATION
13 BY MR. CRAWFORD:
14     Q.      Doctor, you just testified
15 regarding several studies, correct?
16     A.      Yes.
17     Q.      And when you were testifying about
18 those studies, you were reading from those
19 studies, weren't you?
20     A.      Yes, I was.
21     Q.      Okay, I need to see them.
22     Doctor, I've been handed a stack of
23 studies that you were reading from in your
24 testimony to questions asked by defense counsel
25 just now; is that right?

Page 187

1      A.      Yes.
2  (Whereupon, Deposition Exhibit 7,
3      "Influence of implantation Interval on the
4      long-term biocompatibiity of surgical mesh"
5      by Klosterhalfen, et al,
6      was marked for identification.)
7  BY MR. CRAWFORD:
8      Q.      In your examination by defense
9  counsel, did you read from Exhibit No. 7?
10     A.      I did.
11     Q.      How would you describe that report?
12 What's the name of that report?
13     A.      "Influence of implantation interval
14 on the long-term biocompatibility of surgical
15 mesh."
16     Q.      For purposes of time and economy,
17 if you were talking to one of your colleagues,
18 would you say this is the Klosterhalfen report?
19     A.      Yes --
20     Q.      Okay.
21     A.      -- but you know, you want to make
22 sure because authors often write multiple papers,
23 so you want to make sure you're referencing the
24 right paper.
25     Q.      Okay.  This document has highlights

Page 188

1  on it, correct?
2      A.      Correct.
3      Q.      Are those the highlights you were
4  reading from in your examination by defense
5  counsel?
6      A.      Yes.
7      Q.      Did you put those highlights on
8  there?
9      A.      I did not.
10     Q.      Who did?
11     A.      The counsel did, but I've read
12 these articles myself.
13      MR. CRAWFORD:  Objection.
14 Non-responsive.  Move to strike after "counsel
15 did."
16  (Whereupon, Deposition Exhibit 8,
17      "Histopathology of excised midurethral sling
18      Mesh" by Hill, et al,
19      was marked for identification.)
20 BY MR. CRAWFORD:
21     Q.      I'm going to show you what was
22 marked as Exhibit No. 8.
23      Do you recognize that as one of the
24 studies you were reading from in your examination
25 by defense counsel?

Page 189

1      A.      Yes.
2      Q.      How would you describe it to one of
3  your colleagues, that article?
4      A.      This is the Hill study about
5  histopathology of excised midurethral sling mesh.
6      Q.      Does that exhibit have highlights
7  on it?
8      A.      Yes, it does.
9      Q.      Did you make those highlights?
10     A.      On this particular copy, no.
11     Q.      Did you read from those highlights
12 during your examination by defense counsel?
13     A.      Yes, I did.
14     Q.      Who put those highlights on that
15 document?
16     A.      Attorney Rosenblatt.
17     Q.      The lawyer for Ethicon?
18     A.      Yes.
19      MR. ROSENBLATT:  And, Counsel, I'll
20 just represent I only had one copy, so I showed
21 him my highlighted copy.
22  (Whereupon, Deposition Exhibit 9,
23      "Current Controversies Regarding Oncologic
24      Risk Associated with Polypropylene
25      Midurethral Slings" by King, et al,

Peter L. Rosenblatt, M.D.

Page 190

1    was marked for identification.)
2  BY MR. CRAWFORD:
3      Q.    Do you recognize the exhibit marked
4  as -- strike that.
5            Do you recognize the document
6  marked as Exhibit No. 9?
7      A.    Yes.
8      Q.    Is that a study you were referring
9  to in your examination by defense counsel?
10     A.    Yes.
11     Q.    How would you describe that study
12 to one of your colleagues?
13     A.    This is a study by -- the first
14 author is King, and it's "Current Controversies
15 Regarding Oncologic Risk Associated with
16 Polypropylene Midurethral Slings."
17     Q.    Does that document have highlights
18 on it?
19     A.    Yes, it does.
20     Q.    Did you read from those highlights
21 during your examination by defense counsel?
22     A.    I did.
23     Q.    Who put those highlights on that
24 document?
25     A.    Attorney Rosenblatt.

Page 191

1      Q.    The attorney for Ethicon?
2      A.    Yes.
3  (Whereupon, Deposition Exhibit 10,
4    "Polypropylene as a reinforcement in pelvic
5    surgery is not inert: comparative analysis
6    of 100 explants" by Clavé,
7    was marked for identification.)
8  BY MR. CRAWFORD:
9      Q.    Do you recognize the document
10 marked as Exhibit No. 10?
11     A.    Yes.
12     Q.    How would you describe that
13 document to one of your colleagues?
14     A.    This is the Clavé article about
15 polypropylene as a reinforcement in pelvic
16 surgery is not inert.
17     Q.    Does that document have highlights
18 on it?
19     A.    It does.
20     Q.    Did you read from those highlights
21 during your examination by defense counsel?
22     A.    I did.
23     Q.    And who put those highlights on
24 that document?
25     A.    Attorney Rosenblatt.

Page 192

1      Q.    Is that the attorney for Ethicon?
2      A.    Yes.
3  (Whereupon, Deposition Exhibit 11,
4    "Long-Term Results of Burch Colposuspension"
5    by Demirci, was marked
6    for identification.)
7  BY MR. CRAWFORD:
8      Q.    Do you recognize the document
9  marked as Exhibit No. 10?
10     A.    Yes.
11     Q.    How would you --
12           MR. ROSENBLATT:  Just, Counsel, I
13 think that says 11 there.
14           MR. CRAWFORD:  I'm sorry.  Thank
15 you.
16           Do you recognize the document
17 marked as Exhibit No. 11?
18     A.    Yes.
19     Q.    How would you describe that
20 document to one of your colleagues?
21     A.    The first author is Demirci,
22 D-E-M-I-R-C-I, and it's "Long-Term Results of
23 Burch Colposuspension."
24     Q.    Did you read from that document
25 during your examination by defense counsel?

Page 193

1      A.    Yes.
2      Q.    Did you read the highlighted
3  portions?
4      A.    I did.
5      Q.    And who put those highlights there?
6      A.    Attorney Rosenblatt.
7      Q.    Is that the attorney representing
8  Ethicon?
9      A.    Yes.
10 (Whereupon, Deposition Exhibit 12,
11   "Biocompatibility of prosthetic meshes in
12   abdominal surgery" by Binnebösel,
13   was marked for identification.)
14 BY MR. CRAWFORD:
15     Q.    Do you recognize the document
16 marked as Exhibit No. 12?
17     A.    Yes.
18     Q.    How would you describe that
19 document to one of your colleagues?
20     A.    The first author is Binnebösel, and
21 it's entitled "Biocompatibility of prosthetic
22 meshes in abdominal surgery."
23     Q.    Is that document highlighted?
24     A.    Yes.
25     Q.    Did you read from those highlights

Peter L. Rosenblatt, M.D.

Page 194

1 during your examination by defense counsel?
2     A.     I did.
3     Q.     Who put those highlights on that
4 document?
5     A.     Attorney Rosenblatt.
6     Q.     Is that the lawyer representing
7 Ethicon?
8     A.     It still is.
9     (Whereupon, Deposition Exhibit 13,
10    "Does the tension-free vaginal tape stay
11    where you put it?" by Dietz,
12    was marked for identification.)
13 BY MR. CRAWFORD:
14    Q.     Do you recognize the document
15 marked as Exhibit No. 13?
16    A.     Yes.
17    Q.     How would you describe that
18 document to one of your colleagues?
19    A.     That's the article by Dr. Dietz on
20 "Does the tension-free vaginal tape stay where
21 you put it?"
22    Q.     Does that document have highlights
23 on it?
24    A.     It does.
25    Q.     Did you read from those highlights

Page 195

1 during your examination by defense counsel?
2     A.     I did.
3     Q.     Who put those highlights on that
4 document?
5     A.     Attorney Rosenblatt.
6     Q.     Is that the attorney for Ethicon in
7 this case?
8     A.     Correct.
9     (Whereupon, Deposition Exhibit 14,
10    "Ultrasound Assessment of Mid-Urethra Tape
11    at Three-Year Follow-Up after Tension-Free
12    Vaginal Tape Procedure" by Lo, et al,
13    was marked for identification.)
14 BY MR. CRAWFORD:
15    Q.     Do you recognize the document
16 that's been marked as Exhibit No. 14 to your
17 deposition?
18    A.     Yes.
19    Q.     How would you describe that
20 document to one of your colleagues?
21    A.     The first author is Lo, L-O, and
22 it's "Ultrasound Assessment of Mid-Urethra Tape
23 at Three-Year Follow-Up After TVT Procedure."
24    Q.     Does that document have highlights
25 on it?

Page 196

1     A.     It does.
2     Q.     Did you read from those highlights
3 during your examination by defense counsel?
4     A.     I did.
5     Q.     Who put those highlights on that
6 document?
7     A.     Attorney Rosenblatt.
8     Q.     Is that one of the attorneys
9 representing Ethicon in this case?
10    A.     Yes.
11    (Whereupon, Deposition Exhibit 15,
12    "Mesh contraction: myth or reality?"
13    by Dietz, et al,
14    was marked for identification.)
15 BY MR. CRAWFORD:
16    Q.     Do you recognize the document
17 marked as Exhibit No. 15 to your deposition?
18    A.     Yes.
19    Q.     How would you describe that
20 document to one of your colleagues?
21    A.     So that's another article by
22 Dr. Dietz, and it's "Mesh Contraction:  myth or
23 reality?"
24    Q.     And does that document have
25 highlights on it?

Page 197

1     A.     It does.
2     Q.     Did you read from those highlights
3 during your examination by defense counsel?
4     A.     Yes, I did.
5     Q.     Who put those highlights on that
6 document?
7     A.     Attorney Rosenblatt.
8     Q.     Is that the lawyer for Ethicon in
9 this case?
10    A.     It is.
11    (Whereupon, Deposition Exhibit 16,
12    "Basic science and clinical aspects of mesh
13    infection in pelvic floor reconstructive
14    surgery" by de Tayrac, et al,
15    was marked for identification.)
16 BY MR. CRAWFORD:
17    Q.     Do you see the document marked as
18 Exhibit No. 16 to your deposition?
19    A.     Yes.
20    Q.     How would you describe that
21 document to one of your colleagues?
22    A.     This is an article by de Tayrac,
23 D-E T-A-Y-R-A-C, and it's entitled "Basic signs
24 and clinical aspects of mesh infection in pelvic
25 floor reconstructive surgery."

Peter L. Rosenblatt, M.D.

Page 198

1    Q.    Is that document highlighted?
2    A.    Yes.
3    Q.    Did you read from those highlights
4 during your examination by defense counsel?
5    A.    I did.
6    Q.    Who highlighted that document?
7    A.    Attorney Rosenblatt.
8    Q.    Is that the attorney representing
9 Ethicon in this case?
10    A.    Yes.
11    (Whereupon, Deposition Exhibit 17,
12    "The Myth: In Vivo Degradation of
13    Polypropylene Meshes" by Ong et al,
14    was marked for identification.)
15 BY MR. CRAWFORD:
16    Q.    Do you recognize the document
17 marked as Exhibit No. 17 to your deposition?
18    A.    I do.
19    Q.    How would you describe that
20 document to your colleagues?
21    A.    That is an article -- an abstract
22 by Ong, O-N-G, and it's entitled "The Myth:  In
23 Vivo Degradation of Polypropylene Meshes."
24    Q.    Is that document highlighted?
25    A.    It is.

Page 199

1    Q.    Did you read from those highlights
2 during your examination by defense counsel?
3    A.    I did.
4    Q.    Who highlighted that document?
5    A.    Attorney Rosenblatt.
6    Q.    Is that the attorney representing
7 Ethicon in this case?
8    A.    Yes.
9    (Whereupon, Deposition Exhibit 18,
10    "Purely Transvaginal/Perineal Management of
11    Complications From Commercial Prolapse Kits
12    Using a New Prostheses/Grafts Complication
13    Classification System" by Firooz, et al,
14    was marked for identification.)
15 BY MR. CRAWFORD:
16    Q.    Do you recognize document number --
17 excuse me.
18    Do you recognize the document
19 marked as Exhibit No. 18 to your deposition?
20    A.    Yes.
21    Q.    How would you describe that
22 document to one of your colleagues?
23    A.    This is by first author Firoozi,
24 F-I-R-O-O-Z-I, and it's entitled "Purely
25 Transvaginal/Perineal Management of Complications

Page 200

1 From Commercial Prolapse Kits."
2    Q.    Is that document highlighted?
3    A.    It is.
4    Q.    Did you read from those highlights
5 during your examination by defense counsel?
6    A.    I did.
7    Q.    Who highlighted that document?
8    A.    Attorney Rosenblatt.
9    Q.    Is that the attorney for Ethicon in
10 this case?
11    A.    Yes.
12    (Whereupon, Deposition Exhibit 19,
13    Material Safety Data Sheet for
14    polypropylene, was marked
15    for identification.)
16 BY MR. CRAWFORD:
17    Q.    Do you recognize the document
18 marked as Exhibit No. 19?
19    A.    Yes.
20    Q.    What is that?
21    A.    This is the MSDS for polypropylene.
22    (Whereupon, Deposition Exhibit 20,
23    "Frequently Asked Questions by Providers
24    Mid-urethral Slings for Stress Urinary
25    Incontinence, was marked

Page 201

1 for identification.)
2 BY MR. CRAWFORD:
3    Q.    Okay.  Do you recognize the
4 document marked as Exhibit No. 20 to your
5 deposition?
6    A.    Yes.
7    Q.    Do you recognize that document?
8    A.    Yes.
9    Q.    All right.  How would you describe
10 that document to one of your colleagues?
11    A.    This is the Frequently Asked
12 Questions by Providers regarding midurethral
13 slings that is from AUGS and SUFU, A-U-G-S and
14 S-U-F-U.
15    Q.    Is that document highlighted?
16    A.    Yes.
17    Q.    Did you read from those highlights
18 during your deposition?
19    A.    Yes.
20    Q.    And who highlighted that document?
21    A.    Attorney Rosenblatt.
22    Q.    Is that one of the attorneys
23 representing Ethicon in this case?
24    A.    Yes.
25    Q.    Exhibit Nos. 7 through 20 all

Peter L. Rosenblatt, M.D.

Page 202

1  documents that were highlighted by defense
2  counsel handed to you which you read from in your
3  deposition, are these all materials that were
4  provided to you by Butler Snow, the law firm
5  representing Ethicon in this case, when you were
6  first hired --
7          MR. ROSENBLATT:  Object to form.
8      Q.    -- as an expert witness?
9      A.    I can't tell you how many, but many
10 of those are articles that I had already pulled
11 myself.
12     Q.    Are any of Exhibits No. 7 through
13 20 materials that were provided to you by defense
14 counsel Butler Snow when you were retained or in
15 conjunction with your retainment by them for
16 expert witness testimony in this case?
17         MR. ROSENBLATT:  Objection, asked
18 and answered.
19     A.    I thought I answered that.
20     Q.    One more time.
21     A.    Some of them I've already seen, but
22 those were just handed to me, but I'm familiar
23 with all of those.
24     Q.    So you're telling me that you've
25 seen them before.  I'm asking you were they given

Page 203

1  to you by Butler Snow in the materials that
2  Butler Snow provided to you shortly after you
3  were hired by them as an expert witness in this
4  case?
5          MR. ROSENBLATT:  Object to form.
6  Mischaracterizes the testimony, asked and
7  answered.
8      A.    What I'm trying to say is that, and
9  I can go through each one of them, but many of
10 them I was already familiar with before they were
11 provided to me by Butler Snow.
12     Q.    I understand, but were they all
13 provided to you by Butler Snow regardless of
14 whether you were familiar with them?
15         MR. ROSENBLATT:  Object to form.
16 You mean in addition to him having them himself?
17         MR. CRAWFORD:  Yes, sir.
18     A.    In addition to me having them
19 myself, they were also given to me by Butler
20 Snow.
21     Q.    The copies that were sent to you by
22 Butler Snow, were they highlighted?
23     A.    No.  No documents from Butler Snow
24 were highlighted before they got to me.
25     Q.    Are all of these documents marked

Page 204

1  Exhibits 7 through 20 included in your reliance
2  list?
3      A.    I would have to check, and the
4  reason I say that is -- can I take a look for a
5  minute?
6      Q.    Sure.
7      A.    The one in particular that I
8  believe is not -- that I know is not in my
9  reliance list, at least I don't think so, is the
10 abstract from the IUGA meeting which has taken
11 place yet.  So it was provided recently because
12 the abstracts were recently, you know, published
13 in the International Urogynecology Journal.
14     Q.    One of these articles that's
15 contained in Exhibits No. 7 through 20 was an
16 article I'd asked you for during my examination
17 of you, and you said that you'd check on one of
18 the breaks and you'd get it for me and bring it
19 to me, correct?
20     A.    Correct.
21     Q.    We came back from break and you
22 provided it, correct?
23     A.    Yes.
24     Q.    Did you find it yourself or did
25 defense counsel find it for you?

Page 205

1      A.    Defense counsel found it 'cause I
2  couldn't find it in my own, but I know it's
3  there.  It's in one of these banker's boxes.
4      Q.    And then he highlighted it for you,
5  right?
6      A.    Yes, I think to save time.
7          MR. ROSENBLATT:  Object to form.
8  That was the only copy.  For efficiency sake, I
9  printed one copy.
10     Q.    You testified that you reviewed and
11 considered materials that are cited in
12 Dr. Rosenzweig's report, correct?
13     A.    Yes.
14     Q.    Do you know which ones?
15         MR. ROSENBLATT:  Object to form.
16     A.    No, it's been quite a while.  I'd
17 have to go back and look at it.
18     Q.    If you look at it, can you tell us?
19     A.    Is this it?
20     Q.    That's a good question.  This one
21 is it.
22     A.    Okay.  Thank you.  Ask me what the
23 question was again.
24     Q.    Well, you've indicated that you've
25 reviewed materials that were attached to

Peter L. Rosenblatt, M.D.

Page 206

1  Dr. Rosenzweig's report, and I want to know which
2  of those materials that are attached to
3  Dr. Rosenzweig's report have you reviewed?
4      A.    Not exclusively, but I'm just
5  telling you which ones I recognize that I've
6  reviewed.  Clavé, which we talked about, that
7  polypropylene as a reinforcement in pelvic
8  surgery is not inert.  I believe that the Coda,
9  C-O-D-A, article.  I believe that's in my
10  reliance report.  There are others as well.  I
11  would have to do the cross-reference to see if
12  they are in my reliance report, but I'm aware of
13  these articles.
14     Q.    Well, I know that -- is there a
15  difference between being aware of the articles
16  and reviewing the articles?
17     A.    No, I have.  I have reviewed.  I
18  can't say that I reviewed 100 percent of these,
19  but ones I thought were important I looked at.
20         I know I've seen articles by
21  K-L-I-N-G-E, Kling or Klingy.  I don't know which
22  one of these I've looked at, but I have seen
23  those articles.
24     Q.    I know it's late.  I know we've
25  been on for a long time.

Page 207

1      A.    No, I'm okay.  Thank you.
2      Q.    And I promise I'm not picking on
3  you.  And I'll be completely candid with you, I
4  expect to hear something to the tune of
5  Dr. Rosenzweig not only reviewed all the
6  materials in his report but he also, in
7  criticizing Dr. Rosenzweig, has reviewed all of
8  the stuff Dr. Rosenzweig has reviewed.  And if
9  that's not true, I need to know, and that's why I
10  need to know what you've -- what is attached to
11  Dr. Rosenzweig's report that you've reviewed.
12     A.    So I think, in my mind, the
13  important thing is I've reviewed Dr. Rosenzweig's
14  report.  He references those other reports.  Have
15  I read every one of those other reports,
16  absolutely not, but I know what's contained.
17  What he's doing is summarizing what's in those
18  reports in his report.  And I would not expect
19  him to fabricate anything, so I take it at face
20  value his opinions are based on those reports.
21     Q.    That will do.  We'll move on.
22  Thank you.
23         Ethicon approached you to teach
24  students or other doctors about Ethicon products,
25  correct?

Page 208

1      A.    Correct.
2      Q.    You have also been approached by
3  other medical device manufacturers and asked to
4  teach about their products, correct?
5      A.    I have been, yes.
6      Q.    And there's other products that are
7  manufactured by other manufacturers that you
8  either didn't believe in or weren't compelled to
9  teach because either you don't use them or you
10  just aren't that crazy about the product; is that
11  fair to say?
12     A.    Well, if I'm not crazy about a
13  product, I won't use it.
14     Q.    And you won't teach it?
15     A.    And I won't teach it.
16     Q.    What manufacturers have approached
17  you about -- asking you to teach about their
18  products that you've declined?
19     A.    Caldera, for instance.
20     Q.    What device?
21     A.    Their slings.
22     Q.    Okay.
23     A.    Mentor approached me years ago
24  about ObTape which I was not pleased with.
25     Q.    And who was that?  I'm sorry.

Page 209

1      A.    Mentor, M-E-N-T-O-R.  I've been
2  asked about teaching for AMS when they had
3  Elevate, and I declined.  Those are the ones that
4  come to mind.
5      Q.    Why did you decline Caldera's offer
6  to teach others how to use their slings?
7      A.    Only in that I wasn't using their
8  slings, and there was nothing particularly wrong
9  with their sling, but I wasn't using it.
10     Q.    Why did you decline Mentor's
11  request to teach others how to use their tape?
12     A.    I did not like the characteristics,
13  the physical characteristics, of their tape.
14     Q.    What about it did you not like?
15     A.    It was a multifilament microporous
16  tape that didn't have the characteristics of a
17  Type 1 polypropylene monofilament that we talked
18  about earlier.
19     Q.    Did the microporous nature of the
20  tape turn you off for lack of a better term?
21     A.    Yes.
22     Q.    Why?
23     A.    Because of the risk of infection
24  and lack of incorporation into the tissues.
25     Q.    Anything else about the Mentor tape

Peter L. Rosenblatt, M.D.

Page 210

1 that you didn't like?
2     A.    There were already reports of
3 exposures and erosions, and I didn't feel like it
4 was something that I wanted to get involved in.
5     Q.    Why did you decline AMS's request
6 to teach others how to use their Elevate®
7 product?
8     A.    No other reason than that I was
9 using a comparable product from Boston Scientific
10 at that point and was very pleased with the way
11 it worked on, and I just wasn't -- I had tried
12 the Elevate® product a couple times, and I
13 thought it was fine, but I just wasn't using it,
14 and I didn't think it was right to teach
15 something I wasn't using.
16     Q.    Regarding teaching other doctors
17 how to use Ethicon products, you testified that
18 while you were doing it for the love of
19 teaching -- strike it.
20         Regarding teaching other doctors
21 how to use Ethicon products, you've testified
22 that you were doing that for the love of
23 teaching, not for the money, true?
24     A.    I could make just as much from my
25 practice by staying, you know, at home and seeing

Page 211

1 patients and doing surgery, that's correct.
2     Q.    You testified that you were doing
3 it for the love of the product, not the money.
4 Is that true?
5         MR. ROSENBLATT:  Object to form.
6 Asked and answered.
7     A.    Right.  I think I actually said for
8 the love of teaching and teaching products that I
9 was using.
10     Q.    Nevertheless, Ethicon paid you?
11     A.    They compensated me.
12     Q.    How much were you compensated by
13 Ethicon for teaching others how to use their
14 products?
15     A.    I don't remember, but it was in
16 line with what everyone else was getting.  As far
17 as I knew, it was fair market value for teaching.
18     Q.    What was everybody else getting?
19     A.    You know, I don't remember 'cause
20 it was over a span of many years, but there were
21 consulting agreements that spelled out what I was
22 making.
23     Q.    How many different consulting
24 agreements have you entered into with Ethicon
25 concerning teaching their products?

Page 212

1     A.    I don't know.
2     Q.    More than five?
3     A.    Well, I think it -- I think it had
4 a term on it of maybe a year or maybe two years,
5 and so when that was up, I was sent a new
6 consulting agreement.
7     Q.    And for how many years?
8     A.    I'm going to guess it started
9 around the year 2000, and I do not remember the
10 last year that I signed a consulting agreement,
11 but it's got to be at least five years ago.
12     Q.    Five years ago from today would be
13 2011, correct?
14     A.    Yeah, but that's a rough estimate.
15 I really don't know.
16     Q.    I totally understand we're dealing
17 with a rough estimate --
18     A.    Yeah.
19     Q.    -- but if you started around 2000
20 and ended in 2011, you were under consulting
21 agreements with Ethicon for approximately 11
22 years.
23     A.    I think that's about right.
24     Q.    And I'll rephrase the question.
25         For approximately 11 years from

Page 213

1 about year 2000 to around 2011 you were under
2 consulting agreements with Ethicon concerning
3 teaching others how to use their products?
4     A.    Correct.
5     Q.    But as you sit here today under
6 oath as an expert witness in this case involving
7 Ethicon, you cannot recall the compensation rate
8 for any of the consulting agreements you entered
9 into with Ethicon between the year 2000 and 2011?
10         MR. CRAWFORD:  Object to form.
11 Asked and answered.
12     A.    So I would be guessing which I
13 don't want to do but if -- and I'd be happy if --
14 if my counsel wants me to guess, I'd be happy to
15 guess.
16         MR. ROSENBLATT:  I'd prefer if you
17 did not guess.
18     Q.    I'd prefer for you to estimate,
19 kind of like you estimated that your last
20 consulting agreement with Ethicon was about five
21 years ago.  Estimate for me about how much were
22 the consulting agreements?
23         MR. CRAWFORD:  Object to form.
24 Asked and answered, asking the witness to
25 speculate.  If you can provide a reliable

Peter L. Rosenblatt, M.D.

Page 214

1  estimate, you can do so.
2      A.    My best guess would be that a day
3  of consulting was probably $2,000 dollars to
4  $2,500.
5      Q.    Did that remain the same from 2000
6  to 2011?
7      A.    I don't remember.
8      Q.    How many days a month were you
9  consulting for Ethicon?
10         MR. ROSENBLATT: Object to form.
11     A.    I really do not remember.
12     Q.    Do you have an estimate?
13     A.    It was -- I don't even think it was
14  number of days per month. It was probably number
15  of days per year. You know, maybe there were six
16  courses, maybe there were ten.
17     Q.    How many days would a course last?
18     A.    I think it varied, but it was never
19  more than two. It was usually one.
20     Q.    One to two days each course?
21     A.    Correct.
22     Q.    Again, we're using estimates here.
23     A.    Yeah.
24     Q.    And to summarize, you were involved
25  in consulting agreements with Ethicon for

Page 215

1  approximately 11 years from 2000 to 2011,
2  correct?
3      A.    Correct.
4      Q.    You're estimating you were
5  compensated approximately $2,000 per day for each
6  day of consulting, correct?
7      A.    I think I said between 2,000 and
8  2,500.
9      Q.    You would teach approximately six
10  to ten courses per year --
11         MR. ROSENBLATT: I object to form.
12     Q.    -- is that right?
13         MR. ROSENBLATT: Assumes facts not
14  in evidence.
15     A.    Yeah, I wish I could be more
16  precise. It may have been less, and it may have
17  been more, and it varied per year.
18     Q.    That's why you're estimating a
19  range which is approximately six to ten courses
20  per year; is that right?
21     A.    Yeah, the best I can recall, yes.
22     Q.    Each course would last between one
23  to two days but no more than two days?
24     A.    Correct.
25     Q.    Did you keep any of those

Page 216

1  consulting agreements?
2      A.    I believe -- I probably have kept
3  the last one. I may have others.
4      Q.    If you were going to retain an
5  Ethicon consulting agreement, where would you
6  keep it?
7         MR. ROSENBLATT: Object to form.
8  Counsel, I think those would have all been
9  produced in the general Ethicon production.
10     Q.    Would they be at your office?
11     A.    They'd either be in my office or in
12  my home.
13     Q.    How much do you charge per day to
14  testify for Ethicon?
15     A.    I think it's listed in my report.
16  So it's $9,000 a day and a day is considered any
17  more than three hours which includes traveling
18  time.
19     Q.    Your deposition was scheduled to
20  start today at 9 a.m., correct?
21     A.    Correct.
22     Q.    And we got started at about that
23  time, right?
24     A.    (Witness nods.)
25     Q.    Right?

Page 217

1      A.    Correct.
2      Q.    And it's 3 o'clock now, correct?
3      A.    Correct.
4      Q.    So you're in excess of the three
5  hour minimum, right?
6      A.    Correct.
7      Q.    So we're in the $9,000 range today,
8  correct?
9      A.    Correct.
10     Q.    You expect to be compensated $9,000
11  for your testimony at this deposition today --
12     A.    Correct.
13     Q.    -- which is taking place at the
14  Courtyard by Marriott located at 777 Memorial
15  Drive in Cambridge, Massachusetts?
16     A.    Correct.
17     Q.    Did you also charge for review of
18  materials in preparation for this deposition?
19     A.    I haven't yet but yes.
20     Q.    How long did you spend reviewing
21  materials for this deposition that you'll charge
22  for?
23         MR. ROSENBLATT: I was just going
24  to say to the best of your recollection.
25     A.    Yeah, I don't have it in front of

Peter L. Rosenblatt, M.D.

Page 218

1  me, but if I had to guess, my best estimate would
2  probably be in the, you know, 20-hour range.
3      Q.    How much do you charge for
4  reviewing documents in preparation for this
5  deposition?
6      A.    $800 an hour.
7      Q.    Did you charge for your meeting
8  with defense counsel prior to walking into the
9  deposition this morning?
10      A.    You mean this morning?
11      Q.    Yes, sir.
12      A.    No, that's part of the $9,000 per
13  day.
14      Q.    Did you come from out of town
15  today?
16      A.    I live about 20 minutes from here.
17      Q.    See, I couldn't remember.  So
18  that's a no.  You didn't stay at the Courtyard
19  last night, did you?
20      A.    It's a different town.  It's out of
21  town.
22      Q.    Is it far enough to get a per diem
23  payment?
24      A.    No.
25      Q.    So if you've got $9,000 for your

Page 219

1  deposition time today plus $800 per year for 20
2  hours of depo prep time, that would be $16,000.
3          $800 per hour for 20 hours is
4  $16,000 charged for your records review in
5  preparation for this deposition.
6      A.    Correct.
7      Q.    Plus there's $9,000 for the actual
8  deposition time, correct?
9      A.    Correct.
10      Q.    So that's a $25,000 charge for the
11  work you've done in preparation for this
12  deposition today?
13      A.    Correct.
14      Q.    This deposition lasted
15  approximately six hours?
16      A.    If you do the math, I believe you.
17      Q.    Well, we're not quite done, but
18  let's say from -- if we started at 9 a.m. and we
19  end right now at approximately 3 p.m., that would
20  be approximately six hours, correct?
21      A.    Yes.
22      Q.    Your report that's been marked as
23  an exhibit to your deposition today, that's your
24  general causation report, correct?
25      A.    Yes.

Page 220

1      Q.    When you submitted that report to
2  Butler Snow, it was in a different font than what
3  it's in right now; is that right?
4      A.    Yeah, when I say different font, I
5  think it might have been just -- again, I think
6  it was the line spacing.  That's why I just
7  wanted to make sure it was mine that you were
8  handing me.
9      Q.    Do you know who modified that
10  report between the time you submitted it to
11  Butler Snow and today?
12      A.    When you say "modified," it was
13  just a change in the format.  There's no changes
14  in the language or the words.  And do I know who
15  did that --
16      Q.    Yes, sir.
17      A.    -- no, I don't.
18          MR. ROSENBLATT:  Counsel, I'll
19  represent that I double spaced his report, and I
20  put the cover page on there with the case heading
21  because I don't think Dr. Rosenblatt really knew
22  how to format that first page.
23          MR. CRAWFORD:  Thank you, Paul.
24          One of the exhibits to your
25  deposition is a document related to AUGS; is that

Page 221

1  correct.
2      A.    The one that we just read a little
3  while ago?
4      Q.    Yes, sir.
5      A.    Yes.
6      Q.    In fact, it's Exhibit No. 20 to
7  your deposition, correct?
8      A.    Yes.
9      Q.    What is AUGS?
10      A.    AUGS is the American Urogynecologic
11  Society.
12      Q.    In 2013, AUGS released a position
13  statement on surgical options for pelvic floor
14  disorders; is that right?
15      A.    Yes.
16      Q.    Can you summarize what AUGS said in
17  2013 as it relates to surgical options for pelvic
18  floor disorders?
19      A.    I mean, there have been several
20  position statements that AUGS has released, and I
21  think the one you're referring to is -- well,
22  there are several.  There was one that had to do
23  with midurethral slings for stress incontinence,
24  and the other one that I recall is the one that
25  had to do with limiting, you know, limiting

Peter L. Rosenblatt, M.D.

Page 222

1 options for pelvic floor reconstruction.
2    Q.    What is your understanding as far
3 as AUGS position on transvaginal mesh used for
4 midurethral slings?
5    A.    Right.  So what the position
6 statement was saying for that was that, you know,
7 slings have become the gold standard, that
8 they've been used in millions of women with great
9 success and that it was not the intention of the
10 FDA to limit the use of suburethral slings and
11 that it was a very important procedure for stress
12 incontinence.
13    Q.    Is it fair to say that AUGS
14 advocates the use of transvaginal mesh for --
15         MR. ROSENBLATT:  Object to form.
16    Q.    -- stress urinary incontinence
17 repairs?
18         MR. ROSENBLATT:  Object to form.
19    A.    Yeah, I'm not sure I'd use the word
20 advocates.  I don't mean to be splitting hairs,
21 but it is a very important device that the
22 overwhelming majority of AUGS members which
23 represent the primary surgeons in the country
24 from a, you know, urogynecologic standpoint who
25 take care of women who have stress incontinence,

Page 223

1 and it's used by over I think it's 95 percent of
2 AUGS members, and that there should be no
3 limiting of that by any, you know, government
4 body.
5    Q.    What's required to gain membership
6 in that organization?
7    A.    Presently paying dues.
8    Q.    How much are the dues?
9    A.    I really don't remember.  It's a
10 couple hundred dollars a year.
11    Q.    Is there a board of directors for
12 AUGS?
13    A.    There is.
14    Q.    What does it take to get on the
15 board of directors?
16    A.    It just quoted you.  How does that
17 happen?
18    Q.    I don't know.
19         MR. ROSENBLATT:  We'll get Siri to
20 testify.
21    A.    I'm sorry, what were you saying?
22    Q.    How do you get on the board of
23 directors for AUGS?
24         MR. ROSENBLATT:  Object to form.
25    A.    It is usually an elected position.

Page 224

1    Q.    Who elects you?  Who elects the
2 board members?
3    A.    I think names are brought up that
4 are nominated, and then the society itself will
5 vote on the board members.
6    Q.    You've been on the board of
7 directors for AUGS?
8    A.    Yes.
9    Q.    What years did you serve on the
10 AUGS board of directors?
11    A.    Do you have my CV?  I believe it
12 was -- 2012 to 2014, I believe.  In that time
13 frame.
14    Q.    So you were on the AUGS board of
15 directors when the 2013 position statement was
16 issued, correct?
17    A.    I was, but I was not part of that.
18 I completely support it, but I was not part of
19 drafting that.  I think it was drafted right
20 before I came on to the board.
21    Q.    Did you have any involvement in the
22 editorial process concerning that position
23 statement in 2013?
24    A.    No.
25    Q.    Did you vote on it, whether it

Page 225

1 should be issued by AUGS?
2    A.    No, I think it was right before I
3 came on the board, I believe.  I did not vote on
4 that, but I would have voted for it.
5    Q.    Do you agree with the notion that
6 when trying to determine the credibility of a
7 statement one should consider the relationship
8 between the one making the statement and the one
9 benefitting from the statement?
10         MR. ROSENBLATT:  Object to form.
11    A.    Can you say that again?
12    Q.    Yes.  Do you agree with the notion
13 when trying to determine the credibility of a
14 statement one should consider the relationship
15 between the one making the statement and the one
16 benefitting from the statement?
17         MR. ROSENBLATT:  Object to form.
18    A.    Yeah, I think it's kind of a vague
19 statement, but if you gave me a more specific
20 example or maybe how it relates to what we're
21 talking about, I'd be happy to answer that.
22    Q.    Do you agree that whether or not
23 AUGS board members are receiving direct financial
24 benefits from mesh manufacturers is a factor to
25 consider when trying to determine the credibility

Peter L. Rosenblatt, M.D.

Page 226

1  of an AUGS position statement?
2  MR. ROSENBLATT: Object to form.
3  Lack of foundation.
4  A.  I'll just say that I know the
5  members of the board. I know the members of the
6  board when this position statement came out, and
7  I completely believe in their integrity and their
8  motivation, and their motivation and their only
9  motivation is to protect their patients, and I do
10 not believe that there was any influence and
11 financial compensation when they came out with
12 the position statement.
13 MR. CRAWFORD: I'll object as
14 non-responsive and move to strike.
15 My question is a little bit more
16 narrow and tailored. I'll ask it again.
17 Do you agree that whether or not
18 AUGS board members are receiving direct financial
19 benefits from a mesh manufacturer is a factor to
20 consider in determining the credibility of an
21 AUGS position statement about the use of mesh?
22 MR. ROSENBLATT: Object to form,
23 asked and answered.
24 A.  So I'm going to say it again,
25 that -- by the way, there are some board members,

Page 227

1  including the president, the -- I assume it's
2  called the vice president or the president elect.
3  No. Whoever the next in line is. There are
4  several of the executive board who are not
5  permitted to have any potential conflicts of
6  interest.
7  There are others on the board,
8  myself included at the time, but not during the
9  position statement but while I was on the board,
10 that were permitted to have potential conflicts
11 of interest, but we had to declare those
12 potential conflicts of interest. So as long as
13 you declare those potential conflicts of interest
14 and you have integrity as a person and a
15 physician, then I have no problem with what the
16 position statement would say.
17 MR. CRAWFORD: I object as
18 non-responsive and move to strike.
19 Can you answer the question I just
20 asked you with a yes-or-no answer or is that
21 impossible?
22 A.  I think it's impossible.
23 Q.  Okay. Have you ever been involved
24 in a program whereby you were paid by a synthetic
25 mesh manufacturer to mentor other doctors or

Page 228

1  promote synthetic mesh products?
2  MR. ROSENBLATT: I object to the
3  characterization.
4  A.  I've taught at professional
5  education courses, you know, under the support of
6  medical device manufacturers.
7  Q.  Have you ever been part of Boston
8  Scientific's Healthcare Professional or also
9  known as HCP program?
10 A.  If that's what it's called. I
11 guess maybe I am not familiar with that term, but
12 I have taught for Boston Scientific, yes.
13 Q.  As you sit here today, you don't
14 know whether or not you've ever been involved in
15 the Boston Scientific Corporation Healthcare
16 Professional Program?
17 A.  I don't think I've ever heard it
18 referred to as that, but if that's what I've been
19 a part of, then I think the answer is yes. I
20 don't deny it. I just don't know what it's
21 called.
22 Q.  In 2009, did you receive a
23 quarterly payment of $10,000 each quarter from a
24 synthetic mesh manufacturer for participation in
25 a program where you would mentor other doctors or

Page 229

1  promote synthetic mesh products?
2  MR. ROSENBLATT: Object to the
3  form, the characterization of promote.
4  A.  Right, but I'm also asking you are
5  you suggesting that I was paid $10,000 regardless
6  of what I taught?
7  Q.  No, I have no idea what you were
8  teaching. I'm just exploring this issue.
9  A.  Understood. So I don't recall that
10 particular year, but any time I've done any
11 teaching for any mesh manufacturer I've been paid
12 for my services. I have never been paid like
13 a -- what's the word I'm looking for. Like a
14 retainer. I've never been paid as a retainer.
15 I've been paid for my services.
16 Q.  Have you ever received set
17 quarterly payments?
18 A.  No, never.
19 Q.  Is it true that during the years
20 2011 and 2012, that being the years leading up to
21 the release of the 2013 AUGS position statement,
22 you were paid approximately $100,000 by Boston
23 Scientific Corporation for participation in their
24 Healthcare Professionals Program?
25 A.  I don't have the exact figures, but

Peter L. Rosenblatt, M.D.

Page 230

1  that is possible, but I think -- did you say
2  leading up to the position statement?
3      Q.    I said in 2011, 2012.  I'll ask it
4  again.
5      A.    Yeah, please.
6      Q.    Is it true that during the years
7  2011 and 2012 you were paid approximately
8  $100,000 by Boston Scientific Corporation for
9  participation in their Healthcare Professionals
10 Program?
11     A.    If that's what it's called.  I did
12 consulting work for Boston Scientific, and it's
13 quite possible that that was the amount of money
14 that I was paid.
15     Q.    You're just not sure if it was
16 called the Healthcare Professionals Program?
17         MR. ROSENBLATT:  Object to form.
18     A.    Correct.
19     Q.    Of the 13 board members who were on
20 the AUGS board when the 2013 position statement
21 was released, how many of them had received
22 financial compensation from synthetic mesh
23 manufacturers during the two years preceding the
24 release of the statement?
25     A.    I have no idea.

Page 231

1      Q.    Being a former AUGS board member,
2  is that information you would expect to be kept
3  in the regular course of business activity within
4  the AUGS organization?
5      A.    So I guess I missed that point.
6  Being an AUGS member, what was the question?
7      Q.    Being a former AUGS board member,
8  do you believe that the information I just asked
9  you about is information that would be kept in
10 the regular course of business activity within
11 the AUGS organization?
12     A.    Yes.
13         MR. ROSENBLATT:  Object to form.
14     A.    But let me just state that again
15 there is I believe it's called the executive
16 board that are not permitted to have any
17 potential conflicts of interest, but any
18 conflicts of interest, potential conflicts of
19 interest of the other board members is declared
20 and is publicly available.
21     Q.    How is it declared and where is it
22 made publicly available?
23     A.    I don't know.  All I know is that
24 at every board meeting we were required to list
25 any potential conflicts of interest, and if we

Page 232

1  had a potential conflict of interest that would
2  affect any decisions, we were asked to abstain
3  from those decisions.
4      Q.    Doctor, I appreciate your patience
5  with me in coming out here to talk to us today.
6  At this point in time I don't have any further
7  questions for you.  I pass the witness.
8         MR. ROSENBLATT:  I'll be very, very
9  brief.
10
11         FURTHER EXAMINATION
12 BY MR. ROSENBLATT:
13     Q.    Doctor, we were just talking about
14 AUGS position statement.  I want to hand you --
15 what are we on?
16         MR. CRAWFORD:  21, I think.
17     (Whereupon, Deposition Exhibit 21,
18     AUGS position statement,
19     was marked for identification.)
20 BY MR. ROSENBLATT:
21     Q.    I'm going to hand you what's been
22 marked as Exhibit 21.  If you could take a second
23 and flip through that.
24     A.    Mm-hmm.
25     Q.    Now, Doctor, do you see any

Page 233

1  highlighting on this document?
2      A.    No, I do not.
3      Q.    Good.  I will represent to you this
4  is my only copy, but to spare counsel another set
5  of questioning, I will not highlight anything.
6         Was this position statement
7  initially published in January of 2014 and then
8  updated in June of 2016?
9         MR. CRAWFORD:  Objection to form.
10     A.    It was.
11     Q.    And was this position statement
12 limited to the support of AUGS?
13     A.    No.
14     Q.    And if you could just describe the
15 organizations that joined in showing their
16 support for the AUGS/SUFU position statement?
17     A.    Right.  And just so I know is this
18 the one from 2000 -- this is the one from 2016?
19     Q.    Correct.
20     A.    Yeah.  So there were other
21 organizations that supported this, including the
22 AAGL, the American Association of Gynecologic
23 Laparoscopists, the American College of
24 Obstetrics and Gynecologists, the National
25 Association for Continence, and the Society of

Peter L. Rosenblatt, M.D.

Page 234

1 Gynecologic Surgeons, as well as the Women's
2 Health Foundation.
3      Q.   So, Doctor, it would be fair to say
4 that the support for the AUGS/SUFU position
5 statement on midurethral slings is not limited to
6 professional societies but also patient support
7 groups such as the NAFC and the WHF?
8           MR. CRAWFORD:  Objection to form.
9      A.   That is correct.
10      Q.   And, Doctor, is this position
11 statement something that you would have received
12 on your own?  Strike that.
13      Doctor, is this position statement
14 something that you were made aware of directly
15 through AUGS?
16      A.   Yes.
17      Q.   Is this also something that was
18 provided to you by Butler Snow?
19      A.   Yes.
20      Q.   And so although it was provided to
21 you from Butler Snow, that was not in fact the
22 first time you had seen that document?
23      A.   That is correct.
24      Q.   And the same would be true for a
25 significant amount of medical literature that

Page 235

1 we've discussed?
2      A.   That is correct.
3      Q.   And counsel asked you about some of
4 the studies that we looked at earlier where we
5 quickly went through and there was some
6 highlighting on those studies.  Do you remember
7 those?
8      A.   Yes.
9      Q.   Had you reviewed those studies
10 prior to today's deposition?
11      A.   Yes.
12      Q.   And when counsel suggested that you
13 were just reading the highlights, would it be
14 fair to say that -- well, strike that.
15      Would it be fair to say that
16 counsel asked you to provide some of the
17 documents and literature that you had discussed
18 with him earlier today?
19      A.   Can you ask that again?
20      Q.   Would it be fair to say that you
21 provided literature in response to some of the
22 questions that counsel asked today?
23      A.   Yes.
24      Q.   And you in fact asked me to print
25 out some of those studies so that we could move

Page 236

1 things along today since counsel asked you to
2 find those during a break; is that correct?
3           MR. CRAWFORD:  Objection to form.
4      A.   That is correct.  I mean, we have,
5 you know, one, two, three, four, I believe it's
6 five, yeah, banker's boxes of documents, and just
7 to expedite things, I asked you to print these
8 out.  But these are articles that are in here
9 that I've highlighted either here or on my
10 computer.
11      Q.   And counsel asked you questions
12 about your experience teaching for various
13 manufacturers.  Do you recall those questions?
14      A.   Yes.
15      Q.   And in his questions, he used the
16 word promote their products.  What is your
17 interpretation of whether or not you were or
18 strike that.
19      What is your understanding of
20 whether or not you were promoting products for
21 these manufacturers?
22           MR. CRAWFORD:  Objection, form.
23      A.   Yeah, so that's never been my goal,
24 is to promote a product for a company.  My goal
25 is to share my experience with others.  And you

Page 237

1 know, just to give you an example, when TVT came
2 out, you know, and I was first very skeptical of
3 it, and then when I started using it, I realized
4 what an incredible advantage it was compared to
5 what I had been using previously.  The same was
6 true with TVT-O when that came out.  But, you
7 know, just to give another example with the same
8 company, I think it was 2006 is when Ethicon
9 introduced TVT Secur which is a single incision
10 sling, and I wasn't so sure about it.  The data
11 was not as compelling as it had been for the
12 other slings, and my center did a randomized
13 prospective trial comparing TVT-O, which is
14 something that we had been using for several
15 years and very happy with, with TVT Secur.  This
16 was a study that was funded by Ethicon, and we
17 decided even before we started the study that we
18 would do an interim analysis, and based on the
19 interim analysis, we felt compelled to stop the
20 study because the results were so significantly
21 different between TVT-O and TVT Secur where we
22 were not satisfied with the results, and we
23 published those results.
24           MR. CRAWFORD:  Objection.
25 Non-responsive.

Peter L. Rosenblatt, M.D.

Page 238

1  Q.  Did Ethicon try to prohibit you
2  from publishing the results of that study in any
3  way?
4  A.  No, never.
5  Q.  Did Ethicon try to retract the
6  funding from that statement because of the data
7  that you presented?
8  A.  No, that was never ever even a
9  question, and it was based on I believe our study
10  and several other studies that were similar
11  studies that Ethicon decided not to -- decided
12  not to sell that product anymore.
13  Q.  And would that be an example of how
14  a product with less mesh such as TVT Secur is not
15  necessarily a better product than something that
16  uses -- than a product that has more mesh such as
17  TVT-O just based on the amount of mesh that's
18  used?
19  MR. CRAWFORD:  Objection to form.
20  A.  That is correct.
21  Q.  And you were asked some questions
22  about consulting agreements with Ethicon.  Do you
23  recall those questions?
24  A.  Yes.
25  Q.  The consulting agreements to my

Page 239

1  understanding would list a maximum amount; is
2  that consistent with your understanding?
3  MR. CRAWFORD:  Objection to form.
4  A.  Yeah, I do remember that.
5  Q.  So would it be fair to say that the
6  amount listed on the consulting agreement is not
7  necessarily an accurate portrayal of what you
8  were actually paid for any given year?
9  A.  That is correct.
10  Q.  You were asked some questions about
11  how much you're being paid here today and how
12  much you've been paid over the time you were
13  teaching Ethicon professional education.
14  Do you think that payments you've
15  received from industry for teaching on the safe
16  and efficacious use of products has in any way
17  inhibited your ability to provide a fair and
18  balanced review of the medical literature
19  regarding the products at issue?
20  MR. CRAWFORD:  Objection to form.
21  A.  So, you know, since I started in
22  practice 21 years ago, I've always been
23  committed.  My primary interest is helping women
24  and teaching surgeons.  I mean, that's what I've
25  been dedicated to being at Harvard, having

Page 240

1  medical students, residents and fellows.  We
2  started the fellowship in 1999.  This is what I'm
3  dedicated to in my career.  I would only teach
4  products that I felt that were worthy of being
5  taught and that were excellent products, but my
6  teaching is based on the medical literature, it's
7  based on evidence-based medicine, and I'm very
8  comfortable with that.
9  Q.  And so the fact that Dr. Rosenzweig
10  has testified that he has been paid by
11  plaintiffs' counsel more than a million dollars
12  in the pelvic mesh litigation, that alone would
13  not in itself in your opinion automatically
14  discount his opinions solely based on the
15  millions of dollars he's been paid by plaintiffs'
16  counsel --
17  MR. CRAWFORD:  Objection to form.
18  Q.  -- is that fair?
19  A.  I think it's a fair statement.
20  Q.  All right.  Would you agree or
21  disagree that there is a difference between
22  actual bias and a potential for a conflict of
23  interest?
24  A.  Yes.
25  Q.  You would agree?

Page 241

1  A.  I would agree.
2  Q.  I appreciate your time, Doctor.  No
3  further questions.
4  MR. CRAWFORD:  I have nothing
5  further.  Thank you very much.
6  (Deposition concluded at 3:37 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Peter L. Rosenblatt, M.D.

Page 242

```
 1        C E R T I F I C A T E
 2       I, Maryellen Coughlin, RPR/CRR and
 3   notary public in the Commonwealth of
 4   Massachusetts, do hereby certify that the
 5   foregoing is a true and accurate transcript of
 6   my stenographic notes of the deposition of
 7   PETER L. ROSENBLATT, M.D., who appeared before
 8   me, satisfactorily identified himself, and was
 9   by me duly sworn, taken at the place and on the
10   date hereinbefore set forth.
11       I further certify that I am neither
12   attorney nor counsel for, nor related to or
13   employed by any of the parties to the action in
14   which this deposition was taken, and further
15   that I am not a relative or employee of any
16   attorney or counsel employed in this case, nor
17   am I financially interested in this action.
18       THE FOREGOING CERTIFICATION OF THIS
19   TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF
20   THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT
21   CONTROL AND/OR DIRECTION OF THE CERTIFYING
22   REPORTER.
23
24       MARYELLEN COUGHLIN, RPR/CRR
25
```

Page 243

```
 1       INSTRUCTIONS TO WITNESS
 2
 3
 4       Please read your deposition over
 5   carefully and make any necessary corrections.
 6   You should state the reason in the appropriate
 7   space on the errata sheet for any corrections
 8   that are made.
 9       After doing so, please sign the
10   errata sheet and date it.  It will be attached to
11   your deposition.
12       It is imperative that you return
13   the original errata sheet to the deposing
14   attorney with thirty (30) days of receipt of the
15   deposition transcript by you.  If you fail to do
16   so, the deposition transcript may be deemed to be
17   accurate and may be used in court.
18
19
20
21
22
23
24
25
```

Page 244

```
 1       - - - - - -
         E R R A T A
 2       - - - - - -
 3
 4   PAGE  LINE  CHANGE
 5   ____  ____  _____
 6     REASON: _____
 7   ____  ____  _____
 8     REASON: _____
 9   ____  ____  _____
10     REASON: _____
11   ____  ____  _____
12     REASON: _____
13   ____  ____  _____
14     REASON: _____
15   ____  ____  _____
16     REASON: _____
17   ____  ____  _____
18     REASON: _____
19   ____  ____  _____
20     REASON: _____
21   ____  ____  _____
22     REASON: _____
23   ____  ____  _____
24     REASON: _____
25
```

Page 245

```
 1
 2       ACKNOWLEDGMENT OF DEPONENT
 3
 4       I,_____, do
 5   hereby certify that I have read the
 6   foregoing pages, and that the same is
 7   a correct transcription of the answers
 8   given by me to the questions therein
 9   propounded, except for the corrections or
10   changes in form or substance, if any,
11   noted in the attached Errata Sheet.
12
13
14   _____
15   PETER L. ROSENBLATT, M.D.       DATE
16
17
18   Subscribed and sworn
     to before me this
19   _____ day of _____, 20____.
20   My commission expires:_____
21
22   _____
     Notary Public
23
24
25
```

Peter L. Rosenblatt, M.D.

Page 246

| | LAWYER'S NOTES |
|---|---|

1
2 PAGE LINE
3 \_\_\_\_ \_\_\_\_ _____
4 \_\_\_\_ \_\_\_\_ _____
5 \_\_\_\_ \_\_\_\_ _____
6 \_\_\_\_ \_\_\_\_ _____
7 \_\_\_\_ \_\_\_\_ _____
8 \_\_\_\_ \_\_\_\_ _____
9 \_\_\_\_ \_\_\_\_ _____
10 \_\_\_\_ \_\_\_\_ _____
11 \_\_\_\_ \_\_\_\_ _____
12 \_\_\_\_ \_\_\_\_ _____
13 \_\_\_\_ \_\_\_\_ _____
14 \_\_\_\_ \_\_\_\_ _____
15 \_\_\_\_ \_\_\_\_ _____
16 \_\_\_\_ \_\_\_\_ _____
17 \_\_\_\_ \_\_\_\_ _____
18 \_\_\_\_ \_\_\_\_ _____
19 \_\_\_\_ \_\_\_\_ _____
20 \_\_\_\_ \_\_\_\_ _____
21 \_\_\_\_ \_\_\_\_ _____
22 \_\_\_\_ \_\_\_\_ _____
23 \_\_\_\_ \_\_\_\_ _____
24 \_\_\_\_ \_\_\_\_ _____
25 \_\_\_\_ \_\_\_\_ _____