# EXHIBIT 4

Salil Khandwala, M.D.

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON

Master File No. 2:12-MD-02327

IN RE:  ETHICON, INC., PELVIC

REPAIR SYSTEM PRODUCTS                  MDL 2327

LIABILITY LITIGATION                JOSEPH R. GOODWIN

U.S. DISTRICT JUDGE

_____

Nancy Smallwood, et al. v. Ethicon, Inc., et al.

Civil Action No. 2:12-cv-01662

Alvette Chase v. Ethicon, Inc., et al.

Civil Action   No. 2:12-cv-01533

Margaret Schomer v. Ethicon, Inc., et al.

Civil Action  No. 2:12-cv-01497

Patricia Lindberg, et al. v. Ethicon, Inc., et al.

Civil Action No. 2:12-cv-01637

_____

THE DEPOSITION OF SALIL KHANDWALA, M.D.

JULY 8, 2016

Salil Khandwala, M.D.

```
                                                    Page 2
 1        The deposition of SALIL KHANDWALA, M.D.,
 2        Taken at 22731 Newman Street, Suite 200,
 3        Dearborn, Michigan,
 4        Commencing at 9:04 a.m.,
 5        Friday, July 8, 2016,
 6        Before Cheryl McDowell, CSR-2662, RPR.
 7
 8    APPEARANCES:
 9    YVONNE M. FLAHERTY, ESQUIRE
10    ELIZABETH A. PETERSON, ESQUIRE
11    Lockridge Grindal Nauen, P.L.L.P.
12    100 Washington Avenue S., Suite 2200
13    Minneapolis, Minnesota  55401
14    (612) 339-6900
15    ymflaherty@locklaw.com
16        Appearing on behalf of the Plaintiffs.
17
18    JORDAN N. WALKER, ESQUIRE
19    Butler Snow, LLP
20    1020 Highland Colony Parkway, Suite 1400
21    Ridgeland, Mississippi  39157
22    (601) 948-5711
23    jordan.walker@butlersnow.com
24        Appearing on behalf of the Defendants.
```

Salil Khandwala, M.D.

Page 3

1                    TABLE OF CONTENTS
2    Witness                                      Page
3    SALIL KHANDWALA, M.D.
4
5    EXAMINATION BY MS. FLAHERTY:                    5
6
7                         EXHIBITS
8    Exhibit                                       Page
9    KHANDWALA EXHIBIT NO. 1                         6
10   Second Amended Notice to Take Deposition
     of Dr. Salil Khandwala
11
     KHANDWALA EXHIBIT NO. 2                         8
12
     Invoice
13
     KHANDWALA EXHIBIT NO. 3                        18
14
     Flash Drive
15
     KHANDWALA EXHIBIT NO. 4                        37
16
     Defense Expert General Report of
17   Salil Khandwala, M.D., dated June 30, 2016
18   KHANDWALA EXHIBIT NO. 5                        37
19   Defense Expert General Report of
     Salil Khandwala, M.D., dated June 30, 2016
20
     KHANDWALA EXHIBIT NO. 6                        39
21
     Curriculum Vitae
22
     KHANDWALA EXHIBIT NO. 7                        43
23
     Reliance List
24

Salil Khandwala, M.D.

Page 4

1    KHANDWALA EXHIBIT NO. 8                      170

2

     Attachment 4, Gynecare TVT Obturator System

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Salil Khandwala, M.D.

Page 5

1        Dearborn, Michigan

2        Friday, July 8, 2016

3        About 9:04 a.m.

4                          - - -

5                   SALIL KHANDWALA, M.D.,

6        having first been duly sworn, was examined and testified

7        on his oath as follows:

8    EXAMINATION BY MS. FLAHERTY:

9    Q.   Well, good morning, Doctor.  My name is Yvonne

10       Flaherty.  We met very briefly before we started the

11       deposition this morning.  I'm a lawyer from

12       Minneapolis, and I represent plaintiffs in the

13       litigation against Johnson and Johnson and Ethicon,

14       and I have with me today one of the lawyers from my

15       office, Elizabeth Peterson, as well.

16              We have opened up the telephone lines, but

17       at this point it does not sound like anybody is on the

18       telephone line, and if somebody does join, we'll ask

19       them to identify themselves as well.

20              It is my understanding that you have been

21       deposed before, and the last deposition at least

22       related to the Ethicon pelvic mesh products was about

23       two weeks ago on June 24th.

24              Does that sound about correct?

Salil Khandwala, M.D.

```
                                                      Page 6
 1    A.    That's correct.

 2    Q.    Okay.  And at that time it was a deposition focused on

 3          certain individual or case-specific matters, is that

 4          your understanding?

 5    A.    That is correct.

 6    Q.    Okay.  And when I state Ethicon pelvic mesh products,

 7          do you understand that to mean products such as the

 8          TVT, TVT-O, and TVT-Secur?

 9    A.    Yes.

10    Q.    As well as probably some other products that Ethicon

11          has.

12                   Our focus today will be on TVT, TVT-Secur,

13          and TVT-O.

14                   I'm going to hand to you what the court

15          reporter will mark as Exhibit No. 1.

16                   (Khandwala Exhibit No. 1 marked and

17                    attached.)

18    BY MS. FLAHERTY:

19    Q.    Have you seen this document before?

20    A.    Yes, I have.

21    Q.    Okay.  And what is your understanding of what this

22          document is?

23    A.    It is basically what we'll be discussing today and

24          going over the information about the cases, the case
```

Salil Khandwala, M.D.

Page 7

```
 1        specific that we did last time and the general
 2        opinions on the three devices that you mentioned.
 3   Q.   Okay.  And if you turn to page eight of the deposition
 4        notice, look at the top of the page, it says
 5        Schedule A.
 6                   Do you see that?
 7   A.   Yes.
 8   Q.   And this is a list of items that have been requested
 9        from you.
10                   Have you brought any materials with you
11        today?
12   A.   Yes, I have.
13   Q.   Okay.  And what do you have?
14   A.   I have the documents and my Reliance List is on this
15        flash drive, my CV is here.  The invoices are here.  I
16        do not have any photographs.
17                   MR. WALKER:  And for the record, we have
18        numerous binders that are outside on a table that are
19        in response to Schedule A that I directed counsel to
20        for inspection if she so desires.
21                   MS. FLAHERTY:  And just to clarify, the
22        hard copy documents that are available in binders,
23        it's my understanding that those are hard copies of
24        items that are printed from the Reliance List?
```

Salil Khandwala, M.D.

Page 8

1                    MR. WALKER:  Correct.

2                    MS. FLAHERTY:  Okay.  And not additional

3         items --

4                    MR. WALKER:  Correct.

5                    MS. FLAHERTY:  -- specific to Schedule A.

6                    MR. WALKER:  Correct.

7                    MS. FLAHERTY:  Okay.

8                    MR. WALKER:  And the hard copies are not

9         all inclusive of his reliance materials.  It's just a

10        portion of them that we actually printed.  All of them

11        are electronically contained on the flash drive.

12   BY MS. FLAHERTY:

13   Q.   Okay.  So there's just a couple additional items on

14        Schedule A that I want to confirm before we move

15        forward.  If you go on to page nine, item number ten

16        talks about consulting agreements, time sheets,

17        billing records, invoices, and it goes on.

18                    I know that you do have an invoice that you

19        brought with you today which I think we will mark as

20        Exhibit No. 2.

21                    (Khandwala Exhibit No. 2 marked and

22                    attached.)

23   BY MS. FLAHERTY:

24   Q.   And the court reporter has handed to you what's been

Salil Khandwala, M.D.

Page 9

1        marked as Exhibit No. 2.

2                    Just so the record is clear, is this a copy

3        of the invoice that you brought with you today?

4    A.   It is.

5    Q.   Do you have other time records or notes or billing

6        records that reflect the time that is set forth on

7        this invoice?

8    A.   Yes, I do.

9    Q.   Okay.  And how are those records maintained?

10   A.   Electronically.  Whenever I reviewed a document,

11       whether it was a patient-specific or for general

12       reporting, I would just log the start time and the end

13       time, and then I compiled it and created this summary

14       report.

15   Q.   Okay.  And I apologize if you said this already.  You

16       said it's electronic?

17   A.   Yes.

18   Q.   Is it in an Excel spreadsheet or some other format?

19   A.   It's in just, it's in a Word, Word spreadsheet.

20   Q.   Okay.  Do you have any other notes or information on

21       that document other than start and end times of your

22       task?

23   A.   No.

24   Q.   And is that a separate document for each case or is it

Salil Khandwala, M.D.

Page 10

1    a larger document for all of your expert work with

2    respect to the Ethicon litigation?

3  A.  I usually do it per wave.  So, for example, this is

4      Wave II, so I just started it, when it started, when I

5      finished a certain task, what that task was, and I

6      just created a little bit of a Word document that will

7      help me eventually compile this particular list.

8  Q.  Okay.  Does -- are you able to print a copy of that

9      document?

10 A.  Yes.

11 Q.  Okay.  We'll follow up with counsel perhaps during the

12     break to get a copy of that.

13          And this invoice, Exhibit No. 2, is dated

14     July 5th which is just a few days ago.

15          Have you put or billed any time since

16     July 5th with respect to the Wave II cases?

17 A.  No, I haven't.

18 Q.  Is there any time that's been billed that's not

19     reflected on the invoice?

20 A.  No, not for Wave II.

21          MR. WALKER:  For Wave II.

22          MS. FLAHERTY:  Correct.

23 BY MS. FLAHERTY:

24 Q.  And have you started to do work with respect to

Salil Khandwala, M.D.

Page 11

1          Wave III cases?

2     A.   Not yet.

3     Q.   Okay.  So you have not billed any time with respect to

4          Wave III cases?

5     A.   That is correct.

6     Q.   Is it fair to say you probably have some ongoing time

7          that you're billing with respect to Wave I cases?

8     A.   Could you please repeat that?

9     Q.   Sure.  With respect to -- are you doing any ongoing

10         work with respect to Wave I?

11    A.   Not as of now.

12    Q.   Okay.  Do you anticipate any in the future?

13    A.   I may be amending my general report on the vaginal

14         mesh, but that is not certain.

15    Q.   Okay.  So going through Exhibit No. 2, the third line

16         down says invoice regarding and that is it states

17         general report.

18              And that would be your general liability

19         reports for TVT and TVT-O which is one report and

20         TVT-S?

21    A.   That is correct.

22    Q.   And then your case-specific review?

23    A.   Yes.

24    Q.   And that would be for the files of the individual

Salil Khandwala, M.D.

Page 12

1        plaintiffs that you reviewed in Wave II?

2    A.   That's correct.

3    Q.   And then independent medical examinations.

4             How many independent medical examinations

5        have you conducted in Wave II?

6    A.   Two.

7    Q.   And which plaintiffs were those for?

8    A.   Mrs. Smallwood and Chase.

9    Q.   And then time for the last item on that list is

10       depositions, correct?

11   A.   I'm sorry.  Yes.

12   Q.   And that would be your time for the depositions a

13       couple weeks ago, today, and I believe there was one,

14       a third day scheduled for next week.

15   A.   I'm sorry.  That does not include -- today is not

16       included in this.

17   Q.   Okay.

18   A.   This is just the last time that I did for the two

19       cases.

20   Q.   Okay.  Would it also include your time to prepare for

21       the depositions?

22   A.   No.

23   Q.   Okay.  Does it include your time to prepare for the

24       depositions that took place on June 24th?

Salil Khandwala, M.D.

Page 13

```
 1   A.   No, just the actual depositions.
 2   Q.   Okay.  Do you bill separately for your time to prepare
 3        for depositions?
 4   A.   It's part of the general report or the case-specific
 5        review, same, same rates.
 6   Q.   Okay.  So would the time then be combined with that --
 7        strike that.
 8             Is your time preparing for depositions
 9        included in this invoice, at least with respect to the
10        depositions that already happened?
11   A.   Yes.
12   Q.   Okay.  And it indicates that you have spent -- I
13        haven't totaled up the number of hours, but you have
14        broken down your hours based on the general report of
15        seventy-two hours, is that correct?
16   A.   That is correct.
17   Q.   And that's for both general reports, total for the
18        general reports?
19   A.   Yes, three.
20   Q.   And just to clarify, when you say three reports, three
21        general reports, which three general reports are you
22        referring to?
23   A.   Two reports of three devices, the TVT, TVT-O being one
24        report and the second is the TVT-Secur.
```

Salil Khandwala, M.D.

Page 14

```
1    Q.   Okay.  I just wanted to make sure we were talking
2         about two reports.
3    A.   Yes.
4    Q.   Three devices but two reports.
5              Do you know how that time is split out
6         between the TVT-Secur and the TVT, TVT-O report?
7    A.   I'm not sure if it is in my breakup sheet.  It could
8         possibly be.
9    Q.   Okay.
10   A.   But I'm not certain.
11   Q.   Okay.  Do you have a general recollection?
12   A.   It probably would be about, if I were to guess, it
13        will be sixty percent for the Secur and forty percent
14        for the TVT, TVT-O.
15   Q.   Okay.  And case-specific reviews, that looks like it
16        was about ninety-three hours.
17             And that would be with respect to your
18        preparation in case-specific reports and review of
19        medical records for those reports?
20   A.   Medical records, the depositions, and preparation on
21        the case, write-up of the case and things like that.
22   Q.   Okay.  And then it says review with Mr. Walker on June
23        23rd, five hours.
24             That I presume was preparation for your
```

Salil Khandwala, M.D.

Page 15

1     deposition on June 24th?

2  A.  That is correct.

3  Q.  And the IME and report, eight hours.

4          I presume that is the IME and reports for

5     Miss Smallwood and Miss Chase?

6  A.  That is right.

7  Q.  Okay.  And it next says reviews with case-specific

8     attorney and independent pre-deposition review.

9          What was that?

10 A.  So that is each of these four cases that I did had a

11    case-specific attorney assigned to them.  So once I

12    did my report and I reviewed it, I wanted to go back

13    and forth with the attorney to see what were the

14    points of discussion that could come across.

15 Q.  Okay.  And so that pre-deposition review would be in

16    addition to any time you spent with Mr. Walker on June

17    23rd?

18 A.  That is correct.

19 Q.  And then you have the case-specific depositions, five

20    hours on June 24th?

21 A.  That is right.

22 Q.  And so the total for the Wave II work it looks like up

23    through approximately June 24th is ninety-five

24    thousand three hundred dollars?

Salil Khandwala, M.D.

```
                                                        Page 16
 1    A.   Yes.

 2    Q.   Do you know when you plan to prepare your next invoice

 3         for Wave II cases?

 4    A.   I probably will wait until next week to finish my

 5         case-specific reviews, and once those depositions are

 6         done, then probably I will do that.

 7                    MR. WALKER:  I'm sorry.  Was your question

 8         about Wave II?

 9                    MS. FLAHERTY:  Yes.

10                    MR. WALKER:  I thought your answer was

11         about Wave III.

12                    THE WITNESS:  No, Wave II.

13                    MR. WALKER:  Okay.

14                    MS. FLAHERTY:  There are more case-specific

15         Wave II depositions next week.

16                    MR. WALKER:  Thank you.  I forgot we have

17         one left.

18    BY MS. FLAHERTY:

19    Q.   Okay.  And are the rates that you have charged and set

20         forth in this invoice similar to the rates charged for

21         your Wave I work?

22    A.   Yes.

23    Q.   Okay.  And do you anticipate that these rates will be

24         the same for your Wave III work?
```

Salil Khandwala, M.D.

```
                                                      Page 17
 1   A.   Yes.

 2   Q.   Do you know how much you have billed thus far with

 3        respect to Wave I?

 4   A.   I don't recall exactly what my number was, but I'm

 5        sure it's somewhere in the file.

 6   Q.   Okay.  Do you have an estimate?

 7   A.   Something thirty-five, forty thousand.

 8   Q.   So about a third of what you have billed so far for

 9        Wave II?

10   A.   It's possible.

11   Q.   You have also brought with you a thumb drive, is that

12        the correct term, flash drive, thumb drive?

13   A.   Yes.

14              MS. FLAHERTY:  Counsel, is that one that we

15        can mark as an exhibit or --

16              MR. WALKER:  Yes.

17              MS. FLAHERTY:  Okay.

18              MR. WALKER:  It's yours to take, yeah.  You

19        can mark it.

20              MS. FLAHERTY:  Okay.  We can talk maybe off

21        the record the best way to handle it, but I'm inclined

22        to probably mark it.

23              MR. WALKER:  That's what I've seen done

24        most of the time.
```

Salil Khandwala, M.D.

Page 18

1              MS. FLAHERTY:  So we can probably mark that

2         just so I don't forget as Exhibit No. 3.

3              (Khandwala Exhibit No. 3 marked and

4              attached.)

5    BY MS. FLAHERTY:

6    Q.   Going back to Exhibit No. 1 on page nine, number ten

7         also asks about billing records, time sheets,

8         et cetera, with respect to consulting work that you

9         may have done with respect to studies, cadaver labs,

10        personal education training are also listed.

11             Do you have any documents related to those

12        items?

13   A.   I do not.

14   Q.   Okay.  Are you currently doing any consulting work

15        with Ethicon with respect to studies?

16   A.   No, I'm not.

17   Q.   Are you currently doing any work with Ethicon,

18        actually with any manufacturer with respect to pelvic

19        mesh products?

20   A.   Well, I'm about to start.

21   Q.   Okay.  What are you about to start?

22   A.   It is a study on vaginal mesh hysteropexy with the

23        Restorelle, R-E-S-T-O-R-E-L-L-E, mesh system, and the

24        company is called Coloplast.

Salil Khandwala, M.D.

Page 19

1   Q.   And that's --

2   A.   I'm sorry.

3   Q.   I didn't mean to interrupt you.

4   A.   There's just one more study we are about to start, and

5        that is on tibial nerve stimulation for overactive

6        bladder, and it is with Medtronics.

7   Q.   Let's start first with the study that you anticipate

8        starting soon with respect to Restorelle.

9             What is your understanding of what your

10       role will be?

11  A.   I am the primary investigator.  It is an

12       investigator-initiated study, so it is not a

13       company-sponsored study.  So I have initiated the

14       study, and I sent the proposal to the company for

15       sponsorship and their investigative body approved it,

16       and so I will be maintaining the entire control of the

17       clinical trial.

18  Q.   Okay.  And how long do you anticipate that clinical

19       trial to take?

20  A.   The enrollment will probably last about nine months

21       and the follow-up is for three years.

22  Q.   And I can't recall.  Is Restorelle a product for

23       pelvic organ prolapse or for incontinence?

24  A.   Pelvic organ prolapse.

Salil Khandwala, M.D.

Page 20

1  Q.   And with respect to the tibial nerve stimulation study

2       with Medtronic, what do you understand your role to be

3       with that study?

4  A.   I will be one of the coinvestigators.  So this is an

5       industry-sponsored trial which Medtronics has started

6       because they're coming up with a new technique for

7       management of overactive bladder, so they want to

8       assess and see how effective it is.  So this is the

9       initial clinical pilot trial that we will be involved

10      with.

11             MR. WALKER:  Doctor, let me just say I

12      don't know the terms of any kind of agreements you may

13      have with these other companies, but just make sure

14      you don't divulge anything that's confidential in

15      terms of those agreements when you're answering

16      questions.

17 BY MS. FLAHERTY:

18 Q.   Are there any other consulting agreements that you

19      have with pelvic mesh manufacturers other than what we

20      just talked about?

21 A.   Well, there are two studies which are closing down.

22      One was the 522 study for Elevate mesh by American

23      Medical Systems or Astora, so they're shutting it

24      down, and the other was with Coloplast on the Exair,

Salil Khandwala, M.D.

Page 21

```
 1          E-X-A-I-R, system which was also a 522 which was
 2          shutting down.  So it's almost in its final phases of
 3          closing down.
 4     Q.   And what was your role with respect to the two 522
 5          studies?
 6     A.   So as you may know, the FDA had advised that there
 7          should be these 522 postmarketing surveys and analysis
 8          be performed.  So we were part of that in the mesh
 9          group to see the role of vaginal mesh for prolapse
10          with the Elevate system and also with the Exair
11          system.
12                    Unfortunately, both these companies decided
13          to shut it down, their products.  So we're not doing
14          the study anymore.
15     Q.   Okay.  Other than these studies, so we've talked about
16          the upcoming studies on Restorelle and the nerve
17          stimulation study and the two 522 studies that the
18          companies are going to discontinue or shut down was I
19          think how you described it, is there any other
20          consulting work that you are currently doing for
21          pelvic mesh manufacturers?
22     A.   No.
23     Q.   Are you doing any consulting work for Ethicon on
24          products other than pelvic mesh?
```

Salil Khandwala, M.D.

Page 22

```
 1    A.    No, I'm not.

 2    Q.    Have you done any?

 3    A.    I'm not doing any consulting for pelvic mesh either.

 4    Q.    Okay.  Have you done any consulting work for Ethicon

 5          on any pharmaceutical products?

 6    A.    No.

 7    Q.    Okay.  Are you currently doing any consulting or other

 8          work with respect to cadaver labs for pelvic mesh

 9          manufacturers?

10    A.    No.

11    Q.    And do you have any plans to do that in the

12          foreseeable future?

13    A.    It's possible.

14    Q.    Okay.  Is that with respect to a certain manufacturer

15          or product?

16    A.    It's hard to say.  Whatever comes by.  So if it is

17          something that is interesting to me, I may do a study,

18          but nothing in the foreseeable future.

19    Q.    Okay.  You have done some training and education for

20          Ethicon with respect to pelvic mesh products in the

21          past, is that correct?

22    A.    That is correct.

23    Q.    And have you had agreements or contracts with Ethicon

24          with respect to your role in those training programs?
```

Salil Khandwala, M.D.

Page 23

1    A.    Yes, I have.

2    Q.    Do you have copies of those agreements?

3    A.    You know, those were way back, you know, when the

4          Prolift and Prolift+M meshes were just coming out, so

5          this is we're talking about maybe 2004, 2005.  So I'm

6          sure -- I could have them, but it would be hard to dig

7          them out.

8    Q.    Okay.  And you've been paid over the years by Ethicon

9          for your assistance in helping with those training

10         sessions, is that correct?

11   A.    That is correct.

12   Q.    Do you have documents that reflect the amount of the

13         monies that you have received from Ethicon over the

14         years?

15   A.    It would probably be on my tax returns, but that's the

16         only way I could find it.

17   Q.    Do you know if Ethicon sends you a 1099 in the years

18         that you do some work for them?

19   A.    Yes, but, again, I don't know how to break it down

20         between a clinical trial because at the same time I

21         was doing an investigator-initiated study on the

22         TVT-Secur in-office, so I was getting reimbursed for

23         that too by Ethicon.

24              So I don't know how to break up whether I

Salil Khandwala, M.D.

Page 24

1      went for a proctorship course, when I was proctoring

2      at my site, or whether I was being paid for the

3      clinical trial.  So they were just giving me a lump

4      sum 1099.

5   Q.  Okay.  Do you have records that you submitted to

6      Ethicon when you were working on the TVT-Secur that

7      would reflect the expenses and things that you had?

8   A.  Yes, I'm sure we have that.

9   Q.  Okay.  So that's something that you could reproduce?

10  A.  It was in 2006 is when we did the clinical trials, so

11     I don't know if we still have those records.  But if

12     it is, we should be able to find it.

13  Q.  Okay.  Do you recall, you know, over the years --

14     well, strike that.

15          Is it fair to say you've been doing some

16     work with Ethicon for probably the past fifteen to

17     sixteen years?

18  A.  I don't think I have been doing for since maybe 2008,

19     2009.

20  Q.  Okay.

21  A.  I haven't done much.  I have done my own clinical

22     trials using the Ethicon products but not for Ethicon.

23  Q.  Okay.

24  A.  So I believe it may have spiked around the time when

Salil Khandwala, M.D.

Page 25

1      the TVT-O, the TVT-Secur, and the Prolift+M meshes

2      were just getting started.

3  Q.  Okay.

4  A.  So maybe about six years or so, around 2002 to 2008

5      possibly.

6  Q.  Okay.  So you think that was probably the peak of your

7      work for Ethicon?

8  A.  Yes.

9  Q.  Okay.  Do you know during that roughly four- to

10     five-year time period about how much money Ethicon

11     paid you?

12 A.  No, I'm sorry, I don't.

13 Q.  And that would be something that you think would be on

14     your tax returns or the 1099s?

15 A.  Yes.  However, it will again be mixed with my clinical

16     trial, so I do not know how to differentiate that.

17          MR. WALKER:  And I just want to put on the

18     record, I believe we have an outstanding objection to

19     the request for Doctor Khandwala's 1099s.

20 BY MS. FLAHERTY:

21 Q.  On the -- you had mentioned that it's difficult to

22     discern which monies might be associated with training

23     or consulting and which might be associated with

24     clinical trials, is that fair?

Salil Khandwala, M.D.

Page 26

```
1    A.    That's correct.
2    Q.    I want to make sure I have an understanding of the
3          money that comes with respect to the clinical studies.
4          Can you describe that for me a little bit?
5    A.    Yes.  So the TVT-Secur study that we did was an
6          investigator-initiated study.  That means I initiated
7          the study, and I sent the proposal over to the Ethicon
8          research committee and they approved it.
9                Once they approved it, then we had set some
10         specific budget, timely budget, and they paid for
11         those invoices, for example, when it went for the IRB,
12         when the initial patients enrolled, when we got the
13         consents, when they came back for their surgery, when
14         they came back for the postoperative visits.  So for
15         all those activities performed, invoices were made and
16         submitted to Ethicon once they're created.
17   Q.    Do you have any recollection of what those invoices
18         totaled for the TVT-Secur study?
19   A.    I'm sorry, I don't know offhand.
20   Q.    Do you know if it was above one hundred thousand?
21   A.    Very unlikely.
22   Q.    Okay.  If we go on Exhibit No. 1 down to number
23         twelve, it asks for correspondence and other
24         communications with employees of defendants with
```

Salil Khandwala, M.D.

Page 27

1        respect to the female pelvic mesh products.

2                Do you have a file or a correspondence

3        folder for your communications with the company?

4    A.  No, I do not.

5    Q.  Okay.  Is there anyplace where you keep e-mail

6        communications that you may have with Ethicon?

7                And just to clarify, I'm not talking about

8        any communications that you may have with lawyers that

9        are representing Ethicon.  These would be

10       communications directly with Ethicon.

11   A.  No, I do not keep any folders or any e-mails.

12   Q.  Okay.  Do you have a file with respect to the

13       TVT-Secur study that you did with Ethicon?

14   A.  For the study itself?

15   Q.  Yes.

16   A.  Yes, I do.

17   Q.  Okay.  And would that study -- or strike that.

18               Would that file include communications that

19       you may have had with Ethicon during that time period?

20   A.  So, again, the study was an investigator-initiated

21       study, so Ethicon did not have any role to play in

22       this study.  So all the information in the study would

23       be pertaining to the study documents, you know, and

24       the study paper that was done and eventually

Salil Khandwala, M.D.

Page 28

```
 1          published, and there were no communications with
 2          Ethicon.  I was not obliged to inform them as to what
 3          was going on.
 4                      And that's one of the main things that we
 5          had set up is that Ethicon will not influence or
 6          impact the clinical studies or the clinical outcomes,
 7          it will be entirely up to us to do it.  So the only
 8          interaction and e-mails that could have gone back and
 9          forth would be sending them invoices for that
10          particular setup for that period of time.
11     Q.   And is it fair to say there would have been some
12          initial communication when you approached them with
13          respect to the study that you were doing?
14     A.   That is correct.
15     Q.   And with respect to some of the training and I'll call
16          it nonclinical study work that you have done with
17          Ethicon, how do they communicate with you about those
18          sessions?
19     A.   Well, it depends on what was the session.  If it was a
20          proctorship at my site where surgeons were coming in,
21          then it would be the local representative for Ethicon
22          who would set it up and let me know that a few doctors
23          are coming in on a certain date, was it okay with me,
24          and then we would arrange it with the hospital.  So
```

Salil Khandwala, M.D.

Page 29

1          that's how it would happen.

2                   If I was to go to a site to do a cadaver

3          lab, then it would be set up by the manager of the

4          area or the educational person in charge for Ethicon.

5          They would set it up and they would call me and ask me

6          whether I would want to be a proctor for that

7          particular course, cadaver course.

8                   If it was training at a doctor's site where

9          I had to visit a doctor to go, then a particular

10         manager of that district, you know, sales manager or

11         someone, would call me and say could you come and

12         proctor this doctor on this particular product.

13                  So it all depends on what was the outcome,

14         what was being asked.

15    Q.   Okay.  And if those communications were via e-mail, it

16         sounds like you probably would not have saved those

17         e-mails?

18    A.   Most of the communications I believe were verbal, a

19         phone call, a rep letting me know in the operating

20         room that this is happening.

21    Q.   Okay.  And how -- actually, strike that.

22    A.   And I think most of these happened around 2004.  I

23         highly doubt if I did any consulting of significance

24         after 2007.

Salil Khandwala, M.D.

Page 30

1  Q.  Okay.  Do you recall when the last time was that you

2      had communication with an Ethicon employee?  Again,

3      not the lawyers, just the Ethicon employees.

4  A.  When I had gone for a court case in Texas, I believe

5      it was last year, Butler Snow, and I think I met

6      Mr. -- well, he was not employed, Mr. Hinoul.  I don't

7      think he was employed.  So it's been a long time since

8      I've communicated with any existing employees.

9  Q.  Okay.  And we'll get into this a little bit further

10     later, but since you mentioned 522 studies, I want to

11     ask so I don't forget.

12                 Was the TVT-Secur -- strike that.

13                 The FDA had indicated that J & J also

14     needed to do a 522 study on the TVT-Secur, is that

15     correct?

16  A.  That is correct.

17  Q.  Did you do any work with respect to -- well, first of

18     all, did they start the 522 studies on the TVT-Secur?

19  A.  Not that I'm aware of.

20  Q.  Okay.  Did you do any consulting with Ethicon with

21     respect to the 522, potential 522 studies on

22     TVT-Secur?

23  A.  No.

24  Q.  Okay.  You had mentioned that you've done various

Salil Khandwala, M.D.

Page 31

1          types of training, primarily several years ago, with

2          respect to Ethicon's pelvic mesh products.

3                    Did you ever speak at what I would call a

4          symposium or a conference perhaps to other medical

5          professionals?

6    A.    Yes, I did.

7    Q.    Okay.  Did you have any presentation materials related

8          to those speeches or presentations?

9    A.    Yes.

10   Q.    Okay.  Do you maintain copies of those materials?

11   A.    Not specifically for a conference as such but just

12         overall slides that I do have.

13   Q.    Okay.  And are those something that you maintain?

14                    Well, how do you maintain those?

15   A.    In a PowerPoint presentation, so it's usually by

16         topic.  If I'm talking on stress incontinence, it will

17         be a stress incontinence slide set, and if it is

18         prolapse, it will be on a prolapse slide set.  So it

19         will be by subject.

20   Q.    And is that something you maintain electronically?

21   A.    Yes.

22   Q.    And so you would have copies of those on your computer

23         system?

24   A.    Yes.

Salil Khandwala, M.D.

Page 32

```
 1   Q.   Okay.  In addition to the PowerPoints, would you have
 2        any other course materials that you would maintain?
 3   A.   Are you asking specifically for something or just
 4        overall?
 5   Q.   Just with respect to Ethicon pelvic mesh products.
 6   A.   So this could be for, if I understand correctly, this
 7        could be for training anybody, it could be any
 8        residents, anybody?
 9   Q.   Yes, correct.
10   A.   Yes.  Well, we do have in an electronic format that we
11        have in our patient medical records because we do go
12        over that information with our patients when they come
13        in to the office for incontinence and we are talking
14        to them about different techniques of management of
15        incontinence.
16             So we explain to them about what a TVT is,
17        what a transobturator sling is, what a mini sling is.
18        So that information is there, and then electronic
19        medical records, the risks, benefits, what it is and
20        things like that.
21   Q.   Okay.  And I think I probably didn't phrase the
22        question very well.  What I'm wondering about is when
23        you would give a presentation at a symposium or to
24        another group of medical professionals regarding
```

Salil Khandwala, M.D.

Page 33

1        pelvic mesh products, would you prepare course

2        materials?

3    A.   Not usually.  It's more of, more often than not it's a

4        slide set.  If I'm giving out anything, it's usually

5        my published papers.

6    Q.   Okay.  Do you have any videotapes or other electronic

7        or digital I guess depictions of your presentations?

8    A.   I don't.

9    Q.   Okay.  Do you know if other people have those?

10   A.   I do not know.

11   Q.   Did you ever participate in any market evaluations

12       with respect to Ethicon's pelvic mesh products?

13   A.   Could you please explain?

14   Q.   Sure.  On Exhibit 1, the bottom at page nine, it also

15       asks for marketing evaluations created or provided,

16       created by or provided to you.

17   A.   Yes.  I believe there was a time when -- I do not know

18       if it was marketing or education to the news media.

19       There's one time when I was interviewed by the news

20       media about the Prolift or the Prolift+M system.  I do

21       not recall which one it was.  This was several years

22       ago, and I think it came in some newspaper that

23       Doctor Khandwala was interviewed and this is what he

24       said.

Salil Khandwala, M.D.

Page 34

```
 1   Q.   Okay.  Did you -- with respect to the TVT-Secur study,

 2        did you maintain minutes for any study meetings that

 3        may have occurred?

 4   A.   Well, there were three different studies.

 5             MS. FLAHERTY:  Off the record.

 6             (Off the record at 9:39 a.m.)

 7             (Back on the record at 9:39 a.m.)

 8             THE WITNESS:  So there were different

 9        clinical trials, so one was as I mentioned the

10        investigator-initiated study.  I do not have any

11        minutes on that.

12             Then there were two others, but I do not

13        know if Ethicon would have kept the minutes.  One

14        was the TVT World Registry which Doctor Tincello,

15        T-I-N-C-E-L-L-O, he was the person in charge.  So I'm

16        not sure if they kept the minutes.

17             And the other was the initial pilot

18        clinical trial that we did with the TVT-Secur in 2006,

19        and that, I did not keep any minutes.  I don't know if

20        anybody else did.

21   BY MS. FLAHERTY:

22   Q.   Do you have -- with respect to the initial clinical

23        trial and the investigator-initiated trials for Secur,

24        do you have what I'll call raw study data that you
```

Salil Khandwala, M.D.

Page 35

1          have maintained?

2     A.   For the investigator-initiated trial?  Yes.

3     Q.   Okay.

4     A.   I think I'm obliged to keep them for a certain number

5          of years, but I still kept the case-specific reports.

6     Q.   Okay.  And how are those maintained?

7     A.   In hard copy.

8     Q.   Are those hard copies maintained here at your office

9          or in another location?

10    A.   In a storage, it has to be in a storage facility.

11    Q.   Where is that storage facility located?

12    A.   It's somewhere in Dearborn, close by.

13    Q.   Have you testified before the FDA or any other

14         governmental agencies with respect to pelvic mesh

15         products?

16    A.   I have not.

17    Q.   Okay.  Do you have any graphs or presentations or

18         charts that you may have used during the trial in

19         Texas?

20              And I'll just clarify that.  That were

21         actually used in front of a jury.  I'm not talking

22         about things you discussed with your lawyers during

23         the trial.

24    A.   No, I don't.

Salil Khandwala, M.D.

Page 36

1    Q.    Okay.  So we talked about the invoice, the hard copy

2          binders, and the thumb drive that you have brought

3          with you today.

4                   Are there any other materials or items that

5          you have brought in response to the deposition notice

6          that we have not yet discussed?

7    A.    The outside information also included, the hard copy.

8    Q.    Correct.  The binders?

9    A.    Yes.

10   Q.    The binders of hard copies?

11   A.    Yes.

12   Q.    Is that the totality of everything you have with you

13         for today?

14   A.    Yes.

15   Q.    Okay.

16                  MR. WALKER:  In addition to his report and

17         cited material in those reports.

18                  MS. FLAHERTY:  Understood.

19                  MR. WALKER:  Yeah.

20                  MS. FLAHERTY:  Why don't we mark the two

21         reports as exhibits.

22                  MR. WALKER:  Can we go off the record?

23                  MS. FLAHERTY:  Yeah, let's go off the

24         record.

Salil Khandwala, M.D.

Page 37

1                    (Off the record at 9:42 a.m.)

2                    (Back on the record at 9:43 a.m.)

3                    (Khandwala Exhibits Nos. 4 and 5 marked and

4                    attached.)

5    BY MS. FLAHERTY:

6    Q.   Okay.  So the court reporter has handed you what has

7         been marked as Exhibit No. 4 and Exhibit No. 5.

8                    Do you have those in front of you?

9    A.   Yes, I do.

10   Q.   Okay.  And let's start with Exhibit No. 4.

11                   Do you recognize this document?

12   A.   Yes, I do.

13   Q.   Okay.  And what is it?

14   A.   It is my general report on TVT and the TVT-O system.

15   Q.   Okay.  And is that your signature on the first page?

16   A.   Yes, it is.

17   Q.   Okay.  And that's dated June 3rd, 2016, correct?

18   A.   Yes.

19   Q.   All right.  And since you issued this report just a

20        little over a month ago, have you made any changes to

21        the report?

22   A.   No, I have not.

23   Q.   Do you currently have any plans to amend this report?

24   A.   Currently, no.

Salil Khandwala, M.D.

Page 38

1   Q.   Okay.  Do you anticipate that you may be seeking to
2        amend it in the future?
3   A.   It is possible.
4   Q.   Do you know when you may make that decision?
5   A.   For example, if I get some new information on new
6        studies that might come up and I have to add them into
7        that, if it is pertinent enough, then I may do it.
8   Q.   Okay.  But as you sit here today, are there any
9        studies or other information that you feel needs to be
10       added to Exhibit No. 4?
11  A.   No.
12  Q.   Okay.  And the other document that is in front of you
13       is Exhibit No. 5?
14  A.   Yes.
15  Q.   And do you recognize that document?
16  A.   Yes, I do.
17  Q.   And what is that?
18  A.   It is my report on the TVT-Secur suburethral sling
19       system.
20  Q.   And on page one, is that your signature?
21  A.   Yes, it is.
22  Q.   Okay.  And this report is also dated June 3rd, 2016,
23       is that correct?
24  A.   That is correct.

Salil Khandwala, M.D.

Page 39

1  Q.  Okay.  And have you made any changes to this report?

2  A.  I have not.

3  Q.  So she doesn't get mad at us.  I know you can

4       anticipate, but, and as you sit here today, do you

5       have any plans to amend Exhibit No. 5?

6  A.  No, I do not.

7              MS. FLAHERTY:  Okay.  Why don't we mark the

8       CV.

9              (Khandwala Exhibit No. 6  marked and

10              attached.)

11  BY MS. FLAHERTY:

12  Q.  The court reporter has handed you what has been marked

13       Exhibit No. 6.

14              Do you recognize this document?

15  A.  Yes, I do.

16  Q.  And what is this?

17  A.  It is my curriculum vitae.

18  Q.  Okay.  And I'll represent to you that we obtained this

19       exhibit, it was attached as the CV to your reports.

20              Have you made any changes to your CV since

21       June 3rd of 2016?

22  A.  No, I have not.

23  Q.  Okay.  And as you sit here today, are you aware of

24       any -- anything that needs to be changed on your CV?

Salil Khandwala, M.D.

Page 40

```
1    A.   No.

2    Q.   Okay.  Do you have any presentations or publications

3         that perhaps are pending that are not yet listed on

4         your CV?

5    A.   Yes.

6    Q.   Okay.  And what are those?

7    A.   There are two clinical trials that we have just

8         submitted for publication.

9    Q.   What are those clinical trials?

10   A.   One is on the Exair, that's E-X-A-I-R, mesh system for

11        vaginal mesh hysteropexy, and the other is the MiniArc

12        suburethral sling procedure for stress incontinence.

13   Q.   And the MiniArc, that is an American Medical Systems

14        product?

15   A.   That is correct.

16   Q.   I think they actually have another name now.

17   A.   Astora.

18   Q.   Correct.

19              And the other one, Exair, is that

20        Coloplast?

21   A.   Yes.

22   Q.   Okay.  Do you know or anticipate when those studies

23        will be published?

24   A.   We haven't heard back from the reviewers yet.  We've
```

Salil Khandwala, M.D.

Page 41

1          just sent the documents over.

2     Q.   And how long does that process usually take?

3     A.   It could take up to about four weeks for them to

4          review it, and then if they come with edits, then we

5          have to go back and forth with the edits.  So it could

6          take up to a couple of months.

7     Q.   Do you have -- let's start first with the MiniArc

8          study.  Do you have a coauthor or cosponsor -- I'm not

9          quite sure what the correct phrase is -- on that

10         study?

11    A.   It is our own study.  It is a non-sponsored study and

12         there is no coinvestigator.

13    Q.   And when you say our own, you mean Doctor Khandwala

14         and his office?

15    A.   That is correct.

16    Q.   Okay.  And with respect to the Coloplast product,

17         Exair I think it is called, do you have any coauthors

18         or coinvestigators with you on that?

19    A.   No.  However, that is an investigator-initiated study,

20         so it was sponsored by Coloplast, but Coloplast had

21         nothing to do with the study design or the writing of

22         the paper or enrollment.

23    Q.   Has Coloplast seen a draft of the paper?

24    A.   They have not.

Salil Khandwala, M.D.

Page 42

1   Q.   All right.  Are those the only two studies or papers
2        that are currently pending that are not listed on your
3        CV?
4   A.   That is correct.
5   Q.   Okay.  And then on the very last page of your CV,
6        under references, it looks like those are redacted.
7             I'm assuming that's the names of other
8        doctors or colleagues of yours?
9   A.   Yes.
10  Q.   Okay.  And one other thing I wanted to ask.  With
11       respect to the last page, it lists your professional
12       memberships.
13  A.   Yes.
14  Q.   The American College of Obstetrics and Gynecology,
15       that's also known as ACOG?
16  A.   Yes.
17  Q.   Yes.
18  A.   Yes.
19  Q.   And the American Urogynecology Society?
20  A.   Yes.
21  Q.   Are there any others that you participate in as a
22       member?
23  A.   No.
24  Q.   You can set this exhibit aside.

Salil Khandwala, M.D.

Page 43

1                      (Khandwala Exhibit No. 7 marked and

2                      attached.)

3     BY MS. FLAHERTY:

4     Q.   All right.  The court reporter has handed you what has

5          been marked as Exhibit No. 7.

6                      Do you recognize this document?

7     A.   Yes, I do.

8     Q.   And what is this?

9     A.   It is my Reliance List.

10    Q.   And we had previously conferred with counsel for

11         Ethicon, and it's our understanding that the Reliance

12         List for both your TVT-Secur and your TVT, TVT-O

13         reports are identical.

14                     Is that your understanding?

15    A.   It's all together.

16    Q.   So it's one comprehensive list?

17    A.   Yes.

18    Q.   Okay.  It's a long list, so we didn't want to compare

19         line by line if we didn't have to.

20                     And since you prepared the report on

21         June 3rd, are there any materials that you feel need

22         to be added to this Reliance List?

23    A.   No.

24    Q.   Okay.  Aside from your own personal experiences, I

Salil Khandwala, M.D.

Page 44

```
 1          know you've been practicing for many years, Doctor,
 2          does the Reliance List contain the totality of
 3          information that you relied upon with respect to your
 4          opinions in your reports?
 5     A.   Besides my experience, yes.
 6     Q.   Okay.  And have you reviewed all the items that are on
 7          the Reliance List?
 8     A.   Yes, I have.
 9     Q.   You personally or have some people assisted you?
10     A.   No, I reviewed it myself.
11                    MR. WALKER:  I'm sorry.  Assist in the
12          compilation or the review?
13                    MS. FLAHERTY:  The review of the materials,
14          not preparation of the list.
15                    MR. WALKER:  Okay.  Object to form.
16                    MS. FLAHERTY:  Okay.  That's fine.
17     BY MS. FLAHERTY:
18     Q.   Do you know when you last reviewed items that are
19          listed on the Reliance List?
20     A.   Just about a couple of days ago when I was again
21          reviewing for the general report.
22     Q.   And I can't recall but I think you had on your invoice
23          roughly how much time you have spent in preparation of
24          the report.
```

Salil Khandwala, M.D.

Page 45

1              Does that time -- thank you.  Does that

2         time include reviewing the materials that are on the

3         Reliance List?

4    A.   Yes.

5    Q.   Okay.  So the seventy-two hours listed for the general

6         report and then there are some additional hours for

7         the case-specific reports.

8    A.   However, several of these papers I have already

9         reviewed before, so I've been ongoing reviewing these

10        articles because we publish all the time.  So when

11        you're publishing, you have to know several of these

12        topics.

13             So, in fact, when I was publishing for the

14        Exair paper, in the discussion you have to know what

15        other prolapse studies were done.  So I keep reviewing

16        these and I keep reviewing these articles on an

17        ongoing basis.

18             So several of these articles and papers I'd

19        already reviewed, and that's why I put it in my

20        Reliance List, and some I reviewed as preparation to

21        the general report.

22   Q.   Okay.  Do you recall when you first started to receive

23        materials to review with respect to your report?  And

24        I will -- I understand some of the studies you've read

Salil Khandwala, M.D.

Page 46

```
 1            over the years.  But with respect to the other
 2            materials, do you recall when you first started to
 3            review those?
 4      A.    When I started compiling the general report and I was
 5            wanting to see what other articles were there, so I
 6            usually contact my hospital library and I give it a
 7            list of articles that I would want to see.
 8                        So, for example, if I read a paper and I
 9            find that in the reference of that paper there are
10            some interesting articles, I would highlight them and
11            my secretary would send the list over to my librarian,
12            and my librarian would pull it up and send it back to
13            me electronically.  So that's how most of those
14            articles are compiled, especially the medical
15            literature articles were compiled in that fashion.
16                        The Ethicon documents, however, I had some
17            of the documents I had from the previous trial, and
18            then when I looked at plaintiffs' depositions,
19            especially plaintiffs' expert depositions, and when I
20            read them and some of these documents were referenced,
21            I contacted the attorneys to see if they could help
22            track some of those documents for me.
23      Q.    Okay.  Did you also receive perhaps a DVD or some
24            other storage -- strike that -- DVD or some other
```

Salil Khandwala, M.D.

Page 47

1          method of transmitting Ethicon documents that perhaps

2          Ethicon provided directly to you?

3     A.   I think most of it was electronically.

4     Q.   Okay.

5     A.   E-mail.

6     Q.   And some of those you asked for and some of those

7          Ethicon provided because they thought they would be

8          relevant to your review?

9     A.   That is correct.

10    Q.   Okay.  You had mentioned that you go to a librarian at

11         the hospital?

12    A.   Yes.

13    Q.   Which hospital is that?

14    A.   It's called Beaumont, Beaumont Dearborn Hospital.  The

15         name has just changed.

16    Q.   Is that here in Dearborn, Michigan?

17    A.   Yes.

18    Q.   Is that the hospital where you have privileges?

19    A.   Yes.

20    Q.   Would that be considered your primary hospital?

21    A.   Yes.

22    Q.   Okay.  Is that where you conduct your surgeries?

23    A.   It is another hospital but in the same system.

24    Q.   Okay.  Are there other hospitals in Michigan or

Salil Khandwala, M.D.

Page 48

1        elsewhere where you have privileges?

2    A.   It is under the same umbrella called Beaumont Health

3        System.

4    Q.   Okay.

5    A.   But two different hospitals, one is in Dearborn, one

6        is in Annapolis.

7    Q.   Okay.  Annapolis in Michigan or Annapolis in a

8        different state?

9    A.   Michigan.

10   Q.   Are there any documents that you had asked for that

11       perhaps Ethicon wasn't able to locate or has not yet

12       been able to provide?

13   A.   I don't recall.

14   Q.   Okay.  I believe your Reliance List materials indicate

15       that you had reviewed some of the deposition

16       transcripts for plaintiffs and perhaps some doctors,

17       is that correct?

18   A.   That is correct.

19   Q.   Have you reviewed deposition transcripts for any of

20       plaintiffs' expert witnesses?

21   A.   Yes, I have.

22   Q.   Have you reviewed any videotapes of any depositions?

23   A.   No, I have not.

24   Q.   So your review of depositions would have been done via

Salil Khandwala, M.D.

Page 49

```
 1          reading a transcript?

 2     A.   That is correct.

 3     Q.   Okay.  As you prepared your reports, I believe they

 4          are marked as 4 and 5, did you consult with any other

 5          experts as you prepared those reports?

 6     A.   No, I did not.

 7     Q.   Other than your lawyers, did you consult with anyone

 8          else while you were preparing the two reports?

 9     A.   Actually, I did not even consult with my lawyers about

10          the report.  I did the report entirely on my own.

11     Q.   Okay.  Do you have any staff or assistants that help

12          you with perhaps assembling some of the materials and

13          things?

14     A.   Yes, just as I mentioned, mainly to get the articles

15          from the librarian.  My secretary would go and get

16          those articles, and I give her a highlighted list of

17          which articles I need, and then once she brings it, I

18          will highlight the text and she would type that text

19          and, you know, compile it for me, and I would review

20          that and put it in my report.

21     Q.   Okay.  Do you keep any time records for your secretary

22          or any other staff that may be assisting you?

23     A.   Actually, I do not.

24     Q.   Okay.
```

Salil Khandwala, M.D.

Page 50

1    A.    Maybe I should.

2    Q.    Sorry.

3               We had talked a little bit earlier about

4          some of your consulting work with Ethicon and some

5          other companies.

6               Are there any other companies that you have

7          consulted for in the past with respect to medical

8          devices?

9    A.    Yes, I have.

10   Q.    Okay.  And what are those companies?

11   A.    Coloplast, American Medical Systems, slash, Astora,

12         Medical Devices, Medtronics.

13   Q.    Okay.  And the Medtronic consulting, is that with

14         respect to the I think it was a stimulation device for

15         incontinence?

16   A.    Yes, but I'm not doing it that much for the InterStim.

17         It's more for the tibial nerve stimulation which is an

18         upcoming study.

19   Q.    Have you done any consulting on the InterStim?

20   A.    No, I have not.

21   Q.    Okay.  Do you still treat patients, Doctor?

22   A.    Yes, I do.

23   Q.    On an average week, about what percentage of your

24         workweek is devoted to treating patients?

Salil Khandwala, M.D.

Page 51

1    A.    About seventy percent.

2    Q.    Is the other thirty percent related to litigation

3          activities?

4    A.    No.  It is mainly related to clinical trials, my

5          ongoing studies, education, because I teach at least

6          two OB/GYN residents per month on an ongoing basis.

7                    And we did have a fellowship until now but

8          my fellow had to leave, but we're expecting a fellow

9          within a few weeks.  So it's training the fellow and

10         then some of the typical administrative activities

11         that you have to do to run an office.

12   Q.    You had mentioned that you teach two OB/GYN residents

13         per month.

14                   When you say typically, is that a formal

15         program that you do at one of the colleges or medical

16         schools, or is it more of an internship with your,

17         with your practice?

18   A.    Each OB/GYN program has a requirement where the

19         residents have to do some type of subspecialty

20         rotation, and one of the subspecialty rotations that

21         they're expected to do is in urogynecology.

22                   So there are four programs which have

23         OB/GYN residencies, and they send their residents to

24         me.  One is the Wayne State University School of

Salil Khandwala, M.D.

Page 52

1      Medicine, so I am their main urogynecology faculty.

2      Then the Oakwood, slash, Beaumont Dearborn Hospital

3      Medical System.  Third is Botsford Hospital and fourth

4      is Genesys Hospital.

5              So these are four hospitals in my area

6      where they have OB/GYN residencies, and their

7      residents come to me for their urogynecology training.

8   Q.   Okay.  And how long does that training typically last?

9   A.   It's typically between one to two months.

10  Q.   Okay.  And is that -- is it fair to say that that

11       training is not necessarily specific just to pelvic

12       mesh products but to the larger urogyn practice?

13  A.   Yes, correct.

14  Q.   Would that also be similar with respect to your

15       training of fellows?

16  A.   Yes.

17  Q.   Okay.  Have you ever served as an expert for a pelvic

18       mesh company other than Ethicon?

19  A.   No.

20              MR. WALKER:  In litigation?

21              MS. FLAHERTY:  In litigation, yes.

22              THE WITNESS:  No.

23  BY MS. FLAHERTY:

24  Q.   Okay.  Have you ever served as a litigation expert for

Salil Khandwala, M.D.

Page 53

1        any type of case other than the current Ethicon pelvic

2        mesh cases that you're working on?

3   A.   Yes, I have.

4   Q.   Okay.  Did any of those involve medical devices?

5   A.   Yes.

6   Q.   Did any of those involve pelvic mesh products?

7   A.   Yes.

8   Q.   Can you describe those for me, please?

9   A.   It was an Elevate system which is an American Medical

10       System product, and it was a case against one of the

11       doctors who had implanted that device.  So I was

12       involved as an expert.  I was deposed as an expert.

13  Q.   And for whom were you an expert?

14  A.   For the doctors, the defense attorney.

15  Q.   So in that Elevate case, the plaintiff's lawyers had

16       alleged that the doctor may have done something wrong,

17       is that correct?

18  A.   That is correct.

19  Q.   And you were retained to testify as to whether or not

20       that doctor did anything wrong?

21  A.   Yes.

22  Q.   Okay.  And was it your opinion that the doctor did not

23       breach any standard of care?

24  A.   Yes.

Salil Khandwala, M.D.

Page 54

1   Q.   Okay.  Did that case go to trial?

2   A.   No, it did not.

3   Q.   Okay.  But you were deposed?

4   A.   Yes.

5   Q.   Did you issue a report on that case?

6   A.   Yes, I did.

7   Q.   Do you recall where that case was located?

8   A.   Where I was deposed?

9   Q.   Not physically where your deposition was but where the

10       case itself was pending.

11  A.   I think it was Arkansas.

12  Q.   Have you ever served as an expert, litigation expert,

13       in other medical malpractice cases?

14  A.   Not that I recall.

15  Q.   Okay.  Have you ever served as an expert, have you

16       ever served as a litigation expert on behalf of a

17       plaintiff in any type of litigation?

18                MR. WALKER:  I'm going to object to form.

19                THE WITNESS:  Not that I recall.

20  BY MS. FLAHERTY:

21  Q.   Are there any other cases in which you have served as

22       a litigation expert, again, other than Ethicon and the

23       Elevate case that you just mentioned?

24                MR. WALKER:  Object to form.

Salil Khandwala, M.D.

Page 55

```
 1                THE WITNESS:  Not that I recall.
 2   BY MS. FLAHERTY:
 3   Q.   Okay.  You had indicated that you still treat
 4        patients, and that's about seventy percent of your
 5        time at this point, your work, your work time?
 6   A.   That is correct.
 7   Q.   Do you -- on average, about how many patients do you
 8        see per week?
 9   A.   About anywhere from seventy to eighty patients.
10   Q.   Do you have a general breakdown of how those
11        patients -- how many of those patients come to you
12        with urinary stress incontinence issues?
13   A.   Let's see.  Well, all of those are not new patients.
14        But if you just take all of them, if it's new
15        consultation or established patients, I would probably
16        say maybe about twenty, twenty-five percent.
17   Q.   This may seem like a silly question but I'll ask.  Do
18        you treat any men for uro issues?
19   A.   No.
20   Q.   Okay.  So your practice is one hundred percent female
21        based?
22   A.   Yes.
23   Q.   Okay.  And approximately what percentage of your
24        patients do you treat for pelvic organ prolapse?
```

Salil Khandwala, M.D.

Page 56

1    A.    Similar percentage, about twenty-five percent.

2    Q.    And so the other fifty percent of your patients is it

3          fair to say see you for a variety of gynecological or

4          urogynecological issues?

5    A.    My practice is essentially entirely urogynecology.  So

6          they may be coming for overactive bladder, urgency

7          incontinence, pelvic pain, painful bladder syndrome or

8          urgency and frequency, mixed incontinence.  So that's

9          predominantly what I would be seeing otherwise.

10   Q.    Okay.

11   A.    Bladder infections.

12   Q.    You had mentioned that you testified at a trial down

13         in Texas?

14               MR. WALKER:  Object to form.

15   BY MS. FLAHERTY:

16   Q.    Have you testified at trial before?

17   A.    No.

18   Q.    Okay.  So you've never testified at any trial, pelvic

19         mesh or otherwise?

20   A.    No.

21   Q.    Okay.  Do you want to take a break?  It's about an

22         hour.

23   A.    I'm fine.

24   Q.    Okay.  I know some people like a break every hour or

Salil Khandwala, M.D.

Page 57

1          so.

2                        Have you conducted any -- strike that.

3                        Have you ever worked for the FDA?

4     A.   No, I have not.

5     Q.   Have you ever done any consulting work for the FDA?

6     A.   No, I have not.

7     Q.   Have you ever served as a regulatory consultant?

8     A.   No, I have not.

9     Q.   Have you done any work commenting or helping to draft

10         proposed regulations with the FDA?

11    A.   No, I have not.

12    Q.   Have you done any work advising or consulting on

13         compliance issues with the FDA?

14    A.   No, I have not.

15    Q.   Okay.  Do you consider yourself an expert with respect

16         to FDA regulations?

17    A.   No, I do not.

18    Q.   Have you ever done any work drafting warning labels

19         for any kind of medical product?

20    A.   No, I have not.

21    Q.   Okay.  And so that would include no warning labels

22         with respect to pelvic mesh products?

23    A.   That is correct.

24    Q.   Okay.  Have you -- strike that.

Salil Khandwala, M.D.

Page 58

```
 1                   Do you have -- you're not a pathologist,
 2          are you?
 3     A.   I am not.
 4     Q.   Okay.  And so you don't have any certifications with
 5          respect to pathology?
 6     A.   I can see slides.  As a part of gynecology residency,
 7          we do a pathology rotation.  So we can see slides and
 8          understand how to read slides, but I'm not a certified
 9          pathologist.
10     Q.   Okay.  And you have not previously served as an expert
11          specific to issues on pathology?
12     A.   That is correct.
13     Q.   Okay.  And you are not a toxicologist, are you,
14          Doctor?
15     A.   I am not.
16     Q.   Okay.  And you have not previously served as an expert
17          on issues specific to toxicology?
18     A.   That is correct.
19     Q.   Are you familiar with the term Device History File?
20     A.   No, I'm not.
21     Q.   Okay.  Is it fair to say then that you have not worked
22          on a Device History File?
23     A.   That's correct.
24     Q.   Okay.  Are you familiar with the term DFMEA?
```

Salil Khandwala, M.D.

Page 59

1    A.    No, I'm not.

2    Q.    Okay.  How about Design Failure Mode Effects Analysis?

3    A.    No, I'm not familiar.

4    Q.    Okay.  So, again, fair to say that you probably have

5          not worked on Design Failure Effects Analysis?

6    A.    That is correct.

7    Q.    Okay.  Similarly, are you familiar with the phrase

8          FMEA which is Failure Mode and Effects Analysis?

9    A.    No, I have not.

10   Q.    Okay.  And you have not done any work specific to

11         Failure Mode and Effects Analysis?

12   A.    That is correct.

13   Q.    Okay.  And one more for you.  I know they sound

14         similar.  FMMEA which is Process Failure Mode Effects

15         Analysis.

16                   Are you familiar with that?

17   A.    I am not.

18   Q.    Okay.  And so you have not done any work specific to

19         Process Failure Mode Effects Analysis?

20   A.    That is correct.

21   Q.    I forgot to ask this earlier.  Have you ever been on

22         an FDA advisory board?

23   A.    No, I have not.

24   Q.    Have you ever communicated directly with the FDA

Salil Khandwala, M.D.

Page 60

1       regarding your opinions on pelvic mesh products?

2   A.  Yes, I have.

3   Q.  Okay.  And in what context was that?

4   A.  It was a paper that we had submitted with the lead

5       author being Miles Murphy in response to the FDA

6       advisory of 2011.

7   Q.  Do you know if that paper was published?

8   A.  Yes, it was.

9   Q.  I'm sure it's on your list, but do you recall where,

10      in what journal or where it was published?

11  A.  I think it was the American Urogynecology Journal, the

12      Gold Journal.

13  Q.  Are you familiar with the phrase MAUDE Report?

14  A.  Yes.

15  Q.  Have you ever filed a MAUDE Report?

16  A.  I have not.

17  Q.  Do you differentiate between a MAUDE Report and an

18      Adverse Event Report?

19  A.  It depends on if it's part of a clinical trial because

20      many of my patients are part of clinical trials.  So

21      if it's part of a clinical trial, then we have to do a

22      case-specific form called a CRF, and that has to be

23      filed with the Institution Review Board.

24              If there's any adverse event, whether it is

Salil Khandwala, M.D.

Page 61

```
1        a serious adverse event or just an adverse event, so

2        that would be to a different channel.  So that's the

3        typical filing that I would be doing that we have

4        done.

5   Q.   Okay.  And outside the clinical study context so with

6        respect to your care and treatment of patients outside

7        of clinical trials, have you prepared any Adverse

8        Event Reports?

9   A.   No, I have not.

10  Q.   You had mentioned the CRFs --

11  A.   Yes.

12  Q.   -- which those, is it fair to describe those as the

13       adverse event that may occur during a clinical trial?

14  A.   No.  These are just Clinical Research Forms, CRFs.  So

15       anything that goes into that form is what we keep.  It

16       could be patient information at their one-month visit

17       or a six-month visit.  So those are the patient forms,

18       and that goes in the chart.

19                 The Adverse Event Forms are different

20       forms, and so those are also kept and sent to the

21       Institution Review Board.

22  Q.   Okay.  And then do you keep the CRF forms as well for

23       the clinical studies that you perform?

24  A.   Yes.
```

Salil Khandwala, M.D.

Page 62

```
 1   Q.   And those also go to the IRB, is that correct?

 2   A.   Not all of them because most of them stay with us.

 3        Only the Adverse Event Forms and something specific,

 4        then it would go to the IRB.

 5   Q.   So if something goes wrong or is adverse, it goes to

 6        the IRB.  Otherwise, it stays with you?

 7   A.   If it goes to the IRB, then it stays with us also and

 8        it goes to the IRB.  So everything essentially stays

 9        with us.  Certain things may go to the IRB which would

10        be pertinent.

11   Q.   Do the materials that go to the IRB also go to the

12        FDA?

13   A.   No.

14   Q.   Okay.  So that goes just to the IRB?

15   A.   That is correct.

16   Q.   Okay.  So if there was an adverse event that occurred

17        during the clinical study, you would send that

18        information to the IRB but you do not send it to the

19        FDA?

20   A.   That is correct.

21   Q.   You had mentioned a couple of times that some of your

22        studies have been I think you describe it as

23        investigator-initiated studies?

24   A.   Yeah.
```

Salil Khandwala, M.D.

Page 63

1  Q.  And just so I'm clear on that, that's a study that
2      you, for example, have initiated as opposed to one of
3      the manufacturers?
4  A.  That is correct.
5  Q.  Okay.  And do you have a preference for one over the
6      other?
7  A.  I usually prefer an investigator-initiated study
8      because then I control the outcome.  The bias factor
9      is much lesser because it is not a company-sponsored
10     trial, and, you know, there's always an element of
11     bias when there is a company-sponsored trial as
12     opposed to an investigator-initiated study.
13             But the study that we typically favor or I
14     typically favor which is not even investigator
15     initiated such as the one that I mentioned about the
16     MiniArc study which I completely manage it.  It's not
17     sponsored by any company and we do it ourselves, so
18     then the potential risk of bias is the least and since
19     it's not being funded by any particular company with
20     vested interest.
21 Q.  And that's because in your view, it would not be
22     appropriate to have a vested interest in the outcome
23     of the study?
24 A.  It is just a bias that is generated, and sometimes you

Salil Khandwala, M.D.

Page 64

1     have to put it in.  Most investigator-initiated

2     studies or sponsored studies are very ethical studies,

3     but, unfortunately, it always comes with a bias, that,

4     okay, this was sponsored by this company, so maybe the

5     results are more favorable to that company.

6            However, if it is not, then it gives the

7     study a little more authenticity and gives me that

8     little more additional armamentarium to put in that

9     additional sentence which states that this was not a

10    sponsored study and so maybe looks more authentic.

11 Q.  Okay.  And if it's not a manufacturer-sponsored study,

12    do they still reimburse you for certain expenses and

13    things?

14 A.  No, they do not.

15 Q.  Okay.

16 A.  They are not even aware that I'm doing the study.

17 Q.  Okay.  And on the TVT-Secur study that we talked about

18    earlier today, you had mentioned that there were I

19    think you had said some reimbursements from Johnson

20    and Johnson, is that correct?

21 A.  So there were essentially three studies that I was

22    involved with with the TVT-Secur.

23 Q.  Okay.

24 A.  The first was the initial clinical trial which was

Salil Khandwala, M.D.

Page 65

1       completely conducted by Ethicon.

2                   The second paper that I published was our

3       own data which was not sponsored by anybody, and the

4       third paper which was the TVT-Secur in-office that I

5       think you're alluding to, that was an

6       investigator-initiated study which was sponsored by

7       Ethicon.

8    Q.  Okay.  So an investigator-initiated study can also be

9       sponsored by a manufacturer?

10   A.  So the investigator-initiated studies are all

11      sponsored.  So it is initiated by the investigator.

12      They submit the proposal to the company, and if the

13      company feels that it is a good study from the

14      clinical standpoint, from the research standpoint,

15      then they accept it.  So once they accept it, that

16      means they are willing to fund the expenses of that

17      study.

18   Q.  Okay.  And if an investigator study is sponsored by

19      the manufacturer, is there some communication with the

20      manufacturer then with respect to the end points for

21      that study?

22   A.  Yes.  Usually, for example, with the Exair study, they

23      wanted to know where did they stand, how much is the

24      enrollment, are we keeping our time lines.  So if I

Salil Khandwala, M.D.

Page 66

1    said that maybe by the end of December, we should

2    finish enrollment, then I would be fine, I'd be

3    sticking to the time lines.

4              So it's a very loose connection.  It's not

5    that absolutely we have to do something based upon

6    what they want, but it's tracking what am I doing.

7    I'm not just -- it's not that the study's stopped and

8    we're doing nothing about it.  We just want to make

9    sure we're still continuing to maintain the time line

10   that I had proposed.

11  Q.   So you do have some periodic reporting obligations to

12       the company during a study of that nature?

13  A.   Yes.

14  Q.   Okay.  I know you have some opinions that we'll get to

15       in a little bit with respect to porosity of mesh.

16              Have you conducted any studies that are

17       specific to the porosity issues?

18  A.   No, I have not.

19  Q.   Have you published any peer-reviewed literature with

20       respect to, specifically with respect to porosity of

21       pelvic mesh?

22  A.   No, I have not.

23  Q.   Have you conducted any studies with respect to

24       degradation of pelvic mesh?

Salil Khandwala, M.D.

Page 67

1    A.    No, I have not.

2    Q.    And have you published any studies specific or, I'm

3          sorry, published any articles specific to degradation

4          of pelvic mesh?

5    A.    No, I have not.

6    Q.    Have you conducted any studies specific to the

7          flexibility or stiffness of pelvic mesh?

8    A.    No, I have not.

9    Q.    Have you published any articles specific to

10         flexibility or stiffness of pelvic mesh?

11   A.    I have not specifically stated or published a paper on

12         flexibility or as you mentioned porosity.

13               However, in my Prolift+M paper that I had

14         published, I did mention about the change in the

15         porosity and the weight that happens with the

16         Prolift+M as it -- as part of the mesh disappears or

17         it's absorbed which is the Monocryl component of the

18         Prolift+M.  And from the -- I believe there was some

19         mention in the discussion about the flexibility of

20         that, of the Prolift+M mesh that I had mentioned.

21   Q.    Okay.  Have you done -- have you published any papers

22         that discuss the flexibility or stiffness of TVT or,

23         actually, strike that, of an SUI product?

24   A.    Could you explain?

Salil Khandwala, M.D.

Page 68

1   Q.   Sure.  I'll rephrase that.

2             Have you done or published any articles

3        with respect to flexibility or stiffness in a

4        midurethral sling?

5   A.   So if you are specifically asking whether I've done

6        anything to see the tension strength and the measuring

7        of the weights and things like that, I have not.

8   Q.   Okay.  Are you familiar with the phrase 510(k)

9        submission?

10  A.   Yes, I have.

11  Q.   Okay.  Have you participated in submissions or

12       assembly of materials for a 510(k) submission?

13  A.   No, I have not.

14  Q.   And you have not authored any peer-reviewed articles

15       with respect to 510(k) submissions?

16  A.   That is correct.

17  Q.   Have you ever worked on the design of pelvic mesh

18       products?

19  A.   Yes, I have.

20  Q.   Okay.  And in what context have you worked on the

21       design of the products?

22  A.   There is a modification of a particular mesh system

23       that I made so as to eliminate a passage of a trocar,

24       and I submitted the drawings to the company.

Salil Khandwala, M.D.

Page 69

1    Q.    Is that -- I think I had read that you have a patent

2          on a product.

3                    Is that the product?

4    A.    No.  That's a different product.

5                    MR. WALKER:  And I just want to make sure,

6          you know, you don't have to divulge anything that's

7          proprietary or otherwise confidential, okay?

8                    THE WITNESS:  Okay.

9    BY MS. FLAHERTY:

10   Q.    You had mentioned that you had submitted some drawings

11         to a company regarding the trocars, was that correct?

12   A.    Yes.

13   Q.    Okay.  And was that company Ethicon?

14   A.    No, it was not.

15   Q.    Okay.  Can you state which company that was?

16   A.    It was Coloplast.

17   Q.    Coloplast.

18                   And do you know, have you submitted a

19         patent application?

20   A.    Yes, I have.

21   Q.    Okay.  What is the status of the patent application?

22   A.    It is in its provisional patent state.

23   Q.    Okay.  Do you know -- I will admit I am not familiar

24         with the patent process, but do you know approximately

Salil Khandwala, M.D.

Page 70

1          how long that process takes?

2     A.   I can hold the provisional patent for a year, and we

3          have just been extending it to see that whether I need

4          to file the final patent or do I just give up the

5          patent.

6     Q.   Okay.  And how many years have you held that?

7     A.   Now it's two years.

8     Q.   Two years.

9               Have you ever conducted any studies on

10         polymers?

11    A.   No.

12    Q.   Have you authored any peer-reviewed articles specific

13         to polymers?

14    A.   No, I have not.

15    Q.   Have you done any bench research specific to

16         polypropylene?

17    A.   No, I have not.

18    Q.   Have you performed any explants or revisions of pelvic

19         mesh products?

20    A.   Yes, I have.

21    Q.   Do you know approximately how many revisions or

22         explants you've performed?

23    A.   Anything specific or just overall?

24    Q.   Let's start with overall, and we can break it down

Salil Khandwala, M.D.

Page 71

1         from there.

2    A.   Maybe about twenty-five.

3    Q.   And just so we're clear, does that include what I

4         would call a trimming that might happen in the office

5         under a local anesthesia, or is that only a surgical

6         procedure with general anesthesia?

7    A.   That includes any explants, whether it's in the office

8         or in the operating room.  That includes whether the

9         mesh was used for a sacrocolpopexy or whether it was

10        used for a vaginal prolapse.  That includes whether a

11        sling was used for incontinence, and that's includes

12        any possible sling or mesh, whether it is Ethicon or

13        non-Ethicon, and that also includes suture such as

14        Prolene suture that could be sticking into the vagina.

15   Q.   Okay.  And when you conduct those explants, do you do

16        any sort of microscopic evaluation of the mesh that

17        you remove?

18   A.   I do not, but sometimes -- I am not sure if I've done

19        that, but I may have sent it for pathology.

20   Q.   So you send it on to somebody else to handle the

21        pathology, is that correct?

22   A.   If I did that, yes.

23   Q.   Okay.  Do you have a degree in epidemiology?

24   A.   I do not.

Salil Khandwala, M.D.

Page 72

1   Q.   Is it fair to say you would not call yourself an

2        expert on epidemiology?

3   A.   Yes.

4   Q.   Okay.  Why don't we take just a five-minute break.

5   A.   Sure.

6                    (Off the record at 10:27 a.m.)

7                    (Back on the record at 10:40 a.m.)

8   BY MS. FLAHERTY:

9   Q.   Okay, Doctor.  We're back on the record, and I want to

10       switch gears a little bit and talk about your

11       treatment of patients with urinary stress

12       incontinence.

13                    And I think you had mentioned was it

14       roughly twenty to twenty-five percent of your patients

15       have urinary stress incontinence, is that correct?

16       Did I get that correct?

17  A.   That is correct.

18  Q.   Okay.  And is it fair to say that for at least some of

19       these patients, their incontinence is a quality of

20       life issue for them?

21  A.   Most patients who come to see us usually do that for

22       that particular reason, it is bothering them, and very

23       few would come in just because they've been sent by

24       their physician.  But most of them would come for

Salil Khandwala, M.D.

Page 73

1     quality of life issues.

2  Q.  Okay.  And you use midurethral slings for treatment of
3     SUI, is that correct?

4  A.  Yes, I do.

5  Q.  And you also have some other surgical procedures that
6     you use for treatment of SUI, is that correct?

7  A.  Yes, I do.

8  Q.  And what are those other surgical procedures?

9  A.  I predominantly use, if it is a surgical intervention,
10    I predominantly use a midurethral sling, and, of
11    course, there are different types of midurethral
12    slings.

13           However, if it is a patient who has
14    restricted mobility of the urethrovesical junction,
15    then I would use a bulking procedure called
16    transurethral injection of Macroplastique.

17 Q.  Okay.  Any other surgical interventions that you would
18    do?

19 A.  For stress incontinence, essentially those are the two
20    main procedures that I would do.

21 Q.  And are there some nonsurgical procedures that you
22    would also try?

23 A.  Yes.

24 Q.  And what are those?

Salil Khandwala, M.D.

Page 74

1  A.   First of all, we would start with behavioral

2       modifications just like as I was mentioning, caffeine

3       elimination so as to decrease the amount of urine

4       production.

5            The second would be timed voiding.

6       Sometimes the patient may be holding her bladder for

7       over four to five hours, and then when she sneezes,

8       she may leak because her bladder is too full.  So all

9       she needs to do is go to the bathroom every three

10      hours.  So that's timed voiding.

11           Fluid management.  They could be drinking a

12      lot of water as part of let's say weight loss, and

13      that could be creating a deluge in the bladder and the

14      blader may be filling up very fast, and that could

15      overpower the urethra.  So then amount of fluid

16      control, restricting fluids to about sixty to

17      sixty-five ounces a day.

18           So timed voiding, fluid management,

19      elimination of caffeinated beverages, pelvic floor

20      exercises with a pelvic floor training system that we

21      have at our office.  So these are the main things that

22      we always talk to our patients prior to embarking onto

23      a surgical intervention.

24  Q.   Okay.  Do you also recommend the use of pessaries from

Salil Khandwala, M.D.

Page 75

1      time to time?

2   A.  Very rarely would I use pessary exclusively for stress

3       urinary incontinence.

4   Q.  And why is that?

5   A.  That is, first of all, because it's very incumberent.

6       Number two, the success is not very high.  Number

7       three, most patients do not like using a pessary for

8       that reason.  So that's predominantly it.

9           I would typically use it in a patient who

10      would tell me that she has extremely sporadic stress

11      incontinence, only if she is playing golf would she

12      leak.  I'd say, okay, you can consider this, or a

13      woman who is desirous of getting pregnant.  Then if we

14      tried everything else and finished pelvic floor

15      therapy, it's not working, then I would go on to

16      considering an incontinence ring pessary.

17  Q.  Okay.  With respect to the surgical treatment options,

18      is an anterior -- I may not pronounce this

19      correctly -- is it colporrhaphy?

20  A.  Colporrhaphy.

21  Q.  Yeah.  Colporrhaphy.

22  A.  That's right.

23          So an anterior colporrhaphy is not a

24      surgical procedure for stress incontinence management.

Salil Khandwala, M.D.

Page 76

1   Q.   Okay.  Is a Burch colposuspension?

2   A.   Yeah.  You can just say Burch procedure.

3   Q.   Okay.

4   A.   Burch procedure is a surgical intervention for

5        incontinence.

6   Q.   Okay.

7   A.   Stress incontinence.

8   Q.   Do you utilize the Burch procedures?

9   A.   Not at the moment.

10  Q.   Okay.  Have you used Burch procedures in the past?

11  A.   Yes, I have.

12  Q.   Okay.  Do you know how many Burch procedures you have

13       done in the past?

14  A.   Probably about three hundred or so.

15  Q.   When was the last time you did a Burch procedure?

16  A.   Almost about ten years ago.

17  Q.   Did you stop doing Burch procedures about the time you

18       started using midurethral slings?

19  A.   Yes, I did.

20  Q.   Is needle suspension surgery a surgical treatment

21       option for urinary stress incontinence?

22  A.   It has been reported as a surgical procedure for

23       stress incontinence.

24  Q.   Okay.  Have you used this procedure for urinary stress

Salil Khandwala, M.D.

Page 77

1          incontinence?

2     A.   Typically the needle procedure is like the Raz, R-A-Z,

3          or the Pereyra, P-E-R-E-Y-R-A, procedures, and if that

4          is what it is, then, no, I have not used it.

5     Q.   Is a Stamey procedure also a needle suspension

6          procedure?

7     A.   Yes.

8     Q.   Have you used the Stamey procedure?

9     A.   I have not.

10    Q.   And I just want to clarify.  On page fourteen of the

11         TVT and TVT-O report, I'll let you get to that.

12    A.   Should I put this away?

13    Q.   You can keep it close, but we don't need it right this

14         minute.

15    A.   Okay.  Yes.

16    Q.   And do you see where it says surgical treatment for

17         urinary stress incontinence, probably in the top third

18         of the page?

19    A.   Yes.

20    Q.   And the first item listed is anterior --

21    A.   Colporrhaphy.

22    Q.   Correct.

23    A.   Yeah.

24    Q.   Is the anterior colporrhaphy -- I cannot say it.

Salil Khandwala, M.D.

Page 78

```
 1    A.   Anterior repair.

 2    Q.   Anterior repair.  Thank you.

 3              So just to clarify, you said that is not a

 4         surgical treatment for urinary stress incontinence?

 5    A.   That is correct.

 6    Q.   Okay.

 7    A.   However, what they are probably alluding to is what is

 8         often called an anterior colporrhaphy with Kelly

 9         plication.

10    Q.   Okay.

11    A.   So Kelly plication is where a suture is placed at the

12         bladder neck, and that is -- that was one of the main

13         operations for stress incontinence at that time, so

14         probably in the forties to the sixties, and Howard

15         Kelly who was considered the father of urogynecology

16         devised this particular technique.

17              However, nobody else could enjoy great

18         results with this, so it gets lumped around with

19         anterior colporrhaphy.  Anterior colporrhaphy per se

20         is a procedure for anterior vaginal wall prolapse, not

21         incontinence.

22    Q.   Okay.  And you had indicated that they used it.

23              I just want to -- who are you referring to

24         as they?
```

Salil Khandwala, M.D.

Page 79

1  A.  Gynecologists.

2  Q.  Okay.  Gynecologists during that time period?

3  A.  Yes.

4  Q.  Okay.  And have you ever used the anterior repair with

5      Kelly plication?

6  A.  Yes, I have.

7  Q.  Okay.  Do you still use that procedure?

8  A.  I do perform anterior colporrhaphy for vaginal wall

9      prolapse, but I do not do a Kelly plication.

10 Q.  Okay.  And the Kelly plication would come in if there

11     was urinary stress incontinence?

12 A.  That is correct.

13 Q.  Okay.  And just an overview of the nonsurgical

14     treatments for urinary stress incontinence, you talked

15     about pelvic floor muscle therapy which you offer in

16     your office?

17 A.  Yes, I do.

18 Q.  And the pessaries?

19 A.  Yes.

20 Q.  And behavior modification, and that included things

21     such as limiting caffeine, timing of voiding, is that

22     correct?

23 A.  That is correct.

24 Q.  Okay.  And then also the bulking agents?

Salil Khandwala, M.D.

Page 80

1    A.    Yes.

2    Q.    Are there any other nonsurgical options that you

3          recommend with respect to treatment of urinary stress

4          incontinence?

5    A.    Yes.  I do also based upon sometimes weight, if a

6          patient is obese, then I would recommend that weight

7          loss has clearly been shown to improve incontinence.

8          So that's something I would recommend and also things

9          like smoking cessation because smoking can cause

10         several factors, especially coughing would increase

11         the risk of the pelvic floor and stress incontinence.

12         So depending on what is the patient's medical history,

13         then I go by that.

14               Sometimes patients are taking medications

15         such as lisinopril which is classic medication for

16         high blood pressure.  That medication causes a side

17         effect of coughing, and then if they're taking that

18         and they're coughing, that could be causing stress

19         incontinence.

20               Sometimes patients have it because of

21         weight or neck issues, they may be snoring, and they

22         may have something called obstructive sleep apnea, and

23         if they have that, then it's almost like straining

24         when you're obstructing, so they may be leaking urine.

Salil Khandwala, M.D.

Page 81

```
 1        So what they may need instead of getting a sling is
 2        just a CPAP machine, and that could take care of the
 3        leakage.
 4                 So there are many factors based upon the
 5        medical history of the patient that I may be
 6        addressing that could help with the incontinence.  It
 7        could also be that she may be taking a diuretic, and
 8        we may just have to change the timing of the diuretic.
 9   Q.   Okay.  And so to summarize, it sounds like you have a
10        conversation or it's your usual practice to have a
11        conversation with your patients and examine a variety
12        of factors with respect to their urinary stress
13        incontinence, is that correct?
14   A.   Yes.  So what we do is we give the patients several
15        validated questionnaires and a history form which is
16        almost like a little booklet as they complain because
17        it's a lot of forms that they have to fill out, but it
18        is extremely helpful to us to understand what exactly
19        is their overall perspective that they may not even
20        have realized could impact their complaint.
21                 And when we look at those aspects and the
22        history and review everything with the patient and
23        then we have this conversation with the patient, then
24        we can appropriately come to proper management
```

Salil Khandwala, M.D.

Page 82

1       options.

2   Q.  Okay.  And during that conversation, is it your usual

3       practice to have a conversation or a discussion with

4       the patients regarding the risks and benefits of the

5       various options?

6   A.  Yes.

7   Q.  Okay.  What percentage of your SUI patients require

8       surgical intervention?

9   A.  I would say in between seventy-five to eighty percent,

10      but, you know, it's hard to say.  This is just a guess

11      because I have not really studied that and seen how

12      many patients actually go for surgery because our

13      typical, our typical course when we see a patient with

14      stress incontinence is we go over all these things,

15      and then we leave it to the patient to decide based

16      upon the risk-benefits profile and what she feels is

17      the best option for her.  So she may choose surgery or

18      she may choose otherwise.

19  Q.  Sure.

20  A.  And so then we respect what their decision is based

21      upon what we think would also be good for her.

22  Q.  Understood.

23              And with respect to the surgical repair or

24      surgical treatment of SUI, is it fair to say that the

Salil Khandwala, M.D.

Page 83

1         majority of your surgical repairs at this point in

2         time involve a midurethral sling?

3    A.   Yes.

4    Q.   Okay.  And I believe your report had broken down, I

5         think it says you had performed maybe one thousand or

6         so surgical repairs with respect to SUI over the

7         course of your career?

8    A.   Yes.

9    Q.   And I think there were roughly three hundred of those

10        that were TVT-Secur.

11             Does that sound about right?  I probably

12        have the number.  I can find it in your report.  Let's

13        see if I can find the page.

14   A.   It's a hundred TVTs, four hundred TVT-O, and three

15        hundred TVT-Secur.

16   Q.   One hundred TVT, four hundred TVT-O, three hundred

17        Securs?

18   A.   Yes.

19   Q.   So that's roughly eight hundred sling procedures?

20   A.   Roughly.

21   Q.   At least with Ethicon products?

22   A.   Correct.

23   Q.   And with respect to the other approximately two

24        hundred surgical procedures, what percentage of those

Salil Khandwala, M.D.

Page 84

1       involve other types of midurethral slings?

2    A.  Almost all of them were other types of midurethral

3        slings.

4    Q.  Okay.  Aside from the TVT, TVT-O, and the Secur, what

5        other types of pelvic mesh slings do you use?

6    A.  Suburethral slings?

7    Q.  Yes.

8    A.  I have done the MiniArc suburethral sling and the

9        Solyx, S-O-L-Y-X.

10   Q.  Is Solyx a Boston Scientific product?

11   A.  Yes.

12   Q.  Do you still use the MiniArc and Solyx?

13   A.  MiniArc is no longer available, and I still use the

14       Solyx.

15   Q.  Okay.  And is Solyx a retropubic transobturator

16       approach?

17   A.  It is a single-incision sling.

18   Q.  Okay.  And the TVT-Secur was a single-incision sling,

19       wasn't it?

20   A.  That is correct.

21   Q.  Did you switch to the Solyx after the TVT-Secur was no

22       longer available?

23   A.  I switched to the MiniArc which is a single-incision

24       sling.

Salil Khandwala, M.D.

Page 85

1    Q.    Yes.

2    A.    So I have maintained the single-incision sling as part

3          of my practice.  That's my primary surgical

4          intervention.

5    Q.    Okay.  And so you went from the Secur, when that was

6          no longer available, you went to the MiniArc.  When

7          that was no longer available, you went to the Solyx?

8    A.    That is correct.

9    Q.    Okay.  And you've done about four times as many TVT-O

10         procedures as opposed to TVT.

11              Is that because of the approach that is

12         used with the TVT-O procedure?

13   A.    It is just the timing.  So when the TVT initially came

14         out, I was still in my fellowship, and I was doing the

15         Burch colposuspensions.  Then we were doing a study on

16         laparoscopic Burch colposuspensions.  So we were

17         focusing more on that, and this was around the late

18         1990s.

19              And then very shortly thereafter, I believe

20         it is 2007 or 2008 when -- 2011 when the TVT-O came

21         out.  So I immediately, I was one of the first persons

22         who started using it because I had trained in France,

23         same place where Jean Delavalle had, he was from

24         Belgium, but his associate, Doctor Jacques Thayer, was

Salil Khandwala, M.D.

Page 86

1       in the same hospital.

2               So I had contacted him and he had advised

3       me this is a very good technique to perform, it goes

4       along the natural fascial supports of the urethra

5       which John Delancey from the University of Michigan

6       had described as the hammock hypothesis.  So it

7       sounded to be more of a natural support for the

8       urethra because that's where it's coming from.

9               So I thought that might be a good option to

10      go by, and once I started doing it, I somehow starting

11      having good results.  I continued doing the

12      transobturator procedure.

13  Q.  Okay.  And just so the record is clear, I suspect both

14      know and I know what we're talking about,

15      transobturator mesh is the TVT-O?

16  A.  That is correct.

17  Q.  Okay.  And TVT is the retropubic approach?

18  A.  That is correct.

19  Q.  Okay.  Now, in your TVT and TVT-O report, you indicate

20      that the retropubic approach offers a slight advantage

21      over the transobturator approach in terms of cure

22      rates.  That's on page twenty-three of your report.

23  A.  Which paragraph?

24  Q.  Let's see.  The second paragraph on page twenty-three.

Salil Khandwala, M.D.

Page 87

1    It starts with:  Overall, these data suggest that the

2    retropubic approach.

3    A.   It has, yes.

4              I'm sorry.  What's the question?

5    Q.   Sure.  Is it your opinion that the retropubic approach

6         has a slight advantage in terms of objective cure

7         rates over the obturator approach?

8    A.   No.

9    Q.   Okay.  So is that -- I just want to make sure I

10        understand that statement in your report.

11             That's not your opinion.  Is that just a

12        summary of the data that you were reviewing?

13   A.   Yes.

14   Q.   Okay.  And then the next sentence states that --

15   A.   Could I clarify?

16   Q.   Sure.

17   A.   This data essentially states that the retropubic

18        approach offers a slight advantage over the

19        transobturator approach in terms of objective cure

20        rate.

21             So we look at overall cure rate and the

22        subjective cure rate, there was no difference, but in

23        certain studies, the objective cure rate may have been

24        slightly better with the retropubic than with the

Salil Khandwala, M.D.

Page 88

1        TVT-Secur.

2   Q.   Okay.  And how do you distinguish between the

3        objective cure rate and the subjective cure rates?

4   A.   So the subjective cure rate is essentially what the

5        patient states.  Usually that is conducted through

6        validated questionnaires that they fill out before and

7        after.

8             The question could be in a validated form

9        do you leak urine with coughing, laughing, or

10       sneezing, and she may have said yes or no, and how

11       bothersome is that, and she may have mentioned yes

12       initially and she may have said greatly bothersome.

13            Postoperatively the same question is asked,

14       do you leak with laughing, coughing, and sneezing, and

15       now she may say no, so then that's a subjective

16       change.  So you say how many patients said yes, how

17       much patients say no, and look at what the difference

18       is, and then you can see the percentage change in that

19       particular subjective questionnaire.  In some studies

20       they may just ask the patients how are you doing.  So

21       it all depends on how the question is formatted.

22            Objectively, typically it is a cough test

23       which is usually done at a standard amount of bladder

24       fullness or when the patient feels subjectively full,

Salil Khandwala, M.D.

Page 89

1        or it could be in the form of a pad weight test.  So

2        preweighed pads are given to the patient.  She walks

3        around either for an hour, she changes it, or for a

4        day, and then she puts it back in a Ziploc bag and

5        brings it back to the office, and then we weigh it and

6        we see what is the difference in the weight in grams,

7        and based upon the difference, we can state that this

8        is successful or not.

9    Q.   Okay.  And so to summarize that, there's a functional

10       component of the analysis as well as perhaps the

11       patient's interpretation or quality of life view with

12       respect to the results as well?

13   A.   So functional, yes.

14   Q.   Okay.  And this goes on then to state that the two

15       approaches have different adverse effect profiles but

16       with the retropubic approach or with -- I'm sorry --

17       with the retropubic approach causing a higher rate of

18       perioperative complications.

19            Has that -- is that your opinion that the

20       retropubic approach has a higher rate of perioperative

21       complications?

22   A.   No.

23   Q.   Okay.  Do you -- in your opinion is there a difference

24       between the retropubic and transobturator approaches

Salil Khandwala, M.D.

Page 90

1          with respect to complications?

2    A.   There's no difference.

3    Q.   And what is the basis for that?

4    A.   The subsequent studies that I've quoted, especially by

5         Tommaselli, T-O-M-M-A-S-E-L-L-I, and Ford, F-O-R-D.

6         So they have basically looked at this and shown that

7         ultimately there is no significant difference.  The

8         numbers are very similar.  Whether it is bladder

9         injury you're looking at or voiding dysfunction or

10        pain, they're very similar.

11               And that also, these are good studies which

12        are published in the literature, plus my own

13        experience having done the TVT and having done the

14        TVT-O, I've seen that there is really nothing that

15        stands out.

16   Q.   Do you -- after your patients have a surgical

17        procedure, specifically a midurethral sling, do they

18        continue to treat with you after, after that procedure

19        and perhaps after the initial recovery period?

20   A.   We have a very strict format in our office because we

21        do clinical trials.  So whether patients are part of a

22        clinical trial or not, we almost always insist at the

23        presurgical appointment that the patients need to

24        follow up, and we tell them that there's a certain

Salil Khandwala, M.D.

Page 91

1     period of follow-up.  Usually it's at six months

2     postoperative, one year postoperatively, and maybe

3     then two years either on the phone or at the office.

4             And we do not charge for these visits.  So

5     this is more to see how are these patients doing and

6     for us to understand what is the long-term outcome and

7     how these patients have been doing ongoingly.

8  Q.  Okay.  And if the patients don't follow up, do you

9     reach out to them to try to get them back into the

10    clinic?

11 A.  Yes.

12 Q.  And I know you had mentioned again the clinical

13    studies.

14            Do you have a sense for what percentage of

15    your patients are part of a study versus what percent

16    are coming to see you outside the scope of one of your

17    studies?

18 A.  We try to almost put everybody in some kind of a

19    clinical study or preparing for a clinical study.  So

20    she may not be enrolled in a clinical study for now,

21    but we may use her data in another study which could

22    be a study done postoperatively, almost like a

23    retrospective study.  So if it is a retrospective

24    analysis, as long as the data is prospectively or

Salil Khandwala, M.D.

Page 92

```
 1          properly collected, then we can fall back on that data
 2          in the future.
 3                    Since I have a fellowship and, you know,
 4          the fellows are obliged to come up with papers, it is
 5          important to continue to keep publishing.  So it is
 6          good to collect the data.  We never know when the data
 7          would be useful.  Just like when in 2008 the FDA came
 8          out with the initial warning and said that this may be
 9          a problem, we had enough data to fall back on and see
10          our other clinical trial and see what was our
11          outcomes.
12                    So just like what MDS proposing to talk to
13          the patient about your outcomes, we can now
14          knowledgeably talk to our patients about our own
15          outcomes and tell them what are the facts.
16     Q.   Will you treat patients if they aren't part of a
17          clinical study or decline to be part of a clinical
18          study?
19     A.   Yes.  So, again, I'm sorry.  Most patients, they're
20          not all part of a clinical study, but we try to get
21          all the papers.
22                    So if a patient were to say I do not want
23          to fill the forms out, we try to explain to them the
24          value of that for themselves and for women at large,
```

Salil Khandwala, M.D.

Page 93

1      and if they still decline, then we will still manage

2      them.

3  Q.  Sure.

4          And if you use it in -- if you use the data

5      in a retrospective analysis, is that something you

6      have to go back to the patients and gather their

7      consent, or is there a different process for that?

8  A.  For that we do not have to get a consent.  It's a

9      chart review.  As long as we have the information in

10     the chart, we can just review the chart, and the

11     patient's information is, of course, blinded.

12 Q.  So they wouldn't necessarily know it's being used for

13     that purpose later, but their individual identifying

14     data is not shared?

15 A.  Correct.

16 Q.  Okay.  Do you -- I think you had said you have done

17     maybe just twenty to twenty-five surgical repairs of

18     mesh that was previously implanted, is that correct?

19 A.  Explants.

20 Q.  Explants?

21 A.  Yes.

22 Q.  Are there other types of surgical repair that you

23     might do for mesh?

24 A.  Yes.

Salil Khandwala, M.D.

Page 94

1    Q.   And can you describe that for me, please?

2    A.   If I've done, for example, one wall mesh and then the

3         contralateral wall falls down, then I may go back and

4         repair the contralateral wall.  So it is recurrence of

5         the contralateral wall prolapse or recurrence of the

6         treated wall prolapse.

7              For stress incontinence, it could be that

8         I've performed a sling on a patient, and now she has

9         ongoing stress incontinence.  Then I may go in and do

10        a modification of that sling or put another sling in.

11        So those are the typical things I've done.

12             In the past I've also done where the sling

13        was too tight, then I had to release the sling.  So

14        these are procedures that could be done for different

15        reasons.

16   Q.   Okay.  And do you have occasion to treat patients that

17        were implanted by other physicians that may now have

18        some complications with respect to their mesh?

19   A.   Yes.

20   Q.   Okay.  And would those patients be included in the

21        explant procedures that you just described?

22   A.   Yes.

23   Q.   Okay.  Are there patients that actually -- strike

24        that.

Salil Khandwala, M.D.

Page 95

1              In the explant procedures, were you able to
2        remove all of the mesh?
3    A.  I have never had to remove all of the mesh.
4    Q.  Okay.
5    A.  Ever.
6    Q.  Okay.  Would you agree that dyspareunia is a
7        complication that's been reported with respect to both
8        the transobturator and retropubic slings?
9    A.  I do not agree that dyspareunia is a cause of the or
10       as an outcome of the sling, but it has been reported
11       in papers published on slings.
12   Q.  Okay.  And is it your opinion that the dyspareunia is
13       caused by something other than the sling?
14   A.  Yes.
15   Q.  Okay.  And what in your view causes the dyspareunia?
16   A.  There are many factors.  One key thing to note is did
17       the patient have -- is it de novo dyspareunia or is it
18       ongoing dyspareunia.  So for that it is very important
19       to document whether the patient had this before a
20       procedure was done, whatever that procedure could be.
21       So that's important.
22              Number two, she could have a condition
23       called underlying pelvic pain syndrome.  There could
24       be postmenopausal vaginal atrophy.  There could be

Salil Khandwala, M.D.

Page 96

1        previous surgical procedures done that could have

2        resulted in scarring that could be causing pelvic

3        pain.

4                 There could be so many factors, it could be

5        a male, female disparity, you know, and whether it's

6        the same partner, different partner, whether it is

7        psychological, nonpsychological.  So there are so

8        many, so many factors that could play a role in

9        dyspareunia.

10   Q.   Would you agree that erosion of the mesh can

11        contribute to dyspareunia?

12   A.   No.  It does not contribute to dyspareunia.  I

13        disagree.

14   Q.   So in your view, you would disagree with anyone that

15        would associate dyspareunia with extrusion or erosion

16        of mesh?

17   A.   Yes, and I can explain why.  It is the mesh where it

18        is placed in the vagina, it's already placed.  Whether

19        the skin or the epithelium under that heals or remains

20        open does not change the configuration of the mesh in

21        the patient's body.  It remains as is.

22                 Many a times if there's an exposure, this

23        could be managed expectantly.  Fifty percent of the

24        times the mesh exposure does not have any symptoms and

Salil Khandwala, M.D.

Page 97

1      does not need to be removed.

2            The typical complaint that I have seen

3      patients come with mesh exposure is not dyspareunia.

4      It is either vaginal spotting or more likely it is

5      hispareunia, meaning he, her partner, feels something

6      in the vagina that is sharp.  And then if you feel

7      this thing and, yeah, that is what is causing it, and

8      then we may have to take care of that exposure.

9            But the patient almost never feels that as

10      a cause of dyspareunia because it's already there.

11      Whether the epithelium under that heals or not, it

12      doesn't remove the mesh as such.  So if it has healed

13      below it and there is no exposure whereas if it's

14      open, that doesn't make a difference from the point of

15      view of the patient.

16  Q.  And you have not analyzed any of the mesh material

17      that has been removed from women in terms of any

18      degradation or change in consistency of that mesh from

19      a pathologic point of view, have you?

20  A.  I have not analyzed mesh.

21  Q.  Okay.  And you would agree that groin pain is a

22      complication that's been reported with respect to

23      midurethral slings, is that correct?

24  A.  Yes.

Salil Khandwala, M.D.

Page 98

1    Q.    And you would distinguish between I think what your

2          report refers to as transient versus chronic groin

3          pain, is that fair?

4    A.    Yes.

5    Q.    And would you agree that a chronic pain is something

6          that's going to have perhaps a more significant impact

7          on a woman's quality of life?

8    A.    Well --

9                     MR. WALKER:  Object to form.

10                    THE WITNESS:  Even a transient pain could

11         have some impact on quality of life because even if

12         it's there and it's hurting her, it's hurting her.  So

13         the only thing different between transient and chronic

14         is chronic has been ongoing for quite some time.

15                    Typically the definition varies what

16         chronic pelvic pain or chronic groin pain may be, but

17         usually it's attributed to usually lasting more than

18         six months which is an ongoing process.

19   BY MS. FLAHERTY:

20   Q.    Okay.  Do you -- actually, strike that.

21                    When we were talking about the surgical

22         operations for SUI, just to step back, I think I

23         forgot to ask you about this.  Is another option the

24         fascial sling?

Salil Khandwala, M.D.

Page 99

1    A.   Yes.

2    Q.   And that's different than a Burch procedure, correct?

3    A.   That is correct.

4    Q.   Okay.  And have you performed any fascial sling

5         procedures?

6    A.   Yes, I have.

7    Q.   Okay.  Is that something that you utilize for certain

8         patients?

9    A.   Extremely rarely at this moment in time.

10   Q.   Okay.  And why is that?

11   A.   It is too invasive to perform, especially if you're

12        using an autologous fascial sling because you have to

13        the harvest either the fascia lata, L-A-T-A, which

14        comes from the side of the thigh, so you take a strip

15        from the thigh and then put it under the urethra, or

16        you harvest the rectus fascia which is from the lower

17        belly and put it under the urethra.  So it's a very

18        involved operation for something that can be managed

19        minimally invasively.

20   Q.   And when you say that, you mean via the midurethral

21        sling?

22   A.   That is correct, synthetic midurethral sling.

23   Q.   Yes.  Do you use any biologic products for treatment

24        of SUI?

Salil Khandwala, M.D.

Page 100

1    A.    The only thing I would use is the Macroplastique, it's
2          partly biodegradable, but not for a sling.
3    Q.    Okay.  And why is that?
4    A.    Because the data that has been published on biologics
5          has been very poor with significant failure rates, and
6          I have overall been very happy with the use of
7          midurethral slings using a synthetic material, and it
8          has stood the test of time.
9    Q.    I want to talk a little bit about training with
10         respect to the pelvic mesh products, specifically the
11         midurethral slings.
12                   Your opinion indicates that you have and
13         your testimony earlier today have indicated you've
14         participated in quite a bit of training with respect
15         to the various Ethicon sling products, is that
16         accurate?
17   A.    As a proctor or teacher?
18   Q.    Yes.
19   A.    Yes.
20   Q.    And do you know about how many hours you have spent
21         teaching or proctoring with respect to sling products?
22   A.    Just the Ethicon you're talking about?
23   Q.    Let's start with Ethicon.
24   A.    I know that's way back.  As I mentioned, I do not

Salil Khandwala, M.D.

Page 101

1        think I've done anything since 2008.

2   Q.   Okay.

3   A.   So it's way back, so it will be total conjecture for

4        me to think about how many hours.

5   Q.   And you've also done some proctoring with respect to

6        other companies' mesh products, is that correct?

7   A.   Yes.

8   Q.   And we'll focus just on slings for right now.

9   A.   Okay.

10  Q.   And then did you mention earlier that you had trained

11       in France with some doctors on midurethral slings?

12  A.   Actually, I trained in operative laparoscopy, but the

13       next hospital was the main hub of their French

14       Urogynecology Society.  So I met him, but I had not

15       trained with him.

16  Q.   Okay.  Did you participate in any meetings or have the

17       opportunity to maybe take advantage of having that

18       proximity to that additional training?

19  A.   Yes.

20  Q.   Okay.  And in addition to the proctoring, I assume

21       before you did that, you probably attended some of the

22       training sessions so that you yourself could learn

23       about the implant process for the TVT products?

24  A.   Yes.

Salil Khandwala, M.D.

Page 102

```
 1   Q.   And can you -- do you recall how much training you
 2        received prior to implanting your first TVT product?
 3   A.   You know, that will be way back.  So it would probably
 4        be like 1990.  So I don't even remember if my -- I
 5        think it was I was in my fellowship.  Doctor Bent,
 6        B-E-N-T, was my fellowship director, and I believe he
 7        had just started doing the slings, and he was training
 8        me as his fellow.
 9   Q.   Okay.  So did you also attend any cadaver training
10        prior to implanting TVT products?
11   A.   Yes, I did.
12   Q.   Okay.  And did you at some point while you were
13        proctoring, did you -- was that also done in cadaver
14        labs?
15   A.   Yes.
16   Q.   And did you also have occasions where other doctors
17        could come in and observe you during surgical
18        implantations?
19   A.   Yes.
20   Q.   And what other types of training did you conduct for
21        doctors who were wanting to learn about the Ethicon
22        midurethral slings?
23   A.   You know, I was on their advisory board in the sense
24        that if a doctor had any question, they could e-mail
```

Salil Khandwala, M.D.

Page 103

1    me or ask, call me and ask me specific questions in

2    that regard.  So I may have had a few calls from

3    doctors in the field who were asking questions about

4    what may have happened or how they could improve the

5    process.

6                Then I used to go to the Ethicon-driven

7    Summit meetings they would call it, and those were

8    held annually, very good networking meetings where

9    physicians would come together and we would brainstorm

10   each other and there would be breakout situations, and

11   I have sometimes led the TVT-Secur or the Prolift+M

12   breakout session.  But, again, these are physicians

13   who are practicing, so then we would learn from each

14   other.

15   Q.  And in the advisory board, just so I'm clear, is that

16       an Ethicon advisory board, or what type of board is

17       that?

18   A.  It's not an advisory board.  It's just some physicians

19       who they are main proctors, and they could bounce some

20       questions by them.  So if a physician had any

21       question, they would ask the proctors.

22                So since I was one of the proctors, I had

23       agreed to have doctors call me, especially doctors who

24       had come to my site and trained with me or doctors who

Salil Khandwala, M.D.

Page 104

```
 1        I had trained at cadaver lab, and they went out and
 2        started practicing and had some outstanding questions,
 3        I would field their calls.
 4   Q.   Do you recall, how long did you serve in that
 5        capacity?
 6   A.   I was open to them, so there's no set rule, there is
 7        no financial agreement to do that.  It was just a
 8        courtesy for my colleagues so if they had to call me,
 9        they could call me any time.
10   Q.   Okay.  And the Ethicon-driven Summit meetings, is that
11        what they were called?
12   A.   Yes.
13   Q.   And those were annual meetings for physicians?
14   A.   Yes.
15   Q.   And then were there Ethicon representatives there as
16        well that could answer questions regarding the various
17        products?
18   A.   Yes, but it was mainly aimed at physician interaction,
19        physician-to-physician interaction.
20   Q.   Okay.  And did those occur at various locations each
21        year?
22   A.   Yes.
23   Q.   Okay.  And did you prepare materials for those Summit
24        meetings?
```

Salil Khandwala, M.D.

```
                                                      Page 105
 1    A.   Yes.
 2    Q.   And are those materials that you would then present or
 3         share with the other physicians that were attending?
 4    A.   Yes.
 5    Q.   And did Ethicon have any role or did you -- did they
 6         review any of those materials that you prepared for
 7         the Summit meetings?
 8    A.   No.
 9    Q.   Do you still have copies of the materials that you
10         would have used?
11    A.   No.
12    Q.   Were you paid for any of your time at the Ethicon
13         Summit meetings?
14    A.   Yes.
15    Q.   Do you have any invoice or other documentation
16         regarding the compensation you would have received
17         during that time?
18    A.   No.  Again, this was probably on the 2004 to 2006 time
19         frame.
20    Q.   Okay.  And is it fair to say that that information
21         would or at least should be included in the 1099s that
22         you've received over the years from Ethicon?
23    A.   Yes.
24    Q.   We've been talking lots about the three different mesh
```

Salil Khandwala, M.D.

Page 106

1        products, and I just want to confirm.

2                    With respect to TVT and TVT-O, is it your

3        opinion, Doctor, that the mesh is the same, the

4        approach is different but the mesh itself is the same?

5    A.  It may have been changed.  Some slings are cut

6        mechanically, one is laser cut, you know, so that may

7        be different.  But otherwise it's essentially the

8        same.

9    Q.  And with respect to the laser cut versus mechanical

10       cut, do you have a preference for which one you use

11       during your procedures?

12   A.  No, I do not.

13   Q.  Do you make a request to have laser cut versus

14       mechanical cut?

15   A.  No, I do not.

16   Q.  Okay.  And do you know what percentage of the mesh you

17       use is mechanical versus laser cut?

18   A.  Well, now I believe -- I don't know what the present

19       mesh is on the sling is, but I believe that it is cut,

20       almost all are laser cut, but the TVT-Secur that I

21       used finally was a laser-cut mesh.

22   Q.  And we talked a little bit about you had attended

23       cadaver lab and I think some other proctor session.

24                    Was there any other training that you

Salil Khandwala, M.D.

Page 107

```
 1          received prior to implanting the TVT devices?
 2     A.   The TVT-Secur I had to go to cadaver lab at Ethicon
 3          because it was the first time that they were launching
 4          this.  So that was the -- and then that was the only
 5          thing.  No, I have not gone to anybody else to train.
 6     Q.   Okay.  So on the TVTs and the TVT-Os, what was the
 7          training that you received prior to implanting those
 8          devices?
 9     A.   TVT was most likely with my fellowship director,
10          Doctor Bent, and the TVT-O, I don't recall if I went
11          anywhere.  I know I went to a cadaver course, but I'm
12          not sure if I went to -- I think 2002 I believe.  I
13          don't even remember where I went, if I went to someone
14          to watch him or her operate.
15     Q.   Prior to using the TVT and the TVT-O, were you using
16          other manufacturers' midurethral slings?
17     A.   I don't think there existed any.  No, I was not.
18     Q.   So the first midurethral sling you would have used
19          would have been the TVT?
20     A.   Synthetic one, yes.
21     Q.   Were you required to observe a certain number of
22          procedures before you were able to implant a synthetic
23          midurethral sling?
24     A.   Since I was already doing it as part of
```

Salil Khandwala, M.D.

Page 108

```
 1        sacrocolpopexies, we were already using synthetic

 2        material for prolapse.  So that was part of my

 3        training.

 4                     And then as part of my fellowship, I was

 5        already being trained to using the TVT product.

 6   Q.   So there wasn't a certain number of procedures you

 7        were required to observe?

 8   A.   Yeah, I don't recall any such number.

 9   Q.   Did you assist in drafting any of the training

10        materials that Ethicon used to train other physicians

11        in the use of synthetic midurethral slings?

12   A.   Yes, I did.

13   Q.   Okay.  And what was your role in drafting those

14        materials?

15   A.   It was a surgeon monogram that we put together for the

16        TVT-Secur.  So we were -- so people who had enough

17        experience with the TVT-Secur and had good results

18        were invited to participate in this meeting, and when

19        we got together, we fielded some potential concerns

20        and questions that Ethicon may have heard from

21        physicians.

22                     And having done several of these, we could

23        understand where these concerns were coming from, and,

24        therefore, we tried to come up with certain set
```

Salil Khandwala, M.D.

Page 109

1           guidelines to help surgeons improve their outcomes.

2           So that was the goal of that monogram.

3    Q.    Okay.  And so that was after the TVT-Secur was on the

4           market, and you were trying to help perhaps further

5           clarify or explain some of the issues or how to

6           address issues that physicians were experiencing?

7    A.    That's correct.

8                     MR. WALKER:  Object to form.

9    BY MS. FLAHERTY:

10   Q.    Okay.  And you had mentioned a monogram.

11                    Can you describe for me what a monogram is?

12   A.    It is a booklet that we have put together, and that's

13          basically what it was.

14   Q.    Okay.  So that's something that's in addition to or

15          different from -- actually, strike that.

16                    The monogram is not the IFU, Instructions

17          For Use?

18   A.    That is correct.

19   Q.    Okay.  And I believe I had -- are you familiar with

20          the phrase, I think it's Tips and Pearls --

21   A.    Yes.

22   Q.    -- with respect to Ethicon products?

23   A.    Yes.

24   Q.    Do you recall if there was a Tips and Pearls document

Salil Khandwala, M.D.

Page 110

1          with respect to the TVT-Secur?

2     A.   Yes.

3     Q.   Okay.  Is that part of the monogram that you just

4          described?

5     A.   I believe so.

6     Q.   Okay.  And the intent behind those was to help perhaps

7          further clarify the information that was in the IFU?

8     A.   It was mainly to help --

9                    MR. WALKER:  Object to form.

10                   THE WITNESS:  It was mainly to see what are

11         the technical differences between the slings that were

12         being done before and now, and that was a major

13         problem that surgeons were not able to get over the

14         fact that these are no longer long slings, this is a

15         short sling, and how do you actually place it.

16                   And the value of placing was so important

17         because what we realized is that the entire tension

18         was being directed to us thinking, oh, this is a small

19         little incision in the vagina, it's very easy to do

20         this procedure.

21                   In fact, it was very -- it was harder to do

22         the procedure as compared to a TVT or a TVT-O because

23         you had to absolutely make sure that if you're going

24         by the hammock approach, you're actually getting into

Salil Khandwala, M.D.

Page 111

1      the muscle.  With a TVT-O, you are going through the

2      muscle.  There is no question about that because

3      you're coming out to the skin and so you know that you

4      have gone through the muscle whereas here if you do

5      not angle it correctly, you are not getting into the

6      muscle.  So those were important features that we

7      realized.

8                  At the same time, you know, how do you lay

9      the sling.  It is a pull-out technique, it's not a

10     pull-up technique.  That was a huge difference for us

11     to understand.  So rather than leave an instrument

12     because throughout what we had learned, and surgeons

13     had done hundreds of these operations, maybe

14     thousands, leaving an instrument between the sling and

15     the urethra at the time of tensioning.

16                 So all of us were used to leaving a little

17     bit of a gap there.  But with the Secur if a gap was

18     left, that was bad news, and that is why even I had

19     initial failures with the TVT-Secur.

20                 And then I realized that, no, this is a

21     problem of my technique, and as I got better and

22     better at it, I realized that this is a different type

23     of placement, you know, than the TVT and the TVT-O,

24     and that is what we wanted to explain and make the

Salil Khandwala, M.D.

Page 112

1        other surgeons understand.

2   BY MS. FLAHERTY:

3   Q.   Okay.  And that's because it was important to make

4        sure that doctors understood the proper implantation

5        technique for the product?

6   A.   That is correct.

7                 MR. WALKER:  Object to form.

8   BY MS. FLAHERTY:

9   Q.   And the monogram which I think is -- actually, strike

10       that.

11                And the monograms were necessary to help

12       further explain that process for physicians?

13                MR. WALKER:  Object to form.

14                THE WITNESS:  So if physicians felt the

15       need that they were having some issues, and then it

16       was more to highlight, once the material, once the

17       device was in place for some time and then what did we

18       find.  So obviously there's no way we can find

19       outcomes in three months, what happened at six months

20       out, what happened at a year out, and then why if, at

21       all things, were not going right, what was happening.

22                So many of us realized over time, and

23       that's the only way to learn, because information for

24       use will not tell you what is going on because that's

Salil Khandwala, M.D.

Page 113

1          initially set, and then as we go on, we say what did

2          we learn from clinical experiences, what did we learn

3          from our peers, what did we learn from what is

4          published, and based upon that, we came up with these

5          different notions and ideas and we put together in

6          there what you mentioned, the Tips and Pearls.

7     BY MS. FLAHERTY:

8     Q.   Okay.  So it sounds like the implantation technique

9          and the tensioning were factors with respect to the

10         outcome for a particular patient or doctor?

11                   MR. WALKER:  Object to form.

12                   THE WITNESS:  From the point of view of the

13         TVT-Secur, it's very important to do it correctly, and

14         if it was -- if the procedure points that are

15         highlighted in let's say the IFU, they're mentioned

16         there but they had to be stressed, the value of doing

17         this correctly.

18                   So, for example, the IFU say not too less

19         tensioning, not too much tensioning, you know, what

20         does that clinically mean, so how does a doctor

21         understand those things.

22                   So ultimately if I'm out there, if I'm out

23         there as a doctor who is practicing and I want to know

24         what to do, how would I go about it is to look at what

Salil Khandwala, M.D.

Page 114

1          is published, what other information comes out, and

2          usually it is mostly I would get some publications.

3                    And in a paper that we published, we even

4          highlighted in the discussion the value of this

5          pull-out technique and how the sling should be

6          positioned as opposed to the previous slings.

7     BY MS. FLAHERTY:

8     Q.   And the monograph is one of the things that would help

9          physicians understand this and highlight the

10         importance of this as you just mentioned?

11    A.   Yes, one of the things.

12                   MR. WALKER:  Object to form.

13    BY MS. FLAHERTY:

14    Q.   Okay.  Did you assist in preparation of any of the

15         training materials with respect to the TVT or TVT-O?

16    A.   No, I did not.

17    Q.   Okay.  Do you need a break?  It's been about another

18         hour.

19    A.   No.  It's up to you.

20                   MR. WALKER:  Can we go off the record real

21         quick?

22                   MS. FLAHERTY:  Yeah.

23                   (Off the record at 11:29 a.m.)

24                   (Back on the record at 11:38 a.m.)

Salil Khandwala, M.D.

Page 115

```
 1                MS. FLAHERTY:  Back on the record.

 2   BY MS. FLAHERTY:

 3   Q.   Doctor, in your TVT-Secur report which is Exhibit

 4        No. 5 --

 5   A.   Yeah.

 6   Q.   All right.  On page twenty-seven, you indicate that

 7        the TVT-Secur was developed because of dangers

 8        associated with the TVT and TVT-O, is that correct?

 9   A.   Could you -- which line is that?

10   Q.   Sure.  Let's see.  On page twenty-seven, see where it

11        says genesis and rationale for the TVT-Secur system?

12   A.   Yes.

13   Q.   And the second paragraph, it says:  The main risks of

14        the retropubic TVT passage are bladder injury and

15        injury to blood vessels.

16   A.   Uh-huh.

17   Q.   Some of these injuries, especially to blood vessels,

18        can be catastrophic.

19   A.   Uh-huh.

20   Q.   And you would agree with that?

21   A.   It depends on the placement.  So if the surgeon does

22        not follow the typical technique of placement of a TVT

23        and sort of goes lateral, then they could hit the

24        external iliac vessels, and that has happened,
```

Salil Khandwala, M.D.

Page 116

1    especially if they deviate from the normal method of

2    doing it, and that could be catastrophic.

3    Q.    And you go on to say that the elimination of trocars

4          could help with these complications or help prevent

5          these complications I think is what it says.

6    A.    Potentially.

7    Q.    Potentially.

8                Okay.  Are there additional potential

9          dangers associated with the retropubic approach aside

10         from the bleeding that we just described?

11               MR. WALKER:  Object to form.

12               THE WITNESS:  Are you talking about

13         retropubic TVT sling?

14   BY MS. FLAHERTY:

15   Q.    Yes.

16   A.    So any surgical intervention has possible

17         complications, whether it is a device or non-device,

18         and typically would be bleeding, infection, and injury

19         is the three things that we typically always quote.

20         So bleeding to the neighboring vessels could happen,

21         and you never know, there could be a vessel in the

22         space of Retzius that could bleed.

23               Second is injury.  Even if you try to

24         deflect the bladder to the contralateral side, there

Salil Khandwala, M.D.

Page 117

1        may be scarring from a previous operation that the

2        patient may have had, and there is possible risk of

3        injury to the bladder and possible risk of infection

4        because you are working in the vagina which has a

5        bacterial flora.  So that's why it's called a

6        clean-contaminated surgery.

7                    So there's always a possible risk of these

8        three factors.

9    Q.   Would you also include in the risks or, I'm sorry, in

10       the list of potential dangers associated with the

11       retropubic approach bowel perforation?

12                   MR. WALKER:  Object to form.

13                   THE WITNESS:  If a sling is done correctly,

14       then it is very, very unlikely to happen, and it is

15       even in reports published, I mean, they don't even

16       mention it because it could be like one or two cases

17       over maybe a hundred thousand.

18                   So typically I would not even discuss with

19       my patient, though I may say that that could happen,

20       it's very rare.  You can't even give a percentage to

21       that complication.

22   BY MS. FLAHERTY:

23   Q.   What about bladder perforation?

24   A.   Bladder perforation is just the way you're going in,

Salil Khandwala, M.D.

Page 118

1      and it's impossible to say whether it could hit or

2      not.  That's why it's always good to look inside the

3      bladder, but the risk of that is very low.  Typical

4      reports would say less than two percent likely risk of

5      bladder injury with the TVT.

6                And it has not changed whether it's a TVT

7      or the transobturator.  So one may feel that

8      potentially bladder perforation is lesser with a

9      transobturator but could even happen with a

10     transobturator technique.

11  Q.  Okay.  So it could happen with either technique?

12  A.  Yes.  And it also could happen with a Burch

13     colposuspension.  So any incontinence procedure, even

14     a Kelly plication, could cause bladder injury.

15  Q.  Okay.  And is that something that you would discuss

16     with your patient before they make a decision as to

17     which treatment option may be best for them?

18  A.  So when we discuss about a surgical modality, then I

19     would talk to her about what surgical modality and

20     what are the potential risks associated with that.

21                But most of the complications could happen

22     with any anti-incontinence procedure, whether it

23     involves a sling or otherwise.

24  Q.  Okay.  And vaginal extrusion, is that an additional

Salil Khandwala, M.D.

Page 119

1      complication that you would discuss with your

2      patients?

3   A.  I would mention that it could happen and there is a

4      potential likelihood of it happening, but that, again,

5      depends on so many factors.

6              I do not believe -- in my opinion based

7      upon reasonable degree of medical certainty, a sling

8      does not cause erosion or exposure.

9   Q.  The women who have had slings, you're aware that women

10     who have had slings placed have suffered from vaginal

11     extrusion?

12             MR. WALKER:  Object to form.

13             THE WITNESS:  Vaginal exposure or extrusion

14     as you mention is a phenomena where the vagina doesn't

15     heal under the sling, and the sling is then seen or

16     exposed.  So that is not a complication of the sling,

17     but it has happened, I agree.

18  BY MS. FLAHERTY:

19  Q.  Okay.  And would you agree that women who have had

20     synthetic midurethral slings placed have also suffered

21     from urethral erosion?

22             MR. WALKER:  Object to form.

23             THE WITNESS:  Could you please repeat the

24     question?

Salil Khandwala, M.D.

Page 120

1    BY MS. FLAHERTY:

2    Q.    Sure.  Would you agree that women who have had

3          synthetic midurethral slings placed have suffered from

4          erosion of the mesh?

5                    MR. WALKER:  Object to form.

6                    THE WITNESS:  I would agree that erosions

7          have been reported in patients who've had some type of

8          a synthetic midurethral sling placed.

9                    However, it is not because of the sling

10         that the erosion has happened.

11   BY MS. FLAHERTY:

12   Q.    And is it your view that that is caused by other

13         mechanical issues with respect to the patient?

14   A.    There could be many factors.  It could be patient

15         factors, it could be the surgeon factors, it could be,

16         you know, the technique, how it was placed, and a part

17         of the patient factor also, what previous operations

18         she had undergone, how thin is the tissue under the

19         urethra, and then, again, you know, what was the

20         tensioning that the surgeon placed under the urethra.

21   Q.    And the tensioning is an important piece of the

22         implant procedure, is that correct?

23   A.    From the success standpoint, yes.

24   Q.    Okay.  And when you talk about the success standpoint,

Salil Khandwala, M.D.

```
                                              Page 121
 1        does that also factor in any complications or adverse
 2        consequences that a patient may have following the
 3        procedure?
 4                    MR. WALKER:  Object to form.
 5                    THE WITNESS:  In what sense?
 6   BY MS. FLAHERTY:
 7   Q.   Well, you had talked about it factors into the success
 8        of the procedure.
 9                    Does your definition of success with
10        respect to a midurethral sling procedure include both
11        whether it stops the incontinence as well as whether
12        there's any sort of complications that that woman is
13        suffering following the procedure?
14                    MR. WALKER:  Object to form.
15                    THE WITNESS:  That's a good question.  So,
16        now, in the past, the typical success was based upon
17        certain factors just like as we talked about earlier,
18        subjective cure versus objective cure.
19                    Now, you know, the NIH consensus is, the
20        NIH consensus is that it should not be based upon
21        that.  It should be a composite score, it should be
22        how is, how is her quality of life.  In other words,
23        yes, you put the sling in, she's not leaking, but how
24        is she voiding, is it too tight that she's not voiding
```

Salil Khandwala, M.D.

Page 122

1       properly and she's struggling to empty her bladder.

2                So you want to make sure that you get a

3       composite score which looks at not only how well it

4       has treated the problem that she came for but you did

5       not give her any new problems thereafter.

6                So when we published our paper on the

7       TVT-Secur in-office, we actually looked at a composite

8       score where we looked at not just how our success was

9       and how dry she was but also did she get any other

10      problems with it.  So we put all that together and

11      then came up with a score.

12   BY MS. FLAHERTY:

13   Q.  If the TVT-Secur was still on the market, would you --

14      would it be your preference to use that product over

15      the TVT or TVT-O?

16   A.  I would.  I had transitioned from the TVT-O on to the

17      TVT-Secur, and the only reason I stopped doing the

18      TVT-Secur was because it was taken off the market.

19      Otherwise, I was very happy with how it was going, and

20      especially with my patients that we were following up

21      were doing excellent with the technique.

22                And, in fact, I switched to a similar

23      family of operations.  So I did not go from the

24      TVT-Secur back to the TVT-O.  I went from TVT to Secur

Salil Khandwala, M.D.

Page 123

1      which is a single-incision sling to another

2      single-incision sling made by a different company

3      which is the MiniArc.

4   Q.  And then you went to the Solyx?

5   A.  Which is a single-incision sling.  So, in other words,

6      if TVT-Secur was still to be on the market, I would

7      still be using the TVT-Secur.

8   Q.  Okay.  And that's because you felt that the success

9      rate was better than what you had experienced with TVT

10      and TVT-O?

11   A.  No.  My success was very good with the TVT and the

12      TVT-O.  I felt that because it was minimally invasive,

13      I could do it under local anesthesia, and that is why

14      I did a clinical trial in the office.  So in that

15      study when we did it, we had a properly formatted

16      trial that we did it where we performed fifty patients

17      in the office completely under local anesthesia.

18          So what I thought is that it would be a

19      boon for women where now they do not have to go to a

20      hospital, they do not have to go to a surgery center,

21      they could come to a doctor's office, in a methodic

22      and a proper fashion, a procedure should be done, and

23      she is home within an hour and back to work the next

24      day.

Salil Khandwala, M.D.

Page 124

1           Because in our clinical trial, when we did

2       a proper pain scale, patients did not take any

3       narcotics.  If anything, they took Tylenol for pain.

4    Q.  Is the Solyx also -- is the Solyx implant also done in

5       the office?

6    A.  I have -- I'm doing it under, entirely under local

7       anesthesia, but since I'm working on my patent

8       procedure, I have not moved it to the office yet.

9    Q.  Do you agree that the TVT, and I'll say TVT, TVT-O,

10      and TVT-S, those implants cause a foreign body

11      response in the woman?

12   A.  Any foreign body which is implanted would cause a

13      foreign body response.  So, yes, they would cause a

14      foreign body response.

15   Q.  And those products can also cause chronic

16      inflammation?

17   A.  I do not agree with that.  There has been no -- well,

18      actually, let me take it back.  It is possible it may

19      cause some type of a macrophage response, but it has

20      never been studied in situ where everything is intact

21      whether it continues to do it, but, because it goes

22      through a certain phase of a foreign body response

23      which starts from tissue injury when the surgical

24      intervention happens, protein absorption, acute

Salil Khandwala, M.D.

Page 125

1          inflammation where initial neutrophils come out,

2          chronic inflammation where there's macrophages which

3          eventually become multinucleated giant cells, and that

4          leads to granulation tissue formation and finally

5          encapsulation.  So I see this with any foreign body.

6                    For example, if it's an InterStim battery,

7          you see the same thing.  So there is not an ongoing

8          inflammation because I have gone back in a patient who

9          had, for example, the TVT-Secur placed, and she was

10         still having incontinence.  So I've gone back and

11         opened up the incision and found that the sling was as

12         is as it was placed, and there was no evidence of

13         infection at all.

14    Q.   Do you know how long that procedure or how much time

15         had passed from implant until you had conducted that

16         procedure you just discussed?

17    A.   Yeah.  I have -- I'm doing a clinical trial on

18         something called the plication of the sling, and that

19         is where we just go back in a patient who is still

20         having some residual stress incontinence, we go back.

21                    And it started because I had gone back to

22         replacing sling, I put in a TVT-Secur.  I opened up

23         the incision, I looked at the Secur, and I could not

24         believe what else more could I do because the sling

Salil Khandwala, M.D.

Page 126

1    looked perfectly as it was.  It was where it was

2    supposed to be and it seemed to be as tight as I could

3    put it.  And I asked some of my colleagues and I took

4    a video and asked them what do you think, and they

5    mentioned this is perfect.  But she was still leaking.

6         So what I then did, I thought that maybe

7    it's like a buckle of a belt.  If someone loses

8    weight, you just tighten it up, you don't throw the

9    belt away.  So I said why should I not then just

10   tighten the sling.  So we did a tightening of the

11   sling called plication of the existing sling, and we

12   are tracking our patients, and we're finding that the

13   results are very good.

14        So this, to answer your question, this has

15   varied from I could be going back in six months to

16   about two years to five years.  Recently I did a

17   patient who was almost about four to five years out,

18   and I went and plicated it.

19  Q.  And the plication, is that something that is done --

20      I'm sorry.

21  A.  It's my pager.  That's all right.

22  Q.  You're okay?

23              MR. WALKER:  You don't need it?

24              THE WITNESS:  No, that's okay.

Salil Khandwala, M.D.

Page 127

1                    MS. FLAHERTY:  Strike that last question.

2        Sorry.

3    BY MS. FLAHERTY:

4    Q.   With respect to the plication study, is that focused

5         on situations where the woman is continuing to suffer

6         from incontinence?

7    A.   Yes.

8    Q.   Okay.  And so the plication study's focus is not on

9         erosion or degradation of the mesh; it's whether the

10        mesh worked to stop the incontinence, is that a fair

11        statement?

12   A.   That's correct, right.

13   Q.   Okay.

14   A.   And the reason I could plicate it is because the mesh

15        was still there as placed just almost yesterday.

16   Q.   Okay.  And what's the status of the plication study in

17        terms of completion and where you're at with that

18        process?

19   A.   You know, fortunately we have had very good results

20        with our studies, so we do not have that many failures

21        of the sling.  So it's we are finding difficulty

22        enrolling patients in, but I think once we get to

23        about ten or fifteen cases, then we will be enrolling.

24                    We want to see at least a year follow-up.

Salil Khandwala, M.D.

Page 128

1      So I believe we're about six months, you know, from

2      follow-up, so then we're waiting for six more months

3      to see how these patients do.

4   Q.   Okay.  So at this point you're somewhere less than ten

5      to fifteen patients, hoping to -- I shouldn't said

6      hoping but waiting to see if some additional patients

7      will meet the criteria to be enrolled?

8   A.   Right, yes.

9   Q.   Okay.  Would you agree, Doctor, that there's a

10     distinction between postoperative pain and chronic

11     pain?

12  A.   Well, typically the postoperative pain is usually

13     transient, should not be long lasting, and everybody

14     has some type of postoperative pain.

15          So the chronic pain is where you do not

16     expect this to be the case, whether it is pain because

17     of fibromyalgia, you know, or pelvic pain syndrome or

18     vulvodynia, and so that's an ongoing issue.

19          So that's the main difference.  One is

20     usually a transient thing which is always there but

21     goes away which is the postoperative pain, and chronic

22     pain is longstanding.

23  Q.   Do you treat any patients that have chronic pelvic

24     pain?

Salil Khandwala, M.D.

Page 129

1   A.   Yes, I do.

2   Q.   And what is your general treatment for those patients?

3   A.   It depends on the disease state typically, so, and

4       what symptoms they have.

5           Most of these patients that I see come

6       with, you know, pain during intercourse, just

7       generalized pain in the vagina, and they have this

8       condition called vulvodynia, slash, pelvic pain

9       syndrome.  Many of them are managed medically with

10      older neuromodulation therapy such as amitriptyline.

11  Q.   And is that a prescription drug?

12  A.   Yes.

13  Q.   And is that something that you anticipate has a

14      limited duration or they could be on these

15      prescription drugs for an indefinite period of time?

16  A.   It is variable.  We haven't studied this.

17         However, we have had some patients who have

18      sort of reset their nerves, and they're doing well and

19      they do not need to be on the medication and we can

20      wean them off whereas some others we have tried to

21      wean off, but, again, the symptoms come back and we

22      have to keep them on it.

23  Q.   Okay.  So chronic pain can be somewhat difficult to

24      treat from patient to patient?

Salil Khandwala, M.D.

Page 130

1    A.    Yes.

2    Q.    Okay.  And there can be some side effects of the

3          medications that they need to take if they're having

4          chronic pain, is that fair?

5    A.    Yes.

6    Q.    Are you offering any opinions, general opinions, not

7          case-specific, with respect to nerve damage associated

8          with TVT, TVT-O, or TVT-S?

9    A.    Your question is are you offering?  Yes, I am

10         offering.

11   Q.    Okay.  What is your opinion?

12   A.    My opinion is that it does not produce nerve damage.

13   Q.    Does not, I'm sorry, produce?

14   A.    It does not produce nerve damage.

15               MR. WALKER:  I'm sorry.  I just want to

16         clarify.  Were you talking about the procedure itself

17         or the mesh in place?

18               MS. FLAHERTY:  Well, both, but I will break

19         it down into each question.

20               MR. WALKER:  Okay.

21               THE WITNESS:  Okay.

22   BY MS. FLAHERTY:

23   Q.    First, why don't we go to Exhibit 4.  4 I think is TVT

24         and TVT-O.

Salil Khandwala, M.D.

Page 131

1          Can you tell me just so I know where we're
2     looking where in your report -- and take a minute if
3     you need to -- your opinions are with respect to nerve
4     damage associated with the TVT and TVT-O.
5   A.    I do not -- the TVT and the TVT-O as a device does not
6     cause nerve damage, so I don't think I would have a
7     report to state that.
8   Q.    So there's nothing in the report to state that, is
9     that correct?
10  A.    I do not think.  I mean, I can look at it if you want,
11     diligently look at it.
12  Q.    I haven't seen it, so I believe you when you say
13     that --
14  A.    Okay.
15  Q.    -- you don't think it's in there.
16          Do you have an opinion that the procedure
17     can cause nerve damage?
18  A.    Yes.  Any surgical intervention can cause nerve
19     damage.  So whether it is an incision in the vagina or
20     dissection can potentially cause nerve damage, or an
21     improper placement of the device can cause nerve
22     damage.
23  Q.    I know we've talked a lot today about the importance
24     of the placement and the implant technique.

Salil Khandwala, M.D.

Page 132

1          You haven't rendered any opinions
2      indicating that implanting physicians have caused or
3      done malpractice with respect to how they've implanted
4      mesh, have you?
5               MR. WALKER:  Object to form.
6               THE WITNESS:  No.
7  BY MS. FLAHERTY:
8  Q.   Did you understand my question, Doctor?
9  A.   That means have I stated that a particular doctor did
10     something wrong.
11 Q.   Correct.
12 A.   No, I have not stated so, something such.
13 Q.   And is it fair to say that if a mesh maybe has too
14     much or too little tension that that's not a breach of
15     the standard of care, it's a factor of the implant but
16     not necessarily malpractice?
17               MR. WALKER:  Object to form.
18               THE WITNESS:  That is correct.  For
19     example, it also depends on who the patient is.
20          So just like what I mentioned, when I went
21     to put a new sling in and I looked at the previous
22     sling and I thought I could not do any better, so for
23     most patients that sling might have done fine, but
24     maybe this patient was a little bit obese or had a

Salil Khandwala, M.D.

Page 133

1      significant cough from let's say asthma, and she may

2      be totally different as someone else who just barely

3      coughs.  So the other barely cougher would have been

4      just fine and the sling would have been great whereas

5      this person, it was not tight enough for her.

6              So it is so subjective and has to be so

7      much tailored to each individual patient that it's

8      hard to determine what exactly should be the placement

9      and the tensioning.  So it is not malpractice or

10     deviation from standard of care if it is not placed

11     adequate for that particular patient.

12  BY MS. FLAHERTY:

13  Q.   Okay.  And would the same hold true with respect to

14       the TVT-S?

15  A.   Yes, as long as the proper steps are followed and they

16       have done the proper procedural attachments.

17              For example, if they're doing it in the U

18       fashion, then they have to put it -- the sling has to

19       be in the urogenital diaphragm, and if it is by the H,

20       it should penetrate the obturator internus muscle.  So

21       if that has been done, what should be done by a proper

22       implanting surgeon, then that is standard of care.

23  Q.   And that's information that you I think you said

24       highlighted or stressed in the monograph --

Salil Khandwala, M.D.

Page 134

1    A.    Yeah.

2    Q.    -- that you and your colleagues previously prepared?

3    A.    That's correct.

4    Q.    Okay.  You had mentioned that any -- in your opinion

5          surgical procedures can cause nerve damage.

6                Would that include the TVT-Secur implant

7          procedure?

8    A.    The surgical procedure, yes.

9    Q.    Okay.  Have you ever had occasion to refer a patient

10         to another doctor for explants or revision of

11         synthetic mesh?

12   A.    Could you please repeat that?

13   Q.    Sure.  Have you had occasion to refer patients to

14         other doctors for either the or for the explantation

15         or revision of synthetic mesh?

16   A.    I have not had, not for explants, because explant I

17         could do it.

18                However, there was a patient that I had

19         seen who was -- who came to see me because she had a

20         sling procedure done and was complaining of pain, and

21         I advised her that the pain was not because of the

22         sling, and she kept insisting that I should take the

23         sling out, and I told her that that will be not good

24         for her because she would have incontinence, and we

Salil Khandwala, M.D.

Page 135

```
 1        were not on the same wavelength.

 2                    So I sent her to one of my colleagues for a

 3        second opinion.

 4   Q.   Are you aware with the TVT-O mesh -- actually, strike

 5        that.

 6                    On the TVT-O mesh, are there arms or legs

 7        of the mesh that will extend perhaps a little bit

 8        further into the transobturator space and/or perhaps

 9        into the legs?

10   A.   For the TVT-O?

11   Q.   Yes.

12   A.   Yes.  You always do it.  They always go through the

13        obturator muscle and they come out into the groin.

14   Q.   And so if a TVT-O mesh needed to be removed, is it

15        fair to say that it's going to be much more difficult

16        to remove the portions of the mesh that go through the

17        transobturator space or into the leg area?

18                    MR. WALKER:  Object to form.

19                    THE WITNESS:  You know, I don't even see

20        any reason to do that because, you know, as has been

21        clearly highlighted in my personal experience but also

22        in many literature reviews and literature itself that

23        TVT-O, even if there is groin pain, it's very

24        transient.
```

Salil Khandwala, M.D.

Page 136

1            So almost all articles published with
2       long-term information would say that the groin pain
3       goes away.  So it's very unlikely that, it's very
4       unlikely that there would be persistence of groin
5       pain.
6            In my practice as I have done several
7       hundreds of that, I had one patient who had a little
8       longstanding groin pain, and it went away on its own.
9       So I can't even come across a scenario where I would
10      want to go and dig into the muscle and try to pull out
11      the entire sling because ultimately when it goes into
12      the muscle, it's almost like a string, it folds up
13      into the muscle, whereas under the urethra, it's like
14      a flat piece but not into the muscle.
15           So I don't even see any reason to take it
16      out unless, for example, there's some infection and it
17      has to be taken out, but that's extremely rare, and
18      these are reported cases, maybe one or two, who knows.
19  BY MS. FLAHERTY:
20  Q.   In taking it out from I think the leg area, the
21      transobturator space, that's going to be more
22      difficult than removing the mesh from just the vaginal
23      area?
24  A.   If it has to be, but I don't even see a scenario for

Salil Khandwala, M.D.

Page 137

1        taking it out from the muscle.

2   Q.   Okay.  And you've had -- I think you have testified

3        that you've had fairly good success in your mind or

4        your view with respect to implantation of synthetic

5        midurethral slings?

6   A.   In fact, I was -- it's because we have published this

7        report also as part of the main cornerstone clinical

8        trial which was done on the TVT-O and the TVT which

9        was the TOMUS trial, the Trial of Midurethral Sling,

10       which is the main study which is always quoted about

11       the success and the failures, so, and we have had very

12       good results, not only as a multicentric study but as

13       an individual practice.

14  Q.   You would agree that you probably have more experience

15       with mesh than a lot of doctors that do the implants?

16                  MR. WALKER:  Object to form.

17                  THE WITNESS:  I'm sorry.  I can't say for

18       them.

19  BY MS. FLAHERTY:

20  Q.   But in your opinion you do have a lot of experience

21       implanting mesh?

22  A.   Yes.

23  Q.   Okay.  And you would agree that not all doctors

24       have -- that do these implant procedures have had the

Salil Khandwala, M.D.

Page 138

1       opportunity to proctor other programs?

2   A.  Yes.

3   Q.  Okay.  And that not all doctors that do these implant

4       procedures have had the opportunity to study in France

5       where they had proximity to people who work conducting

6       studies with respect to the mesh products?

7                   MR. WALKER:  Object to form.

8                   THE WITNESS:  Yes.  However, they should at

9       least -- anybody, what I know is anybody who through

10      the Summit, anybody who has been implanting this, the

11      people that I have met have always had a good

12      understanding of they're doing, a good follow-through

13      of their own successes or failures, and also what they

14      have implanted.

15                  So I think most -- since I've trained the

16      residents and I know what happens typically is that

17      when they go out, they go out in a proper, where they

18      have a good understanding of the anatomy, good

19      understanding of the surgical anatomy and what is to

20      be done and review of literature.

21                  So I think most physicians who are using

22      this, you know, they may not be reviewing the

23      literature as much as I'm reviewing it or may not be

24      proctoring it, but they have at least fair and

Salil Khandwala, M.D.

Page 139

```
1        balanced information about what should be done.
2        Otherwise, they should not be practicing.  And I have
3        not come across any physician who has not been doing
4        it correctly.
5   BY MS. FLAHERTY:
6   Q.   And how many doctors generally attended the Summits
7        that you mentioned?
8   A.   About maybe four hundred or five hundred.
9   Q.   And do you know how doctors were invited to the
10       Summit?
11  A.   I don't know.  I'm sorry.
12  Q.   And do you know, do you have any information regarding
13       any follow-up that Ethicon may have done with doctors
14       following their training sessions?
15            MR. WALKER:  Object to form.
16            THE WITNESS:  The main thing that they
17       asked the physicians is how was their experience, and
18       why they did it on an ongoing basis was because the
19       networking physicians really enjoy it.
20            So we realized that we were getting out of
21       our comfort zone and we want to stay at home with our
22       family over the weekend but then going out here to do
23       this, but then we really enjoyed that networking,
24       asking our colleagues what did they find, what should
```

Salil Khandwala, M.D.

Page 140

1        we do.

2                    And at that time it was more of subtleties.

3        We knew most of the things but what are the subtle

4        steps that we could do that would change a little bit

5        more, significantly more, whatever that may be.

6   BY MS. FLAHERTY:

7   Q.   And so those subtle changes to the approach or the

8        techniques could have a significant impact on the

9        outcome?

10  A.   Could or could not.  So to be able to talk to each

11       other and say is there anything else or there's

12       nothing else.

13                   But that's a great brainstorming that we

14       enjoyed, and that is why they kept doing it on an

15       annual basis.

16  Q.   Okay.  And when you say this, you're referring to the

17       Summits?

18  A.   Yes.

19  Q.   And for doctors that did not go to the Summit, do you

20       knows what steps Ethicon took, if any, to follow up

21       and make sure that they were comfortable with the

22       training that they had received?

23                   MR. WALKER:  Object to form.

24                   THE WITNESS:  I don't know, but I would say

Salil Khandwala, M.D.

Page 141

1      that they would go to the American Urogynecology

2      Society conference.  So some of the people who are

3      implanting slings, slings or meshes, are members of

4      the AUGS.  So I'm sure when they went to the

5      conference, they could also do similar networking with

6      colleagues.

7   BY MS. FLAHERTY:

8   Q.   Okay.  And you don't have specific information as to

9        which doctors did or did not attend these conferences?

10  A.   No.

11  Q.   Do you know if Ethicon provided any training to

12       physicians on how to remove mesh if it became

13       necessary?

14  A.   I don't know.

15  Q.   Okay.  And you haven't tested any mesh that you have

16       removed from patients for degradation, have you?

17  A.   I don't believe the mesh degrades, but I have not done

18       any of that.

19  Q.   So you haven't done any testing on that?

20  A.   No.

21  Q.   And you haven't done any testing on shrinkage or

22       contraction of synthetic mesh, have you?

23  A.   I have done a clinical trial in which we looked at the

24       total vaginal length postoperatively, and if there was

Salil Khandwala, M.D.

Page 142

```
 1        any evidence of shrinkage, then the vaginal lengths

 2        should shorten, and we not see that happen.

 3                So the vaginal caliber postoperatively a

 4        year out and the total vaginal length remained the

 5        same as compared to preoperatively, and we made a

 6        statement in our paper stating that, you know, if

 7        there was a problem, then we would have noticed this.

 8                Similarly, just like how Doctor Neilson

 9        mentioned in his TVT report that if seventeen years

10        out if there was a problem with the shrinkage of the

11        sling, then there would be some more voiding

12        dysfunction or difficulty emptying, and he did not

13        see.

14                So what I go by is completely a clinical

15        outcome, and in my clinical outcome and my clinical

16        practice and even by documentation of the findings, we

17        have not seen mesh shrinkage.

18   Q.   And in terms of your clinical practice and your

19        experience in looking at shortening or contraction of

20        the vaginal canal, is that in patients that have the

21        mesh in place, or does it include patients who have

22        had mesh removed?

23   A.   Could you please repeat the question?

24   Q.   Sure.  You had just mentioned that you have in both
```

Salil Khandwala, M.D.

Page 143

1       your practice and I think in a study you have looked

2       at the length of the vaginal canal, and in your

3       opinion there was no contraction because the length

4       was the same, is that correct?

5    A.  That is correct.

6    Q.  Okay.  And in that study and in your practice, does

7       that include patients who've had the mesh removed?

8    A.  Well, I have not removed any meshes on an entirety as

9       I mentioned.  So I don't, I don't understand the

10      question.

11   Q.  Well, how about if they've had erosion of the mesh and

12      portions of that mesh have been explanted or revised.

13   A.  It didn't matter.  It didn't change.

14              See, the reason why a mesh exposure happens

15      in my opinion, again, based upon reasonable degree of

16      medical certainty and from what I've reviewed, is that

17      the vaginal epithelium under the mesh does not heal

18      completely, and that does not change the integrity of

19      the vagina itself.

20              So it is not that the mesh shrinks, it is

21      usually the tissues around the mesh that shrinks.

22      More likely it is the vagina which conforms to its

23      normal shape.  A bulging vagina when it is prolapsing

24      out is distended because is prolapsing.  Now, once you

Salil Khandwala, M.D.

Page 144

1          put it back to where it belongs, it again reverts to
2          its normal shape.
3                    Very similar to what happens to the vagina
4          after childbirth, a baby comes out the vagina,
5          distends, but then it doesn't remain that big, it
6          comes back to normal, and ultimately, in fact, it
7          becomes a potential space.  That means the walls are
8          together.  There is no open space in the vagina.
9                    Similarly, once the bladder or the prolapse
10         is put back in, the vagina goes back to its normal
11         shape.  So it's a live tissue, so it's all about the
12         healing process.
13                   But what we found is that there was no
14         change.  Whether there was an erosion or not, the
15         vaginal length before and after remained unchanged,
16         and so clinically there was no evidence of any vaginal
17         contraction.
18                   And that has been also reported in other
19         not sling studies we're talking about, we're talking
20         about mesh studies, especially with a group by Meloni,
21         et al., were reporting.
22    Q.   And with respect to slings specifically, you haven't
23         done any studies on the mesh itself once it's been
24         removed, even partially removed, in terms of shrinkage

Salil Khandwala, M.D.

Page 145

```
1          of the mesh or any alterations to the biomechanical
2          properties of that mesh?
3     A.   I don't know how one can do shrinkage assessments in
4          the lab, but biomechanical, I have not done any.
5     Q.   Okay.
6     A.   But the only thing as I mentioned earlier was when I
7          have gone back and opened the vagina to see the sling
8          during the plication procedures, I've seen that it
9          remains the same.  It has not shrunk or caused any
10         distortion in the sling, and most of the times I see
11         the same blue mesh as it was placed.
12    Q.   Okay.  And those plication procedures are the ones
13         where the mesh wasn't working to stop the
14         incontinence, and you were going in to see what was
15         going on because it wasn't stopping -- the
16         incontinence hadn't improved?
17    A.   Correct.
18    Q.   Okay.  Have you conducted any studies specific to the
19         various porosities or weight of synthetic mesh?
20    A.   No, I have not.
21    Q.   Okay.  Is it fair to say you have not offered any
22         peer-reviewed studies on porosity or weight of
23         synthetic mesh?
24    A.   That is correct.
```

Salil Khandwala, M.D.

Page 146

1   Q.   Are you aware that Ethicon has documents that discuss
2        fraying of the TVT or TVT-O mesh?
3   A.   I believe I read something.  Maybe I don't know if
4        it's an e-mail or something such, but I don't remember
5        what document it was.
6   Q.   And you haven't considered this with respect to
7        your -- well, actually, strike that.
8             Have you considered that with respect to
9        your opinions?
10  A.   I have considered it.
11  Q.   Okay.  And it has not -- why hasn't that impacted your
12       opinions?
13  A.   Because in my clinical experience, I've never seen
14       this happen.  I have gone back, and even when I have
15       seen where there's an exposure or I've opened up the
16       vagina for the sling plications, I've seen the sling
17       just remain as it is.
18            So when this is stated it could, I
19       personally in my opinion based upon reasonable degree
20       of medical certainty, it's based upon, you know, the
21       surgical technique, how the sling was laid, how it was
22       tightened, it has nothing to do with the sling itself.
23            So I have never seen, nor have I seen any
24       reports of any fraying or implications of that in

Salil Khandwala, M.D.

Page 147

1        clinical practice.

2    Q.  Okay.  And you've done twenty to twenty-five removal

3        or at least explant procedures I think is how we

4        described it?

5    A.  Just excisions and revisions of exposures of vaginal

6        mesh.

7    Q.  Okay.

8    A.  Mainly for prolapse, though.

9    Q.  Okay.  And so of that twenty to twenty-five you said

10       mainly are prolapse, so do you have an estimate as to

11       what percentage of those were for TVT or incontinence

12       products?

13   A.  I would say about maybe of that, maybe seven would be

14       for incontinence.

15   Q.  Okay.  So with respect to the explant or revision of

16       incontinence, synthetic incontinence mesh, you've done

17       roughly seven or eight procedures?

18   A.  Could you repeat that?

19   Q.  Sure.  With respect to synthetic midurethral slings

20       and specifically the explant or revision of that mesh,

21       have you done approximately seven or eight of those

22       procedures?

23   A.  Yeah.  So I just want to make sure that I think

24       explant is I'm not removing it.  I've never removed a

Salil Khandwala, M.D.

Page 148

```
 1          single sling in its entirety.
 2    Q.    Okay.
 3    A.    If I've gone back, I've removed or excised the
 4          exposure in the vagina and closed the vagina on top of
 5          that.
 6                    So that's the only thing that I've
 7          encountered.  I have not seen any urethral erosions or
 8          bladder erosions of the sling.
 9    Q.    And are a fair number of your patients patients that
10          you have implanted?
11    A.    Yes.
12    Q.    Okay.  And you haven't done any specific studies on
13          TVT or TVT-O that other doctors have removed?
14    A.    No.
15                    MR. WALKER:  Object to form.
16    BY MS. FLAHERTY:
17    Q.    And you had testified previously that you do not have
18          a preference of mechanical- versus laser-cut mesh?
19    A.    That is correct.
20    Q.    And that's because in your clinical experience, you
21          haven't experienced a difference?
22    A.    And also what I've seen in information published,
23          literature prior to 2007, and if you look at
24          literature that we just published with the TOMUS
```

Salil Khandwala, M.D.

Page 149

1      trial, the T-O-M-U-S trial, there's absolutely no

2      difference in successes before or after.  So it's very

3      likely that post 2007 I believe when they changed from

4      mechanical cut to laser cut, when that became also

5      available, I know mechanical cut is still available

6      for the TVT, but when it switched over, there was no

7      difference in the outcomes.

8              So I'm really more interested in what the

9      clinical outcome changes were, and there's nothing

10     that I've read in published literature or reviewed

11     with my colleagues or at conferences or my personal

12     experience that laser or mechanical, one is better

13     than the other, because I have been using the

14     TVT-Secur which is a laser-cut mesh and the TVT which

15     is a mechanical-cut mesh, and I don't even know that

16     the TVT that we have at the hospital is mechanical cut

17     or laser cut and it doesn't matter to me because both

18     of them do very well.

19  Q.  And have you reviewed documents from Ethicon that

20      discuss particle loss?

21  A.  Yes, I have.

22  Q.  Okay.  Do you disagree with those documents?

23              MR. WALKER:  Object to form.

24              THE WITNESS:  The document I believe which

Salil Khandwala, M.D.

Page 150

1      was by the medical director that eventually addressed

2      the particle loss, I believe it was Marty Weisberg or

3      Weinberg, he basically said that this should be

4      further assessed, and from what I understand from the

5      conclusion is that it could happen, it may happen, but

6      clinically it has never been shown.

7              To me, I completely go by what's clinical

8      data and clinical outcomes, and having reviewed this,

9      I've never seen any clinical trial that highlights

10     particle loss as a concern.  I have personally never

11     seen a particle just floating around as what was

12     mentioned in one of those Ethicon e-mails that you're

13     talking about.  And it doesn't matter whether it was a

14     mechanically cut or laser cut.  I've never seen that.

15             So I think it could be just, you know, they

16     may have noticed on an in vitro basis in the lab as

17     opposed to what someone may have just reported to

18     them, but overall in clinical publications, there has

19     been no implication of this problem.

20   BY MS. FLAHERTY:

21   Q.   And you haven't had any conversations with Ethicon or

22        the authors of those documents regarding particle

23        loss, have you?

24   A.   No, I have not.

Salil Khandwala, M.D.

Page 151

1   Q.   And you haven't seen any underlying data that Ethicon

2        may have with respect to particle loss, have you?

3                  MR. WALKER:  Object to form.

4                  THE WITNESS:  Like what would you say?

5   BY MS. FLAHERTY:

6   Q.   Have you seen any case reports that Ethicon may have

7        with respect to particle loss?

8   A.   No.

9   Q.   Okay.  I'm sorry.  Particle release is what I meant to

10       say.  I apologize.

11  A.   No, I have not.

12  Q.   Okay.  So you would not know whether those case

13       reports discuss anything regarding particle release or

14       not?

15  A.   See, if there's anything which was significant, it

16       would have been in a peer-reviewed journal, so I would

17       clearly have read it if it's in a peer-reviewed

18       journal which is the most important journal that we

19       look at rather than someone who may anecdotally report

20       a case.

21                  And the value of that is not really

22       clinically significant if one person reports whereas

23       ten thousand reports state to the contrary.  So

24       typically go by the ten thousand which states to the

Salil Khandwala, M.D.

Page 152

1        contrary than one case that stands out.

2                  Not that I ignore it.  I observe it, but at

3        the same time, I go by what is the likelihood or

4        implication of this overall, and what physicians like

5        myself and others go by is data, what is published,

6        what's information, what do we discuss, what's the

7        information amongst colleagues rather than company

8        material.

9    Q.   And in your own personal clinical practice, that's

10       going to be limited to about seven to eight TVT

11       revision procedures?

12   A.   And also the plications that I've gone in when I had

13       to do that, and also when I've had to operate, for

14       example, if I placed a sling and I'm going down to put

15       a mesh for prolapse and I open up that area and happen

16       to notice the sling, so then the sling's okay, I'm not

17       going to touch it, but I'm operating there, so the

18       sling might still be there.

19   Q.   So that latter part, that's a procedure where somebody

20       has a new issue, for example, prolapse that's

21       unrelated to their SUI condition or mesh?

22   A.   Yes.

23   Q.   Okay.

24   A.   But then I would see the sling, how it is.

Salil Khandwala, M.D.

Page 153

1          So based upon clinical in vivo presence, I

2      have never seen any concerns that I would have based

3      upon this particle loss issue.

4   Q.  Are you aware that some doctors refer to the particle

5      release as a linting factor?

6              MR. WALKER:  Object to form.

7              THE WITNESS:  I have not heard that.

8              MS. FLAHERTY:  Okay.  You know, we can

9      probably take one last break, and I think there's a

10      good chance we'll be done by 1:00 o'clock.

11              (Off the record at 12:24 p.m.)

12              (Back on the record at 12:31 p.m.)

13   BY MS. FLAHERTY:

14   Q.  All right, Doctor.  I think we're getting close to the

15      end.

16   A.  Okay.

17   Q.  To clarify, and I apologize if I asked you this

18      previously, you have not produced or participated in

19      the design of any pelvic mesh product?

20              MR. WALKER:  Object to form.

21              THE WITNESS:  For a sling for incontinence?

22   BY MS. FLAHERTY:

23   Q.  For a sling.

24   A.  Yes, I have not.

Salil Khandwala, M.D.

Page 154

1    Q.    Have not?

2    A.    Have not.

3    Q.    Correct.

4          And you do not consider yourself an

5    expert on the design of synthetic midurethral slings,

6    do you?

7    A.    I'm sorry.

8          MR. WALKER:  Object to form.

9          THE WITNESS:  Actually, I do.  That's part

10   of the reason why I'm working on this particular

11   patent.

12   BY MS. FLAHERTY:

13   Q.    Okay.  And the patent, did you say that had to do with

14   the implant technique or the mesh itself?

15   A.    It's more the implant technique and technique itself.

16   Q.    Do you have opinions regarding which type of implant

17   technique is better?

18   A.    In what sense?

19   Q.    With respect to potential risks associated with a

20   synthetic midurethral sling.

21         MR. WALKER:  Object to form.

22         THE WITNESS:  From the literature, the TVT

23   and the TVT-O both have stood the test of time and

24   have been studied extensively in randomized trials and

Salil Khandwala, M.D.

Page 155

1      found to be very effective.  So there is no doubt that

2      the transobturator TVT-O is as good as the retropubic

3      TVT which basically took over the gold standard

4      pedestal from the Burch colposuspension.  So we now

5      know both these techniques are good.

6              However, there's some concern about the

7      single-incision slings, but what we have realized that

8      that's more technique driven, and now that surgeons

9      who have mastered the technique clearly prefer the

10     single-incision sling.  I prefer the single-incision

11     sling because I can do this entirely under local

12     anesthesia.

13              It is not about the success or the

14     complications.  It is about the ease of how you can do

15     this procedure and get the woman back into the

16     workforce.

17              As you mention, transient pain can happen

18     with any procedure.  We talked about that.  And with

19     the TVT and the TVT-O, there is a potential risk of

20     transient pain.  With the TVT-Secur like products such

21     as the single-incision sling, it is much lesser

22     discomfort or pain, and that's what I've seen in my

23     practice, and that's why I favor a single-incision

24     sling.

Salil Khandwala, M.D.

Page 156

1    BY MS. FLAHERTY:

2    Q.   Okay.  And with respect to the design of Ethicon's

3         synthetic midurethral sling, you did not participate

4         in the design of those products, is that correct?

5    A.   That is correct.

6    Q.   And you did not participate in the design controls

7         with respect to those products?

8    A.   That is correct.

9    Q.   And do you have any knowledge regarding Ethicon's

10        internal standards with respect to their design

11        controls for those products?

12   A.   Yes, I do.

13   Q.   Okay.  And what is your knowledge regarding Ethicon's

14        standards?

15   A.   I have read several documents that have gone over

16        exhaustive studies for right from the Prolene suture

17        and how it was studied to the mesh, the sling, and to

18        the instruments, the needle that was placed for the

19        TVT-Secur, for example, and the validation criteria

20        that were done, the clinical trials that were done,

21        whether it was a sheep model or ultimately the human

22        model.  So I've reviewed all that.

23             And on the review of the literature, my

24        opinion is that there is extensive research and work

Salil Khandwala, M.D.

Page 157

```
1        done in validation of the device and the instruments.

2   Q.   So that's based on your review of literature that

3        other people have authored?

4   A.   Yes.

5   Q.   And have you participated in any meetings with Ethicon

6        regarding the design of its midurethral sling

7        products?

8   A.   I think, I believe by the time the TVT-Secur, when we

9        initially started the clinical trial, the design was

10       already established, so I was not involved in the

11       design of the TVT-Secur.

12  Q.   And you have not drafted or reviewed any failure

13       analysis documents with respect to Ethicon synthetic

14       midurethral slings, have you?

15  A.   I have done my clinical trials.  So in the clinical

16       trials, I also mentioned the success and failures.

17  Q.   But have you looked at any actual failure analysis

18       documents that Ethicon has --

19  A.   Provided me?

20  Q.   Actually, strike that.

21            Have you authored or contributed to any of

22       Ethicon's failure analysis documents?

23  A.   No, I have not.

24  Q.   Okay.  You have not done any bench research with
```

Salil Khandwala, M.D.

Page 158

1          respect to polypropylene, have you, Doctor?

2     A.   No, I have not.

3     Q.   You've not authored any studies with respect to bench

4          research on polypropylene?

5     A.   No, I have not.

6     Q.   Is it your opinion that there's a learning curve with

7          respect to the implant or the technique associated

8          with Ethicon's midurethral slings?

9               MR. WALKER:  Object to form.

10              THE WITNESS:  I believe there's a learning

11         curve with any surgical intervention.  Any and every

12         surgical intervention has a learning curve.

13              In fact, it's very well documented by a

14         paper by Romans, et al., R-O-M-A-N-S, where they show

15         that the learning curve varies depending on what is

16         the surgical procedure and then how many years or how

17         many months or how many procedures would it take to

18         overcome to get to the learning curve.

19    BY MS. FLAHERTY:

20    Q.   And so that would include the midurethral sling

21         procedures as well?

22    A.   Yes.

23    Q.   Okay.  I don't think I asked this before, and I

24         apologize if I did.  Did you draft any portion of the

Salil Khandwala, M.D.

Page 159

1         IFU or Instructions For Use on the TVT?

2    A.   I have not.

3    Q.   And did you draft any portion of the IFU with respect

4         to TVT-O?

5    A.   No, I have not.

6    Q.   And I have the same question with respect to the

7         TVT-Secur.

8    A.   No, I have not.

9    Q.   Okay.  Did you consult with anyone at Ethicon or did

10        Ethicon consult with you with respect to the

11        Instructions For Use?

12   A.   No.

13   Q.   Did you draft any patient brochures regarding

14        Ethicon's midurethral slings?

15   A.   No, I have not.

16   Q.   Did Ethicon consult with you with respect to the

17        patient brochures for its midurethral slings?

18   A.   No, they did not.

19   Q.   Do you use the patient brochures in your practice,

20        Doctor?

21   A.   Yes, I do.

22   Q.   And how do you use those patient brochures?

23   A.   It is one element of the total discussion when we do

24        what is called a consultation visit.  So we hand them

Salil Khandwala, M.D.

Page 160

1       the brochure and tell them this is some information.

2                   However, the most important information

3       that we make our -- we discuss with the patient is the

4       actual discussion with the patient based upon their

5       disease state, what is the best option for them and

6       what would work based upon risk-benefit assessment,

7       determined by several factors of which most of them

8       could be patient factors, the desire factor, the

9       attitude factors, what they want, and what is the main

10      complaint.

11   Q.  And so the discussion is I think you said the most

12      important piece of that analysis, is that correct?

13   A.  Yes.

14   Q.  Okay.  So if the discussion is the most important

15      piece of that analysis, is it fair to say it's

16      important that the doctors have the information they

17      need to have that conversation with the patient?

18                   MR. WALKER:  Object to form.

19                   THE WITNESS:  I think most doctors already

20      formed that right from their training as medical

21      students, even before they become OB/GYN residents or

22      urology residents.  So they already have that, and

23      part of our education of residents is to see how they

24      discuss and talk to a patient.

Salil Khandwala, M.D.

Page 161

1            So, in fact, every resident is evaluated by

2      a faculty, actual their interaction with the patient.

3      So this is an ongoing thing that we do all the time.

4      So it's nothing new for doctors to be communicating

5      and discussing information with their patients.

6  BY MS. FLAHERTY:

7  Q.  And part of that information comes from the

8      Instructions For Use, is that fair?

9  A.  Instructions For Use is just one document that we may

10     refer to, but it is just one part of it.  A lot of the

11     information comes from many other sources.

12 Q.  And the Instructions For Use for the midurethral

13     slings have changed over time, is that fair to say?

14 A.  Yes.

15 Q.  Do you use the Instructions For Use at all in your

16     practice when consulting with patients?

17 A.  Well, no.  I don't tell them this is what is in the

18     Instructions For Use.  So I just, I have reviewed it.

19            Instructions For Use from what we

20     understand as physicians is that Instructions For Use

21     is more for physicians.  It's not for patients.  It's

22     getting awareness and then understanding it.  We have

23     to -- one should review it before doing a procedure.

24     That's important.

Salil Khandwala, M.D.

```
                                                          Page 162
 1                 However, then most of our knowledge is then
 2         and our discussion with the patients is based upon
 3         experience, what is in the literature, what has been
 4         published, what is my information.  So I almost never
 5         tell the patient that this is the information for use
 6         and this is what you should have.
 7                 I would tell them let's say if she has a
 8         sling, I'd go back, what is the risk-benefits
 9         assessment for her condition, for her let's say body
10         frame, for her habitus, you know, her health status,
11         her desires, what she wants, and then assess it based
12         upon experience, my experience, my results, and
13         results published in the literature.
14   Q.    Would you agree, though, that there is some
15         information in the Instructions For Use that patients
16         may want to consider in their decision-making process?
17                 MR. WALKER:  Object to form.
18                 THE WITNESS:  Most of the discussion would
19         be coming from the physician.  So I think what the
20         patient should rely on is even more than Instructions
21         For Use.  I think it may be the patient brochure that
22         she may look at.
23                 But even more than that, I think a patient
24         should always listen and follow with the doctor, and
```

Salil Khandwala, M.D.

Page 163

```
 1        the doctor should really focus on explaining to the
 2        patient and not just giving her a brochure and say,
 3        here, read the Instructions For Use and read the
 4        brochure, patient brochure, that the company has
 5        produced.
 6                    I think it's very important because each --
 7        the beauty of medicine is that each case is individual
 8        and tailored, so there is nothing like a blanket
 9        statement or black and white, you know, one set
10        protocol.  Every woman is so different from the other.
11                    So if a patient comes and presents her
12        story, it also depends on what her story is, and you
13        have to tailor it appropriately.  So it entirely
14        comes, it's a very live discussion, and it entirely
15        comes from the doctor and the patient interaction.  So
16        that is the key part.  What is somehow labeled as an
17        informed consent or a procedure of consultation is
18        most important rather than any particular document as
19        such.
20   BY MS. FLAHERTY:
21   Q.   And do you hold that same opinion with respect to the
22        adverse events that are described in the Instructions
23        For Use?
24   A.   Yes.  The adverse events, when we talk to a patient,
```

Salil Khandwala, M.D.

Page 164

1      we put things into perspective, tell them what is the

2      likelihood of something happening, and we inform the

3      patients of our, you know, the most common.  We may

4      not be highlighting every possible adverse event like

5      something the PDR would have about a drug, but we tell

6      them what is the likelihood of happening.

7              So once the patient is aware of that, she

8      can put it into a risk-benefit profile and say, okay,

9      considering the information I've been given by my

10     physician, based upon his or her experience and the

11     knowledge which is out there, this is what he's

12     telling me.  Now, what is my concern and my complaint,

13     and she balances it out and sees what is favorable for

14     her to choose.

15  Q.   Would you agree that for most patients, they're going

16       to then obtain information regarding risks and

17       benefits of a product either from the patient brochure

18       or their discussion with their doctor?

19              MR. WALKER:  Object to form.

20              THE WITNESS:  Could you repeat the

21       question?

22  BY MS. FLAHERTY:

23  Q.   Sure.  Would you agree that patients are going to

24       obtain their information regarding risks or benefits

Salil Khandwala, M.D.

Page 165

1       associated with the midurethral sling either from the

2       patient brochure or conversation with their doctor?

3                 MR. WALKER:  Same objection.

4                 THE WITNESS:  Yes.  Unfortunately, now they

5       may get biased by seeing adds on TV, you know, what

6       happens, or it may be something that they hear from a

7       colleague and his or her experience that they noted.

8       So that could be some other information they may get.

9                 However, the information that we always

10      tell our patients to rely upon is what we provide them

11      and because we provide them nondirective information.

12      We do not give them biased information.  We give them

13      information which is not nonjudgmental, nonbiased,

14      nondirective, in order to help them make the right

15      decision based upon facts and what their complaints

16      are.

17                So we try to balance that out, and most

18      doctors do that.  They say, okay, what is your

19      concern, how much does it bother you, and this is --

20      these are what your options are.  So ultimately it is

21      the way we practice and I'm sure most doctors

22      practice.  We leave the decision to the patient, what

23      does she want based upon the information that she has

24      been given, and that is called nondirective

Salil Khandwala, M.D.

Page 166

1          counseling.  That's what most of us practice.

2    BY MS. FLAHERTY:

3    Q.   And the key piece of that is the information that's

4         given to the patient so ultimately she can make a

5         decision?

6    A.   That is correct.

7                   MR. WALKER:  Object to form.

8    BY MS. FLAHERTY:

9    Q.   And do you utilize a consent form for your midurethral

10        sling implant procedures?

11   A.   It is more a process that we utilize rather than a

12        form.  We do have a form, but it's a process.  So the

13        process goes right from the first visit to the

14        discussion of the consultation.

15              So for us, the most important is the

16        consultation discussion when we tie everything up,

17        what is her history, what is her exam, what are the

18        findings on urodynamics, on her diaries, what are her

19        complaints again, and we put everything in perspective

20        and say, okay, this is the problem, this is what can

21        be done about it, and then what do you want.

22              So that whole thing is outlined in our

23        notes and the discussions, and one of the forms

24        happens to be a consent form.

Salil Khandwala, M.D.

Page 167

1    Q.   Has that process and the content of that process

2         evolved over the years for you?

3    A.   Yes, it has.

4    Q.   And does that evolution include perhaps additional

5         information regarding risks that are now in the

6         Instructions For Use that may not have been there six

7         years ago?

8              MR. WALKER:  Object to form.

9              THE WITNESS:  You know, the only evolution

10        that has happened is the FDA advisories, and what we

11        do now is we give, you know, we have -- in our

12        practice, nothing has changed from the point of view

13        how we conduct things.  The only thing we're doing is

14        we're talking more to the patients because we hear the

15        patients hearing, we know patients are seeing things

16        on TV about the vaginal mesh and the slings.

17             So we want to make them understand the

18        difference between a sling and what a mesh for

19        prolapse is and what a sling for incontinence is and

20        at the same time what did the White Paper of the FDA

21        state, what are the questions that the FDA asks the

22        patients to ask their doctors.  So we give them the

23        questions, we give them our answers, and then we go

24        over the FDA's recent up classification.

Salil Khandwala, M.D.

Page 168

1           So the real change in our documentation and

2      discussion with our patient is giving them the

3      information, what the FDA is recommending, at the same

4      time, making them understand the facts and not get

5      spooked by the fear of what they see on TV.

6  BY MS. FLAHERTY:

7  Q.   Have you changed your informed consent form over the

8      years?

9  A.   We have just added that, we've added the White Paper

10      that we hand the patients over.  We give them the

11      questions, answers of the FDA, what the FDA states you

12      should ask your doctor statement.

13           So it's question, answer, the question that

14      the FDA says that you should ask a doctor and our

15      answers to that.  So that's essentially the only real

16      change that has happened.

17  Q.   So you have not added any of the additional adverse

18      reactions that might be listed in updated Instructions

19      For Use?

20           MR. WALKER:  Object to form.

21           THE WITNESS:  In fact, what we have done,

22      in fact, what we have done is that we have now put

23      things into better perspective.

24           So, for example, we would just quote, you

Salil Khandwala, M.D.

Page 169

1       know, that patient had a, let's say, you know, a groin

2       pain of ten percent because that was quoted in the

3       literature, but as time has revolved, then we would

4       say that, yeah, that is a transient groin pain of ten

5       percent, but over a few months, it's gone, it's no

6       longer there.

7              So as we realized and we have realized from

8       own clinical trials what the percentages are, and, if

9       anything, we've dropped the percentages down because

10      now we realize that the complication rate is even

11      lesser, maybe because we are gaining more experience.

12      So we're getting lesser.

13             So we are putting things in perspective

14      where we just don't state the complication but now we

15      also state the percentage since we have data now

16      available in our own practice.

17  BY MS. FLAHERTY:

18  Q.   But you're aware that at least as of 2015, Ethicon's

19      Instructions For Use for the TVT state, for example,

20      that dyspareunia or pain with intercourse may not

21      resolve, and that's something new that they have

22      stated that they did not originally state.

23  A.   Actually, I would have to see where that is.

24           MR. WALKER:  Object to the form.

Salil Khandwala, M.D.

Page 170

1              Is that a question pending or a statement?

2         I might have missed it.

3              MS. FLAHERTY:   That's a question.

4              MR. WALKER:   Okay.

5              THE WITNESS:   Is there a particular area?

6              MS. FLAHERTY:   Sure.

7              (Khandwala Exhibit No. 8 marked and

8              attached.)

9              THE WITNESS:   So which page is this on?

10    BY MS. FLAHERTY:

11    Q.   I'm sorry.   It ends in 8411.   There's little numbers

12         on the right-hand corner.

13    A.   Which?

14    Q.   Okay.   So if you go to roughly the middle of the page,

15         do you see where it says adverse reactions?

16    A.   Uh-huh.

17    Q.   It's probably about two-thirds of the way down, it

18         says pain with intercourse?

19    A.   Yes.

20    Q.   It says some patients may not resolve.

21    A.   Yes.

22    Q.   Do you see that?

23    A.   Yes.

24    Q.   And so that is not information that you would provide

Salil Khandwala, M.D.

Page 171

1          to your patients?

2    A.    Well, from most sling studies that have been

3          published, dyspareunia improves.  So the pain that

4          patients have, may have, or dyspareunia that they may

5          have improves.

6                    And there are several theories for that.

7          One is that patients may not have coital incontinence.

8          That means they're not leaking during intercourse, so

9          now they're not that tight and they can enjoy having

10         sex that they're not incontinent anymore.

11                   So the paper that I mentioned to you,

12         Helena Zyczynski from Pittsburgh, she had a paper that

13         shows that, in fact, sexual function improved.  I have

14         a paper in my report also that also shows that sexual

15         function improves after this particular, after a sling

16         is placed.  So, if anything, the sexual dysfunction,

17         sexual pain or dyspareunia would improve.

18                   What I'm looking at this is it's stating

19         that if a patient has dyspareunia, then a sling is not

20         going to cause or take away the dyspareunia but it may

21         just persist.  So I would not go and tell my patients

22         that if I did a sling on you, then you will have

23         dyspareunia.  And the likelihood of dyspareunia is

24         extremely low, and, if anything, dyspareunia is cured

Salil Khandwala, M.D.

Page 172

1        by placement of a sling.

2    Q.  Okay.  But that's not what it says right here, is it?

3        That's your interpretation of it.

4    A.  It says pain with intercourse which in some patients

5        may not resolve.  So it could be that if the patients

6        have pain, it could be from the -- this could be from

7        two factors.  Number one, the surgical intervention,

8        if there is pain it may persist.  This is what it may

9        be alluding to, or it may be saying that if the

10       patient has preexisting pain with intercourse, then it

11       may not resolve.  It may continue.  That's my

12       interpretation.

13              However, I look at this, but what I really

14       go by is the published clinical trials and the data

15       which is out there which clearly shows beneficial

16       effect of a sling on sexual function.  And this is I

17       think a paper by Jha, J-H-A, that I referred to in my

18       general report.

19   Q.  And if you go to the next bullet point down where it

20       says neuromuscular problems, do you see that?

21   A.  Yes.

22   Q.  Then it says:  Including acute and/or chronic pain in

23       the groin, thigh, leg, pelvic, and/or abdominal area

24       may occur.

Salil Khandwala, M.D.

Page 173

1                    Did I read that correctly?

2    A.   Yes.

3    Q.   And so you, again, had talked about acute or transient

4         pain, but the Instructions For Use that Ethicon has

5         provided for the transobturator or the TVT-O device

6         state right here that chronic pain may occur.

7                    Is that something that you would discuss

8         with your patients?

9    A.   I would, again, go by literature.

10                   First of all, the likelihood of abdominal

11        pain happening with a transobturator approach is just

12        not feasible to some extent because we are not really

13        getting into the abdomen at all.  The sling is going

14        from the vagina into the groin and coming out.  So, if

15        anything, there may be some groin pain but not

16        abdominal pain.

17                   Unless they're mixing this, if I read this

18        correctly this is a transobturator IFU, right?

19   Q.   Yes.

20   A.   Yeah.  So, you know, so to me as a clinician, I look

21        at this, and then I completely go by what the clinical

22        information is and what is published.

23                   And I do not see any published information

24        where it shows abdominal pain as an outcome of a TVT-O

Salil Khandwala, M.D.

Page 174

1      procedure.  Even if there is groin pain, you know, the

2      articles I quoted by Ford and Tomaselli and Athenasiou

3      and Serati, all these four authors independently have

4      shown that groin pain over time disappears.

5               In my practice, so we go by what is

6      published in the literature, my clinical experience

7      where I have not seen this on an ongoing basis.  So I

8      will tell the patients that these are potential

9      things.  However, the likelihood of this ongoing is

10     very low.

11              Our job as physicians is to put things in

12     perspective to the patient.  So here it is a statement

13     which put things in perspective.  That means what is

14     the likelihood of this happening, what is the

15     likelihood of this continuing, and that is based upon

16     published literature and our own clinical guidelines.

17              And so published literature clearly shows

18     that with the transobturator technique and the papers

19     that I've mentioned, Serati, S-E-R-A-T-I, they showed

20     that it was I believe ten percent at one week and it

21     dropped down to like zero percent at one year.  The

22     second was Athenasiou, it showed the same thing, and,

23     again, the Cochran reviews by Ford and Tommaselli.  So

24     clearly these are not long-term.

Salil Khandwala, M.D.

Page 175

1              So when I look at the literature, what's
2        published, and then when I look at my own clinical
3        experience when I've done so many of these
4        transobturator slings, never had a single patient with
5        outstanding groin pain, and I'm not going to tell the
6        patient that she's going to have long-term groin pain
7        based upon literature, based upon evidence, and my
8        opinion based upon all this data.
9   Q.   And you'd agree that doctors have different clinical
10       experiences based on their skill set, their
11       experiences, et cetera, and their patient population,
12       is that fair?
13  A.   Yes.
14  Q.   And so not all doctors will have had the same clinical
15       experience that you have had?
16  A.   Yes.
17              MR. WALKER:  Object to form.
18  BY MS. FLAHERTY:
19  Q.   And you're not suggesting that doctors should
20       disregard information in Instructions For Use, are
21       you?  It's just a factor?
22  A.   It is just something.  However, they should look at
23       it, but they have to get directed by what is their
24       experience and clinical data published.

Salil Khandwala, M.D.

Page 176

```
1              So, yes, they may not have the experience
2         that I have because I exclusively just practice
3         urogynecology.  However, they read the literature.
4         They go to the American Urogyn conference or American
5         Urology Association conference, and they hear what
6         doctors present.  So then they put things in
7         perspective.
8              What we really do when we do this
9         consultation visit is we just do not throw just names
10        at the patient that you will get this, this, or this.
11        We tell them what is the likelihood, and that is how
12        the patient can then balance risk versus benefits.
13             So if I tell the patient that, yes, you
14        will have success and, yes, you will have groin pain,
15        well, that doesn't tell her a whole lot.  If I tell
16        her that your success is going to be ninety-seven
17        percent, that's a ninety-seven percent chance that
18        you'll be cured of this disease state and you have
19        less than one percent chance of a complication.  Well,
20        then she can put some weightage in the balance pans.
21             So that's what we do when we consult
22        patients and tell them what is the actual information.
23        So this is giving them the true facts, and that's
24        what's based upon the data.
```

Salil Khandwala, M.D.

Page 177

```
 1   Q.    And would you agree that's why it's important to have
 2         this data in the Instructions For Use so that the
 3         doctors can take the totality of that information and
 4         have that discussion with patients so patients can
 5         make an informed decision?
 6               MR. WALKER:  Object to form.
 7               THE WITNESS:  Well, the Instructions For
 8         Use is just one document.  I'm not a regulatory person
 9         as I told you, so I do not know what Ethicon puts in
10         and what they need to put in.  It is just one document
11         that we look at, and we just don't keep reviewing this
12         again.
13               Information For Use is really not a
14         document that physicians stick by and memorize.  What
15         we really memorize is what is our clinical experience
16         and what is published in the literature and how things
17         evolve.
18               As we mentioned, yes, there's a learning
19         concern, but then we also understand what is best in
20         my hands.  So in my hands, this particular
21         single-incision thing works great, but in Doctor
22         Smith's hands, it may be a TVT.
23               So ultimately, even what the FDA states is
24         ask your doctor what is his or her experience and
```

Salil Khandwala, M.D.

Page 178

1       success, and that could be very different from one to

2       the other based upon individual preferences.

3   Q.  Okay.  I'm going to just take a quick two minutes, but

4       I think we might be done.

5   A.  Okay.

6                       (Off the record at 1:00 p.m.)

7                       (Back on the record at 1:04 p.m.)

8                       MS. FLAHERTY:  Doctor, thank you very much

9       for your time today.  I don't have any further

10      questions for you.

11                      THE WITNESS:  Thank you.

12                      MR. WALKER:  We're done.  Thank you.

13

14                      (Deposition concluded at 1:04 p.m.)

15

16

17

18

19

20

21

22

23

24

Salil Khandwala, M.D.

Page 179

1   STATE OF MICHIGAN     )
                          )SS.
2   COUNTY OF LIVINGSTON )
3                    CERTIFICATE OF NOTARY PUBLIC
4                         I certify that this transcript
5        is a complete, true, and correct record of the
6        testimony of the deponent to the best of my ability
7        taken on Friday, July 8, 2016.
8                         I also certify that prior to
9        taking this deposition, the witness was duly sworn by
10       me to tell the truth.
11                        I also certify that I am not a
12       relative or employee of a party, or a relative or
13       employee of an attorney for a party, have a contract
14       with a party, or am financially interested in the
15       action.
16
17
18
19
20
         _____
21
         Cheryl McDowell, CSR-2662, RPR
22       Notary Public, Livingston County
         State of Michigan
23       Commission Expires September 13, 2019
24