Janet Tomezsko, M.D.

```
 1           UNITED STATES DISTRICT COURT
 2        SOUTHERN DISTRICT OF WEST VIRGINIA
 3                 AT CHARLESTON
 4   IN RE: ETHICON, INC.,        Master File No.
     PELVIC REPAIR SYSTEM         2:12-MD-02327
 5   PRODUCTS LIABILITY           MDL No. 2327
     LITIGATION                   Joseph R. Goodwin
 6   _____     U.S. District Judge
     THIS DOCUMENT RELATES
 7   TO:
     All Wave II TVT Cases
 8   Jean Fleck v. Ethicon,
     Inc., et al.
 9   Case No. 2:12-cv-01681
10   Phyllis Martin v.
     Ethicon, Inc., et al.
11   Case No. 2:12-cv-02029
12   Ramona Phillips v
     Ethicon, Inc., et al.
13   Case No. 2:12-cv-02143
     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
14
15          VIDEOTAPED DEPOSITION OF
16            JANET TOMEZSKO, M.D.
17               June 27, 2016
18                 8:07 a.m.
19            9599 Skokie Boulevard
20              Skokie, Illinois
21
22
23       Deanna Amore, CSR, RPR, 084-003999
24
```

Janet Tomezsko, M.D.

```
 1              APPEARANCES OF COUNSEL

 2

    On Behalf of the Plaintiff, RAMONA PHILLIPS:

 3

           WEXLER WALLACE LLP
 4         TIM E. JACKSON, ESQUIRE
           55 West Monroe Street
 5         Suite 3300
           Chicago, Illinois 60603
 6         (312) 346-2222
           tej@wexlerwallace.com

 7

    On Behalf of the Defendants, ETHICON, INC., et al.:

 8

           BUTLER SNOW LLP
 9         NILS B. SNELL, ESQUIRE
           500 Office Center Drive
10         Suite 400
           Washington, Pennsylvania 19034
11         (267) 513-1884
           burt.snell@butlersnow.com

12

    ALSO PRESENT:
13         Milo Savich, Legal Video Specialist

14

15

16

17

18

19

20

21

22

23

24
```

Janet Tomezsko, M.D.

```
 1                    I N D E X

 2    WITNESS                        EXAMINATION

 3    JANET TOMEZSKO, M.D.

 4       EXAMINATION BY MR. JACKSON              7

 5       EXAMINATION BY MR. SNELL             145

 6       FURTHER EXAMINATION BY MR. JACKSON   178

 7       FURTHER EXAMINATION BY MR. SNELL     184

 8                        EXHIBITS

 9    NUMBER           DESCRIPTION          PAGE

10    Exhibit 1      TVT Expert Report of       8

11                   Janet E. Tomezsko, M.D.

12    Exhibit 2      Curriculum Vitae of        8

13                   Janet E. Tomezsko, M.D.

14    Exhibit 3      Reliance List of           9

15                   Materials Referenced

16    Exhibit 4      Notice of Video           11

17                   Deposition of Dr. Janet

18                   Tomezsko, M.D.

19    Exhibit 5      Case Materials Binder     13

20    Exhibit 6      6.1.2016 Invoice          17

21    Exhibit 7      2008 Gynecare TVT         73

22                   Instructions for Use;

23                   ETH.MESH.02340504-533

24
```

Janet Tomezsko, M.D.

| 1 | | EXHIBITS | |
|---|---|---|---|
| 2 | NUMBER | DESCRIPTION | PAGE |
| 3 | Exhibit 8 | 1.9.2012 E-mail; | 103 |
| 4 | | ETH.MESH.08421479 | |
| 5 | Exhibit 9 | 6.26.2006 | 105 |
| 6 | | Ethicon-Approved Product | |
| 7 | | Pointer Gynecare TVT; | |
| 8 | | ETH.MESH; 00167119 | |
| 9 | Exhibit 10 | Pore Size Table; | 112 |
| 10 | | ETH.MESH.05479535 | |
| 11 | Exhibit 11 | 1.29.2009 E-mail | 129 |
| 12 | | Exchange; | |
| 13 | | ETH.MESH.04094863-64 | |
| 14 | Exhibit 12 | 2.20.2003 E-mail | 141 |
| 15 | | Exchange | |
| 16 | Exhibit 13 | TVT Medical Literature | 182 |
| 17 | | Binder | |
| 18 | Exhibit 14 | 14A - TVT (PM) Videos; | 182 |
| 19 | | 14B - Tomezsko Wave II; | |
| 20 | | 14C - Tomezsko General | |
| 21 | | Materials; | |
| 22 | | 14D - Unspecified | |
| 23 | | | |
| 24 | | | |

Janet Tomezsko, M.D.

```
 1              THE VIDEOGRAPHER:  We are now on the
 2    record.
 3              My name is Milo Savich, and I am a
 4    videographer for Golkow Technologies.
 5              Today's date is June 27, 2016, and time is
 6    8:07 a.m.
 7              This video deposition is being held in
 8    Skokie, Illinois, in the matter of In Re:  Ethicon
 9    Inc., Pelvic Repair System Products Liability
10    Litigation, which is being heard in the
11    United States District Court, Southern District of
12    West Virginia, Charleston Division.  The case
13    number is 2:12-MD-02327.
14              The deponent is Dr. Janet Tomezsko.
15              Will counsel please identify themselves
16    for the record.
17       MR. JACKSON:  Tim Jackson, Wexler Wallace, on
18    behalf of the plaintiffs.
19       MR. SNELL:  Burt Snell, representing
20    Johnson & Johnson and Ethicon.
21       THE VIDEOGRAPHER:  The court reporter is Deanna
22    Amore, who will now swear in the witness, and we
23    may then proceed.
24
```

Janet Tomezsko, M.D.

```
 1                          (Whereupon, the witness was

 2                           duly sworn.)

 3       THE WITNESS:  I do.

 4       MR. JACKSON:  Good morning, Doctor.

 5       THE WITNESS:  Good morning.

 6       MR. JACKSON:  Could you please state and spell

 7   your name for the record.

 8       THE WITNESS:  Janet Tomezsko, T-o-m-e-z-s-k-o.

 9       MR. JACKSON:  And, Dr. Tomezsko -- am

10   I pronouncing that correctly?

11       THE WITNESS:  That's correct.

12       MR. JACKSON:  As I introduced myself before we

13   got on the record, my name is Tim Jackson, and I'm

14   from a firm called Wexler Wallace here in Chicago;

15   do you understand that?

16       THE WITNESS:  Yes.

17       MR. JACKSON:  And you're here today to give

18   testimony about the general TVT report you wrote in

19   this case; is that correct?

20       THE WITNESS:  Yes.

21       MR. JACKSON:  And you also wrote three separate

22   plaintiff-specific reports related to this case; is

23   that correct?

24       THE WITNESS:  Yes.
```

Janet Tomezsko, M.D.

1      MR. JACKSON:  And we'll be addressing some of

2  those later today; is that your understanding?

3      THE WITNESS:  Yes.

4      MR. JACKSON:  And is there any reason you feel

5  you cannot testify fully and accurately today?

6      THE WITNESS:  No.

7      MR. JACKSON:  And if I ask something and it's

8  not clear what I'm asking, I'll ask that you let me

9  know that so I can rephrase it; is that fair?

10     THE WITNESS:  Yes.

11     MR. JACKSON:  And if I ask a question and you

12  answer it, is it fair for me to assume that you

13  understood the question?

14     THE WITNESS:  Yes.

15              JANET TOMEZSKO, M.D.,

16  called as a witness herein, having been first duly

17  sworn, was examined and testified as follows:

18                  EXAMINATION

19  BY MR. JACKSON:

20     Q.   Have you ever had your deposition taken

21  before?

22     A.   Yes, I have.

23     Q.   Okay.  In what context?

24     A.   Subsequent treater.

Janet Tomezsko, M.D.

1       Q.    And about how many times?

2       A.    I think three or four.

3       Q.    And are there any other times you've been

4    deposed?

5       A.    No.

6                       (Whereupon, TOMEZSKO Exhibit 1

7                       was marked for identification.)

8    BY MR. JACKSON:

9       Q.    I'm going to hand you what we've premarked

10   as Exhibits 1 through 3.

11          If you could just confirm that Exhibit 1

12   is an accurate copy of the ex -- the general TVT

13   report you provided in this case?

14      A.    It appears to be, yes.

15      Q.    And if you could look at Exhibit 2,

16   please.

17                      (Whereupon, TOMEZSKO Exhibit 2

18                      was marked for identification.)

19   BY MR. JACKSON:

20      Q.    And can you just confirm that looks like

21   an accurate copy of the CV that would have been

22   submitted with your report?

23      A.    Yes, it does.

24

```
 1                    (Whereupon, TOMEZSKO Exhibit 3

 2                    was marked for identification.)

 3    BY MR. JACKSON:

 4        Q.   And if you could just look at Exhibit 3

 5    and confirm that that looks like an accurate copy

 6    of the reliance list that was provided with your

 7    report in this case.

 8        A.   I think we might have a more up-to-date

 9    one.

10        Q.   Okay.  But is it your understanding that

11    that's the one that would have been submitted with

12    the report?

13        A.   Originally, yes.

14        Q.   Okay.  Thank you.  Thank you.

15             And, Doctor, did you review prior to the

16    deposition today?

17        A.   Yes, I have.

18        Q.   And what did you review specifically for

19    this deposition?

20        A.   I reviewed the general medical literature,

21    literature regarding urinary incontinence

22    treatment, TVT-specific literature.

23             I have reviewed the testimony of medical

24    experts for the cases.
```

Janet Tomezsko, M.D.

1          I have reviewed some Ethicon documents and

2     then patient-specific data, but that's not for this

3     report.

4          Q.   Okay.  And did you speak with anyone prior

5     to your deposition today specifically in regards to

6     the deposition?

7          MR. SNELL:  Objection.  Form.  Vague.

8          Go ahead.

9          THE WITNESS:  Yeah, that's very vague.  Can you

10    clarify?  Do you mean when the deposition was or...

11    BY MR. JACKSON:

12         Q.   Did you -- strike that.

13         You met with your attorney in preparation

14    for the deposition today, correct?

15         A.   Yes.

16         MR. SNELL:  Objection.  Form.  I'm not her

17    attorney.

18         THE WITNESS:  Oh, that's true.  Sorry.

19    BY MR. JACKSON:

20         Q.   Did you meet with an attorney for Ethicon

21    in preparation for this deposition today?

22         A.   Yes.

23         Q.   And how many times did you meet?

24         A.   Two times.

Janet Tomezsko, M.D.

1    Q.   Okay.  And for about how long total?

2    A.   That's a good question.  Probably about

3  eight or ten hours.

4                    (Whereupon, TOMEZSKO Exhibit 4

5                     was marked for identification.)

6  BY MR. JACKSON:

7    Q.   I'm going to hand you what's been marked

8  Exhibit 4, and this is the notice of the deposition

9  today.

10   A.   Yes.

11   Q.   Have you seen that document before?

12   A.   Yes, I have.

13   Q.   Okay.  And I see you brought some

14  documents with you.  Are you bringing those in

15  response to the document request in the deposition

16  notice?

17   A.   These are the documents that go along with

18  my general report.

19   Q.   Okay.

20   A.   And I don't have any other -- they are

21  just all the literature.

22   Q.   Okay.  So I see one -- one large binder on

23  the desk in front of you.  Could you just generally

24  tell me what's in that?  You mentioned literature.

Janet Tomezsko, M.D.

1    A.    Right.  So this is -- this is my -- my

2    CV -- my report, my CV, the materials list and then

3    part of the literature that I reviewed.

4    Q.    Okay.  When you say "part of the

5    literature that you've reviewed," are there other

6    documents you reviewed that are not included in

7    this binder?

8    A.    Yes, there are many.

9    Q.    So how did you choose which documents to

10   include in this binder?

11   A.    We narrowed it down to include the ones

12   that were most pertinent and most referenced in

13   this document.  We can't include all of them

14   because there are thousands of them.  So the ones

15   that are most relevant and most pertinent, the

16   Level 1 data.

17   Q.    And, Doctor, when you say "Level 1 data,"

18   what do you mean by that?

19   A.    That is the peer-review classification,

20   Level 1 data is the meta-analysis, systematic

21   reviews of randomized controlled trials considered

22   the highest level data to base clinical opinions

23   on.

24   Q.    Okay.  And can we go ahead and we'll mark

Janet Tomezsko, M.D.

1   the binder she brought with her as Exhibit 5, if

2   that makes sense.

3                    (Whereupon, TOMEZSKO Exhibit 5

4                    was marked for identification.)

5   BY MR. JACKSON:

6       Q.   Doctor, can you tell me when were you

7   first contacted about providing a report in this

8   case?

9       A.   Oh, several months ago.

10           Exactly when?  The date?

11      Q.   I mean, could you give me a guess of

12  approximately which month?

13      A.   February-March.

14      Q.   Okay.

15      MR. SNELL:  Counsel, can I make a statement for

16  the record?

17      MR. JACKSON:  Sure.

18      MR. SNELL:  Your question about what she

19  brought, you were directing her attention to that

20  big binder.  She did bring other stuff in response.

21      MR. JACKSON:  Okay.

22      MR. SNELL:  I just didn't want there to be --

23  the record to be unclear because we all know that

24  there are multiple boxes sitting over in the corner

Janet Tomezsko, M.D.

1   and things.  So if your question was limited to

2   that, she's answered it, but if you want to know

3   the entirety of everything she brought, it's here

4   for you to look at or ask her about.  I just want

5   to make sure there was no unclarity on the record.

6   BY MR. JACKSON:

7       Q.   Okay.  Doctor, your counsel for Ethicon

8   mentioned that there were other boxes brought by

9   you today; is that correct?

10      A.   Yes.

11      Q.   And what -- what is in the other boxes?

12      A.   So in the entirety of the boxes there are

13  -- there is more literature.  There are IFUs for

14  the TVT device.  There are other Ethicon documents,

15  and there is the patient's -- patient records that

16  we need for the later depositions.  I have also

17  thumb drives with data on them, research papers,

18  et cetera.

19      Q.   Okay.  And, Doctor, is the entirety of the

20  materials you've reviewed in connection with your

21  reports in this case contained in the binder and

22  the boxes you brought with you today?

23      A.   I would say no.  I'm sure there is other

24  documents and literature that I've read that is not

Janet Tomezsko, M.D.

1    included because there is so much volume of

2    literature I've read through the years, and that is

3    part of my knowledge.

4        Q.   Okay.  Thank you.

5             And, Doctor, I believe you stated a moment

6    ago that you were first contacted about providing a

7    report in this case in February; is that right?

8        A.   Yeah, I think that might be, yes.

9        Q.   And at the time you submitted your report

10   in this case, about how much time had you spent on

11   that report?

12       A.   I would say about 45, 50 hours.

13       Q.   Okay.  And do you keep track of your time

14   somewhere?

15       A.   Not -- not a detailed track, no.

16       Q.   Have you submitted an invoice yet for that

17   time?

18       A.   I have submitted an invoice for part of

19   the time, yes.

20       Q.   Okay.  Did you bring any billing

21   information with you today?

22       A.   I have the one invoice.

23       Q.   Okay.  Is that something you have handy

24   right now?

Janet Tomezsko, M.D.

1      A.   Yes.

2      Q.   Okay.  Could I take a look at that?

3      A.   Forgive me.  I have to find it.

4           Can I unclip for a moment?

5      Q.   Of course.

6      MR. JACKSON:  Let's just go off the record for

7  a second.

8      THE VIDEOGRAPHER:  The time is 8:17 a.m., and

9  we are going off the video record.

10                    (A short break was taken.)

11     THE VIDEOGRAPHER:  The time is 8:18 a.m., and

12  we are back on the video record.

13  BY MR. JACKSON:

14     Q.   Doctor, while we were off the record, were

15  you able to locate the billing information you

16  brought with you today?

17     A.   Yes, I was.

18     Q.   And is that something I could take a look

19  at quickly?

20     A.   Yes.

21     MR. JACKSON:  Can we go ahead and mark that as

22  Exhibit 6, please.

23

24

Janet Tomezsko, M.D.

```
 1                    (Whereupon, TOMEZSKO Exhibit 6

 2                    was marked for identification.)

 3      MR. SNELL:  What's the date of that?

 4   BY MR. JACKSON:

 5      Q.   Doctor, we've marked as Exhibit 6 a letter

 6   from you to Mr. Burt Snell dated June 1, 2016.

 7           It says "I'm submitting this invoice for

 8   my expert witness work from April 1, 2016, through

 9   May 31, 2016.  The hours include face-to-face

10   meeting, phone conversations and record review, all

11   with an hourly rate of $400 per hour."

12           Is that your hourly rate?

13      A.   Yes, it is.

14      Q.   "Total hours for this time period is 45.

15   Total fee is $18,000."

16           Did I read that correctly?

17      A.   Yes, you did.

18      Q.   Okay.  Thank you.

19           And so from April 1 to May 31, it looks

20   like you spent about 45 hours; is that correct?

21      A.   Yes.

22      Q.   And so you said you would have been first

23   retained in this case around February?

24      A.   You asked me when I was first contacted.
```

Janet Tomezsko, M.D.

1      Q.   When did you first start working on your

2  report in this case?

3      A.   It would have been the beginning of April

4  then.

5      Q.   So that 45 hours is about the entirety of

6  the time you spent?

7      A.   I have -- I'm sure I have spent more than

8  that.

9      Q.   And --

10     A.   That does not -- I'm sorry.

11          That does not include recent time.

12     Q.   And does that 45 hours include work on

13  both the TVT general report as well as the

14  plaintiff-specific reports?

15     A.   It does include part of both.

16     Q.   Okay.  And is it fair to say that since

17  May 31, you've spent additional time working on

18  this case?

19     A.   Yes, I've spent about another month worth

20  of work.

21     Q.   When you say "about a month worth of

22  work," approximately how many hours would that be?

23     A.   Probably another 40 to 50 hours at least.

24     Q.   Okay.  Doctor, we have a copy of your CV,

Janet Tomezsko, M.D.

1  so I won't spend an inordinate amount of time on

2  that, but can you tell me where you went to medical

3  school?

4      A.   I went to Hahnemann University, which is

5  now known as Drexel University in the Tradition of

6  Hahnemann and Medical College of Pennsylvania.

7      Q.   And where in Pennsylvania is that?

8      A.   Philadelphia.

9      Q.   And, Doctor, where did you do your

10 undergrad?

11     A.   Penn State.

12     Q.   And your residency?

13     A.   Lehigh Valley Hospital in Allentown,

14 Pennsylvania.

15     Q.   And what year did you do -- what year was

16 your residency?

17     A.   1991 to 1995.

18     Q.   And did you have a fellowship?

19     A.   Yes, I did.

20     Q.   And where was that?

21     A.   It was -- at the time it was called

22 Evanston Continent Center here in Evanston,

23 Illinois, under Northwestern University, and now we

24 are called NorthShore University HealthSystem.

Janet Tomezsko, M.D.

1      Q.   And when was -- when was your fellowship?

2      A.   1995 to 1997.

3      Q.   And what did you do after you completed

4  your fellowship?

5      A.   I went into practice.

6      Q.   And what was your first job in practice?

7  Where did you first practice?

8      A.   I practiced at Advocate Christ Medical

9  Center.

10     Q.   And how long did you work at Advocate

11 Christ Medical Center?

12     A.   Four-plus years.

13     Q.   Okay.  And after Advocate Christ Medical

14 Center, what was your next position?

15     A.   I left Advocate to become the director of

16 urogynecology at Northwestern Memorial Hospital for

17 the Northwestern Medical Faculty Foundation.

18     Q.   Okay.  And, Doctor, how long did you hold

19 that position?

20     A.   Approximately nine years.

21     Q.   Okay.  And after that position, where --

22 where did you work?

23     A.   Then I came to NorthShore University

24 HealthSystem.

Janet Tomezsko, M.D.

1        Q.    Okay.  And, Doctor, that's your current

2   position?

3        A.    That's my current position, yes.

4        Q.    And what's your current title at

5   NorthShore University -- NorthShore HealthSystem?

6        A.    I am just a specialist in female pelvic

7   medicine and reconstructive surgery.

8        Q.    And, Doctor, do you have any board

9   certifications?

10       A.    Yes, I do.

11       Q.    Okay.  And what certifications are those?

12       A.    I am board certified in obstetrics and

13   gynecology and in female pelvic medicine and

14   reconstructive surgery.

15       Q.    Doctor, when did you become board

16   certified in obstetrics and gynecology?

17       A.    In -- that's a good question.  I have to

18   look at my CV.

19       Q.    Please.  Please do.

20       A.    All of these years start to blend

21   together.

22              Immediately, the first year I could become

23   board certified.  So that was November 1 -- I'm

24   sorry -- yes, November 1998.

Janet Tomezsko, M.D.

```
 1        Q.    And, Doctor, you also mentioned you're

 2   board certified in female pelvic medicine and

 3   reconstructive health?

 4        A.    That's correct.

 5        Q.    And when did you become board certified in

 6   that?

 7        A.    2013, the first year you could become

 8   board certified.

 9        Q.    And, Doctor, are you licensed in Illinois?

10        A.    Yes, I am.

11        Q.    And, Doctor, have you performed any

12   research in your medical career after medical

13   school?

14        A.    Yes, I have.

15        Q.    And what's the general nature of that

16   research?

17        A.    I have done different research.

18             I have performed research on medications

19   for overactive bladder.

20             I have performed surgical research for

21   vaginal prolapse.

22             And I have done also spinal curvature

23   research having to do with prolapse occurrence,

24   research on nonsurgical management of urinary
```

Janet Tomezsko, M.D.

```
 1    incontinence.
 2         Q.   And has any of that research been funded
 3    by Johnson & Johnson or Ethicon?
 4         A.   No, it has not.
 5         Q.   Have you been involved in any clinical
 6    studies in your medical career?
 7         A.   Yes, that's under the research.
 8         Q.   Okay.  Were any of those studies specific
 9    to stress urinary incontinence?
10         A.   Not addressing just stress urinary
11    incontinence, but, yes, they did.
12         Q.   Okay.  Can you explain what you mean by
13    that?
14         A.   One of the studies I was involved in was
15    nonsurgical management of urinary incontinence,
16    which included urge and stress urinary
17    incontinence, and then the prolapse studies also
18    include and evaluate urinary incontinence as part
19    of the studies.
20         Q.   And when was the clinical study to
21    evaluate nonsurgical treatments of stress urinary
22    incontinence?
23         A.   So I had -- I participated in -- also
24    medication studies too -- which was in 2006, 2007,
```

Janet Tomezsko, M.D.

```
1    2002, 2004, back to 1999, and then through the
2    years, the other research studies have been from
3    '99 on through 2010, 2012.
4         Q.   And shifting gears a little bit, Doctor,
5    do you currently implant the retropubic TVT
6    product?
7         A.   I do retropubic midurethral slings.
8    Currently, our hospital system does not use TVT
9    products.
10        Q.   And which retropubic midurethral sling
11   product does your hospital use?
12        A.   Right now we use Boston Scientific.
13        Q.   Is there a specific product name?
14        A.   Oh, I'm sorry.  Advantage Fit.
15        Q.   Advantage Fit.
16             So, doctor, have you previously implanted
17   the TVT Retropubic product?
18        A.   Yes, I have.
19        Q.   And when did you begin implanting the
20   TVT Retropubic product?
21        A.   I think I began around 1999.
22        Q.   So around the time it was first
23   introduced; is that fair?
24        A.   That's correct.
```

Janet Tomezsko, M.D.

1     Q.   And when did you cease using the

2  TVT Retropubic product?

3     A.   Our hospital system switched over based on

4  contracts.

5     Q.   Okay.  And --

6     A.   So I believe that was two or three years

7  ago.  It was not a physician decision.

8     Q.   So, Doctor, did you use the TVT Retropubic

9  product yourself for about 15 years; is that fair?

10    A.   Approximately, yes.

11    Q.   And how did you come to use it initially

12 in 1999?

13    A.   Can you be more specific with that

14 question?

15    Q.   How were -- how were you introduced to the

16 TVT Retropubic product the first -- prior to the

17 first time you used it?

18    A.   I -- I believe I first learned about it at

19 our scientific meetings.

20    Q.   When you say "our scientific meetings,"

21 whose scientific meetings?

22    A.   Thank you.

23         Our urogynecology scientific meetings such

24 as AUGS or SGS, and then I went to specific

Janet Tomezsko, M.D.

1    training for it, and my partner at the time was

2    also training at the same time.

3        Q.    And who was your partner at the time?

4        A.    It was Denise Elser.

5        Q.    E-l-s-e-r?

6        A.    Yes.

7        Q.    And, Doctor, you mentioned training of the

8    retropubic TVT device; is that correct?

9        A.    Yes.

10       Q.    And was that an Ethicon training?

11       A.    I do not recall specifically my first

12   training.  I assume it was, but I underwent

13   different educational programs, and I'm certain

14   some portion of it was an Ethicon training program.

15       Q.    Okay.  Well, specific to the training

16   program you would have attended before you started

17   using the TVT Retropubic device, you don't remember

18   if that was Ethicon or not?

19       A.    I do not remember when or where it was.

20   I'm sure I did attend an Ethicon training at some

21   point, yes.

22       Q.    Okay.  But prior to using the TVT

23   Retropubic device for the first time --

24       A.    Prior to using it for the first time, yes.

Janet Tomezsko, M.D.

1      Q.    -- you are certain you attended an Ethicon

2  training?  You are certain --

3      A.    I am certain.

4      Q.    Okay, and, Doctor, in the 15 years you've

5  used the retropubic -- I'm sorry.  Strike that.

6           In the 15 years you did use the

7  TVT Retropubic device, approximately how many have

8  you implanted in patients?

9      A.    I think approximately 1,000 to 1,500.

10     Q.    And, Doctor, the retropubic TVT device has

11  been available in both a laser cut and a mechanical

12  cut variation; is that correct?

13     MR. SNELL:  Form as to time.

14     THE WITNESS:  Yes.

15  BY MR. JACKSON:

16     Q.    Doctor, at the time you've implanted the

17  TVT Retropubic device beginning in 1999 until

18  approximately two or three years ago, have you

19  implanted both the laser cut and the mechanically

20  cut version of the TVT?

21     A.    Yes, I have.

22     Q.    And do you know when you are doing a

23  surgery whether it's mechanical cut or laser cut?

24     A.    Previously?

Janet Tomezsko, M.D.

1    Q.   Yes.

2    A.   At the time I believe our institution

3  switched over from mechanical cut to laser cut, and

4  they only stocked one at the time, you know, one

5  form at the time.  So, yes, I did know that we had

6  switched from mechanical to laser cut.

7    Q.   Okay.  And do you have an understanding as

8  to approximately when your institution would have

9  switched from mechanical cut to laser cut?

10   A.   I do not recall exactly, no.

11   Q.   Okay.  Doctor, just so -- just to make

12  sure I'm clear, is it your testimony that you

13  implanted the mechanical cut TVT and then your

14  institution switched to the laser cut TVT, and you

15  began implanting the laser cut TVT?

16   A.   Correct.

17   Q.   Okay.  So, Doctor, was there ever a period

18  of time where you would have been implanting both

19  the laser cut and the mechanical cut?

20   A.   It's possible based on what they had on

21  the shelves.  I don't remember specifically.

22   Q.   Okay.  Doctor, is it fair to say that when

23  you put a laser cut mesh next to a mechanical cut

24  mesh -- and I'm specifically talking about the TVT

Janet Tomezsko, M.D.

1   Retropubic -- that you can tell the difference?

2       A.   Inside the package?

3       Q.   No, if they are outside the package.

4       A.   When -- if you were to remove the sheaths?

5       Q.   Sure.

6       A.   So that you can see the mesh?

7       Q.   Doctor, let me ask a better question.

8            If you're just holding up a mechanical cut

9   TVT Retropubic and a laser cut TVT Retropubic next

10  to each other in your hands, can you tell the

11  difference looking at them?

12      A.   I could not tell the difference, no.

13      Q.   And that would just be looking at it with

14  your -- with your naked eye, correct?

15      A.   Correct.

16      Q.   Okay.  Would you need a microscope to tell

17  the difference; is that correct?

18      MR. SNELL:  Form.

19      Go ahead.

20      THE WITNESS:  I've never looked at them under a

21  microscope myself to try to tell a difference.  So

22  I cannot answer that question.

23  BY MR. JACKSON:

24      Q.   Okay.  Doctor, you testified that you --

Janet Tomezsko, M.D.

1    your best guess is you've implanted approximately

2    1,000 to 1,500 retropubic TVTs; is that correct?

3        A.    Yes.

4        Q.    And do you have an understanding of what

5    the breakdown would be between the mechanical cut

6    and the laser cut in terms of how many you've

7    implanted?

8        A.    Based on the years, I'd say maybe a

9    slightly higher proportion of mechanical than laser

10   cut, just based on the years that they were

11   produced.

12       Q.    And when you say "based on the years they

13   were produced," I'm just -- I'm just curious how

14   you are coming up with the answer that you think

15   you've implanted slightly more mechanically cut

16   than laser cut.

17       A.    Well, being the last several years that we

18   -- our institution changed brands.  So I can count

19   those.  So those were years of my doing slings, and

20   I believe they switched over 2005-2006.  So the

21   amount of years that I've been using slings

22   altogether, probably from 1999 to 2006 or so, was

23   mechanical cut, and then laser cut after that until

24   our institution switched.  So probably it's a

Janet Tomezsko, M.D.

1    little bit more mechanical cut.

2      Q.   Okay.  And, Doctor, is it your

3    understanding that even though your institution

4    switched to the laser cut TVT Retropubic in,

5    I think you said approximately 2006, is it your

6    understanding that the mechanically cut TVT

7    Retropubic was still on the market being sold at

8    that time?

9      A.   At the time, in my discussions, I believe

10   it was not simple for us to get the mechanical cut,

11   and that might have just been an institutional, you

12   know, they like to order one SKU.  So I did not

13   have a lot of discussions about what was on the

14   market as what was decided was by the institution,

15   not by the physicians.

16     Q.   Okay.  But do you have an understanding as

17   to whether beginning in 2006 when the laser cut

18   mesh was available, was the mechanically cut TVT

19   Retropubic also available at that time?  Do you

20   have an understanding?

21     A.   I believe it was.

22     Q.   Okay.  So your understanding is from 2006

23   onward, Ethicon was selling both the laser cut and

24   the mechanically cut TVT Retropubic; is that

Janet Tomezsko, M.D.

1    correct?

2        A.   No.   Initially, I knew that was correct,

3    but I actually am not sure as of today.

4        Q.   So as of today, you're not sure whether

5    Ethicon was selling both the mechanically cut and

6    the laser cut TVT Retropubic from 2006 onward?

7        MR. SNELL:   Form.

8        THE WITNESS:   Correct.

9    BY MR. JACKSON:

10       Q.   Okay.   Doctor, did any of the documents

11   you reviewed in connection with your report in this

12   case inform you as to whether the laser cut TVT

13   Retropubic and the mechanically cut TVT Retropubic

14   were both on the market from 2006 onward?

15       A.   I don't recollect seeing that in the

16   volume of documents, but I can't 100 percent say

17   for sure that it's not there.

18       Q.   Okay.   Doctor, in 2009, for example, do

19   you have an understanding of whether both the laser

20   cut TVT Retropubic and the mechanically cut TVT

21   Retropubic were being sold by Ethicon?

22       A.   I do not.

23       Q.   Doctor, other than the retropubic TVT

24   device, have you ever implanted any other TVT

Janet Tomezsko, M.D.

1  devices yourself?

2      A.   I have.

3      Q.   Okay.  And which -- which devices would

4  those be?

5      A.   I have implanted TVT Secur and only a few

6  TVT-O.

7      Q.   Okay.  And do you currently implant the

8  TVT-O?

9      A.   No, I do not.

10      Q.   And, Doctor, approximately when would you

11  have implanted the TVT-O and the TVT-S?  Do you

12  have a sense of that?

13      A.   The TVT-O was several years after it was

14  first on the market, and then I only did a few.

15  And the same with the TVT Secur, it was probably

16  two or three years after -- it was not immediately

17  after it was on the market, and I only did a few.

18      Q.   Okay.  Doctor, do you currently implant

19  any Ethicon products at all?

20      A.   I will use Prolene suture.

21      Q.   In what application?

22      A.   In prolapse repair or just in general

23  suturing wound closure.

24      Q.   Okay.

Janet Tomezsko, M.D.

1      A.   Our hospital is not an Ethicon hospital.

2      Q.   Okay.  And, Doctor, just so I'm clear,

3  when you say "suture," you're talking about an

4  individual strand of fiber, correct?

5      A.   Correct.

6      Q.   Okay.  And you'd agree with me that a

7  suture is different from a mesh, correct?

8      MR. SNELL:  Form.  Vague.

9      THE WITNESS:  A suture is a different form, but

10  it can be of the same material.

11  BY MR. JACKSON:

12      Q.   Okay.  Doctor, when was the first time you

13  ever worked with polypropylene mesh of any kind?

14      A.   I believe my first use of polypropylene

15  mesh was with the retropubic TVT.

16      Q.   And, Doctor, you've mentioned the

17  retropubic TVT, the TVT Obturator, the TVT Secur

18  and the Advantage Fit, correct?

19      A.   Yes.

20      Q.   Are there any other polypropylene meshes

21  that you've worked with in your career?

22      A.   Yes.  I have used Gynemesh for prolapse

23  repair.  I have used other brands of mesh for

24  sacrocolpopexy also.  My Gynemesh would be for

Janet Tomezsko, M.D.

1    sacrocolpopexy also, and I'm sure I have used other

2    retropubic slings along the way.

3        Q.   Doctor, we previously marked as Exhibit 3

4    the reliance list you provided with your report,

5    correct?

6        A.   Yes.

7        Q.   And it's a -- it's a big document,

8    correct?

9        A.   Correct.

10       Q.   And have you reviewed every document on

11   that list?

12       A.   I have -- through the years I've seen,

13   I believe, all of the research, and then the

14   Ethicon documents I've had access to and have,

15   I think, briefly reviewed almost every one of them,

16   yes.

17       Q.   Okay.  Doctor, as you -- you've mentioned

18   you reviewed some Ethicon internal documents in

19   this case, correct?

20       A.   Yes.

21       Q.   Did you talk to anyone from Ethicon or

22   counsel for Ethicon about which documents you

23   should be reviewing?

24       MR. SNELL:  Objection.  I don't think you are

Janet Tomezsko, M.D.

1    allowed to ask her about my conversations with her.

2    That's work product, and I don't do that between

3    Ed and Dr. Rosenzweig and stuff.  So I think that's

4    an improper question as to me.

5        MR. JACKSON:  Sure.  I can ask a better

6    question.

7    BY MR. JACKSON:

8        Q.   Doctor, how did you -- how did you

9    determine which Ethicon documents you were

10   reviewing in connection with your report in this

11   case?

12       A.   I reviewed Ethicon documents that were

13   included in the medical experts' reports, and

14   they're in many of the medical expert reports.

15            And then I was also supplied with some

16   others.

17       Q.   Okay.  Doctor, how did you first become

18   involved in this case?

19       A.   I was contacted by Butler Snow as an

20   expert in the area.

21       Q.   And, obviously, I'm not asking you to

22   violate any attorney-client privilege or anything

23   like that, but can you just describe how you were

24   contacted by Butler Snow?  I mean, did you get a

Janet Tomezsko, M.D.

1    phone call out of the blue?

2        A.   The original contact, I believe, was by

3    e-mail, and I don't -- now I don't remember

4    actually.

5        Q.   Doctor, is it fair to say that someone

6    from Butler Snow contacted you in about February of

7    this year to ask if you might be interested in

8    providing an expert report in this case?

9        A.   Yes.

10       Q.   Okay.  And at that time did you have an

11   understanding that they wanted you to provide an

12   opinion that the TVT Retropubic device was safe and

13   effective?

14       A.   It was my understanding that they wanted

15   me to provide my opinion about the TVT Retropubic

16   device.

17       Q.   But did you have an understanding that

18   anybody wanted your opinion to be that the TVT

19   Retropubic device was safe and effective?

20       A.   No.

21       MR. SNELL:  Objection.  Form.

22       Go ahead.

23       THE WITNESS:  Sorry.

24       No, it was very clear that they wanted my

Janet Tomezsko, M.D.

1    opinion, no matter what that opinion was.

2    BY MR. JACKSON:

3        Q.    Okay.  So if you had reached the opinion

4    that the TVT Retropubic device was not safe and

5    effective, you still would have submitted a report

6    on behalf of Ethicon in this case?

7        A.    I can't answer that question.

8        Q.    Why can't you answer that question?

9        A.    Because that was not the situation.

10   I don't know what would have happened in a

11   situation that did not occur.

12       Q.    Okay.  Doctor, when you used the TVT

13   Retropubic device for approximately 15 years in

14   your practice, did you believe that the

15   TVT Retropubic device was safe and effective?

16       A.    Yes, I did.

17       Q.    And, Doctor, when you were first -- sorry.

18   Strike that.

19            Doctor, at the time you were first

20   contacted by Butler Snow in approximately

21   February of 2016, did you hold the opinion that the

22   TVT Retropubic device was safe and effective?

23       A.    Yes, I do.

24       Q.    So, Doctor, at the time you began your

Janet Tomezsko, M.D.

1    work in this case, you already believed that the

2    TVT device, the TVT Retropubic device was safe and

3    effective, correct?

4        A.    Absolutely.

5        Q.    And is it fair to say you haven't come

6    across anything that's changed your mind?

7        A.    That's correct.

8        Q.    Did you see anything or learn anything

9    that gave you concern about the safety and efficacy

10   of the TVT Retropubic device?

11       A.    No, I did not.

12       Q.    Doctor, in regards to the report that

13   we've marked as Exhibit 1, did you type the report

14   yourself?

15       A.    Yes, I did.

16       Q.    Okay.  And I believe there are 43 pages.

17   Is that -- does that sound right?

18       A.    Yes.

19       Q.    And, just generally, was it a situation

20   where you reviewed documents and worked on the

21   report as you went along, or you sat down and typed

22   all 43 pages at once?

23       A.    No, I'm a person that gets a portion of

24   the topic I want to evaluate and then review the

Janet Tomezsko, M.D.

```
1   most current literature, review, and my also

2   general knowledge and then type that kind of

3   section at a time.  I'm a one-section-at-a-time

4   kind of person.

5        Q.   So you worked on it section by section?

6        A.   Yes.  Sorry.  Yes.

7        Q.   And, Doctor, I think you mentioned when

8   you were listing some materials you read in

9   connection with your report that you looked at the

10  Instructions for Use for the TVT Retropubic device;

11  is that correct?

12       A.   Yes.

13       Q.   Okay.  And, Doctor, would you agree with

14  me it is appropriate for a physician that's going

15  to implant the TVT Retropubic device to look at

16  those instructions for use before implanting the

17  device?

18       A.   Yes.

19       Q.   And is it appropriate for a physician who

20  is going to implant the TVT Retropubic device to

21  rely on those instructions for use?

22       A.   I would say we don't rely on the

23  instructions for use because we are trained to do a

24  procedure and know about a procedure.  That is a
```

Janet Tomezsko, M.D.

1   portion of the information but that is not

2   something we rely on for our expertise and the

3   technique or the procedure.

4        Q.   Okay.  Doctor, the Instructions for Use

5   for the TVT Retropubic device list known risks that

6   come with that device, correct?

7        A.   Yes.

8        Q.   Okay.  So as a physician, is it your

9   testimony that you did not rely on those warnings?

10        A.   I know of those risks through my years of

11   experience with many operations including different

12   incontinence operations as well as retropubic

13   slings.  So that is not the only source of my

14   knowledge.  So it's a portion of knowledge, but

15   it's not the only source of my knowledge.

16        Q.   Okay.  Doctor, you -- Doctor, is it fair

17   to say that some surgeons who implant the

18   TVT Retropubic device don't have as much experience

19   as you do?

20        MR. SNELL:  Form.

21        THE WITNESS:  I can't answer that.  I would

22   assume there is some surgeons who do less surgery

23   than I do.

24

Janet Tomezsko, M.D.

1    BY MR. JACKSON:

2        Q.   Doctor, when you started implanting the

3    TVT Retropubic device in 1999, you had limited

4    experience implanting devices as a surgeon; is that

5    correct?

6        MR. SNELL:   Object.   Form.

7        THE WITNESS:   At that time in my career, I had

8    extensive experience in all different continence

9    operations, including the most similar pubovaginal

10   sling.   So I did have limited experience in the

11   TVT Retropubic but extensive experience all around.

12   BY MR. JACKSON:

13       Q.   Okay.   Doctor, is it the company's

14   responsibility to warn of the risks that come with

15   the TVT Retropubic device?

16       MR. SNELL:   Form.

17       THE WITNESS:   No.

18   BY MR. JACKSON:

19       Q.   Why not?

20       A.   It's a physician's, as a surgeon's

21   responsibility to know the risks of procedures.

22       Q.   And how does a surgeon learn of the risks

23   that accompany a given procedure?

24       A.   We learn through the literature, through

Janet Tomezsko, M.D.

1   our research, through our meetings.  We learn

2   through our clinical experiences amongst the group,

3   the AGS, SGS, and the fund of knowledge there is

4   regarding procedures.

5       Q.   So if a company -- strike that.

6            If Ethicon has knowledge of risks that

7   accompany the TVT Retropubic product, does Ethicon

8   have an obligation to warn of those risks?

9       MR. SNELL:  Form.

10      THE WITNESS:  Yes, as a portion of our

11   knowledge.

12   BY MR. JACKSON:

13      Q.   Okay.  And one way they might warn about

14   those risks is through the Instructions for Use; is

15   that correct?

16      A.   Yes.

17      Q.   Would you agree that the

18   Instructions for Use for the TVT Retropubic device

19   is certainly one way that an implanting surgeon can

20   learn about warning information that goes with that

21   device?

22      A.   Yes.

23      Q.   Certainly not the only way but it's one

24   way?

Janet Tomezsko, M.D.

1      A.   It's one way, yes.

2      Q.   Doctor, would you agree that mesh repair

3   for stress urinary incontinence carries with it

4   risks that are not present in other surgeries for

5   stress urinary incontinence?

6      MR. SNELL:  Object.  Lacks foundation.

7      Go ahead.

8      THE WITNESS:  No, I don't.

9   BY MR. JACKSON:

10     Q.   The risk of mesh erosion certainly is not

11  present in nonmesh surgeries, right?

12     A.   With each of the incontinent surgeries

13  that we perform that we implant either suture or a

14  fascia or a mesh, there is a risk of an exposure or

15  erosion of that material that we use.  So it's just

16  a matter of which material has that risk, but they

17  all carry that risk.

18     Q.   But it's your testimony that there are no

19  specific risks that come with the TVT Retropubic

20  device that are not found in other surgeries?

21     A.   When I look at the -- the risk that most

22  people attribute specifically to mesh, since each

23  of the surgeries can also have erosions or

24  rejection of the material, that, to me, all of the

Janet Tomezsko, M.D.

```
 1    surgeries have the same risks, just a matter of

 2    which material, and that's well borne out in the

 3    Level 1 literature where they all have been shown

 4    to have these -- these types of complications.

 5        Q.   Doctor, the -- just generally, the

 6    TVT Retropubic device is made out of polypropylene

 7    mesh, correct?

 8        A.   Correct.

 9        Q.   And polypropylene is a synthetic material,

10    correct?

11        A.   Correct.

12        Q.   And the implantation of a synthetic

13    material could lead to a foreign body response,

14    correct?

15        A.   Every material that we implant leads to a

16    foreign body response.  It does not mean it's a

17    negative response or a problem.  When we operate,

18    it leads to a response.

19        Q.   Doctor, is it your testimony that

20    implantation of a synthetic material and the

21    implantation of the patient's native tissue would

22    result in the same foreign body response?

23        A.   That would be different types of responses

24    for those two different operations.
```

Janet Tomezsko, M.D.

1      Q.    In what way could the responses be

2   different?

3      A.    There is still a response of the body to

4   the surgery.  If you are leaving a material,

5   whether it's synthetic or autologous or xenograft,

6   it will have slightly different responses by the

7   body, but the body still responds to it.

8      Q.    Can a -- Doctor, can the implantation of a

9   polypropylene mesh, such as the TVT Retropubic,

10   result in a chronic foreign body response?

11      A.    I don't believe the literature has borne

12   out that there is a chronic foreign body response

13   to the mesh.

14      Q.    Doctor, are you aware of any peer-reviewed

15   literature which suggests that the implantation of

16   a polypropylene mesh can result in a chronic

17   foreign body response?

18      MR. SNELL:  Object.  Form.  Overbroad.  Scope

19   as to polypropylene mesh to the extent you are

20   talking about prolapse, hernia, something beyond

21   the TVT that she's issued a report on.

22      Go ahead.

23      THE WITNESS:  So for the TVT Retropubic sling

24   mesh, the literature, the Level 1 literature, shows

1    longstanding safety without any chronic problems of

2    chronic foreign body response, low rates of

3    complications, erosions, pain, et cetera.

4    BY MR. JACKSON:

5        Q.   Doctor, are you aware of any peer-reviewed

6    literature regarding polypropylene mesh as used in

7    stress urinary incontinence surgery that can result

8    in a chronic foreign body response?

9        MR. SNELL:  Object.  Form.  Asked and answered.

10       THE WITNESS:  No, the literature -- the peer

11   review Level 1 literature shows that it's a safe,

12   efficacious product that's tolerated, and if there

13   was a chronic foreign body response that was

14   negative, we should see a much more negative

15   response.

16   BY MR. JACKSON:

17       Q.   Okay.  I understand that.  Doctor, I think

18   I'm asking a slightly different question.

19           I'm just asking whether you are aware of

20   any peer-reviewed literature that suggests there

21   can be a chronic foreign body response in

22   connection with the implantation of a polypropylene

23   mesh for stress urinary incontinence.

24           Do you understand that question?

Janet Tomezsko, M.D.

1      A.   I do.

2      Q.   Okay.

3      A.   And I think I looked at the literature

4  whether they have proven any chronic foreign body

5  response, and I have not known of any that have

6  proven a chronic foreign body response.  So maybe

7  I can't answer whether there is any that suggests a

8  foreign -- chronic foreign body response.

9      Q.   And when you say "proven," what do you

10  mean by that?

11      A.   They -- there is -- through the

12  literature, the Level 1 evidence showing the

13  safety, the low risk of complications with the

14  pain, the erosions that has been looked at and has

15  not shown a chronic foreign body response.

16      Q.   Doctor, would you agree that an erosion is

17  a known risk of the TVT Retropubic device?

18      A.   Yes.

19      Q.   Is there a difference between erosion and

20  extrusion in your mind?

21      A.   According to the IUGA Classification,

22  there is, yes.

23      Q.   And what is that difference?

24      A.   I can pull up the actual document, and

Janet Tomezsko, M.D.

1   they -- I believe they define erosion as a

2   separation over the mesh versus extrusion is the

3   mesh going into a cavity.

4       Q.   Okay.  So, fair to say, in practice, there

5   is a difference?

6       A.   Yes, there is.

7       Q.   Doctor, do you believe the implantation of

8   a TVT Retropubic can result in chronic

9   inflammation?

10      MR. SNELL:  Objection.  Asked and answered.

11   BY MR. JACKSON:

12      Q.   Doctor, I asked about chronic foreign body

13   response before.  I'm just asking about chronic

14   inflammation now.  Do you understand the question?

15      A.   I believe I do.

16           So I don't believe that the TVT device

17   will develop into a chronic inflammation that has a

18   clinical effect.

19      Q.   Okay.  Doctor, I'm not asking about a

20   clinical effect.  Let me ask a better question.

21           Are you aware of any peer-reviewed

22   literature that suggests that the type of

23   polypropylene mesh contained in the TVT Retropubic

24   device can result in chronic inflammation, whether

Janet Tomezsko, M.D.

1    you agree with that or not?

2       A.   Again, I look at the literature for what

3    it proves, not what it suggests.  So when you say

4    am I aware of the "suggests," I really look at the

5    literature for what is proven, and the literature

6    does not show any chronic inflammation in the

7    Level 1 evidence.

8       Q.   Are you aware of any literature that

9    suggests that the type of polypropylene mesh used

10   in the TVT Retropubic can cause chronic

11   inflammation?  Are you at least aware of that

12   literature?

13      MR. SNELL:  Object to form.  Asked and

14   answered.

15      THE WITNESS:  I would guess there is something

16   out there, and you can show it to me specifically,

17   if there is something you want me to specifically

18   look at.

19   BY MR. JACKSON:

20      Q.   Okay.  Doctor, if there is literature out

21   there that would show that there is a chronic

22   inflammation associated with the implantation of

23   the TVT Retropubic device, is it fair to say you

24   disagree with that literature?

Janet Tomezsko, M.D.

1      MR. SNELL:  Object.  Lacks foundation.

2      Go ahead.

3      THE WITNESS:  I would disagree with that

4  literature based on the multiple meta-analysis,

5  long-term studies showing the low rate of

6  complications that we actually see such as erosions

7  or pain.  So that's what matters.

8  BY MR. JACKSON:

9      Q.   Doctor, is there -- Doctor, in your

10  practice is there a difference between transient

11  pain and long-term pain?

12      A.   Yes.

13      Q.   Okay.  And what is that difference?

14      A.   I think there are multiple definitions for

15  both, but transient pain, in general, means

16  something that is short-lived, might be related to

17  an event; whereas a long-term pain usually is a

18  chronic pain, in our practice, maybe over six

19  months, chronic and persistent.

20      Q.   Okay.  Doctor, is it fair to say that

21  transient pain might just be normal pain after an

22  operation that would resolve?

23      A.   Correct.  I would call normal pain after

24  an operation a transient pain, as it resolves.

Janet Tomezsko, M.D.

```
 1       Q.   And the fact that a pain might be
 2  long-lasting, you'd call it chronic; is that fair?
 3       A.   Yes.
 4       Q.   Okay.  Doctor, would you agree that
 5  physicians in your field would use a similar
 6  definition of chronic versus transient pain?
 7       A.   Yes.
 8       Q.   Doctor, do you believe there is a
 9  significant difference between transient pain and
10  chronic pain?
11       MR. SNELL:  Object.  Form.  Vague.
12       THE WITNESS:  I think they are different, yes.
13  BY MR. JACKSON:
14       Q.   Doctor, you testified that transient pain
15  might just be normal postoperative pain, correct?
16       A.   I'm testifying that normal postoperative
17  pain that occurs from surgery and resolves would be
18  a form of transient pain, yes.
19       Q.   So, Doctor, would you agree that pain that
20  resolves and pain that may last longer than six
21  months are significantly different?
22       MR. SNELL:  Object.  Form.  "Significantly."
23       THE WITNESS:  Can you clarify "significantly
24  different" for me?
```

Janet Tomezsko, M.D.

1    BY MR. JACKSON:

2        Q.    Doctor, in your practice, do you see

3    patients who present with chronic pain that exists

4    six months after an operation?

5        A.    Do I personally see them?

6        Q.    Yes.

7        A.    It's very uncommon.

8        Q.    And, Doctor, in your practice do you see

9    patients who have pain immediately after a surgery

10   that then resolves?

11       A.    Yes.

12       Q.    Okay.  And do you view those as

13   significantly different in your practice?

14       A.    There is so many different definitions of

15   significantly different.  I think that's what I'm

16   getting hung up on.  They are both very bothersome

17   to a patient.  They might be managed identically.

18   It's just you are getting me on the significantly

19   different.

20       Q.    So it's the word "significant"?

21       A.    No, it's the word "different."  They are

22   both bothersome to patients.  They both have to be

23   managed.  So maybe clarify your definition of

24   different.

Janet Tomezsko, M.D.

1      Q.   Would you counsel a patient differently if

2  they had short-term pain after a surgery versus if

3  they had continuing pain six months after a

4  surgery?

5      MR. SNELL:  Object.  Form.  Vague.

6      THE WITNESS:  I can't answer that because

7  pain -- we might have the exact same treatment.  So

8  that's hard to answer.

9  BY MR. JACKSON:

10     Q.   Okay.  Doctor, turning to your report that

11 we've marked as Exhibit 1, you cite a great deal of

12 literature in this report, correct?

13     A.   Yes.

14     Q.   Okay.  And can you cite any literature in

15 your report that tracks chronic, long-term pain?

16     A.   Chronic, long-term pain in regards to

17 what?

18     Q.   In regards to stress urinary incontinence

19 surgery.

20     A.   As the result of stress urinary

21 incontinence surgery?

22     Q.   Yes.

23     A.   The Cochrane Reviews, the meta-analysis,

24 they all look at pain as one of the outcomes and

Janet Tomezsko, M.D.

1   the also very low rates of pain.  There is

2   different kinds of pain such as dyspareunia.

3       Q.   Well, doctor, I'm specifically asking

4   about chronic, long-term pain.  Is it your

5   testimony that the Cochrane Reviews specifically

6   track chronic, long-term pain?

7       A.   I believe that is one of the variables.

8   I know in several of the meta-analyses they look at

9   pain as -- I can find it for you.

10      Q.   Well, no.  I'm just asking do you have an

11  understanding whether chronic, long-term pain is

12  specifically tracked as an end point in any of the

13  studies you cite?

14      A.   So there is many definitions of pain.

15  I can pull up one -- I can pull up the studies and

16  read to you their definition of pain.

17      Q.   Well, I'm just asking about chronic,

18  long-term pain.

19      A.   So to clarify, I would have to pull up the

20  study for their definition of pain.

21      Q.   Okay.

22      A.   They all track pain, but what is your

23  definition of chronic, long-term pain?

24      Q.   Well, Doctor, I thought you said your

Janet Tomezsko, M.D.

1    definition of chronic, long-term pain was pain that

2    persisted six months after surgery; is that

3    correct?

4        A.    That's my definition but --

5        Q.    Doctor, under your definition, are there

6    any studies you cite that specifically track

7    chronic, long-term pain as an end point?

8        A.    So they do all track pain, but I would

9    have to look up the specific definitions for each

10   one.

11       Q.    Okay.  So --

12       A.    So I can pull them up, if you'd like.

13       Q.    Well, I'm just asking if you can name a

14   study you cite right now.

15       A.    So, yes, the meta-analysis in the

16   Cochrane review, they do look at pain as part of

17   their review.

18       Q.    And do they specifically track chronic,

19   long-term pain as an end point?

20             I'm just looking for a yes or no on that.

21       A.    I can't answer that yes or no without

22   looking at the study to know their specific

23   definition of pain.

24       Q.    And, Doctor, do you -- do you rely on the

Janet Tomezsko, M.D.

1    Cochrane review to support your opinion in your

2    report that the TVT Retropubic device is safe and

3    effective?

4         A.    Yes.

5         Q.    You do.

6               And is there a specific year of the

7    Cochrane review that you are relying on?

8         A.    There are several years the Cochrane

9    review has come out, and the most recent year is

10   2015.

11        Q.    And sitting here, do you know whether the

12   2015 Cochrane review specifically uses chronic,

13   long-term pain as an end point?

14        A.    Again, I have -- I would have to look at

15   the document to look for pain and the definition of

16   pain.

17        Q.    But sitting here right now, is it fair to

18   say you're not sure?

19        A.    Correct.  I'm not sure.  I'd have to look

20   at the document.

21        Q.    Doctor, is there a randomized clinical

22   trial anywhere for polypropylene mesh to treat

23   stress urinary incontinence that tracks safety as

24   the primary end point?

Janet Tomezsko, M.D.

1      A.   Most of the studies, the primary

2  end points are efficacy, and secondary end points

3  are safety.

4      Q.   So do you know of anywhere that's

5  reversed, where safety is the primary end point?

6      A.   I do not, off the top of my head, no.

7      Q.   Okay.  Doctor, are there any studies that

8  you believe support your opinion that the

9  TVT Retropubic device is safe and effective that

10  specifically track dyspareunia as an end point?

11      A.   As a primary end point or the secondary

12  end point?

13      Q.   Let's start with the primary end point.

14      A.   Not that I believe for a primary

15  end point.

16      Q.   And how about as a secondary end point?

17      A.   It's usually tracked as a portion of the

18  data, but I don't believe they are tracked as a

19  secondary end point either, as a specific secondary

20  end point.

21      Q.   So, Doctor, just to be clear, you don't

22  believe there are any studies that support your

23  opinion that the TVT Retropubic device is safe and

24  effective that track dyspareunia as either a

Janet Tomezsko, M.D.

1    primary or secondary end point, correct?

2        A.   I'm sorry.  I believe you asked me if it

3    was a randomized controlled trial.  I'm sorry.

4    Maybe I misunderstood.

5        Q.   I think I was asking about just any

6    studies.  So let me back up.

7             Are there any studies that you know of

8    that support your opinion that the TVT Retropubic

9    device is safe and effective that track dyspareunia

10   as a primary end point?

11       A.   So the primary end points are usually done

12   in randomized controlled trials.

13            So the meta-analysis and the Cochrane

14   Reviews are looking at all the points, not just the

15   primary or secondary end point.

16            So in terms of the best literature,

17   Level 1 literature, looking at the end points of

18   dyspareunia or pain, those are the best sources

19   because they put together the most literature.

20            In a smaller, randomized, controlled

21   trial, dyspareunia or chronic pain are not usually

22   a secondary or primary end point because the rate

23   is so low, you'd need just thousands of patients to

24   use as a secondary or primary end point.

Janet Tomezsko, M.D.

```
 1              So the best literature to look at is the

 2   meta-analysis and the Cochrane Reviews because they

 3   pull -- they pull all the literature, and then they

 4   can look at those, and at that point they are not

 5   called primary or secondary end points.  They are

 6   just part of what they are looking at.

 7        Q.   Let me ask a very simple question, and

 8   I think we can move on.

 9              Are there any studies that you believe

10   support your opinion that the TVT Retropubic device

11   is safe and effective that specifically track

12   dyspareunia as a primary end point?

13        MR. SNELL:  Object to form.  Asked and

14   answered.

15   BY MR. JACKSON:

16        Q.   I'm just looking for a yes or no.

17        A.   So yes.

18        Q.   What studies?

19        A.   I believe, as I just explained, that the

20   Cochrane Reviews in the meta-analysis that use them

21   as an end point in their research, that those

22   studies support that.

23        Q.   Okay.  And it's your testimony that the

24   2015 Cochrane review specifically tracks
```

Janet Tomezsko, M.D.

1  dyspareunia as a primary end point?

2      A.   So, again, not using the word "primary end

3  point."  They don't use primary end point.  They

4  look at categories.

5      Q.   Doctor, would you agree with me that one

6  or more revision surgeries may be necessary to

7  treat adverse reactions after the implantation of a

8  TVT Retropubic device?

9      A.   Yes.

10     Q.   Doctor, do you believe that the entire TVT

11 Retropubic device can be removed after it's ingrown

12 into a woman's tissues?

13     A.   I believe that you can attempt to remove

14 the entire device, and I'm not sure, on a

15 microscopic level, that you can remove the entire

16 device.

17     Q.   Okay.  Doctor, have you personally

18 performed TVT removal surgeries yourself?

19     A.   Yes, I have.

20     Q.   About how many?

21     A.   Do you mean -- can you clarify what kind

22 of removal?

23     Q.   Doctor, have you ever personally removed

24 an entire TVT device yourself?

Janet Tomezsko, M.D.

1      A.   I have never had a case where I needed to

2  remove an entire TVT.  I've had to remove a large

3  portion of it.

4      Q.   So fair to say you've never removed an

5  entire TVT device yourself?

6      A.   Correct.  I've never been in a situation

7  where I've needed to.

8      Q.   Okay.  Do you know anybody who has --

9      A.   Yes.

10      Q.   -- removed an entire TVT device yourself?

11      A.   Sorry.  Yes, I have.

12      Q.   And who would that be?  Do you know?

13      A.   Is that privileged information?

14      Q.   I mean, I'm -- I'm asking for -- do you

15  know the name of a surgeon who -- who's removed an

16  entire TVT device?

17      A.   Yes, I do.

18      Q.   Okay.  And can you tell me who that is?

19      A.   Wouldn't -- I'm concerned about privileged

20  information because those are done so rarely that

21  by naming that physician, it could easily lead to

22  the patient identification because it's so rare

23  that it's done, but, yes, I do.

24           I will tell you one of my partners

Janet Tomezsko, M.D.

1  recently removed one.

2      Q.   A partner you currently --

3      A.   Work with, yes.

4      Q.   -- work with recently removed an entire

5  TVT Retropubic device?

6      A.   Well, I'm sorry.  I should clarify that.

7  I'm not sure she was certain it was a TVT, but it

8  was a retropubic sling.  Sorry.  It may not have

9  been a TVT.

10     Q.   Okay.  So --

11     A.   But for the technique of removing an

12 entire retropubic sling.

13     Q.   And I'm certainly not trying to violate

14 anyone's privacy or anything, but, Doctor, let me

15 try to ask a simple question here.  Sitting here

16 today, do you personally know of anyone who has

17 removed an entire TVT Retropubic device?

18     A.   So beyond the records that I have reviewed

19 where they might have stated that they've removed

20 an entire device, I know of people who removed --

21 have removed entire retropubic slings, and I'm just

22 not sure if they were TVT slings or not.

23     Q.   So is it fair to say that sitting here

24 today, you can't say that you have -- you can't say

Janet Tomezsko, M.D.

1    you know of someone who has removed an entire TVT

2    Retropubic device; is that fair?

3        A.    No, because I do know of people who have

4    removed them as part of the record, of patient

5    records as part of the cases.

6        Q.    And is that from the literature?

7        A.    No, patient cases.

8        Q.    Okay.  Doctor, would you agree that

9    removing an entire TVT Retropubic device may

10   require aggressive dissection?

11       A.    Yes, I would.

12       Q.    And, Doctor, would you agree that there is

13   no guarantee a surgeon would be able to remove an

14   entire TVT device in the event it needed to be

15   removed?

16       MR. SNELL:  Form.

17       THE WITNESS:  I agree.

18   BY MR. JACKSON:

19       Q.    Doctor, would you agree that -- let me

20   back up.

21            Doctor, you said you've personally

22   performed revision surgeries on TVT Retropubic

23   devices; is that correct?

24       A.    I have performed revision surgeries on TVT

Janet Tomezsko, M.D.

1  as well as other retropubic devices.

2      Q.   Okay.  Have you ever seen any pathology

3  reports of the TVT Retropubic mesh that you've

4  personally removed?

5      A.   Yes, I have.

6      Q.   Okay.  Have you ever held the -- I'm

7  sorry.  Strike that.

8           After you've removed portions of a

9  retropubic TVT device, have you held the mesh in

10  your hands?

11      A.   Yes.

12      Q.   Has it ever felt stiff?

13      A.   No, it usually feels normal.

14      Q.   Okay.  Would you agree that the mesh can

15  be stiff when it's removed?

16      MR. SNELL:  Object.  Form.  Speculation.

17      THE WITNESS:  I would not know.

18  BY MR. JACKSON:

19      Q.   Doctor, when mesh is removed, is it

20  possible to just take the mesh out, or do you also

21  have to take out mesh and surrounding scar tissue?

22      A.   It depends on the case.

23      Q.   Doctor, have you seen cases where just

24  TVT Retropubic mesh was removed without any scar

Janet Tomezsko, M.D.

1   tissue also being removed?

2       A.   So I'm going to speak to my general

3   removal of retropubic slings because it's not

4   always you can say that it's a TVT.  So in specific

5   cases I've had to remove some where it's just the

6   sling that comes out, and actually very easily, and

7   sometimes there is surrounding tissue, yes.

8       Q.   Doctor, are you able to answer the

9   question specifically regarding the TVT Retropubic,

10  though, or can you only speak with your experience

11  with all -- all midurethral slings?

12      A.   I -- I have to speak to my experience with

13  polypropylene midurethral slings because we don't

14  always know the original, which sling was

15  originally implanted.

16      Q.   So is it fair to say you may be relying on

17  experience with other products to inform that

18  opinion on the TVT Retropubic?

19      A.   Yes.

20      Q.   Doctor, would you agree that the way to

21  manage complications that are associated with the

22  TVT Retropubic device is typically to remove a

23  portion of the mesh?

24      MR. SNELL:  Object.  Form.

Janet Tomezsko, M.D.

```
1        THE WITNESS:  You would need to be -- to

2   clarify for me on what type of complication you're

3   talking about.

4   BY MR. JACKSON:

5        Q.   Doctor, in your practice are there

6   complications that can arise after the implantation

7   of the TVT Retropubic device where the way to

8   manage those complications is to remove a portion

9   of the device?

10       A.   Yes, there are complications that might

11  occur where it is necessary to revise a portion of

12  the sling, the TVT device.

13       Q.   Okay.  And, Doctor, is it fair to say that

14  a physician, such as yourself, who may be revising

15  a portion of that sling has to make a judgment

16  about how much mesh to remove?

17       A.   Yes.

18       Q.   So it's a judgment call at that point?

19       A.   It's based on the clinical scenario.

20       Q.   So if a doctor decides to remove only a

21  portion of the mesh and some mesh is left behind,

22  you're not here to fault a doctor for making a

23  judgment about how much mesh to remove?

24       A.   Correct.
```

Janet Tomezsko, M.D.

1    Q.   Doctor, would you agree that in many cases

2  removal of a portion of the mesh does not solve the

3  complications?

4    MR. SNELL:  Form.  Lacks foundation.

5    THE WITNESS:  You'd have to put it in context.

6  BY MR. JACKSON:

7    Q.   Doctor, have you seen patients who have

8  presented to you with erosions of the TVT device?

9    A.   This is where it gets hard for me because

10  I do see patients who have erosions of retropubic

11  slings, and, again, oftentimes, they're not

12  patients that I know which procedure that they had.

13  So I have to say it's a general polypropylene mesh

14  retropubic midurethral sling that I can comment on.

15    Q.   So you can't speak specifically to the

16  TVT Retropubic?

17    A.   I -- I did not go back and look at my

18  cases to fortunately where, to see which ones

19  specifically were TVTs, and then the vast majority

20  of revision surgery that I have done has come in

21  from other physicians.

22    Q.   Doctor, have you specifically treated

23  patients for chronic pain associated with

24  midurethral slings?

Janet Tomezsko, M.D.

1     A.   Can you define what type of chronic pain

2  do you mean?  Like whole body pain?  Local pain?

3     Q.   Doctor, have you specifically treated any

4  patients for chronic pain using your definition

5  that you believe to be a result of a midurethral

6  sling?

7     A.   I have treated patients for local pain.

8  So being very specific, it's usually at the sling

9  site or mid --

10     Q.   That would be chronic pain?

11     A.   Chronic, more than six months' duration,

12  local pain for retropubic midurethral slings, yes.

13     Q.   And can you say whether you have treated

14  any patients for chronic, local pain at the

15  implantation site following a TVT Retropubic

16  device?

17     A.   I cannot say specifically whether it was

18  TVT.

19     Q.   Okay.  And, Doctor, you've mentioned you

20  had to partially remove TVT Retropubic devices,

21  correct?

22     A.   I can specifically say that revision

23  surgeries I've had to do on TVT Retropubic devices

24  were usually just incising a sling for voiding

Janet Tomezsko, M.D.

1    dysfunction.  The other sling surgeries where

2    I might have had to remove a portion, those are the

3    ones I'm not sure whether they were truly TVTs or

4    not.

5        Q.    Doctor, have you ever personally tested a

6    TVT Retropubic mesh for degradation?

7        A.    No.

8        Q.    Okay.  Have you ever tested a device of

9    any kind for degradation?

10       A.    No.

11       Q.    Has anyone you worked with ever done that?

12       A.    Not that I'm aware of.

13       Q.    Are you familiar with the chemical process

14   of oxidative degradation?

15       A.    Yes, I am.

16       Q.    And how are you familiar with the chemical

17   process of oxidative degradation?

18       A.    Just through the literature regarding

19   degradation of slings and mesh materials.

20       Q.    Do you know what sort of polypropylene is

21   in the Ethicon mesh --

22       MR. SNELL:  Form.

23   BY MR. JACKSON:

24       Q.    -- specific to the TVT Retropubic device?

Janet Tomezsko, M.D.

```
 1        MR. SNELL:  Form again.
 2        THE WITNESS:  And by what sort of -- do you
 3   mean the chemical structure, or do you mean --
 4   BY MR. JACKSON:
 5        Q.   Doctor, do you know who manufactures the
 6   polypropylene mesh used in the TVT Retropubic
 7   device?
 8        A.   It's my belief that it's Ethicon.
 9        Q.   Doctor, do you know -- back up.
10        Doctor, the polypropylene mesh is woven
11   out of polypropylene fibers, correct?
12        A.   Correct.
13        Q.   And the polypropylene fibers are made out
14   of a polypropylene resin; is that fair?
15        A.   Yes.
16        Q.   And, Doctor, do you know who manufactures
17   the polypropylene resin that ends up in the mesh in
18   the TVT Retropubic device?
19        A.   I do not know who -- when it starts at the
20   petroleum or wherever it starts, I don't know who
21   manufactures that, no.
22        Q.   Doctor, do you know whether or not pure
23   polypropylene degrades without antioxidants?
24        MR. SNELL:  Object.  Form as to scope.
```

Janet Tomezsko, M.D.

```
 1   Overbroad.

 2        THE WITNESS:  I do not know.

 3   BY MR. JACKSON:

 4        Q.   Doctor, are you aware of any established

 5   science by chemists that shows that pure

 6   polypropylene could degrade without antioxidants?

 7        A.   No, I don't have knowledge.

 8        Q.   Doctor, do you know which antioxidants are

 9   added to the polypropylene in the TVT Retropubic

10   device?

11        A.   I do not.

12        Q.   Doctor, in connection with the preparation

13   of your report, have you undertaken an independent

14   analysis of the antioxidants in the mesh in the

15   TVT Retropubic device?

16        A.   No, I have not.

17        MR. JACKSON:  Why don't we go off the record

18   and take a little break?  We have been going a

19   little over an hour.

20                    (Whereupon, a discussion was had

21                     off the written record but on

22                     the video record.)

23        THE VIDEOGRAPHER:  The time is 9:29 a.m.  This

24   is the end of Tape 1.  We are off the record.
```

Janet Tomezsko, M.D.

```
 1                      (A short break was taken.)

 2        THE VIDEOGRAPHER:   The time is 9:40 a.m.   This

 3   is the beginning of Tape 2, and we are back on the

 4   video record.

 5                           (Whereupon, TOMEZSKO Exhibit 7

 6                           was marked for identification.)

 7   BY MR. JACKSON:

 8        Q.   Doctor, I've premarked an exhibit while we

 9   were off the record, and it's Exhibit 7.   And this

10   is the Instructions for Use of the TVT Retropubic

11   device, and that is the 2008 version of those

12   Instructions for Use.

13             Have you seen this document before?

14        A.   Yes, I have.

15        Q.   Okay.  And you'll see, if you turn to the

16   page on the bottom right corner that ends in 0531,

17   do you see that page?

18             I believe it's the fourth page.

19        A.   Yes, I do.

20        Q.   Okay.  And under "Contraindications," do

21   you see that section?

22        A.   Yes.

23        Q.   It says "As with any suspension surgery,

24   this procedure should not be performed on pregnant
```

Janet Tomezsko, M.D.

1    patients.  Additionally, because polypropylene mesh

2    will not stretch significantly, it should not be

3    performed in patients with future growth potential,

4    including women with plans for future pregnancy."

5         Do you see that?

6    A.   Yes, I do.

7    Q.   Doctor, would you agree with me that this

8    version of the Instructions for Use doesn't list,

9    as a contraindication, that the TVT Retropubic

10   device should not be used in obese women?

11   MR. SNELL:  Object.  The document speaks for

12   itself.

13   Go ahead.

14   THE WITNESS:  Correct.

15   BY MR. JACKSON:

16   Q.   And, to your knowledge, does the

17   TVT Retropubic IFU say anywhere that it should not

18   be used in women who smoke, for example?

19   A.   Correct.  It does not say it should not be

20   used in women who smoke.

21   Q.   And it doesn't say anywhere that it should

22   not be used in women who have weak connective

23   tissue, for example?

24   A.   Correct.

Janet Tomezsko, M.D.

```
1        Q.   And is it fair to assume that Ethicon

2   would have known that the TVT Retropubic -- I'm

3   sorry.  Strike that.

4            Is it fair to assume that Ethicon would

5   have known that there is a certain portion of the

6   population who is obese?

7        A.   Yes.

8        Q.   And they didn't say that these woman

9   shouldn't get the device, did they?

10       A.   Correct.

11       Q.   Is it fair to say that if Ethicon thought

12  these women should not get the device, they would

13  have put that in the contraindications?

14       MR. SNELL:  Object.  Calls for speculation.

15       THE WITNESS:  Is it fair to say if they thought

16  that it was a contraindication, they would have put

17  it in their -- I would assume so.

18  BY MR. JACKSON:

19       Q.   And, Doctor, the TVT Retropubic device is

20  obviously intended for women with stress urinary

21  incontinence, right?

22       A.   Correct.

23       Q.   And is it fair to say that women with

24  stress urinary incontinence often have other
```

Janet Tomezsko, M.D.

1   comorbidities?

2      A.   Yes.

3      Q.   And the TVT Retropubic device, in your

4   opinion, is perfectly acceptable to implant in

5   women with stress urinary incontinence despite

6   their comorbidities?

7      A.   So there are many potential comorbidities,

8   but, yes, the TVT device is safe with most

9   comorbidities.  We'd have to be more specific.

10     Q.   Can you give me an example of a

11  comorbidity that you may see in a patient where you

12  would choose not to implant the TVT Retropubic

13  device?

14     A.   I may not implant a TVT on someone who is

15  about to undergo radiation therapy to the vagina.

16     Q.   Okay.  And why is that?

17     A.   Because radiation causes damage to tissues

18  intentionally.

19     Q.   Okay.  And is that -- is that common

20  knowledge for any -- any surgeon?

21     A.   Yes.

22     Q.   Okay.  And, Doctor, if you see the first

23  bullet point under "Warnings and Precautions" on

24  this same page, it says "Do not use Gynecare TVT

Janet Tomezsko, M.D.

1    procedure for patients who are on anticoagulation

2    therapy."

3             Did I read that right?

4        A.   Correct.

5        Q.   And is it fair to say that certainly you

6    don't want to implant a TVT Retropubic device for a

7    patient who is currently on Xarelto, for example?

8        A.   That's correct.

9        Q.   Because they may start bleeding?

10       A.   Correct.

11       Q.   And is that common knowledge among

12   surgeons?

13       A.   Yes.

14       Q.   Okay.  Doctor, are you offering yourself

15   as an expert with respect to the warnings that come

16   with the TVT Retropubic device?

17       A.   Yes.

18       Q.   So do you feel that you're an expert in

19   what should and what should not be included in the

20   TVT Retropubic device's warnings?

21       A.   Yes.

22       Q.   Doctor, let's look at the "Adverse

23   Reactions" section towards the bottom of this page.

24            The second bullet point says "Transitory

Janet Tomezsko, M.D.

1   local irritation at the wound site and a transitory

2   foreign body response may occur.  These responses

3   could result in extrusion, erosion, fistula

4   formation and inflammation."

5        Do you see that?

6   A.   Yes.

7   Q.   Now, we discussed the definition of

8   transitory to be what would just be normal

9   postoperative pain; is that right?

10  A.   In regards to pain when we discuss

11  transitory pain, yes.

12  Q.   Okay.  And Doctor, under the "Adverse

13  Reactions" section, there is no mention of

14  long-term pain, is there?

15  A.   In this specific document?

16  Q.   Correct, just in the four bullet points

17  under the "Adverse Reactions" section.

18  A.   The print is very small.  I have to get my

19  bifocal contacts just in the right place.

20       Correct.  There is no mention of pain.

21  Q.   And there is no mention of acute pain, is

22  there?

23  A.   No, I don't believe there is.

24  Q.   Okay.  And, Doctor, there is no mention of

Janet Tomezsko, M.D.

1    pain with intercourse, is there?

2         A.    No, there is not.

3         Q.    And, Doctor, do you know with respect to

4    the TVT Retropubic device's Instructions for Use,

5    whether there was ever any language that one or

6    more revision surgeries may be necessary?

7         A.    Are you talking about all versions?

8         Q.    Correct, yes.

9              Do you have any knowledge of whether there

10   was ever any language included in the

11   TVT Retropubic IFU that one or more revision

12   surgeries may be necessary?

13        A.    I'd have to look at the last one again,

14   but I don't believe it said "one or more revision

15   surgeries."

16        Q.    And, Doctor, do you know if any of the

17   Instructions for Use for the TVT Retropubic say

18   that there might be permanent injury to the patient

19   which may not resolve?

20        A.    I would have to look at the wording on the

21   -- on the most recent one because that's very

22   vague.  It could be any kind of permanent injury.

23   So I'd have to look at the most recent one.

24              Do you want me to pull that out or --

Janet Tomezsko, M.D.

1      Q.   No, just focusing on Exhibit 7 in front of

2  us, to your knowledge, anywhere in here is there

3  mention of permanent pain that may not resolve in

4  connection with the TVT Retropubic TVT device?

5      A.   No.

6      Q.   Doctor, do you believe Ethicon is

7  responsible for telling physicians how to properly

8  tension the TVT device?

9      A.   No.

10     Q.   And is your answer different if the device

11 is laser cut versus mechanical cut?

12     A.   No.

13     Q.   Do you believe the mechanical cut mesh

14 should be put in with the same amount of tension as

15 a laser cut mesh?

16     MR. SNELL:  Form.

17     Go ahead.

18     THE WITNESS:  These are, first of all,

19 tension-free procedures.  So we don't place them on

20 tension.

21     If you are talking positioning for the

22 retropubic, I believe the positioning is similar.

23 BY MR. JACKSON:

24     Q.   Doctor, specifically with regard to the

Janet Tomezsko, M.D.

1    TVT Retropubic device, do you have an understanding

2    as to whether Ethicon instructs physicians as to

3    how to properly tension the device?

4        A.    Are you talking about whether they are

5    currently instructing physicians on how to properly

6    tension it?

7        Q.    Whether they ever have.

8        A.    As part of the training, at least

9    originally, they did discuss ways to tension,

10   position the mesh.

11       Q.    Okay.  And, Doctor, specifically with

12   regard to the TVT Retropubic device, do you believe

13   the laser cut mesh and the mechanical cut mesh are

14   tensioned the same?

15       MR. SNELL:  Form.  Asked and answered.

16       Go ahead.

17       THE WITNESS:  I believe they are positioned the

18   same.

19   BY MR. JACKSON:

20       Q.    Do you believe they are tensioned the

21   same?

22       A.    Can you then define tension, if I'm

23   misunderstanding?

24       Q.    Well, what's your definition of tension?

Janet Tomezsko, M.D.

1      A.   So I don't tension the sling.  I position

2  the sling.  So intraoperatively, depending on the

3  case, whether the patient is awake or under general

4  anesthesia, I have different methods of how

5  I position the retropubic slings.

6      Q.   Okay.  If a medical director at Ethicon

7  stated that the laser cut mesh and the mechanical

8  cut mesh needed to be tensioned differently, would

9  you disagree with that?

10     MR. SNELL:  Objection.  Misstates.  Lacks

11 foundation.

12     THE WITNESS:  I -- I would disagree with that

13 as based on clinical practice.  I've used many

14 different -- multiple different slings, and

15 I pretty much placed them for the retropubic method

16 all the same.  Different methods, whether they have

17 general anesthesia or they are awake.

18 BY MR. JACKSON:

19     Q.   Okay.  So, Doctor, you mentioned earlier

20 from about 1999 to 2006, you implanted the

21 mechanical cut retropubic TVT device, correct?

22     A.   Yes.

23     Q.   And from that point, 2006 until

24 approximately two or three years ago, you implanted

Janet Tomezsko, M.D.

1    the laser cut version of the TVT Retropubic,

2    correct?

3         A.   Yes.

4         Q.   And did you implant the two versions of

5    the TVT Retropubic the same?

6         A.   Yes.

7         Q.   Okay.  Did you have any preference between

8    the mechanical and the laser cut TVT Retropubic?

9         A.   I personally did not, no.

10        Q.   You personally did not?

11        A.   No.

12        Q.   Doctor, would you agree that Ethicon --

13   I'm sorry.  Strike that.

14             Doctor, you said that when you implant the

15   TVT Retropubic device, there is no tension?

16        A.   I'm positioning it.

17        Q.   And do you position it tension free?

18        A.   The goal is to be tension free, yes.

19        Q.   And how do you test whether it's tension

20   free?

21        A.   Before and after I place it, I check the

22   position of the sling mesh by taking an instrument,

23   hemostat or some type of instrument, and making

24   sure I can pass it between the urethra and the

Janet Tomezsko, M.D.

1    sling mesh as the sheaths are removed to make sure

2    there is adequate movement between the two, that

3    there is a space between the two that is not

4    pressed up tightly against the urethra.

5        Q.   Doctor, do different surgeons have

6    different ways of testing whether there is tension

7    in the TVT Retropubic mesh?

8        A.   Absolutely.

9        Q.   Doctor, is it -- Doctor, does the --

10   sorry.  Strike that.

11            Some women are obviously built

12   differently, correct?

13       A.   Correct.

14       Q.   And is variations in female anatomy a

15   factor you have to take into account in determining

16   whether the mesh has been placed tension free?

17       MR. SNELL:  Form.

18       Go ahead.

19       THE WITNESS:  It's -- the variation in anatomy

20   is more important when actually placing the sling.

21   In the end it doesn't matter how their anatomy

22   looks.  I want to make sure the placement is not

23   pressed tightly against the urethra.

24

Janet Tomezsko, M.D.

1   BY MR. JACKSON:

2        Q.   Doctor, do you believe that the TVT

3   Retropubic device can curl and rope under tension?

4        A.   I believe that with significant tension,

5   it can curl or rope.

6        Q.   Doctor, if there were Ethicon documents to

7   the effect that the TVT Retropubic mesh could curl

8   and rope, would you want to see those documents?

9        MR. SNELL:  Object.  Foundation.

10       It assumes she hasn't.

11       THE WITNESS:  As a -- just as an implanting

12   clinician, do you mean, as opposed to an expert?

13   BY MR. JACKSON:

14       Q.   Yes.

15       A.   As an implanting physician, I -- we know

16   all materials can change shape with the wrong use.

17   So it's one of those common knowledge.  So I don't

18   need to see any internal materials to know that

19   I can -- you know, I can ruin a suture by tying it

20   wrong.  I can ruin an implant by positioning it

21   wrong.  So I don't think it's really necessary to

22   see them because it's part of the common knowledge

23   of procedures that you do have to use the device or

24   position it correctly.

Janet Tomezsko, M.D.

1      Q.   Doctor, have you seen any Ethicon

2  documents that would suggest that the

3  TVT Retropubic mesh can curl and rope under

4  tension?

5      A.   Yes.

6      Q.   But you don't think it's necessary to see

7  them?

8      A.   Correct, because you know that's part of

9  procedures.

10     Q.   Okay.  Doctor, have you seen any Ethicon

11 documents stating that fraying of the mesh in the

12 TVT Retropubic device is a concern?

13     A.   A concern to who?

14     Q.   To Ethicon.

15     A.   Yes.

16     Q.   Have you seen any Ethicon documents where

17 fraying of the TVT Retropubic mesh was referred to

18 as a defect by Ethicon?

19     A.   I'm not sure whether it was referred as a

20 defect or not.  I would have to look at them again.

21     Q.   Okay.  Doctor, wouldn't you want to know,

22 especially in a case where you are offering an

23 opinion that the TVT device is not defective,

24 whether or not Ethicon has called its own device

Janet Tomezsko, M.D.

1  defective?

2     A.   Yes, I'm just -- I'd be glad to relook at

3  those.  I'm just not sure of the exact terminology.

4     Q.   But if Ethicon had referred to the TVT

5  Retropubic device as defective, that's certainly

6  information you'd want to review and consider?

7     MR. SNELL:  Object.  Foundation.

8     If you have something, the witness has said

9  she'd look at it.  I think you should show it to

10  her.  This is improper.

11     THE WITNESS:  Right.  So in my -- my clinical

12  opinion is based on the clinical use.  My expert

13  opinion is based on the clinical use of the

14  product.  So that includes the long-term use of the

15  product, all the studies that show its safety and

16  efficacy in human beings and how we use it and how

17  we actually use it.  So that's what my expert

18  opinion is based upon.  So whether Ethicon has a

19  memo of some sort, that wouldn't change my expert

20  opinion.

21  BY MR. JACKSON:

22     Q.   Doctor, you mentioned that your expert

23  opinion is based on the clinical use of this

24  product, right?

Janet Tomezsko, M.D.

1    A.    Correct.

2    Q.    Your expert opinion is also based on your

3    experience and clinical use with other midurethral

4    slings, correct?

5    A.    Yes.

6    Q.    Doctor, if I could ask you to turn, in

7    Exhibit 7, to the page which the last four numbers

8    in the bottom right-hand corner are 0532.  I think

9    it's just the next page.

10   A.    Yes.

11   Q.    And do you see the section entitled

12   "Actions"?

13   A.    Yes.

14   Q.    The last sentence of this section says

15   "The material is not absorbed, nor is it subject to

16   degradation or weakening by the action of tissue

17   enzymes."

18         Do you see that sentence?

19   A.    Yes.

20   Q.    Okay.  And is that a true statement?

21   A.    According to my review of the literature

22   it has not been shown to suffer from degradation by

23   human enzymes, or I guess this is referring to

24   animal enzymes -- sorry -- animal studies.

Janet Tomezsko, M.D.

1      Q.   Doctor, if basic chemical principles

2  suggest that polypropylene antioxidants degrades,

3  would that make this last sentence of the "Actions"

4  section untrue?

5      MR. SNELL:  Object.  Lacks foundation.  It

6  calls for pure speculation.

7      THE WITNESS:  No, it would not make it untrue

8  because laboratory studies versus actual in vivo

9  experience, what's happening in the human body can

10  be two different things.

11  BY MR. JACKSON:

12      Q.   If Ethicon had information that the mesh

13  used in the TVT Retropubic device did degrade,

14  would that make this sentence untrue?

15      MR. SNELL:  Objection.  Lacks foundation.

16  Calls for speculation.

17      THE WITNESS:  So this is talking about

18  degradation regarding specific enzymes.  So just a

19  vague it does degrade?  No, it does not make that

20  untrue.  This is talking specifically versus

21  certain enzymes.

22  BY MR. JACKSON:

23      Q.   Doctor, in your review of Ethicon

24  documents in connection with your report in this

Janet Tomezsko, M.D.

```
 1    case, did you review any studies that Ethicon did

 2    on dogs where they implanted Prolene in those dogs?

 3         A.    The Prolene sutures or Prolene mesh?

 4         Q.    Either one.

 5         A.    Yes, I believe I did.

 6                         (Whereupon, a discussion was had

 7                         off the written record but on

 8                         the video record.)

 9    BY MR. JACKSON:

10         Q.    Doctor, have you read the deposition of

11    Dr. Thomas Barbolt in connection with your work on

12    this report?

13         A.    I am trying to remember whether I have.

14    Is that a materials witness or...

15         Q.    He was an Ethicon employee.

16         A.    Was that the one testifying for the IFUs,

17    or what would his testimony have been about?

18         Q.    Do you remember any specific testimony --

19    I'm sorry.  Strike that.

20               Do you remember reading anything

21    Dr. Thomas Barbolt would have said about

22    degradation?

23         A.    Right at this moment I don't remember

24    reading that specific.  I might have, but at this
```

Janet Tomezsko, M.D.

1  moment I would have to see it to refresh my memory.

2  There were so many.

3      Q.    Fair enough.

4            Doctor, you're offering an opinion in this

5  case that the mesh in the TVT Retropubic device

6  does not degrade by oxidative degradation, correct?

7      A.    I'm offering the opinion it does not

8  degrade in the human body based on the evidence

9  that we see, the safety and efficacy and the

10  excellent results and then the studies that have

11  tried to prove degradation, like the Clave study

12  has not actually proven the degradation.

13      Q.    Doctor, to your knowledge, have any

14  Ethicon employees testified under oath that the

15  mesh does, in fact, degrade in the body?

16      A.    I'm not sure.

17      Q.    If -- Doctor, if an Ethicon employee had

18  testified under oath that the mesh did degrade in

19  the body, would that make the sentence in this

20  "Actions" section, that "The material is not

21  absorbed, nor is it subject to degradation or

22  weakening by the action of tissue enzymes" untrue?

23      MR. SNELL:  Object.  Lacks foundation.  Calls

24  for speculation.

Janet Tomezsko, M.D.

1        Go ahead.

2        THE WITNESS:  Would that be regarding --

3        MR. SNELL:  Actually, asked and answered.

4        Go ahead.

5        THE WITNESS:  Would that be regarding sling

6    mesh or any Ethicon mesh?

7    BY MR. JACKSON:

8        Q.   The sling mesh in the TVT Retropubic

9    device.

10       MR. SNELL:  Same objections.

11       THE WITNESS:  I don't -- I don't know if their

12   testimony would make something true or not without

13   seeing it and knowing the basis of their testimony.

14   BY MR. JACKSON:

15       Q.   Okay.  Doctor, is it fair to say you cite

16   several studies about the TVT Retropubic mesh in

17   your report?

18       A.   Yes.

19       Q.   Okay.  And are any of those studies

20   specific to laser cut mesh?

21       A.   Yes.

22       Q.   Can you tell me which one or ones are

23   specific to laser cut mesh?

24       A.   In discussing the issue of laser cut mesh?

Janet Tomezsko, M.D.

1       Q.   I'm just looking for a specific study on

2   the TVT Retropubic using laser cut mesh.

3       MR. SNELL:   What page are you at?

4       THE WITNESS:   33.

5       MR. SNELL:   33.

6       THE WITNESS:   Yeah.

7   BY MR. JACKSON:

8       Q.   Doctor, is there a specific study on

9   page 33 regarding the TVT retropubic laser cut

10   mesh?

11       A.   I have to refresh my memory.   Sorry.

12           Most of it is talking about the mechanical

13   cut.  So are you talking a study of mechanical cut

14   versus laser cut?

15       Q.   Doctor, do you --

16       A.   Because that's -- I don't have that

17   specifically.

18       Q.   So, Doctor, is it your testimony that you

19   do not reference a specific study on the

20   TVT Retropubic device that looks at laser cut

21   versus mechanical cut mesh?

22       A.   For the TVT device specifically, correct.

23       Q.   Yes.

24       A.   At this -- at this moment I would have to

Janet Tomezsko, M.D.

1    look for that, but I don't believe I reference

2    that, no.

3         Q.    Doctor, could you turn to page 34 of your

4    report, which we've marked as Exhibit 1.

5         A.    Yes.

6         Q.    And I'm looking towards the top of the

7    page, a sentence that says "I have not seen a

8    difference when using mechanically versus laser cut

9    mesh in complication rates in the literature."

10            Did I read that correctly?

11        A.    Correct.

12        Q.    What literature have you looked at which

13   looks at complication rates of mechanically cut

14   versus laser cut mesh?

15        A.    So that's basically based on time frame of

16   studies.  The earlier studies, TVT are done with

17   mechanical cut, and then later studies are done

18   with laser cut.  So specifically -- so it's -- in

19   looking at the different versions of the sling,

20   there has been no specific difference that I'm

21   aware of.

22        Q.    Okay.

23        A.    And looking at the larger studies also,

24   there has been no change in the erosion rate or

Janet Tomezsko, M.D.

1   complication rate after the change where most,

2   I think, institutions probably changed from

3   mechanical to laser cut, started using the TVT

4   EXACT, et cetera.

5       Q.   Doctor, are you just making assumptions

6   about when other institutions made the switch from

7   laser cut and mechanical cut mesh based on your own

8   institution?

9       A.   No, it just was the availability.  So

10  especially when people changed to the TVT EXACT,

11  that's laser cut only.

12      Q.   Doctor, you mentioned that later studies

13  only used laser cut mesh, correct?

14      A.   So they included laser cut mesh.  So

15  I have to look at each study that you would like to

16  review and be able to tell you from that.

17      Q.   Okay.  But, Doctor, sitting here today,

18  can you identify a single study on the

19  TVT Retropubic device that only focuses on laser

20  cut mesh and not mechanical cut mesh?

21      A.   It would be TVT EXACT studies, and I do

22  have some with me.  I'd have to find them, pull

23  them out.

24      Q.   You'd certainly agree that the TVT EXACT

Janet Tomezsko, M.D.

1    is a different product than the TVT Retropubic?

2        MR. SNELL:  Objection.  Lacks foundation.

3        THE WITNESS:  I do not agree it is different at

4    all, and it's a -- it just is a thinner needle.

5    That's it.  Laser cut and thinner needle, so

6    clinically, it's not a different product.

7    BY MR. JACKSON:

8        Q.   Doctor, when was the TVT EXACT introduced

9    into the market?

10       A.   I believe it was around 2009.  I don't

11   remember exactly.  2009.  2008 to 2010.

12       Q.   And, Doctor, is it your opinion that data

13   on the TVT EXACT, which was introduced in 2009 or

14   2010, can support the safety and efficacy of the

15   TVT Retropubic device with laser cut mesh?

16       A.   Yes.

17       Q.   And the TVT Retropubic device with

18   laser cut mesh was on the market for multiple years

19   prior to the introduction of the TVT EXACT device,

20   correct?

21       A.   Yes, that's my understanding.

22       Q.   Doctor, are you familiar with a

23   Dr. Carl Gustaf Nillson?

24       A.   In -- familiar in what respect?

Janet Tomezsko, M.D.

1      Q.   Are you aware that Carl Gustaf Nillson was

2   a co-inventor of the TVT Retropubic device?

3      MR. SNELL:  Hold on.  Object to foundation.

4      Did you say co-inventor?

5      THE WITNESS:  Co-inventor, yes.

6      MR. JACKSON:  I did.

7      MR. SNELL:  I'm going to have to object on

8   foundation on that.

9      THE WITNESS:  It was my understanding he was a

10   co-investigator.

11   BY MR. JACKSON:

12      Q.   Okay.  Doctor, have you heard of

13   Carl Gustaf Nillson in connection with the

14   TVT Retropubic device?

15      A.   Yes.

16      Q.   And whether he was a co-investigator or

17   co-inventor, are you aware that he had involvement

18   in the development of the TVT Retropubic device?

19      A.   I'm definitely aware he was an

20   investigator.  So into that -- to that, yes.

21      Q.   Doctor, have you read any Ethicon

22   documents where Dr. Nillson offered any opinions

23   about laser cut mesh?

24      A.   I saw some Ethicon e-mails about laser cut

Janet Tomezsko, M.D.

```
1   mesh, and I'm -- but I'm not sure if that was with

2   him or not.

3       Q.   Have you read any Ethicon documents where

4   Dr. Nillson expressed an opinion that he would

5   personally not use laser cut mesh because he

6   thought it was too stiff?

7       A.   I believe I did see e-mails or something

8   to that effect, but I would have to review them

9   again.

10      Q.   And do you think it's important to know

11  what Dr. Nillson thinks specifically in regards to

12  the TVT Retropubic device?

13      MR. SNELL:  Form.  Vague.  Scope.

14      THE WITNESS:  I think -- I don't think it's

15  important in regards to a laser cut versus

16  mechanical cut because of the persistent success

17  and longevity of the use, the long-term success of

18  the procedures being mechanical or laser cut that

19  continue to occur.  So I think the literature,

20  Level 1 evidence versus the less than Level 5

21  opinion of his opinion, that's just his own

22  personal opinion.  The Level 1 evidence of the

23  long-term safety and minimal problems make me

24  confident in the laser versus mechanical cut.
```

Janet Tomezsko, M.D.

1    BY MR. JACKSON:

2        Q.    Have you -- Doctor, have you seen any

3    Ethicon documents that suggest that fraying of the

4    mesh can result in particle loss?

5        A.    Yes.

6        Q.    And have you seen any Ethicon documents

7    that suggest that that particle loss can result in

8    pain?

9        A.    I believe they were discussing whether it

10   could result in pain or not.

11       Q.    Would whether particle loss can result in

12   pain, is that important for you to know as the

13   physician?

14       MR. SNELL:  Object to form.  Lacks foundation.

15       THE WITNESS:  Again, I think the long -- the

16   longstanding literature showing such a low pain

17   rate, less than 2 percent, is really what is more

18   important.  So whether there is particle loss or

19   not, whatever it's been shown to have such a low

20   pain rate and dyspareunia rate, that the clinical

21   experience does not substantiate that as a concern.

22   BY MR. JACKSON:

23       Q.    Doctor, are you aware that particle loss

24   was a reason why Ethicon wanted to use laser cut

Janet Tomezsko, M.D.

1    mesh rather than mechanical cut mesh?

2        MR. SNELL:  Object to foundation as to Ethicon.

3        Go ahead.

4        THE WITNESS:  I do believe that was part of the

5    reason.

6    BY MR. JACKSON:

7        Q.   Doctor, do you know whether Ethicon did

8    any studies themselves to see if there were

9    increased complications due to particle loss?

10       A.   Just specifically due to particle loss?

11       Q.   Yes.

12       A.   I believe there was information regarding

13   particle loss, but I'm not sure of the extent of

14   the studies, how the studies were run -- I'm

15   sorry -- off the top of my head.

16       Q.   Doctor, to your knowledge, has Ethicon

17   done any studies to see if there was any clinical

18   significance to degradation?

19       MR. SNELL:  Objection.  Form.  Lacks

20   foundation.

21       The witness has testified there is no

22   degradation in her opinion.

23       THE WITNESS:  So I -- are you talking about

24   patient studies?  Animal studies?  What type of

Janet Tomezsko, M.D.

1    studies?

2    BY MR. JACKSON:

3        Q.   Has Ethicon done any studies, whether

4    patient or animal, to your knowledge, to determine

5    whether or not there is any clinical significance

6    to any degradation?

7        MR. SNELL:  Objection.  Lacks foundation as to

8    there being degradation.

9        Go ahead.

10       THE WITNESS:  Yes, I believe they have done

11   studies.

12   BY MR. JACKSON:

13       Q.   And which studies are those?

14       A.   So I believe there has been studies on the

15   Prolene sutures.  I believe there has been animal

16   studies, dog studies.

17       Q.   To your knowledge, has Ethicon done any

18   studies to see whether or not there was any

19   clinical significance to roping or fraying of the

20   TVT Retropubic mesh?

21       MR. SNELL:  Object.  Lacks foundation.

22       THE WITNESS:  You said were there any "clinical

23   studies."  So involving patients?

24

Janet Tomezsko, M.D.

```
 1   BY MR. JACKSON:

 2       Q.   Do you know of any clinical studies?

 3       A.   I don't believe there were clinical

 4   studies within patients.  I believe there were

 5   studies just based on bench research on the mesh

 6   themselves, the slings themselves, specifically

 7   performed by Ethicon that I'm aware of.

 8       Q.   And, Doctor, how do you determine clinical

 9   significance from a bench study?

10       A.   You can't -- in my view you can't

11   determine true clinical significance just from a

12   bench study.

13            So you had asked me if there were any

14   clinical studies.

15       Q.   And then you identified some bench

16   studies, right?

17       A.   So I'm not aware of -- so I asked you

18   specifically if you're asking for studies in

19   patients, and then you said "any studies."

20       MR. JACKSON:  Excuse me just a minute.

21       Why don't we go ahead and mark this as

22   Exhibit 8, I believe.

23

24
```

Janet Tomezsko, M.D.

1                         (Whereupon, TOMEZSKO Exhibit 8

2                         was marked for identification.)

3      BY MR. JACKSON:

4          Q.    And, Doctor, do you see the subject of

5      this 2012 e-mail is "TVT for Dr. Tomezsko"?

6          A.    Uh-huh.

7          Q.    And does that refer to you?

8          A.    Yes.

9          Q.    Who is Michael Trester?

10         A.    He was an Ethicon rep.  I'm not sure if he

11     still is.

12         Q.    Was he an Ethicon rep that you worked

13     with?

14         A.    Or -- or a Gynecare rep.  I'm sorry.  I'm

15     using the wrong terminology.

16               Yes.

17         Q.    But he's someone you knew professionally?

18         A.    Yes.

19         Q.    And who is Dorothy Kase?

20         A.    She is an OR person in our

21     NorthShore University HealthSystem, one of the OR

22     staff that is involved in purchasing.

23         Q.    And, Doctor, do you see where it says

24     "Dr. Tomezsko said she would prefer the laser cut

Janet Tomezsko, M.D.

1    mesh, which is Product Code 810041BL"?

2        A.    Yes, I believe that was for the TVT EXACT.

3        Q.    Okay.  Do you see anything on this

4    document to indicate that it was the TVT EXACT?

5        MR. SNELL:  Object.  Foundation.

6        She didn't write this.

7        THE WITNESS:  But my recollection at the time

8    was trend was converting from the classic to the

9    EXACT.

10    BY MR. JACKSON:

11        Q.    So, Doctor, your testimony is that you

12    believe this refers to laser cut mesh for the

13    TVT EXACT?

14        A.    I believe so, yes.

15        Q.    And, Doctor, is it your understanding that

16    this -- Doctor, I'm sorry.

17            It says "The hospital is currently

18    ordering Code 810041B, which is the mechanical cut

19    mesh."

20            Did I read that correctly?

21        A.    Yes.

22        Q.    And which product do you believe that

23    refers to mechanical cut mesh for?

24        A.    The TVT Classic, as I wrote down,

Case 2:12-md-02327   Document 2539-1   Filed 08/08/16   Page 105 of 189 PageID #: 85581

Janet Tomezsko, M.D.

1    I believe.

2        Q.   And here it says "The laser cut mesh which

3    is Product Code 810041BL," right?

4        A.   Correct.

5        MR. JACKSON:  Okay.  Can we mark this as

6    Exhibit 8.

7        THE COURT REPORTER:  9.

8                    (Whereupon, TOMEZSKO Exhibit 9

9                    was marked for identification.)

10       MR. JACKSON:  Or 9, I'm sorry.

11       MR. SNELL:  Do you have one for me by chance?

12       MR. JACKSON:  Yeah, I do somewhere.

13       Why don't we just go off the record for a

14   second.

15       THE VIDEOGRAPHER:  The time is 10:22 a.m.  We

16   are going off the video record.

17                    (Brief interruption.)

18       THE VIDEOGRAPHER:  The time is 10:23 a.m., and

19   we're back on video record.

20   BY MR. JACKSON:

21       Q.   Doctor, I've handed you what we marked as

22   Exhibit 9, which is a document that says "Product

23   Pointer Gynecare TVT Tension-Free Support for

24   Incontinence," and this is a June 26, 2006,

Golkow Technologies, Inc.                          Page 105

Janet Tomezsko, M.D.

1   document; do you see that?

2       A.   Yes.

3       Q.   And do you see the bold, underlined

4   portion towards the top, where it says "We will

5   continue to have both the mechanically cut and

6   laser cut meshes for sale"?

7       A.   Yes.

8       Q.   And do you see where it says "Gynecare

9   TVT 810041BL"?

10      A.   Yes.

11      Q.   And is that -- is it your understanding

12  that that represents the product code for the laser

13  cut TVT Retropubic?

14      A.   I would assume so.

15      Q.   Okay.  And is that the same product code

16  that is listed on Exhibit 8 for --

17      A.   Yes.

18      Q.   So looking at this e-mail, is it still

19  your testimony that that laser cut mesh would be a

20  TVT EXACT?

21      MR. SNELL:  Object.  Hold on.  Hold on.

22  Object.  Asked and answered.

23      THE WITNESS:  The only -- to my recollection,

24  the only change I remember intentionally trying to

Janet Tomezsko, M.D.

1  make was to the TVT EXACT, and we did change to the

2  TVT EXACT.  So I'm not sure -- so to my

3  recollection, I don't remember specifically asking

4  for laser cut versus mechanical cut.  I do remember

5  specifically asking for TVT EXACT at some point.

6  BY MR. JACKSON:

7      Q.   So, Doctor, just to wrap this up, you

8  would certainly disagree with the idea that this

9  suggests you preferred the laser cut TVT to the

10 mechanical cut TVT; is that fair?

11     MR. SNELL:  Form.

12     THE WITNESS:  Correct.

13     I believe in terms of changing to the TVT

14 EXACT, it was for fellow training, it was easier to

15 train them, less trauma to the patient tissue.

16 There were several reasons I remember why I wanted

17 to change to the TVT EXACT.  I do not have an

18 independent recollection of ever having those

19 conversations otherwise.

20 BY MR. JACKSON:

21     Q.   We can set that aside.

22          Doctor, on page 32 of your report -- I'm

23 sorry.

24          On page 31 of your report, I'm looking at

Janet Tomezsko, M.D.

1    a sentence which begins on the fourth line down

2    that says "The Prolene TVT is an Amid Type I

3    macroporous mesh, which is the generally accepted

4    classification for biomaterials."

5          Do you see that sentence?

6    A.   Yes, I do.

7    MR. SNELL:  I'm sorry.  Counsel, you were on?

8    MR. JACKSON:  31.

9    BY MR. JACKSON:

10   Q.   And, Doctor, in your opinion is

11   macroporous mesh safer than microporous mesh?

12   A.   For the indication of a sling?

13   Q.   Yes.

14   A.   Yes, it is.

15   Q.   Doctor, would you agree that in the

16   context of polypropylene mesh for stress urinary

17   incontinence surgery, smaller pore or microporous

18   mesh is less desirable than macroporous mesh for

19   tissue ingrowth?

20   MR. SNELL:  Object.  Foundation.

21   THE WITNESS:  Yes.

22   BY MR. JACKSON:

23   Q.   Doctor, what is the Amid classification

24   that you cite to here?

Janet Tomezsko, M.D.

1      MR. SNELL:  Objection.  Vague as to "here."

2      THE WITNESS:  The Amid classification is a

3  classification by Dr. Amid.  He classifies the

4  different mesh materials from microporous to --

5  well, from macroporous to microporous from Type I

6  to Type IV and looking at the pore size and member

7  weave to basically identify the different mesh

8  types.

9  BY MR. JACKSON:

10     Q.   Doctor, do you have an understanding of

11  when Dr. Amid came out with that classification?

12     A.   I do have his paper with me.  I can look

13  that up, the exact year.

14     MR. SNELL:  Would you like her to look that up?

15     MR. JACKSON:  No.

16  BY MR. JACKSON:

17     Q.   Do you have a general understanding of

18  when that would have been?

19     A.   I believe it was in the '90s, but

20  I definitely could be wrong about that because I'm

21  bad with dates, but I would be glad to look it up

22  for you.

23     Q.   Would it be fair to say that Amid's

24  classification was published prior to the -- prior

Janet Tomezsko, M.D.

1  to the introduction of the TVT Retropubic device?

2      A.   I would have to look that up to see.

3  I'm sorry.

4      Q.   The TVT Retropubic device was first

5  marketed in 1999, is that --

6      A.   Correct.

7      MR. SNELL:  Foundation.  Objection.

8      Go ahead.

9  BY MR. JACKSON:

10      Q.   What is your understanding of when the

11  TVT Retropubic device was first marketed in the

12  United States?

13      A.   1999, I believe, yeah.

14      Q.   And is it your understanding that the

15  Amid pore size classification was developed prior

16  to 1999?

17      A.   I'm sorry.  I would have -- I actually

18  have to look that up to make sure.

19      Q.   So sitting here today, you are not

20  certain?

21      A.   At this moment, just with all of this

22  information, I'm -- to be completely accurate,

23  I would have to look it up.

24      Q.   And --

Janet Tomezsko, M.D.

```
1        A.    Sorry.

2        Q.    Is it your understanding that the

3    Amid classification was developed for mesh and

4    hernia applications?

5        A.    I do believe that's correct.  It is for

6    mesh used throughout the body, but I do believe it

7    was for hernia applications originally.

8        Q.    Doctor, what is your -- I'm sorry.  Strike

9    that.

10            Doctor, what support do you have for the

11    statement that the Prolene TVT is a Type I

12    macroporous mesh?

13        A.    By his classification, which is pores are

14    greater than 75 microns, it's usually -- it's a

15    monofilament with a macroporous of, like, 1.1 to

16    1.3.  So it's over the 75 microns.

17        Q.    And the measurements you just gave me,

18    1.1 to 1.3, where does that come from?

19        A.    It -- it comes from -- so basically, I've

20    looked at it myself, as you can see through -- but

21    I think throughout many studies, they put down the

22    size, the Moalli studies, they put down the size of

23    the pores.  So probably the Moalli studies are a

24    very good source.
```

Janet Tomezsko, M.D.

1     Q.    And, Doctor, do you believe you've done

2  enough diligence to offer the opinion that the

3  TVT Retropubic mesh is macroporous?

4     A.    Yes, I do.

5     MR. JACKSON:  Why don't we mark this as

6  Exhibit 10.

7                      (Whereupon, TOMEZSKO Exhibit 10

8                      was marked for identification.)

9  BY MR. JACKSON:

10    Q.    And, Doctor, I'll represent to you that

11 this is a -- this exhibit is from Ethicon, and do

12 you see where Ethicon refers to the TVT sling mesh

13 as microporous?

14    MR. SNELL:  Object.  Foundation as to Ethicon.

15 This is not an Ethicon -- the way you stated it,

16 you lacked foundation.  I'll just leave it at that.

17    THE WITNESS:  So in this classification they

18 wrote down "microporous," but there is no -- they

19 do not have their definition.  This is not by

20 Amid classification.  So you need to see their

21 definition of sizes.

22 BY MR. JACKSON:

23    Q.    Doctor, if I suggested that this document

24 suggests that the Prolene is microporous, you'd

Janet Tomezsko, M.D.

1    disagree with that?

2        MR. SNELL:  Form.

3        THE WITNESS:  By the standard accepted medical

4    classification of Amid, it is macroporous.  Someone

5    certainly could have made up their own

6    classification system and called it microporous,

7    but the standard that we go by is Amid, and it's a

8    macroporous mesh.

9    BY MR. JACKSON:

10       Q.   Doctor, did you mention that you've

11   measured the pore sizes on the Ethicon mesh in the

12   TVT Retropubic device yourself?

13       A.   Yes.  It would be -- the mesh itself is

14   see-through, and we show our fellows all the time

15   with a little ruler to see a millimeter.

16       Q.   So that's something you've done --

17       A.   Yes, we did.

18       Q.   -- just with the naked eye yourself?

19       A.   Yes, it's part of teaching.

20       Q.   You do that with a ruler?

21       A.   Yes.

22       Q.   Did you use any microscopic instruments or

23   anything?

24       A.   No, we're just talking about the main, the

Janet Tomezsko, M.D.

1  larger holes in the mesh, yeah.

2      Q.   And so your visual examination would be

3  based on holding a ruler up to the pores of the

4  mesh?

5      A.   Correct.  It's not microscopic.  Right.

6      Q.   And how many times have you done that?

7      A.   I don't know altogether.  Several -- we

8  teach fellows and residents, new fellow every year.

9      Q.   But your best guess of how many times

10 you've measured those pores?

11     A.   Maybe ten.

12     Q.   Doctor, turning back to page 31 of your

13 report, I'm looking at a sentence just a little

14 lower than we were before, that says "It is often

15 described as large pore, lightweight mesh

16 (AUGS/SUFU 2014 Position Statement)."

17          Do you see that sentence?

18     A.   Yes, I do.

19     Q.   Doctor, does the AUGS/SUFU 2014 Position

20 Statement specifically deal with TVT Retropubic

21 mesh?

22     A.   It deals with midurethral slings in

23 general.

24     Q.   Right.  But it does not deal with -- I'm

1    sorry.  Strike that.

2         It does not deal specifically with

3    TVT Retropubic devices, does it?

4       MR. SNELL:  Objection.  Misstates.

5       THE WITNESS:  So this -- this sentence is

6    describing Type I meshes, and this is relating to

7    Type I meshes in specific.  So this sentence of my

8    report is regarding Type I meshes in specific, and

9    then also it refers to the Prolene TVT is an

10   Amid Type I, and then it goes into more specifics

11   about the Type I meshes.  So the AUGS/SUFU report

12   is talking about Type I meshes in the future.

13   BY MR. JACKSON:

14      Q.   And the AUGS/SUFU 2014 Position Statement

15   looks at the TVT Retropubic device as well as other

16   devices from other manufacturers, correct?

17      A.   Correct, because there have been Type III

18   meshes that were used, and so they are specifically

19   supporting the Type I meshes.

20      Q.   And when the AUGS/SUFU 2014 Position

21   Statement discusses Type I mesh, they're referring

22   to products such as the SPARC mesh, perhaps?

23      MR. SNELL:  Objection.  Form.

24      Why don't you pull it out, Counsel, or show it

Janet Tomezsko, M.D.

1    to her?

2    BY MR. JACKSON:

3        Q.    Is it your understanding that the AUGS

4    2014 SUFU Position Statement incorporates data from

5    other products?

6        A.    Yes.

7        Q.    Doctor, do you recall reading

8    Brigitte Hellhammer's deposition testimony in

9    connection with your report in this case?

10       A.    Can you remind me what the testimony was

11   about?

12       Q.    I'm just asking if you recall reading a

13   deposition by somebody with the last name of

14   Hellhammer.

15       A.    I'm bad with names.  I remember the

16   content better than the names.  I'm sorry.

17       Q.    Do you remember reading deposition

18   testimony --

19       A.    I get called out --

20       Q.    -- of a Ms. Brigitte Hellhammer in regard

21   to pore size of Ethicon'S retropubic TVT meshes?

22       A.    I believe I did review that.

23       Q.    Do you recall anything she said about the

24   pore size of the TVT Retropubic mesh?

Janet Tomezsko, M.D.

1      A.    Can you be more specific?

2      Q.    Are you aware that she testified that the

3  TVT Retropubic mesh was microporous in her view?

4      MR. SNELL:   Object.   Lacks foundation.

5  I believe that misstates the actual testimony of

6  the witness.

7      But go ahead.

8      THE WITNESS:   I would have to look at that

9  context again.   I'm sorry.

10  BY MR. JACKSON:

11      Q.    Doctor, at the time that Ethicon began

12  selling the TVT Retropubic mesh in the

13  United States, do you know whether or not Ethicon

14  had available to it a lighter weight, larger pore

15  mesh?

16      A.    At that time specifically, I -- I'm not

17  sure whether they had already developed a lighter

18  weight, larger pore mesh that they had tested at

19  all in clinical applications.   I'm not sure.

20          For sling application, I mean,

21  specifically.

22      Q.    And, Doctor --

23      A.    I know it had to be in -- in process for

24  applications, though.

Janet Tomezsko, M.D.

1      Q.    Okay.  Thank you.

2            And you said you don't know whether there

3  was a lighter weight, lighter pore mesh that had

4  been tested in clinical applications at the time

5  the TVT was launched, correct?

6      MR. SNELL:  Object.  She said "TVT

7  application."

8      THE WITNESS:  So for TVT application, I'm not

9  sure if there had been any clinical use by Ethicon

10  at that point.  I don't believe there was.

11  BY MR. JACKSON:

12     Q.   Would you agree with me, Doctor, that less

13  synthetic material inside the body is preferable?

14     MR. SNELL:  Objection.  Overbroad.  Lacks

15  foundation.

16     THE WITNESS:  Yeah, I -- I -- can you rephrase?

17  It's very vague.

18  BY MR. JACKSON:

19     Q.   Doctor, when it comes to polypropylene

20  material in the context of treating stress urinary

21  incontinence, would you agree with the statement

22  that less material is better?

23     MR. SNELL:  Same objection.

24     Go ahead.

Janet Tomezsko, M.D.

```
 1        THE WITNESS:  I do not agree with that because

 2   the study -- remember the name --- the study that

 3   compared the Vypro, the thinner meshes for a sling,

 4   not compared directly to TVT, they had a higher

 5   rejection rate, 4 percent.  So I'm not necessarily

 6   sure that a lighter weight, larger pore would be as

 7   effective for the treatment of stress urinary

 8   incontinence if used as a sling.  I think that

 9   would need to be borne out in more studies.

10        But the current -- there is one study that

11   looks at the three slings -- the Vypresh -- the

12   Vypro, ULTRAPRO, I think it was, and

13   Vigenis (phonetic), and has been looked at, and it

14   did not show as good equivalence as the

15   TVT Retropubic.

16   I don't think that's been proven yet.

17   BY MR. JACKSON:

18        Q.   Doctor, have you seen any Ethicon

19   documents that indicate that less mesh overall was

20   preferred?

21        MR. SNELL:  Object.  Vague.  Lacks foundation.

22        THE WITNESS:  For what indication?

23   BY MR. JACKSON:

24        Q.   For treating stress urinary incontinence.
```

Janet Tomezsko, M.D.

1      A.   So in terms of Ethicon's opinion, I -- I'm

2  not sure, but what matters to me more is what

3  research we have, and what little research we have

4  on that did not show an improvement in outcome.  It

5  actually showed worse outcome.

6      Q.   Doctor, throughout your report in this

7  case, you cite a number of complication rates based

8  on literature, correct?

9      A.   Correct.

10     Q.   And --

11     MR. SNELL:  Counsel, if we are going to

12  transition into something else, can I take a break

13  and use the restroom real quick?

14     MR. JACKSON:  Sure.  Let's go off the record.

15  Let's take a break.

16     THE VIDEOGRAPHER:  The time is 10:42 a.m., and

17  we are going off the video record.

18                    (A short break was taken.)

19     THE VIDEOGRAPHER:  The time is 10:52 a.m., and

20  we are back on the video record.

21  BY MR. JACKSON:

22     Q.   Doctor, before we just went off the

23  record, I was asking whether you cite complication

24  rates in your report based on literature.

Janet Tomezsko, M.D.

1      A.   Yes, I do.

2      Q.   Okay.  And the numbers for a given

3  complication are not uniform, are they?

4           Let me ask a better question.

5  I apologize.

6           Doctor, you cite literature for

7  complication rates for erosion in your report,

8  correct?

9      A.   Correct.

10     Q.   And the erosion rate numbers for the

11  TVT Retropubic device are not uniform from

12  publication to publication, are they?

13     MR. SNELL:  Object.  Form.

14     THE WITNESS:  They -- they can vary from

15  publication to publication, yes.

16  BY MR. JACKSON:

17     Q.   Okay.  And why do they vary, in your

18  opinion?

19     A.   Well, I believe there is minimal variation

20  overall.  So when you look at the largest -- all

21  the larger studies, all the meta-analysis, all the

22  Cochrane Reviews, the reviews, even amongst the

23  randomized controlled trials, they are fairly

24  consistent at a 2 percent erosion rate.  There is a

Janet Tomezsko, M.D.

1     few outlier studies, and it's hard to explain why

2     they vary, different definitions, usually, of an

3     erosion.  They may not be all consistent with their

4     definitions, but when you look at the vast majority

5     of the literature, the large basis of the

6     literature, it's all fairly consistent about

7     2 percent.

8         Q.   I take it you would disagree with me if

9     I said the erosion rates in the literature vary

10    significantly?

11        A.   So I would disagree based on the larger

12    studies, yes.

13        Q.   Okay.  And, Doctor, you cite to the

14    2015 Cochrane review in your report, correct?

15        A.   Correct.

16        Q.   And that's a meta-analysis, correct?

17        A.   Correct.

18        Q.   And I believe you referred to that before

19    as a Type I evidence, correct?

20        A.   Correct.

21        Q.   And why is a meta-analysis Type I

22    evidence?

23        A.   It's usually Type I evidence because it

24    includes the randomized controlled trials.

Janet Tomezsko, M.D.

1      Q.   And, Doctor, you believe that the

2  2015 Cochrane review supports your opinion that the

3  TVT Retropubic device is safe and effective,

4  correct?

5      A.   Yes.

6      Q.   Okay.  And I believe we stated earlier

7  that the Cochrane review -- I'm sorry.  Strike

8  that.

9           The Cochrane review is a meta-analysis of

10  different studies, correct?

11      A.   Yes, it is.

12      Q.   Okay.  And those different studies --

13  I'm sorry.  Strike that.

14           The Cochrane review that you cite in your

15  report that cites to different studies and looks at

16  different studies includes various midurethral

17  slings, correct?

18      A.   That is correct.  It does include varied

19  midurethral slings, but it's heavily weighted upon

20  the TVT data.  The vast majority of the data that's

21  used is the TVT Retropubic.

22      Q.   Okay.  And there is also data from other

23  devices from other manufacturers in the

24  2015 Cochrane review that you rely on, correct?

Janet Tomezsko, M.D.

1      A.    Yes, there is.

2      Q.    And so, for example, are you relying on

3    data on the SPARC and other midurethral slings to

4    support your opinion that the TVT Retropubic device

5    is safe and effective?

6      A.    Well, since I'm relying on data from

7    multiple different studies, not just the Cochrane

8    review, that is part of the Cochrane review but,

9    again, the vast percentage of all the literature

10   I'm looking at is TVT Retropubic-based.

11     Q.    But would you agree with me you're looking

12   on -- looking at some literature that relies on the

13   SPARC, for example, and other midurethral slings to

14   support your opinion that the TVT Retropubic device

15   is safe and effective?

16     A.    Yes.

17     Q.    Okay.  So what makes you say the

18   TVT Retropubic device is safe and effective based

19   on a different product?

20     MR. SNELL:  Object.  Form.

21     Go ahead.

22     THE WITNESS:  So I'm not doing it based on a

23   different product, and actually, the Cochrane

24   review says the retropubic top-down approach, the

Janet Tomezsko, M.D.

1    SPARC, is not included as part of their retropubic.

2    They're talking about midurethral slings that are

3    top-up approach.  So -- and so the vast majority of

4    the data -- when you look at the other studies --

5    the Schimpf, Tommaselli -- they are primarily

6    TVT Retropubic studies.  So I can say with

7    confidence that this is, you know, this is TVT

8    Retropubic data primarily.

9    BY MR. JACKSON:

10       Q.   And what other top-up products are

11   included in the 2015 Cochrane review other than the

12   TVT Retropubic device?

13       A.   That's the vast majority.  I can --

14       MR. SNELL:  Counsel, I think you said top-up

15   instead of bottom-up --

16       MR. JACKSON:  Oh, I'm sorry.  Thank you.

17       MR. SNELL:  -- unless I misheard.

18       THE WITNESS:  He did, but I might have said it

19   too.

20   BY MR. JACKSON:

21       Q.   What other bottom-up slings are included

22   in the 2015 Cochrane review other than the

23   TVT Retropubic device?

24       A.   Can I look that up for you?  Can I --

Janet Tomezsko, M.D.

1      Q.    Certainly.

2      A.    -- bring it up for you?

3            Do we need to go off the record while I

4      find it?

5      MR. JACKSON:  Sure.  Let's go off the record.

6      THE VIDEOGRAPHER:  The time is 10:57 a.m., and

7      we are going off the video record.

8                      (Brief interruption.)

9      THE VIDEOGRAPHER:  The time is 11:03 a.m., and

10     we are back on video record.

11     BY MR. JACKSON:

12     Q.    Doctor, before we went off the record,

13     I asked you what other bottom-up slings, other than

14     the TVT Retropubic device, are included in the

15     2015 Cochrane review.  We've taken a few moments

16     off the record for you to review that 2015 Cochrane

17     review.

18           Are you able to answer that question?

19     A.    Yes, so looking through their list, the

20     vast majority of the retropubic-type bottom-up is

21     TVT.  There is Vypro, ULTRAPRO, Prolene light mesh,

22     and the Okulu study, just going through them --

23     they are -- there is an occasion one that just says

24     retropubic, the IV-- IVS similar system, but the

Janet Tomezsko, M.D.

1    vast majority are TVT retropubic, you know, that

2    are not SPARC or transobturator.

3        Q.    So, Doctor, you listed the IVS, the

4    ULTRAPRO, the Vypro?

5        A.    Correct.

6        Q.    And those are all bottom-up midurethral

7    slings listed in the 2015 Cochrane review?

8        A.    Correct.

9             There is -- I found -- so there is one

10   study with an ULTRAPRO Vypro, and then there is one

11   study with ObTape and DUPS, which I'm not sure

12   exactly what that is.  I'd have to look that up.

13            And there is another one that just says

14   retropubic.  So I'm not sure which study that is.

15   I'd have to look that up.  There is some

16   nonspecific language in this summary table that I'm

17   looking at.

18       Q.    And, Doctor, when you see a study that

19   just said "retropubic" and doesn't specify a

20   particular product, do you find that study to

21   reliably inform your opinion on whether the

22   TVT Retropubic device is safe and effective?

23       A.    So that study --

24       Q.    Doctor, I'm just asking generally.  I'm

Janet Tomezsko, M.D.

1    not asking about a specific study.

2        MR. SNELL:  Object to speculation and vague on

3    define.

4        THE WITNESS:  Right.

5        So I would have to look at that specific

6    document to know whether that's a TVT in itself,

7    but assuming that it's not, since the vast majority

8    of the studies, the vast majority of the patients

9    looked at TVT Retropubic, I can reliably use this

10   as a source for the TVT Retropubic.

11   BY MR. JACKSON:

12       Q.   We can switch directions and move on.

13            Doctor, we talked a little bit earlier

14   about the TVT Retropubic Instructions for Use; do

15   you remember that?

16       A.   Yes.

17       Q.   Okay.  And do you remember reading the

18   testimony of an Ethicon employee named Meng Chen

19   about the Instructions for Use of the TVT IFU?

20       A.   Yes.

21       Q.   And can you tell me, sitting here, what

22   you remember about that testimony?

23       A.   I believe -- again, I'm not good with the

24   names but the substance of the IFUs -- I believe it

Janet Tomezsko, M.D.

1    was testimony about what should be included and

2    what shouldn't be included.

3                        (Whereupon, TOMEZSKO Exhibit 11

4                        was marked for identification.)

5         MR. JACKSON:  Is that Exhibit 10?

6         THE COURT REPORTER:  11.

7    BY MR. JACKSON:

8         Q.   Doctor, do you recall seeing this document

9    before?

10        A.   I believe I have.

11        Q.   And, Doctor, it says that Meng Chen is the

12   associate medical director; do you see that?

13        A.   Yes.

14        Q.   And that would be the associate medical

15   director of Ethicon; is that correct?

16        A.   Correct.

17        Q.   Okay.  Have you ever met her?

18        A.   No, I have not.

19        Q.   Have you reviewed any documents authored

20   by her in addition to this one?

21        A.   I believe I've seen other e-mails

22   regarding this.

23        Q.   Doctor, this message is dated --

24   I'm sorry.  Strike that.

Janet Tomezsko, M.D.

1          Doctor, do you see that this is an e-mail

2    from Meng Chen dated January 29, 2009?

3          A.    Yes.

4          Q.    And do you see on that January 29, 2009,

5    e-mail where Meng Chen is questioning whether or

6    not the general statement about transitory local

7    irritation is still sufficient?

8          A.    Yes.

9          Q.    And do you see what she says above that,

10   about an hour later?  She tells Bryan Lisa, "Pardon

11   me again.  From what I see each day these patient

12   experiences are not transitory at all"?

13         A.    Yes.

14         Q.    And do you see that she's talking about

15   the TVT IFU on tape erosion, exposure and

16   extrusion?

17         A.    Yes.

18         Q.    Doctor, do you see toward the top of the

19   page a mention of Dr. Kirkemo?

20         A.    Yes.

21         Q.    Do you know who Aaron Kirkemo is?

22         A.    I recognize the name, but I forget the

23   specific position.

24         Q.    Doctor, are you aware that Meng Chen

Janet Tomezsko, M.D.

1  recommended that the IFUs be updated to reflect the

2  kind of calls she was getting about permanent pain

3  and chronic pain and the inability to have

4  intercourse?

5      MR. SNELL:  Objection.  Lacks foundation.

6  Misstates the evidence.

7      Go ahead.

8      THE WITNESS:  Those specific words, I -- I did

9  see other documents, but I don't remember if that's

10  what they specifically said.

11  BY MR. JACKSON:

12      Q.   Doctor, do you see here where it says

13  "Meng Chen, M.D., Ph.D.," "The Associate Medical

14  Director, Worldwide Customer Quality, Ethicon"?

15      A.   Yes.

16      Q.   Do you disagree with the worldwide medical

17  director of Ethicon if she said these things need

18  to be changed to update what is happening?

19      MR. SNELL:  Objection.  Misstates the evidence.

20      Go ahead.

21      THE WITNESS:  I -- in terms of the IFU and what

22  it should specifically say, I think these are all

23  information that implanting surgeons need to know

24  regardless, and it's part of our general medical

Janet Tomezsko, M.D.

1    knowledge, and it's part of our medical knowledge

2    just as surgeons and from our literature.

3        So what they feel is important to write in

4    their IFU, I think, you know, is up to them, but

5    because this is erosion and dyspareunia or things

6    that we do know about, whether it's in the IFU or

7    not, we, as surgeons, need to know that, and we

8    don't depend on the IFU for that information.  We

9    depend on the research for that information.

10   BY MR. JACKSON:

11       Q.   Do you believe that the IFU for the

12   TVT Retropubic device should contain information on

13   all known risks?

14       A.   I think it should contain information on

15   known risks.  I think it's hard to do all known

16   risks because that would be an extensive -- that

17   would be a document like my binder.

18       Q.   Doctor, if a company is getting reports in

19   postmarket surveillance of permanent pain

20   associated with the TVT Retropubic device, does the

21   IFU need to be updated to include that information?

22       MR. SNELL:  Object.  Improper hypothetical.

23   Lacks foundation.

24       THE WITNESS:  So, again, I think that would be

Janet Tomezsko, M.D.

1  up to the company.  This is -- as a surgeon, it is

2  up to us to keep up with the literature and what's

3  going on at our meetings, what we discuss and what

4  we're finding as we have experience with patients

5  regardless of what the IFU says.  So, you know,

6  it's up to the company what it should say, but that

7  is not our only source of knowledge.

8  BY MR. JACKSON:

9      Q.   But I think you agreed earlier, Doctor,

10  that the IFU is certainly a source of knowledge

11  that physicians would rely on?

12     A.   Right, it is a source of knowledge.  Yes,

13  it is part of the knowledge.

14     Q.   Doctor, as someone who is offering

15  opinions about which warnings should or should not

16  be included in the IFU for the TVT Retropubic

17  device, how do you believe the decision should be

18  made on what should be included?

19     A.   So you're saying if it was my job to be

20  the one to complete the IFU?

21     Q.   No.

22          Doctor, I'm saying you're offering

23  opinions in this case about what information or

24  warnings should be contained in the TVT IFU,

Janet Tomezsko, M.D.

1  correct?

2     MR. SNELL:  I'm going to object.  I think

3  you're misstating her opinion.  Her opinion is the

4  adequacy, sufficiency of the IFU and what risks are

5  commonly known by surgeons like her.  She's not

6  offering an opinion that she would write the IFU in

7  a certain manner.

8  BY MR. JACKSON:

9     Q.   Doctor, we discussed earlier that the risk

10  of dyspareunia or painful sexual intercourse is not

11  listed in the TVT Retropubic IFU, correct?

12     A.   Correct.

13     Q.   Do you think a woman would want to know if

14  there is a risk, even if it's not causally related,

15  that there is a risk that after she gets the

16  implant, she may experience painful sexual

17  intercourse?

18     MR. SNELL:  Object.  Vague.  Compound.  It asks

19  for what this undefined woman would or would not

20  want to know.

21     THE WITNESS:  I very much agree that a woman

22  would want to know whether dyspareunia was a risk

23  of any surgical procedure that she had, and as a

24  surgeon, that is my job to ascertain the risk of

Janet Tomezsko, M.D.

1    whatever procedure I'm doing and relay it to the

2    patient.  And, again, that doesn't come from a few

3    IFU.  There are surgeries that we do that have no

4    IFUs that result in dyspareunia, and we still have

5    to relay that information.  So that is not

6    IFU-dependent.  That is procedure and

7    surgeon-dependent to relay information to the

8    patient.

9    BY MR. JACKSON:

10       Q.  Okay.  But if Ethicon were getting reports

11   of dyspareunia in postmarket surveillance, do you

12   believe Ethicon had a right to update the IFU to

13   include that information?

14       MR. SNELL:  Form.

15       THE WITNESS:  It has a right to include any

16   information that it would like, of course.

17   BY MR. JACKSON:

18       Q.  Does Ethicon have an obligation to include

19   information about painful sexual intercourse that

20   they've obtained in postmarket surveillance

21   regarding the TVT Retropubic?

22       MR. SNELL:  Form.  Calls for a legal

23   conclusion.

24       THE WITNESS:  I don't know what the legal

Janet Tomezsko, M.D.

1    obligation is.  That's true.  I think in terms of

2    how I view it -- again, I know all of this

3    independent of the IFU.  So, again, I believe they

4    should put in what they feel is appropriate for

5    clinicians to know.

6    BY MR. JACKSON:

7        Q.   Well, don't you think as -- I'm sorry.

8    Strike that.

9             Doctor, you stated earlier that a woman

10   may require multiple revision surgeries after the

11   implantation of a TVT Retropubic device, correct?

12       A.   Yes.

13       Q.   And do you think that's information a

14   woman -- I'm sorry -- do you think that's

15   information a patient of yours would want to know

16   prior to the implantation of the device?

17       MR. SNELL:  Same objection.  Foundation.

18       Go ahead.

19       THE WITNESS:  I do personally think it's

20   standard of care, and it's standard of care in my

21   practice to warn patients that, for multiple

22   different reasons, they may require repeat

23   operations from this procedure, as well as other

24   procedures that I do.  So that it is something that

Janet Tomezsko, M.D.

1    I do warn patients about.

2    BY MR. JACKSON:

3        Q.    But you're not offering any opinions on

4    whether the risk of multiple revision procedures

5    should have been included in the IFU by Ethicon?

6        MR. SNELL:  Object.  Misstates.

7        THE WITNESS:  I find that hard to answer.

8    I'm sorry.

9    BY MR. JACKSON:

10       Q.    Do you believe Ethicon should have

11   included the risk of multiple revision surgeries

12   following the TVT Retropubic procedure in the

13   TVT Retropubic IFU?

14       A.    I think the -- the risk of multiple

15   revision surgery, being well less than 1 percent,

16   is such a small risk that I don't think they need

17   to include every small risk because, again, we know

18   about these small risks, but that would be up to

19   Ethicon to decide if they felt it was appropriate.

20       Q.    Okay.  So, Doctor, I just want to make

21   sure I'm clear.  Is it your testimony that because

22   it's a risk that -- I am sorry.

23           Doctor, is it your testimony that the risk

24   of multiple revision surgeries is a risk inherent

Janet Tomezsko, M.D.

1    with all surgeries; is that correct?

2        A.   Yes, there is a risk that no matter what

3    incontinence procedure you have, that you could

4    need more than one revision surgery or repeat

5    surgery on that procedure.

6        Q.   And, Doctor, that's common knowledge that

7    any surgeon would know?

8        A.   That is common knowledge for any

9    procedure.

10       Q.   But, Doctor, we talked earlier about how

11   Ethicon warns that you shouldn't implant the

12   TVT Retropubic in patients who are on

13   anticoagulation therapy, correct?

14       A.   Correct.

15       Q.   And that's also common knowledge that any

16   surgeon would know, correct?

17       A.   That is correct.

18       Q.   Okay.  So is it fair to say that Ethicon

19   does warn about some things that are common

20   knowledge?

21       A.   Yes, absolutely.

22       Q.   But it's your testimony that warning about

23   multiple revision surgeries after the

24   TVT Retropubic procedure is not necessary because

Janet Tomezsko, M.D.

1    it's common knowledge?

2        A.    I think the content of the IFU is really

3    difficult because there are so many things that

4    potentially can be contained.  So it's, I would

5    say, up to them to -- what they include.

6        Q.    Doctor, turning to the -- I'm sorry.

7            Doctor, are you aware of brochures for the

8    TVT Retropubic device?

9        A.    Yes.

10       Q.    Okay.  And, generally speaking, do you

11   know whether or not the TVT brochure always

12   disclosed the risk of dyspareunia?

13       A.    Oh, I would have to look back at my copies

14   that I have.  I do not think it originally did, but

15   I'd have to look at the copy.

16       Q.    Okay.  And, Doctor, we established,

17   I believe, that the IFU for the TVT Retropubic is

18   one piece of evidence that an implanting surgeon

19   such as yourself would consider in forming sort of

20   your risk-benefit analysis of the TVT Retropubic;

21   is that fair?

22       MR. SNELL:  Object to form.  Misstates,

23   I believe, her testimony.

24       THE WITNESS:  It is part of the information

Janet Tomezsko, M.D.

1    that we can include.

2    BY MR. JACKSON:

3       Q.   Okay.  And is information contained in the

4    TVT Retropubic brochure also part of the

5    information you would consider?

6       A.   Specifically, I would consider for what?

7            I'm sorry.

8       Q.   Doctor, do you read the TVT -- I'm sorry.

9    Strike that.

10           Doctor, have you read the TVT Retropubic

11   brochure prior to implanting the TVT Retropubic

12   device in patients?

13      A.   You're talking about the patient

14   brochure --

15      Q.   Yes.

16      A.   -- versus the brochure that's given to

17   providers?

18      Q.   Yes.

19      A.   Yes, I had looked at the patient brochure

20   in the past.  I am not sure originally whether I

21   read it prior to or not.  I almost think I did not.

22   I don't think they were available initially.  That

23   is not something that I routinely use.  To me

24   that's not enough information to make any judgments

Janet Tomezsko, M.D.

1    on as a -- as a surgeon.

2        Q.    Doctor, would it surprise you to know

3    that, for example, there are brochures that existed

4    for a significant period of time that did not

5    disclose the risk of painful sexual intercourse to

6    women?

7        A.    Would that surprise me?

8            No, it would not surprise me.

9    MR. JACKSON:  Mark this as an exhibit.

10                    (Whereupon, TOMEZSKO Exhibit 12

11                    was marked for identification.)

12   BY MR. JACKSON:

13       Q.    Doctor, do you recall having seen this

14   document before?

15       A.    I believe I have, yes.

16       Q.    Do you know who Professor Hausler is?

17       A.    I recognize the name.  I believe he's one

18   of the European surgeons.

19       Q.    Okay.  And do you know who Axel Arnaud is?

20       A.    One of the scientific directors.

21       Q.    Doctor, do you see where Dr. Hausler

22   thought that erosions with respect to the TVT mesh

23   were underreported?

24       A.    Yes.

Janet Tomezsko, M.D.

1     Q.   Do you agree with the rest of that

2   statement, where it says "There can be hidden

3   erosions that are asymptomatic"?

4     MR. SNELL:  Object.  Form.  Incomplete part of

5   the statement.

6     THE WITNESS:  So he wrote that "Most of the

7   time a hidden erosion is asymptomatic, and neither

8   the patients, nor their sexual partners have -- if

9   any complain, but it might happen that a patient

10   may complain."

11     So do I agree that he might have felt that way?

12   BY MR. JACKSON:

13     Q.   Sure.

14     A.   You know, per -- Axel said that's what

15   Dr. Hausler said to him.

16     Q.   Doctor, do you believe that asymptomatic

17   erosions are a possibility following the

18   implantation of a TVT Retropubic mesh?

19     A.   Yes.

20     Q.   And do you believe that those asymptomatic

21   erosions can sometimes turn into symptomatic

22   erosions many months later?

23     A.   That's hard -- that's hard to speak to

24   because asymptomatic erosion, no one knows is

Janet Tomezsko, M.D.

1  there, and it hasn't been identified.  So I can't

2  say whether that's the one that would turn into a

3  symptomatic erosion or not.  There is no study

4  that's been done on that.

5      Q.   Doctor, is it fair to say that the body

6  continues to react to the mesh as long as the mesh

7  is in the body?

8      MR. SNELL:  Objection.  Vague.  Overbroad.

9  Asked and answered.

10     THE WITNESS:  No, I would disagree with that.

11 BY MR. JACKSON:

12     Q.   Doctor, do you see the sentence in the

13 paragraph that starts "I explained," that says

14 "I also indicated that we want to be very careful

15 with any modifications to our tape, since a change

16 in the mesh would obsolete all the long-term

17 clinical results we have about the procedure."

18          Do you see that sentence?

19     A.   Yes, I do.

20     Q.   And can you tell me what, if anything, you

21 know about that statement?

22     MR. SNELL:  Object.

23     THE WITNESS:  It implies that they don't --

24 they have to be careful of any changes because then

Janet Tomezsko, M.D.

1   that will make it into a different product.

2   BY MR. JACKSON:

3       Q.   When you say "they," you mean Ethicon?

4       A.   If Ethicon changed it, it would make a

5   different product, and then -- and, as surgeons, we

6   don't automatically say "This product is the same

7   as that one.  They are different."  So then we --

8   you have to start fresh, and they had already had

9   good success with their product.

10      Q.   Doctor, we can put that aside.  I'm done

11  with that one.

12           Doctor, do you know Dr. Roger Goldberg?

13      A.   Yes, I do.

14      Q.   Does he work at NorthShore Hospital with

15  you?

16      A.   Yes, he does.

17      Q.   And do you just know him professionally?

18      A.   Yes.

19      Q.   Doctor, do you know a Dr. Gregory Bales at

20  the University of Chicago?

21      A.   Yes, yes, I do.

22      Q.   And do you just know him professionally?

23      A.   Yes, just professionally.

24      Q.   And how do you know Dr. Bales

Janet Tomczsko, M.D.

1  specifically?

2      A.   Because he's a urologist that works in the

3  urogynecology sphere.  We know each other from

4  professional organizations, as well as I'm also a

5  University of Chicago professor, so to speak, and

6  we train -- he also can help train our fellows, and

7  most of my interactions have been through our

8  scientific meetings like AUGS, SUFU, that kind of

9  thing.

10     MR. JACKSON:  I think I have no more questions

11  at this time.  I'll reserve the rest of my time.

12     THE VIDEOGRAPHER:  The time is 11:27 a.m., and

13  we are going off video record.

14                    (Brief interruption.)

15     THE VIDEOGRAPHER:  The time is 11:32 a.m., and

16  we are back on the video record.

17                    EXAMINATION

18  BY MR. SNELL:

19     Q.   Doctor, my name is Burt Snell.  We know

20  each other.  I just want to follow up on some of

21  the questions that plaintiff's counsel asked you.

22          Are you prepared to proceed?

23     A.   Yes, I am.

24     Q.   Are you prepared to answer my questions to

Janet Tomezsko, M.D.

1    the same degree of truthfulness that you answered

2    plaintiff's counsel's questions?

3         A.    Yes.

4         Q.    During your answers to plaintiff's

5    counsel, at certain times you asked if plaintiff's

6    counsel would provide certain documents or if he

7    would allow you to look at certain materials.  So

8    some of what I'm going to ask you about pertains to

9    the materials to which you were referencing.  I'm

10   just giving you a heads-up where I am going to go.

11   Okay?

12        A.    Yes.

13        Q.    First of all, do you recollect plaintiff's

14   counsel asking you some questions about your

15   opinions as to the adequacy and content of the

16   Ethicon TVT sling IFU?

17        A.    Yes.

18        Q.    And is it your opinion that the Ethicon

19   TVT IFU is adequate to warn pelvic floor surgeons

20   of the potential risks specific to the device?

21        A.    Yes.

22        Q.    Who are the intended users, based upon

23   your expert review and analysis, of the

24   TVT Retropubic stress incontinence device?

Janet Tomezsko, M.D.

1      A.   The intended users are surgeons who have

2  specific training in the treatment of stress

3  urinary incontinence and specific knowledge of the

4  treatments and surgeries for stress urinary

5  incontinence.

6      Q.   Plaintiff's counsel asked you several

7  questions about whether risks were commonly known

8  or not to pelvic floor surgeons; do you recollect

9  that?

10     A.   Yes.

11     Q.   And is that something you investigated and

12  formulated opinions about, the risks that are

13  commonly known for stress incontinence surgeons,

14  including TVT, as to pelvic floor surgeons like

15  yourself?

16     A.   Yes.

17     Q.   You mentioned the various sources of

18  knowledge that a surgeon has with regard to these

19  commonly known risks.  Let me ask you this:  Are --

20  is knowledge of those commonly known risks, is that

21  acquired, if at all, in your medical school?

22     A.   Yes, we start learning about surgical risk

23  for varied procedures, including stress

24  incontinence, in medical school.

Janet Tomezsko, M.D.

1    Q.   Is a source of that common knowledge that

2    plaintiff's counsel asked you about with regard to

3    risk of incontinency procedures, does that flow

4    from your learning in residency as a pelvic floor

5    surgeon?

6    A.   Yes.  Stress incontinence treatment,

7    surgical and nonsurgical, are part of the core

8    curriculum of residencies.

9    Q.   And same question as to fellowship.  Is

10   the fellowship program that a pelvic floor surgeon

11   can undergo, do you know whether or not that is a

12   source of this common knowledge of risk of stress

13   incontinent surgery?

14   A.   Yes, especially in fellowship, that is the

15   source -- that is where we are learning even a

16   higher level of all the risk of incontinent

17   surgeries as well as the procedures.  That's where

18   we absolutely can fine-tune our knowledge of all of

19   that.

20   Q.   Have you investigated or read any of the

21   core curriculum and curriculum -- expected

22   curriculum materials for pelvic floor surgeon

23   residencies and fellowships that pertain to the

24   risk of not just TVT but also other incontinent

Janet Tomezsko, M.D.

1    surgeries?

2        A.   Yes, as part of the core curriculum put

3    out by the ACGME for residency in OB/GYN, as well

4    as fellowships in FPMRS, yes, it's part of the core

5    curriculum that you should know the procedures as

6    well as the complications.

7        Q.   Did you also -- in formulating your

8    opinions, did you also look out and review or

9    consider the American Urologic Association's

10   curriculum regarding stress incontinent surgery

11   that their residents are expected to know of?

12       A.   Yes, I think the American Urologic

13   Association, AUA, core curriculum includes those

14   topics for residents, as well as for the medical

15   students.

16       Q.   And were those sources of your foundations

17   for your opinions as to what risks are commonly

18   known to pelvic floor surgeons with regard to TVT

19   and stress incontinent surgeries?

20       A.   Yes, they are.

21       Q.   Is pain a commonly known potential risk of

22   stress incontinent surgeries?

23       A.   Yes, it is.

24       Q.   Is chronic pain a potential risk that's

Janet Tomezsko, M.D.

1    commonly known by pelvic floor surgeons of stress

2    incontinent surgeries?

3        A.   Chronic pain is commonly known.  It's very

4    rare, but it's known that it could possibly happen.

5        Q.   And have you seen or did you consider the

6    regulation on the labeling for medical devices and

7    whether or not it stated that commonly known risks

8    need not be included in the Instructions for Use?

9        MR. JACKSON:  Objection.  Form.

10       THE WITNESS:  Yes, I have seen the -- if you're

11   talking about the FDA regulatory advice on how to

12   write up, it's -- it said it was up to the judgment

13   of the person creating it but does not have to

14   include the commonly known risks.

15   BY MR. SNELL:

16       Q.   And have -- did you investigate and have

17   you opined on what are the commonly known risks to

18   the intended user pelvic floor surgeon?

19       A.   For the sling?

20       Q.   Yes.

21       A.   Yes, I have.

22       Q.   Now, do you have that Ethicon IFU in front

23   of you, Exhibit 7, that you discussed with

24   plaintiff's counsel?

Janet Tomezsko, M.D.

1       A.   Yes, I do.

2       Q.   On the very first page under "Important,"

3   do you see it says that "The IFU is not a

4   comprehensive reference to surgical technique for

5   correcting stress urinary incontinence"?

6       A.   Yes, it does say that.

7       Q.   And is that something you considered in

8   formulating your opinion as to whether the IFU was

9   adequate?

10      A.   Yes.

11      Q.   Is that something you considered in

12  formulating your opinions as to whether the

13  commonly known stress incontinence risk needed to

14  be in the TVT IFU?

15      A.   Yes.

16      Q.   A little further down, it states

17  "Variations in use may occur in specific procedures

18  due to individual technique and patient anatomy";

19  do you see that?

20      A.   Yes, I do.

21      Q.   Is that consistent or inconsistent with

22  your opinion with regard to the adequacy of the IFU

23  for how to tension or not tension the TVT?

24      A.   Yes.

Janet Tomezsko, M.D.

1      Q.    Plaintiff's counsel asked you a question

2  about whether the TVT IFU contraindicated its use

3  in women who are obese; do you recollect that?

4      A.    Yes.

5      Q.    Is there any Level 1 or Level 2 or

6  reliable evidence that you are aware of that shows

7  the TVT is not effective in obese women?

8      A.    No, there is not.

9      Q.    To the contrary, have you investigated the

10  medical literature to determine whether TVT is

11  efficacious and safe in women who are normal

12  weight, overweight or who may be obese?

13      MR. SNELL:  Objection.  Form.

14      THE WITNESS:  Yes, there is literature that

15  supports the use in varied weight.

16  BY MR. JACKSON:

17      Q.    Do you recall plaintiff's counsel asked

18  you some questions about tensions, and I believe

19  you testified that you did not want tension of the

20  TVT once it was placed?

21      A.    Correct.

22      Q.    If you look at the bottom of this

23  paragraph, on page number 27, I'm just going to

24  read it into the record where it's talking about

Janet Tomezsko, M.D.

1    Instructions for Use, actually placing the device.

2         The last paragraph on page 27 says "To

3    avoid putting tension on the tape, a blunt

4    instrument (scissors or forceps) should be placed

5    between the urethra and the tape during removal of

6    the plastic sheath"; do you see that?

7    A.   Yes.

8    Q.   "Premature removal of the sheath may make

9    subsequent adjustments difficult"; do you see that?

10   A.   Yes.

11   Q.   Is that part of the IFU that you

12   considered in formulating your opinions?

13   A.   Yes.

14   Q.   Is that part of the IFU actually

15   consistent or inconsistent with your opinions that

16   you do not want to put the TVT in with tension

17   ultimately?

18   A.   I think it's consistent with my opinion.

19   Q.   Is it consistent with your technique that

20   you described to plaintiff's counsel?

21   A.   Yes, it is consistent with my technique.

22   Q.   Is that something you've learned during

23   the Ethicon professional education with regard to

24   TVT and how to space or provide space between the

Janet Tomezsko, M.D.

1  tape and the urethra?

2      A.   They did give instruction and basically

3  made the point of do not tension it, to leave

4  space.

5      Q.   On the first page, this also says that

6  "The device should be used only by physicians

7  trained in the surgical treatment of stress urinary

8  incontinence"?

9      A.   Yes.

10     Q.   "And specifically in implanting the

11  Gynecare TVT"; do you see that?

12     A.   Yes.

13     Q.   Is that something you read and considered

14  in formulating your opinions as to the adequacy of

15  the IFU to pelvic floor surgeons?

16     A.   Yes.

17     Q.   Is that something you also considered in

18  formulating your opinions as to the adequacy of the

19  IFU as to pelvic floor surgeons specifically with

20  regard to the risk that would already be commonly

21  known?

22     A.   Yes.

23     Q.   And because the IFU specifically says that

24  surgeons should be trained or receive some

Janet Tomezsko, M.D.

1    education on the TVT device, do you consider that

2    professional education, training, the surgical

3    videos, the slides and other curricula, to

4    supplement the actual text of the IFU?

5        A.    Absolutely.

6        Q.    In the warning section, Warning No. 3 says

7    "Users should be familiar with surgical technique

8    for bladder neck suspensions and should be

9    adequately trained in implanting the TVT device";

10   do you see that?

11       A.    I'm sorry.  Is it on the same page?

12       Q.    I'm sorry.  Page 28, the third bullet

13   point under "Warnings."

14       A.    Thank you.

15             Yes, I do see that.

16       Q.    And it says "It's important to realize

17   that TVT is different from the traditional sling

18   procedure in that the tape should be located

19   without tension under the midurethra"; do you see

20   that?

21       A.    Yes.

22       Q.    Is that an accurate statement, first of

23   all, that "TVT is different than the traditional

24   sling procedure in that it's located without

Janet Tomezsko, M.D.

1    tension under the midurethra"?

2        A.   That is true.

3        Q.   And did you consider that in formulating

4    your opinions as to the adequacy of the TVT IFU?

5        A.   Yes.

6        Q.   Did you consider that in formulating your

7    opinions as to whether that needed to be warned of,

8    that there was a clear difference, according to

9    your analysis and investigation, between the TVT

10   and the traditional sling in that regard?

11       A.   That's one of the most important points

12   between -- the difference between the retropubic

13   TVT and a pubovaginal sling.  So that is something

14   I feel is important to be on the IFU.

15       Q.   The third-to-last bullet point discusses

16   that "To minimize risk, make sure to place the tape

17   tension free in the midurethral position"; do you

18   see that?

19       A.   Yes.

20       Q.   Is that something you considered in

21   formulating your opinions as to the adequacy of the

22   TVT IFU?

23       A.   Yes.

24       Q.   Is that consistent or inconsistent with

Janet Tomezsko, M.D.

1    the opinions you expressed earlier with regard to

2    not wanting to tension the TVT device?

3        A.    That's consistent with.

4        Q.    You were asked some questions about --

5    let's go to the mechanical versus the laser --

6    laser cut issue first.

7            Do you recollect covering that subject

8    with plaintiff's counsel?

9        A.    Yes, I do.

10       Q.    Turn to your report at page 32.

11       A.    Okay.

12       Q.    Page 3, you have a section titled

13   "Mechanical Versus Laser Cut"?

14       A.    Yes.

15       Q.    You state that the TVT sling was

16   mechanically cut beginning between 1998 and 2007,

17   and that after the introduction of laser cut,

18   Ethicon continued to make and sell mechanically cut

19   mesh as well, and that Ethicon still sells both

20   mechanical cut and laser cut TVT in order to

21   satisfy surgeon preferences; do you see that?

22       A.    Yes, I do.

23       Q.    Now, earlier -- let me ask you this:  Does

24   that refresh your recollection as to whether it's

Janet Tomezsko, M.D.

1   your opinion or understanding, based on your review

2   of the Ethicon documents and other sources, as to

3   whether the mechanical cut mesh is still available

4   for the TVT Retropubic device?

5       MR. JACKSON:  Objection.  Form.

6       THE WITNESS:  Yes, it does.

7   BY MR. SNELL:

8       Q.   Fair to say you've reviewed a lot of

9   Ethicon documents?

10      MR. JACKSON:  Object to form.

11      THE WITNESS:  Yes, I have.

12  BY MR. SNELL:

13      Q.   Binders and binders full?

14      A.   And thumb drives and thumb drives full.

15      Q.   Plaintiff's counsel asked you about any

16  studies that were specific or addressed the

17  mechanical cut versus laser cut issue for the mesh;

18  do you recall that?

19      A.   Yes.

20      Q.   Did you identify at page 32 and 33 of your

21  report studies that you were able to find in the

22  literature that looked at mechanical cut versus

23  laser cut mesh and whether there was a clinically

24  significant difference between the two?

Janet Tomezsko, M.D.

```
1        A.    The Neuman -- the Agarwal studies.

2        Q.    And --

3        A.    Then there is an Thubert study that we

4   identified that looks specifically at mechanical

5   versus laser cut.

6        Q.    The Thubert study, can you just tell us

7   does that concern TVT or TVT EXACT?

8        A.    TVT versus TVT EXACT.

9        Q.    Is that the study you were referencing

10  earlier to plaintiff's counsel?

11       A.    I think so.

12       Q.    Did that study show a significant

13  difference in the exposure rate between the TVT and

14  newer TVT EXACT laser cut?

15       A.    At 12 month follow-up, both of them had a

16  zero percent exposure rate.

17       Q.    Is that a study you considered in

18  formulating your opinion that there has been no

19  demonstrated clinically significant difference

20  between mechanical and laser cut mesh for the

21  TVT Retropubic device based upon the reliable

22  literature?

23       A.    Yes.

24       Q.    In your review of these issues, do you
```

Janet Tomezsko, M.D.

1    recall seeing the -- do you know what TVT Abbrevo

2    device is?

3         A.   Yes, I do.

4         Q.   Do you recall looking at the

5    de Leval-Waltregny TVT-O versus the TVT Abbrevo

6    device clinical study that assessed things like

7    rates of exposure at one year and three years?

8         A.   Yes, I do recall that.

9         Q.   Is the Abbrevo, do you have an

10   understanding whether that's only laser cut too?

11        A.   That is -- that is only laser cut.

12        Q.   And do you have a recollection as to

13   whether those -- that study that actually compared

14   the older TVT-O with the TVT Abbrevo, whether it

15   showed any difference, statistically significant

16   difference in complication rates pertaining to

17   rates of exposure or erosion?

18        A.   There was no difference in rates of

19   exposure.

20        Q.   Do you also -- is that -- does that form

21   part of the basis of your opinion that there has

22   been no reliably demonstrated clinically

23   significant effect for the mechanical versus laser

24   cut mesh for TVT?

Janet Tomezsko, M.D.

```
1        A.    Yes, yes.

2        Q.    You were asked a question about the

3   AUGS/SUFU Position Statement and the reference in

4   your report that TVT is a large bore, lightweight

5   mesh; do you recall that?

6        A.    Yes.

7        Q.    Do you -- can you turn to -- I think it's

8   No. 55 in your binder.

9        A.    I think I also have it right here.  I have

10  it right here, yeah.

11       Q.    The sentence in the AUGS/SUFU Position

12  Statement where it references the midurethral sling

13  as a large pore, macroporous lightweight mesh, can

14  you find that in that document for me?

15             I believe it's on the second page --

16       A.    Yeah.

17       Q.    -- under Item No. 1.

18       A.    One, yes.

19       Q.    And do you see there is a reference after

20  that?

21             For the record it says "As a knitted

22  implant for the surgical treatment of SUI,

23  macroporous, monofilament, lightweight

24  polypropylene has demonstrated long-term
```

Janet Tomezsko, M.D.

1    durability, safety and efficacy up to 17 years,"

2    with a reference eight.  Do you see that?

3        A.   Yes.  That's Dr. Nillson's 17-year study

4    of TVT Retropubic.

5        Q.   Is that the TVT Retropubic device --

6    specific device you rendered opinions on here

7    today?

8        A.   Yes, it is.

9        Q.   And did this physician statement include

10   any other data on the TVT device?

11       A.   Yes, it does.

12       Q.   Any Level 1 data?

13       A.   Yes, there is.  It includes the --

14   actually, multiple, the Ward study, the Ward-Hilton

15   study, the Novara review, which includes some of

16   the TVT --

17       Q.   There is a reference to the Ogah-Cochrane

18   review.  I believe you discussed that with

19   plaintiff's counsel already?

20       A.   Right, that was -- Ogah-Cochrane review

21   yes.

22       Q.   Was that the same --

23       A.   2009 Cochrane Review that we were

24   discussing, yes.

Janet Tomezsko, M.D.

1    Q.   And did you investigate whether the larger

2   pore, supposedly lighter weight meshes for hernia

3   or prolapse, whether they had been demonstrated to

4   be as effective as TVT in the application of a

5   stress incontinence sling?

6    MR. JACKSON:   Object to form.

7    THE WITNESS:   Yes.

8   BY MR. SNELL:

9    Q.   And did you find any data that supported

10   the conclusion -- strike that.

11    What is your opinion with regard to

12   whether the ULTRAPRO and Vypro have been

13   demonstrated to be as safe and effective as TVT?

14    A.   In the ULTRAPRO and Vypro study, they

15   actually had a higher erosion rate, a 4 percent

16   versus the 2 percent of the TVT Retropubic.  So in

17   my opinion it does not prove it is as safe.

18    Q.   And have any of the other meshes, larger

19   pore or lighter weight absorbable meshes been shown

20   to be as effective and durable and been studied as

21   long as TVT?

22    A.   No, nothing has.

23    Q.   Is it desirable to surgeons, like

24   yourself, that the TVT has been studied in multiple

Janet Tomezsko, M.D.

1    long-term studies?

2        A.    It very much is, yes.

3        MR. SNELL:  Let's go off the tape.

4        THE VIDEOGRAPHER:  The time is 11:55 a.m.  This

5    is the end of Tape 2, and we are going off the

6    video record.

7                    (Brief interruption.)

8        THE VIDEOGRAPHER:  The time is 12:00 noon, and

9    we are back on the video record.

10   BY MR. SNELL:

11       Q.    Doctor, do you recall being asked

12   questions about the Cochrane Reviews and, for

13   example, whether data for a device called SPARC was

14   included?

15       A.    Yes.

16       Q.    And whether TVT was included as well?

17       A.    Yes, I do.

18       Q.    Do you have in front of you the

19   Ogah-Cochrane review?

20       A.    Yes, I do.

21       Q.    Is that -- first of all, based on the

22   level of evidence you've described to plaintiff's

23   counsel, what level of evidence is that?

24       A.    It's Level 1.

Janet Tomezsko, M.D.

1      Q.    Is there anything higher than Level 1

2   evidence?

3      A.    No.

4      Q.    Did you try to formulate your opinions on

5   the highest level evidence that you could find?

6      A.    Yes.

7      Q.    Did this Cochrane -- was it a systematic

8   review of meta-analysis?

9      A.    Yes, it is.

10     Q.    Did it investigate the efficacy and safety

11  of the TVT Retropubic device upon which you've

12  rendered your opinions?

13     A.    Yes.

14     Q.    Did it compare the actual TVT Retropubic

15  device to the SPARC device?

16     A.    Yes, there is a study in there.

17     Q.    What, if anything, did it show -- did the

18  TVT show as compared to the SPARC?

19     A.    The retropubic TVT had a higher success

20  rate and less voiding dysfunction, less spotter

21  perforations and less tape erosions than the SPARC

22  procedure.

23     Q.    Is that something you considered in

24  formulating your opinions in this case?

Janet Tomezsko, M.D.

1      A.   Yes.

2      Q.   Did that Cochrane review also investigate

3   the safety of monofilament tapes, like TVT,

4   compared to multifilament tapes, like others that

5   use polypropylene, Monocryl, Vicryl or various

6   multifilament tapes?

7      MR. JACKSON:  Objection.  Form.

8      MR. SNELL:  Strike that.

9   BY MR. SNELL:

10     Q.   Did that Cochrane review compare the

11  monofilament tapes, like TVT, to multifilament

12  tapes?

13     A.   Yes, it did.

14     Q.   And what, if anything, did it show you?

15     A.   It showed the monofilament tapes -- tapes

16  showed fewer tape erosions than the multifilament

17  tapes.

18     Q.   What was the rate of erosion with the

19  monofilament tapes?

20     A.   The relative risk for the monofilament

21  tape was 1.3 percent, so 30 percent higher.

22     Q.   So the rate of erosion with the

23  monofilament was 1.3 percent?

24     A.   No, so the relative risk -- I have to look

Janet Tomezsko, M.D.

1   up the exact rate.  Sorry.  I have to find

2   Figure 6.  Sorry.

3           So this, you know, gives the relative risk

4   of 1.3 percent, which is usually a 30 percent

5   higher risk.  It doesn't give the exact rate of

6   erosion.

7       Q.   Can I see --

8       A.   I don't think.

9       Q.   Can I see that Cochrane review?

10      A.   Uh-huh.  Unless I'm just missing it.

11      Q.   It states "Monofilament tapes had fewer

12  tape erosions (1.3 percent versus 6 percent) with

13  the RR of 0.25"; do you see that?

14      A.   Okay.  Sorry.  I was looking right past

15  it.

16      Q.   So the rate for the monofilament -- so the

17  rate for the monofilament tapes was 1.3 percent?

18      A.   Correct.

19           And the multifilament was 6 percent.

20      Q.   And the RR of 0.25, what does that mean?

21      A.   It's a quarter of the percentage,

22  one fourth.

23      Q.   Do you have the Ford-Cochrane review for

24  2015 that you referenced with plaintiff's counsel

Janet Tomezsko, M.D.

1    handy?

2         A.   Yes, I do.

3         Q.   I just want to turn your attention to

4    page 10.

5              You were asked questions about whether the

6    TVT is a macroporous mesh.  Do you recollect that?

7         A.   Yes.

8         Q.   You were shown a document that it included

9    in a microporous category; do you recall that?

10        A.   Yes.

11        Q.   Is that a document you had seen before

12   even here today?

13        A.   Yes.

14        Q.   Is that a document that you disagree with?

15        A.   Yes.

16        Q.   And did you consider and look to see

17   whether the Cochrane review identifies whether TVT

18   would be a macroporous or a microporous mesh?

19        A.   Yes.  According to the Cochrane review,

20   the Ford review, it's a macroporous Type I mesh.

21        Q.   Is that consistent or inconsistent with

22   your opinion?

23        A.   That's consistent with my opinion.

24        Q.   Does the Cochrane review state whether

Janet Tomezsko, M.D.

1    macroporous mesh, like the TVT, is biocompatible?

2        A.   Yes, it does.  It says it has

3    biocompatibility and low risk of infection.

4        Q.   Do you agree with that statement?

5        A.   I do.

6        Q.   Is that a statement -- is that an opinion

7    you formulated based upon your own independent

8    analysis of the literature and data?

9        A.   Yes, based on the Level 1 data.

10       Q.   Is that an opinion you hold and rely upon

11   for your earlier expressed opinions that the

12   reliable data do not show degradation or a

13   clinically significant long-term chronic

14   inflammatory effect of the TVT device?

15       A.   Yes --

16       MR. JACKSON:  Objection.  Form.

17       THE WITNESS:  Yes, it is.

18   BY MR. SNELL:

19       Q.   Can you tell us what level of evidence is

20   the Ford-Cochrane review?

21       A.   Level 1.

22       Q.   Do you recall being asked questions about

23   the pore size of TVT?

24       A.   Yes.

Janet Tomezsko, M.D.

1     Q.   I think you earlier stated that the pore

2  size of TVT was between 1100 and 1300 microns, but

3  the Moalli study would have measured it more

4  specifically?

5     A.   Yes.

6     Q.   If the Moalli study identified the pore

7  size of the TVT Retropubic device at greater than

8  1300 microns, would that be consistent or

9  inconsistent with your general understanding and

10 recollection of what you had viewed its pore size

11 to be?

12    A.   That's more accurate than my view, of

13 course.

14    Q.   You were asked questions about specific

15 studies that would have looked at longer term or

16 chronic pain; do you recall that topic?

17    A.   Yes.

18    Q.   Is that something you investigated in

19 formulating your opinions?

20    A.   Yes.

21    Q.   Look at your report at pages 27 and 28.

22         At page 28 you identify a meta-analysis by

23 Tommaselli?

24    A.   Yes.

Janet Tomezsko, M.D.

1      Q.   And you say "It was a systematic review of

2  long-term studies"; do you see that?

3      A.   Yes.

4      Q.   Was the TVT device included in that study

5  or in that meta-analysis?

6      A.   Yes, it was.

7      Q.   Do you have a recollection of the 3,974

8  retropubic cases, how many were -- how many of

9  those was persistent or chronic pain present in?

10     A.   13, which is .3 percent.

11     Q.   And do you believe that 0.3 percent to be

12 a reliable number?

13     A.   Yes.

14     Q.   What level of evidence is the Tommaselli

15 systematic review in that analysis?

16     A.   That's Level 1 evidence.

17     Q.   Do you have a general recollection as to

18 whether there was one or two TVT Retropubic

19 long-term studies or multiple ones?

20     A.   There is multiple TVT long-term studies.

21     Q.   More than 10 or 20?

22     MR. JACKSON:  Objection.  Form.

23     THE WITNESS:  Yes, definitely more than 10.

24

Janet Tomezsko, M.D.

```
1    BY MR. SNELL:

2        Q.   You recall being asked questions about

3    certain studies and whether they had a primary

4    end point of safety or dyspareunia or pain?

5        A.   Yes.

6        Q.   And you identified that primary end points

7    are something that are specific to a randomized

8    control trial?

9        A.   Yes.

10       Q.   Let me ask you this:  Did you look at

11   meta-analyses or database studies whose primary --

12   one of the primary purporting goals was to report

13   rates of dyspareunia or pain?

14       A.   So in saying "primary end point of the

15   studies," I'm thinking of the components of the

16   meta-analysis.  So the randomized control studies

17   were looking at the studies -- especially, like,

18   just one randomized controlled study, usually, you

19   can't power it with enough patients.  So therefore

20   you have to have a meta-analysis where they look at

21   all these different components.  So a meta-analysis

22   primary end point is different than a randomized

23   controlled trial primary end point.  They have

24   enough volume to actually look at different
```

Janet Tomezsko, M.D.

```
 1    components.

 2        Q.   And is that, in your opinion, the best,

 3    most highest level of evidence of what the rate of

 4    that complication would be?

 5        A.   Yes --

 6        MR. JACKSON:  Objection.  Form.

 7        THE WITNESS:  Yes.  Absolutely.

 8    BY MR. SNELL:

 9        Q.   You reference, for example, at the bottom

10    of page 28, the Unger 2015 study.  Is that a study

11    of a database -- database-type study?

12        A.   Yes, it is.

13        Q.   Where the rate of women requiring revision

14    for pain -- vaginal pain or dyspareunia was

15    0.2 percent; do you see that?

16        A.   Yes.

17        Q.   And, actually, is that number consistent

18    or inconsistent with the Tommaselli number of

19    0.3 percent long term?

20        A.   Consistent.

21        Q.   And did you find that number, 0.2 percent,

22    to be reliable as to the longer term rate of pain

23    or dyspareunia that requires a reoperation?

24        A.   Can you repeat that?
```

Janet Tomezsko, M.D.

1     Q.    Yeah.

2           Did you find the 0.2 percent rate reported

3     by the Unger paper to be a reliable indicator of

4     the longer term chronic pain in that database

5     study?

6     A.    Yes, I do.

7     Q.    Page 29, you have the Laurikainen 2014

8     randomized control trial; do you see that?

9     A.    Yes.

10    Q.    Do you have a recollection as to whether

11    that was the five-year TVT specific study?

12    A.    Yes, I believe it was five years.

13    Q.    Did you consider the dyspareunia rate in

14    that long-term study in formulating your opinions?

15    A.    Yes.

16    Q.    Svenningsen, you identify a ten-year

17    study, did it have any rate of long-term

18    dyspareunia?

19    A.    No, it did not.

20    Q.    Serati, another ten-year prospective TVT

21    study, is that something you considered as well?

22    A.    Yes.

23    Q.    The Nguyen, spelled N-g-u-y-e-n, did they

24    report that any patients in that database had to

Janet Tomezsko, M.D.

1    have an excision due to pain?

2        A.    1 out of 2,339 for a .02 percent excision

3    for pain.

4        Q.    Is that consistent or inconsistent with

5    your opinion that the rate of dyspareunia and

6    chronic pain is below 1 percent for TVT?

7        A.    That's consistent.

8        Q.    And do you cite other data in your report,

9    like the Schimpf meta-analysis and the AUA 2012

10   meta-analysis?

11       A.    Yes.

12       Q.    And the Schimpf meta-analysis, the

13   AUA 2012 meta-analysis, what -- what level of

14   evidence are those, if any?

15       A.    They are a Level 1.

16       MR. SNELL:  Let's go off the record.  Just give

17   me a quick second.

18       THE VIDEOGRAPHER:  The time is 12:15 p.m., and

19   we are going off the video record.

20                    (Brief interruption.)

21       THE VIDEOGRAPHER:  The time is 12:20 p.m., and

22   we are back on the video record.

23   BY MR. SNELL:

24       Q.    Doctor, I just have one or two more

```
 1    questions.

 2           Do you recall being asked about your

 3    personal use of the TVT Retropubic device?

 4      A.   Yes, I do.

 5      Q.   And the need to do a revision or excision

 6    of TVT or other retropubic midurethral slings?

 7      A.   Yes, I do.

 8      Q.   Do you have a general estimate as to the

 9    number of TVT Retropubic-specific devices that you

10    have excised or removed in your career?

11           And I only want your estimate as to

12    TVT Retropubic.

13      MR. JACKSON:  Objection.  Form.

14      THE WITNESS:  So for TVT Retropubic, I believe

15    I have only revised or excised about five.

16    BY MR. SNELL:

17      Q.   And I believe you earlier identified for

18    the TVT Retropubic device, your best estimate is

19    you've performed 1,000 to 1,500 of that device over

20    your entire career?

21      A.   Yes.

22      Q.   The five TVTs that you recollect, as your

23    best estimate, that you had to revise or excise,

24    how do you give us that estimate of five?
```

Janet Tomezsko, M.D.

```
1        A.   I always kept track based on counseling

2   for my future sling patients, and they were just so

3   few and far between, it was easy to keep track of

4   them and tell a patient I have to excise or revise

5   one once every three or four years.

6        Q.   Last topic.

7             Plaintiff's counsel asked you some

8   questions about the rate of mesh exposure with the

9   TVT device and your disagreement with him that the

10  rate varies greatly; do you recall that subject?

11       A.   Yes.

12       Q.   Just so the record is clear, at page 27 of

13  your report, you have a paragraph about what you

14  believe the rate of exposure to be with TVT; is

15  that correct or not?

16       A.   Yes, I do.

17       Q.   And are those the particular data sources

18  you rely upon for your opinion with regard to the

19  rate of TVT being 1 to 2 percent, with 2 percent

20  being the most common?

21       A.   Yes, it is.

22       Q.   And are those -- how would you categorize

23  those literature or sources that you have utilized

24  in formulating your opinion with regard to the rate
```

Janet Tomezsko, M.D.

1    of TVT mesh exposure?

2        A.    These are primary Level 1 evidence, maybe

3    a little bit of Level 2 evidence, primarily

4    Level 1.

5        Q.    And do those studies, do they cover both

6    short- and long-term studies?

7        A.    Yes, these cover short and over ten-year

8    studies.

9        MR. SNELL:   That's all the questions I have.

10   Thank you.

11                     FURTHER EXAMINATION

12   BY MR. JACKSON:

13       Q.    Doctor, when Ethicon's counsel was just

14   asking you questions about literature, do you

15   recall him asking a question about the Nillson

16   study of 17-year data?

17       A.    Yes.

18       Q.    And, Doctor, to your knowledge, did that

19   study involve the mechanically cut TVT Retropubic

20   device or the laser cut TVT Retropubic device?

21       A.    To my knowledge, it's the mechanical cut.

22       Q.    And would that study be exclusively

23   mechanical cut?

24       A.    I believe based on the time period -- I'm

Janet Tomezsko, M.D.

1    not 100 percent certain -- but based on the time

2    period, I believe it's mechanical cut.

3        Q.   Doctor, have you reviewed any studies that

4    compare laser cut mesh and mechanically cut mesh in

5    the TVT-R device?

6        MR. SNELL:  Object.  Asked and answered.

7        THE WITNESS:  Specifically, just the TVT-R?

8    BY MR. JACKSON:

9        Q.   Correct.

10       A.   Not the TVT EXACT, you mean?

11       Q.   Correct.

12       A.   I have in the past.  I believe I have in

13   the past, and right off the top of my head, I can't

14   think of them right now.  I'm sorry.

15       Q.   Doctor, when Ethicon's counsel was asking

16   you questions about literature, do you remember

17   being asked about a study involving the TVT-O and

18   the TVT Abbrevo, which looked at rates of exposure?

19       A.   Yes.

20       Q.   And is it fair to say that study did not

21   involve the TVT Retropubic device?

22       A.   Yes.

23       Q.   Doctor, when Ethicon's counsel was asking

24   you questions about the five revision surgeries you

Janet Tomezsko, M.D.

1    have performed, do you remember that line of

2    questioning?

3        A.    Yes.

4        Q.    Okay.  Did you report those five revision

5    surgeries to Ethicon?

6        A.    No, I did not.

7        Q.    Okay.  Did you report those five revision

8    surgeries to the FDA?

9        A.    No, I did not.

10       Q.    Okay.  Are you aware, Doctor, of

11   underreporting of adverse events in regards to the

12   TVT Retropubic device?

13       MR. SNELL:  Objection.  Foundation.

14       THE WITNESS:  The concept of underreporting?

15   BY MR. JACKSON:

16       Q.    Yes.

17       A.    Yes.

18       Q.    And, Doctor, is it fair to say that if

19   you, yourself, did not report those revision

20   procedures to Ethicon or the FDA, that there may be

21   other surgeons who did not report those revision

22   procedures to Ethicon or the FDA?

23       MR. SNELL:  Object.  Requires speculation.

24       THE WITNESS:  Yes, I would assume there are.

Janet Tomezsko, M.D.

 1    BY MR. JACKSON:

 2         Q.   And, Doctor, all the literature you've

 3    cited can only include known complications,

 4    correct?

 5         MR. SNELL:  Objection on that one too.

 6    BY MR. JACKSON:

 7         Q.   Doctor, I'm sorry.  Let me ask a better

 8    question.  Strike that.

 9              Doctor, if the author of a study wants to

10    provide an erosion rate, how do they come up with

11    that erosion rate?

12         A.   So depending on the study, most of the

13    studies are -- erosion rate is detected on

14    examination, so physically seeing the patient and

15    identified on the examination.

16         Q.   And, Doctor, the -- sorry.  Strike that.

17              Doctor, would the five revision procedures

18    you performed yourself on TVT Retropubic devices be

19    included in any of the literature you cited?

20         A.   Those patients were not part of studies,

21    and they were also not erosions.

22         MR. JACKSON:  We had previously marked as

23    Exhibit 5 a binder that the doctor had brought with

24    her.  There is a second binder that she brought on

Janet Tomezsko, M.D.

```
1    the table.  If we could mark that as Exhibit 13.
2                        (Whereupon, TOMEZSKO Exhibit 13
3                        was marked for identification.)
4    BY MR. JACKSON:
5        Q.   And, Doctor, I believe you also brought
6    some thumb drives with you today?
7        A.   Yes.
8        Q.   Could we mark those as Exhibit 14, please.
9                        (Whereupon, TOMEZSKO Exhibit 14
10                       was marked for identification.)
11   BY MR. JACKSON:
12       Q.   Could you just let us know how many thumb
13   drives are in that bag?
14       A.   There is four.
15       MR. SNELL:  Should we mark them collectively A,
16   B, C, D?
17       MR. JACKSON:  Yeah, let's do that.
18   BY MR. JACKSON:
19       Q.   And, Doctor, is it your understanding that
20   the two binders you have in front of you -- I'm
21   sorry.  Strike that.
22            Doctor, the two binders you have in front
23   of you, can you just identify the materials that
24   are in what we just marked as Exhibit 13, the
```

Janet Tomezsko, M.D.

1   second binder?  Could you just generally let me

2   know that what is?

3       A.   It's -- some of it is duplicative of the

4   other binder.  It's primarily the -- just more the

5   research trials, literature.

6       Q.   Okay.  And, Doctor, I believe you also

7   brought a box of documents, which is on the floor;

8   is that correct?

9       A.   Yes.

10       Q.   And are those copies of Ethicon

11   depositions and documents?

12       A.   Yes.

13       Q.   Okay.  And are those same documents also

14   included on the flash drives, to the best of your

15   knowledge?

16       A.   To the best of my knowledge, yes.

17       Q.   And, Doctor, do you believe that the

18   reliance list you provided in this case is

19   comprehensive of all of the materials you reviewed

20   in this case?

21       A.   To the best of my knowledge.

22       Q.   Okay.  Thank you.

23       MR. JACKSON:  I have no more questions.

24       MR. SNELL:  I just have a question or two.

Janet Tomezsko, M.D.

```
 1              FURTHER EXAMINATION

 2    BY MR. SNELL:

 3         Q.   Plaintiff's counsel asked you a question

 4    about your five cases with TVT of the revisions or

 5    whatever type of surgery they were.  Did you look

 6    in the literature for studies and databases that

 7    would pick up whether there was a sling release or

 8    not, regardless of whether the surgeon reported it

 9    as an adverse event or whether the patient even

10    returned back to the same surgeon?

11         MR. JACKSON:  Objection.  Form.

12         THE WITNESS:  Yes.  So most of the large

13    studies are comprehensive in capturing patients or

14    there are other database studies that basically are

15    capturing patients through insurance data.  So they

16    are inclusive of whether the patient went back to

17    the same surgeon or not.  So I feel they are very

18    comprehensive in actually capturing what patients

19    have revisions or required erosion surgery.

20    BY MR. SNELL:

21         Q.   And did you look at those different

22    database studies to see whether their rates were

23    consistent or inconsistent with the other data?

24         A.   Yes, I do, and they are all consistent
```

Janet Tomczsko, M.D.

1   with 2 percent.

2       Q.   Page 27, you identify -- I'm just going to

3   give an example -- the Jonsson-Funk 2013 database

4   study, nine-year study; do you see that?

5       A.   Yes.

6       Q.   Did you consider that to be a long-term

7   study?

8       A.   Yes.

9       Q.   Did you -- was that a study in a large

10  enough group of patients that it was significant in

11  your opinion?

12      A.   Yes, absolutely.

13      Q.   Do you have a recollection of roughly how

14  many patients were in that study?  Was it less than

15  a 100?  More than 1,000?

16      A.   I believe that was the 185,000 patients.

17      Q.   Pretty big study?

18      A.   Very big study.

19      Q.   And so do you feel that the rates you've

20  reported and established in your opinions with

21  regard to the complications, as well as reoperation

22  rates, are reliable?

23      A.   Yes, I do.

24      MR. SNELL:  I have no further questions.

Janet Tomezsko, M.D.

1        MR. JACKSON:  I have no further questions.

2        THE VIDEOGRAPHER:  Okay.  The time is

3    12:32 p.m.  This is the end of Tape 3.  It's also

4    the end of the deposition of Dr. Janet Tomezsko,

5    and we are going off the video record.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Janet Tomezsko, M.D.

```
 1                C E R T I F I C A T E

 2

 3          I, DEANNA AMORE, a Shorthand Reporter and

 4    notary public, within and for the State of

 5    Illinois, County of DuPage, do hereby certify:

 6          That JANET TOMEZSKO, M.D., the witness

 7    whose examination is hereinbefore set forth, was

 8    first duly sworn by me and that this transcript of

 9    said testimony is a true record of the testimony

10    given by said witness.

11          I further certify that I am not related to

12    any of the parties to this action by blood or

13    marriage, and that I am in no way interested in the

14    outcome of this matter.

15

16          IN WITNESS WHEREOF, I have hereunto set my

17    hand this 28th day of June, 2016.

18

19

20          _____

21          Deanna M. Amore, CSR, RPR

22

23

24
```

Janet Tomezsko, M.D.

```
 1                 -   -   -   -   -   -

                      E R R A T A

 2                 -   -   -   -   -   -

 3

 4    PAGE   LINE   CHANGE

 5    _____  _____  _____

 6        REASON:  _____

 7    _____  _____  _____

 8        REASON:  _____

 9    _____  _____  _____

10        REASON:  _____

11    _____  _____  _____

12        REASON:  _____

13    _____  _____  _____

14        REASON:  _____

15    _____  _____  _____

16        REASON:  _____

17    _____  _____  _____

18        REASON:  _____

19    _____  _____  _____

20        REASON:  _____

21    _____  _____  _____

22        REASON:  _____

23    _____  _____  _____

24        REASON:  _____
```

Janet Tomezsko, M.D.

1

2          ACKNOWLEDGMENT OF DEPONENT

3

4            I,_____, do

5    hereby certify that I have read the

6    foregoing pages, and that the same is

7    a correct transcription of the answers

8    given by me to the questions therein

9    propounded, except for the corrections or

10   changes in form or substance, if any,

11   noted in the attached Errata Sheet.

12

13

14   _____

15    JANET TOMEZSKO, M.D.              DATE

16

17

18   Subscribed and sworn

     to before me this

19   _____ day of _____, 20_____.

20   My commission expires:_____

21

     _____

22   Notary Public

23

24