# EXHIBIT C

Vladimir Iakovlev, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON


IN RE: ETHICON, INC.,                    Master File No.

PELVIC REPAIR SYSTEM PRODUCTS            2:12-MD-02327

LIABILITY LITIGATION                     MDL 2327

---------------------------------

THIS DOCUMENT RELATES TO CASE

CONSOLIDATION:

Terreski Mullins, et al., v.

Ethicon, Inc., et al.

Case No. 2:12-CV-02952

---------------------------------



DEPOSITION OF

VLADIMIR IAKOVLEV, M.D.


* * * *

HIGHLY CONFIDENTIAL PORTION

* * * *


September 11, 2015

9:00 a.m. - 5:05 p.m.

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

## Page 2

1      Deposition of VLADIMIR IAKOVLEV, M.D.,
2 a witness herein, called for examination by counsel
3 for the Defense, in the above-mentioned matter, the
4 witness having been affirmed, taken at the law
5 offices of Siskinds LLP, 100 Lombard Street,
6 Toronto, Ontario, commencing at 9:03 a.m. on
7 Friday, September 11, 2015, and the proceedings
8 taken down by Stenotype and transcribed by
9 JUDITH M. CAPUTO, RPR, CSR, CRR.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1    A P P E A R A N C E S :
2
3 On Behalf of the Consolidated Plaintiffs:
4 JONATHAN ORENT, Esquire
5 Motley Rice, LLC
6 321 South Main Street, Suite 200
7 Providence, Rhode Island  02903
8 410.457.7700
9 jorent@motleyrice.com
10
11 On Behalf of the Defendants, Ethicon:
12 DAVID B. THOMAS, Esquire
13 Thomas, Combs & Spann, PLLC
14 300 Summers Street, Suite 1380
15 Charleston, West Virginia
16 304.414.1807
17 dthomas@tcspllc.com
18
19 M. ANDREW SNOWDEN, Esquire
20 Butler Snow, LLP
21 The Pinnacle at Symphony Place
22 150 3rd Avenue South, Suite 1600
23 Nashville, Tennessee  37201
24 615.651.6700
25 andy.snowden@butlersnow.com

## Page 4

1      I N D E X
2
3 WITNESS:   VLADIMIR IAKOVLEV
4         PAGE
5 DIRECT EXAMINATION BY MR. THOMAS.................5
6 CROSS-EXAMINATION BY MR. ORENT.................296
7 **Highly Confidential Portion noted on page 40**
8
9
10     INDEX OF EXHIBITS
11 NUMBER/DESCRIPTION        PAGE NO.
12 NO. 1: Expert Report of Dr. Iakovlev in the   5
13 Mullins consolidated cases.
14 NO. 2:  Supplemental Expert Report of     5
15 Dr. Iakovlev in the Mullins consolidated cases.
16 NO. 3:  Notice of Deposition of Dr. Iakovlev.   5
17 NO. 4:  Thumb drive.         5
18 NO. 5:  Study Entitled, "Safety Considerations   259
19 for synthetic sling surgery."
20 NO. 6:  Article entitled, "Degradation of     271
21 polypropylene in vivo: A microscopic analysis
22 of meshes explanted from patients."
23 Authored by  Vladimir Iakovlev, et al.
24
25 -- NOTE: Exhibit 4 was retained by Mr. Thomas.

## Page 5

1    EXHIBIT NO. 1:  Expert Report of
2 Dr. Vladimir Iakovlev in the Mullins
3 consolidated cases.
4    EXHIBIT NO. 2:  Supplemental Expert
5 Report of Dr. Vladimir Iakovlev in the
6 Mullins consolidated cases.
7    EXHIBIT NO. 3:  Notice of Deposition of
8 Dr. Vladimir Iakovlev.
9    EXHIBIT NO. 4:  Thumb drive.
10
11 Whereupon,
12    VLADIMIR IAKOVLEV, M.D.,
13 called for examination by counsel for Defendant
14 and having been affirmed by me, was examined and
15 testified as follows:
16    DIRECT EXAMINATION BY MR. THOMAS:
17    **Q.  Good morning, Doctor.**
18    **We've met before.  My name is David**
19 **Thomas.  I'm going to ask you a number of questions**
20 **about your expert witness opinion in the Mullins**
21 **case pending in the MDL in West Virginia; fair**
22 **enough?**
23    A.  Yes.
24    **Q.  I'm going to hand you what I've**
25 **marked as Exhibits 1 and 2 and ask you if Exhibit**

Vladimir Iakovlev, M.D.

Page 6

1  Nos. 1 and 2 are the expert reports that you
2  prepared in the Mullins case.
3          A.  Yes, that's correct.  This one is
4  on the left, the thicker one, is a combination of
5  several patients and this one on the right, Exhibit
6  No. 2, is a supplemental set of figures
7  specifically from the specimen of Ms. Mullins.
8          Q.  And Exhibits No. 1 and 2 represent
9  the complete opinions you're prepared to give in
10  this case; is that fair?
11          A.  That's correct.
12          Q.  I show you now what's been marked
13  as deposition Exhibit No. 3.  That's a Notice of
14  Deposition in this case.
15          A.  Yes, I do see it.
16          Q.  Have you seen that before today?
17          A.  Yes, I did.
18          Q.  As a part of Exhibit 3, there's a
19  request attached to it that you produce documents
20  in response to that.
21          A.  There are 27 requests.  Yes, I've
22  seen that.
23          Q.  Did you review those requests?
24          A.  Yes, I did.
25          Q.  Did you attempt to collect the

Page 7

1  information contained in those requests and produce
2  it to me today?
3          A.  Yes, I gathered all what I could
4  on the thumb drive.
5          Q.  And counsel has given me today
6  what I've marked as Exhibit No. 4, which is a thumb
7  drive.  Is this the thumb drive that you just
8  described where you attempted to load all of the
9  documents responsive to the Notice of Deposition
10  that you could find to put on the thumb drive?
11          A.  That is correct.
12          MR. ORENT:  At this point I want to
13  place an objection and notification.  We did file a
14  written objection so subject to those written
15  objections that material has been produced.
16          BY MR. THOMAS:
17          Q.  To save the time of going through
18  the notice or the thumb drive for right now, can
19  you recall any documents responsive to the Notice
20  of Deposition that you did not include on the thumb
21  drive?
22          A.  Well, the communication with
23  lawyers I didn't put.
24          Q.  Okay.
25          A.  The rest, I think I included

Page 8

1  everything I had pertinent to this case.
2          MR. ORENT:  Just to clarify though
3  again, the communication, I believe, was outside of
4  the three areas specified on Number 27.
5          MR. THOMAS:  I'm sorry, I did not hear
6  you.
7          MR. ORENT:  Under the federal rules
8  your request Number 27, to make the federal rule
9  recognizing the privilege existing between expert
10  and attorneys.
11          With the exception of the three areas
12  that you requested, I believe there were no
13  responsive communications specifically to those
14  three areas.
15          I believe other communications exist
16  that are not discoverable, and that's what the
17  doctor is referring to.
18          MR. THOMAS:  Okay.
19          MR. ORENT:  I don't believe he withheld
20  anything responsive to the request as written.
21          BY MR. THOMAS:
22          Q.  Doctor, you've given depositions
23  before in the Ethicon MDL, correct?
24          A.  That is correct.
25          Q.  You've testified in connection

Page 9

1  with the Bellew case?
2          A.  Yes, I did.
3          Q.  And you've testified in connection
4  with the Huskey and Edwards cases, correct?
5          A.  That is correct.
6          Q.  And in those depositions you
7  testified to a methodology that you used to collect
8  specimens, create histopathological slides where
9  appropriate and review those slides.
10          Did you follow the same process in the
11  Mullins case that you followed in the Bellew and
12  Huskey Edwards cases?
13          A.  The process is standard.  It's not
14  specifically for medical-legal cases or mesh cases.
15  It's a standard histology protocols in a diagnostic
16  pathology lab, so I don't change it.  I follow them
17  for each specimen regardless if it's medical-legal
18  or a regular hospital patient.
19          Q.  Doctor, my question really meant
20  to eliminate re asking all those questions that
21  were asked in Huskey, Edwards and Bellew.
22          And if we can confirm that you followed
23  the same procedures in the Mullins case that you
24  followed in the prior depositions where you were
25  asked about your procedures then I'm not going to

3  (Pages 6 to 9)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 10

1  go over that again.  Can we confirm that you
2  followed the same steps?
3       A.  Yes, I can confirm that.
4       Q.  Doctor, what is a neuropathologist?
5       A.  Neuropathologist?
6       Q.  Yes.
7       A.  Neuropathologist is a surgical
8  pathologist who is specializing in examining brain
9  tissue or spinal cord.  Sometimes it's the
10  subspecialty people do just neuropathology;
11  sometimes there is cross-coverage.
12       In our institution we have a
13  neuropathologist but it's only one.  Sometimes he
14  goes away on meetings, so we cover neuropathology.
15       Q.  Are you a neuropathologist?
16       A.  I'm cross-covering neuropathology
17  when he is away but I have not specialized in
18  neuropathology.
19       Q.  Are you board certified in
20  neuropathology?
21       A.  No, and you don't have to be board
22  certified in neuropathology because surgical
23  pathology includes neuropathology.
24       I mean, you can sub specialize further
25  down, but it depends on specific institution.

Page 11

1  Because some institutions have a large number of
2  specialized cases and some institutions they cover
3  broad range.
4       Q.  You said you had a
5  neuropathologist at St. Michael's?
6       A.  Yes, we do.
7       Q.  What is the person's name?
8       A.  Dr. David Munoz.
9       Q.  Is that the only neuropathologist
10  at St. Michael's?
11       A.  Right now, yes.
12       Q.  Did you consult with Doctor --
13  what's his last name?
14       A.  Munoz.
15       Q.  M-U-N-O-Z?
16       A.  Yes.
17       Q.  Did you consult with Dr. Munoz in
18  connection with any of the opinions that you've
19  given in this case?
20       A.  No.
21       Q.  Did you consult with any
22  neuropathologist in connection with the opinions
23  you've given in this case?
24       A.  We're not talking about brain
25  tumors; we're talking about sub tissue

Page 12

1  transvaginal.  I mean, why would I consult a
2  neuropathologist?
3       Q.  Just a simple yes or no question?
4       A.  No, I didn't.  There was no
5  purpose.
6       Q.  Did you consult any neuropathology
7  textbooks in connection with your opinions in this
8  case?
9       A.  Specifically just recently?
10       Q.  Any time during your work in this
11  case?
12       A.  Not in this case.  I opened and
13  read several neuropathology books when I was doing
14  research in meshes.  It's not just neuropathology
15  books, I mean, neuropathology is described in
16  general surgical pathology books.  Because I've
17  been in this field for three years.
18       Q.  I understand.  Just specific
19  questions, we'll get done quicker if you answer
20  "yes" or "no", if you can, and I'm not trying to
21  pin you down.
22       Is it your belief that neuropathology
23  has no role in understanding the presence of nerves
24  in the pelvic floor?
25       MR. ORENT:  Objection to form.

Page 13

1       THE WITNESS:  Yeah, actually the form
2  of the question is quite bizarre.
3       Because neuropathology is part of
4  surgical pathology.  So I'm a surgical pathologist
5  I'm examining -- yes, there is a field of
6  neuropathology when you specialize in that.
7       If you take a combination of peripheral
8  nerves as part of neuropathology, then I can say
9  yes, there is a part of neuropathology.  But as I
10  said, it's still within surgical pathology.
11       This separation is somewhat artificial.
12  You probably don't understand exactly how such
13  specialization works.  Probably that's where it's
14  coming from.
15       BY MR. THOMAS:
16       Q.  Perhaps.  Do you know a Kenneth
17  Aldape, A-L-D-A-P-E?
18       A.  No.
19       Q.  Lorraine Kalia, K-A-L-I-A?
20       A.  No.
21       Q.  Julia Keith?
22       A.  No.
23       Q.  Tim Rasmus Kiehl, K-I-E-H-L?
24       A.  The names might be similar.  I
25  mean, a couple of those names are the same as a

4 (Pages 10 to 13)

Vladimir Iakovlev, M.D.

Page 14

1  couple of neuropathologists in Toronto, I believe,
2  but I don't know their first names.
3      **Q.  My information is these**
4  **neuropathologists are affiliated with the**
5  **University of Toronto.**
6      A.  Yes, so Dr. Kiehl is practicing at
7  UHN and I think there was another name that also
8  practices at UHN.  It's a different institution.
9  The U of T affiliated hospital is called UHN.
10     **Q.  There's special neuropathology**
11 **journals, aren't there?**
12     A.  Yes, there are.
13     **Q.  Do you subscribe to any?**
14     A.  No.
15     **Q.  So fair to say you don't serve on**
16 **the editorial board of any neuropathology journals,**
17 **true?**
18     A.  No, that's true.
19     **Q.  Is there any reason for you to**
20 **consult with a neuropathologist to understand how**
21 **nerves function in the pelvic floor?**
22     A.  Not really.  The only reason I
23 would go to a neuropathologist when there is
24 something I don't know and I cannot find answers in
25 regular books, something which comes from

Page 15

1  experience.  We are talking about basic function.
2      **Q.  In Canada, is there a board**
3  **certification for your position as anatomical**
4  **pathologist?**
5      A.  Yes, there is.
6      **Q.  Is there a board certification for**
7  **neuropathologists?**
8      A.  I'm not sure, but we are
9  practicing neuropathology with this anatomical
10 pathology certification.
11     **Q.  As far as you recall, you haven't**
12 **consulted with any neuropathologists in connection**
13 **with your work in this mesh litigation; fair?**
14     MR. ORENT:  Objection.
15     THE WITNESS:  Not for this specific
16 case.  Earlier, when I started research, I ask a
17 few questions which stain sometimes it was better
18 to use when there is pathology of nerves.
19     BY MR. THOMAS:
20     **Q.  Who did you ask?**
21     A.  Dr. Munoz, but I think it was even
22 before the litigation started.
23     **Q.  And what did you ask Dr. Munoz?**
24     A.  Which stains he was using, if he
25 was using something different that I was using.

Page 16

1      **Q.  And what question did you ask him?**
2  **What stain do you use for what?**
3      A.  When we started our research in
4  meshes, the question was, if the nerve's ingrown.
5  So this is kind of basic question.
6      **Q.  Sorry, if the nerves what?**
7      A.  Grow into the mesh.  So this was a
8  basic question.  But then I was thinking, okay, so
9  I need to make sure that I'm not missing anything
10 and I started thinking of possible scenarios, how
11 nerves can be affected by the mesh.
12     Are they going atrophic, can they
13 disappear completely?  And if they go atrophic, you
14 can see atrophy in the nerve with any stain,
15 because the area becomes empty, sort of ooze, the
16 Schwann cells disappear, their axons, this is a
17 basic knowledge.
18     And I ask him if he's using something
19 else, and he was using exactly what I was using.
20     **Q.  So is it fair to understand that**
21 **you confirmed with Dr. Munoz your choice of the**
22 **S100 stain for nerves?**
23     A.  No, that was not about the S100.
24     **Q.  What stain specifically was it**
25 **about?**

Page 17

1      A.  If anything else he's using to
2  examine nerve atrophy or degeneration.
3      **Q.  And what were you using to analyze**
4  **that question?**
5      A.  Just locating H&E.
6      **Q.  And Dr. Munoz said that was what**
7  **he was using to analyze the same question?**
8      A.  He said that you can see it on
9  H&E, but there are a number of other stains to
10 examine for nerve atrophy.
11     **Q.  And what stains did he tell you**
12 **that you could use, other than H&E?**
13     A.  Well, you can see some of the
14 atrophy on S100 -- I don't remember exactly what he
15 said because it was three years ago, because now
16 what I remember it might be coming from different
17 sources, so from my own experience.
18     **Q.  Do you have a specific**
19 **recollection of talking to any neuropathologist who**
20 **gave you any information about how to conduct your**
21 **investigation into these meshes?**
22     A.  I don't understand your question.
23     **Q.  You've told me about conversation**
24 **you had with Dr. Munoz.  Do you have a specific**
25 **recollection, you remember having any conversations**

5 (Pages 14 to 17)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 18

1  with any neuropathologists about how to conduct
2  your work in these cases?
3      A.  Why would I?
4      Q.  I'm just asking you if you did or
5  not?
6      A.  No, I didn't.
7      Q.  Thank you.  Now, Exhibit No. 1 and
8  Exhibit No. 2 are your reports in this case; we
9  talked about that already.  They contain a number
10  of images?
11      A.  That's correct.
12      Q.  Have you supplied copies of all
13  those images on this thumb drive?
14      A.  No, because they're already
15  included in the report.  I can produce them for you
16  separately.
17      Q.  Do you have digital images of the
18  slides in this report?
19      A.  Of course.
20      Q.  But they're not on the thumb
21  drive?
22      A.  No, because they're already in the
23  report.
24      Q.  Do you have images of the tissue
25  samples that are contained in the report that are

Page 19

1  not in the report?
2      A.  But we took those images together
3  with your expert.
4      Q.  I'm just asking you if you have
5  them?
6      A.  I should have them, yeah.
7      Q.  Okay?
8      A.  Because we were taking them -- he
9  would take picture.  I would take picture of the
10  same field.
11      Q.  But there are images that you have
12  of the tissue samples that are contained in your
13  report that are not produced on this thumb drive,
14  correct?
15      MR. ORENT:  Objection.
16      THE WITNESS:  There should be.  I was
17  not using them.  I was just recording together with
18  your expert when I received the specimens.
19      BY MR. THOMAS:
20      Q.  Okay.  And if you go to -- let me
21  just ask this question.
22      What is the source of the images that
23  are contained in your report?  Where did you get
24  them?
25      A.  I took them.

Page 20

1      Q.  Okay.  And from what tissue
2  samples did you take them?
3      A.  From explanted TVT and
4  TVT-O meshes.
5      Q.  How many TVT?
6      A.  Oh, that I would have to check
7  with my records now.  I don't remember now.
8      Q.  And TVT-O?
9      A.  It's there, but I don't remember
10  now.
11      Q.  And the TVT and the TVT-O
12  specimens that are contained in your report are
13  that, are those specimens from the set of specimens
14  that you obtained from Dr. Klinge?
15      A.  No.  It's a combination of earlier
16  medical-legal cases, patients of St. Michael's
17  Hospital, and samples which came within this
18  consolidated trial.
19      The earlier cases came from different
20  law firms.
21      Q.  Do you know what I'm referring to?
22  You talked about the Bellew case, the set of slides
23  that you received from Dr. Klinge, and Dr.
24  Kreutzer, 22 TVT and TVT-O samples?
25      A.  My recollection is I was contacted

Page 21

1  by Anderson Law and I'm not sure when -- I don't
2  remember exactly where the package came from, but
3  all my communication was with the Anderson Law.
4      Q.  I understand that, Doctor, but in
5  the Bellew case you testified at length about a set
6  of 22 TVT and TVT-O samples that you had received
7  from Mr. Anderson that had previously been reviewed
8  by Dr. Kreutzer and by Doctor Klinge?
9      A.  Kreutzer for sure; I'm not sure
10  about Doctor Klinge.  There were no records, or
11  maybe there was records but I just don't remember
12  them.
13      I didn't contact specifically Doctor
14  Klinge, or he didn't contact me specifically about
15  these samples.
16      Q.  Are the images of the TVT and the
17  TVT-O slides that are in your report in this case
18  from the same set of slides that Dr. Kreutzer
19  reviewed?
20      A.  Some of them could be.  Again, I
21  don't remember now.  It would be difficult to trace
22  them back.
23      Q.  Do you have somewhere a key that
24  shows whose tissue this is in the report?
25      A.  In the report, the way the images

6 (Pages 18 to 21)

f99c642e-2654-4b08-aa8d-461cc8038817

Vladimir Iakovlev, M.D.

Page 22

1  were saved during my work, they would be usually
2  saved in folders for specific expert report.
3       Q.  Let's go to page 19 of your
4  report, please, Exhibit No. 1?
5       A.  So if we open these images, I
6  specify if the image is coming from consolidated
7  trial cases, which I received just recently, or if
8  the images are of additional cases, and additional
9  I meant previous TVT and TVT-O cases which I
10 received during the course of my work on expert of
11 possible Bellew case and others.
12      Q.  How many consolidated cases do you
13 have images for, individual plaintiffs?
14      A.  Like four, three.  Three, four.
15 Some specimens came as bare mesh, had difficulty
16 embedding -- well, we embedded them but there was
17 not much in there.
18      Q.  I understand.  I'm just trying to
19 understand what you're working from.
20      So you have three or four tissue
21 samples from plaintiffs in the consolidated cases,
22 correct?
23      A.  That is correct.
24      Q.  What kind of mesh is that?
25      A.  TVT or TVT-O.

Page 23

1       Q.  Okay.  And so in your report,
2  where you refer to images of consolidated cases, is
3  it fair to say that those images come from the
4  three to four tissue samples that you got from the
5  consolidated cases?
6       A.  That's correct.
7       Q.  If you go to page 21?
8       A.  Yes.
9       Q.  Page 21 identifies in Figure Set
10 1c, images of additional TVT cases; what does that
11 mean?
12      A.  That means this image comes from
13 previous TVT and TVT-O cases, or cases I received
14 previously.
15      Q.  Can you tell by looking at this
16 whether it's a medical-legal or whether it's
17 something that came through St. Michael's?
18      A.  It would have to be sort of
19 picture matching.  I would have to open the folders
20 which contain previous reports.
21      It all depends how the figure was
22 taken.  If it was taken by older camera, it didn't
23 record the case number.
24      Now, for some newer cases the images
25 were scanned and when the scanner works, there is

Page 24

1  embedded surgical number.
2       Because they're all spread within
3  almost three years, some of them can be traced;
4  some of them would be difficult to trace.
5       Q.  Is it fair to understand that
6  looking at the image, where you identify images
7  from additional TVT cases, you're unable to tell me
8  from what case that image comes from?
9       MR. ORENT:  Objection.
10      THE WITNESS:  In some cases I can, and
11 some cases I cannot.  I can tell that you all of
12 them came from TVT and TVT-O because I kept strict
13 records for that.
14      But I didn't keep strict records for
15 specific cases, at least at the beginning.
16      BY MR. THOMAS:
17      Q.  Okay.  In those places where you
18 can identify the patient, did you do so in your
19 report?
20      A.  No.
21      Q.  Why not?
22      A.  But they are not in this trial --
23 and they may be confidential.  And why would I?
24      Q.  But there are images in this
25 report that don't have identifying information --

Page 25

1  none of them have identifying information?
2       A.  They have one single identifying
3  information which is important:  TVT or TVT-O.
4  Everything else doesn't matter.
5       Q.  But I can't take this, go into
6  your file and figure out where this slide is, can
7  I?
8       A.  I'm telling you it's all TVT and
9  TVT-O.  What else do you need to know?
10      Q.  Am I able to take this thumb drive
11 and figure out which slide is which patient on
12 page 21?
13      MR. ORENT:  Objection.  I think what
14 the doctor is explaining is that these are all from
15 prior reports served on you.
16      THE WITNESS:  Most of them are.  You
17 can go to older reports and find them.
18      BY MR. THOMAS:
19      Q.  Why didn't you say "from the
20 Edwards case" to tell us where it came from?
21      A.  Why would I?  I don't understand
22 the question.  I mean, this is an opinion about TVT
23 and TVT-O.
24      I am not making an opinion about
25 Edwards or any other specific patient.  I am giving

7 (Pages 22 to 25)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 26

1    you opinion about TVT-O as a product.
2         Q.  Do you maintain your sets of these
3    slides by individual plaintiff?
4         A.  In some cases, yes.  If there is a
5    generated report because that is a specific
6    plaintiff, I save them as separate folder.
7         But remember those 23 or 22 cases when
8    they came as a bulk and I did not produce any
9    specific reports for specific patients, individual
10   patients.  They were all saved in one folder.
11        Q.  Okay?
12        A.  Which was just additional --
13   didn't keep record for that.
14        Q.  Are the files on this thumb drive,
15   Exhibit 4, marked by individual plaintiff?
16        A.  No.  As I said, I didn't include
17   figures because they were included in the report
18   already.
19        If you want me to include these
20   specific figures, I can do that.  But it will not
21   be possible to trace specific picture, specific
22   patient.
23        And that was not the purpose because
24   the purpose was to give an opinion about TVT-O or
25   TVT as a product, not to give opinion for specific

Page 27

1    plaintiffs.
2         Q.  Exhibit No. 2 is a supplemental --
3    micro photographs.  You identify those as from the
4    specimen of Ms. Elizabeth Mullins?
5         A.  That is correct.
6         Q.  Is Elizabeth Mullins -- strike
7    that.  Did you share this tissue with Ethicon?
8         A.  Yes, I mailed it a week ago.
9         Q.  Why did you identify this by
10   patient name and not identify the others in your
11   report by patient name?
12        A.  Because it was a single case
13   specifically supplemented for one specific patient.
14        Q.  So this is one of the three or
15   four TVT, TVT-O cases that you reviewed for
16   consolidated plaintiffs?
17        A.  Might be an additional to the
18   three or four.
19        Q.  Okay?
20        A.  So it could be fifth, or fourth.
21        Q.  Okay.  Do you expect to receive
22   any more tissue samples from the consolidated
23   plaintiffs?
24        A.  No.  As far as I would understand
25   this is all what we have at this point.

Page 28

1         Q.  For the original tissue samples
2    that you received from Dr. Kreutzer, the 22 or 23
3    TVT or TVT-O, did you know that those samples,
4    tissue samples, were also analyzed by Dr. Jordi,
5    using analytical chemistry?
6         A.  The name sounds familiar but I
7    don't know details.  I don't remember, sorry.  I
8    don't remember specific details, what was done in
9    that time.
10        Q.  Have you ever seen any analytical
11   chemistry testing on the 22 or 23 TVT samples that
12   you received from Dr. Kreutzer?
13        A.  I don't recall specific details.
14   I could have seen something, I could have not, it's
15   been quite a long time ago.
16        Q.  Did you ever request that
17   analytical chemistry testing be conducted on any of
18   the mesh samples that you've analyzed?
19        A.  No.  I have my own methodology in
20   this; I describe what I see.  Why would I ask
21   somebody else to do something else?
22        Q.  So is it fair to understand that
23   for Exhibits Number 1 and 2, which is your report
24   and supplemental report, that all of the images in
25   here are TVT or TVT-O manufactured by Ethicon?

Page 29

1         A.  Yes.  Some images were taken from
2    publications, so there was one or two panels from
3    different mesh manufacturer.
4         But the rest, when the pictures were
5    individual, they were all of TVT or TVT-O explanted
6    specimens.
7         Q.  Are you able to tell me sitting
8    here today -- strike that.
9         Let's go to Exhibit 3, please.  Number
10   15?
11        A.  Yes.
12        Q.  Number 15 asks for all materials
13   including but not limited to any protocol
14   specimens, slide raw data interim and final test
15   results, log laboratory books, notes, photographs,
16   photo micrographs and any other documents relating
17   to the pristine polypropylene control you tested by
18   exposure to formalin for up to four months
19   referenced on page 17 of your report in this case.
20        Is there any information on the thumb
21   drive from Exhibit 4 for that?
22        A.  The entire protocol is really
23   simple.  It was included in the paper, so it is on
24   the thumb drive; the paper is on the thumb drive.
25   I didn't have anything in addition to that.

Vladimir Iakovlev, M.D.

Page 30

1    Q.  Is there any lab notebook?
2    A.  No, I mean --
3    Q.  Are there any photographs?
4    A.  All photographs I had, I included
5    there.
6        Q.  So whatever you have related to
7    the formalin exposed polypropylene control is on
8    the thumb drive?
9        A.  In the report.  The pictures are
10   on the report.  The paper with description of the
11   experiment is on the thumb drive.
12       Q.  What kind of polypropylene was
13   tested with formalin?
14       A.  What do you mean, what kind?  I
15   tested meshes of different manufacturers including
16   Ethicon TVT.
17       Q.  So you did use an Ethicon Prolene
18   mesh in the formalin control test?
19       A.  It was TVT.
20       Q.  Okay.
21       A.  It was a piece of TVT, a few
22   pieces of TVT put in formalin.
23       Q.  When you say you put it in
24   formalin, did you do anything other than just put
25   it in a jar?

Page 31

1        A.  They were kept in formalin, in a
2    jar, and then they were put in the cassette for
3    tissue processing and then they went through the
4    whole process of xylene alcohol and everything else
5    and then I had slides made.
6        Q.  And no analytical chemistry done
7    of that control, correct?
8        A.  Why would I?  I'm doing histology.
9        Q.  I understand.  No analytical
10   chemistry; is that correct?
11       A.  That is correct.
12       Q.  Thank you.  Number 19.
13       A.  Yes.
14       Q.  "Request all materials related
15       to testing of intentionally oxidized
16       polypropylene that had not been
17       implanted or exposed to formalin."
18       Do you see that?
19       A.  Yes, I do.
20       Q.  Is there any information on
21   Exhibit No. 4 related to that kind of testing?
22       A.  No, because the test is still in
23   progress.  I mean, I kept part of mesh in different
24   solutions and I haven't taken them out yet.  I
25   haven't examined them yet.

Page 32

1        Q.  Okay.  Tell me what that
2    experiment does?
3        A.  I did the same thing as I did for
4    formalin exposure.  I took pieces of mesh and put
5    them in solutions of hydrogen peroxide, hydrogen
6    peroxide with catalysts, few strong acids,
7    solvents, and just they are stored in these
8    solutions.
9        Q.  How many pieces of mesh are you
10   testing?
11       A.  It's hard to say now.  It might be
12   over 20 small pieces.
13       Q.  And how are they stored right now?
14       A.  In a dark room in a cabinet.
15       Q.  In a vial?
16       A.  What do you mean, vial?
17       Q.  Are they in a container with a
18   cover on them?
19       A.  Yes, of course.  Some of them are
20   acids and they're in glass containers.
21       Q.  What temperature are they being
22   stored?
23       A.  Just room temperature.
24       Q.  Do you have a protocol that you
25   wrote up for this test?

Page 33

1        A.  No.  The only protocol I used was
2    there was a published paper, they introduced this
3    stimulated body environment -- simulated, not
4    stimulated.  Simulated body environment.  Hydrogen
5    peroxide was the catalyst.  Catalyst is a chromium
6    salt.
7        Q.  Cobalt chloride?
8        A.  Probably.
9        Q.  That's Dr. Guelcher's paper?
10       A.  I'm not sure if it's his paper,
11   it's another paper.  But anyway, I'm testing his
12   protocol.  I followed exactly the description in
13   the paper and kept it in the solution for almost a
14   year by now, but it's still too early to take it
15   out.
16       Q.  Why is it still too early to take
17   it out?
18       A.  Because based on my analysis of
19   the specimens explanted from the body I can barely
20   see the degradation bark after a year in the body.
21   So if I take them now it would be too early.
22       I may just waste samples, so I have to
23   wait for probably a few extra months or maybe
24   another year.  Because by year two or 1 1/2 years
25   in the body, the bark becomes visible in

9 (Pages 30 to 33)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 34

1    100 percent of the cases.
2         If I take them out by 12 months, I may
3    or may not see something and then it would -- I'll
4    just waste samples.
5         Q.  Did you prepare the solution in
6    which these samples are stored?
7         A.  Yes, I did.
8         Q.  And what is the recipe for the
9    solution that you used?
10        A.  It's written in the original paper
11   I used for the --
12        Q.  Can you tell me what the original
13   paper is?
14        A.  I'd have to check now.
15        Q.  And how many samples are stored?
16        A.  As I said, probably over 20.
17        Q.  And how many different kinds of
18   mesh are being tested?
19        A.  There is one from one
20   manufacturer, and then -- four types of mesh.
21        Q.  How many Ethicon meshes are being
22   tested?
23        A.  At least one.
24        Q.  What kind?
25        A.  It's written on the jars.  I may

Page 35

1    have to check later.
2         Q.  Doctor, do you have an inventory
3    of what's in each vial written down?
4         A.  It's written on the jar.
5         Q.  Is it written down on a piece of
6    paper anywhere?
7         A.  No.
8         MR. ORENT:  Objection.
9         BY MR. THOMAS:
10        Q.  Is it written in a computer
11   somewhere?
12        A.  No, just on jars.  Jars label when
13   the case was put and what type of mesh was put in.
14        Q.  When did you start this
15   experiment?
16        A.  Last September.
17        Q.  So it's been a full year?
18        A.  Yes.
19        Q.  And did you put the mesh in this
20   solution in these 20 or so samples all at the same
21   time?
22        A.  Within two weeks.
23        Q.  All right.  As I understand it,
24   there are at least four different mesh
25   manufacturers that are a part of this experiment?

Page 36

1         A.  At least four different type of
2    mesh.  I would have to check with the labels what
3    is written there, what manufacturers, what mesh was
4    put in there.  I don't remember.  It's been a year.
5         Q.  Are you working with anybody else
6    on that experiment?
7         A.  No.
8         Q.  This is solely your work?
9         A.  Yes.
10        Q.  Did you consult with anybody about
11   the kind of solution that you would use for your
12   experiment?
13        A.  No.  Whom I would consult?  Nobody
14   did it before.  The only information I extracted
15   was from that specific simulation body environment
16   simulation from the paper.
17        Q.  You know Dr. Guelcher has tried to
18   insulate oxidized polypropylene, don't you?
19        MR. ORENT:  Objection.
20        THE WITNESS:  I know that he did an
21   experiment, and he asked me what I see.  I said
22   it's too early, I'm not going to take them out yet.
23   I will keep them a little longer.
24        BY MR. THOMAS:
25        Q.  Did Dr. Guelcher tell you he had

Page 37

1    intentionally oxidized polypropylene by exposing it
2    to some chemical solution?
3         MR. ORENT:  Objection.
4         THE WITNESS:  Yes, he did.
5         BY MR. THOMAS:
6         Q.  Did you ask him to have that mesh
7    so that you could determine whether this
8    intentionally oxidized polypropylene absorbed
9    stain?
10        MR. ORENT:  Objection.
11        THE WITNESS:  No.
12        BY MR. THOMAS:
13        Q.  Why not?
14        MR. ORENT:  Objection.
15        THE WITNESS:  Because I'm doing my own
16   experiment and I believe I need to keep it for at
17   least a year and a half.
18        BY MR. THOMAS:
19        Q.  Did you discuss with Dr. Guelcher
20   the scope of his experiment?
21        MR. ORENT:  Objection.  At this point,
22   Counsel, I think you're getting into -- I think you
23   need to clarify whether your questions are in the
24   context of litigation or research.
25        To the extent it's in litigation it's

10 (Pages 34 to 37)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 38

1  covered by privilege and I would instruct the
2  witness not to answer under the rules.  But to the
3  extent that you're discussing research, I think
4  that's fair game to discuss.
5       BY MR. THOMAS:
6       **Q.  Okay.  From a research**
7  **perspective, did you have any discussions with Dr.**
8  **Guelcher about his experiment?**
9       A.  It's work in progress so it's
10  privileged to researchers, I guess, at this point.
11       **Q.  Are you going to assert a**
12  **privilege for your research?**
13       A.  For research information, yes.
14       **Q.  Okay.  And you asserted a**
15  **litigation privilege, which I don't think is**
16  **appropriate -- I'm not arguing with you.  You said**
17  **there's no research privilege.  Now he's trying to**
18  **assert a research privilege?**
19       MR. ORENT:  No, what I said was in
20  terms of legal -- in terms of legal privileges that
21  I can, that I have, that I have an attorney-client --
22  excuse me, a attorney work product under the Rule
23  26.
24       Rule 26 specifically allows for expert
25  witnesses to consult with one another under the

Page 39

1  2010 amendments to the federal rules.
2       So, what I was clarifying is that it is
3  my privilege to seek and to utilize for my client,
4  and that's what I was exercising with regard to
5  non-research thought processes for litigation.
6       To the extent Dr. Iakovlev has
7  proprietary interests in research that is ongoing
8  or may be ongoing, that's up to him as to whether
9  or not -- and I know that on both sides in this
10  mesh litigation have previously taken a position
11  that those sort of things are not discoverable.
12       To the extent the doctor is
13  comfortable, I'd be happy to designate this portion
14  of the transcript highly confidential and allow the
15  witness to answer.
16       THE WITNESS:  I also need to add that
17  that experiment is not in my opinions.  I was not
18  base my opinions on any part of that experiment.
19  And I'm not really sure why you asking me these
20  questions.
21       BY MR. THOMAS:
22       **Q.  Because I get to ask them.**
23       MR. ORENT:  If I can just have a minute
24  with the witness and explain what the highly
25  confidential designation means, that may clarify

Page 40

1  this.
2       MR. THOMAS:  Thank you.
3       -- RECESS AT 9:42 --
4       -- UPON RESUMING AT 9:43 --
5       MR. ORENT:  We can go back on the
6  record.
7       I'll just say for the record over the
8  break I just explained to Dr. Iakovlev what the
9  highly confidential designation is and that all the
10  lawyers in this litigation have all signed on to
11  it.
12       Confidentiality agreement whereby there
13  are limited distribution on each side as to who can
14  receive highly confidential information and that
15  after discussing it I believe the witness is
16  comfortable with the designation and will proceed
17  to answer.
18       BY MR. THOMAS:
19       **Q.  Thank you.  Have you have**
20  **discussed with Dr. Guelcher the results of his**
21  **test?**
22       A.  Yes, I asked him what he saw.
23       **Q.  And what did he tell you?**
24       A.  He said that there is flaking on
25  the surface early, it's not confluent but there are

Page 41

1  some flakes forming.
2       I said it might be too early, because
3  he did it I think on six weeks or so, maybe more,
4  maybe up to three months.
5       I said, well, I keep my specimens for
6  at least a year and a half because I believe that
7  that's much time you need to make it visible by my
8  techniques.  Maybe by SCM we can see a little bit
9  earlier, and we stopped at that.
10       **Q.  Do you know whether he conducted**
11  **any analytical chemistry testing on any of the mesh**
12  **he analyzed?**
13       A.  I think he did.
14       MR. ORENT:  Objection.
15       THE WITNESS:  I don't remember at this
16  point. It's not my specifically methodology, so I
17  didn't do these things.
18       BY MR. THOMAS:
19       **Q.  Did you have discussions with Dr.**
20  **Guelcher about trying to stain the polypropylene**
21  **that he had intentionally oxidized?**
22       A.  He asked me.  I said it's too
23  early.
24       **Q.  Okay?**
25       A.  So I said maybe by your methods

11 (Pages 38 to 41)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 42

1    you can detect it.  By my methods, probably I
2    cannot.  And I said I will keep my pieces for
3    longer and then we'll see what happens.
4         Q.  And how did you decide -- strike
5    that.  Did I understand you to say that you have
6    chosen 18 months as the time when you think it will
7    be appropriate to test for oxidation?
8         MR. ORENT:  Objection to form.
9         THE WITNESS:  Yes.
10        BY MR. THOMAS:
11        Q.  And at 18 months is it your
12   intention to remove all of those meshes from the
13   chemical solution and determine whether it's
14   intentionally oxidized?
15        A.  Part of it.  Probably not all of
16   them in one shot.  I will start taking some pieces
17   and examining them see what happens and if I --
18   depends on what I see, I may keep them longer.
19        Q.  And what kind of tests do you
20   propose to run on them after 18 months?
21        A.  Histology, what I've done -- what
22   I showed in the paper.
23        Q.  The same kind of tests that you've
24   run on the meshes that are contained in your
25   reports?

Page 43

1         A.  Similar.
2         Q.  Any differences?
3         A.  Don't plan on anything different
4    at this point.  I may, I mean, it's work in
5    progress research.  Maybe I'll find something else,
6    I don't know.
7         Q.  Are you consulting with anybody
8    else on this particular experiment?
9         A.  We discussed it only with Scott
10   Guelcher.
11        Q.  And is the mesh that's being
12   tested pristine new mesh?
13        A.  Yes.
14        Q.  Never been exposed to tissue?
15        A.  That is correct.
16        Q.  Never been exposed to formalin?
17        A.  That is correct.
18        Q.  Who is paying for this testing?
19        A.  Nobody.  I just took chemicals
20   from our histo lab.
21        Q.  Did counsel fund this experiment?
22        A.  No, there is no additional
23   funding.  What funding would I need for it?
24   Chemicals are in the lab.
25        Q.  Where did you get the mesh?

Page 44

1         A.  They came from some law firms
2    during earlier cases.
3         Q.  Okay.  And where did you get the
4    chemicals?
5         A.  I said, they are in the lab.
6         Q.  Okay.  So you used materials from
7    the St. Michael's histo lab to put them, and you
8    combined those chemicals in a recipe that you're
9    now exposing this polypropylene to?
10        A.  That is correct.  These are
11   regular chemicals that are used in histo lab.
12        Q.  And the reason why you're doing
13   this test is to determine whether, first, after
14   18 months this polypropylene will oxidize due to
15   exposure to this chemical solution, correct?
16        A.  Could you repeat the question?
17        MR. THOMAS:  Can you read it back?
18        -- REPORTER'S NOTE:  Question read back
19   as recorded above.
20        THE WITNESS:  That's correct.
21        BY MR. THOMAS:
22        Q.  And how will you determine whether
23   it's oxidized?
24        A.  I would see degradation layer on
25   the surface.

Page 45

1         Q.  And that would be by light
2    microscopy?
3         A.  Yes.
4         MR. ORENT:  Objection.
5         BY MR. THOMAS:
6         Q.  Any other analytical technique
7    that you propose to use?
8         A.  As I said, none at this point.
9         Q.  And as a part of your experiment
10   do you then intend to see whether -- if you are
11   able to oxidize polypropylene, according to your
12   visual observation by light microscopy, will you
13   then see whether the oxidized polypropylene holds
14   stain?
15        A.  Yes, that's the way to see it.
16   This just becomes porous and after absorbs stain.
17        Q.  And the way you will test that is
18   the same way you've processed the slides in Exhibit
19   No. 1 and 2 -- you'll put them through the sample
20   preparation histology analysis that you've done in
21   all your other cases?
22        A.  Can be tried without putting them
23   through histology; you can immerse exposed mesh
24   into the dye solution.
25        Q.  Just drop it in the jar?

12 (Pages 42 to 45)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 46

1    A.  Pretty much.  If it stains, then
2   you can see staining on the surface.  That means
3   there is a layer of porous polypropylene on the
4   surface.
5           It's like, this is not stain, this is
6   anodized aluminum.  So there's porous layer on
7   aluminum.  If you drop unprepared aluminum in the
8   jar with black ink it will not absorb anything
9   because it's sealed.
10          If you drop it with anodized layer it
11  will become black because it will absorb it.  It's
12  the same technique; it's pretty basic.
13          Q.  I understand.  Thank you.
14          Are you aware of a method where you can
15  take a piece of pristine mesh that's been exposed
16  as you've described, and prepare a histological
17  slide of that exposed material without embedding it
18  in some other medium?
19          A.  Let me ask you if I got your
20  question right.
21          Am I aware of a histological technique
22  which will allow me to cut through the mesh without
23  embedding it into anything?
24          Q.  Correct.
25          A.  No.  It has to be embedded into

Page 47

1   some form of medium to hold it for the knife to cut
2   through.
3           Q.  Have you devised or thought of a
4   method to do that?
5           A.  No.  Why would I?
6           Q.  If you're going to do a histology
7   slide of this mesh that's been exposed to chemicals
8   after a year and a half, you're going to have to
9   put it in some medium before the microtome can cut
10  it, correct?
11          A.  Paraffin.
12          Q.  So you're going to put the mesh by
13  itself in paraffin and cut it from there?
14          A.  Yes.
15          Q.  Okay.
16          A.  That's how it's done.
17          Q.  That's fine.  Doctor, on page 82
18  of your report?
19          A.  Yes.
20          Q.  Are you on page 82?  That's where
21  I want you to be.
22          A.  Oh, yes, okay.
23          Q.  I'm sorry, 83.  I apologize, I was
24  wrong.
25          Page 83 of your report has two images,

Page 48

1   A and B, identified as Figure Set 16 A, is
2   identified as "cracking on the surface of TVT mesh
3   fibers immediately after removal from the body".
4           Where did you get this?
5           A.  This was a St. Michael's patient.
6   So when it was excised I immediately placed it
7   under the microscope.
8           Q.  How did you know it was being
9   excised?
10          A.  What do you mean how do I know?
11  We receive specimens.
12          Q.  Just so I understand -- strike
13  that.
14          Typically after a surgical procedure
15  when mesh is excised the surgeon immediately places
16  it in formalin, correct?
17          A.  Not always.
18          Q.  Okay.
19          A.  We receive it fresh, so in this
20  case it was fresh.
21          Q.  And did you discuss with the
22  surgeon any of the circumstances of removal?
23          A.  This was a St. Michael's specimen,
24  so I did ask, but I'm not sure if I can go there
25  because of the confidentiality issues.  It was not

Page 49

1   a medical-legal case.
2           Q.  Who was the doctor that you
3   discussed it with?
4           A.  I don't know if I can disclose it.
5           Q.  I'm going to ask you to and if you
6   tell me no, you tell me no?
7           A.  Again, I'm not sure if I can
8   disclose that because it is confidential
9   information.
10          Q.  Are you telling me you're not
11  going to?  That's fine.  Tell me you're not going
12  to and I'll move on.
13          A.  No, I will not.  I will not
14  because I don't want to compromise confidentiality.
15          Q.  Okay.  Can you tell me the nature
16  of the conversation you had with this doctor?
17          A.  Oh, I asked her later on what was
18  -- because then I would ask how long it's been in
19  the body, some information was on the records and
20  just basic information.
21          Q.  Did you get medical records for
22  this mesh?
23          A.  It was in medical -- in the
24  medical records of St. Michael's Hospital.
25          Q.  Did you produce on the thumb

13 (Pages 46 to 49)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 50

1  drive, Exhibit No. 4, the medical records for the
2  patient that's on page 83?
3      MR. ORENT:  Objection.
4      THE WITNESS:  No, it's confidential
5  information, St. Michael's Hospital information.
6  And the picture is not coming from a case itself;
7  picture is coming from a publication.
8      BY MR. THOMAS:
9      Q.  Well, it's your publication; is
10 that fair?
11     A.  Yes.
12     MR. ORENT:  Objection.
13     BY MR. THOMAS:
14     Q.  Okay?
15     A.  But it's not coming from a set of
16 TVT or TVT-O cases which are received within the
17 litigation process.  It's coming from a publication
18 and for that publication I had REB approval and
19 there are strict rules what can be disclosed, what
20 cannot be disclosed.
21     Q.  How long from the removal of this
22 mesh until the time you looked under the
23 microscope?
24     A.  I would say an hour, maybe
25 40 minutes, maybe less.

Page 51

1      Q.  How did you manage to get it so
2  quickly?
3      A.  We have a lab in the OR.  OR is
4  practically -- I mean, our receiving area for
5  specimens is in OR, it's like there.
6      Q.  Did you tell the doctor if she
7  ever got a TVT specimen that you'd like to have it
8  before it was put in formalin?
9      A.  No, but I told, I told several
10 physicians and several -- everybody knows that I'm
11 working on meshes, so people know that I'm
12 interested in meshes.
13     Q.  My question was, did you tell a
14 doctor to give one to you before it was exposed to
15 formalin?
16     MR. ORENT:  Objection.  Can I just ask
17 for clarification.  Your prior question was --
18 included the word TVT.  Prior testimony on this was
19 that this was not a TVT, I believe.  Oh, this is a
20 TVT, I apologize.
21     THE WITNESS:  In the earlier, very
22 early when we started working on these meshes, the
23 question was how do I process them for scanning of
24 -- transmission of electron microscopy, and I
25 needed fresh samples.

Page 52

1      Not only specifically for this case, I
2  asked if you can sometimes help me with what you're
3  excising, or submit it in saline, so it's not
4  exposed to formalin because I needed samples to be
5  put in a glutaraldehyde.  This came in saline.
6      BY MR. THOMAS:
7      Q.  Was this put in glutaraldehyde
8  before you made this image?
9      A.  No, it was put in saline.  I
10 received it in saline, I examined it, took pictures
11 and put it in formalin.
12     Q.  Other than putting it in saline,
13 was any effort made to clean the mesh prior to the
14 time that you took these images?
15     A.  No, just washed them in saline,
16 that's it.
17     Q.  Was it washed in saline or just
18 soaked in saline?
19     A.  What's the difference?
20     Q.  Well, there was no effort to wash
21 it, it was merely stored in saline before you took
22 your images; is that fair?
23     A.  You immerse something in fluid;
24 it's being washed.
25     Q.  Okay.  Go to page 5 of your

Page 53

1  report, please.
2      A.  Yes.
3      Q.  Down at the bottom of the page,
4  the sentence, it reads:
5          "Immediately after placement in
6          the body, foreign objects become
7          coated with human proteins before
8          appearance of the inflammatory
9          cells."
10 Do you see that?
11     A.  Yes.
12     Q.  What does that mean?
13     A.  It means that anything you put in
14 the body will get coated by serum proteins.
15     Q.  How many different kinds of
16 proteins are there in the body?
17     A.  Very large number, thousands,
18 maybe millions.
19     Q.  Is there a special kind of protein
20 that surrounds the foreign body?
21     A.  It's non-specific.  The area will
22 be filled with blood immediately, so main proteins
23 are in the serum, so it will be albumin, some
24 immuglobins, then the blood clotting cascade sets
25 in.

14  (Pages 50 to 53)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 54

1        So there will be more of a fibrinogen
2    and fibrin, all of those proteins which are
3    involved in blood clotting.  It depends what
4    timeframe we're talking about, immediate coating,
5    or minutes or hours or days after.
6        Q.  Do you know what protein
7    adsorption is, A-D-S-O-R-P-T-I-O-N?
8        A.  You mean adherence of the protein
9    to the surface?
10        Q.  Are you familiar with that?
11        A.  I mean, that's the term as I
12    understand it.
13        Q.  Do you know chemically how that
14    works?
15        A.  For all proteins?
16        Q.  For protein adsorption to foreign
17    bodies; do you know how it works?
18        A.  Not the specific chemical details.
19        Q.  Do you know the extent to which
20    the proteins form a bond with the foreign body?
21        A.  Not the specific details.
22        Q.  Do you specifically with
23    polypropylene -- or strike that.  Specifically with
24    Prolene, do you have any information about the
25    extent to which human proteins form a bond with the

Page 55

1    Prolene polypropylene?
2        MR. ORENT:  Objection.
3        THE WITNESS:  No.
4    BY MR. THOMAS:
5        Q.  Do you have any information about
6    the extent to which saline is adequate to remove
7    any proteins that are adsorbed on to the Prolene
8    mesh?
9        A.  No, I think it's irrelevant
10    because that mesh which was examined didn't have
11    time to dry and couldn't dry because it was in
12    saline.
13        So if it cracks it means that it had
14    time to crack.  In this case it couldn't dry.
15        Q.  There's no analytical chemistry
16    done on this, correct?
17        A.  No.
18        Q.  There are none; am I correct?
19        A.  You are correct.
20        Q.  Thank you.  So, you're basing your
21    opinion on the cracking, which you claim to be the
22    Prolene, based on your visual observation?
23        A.  That is correct.
24        Q.  Let's go back to page 82, please
25    which is your statistical analysis of TVT meshes

Page 56

1    analyzed as groups?
2        A.  Which page number?
3        Q.  I'm on 82.
4        A.  Okay.
5        Q.  82 is called, "Figure Set 15, TVT
6    Meshes Analyzed as a Group".
7        And you're doing a statistical analysis
8    here of the TVT meshes; is that correct?
9        A.  That's correct.
10        Q.  Are the TVT meshes described on
11    page 82 the meshes that you got from Dr. Kreutzer?
12        A.  Some of them.
13        Q.  How many of them?
14        A.  I don't remember now.  Probably
15    about 20 or 19.
16        Q.  And how many are in this group?
17        A.  23.
18        Q.  So probably 19 or 20 out of 23
19    were meshes you got from Dr. Kreutzer?
20        A.  Probably, but I'm not sure.  I
21    don't remember now.
22        Q.  Are you a trained statistician?
23        A.  No, but I had my statistics when I
24    did my research training.
25        Q.  Okay.  Who chose the statistical

Page 57

1    method that's employed here?
2        A.  I did.
3        Q.  And why?
4        A.  What do you mean why?
5        Q.  Why was this method the method you
6    chose?
7        A.  Because it's the method to check
8    what I was intending to check.
9        Q.  And tell me why that is an
10    appropriate method for what you have done?
11        A.  What do you mean?
12        Q.  Why is this Pearson coefficient?
13        A.  Pearson coefficient?  It's a
14    standard correlation coefficient method.
15        Q.  Are you aware of other statistical
16    methods to test your results?
17        A.  What do you mean?  For
18    correlation?
19        Q.  Yes.
20        A.  Could be Spearman.
21        Q.  Spearman?
22        A.  Yes.
23        Q.  Any others, R-squared?
24        A.  For correlation?
25        Q.  Yes.

15 (Pages 54 to 57)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 58

1    A.  There might be others, but the
2  main are Pearson and Spearman; there is not much
3  difference between them.
4    **Q.  Is the raw data you used to do**
5  **your statistical correlation on Exhibit 4?**
6    A.  Yes, it is.
7    **Q.  And how is it marked, so if I**
8  **wanted to find it, I could see it?**
9    A.  It's in a separate file it's
10  called 23 TVT-O and something else for the chart.
11    **Q.  So if I wanted to have a**
12  **statistician run a different model, all of the data**
13  **he would need to do it is on Exhibit 4?**
14    A.  Yes.  It's there.
15    **Q.  Okay.  Doctor, since you were last**
16  **deposed, you've had a couple of studies published**
17  **in journals?**
18    A.  Probably more than a couple, yes,
19  I did.
20    **Q.  And your deposition notice**
21  **requested communications with the journals about**
22  **publications that you produced.  Are those on**
23  **Exhibit 4?**
24    MR. ORENT:  Objection.
25    THE WITNESS:  I believe it's

Page 59

1  confidential to me as a researcher, privileged.
2  They've been published, they've been accepted, they
3  are publicly available.
4    BY MR. THOMAS:
5    **Q.  Is the answer to my question no,**
6  **you didn't produce any of those communications?**
7    A.  No, I didn't.
8    **Q.  Do you have such communications?**
9    A.  Acceptance letters, that's about
10  it.
11    **Q.  Do you have any comments or**
12  **criticisms from any peer reviewers?**
13    MR. ORENT:  Objection.
14    THE WITNESS:  There were some.
15    BY MR. THOMAS:
16    **Q.  Do you still have those?**
17    A.  Yes, I do.
18    **Q.  Were any of these articles**
19  **rejected by any journals?**
20    A.  Sometimes I submit to one journal
21  they say it's out of scope it's probably best
22  suited for another journal so it bounces back.
23    I don't remember specific rejection,
24  saying that the data isn't reliable.  The only way
25  -- the only time when the paper was not accepted it

Page 60

1  was quick answer, right away, that's not in our
2  scope.
3    **Q.  So how many journals did not**
4  **accept your publication?**
5    MR. ORENT:  Objection.
6    THE WITNESS:  I don't remember now.
7    BY MR. THOMAS:
8    **Q.  Okay.  Do you have that**
9  **information?**
10    A.  Probably somewhere in the replies
11  I can find it.
12    **Q.  Okay.  Did you ever disclose to**
13  **the journals to which you submitted these**
14  **publications that some of the work contained in the**
15  **journal publication had been funded by plaintiff's**
16  **counsel?**
17    MR. ORENT:  Objection.
18    THE WITNESS:  Nothing was funded by
19  plaintiff's counsel.  They were litigation cases
20  but I didn't get any additional funding to conduct
21  the study.
22    BY MR. THOMAS:
23    **Q.  Certainly the slides from Dr.**
24  **Kreutzer were provided to you by plaintiff's**
25  **counsel?**

Page 61

1    MR. ORENT:  Objection, argumentative.
2    THE WITNESS:  I didn't use them.
3    BY MR. THOMAS:
4    **Q.  In your study?  Isn't that what --**
5    A.  I meant I didn't use the stains he
6  used.  I re-stained on stain slides.  Maybe even
7  cut the blocks.
8    **Q.  So is it your testimony that all**
9  **of the information that you submitted to the**
10  **journals was unrelated to your medical-legal work?**
11    A.  No.  It's not unrelated because
12  some samples came for medical-legal purposes.
13    **Q.  And for which you were paid to**
14  **analyze by plaintiff's counsel, correct?**
15    A.  To provide reports.
16    **Q.  And what percentage of the cases**
17  **that you report in the study were cases for which**
18  **you were compensated by plaintiff's counsel?**
19    MR. ORENT:  Objection.
20    THE WITNESS:  The study was not
21  compensated by anyone.  I did it on my own time,
22  during my own time, and I don't know why you're
23  saying that.
24    The percentage of cases which came
25  through medical-legal litigation process is

16  (Pages 58 to 61)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 62

1  indicated in the paper.
2      BY MR. THOMAS:
3      Q.  Okay.  We'll get to that in a
4  minute.
5      In the last year you've traveled and
6  made presentations around the world on the research
7  that you've done?
8      A.  Yes, I did.
9      Q.  Who has funded that work?
10     A.  Pretty much I did.
11     Q.  Did anybody subsidize your trips?
12     A.  No, I mean, we have a specific
13 portion of our salary from St. Michael's Hospital
14 which is dedicated for presentations.  But it's
15 within my salary, it's more or less a way of
16 getting it through a different tax bracket because
17 it's money spent for -- it's within my contract.
18     Q.  Did you receive any funds from
19 plaintiff's counsel for your presentations in the
20 last year?
21     A.  Never.
22     Q.  The articles that you had worked
23 on --
24     A.  The full answer would be I paid
25 for all the trips and I never received any money

Page 63

1  for making presentations or publishing the papers.
2      Q.  Okay.  Let's go back to page 83.
3  83 again is the mesh fiber that you looked at under
4  light microscopy 40 minutes to an hour after it was
5  removed and before it was stored in formalin,
6  correct?
7      A.  That is correct.
8      Q.  Where is that fiber today?
9      A.  It's embedded in formalin.  The
10 specimen went into formalin -- sorry.  The specimen
11 went to formalin and now it's embedded in paraffin.
12     Q.  Why is it in paraffin?
13     A.  To take histological section.
14     Q.  Have you taken histological
15 sections of it yet?  Have you taken histological
16 sections of this mesh fiber yet?
17     A.  Yes, I did.
18     Q.  Are those reported anywhere?
19     A.  What do you mean?  This was St.
20 Michael's Hospital patient.  I described it, and I
21 reported whatever I saw in the microscope.
22     Q.  Okay.
23     A.  It's not within the litigation
24 process.  It's a patient outside of litigation and
25 the only way this picture made it into this report

Page 64

1  because it was in a publication.
2      Q.  Did you obtain permission from the
3  patient to do that?
4      A.  For using the -- we have a
5  standard protocol for research.  We use material
6  for research purpose and I had REB approval.
7      Q.  Did you obtain permission from the
8  patient to use this image?
9      A.  As I said, each person who enters
10 the hospital, academic hospital, St. Michael's
11 Hospital, signs agreements or release form and it's
12 covered by blanket research regulations.
13     Q.  Does the patient know that her
14 mesh fiber was featured in a publication?
15     A.  No, I didn't tell her specifically
16 to the patient.
17     Q.  Okay.  So the entirety of the
18 excised mesh was then placed in paraffin?
19     A.  I believe so.
20     Q.  Is there any remaining of the mesh
21 explant that was not put in paraffin?
22     A.  I don't think so.  It depends.  If
23 it's a large piece, which I don't suspect it is,
24 there are some remnants which are stored in
25 formalin.  In this case, probably everything went

Page 65

1  to paraffin.
2      Q.  So there still exists some mesh
3  material in paraffin that could be available for
4  analysis; fair?
5      MR. ORENT:  Objection.
6      THE WITNESS:  For histology?
7      BY MR. THOMAS:
8      Q.  Yes.
9      A.  Yes.
10     Q.  And have you prepared histological
11 slides of the mesh fibers that are contained on
12 page 83 of your report?
13     A.  Yes.
14     MR. ORENT:  Objection.
15     BY MR. THOMAS:
16     Q.  As I understand it, they are not
17 part of your report in this case, true?
18     A.  No.  As I said, this patient has
19 nothing to do with this report.  The only mechanism
20 that this paper appeared in this report because it
21 was in peer-reviewed publication, that's it.  Why
22 are we talking about this patient?  I don't
23 understand.
24     Q.  And if I wanted you to produce the
25 paraffin with the remaining mesh and the slides

17 (Pages 62 to 65)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 66

1  that you have for this mesh, which is depicted on
2  83, would you do that for me?
3         MR. ORENT: Objection. I think you
4  need to deal with the hospital and privacy laws of
5  Canada. I don't think Dr. Iakovlev owns that
6  property, nor --
7         MR. THOMAS: If he's not going to do
8  it, that's all I want to know.
9         THE WITNESS: No, I will not do that.
10 As I said, the paper is published. It's public,
11 that is why it made it into this report.
12 Everything which belong to St. Michael's and
13 individual patients outside of litigation has
14 nothing to do with this report.
15        BY MR. THOMAS:
16        Q.  Did you wait until it was
17 published before you used it in the report?
18        A.  Yes, I did. I mean, it was
19 published by the time I produced the report.
20        Q.  Okay. Did you use it in any other
21 report prior to the time that it was published in
22 the journal?
23        A.  I don't think so.
24        Q.  That would have been
25 inappropriate?

Page 67

1         A.  Before it was published, or
2  accepted -- it depends. It's my research project
3  and I'm covered by REB.
4         So if it's within my research and
5  knowledge it would be appropriate because I conduct
6  research, that's information I extract during my
7  research.
8         Q.  So if you used it in a report
9  against Ethicon prior to the time that it was
10 published in the journal, that's okay, because it's
11 a product of your independent research under the
12 REB; is that correct?
13        A.  Yes.
14        (Reporter sought clarification.)
15        A.  Research Ethics Board.
16        Q.  Is the Research Ethics Board the
17 Canadian equivalent of the American Institutional
18 Review Board; do you know?
19        A.  No, no.
20        Q.  What's the difference?
21        A.  Ethics board is individual for
22 specific institutions. Each institution has their
23 specific research ethics board.
24        Q.  What does the REB do?
25        A.  They review your application.

Page 68

1  They see if there can be any harm to the patients,
2  then they approve your methodology.
3         Q.  And do you have a written document
4  from the REB that approves your mesh research work?
5         A.  Yes.
6         Q.  Is there more than one that you
7  have from there?
8         A.  There was renewal.
9         Q.  Did you submit an application to
10 them for this REB approval?
11        A.  Yes, of course.
12        Q.  And you have that application
13 still?
14        A.  Yes, I should.
15        Q.  What other documents did you have
16 in your possession related to your request for, or
17 their approval of your research in meshes?
18        A.  Nothing. Just application and
19 their approval letter.
20        Q.  Did you have to appear before the
21 REB to represent on your research?
22        A.  No, it's a simple, it is a very
23 simple project. I don't do anything to the
24 patient. I don't do anything specific.
25        I do exactly what I do every day, so it

Page 69

1  was straightforward. It couldn't be any hard, just
2  examining histologically.
3         Q.  Let's take a break.
4         -- RECESS AT 10:19 --
5         -- UPON RESUMING AT 10:26 --
6         BY MR. THOMAS:
7         Q.  Doctor, going back to the images
8  on page 83 of your report, did you write a
9  pathology report of your findings for your review
10 of the histology?
11        A.  Probably I did. Maybe I haven't
12 completed it yet. With the meshes, I'm slow, so I
13 could have completed the report, could have not. I
14 don't remember now.
15        Q.  What's your practice for doing a
16 pathology report for a patient in the hospital who
17 is not involved in medical-legal? Do you turn that
18 around pretty quickly?
19        A.  What do you mean is not involved
20 in medical-legal?
21        Q.  I thought you told me this was not
22 a medical-legal case, this mesh that's on page 83
23 of your report?
24        A.  That's correct.
25        Q.  So, have you done a pathology

18 (Pages 66 to 69)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 70

1  report for this patient based on your review of the
2  histology of her mesh?
3        A.  Doesn't matter medical-legal or
4  not medical-legal, when I collect mesh specimens
5  because my work is done so slow, I think and it
6  takes me time.  It has nothing to do with
7  medical-legal or not.  The difference is mesh
8  versus no mesh.
9        Q.  Have you prepared any -- have you
10  dictated anything related to the histology from the
11  mesh ex-plant that's depicted on page 83 of your
12  report?
13        MR. ORENT:  Objection.
14        THE WITNESS:  I don't remember.
15  BY MR. THOMAS:
16        Q.  Have you written anything about
17  your review of the histology from the explanted
18  mesh that's based on page 83 of your report?
19        MR. ORENT:  Objection.
20        THE WITNESS:  As I said, I don't
21  remember.  I've written something, because there
22  was a gross description at least there at the
23  beginning of the report.  Maybe it's signed out, I
24  don't remember now.  I use exactly the same format
25  for all mesh specimens litigation, non litigation.

Page 71

1        BY MR. THOMAS:
2        Q.  I understand that.
3        A.  And because there are so many
4  items I'm checking it takes me time and I don't
5  want to do it in a rush.
6        With cancer cases it is a different
7  story.  I rush, I try to make sure diagnostic
8  process is not involved.  In this case the mesh is
9  out already so there is no pressure.
10        Q.  So to your knowledge, you don't
11  know whether the doctor or the patient had the
12  benefit of your pathological review of the
13  histology, correct?
14        A.  I think I described it for the
15  physician.
16        Q.  How did you describe it to her?
17  In writing or voicemail or person to person?
18        A.  I don't remember now.  I'm not
19  sure where we're going with this, this is
20  confidential, and I'm not comfortable getting into
21  confidential information of a St. Michael's
22  Hospital patient.
23        The paper has been published and the
24  picture made it in the report after the publication
25  was peer reviewed and accepted.

Page 72

1        Now we're getting into completely
2  different area and I said I'm not getting
3  comfortable in getting into confidential
4  information of a St. Michael's patient.
5        Q.  I'm trying to figure out whether
6  anything in writing exists to your knowledge that
7  describes the findings you made based upon
8  histological review of this explanted mesh.
9        MR. ORENT:  I think he's answered those
10  questions.  I think he's gone far beyond his
11  comfort level.  Let's move on.
12        MR. THOMAS:  Are you instructing him
13  not to answer?
14        MR. ORENT:  I'm not.  However, if he
15  believes that he's confined to Canada's
16  confidentiality laws it's up to him in terms of his
17  knowledge, and what he can share as a doctor over a
18  patient who is not at issue in this lawsuit and not
19  put their medicals at issue.
20        THE WITNESS:  As I said, I'm not
21  comfortable getting into further details.  I think
22  it's inappropriate.  This picture appeared in the
23  report because it was published.
24        BY MR. THOMAS:
25        Q.  Doctor, on page 8 through 11 of

Page 73

1  your report, you have a section titled
2  "Polypropylene Degradation and Review of Ethicon's
3  Internal Documents"?
4        A.  That is correct.
5        Q.  How did you determine what
6  documents to review from Ethicon?
7        A.  I asked to send me anything which
8  was available pertinent to polypropylene
9  degradation, specifically if Ethicon scientists
10  performed testing using similar technology and
11  methodology, histology mainly.
12        Q.  Did you rely on counsel to provide
13  to you the documents that you reviewed?
14        A.  Yes.
15        Q.  Did you produce for us on
16  Exhibit 4 all of the documents that you reviewed?
17        A.  Yes, I did.
18        Q.  Were there other documents that
19  plaintiff's counsel supplied to you that you did
20  not include on Exhibit 4?
21        A.  Not to the best of my knowledge.
22        Q.  All right.  You also refer to
23  deposition testimony of Thomas Barbolt?
24        A.  Yes.
25        Q.  Is Dr. Barbolt's deposition on

19 (Pages 70 to 73)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 74

1 Exhibit 4?
2         A.  Yes, it is.
3         Q.  Do you remember how many days his
4 deposition was?
5         A.  I think there were two days.
6         Q.  Did you read the whole thing?
7         A.  I read most of the deposition.
8 Skimmed, I mean it's really long document.
9         Q.  Do you recall what his job was at
10 Ethicon?
11         A.  I don't recall now.
12         Q.  Do you know what his training was?
13         A.  No.
14         Q.  Do you know what kind of testing
15 Dr. Barbolt conducted while he was at Ethicon?
16         A.  I don't remember now.
17         Q.  Do you know whether he conducted
18 any animal testing of mesh?
19         A.  I saw documents of animal testing,
20 many documents.  If he was part of all of them or
21 some of them, I don't remember.
22         Q.  Do you know whether he conducted
23 any tissue reaction studies?
24         A.  I don't remember that, no.
25         Q.  Do you know whether Dr. Barbolt

Page 75

1 compiled and reviewed testing on Prolene
2 polypropylene from the 1960s to the present?
3         A.  As I said, there were many
4 documents and it's hard for me to remember now.
5         Q.  Do you know -- strike that.  Is it
6 fair to understand that to the extent Dr. Barbolt
7 presented any testing in his depositions you have
8 not reviewed that testing?
9         MR. ORENT:  Objection.
10         THE WITNESS:  As I said, I was asking
11 counsel to provide specific information, specific
12 topics.  So they provided this information and I
13 received a number of documents.
14         I specifically didn't even check
15 whoever signed this, who were the names.
16         BY MR. THOMAS:
17         Q.  Did you review any of the testing
18 Dr. Barbolt reviewed in his deposition?
19         A.  As I said --
20         MR. ORENT:  Objection.
21         THE WITNESS:  I don't remember the
22 names.  The only reason I remember his name because
23 it was the only deposition I had specifically for
24 that specific subject.
25

Page 76

1         BY MR. THOMAS:
2         Q.  What testing do you recall
3 reviewing as a part of your review of the Ethicon
4 documents in the case?
5         A.  As I said, I was focused mainly on
6 histological examination but I also skimmed through
7 the testing which was done using scanning electron
8 microscopy and just regular light microscopy.
9         Q.  Did you have see any histological
10 examination of what was described as cracked
11 polypropylene sutures?
12         A.  Yes.
13         Q.  And what did you find in your
14 review of the histological examination?
15         A.  I was really surprised.  They
16 found exactly what I found 30 years before I did.
17 I did it independently; I didn't have those
18 documents before.  So I thought I was Columbus, but
19 I guess I wasn't.
20         Q.  And you say they found exactly
21 what you found?
22         A.  Yes, exactly the same.  Even
23 arrows were so much like mine.
24         Q.  What was it that they found which
25 was exactly what you found?

Page 77

1         A.  There is a degradation bark and it
2 retains histological dyes, and it also retains the
3 granules of blue fibers.  And they also used
4 polarized light.
5         I think you asked me earlier in the
6 deposition who was using polarized light before.
7 Your scientists were.
8         Q.  Is it your opinion that Ethicon
9 conclusively found exactly what you found?
10         A.  Yes.
11         Q.  And that's based on the documents
12 that have been provided to you?
13         A.  Yes.
14         Q.  Did you see any histological
15 examination of the sutures that analyze to the
16 extent to which it created any risk of harm to
17 patients?
18         A.  I don't think I understand your
19 question.
20         Q.  What don't you understand about
21 it?
22         MR. ORENT:  Objection.
23         BY MR. THOMAS:
24         Q.  Let me start over again.  During
25 the course of your review of Ethicon documents, did

20 (Pages 74 to 77)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 78

1  you review any documents where Ethicon scientists
2  reviewed histological slides of tissue samples
3  containing mesh that was described as having
4  cracks?
5         A.  Yes, I did.
6         Q.  And do you recall what the tissue
7  reaction was that they described in those samples?
8         A.  Yes, I do.
9         Q.  And what is that?
10        A.  It is the same thing which I saw,
11 fibrosis foreign body reaction formation.
12        Q.  Do you know how the description
13 they found in their documents compares to what the
14 tissue reaction as described for Prolene sutures at
15 the time that it was approved at the FDA in 1969?
16        MR. ORENT:  Objection.
17        THE WITNESS:  The documents I reviewed
18 they were dated in '80s.
19        BY MR. THOMAS:
20        Q.  I understand that.
21        A.  They had exactly the same
22 description as earlier papers or papers after that.
23 So I don't think there is any difference in any of
24 the descriptions.
25        Q.  Okay.

Page 79

1         A.  Either at time of filing of the
2  FDA application or after, it's all the same.
3         Q.  And the findings that they found
4  in the '80s and the findings that they found
5  earlier, and the findings that they reported later
6  are just the same as yours are?
7         A.  Pretty much.
8         Q.  Okay.  You say on page 9 of your
9  report at the end of the first paragraph:
10            "An important conclusion should
11            be made that if chemical and
12            physical properties have material
13            change while it is in the body, it
14            should not be used for permanent
15            applications and for anatomical
16            sites from which the devices cannot
17            be safely removed."
18        Did I read that correctly?
19        A.  Yes, you did.
20        Q.  Does St. Michael's use Prolene
21 sutures?
22        A.  Yes, I understand they do.
23        Q.  Does St. Michael's use Prolene
24 hernia mesh?
25        MR. ORENT:  Objection.

Page 80

1         THE WITNESS:  I see it removed.
2  Probably it's used for hernia mesh as well.
3  Prolene or Marlex, I'm not sure.  There are newer
4  meshes coming on the market.
5         BY MR. THOMAS:
6         Q.  Does St. Michael's use Prolene
7  polypropylene mesh for the treatment of stress
8  urinary incontinence in TVT and TVT-O?
9         MR. ORENT:  Objection.
10        THE WITNESS:  I don't think so.
11        BY MR. THOMAS:
12        Q.  Do you know?
13        A.  Maybe in the past.  Right now I
14 just receive them when they're removed.
15        They've been using them before.  I
16 don't know if they still using it right now.
17        Q.  Have you told St. Michael's to
18 stop using Prolene polypropylene sutures?
19        A.  Not sutures.  I talk to
20 gynecologist.  I show them what my research found,
21 what I found, let them know, what's, what's my
22 opinion about this.
23        Q.  Who did you talk to at St.
24 Michael's about that?
25        A.  Our gynecologist.

Page 81

1         Q.  I'm sorry?
2         A.  Our gynecologist.
3         Q.  And who is that?
4         A.  I don't think I can go there.
5  Again, I'm not comfortable getting into specific
6  information which is not relevant to my report.
7         Q.  What did you tell that person?
8         A.  I shared my research, what I
9  shared in my papers.
10        Q.  Did you tell them that St.
11 Michael's should not use Prolene polypropylene?
12        A.  I'm not making any guidelines.
13 I'm not a regulating body.  As a researcher I can
14 share my opinion, my findings, with colleagues.
15 And that's what I do in my publications and that's
16 what I did in my personal conversations and
17 personal contacts with St. Michael's physicians.
18        Q.  When did you have those
19 conversations?
20        A.  Throughout.  I've been involved in
21 these meshes for the last year, maybe over a year,
22 I don't remember now.  First it was hernia
23 surgeons, then gynecologists.
24        Q.  So you've spoken to hernia
25 surgeons at St. Michael's about the use of

21 (Pages 78 to 81)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 82

1  polypropylene mesh?
2       A.  That's how it came, it came
3  through hernia surgeons.  The whole research
4  project came through hernia surgeons.
5       Q.  Do you know whether hernia
6  surgeons at St. Michael's are still using
7  polypropylene mesh?
8       A.  Probably they do.  But not all of
9  them.  Some of them do, some of them don't.
10      Q.  Do you know whether St. Michael's
11 continues to use polypropylene mesh for the
12 treatment of stress urinary incontinence?
13      A.  As I said, I know they've used it.
14 I don't know if they're still using it right now as
15 we speak.
16      Q.  Did you ever tell them as a
17 scientist and pathologist that they should stop
18 using Prolene polypropylene mesh because it was
19 harming their patients?
20      MR. ORENT:  Objection.
21      THE WITNESS:  I described pathological
22 findings and I disclosed everything I found in the
23 specimens which were coming to me as part of St.
24 Michael's Hospital and what I found during the
25 course of my research.  Yes, I did disclose all of

Page 83

1  this.
2       They are independent practitioners.
3  They collect information from peer-reviewed
4  studies.  They see the evidence which is published.
5  I'm one piece of the puzzle, one piece of the
6  information.
7       They make their own decision.  They're
8  licensed physicians and there are regulating bodies
9  which give guidelines.
10      Again, they are free to use my
11 guidelines in my research or anything else and
12 advise their patients what is the best course and
13 what can be complications.
14      BY MR. THOMAS:
15      Q.  Who was the person at St.
16 Michael's who makes the decision whether to use
17 polypropylene mesh?
18      A.  Each individual physician makes
19 own decisions after discussion with the patient.
20 That's my understanding.
21      I don't think there is any guiding body
22 in specific hospital which can stop physicians from
23 using specific device.
24      Q.  When you said you went to the
25 gynecologist, there's more than one gynecologist at

Page 84

1  St. Michael's, isn't there?
2       A.  Yes, but not all of them are
3  dealing with stress urinary incontinence.  There is
4  a degree of specialization.  Some of them do it,
5  sometimes some people specialize more in the field.
6       Q.  There's more than one hernia
7  surgeon, isn't there?
8       A.  Yes, correct.
9       Q.  Is there someone over both of
10 those specialties that can determine that the
11 hospital should not use polypropylene sutures or
12 mesh?
13      A.  I don't know if it can be done.
14      Q.  Have you ever made an effort to do
15 that?
16      A.  To stop them?
17      Q.  (Nods).
18      A.  As I said, I don't know if it can
19 be done.
20      Q.  Have you ever made an effort to
21 stop St. Michael's Hospital from using Prolene
22 sutures or Prolene mesh other than the
23 conversations you had with a gynecologist and a
24 hernia surgeon?
25      A.  No.

Page 85

1       Q.  Thank you.
2       What did Dr. Barbolt say about the
3  clinical significance, if any, of surface cracks on
4  polypropylene implanted in the dog study?
5       A.  I don't remember now.
6       Q.  What did Dr. Barbolt say about the
7  molecular weight of the Prolene sutures implanted
8  in the dog study after seven years?
9       A.  I don't remember now.
10      Q.  What did he say about the --
11 strike that.  What did Dr. Barbolt say about the
12 physical properties of the Prolene sutures
13 implanted in the dogs after seven years?
14      MR. ORENT:  Objection.
15      THE WITNESS:  I don't remember now.
16      BY MR. THOMAS:
17      Q.  Page 11 of your report.  You talk
18 about effect on the tissue, we're talking about
19 pain -- sorry, I'm on the wrong page.
20      It's on page 12, I'm sorry.
21      A.  Okay.
22      Q.  Page 12, it says:
23      "It is important to note that
24      in hernia surgery, chronic pain
25      after mesh repair is a growing

22 (Pages 82 to 85)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 86

1    problem.  Prophylactic neurectomy is
2    offered as a method to reduce
3    incidence of pain after mesh
4    repair."
5        What is a prophylactic neurectomy?
6        A.  When you cut the nerves before you
7    put the mesh in anticipating the mesh is going to
8    cause pain.
9        Q.  When you say cut the nerve, what
10   kind of nerve are you going to cut in the hernia
11   surgery?
12       A.  There are three main nerves
13   branches:  Genitofemoral, inguinal, um, some names,
14   um...
15       Q.  Any other nerves as a part of the
16   hernia surgery?
17       A.  There are three branches, which
18   can be identified visually.  They are thicker
19   trunks.  There is a variability between people, but
20   they're called triple neurectomy because in most
21   people there will be three branches supplying
22   innervation to the area.
23       Q.  So tell me what is done and why
24   it's done in hernia surgery with prophylactic
25   neuroectomy?

Page 87

1        A.  It depends.  There's different
2    techniques.  Either the branches can be cut in the
3    area, so there will be three branches identified
4    and transected, buried in muscle.  The stumps will
5    be buried in muscle.
6        It could be also arthroscopic
7    techniques when they go and try and cut the nerve
8    trunks closer to the spinal cord.
9        Then I'm not sure if it will be three
10   branches, because if you go proximally it will be
11   less branches, they will all merge into larger
12   trunks.  So you cannot call it triple neurectomy at
13   that level.
14       But the basic rule, we try to identify
15   supply innervation, either larger trunk or smaller
16   branches, transect them and bury the stump in the
17   muscles, so it doesn't form traumatic neuroma.
18       It's done because you want to denervate
19   the area where you anticipate the mesh is going to
20   cause pain.
21       Q.  Why is it important to note the
22   prophylactic neurectomy in your report?
23       A.  Because when chronic pain due to
24   mesh occurs, going back into the scarred area,
25   obstructed by the mesh, proved to be hard.

Page 88

1        So historically, first there were
2    meshes put in, and then more meshes put in, and
3    then more patients started coming back as chronic
4    pain, taking the mesh out was difficult, there was
5    large defect.
6        So somebody came up with the idea,
7    let's leave the mesh in but try to denervate the
8    area, either bury the nerves with some chemicals
9    like alcohol, or put nerve blocks, which was an
10   effective strategy.
11       You anesthetize the area, so the nerve
12   doesn't work for few weeks, and then the pain would
13   be gone.
14       And then somebody came up with this
15   idea of more permanent denervation, when the area
16   is anesthetized by cutting the nerve.
17       And then first surgeons try to do
18   neurectomy or transection of the nerve after mesh
19   repair, and after some experience they figure out
20   it's really hard to do to find the nerves from the
21   old scarred area.
22       So somebody offered, okay, if we
23   anticipate the pain developing from mesh, let's cut
24   the nerve before, when the area is clean and there
25   are no scarring or mesh in the area.

Page 89

1        Q.  Is that an accepted surgical
2    technique to do a nerve neurectomy prior to mesh
3    implantation?
4        A.  Yes, it is.  It's offered, it's
5    published and there are results.
6        Q.  Is that a common occurrence with
7    mesh implantation?
8        MR. ORENT:  Objection.  Vague.
9        THE WITNESS:  Depends on the surgeons.
10   Some surgeons believe in this and they do it.
11   Depends probably on the group of surgeons' practice
12   habits.
13       BY MR. THOMAS:
14       Q.  Right above that section on the
15   prophylactic neurectomy, you discuss the mesh scar
16   complex and its "interlocking and
17   compartmentalizing nature".  What is the
18   interlocking and compartmentalizing nature of the
19   mesh scar complex?
20       A.  So if we look at the mesh, mesh is
21   a structure, three-dimensional structure made out
22   of mesh fibers or mesh filaments.
23       So filament of fiber, circles around,
24   loops around, and then it forms in pores, and in
25   these tissues.  And each pore has 360 degrees of

23 (Pages 86 to 89)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 90

1  surrounding fibers, that's why it is a pore.
2      So it becomes a compartment.  An area
3  which is surrounded by something or a physical
4  structure with volume inside, that is a
5  compartment.  So the mesh introduces all these
6  micro compartments.
7      **Q.  There aren't walls around each of**
8  **these compartments, are there?**
9      A.  Yes, there are.  Fibers, mesh
10  fibers, they form the walls of this compartment.
11      **Q.  But they don't totally encapsulate**
12  **-- strike that.**
13      **The compartment though, has an opening**
14  **on either side much like a screen, correct?**
15      A.  Yeah, more like a screen or a
16  tube.  To a degree, because mesh is not completely
17  flat, it's a more of a three-dimensional.  If you
18  go with microscopic level, it's three-dimensional.
19      So I would compare it with each pore as
20  a very complex irregular tube, more or less.
21      **Q.  My point is, instead of a**
22  **compartment it is a tube with openings on either**
23  **side?**
24      A.  A compartment is a tube.  All
25  compartments in human body are tubes.

Page 91

1      **Q.  That has an opening on either**
2  **side?**
3      A.  Yes, that's how they are in the
4  body.  If we talk about tunnel syndromes in the
5  hand or in the chest, all these compartments form a
6  tube.
7      And the tube lets nerves and blood
8  vessels through and if compartment syndrome occurs,
9  it compromises the nerves in the vessel, in the
10  tube-like structure.
11      **Q.  Doctor, in your report you**
12  **discussed the concept of mesh stiffening?**
13      A.  Yes, I did.
14      **Q.  Please tell me how mesh stiffens?**
15      A.  Immediately after placement, it
16  can fold and curve.  So two layers or three layers
17  of mesh is different than one layer.  So this is
18  initial step, if it folds or curls or wrinkles
19  immediately after placement.
20      Then next step which will increase
21  stiffness of the structure is scar encapsulation.
22  So scar immobilizes the fibers in the structures so
23  they can not move inside the elasticity of the
24  meshes, mainly because of the bending ability of
25  the fibers and movement within the structure.

Page 92

1      When it's used with scar it cannot so
2  that is lost.  When it's incorporated in scar
3  tissue, the movement and bendability of fibers is
4  limited.
5      **Q.  Let me ask you a question here; I**
6  **don't mean to interrupt you.  Is folding or curling**
7  **a necessary part of mesh stiffening?**
8      A.  No.  It's one of the processes
9  which increases mesh stiffness if you compare it
10  with the flat product.
11      **Q.  So you can have, as far as you're**
12  **concerned, mesh stiffening if the mesh does not**
13  **fold or curl?**
14      A.  Then other mechanisms will set in.
15      **Q.  But the first one deals with**
16  **folding, curling and then the scar that you just**
17  **described?**
18      A.  Yes.
19      **Q.  I didn't mean to interrupt you.**
20  **Is there anything else you wanted to say about that**
21  **mechanism?**
22      A.  And then slowly over the years,
23  the degradation layer will start building up and we
24  know it's brittle.  Like any other plastic, we see
25  over time it starts cracking.  It becomes harder

Page 93

1  and less flexible and it breaks.
2      **Q.  The degradation layer you**
3  **described is four to five microns?**
4      A.  It depends.  It depends how long
5  it's been in the body.
6      **Q.  Is four to five microns about the**
7  **largest you've seen?**
8      A.  No, I've seen up to seven or
9  eight.  Depends on the type of mesh, I guess --
10      **Q.  Well, Prolene polypropylene, what**
11  **is the largest you've seen?**
12      A.  It's hard to say because it's for
13  -- currently that mesh is -- 80 percent of the time
14  I don't actually know what the product is.
15      **Q.  80 percent of the time you don't**
16  **know what the product is?**
17      A.  Yes.
18      **Q.  And the reason why I ask is, in**
19  **all the reports I've seen, I've never seen you give**
20  **an opinion that is greater than five microns to a**
21  **Prolene mesh?**
22      A.  That's just happened with any
23  litigation process, but I have over 300 meshes in
24  my office.
25      I'm just telling you the thickest bark

24  (Pages 90 to 93)

Vladimir Iakovlev, M.D.

Page 94

1  as far as I remember was up to seven, probably just
2  over seven microns thick.
3       And I think it was a hernia mesh and
4  for hernia meshes, when they've been in the body
5  for like 12 or 14 years, it's very difficult to
6  trace what type of mesh was put in.
7       **Q.  Your best recollection insofar as**
8  **you're dealing with Prolene mesh for the treatment**
9  **of stress urinary incontinence, the largest you've**
10 **seen is five microns, correct?**
11      MR. ORENT:  Objection.
12      THE WITNESS:  Probably six, I don't
13 remember now.
14      BY MR. THOMAS:
15      **Q.  This bark, as you've described it,**
16 **by definition is cracking?**
17      A.  Yes.
18      **Q.  And when you get past the bark**
19 **layer the interior of the polypropylene as best as**
20 **you can tell is unaffected?**
21      A.  Yes.
22      **Q.  Okay.**
23      A.  The core of the fibers remains, at
24 least, the same by my methods.
25      **Q.  And by your methods, as far as you**

Page 95

1  **can tell, past the five microns or so, the physical**
2  **properties of the polypropylene remain the same,**
3  **true?**
4       MR. ORENT:  Objection.
5       THE WITNESS:  By my methods, yes.
6       BY MR. THOMAS:
7       **Q.  Have you described -- you've**
8  **described two ways that you believe that mesh**
9  **becomes stiff.**
10      **Are there any other ways that you**
11 **believe mesh becomes stiff in the body?**
12      A.  Three.  So multi layering, scar
13 encapsulation and then degradation.  No, I don't
14 know any other mechanism for stiffening.
15      **Q.  And the way that you're able to**
16 **identify multi layering is when you analyze the**
17 **mesh after it's been sent to you in formalin from**
18 **the surgeon, correct?**
19      A.  As I said, sometimes I receive
20 meshes fresh in saline or not just -- and I see
21 it's folded already.
22      **Q.  The only polypropylene meshes that**
23 **you've given us, other than the one that you've**
24 **given us limited information about, come to you in**
25 **formalin, correct?**

Page 96

1       MR. ORENT:  Objection.
2       THE WITNESS:  For litigation cases?
3  Meshes come in formalin, that is correct.  But in
4  St. Michael's Hospital, when they receive mesh, as
5  I mentioned, everybody knows I'm the mesh guy.
6  They call me when they receive a mesh, sometimes I
7  receive them fresh.
8       BY MR. THOMAS:
9       **Q.  Do you have any documents, images**
10 **or any other information about meshes that you've**
11 **received fresh, without formalin, that show folding**
12 **or curling?**
13      MR. ORENT:  Objection to form.
14      THE WITNESS:  I describe them when I
15 receive them.  But again, we're going to the St.
16 Michael's Hospital patients and I don't want to go
17 there.  I'm not comfortable discussing this
18 confidential information.
19      BY MR. THOMAS:
20      **Q.  Okay.**
21      A.  Probably took some pictures at
22 some time.
23      **Q.  You have not produced those**
24 **pictures to us?**
25      A.  They're not in the report.

Page 97

1  They're confidential information and I took them
2  because in the course of my work as a pathologist
3  at St. Michael's.
4       **Q.  Do you have any information about**
5  **the incidents of folding or curling in mesh**
6  **implanted -- in Prolene mesh implanted for the**
7  **treatment of stress urinary incontinence?**
8       A.  For stress urinary incontinence,
9  the degree of curling is visible in most of the
10 cases.
11      **Q.  More than half?**
12      A.  I would say more than half.
13 Again, it depends.  Sometimes one piece is curled,
14 the other one is completely flat.
15      **Q.  And again, these are cases where**
16 **you've received the mesh in formalin?**
17      A.  Yes.  But I mean we're talking
18 about curling, not curling on the whole specimen.
19 We're talking about curling as it sits in scar
20 tissue.
21      So whatever curling I'm assessing as is
22 significant is on that, that which can -- which is
23 immobilized by scar tissue.
24      So I'm not talking about curling which
25 occurs secondary to fixation.  I'm talking about

25  (Pages 94 to 97)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 98

1  curling which occurred in the body. I'm able to
2  distinguish between one and the other.
3       Q.  How?
4       A.  I just said. If it's curled and
5  it's completely surrounded, integrated in scar
6  tissue in curled shape, it occurred in the body.
7       If the entire specimen is curled
8  together with scar, that could have been an
9  artifact. So I immediately disregard the shape or
10 the formation which occurred as an artifact.
11      Q.  Let's go to page 19 of your
12 report, please.
13      A.  Um-hum.
14      Q.  I'm going to refer you back to
15 page 14, because I think that that's the commentary
16 that you have on that. So you've got 19, which is
17 the images, and page 14 is the text.
18      A.  Yes.
19      Q.  Okay. As you look at page 19,
20 Figure Set 1a is described as:
21          "A foreign body inflammatory
22          reaction H&E, 40X images
23          consolidated cases."
24          What are you showing here?
25      A.  Foreign body type inflammatory

Page 99

1  reaction.
2       Q.  Is there anything unusual about
3  this foreign body reaction?
4       A.  What do you mean unusual?
5       Q.  Is there anything remarkable about
6  it? There's a foreign body reaction anytime you
7  have an implant, correct?
8       A.  Then usually it's not normal
9  tissue. Normally there shouldn't be any
10 inflammation in the tissue.
11      Q.  Okay. And so would there be
12 inflammation regardless of what kind of foreign
13 body is placed in there?
14      A.  Yes, because having a foreign body
15 in the body is not normal thing.
16      Q.  And so is it fair to say that
17 Figure Set 1a describes a typical foreign body
18 reaction to implanted materials?
19      MR. ORENT: Objection.
20      THE WITNESS: I wouldn't say typical,
21 although you can use that word. I would say
22 non-specific reaction to a foreign body. The body
23 is trying to destroy the foreign body because it's
24 a noxious stimulus, a noxious or damaging object.
25

Page 100

1       BY MR. THOMAS:
2       Q.  The images on the left show that
3  the polypropylene was removed as part of the
4  microtoming process; correct?
5       A.  Could you repeat that question.
6       Q.  I'm looking at the figures on the
7  left, which show the white images, compared to the
8  right, which show the yellow.
9           And on the left it shows that the
10 polypropylene that used to be where the white is
11 has been removed as a part of the microtoming
12 process; correct?
13      A.  No, actually, there might be all
14 of them present there. They're just clear;
15 polypropylene is clear. If it is not degraded,
16 it's completely clear.
17          If the fibers were blue fibers, they
18 would be visible. If it's clear fiber they would
19 not.
20          So technically, looking at these
21 images, we cannot say which hole is the actual MTM,
22 and which sort of appear in holes, still contain
23 polypropylene. You would need polarized light to
24 see that.
25      Q.  So what can you tell me about the

Page 101

1  part of the mesh that we're seeing in Figure 1a?
2       A.  Specifically, I don't -- do you
3  want me to discuss a specific feature?
4       Q.  For example, you don't have a
5  clean cut where you're looking at a perfectly round
6  portion of the mesh, correct?
7       MR. ORENT: Objection to form, to the
8  use of the term "clean cut".
9       THE WITNESS: Some of them are closer
10 to perpendicular orientation. Some of them are
11 angled.
12      BY MR. THOMAS:
13      Q.  Okay. For example, when you have
14 a microtoming process and you pull the knife across
15 the histological slide, sometimes you will create
16 an artifact by pulling the tissue away from the
17 polypropylene, correct?
18      A.  Yes, because polypropylene is
19 harder than tissue, you can damage tissue during
20 cutting.
21      Q.  And you can't tell if you look at
22 set 1a whether the polypropylene is there or not;
23 true?
24      A.  Yes, that's true.
25      Q.  You can't tell by looking at the

26 (Pages 98 to 101)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 102

1  figures in set 1a whether those are the actual size
2  of the hole that was occupied by the polypropylene,
3  and whether that is an artifact from microtoming?
4      A.  That I can tell you because
5  artifact from microtoming looks completely
6  different.  These are holes from fibers.
7      Q.  Completely?
8      A.  For these specific holes?
9      Q.  How can you tell the difference?
10     A.  Well, you have to work as I
11 pathologist for so many years and then you can
12 tell.
13     But generally, how we go for that
14 specific feature, it would be shape, rounded shape,
15 oblique, assuming, if we look at this image here --
16 if you want me to point, circle.
17     Q.  I'll give you a red pen -- let's
18 give you a blue pen.  That will show up better.
19     A.  Assuming if we see this tissue,
20 this specific, this is displaced.  So when the
21 fiber was not cut, it probably had different
22 position, different orientation.  Because it's
23 misplaced, it doesn't completely circle here.
24     Q.  Is that an artifact from the
25 microtoming process?

Page 103

1      A.  To a degree.
2      Q.  Okay.
3      A.  Now, see this empty space here?
4      Q.  Mark that A.  Mark the first one
5  A, and the next one B, so the record is clear what
6  you've just done.
7      A.  (Witness complies).
8      Q.  This one will be A.  That's the
9  one you've discussed first.  The other one you're
10 discussing now is B.
11     A.  So this circle labelled A moved
12 during microtomy.  It was within the fibers and now
13 it moved, it changed position slightly.
14     The area B appears empty, but it was
15 occupied in vivo, and this is an artifact.  Another
16 artifact here is artifact C, which is tissue
17 retraction.  Now, if we --
18     Q.  And those are all caused by the
19 microtoming process?
20     A.  No.  Different combination of
21 factors which cause all of this.
22     Now, if we look at the entire opening
23 marked as D, is perfect round shape, no tissue is
24 displaced.  So this would be as close as it gets to
25 the area which is occupied by a cross-section of

Page 104

1  the mesh fiber.
2      Q.  Okay.  Let's go now to the next
3  page, page 20.  Anything else remarkable about that
4  page, page 19?
5      A.  It depends what you want me to
6  describe.
7      Q.  Well, I've seen you testify
8  before.  And you put these images up on the screen
9  and you tell the jury what you think is remarkable
10 about them?
11     A.  Do you want me to go through this
12 description?
13     Q.  Do you have anything other than a
14 foreign body reaction, as depicted in the tissue,
15 is there anything other than that that's remarkable
16 about the images on 19?
17     A.  This picture is actually good in
18 terms of it shows this layering.
19     So the fibers are surrounded by this
20 dense foreign body type inflammation, and then the
21 inflammation is actually encapsulated by dense scar
22 on the outside, so this very dense pink area is a
23 scar.  So it goes on the outside of the
24 inflammation.
25     And then beyond the scar plate, here is

Page 105

1  the transition into normal lighter tissue not as
2  densely scarred or densely collagenized.
3      So this picture is a good example of
4  showing this multilayering, sort of onion skin
5  around the mesh fibers.
6      Q.  Anything else?
7      A.  No.
8      Q.  Let's go to page 20 now.
9      A.  Now, I have the mark coming
10 through.  Should I use a pen?
11     Q.  We'll do that next time, we'll
12 take that away.
13     Now on page 20, again, this is an image
14 from the consolidated cases?
15     A.  That's correct.
16     Q.  And as you look in the top on 1b,
17 you see blue.  And that is polypropylene mesh.
18     A.  Yeah, that's a cross-section of a
19 blue polypropylene fiber.
20     Q.  And it looks like it's been folded
21 as a part of the microtoming process; is that fair?
22     A.  It's not microtoming process; it
23 folds, curls.  Polypropylene just tends to curl.
24     Q.  But this is a four-micron thick
25 slice of polypropylene, correct?

27 (Pages 102 to 105)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 106

1          A.   Then it curls up like this.  Some
2   of them just stay flat.  Some of them curl up.
3          Q.   But this is an artifact of the
4   sample preparation process?
5          A.   Curling?  Yes.
6          Q.   So the curling of the blue
7   polypropylene in set 1b on page 20 is an artifact
8   of the sample preparation process?
9          A.   That's correct.
10          Q.   All right?
11          A.   The exact shape of that slice is
12   better to be estimated by the tissue which
13   surrounds it because tissue didn't curl, didn't
14   move much.  There is more movement of the
15   polypropylene slices.
16          Q.   What does that mean?  I don't
17   understand.
18          A.   Well, see, when the tissue is cut
19   it doesn't curl, it doesn't wrinkle most of the
20   time because of the technology of the slides and
21   knives.  Everything was designed to keep it flat.
22          So over the years, over the hundred
23   years we learned how to keep it flat.  With
24   polypropylene, because it is a different material,
25   doesn't stick.  The histological slides don't hold

Page 107

1   it as well so it's not firmly attached.
2          So, when it's cut initially, it may
3   stay flat.  But then after drying and some chemical
4   treatment, starts curling up, while tissue stays
5   flat.
6          Q.   Okay.
7          A.   Curling up or moving, I mean curls
8   up, lifts up, and then starts floating around.
9          Q.   What are you going to say at trial
10   about Figure Set 1b on page 20?
11          A.   Just an example of foreign body
12   type inflammatory reaction.
13          Q.   Okay.  Let's go to page 21.
14          A.   Yes.
15          Q.   Page 21 is Figure Set 1c:
16          "Foreign body inflammatory
17          reaction, H&E 40X, image of
18          additional TVT cases."
19          Now, I think you told us before that
20   these are previous TVT and TVT-O cases?
21          A.   Yes.
22          Q.   Do you know whether this is a TVT
23   or a TVT-O?
24          A.   No.
25          Q.   Can you tell me today whether this

Page 108

1   slide comes from the set of 22 patients that you
2   received from Dr. Kreutzer?
3          MR. ORENT:  Objection.
4          THE WITNESS:  My recollection is it was
5   later, one of the later cases.
6          BY MR. THOMAS:
7          Q.   Do you know which one it is?
8          A.   I can probably trace it but...
9          Q.   Is it a medical-legal case?
10          A.   I think so, but again it would be
11   hard for me -- just what I recall, it is a TVT that
12   I kept track quite well, TVT or TVT-O.
13          Q.   If I asked you to, could you tell
14   me where it came from?
15          A.   I can make an effort to figure it
16   out.
17          Q.   Okay.
18          A.   If I can't, I can't.
19          Q.   I'm going to want to know where
20   all these came from.  That's what we asked for in
21   advance and I understand we don't have it today?
22          A.   I never had the purpose to trace
23   individual cases unless it's for a specific -- the
24   report is prepared for a specific patient.
25          Q.   Okay.

Page 109

1          A.   Because of it wasn't my purpose.
2   My purpose was to collect information and
3   photographs for TVT or TVT-O as device.  That's why
4   I have difficulty tracing all of them back.  Some
5   of them can be traced; some of them cannot.
6          Q.   If you look at Figure Set 1c, top
7   left, again, you see the blue polypropylene,
8   correct?
9          A.   Yes, I do.  And the other hole
10   above it may still contain polypropylene but it's
11   clear because the way it's done two fibers are
12   combined together.
13          One filament is blue, one filament is
14   clear.  And they go through the knitting product
15   together, this pair.
16          Q.   Does the fact that the hole that
17   you just identified above the presence of blue
18   polypropylene has an irregular shape, does that
19   impact your opinion as to whether the polypropylene
20   is present or not?
21          A.   Not irregular.  It's more regular
22   curvilinear shape, and there is inflammation around
23   it, so there are several features which tell me
24   that this is space where polypropylene either still
25   is or used to be.

28 (Pages 106 to 109)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 110

1    If I had polarized light or if I had
2  microscope right now and it would be in the
3  microscope, I could flip polarized light and see.
4    Q.  Now, is that tissue that is in
5  that large white area above the polypropylene?
6    A.  It is a small fragment of tissue.
7    Q.  Is that part of a microtoming
8  artifact?
9    MR. ORENT:  Objection.
10    THE WITNESS:  Microtomy or processing,
11  it's hard to say, but it's an artifact.  It's
12  displaced.
13    BY MR. THOMAS:
14    Q.  As you look down to the piece of
15  polypropylene in set 1c, on the top of that blue
16  portion it appears to be some tissue?
17    A.  Yes.
18    Q.  And that tissue looks to fit right
19  into the tissue above it?
20    A.  That's correct.
21    Q.  So that's pulled away from the
22  tissue as a part of the microtoming process,
23  correct?
24    MR. ORENT:  Objection.
25    THE WITNESS:  You have good eyes.

Page 111

1    BY MR. THOMAS:
2    Q.  Why don't I see any bark on that
3  polypropylene?
4    A.  Two reasons.  Not enough
5  resolution of the picture, and second, not in
6  focus.
7    Q.  And do you know how long this mesh
8  was implanted in the person?
9    A.  No, I don't remember.
10    Q.  But you have those records?
11    A.  Most likely.  But again, some
12  patient samples came without much records.  Most of
13  the samples I received had implantation dates.
14    Q.  So what is remarkable about the
15  slides in Figure Set 1c which you'll talk to the
16  jury about?
17    A.  It shows a blue fiber.  It shows
18  that some of the fibers are blue, but otherwise it
19  shows exactly the same feature as before.
20    It's kind of onion skin mesh fiber
21  covered by inflammation, and then outside of that
22  everything is encapsulated in scar tissue.
23    Q.  And the scar tissue would be
24  reflected in your notations in the ones on the
25  right?

Page 112

1    A.  Yes, sometimes I do that.
2    Q.  Okay.  Anything else remarkable
3  about the figures on page 21?
4    A.  No.
5    Q.  Let's go to page 22, Figure Set
6  2a.  Again, this is images of additional TVT cases.
7  And these would be cases that were not part of the
8  consolidated group that you've just reviewed,
9  correct?
10    A.  That is correct.
11    Q.  And can you tell me by looking at
12  this whether it was part of the set of cases that
13  you received from Dr. Kreutzer?
14    A.  No, that was later case.
15    Q.  How can you tell me that?  How do
16  you know that?
17    A.  Quality of the picture.  I see it
18  was not taken with the camera that I had at the
19  time that I received the, those specimens.
20    Q.  Was this taken from an active
21  medical-legal case involving Ethicon?
22    MR. ORENT:  Objection to the form.
23    THE WITNESS:  I don't remember.  Most
24  likely it is.
25

Page 113

1    BY MR. THOMAS:
2    Q.  But you can't tell me today what
3  it might be?
4    A.  It's hard to say.
5    Q.  And what is remarkable about the
6  image in Figure Set 2a on page 22 for purposes of
7  the jury?
8    A.  Can I have a pen?
9    Q.  I'll give you a blue pen.
10    A.  Remember, earlier you asked me
11  about why you cannot see bark?  Now you can see the
12  bark, so this is the bark.  Right there.
13    Q.  What you've indicated is on the
14  left?
15    A.  This is the bark right there.
16  This is the bark right there.
17    Q.  Now are you assuming for purposes
18  of that statement that polypropylene is still
19  present in that slide?
20    A.  Well, degraded part of the
21  polypropylene is still present for sure, because I
22  can see it stained.  If the core remains unlocked,
23  there's a different question.  In this area, most
24  likely it is.
25    Q.  You say most likely it is?

29 (Pages 110 to 113)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 114

1    A.  Because this bark layer is free in
2  the space, and doesn't happen that often.  Because
3  if it was free in this area, it would flow all the
4  way.  So the way it remains in the tissue it
5  remains attached to tissue.
6    So the bark which is firmly attached to
7  tissue like in this area is most likely detached.
8  So there is no fiber core in this area.  But in
9  this specific area, I suspect the core of the fiber
10  is still there.
11    Q.  Let me do something so the record
12  is clear.
13    You've made some arrows on Figure 2 A,
14  on the upper image, and there's two arrows on the
15  upper left-hand portion and you suggest that
16  indicates bark -- you suggest that indicates bark,
17  correct?
18    A.  I didn't suggest.  I just pointed
19  where it is.
20    Q.  Okay, fine.  And then down in the
21  lower right-hand corner, you've drawn several
22  diagonal lines in addition to two arrows.
23    The two arrows indicate bark, as you
24  understand it, and you believe that the diagonal
25  lines represent polypropylene which is present in

Page 115

1  the slide, correct?
2    A.  Most likely.
3    Q.  Okay.  Now, we requested that all
4  of the slides that were used in your report be
5  forwarded to our pathologist for their review.
6    Was this slide forwarded to them, to
7  your knowledge?
8    MR. ORENT: Objection.
9    THE WITNESS: No, it's an additional
10  case.
11    BY MR. THOMAS:
12    Q.  Okay.
13    MR. ORENT: By the way, just for the
14  record, we have not received any slides from your
15  pathologist either and we have requested that
16  repeatedly.
17    MR. THOMAS:  We don't have any to give
18  you.  We're working from the same set of slides.
19    MR. ORENT: So you're using the
20  plaintiff's stained slides --
21    MR. THOMAS: So far we have.  We figure
22  it's better off using one set of slides.  And to
23  the extent we make any, you will have them
24  promptly.
25    THE WITNESS:  If it was a litigation

Page 116

1  case, you have the report.
2    BY MR. THOMAS:
3    Q.  Are you familiar with whole slide
4  imaging?
5    A.  Yes, I am.
6    Q.  Do you do whole slide imaging of
7  these cases?
8    A.  Yes, I do.
9    Q.  So you have --
10    A.  Not for all of them.  For some
11  cases, especially the later ones.
12    Q.  Okay.  And who maintains your
13  whole slide imaging equipment; who has that?  St.
14  Michael's?
15    A.  Yes, St. Michael's.  It's standard
16  equipment.
17    Q.  Do you have to pay St. Michael's
18  for use of the whole slide imaging equipment?
19    A.  No.
20    Q.  Okay.
21    A.  It's free for researchers.
22    Q.  What kind of machine do they have?
23    A.  Aperio.
24    Q.  So, you could supply to us digital
25  images of the slides that you have on whole slide

Page 117

1  imaging, correct?
2    A.  As long as you're entitled to
3  receive material or information about the case.
4    Q.  Okay.  What else is remarkable
5  about Figure Set 2a on page 22?
6    A.  Oh, it is a very nice example,
7  again of this layering, onion skinning.
8    The mesh fibers are surrounded by halo
9  of foreign body reaction and everything is encased
10  in solid scar plate.
11    And then normal tissue is beyond the
12  solid scar plate so it is a good example of how it
13  happens.
14    Q.  And in terms of -- you've told me
15  that on the upper left of the area where you had
16  the arrows, there's likely not polypropylene but in
17  the lower right there likely is polypropylene?
18    A.  Yes.
19    Q.  How about in the white area to the
20  right where you've written; can you tell whether
21  polypropylene is present or not?
22    A.  Not without polarized light.
23    MR. ORENT: Counsel, we've been going
24  about another hour.  Shall we take a short break?
25    MR. THOMAS:  Good time, yes.

30 (Pages 114 to 117)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 118

1    -- RECESS AT 11:27 --
2    -- UPON RESUMING AT 11:44 --
3    BY MR. THOMAS:
4        Q.  Doctor, going back to image 2a on
5    page 22 of your report, you described this scar
6    area in your testimony, and then showed how the
7    scar then changed to normal tissue, correct?
8        A.  That' is correct.
9        Q.  How thick is the area between what
10   you show to be the polypropylene mesh and the scar
11   to the normal tissue?  How thick is that area
12   between the polypropylene and the normal tissue?
13       A.  You mean in this specific image or
14   in general?
15       Q.  In this image.
16       A.  It depends on which part of the
17   mesh. The thinnest part is within the hundred
18   microns.  The thickest part can be as thick as
19   couple of millimeters, if we measure the whole
20   thing like this.
21       Q.  And just for the record, when you
22   say within a hundred microns, you're referring to
23   the area on the left side of the lower image in the
24   yellow, through the scar to the normal tissue.  And
25   when you're referring to the couple of millimeters,

Page 119

1    you were referring to normal tissue to normal
2    tissue in between the two mesh fibers; is that
3    fair?
4        MR. ORENT:  Objection.
5        THE WITNESS:  That's correct.
6        BY MR. THOMAS:
7        Q.  And similarly, down below on the
8    lower left, where you show the polypropylene mesh,
9    you show scar and then you do show normal tissue;
10   how far is it from the polypropylene to the normal
11   tissue; how wide is the scar band?
12       A.  The same, within 100 microns.
13   Sometimes you have normal tissue pushing into the
14   pores, sometimes not.  Sometimes the scar plate is
15   within a hundred microns -- I mean, the scar
16   capsule.  Sometimes it goes to the millimeters,
17   three, four millimeters, it depends.
18       Q.  Okay.  Anything else remarkable
19   about the images on page 22?
20       A.  No, we discussed everything, I
21   think.
22       MR. ORENT:  Objection.
23       BY MR. THOMAS:
24       Q.  Let's go to page 23 please, Figure
25   Set 2b.  Let's talk about this a little bit.

Page 120

1        Where does this come from?
2        A.  It came from, if I remember
3    correctly, Edwards case.  If I remember correctly.
4        Q.  What is it about this that makes
5    you think it's the Edwards case?
6        A.  It is an old photograph.
7        Q.  And in the top, on the right-hand
8    side of the image, it looks like a piece of blue
9    polypropylene that's displaced in its location; is
10   that fair?
11       A.  Slightly displaced, most of it
12   sits right there, it was in vivo.
13       Q.  The other blue pieces that appear
14   there other than the -- why don't you just mark
15   that with an "X" for me so it's clear what we're
16   talking about.
17       A.  (Witness complies).
18       Q.  There are other blue pieces
19   throughout that image, is that polypropylene or is
20   that stain?
21       A.  You mean the blue areas here?
22       Q.  Yes.
23       A.  Some of it is probably displaced
24   polypropylene, it's hard to say because of the
25   resolution.  It could just be inflammation because

Page 121

1    there is a weird color coming into the pictures.
2        Q.  If the blue that appears there is
3    in fact displaced polypropylene, then that's part
4    of the microtoming artifact; is that fair?
5        A.  Yes, that's fair.
6        Q.  All right.
7        A.  Anywhere where cross-section of
8    the fiber overlaps with tissue, is a displacement.
9        Q.  All right.  And you title this,
10   "Fibrous Bridging and Scar Encapsulation".  And
11   it's four times power.  What does this show?
12       A.  All pores in this section of the
13   mesh are filled with scar tissue.  So normal tissue
14   is beyond the scar plate, and all the pores are in
15   the spaces in between, and mesh walls are filled
16   with scar tissue.
17       Q.  Okay.  The magnification of the
18   image on the prior page is five times this
19   magnification, correct?
20       A.  About, yes.
21       Q.  Okay.  And can you tell me by
22   looking at the image on page 23 in the cluster of
23   four circles, how close it is from the
24   polypropylene across the scar tissue to the normal
25   tissue?

31 (Pages 118 to 121)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 122

1      A. In this area?
2      Q. Yes.
3      A. It would be within the 100 microns
4  or so.
5      Q. Mark that -- good.
6      A. (Witness complies.)
7      In this case, it's thicker, could be as
8  thick as 200 microns.
9      Q. Okay.
10     A. It could be .2 millimeters,
11 roughly.
12     Q. If you wanted to measure that on
13 the slides that you have, can that be done?
14     A. With a eyepiece micrometer, yes.
15     Q. Anything else remarkable about
16 Figure 2b other than showing the scar?
17     A. Fiber bridging, and completely
18 encapsulating the entire structure of mesh pores
19 that fill the scar tissue, and normal tissue is
20 outside. This is the mesh scar complex, or mesh
21 scar plate.
22     Q. As you look at this image, is this
23 a complete slide?
24     A. No, there is tissue beyond
25 slightly. And this end, I think is here on the

Page 123

1  next page, page 24.
2      Q. Okay. We'll come to that in a
3  second.
4      A. That's my recollection.
5      Q. The figure on 2a, page 22, is
6  obviously a smaller part of a bigger slide, correct?
7      A. That's correct.
8      Q. And you believe that the image on
9  page 23 is also a smaller part of a bigger slide?
10     A. I think most of the mesh is here
11 on the slide --
12     Q. Um-hum.
13     A. -- so there's not much mesh
14 beyond.
15     Q. That's why I'm asking the
16 question.
17     Does the image that's shown on page 23
18 represent the outer boundaries of the mesh in that
19 slide?
20     A. I think so.
21     Q. Okay.
22     A. I think so, there's an edge of
23 tissue here. Now, this exactly piece of this --
24     Q. You've now turned the page, you're
25 on page 24. So you believe this is probably from

Page 124

1  the Edwards case, your best recollection?
2      A. Yes.
3      Q. And it's magnified ten times, and
4  this is the one that is a magnification of the far
5  right side of the image on page 23?
6      A. Likely at different level.
7      Q. What do you mean, a different
8  slide?
9      A. Different slide, yes.
10     Q. Okay.
11     A. So it's the same piece, but cut
12 little deeper.
13     Q. Now if you look on the top page of
14 page 24, top image, on the right side there's a
15 blue, that's again, displaced polypropylene?
16     A. Yes, this is displaced
17 polypropylene. And this as well (indicating).
18     Q. Okay. And that's an artifact due
19 to the microtoming process?
20     A. It could've done that, yes.
21     Q. And the description down below
22 again is "fibrous bridging and scar encapsulation",
23 does this image show anything in addition to what
24 we've talked about in the prior slides?
25     A. This is a terminal pore.

Page 125

1      Q. Sorry?
2      A. This is a terminal pore of the
3  mesh. So this is the edge of the mesh and the
4  terminal pore contains normal non-scar tissue.
5      Q. When you say "terminal pore"
6  that's the outside pore?
7      A. Yes, it is.
8      Q. So what is the significance of the
9  terminal pore having normal tissue?
10     A. It just shows comparison. Pores
11 which are not filled with scar tissue, and pores
12 which are filled with scar tissue. So this
13 specific pore contained normal scar tissue. So
14 within that specific pore, there's no fibrous
15 bridging.
16     Q. Is it fair to say every place we
17 see the blue, we see displaced polypropylene?
18     A. Most of the time. It can be just
19 a weird color of inflammation.
20     Q. Okay. Anything else remarkable
21 about the slide on page 24?
22     A. No.
23     Q. Okay. Let's go to page 25.
24     A. Yes.
25     Q. This is cited to an article. Do

32 (Pages 122 to 125)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 126

1  **you know off the top of your head what article that**
2  **is?**
3       A.  On the safety of synthetic sling
4  surgery, I believe.
5       **Q.  Are you able to tell me what slide**
6  **that is, what plaintiff?  Strike that.**
7       **Is that a medical-legal slide?**
8       A.  The picture comes from the same
9  case, as you can see it's exactly the same.
10      **Q.  Okay.  Is B part of A?**
11      A.  No, I don't believe so.
12      **Q.  Let's talk about A.  And what does**
13 **the "BF" mean?**
14      A.  "Bridging fibrosis".
15      **Q.  And the "AT"?**
16 **"Adipose tissue"?**
17      A.  Adipose tissue, yes.
18      **Q.  What is the significance of the**
19 **adipose tissue?**
20      A.  It's a normal non-scar tissue.
21      **Q.  So what is the significance of**
22 **including this slide in your report if it's the**
23 **same thing that you had in the prior two slides?**
24      A.  It's a little bit different.
25 Because, see, on the bottom, B, it shows scar

Page 127

1  tissue in a different stain.
2       Scar tissue may have some smooth
3  muscle, when the scar tissue is being remodeled by
4  myofibroblast.  Myofibroblast can have smooth
5  muscle.  But once it's mature scar tissue, there is
6  no contractile filament in the cells anymore, and
7  it doesn't stain with smooth muscles stain.
8       But, normal tissue of vaginal wall
9  contains smooth muscle.  So here you can see that
10 the fibers bridging, can be separated from normal
11 tissue by using smooth muscle stain.
12      **Q.  And so the smooth muscle, or the**
13 **normal tissue is represented by the brown?**
14      A.  Yes.
15      **Q.  And this is another representation**
16 **of the fibrous bridging and scar encapsulations**
17 **depicted in blue?**
18      A.  Yes.
19      **Q.  Is that the only significance of**
20 **that stain?**
21      A.  Yes.
22      **Q.  Okay.**
23      A.  For this specific picture, yes, it
24 is.
25      **Q.  All right.  Are you able to tell**

Page 128

1  **me the magnification of that image?**
2       A.  Close to times four maybe --
3  because there's cropping and then the size was --
4  now it's hard to -- it's much larger than it
5  appears in the publication.  So I would say for
6  this specific, it would be close to times four
7  objective.
8       **Q.  If you go down here it says:**
9       **"Scar encapsulating mesh in**
10      **surrounding pre-existent normal**
11      **adipose tissue and muscle tissues, a**
12      **2.5 image of histological sections."**
13      **That means it's magnified 2.5 times.**
14      A.  It means that the objective you
15 would use to produce this appearance in the
16 microscope, this would be times 2.5.
17      **Q.  Okay.  But the degree of**
18 **magnification is different from that?**
19      A.  On this page?
20      **Q.  Yes.**
21      A.  Yes.  Because it's cropped and
22 resized and the publication is much smaller.
23      **Q.  I see.**
24      A.  So if you trace it, if more
25 correctly to trace it, to trace is the objective,

Page 129

1  you would use to see like this in the microscope.
2       **Q.  And you could use the optical**
3  **micrometer in order to measure to the extent**
4  **necessary?**
5       A.  Yes, I can.
6       **Q.  Anything else about this image?**
7       A.  No.
8       **Q.  Let's go to page 26, image 3a.**
9       A.  Yes.
10      **Q.  What's the purpose of this image?**
11      A.  This image shows the nerve in H&E
12 stain.
13      **Q.  What is the significance of**
14 **showing the nerve; just the fact that you can show**
15 **it?  Is there any damage to it or any issues**
16 **associated with it?**
17      A.  It's normal nerve, it's present
18 within this mesh scar plate, it innervates the
19 tissue which is inside and outside of the mesh.  It
20 can become trapped.
21      **Q.  Is it trapped in this image?**
22      A.  Well, it is in scar tissue.  So
23 it's trapped in scar tissue.
24      **Q.  Is there any indication that this**
25 **nerve is damaged in this image?**

33 (Pages 126 to 129)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 130

1      A.  Not from this power, I don't see
2  any -- "damage," you mean atrophic degenerated or
3  damaged in terms of physical damage?
4      Q.  Any kind of damage.
5      A.  It is in scar tissue.  For a nerve
6  to be in scar tissue, is not a healthy environment.
7      Q.  But not all nerves in scar tissue
8  produce symptoms, correct?
9      A.  Not all.
10      Q.  And you can't tell by looking at
11  this image, whether the nerve in Figure Set 3a is
12  producing any symptoms, correct?
13      A.  Again, it depends on timing.  It
14  may produce symptoms at one time and not produce at
15  another time.
16      If this specific nerve was producing
17  pain sensation, it would be difficult to determine.
18      Q.  But you can't tell, looking at the
19  nerve in Figure Set 3a, whether that nerve is
20  producing symptoms for this patient, correct?
21      A.  I can tell you that this nerve is
22  in a situation when it can produce symptom.  This
23  is the main thing I can say, it can because it is
24  in an abnormal environment.
25      Q.  And the abnormal environment is

Page 131

1  the presence in the scar tissue?
2      A.  Yes.  In addition to be present
3  inside the mesh.
4      Q.  Okay.  Well, it's adjacent to the
5  mesh, correct?
6      A.  I don't know.  There might be
7  fiber right there.
8      Q.  Okay.
9      A.  So it can be inside or outside, it
10  doesn't matter.  It's in scar tissue, it's abnormal
11  environment, it can produce mesh.  And we know that
12  traumatic neuromas, which is the formation of a
13  mesh in scar tissue, is a painful lesion.  This is
14  an established fact.
15      Q.  But there's no traumatic neuroma
16  in this image, correct?
17      A.  A mesh is deformed, we can see
18  it's getting there.
19      Q.  Can you see a traumatic neuroma in
20  this image, 3a on page 26?
21      A.  The formation is not significant
22  to call it a traumatic neuroma.  So in this
23  specific image, I would not use that term.
24      Q.  Now, can you tell whether the
25  nerve on page 26 that you show is a motor nerve?

Page 132

1      A.  It's a mixed nerve.
2      Q.  What do you mean by "mixed nerve"?
3      A.  "Mixed" means they're both
4  afferent and efferent, or motor and sensory signals
5  going back and forth.
6      Q.  How can you tell it does both?  Do
7  all nerves do both?
8      A.  Peripheral nerves, yes.
9      Q.  All of them?
10      A.  Except for head.
11      Q.  Okay.  So are all nerves in the
12  body, peripheral nerves, capable of mediating pain?
13      A.  Except for cranial nerves.
14      Q.  Okay.  And what's the basis for
15  your understanding in that regard?
16      A.  It's a basic knowledge, it's in
17  the textbooks.
18      Q.  Okay.
19      A.  There is some very small
20  proportion of nerves, peripheral nerves, less than
21  5 percent, which are only sensory.  So some of the
22  nerves will be only sensory.  But there are almost
23  no, only motor nerves outside of the cranial
24  nerves.
25      Q.  Can you, by light microscopy,

Page 133

1  distinguish among the type of nerves which you see?
2      A.  What do you mean, what type of
3  nerves?
4      Q.  Well, sensory and motor nerves?
5      A.  We just agreed that they're all
6  mixed.
7      Q.  You said that, okay.
8      Is there any way for you to distinguish
9  by light microscopy which nerves are capable of
10  mediating pain?
11      A.  They all are.
12      Q.  Okay.  5 percent you said, where
13  are they?
14      A.  5 percent is still sensory.  So
15  all of them can deliver pain.  Some of them,
16  5 percent, may not be able to do any motor
17  function, but they will still be able to transmit
18  pain.  And it also depends on the size, because
19  once you go into the very small branches, they
20  become more specialized.  If you go into the large
21  trunk, then you get all of them mixed together.
22      Q.  When you talk about going into the
23  nerve twigs, that's what you're talking about,
24  right?
25      A.  Fibers, individual fibers, yes.

34 (Pages 130 to 133)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 134

1    Q.  Then they become more specialized;
2  what do you mean by that?
3        A.  So they may have more function for
4  sensory or motor function.
5    Q.  So as the nerves break into twigs,
6  will there be some nerves that don't mediate pain,
7  or they still mediate pain?
8        A.  Fibers.  If you go into fibers
9  which is even smaller than twigs, which is
10  individual axon, those will have individual
11  function.
12    Q.  And what are we looking at nerves
13  here; are we looking at twigs, fibers, or are we
14  looking at nerves?
15       A.  It's a nerve.  It's thicker than a
16  twig.
17    Q.  Okay.  And what is remarkable
18  about what you see in Figure 3a; anything more than
19  you've just described, the presence of a nerve
20  adjacent to mesh?
21       A.  No, just everything else -- we
22  discussed everything significant.
23    Q.  Now, the polypropylene in the
24  lower left-hand corner image, that's blue
25  polypropylene, correct?

Page 135

1        A.  That's correct.
2    Q.  And it's folded over as a part of
3  the sample preparation process or microtoming
4  process, correct?
5        A.  That's correct.
6    Q.  This is a 4 micron thick slide,
7  correct?
8        A.  About 4 microns, plus or minus.
9    Q.  I don't see bark on that
10  polypropylene.  Do you see any bark on the
11  polypropylene?
12       A.  There is a faint line here, I
13  don't know if it's there or not.
14    Q.  When you say "there," you're not
15  pointing to the polypropylene.  You're pointing to
16  the circular area to the left of the polypropylene
17  adjacent to the tissue, correct?
18       A.  Yeah.  Curving linear, yes.
19    Q.  And you're suggesting that that
20  may be some bark?
21       A.  Yes.
22    Q.  And why do you say that?
23       A.  Because it looks like it.
24    Q.  Okay.  And this is magnified at 20
25  times?

Page 136

1        A.  Yes.  For this specific image,
2  about 20 times -- 20 times objective magnification.
3        The magnification itself is higher,
4  because there's also an eyepiece, but eyepiece is
5  fixed.
6    Q.  Look at the right side of that
7  image with the polypropylene.  It's folded over, on
8  the right side; you'd agree with me there is no
9  bark?
10       A.  Not visible bark.
11    Q.  Okay.  If we go to page 27, set
12  3b.
13        So 3a comes from the images from the
14  consolidated cases, correct?
15       A.  That is correct.
16    Q.  So we should have this slide, I
17  think.  So paragraph 3b, so set 3b on page 27 says,
18  "additional TVT cases".
19        Are you able to tell me from which case
20  this slide comes?
21       A.  I can only tell you that the top
22  panel is from a newer case, and the bottom is
23  likely from an older case.
24    Q.  So they're two separate cases?
25       A.  Yes.

Page 137

1    Q.  Do you have any idea from looking
2  at this, how long the mesh was implanted in these
3  people?
4        A.  No.  Not at this magnification.
5    Q.  And other than showing the
6  presence of nerves within the mesh scar plate like
7  you did on page 26, is there anything significant
8  about your findings on page 27?
9        A.  The only difference is that in top
10  panel, you can clearly see that this nerve is
11  within the pore.
12    Q.  Are you suggesting that this nerve
13  is inside of a single pore in the mesh?
14       A.  Somewhere within the mesh.
15    Q.  Okay.  Not within the pore itself?
16       A.  It can be within the pore.
17    Q.  Do you know?
18       A.  It also depends how you define the
19  pore.  Pore is a hole in the mesh structure, yes,
20  it is within the space in the mesh structure.
21    Q.  This is 20 times magnification,
22  how far is it from one yellow to the other yellow?
23       A.  At 1.5 millimeter.  Between 1 and
24  1.5 millimeter.
25    Q.  Is there anything abnormal about

35 (Pages 134 to 137)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 138

1  the nerve that's depicted on page 27 in the top
2  frame?
3          A.   It's in the scar and it's in the
4  mesh, that is abnormal.
5          Q.   Other than being in the scar
6  plate, is there anything you can tell by light
7  microscopy about abnormality in that nerve?
8          A.   Otherwise, the nerve looks
9  healthy, it would conduct pretty healthy pain
10  signals.
11          Q.   Okay.   Same thing for the lower
12  frame.   Other than the presence of the nerve within
13  the scar tissue, is there anything that you can
14  tell from light microscopy about the general health
15  of the nerve?
16          A.   Same thing, it's not degenerated,
17  therefore, it can conduct pain signal.
18          Q.   As you look at the image on the
19  lower left on 3b, the white in that image, again,
20  is where polypropylene was?
21          A.   Yes.
22          Q.   And as you come down around from
23  about 6 o'clock to about 9 o'clock, there's no bark
24  there, is there?
25          A.   No.   I don't think so.

Page 139

1          Q.   Let's go to page 28.   Page 28 is
2  additional TVT cases.
3          Is this one mesh or two?   One patient
4  or two, I guess I should say.
5          A.   This is hard to say, both are come
6  from earlier cases.   I probably have thousands of
7  images by now, so it will be hard.
8          Q.   But you can't tell me from which
9  patient they come, or which case they're from?
10          A.   I may or may not be able.   It
11  would be checking if it's in a specific folder or
12  just in pooled images.
13          Q.   And your description again, below
14  is, "Innervation within the mesh scar plate, H&E,
15  20 times magnification."
16          Other than showing the presence of
17  these nerves in the mesh scar plate, is there
18  anything that indicates to you by light microscopy
19  that these nerves are unhealthy?
20          A.   Well, it's the location.   You see,
21  it's slightly curved, it's inside the pore.
22          Q.   Which one are you talking about
23  now, please?
24          A.   The upper panel.
25          Q.   Okay, thank you.

Page 140

1          A.   There are two nerves, one is here,
2  one is there (indicating).
3          Q.   And you indicate that with your
4  two arrows --
5          A.   This one is gone.
6          Q.   Okay.
7          A.   So it is a location -- it's not
8  the nerve itself, it's the location is abnormal.
9          Q.   Is there anything that you can
10  tell me by looking at this image by light
11  microscopy that these nerves were producing
12  symptoms in the patient?
13          A.   The question is, if they can.
14          Q.   Can you tell me by looking at this
15  image in set 3c, that these nerves are causing
16  symptoms in the patient?
17          MR. ORENT:   Objection.
18          THE WITNESS:   Again, as a pathologist,
19  I can only estimate the probability.   If it can, if
20  it's in abnormal location, if it's causing a lot --
21  first of all, it's out of the body now, so it
22  cannot cause anything.   But when it was in the
23  patient, it could.
24          BY MR. THOMAS:
25          Q.   Could?

Page 141

1          A.   Could produce symptoms all the
2  time, or one specific time, or only once in a
3  specific moment, it's hard to say.
4          Q.   And it could be a nerve positioned
5  as it is, that never produced any symptoms, true?
6          MR. ORENT:   Objection.
7          THE WITNESS:   Some of them probably not
8  producing anything.
9          BY MR. THOMAS:
10          Q.   Okay.   And the same thing about
11  the image below on Figure Set 3c on page 28, other
12  than presence of the nerves in the mesh scar plate,
13  anything remarkable about this image?
14          A.   No.   Nothing beyond what we've
15  discussed.
16          Q.   Let's go to page 29.
17          A.   Yes.
18          Q.   What are we showing on page 29?
19          A.   The same features of innervation
20  of the mesh scar plate.   But now in S100 stain.
21          Q.   Now, is there anything other than
22  presence of these nerves in the mesh scar plate
23  that indicates to you that these nerves were
24  causing pain in the patient?
25          A.   They are in abnormal location.

36  (Pages 138 to 141)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 142

1      Q.  And we've already agreed that
2  nerves, even in an abnormal location, may not be
3  producing pain, correct?
4      A.  Yes, but more likely they will
5  produce pain.
6      Q.  Are you saying that every nerve
7  within the mesh scar plate more likely than not is
8  going to cause pain?
9      A.  Through one mechanism or the
10 other, there will be zero mechanism at one point
11 that can produce pain, it may not be chronic pain
12 continuous, but I mean, in a specific movement you
13 have start forming the mesh, so it can cause pain.
14     Q.  Let's talk about this for a
15 minute.  Doctor, if you look at page 29, and 28,
16 and 27 and 26 --
17     A.  Yes?
18     Q.  -- it's fair to understand that
19 for every mesh implantation, there are going to be
20 nerves that are going to be in scar tissue.
21     A.  Are you talking for all meshes?
22 Regardless of location, or just --
23     Q.  I'm talking about slings.  Stress
24 urinary incontinence slings, TVT, Prolene.
25     A.  So for slings, there will be

Page 143

1  innervation, at least those samples I examined,
2  there will be innervation in all of them.
3      Q.  Okay.  And complaints of pain for
4  slings, TVT slings, you'll agree is less than 5
5  percent?
6      MR. ORENT:  Objection.
7      THE WITNESS:  For the specimens I
8  received?
9      BY MR. THOMAS:
10     Q.  I'm talking about the studies on
11 the topic?
12     MR. ORENT:  Objection.  Outside the
13 scope.
14     THE WITNESS:  Now we're talking about
15 what I received and what is still in the patients.
16 Because studies were clinically done based on
17 clinical -- clinical symptoms for the samples or
18 slings which are still in the body.
19     BY MR. THOMAS:
20     Q.  Very simple question.
21     How do you explain findings in the
22 clinical studies that pain is a complaint of
23 patients in less than 5 percent of the time, when
24 you say in every mesh that you see, that there are
25 nerves within the scar plate?

Page 144

1      A.  Well, first of all, let's start
2  with 5 percent.
3      That number would have to be specific
4  for our study.  There is a range of reported pain
5  anywhere from 5 to 40 plus percent.  It depend on
6  methodology, if the patients were followed in time
7  correctly, if there was correctly of follow up
8  time.  So the 5 percent is a questionable number.
9      Q.  Can I interrupt you there, if you
10 don't mind.  Let's take your upper bound of
11 40 percent?
12     A.  Yes.
13     Q.  So you have, by your own
14 statement, even in the worse case scenario, you
15 have 60 percent of the sling patients who don't
16 experience pain, correct?
17     A.  Who do not complain to the point
18 when it's recorded.
19     There are multiple reasons why it may
20 not be recorded, they may still experience some
21 pain.  Maybe it's not serious enough to be
22 recorded, maybe it's not serious enough -- there
23 will be some patients which have no pain at all.
24 There will be some patients which have so little
25 pain, only in a specific moment, that it's not

Page 145

1  worth reporting.  Some of them don't report it and
2  so forth.
3      And then there will be patients that
4  there is so severe pain, the mesh needs to come
5  out.  There will be a range of sensations and
6  personal perception.
7      So, from my perspective, when I examine
8  specimens, I report what is abnormal.  To what
9  degree it's causing clinical symptoms, it depends
10 on many factors.  If you want to -- you cannot look
11 at the human body as a machine.  I mean, there is
12 part missing, it's not going to work.  Or if there
13 is wire loose, I mean, it may cause some problems.
14     So, there will be a range of -- or
15 degree of pain sensation and a range of personal
16 attitude so this will effect the recording of
17 clinical symptoms.
18     On the histology side, again, there
19 will be a range of how many nerves are involved,
20 one or two, or a really high density.  To what
21 degree they are involved, some of them will have
22 such a strong deformation, that it will have
23 100 percent probability that it will cause pain.
24     Q.  Let me ask this question --
25     A.  So that's the complexity of the

37 (Pages 142 to 145)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 146

1 situation. I mean you cannot separate it sharply,
2 okay, 5 percent for this, 5 percent for that. It
3 can cause a pain. This is abnormal location, this
4 is abnormal situation, this is a pathological
5 finding.
6 Q. Let's talk about this for a
7 minute. So the pages we've just been through,
8 we've talked about, on pages 26, 27, 28 and 29, and
9 it goes on to 30 and 31, and on to 33. But just
10 for those for now.
11 Is it fair to understand that in every
12 mesh that you've analyzed - regardless of
13 manufacturer - in the pelvic floor, for treatment
14 of stress urinary incontinence, you find nerves in
15 scar tissue?
16 A. Yes.
17 Q. Okay.
18 A. The degree of innervation will be
19 different, there will be a degree of also nerve
20 deformation within the mesh, but strictly saying
21 there will be innervation of the scar plate in
22 almost all patients.
23 Q. Have you made any attempt to
24 differentiate across manufacturers, the extent to
25 which the innervation of the scar plate varies?

Page 147

1 A. No.
2 Q. Have you made any attempt to
3 differentiate across types of mesh products, the
4 extent to which nerve innervation varies?
5 A. I may in the future, I haven't
6 done it yet. But I may in the future.
7 Q. Okay. So is it fair for me to
8 understand, and the record to reflect, that for
9 every mesh implanted for the treatment of stress
10 urinary incontinence, it's your opinion that there
11 will be nerve innervation within scar plate, that
12 you think is capable of causing pain?
13 MR. ORENT: Objection. I think his
14 testimony is every mesh that he's looked at.
15 Manufactured, that he's looked at.
16 I don't think Dr. Iakovlev has any
17 opinions about mesh he's never looked at, brands
18 he's never looked.
19 THE WITNESS: Yeah, that's correct.
20 BY MR. THOMAS:
21 Q. Okay. Let me ask you this question --
22 A. Let's repeat the question, then I
23 can answer it in more...
24 MR. THOMAS: Would you read it back,
25 please?

Page 148

1 -- REPORTER'S NOTE: Question read as
2 recorded above.
3 THE WITNESS: Oh, as I said, I can only
4 testify or make opinions of what came out of the
5 specimen. And I told you earlier, that there is --
6 I have been dealing with those specimens which
7 caused complications already.
8 BY MR. THOMAS:
9 Q. For every mesh sample that you've
10 looked at for mesh use for the treatment of stress
11 urinary incontinence, have you found mesh
12 innervation in the scar tissue?
13 A. Almost all, yes.
14 Q. Any you haven't?
15 A. If it was a small sample, maybe
16 one or two, I couldn't find nerves.
17 Q. Is that because -- do you have an
18 opinion, is that because the sample was too small,
19 because it didn't exist, or do you have an opinion?
20 A. I cannot say beyond that, I just
21 didn't find it. It could be sampling issue, it
22 could be not. Again, I cannot state what I don't
23 know.
24 Q. And how many have you seen?
25 A. Individual cases.

Page 149

1 Q. How many have you seen?
2 A. Less than five.
3 Q. How many total cases have you
4 seen?
5 A. Oh, from slings?
6 Q. Yes.
7 A. About 100.
8 Q. About 100. And less than five you
9 have not seen nerve innervation within scar tissue?
10 A. Yes.
11 Q. And you don't know whether that's
12 because it is a sampling error or because there
13 wasn't any nerves in the scar plate?
14 A. That's correct.
15 Q. Is it fair to say, based on your
16 experience as a pathologist, that you would expect
17 that when mesh is placed for the treatment of
18 stress urinary incontinence, that nerves would be
19 encapsulated by the scar tissue in the healing
20 process?
21 A. They can. If they become trapped
22 in the scar tissue, each single implanted mesh, we
23 would have to do autopsy series. I cannot go
24 beyond what I see in explanted meshes, and all
25 explanted meshes came out for complications. And

38 (Pages 146 to 149)

Golkow Technologies, Inc. - 1.877.370.DEPS

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 150

1  almost all of them, or a large proportion had pain
2  as a symptom.
3      Q.  Again, the cases you've received
4  have been complications?
5      A.  Yes.
6      Q.  And of course you know that people
7  have mesh removed for reasons other than pain,
8  don't you?
9      A.  In hernia surgery, yes.
10     Q.  Do you know whether or not
11  patients have mesh removed for reasons other than
12  pain?
13         MR. ORENT:  Objection.
14         THE WITNESS:  There might be an
15  overwhelming other complaint, like erosion or
16  infection, but in almost -- I don't want to stick a
17  number, but most of these patients complain of some
18  degree of pain.
19         BY MR. THOMAS:
20     Q.  Have you have investigated, as a
21  part of your work in this case, the reasons why
22  patients have mesh removed?
23     A.  There's always a reason.
24     Q.  I understand that.  Do you know
25  what they are, and percentage wise, how they

Page 151

1  breakout across a patient population?
2      A.  You mean the driving reasons for
3  implantation?
4      Q.  Yes.
5      A.  It's in the paper.  At least in
6  those 164 samples.
7      Q.  And that's the paper you did with
8  Dr. Blaivas?
9      A.  No.  The degradation paper.
10     Q.  Okay.
11     A.  But there's always a driving
12  reason for explantation.  There may be driving
13  reason for explantation is erosion, but then pain
14  is attributed to erosion.  So it's not indicated as
15  a main reason of explantation.
16     Q.  You can have voiding dysfunction?
17     A.  Okay.  In a voiding dysfunction,
18  but again, voiding dysfunction usually what
19  happens, you have a strong compression against
20  urethra, and this produces pain due to compression.
21  So there will be a mixture of mechanisms for pain.
22     Q.  Are you suggesting that voiding
23  dysfunction is subsumed within the pain that's
24  reported in these studies?
25         MR. ORENT:  Objection.

Page 152

1         THE WITNESS:  No, it's combined.  It
2  can be combined, this pain.
3         BY MR. THOMAS:
4      Q.  Okay.
5      A.  To cause void and dysfunction,
6  even to compress urethra to a degree that the
7  outflow is obstructed.
8      Q.  Are you aware of any studies which
9  have analyzed meshes removed because of pain,
10  compared to meshes removed for other reasons in
11  comparing the histology of those meshes?
12     A.  We're doing some work in hernia
13  specimens.
14     Q.  But in terms of published
15  peer-reviewed studies today, are you aware of any
16  studies out there, which compare the histology of
17  meshes removed for pain, and meshes removed for
18  non-pain reasons?
19     A.  That's a very good question.  Why,
20  after 50 years and a large proportion of specimens
21  removed for pain, there is no histology study.  Why
22  has this not been done?
23     Q.  So did you do a literature search
24  of that?
25     A.  Of course I did.

Page 153

1      Q.  And you didn't find any studies
2  that compared the histology of mesh removed from
3  patients who complained of pain, compared to the
4  histology of patients who had mesh removed for
5  non-pain reasons?
6      A.  There were descriptions in hernia
7  publications.  I mean in meshes removed for hernia
8  repair.
9      Q.  Which studies, do you remember?
10     A.  2005, Klosterhalfen.  He put the
11  picture of deformed nerve, and he states that in
12  his experience, over 60 percent of the meshes
13  removed for pain have some degree of nerve
14  involvement.
15     Q.  Do you view Dr. Klosterhalfen as
16  authoritative in this area?
17     A.  Yes.  He's an authority, he's one
18  of the oldest researchers.
19     Q.  Do you know whether Dr.
20  Klosterhalfen has ever investigated the precise
21  question about whether the histology of mesh
22  removed for indications of pain is different from
23  the histology of mesh for -- from patients removed
24  for non-pain reasons?
25     A.  That's what he stated.  Over

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 154

1  60 percent of the specimens removed for pain showed
2  nerve involvement.
3      MR. ORENT:  Before we go on to the next
4  question, you had cut Dr. Iakovlev off from
5  answering.  He started to say "but there are other
6  authors", if you want to just continue.
7      THE WITNESS:  Yes.  There are other
8  descriptors of meshes removed for pain, and they
9  would find nerve involvement with traumatic
10 neuroma.  Those are, I think individual cases, not
11 the series.
12     Again, same histology.  They were
13 trying to figure out what was wrong, what was
14 causing pain, and they found nerve involvement.
15 And that was done before I started researching my
16 nerves.
17     BY MR. THOMAS:
18     Q.  Would you expect more or less
19 inflammation to be seen in histology of meshes
20 removed for pain than meshes removed for non-pain
21 reasons?
22     A.  To a degree.  My research in
23 hernia showed that foreign body inflammation is a
24 component of pain mechanism.  So those meshes which
25 were removed for pain only, they continue to have

Page 155

1  relatively steady, pronounced foreign body reaction
2  many years after implantation.
3      And those which were removed for
4  recurrence, they show a trend down.  So at the
5  beginning, there is inflammation, then it goes
6  down.
7      So by the time of explantation, if it
8  happens eight years or ten years after
9  explantation, foreign bodies subsided; which is
10 different from those which were removed for pain.
11     Q.  So are you able, from your
12 research, in your work, to form an opinion as to
13 whether mesh removed for purposes of pain, the
14 histology will show higher rates of inflammation
15 than the histology for meshes removed for non-pain
16 reasons?
17     A.  So before we go into the
18 individual findings, you're trying to split it into
19 what is causing the pain, nerve entrapment and
20 inflammation or something else.
21     This is a complex process.  There are
22 multiple factors which are playing, together with
23 patient perception of pain and reporting of pain.
24     So with this type of complexity, we
25 cannot separate one individual feature.  Overall,

Page 156

1  there's a pool, if we collect enough, we can see
2  the difference.  For each individual patient, how
3  much of this feature, or that feature is playing a
4  role in each individual symptom, will be very
5  different from patient to patient.
6      So overall, the higher degree of
7  foreign body reaction is associated with higher
8  rates for chronic pain.
9      Q.  And that's based on your research
10 or other published research?
11     A.  Foreign body has been worked up
12 quite a bit in published histological studies.  How
13 much of that was specifically determined, comparing
14 two groups or three groups, it's difficult to say,
15 I don't remember right now.
16     So it is a combination of what was
17 published before, and what I find in my samples, so
18 that's -- that would be a basis for my opinion.
19     Q.  Is it your opinion that results in
20 the hernia literature on the issue of association
21 between inflammation and pain, are transferrable to
22 the pelvic floor?
23     A.  Some are, yes.  Not everything,
24 but some are.
25     Q.  Okay.  And why would it not be?

Page 157

1      A.  There are different anatomical
2  locations, different physical factors acting on the
3  scar plate.  It also crosses many anatomical planes
4  in the pelvis.  While in the abdominal wall, and
5  it's parallel to anatomical planes.
6      Q.  I'm trying to get through this for
7  a second.  If you'll look at pages 30, 31, 32 and
8  33.  Are the images on those pages additional
9  depictions of nerves within the mesh scar plate?
10     A.  That's correct.
11     Q.  Is there anything else significant
12 about those images other than they show innervation
13 within the mesh scar plate?
14     A.  No.
15     Q.  On page 33, Figure Set 3h, in the
16 upper right-hand corner, you've called out what
17 you've described as a "neurovascular bundle"; what
18 is that?
19     A.  Most of the larger nerves in the
20 medium size arteries, become together.  One artery,
21 two veins, and one nerve, that's how it works.  And
22 the nerve just starts bleeding, so the nerve goes
23 its way and artery goes its own way.
24     So in this specific case, an artery and
25 a nerve are still together.

Vladimir Iakovlev, M.D.

Page 158

1    Q.  Okay.  The brown is the nerve,
2  correct?
3    A.  Yes.  I mean, there are some other
4  brown, probably picking up some other stuff, but
5  this is --
6    Q.  Where is the artery?
7    A.  In the blue.  You can see
8  streaming, it's not a really high resolution.
9    Q.  What is the significance of the
10  neurovascular bundle as depicted in that image?
11    A.  Well, see, it is in the tight
12  spot.  So this is really as compartmentalized as it
13  gets, and slightly deformed.
14    So if you move this mesh around, the
15  fibers will start compressing on the neurovascular
16  bundle.  It may cause obliteration of the artery,
17  or can impinge the nerve.
18    Q.  Is there any impingement shown in
19  this image?
20    A.  Well, it's deformed.
21    Q.  Is there any impingement shown?
22    A.  It does, because it's deformed,
23  it's curved.
24    Q.  And you're referring now to the
25  lower right-hand image?

Page 159

1    A.  That's correct.
2    Q.  Is there anything you can tell by
3  looking at that image, whether that curved nerve
4  was causing pain in this patient?
5    A.  I can say the probability of this
6  causing pain is much higher than a nerve which is
7  not deformed.  Like something like this on page 31.
8    Q.  You can't rule out by looking at
9  the image on page 33, where you show the curved
10  nerve, you can't rule out that that nerve is not
11  causing pain, correct?
12    A.  I think we're going back to the
13  same issue.  You're taking human body as a machine,
14  it's not.  Medicine doesn't happen like that.  So
15  there are many, many, many factors which cause.
16    If the same image we put in MRI image,
17  and this deformation would be on the root coming
18  from the back, the radiologist would report that
19  there's impingement of a root.  And that's how back
20  pain occurs that's radiating to the leg, and so
21  forth.  So this is a much smaller scale, the same
22  mechanism.
23    Q.  Do you know whether this patient
24  was complaining of pain?
25    A.  Most likely she was.

Page 160

1    Q.  Do you know?
2    MR. ORENT:  Objection.
3    THE WITNESS:  With 100 percent
4  certainty, no.
5    BY MR. THOMAS:
6    Q.  Okay.  And you talked about an
7  obliteration of the artery.  Does the image on
8  page 33 in the upper right show an obliteration of
9  the artery?
10    A.  No, not this image.
11    Q.  Other than the nerve impingement
12  that you've described, and the potential for
13  obliteration of the artery, is there anything
14  unusual about the depiction of the nerves in those
15  images?
16    A.  No.
17    Q.  And I need you to go back, because
18  I didn't ask you that question about the prior two
19  pages, 30 through 32.
20    Other than the depiction of the nerves
21  within the scar plate, is there anything about the
22  nerves that are seen there that cause you any
23  concern about the potential of those nerves to
24  cause injury?
25    MR. ORENT:  Objection.

Page 161

1    THE WITNESS:  So going back to
2  mechanisms of pain.  So there are two mechanisms,
3  or two major groups of mechanisms to cause pain.
4  First, you affect the nerve itself.  So you impinge
5  it, squeeze it, becomes deformed and that can be
6  felt as pain, the nerve itself, the nerve trunk.
7    The second group of mechanisms is when
8  you affect the receptors.  And the receptors can be
9  affected, it can be again a mechanical trauma,
10  cutting, compressing, burning, chemical trauma,
11  ischemia, then the receptors are signalling pain
12  through the nerve.  So for smaller branches, the
13  significance is that the receptors now can pick up
14  the signal of nerves -- of pain, and then it will
15  be delivered through these branches, so it just
16  shows that this tissue can sense pain.
17    BY MR. THOMAS:
18    Q.  Okay.  This tissue is capable of
19  sensing pain?
20    A.  Yes.
21    Q.  Not that it is in fact sensing
22  pain in the body at the time?
23    A.  If you have other mechanisms to
24  deliver pain, it will be -- it will be causing
25  pain.

41 (Pages 158 to 161)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 162

1    Q.  Correct.
2        A.  Now, if you go to page 33, this
3    will be an example where it would be directly
4    effecting the nerve trunk.  Impingement of the
5    nerve.
6        Q.  Now, are you able, in these
7    images, 30 to 33, to show me any nerve receptors?
8        A.  You mean receptors, nerve endings.
9    When it goes really small, you can see really
10   fiber, and it is -- most of the ends will have no
11   staining, because they just disappear.  But I mean,
12   you'd have to go in higher magnification.
13       Q.  So with the magnification you have
14   here, you're not able to identify any nerve
15   receptors; is that fair?
16       A.  No, not in these pictures.  It's
17   too small magnification.
18       Q.  I have to ask the question again
19   because you answered "no" to a negative question.
20       It's fair to understand that based on
21   the magnification that you have in these images on
22   pages 30 to 33, you can't identify any nerve
23   receptors, correct?
24       A.  I cannot see nerve receptors at
25   this degree of magnification.

Page 163

1        Q.  Thank you.
2        If you go to page 34, what is the
3    significance of this image?
4        A.  This shows another severely
5    deformed nerve.  So this would be a mechanism for
6    pain through impingement.
7        Q.  And the severely deformed nerve as
8    you described it, is the brown portion, stained
9    brown?
10       A.  The dark brown portion or dark
11   brown structure.
12       Q.  And in the lower left-hand corner,
13   the white area is where the polypropylene is or
14   was, correct?
15       A.  That's correct.
16       Q.  And what's the significance of the
17   dark blue and the border of that area?  Is that the
18   staining mechanism, or does that tell you anything?
19       A.  Can you point it?  So significance
20   of what?
21       Q.  The darker blue.
22       A.  This dark blue?
23       Q.  Yes.
24       A.  That's inflammation.
25       Q.  Okay.  And the upper is 2.5 power,

Page 164

1    and the lower one was four times; is that correct?
2        A.  It's a typo, it should be 40.
3        Q.  40?
4        A.  40.  Somewhere between 40 X and 50 X.
5    Again, the cropping factor there, the magnification
6    there is not exactly...
7        Q.  And these are, again, additional
8    TVT cases, and you have not supplied us the slides
9    for these cases, correct?
10       MR. ORENT:  Objection.
11       BY MR. THOMAS:
12       Q.  In this case?
13       A.  That's correct.  These are
14   previous TVT cases.
15       Q.  On page 35 --
16       A.  Yes.
17       Q.  -- you suggest degeneration of
18   affected nerves; tell me what you mean by that?
19       A.  So you see the inner portion of
20   the nerve lost myelination.  So there is
21   degeneration of myelin sheath in the nerves.  It
22   means that these nerves cannot deliver, or most
23   likely not deliver irregular signals.
24       So earlier you were asking about the
25   abnormality, this is the abnormality that we're

Page 165

1    talking about, this is the nerve degeneration.  In
2    this case, if this part is sensory, inside, it
3    means that the area is numb.
4        This part of the nerve cannot sense
5    pain or innervation of that part of the body, which
6    goes through this nerve, may not experience any
7    pain; it's numb.
8        Q.  And that's the portion you're
9    referring to in the lower right-hand image with the
10   arrow, correct?
11       A.  That's correct.  So the
12   abnormality of the neural section indicates the
13   other process, of loss of sensation, loss of pain
14   sensation.
15       Q.  Do you know what a Renaut body is?
16       A.  Say that again.
17       Q.  Do you know what a Renaut body is?
18   R-E-N-A-U-T.
19       A.  I think I've seen this term, but I
20   don't remember it.
21       Q.  Okay.  Does the S100 stain all
22   components of the nerve?
23       A.  It only stains schwann cells.
24       Q.  When you reached the opinion on
25   page 35 that that shows a degeneration of the

42 (Pages 162 to 165)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 166

1  nerve, did you rule out the presence of nerve
2  structures other than schwann cells that might be
3  present?
4          A.  There might be axons still there,
5  but that's not the point.  The point is the nerve
6  is degenerating.
7          Q.  And what's the clinical impact of
8  the degenerated nerve?
9          A.  I just told you.  There are
10 fibers, which are in the area, mainly not function.
11 It means that if they are sensory fibers, they may
12 not deliver signals.  So that area which is
13 innervated through those fibers, will be numb.  You
14 will not feel anything in that area.
15         Q.  So it will not cause pain?
16         A.  In the reverse, it will not feel
17 anything.
18         Q.  But if it doesn't feel anything,
19 does that mean that it does not cause pain?
20         A.  Including pain.  It will not feel
21 touch, it will not feel temperature, it will not
22 feel pain.
23         Q.  Okay.  Anything else remarkable
24 about it then?
25         A.  No.

Page 167

1          Q.  If you go to page 36, Figure Set 4.
2          A.  Yes.
3          Q.  You have, "A neural ganglia in
4  additional TVT cases."
5          Again, these are cases that you
6  previously worked up?
7          A.  That is correct.
8          Q.  What is a neural ganglia?
9          A.  Neural ganglion is like a switch
10 box, or connection box for the autonomous
11 neuro system.  The neuro system which is
12 innervating in the organs rather than skin and
13 mucosa.
14         Q.  What is the significance of the
15 presence of this image of the neural ganglion?
16         A.  It tells you that some of the
17 nerves, which we see in the specimens are
18 autonomous.  So some of them go into the bladder.
19 That's one -- well, one important aspect of this.
20         The second important aspect is that the
21 ganglia themselves can be affected by the image.
22         So in first case, the nerves can be
23 affected, which are further away from the ganglia.
24 And second case scenario, the ganglia themselves.
25         Q.  Is there anything about this image

Page 168

1  on page 36 -- strike that.
2          This is one image, the second one
3  you've labeled, so it's just one image?
4          A.  That is correct.
5          Q.  Is there anything about the image
6  on page 36, that you can tell by light microscopy,
7  that there's anything abnormal about the ganglia
8  that's depicted there?
9          A.  To begin with, as we saw the
10 nerves, the location was abnormal.  So it's in the
11 scar tissue and it's inside the mesh.
12         Q.  Is that the only thing about this
13 image and the ganglia that causes you concern?
14         A.  No.
15         Q.  What else?
16         A.  I mean, that's about it.  I don't
17 have any other concerns.
18         Q.  Thank you.  Page 37 you have:
19 "Innervation of mucosa overlying the mesh, H&E and
20 S100 of the same tissue area, four times.
21 Additional TVT cases."
22         Again, these are cases outside of the
23 consolidated group, correct?
24         A.  That is correct.
25         Q.  And are all these images just four

Page 169

1  times?
2          A.  The degree of magnification on the
3  top image is slightly lower, and magnification on
4  the lower is slightly higher.  Again, this is
5  not -- it's hard to say exactly what's the degree
6  of magnification.  Because they've been taken
7  through a camera and sort of objective, and then
8  cropped, and then resized to be reprinted so...
9          Q.  What is the significance of the
10 image on the top where you showed mucosa, distorted
11 mucosa, and a measurement of 1 millimeter?
12         A.  Significance is that the mesh is
13 right under the mucosa.  So, if you touch the
14 mucosa, even if it's light pressure, it immediately
15 gets compressed into the mesh.  It can be exposed,
16 I mean, the mucosa can breakdown.
17         Q.  This is from the Edwards case,
18 isn't it?
19         A.  It could be, I don't know.  It's
20 old picture, it could be from the Edwards case.
21         Q.  And this does not show an
22 exposure, correct?
23         A.  It's not exposed, yes.
24         Q.  It's not an erosion either yet?
25         A.  In this specific image, it's not

43 (Pages 166 to 169)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 170

1   exposed.
2       Q.  Okay.  And what's the significance
3   of the distorted mucosa?
4       A.  Probably, it was getting close to
5   the exposure site.  I don't remember specifics.
6       Q.  Okay.  But is it simply the fact
7   of the location of this mesh related to the mucosa
8   that you're pointing out here?
9       A.  That is correct.
10      Q.  Is that a surgical placement issue?
11      A.  Not exactly.  It can migrate, it
12  can move centimeters within the body.
13      Q.  Or a surgeon can place it there,
14  correct?
15      A.  Both.
16      Q.  Yes.  And you're not able to tell
17  from this image, whether the surgeon placed it
18  there or it moved there from somewhere else,
19  correct?
20      A.  No.  I know that all of them are
21  covered by mucosa after surgery.  That's what
22  surgeons are trying to do.
23      Q.  So again, I asked a bad question.
24  You can't tell from looking at the
25  image, whether the surgeon placed it there, or

Page 171

1   whether it migrated there, correct?
2       A.  That's correct.
3       Q.  Thank you.  And what's the
4   significance of the two images below that on
5   Figure Set 5?
6       A.  It's the same image, the right
7   copy is labeled, the left one is not labeled.  It
8   shows that the tissue in between mucosa and the
9   mesh is innervated.
10      Q.  I see.
11      A.  So if you compress mucosa, you are
12  hitting the receptors, hence small nerve branches
13  at the same time.
14      Q.  Anything abnormal about the nerve
15  branches and twigs that you depict in those images?
16      A.  Just the location.
17      Q.  Okay.  Page 38, "Additional TVT
18  cases."  What does this show?
19      A.  The same as it says on the
20  previous page, superficial location of the mesh,
21  overlying mucosa, innervation of the tissue and the
22  mucosa.
23      Q.  And other than the presence of the
24  nerves in the mucosa, and the position of those
25  nerves relative to the mesh in the mucosa, is there

Page 172

1   anything else remarkable about that image?
2       A.  No.
3       Q.  If we go to page 39, what is
4   vascular dilatation?
5       A.  When the vessels are being
6   distended, so the outflow from the vessels is
7   obstructed for varying reasons.  So there is more
8   fluid coming in, than fluid coming out.
9       Q.  And what does mesh have to do with
10  vascular dilatation?
11      A.  It caused it.
12      Q.  How do you know that?
13      A.  Because normally vessels are not
14  distended like this, there is a reason why the
15  outflow is obstructed.
16      Q.  Are there any other causes for
17  vascular dilatation?
18      A.  In normal tissue?
19      Q.  Yes.
20      A.  There are some other, like typical
21  example is hemorrhoids.
22      Q.  I'm sorry?
23      A.  Hemorrhoids.
24      Q.  Hemorrhoids?
25      A.  Hemorrhoids.

Page 173

1       Q.  I'm sorry.  That's a southern West
2   Virginia way of saying it, I apologize.
3       A.  Okay.  So there is dilatation of
4   the vascular structure, blood stays in.  If it's
5   lymphatic vessel, lymph will stay, so it will
6   distend and it becomes larger.
7       Q.  Now, what is statis, S-T-A-T-I-S?
8       A.  Stasis, sorry.
9       Q.  Stasis.  So stasis and tissue
10  edema; what does that mean?
11      A.  Stasis means that the fluid is
12  stagnant in the vessels.  So it accumulates there,
13  it doesn't outflow.  And then after some time, this
14  fluid starts seeping into the tissue.  So because
15  the blood vessels, or lymphatics are so backed up,
16  fluid starts going into the tissue; that's how
17  edema happens.
18      Q.  Okay.  The blue in the image is
19  polypropylene?
20      A.  Yes.
21      Q.  And that is moved in the image by
22  sample preparation?
23      A.  That's correct.
24      Q.  The artifacts?
25      A.  Yes.

44 (Pages 170 to 173)

Vladimir Iakovlev, M.D.

Page 174

1      Q.  And do you see any bark around the
2  polypropylene in those images?
3      A.  Here.
4      Q.  You pointed to the white.  I'm
5  looking at the blue polypropylene itself.  There's
6  no bark attached to any of the polypropylene, is
7  there?
8      A.  Probably there is, but so low
9  magnification.  I can see it clearly in this space.
10     Q.  And you're referring now to the
11 upper right-hand corner and the black mark at the
12 lower right, correct?
13     A.  Just above it -- no, no, here.
14     Q.  Are you talking about --
15     A.  The faint line.  This faint line.
16 (Indicating).
17     Q.  Oh, I see, okay.
18     And what's the clinical significance of
19 the vascular dilatation and statis tissue edema?
20     A.  There's pressure inside.  If fluid
21 accumulates to a degree, and then it starts
22 pressing in tissue, there will be pressure
23 accumulating.
24     Q.  And to what extent can you
25 determine whether this pressure is present in an

Page 175

1  area larger than what is presented in this one
2  slide?
3      A.  What do you mean?
4      Q.  Well, this obviously depicts these
5  findings within this slide.  This slide is
6  4 microns thick, and I don't know how far across.
7      A.  About two and a half, three
8  millimeters.
9      Q.  Okay.  Can you tell whether this
10 finding is present anywhere else in the woman from
11 which this was explanted?
12     A.  Oh, it's patches.  Somewhere it's
13 dilated, some areas are edematous, some are not.
14 Sometime the entire mesh is just sewed, or is shown
15 edema or dilatation.  It depends, variables.
16     Q.  And so you're unable to say,
17 looking at this figure on page 39, Figure Set 6a,
18 whether what you've described here was causing
19 symptoms in this woman, correct?
20     MR. ORENT:  Objection.
21     THE WITNESS:  Oh, I think we talked
22 about this before.  Causing symptoms is a complex
23 process, and perceptions.
24     So this is abnormal mechanism, it is a
25 factor in pain mechanisms in some other areas.

Page 176

1  Take hemorrhoids, you ask some patients, have them
2  painful; some patients have them not painful.
3      BY MR. THOMAS:
4      Q.  I understand that.  But it's also
5  fair to understand that this woman may have had
6  this issue in the histology, as you've described
7  it, but not be experiencing any symptoms because of
8  it, correct?
9      A.  That's correct.  The main thing is
10 it's an abnormal finding and it can cause pain.
11     Q.  Okay.  Do you know whether the
12 images that are on page 40 are --
13     A.  Stasis.
14     Q.  It's the same patient, 6a, 6b?
15     A.  Could be, I'm not sure.
16     Q.  You don't know, okay.
17     Again, the blue is polypropylene?
18     A.  Yes.
19     Q.  Are you able to tell in 6b, the
20 long, narrow white space in the lower left hand,
21 whether that is polypropylene that's present or not
22 present?
23     A.  I'm not sure.  The largest part is
24 difficult.  I can see a little bit of the
25 degradation bark can be sitting on the non-degraded

Page 177

1  bark and -- oh, I can see some of the mesh fibers
2  left here in this space.
3      Q.  Okay.  I'm looking at the area
4  above that one, though.  This one (indicating).
5      A.  Yes, it's folded and it trapped
6  some of the dye.
7      Q.  Now how do you know that's folded
8  as opposed to just mesh, part of the interstitialcy
9  or part of the mesh being right adjacent to it?
10     A.  Do you see this line, or this
11 slice, or cross-section of the fiber, it's folded
12 like this, and then there's a little bit of a dye
13 in this space, you can see it.
14     Q.  So what you're showing here is
15 vascular dilatation stasis again?
16     A.  Yes.
17     Q.  Tissue edema?
18     A.  Yes.
19     Q.  Anything else remarkable about
20 this slide?
21     A.  No.
22     Q.  And the top is four times
23 magnification, and the bottom is ten times
24 magnification?
25     A.  That's the best approximation.

45  (Pages 174 to 177)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 178

1    Q.  And my expert should have this
2  slide, correct?
3    A.  Yes.
4    Q.  Since you did 6a, 6b, 6c, does
5  that mean that it's from the same patient?
6    A.  No.  They group by the feature.
7    Q.  Okay.  So you don't look at it?
8    (Reporter sought clarification.)
9    A.  Feature.  So if it's the same
10  feature, it's the same figure number, but if it's
11  different images on different pages, they are
12  labeled A, B, C, D.
13    Q.  What is the significance of the
14  edematous scar; the edema, loose scar?
15    A.  It's edema, the same thing we
16  discussed before.  The fluid stays in it, it builds
17  up pressure and can compress the structures.
18    Q.  The same on page 41, 6c?
19    A.  That's correct.
20    Q.  Anything remarkable about the
21  image on page 41 beyond what you've described?
22    A.  No.
23    MR. ORENT:  Counsel, I'm wondering if
24  it's a good time to take a quick lunch break?
25    THE WITNESS:  It feels like it.

Page 179

1    MR. THOMAS:  Sure, absolutely.
2    -- OFF THE RECORD DISCUSSION --
3    -- RECESS AT 1:01 --
4    -- UPON RESUMING AT 2:11 --
5    BY MR. THOMAS:
6    Q.  Let's go to page 42 of your
7  report, please.  I see you're open to it already.
8    A.  Um-hum.
9    Q.  Figure 7a says, "Involvement of
10  striated muscle by the mesh, H&E, 4 times.
11  Additional TVT cases."
12    Again, this is a case that is not
13  contained within the consolidated cases?
14    A.  That is correct.
15    Q.  Can you tell whether this is
16  TVT or TVT-O?
17    A.  No.
18    Q.  Does the fact that it's involved
19  striated muscle help you at all?
20    A.  To a degree.
21    Q.  Why would that influence which
22  kind of mesh it is?
23    A.  It helps, because most frequently
24  if I see striated muscle, it's transobturator tape,
25  but occasionally I see striated muscle in

Page 180

1  retropubic tapes as well.
2    Q.  And what are you showing in Figure 7a?
3    A.  I'm showing involvement of
4  striated muscle in the mesh.
5    Q.  Tell me what you mean by that.
6    A.  Striated muscle can be
7  incorporated right in the mesh, most likely mesh
8  migrated into the striated muscle.  Or sometimes
9  it's just attached to it, so the fibrous capsule.
10    Q.  On the left side is the actual
11  slide, and on the right side you've filled in with
12  a red, orange and a yellow, correct?
13    A.  Yellow and red.
14    Q.  Okay.  The yellow is the
15  polypropylene?
16    A.  That is correct.
17    Q.  And the red is what?
18    A.  Red is striated muscle.
19    Q.  All right.  And you said
20  "involvement of striated muscle by the mesh."
21    This shows striated muscle adjacent to,
22  but not incorporated in the mesh, correct?
23    A.  Some parts of this incorporated,
24  sometimes it's just been fused, surface scar
25  tissue.

Page 181

1    Q.  Help me.  Show me where it's
2  incorporated in it.
3    A.  Well, in this case --
4    Q.  You're referring to the lower
5  right?
6    A.  In the lower panel, striated
7  muscle is encircling one of the mesh fibers.
8    Q.  Okay.  What's the distance, in
9  four times magnification from the muscle and the
10  mesh?
11    A.  Within 1 to 2 hundred microns,
12  probably 100.
13    Q.  Okay.  And what's the significance
14  of that finding to your opinions in this case?
15    A.  Well, if the mesh is fused with
16  the striated muscle, any contraction of the muscle
17  will tug on the mesh and prevent muscle from free
18  contraction.
19    Q.  And what symptoms does that create?
20    A.  The mesh is tugged, and you can
21  feel the mesh moving, pulling the nerves and other
22  tissues.  So it's related to discomfort, feeling of
23  pressure and pain.
24    Q.  Once again, is it true that you
25  can't say by looking at the images in 7a, that this

46 (Pages 178 to 181)

Vladimir Iakovlev, M.D.

Page 182

1  patient was experiencing pain or discomfort due to
2  the presence of the striated muscle next to the
3  polypropylene mesh?
4       A.  I cannot say the degree of
5  sensation, but in this specific location, any
6  contraction of the muscle will tug on the mesh.  So
7  there will be a degree of sensation, to what degree
8  I cannot say.
9       Q.  All right.  Anything else
10  remarkable about the images on 42?
11       A.  No.  Just striated muscle
12  involvement by the mesh.
13       Q.  So let's go to Figure 7b on
14  page 43.  You're using a different stain here, the
15  desmin stain.
16       A.  That is correct.
17       Q.  What is the significance of Figure
18  Set 7b on page 43 of your report?
19       A.  Clearly, more visible in the
20  picture.
21       Q.  What is more visible?
22       A.  Striated muscle.
23       Q.  And that's yellow in this image?
24       A.  No, brown.  Brown is striated
25  muscle.

Page 183

1       Q.  Brown, I'm sorry.
2       A.  Because for a non-pathologist, it
3  would be hard to see where striated muscle is in
4  H&E section, but when we use desmin stain, it
5  demonstrates even the presence of striated muscle.
6       Q.  I see.  Are you able to tell me
7  whether the image in 7b is from the same patient as
8  the image in 7a?
9       A.  No, likely not.
10       Q.  Why do you say that?
11       A.  Just my recollection.
12       Q.  Are you able to tell me from what
13  patient 7b comes from?
14       A.  I may or may not.
15       Q.  How about 7a, do you know who that
16  came from?
17       A.  Same thing, I may or may not.
18       Q.  Okay.  Tell me, please, the
19  significance of the image in 7b.
20       A.  Now, we can see clearly that
21  muscle is on both sides of the mesh.  So the mesh
22  is sandwiched between striated muscle, surrounded
23  by it.
24       Q.  The same answers for 7b as 7a,
25  that when the striated muscles touch the mesh there

Page 184

1  would be a tugging, discomfort and possible pain?
2       A.  That is correct.
3       Q.  But you don't know the extent to
4  which those may manifest themselves from this
5  figure?
6       A.  The degree of sensation is
7  difficult to predict, it depends on multiple
8  factors.
9       I mean, it's clear that in this
10  location striated muscle contraction will be
11  restricted, and will cause movement of the mesh.
12  But the degree of sensation cannot be determined.
13       Q.  What about page 44?  Sorry, let's
14  go back to 43.
15       Did that cover the remarkable findings
16  in Figure 7b?
17       A.  No, I mean --
18       Q.  Is there anything else remarkable
19  about this?
20       A.  We've covered everything.
21       Q.  Thank you.  Figure 8a, on page 44.
22       A.  Yes.
23       Q.  "Involvement of smooth muscle by
24  the mesh, H&E, 10 times.  Consolidated cases."
25       Are you able to tell me whether this is

Page 185

1  a TVT or TVT-O?
2       A.  No.
3       Q.  Okay.  And you can't tell me which
4  patient it's from as you sit here?
5       A.  I can determine for this specific
6  figures which patient it came from, because this
7  image has been numbered by this time.
8       Q.  And can you tell right now, or do
9  you have to consult something?
10       A.  No, no.  I would have to go back
11  and check the names of the files.
12       Q.  I see, okay.
13       And what's the purpose of depicting the
14  smooth muscle in this image?
15       A.  To show that smooth muscle can
16  also be involved by the mesh.
17       Q.  Is the smooth muscle impacted in
18  the same way as the striated muscle that you
19  described in the last two slides?
20       A.  In a similar way, yes.
21       Q.  Okay.  Is the point here to show
22  that the smooth muscle is in close proximity to the
23  polypropylene mesh?
24       A.  That's correct.
25       Q.  And similar to 7a and 7b, any

47  (Pages 182 to 185)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 186

1  **contact with polypropylene with the smooth muscle**
2  **may cause some discomfort, tugging or possible**
3  **pain?**
4       A.  There is a little bit more to
5  smooth muscle.  Because smooth muscle is present in
6  both vaginal wall urethra and bladder.
7       So urethra and bladder have thicker
8  bundles of smooth muscle.  Vaginal wall has wisps
9  of smooth muscle.
10      If mesh is in the vaginal wall, smooth
11 muscle, which is in the vaginal wall, can be either
12 attached to the scar plate.  Or, if the mesh
13 migrates, it incorporates smooth muscle inside the
14 pores.
15      So if the smooth muscle of the vaginal
16 wall contracts, the mesh will interfere.  So this
17 will be more of a sensation in the vagina, more
18 likely during intercourse, whether the vaginal wall
19 contracts.
20      Now, if we compare it with the smooth
21 muscle of the bladder and the urethra, it's a
22 different organ.  So if mesh is interfering with
23 those bundles, they may not contract correctly.  So
24 there may be interference with the function of
25 urethra and voiding, urination.  And also,

Page 187

1  sensation in the area.
2       Also, you should obstruct urethra
3  through compression of it.  The mesh is pressing
4  against these thick bundles, and then compresses
5  the urethra.  So it's indication that position of
6  the mesh was such that it was causing urinary
7  symptoms.
8       **Q.  Are you able to tell from Figure**
9  **8a, whether this tissue sample is from the vagina**
10 **or in the area underneath the urethra?**
11      A.  For Figure 8a, it would be
12 difficult because it's an H&E slide.  If I stain it
13 with smooth muscle, then I can see exactly borders
14 and position of the muscle.  Or, I can see it in
15 the microscope.
16      It's likely to be urethra, because the
17 area is more compact and there are bundles of it,
18 but I would have to look at the slide.  But
19 comparing between these two applications, I would
20 favor the urethral muscle in this specific image.
21      **Q.  And it's fair to say that the**
22 **muscle here has not yet been incorporated into the**
23 **mesh, correct?**
24      A.  Not fully, but you can see that
25 the mesh is --

Page 188

1       **Q.  Adjacent to?**
2       A.  Moving, or pressing against this
3  bundle.  It's partially compressed; you see the
4  indentation made with the mesh here.
5       **Q.  Okay.  And again, you don't know**
6  **the extent to which the situation, circumstances**
7  **described in this slide, may cause or contribute to**
8  **discomfort, tugging or pain?**
9       A.  If it's urethral muscle, it can
10 cause urinary outflow obstruction, because it's
11 clearly pressing on this part of the muscle.  So
12 it's pressing on the whole urethra.
13      **Q.  But you don't know the extent to**
14 **which it was removed for obstruction, or why the**
15 **mesh was removed; do you?**
16      MR. ORENT:  Objection.
17      THE WITNESS:  Yeah.  Again the degree
18 of the symptoms would depend on many factors.  I
19 can say that this picture shows that there was a
20 degree of compression of the muscle.
21      BY MR. THOMAS:
22      **Q.  Can you say from this slide, that**
23 **there was urinary dysfunction based upon this**
24 **slide?**
25      A.  Complete obstruction of the

Page 189

1  urinary outflow, no, I cannot say that.  I mean
2  there is interference, but the degree of it is more
3  complex question.
4       **Q.  Page 45, Figure Set 8b is the same**
5  **issue using a smooth muscle actin stain.  And**
6  **because this is additional TVT cases, this is going**
7  **to be a different patient than 8a, correct?**
8       A.  That's correct.
9       **Q.  Is this a TVT or a TVT-O?**
10      A.  I cannot say.
11      **Q.  And is this the smooth muscle**
12 **stain that you referred to a few minutes ago?**
13      A.  That's correct.
14      **Q.  And what does the stain in Figure**
15 **Set 8b tell you?**
16      A.  So you can see clearly that the
17 smooth muscle is in wisps.  So this is the smooth
18 muscle of vaginal wall, and it became incorporated
19 into the mesh.
20      So the mesh migrated in the tissue, and
21 this part of smooth muscle became incorporated in
22 the mesh pore.
23      **Q.  How can you tell from Figure 8b**
24 **that the mesh migrated or moved?**
25      A.  Because it contains normal structure.

48  (Pages 186 to 189)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 190

1      Q.  How does this figure -- how are
2   you able to tell from this figure that the mesh
3   wasn't placed there in the first place, as opposed
4   to migrated or moved there?
5      A.  This space didn't exist before the
6   mesh was placed (indicating).
7      Q.  Okay.  And "this space" is what
8   you just drew as a circle?
9      A.  Yes.
10      Q.  And what does that space represent?
11      A.  It's the space within the mesh.
12   So it was created in the body, when the mesh was
13   placed.  When the mesh was placed, it's empty space
14   because tissue is disrupted.  The mesh goes in, and
15   everything inside needs to be filled with tissue.
16   new tissue.  So this area was filled with tissue
17   after the mesh was placed.
18      But, we know that smooth muscle is a
19   more specialized type of tissue.  It has very
20   limited ability for regeneration, so the scar which
21   can be produced.  So if there is normal tissue
22   within the mesh pore, it means that it had been
23   incorporated later on, either through scar
24   contraction, which pulls normal tissue in, or
25   through mesh migration, which migrates into this

Page 191

1   (indicating).
2      Q.  What types of symptoms are present
3   from the findings that you have in Figure Set 8b?
4      A.  I don't remember exact history for
5   this specific patient, but this position of smooth
6   muscle inside the mesh, is at risk for pain,
7   especially during intercourse, dyspareunia.  Again,
8   the degree of these symptoms is difficult to
9   predict.  But this is an abnormal position of
10   smooth muscle.
11      Q.  Are you suggesting that every time
12   this patient would have sexual intercourse, that
13   she experienced pain due to this condition?
14      MR. ORENT:  Objection.
15      THE WITNESS:  How much of this will
16   contribute to her symptoms would be difficult to
17   predict.  But as I said, this is an abnormal
18   position, and this abnormality provides a risk
19   factor for pain during intercourse.
20      BY MR. THOMAS:
21      Q.  Okay.
22      A.  Or just simply chronic pain.
23      Q.  So as we've talked about before,
24   this is a risk factor in conjunction with other
25   things that may cause the conditions you're talking

Page 192

1   about?
2      A.  That's correct.
3      Q.  Anything else remarkable about 45?
4      A.  No.
5      Q.  46, Figure Set 8c.
6      Again, this is more smooth muscle with
7   smooth muscle actin stain, additional TVT cases.
8   Is this a third patient, do you know?
9      A.  This is an older case.
10      Q.  So is this a third patient within
11   this set?
12      A.  Most likely.
13      Q.  And it's an older case given the
14   camera that's used?
15      A.  Yes.
16      Q.  Can you tell whether it's a TVT or
17   TVT-O?
18      A.  No.
19      Q.  What is the significance of Figure 8c?
20      A.  This is a nice picture, this is
21   urethral wall.
22      Q.  You're talking about the muscle on
23   the right side of the image on the left?
24      A.  Yup.
25      Q.  Okay.

Page 193

1      A.  It's a thicker bundles of urethra,
2   and this part is vaginal wall.  So this is part of
3   vaginal wall.  And you can see the curve of the
4   sling was compressing urethra (indicating).
5      So this part of the sling was excised
6   with some of the urethral muscle.
7      Q.  What is the significance of this
8   finding in this figure?
9      A.  It shows the difference between
10   smooth muscle in the vaginal wall and smooth muscle
11   in the urethra, and the relationship of the mesh,
12   how it sits right on the muscle of the urethra.
13      Q.  If you look at this, as it's going
14   to be in-situ, is it going to look like this?
15      A.  Eventually it will look like this.
16      Q.  So this is the urethral muscle,
17   and I'm holding Figure 8 sideways.  So this shows
18   how the mesh has either the U-shape or the hammock
19   shape underneath the urethra; correct?
20      A.  That is correct.
21      Q.  Okay.  So the positioning of this
22   mesh is really consistent with the way it should be
23   placed; is that correct?
24      A.  It's the normal position.  It's
25   not normal, intended position.

49 (Pages 190 to 193)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 194

1     **Q.  Intended position, okay.**
2     **So what is significant about Figure 8c,**
3     **insofar as it relates to your opinions in this**
4     **case?**
5         A.  Well, I'm demonstrating that the
6     mesh is compressing right against urethra.  And if
7     it was more pressure, it would start migrating into
8     urethra and sometimes I see that as well.
9         **Q.  When you say migrating, are you**
10    **talking about eroding into the urethra?**
11        A.  Yes.
12        **Q.  Okay.  There's no evidence here,**
13    **though, of evidence of erosion into the urethra,**
14    **correct?**
15        A.  In this specific case, I don't
16    remember.
17        **Q.  Well, you don't see it in the**
18    **slide.  You can't offer the opinion to a reasonable**
19    **degree of medical certainty that this mesh has**
20    **eroded into the urethra here, correct?**
21        MR. ORENT:  Objection.
22        THE WITNESS:  Not in this image.  And
23    the purpose of this different.
24        So you can see clearly, I should have
25    probably turned it.  I should have turned it like

Page 195

1     this (indicating).  And this would demonstrate that
2     with more pressure, it would start migrating; in
3     this specific case, it didn't.
4         BY MR. THOMAS:
5         **Q.  Isn't this supposed to be right**
6     **underneath the urethra in order to control the**
7     **urine flow?**
8         A.  Yes, but I mean --
9         **Q.  Is this not placed properly?**
10        MR. ORENT:  Objection.
11        THE WITNESS:  I wouldn't go and I
12    cannot testify exactly for placement.
13        To me, as a pathologist, I examine what
14    is abnormal and what can cause symptoms.
15        So if there are specific requirements
16    for placement or positioning, it would be a
17    clinical question.
18        BY MR. THOMAS:
19        **Q.  Okay.**
20        A.  So to me, this position, right
21    against smooth muscle of urethra, indicates that
22    sling is compressing against urethra directly.
23        So, with extra pressure, you can
24    collapse or compress urethra and cause urinary
25    outflow.  And this is repeated in medical histories

Page 196

1     that slings can cause urinary outflow and
2     obstruction.
3         And with more pressure, it will start
4     going through the muscle and become eroded.  Also,
5     it will describe the clinical phenomena.
6         **Q.  And when you talk about disrupting**
7     **urinary outflow, is that the same thing as**
8     **retention?**
9         A.  Yes.
10        **Q.  And that's a recognized complication**
11    **from mesh placement?**
12        A.  Yes, it is.
13        **Q.  Anything else remarkable about**
14    **this slide?**
15        MR. ORENT:  Objection.
16        THE WITNESS:  No.
17        BY MR. THOMAS:
18        **Q.  Is it fair to understand that**
19    **you're not able to diagnose urinary retention based**
20    **upon this single slide, correct?**
21        A.  Retention is a symptom, as we've
22    discussed before, symptoms are caused by multiple
23    factors together, so...
24        **Q.  Answer my question.  Based on this**
25    **slide alone, you can't make that finding?**

Page 197

1         A.  You can say that this position
2     creates a risk for obstruction.
3         **Q.  Yeah.**
4         A.  And a degree of compression of the
5     urethra.
6         **Q.  But like everything else, that's a**
7     **risk factor that you'd have to combine with other**
8     **things to determine whether, and to what extent**
9     **this could cause any problems in her, right?**
10        MR. ORENT:  Objection.
11        THE WITNESS:  Not necessarily.  It may
12    not need other factors.  It may cause symptom on
13    its own.  But the degree of the symptom is clinical
14    presentation.
15        BY MR. THOMAS:
16        **Q.  And you don't know what that**
17    **clinical presentation is as you sit here today?**
18        A.  That's correct.
19        Q.  Page 47, Figure 8d.  This is,
20    **"Innervation within the mesh and between the mucosa**
21    **and the mesh.  Also, images of muscle movement**
22    **involvement by the mesh."  And this is a**
23    **publication?**
24        A.  That's correct.
25        Q.  Do you know what kinds of mesh are

50 (Pages 194 to 197)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 198

1    involved here?
2        A.  I don't remember.  I think two of
3    these images are from TVT or TVT-O.  And two of
4    these images are from different mesh.
5        Q.  Which ones are from TVT or TVT-O?
6        A.  I don't remember now.  I would
7    have to sort of do matching.
8        Q.  Okay.  What other manufacturers
9    did you look at?
10       A.  AMS, Boston Scientific, Bard.
11       Q.  And do you know which of those
12   manufacturers are depicted in this image?
13       A.  No, I know for sure that there's
14   at least one TVT mesh here.
15       Q.  At least one?
16       A.  At least one.  I don't remember --
17       Q.  Do you know whether it was a TVT
18   or a TVT-O?
19       A.  No.
20       Q.  Okay.  And what is the purpose of
21   this image?
22       A.  It demonstrates same smooth muscle
23   involvement.
24       Q.  Are you able to tell -- as I
25   understand the smooth muscle is either going to be

Page 199

1    in the vagina or around the urethra, correct?
2        A.  That's correct.
3        Q.  Are you able to tell in Figure 8
4    whether this is the vagina or the urethra?
5        A.  Let me see, because the pictures
6    are cropped to a degree.
7        Q.  They're "cropped", did you say?
8        A.  Cropped, yes.  So I need the
9    larger pictures to -- let me see.
10       Maybe it's described in the caption.
11   (Witness reviews document.)
12       Just representative image.  From what I
13   see, but it's not 100 percent, it may not be
14   100 percent correct.
15       C, would reflect urethral muscle.  And
16   D would reflect vaginal muscle.  But I'm not sure,
17   because most of the structures are cropped.  It
18   just describes the fact that the mesh can
19   incorporate smooth muscle, from either origin.
20       Q.  And just so we're clear.  You're
21   pretty sure that one of these is a TVT or a TVT-O,
22   but you don't know which of the four figures in
23   Figure Set 8d is a Johnson & Johnson product?
24       MR. ORENT:  Objection.
25       THE WITNESS:  It would be either these

Page 200

1    two or both (indicating).
2        BY MR. THOMAS:
3        Q.  Okay.  C and D, correct?
4        A.  C and D.  That is my recollection.
5        Q.  What is it about those images that
6    cause you to believe it's an Ethicon TVT or TVT-O?
7        A.  Oh, maybe not.  Wait a second.
8        (Witness reviews document).
9        Sorry.  I have to retry this.  I don't
10   remember which exactly are TVT or TVT-O.  It could
11   be one of these images in one of these.
12       Q.  It could be any one of the four?
13       MR. ORENT:  Objection.
14       THE WITNESS:  Yes, I would have to go
15   back and check.
16       BY MR. THOMAS:
17       Q.  Now this is smooth muscle; is that
18   what you're saying?
19       A.  These are smooth muscle.
20       Q.  In A, B, C and D?
21       A.  No.  Figure A shows neurovascular
22   bundle in the pore, we saw similar images before
23   that.
24       Figure B shows innervation between
25   sling and mucosa.

Page 201

1        Figure C -- (witness reviews document.)
2        Q.  Are you reading the text now?
3        A.  Yes.  So Figure C shows striated
4    muscle.
5        And Figure D, shows smooth muscle
6    unspecified, either from vagina or urethra.
7        Q.  Okay.  And is the purpose of this
8    image just to show the innervation of the mesh in
9    general?
10       A.  Well, the purpose of the image is
11   to show all these pictures together.  And I
12   included it because I knew that at least one
13   contains TVT or TVT-O, it is a supplementary
14   picture.
15       Q.  Anything else significance for the
16   figures on page 47?
17       A.  No.
18       Q.  Page 48, Figure Set 9a.  "Arterial
19   obliteration in the mesh scar plate, H&E 10 times.
20   Consolidated cases."
21       This obviously is from one of the
22   plaintiffs in the consolidated cases.
23       A.  Yes.
24       Q.  And you've indicated on the image
25   an obliterated artery.  How can you -- what is it

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 202

1  about this image that tells you that this artery is
2  obliterated?
3        A.  The lumen is collapsed.
4        Q.  The lumen is collapsed?
5        A.  Yes.  The arterial wall is
6  degenerated, so clearly non-functional.
7        Q.  And what does it mean to have an
8  obliterated artery?
9        A.  It means that there is an area in
10  the body which had insufficient or disrupted blood
11  supply.
12        Q.  Okay.  When you say "insufficient
13  or disrupted", it can be disrupted without being
14  insufficient; can't it?
15        A.  That's correct.  There might be a
16  collateral circulation sufficient to supply.
17        Q.  And you're not able to tell from
18  looking at this image in Figure Set 9a, that if
19  this is an obliterated artery, that it has any
20  clinical impact on the patient, correct?
21        MR. ORENT:  Objection.
22        THE WITNESS:  Again, could have had
23  only short-term impact, could have had longer term
24  impact.  Short term would be necrosis, right after
25  the obliteration, or thrombosis, it's like heart

Page 203

1  attack.
2        And then long-term would be scarring
3  and fibrosis.  The same thing as a heart, people
4  who have insufficient cardiac output.  If heart
5  muscle doesn't work as well as before the infarct,
6  so the same thing here, it would be a short term,
7  shortly symptoms or changes in the body.  And then
8  longer term.  Longer term would be caused more
9  fibrosis.
10        BY MR. THOMAS:
11        Q.  And longer term there may or may
12  not be a problem, correct?
13        A.  You mean how they would translate
14  into clinical symptoms?
15        Q.  Yes.
16        A.  The degree of translation into
17  clinical symptoms is more a complex process.
18        Q.  Okay.  Is there necrosis in this
19  image?
20        A.  No.  Because artery has supplied
21  the blood to somewhere else further down, so...
22        Q.  Okay.  So given your finding of an
23  obliterated artery, there are no clinical symptoms
24  manifested in this image, at this time that you can
25  point to, correct?

Page 204

1        MR. ORENT:  Objection.
2        THE WITNESS:  Not in this area.
3        BY MR. THOMAS:
4        Q.  Okay.
5        A.  But it tells us that somewhere
6  else beyond this square picture, there was damage
7  for the tissue.
8        Q.  There was or may be?
9        A.  There was.
10        Q.  Okay.
11        A.  The degree of it is difficult to
12  determine.  But there was.
13        Q.  You'd have to see the tissue in
14  order to make that evaluation, correct?
15        MR. ORENT:  Objection.
16        THE WITNESS:  Yes.
17        BY MR. THOMAS:
18        Q.  Where is the mesh in Figure 9a?
19        A.  Somewhere beyond it.
20        Q.  It's not in the slide?
21        A.  Maybe right at the corners, I
22  don't know.
23        Q.  But you didn't capture any mesh in
24  the slide on 9a?
25        A.  I didn't crop it in.

Page 205

1        Q.  Let's go to page 49, Figure Set 9b.
2        A.  Yes.
3        Q.  It says, "Examples of capillary
4  thrombosis in the mesh scar plate."
5        What is "capillary thrombosis"?
6        A.  When there are small thrombi
7  formed in the capillaries.
8        Q.  What is the significance of
9  capillary thrombosis in the mesh scar plate?
10        A.  The same as for arteries, just on
11  a small scale.  So there's interruption of blood
12  supply in the smaller area.  Artery can cover large
13  area, capillaries are covering small.
14        Q.  Is there anything about what you
15  see in Figure Set 9b, that would tell you that this
16  patient is experiencing any clinical symptoms?
17        A.  Again, the degree of manifestation
18  of this finding would be difficult to determine.
19        Q.  It could be nothing?
20        A.  May not be clinically apparent.
21        Q.  And is this a single plaintiff or
22  is it two different plaintiffs?  It says,
23  "additional TVT cases."  I can't tell if it's one
24  patient or two.
25        A.  I think it's from the same patient.

52 (Pages 202 to 205)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 206

1    Q.  Is it a TVT or TVT-O?
2    A.  I think it was the Edwards case.
3 That's as far as I can recollect.
4    Q.  Okay.  Is there any mesh in Figure
5 Set 9b?
6    A.  Right there (indicating).
7    Q.  So that's on the lower left, okay.
8    Is there any mesh in the image above?
9    A.  Not in the image.  It was probably
10 right beside it.
11    Q.  Okay.  Let's go to Figure Set 10a
12 on page 50.  It says, "TVT sling curled into a roll
13 cross-section through parallel walls.  H&E stain
14 2.5 power magnification.  Consolidated cases."
15    This shows a piece of curled mesh,
16 doesn't it?
17    A.  That is correct.
18    Q.  And this is the curled mesh that
19 you talked about before when you place it in
20 formalin that it will curl over on itself, correct?
21 When it's placed in formalin?
22    A.  Did I say that it curls in
23 formalin?  I said that mesh, which is curled in
24 scar tissue, curled in the body.
25    Q.  I see.  So you believe that this

Page 207

1 curled in the body?
2    A.  Yes.
3    Q.  And on what basis do you believe
4 that?
5    A.  Because that curl shape is
6 immobilized within the scar tissue, it's
7 incorporated in the scar tissue, in this shape.
8    Q.  Okay.  Anything other than the
9 curling phenomena that you've just described as the
10 purpose of Figure Set 10a?
11    A.  Curling phenomena, scarring, it's
12 all encased in scar tissue.
13    Q.  Okay.
14    A.  That's about it.
15    Q.  Okay.  And at the top where we see
16 the blue, those are going to be artifacts?
17    A.  No.  The blue ones are
18 cross-sections of the blue filaments.
19    Q.  I should have said, in places
20 where they don't fill the holes?
21    A.  It can't be clear filament.
22 Because remember, half of the fibers in the sling
23 are blue, half of them are clear.
24    Q.  Okay.  Let's look at the top, off
25 of the slide there is a blue fragment.  That

Page 208

1 obviously has been pulled away from the slide,
2 correct?
3    A.  That's correct.
4    Q.  That's polypropylene?
5    A.  That's correct.
6    Q.  Let's go to set 10b.  Is set 10b
7 from the same patient or a different patient?
8    A.  I suspect it is the same patient.
9    Q.  Do you know?
10    A.  Not with 100 percent certainty.
11 But I think it is.  It's just a different part the
12 of the same curled mesh.
13    Q.  Okay.  And does Figure Set
14 10b show anything new beyond what you've showed in
15 10a, or is it the same?
16    A.  It's the same, just tighter roll.
17    Q.  And if you look at the images at
18 the top, there's a blue line coming out of the top
19 right, and that's a polypropylene artifact?
20    A.  Displaced polypropylene fibers.
21 You can also see dilated vascular channels.
22    (Reporter sought clarification.)
23    A.  So in this area, there is vascular
24 dilation.
25    Q.  Can you tell from these images,

Page 209

1 10a and 10b, whether this mesh caused any symptoms
2 in the patient when it was implanted?
3    MR. ORENT:  Objection.
4    THE WITNESS:  My answer is the same.
5 Clinical symptoms is a multifactorial, complex
6 phenomena.
7    BY MR. THOMAS:
8    Q.  This is a risk factor?
9    A.  No, this is not a risk factor,
10 this is a mechanism, how the complications occur.
11    But then there is a patient in between
12 who feels the symptoms, and the body however reacts
13 and so forth.  But in this case, the mesh is
14 rolled, so the pressure is distributed in a small
15 area.
16    The probability that it will compress
17 urethra is higher, because if it was flat, it would
18 have much larger distribution of pressure.
19    Q.  So is the risks from this curl
20 mesh compression against the urethra and urinary
21 retention?
22    A.  Yes, one of those.
23    Q.  Do you know whether this patient
24 had urinary retention?
25    MR. ORENT:  Objection.

53 (Pages 206 to 209)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 210

1    THE WITNESS: I don't remember now.
2  Because my purpose for this report was to actually
3  show these things which can happen, and the
4  pathological changes which happen after mesh
5  placement.
6    And, symptoms which can factor in.
7    BY MR. THOMAS:
8    **Q.  Okay.**
9    A.  But I wasn't working on specific
10 connection between this pathological change, caused
11 that symptom in this specific patient.
12   **Q.  Okay.  Anything else remarkable**
13 **about the images on 50 and 51?**
14   A.  No.
15   **Q.  Go to page 52.  And you get**
16 **"Neurovascular bundle within curled mesh, four**
17 **times magnification.  Consolidated cases."**
18   **Is this a different patient than was**
19 **depicted in 10a and 10b?**
20   A.  One of these, because I say that
21 it's curled mesh --
22   (Witness reviews document).
23   So likely it was one of these two.
24   **Q.  I think you told me -- well, maybe**
25 **I didn't hear this right.  I thought you told me**

Page 211

1  **that A and B were from the same person?**
2    A.  Most likely.
3    **Q.  Do you know?**
4    A.  I can tell you, but not right now.
5  I can just check the name of the files.
6    **Q.  And do you think that 10c, is the**
7  **same or different person?**
8    A.  Most likely it is the same person,
9  or one of the two.  It could all be from one
10 patient, it could be from two patients.
11   **Q.  Okay.  In the top part on 10c, on**
12 **page 52, you have a displaced piece of**
13 **polypropylene?**
14   A.  Yes.
15   **Q.  And what's the significance of**
16 **identifying this neurovascular bundle in the**
17 **figure?**
18   A.  As before, we were talking about
19 entrapment of the neurovascular bundle before.  But
20 in this case, it's not just in pore.  It goes in
21 the pore, and became entrapped in the curls.
22   So it's in between two layers of the
23 mesh right inside the curl.  So it's secondary type
24 of compartment.  Because before we're talking about
25 compartmentalizing nature of the mesh, and then we

Page 212

1  talk about flat mesh, it's sort of third dimension.
2  So compartments are within the thickness of the
3  mesh.  But when it curls, it creates secondary
4  compartment.  Compartment which is encircled by the
5  mesh or between the folds.
6    **Q.  Anything that you can see in**
7  **Figure 10c, on page 52 that is abnormal or**
8  **symptomatic about that neurovascular bundle, other**
9  **than its presence in the scar tissue?**
10   A.  It's abnormal location.
11   **Q.  It's simply that, the abnormal**
12 **location?**
13   A.  Yes.
14   **Q.  Anything else?**
15   A.  The surroundings are abnormal.
16   **Q.  Okay.  Anything else remarkable**
17 **about that image?**
18   A.  No.
19   **Q.  Let's go to page 53, section 10d.**
20 **This is, "A twisted TVT sling" from additional TVT**
21 **cases."**
22   **So this is one of your older cases,**
23 **correct?**
24   A.  Yeah.  Earlier or concurrent.
25   **Q.  Is this a TVT or TVT-O?**

Page 213

1    A.  I don't know.
2    **Q.  What is the significance of what**
3  **you've done in Figure 10d?**
4    A.  It shows that the mesh just
5  curled, and also twisted.  To get the shape like
6  this out of flat tape, it has to curl and then one
7  end is twist.
8    Just think about it, how they put these
9  sections in this shape.  So one end like this, and
10 the other one is probably that (indicating).
11 Or maybe like this (indicating).
12   **Q.  Okay.  Does that happen by**
13 **placement, or by migration in the body, or do you**
14 **know?**
15   A.  It's hard to figure out if you can
16 place it like this.
17   **Q.  Do you know?**
18   A.  I don't know.  One thing I can
19 tell you, this shape was formed in the body and
20 then it became incorporated in scar tissue like
21 this.
22   **Q.  But you don't know whether that**
23 **happened on placement or in some other way?**
24   A.  No.
25   **Q.  Okay.  Now, in Figure 2 and**

54 (Pages 210 to 213)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 214

1  **Figure 3, you show different images of the yellow.**
2  **What's the purpose of doing gradations of the**
3  **yellow?**
4       A.  Well, this shows the planes of the
5  mesh.  Just to help you to understand that we're
6  talking about the mesh which twisted.
7       **Q.  Okay.  Figure 10e is explanted**
8  **mesh.  This has been in formalin, correct?**
9       A.  Yes.  I believe it was in
10 formalin.
11      **Q.  Okay.  And no attempt to clean it**
12 **at all, correct?**
13      A.  That is correct.
14      **Q.  And the purpose here is to show**
15 **what you believe to be the curling of the mesh?**
16      A.  Well, it's not what I believe.  I
17 observe curling.  It's hard to show in the picture,
18 but when you look at it with just magnifying glass
19 or if you have good eyes, you can see that the mesh
20 is curled up and then it's all filled with scar
21 tissue.
22      **Q.  Is the purpose of this just to**
23 **show the simple curling, or are you trying to show**
24 **something beyond other than that?**
25      A.  No, just curling.  And that the

Page 215

1  curled shape is actually filled with scar tissue.
2  It's not formalin, as you'd like to say, causing
3  the curling.  It was removed from the body in that
4  shape.
5       **Q.  Can you tell whether, assuming**
6  **this is curled in the body, whether it was curled**
7  **upon placement or curled after placement?**
8       A.  The only thing I can say, it can
9  happen, and it happened.
10      **Q.  Okay.  But you don't know whether**
11 **it happened during placement or after placement?**
12      MR. ORENT:  Objection.
13      THE WITNESS:  I don't know.
14      BY MR. THOMAS:
15      **Q.  If you go to page 55, Figures A**
16 **and B, set 10f.  "A TVT sling with curled edges.**
17 **Right sling is TVT."**
18      **Are these two different slings or one;**
19 **do you know?**
20      A.  These are two different slings,
21 this is AMS, this one I remember.
22      **Q.  AMS is on the left?**
23      A.  Yes.
24      **Q.  And TVT is on the right?**
25      A.  Yes.

Page 216

1       **Q.  Is it TVT or TVT-O?**
2       A.  I don't know.
3       **Q.  Does the AMS figure have any**
4  **relevance to your discussion in this case?**
5       A.  Not necessarily, no.
6       **Q.  Okay.  Tell me what is significant**
7  **to you about the TVT in part B of set 10f?**
8       A.  See, the images which were taken
9  from publications were not cropped, so I don't
10 remove any panels.  So in this image, I think I had
11 a TVT, I provided the entire --
12      **Q.  I understand, that's okay.**
13      A.  So in this case I can tell exactly
14 this is TVT, and this is a different manufacturer.
15      **Q.  All right.  So what is the**
16 **significance of slide B?**
17      A.  It's curled, it's roped.  You can
18 see it's not tightly -- it's not flat.  It's
19 tightly curled.
20      **Q.  Can you tell whether it was placed**
21 **that way or whether that happened after placement?**
22      MR. ORENT:  Objection.
23      THE WITNESS:  I can't say.  The only
24 thing I can say is that it happened in the body.
25

Page 217

1       BY MR. THOMAS:
2       **Q.  Okay.  Anything else remarkable**
3  **about 10f on page 55?**
4       A.  No, just roping.
5       **Q.  Page 56, you have Figure Set**
6  **10f again.  Is that a typo, or is that the same**
7  **mesh?  It looks like a different mesh, it looks**
8  **like one of yours.**
9       A.  It's a typo.
10      **Q.  So this would be 10f --**
11      A.  No, it should be 10d.
12      **Q.  10d?**
13      A.  I think it's the same specimen as
14 10e.
15      **Q.  Okay.**
16      A.  The same case, I believe.  So this
17 case took two pieces.  One piece was rolled like
18 this, like 10e.
19      **Q.  Okay.**
20      A.  And the second piece was flat
21 area.  Sometimes one piece, especially if it's
22 heat-treated doesn't curl.  So there is a segment
23 of mesh --
24      **Q.  What do you mean heat-treated,**
25 **during removal?**

55 (Pages 214 to 217)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 218

1    A.  No, during manufacturing.
2        Q.  Are you talking about heat-treated
3    as in laser cut?
4        A.  No, the entire surface is
5    heat-treated, not just edges.
6        Q.  And so what impact -- I didn't see
7    it anywhere in your report, that heat somehow in
8    the manufacturing process will impact the ability
9    of the mesh to lay flat in the body?
10       A.  It doesn't curl -- oh, doesn't
11   curl as much.
12       Q.  Okay.
13       A.  It's more stable structure because
14   fibers are welded together, or to a degree
15   connected together.
16       Q.  Okay.
17       A.  I know that some of the tapes --
18       Q.  Some other manufacturers?
19       A.  Other manufacturers, middle
20   portion is heat-treated.
21       Q.  Okay.  So did Boston Scientific
22   mention it?
23       A.  I don' know.
24       Q.  It's all right.
25       A.  I don't remember now.  I mean some

Page 219

1    of them were coming out first, with no heat
2    treatment, and then later on they became
3    heat-treated.
4        So some portions don't curl because of
5    heat treatment, or just don't curl because of other
6    factors.  So in this specific case, there was a
7    segment of the sling removed, and it was curled.
8    And in another segment of the sling removed and it
9    remained flat in the body.
10       Q.  Okay.  Do you know why?
11       A.  No, I don't know.  One of the
12   reasons can be heat treatment.
13       Q.  It could also be placement?
14       A.  It could also be placement or
15   location.
16       Q.  And what is the purpose of the red
17   and the yellow on the image on 10f on page 56?
18       A.  It just demonstrates how flat
19   section of the mesh looks, and how a curled section
20   of the mesh looks.  Because here, cross-section,
21   this mesh.
22       Q.  Yes?
23       A.  And then it came on histological
24   sections like this.
25       Q.  Is this from a case, additional

Page 220

1    TVT cases?
2        A.  Yes.
3        Q.  Has this been produced in a report
4    somewhere?  I've never seen this image in a case
5    anywhere, I'm just curious to know if it's been
6    published in a report someplace.
7        A.  I don't want to disclose that if
8    it has not been produced, so it have been produced.
9        Q.  Let me ask you this.  Here is why
10   I ask:  Generally, as you know, at least with
11   Ethicon, we divide these meshes before any work is
12   done on them.
13       Did you divide this mesh with Ethicon
14   before you did this work on 10f?
15       A.  It could be that was divided with
16   your expert, so we were taking pictures together.
17       Q.  Okay.  Well maybe that's right.
18       A.  I think it was the case.  Now I
19   can vaguely remember the issue because we were
20   discussing how we're going to cut this diagonal or
21   cut it --
22       Q.  I see.
23       A.  And so I remember him standing
24   beside me, and I was taking those pictures.
25       Q.  I see.

Page 221

1        A.  I took this picture, then this
2    picture, then we probably have similar pictures
3    from him.
4        Q.  And I apologize, I've been asking
5    this question a lot, and I don't know if I've asked
6    you about this slide, so if I have, I apologize.
7        You don't know whether the curling
8    depicted in 10f, on page 56 occurred during
9    placement or after placement, do you?
10       A.  No, I don't.
11       MR. ORENT:  Objection.
12       BY MR. THOMAS:
13       Q.  Page 57, Figure Set 10g.  "A TVT
14   sling with curled edges."  Is this a different TVT
15   than the ones we've looked at?
16       A.  I think these are the pictures of
17   the same case.  Again, that is my recollection, I'm
18   not 100 percent sure, but I think.
19       Q.  Do you know if this is a TVT or a
20   TVT-O?
21       A.  No.
22       Q.  Are you trying to show anything by
23   these images on 10g other than a different
24   depiction of what's in 10f?
25       A.  Well, no.  This just shows the

56 (Pages 218 to 221)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 222

1    curling state, this cross-section (indicating).
2        Q.   Okay.  So it's your best
3    recollection that the images in 10e, 10f and 10g,
4    are from the same mesh, same patient?
5        A.   Yes, likely than not, these are
6    all from the same patient.
7        Q.   But you're not sure?
8        A.   No.  As I said, the purpose of
9    this report was to analyze the device as a whole,
10   not the individual patients.
11       Q.   10h:  "TVT sling with curled
12   edges.  Additional TVT cases"?
13       A.   Yes.
14       Q.   Do you know where -- is this a new
15   patient; do you know?
16       A.   It's older pictures, taken by old
17   camera.
18       Q.   Do you know whether this is a
19   TVT or TVT-O?
20       A.   No.
21       Q.   What is the purpose of this image?
22       A.   It show the cross-section of the
23   curl.  And you can see it clearly, the whole field
24   is scar tissue.  This indicates that this curl
25   shape was formed in the body and then the scar

Page 223

1    tissue growing inside and filled the two-block
2    structure.
3        Q.   And are you able to tell from this
4    image, whether it was curled on placement or curled
5    after placement?
6        MR. ORENT:  Objection.
7        THE WITNESS:  No.
8        BY MR. THOMAS:
9        Q.   Anything else remarkable about
10   Figure Set 10h?
11       A.   No.  Curling, scar encapsulation,
12   scar filling.
13       Q.   Page 59, Figure Set 10i:
14   "Neurovascular bundle with rolled TVT tape, S100
15   stain.  Additional TVT cases."
16       Is this from the same or a different
17   patient as set 10h?
18       A.   I don't remember now.
19       Q.   Do you know if it's a TVT or
20   TVT-O?
21       A.   No.
22       Q.   What are you trying to show in
23   Figure 10h?
24       A.   It's a single picture for single
25   purpose as 10c, on page 52.  A neurovascular bundle

Page 224

1    is inside the roll of the curled tape.
2        Q.   And is there anything about the
3    depiction in the neurovascular bundle in set 10i on
4    page 59 that is irregular or abnormal other than
5    its presence in the scar plate?
6        A.   Well, it's bent by the mesh fiber,
7    you can see clearly that it deviates from straight
8    course.
9        Q.   Anything about that that makes you
10   have an opinion that this is causing any symptoms
11   in the person who has this mesh?
12       MR. ORENT:  Objection.  Form.
13       THE WITNESS:  Probably, the nerve is
14   irritated by these fibers higher, because it is a
15   direct compression on the nerve.
16       BY MR. THOMAS:
17       Q.   But there's nothing about this
18   slide, just like the other slides, which tells you
19   that the neurovascular bundle in Figure Set 10i,
20   actually caused symptoms in the person who had this
21   mesh?
22       MR. ORENT:  Objection.
23       THE WITNESS:  We discuss this before.
24   The degree of symptoms, the expression by the
25   patient is a complex process.

Page 225

1        So I can say that this is abnormal,
2    this is a mechanism for symptoms, and then that can
3    happen.
4        BY MR. THOMAS:
5        Q.   And the reason why you say it's
6    abnormal is because the mesh fiber causes this
7    bundle to alter its path?
8        A.   Yes.
9        Q.   Anything else?
10       A.   No.
11       Q.   Page 60.
12       A.   Yes.
13       Q.   Figure Set 10j:  "A rolled TVT
14   sling sectioned parallel and perpendicular to the
15   roll.  Additional TVT cases."
16       Do you know whether this is a TVT or
17   TVT-O?
18       MR. ORENT:  Objection.
19       THE WITNESS:  No.
20       BY MR. THOMAS:
21       Q.   What is the significance of this
22   slide to show what you showed in previous slides.
23   That is, the fact of the curling?
24       A.   Fact of the curling and mechanism
25   for erosion on page 61, I demonstrate how the

57 (Pages 222 to 225)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 226

1  erosion occurred.  Because one end of this curled
2  tape became eroded.
3      Q.  Okay.  So this is, the dark end of
4  the tape on page 60 and on 61, it is in fact an
5  erosion?
6      A.  Yes, it's --
7      Q.  Where did it erode?
8      A.  In the mucosa, in vaginal mucosa.
9      Q.  Did it erode into another organ?
10     A.  No, it eroded through the mucosa
11 into the vagina.
12     Q.  Do you distinguish between an
13 erosion and an exposure?
14     A.  Technically, there is a
15 distinction.  The terms are used interchangeably,
16 so there is no agreement which one is --
17     Q.  Let's use the technical terms,
18 just so you and are communicating.  Is this an
19 erosion or an exposure?
20     A.  Both.
21     Q.  Okay.
22     A.  Because the mucosa eroded on top
23 of it and mesh became exposed.
24     Q.  Okay.  But in terms of the mesh
25 going into or eroding into another organ, that

Page 227

1  didn't happen here?
2      A.  Well, it eroded into the mucosa.
3      Q.  Okay.  But just the mucosa, not
4  the bladder, not the rectum?
5      A.  Not the organs.  Because it is a
6  different location.
7      Q.  All right.  And do you remember
8  this patient?
9      A.  No.
10     Q.  Do you know how this patient was
11 treated?
12     A.  By sling excision.
13     Q.  Do you know how it worked out?
14 How she recovered from the excision?
15     A.  Better that she didn't have eroded
16 mesh anymore after surgery.  Maybe it eroded again
17 in a different place.
18     Q.  Do you know whether she
19 experienced pain as a part of this?
20     A.  Most likely she did.
21     Q.  Do you know whether she
22 experienced pain as part of this?
23     A.  The degree of pain, as I said, I
24 don't remember now.  But most likely she did.
25     Q.  You have not consulted her records

Page 228

1  to see the extent to which this was a painful
2  experience for her?
3      A.  This is commonsense.  This is a
4  chronic and open wound; would it hurt?  Of course
5  it would.
6      Q.  Go to page 61.  Figure Set 11b.
7  Is this the same mesh?
8      A.  No, it's a different one.
9      Q.  All right.  Is this a TVT or a
10 TVT-O?
11     A.  I don't know.
12     Q.  And what are you trying to show in
13 Figure Set 11b?
14     A.  Similar mechanism for erosion, the
15 mesh somehow rotated, probably through curling of
16 the edges and then became exposed.  The edge
17 pierced through the mucosa.
18     Q.  And this is an erosion, as you've
19 defined it, in the last section, some people may
20 call it an exposure, correct?
21     A.  Yes.  It's called -- if you want
22 to call exposure, we will call it exposure.  So the
23 mesh became exposed.
24     Q.  And what does the mesh in this
25 tissue sample tell you?

Page 229

1      A.  The position, see the position is
2  towards the mucosa.  So it's not bilateral to the
3  mucosa, it's angled.  And the edge, or the end of
4  the tape became exposed, pierced through the
5  mucosa.  And the site of exposure became infected
6  and now there is acute inflammation surrounding.
7      Q.  How do you know that this mesh was
8  infected?
9      A.  Because there is acute
10 inflammation in there.
11     Q.  Do you know how long this woman
12 had this sling before it was removed?
13     A.  I don't remember.
14     Q.  Are you able to tell from this
15 slide whether this mesh was placed this way or
16 whether it changed after it was placed?
17     A.  It's hard to place it like this,
18 because you can see it's clearly perpendicular.  So
19 I just cannot imagine it.
20     Q.  Do you know?
21     MR. ORENT:  Objection.
22     THE WITNESS:  I don't know for sure,
23 but this would be a really difficult position to
24 achieve during placement.
25

58 (Pages 226 to 229)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 230

1      BY MR. THOMAS:
2          **Q.  Anything else remarkable about**
3  **your description of set 11b?**
4          A.  No, we discussed most of it.
5          **Q.  Anything else you want to talk**
6  **about?  You said "most".**
7          A.  Sorry.
8          **Q.  Page 63, Figure Set 11c:  "Exposed**
9  **edge of TVT sling rotated towards the mucosa.**
10  **Additional TVT cases".**
11          **Do you know whether this is a TVT or**
12  **TVT-O?**
13          A.  No, I don't.
14          **Q.  And what is your purpose of**
15  **including Figure Set 11c?**
16          A.  Just mechanism of exposure,
17  because the edge is pointing towards mucosa.
18          So it's a near exposed position in this
19  case.  Probably exposure occurred somewhere either
20  more superficial, or deeper in the block.
21          **Q.  As you're looking at that mesh, is**
22  **the mesh -- you show the yellow portion of the mesh**
23  **going from the bottom of the figure to the top of**
24  **the figure.  Is that the width of the mesh?**
25          A.  With the length, it's very hard to

Page 231

1  determine in this place.  So the mesh is either in
2  this shape (indicating), or this shape
3  (indicating).
4          In any case, one of the edges is
5  pointing towards mucosa.
6          **Q.  When you talk about -- strike**
7  **that.  This mesh when placed, is going to stretch**
8  **from one side of the abdomen to the other, isn't**
9  **it?**
10          A.  Yes.  But we are talking about
11  mucosa.  So it is a very short stretch of the mesh
12  right where it goes between the urethra and vaginal
13  wall.
14          **Q.  I understand that.  But my point**
15  **is, the only thing that can be exposed there is the**
16  **midpoint, not the ends, correct?**
17          A.  Unless you cut one end, and then
18  it becomes exposed again.
19          **Q.  Okay.  And in order to cut the**
20  **end, you'd have to cut the end at the vaginal**
21  **mucosa, correct?**
22          A.  Inside.  So what happens -- first
23  exposure occurs, it curls up like this.  So this
24  part is exposed, there is a revision surgery, one
25  end is cut, the patient is left and sometimes it

Page 232

1  curls up like this.
2          **Q.  Is this a multiple revision?**
3          A.  I don't know.
4          **Q.  You don't know?**
5          A.  (Witness nods.)
6          **Q.  Okay.  For the other mesh**
7  **erosions, or exposures that you've discussed on 58,**
8  **59, 60, 61, 62 and now 63, do you know whether**
9  **those are first revision cases, second revision**
10  **cases, or multiple revision cases?**
11          MR. ORENT:  Objection.
12          THE WITNESS:  I don't remember exactly.
13  Sometimes it's first revision, sometimes five, six
14  revisions.
15          BY MR. THOMAS:
16          **Q.  You just don't know?**
17          MR. ORENT:  Objection.
18          THE WITNESS:  If I go through records,
19  if it was individual report of a case, I go through
20  records thoroughly, so I know exactly how many
21  revisions it was.
22          BY MR. THOMAS:
23          **Q.  Go to page 64.  Figure Set 11b, is**
24  **that part of Figure Set 11c, or is that different?**
25          A.  No, it's different.

Page 233

1          **Q.  How can you tell?**
2          A.  It's a different slide.
3          **Q.  Okay.  Is it a different patient?**
4          A.  I don't remember.
5          **Q.  Okay.**
6          A.  It may or may not be.
7          **Q.  Okay.  Do you know if it's TVT or**
8  **TVT-O?**
9          A.  No.
10          **Q.  Page 65, Figure Set 11e; isn't**
11  **that the same as Figure Set 11c?**
12          A.  I just noticed, something
13  happened.
14          **Q.  You liked that one?**
15          A.  Could have been pasted twice or
16  selected and pasted -- I don't remember.  Something
17  happened here.  So I probably intended to insert
18  different picture, but this one made it.
19          **Q.  Okay.  I think we can say that**
20  **63 and 65 came from the same patient?**
21          A.  Yes.  It just shows you that I
22  don't have an army of people helping me, I'm just
23  alone.
24          **Q.  I understand.  Let's go to**
25  **page 66, Figure Set 12.**

59 (Pages 230 to 233)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 234

1    A.  Yes.
2    Q.  This is additional TVT cases.  Do
3  you know whether this is a single mesh or multiple
4  meshes?
5    A.  What do you mean a single mesh --
6    There are four frames here.
7  Excuse me, there are two frames here.
8    Do you know if it's the same one
9  patient or two?
10    A.  No.
11    Q.  You don't know whether it's one or
12  two?
13    A.  No.
14    Q.  Do you know whether it's TVT or
15  TVT-O?
16    A.  No.
17    Q.  What are you trying to show in the
18  top image on page 66, Figure Set 12.
19    A.  Acute inflammation at the site of
20  exposure.
21    Q.  When you say acute inflammation,
22  is that different from infection?
23    A.  No.  Acute inflammation is
24  reaction to infection.  Technically, it's the same
25  pathological process.

Page 235

1    Q.  I was just going to ask you that.
2  Can you diagnose infection from this slide?
3    A.  Yes, I can.
4    Q.  And based on what?
5    A.  Based on the acute inflammation.
6    Q.  Okay.  And what is it about the
7  slide that shows the acute inflammation?
8    A.  The neutrophils.
9    Q.  And the slide below that, again,
10  shows acute inflammation, and that may or may not
11  be the same patient?
12    A.  That's correct.  I have feeling
13  that they are different patients.  I think one
14  of -- the top one is the later case, the bottom one
15  is an earlier case.
16    Q.  As you sit here, do you know which
17  ones they are?
18    A.  The quality of the histology and
19  the quality of the picture.
20    Q.  In the top image, where you show
21  the acute inflammation, is there mesh in that
22  image?
23    A.  Underneath, if you go a little bit
24  over.
25    Q.  This doesn't appear in the image,

Page 236

1  correct?
2    A.  You're correct.
3    Q.  Thank you.  And in the lower image
4  on Figure Set 12, the yellow represents
5  polypropylene?
6    A.  That is correct.
7    Q.  And the presence of neutrophils
8  again shows the acute inflammation?
9    A.  That's correct.
10    Q.  Anything else remarkable about
11  that slide?
12    A.  No.
13    MR. THOMAS:  I need to take a break,
14  please.
15    -- RECESS AT 3:19 --
16    -- UPON RESUMING AT 3:23 --
17    BY MR. THOMAS:
18    Q.  Doctor, I understand from prior
19  depositions that when you analyzed your
20  medical-legal cases that you prepared your own, for
21  lack of a better description, your own pathology
22  report.  I think you called it a synoptic recording
23  for each of the plaintiffs?
24    A.  Not for medical-legal.  I do it
25  for all mesh cases, it's a part of research.

Page 237

1    Q.  Do you have those kinds of
2  recordings for all of the patients that are in your
3  report?
4    MR. ORENT:  Objection.
5    THE WITNESS:  May or may not.  Probably
6  I don't have for all patients.  Some cases are
7  probably not even signed out, so the report is not
8  completed yet.
9    BY MR. THOMAS:
10    Q.  I guess my point is that we didn't
11  get any of those on your thumb drive.  And I'm
12  curious if there's some of those that we don't
13  have.  We have a lot of them in the Huskey, Edwards
14  case or the Bellew case -- in the Bellew case, you
15  produced those to us for the --
16    A.  Yes.  When I started doing my
17  research, I realized that I needed more or less
18  standardized approach when I examined the meshes.
19    And I started entering them as a
20  synoptic report, which is a specific pre-set number
21  of parameters, so I don't forget and they're all
22  analyzed in the same manner so they can compare
23  them.  It has nothing to do with medical-legal
24  cases, or nothing else.  It's pure documentation
25  for research purposes.

60 (Pages 234 to 237)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 238

1    Q.  Do you have that for each of the
2 slides that are in this report?
3    A.  As I said --
4    MR. ORENT:  Objection.
5    THE WITNESS: -- I don't have all of
6 these patients, some of the reports are not
7 finalized.
8    BY MR. THOMAS:
9    Q.  I'm going to ask you to produce
10 those that you do have.
11    I have a --
12    A.  If it's medical-legal case and
13 you're entitled to see the information.
14    Q.  Okay.  I have a title of a study,
15 we talked before about your chemical oxidation
16 study you were performing, and I asked you about
17 the recipe for the chemicals to which you're
18 exposing the TVTs to.
19    A.  You mean hydrogen peroxide with
20 chromium salt catalyst?
21    Q.  Yes.
22    A.  Okay.  I remember.
23    Q.  And there was a study we found
24 called, "Controlled Peroxide Degradation of
25 Polypropylene - Rheological Properties and

Page 239

1 Prediction of MWD From Rheological Data".  Lead
2 author, Azizi, A-Z-I-Z-I.  Including I. Ghasemi,
3 G-H-A-S-E-M-I, and M. KARRABI, K-A-R-R-A-B-I; does
4 that ring a bell?
5    MR. ORENT:  Objection.
6    THE WITNESS:  You're asking the wrong
7 person, I'm really bad with names.  I'm a
8 pathologist, I remember the slides but I don't
9 remember the names.
10    BY MR. THOMAS:
11    Q.  Do you have the study that you
12 used to come up with the recipe?
13    A.  Yes, I do.  I can find it in my
14 hard drive, and I can find it.
15    Q.  Okay.  Good.
16    A.  It's most likely at least in the
17 reference materials as well.
18    Q.  In the reference materials to your
19 report?
20    A.  Yes.
21    Q.  Okay.  How did you determine which
22 of the slides from your total number of TVT-O and
23 TVT cases to include in the report?
24    A.  I went to features.  So every time
25 I would be describing a specific feature in the

Page 240

1 opinions, I would go back in my pool of images, for
2 TVT and TVT-O cases, and search for best images
3 representing that specific feature.
4    Q.  I see.  So when you say "best
5 images", you went back through about 100 different
6 TVTs and TVT-Os did you say?
7    A.  No, I said slings.
8    Q.  I'm sorry.  How many TVTs and
9 TVT-Os have you looked at?
10    A.  Ballpark of 30 to 40.
11    Q.  Okay.  And so you went back
12 through your 30 to 40 to identify those that best
13 represented the features that you wanted to show?
14    A.  Images.
15    MR. ORENT:  Objection.
16    BY MR. THOMAS:
17    Q.  Okay.  Images?
18    A.  I didn't take new images of
19 various cases, I just used those images which were
20 taken already.  The only new images that I produced
21 are the cases I received as a consulting trial set.
22    (Reporter sought clarification.)
23    A.  Trial set, as a set to facilitate
24 at trial.
25    Q.  Let's go to Exhibit No. 2.

Page 241

1    Exhibit No. 2 is your supplemental
2 report served two days ago.
3    A.  Yes.
4    Q.  And when you received this, you
5 received slides from CAMC?
6    A.  Yes.
7    Q.  You didn't create your own slides?
8    A.  No, I did the staining.
9    (Reporter sought clarification.)
10    A.  My lab did staining.
11    Q.  Do you know whether this is a TVT
12 or a TVT-O?
13    A.  No, I don't remember now.
14    Q.  Okay.
15    A.  I didn't review any medical
16 records for the consolidated trial cases.
17    Q.  And if you look at -- your pages
18 aren't numbered, but the first image, which is
19 identified as supplemental Figure EM1, it says:
20 "Portion of excised mucosa with underlying mesh,
21 H&E magnification equivalent to 1.6X objective".
22 What is the significance of this image?
23    A.  It's just from my review showing
24 where the mesh is and how it relates to the mucosa.
25    Q.  Is there anything significant

61 (Pages 238 to 241)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 242

1  about this image in terms of risk factors or issues
2  related to symptoms, clinical symptoms?
3       A.  Well, it's close.  So it's an
4  overview of the part which didn't get exposed but
5  it shows the proximity.  You know, that's
6  significant.
7       Q.  And again, you don't know whether
8  that was placed there or if it migrated there after
9  placement, correct?
10      MR. ORENT:  Objection.
11      THE WITNESS:  That's correct.
12      BY MR. THOMAS:
13      Q.  Okay.  Anything else remarkable
14  about supplemental Figure EM1?
15      A.  No, there's scar tissue which
16  encapsulates and fills the pore; that's about it.
17      Q.  Okay.  Supplemental Figure EM2.
18  Is this part of the same slide or is this a
19  different slide?
20      A.  Oh, it's the same block.
21      Q.  Got it.
22      A.  Yeah, I think it's the same slide
23  because I had only one H&E slide.
24      Q.  It says in the first page you
25  received unstained histological slides, plural.

Page 243

1  Did you only have one?
2       A.  For H&E, I stain only one slide.
3  So one slide was stained by H&E method, one slide
4  smooth muscle actin, and one slide S100 protein.
5       Q.  Okay.  So supplemental Figure EM2
6  is just more of a magnification of Figure EM1,
7  correct?
8       A.  Yes, I think you can match it,
9  it's from here.
10      Q.  And again, what you're trying to
11  show is the foreign body reaction and inflammation?
12      A.  That is correct.
13      Q.  Where is the bark in this image?
14      A.  Which image?  The EM2?
15      Q.  Yes.
16      A.  Maybe out of focus, maybe not
17  there.
18      Q.  Okay.  If you go to supplemental
19  Figure EM3, this is another portion of the same
20  image, correct?
21      A.  I think it's a different fragment,
22  from the same slide but from a different piece of
23  tissue.  There were several pieces of tissue on the
24  slide.
25      Q.  I see.  And what is the purpose of

Page 244

1  showing supplemental Figure EM3?
2       A.  Again, shows mucosa and proximity
3  of the mesh to mucosa.  There is less than a half
4  millimeter between the mesh and mucosa.
5       Q.  What is the distance between those
6  two mesh fibers that are shown there?
7       A.  About a millimeter.
8       Q.  Okay.  Supplemental Figure EM4,
9  again, you're showing the foreign body inflammatory
10  reaction?
11      A.  That's correct.
12      Q.  If you go to supplemental Figure
13  EM5?
14      A.  Yes.
15      Q.  You indicate in the description,
16  "acute inflammation and indication of mesh erosion
17  and bacterial infection".
18      Do you know whether this patient was
19  diagnosed with an infection?
20      A.  No, I didn't read the records.  I
21  can see clearly there is bacterial infection
22  triggering acute inflammation.  If they saw it
23  clinically or they didn't, I don't know.  But even
24  if they didn't, I would tell them there was an
25  infection.

Page 245

1       Q.  Okay.  Are you able to tell from
2  these images that there was in fact a mesh erosion
3  or mesh exposure?
4       A.  Yes.
5       Q.  And how can you tell that?
6       A.  There was a breakdown of mucosa
7  and entry for infection.  That's why I can see
8  acute inflammation.
9       Q.  Where is the breakdown of the
10  mucosa?
11      A.  I don't know.  It didn't get in
12  the section.
13      Q.  Are you assuming there's a
14  breakdown of mucosa?  You don't show one on the
15  slide, correct?
16      A.  It's not an assumption.  I can
17  tell you with 100 percent certainty that there was
18  a breakdown in the mucosa.  Because if mucosa is
19  not broken down, there is no bacterial insemination
20  and acute inflammation.
21      Q.  Supplemental Figure EM6, you
22  identify an obliterated artery?
23      A.  That is correct.
24      Q.  Anything remarkable about that
25  finding beyond what we've talked about before, the

62 (Pages 242 to 245)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 246

1    other obliterated artery?
2         A.  No.  Exactly the same finding;
3    interrupted blood supply.
4         Q.  Which may or may not have clinical
5    significance?
6         MR. ORENT:  Objection.
7         THE WITNESS:  The degree of the changes
8    may or may not be clinically apparent.
9    BY MR. THOMAS:
10        Q.  Okay.  Because if the blood flow
11   is reduced or interrupted, they may receive blood
12   flow from other sources that would vascularize this
13   area?
14        A.  Yes.  And then that was fibrosis,
15   and then you mix up fibrosis which is caused by the
16   mesh, then fibrosis lead to ischemia.
17        It's a complex setting; how much of
18   that would translate from one specific symptom
19   would be difficult to discern.
20        Q.  Obliteration of arteries is a risk
21   in any surgery of the pelvic floor, isn't it?
22        MR. ORENT:  Objection.
23        THE WITNESS:  Yes, there would be a
24   risk for obliterated artery.  But when you say
25   obliterated artery in the tissue, which is not

Page 247

1    changed otherwise, because to obliterate an artery
2    during surgery, you have to transect it.
3         So by the time of mesh placement, this
4    part would be separated.  So this is an intact
5    structure, which was not transected during surgery.
6    It became obliterated later on.
7    BY MR. THOMAS:
8         Q.  If you go to supplemental -- how
9    can you tell that it happened after placement?
10        A.  It's not transected during
11   surgery.
12        Q.  I see.
13        A.  See how are the arteries being
14   damaged --
15        Q.  I understand.
16        A.  -- they get transected.
17        Q.  I understand.  Supplemental Figure
18   EM7a, "innervation of the scar tissue encapsulating
19   the mesh, S100".  What are you showing in EM7a?
20        A.  Nerve branch.  EM7a and 7b is the
21   same image; 7b is labeled copy of 7a.
22        Q.  Okay.  And the arrows are pointing
23   to what?
24        A.  Nerve branches, or nerves.
25        Q.  And for the nerve and nerve branch

Page 248

1    on the upper right-hand corner, how far is that
2    from the mesh?
3         A.  This one is --
4         Q.  I'm talking about this one, upper
5    right?
6         A.  Oh, this one.  See, with this one
7    I don't even know.  Maybe there is fiber right
8    there, so it's pinching it.
9         Q.  Do you know whether that's fiber
10   or not?
11        A.  That is hard to determine, I
12   suspect there is, but I wasn't sure therefore I
13   didn't put it.
14        Now, looking at this image, I think
15   there was a fiber.  So that curvilinear shape is
16   actually fiber compressing.
17        Q.  How do you know that without
18   looking at it?
19        A.  Well, there's density, increased
20   density.  Similar to this area, the collagen is
21   compacted right around the fibers.
22        Q.  The tissue itself is pretty
23   irregular, isn't it?
24        A.  Well, see, this is clearly not the
25   place where mesh fiber was.  Because there is no

Page 249

1    capsule.  If you look here, there is a capsule
2    around the fiber, and if you look there, there is a
3    capsule around the fiber.  So I suspect there was a
4    fiber here.
5         Q.  Okay.
6         A.  Not here, but there.
7         Q.  Looking at those nerves, is there
8    anything about the appearance of those nerves on
9    light microscopy that suggests to you they were
10   causing pain to the patient while the mesh was in
11   place?
12        A.  Could you repeat the question.
13   I'm getting tired, sorry.
14        MR. THOMAS:  Would you repeat it for
15   me, please?
16        -- REPORTER'S NOTE:  Question read back
17   as recorded above.
18        THE WITNESS:  They're healthy nerves
19   which can conduct pain.  This is one of the main
20   findings.
21        BY MR. THOMAS:
22        Q.  Okay.  But again, there's nothing
23   about those that allow you to state that those
24   nerves were in fact reacting in a way to cause pain
25   in a patient while the mesh was implanted?

63 (Pages 246 to 249)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 250

1        A.   The point of the picture is to
2  show that that tissue is sensitive, so it can sense
3  pain.
4        Those nerve branches are not directly
5  affected or at least one may, but the others are
6  not directly affected by the mesh.
7        The point is that tissue around it is
8  innervated, so if you get a formation, if you get
9  distortion, mechanical compression, then it can
10  sense pain.
11        Q.   Okay.  Page 67 of your first
12  report, Figure Set 13a, you're talking about the
13  Prolene degradation layer.
14        Do you know if this is TVT or TVT-O?
15        A.   No.
16        Q.   Do you know from what case this
17  comes?
18        MR. ORENT:  Objection.
19        THE WITNESS:  One of the consolidated
20  cases.
21        It's so similar to this study, which I
22  think our scientists did in 87.  I mean, even the
23  arrow there is so similar.
24        BY MR. THOMAS:
25        Q.   So all of these images are from

Page 251

1  the consolidated cases through 72, and our experts
2  have these images, correct?
3        A.   Images -- they have slides.
4        Q.   Slides, that's what I meant.
5        A.   Yes.
6        Q.   I've talked to you, you've been
7  talked to at length about these images in prior
8  cases.  Is there anything new and different about
9  what's expressed in these images that you haven't
10  seen before?
11        A.   It is exactly what I described in
12  the published papers and previous reports.  Exactly
13  all, everything is the same.
14        Q.   For the other cases that you begin
15  on 73, you had images from additional TVT cases.
16  Do you know whether those are TVT or TVT-O?
17        A.   No.
18        MR. ORENT:  Objection.
19        BY MR. THOMAS:
20        Q.   If you go to page 72, please?
21        A.   Yes.
22        Q.   On page 72, you show an empty
23  space of detached core on the right image.  And a
24  separated degradation bark.  The empty space means
25  that the polypropylene dropped out of the image?

Page 252

1        A.   Not image, slide.
2        Q.   Slide, I'm sorry.  Thank you.
3        A.   It came detached and displaced.
4        Q.   Okay.  And left what you have
5  described as the bark behind?
6        A.   Yes, that's correct.
7        Q.   All right.  Now, if you go to the
8  next page, page 73, again, additional TVT cases you
9  show an image where you show the polypropylene
10  still in place, correct?
11        A.   Yes.  So now there is a
12  separation.  The core separated from the bark, but
13  the core didn't detach completely and floated away.
14  It's still close, but there was a split.
15        Q.   And this is detached as a part of
16  the sample preparation process, correct?
17        MR. ORENT:  Objection.
18        THE WITNESS:  I don't know when it
19  became detached.  During surgery or during
20  sectioning or during processing of the specimen.
21        BY MR. THOMAS:
22        Q.   Didn't happen in vivo, didn't
23  happen in the body?
24        A.   No.  I suspect it doesn't happen
25  that often.  I very rarely see the bark actually in

Page 253

1  the tissue, being displaced in the tissue away from
2  the fibers.
3        Q.   Have you studied how mechanically
4  that happens?
5        A.   It just breaks off.  There is a
6  shear force, a breaking force.
7        Q.   When you say a shear force, does
8  it shear off at the point where -- at about five
9  microns as the degradation ceases?
10        A.   It shears off in the interface
11  between degraded and non-degraded.
12        Q.   That's my point.  Let's see if we
13  can agree with this.  We're dealing with visual
14  observations here, correct?
15        A.   Yes, that's correct.
16        Q.   And is it fair to understand with
17  respect to the images on page 73, where you show
18  detached core and degradation bark separated, are
19  you telling me that the detached core no longer has
20  a bark on it?
21        A.   They have a really thin layer of
22  degraded material.  Because the bark itself is not
23  uniform.  There is a higher degree of degradation
24  on the outside and then smaller, smaller, smaller,
25  smaller, smaller.

Vladimir Iakovlev, M.D.

Page 254

1    Q.  Right.
2    A.  And then the degradation blends
3    into not degraded polypropylene.
4    Q.  Right.
5    A.  So at certain point these micro
6    cracks, and mono cracks, they cannot go into this
7    completely solid material, so it shears off
8    somewhere there.
9        I don't know if it's right at the end
10   of them, close to them or how far they are.  So
11   there might be a layer of degraded polypropylene on
12   the core.  How thick it is, I wouldn't know.
13   Q.  It's too small to measure by your
14   technique?
15   A.  That's correct.
16   Q.  And your best estimate is that the
17   degradation bark that appears, as you've described
18   it in 73, is much as five microns?
19   A.  This is thinner.  By looking at
20   it, it is around two microns.
21   Q.  Now what you show on page 75,
22   again from additional TVT cases, are the cracks
23   which you believe to be oxidized polypropylene,
24   correct?
25   A.  I don't believe -- I know.

Page 255

1    Q.  Okay.  And Figure 13i, do you
2    know if this is a TVT or TVT-O?
3    A.  No.
4    Q.  Do you know how long this was in
5    the body?
6    A.  Certainly more than a year.
7    Q.  Why do you say that?
8    A.  It's relatively thick.  So if I
9    check here where it's less tangential, this is the
10   thickness, so it's definitely more than a year.
11   Q.  When you devised your experiment
12   to intentionally oxidize polypropylene, did you
13   look at any methods that would allow you to
14   intentionally oxidize polypropylene in a time of
15   less than a year and a half?
16   A.  No, I didn't take them out.
17   Q.  You misunderstood my question.
18       Did you attempt to identify any kind of
19   chemical recipe that would allow you to
20   intentionally oxidize Prolene more quickly than a
21   year and a half?
22   A.  No.
23   Q.  Why not?
24   A.  I'm busy enough with other things.
25   Q.  Okay.

Page 256

1    A.  And I figure I just leave it long
2    enough, soon enough it will form and I will see
3    which would -- in which fluid the bark is thicker.
4    Q.  We talked before, I believe at
5    trial, about xylene and that you were conducting a
6    test to determine the extent to which xylene
7    impacted Prolene polypropylene; do you remember
8    that?
9    A.  Yes, I do.
10   Q.  You told me, I believe, that you
11   were currently testing xylene to determine whether
12   xylene would impact Prolene polypropylene.  Are you
13   still conducting that test?
14   A.  It's in the same set of jars.  One
15   of the jars contains xylene.
16   Q.  Is that the only test that you're
17   doing with xylene?
18   A.  Well, previously I did testing for
19   processing.  So new mesh was put in regular xylene
20   solution for time when it happens during tissue
21   process.
22   Q.  Did you produce that to me in the
23   jump drive Exhibit 4.
24   A.  No, these are the images of new
25   pristine mesh.  So this mesh had been through

Page 257

1    xylene.
2    Q.  Okay.  Did you do any other
3    testing of pristine mesh impact on xylene over a
4    period of time?
5    A.  No.  These only two.  I did
6    experiment for our routine processing, routine
7    exposure to xylene, and then I started this
8    experiment.
9        I was testing it within month or two
10   after it became exposed.  I was thinking maybe it
11   would get dissolved; it didn't.  But the long-term
12   effect will be studied later on together with other
13   solutions.
14   Q.  When you put the pristine mesh
15   through the sample preparation process, did you
16   perform any analytical chemistry on the mesh to
17   determine the extent to which xylene may have
18   altered the chemical structure of polypropylene?
19   A.  No.
20   Q.  On page 84?
21   A.  Yes.
22   Q.  Is page 84 another image of what
23   we had talked about at length on page 83?
24   A.  No, this is a different case.
25   This is a case consolidated case.  This is

65  (Pages 254 to 257)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 258

1  appearance of case from -- you can see the name of
2  the patient.
3      Q.  Okay.  So this is -- strike that.
4      Did you do any analysis for bark on the
5  mesh depicted in Figure 16a?
6      A.  It's embedded in histology.  It's
7  there.  I mean --
8      Q.  Have you ever done it?
9      A.  I didn't do anything specific.
10  It's embedded in histology.  I can pull the slide
11  and take picture of the bark.
12      But again, this is a St. Michael's
13  patients, I'm not comfortable disclosing or giving
14  pictures specifically for trial or anything else.
15  I can tell you that I saw the bark.
16      Q.  So, Figure 16b on page 84 is
17  cracking on the surface of TVT mesh fibers.  And
18  this is from the consolidated cases for patient
19  Dameron; is that correct?
20      A.  That is correct.
21      Q.  And these are the tissue samples
22  that you show on 84 that you had available to you?
23      A.  Yes.
24      Q.  And they had been stored in
25  formalin?

Page 259

1      A.  No.  We received it dry.  Your
2  expert was there.
3      Q.  Okay.
4      A.  It was jar without formalin.
5      Q.  Do you know whether it was in
6  formalin?
7      A.  I don't.  Probably it was at one
8  time, it leaked out but... that's my assumption.
9      Q.  You do know how long this was in
10  the body?
11      A.  No.
12      Q.  And obviously you don't know how
13  it was handled before it got to you, correct?
14      A.  No.
15      EXHIBIT NO. 5:  Study Entitled "Safety
16      Considerations for Synthetic Sling
17      Surgery" in which Dr. Vladimir Iakovlev
18      appears as an author.
19      BY MR. THOMAS:
20      Q.  Doctor, I'm going to hand you
21  what's been marked as deposition Exhibit No. 5.
22      A.  Yes.
23      Q.  Deposition Exhibit No. 5 is a
24  review study in which you appear as an author --
25      A.  Yes.

Page 260

1      Q.  -- entitled, "Safety
2  Considerations for Synthetic Sling Surgery".
3      I know Dr. Blaivas.  Who is Dr.
4  Purohit?
5      A.  I don't know.  It's a team of
6  urologists and fellows working with Dr. Blaivas.
7      Q.  Okay.  Did you consult with Dr.
8  Blaivas on the content of this article?
9      A.  Well, we wrote it together.
10      Q.  And that's my point.  Did you work
11  with this whole team in writing the article?
12      A.  Yeah.  We were changing, everybody
13  was contributing.  It was changed several times,
14  redacted and...
15      Q.  Did you work with any individual
16  specifically, or did you write your own piece and
17  just look after your own section of the article?
18      A.  Oh, it's a joint effort.  I mean,
19  the manuscript consult, everybody contributes, puts
20  one piece there, puts one piece there.
21      It's been changed and then editorial
22  office changes and then we change back and then so
23  forth.  By the end of the day each single word may
24  be coming from a different person.
25      Q.  How many drafts did this Exhibit 5

Page 261

1  go through?
2      A.  Five, six.
3      Q.  Do you still have those drafts?
4      MR. ORENT:  Objection.
5      THE WITNESS:  Yes, I do.  But I mean
6  this is more of a delicate issue because there are
7  many authors involved and there is research
8  produced information, and it's a work in progress.
9      What became public is what we see right
10  in front of us.  What we decided to be correct to
11  be exposed to the public.
12      BY MR. THOMAS:
13      Q.  Other than the journal itself, was
14  anybody else involved in the preparation of
15  Exhibit 5?
16      A.  What do you mean?
17      Q.  Did you have any contribution from
18  any other source other than the authors that were
19  listed in the preparation of the article?
20      A.  Everybody listed as authors,
21  everybody who contributed is here.  Well, editorial
22  office was working with it also.
23      Q.  And who did you work with at the
24  editorial office?
25      A.  I don't remember now.

66 (Pages 258 to 261)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 262

1    Q.  Okay.
2    A.  I mean, they send their paper,
3  they said, okay, this revision needs to be
4  reviewed, please check this, please check that,
5  they suggest some changes, mainly just style.  Very
6  strict regarding style.
7    Q.  You said something earlier today,
8  I want to make sure I understand.  In this
9  document, there is reference to work that you have
10  done on different meshes in the medical-legal
11  setting.
12    I thought I understood you to say that
13  you didn't use the slides that were provided to you
14  by Dr. Kreutzer, but that you cut new slides from
15  existing blocks and conducted your analysis on
16  those new slides; is that correct?
17    A.  For some cases, I received only
18  slides, stained and unstained.  For some cases I
19  received blocks.  As far as I remember, it's been
20  long time.
21    So I could either use unstained slides
22  which came together with stained slides, or I could
23  ask my lab to do recuts from the blocks which were
24  made before me.
25    Q.  All right.  So, your best

Page 263

1  recollection it was a mixture of previously
2  existing slides or recuts from this mesh that you
3  had obtained from Dr. Kreutzer, correct?
4    A.  Yes.
5    Q.  Is the same thing true with your
6  other mesh specimens that were involved in
7  medical-legal field, that on some occasions you'd
8  use existing slides and some occasions you'd use
9  recuts or you'd have recuts made of existing
10  blocks?
11    A.  That's correct.  Depends on
12  situation.
13    Q.  I assume you stand by all the
14  findings in this report, correct?
15    A.  It's not findings; this report is
16  a review.  So it's more based on the other papers.
17    Q.  Okay?
18    A.  The only thing which was produced
19  in this paper from us personally was figures.
20    Q.  Let's go to one of those figures
21  on page 4.
22    A.  You mean the table?
23    Q.  Table two on page 4?
24    A.  Yes.
25    Q.  And this review paper, in

Page 264

1  reporting longer-term complications, reports pain
2  greater than six weeks for either retropubic or
3  transobturator tape slings at 3.5 percent, correct?
4    A.  Which line?
5    Q.  Third from the bottom, longer-term
6  complications.  Do you see it, for refractory pain
7  greater than six weeks?
8    A.  So the incidence range is from 4.1
9  to 30 percent.
10    Q.  The complications percentage of
11  patients that report refractory pain greater than
12  six weeks is 3.5 percent, correct?
13    A.  What I see is 4.1 to 30 percent.
14    Q.  Well --
15    A.  Third line from the bottom.
16    Q.  I understand that's the mean and
17  the range, correct?
18    A.  Yes.
19    Q.  4.1?
20    A.  Sorry, 4.1 is mean.  Yes, you're
21  correct.  I need my glasses.
22    So this is -- the range is from 0 to
23  30 percent.
24    Q.  But the average -- excuse me --
25  the percentage of patients at 7,084 that report

Page 265

1  pain greater than six weeks, is 247 or 3.5 percent,
2  correct?  Is that right?
3    A.  Yes and no.  So this is a review
4  of previously published studies.  So the quality of
5  the studies is different, methodology is different.
6  But when you check them, the pain over six weeks is
7  reporting anywhere from 0 to 30 percent.
8    Q.  Okay.
9    A.  With a mean, or average
10  4.1 percent.
11    Q.  But these numbers are correct,
12  aren't they?
13    A.  Well, from what we extracted at
14  that stage from the papers, that's what we have.
15    Q.  Okay.  You went out and tried to
16  obtain complication rates for retropubic or TOT
17  slings, didn't you?
18    A.  Yes.  The whole paper is just for
19  slings.
20    Q.  And as a part of looking at
21  long-term pain which is greater than six weeks, you
22  looked at 7,084 patients, correct?
23    A.  No, we didn't.  The papers in
24  combination.
25    Q.  I understand.  But you gathered

67 (Pages 262 to 265)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 266

1    papers that looked at over 7,000 patients?
2          MR. ORENT:  Objection.
3          THE WITNESS:  That's what it says
4    there, yes.
5          BY MR. THOMAS:
6          Q.  And in gathering the papers, who
7    was in charge of picking which studies you looked
8    at?
9          A.  That part -- it's not a study; it
10   is a review.
11         Q.  I apologize.
12         A.  That part of the review was done
13   mainly by urologist.
14         Q.  Do you know who that was?
15         A.  It's a team working with Dr.
16   Blaivas.
17         Q.  So the urologist, the clinicians,
18   are the people who are responsible for identifying
19   the studies to identify the complication rates?
20         A.  That's correct.
21         Q.  And through their best efforts,
22   they identified a percentage of patients that have
23   pain more than six weeks at 3.5 percent, correct?
24         A.  That was an estimate of a minimal,
25   a minimum number.  So this is the bottom line.  So

Page 267

1    it's minimum of 3.5 percent of the patients will
2    develop chronic pain.
3          Q.  Okay.
4          A.  Which is -- probably doesn't say
5    right away, but that was the minimum.  It wasn't
6    that we were implying that it's a true number.
7          Q.  Do you know how many, for how many
8    of those 3.5 percent that the pain was ultimately
9    resolved?
10         A.  Again, 3.5 percent was minimum
11   number.
12         Q.  I understand.  But for some of
13   those people they were cured of the chronic pain,
14   weren't they?
15         MR. ORENT:  Objection.
16         THE WITNESS:  After mesh removal?
17         BY MR. THOMAS:
18         Q.  Or for whatever treatment?
19         MR. ORENT:  Objection.
20         BY MR. THOMAS:
21         Q.  Do you know that?
22         A.  No, I don't know.  I don't think
23   it was in the published literature.
24         Q.  That's fine.  Do you know whether
25   the urologist group who were looking at the mesh

Page 268

1    complications looked to see how many people had
2    their pain resolved by surgery or some other
3    treatment?
4          A.  Those papers are reviews.  Most of
5    them didn't provide that information.  They just
6    provided numbers for complications.
7          Q.  Did you do a literature search
8    yourself to determine the extent to which long-term
9    complications of chronic pain were resolved by
10   surgery or other treatment?
11         A.  Not to answer that specific
12   question.  Again, I mean, I only can read what is
13   published.  Because studies don't concentrate,
14   don't focus on this question; I cannot get an
15   answer.
16         Q.  Well, this was your group's best
17   effort at presenting, in a reviewed paper, the rate
18   of complications for long-term pain, correct?
19         MR. ORENT:  Objection.
20         THE WITNESS:  Yes, you're correct.
21         BY MR. THOMAS:
22         Q.  Thank you.
23         A.  But the question is that if I made
24   an effort to look for something which is barely
25   ever published; that's why I answered that is

Page 269

1    specifically to that question, would be difficult
2    to do.
3          -- RECESS AT 4:08 --
4          -- UPON RESUMING AT 4:15 --
5          BY MR. THOMAS:
6          Q.  Doctor, let's go back to Exhibit
7    No. 5, page 5.  I asked you about the wrong chart.
8    I asked you about the chart on page 4.
9          The chart on page 4 does retropubic and
10   obturator slings.  The one on page 5 is limited to
11   retropubic slings; do you see at the top?
12         A.  Yes.
13         Q.  And retropubic slings are what TVT
14   slings are, correct?
15         A.  Yes.
16         Q.  And the long-term refractory pain
17   greater than six weeks reported by your group is
18   1.8 percent, correct?
19         A.  Yes, but it's not reported by our
20   group.
21         Q.  Collected by your group?
22         A.  Collected from other papers by our
23   group, yes.
24         Q.  And as a part of that, the group
25   looked at studies reporting on about 2,328

68  (Pages 266 to 269)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 270

1  patients, correct?
2      A.  Yes.
3      Q.  Okay.  For the slide on page 82,
4  about the -- 83, I'm sorry.  About the image of the
5  TVT mesh fibers immediately after surgery removal?
6      A.  Yes.
7      Q.  Did you submit any histology to
8  the journal for publication?
9      A.  For this case?
10     Q.  For the journal.  For --
11     A.  Which one?
12     Q.  In one of the studies you have the
13 image of that --
14     A.  It's --
15     Q.  Is it the other journal?
16     A.  Yes, this one.
17     Q.  I'll come back to that.
18     A.  You mean histology of that
19 specific case?
20     Q.  Yes.
21     A.  No.
22     Q.  Have you shared the histology of
23 that specific slide with anybody period?
24     MR. ORENT:  Objection.
25     THE WITNESS:  No.

Page 271

1      BY MR. THOMAS:
2      Q.  So you're the only one that's ever
3  looked at it?
4      A.  Pardon?
5      Q.  You're the only one that's ever
6  looked at it?
7      A.  Yes.  I don't think I have
8  pictures, I didn't take pictures.
9      Q.  Okay.  Why not?
10     A.  What for?
11     Q.  Okay.
12     EXHIBIT NO. 6:  Article entitled,
13     "Degradation of Polypropylene in Vivo:
14     A Microscopic Analysis of Mesh
15     Explanted from Patients."
16     BY MR. THOMAS:
17     Q.  Let me show you what's been marked
18 as deposition Exhibit No. 6.
19     Deposition Exhibit No. 6 is an article
20 entitled, "Degradation of Polypropylene in Vivo: A
21 Microscopic Analysis of Mesh Explanted from
22 Patients".  That was just recently released,
23 correct?
24     A.  That is correct.
25     Q.  And you worked with Dr. Guelcher

Page 272

1  and Dr. Bendavid on this?
2      A.  Yes.
3      Q.  Did you receive any funding for
4  your work in Exhibit 6?
5      A.  No.
6      Q.  Did Dr. Guelcher or Dr. Bendavid
7  receive any funding for their work on Exhibit 6?
8      A.  No.  The work actually was done
9  mainly by me.  Dr. Guelcher and Dr. Bendavid just
10 contributed to the drafting of the manuscript.
11     Q.  What did Dr. Guelcher contribute
12 to the manuscript?
13     A.  The drafting of the manuscript, we
14 discussed mechanism of degradation, mechanically
15 how it happens, oxidation and other aspects.
16     Q.  Do you view Dr. Guelcher as
17 authoritative on the issue of oxidative
18 degeneration -- excuse me.
19     Do you view Dr. Guelcher as
20 authoritative in the area of oxidative degradation
21 of polypropylene?
22     A.  He's a bio engineer.  He works in
23 the area.
24     Q.  How do you feel about him?  Do you
25 view him as authoritative in the field?

Page 273

1      MR. ORENT:  Objection.
2      THE WITNESS:  I'm not sure if I can
3  answer that question.
4      BY MR. THOMAS:
5      Q.  Okay?
6      A.  He's a specialist who works in the
7  area and works in the field.
8      Q.  At any time, have you relied upon
9  Dr. Guelcher to tell you, chemically, how
10 polypropylene oxidizes?
11     A.  No.  In fact, it wasn't my purpose
12 to answer the question how it oxidizes.  It only
13 describes that it does oxidize.
14     Q.  So what role did Dr. Guelcher play
15 in the preparation of Exhibit 6?
16     A.  Drafting of the manuscript, mainly
17 the discussion part.  He also suggested at one
18 point when we started working on this, doing a
19 myeloperoxidase stain.  Again, in relation to
20 oxidative degradation.
21     Q.  What role did Dr. Bendavid have in
22 this study?
23     A.  Well, he actually brought me to
24 this mesh field and he supplied, or some samples
25 came from Shouldice Hospital, where he worked.  And

69 (Pages 270 to 273)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 274

1    he also helped drafting the manuscript.
2        Q.   In terms of the data gathering and
3    the conclusions contained herein, is this basically
4    your work?
5        A.   For the most part.
6        Q.   And I hate to ask you again, but
7    what data gathering or conclusions did Dr. Guelcher
8    or Dr. Bendavid provide?
9        A.   Dr. Guelcher didn't gather any
10   data.  As you can read the manuscript or paper,
11   it's all histology.
12       Q.   Okay?
13       A.   So I've been collecting data and
14   analyzing the samples.
15       But Dr. Bendavid contributed with idea
16   of degradation and contributing some samples,
17   hernia samples, and Dr. Guelcher contributed in
18   drafting the manuscript and also suggesting
19   myeloperoxidase stain and suggesting what is the
20   mechanism of degradation.
21       But the histology itself, data
22   collection and analysis, was done by me.
23       Q.   As part of the preparation of this
24   paper, did you and your coauthors discuss
25   intentionally oxidizing polypropylene to see if it

Page 275

1    would hold stain?
2        A.   No.  This paper was started, or
3    most of the data was collected even before I
4    learned about this simulation model.  So it wasn't
5    a part.
6        Q.   Did you ever discuss with Dr.
7    Guelcher different ways to intentionally oxidize
8    polypropylene?
9        A.   Later on.  I mean, the manuscript
10   was mainly written already and then we started
11   discussing plans for the future.  And then that's
12   how I used the paper he suggested as a recipe for
13   simulation.
14       Q.   Okay.  So Dr. Guelcher suggested
15   to you the paper that you used for the simulation?
16       A.   I think so.
17       Q.   Okay?
18       A.   Maybe I saw it before, but he
19   pointed that, that's the recipe he was using as
20   well.
21       Q.   Got it.  Is Dr. Guelcher involved
22   in your experimental work on the samples that
23   you're now storing?
24       A.   No.  I mean, I had my own samples.
25   His contribution to this work is that I ask him

Page 276

1    what he's using, or I don't remember exactly how
2    the conversation started, and he said that he's
3    using recipe from that specific paper.
4        Q.   I see.
5        A.   And I used it.  We didn't have
6    exchange of the samples, or testing of each other's
7    samples.
8        Q.   So you have never analyzed the
9    samples that he tested?
10       A.   No, never seen those.
11       Q.   And you know that he's exposed
12   samples to five and six weeks' worth of exposure?
13       A.   I do know that.
14       Q.   Okay.
15       A.   I do know that.
16       Q.   Have you requested to look at
17   those or test those or analyze those in any form?
18       A.   There was a discussion.  I don't
19   know if I said that I don't want to do it because I
20   have my own and I believe it needs to be a year.
21       Or maybe they used all their samples
22   for SEM, and they didn't have anything left.  But
23   at that time the decision was to wait for my
24   samples to become mature.
25       Q.   Okay.  Did you submit this article

Page 277

1    to multiple journals?
2        A.   There was submission to at least
3    two journals and the answer was really quick, next
4    day.  They said no, it's not in our scope.  And I
5    was aiming at really high impact like Nature, so...
6        Q.   Nature turned it down?
7        A.   (Witness nods).
8        Q.   Okay.
9        A.   Are you surprised?
10       Q.   And so is the Journal of
11   Biomedical Materials the only other journal that
12   reviewed it?
13       MR. ORENT:  Objection.
14       THE WITNESS:  Yeah, this is my usual
15   approach.  For all my papers I start really high
16   impact journal, hope for the best, and then go
17   from there.
18       BY MR. THOMAS:
19       Q.   Now, was there a peer-review
20   process of this article?
21       A.   Yes.  They ask for revisions, I
22   did revisions, then we drafted it.
23       Q.   How many drafts did you have of
24   Exhibit 6?
25       A.   We had one revision, one large

70 (Pages 274 to 277)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 278

1    revision. Part of the manuscript removed tables.
2         MR. ORENT: I object to this whole line
3    of questioning. It's outside of the scope of the
4    expert testimony, and moreover I think there's a
5    public policy interest in maintaining the integrity
6    of the editorial board process of the journals.
7         BY MR. THOMAS:
8         Q. Do you still have your first
9    draft?
10        MR. ORENT: Objection.
11        THE WITNESS: I can't answer that.
12        BY MR. THOMAS:
13        Q. You can't?
14        A. (Nods).
15        Q. Why?
16        A. It goes to the issues Mr. Orent
17   just mentioned.
18        Q. Okay. So have you maintained a
19   file on the preparation, the data you gathered, the
20   submission process and the peer-review process for
21   Exhibit 6?
22        A. Did I?
23        Q. Yes.
24        MR. ORENT: Objection.
25        THE WITNESS: Yes, I did.

Page 279

1         BY MR. THOMAS:
2         Q. I just ask you to maintain that
3    file and either I'll get it or I won't. Just don't
4    do anything to it; that's all I ask.
5         Just so I can short cut this. Is it
6    fair to say you're not going to answer any more
7    questions about the generation, drafting, peer
8    review, submission and publication of the article?
9         A. It was a standard process. There
10   was nothing unusual about it.
11        Q. But in terms of the details of it
12   you're not going to answer any questions about
13   that?
14        A. No. I can tell you that there was
15   nothing unusual.
16        Q. I understand. If you'll turn to
17   page 2, Table 1 is the sample and patient data?
18        A. Yes.
19        Q. And under "Slings", it says that
20   you have 28 TVT or TVT-Os; do you see that?
21        A. That is correct.
22        Q. Do you know the breakdown between
23   TVT and TVT-O?
24        A. No.
25        Q. Okay. Do you know whether any of

Page 280

1    them are machine cut or laser cut?
2         A. No.
3         Q. You have four Prolift products; do
4    you see that?
5         A. Yes, I do.
6         Q. And then a number of hernia mesh
7    cases, correct?
8         A. That is correct.
9         Q. Of the 69 slings that you
10   analyzed, how many were medical-legal cases?
11        A. The breakdown was about
12   70 percent. I cannot tell you exact number. But
13   roughly, it's for the whole set was 70 percent
14   medical-legal and 30 percent hospital cases.
15        And not necessarily St. Michael's.
16   They were coming from different hospitals.
17        Q. Okay. Is it fair to say if
18   they're undetermined that they're not medical-legal
19   cases?
20        A. At least 70 percent were
21   medical-legal.
22        Q. I understand that, but I'm trying
23   to break it down further to find out which ones
24   were medical-legal and which ones were not.
25        And you have 45 hernia cases that you

Page 281

1    identify as undetermined. I'm making an assumption
2    that because they're undetermined hernia cases that
3    they're probably not medical-legal cases; is that a
4    fair assumption?
5         A. Some of them are medical-legal.
6         Q. What percentage of the
7    undetermined hernia cases were medical-legal; do
8    you know?
9         A. The undetermined are probably all
10   non-medical-legal. I don't think medical-legal is
11   undetermined.
12        Q. That was my point?
13        A. Yes.
14        Q. So when we're making the
15   calculation of the 70 percent, is it safe for us to
16   exclude -- or strike that.
17        Is it safe for us to include the 45
18   undetermined hernia cases in the 30 percent of the
19   non-medical-legal cases?
20        A. Yes, we can do that right away.
21   Those would be non-medical-legal cases.
22        Q. Okay.
23        A. There could be some potentially
24   medical-legal cases when I receive a specimen but I
25   have not received a history. They say, hold on to

71 (Pages 278 to 281)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 282

1    this -- may be medical-legal case later on.
2         Q.  Okay?
3         A.  So it's not hard number.
4         Q.  Right.
5         A.  But it's a ballpark.
6         Q.  For the Ethicon TVT, TVT-O of
7    those 28 how many of them are medical-legal?
8         A.  At least 80 percent.
9         Q.  Perhaps more?
10        A.  Possibly more.
11        Q.  And included within the 28 Ethicon
12   TVT and TVT-O are the cases that you received from
13   Dr. Kreutzer, correct?
14        A.  Yes.  Most of St. Michael's cases,
15   when I had a record, were actually TVT.  So I don't
16   know for whatever reason most of those excised at
17   St. Michael's were TVT.
18        Q.  Okay.  And in addition, you had
19   new TVT and TVT-O cases since Dr. Kreutzer, and
20   those would be included in this article as well?
21        A.  Yes.
22        Q.  So, for example, the Edwards case
23   would probably be in this?
24        A.  Yes, it would be in there.  I
25   received the Edwards case before I received

Page 283

1    specimen from Dr. Kreutzer.
2         Q.  Okay.  Interesting.
3         On page 3 of this study, you talk about
4    measuring the degradation layer's thickness?
5         A.  Yes.
6         Q.  And you say a set of 23
7    mid-urethral slings was the largest uniform group
8    that fulfilled your criteria.  Is that the slings
9    that you got from Dr. Kreutzer?
10        A.  Most of them came in that set of
11   samples.
12        Q.  All right.  Tell me how you
13   physically measure the thickness of the stained
14   layer with the eyepiece micrometer?
15        A.  I would find fibers which are cut
16   as perpendicular as largest and measure bark
17   thickness on at least two occasions.
18        And then measure -- I try to find
19   another fiber, measure again, and then take median
20   number, the most frequent I'm getting.
21        Q.  Do you have the data that you
22   collected on those measurements?
23        A.  Yes, I do.
24        Q.  Okay.
25        A.  I mean, you have it on the --

Page 284

1         Q.  Is it on the thumb drive?
2         A.  It's on the thumb drive.  And you
3    saw it before at various depositions.
4         Q.  Thank you.  I don't want to redo
5    that.
6         And when you do the eyepiece micrometer
7    and you measure, to what level can you measure?
8         A.  Initially, I had one micrometer.
9    It was graded only to one micrometer.  Now, I have
10   little bit better so I can measure up to half a
11   micrometer.
12        Q.  When you were doing this study,
13   were you measuring at one micrometer?
14        A.  I was rounding to one micrometer;
15   it was an older eyepiece.
16        Q.  So the data in the study, you're
17   rounding your findings to the closest micrometer?
18        A.  Yes.  To the full number.
19        Q.  Did you round up always?
20        MR. ORENT:  Objection.
21        THE WITNESS:  No, it depends.  If it's
22   less than a half of the next gradation, it would go
23   to the lower, but that's the usual rule for --
24        BY MR. THOMAS:
25        Q.  Okay, that's fine.  And then when

Page 285

1    you had two together -- so you had a total of four
2    measurements?
3         A.  I would aim at four measurements
4    at least.
5         Q.  And each one of those would go
6    through some rounding process?
7         A.  Yeah, I mean, the accuracy of
8    measurement was within half a micrometer plus or
9    minus.
10        Q.  Okay.  Now --
11        A.  But it would be random, up and
12   down, up and down, so they would constantly change.
13        Q.  Now, in some places in images we
14   looked at today, we didn't find any bark, correct?
15        MR. ORENT:  Objection.
16        THE WITNESS:  This is not correct.  We
17   could not see it in the images.  I can tell you
18   that in some specimens I did not see bark.
19        BY MR. THOMAS:
20        Q.  How do you report that?
21        A.  I report that I don't see it.  I
22   have cases when I reported that I don't see a bark.
23        Q.  And you reported here that you had
24   two specimens where the degradation layer was not
25   visible where a hernia mesh and a sling were

72 (Pages 282 to 285)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 286

1    removed at three and ten months.
2            Are those the only two times you
3    haven't been able to see a bark?
4            A.   At that time, the only two.  Since
5    then I've seen a couple of more cases where I
6    couldn't identify bark.
7            Q.   Any of those medical-legal cases?
8            A.   No, I think it was all hernia
9    meshes, not medical-legal cases.
10           Q.   Do you have those slides
11   available?
12           MR. ORENT:  Objection.
13           THE WITNESS:  Yes, I do, but they are
14   of patients.
15   BY MR. THOMAS:
16           Q.   You can't produce those to me if I
17   asked you for them?
18           A.   I can't produce them.
19           Q.   Did the slides where there was no
20   degradation bark, if you will, present contain
21   inflammation?
22           A.   Yes, they did.
23           Q.   Were they removed because of pain?
24           A.   Yes.  I think one of them was
25   removed for erosion with pain.  The other one, the

Page 287

1    hernia mesh, was removed just for pain.
2            Q.   On page 6 of the study, you
3    describe that you use transmission electron
4    microscopy --
5            A.   That's correct.
6            Q.   -- to study the ultra structural
7    organization of the degraded layer in
8    cross-sections?
9            A.   That's correct.
10           Q.   Did you use the TEM to study any
11   TVT device?
12           A.   One.  It was one Ethicon device,
13   TVT or Prolift, I don't remember.  I think it was a
14   TVT.
15           Q.   Have you produced that work to us
16   before?
17           A.   It's a St. Michael's Hospital
18   patient.
19           Q.   Okay.  So, is it fair to
20   understand that the only transmission electron
21   microscopy analysis that you've done on an Ethicon
22   mesh is the St. Michael's patient that you can't
23   produce to us?
24           A.   Well, it was a part of research.
25   So if it was included in images, it was included as

Page 288

1    part of research project.
2            Q.   Well, have you produced that to to us
3    before?
4            A.   I don't know.
5            Q.   Okay.  But just to make sure I got
6    a clean answer.  In all the work that you've done
7    on all the Ethicon meshes, the only Ethicon mesh
8    that you've analyzed by transmission electron
9    microscopy is a mesh of a St. Michael's patient
10   that's either a TVT or a Prolift, you don't know
11   which?
12           A.   Now I'm not sure if it was St.
13   Michael's or it was a medical-legal case.  I don't
14   remember now.
15           Q.   Okay?
16           A.   I would have to check, but if it
17   was, it was the only case.  I could do only one
18   case of Ethicon mesh by transmission electron
19   microscopy.
20           Q.   And why have you not conducted
21   transmission electron microscopy on other meshes?
22           A.   There was no need.  It is a really
23   cumbersome, difficult and --
24           Q.   Does St. Michael's have that kind
25   of equipment?

Page 289

1            A.   Yes, we do.  Otherwise, I wouldn't
2    be able to do it.  It's really expensive to do it
3    somewhere outside.
4            Q.   Did you have to pay St. Michael's
5    to do this?
6            A.   No, it's just part of our academic
7    work.
8            Q.   Are you able to do this yourself
9    or does somebody have to do it for you?
10           A.   I'm trained to do transmission
11   electron microscopy.  I mean, technicians prepare
12   slides.  It's usual, the same as for histology.
13   But I do examination myself.
14           Most of the transmission electron
15   microscopy samples are with hernia meshes.
16           Q.   Page 10 there is a discussion of
17   the clinical significance of polypropylene
18   degradation?
19           MR. ORENT:  Are we going back to the
20   report or saying on the study?
21           MR. THOMAS:  I'm on the study, sorry.
22           THE WITNESS:  Yes.
23   BY MR. THOMAS:
24           Q.   Page 10 on Exhibit 6, "Clinical
25   Significance of Polypropylene Degradation".

73 (Pages 286 to 289)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 290

1    **Who drafted this section?**
2        A.  Mostly me, partially my coauthors.
3        **Q.  Dr. Bendavid?**
4        A.  Yes.  And well, mostly Dr.
5    Bendavid.  I mean, I drafted most of it, but I was
6    getting some corrections or changes, and the
7    changes were coming mostly from Dr. Bendavid.
8        **Q.  Exhibits 5 and 6, you stand by the**
9    **findings stated in each of those articles?**
10       A.  Yes, I am.
11       **Q.  Do you have depositions scheduled**
12   **in the next month?**
13       A.  I'm not sure if I can disclose
14   that.
15       **Q.  Do you have trial responsibilities**
16   **in the next month?**
17       A.  Pardon?
18       **Q.  Do you have any trial**
19   **responsibilities in the next month?**
20       A.  No, I don't think so.
21       **Q.  Your next trial is a December**
22   **trial with Ethicon?**
23       A.  I'm not sure if I can disclose
24   that either.
25       **Q.  Are you choosing not to?**

Page 291

1        A.  There might be more and earlier, I
2    don't want to disclose that.  I'm not sure if I
3    can, if I legally can disclose it.
4        I mean, if it's not for Ethicon cases.
5    For Ethicon I would disclose, but if it's not then
6    I cannot disclose.
7        MR. THOMAS:  Counsel, there's no legal
8    prohibition for him saying it?
9        MR. ORENT:  You can answer.
10       THE WITNESS:  They said that --
11       MR. ORENT:  Wait, hold on.  They said
12   is not an answer.  So any communications that
13   you've had are covered by a privilege.  So what
14   he's asking specifically are, if anything is firm
15   in terms of a date that you know of, so --
16       BY MR. THOMAS:
17       **Q.  For depositions or trial?**
18       MR. ORENT:  For depositions or trial,
19   not any communications about we might do this or
20   might do that.  But anything firm that you know you
21   have a date set for.
22       THE WITNESS:  Then everything is
23   changing.  I have a set date one deposition.  But
24   the rest is still in the air.
25

Page 292

1        BY MR. THOMAS:
2        **Q.  Do you have any set dates for any**
3    **trials between now and the Ethicon trial?**
4        A.  No.  Again, nothing set firmly.
5        **Q.  Okay.**
6        MR. ORENT:  Just a sec.  In addition to
7    that, I think in the Cantrell matter I've been
8    working with Kelly Crawford to schedule, I would
9    imagine that would be within the next month.
10   That's an Ethicon case, obviously.
11       MR. THOMAS:  Yes, I know about that.
12   Hang on.  Getting close to the end.
13       -- OFF THE RECORD DISCUSSION --
14       BY MR. THOMAS:
15       **Q.  Doctor, I'm told that the**
16   **information supplied to us concerning the eyepiece**
17   **micrometer measurements of the bark layers is**
18   **expressed in a single value as opposed to the four**
19   **individual measurements?**
20       A.  No, it's a median, I told you
21   that, then I pick median value out of four.
22       **Q.  Okay.**
23       A.  It is described in the paper.  So
24   the volume which goes for analysis is a median one,
25   which is more frequent.

Page 293

1        **Q.  Do you have the four measurements**
2    **that you made or did you just pick the -- do you**
3    **have that as a part of your data set?**
4        A.  I just measure them and right
5    there I know how frequent is this measurement or
6    that.  So I don't have to put in the paper.
7        **Q.  Did you write down or keep a copy**
8    **of the four individual measurements that you made**
9    **of the --**
10       A.  No, no.  The methodology is check
11   four spots.  I see three, four, four, four, then
12   four is the winner, so then four goes in the
13   record.
14       **Q.  Did you produce your bills today**
15   **for the time that you spent in this case?**
16       A.  In this case?
17       **Q.  In this case?**
18       A.  Oh, in this.  I had billing done
19   for the -- for the report, it's in the folder.
20       **Q.  Do you recall how much time and**
21   **money you've spent on preparing the report in this**
22   **case, Exhibit 3 and 4?**
23       A.  No, I don't.
24       **Q.  The invoice that you produced to**
25   **us on a thumb drive suggests that you have a**

Vladimir Iakovlev, M.D.

Page 294

1  balance, professional services August 14th,
2  August 24th for a total of $8,550 --
3      A.  Sounds right.
4      Q.  -- is that right?
5      Doctor, I don't see -- I see general
6  part text revision; what does that mean?
7      A.  Revision of the general part.
8      Q.  General party report?
9      A.  Yes.
10      Q.  This report is the first time that
11  you reviewed any Ethicon documents or Ethicon
12  depositions, true?
13      A.  No, there was another case.
14      Q.  I didn't see it in any of your
15  reports before where you reviewed Ethicon
16  depositions and Ethicon documents?
17      MR. ORENT:  One moment.
18      BY MR. THOMAS:
19      Q.  The only other case it could be
20  would be the Bellew case?
21      MR. ORENT:  The doctor has not
22  testified previously about these issues.  I don't
23  know whether or not there has been another report
24  on another matter disclosed.
25      It may very well be that there is

Page 295

1  something that's still work product and not been
2  disclosed.  So I don't want to get into the details
3  of that other potential matter.
4      BY MR. THOMAS:
5      Q.  Let me just ask it this way:  The
6  bills that you've submitted to counsel in this
7  matter do not reflect any charges for time that
8  you've spent reviewing Ethicon documents or
9  depositions, correct?
10      A.  Partially, they do.  I reviewed
11  some of that again; it's been drafted earlier.
12      MR. ORENT:  Counsel, just to speed this
13  area up to the extent that it's not clear on the
14  bills, I think what we can do is we can supplement
15  by letter.
16      MR. THOMAS:  That would be fine.  I'm
17  not interested in getting anybody.  I just want --
18      MR. ORENT:  I think what we'll do is we
19  can figure out the amount of time.
20      MR. THOMAS:  I just want to make sure
21  you get paid for your time.  You have to send your
22  bills and get paid.
23      Okay, that's all the questions I have,
24  Doctor.  Thank you.
25      THE WITNESS:  Thank you.

Page 296

1      MR. ORENT:  Why don't we take two
2  minutes.  I'll going to have probably about ten
3  minutes worth of questions.
4      -- RECESS TAKEN AT 4:52 --
5      -- UPON RESUMING AT 4:55 --
6      CROSS-EXAMINATION BY MR. ORENT:
7      Q.  Good afternoon, Doctor.
8      A.  Good afternoon.
9      Q.  Earlier today you were asked a
10  number of questions about each of the
11  photomicrographs that we looked at, and one of the
12  predicate questions that you were asked for each
13  one was whether or not it was a TVT or a TVT-O; do
14  you recall being asked that series of questions?
15      A.  Yes, I do.
16      Q.  For purposes of your work does it
17  make any difference whether or not the product is
18  the TVT or TVT-O in terms of your findings as
19  reported here?
20      A.  No, it's the same sling, the same
21  mesh.  The only difference is how it's placed and
22  the other components which come in the kit.
23      Q.  So if I understand your testimony,
24  is it your testimony that the TVT and the TVT-O --
25  the actual mesh device is the exact same?

Page 297

1      A.  Exactly the same.
2      Q.  Okay.  And so in terms of the
3  pathological findings that you make, as reported in
4  your report and your supplement, is there a -- is
5  there any reason for making a distinction between
6  the two devices?
7      MR. THOMAS:  Object to the form of the
8  question.
9      THE WITNESS:  No.  The only difference
10  is there can be more frequent occurrences of
11  striated muscle in the TVT-O samples than in TVT,
12  but it can be seen in both.
13      BY MR. ORENT:
14      Q.  And is that because of the
15  implantation route?
16      A.  That's correct.
17      Q.  And both devices are made of
18  Prolene mesh; is that correct?
19      A.  That is correct.
20      Q.  Now every one of the
21  photomicrographs that appear in Exhibits 1 and 2 to
22  today's deposition, that is your report and
23  supplemental report, did every one of those
24  photomicrographs appear either from prior expert
25  reports in Ethicon litigation, in the specific

75 (Pages 294 to 297)

Golkow Technologies, Inc. - 1.877.370.DEPS

Vladimir Iakovlev, M.D.

Page 298

1  pathology of the consolidated plaintiffs, or in
2  peer-reviewed medical literature written by you?
3       A.  That's correct.  These are the
4  three sources.
5       Q.  And you've been asked questions
6  today about identifying various -- what you called
7  additional TVT cases in your report; do you recall
8  those questions?
9       A.  Yes, I do.
10       Q.  Did you produce photomicrographs
11  of the additional TVT cases in the course of other
12  reports you've provided in TVT cases?
13       A.  Yes, I did.
14       Q.  Now, with regard to the opinions
15  that you express in your expert report in this
16  case, and your supplement, do you use the same
17  methodology that you have previously used when you
18  testified in the western district -- excuse me, in
19  the southern district of West Virginia?
20       A.  Yes, exactly the same methodology.
21       Q.  And is your -- the materials and
22  your methodology that you utilized in this report
23  the same methodology that you've used in other
24  courts where you have been allowed to testify at
25  trial?

Page 299

1       A.  That's correct.
2       Q.  Did you use any different
3  techniques in this report?
4       A.  No.
5       Q.  Okay.  Now, the opinions that you
6  testified to in this report, and in the supplement,
7  are they identical to the opinions that you've
8  previously provided in trial in matters before the
9  southern district of West Virginia?
10       A.  Yes.
11       MR. THOMAS:  Object to form.
12       THE WITNESS:  That is correct.  The
13  same opinions.
14       BY MR. ORENT:
15       Q.  Are they, the opinions that you
16  express in your expert report and in the
17  supplement, are they also identical to opinions
18  that you have provided in other courts during
19  trials throughout the country?
20       MR. THOMAS:  Object to form.
21       THE WITNESS:  That is correct.
22       BY MR. ORENT:
23       Q.  And throughout the course of your
24  report you provide just a few examples of a variety
25  of failure modes associated with the TVT and TVT-O

Page 300

1  device; is that correct?
2       MR. THOMAS:  Object to form.
3       THE WITNESS:  That is correct.
4       BY MR. ORENT:
5       Q.  And why is it that you don't list
6  a sample size or rate of error in your report?
7       A.  It's not the purpose.  I'm not
8  analyzing statistically frequency or rate of
9  occurrence.  I showed the changes which can occur.
10  It's binary assessment; either it can occur or
11  cannot occur.  It can occur in one case, it can
12  occur in 100 percent of cases, but it can happen.
13  For a specific patient it either occurs or it
14  doesn't.
15       Q.  In order to show that something
16  can occur, in terms of a failure mode, is there a
17  sample size, a minimum sample size that you have
18  need to show that a failure rate or failure mode
19  can occur?
20       MR. THOMAS:  Object to form.
21       THE WITNESS:  One case is enough.  If
22  it can occur in one case, it can occur again.
23       BY MR. ORENT:
24       Q.  And these concepts of sample size
25  with one being enough to prove capability, is that

Page 301

1  something that's generally accepted in the medical
2  community, in the scientific community?
3       MR. THOMAS:  Object to form.
4       THE WITNESS:  Yes.  If you answer the
5  question if it can occur, one case is enough.
6       BY MR. ORENT:
7       Q.  Same thing with a binary
8  observation; it either occurs or doesn't occur.
9  There's no rate of error associated with that; is
10  that correct?
11       MR. THOMAS:  Object to the form of the
12  question.
13       THE WITNESS:  It's either there or it's
14  not.  It's either zero occurrence or 100 percent.
15       BY MR. ORENT:
16       Q.  When you talk about using large
17  enough sample sizes and large enough rates of
18  error, is that only used when you actually try and
19  extrapolate from a data set to an individual?
20       MR. THOMAS:  Object to the form of the
21  question.
22       THE WITNESS:  That's used to predict
23  specific rates of specific occurrence, and that's
24  used in relation to a cohort of patients and
25  devices.  And it's a different question.

76 (Pages 298 to 301)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 302

1    BY MR. ORENT:
2        Q.  Okay.  And in terms of the
3    opinions that you provided here in your expert
4    report, do you hold each of those opinions to a
5    reasonable degree of medical and professional
6    certainty?
7        A.  Yes, I do.
8        Q.  And with regard to the various
9    staining techniques that you've utilized, are each
10   one of those staining techniques peer-reviewed in
11   their own right?
12       MR. THOMAS:  Object to the form of the
13   question.
14       THE WITNESS:  That is correct, yes.
15       BY MR. ORENT:
16       Q.  Has H&E been utilized as a stain
17   and been peer-reviewed as a proper way of looking
18   at tissue for a significant period of time?
19       A.  Over 100 years, or over the course
20   of 100 years.
21       Q.  How about myeloperoxidase, has
22   that been peer-reviewed as use for staining?
23       MR. THOMAS:  Object to the form of the
24   question.
25       THE WITNESS:  We have several decades

Page 303

1    of use.
2        BY MR. ORENT:
3        Q.  And how about S100?
4        MR. THOMAS:  Object to the form of the
5    question.
6        THE WITNESS:  Same thing.  It's been
7    used since late '70s, early '80s.
8        BY MR. ORENT:
9        Q.  What about the use of polarizing
10   light, is that something that's peer-reviewed and
11   accepted in the identification of crystalline
12   substances?
13       A.  It's been described for histology
14   use from 1920s, and even I saw it's been used in
15   Ethicon studies as well.  Ethicon scientists were
16   using polarized light as well.  Well, let me
17   rephrase that.  Who came to the same conclusions I
18   came.
19       Q.  And with regard to the medical
20   peer-reviewed literature on mesh and mesh
21   complications, in fact, there's a group out of the
22   University of Michigan that published utilizing
23   some of the same techniques that you've described
24   in your report; is that correct?
25       MR. THOMAS:  Object to the form of the

Page 304

1    question.
2        THE WITNESS:  Yes.
3        BY MR. ORENT:
4        Q.  Now, with regard to the work that
5    you've done here, none of these opinions are new;
6    is that right?
7        MR. THOMAS:  Object to the form of the
8    question.
9        THE WITNESS:  That is correct.
10       BY MR. ORENT:
11       Q.  And in terms of the material that
12   you've produced on disk.  Having provided to
13   counsel today, did you produce all non-confidential
14   materials that you could provide?
15       A.  Yes.  I selected that I could
16   safely release.
17       Q.  You were also asked a number of
18   questions about the peer review and peer-review
19   process; do you recall those questions?
20       A.  Yes, I do.
21       Q.  As an academic, do you have
22   concerns about maintaining the integrity of the
23   peer-review process?
24       A.  Could you repeat the question.
25       Q.  Sure.  As an academic, as an

Page 305

1    author and a researcher, are there important
2    reasons why the confidentiality of the
3    peer-review process needs to be maintained?
4        A.  Yes.  I mean, especially when
5    there is an involvement of a manufacturer, because
6    I mean, this is major concern.
7        Most publications -- journals, they
8    require, the first thing they need to have
9    submitted, has it been funded by industry, by
10   manufacturers.  So it's a major concern to try to
11   be independent from manufacturers.
12       MR. ORENT:  All right, Doctor, thank
13   you very much.  I have no further questions.
14       MR. THOMAS:  Thank you, Doctor, for
15   your time.
16
17
18   -- Whereupon the deposition concluded at 5:05 p.m.
19
20
21
22
23
24
25

77 (Pages 302 to 305)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 306

REPORTER'S CERTIFICATE

I, JUDITH M. CAPUTO, RPR, CSR, CRR, Registered Professional Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

Dated this 14th day of September, 2015.

_____

PER:  JUDITH CAPUTO, RPR, CSR, CRR

Page 307

CERTIFICATE OF REPORTER

CANADA          )
PROVINCE OF ONTARIO  )

I, Judith M. Caputo, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in shorthand, using Computer Aided Realtime, to the best of my ability and thereafter reduced to written format under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which the deposition was taken, and further that I am not related or an employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

_____

Judith M. Caputo, RPR, CSR, CRR

Commissioner for taking
Oaths in the Province of Ontario

Page 308

INSTRUCTIONS TO WITNESS

Read your deposition over carefully. It is your right to read your deposition and make changes in form or substance. You should assign a reason in the appropriate column on the erratum sheet for any change made.

After making any changes in form or substance, and which have been noted on the following erratum sheet, along with the reason for any change, sign your name on the erratum sheet and date it.

Then sign your deposition at the end of Your testimony in the space provided. You are signing it subject to the changes you have made in the erratum sheet, which will be attached to the deposition before filing. You must sign it in front of a witness. The witness need not be a notary public. Any competent adult may witness your signature.

Return the original erratum sheet promptly. Court rules require filing within 30 days after you receive the deposition.

Page 309

* * ERRATA SHEET * *

NAME OF CASE:  TERRESKI MULLINS, ET AL. V. ETHICON, INC., ET AL.
DATE OF DEPOSITION:  SEPTEMBER 14th, 2015
NAME OF WITNESS:  VLADIMIR IAKOVLEV

PAGE  LINE    FROM    TO
___|___|_____|_____|_____
___|___|_____|_____|_____
___|___|_____|_____|_____
___|___|_____|_____|_____
___|___|_____|_____|_____
___|___|_____|_____|_____
___|___|_____|_____|_____
___|___|_____|_____|_____
___|___|_____|_____|_____
___|___|_____|_____|_____
___|___|_____|_____|_____
___|___|_____|_____|_____

_____

VLADIMIR IAKOVLEV

78 (Pages 306 to 309)

f99c642e-2654-4b08-aa8d-461cc8038857

Vladimir Iakovlev, M.D.

Page 310

1    PROVINCE OF ONTARIO   )
2    TORONTO REGION        )
3
4
5         I, the undersigned, declare under
6    penalty of perjury that I have read the foregoing
7    transcript, and I have made any corrections,
8    additions or deletions that I was desirous of
9    making;
10        That the foregoing is a true and
11   correct transcript of my testimony contained
12   therein.
13
14        _____
15             VLADIMIR IAKOVLEV, M.D.
16
17
18   Subscribed and sworn to before me this ____
19   Day of _____, 2015 at
20   _____. _____
21      (City)          (Province)
22
23   _____
24   (Notary Public)
25   My Commission Expires: _____

Golkow Technologies, Inc. - 1.877.370.DEPS

f99c642e-2654-4b08-aa8d-461cc8038857