# EXHIBIT I

Vladimir Iakovlev, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION


IN RE:  BOSTON SCIENTIFIC CORP.,      MDL NO.:  2326

PELVIC REPAIR SYSTEM

PRODUCTS LIABILITY LITIGATION


THIS DOCUMENT RELATES TO:

Chapa v. Boston Scientific Corporation      2:13-cv-17511

Fisher v. Boston Scientific Corporation      2:13-cv-29324

Flandro v. Boston Scientific Corporation      2:13-cv-17027


Toronto, Ontario, Canada

Wednesday, December 17, 2014

VOLUME I


Videotaped Deposition of VLADIMIR IAKOVLEV,

M.D., a witness herein, called for examination

by counsel for the Defendants in the above-mentioned

matter, the witness having been affirmed, taken at the

offices of Neesons Reporting, 141 Adelaide Street West,

Toronto, Ontario, at 9:11 a.m., on Wednesday, December 17,

2014, and the proceedings being taken down by Stenotype

and transcribed by JUDITH M. CAPUTO, RPR, CSR, CRR.

Vladimir Iakovlev, M.D.

Page 2

1  THIS DOCUMENT RELATES TO: (Cont'd)
2
3  Fleming v. Boston Scientific Corporation    2:12-cv-05131
4  Franco v. Boston Scientific Corporation     2:12-cv-07248
5  Hanson v. Boston Scientific Corporation     2:13-cv-10653
6  Hoffman v. Boston Scientific Corporation    2:12-cv-04433
7  Howard v. Boston Scientific Corporation     2:12-cv-04145
8  Kilgore v. Boston Scientific Corporation    2:13-cv-09171
9  Parker v. Boston Scientific Corporation     2:12-cv-01243
10 Reynolds v. Boston Scientific Corporation   2:12-cv-09934
11 Robbins v. Boston Scientific Corporation    2:12-cv-01413
12 Tame v. Boston Scientific Corporation       2:13-cv-01059
13 Watanabe v. Boston Scientific Corporation   2:13-cv-12227
14
15
16 A P P E A R A N C E S :
17
18 ON BEHALF OF THE PLAINTIFFS:
19 BY:  JONATHAN D. ORENT, ESQ.
20 Motley Rice, LLC
21 321 South Main Street, 2nd Floor
22 Providence, Rhode Island 02903
23 401.457.7723
24
25

Page 4

1  A P P E A R A N C E S: (Cont'd)
2
3  ON BEHALF OF THE PLAINTIFFS:
4  BY:  CRAIG EILAND, ESQ.
5  Law Offices of Craig Eiland
6  2211 The Strand, Suite 201
7  Galveston, Texas  77550
8  409.763.3260
9
10 ON BEHALF OF THE DEFENDANTS:
11 BY:  ADRIENNE L. BYARD, ESQ.
12 Shook, Hardy & Bacon, LLP
13 2555 Grand Boulevard
14 Kansas City, Missouri  64108
15 816.474.6550
16
17 ALSO PRESENT:
18 DENNIS COSTIGAN, Motley Rice LLC
19
20
21
22
23
24
25

Page 3

1  A P P E A R A N C E S :
2
3  ON BEHALF OF THE PLAINTIFFS:
4  BY:  ALAN S. LAZAR, ESQ.
5  Marlin Saltzman, LLP
6  29229 Canwood Street, Suite 208
7  Agoura Hills, California 91301
8  818.991.8080
9
10 ON BEHALF OF THE PLAINTIFFS:
11 BY:  NATHAN C. BESS, ESQ.
12 Aylstock, Witkin, Kreis & Overholtz
13 17 East Main Street, Suite 200
14 Pensacola, Florida  32502
15 850.202.1010
16
17 ON BEHALF OF THE PLAINTIFFS:
18 BY:  KATY KROTTINGER, ESQ.
19 The Monsour Law Firm
20 404 North Green Street
21 Longview, Texas  75606
22 903.758.5757
23
24
25

Page 5

1         I N D E X
2
3  WITNESS:  VLADIMIR IAKOVLEV, M.D.
4                    PAGE
5  DIRECT EXAMINATION BY MS. BYARD...................8
6
7
8
9
10
11      INDEX OF EXHIBITS
12
13 NUMBER/DESCRIPTION          PAGE NO.
14 1195:  Notice of Videotaped Deposition   10
15 Duces Tecum of Dr. Vladimir Iakovlev.
16 1196:  General Expert Report of   27
17 Dr. Iakovlev dated November 10, 2014.
18 1197:  Article entitled, "Mesh-Related   80
19 SIN Syndrome:  A Surreptitious Irreversible
20 Neuralgia and Its Morphologic Background
21 in the Etiology of Post-Herniorrhaphy Pain,"
22 International Journal of Clinical
23 Medicine, 2014, by Dr. R. Bendavid,
24 Dr. W. Lou, Dr. A. Koch and Dr. V. Iakovlev.
25

Vladimir Iakovlev, M.D.

Page 6

1    1198:  International Scholarly and      156
2    Scientific Research & Innovation, 2014,
3    Publication entitled, "Pathology of
4    Explanted Transvaginal Meshes," by
5    Dr. V. Iakovlev, Dr. E. T. Carey and
6    Dr. J. Steege.
7    1199:  Abstract entitled, "Pathological  186
8    Findings of Transvaginal Polypropylene
9    Slings Explanted for Late Complications:
10   Mesh is Not Inert," by Dr. V. Iakovlev,
11   Dr. G. Mekel and Dr. J. Blaivas.
12   1201:  Abstract entitled, "In-vivo      207
13   Degradation of Surgical Polypropylene
14   Meshes:  A Finding Overlooked for
15   Decades," by Dr. V. Iakovlev,
16   Dr. S. Guelcher, Dr. R. Bendavid.
17
18
19
20
21
22
23
24
25

Page 7

1    -- Upon commencing at 9:11 a.m.
2
3            THE VIDEOGRAPHER:  Good morning.  We
4    are now on the record.  My name is Peter Goodale,
5    certified legal videographer for Golkow Technologies.
6            Today's date is December 17, 2014, and
7    the time on the video monitor is 9:11 a.m.
8            This video deposition is being held in
9    Toronto, Ontario, Canada in the matter of:  In Re:
10   Boston Scientific Corporation Pelvic Repair System
11   Products Liability Litigation, for the United
12   States District Court, for the Southern District of
13   West Virginia, Charleston Division, MDL No. 2326.
14           The deponent is Dr. Vladimir Iakovlev.
15   Counsel, please identify yourselves and state who
16   you represent.
17           MR. ORENT:  Jonathan Orent for the
18   Plaintiffs.
19           MR. LAZAR:  Alan Lazar for the
20   Plaintiffs.
21           MR. BESS:  Nathan Bess, also for the
22   Plaintiffs.
23           MS. KROTTINGER:  Katy Krottinger for
24   the Plaintiffs.
25           MS. BYARD:  And Adrienne Byard for

Page 8

1    Defendant, Boston Scientific.
2            MR. EILAND:  Craig Eiland for the
3    Plaintiffs.
4            THE VIDEOGRAPHER:  Thank you.
5            The court reporter is Judy Caputo, CSR,
6    and who will now swear in or affirm the witness.
7    Whereupon,
8            VLADIMIR IAKOVLEV, M.D.,
9    called for examination by counsel for Defendants
10   and having been affirmed by me, was examined and
11   testified as follows:
12           DIRECT EXAMINATION BY MS. BYARD:
13       Q.  Dr. Iakovlev, it's very nice to
14   see you again.  You'll recall I'm Adrienne Byard.
15   I think the last time we had the opportunity to
16   talk was in January of 2014, when I took your
17   deposition here in Toronto.  Do you remember that
18   deposition?
19       A.  Yes, I do.
20       Q.  And since that time you've been
21   deposed again; correct?
22       A.  By Boston Scientific, yes.
23       Q.  And also by other mesh
24   manufacturers, right?
25       A.  Yes, that's correct.

Page 9

1            Q.  Okay.  And you've also had the
2    opportunity to testify at some trials; correct?
3        A.  Yes.
4        Q.  Let's work forwards in time.
5            So from January 2014, when I took your
6    deposition here in Toronto, when was your next
7    deposition?
8        A.  I think I had one, either in
9    February, February 4th or somewhere in that date,
10   and there was another one in March --
11       Q.  Let me stop you there, if you
12   don't mind.  Were those in an AMS matter?
13       A.  Yes.
14       Q.  And just one, one case, right?
15       A.  What do you mean "one case"?
16       Q.  Was it just -- were you just
17   looking at pathological specimens for a single
18   case, or were your opinions applying across
19   AMS cases; if you know?
20       A.  There were a number of cases.
21       Q.  Okay.  And then when was your
22   next deposition?
23       A.  From February 4th?
24       Q.  Yes.  February and March for AMS,
25   and then when was the next one?

3 (Pages 6 to 9)

Vladimir Iakovlev, M.D.

Page 10

1    A. Then there was one for Ethicon in
2  April.
3    Q. Okay.
4    A. But that's not a memory test. The
5  recent depositions is provided on the flash drive
6  for you.
7    Q. Okay. So you've brought some
8  materials with you here today through counsel in
9  response to our request. Is that what you're
10 saying?
11   A. That's correct.
12   Q. Okay. And we'll go ahead and mark
13 as 1195, the Notice of Deposition. I'll pass a
14 copy of that to you.
15   EXHIBIT NO. 1195: Notice of Videotaped
16   Deposition Duces Tecum of Dr. Vladimir
17   Iakovlev.
18   BY MS. BYARD:
19   Q. Is this deposition notice, or one
20 similar to it, familiar to you, sir?
21   A. Yes.
22   Q. And did you bring documents
23 responsive to our request through counsel?
24   A. Yes.
25   Q. What were the documents, as far as

Page 11

1  you understand it, that were being brought here
2  today in response to our request?
3    A. Medical records I reviewed for the
4  Plaintiffs. My publications, billing I produced
5  for the Plaintiffs, which were identified in this
6  notice.
7    Q. Okay.
8    A. For whatever reason, there is no
9  list here. It looks different than what I
10 received.
11   Q. Right. The list you saw, and I'll
12 just show you this -- we're not going to mark it at
13 this point -- but it was a longer list like this,
14 right?
15   A. Yes. That looks more familiar
16 than this.
17   Q. Okay. And so you brought the
18 billing that pertained to those women's cases,
19 right?
20   A. Um-hum.
21   Q. Okay.
22   A. Yes.
23   Q. Now, when you say "obligations,"
24 what do you mean by that?
25   A. What do you mean?

Page 12

1    Q. You said "my obligations"?
2    A. No, no, I didn't say that.
3    Q. Oh, really? Okay, I missed it
4  then. Somewhere between "medical records reviewed
5  for Plaintiffs" and the "billing for Plaintiffs" --
6    MR. ORENT: He said "publications."
7    BY MS. BYARD:
8    Q. "Publications." Publications,
9  thank you so much.
10   You'll remember the rules of the
11 deposition, I'm sure, that if there are times when
12 we don't understand each other, I'll ask for
13 clarification and I'll ask that you do the same;
14 all right?
15   A. Sure.
16   Q. If you don't ask for
17 clarification, I'll assume you understood me, okay?
18   A. (Witness nods).
19   Q. Is that fair?
20   A. Yes, that's fair.
21   Q. Very good.
22   What else was, besides your
23 publications, the medical records you reviewed for
24 Plaintiffs, and the billings for Plaintiffs, is on
25 that thumb drive, so far as you know?

Page 13

1    A. The list of testimonies I gave.
2    Q. Okay.
3    A. My current CV.
4    Q. You don't have a paper copy of
5  that that I could review and go over with you now
6  of any of those materials?
7    A. No, I didn't bring them. I tried
8  to save trees.
9    Q. Okay. Well, we'll take that up on
10 a break.
11   I want to return to this list of
12 depositions. So you gave a deposition in April or
13 in that timeframe for Ethicon, have you given
14 depositions in any cases involving any other
15 manufacturers of transvaginal mesh?
16   A. Yes.
17   Q. Okay. Which others?
18   A. Bard.
19   Q. When was that deposition?
20   A. Let me turn it up. The deposition
21 for Bard was in November.
22   Q. November. Now you've also
23 testified at some trials; correct?
24   A. That's correct.
25   Q. What trials have you testified at

4 (Pages 10 to 13)

Vladimir Iakovlev, M.D.

Page 14

1   and when were they?
2       A.  Both were for Boston Scientific
3   devices.  One trial was in August for Ms. Cardenas
4   and the other one was in Miami for Ms. Eghanayem
5   and other patients.
6       Q.  Going back to depositions, you
7   also had -- besides the time that I took your
8   deposition in January with Ms. Weiler for Boston
9   Scientific, you also had a deposition in July,
10  where you covered, specifically, the Cardenas and
11  the Eghanayem matters, right?
12      A.  That's correct.
13      Q.  So all told, you've been deposed
14  once in the Boston Scientific MDL; once for two
15  specific cases in the Boston Scientific MDL; once
16  for Ethicon --
17      A.  Twice.
18      Q.  Twice for Ethicon.  Then a
19  deposition for Bard?
20      A.  Twice for Bard.
21      Q.  Twice for Bard.  And so we're in
22  the neighborhood of six or seven depositions?
23      A.  That's correct.
24      Q.  And two trials?
25      A.  That's correct.

Page 15

1       Q.  Because we've already covered so
2   many of your opinions with you in these other
3   depositions and at trials, I'm not going to rehash
4   a bunch of old ground with you.
5       I'd like to specifically cover with you
6   today, your deposition for these wave cases, this
7   general report that you've authored.  It's roughly
8   the 93-page report that was submitted in the wave
9   cases, all right?
10      And then I'd also like to cover with
11  you some of the updates to your opinions, if any,
12  okay, sir?
13      A.  (Witness nods.)
14      Q.  Has your opinion across these
15  depositions and trials been basically the same?
16  And by that I mean, that the tissue response that
17  you see the polypropylene mesh is essentially
18  similar across all the various manufacturers?
19      MR. ORENT:  Objection.
20      THE WITNESS:  Yes, to a degree.  I
21  learn a little bit more after examining more
22  specimens, more details.  But basic principles
23  remain the same.
24      BY MS. BYARD:
25      Q.  Have you in your observations of

Page 16

1   tissue and mesh samples, observed any differences
2   that you believe would increase or decrease the
3   risk of clinical complications in women, depending
4   on the type of mesh that is used?
5       MR. ORENT:  Objection.
6       THE WITNESS:  Define "type."  Different
7   manufacturer, different device, different knit
8   pattern?  I mean, what, what exactly --
9       BY MS. BYARD:
10      Q.  Any of those are fine.  It's an
11  open-ended question.
12      A.  In some lightweighter meshes,
13  there is more inclusion of normal tissue into the
14  pores.  The difference is not drastic, but there
15  is -- at the same time, these lightweight meshes
16  fold easier, so it defeats the purpose of the
17  design.
18      But theoretically, they're flat.  They
19  would behave better than those more heavier with
20  less pores.  I mean, there are drawbacks and cons
21  and pros of this, but the design behaves slightly
22  differently than other designs -- than heavier
23  weight designs.  That's what I can say.
24      Q.  So at this point, based on your
25  observations to date, you're not in a position to

Page 17

1   say that those designs are safer or would minimize
2   the risk of clinical complications in women, right?
3       MR. ORENT:  Objection.
4       THE WITNESS:  Not to a noticeable degree.
5       BY MS. BYARD:
6       Q.  Okay.
7       A.  To detectable degree.
8       I see they behave differently, the
9   tissue reacts differently.  But all of them came to
10  me because of complications.
11      Q.  Right.
12      A.  So I ended up with specimens which
13  are excised complications.  Therefore,
14  complications occurred in those.
15      Q.  And I believe you noted in one of
16  your original reports, that there's mesh that has
17  tangs and mesh that doesn't have tangs, comparing
18  Boston Scientific mesh either between products or
19  Boston Scientific mesh to other products; do you
20  recall that distinction?
21      A.  Yes, there is distinction.  I
22  mean, some are tanged; heat treated them in slings,
23  but they're not treated along all lengths.  Some
24  are shorter segment.
25      So it also behaves somewhat differently.

5 (Pages 14 to 17)

Vladimir Iakovlev, M.D.

Page 18

1  But the end result was they became excised, they
2  were problematic.
3          Q.  So similarly, you're not in a
4  position today, based on your observations to date,
5  to testify that the tissue response to the
6  de-tanged mesh versus tanged mesh, is better or
7  worse in terms of its likelihood of causing
8  complications in women, right?
9          MR. ORENT:  Objection.
10         THE WITNESS:  That is difficult
11 question.  I mean, you're asking likelihood.  This
12 would be more of a clinical question, and to be a
13 clinical trial, larger trial.
14         I can tell you that there is a
15 different tissue reaction.  And I can tell you that
16 my specimens came to me because patients
17 experienced complications.
18         But I would not be able to give you a
19 statement of what's the percentage of improvement
20 or, or lack of improvement.
21         BY MS. BYARD:
22         Q.  And you wouldn't be able to say
23 that to a reasonable degree of certainty, right?
24         MR. ORENT:  Objection.
25         THE WITNESS:  I just wouldn't be able

Page 19

1  to say that.  And these factors, the efficacy, it
2  was a clinical question that had to be a long-term
3  clinical study.
4          BY MS. BYARD:
5          Q.  Okay.  What were the -- you said
6  there are some differences.  What were the tissue
7  responses that you've seen that are different
8  between tanged and de-tanged mesh?
9          A.  If it's tanged, the edges don't
10 curl as much.  So if it's a sling, I can see
11 clearer difference.  When it gets excised, the
12 heat-treated portion doesn't curl.  But then there
13 is a sharp transition into non-heat-treated
14 portions, and they curl.
15         So if those slings were not -- I mean,
16 original slings were not heat-treated, so the whole
17 length is curled into a rope.  But if there is
18 section is treated, that section doesn't curl, but
19 the ends curl.  So I can see the difference.  But
20 the design failed in one way or another.
21         Q.  And so a distinction I might try
22 and make throughout the day, and I want to make
23 sure it's accurate.  You're talking about the shape
24 of the mesh itself, right, if it curls --
25         A.  Shape before insertion, or shape

Page 20

1  after excision, or during in vivo?
2          Q.  Sure.  So you're talking about the
3  shape after excision; correct?
4          A.  That's correct.
5          Q.  Okay.  And when you look at the
6  shape after excision, you're not able to say with
7  certainty, what the shape of the mesh was in vivo,
8  typically, unless it's completely encased in scar
9  tissue, right?
10         MR. ORENT:  Objection.
11         THE WITNESS:  That's not correct
12 statement.  I can find features which will give me
13 indication what was shape in vivo.  I am able to
14 say what was shape in vivo.
15         BY MS. BYARD:
16         Q.  Let's take that up in a little
17 bit, if you don't mind.
18         Returning, though, to your statement
19 that the heat-treated edges don't curl, was that
20 your basic observation?
21         A.  Generally, yes.
22         Q.  Okay.  And so the de-tanged
23 sub-urethral portion of the Boston Scientific mesh
24 slings had a lesser propensity to curl?
25         A.  That's correct.

Page 21

1          MR. ORENT:  Objection.
2          BY MS. BYARD:
3          Q.  In terms of the tissue response,
4  the amount of inflammation that you've seen was the
5  same between de-tanged and non-de-tanged mesh,
6  though?
7          A.  It's exactly the same.  There is
8  no difference.  No detectable difference.
9          Q.  And you make a distinction between
10 an inflammatory response that you see under a
11 microscope and a foreign body reaction; correct?
12         A.  A foreign body reaction is an
13 inflammatory response.  I don't make a distinction.
14         Q.  Okay.
15         A.  I make distinction between types
16 of inflammatory reaction.
17         Q.  In particular, whether or not
18 there is a presence of multinucleated cells or
19 giant cells?
20         A.  These are just microfibers who
21 decided to become multinucleated.  So there is no
22 difference between multinucleated microphage and
23 single nucleated microphage.  Functionally,
24 genetically, they're all the same.
25         Q.  Does it tell you whether or not

6 (Pages 18 to 21)

Vladimir Iakovlev, M.D.

Page 22

1  the inflammatory reaction is in response to a
2  foreign body, though, depending on the type of
3  macrophage?
4          A.  No.  All macrophage is a reaction
5  to foreign body.
6          Q.  Okay.
7          A.  If there is a foreign body, and
8  there are macrophages, they're reacting.  Because,
9  generally, the foreign body or granulomatous
10 reaction is defined as epithelioid histiocytes or
11 macrophages.
12         Q.  So if my question were whether you
13 had seen any difference in the foreign body
14 reaction between de-tanged and tanged meshes, your
15 answer would be the same; wouldn't it?  No, you
16 didn't see a difference?
17         MR. ORENT:  Objection.  Asked and
18 answered.
19         THE WITNESS:  That's correct.  I did
20 not see the difference.
21         BY MS. BYARD:
22         Q.  Okay.  I want to look at your
23 billing records once we have copies of them, but do
24 you have a number in mind of all told how much
25 you've been paid by Plaintiffs in the mesh

Page 23

1  litigation for your expert work against Boston
2  Scientific?
3          A.  It's hard to say now, because I
4  don't keep that exact records, really, I'm so busy.
5          Last year my income tax return was
6  $24,000 from depositions and statements.  This year
7  it's larger.  I don't know how much larger.
8          Q.  Is it two times larger?
9          MR. ORENT:  Objection.
10         THE WITNESS:  Possibly.
11         BY MS. BYARD:
12         Q.  Could it be three times larger?
13         MR. ORENT:  Objection.
14         THE WITNESS:  I don't want to guess.
15         BY MS. BYARD:
16         Q.  What would you need to do to
17 calculate for me how much money you've been paid by
18 plaintiffs for acting as an expert against mesh
19 manufacturers?
20         A.  I would have to --
21         MR. ORENT:  Objection.  Form.
22         THE WITNESS:  I would have to complete
23 billing, which I have not completed yet.  I mean,
24 this is a long list, it takes a long time to
25 produce all of this, and I just didn't have time to

Page 24

1  complete the billing.
2          BY MS. BYARD:
3          Q.  But you will by the time you file
4  your taxes?
5          A.  Yes.
6          Q.  And when do you anticipate doing
7  that?
8          A.  Next spring.
9          Q.  Did you do anything to prepare for
10 your deposition today?
11         A.  I prepared documents for you on
12 the flash drive.
13         Q.  Did you meet with counsel to
14 review documents?
15         A.  Yes, we met yesterday.
16         Q.  Have you prepared by phone for
17 your deposition here today?
18         A.  No.
19         Q.  How long did you meet yesterday?
20         A.  A couple of hours.
21         Q.  And did you review any materials
22 that weren't provided on that flash drive?
23         A.  No, we just went through whatever
24 was on the flash drive and my reports.
25         Q.  Do you intend to bill for the time

Page 25

1  that you spent yesterday with counsel?
2          A.  Yes.
3          Q.  How much is your rate now?
4          A.  475.
5          Q.  It's gone up.
6          A.  I published, so I don't think it's
7  too high.  I mean, I see some reports which are
8  much higher.
9          Q.  So you hadn't worked on mesh
10 before as a subject area or a material before 2013,
11 right?
12         A.  2012.
13         Q.  2012?
14         A.  Yeah, first time I saw it --
15 became involved in this was end of 2012.
16         Q.  And that was your work with
17 Dr. Bendavid on hernia meshes; correct?
18         A.  That's correct.
19         Q.  And then in 2013 you were
20 approached by Plaintiffs' attorneys in litigation
21 and began working on transvaginal mesh as opposed
22 to hernia mesh; correct?
23         MR. ORENT:  Objection.
24         THE WITNESS:  I don't know who
25 approached me first.  So I don't remember now what

7 (Pages 22 to 25)

Vladimir Iakovlev, M.D.

Page 26

1   was my first transvaginal specimen.  Probably an
2   attorney, probably Dr. Thomson asked me to look at
3   it.  Maybe, maybe not.  I don't know, I don't
4   remember now.
5            BY MS. BYARD:
6            Q.  Okay.  And originally your rate
7   was $400, and now it's $475, right?
8            A.  That's correct.
9            Q.  And why did you increase your
10  rate?
11           A.  As I said, I published, I'm more
12  experienced.  It wouldn't be unfair, because when I
13  started I had no experience in litigation cases.
14           Q.  So since beginning work on
15  transvaginal mesh matters in 2013, and now sitting
16  here today at the end of 2014, you've now published
17  articles on the subjects of this litigation; correct?
18           A.  No, this is not correct.  I didn't
19  publish on the subject of litigation.  I published
20  on my research, on topics of surgical polypropylene
21  meshes.
22           Q.  Based on your review of specimens
23  provided to you by Plaintiffs' attorneys in
24  litigation?
25           MR. ORENT:  Objection.

Page 27

1            THE WITNESS:  Most publications
2   actually are based on hernia meshes, which were
3   coming from just regular patients.  I examined more
4   specimens for litigation, but publications are
5   mostly based on that.
6            BY MS. BYARD:
7            Q.  Okay.  We can take a look at those
8   articles.  Before we do, though, let's mark your
9   report as 1196.
10           MS. BYARD:  Do you need a copy, John?
11           MR. ORENT:  Yeah, we'll take copies of
12  everything, just position them on my list here
13  somewhere.
14           EXHIBIT NO. 1196:  General Expert
15           Report of Dr. Vladimir Iakovlev dated
16           November 10, 2014.
17           BY MS. BYARD:
18           Q.  Doctor, do you recognize 1196?
19           A.  Strange, 1196.  Where are 1195?
20           Q.  Sorry, that's just the exhibit
21  number.  Do you recognize this document?
22           A.  Yes, I do recognize this.  It's
23  just, exhibit usually starts with number one, but
24  now it's throwing me.
25           Q.  I know, I know.  You and me both.

Page 28

1            You recognize it, though?
2            A.  Yes, this is my document.
3            Q.  And if you flip into the document,
4   you'll see your signature on it?  Hopefully.
5            MR. ORENT:  Page 65.
6            THE WITNESS:  Yes, I do.
7            BY MS. BYARD:
8            Q.  What date did you sign this report?
9            A.  November 10th.
10           Q.  When did you start working on it?
11           A.  This is a general report, so
12  essentially, this has been transformed original
13  report.  We discussed in January, so it just was
14  modified several times, reformatted and new images
15  were inserted so...
16           If you ask me when I started working on
17  this, it would be probably two thousand and --
18  early -- late 2013.
19           Q.  Okay.  Have you issued similar
20  reports, reports in formatting similar to this one
21  in the other mesh manufacturers' cases?
22           A.  Yes.  Usually we keep the same
23  format, general report and case-specific reports.
24           Q.  Visually, this report appears
25  different than the report I originally deposed you

Page 29

1   about in January of 2014.  Do you agree with me
2   about that?
3            A.  Yes.  This is more structured.
4   Because I understood that, medically, though
5   moderate, a little bit difference, so it's not a
6   guide for -- my report shouldn't be a guide for a
7   clinician.  It should be more of a legal document.
8            Q.  And I understand that you've
9   continually built on your base knowledge in coming
10  at what we have here as a final work product.  But
11  when was the transition made between the format of
12  a report that we looked at in January of 2014 to
13  what we see here today?
14           MR. ORENT:  Objection.
15           THE WITNESS:  In October or November.
16  Because some of the supplied reports, they had
17  older general part, older format.  And some had --
18  so it was somewhere in -- during my work on this
19  report.  I had to streamline it.  This is a huge
20  number, a huge amount of work.  I had to streamline
21  it and kind of organize it in a way that it would
22  be easier to produce this large number.
23           BY MS. BYARD:
24           Q.  And that was one of my questions
25  for you.  I don't want to get into the

8 (Pages 26 to 29)

Vladimir Iakovlev, M.D.

Page 30

1   case-specific reports today, but some of them
2   revert to the earlier format that you used, right?
3       A.   Yes.
4       Q.   But the exhibit that we're looking
5   at, 1196, this reflects the most -- I guess your
6   most distilled version of your opinions in this
7   litigation; is that fair?
8       A.   I don't know about distilled, but
9   it's most updated version, most recent.
10      Q.   So if we wanted to talk about your
11  current opinions, it would be better for us to work
12  off of 1196 than the version that I deposed you
13  about in January of 2014, right?
14      A.   Yes, it would be easier.
15      Q.   Okay.  Notwithstanding the fact
16  that that older version appears inserted in some of
17  these case-specific reports that we'll talk about
18  tomorrow, right?
19      A.   That's correct.
20      Q.   Okay, good.  Turning to your
21  report, we start off with your qualifications.  Are
22  you with me?
23      A.   Yes, I am.
24      Q.   Have there been -- and then we
25  have attached as an exhibit to your report, we have

Page 31

1   your CV; true?
2       A.   Yes, I saw it.
3       Q.   I think it's Exhibit A.
4       Apart from the publications that I'll
5   talk about here in a moment as they come up in the
6   report, have there been any other updates to your
7   CV or your qualifications?
8       A.   Publications, presentations,
9   abstracts, posters, that's main things, nothing
10  else.
11      Q.   Okay.
12      A.   I'm still working in the same place.
13      Q.   Same place, same title?
14      A.   (Witness nods.)
15      Q.   Very good.  And if we go further
16  into your report, you have a section -- it's the
17  second paragraph on page 2.  It's the first full
18  paragraph.
19      Here where you're talking about the
20  research that you started with Dr. Bendavid, you
21  mention in the last sentence that:
22          "Previous studies in
23      manufacturers' testing have been
24      concentrated on experimental
25      modeling in animals and controlled

Page 32

1       testing in a laboratory environment."
2       Did I read that correctly?
3       A.   Yes, that's correct.
4       Q.   I believe we previously
5   established, but I wanted to make sure in light of
6   this language, that you haven't reviewed any of
7   Boston Scientific's internal testing?
8       A.   No, not specifically Boston
9   Scientific.
10      Q.   Okay.  And have you reviewed any
11  of Boston Scientific's biocompatibility testing?
12      A.   No, not internally.
13      Q.   Have you reviewed any of Boston
14  Scientific's animal testing?
15      A.   As I said, I had no access to
16  specifically internal documents of Boston Scientific.
17      Q.   Would it interest you, as a
18  pathologist, to see what Boston Scientific's animal
19  testing revealed the tissue response to its
20  products?
21      A.   Yes, it would be interesting.
22      Q.   Is that anything that you
23  requested from the Plaintiffs' counsel?
24      MR. ORENT:  Objection.
25      THE WITNESS:  It didn't occur to me

Page 33

1   that you would provide it.
2       BY MS. BYARD:
3       Q.   And similarly, you haven't done a
4   review of the literature for clinical studies
5   conducted on Boston Scientific's products, right?
6       MR. ORENT:  Objection.
7       THE WITNESS:  Repeat --
8       MR. ORENT:  Hold on one second.
9       Do you mean "randomized control"?
10  Because the term "study" has a very specific
11  meaning in science.
12      MS. BYARD:  Counsel, please don't coach
13  the witness with your objections.
14      MR. ORENT:  No.  I'm asking you to
15  clarify the question.
16      BY MS. BYARD:
17      Q.   Clinical studies, studies in
18  humans.
19      What does "clinical studies" mean to
20  you, sir?
21      A.   Please repeat the first question.
22      Q.   Sure.  What does clinical -- what
23  does the term --
24      A.   No, no, previous question.
25      Q.   No, that's okay.  It's my

9 (Pages 30 to 33)

Vladimir Iakovlev, M.D.

Page 34

1  deposition.  What is --
2      MR. ORENT:  Are you withdrawing the
3  prior question?
4      MS. BYARD:  Yes, I'll withdraw that.
5      BY MS. BYARD:
6      Q.  What does the term "clinical
7  studies" mean to you as opposed to "preclinical
8  studies"?
9      A.  Clinical studies, when it's
10  experimentational testing is done on patients.
11      Q.  Okay.  Have you reviewed any of
12  the clinical studies, so testing on humans, of
13  Boston Scientific's products?
14      MR. ORENT:  Objection.
15      THE WITNESS:  I have reviewed published
16  literature from clinical studies, including Boston
17  Scientific.  Usually it's a mix, it's not a
18  separate -- sometimes it's a separate device, but
19  mostly it's a mix.
20      BY MS. BYARD:
21      Q.  Okay.  So you couldn't say, you
22  couldn't sit here today and testify that you've
23  reviewed all 25-plus Obtryx studies, for instance;
24  could you?
25      MR. ORENT:  Objection.  Foundation.

Page 35

1      I think the record speaks to the fact
2  there aren't 25 studies in Obtryx.
3      MS. BYARD:  Counsel, please, make a
4  form objection.
5      THE WITNESS:  I have a large hard drive
6  filled with publications which I reviewed.  I don't
7  remember how many of those were Obtryx and so --
8  but I can tell you that I read a lot of clinical
9  studies.
10      BY MS. BYARD:
11      Q.  Okay.  I want to turn to the next
12  paragraph here in this preface to your report,
13  which talks about your review of polypropylene mesh
14  explants.  Are you with me?
15      A.  Yes.
16      Q.  And you reference, "now having
17  approximately 120 samples being transvaginal mesh
18  explants."
19      A.  This number is probably higher
20  now, something like 150.
21      Q.  Is there a way that you track this
22  number?
23      A.  When I have time, I sit and then
24  start putting them in spreadsheet.  But I haven't
25  done it for last two months.

Page 36

1      Q.  Okay.
2      A.  I have piles sitting on my desk
3  now to sort out, maybe Christmastime.
4      Q.  Okay.  And so when was the last
5  time you updated this spreadsheet?
6      A.  Late August, early September,
7  somewhere in that time.  It was slow time, so I
8  could, could do that.
9      MR. ORENT:  Vladimir, can you just keep
10  your voice up.
11      THE WITNESS:  Sure, yeah.  Just remind
12  me.
13      BY MS. BYARD:
14      Q.  I don't know that we have a copy
15  of the spreadsheet, so that's something that I
16  would request.
17      A.  I provided it in July.  I don't
18  remember if I updated since then, but it could be a
19  small update.
20      Q.  Okay.
21      A.  But you received a copy in July.
22  I think in July it was 97 transvaginal cases.
23      Q.  So I don't, though, have a
24  spreadsheet that would reflect this 120 number of
25  samples that appears here in your report, right?

Page 37

1      A.  I'm not sure if it exists.  And,
2  yes, I counted those 97.  I know the number because
3  I could count them quickly, but they are not
4  entered in the spreadsheet.
5      Q.  Okay.  I guess I should back up
6  for a second.
7      Are you fully prepared to discuss all
8  the opinions that are set forth in your report
9  today?
10      A.  Yes.
11      Q.  Okay.  And have you seen
12  everything that you need to see, to offer the
13  opinions that are set forth here in 1196?
14      A.  Yes.
15      Q.  Okay.  And do you have any
16  additional info, information, at this time that
17  would change the opinions that are reflected here
18  in Exhibit 1196?
19      A.  No.
20      Q.  Okay.  And did your report include
21  all of the opinions, the basis and the reasons for
22  your opinions that you intend to offer in trial on
23  these matters?
24      A.  No.  Because basis of my opinions
25  is my career, my knowledge and everything.  It

10 (Pages 34 to 37)

Vladimir Iakovlev, M.D.

Page 38

1  cannot fit in this report.  It's just a summary.
2      Q.  Are all of the opinions that you
3  intend to offer at trial set forth in this report,
4  Exhibit 1196?
5      A.  As I said, there's a summary, yes.
6      Q.  And you understand that if there
7  are updates to this information, that you'll
8  supplement this through counsel, right?
9      MR. ORENT:  Objection.
10      THE WITNESS:  That's correct.
11      BY MS. BYARD:
12      Q.  Of these 120 samples that -- of
13  transvaginal mesh that you had at least as of the
14  date that you authored your report and signed it,
15  how many of those had come to you through
16  Plaintiffs' attorneys?
17      A.  Ratio is somewhat close to
18  70 percent.  Again, it's approximate ratio.
19      Q.  Previously when we've deposed you,
20  you've testified that you didn't know how the
21  Plaintiffs' attorneys selected the specimens that
22  they sent to you; do you recall that?
23      A.  I don't know the specific details,
24  but I think it's an irrelevant question, because
25  nobody knows what's in the specimen unless you look

Page 39

1  in the microscope.  So they selected it blindly.
2      MS. BYARD:  Object and move to strike.
3      BY MS. BYARD:
4      Q.  Do you recall having testified
5  before that you didn't know how the Plaintiffs'
6  attorneys selected the specimens that they sent to
7  you?
8      MR. ORENT:  Wait a minute.  Hold on.
9      He's entitled to a full answer, so we
10  would oppose any motion to strike.
11      Go ahead and answer to the extent that
12  you need to, to make sure that you're offering a
13  full testimony, full response to the question.
14      BY MS. BYARD:
15      Q.  My question is whether you
16  testified before that you didn't know how
17  Plaintiffs' attorneys selected the specimens that
18  they gave to you?
19      MR. ORENT:  Objection.
20      THE WITNESS:  What was their
21  methodology?  I don't know.
22      But as I said, they selected it blindly
23  because they couldn't see what's in the specimen.
24  There's no way of seeing -- I don't know what I'm
25  going to find in a specimen before I cross it.

Page 40

1      BY MS. BYARD:
2      Q.  Okay.  I'd like to look with you,
3  and I'll represent to you that these are reports
4  that my expert, Dr. Steven Badylak, put together
5  based on specimens that he reviewed.
6      And the first is for a woman named
7  Ellen Hoffman; another is for a woman named Connie
8  Bennett; and another is for a woman named Deborah
9  Kilgore.  If you wouldn't mind taking the time to
10  just briefly review those.
11      MR. ORENT:  Let me see those.
12      THE WITNESS:  They look awfully short
13  in comparison to mine.
14      MS. BYARD:  There was no question
15  pending, sir.
16      MR. ORENT:  I have multiple objections
17  to the use of these documents by Dr. Iakovlev.
18      Particularly, one, to the extent that
19  this contains information that may relate to the
20  private healthcare information of individuals who
21  Dr. Iakovlev has not intended to offer any specific
22  testimonies on.
23      So to the extent that this relates to
24  any protected healthcare information under HIPAA,
25  I'm going to place an objection on the record to

Page 41

1  that.
2      Second, to the extent that it goes
3  beyond the scope of any of his opinions, I would
4  object to that.
5      And, I object to asking him to form new
6  opinions on the basis of something that he's never
7  seen before today.
8      And third, I'm not sure -- we have
9  multiple questions.  These are very new reports,
10  and I'm not sure where the specimens originated
11  from in all of these cases.  So subject to those
12  objections --
13      MS. BYARD:  Has he signed a protective
14  order?
15      MR. ORENT:  He has not.
16      MS. BYARD:  And so how would his review
17  of these specimens be any different from the
18  protected health information that you provide to
19  him in the form of samples of human tissue?
20      MR. ORENT:  He's retained as an expert
21  and as a treating -- as a physician, he's subject
22  to the code of medical ethics.
23      MS. BYARD:  Okay.
24      BY MS. BYARD:
25      Q.  Let me just ask you, Doctor, have

11 (Pages 38 to 41)

Vladimir Iakovlev, M.D.

Page 42

1  you reviewed a pathological specimen for Ellen
2  Hoffman?
3        MR. ORENT:  And I'm also going to
4  object, because that is -- to the extent that
5  you're asking questions whether or not he's been a
6  disclosed or undisclosed expert, he doesn't need to
7  answer that question under Rule 26.
8        So I'm going to instruct you not to
9  answer.
10       BY MS. BYARD:
11       Q.  Are you going to follow Counsel's
12  instruction?
13       A.  Yes.
14       Q.  Have you reviewed a specimen for
15  Deborah Kilgore?
16       MR. ORENT:  I need to consult with the
17  witness on this.
18       MS. BYARD:  Okay.  We can go off the
19  record.
20       THE VIDEOGRAPHER:  Off the record at
21  9:50 a.m.
22       -- RECESS AT 9:50 --
23       -- UPON RESUMING AT 9:59 --
24       THE VIDEOGRAPHER:  One moment, please.
25  We're back on the record at 9:59 a.m.

Page 43

1        MR. ORENT:  So, Counsel, and I have
2  spoken off the record, and I've spoken with
3  Dr. Iakovlev.
4        The issue that is concerning
5  Plaintiffs' counsel for the MDL, is that there is
6  the chance that we are moving from areas where
7  Dr. Iakovlev has been disclosed as a testifying
8  expert to areas where he may have been retained by
9  individual case counsel in a consulting capacity.
10       First and foremost, Plaintiffs want to
11  ensure that there's not going to be a waiver by
12  allowing Dr. Iakovlev to testify to certain factual
13  findings that he had.  And consistent with that, we
14  will allow him to testify to the factual nature of
15  things that he saw, or didn't see.
16       However, we would -- we will object to
17  any questions relating to his interactions with
18  counsel, his interactions with counsel in terms of
19  writing a report, or not writing a report, and the
20  decision to file or not file a report in a
21  particular case.
22       MS. BYARD:  So what I'd like to do is,
23  I'll ask my questions along the lines that you've
24  just outlined.  I will ask some questions to make a
25  record in case I need it later.

Page 44

1        MR. ORENT:  And I also --
2        MS. BYARD:  And you can instruct him as
3  you think prudent.
4        MR. ORENT:  Okay.  Just to be clear.
5  By allowing us, allowing Dr. Iakovlev to answer
6  questions as to his recollection about these
7  particular samples, we're not waiving anything in
8  terms of privileges, regarding communications or
9  anything else in those cases, or generally
10  speaking.
11       BY MS. BYARD:
12       Q.  Let's return to my question then,
13  Doctor, on Ellen Hoffman.
14       Did you review her pathology specimens?
15       A.  I would have to check.  (Witness
16  reviews documents.)
17       Okay.  She is not on this list.  There
18  is "Hoffman, Lori," but she is not on the list.
19       Q.  Okay.  So --
20       A.  But --
21       Q.  You know you didn't issue a report
22  on Ellen Hoffman?
23       MR. ORENT:  Objection.
24       THE WITNESS:  I don't recall.  But
25  again, I don't remember now.

Page 45

1        BY MS. BYARD:
2        Q.  And you can't tell me whether or
3  not you reviewed her pathology or not --
4        A.  If I --
5        Q.  -- sitting here today?
6        A.  If I didn't issue a report, I
7  didn't review it.
8        Q.  Okay.
9        A.  Again, I mean, she's not on the
10  list, so I don't recall now.
11       Q.  Okay.  Do you know whether or not
12  there were cases where you formulated reports which
13  were never disclosed to me?
14       MR. ORENT:  Objection.
15       On that one, I'm going to instruct the
16  witness not to answer.
17       THE WITNESS:  You're instructing not to
18  answer?
19       MR. ORENT:  Yes.
20       THE WITNESS:  Okay.
21       BY MS. BYARD:
22       Q.  Are you aware of any instances
23  when you've written reports on cases which were
24  never ultimately provided?
25       MR. ORENT:  Again, I'm going to

12  (Pages 42 to 45)

Vladimir Iakovlev, M.D.

Page 46

1    instruct the witness not to answer.
2            BY MS. BYARD:
3        Q.  Do you know if there are instances
4    when counsel had pathological specimens that were
5    never provided to you?
6        A.  How would I know that?
7        Q.  And returning to Deborah Kilgore,
8    did you review pathology for her?
9            MR. ORENT:  Again, subject to my prior
10   objections.
11           THE WITNESS:  She's not on the list.
12           BY MS. BYARD:
13       Q.  And the list that you're referring
14   to, is a list of cases where you have reports that
15   have been noticed for the deposition, right?
16       A.  Yes.  And there are a few more,
17   which are not on the list.  But I may not recall
18   it.  I mean, there is a huge number, like there is
19   30.  How can I remember all these names?
20       Q.  Okay.  You're not looking at a
21   chain of custody for specimens that have been
22   received by your lab, from Steelgate, are you?
23       A.  No, we're not looking at that.  I
24   could have received some -- sometimes specimens
25   come dry, and I cannot examine it.  Or there is a

Page 47

1    piece of suture or calcification, something like
2    this.  I mean...
3        Q.  Okay.
4        A.  Or in some cases, it's not mesh,
5    it's like a uterus or...
6            I think even for uterus, I issued a
7    report but...
8        Q.  So in some of the pathological
9    specimens that you've received, there isn't even
10   any mesh, right?
11       A.  In some specimen, yeah, I receive
12   sometimes just a -- it's mucosa, or scar tissue
13   with some changes adjacent to the mesh, sometimes
14   just mucosa.
15       Q.  In those instances, you don't
16   issue a report, do you?
17           MR. ORENT:  Objection.
18           THE WITNESS:  It depends.  If I see --
19           MR. ORENT:  I'm going to instruct the
20   witness not to answer this particular question.
21           BY MS. BYARD:
22       Q.  You'll acknowledge, though, won't
23   you, that women have excisions following pelvic
24   surgery resulting in specimens that don't include
25   mesh; correct?

Page 48

1        A.  Ask the question again.
2        Q.  You'll acknowledge, though, won't
3    you, that women have excisions following pelvic
4    surgery, resulting in specimens that don't even
5    contain mesh?
6        A.  Yes.  There are some specimens
7    which don't contain mesh.
8        Q.  Those were surgeries performed
9    because women were experiencing complications,
10   right?
11           MR. ORENT:  Objection.
12           THE WITNESS:  Specimens I received
13   don't have mesh.  But I don't know if they had mesh
14   while they were processed in the original
15   institution.
16           So what happens, original institution
17   shaves off subtissue, puts it in the block, and the
18   mesh is discarded.
19           So if it was original excised, and I
20   didn't receive it, or it wasn't excised, this, this
21   sometimes is a difficult question.
22           BY MS. BYARD:
23       Q.  And you don't even know if the
24   original institution shaved off the tissue or
25   whether there was even mesh to begin with; correct?

Page 49

1        A.  In some cases it's described in
2    the pathology report, that they describe mesh; but
3    they didn't submit sections.
4        Q.  And in other --
5        A.  If I have a pathology report.
6    Sometimes I don't have a pathology report.
7        Q.  Now, they use 120 samples that you
8    speak of in your report.  Do those include
9    specimens that you received where you never
10   ultimately issued a report?
11       A.  Which report?  That's a question,
12   surgical pathology report, report which is served?
13       Q.  Either one.
14       A.  No.  I enter only those cases I
15   examine in one way or another and -- actually,
16   those 120 samples, they had mesh.  So I could find
17   features specific for the mesh.  Either mesh or
18   features specific for the mesh.
19       Q.  So these 120 exclude cases where
20   there were no findings related to mesh?
21       A.  No.
22           MR. ORENT:  Objection.
23           BY MS. BYARD:
24       Q.  Right?
25       A.  That's not correct.

13 (Pages 46 to 49)

Vladimir Iakovlev, M.D.

Page 50

1    So the specimen contains a mesh, and
2  it's from vaginal area, then I examine it.  If it's
3  specimen -- sometimes, as I said, I receive a
4  uterus.  So why would I include the uterus --
5  findings of a uterus in a spreadsheet which is
6  research -- which is made for research purposes for
7  mesh.
8    So I examined those, I issue report for
9  uterus, but then they don't use it for this
10  purpose, research purpose.  So it's not listed
11  there.  Or sometimes I receive three, four
12  specimens for the same patient.  Some of them have
13  sort of piecemeal excision at the same time, or
14  excisions are spread during time.
15    Q.   So for any specimen that you
16  receive, provided there is mesh, you issue
17  pathology report?
18    A.   Sooner or later, I -- any specimen
19  which came in and had to be registered at
20  St. Michael's Hospital, I issue surgical pathology
21  report.
22    Q.   And does that include the
23  specimens that you receive through Plaintiff's
24  counsel?
25    A.   Yes.  It doesn't matter if it

Page 51

1  contains a mesh or doesn't contain a mesh, surgical
2  pathology report needs to be issued.  I have to
3  sign it out as a diagnostic pathologist, and have
4  to produce surgical pathology report.
5    Q.   So irrespective of whether counsel
6  ultimately disclosed a report for you in a case,
7  you would have logged it when that specimen came in
8  to you at St. Michael's; true?
9    MR. ORENT:  Objection.
10    THE WITNESS:  That's true.  I cannot do
11  staining or I cannot do anything without logging it in.
12    BY MS. BYARD:
13    Q.   Okay.  And so the 120 number would
14  be your number of what -- the number of specimens
15  that you had received?
16    A.   120 --
17    MR. ORENT:  Objection.
18    THE WITNESS:  120 is mesh specimens.
19  Those specimens I extracted knowledge about mesh
20  body interactions.  120 is not a log number.
21    BY MS. BYARD:
22    Q.   Do you have a log number?
23    A.   It's in St. Michael's information
24  system.  And cases are accessioned and they are
25  there.

Page 52

1    Assuming if I receive three, four
2  specimens for the same patient, I get three, four
3  different surgical pathology cases.  Or, if two
4  specimens were excised on the same day, they can be
5  accessioned as one surgical number with A and B.  It
6  depends on the patient.  Sometimes it's 1 and 2,
7  A and B.
8    So, are you counting number of cases,
9  or are you counting number of patients, or are you
10  counting number of meshes?  Some patients have
11  three meshes.
12    Q.   How do you log it?
13    A.   We log by surgical number in
14  St. Michael's Hospital.  So if a specimen comes as
15  a one, on one single requisition, marked A and B,
16  it becomes one surgical number.  Specimen A and
17  specimen B.  But sometimes I receive them spread in
18  time, and then the accessioning becomes spread in
19  time, so there are two surgical numbers.
20    Or, if I can catch it, when I receive
21  it, then I can put it on the same number, just add
22  it.  Again, it's not straightforward sometimes.
23    Q.   Okay.  We don't have in your
24  report the number of specimens that you've received
25  by surgical number, do we?

Page 53

1    MR. ORENT:  Objection.
2    THE WITNESS:  No.  I haven't logged
3  them, those.
4    BY MS. BYARD:
5    Q.   St. Michael's did, though, didn't
6  they?
7    A.   I mean, well, they don't count
8  number of specimens received.  I can try to do
9  search by words, like "vaginal mesh" or something
10  like this.  But sometimes they come without
11  definition of mesh, so accessioning clerk doesn't
12  know that it's mesh, and it's just entered as
13  "tissue."  So this would escape search by word.
14    Q.   So today, there's no way for us to
15  recreate however many specimens you've received
16  through the mesh litigation?
17    A.   Exact up to single specimen?  No,
18  this would be difficult.
19    There is no -- I mean, in ballpark,
20  yes.  But, I mean, specifically trace each single
21  specimen would be hard.  Probably chain of custody
22  forms, this would be easier.  But then they are
23  spread all over, I mean, from different sources.
24    Q.   Do you have copies of all the
25  chain of custody forms that you've received, the

14 (Pages 50 to 53)

Golkow Technologies, Inc. - 1.877.370.DEPS

Vladimir Iakovlev, M.D.

Page 54

1  specimens you've received through the mesh
2  litigation?
3        A.  Yes, I do keep copies.  But
4  sometimes chain of custody forms comes in, and then
5  there are three specimens behind it.  They put on
6  one chain of custody forms, and then next patient
7  has three different specimens, which are coming
8  from three different sources with three different
9  chains of custody.
10       And sometimes chain of custody doesn't
11 specify how many specimens, which shape they came
12 in.  I describe them in surgical pathology report
13 each time I describe the specimen.
14       Q.  Okay.  So returning to specimens
15 where you either haven't reviewed or haven't issued
16 a report that we know of, this Connie Bennett case
17 that I mentioned before; is that one that's
18 familiar to you?
19       MR. ORENT:  Subject to my same
20 objections.
21       THE WITNESS:  As I said, it's not a
22 memory test.  I cannot remember.
23       I don't remember the name.  I may or
24 may not have -- is it on the list?
25

Page 55

1        BY MS. BYARD:
2        Q.  And again, you're looking at the
3  list of your reports?
4        A.  Yes.  What was the last name?
5        Q.  Connie Bennett, B-E-N-N-E-T-T?
6        A.  (Witness reviews document.)
7        It's not on this list.  I could have
8  issued the report, could have.  I don't remember
9  now.
10       Q.  Okay.  I'll represent to you,
11 Doctor, that these three cases are cases where my
12 expert has received a specimen and issued a report,
13 okay?
14       All I want to know from you, my
15 question is whether you can tell me if you either
16 didn't receive specimens for these women; or, a
17 report that you did on your findings was never
18 provided to me?
19       MR. ORENT:  I'm going to instruct the
20 witness not to answer those questions.
21       THE WITNESS:  As per my counsel --
22       MS. BYARD:  Are you going to follow
23 your counsel?
24       THE WITNESS:  I'm going to follow.
25

Page 56

1        BY MS. BYARD:
2        Q.  In short, you can't assure to me
3  that all of the specimens that are available
4  through counsel, had been provided to you, can you?
5        A.  How can I?  I mean, I ask for
6  everything available.  Every time there is a new
7  specimens, or a new set of specimens coming out,
8  I'm asking for all available medical records and
9  all available specimens.
10       Q.  Beyond that, you can't assure,
11 though, that your request has been fulfilled?
12       MR. ORENT:  Objection.
13       BY MS. BYARD:
14       Q.  Can you?
15       A.  No.
16       Q.  Similarly, you can't assure me
17 that every specimen that you've examined has
18 resulted in a report that's been provided to me,
19 can you?
20       MR. ORENT:  I'm instructing you not to
21 answer.
22       BY MS. BYARD:
23       Q.  Okay.  Let's continue with this
24 paragraph that we're looking at, if you don't mind,
25 Doctor.  It says:

Page 57

1        "My data pool of mesh explant
2        samples contains specimens of
3        St. Michael's Hospital patients,
4        cases sent from outside hospitals,
5        as well as potential and active
6        litigation cases sent to me as
7        consultant."
8        My only question here is on percentages.
9  And I think you said you thought close to 70 of the
10 120 listed here were cases that came to you through
11 litigation.
12       Do you have updated estimates for me of
13 the number of samples that came from St. Michael's
14 Hospital patients and the number sent from other
15 hospitals?
16       MR. ORENT:  Objection.  I just want to
17 clarify.  He said 70 percent, not 70.
18       BY MS. BYARD:
19       Q.  Oh, did you say 70?
20       A.  Yes, 70 percent.
21       Q.  Oh, thank you.
22       A.  Roughly 70 percent, I think.  It's
23 an estimate.
24       Q.  Okay.  And then what are the
25 percentages for the others?

15 (Pages 54 to 57)

Vladimir Iakovlev, M.D.

Page 58

1      A.  I mean, 70 from litigation and 30,
2   about 30 non-litigation.
3      Q.  So 30 either from St. Michael's or
4   from outside hospitals?
5      A.  It's mainly St. Michael's.  For
6   transvaginal, it's mainly St. Michael's Hospital.
7      Q.  For the outside hospitals, do you
8   know how they select which samples they give to you
9   and which they don't?
10     A.  Those clinicians, they just send
11  whatever is available, consecutive.
12     (Reporter sought clarification.)
13     A.  Consecutive.
14     Q.  But if there are samples that they
15  don't send to you, you wouldn't know about that one
16  way or the other, would you?
17     A.  No.
18     MR. ORENT:  Objection.
19     BY MS. BYARD:
20     Q.  Okay.  Turning to the next page,
21  the first full paragraph.
22     And I'm on page 3 of 1196 for the
23  record?
24     A.  Yes.
25     Q.  You talk about how pathologists

Page 59

1   are trained and develop skills for subjective
2   assessments?
3      A.  That's correct.
4      Q.  You write that:
5         "To understand the related
6         pathological processes and make a
7         correct diagnosis, pathologists need
8         to understand the function of the
9         devices being analyzed --"
10     A.  That's correct.
11     Q.  "-- their physical characteristics --"
12     A.  That's correct.
13     Q.  "-- surgical and other techniques
14        introducing the objects into the body."
15     Right?
16     A.  That's correct.
17     Q.  Speaking of the devices, is the
18  Solyx a sling or a pelvic organ prolapse device?
19     MR. ORENT:  Objection.
20     THE WITNESS:  As far as I remember,
21  Solyx is a sling.
22     BY MS. BYARD:
23     Q.  Is Polyform indicated for slings
24  or for treatment of pelvic organ prolapse?
25     A.  Polyform is just a name of a type

Page 60

1   of mesh, or more of a raw mesh.
2      (Reporter sought clarification.)
3      A.  Raw material, raw material of the
4   mesh.  It's not formal device.
5      Q.  Is the Prefyx a sling, or is it
6   indicated for the treatment of pelvic organ
7   prolapse?
8      A.  Prefyx, I'm not sure about this
9   one.
10     Q.  How about the Advantage Fit?
11     A.  Advantage is -- I would have to
12  check.  I mean, it's not a memory test.  Every time
13  I see some name I'm not sure, I just Google and
14  check with Boston Scientific website.
15     Q.  Sitting here today, though, you
16  can't tell me?
17     MR. ORENT:  Objection.
18     THE WITNESS:  I wouldn't guess.  I
19  don't want to guess.
20     BY MS. BYARD:
21     Q.  What about Uphold?  Is that
22  indicated for stress urinary incontinence or for
23  pelvic organ prolapse?
24     A.  Pelvic organ prolapse.
25     Q.  How many incisions are used to

Page 61

1   place a Solyx?
2      A.  It's a clinical question.  I'm not
3   a clinician.
4      Q.  Where is the incision or incisions
5   located?
6      MR. ORENT:  Objection.
7      THE WITNESS:  For which type?
8      BY MS. BYARD:
9      Q.  Solyx.
10     A.  So my understanding is for slings,
11  there is a midline incision, and then there are
12  devices usually trocars used to push the devices
13  further.  But the incision is midline to open the
14  area.
15     Q.  Does the Obtryx make use of one
16  incision or more than one incision?
17     MR. ORENT:  Objection.
18     THE WITNESS:  You mean the linear
19  incision or trocar tracks?
20     BY MS. BYARD:
21     Q.  Either way.
22     A.  A linear incision is one, as far as
23  I understand, in the middle.  And then there are
24  trocar tracks.
25     Q.  I'm sorry?

16  (Pages 58 to 61)

Vladimir Iakovlev, M.D.

Page 62

1           A.  Which go through skin, so there --
2    you need to make an incision in the skin.  But then
3    it's not an incision linear.
4           Q.  Where does the -- what you're
5    calling the trocar track, or the trocar pass,
6    compare in location for an Obtryx versus retropubic
7    sling, for instance?
8           MR. ORENT:  Objection.
9           THE WITNESS:  A retropubic sling
10   doesn't go into a transobturator.  So the arms go
11   retropubically, pointing upward.  So it's --
12          BY MS. BYARD:
13          Q.  Where do the incisions for the
14   trocar tracks -- let me start over.
15          How do the incisions for the trocar
16   tracks or passes for the Obtryx sling compare to
17   the Advantage sling?
18          MR. ORENT:  Objection.
19          THE WITNESS:  I think we are going
20   beyond the scope of what pathologists need to
21   understand.
22          I need to understand if the sling is
23   placed in specific anatomical area, and what
24   anatomical spaces are displaced.  Specific details
25   of surgical techniques need to be understood only

Page 63

1    to a degree, which helps me to understand the
2    function.
3           So you're asking me very specific
4    details which would be important for a clinician,
5    but as a pathologist, they are not as important to
6    me.  So, I think we're going beyond what I would
7    need to know.
8           BY MS. BYARD:
9           Q.  Well, would the Obtryx device or
10   the Uphold device pass closer to the pudendal
11   nerve?
12          MR. ORENT:  Objection.
13          THE WITNESS:  Obtryx or Uphold.  I
14   cannot tell you which one would be closer.  Again,
15   this would be irrelevant, because I see nerve
16   ingrowth in both, and it doesn't matter if it's
17   coming from a pudendal nerve or any other nerve or
18   smaller branch.
19          BY MS. BYARD:
20          Q.  Does it matter for a patient's
21   clinical symptomology whether or not there's
22   involvement of the pudendal nerve versus other
23   nerves?
24          A.  What matters is involvement of a
25   nerve.  If it has a name, it doesn't matter.

Page 64

1           Q.  So it's your testimony that the
2    treatment modalities wouldn't differ depending on
3    whether a pudendal nerve branch versus another
4    nerve branch were ingrown in mesh?
5           A.  No.
6           MR. ORENT:  Objection.
7           BY MS. BYARD:
8           Q.  The reality is that you don't
9    treat clinical complications from pelvic mesh, do
10   you?
11          MR. ORENT:  Objection.
12          THE WITNESS:  No.
13          BY MS. BYARD:
14          Q.  And so you don't need to
15   understand, as a pathologist, from your
16   perspective, whether or not the nerve that you see
17   is a pudendal nerve, or part of an obturator nerve,
18   or part of the genital femoral nerves, right?
19          A.  I think you're misrepresenting.
20   You're talking about large nerves, large branches
21   so -- which have names.  There will be thousands of
22   other smaller branches, which don't have names.
23          So you're making it kind of like a
24   cartoon, more of a -- reality is different.  The
25   genital area is very richly innervated, nerves

Page 65

1    coming from different places.  You're talking about
2    large nerve, but the branches have no names, and
3    then they go in the area.  So it's either you have
4    a misunderstanding, or just trying to make it look
5    like this.
6           MS. BYARD:  Object and move to strike.
7           MR. ORENT:  Oppose.
8           BY MS. BYARD:
9           Q.  Does the Uphold fix to any
10   specific anatomical structures in the female
11   pelvis?
12          MR. ORENT:  Objection.
13          THE WITNESS:  What do you mean "fixed"?
14   By stitches?
15          BY MS. BYARD:
16          Q.  Sure.
17          A.  No, there are no stitches.
18          Q.  Is it affixed to any other
19   anatomical landmarks in the pelvis?
20          MR. ORENT:  Objection. Scope.
21          THE WITNESS:  I have to ask questions,
22   how it is fixed?  I mean, is it fixed by stitching,
23   or it's fixed by ingrowth?
24          BY MS. BYARD:
25          Q.  Either one.

17 (Pages 62 to 65)

Vladimir Iakovlev, M.D.

Page 66

1    A.  Specifically, the meshes are not
2  stitched to tissues.  So they mainly depend on
3  tissue ingrowth.
4    Q.  How about fixed by placement to
5  any of the anatomical structures of the pelvis?  Do
6  you know whether that occurs?
7    MR. ORENT:  Objection.
8    THE WITNESS:  What do you mean, "fixed
9  by placement"?
10    Placement is just you place something.
11    BY MS. BYARD:
12    Q.  What is the Capio?
13    A.  Pardon?
14    Q.  The Capio?
15    A.  I don't know what you're talking about.
16    MR. ORENT:  Objection.  Scope.
17    BY MS. BYARD:
18    Q.  Do Boston Scientific's pelvic mesh
19  products make use of trocars?
20    MR. ORENT:  Objection.  Vague.  Form.
21  Scope.
22    THE WITNESS:  What do you mean?
23    BY MS. BYARD:
24    Q.  You used the word "trocars"
25  before.  What did you mean by that?

Page 67

1    A.  It's a device which comes in the
2  kit.  It's more of like a long needle.
3    Q.  Do Boston Scientific's pelvic
4  organ prolapse kits make use of trocars?
5    MR. ORENT:  Objection.
6    THE WITNESS:  Yes, they're included in
7  the kits.
8    BY MS. BYARD:
9    Q.  Doctor, if I asked you to describe
10  how you perform a Kelly plication, would you be
11  able to do that?
12    MR. ORENT:  Objection.  Outside the
13  scope.
14    THE WITNESS:  I'm a pathologist.  I
15  don't do --
16    BY MS. BYARD:
17    Q.  Okay.  Same thing for perineorrhaphy?
18    MR. ORENT:  Objection.  And similarly,
19  I think these questions are designed to embarrass
20  or offend the witness.
21    MS. BYARD:  No.  I'm asking the
22  questions I need to ask, John.  So I object to the
23  colloquy.
24    MR. ORENT:  They're ridiculous
25  questions for a pathologist.

Page 68

1    THE WITNESS:  I mean, you're asking me
2  questions which clearly are clinical questions.
3    BY MS. BYARD:
4    Q.  Okay.
5    A.  As I said, as a pathologist I need
6  to understand what the device looks like, what is
7  it made from, and what anatomical location it is
8  placed, what is its function.
9    That's as much -- that's, basically,
10  generally what I need to know.  You're going to
11  somewhere where it's completely beyond my scope, my
12  expertise.
13    Q.  You write in your report that you
14  need to understand the function of the devices
15  being analyzed, right?
16    A.  Yes.
17    Q.  You write that you need to know
18  the devices' physical characteristics, right?
19    MR. ORENT:  Objection.  These are --
20    THE WITNESS:  The functions for stress
21  urinary incontinence is to support urethra.
22    Physical characteristics, I see it's a
23  polypropylene, it's not biological mesh.  That's
24  what I'm talking about.
25

Page 69

1    BY MS. BYARD:
2    Q.  Okay.  But as far as where these
3  devices pass in the anatomy, based on their
4  surgical placement, you haven't been able to tell
5  me that with specificity, because those are better
6  questions for a clinician; correct?
7    A.  No --
8    MR. ORENT:  Objection.
9    THE WITNESS:  -- this is not correct.
10  I know where they are placed.  You are asking me
11  how they are placed, and this is the difference.
12    Because I don't need to know exact very
13  specific details how they are placed.  But, in
14  general, where they are placed and what anatomical
15  sort of locations are they placed -- that's
16  generally what I need to understand.
17    If I need very specific questions, if
18  there is a very specific question for specific
19  diagnostic procedure, then I would go and consult
20  with clinician.  Like a placement of a stent, which
21  artery it was placed in the heart, was it LED or it
22  was circumflex?  I mean, these would be very
23  specific.  So what kind of stent it was, so if I
24  cannot find it.
25    But you're asking me trocar incisions

18 (Pages 66 to 69)

Vladimir Iakovlev, M.D.

Page 70

1 and other things. I mean, I receive specimen six
2 years later when all incisions are healed.
3 BY MS. BYARD:
4 Q. Does the location of the incision
5 help you understand where the device was
6 anatomically located when it was actually in the
7 patient's body?
8 A. It can be very long way from
9 incision to the placement of the device. So it may
10 or may not help, but most of the time --
11 For example, if it's a hernia, if it's
12 open hernia, I know that there was incision from
13 skin. So it's open hernia surgery.
14 If it's laparoscopic, I know that the
15 access was laparoscopically. So it's a different
16 anatomical location. So a laparoscopic hernia
17 would be more of an intraperitoneal access. That
18 makes a difference.
19 If you put sling through incision one
20 centimeter to the left or right, it will not make a
21 difference.
22 Q. So whether --
23 A. But it might make a difference for
24 a surgeon.
25 Q. So whether or not the sling is

Page 71

1 placed in the retropubic space as opposed to
2 through the transobturator space doesn't make a
3 difference to you as a pathologist?
4 A. It does make a difference.
5 As I said, this is an anatomical
6 location, that's what I'm -- I try to understand
7 every time I encounter a new device. But how it
8 was placed specifically, all intricate details of
9 surgical techniques, they're irrelevant for this.
10 Q. Moving to the third paragraph, the
11 third full paragraph on page 3, please, Doctor.
12 A. Yes.
13 Q. You write that you have been able to:
14 "Directly observe changes in
15 the mesh samples, including but not
16 limited to scar encapsulation, scar
17 maturation with contraction, the
18 inflammatory response to the
19 implanted mesh, including but not
20 limited to the foreign body reaction
21 and chronic lymphoplasmacytic
22 inflammation --"
23 A. Plasmacytic.
24 Q. Thank you.
25 "-- vascular congestion and

Page 72

1 edema within mesh compartments, as
2 well as innervation with nerve
3 ingrowth into the mesh compartments,
4 vascular abnormalities and mesh
5 degradation."
6 Did I read that all reasonably
7 correctly?
8 A. That's correct.
9 Q. How do you define chronic
10 lymphoplasmacytic --
11 A. Cytic.
12 Q. -- cytic inflammation composed of
13 foreign body reaction?
14 A. Foreign body reaction, as I
15 explained before, is a collection of epithelioid
16 histiocytes, these are mononucleated or
17 multinucleated. Lymphoplasmacytic, as the word
18 implies, is lymphocytes and plasma cells.
19 Q. How do you define vascular
20 congestion?
21 A. If the vessels are enlarged, then
22 fully packed with red blood cells.
23 Q. What did you mean by "vascular
24 abnormalities"?
25 A. I see obliterated arteries. I see

Page 73

1 thrombosed capillaries.
2 Q. And for a lay person, what does
3 obliterated arteries and thrombose capillaries
4 mean?
5 A. A vessel which doesn't supply
6 blood anymore.
7 Q. Are you able to tell,
8 microscopically, when that obliteration occurred?
9 A. To a certain degree.
10 Q. How so?
11 A. Sometimes I can say that it's been
12 week or even month, maybe years, or sometimes it's
13 a relatively recent event, days. Or hours.
14 Q. But how do you discern that
15 microscopically, I think was my question?
16 A. Oh, then I would have to give you
17 a lecture. Vital response, the stages of tissue
18 reacting to a blocked vessel.
19 First, inflammatory cells, then there
20 would be changes in the vascular wall, organization
21 of the thrombus, recolonization.
22 Q. And so when you say you observe an
23 obliterated artery, for instance, would you
24 typically, as a pathologist, record whether or not
25 you saw these tissue reactions to the inciting

19 (Pages 70 to 73)

Vladimir Iakovlev, M.D.

Page 74

1    event?
2         A.   Depends on clinical relevance.
3         For example, if there is autopsy case
4    and I see that the arteries in the heart is
5    obliterated, it will depend.  If it's an old
6    injury, definitely it wasn't cause of death.  If
7    it's fresh injury, this can be cause of death.
8    This is just an example.
9         Q.   And what is thrombosed capillary?
10   What does that term mean for a lay person?
11        A.   Capillaries doesn't supply blood
12   anymore.
13        Q.   Turning to your list of articles
14   that you've set forth here, this list, did you
15   intend to include all of your publications,
16   abstracts, lectures, oral and poster presentations
17   pertinent to the subject of your report?
18        A.   Pertinent to my mesh research, yes.
19        Q.   Okay.  All of these are from 2014,
20   right?
21        A.   Yes.
22        Q.   I'd like to --
23        A.   Just one was earlier.  When we
24   started --
25        Q.   Oh, yes.  "The Pathological

Page 75

1    Findings in Explanted Surgical Meshes," that
2    presentation --
3         A.   Yes.
4         Q.   -- that you gave?
5         A.   The work, as I said, started in 2012.
6         Q.   For hernia mesh, right?
7         A.   Yeah.  I think I received first
8    transvaginal mesh very soon, January or February
9    of -- or looked at it, I mean.  It could have been
10   St. Michael's Hospital transvaginal mesh, which is --
11   I don't remember now.
12        Q.   Yeah, but 2013?
13        A.   All in 2013, yes.
14        Q.   Okay.  All of these publications,
15   though, with the exception of this oral
16   presentation, are from 2014, right?
17        A.   Yes.  Most of the work was done --
18   completed in 2014.
19        Q.   And I understand the publication
20   process takes some time, okay.  That's not what I'm --
21   I don't intend to quibble with you about that at
22   all.
23        I want to walk through these before we
24   get into any detail in them.  The first is an
25   article that you published with Dr. Erin Teeter

Page 76

1    Carey and Dr. John Steege, "Pathology of Explanted
2    Transvaginal Meshes," International Journal of
3    Medical Health, Pharmaceutical and Biomedical
4    Engineering, 2014; is that right?
5         A.   Correct.
6         Q.   The second is an article published
7    with Dr. Bendavid, Dr. Lou and Koch, "Mesh-Related
8    SIN Syndrome:  A Surreptitious, Irreversible
9    Neuralgia and Its Morphologic Background in the
10   Etiology of Post-Herniorrhaphy Pain," International
11   Journal of Clinical Medicine, 2014.
12        These are both full published articles,
13   right?
14        A.   Yes, these are full articles.
15        Q.   And then we have a list of
16   abstracts.  And there's five listed here, right?
17        A.   No, there are more.  They're all
18   included on the flash drive.
19        Q.   There are five listed here, right?
20        A.   On this page, yes, there are five.
21        Q.   How many more are there on that
22   thumb drive?
23        A.   Maybe a couple.  I don't remember now.
24        Q.   And you put this list together
25   sometime around November 10th, 2014, right?

Page 77

1         A.   October, November, yeah.
2         Q.   So the abstracts that are -- you
3    have on your thumb drive, the abstracts that are in
4    addition to this list that are available on this
5    thumb drive, were published since November 10th of
6    2014?
7         A.   Either published or presented.  So
8    I usually put something published or presented on
9    my CV.  Not something which was been accepted.
10        Q.   Okay.
11        A.   But sometimes depends.  Sometimes
12   I put something that has been accepted, but hasn't
13   been presented.
14        Q.   Let's look at these five
15   abstracts.  The first one is published by you and
16   Dr. Mekel and Blaivas?
17        A.   That's correct.
18        Q.   "Pathological Findings of
19   Transvaginal Polypropylene Slings Explanted for
20   Late Complications:  Mesh Is Not Inert," the
21   International Continence Society Annual Meeting,
22   2014, right?
23        A.   That's correct.
24        Q.   And then the next one, Dunn,
25   Guelcher and you: "Failure Analysis of Transvaginal

20  (Pages 74 to 77)

Vladimir Iakovlev, M.D.

Page 78

1   Mesh Products:  A Biomaterials Perspective Using
2   Materials Science Fundamentals," 2014.
3         A.   That's correct.
4         Q.   Number three is Vladimir Iakovlev:
5   "Explanted Surgical Meshes:  What Pathologists and
6   Industry Failed to Do for 50 Years," 2014, right?
7         A.   That's correct.
8         Q.   Yourself, Dr. Guelcher and
9   Dr. Bendavid:  "In-vivo Degradation of Surgical
10  Polypropylene Meshes:  A Finding Overlooked for
11  Decades," 2014.  Right?
12        A.   That's correct.
13        Q.   Number five is an abstract with
14  yourself, Dr. Erin Teeter Carey, Dr. Iakovleva --
15        A.   Yes.
16        Q.   -- Dr. Steege and Dr. Bendavid:
17  "Pathological Findings Associated with Pain in
18  Transvaginal Meshes."
19        A.   That's correct.
20        Q.   2014.
21        And then you list here some lectures
22  and oral presentations.
23        This first one, is a copy of that
24  included in materials that you've provided on the
25  thumb drive?

Page 79

1         A.   Yes.  I included all what I could
2   at this stage, I mean, whatever I had.
3         Q.   Okay.  And number two, is that
4   essentially a duplication of the fully published
5   article number one on your list?
6         A.   Well, it's a duplication of the
7   title.  So what happens with some conferences or
8   other meetings, it's a bit an abstract.  Abstract
9   is accepted, it's published either in special
10  journal issue, and then they make a decision, if
11  you make an oral presentation, or you make a poster
12  presentation.
13        So then abstract is duplicated as oral
14  presentation or poster presentation, because
15  abstract you describe your work to the peer review
16  process, and then there is a decision how you
17  present it.
18        So it becomes presented twice.  One in
19  the form of abstract, and then one in the form of
20  presentation.  Either oral presentation or poster
21  presentation.
22        Q.   Okay.  So for all these articles
23  and abstracts, the two articles, the five
24  abstracts, this list then of lectures and oral
25  presentations or poster presentations, are

Page 80

1   presentations forms of the articles and abstracts?
2         A.   Not all of them.  For the Canadian
3   hernia meetings, I was just invited to come without
4   abstracts.
5         Q.   Okay.  Can you point those out to me?
6         A.   This, number one.
7         Q.   Okay.
8         A.   (Witness reviews document.)
9         This was just an invitation.  Number
10  three, also just an invitation.  Number five --
11        Q.   Okay.
12        A.   -- this was just an invitation.
13  Yup.
14        MR. ORENT:  When we get to a good
15  breaking point, we can take our first break.
16        MS. BYARD:  Now is a fine time for me.
17        MR. ORENT:  Okay.
18        THE VIDEOGRAPHER:  This marks the
19  end of media number one, in the deposition of
20  Dr. Vladimir Iakovlev.
21        We're going off the record at 10:43 a.m.
22        -- RECESS AT 10:43 --
23        EXHIBIT NO. 1197:  Article entitled,
24        "Mesh-Related SIN Syndrome:  A
25        Surreptitious Irreversible Neuralgia

Page 81

1         and Its Morphologic Background in the
2         Etiology of Post-Herniorrhaphy Pain,"
3         International Journal of Clinical
4         Medicine, 2014, by Dr. R. Bendavid,
5         Dr. W. Lou, Dr. A. Koch and Dr. V.
6         Iakovlev.
7         -- UPON RESUMING AT 11:03 --
8         THE VIDEOGRAPHER:  Here begins media
9   number two in the deposition of Dr. Vladimir
10  Iakovlev.
11        We're back on the record at 11:03 a.m.
12        BY MS. BYARD:
13        Q.   Doctor, I'll hand you what's been
14  marked as 1197.  Counsel.
15        MR. ORENT:  Thank you.
16        BY MS. BYARD:
17        Q.   Doctor, do you recognize Exhibit 1197?
18        A.   Yes.
19        Q.   What is it?
20        A.   It's published article,
21  co-authored by me.
22        Q.   So these other doctors listed on
23  the article are Dr. Bendavid, Dr. Lou and Dr. Koch;
24  do you see that?
25        A.   Yes.

21 (Pages 78 to 81)

Vladimir Iakovlev, M.D.

Page 82

1      Q.  Do these doctors use mesh and
2  hernia repair, to your knowledge?
3      A.  Yes.  Except for Dr. Lou, she's a
4  statistician.
5      Q.  Presently Dr. Bendavid continues
6  to use polypropylene mesh for the treatment of
7  abdominal hernia repair; correct?
8      MR. ORENT:  Objection.
9      THE WITNESS:  No.  Actually, he uses
10  native tissue to repair.  He takes out meshes.
11      BY MS. BYARD:
12      Q.  Did there come a time when his
13  practice changed in that regard, to your knowledge?
14      A.  It depends.  I mean, in some
15  patients you just have no choice.  You have to use,
16  like, um, central large defects.
17      Q.  So he makes a patient -- your
18  understanding is that Dr. Bendavid makes a
19  patient-specific determination about whether or not
20  to use polypropylene mesh in hernia repair?
21      MR. ORENT:  Objection.
22      THE WITNESS:  That's correct.
23      BY MS. BYARD:
24      Q.  Is the same true for Dr. Andreas
25  Koch?

Page 83

1      A.  Koch.
2      MR. ORENT:  Objection.
3      BY MS. BYARD:
4      Q.  Koch?
5      A.  Yes.
6      Q.  Okay.  Explain to the jury what a
7  controlled study is.
8      A.  Where is the jury?
9      Q.  (Indicates.)
10      A.  Okay.  You mean controlled
11  clinical study?
12      Q.  Just in general, what a controlled
13  study is.  Whether it's in a clinical setting, or
14  in your laboratory?
15      A.  "Controlled" usually implies to a
16  clinical study, so if it's in a laboratory it
17  wouldn't be controlled.
18      Controlled is a prospective study where
19  patients are registered and specific statistical
20  requirements for this.
21      Q.  In this study with Dr. Bendavid,
22  you used ten specimens, in three groups; in each of
23  three groups.  You looked at virgin tissue, you
24  looked at scar tissue, and you looked at explanted
25  mesh from the posterior inguinal wall; correct?

Page 84

1      A.  That's correct.
2      Q.  Would you describe this study as
3  having been controlled through the use of virgin
4  tissue and scar tissue?
5      A.  No.  As I said, control is a
6  specific statistical term for clinical prospective
7  studies.
8      Q.  How would you describe this study
9  then?
10      A.  This was a prospective study.
11      Q.  Why was it important for the study
12  to use virgin tissue, scar tissue, and explanted
13  mesh specimens in comparison to one another?
14      A.  There were two questions.  First
15  question was, if nerve ingrowth occurs in the mesh
16  which has been reported even before this paper.
17      And the second question was, what's the
18  nerve density in comparison with virgin tissue and
19  scar without mesh.  If mesh inhibits nerve
20  ingrowth; and if it inhibits, to what degree.  Sort
21  of establishes a baseline for these parameters.
22      Q.  So you used virgin tissue and scar
23  tissue in order to establish a baseline for the
24  comparison to mesh that you were making in terms of
25  nerve proliferation in tissue, correct?

Page 85

1      A.  Mesh and scar were more of a
2  controls in this study.  I mean virgin, was more of
3  a control.  But baseline was between all of those
4  three types of tissue.
5      Q.  So explain to the jury what you
6  mean by "control".
7      MR. ORENT:  Objection.
8      THE WITNESS:  I didn't mean control.
9  Where did I say "control"?  Control, you mean
10  control samples?
11      BY MS. BYARD:
12      Q.  Yes.
13      A.  Sorry, I misunderstood you.
14      Control sample is a sample which is
15  used for comparison, something which implies
16  doesn't have any changes.
17      Something neutral, normal, or something
18  which has been exposed to only methodology
19  manipulations, rather than biological processes
20  which are being studied.
21      BY MS. BYARD:
22      Q.  And similarly, you've used scar
23  tissue in this study as a control to understand if
24  there were differences related to the mesh?
25      A.  Yes.  So mesh is encapsulated by

22 (Pages 82 to 85)

Vladimir Iakovlev, M.D.

Page 86

1  scar tissue.  So control for scar around and inside
2  the mesh would be scar without mesh.  So the same
3  area, surgical procedure, all of those are
4  variables are the same, except one group has mesh
5  and the other group doesn't have mesh.
6       Q.   Other terms that are used to
7  describe study designs include "randomized studies"
8  or "blinded studies"; are you familiar with those
9  terms?
10       A.   Yes, I am.
11       Q.   Is it fair to say that this was a
12  controlled study, but not randomized or blinded?
13       A.   You're just using it in different --
14  randomized, controlled studies -- these are all
15  clinical terms, specific statistical methods for
16  clinical prospective studies when a drug is tested
17  or a new device is tested.  So the patients are
18  randomized before they are given treatment.  And
19  then they follow this cohorts.  And then there is
20  statistical methods to follow that, and there are
21  specific requirements for that.
22       In this case, it's not applicable,
23  because there were no new device, no new medication
24  introduced.  And the randomization is done before
25  the device is being inserted, or new medication is

Page 87

1  given.  You cannot randomize it after.  So it's
2  completely different, we are talking about
3  completely different scenarios.
4       Q.   Well, and it wasn't blinded in the
5  sense that you knew whether the specimen that you
6  were looking at was native tissue or virgin tissue,
7  whether it was scar tissue or whether it was mesh,
8  correct?
9       A.   Blinded, again, it's more of a
10  clinical terminology when you do controlled
11  studies.
12       So either patients are blinded, or
13  researchers are blinded.  I mean, there was a
14  degree of blindness in this study.  But again,
15  talking about completely different statistical
16  scenarios, completely different approaches.
17       Q.   What do you mean by, there was a
18  degree of blinded in this study?
19       A.   When I was examining them, I was
20  examining them without knowledge of other clinical
21  variables.  I could clearly see that there's no
22  mesh in it; if it's scar or not scar.
23       But then I didn't know if there were
24  comorbidities, other possible clinical variables.
25       Q.   So here you examined the samples

Page 88

1  for nerve density, nerve size, and nerve and vessel
2  ingrowth, correct?
3       A.   That's correct.  Well, we assessed
4  the specimen, so we observed what was abnormal in
5  the microscope.  So the main hypothesis and main
6  focus was nerve ingrowth, but then there were other
7  microscopic findings within mesh specimens which
8  were observed.
9       Q.   You found that there were no
10  significant differences in nerve density between
11  virgin scar and mesh samples, correct?
12       A.   Yeah, that's correct.  In that
13  sample size, there was no statistical significant
14  difference.
15       Q.   You concluded that the presence of
16  mesh does not significantly affect nerve density,
17  right?
18       A.   It's the same statement as before.
19       Q.   You concluded that -- you
20  concluded, though, that the nerves and their
21  terminal ends were in a vonlerable position about
22  the mesh and within its pores?
23       A.   That was additional findings,
24  because we observed changes of the scar tissue
25  within the mesh, because it was different from the

Page 89

1  scar without the mesh.
2       Q.   How so?
3       A.   It's all described in the paper.
4  There are vascular congestion, edema, inflammation,
5  foreign body type, chronic lymphoplasmacytic
6  inflammation.
7       (Reporter sought clarification.)
8       A.   Foreign body type inflammation,
9  and chronic lymphoplasmacytic inflammation.
10       MR. ORENT:  L-Y-M-P-H-O-P-L-A-S-M-A-C-Y-T-I-C.
11       BY MS. BYARD:
12       Q.   What did you mean by "in a
13  vulnerable position"?
14       A.   In a pathologically changed
15  tissue, mainly it is compartmentalization of the
16  mesh.  So what happens, the scar tissue within the
17  mesh is divided into compartments.  So,
18  essentially, there are little gates or bottlenecks
19  in the mesh.  And this mainly causes the problem.
20       Because it's compartment, it's enclosed
21  compartment.  Like tooth pulp, this is best
22  analogy.  It gets inflamed; you feel pain.
23       Q.   You didn't write here, though,
24  that the compartmentalization of nerves in mesh is
25  what caused clinical complications in these

23 (Pages 86 to 89)

Vladimir Iakovlev, M.D.

Page 90

1   patients.  You wrote that they were in a vulnerable
2   position, correct?
3       A.  In the text, I think there is
4   compartmentalization discussion.
5       Q.  Well, what you wrote, though, was
6   that nerve receptors were exposed to potential
7   mechanical and chemical factors:  Scarring,
8   entrapment, compression, tugging, deformation,
9   contraction, hypoxia/acidosis, inflammation and
10  edema.  That's what you wrote; correct?
11      A.  That's an abstract.
12      MR. ORENT:  Objection.
13      THE WITNESS:  You're reading an
14  abstract.  I'm saying that there is discussion
15  longer in the text.
16      BY MS. BYARD:
17      Q.  Is that what appears in the
18  abstract, sir?
19      A.  You just read it, yes.
20      Q.  In the introduction, the last
21  sentence reads:
22          "The mesh in question is
23          polypropylene, the most widely used
24          polymer in hernia repair."  Correct?
25      A.  That's correct.

Page 91

1       Q.  There's a discussion here under
2   your methods, that the mesh samples --
3           "The mesh specimens were
4           sampled initially by two blocks, and
5           then if nerve ingrowth was not
6           detected within the initial two
7           blocks, additional blocks were taken
8           until penetration was directed."
9           Do you see that?
10      A.  "Detected".
11      Q.  Thank you.  Do you see that?
12      A.  Yes.
13      Q.  Did you perform the same type of
14  sampling for microscopic evaluation in your
15  examinations of transvaginal mesh?
16      A.  No, there was no need.  The nerve
17  density is so much higher in transvaginal meshes,
18  that pretty much very small piece would contain it.
19      Q.  So unlike this study on hernia
20  mesh, for transvaginal mesh you didn't initially
21  sample the specimens to determine if you could
22  detect nerve ingrowth or not?
23      MR. ORENT:  Objection.
24      THE WITNESS:  For transvaginal meshes I
25  don't submit additional sections.  I just submit

Page 92

1   what I think is -- well, usually, it is what is
2   available.
3       If it's a large POP device, I submit
4   representative sections.  Usually not more than
5   three blocks.  I never needed to submit more
6   tissue.  Either I submitted everything, or it was
7   satisfactory for examination to submit what I
8   submitted first time.
9       BY MS. BYARD:
10      Q.  What do you mean by
11  "representative sections"?
12      A.  Representative of the sample.
13      Q.  And how do you determine that?
14      A.  According to my training and
15  experience.
16      Q.  Are you taking, though, when you
17  examine transvaginal mesh specimens, are you taking
18  samples or sections that you determine are
19  representative based on your training?
20      A.  Yes.
21      MR. ORENT:  Objection.
22      BY MS. BYARD:
23      Q.  In the second full paragraph under
24  methods you write:
25          "If a peripheral nerve was seen

Page 93

1           an imaginary line connecting the
2           outermost points of adjacent mesh
3           filaments, it was recorded as nerve
4           ingrowth into the mesh pore."
5           Right?
6       A.  That's correct.
7       Q.  Tell me what you mean by
8   "imaginary line"?
9       A.  Do you want me to draw or -- that
10  would be easier.
11      Q.  We might do that later.  Can you
12  try and explain it to me in words?
13      A.  Essentially this describes the
14  boundaries of a mesh area, area which is occupied
15  by mesh, which by definition would be new tissue.
16  Tissue which appeared after the mesh was placed.
17      Q.  So when you look at a slide, you
18  see either a clear space or a whole space where you
19  determine that the mesh was or is and can't be
20  seen, right?
21      MR. ORENT:  Objection.
22      THE WITNESS:  What I see in the
23  microscope, I see cross-sections of the filaments,
24  they are clear, yes, you are right.
25      So I can see the outermost points of

24  (Pages 90 to 93)

Vladimir Iakovlev, M.D.

Page 94

1   the mesh filaments.  Therefore, anything inside
2   this boundaries, is new tissue which was generated
3   after mesh was placed.
4           It was an artificial sort of
5   distinction for us to understand during this study,
6   which nerves were new, new innervation or
7   reinnervation.  And which nerves could have been
8   trapped in the scar which was expanding into normal
9   tissue.
10          BY MS. BYARD:
11          Q.  To identify when looking -- let me
12  start over.
13          When looking at transvaginal mesh
14  slides under microscope, you have to draw the same
15  imaginary line connecting the outermost points of
16  the adjacent mesh filaments in order to record
17  whether nerves are ingrown in the mesh, are whether
18  they were preexisting, correct?
19          A.  Yes, I mean this would be a very
20  strict criteria.  Because some nerve branches just
21  outside of the imaginary line can still be new
22  ones.  But, I mean, anything beyond those lines is
23  new, by definition.
24          But the one I assess, I make a
25  distinction.  Especially if I collect data for

Page 95

1   research product.  But for symptoms as a diagnostic
2   tool, it doesn't have much significance.
3           Because as I said, I mean, nerves
4   right -- just outside that line, can be affected to
5   the same degree as -- it might be microns
6   difference, here or there, so -- but that was
7   important for this study, to understand it as
8   diagnostically this doesn't have much significance.
9           Q.  Do you know, or did your -- I'm
10  sorry, let me start over.
11          Did your research here, look at how,
12  diagnostically, nerves growing outside of mesh or
13  preexisting nerves, compared in terms of clinical
14  complications to nerves growing within the mesh?
15          A.  In this study?
16          Q.  (Nods.)
17          A.  In this study, we, as I said,
18  establish baseline.
19          Q.  So the answer to my question is,
20  "no, you did not," right?
21          MR. ORENT:  Objection.
22          THE WITNESS:  Well, you see that there
23  is no specific correlation with clinical
24  presentation in this specific study.
25          BY MS. BYARD:

Page 96

1           Q.  And this same process that you
2   describe here in this study of drawing an imaginary
3   line connecting the outermost points of the
4   adjacent mesh filaments, is the same process by
5   which you determined the shape of the mesh when
6   looking at transvaginal specimens, correct?
7           A.  No, I don't understand your
8   question.  Shape in nerves -- they are different
9   issues.
10          Q.  Okay.  Let me take it then the way
11  that you've presented it.
12          This same process that you describe in
13  the study of drawing an imaginary line connecting
14  the outermost points of adjacent mesh filaments, in
15  order to determine whether nerves were there
16  beforehand, or whether they grew into the mesh, is
17  the same method that you applied to your analysis
18  of transvaginal mesh specimens in the litigation,
19  correct?
20          A.  In litigation, I describe nerve
21  involvement.  I mean, they might be ingrown; they
22  might be just outside.
23          As I said, diagnostically, if the nerve
24  is affected, it could be outside of the imaginary
25  line.  It can be trapped in the scar tissue or

Page 97

1   around.
2           I think it is a little artificial to
3   hook on this imaginary line.  It was done for the
4   research project.  As I said, diagnostically, what
5   matters is, if there is an innervation in the
6   tissue, in that tissue.  That's important.
7           Q.  To determine whether or not a
8   nerve had ingrown into mesh, though, when you were
9   looking at transvaginal mesh specimens, you had to
10  draw this imaginary line connecting the outermost
11  points of adjacent mesh filaments?
12          A.  If I want to call it ingrown, yes,
13  it's important.  But diagnostically, is it -- if
14  only ingrown nerves are important for diagnostic
15  purposes, this is not correct.
16          Because ingrown nerves which are inside
17  the compartment, they are much deeper.  But at the
18  same time, if a nerve is just outside, it branches,
19  and then supplies nerve endings, small branches in
20  the tissue inside.
21          Q.  Please listen to my question, sir.
22          In order to determine whether nerve was
23  ingrown in mesh, when examining transvaginal mesh
24  specimens, you had to draw this same imaginary line
25  that you describe in your study with Bendavid,

Golkow Technologies, Inc. - 1.877.370.DEPS

Vladimir Iakovlev, M.D.

Page 98

1  connecting the outermost points of adjacent mesh
2  filaments, didn't you?
3          MR. ORENT: Objection. Asked and
4  answered. Moreover, Dr. Iakovlev is entitled to
5  give a full and complete response to the questions
6  and he will continue to do so and --
7          MS. BYARD: Please limit your
8  objections to form, sir.
9          MR. ORENT: Asked and answered.
10         THE WITNESS: As I said, in the
11 description if I say ingrown, I use this imaginary
12 line. But diagnostically, this has not -- it
13 doesn't have much significance. Because what I do
14 in diagnostically, I try to estimate or assess if
15 the tissue is innervated. That's what important.
16         BY MS. BYARD:
17         Q. But whether you determine that a
18 nerve was ingrown, depends completely on whether it
19 lies within the parameters of this imaginary line
20 that you've drawn?
21         MR. ORENT: Objection. Asked and
22 answered.
23         THE WITNESS: Ingrown where? Ingrown
24 in the scar, or ingrown inside the mesh?
25         BY MS. BYARD:

Page 99

1          Q. Ingrown inside the mesh, please.
2          A. If it's ingrown inside the mesh
3  and I make a statement --
4          MR. ORENT: Objection.
5          THE WITNESS: -- that it was beyond
6  that imaginary line, diagnostically it does not
7  matter. Because it can be ingrown in the scar, it
8  innervates the tissue.
9          I think we are mixing up diagnostic
10 process with our research.
11         Descriptive term can be, if I make a
12 statement if it's ingrown in the mesh, I used that
13 imaginary line.
14         BY MS. BYARD:
15         Q. Thank you.
16         Part of what you did in the study with
17 Dr. Bendavid included calculating an adjustment
18 ratio between specimens to come to a more accurate
19 picture of the rate of nerve ingrowth, correct?
20         A. Not rate, density.
21         Q. Density, thank you.
22         With respect to your examination of
23 transvaginal mesh for the litigation, you didn't
24 evaluate nerve density at the technical level that
25 you did for the study on hernia repair; correct?

Page 100

1          MR. ORENT: Objection.
2          THE WITNESS: No.
3          BY MS. BYARD:
4          Q. And so you didn't adjust --
5  calculate an adjustment ratio, and your examination
6  and analysis of transvaginal mesh for litigation,
7  correct?
8          MR. ORENT: Objection.
9          THE WITNESS: Again, we are going from
10 research from scientific question to diagnostic
11 processes.
12         I don't base my opinion on adjustment
13 ratios or on the specifics of what I did in the
14 research part. I don't --
15         BY MS. BYARD:
16         Q. My only question is whether you
17 did it?
18         A. I never used it. It was only used
19 once for this specific study, for specific
20 question. It wasn't diagnostic question. It was
21 more of a mathematical question.
22         Q. I want to turn to page 802 of 1197.
23         The last two full sentences before the
24 figures read:
25         "The branches located at the

Page 101

1  mesh interface tended to have an
2  orientation parallel to the mesh
3  plane."
4          A. That's correct.
5          Q. "Some branches showed a coarse
6  angled to the mesh plane, and nine
7  out of the ten specimens, 90
8  percent, showed penetration of
9  nerves into the mesh structure.
10 Table 1."
11         A. That is correct.
12         Q. What do you mean by, "the branches
13 at the mesh interface tending to have an
14 orientation parallel to the mesh plane"?
15         A. They had orientation parallel to
16 the mesh plane.
17         Q. So the majority of the nerves that
18 were located at the mesh interface were running
19 parallel to the mesh as opposed to through it?
20         A. Yes, that's how you would orient
21 any cable. Just think about cables. There's a
22 cable, and then you run it in the corner because
23 there is an obstacle here, and then there are
24 branches which go into the ceiling, or the walls,
25 or somewhere else; so you can imagine the same way.

26 (Pages 98 to 101)

Vladimir Iakovlev, M.D.

Page 102

1    Nerve branch goes along the plane, and
2 then there are small branches going into the mesh
3 and they innervate inside tissue.  It's logical
4 biological.
5    Q.  Is this same finding -- let me
6 start over.
7    Were your findings about the
8 orientation of the branches of nerves located at
9 the mesh interface similar for transvaginal mesh as
10 you've described here for hernia mesh?
11    A.  Transvaginal mesh is different
12 because there are no anatomical planes.  In the
13 hernia, in the anterior abdominal wall, you have
14 layers which are separated by fascia, serrated
15 muscle, so there are anatomical planes.
16    In transvaginal location, there is no
17 anatomical plane.  Tissues just merge into each
18 other. The orientation of nerves is a little bit
19 different, because in the anterior abdominal wall,
20 most of the nerves run parallel to supply further;
21 so the mesh is placed parallel.
22    In the transvaginal location, the nerve
23 branches are running to innervate mucosa.  And the
24 mesh is placed perpendicular, so this is completely
25 a different anatomical structure.

Page 103

1    So in transvaginal meshes, they are all
2 over the place, and I did not see that predominance
3 of parallel orientation.  It's different anatomical
4 structure.
5    Q.  You write that the number of
6 nerves ingrown -- and I've switched to page 803.
7 On page 803, the first full sentence you write:
8    "The number of nerves ingrown
9    into the mesh structures range from
10    one to three per examined portion of
11    a specimen."
12    Correct?
13    A.  That's correct.
14    Q.  Were your findings in examining
15 transvaginal mesh specimens similar to your
16 findings here on hernia mesh?
17    A.  No. Densities are much higher in
18 transvaginal meshes.  About six times on average
19 than in inguinal hernia.
20    Q.  So when you see the number of
21 nerves ingrown into mesh structures and hernia
22 repair ranging from one to three per examined
23 portion of the mesh; the number would be closer to
24 6 to 18 nerves per examined specimen for
25 transvaginal mesh?  Is that your testimony?

Page 104

1    A.  No, this is not my testimony.
2 It's higher.  And on an average, the last time I
3 calculated, it's about six times higher.  What is
4 an average number of nerves I see, and I'm talking
5 about densities, which was about six times higher.
6    Number of nerves I see, I don't know
7 now.  It's much higher.  I mean, it's definitely
8 not one to three, it's about beyond ten or so.
9    And then it depends, I mean, what
10 device we are talking about.  Sling, slings tend to
11 have smaller specimens.  POP devices, it might be
12 over a hundred of nerves that I see in one section,
13 it depends.
14    Q.  So the way you went about arriving
15 at this number for your valuation of hernia repair,
16 was to actually count the number of nerves per
17 specimen, correct?
18    A.  That's correct.
19    Q.  And you haven't done that counting
20 activity for transvaginal mesh specimens?
21    A.  I have not.
22    MR. ORENT:  Objection.
23    THE WITNESS:  There are reports,
24 completed surgical pathology reports with synoptic
25 data, and there is a full count.

Page 105

1    Again, it's not what I am basing my
2 opinion, but this was done more for research
3 purpose later on.
4    BY MS. BYARD:
5    Q.  Okay.  So in answer to my
6 question, you haven't done this type of overall
7 analysis of counting the nerves, the number of
8 nerves that you see grown into mesh structure for
9 transvaginal mesh, right?
10    MR. ORENT:  Objection.  Asked and
11 answered.
12    THE WITNESS:  I have done it.  When the
13 complete surgical report is issued, it contains
14 these numbers.
15    BY MS. BYARD:
16    Q.  Whose complete surgical report?
17    A.  There's some, I think I completed
18 it to -- when I sign out a surgical pathology
19 report in St. Michael's system, I include full
20 analysis for nerve report -- nerve densities.
21    Q.  So there are some cases where
22 you've completed a complete St. Michael's surgical
23 pathology report and others where you haven't,
24 correct?
25    A.  For most of this, I didn't have

27 (Pages 102 to 105)

Vladimir Iakovlev, M.D.

Page 106

1  time to complete the surgical pathology reports.
2          But you have at least one here, I think
3  for Ms. Holland.
4          MR. ORENT: Tab 1.
5          BY MS. BYARD:
6          Q. I know what you're referring to
7  and we'll look at that tomorrow.
8          A. Okay.
9          Q. Take the time you need, I know
10 what you're referring to, though.
11         A. So how this is done, when I --
12         Q. That's okay, there's no question
13 pending.
14         MR. ORENT: That's the report you're
15 looking for?
16         THE WITNESS: Yeah, the densities here,
17 right there.
18         BY MS. BYARD:
19         Q. So my question is focused on your
20 analysis -- which case is that?
21         A. This one.
22         MR. ORENT: Lucy Allen.
23         MS. BYARD: Okay.
24         (Reporter sought clarification).
25         MR. ORENT: Lucy Allen.

Page 107

1          And he's pointing to the line that
2  reads, "was it 59 branches?"
3          BY MS. BYARD:
4          Q. Okay. So my question is focused
5  on the 120 specimens that are talked about in your
6  report.
7          You didn't perform an analysis of the
8  number of nerves in each individual specimen of
9  those 120 that you examined, in order to arrive at
10 a range of averages of the number of branches
11 ingrown into mesh structures for transvaginal mesh?
12         MR. ORENT: Objection.
13         THE WITNESS: I have done for large
14 part of those. Those counts are done for large
15 number of this specimens.
16         BY MS. BYARD:
17         Q. That doesn't appear in your
18 report, does it?
19         A. Which, which report?
20         Q. In your report, Exhibit 197?
21         A. Which one? I don't understand.
22         Q. Or 196.
23         A. On the general report? As I said,
24 it doesn't have diagnostic significance.
25         Q. So it wasn't done? That's my only

Page 108

1  question.
2          A. I've done it.
3          MR. ORENT: Objection.
4          THE WITNESS: You asked me if I've done
5  it for 120. I've done the count for those which
6  were completed cases.
7          I have stacks of cases at different
8  stages of completion. It's work in progress for
9  some of them. But with the cases completed,
10 altogether with a surgical pathology report, there
11 is count. For each single specimen completed,
12 there is count of nerves and nerve densities.
13         BY MS. BYARD:
14         Q. And of the 25-plus cases we will
15 talk about tomorrow, you have one example of that,
16 right?
17         MR. ORENT: Objection. Misstates his
18 testimony.
19         THE WITNESS: Not example. One case is
20 completed in that respect.
21         BY MS. BYARD:
22         Q. Okay. And the range of the number
23 of nerves ingrown into mesh structures for
24 transvaginal mesh in the 120 specimens that are
25 detailed in your report, doesn't appear in your

Page 109

1  report, does it?
2          MR. ORENT: Objection.
3          THE WITNESS: No, I didn't record it.
4  Because I'm not basing my opinion for that specific --
5  for this specific purpose we are here today.
6          BY MS. BYARD:
7          Q. Okay. And, Doctor, if there are
8  reasons why things were included or not included,
9  your counsel can ask you about that. I just am
10 asking you if it's there or not, okay?
11         You conclude this paragraph on page 803
12 of Exhibit 1197 by saying:
13         "These one to three ingrown
14         nerves into the pores constituted a
15         median of 6.3 percent range,
16         2.17 percent to 15.8 percent of all
17         nerves seen within the examined
18         tissue."
19         A. That's correct.
20         Q. Here you compared the number of
21 nerves ingrown into pores with the number of nerves
22 that were seen in the examined tissue as a whole?
23         A. Yes. I mean, so this is a
24 percentage of those nerves which were seen ingrown,
25 with those three criteria we discussed earlier.

28 (Pages 106 to 109)

Vladimir Iakovlev, M.D.

Page 110

1     Q.  And compared to the number of
2  nerves that were in the examined tissue overall,
3  the number of nerves that were grown into pores,
4  was a median of 6.3 percent with a range of 2.17 to
5  15.8 percent, correct?
6     A.  That's correct.
7     Q.  Have you performed this same
8  statistical analysis for the transvaginal mesh
9  specimens?
10     A.  For those I completed test, I
11  mean, it's somewhere in the spreadsheet.  I started
12  testing that as well.  But it's only when the nerve
13  count is completed that I can do it.
14     Q.  So it's not in your report, is it?
15     A.  No.  It has no diagnostic
16  significance.  One nerve is enough.  I mean, if you
17  have one nerve in the tooth and it hurts, it's just
18  one nerve is enough.
19     MS. BYARD:  Object and move to strike
20  after the words, "No, it's not in the report."
21     MR. ORENT:  Oppose.
22     BY MS. BYARD:
23     Q.  Do you know how the percentage of
24  nerve ingrowth in transvaginal mesh samples within
25  mesh structures compares to the number of nerves in

Page 111

1  transvaginal mesh specimens overall?
2     MR. ORENT:  Objection.
3     THE WITNESS:  I think I answered that
4  generally, density is about six times higher.  I
5  mean, it depends on how you group those devices.
6  If you split them into slings versus POP devices,
7  but generally several fold higher.
8     BY MS. BYARD:
9     Q.  That's true across the tissue
10  specimen, though, correct?
11     A.  Transvaginal.  If we compare
12  transvaginal versus inguinal hernia, that's true.
13     Q.  What I am focused on now is the
14  amount of nerves growing into the mesh pores
15  compared to the amount of nerves overall.  And we
16  know from your study that it's around 6.3 percent
17  for inguinal hernia repair mesh.
18     I'm asking if you have a percentage for
19  me of the percentage rate of nerve ingrowth into
20  compartmentalized pores for transvaginal mesh as
21  compared to the number of tissues overall in the
22  specimens that you've examined?
23     MR. ORENT:  Objection.
24     THE WITNESS:  As I said, that work is
25  not completed.  It is not done yet.  If there is a

Page 112

1  scientific question, I will complete it.  But
2  again, the conclusions in this paper were not based
3  on this number.  This number was provided for
4  readers to understand what is going on.
5     BY MS. BYARD:
6     Q.  Could you tell me, sitting here
7  today, what percentage of nerves you would expect
8  to be ingrown compared to not ingrown and present
9  in tissue for transvaginal mesh?
10     A.  At least the same as in hernia.
11  As I said, likely several fold higher as well,
12  because of difference in anatomical orientation.
13     As I said, in transvaginal location,
14  there are branches that going to innervate mucosa,
15  so they're perpendicular to the mesh.  So I'm
16  expecting to see much higher percentage.
17     Q.  That's a working hypothesis at
18  this point, but not a scientific conclusion arrived
19  at through the same type of statistical analysis --
20     MR. ORENT:  Objection.
21     BY MS. BYARD:
22     Q.  -- right?
23     A.  Yes, this is.  But it will be at
24  least 6.3 percent.  Again, diagnostically, it's
25  irrelevant.  For specific patients, for specific

Page 113

1  purpose we're here today.
2     Q.  And here you have this nerve
3  assessment data Table 1 on page 804.
4     A.  Yes.
5     Q.  And the transvaginal specimen
6  analysis that you have done, did you compare virgin
7  tissue and scar tissue with actual samples?
8     A.  No --
9     MR. ORENT:  Objection.
10     THE WITNESS:  -- I mean I don't
11  understand why you're asking these questions.  And
12  I didn't complete -- this was different study and
13  just, I mean, this is -- again, as I said, this is
14  not diagnostically relevant.
15     MS. BYARD:  Object and move to strike
16  everything besides, "no."
17     MR. ORENT:  So are you suggesting by
18  your repeated motions to strike, that he's not
19  entitled to give a full answer?
20     MS. BYARD:  I don't think I have to
21  answer your question for the basis of my motion.
22     I just -- my questions are simple, and
23  we're going to be here a long time if I can't just
24  get answers to my questions.
25     MR. ORENT:  I think that's what he is

Vladimir Iakovlev, M.D.

Page 114

1  doing.  And I think you're going beyond the scope
2  of what he's even intending to offer at trial.  So
3  if we stick to his opinions, we can move fast, too.
4       But, Doctor, you can go ahead and keep
5  answering your questions as you see fit.
6       BY MS. BYARD:
7       Q.  So here for this study, you've
8  used control samples, haven't you?
9       A.  For this study, yes.
10      Q.  You used the control sample in
11 virgin tissue?
12      MR. ORENT:  Objection.  Asked and
13 answered.
14      THE WITNESS:  Yes.
15      BY MS. BYARD:
16      Q.  You used another control sample in
17 scar tissue, correct?
18      MR. ORENT:  Objection.  Asked and
19 answered.
20      THE WITNESS:  Scar tissue was control
21 and at the same time, it was a test group depending
22 on how we compare them.
23      BY MS. BYARD:
24      Q.  In your report on your 120
25 specimens for transvaginal mesh, you don't have a

Page 115

1  control group in virgin tissue?
2       A.  This is research.  This is
3  diagnostic work.  We are mixing things which are
4  completely unmixable.  I just don't understand why
5  we are doing this.
6       Q.  Please answer my question.
7       MR. ORENT:  Objection.  Asked and
8  answered.
9       THE WITNESS:  This is research.  This
10 is diagnostic work.  Can you repeat the question so
11 I understand what we are talking about, research or
12 diagnosis?
13      MS. BYARD:  Would you mind reading back
14 my question, Madam Court Reporter?
15      REPORTER'S NOTE:  Whereupon the
16 question was read back as follows:
17      "In your report on your 120
18      specimens for transvaginal mesh, you
19      don't have a control group in virgin
20      tissue?"
21      MR. ORENT:  Objection.
22      THE WITNESS:  I do.  There are samples
23 in St. Michael's Hospital of transvaginal mucosa
24 excised.  So when the study is completed, I intend
25 to examine those as well.

Page 116

1       BY MS. BYARD:
2       Q.  That's not in your report?
3       A.  That's for research, the report is
4  diagnostic.  Again, the same issue.  We are mixing
5  up unmixable things.  Research and diagnostic work.
6       Q.  That's not in your report is it,
7  sir?
8       MR. ORENT:  Objection.
9       THE WITNESS:  There is no statistics of
10 comparison at all, because my reports are
11 diagnostic reports, and this is research.
12      BY MS. BYARD:
13      Q.  So you agree with me it doesn't
14 appear in your report?
15      MR. ORENT:  Objection.  Asked and
16 answered for the fourth time.
17      THE WITNESS:  There was no research
18 methodology or -- the reports are not research
19 project.  They are reports.
20      BY MS. BYARD:
21      Q.  So the answer to my question is,
22 no, that control group in virgin tissue is not set
23 forth or analyzed in your report in the litigation?
24      MR. ORENT:  Objection.
25      THE WITNESS:  It's not mentioned, but I

Page 117

1  know about the mesh tissue, or human body
2  interactions based on this study.
3       So in order to produce this report, I
4  used my knowledge, which I gained through my
5  training, through this study and other studies, and
6  then I make conclusions in diagnostic report.  I
7  could not put everything which I know or which --
8  or research studies I've done and the reports.
9       BY MS. BYARD:
10      Q.  Have you done an analysis of nerve
11 assessment data on vaginal virgin tissue?
12      MR. ORENT:  Objection.
13      THE WITNESS:  As I said, it's work in
14 progress.  It will be done when I complete.
15      BY MS. BYARD:
16      Q.  To date, it hasn't been completed?
17      MR. ORENT:  Objection.
18      THE WITNESS:  No.
19      BY MS. BYARD:
20      Q.  And the same thing is true for
21 vaginal scar tissue, correct?
22      A.  As I said, it was not a question
23 for the reports.  The reports describe pathological
24 findings which I see, which I know pathological
25 already.

30 (Pages 114 to 117)

Vladimir Iakovlev, M.D.

Page 118

1    We're talking about research questions.
2  Sometimes it's question which is not relevant
3  specifically to diagnostic process.
4    Q.  The answer to my question is that,
5  no, that analysis has not been completed to date,
6  right?
7    MR. ORENT:  Objection.
8    THE WITNESS:  The answer is, yes, I
9  have not completed the analysis of transvaginal
10  meshes for research purpose.
11    BY MS. BYARD:
12    Q.  And I'm focusing on an analysis of
13  vaginal scar tissue.
14    MR. ORENT:  Is there a question there?
15    BY MS. BYARD:
16    Q.  Same question for vaginal scar
17  tissue.
18    MR. ORENT:  Objection to form.
19    THE WITNESS:  That, that's correct.
20    BY MS. BYARD:
21    Q.  You write that you:
22    "Detected no indication that
23    the scar around and within the mesh
24    has significantly lower innervation
25    than an ordinary scar."  Correct?

Page 119

1    A.  That's correct.
2    Q.  Are those same findings true for
3  transvaginal mesh?
4    A.  As I said, I mean, we -- to answer
5  these questions which are not relevant to
6  diagnostic process, you would have to compare
7  vaginal scar and the scar in around meshes.
8    Q.  And that work has not been
9  completed to date, correct?
10    A.  It has not been completed.
11    Q.  Based on your observations to
12  date, do you expect that the innervation within a
13  mesh scar conglomerate is the same as within
14  vaginal scarring?
15    MR. ORENT:  Can you repeat that or read
16  that one back?
17    REPORTER'S NOTE:  Whereupon, the
18  pending question was read back as follows:
19    "Based on your observations to
20    date, do you expect that the
21    innervation within a mesh scare
22    conglomerate is the same within
23    vaginal scarring?"
24    MS. BYARD:  Let me add to that.
25

Page 120

1    BY MS. BYARD:
2    Q.  In terms of the number of nerves
3  present in tissue specimens density?
4    A.  My expectation is that the scar
5  outside of the mesh would have about the same nerve
6  density as an irregular scar from after any
7  procedure.
8    In regards to innervation inside the
9  mesh, it will be somewhat lower than innervation
10  outside.  But again, it's not clinically relevant
11  because the fact that it can ingrow, that's the
12  most important clinical question.
13    Q.  And again, whether or not the
14  number of nerves that ingrow at the mesh is lower,
15  or whether it's statistically significantly lower,
16  is an open hypothesis at this point, true?
17    MR. ORENT:  Objection.
18    THE WITNESS:  I don't understand why we
19  are asking this.  I mean, diagnostic process is --
20    BY MS. BYARD:
21    Q.  Sir, you don't need to agree with
22  my questions or why I'm asking them --
23    MR. ORENT:  Excuse me.  He's answer --
24    BY MS. BYARD:
25    Q.  -- you just need to answer them.

Page 121

1    MR. ORENT:  Counsel, he's entitled to
2  finish.  The way this process works is, you ask a
3  question, he answers.  You don't cut him off midway
4  through his answer.
5    He's entitled to finish his answer,
6  then you can say whatever you want to say.
7  Doctor?
8    MS. BYARD:  If you wouldn't mind,
9  Counsel, I think it would be productive for you to
10  provide some guidance to the witness about not
11  disputing why I'm asking a question.
12    MR. ORENT:  Well, if he doesn't
13  understand, I think he's trying to understand where
14  this fits and so that he can answer the question.
15  I don't think he's trying to be difficult.
16    But, Doctor, if you could answer.
17    THE WITNESS:  So my response is because
18  as far as I understand, we're talking about the
19  conclusions I derived based on my training,
20  knowledge, experience and the research included in
21  this one.
22    But it appears that you equate research
23  with the diagnostic process.  Whatever I have done
24  in this study was in my head before I looked at
25  these specimens.

Vladimir Iakovlev, M.D.

Page 122

1    BY MS. BYARD:
2        Q.  And I'm trying to understand what
3    you've done on hernia repair and what you've done
4    on transvaginal mesh, okay?
5        A.  Okay.
6        Q.  And at this point, whether or not
7    the rate of nerve growth within transvaginal mesh
8    is less than the rate of nerve growth in the scar
9    surrounding the mesh is an open hypothesis,
10   correct?
11       MR. ORENT:  Objection.
12       THE WITNESS:  I can tell you that I
13   have some initial data, initial observations, but
14   it's not completed.  Statistics is not completed
15   yet.
16       BY MS. BYARD:
17       Q.  Okay.  Thank you, sir.
18       Just to paraphrase, your findings with
19   respect to hernia repair was that both scar tissue
20   and scar tissue with mesh have a higher number of
21   nerves than virgin tissue, but that the difference
22   between the two groups was not statistically
23   significant?  That's correct?
24       A.  (Witness nods.)
25       Q.  Now, if you look at the last

Page 123

1    paragraph of the result section, which is just
2    before "discussion," you measured the nerves that
3    you saw, right?  And by that I mean, you measured
4    their size?
5        A.  Diameter, yes.
6        Q.  For your evaluation of
7    transvaginal mesh specimens, you didn't measure the
8    diameter of the nerves that you detected, did you?
9        A.  No.
10       Q.  Part of what you were doing here
11   in your study with Dr. Bendavid, was trying to
12   correlate the size of the diameter of the nerves
13   that you found to whether they were similar,
14   dissimilar to inguinal or iliohypogastric nerves,
15   correct?
16       A.  No.
17       Q.  Tell me what you were trying to do
18   by measuring the diameter of the nerves then?
19       A.  What I've just described, so the
20   readers would understand what I'm talking about.
21   Had no diagnostic significance.
22       Q.  Well, you write:
23       "At 0.9 millimeters, the size
24   is not too dissimilar from that of
25   the ilioinguinal or iliohypogastric

Page 124

1    nerves."  Correct?
2        A.  That's correct.  That's a
3    statement.  It has no diagnostic conclusion or
4    anything else.
5        Q.  Why did you include that language?
6        A.  As I said, it's a description of
7    what we see, just for readers to understand what's
8    going on under the microscope.
9        Q.  There are clinicians who
10   contributed to this paper, right?
11       A.  Yes.
12       Q.  Is it possible that to Dr. Bendavid
13   or to Dr. Koch, that whether these were similar in
14   size to ilioinguinal or iliohypogastric nerves had
15   some clinical bearing?
16       MR. ORENT:  Objection.  Calls for
17   speculation.
18       THE WITNESS:  Had no clinical bearing.
19       BY MS. BYARD:
20       Q.  Did you write this sentence or did
21   they?
22       MR. ORENT:  Objection.
23       THE WITNESS:  Oh, their manuscript was
24   edited, rewritten several times, several people
25   contributed.

Page 125

1    I certainly contributed to each
2    sentence in one way or another.  And I measured.
3    Nobody else could measure them.
4        BY MS. BYARD:
5        Q.  Are you the one who supplied the
6    information about how the nerve sizes and diameter
7    compared to the size of known nerves in this
8    particular anatomy?
9        A.  This is comparison of microscopic.
10   So I contributed by microscopic what I see, and
11   clinicians contributed to what they can see with
12   bare eyes without the microscope.
13       So the comparison is, roughly, for
14   surgeons to understand that the nerves we are
15   talking about can be as big as those they can see
16   by naked eye, but they can be much smaller that
17   they cannot see them.  Therefore, they cannot avoid
18   them.
19       So basically it leads to readers to
20   understand that it's unavoidable to damage nerves
21   because they are so small that surgeons cannot see
22   them.
23       Q.  And it was important for the
24   surgeons to talk about the type of nerves that
25   these were similar in size to, correct?

32 (Pages 122 to 125)

Vladimir Iakovlev, M.D.

Page 126

1     MR. ORENT: Objection.
2     THE WITNESS: I don't understand the
3  question. What do you mean, "type of nerves"?
4     BY MS. BYARD:
5     Q. Well, it mentions specifically
6  inguinal and iliohypogastric nerves, doesn't it?
7     A. It's not a type of nerve. It's
8  just a name of a larger branch.
9     Q. Here, that name of those branches
10  was important to specify?
11     A. No.
12     Q. It was completely superfluous?
13     MR. ORENT: Objection. Argumentative.
14     THE WITNESS: This is something which
15  surgeons have readily -- are familiar with. It's a
16  comparison, it's like a sliding scale, from 1 to
17  10. So everybody within the span would know what
18  we're talking about.
19     BY MS. BYARD:
20     Q. You're not a pain specialist,
21  right?
22     A. What do you mean "pain
23  specialist"?
24     Q. You don't treat and manage pelvic
25  pain, do you?

Page 127

1     A. That's correct.
2     Q. And you're not a neurologist?
3     A. No, I am not a neurologist. You
4  know what I am, I am pathologist.
5     Q. And you're not a specialist in
6  sexual health, correct?
7     A. I just answered, I'm a
8  pathologist.
9     Q. Let's look at the discussion,
10  please. You describe here that:
11        "Indolent years of barber
12     surgeons and anatomists and the
13     beginning of a surgical renaissance."
14     A. Yes, that was mostly Dr. Bendavid's
15  contribution in this part.
16     Q. I like his writing style.
17     A. English is not my first language,
18  so he writes better than me.
19     Q. He writes:
20        "A mini-revival took place with
21     the rediscovery of --"
22     And then he names some researchers and
23  surgeons, right?
24     A. That's correct.
25     Q. And he writes:

Page 128

1        "-- for a better understanding
2     and application of anatomy, which
3     easily transferred to tension free
4     and laparoscopic repairs." Right?
5     A. That's correct.
6     Q. He writes:
7        "Today's leitmotif in hernia
8     surgery, to accompany the newer
9     techniques, has been the extensive
10     use of prosthetic materials."
11     A. That's correct. That's epidemics
12  now.
13     Q. He used -- he says:
14        "The philosophy of tension free
15     repair which was made possible by
16     the advent of synthetic materials
17     was born in Marseille, France,
18     fathered by Don Aqauviva in 1944,
19     who used sagittate nylon sheets as
20     an onlay over a defect which itself
21     was left intact."
22     Did I read that correctly?
23     A. Yeah, you read it correctly.
24     Q. He says:
25        "The theme was re-visited by

Page 129

1     Henri Fruchaud in 1956, who designed
2     an operation also using nylon mesh
3     in a manner which was antedated and
4     precisely anticipated Francis Usher."
5     Did I read that correctly?
6     A. Yes, it appears you read it
7  correctly.
8     Q. "Usher provided the
9     polyethylene, then polypropylene
10     while reproducing Fruchaud's
11     technique."
12     Did I read that correctly?
13     A. That's correct.
14     Q. And then it continues that -- in
15  this next full paragraph:
16        "While several surgical
17     techniques based on the principles
18     of tension free repairs have been
19     introduced in the last 30 years,
20     polypropylene has become the
21     dominant olefin utilized to that end."
22     Did I read that correctly?
23     A. That's correct.
24     Q. It goes on to discuss the plastics
25  industry producing Marlex; do you see that?

33 (Pages 126 to 129)

Vladimir Iakovlev, M.D.

Page 130

1    A.  Yes.
2    Q.  And a synthetic polymer discovered
3  by J. Paul Hogan and Robert Banks of the Phillips
4  Petroleum Company; do you see that?
5    A.  I lost you.  Yes, I do see that.
6    Q.  And it says:
7      "This discovery was made
8      possible, thanks to the pioneering
9      work and olefin chemistry by two
10     Nobel Prize laureates 1963, Giulio
11     Natta and Karl Ziegler."
12   Do you see that?
13   MR. ORENT:  Objection.
14   THE WITNESS:  That's correct.
15   BY MS. BYARD:
16   Q.  And then it goes on to describe
17 there being an "unexpected and unpredicted
18 prominence of pain" being the most common
19 complication seen in mesh groin hernia repairs
20 today, doesn't it?
21   A.  That's correct.
22   Q.  There's a discussion then about
23 the industry development of lighter mesh, meshes
24 with larger pores.  Do you see that?
25   A.  Yes.

Page 131

1    Q.  And it essentially then describes
2  this, this tradeoff in terms of collagen versus
3  scar tissue ingrowth?
4    A.  You would have to read the
5  sentence to me.
6    Q.  Sure.  I just, I would hope to
7  summarize.  Essentially here, and correct me if I
8  don't get this accurately, but essentially here you
9  go on then to describe there being tradeoffs
10 between wider pore -- lighter, larger pore meshes
11 and smaller pore heavier weight meshes, correct?
12   MR. ORENT:  Objection.
13   THE WITNESS:  Yeah, we discussed that
14 topic.
15   BY MS. BYARD:
16   Q.  Sure.  And then it says:
17     "To understand the complex
18     interaction between the olefins and
19     biological tissues, their site of
20     contact needs to be studied as a
21     compartmentalized living tissue."
22   A.  That's correct.
23   Q.  "Additionally, tissue forces
24   and chemical environments affect the
25   mesh which in turn may have an

Page 132

1  effect on tissue components."
2    That's what's written here in your
3  article, right?
4    A.  That's correct.
5    Q.  In this sentence you don't write
6  that "tissue forces and chemical environment affect
7  the mesh, which in turn has an effect on tissue
8  components," do you?
9    A.  I have to see the sentence.
10   MR. ORENT:  Where is the sentence
11 you're looking at, at this point?
12   MS. BYARD:  It's the first sentence
13 preceding the discussion of Figure A and Figure B.
14   THE WITNESS:  Oh, this is like a
15 feedback, this is a description.  See, first is
16 description that mesh affects, and then there is
17 effect.  And then there is a tissue which is
18 affecting mesh, and but mesh can react back, so
19 it's a complex sort of mechanism, which he has not
20 studied yet.
21   BY MS. BYARD:
22   Q.  And the stage that you're at here
23 with hernia mesh, is understanding the tissue
24 response to mesh, right?
25   MR. ORENT:  Objection.

Page 133

1    THE WITNESS:  It's hard to actually
2  differentiate what is mesh response to tissue, or
3  tissue response to mesh, or what is mesh effect on
4  the tissue, or what is tissue reaction to the mesh.
5  I mean, it's interaction between mesh and tissue.
6    But the intricate details of how this
7  feeds back and catalyzes the process, I have not
8  studied.  Molecular mechanisms.
9    BY MS. BYARD:
10   Q.  And the same is true for
11 transvaginal mesh, true?
12   MR. ORENT:  Objection.
13   THE WITNESS:  That's correct.  We can
14 see the changes, what is the end result.  But how
15 this is all happening, and through what molecules,
16 and this is not studied yet.
17   BY MS. BYARD:
18   Q.  If you turn to page 808, please.
19   A.  Yes.
20   Q.  There is a discussion of you all
21 setting up a mesh retrieval industry; do you see
22 that?
23   A.  Yes.
24   Q.  And there being a protocol
25 developed to address how contributions are made to

34 (Pages 130 to 133)

Vladimir Iakovlev, M.D.

Page 134

1    the registry?
2        A.  Not exactly.  Not how
3    contributions are made.  Dr. Bendavid through his
4    contacts with colleagues, I mean, we started
5    acquiring meshes just to build a library of
6    specimens and examine them.
7        Q.  And then it says:
8            "The next step will be the
9        correlation of histology/pathology
10       to the clinical presentation and
11       severity of pain."
12       A.  Yes, that's correct.
13       Q.  What will your role be in this
14   registry as far as you understand it?
15       A.  Not will be, I'm collecting
16   specimens, I'm examining them.
17       Q.  Is your job to do the correlation
18   of the histology pathology to the clinical
19   presentation and severity of pain?
20       A.  Yes.  I mean, I examine these
21   specimens, There is history in them.  Statistician
22   is involved, so she's Dr. Lou is doing final
23   statistical analysis.  So statistical tests are
24   applied by her.  I do some statistics as well on
25   the go and...

Page 135

1        Q.  Who's the one evaluating the
2    clinical presentation severity of pain for this
3    registry, though?
4        A.  Mostly treating clinicians, so
5    they provide -- I mean, at this stage what we
6    manage to do is separate specimens according to
7    reason for excision.
8            So if pain is severe enough to cause
9    excision without any other factors, or if pain was
10   contributing factor as a reason for excision,
11   assuming there is a combination of pain and hernia
12   reoccurrence.  Or, when the pain either didn't
13   exist, or pain was low enough not to trigger
14   incision, but mesh was either excised or sampled
15   during revision of hernia reoccurrence.  So that's
16   where we ended up.  I mean, so severity of pain
17   became assessed as a reason for excision.
18       Q.  Okay.  And that's done by the
19   treating physician, correct?
20       A.  Yes.
21       Q.  And then the correlation between
22   the pathology, what you find under microscopic
23   examination, and this clinical presentation,
24   severity of pain, who does that job?
25       A.  Initially, I see it.  I mean,

Page 136

1    after I examine the specimens, then they are all
2    put in all table, and then I can see the
3    difference.  But final statistical analysis is done
4    by Dr. Lou, she does statistical tests.
5        Q.  So she's inputting the reasons for
6    the excision, the clinical presentation, severity
7    of the pain, she's inputting that with your
8    histological findings?
9            MR. ORENT:  Objection.
10           THE WITNESS:  No.  I'm receiving the
11   specimens, I'm receiving initial information with
12   the specimens.
13           BY MS. BYARD:
14       Q.  What initial information?
15       A.  Reason for excision.  I'm
16   collecting age, gender, heterology, type of hernia,
17   is it ventral, is it molecular, is it inguinal, I'm
18   collecting all this clinical information with the
19   specimen.  It comes with specimens.
20       Q.  You conclude this paragraph by
21   writing:
22           "This is the duty of our
23       profession.  It is an oath" -- I'm
24       sorry.  I didn't start soon enough.
25       Let me strike all that.

Page 137

1    You write:
2            "While knowledge comes, let us
3        translate it into wise application
4        for which it was meant.  This is the
5        duty of our profession, it is an
6        oath which we must honor proudly,
7        disconnected from any notions of
8        personal or commercial conflicts of
9        interest."
10   Do you agree with those statements?
11           THE WITNESS:  Yes, I do.
12           BY MS. BYARD:
13       Q.  Here in the conclusion, and we had
14   started to talk about this in the abstract, and so
15   I wanted to return to it because you had pointed me
16   that further on in the paper there would be
17   discussion of it.  So let's look at that.
18           You write in the conclusion:
19           "It is felt that the mechanism
20       of pain associated with the use of
21       mesh may similarly be due to micro
22       entrapment and micro compartment
23       types of syndromes through new nerve
24       and vessel ingrowth within the mesh
25       pores and other confining spaces

35 (Pages 134 to 137)

Vladimir Iakovlev, M.D.

Page 138

1    with the concomitant edema, anoxia,
2    thrombi scarring, distortion,
3    migration and traction."
4    THE WITNESS:  That is correct.
5    BY MS. BYARD:
6    Q.  Do you see that?
7    A.  That's correct.
8    Q.  And is that what you were
9    referring me back to when we were talking about the
10   abstract?
11       A.  Yes.
12       Q.  Again, you say that:
13       "It is felt that the mechanism
14   of pain associated with the use of
15   mesh may be due to micro entrapment
16   and micro compartment."  Right?
17       A.  It says "similarly."
18       Q.  So the analogy that you're making --
19       A.  So the mechanism is similarly.
20   Not that it's due or not due.  The "may" implies a
21   similarity.
22       Q.  Between what and what?
23       A.  Yes.
24       Q.  Between what and what?
25       A.  Between compartment syndromes we

Page 139

1    already know, and these new compartment syndromes
2    we just discovered.
3        Q.  So the mechanism of pain is
4    understood for compartment syndromes that are
5    already established?
6        A.  Yes.
7        Q.  And the mechanism of pain
8    associated with mesh may be similar for compartment
9    syndromes that you're beginning to study here?
10       A.  Yeah.  Mechanisms may not be
11   exactly the same, but may be similar.  Likely to be
12   similar.
13       Q.  Because at this point in the study
14   of hernia repair, those mechanisms of pain are not
15   established yet?
16       MR. ORENT:  Objection.
17       BY MS. BYARD:
18       Q.  Right?
19       A.  Details of the mechanisms.  So
20   when we observe the changes in the mesh, we clearly
21   saw that the scar tissue within the mesh is not
22   normal scar tissue.
23       So we knew that this tissue is
24   innervated, because we saw nerve ingrowth, and we
25   saw that it's not regular scar tissue.  So the

Page 140

1    findings are there.
2        The balance of them, the details and
3    everything else, again, is not studied, it needs to
4    be further studied.  But the findings, the
5    abnormality is visible, it's there.  It's
6    100 percent there.
7        Q.  So the -- you have observed and
8    established tissue abnormalities with hernia mesh,
9    right?
10       A.  Yes.
11       Q.  The step that hasn't been done yet
12   is understanding the mechanism by which those
13   tissue abnormalities lead to clinical complications
14   of pain?
15       A.  Yes.  Details of those mechanisms.
16       Q.  And with respect to transvaginal
17   mesh, you're one step behind the study in that you
18   haven't yet done the statistical analysis of
19   relative rates of nerve ingrowth and
20   compartmentalization?
21       MR. ORENT:  Objection.
22       THE WITNESS:  What do you mean, one
23   step behind or in front?
24       BY MS. BYARD:
25       Q.  Well, this study, this statistical

Page 141

1    analysis has been done.  That statistical analysis
2    is yet to be done for transvaginal mesh?
3        MR. ORENT:  Objection.
4        THE WITNESS:  Are you asking in respect
5    of my opinions, or in respect of research and plans
6    for research?
7        BY MS. BYARD:
8        Q.  I'm talking about the body of
9    scientific knowledge that's available.  This was a
10   contribution to the understanding of the tissue
11   response to --
12       A.  Yes, I understand that.
13       Q.  -- to hernia repair?
14       A.  Are you asking if this analysis
15   was done to derive to the conclusions of this
16   report, or are we talking just hypotheticals
17   scientific questions.
18       MR. ORENT:  Perhaps you can rephrase
19   the question.
20       BY MS. BYARD:
21       Q.  Okay.  Let me try and do that.
22       And I only am trying to say that with
23   respect to hernia repair, you understand you've
24   identified abnormalities in the tissue, in mesh?
25       A.  Yes.  And this exactly the same in

36 (Pages 138 to 141)

Vladimir Iakovlev, M.D.

Page 142

1    transvaginal meshes.
2            Q.   You've identified tissue abnormalities?
3            A.   Even more.  I found more in
4    transvaginal meshes than in what is the hernia
5    meshes.
6            Q.   Okay.
7            A.   So in this respect, this part is
8    step ahead from this.
9            Q.   Well, in terms of the degree of
10   abnormalities, you're saying?
11           MR. ORENT:  Objection.
12           THE WITNESS:  Yes.
13           BY MS. BYARD:
14           Q.   Okay.
15           A.   There are way more findings in
16   transvaginal meshes than in hernia meshes.  This
17   study was specifically focused on nerve ingrowth.
18   What we found there, abnormality in the scar tissue
19   was observation only, sort of, on the way we did
20   the study.
21           This was done later, and there are more
22   findings, more abnormalities in transvaginal
23   meshes.
24           Q.   You've gotten to the level,
25   though, of doing a statistical analysis to quantify

Page 143

1    the tissue abnormalities for hernia mesh?
2            A.   Yes.
3            Q.   And you haven't reached that stage
4    yet for transvaginal mesh?
5            MR. ORENT:  Objection.
6            THE WITNESS:  Well, it's present.
7    Whatever is present here is 100 percent.  I see
8    abnormality, it's stated there.
9            These rate and frequencies and
10   everything else, only makes sense for scientific
11   questions.
12           But for detection of abnormality in the
13   specific specimen or specific patient, is
14   100 percent.  I see it or I don't see it.  If I
15   don't see it, I don't describe it.
16           BY MS. BYARD:
17           Q.   Okay.
18           A.   We are talking about this specific
19   reports which are produced for each specific
20   patient, and this was done for actually one
21   specific scientific question.
22           Q.   And I guess I'm operating off the
23   assumption that you've applied the same level of
24   scientific rigor, that you did in this publication
25   that you did with Dr. Bendavid, that you did for

Page 144

1    Exhibit 1196?
2            A.   It's not scientific rigor or
3    scientific work.  This is diagnostic work; this is
4    scientific work.  This is research; this is
5    diagnostic.  When I see abnormal, I state.  Here is
6    a specific question.
7            I mean, you're just trying to mix
8    things which are not -- not the same.
9            Q.   But you've made conclusions in
10   your report on transvaginal mesh that are broader
11   than the conclusions that you've reached in this
12   study?
13           A.   Yes.
14           MR. ORENT:  Objection.
15           BY MS. BYARD:
16           Q.   Right?
17           MR. ORENT:  Point out a particular
18   question if you have one.
19           THE WITNESS:  This part -- okay.
20           BY MS. BYARD:
21           Q.   Go ahead.
22           A.   No.
23           MR. ORENT:  Wait for a proper question.
24           MS. BYARD:  Are you instructing him not
25   to answer that question?

Page 145

1            MR. ORENT:  No.  I think there's no
2    question pending that's intelligible.
3            All you said is, "there are some
4    opinions in here that are broader than those."  But
5    you haven't identified any opinions for him to
6    address specifically.
7            BY MS. BYARD:
8            Q.   Do you agree with what I've said, sir?
9            MR. ORENT:  Objection.
10           THE WITNESS:  Opinions or -- I'm a
11   little bit confused.  I mean --
12           BY MS. BYARD:
13           Q.   Okay.  That's okay, I can rephrase it.
14           So here in your study with Dr. Bendavid
15   on hernia mesh, you've described what the
16   mechanisms of pain may be for the relationship
17   between tissue abnormalities and clinical
18   complications, right?
19           MR. ORENT:  Objection.
20           THE WITNESS:  Details of this
21   mechanisms, the connection.  I mean, I see -- so,
22   we know that there is reason for excision, we know
23   that there are pathological findings.  What we see
24   in the microscope is not normal, it's abnormal.
25           We know that the mesh caused clinical

37 (Pages 142 to 145)

Vladimir Iakovlev, M.D.

Page 146

1   symptom, had to be excised.  How this all happened
2   in small details, up to very small molecules of how
3   they interact, is not known.
4          But we know the effect, and we know the
5   pathological findings behind it.  But the details
6   of this connection, these small sort of details are
7   not clear.
8          Some of it is, as mentioned, are
9   similar to more study there is, like toothache I
10  said, or heart attack.  But again, this is in
11  pieces.
12      BY MS. BYARD:
13      Q.  So, for instance, you could have a
14  nerve that was grown into scar tissue, that doesn't
15  cause so much pain that the scar tissue has to be
16  excised, right?
17      MR. ORENT:  Objection.
18      THE WITNESS:  This can happen.  I mean,
19  it may or may not.  People are different.
20      BY MS. BYARD:
21      Q.  And so you can look at a slide of
22  mesh, with scar tissue, and see a nerve grown into
23  it, and you can't predict whether that patient had
24  pain, can you?
25      A.  I can say that there is

Page 147

1   probability, there is mechanism for pain in that
2   specific, if patient have or didn't have pain, this
3   may depend on different circumstances.  It may not
4   hurt today, but it has probability it may hurt
5   tomorrow.
6          So this would be, again, complex.  And
7   it's not just for a nerve.  If there is a nerve
8   ingrown in the tissue, it means that the tissue is
9   alive.  It can sense pain.  So this is the
10  baseline.  Then, pain can occur at any time there.
11  You add extra stimuli for pain, damage to the
12  tissue, inflammation, edema -- the more you add,
13  the probability goes higher and higher.  But,
14  again, you may have just a nerve ingrowth and it
15  gets tugged, and you have mechanism of pain right
16  away.  So this is so complex, and a variable
17  between people, we cannot apply a specific --
18  now I'm --
19      Q.  It's not predictable?
20      MR. ORENT:  Objection.
21      THE WITNESS:  No, this is not true.
22  It's predictable.  If you have nerve ingrowth, you
23  have baseline for pain development.
24          So, once you have innervation of the
25  tissue, pain can develop.  If you don't have

Page 148

1   innervation of the tissue, the tissue would not
2   sense any pain.  So this is, this is predictable.
3          If we have inflammation, we know that
4   there will be lower threshold for pain.  This has
5   been studied extensively in other areas of
6   inflammation.  Inflammation is always associated
7   with lower threshold of pain.  What doesn't hurt in
8   normal tissue, may hurt in inflamed tissue.
9          So inflammation is high enough, it will
10  cause pain on its own.  Inflammation itself will be
11  enough to cause pain, but it may not be enough, and
12  then it will need the extra stimulus such as edema.
13  This is very complex interaction.
14      BY MS. BYARD:
15      Q.  And so -- but those specific
16  mechanisms of how this relationship between nerve
17  ingrowth or vascular ingrowth, scar tissue,
18  inflammation, and whether or not that will cause or
19  predict pain in a patient is not yet described?
20      MR. ORENT:  Objection.
21      THE WITNESS:  It is described in other
22  areas.  It's a general knowledge of what they
23  accumulated.  I mean, does inflamed knee hurt?  I
24  mean, what do you think?  It's not just described,
25  it is a general knowledge.  Something is inflamed,

Page 149

1   it may hurt.
2      BY MS. BYARD:
3      Q.  Do you know whether 100 percent of
4   patients with edema present in their mesh and the
5   tissues surrounding their mesh will feel pain?
6      A.  What's percentage of those who
7   have edema or don't have edema?  I don't know exact
8   percentage.  And I don't think it matters, because
9   it might be multiple mechanisms.
10          So their pathological findings which
11  are normal, and the degree of their contribution to
12  pain development is hard to predict because it's so
13  complex.
14      Q.  And not yet known?
15      MR. ORENT:  Objection.
16      THE WITNESS:  What do you mean, "not
17  yet known?"  We know that inflamed tissue hurts.
18      BY MS. BYARD:
19      Q.  But the rates at which it will
20  occur -- for instance, with edema, you can't tell
21  me the rates at which pain will occur or --
22      A.  The main question is, it can
23  happen.  If it happens in the patient, you know why
24  this is happening.  Assuming, if an area in the
25  body hurts, and you take a biopsy, and you see

38 (Pages 146 to 149)

Vladimir Iakovlev, M.D.

Page 150

1  inflammation in there, but you don't see anything
2  else, what would be your logical conclusion, why
3  did it hurt?  Because it was inflamed and you don't
4  see anything else.
5       The same with meshes.  Meshes hurt;
6  they come out.  There is no tumor in it, there is
7  no informal carcinoma, but there is nerve ingrowth,
8  there is mesh, there is scarring.
9       Therefore, the only reason for it to
10 hurt is mesh-related changes.  But the degree of
11 contribution of how much inflammation contributed,
12 how much edema contributed, is difficult to
13 predict.  It has been studied in other areas.  It
14 was not studied in specific details in meshes.
15      Q.  Thank you.
16      Let me check the time.
17      MS. BYARD:  Do you guys have steam for
18 another article before we break for lunch?
19      THE WITNESS:  I have to go to the
20 washroom.
21      MR. ORENT:  Why don't we take five.
22      THE VIDEOGRAPHER:  Off the record at
23 12:24 p.m.
24      -- RECESS AT 12:24 --
25      -- UPON RESUMING AT 12:40 --

Page 151

1       THE VIDEOGRAPHER:  We're back on the
2  record at 12:40 p.m.
3       BY MS. BYARD:
4       Q.  Doctor, would you agree with me
5  that it's important to keep bias out of scientific
6  research?
7       MR. ORENT:  Objection.
8       THE WITNESS:  Yes.  Yes, it is
9  important.
10      BY MS. BYARD:
11      Q.  And you would agree that bias in
12 the form of industry influence, is bad for science,
13 right?
14      MR. ORENT:  Objection.
15      THE WITNESS:  Yes.
16      BY MS. BYARD:
17      Q.  So if a study was supported or
18 funded by industry, the author would disclose that,
19 right?
20      A.  Yes, usually all conflicts are
21 disclosed.
22      Q.  Or should, in your view --
23      A.  Should, yes.
24      Q.  -- disclose that?
25      A.  Yes, yes.  Sometimes there's so

Page 152

1  many points of contact with other agencies, not
2  everything is disclosed, or authors decide for that
3  specific study there is no conflict of interest.
4  It's more up to the discretion of the author.
5       Q.  But all things being equal, the
6  better course would be if the bias might affect the
7  subject of study, to disclose that conflict of
8  interest, right?
9       A.  Yes --
10      MR. ORENT:  Objection.
11      THE WITNESS:  -- it's the best sort of
12 scientific practice.  Not practice, but --
13      BY MS. BYARD:
14      Q.  It's important for authors in the
15 scientific and medical community, to disclose
16 conflict of interest?
17      MR. ORENT:  Objection.
18      THE WITNESS:  It's important for
19 readers to know if there's potential conflict of
20 interest, yes.
21      BY MS. BYARD:
22      Q.  So, at this point, you have been
23 deposed, I think we had the number at around seven
24 or eight times in litigation where you've testified
25 as an expert against mesh manufacturers, right?

Page 153

1       A.  That's correct.
2       Q.  And you've never once testified
3  for a defendant manufacturer in a medical device
4  case, correct?
5       A.  You mean like crossing sides?  No.
6       Q.  You never testified on behalf of a
7  mesh manufacturer in that company's defence?
8       MR. ORENT:  Objection.
9       THE WITNESS:  No.
10      BY MS. BYARD:
11      Q.  And since 2012, early 2013, all of
12 the work that you've done on mesh as an expert in
13 litigation has been for plaintiffs, right?
14      MR. ORENT:  Objection.
15      THE WITNESS:  That's correct.  It just
16 happened that all findings I had, they were
17 supporting plaintiffs' claims.
18      BY MS. BYARD:
19      Q.  Those findings were made while you
20 were being paid for your work for the plaintiffs'
21 though, correct?
22      MR. ORENT:  Objection.
23      THE WITNESS:  I'm just paid for my
24 time.
25

39 (Pages 150 to 153)

Vladimir Iakovlev, M.D.

Page 154

1      BY MS. BYARD:
2          Q.   You're paid by plaintiffs for your
3   time?
4          MR. ORENT:  Objection.
5          THE WITNESS:  Sometimes, like today, I
6   don't know, maybe you will pay for that, I mean --
7   I actually sometimes don't know where the money
8   comes from.  There's so many people involved.
9      BY MS. BYARD:
10         Q.   And while there's nothing -- I
11  guess returning to my question about disclosures.
12  There's nothing that prevents an author from
13  providing disclosures of conflicts of interest if
14  the author feels that's important, right?
15         A.   For full articles, it's usually a
16  requirement, but sometimes for abstracts, I mean,
17  then you don't know where to squeeze it, if there
18  is no line when you submit it.  So for abstracts
19  there may be no space to put this disclosure.
20         So if I don't have that space, while
21  submitting an abstract, I insert a slide disclosing
22  that I've been consulting for medical-legal cases.
23  I don't remember single time when I never -- when I
24  have not disclosed it.
25         Either way, I will find a way how to

Page 155

1   disclose it.  Either during presentation or during
2   abstract submission, or any other way.
3          Q.   Were all the publications that you
4   have authored on transvaginal mesh published in
5   2014?
6          A.   Yes.
7          Q.   And the articles that you've
8   authored on transvaginal mesh have direct bearing
9   on the reasons for your opinions in the lawsuit,
10  right?
11         MR. ORENT:  Objection to form.
12         THE WITNESS:  It's kind of -- I
13  wouldn't word it like this.  I considered all the
14  knowledge extracted during, doing this research
15  project in formulating my opinions in these
16  reports, yes.
17      BY MS. BYARD:
18         Q.   Well, and in fact, in all of the
19  publications that you authored, that came out this
20  year, you included information that you identified
21  during your work as a paid expert for the
22  Plaintiffs, correct?
23         A.   Yes.  As I said, I mean, I
24  disclose it every time I can.
25         Q.   Let's mark 1198.

Page 156

1          A.   Payment is not the only bias, I
2   will mean only other bias.  I mean it's just what
3   you consider.  But people may be biased by
4   something else.
5          EXHIBIT NO. 1198:  International
6          Scholarly and Scientific Research &
7          Innovation, 2014, Publication entitled,
8          "Pathology of Explanted Transvaginal
9          Meshes," by Dr. V. Iakovlev,
10         Dr. E. T. Carey and Dr. J. Steege.
11      BY MS. BYARD:
12         Q.   Doctor, do you recognize
13  Exhibit 1198?
14         A.   Yes, it's a paper I co-authored.
15         Q.   Dr. Erin Teeter Carey is an expert
16  whose time is paid for by the Plaintiffs in the
17  mesh litigation; isn't she?
18         A.   Yes.
19         Q.   And Dr. John Steege is a paid
20  Plaintiffs' expert too, right?
21         A.   Yes.
22         Q.   And you were in fact introduced to
23  Dr. Erin Teeter Carey and Dr. John Steege by
24  Margaret Thomson, a lawyer for the Plaintiffs,
25  right?

Page 157

1          A.   Yeah.  I think first contact was
2   during a conference call, and I think Dr. Thomson
3   was either participant or organizer of that call.
4          Q.   She was acting as a lawyer during
5   that conference call, correct?
6          MR. ORENT:  Objection.  At this point,
7   I'm going to instruct the witness not to answer to
8   the extent that there are -- that this was as part
9   of a case consultation or work.
10         You can answer to the extent that you
11  had any conversations with the four of those people
12  related to non-litigation work.
13      BY MS. BYARD:
14         Q.   Dr. Margaret Thomson was on the
15  call in her capacity as a lawyer, not in her
16  capacity as a medical doctor, right?
17         MR. ORENT:  Objection.
18         THE WITNESS:  I don't know.  She's a
19  doctor and a lawyer, I mean, what capacity she's
20  serving in...
21      BY MS. BYARD:
22         Q.   You were paid for your time on
23  these conference calls by Plaintiffs' lawyers or
24  their firms, right?
25         MR. ORENT:  Objection.

40 (Pages 154 to 157)

Vladimir Iakovlev, M.D.

Page 158

1      THE WITNESS:  I don't think I
2  specifically charged for all these conference calls
3  or contacts.  It depends, I mean, it's...
4      BY MS. BYARD:
5      Q.  You weren't there in conjunction
6  with your work as an anatomical pathologist at
7  St. Michael's, though, right?
8      MR. ORENT:  I'm going to now instruct
9  the witness -- this is all covered by Rule 26
10  privileges.  So if you want to ask questions
11  related to his work on these papers, I'll let him
12  answer anything related to the papers.  But if
13  you're asking about his specific relationship with
14  Plaintiffs, Plaintiffs' experts and trial strategy
15  meetings, I'm going to specifically instruct him
16  not to answer.
17      BY MS. BYARD:
18      Q.  Are you going to follow Counsel's
19  instruction?
20      A.  As I said initially, I had first
21  contact --
22      MR. ORENT:  I only want you to answer
23  as to the extent that you can answer without
24  revealing any trial strategy meetings you may have
25  attended, or anything related to your consultation

Page 159

1  related to Plaintiffs in this litigation.
2      THE WITNESS:  Okay.
3      BY MS. BYARD:
4      Q.  Let's take a look at the abstract
5  of this published article conceived in a conference
6  call with Plaintiffs' counsel.
7      MR. ORENT:  And I'm going move to
8  strike that comment as without foundation.
9      BY MS. BYARD:
10      Q.  It says:
11          "We aimed to perform a thorough
12      pathological examination of
13      explanted POP meshes and describe
14      findings that may explain mechanisms
15      of complications resulting in
16      product excision."
17      Do you see that?
18      THE WITNESS:  Yes, I do.
19      BY MS. BYARD:
20      Q.  And again, we see that word "may"
21  there, don't we?
22      A.  Yes.  This is a commonly accepted
23  term, which we use when the degree of significance
24  is not 95 percent.
25      Q.  So the degree of confidence or

Page 160

1  significance?  I didn't hear you.
2      A.  The degree of statistical
3  significance is not either assessed, or is not
4  95 percent, or there are other factors which
5  introduce the degree of unknown factors.
6      Q.  Okay.  So here, for whether or not
7  the pathological examination explains mechanisms of
8  complications resulting in product excision, which
9  one of those factual scenarios that you described
10  applied?  Is that, is it that there was not an
11  assessment of statistical significance?  Was it
12  that there was other confounding factors, or that
13  the degree of significance was not statistically --
14  the degree of difference was not statistically
15  significant?
16      MR. ORENT:  Objection.
17      THE WITNESS:  No, neither.  Because
18  this states a hypothesis, so before we started, we
19  examined and we had a hypothesis made.  So it was --
20  this statement describes state of the research
21  project before the research project.
22      BY MS. BYARD:
23      Q.  Okay.  So let's look at the
24  discussion on page 508.  The last paragraph of the
25  discussion ends after discussion of nerve

Page 161

1  entrapment and compression, stretching, edema,
2  ischemia.
3      It says:  "The roles of these
4  mechanisms need to be further studied," doesn't it?
5      A.  Yes.  Exactly which part of -- can
6  you point?
7      Q.  Yes, yes.  Excuse me.  The last
8  sentence of the first full paragraph under
9  "Discussion".
10      A.  Yes, I can see it.
11      Q.  And I read that correctly, right?
12      A.  "The roles of these mechanisms
13  need to be further studied."  Yes, that is correct.
14      Q.  The conclusory sentences of the
15  next paragraph read:
16          "Polypropylene degradation may
17      play a role in the continuous
18      inflammatory response mesh hardening
19      and light deformations."
20      Did I read that correctly?
21      THE WITNESS:  That's correct.
22      BY MS. BYARD:
23      Q.  And it says:
24          "Also, chemical products of
25      degradation need to be studied for

41 (Pages 158 to 161)

Vladimir Iakovlev, M.D.

Page 162

```
1              their composition and effect on the
2         tissue."
3              Did I read that correctly?
4              A.   That is correct.
5              Q.   And then in the last sentence of
6    the last paragraph of the discussion, it says:
7              "We believe that these
8         specimens contain information of the
9         mechanisms of complications and
10        further study may help guide future
11        development of treatment modalities."
12             Did I read that correctly?
13             A.   That's correct.
14             Q.   And it says:
15             "These are previously
16        unreported findings."
17             In the first sentence of that
18   paragraph, right?
19             A.   Some of the findings were
20   previously unreported, yes, that's correct.
21             Q.   And again, was this language "may"
22   used here because the statistical -- a
23   statistically significant difference was not
24   assessed between controlled samples in the study?
25             MR. ORENT:  Objection.
```

Page 163

```
1              THE WITNESS:  You have to point exact
2    sentence.  Which, which "may"?
3              BY MS. BYARD:
4              Q.   "Polypropylene degradation may
5         play a role in the continuous
6         inflammatory response, mesh
7         hardening and late deformations."
8              A.   Yes, so let me see.  I have to
9    read the whole paragraph.
10             Q.   Okay.
11             A.   (Witness reviews document).
12        Yeah, this is a combination.  See,
13   inflammatory response, mesh hardening and late
14   deformations.
15             This is observations which we have.
16   But the degree of connection between degradation
17   and each of this is different.
18             For example, if we go to continuous
19   inflammatory response, we would have to study exact
20   chemicals which are produced during degradation.
21   And how these chemicals may modify inflammatory
22   response and other thing, this is unknown.
23   Therefore, it introduces a degree of uncertainty.
24             Mesh hardening -- there will be
25   different mechanisms for mesh hardening, scar
```

Page 164

```
1    ingrowth, then degradation itself, how much of one
2    of those contribute and so on.  It's, again, degree
3    of uncertainty.
4              Also, degradation is continuous
5    process, so it will build up over the years, in the
6    beginning so -- there's a degree of uncertainty
7    between all of those.  I mean, what we know, it
8    degrades, and with what we know, it hardens.  So
9    these are the two points which we know for sure.
10             But the degree of connection and the
11   complex interaction between these factors is not
12   studied to details.  Therefore, in scientific
13   literature the word "may" is used.
14             Q.   What this discussion doesn't say
15   is that the tissue findings that you have observed
16   in transvaginal mesh causes pain through the
17   mechanisms that you've described?
18             A.   Where does it say?
19             Q.   Well, I'm saying, nowhere does
20   this discussion conclude that, does it?
21             A.   It wasn't the purpose of the
22   study.  Just read the title:  "Pathology of
23   Explanted Transvaginal Meshes."
24             It was a descriptive study describing
25   the findings.
```

Page 165

```
1              Q.   Okay.  And, again, this article
2    doesn't even go so far as to say that mesh could
3    cause pain through the -- through these tissue
4    response mechanisms that you've described?
5              MR. ORENT:  Objection.
6              THE WITNESS:  Again, this was not the
7    purpose of this study.  Purpose of this study, if
8    you read the abstract is, meshes cause
9    complications.  This triggers excision, and they
10   have not been studied as to find reasons and
11   mechanisms of the complications.
12             So the purpose of this was to study and
13   see what is pathological in those specimens,
14   abnormal.  And then these abnormalities can be
15   described and documented.
16             And then the next step would be to
17   split specimens according to specific complications
18   and see statistically what each of those specific
19   pathology co findings contribute, and what's the
20   interaction between them.  So it's study details of
21   all this.
22             BY MS. BYARD:
23             Q.   And that second step that you've
24   described wasn't done here?
25             A.   No.
```

42 (Pages 162 to 165)

Vladimir Iakovlev, M.D.

Page 166

1     Q.  And it hasn't been done by you?
2     A.  I'm in the process of doing,
3  studying the small details of these things.
4         Because for each specific finding,
5  there is a degree of knowledge we have in pathology
6  and overall in general.  I mean, even for common
7  person, if vessel is obstructed, you know, there
8  will be no bleed going through it.  It doesn't need
9  further studying.
10        But how does it get obstructed?  Is it
11  because there is a slowing down of the blood in
12  there?  Or because it's chemical issues affecting --
13  a chemical product of degradation, which is
14  affecting blood or blood vessel, that makes it
15  clot.
16        All these details will have to be
17  studied.  I'm surprised it wasn't for 50 years,
18  because the findings are there.
19        Q.  Right, and that's a fair point.  I
20  mean, for 50 years, pathologists have looked at
21  polypropylene mesh, and no one has seen what you
22  have seen and reported here, which is
23  degradation --
24        MR. ORENT:  Objection.
25        BY MS. BYARD:

Page 167

1     Q.  -- right?
2     A.  Have they been looking at all
3  meshes?  Have they been looking to answer the
4  questions of complications?  I mean...
5     Q.  My question is simpler:  No one
6  else has reported having seen what you see.
7         MR. ORENT:  Objection.  That misstates
8  the record.
9         THE WITNESS:  That's not true.  I mean,
10  there are papers which are stating some of the
11  findings.
12        Like polypropylene degradation, it was
13  first described in the '70s.  There's a degree,
14  there are different methods.  Sometimes it's not
15  the primary purpose of the study, but in
16  combination, these findings were mentioned in many
17  papers.
18        BY MS. BYARD:
19     Q.  By pathologists?
20     A.  Pathologists -- you mean scientist
21  pathologists or diagnostic pathologists?
22     Q.  Either.
23     A.  I don't know.  We would have to
24  look at each paper and see what's the credentials
25  included, and what exactly is described there.

Page 168

1     Q.  Okay.  We can do that in a second.
2         Looking back here at the "Materials and
3  Methods Section," if you would, Doctor.
4     A.  Yes.
5     Q.  You write:
6         "In total, 24 specimens of
7         St. Michael's Hospital patients and
8         external consultation cases from
9         litigation processes have been
10         analyzed."
11         Did I read that correctly?
12     A.  That's correct.
13     Q.  What does, "external consultation
14  cases from litigation processes" mean?
15     A.  Litigation cases.
16     Q.  These lawsuits we're here to talk
17  about today, as well as the ones involving other
18  manufacturers?
19     A.  Yes.
20     Q.  Why is the number here 24, when
21  we -- in your report we have 120?
22     A.  For that specific number -- first
23  of all, let's see if it was -- see, it was limited
24  to POP first.  It was limited to those -- I could
25  get exact information at that point, it was entered

Page 169

1  in the spreadsheet.  So at that point, I had
2  verified reliable data, which was on the
3  spreadsheet for those 24 only POPs.
4         Again, this was started much earlier
5  before 120.  The paper became published maybe half
6  a year after the study was pretty much done.
7     Q.  So at the time that you submitted
8  this report for publication, you only had the
9  completed verified data set or 24 POP specimens; is
10  that right?
11         MR. ORENT:  Objection.
12         THE WITNESS:  With all information, I
13  would need to include it in the study, yes.  It my
14  be for some samples I didn't have exact information
15  if it was POP or sling or something else.
16         BY MS. BYARD:
17     Q.  If we were going to consider the
18  120 specimens that are in your report for inclusion
19  in this study, how many would meet the criteria?
20         And let's say for purposes of this
21  evaluation, that the study is not limited to POP,
22  but includes SUI product?
23         MR. ORENT:  I just want to object to
24  your use of the term, "120 cases included in your
25  report."

43 (Pages 166 to 169)

Vladimir Iakovlev, M.D.

Page 170

1        I want to make clear, what Dr. Iakovlev
2   is talking about on page 2 of his report is his
3   experience, and then he goes on to talk about his
4   education and training.
5        His opinions are based on his
6   experience, education and training; but are not
7   based specifically on any one sample or samples.
8   And I think you're confusing him.  It's not a
9   report on 120 cases that he's offered here.
10       MS. BYARD:  Counsel, again, the
11  speaking objections are not --
12       MR. ORENT:  That's not an objection.
13  That's a clarification for the record.
14       MS. BYARD:  I'm asking him about his
15  data set, which are specimens, which are what my
16  questions are directed to.
17       THE WITNESS:  I can answer that
18  question.
19       All findings described in this paper
20  could be seen in those 120 or larger number of
21  specimen.  I see them over and over again.
22       BY MS. BYARD:
23       Q.  But you don't have -- you don't
24  have this completed data set that you had on these
25  24 specimens on all 120?

Page 171

1        A.  We'll deal in data set.  It's not
2   a data set, it's a descriptive study which is
3   describe what findings we could find.  There is no
4   statistics in it, if you can see --
5        I mean, there is statistics of
6   frequencies in this specific 24.
7        Q.  Right.
8        A.  But it's not a comparison between
9   what happens in those who experience these type of
10  complication and the other one.
11       I mean, as I said, if we take generally
12  the purpose of this study, pathology of explanted
13  transvaginal meshes so -- and it was specifically
14  focused on POP devices.
15       If I take all of the POP devices I
16  examined, there will be no -- all of these findings
17  can be seen there.  And all of them can be
18  included, and if you're trying to ask me if I
19  selected them specifically, no.  I can expect these
20  findings in any POP devices.
21       Q.  Actually, what I'm trying to
22  understand, Doctor, is whether the data that you
23  had to complete this study.  So, for instance, here
24  you have descriptions of the fragment size.  You
25  have descriptions of the heavyweight versus

Page 172

1   lightweight mesh, how many samples of each were
2   included in these 24.  You have examples of what
3   area focally of the mesh was filled with loose
4   connective tissue.  You have statistics on the
5   number of specimens that showed neural ganglia
6   involvement.
7        I'm just trying to understand if all of
8   those same data points have been obtained and exist
9   in the spreadsheet, or however you keep it, for the
10  120 specimens that are referenced in your report?
11       MR. ORENT:  Objection.
12       THE WITNESS:  This data is obtained for
13  all specimens which are completed, which excision
14  is completed with surgical pathology report.
15       As you saw, as I mentioned, the
16  surgical pathology report includes all of this
17  because I examine all specimens according to
18  standardized protocol.
19       So all of the findings which are
20  described are even more since then are recorded,
21  assessed, either they're there or they're not
22  there.
23       How many of those have been completed,
24  likely close to 100, but I haven't updated it
25  recently because of an avalanche of work recently.

Page 173

1        BY MS. BYARD:
2        Q.  Here under "Results," you mention
3   that:
4            "Available clinical records
5        indicated mucosal exposure as a
6        reason for excision in 67 percent of
7        cases --" do you see that?
8        A.  Yes.
9        Q.  And:
10           "Pain in 56 percent of cases,
11       and both, in 33 percent of cases."
12       A.  Correct.
13       Q.  You also say that the product --
14  these 24 specimens, include products from three
15  different manufacturers; do you see that?
16       A.  Yes, I do.
17       Q.  Which were the three
18  manufacturers?
19       A.  The earliest I received was AMS,
20  and then you, and then probably Ethicon.
21       Q.  Okay.  So the study includes
22  Boston Scientific devices?
23       A.  By the time of this study, likely.
24       Q.  Is there something you can check
25  to confirm that for me?

44 (Pages 170 to 173)

Vladimir Iakovlev, M.D.

Page 174

1     A.  Yes, I should be able to do that.
2          MS. BYARD:  Okay.  We need to go off
3  the record to change the tape.
4          THE VIDEOGRAPHER:  This marks the end
5  of media number two in the deposition of
6  Dr. Vladimir Iakovlev.
7          We are going off the record at
8  1:08 p.m.
9          -- OFF THE RECORD DISCUSSION --
10         THE VIDEOGRAPHER:  Here begins media
11  number three in the deposition of Dr. Vladimir
12  Iakovlev.
13         We're back on the record at 1:09 p.m.
14  Go ahead, Counsel.
15         MS. BYARD:  Thank you.
16  BY MS. BYARD:
17     Q.  What did you mean by -- excuse me
18  if I said this -- actually, let me withdraw that.
19         Here, if we turn to "Disclosures", Doctor.
20         This reads:
21         "Authors provided medical-legal
22         consultations on the subject."
23     A.  Yes.
24     Q.  At the time you published this
25  article, you were working as a paid expert for

Page 175

1  Plaintiffs, right?
2          MR. ORENT:  Objection.
3          THE WITNESS:  No, I was working as a
4  pathologist at St. Michael's Hospital.  But I
5  provided consultations, and I was paid for time I
6  spent for consultations.
7  BY MS. BYARD:
8      Q.  At the time that you published
9  this report, you were still acting as a retained
10  expert for Plaintiffs, right?
11         MR. ORENT:  Objection.
12         THE WITNESS:  What do you mean
13  "acting"?  I mean, my main job is pathologist at
14  St. Michael's Hospital and assistant professor at
15  the University of Toronto.  I do provide
16  medical-legal consultations when asked.
17  BY MS. BYARD:
18     Q.  Your relationship, your consulting
19  relationship with Plaintiffs' counsel, hadn't ended
20  by the time this report was published, right?
21         MR. ORENT:  Objection.
22         THE WITNESS:  That's correct.
23  BY MS. BYARD:
24     Q.  It was ongoing?
25         MR. ORENT:  Objection.

Page 176

1          THE WITNESS:  That's correct.
2  BY MS. BYARD:
3      Q.  You were a paid expert for the
4  Plaintiffs in mesh litigation before you published
5  this report, right?
6      A.  Yes.
7      Q.  And you continue to be one today?
8      A.  Yes, I am.
9      Q.  That relationship hasn't stopped
10  since it began?
11         MR. ORENT:  Objection.
12         THE WITNESS:  No, but you made it sound
13  as if it's my full-time job.
14  BY MS. BYARD:
15     Q.  I didn't mean to imply that.  What
16  percentage of it is your income?
17     A.  As I said, I mean, I haven't
18  completed billing, and I haven't -- last year it
19  was less than 10 percent.
20     Q.  And this year do you have an
21  estimate of what percentage litigation consulting
22  work for Plaintiffs will make of your overall
23  income?
24     A.  Probably more than last year,
25  likely more than 10 percent.  But how much more, I

Page 177

1  don't know.  Less than 50 percent, anywhere between
2  10 to 50 percent.
3      Q.  Here, though, in your disclosure
4  it doesn't say which side your consulting work was
5  on, does it?
6          MR. ORENT:  Objection.
7          THE WITNESS:  No.  But should I bias
8  readers, or just tell them that I may be biased?
9  Because if I start disclosing then, further
10  details, I introduce extra bias.
11         BY MS. BYARD:
12     Q.  Well, it could cause some authors
13  to discredit your -- some readers to discredit your
14  work, because they know that your work was for one
15  side versus the other; is that what you're saying?
16         MR. ORENT:  Objection.
17         THE WITNESS:  It's up to readers to
18  decide if there is a bias in the paper.  I just
19  provide them this information that I may have a
20  bias.  Which way and how -- I mean, I can be
21  criticizing specific type of mesh and working for
22  another manufacturer, who is trying to discredit not
23  polypropylene mesh.  I mean, there might be
24  multiple biases.
25         But it clearly states that I can be

45 (Pages 174 to 177)

Vladimir Iakovlev, M.D.

Page 178

1    biased in this paper, and I disclose it.
2            BY MS. BYARD:
3        Q.  It sounds like this is something
4    you've thought about this before?
5        A.  What do you mean?
6        Q.  Did you make a conscious decision
7    about whether or not to include that it was for one
8    side versus the other that you were doing this
9    consulting work?
10           MR. ORENT:  Objection.
11           THE WITNESS:  I always approach
12   everything trying to be as neutral as possible, and
13   give neutral information.  I mean, it's always in
14   my head.
15           BY MS. BYARD:
16       Q.  So did you have a discussion with
17   Dr. Carey and Dr. Steege about whether you should
18   put which side your consulting work was on?
19       A.  No, I don't remember if we
20   discussed the specifics.  I mean, usually, it's
21   disclosed conflict of interest, and people describe
22   them as the way they think is most appropriate.
23   Sometimes journal has specific requirements, how
24   you describe it.
25       Q.  So, for instance, if a study -- a

Page 179

1    clinical study, let's say, was funded by Boston
2    Scientific, it would indicate that it was funded by
3    Boston Scientific, if the author was following,
4    what you've described as the best practices, right?
5            MR. ORENT:  Objection.
6            THE WITNESS:  If a study is funded by a
7    specific agency, there might be a specific
8    question.
9            When you submit it, it might be just a
10   drop-down menu.  Was it funded by someone; by whom?
11   Then you have to disclose it.
12           If it's a free text, what you disclose,
13   you can say that funding came from this, this and
14   that agency.  And then readers can decide if it can
15   have a bearing on the conclusions.
16           BY MS. BYARD:
17       Q.  How common is it for you to see a
18   disclosure that says, "this research was funded"
19   without any indication as who the funding was from?
20       A.  What do you mean "funded"?
21   Usually when it's funded it says a grant or
22   something else agency.
23       Q.  The disclosure tells you who
24   funded?
25       A.  Yes.  But this study wasn't funded.

Page 180

1        Q.  Peers, just picking up this
2    article, this article alone, wouldn't know that you
3    have testified for plaintiffs against mesh
4    manufacturers in seven depositions and at two
5    trials, would they?
6            MR. ORENT:  Now you're misrepresenting
7    the timeline and facts of this case and being
8    argumentative.
9            THE WITNESS:  I just don't understand
10   where you would see that somebody would list all
11   the depositions and everything else in disclosure.
12           Disclosure, as I said, if it's funded,
13   usually the funding agencies provide it.
14           If there are other conflicts of
15   interest, they just provide it through best sort of
16   neutral, or shortest way, or depending on the
17   paper.
18           This paper wasn't funded by anyone.  I
19   received the specimens from different sources, and
20   we analyzed it, and there was no additional work to
21   what usually pathology laboratory does.
22           BY MS. BYARD:
23       Q.  So the words "for plaintiffs" does
24   not appear in this disclosure, right?
25           MR. ORENT:  Objection.

Page 181

1            THE WITNESS:  No.  And, essentially, it
2    was part of the purpose not to bias it in this way.
3            As I said, there might be multiple
4    biases.  Plaintiff, not plaintiff, the manufacturer
5    can be presenting different type of biases.
6            Plaintiffs have claims that it caused
7    damage.  But at the same time, there might be
8    another manufacturer which can introduce bias.  As
9    I said, there's two types of devices on the market
10   and so forth.  There might be multiple biases.
11           BY MS. BYARD:
12       Q.  As a reader, someone could not
13   tell which type of multiple biases that are
14   possible could have influenced your writing on the
15   subject?
16           MR. ORENT:  Objection.
17           THE WITNESS:  That's not the point.
18   The point is that to disclose that there might be
19   bias.  And -- if you are funded by an agency,
20   assuming.  So, you assume that that agency has --
21   either doesn't or has some control of what is being
22   published and what is not being published.
23           But it's not included in the statement;
24   it just states what's the agencies.  It's up to
25   readers to think if it could have an affect on the

46 (Pages 178 to 181)

Vladimir Iakovlev, M.D.

Page 182

1 researcher or couldn't.
2       So this is how it is done. It is
3 disclosed to the most neutral way, and then it's up
4 to readers to see if the paper, paper itself,
5 contains any information that it could have been
6 biased.
7       BY MS. BYARD:
8       Q. And part of how you evaluate that
9 is by knowing who funded the study?
10      MR. ORENT: Objection.
11      THE WITNESS: No, no. Not exactly.
12      BY MS. BYARD:
13      Q. Part of the way that you do that
14 is knowing who prior consulting work was for?
15      MR. ORENT: Objection.
16      THE WITNESS: I would say not who
17 funded the study, but if the funding agency could
18 have an effect or control on the researchers,
19 that's the most important question.
20      I mean, most of the clinical studies or
21 other are funded, because it's such an expensive --
22 but then it's up to readers to see if funding
23 agency could control, could have an effect. It may
24 be not direct.
25      I mean, like you focusing on

Page 183

1 manufacturers. But there are some non-for-profit
2 organizations which are funding with grants and
3 everything else, and there is a competition to get
4 these grants and so forth. So you might be biased
5 to produce better results in order to renew a grant
6 and so forth.
7       So this is a different bias. It might
8 be even stronger than just financial bias. It's
9 the same financial bias, because you are acquiring
10 grants from there. Again, it's up to the readers
11 to decide if that specific funding agency could
12 have an effect.
13      Medical-legal consultation means that
14 somebody provided opinion and was paid. So this
15 can create a bias, and it's up to readers, again,
16 go and see if there is any indication that there
17 was a bias. And I provided bias -- that, that
18 possibility.
19      BY MS. BYARD:
20      Q. Let's see what we can agree on,
21 because you've said a lot on this.
22      All I want to know is whether the word
23 "for plaintiffs" appears in this sentence?
24      MR. ORENT: Objection. That's been
25 asked and answered.

Page 184

1       THE WITNESS: Have you ever seen --
2       BY MS. BYARD:
3       Q. Does the word appear there,
4 Doctor?
5       A. No, it's not --
6       MR. ORENT: Counsel, you're not
7 entitled to badger the witness. He's answered your
8 question four times. You're trying to clearly get
9 your bullet point, you can read the article just as
10 well as any of us.
11      The Rules of Civil Procedure do not
12 permit badgering of the witness, so move on.
13      MS. BYARD: It's my deposition and I'm
14 entitled to get answers to my questions.
15      BY MS. BYARD:
16      Q. My question is simply this, Doctor:
17      Under the disclosure, in your study
18 with Dr. Carey and Dr. Steege, it says, "authors
19 provided medical-legal consultations on this
20 subject." It does not say "for plaintiffs," does
21 it?
22      A. No, it does not --
23      MR. ORENT: Objection.
24      THE WITNESS: -- state. I could have
25 been providing for both Plaintiffs and

Page 185

1 manufacturers.
2       BY MS. BYARD:
3       Q. As a reader, I would have no way
4 of knowing which side your testimony had been paid
5 for by reading your article?
6       MR. ORENT: Objection.
7       THE WITNESS: You shouldn't have to
8 know. You should be able to go through the paper
9 and try to find clues if there was a bias. Because
10 that's the whole point of critical appraisal in the
11 literature.
12      If somebody tells you from the
13 beginning, that this study is biased because it was
14 paid and so forth, would you read this article?
15      BY MS. BYARD:
16      Q. Is that part of the reason why you
17 didn't disclose which side you were on?
18      A. No, I'm just saying that I never
19 seen a single paper where the disclosure was
20 formulated the way you're trying to introduce.
21      I have never seen when it states that
22 somebody was consulted on side of plaintiff. Maybe
23 they exist, but I've never seen it.
24      Q. Have you seen disclosures where it
25 says, "doctor so and so provided consulting for

47 (Pages 182 to 185)

Golkow Technologies, Inc. - 1.877.370.DEPS

Vladimir Iakovlev, M.D.

Page 186

1  such and such company"?
2          MR. ORENT:  Objection.
3          THE WITNESS:  Usually it's financial
4  disclosure.  "This funding was sponsored or funded
5  in part by this manufacturer" or something like
6  this.
7          I don't remember specifically wording
8  like you've just said.  Usually they describe
9  funding agency or manufacturer in terms of funding
10  source.
11          EXHIBIT NO. 1199:  Abstract entitled,
12          "Pathological Findings of Transvaginal
13          Polypropylene Slings Explanted for Late
14          Complications:  Mesh is Not Inert," by
15          Dr. V. Iakovlev, Dr. G. Mekel and Dr.
16          J. Blaivas.
17          BY MS. BYARD:
18          Q.  I'm handing you Exhibit 1199.
19          And this is another publication of
20  yours from this year, right, Doctor?
21          A.  That's correct.
22          Q.  And this is an article that you
23  published with doctor -- I'm sorry -- an abstract
24  that you published with Dr. Mekel and Dr. Blaivas,
25  right?

Page 187

1          A.  That's correct.
2          Q.  And Dr. Blaivas is a paid
3  Plaintiffs' expert, too, right?
4          A.  I know that he gave his opinion to
5  some cases.
6          Q.  For the Plaintiffs, correct?
7          A.  I don't know if only for the
8  Plaintiffs.  For those I know for Plaintiffs, it
9  could have been giving opinion for manufacturers of
10  this.
11          Q.  So of the cases that you're aware
12  of, he testified for the Plaintiffs?
13          A.  Yes.
14          Q.  You write:
15          "Over the last decade
16          polypropylene mesh slings have
17          become the most commonly performed
18          operation for stress incontinence."
19          Correct?
20          A.  That's correct.  Did I write --
21  where did I say -- (Witness reviews documents.)
22          In part.  It could be part of my
23  wording and part of other --
24          BY MS. BYARD:
25          Q.  That's the language that appears

Page 188

1  here.
2          A.  Coauthors.  Yes, you read it
3  correct.
4          Q.  Here there is a discussion of,
5  again, looking at specimens.  This time of
6  transvaginal slings; do you see that?
7          A.  Yes, this was limited to slings.
8          Q.  How many specimens were included
9  in this write-up?  I thought I saw 63 in Table 1.
10          A.  Yes.  So a total number was 63,
11  18 were retropubic and 45 were transobturator.
12          Q.  Here, for the 63 studies, you used
13  scar tissue from non-mesh excisions as a reference
14  control?
15          A.  Just general understanding, how it
16  looks and what are the pathological findings, yes.
17          Q.  There wasn't any sort of objective
18  measuring of the number of nerves, or the number of
19  blood vessels like we saw in your hernia mesh study
20  with Dr. Bendavid, right?
21          A.  No.  In this case, scar tissue was
22  used more for a reference for inflammation, for
23  foreign body reaction and other mesh-related
24  changes.
25          Q.  I wanted to understand the

Page 189

1  sentence two, three lines in, under "Interpretation
2  of Results" where you write:
3          "In contrast, mature scar
4          tissue after non-mesh surgeries does
5          not show inflammation."
6          Do you see that?
7          A.  So can you point where you --
8          Q.  Sure.  Underneath "Interpretation
9  of Results," the third sentence in.
10          MR. ORENT:  Paragraph 2.
11          THE WITNESS:  "In contrast, mature scar
12  after non-mesh surgeries does not show
13  inflammation."  Yes, that's correct.
14          BY MS. BYARD:
15          Q.  What does "mature scar tissue"
16  mean?
17          A.  Mature scar tissue.  Scar tissue
18  is mature.
19          Q.  Is there a point in time when scar
20  tissue shows evidence of inflammation?
21          A.  When it's really early in its
22  development.  I mean, the first initial reaction to
23  injury, the initiating event of scarring is
24  associated first with the formation.  First
25  neutrophils come, and then macrophages and then --

48 (Pages 186 to 189)

Vladimir Iakovlev, M.D.

Page 190

```
1        Q.  And we don't really need to go
2   into all that, because I do understand that from
3   your deposition before.  I appreciate that, thank
4   you, Doctor.
5        What I'm trying to understand is when
6   in time you will stop seeing inflammation in the
7   development of scar tissue?
8        A.  Sometime after few weeks of
9   healing.
10       Q.  How long will it take for nerves
11  to begin to ingrow in scar tissue?
12       A.  Also happens within first few
13  weeks of healing.
14       Q.  First few weeks -- are we talking
15  one to four weeks, or are we talking one to
16  six weeks?  What's the window that's accepted?
17       A.  It's very variable.  It depends on
18  individuals, conditions, repetitive injury.  And
19  all this process are continuing from about day
20  three to anywhere six, eight weeks, maybe longer.
21  If there is continuous injury, it may repeat itself
22  during years.
23       Q.  So if a patient, for instance,
24  complained of immediate postoperative pain, would
25  it be fair to say that nerve ingrowth in mesh
```

Page 191

```
1   structures could not be the source of that pain,
2   because nerves could not yet appear growing within
3   the mesh structure?
4        A.  Yes, that's correct.
5        Q.  Okay.  And here you talk about
6   potential sources of pain, you write:
7            "Within these mini compartments,
8        the innervated tissue is exposed to
9        potential sources of pain such as
10       compression, stretching,
11       inflammation, ischemia, etcetera."
12       A.  That's correct.
13       Q.  But you would agree these
14  potential sources of pain are also present in scar
15  tissue where there is compression, stretching of
16  the scar tissue, inflammation in the scar tissue,
17  ischemia, etcetera, wouldn't you?
18       A.  No.
19       MR. ORENT:  Objection.
20       THE WITNESS:  No, I wouldn't agree.
21  There is no inflammation, there is no edema, scar
22  tissue doesn't show conditional edema.  Scar is
23  pliable, it can change over time.  So if there is
24  shrinking, it will slowly change because it's
25  native tissue.
```

Page 192

```
1        There are multiple differences between
2   a scar without mesh and a scar with mesh.
3        BY MS. BYARD:
4        Q.  In this discussion where you say,
5   "scar tissue from non-mesh excisions were used as
6   reference controls," are you referring to the scar
7   tissue that you used from the abdominal wall in the
8   Dr. Bendavid study, or were you specifically
9   referencing scar tissue from vaginal mesh
10  excisions?
11       A.  In this case, specifically for
12  vaginal mesh.  I mean, they were not grouped
13  together, but either with the specimens, sometimes
14  I received just scar tissue without mesh outside.
15  Sometimes it's just a scar excision and surgeon
16  identifies it as a scar excision.  Or sometimes we
17  receive it in the course of some surgeries in
18  St. Michael's Hospital, so I visually know what it
19  looks like.
20       Q.  And then you go on to write that:
21           "Surprisingly, easily visible
22       in the microscope, it has been
23       overlooked for 50 years."
24       And there you're describing what you've
25  coined as a term, "degradation bark"; right?
```

Page 193

```
1        A.  Yes, that's correct.  The
2   degradation layer was not described as it appears
3   in the light microscope.
4        Q.  And that's what I was getting at
5   earlier.  On the one hand you told me degradation
6   of polypropylene has been described since the
7   1970s.  And then here, in this abstract that you
8   publish with Dr. Blaivas, you say it's been
9   overlooked for 50 years?  I was trying to reconcile
10  that.
11       A.  Well, it's clear.  This states
12  about microscopic appearance and the cross-sections
13  in a light microscope, and I'm talking about
14  detection of degradation by other means, either
15  scanning electron microscopy or mechanical testing.
16  So this is specifically for microscopic appearance
17  and light microscope.
18       Q.  So if you were going to complete
19  the following sentence:  "I was the first
20  pathologist to observe..." what?
21       MR. ORENT:  Objection to form.
22       THE WITNESS:  I don't know if I was
23  first one.
24       BY MS. BYARD:
25       Q.  You were the first one to report
```

49 (Pages 190 to 193)

Vladimir Iakovlev, M.D.

Page 194

1  findings on degradation of -- degradation bark
2  under polarized light in microscopic observation?
3       MR. ORENT:  Objection.
4       THE WITNESS:  I'm the first one who is
5  describing light microscopy features of
6  polypropylene degradation.  So that would be a full
7  definition.  To my knowledge, I am the first one.
8       BY MS. BYARD:
9       Q.  To your knowledge, nobody else has
10  done it besides you up until this point?
11      A.  Nobody published.
12      Q.  You continue:
13          "From mesh exposure an
14          important finding was that sling
15          edges rotated or curled towards the
16          surface at the exposure sites."
17      Tell me what you meant by that.
18      THE WITNESS:  Sometimes when a reason
19  for excision is mesh exposure, the mesh, if you can
20  see the mesh is rotated -- if this is the mucosal
21  surface, I can see it's rotated.  I can see the
22  curl.  If it is a big enough piece and well
23  oriented then I can see it.
24      BY MS. BYARD:
25      Q.  Based on your observations to

Page 195

1  date, are you able to say whether the exposure of
2  the mesh causes the curling or whether the curling
3  causes the exposure?
4       A.  Sometimes it's not curled, but
5  it's still exposed.  So I make a conclusion,
6  curling which makes it exposed.
7       Q.  Sometimes it's exposed but not
8  curling, though, right?
9       A.  Yes.
10      Q.  Okay.  So something other than the
11  curling causes the exposure in those instances?
12      A.  There might be different
13  mechanisms, but one of the mechanisms is curling.
14      Q.  Okay.
15      A.  Most of the curled part is inside
16  the exposure site.  It's only the tip which is
17  exposed.
18      Q.  And you haven't done a statistical
19  analysis in order to say whether or not this edge
20  curling phenomena occurs with a statistically -- at
21  a statistically significant rate with exposures to
22  conclude there's a causal relationship, right?
23      MR. ORENT:  Objection.
24      THE WITNESS:  I don't understand what
25  would you compare with -- I mean, what -- I mean --

Page 196

1       BY MS. BYARD:
2       Q.  So you could design an experiment
3  where you looked at incidences of exposure, and
4  whether or not there was curling, and also a
5  control sample where there's curling but not
6  exposure, right?
7       A.  I can tell you for sure, if I see
8  the edge rotated towards, the mesh was curled
9  100 percent.
10      Some cases I see curling completely
11  outside of the exposure -- if there's no exposure
12  surgically described.  So, based on these two
13  observations, I can state if curling occurs close
14  to the surface, the edge is prone to be exposed.
15      Q.  You can't say that exposures occur
16  at a statistically significant rate with curled
17  mesh edges?
18      A.  But --
19      Q.  Over non-curled mesh edges?
20      A.  What do you compare it with?  You
21  have to -- clinical experiment would be, curled
22  meshes are placed right under the mucosa, and then
23  the rate of exposure is measured.  Can you do that?
24  You can't.
25      Every time I see it's curled at the

Page 197

1  mucosa, it's exposed; 100 percent, as I said.  If
2  it's not at the mucosa, it cannot be exposed
3  because it's too far.  You cannot design experiment
4  in this retrospective way.
5       Q.  Well, there isn't an edge if it's
6  not exposed though?
7       A.  No, I don't -- so if you want to
8  assess the rate of exposure, which would occur due
9  to curling, you would have to place flat meshes
10  under the surface and then curled meshes under the
11  surface, observe them for five, six years, and then
12  calculate the rate.  That would be start answering
13  your question.
14      Right now what I see, if it's curled
15  and it's at mucosa, it's 100 percent exposed.  But
16  as I said, sometimes it's flat and it's still
17  exposed.  Or, in orientation I cannot assess if
18  it's curled, not curled.  It's just poor
19  orientations.
20      Q.  You conclude with a message:
21          "Polypropylene degradation
22          needs to be studied further for its
23          role in inflammation, mesh hardening
24          and late deformation, as well as for
25          the properties of chemical

50 (Pages 194 to 197)

Vladimir Iakovlev, M.D.

Page 198

1    degradation products."
2    Did I read that correctly?
3        A.  That is correct.
4        Q.  And here again, what this
5    conclusion reinforces, is that there's a need for a
6    further study to understand the details of the
7    mechanisms of actions of the relationships between
8    degradation and inflammation, as well as mesh
9    hardening, and whether any chemical degradation
10   products are produced or what they are, right?
11       MR. ORENT:  Objection.
12       THE WITNESS:  That's correct.  Because
13   what we know?  We know that some patients present
14   with complaints six or eight years after the
15   insertion.
16       So the only thing which changes over
17   time is the degree of degradation.  So degradation
18   layer or bark is getting thicker, so it's inflamed
19   and so forth.
20       So from what we know now, the only late
21   factor which happens around the mesh or to the mesh
22   is degradation.  So those changes which occur later
23   on, will have more -- larger component of
24   degradation within the mechanisms of this.
25       But how exactly it occurs, then again,

Page 199

1    it needs to be studied.  Or, if I observe a bark or
2    degradation layer, I can see the cracks in it.  I
3    know that they're internal forces which shrink it.
4    But how much of that, how all these forces work, I
5    mean, it all needs to be studied.
6        BY MS. BYARD:
7        Q.  You also write here one sentence
8    before this:
9            "The compartmentalizing nature
10           of the meshes and nerve ingrowth
11           might create a background for the
12           pain mechanisms."
13   Do you see that?  It's just one
14   sentence before the one we just read.
15       A.  Can you point on your copy?
16       Q.  Yes, here.
17       A.  Yes, that's correct.
18       Q.  Again, you've used this word
19   "may"?
20       A.  Again, because all these --
21       Q.  That's my only question.  That's
22   the word that you've used, right?
23       A.  Well, it's written.
24       Q.  And there's no disclosure of any
25   conflicts of interest related to medical-legal

Page 200

1    consulting in Exhibit 1199, right?
2        A.  Well, this is --
3        MR. ORENT:  Objection.
4        THE WITNESS:  -- clearly disclosed.
5        BY MS. BYARD:
6        Q.  Where?
7        A.  "Some external consultations sent
8    for litigation purposes" -- see, again, this was a
9    very structured way of submitting abstract.  I
10   didn't have much flexibility to put in.  I had a
11   drop-down menu for funding only.
12       See if it's -- see, funding, subject,
13   ethics committee and everything else, I could enter
14   only specific amount of information in the
15   drop-down menu.  So I tried my best to disclose as
16   much as I can.
17       Q.  So your testimony is that for
18   1198 and 1199, there was a free text field you
19   could type in?
20       MR. ORENT:  Objection.
21       THE WITNESS:  To a certain degree -- I
22   don't remember exactly now but I mean it was --
23   which one?
24       BY MS. BYARD:
25       Q.  The one we looked at before where

Page 201

1    you published with Dr. Carey?
2        A.  This one was free text, just
3    submitted paper.  It was just, um, paragraph
4    disclosures, this one was more restricted.
5        Q.  And so -- but you typed in the
6    words, "Some specimens were received as external
7    consultations sent for litigation purposes."
8        A.  That's correct.  Yes, I did it.
9        Q.  And again, the word "for
10   Plaintiffs" does not appear here, does it?
11       A.  No.  But, as I said, we discussed
12   it before.
13       MS. BYARD:  We need to take a break now
14   for everyone.
15       THE WITNESS:  So it's 20 to 2:00.  Do
16   we take a break and then come back?  I can still go
17   on for another hour or so.
18       MS. BYARD:  Do you mind if we discuss
19   this off the record?
20       MR. ORENT:  Yes, sure.
21       THE VIDEOGRAPHER:  Going off the record
22   at 1:40 p.m.
23       -- RECESS AT 1:40 p.m.
24       -- UPON RESUMING AT 2:16 --
25       THE VIDEOGRAPHER:  We're back on the

51 (Pages 198 to 201)

Vladimir Iakovlev, M.D.

Page 202

1    record at 2:16 p.m.
2          BY MS. BYARD:
3          Q.   Doctor, I'm handing you
4    Exhibit 1200.  I'll ask if you recognize that?
5          A.   Yes, I do.
6          Q.   This was an abstract that you
7    published this year with the -- let me start over.
8    This was an abstract that was published this year?
9          A.   Yes, that's correct.
10         Q.   The title is, "Explanted Surgical
11   Meshes:  What Pathologists and Industry Failed to
12   Do for Over 50 Years"; is that right?
13         A.   For 50 years.
14         Q.   Thank you.  Under "Objective" you
15   write, three sentences in:
16              "Estimated millions of devices
17         have been excised over the years,
18         however, the study material remain
19         largely ignored and the mechanisms
20         of complications are still poorly
21         understood".
22         A.   That's correct.
23         Q.   Under "method" you write:
24              "130 meshes excised from
25         different anatomical sites were

Page 203

1         studied in search of features
2         explaining the complications."
3         Did I read that correctly?
4    THE WITNESS:  That's correct.
5    BY MS. BYARD:
6          Q.   Did these 130 mesh specimens
7    include both hernia mesh and transvaginal mesh?
8          A.   Yes.  At that time, yes.
9          Q.   Did they include any other
10   anatomical sites or types of polypropylene mesh?
11         A.   What do you mean "types of
12   polypropylene?"  Polypropylene mesh is
13   polypropylene mesh.  Do you mean lightweight,
14   heavyweight or...
15         Q.   I was just thinking of the
16   indication.
17         A.   At that time, all 130 were needed
18   polypropylene meshes from hernia or a transvaginal
19   locations.
20         Q.   And your report in the litigation
21   which has been marked as Exhibit 1196, you wrote
22   that the explanted transvaginal mesh specimens that
23   you've examined include slings and POP devices,
24   heavy and lightweight netted polypropylene and
25   Gore-Tex and combined designs.

Page 204

1          My question for you is whether this 130
2    meshes includes Gore-Tex and combined designs in
3    addition to polypropylene mesh?
4          A.   No.  This would just be POP and
5    knitted polypropylene meshes.
6          Q.   And then you describe here some
7    findings that we've already discussed in
8    relationship to your other article with Dr. Carey,
9    correct?
10         A.   That's correct.
11         Q.   Are there any findings reported
12   here that are different, or in addition to the
13   findings reported in the full length article that
14   you authored with Dr. Carey and Dr. Steege?
15         A.   Um, this was a smaller abstract
16   which, as you can see, combine transvaginal meshes,
17   slings and POP devices and hernia meshes.  So this
18   is more of a descriptive study of all meshes,
19   irrespective of their anatomical location.  Where
20   other papers were concentrated on specific type of
21   transvaginal locations, whether slings or POP devices.
22         Q.   And so it wouldn't be true to say
23   that the 120 specimens that you described in your
24   litigation report are all included in this
25   abstract, correct?

Page 205

1          A.   You see the abstract was written
2    earlier, a few months earlier so...
3          Q.   The reason why we get to 130
4    specimens is because you've included other types of
5    polypropylene mesh besides transvaginal mesh,
6    right?
7          A.   At that point, yes.  This was
8    total amount of polypropylene meshes I had in my
9    specimen pool.
10         Q.   Can you tell me how many of these
11   130 specimens were transvaginal mesh?
12         A.   Just below 100.  I think you had
13   the table which I supplied in July that was
14   representing approximately the time of this --
15         Q.   Okay.
16         A.   -- roughly.  So I think I had 97
17   transvaginal meshes.  If it was a different number,
18   then probably it was different at that point.  But
19   what I recall was 97 transvaginal meshes.
20         Q.   Okay.  So including sources of
21   specimens from -- provided to you from Plaintiffs'
22   counsel in the mesh litigation?
23   MR. ORENT:  Objection.
24   BY MS. BYARD:
25         Q.   Correct?

52 (Pages 202 to 205)

Vladimir Iakovlev, M.D.

Page 206

1    A.   There was 97, yes.
2    Q.   You conclude that:
3         "General lack of interest
4    created a paradoxical gap of
5    knowledge in the presence of
6    abundant study material and readily
7    available tools."
8    Right.
9    A.   That's correct.
10   Q.   You continue:
11        "The newly described findings
12   need to be studied in correlation
13   with clinical symptoms to guide
14   future developments."
15   Correct?
16   THE WITNESS:  That's correct.
17   BY MS. BYARD:
18   Q.   This study doesn't describe any
19   correlation of your histological findings with
20   clinical symptoms, does it?
21   A.   No, not directly.
22   Q.   There is no conflict of interest
23   disclosure in Exhibit 1200, right?
24        A.   It was provided later in the
25   presentation, I believe.  It's just the way it was

Page 207

1    published.
2         I think I gave disclosures during
3    submission.  But the way they publish it, there's
4    no disclosure.  I can see there's no other
5    disclosures for any other abstracts.
6         Q.   There's not a disclosure that
7    appears here in Exhibit 1200, is there?
8    A.   On the paper, no.
9    MR. ORENT:  Objection.
10   THE WITNESS:  But it doesn't mean that
11   it was not provided, or was not disclosed elsewhere
12   assuming for presentation.
13        If it's a presentation, I give slide
14   with some disclosure, which is usually first slide
15   before the presentation.
16   BY MS. BYARD:
17   Q.   Okay.  If you're able to find the
18   disclosure form that you think you might have
19   completed for this, would you provide it to counsel
20   for me?
21        A.   I could not have it, because it
22   was electronic submission.
23   Q.   Okay.
24   EXHIBIT NO. 1201:  Abstract entitled,
25        "In-vivo Degradation of Surgical

Page 208

1    Polypropylene Meshes:  A Finding
2    Overlooked for Decades," by Dr. V. Iakovlev,
3    Dr. S. Guelcher, Dr. R. Bendavid.
4    BY MS. BYARD:
5    Q.   Exhibit 1201 will be passed to you
6    here momentarily.
7    MR. ORENT:  This is 1201 you said?
8    MS. BYARD:  Correct.
9    BY MS. BYARD:
10   Q.   The title of 1201 -- well, first I
11   should ask, this is familiar to you, right?
12   A.   Yes.  That's the same conference,
13   the same submission process.  The same journal, the
14   same issue.
15   Q.   The title of this abstract is:
16   "In vivo Degradation of Surgical Polypropylene
17   Meshes:  A Finding Overlooked for Decades."
18   A.   That's correct.
19   Q.   And this is published with
20   Dr. Scott Guelcher and Dr. Bendavid, right?
21   MR. ORENT:  Guelcher.
22   THE WITNESS:  Guelcher.
23   BY MS. BYARD:
24   Q.   Thank you.  And Dr. Guelcher is a
25   paid Plaintiffs' expert like you, correct?

Page 209

1    MR. ORENT:  Objection.
2    THE WITNESS:  Yes.  He served as expert
3    witness.
4    BY MS. BYARD:
5    Q.   On the Plaintiffs' side, as far as
6    you know, right?
7    A.   From those cases we've been
8    involved together, yes, he was on Plaintiffs' side.
9    Could have been on manufacturer side for something
10   else.
11        Q.   But as far as you know, it's been
12   on the Plaintiffs' side, right?
13   MR. ORENT:  Objection.
14   THE WITNESS:  I don't make the
15   distinction.  Because as I said, I mean, this is up
16   to me to decide, or any other reader if there is a
17   bias on which side and how it is presented.
18   BY MS. BYARD:
19   Q.   My only question is, as far as you
20   know, he served as a testifying expert for
21   Plaintiffs against mesh manufacturers, correct?
22   A.   That's correct.
23   Q.   Under "Objectives", you write:
24        "Surgical polypropylene meshes
25        introduced over 50 years ago are

Vladimir Iakovlev, M.D.

Page 210

1    excised in up to 10 percent for
2    complications."
3    Did I read that correctly?
4        A.  Yes.
5        Q.  Is this a statistic for hernia
6    mesh or for transvaginal mesh?
7        A.  This is difficult now to remember.
8    Because it was based on all of those.  So "up to"
9    means the highest number I could see in
10   sufficiently reliable source.
11       Q.  Sometimes the rate is lower than
12   that in the reported literature, true?
13       A.  It's a range.  I mean, if you take
14   small sample size, one single mesh which has not
15   been excised, you don't have any rate.  If a sample
16   size goes larger, then you get more or less
17   representative sample of the whole population.
18       Q.  For this statement, were you
19   including literature on rates of removal from both
20   hernia repair and transvaginal mesh repairs?
21       A.  It was pertinent to both.  So I
22   don't remember exactly if 10 percent was for hernia
23   or transvaginal.  I suspect it could have been for
24   transvaginal from what I remember.
25       Q.  You write:

Page 211

1        "We studied 103 explanted
2        meshes and different designs,
3        manufacturers and anatomical sites
4        using conventional and transmission
5        electron microscopy."
6        Correct?
7        A.  That's correct.
8        Q.  Why are we at 103 here, compared
9    to the sample size of 120 we saw in Exhibit 1200?
10       A.  Multiple reasons.  It could be
11   different point in time when this abstract was
12   written.  Something else, like not completed study
13   at that time, because I would need polarize or
14   measure the degradation thickness; so I don't know.
15   But at that time when the abstract was written,
16   total number was 103.
17       Q.  You conclude this abstract by
18   writing:
19       "The discovery --" and you're
20       referring to the discovery of
21       degradation under microscopy
22       "-- opens the door to study the role
23       of degradation in the development of
24       complications."
25       Right?

Page 212

1        A.  Yes.
2        Q.  That study has not yet been
3    completed, true?
4        A.  What exactly?  Which study?
5        Q.  The study of the role of
6    degradation in the development of complications?
7        A.  It doesn't state it there as a
8    study.
9        Q.  You write:
10       "The discovery opens the door
11       to study the role of degradation in
12       the development of complications".
13       A.  Yes.  But it doesn't state that we
14   have a study ongoing to do that.  "Study" is used
15   as a verb here not as a noun.
16       Q.  You haven't yet published anything
17   on the role of degradation and the development of
18   complications, right?
19       A.  On exact mechanisms?  No.
20       Q.  There is no conflict of interest
21   disclosure in Exhibit 1201 for you, is there?
22       MR. ORENT:  Objection.  Asked and
23   answered.
24       THE WITNESS:  The same thing.  During
25   submission there was an option, if there was an

Page 213

1    option, submitted all information I could during
2    presentations.  If it's PowerPoint presentation,
3    the first slide which appears after the title slide
4    is disclosure of conflict.
5        BY MS. BYARD:
6        Q.  A conflict of interest disclosure
7    does not appear in Exhibit 1201, does it?
8        MR. ORENT:  Objection.
9        THE WITNESS:  It's up to a journal.
10       BY MS. BYARD:
11       Q.  Is there a conflict of interest
12   disclosure that appears in Exhibit 1201, sir?
13       MR. ORENT:  Objection.
14       THE WITNESS:  I don't see it.
15       Maybe it was somewhere at the end of
16   the journal issue, I don't know.  I mean, this is
17   just a page from the issue.  Maybe they had
18   conflict of interest gathered at the end.
19       BY MS. BYARD:
20       Q.  I'd like to turn back to your
21   report, which is Exhibit 1196.
22       Are you on the "Opinion" section with
23   me, sir?
24       A.  Which page number?
25       Q.  Five, please.  You write that:

54 (Pages 210 to 213)

Vladimir Iakovlev, M.D.

Page 214

1      "Explanted mesh specimens show
2      non-specific reaction of the body to
3      a foreign object, as well as findings
4      specific for a mesh type or an
5      anatomical location."
6      Is that right?
7      A.  That's correct.
8      Q.  You continue:
9          "Findings for abdominal mesh
10      explants differ from findings for
11      vaginal mesh implants."
12      A.  That's correct.
13      Q.  How so?
14      A.  I've explained some of the
15  differences earlier.  Hernia meshes are placed in
16  parallel to anatomical planes.  There are
17  separated, well defined planes between fascia,
18  adipose tissue, muscle and transvaginal
19  allocations.  There is no fascia, really, there's
20  no anatomical plane.  The tissue gradually
21  transitions into -- one to another.
22      Another difference is that functionally,
23  abdominal wall is just holding pressure of --
24  abdominal pressure.  While vaginal tissue has
25  completely different purpose.  There is more

Page 215

1  mobility, there is stress of bladder expansion,
2  bowel movement, then stress of intercourse.
3      Muscles within the bladder wall,
4  muscles within the vaginal wall which contract,
5  type of innervation is completely different.
6      Where in the abdominal wall, it mainly
7  serves as a passage of nerves parallel to abdominal
8  wall, where the vagina is practically the target of
9  innervation, because the endings are there, and the
10  nerves are in different orientation.
11      And I can continue on and on, I mean
12  it's -- abdominal wall is a completely sealed
13  environment, there's no contamination.  Vaginal
14  environment is contaminated.  Do you want me to
15  continue?
16      Q.  Are those the main differences
17  that you're noting?
18      A.  I mean --
19      Q.  Those are the ones that are
20  important to your opinions here?
21      A.  I can continue more with the
22  differences.
23      Q.  Are they relevant to your opinions
24  in this report, the other differences besides those
25  that you've mentioned?

Page 216

1      A.  Yes.  They are important to
2  understand.  I mean, everything is important to my
3  opinion, because I wouldn't be providing this
4  opinion if I didn't go to medical school.  So you
5  have to go back to 1986.
6      Q.  I don't think we have time for
7  that, unfortunately.
8      Under paragraph 2 of your opinions,
9  there's a sentence that reads:
10      "This reaction --" and you're
11      talking about the foreign body
12      reaction "-- persists until the
13      inciting agent is either removed, in
14      parenthesis, [expelled or reabsorbed]."
15      Are you with me?
16      A.  "Resorbed".
17      Q.  Resorbed.  Thank you.
18      Does there come a point in time, in the
19  tissue response to mesh, where the inflammatory
20  response reaches a chronic or steady state?
21      A.  Foreign body reaction is a chronic
22  inflammatory reaction.
23      When it starts, it may start acutely
24  but on its own it's a chronic response.  Not may
25  start; it starts acutely after the placement of

Page 217

1  foreign body, and then continues on as a chronic
2  response.
3      Q.  Does the foreign body response
4  drop off over time?
5      A.  Not in what I see.  In relation to
6  polypropylene, I see even -- I think my oldest
7  specimen was 12 years after insertion, and I still
8  see inflammatory -- chronic body -- chronic foreign
9  body type reaction.
10      So in relation to polypropylene, it's a
11  variable.  But I've never seen it went away
12  completely.
13      Q.  Does the foreign body reaction
14  drop off after this acute phase that you've
15  described?  And I don't mean completely, but just
16  decrease?
17      A.  That was one of the questions.
18  And I would expect that it would decrease, but so
19  far have not been able to show it.  Every time I'm
20  checking, every time data builds up and then I
21  check if there is correlation between foreign body
22  reaction, what degree, and I'm just -- it doesn't
23  correlate yet.
24      Maybe I need to go to a thousand cases
25  and then I see some weak correlation.  What seems

55 (Pages 214 to 217)

Vladimir Iakovlev, M.D.

Page 218

1    to be a case that it's variable between
2    individuals, or maybe it's variable within the same
3    individual, so it fluctuates with time. But again,
4    that's why we need to study all this.
5        Q.   So those conclusions haven't been
6    established yet, based on your observations to
7    date?
8        MR. ORENT:  Objection.
9        THE WITNESS:  What exactly defines the
10   degree of foreign body reaction?  No, the degree is
11   not.
12       I mean, we know --
13       BY MS. BYARD:
14       Q.   The degree -- and I guess what I'm
15   focusing on is, it's activity over time?
16       A.   Yes.  This is not completely
17   understood.  What we know, it is present and it is
18   always present.
19       Q.   Okay.
20       A.   In all specimens.
21       Q.   You write here in your third
22   paragraph that:
23          "A mesh is a large foreign body
24          in comparison to regular surgical
25          sutures."  Right?

Page 219

1        A.   That's correct.
2        Q.   Do you note how many surgical
3    sutures are used, for example, in abdominal
4    paravaginal repairs?
5        A.   They're not placed every
6    millimeter or so, that's for sure.  Much smaller
7    amount than a mesh would be.
8        Q.   Have you ever seen the performance
9    of an abdominal paravaginal repair?
10       A.   I've seen some surgeries, I
11   assisted to some surgeries.  And definitely there
12   are not that many sutures, in any surgery, I would
13   say.
14       In any type of surgery, you probably
15   now ask me for specific surgical techniques.  No
16   surgeon will insert that many sutures, that much of
17   foreign body in the -- during the surgery.  There's
18   no need for that.
19       Q.   My question to you, sir, was
20   whether you've ever seen an abdominal paravaginal
21   repair performed; and I think your testimony is
22   that you can't say for certain you have seen
23   abdominal pelvic surgeries performed?
24       A.   I have seen some pelvic abdominal
25   surgeries, but I don't know exactly what type of

Page 220

1    that was.  I mean, I just don't remember now.
2        Q.   Okay.  And that's fine.  And I
3    think your testimony in response to my question
4    about how many sutures are placed, for example,
5    during abdominal paravaginal repair, is that you
6    don't know for certain that the amount of materials
7    are less than with the surgical mesh; is that fair?
8        A.   Significantly less, that is fair.
9        Q.   You write in paragraph 4 of your
10   opinions, and I'm just reading part of the sentence
11   that I want to ask you about is that:
12          "The filaments --" here you're
13          referring to vaginal mesh "-- are
14          always surrounded by fibrous scar."
15          Do you see that?
16       A.   Yes.
17       Q.   Is it true that you see tissue
18   changes to mesh adjacent to the mesh, but at some
19   point you see a resumption in normal tissue
20   response?
21       A.   What do you mean, "resumption of
22   normal tissue response?"
23       Q.   So you see a foreign body reaction
24   and chronic inflammatory state in the tissue
25   immediately adjacent to the mesh, correct?

Page 221

1        A.   That's correct.
2        Q.   But at some point and distance
3    away from the mesh, you see the body return to
4    normal tissue responses, correct?
5        A.   There is no response.  Tissue
6    response is abnormal tissue, which doesn't respond;
7    that's normal.
8        Q.   Okay.
9        A.   So --
10       Q.   So then maybe if we can --
11       THE WITNESS:  -- there is an edge ----
12       MR. ORENT:  Hold on.  Slow down and let
13   him answer.
14       THE WITNESS:  There is an edge of
15   changes of scarring, and then there is normal
16   tissue.  So if you use word "response," it means
17   abnormal already.
18       BY MS. BYARD:
19       Q.   Okay, thank you for that
20   correction.
21       There's an edge that you see away from
22   the mesh, where there's a resumption in normal
23   tissue?
24       A.   Yeah.  Interface between scar and
25   normal tissue.

56 (Pages 218 to 221)

Vladimir Iakovlev, M.D.

Page 222

1    Q.  Have you measured to find a range
2  at which the average return to normal tissue is
3  from the mesh?
4    A.  I don't think you're using words
5  "return" is not --
6    Q.  Okay.
7    A.  It's not applicable.  You don't
8  know if it was scar and then return -- actually,
9  it's impossible.
10    Q.  Okay.  So is there, I guess -- and
11  help me with how to phrase it.  But is there a
12  distance -- have you measured -- let's start over.
13    Have you measured how far away from the
14  mesh the tissue ordinarily appears normal?
15    A.  Yes.  I didn't perform statistical
16  analysis or study, but I measured approximately
17  what's the distance of changes.
18    Q.  And what is that distance on
19  average?
20    A.  It's within one to two millimeters,
21  not greater than two, at least from most of the
22  cases I see.
23    Q.  So in most instances, when looking
24  at a transvaginal mesh and tissue specimen, you
25  will see normal tissue one to two millimeters from

Page 223

1  the mesh?
2    A.  Yeah.  From the most, outermost
3  point of mesh filament.  Usually it's within one to
4  two -- or I would say, to be safe, one to three
5  millimeters.  I don't see it exceeding three
6  millimeters, unless there is something else, like
7  an abscess.
8    If there's an abscess, then there is
9  much more scarring in the area.  Or, if there is
10  erosion, there's inflammation, there is much more
11  damage to the tissue, then it expands.
12    But if we go into deep environment and
13  changes which can be only attributed to mesh, then
14  it's within three millimeters beyond the mesh.
15    But, if the mesh is curled, or folded
16  like POP, the distance between two mesh planes in
17  the fold can be much greater, five, six millimeters,
18  and this will all be filled by scar.  I'm talking
19  about extent towards normal tissue.
20    Q.  That's what I was asking.
21    A.  Externally, yes.
22    Q.  Okay.  Good.
23    MS. BYARD:  Doctor, I want to keep you
24  on schedule, so I know we need to break for an
25  appointment.  Let's do that now.

Page 224

1    THE WITNESS:  Thank you.
2    THE VIDEOGRAPHER:  Off the record at
3  2:44 p.m.
4    -- RECESS AT 2:44 --
5    -- UPON RESUMING AT 4:35 --
6    THE VIDEOGRAPHER:  We're back on the
7  record at 4:37 p.m.
8    BY MS. BYARD:
9    Q.  Doctor, attached to your report
10  are a number of figures numbered 1 through 20,
11  correct?
12    A.  Figure sets, I believe, sometimes
13  they are gathered in sets.
14    Q.  Sitting here today, is it true
15  that you are not able to tell me what clinical
16  complications or symptoms led to each of these
17  patients whose specimens are depicted in Figures 1
18  through 20?  Wait, let me start over, I don't think
19  I finished that right.  Strike that.
20    Now, is it true that sitting here
21  today, you're not able to tell me that clinical
22  symptoms leading to these excision surgeries of
23  each of the patients whose specimens are depicted
24  in Figures 1 through 20?
25    A.  You mean, do I remember the

Page 225

1  history for a specific photograph and --
2    Q.  (Nods).
3    A.  I don't.  Is it what you meant?
4    Q.  Yes, that was what I meant.  Thank
5  you.
6    A.  I don't remember histories, I
7  mean, they are all collected from Boston Scientific --
8  or most of them.  If it's not, they are specified
9  to be a known Boston Scientific.
10    Q.  Okay.  And so similarly, you
11  aren't able to tell me that for the figures
12  numbered 1 through 20, when any symptoms began,
13  that led to the excisions resulting in the
14  specimens whose -- that are depicted in Figures 1
15  through 20, right?
16    MR. ORENT:  Objection.
17    THE WITNESS:  When specific symptoms
18  began?
19    BY MS. BYARD:
20    Q.  (Nods.)
21    A.  No, I cannot.
22    Q.  Okay.  Thank you, Doctor.
23    Returning to your report and
24  paragraph 5; do you have that there in front of
25  you?

57 (Pages 222 to 225)

Vladimir Iakovlev, M.D.

Page 226

1    A.  Yes.
2    Q.  I just want to look at one
3  sentence there at the end, where you write that:
4        ""Mature scar tissue after
5    non-mesh surgeries --"the sentence
6    continues "-- can remodel with time."
7    Can you see that?
8    A.  Yes, I do.
9    Q.  Is it your opinion that scar
10  tissue from mesh surgeries can't remodel with time?
11    A.  Cannot or can?
12    Q.  Cannot.
13    A.  It can.  It can remodel, but the
14  mesh cannot remodel.
15    Q.  So the scar tissue -- I'm sorry.
16    A.  So there will always be scar
17  around the mesh.  If mesh travels, migrates, the
18  scar will remodel.
19    So does that answer your question?
20    Q.  Yes, it does.
21    So you would agree with me that scar
22  tissue surrounding mesh can remodel over time?
23    A.  Yes, it can.
24    Q.  Okay.  The sentence continues that:
25        "Mature scar tissue from

Page 227

1        non-mesh surgeries does not exhibit
2        the same long-term reactions or
3        clinical complications".
4    Do you see that?
5    A.  That's correct.
6    Q.  I just want to focus on the term
7  "clinical complications" with you, okay?
8    Would you agree with me that there is
9  no peer-reviewed published literature concluding
10  that non-mesh surgical procedures are free of
11  long-term clinical complications?
12    MR. ORENT:  Can you read that back?
13  I'm sorry.
14    THE WITNESS:  I'm confused as well,
15  yeah.
16    REPORTER'S NOTE:  Whereupon the
17  question was read back as follows:
18        "Would you agree with me that
19        there is no peer-reviewed published
20        literature concluding that non-mesh
21        surgical procedures are free of
22        long-term clinical complications?"
23    THE WITNESS:  You can state it for any
24  type of -- well, not --
25    MR. ORENT:  I object to the form.  Go

Page 228

1  ahead.
2    THE WITNESS:  We have to kind of
3  separate it, other clinical publications saying
4  that mesh -- non-mesh surgeries are free of
5  complications?
6    No.  Because any surgery has a form of
7  complication -- early complications, or later
8  complications.  I mean, it depends what surgery.  I
9  mean, then again, it's so broad and kind of worded
10  in --
11    BY MS. BYARD:
12    Q.  Okay, sure.  And I just wanted to
13  see if we could agree that non-mesh surgeries can
14  also result in long-term clinical complications?
15    MR. ORENT:  Objection.
16    THE WITNESS:  Which -- I mean, any
17  surgery will have specific complications.  Early or
18  later, we have to take specific surgery and then
19  compare.  Non-mesh surgery will not have long-term
20  complications of meshes; that's clear.
21    If there is no mesh, there will not be
22  complications related to the mesh.  If there is
23  mesh, there can be complications related to the
24  mesh.
25

Page 229

1    BY MS. BYARD:
2    Q.  So you can't cite for me, can you,
3  what the rate of pain with a non-mesh
4  perineorrhaphy is compared to a posterior repair
5  with mesh; can you?
6    MR. ORENT:  Objection.  Outside the
7  scope.
8    THE WITNESS:  I'm not a clinician, so
9  you have to ask other expert this question.
10    BY MS. BYARD:
11    Q.  Okay, thank you.
12    Your next paragraph, paragraph 6, deals
13  with your opinions related to degradation, right?
14    A.  That's correct.  Let me see.
15  (Witness reviews document).
16    Yes, that's correct.
17    Q.  As I understand it, there are
18  three principle findings from which you conclude
19  that polypropylene mesh degrades in vivo, all
20  right?
21    First you opine that the ability of the
22  non -- I'm sorry, let me start over.
23    First, you describe that the ability of
24  the degradation bark to trap histological dyes,
25  evidences degradation in vivo, right?

58 (Pages 226 to 229)

Vladimir Iakovlev, M.D.

Page 230

1     A.  No, this is not correct.  You're
2  mixing up things.  So let's split it.
3     If you want me to explain, I will
4  explain.  If you want me to answer your question, I
5  will; what do you want?
6     Q.  Okay.  Well, you have three -- you
7  have three basic findings.
8     A.  No, no, not three.  There are way
9  more than three, but...
10    MR. ORENT:  Just let her --
11    THE WITNESS:  Okay.
12    BY MS. BYARD:
13    Q.  Is it your opinion that
14  polypropylene mesh degrades in vivo, in part
15  because the degraded bark is able to trap
16  histological dyes?
17    A.  No, this is not correct.
18    Q.  Explain it to me then.
19    A.  So let's dissect it.
20    So first, what findings in the light
21  microscope and electron transmission microscope
22  through cross-sections prove that the layer I
23  observe is polypropylene?
24    So the first finding, light microscopy,
25  it polarizes.  So it behaves as polypropylene --

Page 231

1  non-degraded polypropylene in polarized light.  So
2  this is first finding.
3     Second finding is that those mesh
4  filaments where there are blue granules included, I
5  observed them in this stainable layer.  So this is
6  another proof that it's coming from polypropylene.
7     Then with other stains, as for one
8  cause of stain, because the stainable layer is
9  brittle, it cracks.  So the first question for
10  pathologists would be, can it be calcified
11  material?  Which is very common to have calcified
12  material in human body, especially with long-term
13  chronic processes.  So I did Von Kossa stain,
14  calcium stain, it's not -- it's not staining for
15  calcium.
16    The next set of stains was to stain for
17  proteins, because if it's a protein, it mixes, it's
18  a hydrophilic mix of some sort, to mix with
19  proteins.  So I stained it for several
20  ubiquitous -- "ubiquitous" means present in many
21  body fluids, immunoglobins, and it doesn't stain
22  the layer.  It's deposited right next to it, it
23  goes into crevices, it follows the surface, but it
24  doesn't mix.  Again, this shows that the material
25  is hydrophobic, and doesn't mix again; proof is

Page 232

1  that it's polypropylene.  So these would be
2  findings in light microscope.  And if we go to
3  transmission electron microscopy, I can see
4  transition.  I see non-degraded, sort of finely
5  granule, almost smooth, no granulation, sort of
6  granularity.  And then there's a smooth transition
7  into smaller cracks, fine lattice of cracks, and
8  then it expands, and expands, and expands in larger
9  crevices towards the surface.
10    So there's a range of degradation from
11  a core to the surface.  So this findings would
12  confirm that this is -- this stainable layer is in
13  fact polypropylene.
14    Q.  Okay.  So then what was wrong with
15  my question --
16    MR. ORENT:  Wait, hold on.  He's not
17  done.
18    THE WITNESS:  Then there's a next set
19  of findings, which is proving that it is altered or
20  degraded polypropylene.
21    All right.  First, we concluded that it
22  is polypropylene.  And the second set of findings
23  proving that it's altered polypropylene.
24    Obviously, first thing which is visible
25  in light microscopy is it observes dye.

Page 233

1  Non-degraded polypropylene is completely clear,
2  it's solid, it doesn't have pores to trap dyes.
3     The degraded polypropylene absorbs
4  dyes.  And, if I do staining with two stains, one
5  is with small molecular size of the dye, and one is
6  larger molecular size of the dye.  The smaller
7  molecule -- the dye with smaller molecule size will
8  retain in smaller cracks, really fine sort of
9  microcracks.  And then larger molecules would stay
10  in the larger.
11    So, therefore, I had this trichrome
12  stain layer of red, which indicates smaller
13  porosity we see in the degraded material, and then
14  a layer of green color, which highlights a larger
15  porosity material.  So this is degraded in light
16  microscopy.
17    Cracking, that's another feature.
18  Peeling off.  So what happens, there is internal
19  force -- it's like drying, or drying on lips
20  or like rust on the surface of the metal.  Because
21  it shrinks somewhat, and then the internal force
22  pulls it, there's a crack, but it pulls and sloughs
23  off of non-degraded surface, and then it starts
24  peeling.
25    So that's another feature showing that

Vladimir Iakovlev, M.D.

Page 234

1  it's degrading, it's changing properties, physical
2  properties and it's non-degraded material.
3      BY MS. BYARD:
4      Q.  Okay.
5      A.  And then there is a third set of
6  findings, which proves that it happens in vivo.  So
7  "in vivo" means that it happens before it is --
8      Q.  Explanted?
9      A.  Piece of mesh is excised.  So one
10 of the findings is that some surgeries are done
11 with electric cautery devices.  So the edges of the
12 specimen are burned, and it melts polypropylene.
13 So this sides, I can see that the degraded material
14 melted, and non-degraded material melted.  And then
15 they melt together and form one pool, and they
16 merge together and crystalize together.
17      So this also shows that it is
18 polypropylene, because in melted state, they're
19 compatible.  So they can recrystallize on their own.
20      But, it also indicates that the tool
21 was touching it when it was already present.  So it
22 means that it was forming in vivo, before it was
23 burned.
24      Another feature shows that it was in
25 vivo, is when I measure degradation layer and

Page 235

1  correlated it with time, it was gradually growing
2  over the years.  So the first time when you can see
3  it with light microscope, is probably about a year
4  or two in vivo.  And then there is a rapid growth
5  which later on plateaus and goes really slow, which
6  is biological response.  I mean, it grows to a
7  specific thickness, and then the rate of growth
8  slows down.  So this also proves that it forms in
9  vivo.
10      Another thing I said, I put new meshes
11 in formalin, and kept them in formalin up to four
12 months, and then kept them -- and put them for
13 processing and examined them.  There's no
14 degradation bark after four months.  So, expose it
15 to formalin up to four months, it doesn't form
16 degradation.  Again, if degradation is present and
17 formalin doesn't cause it, it was present before
18 surgery.
19      And then for transmission electron
20 microscopy, the fact that inflammatory cells could
21 migrate partially in the cracks, into crevices and
22 expand, that's what they normally do, inflammatory
23 cells go through very tight spots to migrate
24 through the vessel walls.  They try to do the same
25 thing into the cracks of degraded material, but

Page 236

1  because it's dead then, they get stuck.  So this is
2  another process.  Degraded material was present in
3  vivo, while the inflammatory cells were mobile, so
4  they could do that.  So that's kind of overview.
5      Q.  And maybe we're talking past each
6  other.  What I was focusing on was paragraph 6.
7  And there you list its ability to trap histological
8  dyes, right?
9      A.  That's proof that it's altered.
10     Q.  There you also list that it
11 retains inclusions of blue granules?
12     A.  That's proof that it was protein,
13 that it's originating from original protein.  Not
14 protein, I'm sorry.  Polypropylene.  That it
15 originates from polypropylene, which was
16 manufactured with inclusion of blue granules.
17     Q.  And then you list optical
18 properties in polarized light, right?
19     A.  Yes.  Which are very different
20 from anything else in the body, and this shows as
21 well that it's polypropylene.
22     Q.  Okay.  So those were the three
23 buckets I was talking about that were listed there
24 in paragraph 6.
25     A.  Yup.  But then there is a

Page 237

1  description in the pictures with figure captions
2  further going into the details.
3      Q.  Okay.  I understand that.
4      Have you just described for me all of
5  the findings that you've made that lead you to
6  conclude that polypropylene degrades in vivo?
7      A.  I think most.
8      Q.  I think so.
9      Can you identify for me, any
10 peer-reviewed published literature, besides your
11 own that we've looked at, that describe these three
12 findings that are set forth in paragraph 6?
13     A.  Okay.  So you have to remind me
14 which three findings; the blue granules?
15     Q.  Blue granules, ability to track
16 histological dyes, and optical properties in
17 polarized light?
18     A.  Blue granules, no.  Polarized
19 light has been used to identify foreign materials
20 for decades.
21     Q.  Okay.  But not degradation?
22     A.  Including degradation.
23     Q.  Of polypropylene?
24     A.  Not poly -- well, polypropylene
25 is, no; because sutures were around.  So what

60 (Pages 234 to 237)

Vladimir Iakovlev, M.D.

Page 238

1    pathologists do, they see something, it's clear,
2    it's not sure if it's foreign or a native tissue,
3    polarize and see what's the state of it.
4            Specifically for degradation bark, the
5    way I describe it, no.  But, I mean, generally,
6    pathologists identify foreign bodies, including
7    polypropylene sutures, and they assess the state
8    they are in.
9        Q.  My question is more narrow than
10   what you're responding to, okay?
11           My question is simply whether there is
12   peer-reviewed published literature besides your own
13   that we've looked at, that describes finding of
14   degradation of polypropylene with polarized light?
15           MR. ORENT:  Objection.  Misstates the
16   opinions of Dr. Iakovlev.
17           THE WITNESS:  As I said, the state of
18   polypropylene sutures and the examination in
19   polarized light has been described before.  Nobody
20   coined it as I did as a bark, and went into these
21   details, that's true.
22           But, was it used to see if
23   polypropylene is there and if it's in degraded
24   state or -- yes.
25

Page 239

1            BY MS. BYARD:
2        Q.  Can you point me to an article
3    that talks about identifying degradation of
4    polypropylene sutures through the use of polarized
5    light?
6        A.  I'd have to search for it, but as
7    I said, I mean, generally the tool is there and for
8    diagnostic surgical pathologists they see foreign
9    material, they have to assess what state it is in.
10       Q.  Can you name an article for me,
11   Doctor?
12       A.  I cannot do it now, but I would
13   have to search for that, but...
14       Q.  Okay, thank you.
15           Similarly, can you give me the name of
16   an article, a peer-reviewed published article, that
17   talks about identification of degraded polypropylene
18   by its ability to trap histological dyes?
19           MR. ORENT:  Objection.
20           THE WITNESS:  That is also my
21   description.
22           BY MS. BYARD:
23       Q.  Okay.  You are the only one who
24   has reported that finding, correct?
25           MR. ORENT:  Objection.

Page 240

1            THE WITNESS:  Specifically for
2    polypropylene, yes, I'm the first one.
3            BY MS. BYARD:
4        Q.  Let's talk a little bit about how
5    specimens get to you from the surgical location,
6    all right?  In order to understand it and breakdown
7    what you've said here in paragraph 6 a little bit
8    better.
9            You would agree with me that all the
10   specimens that you've reviewed were excised during
11   surgery by a physician, right?
12       A.  That's correct.
13       Q.  And apart from what's described in
14   the operative report of the excision, you don't
15   know beyond that, what was done to remove the mesh,
16   correct?
17       A.  Specific details, no.  The only
18   thing I need to assess as a pathologist, is
19   acceptable for examination and to what degree I can
20   examine it.
21       Q.  Okay.  And my question is a little
22   different.
23           My question is, beyond what's set forth
24   in the op report describing this excision
25   procedure, you don't know the details of what the

Page 241

1    surgeon did to remove that specimen, correct?
2        A.  No, it's irrelevant to my
3    practice.  I don't ask it even if there were other
4    regular diagnostic specimens.
5        Q.  Okay.  So the answer to my
6    question is "no" --
7            MR. ORENT:  Objection.
8            BY MS. BYARD:
9        Q.  -- and you would also add that
10   it's not relevant to you?
11       A.  That's correct.
12       Q.  Okay.  And again, unless it's set
13   forth in the operative report, you don't typically
14   know what instruments the doctor used to excise
15   this specimen, correct?
16           MR. ORENT:  Objection.
17           THE WITNESS:  I can deduct it from what
18   I see.  If I see cautery, then they used cautery.
19   If I see depth of the changes in the tissue and so
20   forth.
21           So, essentially, what I do, I go by
22   what I see.  And if something is different, then
23   there are specific features to assess what happened
24   to a specimen.
25

61 (Pages 238 to 241)

Vladimir Iakovlev, M.D.

Page 242

1    BY MS. BYARD:
2        Q.  For instance, are you able to
3    discern whether the doctor used a scalpel or
4    Metzenbaum scissors?
5        A.  It doesn't matter to me.  I mean,
6    this is completely irrelevant.
7        Q.  Okay.  So the answer to my
8    question is, no, you're not able to discern that,
9    right?
10       A.  No, I don't know why you're asking
11   me this.
12       Q.  Doctor, I just -- I just am asking
13   you my questions.  If you understand where they're
14   coming from or not, is okay.  But I just need
15   answers so that we can move along, all right?
16       A.  Okay.
17       Q.  Okay.  So the answer to my
18   question is that you can't discern whether scalpel
19   or scissors were used, for example?
20       MR. ORENT:  Objection.
21       THE WITNESS:  I can discern if it was
22   hot or cold instrument.
23       BY MS. BYARD:
24       Q.  Okay, thank you.
25       A.  Or if it was crushing or sharp,

Page 243

1    that I can discern, but not beyond that.
2        Q.  Thank you.  And again, apart from
3    what's set out in the operative report, you can't
4    identify what degree of force, if any, was used to
5    excise the specimen, correct?
6        MR. ORENT:  Objection.
7        THE WITNESS:  I can only define the
8    degree of manipulation instrument or other handling
9    affected it to a degree where I cannot assess if
10   it's acceptable or not; that's what I can assess.
11       If the degree of manipulation was not
12   strong enough to alter it in the way it would
13   change microscopic appearance, then I cannot.  But
14   then it becomes irrelevant, because it doesn't
15   affect my ability to interpret it.
16       BY MS. BYARD:
17       Q.  And perhaps we can come back to
18   that in reference to some of the specific cases
19   tomorrow.  But I'll move on for now.
20       On a similar line of questioning, you
21   don't typically know, unless it's set forth in the
22   operative report, what degree of difficulty the
23   surgeon encountered in removing this specimen,
24   correct?
25       A.  Sometimes if it's really raggedy

Page 244

1    and piecemeal -- not necrose -- sorry, I'm a little
2    bit.
3        If it's piecemealed resection and it's
4    raggedy, it's clear that it was difficult excision.
5    If it's cleanly excised, no damage to it, I mean,
6    it's clear that it was easy excision.
7        Q.  In the litigation context, you
8    don't review the depositions of the excising
9    surgeons, right?
10       A.  No.
11       Q.  You don't speak to the excising
12   surgeons in the litigation context, do you?
13       A.  No.
14       Q.  Generally, though, you do know
15   that doctors when excising specimens, need to grip
16   the area of mesh that they're removing in order to
17   accomplish the surgery, right?
18       A.  Of course.
19       Q.  And unless it's set forth in the
20   operative report, you don't know what
21   instrumentation was used to grip the mesh, correct?
22       A.  No.
23       Q.  Similarly, to the extent that
24   distortions to the mesh occur as the doctor is
25   cutting and removing it, you're not able to tell

Page 245

1    whether that distortion occurred in vivo, or
2    whether it occurred during this removal process,
3    correct?
4        A.  That is not correct.
5        Q.  For example, if you are given two
6    specimens of mesh from a sling incision, you
7    couldn't say that the mesh was broken apart in the
8    women's body before it was removed, right?
9        A.  This is not correct.
10       MR. ORENT:  Objection.
11       THE WITNESS:  Again, this is the second
12   incorrect statement.
13       BY MS. BYARD:
14       Q.  Is the way that you would tell,
15   based on whether the -- both specimens are
16   encapsulated in scar tissue?
17       A.  There are multiple other features
18   they can see.  If damage was in the body, white
19   cell reaction, I mean, including scar
20   encapsulation, your guess was right.
21       Q.  So after excision, the specimen is
22   sent to pathology and put in a jar of formalin?
23       A.  That's correct.
24       Um, not always.  Sometimes I let it
25   dry, so I had a few specimens which were left dry.

62 (Pages 242 to 245)

Vladimir Iakovlev, M.D.

Page 246

1      Q.  And I think you said the longest
2  that you put your control sample of virgin mesh in
3  a jar of formalin was four months?
4      A.  Up to four months, yes.
5      Q.  So from the operating room, the
6  specimen goes to pathology at the patient's
7  hospital or a local hospital typically, correct?
8      A.  That's correct.
9      Um, if it is preserved, it goes to a
10 lab through some channels.  Some specimens are not
11 preserved, they are discarded.
12     Q.  If the sample or specimen is
13 examined by a local pathologist, it's examined
14 grossly and/or microscopically, typically, right?
15     A.  There should be some form of
16 examination, gross or microscopic; yes, that is
17 correct.
18     Q.  Okay.  You talked about the sample
19 being preserved; what does that process entail?
20     A.  The main preservative is formalin,
21 so it's kept in formalin.
22     Q.  For the litigation context, you
23 received samples through a company called
24 Steelgate, right?
25     A.  Most of the samples came through

Page 247

1  Steelgate, sometimes it comes from law firms
2  directly or through Scisafe.
3      Q.  Spell that for me.
4      A.  I think it is Scisafe.  S-C-I
5  safe.  My understanding is, it is a company similar
6  to Steelgate.
7      Q.  So someone has, either Steelgate
8  or Scisafe of a Plaintiffs' firm, sent those
9  specimens to you at this point in the process from
10 the operating room to your lab?
11     MR. ORENT:  Objection.
12     THE WITNESS:  Most of the specimens
13 come from either law firms or depositor like
14 Steelgate.
15     Occasional specimens, when they are
16 prospective, when the excision is planned, they
17 come directly from the hospitals.
18     BY MS. BYARD:
19     Q.  There is also a process of
20 dehydration with increasing series of alcohol
21 concentrations that are applied to the specimens,
22 correct?
23     A.  That's correct.
24     Q.  Where does that process take place
25 in these steps that we've outlined from the

Page 248

1  operating room to the laboratory?
2      A.  After grossing.  After I gross or
3  somebody gross the specimen, they take sections, so
4  it could fit in the cassettes.  Then the cassettes
5  are loaded in the machine, and then there's a
6  process of dehydration, saturation of tissue with
7  paraffin, and then the tissue can be cut when
8  paraffin solidifies and then it can be cut.
9      Q.  Sometimes that dehydration and
10 alcohol application and saturation with paraffin
11 process happens in your laboratory for these
12 litigation specimens, but sometimes they happen at
13 the local hospital?
14     A.  That's correct.
15     Q.  How long does the process of
16 applying increasing alcohol concentrations take?
17     A.  The machine can be programmed
18 differently, but roughly it runs about, the full
19 cycle is anywhere between 12 to 24 hours, with
20 different solutions.  The short --
21     Q.  Is it just alcohol?
22     A.  No, no.  There are serial
23 concentrations of alcohol increasing, and then
24 xylene, and then xylene is replaced by paraffin.
25     MR. ORENT:  "Saline"?

Page 249

1      BY MS. BYARD:
2      Q.  X-Y-L-E-N-E?
3      A.  That's correct.
4      Q.  Then paraffin?
5      A.  And all of those new meshes went
6  through all the same steps, they were loaded in the
7  same machine.
8      Q.  You anticipated my question.
9      So the virgin mesh that you examined
10 for degradation went through this alcohol
11 dehydration?
12     A.  (Witness nods.)
13     MR. ORENT:  You have to say "yes".
14     THE WITNESS:  Yes.  Yes, sorry.
15     BY MS. BYARD:
16     Q.  They went through xylene
17 treatment?
18     A.  They were loaded in the same rack,
19 and the same basket as all other specimens, and
20 then they went through exactly the same procedural
21 steps.
22     And also, those specimens which had
23 different thickness of the degradation layer, they
24 also went through all the same.  But, the
25 correlation was only between in vivo exposure and

63 (Pages 246 to 249)

Golkow Technologies, Inc. - 1.877.370.DEPS

Vladimir Iakovlev, M.D.

Page 250

1  thickness of the degradation layer; there was no
2  correlation between the storage time.  It showed 0
3  correlation.  It was exactly like minus 0.06 or
4  something like this.
5          While the correlation between in vivo
6  and thickness of the bark was .76 which is very
7  good for biological response.
8          Q.  Is this data somewhere where I
9  could look at it?
10         A.  The publication is almost
11 published.  I mean, it's ready, it's written, so I
12 need to just submit it.  And, hopefully, when it is
13 submitted soon, and it will be accepted, then I can
14 present it to you.
15         Q.  And until it's published, you
16 wouldn't share that because it's considered
17 confidential by you at this point --
18         A.  Yes.
19         Q.  -- is that fair?
20         A.  Yes.  At this point it would be,
21 thoroughly.
22         Q.  Once the paraffin processing takes
23 place, the specimen is typically cut into a
24 four-micron thick slice with what's called a --
25         A.  Microtome.

Page 251

1          Q.  Thank you.  Sometimes for the
2  specimens that you reviewed in litigation, those
3  slices are made in your laboratory, but other times
4  they've already been made by the local hospital; is
5  that right?
6          A.  That's correct.
7          Q.  And then at some point in time
8  during this process from the operating room to your
9  laboratory, you apply stain, which you've talked to
10 me about?
11         A.  That's correct.
12         Q.  Does that take place after you've
13 prepared these four-micron thick slides?
14         A.  Yes.
15         Q.  And there is a staining called
16 hemotoxin and Eosin, H&E?
17         A.  Eosin, yes.
18         Q.  Eosin?
19         A.  Um-hum.
20         Q.  That's one stain that you might use?
21         A.  It's a basic standard stain, first
22 stain.  Most commonly used in North America as an
23 initial stain.  And most time it's the only stain
24 which is used.
25         Q.  You also performed staining with

Page 252

1  immunoperoxidase stains to do the S100 nerve
2  observations?
3          A.  Yes.  Immunoperoxidase stain is
4  technique for immunostains where antibodies labeled
5  against specific proteins.  And then you choose
6  antibody against what protein you want to stain.
7          Q.  You describe in your study with
8  Dr. Carey, enzyme digestion for four minutes; what
9  is that, for a lay person?
10         A.  It's the way you try to reverse
11 affect of formalin on tissue.  So how formalin
12 preserves tissue, it crosslinks proteins in a way
13 that bacteria cannot degrade it anymore.
14         It's crosslinked, it ties up in a way
15 that bacteria cannot digest it.  But then some of
16 the epitopes, it points where antibody is
17 connecting, are hidden in this sort of crosslink.
18         So you have to un-crosslink, open it
19 up.  And for some antigens, it's -- it's enzymes --
20 usually, it is a protease, weakened protease.
21         Q.  And that's only applied for four
22 minutes?
23         A.  It depends, I mean, these are
24 tested -- sometimes manufacturer gives
25 instructions, sometimes we have to adjust it.  I

Page 253

1  mean, it's a quality assurance process.  We use
2  standard tissue to validate the stain and other
3  things.
4          Q.  For instance, you describe in your
5  study with Dr. Carey that the enzyme or the
6  retrieval process is something like 36 minutes for
7  smooth muscle?
8          A.  I mean, either manufacturer
9  recommended that time, or we, in the lab,
10 determined that this is optimal time for retrieval,
11 antigen retrieval.
12         Q.  You also in this process of
13 staining the slide and using enzyme digestion to
14 examine the slide, or really to prepare the slide
15 for examination, you also incubate the slice?
16         A.  "Incubate" means when you apply
17 antibody, you need to give it time to work to find
18 it; so this is incubation.
19         This time when you wait, apply antibody
20 and wait until you can proceed to other steps.
21         Q.  So for this process of dehydration
22 and xylene replacement, and paraffin embedding and
23 for enzyme digestion and incubation, are you
24 applying heat?
25         A.  37 degrees, sometimes it's a

64 (Pages 250 to 253)

Vladimir Iakovlev, M.D.

Page 254

1    little higher.  I mean, there is a range of -- it
2    depends on what retrieval is done and how it is
3    done.  But there is a degree of heating involved in
4    some of the techniques.
5            Q.  Celsius, 37 degrees celsius?
6            A.  37 degrees celsius, sorry.  I
7    completely forgot you're on a different scale.
8            Q.  So as the specimen is undergoing
9    paraffin embedding for 12 to 24 hours, it may be
10   maintained at 37-degree celsius?
11           A.  37 or higher.  I mean, depends.
12   Sometimes there's no retrieval at all, it just
13   stain it the way it is; without retrieval.  So
14   there is no temperature, and no, um, higher
15   temperatures.
16           Q.  If you were going to say that the
17   specimens are subjected to heat up to a certain
18   temperature, what would you -- what would be the
19   "up to" amount?
20           A.  90 degrees centigrade, highest.  I
21   don't think it will go beyond in any of the steps.
22           Q.  And where would you use those
23   higher temperatures for processing?
24           A.  Paraffin.  Usually, the highest
25   temperature would be melting point of a paraffin,

Page 255

1    maybe 80 degrees, maybe 90, I'm not sure now.
2    Because I think if it's too high, the paraffin is
3    brittle, it's melting point is high.  If it's
4    lower, it becomes too soft.
5            I would say probably closer to 80 than
6    90.  But I'm not sure, I mean, it all depends.
7            Q.  Were the samples of virgin mesh
8    that you looked at for a control, and your
9    degradation observations, subjected to 80 to
10   90 degrees celsius?
11           A.  Yes.  I mean, that's only way to
12   embed it to melt paraffin.  And, both the central
13   non-degraded part was also exposed.
14           So I think there's internal control in
15   each slide, non-degraded part is exposed to exactly
16   the same procedural steps.  There's no dying in the
17   center, it remains clear.  Therefore, all
18   procedural steps have no effect on polypropylene
19   degradation.
20           Q.  My question was simply whether or
21   not the samples were exposed to 80 to 90 degrees
22   temperature, okay?
23           MR. ORENT:  Objection.
24           THE WITNESS:  Well, I mean, I just told
25   you that both virgin tissue and the non-degraded

Page 256

1    parts were -- and degraded were exposed to exactly
2    the same environment, heating chemicals.
3            BY MS. BYARD:
4            Q.  And I'm not making a distinction
5    between the degraded and -- the degraded bark as
6    you've coined the term, and the non-degraded core.
7            I'm talking about the virgin samples of
8    mesh, off the shelf, that you examined?
9            A.  Virgin tissue was exposed to
10   exactly the same temperatures and chemicals.
11           Q.  I'm talking about virgin mesh.
12           A.  Virgin mesh.  Um, virgin mesh,
13   sorry.  Yes.
14           Q.  It was, okay.
15           Did you expose the virgin mesh to all
16   the same staining procedures that we've discussed?
17           A.  H&E.
18           Q.  Just H&E?
19           A.  Yes.
20           Q.  When you examine the mesh for the
21   litigation cases for whether or not the sample
22   absorbs dye, are you just using H&E stain?
23           A.  I think it's incomplete question.
24   To observe what?
25           Q.  In paragraph 6 where you talk

Page 257

1    about the absorption of the mesh of histological
2    dyes?
3            A.  No.  H&E and trichrome, and even
4    immunoperoxidase, its counterstain was hematoxylin
5    and it stains the degraded layer.
6            Any stain, any histological,
7    histochemical stain, will stain it.
8            Q.  So what I want to understand is,
9    which dyes were applied to the virgin mesh, which
10   stains --
11           A.  H&E.
12           Q.  -- were applied to the virgin
13   mesh, and then which stains were applied to the
14   mesh that you looked at for degradation?
15           A.  For virgin mesh experiments, I
16   used only H&E.
17           For specimens, and all pictures are
18   there.  I used H&E, trichrome stain, Gomori
19   trichrome stain, Masson trichome stain, Von Kossa
20   stain, immunohistochemical stains.
21           Q.  So one difference between the
22   virgin mesh samples, and the mesh samples that you
23   examined for degradation that were surrounded by
24   tissue, were the number of different stains that
25   you applied to those specimens, fair?

65 (Pages 254 to 257)

Vladimir Iakovlev, M.D.

Page 258

1     MR. ORENT: Objection.
2     THE WITNESS: Could you repeat the
3  question?
4     BY MS. BYARD:
5     Q. Sure. So looking at specimens,
6  mesh and tissue, you applied multiple different
7  stains?
8     A. For some --
9     MR. ORENT: Objection.
10     THE WITNESS: -- specimens, I only had
11  H&E. For some specimens I had more than H&E.
12     BY MS. BYARD:
13     Q. Okay. But for the virgin mesh
14  samples you only used H&E?
15     MR. ORENT: Objection. Asked and
16  answered.
17     THE WITNESS: That is correct. Because
18  there are no purpose for other stains.
19     BY MS. BYARD:
20     Q. When you looked at mesh for
21  degradation, you never cleaned the samples to
22  remove the tissue, right?
23     A. No.
24     Q. As a pathologist, are there
25  processes that you would use to remove tissue from

Page 259

1  a foreign body?
2     A. I don't understand the question,
3  or are you reading from --
4     Q. I was asking. I was asking you,
5  as a pathologist, are there processes that you
6  would use if you wanted to remove tissue from a
7  foreign body?
8     A. No, not really. Because we cut
9  through specimens, so it would be totally
10  separated.
11     Q. Okay. There's a way to do that if
12  you wanted to, though, right?
13     A. I read an article, some
14  researchers use separation to observe the surface,
15  yes.
16     But we don't have to, because we slice
17  across. For transmission electron microscopy, I
18  got -- we're just cutting through it.
19     Q. Okay. It's possible that you
20  haven't done it, because you didn't feel the need
21  to do that?
22     MR. ORENT: Objection.
23     THE WITNESS: Not just didn't feel.
24  It's not needed, period. For cross-sections it's
25  not needed.

Page 260

1     Actually, you don't want tissue to be
2  separated. You want tissue to hold the mesh.
3     BY MS. BYARD:
4     Q. Okay. You didn't remove tissue
5  before you looked at the samples, and there is a
6  way to do it?
7     MR. ORENT: Objection. Compound asked
8  and answered.
9     THE WITNESS: Yes. That summarizes.
10     BY MS. BYARD:
11     Q. Okay. So when you're examining
12  the mesh for degradation then in your report, you
13  are looking at the mesh while it's still in the
14  surrounding tissue, right?
15     A. Most of the time. Occasional
16  filaments are kind of sticking out, or they are
17  cross section -- like the slice of salami falls
18  off.
19     Q. Okay. And in all the figures
20  you've given us here in your report, all of the
21  samples are embedded in tissue, right?
22     A. Yes.
23     Q. As I understand it, would these
24  specimens that you receive, may have mesh that is
25  oriented in the three-dimensional space of the

Page 261

1  specimen in different ways, right?
2     A. Yes.
3     Q. So when the knife of the microtome
4  is cutting the specimen, you are not assured that
5  the meshes that are completely perpendicular and
6  angled to the knife blade, right?
7     A. What do you define as the plane of
8  the mesh?
9     Q. So, mesh has a length, a fiber,
10  and it has a width of fiber within its knitting
11  structure, right?
12     A. You mean individual mesh fibers
13  or -- well, it's more or less filaments. So fiber
14  and filament in this case is the same term.
15     You mean individual filaments, if I
16  know if they are entered perpendicular or
17  obliquely? Of course I'd know. I mean, the shape,
18  if it's perfect circle -- or close to perfect
19  circle, it's close to perpendicular shape.
20     If it's oblique, then you have the
21  long, longitudinal section. So for specific
22  filaments, it's easier. Because you can see it.
23     For the whole mesh itself, it may not
24  have a plane anymore, because it's all folded and
25  it's -- there is no plane.

Vladimir Iakovlev, M.D.

Page 262

1      Q.  And the mesh might not be oriented
2  in the specimen, along the length of the specimen,
3  right?
4      A.  Let's separate.  Filaments,
5  individual filaments and the mesh.
6      Q.  That's what I was trying to do.
7  You're the one who went to the mesh within the
8  larger specimen potentially being folded.
9      Let's take out for now, just the
10  fibers, the filaments of mesh itself?
11      A.  That's okay.
12      Q.  So because you don't know how the
13  mesh is oriented in the specimen --
14      A.  Mesh filament or the mesh?
15      Q.  We'll get to that.
16      So because you don't know how the mesh,
17  as a whole, is oriented in the specimen, you
18  similarly don't know how the individual fibers are
19  oriented in the specimen --
20      A.  No, this is not correct.
21      Q.  -- right?
22      A.  I can go -- mesh filament is
23  around the structure.  So if it's cut
24  perpendicular, there is a round cross section.  If
25  it is oblique, then you get an oval, and then

Page 263

1  sometimes you get a really long sort of cross
2  section.
3      So just by the shape, I can tell you
4  exact, approximately what's angle.
5      Q.  Do you measure each one of the
6  mesh shapes that you look at to assure that they
7  are perfectly round?
8      A.  There is a bunch of different
9  shapes, and some of them are round, some of them
10  are oval.  So the more longer oval you get, the
11  more angle -- I mean, more acute angle is.
12      Q.  And so the way that you've
13  represented mesh in your colorized figures is with
14  yellow, right?
15      A.  Yes.
16      Q.  And many of those shapes, you'll
17  concede, are not perfect circles, they're ovals;
18  aren't they?
19      A.  Yes.  They are angled.
20      Q.  And so when the knife of the
21  microtome is cutting each specimen to create a
22  slide, each mesh fiber or filament is not being cut
23  at a 90-degree angle in every circumstance,
24  correct?
25      A.  That's correct.  There is a degree

Page 264

1  of angle from 90 degrees to almost, um, almost
2  parallel orientation, anywhere.
3      I mean, pretty much any specimen if
4  it's large enough, you will find a range of angles.
5      Q.  So not every slide is a 90-degree
6  cross section of all of the mesh fibers contained
7  in that section of the specimen?
8      A.  That's correct.
9      MR. ORENT:  Objection.
10      BY MS. BYARD:
11      Q.  Does polarized light reflect off
12  different thicknesses of material differently?
13      A.  I'm not sure exactly what you're
14  asking.  If it brightens, it will be different if
15  the thickness of the material is different?  Yes.
16      If it's getting thicker, there will be
17  more material, it will -- to a certain degree, I
18  mean, that's to a certain degree I mean, so...
19      Q.  It will get brighter or dimmer?
20      A.  If it's clear, it will get -- to a
21  certain degree, it will get brighter.  When it's
22  really thin, the brightness will be lower and then
23  it will build up.  And then after a certain
24  thickness, it will not matter anymore.  So it
25  reaches full capacity.

Page 265

1      Q.  Okay.  So if I was looking at a
2  thinner amount of material that was clear, under
3  polarized light, it would be brighter or dimmer
4  than thicker amounts of that same material?
5      A.  If it's clear, because polarizable
6  materials may be clear or not clear, so then
7  there is a --
8      Q.  It's clear in this hypothesis.
9      A.  If it's clear, and it's really --
10  if it gets thicker -- I mean, start from very thin,
11  barely visible.  So the brightness of the light
12  will be dimmer.
13      And then with increasing thickness, the
14  brightness will be going up, up until it reaches
15  full capacity.  I mean, beyond which it cannot get
16  any brighter.  And then there might be some
17  influence with light transmission and so forth
18  there so...
19      Q.  Okay.  I think I understand, thank
20  you.
21      A.  But these sections I cut all at
22  four microns.  All tissue within the one section is
23  exactly the same thickness.
24      Q.  Not if it's not cut at a 90-degree
25  angle, right?

67 (Pages 262 to 265)

Vladimir Iakovlev, M.D.

Page 266

1      A.  No, it's all four microns.
2      Q.  If the material is oriented at an
3  angle, and not completely 90 degrees --
4      A.  It's still four microns.
5      Q.  -- to the knife --
6      A.  It's four microns.  Can I draw it?
7      Q.  It's a three-dimensional space,
8  though.
9      A.  No, it's a slice.  So if you get
10  slice like this, four microns.  If you get slice
11  like this, four microns.  If you get slice like
12  this, it's oblique, it's still four microns.
13      Q.  But the way the material is angled
14  within the specimen is tilted?
15      A.  Yes.  But it's still four microns
16  thickness.  The cross section is four microns
17  thick, it doesn't matter what orientation, it's
18  still four microns.  Doesn't matter how you're in
19  it, four microns.  It's like a salami.
20      Q.  But if you look at it from looking
21  up, you would be looking through less material on
22  the far edge of the material if it was oriented
23  sideways?
24      A.  Or the very edge, the very tip of
25  this, yes.  It will be somewhat different, yes.

Page 267

1      Q.  Okay, thank you.  Thank you.
2      THE VIDEOGRAPHER:  Excuse me, Counsel.
3  I have to change the tape.
4      MS. BYARD:  Perfect, let's take a
5  break.
6      THE VIDEOGRAPHER:  This marks the end
7  of media number three in the deposition of
8  Dr. Vladimir Iakovlev.
9      We are going off the record at
10  5:28 p.m.
11      -- RECESS AT 5:28 --
12      -- UPON RESUMING AT 5:38 --
13      THE VIDEOGRAPHER:  Here begins media
14  number four in the deposition of Dr. Vladimir
15  Iakovlev.
16      We're back on the record at 5:38 p.m.
17      BY MS. BYARD:
18      Q.  Doctor, I have some relatively
19  straightforward questions about the figures in your
20  report related to paragraph 6.  If you wouldn't
21  mind turning with me to Figure 9C.
22      A.  What page number?
23      Q.  It's on page 33, sir.  And I
24  guess, really, this question refers to 9, 9A, 9B,
25  9C, really all the way through to 16.

Page 268

1      And in none of these figures do we see
2  the entire circumference of the mesh filament, do
3  we?
4      A.  No, because it doesn't fit.  Well,
5  the thickness of this degraded layer is anywhere
6  between two to six microns.  Filament is up to
7  here.  It wouldn't fit.
8      Q.  Okay.  So in the -- at the level
9  of magnification that you need to view this narrow
10  margin, what you call the degraded bark, you're not
11  able to capture the entire circumference of the
12  mesh filament in your imaging?
13      A.  Yes.  This magnification size of
14  filament is much larger, several pages larger.  In
15  some lower magnification, you can still see the
16  degraded layer, but it's much less details.
17      Q.  One question I had was how you're
18  able to tell that there isn't tissue interposed
19  over the edge of the filament, and your eye,
20  through the microscope.
21      So if you're able to answer that, if
22  not I can rephrase.
23      A.  How do I see if there's no tissue
24  overlapping with the filament?  Sometimes it is,
25  just play with focus.  Because it goes like this.

Page 269

1  It's a different plane of focus, so you cannot
2  focus on exactly the same.  Even within four
3  microns, you can focus only within very narrow
4  range.
5      So, essentially, you're looking at the
6  slice which is much thinner than four microns.
7  Probably you're in the focus of a range of one
8  micron thickness only.  The rest will be blurred.
9      Like this picture, you mentioned 32.
10  You see this is completely blurred.  And it's
11  probably just one micron deeper than this part.
12  It's different plane, and it's out of focus, and
13  then you don't see any details.  Little further
14  down, it will be just pink haze, from the breakoff.
15      Q.  Okay.  So in order to focus in on
16  what you call the degraded bark, you have to focus
17  in at a level where you are assured you're looking
18  past the tissue?
19      A.  What do you mean, where it overlaps?
20      Q.  (Nods.)
21      A.  Yes.  I mean, I can even see -- I
22  can focus on different layers of degraded material.
23  On deeper, some more superficial, because focusing
24  depth is very narrow.  As I said, within one micron --
25  with that magnification, it's very shallow.

68  (Pages 266 to 269)

Vladimir Iakovlev, M.D.

Page 270

1      Q.  You would agree, though, that it
2  is typical for there to be some tissue overlapping
3  the circumference of the mesh filament on cross
4  section?
5      A.  No.  Typical is contraction, so
6  tissue contracts during dehydration, it splits and
7  goes away.  Usually, the way when it overlaps, when
8  it lifts up, floats and sits on tissue.
9      But if it sits in situ, this should
10 contract and retracts.  So usually there is a
11 separation.  Sometimes there is not on edges, but
12 overlap with the tissue is least common phenomena.
13     Again, any overlap in the field will
14 not be visible because of the depth of sharpness.
15 I can focus on the very narrow point.  You can have
16 15-microns difference with different layers, and if
17 you have enough light which is passing through, you
18 can gradually see layer by layer, and steady
19 details within these 15 microns.
20     Q.  Have you continued soaking that
21 virgin mesh or other virgin mesh samples in
22 formalin?
23     A.  Yeah, I have some still sitting in
24 formalin.
25     Q.  When was the last time that you

Page 271

1  examined them for degradation?
2      A.  Sometime during summer.  But
3  sometimes I completely use up the sample, so I have
4  to start the process again, so it's not -- the
5  first mesh was exposed, I think last fall.  But I
6  don't think I have samples from that time, so there
7  will be -- I just have dates written on the jars,
8  so...
9      Q.  Okay.  And the longest still it's
10 been in formalin is four months?
11     A.  Four months.  It's way beyond the --
12 when I was writing this manuscript, we talk about,
13 about 25 percent of the samples had exposure time
14 less than a month.  And about 8 or 10 percent of
15 the specimens I examined had exposure to formalin
16 less than 72 hours.  And they still showed the same
17 degradation layer, so...
18     Q.  And you're referring to one of
19 your published studies?
20     A.  In preparation.  But I'm just
21 telling you the date.  So four months is overkill
22 by many fold.
23     Q.  Okay.  And that's not data that we
24 have yet, right?
25     MR. ORENT:  Objection.

Page 272

1      THE WITNESS:  I'm telling you.
2      BY MS. BYARD:
3      Q.  You're telling me, but I don't
4  have the underlying data, right?
5      MR. ORENT:  Objection.
6      THE WITNESS:  That's correct.
7      BY MS. BYARD:
8      Q.  Okay.  Looking at paragraph 7 of
9  your report, sir, on page 6.  You write that:
10         "The published literature
11     indicates that the main
12     complications of transvaginal mesh
13     devices leading to mesh excision are
14     chronic pelvic pain, pain with
15     intercourse, parenthesis, [dyspareunia],
16     de novo, worsening urinary symptoms
17     and mucosal erosion, parenthesis,
18     [mesh erosion]."
19     Which articles are you relying on for
20 that statement?
21     A.  Clinical.
22     Q.  Are there articles in your list of
23 materials reviewed that you can point me to for
24 that proposition?
25     A.  The regular complications?  Yes.

Page 273

1  I mean, there are some clinical articles there.
2      Q.  Any in particular that you would
3  cite for support for that proposition?
4      A.  I would have to check these papers
5  again, sorry.  Because it's been quite sometime.  I
6  don't remember exactly which article specifies,
7  but...
8      Q.  Now in contrast, your data that
9  you publish with Dr. Carey indicated that the
10 number one reason for excision in the samples that
11 you reviewed there, were for exposure, correct?
12     A.  You mean mucosal exposure?  Yes.
13     Q.  Okay.  If I were to ask you what
14 the rate in the medical and scientific literature
15 of excision for dyspareunia was, compared to the
16 rate of excision for dyspareunia in your 120
17 specimens, you couldn't cite me those numbers,
18 could you?
19     A.  I would have to go through papers
20 and -- the rate will be different in each paper,
21 and there is no such thing as the same rates.  So
22 there will be a range of rates.
23     Q.  And that analysis hasn't been
24 completed, has it?
25     MR. ORENT:  Objection.

Vladimir Iakovlev, M.D.

Page 274

1      THE WITNESS:  What do you mean, which
2  analysis?
3      BY MS. BYARD:
4      Q.  Comparing the range of reported
5  rates of dyspareunia as the reason for excision in
6  the published literature, with the rate of excision
7  for dyspareunia in your sample size of 120
8  specimens?
9      A.  If I published this comparison?
10  No, I have not published this comparison.
11      Q.  And you haven't done that
12  comparison yet, either, right?
13      A.  Well, roughly I estimated.
14  Because you can see in the papers what is
15  percentage of those excised for -- where is it?
16      Q.  It was Exhibit 1198.
17      A.  So if we split now, see I have --
18  I had 67 percent exposure, 56 percent pain, and
19  overlap between them, 33 percent.
20      Q.  That was for 24 specimens, though?
21      A.  Yeah, that was a pool size in
22  that.  If you're asking for complete set, no.  And
23  this set is growing every day, I mean I'm receiving
24  samples, so...
25      Q.  So for the set of 120 specimens,

Page 275

1  you can't tell me what the rate of complications
2  were prompting the revision surgery, right?
3      MR. ORENT:  Objection.
4      THE WITNESS:  I can estimate the range
5  anywhere from 30 to 50 percent, somewhere.  It
6  depends on the -- I mean, again...
7      BY MS. BYARD:
8      Q.  You don't have those numbers or
9  those statistics analyzed yet, correct?
10      A.  Not for the total number of
11  specimens I received by today.  I mean, I
12  initially, as for this study, I did analysis; and
13  then I think I did analysis sometime in between.
14  But I mean, I have not done it like yesterday --
15      Q.  Okay.
16      A.  -- for all specimens I receive.
17      Q.  The numbers you can quote for me
18  today are from these 24 samples that are -- that
19  have been analyzed in the study that you published
20  with Dr. Carey that's Exhibit 1198?
21      A.  This is just the paper in front of
22  me.  I might have the number on the spreadsheet in
23  my log of specimens.
24      Q.  Okay.  And they're not set forth
25  in your report, right?

Page 276

1      A.  No, but --
2      Q.  Okay, thank you.
3      You write here in paragraph 7, that
4  this is consistent with random sampling since the
5  samples had variable sources and manufacturers; do
6  you see that?
7      A.  Yes, they were coming from
8  different sources, from -- they were of different
9  manufacturers.  They were excised for different
10  reasons.  The range of patient demographics was
11  large.
12      Q.  You haven't set up a registry,
13  though, for mesh excisions in the transvaginal mesh
14  example like you have for hernia mesh in your study
15  with Dr. Bendavid, right?
16      A.  No.  Those samples are obtained
17  prospectively, these samples were obtained
18  retrospectively.
19      Q.  And the sources were threefold.
20  They were either St. Michael's, they were other
21  hospitals, and they were from the Plaintiffs'
22  lawyers through various --
23      A.  But when they come from lawyers,
24  they're not coming from one specific individual.
25  They're coming from different excising surgeons,

Page 277

1  different states, different hospitals of -- you
2  make it sound as if lawyers, just one person, one
3  clinician and one lab, no.  It's all over, you know
4  that.
5      Q.  And your research on hernia repair
6  mesh, you didn't receive samples from Plaintiffs'
7  lawyers, right?
8      MR. ORENT:  Objection.
9      THE WITNESS:  Which research?
10      BY MS. BYARD:
11      Q.  The study that you published with
12  Dr. Bendavid?
13      A.  The SIN paper?  No, there was no
14  litigation cases in this paper.
15      Q.  Paragraph 8 continues:
16      "Pain is reported as the most
17      frequent complication of a mesh
18      procedure in published literature
19      and in the clinical records that I
20      reviewed."
21  Do you see that?
22      A.  That's correct.
23      Q.  Which study are you relying on for
24  that proposition?
25      A.  There were a number of studies

70 (Pages 274 to 277)

Vladimir Iakovlev, M.D.

Page 278

1    where the pain was higher.  Sometimes there are
2    other -- pain is a very subjective subject, and
3    sometimes it's not assessed.  There is no primary
4    goal of the studies to assess pain, so they just
5    provide statistics.  When the study is more focused
6    on pain, the numbers might be higher.  So it's a
7    range.
8            Q.   And the studies that you reviewed,
9    what was the range of reported pain as a reason for
10   excision?
11           A.   You mean percentage-wise?  I don't
12   remember now, but I mean there were a number of
13   studies which showed pain as a first -- the number
14   was higher, higher than anything else.
15           Q.   Are you referring to hernia mesh
16   literature or transvaginal mesh literature?
17           A.   Transvaginal mesh.  And this is
18   just complication, it's not a reason for excision.
19           You see, if you read this, "the pain is
20   the most frequent complication."  So if you go
21   through it, it may go up to 30 percent, even higher
22   in some literature.  Some literature it goes -- in
23   some publications it goes lower.
24           Q.   As you were reviewing the medical
25   literature on complications of transvaginal mesh,

Page 279

1    did you keep any notes on what the reported rate of
2    complication was for different symptoms?
3            A.   No.  Because I wasn't writing a
4    paper for that specific, it was just a memory of my
5    understanding.
6            Q.   Do you agree that innervated
7    tissue, anywhere in the body, can be subject to
8    potential pain mechanisms of direct irritation to
9    the nerves?
10           A.   Yes.
11           Q.   Entrapment?
12           A.   Entrapment in normal tissue?
13           Q.   (Nods.)
14           A.   If entrapment happens, it's
15   abnormal.  I mean, if you assume that there are
16   places in the body which can cause entrapment
17   syndromes, the entrapment itself becomes abnormal.
18           Q.   Sure.  And I'm talking about
19   innervated tissue anywhere in the body can present
20   a finding of entrapment on histological examination?
21           A.   No, it cannot.  Entrapment, in
22   normal circumstances, occurs in tight spaces where
23   nerves pass by.  So these are very specific
24   anatomical locations.
25           Q.   It's possible for nerves to be

Page 280

1    entrapped in tissue that was never exposed to mesh,
2    right?
3            A.   No, this is not correct.  If you
4    take tissue as a general, there cannot be
5    entrapment because there is no tight area.
6    Entrapment happens in specific anatomical locations
7    where there is a tunnel, or there is a compartment.
8    I'm talking about normal, spontaneously occurring
9    sort of entrapment or tunnel syndromes.
10           This is not happening in, in tissue as
11   we talk about it.  It's like a tunnel, usually
12   surrounded by some kind of winding, synovial
13   winding of the place, tight spot where nerves pass
14   through.
15           Q.   So if I understand your testimony
16   correctly, you can have nerve entrapment in the
17   body, even if there's not any mesh, against certain
18   anatomical structures, or tunnels, or compartments
19   as you've described it?
20           MR. ORENT:  Objection.
21           THE WITNESS:  I mean, usually there is
22   some degree of pathology called changes in the
23   area.  It's not normal to have an entrapment
24   syndrome.
25

Page 281

1            BY MS. BYARD:
2            Q.   Sure.  But what I want to focus on
3    here are abnormal pathological findings that are
4    mechanisms for pain.
5            And I want to focus on abnormal
6    pathological findings that are mechanisms for pain,
7    and whether those mechanisms exist without mesh?
8            A.   In the vaginal area, no.  There
9    are no anatomical locations, or specific anatomical
10   structures to cause nerve entrapment without mesh.
11           Q.   Without mesh you can never have
12   nerve entrapment in the vagina; is that your
13   testimony?
14           MR. ORENT:  Objection.
15           THE WITNESS:  If there is no mesh and
16   there is no other pathological condition, like a
17   tumor or something else, it cannot happen.
18           BY MS. BYARD:
19           Q.   Okay.  So if there is a tumor you
20   can have nerve entrapment?
21           A.   That's correct.  With tumor, there
22   will be little bit different mechanisms.  But there
23   will be effected nerves.
24           Q.   Okay.  If there's another foreign
25   body besides the mesh in the vagina, there could be

71 (Pages 278 to 281)

Vladimir Iakovlev, M.D.

Page 282

1    nerve entrapment?
2         A.  If there is foreign body with
3    compartment.
4         Q.  Okay.  Innervated tissue anywhere
5    in the body can be exposed to pain mechanisms that
6    are inflammatory in nature, right?
7         A.  Spontaneously occurring
8    inflammatory conditions, that's what you mean?
9         Q.  Any sort of inflammatory mechanism
10   of pain.
11        MR. ORENT:  Objection.  Vague.
12        THE WITNESS:  As we stated before, as I
13   stated before, inflammation alters sensitivity
14   threshold.
15        So any inflammation can build up, so
16   the basis for pain, or cause pain if it's
17   sufficiently high enough.
18        BY MS. BYARD:
19        Q.  Can compression by edema act as a
20   mechanism for pain for tissue with nerve ingrowth,
21   even when there is no mesh present?
22        A.  If it's enclosed compartment --
23   well, see, edema, if there's no walls of a
24   compartment, edema will expand further.  If it
25   grows rapidly, it may cause some discomfort or

Page 283

1    pain.  If there is no compartment, edema will --
2    and if it goes slowly, it will just be painless
3    edema.  But the problems are when the edema goes
4    faster; or, if it occurs in enclosed space.
5         So you need to set some pathological
6    condition.  To form this walls of compartment, or
7    place foreign body, and then, to cause edema.  And
8    then edema would occur in an enclosed compartment.
9         Q.  So in certain pathological
10   conditions, in the absence of mesh, compression by
11   edema can cause pain?
12        MR. ORENT:  Objection.
13        THE WITNESS:  That's correct.
14        BY MS. BYARD:
15        Q.  Even in the absence of mesh?
16        A.  Yes.  That's why I know that edema
17   can cause pain, because there are conditions which
18   cause pain through the swelling.
19        Q.  Thank you.
20        Is the same true for ischemia?
21        MR. ORENT:  Objection.
22        THE WITNESS:  For ischemia, yes.
23   Again, that's why I can state that this has
24   probability to cause pain, because we know that it
25   causes pain in other parts of the body.

Page 284

1         BY MS. BYARD:
2         Q.  That's a very fair point.  The
3    entire reason you have identified these potential
4    pain mechanisms with mesh, is because these are
5    well understood mechanisms for pain in the
6    literature, apart from any findings related to
7    mesh, correct?
8         A.  Yes.  But, when I examine
9    specimens, I don't find anything else except for
10   changes related to the mesh.  I don't find the
11   tumor, I don't find musculitis, which can cause
12   necrosis of the vessels.
13        So, part of my job as a pathologist, is
14   to rule out other conditions.  And then I see only
15   changes which are related to the mesh.
16        Q.  As a part of your practice,
17   though, in the litigation context, if you receive a
18   specimen that's a uterus, and clearly not mesh, you
19   don't examine it?
20        A.  I do examine it.
21        Q.  You do?
22        A.  I do, yeah.  If I receive a
23   specimen, I look through the microscope.
24        Q.  And do those findings make their
25   way into a report that's disclosed to us?

Page 285

1         MR. ORENT:  Objection.
2         THE WITNESS:  I don't remember now.
3         BY MS. BYARD:
4         Q.  Withdrawn.
5         In the absence of mesh, there can also
6    be mechanical irritation of receptors, right?
7         A.  Mechanical, if it's normal degree
8    of stimulation, it will not cause pain.  If it's
9    abnormal degree, if it's high enough, it will cause
10   pain.  That's how --
11        Q.  Yes.  Exactly.
12        A.  -- take a hammer and then it will,
13   it will hurt without mesh.
14        Q.  Okay.
15        A.  But if you just press it with your
16   finger, just feel the touch.
17        Q.  Ending paragraph 8 you write:
18        "These findings correlate with
19        clinical findings of pain, particularly
20        chronic pain in women."
21        Do you see that?
22        A.  Yes.
23        Q.  What's the difference, in your
24   understanding, your vocabulary, between
25   "correlation" and "causation"?

72 (Pages 282 to 285)

Vladimir Iakovlev, M.D.

Page 286

1    A.  Clinical pathological correlation.
2   So when I receive a specimen, and described as
3   removed for reasons of pain, as I said, I examine
4   it for pathological findings, I rule out natural
5   occurring non-mesh-related conditions, then examine
6   what happened in the mesh.  So, that's what it
7   meant.
8       Q.  Okay.  And so it's not as if
9   you're looking at a pathological -- a pathology
10  slide and saying, "aha, it was this edema that
11  caused all this pain that she reported."  Right?
12      MR. ORENT:  Objection.
13      THE WITNESS:  See, when I receive a
14  specimen, I know that there was pain, and it's
15  indicated that -- sometimes I look at the history
16  later.  So I know that there was pain, and I do
17  clinical pathology called correlation.
18      You cannot -- it's not a game, I mean,
19  it's a diagnostic process.  You have to take all
20  information available to you and then correlate.
21      Clinical investigation was done because
22  of pain, they narrowed down problem to the excised
23  mesh, I received a specimen.  So I already know
24  that there was a problem, complication, that's why
25  it was excised.

Page 287

1       Then I try to figure out what was
2   causing it, what is abnormal in the specimen which
3   was removed as a part of treatment of the
4   complications, or patient's symptoms.  And then I
5   rule out naturally occurring, I don't see it, and
6   then I see this.
7       And then, if somebody tells me, "I have
8   a pain."  And I examine the specimen, and there is
9   mesh with edema, with nerve ingrowth, this is the
10  cause of pain.  Because there is nothing else in
11  the specimen which would explain it.
12      BY MS. BYARD:
13      Q.  Now, if that patient's pain
14  continues after that mesh is excised, you can then
15  agree with me that the edema, or the foreign body
16  inflammation can no longer be considered the cause
17  of those symptoms, right?
18      MR. ORENT:  Objection.
19      THE WITNESS:  If entire mesh is excised
20  without damage to the tissue, which is
21  hypothetical, I don't think most of the meshes can
22  be excised completely, or completeness of excision
23  can be as certain.  So the first difficult part of
24  the statement.
25      The second difficulty is that when you

Page 288

1   excise, you cause damage, and there is more
2   scarring.  Because when you do multiple procedures
3   throughout, the scar is there.  So there might be
4   some residual changes in there.  So the initial
5   cause of these changes would be still mesh.
6       How do you separate all of this?  And
7   how do you ascertain completeness of excision?  How
8   they are certain that the postexcision changes are
9   not residual changes which occurred while mesh was
10  there?  This is difficult.
11      BY MS. BYARD:
12      Q.  You would agree that correlation
13  isn't causation, though, wouldn't you?
14      MR. ORENT:  Objection.
15      THE WITNESS:  See, when you use
16  causation, do you use it in -- let me ask, I mean,
17  just to clarify this.
18      When you use word "causation," do you
19  mean "prediction"?  Or correlation of clinical
20  picture with the pathological findings?
21      BY MS. BYARD:
22      Q.  I guess maybe the better way to
23  ask it is that the word you used here was
24  "correlate," right?  Not "cause"?
25      A.  And I explain it.  Correlation is

Page 289

1   clinical pathology calculation.  Patient comes with
2   complication, symptoms.  So that's where clinical
3   part comes in.  And there's investigation, there's
4   narrowing down, and then I examine the specimen to
5   see what is abnormal in it.  So this is diagnostic
6   process and treatment process.
7       If you're talking about prediction,
8   what can happen in the future is something
9   occurring now, that's not how medicine works.
10      So the correlation here, correlation
11  between what was clinically seen abnormal, and what
12  I see in the microscope.
13      Q.  So you're relying, in large part
14  then, on the clinical determination that's made by
15  the treating physician, that the doctor and the
16  patient should at least try to excise the mesh to
17  address the patient's symptoms, right?
18      A.  Yes.
19      Q.  You also write that:
20      "Placement of vaginal tissue --"
21  and I'm looking at paragraph 9 now,
22  Doctor.  "-- is associated with a
23  higher risk of chronic pain issues
24  than the placement of abdominal mesh --
25  abdominal hernia mesh."  Excuse me.

73 (Pages 286 to 289)

Vladimir Iakovlev, M.D.

Page 290

1    A.  That's correct.
2    Q.  And what literature are you citing
3  for that proposition?
4    A.  Again, clinical literature.  Being
5  in the hernia is lower, somewhere in the range from
6  about 10 percent or so, but for transvaginal meshes
7  it can go up to 30 percent.
8    Again, it's very, very difficult to
9  compare the studies, because they use different
10 questionnaires and different approaches.
11   Q.  And are you talking about rates of
12 chronic pain as a complication overall, or is it
13 complication leading to excision in this statement?
14   A.  Complication overall.
15   Q.  We talked earlier about how the
16 vagina compared to the abdominal wall, as a
17 nerve-rich environment, right?
18   A.  Yes.
19   Q.  And you would also agree with me
20 then, that the vagina as an area of the body is
21 associated with a higher risk of chronic pain
22 compared to the abdomen, because it is a more
23 nerve-rich environment, right?
24   A.  Yes.
25   Q.  And that's true in the absence of

Page 291

1  mesh, too, isn't it?
2    A.  Yes.
3    Q.  You conclude paragraph 10, with
4  the statement that:
5       "It is well established that
6       inflamed tissue alters the
7       sensitivity threshold of pain
8       receptors."
9    A.  Yes.
10   Q.  Are you with me?
11   A.  Yes.
12   Q.  Is there a specific study or
13 studies that you're relying on in support of that
14 proposition?
15   A.  There are studies, I mean, but you
16 probably experience inflammation yourself during
17 your lifetime, everybody does.  So do you need a
18 study to learn this?
19   Q.  Leave me out of it.  Let's leave
20 me out of it.
21   Is there, so you can point me to, though?
22   A.  I mean, everybody experience
23 inflammation in their lifetime.  Everybody knows.
24 And there are studies which are studying mechanisms
25 of that.  The fact itself is not even commonsense,

Page 292

1  it's personal experience of each individual.
2    But the studies who studied further,
3  how it happens with inflammatory mediators and
4  other things, yeah, they are there.
5    Q.  There are studies that exist?
6    A.  There should be at least in that.
7    Q.  Okay.  Are there studies looking
8  more specifically at inflammation and foreign body
9  reaction in the presence of mesh, and whether that
10 heightens the sensitivity threshold of pain
11 receptors?
12   A.  It's almost like narrowing down
13 something to a specific area, like could there be a
14 doctor for a little right finger.
15   Q.  The answer is, "no," right?
16   A.  There are studies which study
17 inflammation, in general.  I mean, there's a
18 physician or any thinking person, you can apply it
19 to any areas so...
20   Q.  So the answer to my question is,
21 no, the literature doesn't get that specific,
22 right?
23   MR. ORENT:  Objection.
24   THE WITNESS:  Not that narrow.
25

Page 293

1    BY MS. BYARD:
2    Q.  Thank you.  Let's look at page 8,
3  please.
4    I assume your response will be the
5  same, but with respect to transvaginal mesh, or
6  really just polypropylene mesh in general, you
7  can't point me to a specific study showing that the
8  pain caused by swelling is present in amplified
9  state, because of the compartments of mesh, right?
10   MR. ORENT:  Objection.
11   THE WITNESS:  Specific studies?  I
12 mean, we described it in our paper.  But
13 specifically that the edema was studied in meshes,
14 I cannot -- there are no studies which specifically
15 studied edema in meshes.
16   BY MS. BYARD:
17   Q.  And you would concede that there
18 could be women with edema present in the presence
19 of their mesh, who don't complain of pain, right?
20   A.  It's possible that there is edema
21 within some compartments, and it doesn't cause
22 pain.  Because it's a complex process, you might
23 need several factors which play together to cause
24 pain.  Some people not sensitive, some people don't
25 complain, so this is not black and white.

74 (Pages 290 to 293)

Vladimir Iakovlev, M.D.

Page 294

1     Q.  Okay.  And the same thing is true
2  for scar tissue, right?  We know that all mesh will
3  be present with scar tissue, and yet not all women
4  with mesh experience pain?
5     MR. ORENT:  Objection.
6     THE WITNESS:  See, this is difficult.
7  Because I don't actually have the specimens from
8  women who for sure didn't experience pain, or
9  didn't experience any complications.  This would be
10  an autopsy series, which is difficult.
11     So all cases I receive, they have
12  complications, all have scars.  If those who never
13  have any complications, how much of scarring --
14  there would be scar, if there is a different extent
15  of scarring, I don't know.
16     BY MS. BYARD:
17     Q.  In fact, let me rephrase that.
18  Strike that.
19     The fact that women can have scarring
20  because of mesh, but not experience pain, tends to
21  call into question, the association between the
22  presence of that scar tissue around the mesh and
23  pain, doesn't it?
24     A.  It contributes.  The scar itself,
25  wouldn't be a problem.  But scar with mesh, with

Page 295

1  innervation, with connection to other areas, then
2  the whole complex of changes, this leads to pain.
3     Q.  Well, from your research you've
4  concluded that all mesh will have innervation,
5  right?
6     A.  Transvaginal?
7     Q.  (Nods).
8     A.  Yes.  Because all meshes I
9  received.  But again, I don't know what is
10  happening in those meshes which don't have any
11  complications, or patients don't complain to a
12  degree that the mesh is excised.
13     Q.  Okay, thank you.
14     Have you heard of a condition called
15  pelvic floor congestion syndrome?
16     A.  Not specifically.
17     Q.  Do you know if there are ways to
18  measure blood flow in the pelvis?
19     A.  Dopplar.
20     Q.  And you haven't looked at studies
21  on that issue, have you?
22     A.  On Dopplar studies, no.
23     Q.  Would you agree with me that blood
24  vessels can become dilated and congested in the
25  vagina and surrounding area in the absence of mesh?

Page 296

1     A.  Possibly in some locations, yes.
2  But when I see it in the meshes, everything outside
3  of mesh is collapsed, and then vessels in the folds
4  of the mesh are dilated.
5     So, therefore, I have internal control.
6  I see what is outside of the mesh and I see what is
7  inside of the mesh, it's different.
8     Q.  You've looked at about 120
9  specimens of transvaginal mesh at the time that you
10  authored your report.
11     Do you have any statistics that you can
12  cite for me for the rate of dilated and congested
13  vessels in non-scarred vaginal tissue that you have
14  examined in your course as a pathologist.
15     A.  See, normally, you don't see
16  congestion.  Congestion of the vessels is not
17  normal.  I mean, there has to be something which is
18  causing it.  So if it's normal tissue -- if I quote
19  it "normal," it means that there are no
20  pathological findings.
21     If I see congestion, and some other
22  changes, I mean, this would not be perfectly
23  abnormal.  I mean, there might be some bleeding due
24  to surgery or something else.
25     Q.  You can't quote a rate then

Page 297

1  because you don't see it typically; is that what
2  you're saying?
3     A.  What do you mean, rate of what
4  happens with --
5     Q.  How often those findings are
6  present in non-mesh vaginal specimens?
7     A.  I don't see it.
8     MR. ORENT:  Objection.
9     THE WITNESS:  I don't see it normally.
10     BY MS. BYARD:
11     Q.  And I'm using the word "normally"
12  to describe "commonly".  I'm asking about abnormal
13  pathological findings.
14     A.  I don't understand exactly.  If
15  you want me to tell if I see the difference what is
16  inside the mesh of tissue, and what is outside on
17  the mesh, either in the specimen of mesh or
18  specimens without the mesh; there is a marked
19  difference between what is inside the mesh and
20  outside the mesh.
21     Q.  And I'm thinking about patients
22  who undergo excisions who have never had mesh.  Not
23  variation within a specimen.
24     MR. ORENT:  Objection.
25     THE WITNESS:  I don't see any

75 (Pages 294 to 297)

Vladimir Iakovlev, M.D.

Page 298

1    congestion.  If it's a healthy, elective procedure
2    for hysterectomy, when they do some trimming of the
3    vagina, and then they get vaginal cuff, there is no
4    congestion.
5         BY MS. BYARD:
6         Q.  Okay.
7         A.  No edema, no congestion, no
8    inflammation, is pristine tissue.
9         Q.  And that's for a patient who's
10   undergoing surgery electively, not because the
11   uterus or surrounding organs, the ovaries, were
12   identified as being a potential cause of that
13   woman's complaints, right?
14        A.  There are complaints.  I mean,
15   there is a reason for hysterectomy.  Usually it's
16   dysmenorrhea or just --
17        Q.  Heaviness?
18        A.  Excessive bleeding in perimenopausal
19   periods, so they don't want to have -- to take
20   drugs, so...
21        Q.  Okay.  You write in paragraph 13
22   about muscle relationships with mesh; are you with
23   me?
24        A.  Yes.
25        Q.  Can striated muscle grow within

Page 299

1    the mesh structure?
2         A.  That's a difficult question.
3    Technically, muscle itself cannot grow through
4    the -- or in large amount, cannot grow through
5    mesh.
6         So there has to be a combination of
7    either mesh placement into the muscle, which is
8    done, we know.  Or migration of the mesh into the
9    muscle, and a degree of muscle regeneration in the
10   folds or in the -- so it would be a combination of
11   factors, how the mesh -- how the muscle strands
12   become inside the mesh pores or folds.
13        Q.  And you can't say when you look at
14   a specimen, how that muscle and mesh got to where
15   they are?
16        A.  Depends.  In some specimens, the
17   mesh just cuts through the muscle, and you see the
18   trail of the muscle, it just sifts through it.
19   Then I can say for sure the mesh migrated into the
20   muscle, it left behind.  But now muscle is
21   interrupt, because mesh just went through it.  But
22   sometimes it's an array of different things, so I
23   don't know, I cannot tell.
24        Q.  You write that:
25        "Where muscle is attached to

Page 300

1    mesh, muscle contraction results in
2    pulling of the entire mesh."
3    Do you see that?
4         A.  Yes.
5         Q.  Can you point me to any published
6    articles that show muscle contraction pulling on
7    the mesh?
8         A.  No, it has not been specifically
9    studied in that specific sequence as you word it.
10        Q.  You could design an experiment
11   where you could look at muscle contraction in its
12   relationship to mesh, couldn't you?
13        A.  What I do see, when I can tell you
14   that if the muscle strength is viable, so it's
15   contractile.  Because see, with a muscle, if it
16   doesn't -- if it degenerates, it's not contract
17   anymore.
18        If it's healthy muscle, it will
19   contract.  So those muscle fibers or bundles, I see
20   in the mesh, they're healthy.  Therefore, they
21   contract.
22        Q.  As far as how the mesh is then
23   pulled by that muscle contraction, you could design
24   an experiment, though, looking at, for instance,
25   3D ultrasound technology?

Page 301

1         A.  Oh, if the mesh is moving during
2    movements, and -- yeah, you can do it.  I mean, you
3    can see -- well, as long as mesh is mobile.  If
4    it's so tight that it's not mobile anymore, like if
5    it's saw it here in between pubic bones, then it
6    will not be mobile.  But it doesn't allow -- that
7    muscle is trying to contract, it just cannot move
8    it anymore because it's so immobile.
9         Q.  And you're talking about various
10   scenarios that you could understand based on your
11   training and experience, correct?
12        A.  That's correct.
13        Q.  You're not talking about findings
14   that you've seen based on an experiment using, for
15   instance, 3D ultrasound technology that you,
16   yourself, have performed, right?
17        A.  No.  I'm basing what I see on the
18   microscope.  If it's healthy muscle, within the
19   mesh, completely surrounded by the mesh, it's
20   contraction will cause movement of the muscle.
21        Q.  And you haven't tested your
22   hypothesis about how muscle contraction will
23   interact with mesh in living patients?
24        MR. ORENT:  Objection.
25        THE WITNESS:  It's not a hypothesis.

Vladimir Iakovlev, M.D.

Page 302

1  This is my interpretation of the microscopic
2  findings, that's what I'm trained to do.  Interpret
3  what I see in the microscope, so...
4        BY MS. BYARD:
5        Q.  You haven't tested that finding in
6  living patients, right?
7        MR. ORENT:  I'm not sure if he was done
8  with his prior answer.
9        BY MS. BYARD:
10       Q.  Oh, sorry.
11       A.  See, this is not my job, I mean, I
12  know what tissue does.  So if a muscle is healthy,
13  it contracts.  This is what we know based on --
14  mesh, no mesh, we've known it for thousands of
15  years, muscle contracts.  If it's healthy muscle,
16  it contracts.  If it is in the mesh and completely
17  surrounded by the mesh, the contraction will pull.
18  So this is my interpretation as a pathologist.
19       If I measured what the strength, what
20  the force it produces in that specific section, no,
21  but I don't have to.  Because my job is
22  interpretation, and that is my interpretation.
23       Q.  Okay.  So in answering my
24  question, have you tested this yourself in humans,
25  in living humans, your answer would be, "no"?

Page 303

1        MR. ORENT:  Objection.
2        THE WITNESS:  No.  I mean, I explained
3  to you that I interpret based on what we know about
4  tissue reaction and general physiology of humans.
5        BY MS. BYARD:
6        Q.  Okay.  You also write that:
7            "Mesh in smooth muscle can
8        interfere with muscle contraction
9        and organ function."
10       A.  Yes.
11       Q.  Again, you haven't used any
12  imaging to test in human beings, how mesh present
13  with smooth muscle interferes with muscle
14  contraction or with organ function, have you?
15       A.  I'm not radiologist, I don't use
16  images -- what I see, I see when the mesh is in
17  the smooth muscle, I know it went all the way to
18  urinary bladder, it's somewhere in the detrusor
19  muscle.  I mean, if the bundles are consistent with
20  bladder.  It correlates almost 100 percent with
21  clinical descriptions of urinary symptoms.
22       Q.  So in answer to my question, no,
23  you haven't studied that in humans because you're
24  not a radiologist and that's not in your area of
25  study --

Page 304

1        MR. ORENT:  Objection.
2        BY MS. BYARD:
3        Q.  -- right?
4        A.  That's correct.
5        Q.  There are ways to measure the
6  forces at work in the body, aren't there?
7        A.  You have to explain a little bit
8  more, what do you mean "forces in ways --"?
9        Q.  Well, there are ways that you
10  could measure, for instance, the intraabdominal
11  force placed on muscle through, through ultrasound
12  technology, can't you?
13       MR. ORENT:  Objection.  Vague.
14       THE WITNESS:  I'm not sure if you can
15  use ultrasound to measure the force.
16       For diagnostic purposes, I don't --
17  well, I mean, first of all, I'm not sure if it can
18  be done.  Second, I don't see diagnostic purpose,
19  and I certainly wouldn't expect it to be done for
20  diagnostic purposes.
21       BY MS. BYARD:
22       Q.  Are you familiar with something
23  called "urodynamic testing"?
24       A.  Urodynamic is different.
25       Q.  How so?

Page 305

1        A.  Well, then they measure forces and
2  pressures to understand what's causing urinary
3  symptoms.
4        Q.  And they measure the forces of
5  various intraabdominal contractions, or the
6  detrusor muscle contraction --
7        A.  Detrusor muscle, yes.
8        Q.  -- within the female body, right?
9        A.  Yes, there is --
10       Q.  That's not an area that you've
11  studied though, correct?
12       A.  No.  No, I have not.
13       MR. ORENT:  Counsel, we're at 6:25,
14  we're going to wrap up in about five minutes.
15       MS. BYARD:  Okay.  I might be at a good
16  stopping point then.
17       BY MS. BYARD:
18       Q.  There's also a discussion here of
19  limited elasticity.  And, similarly, there are ways
20  to study the elasticity of different tissues within
21  the body, aren't there?
22       A.  Yes, including gross examination,
23  which I do.
24       Q.  But there is testing that can be
25  done beyond gross examination, right?

77 (Pages 302 to 305)

Vladimir Iakovlev, M.D.

Page 306

1        A.  For my purposes, we are not doing
2   more than that as a pathologist.  If it's done for
3   any other diagnostic procedures, I'm not aware of
4   commonly used diagnostic tool which would use
5   elasticity for a specific diagnosis.
6        Q.  Well, researchers have looked at
7   the elasticity of virgin tissue compared to scar
8   tissue, haven't they?
9        A.  Well, that's research.  Research
10  and clinical practice are different areas, I
11  mean --
12       Q.  So irrespective of whether it's in
13  research or clinical practice, there are ways to
14  look at the relative elasticity of different types
15  of tissues?
16       MR. ORENT:  Objection.
17       BY MS. BYARD:
18       Q.  True?
19       A.  Yes.  I mean, mostly for research,
20  as I expect.  Maybe there is a very limited amount
21  of clinical applications, like for genetic
22  conditions when there is not enough collagen or
23  something else, I mean, but --
24       Q.  Or with pelvic organ prolapse,
25  too, where there are different types of collagen

Page 307

1   present at different levels that lead to
2   abnormalities in the structures of the pelvis?
3        A.  I don't think it is not.  Pelvic
4   organ prolapse is just by visual assessment and
5   degree of prolapse.
6        Q.  Do you know how the presence of
7   different types of collagen in the pelvic floor
8   correlate to incidence of pelvic organ prolapse in
9   women?
10       MR. ORENT:  Objection.
11       THE WITNESS:  Collagen alteration, the
12  ratios, I mean, they affect not just pelvic organ
13  prolapse, they affect the whole body.  There will
14  be abnormalities, aortic dilatation and
15  hyperelasticity of joints and so forth.  So it's
16  not just pelvic organs which are affected.
17       BY MS. BYARD:
18       Q.  But that's not an area of your
19  study, right?
20       A.  But this would be an abnormal
21  genetic condition, if we talk about collagen
22  alteration.
23       If it's a normal, healthy person, I
24  mean, there would not be collagen alterations
25  beyond what is normal expected with aging.

Page 308

1        Q.  Well, in a normal healthy person,
2   you wouldn't see pelvic organ prolapse to begin
3   with, would you?  That's an abnormal finding?
4        MR. ORENT:  Objection.
5        THE WITNESS:  Partially, it's a
6   relaxation, age-related; so what do you mean?  I
7   mean, healthy younger individual, yes, this would
8   be a problem.
9        BY MS. BYARD:
10       Q.  Similarly, stress urinary
11  incontinence is an abnormal finding, isn't it?
12       A.  Yes.
13       MS. BYARD:  Okay, Doctor, I think we've
14  reached a good stopping point for the night.  I
15  thank you for your time.
16       THE WITNESS:  Thank you.
17       THE VIDEOGRAPHER:  This marks the end
18  of media number four in today's proceedings in the
19  deposition of Dr. Vladimir Iakovlev.
20       We are going off the record at 6:31 p.m.
21
22  -- Whereupon the deposition was suspended at 6:31 p.m.
23
24
25

Page 309

1           REPORTER'S CERTIFICATE
2
3
4        I, JUDITH M. CAPUTO, RPR, CSR, CRR,
5   Registered Professional Reporter, certify;
6        That the foregoing proceedings were
7   taken before me at the time and place therein set
8   forth, at which time the witness was put under oath
9   by me;
10       That the testimony of the witness and
11  all objections made at the time of the examination
12  were recorded stenographically by me and were
13  thereafter transcribed;
14       That the foregoing is a true and
15  correct transcript of my shorthand notes so taken.
16
17
18
19       Dated this 23rd day of December, 2014.
20
21
22       _____
23
24       PER:  JUDITH CAPUTO, RPR, CSR, CRR
25

78 (Pages 306 to 309)

Vladimir Iakovlev, M.D.

Page 310

1    CERTIFICATE OF REPORTER
2    CANADA          )
3    PROVINCE OF ONTARIO   )
4
5    I, Judith M. Caputo, the officer before whom the
6    foregoing deposition was taken, do hereby certify
7    that the witness whose testimony appears in the
8    foregoing deposition was duly sworn by me; that the
9    testimony of said witness was taken by me in
10   shorthand, using Computer Aided Realtime, to the
11   best of my ability and thereafter reduced to
12   written format under my direction; that I am
13   neither counsel for, related to, nor employed by
14   any of the parties to the action in which the
15   deposition was taken, and further that I am not
16   related or any employee of any attorney or counsel
17   employed by the parties thereto, nor financially or
18   otherwise interested in the outcome of the action.
19
20
21   _____
22   Judith M. Caputo, RPR, CSR, CRR
23
24   Commissioner for taking
25   Oaths in the Province of Ontario

Page 312

1    * * ERRATA SHEET * *
2
3    NAME OF CASE:   IN RE:  BOSTON SCIENTIFIC CORP.,
4    PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION
5    MDL NO. 2326
6    DATE OF DEPOSITION:  DECEMBER 17, 2014
7    NAME OF WITNESS:  VLADIMIR IAKOVLEV, M.D.
8
9    PAGE  LINE    FROM    TO
10   ____|____|_____|_____
11   ____|____|_____|_____
12   ____|____|_____|_____
13   ____|____|_____|_____
14   ____|____|_____|_____
15   ____|____|_____|_____
16   ____|____|_____|_____
17   ____|____|_____|_____
18   ____|____|_____|_____
19   ____|____|_____|_____
20   ____|____|_____|_____
21   ____|____|_____|_____
22   ____|____|_____|_____
23
24   _____
25        VLADIMIR IAKOVLEV, M.D.

Page 311

1    INSTRUCTIONS TO WITNESS
2
3         Read your deposition over carefully.
4    It is your right to read your deposition and make
5    changes in form or substance.  You should assign a
6    reason in the appropriate column on the erratum
7    sheet for any change made.
8         After making any changes in form or
9    substance, and which have been noted on the
10   following erratum sheet, along with the reason for
11   any change, sign your name on the erratum sheet and
12   date it.
13        Then sign your deposition at the end of
14   Your testimony in the space provided.  You are
15   signing it subject to the changes you have made in
16   the erratum sheet, which will be attached to the
17   deposition before filing.  You must sign it in
18   front of a witness.  The witness need not be a
19   notary public.  Any competent adult may witness
20   your signature.
21        Return the original erratum sheet
22   promptly.  Court rules require filing within 30
23   days after you receive the deposition.
24
25

Page 313

1    PROVINCE OF ONTARIO   )
2    TORONTO REGION       )
3
4
5
6         I, the undersigned, declare under penalty
7    of perjury that I have read the foregoing transcript,
8    and I have made any corrections, additions or
9    deletions that I was desirous of making;
10        That the foregoing is a true and
11   correct transcript of my testimony contained
12   therein.
13
14   _____
15        VLADIMIR IAKOVLEV, M.D.
16
17
18   Subscribed and sworn to before me this _____
19   Day of _____, 2014 at
20   _____, _____
21    (City)        (Province)
22
23   _____
24   (Notary Public)
25   My Commission Expires: _____