# EXHIBIT B

Confidential - Subject to Stipulation and Order of Confidentiality

Page 293

SUPERIOR COURT OF NEW JERSEY

LAW DIVISION - ATLANTIC COUNTY

CIVIL ACTION

- - -

|  | :CASE NO. |
|---|---|
|  | :291 CT |
| IN RE: | : |
| PELVIC MESH/GYNECARE LITIGATION | :MASTER CASE |
|  | :6341-10 |

CONFIDENTIAL

SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY

November 13, 2015

Continued videotape realtime deposition of MARTIN WEISBERG, M.D., was taken pursuant to notice and held at the law offices of RIKER DANZIG HYLAND PERRETTI LLP, Headquarters Plaza, One Speedwell Avenue, Morristown, New Jersey, beginning at 9:42 a.m. on the above date, before Kimberly A. Cahill, a Federally Approved Registered Merit Reporter and Notary Public for the State of New Jersey.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 294

```
1          Transcript of the continued
2    deposition of MARTIN WEISBERG, M.D., called for
3    Videotape Examination in the above-captioned matter,
4    said deposition taken pursuant to Superior Court
5    Rules of Practice and Procedure by and before
6    KIMBERLY A. CAHILL, a Federally Approved Registered
7    Merit Reporter, Certified Court Reporter, and Notary
8    Public for the State of New Jersey, at the offices
9    of RIKER DANZIG SCHERER HYLAND PERRETTI LLP,
10   Headquarters Plaza, One Speedwell Avenue,
11   Morristown, New Jersey, commencing at 9:42 a.m.
12
13                - - -
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 296

```
1    BUTLER SNOW LLP
     BY:  WILLIAM M. GAGE, ESQUIRE
2    1020 Highland Colony Parkway, Suite 1400
     Ridgeland, Mississippi 39157
3    (601) 948-5711
     william.gage@butlersnow.com
4    Representing the Johnson & Johnson and Ethicon
     Defendants
5
6    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
     BY:  RICHARD T. BERNARDO, ESQUIRE
7    (via telephone)
     4 Times Square
8    New York, New York  10036
     (212) 735-3453
9    richard.bernardo@skadden.com
     Representing the Johnson & Johnson and Ethicon
10   Defendants
11
     VIDEOTAPE TECHNICIAN:
12
         Dale Swindell
13
14
15
16
17                - - -
18
19
20
21
22
23
24
25
```

Page 295

```
1    APPEARANCES:
2
     HEARD ROBINS CLOUD LLP
3    BY:  ALEX BARLOW, ESQUIRE
     2000 West Loop South
4    22nd Floor
     Houston, Texas  77027
5    (713) 650-1200
     barlow@heardrobins.com
6    Representing the MDL Plaintiffs
7
     FREESE & GOSS, PLLC
8    BY:  RICHARD A. FREESE, ESQUIRE
     Regions Harbert Plaza 1901
9    6th Avenue North, Suite 3120
     Birmingham, Alabama 35203
10   (205) 871-4144
     rich@freeseandgoss.com
11   Representing the Texas Plaintiffs
12
     KLINE & SPECTER, P.C.
13   BY:  CATHERINE A. FOLEY, ESQUIRE
     (via telephone)
14   The Nineteenth Floor
     1525 Locust Street
15   Philadelphia, Pennsylvania 19102
     (215) 772-1000
16   Catherine.Foley@KlineSpecter.com
     Representing the Plaintiffs
17
18   RIKER DANZIG SCHERER HYLAND PERRETTI LLP
     BY:  MAHA M. KABBASH, ESQUIRE
19   Headquarters Plaza
     One Speedwell Avenue
20   Morristown, New Jersey  07962-1981
     (973) 538-0800
21   mkabbash@riker.com
     Representing the Johnson & Johnson and Ethicon
22   Defendants
23
24
25
```

Page 297

```
1                - - -
2             I N D E X
3                - - -
4
5    Testimony of:  MARTIN WEISBERG, M.D.
6       By Mr. Barlow        304
        By Mr. Freese        381
7       By Mr. Gage          457
        By Mr. Freese        527
8       By Mr. Barlow        581
        By Mr. Gage          603
9
10               - - -
11           E X H I B I T S
12               - - -
13
14   NO.      DESCRIPTION          PAGE
15   D-1      Ethicon Response to Section   459
             39 Request and Attachments,
16           ETH.MESH.22631022 through
             ETH.MESH.22632029
17
18   D-2      7/29/14 CAPA-003474,         476
             ETH.MESH.22625140 through
19           ETH.MESH.22625145
20   D-3      2008 TVT Brochure,           481
             ETH.MESH.08003279 through
21           ETH.MESH.08003294
22   D-4      2012 TVT Brochure,           483
             ETH.MESH.09744858 through
23           ETH.MESH.09744863
24   D-5      1/15 E-Mail Chain,           488
             ETH.MESH.22631008
25   D-6      4/8/15 Cover Letter from     494
```

2 (Pages 294 to 297)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 298

| 1 | | Kluesner Attaching |
| 2 | | Add-To-File Submission, etc., Beginning with ETH.MESH.22617620 |
| 3 | D-7 | E-Mail Chain and Attachments, 496 |
| 4 | | Beginning with ETH.MESH.22865906 |
| 5 | D-8 | 6/4/15 E-Mail from Andrews to 500 |
| 6 | | Kluesner, ETH.MESH.22634691 and ETH.MESH.22634692 |
| 7 | D-9 | Six-Page Document Labeled 503 |
| 8 | | "Chronology" |
| 9 | D-10 | 6/5/15 E-Mails, with First 506 |
| 10 | | One from Andrews to Kluesner, ETH.MESH.22865922 |
| 11 | P-1656 | 9/24/15-Present TVT Abbrevo 303 |
| 12 | | IFU, HMESH_ETH_11049264 through HMESH_ETH_11049274 |
| 13 | P-1657 | 9/10/10-11/27/14 TVT Abbrevo 333 |
| 14 | | IFU, ETH.MESH.02341203 through ETH.MESH.02341213 |
| 15 | P-1658 | 11/6/15 Updated IFU Index and 335 |
| 16 | | Production Bates Range Chart |
| 17 | P-1659 | 7/1/15-9/15/15 TVT Abbrevo 336 |
| 18 | | IFU, ETH.MESH.02617489 through ETH.MESH.02617499 |
| 19 | P-1660 | 9/18/15-Present TVT Exact 356 |
| 20 | | IFU, ETH.MESH.22129185 through ETH.MESH.22129191 |
| 21 | P-1661 | 5/4/10-6/6/13 TVT Exact IFU, 356 |
| 22 | | ETH.MESH.05799233 through ETH.MESH.05799239 |
| 23 | P-1662 | 10/23/13-11/26/14 TVT Exact 356 |
| 24 | | IFU, HMESH_ETH_03038566 through HMESH_ETH_03038572 |
| 25 | P-1663 | 8/12/14-9/9/15 TVT Exact IFU, 356 |
| | | ETH.MESH.02618012 through |

Page 300

```
1        - - -
2   DEPOSITION SUPPORT INDEX
3        - - -
4
5   Direction to Witness Not to Answer
6   Page Line  Page Line      Page Line
7
8   Request for Production of Documents
9   Page Line  Page Line      Page Line
10
11
    Stipulations
12
    Page Line  Page Line      Page Line
13
    605 25
14
15  Question Marked
16  Page Line  Page Line      Page Line
17
18
19
20
21
22
23
24
25
```

Page 299

| 1 | | ETH.MESH.02618018 |
| 2 | P-1664 | 8/5/13-10/17/13 TVT Exact 357 |
| 3 | | IFU, ETH.MESH.10670138 through ETH.MESH.10670144 |
| 4 | P-1665 | E-Mail Chain, 382 |
| 5 | | ETH.MESH.17619387 through ETH.MESH.17619398 |
| 6 | P-1666 | Document Labeled "Ethicon 409 |
| 7 | | Approvers of 2015 Pelvic Mesh IFU Changes" |
| 8 | P-1667 | 4/14 E-Mail Chain, 419 |
| 9 | | ETH.MESH.176324274 and ETH.MESH.176324275 |
| 10 | P-1668 | 5/8/14 E-Mail Chain, 425 |
| 11 | | ETH.MESH.17636165 through ETH.MESH.17636167 |
| 12 | P-1669 | 6/2/14 PRE14-055S Health 434 |
| 13 | | Canada Section 39 Request and Response, ETH.MESH.17639467 |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 301

```
1
2   Reserved for Confidential Designation Index as
3   Pursuant to the Protective Order
4        - - -
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3 (Pages 298 to 301)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

| Page 302 |
|---|
| 1      Reserved for Confidential Designation Index as |
| 2        Pursuant to the Protective Order |
| 3          - - - |

**Page 302**

1      Reserved for Confidential Designation Index as
2        Pursuant to the Protective Order
3         - - -
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 303**

1        - - -
2        THE VIDEO TECHNICIAN:  We're now on
3 the record.  My name is Dale Swindell.  I am a
4 videographer for Golkow Technologies.  Today's date
5 is November 13th, 2015 and the time is 9:42 a.m.
6        This video deposition is being held
7 in Morristown, New Jersey in the matter of In Re:
8 Pelvic Mesh/Gynecare (Atlantic).  The deponent is
9 Martin Weisberg, M.D.  Counsel will be noted on the
10 stenographic record.
11        The court reporter is Kimberly Cahill
12 and will now swear in the witness.
13         - - -
14        MARTIN WEISBERG, M.D., after having
15 been duly sworn, was examined and
16 testified as follows:
17         - - -
18        (Deposition Exhibit No. P-1656,
19 9/24/15-Present TVT Abbrevo IFU,
20 HMESH_ETH_11049264 through
21 HMESH_ETH_11049274, was marked for
22 identification.)
23         - - -
24        EXAMINATION
25         - - -

**Page 304**

1 BY MR. BARLOW:
2      Q.    Good morning, Dr. Weisberg.
3      A.    Hello.
4      Q.    I'm Alex Barlow.  We met yesterday.
5      A.    Yes.
6      Q.    And I'm going to be continuing with
7 your questioning today.
8        I'm going to hand you a document that
9 I've marked P-1656, and I will represent to you that
10 that is the TVT Abbrevo IFU that Ethicon has
11 produced in this case and represented to us was in
12 use from September 24, 2015 to the present day.
13 Take a look at that and confirm it for me, please.
14        And here, Maha -- I'm sorry, Maha.
15        MR. GAGE:  It's probably better to
16 hand them to her because she can kind of look, check
17 in on it and make sure that --
18        MR. BARLOW:  Make sure I'm not --
19        MR. GAGE:  Yep.
20        MR. BARLOW:  -- getting the wrong
21 one.
22        MR. GAGE:  She's going to go get her
23 chart, but you go ahead and keep going with him.  If
24 there's a problem, she'll let us know when she comes
25 back.

**Page 305**

1        (Pause.)
2        THE WITNESS:  Yes.
3 BY MR. BARLOW:
4      Q.    And, Doctor, I'm going to ask you --
5 we're going to go through.  I'm going to ask you to
6 compare that to Exhibit 1640, which is the list of
7 adverse reactions for TVT.
8      A.    Okay.
9      Q.    First, let me ask you about 1640.
10 All of the adverse reactions listed on Exhibit 1640
11 are adverse reactions that can occur with the TVT
12 Abbrevo; correct?
13      A.    Yes.
14      Q.    And all of the reactions, the adverse
15 reactions, listed on 1640, Exhibit 1640, are adverse
16 reactions that were known to be something that could
17 occur with regard to the TVT family of products when
18 -- at the initial launch of the original TVT;
19 correct?
20      A.    I don't know that there was any
21 documentation of excessive contraction at that time.
22 It was hypothetical.
23      Q.    It was -- it was known to be a
24 possibility at the launch of the first TVT that
25 excessive contraction was a possibility.

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 306

1    A.    I think it was hypothesized.
2    Q.    When were the first reports of
3  excessive contraction that you're aware of?
4    A.    For TVT?
5    Q.    Uh-hum.
6    A.    I don't know that I can recall any
7  documentation of excessive contraction.  I just
8  don't know.
9    Q.    Okay.
10        It was a risk that was considered as
11  a reasonable possibility at the launch of the
12  original TVT that there could be excessive
13  contraction; correct?
14    A.    Well, it was only hypothesized
15  because the device was new.
16    Q.    What preclinical testing or prelaunch
17  clinical testing did you do to exclude the
18  possibility of excessive contraction before the
19  launch of the original TVT?
20        MR. GAGE:  Objection; beyond the
21  scope.
22        THE WITNESS:  I don't have that
23  information in my head.  I would need to look it up.
24  BY MR. BARLOW:
25    Q.    As you sit here today, can you

Page 307

1  identify any clinical testing that was done on the
2  original TVT before launch to inquire about whether
3  or not excessive contraction was something more than
4  a hypothesized risk?
5        MR. GAGE:  Objection; beyond the
6  scope.
7        Go ahead.
8        THE WITNESS:  I don't recall any.
9  BY MR. BARLOW:
10    Q.    Doctor, with regard to the other
11  adverse reactions listed on 1640, were all those
12  adverse reactions known by Ethicon to be risk --
13  adverse reactions that could occur with the TVT
14  family of products at the time of the launch of the
15  original TVT?
16    A.    Yes.
17    Q.    Doctor, at the time -- strike that.
18        It would have been feasible to warn
19  of all of the risks listed on Exhibit 1640 at the
20  time of the launch of the original TVT, would it
21  have -- wouldn't it have?
22    A.    Feasible --
23    Q.    Let me ask that again because it was
24  a -- at the time of the launch of the original TVT,
25  it would have been feasible to warn of all of the

Page 308

1  adverse reactions listed on 1640; correct?
2    A.    If feasible means could it be done --
3  could it have been done, yes.
4    Q.    And it would have been feasible at
5  the time of the launch of the TVT Abbrevo to warn of
6  all of the adverse reactions listed on 1640;
7  correct?
8    A.    Yes.
9    Q.    And it would have been reasonable to
10  warn of all of the adverse reactions listed on 1640
11  at the time of the launch of the Abbrevo; correct?
12    A.    I'm hesitating because I don't know
13  that there was enough evidence to include excessive
14  contraction; and then if -- if that evidence did not
15  exist, then it might not have been reasonable.
16    Q.    You don't know one way or the other
17  whether or not there was enough evidence of
18  excessive contraction at the time of the launch of
19  the Abbrevo as to whether or not it would have been
20  reasonable to include that?
21    A.    That's right.
22    Q.    You included it, obviously, after the
23  Health Canada inquiry; correct?
24        MR. GAGE:  Object to form.
25        THE WITNESS:  We notified Health

Page 309

1  Canada that we would include it, yes.
2  BY MR. BARLOW:
3    Q.    You notified Health Canada that you
4  would include it, but it did not actually appear in
5  the TVT Abbrevo.
6    A.    That's right.
7    Q.    IFU.
8    A.    That's correct.
9    Q.    With the exception of the excessive
10  contraction, all of the adverse reactions listed on
11  1640 would have been reasonable to warn of at the
12  time of the launch of the Abbrevo; correct?
13    A.    Yes.
14    Q.    It would have been reasonable to warn
15  of foreign body response resulting in inflammation,
16  extrusion, erosion, exposure, and fistula formation;
17  correct?
18    A.    Yes.
19    Q.    At the time of the launch of the
20  Abbrevo, it would have been reasonable to warn of
21  mesh extrusion, exposure, and erosion into the
22  vagina and other structures or organs; correct?
23    A.    Yes.
24    Q.    And it would have been reasonable to
25  warn at the time of the launch of the TVT Abbrevo of

5 (Pages 306 to 309)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 310

1  acute and chronic pain, wouldn't it have?
2      A.    Yes.
3      Q.    It would have been reasonable to warn
4  of pain with intercourse with some patients that may
5  not resolve at the time of the launch of the TVT
6  Abbrevo; correct?
7      A.    Yes.
8      Q.    It would have been reasonable to warn
9  of neuromuscular problems, including acute and/or
10 chronic pain in the groin, thigh, leg, pelvic and
11 abdominal area at the time of the launch of the TVT
12 Abbrevo, wouldn't it have?
13     A.    Yes.
14     Q.    And it would have been reasonable to
15 warn at the time of the launch of the TVT Abbrevo of
16 the adverse reactions, that they may require
17 surgical treatment to cure them; correct?
18     A.    Yes.
19     Q.    It would have been reasonable to warn
20 at the launch of the TVT Abbrevo that one or more
21 revision surgeries may be necessary to treat adverse
22 reactions to the TVT Abbrevo.  That would have been
23 reasonable to warn of at its launch; correct?
24     A.    Yes.
25     Q.    It would have also been -- strike

Page 311

1  that.
2          It would have been reasonable to warn
3  at the time of the launch of the TVT Abbrevo that in
4  cases in which Prolene mesh needs to be removed in
5  part or in whole, significant dissection may be
6  required; correct?
7      A.    Yes.
8      Q.    And, Doctor, just so we have the
9  record clean, at the time of the launch of the
10 original TVT, it would have been reasonable to warn
11 of the foreign body response that could result in
12 inflammation, extrusion, erosion, exposure, and
13 fistula formation; correct?
14     A.    Yes.
15     Q.    At the time of the launch of the
16 original TVT, it would have been reasonable to warn
17 of mesh extrusion, exposure, erosion into the vagina
18 and other structures or organs; correct?
19     A.    Yes.
20     Q.    At the time of the launch of the TVT,
21 it would have been reasonable for Ethicon to warn
22 about acute and/or chronic pain in association with
23 the TVT; correct?
24     A.    Yes.
25     Q.    At the time of the launch of the

Page 312

1  original TVT, it would have been reasonable to warn
2  of pain with intercourse, which in some patients may
3  not resolve; correct?
4      A.    Yes.
5      Q.    At the time of the launch of the
6  original TVT, it would have been reasonable to warn
7  of neuromuscular problems, including acute and/or
8  chronic pain in the groin, thigh, leg, pelvic and/or
9  abdominal area; correct?
10     A.    Yes.
11     Q.    At the time of the launch of the
12 original TVT, it would have been reasonable to warn
13 that adverse reactions to the TVT may require
14 surgical treatment; correct?
15     A.    Yes.  I -- you know what?  I think I
16 spoke too quickly on one of those and I'd like to go
17 back to the -- the thigh and leg pain for the
18 original TVT.
19          The original TVT did not involve that
20 area.
21          MR. BARLOW:  I'm going to object as
22 nonresponsive and I'll ask you a clean question.
23          THE WITNESS:  Okay.
24 BY MR. BARLOW:
25     Q.    At the time of the launch of the

Page 313

1  original TVT, it would have been reasonable to warn
2  of neuromuscular problems, including acute and/or
3  chronic pain in the groin and/or pelvic and
4  abdominal area.
5      A.    Yes.
6      Q.    At the time of the launch of the
7  original TVT, it would have been reasonable to have
8  warned that adverse reactions to the TVT may require
9  surgical treatment; correct?
10     A.    Yes.
11     Q.    And it would have been -- strike
12 that.
13          It would have been reasonable to warn
14 at the time of the launch of the original TVT that
15 one or more revision surgeries may be necessary to
16 treat adverse reactions to the TVT; correct?
17     A.    Yes.
18     Q.    It would have been reasonable to warn
19 at the time of the launch of the original TVT that
20 in cases where Prolene mesh needs to be removed in
21 part or whole, significant dissection may be
22 required; correct?
23     A.    Yes.
24     Q.    And, Doctor, I'm going to go through
25 the same questions with the TVT-O and then we'll

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Stipulation and Order of Confidentiality

Page 314

1  move forward.  Okay?
2      A.    Okay.
3      Q.    At the time of the launch of the
4  TVT-O, it would have been reasonable for Ethicon to
5  warn that foreign body response to the TVT-O could
6  result in inflammation, extrusion, erosion,
7  exposure, and fistula formation; correct?
8      A.    Yes.
9      Q.    It was something that was known to
10  Ethicon at the time of the launch of the TVT-O that
11  the foreign body response to the TVT-O can result in
12  inflammation, extrusion, erosion, exposure, and
13  fistula formation; correct?
14      A.    Yes.
15      Q.    It was something that was known to
16  Ethicon at the time of the launch of the TVT-O that
17  mesh extrusion, exposure, and erosion into the
18  vagina or other structures or organs could occur
19  with the TVT-O; correct?
20      A.    Yes.
21      Q.    It would have been reasonable for
22  Ethicon to warn the doctors and consumers that mesh
23  extrusion, exposure, or erosion into the vagina or
24  other structures or organs could occur with the
25  TVT-O at the time of its launch; correct?

Page 315

1          MR. GAGE:  Object to form.
2          THE WITNESS:  Yes.
3          MR. BARLOW:  Because of the
4  objection, let me ask it a different way.
5  BY MR. BARLOW:
6      Q.    Doctor, it would have been reasonable
7  for Ethicon to warn with regard to the TVT-O at the
8  time of its launch that mesh extrusion, exposure, or
9  erosion into the vagina or other structures or
10  organs could occur with the TVT-O; correct?
11      A.    Yes.
12      Q.    It was known to Ethicon at the time
13  of the launch of the TVT-O that acute and/or chronic
14  pain could result from the TVT-O; correct?
15      A.    Yes.
16      Q.    It was also -- well, strike that.
17          It was reasonable -- it would have
18  been reasonable for Ethicon to warn at the time of
19  the launch of the TVT-O that acute and/or chronic
20  pain could result from the TVT-O; correct?
21      A.    From the procedure?  Or from the
22  device?
23          MR. BARLOW:  Object as nonresponsive.
24  BY MR. BARLOW:
25      Q.    At the time of the launch of the

Page 316

1  TVT-O device, it would have been reasonable for
2  Ethicon to have warned that acute or chronic pain
3  could result from the device.
4      A.    The reason I'm hesitating is because
5  the device is part of the procedure and it's hard to
6  know what the pain is from, whether it's from the
7  device or from the procedure, but --
8      Q.    Doctor, it would have been reasonable
9  to warn that -- at the time of the launch of the
10  TVT-O, that use of the product could result in acute
11  and/or chronic pain.
12      A.    Yes.
13      Q.    It would have been reasonable to warn
14  at the time -- strike that.
15          It was known to Ethicon at the time
16  of the launch of the TVT-O that pain with
17  intercourse, which in some patients may not resolve,
18  may result from use of the TVT-O.
19      A.    Yes.
20      Q.    And it would have been reasonable to
21  warn at the time of the launch of the TVT-O that
22  pain with intercourse, which in some patients may
23  not resolve, could result from use of the TVT-O;
24  correct?
25      A.    Yes.

Page 317

1      Q.    And it was known to -- strike that.
2          It was known to Ethicon at the time
3  that the TVT-O was launched that neuromuscular
4  problems, including acute and/or chronic pain in the
5  groin, thigh, leg, pelvic and/or abdominal area
6  could result from the use of the TVT-O; correct?
7      A.    Yes.
8      Q.    And at the time -- it would have been
9  reasonable to warn at the time of the launch of the
10  TVT-O that neuromuscular problems, including acute
11  and/or chronic pain in the groin, thigh, leg, pelvic
12  and abdominal area could result, correct, from its
13  use?
14      A.    Yes.
15      Q.    It was known to Ethicon at the time
16  of the launch of the TVT-O that the adverse
17  reactions to the TVT-O may require surgical
18  treatment; correct?
19      A.    Yes.
20      Q.    It would have been reasonable for
21  Ethicon to have warned at the time of the launch of
22  the TVT-O that adverse reactions may require
23  surgical treatment; correct?
24      A.    Yes.
25      Q.    It was known to Ethicon at the time

7 (Pages 314 to 317)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 318

1    of the launch of the TVT-O that one or more revision
2    surgeries may be necessary to treat the adverse
3    reactions to the TVT-O; correct?
4            A.    Yes.
5            Q.    And at the time of the launch of the
6    TVT-O, it would have been reasonable for Ethicon to
7    warn that one or more revision surgeries may be
8    necessary to treat the adverse reactions from its
9    use; correct?
10           A.    Yes.
11           Q.    Doctor, at the time of the launch of
12   the TVT-O, it was known to Ethicon -- strike that.
13   I've got a dry mouth.  I'm sorry.
14           MS. KABBASH:  Alex, while you've
15   stopped, I don't know if we need to go off.  There's
16   an attorney who can't dial in because he says the
17   number from yesterday is not working.
18           Is there a different number today?
19           THE VIDEO TECHNICIAN:  We'll go off
20   the record?
21           MS. KABBASH:  Yeah.
22           THE VIDEO TECHNICIAN:  The time is
23   9:59.  We're going off the record.
24                        - - -
25           (A discussion off the record

Page 319

1       occurred.)
2                        - - -
3            THE VIDEO TECHNICIAN:  The time is
4    10:02.  We're back on the record.
5    BY MR. BARLOW:
6            Q.    Doctor, now that I've got some water
7    and not choking, we'll take up the questions again.
8            At the time of the launch of the
9    TVT-O, it was known to Ethicon that in cases in
10   which the Prolene mesh needed to be removed in part
11   or whole, significant dissection may be required;
12   correct?
13           A.    Yes.
14           Q.    And it would have been reasonable at
15   the time of the launch of the TVT-O for Ethicon to
16   warn that in cases in which the Prolene mesh needs
17   to be removed in part or whole, significant
18   dissection may be required; correct?
19           A.    Yes.
20           Q.    And, Doctor, at the time of the
21   launch of the TVT -- the original TVT, it was known
22   to Ethicon that the foreign body response could
23   result in inflammation, extrusion, erosion,
24   exposure, and fistula formation; correct?
25           A.    Yes.

Page 320

1            Q.    It was known to Ethicon at the time
2    of the launch of the original TVT that mesh
3    extrusion, exposure, or erosion into the vagina or
4    other structures or organs could occur as a result
5    of the use of the TVT; correct?
6            A.    Yes.
7            Q.    It was known by Ethicon at the time
8    of the launch of the original TVT that acute and/or
9    chronic pain could result from its use; correct?
10           A.    Yes.
11           Q.    It was known by Ethicon at the time
12   of the launch of the original TVT that pain with
13   intercourse, which in some patients may not resolve,
14   could result from the use of the TVT; correct?
15           A.    Yes.
16           Q.    It was known by Ethicon at the time
17   of the launch of the original TVT that neuromuscular
18   problems, including acute and/or chronic pain in the
19   groin, pelvis, and abdominal area could result from
20   the use of the TVT; correct?
21           A.    Yes.
22           Q.    It was known by Ethicon at the time
23   of the launch of the original TVT that the adverse
24   reactions that could occur as a result of its use
25   may require surgical treatment; correct?

Page 321

1            A.    Yes.
2            Q.    It was known at the time of the
3    launch of the original TVT that one or more revision
4    surgeries may be necessary to treat the adverse
5    reactions to the TVT's use; correct?
6            A.    Yes.
7            Q.    In cases in which -- strike that.
8            It was known to Ethicon at the time
9    of the launch of the original TVT that in cases in
10   which the Prolene mesh used in the TVT needed to be
11   removed in part or whole, significant dissection may
12   be required; correct?
13           A.    Yes.
14           Q.    Doctor, it was known at the time of
15   the launch of the original TVT that even when
16   additional surgeries were performed, that the
17   adverse reactions and the symptoms related to them
18   may not resolve; correct?
19           A.    That's correct.
20           Q.    And that -- it was known at the time
21   of the launch of the TVT-O that even with additional
22   surgeries to treat the adverse reactions that may
23   occur with the TVT-O, those adverse reactions or the
24   symptoms related to them may not resolve; correct?
25           A.    That's correct.

Golkow Technologies, Inc. - 1.877.370.DEPS

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 322

1  Q.   And it was known at the time of the
2  launch of the TVT Abbrevo that even with surgeries
3  to correct the adverse reactions to the TVT Abbrevo,
4  that the symptoms or the adverse reactions may not
5  resolve; correct?
6  A.   Yes.
7  Q.   And it would have been reasonable at
8  the time of the launch of the TVT Abbrevo to warn
9  about the possibility that additional surgeries may
10 not cure the symptoms or adverse reactions; correct?
11 A.   Yes.
12 Q.   It would have been reasonable to warn
13 at the time of the launch of the original TVT that
14 additional surgeries may not resolve the adverse
15 reactions or the related symptoms to the use of the
16 TVT; correct?
17 A.   Correct.
18 Q.   And it would have been reasonable for
19 -- strike that.
20      At the time of the launch of the
21 TVT-O, it would have been reasonable for Ethicon to
22 warn that additional surgeries to treat adverse
23 reactions may not resolve those adverse reactions or
24 symptoms; correct?
25 A.   Correct.

Page 323

1  Q.   Doctor, let me turn your attention to
2  Exhibit 1641.
3  A.   Okay.
4  Q.   Doctor, at the time of the launch of
5  the original TVT, it was known to Ethicon that urge
6  incontinence could result from its use; correct?
7  A.   Yes.
8  Q.   At the time of the launch of the
9  original TVT, it was known to Ethicon that urinary
10 frequency could result from the TVT's use; correct?
11 A.   Yes.
12 Q.   And this would be de novo urinary
13 frequency.  Right?
14 A.   Yes.
15 Q.   And, Doctor, let me go back and clean
16 it up.
17      At the time of the launch of the
18 original TVT, it was known to Ethicon that de novo
19 urge incontinence could result from its use;
20 correct?
21 A.   Yes.
22 Q.   And at the time of the launch of the
23 original TVT, it was known that de novo urge --
24 urinary frequency could result from its use;
25 correct?

Page 324

1  A.   Yes.
2  Q.   It was known by Ethicon at the time
3  of the launch of the original TVT-O that de novo
4  urinary retention could result from its use;
5  correct?
6  A.   Yes.
7  Q.   It was known by Ethicon at the time
8  of the launch of the original TVT that urinary
9  obstruction -- de novo urinary obstruction could
10 result from its use; correct?
11 A.   Yes.
12 Q.   It was known at the time of the
13 launch of the original TVT that de novo voiding
14 dysfunction could result from its use; correct?
15 A.   Yes.
16 Q.   Doctor, at the time of the launch of
17 the TVT-O, it was known that de novo urge
18 incontinence could result from its use; correct?
19 A.   Yes.
20 Q.   At the time of the launch of the
21 TVT-O, it was known that de novo urinary infrequency
22 -- urinary frequency could result from its use;
23 correct?
24 A.   Yes.
25 Q.   At the time of the launch of the

Page 325

1  original -- of the TVT-O, it was known that de novo
2  urinary retention could result from its use,
3  correct, by Ethicon?
4  A.   Yes.
5  Q.   That was known.
6      It was known by Ethicon at the time
7  of the launch of TVT-O that de novo urinary
8  obstruction could occur from its use; correct?
9  A.   Yes.
10 Q.   And it was known by Ethicon at the
11 time of the TVT-O's launch that de novo voiding
12 dysfunction could result from its use; correct?
13 A.   Yes.
14 Q.   Doctor, at the time of the launch of
15 the original TVT, it would have been reasonable for
16 Ethicon to warn that de novo urge incontinence could
17 result from its use; correct?
18 A.   Yes.
19 Q.   At the time of the launch of the
20 original TVT, it would have been reasonable for
21 Ethicon to warn that de novo urinary frequency could
22 result from its use; correct?
23 A.   Yes.
24 Q.   At the time of the launch of the
25 original TVT, it was -- it would have been

Golkow Technologies, Inc. - 1.877.370.DEPS

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 326

1  reasonable for Ethicon to have warned that de novo
2  urinary retention could result from its use;
3  correct?
4      A.    Yes.
5      Q.    At the time of the launch of the
6  original TVT, it would have been reasonable for
7  Ethicon to have warned that de novo urinary
8  obstruction could result from its use; correct?
9      A.    Yes.
10      Q.    At the time of the launch of the
11  original TVT, it would have been reasonable for
12  Ethicon to have warned that de novo voiding
13  dysfunction could result from its use; correct?
14      A.    Yes.
15      Q.    Doctor, at the time of the launch of
16  the TVT-O, it would have been reasonable for Ethicon
17  to warn that de novo urge incontinence could result
18  from its use; correct?
19      A.    Yes.
20      Q.    At the time of the launch of the
21  TVT-O, it would have been reasonable for Ethicon to
22  have warned that de novo urinary frequency could
23  result from its use; correct?
24      A.    Yes.
25      Q.    At the time of the launch of the

Page 327

1  TVT-O, it would have been reasonable for Ethicon to
2  have warned that de novo urinary retention could
3  result from its use; correct?
4      A.    Yes.
5      Q.    At the time of the launch of the
6  TVT-O, it would have been reasonable for Ethicon to
7  have warned that de novo urinary obstruction could
8  result from its use; correct?
9      A.    Yes.
10      Q.    At the time of the launch of the
11  TVT-O, it would have been reasonable for Ethicon to
12  warn of de novo voiding dysfunction resulting from
13  its use; correct?
14      A.    Yes.
15      Q.    Doctor, at the time of the launch of
16  the Abbrevo, it would have been reasonable -- strike
17  that.
18           At the time of the launch of the
19  Abbrevo, it was known to Ethicon that de novo urge
20  incontinence could result from its use; correct?
21      A.    Yes.
22      Q.    At the time of the launch of the
23  Abbrevo, it was known to Ethicon that de novo
24  urinary frequency could result from its use;
25  correct?

Page 328

1      A.    Yes.
2      Q.    At the time of the launch of the
3  Abbrevo, it was known by Ethicon that de novo
4  urinary retention could result from its use;
5  correct?
6      A.    Yes.
7      Q.    At the time of the launch of the TVT
8  Abbrevo, it was known that de novo urinary
9  obstruction could result from its use; correct?
10      A.    Yes.
11      Q.    At the time of the launch of the TVT
12  Abbrevo, it was known by Ethicon that de novo
13  voiding dysfunction could result from its use;
14  correct?
15      A.    Yes.
16      Q.    Doctor, at the time of the launch of
17  the Abbrevo, it would have been reasonable for
18  Ethicon to warn that de novo urge incontinence could
19  result from its use; correct?
20      A.    Yes.
21      Q.    At the time of the launch of the TVT
22  Abbrevo, it would have been reasonable for Ethicon
23  to warn that de novo urinary frequency could result;
24  correct?
25      A.    Yes.

Page 329

1      Q.    At the time of the launch of the TVT
2  Abbrevo, it would have been reasonable for Ethicon
3  to have warned that de novo urinary retention could
4  result from the Abbrevo; correct?
5      A.    Yes.
6      Q.    At the time of the launch of the TVT
7  Abbrevo, it would have been reasonable for Ethicon
8  to warn that de novo urinary obstruction could
9  result from the Abbrevo; correct?
10      A.    Yes.
11      Q.    At the time of the launch of the TVT
12  Abbrevo, it would have been reasonable for Ethicon
13  to have warned that de novo voiding dysfunction
14  could result from the Abbrevo; correct?
15      A.    Yes.
16      Q.    Okay.
17           Doctor, of the adverse reactions
18  listed in 1640, I want you to compare that to
19  Exhibit 1656.  Okay?  The TVT Abbrevo IFU?
20      A.    Yes.
21      Q.    Are all of the adverse reactions
22  listed in 1640, do they appear in 1656?
23      A.    Mesh contraction does not.  The
24  excessive contraction or shortening of the tissue
25  surrounding the mesh is not.

Golkow Technologies, Inc. - 1.877.370.DEPS

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 330

1      Q.     With the exception of contraction, do
2   all of the adverse reactions listed on 1640 appear
3   in the Abbrevo?
4      A.     Yes.
5      Q.     And with regard to contraction,
6   Ethicon informed Health Canada that contraction --
7   excess contraction would be included, but that has
8   not yet occurred; correct?
9      A.     Yes.
10     Q.     So, Doctor, I guess it makes it -- so
11  the record's clean, just let me quickly do this:
12  Foreign body response resulting in inflammation,
13  extrusion, erosion, exposure, and fistula formation
14  appears in the current TVT Abbrevo, which is Exhibit
15  1656; correct?
16     A.     Yes.
17         (Pause.)
18  BY MR. BARLOW:
19     Q.     Doctor, foreign body response
20  resulting in inflammation, extrusion, erosion,
21  exposure, and fistula formation appears in the
22  current TVT Abbrevo IFU, which is Exhibit 1656;
23  correct?
24     A.     Yes.
25         MR. GAGE:  Hang on.  You --

Page 331

1          MR. BARLOW:  Or is that incorrect?
2          MR. GAGE:  I don't think he -- could
3   you -- let him find --
4          MR. BARLOW:  Sure.
5          MR. GAGE:  -- where it is because I'm
6   not sure he knows -- he's struggling to find it.
7          MR. BARLOW:  Let me see if I can find
8   it.
9          MR. GAGE:  No, I don't -- that's not
10  his question, though.
11         THE WITNESS:  Did I misunderstand
12  your question?
13         MR. GAGE:  Yeah.
14         THE WITNESS:  Maybe I ought to listen
15  to your question again.
16         MR. BARLOW:  Okay.
17         THE WITNESS:  I think it's the second
18  adverse reaction.
19         (Pause.)
20         MR. BARLOW:  I think it's the third
21  bullet point under adverse reactions.
22         MR. GAGE:  Okay.  And I think what
23  got me was that your -- the actual text of your
24  question was not matching up with the actual wording
25  in that third bullet point, I think.

Page 332

1          MR. BARLOW:  Well, I'm not quoting
2   it.  I'm just asking if those appear in there.
3          MR. GAGE:  Oh, oh, oh, oh, oh.  Okay.
4   So you have to listen very carefully because I don't
5   think you understood what he was asking you.
6          All right.
7          MR. FREESE:  I think you're the one
8   that didn't understand.  I understood and I think
9   the doctor understood.
10         MR. GAGE:  No, he said -- but he
11  answered, yes, it does appear.
12         MR. BARLOW:  It does.
13         MR. FREESE:  It does.
14         THE WITNESS:  Not --
15         MR. GAGE:  Not some of the words you
16  had in the question.  Anyway, I'm -- look, if I
17  messed it up, I'm sorry.  I'm -- go ahead.
18         THE WITNESS:  Okay.
19         MR. GAGE:  You now have your eyes on
20  the language and he can ask you the question.
21         THE WITNESS:  Okay.
22         MR. GAGE:  Okay.
23  BY MR. BARLOW:
24     Q.     Okay.  Doctor, foreign -- there is a
25  foreign body response that could result in

Page 333

1   extrusion, erosion, exposure, fistula formation,
2   and/or inflammation appears in the -- the current
3   TVT Abbrevo IFU; correct?
4      A.     Yes.
5      Q.     And it appears under the -- in the
6   adverse reactions section; correct?
7      A.     Yes.
8      Q.     Doctor, on the -- with the exception
9   of the excess contraction, which we've already
10  discussed, do all of the adverse reactions listed on
11  1640 appear in the current TVT Abbrevo IFU?
12     A.     Just give me a moment.
13     Q.     Sure.
14     A.     Yes.
15     Q.     And, Doctor, turning to page --
16  strike that -- Exhibit 1641, do all of the TVT
17  urinary adverse reactions listed there appear in the
18  current TVT Abbrevo IFU?
19     A.     Yes.
20              - - -
21         (Deposition Exhibit No. P-1657,
22         9/10/10-11/27/14 TVT Abbrevo IFU,
23         ETH.MESH.02341203 through
24         ETH.MESH.02341213, was marked for
25         identification.)

11 (Pages 330 to 333)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 334

1              - - -
2    BY MR. BARLOW:
3        Q.    Doctor, I'm going to hand you what
4    I've marked as P-1657, and I'll represent to you
5    that this is the TVT Abbrevo IFU in use from 9 --
6    September 10, 2010 until November 27th, 2014.
7        A.    That's correct.
8        Q.    Okay.
9              Doctor, before we -- I question you
10   further on this, I'm looking at the -- do you have
11   the chart?
12            Have we marked this as an exhibit,
13   the chart of the IFUs with dates?  Is that an
14   exhibit yet?
15            MS. KABBASH:  I don't think it's been
16   marked.
17            MR. BARLOW:  Let's go ahead and do
18   that.  Do you have a chart that we can mark it?
19            MR. GAGE:  Yeah.
20            MR. BARLOW:  If it's got your writing
21   on it, maybe we can get another copy.
22            THE WITNESS:  I don't think it does.
23            MR. GAGE:  I don't think it does.
24   Let me see.  No.  You've got an exhibit sticker?
25            MR. BARLOW:  Yeah.  Let's mark the

Page 335

1    chart of IFUs for the various TVT family of products
2    and the -- does this have the pelvic organ prolapse
3    products on it, too?
4            MS. KABBASH:  It does.
5            MR. BARLOW:  Okay -- and the pelvic
6    organ prolapse products that was produced to us by
7    Ethicon and it's titled "Updated IFU Index and
8    Production Bates Range Chart," and we're going to
9    mark it as P-1658.
10            - - -
11            (Deposition Exhibit No. P-1658,
12            11/6/15 Updated IFU Index and Production
13            Bates Range Chart, was marked for
14            identification.)
15            - - -
16            MR. GAGE:  And, Alex, for the record,
17   can we identify the date, or the approximate date,
18   when this one was produced to plaintiffs?
19            MR. BARLOW:  This one was produced to
20   plaintiffs on 11/6/15.
21            MR. GAGE:  Perfect.  Thank you.
22            MR. FREESE:  Answer man.
23            MR. BARLOW:  I can read.
24            MR. FREESE:  Shell answer man.
25            MR. BARLOW:  That's right.

Page 336

1            MR. GAGE:  I didn't know it was on
2    the exhibit.
3            MR. BARLOW:  I can sit here and read
4    verbatim what's in front of me like a champ --
5    actually, that's not true.
6    BY MR. BARLOW:
7        Q.    All right.  I'm looking on this
8    chart.  I'm a little bit confused -- so maybe I
9    can't -- I'm looking at the Abbrevo IFUs and we've
10   got first use date and last use date.
11            Now, the -- what I've -- the IFU that
12   I've just marked as 1657, the first use date is
13   September 10, 2010 and the last use date is listed
14   as 11/27/2014?
15       A.    Yes.
16       Q.    And then if you go to the next IFU --
17   which I guess we'll go ahead and mark as P-1659.
18            - - -
19            (Deposition Exhibit No. P-1659,
20            7/1/15-9/15/15 TVT Abbrevo IFU,
21            ETH.MESH.02617489 through
22            ETH.MESH.02617499, was marked for
23            identification.)
24            - - -
25            MR. BARLOW:  I'll give you a copy of

Page 337

1    it, Doctor.
2    BY MR. BARLOW:
3        Q.    It has a first use date of July 1st,
4    2015 and a last use date of September 15, 2015.  Do
5    you see that?
6        A.    Yes.
7        Q.    There appears to me to be a gap
8    between the Abbrevo -- one IFU to the next for the
9    Abbrevo.  Do you know why that is?
10       A.    I don't know specifically in this
11   case.
12       Q.    Do you have an idea of what that
13   might be?
14       A.    Well, it -- the first use date is the
15   date of the beginning of the run of manufacturing
16   the device in which this was to be used.  I don't
17   know whether there was a run between 11/27/14 and
18   7/1/15.  They may have had enough product that they
19   didn't do another run.
20            I'm not sure of that.  That's just
21   one possible explanation that I've seen in other
22   cases.
23       Q.    So, in other words, it could be that
24   there was enough back stock, I guess, of the Abbrevo
25   that already had the first IFU in the packaging, and

12 (Pages 334 to 337)

Golkow Technologies, Inc. - 1.877.370.DEPS

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 338

1  a new IFU wasn't produced until you got through that
2  stock.
3       A.    Well, the new IFU may have been
4  produced, but it wasn't --
5       Q.    Put into use.
6       A.    The line -- yeah, the manufacture of
7  the product in which it was going to be inserted --
8  used didn't happen until 7/17/15, and that is a
9  guess because I don't know for sure.
10      Q.    You don't know sitting here.
11           Do you all know?
12           MR. GAGE:  Alex, counsel knows --
13           MS. KABBASH:  He's actually correct.
14  So the reason why there's a gap is that the
15  company's not making batches every day, so the IFU
16  will be approved for use.  It will enter the bill of
17  materials, which is like a recipe for the batch.
18           The first use date will be day one
19  that the batch is made that that IFU is going into,
20  and then the last use date is day one of the batch
21  -- the last batch that that IFU goes into.
22           So the next batch that's made might
23  be a couple months down the road because they just
24  don't need to make another batch.  So that explains
25  --

Page 339

1           MR. BARLOW:  Okay.  I get it.  I just
2  was confused.  I wanted to make sure we weren't
3  missing one.
4  BY MR. BARLOW:
5       Q.    All right, Doctor.  Then let's talk
6  about the TVT Abbrevo IFU that I've marked as
7  P-1657, which was in use from September 10, 2010
8  until November 27th, 2014.  Okay?
9       A.    Yes.
10      Q.    Doctor, does the adverse reaction of
11  foreign body response resulting in inflammation,
12  extrusion, erosion, exposure, and fistula formation
13  appear in that IFU?
14      A.    Yes.
15      Q.    Where?
16      A.    Adverse reactions, second bullet,
17  transitory local irritation at the wound site and
18  transitory foreign body response may occur.  This
19  response could result in extrusion, erosion, fistula
20  formation, or inflammation.
21      Q.    Doctor, in the IFU for the Abbrevo,
22  which is marked as 1657, the local irritation is
23  listed as -- or noted to be transitory; correct?
24      A.    That's correct.
25      Q.    And the foreign body response is

Page 340

1  indicated to be transitory; correct?
2       A.    That's correct.
3       Q.    In the current TVT Abbrevo IFU, it is
4  noted that the local -- there is no indication that
5  the local irritation is transitory; correct?
6           MR. GAGE:  Which one is the current?
7  Is it 1659?
8           THE WITNESS:  Is that 1659?
9           MR. BARLOW:  Actually, current is
10  1656.
11           MR. GAGE:  Oh, here it is.  I'm
12  sorry.
13           MR. BARLOW:  Strike that.  I withdraw
14  the question.
15           MR. GAGE:  Okay.
16           MR. BARLOW:  Withdrawn.
17  BY MR. BARLOW:
18      Q.    Doctor, the foreign body response
19  with regard to the TVT Abbrevo can be chronic, can't
20  it?
21      A.    Histologically, yes.
22      Q.    Chronic foreign body response is not
23  in the TVT Abbrevo listed -- or listed in the
24  adverse reactions under the -- strike that.
25           Chronic foreign body response is not

Page 341

1  listed as an adverse reaction in 1657, the TVT
2  Abbrevo IFU; correct?
3       A.    It's not listed in those words.  Its
4  actions are in the following section.
5       Q.    Doctor, the words chronic foreign
6  body response do not appear in the actions section
7  either, do they?
8       A.    No, they don't.
9       Q.    In fact, the words chronic foreign
10  body response appear nowhere in the TVT Abbrevo IFU
11  which has been marked as Exhibit 1657; correct?
12      A.    That's correct.
13      Q.    Doctor, does the adverse reaction
14  mesh extrusion, exposure, or erosion into the vagina
15  or other structures or organs appear in the adverse
16  reactions section of the TVT Abbrevo which has been
17  marked as Exhibit 16 -- IFU which has been marked as
18  Exhibit 1657?
19      A.    The vagina and other organs is not
20  spelled out.
21      Q.    Doctor, in the adverse reactions
22  section of the Abbrevo IFU, which has been marked as
23  Exhibit 1657, acute and/or chronic pain does not
24  appear; correct?
25      A.    Correct.

Golkow Technologies, Inc. - 1.877.370.DEPS

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 342

1    Q.    In fact, acute and/or chronic pain
2  does not appear anywhere in the TVT Abbrevo IFU that
3  has been marked as Exhibit 1657; correct?
4    A.    1657 -- wait a minute.  Let me make
5  sure I'm on the right one.
6    Q.    This is the -- the IFU that was in
7  use from September 2010 to November 2014.
8    A.    Yeah, can you ask that question
9  again, please?
10   Q.    Sure.
11   A.    Or have that read back?
12   Q.    Sure.  Acute and/or chronic pain does
13  not appear in the TVT Abbrevo IFU that is marked as
14  Exhibit 1657, does it?
15   A.    Well, it discusses transient leg pain
16  in the warnings and precautions.
17   Q.    Doctor, that transient leg pain does
18  not encompass all of the acute and/or chronic pain
19  that can result from use of the TVT Abbrevo;
20  correct?
21   A.    No, it doesn't.
22   Q.    And chronic pain appears nowhere in
23  the TVT Abbrevo IFU which has been marked as Exhibit
24  1657, does it?
25   A.    That's correct.

Page 343

1    Q.    And other than transitory leg pain,
2  acute pain does not occur -- does not appear in the
3  TVT Abbrevo IFU, which has been marked as Exhibit
4  1657; correct?
5    A.    The word acute does not.
6    Q.    Doctor, is pain with intercourse,
7  which in some patients may not resolve, included in
8  the adverse reactions listed in the TVT Abbrevo IFU
9  which has been marked as Exhibit 1657?
10   A.    No.
11   Q.    Doctor, do neuromuscular problems,
12  including acute and/or chronic pain in the groin,
13  thigh, leg, pelvic or abdominal area appear in the
14  adverse reactions listed in the TVT Abbrevo IFU
15  which has been marked as 1657?
16   A.    No, but leg pain does occur in the
17  warnings and precautions section.
18   Q.    Neuromuscular problems is not listed
19  in the adverse reactions section of the TVT Abbrevo
20  IFU, which has been marked as Exhibit 1657; correct?
21   A.    Correct.
22   Q.    And acute and/or chronic pain in the
23  groin does not appear listed in the adverse
24  reactions that can occur with the TVT Abbrevo;
25  correct?

Page 344

1    A.    That's correct.
2    Q.    And the IFU which has been marked as
3  Exhibit 1657 does not note chronic thigh and leg
4  pain can result from the TVT Abbrevo, does it?
5    A.    No, it doesn't.
6    Q.    And, Doctor, acute and/or chronic
7  pain in the pelvis and/or abdominal area -- pelvic
8  and/or abdominal area is not listed in the TVT
9  Abbrevo IFU which has been marked as Exhibit 1657;
10  correct?
11   A.    Correct.
12   Q.    Doctor, the TVT Abbrevo IFU which has
13  been marked as 1657 does not list -- strike that.
14        The TVT Abbrevo IFU which has been
15  marked as Exhibit 1657 does not discuss that adverse
16  reactions may require surgical treatment, does it?
17   A.    No.
18   Q.    Doctor, the IFU which has been marked
19  as Exhibit 1657 for the Abbrevo does not list that
20  one or more revision surgeries may be necessary to
21  treat the adverse reactions that can result from the
22  Abbrevo, does it?
23   A.    No.
24   Q.    Doctor, the TVT -- TVT Abbrevo IFU
25  which has been marked as Exhibit 1657 does not

Page 345

1  discuss that in cases in which Prolene mesh needs to
2  be removed in part or whole, significant dissection
3  may be required, does it?
4    A.    No.
5    Q.    And, Doctor, the TVT Abbrevo IFU
6  which has been marked as Exhibit 1657 does not state
7  anywhere in it that even when revision surgeries are
8  performed to treat adverse reactions, that those
9  adverse reactions may not resolve; correct?
10   A.    Correct.
11   Q.    Doctor, in the TVT Abbrevo IFU, which
12  has been marked as Exhibit 1657, does it warn that
13  de novo urge incontinence can result from the
14  Abbrevo's use?
15   A.    No.
16   Q.    Doctor, in the TVT Abbrevo IFU that
17  is marked as Exhibit 1657, does it warn that de novo
18  urinary frequency can result from its use?
19   A.    No.
20   Q.    Doctor, in the TVT Abbrevo IFU which
21  has been marked as Exhibit 1657, does it warn that
22  de novo urinary retention can result from its use?
23   A.    Only in reference to lower urinary
24  tract obstruction.
25   Q.    And, Doctor, there are other lower --

14 (Pages 342 to 345)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 346

1  well, urinary retention is a result of obstruction.
2  Right?
3       A.    It can be.
4       Q.    Can be.  Okay.
5            The TVT Abbrevo IFU that's been
6  marked as Exhibit 1657 does not explicitly lay
7  urinary retention as a possibility; correct?
8       A.    That's correct, not in those words.
9       Q.    It does discuss that de novo
10 obstruction can occur; correct?
11      A.    Yes.
12      Q.    Okay.
13           Where does it -- point me to that.
14      A.    It's the last adverse reaction.
15      Q.    Doctor, the obstruction that is noted
16 in the adverse reactions list obstruction resulting
17 from over-tensioning during implant; correct?
18      A.    That's correct.
19      Q.    Obstruction can also occur with the
20 TVT Abbrevo when there is not over-tensioning by the
21 surgeon; correct?
22      A.    Possibly, yes.
23      Q.    And that possibility is not listed in
24 the TVT Abbrevo IFU that's marked as Exhibit 1657;
25 correct?

Page 347

1       A.    That's correct.  However, it doesn't
2  say by the surgeon.  It just says over-tensioning or
3  overcorrection.
4            MR. BARLOW:  Move to strike as
5  nonresponsive.
6            THE WITNESS:  Okay.
7  BY MR. BARLOW:
8       Q.    Doctor, it says, too much tension
9  applied to the mesh implant.  Right?
10      A.    Yes.
11      Q.    That suggests surgeon error; correct?
12      A.    Or swelling.
13      Q.    Doctor, urinary obstruction can occur
14 with the TVT Abbrevo from scarification; correct?
15      A.    It could.
16      Q.    Obstruction resulting from
17 scarification with regard to the TVT Abbrevo is not
18 listed as an adverse reaction in the IFU which is
19 marked as Exhibit 1657; correct?
20      A.    Correct.
21      Q.    And, Doctor, you would agree with me
22 that swelling does not appear anywhere in the TVT
23 Abbrevo IFU; correct?
24      A.    That word does not occur.
25      Q.    And it doesn't appear in the IFU with

Page 348

1  regards to over-tensioning; correct?
2       A.    That's correct.
3       Q.    Doctor, the TVT Abbrevo IFU that's
4  marked as Exhibit 1657 does not warn about the
5  possibility of de novo voiding dysfunction resulting
6  from the Abbrevo, does it?
7       A.    Only in the -- when it refers to
8  lower urinary tract obstruction.
9       Q.    There are other types of voiding
10 dysfunction; correct?
11      A.    Yes.
12      Q.    There are other types of voiding
13 dysfunction that can result from the TVT Abbrevo;
14 correct?
15      A.    From the procedure in which the TVT
16 Abbrevo's used, yes.
17      Q.    There are other types of voiding
18 dysfunction that can result from the use of the TVT
19 Abbrevo; correct?
20      A.    Yes.
21      Q.    Doctor, let's turn to Exhibit 1659,
22 which I believe is the TVT Abbrevo IFU that was
23 first use date -- that's first use date is July 1,
24 2015 and last use date has been listed as September
25 15, 2015.

Page 349

1       A.    Yes.
2       Q.    Doctor, chronic foreign body response
3  is not listed in the TVT Abbrevo IFU as an adverse
4  reaction; correct?
5       A.    Correct.
6       Q.    And I'm referring in that instance to
7  the IFU marked as Exhibit 1659.
8       A.    Yes.
9       Q.    Do you understand that?
10      A.    Yes.
11      Q.    Doctor, foreign body response
12 resulting in inflammation that is not transitory,
13 it's not listed in the TVT Abbrevo IFU that is
14 marked as Exhibit 1659, is it?
15      A.    No.
16      Q.    Foreign body response resulting in
17 extrusion -- strike that.
18           Chronic foreign body response
19 resulting in extrusion is not listed in the Abbrevo
20 IFU that has been marked as Exhibit 1659, does it?
21      A.    No.
22           MR. GAGE:  Let me ask you a question.
23 Is 1659 -- can I just compare quickly?  Just a
24 second.
25           (Pause.)

15 (Pages 346 to 349)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 350

1         MR. GAGE:  All right.  I'm sorry,
2 Alex.  Go ahead.
3 BY MR. BARLOW:
4     Q.    Doctor, chronic foreign body response
5 that can result in erosion is not listed in the
6 adverse reactions in the IFU -- the Abbrevo IFU that
7 has been marked as 1659; correct?
8     A.    Correct.
9     Q.    Chronic foreign body response that
10 can result in fistula formation is not listed as a
11 possible adverse reaction in the IFU for the Abbrevo
12 that has been marked as Exhibit 1659; correct?
13    A.    Correct.
14    Q.    The IFU for the Abbrevo that has been
15 marked as Exhibit 1659 does not list chronic foreign
16 body response that can result in inflammation as a
17 possible adverse reaction; correct?
18    A.    That's correct.
19    Q.    And chronic inflammation is not
20 listed as a possible adverse reaction; correct?
21    A.    That's correct.
22    Q.    Doctor, the Abbrevo IFU that is
23 marked as Exhibit 1659 does not list as an adverse
24 reaction or warn regarding mesh extrusion, exposure,
25 or erosion into the vagina or other structures or

Page 351

1 organs, does it?
2     A.    The vagina or other structures or
3 organs is not culled out.
4     Q.    The IFU for the Abbrevo that is
5 marked as Exhibit 1659 does not list as an adverse
6 reaction acute and/or chronic pain, does it?
7     A.    No.
8     Q.    The IFU for the Abbrevo that has been
9 marked as Exhibit 1659 does not list as an adverse
10 reaction pain with intercourse, which in some
11 patients may not resolve, does it?
12    A.    No.
13    Q.    The IFU which -- for the -- strike
14 that.
15         The IFU for the TVT Abbrevo which has
16 been marked as Exhibit 1659 does not list as a
17 adverse reaction neuromuscular problems; correct?
18    A.    Only the leg pain noted in warnings
19 and precautions.
20    Q.    Doctor, that -- the neuromuscular
21 problems -- strike that.
22         There are neuromuscular problems
23 other than leg pain; correct?
24    A.    Yes.
25    Q.    All right.

Page 352

1         There are neuromuscular problems that
2 can result from the Abbrevo other than leg pain;
3 correct?
4     A.    From the procedure in which the
5 Abbrevo is used?
6     Q.    There are neuromuscular problems from
7 the use of the TVT Abbrevo that can result other
8 than leg pain; correct?
9     A.    Yes.
10    Q.    Okay.
11         Doctor, the leg pain that is
12 discussed in the Abbrevo IFU is listed as transient
13 leg pain lasting 24 to 48 hours; correct?
14    A.    That's correct.
15    Q.    There is no warning regarding the
16 possibility of leg pain lasting beyond 48 hours;
17 correct?
18    A.    Not in those words.
19    Q.    So, Doctor, the TVT IFU -- strike
20 that.
21         The TVT Abbrevo IFU that's marked as
22 Exhibit 1659 does not list as an adverse reaction
23 neuromuscular problems, including acute and/or
24 chronic pain in the groin, thigh, leg, pelvic and/or
25 abdominal area, does it?

Page 353

1     A.    No, it doesn't.
2     Q.    And, Doctor, the TVT Abbrevo does not
3 list as -- chronic thigh pain as an adverse
4 reaction, does it?
5     A.    It does not.
6     Q.    It does not list chronic leg pain as
7 a possible adverse reaction, does it?
8     A.    No.
9     Q.    Doctor, the TVT Abbrevo IFU that's
10 marked as Exhibit 1659 does not state that the
11 adverse reactions that may result from the Abbrevo
12 may require surgical treatment, does it?
13    A.    It says some of them do.
14    Q.    Which ones does it say may result?
15    A.    The first adverse reaction, punctures
16 or laceration of vessels, nerves, bladder, urethra,
17 bowel may occur during needle passage and may
18 require surgical repair.
19    Q.    Doctor, those are all adverse
20 reactions that may require surgical repair related
21 to the procedure to implant it; correct?
22    A.    Correct.
23    Q.    With regard to adverse reactions that
24 may -- adverse reactions to the device itself,
25 nowhere in the TVT Abbrevo IFU that's marked as

16  (Pages 350 to 353)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

---

Page 354

1  Exhibit 1659 does it state that there may -- there
2  may be surgical treatment required, does it?
3      A.    The device consists of the mesh and
4  the needles to insert the mesh, so if you say due to
5  the device itself, I'd have to say that that's not
6  correct.
7      Q.    Doctor, the TVT Abbrevo IFU that's
8  marked as Exhibit 1659 does not state that adverse
9  reactions that may occur postoperatively may require
10 surgical treatment, does it?
11     A.    No.
12     Q.    And, Doctor, it does not -- the TVT
13 Abbrevo that's marked as Exhibit 1659 does not state
14 that adverse reactions to the sling itself may
15 require surgical treatment, does it?
16     A.    No.
17     Q.    Doctor, the TVT Abbrevo IFU that's
18 marked as Exhibit 1659 does not state that one or
19 more revision surgeries may be necessary to treat
20 the adverse reactions that occur postoperatively,
21 does it?
22     A.    No.
23     Q.    The TVT Abbrevo that's marked as
24 Exhibit 1659 does not state that one or more
25 revision surgeries may be necessary to treat adverse

---

Page 355

1  reactions to the sling itself, does it?
2      A.    No.
3      Q.    Doctor, the TVT Abbrevo IFU that's
4  marked as Exhibit 1659 does not state that in cases
5  in which the Prolene mesh needs to be removed in
6  part or whole, that significant dissection may be
7  required, does it?
8      A.    No.
9      Q.    And, Doctor, nowhere in the TVT
10 Abbrevo that's marked as Exhibit 1659 does it state
11 that the surgical repair for possible adverse
12 reactions may not resolve the symptoms or the
13 adverse reactions, does it?
14     A.    No.
15         MR. BARLOW: Okay, Doctor. I think
16 we can set aside the Abbrevo stuff for now. We're
17 going to move on to the Exact.
18         MR. GAGE: Yeah, can we take a quick
19 bathroom break?
20         MR. BARLOW: Sure, sure.
21         MR. GAGE: Let's just make it quick.
22         THE VIDEO TECHNICIAN: The time is
23 10:50. We're going off the record.
24         (A recess was taken from 10:50 a.m.
25     until 11:05 a.m.)

---

Page 356

1              - - -
2          (Deposition Exhibit No. P-1660,
3      9/18/15-Present TVT Exact IFU,
4      ETH.MESH.22129185 through
5      ETH.MESH.22129191, was marked for
6      identification.)
7              - - -
8          (Deposition Exhibit No. P-1661,
9      5/4/10-6/6/13 TVT Exact IFU,
10     ETH.MESH.05799233 through
11     ETH.MESH.05799239, was marked for
12     identification.)
13             - - -
14         (Deposition Exhibit No. P-1662,
15     10/23/13-11/26/14 TVT Exact IFU,
16     HMESH_ETH_03038566 through
17     HMESH_ETH_03038572, was marked for
18     identification.)
19             - - -
20         (Deposition Exhibit No. P-1663,
21     8/12/14-9/9/15 TVT Exact IFU,
22     ETH.MESH.02618012 through
23     ETH.MESH.02618018, was marked for
24     identification.)
25             - - -

---

Page 357

1          (Deposition Exhibit No. P-1664,
2      8/5/13-10/17/13 TVT Exact IFU,
3      ETH.MESH.10670138 through
4      ETH.MESH.10670144, was marked for
5      identification.)
6              - - -
7          THE VIDEO TECHNICIAN: The time is
8  11:12. We're back on the record.
9  BY MR. BARLOW:
10     Q.    Okay, Doctor. We're going to turn
11 now to the TVT Exact and we're going to try to
12 shorten this process a little bit.
13         I have handed you an exhibit that is
14 marked as P-1660; correct?
15     A.    Yes.
16     Q.    Okay.
17         And I believe that is the IFU that
18 has been in use from 9/18/2015 to the present day;
19 correct?
20     A.    Yes.
21     Q.    And then I've handed you several
22 other IF -- well, strike that.
23         I've also handed you an Exhibit 1661
24 that I believe has been represented to us to be the
25 TVT Exact IFU for -- that's been in -- that was in

---

17 (Pages 354 to 357)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 358

1  use from May 4th, 2010 to June 6, 2013.
2        Do you have that?
3     A.   Yes.
4     Q.   And is that correct?
5     A.   Yes.
6     Q.   Okay.
7        Exhibit 1662 is the TVT Exact IFU
8  that was in use from 10/23/13 until 11/26/14
9  according to what has been produced to us; correct?
10    A.   Yes.
11    Q.   Exhibit 1663 is the TVT Exact IFU
12 that has been represented to be in use from August
13 12, 2014 to September 9, 2015; is that correct?
14    A.   Yes.
15    Q.   1664 is the TVT Exact IFU that has
16 been represented to be in use from August 5th, 2013
17 until October 17th, 2013; correct?
18    A.   Yes.
19    Q.   Now, Doctor, on the break, I asked
20 you to review Exhibit 1660 through 1664, and you had
21 an opportunity to do that.  Right?
22    A.   I did.
23    Q.   Exhibit 1660 is the TVT Exact IFU
24 that was put out as a result of the Health Canada
25 inquiry; correct?

Page 359

1     A.   Yes.
2     Q.   With regard to Exhibit 1661 through
3  1664, you understand I'm going to be questioning you
4  regarding warnings and adverse reactions, just as we
5  had been discussing earlier; correct?
6     A.   Correct.
7     Q.   With regard to the adverse reactions
8  listed on Exhibit 1640 and Exhibit 1641, have you
9  had an opportunity to review Exhibits 1661 through
10 1664 and determine that your answers would be the
11 same with regard to all of those IFUs regarding the
12 adverse reactions listed in 1640 and 1641?
13    A.   Let me just understand.  My answers
14 will be the same for all of these?
15    Q.   Yes.
16    A.   Yes.
17    Q.   Okay.
18        MR. GAGE:  And to clarify, "these" --
19 the word "these" does not include P-1660, which is
20 the current --
21        MR. BARLOW:  Current.
22        THE WITNESS:  Correct.
23        MR. GAGE:  -- Abbrevo IFU.
24        MR. BARLOW:  Yes.  Okay.
25        With that clarification, what I'm

Page 360

1  going to do is, I'm going to ask you questions
2  regarding the adverse reactions that would be listed
3  in the TVT Exact IFUs that are marked as Exhibits
4  1661 through 64.
5        And I'm going to ask you that if your
6  answer needs to be different for any of the exhibits
7  -- the IFUs that are Exhibits 1661 through 1664, you
8  tell me; otherwise, we're going to apply your answer
9  to each of those individually.  Okay?
10        THE WITNESS:  I'm not sure I followed
11 that.
12        MR. BARLOW:  Okay.
13        THE WITNESS:  I'm sorry.
14 BY MR. BARLOW:
15    Q.   1660's obviously different because
16 that's the current IFU.
17    A.   Right.  Okay.
18    Q.   I'm going to be asking you questions
19 about 1661 through 1664, which are the out-of-date
20 IFUs and -- but I'm going to ask them collectively,
21 with the consent of your counsel, and you're going
22 to point out to me, if you would, if there needs to
23 be a different answer for one of those.  Otherwise,
24 we're going to apply your answer individually to
25 each one of those IFUs.  Okay?

Page 361

1     A.   Okay.  I --
2     Q.   Is that agreeable?
3     A.   Yes.
4        MR. BARLOW:  Counsel, is that
5  agreeable?
6        MR. GAGE:  Yeah, that's fine.
7        MR. BARLOW:  Okay.
8  BY MR. BARLOW:
9     Q.   Doctor, at the time of the launch of
10 the TVT Exact, it was known to Ethicon that there
11 could be foreign body response to the Exact that
12 would result in inflammation, extrusion, erosion,
13 exposure, and fistula formation; correct?
14    A.   Yes.
15    Q.   At the time of the launch of the TVT
16 Exact, it was known to Ethicon that mesh extrusion,
17 exposure, or erosion into the vagina or other
18 structures or organs could result from the use of
19 the TVT Exact.
20    A.   Yes.
21    Q.   It was known at the time of the
22 launch of the TVT Exact that mesh extrusion,
23 exposure, or erosion into the vagina or other
24 structures or organs could result from the TVT
25 Exact; correct?

18 (Pages 358 to 361)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 362

1    A.    Yes.
2    Q.    It was known to Ethicon at the time
3 of the launch of the TVT Exact that acute and/or
4 chronic pain could result from the TVT Exact;
5 correct?
6    A.    Yes.
7    Q.    It was known at the time of the
8 launch of the TVT Exact that pain with intercourse,
9 which in some patients may not resolve, could result
10 from the use of the TVT Exact; correct?
11    A.    Yes.
12    Q.    It was also known by Ethicon that
13 pain with intercourse, which in some patients may
14 not resolve, could result from the TVT Exact sling
15 itself; correct?
16    A.    Can you ask that again, please?
17    Q.    It was known at the time of the
18 launch of the TVT Exact that pain with intercourse,
19 which in some patients may not resolve, could result
20 from the TVT Exact.
21    A.    From the use of TVT Exact in that
22 procedure.
23    Q.    Okay.
24        Doctor, with regard to the -- strike
25 that.

Page 363

1        It was known at the time of the
2 launch of the TVT Exact that neuromuscular problems,
3 including acute and/or chronic pain in the groin,
4 thigh, leg, pelvic and abdominal area could occur
5 with the TVT Exact; correct?
6    A.    No, there was no -- there was no
7 thought that pain in the thigh or leg --
8    Q.    Is that because the TVT Exact is a
9 retropubic approach?
10    A.    That's correct.
11    Q.    Okay.
12        So let me ask it a different way:
13 Doctor, with regard to -- strike that.
14        It was known at the time of the
15 launch of the TVT Exact that neuromuscular problems,
16 including acute and/or chronic pain in the groin,
17 pelvic and abdominal area could result from the TVT
18 Exact; correct?
19    A.    From the use of the TVT Exact in that
20 procedure, yes.
21    Q.    Okay.
22        Doctor, it was known at the time of
23 the launch of the TVT Exact that the adverse
24 reactions that we've been discussing could -- that
25 could result from the TVT Exact may require surgical

Page 364

1 treatment; correct?
2    A.    Correct.
3    Q.    It was known at the time of the
4 launch of the TVT Exact that one or more revision
5 surgeries may be necessary to treat adverse
6 reactions from the TVT Exact; correct?
7    A.    From the use of the TVT Exact, yes.
8    Q.    Well, one or more revision surgeries
9 may be necessary to treat adverse reactions that
10 result from the Exact sling itself; correct?
11    A.    Yes.
12    Q.    And that was known at the time of its
13 launch. Right?
14    A.    Yes.
15    Q.    Doctor, it was known by Ethicon at
16 the time of the launch of the TVT Exact that in
17 cases where the Prolene mesh needed to be removed in
18 whole or in part, significant dissection may be
19 required; correct?
20    A.    The whole part, yes. The part part,
21 removed in part, may not require --
22    Q.    It depends on how big a part. Right?
23    A.    Well, that and where it -- from where
24 it needs to be removed. If you'd like further
25 explanation, I'd be happy to give it to you.

Page 365

1    Q.    Okay. What would be the distinction?
2    A.    Well, one of the times where part of
3 the TVT Exact, or really any of the other TVTs,
4 might need to be removed is if it is exposed in the
5 vagina; and in that case, it doesn't require a
6 dissection of any significance. It's something that
7 can be done in the office with a scissors, where a
8 small piece that's exposed is just removed.
9    Q.    And, Doctor, there are other -- and I
10 need to object as nonresponsive except to the extent
11 he was answering with regard to the Exact, because
12 that's where our questions are -- that's what my
13 questions are directed to.
14        With regard to the TVT Exact, there
15 may be repairs that need to -- removals that need to
16 occur that go beyond just the -- a small exposure
17 that can be done in office; correct?
18    A.    Correct.
19    Q.    And when those surgeries to remove
20 portions of the TVT Exact go beyond just the portion
21 that would be exposed -- small portion under the
22 urethra, if it requires greater -- strike that.
23        There are removals of TVT Exact mesh
24 that require greater dissection when you don't
25 remove the whole device; correct?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 366

1    A.    That's correct.
2    Q.    In fact, it's very difficult to ever
3  remove the entire device; correct?
4    A.    It's a difficult surgery, yes.
5    Q.    And so it would be true that when the
6  Prolene mesh needs to be removed in part, if it's a
7  significant part, significant dissection may be
8  required; correct?
9    A.    That's correct.
10    Q.    And that was something that was known
11  to Ethicon at the time of the launch of the TVT
12  Exact; correct?
13    A.    Yes.
14    Q.    And that's why you used the language
15  may be required as opposed to will be required.
16  Right?
17    A.    That's correct.
18    Q.    Doctor, with regard to -- strike
19  that.
20        At the time of the launch of the TVT
21  Exact, it was known that use of the Exact could
22  result in de novo urge incontinence; correct?
23    A.    Yes.
24    Q.    At the time of the launch of the TVT
25  Exact, it was known to Ethicon that implantation --

Page 367

1  strike that.
2    Doctor, at the time of the launch of
3  the TVT Exact, it was known that a potential adverse
4  reaction was de novo urinary frequency; correct?
5    A.    Yes.
6    Q.    At the time of the launch of the TVT
7  Exact, it was known that a possible adverse reaction
8  was de novo urinary retention; correct?
9    A.    Yes.
10    Q.    At the time of the launch of the TVT
11  Exact, it was known by Ethicon that a possible
12  adverse reaction was de novo urinary obstruction;
13  correct?
14    A.    Yes.
15    Q.    At the time of the launch of the TVT
16  Exact, it was known by Ethicon that a possible
17  adverse reaction was de novo voiding dysfunction;
18  correct?
19    A.    Yes.
20    Q.    Doctor, at the time of the launch of
21  the TVT Exact, it would have been reasonable to warn
22  that there could be foreign body response resulting
23  in inflammation, extrusion, erosion, exposure, and
24  fistula formation as an adverse reaction; correct?
25    A.    Yes.

Page 368

1    Q.    At the time of the launch of the TVT
2  Exact, it would have been reasonable to include in
3  the adverse reactions that mesh exposure, extrusion,
4  or erosion into the vagina or other structures or
5  organs could occur; correct?
6    A.    Yes.
7    Q.    At the time of the launch of the TVT
8  Exact, it would have been reasonable to list as a
9  possible adverse reaction that acute and/or chronic
10  pain could result; correct?
11    A.    Yes.
12    Q.    At the time of the launch of the TVT
13  Exact, it would have been reasonable to list as an
14  adverse reaction that pain with intercourse, which
15  in some patients may not resolve, could result;
16  correct?
17    A.    Yes.
18    Q.    At the time of the launch of the TVT
19  Exact, it would have been reasonable to list as an
20  adverse reaction that neuromuscular problems,
21  including acute and/or chronic pain in the groin,
22  pelvic and/or abdominal area could result; correct?
23    A.    Yes.
24    Q.    At the time of the launch of the TVT
25  Exact, it would have been reasonable to list as a

Page 369

1  possible adverse reaction -- strike that.
2        At the time of the launch of the TVT
3  Exact, it would have been reasonable to include that
4  the adverse reactions of the Exact may require
5  surgical treatment; correct?
6    A.    Yes.
7    Q.    At the time of the launch of the TVT
8  Exact, it would have been reasonable to include in
9  the IFU that one or more revision surgeries may be
10  necessary to treat adverse reactions to the TVT
11  Exact; correct?
12    A.    Yes.
13    Q.    At the time of the launch of the TVT
14  Exact, it would have been reasonable to include in
15  the adverse reactions in the IFU that in cases in
16  which the Prolene mesh needs to be removed in part
17  or whole, significant dissection may be required;
18  correct?
19    A.    Yes.
20    Q.    At the time of the launch of the TVT
21  Exact, it would have been reasonable to include in
22  the adverse reactions section that de novo urge
23  incontinence could occur; correct?
24    A.    Yes.
25    Q.    At the time of the launch of the TVT

Confidential - Subject to Stipulation and Order of Confidentiality

Page 370

1  Exact, it would have been reasonable to include as a
2  possible adverse reaction that de novo urinary
3  frequency could occur; correct?
4      A.    Yes.
5      Q.    At the time of the launch of the TVT
6  Exact, it would have been reasonable to include in
7  the adverse reactions section that urinary retention
8  could occur; correct?
9      A.    Yes.
10     Q.    At the time of the launch of the TVT
11 Exact, it would have been reasonable to include in
12 the adverse reactions that urinary obstruction could
13 occur; correct?
14     A.    Yes.
15     Q.    And at the time of the launch of the
16 TVT Exact, it would have been reasonable to include
17 that de novo voiding dysfunction could occur;
18 correct?
19     A.    Yes.
20     Q.    Okay, Doctor.  Turning to Exhibits
21 1661 and -- through 1664, Doctor, the TVT IFU for
22 Exact -- strike that.
23           MS. KABBASH:  I think this is harder
24 than a normal deposition.
25           MR. BARLOW:  It is.  Yes, I can

Page 371

1  babble more fluently when I'm just asking regular
2  questions than kind of these formal questions,
3  but...
4  BY MR. BARLOW:
5      Q.    Doctor, in the TVT Exact IFU, chronic
6  foreign body response resulting in inflammation,
7  extrusion, erosion, exposure, or fistula formation
8  is not listed; correct?
9      A.    The word chronic is not mentioned.
10     Q.    And to the extent foreign body
11 response is discussed at all, it is characterized as
12 being transitory; correct?
13     A.    That's correct.
14     Q.    And there is -- we know that there
15 can be a chronic foreign body response with the TVT
16 Exact; correct?
17     A.    Histologically chronic.
18     Q.    That's correct?
19     A.    Yes.
20     Q.    Doctor, the adverse reactions listed
21 in the TVT Exact IFU do not include mesh extrusion,
22 exposure, or erosion into the vagina or other
23 structures or organs, do they?
24     A.    Well, it includes extrusion, erosion,
25 and fistula formation, but it doesn't specify the

Page 372

1  vagina or other organs.
2      Q.    Okay.
3           Doctor -- I'm going to object as
4  nonresponsive.
5           Doctor, the words mesh extrusion,
6  exposure, or erosion into the vagina or other
7  structures or organs does not appear in the adverse
8  reactions section of the TVT Exact IFU, does it?
9      A.    Right.
10           MR. GAGE:  Object to form.
11           THE WITNESS:  The vagina and other
12 organs aren't spelled out, but the other words are
13 there.
14           MR. BARLOW:  Object as nonresponsive.
15 What did I mess up, Bill?
16           MR. GAGE:  You said -- when you said
17 "the words" and then you listed, if you said "the
18 phrase," it would not be objectionable, but because
19 some of the words appear and some don't, that's why
20 I objected.
21           MR. BARLOW:  I understand.
22 BY MR. BARLOW:
23     Q.    Doctor, the phrase mesh extrusion,
24 exposure, or erosion into the vagina or other
25 structures or organs does not appear in the TVT

Page 373

1  Exact IFU, does it?
2      A.    That's correct.
3      Q.    It's not noted that the extrusion,
4  exposure, or erosion can be into the vagina or other
5  structures or organs; correct?
6      A.    Correct.
7      Q.    The TVT Exact IFU does not include a
8  warning regarding acute and/or chronic pain, does
9  it?
10     A.    That's correct.
11     Q.    Doctor, the TVT IFU -- Exact IFU does
12 not include a warning regarding pain with
13 intercourse, which in some patients may not resolve;
14 correct?
15     A.    Correct.
16     Q.    That's not listed in the adverse
17 reactions; correct?
18     A.    That's correct.
19     Q.    The TVT Exact IFU does not list
20 neuromuscular problems, including acute and/or
21 chronic pain in the groin, pelvis and/or abdominal
22 area, does it?
23     A.    That's correct.
24     Q.    The TVT Exact IFU does not include a
25 warning or information that adverse reactions to the

Golkow Technologies, Inc. - 1.877.370.DEPS

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 374

1  Exact may require surgical treatment, does it?
2      A.    It does not.
3      Q.    The TVT Exact IFU does not include a
4  statement or information that one or more revision
5  surgeries may be necessary to treat the adverse
6  reactions to the Exact, does it?
7      A.    It does not.
8      Q.    The TVT Exact IFU does not state that
9  in cases in which the Prolene mesh needs to be
10 removed in part or whole, that significant
11 dissection may be required, does it?
12     A.    It does not.
13     Q.    And the TVT Exact IFU does not state
14 that even when multiple surgery -- strike that.
15           The TVT Exact IFU does not state that
16 when one or more revision surgeries are performed,
17 they may not resolve or cure the adverse reactions
18 to the Exact; correct?
19     A.    Correct.
20     Q.    Doctor, the TVT Exact IFU does not
21 state that de novo urge incontinence can result from
22 the Exact, does it?
23           MR. GAGE:  Objection to the form.
24           THE WITNESS:  Actually, it does.
25           MR. BARLOW:  Okay.

Page 375

1           THE WITNESS:  And I really just
2  discovered this looking at all these IFUs side by
3  side, as you asked me to do; and I noticed that in
4  warnings and precautions, there's a statement that
5  says:  As with other incontinence procedures, de
6  novo detrusor instability, which is the medical term
7  for urge incontinence, may occur following the
8  Gynecare TVT Exact continence system procedure. To
9  minimize this risk, make sure -- I can go on, but --
10          MR. BARLOW:  Make sure that -- go
11 ahead.  Finish the --
12          THE WITNESS:  Make sure to place the
13 implant tension free in the mid-urethral position.
14          MR. BARLOW:  Okay.
15          THE WITNESS:  And, unfortunately,
16 that's going to modify or amend many of the answers
17 that I gave today and yesterday, because I just
18 really found this.  I was looking for the words urge
19 incontinence, and detrusor instability just kind of
20 went by and I just discovered it in reviewing these
21 documents.
22          MR. BARLOW:  All right.
23 BY MR. BARLOW:
24     Q.    Doctor, the -- let's do it this way
25 -- I need to object as nonresponsive to the extent

Page 376

1  that it extended past the TVT Exact, which was the
2  subject of the question, but let me ask it this way.
3           Doctor, urge incontinence is not
4  included in the adverse reactions section of the TVT
5  Exact IFU, does it?
6      A.    No.
7      Q.    Or is it.  Yeah.
8           With regard to the mention of
9  detrusor instability in the warnings and precautions
10 section, that is -- that warning is intended to make
11 the surgeon aware of the possibility of de novo
12 detrusor instability as a result of surgical
13 technique; correct?
14     A.    There's a specific warning about
15 implanting the Gynecare TVT Exact, but the sentence
16 begins:  As with other incontinence procedures, de
17 novo detrusor instability may occur.
18     Q.    And that would -- and read as a
19 whole, that's directed toward warning surgeons not
20 to put the Exact in too tightly; correct?
21     A.    Well, but it also qualifies that this
22 is a part of any incontinence surgery, whether or
23 not the Exact is used or any other -- it's a general
24 warning for incontinence procedures with some --
25 with a specific warning of one thing they can do to

Page 377

1  try to avoid it with this procedure.
2      Q.    Okay.
3           Doctor, with regard to urinary
4  frequency, urinary frequency is not included in the
5  adverse reactions section of the TVT Exact IFU, does
6  it?
7      A.    No.
8      Q.    The TVT Exact IFU adverse reactions
9  section does not include urinary retention, does it?
10     A.    Only in -- with reference to urinary
11 tract obstruction.
12     Q.    The specific issue of urinary
13 retention does not appear in the TVT Exact IFU
14 adverse reactions section, does it?
15     A.    The words don't appear.
16     Q.    Okay.
17          Urinary obstruction -- strike that.
18          Doctor, the TVT Exact adverse
19 reactions does not include urinary obstruction
20 resulting from scarification of the TVT Exact, does
21 it?
22     A.    Just check -- no.
23     Q.    Doctor, the TVT Exact IFU does not
24 include voiding dysfunction as a result of the TVT
25 Exact sling itself, does it?

Golkow Technologies, Inc. - 1.877.370.DEPS

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 378

1    A.    Those words are not included, but
2  voiding dysfunctions are discussed.
3    Q.    There are other voiding -- there are
4  other voiding dysfunctions other than obstruction;
5  correct?
6    A.    Right.  Detrusor instability is
7  another one and that's in the warnings.
8    Q.    Doctor, of the adverse reactions
9  listed on 1641, detrusor instability implicates
10  which of those?
11    A.    Detrusor instability is included in
12  the IFU in the warnings and precautions section, not
13  in the adverse reactions section.
14    MR. BARLOW:  Okay.  I need to object
15  as nonresponsive.
16  BY MR. BARLOW:
17    Q.    De novo detrusor instability
18  implicates what, if any, of the urinary adverse
19  reactions listed on 1641 -- Exhibit 1641?
20    MS. KABBASH:  On the list.
21    MR. GAGE:  He's asking about -- he's
22  wanting you to look at this list when you answer the
23  question.
24    THE WITNESS:  Oh, I'm sorry.
25    MR. GAGE:  So would you now --

Page 379

1    THE WITNESS:  I misunderstood.
2    MR. GAGE:  -- Alex, reask the
3  question?
4    THE WITNESS:  Yeah.
5  BY MR. BARLOW:
6    Q.    Doctor, detrusor instability
7  implicates which of the urinary conditions on
8  Exhibit 1641?
9    A.    Urge incontinence.
10    Q.    Is that the only one?
11    A.    Yes.
12    Q.    Okay.
13    A.    Although some patients with detrusor
14  instability have urinary frequency, also.
15    Q.    Because of the detrusor instability?
16    A.    Yes.
17    MR. BARLOW:  Doctor, give me just a
18  minute to fret, and then I'm probably going to turn
19  it over to Rich.
20    MR. GAGE:  And, Rich, are you please
21  going to tell us you're not going to go through
22  IFUs?
23    MR. FREESE:  I'm not going over IFUs,
24  I can tell you that.
25    MR. GAGE:  Thank you.

Page 380

1    MR. FREESE:  I mean, I'm going to go
2  over --
3    MR. GAGE:  I mean, you know what I'm
4  talking about.
5    MR. FREESE:  I'm going over an IFU.
6    MR. GAGE:  Yep.
7    MR. BARLOW:  At this time, I'm going
8  to -- sorry.  At this time, I'm going to turn the
9  questioning over to Mr. Freese on behalf of the
10  Texas plaintiffs.
11    I just want to reiterate, and I'm not
12  going to go through the whole thing again, what we
13  talked about on the record yesterday:  The MDL's
14  position is, is that due to the volume and manner in
15  which the discovery was produced, the document
16  discovery was produced, in advance of this
17  deposition, we've been unable to review large
18  portions, perhaps the majority, of those documents.
19    And we reserve our right, after we've
20  had an adequate opportunity to review those
21  documents, to come back and seek to question some
22  more in a nonduplicative manner.  Okay?
23    With that, I'm going to turn it over
24  to Mr. Freese.  We can go off the record.
25    THE VIDEO TECHNICIAN:  Sure.  The

Page 381

1  time is 11:41.  We're going off the record.
2    - - -
3    (A discussion off the record
4    occurred.)
5    - - -
6    THE VIDEO TECHNICIAN:  The time is
7  11:45.  We're back on the record.
8    - - -
9    EXAMINATION
10    - - -
11  BY MR. FREESE:
12    Q.    Good morning, Dr. Weisberg.  How are
13  you doing?
14    A.    Good morning.
15    Q.    I'm Richard Freese and we've met
16  before, have we not?
17    A.    We have.
18    Q.    I think this is maybe the -- either
19  the second or third time I've been in a deposition
20  with you.
21    I get the privilege of being cleanup
22  today, so that may encompass me jumping around a
23  little bit, so I'll apologize to you ahead of time,
24  but I'm go going to try to cover what I need to
25  cover and then ask you some questions that relate to

23 (Pages 378 to 381)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 382

1 some that you may have already answered and -- so
2 just do your best to work with me, if you don't
3 mind.
4    A.    Please proceed.
5    Q.    Great.  Thank you.
6    I want to first show you what is
7 being marked as Plaintiffs' Exhibit P-1665.
8          - - -
9    (Deposition Exhibit No. P-1665,
10   E-Mail Chain, ETH.MESH.17619387 through
11   ETH.MESH.17619398, was marked for
12   identification.)
13         - - -
14 BY MR. FREESE:
15   Q.    And this is a series of e-mails
16 between Stacy Kluesner and Heather Rodriguez and
17 Richard Sedlatschek?  Do you see that?
18   A.    Sedlatschek.
19   Q.    Sedlatschek -- do you see that --
20 first of all, have you seen these series of e-mails
21 before, Dr. Weisberg?
22   A.    Let me just take a quick look.
23   Q.    Yes, sir.
24   MR. GAGE:  You need to go to the back
25 to start from the front.

Page 383

1    THE WITNESS:  Yeah, yeah.
2    (Pause.)
3    THE WITNESS:  I have seen them
4 before, but I'll need a few minutes to review all
5 the content.
6    MR. FREESE:  Okay.
7    THE WITNESS:  If you don't mind.
8    MR. FREESE:  Well, if you need some
9 time, we can just -- we can jump off the record for
10 a second and let you look at it.
11   THE WITNESS:  Yeah, just give me five
12 minutes.
13   MR. FREESE:  Sure.
14   THE VIDEO TECHNICIAN:  The time is
15 11:47.  We're going off the record.
16         - - -
17   (A discussion off the record
18   occurred.)
19         - - -
20   (The following discussion off the
21   videotape record occurred:
22   MR. GAGE:  All right.  The witness
23 has left the room.  I'm going to -- and counsel --
24 plaintiffs' counsel has handed Dr. Weisberg an
25 e-mail chain Bates marked ETH.MESH.17619387.

Page 384

1    Counsel represented that it was on
2 the list of documents that were produced by Ethicon
3 in response to this deposition notice.  We've
4 checked our list.  It does, in fact, appear on the
5 list.
6    From my reading of the document, I
7 don't see how it pertains at all to the IFU drafts
8 or the changes that are the subject of the
9 deposition.
10   So I don't object to plaintiffs'
11 counsel asking him what, if any, relationship this
12 document has to the changes in the IFU, because he
13 may know something that I don't, but I will object
14 to further questioning if he answers and says "I
15 don't know what relationship this has to the IFU
16 changes" on the basis of the scope.
17   And I'll just limit my objection in
18 his presence to just saying, "Objection; beyond the
19 scope of the deposition."
20   MR. FREESE:  Well, that's fine.  Let
21 the record be clear, this is a document that was
22 within the avalanche of tens of thousands, if not
23 hundreds of thousands, of pages of documents that
24 were produced to us responsive to this deposition
25 notice.

Page 385

1    Dr. Weisberg has been designated to
2 testify on behalf of the corporation on the -- on
3 issues related to the IFU.  This is a document that
4 was produced in response to that.
5    Obviously, I'm entitled to ask the
6 witness about it.  He's already admitted that he has
7 seen it and is aware of the document.  We're going
8 to find out in what context he became aware of it.
9    But I would -- I would really ask,
10 William, that you say nothing other than form or
11 scope and leave it at that and not do any further,
12 you know, suggesting to the witness what the answer
13 should be.
14   And suggesting to him that he has no
15 idea what it has to do with the IFU is not going to
16 lessen any of the questions I have, so --
17   MR. GAGE:  And don't worry.  That's
18 why I sent him out of the room, because I didn't
19 want him to hear that.
20   MR. BARLOW:  I would add that on the
21 face of the document itself in the e-mail chain,
22 that it discusses how the content of the other
23 e-mails are going to be used in response to Health
24 Canada and their inquiries in question.
25   So I think on the face of the

Confidential - Subject to Stipulation and Order of Confidentiality

Page 386

1  document, it's relevant to this deposition and
2  within the scope of this deposition.
3       MR. GAGE:  Got it.  So let's go get
4  Marty back in and let's see if he's read it and...)
5           - - -
6       THE VIDEO TECHNICIAN:  The time is
7  11:55.  We're back on the record.
8  BY MR. FREESE:
9       Q.    Dr. Weisberg, you have in front of
10 you Plaintiffs' Exhibit 1665; is that correct, sir?
11      A.    Yes.
12      Q.    And this is a series of e-mails from
13 various people within Ethicon and some folks that
14 work for a supplier of Ethicon; correct?
15      A.    Yes.
16      Q.    And you have seen this string of
17 e-mails before?
18      A.    It looks familiar, but I can't
19 pinpoint when or how much detail I went into.
20      Q.    Do you remember the last time you saw
21 this string of e-mails?
22      A.    It was -- it was -- no, I don't.
23      Q.    Okay.
24      A.    I really don't.
25      Q.    Did you look at it in preparation for

Page 387

1  your deposition today?
2       A.    I don't believe that I saw this
3  particular e-mail.
4       Q.    You understand, sir, that this
5  document was produced to us as responsive to our
6  request for all documents related to the topics of
7  which you've been designated by the company to
8  testify for.  Okay?
9       A.    I understand that.
10      Q.    I'm just trying to give you some
11 context there.
12          Sir, do you know what Secant Medical
13 is?
14      A.    Yes.
15      Q.    And would you tell us what Secant
16 Medical is, sir?
17      A.    It's a manufacturer of mesh.
18      Q.    And is it, in fact, the manufacturer
19 of the Prolene polypropylene mesh that is used in
20 all of Johnson & Johnson's TVT products?
21      A.    I'm not sure if they're the exclusive
22 supplier.
23      Q.    They certainly supply Prolene
24 polypropylene mesh for use in TVT.  Am I correct?
25      A.    Yes, they do.

Page 388

1       Q.    And have done so for many, many
2  years; correct?
3       A.    Yes.
4       Q.    And were you aware in December of
5  2013 of the e-mail that Jacqueline Ferro from Secant
6  sent to Lea Ann Conway, Jeff Robertson regarding the
7  Secant Medical inquiry on Gynecare mesh products?
8       A.    Although I wasn't involved in this
9  particular issue at the time, I do remember hearing
10 about it.
11      Q.    Okay.  And the issue you heard about
12 was that your supplier was concerned about the
13 complications and alleged injuries occurring from
14 the use of their Prolene mesh and lawsuits resulting
15 therefrom; correct?
16      A.    That's --
17          MR. GAGE:  Object to form.
18          THE WITNESS:  That's correct.
19 BY MR. FREESE:
20      Q.    And wanted Johnson & Johnson to
21 answer some questions to satisfy them regarding the
22 concerns that Secant and its insurers had; is that
23 correct?
24      A.    That's correct.
25      Q.    Tell me just generally what you

Page 389

1  remember about the issue, and then I'm going to ask
2  you some specific questions.
3       A.    That is pretty much --
4          MR. FREESE:  Objection; beyond the
5  scope.
6          THE WITNESS:  That is pretty much it.
7  This was a project that I wasn't personally involved
8  in.  There was another -- other medical directors
9  attending to this project, but it's -- I remember
10 hearing it.
11 BY MR. BARLOW:
12      Q.    Was this considered a major issue?
13          MR. GAGE:  Objection; scope.
14          THE WITNESS:  I -- I can't tell you
15 how it was viewed.  I think we take everything very
16 seriously.
17 BY MR. FREESE:
18      Q.    Who was the other medical director
19 that was involved with this Secant issue?
20          MR. GAGE:  Objection; scope.
21          THE WITNESS:  I believe it was Piet
22 Hinoul.
23 BY MR. FREESE:
24      Q.    And how do you know that?
25          MR. GAGE:  Objection; scope.

25 (Pages 386 to 389)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 390

1         THE WITNESS:  That's -- in my
2  recollection, it was a discussion that we had, but
3  --
4  BY MR. FREESE:
5      Q.    When?
6      A.    -- but I -- I can't pinpoint that.
7  I'm not even sure.  This is a fuzzy memory.  I knew
8  that I knew about it.  It was a time that Piet was
9  managing these things.
10         That's the best I can do.
11      Q.    Yes, sir.
12         Do you recall whether or not anyone
13  other than Secant in December of 2013 was supplying
14  Johnson & Johnson with Prolene polypropylene mesh
15  for use in TVT products?
16      A.    I don't know the answer to that.
17         MR. GAGE:  Objection; scope.
18         THE WITNESS:  I don't know the answer
19  to that.
20  BY MR. FREESE:
21      Q.    As you sit here today, can you name
22  me another one other than Secant?
23         MR. GAGE:  Objection; scope.
24         THE WITNESS:  I cannot.
25  BY MR. FREESE:

Page 391

1      Q.    You could name Secant, could you not?
2         MR. GAGE:  Objection; scope.
3         THE WITNESS:  I knew about Secant.
4  BY MR. FREESE:
5      Q.    You knew that Secant was a supplier
6  to J & J for its TVT Prolene polypropylene mesh.
7         MR. GAGE:  Objection; scope.
8         THE WITNESS:  I knew that they
9  supplied mesh and I wasn't any more -- I didn't know
10  anything more specific than that.
11  BY MR. FREESE:
12      Q.    And you see in the December 17th,
13  2013 e-mail, Ms. Conway writes:  As you know, Secant
14  Medical supplies Prolene mesh for your vaginal and
15  uterine prolapse devices under the Gynecare TVT
16  line; is that correct?
17         MR. GAGE:  Objection; scope.  He
18  wasn't following you.  I think he was reading that
19  sentence to you.  Rich, you may want to re --
20         THE WITNESS:  Okay.  I see.
21         MR. FREESE:  I'm on the very last
22  page of the exhibit, Dr. Weisberg.
23         THE WITNESS:  The last page of the
24  exhibit?
25         MR. BARLOW:  Yeah, where Ms. -- mine

Page 392

1  are double-sided.  I'm sorry.
2         MR. GAGE:  Last page of the e-mail
3  chain is what he meant to say.
4         MR. FREESE:  I'm sorry.  Last page of
5  the e-mail chain.  Thank you.
6         THE WITNESS:  Okay.
7  BY MR. FREESE:
8      Q.    Do you see Ms. Conway's e-mail?
9         MR. GAGE:  Object to scope.
10         THE WITNESS:  Yes, I do.  Yes, I do.
11         MR. FREESE:  And, William, I'll give
12  you a standing objection on scope on this exhibit if
13  you want.
14         MR. GAGE:  Yes, I would.
15         MR. FREESE:  That's fine.
16         MR. GAGE:  Is that acceptable to MDL
17  counsel as well?
18         MR. BARLOW:  Yes.
19         MR. GAGE:  Okay.
20  BY MR. FREESE:
21      Q.    She goes on -- first of all, who is
22  Lea Ann Conway?
23      A.    I'm trying to think of Lea Ann's
24  position at that time.  I believe she was in our
25  quality division, but I'm not sure of her particular

Page 393

1  job.
2      Q.    All right.  Have you had occasion to
3  work with her?
4      A.    Yes, and, you know, over the years,
5  people change their -- you know what?  I'm not sure
6  what her position was at that time.
7      Q.    Obviously, she was somebody at
8  Johnson & Johnson who worked with Secant.
9      A.    Yes.
10      Q.    All right.
11      A.    Or had a relationship of some kind.
12      Q.    Ms. Ferro says:  Quote, Most
13  recently, in light of all the litigation around mesh
14  products used for vaginal and uterine prolapse, it
15  appears that the Biomaterials Assurance Act lacks
16  precedence and may not protect suppliers like Secant
17  as intended.
18         Do you see that?
19      A.    Yes.
20      Q.    Secant Medical is owned by Fenner
21  PLC, a public industrial company based in the UK, do
22  you see that?
23      A.    Yes.
24      Q.    Because our parent company is not in
25  the life science industry -- life sciences

26  (Pages 390 to 393)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 394

1  industry -- our insurance carriers are starting to
2  mandate that we no longer sell mesh for device
3  applications as outlined under the litigation.
4          Do you see that?
5      A.   Yes.
6      Q.   Is that the fact that you became
7  aware of at some point, through Dr. Hinoul or
8  someone else, that your supplier of Prolene mesh was
9  being instructed by their insurers not to supply
10  Johnson & Johnson with Prolene mesh for use in
11  vaginal and uterine prolapse devices?
12          MR. GAGE:  Object to form.
13          THE WITNESS:  Well, pretty much the
14  only thing I remember is that -- that Secant was
15  considering not supplying mesh anymore.  That's --
16  that's pretty much the sum total of this
17  interaction.
18          MR. FREESE:  Yes, sir.
19  BY MR. FREESE:
20      Q.   And it says -- goes on, quote, There
21  is also considerable discussion of this at our CEO
22  and board of directors level.  It says BOD.  Right?
23      A.   Yes.
24      Q.   She goes on to ask, quote, Is it
25  possible for you or a member in your organization to

Page 395

1  share information on the rationale for keeping these
2  products on the market?  Since the initial launch, I
3  am certain that there has been corrective action for
4  complaints and MDRs which resulted in changes to the
5  IFU, user training, protocols for care after
6  implantation, and design changes.
7          Do you see that?
8      A.   Yes.
9      Q.   Are you aware, Dr. Weisberg, whether
10  or not since the initial launch there were any
11  changes made by Johnson & Johnson or Ethicon in its
12  IFUs because of lawsuits that were filed against it?
13          MR. GAGE:  Object to form.
14          THE WITNESS:  Because of, no.
15  BY MR. FREESE:
16      Q.   Would your answer be, during that
17  time, there were changes that we've discussed over
18  the last couple of days?
19      A.   Yes.
20      Q.   Was there any changes in user
21  training that Ethicon did since the filing of the
22  lawsuits against the company?
23      A.   They're constantly updating their
24  training.  I'm really not sure what changes would
25  have been made when.

Page 396

1      Q.   Essentially, Ms. Ferro's asking for
2  Johnson & Johnson to provide some insight into all
3  the changes that you had made, your company had
4  made, to the IFU user training and protocols to
5  solve or minimize the risk from litigation arising
6  out of the use of Prolene mesh; correct?
7      A.   You can get that out of the letter,
8  yes.
9      Q.   All right.
10          And the Prolene mesh that she's
11  referring to is the same Prolene mesh that is in all
12  TVT products; correct?
13      A.   Yes, the mesh is the same.
14      Q.   Now, do you know who -- and I'm going
15  to mispronounce the name -- Rick Sedlatschek is?
16      A.   Sedlatschek?
17      Q.   Sedlatschek.  Thank you.
18      A.   Yes.
19      Q.   And he at the time was a vice
20  president of quality and regulatory compliance?
21      A.   Yes.
22      Q.   Did you work with him?
23      A.   On occasion.
24      Q.   And he prepared a rather lengthy
25  response to Secant to convince Secant to continue to

Page 397

1  sell Prolene mesh to Johnson & Johnson and Ethicon;
2  correct?
3          MR. GAGE:  Objection to form.
4          THE WITNESS:  Well, he prepared a
5  response to answer their questions.
6  BY MR. FREESE:
7      Q.   And their question was, what have you
8  done in response to this litigation, because our
9  insurers are telling us they don't want us to sell
10  you Prolene mesh anymore for use in your vaginal and
11  pelvic products; correct?
12          MR. GAGE:  Object to form.
13          THE WITNESS:  Yes -- well, they said
14  they're starting to tell us.
15          MR. FREESE:  Starting to mandate.
16          THE WITNESS:  Starting to mandate,
17  yeah.
18  BY MR. FREESE:
19      Q.   That they no longer sell mesh to
20  Johnson & Johnson.
21      A.   Right.
22      Q.   And this gentleman then writes his
23  response to Secant, explaining all of the reasons
24  why Johnson & Johnson believed that it was a safe
25  product; correct?

27 (Pages 394 to 397)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 398

1     MR. GAGE:  Object to form.
2     THE WITNESS:  I mean, you said "all
3   of the reasons."  I'm not going to say that this is
4   entirely inclusive of everything that could be said,
5   but I think he responded to their questions.
6   BY MR. FREESE:
7     Q.    If you'll look on what's the third
8   page of Mr. --
9     A.    Sedlatschek's?
10     Q.    Sedlatschek.  Thank you.  I'm sorry
11   -- Mr. Sedlatschek's e-mail, he quotes Dr. Nilsson's
12   17-year follow-up study in support of the safety and
13   efficacy of the Prolene mesh?
14     A.    Yes.
15     Q.    Nowhere does he tell Secant that Dr.
16   Nilsson was a paid consultant for Ethicon, does he?
17     A.    No, not in this letter.
18     Q.    He goes on to say that in December of
19   2013, Ethicon conducted a Quality Review Board with
20   its most senior medical affairs, legal, regulatory,
21   and quality leaders to assess the increased trend of
22   litigation alleging injuries related to pelvic floor
23   repair systems and Gynecare tension-free tape, as
24   well as Prolene polypropylene mesh, Mersilene mesh,
25   and UltraPro mesh and hernia repair meshes.

Page 399

1     Do you see that?
2     A.    Yes, but I have to go back and amend
3   my last answer.
4     Q.    Okay.
5     A.    Because on the attachment to this
6   letter that Dr. Sedlatschek sent was a paper by
7   Nilsson, and it said "Conflicts of Interest" on the
8   last page.  It says, "CGN," which is Nilsson "and CF
9   have acted as consultants for Astellas, Ethicon, and
10   Pfizer."
11     Q.    All right.  And my question to you,
12   sir, was -- was, did Mr. Sedlatschek say that in his
13   e-mail?
14     A.    No, just in the attachment.
15     I'm sorry.  I lost your last question
16   entirely.
17     Q.    Sure, that's okay.  I was asking you
18   where he's telling Secant in December of 2013
19   Ethicon conducted a Quality Review Board.
20     A.    Okay.
21     Q.    Do you see that?
22     A.    And which page is that?
23     Q.    It's right under --
24     A.    I see it.
25     Q.    -- the Nilsson comment.

Page 400

1     A.    I see it, yes.
2     Q.    Assessing the increased trend in
3   litigation alleging injuries, do you see that?
4     A.    Yes.
5     Q.    Were you involved in that Quality
6   Review Board?
7     A.    I was not.
8     Q.    Who was the most senior medical
9   affairs people in December of 2013 involved in that
10   medical affairs -- I'm sorry.  Let me start over.
11     Who was the medical affairs doctor
12   involved in the Quality Review Board in December of
13   2013?
14     A.    I can't tell you for a fact, but it
15   was likely Piet Hinoul.
16     Q.    Was there a report prepared out of
17   that Quality Review Board?
18     A.    Typically, quality review boards do
19   publish minutes.
20     Q.    Have you looked at those minutes,
21   sir?
22     A.    I don't believe that I did.
23     Q.    And you said you were not part of
24   that Quality Review Board.
25     A.    I was not.

Page 401

1     Q.    He goes on to say:  In addition to
2   its own analysis, independent professional
3   organizations have reaffirmed the safety and
4   efficacy of polypropylene mesh mid-urethral slings
5   such as TVT line of products.
6     And then it goes on to say:  For
7   example, in a 2014 position statement, the American
8   Urogynecologic Society and the Society of
9   Urodynamics -- that's AUGS and SUFU; correct?
10     A.    Yes.
11     Q.    -- and he quotes from that position
12   paper; correct?
13     A.    Yes.
14     Q.    And do you see where he calls that an
15   independent professional organization?
16     A.    Yes.
17     Q.    Do you know who authored that
18   position paper?
19     A.    I don't recall.
20     Q.    Do you know Charles Nager?
21     A.    Yes.
22     Q.    Do you know Dennis Miller?
23     A.    Yes.
24     Q.    Do you know Eric Rovner?
25     A.    Yes.

28 (Pages 398 to 401)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 402

1    Q.    Do you know Paul Tulinkangas?
2    A.    Not personally.
3    Q.    Do you know he was one of the authors
4 of the paper?
5    A.    I --
6    Q.    And do you know Dr. Goldman from
7 Cleveland Clinic?
8    A.    Yes.
9    Q.    Did you know every one of those
10 authors -- first of all, did you know that those
11 were all the authors of the AUGS and SUFU position
12 paper?
13    A.    I didn't recall who authored them.
14    Q.    Well, I'm going to represent to you
15 those are all the authors, and every one of them are
16 paid consultants either to Ethicon, American Medical
17 Systems, or Boston Scientific Corporation.
18          Did you know that?
19    A.    I was aware that some of them were
20 consultants for us.
21    Q.    Well -- some were consultants for
22 you, but every one of them were consultants for
23 either you or your competitors.
24          MR. GAGE:  Object to form.
25 BY MR. FREESE:

Page 403

1    Q.    Did you know that?
2    A.    I wasn't sure of that, no.
3    Q.    It doesn't make them very
4 independent, does it?
5          MR. GAGE:  Object to form.
6          THE WITNESS:  Pardon me?
7          MR. GAGE:  No --
8          THE WITNESS:  Oh.  I think that these
9 are ethical people who gave ethical answers based on
10 their clinical experience, and they're honest and
11 the organizations that they work for are concerned
12 about women's health.
13          MR. FREESE:  Move to strike.
14          Doctor, that really wasn't my
15 question.
16 BY MR. FREESE:
17    Q.    As paid consultants for Ethicon and
18 Boston Scientific Corporation and American Medical
19 Systems, there might be an appearance of bias if
20 they are writing position papers saying that the
21 industries that they're being paid by are making
22 products that are safe and effective.
23          You'd agree with me?
24    A.    No -- yeah, an appearance of bias,
25 but an appearance of bias is not necessarily bias.

Page 404

1    Q.    I understand that, but Johnson &
2 Johnson has very thorough rules and regulations
3 governing your investigators to avoid appearance of
4 bias, correct, in studies you did -- clinical trials
5 you did?
6    A.    Well, I mean, we tell it like it is.
7 You know, if it appears biased and it's not, then
8 it's not biased.
9    Q.    In fact, Johnson & Johnson doesn't
10 allow anymore its investigators of clinical studies
11 to have an economic stake in the outcome of the
12 data, do they?
13    A.    I don't know that that was the policy
14 in 2013.
15    Q.    Well, I'll represent to you it was --
16 as of 2010, it was the policy of Johnson & Johnson.
17    A.    Oh.
18    Q.    But my question is, the gentleman
19 here on behalf of Ethicon is telling Secant that
20 these are independent professional organizations,
21 but he does not tell him or tell Secant that the
22 authors of these position papers are all paid-for
23 consultants by industry, does he?
24          MR. GAGE:  Object to form.
25          THE WITNESS:  No, that's not in

Page 405

1 there.
2 BY MR. FREESE:
3    Q.    And as you sit here today, you've not
4 reviewed any of the results of that Quality Review
5 Board.
6    A.    If I did, I don't recall.
7    Q.    Now, if you'll look up to the next
8 e-mail above that --
9    A.    Date, please?
10    Q.    Yes, March 26th, 2014 --
11    A.    Okay.
12    Q.    -- written to Adrienne Brott -- do
13 you know her?
14    A.    Not -- yes, I know who she is.
15    Q.    And who is she?
16    A.    See -- I believe she was -- she was
17 with quality, too, but I'm not sure.
18    Q.    And Mr. Sedlatschek writes:  The
19 outline below is a response I had sent to Secant
20 Medical in response to their request.  I recommend
21 you leverage it as much as possible in support of
22 our response to Health Canada regarding similar
23 questions and concerns.  This info was reviewed and
24 approved by all necessary Ethicon/J & J parties, so
25 it is well vetted.

29  (Pages 402 to 405)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 406

1      Do you see that?
2    A.    Yes.
3    Q.    What does that mean?
4    A.    It means that it's accurate.
5    Q.    What does it mean to leverage as much
6  as possible in support of our response to Health
7  Canada?
8    A.    Well, Mr. Sedlatschek put a lot of
9  work into that and has a lot of statistics and a lot
10 of facts that are in there; and rather than
11 reinventing the wheel, if the questions are the
12 same, we know that we have a well-vetted document
13 from which we can take information without having to
14 go back to the files.
15   Q.    And he was telling Ms. Brott to use
16 this information that he sent to Secant in
17 leveraging their response to Health Canada.
18         MR. GAGE:  Object to form.
19         THE WITNESS:  Well, as I said, I am
20 interpreting leveraging the way I think it was
21 intended, and that means that here are answers that
22 we researched and validated, use these to answer any
23 other questions that Secant may ask.
24         MR. FREESE:  That's my question.
25 BY MR. FREESE:

Page 407

1    Q.    He's telling her to use this Secant
2  response in responding to Health Canada if they ask
3  similar questions --
4    A.    Yes.
5    Q.    -- about the product; correct?
6    A.    Yes.
7    Q.    And you were involved in the Health
8  Canada project, were you not?
9    A.    I was.
10   Q.    That's why you're the spokesman for
11 the company today; correct?
12         MR. GAGE:  Object to form.
13         THE WITNESS:  I don't know the second
14 answer, but the first answer is, yes, I was involved
15 in it.
16         MR. FREESE:  And you know you're here
17 today to speak on behalf of the corporation on the
18 Health Canada issues; correct?
19         THE WITNESS:  Yes.
20 BY MR. FREESE:
21   Q.    And here's a document that is being
22 recommended to use in the Health Canada response.
23   A.    Yes.
24   Q.    Did you know that?
25   A.    I didn't see this at all in the -- in

Page 408

1  any of the Health Canada meetings.  This may have
2  been a behind-the-scenes, you know, somebody's
3  working to get an answer to this question.  They may
4  have pulled it out of there.  They may have pulled
5  it out of, you know, any previous vetted, accurate
6  answers.
7    Q.    Did you -- did you vet any of the
8  responses that went to Health Canada, sir?
9    A.    They were all vetted.
10   Q.    By you?
11   A.    Yes.
12   Q.    And who else?
13   A.    Oh, I suspect that -- well, I can
14 tell you the team, because everybody looked at them,
15 and I think I have a list of the Health Canada team.
16 These are just...
17         (Pause.)
18         THE WITNESS:  Do I have a list of the
19 Health Canada team.  I have a list of the people who
20 participated in changing of the IFU, but I don't
21 have a list of the people on the Health Canada team.
22         MR. FREESE:  Let's go ahead and mark
23 that as an exhibit so we'll have that.
24         THE WITNESS:  Okay.
25         MR. FREESE:  Has it already been

Page 409

1  marked or --
2         MR. KABBASH:  No.
3         MR. GAGE:  No.
4         MR. FREESE:  I'm sure Mr. Gage won't
5  mind.  He's probably got a thousand of these sitting
6  around somewhere.
7                 - - -
8         (Deposition Exhibit No. P-1666,
9         Document Labeled "Ethicon Approvers of
10        2015 Pelvic Mesh IFU Changes", was marked
11        for identification.)
12                - - -
13 BY MR. FREESE:
14   Q.    And P-1666 is entitled "Ethicon
15 Approvers of 2015 Pelvic Mesh IFU Changes"?
16   A.    Yes.
17   Q.    You're obviously on there; correct?
18   A.    Yes.
19   Q.    Stacy Kluesner in regulatory affairs
20 is on there; correct?
21   A.    Yes.
22   Q.    And, in fact, she's on the e-mail
23 chain with Sedlatschek and Brott over this Secant
24 response, is she not?
25   A.    Yes, she is.

30 (Pages 406 to 409)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 410

1    Q.    And you said there was a Health
2  Canada team -- was that a distinct group of people
3  known as the Health Canada team?
4    A.    Yeah, and many of those -- them may
5  be on that list, but the -- there was -- there were
6  Health Canada meetings on a regular basis from the
7  time we got the initial letter until the time that
8  Health Canada said that the situation was resolved.
9         Closed, I think, was their words.
10   Q.    And --
11   A.    Now, I'm -- let me back that off.
12  That may have been the FDA that said it was closed.
13        There was a Health Canada team that
14  started when we got the initial letter until we
15  submitted our response and then for a little bit
16  after that.
17   Q.    And it may have included more than
18  what's on Exhibit 1666?
19   A.    That's correct.
20   Q.    Do you believe there's a document
21  somewhere identifying everyone who's on the Health
22  Canada team?
23   A.    I'm sure there is.
24   Q.    You just don't have it with you --
25   A.    I just didn't pull that out. I

Page 411

1  pulled out a couple of things that I knew I wouldn't
2  remember, lists of people, and that just wasn't a
3  list of the people.
4    Q.    But it is a discrete document you
5  looked at in preparation for your deposition.
6    A.    No, but I looked at a series of
7  e-mails and minutes from -- from the Health Canada
8  team meetings and if you look up at the top, you can
9  see who is addressed and those would be the people.
10        MR. FREESE: I don't know if we have
11  seen those yet. I don't have the Health Canada
12  minute meetings, not to say they're not in the
13  300,000 pages that were produced --
14        MR. GAGE: They're in there.
15        THE WITNESS: Even in the meeting
16  invitations, their names would be in there.
17        MR. FREESE: Oh, that's fine.
18        MR. GAGE: Hang on a second, Rich.
19        (Pause.)
20        MR. GAGE: Rich, let Maha --
21        MS. KABBASH: The only minutes that
22  I'm aware of that exist, Rich -- I'm not going to
23  say none exist, but what we have seen is the minutes
24  from the Quality Review Board meetings held in June
25  and August 2014. And Dr. Weisberg does have a list

Page 412

1  of those individuals. I believe they might have
2  been discussed with Adam yesterday.
3        MR. FREESE: Okay.
4        MS. KABBASH: But I don't know that
5  we have seen minutes beyond those Quality Review
6  Board meeting --
7        MR. GAGE: It may be there.
8        MS. KABBASH: They may be there --
9        MR. GAGE: But we just haven't seen
10  them.
11        MR. FREESE: Do you have an exemplar
12  --
13        THE WITNESS: I don't. I mean, my
14  computer was swept, so every meeting invitation that
15  said Health Canada on it was pulled and provided.
16        MR. FREESE: Okay.
17  BY MR. FREESE:
18   Q.    Dr. Weisberg, you said all the
19  communications with Health Canada were thoroughly
20  vetted by yourself and other members of the Health
21  Canada team?
22   A.    Yes.
23   Q.    Did anybody tell Health Canada that
24  your possibly sole supplier of polypropylene mesh
25  was threatening to stop selling it to you because it

Page 413

1  was concerned about safety matters and the use of
2  its products for permanent implantation in women?
3        MR. GAGE: Object to form.
4        THE WITNESS: I don't believe so.
5  BY MR. FREESE:
6    Q.    Did you ever suggest that might be a
7  prudent thing to do?
8    A.    That's something that our regulatory
9  and legal people would probably address better than
10  I.
11   Q.    And as you sit here today, you know
12  that nobody in regulatory alerted Health Canada
13  during this whole IFU discussion with Health Canada
14  that your either major or sole supplier of
15  polypropylene mesh was threatening to -- refusing to
16  even sell you the product anymore because of safety
17  concerns; correct?
18        MR. GAGE: Object to form.
19        THE WITNESS: I'm not aware of that.
20  BY MR. FREESE:
21   Q.    Do you believe that that would have
22  been a prudent piece of information that Health
23  Canada might have considered relevant in its
24  assessment of your IFU?
25        MR. GAGE: Object to form.

31 (Pages 410 to 413)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 414

1    THE WITNESS: Well, I think if they
2  stopped selling it to us, that it would be prudent;
3  but they wanted to discuss with us about whether to
4  sell it to us or not, I don't know that that's --
5  that would be prudent.
6  BY MR. FREESE:
7    Q.    Okay. Well, how about if the reason
8  they were discussing refusing to sell it to you was
9  because of fears of injuries that were being caused
10  by women using the product?
11    MR. GAGE: Object to form.
12  BY MR. FREESE:
13    Q.    Do you think that would have been a
14  relevant piece of information to share with the
15  officials at Health Canada?
16    MR. GAGE: Object to form.
17    THE WITNESS: No. I think that once
18  a result was -- was -- once there was a conclusion
19  to their inquiries, then it may have been important
20  to tell them.
21  BY MR. FREESE:
22    Q.    It may have been important to tell
23  Health Canada.
24    A.    Yes.
25    Q.    But they never got told, did they?

Page 415

1    A.    Well, that's because there was no
2  change in what was being supplied to us.
3    Q.    Well, they couldn't comment on
4  something they weren't told and they didn't know,
5  could they?
6    MR. GAGE: Object to form.
7    THE WITNESS: This question is -- is
8  strictly a legal and regulatory question; and
9  although I am representing the company, I was not
10  involved in any discussions about whether or not to
11  include that information.
12  BY MR. FREESE:
13    Q.    Well, but you were on the team that
14  was vetting all the information that was going to
15  Health Canada; correct?
16    A.    We vetted the information that was --
17  that we drafted.
18    Q.    You wanted to give Health Canada a
19  full and complete and honest appraisal of the
20  situation as it existed in 2014 when you were having
21  these discussions with Health Canada; correct?
22    MR. GAGE: Object to form.
23    THE WITNESS: We needed to answer
24  Health Canada's questions.
25  BY MR. FREESE:

Page 416

1    Q.    Could you answer my question? I can
2  have the court reporter read it back if you need to.
3    A.    I -- I don't know where the line
4  stops about what needed to be transmitted to them
5  and what didn't and --
6    Q.    Well, let's break it down then. Did
7  all of your responses to Health Canada need to be
8  fully truthful and open and honest?
9    A.    Yes.
10    Q.    And the supplier of your
11  polypropylene mesh was questioning whether or not
12  they should even continue to sell you the mesh
13  anymore; correct?
14    A.    No, they were alerting us that they
15  may be mandated to not sell it to us, may be.
16    Q.    And if they stopped selling you mesh,
17  that would have necessitated you stop making your
18  slings; correct?
19    MR. GAGE: Object to form.
20    THE WITNESS: I'm not familiar enough
21  with our operations people to know whether they had
22  another supplier.
23  BY MR. FREESE:
24    Q.    Well, can we agree that Secant
25  refusing to sell you polypropylene mesh would have

Page 417

1  been a major disruption to your manufacturing
2  process?
3    MR. GAGE: Object to form.
4    THE WITNESS: If that happened, which
5  it didn't.
6    MR. FREESE: I understand.
7  BY MR. FREESE:
8    Q.    And during that time that you were
9  dealing with Health Canada, you had already been in
10  discussions for many months with Secant where they
11  were expressing the concern over the safety of the
12  use of mesh in vaginal and pelvic floor products;
13  correct?
14    MR. GAGE: Object to form.
15    THE WITNESS: Yes.
16  BY MR. FREESE:
17    Q.    And someone at Ethicon made the
18  decision not to share that information with Health
19  Canada; correct?
20    MR. GAGE: Object to form.
21    THE WITNESS: I don't know if it was
22  even brought up and a decision was made or it was
23  just considered nothing that we needed to consider.
24  BY MR. FREESE:
25    Q.    You certainly did not suggest telling

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Stipulation and Order of Confidentiality

Page 418

1  Health Canada about what Secant was threatening to
2  do; correct?
3       MR. GAGE: Objection.
4       THE WITNESS: They didn't threaten
5  anything. They informed us.
6  BY MR. FREESE:
7       Q.    You did not inform Health Canada that
8  Secant was alerting you that they were being
9  mandated not to sell you polypropylene mesh anymore;
10 correct?
11      A.    We did not.
12      Q.    And to your knowledge, no one else at
13 Ethicon, either in regulatory affairs or marketing
14 or compliance or global supply or legal, no one
15 suggested telling Health Canada about the Secant
16 issue; correct?
17      MR. GAGE: Object to form.
18      THE WITNESS: That's correct.
19 BY MR. FREESE:
20      Q.    Do you know or have you seen what
21 Secant's response was to Mr. Sedlatschek's e-mail?
22      A.    I don't believe I did.
23      Q.    As you sit here today, Dr. Weisberg,
24 do you know if there even was a response to it?
25      A.    I don't know.

Page 419

1       Q.    Is he still with the company?
2       A.    I believe he is.
3       Q.    Is he still in this same job?
4       A.    Yes.
5       Q.    Does he work here in Somerville?
6       A.    I don't know whether he's in
7  Somerville or in Cincinnati, or in New Brunswick for
8  that matter.
9       MR. FREESE: All right, Dr. Weisberg.
10 I'm going to show you what I'm marking as Exhibit
11 1667.
12            - - -
13       (Deposition Exhibit No. P-1667, 4/14
14       E-Mail Chain, ETH.MESH.176324274 and
15       ETH.MESH.176324275, was marked for
16       identification.)
17            - - -
18 BY MR. FREESE:
19      Q.    I assume you've seen this document
20 before, sir?
21      A.    Yes.
22      Q.    Stacy Kluesner writes you in April of
23 2014 and says, quote, Hi, Marty -- that's you;
24 correct?
25      A.    Yes.

Page 420

1       Q.    -- the subject is Health Canada?
2       A.    Yes.
3       Q.    -- as per our discussion, could
4  medical please help to create a response to: In
5  addition, one or more revision surgeries may be
6  necessary to treat these complications, while some
7  complications may not always be completely
8  corrected.
9            Do you see that?
10      A.    Yes.
11      Q.    And that was one of the questions
12 posed by Health Canada; correct?
13      A.    Yes.
14      Q.    And Ms. Kluesner was looking on how
15 to respond to that; correct?
16      A.    Yes.
17      Q.    And she came to you for that;
18 correct?
19      A.    Yes, she did.
20      Q.    And she said: Points we discussed
21 during our meeting -- and I assume that's a meeting
22 that you were in?
23      A.    Likely.
24      Q.    One of your Health Canada meetings?
25      A.    I suspect.

Page 421

1       Q.    -- it says, the need for the revision
2  surgery is independent of the mesh.
3       A.    Yes.
4       Q.    The mesh is fine, does not fail.
5       A.    Yes.
6       Q.    In these cases, the tissue's what
7  fails, do you see that?
8       A.    Yes.
9       Q.    Who came up with those points, those
10 bullet points?
11      A.    They were discussed at the meeting
12 and it was explained that when these operations
13 fail, it's not because the mesh rips or comes apart
14 or absorbs or goes away.
15            It's because what it's attached to,
16 the tissue it's attached to, it may pull -- pull
17 loose or a part of the pelvic floor that's not
18 covered by the mesh may create a new recurrence.
19      Q.    Well, can we agree that whatever
20 surgery for revision is necessary is because of the
21 implantation of the mesh; correct? If the mesh
22 wasn't there, you wouldn't need a revision surgery,
23 would you?
24      A.    Well, it depends. If it's a -- if
25 it's a repeat pelvic floor prolapse -- the best

Confidential - Subject to Stipulation and Order of Confidentiality

Page 422

1    example I can give you is that -- now, let's see
2    what device we're talking about.  Anything -- okay.
3            If somebody does an anterior repair
4    of pelvic floor prolapse and somebody has another
5    prolapse, which is from the top of the vagina or the
6    bottom of the vagina, that's really due to the
7    tissue that's bad and you've fixed one part and the
8    other parts didn't get fixed, and that sometimes
9    happens, especially if you reinforce one part,
10   another part may pop through.
11       Q.    In fact, that was an identified
12   complication of Prosima, was it not?
13       A.    Yes.
14       Q.    Because you repair one compartment
15   and you're causing a prolapse in another
16   compartment; correct?
17       A.    Well, yeah, it goes for any kind of
18   pelvic floor repair, mesh or not.
19            MR. FREESE:  Move to strike;
20   nonresponsive.
21   BY MR. FREESE:
22       Q.    That was a known complication of a
23   Prosima, was it not?
24       A.    Yes.
25       Q.    Which used polypropylene mesh;

Page 423

1    correct?
2        A.    Yes.
3        Q.    And the question that Ms. Kluesner is
4    asking is about complications.  So the need for
5    revision surgeries independent of the mesh, that's
6    not a true statement, is it, because but for the
7    existence of the mesh, there wouldn't be a revision
8    surgery; correct, sir?
9            MR. GAGE:  Object to form.
10           THE WITNESS:  A revision surgery
11   might be necessary even if the mesh is functioning
12   as intended, but it might be a misplacement of the
13   mesh or it might be a tearing free of the mesh, but
14   the mesh when it's removed is -- appears the way it
15   does when it goes in.
16           MR. FREESE:  Move to strike as
17   nonresponsive.
18   BY MR. FREESE:
19       Q.    Dr. Weisberg, my question is simply
20   that you don't have revision surgery independent of
21   the mesh.  The mesh is a necessary component of
22   needing a revision surgery, is it not?
23       A.    It may be.
24           MR. GAGE:  Objection.
25   BY MR. FREESE:

Page 424

1        Q.    So at least in that respect, that is
2    not a totally accurate statement, is it, that the
3    need for revision surgery is independent of the
4    mesh?
5        A.    Well, I'm not sure that I made that
6    statement.  This is what Stacy said that -- her
7    interpretation of what the results of the meeting
8    were.
9        Q.    I understand.  These are not your
10   words.  So you do not agree that the literal things
11   she wrote there is correct, do you?
12       A.    I agree in -- yeah, I do agree with
13   them.  The mesh is generally fine and the mesh
14   itself doesn't fail, that's for sure.  The need for
15   the revision surgery is independent of the mesh, I
16   think that the context of that at the meeting was
17   not what was discussed here; and in these cases,
18   could be in some cases, the tissue is what fails.
19       Q.    In some cases.
20       A.    Yeah.  And in other cases, it wasn't
21   put in right.  But usually a revision is -- when the
22   mesh comes out, it looks like when the mesh went in.
23   It's a little dirtier, but it's intact.  It doesn't
24   have holes in it.
25           MR. FREESE:  Move to strike as

Page 425

1    nonresponsive.
2    BY MR. FREESE:
3        Q.    You asked her to send you IFUs.
4        A.    Yes.
5        Q.    To answer that question; correct?
6        A.    Yes.
7        Q.    And she says this is for all IFUs,
8    all TVTs, Gynemesh PS, and Artisyn Y's.  Right?
9        A.    Yes.
10       Q.    And you write would you like all of
11   these, and you said unfortunately yes.
12       A.    Yes.
13       Q.    Because you wanted to look at all of
14   them.
15       A.    Yes.
16       Q.    And you did.
17       A.    Yes.
18           (Pause.)
19              - - -
20           (Deposition Exhibit No. P-1668,
21           5/8/14 E-Mail Chain, ETH.MESH.17636165
22           through ETH.MESH.17636167, was marked for
23           identification.)
24              - - -
25   BY MR. FREESE:

34 (Pages 422 to 425)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 426

1    Q.    Dr. Weisberg, I'm going to show you
2 what I've marked as P-1668. Have you seen that
3 document before, sir?
4    A.    Let me read it, please.
5    Q.    All right.
6    (Pause.)
7    THE WITNESS: Okay. Yes, I'm
8 familiar with this.
9 BY MR. FREESE:
10    Q.    Did you review this in preparing your
11 -- for your deposition?
12    A.    I reviewed a lot of documents.  I
13 don't know if I reviewed this at that time, but I'm
14 familiar with the e-mail.
15    Q.    Who is Dr. Caroline Charles?
16    A.    She's a medical writer.
17    Q.    Paid for by Ethicon?
18    A.    Yes.
19    MR. GAGE: Object to form.
20 BY MR. FREESE:
21    Q.    What does she write?
22    A.    She is the one that takes our
23 information that we gather for our clinical
24 evaluation reports that we do on all of our products
25 on a regular basis and puts them into the format

Page 427

1 that's required.
2    Q.    Was she helping on the Health Canada
3 response?
4    A.    I don't believe so.
5    Q.    Why is she giving information to
6 Stacy Kluesner, re: Health Canada request?
7    A.    Stacy may have reached out to -- and
8 this is a guess, but I think I recall that Stacy may
9 have reached out to her to get some information to
10 include in the Health Canada request.
11    Q.    Do you see the question she poses:
12 Can you please assist in the rationale for why no
13 statistical methods were used to analyze the data,
14 different methodologies, endpoints, statistical
15 plans, et cetera? This can be generic.
16    Do you see that?
17    A.    I'm trying to see where you're
18 reading. What --
19    Q.    The -- the first --
20    A.    Which date?
21    Q.    The full paragraph here on the front
22 page here (Indicating).
23    A.    Okay. Okay. Yes, I see that.
24    Q.    And Dr. Charles writes to Stacy
25 Kluesner, she goes, I believe the -- the problem

Page 428

1 with these retrospective/prospective studies is,
2 they are often conducted in single centers and the
3 authors do not always meticulously describe the
4 methods for data collection and analysis. I also
5 believe that the size of the cohorts would not allow
6 for a meta-analysis. We would need several
7 larger-scale studies. I tried to select the
8 information that was statistically significant,
9 however the information wasn't always clear in the
10 documents and sometimes there was no P values.
11 These only give us an indication that the number of
12 studies for TVT makes me think that the overall TVT
13 is no less safer than traditional surgery. But,
14 again, we would need robust, randomized,
15 multicenter, large-scale trials to confirm every
16 single point.
17    Do you see that?
18    A.    I do.
19    Q.    Is that a true statement?
20    A.    I believe it is.
21    Q.    Did you --
22    A.    For a limited number of studies that
23 she looked at. What I have to establish here is
24 whether she was doing -- whether the clinical
25 evaluation report she did had a limited number of

Page 429

1 years of studies that she -- that she looked at. I
2 don't know that. I don't remember.
3    Q.    Can we agree that as of May 2014,
4 there were no robust, randomized, multicenter,
5 large-scale trials to confirm every single point
6 that is being discussed here?
7    A.    No, that's not --
8    MR. GAGE: Object to form.
9    THE WITNESS: That's not true.
10 BY MR. FREESE:
11    Q.    That is what she says, is it not?
12    MR. GAGE: Object to form.
13    THE WITNESS: Well, that may be what
14 she says, but that's not true. What she says is
15 that you can't take these studies and put them
16 together to create a meta-analysis because the ways
17 that they were done weren't exactly -- or weren't
18 similar enough to be able to merge them into one new
19 study. That's what a meta-analysis is.
20    MR. FREESE: I understand that. And
21 you agree with that, that there was not enough
22 studies in existence as of 2014 to even do a proper
23 robust meta-analysis of the TVT studies; correct?
24    MR. GAGE: Object to form.
25    THE WITNESS: That's not what I said.

35 (Pages 426 to 429)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 430

1    BY MR. FREESE:
2        Q.    That is what Dr. Charles is saying,
3    is it not?
4            MR. GAGE:  Object to form.
5            THE WITNESS:  Let me just read this
6    again:  Very wide variety of methods, patient
7    selection, variable statistical analysis of POP-Q
8    endpoint, et cetera.  These
9    retrospective/prospective studies is that they are
10   often conducted in single centers.
11           Okay.  So she's talking about a lot
12   of the publications that were not randomized,
13   controlled.  The size of the cohorts would not allow
14   for a meta-analysis, need several larger-scale
15   studies.  I tried to select information that was
16   statistically significant.  Information wasn't
17   always clear and there were no P values.  This gives
18   us an indication of the number of studies for TVT
19   and makes us think that overall TVT is no less safe
20   than traditional surgery, but again we would need
21   robust, randomized, multicenter, large-scale trials
22   to confirm every patient.
23   BY MR. FREESE:
24       Q.    Do you agree with that?
25       A.    I really don't.

Page 431

1        Q.    Did anybody tell Dr. Charles she was
2    wrong?
3        A.    I did not.  I don't specifically
4    remember discussing this, although I suspect -- I'm
5    remembering that we did discuss it and whether I
6    gave an answer or not -- I know I didn't give it to
7    her.  Whether somebody else answered her or not, I
8    don't know.
9        Q.    Well, sitting here today, you don't
10   have your response in front of you; correct?
11       A.    No, I don't.
12       Q.    You don't remember what your response
13   was; correct?
14       A.    It would have been the same as it was
15   just now.
16       Q.    As we sit here today, did Ethicon
17   ever do any more robust, randomized, multicenter,
18   large-scale trials after 2014 to confirm any of the
19   questions that Ms. Kluesner had at that time?
20       A.    We have over the -- the life of TVT
21   probably a hundred randomized, controlled trials,
22   including thousands of patients, and some of them go
23   out as long as 17 years.
24       Q.    Yeah, Dr. Nilsson's study.
25       A.    Dr. Nilsson's study.

Page 432

1        Q.    The paid-for Ethicon consultant;
2    correct?
3            MR. GAGE:  Object to form.
4    BY MR. FREESE:
5        Q.    Right?
6        A.    He has consulted with Ethicon.
7        Q.    And so my question to you, sir, is
8    since the time -- apparently Dr. Charles is just --
9    she's unaware of all these studies you're talking
10   about.
11           MR. GAGE:  Object to form.
12           THE WITNESS:  Well, she doesn't say
13   whether she's aware of them or not.
14   BY MR. FREESE:
15       Q.    Well, she says they don't exist and
16   that she can conclude no more -- that TVT is no less
17   safer than traditional surgery.  Do you see that
18   line?
19           MR. GAGE:  Object to form.
20           THE WITNESS:  I see that line.
21   BY MR. FREESE:
22       Q.    And my question to you, sir, is, is
23   that a different way of saying it's no more
24   dangerous than traditional surgery?
25       A.    Well, you'd have to ask her what she

Page 433

1    meant by that.
2        Q.    I'm asking you --
3        A.    No.
4        Q.    -- as a medical director, what does
5    it mean to be no less safer than?
6        A.    Well, in the statistical world, there
7    are equivalence studies which says things like no
8    less safe or no less effective.
9            And then there are other studies
10   which are powered and controlled for, being able to
11   say it's better, and there are many, many, many
12   studies that show that.
13           The -- of those hundred randomized,
14   controlled studies, the safety and effectiveness has
15   been consistent, not to the exact percentage, but
16   within a highly successful range, and the safety has
17   been also -- they have -- this is a device that has
18   shown to be safe.
19           MR. FREESE:  Move to strike as
20   nonresponsive.
21           I didn't ask you anything at all
22   about TVT, sir.  I simply asked you to define what
23   no less safer means.  That's all I asked you.
24           Do you understand that was my
25   question?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 434

1        THE WITNESS:  That's in the beginning
2   of my question -- the beginning of my answer.
3   BY MR. FREESE:
4        Q.     Well, I move to -- all I asked you
5   was, what does no less safer mean.
6        A.     It's a statistical term.
7        MR. FREESE:  I move to strike
8   everything after it's -- everything other than "It's
9   a statistical term."
10       (Pause.)
11       MR. FREESE:  Dr. Weisberg, I want to
12  show you what I've marked as P-1669.
13                    - - -
14       (Deposition Exhibit No. P-1669,
15       6/2/14 PRE14-055S Health Canada Section 39
16       Request and Response, ETH.MESH.17639467,
17       was marked for identification.)
18                    - - -
19  BY MR. FREESE:
20       Q.     And this is a -- it looks like a
21  Power Point presentation on the Health Canada
22  Section 39 request and response.  Do you see that?
23       A.     Yes.
24       Q.     Dated June 2nd, 2014?
25       A.     Yes.

Page 435

1        Q.     Are you familiar with this document?
2        A.     I am.
3        Q.     Did you help author any part of it?
4        A.     I didn't put it together, but it was
5   put together with the team that I worked with.
6        Q.     All right.  Can you describe for me
7   what this document is, please, sir?
8        A.     Let me just look through it to make
9   sure that...
10       (Pause.)
11       THE WITNESS:  This is a -- I believe
12  this is a quality board document.
13  BY MR. FREESE:
14       Q.     For Health Canada?
15       A.     Yes.  I'm not a hundred percent sure.
16  This is obviously a presentation made to people not
17  directly involved on the Health Canada team, so this
18  is a presentation that was made, it looks like a
19  presentation that was for -- it was for quality
20  board review, yeah.  I'm sorry.
21       Q.     And it describes what went on, that
22  is, the request coming into Johnson & Johnson from
23  Health Canada March 24th, 2014?
24       A.     Yes.
25       Q.     And it says requested, and I'm

Page 436

1   looking at page 5, what was requested in part was
2   the labeling that contains up-to-date information on
3   potential complications as listed by Health Canada.
4        A.     Yes.
5        Q.     And if you'll look on page 9, it says
6   results of investigation.  Do you see that?
7        A.     Yes.
8        Q.     And it says:  Changes are required in
9   the global labeling due to Health Canada's Section
10  39 request and to align with FDA's proposed rule.
11       Do you see that?
12       A.     Yes.
13       Q.     And I think you mentioned this
14  earlier, but this started off as just changing the
15  IFUs for Health Canada.  At some point, the company
16  decided to change its IFUs worldwide.
17       A.     Yes.
18       Q.     For all of the TVTs, the Gynemesh,
19  and Artisyn Y?
20       A.     Yes.
21       Q.     And was this document created in the
22  normal course of business by Ethicon?
23       A.     Yes.
24       Q.     By Ethicon employees?
25       A.     Yes.

Page 437

1        Q.     At or about the time that it was
2   prepared on June 2nd, 2014?
3        A.     Yes.
4        Q.     And does the information here to the
5   best of your knowledge appear to be correct and
6   accurate?
7        A.     Yes.
8        Q.     And if you'll look on page --
9   starting on page 12.  It says labeling changes to be
10  made.  Do you see that?
11       A.     Yes.
12       Q.     And it lists across there the changes
13  made to the labeling for TVT, Gynemesh PS, and
14  Artisyn.  Do you see that?
15       A.     Yes.
16       Q.     And if you'll -- they have an adverse
17  events section.  Do you see that?
18       A.     I do.
19       Q.     Then there's a labeling modification,
20  do you see that, for the adverse events?
21       A.     Yes.
22       Q.     And then there's a section, labeling
23  additions, adverse events section.  Do you see that?
24       A.     Yes.
25       Q.     And that means that -- that the

Golkow Technologies, Inc. - 1.877.370.DEPS

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 438

1  things listed on here were additions to the IFU that
2  did not previously exist; correct?
3          MS. KABBASH:  Rich, are you talking
4  about page 15 of the slide deck?
5          MR. FREESE:  Yes.
6          THE WITNESS:  15?
7          MR. FREESE:  Yes, sir.
8          THE WITNESS:  I'm sorry.
9          MR. FREESE:  I'm walking you through
10 each page.
11         THE WITNESS:  Okay.
12         MR. FREESE:  Page 12 lists the
13 adverse events, under new section other adverse
14 events.
15         THE WITNESS:  Yes.
16         MR. FREESE:  Page 13 is labeling
17 modification adverse events, same for page 14.  And
18 page 15 is labeling additions adverse events
19 section.
20         Do you see that?
21         THE WITNESS:  Right.
22         MR. FREESE:  Okay.
23         THE WITNESS:  Page 14 is labeling
24 modifications.  Page 15 is labeling additions.
25 BY MR. FREESE:

Page 439

1     Q.    And it lists here all the additions
2  to the IFU in the adverse events section; correct?
3     A.    Correct.
4     Q.    It lists that there -- all these
5  things are going to be put into TVT's IFUs; correct?
6     A.    That's correct.
7     Q.    And one of the -- strike that.
8          And then if you'll look over at page
9  18, Dr. Weisberg, there's a -- there's some --
10 several graphs.  Do you see that?
11    A.    I do.
12    Q.    And are these charts intended to
13 document adverse event reports?
14    A.    Yes.
15    Q.    And there's a spike in adverse event
16 reports between, I guess, March-April of 2013
17 through December of 2013; is that correct?
18    A.    That's correct.
19    Q.    What was the purpose of these charts
20 being prepared?
21    A.    We do this every week with all of our
22 complaints during our adverse event meeting.  We do
23 it weekly and we do it monthly so we can track
24 adverse events.
25    Q.    And if you'll look on the legend

Page 440

1  there, orange is attributing the adverse event to
2  litigation; correct?
3     A.    Yes.
4     Q.    Blue is attributed to nonlitigation;
5  correct?
6     A.    Correct.
7     Q.    And the green line is the rate?
8     A.    Yes.
9     Q.    Okay.
10         My question, sir, is, how does
11 Ethicon track whether or not a complaint is
12 litigation related or not?
13    A.    Well, they can't be a hundred percent
14 accurate, but the complaints that have come from
15 doctors or patients themselves are what you see at
16 the top of each column in blue.
17         Everything in orange comes from
18 attorneys.
19    Q.    So if a lawsuit was filed -- is this
20 like a lawyer files an adverse event or is Ethicon
21 simply counting the number of lawsuits filed against
22 it in order to come up with that number?
23    A.    Any time we learn of an adverse
24 event, whether it's walking down the street and
25 talking to somebody, reading an article in the

Page 441

1  paper, casually being at dinner with somebody who
2  said, you know, I had your device and it didn't
3  work, even to the point of I don't like the color of
4  the box, all of that goes in as a complaint.  And
5  it's the role of every Ethicon employee to report
6  any adverse event that they learn about.
7     Q.    I understand, but my question is, I
8  mean, you're tracking literally numbers of
9  complaints and ascribing them to litigation in here.
10    A.    Well, the information is given to us
11 by our legal department that these many -- that the
12 -- they received notices on these cases and they're
13 counted as complaints.
14    Q.    That's my point.  So if a -- if a
15 woman has a complication from a TVT mesh, has
16 surgery, multiple surgeries, and doesn't file a
17 lawsuit, that doesn't show up in this list unless
18 she or her doctor reports it; correct?
19    A.    That's correct.
20    Q.    If however -- but if a lawsuit's
21 filed on behalf of that woman where she's got a
22 complication, it gets counted; correct?
23    A.    That's correct.
24    Q.    So had the lawsuit not been filed and
25 the doctor didn't report it or the patient didn't

Golkow Technologies, Inc. - 1.877.370.DEPS

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 442

1  report it, it never would have gotten counted, would
2  it?
3      A.    That's correct.
4      Q.    So the lawsuits do help you track
5  more accurately the number of adverse events, do
6  they not?
7            MR. GAGE:  Object to form.
8            THE WITNESS:  Well, it gives us the
9  opportunity to look into all these cases.
10 BY MR. FREESE:
11     Q.    Because otherwise you might have an
12 adverse event that didn't otherwise get reported;
13 correct?
14     A.    That's correct.
15           MR. GAGE:  Object to form.
16 BY MR. FREESE:
17     Q.    You would agree with me that the
18 number of adverse events are normally well
19 underreported, are they not?
20     A.    I believe that's true.
21     Q.    In other words, the number of
22 complications from TVT, generally, the ones that are
23 actually reported are much less than the actual
24 complications that are existing in society as a
25 whole.

Page 443

1      A.    I think that's generally true.
2      Q.    All right.
3            And you're not ascribing any question
4  as to the merits or lack of merits if it's
5  litigation -- strike that.
6            In the columns that are listing the
7  number of complaints versus -- litigation versus
8  nonlitigation, this is not an attempt to quantify by
9  merits whether or not it's a valid complaint;
10 correct?
11     A.    Not at all.
12     Q.    What is the purpose of tracking it by
13 litigation as opposed to nonlitigation?
14     A.    Well, I can't really answer why they
15 do that, except to explain why there's a spike, and
16 that spike may mean that more of these cases are
17 being reported that weren't being reported at all.
18 And it's still a spike.  You know, we still need to
19 look into it.
20           Sometimes the --
21     Q.    Go ahead.
22     A.    Sometimes the litigation reports are
23 harder to get information from to try to investigate
24 the complaints, but every one of them -- there's an
25 attempt to investigate every complaint that comes in

Page 444

1  to see what we can learn from it and to see whether
2  there's something we can do to make sure that we
3  minimize the bad things that happen when people have
4  operations.
5      Q.    Well, what has Ethicon done to
6  minimize the bad things that happen from
7  complications because of these litigation charts
8  that you got here?
9      A.    Well, you know, you're asking a very
10 broad question.
11     Q.    Yes, sir.
12     A.    The things that have happened -- I
13 can give you some general -- I'll have to give you a
14 broad answer.
15     Q.    Well, let me withdraw the question
16 then.
17     A.    Okay.
18     Q.    Do you agree with me, Dr. Weisberg,
19 that to the extent that the lawsuits have alerted
20 Ethicon to complications arising out of the use of
21 its products that it didn't otherwise know of is a
22 good thing?
23           MR. GAGE:  Object to form.
24           THE WITNESS:  I don't know that we
25 got any new complications or adverse events, but

Page 445

1  certainly we're able to see the -- how widespread,
2  at least complaints of such events are, and, yes, it
3  helps us.
4  BY MR. FREESE:
5      Q.    Because that -- these lawsuits that
6  are being reported here may very well alert you to
7  complications you wouldn't otherwise have seen in
8  any reporting database; correct?
9            MR. GAGE:  Object to form.
10           THE WITNESS:  That's correct.  Any
11 time we learn about a complication and can
12 investigate it and see what the story is, it makes
13 us better.
14 BY MR. FREESE:
15     Q.    And who at Ethicon's in charge of
16 investigating all of these lawsuits to see whether
17 or not they are valid adverse events?
18           MR. GAGE:  Object to form.
19           THE WITNESS:  Our quality department
20 tries to investigate every case.  Sometimes with the
21 litigation cases, we don't get answers.
22 BY MR. FREESE:
23     Q.    When -- strike that.
24           You understand that many, many, many
25 of the women who have filed lawsuits against J & J

39 (Pages 442 to 445)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 446

1  over their TVT products or their -- or their
2  prolapse products have had to have revision
3  surgeries; correct?  You do know that.
4        MR. GAGE:  Object to form.
5        THE WITNESS:  I know that some have.
6  I don't know how you're defining many, many, many.
7        MR. FREESE:  A -- a -- not a hundred
8  percent, but a double digit percent of the women who
9  filed complaints have had to have additional
10 surgeries arising from complications out of the use
11 of a POP or SUI product.
12       MR. GAGE:  Object to form.
13 BY MR. FREESE:
14    Q.    You know that.
15    A.    I can't answer that specifically.  I
16 would have to look at it case by case.  There are
17 lots of reasons that people need additional surgery.
18    Q.    Well, let me ask you this, sir:  Is
19 it your belief that any of the surgeries that are
20 being done by doctors in this country for
21 complications arising out of the use of an SUI or
22 POP product are unnecessary surgeries?
23       MR. GAGE:  Object to form; beyond the
24 scope.
25       THE WITNESS:  I can't answer that.

Page 447

1  BY MR. FREESE:
2     Q.    As you sit here today, you have no
3  evidence that any surgery being performed on a woman
4  to repair a complication from an injury related to
5  mesh was an unnecessary surgery.
6        MR. GAGE:  Object to form; beyond the
7  scope.
8        THE WITNESS:  I can't answer that.
9  BY MR. FREESE:
10    Q.    Has anybody at Ethicon ever looked at
11 that question, whether or not women are having
12 unnecessary surgeries?
13       MR. GAGE:  Object to form; beyond the
14 scope.
15       THE WITNESS:  We try to look at every
16 complaint individually and there are some that
17 appear to have surgery that could have been avoided.
18       MR. FREESE:  Okay.
19       THE WITNESS:  And others where it
20 appears that it was a necessary surgery.
21 BY MR. FREESE:
22    Q.    Who tracks that?
23       MR. GAGE:  Object to form --
24       THE WITNESS:  Quality.
25       MR. GAGE:  -- beyond the scope.

Page 448

1  BY MR. FREESE:
2     Q.    Who in quality tracks whether or not
3  surgeries are necessary in the view of Ethicon?
4        MR. GAGE:  Beyond the scope.
5  Objection; beyond the scope.
6        THE WITNESS:  Each individual case is
7  evaluated, and I don't know that we keep a record of
8  how many need un -- had a what we consider
9  unnecessary surgery or may not have needed surgery.
10       I mean, you know, we're very limited.
11 We don't know the patient.  We haven't seen the
12 patient.  We haven't seen the X-rays, et cetera, but
13 we do track that and if you look at any individual
14 case, if we were able to gather enough information,
15 we may make a comment that there were other ways
16 that may have been taken care of this complaint.
17 BY MR. FREESE:
18    Q.    All right.  But my question to you
19 is, who is in charge of that department -- that
20 quality assurance department in Ethicon that tracks
21 whether or not surgeries are necessary?
22       MR. GAGE:  Objection; scope.
23       THE WITNESS:  That's a compound
24 question.  Who's in charge of --
25       MR. FREESE:  Of -- you said the

Page 449

1  person who tracks whether or not surgeries that
2  women are having to correct complications from mesh
3  is done in the quality department.  I'm asking you
4  who's in charge of that.
5     A.    I don't know --
6        MR. GAGE:  Objection; scope.
7        THE WITNESS:  I'm sorry.  I don't
8  know that it's tracked.  It's investigated, but I
9  don't know that it's tracked.
10       MR. FREESE:  I may have misunderstood
11 your testimony.
12       (Pause.)
13 BY MR. FREESE:
14    Q.    Did Health Canada ask any questions
15 about degradation of the mesh?
16    A.    No.
17    Q.    And did you supply them any
18 information about evidence of degradation of the
19 mesh?
20    A.    The mesh is clinically nondegradable,
21 and that's in the IFU.
22       MR. FREESE:  Move to strike,
23 nonresponsive.
24 BY MR. FREESE:
25    Q.    I simply asked you, did you supply

40 (Pages 446 to 449)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 450

1 any information to Health Canada regarding
2 degradation of the mesh?
3 A. Yes.
4 Q. And was it supplied because it was
5 already in the IFU?
6 A. Yes.
7 Q. So -- we can look at that. Is that
8 the phrase, under the action section, of animal
9 studies show that implantation of Prolene mesh
10 elicits a minimal inflammatory reaction in tissues
11 which is transient followed by the deposition of
12 thin fibrous tissue layers that can grow through the
13 interstices of the mesh, thus incorporating the mesh
14 into adjacent tissue. The material is not absorbed,
15 nor is it subject to degradation or weakening or
16 action of tissue enzymes, is that the phrase you
17 were referring to?
18 A. That's correct.
19 Q. And that didn't change.
20 A. That didn't change.
21 Q. And they didn't ask you about that.
22 A. No, they didn't.
23 Q. Did you share with them any of your
24 studies showing that mesh did degrade?
25 MR. GAGE: Object to form.

Page 451

1 THE WITNESS: We discussed a study
2 that was done a long time ago and concluded that any
3 degradation, as minimal as it is, did not affect the
4 strength or the weight of -- it was a suture study
5 and it was in dogs. It did not affect either the
6 strength or the weight of the polypropylene.
7 So, clinically, it doesn't -- it
8 doesn't degrade in any way to -- it's not clinically
9 significant. It's not clinically important.
10 MR. FREESE: Move to strike as
11 nonresponsive.
12 BY MR. FREESE:
13 Q. Dr. Weisberg, did you share the PA
14 Consulting study with Health Canada?
15 A. The PA Consulting --
16 MR. GAGE: Object to form.
17 BY MR. FREESE:
18 Q. First of all, are you familiar with
19 the PA Consulting study?
20 MR. GAGE: Object to form.
21 THE WITNESS: I would need to see it.
22 MR. FREESE: It's a London-based
23 company that Ethicon hired to review all the science
24 and literature on why --
25 THE WITNESS: Oh --

Page 452

1 MR. FREESE: -- TVTs were causing
2 complication in women. Are you familiar with that
3 report?
4 MR. GAGE: Object to form.
5 THE WITNESS: Yes, I am.
6 BY MR. FREESE:
7 Q. Was the PA Consulting study shared
8 with Health Canada?
9 A. No.
10 MR. FREESE: I'm trying to zip
11 through my questions here to get us going.
12 Let's go ahead -- I think he needs to
13 change the tape anyway. Let's take five minutes.
14 Let me look at my notes.
15 THE VIDEO TECHNICIAN: The time is
16 1:06. We are going off the record.
17 - - -
18 (A discussion off the record
19 occurred.)
20 - - -
21 (A luncheon recess was taken from
22 1:07 p.m. until 1:56 p.m.)
23 - - -
24 (Whereupon, the following discussion
25 took place off the videotape record:

Page 453

1 - - -
2 MR. GAGE: So, Madam Court Reporter,
3 I have on my speakerphone, me being William Gage,
4 Rich Bernardo, who is counsel for Ethicon and
5 Johnson & Johnson, in this litigation along with
6 Alex Barlow and Rich Freese.
7 And Mr. Freese has asked us to make
8 certain stipulations with regard to some of the
9 documents that were shown to Dr. Weisberg over the
10 past two days, and I believe we have an
11 understanding or an agreement that we need to
12 memorialize on the record.
13 MR. BERNARDO: This is Rich Bernardo,
14 who, for the record, is not at the deposition, but
15 is calling in telephonically.
16 Mr. Freese and myself and some
17 colleagues representing Ethicon have been engaged in
18 ongoing discussions with respect to evidentiary
19 issues and documentary issues; and we've come to an
20 agreement for purposes of certain cases, including
21 the Texas cases in this litigation, not to object on
22 the grounds of business record to e-mails composed
23 or created by Ethicon employees.
24 But we do point out, as we have in
25 our prior discussions with Mr. Freese, that we do

Confidential - Subject to Stipulation and Order of Confidentiality

Page 454

1  not agree as a legal matter that every e-mail the
2  company creates does constitute a business record.
3  Rather, we're doing this as an accommodation to get
4  by a number of issues and we certainly do reserve
5  our right in certain circumstances to raise that
6  issue.
7          And we will also agree as to those
8  documents or e-mails that are not created by
9  Ethicon, but indicate from their face that they were
10  received by an Ethicon employee, that they were, in
11  fact, received by that Ethicon employee in
12  connection with his business and received by any
13  individual from whose custodial file the record was
14  collected.
15          Rich, does that accurately reflect
16  what you and I have been discussing?
17          MR. FREESE:  Yeah, with a couple of
18  additions:  That the recipient of the e-mail or the
19  holder of the e-mail in their custodial file was on
20  notice of the information contained therein.
21          And the only other thing I would say
22  is, you said you -- I understand you're not making a
23  blanket agreement that all e-mails forever are
24  business records of Johnson & Johnson and you are
25  reserving that right.

Page 455

1          In cases other than the ones that
2  you're agreeing -- you're not going to reserve it in
3  this one because we haven't accomplished anything
4  then.  You're reserving it generally, but you're not
5  going to assert it in this litigation on the
6  particular documents that we're making the agreement
7  on.
8          MR. BERNARDO:  That is correct.
9          MR. BARLOW:  And by this litigation,
10  you mean the MDL litigation, the New Jersey
11  litigation, or Mr. Freese's cases.  Right?
12          MR. BERNARDO:  That is correct.
13          MR. GAGE:  And so now I think the
14  only task that remains at hand is, we do have to go
15  through and pull out of the stack of the exhibits
16  those documents which do not fall within the scope
17  of this agreement, things such as the list of
18  witnesses that he -- I mean, the list of people on
19  the various teams that he created and a couple of
20  other documents.
21          MR. BARLOW:  Documents that weren't
22  created by Ethicon --
23          MR. BERNARDO:  One additional point
24  that Mr. Gage reminds me of is, Mr. Freese, in
25  connection with our discussions, one example of

Page 456

1  things that we pointed out we would not agree to as
2  falling within business records, even though they
3  are e-mails, are e-mails of a personal nature or
4  e-mails of such language that clearly are not
5  business related and other examples like that.
6          We've had those discussions a number
7  of times.  I think we've come to agreement on that,
8  and that's one of the reasons that I'm reserving for
9  Ethicon its right to object to certain documents and
10  not making a blanket statement here.
11          MR. FREESE:  Yeah, and that's fine,
12  Rich, and I don't think we have any of those in
13  front of us today, so --
14          MR. BERNARDO:  Perfect.
15          MR. GAGE:  Are you all done?
16          MR. BARLOW:  Yeah.
17          MR. GAGE:  Thank you, Rich.  We very
18  much appreciate it.
19          MR. BERNARDO:  My pleasure.)
20          - - -
21          (A discussion off the record
22  occurred.)
23          - - -
24          THE VIDEO TECHNICIAN:  The time is
25  2:01.  We're back on the record.

Page 457

1          - - -
2          EXAMINATION
3          - - -
4  BY MR. GAGE:
5      Q.    Good afternoon, Dr. Weisberg.  My
6  name is William Gage.  I'm an attorney for Ethicon
7  and Johnson & Johnson, and I have some questions to
8  ask you.
9      A.    Okay.
10      Q.    The first document that you have
11  there in front of you is marked P-1608; correct?
12      A.    Yes.
13      Q.    And you were asked some questions, I
14  think yesterday, about that document; correct?
15      A.    Yes.
16      Q.    Would you tell the jury what this
17  document is?
18      A.    The document's a request from Health
19  Canada for additional information on some of our
20  medical devices.
21      Q.    And you've been testifying for a day
22  and a half about generally the Health Canada
23  request; correct?
24      A.    Correct.
25      Q.    And this is the document that

42 (Pages 454 to 457)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 458

1  constitutes the Health Canada request that was sent
2  to Ethicon and about which we have generally been
3  discussing for the past day and a half; correct?
4       A.    Yes.
5             MR. GAGE: All right. Dr. Weisberg,
6  I'm handing you -- what number is the exhibit number
7  on that? What is the next exhibit number, ma'am; do
8  you know?
9             MR. FREESE: It's going to be on
10 whatever those stickers are.
11            (Pause.)
12            MR. GAGE: Does it still say P? It
13 doesn't say P-1670.
14            MR. FREESE: I think they have been
15 saying that. I was kind of thrown off by that.
16            MR. GAGE: It says P, even if it's
17 one of my exhibits, a defense exhibit?
18            THE COURT REPORTER: (Indicating.)
19            THE VIDEO TECHNICIAN: Off the
20 record?
21            MR. FREESE: Off the record. Sure.
22            THE VIDEO TECHNICIAN: The time is
23 2:03. We're going off the record.
24            - - -
25            (A discussion off the record

Page 459

1       occurred.)
2             - - -
3             THE VIDEO TECHNICIAN: The time is
4  2:04. We're back on the record.
5             - - -
6             (Deposition Exhibit No. D-1, Ethicon
7       Response to Section 39 Request and
8       Attachments, ETH.MESH.22631022 through
9       ETH.MESH.22632029, was marked for
10      identification.)
11            - - -
12 BY MR. GAGE:
13      Q.    Dr. Weisberg, I'm handing you a
14 document that is marked D-1. Are you familiar with
15 that document?
16      A.    Yes.
17      Q.    And what is that document?
18      A.    This is the response to the Health
19 Canada request.
20      Q.    And when you say the response, you're
21 talking about Ethicon's response?
22      A.    Ethicon's response to their request.
23      Q.    And what is that comprised of?
24 What's the -- just generally?
25      A.    The --

Page 460

1       Q.    Is it a response with attachments?
2       A.    It's a response letter with a number
3  of attachments.
4       Q.    Was that document and the
5  attachments, were they made at or near the time of
6  the events described in the documents by person or
7  persons with actual knowledge?
8       A.    Yes.
9       Q.    And was the writing and those
10 attachments made in the regular course of Ethicon's
11 business?
12      A.    Yes.
13      Q.    And was it Ethicon's regular business
14 practice to make that record or document?
15      A.    Yes.
16      Q.    And Dr. Weisberg, as I understand it,
17 you were the medical director -- the Ethicon medical
18 director who was the most heavily involved in the
19 Health Canada response; is that correct?
20      A.    That's correct.
21      Q.    Tell the jury, if you would, a little
22 bit about your background and training, just
23 briefly.
24      A.    I am a gynecologist. I practiced for
25 -- from -- I was at Thomas Jefferson University

Page 461

1  Hospital from 1972 through the year 2000, practicing
2  gynecology. After that, I came to work at Ethicon
3  as a medical director.
4       Q.    So what did you do between -- what do
5  you do now?
6       A.    I retired on August the 31st and
7  started back as a contractor part-time for Ethicon
8  on September 1st, and that's what I'm doing now.
9       Q.    So were you a medical director at
10 Ethicon from 2000 through the mid part of 2015?
11      A.    Yes.
12      Q.    And what, if any, gynecological
13 meshes were you responsible for during that
14 timeframe?
15      A.    Throughout that period, I -- I
16 participated in -- in almost all of the
17 gynecological meshes at one time or another.
18      Q.    Would that have included the TVT
19 family of products?
20      A.    Yes.
21      Q.    Would that have included Gynemesh PS?
22      A.    Yes.
23      Q.    And at the time that you retired in
24 August of 2015, the Health Canada response and the
25 IFU changes that resulted from that process had

Confidential - Subject to Stipulation and Order of Confidentiality

Page 462

1  already been implemented; correct?
2      A.    Yes.
3      Q.    Now, sir, when -- did you work as
4  part of a team in preparing the response to the
5  Health Canada inquiry?
6      A.    Yes, I did.
7      Q.    When your team began the process of
8  making changes to the various IFUs we've discussed,
9  was any consideration given by your team of the
10  number of years that these various devices had been
11  on the market?
12      A.    Yes.
13      Q.    Why?
14      A.    Because it's data.  It's confirmed,
15  published evidence, and that's really the best way
16  to know how a product is behaving and interacting
17  and is being used and how successful it is.
18      Q.    And when you talk about published
19  data, what are you speaking of in particular?
20      A.    Generally, randomized, controlled
21  studies that are published in medical journals.
22      Q.    What are randomized, controlled
23  studies?
24      A.    Randomized -- we'll break that down.
25  A randomized study is one in which one group

Page 463

1  receives an investigational device -- now,
2  investigational doesn't necessarily mean that it
3  hasn't been approved, but the device that you're
4  investigating in this study -- and another group has
5  the same procedures done with other devices or other
6  methods and you get to -- patients are randomly
7  assigned into these groups to avoid bias.
8          And you compare the results of the --
9  of the two groups to see if one is better, worse, as
10  good as the other.
11      Q.    What is the significance, if any, of
12  that process as viewed by the medical and scientific
13  community?
14      A.    Randomized, controlled studies are --
15      MR. FREESE:  Object to the form of
16  the question.
17          You can go ahead.
18      THE WITNESS:  Randomized, controlled
19  studies are considered the best kinds of studies
20  because the same things are looked for in each
21  group, the same -- as many parameters as can be are
22  the same in each group, and the only variant is the
23  device that you're testing.
24  BY MR. GAGE:
25      Q.    The team that responded -- or strike

Page 464

1  that.
2          The team that was responsible for
3  preparing the response to the Health Canada inquiry
4  obviously did its work in 2015, because the inquiry
5  from Health Canada first arrived in 2015; is that
6  correct?
7      A.    Correct.
8      MR. FREESE:  Object to the form of
9  the question.  Do you mean '14?
10      THE WITNESS:  Oh --
11      MR. FREESE:  The request, was it --
12      THE WITNESS:  I'm sorry.  The request
13  was in March of '14.
14      MR. GAGE:  I'm sorry.  Strike that.
15  Let me ask the question.
16      THE WITNESS:  Thank you.
17  BY MR. GAGE:
18      Q.    The work that your team did was to
19  perform -- strike it.  Let me start it over.
20          The work that your team did began in
21  2014 after receiving the Health Canada inquiry in
22  2014; is that correct?
23      A.    That's correct.
24      Q.    As of the time that your team
25  prepared the response, how many years of data was

Page 465

1  already in existence with regard to the TVT line of
2  products?
3      A.    Well, we had studies that looked at
4  women who had it in for 17 years, but the device was
5  launched in 1997 and there were papers back that
6  far.
7      Q.    And which device specifically are you
8  referring to?
9      A.    That would be the TVT Retropubic.
10      Q.    When was the TVT-O launched?
11      A.    In 2004.
12      Q.    How many years of data did your team
13  have available, as of the time it began working on
14  the response to the Health Canada inquiry, with
15  regard to TVT-O?
16      A.    Ten.
17      Q.    Do you know how many randomized
18  clinical trials had been performed on the TVT device
19  as of 2014 when your team was working on the
20  response to the Health Canada inquiry?
21      MR. FREESE:  Object to the form of
22  the question.
23      THE WITNESS:  On the retropubic, a
24  little over a hundred.  The obturator, a little over
25  60.

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 466

1    BY MR. GAGE:
2        Q.    Who performed those studies?
3        A.    They were performed by a number of
4    people independently.  There were some studies that
5    were funded by Ethicon, but most were not.
6        Q.    How many women were involved
7    collectively in these studies?
8        A.    Thousands.  I don't have an exact
9    number.
10       Q.    Now, you talk about the studies being
11   published.  Where were these studies that contain
12   this data published?
13       A.    In medical journals.
14       Q.    And just help us understand what
15   medical journals are.
16       A.    Medical journals are magazines,
17   publications, to which people submit articles that
18   are then vetted by an editorial board who reviews
19   the articles for the content, the statistics, the
20   investigative technique; and then it's decided by
21   that medical board -- by that editorial board
22   whether an article is worthy of publication.
23       Q.    Putting aside randomized clinical
24   trials, were there other kinds of studies that had
25   been performed on TVT and TVT-O at the time your

Page 467

1    team began work on the response to Health Canada?
2        A.    Many others.
3        Q.    What kinds of studies are those
4    briefly?
5        A.    Well, and -- it's probably in the
6    range of a thousand -- there are case reports.
7    There are case series, and what that is is a doctor
8    says, gee, I've done this many of these procedures,
9    I want to tell people how I do it and what my
10   results are.  Or it may be a list of these are the
11   procedures I've done and these are some
12   complications that I've -- that I've come up
13   against.  Or it just may be -- just a history of how
14   somebody treats urinary stress incontinence.
15       Q.    As your team was working on changes
16   to the IFU, did the team reach any conclusion with
17   regard to the safety -- the safety profile of the
18   TVT device based on those studies?
19       A.    Yeah, looking at all the articles and
20   everything that we researched and knew about,
21   because we'd really been following these things all
22   along, it was clear that this is an effective and a
23   very safe device.
24            MR. FREESE:  Move to strike as
25   nonresponsive.

Page 468

1    BY MR. GAGE:
2        Q.    Did your team reach any conclusions
3    with regard to the safety of the TVT?
4        A.    Yes.
5        Q.    What were those conclusions?
6        A.    That this was a relatively safe
7    device.
8        Q.    Did the team reach any conclusions
9    with regard to the efficacy of the TVT device?
10       A.    Yes.
11       Q.    And what were those conclusions?
12       A.    That almost all the publications said
13   that it was a very effective device.
14       Q.    Did the team reach any conclusions
15   with regard to the safety of the TVT-O device?
16       A.    They concluded that that, too, was a
17   safe device, relatively safe device.
18       Q.    And did the team reach any
19   conclusions with regard to the efficacy or
20   effectiveness of the TVT-O device?
21       A.    They did and that was -- oh.  They
22   did.
23       Q.    And what was that conclusion?
24       A.    That the TVT-O is also an effective
25   device.

Page 469

1        Q.    Now, with regard to the 2015 changes
2    to the TVT family of IFUs, was any risk information
3    added to the IFUs that was not previously discussed
4    in the body of TVT and TVT-O published studies?
5            MR. FREESE:  Object to the form of
6    the question.
7            THE WITNESS:  There was no new real
8    risk information.
9    BY MR. GAGE:
10       Q.    Now, you were the medical director
11   for the team at Ethicon that was in charge of making
12   these changes to the IFUs; correct?
13       A.    Yes.
14       Q.    And over the course of your years,
15   have you had an occasion to interact with physicians
16   who were actually using the TVT family of devices?
17       A.    Many.
18       Q.    Would the same hold true for other
19   members of your team?
20       A.    Of the Health Canada team?
21       Q.    Yes.
22       A.    Most of the interactions would have
23   come through either the quality people or medical
24   affairs.
25       Q.    Did the team reach any conclusions as

45 (Pages 466 to 469)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 470

1  it was going through the analysis of the TVT IFUs as
2  to what doctors may have already known or didn't
3  already know about the substance of the 2015
4  changes?
5          MR. FREESE: Object to the form of
6  the question.
7          THE WITNESS: Yes.
8  BY MR. GAGE:
9      Q.    What were those conclusions?
10     A.    For the most part -- for the most
11  part, the conversations that I personally had and
12  that we had during our validations of the new IFU
13  was that this is not really new information.
14     Q.    And why is that?
15     A.    The device is used for the treatment
16  of urinary incontinence. Most of the warnings, most
17  of the adverse events, are events that happened with
18  any method of trying to treat urinary stress
19  incontinence, and the surgeons who were using this
20  understood that for the most part.
21     Q.    The other piece of it was that this
22  was a mesh product, and doctors understand what can
23  happen when you put mesh in.
24          MR. FREESE: Move to strike;
25  nonresponsive.

Page 471

1  BY MR. GAGE:
2      Q.    Dr. Weisberg, I'm handing you a
3  document that's been previously marked as P-1635.
4  Are you familiar with this document?
5      A.    I am.
6      Q.    This appears to be a memo from Lee
7  Hackman to the project file, and the subject says
8  initial product risk assessment for IFU change
9  project for TVT products, and it's dated September
10  19, 2014; correct?
11     A.    Correct.
12     Q.    Are you familiar with this document?
13     A.    I am.
14     Q.    Was this document created by a member
15  of your team that was working on the Health Canada
16  response?
17     A.    Yes.
18     Q.    Was this a writing made at or near
19  the time of the events described in the document by
20  a person or persons with actual knowledge?
21     A.    Yes.
22     Q.    Was the writing made in the regular
23  course of Ethicon's business?
24     A.    Yes.
25     Q.    Was it Ethicon's regular business

Page 472

1  practice to make that record or document?
2      A.    Yes.
3      Q.    Now, sir, if you look under the
4  purpose paragraph there, it says to comply with
5  request from Health Canada to align with the FDA
6  proposed rules and to align with internal standards,
7  change project, certain number, will revise IFUs of
8  products in the TVT product family. This memo
9  serves as the initial product risk assessment
10  evaluating the impact of this change.
11         Do you see that?
12     A.    Yes.
13     Q.    And then we go further down and it
14  says assessment.
15     A.    Yes.
16     Q.    Now, this document pertains to the
17  changes to the IFU that were being made in response
18  to Health Canada; correct?
19     A.    Yes.
20     Q.    We go further down and it says,
21  assessment: Per the design change notice for this
22  project, the proposed IFU changes consist of
23  enhancing the current IFUs to better describe known
24  product risks or to include hazards not currently
25  identified in the IFUs.

Page 473

1          Do you see that?
2      A.    Yes.
3      Q.    What does that mean?
4          MR. FREESE: Object to the form of
5  the question.
6          THE WITNESS: Well, there is a -- a
7  procedure that we need to follow when we make these
8  changes to see if they were included in the previous
9  risk documents that we created, and one of the
10  things that it looks for is to make sure that all
11  the identified harms are addressed in those risk
12  documents and that to see whether there are any
13  things in the IFU that haven't been addressed.
14  BY MR. GAGE:
15     Q.    So we go to the next paragraph and it
16  says, a review of the risk assessment summaries for
17  TVT and TVT Exact and for TVT Obturator and TVT
18  Abbrevo, as well as the corresponding clinical
19  evaluation report for TVT products, confirms that
20  all identified harms are adequately addressed in
21  current risk management documents and that the
22  proposed IFU changes introduce no new design or
23  user-related risks, nor increase any risk levels.
24         Do you see that?
25     A.    That's true.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 474

1    Q.    What does it mean when the sentence
2  says, a review of the risk assessment summaries
3  confirms that all identified harms are adequately
4  addressed in current risk management documents?
5          MR. FREESE:  Object to the form of
6  the question.
7          THE WITNESS:  Risk management
8  documents include, among other things, failure mode
9  analyses, design failure mode analyses, production
10 failure mode analyses, the users -- things that
11 could go wrong when the user uses the device,
12 application failure mode analyses.
13         And for every one of those failure
14 modes, anything that could go wrong, we assess what
15 the severity of that might be, does it require no
16 treatment, does a patient die, and everything in
17 between are all given numbers.
18         And then we assess the frequency of
19 these failure modes and how often they are --
20 initially, when a device first comes out, how often
21 they are expected to happen and then as they are
22 reviewed, how often do they actually happen.
23         So you have frequency and severity of
24 each hazard and the harm that it may create.
25 BY MR. GAGE:

Page 475

1    Q.    And what did that review conclude
2  with regard to the changes being made in response to
3  the Health Canada inquiry?
4          MR. FREESE:  Object to the form of
5  the question.
6          THE WITNESS:  Everything in the
7  changes were previously addressed in these failure
8  mode analyses.
9          MR. FREESE:  Move to strike as
10 nonresponsive.
11 BY MR. GAGE:
12    Q.    The sentence then goes on:  The
13 proposed IFU changes introduce no new design or
14 user-related risks, nor increase any risk levels.
15 What does that mean?
16         MR. FREESE:  Object to the form of
17 the question.
18         THE WITNESS:  Well, new design or
19 user-related risks would be additional things in the
20 hazard column of this report, and the risk levels
21 would -- would -- the risk level's a summary of the
22 severity and the frequency.
23 BY MR. GAGE:
24    Q.    And what was the conclusion, if any,
25 of the review of the risk of summaries with regard

Page 476

1  to those concepts?
2          MR. FREESE:  Object to the form of
3  the question.
4          THE WITNESS:  That the ones that were
5  in these files remained accurate and honest and none
6  had to be changed.
7          MR. FREESE:  Move to strike as
8  nonresponsive.
9          - - -
10         (Deposition Exhibit No. D-2, 7/29/14
11         CAPA-003474, ETH.MESH.22625140 through
12         ETH.MESH.22625145, was marked for
13         identification.)
14         - - -
15 BY MR. GAGE:
16    Q.    Dr. Weisberg, I'm now handing you a
17 document marked D-2.  Do you see this document?
18    A.    I do.
19    Q.    Are you familiar with this document?
20    A.    I am.
21    Q.    Is this document, was it created in
22 connection with the response to Health Canada?
23    A.    Yes.
24    Q.    What is this document?
25    A.    This is a CAPA report and --

Page 477

1    Q.    Let me stop you there.  What is a
2  CAPA report?
3    A.    It's a corrective action -- oh, I
4  always forget the --
5    Q.    Is it pre --
6    A.    Corrective and preventative action --
7    Q.    All right.
8    A.    -- report and if something comes up
9  that sounds like it might need a corrective or
10 preventative action, a CAPA is established and
11 investigation is done to see if or whether or what
12 may need to be modified to address the issue.
13    Q.    All right.  On the first page, it
14 says the CAPA was created July 29, 2014.  Do you see
15 that?
16    A.    I see that.
17    Q.    Was this a writing that was made at
18 or near the time of the events described in the
19 document by a person or persons with actual
20 knowledge?
21    A.    Yes.
22    Q.    Was this writing made in the regular
23 course of Ethicon's business?
24    A.    Yes.
25    Q.    And was it Ethicon's regular business

47 (Pages 474 to 477)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 478

1 practice to make this sort of record or document?
2     A.   Yes.
3     Q.   Sir, on the first page, we see in the
4 middle, it says: This CAPA was open to address the
5 labeling updates that will be made to the TVT,
6 Gynemesh, and Artisyn product families to address
7 the Health Canada Section 39 request.
8          Do you see that?
9     A.   I see that.
10     Q.   And that's the team that you were the
11 medical director for; correct?
12     A.   Yes.
13     Q.   On the next page, ETH.MESH.22625141,
14 in the middle of the page, we see a paragraph that
15 begins: According to the health hazard evaluation,
16 HHE, documented in PRE14-0055S, no immediate or
17 long-range health consequences that may result from
18 use of or exposure to the products are expected.
19 The safety and effectiveness of the devices have not
20 changed. The existing labels were adequate to
21 provide instructions for use including warnings and
22 precautions, and the proposed new labels clarify and
23 expand on information currently contained within the
24 labeling. According to the medical director, quote,
25 it is my medical opinion that the existing labels

Page 479

1 were adequate to provide instructions for use
2 including warnings and precautions, although perhaps
3 they were not articulated in the manner and to the
4 degree requested by Health Canada. Changes will be
5 made to generally refresh the labels and satisfy
6 requests made by Health Canada, close quote.
7          Do you see that?
8     A.   I do.
9     Q.   It says according to the medical
10 director. Who is that person?
11     A.   That would have been me.
12     Q.   Are those your words --
13     A.   Oh. I believe these are my words and
14 I believe that was me, yes.
15     Q.   And that -- the words would be what's
16 inside the quotations; correct?
17     A.   Yes.
18     Q.   Now, it says, it's my medical opinion
19 that the existing labels were adequate to provide
20 instructions for use including warnings and
21 precautions.
22          Do you see that?
23     A.   Yes.
24     Q.   Why was that your opinion?
25          MR. FREESE: Object to the form of

Page 480

1 the question.
2          THE WITNESS: It was my opinion
3 because upon reading it, I felt that anyone who knew
4 how to do this procedure would know who to choose to
5 do it -- who to choose to do it on, who not to do it
6 on, exactly how to do it, and there would have been
7 none of the -- well, let me just stop it there.
8 BY MR. GAGE:
9     Q.   All right.
10          It says -- it says, although perhaps
11 they were not articulated in the manner and to the
12 degree requested by Health Canada. Do you see that?
13     A.   I do.
14     Q.   What did that mean?
15          MR. FREESE: Object to the form of
16 the question.
17          THE WITNESS: Judging by their
18 suggestions, they wanted some very basic,
19 well-known, well understood facts to be put into the
20 IFU, which were just so well-known in the surgical
21 community that they weren't necessarily -- they
22 weren't necessary to be there.
23          MR. FREESE: Move to strike as
24 nonresponsive.
25                - - -

Page 481

1          (Deposition Exhibit No. D-3, 2008 TVT
2      Brochure, ETH.MESH.08003279 through
3      ETH.MESH.08003294, was marked for
4      identification.)
5                - - -
6 BY MR. GAGE:
7     Q.   Sir, I'm handing you a document
8 marked D-3. Are you familiar with this document,
9 sir?
10     A.   Yes, I am.
11     Q.   And what is this document?
12     A.   This is a patient brochure.
13     Q.   And I think if we go over to the last
14 page, the very last page near the bottom --
15     A.   Yes.
16     Q.   -- it says Ethicon, Inc. 2008. Do
17 you see that?
18     A.   Yes.
19     Q.   And then it says TVT016R9. What is
20 that number?
21     A.   It's a copy review number.
22     Q.   And what's the significance, if any,
23 of that?
24     A.   Everything that goes out of Ethicon
25 to customers or to patients needs to be reviewed by

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Stipulation and Order of Confidentiality

Page 482

1  medical, legal, and regulatory for accuracy, and
2  that's done by a copy review team; and each of these
3  has a number and that's how you can reference that
4  it was approved.
5      Q.    All right.  And is this a patient
6  brochure?
7      A.    It is a patient brochure.
8      Q.    For the TVT family of products?
9      A.    Yes.
10     Q.    Sir, if you would, turn with me to
11 page 10 -- I'm sorry -- page -- page 13.
12     A.    (Witness complies.)
13     Q.    Are you at the place where it says:
14 What are the risks?
15     A.    Yes.
16     Q.    It says:  All surgical complications
17 present some risks.  Complications associated with
18 the procedure include injury to blood vessels of the
19 pelvis, difficulty urinating, pain, scarring, pain
20 with intercourse, bladder, and bowel injury.
21 There's also a risk of the mesh material becoming
22 exposed.  Exposure may require treatment.  For a
23 complete description of risks, see the attached
24 product information.  Synthetic mesh is a permanent
25 medical device implant; therefore, you should

Page 483

1  carefully discuss the decision to have surgery with
2  your doctor and understand the benefits and risks of
3  mesh implant surgery before deciding how to treat
4  your condition.
5          Do you see that?
6      A.    Yes.
7      Q.    What is the significance, if any, of
8  the risks contained in this 2008 patient brochure in
9  the context of the information that Health Canada
10 was asking you to include in your IFUs?
11         MR. FREESE:  Object to the form of
12 the question.
13         THE WITNESS:  A good deal of it is
14 within those two paragraphs.
15             - - -
16         (Deposition Exhibit No. D-4, 2012 TVT
17     Brochure, ETH.MESH.09744858 through
18     ETH.MESH.09744863, was marked for
19     identification.)
20             - - -
21 BY MR. GAGE:
22     Q.    Sir, I'm handing you a document
23 marked as D-4 -- oh, and I'll tell you what, let me
24 -- let me go back for D-3.
25         Was this a document made at or near

Page 484

1  the time of the events described in the document by
2  persons or a team with actual knowledge?
3      A.    Yes.
4      Q.    And was this writing made in the
5  regular course of Ethicon's business?
6      A.    Yes.
7      Q.    And was it Ethicon's regular business
8  practice to make those types of records or
9  documents?
10     A.    Yes.
11     Q.    All right.
12         Sir, I've handed you another
13 document.  It's marked D-4.  Do you see that?
14     A.    Yes.
15     Q.    And if you would, what is this
16 document?
17     A.    This is also a patient brochure.
18     Q.    All right.
19         And we see at the very bottom on the
20 first page, Ethicon, Inc. 2012 and then we see over
21 to the right, TVT-375-12.
22         Do you see that?
23     A.    Yes -- yes.
24     Q.    And would that be a copy review
25 number?

Page 485

1      A.    Yes.
2      Q.    And, sir, again, this is a patient
3  brochure for the TVT family of products; is that
4  correct?
5      A.    It is.
6      Q.    And if you would, sir, please turn to
7  the last piece of paper in this exhibit.
8      A.    (Witness complies.)
9      Q.    And there's a title -- a heading
10 there that says what are the risks.  Do you see
11 that?
12     A.    Yes.
13     Q.    It says, risks common to all pelvic
14 surgeries:  Risks for all pelvic surgeries include
15 pain with intercourse, pelvic pain, development of
16 urinary incontinence or voiding difficulties,
17 hemorrhage, bleeding or hematoma, collections of
18 blood in the pelvis, injury to abdominal organs
19 including bowel, urinary tract infection, bladder
20 injury, wound healing problems, fistula, holes
21 between bladder or bowel and the vagina, injury to
22 ureters, tubes bringing urine from kidneys to
23 bladder, pelvic abscess formation, and nerve damage.
24         Did I read that correctly?
25     A.    Yes.

49 (Pages 482 to 485)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 486

1    Q.    Beneath that, it says, complications
2  associated with synthetic mesh:  There is a risk of
3  the mesh material becoming exposed into the vagina.
4  Mesh exposure can be associated with pain during
5  intercourse for you and your partner.  Exposure may
6  require treatment, such as vaginal medication or
7  removal of the exposed mesh, which may be performed
8  in the office or operating room.  There's a risk of
9  infection, inflammation, vaginal scarring, and mesh
10 contracture, mesh shortening due to scar tissue.
11 Pelvic pain or pain with intercourse may occur and
12 may resolve with time.  There is a risk of
13 developing urinary incontinence or difficulty
14 urinating.  Synthetic mesh is a permanent medical
15 device implant; therefore, you should carefully
16 discuss the decision to have surgery with your
17 surgeon and understand the benefits and risks of
18 mesh implant surgery before deciding how to treat
19 your condition.
20      Did I read that correctly?
21    A.    Yes.
22    Q.    Did the Health Canada team, as it was
23 contemplating the requests from Health Canada, take
24 into account any of the information in this patient
25 brochure?

Page 487

1    A.    Yes.
2        MR. BARLOW:  Object to the form and
3  foundation.
4        MR. FREESE:  Object to the form of
5  the question.
6  BY MR. GAGE:
7    Q.    In what respect?
8    A.    We reviewed it.
9        MR. BARLOW:  Same objection.
10 BY MR. GAGE:
11   Q.    And what is the significance, if any,
12 of the conditions or risks listed in this patient
13 brochure and the requests that Health Canada had
14 made of the company?
15       MR. FREESE:  Object to the form of
16 the question.
17       THE WITNESS:  Most of the -- the
18 requests by Health Canada are already in the patient
19 brochure.
20 BY MR. GAGE:
21   Q.    And was this brochure or writing made
22 at or near the time of the events described in the
23 document by a person or persons with actual
24 knowledge?
25   A.    Yes.

Page 488

1    Q.    Was the writing made in the regular
2  course of Ethicon's business?
3    A.    Yes.
4    Q.    And was it Ethicon's regular business
5  practice to make records and documents of this type?
6    A.    Yes.
7              - - -
8        (Deposition Exhibit No. D-5, 1/15
9        E-Mail Chain, ETH.MESH.22631008, was
10       marked for identification.)
11             - - -
12 BY MR. GAGE:
13   Q.    I'm handing you a document marked
14 D-5, and this appears to be an e-mail; is that
15 correct?
16   A.    Series of e-mails.
17   Q.    Series of e-mails.  It's from --
18 reading from the top of the document down, it's from
19 Stacy Kluesner to Becky Robinson and others, dated
20 January 21, 2015.
21      Do you see that?
22   A.    That's correct, yes.
23   Q.    And who is Stacy Kluesner?
24   A.    Stacy Kluesner is the regulatory
25 representative working on the Health Canada project.

Page 489

1    Q.    And so she was one of your team
2  members?
3    A.    Yes.
4    Q.    Did you work with her in preparing
5  the response to Health Canada?
6    A.    Yes.
7    Q.    Did you have any conversations with
8  Ms. Kluesner in preparing for your -- in preparing
9  for this deposition?
10   A.    I did.
11   Q.    What was the purpose of that?
12   A.    I just wanted to make sure that my
13 timeline was accurate and that I understood all of
14 her correspondence that I had access to and that I
15 -- I understood some of the regulatory things that
16 may have been happening outside of my purview.
17   Q.    And was this a document that you
18 reviewed in preparation for your deposition today?
19   A.    Yes.
20   Q.    And was this a writing made at or
21 near the time of the events described in the
22 document by a person or persons with knowledge?
23   A.    Yes.
24   Q.    Was the writing made in the regular
25 course of Ethicon's business?

Golkow Technologies, Inc. - 1.877.370.DEPS

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 490

1    A.    Yes.
2    Q.    And was it Ethicon's regular business
3  practice to make records or documents of this type?
4    A.    Yes.
5    Q.    We see -- if we kind of read from the
6  bottom up, we see the -- there's an e-mail -- well,
7  from the very bottom, there's a Cisco Unity
8  Connection Messaging System to
9  ehb@fdsla04029.fda.hhs.gov.
10        Do you see that?
11    A.    I do.
12    Q.    And the subject is message from
13  unknown sender.  Do you see that?
14    A.    Yes.
15    Q.    Do you understand this to be a voice
16  mail?
17    A.    I do.
18    Q.    And it's dated Monday, January 19,
19  2015; correct?
20    A.    Yes.
21    Q.    And then we go above and we see an
22  e-mail from Elaine Blyskun --
23    A.    Yes.
24    Q.    -- at FDA to Stacy Kluesner.  Do you
25  see that?

Page 491

1    A.    Yes.
2    Q.    And it says:  Hi, Stacy.  I'm sorry
3  that I missed your call.  I'm currently on detail to
4  a different office in CDRH and think it would be
5  best if you work with Sharon Andrews and Becky
6  Robinson copied here.  Thank you, Elaine.
7        And then above that, we see an e-mail
8  from Ms. Kluesner; correct?
9    A.    Correct.
10    Q.    Dear Ms. Robinson and Ms. Andrews, I
11  would like to briefly discuss planned labeling
12  changes to Ethicon's stress urinary incontinence and
13  pelvic organ prolapse devices and updating Ethicon's
14  510(k)'s with an add-to-file for these changes.
15  Would you have time for a brief discussion, 15
16  minutes, in the near future?  If so, please let me
17  know a time that will be convenient for you.
18        Do you see that?
19    A.    Yes.
20    Q.    What was -- what did Ethicon do with
21  respect to the FDA after it had made the changes
22  requested by Health Canada?
23        MR. FREESE:  Object to the form of
24  the question.
25        THE WITNESS:  When we came up with

Page 492

1  our final document on what we were going to send to
2  Health Canada and the changes we were going to make
3  in our IFU, we decided that we should make these
4  changes universally or globally.
5        And Stacy called the FDA to discuss
6  these changes that we were going to make and get
7  their blessings that it would be either an
8  add-to-file or whether it would need a 510(k)
9  application.
10  BY MR. GAGE:
11    Q.    Did FDA first contact Ethicon about
12  making changes to the IFUs in the TVT brochures or
13  did Ethicon first contact FDA about the changes?
14        MR. FREESE:  Object to the form of
15  the question.  You gotta give me a chance to
16  interject.
17        THE WITNESS:  I'm sorry.
18        MR. FREESE:  So the court reporter
19  can get the order correctly.
20        THE WITNESS:  I'm sorry.
21        MR. FREESE:  That's okay.
22        THE WITNESS:  Ethicon made the first
23  request to FDA, not the other way around.
24  BY MR. GAGE:
25    Q.    At any time, did FDA ask Ethicon to

Page 493

1  implement the Health Canada changes in the United
2  States?
3        MR. FREESE:  Object to the form of
4  the question.
5        THE WITNESS:  No.
6  BY MR. GAGE:
7    Q.    What was your team's understanding,
8  if any, as to whether Ethicon was going to be
9  required to implement these changes in the United
10  States?
11        MR. FREESE:  Object to the form of
12  the question.
13        THE WITNESS:  We had no indication
14  that they would be required.
15  BY MR. GAGE:
16    Q.    Did Ethicon act on its own volition
17  to implement these changes in the United States?
18        MR. FREESE:  Object to the form of
19  the question.
20        THE WITNESS:  Yes.
21  BY MR. GAGE:
22    Q.    When FDA was contacted by Ethicon
23  about the 2015 changes to the IFU and brochure, did
24  FDA ever indicate that it was going to order or
25  otherwise require Ethicon to implement these

51 (Pages 490 to 493)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 494

1 changes?
2    A.    No.
3            - - -
4       (Deposition Exhibit No. D-6, 4/8/15
5       Cover Letter from Kluesner Attaching
6       Add-To-File Submission, etc., Beginning
7       with ETH.MESH.22617620, was marked for
8       identification.)
9            - - -
10 BY MR. GAGE:
11    Q.    Dr. Weisberg, at some point in time,
12 did Ethicon provide any documentation to FDA about
13 the proposed changes to the IFUs and brochures in
14 the United States?
15    A.    Yes.
16    Q.    Dr. Weisberg, I'm handing you a
17 document that's been marked as D-6.  Take just a
18 minute and look at that.
19    A.    (Witness complies.)  Okay.
20    Q.    Now, Doctor, what is collectively
21 marked as D-6 is one, two, three, four, five, six
22 different separately stapled groups of documents;
23 correct?
24    A.    Yes.
25    Q.    And the first one is dated April 8,

Page 495

1 2015 and the re line is add-to-file submission,
2 Gynecare TVT system; correct?
3    A.    Yes.
4    Q.    And the next one is another
5 add-to-file submission; correct?
6    A.    Yes.
7    Q.    In fact, each one of these separately
8 stapled documents is a separate add-to-file
9 submission; is that correct?
10    A.    That's correct.
11    Q.    Now, were these documents,
12 collectively marked as Exhibit D-6, writings that
13 were made at or near the time of the events
14 described in the documents by a person or persons
15 with actual knowledge?
16    A.    Yes.
17    Q.    Were these writings made in the
18 regular course of Ethicon's business?
19    A.    Yes.
20    Q.    And was it Ethicon's regular business
21 practice to make these records and documents?
22    A.    Yes.
23    Q.    What are these documents?
24    A.    These are add-to-file submissions,
25 meaning they are basically redlined documents of the

Page 496

1 IFUs as they were and as we intend to change them.
2 And they were submitted to the FDA for examination.
3    Q.    And when you say redlined documents,
4 what do you mean by redlined?
5    A.    Well, on a computer, if you delete
6 something, the red line goes through it to delete it
7 and if you add something, a red line goes under that
8 addition, so you can readily look at it and see what
9 was deleted and what was added.
10    Q.    And what was the purpose of sending
11 these to the -- of your team sending these to the
12 FDA?
13    A.    We wanted them to know what kind of
14 changes we were intending to make.
15            - - -
16       (Deposition Exhibit No. D-7, E-Mail
17       Chain and Attachments, Beginning with
18       ETH.MESH.22865906, was marked for
19       identification.)
20            - - -
21 BY MR. GAGE:
22    Q.    Dr. Weisberg, I'm handing you a
23 document marked D-7.  Are you familiar with this
24 document?
25    A.    I am.

Page 497

1    Q.    And this is a chain of e-mails which
2 on the first page at the top is from Stacy Kluesner
3 dated June 1, 2015 to Sharon Andrews, re:  Ethicon
4 510(k) amendments for labeling changes request for
5 redline patient labeling.
6       Did I read that correctly?
7    A.    Yes, you did.
8    Q.    And we -- the e-mail chain continues
9 a little bit, but at the top on the first page, it
10 says:  Good afternoon, Sharon -- this is the e-mail
11 from Stacy to Sharon -- it says, Good afternoon,
12 Sharon.  As per the FDA's request, we're providing
13 the redlines for the TVT family of products patient
14 brochure and the Artisyn Y patient brochure to
15 support the previously submitted add-to-files.
16 Thank you for your continued support during the
17 add-to-file review.  Please feel free to contact me
18 if the agency has any additional questions.
19 Sincerely, Stacy.
20       Did I read that correctly?
21    A.    You did and it reminds thee that I
22 should probably amplify my previous answer about why
23 we sent the redlines.
24       It's true that we wanted them to see
25 the changes, but I do remember now that in the

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 498

1  conversation, FDA said can you send us some redline
2  changes.
3          MR. FREESE:  Move to strike as
4  nonresponsive.
5          MR. GAGE:  Why did you send redline
6  versions of the IFUs and the patient brochures to
7  the FDA?
8          THE WITNESS:  Well, this reminded me
9  that the FDA did ask for them.
10 BY MR. GAGE:
11         Q.    All right.  So going back to the --
12 7, what document is being sent to FDA here?
13         A.    This is a patient brochure.
14         Q.    And I see handwriting -- they're two
15 different brochures; correct?
16         A.    Yes.
17         Q.    And I think if you go to -- if you go
18 a little deeper into the document, flip with me to
19 ETH.MESH.24255174 -- do you see that?
20         A.    Yes.
21         Q.    -- it's a -- this appears to be the
22 first page of the Gynecare TVT family of products
23 patient brochure?
24         A.    Yes.
25         Q.    All right.

Page 499

1          And we see handwritten changes
2  throughout this document.
3          A.    Yes.
4          Q.    Correct?
5          A.    Correct.
6          Q.    And then at the back, we see --
7  actually 242 -- ETH.MESH.24255186 --
8          A.    Yes.
9          Q.    -- we see a typed sheet.  Do you see
10 that?
11         A.    Yes.
12         Q.    All right.
13         And what are these handwritten
14 changes?
15         A.    Well, the patient brochure was a
16 printed document that was not editable.  So the
17 redlining was done manually, I believe by Stacy
18 Kluesner, to show the changes.
19         Q.    And the redline changes, were those
20 changes Stacy herself thought up or were these
21 changes that the team put together?
22         A.    These were changes that the team came
23 up with.
24         Q.    And you were involved in those
25 changes?

Page 500

1          A.    I was.
2          Q.    And was this document -- was this
3  document and the attachments, were these made at or
4  near the time of the events described in the
5  document by a person or persons with actual
6  knowledge?
7          A.    Yes.
8          Q.    Was the writing made in the regular
9  course of Ethicon's business?
10         A.    Yes.
11         Q.    And was it Ethicon's regular business
12 practice to make this record or document?
13         A.    Yes.
14                    - - -
15         (Deposition Exhibit No. D-8, 6/4/15
16         E-Mail from Andrews to Kluesner,
17         ETH.MESH.22634691 and ETH.MESH.22634692,
18         was marked for identification.)
19                    - - -
20 BY MR. GAGE:
21         Q.    Dr. Weisberg, I'm handing you a
22 document marked D-8.  This appears to be an e-mail
23 from Sharon Andrews to Stacy Kluesner, and it's re a
24 number of specific documents.  And the subject line
25 is physician and patient labeling updates to Ethicon

Page 501

1  urogynecologic surgical mesh, dated June 4, 2015.
2          Do you see that?
3          A.    Yes.
4          Q.    Are you familiar with this document?
5          A.    I am.
6          Q.    Did you -- did you discuss it with
7  Stacy Kluesner?
8          A.    I did.
9          Q.    In preparation for your deposition?
10         A.    I did.
11         Q.    And, generally, what is this
12 document?
13         A.    This is a response from the FDA with
14 some suggestions for the new labeling.
15         Q.    All right.  So we go down to number
16 1 -- we see number 1, 2, 3 A, B, and C; correct?
17         A.    Yes.
18         Q.    And in each of these, the FDA -- what
19 is the FDA doing in these various paragraphs?
20         A.    They're making suggestions on how
21 these might be edited or changed from what we sent
22 in.
23         Q.    And number 1, it says:  The physician
24 labeling includes two categories of risks, adverse
25 reactions and other adverse reactions.  It is

53 (Pages 498 to 501)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 502

1  unclear why the risks identified as other are
2  categorized separately from the risks described as
3  adverse reactions.  We recommend that you revise the
4  labeling to combine both categories or explain why
5  the criteria used to categorize the risks into
6  different categories; correct?
7       A.    Correct.
8       Q.    And then it says for the Gynecare TVT
9  family of devices, we also note that voiding
10  dysfunction is listed under adverse reactions, but
11  urge incontinence, urinary frequency, and urinary
12  retention, all types of voiding dysfunction, are
13  listed as other adverse reactions.  We recommend
14  that you list incontinence, urgency -- urinary
15  frequency, and urinary retention as examples of
16  voiding dysfunction under adverse reactions or
17  clarify in the physician labeling why urge
18  incontinence, urinary frequency, and urinary
19  retention are categorized separately under other
20  adverse reactions; correct?
21       A.    Correct.
22       Q.    And then paragraph 3 has various
23  suggestions or recommendations for the patient
24  labeling; correct?
25       A.    Yes.

Page 503

1       Q.    And this was a document received by
2  Stacy Kluesner in the course of her employment at
3  Ethicon concerning the changes to the TVT and
4  Gynemesh IFUs and brochures; correct?
5       A.    Correct.
6              - - -
7              (Deposition Exhibit No. D-9, Six-Page
8              Document Labeled "Chronology", was marked
9              for identification.)
10              - - -
11  BY MR. GAGE:
12       Q.    Apart from Exhibit 8, which is the
13  e-mail from Sharon Andrews at FDA to Stacy Kluesner,
14  did FDA otherwise provide any comments to any of
15  Ethicon's proposed changes?
16              MR. FREESE:  Object to the form of
17  the question.
18              THE WITNESS:  No.
19  BY MR. GAGE:
20       Q.    Did FDA ever object to any of the
21  changes that Ethicon proposed to the IFUs or patient
22  brochures?
23              MR. FREESE:  Object to the form of
24  the question.
25              THE WITNESS:  Nothing outside of this

Page 504

1  letter.
2  BY MR. GAGE:
3       Q.    Did FDA ever ask or suggest to
4  Ethicon that a dear doctor letter was necessary?
5       A.    No.
6              MR. FREESE:  Object to the form of
7  the question.
8              THE WITNESS:  I'm sorry.
9              MR. FREESE:  That's okay.  Don't
10  worry.
11              THE WITNESS:  Want to do it again?
12              MR. FREESE:  That's fine.
13  BY MR. GAGE:
14       Q.    Why didn't Ethicon send a dear doctor
15  letter?
16              MR. FREESE:  Object to the form of
17  the question.
18              THE WITNESS:  Ethicon didn't feel it
19  was necessary.
20  BY MR. GAGE:
21       Q.    Why?
22       A.    Because the existing IFU we felt was
23  adequate, and the safety and effectiveness record of
24  the device really bolstered that opinion.
25              MR. FREESE:  Move to strike as

Page 505

1  nonresponsive.
2  BY MR. GAGE:
3       Q.    At some point, did Ethicon put the
4  revised IFUs for the TVT family on the Ethicon
5  website?
6       A.    Yes.
7       Q.    Can you tell us when, approximately,
8  that would have occurred?
9       A.    Hang on.  May 1st, 2015.
10       Q.    At some point, did Ethicon begin
11  putting the revised IFUs in the actual boxes in
12  which the products are packaged and shipped to
13  customers?
14       A.    Yes.
15       Q.    When did that occur?
16       A.    September -- September-October 2015.
17       Q.    Dr. Weisberg, I'm handing you a
18  document that I'm marking as Exhibit 9.  This is a
19  chronology that you have referred to several times
20  during your testimony; is that correct?
21       A.    That's correct.
22       Q.    Is this a document that you helped
23  prepare in order for you to be prepared to testify
24  at this deposition?
25       A.    Yes.

54 (Pages 502 to 505)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 506

1    Q.    Did you review the entries on this
2   timeline?
3    A.    I did.
4    Q.    Did you investigate to ensure -- or
5   did you conduct an investigation to ensure that the
6   entries are accurate and correct?
7    A.    Yes.
8              - - -
9          (Deposition Exhibit No. D-10, 6/5/15
10         E-Mails, with First One from Andrews to
11         Kluesner, ETH.MESH.22865922, was marked
12         for identification.)
13             - - -
14  BY MR. GAGE:
15   Q.    Dr. Weisberg, I'm handing you a
16  collection of e-mails from Sharon Andrews to Stacy
17  Kluesner, all of which are dated June 5, 2015.
18         Do you see those?
19   A.    Yes.
20   Q.    And it says:  We've reviewed the
21  information sent to your previously closed
22  submission.
23         And then there's a number and the
24  number would be different for each of the various
25  e-mails; correct?

Page 507

1    A.    Yes.
2          MR. FREESE:  Is this D-10?  Okay.  Go
3   ahead.  You're good.
4   BY MR. GAGE:
5    Q.    Then on the first e-mail that's part
6   of the collective Exhibit D-10, it says June 5,
7   2015:  Based solely on the information you have
8   provided, it does not appear that you have
9   significantly changed or modified the design,
10  components, method of manufacture, or intended use
11  of the device.  Additionally, we did not review any
12  data submitted with this add-to-file.  It is,
13  however, your responsibility to determine if the
14  change or modification to the device or its labeling
15  could significantly affect the device's safety or
16  effectiveness and thus requiring submission of a new
17  510(k).  Please refer to the guidance in deciding
18  when to submit a 510(k) for a change to an existing
19  device at -- and then there's a website provided.
20         And then it says:  The information
21  you have supplied will be added to your submission
22  record, and then it indicates that the particular
23  file number is now closed.
24         Did I read that correctly?
25   A.    Yes.

Page 508

1    Q.    What are these generally?
2    A.    Well, this -- it's a letter of
3   closure from the FDA saying they've reviewed our
4   request and basically approve it.
5    Q.    Did FDA --
6          MR. FREESE:  Move to strike as
7   nonresponsive.
8   BY MR. GAGE:
9    Q.    Did FDA require you to submit a
10  510(k)?
11   A.    They did not.
12   Q.    And that would hold true with regard
13  to any of the devices or IFUs or patient brochures
14  that we've been discussing?
15   A.    Yeah, in these applications, yes.
16         (Pause.)
17  BY MR. GAGE:
18   Q.    Dr. Weisberg, I'm handing you a
19  document that was marked yesterday as P-1638.  It's
20  the transcript of Piet Hinoul dated January 14,
21  2014, and I'm opening it to the page that I'd like
22  for you to be looking at.  It's actually page 1244.
23         MS. KABBASH:  You know what?
24         THE WITNESS:  Okay.  Do you need
25  this?

Page 509

1          MR. FREESE:  Yes, sir.
2          (Pause.)
3          MR. FREESE:  Is this the page we're
4   looking at?
5          MR. GAGE:  Yeah.
6          MR. FREESE:  Did you mark this
7   already?  It's P --
8          MR. GAGE:  It's already marked.
9          THE WITNESS:  1638.
10         MR. GAGE:  P-1638.
11  BY MR. GAGE:
12   Q.    Dr. Weisberg, you were asked some
13  questions about some of Dr. Hinoul's previous
14  deposition testimony yesterday.  Do you remember
15  that?
16   A.    Yes.
17   Q.    And who is Dr. Hinoul?
18   A.    Dr. Hinoul is a urogynecologist
19  currently working as the chief medical officer in
20  Ethicon.
21   Q.    And you are -- do you know Dr.
22  Hinoul?
23   A.    Yes.
24   Q.    And on page 24, line 8, there's a
25  line of questioning that I'd like to just refresh

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 510

1   your recollection about. It was question: One of
2   the known adverse events is clinically significant
3   compression -- rephrase. One of the known adverse
4   events is what is termed as contraction of the mesh;
5   correct? Answer: I disagree with that.
6           Question: Because I called it
7   contraction of the mesh. Answer: Correct.
8   Question: One of the known adverse events is
9   contraction; correct? Answer: Contraction of the
10  tissue around the mesh, yes.
11          Question: And we're talking in this
12  context of the scar tissue forming around the mesh
13  that compresses down and contracts the mesh;
14  correct? Answer: Squeeze the mesh so it's
15  enveloped in the scar and that is retracted, yes.
16  So the total mesh scar, that is what contracts.
17          I think I've heard that referred to
18  as the scar mesh complex. Answer: That's an
19  appropriate way of putting it.
20          Did I read that correctly?
21      A.    Yes.
22      Q.    Now, you were asked some questions
23  about that testimony. Anywhere in this section, is
24  there any reference to excessive contraction?
25          MR. FREESE: Object to the form of

Page 511

1   the question.
2           THE WITNESS: The word "excessive" is
3   not in there.
4   BY MR. GAGE:
5       Q.    Dr. Weisberg, you were asked some
6   questions about the response to Health Canada; and I
7   believe in the response, there was an indication
8   that the IFU would be revised to the TVT family of
9   devices -- the IFUs for those products would be
10  revised to include a warning or a statement about
11  excessive contraction.
12          Do you recall those questions?
13      A.    Yes.
14      Q.    And, ultimately, did that statement
15  about excessive contraction appear in the TVT family
16  IFUs?
17      A.    It did not.
18      Q.    Why is that?
19      A.    We couldn't find good evidence that
20  it was a truthful statement that, indeed -- first of
21  all, excessive was never defined anywhere. Second
22  of all, we weren't able to establish a cause and
23  effect for contraction and any of the -- the adverse
24  events that were reported.
25      Q.    Is it theoretically possible that

Page 512

1   excessive contraction occurs in a TVT device?
2           MR. BARLOW: Object to form.
3           THE WITNESS: Theoretically, yes.
4   BY MR. GAGE:
5       Q.    What was the evidence, if any, that
6   the company had to demonstrate that excessive
7   contraction was, in fact, occurring in TVT devices?
8           MR. FREESE: Object to the form of
9   the question.
10          THE WITNESS: Well, I don't know that
11  we had any evidence that it was -- that excessive
12  contraction was occurring.
13  BY MR. GAGE:
14      Q.    Now, can you explain to the jury
15  whether mesh contracts -- and when I say mesh, I'm
16  talking about the mesh in -- well, strike that.
17          Can you describe for the jury --
18  strike that.
19          Does mesh contract?
20          MR. FREESE: Object to form --
21          MR. GAGE: After it's implanted in
22  the body?
23          MR. FREESE: Object to the form of
24  the question.
25          THE WITNESS: The mesh itself does

Page 513

1   not contract. The fibers of the mesh do not
2   contract.
3   BY MR. GAGE:
4       Q.    Does scar tissue contract?
5       A.    Yes.
6           MR. FREESE: Object to the form of
7   the question.
8   BY MR. GAGE:
9       Q.    What impact, if any, does the
10  contraction of scar tissue have on mesh that is near
11  it or touching it?
12          MR. FREESE: Object to the form of
13  the question; outside the scope. Can I have a
14  continuing objection on these questions as it being
15  outside the scope?
16          MR. GAGE: You may.
17          MR. FREESE: Because you objected
18  that it was outside the scope and so your questions
19  are outside the scope, too.
20          MR. GAGE: Okay.
21          MR. FREESE: Fair enough?
22          MR. GAGE: Fair enough.
23          MR. BARLOW: Contingent objections.
24          MR. GAGE: Contingent scope
25  objections.

56 (Pages 510 to 513)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 514

1      THE WITNESS:  Well, what happens to
2  the mesh when it's implanted is that the tissue from
3  the body -- the body tissues grow into those little
4  holes and really wind up encapsulating the mesh in
5  tissue in and out of the holes and all around it.
6  So if that tissue contracts, it pulls the mesh with
7  it.
8      The mesh itself, the fibers of the
9  mesh, don't contract, but the complex of the scar
10 tissue -- and that's what -- that's what it is.
11 It's a -- it's supposed to be a scarring type of
12 ingrowth; as that contracts, it takes the mesh with
13 it, to some extent.
14 BY MR. GAGE:
15     Q.    Is that contraction a good thing or a
16 bad thing?
17     MR. FREESE:  Object to the form of
18 the question.
19     THE WITNESS:  Well, it's a broad
20 question.  Are you referring to TVT?
21     MR. GAGE:  Yes.
22     THE WITNESS:  In TVT, it's not
23 necessarily a bad thing.  In fact, what it does, it
24 helps support the urethra.  Now, that's going to
25 require some explanation.

Page 515

1      The TVT works as a loop (Indicating)
2  under the urethra --
3      MR. FREESE:  Hold on one second,
4  Doctor.  I object to the form of the question
5  because he asked you a question and you asked again,
6  so, I'm sorry, I object to the form of the question
7  that Dr. Weisberg's answering right now.
8      Go ahead.
9      THE WITNESS:  Okay.  So one of the
10 problems with incontinence is that the urethra
11 drops, and the purpose of the sling is to go under
12 the urethra and then up out of the way and anchor
13 itself into some kind of tissue.
14     And as the tissue grows into this, it
15 helps support this mesh that we put in and kind of
16 anchors or glues it; and as it contracts, it can --
17 it contracts a little bit.  It doesn't contract a
18 whole lot, because if it did, it would block the
19 urine from coming out and we know that it doesn't do
20 that at the time that the mesh is working its way
21 into the tissue.
22     So what happens is, the -- it
23 essentially makes, like, new ligaments to hold up
24 the urethra.  So the mesh is a -- is a -- I'm
25 blanking on the word -- like a scaffold.  The tissue

Page 516

1  grows into the scaffold and then supports the
2  urethra.  So a little bit of contraction is good in
3  that case.
4      And we know it happens and that's why
5  we make it loose when we put it in, so that we don't
6  get obstruction.
7      MR. BARLOW:  Object as nonresponsive.
8  BY MR. GAGE:
9      Q.    All right.
10     Yesterday, during your deposition,
11 you were asked a question and I'm reading from the
12 transcript.  It said, question:  Excessive
13 contraction or shrinkage of the tissue surrounding
14 the mesh, as we've just discussed it, is that an
15 adverse reaction with the TVT?  Correct?  Answer:
16 Excessive, yes.
17     And it would be reasonable and
18 feasible to include that in the IFU, particularly
19 the adverse reactions section for the TVT; correct?
20 Answer:  It would be reasonable to include it.
21 Question:  And it would have been reasonable and
22 feasible to do so right from the beginning when the
23 TVT first went on the market and the first IFU came
24 out; correct?  The witness:  It would have been
25 reasonable, yes, and feasible.

Page 517

1      Do you wish to clarify that
2  testimony?
3      MR. FREESE:  Object to the form of
4  the question.
5      THE WITNESS:  Well --
6      MR. GAGE:  Let me ask you this:  Are
7  those answers correct?
8      MR. FREESE:  Object to the form of
9  the question.
10     THE WITNESS:  They won't be correct
11 unless I can explain them.
12     MR. GAGE:  Please explain.
13     MR. FREESE:  Object to the form of
14 the question.
15     THE WITNESS:  And the fact is that
16 since we have no good cause-and-effect evidence that
17 this is an adverse reaction, at this point, I don't
18 think that it would be good to include it.
19 BY MR. GAGE:
20     Q.    Who made that decision when the --
21 when the company was looking at the changes
22 requested by Health Canada?
23     A.    I did.
24     Q.    Sir, you were asked a question
25 yesterday at your deposition -- and I'll read the

Confidential - Subject to Stipulation and Order of Confidentiality

Page 518

1 question and answer to you.
2         A.    Do I have it here?
3         MS. KABBASH: Actually, you know
4 what? I don't think he does --
5         MR. GAGE: No, you don't.
6         I don't think I have to mark this as
7 an exhibit because this is just a rough transcript
8 from yesterday, so I'm not going to mark that as an
9 exhibit.
10         But, Dr. Weisberg, I'm handing you a
11 copy of the rough transcript from yesterday's
12 proceedings where you were deposed, and if you could
13 turn to page 183?
14         THE WITNESS: (Witness complies.)
15 BY MR. GAGE:
16         Q.    And at the bottom, at line 18, do you
17 see where the question begins, this IFU --
18         A.    Yes.
19         Q.    -- question: This IFU does not
20 distinguish between an acute or a chronic foreign
21 body response. It just says that the foreign body
22 response in total is transitory. That is
23 technically incorrect. Right? Objection. The
24 witness: Hang on. Let me look at this. No, it
25 doesn't say that. It says transitory local

Page 519

1 irritation and -- oh, yes, and a transitory foreign
2 body response may occur. It says it's transitory.
3 Yes. Question: That's technically incorrect
4 because it's chronic; correct? Objection. The
5 witness: Yes.
6         Do you see that?
7         A.    I do.
8         Q.    Is that a correct answer?
9         MR. FREESE: Object to the form of
10 the question.
11         THE WITNESS: It's really not because
12 I didn't get a chance to explain it.
13         MR. GAGE: Can you explain why your
14 prior answer is really not correct?
15         THE WITNESS: Yes. It's not a yes or
16 no question. It requires explanation. It's going
17 to take me about two minutes to explain what foreign
18 body reaction is and how it works in the body.
19         When anything is implanted, anything,
20 the body tries to get rid of it; and one of the
21 things that it does, it sends in cells to try to eat
22 it, try to destroy it. And some of those cells,
23 depending on what those cells are, are classified
24 under the microscope as a foreign body reaction.
25         With something like polypropylene, it

Page 520

1 becomes very clear that these cells are not going to
2 be able to eat this; and in the process of trying to
3 get rid of it, that's an acute foreign body
4 reaction.
5         After a while, when it's clear that
6 it's not going to work, the body in its wisdom sets
7 up kind of a neutral zone where the foreign body
8 reaction isn't working, the acute foreign body
9 reaction isn't working, but it still identifies the
10 fact that the cells of the body are different from
11 the implant.
12         So at the junction, just at the
13 junction, of the implant and the tissue, a different
14 kind of cell comes in and a pathologist or a micro
15 -- not a microbiologist -- a histologist will look
16 under a microscope and say that this is defined by a
17 number of parameters as a chronic foreign body
18 reaction. And that stays for the life of the -- of
19 the device.
20         However, a chronic foreign body
21 reaction does not cause the same kind of body
22 effects that an acute one does. So there might be
23 some inflammation in the beginning when these cells
24 come in, but eventually, these cells and the foreign
25 body coexist.

Page 521

1         And if -- if you understand what a
2 chronic foreign body reaction is, it's not an
3 inflammatory condition. There are cells that
4 identify it as a foreign body reaction, but, I mean,
5 the way I learned it and the way it's always been is
6 that if you're still having inflammation after two,
7 three weeks of the chronic foreign body reaction,
8 you gotta look for something else like an infection.
9         The chronic foreign body reaction is
10 just there. You can see it on the microscope. The
11 tissue is now working its way into -- into or around
12 this foreign body. It's walling it off -- it can't
13 get rid of it, so it's just walling it off -- and
14 those cells where the tissue meets the foreign body,
15 that's called a chronic foreign body reaction.
16         So it was very difficult to answer
17 that question with a yes or a no.
18         MR. FREESE: Move to strike;
19 nonresponsive.
20 BY MR. GAGE:
21         Q.    Sir, if you would, turn to page 49 of
22 your deposition -- I'm sorry. Turn to page 49 of
23 the transcript of yesterday's proceedings when you
24 were deposed.
25         A.    (Witness complies.) Okay.

58 (Pages 518 to 521)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 522

1    Q.   Line 20, there's a question that
2  reads, question: The adverse reactions that are
3  listed in the IFU for each of the devices at issue
4  here are accurate.  Right?  Objection.  The witness:
5  Yeah, accurate, but not all inclusive.
6       Do you see that?
7    A.   Correct.
8    Q.   What does -- what do you mean by not
9  all inclusive?
10      MR. FREESE:  Object to the form of
11 the question.
12      THE WITNESS:  Instructions for use
13 tells the doctor what the device is.  It tells him
14 when to use it, when not to use it, and lists some
15 adverse reactions.
16      Any adverse reactions that are
17 specific to that device should absolutely be listed;
18 but when you realize that most of the adverse
19 reactions are associated with any kind of surgery
20 for this -- for this problem, you can't possibly --
21 you don't need to possibly list everything that can
22 go wrong in surgery.
23      It's common knowledge.  People
24 understand what can happen in surgery.  People
25 understand that surgery hurts.  People understand

Page 523

1  that surgery sometimes needs to be redone.  People
2  understand that surgery doesn't always work.
3       And for those reasons and for -- with
4  the line that people who are doing this operation
5  need to understand the treatment of stress
6  incontinence and need to understand how to use this
7  device, most of those things are really superfluous
8  and wouldn't affect the safety or effectiveness of
9  the device.
10 BY MR. GAGE:
11   Q.   When you reference people, are you
12 referring to doctors?
13   A.   The surgeons who are using the
14 device.
15   Q.   Now, Dr. Weisberg, you were asked a
16 number of questions yesterday and today as to
17 whether Ethicon was aware of various risks at the
18 time the device first went on the market.
19      Do you recall those questions?
20   A.   Yes.
21   Q.   How is it that Ethicon would know
22 what the risks are of the device before the device
23 even goes on the market?
24      MR. FREESE:  Object to the form of
25 the question.

Page 524

1       THE WITNESS:  Because it was common
2  knowledge to anyone who does this kind of surgery or
3  uses mesh.  We knew it.  Our consultants knew it.
4  The people who reviewed our IFUs knew it, and
5  basically anybody who's had any medical training
6  knows it.
7  BY MR. GAGE:
8    Q.   You were asked a number of times
9  yesterday and today whether it would have been
10 reasonable to warn about certain adverse events at
11 the time the various devices were launched.
12      Do you recall those questions?
13   A.   I do.
14   Q.   Your answers were yes to most of
15 those.  Do you recall that?
16   A.   Yes.
17   Q.   Was it necessary to include those
18 words in order for the IFUs to be adequate?
19      MR. FREESE:  Object to the form of
20 the question.
21      THE WITNESS:  No.
22 BY MR. GAGE:
23   Q.   Why not?
24      MR. FREESE:  Same objection.
25      THE WITNESS:  As I mentioned before,

Page 525

1  some of those things -- most of those things --
2  refer to the general adverse events associated with
3  surgery and/or mesh implantation.
4  BY MR. GAGE:
5    Q.   Sir, you were asked a number of
6  questions about the various IFUs and whether they
7  warned of urge incontinence.  Do you recall that?
8    A.   Yes.
9    Q.   And in some instances, the phrase
10 urge incontinence was not found in the IFUs.  Do you
11 recall that?
12   A.   That's correct.
13   Q.   What is detrusor instability?
14   A.   It's the medical term for urge
15 incontinence.  It also includes frequency.
16   Q.   Does the term detrusor instability
17 appear in the IFUs for the TVT family of products?
18   A.   Yes.
19   Q.   So were your answers correct when you
20 said the IFUs did not warn of urge incontinence?
21      MR. FREESE:  Object to the form of
22 the question.
23      THE WITNESS:  They were not correct.
24 BY MR. GAGE:
25   Q.   Dr. Weisberg, you've answered a

59 (Pages 522 to 525)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 526

1  number of questions over the past two days by saying
2  histologically, yes or histologically, that is
3  correct.
4           What do you mean by that?
5       A.    Well, I'll refer back to my previous
6  answer about chronic foreign body reaction, which
7  means, under the microscope, you see cells that
8  define chronic foreign body reaction.
9           But chronic foreign body reaction is
10 not something that causes inflammation after its
11 initial -- after the initial cells get in and the
12 coating starts on the foreign body.
13          MR. FREESE:  Move to strike;
14 nonresponsive.
15          MR. GAGE:  Dr. Weisberg, that's all I
16 have now.
17          MR. FREESE:  Let's flip-flop real
18 quick.
19          THE VIDEO TECHNICIAN:  The time is
20 3:18.  We're going off the record.
21          (A recess was taken from 3:18 p.m. to
22          3:26 p.m.)
23          THE VIDEO TECHNICIAN:  The time is
24 3:26.  We're back on the record.
25

Page 527

1                - - -
2              EXAMINATION
3                - - -
4  BY MR. FREESE:
5       Q.    Dr. Weisberg, you testified on
6  examination for Mr. Gage that you had retired in
7  August of this year; is that correct?
8       A.    Retired as a full-time employee.
9       Q.    And you're now a consultant for
10 Ethicon?
11      A.    Yes.
12      Q.    Okay.
13          And are you being paid to be here
14 today?
15      A.    I assume so.
16      Q.    Okay.  How much are you being paid to
17 be here?
18      A.    I don't know.  I'm limited to a
19 number of hours that my contract limits me to, and I
20 don't know how they're going to work that out.
21      Q.    Okay.
22          You don't need to tell me the amount
23 of your contract, but whatever you're -- are you
24 paid by the hour under your contract or is it a sum
25 certain?

Page 528

1       A.    I'm paid by the hour, but limited to
2  a number of hours.
3       Q.    And all the time for your preparation
4  and giving the deposition is being compensated by
5  Ethicon.
6       A.    I -- as I said, I haven't even worked
7  that out.  It has to be within a certain number of
8  hours.  I don't know whether we can stretch that out
9  over months or it'll be a -- I don't know.  I
10 haven't worked it out yet.
11      Q.    What is the limit of the number of
12 hours that you are allowed to work under the
13 contract?
14      A.    40 per month, but I don't know
15 whether that means 80 for two months or 80 -- you
16 know, or 40 a month, period.
17      Q.    I understand.  That's -- that's as
18 much detail as I need, thank you.
19          Do you have a judgment how many hours
20 you've spent in preparing for giving your deposition
21 over the last couple days?
22      A.    Well, I can estimate.  Wednesday, we
23 spent about four hours.  Last Thursday, we spent
24 maybe six or seven hours.  Last Friday was about
25 five and a half hours, and I did some review at

Page 529

1  home.  I didn't really -- I didn't really track
2  hours for that, but several -- several evenings of
3  reviewing documents.
4       Q.    All right.
5           So the 20 or so hours that you're
6  saying you were preparing, not at home, you were
7  with the lawyers for Ethicon getting ready for your
8  testimony; correct?
9       A.    Yes.
10      Q.    Was Maha preparing you?
11      A.    Maha was there, yes.
12      Q.    Mr. Gage?
13      A.    Yes.
14      Q.    Who else?
15      A.    Mr. Gage wasn't there all the time.
16      Q.    And --
17      A.    I spoke to -- we brought Stacy
18 Kluesner in because I had a bunch of questions for
19 her.  I spoke to Piet Hinoul for a little bit.
20 There was somebody else that came in and I don't
21 remember who it was.
22      Q.    Were the lawyers always present when
23 you were speaking to Ms. Kluesner or Dr. Hinoul?
24      A.    No.  I spoke to Dr. Hinoul on my own
25 some of the time, and they were present for one

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 530

1   phone call or two.  I don't recall.
2       Q.      How many times did you speak to Dr.
3   Hinoul?
4       A.      I speak to him on a regular basis, so
5   I -- I can't parse out -- you know, I might have
6   thrown a question here and there in other
7   conversations.
8       Q.      Did you speak to anybody not your
9   lawyers last night?
10      A.      No.
11      Q.      That's a bad question.  Did you speak
12  to anyone other than your lawyers last night about
13  this deposition or any of the questions you've been
14  asked?
15      A.      I did.
16      Q.      And who's that?
17      A.      I spoke to Piet.
18      Q.      So after you gave your testimony
19  yesterday, you went and called Dr. Hinoul?
20      A.      I did.
21      Q.      And there were no lawyers on the
22  phone?
23      A.      The lawyers were there.
24      Q.      Okay.
25              But you did speak to Dr. Hinoul with

Page 531

1   your lawyers on the phone last night after you gave
2   a deposition all day yesterday.
3       A.      Yes.
4       Q.      And how long did that call last?
5       A.      Five minutes.
6       Q.      Now, you are not hired by Ethicon to
7   be an expert witness in any of these cases, are you?
8       A.      No.
9       Q.      You've not been designated as an
10  expert?
11      A.      Not -- no.
12      Q.      And you're not here giving any
13  testimony as an expert witness; correct?
14      A.      That's correct.
15      Q.      And to the extent that any Court
16  concludes that any opinion you've rendered is that
17  of which an expert would give, you would agree with
18  me that Marty Weisberg's testimony should not be
19  given as an expert witness.
20              MR. GAGE:  Object to form.
21              THE WITNESS:  I think that's a legal
22  question that --
23              MR. FREESE:  It is.
24              THE WITNESS:  -- the lawyers and the
25  Court have to determine.  I -- I answered to the

Page 532

1   best of my knowledge.
2   BY MR. FREESE:
3       Q.      I understand, but you're here as a
4   fact witness on behalf of the company and not as an
5   expert witness; correct?
6       A.      That's what I --
7               MR. GAGE:  Object to form.
8               THE WITNESS:  That's what I
9   understand.
10              MR. FREESE:  All right.
11  BY MR. FREESE:
12      Q.      Now, you listed for Mr. Gage -- I
13  think you said there were all kinds of RCTs
14  beginning in 1997 with the launch of TVT Retropubic.
15  Do you remember that?
16      A.      Yes.
17      Q.      And you said there were a
18  hundred-plus retropubic RCTs; correct?
19      A.      Yes.
20      Q.      And you said, starting 2004, there
21  were over 60 RCTs for TVT-O; correct?
22      A.      Yes.
23      Q.      And you said there were over a
24  thousand case reports, including case reports, case
25  series, and other kinds of scientific literature, on

Page 533

1   TVT and TVT-O; correct?
2       A.      That's an estimate.
3       Q.      And that's all information in the
4   public domain, is it not?
5       A.      That's correct.
6       Q.      So it was as equally available to
7   Marty Weisberg as it was Health Canada, was it not?
8       A.      Yes.
9       Q.      So was there any data that was
10  available to you, scientific data that you were
11  answering Mr. Gage's question, that was not also
12  available to Health Canada?
13              MR. GAGE:  Object to form.
14              THE WITNESS:  I don't think so.
15  Everything was in public -- if not in the public
16  domain, was available for a price.
17  BY MR. FREESE:
18      Q.      Everything you were testifying about
19  you believe was in the public domain; correct?
20      A.      Yes.
21      Q.      And if it's in the public domain,
22  it's equally available to Health Canada, isn't it?
23      A.      Yes, it is.
24      Q.      And your IFU was available to Health
25  Canada, was it not?

61 (Pages 530 to 533)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 534

1    A.    Yes.
2    Q.    And despite their having access to
3  the thousands of case studies, the hundreds of TVT
4  studies, the 60 TVT-O studies, they still demanded
5  that you make all these changes to your IFUs for
6  your TVT family of products, didn't it?
7         MR. GAGE:  Object to form.
8         THE WITNESS:  They requested that
9  those changes be made, yes.
10        MR. FREESE:  Even though they had
11 access to all that same data you had; correct?
12        THE WITNESS:  I don't know whether
13 they accessed it or not, but they had access to it.
14 BY MR. FREESE:
15   Q.    Absolutely.  And despite having
16 access to it, Health Canada was not satisfied that
17 your IFU was answering or providing the safety and
18 efficacy information about the TVT family of
19 products in its minds; correct?
20        MR. GAGE:  Object to form.
21        THE WITNESS:  I don't know what's in
22 their minds, but they requested some changes.
23 BY MR. FREESE:
24   Q.    You understand that they had access
25 to that scientific data, Health Canada was not

Page 535

1  satisfied that the IFUs that were used by Ethicon
2  prior to May 29th of 2014 were adequate, was it?
3         MR. GAGE:  Object to form.
4         THE WITNESS:  That's correct.
5  BY MR. FREESE:
6    Q.    They believed, in order to be full
7  and fair balanced, that you needed to make the
8  changes that your company went through to make;
9  correct?
10        MR. GAGE:  Object to form.
11        THE WITNESS:  That's what we
12 inferred.
13 BY MR. FREESE:
14   Q.    Same question -- same question with
15 respect to the FDA, Dr. Weisberg, and we're going to
16 talk a little more about this, but all the
17 information that you're saying was available, the
18 scientific studies that you told Mr. Gage about,
19 that was all available to the FDA, was it not?
20   A.    That's correct.
21   Q.    All right.
22        And not one change did the -- that
23 was made to the IFUs was objected to by the FDA;
24 correct?
25   A.    That's correct.

Page 536

1    Q.    Does the FDA ever to your knowledge
2  -- strike that.
3         Since you've been working for
4  Ethicon, has the FDA ever instructed Ethicon not to
5  strengthen any of its warnings or precautions or
6  adverse reactions of any of its products to your
7  knowledge?
8    A.    Not that I'm aware of.
9    Q.    So a hundred percent of your
10 experience, sir, is that if you're trying to
11 strengthen a warning by changing the precautions,
12 warnings, adverse events and provide more
13 information, more detailed information, the FDA has
14 always endorsed that practice; correct?
15        MR. GAGE:  Object to form.
16        THE WITNESS:  I don't know all the
17 circumstances when we tried to do this, but it's my
18 understanding that they would not object.
19 BY MR. FREESE:
20   Q.    Okay.  So as you sit here today, you
21 can't think of a single example when the FDA
22 objected to you strengthening a warning.
23   A.    That's correct.
24        MR. GAGE:  Object to form.
25 BY MR. FREESE:

Page 537

1    Q.    Now, you told us that you supplied
2  some data to Health Canada; correct?
3    A.    Yes.
4    Q.    And you -- you will at least agree
5  with me that there is scientific data that's not so
6  complimentary of the safety of TVT products;
7  correct?  You'll give me that, won't you?
8    A.    You mean generally not --
9    Q.    Yes, sir.
10   A.    No, I think that the specifics of all
11 the articles that talk about adverse events don't
12 demonize the whole project -- the product.
13   Q.    I withdraw the question.  It was a
14 bad question.
15        You will agree with me that there is
16 scientific data demonstrating that TVTs can suffer
17 from complications in greater numbers versus
18 traditional surgeries.
19        MR. GAGE:  Object to form.
20        THE WITNESS:  There are some papers
21 that say that.
22 BY MR. FREESE:
23   Q.    Did you or anyone on behalf of
24 Ethicon supply those to Health Canada?
25   A.    I can't speak for every article that

62 (Pages 534 to 537)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 538

1  was supplied because we supplied a lot of them, but
2  we tried to supply a fair and balanced group of
3  studies.
4        Q.   Well, that's my question and I won't
5  go through all these with you, but Mr. Gage has a
6  collection -- did you give us as the exhibit we
7  discussed earlier all the submission to Health
8  Canada?
9        A.   Yes.
10       Q.   So whatever's in there is the -- is
11 the universe of information that Ethicon supplied to
12 Health Canada in making its judgment as to these
13 changes to the IFU; correct?
14       A.   Yes.
15       Q.   So I can look at them and see whether
16 or not any negative studies were given to Health
17 Canada; is that correct?
18       MR. GAGE:  Object to form.  I think
19 what we have marked is the TVT, not the Gynemesh PS
20 submission.  Right?  Because the Gynemesh PS
21 submission would have gone to Health Canada, too,
22 and we didn't mark that.
23       MR. FREESE:  Well, then, let me
24 qualify the question.
25       MR. GAGE:  Qualify the question --

Page 539

1  limit it to TVT and --
2        MS. KABBASH:  I think it was the
3  whole thing.
4        MR. GAGE:  Is it?
5        MS. KABBASH:  I think it's the whole
6  thing.
7        MR. GAGE:  Oh, well, I'm sorry.  I
8  thought --
9        MS. KABBASH:  I want to look at it
10 just to be absolutely sure, but I'm pretty sure --
11 BY MR. FREESE:
12       Q.   Well, let me ask it this way:  Is it
13 your belief as you sit here, Dr. Weisberg, that
14 everything that was submitted to Health Canada
15 regarding all the products at issue, the Gynemesh
16 PS, the TVT family of products, was included in the
17 exhibit here?
18       A.   Yes.
19       Q.   So we can look and see if there was
20 any negative scientific data supplied to Health
21 Canada; correct?
22       A.   Well, you can look.
23       Q.   And see whether or not it was
24 actually a fair and balanced submission to them to
25 see if you had included negative articles or

Page 540

1  articles that you would consider not complimentary
2  of any of your products.
3        A.   You know --
4        MR. GAGE:  Object to the form.
5        THE WITNESS:  -- generally scientific
6  literature isn't positive or negative.  It includes
7  all the findings, the successes, the failures, the
8  adverse events, and that's how -- generally how good
9  published scientific literature goes.
10       Very infrequently do you see anything
11 that -- that is a whole negative article.  There's
12 always a balance in the article of what the findings
13 were.
14 BY MR. FREESE:
15       Q.   And --
16       A.   And I think you'll find those.
17       Q.   And I didn't mean to suggest
18 otherwise, Dr. Weisberg.  I'm simply asking that
19 I'll find a fair and balanced collection of data
20 that you sent to Health Canada, the good, the bad,
21 and the ugly.
22       A.   Yes.
23       Q.   And that's what being fair and
24 balanced means.
25       A.   Yes.

Page 541

1        Q.   Okay.
2        Now, I want to ask you, at the time
3  -- if you'll look at -- you don't have to -- you're
4  welcome to look at it, but -- P-1636.  That's the
5  Hackman, one-page Hackman memo?
6        A.   Yes.
7        Q.   Mr. Gage showed that to you?
8        A.   Yeah, I don't think it's in here.
9  You can ask the question.  If I can answer it
10 without the reference, I will.  If not, I'll wait
11 and find it.
12       Q.   Here's my question:  Mr. Gage walked
13 you through that memo.  Am I correct?
14       A.   Yes.
15       Q.   And this -- this is what kicked off
16 the project to modify the TVT family of products
17 IFUs; correct?
18       A.   It wasn't a kickoff.  It was part of
19 the -- part of the regime that we go through or the
20 regimen that we go through to try to do an
21 evaluation.
22       Q.   It says initial product risk
23 assessment --
24       A.   Well, yes, that's the initial product
25 risk assessment.  The risk assessment is one piece

Confidential - Subject to Stipulation and Order of Confidentiality

Page 542

1  of everything else that we've done.
2      Q.    And at the time that Mr. Hackman
3  wrote this e-mail in September of 2014, there were
4  tens of thousands of product liability lawsuits
5  pending against Ethicon and Johnson & Johnson at
6  that time; correct?
7      A.    That's correct.
8          MR. GAGE:  Object to form.
9  BY MR. FREESE:
10     Q.    So not only were you involved in this
11 team, but a bunch of lawyers who work for Ethicon
12 were also involved in this Health Canada response
13 team, were they not?
14     A.    Yes.
15         MR. GAGE:  Object to form.
16 BY MR. FREESE:
17     Q.    In fact, not only lawyers for
18 Ethicon, but lawyers who actively manage the tens of
19 thousands of product liability lawsuits were
20 involved in the Health Canada response, were they
21 not?
22     A.    Yes.
23         MR. GAGE:  Object to form.
24 BY MR. FREESE:
25     Q.    And those same lawyers were reviewing

Page 543

1  memos like Mr. Hackman's in September of 2014 before
2  they got issued; correct?
3          MR. GAGE:  Object to form.
4          THE WITNESS:  I can't testify that
5  they have reviewed that.  It was certainly
6  available.  I don't know if it was sent to everyone
7  on the team.  I don't -- I -- you'd really need to
8  check with the lawyers for that.
9  BY MR. FREESE:
10     Q.    Well, you had no problem telling Mr.
11 Gage that this document was created in the normal
12 course of business, that Mr. Hackman had personal
13 knowledge of what he was doing at the time he was
14 doing it -- you didn't write this memo; correct?
15     A.    That's correct.
16     Q.    But you had no problem telling Mr.
17 Gage that Mr. Hackman knew all this himself, did
18 you?  You told us that, didn't you?
19     A.    Well, he knew all of it, but he might
20 not have known it all before he wrote that memo.
21     Q.    I understand.
22     A.    Yeah.
23     Q.    But Mr. Hackman was doing this under
24 the supervision of the lawyers for Ethicon that were
25 involved in defending these tens of thousands of

Page 544

1  product liability lawsuits over synthetic mesh.
2      A.    He was not --
3          MR. GAGE:  Object to form.
4          MS. KABBASH:  Object to form.
5          THE WITNESS:  He was not supervised
6  by the lawyers.
7  BY MR. FREESE:
8      Q.    The lawyers were on the team --
9      A.    They were on the team.
10         MR. GAGE:  Object to form.
11         THE WITNESS:  They were on the team.
12 They may well have participated.  They may well also
13 have waited for him to come up with that and see how
14 it fit in with the rest of the project.
15 BY MR. FREESE:
16     Q.    And, for example, when Mr. Hackman
17 writes in here that a review of the risk assessment
18 summaries -- and I'll paraphrase that.  It's down at
19 the bottom -- that the IFU changes introduce no new
20 design or user-related risk, nor increase any risk
21 levels -- that was reviewed by the team before it
22 was sent out, was it not?
23     A.    That may not have been reviewed by
24 the team before it was sent out because I don't --
25 who was it sent to?

Page 545

1      Q.    It was sent to project file.
2      A.    Okay.  I -- I don't know whether that
3  was -- once again, I'm going to try to explain this.
4          There are a lot of pieces that go
5  into a project like this.  Somebody may have said to
6  Mr. Hackman, review the risk -- the -- you know, the
7  risk assessment documents and make sure that
8  everything was what he said it was.
9          They may have taken that and may not
10 have reviewed those risk documents themselves, but
11 they certainly saw that letter at some point, yes.
12     Q.    The lawyers for Ethicon were looking
13 -- if they were on the team, they were looking at
14 project file documents, were they not?  That's part
15 of what they were looking at.
16     A.    Yes.
17         MR. GAGE:  Object to form.
18         THE WITNESS:  I just don't know
19 whether they looked at it before he wrote it or
20 after he wrote.
21 BY MR. FREESE:
22     Q.    And you don't even know whether or
23 not they wrote it themselves, do you?
24         MR. GAGE:  Object to form.
25         THE WITNESS:  I know that Hackman was

64 (Pages 542 to 545)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 546

1  working on it.
2        MR. FREESE:  I understand that.
3        THE WITNESS:  And I --
4        MR. FREESE:  I'm asking you a
5  different question, sir:  Do you know whether or not
6  Mr. Hackman's e-mail on project file was written in
7  whole or in part by lawyers for Ethicon?
8        MR. GAGE:  Object to form.
9        MR. FREESE:  Do you know that one way
10  or the other?
11        MR. GAGE:  Object to form.
12        THE WITNESS:  I don't know that one
13  way or the other.
14  BY MR. FREESE:
15     Q.    Based on your knowledge, it could
16  have been written by a lawyer; correct?
17        MR. GAGE:  Object to form.
18        MS. KABBASH:  Object to form.
19        THE WITNESS:  Based on my knowledge,
20  I don't know who wrote it.
21        MR. FREESE:  Okay.
22  BY MR. FREESE:
23     Q.    So you don't know if Mr. Hackman
24  wrote it personally -- you don't have personal
25  knowledge of that, do you?

Page 547

1        MR. GAGE:  Object to remember.
2        THE WITNESS:  My understanding was
3  that he wrote it.
4  BY MR. FREESE:
5     Q.    Did you talk to him and ask him if he
6  wrote?
7     A.    Well, we spoke many times.
8     Q.    Did you ask him in preparation for
9  this deposition whether he wrote this memo?
10     A.    No.
11        MR. GAGE:  Object to form.
12  BY MR. FREESE:
13     Q.    Did you simply surmise that because
14  his name appears on it?
15     A.    Yes.
16     Q.    Now, Mr. Gage showed you Defendant's
17  Exhibit 4.  Do you remember that?
18     A.    Yes.
19     Q.    That's one of the patient brochures,
20  sir?
21     A.    Yes.
22     Q.    Tell us -- and he had you read from
23  this patient brochure, did he not?
24     A.    Either I read it or he read it.  I
25  don't remember.

Page 548

1     Q.    This patient brochure, Defense
2  Exhibit No. 4, wasn't even created by Ethicon until
3  2012, was it?
4     A.    Well, it was revised from a 2008
5  edition.
6     Q.    I understand.
7     A.    Yes.
8     Q.    But --
9     A.    That one was created 2012.
10     Q.    So you and Mr. Gage didn't go through
11  the discussion of what was added to this 2012
12  edition from the older edition, did you?
13     A.    No.
14     Q.    So all those things he had you read
15  about what are the risks, you have no idea whether
16  or not that was in a version prior to 2012, do you?
17        MR. GAGE:  Object to form.
18        THE WITNESS:  Well, we read both of
19  them.  We read the 2008 and we read the 2012.
20        MR. FREESE:  I'm talking about this
21  one right here, sir, Defendant's Exhibit No. 4.
22        THE WITNESS:  There were things in
23  there that were in the 2008; correct?
24        MR. FREESE:  Well, we can look at
25  that.  But I'm asking you, you don't know what was

Page 549

1  in Defendant's Exhibit 4 before 2012.
2        MR. GAGE:  Object to form.
3        THE WITNESS:  I don't recall off the
4  top of my head.
5  BY MR. FREESE:
6     Q.    I mean, they don't even look the
7  same.  They have different pictures.
8     A.    (Witness nods head.)
9     Q.    You've never sat down and did a
10  comparison what was in Defendant's-4 versus
11  Defendant's No. 3, did you?
12     A.    No, I didn't.
13     Q.    You simply just read what Mr. -- or,
14  actually, you listened to Mr. Gage read it to you,
15  didn't you?
16     A.    Yes.
17     Q.    And you are not suggesting and have
18  no personal knowledge, Dr. Weisberg, do you, of any
19  specific doctor in this country that received any of
20  these patient brochures to pass out to their
21  patients; correct?
22     A.    I can't name them, but the purpose of
23  the brochures was to give to the physicians who were
24  using the device.
25     Q.    I understand.  And if a physician

65 (Pages 546 to 549)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 550

1  didn't get a patient brochure, they can't have the
2  benefit of it. Do you agree with that?
3          MR. GAGE: Object to form.
4          THE WITNESS: Well, I believe it was
5  on the Internet, also.
6          MR. FREESE: Sir, I'm -- listen to my
7  question.
8  BY MR. FREESE:
9     Q.    If the patient brochure is not given
10 to the doctor and the doctor's not looking for your
11 patient brochure on the Internet, not going to have
12 that information that's contained in the hard copy;
13 correct?
14    A.    That's correct.
15    Q.    And you're not suggesting that any
16 particular doctor got either Defendant's Exhibit No.
17 3 or Exhibit No. 4; is that correct?
18    A.    I know that they were distributed. I
19 don't know to whom or to how many.
20    Q.    And there's no record in Ethicon to
21 say which doctor got which patient brochure or ever
22 got a patient brochure; correct?
23         MR. GAGE: Object to form; beyond the
24 scope.
25         THE WITNESS: If there is, I'm not

Page 551

1  aware of it.
2          MR. FREESE: Okay. Thank you.
3  BY MR. FREESE:
4     Q.    Now, I think you testified yesterday
5  and I think confirmed today -- and I'm looking at
6  Defense Exhibit No. 5 -- this was the -- I guess the
7  voice mail -- it started with the voice mail back
8  and forth with the FDA.
9          Do you remember that exhibit?
10    A.    Yes.
11    Q.    You told Mr. Gage --
12    A.    I have it.
13    Q.    That's really kind of a reference
14 point. You don't necessarily need it, but you're
15 welcome to look at it.
16         You told Mr. Gage that after Health
17 Canada came in and required that these changes be
18 made to your IFUs, Johnson & Johnson and Ethicon
19 decided that you were going to go worldwide with
20 these changes; is that correct?
21         MR. GAGE: Object to form.
22         THE WITNESS: That's correct.
23 BY MR. FREESE:
24    Q.    And it's your testimony, Dr.
25 Weisberg, that the -- the new versions of the IFU,

Page 552

1  the 2015, made no material changes in the safety or
2  health risks regarding the use of the TVT products;
3  correct?
4          MR. GAGE: Object to form.
5          THE WITNESS: The --
6          MR. FREESE: Or is it not? I'm
7  paraphrasing your testimony. Is or is that not what
8  your testimony is?
9          MR. GAGE: Object to form.
10         THE WITNESS: It made no difference
11 in the health risks, no.
12 BY MR. FREESE:
13    Q.    In your view, it made no difference
14 in the health risk. It didn't supply the doctor
15 with any information they didn't already know;
16 correct?
17    A.    Yes.
18    Q.    In your view, it simply parroted, but
19 maybe in different language, the same warnings that
20 were already in the prior IFUs; correct?
21         MR. GAGE: Object to form.
22         THE WITNESS: That's another thing it
23 did.
24 BY MR. FREESE:
25    Q.    And I guess you can agree with me,

Page 553

1  from a medical standpoint, Martin Weisberg thought
2  this was a totally unnecessary task from the
3  standpoint of providing information to doctors about
4  the safety and efficacy of your company's products.
5     A.    Yes.
6     Q.    Yet, once you embarked on complying
7  with Health Canada on a project that you personally
8  believed was totally unnecessary, your group,
9  including all the lawyers for the company that were
10 on the group, decided, we're going to put this
11 change worldwide in every country in which we do
12 business and sell our products; correct?
13         MR. GAGE: Object to form.
14         THE WITNESS: Correct.
15 BY MR. FREESE:
16    Q.    Your IFUs are, the last time I
17 counted, translated by 25 different languages. Does
18 that sound about right?
19    A.    I don't know the exact number.
20    Q.    Sound about right?
21    A.    It's probably right.
22    Q.    In how many countries does Ethicon
23 sell TVT and Gynemesh?
24    A.    I don't know.
25    Q.    Over a hundred?

66 (Pages 550 to 553)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 554

1      A.    I don't know.
2      Q.    On six continents?
3      A.    I suspect.
4      Q.    I'm going to assume you don't sell in
5  Antarctica, but anywhere where people permanently
6  live on this planet, these products are sold, are
7  they not?
8      A.    Well, it's the most widely used
9  product for this procedure.
10     Q.    And in 2015, over a totally
11 unnecessary change, in your view, the company
12 decided to change the IFU in every country in which
13 you do business; correct?
14     A.    Yes.
15         MR. GAGE:  Object to form.
16 BY MR. FREESE:
17     Q.    For every product you sold; correct?
18         MR. GAGE:  Object to form.
19         THE WITNESS:  Yes.
20 BY MR. FREESE:
21     Q.    In every language in which it was
22 sold under; correct?
23     A.    Yes.
24         MR. GAGE:  Object to form.
25 BY MR. FREESE:

Page 555

1      Q.    So the company translated these IFUs
2  into 25 or more different languages to give
3  information that Martin Weisberg believed was
4  totally unnecessary.
5      A.    Totally unnecessary?  I think they're
6  unnecessary, but I think there was no bad
7  information in there.  And why not?
8      Q.    Did --
9      A.    We had been -- we had been making an
10 effort to harmonize our IFUs; and if one regulatory
11 body says we need to put something in and there's
12 nothing wrong with that information, why not include
13 it?
14         MR. FREESE:  Move to strike as
15 nonresponsive.
16 BY MR. FREESE:
17     Q.    My question to you, Dr. Weisberg, is,
18 did anyone on your team say, you know what, Health
19 Canada's right, we do need to strengthen our
20 warnings, this is -- we do have some lapses here,
21 we've got some gaps, this is a good plan and we need
22 to strengthen and make our warnings clearer on
23 safety?  Did anybody on your team express such a
24 sentiment?
25         MR. GAGE:  Object to form.

Page 556

1          THE WITNESS:  I don't recall that
2  throughout the discussions.  I think everybody
3  agreed that what we added was good.  Was it
4  necessary?  Probably not.
5  BY MR. FREESE:
6      Q.    All right.
7          And so -- and that is my question:
8  As you sit here today, Dr. Weisberg, it's your
9  recollection that the -- that the consensus of the
10 Health Canada response team was that this was a
11 unnecessary exercise that you were going through.
12         MR. GAGE:  Objection to the form.
13         THE WITNESS:  It was necessary in
14 that it's a regulatory body and they asked for it.
15         MR. FREESE:  And I apologize.  That
16 was a bad question.
17 BY MR. FREESE:
18     Q.    It was the consensus of your Health
19 Canada response team that from a medical safety
20 standpoint, this was an unnecessary exercise that
21 Health Canada was requiring you to go through.
22         MR. GAGE:  Object to form.
23         THE WITNESS:  Yes.
24 BY MR. FREESE:
25     Q.    And you then took that unnecessary

Page 557

1  work and translated it into every country, in every
2  product, in every language in which your products
3  are sold; correct?
4      A.    Yes.
5          MR. GAGE:  Object to form.
6  BY MR. FREESE:
7      Q.    And, Dr. Weisberg, I -- you were
8  handed Defense Exhibit No. 6, which was the
9  collection of all the redline versions that went to
10 the FDA.
11         Do you recall that?
12     A.    Yes.
13     Q.    And Mr. Gage asked you some questions
14 about communications between Ethicon and the FDA.
15 You remember those questions?
16     A.    Yes.
17     Q.    And he said that the FDA never
18 ordered you to do this; is that correct?
19     A.    That's correct.
20     Q.    And am I correct that no one in the
21 FDA ever expressed to you or anyone else at Ethicon
22 that it believed that this was an unnecessary
23 exercise?
24         That you weren't doing anything, you
25 weren't helping out, there's no -- there's no new

67 (Pages 554 to 557)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 558

1  information here, did anyone from the FDA ever say
2  that?
3      A.    No.
4            MR. GAGE:  Object to form.
5  BY MR. FREESE:
6      Q.    What the FDA did was, once they were
7  alerted that you were doing it, they wanted to see
8  it, they embraced it, and endorsed it; correct?
9      A.    Yes.
10     Q.    All right.
11           And I'm going to ask you a general
12  question, Dr. Weisberg:  All of these e-mails that
13  Mr. Gage showed you back and forth to the FDA and
14  you told Mr. Gage that the person had personal
15  knowledge and the e-mail was done at or about the
16  time -- you remember all those questions?
17     A.    Yes.
18     Q.    As you sit here today, you don't know
19  which, if all, of those e-mails were either written
20  by lawyers for Ethicon or reviewed by lawyers for
21  Ethicon before they were sent out.
22           MR. GAGE:  Object to form.
23           MR. FREESE:  Correct?
24           THE WITNESS:  I don't know.  I know
25  the phone call was not.

Page 559

1  BY MR. FREESE:
2      Q.    And all of these e-mails and
3  correspondence that Mr. Gage showed you was during
4  2014 and 2015; correct?
5      A.    Yes.
6      Q.    When you know and everyone at the
7  company knows there are tens of thousands of product
8  liability lawsuits pending against your company for
9  these very products.
10     A.    Yes.
11           MR. GAGE:  Object to form.
12  BY MR. FREESE:
13     Q.    Now, Mr. Gage showed you D-9, this
14  chronology of events?
15     A.    Yes.
16     Q.    Did any lawyer assist in the
17  preparation of Defense Exhibit No. 9?
18     A.    I requested it.  I worked with Stacy
19  on it.  I don't know if or what kind of input the
20  attorneys had.  I just got this after I requested
21  it.
22     Q.    You requested this chronology from
23  Ms. Kluesner?
24     A.    I requested it at a meeting.  The
25  attorneys were present.

Page 560

1      Q.    Who was present at the meeting when
2  you requested Ms. Kluesner to provide you this
3  document?
4      A.    The attorneys sitting in the room
5  now.
6      Q.    The two lawyers representing you now?
7      A.    Yes -- wait a minute.  I -- that's a
8  -- that's a good question.  Was everybody together
9  at that meeting?  I don't know.  But I know that
10  there was a point at which we all four were in one
11  room vetting this.
12     Q.    So when you say we were all in a room
13  vetting it, you, Ms. Kluesner, and the lawyers for
14  Ethicon were vetting your chronology.
15     A.    Yes.
16     Q.    And you don't think that Ms. Kluesner
17  supplied all these ETH.MESH. documents, do you?
18     A.    Oh, no.  No, that was -- that was
19  supplied by the attorneys.
20     Q.    Yeah.  So if we look through all the
21  pages 1 through 6 of your chronology, we know that
22  all the documents -- the document source, that is,
23  what supports the event, and the date was supplied
24  by the lawyers for Ethicon; correct?
25     A.    Right.  I didn't request the document

Page 561

1  sources.  It was suggested that we put them in there
2  to make it easier for everybody to find the
3  documents.
4      Q.    By the lawyers.
5      A.    Yes.
6      Q.    Now, you remember Mr. Gage asked you
7  questions about your testimony yesterday -- Dr.
8  Weisberg, do you have your rough transcript from
9  yesterday?
10     A.    Is that --
11     Q.    It's what Mr. Gage showed you.
12     A.    -- this one?
13           MR. GAGE:  Yeah, that's it.
14           THE WITNESS:  I have it.
15           MR. FREESE:  Can you identify the
16  exhibit number?  I don't have it --
17           MR. GAGE:  I didn't make it an
18  exhibit number, but --
19           MR. FREESE:  Okay.  That's fair
20  enough.
21  BY MR. FREESE:
22     Q.    If you'll turn to page 175, Dr.
23  Weisberg --
24     A.    Okay.
25     Q.    -- this was the testimony that --

68 (Pages 558 to 561)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 562

1    MR. GAGE:  Hang on.  Did you say 175?
2  Oh, I'm sorry.
3    MR. FREESE:  This is how it's
4  paginated.  It's down here, 175 --
5    MR. GAGE:  It's down here at the
6  bottom.  It's 190 at the top.  It's 175 at the
7  bottom.
8    I think he's with you.
9    MR. FREESE:  The rough pagination is
10  page 175.  Do you see that?
11    THE WITNESS:  Yes.
12  BY MR. FREESE:
13    Q.    And then Mr. Gage asked you the
14  question -- I'm sorry -- no -- Mr. Gage just read
15  you this question and answer 30 minutes ago that you
16  gave yesterday; correct?
17    A.    Yes.
18    Q.    And then he let you explain why the
19  answer that you gave yesterday was not a correct
20  answer; correct?
21    A.    Yes.
22    Q.    And just so the jury understands in
23  this case, when you gave that answer, you gave it
24  based on your best recollection of events at the
25  time; correct?

Page 563

1    A.    Yes.
2    Q.    And you had three lawyers sitting in
3  here yesterday, did you not?
4    A.    Yes.
5    Q.    Before a break was taken, you did not
6  change that answer in any way, did you?
7    A.    I don't believe so.
8    Q.    We then took a break and you and the
9  three lawyers for Ethicon went out of this room,
10  came back, and after that 30-minute break, attempted
11  to amend this answer to this question.  Am I
12  correct?
13    A.    That's correct.
14    MR. GAGE:  Object to form.
15  BY MR. FREESE:
16    Q.    The same is true with the question
17  you were asked about the foreign body reaction, the
18  chronic foreign body reaction -- do you remember --
19    A.    Yes.
20    Q.    -- you gave that answer multiple
21  times yesterday, but you only changed it today after
22  you've had a chance to meet with your lawyers last
23  night; correct?
24    MR. GAGE:  Object to form.
25    MR. FREESE:  After the deposition and

Page 564

1  before today.
2    MR. GAGE:  Object to form.
3    THE WITNESS:  That's not why that
4  happened.  It happened --
5    MR. FREESE:  Dr. Weisberg, I'm not
6  asking you why.  I'm saying, you didn't change the
7  answer to that question until after you took a break
8  yesterday with your lawyers and came back today and
9  changed it when Mr. Gage asked you the question.  Am
10  I correct?
11    MR. GAGE:  Object to form.
12    MR. FREESE:  I'm just asking sequence
13  of events, sir.
14    MR. GAGE:  Object to form.
15    THE WITNESS:  Yes.
16  BY MR. FREESE:
17    Q.    Okay.  And the same question on --
18  you were asked by -- I don't want to ask that.
19  Strike that.  Now, just a couple more questions, Dr.
20  Weisberg, and I'm going to be done.
21    First of all, you understand that --
22  or maybe you don't understand it, but I represent a
23  woman named Jennifer Ramirez in Bear County, Texas.
24    Did you know that before today?
25    A.    I knew that Jennifer Ramirez was one

Page 565

1  of the plaintiffs.
2    Q.    You don't know Jennifer Ramirez, do
3  you?
4    A.    No.
5    Q.    You do not know Cesar Reyes, her
6  doctor, do you?
7    A.    No.
8    Q.    He's the doctor, I'll represent, that
9  implanted a TVT-O in Ms. Ramirez.  Okay.  Did you
10  know that before today?
11    MR. GAGE:  Object to form.
12    THE WITNESS:  I don't know what -- I
13  don't think I knew that.  I may have known it --
14  BY MR. FREESE:
15    Q.    You don't know Dr. Reyes.
16    A.    No.
17    Q.    You don't know what patient brochure,
18  if any, Dr. Reyes has ever seen; correct?
19    A.    That's correct.
20    Q.    And you don't know what version of
21  the TVT Obturator IFU Dr. Reyes saw; is that
22  correct?
23    A.    That's correct.
24    Q.    Now, am I also correct that the IFU
25  must, of necessity, be written so it can be

Confidential - Subject to Stipulation and Order of Confidentiality

Page 566

1 understood by the least-skilled surgeon who is
2 capable of performing the surgery; is that a fair
3 statement?
4      MR. GAGE:  Object to form.
5      THE WITNESS:  Yes.
6 BY MR. FREESE:
7      Q.    Because you and I understand that
8 there are doctors who perform pelvic surgeries for
9 SUI and pelvic organ prolapse that are double
10 board-educated urogynecologists, fellowship-trained,
11 all the way down to gynecologists who have no
12 fellowships, who have no board certifications.
13      You understand the universe of
14 doctors that implant your product runs from very
15 sophisticated to less sophisticated, less educated,
16 less trained physicians; is that a fair statement?
17      MR. GAGE:  Object to form.
18      THE WITNESS:  Yes.
19 BY MR. FREESE:
20      Q.    And you would agree with me that the
21 information, the safety information, that's
22 necessary for a doctor to perform a pelvic organ
23 surgery or a SUI sling surgery, they all need to
24 have a minimum amount of ability; correct?
25      A.    Yes.

Page 567

1      Q.    Because that's one of the changes you
2 recommended, right, that the doctor be properly
3 trained; correct?
4      MR. GAGE:  Object to form.
5      THE WITNESS:  I believe that's always
6 been there.
7 BY MR. FREESE:
8      Q.    And you've added that patient
9 selection is something that needs to be considered
10 more thoroughly now; correct?
11      MR. GAGE:  Object to form.
12      THE WITNESS:  I believe that was
13 added somewhere along the line.
14 BY MR. FREESE:
15      Q.    The doctor needs to consider the
16 specifics of the patient in deciding whether or not
17 it's an appropriate indicated use for, say, a TVT-O
18 sling; correct?
19      A.    Yes.
20      Q.    And I think you told Mr. Gage that --
21 that the IFU is not intended to warn about all
22 risks.  It's just risks that are -- that are
23 peculiar or unique to your particular product;
24 correct?
25      MR. GAGE:  Object to form.

Page 568

1      THE WITNESS:  Yes.
2 BY MR. FREESE:
3      Q.    Because you assume that every doctor
4 implanting your company's products has a -- some
5 baseline adequate amount of training and medical
6 knowledge in order to perform it; correct?
7      A.    Yes.
8      Q.    And you wouldn't waste the doctor's
9 time warning them about things that, as you've
10 described, any pelvic surgeon would know; correct?
11      MR. GAGE:  Object to form.
12      THE WITNESS:  Waste the doctor's time
13 isn't an expression I would use, but it wouldn't be
14 necessary.
15 BY MR. FREESE:
16      Q.    Right.  And I think you said that
17 there are certain things that all doctors know.
18 That's why you don't put all the warnings in the
19 IFU, because there is a -- there's a presumption at
20 Johnson & Johnson that there's a baseline of
21 information that all doctors would have, and anyone
22 doing pelvic surgery would know that, so we don't
23 have to warn them about it; correct?
24      MR. GAGE:  Object to form.
25      THE WITNESS:  Yes.

Page 569

1 BY MR. FREESE:
2      Q.    Now, do you have one -- the IFU in
3 front of you, sir?  This may be from yesterday's --
4 1649 is the one I'd like you to look at because this
5 is the TVT-O system.
6      A.    Would it be down here?  1639, 1649.
7 Got it.
8      Q.    In the contradictions, it's page 20
9 -- ETH.MESH.27 is the last -- on the bottom
10 right-hand corner?  If you'll just go to
11 contraindications section --
12      A.    2027 is the cover sheet?
13      MR. GAGE:  Oh, he's --
14      MR. FREESE:  The last two.  I'm just
15 reading the last two of the Bates stamp number.
16      MR. GAGE:  That's the one -- it's on
17 the same page.  Look up at the second number.
18      MR. FREESE:  32 then.
19      MR. GAGE:  32?  There you go.
20      THE WITNESS:  Okay.
21 BY MR. FREESE:
22      Q.    So 1649, this is the newest, best
23 version or most-current version we have of the TVT
24 Obturator IFU; correct?
25      MR. GAGE:  Objection to form.

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 570

1    THE WITNESS:  Revision 5, let me just
2  check that real fast.
3    MR. FREESE:  Sure.
4    THE WITNESS:  Is there a revision 6
5  in the wind?  I don't know.  Do you have that -- did
6  somebody take my IFU release page?
7    MR. BARLOW:  Just so we don't get
8  crossed up, that is the -- we marked two copies of
9  the 2015, you know, post-Health Canada.  That is not
10  the version that is on the sheet -- it's the one
11  that we looked at and everybody seemed to agree --
12    MS. KABBASH:  And I think Adam did
13  the questioning yesterday, and he covered both, so
14  --
15    MR. BARLOW:  Right.
16    MR. GAGE:  So -- so he's ready to go.
17  We're ready.
18    THE WITNESS:  Yes.
19  BY MR. FREESE:
20    Q.    If you'll look in contraindications,
21  it says:  As with any suspension surgery, this
22  procedure should not be performed in pregnant
23  patients.  Additionally, because Prolene
24  polypropylene will not significantly stretch, it
25  should not be performed in patients with future

Page 571

1  growth --
2    A.    Potential.
3    Q.    -- potential, including women with
4  plans for future pregnancy.
5    Is that a fact that most surgeons
6  would not know?
7    A.    It's a contraindication.  I think
8  most surgeons would know it.
9    Q.    So you think most surgeons would know
10  that.
11    A.    I would think so.
12    Q.    Yet, it's in your IFU; correct?
13    A.    Yes.
14    Q.    Warnings and precautions:  Do not use
15  Gynecare Obturator in patients who are on
16  anticoagulation therapy.  Do not use Gynecare TVT
17  Obturator in a patient who has urinary tract
18  infection.
19    Why don't you want to use a TVT-O on
20  someone on anticoagulation therapy?
21    A.    Because they bleed.
22    Q.    Do you think a pelvic floor surgeon
23  would know that without being told in your IFU?
24    A.    I think so.
25    Q.    Yeah, but you put it in there anyway,

Page 572

1  didn't you?
2    A.    Yes, we did.
3    Q.    Do not use Gynecare TVT Obturator in
4  a patient who has a urinary tract infection.
5    A.    Correct.
6    Q.    Why don't you want to do that?
7    A.    You don't want to operate in an
8  infected area.
9    Q.    Do you think most pelvic surgeons
10  would know that you don't want to operate in an
11  infected area?
12    A.    Yes.
13    Q.    Yet, you put that in the IFU;
14  correct?
15    A.    Yes.
16    Q.    Users should be familiar with
17  surgical technique for urethral suspensions and
18  should be adequately trained in Gynecare TVT
19  Obturator procedure before employing Gynecare TVT
20  Obturator device, do you see that?
21    A.    Yes.
22    Q.    Do you think a surgeon needs to be
23  told that he needs to know what he is doing before
24  he does it?
25    A.    No.

Page 573

1    Q.    But that's in your IFU.
2    A.    Yes.
3    Q.    Acceptable surgical practice should
4  be followed for the procedure, as well as for the
5  management of concomitant -- is it contaminated
6  infected wounds?
7    A.    Yes.
8    Q.    Do most pelvic surgeons know that?
9    A.    Yes.
10    Q.    Do they need to be told that they
11  need to use acceptable surgical practices?
12    A.    No.
13    Q.    Yet, that found its way into your
14  IFU.
15    A.    That's right.
16    Q.    The procedure should be performed
17  with care to avoid large vessels, nerves, bladders,
18  and bowel.  Attention to patient anatomy and correct
19  passage of the device will minimize the risk, do you
20  see that?
21    A.    Yes.
22    Q.    Do you need to tell a pelvic floor
23  surgeon that --
24    A.    No.
25    Q.    -- avoid cutting nerves or other

71 (Pages 570 to 573)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 574

1 organs or blood vessels?
2     A.    No.
3     Q.    Okay.
4          If you need to tell a surgeon that,
5 he doesn't need to have a scalpel in his hand, does
6 he?
7     A.    You're right.
8     Q.    Bleeding may occur postoperatively,
9 do you need to tell pelvic surgeons that bleeding
10 may be a result in a warning and a precaution from a
11 TVT surgery?
12     A.    No.
13     Q.    Although bladder injury is unlikely
14 to occur with this technique, cystoscopy may be
15 performed at the discretion of the surgeon, does
16 every pelvic floor surgeon know that?
17     A.    Probably.
18     Q.    But you put it in your IFU anyway.
19     A.    That's right.
20     Q.    Do not remove the plastic sheath
21 until the tape has been properly positioned, does
22 every pelvic floor surgeon know that?
23     A.    They should know that.
24     Q.    Okay.  But that made it into your
25 IFU, too.

Page 575

1     A.    Yes.
2     Q.    Ensure the tape is placed with no
3 tension under the mid-urethra, does pelvic floor
4 surgeons know that, that they don't need to tension
5 it?
6     A.    Well, those who did the pretape
7 slings procedures put them in with tension, so this
8 is something that somebody new to this device may
9 need to be reminded.
10     Q.    Okay.  So that's the first one that
11 actually you think somebody may -- a pelvic floor
12 surgeon might need to be reminded about.
13     A.    Yes.
14     Q.    Do not perform this procedure if you
15 think the surgical site may be infected or
16 contaminated, do you need to tell a surgeon that?
17     A.    No.
18     Q.    Let me ask you this, Dr. Weisberg:
19 Is there anything in the warnings and precautions
20 that you think any pelvic floor surgeon wouldn't
21 know?
22     A.    Yeah, I think that somebody new to
23 this might ask if there's any information about
24 pregnancy following this procedure.  That's in
25 there.

Page 576

1          Some may want to know about vaginal
2 delivery following this, and what we're basically
3 telling them is, we don't really know, but at least
4 we're answering a question that we would frequently
5 get.
6          I think that it's important to know
7 that if there is leg pain for 24 to 48 hours, that
8 it is likely to resolve.
9          They may want to know whether they
10 should prescribe prophylactic antibiotics.  We say
11 it's their choice.
12     Q.    A physician reading this would think
13 that leg pain is not likely going to last more than
14 24-48 hours, are they?
15          MR. GAGE:  Object to the form.
16          THE WITNESS:  And that's what happens
17 in the majority of cases.
18 BY MR. FREESE:
19     Q.    And in a significant number of cases,
20 women have leg pain beyond 24 or 48 hours with
21 obturator surgeries, do they not?
22          MR. GAGE:  Object to form.
23          THE WITNESS:  Not significant
24 compared to the number that have been done.
25 BY MR. FREESE:

Page 577

1     Q.    So how many women have to have
2 permanent leg pain, Dr. Weisberg, in your opinion,
3 before it becomes a significant amount to Ethicon?
4          MR. GAGE:  Object to form.
5          THE WITNESS:  I don't have an answer
6 for that.
7          MR. FREESE:  Okay.
8 BY MR. FREESE:
9     Q.    This is your newest version of the
10 IFU for TVT Obturator, isn't it?
11     A.    Yes.
12     Q.    And it's still telling doctors using
13 this TVT-O approach, you should expect a transient
14 leg pain of 24 to 48 hours and it will resolve with
15 using mild analgesics; correct?
16          MR. GAGE:  Object to form.
17          THE WITNESS:  That's what happens
18 most of the time.
19          MR. FREESE:  That's like Advil.
20 Right?
21          THE WITNESS:  Yes.
22 BY MR. FREESE:
23     Q.    Dr. Weisberg, is there a single
24 contraindication, a single warning or precaution or
25 a single adverse reaction that you think a normal

72 (Pages 574 to 577)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 578

1 pelvic floor surgeon with just normal, adequate
2 training would not know and needs to be informed of
3 via this IFU?
4       MR. GAGE:  Object to form and
5 objection, asked and answered.
6       THE WITNESS:  We discussed some that
7 I thought that they might need to be -- need to know
8 or to be reminded.
9       MR. FREESE:  I know.
10       THE WITNESS:  But for the most part,
11 I think they know most of this.
12 BY MR. FREESE:
13    Q.    So for the most part, this is a -- is
14 a -- the document itself is meaningless and
15 worthless in your mind.
16    A.    Not at all.
17       MR. GAGE:  Objection to form.
18 BY MR. FREESE:
19    Q.    Because it doesn't inform a doctor of
20 anything that you believe he doesn't already know or
21 should know; correct?
22       MR. GAGE:  Object to form.
23       THE WITNESS:  If you look at the
24 first several pages of the document, it explains how
25 to use this device.

Page 579

1       MR. FREESE:  I'm sorry.  I apologize.
2 You didn't understand my question or I asked a bad
3 question.
4       THE WITNESS:  I think I understood
5 it.
6 BY MR. FREESE:
7    Q.    I'm asking you -- no, I asked a bad
8 question, I'll admit that.
9       With respect to the precautions, the
10 warnings, and adverse reactions, you believe that's
11 all surplusage.  It's unnecessary because you
12 believe all doctors already know or should know
13 everything contained in those sections; correct?
14       MR. GAGE:  Object to form and
15 objection, asked and answered.
16       THE WITNESS:  I believe for the most
17 part -- and we spoke about some specifics -- for the
18 most part, people who understand how to do pelvic
19 surgery and incontinence surgery already know
20 everything in this list.
21 BY MR. FREESE:
22    Q.    But we agreed that you've gotta have
23 the -- you've gotta be at the level of the
24 least-skilled capable and adequate surgeon; correct?
25       MR. GAGE:  Object to form.

Page 580

1       THE WITNESS:  This -- most of this
2 stuff is very basic and would fit into that
3 least-skilled category.
4 BY MR. FREESE:
5    Q.    And you've not read Dr. Reyes'
6 deposition, have you?
7    A.    I have not.
8    Q.    You do not know what he said about
9 the IFU and what his knowledge was, do you?
10    A.    I do not.
11       MR. FREESE:  Dr. Weisberg, I think
12 that's all I have.  I appreciate your time, sir.
13       THE WITNESS:  Thank you.
14       MR. FREESE:  One question.
15 BY MR. FREESE:
16    Q.    The FDA -- the FDA recommended that
17 you not use two adverse reactions sections, did it
18 not?
19    A.    Correct.
20    Q.    Just out of curiosity, because I'm
21 here, you ignored that request of the FDA and didn't
22 follow the recommendation, because you included two
23 separate adverse reactions sections in the final
24 IFU; correct?
25       MR. GAGE:  Object to form.

Page 581

1       THE WITNESS:  My understanding is
2 that we did what they asked and we combined them.
3       MR. FREESE:  1649 has two versions --
4 has --
5       THE WITNESS:  Well, if we could look
6 at the redlined version we sent them, we might get a
7 better idea of how we are going to do this.
8 BY MR. FREESE:
9    Q.    It's your belief that 1649 is not the
10 final-final of the TVT-O IFU?
11       MR. GAGE:  Object to form.
12       THE WITNESS:  It may be that -- that
13 the new one hasn't been printed yet.  I don't --
14 BY MR. FREESE:
15    Q.    But you think they've been combined?
16    A.    I believe they have been combined.
17       MR. FREESE:  Thank you.  I have no
18 further questions.  I think Mr. Barlow may have a
19 few questions.  Thank you, sir.
20       (Pause.)
21          - - -
22       EXAMINATION
23          - - -
24 BY MR. BARLOW:
25    Q.    Doctor, Ethicon doesn't know what any

73 (Pages 578 to 581)

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Stipulation and Order of Confidentiality

Page 582

1  given implanting doctor knows or doesn't know about
2  the adverse reactions that can occur with regard to
3  its mesh products when they go to perform an implant
4  surgery, do they?
5          MR. GAGE: Object to form.
6          THE WITNESS: They don't know
7  specifically what each doctor knows.
8  BY MR. BARLOW:
9      Q.    Exactly.
10          And I believe you testified that
11  Ethicon has not performed any scientific study to
12  determine what pelvic floor surgeons know or don't
13  know about the adverse reactions that can occur with
14  their pelvic mesh products, do they -- have they?
15     A.    That's correct.
16     Q.    And Ethicon hasn't performed any
17  scientific survey with regard to what pelvic floor
18  surgeons may know or not know about the adverse
19  effects that can happen with regard to their pelvic
20  mesh products; correct?
21          MR. GAGE: Object to form.
22          THE WITNESS: I believe that's
23  correct, but I'm not sure.
24  BY MR. BARLOW:
25     Q.    To your knowledge -- you're not aware

Page 583

1  of any scientific survey of what doctors know or
2  don't know about the adverse reactions for your
3  pelvic mesh products. Right?
4          MR. GAGE: Object to form.
5          THE WITNESS: The only -- the only
6  answer I can give you is that all of our IFUs are
7  looked at by a panel of people that we bring in to
8  look at the IFUs, the panel of doctors, and get
9  their opinions on it and ask them whether they --
10  this is adequate for them.
11  BY MR. BARLOW:
12     Q.    And these IFUs are reviewed by -- are
13  they key opinion leaders that you all bring in?
14     A.    Not necessarily. They're just --
15  it's a range of people.
16     Q.    Are they doctors that are brought in
17  that Ethicon feels have significant expertise in the
18  area of pelvic floor surgery?
19     A.    There's a range. There's a range of
20  people -- even sometimes residents, people who are
21  new in practice, people who are key opinion leaders.
22  We try to get a range of these people for these --
23     Q.    Is that --
24     A.    -- these sessions.
25     Q.    I'm sorry. Is that done for every

Page 584

1  iteration of the IFU?
2      A.    I believe it is.
3      Q.    How is that documented?
4      A.    It will be in the design history
5  file.
6      Q.    It'll be -- is there a particular
7  thing that that's called?
8      A.    Design -- it would be under the
9  design validation section, the IFU design validation
10  section.
11     Q.    And how many surgeons are typically
12  brought in for this sort of thing?
13     A.    It depends. There's usually a few
14  sessions, with 10 or 12 in each session.
15     Q.    So we're talking about a few dozen?
16     A.    Yeah.
17     Q.    But there's tens of thousands of
18  surgeons that perform these surgeries in the United
19  States; correct?
20     A.    Well, that's true.
21          MR. GAGE: Object to form.
22  BY MR. BARLOW:
23     Q.    So whatever focus group type thing is
24  done with the IFUs, that's not a scientific survey
25  or study, is it?

Page 585

1          MR. GAGE: Object to form.
2          THE WITNESS: It's not scientific.
3  BY MR. BARLOW:
4      Q.    Doctor, will you pull out -- just
5  take a look at 1635, which is the memo to the
6  project file that purports to be from Lee Hackman?
7      A.    I don't know if we ever found it, but
8  go ahead. I know that memo.
9      Q.    Okay. I'm just going to ask you, it
10  says: The proposed IFU changes consist of enhancing
11  the current IFUs to better describe known product
12  risk or to include hazards not currently identified
13  in the IFUs.
14          Do you agree with that?
15     A.    That's the task of this -- this
16  particular form that he's -- that he's working with.
17     Q.    Do you agree that the new IFUs better
18  describe the known product risk?
19     A.    Yes.
20     Q.    And do you believe that they include
21  hazards not currently identified in the IFUs?
22     A.    Well, the hazards that they add are
23  not spelled out in the old IFUs; but once again,
24  these were things that we assume are common
25  knowledge.

74 (Pages 582 to 585)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 586

1    Q.    Okay.  Fair -- setting aside your
2  assumptions about what doctors may or may not know,
3  do the new IFUs include hazards that were not
4  previously identified in the IFUs?
5    A.    Hazards that are spelled out more
6  specifically, yes.
7    Q.    So we're in agreement that the new
8  IFUs better describe product risk; correct?
9    A.    Yes.
10   Q.    Doctor, you would agree with me then
11 that the language found on -- in Exhibit 1640 with
12 regard to the TVT adverse reactions better describes
13 those adverse reactions than what was found in the
14 IFUs prior to the 2015 revisions; correct?
15        MR. GAGE:  Object to form.
16        THE WITNESS:  Yes.
17        MR. BARLOW:  What's the -- what's the
18 objection, Bill?
19        MR. GAGE:  The phrase "better
20 describe" is vague and ambiguous.
21        MR. BARLOW:  That's fine.
22        MR. FREESE:  Let it go.
23 BY MR. BARLOW:
24   Q.    Doctor, the language regarding
25 foreign body response with regard to TVT adverse

Page 587

1  reactions that's found in 1640, an IFU that included
2  that language would better describe that adverse
3  reaction than for the -- with the IFUs without it;
4  correct?
5        MR. GAGE:  Object to form.
6        THE WITNESS:  I'm sorry.  I don't
7  understand the question.
8        MR. BARLOW:  Sure.
9  BY MR. BARLOW:
10   Q.    With regard to the IFUs that we've
11 discussed, excluding -- excluding the IFUs that came
12 out this year, okay, all of my questions going
13 forward are going to be about the IFUs prior to the
14 Health Canada.  Okay?
15   A.    Okay.
16   Q.    Doctor, the language -- well, an IFU
17 that includes the language regarding foreign body
18 response from Exhibit 1640 better describes that
19 adverse reaction than in your IFUs; correct?
20        MR. GAGE:  Object to form.
21        THE WITNESS:  Correct.
22 BY MR. BARLOW:
23   Q.    And the language regarding mesh
24 extrusion, exposure, or erosion into the vagina or
25 other structures or organs better describes that

Page 588

1  adverse reaction than what is in your IFUs; correct?
2        MR. GAGE:  Object to form.
3        THE WITNESS:  Yes.
4  BY MR. BARLOW:
5    Q.    And, Doctor, the language with regard
6  to acute and/or chronic pain, from Exhibit 1640, an
7  IFU that includes that better describes that adverse
8  risk than what was in your IFUs; correct?
9    A.    Yes.
10        MR. GAGE:  Object to form.
11 BY MR. BARLOW:
12   Q.    With regard to pain with intercourse,
13 which may in some patients not resolve, that
14 language -- an IFU that includes that language would
15 better describe that adverse reaction than what was
16 in your IFUs; correct?
17   A.    Yes.
18        MR. GAGE:  Object to form.
19 BY MR. BARLOW:
20   Q.    Doctor, with regard to neuromuscular
21 problems, including acute and/or chronic pain in the
22 groin, thigh, leg, pelvic and/or abdominal area, an
23 IFU for a TVT-O that -- or -- a TVT-O that includes
24 that language would better describe that adverse
25 reaction than what was in your TVT-O IFUs; correct?

Page 589

1        MR. GAGE:  Object to form.
2        THE WITNESS:  Yes.
3  BY MR. BARLOW:
4    Q.    With regard to neuromuscular
5  problems, including acute and/or chronic pain in the
6  groin, thigh, leg, pelvic and/or abdominal area, an
7  IFU for an Abbrevo that included that language would
8  better describe that adverse reaction than your
9  Abbrevo IFUs; correct?
10        MR. GAGE:  Object to form.
11        THE WITNESS:  Yes.
12 BY MR. BARLOW:
13   Q.    With regard to TVT, original TVT,
14 neuromuscular -- an IFU that included the language
15 neuromuscular problems, including acute and/or
16 chronic pain in the groin, pelvic and/or abdominal
17 area, would better describe -- would better describe
18 that adverse reaction than what was in your TVT
19 IFUs; correct?
20   A.    Yes.
21        MR. GAGE:  Object to form.
22 BY MR. BARLOW:
23   Q.    With regard to the TVT Exact, an IFU
24 that included the language neuromuscular problems,
25 including acute and/or chronic pain in the groin,

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Stipulation and Order of Confidentiality

Page 590

1 pelvic and/or abdominal area would -- an IFU that
2 included that language would better describe that
3 adverse reaction than what was in your Exact IFUs;
4 correct?
5      A.    Yes.
6           MR. GAGE: Object to form.
7           THE WITNESS: Yes.
8 BY MR. BARLOW:
9      Q.    An IFU that includes that these
10 adverse reactions may require surgical treatment
11 would better describe that risk than what was in
12 your previous IFUs; correct?
13           MR. GAGE: Object to form.
14           THE WITNESS: Yes.
15 BY MR. BARLOW:
16      Q.    A -- an IFU that includes the
17 language, one or more revision surgeries may be
18 necessary to treat these adverse reactions, would
19 better describe that risk than what was in your
20 previous IFUs; correct?
21           MR. GAGE: Object to form.
22           THE WITNESS: Yes.
23 BY MR. BARLOW:
24      Q.    Doctor, an IFU that included the
25 language, in cases in which Prolene mesh needs to be

Page 591

1 removed in part or whole, significant dissection may
2 be required -- an IFU that includes that language
3 would better describe that risk than what is -- what
4 was in your IFUs; correct?
5      A.    Yes.
6           MR. GAGE: Object to form.
7           THE WITNESS: Yes.
8 BY MR. BARLOW:
9      Q.    And, Doctor, an IFU that included the
10 language that, even with additional surgeries, the
11 adverse reactions may not resolve, would better
12 describe that risk than what was in your previous
13 IFUs; correct?
14           MR. GAGE: Object to form.
15           THE WITNESS: Yes.
16 BY MR. BARLOW:
17      Q.    Doctor, an IFU that sets forth that
18 urge -- de novo urge incontinence may result from
19 the implantation of your devices would better
20 describe that risk than your previous IFUs; correct?
21      A.    No.
22           MR. GAGE: Object to form.
23           THE WITNESS: No.
24 BY MR. BARLOW:
25      Q.    Because of the detrusor language?

Page 592

1      A.    Yes.
2      Q.    What about urinary frequency, would
3 that better describe?
4           MR. GAGE: Object to form.
5           THE WITNESS: That would better
6 describe. Even though it's included in the
7 detrusor, there are other things that cause
8 frequency.
9 BY MR. BARLOW:
10      Q.    An IFU that included the -- an
11 explicit statement of de novo urinary frequency that
12 may result from the sling would better describe that
13 risk than what was in your IFUs; correct?
14           MR. GAGE: Object to form.
15           THE WITNESS: Not the sling. The
16 procedure in which the sling was used.
17           MR. BARLOW: The use of the sling.
18           THE WITNESS: Yes.
19 BY MR. BARLOW:
20      Q.    Doctor, an IFU that set forth that
21 there may be de novo urinary retention as a result
22 of the use of the sling would be better than what
23 was -- would better describe that risk than what was
24 in your IFUs; correct?
25      A.    Yes.

Page 593

1           MR. GAGE: Object to form.
2           THE WITNESS: Yes.
3           I keep doing that. I'm sorry.
4           MR. GAGE: She's getting it.
5 BY MR. BARLOW:
6      Q.    An IFU that set forth that de novo
7 urinary obstruction could occur as a result of the
8 use of the sling would better describe that risk
9 than what was in your IFUs; correct?
10           MR. GAGE: Object to form.
11           THE WITNESS: No. I think urinary
12 obstruction is handled.
13 BY MR. BARLOW:
14      Q.    Doctor, an IFU that set forth that
15 voiding dysfunction -- de novo voiding dysfunction
16 could result from the use of the sling would better
17 describe that risk than what was in your IFUs;
18 correct?
19           MR. GAGE: Object to the form.
20           THE WITNESS: I don't think so.
21           MR. BARLOW: Okay. You disagree on
22 that one.
23 BY MR. BARLOW:
24      Q.    With regard to the Gynemesh PS, a IFU
25 that included that de novo urinary incontinence

Golkow Technologies, Inc. - 1.877.370.DEPS

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 594

1  could result would better describe that risk than
2  what was in your IFUs; correct?
3          MR. GAGE: Object to form.
4          THE WITNESS: Yes.
5  BY MR. BARLOW:
6      Q.   An IFU that included that de novo
7  urge incontinence could result from the use of the
8  Gynemesh PS would better describe that risk than
9  what was in your IFUs; correct?
10         MR. GAGE: Object to form.
11         THE WITNESS: I'm sorry. I need to
12 look at the Gynemesh IFU.
13         MR. BARLOW: Yes, sir. Be my guest.
14         THE WITNESS: Do we have one
15 available?
16         MR. BARLOW: Yeah, I'm -- you have
17 them in the exhibits. I don't --
18         MR. GAGE: Do you know what the
19 number is?
20         MR. BARLOW: Not off the top of my
21 head.
22         THE WITNESS: Yeah, I'll give you a
23 number.
24         MR. GAGE: They're in the add file.
25         Is that here?

Page 595

1          MS. KABBASH: If you look at the
2  redline, you can tell. You can tell by the redline
3  --
4          MR. GAGE: So why don't we put that
5  one at the top.
6          THE WITNESS: That's the only one I
7  need to look at.
8          MR. GAGE: Okay.
9          MS. KABBASH: That's our copy.
10         MR. GAGE: So I'm going to keep it
11 inside the rubber band so it's still the composite
12 exhibit --
13         MS. KABBASH: That's our copy --
14         MR. GAGE: That's our copy.
15         MS. KABBASH: -- so it doesn't
16 matter.
17         MR. GAGE: Oh, okay. So it doesn't
18 matter. I'm going to let him look at our copy.
19         MR. BARLOW: Yeah, that's fine.
20         MR. GAGE: So that we don't disturb
21 the pristineness of the original composite, such as
22 it were.
23         MR. BARLOW: You will learn over,
24 hopefully, the years, hopefully not in this
25 particular litigation, that I don't stand on

Page 596

1  formality, so...
2          MR. GAGE: I'm sending you all my
3  hotel bill for tonight and I'm going to send you
4  text messages all night long. I'm going to have
5  people come pound on your hotel door --
6          MR. BARLOW: I'm almost done. This
7  is my last line of questioning.
8          MR. FREESE: I'm not keeping you from
9  going to get your flight.
10         MR. BARLOW: Maha can handle this.
11         MR. FREESE: She's chomping at the
12 bit.
13         MR. BARLOW: She can say object to
14 form every bit as good as you, I promise.
15         MR. GAGE: Probably better.
16         THE WITNESS: Unfortunately, I need
17 an old one and I'm trying to figure out whether --
18         MR. GAGE: That's redlined --
19         THE WITNESS: Yeah, it's redlined.
20 It should work. I'm trying to figure out whether
21 there's any reference to detrusor instability, and I
22 don't believe that there is --
23         MR. GAGE: Oh, I see what you're
24 saying.
25         THE WITNESS: -- because I don't

Page 597

1  believe that the Gynemesh should lead to detrusor
2  instability.
3          Okay. I can answer your question.
4          MR. BARLOW: Okay. Now I don't even
5  remember what it was. Which one was I on?
6  BY MR. BARLOW:
7      Q.   Doctor, an IFU that included that de
8  novo urge incontinence could result from the use of
9  Gynemesh PS would better describe that risk than
10 your IFUs; correct?
11     A.   Yes, although the risk is low.
12     Q.   I'll tell you what, Doctor, on 1632,
13 Exhibit 1632 -- do you have that in front of you?
14 Don't worry about it. It'll be quicker for me to do
15 it this way.
16         An IFU that said that de novo urinary
17 frequency could result from the use of Gynemesh PS
18 would better describe that risk than what was in
19 your IFUs; correct?
20     A.   Yes.
21         MR. GAGE: Object to form.
22         THE WITNESS: I'm sorry.
23 BY MR. BARLOW:
24     Q.   And an IFU that said that de novo
25 urinary retention could result from the use of

Confidential - Subject to Stipulation and Order of Confidentiality

Page 598

1  Gynemesh PS would better describe that adverse
2  reaction better than what was in your IFUs; correct?
3          MR. GAGE: Object to form.
4          THE WITNESS: Yes.
5  BY MR. BARLOW:
6      Q.   A IFU that included that de novo
7  urinary obstruction could result from the use of
8  Gynemesh PS would better describe that risk than
9  what was in your IFUs; correct?
10         MR. GAGE: Object to form.
11         THE WITNESS: Yes.
12 BY MR. BARLOW:
13     Q.   An IFU that included an adverse
14 reaction listing of de novo voiding dysfunction that
15 could result from the use of Gynemesh PS would
16 better describe that risk than what was in your
17 IFUs; correct?
18         MR. GAGE: Object to form.
19         THE WITNESS: Yes.
20 BY MR. BARLOW:
21     Q.   A IFU that included the language
22 regarding the foreign body response resulting in
23 inflammation, extrusion, erosion, exposure, and
24 fistula formation from the use of Gynemesh PS would
25 better describe that adverse reaction than what was

Page 599

1  in your IFUs; correct?
2          MR. GAGE: Object to form.
3          THE WITNESS: I believe that that was
4  in the original Gynemesh.
5  BY MR. BARLOW:
6      Q.   That would have been the language
7  that would have had to do with transitory foreign
8  body response; correct?
9      A.   I believe so.
10     Q.   Okay.
11         Then let me amend that to say that
12 one that said that chronic foreign body response
13 could result from the use of Gynemesh PS would
14 better describe that risk than what was in your
15 IFUs; correct?
16         MR. GAGE: Object to form.
17         THE WITNESS: Chronic foreign body
18 response in itself doesn't lead to those late
19 complications.
20 BY MR. BARLOW:
21     Q.   Okay. And that's because you believe
22 that the chronic foreign body response is not strong
23 enough; correct?
24     A.   Well --
25         MR. GAGE: Object to form.

Page 600

1          THE WITNESS: -- that it doesn't
2  trigger -- does not trigger inflammation.
3  BY MR. BARLOW:
4      Q.   Doctor, a Gynemesh PS IFU that
5  included mesh extrusion, exposure, and erosion into
6  the vagina or other structures or organs from the
7  use of Gynemesh PS would better describe that
8  adverse reaction than what was in your IFUs;
9  correct?
10         MR. GAGE: Object to form.
11         THE WITNESS: Better, but very
12 unnecessary.
13         MR. BARLOW: Object to the
14 nonresponsive portion of the answer.
15 BY MR. BARLOW:
16     Q.   Doctor, a IFU that listed acute
17 and/or chronic pain would better describe that risk
18 than what was in your Gynemesh PS IFUs; correct?
19     A.   Yes.
20         MR. GAGE: Object to form.
21         THE WITNESS: Yes.
22 BY MR. BARLOW:
23     Q.   Doctor, a IFU that included that
24 pelvic pain, which in some patients may not resolve,
25 would better describe that adverse reaction than

Page 601

1  what was in your Gynemesh PS IFUs; correct?
2          MR. GAGE: Object to form.
3          THE WITNESS: Yes.
4  BY MR. BARLOW:
5      Q.   An IFU that said -- that stated that
6  pain with intercourse, which in some patients may
7  not resolve, would better describe that adverse
8  reaction than what was in your Gynemesh PS IFUs;
9  correct?
10         MR. GAGE: Object to form.
11         THE WITNESS: Yes.
12 BY MR. BARLOW:
13     Q.   Doctor, an IFU that included that
14 excessive contraction or shrinkage of the tissue
15 surrounding the mesh resulting in vaginal scarring,
16 vaginal tightening, and vaginal shortening would
17 better describe that risk than what was in your
18 Gynemesh PS IFUs; correct?
19         MR. GAGE: Object to form.
20         THE WITNESS: Yes.
21 BY MR. BARLOW:
22     Q.   An IFU that stated that neuromuscular
23 problems, including acute and/or chronic pain in the
24 groin, pelvic and/or abdominal area could result
25 from the Gynemesh PS would better describe that

78 (Pages 598 to 601)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 602

1  adverse reaction than what was in your IFUs;
2  correct?
3          MR. GAGE: Object to form.
4          THE WITNESS: Yes.
5  BY MR. BARLOW:
6      Q.   An IFU that stated that the adverse
7  reactions related to the Gynemesh PS may require
8  surgical treatment would better describe that risk
9  than what was in your IFUs; correct?
10         MR. GAGE: Object to form.
11         THE WITNESS: Yes.
12 BY MR. BARLOW:
13     Q.   An IFU that said, one or more
14 revision surgeries may be necessary to treat the
15 complications resulting from the Gynemesh PS, would
16 better describe that potential adverse reaction than
17 what was in your IFUs; correct?
18         MR. GAGE: Object to form.
19         THE WITNESS: Yes.
20 BY MR. BARLOW:
21     Q.   An IFU that says, in cases in which
22 the Gynemesh needs to be removed in part or whole,
23 significant dissection may be required, would better
24 describe that adverse reaction than what was in your
25 Gynemesh PS IFUs; correct?

Page 603

1          MR. GAGE: Object to form.
2          THE WITNESS: Yes.
3  BY MR. BARLOW:
4      Q.   And, Doctor, one that -- an IFU that
5  said that even with revision surgery, or multiple
6  revision surgeries, the adverse reactions or
7  complications may not be cured would better describe
8  that adverse reaction or risk than what was in your
9  Gynemesh PS IFUs; correct?
10         MR. GAGE: Object to form.
11         THE WITNESS: Yes.
12         MR. BARLOW: Okay. I'm going to pass
13 the witness.
14              - - -
15         EXAMINATION
16              - - -
17 BY MR. GAGE:
18     Q.   Dr. Weisberg, if you thought the
19 changes that we've been discussing to the IFUs and
20 brochures were unnecessary, why did you do it?
21     A.   They were requested by a regulatory
22 body who hold our license. They were all accurate
23 -- all accurate additions, all accurate -- I'm
24 trying to think of the word -- they helped explain
25 some of these reactions, some of these adverse

Page 604

1  reactions. There's nothing wrong with them. They
2  weren't inaccurate. When we thought they were, we
3  didn't add them.
4          And because it was requested and
5  because the information is good, we added it. Was
6  it necessary? I don't think so, but they were good.
7          MR. BARLOW: Object to the
8  nonresponsive portion of the answer.
9  BY MR. GAGE:
10     Q.   You were just asked as to whether the
11 changes to the IFU better described various
12 potential adverse reactions. Do you recall those
13 questions?
14     A.   Yes.
15     Q.   How many, if any, of those adverse
16 reactions were discussed in patient brochures dating
17 back to 2008 and/or 2012?
18         MR. GAGE: Object to form.
19         THE WITNESS: Most of them.
20 BY MR. GAGE:
21     Q.   Did the new IFUs use different
22 wording than the old IFUs?
23     A.   Yes.
24     Q.   Was that different wording used to
25 describe some of these adverse events associated

Page 605

1  with these devices?
2          MR. BARLOW: Object to form.
3          THE WITNESS: Yes.
4  BY MR. GAGE:
5      Q.   Were the IFUs prior to 2015
6  adequate --
7          MR. BARLOW: Object to form.
8  BY MR. GAGE:
9      Q.   -- or inadequate to describe the
10 adverse reactions associated with those devices?
11         MR. BARLOW: Sorry. Object to form.
12         THE WITNESS: I believe they were
13 adequate.
14         MR. GAGE: Nothing further.
15         MR. BARLOW: We're off the record.
16         THE VIDEO TECHNICIAN: The time is
17 4:41. We're off the record.
18     (Witness excused.)
19              - - -
20     (A discussion off the record
21 occurred.)
22              - - -
23     (Whereupon, the following discussion
24 off the videotape record occurred:
25         MS. KABBASH: The deposition of Marty

79 (Pages 602 to 605)

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 606

1    Weisberg has completed for the day.  Maha Kabbash
2    and Alex Barlow have remained to go through and we
3    have gone through all of the exhibits, Plaintiffs'
4    exhibits, from the deposition to determine and
5    identify which ones are subject to the stipulation
6    that counsel discussed earlier in the day.
7            And we're going to read into the
8    record the exhibit numbers of the exhibits that are
9    subject to the stipulation:  Those exhibits are
10   P-1608, P-1609, P-1610, P-1611, P-1612, P-1614,
11   P-1615, P-1616, P-1617, P-1618, P-1619, P-1620,
12   P-1621, P-1622, P-1625, P-1626, P-1627, P-1629,
13   P-1630, P-1631, P-1633, P-1634, P-1635, P-1636,
14   P-1639, P-1642 through P-1657, and P-1659 through
15   P-1665, P-1667, P-1668, and P-1669.
16           And, Alex, do you agree those are the
17   documents that are subject to the stipulation?
18           MR. BARLOW:  I do agree.
19           MS. KABBASH:  Okay.  We're done on
20   the record.  Thank you.)
21           (Deposition concluded at
22           approximately 5:06 p.m.)
23
24
25

Page 607

1                    CERTIFICATE
2
3            I, KIMBERLY A. CAHILL, a Notary
4    Public and Certified Court Reporter of the State of
5    New Jersey, do hereby certify that prior to the
6    commencement of the examination, MARTIN WEISBERG,
7    M.D. was duly sworn by me to testify to the truth,
8    the whole truth and nothing but the truth.
9            I DO FURTHER CERTIFY that the
10   foregoing is a verbatim transcript of the testimony
11   as taken stenographically by and before me at the
12   time, place and on the date hereinbefore set forth,
13   to the best of my ability.
14           I DO FURTHER CERTIFY that I am
15   neither a relative nor employee nor attorney nor
16   counsel of any of the parties to this action, and
17   that I am neither a relative nor employee of such
18   attorney or counsel, and that I am not financially
19   interested in the action.
20
21
22   _____
23   KIMBERLY A. CAHILL, CCR, RMR
     Notary Number: 2160369
24   Notary Expiration: February 20, 2019
     CCR Number: 30XI00188400
25   Dated: November 20, 2015

Page 608

1             INSTRUCTIONS TO WITNESS
2
3            Please read your deposition over
4    carefully and make any necessary corrections.  You
5    should state the reason in the appropriate space on
6    the errata sheet for any corrections that are made.
7            After doing so, please sign the
8    errata sheet and date it.
9            You are signing same subject to the
10   changes you have noted on the errata sheet, which
11   will be attached to your deposition.
12           It is imperative that you return the
13   original errata sheet to the deposing attorney
14   within thirty (30) days of receipt of the deposition
15   transcript by you.  If you fail to do so, the
16   deposition transcript may be deemed to be accurate
17   and may be used in court.
18
19
20
21
22
23
24
25

Page 609

1            - - - - -
2              E R R A T A
3            - - - - -
     PAGE LINE CHANGE/REASON
4    ____ ____ _____
5    ____ ____ _____
6    ____ ____ _____
7    ____ ____ _____
8    ____ ____ _____
9    ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____
25   ____ ____ _____

Golkow Technologies, Inc. - 1.877.370.DEPS

4b809a89-dfa9-4c8a-aefc-193123a96784

Confidential - Subject to Stipulation and Order of Confidentiality

Page 610

```
 1
 2          ACKNOWLEDGMENT OF DEPONENT
 3
 4          I,_____, do
 5    hereby certify that I have read the foregoing
 6    pages, 293 - 611, and that the same is a correct
 7    transcription of the answers given by me to the
 8    questions therein propounded, except for the
 9    corrections or changes in form or substance,
10    if any, noted in the attached Errata Sheet.
11
12
13    _____
14    MARTIN WEISBERG, M.D.              DATE
15
16
17    Subscribed and sworn
      to before me this
18    _____ day of _____, 20____.
19    My commission expires:_____
20
      _____
21    Notary Public
22
23
24
25
```

Page 611

```
 1          LAWYER'S NOTES
 2    PAGE  LINE
 3    ____ ____ _____
 4    ____ ____ _____
 5    ____ ____ _____
 6    ____ ____ _____
 7    ____ ____ _____
 8    ____ ____ _____
 9    ____ ____ _____
10    ____ ____ _____
11    ____ ____ _____
12    ____ ____ _____
13    ____ ____ _____
14    ____ ____ _____
15    ____ ____ _____
16    ____ ____ _____
17    ____ ____ _____
18    ____ ____ _____
19    ____ ____ _____
20    ____ ____ _____
21    ____ ____ _____
22    ____ ____ _____
23    ____ ____ _____
24    ____ ____ _____
25    ____ ____ _____
```

81 (Pages 610 to 611)