# EXHIBIT 9

```
                UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF WEST VIRGINIA
                        AT CHARLESTON

RE: ETHICON, INC, PELVIC,       )   Master File No.
REPAIR SYSTEM PRODUCTS          )   2:12-MD-02327
REPAIR SYSTEM PRODUCTS          )   JOSEPH R. GOODWIN
LIABILITY LITIGATION            )   U.S. DISTRICT JUDGE
_____)

THIS DOCUMENT RELATES TO THE
FOLLOWING CASES IN THE WAVE 1
OF MDL 200:

CHARLENE LOGAN TAYLOR,          )   Case No.
                                )   2:12-cv-00376
          Plaintiffs,           )
vs.                             )
ETHICON, INC., ET AL.,          )
          Defendants.           )
_____/

    VIDEOTAPED DEPOSITION OF NATHAN W. GOODYEAR, M.D.



                       March 3, 2016
                   3:50 p.m. to 7:39 p.m.


                       TRACY IMAGING
                   KNOXVILLE, TENNESSEE




              Michele Faconti, RPR, LCR (667)
```

Nathan W. Goodyear, MD

```
 1                MS. KOTT:  You don't have another copy?
 2                MS. MOORE:  Give me a minute and I'll give
 3         it to you.  Hold on.
 4                MR. KOTT:  If I could get a copy of that.
 5         Off the record.
 6                MS. MOORE:  Know what we can do, just to
 7         keep going -- go off the record.
 8                VIDEOGRAPHER:  Hang on.
 9                (Off-the-record.)
10                VIDEOGRAPHER:  Go right ahead.  16:52.
11         Excuse me 4:52.
12     BY MS. MOORE:
13         Q.   Doctor, we will discuss in a few minutes
14     your information -- the information you had with
15     respect to the erosion risks you discussed with
16     Ms. Taylor.
17              With respect to the other risks that you
18     discussed with her, these are risks that you knew
19     from your surgical training, your experience as a
20     doctor and from the literature and from discussions
21     with colleagues and from your meetings and sessions
22     with the Ethicon team?
23         A.   Correct.
24         Q.   The risks that are outlined in this report
```

1    known to you long before you did surgery on

2    Ms. Taylor or any of the other -- or even Mrs.

3    Shively, correct?

4         A.   Correct.

5         Q.   And, in fact, if -- I think these -- not

6    only did you go in great detail through the risks

7    with her on August 12th, 2008, it looks like you

8    took her through a very detailed consent process

9    with the Prolift, with the TVT-O, and what you

10   called a mesh consent?

11             MS. KOTT:  I'm sorry.  I think you did

12        said Shively just now.  I just want to be clear

13        who we are talking about, which, good luck.

14   BY MS. MOORE:

15        Q.   So the record is clear, I was referring to

16   Ms. Taylor.  And I want to make sure that I'm

17   referencing the consent that Dr. Goodyear went

18   through with Ms. Taylor on August 12th, 2008

19   regarding the Prolift, in TVT-O, and the mesh.

20             MS. MOORE:  And thank you, Counsel.

21             MS. KOTT:  Thank you.

22   BY MS. MOORE:

23        Q.   My question is, you have specific consents

24   for the Prolift and the TVT, why did you also go the

Nathan W. Goodyear, MD

```
 1      extra step and have a mesh consent?
 2           A.    That was under guidance from Ethicon.
 3           Q.    Ethicon recommended that?
 4           A.    Yes.
 5           Q.    And where is that?  Meaning where is -- is
 6      there some type of report that you received saying
 7      it's important to have mesh consent?
 8           A.    No.
 9           Q.    Tell me about that, I need to understand.
10           A.    When I created these operative risk
11      assessments, I then gave them to an Ethicon rep to
12      oversee and make sure I was not -- I was stating the
13      risks appropriately.
14           Q.    So you gave --
15           A.    And that's when they recommended there be
16      one for each.
17                 (Exhibits No. 41, No. 42 and No. 43
18           marked.)
19      BY MS. MOORE:
20           Q.    Okay.  And I'm going to hand you what I
21      have identified as Exhibit No. 42, 43 -- 41
22      pertaining to Ms. Taylor.  And ask you to take a
23      look at that.  Counsel, we'll get you that.
24           A.    Excuse me?
```

```
 1     professor that is discussing complications of the

 2     Prolift mentions the erosion rate he's, again, in

 3     the middle of the midst of the horseshoe.  Talks

 4     about his erosion rate.  I lean to the colleague

 5     next to me and say, "Wow, that's much lower than

 6     anything I've ever seen, let alone mine."  And he

 7     goes, "Me, too."

 8          Q.   So any other discussions with any other

 9     colleagues about erosion rates?

10          A.   That's the specific discussion I remember.

11          Q.   Do you remember the colleague's name?

12          A.   No, I don't.

13          Q.   Do you remember the name of any colleague

14     sitting at the round table?

15          A.   Colleagues, no.  I do remember the

16     lecturer, Dr. Lucente.

17          Q.   You remember the lecturer?

18          A.   Dr. Lucente.

19          Q.   So he was the one that presented and said

20     that the erosion rates were what, 3 to 5 percent?

21          A.   No.  He mentioned his percentage was less

22     than 1 percent.

23          Q.   Okay.  So if we asked Dr. Lucente, and

24     asked the other participants there, he would say
```

Nathan W. Goodyear, MD

1    that the erosion rate he spoke of on that day was
2    less than 1 percent?
3              MR. KOTT:  Object to the form.  How would
4         he know what he's going to say?
5              THE WITNESS:  I don't know what he will
6         say.
7    BY MS. MOORE:
8         Q.   I'm asking you what he said.
9         A.   I'm telling you what I remember.
10        Q.   And what you remember is he said that his
11   erosion rates were less than 1 percent?
12        A.   Yeah.
13        Q.   And despite your experience being
14   different, and your colleague to the left being
15   different, you deferred your medical judgment and
16   told your patients it was what Ethicon said?
17             MR. KOTT:  Object to the form.
18   BY MS. MOORE:
19        Q.   Is that fair?
20             MR. KOTT:  Object to the form.
21   BY MS. MOORE:
22        Q.   Because if I'm wrong, let me know.
23        A.   I did not defer my judgment.
24        Q.   Well, whose judgment is here?

```
 1        A.   Yes.
 2        Q.   So that wasn't -- the three to
 3   five percent that you have warned your patients
 4   about was not based upon your own experience, but
 5   what you had gathered from others; is that fair to
 6   say?
 7        A.   Again, I said it was with my experience,
 8   my education, the reading of the journals, along
 9   with the other education, experts, etcetera.
10        Q.   All right.  And so was your experience
11   three to five percent or 15 to 20 percent?  Because
12   what did you put anything other than your experience
13   in a warning to a patient?
14             MR. KOTT:  Objection to the form.
15             THE WITNESS:  Ma'am, I told you when I
16        presented these consent forms, I wanted to
17        present them as accurate as possible to my
18        clients.  And these were given to the Ethicon
19        rep to say, "yep, that is correct."
20   BY MS. MOORE:
21        Q.   And you defer to an Ethicon rep -- is the
22   Ethicon rep a doctor?
23        A.   No.
24        Q.   You're going to let that Ethicon rep
```