Exhibit C

Confidential - Subject to Protective Order

```
1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                     CHARLESTON DIVISION

4                        -  -  -

5

       IN RE:  ETHICON, INC.        :  MDL NO. 2327
6      PELVIC REPAIR SYSTEM,         :
       PRODUCTS LIABILITY            :
7      LITIGATION                    :

8                        -  -  -

9         AND VARIOUS OTHER CROSS-NOTICED ACTIONS

10                       -  -  -

11                    May 22, 2013

12                       -  -  -

13       CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

14                Videotaped 30(b)(6) deposition of

   DANIEL F. BURKLEY, MS taken pursuant to notice, was

15  held at the law offices of Riker Danzig Scherer

   Hyland & Perretti LLP, Headquarters Plaza, One

16  Speedwell Avenue, Morristown, New Jersey, beginning

   at 9:23 a.m., on the above date, before Ann Marie

17  Mitchell, a Federally Approved Certified Realtime

   Reporter, Registered Diplomate Reporter and Notary

18  Public for the State of New Jersey.

19

                        -  -  -

20

21            GOLKOW TECHNOLOGIES, INC.

          877.370.3377 ph|917.951.5672 fax
22            deps@golkow.com

23

24

25
```

Confidential - Subject to Protective Order

```
 1    APPEARANCES:
 2
 3           ANDERSON LAW OFFICES, LLC
             BY:  BENJAMIN HOUSTON ANDERSON, ESQUIRE
 4           1360 West 9th Street
             Suite 215
 5           Cleveland, Ohio 44113
             (216) 592-8384
 6           ben@andersonlawoffices.net
             Representing the Plaintiffs
 7
 8           KLINE & SPECTER, P.C.
             BY:  ROGER CAMERON, ESQUIRE
 9           The Nineteenth Floor
             1525 Locust Street
10           Philadelphia, Pennsylvania 19102
             (215) 772-1000
11           roger.cameron@klinespecter.com
             Representing the Plaintiffs
12
13           BUTLER, SNOW, O'MARA, STEVENS & CANNADA,
             PLLC
14           BY:  PAUL N. DAVIS, ESQUIRE
             1020 Highland Colony Parkway
15           Suite 1400
             Ridgeland, Mississippi 39157
16           (601) 948-5711
             paul.davis@butlersnow.com
17           Representing Johnson & Johnson and Ethicon
             and the Witness
18
19
20
21
22
23
24
25
```

Confidential - Subject to Protective Order

```
 1    APPEARANCES VIA TELEPHONE:

 2

 3              PAM MAY LAW FIRM, P.S.C.
                BY:  MATTHEW HALL, ESQUIRE
 4              P.O. Box 1439
                Pikeville, Kentucky 41502
 5              (606) 432-0400
                mhall@pammaylaw.com
 6              Representing Altman, McGuire, McClellan &
                Crum, P.S.C. and Rick A. McClellan

 7

 8
                VIDEOTAPE TECHNICIAN:
 9                DAVID LANE
10              ALSO PRESENT:
                  JULIE FILARSKI, Anderson Law Offices, LLC
11                MICHAEL KAUFFMANN, Precision Trial
                  Solutions
12

13

14                            -   -   -

15

16

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Protective Order

```
 1                       -  -  -
 2                    I N D E X
 3                       -  -  -
 4
 5   Testimony of:  DANIEL F. BURKLEY, MS
 6        By Mr. Anderson                  8
 7
                          -  -  -
 8
                    E X H I B I T S
 9
                          -  -  -
10
11
```

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| T-268 | Curriculum Vitae, 3 pages | 11 |
| T-269 | E-mail chain, top one dated 03 Apr 2009, Bates stamped ETH.MESH.02184435 and ETH.MESH.02184436 | 24 |
| T-270 | Johnson & Johnson Credo, 1 page | 34 |
| T-271 | "Our Ethical Code for the Conduct of Research and Development," 1 page | 69 |
| T-272 | E-mail chain, top one dated 01 Mar 2012, Bates stamped ETH.MESH.07226377 through ETH.MESH.07226379 | 95 |
| T-273 | E-mail chain, top one dated 29 Feb 2012, Bates stamped ETH.MESH.04038180 and ETH.MESH.04038181 | 132 |
| T-274 | E-mail chain, top one dated 05 Mar 2012, Bates stamped ETH.MESH.04937874 through ETH.MESH.04937876 | 165 |

```
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Confidential - Subject to Protective Order

| 1  | T-275 | Response to e-mail from C. Huntington, March 6, 2012, Bates stamped ETH.MESH.07212397 and ETH.MESH.07212398 | 169 |
| 2  |       |                                                                                                             |     |
| 3  |       |                                                                                                             |     |
|    | T-276 | Memo dated March 12, 2012, Bates stamped ETH.MESH.07205369 and ETH.MESH.07205370 | 187 |
| 4  |       |                                                                                                             |     |
| 5  |       |                                                                                                             |     |
|    | T-277 | Article entitled "Polypropylene as a reinforcement in pelvic surgery is not inert:  comparative analysis of 100 explants," Arnaud Clave, et al., 10 pages | 198 |
| 6  |       |                                                                                                             |     |
| 7  |       |                                                                                                             |     |
| 8  |       |                                                                                                             |     |
|    | T-278 | E-mail chain, top one dated 07 Mar 2012, Bates stamped ETH.MESH.07226404 and ETH.MESH.07226405 | 198 |
| 9  |       |                                                                                                             |     |
| 10 |       |                                                                                                             |     |
| 11 | T-279 | Interim report mesh explants pelvic floor repair, April 2008, Bates stamped ETH.MESH.00006636 | 267 |
| 12 |       |                                                                                                             |     |
| 13 | T-280 | Intermediate Report -- Prolapse Mesh Explants 6/2009, Bates stamped ETH.MESH.02157879 and ETH.MESH.02157880 | 275 |
| 14 |       |                                                                                                             |     |

15
16
17
18
19
20
21
22
23
24
25

Confidential - Subject to Protective Order

```
 1                        -   -   -

 2              DEPOSITION SUPPORT INDEX

 3                        -   -   -

 4

 5         Direction to Witness Not to Answer

 6                     Page Line

 7

 8

 9

           Request for Production of Documents

10

                        Page Line

11

                         12   24

12                      138   12

                        141   11

13                      142   11

14

15

16                    Stipulations

17                     Page Line

18

19

20

21

                     Question Marked

22

                        Page Line

23

24

25
```

Confidential - Subject to Protective Order

1                    THE VIDEOGRAPHER:  We're now on the

2      record.  My name is David Lane.  I'm a videographer

3      for Golkow Technologies.  Today's date is May 22,

4      2013, and the time is 9:23 a.m.  This video

5      deposition is being held in Morristown, New Jersey

6      In Re:  Ethicon, Inc. Pelvic Repair Systems.  Our

7      deponent today is Daniel Burkley.

8                    Counsel will be noted on the

9      stenographic record.

10                    The court reporter today is Ann Marie

11     Mitchell, and will now swear in the witness.

12                         -   -   -

13                    DANIEL F. BURKLEY, MS, after having

14            been duly sworn, was examined and

15            testified as follows:

16                         -   -   -

17                    THE VIDEOGRAPHER:  Please begin.

18                    MR. HALL:  I would like to note

19     before we begin that Altman, McGuire, McClellan and

20     Crum, P.S.C., as well as Dr. Rick McClellan

21     individually, have objected to the cross-notice of

22     these video depositions but that that objection

23     hasn't yet been heard by the Court.

24                    MR. ANDERSON:  So noted.

25                    MR. HALL:  Thank you.

Confidential - Subject to Protective Order

```
 1                    -  -  -

 2                 EXAMINATION

 3                    -  -  -

 4   BY MR. ANDERSON:

 5        Q.      Good morning, Mr. Burkley.

 6        A.      Good morning.

 7        Q.      Good to see you again.  I took your

 8   deposition back in October of 2012, probably right

 9   here in this same office.

10                Do you recall that?

11        A.      Yes, I do.

12        Q.      And at the beginning you may recall

13   that I gave a few ground rules.  And since I know

14   now that you've been through the deposition process,

15   the only one that I would reiterate is that if you

16   answer one of my questions, we're going to assume

17   that you understood it unless you tell me I need to

18   clarify it or otherwise restate it; is that fair?

19        A.      Yes.

20        Q.      You have been an employee at Ethicon

21   since 1979.  Correct?

22        A.      That is correct.

23        Q.      So you're in your 34th year?

24        A.      Yes.

25        Q.      And you were a senior scientist in
```

Confidential - Subject to Protective Order

1  corporate product characterization for many years,

2  and then at some point in time, corporate product

3  characterization was reorganized within R&D.

4  Correct?

5       A.     That's correct.

6       Q.     And that department is now called

7  analytical characterization; is that correct?

8       A.     That's one of the departments that

9  spun off from corporate product characterization.

10      Q.     And are you currently a senior

11  scientist in the analytical characterization

12  department?

13      A.     My current title is principal

14  scientist.

15      Q.     And you operate the infrared optical

16  microscopy lab, and you characterize polymers,

17  materials, competitor products, as well as

18  characterizing the causes of failure on return

19  product complaints for quality improvement; is that

20  correct?

21      A.     That is correct.

22      Q.     And you are the person at

23  Ethicon/Johnson & Johnson with primary

24  responsibility for performing optical microscopy

25  analysis of surgical meshes in terms of the

Confidential - Subject to Protective Order

```
 1    analytical characterization group; is that correct?

 2                    MR. DAVIS:  Object to the form.

 3                    THE WITNESS:  I am one such resource.

 4    I'm not the only resource.

 5    BY MR. ANDERSON:

 6          Q.      At the Ethicon Somerville location,

 7    who other than yourself currently performs optical

 8    microscopy or infrared analysis of surgical meshes?

 9          A.      I would be one such individual that

10    performs infrared analysis from a research point of

11    view.  As far as optical microscopy, there are other

12    departments that do have optical microscopes, so

13    it's conceivable that they could do optical

14    measurements on meshes or other devices besides

15    myself.

16          Q.      And I appreciate that it may be

17    conceivable, but in all practical purposes, can you

18    and I agree that you are the primary person who

19    performs optical microscopy and IR analysis of

20    Ethicon surgical meshes currently?

21          A.      For analytical characterization, yes,

22    I do.

23          Q.      I will mark my first T exhibit as

24    Exhibit Number 268, which was sent to us and

25    represented as your current CV.
```

Confidential - Subject to Protective Order

```
 1                    -  -  -

 2              (Deposition Exhibit No. T-268,

 3              Curriculum Vitae, 3 pages, was marked for

 4              identification.)

 5                    -  -  -

 6    BY MR. ANDERSON:

 7         Q.     Do you have that in front of you?

 8         A.     I do.

 9         Q.     And is that in fact a current copy of

10    your CV or resume?

11         A.     Yes, it is.

12         Q.     Have there been any significant

13    additions, changes, modifications since we last met

14    in October of last year?

15         A.     I believe that this is the updated

16    version since October.

17         Q.     Right.  And I guess I didn't bring

18    the other one to compare.

19                I was just wondering if anything

20    comes to mind of significance in your CV that has

21    changed or been added since we met in October?

22         A.     Oh, since we met in October.  Well,

23    I've updated it, because I believe the previous one

24    was significantly older.

25         Q.     Yes.  I remember you saying that at
```

Confidential - Subject to Protective Order

1    the time.

2         A.        So yeah.  So I have updated it up to

3    at least 2012.

4         Q.        I notice under your "Publications"

5    and ("Articles)," you have, on the second page of

6    your CV, under the third publication listed --

7    actually, let's make it the fourth one, the last

8    one.

9         A.        Uh-huh.

10        Q.        "In-Vitro Antimicrobial Evaluation of

11   Coated VICRYL Plus Antibacterial Suture (Coated

12   Polyglactin 910 with Triclosan) Using Zone of

13   Inhibition Assays," in the publication Surgical

14   Infections.

15        A.        Yes.

16        Q.        Is that a peer-reviewed publication?

17        A.        I can't answer that question, I don't

18   know.

19        Q.        Do you have a copy of that in your

20   files somewhere that you could provide to us?

21        A.        I had a copy that I had in my office

22   last year, but I've changed locations and I don't

23   believe I have it anymore.

24        Q.        Would you do me a favor and agree

25   that after the deposition, at a reasonable point in

Confidential - Subject to Protective Order

1    time, that you would go and do a thorough search to

2    see if you can find a copy of that --

3             A.       Sure.

4             Q.       -- either in electronic form or hard

5    copy and provide that to counsel?

6             A.       Okay.

7                      MR. ANDERSON:  And, Counsel, if I

8    could just follow-up with you after the deposition,

9    I'll follow up with you after the deposition and

10   I'll just send you an e-mail, if that's okay, and

11   remind us that we're going to have a search for

12   that.  Okay?

13                     MR. DAVIS:  Sure.

14                     MR. ANDERSON:  Thank you.

15   BY MR. ANDERSON:

16            Q.       And if you look at the next page, I

17   see, one, two, three, four, five articles, and the

18   first author is Meng Deng?

19            A.       Yes.

20            Q.       Who is also an Ethicon employee.

21            A.       He is.

22            Q.       Correct?

23                     These publications, one is in the

24   publication Biomaterials.

25                     That's a peer-reviewed publication?

Confidential - Subject to Protective Order

```
 1          A.       I believe so.

 2          Q.       Do you have a copy of any of these

 3   publications listed on page 3 of your CV?

 4          A.       I may have copies of the abstract but

 5   not the actual articles.

 6          Q.       Last time you and I met, we talked

 7   about the fact that Johnson & Johnson/Ethicon has a

 8   database of documents and scientific literature.

 9          A.       They do.

10          Q.       Given that yourself and Meng Deng

11   were authors in these publications, would you

12   anticipate that Johnson & Johnson/Ethicon would have

13   this contained within this scientific literature

14   database?

15          A.       They may.  They're not Ethicon

16   documents, per se, but it's possible that these

17   articles would be in there.

18          Q.       And not all articles, scientific

19   journals, that are in Johnson & Johnson/Ethicon's

20   database are Johnson & Johnson/Ethicon studies.

21   Correct?

22          A.       I don't know the answer to that

23   question.

24          Q.       So there's the one article at the top

25   of page 3 of your resume published in Biomaterials.
```

Confidential - Subject to Protective Order

1    The next one is -- well, strike that.  Let me go

2    back to that first one.

3                    The title is "Effect of Load and

4    Temperature on in-vitro Degradation of

5    Poly(glycolide-co-L-lactide) Multifilament Braids."

6                    Do you see that?

7         A.        I do.

8         Q.        Was that a study that was done

9    internally at Ethicon?

10        A.        Yes.

11        Q.        What was the purpose of doing that

12   study?

13        A.        To gain a better understanding of the

14   absorbable polymer system based on glycolide lactide

15   under in vitro conditions.

16        Q.        And what in vitro conditions were

17   used?

18        A.        I'd have to refresh my memory with

19   the article.  I didn't actually conduct the in vitro

20   experiments.

21        Q.        What was your role in the scientific

22   research analysis and conclusions that may have been

23   reached in that Biomaterials publication?

24        A.        I provided SEM analysis of test

25   articles after they were exposed to in vitro

Confidential - Subject to Protective Order

1  conditions.

2        Q.      What type of in vitro conditions?

3  Are we talking humans?  Are we talking animals?

4        A.      Well, in vitro would be artificial.

5        Q.      Oh, in vitro, I'm sorry.  Yes.

6                So would that have been in the

7  laboratory in mechanical conditions or in wet

8  solutions, what?

9        A.      They would have been in buffered

10  solutions.

11        Q.      Was this in relation to the Vypro

12  mesh?

13        A.      I don't know specifically if it was

14  related to mesh.

15        Q.      Is that particular chemical that's

16  listed there, the polyglycolide-Co-L-lactide, known

17  by other names?

18        A.      Yes.  Known as polyglactin 910.

19        Q.      And polyglactin 910 is the absorbable

20  component in the absorbable suture Vicryl.  Correct?

21        A.      That is correct.

22        Q.      Which is the absorbable component,

23  along with polypropylene, in the hernia mesh known

24  as Vypro made by Ethicon/Johnson & Johnson.

25  Correct?

Confidential - Subject to Protective Order

1          A.      That is correct, yes.

2          Q.      Polyglactin 910 is also an additive

3    component to TVT SECUR, a sling product for SUI made

4    by Ethicon and Johnson & Johnson.  Correct?

5          A.      Yes, it is.

6          Q.      That publication was in 2005, and in

7    the next publication in 2006, also with the same

8    authors except for Xu, X-U, it also appears to

9    address in vitro degradation of polyglactin 910.

10                 Am I reading that correctly?

11         A.      Yes.

12         Q.      This appears to be a book chapter,

13   because it has, "chapter titled:  Degradation

14   Mechanisms."

15                 Would that be correct?

16         A.      I believe so, yes.

17         Q.      And you don't know if you still have

18   a copy of that book?

19         A.      I never got a copy of the book.

20         Q.      Okay.

21                 Out of those authors, who is the most

22   likely person -- well, let me back up a minute and

23   strike that question.

24                 J. Zhou, is that how you pronounce

25   Z-H-O-U?

Confidential - Subject to Protective Order

```
1          A.       I believe it's pronounced Zhou.

2          Q.       Zhou.   Interesting.

3                   And then there's G. Chen.

4                   Are Zhou and Chen also Ethicon

5    employees?

6          A.       They are.

7          Q.       Who of those authors is the most

8    likely to have the book from which this chapter,

9    Degradation Mechanisms, is born?

10         A.       That would be the first author.

11         Q.       So Meng Deng is the most likely

12   person to have a copy of these five -- yes, five

13   articles on page 3 of your resume?

14         A.       Yes.  As the principal author, I

15   would expect him to have a copy.

16         Q.       The next article or publication

17   underneath that one is in Polymer Preprints.

18                  Do you know if that's a peer-reviewed

19   publication?

20         A.       I believe it is.

21         Q.       You know what I mean by peer

22   reviewed.  Correct?

23         A.       Yes.

24         Q.       Again addressing polyglactin 910 in

25   vitro degradation?
```

Confidential - Subject to Protective Order

1          A.       Yes.

2          Q.       The next article also addresses

3    polyglactin 910 degradation that was published in

4    Acta Biomaterialia?

5          A.       Yes.

6          Q.       And Acta Biomaterialia is a

7    publication by a materials industry group or

8    corporation.  Correct?

9          A.       I don't know that for a fact.

10         Q.       Have you heard of the gold medal

11   award that Acta Biomaterialia gives out each year to

12   some person that they consider to be a leading

13   professional in the field of biomaterial research?

14         A.       I'm unfamiliar with that award.

15         Q.       The next and last article is also

16   Polymer Preprints, dealing with polyglactin 910

17   again.  Correct?

18         A.       Yes.

19         Q.       In any of these -- strike that.

20                  In all of these publications and the

21   work that went into them, were you performing

22   basically the same duties that you mentioned before,

23   that you were doing SEM analysis of test articles

24   and looking at the in vitro conditions of

25   polyglactin 910 in buffered solutions?

Confidential - Subject to Protective Order

1          A.      My role would have been to do the SEM

2     examinations of the test articles after they had

3     been exposed to in vitro conditions.

4          Q.      So did you do SEMs before and after?

5          A.      In most instances, I believe I did.

6          Q.      Was there any attempt in the research

7     that went into these publications regarding the

8     degradation of polyglactin 910 to look at and

9     analyze the degradation of any other material other

10    than polyglactin 910?  For example, if this was

11    involving the Vypro product, did you look at the

12    degradation in vivo of both the Vicryl as well as

13    the polypropylene?

14               MR. DAVIS:  Object to the form.

15               THE WITNESS:  No, I do not believe

16    so.

17    BY MR. ANDERSON:

18         Q.      In your 34 years at Ethicon, have you

19    ever been asked to perform SEM analysis of

20    Ethicon/Johnson & Johnson polypropylene surgical

21    mesh?

22         A.      Yes, I've looked at surgical mesh.

23         Q.      And have you ever in those 34 years

24    been asked to conduct a study to look at in vivo or

25    in vitro degradation of polypropylene other than

Confidential - Subject to Protective Order

```
 1   your seven-year dog study?

 2                 MR. DAVIS:  Object to the form.

 3                 THE WITNESS:  No, I have not

 4   conducted such a study or have -- nor have I been

 5   asked to conduct such a study.

 6   BY MR. ANDERSON:

 7        Q.    Have you ever felt the need during

 8   your 34 years at Ethicon/Johnson & Johnson to go to

 9   your superiors or your colleagues within your

10   company and suggest that a polypropylene degradation

11   study be performed, either in vitro, in vitro or

12   both?

13        A.    No, I have not taken such an

14   initiative by myself.  That would be primarily a

15   clinical concern, and such a study would best be

16   performed under clinical direction or preclinical

17   direction.

18        Q.    It may be performed under preclinical

19   direction, but as we've seen with these studies and

20   other things that are done within your company in

21   terms of analytical characterization, you would be

22   the one -- or strike that.

23                 Even though it may be of clinical

24   concern, you are often asked to perform SEM or IR

25   analysis on products within the company, even if
```

Confidential - Subject to Protective Order

1    it's pertaining to a clinical matter.  Correct?

2                    MR. DAVIS:  Object to the form.

3                    THE WITNESS:  There have been

4    instances when I've been asked to perform that as a

5    resource, yes.

6    BY MR. ANDERSON:

7         Q.     So just because it may be direct --

8    strike that.

9                    Just because a particular study might

10   be directed by clinical, that doesn't mean you

11   wouldn't be involved.  Correct?

12        A.     I'm sorry, could you rephrase that

13   again?

14        Q.     Sure.

15                   We're talking now about whether or

16   not you were ever asked to perform any sort of

17   analysis during your 34 years at Ethicon of

18   polypropylene mesh or sutures manufactured by J&J

19   and Ethicon or its competitors --

20        A.     Yes.

21        Q.     -- to look at either in vitro or in

22   vivo degradation, and you said you'd never been

23   asked to do that.

24                   My follow-up question was, just to

25   put us back into our frame of reference --

Confidential - Subject to Protective Order

```
 1          A.      Right.

 2          Q.      -- have you ever asked or addressed

 3   the issue with your colleagues or your superiors

 4   within Ethicon as to whether or not a degradation

 5   study should be performed on polypropylene?

 6          A.      No, I've not taken such an

 7   initiative.

 8          Q.      In your 34 years at Ethicon, are you

 9   aware of anyone within Johnson & Johnson and Ethicon

10   who took the initiative to do a degradation study in

11   vitro or in vivo of Ethicon/Johnson & Johnson's

12   polypropylene mesh or sutures?

13                  MR. DAVIS:  Object to the form.

14                  THE WITNESS:  I'm only familiar with

15   the dog study that involved Prolene suture and at

16   least two other competitors and perhaps another

17   suture.

18   BY MR. ANDERSON:

19          Q.      And that was 25 years ago?

20          A.      I believe that was started around

21   1985, yeah.

22          Q.      So it was almost 30 years ago.  Okay.

23                  Other than that one suture study in a

24   dog -- and what part of the dog was that in?

25          A.      I don't know specifically.
```

Confidential - Subject to Protective Order

```
 1          Q.      It was cardiac, wasn't it?  Does that

 2   refresh your memory?

 3          A.      Yeah, I believe it was a cardiac.

 4          Q.      So other than a cardiac suture in a

 5   dog heart in 1985, just to make sure we're clear for

 6   the record, you're not aware in your 34 years at

 7   Ethicon of anyone at Ethicon or Johnson & Johnson

 8   initiating a degradation study of its polypropylene

 9   sutures or meshes; is that correct?

10                  MR. DAVIS:  Object to the form.

11                  THE WITNESS:  I personally am not

12   aware of any such studies, no.

13                        -  -  -

14                  (Deposition Exhibit No. T-269, E-mail

15             chain, top one dated 03 Apr 2009, Bates

16             stamped ETH.MESH.02184435 and

17             ETH.MESH.02184436, was marked for

18             identification.)

19                        -  -  -

20   BY MR. ANDERSON:

21          Q.      Handing you what we will mark as

22   Plaintiff's Exhibit 269, T-269.  I'm just going to

23   reference the second page of the document.  The last

24   four of the Bates on the cover are 4435.

25                  I'm just going to reference the last
```

Confidential - Subject to Protective Order

```
 1    paragraph on page 2, which ends in 4436.

 2                 By way of reference, if you turn --

 3    and I apologize, if you'll turn back to the front

 4    page just to get us oriented, the -- about a quarter

 5    of the way down on the page, it has "FYI," and then

 6    underneath that it says, "Mark Stachowski."

 7                 Who was he?  What was his title in

 8    2009 at Ethicon?

 9         A.      He was an associate -- excuse me --

10    an associate director of analytical

11    characterization.

12         Q.      Was he a colleague, a direct report,

13    a supervisor?

14         A.      He was basically the department

15    manager.

16         Q.      So would he have been your boss, your

17    supervisor?

18         A.      Yes.

19         Q.      And this e-mail was sent on April 1,

20    2009, correct, just to orient us?

21         A.      That's the date of the e-mail, yes.

22         Q.      So just want to turn to the second

23    page, and the last paragraph.

24                 Are you with me, where it begins,

25    "Additionally, Daniel Burkley"?
```

Confidential - Subject to Protective Order

```
 1            A.       Yes.

 2            Q.       "Additionally, Daniel Burkley, M.S.,

 3     will report to me and lead an increased focus in

 4     Microscopy, including but not limited to SEM," and

 5     that's scanning --

 6            A.       Electronic.

 7            Q.       -- electron microscopy, "AFM."

 8                     AFM, which is --

 9            A.       Atomic force microscopy.

10            Q.       "IR," infrared.  Correct?

11            A.       Yes.

12            Q.       "Microscopy and correlation with," is

13     it Raman?

14            A.       Raman.

15            Q.       "Raman Microscopy."

16                     What is AFM?  I guess a better way of

17     saying it is, I'm familiar with SEM, I'm familiar

18     with AR and I'm vaguely familiar with AFM, but I'm

19     not with Raman at all.  So I was going to have you

20     explain what AFM is, and then we'll do Raman.

21            A.       Oh.  AFM, again, stands for atomic

22     force microscopy.  It's a surface examination

23     technique where you use a cantilever, which is

24     basically a very small, minute mechanical pointer

25     with a very fine tip to basically trace the
```

Confidential - Subject to Protective Order

1   topography.  And basically the readings of that, in

2   terms of how high or how low the needle goes, is

3   basically converted to a surface map.  And that

4   basically is the equivalent image that you would

5   have -- you would see to compare with either optical

6   or SEM.

7        Q.      So if it was a smooth, flat surface,

8   the readout would be a smooth, flat line; whereas if

9   it was a rough or undulating surface, then you would

10  have a readout that would mimic the topographical

11  nature of the device that you're --

12       A.      Correct.

13       Q.      Okay.

14               So, for instance, if it was a

15  surgical mesh that you were performing AFM analysis

16  on, if it was a smoother mesh, that would give you a

17  readout with a more flat line, and if it was a mesh

18  that was -- had a rougher topography, if you will,

19  then it will give you a readout that would mimic

20  that.  Correct?

21       A.      Yes.

22       Q.      What's the purpose of performing AFM

23  as you understand it for surgical meshes at

24  Ethicon/Johnson & Johnson?

25       A.      I am not --

Confidential - Subject to Protective Order

```
 1                    MR. DAVIS:  Object to the form.

 2                    THE WITNESS:  I'm not aware of any

 3    AFM studies on surgical meshes.

 4    BY MR. ANDERSON:

 5         Q.     I guess that would have been a better

 6    question.

 7                    Do you perform AFM on surgical

 8    meshes?

 9         A.     I do not.

10         Q.     What is Raman microscopy?

11         A.     Raman microscopy is in many ways a

12    counterpart to infrared microscopy, where Raman is

13    used instead of infrared.  Raman spectroscopy

14    measures vibrations of bonds that have no dipole

15    moment, whereas infrared measures the vibrations of

16    bonds that do exhibit a dipole moment.  So in many

17    ways, Raman is a complimentary technique to

18    infrared.

19         Q.     Explain, please, what a dipole moment

20    is?

21         A.     In a molecular environment or in a

22    molecular structure, you have atoms that are bonded.

23    For most organic materials, you're talking about

24    carbon combined with oxygen or nitrogen or hydrogen.

25    And each of the atoms has different
```

Confidential - Subject to Protective Order

 1   electronegativity.  When an atom is bonded to

 2   another atom that's of the same type, such as carbon

 3   to carbon, there is no net dipole.  There is no net

 4   difference in electronegativity.  When you're --

 5   when a carbon is bonded to, say, an oxygen, oxygen

 6   hides a higher electronegativity.  It would,

 7   therefore, tend to draw electrons more around the

 8   oxygen atom than for the carbon.  That would then

 9   exhibit a dipole moment.

10        Q.     Do you perform Raman microscopy on

11   polypropylene?

12        A.     I have not performed Raman

13   spectroscopy or Raman microscopy.

14        Q.     Would Raman microscopy be an analysis

15   that would be helpful in determining whether or not

16   the molecular bonds of polypropylene exhibit

17   carbonyls under various conditions?

18        A.     It could possibly be used for that.

19   The sensitivity would be weak, but it still may pick

20   up some.

21        Q.     What would be the better test in

22   order to look for carbonyls in terms of molecular

23   analysis of polypropylene under certain conditions?

24        A.     Infrared would be a more sensitive

25   test as compared to Raman.

Confidential - Subject to Protective Order

1    Q.    And what's the difference between IR,

2  infrared, and FTIR, Fourier?

3    A.    The Fourier transform, which is what

4  FT stands for, that technique was developed in the

5  late '70s/early '80s.  And it was a revolutionary

6  technology that enhanced infrared in terms of both

7  the speed of which it can scan and could also take

8  advantage of that by increasing the signal to noise

9  based on the square root of the number of scans it

10  took.  I can go into the theory if you wish.

11    Q.    More important at this point in time

12  is to find out whether or not you have been asked to

13  perform FTIR analysis of any of Johnson &

14  Johnson/Ethicon's polypropylene sutures or meshes?

15    A.    Yes.

16    Q.    And under what circumstances have you

17  been asked to perform FTIR analysis of polypropylene

18  manufactured by Ethicon and Johnson & Johnson?

19    A.    Primarily for material

20  identification.

21    Q.    Meaning by that, if I'm understanding

22  you correctly, that you've been asked at times to

23  perform FTIR analysis of a particular polypropylene

24  product in order to determine if it is what it's

25  supposed to be.  Correct?

Confidential - Subject to Protective Order

1          A.      Yep.  That's one example, yes.

2          Q.      Is this our Prolene suture or is this

3    some other manufacturer's polypropylene suture.

4    Correct?

5          A.      Yep, that's another example.

6          Q.      Is it correct that you have never

7    been asked nor have you taken upon yourself to

8    perform FTIR analysis of polypropylene meshes or

9    polypropylene sutures either manufactured by

10   J&J/Ethicon or a competitor for looking at

11   degradation of the polypropylene?

12         A.      I have been asked to look at

13   explanted material.

14         Q.      On how many occasions?

15         A.      Well, the one that I remember most

16   clearly would have been the dog study.

17         Q.      Since the dog -- strike that.

18                 Since the time of the completion of

19   the dog study in 1985, have you been asked by anyone

20   at Ethicon and Johnson & Johnson or taken it upon

21   yourself to perform FTIR analysis of polypropylene

22   fibers, either manufactured by Johnson &

23   Johnson/Ethicon and/or a competitor, for purposes of

24   looking at surface degradation?

25                 MR. DAVIS:  Object to form.

Confidential - Subject to Protective Order

```
 1                THE WITNESS:  I don't recall.  If I
 2   have, it would have been in that same time frame as
 3   the dog study.  So certainly not -- nothing in any
 4   recent history, like within the last 15 or so years.
 5   But it's possible I may have looked at some material
 6   in the '80s.
 7   BY MR. ANDERSON:
 8        Q.      Now, you have done FTIR analysis for
 9   specification verification on certain mesh products
10   manufactured by Johnson & Johnson and Ethicon.
11   Correct?
12        A.      Well, material identification tests,
13   it's possible a protocol may have required an
14   identity as a specification.  And I've certainly
15   looked at raw materials.
16        Q.      What was the purpose of looking at
17   the raw materials under FTIR analysis?
18        A.      Primarily part of research, whether
19   they were compounding new materials or making blends
20   or making devices and wanted to look for evidence
21   of, you know, material identification and/or to look
22   to see if there were additives present or residual
23   lubricants.
24        Q.      In other words, if I'm hearing you
25   correctly, there have been times that you've been
```

Confidential - Subject to Protective Order

1   asked to perform FTIR analysis on certain

2   polypropylene mesh or mesh fibers manufactured by

3   Johnson & Johnson and Ethicon in which you would

4   look to see whether or not certain manufacturing

5   additives were there and in what amount.  Yes?

6        A.     Well, not from a manufacturing

7   environment.  From a research environment, a

8   development environment.

9        Q.     And when you've been asked to use

10  FTIR on residuals, by residuals do you mean

11  surfactants and other things that may have been

12  added to the manufacturing process to see if they

13  are there or if they are there, in what amount?

14              MR. DAVIS:  Object to form.

15              THE WITNESS:  Most applications would

16  involve residual lubricants.  There have been a

17  couple of troubleshooting -- work that I've done for

18  troubleshooting purposes to determine -- to try to

19  solve a manufacturing issue, such as the fiber

20  feeling sticky, for example, and trying to determine

21  what could cause that.

22  BY MR. ANDERSON:

23       Q.     Are you familiar with the -- strike

24  that.

25              Are you familiar with the Johnson &

Confidential - Subject to Protective Order

```
1    Johnson credo?

2         A.      Yes.

3         Q.      Do you pronounce it credo or credo?

4         A.      Credo.

5                       -  -  -

6              (A discussion off the record

7         occurred.)

8                       -  -  -

9              (Deposition Exhibit No. T-270,

10        Johnson & Johnson Credo, 1 page, was

11        marked for identification.)

12                      -  -  -

13   BY MR. ANDERSON:

14        Q.      I'm going to hand you Plaintiff's

15   T-270.  I printed this off Johnson & Johnson's

16   website.

17              Is that the credo that you're

18   familiar with?

19        A.      Yes.  It's gone through a few

20   iterations over the duration of my employment, but

21   it's essentially the same.

22        Q.      So since you became employed at

23   Johnson & Johnson/Ethicon in 1979, there has always

24   been a credo in some form in place?

25        A.      There has been, yes.
```

Confidential - Subject to Protective Order

1    Q.    As you look at this one, is this what
2  you believe to be the current version of the credo?
3    A.    This appears to be current, yes.
4    Q.    Even though it says "Johnson &
5  Johnson" at the bottom, it applies to other
6  companies owned or operated by Johnson & Johnson
7  like Ethicon.  Correct?
8    A.    That is correct.
9    Q.    So if we're talking about the Johnson
10  & Johnson credo, we're also talking about the
11  Ethicon credo.  Correct?
12    A.    Yes.
13    Q.    And that's whether it's a Johnson &
14  Johnson or Ethicon facility in the United States or
15  at any other of its facilities worldwide.  Correct?
16    A.    I believe so, yes.
17    Q.    This is actually on the wall, as soon
18  as you come in to Johnson & Johnson.  Correct?
19    A.    It is.
20    Q.    When you walk into your facilities in
21  Somerville, is it on the wall there?
22    A.    It's on at least one wall.
23    Q.    When was the last time you read the
24  credo?
25    A.    I believe it was last year.

Confidential - Subject to Protective Order

1        Q.       Before your last deposition?

2        A.       No.  It was before, a credo survey.

3        Q.       What is a credo survey?

4        A.       At periodic times, Johnson & Johnson

5   conducts surveys of its employees with respect --

6   which they call a credo survey.  And they basically

7   ask a number of questions that -- relating to the

8   credo to get employee feedback.

9        Q.       Is that sent out via e-mail or in

10  what form of media is the survey conducted?

11       A.       It's electronic.  There's usually an

12  e-mail notification along with a link.

13       Q.       And do you follow that link in order

14  to go through a series of questions that you answer?

15       A.       Yes.

16       Q.       Related to the credo?

17       A.       Yes.  Years ago, it used to be

18  physical.  In other words, they'd get the employees

19  together and you'd actually fill it out by hand.

20       Q.       How long have you been doing it

21  electronically approximately?

22                MR. DAVIS:  Object to the form.

23                THE WITNESS:  I'm going to say maybe

24  six to eight years.

25  BY MR. ANDERSON:

Confidential - Subject to Protective Order

1    Q.    Is it done at least once a year, this

2    Johnson & Johnson credo survey?

3    A.    I don't know if it's done at least

4    once at year.  It's done at most once a year.

5    Q.    Is that an opportunity for employees

6    of Johnson & Johnson/Ethicon to state whether or not

7    they believe that the credo is being followed --

8    A.    It is --

9    Q.    -- or violated in some manner?

10    A.    Yeah.  It's an opportunity for the

11    employees to express their opinions, not only on

12    questions, but there are, at the end of the surveys,

13    usually a comments section.  So if they have

14    anything specific they want to say, they may.

15    Q.    So it's a way for employees to give

16    feedback to management in terms of whether or not

17    the employees feel that Johnson & Johnson is in fact

18    following its credo.  Correct?

19    A.    Yes.  It's an opportunity.

20    Q.    If you look at that first -- those

21    first two sentences, under "Our Credo," "We believe

22    our first responsibility is to the doctors, nurses

23    and patients, to mothers and fathers and all others

24    who use our products and services.  In meeting their

25    needs everything we do must be of high quality."

Confidential - Subject to Protective Order

1                    Did I read that correctly?

2          A.      Yes.

3          Q.      And do you believe that?

4          A.      I do.

5          Q.      Do you believe that your colleagues

6     follow that credo?

7                    MR. DAVIS:  Object to the form.

8                    THE WITNESS:  In general, yes, I

9     believe they do.

10    BY MR. ANDERSON:

11         Q.      So one of the things that this

12    particular part of the credo was saying is that the

13    people who use our products, their safety must come

14    first.  Correct?

15         A.      It doesn't say that specifically.

16         Q.      Is that one of the fair

17    characterizations of this first sentence or the --

18    and the second sentence, that in terms of patients,

19    their health and safety must come first at Ethicon.

20    Correct?

21         A.      We're certainly concerned about that,

22    but that's not what this document says.

23         Q.      What's the primary concern at Ethicon

24    and Johnson & Johnson?  Would it be profits to

25    shareholders or patient safety?

Confidential - Subject to Protective Order

1                    MR. DAVIS:  Object to the form.

2    BY MR. ANDERSON:

3         Q.        Or are they equal?

4                    MR. DAVIS:  Object to the form.

5                    THE WITNESS:  That's basically a

6    judgment call or an impression on my part.  I don't

7    know if I can really answer what upper management's

8    primary goals are or what their relative priorities

9    are, but I do believe that they follow the spirit of

10   the credo in that we make products of high quality

11   that are safe and efficacious, and since we are a

12   private company, yeah, there is a -- there is some

13   type of profit margin that's realized.

14   BY MR. ANDERSON:

15        Q.        And I appreciate you answering that.

16                   My question is, what comes first,

17   patient safety or the business aspect of it, the

18   profits, or are they equal in your mind after being

19   an employee there for 34 years?

20                   MR. DAVIS:  Objection.

21                   THE WITNESS:  I can't comment on

22   that.  I can't comment on what priorities they

23   assign.  Certainly all those considerations are

24   taken into account, but I have no idea what the

25   relative priorities are.

Confidential - Subject to Protective Order

```
 1   BY MR. ANDERSON:

 2        Q.      In your mind, for your relative

 3   priorities as a 34-year employee, when you see this

 4   credo on the wall, in your mind, do you believe that

 5   patient safety comes first before profits or profits

 6   come before patient safety?

 7        A.      I don't look at it in that term.

 8        Q.      Well --

 9        A.      I don't assign a hierarchy or a

10   priority.

11        Q.      So in terms of your reading of this

12   part of the credo, you don't have a feeling one way

13   or another as to whether or not patient safety

14   should come before profits of Johnson &

15   Johnson/Ethicon.  Is that your answer?

16             MR. DAVIS:  Object to the form.

17             THE WITNESS:  No.  My answer is that

18   I believe that Johnson & Johnson's products takes

19   into account patient safety, that they're

20   efficacious, that they're of high quality and that

21   they are sold and there is a profit margin realized.

22   I have no idea how high or how significant that

23   profit margin is.  And I don't have a concern as to

24   what the relative priorities of those items are.

25   All I know is that they're all taken into account
```

Confidential - Subject to Protective Order

```
 1    when a product is released.
 2    BY MR. ANDERSON:
 3         Q.     You don't have a concern as to
 4    whether or not your company puts profits ahead of
 5    patient safety?
 6              MR. DAVIS:  Object to the form.
 7              THE WITNESS:  Repeat that question,
 8    please?
 9    BY MR. ANDERSON:
10         Q.     You just said, I don't have a concern
11    as to which one comes first, so I'm trying to
12    clarify --
13         A.     No, no, I didn't say that.
14         Q.     That's why I tried to clarify.
15              Is that what you're saying?
16         A.     You're paraphrasing me.  I said my
17    concern -- I don't have a concern in terms of what
18    priorities they assign.  My -- I'm confident that
19    the products that are released cover safety and
20    efficacy, they're of high quality, and I do realize
21    that they recognize a profit margin, although I have
22    no idea what that is.
23         Q.     So in reading back your answer, "I
24    don't have a concern in terms of what priorities
25    they" -- you mean upper level management?  Who is
```

Confidential - Subject to Protective Order

1    "they"?

2         A.      I don't have a concern -- the --

3    well, you asked me about priorities.  I don't know

4    what the priorities are.  And I'm not concerned

5    about -- and I don't look at it in terms of a

6    priority-type system.  All of these features are

7    taken into account when we release a product.

8         Q.      So you don't have a concern as to

9    whether or not the management of Johnson & Johnson

10   and Ethicon puts profits before patient safety?

11              MR. DAVIS:  Object to the form.

12              THE WITNESS:  I'm confident that all

13   of those factors are taken into account.

14   BY MR. ANDERSON:

15        Q.      Do you believe that that would be a

16   good part of the credo, to say that we put patient

17   safety before profits at Johnson & Johnson?

18              MR. DAVIS:  Object to the form.

19              THE WITNESS:  Well, I haven't been

20   given an opportunity to author for the credo, and I

21   don't feel I'm qualified to do that.

22   BY MR. ANDERSON:

23        Q.      Well, now's your opportunity.

24              MR. DAVIS:  Object to the form.

25              THE WITNESS:  Well, I'm going to have

Confidential - Subject to Protective Order

1    to pass on that opportunity, because I don't feel

2    comfortable doing that.

3    BY MR. ANDERSON:

4         Q.    Do you believe that a company who

5    manufactures permanently implanted medical devices

6    for a woman's pelvis should put patient safety

7    before their profits?

8              MR. DAVIS:  Object to the form.

9              THE WITNESS:  I don't believe it has

10   to come to a decision on that.

11   BY MR. ANDERSON:

12        Q.    If there's a decision as to whether

13   or not the company is going to make a profit but it

14   will come at some risk of injury to the patient, do

15   you have a feeling one way or another as to the --

16   whether the priority should be making that profit or

17   making a safer product?

18             MR. DAVIS:  Object to the form.

19             THE WITNESS:  I don't believe that

20   type of proposition really comes into play.

21   BY MR. ANDERSON:

22        Q.    Let's assume it does.  Let's assume

23   Johnson & Johnson and Ethicon, your colleagues that

24   you've worked with for 34 years, are in -- they're

25   at a decision tree, at a crossroads.  If we go this

Confidential - Subject to Protective Order

```
 1   way, it's going to be better for our profits, but it
 2   could hurt patient safety, but if we go this way, it
 3   could hurt the profits vis-à-vis our competitors,
 4   but it's going to make patients safer.
 5                  Which road should Johnson & Johnson
 6   and Ethicon take?
 7                  MR. DAVIS:  Object to the form.
 8                  THE WITNESS:  I'm inclined to believe
 9   that they would take the road that would ensure
10   patient safety.
11   BY MR. ANDERSON:
12        Q.     So is it your understanding that
13   Johnson & Johnson's credo puts patient safety before
14   corporate profits, or do you not have a feeling one
15   way or another?
16                  MR. DAVIS:  Object to the form.
17                  THE WITNESS:  I believe they take a
18   balanced approach to it.
19   BY MR. ANDERSON:
20        Q.     A balanced approach, meaning?
21        A.     They weigh -- they have to weigh all
22   these factors.
23        Q.     This is your opportunity to write
24   this part of the credo.
25                  Do you believe, being involved with
```

Confidential - Subject to Protective Order

1    this company as long as you have, that your credo

2    should be we put patient safety before profits

3    always?

4                    MR. DAVIS:  Object to the form.

5                    THE WITNESS:  I don't have enough

6    experience as a businessman or an owner/operator of

7    a business, even this business, to make that

8    decision on my own.

9    BY MR. ANDERSON:

10        Q.      How about as a person in the

11   community, as a consumer yourself, do you believe

12   that companies should put patient safety ahead of

13   corporate profit?

14                   MR. DAVIS:  Object to the form.

15                   THE WITNESS:  I believe that

16   companies should be responsible for putting out safe

17   products.

18   BY MR. ANDERSON:

19        Q.      And do you believe -- that's not an

20   answer to my question.

21                   As a person in the community, as a

22   consumer yourself, do you believe that companies

23   should put patient safety ahead of corporate

24   profits?

25                   MR. DAVIS:  Object to the form.

Confidential - Subject to Protective Order

```
 1                    THE WITNESS:  That still puts me in
 2     the role of operating a business.  I'd have to -- to
 3     really look at that objectively, I'd have to look at
 4     myself as a business owner, and there are just a
 5     number of factors and considerations that I have no
 6     clue about, and, therefore, I'm just not capable of
 7     adequately answering that question.
 8     BY MR. ANDERSON:
 9          Q.      I take it from time to time you've
10     had to take medications in your life?
11          A.      Yes.
12          Q.      When you reach into your medicine
13     cabinet and you take down a pill bottle, do you care
14     whether or not the company who made that
15     pharmaceutical put your safety ahead of their
16     corporate profits?
17                    MR. DAVIS:  Object to the form.
18                    THE WITNESS:  I'm concerned about the
19     product's safety and, therefore, I'll read the
20     literature about it.  And I'll consult with my
21     physician and get his opinion as to how safe and
22     efficacious the drug is for, you know, whatever
23     ailment I'm taking it for, so -- but I don't make
24     a -- I don't do a value proposition thought process
25     on terms of, you know, profit versus safety.  The
```

Confidential - Subject to Protective Order

1   product is released.  It has the -- meets certain

2   guidelines, you know, it has to have some type of

3   safety information on there to support it, so -- and

4   then Johnson & Johnson I think is pretty responsible

5   about the products it releases, so that combination

6   of information is going to determine whether or not

7   I feel safe taking that drug.

8   BY MR. ANDERSON:

9        Q.     When you reach into that cabinet and

10  you take that medication, do you expect that the

11  company who made that was more concerned about your

12  safety than they were about making a profit?

13               MR. DAVIS:  Object to the form.

14               THE WITNESS:  I don't think about

15  that consideration when I take a pill off the shelf.

16  BY MR. ANDERSON:

17       Q.     Think about it right now with me, if

18  you would.

19               If you are taking a medication or

20  you're going to have a medical device implanted in

21  your body for the rest of your life, would you

22  rather the company had put patient safety first and

23  profits somewhere down below that or profits ahead

24  of your safety?

25               MR. DAVIS:  Object to the form.

Confidential - Subject to Protective Order

1  BY MR. ANDERSON:

2         Q.      Which way?

3         A.      I'm concerned that the product is

4  safe.  The profit margin is whatever the company is

5  going to get for it.  If it's a good quality

6  product, it may be -- it may very well be worth the

7  profit margin the company asks for it.

8         Q.      So if you were asked to write down

9  this portion of the credo of profits versus safety,

10 am I correct that you wouldn't write Johnson &

11 Johnson should always put patient safety ahead of

12 corporate profits?

13             MR. DAVIS:  Object to the form.

14 BY MR. ANDERSON:

15        Q.      Signed Dan Burkley.

16             You wouldn't write that?

17             MR. DAVIS:  Object to the form.

18             THE WITNESS:  I can't make a comment

19 as to what I would write until I actually go and

20 write that credo.

21 BY MR. ANDERSON:

22        Q.      I'm asking you right now, as a

23 34-year employee of an international company that

24 makes products worldwide, some of which will be

25 permanently implanted in human beings, do you

Confidential - Subject to Protective Order

1    believe that part of the credo, if you could write

2    it, should say, we should always put patient safety

3    ahead of corporate profits?

4              MR. DAVIS:  Object to the form.

5              THE WITNESS:  I would certainly write

6    a statement about the product being safe,

7    efficacious and of high quality, but I would not

8    compare it or put any kind of qualifier in it with

9    respect to profits.

10   BY MR. ANDERSON:

11        Q.     If Johnson & Johnson and Ethicon make

12   a profit on a product that is less safe for patients

13   or consumers, or they can make another product that

14   they're not going to make as good a profit on but

15   it's going to be more safe, and they do equally the

16   same thing, which should it use?

17             MR. DAVIS:  Object to the form.

18   BY MR. ANDERSON:

19        Q.     Which should it make?

20             MR. DAVIS:  I'm sorry.  Object to the

21   form.

22             THE WITNESS:  There are too many

23   variables in that simple comparison that I would

24   have to take into account besides the scenario --

25   besides the details of the scenario that you've

Confidential - Subject to Protective Order

```
 1    given me.  And I can't make a judgment call on that.
 2    BY MR. ANDERSON:
 3         Q.     If you look to the third paragraph,
 4    "We are responsible to the communities in which we
 5    live and work and to the world community as well."
 6                Do you see that?
 7         A.     I do.
 8         Q.     Do you agree with that as a good rule
 9    for Ethicon and its employees?
10         A.     Yes.
11         Q.     "We must be good citizens -- support
12    good works and charities and bear our fair share of
13    taxes."
14                So if you as an employee of Ethicon
15    and Johnson & Johnson are to be responsible to the
16    communities in which you live and work as well as to
17    the world community, don't you agree that you should
18    have patient safety as your primary concern?
19         A.     That paragraph doesn't really address
20    patient safety.
21         Q.     I'm asking you this question, though.
22                Based upon, "We are responsible to
23    the communities in which we live and work and to the
24    world community as well."  Stop right there.
25         A.     It has nothing to do with patient
```

Confidential - Subject to Protective Order

```
 1   safety.
 2              MR. DAVIS:  Wait a second.  Object to
 3   the form.
 4   BY MR. ANDERSON:
 5        Q.    Okay.
 6              Your reading of that is what?
 7              MR. DAVIS:  Object to the form.
 8              THE WITNESS:  That we have -- the
 9   responsibilities that I believe that are meant in
10   that with respect to the community in which we live
11   and work would be such things as being
12   environmentally friendly and being cognizant of
13   environmental laws, being good citizens, support
14   good works and charities, bear our fair share of
15   taxes, in other words, we're responsible for paying
16   our taxes, we contribute to worthy causes and that
17   we're active and do good deeds in the community and
18   encourage civic improvements, better health and
19   education.
20   BY MR. ANDERSON:
21        Q.    So other than Johnson & Johnson and
22   Ethicon being a good citizen who is in tune with
23   environmental concerns, taxes, charities and doing
24   good deeds, do you believe that Ethicon and Johnson
25   & Johnson is also responsible to the communities in
```

Confidential - Subject to Protective Order

1    which you live to make sure that the products that

2    you're making are as safe as possible without regard

3    to corporate profit?

4                    MR. DAVIS:  Object to the form.

5                    THE WITNESS:  That might be covered

6    in another section of the credo, but this particular

7    section I believe does not have anything to do with

8    patient safety.

9    BY MR. ANDERSON:

10        Q.      I'm not asking about this particular

11   section.  You gave me your interpretation of it.

12        A.      That's correct, my interpretation,

13   yeah.

14        Q.      My question was a follow-up to that.

15        A.      Okay.

16        Q.      Saying that in addition to the

17   environment and taxes and charities, all of which

18   are good things.

19        A.      Right.

20        Q.      Do you also believe that being a good

21   citizen of our community, you and your fellow

22   employees at Johnson & Johnson and Ethicon, in order

23   to be good, responsible citizens in the community

24   need to ensure that you put products on the market

25   in which patient safety came before making a dollar?

Confidential - Subject to Protective Order

```
1                    MR. DAVIS:  Object to the form.
2                    THE WITNESS:  I don't believe that
3      consideration is part of this section of the credo,
4      and it's -- you know, that would be addressed in
5      another section of the credo.  But as far as being
6      responsible to communities and where we live, it's
7      basically how this business interacts with the
8      community and to, you know, the citizens and to
9      the -- and its responsibilities to government, so...
10     BY MR. ANDERSON:
11          Q.     Again, you're trying to interpret it
12     from that section.  And I'm not.  My question is not
13     is that what this section means.
14                    My question is, do you believe as a
15     34-year employee --
16          A.     Uh-huh.
17          Q.     -- of Johnson & Johnson and Ethicon
18     that you and your fellow employees in designing and
19     manufacturing and selling products --
20          A.     Uh-huh.
21          Q.     -- to the members of your community,
22     that your credo should say your patient safety comes
23     before us making a dollar?
24                    MR. DAVIS:  Object to the form.
25                    THE WITNESS:  I --
```

Confidential - Subject to Protective Order

1   BY MR. ANDERSON:

2       Q.      Would you consider that being a good

3   citizen pursuant to your credo, sir?

4               MR. DAVIS:  Object to the form.

5               THE WITNESS:  Again, you're asking me

6   to write what the -- to put in what the credo says.

7   There are too many other considerations that have to

8   be weighed before I put in such a statement.  And

9   I'm not prepared to go through that.  I don't have

10  the means of doing that evaluation or the experience

11  of doing that evaluation, so I'm not comfortable

12  making that statement at this time.  So I am

13  confident that the company does keep safety and

14  efficacy in mind with each of its products and that

15  it's of high quality and that these are taken into

16  account when we release our products into the

17  community.

18  BY MR. ANDERSON:

19      Q.      So as part of the community, if one

20  of your neighbors comes up and says, I'm considering

21  whether or not to have transvaginal mesh put into me

22  manufactured by your company and I would like to

23  know as a citizen of this community, you, Mr.

24  Burkley, and as a citizen of this community, you as

25  an employee of Johnson & Johnson and Ethicon, did

Confidential - Subject to Protective Order

```
1    your company put my safety first or your corporate
2    profits first, what are you going to tell that
3    neighbor?
4              MR. DAVIS:  Object to the form.
5              THE WITNESS:  I can't answer that
6    question.
7    BY MR. ANDERSON:
8         Q.    Okay.
9              If you look at the last paragraph,
10   "Our final responsibility is to our stockholders.
11   Business must make a sound profit.  We must
12   experiment with new ideas.  Research must be carried
13   on, innovative programs developed and mistakes paid
14   for."
15             Do you see that?
16        A.    Yes.
17        Q.    I'd like to focus on "mistakes paid
18   for."
19             If Ethicon/Johnson & Johnson
20   employees violate their credo and consumers of your
21   products are injured, what should be the penalty to
22   your company?
23             MR. DAVIS:  Object to the form.
24             THE WITNESS:  That's a pretty
25   complicated question, and I am really not in a
```

Confidential - Subject to Protective Order

```
 1    position of knowledge or experience to answer that.

 2    BY MR. ANDERSON:

 3            Q.       Do you agree that a company should

 4    never needlessly endanger the consumers of its

 5    products?

 6                     MR. DAVIS:  Object to the form.

 7    BY MR. ANDERSON:

 8            Q.       Can we agree to that?

 9            A.       Repeat that, please?

10            Q.       That a company should never

11    needlessly endanger the safety and health of

12    consumers of its products?

13                     MR. DAVIS:  Object to the form.

14                     THE WITNESS:  Well, I can't account

15    for every type of business there is, but in general

16    I would expect most businesses to do as you've

17    indicated there, to not needlessly put -- I'm sorry,

18    repeat that again?

19    BY MR. ANDERSON:

20            Q.       Consumers.

21            A.       Consumers.

22            Q.       So you would agree with that

23    principle, that companies should not -- strike that.

24                     In general, companies should never

25    needlessly endanger the consumers of its products.
```

Confidential - Subject to Protective Order

1    Right?

2         A.       Without knowing the specific nature

3    of the business or what its consumers are, I would

4    say in general, that would be a reasonable

5    expectation.  You know, but, again, I don't know the

6    details of any particular company that you're

7    talking about or how that could be extrapolated.

8         Q.       Should Johnson & Johnson and Ethicon

9    ever needlessly endanger the consumers of its

10   products?

11                 MR. DAVIS:  Object to the form.

12                 THE WITNESS:  Well, I would certainly

13   hope not.

14   BY MR. ANDERSON:

15        Q.       Would it be a good principle, even

16   though it may not be the exact words in the credo,

17   would it be a good principle for your company,

18   Johnson & Johnson and Ethicon, to follow, we at

19   Johnson & Johnson and Ethicon should never

20   needlessly endanger the consumers of our products?

21                 MR. DAVIS:  Object to the form.

22                 THE WITNESS:  Again, I don't have

23   experience as a business owner or operator.  There

24   are a lot more details involved that would need to

25   be considered to make such a conclusion that I don't

Confidential - Subject to Protective Order

1  have at hand, and I just don't feel qualified to

2  make such a strong recommendation as that.

3  BY MR. ANDERSON:

4      Q.      You believe that Johnson & Johnson

5  and Ethicon should make products that are as safe as

6  possible for the consumers who buy their products.

7  Correct?

8              MR. DAVIS:  Object to the form.

9              THE WITNESS:  I guess that would

10  depend on how safe safe can be at the expense of

11  everything else, because you could extrapolate that

12  to an extreme that, you know, may not make it viable

13  as a product or even useful as a product.

14  BY MR. ANDERSON:

15      Q.      Some products carry certain risks.

16  Correct?

17      A.      Some products do, yes.

18      Q.      And some of Johnson & Johnson and

19  Ethicon's products carry risk.  Correct?

20      A.      Yes.

21      Q.      Is it ever okay for Johnson & Johnson

22  to manufacture a product and to sell it to consumers

23  that has needless risk?

24              MR. DAVIS:  Object to form.

25              THE WITNESS:  Again, that's a

Confidential - Subject to Protective Order

1    scenario that has a number of variables that I'm

2    unaware of, and consequently, I really can't make a

3    qualified answer to that.

4    BY MR. ANDERSON:

5         Q.    So just to make sure the jury

6    understands, you, Dan Burkley, as a 34-year employee

7    of Johnson & Johnson/Ethicon don't have an opinion

8    as to whether or not your company should have an

9    internal rule or principle that says we, Johnson &

10   Johnson/Ethicon, should never needlessly endanger

11   the patients who use our products?

12              MR. DAVIS:  Object to the form.

13   BY MR. ANDERSON:

14        Q.    I just want to make sure I've got

15   that right.

16        A.    I don't know -- well, since you're

17   asking my opinion, I don't believe that Johnson &

18   Johnson does that to begin with.  So, therefore, I

19   don't see it as a requirement for a credo.

20        Q.    There's certainly lots of different

21   employees in your company.  Correct?

22        A.    Yeah.

23        Q.    And different ones have different

24   opinions as to whether or not a product should be

25   put on the market or not.  Correct?

Confidential - Subject to Protective Order

```
 1        A.       I'm sure they do.

 2        Q.       Are you saying that one of the

 3   guiding principles of Ethicon and Johnson & Johnson

 4   should always be, when we're developing this, we

 5   should never expose patients to needless danger with

 6   our products.

 7                 Can we agree to that?

 8        A.       I'm not saying that that's --

 9                 MR. DAVIS:  Wait, wait a second.

10   Object to the form.

11                 You can answer.

12                 THE WITNESS:  I'm not phrasing it the

13   way you did.  I don't -- I'm not saying that they

14   have a guideline.

15   BY MR. ANDERSON:

16        Q.       Should they?

17                 MR. DAVIS:  Object to the form.

18   BY MR. ANDERSON:

19        Q.       Should Johnson & Johnson and Ethicon

20   have a guideline that says, we should never

21   needlessly endanger the consumers of our products?

22                 MR. DAVIS:  Object to the form.

23                 THE WITNESS:  Again, as a -- that

24   would be a business decision.  And again, I'm not a

25   business owner or operator and don't have that kind
```

Confidential - Subject to Protective Order

```
 1    of experience to really explore all the

 2    ramifications of adopting such a guideline or not

 3    adopting such a guideline.

 4    BY MR. ANDERSON:

 5         Q.     Do you care whether or not women who

 6    are implanted permanently with your transvaginal

 7    meshes made at Ethicon and Johnson & Johnson are

 8    exposed to needless dangers?

 9              MR. DAVIS:  Object to the form.

10    BY MR. ANDERSON:

11         Q.     Do you not care?

12         A.     Sure, I care.

13         Q.     Well, if you care, don't you believe

14    there should be an internal guiding principle at

15    Johnson & Johnson that says, in making our

16    transvaginal mesh products, we should never

17    needlessly endanger the women in which they're going

18    to be permanently implanted?

19              MR. DAVIS:  Object to the form.

20    BY MR. ANDERSON:

21         Q.     Should that be a guiding principle?

22         A.     I believe that the way that Ethicon

23    designs and develops its products takes the

24    consideration of the safety and health of the

25    patients and -- as well as the quality of the
```

Confidential - Subject to Protective Order

 1    product.

 2         Q.    And if Johnson & Johnson and Ethicon

 3    fail to do that and they manufacture a product that

 4    needlessly endangers the consumers of that product,

 5    don't you agree that those mistakes or those actions

 6    should be paid for?

 7              MR. DAVIS:  Object to the form.

 8              THE WITNESS:  Where it indicates

 9    mistakes are made, yes, I believe.  I believe

10    there's a responsibility to own up to that.

11    BY MR. ANDERSON:

12         Q.    And if it's more than a mistake, if a

13    decision is made by Johnson & Johnson/Ethicon to go

14    for corporate profits over patient safety and they

15    needlessly endanger the consumers of its products,

16    they should pay for that.  Correct?

17              MR. DAVIS:  Object to the form.

18              THE WITNESS:  That's a scenario that

19    needs to be defined a lot further than what you've

20    described as a generalization in order for me to

21    make any kind of decision on that.

22    BY MR. ANDERSON:

23         Q.    If Johnson & Johnson manufactures a

24    product that is going to be permanently implanted

25    into its consumers, and in manufacturing that they

Confidential - Subject to Protective Order

```
 1   were more concerned with business profits than they

 2   were the safety of those patients, thereby

 3   needlessly endangering these patients and causing

 4   them harm, shouldn't Johnson & Johnson and Ethicon

 5   own up to that and compensate those patients?

 6                   MR. DAVIS:  Object to the form.

 7                   THE WITNESS:  Without knowing more

 8   details about that, I can't make a comment about

 9   that.

10   BY MR. ANDERSON:

11        Q.     If a company exposes you to needless

12   harm, should they pay for that?

13                   MR. DAVIS:  Object to the form.

14   BY MR. ANDERSON:

15        Q.     Let me give you that scenario again.

16                   If you as a consumer of a product are

17   put in needless harm -- strike that.

18                   If you as a consumer of a product are

19   harmed needlessly as a result of a product, do you

20   believe that the manufacturer of that product should

21   compensate you for your harms and losses?

22                   MR. DAVIS:  Object to the form.

23                   THE WITNESS:  I'd have to know more

24   about the specific circumstances.  I know certainly

25   if it happened to me, I'd need to get as much
```

Confidential - Subject to Protective Order

```
 1   information as I could about that.  If I felt that

 2   the company was responsible, sure, I would, you

 3   know, try to look for some kind of compensation.

 4   BY MR. ANDERSON:

 5        Q.     For your harms and losses.  Correct?

 6               MR. DAVIS:  Object to the form.

 7               THE WITNESS:  Again, it depends on

 8   the circumstances.

 9   BY MR. ANDERSON:

10        Q.     If Ethicon and Johnson & Johnson put

11   profits before safety and they created transvaginal

12   mesh products and needlessly endangered thousands of

13   women, if those women suffer harm and injury, should

14   Johnson & Johnson/Ethicon pay for their mistakes --

15               MR. DAVIS:  Object to the form.

16   BY MR. ANDERSON:

17        Q.     -- pursuant to your credo?

18               MR. DAVIS:  Object to the form, I'm

19   sorry.

20               THE WITNESS:  Well, the credo is a

21   company-based philosophy.

22   BY MR. ANDERSON:

23        Q.     Sure.

24        A.     You know, the business will make

25   whatever decisions it's going to make, you know,
```

Confidential - Subject to Protective Order

```
 1    with keeping the credo in mind.  Its

 2    responsibilities to the community and, you know, as

 3    far as how it operates, it's going to follow the

 4    laws of the land as far as that goes, so -- but,

 5    again, your -- to make a judgment call on that, I'd

 6    need to know a lot more details in order to make

 7    that kind of decision.

 8         Q.     Forgetting the laws of the land for a

 9    minute, as a company -- strike that.

10              As a company that makes billions of

11    dollars in profit per year -- strike that.

12              Johnson & Johnson and Ethicon makes

13    billions of dollars in profits per year; is that

14    correct?

15              MR. DAVIS:  Object to the form.

16              THE WITNESS:  I believe so, yes.

17    BY MR. ANDERSON:

18         Q.     So let's work on that premise.

19              A company that makes billions of

20    dollars in profit per year, if they needlessly

21    endanger the consumers of their products and those

22    consumers are injured, no matter what the law is,

23    they should do the right thing and compensate those

24    people for their harms and losses.

25              Would you agree with that, sir?
```

Confidential - Subject to Protective Order

```
 1                    MR. DAVIS:  Object to the form.
 2                    THE WITNESS:  It will still depend on
 3     the specific nature and circumstances.  There's a
 4     lot of details that that generalization covers that
 5     I'm not privy to and, you know, therefore, I'm just
 6     not -- I'm not qualified to really give a comment on
 7     that.
 8     BY MR. ANDERSON:
 9          Q.     I'm not asking what you're privy to.
10     I'm saying as someone who's been with this company
11     for 34 years, do you believe it's the right thing to
12     do for Johnson & Johnson and Ethicon, that if they
13     expose women to needless dangers as a result of
14     transvaginal mesh products, and these women are
15     harmed, Johnson & Johnson and Ethicon should do the
16     right thing and step up to compensate these women
17     for their harms and losses?  Do you agree with that?
18                    MR. DAVIS:  Object to the form.
19                    THE WITNESS:  Again, it's going to
20     depend on the circumstances and just how much fault
21     lays with the company.
22     BY MR. ANDERSON:
23          Q.     They made a product in our scenario
24     that needlessly endangered patients.
25          A.     Yeah, but in --
```

Confidential - Subject to Protective Order

```
1                    MR. DAVIS:  Wait.  If that's a

2    question, I object to the form.

3                    MR. ANDERSON:  I wasn't through.

4                    THE WITNESS:  Again, I don't --

5                    MR. DAVIS:  Oh, I'm sorry.

6                    MR. ANDERSON:  Quit interrupting me.

7                    MR. DAVIS:  Yeah.  Make sure he gets

8    his question off.

9                    THE WITNESS:  Okay, I'm sorry.

10                    MR. ANDERSON:  I sometimes pause.  No

11   problem.  The tape's almost done, so -- how much

12   time you got?

13                    THE VIDEOGRAPHER:  Three minutes.

14                    MR. ANDERSON:  Oh, three minutes.

15   Okay.

16   BY MR. ANDERSON:

17        Q.     So do you believe that it is a

18   guiding principle of Johnson & Johnson/Ethicon that

19   if they have needlessly endangered women's very

20   lives with transvaginal mesh products, and these

21   women are injured and harmed, that they should be

22   compensated for those harms and injuries?

23                    MR. DAVIS:  Object to the form.

24                    THE WITNESS:  I don't know if that's

25   a guideline.
```

Confidential - Subject to Protective Order

1  BY MR. ANDERSON:

2        Q.     Should it be?

3               MR. DAVIS:  Object to the form.

4               THE WITNESS:  Again, I'm not in a

5  position to make a business decision as to what

6  guidelines the business should operate under.

7  BY MR. ANDERSON:

8        Q.     If a company in the United States

9  manufacturing a product needlessly endangers and

10  harms the consumers of its products, do you believe

11  that it should compensate those individuals for the

12  harms and losses that they received?

13              MR. DAVIS:  Object to the form.

14              THE WITNESS:  It's going to depend on

15  the details and circumstances of that incident.

16  BY MR. ANDERSON:

17        Q.     So as a general principle, you can't

18  agree with that?

19              MR. DAVIS:  Object to the form.

20              THE WITNESS:  Not without knowing

21  more details.

22              MR. ANDERSON:  Okay.  Why don't we

23  take a break.

24              THE VIDEOGRAPHER:  We're going off

25  the record.  The time is 10:45 a.m.  This is the end

Confidential - Subject to Protective Order

```
 1   of Tape Number 1.

 2                        -  -  -

 3              (A recess was taken from 10:45 a.m.

 4         to 11:01 a.m.)

 5                        -  -  -

 6              THE VIDEOGRAPHER:  We're back on the

 7   record.  Here marks the beginning of Volume 1 and

 8   Tape Number 2 of the deposition of Daniel Burkley.

 9   The time is 11:01 a.m.

10   BY MR. ANDERSON:

11         Q.    I show you Plaintiff's Exhibit T-271.

12                        -  -  -

13              (Deposition Exhibit No. T-271, "Our

14         Ethical Code for the Conduct of Research

15         and Development," 1 page, was marked for

16         identification.)

17                        -  -  -

18   BY MR. ANDERSON:

19         Q.    I also printed this off from the J&J

20   website.  "Our Ethical Code for the Conduct of

21   Research and Development."

22              Have you ever seen this document

23   before?

24         A.    I think I've seen it once.

25         Q.    When was that?
```

Confidential - Subject to Protective Order

1      A.      Probably about two or three years

2   ago.

3      Q.      Under what circumstances, please?

4      A.      It was brought to my attention, so I

5   took a look at it briefly.

6      Q.      When you read it, did you agree with

7   the principles contained in it?

8      A.      Yes, I did.

9      Q.      Do you follow the principles

10   contained in it?

11      A.      I do.

12      Q.      Is one of the purposes of the credo,

13   whether we're talking about the one we just spoke

14   about or this R&D portion of it, is one of the

15   primary purposes of that patient safety?

16      A.      Patient safety is certainly a

17   consideration.  I don't know if it's paramount.

18      Q.      Okay.

19              Under the "Preamble" of this

20   document, Plaintiff's T-271, it says, "Our Ethical

21   Code for the Conduct of Research and Development is

22   intended to complement our credo--"

23              And "our credo" was the document we

24   just looked at, T-270.  Correct?

25      A.      Yes.

Confidential - Subject to Protective Order

1      Q.      -- "by providing more specific

2   standards of conduct and behavior for physicians,

3   clinical research" assistants or "scientists and

4   others who are responsible for medical aspects of

5   research and development."

6              So --

7              And that's talking about physicians,

8   research scientists and others responsible for

9   medical aspects of R&D who are Ethicon and Johnson &

10  Johnson employees.  Correct?  That's what it's

11  referencing?

12     A.      Yeah, clinical research scientists

13  and others who are responsible for medical aspects

14  of research, yes.

15     Q.      Who are also employees of Johnson &

16  Johnson and Ethicon.  Right?

17     A.      Yes, yes.  That's correct.

18     Q.      You would be contained within that --

19  those set of titles.  Correct?

20     A.      That I'm not too sure about.  I'm not

21  a clinical research scientist, and I'm certainly not

22  responsible for medical aspects.

23     Q.      Do you believe that Johnson & Johnson

24  and Ethicon intends for you, Dan Burkley, as an

25  employee, to follow this credo?

Confidential - Subject to Protective Order

```
 1                    MR. DAVIS:  Object to the form.

 2                    Ben, I only objected that time

 3     because you said "this credo."

 4                    MR. ANDERSON:  That's a good point.

 5     BY MR. ANDERSON:

 6           Q.      So right now we're going to

 7     reconcile -- can we call this the R&D credo for

 8     purposes of the record?  Is that okay for you?

 9           A.      That's fine.

10           Q.      So do you believe that Ethicon

11     intends for all of its employees to follow this more

12     specific standard of conduct for its employees?

13           A.      No, considering they have a qualifier

14     in there.

15           Q.      So do you believe this applies to

16     you?

17           A.      Technically, no.

18           Q.      Okay.

19                    If you look at the second bullet

20     point, "Our Ethical Code is intended to describe the

21     principles that guide ethical decision-making to

22     ensure the safe use of our products, and the best

23     interests of our patients and their families,

24     doctors, nurses and health care providers."

25                    Do you believe that that is a good
```

Confidential - Subject to Protective Order

1    rule for Johnson & Johnson and Ethicon to have

2    internally, that ethical decisions should be made to

3    ensure safety of its products for patients and their

4    families?

5         A.      Yes.

6         Q.      Okay.

7                 If you look under "Our Ethical Code."

8                 "It is our fundamental responsibility

9    to place the well-being of the patient first by

10   appropriately balancing risks and benefits and to

11   ensure the best interests of" physicians -- "of

12   patients and physicians who use our products receive

13   utmost consideration."

14                Do you see that?

15        A.      I do.

16        Q.      Do you believe that that principle

17   stands for the code of conduct by Ethicon and

18   Johnson & Johnson employees that, in everything that

19   you do, you should put the well-being, the health

20   and safety of patients first?

21        A.      In everything we do.  That sounds

22   like an absolute statement, which is not included in

23   here, so I'd have to say that that may be an

24   overextrapolation.

25        Q.      Do you believe that that is the

Confidential - Subject to Protective Order

```
 1   primary consideration, and that being the

 2   well-being, the health and safety of the patients

 3   coming first?

 4        A.     A primary -- yeah.  I believe it's a

 5   primary consideration, yes.

 6        Q.     If you look down five bullet points,

 7   "It is our responsibility to ensure all

 8   Company-based, medically relevant product

 9   information is fair and balanced, accurate and

10   comprehensive, to enable well-informed risk-benefit

11   assessments about our products."

12             Do you see that?

13        A.     I do.

14        Q.     Do you agree with that principle?

15        A.     I do agree with that principle.

16        Q.     And what is your understanding of

17   what fair and balanced means?

18             MR. DAVIS:  Object to the form.

19   BY MR. ANDERSON:

20        Q.     In the context of how Johnson &

21   Johnson defines it within its credos?

22             MR. DAVIS:  Object to the form.

23             THE WITNESS:  I'm not quite sure how

24   to interpret that without a specific example.

25   BY MR. ANDERSON:
```

Confidential - Subject to Protective Order

```
1          Q.      What's your general understanding of
2    what fair and balanced means, providing fair and
3    balanced information?  Doesn't that mean you give
4    the good with the bad?
5                  MR. DAVIS:  Object to the form.
6    BY MR. ANDERSON:
7          Q.      And you're accurate and thorough?
8                  MR. DAVIS:  Object to the form.
9                  THE WITNESS:  Well, that you -- you
10   know, that you certainly -- I would interpret that
11   to mean that you consider all the information that's
12   available about it and it be fair in terms of
13   explaining, you know, pros and cons, positives and
14   negatives, you know, different aspects about it.
15   BY MR. ANDERSON:
16         Q.      And as that's applied to you as a
17   scientist, do you believe that fair and balanced
18   means that if you undertake a study or an analysis,
19   that you need to provide information that is
20   accurate, comprehensive, fair and balanced?
21                 MR. DAVIS:  Object to the form.
22                 THE WITNESS:  Well, I don't normally
23   use the term "fair and balanced" with respect to
24   studies or reports, but we certainly do include the
25   other descriptives that you indicated being
```

Confidential - Subject to Protective Order

1   accurate, factual and presenting all the data.

2   BY MR. ANDERSON:

3          Q.      Well, for instance, let's just -- I'm

4   trying to think of an example.

5                  Let's say the FDA were to request

6   information of your company, and you as a scientist

7   were going to provide certain information, and they

8   wanted to know about a potential complication or

9   risk.

10                 If you're involved in it as a

11  scientist and you're trying to provide that

12  information to a regulatory body like the FDA, you

13  would want to provide both the positive and the

14  negative, the pros and the cons of your particular

15  research.  Correct?

16                 MR. DAVIS:  Object to the form.

17                 THE WITNESS:  If they ask for my

18  work, they would get the entire study, which would

19  include all that, whatever information is in there.

20  BY MR. ANDERSON:

21         Q.      Do you believe that a regulatory body

22  has the right to assume that Johnson & Johnson and

23  Ethicon will provide the good and the bad

24  information that they have concerning a particular

25  complication or potential problem with one of its

Confidential - Subject to Protective Order

1   products?

2                   MR. DAVIS:  Object to the form.

3   BY MR. ANDERSON:

4        Q.     Is that a good guiding principle?

5                   MR. DAVIS:  Object to the form.

6                   THE WITNESS:  Well, your question is

7   putting me in the role of the regulatory body.  I

8   don't have regulatory experience.  And it would be

9   very speculative of me to try to assume what they

10  would expect and not expect.  So I -- it's not -- I

11  don't feel it's an appropriate question to answer.

12  BY MR. ANDERSON:

13       Q.     Do you think it's appropriate for a

14  regulatory body like FDA to receive truthful and

15  accurate and thorough information from scientists at

16  Johnson & Johnson and Ethicon?

17                  MR. DAVIS:  Object to the form.

18                  THE WITNESS:  I believe that the FDA

19  would expect to receive the information that they

20  asked for.

21  BY MR. ANDERSON:

22       Q.     Okay.

23                  But if they have a question to ask of

24  your company and you have data, should you provide

25  accurate, truthful and thorough information to that

Confidential - Subject to Protective Order

1  regulatory body?

2              MR. DAVIS:  Object to the form.

3              THE WITNESS:  They should provide a

4  complete answer to their questions.

5  BY MR. ANDERSON:

6      Q.      Should it be truthful and accurate?

7      A.      Yes.

8      Q.      Okay.

9              Do patients and doctors deserve the

10  same level of respect as a regulatory body in that

11  should patients and doctors who use Johnson &

12  Johnson/Ethicon's products expect that Johnson &

13  Johnson and Ethicon will provide truthful, accurate

14  and full, thorough information about their products

15  to them?

16              MR. DAVIS:  Object to the form.

17              THE WITNESS:  A customer is going to

18  have different questions and/or concerns than a

19  regulatory body would, so there isn't exactly a

20  parallel between those two; but certainly if an end

21  user had specific questions, you know, the company

22  should attempt to give the end user adequate

23  answers.

24  BY MR. ANDERSON:

25      Q.      And by adequate, can we extend that

1    to say that it should be truthful and accurate and

2    thorough information?

3                    MR. DAVIS:  Object to the form.

4                    THE WITNESS:  I don't know any --

5    let's see.  What am I trying to say?

6                    In that particular role, which is not

7    my role, I'm unclear as to what the company's

8    responsibilities would be or what their guidelines

9    should be in terms of dealing specifically with

10   customer requests or requests for additional

11   information, other than what's provided typically in

12   the IFU provided for each product.

13   BY MR. ANDERSON:

14        Q.     Okay.

15               Should the IFU contain truthful,

16   accurate and fair and balanced information?

17        A.     I believe so, yes.

18        Q.     And if you as a scientist at Ethicon

19   are asked to provide scientific data to, for

20   example, a regulatory body, should it be truthful,

21   accurate and thorough information?

22                    MR. DAVIS:  Object to the form.

23                    THE WITNESS:  Please repeat that

24   question one more time.

25   BY MR. ANDERSON:

Confidential - Subject to Protective Order

1          Q.       Sure.

2                   And if you as a scientist at Ethicon

3     are asked to provide scientific data to, for

4     example, a regulatory body, should it be truthful,

5     accurate and thorough information?

6                   MR. DAVIS:  Object to the form.

7                   THE WITNESS:  As a scientist, I would

8     certainly provide that information, but as a

9     company, I believe there would be policies that the

10    company would probably need to review that

11    information before it was released.

12    BY MR. ANDERSON:

13         Q.       Regulatory bodies who, like the FDA

14    and other organizations around the world that are

15    similar to FDA, one of the primary reasons they

16    exist is to try to ensure patient safety of goods

17    and products that are sold in its country, correct,

18    over which it has regulatory authority?

19         A.       Right.  That's one of their concerns.

20    I believe that.

21         Q.       So if patient safety is a concern of

22    a regulatory authority, would you agree with me that

23    Johnson & Johnson and Ethicon have an obligation to

24    provide truthful and accurate information to

25    regulatory bodies about their products?

Confidential - Subject to Protective Order

```
 1          A.       I don't know what their legal

 2   obligations are, but from an ethical point of view,

 3   yes, I believe they would.

 4          Q.       Okay.

 5                   Would you agree that a medical device

 6   manufacturer must not put their products on the

 7   market without knowing the risks involved --

 8                   MR. DAVIS:  Object to the form.

 9   BY MR. ANDERSON:

10          Q.       -- by using that product?

11                   MR. DAVIS:  I'm sorry, object to the

12   form.

13                   THE WITNESS:  Again, that's a

14   business decision.  I'm not in that kind of position

15   as a business owner or operator to really draw upon

16   any experience or knowledge of requirements,

17   obligations, to make those kinds of decisions.

18   BY MR. ANDERSON:

19          Q.       Mr. Burkley, as a well educated, very

20   bright principal engineer who's been employed by a

21   multi-billion dollar medical device manufacturer for

22   34 years, do you believe that your company should

23   know the risks involved with its products before

24   they put them on the market and before United States

25   citizens use them?
```

Confidential - Subject to Protective Order

1                    MR. DAVIS:  Object to the form.

2                    THE WITNESS:  The company should be

3    aware of risks associated with the products, yes.

4    BY MR. ANDERSON:

5         Q.    Okay, thank you.

6                    Do you believe that once problems are

7    identified with regard to products that are already

8    on the market by Johnson & Johnson, that your

9    company should take appropriate steps to identify

10   the problem, analyze the problem and come up with a

11   solution?

12                   MR. DAVIS:  Object to the form.

13   BY MR. ANDERSON:

14        Q.    Let me ask it a different way.

15                   Do you feel that your company,

16   Johnson & Johnson and Ethicon, has an obligation to

17   patients and doctors after the product is put on the

18   market to ensure that it is safe while being used?

19                   MR. DAVIS:  Object to the form.

20                   THE WITNESS:  The company is

21   certainly concerned about the quality of the

22   products that it sells and is diligent about quality

23   improvement.  So consequently, yes, they have

24   concerns over the quality of the product and

25   opportunities to improve quality.

Confidential - Subject to Protective Order

1   BY MR. ANDERSON:

2        Q.      In other words, you said a few

3   minutes ago that you believe one of the fundamental

4   principles of the credo and the R&D credo is patient

5   safety.

6                Do you remember that?

7        A.      That's a concern.  I didn't say it

8   was a guideline.

9        Q.      Okay.

10               That's a concern?

11       A.      Yes.

12       Q.      It's not a fundamental priority?

13       A.      It's a primary consideration, but

14   it's not a guideline.

15       Q.      So if patient safety is a primary

16   consideration by Ethicon and Johnson & Johnson based

17   in their credos, does that obligation to patient

18   safety stop once the product is marketed?

19               MR. DAVIS:  Object to the form.

20               THE WITNESS:  No.

21   BY MR. ANDERSON:

22       Q.      So Johnson & Johnson and Ethicon,

23   pursuant to their credo, have an obligation to the

24   consumers of its products that after the product is

25   launched, they will continue to look at

Confidential - Subject to Protective Order

1    complications or other risks to patients that may

2    arise after the product is launched.

3                    Can we agree to that?

4                    MR. DAVIS:  Object to the form.

5                    THE WITNESS:  State that one more

6    time, please?

7    BY MR. ANDERSON:

8         Q.      Sure.

9                    So Johnson & Johnson and Ethicon,

10   pursuant to their credo, have an obligation to the

11   consumers of its products that after the product is

12   launched, they will continue to look at

13   complications or other risks to patients that may

14   arise after the product is launched?

15                   MR. DAVIS:  Object to the form.

16   BY MR. ANDERSON:

17        Q.      Do you agree to that?

18        A.      Well, you're making an extrapolation

19   that refers back to the original credo, whereas we

20   were talking about this R&D credo document

21   previously.  And I believe that you're trying to

22   draw one point from one document and apply it to the

23   other.

24        Q.      Okay.  If that's your impression,

25   it's wrong.

Confidential - Subject to Protective Order

```
 1          A.      Okay.

 2          Q.      So let me see if I can do better.

 3          A.      Okay.

 4          Q.      You said that one of the primary

 5  considerations of Ethicon and Johnson & Johnson is

 6  patient safety.  Correct?

 7          A.      With respect to the R&D --

 8          Q.      New question.  New question.

 9          A.      Oh, I'm sorry.

10          Q.      Okay.

11                  Let's put the credo aside for a

12  moment.

13          A.      Okay.

14          Q.      If that's confusing us, or we can

15  come back to it.

16                  But do you believe that one of the

17  primary considerations at Johnson & Johnson and

18  Ethicon should be patient safety?

19          A.      It's one of the concerns they should

20  have, yes.

21          Q.      And that concern doesn't stop after

22  the product is launched.  Correct?

23          A.      No.  The concern does not stop, no.

24          Q.      So in order to ensure a patient's

25  safety after Johnson & Johnson and Ethicon's
```

Confidential - Subject to Protective Order

1   products are launched, would you agree with me that

2   it should continue to look at new patient

3   complications, new risks associated with its

4   products?

5                    MR. DAVIS:  Object to the form.

6                    THE WITNESS:  Well, it should

7   certainly get more information about its products

8   and how they're used.

9   BY MR. ANDERSON:

10           Q.       Once problems are identified, should

11  a medical device manufacturer take appropriate steps

12  to do testing and analysis to see if those

13  complications or risks could be eliminated or

14  reduced?

15                   MR. DAVIS:  Object to the form.

16                   THE WITNESS:  If a complication has

17  been identified, it should certainly be evaluated

18  and confirmed and then some type of investigation

19  done to determine if it's a quality issue or if

20  there's a way to correct that deficiency or issue.

21  BY MR. ANDERSON:

22           Q.       And here's what I'm getting at.

23                    Johnson & Johnson/Ethicon has

24  thousands of employees worldwide.  Correct?

25           A.       Yes.

Confidential - Subject to Protective Order

1      Q.      You have scientists, you have

2   doctors, you have engineers, all of the specialties

3   required to research, develop, manufacture and sell

4   medical devices.  Correct?

5      A.      They do.

6      Q.      In fact, Johnson & Johnson and

7   Ethicon are in the best position versus any other

8   company or anyone else in the world to understand

9   its products, to test its products and to analyze

10  any potential complications with its products.

11              Would you agree with that?

12              MR. DAVIS:  Object to the form.

13              THE WITNESS:  Well, specific to its

14  own products, yes, since it manufactures its

15  products.

16  BY MR. ANDERSON:

17      Q.      So if a complication --

18              If a potential complication or a risk

19  with one of Johnson & Johnson and Ethicon's products

20  arises, Johnson & Johnson and Ethicon are in the

21  best position in order to identify that potential

22  complication or patient risk, study it, analyze it

23  and provide some sort of information as to whether

24  they believe it is a true complication or a risk to

25  a patient.

Confidential - Subject to Protective Order

```
 1                    Would you agree with that?
 2                    MR. DAVIS:  Object to the form.
 3                    THE WITNESS:  Possibly.  There are a
 4    number of other scenarios that could exist that
 5    might permit other end users or outside research
 6    firms to look at that and maybe get other
 7    information that Johnson & Johnson or Ethicon, you
 8    know, might not have.  So, I mean, there are -- you
 9    know, there's -- it's conceivable other scenarios
10    could be out there.
11    BY MR. ANDERSON:
12         Q.       If Johnson & Johnson and Ethicon are
13    made aware of complications related to its product
14    or potential complications associated with its
15    product, would you agree that your company has a
16    duty and an obligation to reasonably determine the
17    cause of the complications?
18                    MR. DAVIS:  Object to the form.
19                    THE WITNESS:  I believe it has a duty
20    to investigate and confirm, and if after it's been
21    confirmed, then to do some investigation or
22    evaluation, you know, about it.
23    BY MR. ANDERSON:
24         Q.       Would you agree that Johnson &
25    Johnson and Ethicon must continue to do safety
```

Confidential - Subject to Protective Order

```
1    testing, internal studies, to fund external studies,

2    to review all the available new scientific

3    literature that comes out and make any necessary

4    design changes to the product in order to address

5    patient safety issues that may arise during the life

6    of that product?

7              MR. DAVIS:  Object to the form.

8              THE WITNESS:  Well, that goes to --

9    that's way beyond my area of expertise.  And again,

10   it's a business decision.  And I'm not really

11   qualified to address a question of such a broad --

12   basically such a broad question.

13   BY MR. ANDERSON:

14        Q.    Well, do you believe that your

15   company has an obligation to patients that over the

16   life of that product, if new information is brought

17   to Johnson & Johnson and Ethicon's attention, that

18   there may be safety issues with your product, that

19   Johnson & Johnson should do further testing or fund

20   testing in order to look at that problem?

21             MR. DAVIS:  Object to the form.

22             THE WITNESS:  Well, Johnson & Johnson

23   certainly has ways of collecting such information,

24   such as product complaints or similar type things,

25   and get as much information about these particular
```

Confidential - Subject to Protective Order

1    products as possible.  And they certainly do

2    investigate those complaints.  It's conceivable if

3    it becomes a quality issue, then the company would

4    then do some further investigation about that.  But

5    now I'm getting -- beyond that, I don't know exactly

6    what they do or what they would be obligated to do.

7    BY MR. ANDERSON:

8         Q.      On the last bullet point of the R&D

9    credo, "It is our responsibility to challenge each

10   other regarding medical and ethical concerns."

11             Do you agree with that?

12        A.      As part of the Ethicon R&D code,

13   yeah.

14        Q.      Is that something that you regularly

15   do, is challenge your colleagues and have other

16   colleagues challenge one another at Johnson &

17   Johnson and Ethicon regarding medical or ethical

18   concerns with its products?

19             MR. DAVIS:  Object to the form.

20             THE WITNESS:  Well, considering I'm

21   not a clinician and I'm not a medical doctor, it's

22   kind of rare that I make those kinds of challenges.

23   BY MR. ANDERSON:

24        Q.      If you saw an ethical concern at

25   Johnson & Johnson or Ethicon, does the credo require

Confidential - Subject to Protective Order

 1    you to challenge those ethical concerns?

 2              MR. DAVIS:  Object to the form.

 3              THE WITNESS:  The credo itself does

 4    not specifically indicate that, but, I mean, in

 5    terms of a principle, certainly here in the ethical

 6    code for, you know, R&D, it indicates certainly that

 7    for its clinicians and other medical research

 8    scientists, you know, that they would bring these

 9    things up, so...

10    BY MR. ANDERSON:

11        Q.      The last time you and I were together

12    back in October, we had a discussion regarding the

13    2010 publication by Clave, et al. regarding the

14    analysis of 100 explants and the potential

15    degradation of the polypropylene that was seen in

16    those explants that were used for either stress

17    urinary incontinence or pelvic organ prolapse.

18              Do you remember us discussing that?

19              MR. DAVIS:  Object to the form.

20              THE WITNESS:  I do.

21    BY MR. ANDERSON:

22        Q.      And do you recall that you told me

23    that you were asked to be a part of a group of

24    employees at Johnson & Johnson and Ethicon who

25    looked at the Clave study and gave your impressions

Confidential - Subject to Protective Order

```
 1    as to what was contained within that study?

 2          A.      Yes.

 3          Q.      Since we last met in October, have

 4    there been any further meetings, discussions or

 5    communications regarding Ethicon/Johnson & Johnson's

 6    analysis of the Clave article?

 7          A.      No, there have not been.

 8                  MR. DAVIS:  Note my objection to the

 9    form of the last question.

10    BY MR. ANDERSON:

11          Q.      Were any studies, either internal or

12    external, initiated since we last met in October

13    with regard to addressing the potential for

14    Ethicon's polypropylene meshes to degrade in the

15    human body?

16                  MR. DAVIS:  Object to the form.

17                  THE WITNESS:  I'm not aware of any.

18    BY MR. ANDERSON:

19          Q.      What were the circumstances under

20    which Ethicon undertook this analysis of the Clave

21    article?

22                  MR. DAVIS:  Object to the form.

23    BY MR. ANDERSON:

24          Q.      In other words, why did you do that?

25          A.      I believe that regulatory felt that
```

Confidential - Subject to Protective Order

1    it would be worthwhile to issue a response to the

2    article.

3         Q.       Why did regulatory feel that you

4    should issue a response -- sorry.

5                  Why did regulatory at Johnson &

6    Johnson feel that it would be worthwhile to issue a

7    response to the Clave article?

8                  MR. DAVIS:  Object to the form.

9    BY MR. ANDERSON:

10        Q.       Your understanding?

11                 MR. DAVIS:  Object to the form.

12                 THE WITNESS:  There were aspects

13   about the study that they felt needed commenting on

14   to offer an alternative viewpoint.

15   BY MR. ANDERSON:

16        Q.       To offer an alternative viewpoint to

17   whom?  The world at large, through scientific

18   literature, to doctors, to patients?  Who are you

19   responding to?

20                 MR. DAVIS:  Object to the form.

21                 THE WITNESS:  The same audience of

22   people that would have read the Clave article.

23   BY MR. ANDERSON:

24        Q.       Were you aware, Mr. Burkley, that it

25   was actually the United Kingdom regulatory agency

Confidential - Subject to Protective Order

```
 1   MHRA who requested information from Ethicon and

 2   Johnson & Johnson regarding its meshes and whether

 3   or not they may degrade or contract as was set forth

 4   in the Clave article?

 5              MR. DAVIS:  Object to the form.

 6              THE WITNESS:  No, I was not aware of

 7   that.

 8   BY MR. ANDERSON:

 9       Q.      So no one told you that the reason

10   they were asking you to provide your analysis and

11   your opinion of the Clave article was to respond to

12   a foreign regulatory body who had requested this

13   information from Ethicon and Johnson & Johnson?

14              MR. DAVIS:  Object to the form.

15              THE WITNESS:  I did not have such

16   information.

17   BY MR. ANDERSON:

18       Q.      You said that you had in-person

19   meetings as well as many e-mail exchanges regarding

20   this analysis of the Clave article.  That's what you

21   told me at the last deposition.

22       A.      Yes.

23       Q.      Do you remember that?

24       A.      Yes.

25       Q.      So none of these meetings and none of
```

Confidential - Subject to Protective Order

```
 1    those communications, you're telling the jury you

 2    had no idea that a foreign regulatory authority had

 3    actually asked for Johnson & Johnson's response to

 4    the Clave article?

 5         A.     That's correct.  I am not aware of

 6    that.

 7                MR. ANDERSON:  Plaintiff's Exhibit

 8    T-272.

 9                       -  -  -

10                (Deposition Exhibit No. T-272, E-mail

11                chain, top one dated 01 Mar 2012, Bates

12                stamped ETH.MESH.07226377 through

13                ETH.MESH.07226379, was marked for

14                identification.)

15                       -  -  -

16                MR. ANDERSON:  Last four Bates are

17    6377.

18    BY MR. ANDERSON:

19         Q.     Have you ever heard of the MHRA?

20         A.     No, I'm not familiar with that.

21         Q.     If I tell you that the MHRA is

22    similar to the FDA division of pharmaceuticals and

23    medical device regulation, do you have any reason to

24    dispute that with me today?

25         A.     I'd probably want a confirmation of
```

Confidential - Subject to Protective Order

1    it.

2         Q.      For purposes of the deposition, I

3    want you to assume with me that the MHRA is a

4    regulatory agency in the UK that regulates the

5    medical devices and other products sold in the UK in

6    order to address patient safety as one of its

7    priorities.  Okay?

8         A.      Okay.

9         Q.      If you look at the second page of

10   this e-mail, you'll see that in the middle of the

11   page, it says "From:

12   Clare.Huntington@mhra.gsi.gov.uk."

13              Do you see that?

14        A.      I do.

15        Q.      It was sent on January 26, 2012, and

16   the subject was "Polypropylene mesh."  Correct?

17        A.      Yes.

18        Q.      And if you look down below, it says,

19   "Study_of_100_explants.pdf."

20              And we know that the Clave article

21   is -- was a study of 100 explants.  Correct?

22        A.      Yes.

23        Q.      And it is being sent to Mark.

24              "Dear Mark, Please find attached a

25   paper suggesting that Polypropylene used in vaginal

Confidential - Subject to Protective Order

1  meshes is not inert.  Please could you provide me

2  with your comments on this issue and also tell me

3  about any testing you have carried out to show that

4  the meshes used do not shrink."

5           Do you see that?

6      A.    I do.

7      Q.    You will recall that part of the

8  Clave article talked about the degradation of both

9  low weight and heavyweight -- lightweight and

10  heavyweight polypropylene fibers.  Correct?

11     A.    Yes.

12     Q.    It also talked about the meshes can

13  contract or shrink in the human body.  Correct?

14          MR. DAVIS:  Object to the form.

15          THE WITNESS:  I believe so, yes.

16  BY MR. ANDERSON:

17     Q.    And it also offered that it was the

18  first study to look at explants of polymer meshes in

19  the pelvic floor to determine whether or not meshes

20  degrade in a woman's body.

21          Do you recall that?

22          MR. DAVIS:  Object to the form.

23          THE WITNESS:  I believe -- yes, I

24  believe that statement was made by the article, yes.

25  BY MR. ANDERSON:

Confidential - Subject to Protective Order

```
 1          Q.      And that their conclusion was that

 2   they were not inert and that they actually -- strike

 3   that.

 4                  And the conclusion in the Clave

 5   article was that based upon their analysis of these

 6   explanted meshes, that polypropylene meshes do in

 7   fact degrade and are not inert.

 8                  Do you recall that?

 9                  MR. DAVIS:  Object to the form.

10                  THE WITNESS:  I -- yes.

11   BY MR. ANDERSON:

12          Q.      So if you look up above that, you see

13   that there is an e-mail sent the next day from

14   Complaints at Ethicon GB, which would be Great

15   Britain.  Correct?

16          A.      Yes.

17          Q.      And it's sent to various individuals,

18   and it says, "Dear Melissa and Cary, See below and

19   attached from the MHRA.

20                  "I have also attached my response to

21   Ms. Huntington.

22                  "I haven't entered this as a

23   complaint but if you need me to enter anything, just

24   please ask?

25                  "Can you provide me with a response?
```

Confidential - Subject to Protective Order

1                    "Many thanks, Marjorie."

2                    So what we're seeing here is people

3    within Ethicon, both in Great Britain and the United

4    States, sharing this e-mail from the MHRA and

5    looking for a response.  Correct?

6                    MR. DAVIS:  Object to the form.

7                    THE WITNESS:  Yes.

8    BY MR. ANDERSON:

9         Q.     And if you turn to the next page,

10   three days later another e-mail is sent with the

11   same subject line, and it says, "Dan and Brian," and

12   that's Dan Lamont and Brian Kanerviko, "Please see

13   the e-mail below with a request from MHRA regarding

14   pelvic mesh.  Brian, who from your team will take

15   lead on helping with this from an RA" -- that would

16   be regulatory affairs.  Correct?

17        A.     Yes.

18        Q.     -- "perspective?

19                    "Thank you!  Melissa."

20                    And that's on February 14th.

21                    And then if you look up above from

22   Laura Vellucci, there's a jump between February and

23   March here, and we're going to get to some of those

24   e-mails in a minute.

25                    But it says, "As per our

Confidential - Subject to Protective Order

1   conversation...I am" sending "the original request

2   from the MHRA to comment on the issue:

3   polypropylene mesh used in vaginal repair may not be

4   inert."

5              Do you see that?

6        A.    Yes.

7        Q.    And you're copied on this e-mail --

8   oh, you're in the -- you're sent this e-mail as

9   well.  Correct?

10       A.    Yes, I am.

11       Q.    It says, "I am copying Dan and John

12  as you have identified them as resources for the

13  needed information.  Sandy has provided a response

14  on our testing to show that meshes used do not

15  shrink."

16             Even though polypropylene itself

17  doesn't shrink, you know, don't you, Mr. Burkley,

18  that there's abundant evidence in -- both within

19  Ethicon as well as in the literature outside of

20  Ethicon that surgical meshes do have wound

21  contraction causing the area of the mesh to shrink

22  or contract.  You know that.  Correct?

23             MR. DAVIS:  Object to the form.

24             THE WITNESS:  I'm aware of articles

25  that state that, yes.

Confidential - Subject to Protective Order

```
 1   BY MR. ANDERSON:

 2           Q.      And that's the --

 3                   That's known within Ethicon, that

 4   polypropylene meshes can shrink from 30 to

 5   40 percent of their surface area due to normal wound

 6   healing and contraction.  You know that.  Correct?

 7                   MR. DAVIS:  Object to the form.

 8                   THE WITNESS:  I don't know if they

 9   can contract to the extent that you just described,

10   but I've heard of that, that they can contract.

11   BY MR. ANDERSON:

12           Q.      So to provide an answer back to a

13   regulatory body in the United Kingdom whose purpose

14   is to try to ensure patient safety, to just say that

15   our testing shows that meshes do not shrink, that's

16   not a fair and balanced response.  Would you agree

17   with that?

18                   MR. DAVIS:  Object to the form.

19                   THE WITNESS:  I can't comment on

20   that.  It depends on how you define "shrink."

21   BY MR. ANDERSON:

22           Q.      Well, when a regulatory body is

23   asking the manufacturer for information and that

24   manufacturer has information showing that mesh

25   shrinkage and mesh contraction are words that are
```

Confidential - Subject to Protective Order

1    used virtually interchangeable -- strike that.  Let

2    me ask you.

3                   You understand that mesh contraction

4    and mesh shrinkage are terms that are used in common

5    vernacular in your industry somewhat

6    interchangeably.  You know that.  Correct?

7                   MR. DAVIS:  Object to the form.

8                   THE WITNESS:  They could be, but

9    shrink could still have multiple definitions.

10   BY MR. ANDERSON:

11       Q.     Was that, the fact that shrink could

12   have multiple definitions, sent back to the MHRA to

13   say what is it that you're asking us, because shrink

14   could have multiple definitions?  Was that sent?

15                  MR. DAVIS:  Object to the form.

16                  THE WITNESS:  I have no idea what the

17   communication was to the MHRA.

18   BY MR. ANDERSON:

19       Q.     We'll go through this and we'll find

20   out whether or not --

21       A.     Okay.

22       Q.     -- your company just said our meshes

23   don't shrink or can you explain to us what you mean

24   by shrink, because you were -- strike that.  New

25   question.

Confidential - Subject to Protective Order

```
1                    You were aware as of March 2012,
2    weren't you, Mr. Burkley, that mesh contraction
3    occurred in polypropylene meshes manufactured by
4    Johnson & Johnson/Ethicon?  You were aware of that?
5                    MR. DAVIS:  Object to the form.
6                    THE WITNESS:  I have heard of
7    articles stating that.  How factual that was, I
8    don't know.
9    BY MR. ANDERSON:
10        Q.      And the article -- sorry.
11        A.      From an analytical chemist's point of
12   view, shrink could have a different meaning than
13   what's used in a clinical application.  So it's not
14   clear which applications the term is being used at.
15        Q.      As part of this -- we'll get to your
16   part.
17                    You were aware as of March 2012 that
18   Ethicon's own consultants had published in the
19   peer-reviewed literature that there is mesh
20   contraction of all polypropylene meshes somewhere
21   between 30 and 40 percent.  You were aware of that
22   at this time, were you not?
23                    MR. DAVIS:  Object to the form.
24                    THE WITNESS:  I was made aware of
25   that during the deposition in October.
```

Confidential - Subject to Protective Order

```
1    BY MR. ANDERSON:

2         Q.      Were you aware of that at this time?

3         A.      No.

4         Q.      Were you asked to provide information

5    as part of this analytical process in providing a

6    response to the UK regulatory body about

7    contraction?  Okay?  Were you asked to provide your

8    response regarding whether or not your meshes

9    contract or shrink?

10                MR. DAVIS:  Object to the form.

11                THE WITNESS:  No, my -- I was asked

12   to comment on the SEM images.

13   BY MR. ANDERSON:

14        Q.      So your role was more in the

15   degradation rather than the contraction or

16   shrinkage?

17        A.      Well, basically to comment on the SEM

18   images.

19        Q.      It says, "It would be great if the

20   information you are collecting and the data that

21   Sandy has provided can be tied together so that we

22   can present a complete picture of our understanding

23   of the properties of polypropylene mesh and its

24   appropriateness for use in vaginal mesh products."

25                "A complete picture of our
```

Confidential - Subject to Protective Order

1    understanding of the properties of polypropylene

2    mesh," do you see that?

3          A.       Yes.

4          Q.       If Ethicon was aware in March of 2012

5    that it was in the scientific literature that mesh

6    contraction or mesh shrinkage can occur at 30,

7    40 percent but it tells this regulatory body our

8    meshes do not shrink, that's not presenting a

9    complete picture of Ethicon's understanding of the

10   properties of polypropylene mesh, is it, sir?

11                 MR. DAVIS:  Object to the form.

12                 THE WITNESS:  Well, I can't comment

13   on what Sandy means by mesh does not shrink or do

14   not -- the meshes used do not shrink.  And I would

15   need -- you know, you would have to ask her

16   viewpoint in terms of what she means by that

17   statement relative to your statement about

18   contractures.

19   BY MR. ANDERSON:

20         Q.       If Ethicon and Johnson & Johnson

21   wanted to provide a complete picture of its

22   understanding of the properties of polypropylene

23   mesh with regard to mesh shrinkage, if it was going

24   to follow its credo, it would have provided the

25   literature and the testing of which it was aware

Confidential - Subject to Protective Order

```
 1   showing that there's mesh contraction or mesh
 2   shrinkage of up to 30 to 40 percent.
 3                 Would you agree with that?
 4                 MR. DAVIS:  Object to the form.
 5                 THE WITNESS:  If it had that data,
 6   that would certainly be part of the complete
 7   picture.
 8   BY MR. ANDERSON:
 9        Q.    Right.
10                 And if it had that data and did not
11   provide a complete picture, that's a violation of
12   its own credo.  Correct?
13                 MR. DAVIS:  Object to the form.
14                 THE WITNESS:  That's a judgment call
15   on the credo, and I'm not in a position to make a
16   judgment call on that.
17   BY MR. ANDERSON:
18        Q.    Let's go back to the credo.
19                 It says, "It is our" responsible --
20   "responsibility to ensure all Company-based" or
21   "medically relevant product information is fair and
22   balanced, accurate and comprehensive, to enable
23   well-informed risk-benefit assessments about our
24   products."
25                 When a regulatory body from the
```

Confidential - Subject to Protective Order

1    United Kingdom is asking about the mesh shrinkage of

2    your product, in order to follow your own credo at

3    Johnson & Johnson and Ethicon to provide fair,

4    balanced, accurate and comprehensive information and

5    to present a complete picture of the understanding

6    of the properties of polypropylene, you had an

7    obligation and a duty both internally and to this

8    regulatory body to ensure that you made them aware

9    of 30 to 40 percent mesh contraction or mesh

10   shrinkage of your products.  Agreed?

11                   MR. DAVIS:  Object to the form.

12                   THE WITNESS:  The inquiry is actually

13   made about the article.  It's not made about this

14   contracture to 30 or 40 percent.

15   BY MR. ANDERSON:

16        Q.     Let's go back to the initial request,

17   Mr. Burkley --

18        A.     Yeah.

19        Q.     -- from Clare Huntington.

20        A.     Okay.

21        Q.     She says, "Please could you provide

22   me with your comments on this issue and also tell me

23   about any testing you've carried out to show that

24   the meshes used do not shrink."

25                   Do you see that?

Confidential - Subject to Protective Order

```
 1        A.        Yes.

 2        Q.        And if you had testing carried out

 3   either internally or externally through consultants,

 4   published in the worldwide peer-reviewed literature

 5   that said polypropylene meshes shrink from 30 to

 6   40 percent, in keeping with your credo and in just

 7   doing the right thing, you should have told the MHRA

 8   that you're aware of mesh contraction or mesh

 9   shrinkage of 30 to 40 percent.

10              Do you agree?

11              MR. DAVIS:  Object to the form.

12              THE WITNESS:  I can't comment on who

13   generated the data that included the contraction

14   from 30 to 40 percent.  I don't know if that's an

15   internal study or an external study.  This statement

16   is asking for any testing that you've carried out to

17   show the meshes do not shrink.  That would fall

18   under Sandy's area of responsibility, and it

19   indicates that she has provided a response on our

20   testing that show that meshes do not shrink.  I

21   don't know how complete or incomplete that is, and I

22   really can't comment any further about it.

23   BY MR. ANDERSON:

24        Q.        Well, I'm going to ask you to comment

25   further about it, because it's one thing just to
```

Confidential - Subject to Protective Order

1   answer the question and only answer the question.

2   It's another to provide full and accurate

3   information, even if it wasn't the exact specific

4   technical question, wouldn't you agree?

5               MR. DAVIS:  Object to the form.

6               THE WITNESS:  In principle.  In

7   principle, I would agree with that.

8   BY MR. ANDERSON:

9       Q.      And if as of March of 2012 Ethicon

10  had internal PowerPoints and internal studies

11  showing that they were aware that all of their

12  polypropylene meshes shrink, that information should

13  have been provided to Mrs. Huntington at the MHRA.

14              Would you agree with that?

15              MR. DAVIS:  Object to the form.

16              THE WITNESS:  I can't comment on

17  that.  I personally don't know if such information

18  was available.  It's outside my area of expertise

19  and I just can't comment any further about it.

20  BY MR. ANDERSON:

21      Q.      Well, if you're in this --

22              They've asked you, you said there was

23  a series of meetings, there was e-mail

24  communications back in March of 2012 about providing

25  the response to the Clave article.  Correct?

Confidential - Subject to Protective Order

1          A.        Yes, yes.

2          Q.        If in the course of those meetings it

3     came up that Ms. Huntington has said that she would

4     like to know if we have any studies about mesh

5     shrinkage, if your company had internal documents

6     showing that they were aware of mesh shrinkage,

7     would you agree with me, sir, that those should have

8     been provided?

9                    MR. DAVIS:  Object to the form.

10    BY MR. ANDERSON:

11         Q.        Or that information should have been

12    provided to this regulatory person?

13                   MR. DAVIS:  Object to the form.

14                   THE WITNESS:  I can't make a comment

15    on that.  I don't know what information was there.

16    I don't know what information was available.  And I

17    don't know how it would all be put together to

18    present this, quote, complete picture.

19    BY MR. ANDERSON:

20         Q.        But that is my point, is if the

21    information was available to Johnson & Johnson and

22    Ethicon, when this woman made this response, as part

23    of this team, wouldn't you believe that this should

24    be provided to this woman --

25                   MR. DAVIS:  Object to the form.

Confidential - Subject to Protective Order

```
 1   BY MR. ANDERSON:

 2        Q.       -- whose job, at least in part, is

 3   ensuring patient safety, women's safety and

 4   well-being in the UK?

 5                 MR. DAVIS:  Object to the form.

 6                 THE WITNESS:  Again, that's a

 7   business decision that would be made by the

 8   regulatory affairs representative.

 9   BY MR. ANDERSON:

10        Q.       I'm not talking about the business

11   decision.  I'm talking about a women's health

12   decision.  We discussed a few minutes ago that a

13   regulatory body, part of what they do is try to

14   ensure patient safety.

15                 Now that you are aware -- strike

16   that.

17                 As part of this team, if you knew

18   that Ethicon had internal documents and was aware of

19   external studies by its own consultants showing mesh

20   contraction, don't you believe that women's health

21   dictated that you provide this information to this

22   regulatory body?

23                 MR. DAVIS:  Object to the form.

24                 THE WITNESS:  That information, if

25   it's available, should certainly be consulted and
```

Confidential - Subject to Protective Order

1    weighed in along with all the other data and

2    information that we have in order to address the

3    request about asking for any other information.

4    BY MR. ANDERSON:

5         Q.      Well, how about instead of just

6    consulting the information and weighing the

7    information, why not just turn it over to the

8    regulatory agency?  That's my question.

9                 MR. DAVIS:  Object to the form.

10                THE WITNESS:  That's not what was

11   asked.

12   BY MR. ANDERSON:

13        Q.      Okay.  And that was the point we got

14   to a few minutes ago.

15                And that is, you can either do a

16   technical reading of, well, that's not exactly what

17   she was asking, or you could say, this woman is

18   asking from a regulatory body what we know about our

19   mesh shrinkage, what testing's been done.

20                Don't you believe that women's health

21   is important enough for you guys to look internally

22   to see what documents you had, what studies you had,

23   and to look at the scientific literature and to

24   provide that information to her?

25                MR. DAVIS:  Object to the form.

Confidential - Subject to Protective Order

```
1                    THE WITNESS:  We were certainly

2    obligated to look at whatever information we had

3    available and offer basically -- as they said here,

4    provide comments on this issue and results of --

5    let's see.  And tell me about any testing that's

6    been carried out.  So that's what should be

7    addressed.

8    BY MR. ANDERSON:

9         Q.      And it was addressed.

10                   And instead of providing that

11   information, of which your company, a multi-billion

12   dollar manufacturer of medical devices, and in

13   particular these devices, that's what you were

14   obligated to tell her.  Correct?

15                   MR. DAVIS:  Object to the form.

16                   THE WITNESS:  I'm sorry, repeat that

17   again, please?

18   BY MR. ANDERSON:

19        Q.      Instead of providing that information

20   regarding mesh shrinkage and mesh contraction of

21   which your company was aware, your response simply

22   was our meshes don't shrink.  Correct?

23                   MR. DAVIS:  Object to the form.

24                   THE WITNESS:  I don't know what the

25   response was.  I have -- it indicates here that she
```

Confidential - Subject to Protective Order

1    has a response to show that meshes used do not

2    shrink.  I don't know the details of that report and

3    whether or not it includes any of the information

4    that you've cited -- that you've mentioned earlier,

5    so I'm really not -- that's not my area of expertise

6    and I really can't comment on what type of clinical

7    information was provided.

8    BY MR. ANDERSON:

9         Q.     You were asked to be a member of a

10   team that had a response to the Clave article.

11   Correct?

12        A.     That is correct.

13        Q.     As we've looked at these e-mails now,

14   now you understand that the reason for this response

15   was because of a request by a regulatory body in the

16   UK.  Correct?

17        A.     I do, yes.

18        Q.     And part of the reason that

19   regulatory body exists is to protect patient safety.

20   Correct?

21        A.     Yes, that's one of the reasons.

22        Q.     And if what they're trying to do is

23   protect patient safety, and in particular women's

24   safety and their health, shouldn't your company

25   provide the information that it has regarding

Confidential - Subject to Protective Order

1   shrinkage and contracture of meshes?

2                    MR. DAVIS:  Object to the form.

3                    THE WITNESS:  I don't know the answer

4   to that question.  There's a lot of factors involved

5   in terms of providing the information, and I'm

6   not -- I'm only one part of that team.  And again, I

7   don't know all the information that was available

8   and I don't know how much of that information was

9   used in the response.

10  BY MR. ANDERSON:

11       Q.      Is that okay for Johnson & Johnson

12  and Ethicon, when asked to comment on an article

13  that says that its polypropylene meshes may degrade

14  in a woman's pelvis, is it appropriate not to

15  provide all the information you have on that issue?

16                   MR. DAVIS:  Object to the form.

17                   THE WITNESS:  I don't know.  All the

18  information would have to be reviewed and evaluated

19  to see how much is applicable to the question.

20  BY MR. ANDERSON:

21       Q.      Okay.

22                   Well, now that we've talked about

23  this today, do you intend to go back to your

24  colleagues and -- I'm looking at the ethical R&D

25  credo.

Confidential - Subject to Protective Order

1                    Do you intend to leave our deposition

2    and challenge your colleagues regarding any ethical

3    concerns they may be if in fact they didn't provide

4    the information that they have regarding mesh

5    shrinkage and contracture to this woman from a

6    regulatory body seeking that information?

7                    MR. DAVIS:  Object to the form.

8                    THE WITNESS:  I don't know for a fact

9    they have not reported all the information.  I don't

10   know enough details to make a judgment call whether

11   or not an ethical issue has been violated or whether

12   one's even up to be challenged.

13   BY MR. ANDERSON:

14        Q.      Are you proud of being a Johnson &

15   Johnson and Ethicon employee?

16        A.      Yeah, I am.

17        Q.      So if you're proud of being an

18   employee of this company that provides products that

19   are going to be permanently implanted in women,

20   ethically are you going to leave here as a scientist

21   and a proud employee and ask your colleagues whether

22   or not all of the information was provided to this

23   regulatory agency when it was asked?

24                    MR. DAVIS:  Object to the form.

25                    THE WITNESS:  Well, I'm aware of

Confidential - Subject to Protective Order

1    polypropylene products, both sutures and meshes,

2    have had at least 40 years clinical experience as

3    being nonabsorbable sutures.  And, you know, so I'm

4    pretty comfortable with Prolene as a nonabsorbable

5    material.  Again, I don't know the specifics about

6    what data was available and what wasn't available,

7    but I do have confidence in my colleagues, both from

8    the clinical and preclinical and regulatory affairs,

9    that, you know, they're the right people to make --

10   you know, to review that data and determine what

11   should be reported to the MHRA.

12   BY MR. ANDERSON:

13        Q.      So you're not going to go say

14   anything after this deposition to your colleagues

15   about whether or not they should provide more

16   information on mesh shrinkage and mesh contracture

17   to this regulatory body, are you?

18        A.      No.  And I probably shouldn't do that

19   for legal reasons, since there's current trials and

20   I haven't talked to my -- any of my colleagues about

21   any of this.

22        Q.      Forget the legal reasons, what about

23   the patient safety reasons.  Let's talk about that

24   for a minute.

25                Isn't women's -- new question.

Confidential - Subject to Protective Order

1                       Isn't women's health important enough

2       that if you have information that you could provide

3       to a regulatory body of which you're aware regarding

4       degradation or shrinkage of your meshes, that you

5       provide that to the regulatory body?

6                       MR. DAVIS:  Object to the form.

7                       THE WITNESS:  That's -- again,

8       that's -- I'm not a -- I'm not in preclinical, I'm

9       not a clinician, that's not my area of expertise.

10      And all I know is that whatever information I do

11      have should be provided to, you know, those experts

12      within my company to use as appropriate for

13      responding to regulatory agencies.

14      BY MR. ANDERSON:

15             Q.      You said you had 40 years of

16      experience with Prolene sutures, therefore, you had

17      a certain confidence level.  Correct?

18             A.      Well, Prolene itself has had 40 years

19      of clinical experience, so I'm pretty confident in

20      the Prolene line of products.

21             Q.      Right.

22                     And the Clave article had both

23      Prolene and Prolene Soft in it, didn't it?

24             A.      It did.

25             Q.      So you told us a little while ago in

Confidential - Subject to Protective Order

1    the deposition that in 34 years at the company,

2    you're only aware of one degradation study that was

3    done 25 -- 28 years ago that was in a dog's heart.

4              Do you remember that testimony?

5         A.    Yes, I do.

6         Q.    So your company hadn't even done any

7    degradation studies at the time Clave came out.

8    Correct?

9              MR. DAVIS:  Object to the form.

10             THE WITNESS:  Well, it's a

11   nonabsorbable material, and the clinical data that

12   was available supported that.

13   BY MR. ANDERSON:

14        Q.    Yes.

15             But now you have an article with 100

16   explants where it shows that polypropylene mesh that

17   had been extracted and excised from women's pelvises

18   showed that there was in fact degradation.  Correct?

19             MR. DAVIS:  Object to the form.

20             THE WITNESS:  I don't know -- well, I

21   don't know for sure if that was degradation.

22   There's certainly some evidence supporting that

23   there may be some surface sites that are showing the

24   initial signs of degradation.

25   BY MR. ANDERSON:

Confidential - Subject to Protective Order

1      Q.      And if it's showing the initial signs

2   of degradation that supported their conclusion that

3   polypropylene is not inert, why didn't your company

4   do any degradation studies --

5              MR. DAVIS:  Object to the form.

6   BY MR. ANDERSON:

7      Q.      -- after that?

8      A.      I'm not convinced that polypropylene

9   is not inert.

10     Q.      And as a scientist, there's the thing

11  called the scientific method.  Correct?

12     A.      Sure.

13     Q.      You have a theory, and then you work

14  to see if you can prove that theory.  Correct?

15     A.      Yeah.

16     Q.      So if your theory is I'm not

17  convinced that it cracks, where is your proof that

18  it doesn't?  What study has Ethicon done regarding

19  explanted mesh from a woman's pelvis where you could

20  actually look at degradation?

21     A.      Well, considering that Prolene mesh

22  is made out of Prolene fiber, you could still go

23  back to suture studies, which is why -- you know,

24  and again, there's 40 year -- 40-plus years of

25  history as -- for -- of polypropylene being used as

Confidential - Subject to Protective Order

1    a nonabsorbable suture material.

2          Q.      The only one that you're aware of

3    that Ethicon actually did was a seven-year dog study

4    from the heart.

5                  So what I'm asking you is, when you

6    were made aware of Clave's study, why didn't Ethicon

7    or Johnson & Johnson -- strike that?

8                  Johnson & Johnson/Ethicon did not do

9    any degradation study after Clave came out to either

10   confirm or refute those findings, did it?

11                 MR. DAVIS:  Object to the form.

12                 THE WITNESS:  Well, I'm not aware of

13   any degradation studies.  That doesn't mean that

14   none were done.

15   BY MR. ANDERSON:

16         Q.      When you leave the deposition today,

17   are you going to go ask your colleagues whether or

18   not any degradation studies have been done since

19   your seven-year dog study back in the '80s?

20                 MR. DAVIS:  Object to the form.

21                 THE WITNESS:  Not until after the

22   litigation issues have been resolved.

23   BY MR. ANDERSON:

24         Q.      Why not?

25         A.      Because there are legal implications.

Confidential - Subject to Protective Order

1       Q.      What's more important, legal

2    implications or making sure that women don't have

3    degraded polypropylene in their pelvises?

4               MR. DAVIS:  Object to the form.

5    BY MR. ANDERSON:

6       Q.      That's my question.

7               What's more important, the legal

8    ramifications for your company of asking your

9    colleagues if they've done degradation studies or

10   letting -- or finding out whether or not the

11   polypropylene that are in women's pelvises

12   permanently implanted actually degrade?

13              MR. DAVIS:  Object to the form.

14   BY MR. ANDERSON:

15      Q.      Which one is more important?

16      A.      Well, I'm pretty confident that the

17   polypropylene itself does not degrade to any

18   significant degree, so the risk I believe is

19   minimal.

20      Q.      That's not the answer to my question.

21              My question, you said that there's

22   legal implications if you go and ask your colleagues

23   if they've done any degradation studies since the

24   '80s and certainly since this Clave article came out

25   in 2010 and since you were asked to be on a

Confidential - Subject to Protective Order

```
 1   committee or a group of people in 2012 that looked
 2   at this degradation issue in response to a foreign
 3   regulatory body's request.
 4                 And so my question is, are you that
 5   worried about legal implications that you won't ask
 6   your colleagues about this, when in the balance is
 7   degraded polypropylene in a woman's pelvis?
 8                 MR. DAVIS:  Object to the form.
 9                 THE WITNESS:  No, but I'm willing to
10   respect the possible legal risks involved, and I'm
11   confident that the people that are involved in those
12   studies, whether they be in the clinical or
13   preclinical area, you know, are certainly going to
14   be asked that information with respect to any
15   investigations from, you know, as part of this
16   litigation.  So it's -- I'm sure that information is
17   going to come out if it does exist.
18   BY MR. ANDERSON:
19        Q.     What do you mean by that, I'm sure
20   that information is going to come out if it exists?
21        A.     Right.  As I said before, I don't
22   know if there were degradation studies initiated, to
23   my knowledge.
24        Q.     Okay.
25        A.     But if I would -- you know, but I'm
```

Confidential - Subject to Protective Order

1    assuming that if such studies were done, they would

2    have been organized either under preclinical or

3    clinical.

4          Q.     And then you see in this exhibit, the

5    last couple of sentences, after it says that we are

6    going to "present a complete picture of our

7    understanding of the properties of polypropylene

8    mesh and its appropriateness for use in vaginal mesh

9    products.  At the end, we can add in Piet's comments

10   from a clinical perspective as well.  The response

11   will be a work of art!"

12              Would the response be a work of art

13   if it doesn't complete -- if it doesn't give the

14   complete picture?

15              MR. DAVIS:  Object to the form.

16   BY MR. ANDERSON:

17         Q.     And you know what I mean by this?

18   It's not an appropriate complete picture if you

19   don't provide the information that you have

20   available to you that's relevant to the issues of

21   degradation and shrinkage.  That's not much of a

22   work of art, is it, sir?

23              MR. DAVIS:  Object to the form.

24              THE WITNESS:  I can't comment on

25   that.  That's Laura's comment.  I don't know what

Confidential - Subject to Protective Order

1    she means by that.

2    BY MR. ANDERSON:

3         Q.      Well, then let's take it out of the

4    context of a work of art.

5              It's not a good piece of work by

6    Ethicon and Johnson & Johnson if somebody charged

7    with patient safety in the UK is asking you for

8    information about contraction and shrinkage and you

9    don't provide all the information you have.  That's

10   not good work?

11             MR. DAVIS:  Object to the form.

12             THE WITNESS:  The response may not

13   require every last piece of work.

14   BY MR. ANDERSON:

15        Q.      I didn't ask about every last piece

16   of work.

17        A.      You said all.

18        Q.      Yeah.

19             If you have relevant information to

20   this issue to present the complete picture --

21        A.      Right.

22        Q.      -- and you have your own internal

23   documents at Johnson & Johnson/Ethicon saying, we

24   are aware of mesh shrinkage and mesh contraction of

25   30 to 50 percent of our meshes, if you don't provide

Confidential - Subject to Protective Order

1   that to the UK, it's not a complete picture and it's

2   certainly not a work of art.  Would you agree with

3   that?

4                    MR. DAVIS:  Object to the form.

5                    THE WITNESS:  I don't know the value

6   of that information with respect to answering the

7   questions from the MHRA.  That would be the

8   responsibility of the preclinical or clinical

9   representatives.

10  BY MR. ANDERSON:

11       Q.     Let's just use common sense, like

12  being a scientist and being an employee of a company

13  that you say you're proud to work for.

14                    If a regulatory body read this Clave

15  article and they sent a direct request to your

16  company saying can you provide me with any testing

17  that you have on this shrinkage and respond to this

18  article, the right thing to do would be to look and

19  see if you have that information, and if you have

20  it, provide it to them, regarding shrinkage and

21  contraction of your polypropylene meshes.  Right?

22                    MR. DAVIS:  Object to the form.

23                    THE WITNESS:  It depends on the

24  circumstances and the details of the request.

25  BY MR. ANDERSON:

Confidential - Subject to Protective Order

1          Q.       The circumstances and the details are

2     that a regulatory body charged with patient safety,

3     and in this case women's safety, is asking your

4     company for this information about mesh shrinkage

5     and mesh contraction.  And you are in a group that

6     is charged with doing that.  That's the backdrop.

7     That's the context.

8                    So my question in that context is, if

9     someone were to put a stack of documents in front of

10    you that had scientific literature done by your

11    consultants and internal PowerPoints and other

12    documents indicating that people at Johnson &

13    Johnson and Ethicon charged with responsibility for

14    patient safety and safe product design have said

15    that they're aware of 30 to 40 percent contraction

16    and shrinkage, if you're in that room and you had

17    those documents, you, Dan Burkley, would you say,

18    I've seen the response, this is a regulatory body,

19    let's provide those to her?  Or would you say,

20    that's a business decision, that's up to you guys, I

21    wash my hands of it, I don't want to be involved in

22    that?  Which way would you go?

23                   MR. DAVIS:  Object to the form.

24                   THE WITNESS:  I would go and review

25    the data, each piece, see which ones were

Confidential - Subject to Protective Order

1    appropriate for the response.  It's possible that

2    there's data that may be inconsequential or not

3    directly related to what the MHRA has requested.  So

4    consequently, it wouldn't -- it may not be necessary

5    to include it.  But again, I'm not -- you know,

6    this -- that information that you're asking for is

7    either the clinical or preclinical data, and I'm not

8    the one that's appropriate to make a judgment call

9    as to which articles or which data should be

10   included in the response.

11   BY MR. ANDERSON:

12        Q.      Well, there was some -- there was

13   certainly nothing that prevented you or your team in

14   providing this response to her, nothing that

15   prevented you from saying, here's our information.

16   This information over here is of what we consider to

17   be limited value, but it may be important to your

18   decision, this we think is of greater value, and let

19   her make the decision as to whether or not that

20   information is important rather than you making the

21   decision as to whether or not it was important, as

22   Ethicon and Johnson & Johnson?  Nothing prevented

23   you from doing that?

24             MR. DAVIS:  Object to the form.

25   Object to the form.

Confidential - Subject to Protective Order

1            THE WITNESS:  Well, it would

2    certainly be -- you know, the company would

3    certainly reserve the right in terms of how it

4    wishes to do that.  But if it wants to take that

5    information and you know, review it internally

6    before it releases it, I mean, it certainly has that

7    right to do that.

8    BY MR. ANDERSON:

9        Q.      To your knowledge and as you sit here

10   today, this team that you were asked to be a part of

11   in March of 2012 to respond to the Clave article

12   never provided any documents or information

13   concerning mesh shrinkage or mesh contraction other

14   than to say our meshes don't shrink.

15            Is that your understanding as you sit

16   here today?

17            MR. DAVIS:  Object to the form.

18            THE WITNESS:  I'm not aware of what

19   information the preclinical or clinical

20   representatives provided.

21   BY MR. ANDERSON:

22       Q.      Why are you limiting it to

23   preclinical and clinical?  I don't understand why

24   you keep going to that.

25       A.      Well --

Confidential - Subject to Protective Order

1          Q.          You're an engineer, and so I'm asking

2    you as part of the team, as you sit here today -- so

3    let me reask my question.

4          A.          Sure.

5          Q.          You as an engineer who was invited to

6    be on this team because of your expertise --

7          A.          Right.  In analytical chemistry and

8    scanning electron microscopy.

9          Q.          Right.

10               You're not aware of any information

11   that was provided by this team to the MHRA

12   concerning degradation and shrinkage other than to

13   say our meshes don't shrink.  Correct?

14               MR. DAVIS:  Object to the form.

15               THE WITNESS:  I'm not aware of what

16   information was provided by the clinical or

17   preclinical representatives that would address that.

18   BY MR. ANDERSON:

19         Q.          And if Ethicon/Johnson & Johnson had

20   employees and documents within its organization that

21   do believe that their meshes in fact shrink and

22   suffer contraction, do you as a scientist and a

23   43-year employee believe that that information

24   should have been provided to the MHRA in response to

25   this request?

Confidential - Subject to Protective Order

1              MR. DAVIS:  Object to the form.

2              THE WITNESS:  That depends on the

3    request and the circumstances.

4    BY MR. ANDERSON:

5         Q.     Well, we've gone through the request

6    and the circumstances time and again.  The request

7    and the circumstances are this.  The Clave article

8    came out, the regulatory body in the UK asked your

9    company for any testing they have on shrinking

10   meshes.  That's the context.  That's the basis under

11   which it was asked.  You formed a committee under

12   that basis.

13        A.     We did.

14        Q.     And my question is, when they were

15   asked the question, what testing do you have and

16   please respond as to whether your meshes shrink,

17   this group, this company, did not provide any data

18   to your knowledge or documents concerning anyone's

19   belief in the company that their meshes shrink or

20   contract?

21             MR. DAVIS:  Object to the form.

22   BY MR. ANDERSON:

23        Q.     Correct?

24             MR. DAVIS:  Object to the form.

25             THE WITNESS:  I'm not aware of any.

Confidential - Subject to Protective Order

1    Now, it indicates here that Sandy has provided a

2    response in her testing to show that meshes do not

3    shrink.  I don't know the details of that.

4                    MR. ANDERSON:  Plaintiff's Exhibit

5    T-273.

6                         -  -  -

7                    (Deposition Exhibit No. T-273, E-mail

8              chain, top one dated 29 Feb 2012, Bates

9              stamped ETH.MESH.04038180 and

10             ETH.MESH.04038181, was marked for

11             identification.)

12                       -  -  -

13   BY MR. ANDERSON:

14        Q.     Last four Bates 8180.

15               An e-mail that will start in the

16   middle of the first page from Dennis Jamiolkowski to

17   you dated February 28, 2012.

18               Do you see this?

19        A.     Yes.

20        Q.     The subject is "Your Professional

21   Opinion."

22               Do you see that?

23        A.     I do.

24        Q.     "Daniel, I have a request of you

25   relying on your considerable experience in the field

Confidential - Subject to Protective Order

```
 1    of microscopy, especially SEM, and most of all on

 2    the imaging of surgical threads including

 3    polypropylene.

 4                 "I would like you to review the

 5    paper," and it lists the title of the Clave article.

 6    Correct?

 7         A.     Yes.

 8         Q.     And it was attached to that.

 9    Correct?

10         A.     Yes.

11         Q.     And then in all caps, "PLEASE DO NOT

12    COMMUNICATE ANY OPINIONS VIA E-MAIL AS THESE TYPES

13    OF COMMUNICATIONS MAY BE EASILY MISINTERPRETED BY

14    OTHERS."

15                 Others like me, like lawyers or a

16    regulatory body?  Who are others?

17                 MR. DAVIS:  Object to the form.

18                 THE WITNESS:  Basically by anybody

19    who is not a part of the e-mail chain.

20    BY MR. ANDERSON:

21         Q.     Well, why don't you just keep people

22    on the part of the e-mail chain who are involved in

23    the group?

24                 MR. DAVIS:  Object to the form.

25    BY MR. ANDERSON:
```

Confidential - Subject to Protective Order

1     Q.     What's --

2            To your understanding, what was

3     Dennis so worried about, about communication via

4     e-mail?

5            MR. DAVIS:  Object to the form.

6     BY MR. ANDERSON:

7     Q.     Was it such a highly sensitive topic

8     that you guys didn't want to put much in e-mail and

9     you wanted to keep it more verbal communication?

10           MR. DAVIS:  Object to the form.

11           THE WITNESS:  He was probably

12    concerned about having a sentence taken out of

13    context or misinterpreted.

14    BY MR. ANDERSON:

15    Q.     Or as you've referred to a few times

16    here in the deposition, worried about legal

17    concerns, huh?

18           MR. DAVIS:  Object to the form.

19           THE WITNESS:  That is a consideration

20    as well.

21    BY MR. ANDERSON:

22    Q.     And then at the top there, Dennis

23    sends an e-mail on February 29, 2012, the next day,

24    "Dan Burkley, a Principle Scientist in our

25    Analytical Group with extensive experience in the

Confidential - Subject to Protective Order

1    field of microscopy, has had a chance to review the

2    paper in question.  (Please see the e-mail stream

3    below)."

4                    So evidently you received it on the

5    28th, reviewed it and had reviewed it by the next

6    day.

7                    Is that what this e-mail chains seems

8    to indicate?

9         A.    Yes.

10        Q.    And is that representative of your

11   recollection or memory as to what happened?

12        A.    Yes.

13        Q.    Did you get a phone call before you

14   got this e-mail from anyone indicating that they

15   were going to be sending this to you or that there

16   were some issues concerning this that they were

17   going to forward the paper to you, or did it kind of

18   come out of the blue, as you recall?

19        A.    No.  I probably got a call from

20   Dennis.

21        Q.    And what did Dennis say in that phone

22   call?

23                    MR. DAVIS:  Object to the form.

24                    THE WITNESS:  I don't recall

25   specifically, but that he wanted my professional

Confidential - Subject to Protective Order

1    opinion.

2    BY MR. ANDERSON:

3         Q.       He didn't mention to you that a

4    regulatory body was asking for information

5    concerning this?

6         A.       I don't recall that, no.

7         Q.       What else do you recall about that

8    initial phone call?

9         A.       That he wanted me to review an

10   article.

11        Q.       And provide feedback?

12        A.       Right.

13        Q.       And once you reviewed it, did you

14   provide that feedback to him verbally?

15        A.       I did.

16        Q.       And what did you tell him?

17        A.       I made a comments on the scanning

18   electron microscopy images in that they were very

19   similar to the explants that I had observed from the

20   seven-year dog study and that I believe that the

21   cracking phenomenon was generated due to desiccation

22   of the test article during preparation.

23        Q.       Desiccation meaning what?

24        A.       It basically gets dried out.

25        Q.       Where are those SEMs from your dog

Confidential - Subject to Protective Order

1  study?  They're kept in your files or on your

2  computer or in a hard copy?

3       A.      Well, the images that were taken

4  would have been on Polaroids, so I believe those

5  Polaroids still exist.

6       Q.      And where are those?

7       A.      They should be in T106 in a research

8  tower.

9               MR. DAVIS:  I'm sorry, I couldn't

10  hear.

11  BY MR. ANDERSON:

12       Q.      T106 research tower?

13       A.      Right.

14       Q.      And where is the research tower?

15       A.      That's located at the Somerville

16  campus at Ethicon.  It's the tallest building here.

17       Q.      And T106, is that a room?

18       A.      Yeah.  That's a laboratory.

19       Q.      Who maintains the laboratory?

20       A.      I do.

21       Q.      Is that where you go to work every

22  day essentially?

23       A.      In general, yeah, yeah.

24       Q.      In other words, do you have your desk

25  and your phone and your computer is there?

Confidential - Subject to Protective Order

1      A.      No, no, my office is not in there.

It used to be, but no longer.

3      Q.      Because this is the lab and you just

4  go there for --

5      A.      Yeah.

6      Q.      And so if I ask you after the

7  deposition to go to the laboratory at T106 and

8  retrieve those images and make copies of them for

9  your counsel, will you agree to do that, please?

10      A.      Yes.

11      Q.      Yes?  Okay.

12              MR. ANDERSON:  Counsel, if I could

13  request that once he makes copies of those images,

14  that you provide them to me, would you agree to do

15  that?

16              MR. DAVIS:  I'll make note of that

17  request.

18              MR. ANDERSON:  Given that they are

19  Polaroids and they've been around for a little

20  while, if the copies aren't very good, we may just

21  want to come look at the originals.  Okay?

22              MR. DAVIS:  My only hesitancy is I'm

23  not in charge of documents.  I'll pass it along to

24  the people in charge, I'll -- you know.

25              MR. ANDERSON:  That's all I can ask.

1    You're here representing the company today.

2                    MR. DAVIS:  I understand.

3                    MR. ANDERSON:  I've got nobody else

4    to talk to.

5                    MR. DAVIS:  That's why I say, I'll

6    pass it along.  I've got no problem with your

7    request for the production.

8                    MR. ANDERSON:  Okay.  We've got one

9    minute left on the tape.  It's probably a good time

10   for a lunch break.

11                   MR. DAVIS:  Sure.

12                   THE VIDEOGRAPHER:  Going off the

13   record.  The time is 12:23 p.m.  This is the end of

14   Tape 2.

15                        -  -  -

16                   (A luncheon recess was taken from

17           12:23 p.m. to 1:17 p.m.)

18                        -  -  -

19                   THE VIDEOGRAPHER:  We are back on the

20   record.  Here marks the beginning of Volume Number 1

21   and Tape Number 3 in the deposition of Daniel

22   Burkley.  The time is 1:17 p.m.

23   BY MR. ANDERSON:

24        Q.      Going back real briefly, those SEMs

25   that you have from the dog study that are over in

Confidential - Subject to Protective Order

1    tower -- in T106 in the research tower, you still

2    have the SEMs of the competitor's meshes as well or

3    the competitors' sutures as well?

4         A.     They would be included in there, yes.

5         Q.     Did they show cracking as well?

6         A.     Some did, some didn't.

7         Q.     Was it to the extent that the Prolene

8    suture was cracked?

9                MR. DAVIS:  Object to the form.

10               THE WITNESS:  Not to the same degree.

11   BY MR. ANDERSON:

12        Q.     And your conclusion as to what the

13   cracking was on the Prolene suture was?

14        A.     Well, the cracking itself I believe

15   was an artifact from desiccation effect.  But that

16   still, the fact that the cracking, whether it's an

17   artifact or not, it would still indicate that that

18   surface area has undergone some type of change.

19        Q.     And you didn't do any further studies

20   yourself in order to see what the cause of that type

21   of change was on the surface area.  Correct?

22        A.     No additional studies, no.

23        Q.     And you did no additional studies,

24   you or anyone at Ethicon, to your knowledge, of

25   explants that came from a woman's vagina versus a

Confidential - Subject to Protective Order

1    suture that came from a dog's heart.  Correct?

2         A.      I'm not aware of any such studies,

3    no.

4         Q.      And the Clave study actually looked

5    at explanted polypropylene meshes, including Ethicon

6    and Johnson & Johnson meshes, that actually had been

7    explanted from a woman's vaginal space.  Correct?

8               MR. DAVIS:  Object to the form.

9               THE WITNESS:  Yes, I believe so.

10   BY MR. ANDERSON:

11        Q.      So when you go and get those SEMs, I

12   want all the SEMs from the dog study, please, sir.

13   Okay?

14        A.      Yes.

15        Q.      Do you keep anywhere in your files at

16   the laboratory or otherwise any other SEM

17   photographs or other analytical results from an

18   examination of Ethicon or competitors' polypropylene

19   meshes?

20        A.      Well, there would be data on any

21   other analytical testing that was done basically on

22   any of our materials or products that were archived

23   or logged in under a service request number or LIMs

24   number.

25        Q.      What about specific to degradation or

Confidential - Subject to Protective Order

1    any surface irregularities of polypropylene mesh of

2    either Ethicon's products or a competitor's

3    products, do you have SEM photos in your lab of

4    those?

5         A.      There may be SEM images.  SEM is not

6    necessarily routinely done for competitive

7    assessment but may be done on occasion.

8         Q.      And those would be contained in the

9    same place?

10        A.      Yes, they would.

11               MR. ANDERSON:  We'll request those as

12   well, Counsel.

13               MR. DAVIS:  Specifically what is

14   that?

15               MR. ANDERSON:  SEM or other

16   analytical chemistry photographs or microphotographs

17   of Ethicon's polypropylene fibers or meshes or

18   sutures as well as competitors' that are also kept

19   by Ethicon.

20   BY MR. ANDERSON:

21        Q.      So after you determined that the

22   surface cracking on the suture from the dog study

23   was an artifact from desiccation, did you endeavor

24   to develop any sort of analysis that would attempt

25   to look at surface cracking or other surface

Confidential - Subject to Protective Order

1    irregularities in which you could remove or take out

2    of the equation artifacts that may be due to

3    desiccation?

4                In other words, you thought that

5    artifacts from desiccation were what caused these

6    cracks.  Did you attempt to develop any sort of

7    scientific method or analysis that would rule out

8    artifact or desiccation from a review of the surface

9    of polypropylene fibers?

10               MR. DAVIS:  Object to the form.

11               THE WITNESS:  Well, the challenge is

12   to try to take an explanted material and remove any

13   attached tissue, proteins, that are on there so that

14   you can examine the surface.  Since SEM is a surface

15   examination technique, if that's not removed, then

16   all you're going to see is a deposit of material on

17   top of the explant.  So if you really want to get at

18   the surface, there has to be some type of a sample

19   preparation or treatment plan to remove the tissue

20   and proteins.  I recall one experiment where they

21   tried to use a treatment called Soluene, which is

22   supposed to be effective at removing tissue.

23   BY MR. ANDERSON:

24        Q.     How do you spell that?

25        A.     S-O-L-U-E-N-E.

Confidential - Subject to Protective Order

1      Q.      You said they attempted to use it.

2              Who's they?

3      A.      That would be either the -- those

4  that were responsible for the implantation and

5  explantation.

6      Q.      At Ethicon?

7      A.      Yeah.  It's the surgery group.

8      Q.      So the surgery group attempted to use

9  Soluene to do what?

10     A.      To remove the residual tissue and/or

11 proteins on the implants.

12     Q.      Did that attempt fail or have any

13 sort of flaws?

14     A.      Well, it did remove the surface

15 tissues and proteins, but again, when you're drying

16 the explants, which SEM at that time had to be done

17 under high vacuum, you're going to end up

18 desiccating the sample anyway.  And the cracking

19 phenomenon was still observed.

20     Q.      I'm not a scientist, so bear with me.

21              But if one were to attempt an

22 analysis of explanted polypropylene fibers and

23 wanted to use a chemical like Soluene or something

24 else in order to remove residual tissue and protein,

25 but they were concerned that that process itself

Confidential - Subject to Protective Order

1    could lead to surface cracking, in order to rule out

2    whether or not the Soluene or some other chemical

3    that's being used to remove that residue, to rule

4    out that it is causing the cracking, you could put

5    that on a pristine sample and then do the analysis.

6    If you don't see the cracking on the pristine sample

7    but you see it on the other, wouldn't that lead one

8    to believe that the cracking may be due to something

9    other than the Soluene?

10                    MR. DAVIS:  Object to the form.

11                    THE WITNESS:  Well, that experiment

12   would indicate that the solvent, or the Soluene in

13   this case, does not affect the polypropylene itself.

14   BY MR. ANDERSON:

15        Q.      Right.

16        A.      It still indicates -- you know, as I

17   said before, the evidence, the fact that you see

18   cracking may be an artifact, but the fact -- whether

19   it's an artifact or not, it still indicates that

20   that surface, something has happened to it.

21        Q.      That's right.  And that's my point,

22   is that if you wanted to make sure that the surface

23   cracking of an explanted polypropylene was not due

24   to the solvent to remove the tissue and the protein,

25   you could use that solvent on a pristine mesh and if

Confidential - Subject to Protective Order

```
 1   you don't see the same cracking, that would lead the

 2   scientists to look into other factors that may have

 3   caused the cracking.

 4               Can we agree to that?

 5               MR. DAVIS:  Object to the form.

 6               THE WITNESS:  No.  I would only

 7   indicate that the solvent -- that that treatment is

 8   not affecting the unimpacted areas of the

 9   polypropylene fiber.  The impacted area, in other

10   words, the area that's undergone some type of

11   change, that change would not still be completely

12   understood.  It's possible that it may not have been

13   cracked in vivo, but the cracking could have been

14   generated during the desiccation process.

15   BY MR. ANDERSON:

16        Q.     Well, that's my point.  Maybe we're

17   not communicating well.

18               If you take a polypropylene fiber

19   that is pristine, in other words, it has not been

20   implanted, and you dip it in Soluene and you observe

21   it under SEM and you don't see surface cracking --

22        A.     Right.

23        Q.     -- and you take an explanted mesh

24   and/or fiber and you put it in Soluene and there is

25   surface cracking, that would lead the scientist to
```

Confidential - Subject to Protective Order

1    at least go down a course of, well, if the Soluene

2    didn't cause it, what did.  Correct?

3        A.        Right.

4        Q.        Okay.  That's my point.

5                  So if you wanted to determine whether

6    or not, for instance, the suture that came out of

7    the dog heart had surface cracking due to

8    desiccation from the residue --

9        A.        From the sample preparation.

10       Q.        -- from the sample preparation, you

11   could use the same sample preparation on a pristine

12   fiber.  And if you don't see the cracking, that

13   might lead you to believe, ah, it's not artifact due

14   to desiccation, it may be due to something else,

15   let's do some more testing.

16                  Can we agree to that?

17                  MR. DAVIS:  Object to the form.

18                  THE WITNESS:  It would indicate that

19   there is a surface area that's been affected.  How

20   to characterize that effectively is still a

21   challenge.  The Soluene is effective in removing the

22   tissue and the proteins, and you do see, you know,

23   an affected surface that's cracking.  What's not

24   completely understood is whether the cracking is

25   originally present in the implanted device or

Confidential - Subject to Protective Order

```
1   whether the cracking was generated during the sample

2   prep.  It still represents that that surface -- that

3   something has happened to that surface, but the

4   state of that surface in vivo is still not

5   completely understood.

6   BY MR. ANDERSON:

7        Q.      That's right.

8                And when we don't completely

9   understand something that may cause a failure of a

10  particular implantable medical device, one thing we

11  can do is study that.  Correct?

12       A.      Yes.

13               MR. DAVIS:  Object to the form.

14  BY MR. ANDERSON:

15       Q.      And to your knowledge, Ethicon never

16  studied that in order to determine as to whether or

17  not this surface cracking was due to preparation

18  versus some in vivo action.  Correct?

19               MR. DAVIS:  Object to the form.

20               THE WITNESS:  Well, work on the

21  explants was done to try to determine if there were

22  better ways to isolate or, excuse me, to separate

23  proteins and/or tissue, so -- and even with the

24  presence of the cracking, you know, some testing was

25  done to try to understand, okay, what is exactly
```

Confidential - Subject to Protective Order

1    there, you know, regardless of the fact that it is

2    cracked, what does it look like, you know, what kind

3    of characteristics does it have.

4    BY MR. ANDERSON:

5         Q.    Well, "some testing was done to try

6    to understand, okay, what is exactly there, you

7    know, regardless of the fact that it is cracked,

8    what does it look like, you know, what kind of

9    characteristics does it have."

10                  That doesn't tell me anything.  What

11   I'm trying to find out, sir, it's more of a yes or

12   no question.  Okay?

13                  After you determined that in your

14   opinion this dog suture had cracking that was due to

15   the preparation of the sample versus something else,

16   what did you, Dan Burkley, do or another analytical

17   scientist or someone at Ethicon, in order to do a

18   different study, to say, okay, I want to find out if

19   pristine samples have this kind of cracking after

20   this same preparation so that you could determine

21   whether or not this was actually in vivo degradation

22   or in vivo cracking that was going on versus

23   something due to the sample preparation.  That's

24   what I'm talking about.  So it's a yes or a no.

25                  Were other studies done after that,

Confidential - Subject to Protective Order

1    yes or no?

2              MR. DAVIS:  Object to the form.

3              THE WITNESS:  Other testing was done

4    on those same explants.

5    BY MR. ANDERSON:

6         Q.    Okay.

7              What testing was that?  Because I've

8    not seen those documents.  I saw the seven-year dog

9    study and the result of that.

10             Is --

11             Was there something done after that

12   seven-year dog study?

13        A.    The seven-year dog study would have

14   included information such as molecular weight.

15   There would have been some physical testing as well.

16        Q.    What do you mean by some physical

17   testing?

18        A.    Like tensile testing.

19        Q.    So is it your opinion that if there

20   is surface cracking of a polypropylene fiber, if it

21   still has the same strength it had before going in,

22   that surface cracking is not due to in vivo

23   degradation?

24        A.    No, that's not necessarily --

25   that's -- I wouldn't necessarily conclude that, no.

Confidential - Subject to Protective Order

1          Q.      Right.

2                  Because that seemed to be the

3    hypothesis that you were working under the last time

4    you and I met, and we never could communicate on it,

5    so I wanted to make sure that that wasn't what you

6    were saying.  That just because the tensile testing

7    matches from prior to implantation to after

8    explantation, that surface cracking can't be due to

9    degradation in vivo just because they have the same

10   tensile strength?

11         A.      No.

12         Q.      Is that right?

13         A.      No.

14                 MR. DAVIS:  Object to the form.

15                 THE WITNESS:  No, that's correct.

16   BY MR. ANDERSON:

17         Q.      Okay.

18         A.      It only indicates that what is --

19   what areas of the surface that are being affected

20   apparently have no impact on the performance of the

21   suture.

22         Q.      The performance of the suture, yes,

23   but you didn't do any further studies to see what

24   might be happening with the performance of the

25   suture vis-à-vis the foreign body reaction and what

Confidential - Subject to Protective Order

1   was happening in the woman's vaginal space with

2   surgical meshes, did you?

3                   MR. DAVIS:  Object to the form.

4                   THE WITNESS:  No studies of the

5   latter nature that you had indicated were done, to

6   my knowledge.

7   BY MR. ANDERSON:

8        Q.      And if the credo at Johnson & Johnson

9   and Ethicon stands for a proposition that patient

10  safety is a priority, would you agree with me that

11  it's not in keeping with the credo if you don't do

12  the further study to determine whether or not there

13  is in fact surface cracking and degradation of the

14  polypropylene fibers when it's in a woman's vagina?

15                  MR. DAVIS:  Object to the form.

16  BY MR. ANDERSON:

17       Q.      It's not in keeping with the credo if

18  you don't follow that up.  Do you agree?

19                  MR. DAVIS:  Object to the form.

20                  THE WITNESS:  That's subject to

21  interpretation.

22  BY MR. ANDERSON:

23       Q.      Yeah.  And you're the guy that is in

24  the seat to interpret today.  I apologize, but

25  that's just the nature of the process.

Confidential - Subject to Protective Order

1                    And so if you are aware that there's

2    surface cracking, you believe that -- from a suture

3    from a dog's heart that it might be due to

4    desiccation or artifact from the preparation of the

5    sample, shouldn't women who are going to have

6    polypropylene fibers implanted permanently in their

7    vaginas be able to trust that your company would

8    follow up that study to see if in fact these

9    polypropylene fibers were degrading in their

10   pelvises versus it being just some artifact of

11   preparation on an explant?

12                    MR. DAVIS:  Object to the form.

13                    THE WITNESS:  Well, the study that

14   was done as part of a competitive assessment had

15   indicated that after seven years, the physical

16   strength and molecular weight of the material was

17   essentially unchanged.  So if there's any kind of

18   degradation going on, it's relatively insignificant

19   at that point.

20   BY MR. ANDERSON:

21        Q.       That was your conclusion as a result

22   of a suture that -- a suture is 2 or 3 centimeters

23   long.  Right?

24        A.       It depends on the nature of the

25   explant.  Some of the explants were inches long.

Confidential - Subject to Protective Order

1      Q.      Okay.

2              So let's use that.  Let's say inches

3   long.

4      A.      Uh-huh.

5      Q.      Shorter than this piece of paper?

6      A.      Probably, yes.

7      Q.      About like that?

8      A.      Possibly, yeah.

9      Q.      We're also talking about something

10  that's the size of essentially fishing line, just so

11  the jury has some relevance?

12     A.      Right.  That's correct.

13     Q.      So a strand of fishing line this long

14  that was sutured into a dog's heart, you made a

15  conclusion that the cracking that was in that suture

16  was due to sample preparation and did no further

17  studies to determine whether or not a surgical mesh

18  implanted in women's vaginas would also undergo that

19  same kind of degradation, did you?

20             MR. DAVIS:  Object to the form.

21             THE WITNESS:  The data obtained

22  indicated that the device did not suffer any

23  significant loss in molecular weight or in its

24  tensile properties.  So in terms of its function,

25  the surface degradation or, say, change in the

Confidential - Subject to Protective Order

1    surface, appeared to be limited and insignificant.

2    BY MR. ANDERSON:

3         Q.      And this is a few inches of a single

4    fiber.  And the mesh that goes into a woman's pelvis

5    is hundreds of yards long.  Correct?

6         A.      It could be, yes.

7         Q.      Right.

8                 And you never did a test on that much

9    polypropylene in a woman's vaginal space to look at

10   explanted meshes to see if they actually underwent

11   surface degradation -- surface cracking due to

12   degradation versus surface cracking due to treatment

13   in order to examine it, did you?

14                MR. DAVIS:  Object to the form.

15                THE WITNESS:  Not to my knowledge,

16   no.

17   BY MR. ANDERSON:

18        Q.      But that was done by Clave and his

19   colleagues.  Correct?

20                MR. DAVIS:  Object to the form.

21                THE WITNESS:  Yeah.  Investigations

22   of that type were done.

23   BY MR. ANDERSON:

24        Q.      Right.

25                And in response to reviewing that,

Confidential - Subject to Protective Order

1   you used a seven-year dog study from 25 years ago

2   with an SEM analysis of one strand of fiber a few

3   inches long, you used the results of those tests to

4   tell a foreign regulatory body, don't worry about

5   the safety of our pelvic floor meshes in terms of

6   degradation because we've got this 25-year-old

7   study.

8              That's what you told them?

9   A.      Essentially --

10             MR. DAVIS:  Wait.  Object to the

11  form.

12  BY MR. ANDERSON:

13  Q.      Essentially what?

14  A.      Essentially we -- the question was on

15  the material.  The material is Prolene or

16  polypropylene.  The suture study that was done is on

17  Prolene suture.  And the study on the Prolene fiber

18  could be applied, since it's used in a mesh product,

19  you could leverage that type of a study to make a

20  comment on polypropylene mesh.

21  Q.      It's not in keeping with Ethicon's

22  credo of putting patient safety as a priority to

23  rely on one 25-year-old dog study with one suture

24  from a cardiac implantation to say to a regulatory

25  agency, our surgical meshes for the pelvic floor

Confidential - Subject to Protective Order

1    don't degrade over the life of the product.  That's

2    not in keeping with the credo, is it?

3                    MR. DAVIS:  Object to the form.

4                    THE WITNESS:  I would challenge that

5    statement.

6    BY MR. ANDERSON:

7         Q.      You said that the Clave study showed

8    the beginnings of degradation.  Correct?  That's

9    what you said?

10        A.      Yeah.  There was some surface areas

11   that indicated that some change was going on.

12        Q.      Well --

13        A.      It's characterized by cracking under

14   SEM, but it's not clear if the cracking truly does

15   exist in vivo.  I believe that the cracking is

16   generated as part of the sample prep and the

17   desiccation effect.

18        Q.      So you didn't testify earlier that

19   the Clave study indicated the beginnings of

20   degradation of the polypropylene fibers?

21                   MR. DAVIS:  Object to the form.

22                   THE WITNESS:  No.  I indicated that

23   the cracking was most likely generated as an

24   artifact from the sample preparation.

25   BY MR. ANDERSON:

Confidential - Subject to Protective Order

1      Q.      So you came to the same conclusion

2  that you did 25 years prior when you saw a suture

3  and you saw some cracking there and you said, I

4  believe it's the same thing, the Clave team is

5  seeing what we saw 25 years ago, surface cracking

6  due to sample preparation.

7              MR. DAVIS:  Object to the form.

8  BY MR. ANDERSON:

9      Q.      Yes or no; am I right?

10     A.      Yeah.  The surface cracking that they

11 illustrated in the SEM looks to be the same as we

12 examined -- as I observed with the seven-year dog

13 study.

14     Q.      You didn't do any follow-up testing

15 of your own of surgically explanted meshes from a

16 woman's pelvis in order to come to that conclusion.

17 Correct?  Correct?

18     A.      No.  I did not do any studies on

19 polypropylene mesh used in a woman's pelvis, no.

20     Q.      You said that that dog study was done

21 for purposes of competitive comparison.  Correct?

22     A.      Yes.

23     Q.      It wasn't done in order to determine

24 patient safety.  Correct?

25     A.      To my knowledge, it was done for a

Confidential - Subject to Protective Order

```
 1    competitive assessment.

 2         Q.      Right.

 3                 And you told us earlier that you were

 4    not made aware that this work that you were doing on

 5    the Clave study in March of 2012 was going to a

 6    foreign regulatory agency.  Correct?

 7         A.      That's correct.  I was not aware of

 8    that.

 9         Q.      Now that you are aware that it was

10    going to a foreign regulatory agency that we've

11    established is there to try to protect patient

12    safety, do you believe that further studies are

13    warranted to look at possible surface degradation of

14    explanted Ethicon polypropylene meshes?

15                 MR. DAVIS:  Object to the form.

16                 THE WITNESS:  Based on the data that

17    I have seen, both from the seven-year dog study and

18    the Clave article, I'm still confident that

19    polypropylene mesh or polypropylene sutures as a

20    nonabsorbable product are safe and efficacious.

21    BY MR. ANDERSON:

22         Q.      I asked you at your last deposition,

23    I said, were you aware that Ethicon's pathology

24    consultant for the last 30 years, Bern Klosterhalfen

25    from Duren, Germany, analyzed hundreds of explanted
```

Confidential - Subject to Protective Order

1    mesh samples.  And you said you weren't aware of

2    that.

3                   Do you remember that testimony?

4         A.       That's correct, I was not aware of

5    that.

6         Q.       And I asked you if it would have been

7    helpful for you, when yu had this meeting in March

8    of 2012, to have seen what he said about the

9    degradation of polypropylene fibers.

10                  Do you remember that?

11        A.       Yes.  That information could have

12   been useful.

13        Q.       So after the deposition, did you go

14   and ask your attorney or anyone in the company, did

15   you say, could somebody provide me with what Dr.

16   Klosterhalfen had to say about hundreds of explanted

17   mesh samples when he looked at them?

18                  MR. DAVIS:  Let me insert an

19   objection.

20                  MR. ANDERSON:  Okay.  Forget the

21   attorney part.

22                  MR. DAVIS:  Yeah.  I instruct you not

23   to answer with respect to communications with the

24   attorney.

25                  MR. ANDERSON:  Let me clean up the

Confidential - Subject to Protective Order

1   question and you won't even have to object.

2   BY MR. ANDERSON:

3          Q.      After that deposition, I assume you

4   went and talked to your colleagues and said, hey,

5   Mr. Anderson said something about Dr. Klosterhalfen

6   having an analysis of explanted mesh samples.

7          A.      I had no conversations with anyone.

8          Q.      So you didn't go and look that up.

9   Correct?

10         A.      No, I did not.

11         Q.      Why not?

12         A.      For legal implications, I wanted to

13  wait until after this -- these trials and litigation

14  were completed.

15         Q.      How in the world -- strike that.

16                 What legal implications would there

17  be for you to go and to at least satisfy your own

18  curiosity --

19                 MR. DAVIS:  Object to the form.

20  BY MR. ANDERSON:

21         Q.      -- as to whether or not Dr.

22  Klosterhalfen had seen degradation in explanted

23  mesh?

24                 MR. DAVIS:  Object to the form.

25                 THE WITNESS:  I don't know, but I

Confidential - Subject to Protective Order

```
 1   didn't want to find out the hard way.

 2   BY MR. ANDERSON:

 3       Q.      When it comes to the safety of tens

 4   of thousands of women regarding whether or not

 5   polypropylene is degrading in their pelvis,

 6   shouldn't that be a greater concern than whether or

 7   not there might be legal implications for you doing

 8   this investigation?

 9              MR. DAVIS:  Object to the form.

10              THE WITNESS:  I'm sure it's a great

11   concern, and I'm sure that people from the

12   preclinical and clinical area would be looking into

13   that.  I work in an analytical chemistry area.

14   That's outside my area of expertise.

15   BY MR. ANDERSON:

16       Q.      Oh.  It's not outside your area of

17   expertise, though, because they came to you as an

18   expert in analytical chemistry --

19       A.      Right.

20       Q.      -- to weigh in on a response to the

21   Clave article.

22       A.      Yes.

23       Q.      And they wanted your expertise as to

24   whether or not you knew anything about surface

25   cracking or degradation of polypropylene fibers.
```

Confidential - Subject to Protective Order

1    Correct?

2          A.      Well, to comment on the SEM data that

3    they provided.

4          Q.      Right.

5                  So I asked you at your deposition,

6    would you have liked to have the data from Dr.

7    Klosterhalfen, and you said yes, that would have

8    been good to have.  Correct?

9          A.      For the discussion of the group that

10   we had --

11         Q.      Correct?

12         A.      For the discussion of the group that

13   we had.

14         Q.      Well, now that you know that this

15   information was actually being provided to a

16   regulatory agency who is concerned with women's

17   safety long term having these implanted in their

18   bodies, don't you believe it would be in keeping

19   with the credo for you or someone else to provide

20   that information of Dr. Klosterhalfen to this

21   regulatory agency?

22                 MR. DAVIS:  Object to the form.

23   BY MR. ANDERSON:

24         Q.      That's a yes or a no.

25         A.      I can't -- I'm uncertain what I

Confidential - Subject to Protective Order

```
 1    would -- how I would respond to that.

 2         Q.      Well, I'm asking you now.

 3              MR. DAVIS:  And I object to the form.

 4              MR. ANDERSON:  Fine.

 5              THE WITNESS:  That's information that

 6    the preclinical and clinical experts would have

 7    certainly considered in their response.

 8    BY MR. ANDERSON:

 9         Q.      Well, this is talking about your

10    response.

11              You were the expert on the team from

12    analytical chemistry --

13         A.      Right.  And I was --

14         Q.      Just one second.

15              -- to discuss SEM photos.  So I'm not

16    talking about preclinical or clinical.

17         A.      Right.

18         Q.      I'm talking about you, the 34-year

19    employee who they came to to talk about SEM photos

20    of this.

21         A.      Uh-huh.

22         Q.      You said that it would have been nice

23    to have had Dr. Klosterhalfen's information as part

24    of that discussion.

25              So I'm asking you now, wouldn't it be
```

Confidential - Subject to Protective Order

1   nice for you to take that information or discuss

2   that in another meeting and decide whether or not

3   you need to amend your response back to this

4   regulatory agency?

5                MR. DAVIS:  Object to the form.

6                THE WITNESS:  It would be interesting

7   information to have.  I don't know if the

8   information would have directly impacted the

9   response or not.

10  BY MR. ANDERSON:

11       Q.    Well, you don't know because you

12  haven't looked at it?

13       A.    That's correct.

14               MR. DAVIS:  Object to the form.

15                      -  -  -

16               (Deposition Exhibit No. T-274, E-mail

17          chain, top one dated 05 Mar 2012, Bates

18          stamped ETH.MESH.04937874 through

19          ETH.MESH.04937876, was marked for

20          identification.)

21                      -  -  -

22  BY MR. ANDERSON:

23       Q.    Plaintiff's T-274.

24               If you look at the bottom of this

25  page, the last four digits are 7874.  And this is an

Confidential - Subject to Protective Order

1    e-mail from Laura Vellucci again, March 5, 2012.

2    You're copied on that.  Do you see that?

3         A.    Yes.

4         Q.    And it says, "Brian, Piet and Aaron,

5    I would like to send the following e-mail to Clare

6    Huntington in response to her e-mail below.  It will

7    include the response prepared by Dennis, Dan and

8    Sandy as an attachment.  Please review the e-mail

9    below and attached response.  I would be grateful if

10   you could send any comments to me today as I would

11   like to send a reply to Clare on Tuesday or

12   Wednesday.

13              "Sandy/Dennis and Dan -- I added

14   header" and "footer and minor editing (tradename et

15   cetera).  Please let me know if you have any issue

16   with my edits."

17              Then there's an e-mail to Ms.

18   Huntington, saying, "I shared your e-mail regarding

19   the inert nature of polypropylene mesh used in

20   vaginal mesh products with Ethicon scientists who

21   have expertise in analytical chemistry" -- that

22   would be you.  Correct?

23        A.    Yes.

24        Q.    -- "mesh technology and material

25   biocompatibility.  They have provided a brief

Confidential - Subject to Protective Order

1    summary of some of the testing performed that

2    demonstrates the biocompatibility of polypropylene

3    material and its inert properties."

4              Do you see that?

5       A.    Yes.

6              MR. DAVIS:  Object to the form.

7    BY MR. ANDERSON:

8       Q.    Do you remember now receiving --

9              And then if you look on the second

10   page, which would be 7875, we do see in fact at the

11   end of this e-mail string in which she had -- Laura

12   Vellucci had said, I'm sending the following e-mail

13   below to Clare Huntington.  And then that's the one

14   that we read just a few minutes ago.

15             Do you see that?  "Dear Mark," at the

16   very bottom, and then it carries over to the next

17   page?  Do you see that?

18      A.    Which section?

19      Q.    The very bottom of the document that

20   ends in 7875.

21      A.    Okay.

22      Q.    "Dear Mark," and then on the next

23   page, this was Clare Huntington at MHRA.

24      A.    Yes.

25      Q.    So does this refresh your

Confidential - Subject to Protective Order

1    recollection that you did in fact receive an e-mail

2    from the team telling you that Clare Huntington at

3    MHRA was requesting this information of your group?

4         A.      Yes.  I -- yes.  I was part of this

5    e-mail string that includes that information, yes.

6         Q.      So you were in fact made aware that

7    the MHRA had sent a request to your company and that

8    the information you'd be providing would be going to

9    a regulatory body in the UK.  Correct?

10                MR. DAVIS:  Object to the form.

11                THE WITNESS:  No.  I didn't recognize

12   what the MHRA was at that time, no.

13   BY MR. ANDERSON:

14        Q.      Did you ask anybody when you received

15   this e-mail, who is Clare Huntington and what's the

16   MHRA?

17        A.      No.

18        Q.      In the meetings that you were at, no

19   one discussed the fact that Clare Huntington was

20   with a governmental regulatory body in the UK and

21   that's why you guys were meeting in the first place,

22   to conduct this response?

23                MR. DAVIS:  Object to the form.

24                THE WITNESS:  I'm not aware of that

25   being specifically discussed, no.

Confidential - Subject to Protective Order

```
 1    BY MR. ANDERSON:

 2         Q.      I show you Plaintiff's Exhibit T-275,

 3    which ends with 2397.

 4                      -  -  -

 5              (Deposition Exhibit No. T-275,

 6         Response to e-mail from C. Huntington,

 7         March 6, 2012, Bates stamped

 8         ETH.MESH.07212397 and ETH.MESH.07212398,

 9         was marked for identification.)

10                      -  -  -

11    BY MR. ANDERSON:

12         Q.      This document has at the top,

13    "Response to e-mail from Clare Huntington," up in

14    those brackets at the very, very top.  Do you see

15    that?

16         A.      Yeah.

17         Q.      It says, "Response to e-mail from

18    Clare Huntington."  Do you see that?

19         A.      Yes.

20         Q.      And then you see just below that in

21    bold type, "Response to e-mail from Clare Huntington

22    26 January 2012...with attached publication."

23              Do you see that?

24         A.      Yes.

25         Q.      And then the second page has a space
```

Confidential - Subject to Protective Order

1  for you to -- for your signature line.  Correct?

2      A.      That's correct.

3      Q.      And ultimately, you signed this

4  document.  Correct?

5      A.      I did.

6      Q.      And when you signed that and you saw

7  Clare Huntington in two different places, did it

8  pique your curiosity as who in the world Clare

9  Huntington was?

10     A.      Well, she was the contact that Laura

11 Vellucci wanted to respond to.

12     Q.      Right.

13             And did you ask who in the world

14 Clare Huntington was, what organization she was

15 with?

16             MR. DAVIS:  Object to the form.

17             THE WITNESS:  No, I did not.

18 BY MR. ANDERSON:

19     Q.      Do you see in the second paragraph

20 beginning, "The safety and inertness of the fiber"?

21     A.      Yes.

22     Q.      The second sentence, "In compliance

23 with regulatory mandate, ETHICON has established a

24 complaint reporting system:  the Worldwide Customer

25 Quality system.  With PROLENE suture, there have

Confidential - Subject to Protective Order

1    been no observations of fiber degradation in

2    complaints received and/or products returned."

3              Do you see that?

4    A.      Yes.

5    Q.      That wasn't entirely true, was it?

6              MR. DAVIS:  Object to the form.

7    BY MR. ANDERSON:

8    Q.      You did have in fact have four

9    examples of mesh that had been claimed to be

10   degraded, you just didn't have enough in your file

11   to confirm whether or not it was true; isn't that

12   right?

13             MR. DAVIS:  Object to the form.

14             THE WITNESS:  I don't recall.

15   BY MR. ANDERSON:

16   Q.      Then you see down on the final

17   paragraph there on that page, you see, "In an

18   infected field and/or a site of chronic

19   inflammation, it is not unexpected that there will

20   be an increase in free radicals and other reactive

21   oxygen species.  Polymers may be subject to surface

22   degradation by these reactive species, the impact of

23   which has not been clinically assessed."

24             Do you see that?

25   A.      Yes.

Confidential - Subject to Protective Order

1         Q.      So in fact, you're saying in this

2    response to the UK federal regulatory authority that

3    polymers may be subject to surface degradation due

4    to these oxygen species and free radicals, but the

5    impact has not been clinical assessed.  Right?

6                 MR. DAVIS:  Object to the form.

7                 THE WITNESS:  Yes, that's essentially

8    what it says.

9    BY MR. ANDERSON:

10        Q.      If in fact polymers like the

11   polypropylene in Ethicon and J&J's surgical meshes

12   for the pelvic floor are degrading due to free

13   radicals, other reactive oxygen species or some

14   other in vivo action, it would be in keeping with

15   your credo of putting patient safety first to

16   actually do a study to determine whether or not this

17   occurs?

18                MR. DAVIS:  Object to the form.

19   BY MR. ANDERSON:

20        Q.      Do you agree to that?

21                MR. DAVIS:  Object to the form.

22   BY MR. ANDERSON:

23        Q.      That's a yes or no question.

24                Do you agree to that?

25        A.      I do not -- I'm sorry, rephrase that.

Confidential - Subject to Protective Order

```
 1        Q.      I'll just repeat the question.

 2        A.      Yeah, repeat it.  Yeah.

 3        Q.      If in fact the polymers, like the

 4   poly -- dadgummit.  Too fast.

 5               MR. ANDERSON:  Now you have to do it.

 6                        -  -  -

 7               (The court reporter read the

 8          pertinent part of the record.)

 9                        -  -  -

10               MR. DAVIS:  Object to the form.

11   BY MR. ANDERSON:

12        Q.      Yes or no?

13        A.      No, I don't agree with that

14   conclusion.  The reason I don't agree with that

15   conclusion is that the extent of the degradation is

16   not known, or in the instances where we've seen it,

17   it's very limited or insignificant.

18        Q.      Well, the extent is not known because

19   you haven't done the studies.  You haven't looked

20   at -- in Ethicon, you haven't looked at explanted

21   mesh from women's pelvises.

22               MR. DAVIS:  Object to the form.

23   BY MR. ANDERSON:

24        Q.      You told the jury that already.

25        A.      No, but we --
```

Confidential - Subject to Protective Order

```
 1                    MR. DAVIS:  Wait.  Wait a second.

 2                    Object to the form.

 3                    THE WITNESS:  No, but we've looked at

 4    explanted sutures.

 5    BY MR. ANDERSON:

 6         Q.    25 years ago in a dog study, one

 7    suture from the cardiac?

 8         A.    Seven years in a dog, 25 years ago

 9    should be equivalent to seven years in a dog now.

10         Q.    So at the time, though, you didn't

11    know whether or not it was due to some sort of

12    desiccation due to the cleaning.  That's my whole

13    point is you've never done a study to look at

14    explanted pelvic floor meshes in order to determine

15    whether or not there is surface degradation due to

16    reactive oxygen species, have you?

17                    MR. DAVIS:  Object to the form.

18    BY MR. ANDERSON:

19         Q.    That's my question.

20         A.    No, I'm not aware of any additional

21    studies beyond the dog study that investigates that

22    specifically.

23         Q.    And my point is, a multibillion

24    dollar company like Johnson & Johnson, with all its

25    resources, if it wanted to keep with its credo of
```

Confidential - Subject to Protective Order

1   putting patient safety first, and in this case,

2   women's safety and health for the life of their

3   pelvis, you should have done that study to either

4   rule out or confirm that some in vivo action was

5   causing surface degradation of the polypropylene in

6   their body.  True?

7         A.      I'd have --

8                 MR. DAVIS:  Wait a second.  Wait a

9   second.

10                Okay.  Then I object to the form.

11                THE WITNESS:  I'd have to defer to

12  the clinical and preclinical experts who would have

13  access to that -- to far more data than I do to make

14  that type of determination.

15  BY MR. ANDERSON:

16        Q.      With all due respect, you can't have

17  it both ways is my position.  You can't have it both

18  ways.  You can't tell us a minute ago that based

19  upon our seven-year dog study of a suture in the

20  heart it didn't have any clinical implications in

21  patient safety, and then when I say, wouldn't a

22  better study, and if you're really putting patient

23  safety first, be to look at explanted meshes, and

24  then you defer that to clinical.  You can't have it

25  both ways.  Which way is it?

Confidential - Subject to Protective Order

1              MR. DAVIS:  I object to the form.

2              THE WITNESS:  The comments I made

3    were concerned about the SEM information, SEM data

4    and the phenomenon of the surface cracking, whether

5    that was an artifact or whether, you know, it truly

6    does exist in the in vivo state, which is not --

7    which I am indicating -- which I have indicated it's

8    my position that it's an artifact generated during

9    sample prep.

10             Now, I do admit that the fact that

11   you see the cracking, whether it's an artifact or

12   not, does indicate that that surface that it's

13   observed on, that something has happened to it.  All

14   right?  Something that's not completely understood.

15   But from the suture study, the overall molecular

16   weight and tensile strength have not been negatively

17   impacted.

18             There's also clinical data on

19   existing Prolene products that show the product to

20   be safe and efficacious.  So consequently, if it's a

21   nonabsorbable material, unless there's, again, other

22   information that strongly suggests that there's a

23   degradation concern to be -- you know, to

24   investigate, I believe there's enough information

25   that doesn't warrant a specific degradation study.

Confidential - Subject to Protective Order

```
1    BY MR. ANDERSON:

2         Q.        The only data that you have specific

3    to SEM --

4         A.        Yes.

5         Q.        -- is your dog study from the '80s in

6    which you concluded that it must be due to sample

7    preparation, and looking at a piece of paper, the

8    Clave study, not the actual SEM photos, a piece of

9    paper, and saying what I see on that piece of paper

10   looks like what I saw on a suture 25 years ago,

11   therefore, no study needed, no problem with the

12   women, we feel confident that our product is safe

13   and efficacious.  That's what you're telling this

14   jury?

15              MR. DAVIS:  Object to the form.

16              THE WITNESS:  That information, along

17   with the other information from the other experts,

18   we, therefore, conclude that our product is still

19   safe and efficacious.

20   BY MR. ANDERSON:

21        Q.        What other information from other

22   experts?  I mean, it's one thing to say that.  It's

23   another -- I need hard facts here.

24        A.        It would be Dennis and Sandy.

25        Q.        And what did Dennis and Sandy do in
```

Confidential - Subject to Protective Order

1  terms of looking at whether free radicals and other

2  reactive oxygen species were leading to surface

3  degradation, which may or may not impact women?

4  What did they do?

5              MR. DAVIS:  Object to the form.

6              THE WITNESS:  You know, they made

7  their comments concerning the safety and inertness

8  of the fibers as demonstrated by 40 years of

9  clinical experience.

10  BY MR. ANDERSON:

11       Q.      You certainly don't have 40 years of

12  clinical experience as of 2012 of putting hundreds

13  of yards of polypropylene material in a woman's

14  vagina, do you, sir?

15              MR. DAVIS:  Object to the form.

16  BY MR. ANDERSON:

17       Q.      Yes or no?

18       A.      There's 40-plus years of --

19       Q.      I'm sorry, I've got to object.  It's

20  a yes or no question.  And I'm entitled to that if

21  you can give it.  If you say I can't answer your

22  question, that's fine.  But it is a yes or no

23  question, and I am entitled to get that.

24              MR. DAVIS:  And you're also entitled

25  to explain.  But if can be answered yes or no, you

Confidential - Subject to Protective Order

1    know, answer it.

2                    MR. ANDERSON:  Thank you.

3                    THE WITNESS:  I would say no with

4    respect to the mesh products, but for the Prolene

5    line of products, there is a 40-plus year history.

6    BY MR. ANDERSON:

7         Q.      And in that 40-year plus history, the

8    only time you ever looked at surface degradation of

9    your product was in the '80s with one suture from a

10   dog's heart.  Correct?

11                   MR. DAVIS:  Object to the form.

12                   THE WITNESS:  That's the only study

13   that I've looked at, yes.

14   BY MR. ANDERSON:

15        Q.      So out of this 40 years of clinical

16   experience, you have one piece of data in terms of

17   one test that you did 25 years before this article

18   came out.  Correct?

19                   MR. DAVIS:  Object to the form.

20   BY MR. ANDERSON:

21        Q.      Correct?

22        A.      Well, it's not just one test, but it

23   would be several tests done during the --

24        Q.      During one study?

25        A.      Yes, a seven-year study.

Confidential - Subject to Protective Order

```
 1          Q.       Henri Clave, one of the authors, was

 2   an Ethicon consultant.

 3                   You or nobody on the team contacted

 4   him, did you?

 5                   MR. DAVIS:  Object to the form.

 6                   THE WITNESS:  I am not aware if

 7   anybody on the team contacted him.

 8   BY MR. ANDERSON:

 9          Q.       You never saw the actual SEM photos

10   that are contained in the article, did you?

11                   MR. DAVIS:  Object to the form.

12                   THE WITNESS:  I only saw what was

13   reprinted in the article.

14   BY MR. ANDERSON:

15          Q.       Did you provide this information to

16   the team that's in the beginning of the final

17   paragraph of this page, "In an infected field and/or

18   a site of chronic inflammation, it is not unexpected

19   that there will be an increase in free radicals and

20   other reactive oxygen species," and then the next

21   sentence, "Polymers may be subject to surface

22   degradation by these reactive species, the impact of

23   which has not been clinically assessed"?  Did you

24   provide that information?

25                   MR. DAVIS:  Object to the form.
```

Confidential - Subject to Protective Order

1               THE WITNESS:  I was -- I participated

2   in the discussion, but I believe Dennis brought that

3   up.

4   BY MR. ANDERSON:

5        Q.     And what did Dennis do in terms of

6   studies that he looked at or actual testing by your

7   company to come to those conclusions that were

8   ultimately sent to this foreign regulatory agency?

9   Please tell the jury.

10       A.     Well, that would have been a

11  discussion, again, between Sandy and Dennis and I

12  about the types of foreign body reactions that can

13  occur and the different mechanisms that are used on

14  the cellular and microcellular level during those

15  reactions.

16       Q.     Okay.

17              So my question is, what did Dennis,

18  and now you've expanded it to Dennis and Sandy and

19  me.

20       A.     Right.

21       Q.     What did you do in terms of studies

22  that looked at actual testing by your company to

23  come to those conclusions that were ultimately sent

24  to this foreign regulatory agency?  Your answer

25  said, there would have been a discussion about this.

Confidential - Subject to Protective Order

 1    Okay.  That's a discussion.

 2            A.      Yes.

 3            Q.      My question is, what testing did you

 4    look at or perform?  What literature was used in

 5    support of this, to support these statements that

 6    you're making to this regulatory body?  That's what

 7    I want to know.

 8                    MR. DAVIS:  Object to the form.

 9                    THE WITNESS:  I did not conduct any

10    specific tests, and I don't recall citing any

11    specific literature.

12    BY MR. ANDERSON:

13            Q.      So if we take those statements right

14    there that were made after a discussion --

15            A.      Yes.

16            Q.      -- and not after any literature

17    search or testing, as you've just testified, if an

18    infected field -- the more bacteria in an infected

19    or contaminated field and the greater the chronic

20    inflammation, then the greater the chance of surface

21    degradation due to these oxidative species, would

22    you agree with that?  In other words, the more

23    infection, the more chronic inflammation, the

24    greater the risk of degradation.  Correct?

25                    MR. DAVIS:  Object to the form.

Confidential - Subject to Protective Order

```
1                    THE WITNESS:  Yes, I agree with that
2    concept.
3    BY MR. ANDERSON:
4         Q.      Okay.
5                  And your suture study that you did in
6    a dog heart, that was not in a contaminated field in
7    the way that surgical meshes in a woman's vagina
8    are.  Correct?
9                    MR. DAVIS:  Object to the form.
10                   THE WITNESS:  No, it was not done in
11   a contaminated field.
12   BY MR. ANDERSON:
13        Q.      In fact, a woman's vagina has all
14   kinds of bacteria, strep A, candida, gram-negative,
15   a lot of bacteria in a clean contaminated field that
16   simply doesn't exist in a dog's heart.  You agree
17   with that.  Right?
18                   MR. DAVIS:  Object to the form.
19                   THE WITNESS:  That sounds plausible.
20   I don't recall during the dog study whether there
21   were any infected sites or not.
22   BY MR. ANDERSON:
23        Q.      So if you want to compare apples to
24   apples instead of apples to oranges, you wouldn't
25   use a suture from a noncontaminated field to compare
```

Confidential - Subject to Protective Order

```
1    to hundreds of yards of suture material in a clean

2    contaminated field of a woman's vagina?

3              MR. DAVIS:  Object to the form.

4    BY MR. ANDERSON:

5         Q.    Yes or no?

6              MR. DAVIS:  Object to the form.

7              THE WITNESS:  That depends if you're

8    trying to compare different types of infection

9    versus -- well, from an infection point of view, I

10   would agree with that comparison.  But in each of

11   these instances, even a foreign body reaction can be

12   chronic inflammation.  And even in those

13   circumstances, it's not unexpected that you could

14   have free radicals and other reactive oxygen

15   species.

16   BY MR. ANDERSON:

17        Q.    Well, my question is, the greater the

18   chronic inflammatory response, so if you have a

19   severe inflammatory response and you have mesh that

20   is implanted into a bacterial field, it increases

21   the risk of degradation of the polypropylene.  True?

22             MR. DAVIS:  Object to the form.

23             THE WITNESS:  It could increase the

24   risk.

25   BY MR. ANDERSON:
```

Confidential - Subject to Protective Order

1      Q.      Sure.

2              And your suture material in a dog's

3      heart did not have the same bacterial field or

4      chronic inflammatory response that surgical mesh in

5      a woman's pelvis would.  Agree?

6      A.      It probably would not.

7      Q.      So you are comparing apples to

8      oranges in common vernacular when you're comparing a

9      suture from a dog heart to surgical mesh in a

10     woman's pelvis vis-à-vis infection and chronic

11     inflammation.  True?

12             MR. DAVIS:  Object to the form.

13             THE WITNESS:  No, I disagree with

14     that statement.  They're all examples of infection

15     or chronic inflammation.

16     BY MR. ANDERSON:

17     Q.      Yes, but the --

18             We just established that there are a

19     lot more bacteria in the contaminated field of a

20     woman's vaginal space than there was one suture in a

21     dog's heart.  Correct?

22             MR. DAVIS:  Object to the form.

23     BY MR. ANDERSON:

24     Q.      We established that, yes or no?

25     A.      There would be more inflammation,

Confidential - Subject to Protective Order

1  yes, relatively more inflammation.  Correct.

2        Q.      And infection?

3        A.      And infection.

4        Q.      And the more infection and the more

5  inflammation, as we've just established, the greater

6  likelihood of degradation?

7              MR. DAVIS:  Object to the form.

8              THE WITNESS:  The greater likelihood.

9  BY MR. ANDERSON:

10        Q.      Right.

11        A.      But not necessarily guaranteed.

12        Q.      Right.

13              And so the way we find that out as

14  scientists is what?  We study.  Correct?

15        A.      You can.

16        Q.      But you didn't.  You didn't.

17  Correct?

18              MR. DAVIS:  Object to the form.

19              THE WITNESS:  We didn't do that type

20  of comparison study, no.  But they're -- like I

21  said, they're all examples of infected fields or

22  chronic infection.

23  BY MR. ANDERSON:

24        Q.      In fact, infection and chronic

25  inflammation were two of the potential causes listed

Confidential - Subject to Protective Order

1   by the Clave authors in their study as to what was

2   causing the degradation of the polypropylene meshes

3   that were explanted from women's pelvises in their

4   study.  Correct?

5                    MR. DAVIS:  Object to the form.

6                    THE WITNESS:  Possibly, yeah.

7   BY MR. ANDERSON:

8        Q.      Not possibly, it either was or it

9   wasn't.

10                   So my question is, those were two of

11  the potential causes that were listed by the Clave

12  authors in their study as to what was causing the

13  surface degradation of the polypropylene in their

14  study.  True?

15                   MR. DAVIS:  Object to the form.

16                   THE WITNESS:  I'd have to review the

17  article to be sure.

18  BY MR. ANDERSON:

19       Q.      Okay.  We'll look at that in a minute

20  then.

21                   I want to show you Plaintiff's

22  Exhibit T-276.

23                          -  -  -

24                   (Deposition Exhibit No. T-276, Memo

25              dated March 12, 2012, Bates stamped

Confidential - Subject to Protective Order

1              ETH.MESH.07205369 and ETH.MESH.07205370,

2              was marked for identification.)

3                        -   -   -

4    BY MR. ANDERSON:

5         Q.      5369.

6                 Now, the last exhibit we looked at,

7    T-275, was the unsigned version of this document.

8    Correct?

9         A.      Yes.

10        Q.      And if you turn to page 2 of this

11   T-276, it is the signed version.  Correct?

12        A.      Yes.

13        Q.      And if you go down and we take the

14   last document and put it up on the left, first page.

15   Okay.  If you can reverse those and highlight the

16   last paragraph on both.

17                If you look at your document there

18   and you compare it to the one that you just had

19   before you?

20        A.      Yes.

21        Q.      Do you want to pull that one out,

22   too, for me, please?

23                In the final signed version, if you

24   look at the last paragraph, I don't see the

25   language, maybe I'm just missing it and you can help

Confidential - Subject to Protective Order

1    me.

2              Who decided -- let me strike that.

3    Let me go back.

4              Who made the final decision as to

5    what the wording would be in this response?

6              MR. DAVIS:  Object to the form.

7    BY MR. ANDERSON:

8        Q.      And by who, it could be a group

9    decision as far as I know, but which person or

10   persons at Ethicon were responsible for the final

11   language that was going to be sent to Clare

12   Huntington of the UK regulatory agency, MHRA?

13       A.      Well, the document would have been --

14   would have had Dennis and Sandy and myself

15   contributing towards the document.  I don't recall

16   who edited the final version.

17       Q.      I haven't seen anywhere in either

18   version where your team told this person at MHRA, we

19   have never done a study at Ethicon in these 40-plus

20   years where we actually looked at explanted vaginal

21   meshes and compared them to pristine meshes in order

22   to determine whether or not we have found surface

23   degradation or similar surface anomalies.  You

24   didn't tell her that, did you?

25              MR. DAVIS:  Object to the form.

Confidential - Subject to Protective Order

```
 1                    THE WITNESS:  Not that specific

 2    statement, no.

 3    BY MR. ANDERSON:

 4         Q.      And you didn't tell her that we have

 5    one of the top, if not the top, pathologists,

 6    histopathologists in the world on surgical meshes

 7    who has sent us data regarding his view on the

 8    degradation of explanted vaginal meshes, did you?

 9                    MR. DAVIS:  Object to the form.

10                    THE WITNESS:  Not specifically stated

11    in this document, no.

12    BY MR. ANDERSON:

13         Q.      Not even generally stated in this

14    document.  Correct?

15         A.      Correct.

16         Q.      As this group was meeting to

17    determine what kind of response would be given based

18    upon the Clave article, did anyone offer the

19    suggestion that perhaps we should reach out to our

20    top pathologist who's been looking at our meshes for

21    30 years and ask him his opinion on the degradation

22    of surgically implanted meshes into a woman's

23    pelvis?

24                    MR. DAVIS:  Object to the form.

25                    THE WITNESS:  I'm not aware of such a
```

Confidential - Subject to Protective Order

1   discussion.

2   BY MR. ANDERSON:

3       Q.      Don't you think that in order to be

4   in compliance with your internal credo, also just

5   good science, it would have made sense to have

6   reached out to your pathologist who's looked at your

7   explanted meshes and the explanted meshes of other

8   manufacturers in order to determine whether or not

9   you needed to give a thorough response of whether or

10  not you've seen surface degradation of your

11  polypropylene?

12          MR. DAVIS:  Object to the form.

13          THE WITNESS:  I would leave that up

14  to the opinion of our toxicologists and pathologists

15  that were at the Somerville site.

16  BY MR. ANDERSON:

17      Q.      And please tell me which

18  toxicologists and pathologists were involved in

19  these e-mail strings?

20      A.      Well, Sandy Savidge would be the

21  preclinical representative, so ultimately it would

22  be her call.

23      Q.      Well, preclinical doesn't necessarily

24  look at once a product has been put in by a

25  clinician and it's been explanted, she's not

Confidential - Subject to Protective Order

1    necessarily involved with that aspect of the

2    business.  Correct?

3         A.     No.

4         Q.     I mean, that's correct.  Correct?

5         A.     Right.  She's not typically involved

6    with that aspect, that's correct.

7         Q.     Right.

8                So tell me who on the team is someone

9    who would have had access to that information.

10   Strike that.

11               You said a minute ago that decision

12   would have been made by someone else in preclinical

13   or clinical?

14        A.     Yes.

15        Q.     So what I'm asking is, who here would

16   actually be involved in the -- in working with

17   pathologists and histopathologists for explanted

18   material for humans?

19               MR. DAVIS:  Object to the form.

20               THE WITNESS:  I believe it would be

21   Sandy, but I could be wrong.

22   BY MR. ANDERSON:

23        Q.     Can we agree that this was not a

24   thorough investigation of Ethicon's knowledge base

25   concerning whether or not explanted meshes from the

Confidential - Subject to Protective Order

```
 1   pelvis show degradation if your team did not reach

 2   out to your pathologist who has actually looked at

 3   your explanted meshes for decades?  Would you say

 4   it's not a thorough review?

 5                MR. DAVIS:  Object to the form.

 6                THE WITNESS:  I would not agree with

 7   that statement.

 8   BY MR. ANDERSON:

 9        Q.      Do you believe that patients in the

10   UK who are relying upon their regulatory agency and

11   the company Johnson & Johnson/Ethicon who sold them

12   products that were going to be permanently implanted

13   in their body, do you think that they had a right to

14   know and to have information concerning whether or

15   not other women had explanted mesh showing

16   degradation of polypropylene in their vaginas as

17   well?

18                MR. DAVIS:  Object to the form.

19                THE WITNESS:  If they wanted to look

20   at such information, I don't know if that type of

21   information is available or not.

22                MR. ANDERSON:  Motion to strike as

23   nonresponsive.

24   BY MR. ANDERSON:

25        Q.      I asked you, if you believe that
```

Confidential - Subject to Protective Order

1   patients, women, in the UK who were relying upon

2   their regulatory body to be a gatekeeper for safety

3   of medical devices in their country, do you believe

4   those women had a right to expect that your company

5   would provide thorough and accurate information to

6   this regulatory body concerning whether or not

7   polypropylene meshes degrade in a woman's pelvis?

8               MR. DAVIS:  Object to the form.

9               THE WITNESS:  Well, they would

10  certainly -- well, my opinion is that they could

11  expect that, you know, proper product safety

12  information would have been provided to the

13  regulatory body.

14  BY MR. ANDERSON:

15      Q.     How about if the specific product

16  safety information concerns Ethicon's knowledge of

17  its explanted meshes showing degradation by their

18  top pathologist, do you think that might be

19  information they'd want their regulatory body to

20  know?

21              MR. DAVIS:  Object to the form.

22              THE WITNESS:  It might depend on the

23  circumstances and number of incidences observed.

24  BY MR. ANDERSON:

25      Q.     Can I get a yes or a no to my

Confidential - Subject to Protective Order

1    question?

2           A.      Well --

3           Q.      Do women in this country or the UK,

4    can they rightfully expect that the regulatory

5    agencies who are charged with their safety are being

6    provided with thorough and accurate information by

7    your company as to whether or not polypropylene may

8    degrade in their pelvises?

9                   MR. DAVIS:  Object to the form.

10                  THE WITNESS:  Yes, I think they are

11   getting the proper information from Ethicon to the

12   regulatory body.

13   BY MR. ANDERSON:

14          Q.      You think they're getting proper

15   information.

16                  Proper information would also include

17   thorough information, for instance, when you're

18   doing an investigation on degradation, either do

19   your own study or look to your own consultants and

20   look at their explants.  That would be thorough and

21   proper information, not just relying on a seven-year

22   dog study from 25 years ago.  Can we at least agree

23   to that?

24                  MR. DAVIS:  Object to the form.

25                  THE WITNESS:  You'd want to consider

Confidential - Subject to Protective Order

1    information that you had that's been generated in

2    the past as well as the present.

3    BY MR. ANDERSON:

4           Q.      Right.

5                   And if part of that information

6    that's been generated in the past is your

7    pathologist and your -- strike that.

8                   Maybe I should just take it off

9    because it's...

10                  Yes.  And if part of the information

11   that's been generated in the past is information

12   that Ethicon has access to from its own pathologist

13   who has looked at explanted samples from a woman's

14   vagina and it shows degradation, that's information

15   that should be passed along to a regulatory body so

16   that they can protect the safety of women in whom

17   these are going to be implanted.  Can we agree to

18   that?

19                  MR. DAVIS:  Object to the form.

20                  THE WITNESS:  Not necessarily.  It

21   depends on the context and the circumstances and the

22   specific type of information and whether it applies.

23   BY MR. ANDERSON:

24          Q.      And none of those, the context, nor

25   the circumstances, nor the specific type of

Confidential - Subject to Protective Order

1    information, at least vis-à-vis Dr. Klosterhalfen,

2    was ever considered by your group?

3                    MR. DAVIS:  Object to the form.

4    BY MR. ANDERSON:

5        Q.    That was looking at this in March of

6    2012.  Agreed?

7                    MR. DAVIS:  Object to the form.

8                    THE WITNESS:  I don't know what

9    information Sandy or Dennis considered from that

10   particular article.  I can only answer from my own

11   point of view.

12   BY MR. ANDERSON:

13       Q.    If there was a failure of your team

14   to reach out to Dr. Klosterhalfen or to other people

15   within your company to find out what information you

16   had on explanted meshes from either hernia or the

17   pelvis, that would have been a violation of your

18   credo in terms of putting patient safety first.

19   Would you agree to that?

20                   MR. DAVIS:  Object to the form.

21   BY MR. ANDERSON:

22       Q.    Can we agree to that?

23                   MR. DAVIS:  Object to the form.

24                   THE WITNESS:  No, I don't necessarily

25   agree with that.

Confidential - Subject to Protective Order

1              MR. ANDERSON:  Clave article,

2    Plaintiff's T-277.

3                    -  -  -

4              (Deposition Exhibit No. T-277,

5              Article entitled "Polypropylene as a

6              reinforcement in pelvic surgery is not

7              inert:  comparative analysis of 100

8              explants," Arnaud Clave, et al., 10 pages,

9              was marked for identification.)

10                    -  -  -

11   BY MR. ANDERSON:

12        Q.    Before we go to that one, I'm going

13   to show you Plaintiff's Exhibit 278.

14                    -  -  -

15             (Deposition Exhibit No. T-278, E-mail

16             chain, top one dated 07 Mar 2012, Bates

17             stamped ETH.MESH.07226404 and

18             ETH.MESH.07226405, was marked for

19             identification.)

20                    -  -  -

21   BY MR. ANDERSON:

22        Q.    The last Bates numbers are 6404.

23             If you look at the second page of

24   this document, it's an e-mail from you to Lynn Meyer

25   on March 7, 2012.  Do you see that?

Confidential - Subject to Protective Order

```
1          A.      Yes.

2          Q.      It says "Any progress on my

3    questions?"

4                  What questions were those?

5          A.      Questions whether or not there were

6    any -- let's see.  Let me refresh my memory here.

7                  I wanted to know if there were any

8    product complaint records of preabsorption or

9    degradation.

10         Q.      Right.  We talked about this a few

11   minutes ago.

12                 In your final response to the MHRA,

13   you said, "In the 40 plus" -- I need that.  Can I

14   have that?

15                 So you were deciding whether or not

16   you could put the language -- if you look at the

17   middle of the first page of this, you were trying to

18   decide whether or not you were going to -- strike

19   that.

20                 You asked the question of whether or

21   not there was any complaints on degradation or

22   preabsorption?

23         A.      Correct.

24         Q.      And they went back and they did in

25   fact found -- find four complaints regarding Prolene
```

1    sutures that were under degradation or

2    preabsorption.  Correct?

3              MR. DAVIS:  Object to the form.

4              THE WITNESS:  Yes.

5    BY MR. ANDERSON:

6         Q.    And it says, and none of those were

7    confirmed.

8              And so then you say in e-mail to

9    Dennis Jamiolkowski, Sandy and Laura on March 7,

10   2012, "From a search that went" back as far" as

11   1991, only four complaints were found concerning

12   PROLENE suture or mesh under the categories

13   'degradation' or 'pre-absorption,'" and "none of

14   those were confirmed.

15             "So, although there have been

16   complaints made on PROLENE about 'degradation' or

17   'pre-absorption,' none were confirmed.

18             "Therefore, you could state that 'In

19   the 40+ year history of PROLENE, there has not been

20   a single confirmed complaint about degradation or

21   absorption.'"

22             Do you see that?

23        A.    Yes, I do.

24        Q.    Why not just tell the agency that

25   you'd had four unconfirmed reports of degradation or

Confidential - Subject to Protective Order

```
 1    preabsorption?

 2                    MR. DAVIS:  Object to the form.

 3                    THE WITNESS:  You could -- that could

 4    have been done.

 5    BY MR. ANDERSON:

 6         Q.    But it wasn't done, was it?

 7         A.    No.

 8         Q.    Because it sounded better just to say

 9    that there's not been a single confirmed complaint

10    about degradation or absorption?

11         A.    Both are true.

12                    MR. DAVIS:  Wait, wait, wait.  Object

13    to the form.

14    BY MR. ANDERSON:

15         Q.    Yeah.

16                    One is true without telling the whole

17    story so that you're technically right, but you

18    didn't provide all the information to them

19    concerning the fact that you did have four

20    complaints of degradation.

21                    MR. DAVIS:  Object to the form.

22    BY MR. ANDERSON:

23         Q.    Correct?

24         A.    The only difference between the two

25    statements is that in the second one it doesn't
```

1    indicate how many unconfirmed complaints were logged

2    in.

3         Q.       You didn't do it because you

4    didn't -- you wanted to wordsmith it in a way that

5    sounded the best for your company instead of

6    providing them with all the information.  That's the

7    truth.  Correct?

8              MR. DAVIS:  Object to the form.

9              THE WITNESS:  The only piece of

10   information that's missing is that there were a

11   total of four complaints made, of which none were

12   confirmed.  Considering 40 years of the product

13   history to have only four complaints, period, is

14   pretty darn small.  And considering that none of

15   them were confirmed...

16   BY MR. ANDERSON:

17        Q.       And some, they tried to go back into

18   an old obsolete paper system in Germany, and they

19   couldn't even get a complete file on some of the

20   events.  Correct?

21        A.       That is correct.  There is a file --

22   there is a complaint file that is incomplete

23   apparently.  But still, none of the complaints were

24   confirmed.

25        Q.       So then above that, Dennis sends an

Confidential - Subject to Protective Order

1    e-mail to Laura that says, "Although we could make

2    the statement that Dan suggested, I think we need to

3    make" it "crystal clear that polypropylene is not

4    100 percent inert in all clinical situations."

5              Do you see that?

6         A.    Yes, I do.

7         Q.    Do you agree with the statement that

8    polypropylene is not 100 percent inert in all

9    clinical situations?

10        A.    It depends on how you define

11   "clinically inert."

12        Q.    Well, I've heard of chemically inert

13   and biologically inert, but I've certainly never

14   heard of clinically inert.

15             Is this a new phrase you've come up

16   with or is that something you guys use at Ethicon?

17             MR. DAVIS:  Object to the form.

18             THE WITNESS:  Well, as the statement

19   was, "We need to make" it "crystal clear that

20   polypropylene is not 100 percent inert in all

21   clinical situations."

22   BY MR. ANDERSON:

23        Q.    That means in some clinical

24   situations it actually degrades.  Correct?

25             MR. DAVIS:  Wait.  I think he was

Confidential - Subject to Protective Order

1    still trying to answer the question.

2    BY MR. ANDERSON:

3         Q.     Were you still trying to answer the

4    question?

5                MR. DAVIS:  I may be wrong, but...

6                THE WITNESS:  No.  We can move on.

7                MR. DAVIS:  Okay.

8                THE WITNESS:  I'm sorry, your

9    question was?

10               MR. DAVIS:  I apologize.

11   BY MR. ANDERSON:

12        Q.     So this statement by definition is,

13   polypropylene is not inert in all clinical

14   situations.  Correct?

15        A.     Yes, that's what that statement

16   indicates.

17        Q.     In what clinical situations did your

18   group determine, through its own testing, validation

19   or literature review where polypropylene may degrade

20   and not be inert in the human body?

21               MR. DAVIS:  Object to the form.

22               THE WITNESS:  Could you repeat that

23   one more time, please?

24   BY MR. ANDERSON:

25        Q.     In what clinical situations did your

Confidential - Subject to Protective Order

```
 1    group determine through its own testing, validation

 2    or literature review where polypropylene may degrade

 3    and not be inert in the human body?

 4         A.      I believe that was -- I believe that

 5    was acknowledging scenarios where significant

 6    infection was present, where you could -- where it

 7    would -- where you could expect the possibility of

 8    free radicals and oxygen.

 9         Q.      What's your basis for making that

10    statement, sir?

11         A.      Based on the discussion and the

12    response that we made.

13         Q.      So based upon what you just said --

14         A.      Uh-huh.

15         Q.      -- you would have to agree with the

16    Clave authors that in some clinical situations,

17    polypropylene is not inert and it does degrade.

18              MR. DAVIS:  Object to the form.

19    BY MR. ANDERSON:

20         Q.      True?

21         A.      I would agree that there are some --

22    there is some evidence that some of the

23    polypropylene surfaces do undergo some change.

24    That's not totally understood.

25         Q.      Okay.  Not an answer to my question,
```

Confidential - Subject to Protective Order

1    so I'll ask it again.

2              Would you agree with the authors of

3    the Clave paper that in some clinical situations,

4    implanted surgical polypropylene mesh in human

5    beings can degrade and is not inert?

6              MR. DAVIS:  Object to the form.

7    BY MR. ANDERSON:

8         Q.     Yes or no?

9         A.     I would say it was subject to some

10   slight degrees of surface degradation, again, which

11   is not completely understood.

12        Q.     And it could be better understood if

13   your company undertook the testing of this of its

14   own products that are permanently implanted in

15   women.  True?

16             MR. DAVIS:  Object to the form.

17   BY MR. ANDERSON:

18        Q.     Yes or no?

19        A.     If such a study -- if such a study

20   were done, it could possibly give more information

21   about it.

22        Q.     But your company has not spent the

23   money nor taken the time to do that study.  Correct?

24        A.     I'm not aware of any such study being

25   planned.

Confidential - Subject to Protective Order

```
1                    MR. ANDERSON:  We can take a break.

2                    THE VIDEOGRAPHER:  Going off the

3    record.  The time is 2:39 p.m.  This is the end of

4    Tape 3.

5                         -  -  -

6                    (A recess was taken from 2:39 p.m.

7           to 2:58 p.m.)

8                         -  -  -

9                    THE VIDEOGRAPHER:  We are back on the

10   record.  Here marks the beginning of Volume 1 and

11   Tape Number 4 in the deposition of Daniel Burkley.

12   The time is 2:58 p.m.

13   BY MR. ANDERSON:

14        Q.    So real briefly, of this group of

15   people who were meeting to discuss Clave, we had Dan

16   Burkley, that's you, from analytical

17   characterization.  Correct?

18        A.    Yes.

19        Q.    Sandy Savidge from preclinical?

20        A.    Yes.

21        Q.    Laura Vellucci from what department?

22        A.    Regulatory affairs.

23        Q.    Dennis Jamiolkowski from?

24        A.    Suture technology.

25        Q.    Anyone else that was regularly at
```

Confidential - Subject to Protective Order

1    these meetings or involved in this analysis?

2         A.      No, no.  I believe it was just the

3    four of us.

4         Q.      And after that response was sent off

5    to the regulatory body in the UK, have there been

6    any further phone calls, e-mails or meetings

7    concerning the Clave article of which you have been

8    involved in or of which you have been aware?

9         A.      No, none that I've been involved in

10   and none that I'm aware of.

11        Q.      Okay.

12               So did you have a chance to look at

13   the Clave article, which we marked as Plaintiff's

14   Exhibit T-277?  That's the article we've been

15   discussing at length here today.  Correct?

16        A.      Yep, yep.

17               MR. DAVIS:  Let me just note my

18   objection for the record.  This was an exhibit to

19   his last deposition and reviewed thoroughly, but I'm

20   not going to stop you.  I'm just noting my

21   objection.

22               MR. ANDERSON:  I appreciate that.

23   And one of the reasons we're going into it in a

24   little bit more detail is because we received new

25   documents since the time of his deposition and which

Confidential - Subject to Protective Order

1    his name was on, so either we didn't get all of the

2    custodial file or we received it in a later

3    production, and that includes a number of the

4    exhibits that we've used today and other

5    information.  And so it made it necessary for us to

6    not replow old ground, hopefully, maybe a little

7    bit, but to also have an opportunity with the

8    benefit of formerly unproduced documents to ask

9    those questions.  But I note your objection for the

10   record.  Thank you.

11   BY MR. ANDERSON:

12        Q.     If you look at the second page of

13   this -- actually, let's -- I'm sorry, let's go back

14   to the first.

15             If you look under the abstract

16   portion, under "Methods," it says, "A sample."

17             You had it right.

18             "Methods."  "A sample of 100 implants

19   explanted from patients due to complications was

20   examined to evaluate the relative degradation

21   characteristics of polypropylene and PET

22   prosthetics."

23             And then at the top of the next

24   paragraph, going all the way through "Conclusions."

25   It looks like they did SEM, FTIR, which we discussed

Confidential - Subject to Protective Order

```
1   earlier, as well as differential scanning

2   calorimetry, DSC.

3               Do you see that?

4        A.      Yes.

5        Q.      Now, do you ever perform DSC as part

6   of your duties at Ethicon?

7        A.      No, I do not.

8        Q.      Do you have a machine at Ethicon to

9   perform DSC?

10       A.      There is a DSC within analytical

11  characterization.

12       Q.      Under "Conclusions," "This is the

13  first study to evaluate synthetic implants used in a

14  vaginal approach for pelvic floor reinforcement.

15  The study provides evidence contrary to published

16  literature characterizing polypropylene as inert in

17  such applications.  Additionally, the study suggests

18  the need for clinical trials comparatively

19  investigating the performance of new types of

20  monofilament prosthetics, such as those compromising

21  PET."

22               Do you see that?

23       A.      Yes.

24       Q.      So at least according to this, this

25  article in January of 2010 written by these authors,
```

Confidential - Subject to Protective Order

1    was the first one to study that the synthetic

2    implants that had been explanted from a vaginal

3    approach for pelvic floor reinforcement.  Correct?

4                    MR. DAVIS:  Object to the form.

5                    THE WITNESS:  Yes.

6    BY MR. ANDERSON:

7            Q.      When your group met, did you find any

8    other studies prior to this one or after this one

9    where scientists studied and evaluated synthetic

10   explants for pelvic floor reinforcement?

11           A.      I don't recall of any studies prior

12   to this one.  I don't know if there had been other

13   studies since this one.

14           Q.      In order to do a thorough

15   investigation of this problem and to provide a

16   thorough and accurate response to the regulatory

17   body, it would have been a good thing for your group

18   to do a literature search.  Correct?

19                   MR. DAVIS:  Object to the form.

20                   THE WITNESS:  Yes.

21   BY MR. ANDERSON:

22           Q.      Did you do one?

23           A.      I did not do a literature search, no.

24           Q.      Did Laura, Dennis or Sandy do one?

25           A.      I don't know.

Confidential - Subject to Protective Order

1      Q.      Did you ask them at any of the

2  meetings, words to the effect of hey, guys, if we're

3  going to provide a response to Clave, shouldn't we

4  look to the literature to see if there's any other

5  similar studies for vaginal explants?

6      A.      I did not ask the question, but it's

7  conceivable that that could have been discussed at a

8  meeting where I was not present.

9      Q.      And there's a whole host of

10  references in the back of this document.

11            Did you or Sandy or Dennis or Laura

12  take the opportunity to evaluate and analyze any of

13  those bibliographical references listed in the back,

14  of which there are 24?

15     A.      I'm familiar with reference 16.

16     Q.      And did you bring reference 16 to the

17  group's -- you said you're familiar with it.

18            My question was, as part of your

19  review in coming up with a response to this

20  regulatory body, did you review any articles, so are

21  you in response to saying that, yes, we looked at

22  reference 16?

23     A.      I looked at reference 16 but the

24  group did not.

25     Q.      What did reference 16 from 1994, the

Confidential - Subject to Protective Order

1    Martin Yang article, "Infrared spectroscopy of the

2    photooxidation of a polyethylene nonwoven fabric,"

3    tell you?

4         A.    Well, it demonstrated that

5    photooxidation of a polyolefin, such as

6    polyethylene, it's certainly possible, and some of

7    the IR absorbances that you could observe with it.

8    It's an infrared study, basically, to look at

9    photooxidation of polyethylene fabric.

10        Q.    So that study told you that if you

11   look at infrared spectroscopy of this polyolefin,

12   that you could in fact -- that there was degradation

13   noted in that study?

14        A.    You could see -- yes, you could see

15   the oxidative degradation by infrared.  You could

16   pick up the infrared absorbances specifically

17   relating to photooxidation.

18        Q.    Did you raise that to the group's

19   attention?

20        A.    No, I did not.

21        Q.    Why not?

22        A.    It's work I'm familiar with.  We've

23   done our own photooxidation studies on polypropylene

24   back in the '80s, so I am familiar with oxidation of

25   polypropylene or photooxidation of polypropylene, I

Confidential - Subject to Protective Order

```
 1    should say.
 2         Q.      What is photooxidation of
 3    polypropylene?
 4         A.      Basically you're exposing the
 5    polypropylene fiber to high intensity light to -- in
 6    an air or oxygen-filled environment and over time,
 7    seeing the effects of that exposure.
 8         Q.      Of course, when polypropylene
 9    surgical meshes are inserted into a woman's vagina,
10    it's not going to be in an air environment.
11    Correct?
12         A.      No, not an air environment.
13         Q.      So really reviewing a photooxidation
14    study of polyethylene didn't tell you much in terms
15    of whether or not your polypropylene meshes for the
16    pelvis degrade in the human body?
17         A.      Correct.
18         Q.      An article that would have been more
19    specific to your research and the mission that you
20    had in trying to determine whether or not your
21    polypropylene meshes show degradation and how to
22    respond to this regulatory body would have probably
23    been something like reference 20, Costello,
24    "Characterization of heavyweight and lightweight
25    polypropylene prosthetic mesh explants from a single
```

Confidential - Subject to Protective Order

1    patient."

2                    Can we agree that that may have

3    provided more valuable information than looking at

4    IR spectroscopy of polyethylene that's exposed to

5    air?

6                    MR. DAVIS:  Object to the form.

7                    THE WITNESS:  Possibly, possibly.

8    BY MR. ANDERSON:

9         Q.    But you didn't look at that nor raise

10   that to the group's attention, nor did anyone else

11   raise it, did they?

12                   MR. DAVIS:  Object to the form.

13                   THE WITNESS:  I don't know if anyone

14   else raised it.  I certainly didn't raise it and I

15   didn't -- I was not part of a discussion about that.

16   BY MR. ANDERSON:

17        Q.    So if you look at page 2 of this

18   article, under the right-hand column under "Scanning

19   electron microscope analysis," they did a

20   morphological analysis of explants as well as the

21   pristine control mesh samples.  Correct?

22        A.    Yes.

23        Q.    Prior to the doing the imaging, both

24   the explants as well as the pristine samples were

25   fixed and preserved in a solution of cacodylate

Confidential - Subject to Protective Order

1    buffer, then they were rinsed in a buffer and then

2    post fixed.

3              Do you see that?

4         A.    Yes.

5         Q.    Then they were rinsed with distilled

6    water, dehydrated with ethanol solutions of

7    increasing concentrations, dried using

8    hexamethyldisilazane and then sputtered with gold

9    prior to the SEM analysis.  Correct?

10        A.    Yes.

11        Q.    When you read this portion of

12   Costello, was it your opinion that any part of this

13   preparation led to the surface cracking and peeling

14   as noted in the photographs contained within this

15   article?

16        A.    The desiccation effect, when they did

17   the exchanges with ethanol, you know, after it was

18   rinsed with distilled water, that was a possibility

19   that that desiccation effect and/or put in a high

20   vacuum environment, those could have been

21   opportunities of sample manipulation that may have

22   caused that artifact.

23        Q.    Could have been.

24              But in fact in this study what they

25   found is, and the reason that they looked at the

Confidential - Subject to Protective Order

1  pristine samples, was so that they could show that

2  the pristine samples in fact were not degradaded or

3  have -- I'm sorry, were not subject to surface

4  cracking or peeling as a result of this fixation

5  method.  Correct?

6              MR. DAVIS:  Object to the form.

7              THE WITNESS:  The pristine samples

8  would not, because they can withstand this type of

9  sample preparation.  What's not clear is whether the

10  surfaces that were changed could stand this type of

11  sample preparation.

12  BY MR. ANDERSON:

13      Q.      Have you ever done any studies or

14  reviewed any studies wherein this type of sample

15  preparation was applied to explants and it was

16  determined that it was causing surface cracking

17  versus in vivo degradation?

18      A.      Not a specific study, no.

19      Q.      So your conclusion that this may have

20  possibly caused the surface cracking was just based

21  upon general scientific knowledge you have?

22              MR. DAVIS:  Object to the form.

23              THE WITNESS:  Well, what would

24  have -- I'm sorry.

25              What would have been clarifying and

Confidential - Subject to Protective Order

1    useful information is if they had done any optical

2    examinations after each step of the sample

3    preparation to determine if there were any

4    alterations to the surface.

5    BY MR. ANDERSON:

6        Q.      But you have no data and no studies

7    that you can point to that says more likely than

8    not, the cracking that we see in the photos in this

9    article is due to ethanol or a high vacuum

10   environment versus in vivo degradation?

11                 MR. DAVIS:  Object to the form.

12   BY MR. ANDERSON:

13       Q.      That's the truth.  Correct?  Yes or

14   no?

15       A.      No, I have no definitive studies

16   specifically designed to evaluate whether it's an

17   artifact -- whether it's generated as an artifact or

18   whether it's present in the original in vivo

19   environment.

20       Q.      So it was conjecture on your part as

21   to whether or not ethanol or high vacuum environment

22   led to some of the surface cracking that was seen on

23   SEM?

24                 MR. DAVIS:  Object to the form.

25   BY MR. ANDERSON:

Confidential - Subject to Protective Order

1        Q.      It's conjecture?

2        A.      It's my hypothesis.

3        Q.      And you did nothing by way of testing

4   other explanted samples or any sort of testing with

5   any of this treatment method in order to confirm

6   that hypothesis, did you, sir?

7        A.      No, I had no such explants available

8   to do such a test with or do such a comparison with.

9        Q.      And that goes back to my earlier

10  question.

11              If you had no explants, why didn't

12  you or the group reach out and ask for the explants

13  from Dr. Klosterhalfen?

14              MR. DAVIS:  Object to the form.

15              THE WITNESS:  That's an interesting

16  proposal.  But at the time that this was done, which

17  was written in, what, 2009?

18  BY MR. ANDERSON:

19       Q.      Published in 2010.

20       A.      Yeah.  Well, those explants would be

21  pretty old by then.

22       Q.      What if he had already done the

23  analysis and you had it in your own files?

24              MR. DAVIS:  Object to the form.

25  BY MR. ANDERSON:

Confidential - Subject to Protective Order

1      Q.      That would have been something that
2  you would have liked to have seen.  Right?
3                  MR. DAVIS:  Object to the form.
4                  THE WITNESS:  If he did that
5  evaluation, yes.
6  BY MR. ANDERSON:
7      Q.      And that would have been a thorough
8  investigation by your company as to whether or not
9  your polypropylene product degrades in a woman's
10  pelvis.  Yes?
11                 MR. DAVIS:  Object to the form.
12                 THE WITNESS:  It would be another
13  piece of information to evaluate.  Whether it
14  represents a thorough -- a thorough investigation is
15  conjecture.
16  BY MR. ANDERSON:
17     Q.      Well, which is more scientifically
18  valid, sir, your conjecture based on no data
19  whatsoever that the surface cracking was due to
20  ethanol or a high vacuum environment or reaching out
21  to someone who had actual explants and had done
22  analysis of them for your company?  Which one is
23  more scientifically valid?
24                 MR. DAVIS:  Object to the form.
25                 THE WITNESS:  Well --

Confidential - Subject to Protective Order

```
1    BY MR. ANDERSON:

2         Q.      Between those two, please answer my

3    question.

4                 Your conjecture, which is what you

5    said earlier, that it was your conjecture.

6         A.      Right.  My conjecture is based on the

7    explants that I did back in -- from 1985 to 1992.

8         Q.      None of those were vaginal explants,

9    were they?

10        A.      No.  But they were explants.

11        Q.      And we've also determined that

12   vaginal explants are in a bacterial environmental

13   that has greater inflammatory response than other

14   parts of the body.  Correct?

15        A.      Correct.  But it still is an

16   inflammatory or chronic inflammation environment,

17   and you're still talking about polypropylene fibers.

18        Q.      Just so the jury understands, what

19   you're telling them under oath today is that some

20   studies you did back in the '80s are just as valid

21   as explanted Ethicon products that were analyzed by

22   your pathologist of 30 years in Germany.

23                Is that what you're telling the jury?

24                MR. DAVIS:  Object to the form.

25                THE WITNESS:  I'm saying that that
```

Confidential - Subject to Protective Order

 1    information should be considered and can be just as

 2    valid.

 3    BY MR. ANDERSON:

 4         Q.    And the -- what did you in the '80s

 5    was you looked at a suture coming out of a dog's

 6    heart?

 7         A.    I did.

 8         Q.    And that's more valid than looking at

 9    hundreds of explants and the analysis of them by

10    Ethicon's pathologist.

11               Is that what you're telling the jury?

12               MR. DAVIS:  Object to the form.

13               THE WITNESS:  I'm not saying it's

14    more valid.  I'm saying it's just as valid to

15    examine those explants as it is from examining mesh

16    in a vaginal site.

17               MR. DAVIS:  Slow down just a little

18    bit.  I know it's getting late.  Just pause in case

19    I have an objection.

20               THE WITNESS:  Okay.  Sorry.

21                    -  -  -

22               (A discussion off the record

23          occurred.)

24                    -  -  -

25    BY MR. ANDERSON:

Confidential - Subject to Protective Order

```
 1          Q.       If you look at the next page -- let

 2    me ask you this.  Let me go back a minute.

 3               I'm still trying to communicate with

 4    you and get to some understanding of -- and unpack

 5    your answers a little bit on this comparing a

 6    pristine sample that's been treated in the exact

 7    same manner that an explant has been treated.  And I

 8    believe your testimony has been, well, the ethanol

 9    or the high vacuum environment or both would have a

10    different effect on pristine polypropylene than it

11    would on explanted polypropylene.

12               Do I basically have that summarized

13    correctly?

14          A.       I'm saying it would have no impact on

15    the pristine polypropylene.

16          Q.       And why would it have an impact on

17    the explant that it wouldn't have on the pristine?

18    They're the exact same material.

19          A.       That would indicate that that surface

20    has somehow changed.

21          Q.       I don't understand your answer.  Why,

22    if you -- strike that.

23               If you have the same polypropylene

24    fibers from the same manufacturer, one undergoes the

25    treatment that we saw on page 2 of this study, the
```

Confidential - Subject to Protective Order

1    explant undergoes the exact same treatment.  And of

2    that treatment, you said that the ethanol or the

3    high vacuum environment may be leading to --

4    possibly be leading to the surface cracking.  Okay?

5         A.      Yes.

6         Q.      What is it about the explanted mesh

7    that when treated with the ethanol or the high

8    vacuum environment might lead to surface cracking,

9    whereas the control or pristine sample would not

10   show that?

11        A.      The pristine sample would still be --

12   let's see.  What's the best way to describe it?

13              The surfaces where the cracking is

14   observed does represent the fact that that surface

15   has undergone some type of change as compared to the

16   pristine areas of the fiber.  The pristine areas of

17   the fiber, since they haven't gone through any such

18   change and are basically unchanged normally aren't

19   affected by the sample prep conditions.  But there

20   is something about the surface area where the

21   cracking is observed that does respond to the

22   desiccation effect of the sample preparation, and

23   therefore, it behaves differently.  We see it as

24   cracking.  What's not clear is whether that cracking

25   was present before the sample preparation treatment,

Confidential - Subject to Protective Order

```
 1    because it's obscured by the tissue and/or residual

 2    tissue from the explant.  And that's my stipulation,

 3    is that the sample preparation is what's generating

 4    those cracks.

 5          Q.      Now, you said the pristine areas of

 6    the fiber.

 7                  You understand that they took a fiber

 8    out of the box, pristine --

 9          A.      Right.

10          Q.      -- as a control?

11          A.      Yeah.

12          Q.      There's not some pristine part of the

13    explant.

14          A.      Well, there's part -- there's parts

15    of the explant --

16          Q.      Can I just --

17          A.      I'm sorry.

18          Q.      It's really hard for her, so we want

19    to keep Ann Marie happy.

20                  If you have a fiber that has never

21    been put into a human body -- we'll get to that.

22                  Clave and his colleagues are not

23    coming up with some brand new scientific method in

24    taking a control sample and putting them in a

25    solution and then taking the test sample and putting
```

Confidential - Subject to Protective Order

1    the same solution in order to determine whether or

2    not you can remove the solution as the cause for

3    what you're finding in the test sample.  This is

4    scientific method.  This is basic laboratory

5    practice.  Can we agree to that?

6                    MR. DAVIS:  Object to the form.

7                    THE WITNESS:  The control that's used

8    by Clave is done as a comparison with the explant.

9    And it's been demonstrated that the sample

10   preparation has no impact on the control.  All

11   right?  And I agree that's part of the scientific

12   method, you want to demonstrate that the control is

13   unaffected by what you're trying to do to the

14   sample, so -- but the control does not have the

15   affected surface that's on the explant.

16   BY MR. ANDERSON:

17        Q.      What do you mean by that?

18        A.      I mean that there are areas on the

19   surface that is demonstrated by SEM by the cracked

20   regions that have undergone some type of change.

21        Q.      How do you know that the cracked

22   region isn't along the entire line of the

23   polypropylene fiber?

24        A.      Well, that would be demonstrated by

25   what areas are present, so I mean, if -- it's a

Confidential - Subject to Protective Order

1    large area that's cracked, then that's a large --

2    that's a larger area, surface area that's been

3    impacted.  If it's a small area, then it's a small

4    area that's affected.

5         Q.      The whole reason that you do this in

6    the first place is so that you can rule out the

7    fact -- strike that.

8                 The reason that you use the same

9    solution and the same method on the control as you

10   do the test sample is so that you can rule out the

11   fact that the solution that you used or the

12   preparation method is not affecting the test sample.

13   Right?  Correct?

14                MR. DAVIS:  Object to the form.

15                THE WITNESS:  Right.  That you're not

16   impacting the suture itself.

17   BY MR. ANDERSON:

18        Q.      Right.

19                And so the reason they did it and the

20   way -- reason that it's a scientific -- basic

21   scientific method, as you've just agreed, is so that

22   you can say, this surface degradation is not due to

23   the sample preparation, and we know that because we

24   used the same sample preparation on the pristine

25   model.  Correct?

Confidential - Subject to Protective Order

1                    MR. DAVIS:  Object to the form.

2                    THE WITNESS:  That would normally be

3      the logic pattern that's pursued.  However, in this

4      instance, all right, you're looking at some surfaces

5      that are alleged to have degraded and/or cracked.

6      If they have been altered, it's not understood that

7      in the original in vivo state whether those surfaces

8      are cracked in the in vivo state or whether those

9      cracks are generated during dehydration of the

10     sample.  It's conceivable that in the hydrated

11     state, that that surface could be intact and not

12     have any cracks present.

13     BY MR. ANDERSON:

14          Q.      Well, it may be conceivable, but when

15     we look at scientific probability, if the solution

16     and the treatment that's used on the pristine is not

17     causing any surface cracking, and you use the same

18     solution on the explanted mesh, the logical pattern

19     would be that the solution is not causing the

20     cracking, therefore, what is?  And that was the

21     basis of what they were doing.  Correct?

22                   MR. DAVIS:  Object to the form.

23                   THE WITNESS:  That's -- that is their

24     conclusion, but I'm stipulating that what has not

25     been demonstrated is that the sample preparation

Confidential - Subject to Protective Order

1   is -- has no effect at all on the affected area.

2   It's not clear whether the cracks are generated from

3   the sample preparation procedure of the affected

4   areas or whether those affected areas were

5   originally cracked in an implanted state.

6   BY MR. ANDERSON:

7        Q.    So you're critical of the study and

8   would be -- and would have a greater level of

9   confidence as to whether or not the sample

10  preparation caused the cracking if they had done

11  optical microscopy during each phase of this

12  preparation prior to SEM.  Is that what you're

13  saying?

14       A.    Correct, correct.  If they had done

15  some type of examination after each sample step to

16  determine if there are any artifacts being generated

17  during the course of the sample prep, that would

18  address my concern.

19       Q.    But you certainly cannot, as you sit

20  here today, rule out the fact that the surface

21  cracking on those polypropylene fibers occurred due

22  to in vivo degradation, can you, sir?

23            MR. DAVIS:  Object to the form.

24            THE WITNESS:  No.  The argument I can

25  make is that those cracks that are seen in the SEM

Confidential - Subject to Protective Order

1    images may have been generated during the sample

2    preparation.

3    BY MR. ANDERSON:

4         Q.      Yes, but they -- oh, I'm sorry.  Go

5    ahead.

6         A.      The surface area, it's still a

7    possibility that in the implanted state, those

8    cracks may or may not exist.

9         Q.      Right.  And I'm working on --

10             You're working on the negative side.

11   I'm working on the positive side.

12             If we're going to say it may have

13   been caused by the sample preparation, we have to

14   also be able to say, scientifically and common

15   sensically, that it may have occurred in vivo prior

16   to the sample preparation.

17        A.      Correct.

18             MR. DAVIS:  Wait, wait.

19             Object to the form.

20             THE WITNESS:  Yeah.  I have to --

21   yeah.  I'm open to the possibility that the cracks

22   may be present in the in vivo state and that it

23   needs to be determined.  That's not a proven point.

24   BY MR. ANDERSON:

25        Q.      But you didn't say that in your

Confidential - Subject to Protective Order

```
 1   report that went to this regulatory body that these

 2   surface cracks may be present in the in vivo state.

 3   I just can't rule it out?

 4          A.      No.

 5                  MR. DAVIS:  Object to the form.

 6                  THE WITNESS:  I indicated that I

 7   believe that these are generated as an artifact

 8   during the sample preparation process.

 9   BY MR. ANDERSON:

10          Q.      But you didn't say it may have been

11   present in the in vivo state, I can't rule that out,

12   did you?

13                  MR. DAVIS:  Object to the form.

14                  THE WITNESS:  No, I did not.

15   BY MR. ANDERSON:

16          Q.      But that's just what you've told the

17   jury here today.  Correct?  Yes or no?

18                  MR. DAVIS:  Object to the form.

19                  THE WITNESS:  I have told --

20   BY MR. ANDERSON:

21          Q.      Yes or no, is that what you just told

22   the jury?

23          A.      I'm telling the jury, and I've told

24   the jury on other questions, that the cracks that

25   are generated and observed in the SEM images I
```

Confidential - Subject to Protective Order

1   believe are artifacts from the sample preparation

2   procedure.  I cannot prove it definitively one way

3   or the other, but from my experience with the

4   explants, I believe that this is the case.

5                MR. ANDERSON:  Objection, move to

6   strike the answer as nonresponsive.

7                And I'm going to ask you the question

8   again and I'll keep asking it until I get a

9   question -- an answer to my question.

10  BY MR. ANDERSON:

11       Q.    You said you told this jury those

12  cracks may have been present in the in vivo state, I

13  can't rule it out.

14               MR. DAVIS:  Object to the form -- I'm

15  sorry.

16  BY MR. ANDERSON:

17       Q.    However, when you responded to the

18  regulatory agency, you left that out, didn't you?

19               MR. DAVIS:  Object to the form.

20  BY MR. ANDERSON:

21       Q.    Yes or no?

22               MR. DAVIS:  And you're free to

23  explain.

24               MR. ANDERSON:  Well, no.  I'm free to

25  get a yes or a no.  You're welcome to follow up with

Confidential - Subject to Protective Order

 1   any questions you want after the deposition, but --

 2                   MR. DAVIS:  I understand, but I do

 3   think he answered the question.  But he can answer

 4   it again.

 5                   MR. ANDERSON:  Yes or no?

 6                   THE WITNESS:  Please repeat it.

 7                        -  -  -

 8                   (The court reporter read the

 9            pertinent part of the record.)

10                        -  -  -

11                   MR. DAVIS:  Object to the form.

12                   THE WITNESS:  No, I did not make that

13   statement.

14   BY MR. ANDERSON:

15        Q.      To this regulatory body in the -- in

16   response to this analysis.

17        A.      No.

18        Q.      Correct?

19        A.      No, it's not in the response.

20        Q.      Turn to the next page, please, under

21   the FTIR.

22                   And what they did there was before

23   they did FTIR analysis, both prior and after the

24   cleaning, they did it with some sodium hydrochloride

25   and cyclohexane.  Correct?

Confidential - Subject to Protective Order

1      A.      I'm sorry, where are you looking

2  specifically?

3      Q.      Under the FTIR analysis.

4      A.      Yes.

5      Q.      Now, we talked about SEM.  Now I want

6  to talk about the preparation that they did on the

7  FTIR.

8      A.      Okay.

9      Q.      Okay?

10             They did a baseline IR spectra for

11  all the samples.

12      A.      Uh-huh.

13      Q.      And then to eliminate the organic

14  residue on the explants, they treated it with --

15  that's probably an O, sodium hydrochloride solution.

16  And they washed that with deionized water, and then

17  they were extracted with pure cyclohexane for 24

18  hours at room temp.

19             Do you see that?

20      A.      Yes.

21      Q.      The control samples, pristine samples

22  of Prolene and Prolene Soft "were treated with the

23  same protocol to determine if the cleaning process

24  had chemically modified the material."

25             Do you see that?

Confidential - Subject to Protective Order

1          A.        I do.

2          Q.        And this study indicates that they

3    were not chemically altered as a result of the

4    cleaning process.  Correct?

5          A.        Yes.

6          Q.        So in this instance, regarding FTIR

7    spectroscopy, you don't have any problems with the

8    way they cleaned it as to whether or not this

9    cleaning solution may have led to the cracking.  Am

10   I right?

11                   MR. DAVIS:  Object to the form.

12                   THE WITNESS:  What's not included

13   here is any type of optical examination to look for

14   any evidence of cracking during each of the sample

15   preparation steps.

16   BY MR. ANDERSON:

17         Q.        But they said afterwards, because

18   they looked at the FTIR prior to cleaning and after

19   cleaning in order to compare the two, and they found

20   that there was no desiccation whatsoever as a result

21   of the cleaning process.  Correct?

22         A.        No.  They indicate that they -- that

23   there was no chemical modifications.

24         Q.        Can you -- I'm sorry.

25         A.        There was no indication about whether

Confidential - Subject to Protective Order

```
1    they're looking at cracks or not.  And my -- you

2    know, what I'm being critical of is whether or not

3    they did any examination of the fiber during the

4    different sample preparation steps to look at and

5    see if there was any evidence of any cracking.

6            Q.      But they have FTIR spectroscopy, and

7    they looked at them prior to the solution on both

8    the control and the sample, and then they looked at

9    them afterwards.  And on FTIR, there was no -- that

10   the chemical treatment had little to no effect on

11   the material.  Correct?

12           A.      Correct.

13           Q.      So I realize you want the optical

14   microscopy steps in here, but these people who

15   actually did the study and took the time to look at

16   explants, they found that it had no impact on the

17   surface degradation and the cracking.  Correct?

18                   MR. DAVIS:  Object to the form.

19                   THE WITNESS:  For the control

20   material, that's correct.  However, they looked at

21   the explants after the entire sample preparation

22   segment was complete.  They did not look at it

23   during different steps.  And again, my same point

24   is, is that the cracking could have been generated

25   as a desiccation effect on those affected surfaces
```

Confidential - Subject to Protective Order

1    that demonstrate cracking in the SEM.

2    BY MR. ANDERSON:

3         Q.       If you look at the next page, on the

4    bottom right, next page where it says "FTIR

5    analysis," and they did a chemical analysis?

6         A.       Uh-huh.

7         Q.       "The FTIR spectra of pristine Prolene

8    and Prolene Soft, before and after the treatment

9    with" the "sodium hydrochloride and cyclohexane,

10   were similar to typical FTIR spectra of

11   polypropylene reported in the literature...

12   Therefore, the chemical treatment had little effect

13   on the material."

14              Do you see that?

15        A.       I do.

16        Q.       So what you're saying is, it may have

17   had some effect on the explants, you don't know,

18   because you didn't have optical microscopy at every

19   step to be able to look at it.  Correct?

20        A.       Correct.

21        Q.       If the person who actually performed

22   the FTIR analysis and the SEM analysis under oath

23   testified a few months ago that there was no changes

24   during the preparation of these, would you defer to

25   the person who actually did the study versus

Confidential - Subject to Protective Order

1    yourself?

2              MR. DAVIS:  Object to the form.

3              THE WITNESS:  I'd have to see the

4    type of data he generated.

5    BY MR. ANDERSON:

6         Q.     She.

7         A.     She.

8         Q.     One way you could have found out

9    about the information or the data she generated, if

10   you wanted to do a thorough review of Clave before

11   reporting to a regulatory body, would have been to

12   have contacted them, and all their names and all

13   their locations are listed on the front page of the

14   article on the bottom left.

15             Can you pull that up?

16             MR. DAVIS:  Object to the form.

17   BY MR. ANDERSON:

18        Q.     You didn't bother to call or e-mail

19   or write to any of these people, did you?

20        A.     I did not, no.

21        Q.     So instead of criticizing it based

22   upon optimal microscopy sitting in Somerville, New

23   Jersey looking at a piece of paper, in order to

24   provide a thorough response to a regulatory body

25   charged with the safety of women's pelvises, you

Confidential - Subject to Protective Order

1    could have reached out to these folks and asked them

2    what their sample methods and preparations were so

3    that you had a better understanding of their data,

4    couldn't you, sir?

5                    MR. DAVIS:  Object to the form.

6                    THE WITNESS:  It's conceivable.  I'd

7    have to get permission from the company to make such

8    contact, but yes.

9    BY MR. ANDERSON:

10         Q.      Well, do you think that the company

11   would have given you permission to contact someone

12   who's Ethicon's own consultant, Henri Clave?

13         A.      It's quite possible.

14         Q.      But you didn't even ask?

15                   MR. DAVIS:  Object to the form.

16                   THE WITNESS:  No, I did not.

17   BY MR. ANDERSON:

18         Q.      If you wanted to do a thorough review

19   before responding to a regulatory body, you would

20   have reached out to these scientists and asked them

21   the same questions I'm asking you.  Right?

22                   MR. DAVIS:  Object to the form.

23                   THE WITNESS:  It's conceivable that

24   could have been done, yes.

25   BY MR. ANDERSON:

Confidential - Subject to Protective Order

1       Q.      So if you look under -- on the third

2  page of the document, so maybe go to the front again

3  and then just count back three pages.  Right-hand

4  side, "Histological analysis."

5              They found that there were basically

6  three types of tissue reaction around the explanted

7  meshes.  Do you see that?

8       A.      Yes.

9       Q.      Type 1 would be an infection where

10  they saw PMNs.  Correct?

11      A.      PMNs?

12      Q.      Polymorphonuclear neutrophils?

13      A.      I'm sorry, I'm not familiar with that

14  term.

15      Q.      That's a hallmark cellular indication

16  of infection in the human body in response to a

17  foreign body reaction.

18              Are you familiar with that?

19              MR. DAVIS:  Object to the form.

20              THE WITNESS:  No.  I'm not a

21  histologist, so I'm not familiar with this area.

22  BY MR. ANDERSON:

23      Q.      Nonetheless, type 1 reaction is an

24  infection.  Correct?

25      A.      It indicates that in the article,

Confidential - Subject to Protective Order

1    yes.

2        Q.      And type 2 is chronic inflammation,

3    where they see FBGCs or foreign body giant cells and

4    mononuclear cells.  Correct?

5                MR. DAVIS:  Object to the form.

6                THE WITNESS:  That's what it

7    indicates in the article, yes.

8    BY MR. ANDERSON:

9        Q.      Then type 3 was a sclerosis or a

10   pronounced fibrosis.

11               And you've heard about that in terms

12   of fibrotic encapsulation of meshes.  Correct?

13               MR. DAVIS:  Object to the form.

14   BY MR. ANDERSON:

15       Q.      Have you heard about that in response

16   to the body's foreign body reaction to meshes?

17       A.      Well, that's the first I've seen

18   this, sclerosis tied to fibrosis.  Again, I'm not

19   familiar with these histological terms.

20       Q.      If we look at type 1 and type 2, type

21   1 being infection, type 2 being chronic

22   inflammation, those are two of the things that you

23   listed in your response to the regulatory agency --

24       A.      Yes.

25       Q.      -- as to two of the things that could

Confidential - Subject to Protective Order

```
1    be --

2                    Two of the things that could be

3    related to --

4                    Two of the things that could be

5    related to polymer degradation in vivo.  Correct?

6                    MR. DAVIS:  Object to the form.

7    BY MR. ANDERSON:

8        Q.      Is that correct?

9        A.      I'd have to look at that response.

10       Q.      Okay.  I'll go back to it.

11                   In an infected field, that would be

12   type 1, infection.  Correct?  And/or a site of

13   chronic inflammation, that would be type 2, it is

14   not unexpected that there will be an increase in

15   free radicals and other reactive oxygen species,

16   polymers may be subject to surface degradation by

17   these reactive species.

18       A.      Yep.

19       Q.      And here in these articles, these are

20   two of the things listed that they saw in and around

21   what they described as degraded and cracked mesh.

22   Correct?

23                   MR. DAVIS:  Object to the form.

24                   THE WITNESS:  Yes.

25   BY MR. ANDERSON:
```

Confidential - Subject to Protective Order

1        Q.       So would you agree with me that if

2    the area surrounding polypropylene mesh in a woman's

3    vagina shows histological evidence of infection and

4    chronic inflammation, that those two factors could

5    lead to degradation of the polymer?

6                MR. DAVIS:  Object to the form.

7                THE WITNESS:  That environment could

8    promote or could have a population of free radicals

9    and oxygen that could lead to some alteration of the

10   surface.

11   BY MR. ANDERSON:

12       Q.       What happens to a woman if the

13   polypropylene in her pelvis -- strike that.

14                You understand that slings made out

15   of Prolene by Ethicon in pelvic organ prolapse mesh

16   made out of Gynemesh PS are going to be permanently

17   implanted in a woman's pelvis.  You understand that.

18   Right?

19       A.       Yes.  They could be permanently

20   implanted, yes.

21       Q.       Well, that's the indication, they're

22   supposed to be permanently implanted.  Right?

23       A.       Yes.

24       Q.       So if a woman is 30 years old and

25   she's implanted with one of Johnson &

Confidential - Subject to Protective Order

1    Johnson/Ethicon's polypropylene surgical meshes,

2    either for SUI or POP, can you state to a scientific

3    certainty that that polypropylene will not degrade

4    over the life of the product in her pelvis?

5            MR. DAVIS:  Object to the form.

6            THE WITNESS:  The product as designed

7    is not absorbable, so, therefore, it should not

8    degrade over the life of the product.

9    BY MR. ANDERSON:

10        Q.      However, you've just told the jury,

11   based upon the response that your team gave to this

12   regulatory body in the UK, as well as based upon

13   this study conducted by Clave, that in the presence

14   of infection or chronic inflammation, polypropylene

15   can in fact degrade in a woman's pelvis.

16           MR. DAVIS:  Object to the form

17   BY MR. ANDERSON:

18        Q.      Correct?

19        A.      There is some suggestions of surface

20   alterations.  There has been no indication that I've

21   seen of actual product failure in terms of its

22   strength, and from the studies that I've looked at,

23   no evidence of overall loss in molecular weight.

24   And in the data that's in the Clave study, their DSC

25   indicates no significant changes between the

Confidential - Subject to Protective Order

1    pristine and the explanted material.  So the

2    infrared study does show some observations of

3    absorbances, but they cannot conclude whether this

4    was oxidation or whether it was residual proteins or

5    tissue.  So I can't say there's any concrete

6    evidence that there was any significant degradation

7    present.

8         Q.      And you don't have any concrete

9    evidence that polypropylene doesn't degrade in a

10   woman's pelvis either, do you?

11                MR. DAVIS:  Object to the form.

12                THE WITNESS:  I have only -- I have

13   no personal data, but the company does have clinical

14   data and preclinical data on other Prolene products.

15   BY MR. ANDERSON:

16        Q.      We've gone through this before.

17                The only data that you have regarding

18   degradation is a suture from a dog heart from the

19   mid '80s when it comes to degradation and your

20   company looking at SEMs of those.  Correct, sir?

21                MR. DAVIS:  Object to the form.

22                THE WITNESS:  From my studies, yes.

23   BY MR. ANDERSON:

24        Q.      What other degradation -- you

25   qualified that.

Confidential - Subject to Protective Order

 1                    I thought earlier we maintained that

 2     out of your 34 years, you've never seen any

 3     degradation studies other than -- if you called it a

 4     degradation study, it was actually a comparative

 5     study of your sutures.

 6                    So in your 34 years at Ethicon, you

 7     have not seen, nor are you aware of, any degradation

 8     studies performed by your company in order to

 9     determine whether or not polypropylene degrades in

10     the human body?

11                    MR. DAVIS:  Object to the form.

12                    THE WITNESS:  That's correct.  I am

13     unaware of any existing studies.

14     BY MR. ANDERSON:

15          Q.        Okay.

16                    So now we're going back to your

17     answer, because you listed all of these things.  You

18     listed clinical experience, you listed studies that

19     were done, et cetera.  I want to unpack that and get

20     down to nuts and bolts here.  Okay?  So here's my

21     question.

22                    You were making the assumption that

23     polypropylene will not degrade in a woman's pelvis

24     over her lifetime on a seven-year dog study that was

25     conducted from a suture from the dog's heart

Confidential - Subject to Protective Order

1    conducted in the mid '80s when it comes to

2    degradation?

3           A.      That's part of --

4                   MR. DAVIS:  Wait.  Object to the

5    form.

6                   THE WITNESS:  That is part of the

7    information I'm relying on.

8    BY MR. ANDERSON:

9           Q.      If you look at the SEM photographs on

10   page 265, the upper right says "265" and the word

11   "degraded."  If you look at those SEM photographs.

12          A.      Uh-huh.

13          Q.      There's a low density monofilament,

14   like Prolene Soft, and a high density polypropylene

15   monofilament like Prolene pictured there.  Correct?

16          A.      Yes.

17          Q.      And on the left we see no surface

18   cracking and no surface peeling, whereas on the

19   right, in both, we do see surface cracking and

20   perhaps peeling on the bottom with the high density

21   being worse by observation than the one above it.

22                  Can we agree to that observation of

23   these photographs?

24          A.      Yes.

25          Q.      Okay.

Confidential - Subject to Protective Order

1                    When you saw those photographs and

2     your team saw those photographs, was there a

3     discussion amongst you as to what the clinical

4     implications would be to a woman if these explants

5     looked like this -- strike that.

6                    These were taken out after three

7     months.  Correct?  Degradation started appearing at

8     90 days.  Correct?

9          A.      In some instances, according to their

10    article, yes.

11         Q.      So if you see this kind of cracking

12    at 30 days, if in fact this is degrading in a woman,

13    was there a discussion as to whether or not this

14    would have any clinical implications in 20 years?

15                   MR. DAVIS:  Object to the form.

16                   THE WITNESS:  There was a discussion

17    relating to the seven-year dog study where

18    surfaces -- where polypropylene sutures, and in some

19    cases other sutures, had demonstrated this similar

20    type of surface cracking, not only at seven years

21    but at earlier time points.

22                   But yet at the end of seven years,

23    the testing done indicated that the molecular weight

24    of the polypropylene was essentially unchanged and

25    that the tensile strength of the suture was at least

1   90 percent or greater.  So that indicated that

2   although this observation is made, it's apparently a

3   relatively insignificant effect in terms of the

4   performance of the device.

5   BY MR. ANDERSON:

6        Q.      Are you aware that Johnson & Johnson

7   and Ethicon's own expert in this litigation, Dr.

8   David Williams, sat in the exact chair you're

9   sitting in a month after you testified and said that

10  polypropylene does degrade in the human body?

11              MR. DAVIS:  I object to the form.

12  BY MR. ANDERSON:

13       Q.      Are you aware of that, sir?

14              MR. DAVIS:  Object to the form of

15  that.

16              THE WITNESS:  No, I am not aware of

17  that.

18  BY MR. ANDERSON:

19       Q.      Have you read any of his articles

20  from 1976 forward over the last 40 years regarding

21  polypropylene degrading in the human body?

22              MR. DAVIS:  Object to the form.

23              THE WITNESS:  I'm aware of some

24  articles that allege that polypropylene degrades.

25  BY MR. ANDERSON:

Confidential - Subject to Protective Order

```
 1        Q.      He studied this for 40 years --
 2                MR. DAVIS:  Wait, wait.  I think he's
 3   still answering.
 4   BY MR. ANDERSON:
 5        Q.      Were you through?
 6        A.      No, I'm not through.
 7        Q.      Okay.  Keep talking.  Please, I
 8   didn't mean that disrespectfully.
 9        A.      And although these images look very
10   graphic and they look very significant, it's been --
11   I've seen very similar images or even things that
12   look worse than this, but the overall impact to the
13   device itself appears to be minimal to no effect.
14        Q.      You said the overall impact to the
15   device.
16                What about the overall impact to the
17   patient?
18                MR. DAVIS:  Object to the form.
19   BY MR. ANDERSON:
20        Q.      What does surface degradation and
21   polypropylene degrading in a woman's pelvis, what
22   about her impact?
23                MR. DAVIS:  Object to the form.
24   BY MR. ANDERSON:
25        Q.      Tell me what that would do to a woman
```

Confidential - Subject to Protective Order

1    in her tissue if this is in fact degrading.  Forget

2    the impact to the device.  What about the impact to

3    women?

4              MR. DAVIS:  Object to the form.

5              THE WITNESS:  It hasn't been

6    established and is still not clear in my mind that

7    the cracking phenomenon itself is present in vivo.

8    Nonetheless, if there are surfaces that are being

9    affected during chronic inflammation, they are

10   localized and there is no evidence that I've seen

11   that the performance of the device itself has been

12   impacted by it.

13   BY MR. ANDERSON:

14        Q.    Severe and chronic inflammation -- if

15   you want to talk about impact on the device, severe

16   and chronic inflammation can lead to fibrotic

17   bridging and complete encapsulation of the mesh in

18   scar tissue leading to contraction and nerve injury.

19              Do you understand that?

20              MR. DAVIS:  Object to the form.

21              THE WITNESS:  Yes.

22   BY MR. ANDERSON:

23        Q.    And that's not just -- that might be

24   localized to a site, and so would the woman's pain

25   associated with that, too.  It would be localized to

Confidential - Subject to Protective Order

1  that site.  Correct?

2              MR. DAVIS:  Object to the form.

3              THE WITNESS:  For an infection site,

4  yes, it would be.

5  BY MR. ANDERSON:

6       Q.     And for a chronic inflammatory

7  response as well?

8       A.     Yes.

9       Q.     If in fact there is a rough surface

10  like this in the woman's tissue in an implant that

11  is moving in tissue, that would increase the

12  inflammatory response, would it not?

13              MR. DAVIS:  Object to the form.

14              THE WITNESS:  It's possible.  It

15  depends on the circumstances.

16  BY MR. ANDERSON:

17       Q.     So if there's a possibility that

18  surface cracking of polypropylene fibers increases

19  the inflammatory response, that could also increase

20  the amount of fibrosis in and around the implant.

21  Correct?

22              MR. DAVIS:  Object to the form.

23              THE WITNESS:  These are

24  possibilities.

25  BY MR. ANDERSON:

Confidential - Subject to Protective Order

```
 1        Q.      Well, we know from Ethicon's own

 2   investigation and studies that if you increase the

 3   inflammatory response, it increases the fibrosing

 4   around the implant and causes contraction and pain.

 5   Correct?

 6               MR. DAVIS:  Object to the form.

 7               THE WITNESS:  I'm not necessarily

 8   familiar with the details of that, no.  I can't make

 9   that conclusion one way or the other.

10   BY MR. ANDERSON:

11        Q.      Well, here's the way, here's the

12   thing.

13               Again, I'm not trying to be

14   disrespectful, but you can't have it both ways.  You

15   can't, on the one hand, say this surface cracking

16   and some chronic inflammation is localized and

17   doesn't have any impact.  And then when I say that

18   your company is aware that a greater inflammatory

19   response can cause contraction of the mesh, pain,

20   nerve injury and erosions and say, oh, I don't know

21   about that.

22        A.      Well, I'm responding as an analytical

23   chemist that has examined these types of devices and

24   explants before.  So I'm commenting on the surfaces

25   of the explants.  I'm not an expert in histology and
```

Confidential - Subject to Protective Order

1    I'm not an expert in preclinical or clinical

2    aspects.  So when you start talking about

3    inflammation sites and scarring, these are areas I'm

4    unfamiliar with.

5         Q.      Right.

6               With all due respect, you said that

7    being someone who's familiar with looking at these

8    explants and you pointed to those.

9               Truth is, you're not familiar with

10   looking at any explants ever in your 34 years that

11   came from a woman's pelvis, are you?

12              MR. DAVIS:  Object to the form.

13              THE WITNESS:  Not from a woman's

14   pelvis.  I am -- I have experience looking at

15   explants from animals.

16   BY MR. ANDERSON:

17        Q.      Other than the dog study, what

18   explants from animals have you looked at under SEM?

19        A.      I can only recall the dog explants.

20        Q.      Okay.

21              So there weren't explants from

22   animals --

23              MR. DAVIS:  He wasn't through.

24   BY MR. ANDERSON:

25        Q.      Oh.

Confidential - Subject to Protective Order

```
 1          A.      I'd have to refresh my memory if I've
 2   ever looked at any other examples from any other
 3   animal types.
 4          Q.      Well, if you're going to tell the
 5   jury under oath that you have this experience by
 6   looking at explants from other animals, I have a
 7   right to ask you which animals.  And all I've heard
 8   from you this time and the last time I deposed you
 9   was one dog study in the '80s.
10          A.      Then I should correct it to say only
11   dogs.
12          Q.      So when you point at these pictures
13   here, all you've looked at is one suture from a
14   dog's heart.  You haven't looked at 100 explants
15   from women's vaginal space in order to do an SEM or
16   an FTIR or a DSC analysis in order to determine
17   whether or not they are degrading in a woman's
18   pelvis, have you, sir?
19                  MR. DAVIS:  Object to the form.
20   BY MR. ANDERSON:
21          Q.      Yes or no?
22                  MR. DAVIS:  Object to the form.
23                  THE WITNESS:  No, but I've looked at
24   several explants from the dog studies at various
25   time points.  So it's not just simply one explant.
```

Confidential - Subject to Protective Order

1    And there were other testing done besides scanning

2    electron microscopy.  Those examinations include

3    molecular weight and physical testing.

4    BY MR. ANDERSON:

5         Q.    You looked at a fiber a few inches

6    long.  That's what you looked at.  Right?

7         A.    Correct.

8         Q.    You've mentioned molecular weight a

9    few times, so let me ask you this.

10             If in fact a scientist were to

11   perform a study and they actually spent the time,

12   money and effort to look at explants from a woman's

13   vagina and compare the pristine fiber of, let's say

14   Prolene to the explanted fiber of Prolene, and there

15   was a loss of molecular weight, there was evidence

16   of chronic inflammation and infection, would that

17   lead you in the direction of perhaps there was

18   degradation of that polypropylene fiber?

19             MR. DAVIS:  Object to the form.

20             THE WITNESS:  The loss of molecular

21   weight would suggest possible degradation of the

22   Prolene.

23   BY MR. ANDERSON:

24        Q.    Okay.

25             So you just haven't seen any studies

Confidential - Subject to Protective Order

1   wherein explanted surgical polypropylene mesh was

2   compared to pristine polypropylene mesh in which

3   there was a drop in molecular weight of the

4   explanted mesh that would help you out in making

5   that determination.  Correct?

6               MR. DAVIS:  Object to the form.

7               THE WITNESS:  I have not seen that

8   type of evidence.

9   BY MR. ANDERSON:

10       Q.      If you look at the page that has --

11   that says 267 up in the upper right corner, turn to

12   the page just before that, and we're going to carry

13   over from the bottom of the page you have your

14   finger on there, the bottom right.

15               "Several hypotheses concerning the

16   degradation of the polypropylene are described

17   below.  None of these, particularly direct

18   oxidation, could be confirmed in this study."

19               And then you look at the next page,

20   and we have small Roman numeral i, ii and iii.

21               Do you see those?

22       A.      Yes.

23       Q.      The three hypotheses for the surface

24   degradation are "direct oxidation of the

25   polypropylene," "fatty acid diffusion" or "oxidation

Confidential - Subject to Protective Order

```
1    due to free radical attack."

2              Do you see that?

3    A.        Yes.

4    Q.        And free radical attack and oxidation

5    is one of the things that's listed in Ethicon's

6    response to Clare Huntington.  Correct?

7    A.        Yes.

8    Q.        And one of the ways that you would

9    see a greater free radical attack response and

10   oxidation would be in the presence of an infected

11   field or chronic inflammation.  Correct?

12   A.        That's one example, yes.

13   Q.        If you look at the top right of the

14   next column, "The chronic inflammatory reaction may

15   infer free radical synthesis as peroxide and

16   superoxide ions and hypochlorite acid."

17             Do you see that?

18   A.        I do.

19   Q.        The human body produces peroxide, in

20   particular hydrogen peroxide, does it not?

21             MR. DAVIS:  Object to the form.

22   BY MR. ANDERSON:

23   Q.        I'm sorry, that's a bad way of asking

24   the question.

25             Let's take a woman.  A woman's body
```

Confidential - Subject to Protective Order

```
 1    produces hydrogen peroxide and other strong

 2    peroxides.  Correct?

 3                    MR. DAVIS:  Object to the form.

 4                    THE WITNESS:  I don't know the

 5    specific circumstances where that would occur,

 6    unless that's a cellular -- extracellular response.

 7    But I'm not personally knowledgeable nor an

 8    authority to indicate whether they do or not.

 9    BY MR. ANDERSON:

10          Q.      So a woman's body may produce

11    peroxides and in particular hydrogen peroxide, you

12    just don't know?

13          A.      I don't know.  That's correct.

14                    MR. DAVIS:  Object to the form.

15    BY MR. ANDERSON:

16          Q.      If it does, that would be one thing

17    that would infer a free radical synthesis.  Correct?

18                    MR. DAVIS:  Object to the form.

19                    THE WITNESS:  That is one hypothesis

20    explained here in this article, yes.

21    BY MR. ANDERSON:

22          Q.      A woman also has in her vaginal

23    space, in her body, but in this instance where the

24    mesh is located in her vaginal space, hypochlorite

25    acid, does she not?
```

Confidential - Subject to Protective Order

```
 1                    MR. DAVIS:  Object to the form.
 2                    THE WITNESS:  I can't comment on
 3      that.
 4      BY MR. ANDERSON:
 5           Q.      If in fact a woman has strong
 6      peroxide and hypochlorite acid in her body and it
 7      induces a chronic inflammatory reaction, that in
 8      fact could account for surface degradation of
 9      polypropylene.  Correct?
10                    MR. DAVIS:  Object to the form.
11                    THE WITNESS:  It's one hypothesis
12      stated in this article, yes.
13      BY MR. ANDERSON:
14           Q.      Well, I'm not asking if that's just a
15      hypothesis, I'm asking you, because you have given
16      your opinion on things, you've looked at this, some
17      things you agree with, most you don't.  So with all
18      due respect, I'm not asking what they -- I know what
19      they said, it's right here.  I'm asking you, because
20      you had provided a response to this agency.  So
21      that's the backdrop of my question.
22           A.      Right, right.
23           Q.      So if a woman has strong peroxides
24      and hypochlorite acid that's produced and it's in
25      and around this mesh, it can in fact lead to
```

Confidential - Subject to Protective Order

1   degradation of the mesh --

2              MR. DAVIS:  Object to the form.

3   BY MR. ANDERSON:

4        Q.      -- in some women.  Correct?

5              MR. DAVIS:  Object to the form.

6              THE WITNESS:  In that environment,

7   it's possible it could have -- it could impact the

8   surface.

9   BY MR. ANDERSON:

10       Q.      In a septic environment or a

11  contaminated environment like surgical meshes for a

12  woman's vagina are placed, also when you have

13  hematoma and bruising, fatty acids are produced by

14  the woman in response to those two things that could

15  also lead to degradation.  Correct?

16             MR. DAVIS:  Object to the form.

17             THE WITNESS:  I'm not -- I can't

18  comment on that.  I don't know that for a fact or

19  not.

20  BY MR. ANDERSON:

21       Q.      And if you see carboxyl groups on

22  FTIR, that could also be related to direct oxidation

23  of polypropylene, could it not?

24             MR. DAVIS:  Object to the form.

25             THE WITNESS:  It could be related to

1   oxidation.  It could be related to residual

2   proteins.

3   BY MR. ANDERSON:

4        Q.      If we had a bacterial environment

5   with a chronic inflammatory response in the presence

6   of hydrochloride acid and strong peroxides like

7   hydrogen peroxide, in some women that can in fact

8   degrade the polypropylene in their pelvis.  Would

9   you agree with that?

10               MR. DAVIS:  Object to the form.

11               THE WITNESS:  In that environment, it

12  could possibly have an impact on the surface of the

13  polypropylene fibers.

14  BY MR. ANDERSON:

15       Q.      And it could in fact cause it to

16  degrade and lose molecular weight.  Correct?

17       A.      I do not agree with that statement.

18       Q.      You have no basis for stating that

19  you disagree with it other than your dog study in

20  the '80s?

21               MR. DAVIS:  Object to the form.

22               THE WITNESS:  That data -- yes, I'm

23  relying on that data.

24  BY MR. ANDERSON:

25       Q.      If you look right above "Conclusion"

Confidential - Subject to Protective Order

1    on page 269, it says 269 up at the top.

2            Right above the word "Conclusion,"

3    that last sentence, "Additional chemical analysis

4    such as thermogravimetric analysis and molecular

5    weight determination, specifically, would further

6    clarify the mode of prosthetic damage."

7            Do you see that?

8    A.      Yes.

9    Q.      After you read that and before you

10   guys decided to give a response to the UK regulatory

11   authority, what thermogravimetric analysis and

12   molecular weight determinations did you do on

13   explanted meshes from a woman's pelvis?

14           MR. DAVIS:  Object to the form.

15           THE WITNESS:  I'm not aware of any

16   testing that we have done on any explanted meshes

17   from women's pelvises.

18   BY MR. ANDERSON:

19   Q.      Is it your testimony to the jury

20   today that the reason that Johnson & Johnson and

21   Ethicon has not conducted any degradation studies

22   like the Clave study in which explanted Ethicon

23   meshes have been compared to pristine Ethicon meshes

24   is because there's no need to, we have a seven-year

25   dog study from the '80s?

Confidential - Subject to Protective Order

```
1              MR. DAVIS:  Object to the form.
2              THE WITNESS:  The clinical history of
3   the Prolene line of products --
4   BY MR. ANDERSON:
5        Q.     I need to know -- I need to know if
6   that is your testimony.  That's a yes or no.
7   Because I don't want to go back through the clinical
8   history and all those things.  Quite frankly, you've
9   had a great opportunity to lay that out on the
10  record.  I understand your story line.  Okay?  My
11  question is a little different.
12             I don't, quite frankly, and with all
13  due respect, care about 40 years of clinical
14  history, because I'm talking about a very specific
15  study here and we're talking about degradation.
16  Okay?  So that's the context of my question.
17       A.     Right.
18             MR. ANDERSON:  Can you read back my
19  question, please?
20                      -  -  -
21             (The court reporter read the
22        pertinent part of the record.)
23                      -  -  -
24             MR. DAVIS:  And I will remind the
25  witness that while he -- if he can answer yes or no,
```

Confidential - Subject to Protective Order

1  he should, but he's always free to explain every

2  answer.

3            MR. ANDERSON:  Actually, no.  I'm

4  entitled to a yes or no, and you have the right to

5  ask him any questions you want at the end of the

6  deposition.

7            MR. DAVIS:  I'm going to instruct the

8  witness that my understanding of the rule is you are

9  entitled to explain your answer.  But if it can be

10  answered yes or no, you should certainly do that.  I

11  agree with counsel opposite, but you do have a right

12  to explain your answer.

13            MR. ANDERSON:  I respectfully

14  disagree with that and it's certainly not the rule

15  in Ohio -- I mean the rule in New Jersey.

16  BY MR. ANDERSON:

17       Q.     Go ahead.  Can you answer that yes or

18  no?

19       A.     I can't -- I cannot answer it yes or

20  no.  The reason I can't answer it yes or no is I

21  can't speak on behalf of the company as a business

22  decision why they would not pursue such a study as

23  you've indicated.  If I had to speculate, I would

24  say that it would be based -- that their decision

25  would be based that there was not a sufficient need

Confidential - Subject to Protective Order

1    at this time to warrant such a study based on the

2    clinical information on the Prolene line of

3    products, and the information already gathered on

4    other studies such as the seven-year dog study, on

5    other Prolene-type products, since they are made

6    from the same type of polypropylene fibers.

7    BY MR. ANDERSON:

8         Q.      At the time that you responded a

9    little over a year ago to this regulatory body, did

10   Ethicon and Johnson & Johnson have access to

11   explanted tissue and material of its products from

12   women?

13                MR. DAVIS:  Object to the form.

14                THE WITNESS:  I do not know.

15   BY MR. ANDERSON:

16        Q.      Did anyone on your team reach out

17   within the company, send a company-wide e-mail,

18   send an e-mail to anyone in pathology, and ask, do

19   we have any explanted mesh samples or access to our

20   explanted mesh samples that we could perform an

21   analysis of?

22                MR. DAVIS:  Object to the form.

23   BY MR. ANDERSON:

24        Q.      Did your team do that?

25        A.      I'm not aware of any such inquiry.

Confidential - Subject to Protective Order

1    Q.      Now, Joerg Holste is your counterpart

2  in Norderstedt, in the Ethicon Norderstedt facility.

3  Correct?

4    A.      He was a member of corporate product

5  characterization, but he was stationed over in

6  Norderstedt.

7    Q.      And if you testified at your first

8  deposition that he was your counterpart in Ethicon

9  Norderstedt, any reason that you wouldn't agree with

10  that today?

11    A.      He was a member of the department.

12  By counterpart, he does not have -- he did not have

13  the same role I had within corporate product

14  characterization.  So he was -- you know, he was

15  certainly another associate within the department.

16    Q.      I show you Plaintiff's T-279, last

17  four digits 6636.

18                    -  -  -

19             (Deposition Exhibit No. T-279,

20             Interim report mesh explants pelvic floor

21             repair, April 2008, Bates stamped

22             ETH.MESH.00006636, was marked for

23             identification.)

24                    -  -  -

25  BY MR. ANDERSON:

Confidential - Subject to Protective Order

1       Q.      At the top it says "Interim report

2    mesh explants pelvic floor repair, April 2008,

3    Professor B. Klosterhalfen, Institute of Pathology

4    Duren Hospital" in "Germany."

5               Do you see that?

6       A.      I do.

7       Q.      Down at the bottom, you see that this

8    was translated by Joerg Holste in April of 2008, a

9    senior research fellow for Ethicon in -- we just

10   said in Norderstedt.  Correct?

11      A.      Yes, I believe that's where he's

12   located.

13      Q.      Okay.

14              Either way, Joerg Holste is an

15   Ethicon employee?

16      A.      He is.

17      Q.      So he translated this document in

18   April of 2008 of 100 explanted mesh samples.  And

19   these are mesh explants for the pelvic floor.  And

20   that, of course, is what Clave was looking at, 100

21   explants from the pelvic floor.  Correct?

22      A.      Yes.

23      Q.      It says, the "most serious

24   complication following mesh implantation in pelvic

25   floor was mesh erosion in 80 to 90% of the cases."

1    It says, "Mesh erosion is nearly 100% combined with

2    secondary mesh/surgical site infection...

3    Developing a mesh ulceration follows this

4    infection."

5              Then it says under 3, "All meshes

6    without exception induce typical foreign body tissue

7    reaction known from mesh implants in hernia

8    surgery."

9              Number 4, "Foreign body tissue

10   reaction FBR induces fibrosis in the mesh implant

11   area, i.e. severe foreign body reaction is

12   associated with severe fibrosis."

13             5, "Severe fibrotic tissue reaction

14   is often associated with degenerative

15   calcification."

16             Do you see that?

17   A.      Yes.

18   Q.      Do you think it would have been

19   helpful for your team to have reached out to Dr.

20   Klosterhalfen, who five years prior to you giving

21   this response -- four years prior to you giving this

22   response to this regulatory body, had looked at 100

23   explant meshes and given a report to your company

24   about them?

25             MR. DAVIS:  Object to the form.

Confidential - Subject to Protective Order

1    BY MR. ANDERSON:

2         Q.      Don't you think that would have been

3    helpful as part of your investigation?

4         A.      It's possible that information could

5    have been useful.

6         Q.      Now that you've seen this report and

7    you know that Prof. Klosterhalfen has explants, are

8    you going to go back and suggest to your team that

9    perhaps we should do similar Clave analysis on

10   explanted meshes that we have under our control so

11   that we can try to determine whether or not there's

12   degradation of these --

13             MR. DAVIS:  Object to the form.

14   BY MR. ANDERSON:

15        Q.      -- that may be associated with

16   complications in women?

17             MR. DAVIS:  Object to the form.

18             THE WITNESS:  Well, the issue

19   associated with explants that are -- have already

20   been explanted and are old is how they're being

21   preserved, and whether or not they're preserved has

22   an impact on the areas that we're interested in

23   examining.

24   BY MR. ANDERSON:

25        Q.      If he has evidence,

Confidential - Subject to Protective Order

1    histopathologically or on any of the analyses that

2    he has done of explanted pelvic floor meshes

3    indicating degeneration or degradation of the

4    polypropylene fibers, don't you think that would be

5    information that should be provided to the

6    regulatory body who asked you this question a year

7    ago?

8                    MR. DAVIS:  Object to the form.

9                    THE WITNESS:  I don't know if that

10   particular type of information would be applicable

11   or related to the inquiry.  And the reason I say

12   that is I'm not a clinician and I'm not -- you know,

13   I don't have preclinical expertise to determine if

14   these types of observations have any significance

15   with the question about -- that the regulatory body

16   had about the polypropylene pelvic floor mesh

17   device.

18   BY MR. ANDERSON:

19        Q.    Well, you made a statement in that --

20   your signed statement to this regulatory body that

21   says, "With Prolene suture, there have been no

22   observations of fiber degradation in complaints

23   received and/or products returned."

24              If you wanted to make a full

25   statement back to them now and say, you know what, a

Confidential - Subject to Protective Order

1   year ago we told you that we don't -- we've never

2   had any observations of fiber degradation; however,

3   we've reached out to our pathologist in Germany who

4   has hundreds of our explants and what we've found is

5   there actually is degradation.

6              You don't have to be a clinician to

7   be able to provide that information, do you, sir?

8              MR. DAVIS:  Object to the form.

9   BY MR. ANDERSON:

10       Q.      And please answer my question.

11       A.      I see --

12       Q.      Do you have to be a clinician to

13  provide that information, or is that something on

14  your own you could do as part of this group that

15  responded to this regulatory agency?

16             MR. DAVIS:  Object to the form.

17             THE WITNESS:  I don't know how to

18  answer that question, because the question that you

19  asked me before involves specific points on this

20  memo.  And my response was that, you know, I'm not a

21  clinician and I'm not a preclinical expert to

22  determine whether or not these observations are

23  directly related to that.  Then you started talking

24  about fibers, fiber degeneration, but this does not

25   talk about any kind of fiber degeneration.

Confidential - Subject to Protective Order

```
 1    BY MR. ANDERSON:
 2         Q.      I'll ask you my question again.
 3                 In order to provide a thorough,
 4    truthful and accurate response to this regulatory
 5    agency, even though it's a year after you gave your
 6    first response, wouldn't it be a responsible
 7    credo-based action to actually reach out to Prof.
 8    Klosterhalfen and ask him if he has seen in his
 9    samples evidence of degradation?  That's my
10    question.
11                 MR. DAVIS:  Object to the form.
12                 THE WITNESS:  I'd have to discuss
13    that with the rest of the team.
14    BY MR. ANDERSON:
15         Q.      Don't you think you ought to do that?
16                 MR. DAVIS:  Object to the form.
17                 THE WITNESS:  Well, it's worth
18    consulting the team.
19    BY MR. ANDERSON:
20         Q.      Can we agree, just as a basic common
21    sensical principle of credo-based, ethical medical
22    device manufacturing that if you've got information
23    that may be helpful to patient safety, even if it
24    hurts the bottom line of the company, you ought to
25    be providing that to regulatory agencies or doctors
```

Confidential - Subject to Protective Order

1    or patients?

2                    MR. DAVIS:  Object to the form.

3                    THE WITNESS:  I can't agree to that

4    statement.

5    BY MR. ANDERSON:

6        Q.     If you have information in the form

7    of Ethicon/Johnson & Johnson explanted pelvic floor

8    meshes, which have been analyzed pathologically,

9    histopathologically and other forms of analytical

10   characterization that are sitting in Duren, Germany,

11   would it be credo-based, ethical conduct by your

12   company to try to determine that information so that

13   you could provide that information to Ms. Clare

14   Huntington?

15                   MR. DAVIS:  Object to the form.

16                   THE WITNESS:  The observations noted

17   in the article and that are described on here I'm

18   sure would be evaluated by the appropriate

19   professionals and determined, you know, whether

20   these observations are significant enough to be

21   included in such a discussion.  But I don't have

22   the -- you know, the overall expertise to make that

23   kind of a judgment call.

24   BY MR. ANDERSON:

25       Q.     So in other words, yes, Mr. Anderson,

Confidential - Subject to Protective Order

 1    in order to be an ethical, credo-based company who

 2    has patient safety first, we should reach out to

 3    Prof. Klosterhalfen to see if any of our explanted

 4    meshes show degeneration so that we can inform

 5    regulatory bodies, doctors and patients that there

 6    is a chance that polypropylene could degrade in

 7    their pelvises?

 8                    MR. DAVIS:  Object to the form.

 9                    THE WITNESS:  That's not my

10    conclusion.

11                          -  -  -

12                    (Deposition Exhibit No. T-280,

13            Intermediate Report -- Prolapse Mesh

14            Explants 6/2009, Bates stamped

15            ETH.MESH.02157879 and ETH.MESH.02157880,

16            was marked for identification.)

17                          -  -  -

18    BY MR. ANDERSON:

19            Q.      Let's look at T-280, last four 7879.

20                    Did I give you the right one, 7879?

21            A.      Yes.

22            Q.      Okay.

23                    This is a little over a year later,

24    another intermediate report from prolapse mesh

25    explains in June of 2009 where Prof. Klosterhalfen

Confidential - Subject to Protective Order

1    is saying that he's analyzed 172 mesh explants from

2    different manufacturers.

3                  If you look down at number 5, "Strong

4    fibrosis is associated with degradation" and

5    "calcification to a greater than average extent."

6                  Do you see that?

7         A.     Yes.  But what's not clear to me is

8    what he means by degradation/calcification and

9    whether that's supposed to be the same as

10   degenerative calcification.

11        Q.     So wouldn't it be great to have had

12   these for your group so that you could have asked

13   him?

14                  MR. DAVIS:  Object to the form.

15   BY MR. ANDERSON:

16        Q.     You don't know because no one asked.

17   Correct, sir?

18                  MR. DAVIS:  Object to the form.

19                  THE WITNESS:  Well, I don't know

20   under what circumstances this type of study was

21   requested.  And being an analytical chemist, there's

22   a lot of information here that is outside my area of

23   expertise.

24   BY MR. ANDERSON:

25        Q.     Right.

Confidential - Subject to Protective Order

1            And that's why you had different

2    specialties on your group?

3         A.      That's correct.

4         Q.      And no one reached out to Prof.

5    Klosterhalfen for this response, did they?

6                 MR. DAVIS:  Object to the form.

7    BY MR. ANDERSON:

8         Q.      That you're aware of?

9         A.      I'm not aware of that, no.

10                THE VIDEOGRAPHER:  Going off the

11   record.  The time is 4:22 p.m.  This is the end of

12   Tape Number 4.

13                (Deposition adjourned at

14           approximately 4:22 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Confidential - Subject to Protective Order

1

2                          CERTIFICATE

3

4

5               I HEREBY CERTIFY that the witness was

6    duly sworn by me and that the deposition is a true

7    record of the testimony given by the witness.

8

9               It was requested before completion of

10   the deposition that the witness, DANIEL F. BURKLEY,

11   MS, have the opportunity to read and sign the

12   deposition transcript.

13

14

15

16

17   _____

18           ANN MARIE MITCHELL, a Federally Approved

             Certified Realtime Reporter, Registered

19           Diplomate Reporter and Notary Public

20

21

22               (The foregoing certification of this

23   transcript does not apply to any reproduction of the

24   same by any means, unless under the direct control

25   and/or supervision of the certifying reporter.)

Confidential - Subject to Protective Order

1                    INSTRUCTIONS TO WITNESS

2

3               Please read your deposition over

4     carefully and make any necessary corrections.  You

5     should state the reason in the appropriate space on

6     the errata sheet for any corrections that are made.

7                    After doing so, please sign the

8     errata sheet and date it.  It will be attached to

9     your deposition.

10                   It is imperative that you return the

11    original errata sheet to the deposing attorney

12    within thirty (30) days of receipt of the deposition

13    transcript by you.  If you fail to do so, the

14    deposition transcript may be deemed to be accurate

15    and may be used in court.

16

17

18

19

20

21

22

23

24

25

Confidential - Subject to Protective Order

```
1                    -   -   -   -   -   -

                        E R R A T A

2                    -   -   -   -   -   -

3     PAGE   LINE   CHANGE

4     _____  _____  _____

5            REASON _____

6     _____  _____  _____

7            REASON _____

8     _____  _____  _____

9            REASON _____

10    _____  _____  _____

11           REASON _____

12    _____  _____  _____

13           REASON _____

14    _____  _____  _____

15           REASON _____

16    _____  _____  _____

17           REASON _____

18    _____  _____  _____

19           REASON _____

20    _____  _____  _____

21           REASON _____

22    _____  _____  _____

23           REASON _____

24    _____  _____  _____

25           REASON _____
```

Confidential - Subject to Protective Order

```
 1

 2                  ACKNOWLEDGMENT OF DEPONENT

 3

 4             I,_____, do hereby

 5    certify that I have read the foregoing pages, 1 -

 6    282, and that the same is a correct transcription of

 7    the answers given by me to the questions therein

 8    propounded, except for the corrections or changes in

 9    form or substance, if any, noted in the attached

10    Errata Sheet.

11

12

13    _____

14     DANIEL F. BURKLEY, MS                        DATE

15

16

17    Subscribed and sworn

      to before me this

18    _____ day of _____, 20_____.

19    My commission expires:_____

20

      _____

21    Notary Public

22

23

24

25
```

Confidential - Subject to Protective Order

1                           LAWYER'S NOTES

2        PAGE    LINE

3        _____   _____   _____

4        _____   _____   _____

5        _____   _____   _____

6        _____   _____   _____

7        _____   _____   _____

8        _____   _____   _____

9        _____   _____   _____

10       _____   _____   _____

11       _____   _____   _____

12       _____   _____   _____

13       _____   _____   _____

14       _____   _____   _____

15       _____   _____   _____

16       _____   _____   _____

17       _____   _____   _____

18       _____   _____   _____

19       _____   _____   _____

20       _____   _____   _____

21       _____   _____   _____

22       _____   _____   _____

23       _____   _____   _____

24       _____   _____   _____

25       _____   _____   _____