Exhibit H

Shelby F. Thames, Ph.D.

```
 1            IN THE UNITED STATES DISTRICT COURT

 2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                   CHARLESTON DIVISION

 4

 5

    IN RE:  ETHICON, INC.,        MASTER FILE NO.

 6  PELVIC REPAIR SYSTEM          2:12-MD-02327

    PRODUCTS LIABILITY LITIGATION

 7                                MDL 2327

 8                                JOSEPH R. GOODWIN

                                  U.S. DISTRICT JUDGE

 9

10  ****************************************************

11

12  CYNTHIA JOHNSON                       PLAINTIFF

13

14     VS.             CASE NO.:  2:12-cv-01704

15

16  ETHICON, INC., ET AL.              DEFENDANTS

17

          ***********************************************

18        DEPOSITION OF SHELBY F. THAMES, PhD

          ***********************************************

19

20              Taken at Butler Snow

        1020 Highland Colony Parkway, Suite 1400,

21              Ridgeland, Mississippi

                On Tuesday, July 19, 2016,

22        Beginning at approximately 4:31 p.m.

23        **********************************

24             AMY M. KEY, RPR, CSR

                  Notary Public

25
```

Shelby F. Thames, Ph.D.

```
 1                 A P P E A R A N C E S

 2

 3

    REPRESENTING THE PLAINTIFFS,
 4  CYNTHIA JOHNSON:

 5

 6       MICHAEL H. BOWMAN, ESQ.
         Wexler & Wallace, LLP
 7       55 West Monroe Street, Suite 3300
         Chicago, Illinois  60603
 8       (312)346.2222
         mhb@wexlerwallace.com
 9

10

11

12

13  REPRESENTING THE DEFENDANTS,
    ETHICON, INC. AND JOHNSON & JOHNSON:
14

15

         CHAD R. HUTCHINSON, ESQ.
16       Butler Snow
         1020 Highland Colony Parkway, Suite 1400
17       Ridgeland, Mississippi  39157
         Post Office Box 6010
18       Ridgeland, Mississippi  39158
         601.985.4401
19       chad.hutchinson@butlersnow.com
20

21

22

23

24

25
```

Shelby F. Thames, Ph.D.

```
 1              TABLE OF CONTENTS

 2                                        PAGE
```

```
 3  Title Page.................................... 1

 4  Appearance Page.............................. 2

 5  Table of Contents............................ 3

 6  Exhibit Page................................. 3

 7  Stipulation Page............................. 4
```

```
 8

 9                  *******

10       EXAMINATION OF SHELBY F. THAMES, PhD

11
```

```
12  By Mr. Bowman................................ 5

13  Certificate Page............................. 40

14  Signature Page............................... 41
```

```
15

16

17

18                  *******

19               E X H I B I T S

20

21           (No Exhibits Marked.)

22

23

24

25
```

Shelby F. Thames, Ph.D.

1                    * * * * * * *

2              S T I P U L A T I O N

3         It is hereby stipulated and agreed by

4    respective attorneys of record, that this

5    deposition may be taken at the time and place

6    hereinbefore set forth, by AMY M. KEY, Court

7    Reporter and Notary Public, pursuant to the Rules;

8              That the formality of reading and

9    signing is specifically RESERVED;

10             That all objections, except as to the

11   form of the questions and the responsiveness of

12   the answers, are reserved until such time as the

13   deposition, or any part thereof, may be used or

14   sought to be used in evidence.

15

16

17

18

19

20

21

22

23

24

25

Shelby F. Thames, Ph.D.

```
 1                 SHELBY F. THAMES, PhD,

 2              having been first duly sworn,

 3           was examined and testified as follows:

 4                     EXAMINATION

 5  BY MR. BOWMAN:

 6       Q.   So, Doctor, we met before.  My name is

 7  Michael Bowman.  We're here to talk about your

 8  case-specific report for Cynthia Johnson.

 9       A.   Yes, sir.

10       Q.   Do you have the report in front of you

11  now?

12       A.   I do.

13       Q.   And do you mind if I take a look real

14  quick?

15       A.   No, sir.

16       Q.   Okay.  So, Dr. Thames, you have the report

17  you submitted for Ms. Johnson's case in front of

18  you?

19       A.   Yes, sir.

20       Q.   And am I to understand that you examined

21  some mesh that was explanted from Ms. Johnson?

22       A.   Yes, sir.

23       Q.   And was this mesh collected by Kevin Ong

24  per protocols that have already been formed

25  according to this litigation?
```

Shelby F. Thames, Ph.D.

1        A.    Yes, sir.

2        Q.    Is it your understanding that he and

3   plaintiff's counsel -- or he and the expert for

4   plaintiff's counsel divided the mesh evenly and then

5   each went their separate ways?

6        A.    As evenly as possible, yes, sir.

7        Q.    And did you receive one piece of mesh, do

8   you know, for Ms. Johnson's case?

9        A.    I received three pieces.

10       Q.    And did you run all three pieces through

11  the cleaning protocol described on page 2?

12       A.    Yes, sir, I did.

13       Q.    And there are six steps in this 23-step

14  cleaning protocol where you, yourself, received the

15  mesh after it had been dried and desiccated and then

16  you ran a chemical polymer analysis on it; is that

17  correct?

18       A.    I did, a structural and polymer analysis.

19       Q.    So you did FTIR?

20       A.    (Witness nods head affirmatively.)

21       Q.    SEMs?

22       A.    Yes, sir.

23       Q.    And what was the third thing you did?

24       A.    Light microscopy.

25       Q.    Light microscopy?

Shelby F. Thames, Ph.D.

1       A.    LM.  We refer to it as LM.

2       Q.    And you did that for all three pieces of

3   mesh that you were given from Cynthia Johnson; is

4   that correct?

5       A.    Yes, sir.

6       Q.    Is it your understanding that all three

7   pieces of mesh -- well, what is your understanding

8   of the kinds of mesh that were explanted from

9   Ms. Johnson?

10      A.    Well, one was a Gynecare Prolift material,

11  the other was a Gynecare TVT tension-free support

12  for a stress urinary incontinence, as noted in

13  Dr. Ong's information.

14      Q.    What about the third one?

15      A.    That's all we have here.  I'm not sure

16  where the third one came from.  It may be two pieces

17  of the same material.  I'll have to take a look at

18  it.

19      Q.    It indicates they all have --

20      A.    Yes, sir, we're talking about the same

21  material.

22      Q.    And as far as your analysis goes you did

23  on Ms. Johnson's case, you were evaluating it as if

24  all the mesh itself was Prolene, correct?

25      A.    That is correct.

Shelby F. Thames, Ph.D.

1    Q.   And you didn't deviate -- as far as you

2  know, you didn't deviate and Dr. Ong didn't deviate

3  from the steps listed on page 2 of your general

4  export report?

5    A.   That is correct.

6    Q.   And with respect to the opinions offered

7  for Ms. Johnson's case, did you perform a control

8  using oxidized Prolene and run them through the

9  steps that are detailed on page 2 of your report?

10    A.   No, sir, that was not necessary.

11    Q.   Specifically, you didn't run a control of

12  Prolene in distilled water at 80 degrees Celsius,

13  correct?

14    A.   Yes, we did.

15    Q.   You did?

16    A.   We carried an exemplar through all the

17  steps.

18    Q.   I asked the wrong question, didn't I,

19  Doctor?  The question I meant to ask was, did you

20  run a control of oxidized -- purposely oxidized

21  Prolene in the step for distilled water at 80

22  degrees Celsius for 20 hours?

23    A.   I didn't use intentionally oxidized

24  Prolene.  There was no need for that in this system.

25  To get the information that I needed to make my

Shelby F. Thames, Ph.D.

1    determinations, there was no need to do that.

2         Q.   And then the next step is sodium

3    hypochlorite and the shaker.  You didn't run a

4    control of oxidized Prolene through that step?

5         A.   Same answer.

6         Q.   And the same question I could ask for

7    every single step involved here.  You did not --

8         A.   Same answer.

9         Q.   Okay.  Thank you.

10             Is it your testimony that you don't

11   believe that any of the steps that you used in your

12   cleaning protocol would have altered or affected the

13   presence of oxidized Prolene on Ms. Johnson's

14   explanted mesh?

15        A.   If it were present, absolutely, it would

16   not have affected it in any way.

17        Q.   And did you perform any kind of tensile

18   mechanical testing on the mesh that was explanted

19   from Ms. Johnson?

20        A.   No, sir.  That requires a great deal of

21   mesh, and there was simply no way that could be

22   done, physically impossible.

23        Q.   You didn't even try it in Ms. Johnson's

24   case?

25        A.   Sir, we had very small amounts of

Shelby F. Thames, Ph.D.

1    material.  You couldn't make one pull on a tensile

2    material with anything.  There was no way that could

3    be done.  It was impossible to do with the amount of

4    material that we had.  I would love to have done it.

5         Q.   Could you have -- and the reason I ask is

6    this, is that -- I actually asked about mechanical

7    testing, and the reason being is that I wasn't

8    trying to specify just tensile, but I was thinking

9    about pliability.  I was thinking about how the

10   material felt in your hand after it had been

11   cleaned.  Did you do that?

12        A.   No, sir.  I don't give a whole lot of

13   credibility to that since I want specific

14   information and specific data and not -- I didn't

15   have the equipment to do that by virtue of size, as

16   we've talked about here.

17        Q.   Okay.

18        A.   And I guess I would add to that and say

19   you say was it stiff, and I say, well, how stiff?

20   Well, how stiff was it?  So everything becomes

21   subjective at that point in time.  So that's why I

22   would rather not get involved in that kind of

23   "testing."

24        Q.   It would have been for your own benefit

25   basically.  There wouldn't have been any merit to

Shelby F. Thames, Ph.D.

1    it?

2              MR. HUTCHINSON:  Object to the form.

3              THE WITNESS:  Well --

4              MR. BOWMAN:  I'll withdraw the question.

5              MR. HUTCHINSON:  All right.  That's

6         fine.

7    BY MR. BOWMAN:

8         Q.   Let me ask you this:  Did you find any

9    oxidized Prolene on Ms. Johnson's meshes?

10        A.   No, none of them.  None of the three.

11        Q.   And so the three tests -- the three meshes

12   that you examined, you found no evidence of any

13   oxidized Prolene on any of those meshes?

14        A.   No, sir.

15        Q.   And that's based on the testing that you

16   performed and based on the cleaning of the meshes

17   that you had performed as well?

18        A.   And the data that I obtained from the

19   cleaned step-wise meshes.

20        Q.   The data that you, yourself, collected at

21   the analysis was FTIR, SEM and light microscopy,

22   correct?

23        A.   Yes, sir.

24        Q.   For each FTIR that you took, did you

25   choose the same place on the mesh to take an FTIR at

Shelby F. Thames, Ph.D.

1    every point in the process?

2         A.   No, sir.  That's impossible to do.

3         Q.   For the data that you created when you

4    took the SEM images, did you take the same SEM image

5    at the same spot in the mesh at each separate area

6    where you collected analysis?

7         A.   We didn't intentionally do that, no, sir.

8         Q.   Same with light microscopy, did you do

9    that?

10        A.   That's correct, sir.

11        Q.   You did not do that?

12        A.   No, sir, we didn't intentionally try to do

13   that.

14        Q.   With respect to the FTIR itself, when

15   we're talking about the FTIR, do you know does the

16   FTIR examine the bulk of the material or does it

17   examine -- is it more focused on the surface of the

18   material?

19        A.   Well, it was transmission light, so light

20   went completely through the sample.  So I think in

21   your terms, it would be bulk as opposed to the

22   surface.

23             Surface analysis is done by attenuated

24   total reflectance or ATR.  We didn't use that

25   technique.

Shelby F. Thames, Ph.D.

1    Q.    Okay.  With respect to -- and that was for

2    all the FTIR readings that you took on Ms. Johnson's

3    mesh?

4    A.    Yes, sir.

5    Q.    With respect to the data that you

6    collected on the FTIR, you took FTIRs of the mesh

7    before it had undergone anything but the distilled

8    water process of your cleaning process?

9    A.    That's correct.

10   Q.    And you took that FTIR for all three of

11   the meshes you examined?

12   A.    Yes, sir.

13   Q.    And are those represented in figures 12,

14   13 and 14, respectively?

15   A.    Yes, sir.

16   Q.    And in all --

17   A.    Did you say 15 too, sir?

18   Q.    I did not.  I said 13, 14 and 15.

19   A.    Okay.  15.  Yes, sir, that's correct.

20   Q.    And in all three of these, you have

21   highlight in the upper right-hand corner of each

22   FTIR where you -- a photograph of where the FTIR was

23   run?

24   A.    That's correct, sir.

25   Q.    And it appears that in each instance

Shelby F. Thames, Ph.D.

1  you've been able to find an area of mesh that, even

2  though this was unclean mesh, you could at least

3  visibly tell through the FTIR that you were looking

4  at a monofilament; is that right?

5          MR. HUTCHINSON:  Fiber.

6          THE WITNESS:  Yes.  One fiber, yes.

7  BY MR. BOWMAN:

8      Q.   You identify the fiber as being blue in

9  figure 13, you identify the fiber as being blue in

10  figure 14, and you identify the fiber as being clear

11  in figure 15; is that right?

12     A.   Correct.

13     Q.   And in each one of these, you identify an

14  area where there is a protein Amide I carbonyl

15  stretching, correct?

16     A.   Yes, sir.

17     Q.   And you also identify an area where there

18  is a protein Amide N-H stretching, correct?

19     A.   That is correct.

20     Q.   And you also identify the area where

21  polypropylene shows up on this FTIR as well in all

22  three of these, correct?

23     A.   Yes, sir, I have.

24     Q.   And in none of -- you don't identify any

25  oxidized polypropylene in any of these FTIRs?

Shelby F. Thames, Ph.D.

```
1       A.   No, sir.

2       Q.   Do you know if the presence of -- well,

3  I'll strike that.

4            Well, do you know if the presence of

5  proteins or other kinds of carbonyls can shift the

6  FTIR such that the polypropylene -- the carbonyl and

7  polypropylene isn't going to show up where you

8  expect it to be?

9       A.   No, sir.  There may be some shifts

10 occasionally, but they would only be at a very

11 short -- two or three frequency levels, but nothing

12 like you're talking about.

13      Q.   It wouldn't shift to where you -- the

14 oxidized polypropylene wouldn't shift to where

15 you've identified the N-H stretching on the protein

16 Amide?

17      A.   Oh, no.

18      Q.   And the carbonyl, the oxidized

19 polypropylene wouldn't shift to where you've

20 identified protein Amide I carbonyl stretching?

21      A.   What do you mean by wouldn't shift to

22 where I've identified it?  It may shift a frequency

23 or two, depending upon, number one, what the protein

24 was; and, number two, what it was associating with

25 in conjunction, which was polar and may be affecting
```

Shelby F. Thames, Ph.D.

1    it chemically.  But it would be a very few

2    reciprocal centimeter shift.  It wouldn't be a

3    significant shift, as you and I might think.

4        Q.   What would a "significant shift" be?

5        A.   Well, where it might be -- you're talking

6    about completely out of a range, from going from one

7    side of a spectra to another.  I specified the shift

8    as a few reciprocal centimeters, and that would

9    depend upon what was associated with what, you know;

10   in other words, what chemical was present with

11   another chemical.  So what was the hydrogen bonding?

12   What was the polarity?

13       Q.   But the presence of other hydrogen and

14   carbonyl bonding wouldn't shift the carbonyl bond on

15   a piece of polypropylene?

16       A.   No, sir.

17       Q.   And the same is true about an O-H group?

18       A.   I wouldn't think so, no, sir.

19       Q.   So the fact that you don't identify any

20   polypropylene oxidation here, either through the O-H

21   group or the carbonyl group, that is essentially

22   definitive that there was none on the mesh that you

23   examined; is that right?

24       A.   Yes, sir.

25       Q.   Because this is in the prewashed.  This is

Shelby F. Thames, Ph.D.

1    in pretreated polypropylene?

2        A.   Yes, sir.

3        Q.   And how far do you think that carbonyl

4    could move, could be shifted based on what else --

5    the other aspects of what was in the FTIR?

6        A.   A few reciprocal centimeters, and that's

7    an estimate.

8        Q.   Could it be shifted -- okay.  So a few

9    reciprocal centimeters I'm not sure I understand.

10       A.   Well, I'll show you what they are.  In

11   other words, if you look at this on figure 16, you

12   notice you go between 2000 and 2200.  Well, that's

13   200 reciprocal centimeters.

14       Q.   Okay.

15       A.   And I'm talking about a few.

16       Q.   You're talking about five to ten?

17       A.   Or less than five.

18       Q.   So some layers have said that they shift

19   up to 80.

20       A.   I have never experienced that, sir.

21       Q.   Before you worked -- well, have you ever

22   experienced that before you did the work you did on

23   Ms. Johnson's case?

24       A.   No, sir, never in 50 years.

25       Q.   Have you researched peer-reviewed

Shelby F. Thames, Ph.D.

1    literature specifically looking for carbonyl shifts

2    or O-H shifts on polypropylene?

3         A.   No, not for this.  It would be a waste of

4    time.

5         Q.   Would it surprise you if it exists?

6         A.   I think I've told you that there may be a

7    few reciprocal centimeters, haven't I?

8         Q.   You did.

9         A.   Okay.  Well, that's my answer.

10        Q.   Thank you.

11             And if we look at figure 16, this is the

12   before cleaning of the Johnson mesh and you've

13   overlaid it with the collagenase type VII high

14   purity; is that right?

15        A.   That is Johnson 6.1 before cleaning, and

16   this is of the tissue between the fibers.  That is

17   the blue, and the red is the collagenase sample,

18   which is the control-type spectra to show that this

19   is absolutely proteins that we're looking at here.

20        Q.   But this was -- this isn't representative

21   of any of the FTIRs you took in figures 13, 14 and

22   15, correct?

23        A.   Are you saying this is not representative

24   of it?

25        Q.   Well, that's my question, yes.

Shelby F. Thames, Ph.D.

1        A.    Well, certainly it's representative.  It

2   shows you that the absorption frequencies for the

3   N-H bond is in the range of 3300 reciprocal

4   centimeters and for the carbonyl stretching

5   frequency that we've been talking about.

6        Q.    But in figure 16, you show collagenase in

7   the background.  And in the foreground there is the

8   before cleaning tissue and fibers.  So this is an

9   FTIR of the tissue and fibers, correct?

10            MR. HUTCHINSON:  Object to form.

11            THE WITNESS:  This is an FTIR of exactly

12        what it says, the tissue between the fibers.

13   BY MR. BOWMAN:

14        Q.    So my question is this:  Do you see how

15   this photograph is here, if you took the --

16        A.    Which one is that, sir?

17        Q.    That's figure 13.

18        A.    13?

19        Q.    Yes.  Figure 13, 14 and 15, they all have

20   that photograph in the upper right-hand corner of

21   the FTIR.

22        A.    Yes, sir.

23        Q.    So that is what appears to be a fiber,

24   correct?  That's where it is?

25        A.    That's correct.

Shelby F. Thames, Ph.D.

1      Q.    For figure 16, there is no photograph

2  provided, but the description is of tissue and --

3  tissue between fibers?

4      A.    Correct.

5      Q.    So this is an FTIR of the tissue between

6  the fibers, and it's not of the fibers themselves?

7      A.    To show you that tissue we've been talking

8  about all day is protein.

9      Q.    Okay.  Thank you.  It's specifically --

10  thank you.  I'll withdraw it.

11          And then it appears you did the same thing

12  in figure 17 for tissue between the fibers, but this

13  time you overlaid it with the before cleaning of the

14  clear fiber; is that right?

15      A.    Correct.

16      Q.    And there are differences between those.

17  They don't wind up exactly?

18      A.    Well, they're different because they are

19  different concentrations, different amounts of light

20  was able to get through the sample.  But they had

21  the important spectral components that we've been

22  talking about, the 3300 and the carbonyl frequencies

23  and so forth.

24      Q.    And the 3300 is where you assign the N-H

25  groups, correct?

Shelby F. Thames, Ph.D.

1      A.    That's where it's assigned in the chemical

2   literature.

3      Q.    But isn't that also where the O-H groups

4   for oxidized polypropylenes --

5      A.    In that range.

6      Q.    And with respect to the carbonyl group --

7   I'm sorry.  With respect to this carbonyl group,

8   this is the area where you've assigned the Amide I

9   carbonyl?

10      A.    Yes, sir.

11      Q.    And there is no -- as far as you know,

12   there is no oxidized polypropylene showing on this

13   FTIR?

14      A.    That's correct, sir.

15      Q.    Okay.  Thank you.  Then in figure 18 and

16   figure 19 --

17      A.    Yes, sir.

18      Q.    -- and it looks like figure 20 and 21, 22

19   and 23 you are showing the FTIR that you've taken an

20   overlay of each fiber over the course of the five

21   cleaning steps; is that correct?

22      A.    Yes, sir.

23      Q.    And it shows that the cleaning process was

24   successful in removing what you've identified as the

25   Amide group carbonyl and the Amide group N-H; is

Shelby F. Thames, Ph.D.

1    that right?

2         A.   Protein absorption, yes, sir, that are

3    characteristic.

4         Q.   And it shows that in all of these,

5    correct?

6         A.   That is correct, sir.  It shows something

7    else too that is very important.

8         Q.   What is that?

9         A.   There is no carbonyl oxidation of Prolene

10   shown here.

11        Q.   You did not find any carbonyl oxidation of

12   Prolene in this FTIR?

13        A.   No, sir, none.

14        Q.   Did you take into account in making the

15   determination the presence of -- I'm sorry -- the

16   action of a shift in the --

17        A.   Yes, sir.

18        Q.   -- FTIR?  Okay.

19             A shift you said would be a few --

20        A.   Reciprocal centimeters.

21        Q.   -- reciprocal centimeters?  I want to call

22   it --

23        A.   CM minus 1, CM to the minus 1, reciprocal

24   centimeters.

25        Q.   I can't say that out loud.  I can say CM

Shelby F. Thames, Ph.D.

1    to the minus 1, but it's not the same as reciprocal

2    centimeters.

3        A.    Okay.

4        Q.    And then with respect to your opinions on

5    the cross-linked protein-formaldehyde polymer, that

6    is something that occurs after the mesh is placed in

7    formaldehyde, correct?

8        A.    Correct.

9        Q.    Formalin?  Is it formalin or formaldehyde?

10       A.    Well, the aqueous solution of formaldehyde

11   is formalin, but formalin is typically buffered to

12   hold it at a consistent pH.

13       Q.    And your report states that the explant

14   samples were preserved in a 10 percent neutral

15   buffered formalin solution; is that right?

16       A.    Yes, sir.

17       Q.    So the cross-linked protein composite can

18   be reversed by the use of heat and water?

19       A.    Yes, sir.

20       Q.    And that's one of the steps in your

21   cleaning process, correct?

22       A.    Yes, sir.  It's more than one.  It's

23   several.

24       Q.    It's several because you need to -- your

25   cleaning process takes into account that it is

Shelby F. Thames, Ph.D.

1    present on the mesh in different areas and that as

2    you shake or move portions of the protein away,

3    you're going to run into some of the --

4        A.   Expose new surface area.

5        Q.   I wanted to ask again -- I'm not sure if I

6    did in this case.  But did you run a control -- I

7    already asked that question.

8            With respect to your opinion on clear and

9    blue flakes associated with Ms. Johnson's mesh, it's

10   your opinion that in one of these SEM photographs

11   after you did your cleaning protocol -- in several,

12   actually, of the SEM photographs you see flakes

13   coming off of the fibers themselves?

14       A.   Both.

15       Q.   Both?

16       A.   Both blue and clear.

17       Q.   So I actually --

18       A.   When you say "flakes coming off," they

19   appear as areas that have released it, adhesion

20   wise, and have broken adhesion from the fiber itself

21   and are more or less sticking out or raised up from

22   the fiber itself.  So they look like -- if you would

23   go ahead and break them off, they would be a flake.

24       Q.   And I just want to clear something up.

25   It's my understanding that your opinion is that on

Shelby F. Thames, Ph.D.

1    the blue fibers themselves, the flakes do not appear

2    blue.  They appear clear; is that correct?

3         A.    They're not blue.

4         Q.    Is that your opinion?

5         A.    Absolutely.

6         Q.    Okay.  And when you formed that opinion,

7    did you take into account the nature of the blue

8    fiber itself, that the blue is actually distributed

9    through the fiber and not just on the outside?

10        A.    The entire fiber is blue by virtue of the

11   pigment that is used.  And, therefore, if a portion

12   of that fiber lifts up or is cut or something, it

13   will be just as blue as the other portion that it

14   was lifted up or cut from.

15             And if, for instance, you look at

16   figure 32 in section B, you'll see the proteins that

17   are on the surface and you'll see that the flakes --

18   or the material that's lost adhesion to the Prolene.

19   In the clear samples, they are translucent to clear.

20   And if you look the blue, it's translucent to clear.

21             So, therefore, if that were Prolene, with

22   the blue fiber, that would all be blue and they're

23   not.  Both the clear fiber material that's losing

24   adhesion to the Prolene fiber and blue material

25   that's lost adhesion to the blue fiber, they are

Shelby F. Thames, Ph.D.

1    both translucent or clear in nature, meaning,

2    therefore, that -- and by the way, we've proven that

3    over here with our FTIR spectra, which makes it

4    unequivocal that what you're seeing is proteins and

5    not Prolene.

6         Q.   So you're referring to figure B, 32?

7         A.   I am.

8         Q.   And in figure B, it's your opinion that

9    because the flakes on the blue fiber appear white,

10   that they couldn't possibly be from polypropylene;

11   is that right?

12        A.   Absolutely.

13        Q.   And have you taken into account the

14   refractive index of the blue pigment as associated

15   with the polypropylene in making that opinion?

16        A.   Yes, sir, I sure have.

17        Q.   Where is that?

18        A.   Well, I've taken that into consideration.

19   But refractive indices of the fiber itself is the

20   same as -- would be the same as this flake if it

21   were polypropylene.  The refractive indices would

22   only be different if this is not polypropylene.  And

23   it's not polypropylene, so it would be different.

24        Q.   But it's not part of the fiber anymore.

25   It's actually jutting out like a potato chip.  It's

Shelby F. Thames, Ph.D.

```
 1    actually jutting out like --

 2         A.    It's not part of the fiber, no, sir.

 3         Q.    -- it's a scale on a fish.

 4         A.    Therefore, it has to be something other

 5    than polypropylene.  Because if it were blue, it

 6    would be polypropylene, but it's not blue.

 7         Q.    It does have a blue hue to it, though,

 8    right?

 9              MR. HUTCHINSON:  Come on.

10              THE WITNESS:  No, sir, it does not.

11    BY MR. BOWMAN:

12         Q.    That's the thing.  That's what I'm trying

13    to understand.

14              MR. HUTCHINSON:  Excuse me, Counsel.

15         Are you talking about 32B?

16              MR. BOWMAN:  I am.

17              MR. HUTCHINSON:  Note my objection.  The

18         reason I'm objecting, just so it's clear, I

19         don't know which fiber you're talking about.

20              MR. BOWMAN:  I'm talking about the blue

21         fibers in 32B.

22    BY MR. BOWMAN:

23         Q.    And I just wanted to understand that with

24    respect to Ms. Johnson, it's your opinion that this

25    photograph shows conclusive proof that that
```

Shelby F. Thames, Ph.D.

1    material, that white, flaky material on both the

2    clear and the blue fiber could not possibly be

3    polypropylene?

4              MR. HUTCHINSON:  Object to the form.

5    BY MR. BOWMAN:

6         Q.   Based on the color of it alone?

7         A.   Well, based on -- that is correct.  It is

8    not polypropylene based on color, and we've shown

9    that also, but based on FTIR.

10        Q.   Did you try scraping it off?

11        A.   No, sir.  We didn't do anything to try to

12   change the orientation or the nature of these at

13   all.

14        Q.   And I say that because in figure C,

15   they're gone.  And I assume that that is -- it's

16   obviously a different photograph than figure B, but

17   it's also one more step deeper into the cleaning

18   process.

19        A.   That is correct.

20        Q.   So the material that was there, I assume,

21   is now gone because it's further on in the cleaning

22   process but also --

23        A.   It's water soluble.

24        Q.   It could have been just -- it's just gone?

25        A.   It's gone because it was cleaned off.

Shelby F. Thames, Ph.D.

1    That was why -- that was the motivation behind the

2    cleaning process that we put together in the first

3    place.

4         Q.   But in step 2 -- that's really what I'm

5    getting at, is that in step 2 the water soluble --

6    when you do the analysis after that would show up

7    here on 32B, you've done the distilled water soak.

8    I mean, that's the fifth step.  So you did the

9    distilled water soak for an hour with a rinse

10   followed by another rinse.  And before that, you had

11   a distilled water bath at 80 degrees Centigrade --

12        A.   You've lost me.  You have completely lost

13   me.  I'm looking at B.  That has nothing to do --

14   this is after cleaning 1.

15        Q.   Right.  That's what I'm looking at here.

16        A.   Well...

17        Q.   So after cleaning 1, there's been at least

18   three steps associated with the cleaning of it.  And

19   the first step after cleaning -- for cleaning 1 was

20   distilled water water bath 80 degrees Centigrade,

21   correct?

22        A.   Sure.

23        Q.   Followed by sodium chloride shaker?

24        A.   Okay.

25        Q.   30 minutes -- 35, 35, 10, I assume that

Shelby F. Thames, Ph.D.

1  associates with the mesh themselves?

2      A.   That's right.  And this is 1, 8, 1, so it

3  was 35 minutes.

4      Q.   And then a fifth step, distilled water,

5  rinse, soak an hour, rinse?

6      A.   Uh-huh (affirmative response).

7      Q.   And then the sixth step is where you took

8  this photograph?

9      A.   They dried it.

10     Q.   They dried it.

11     A.   Sent it to me.

12     Q.   Sent it to you.  And then when it got to

13  you, you took this photograph or had this photograph

14  taken in 32B?

15     A.   That's correct.

16     Q.   So this photograph, it's gone through the

17  wash soak, so there's tissue associated with it.

18  And then it went through another wash soak again?

19     A.   What are you talking about "wash soak"?

20  Let's call it what it is.  When you talk about --

21  let's say it has gone through step 3 or step 4.

22  Let's put down what's here rather than your

23  terminology.

24     Q.   I feel like I said it like four times

25  already, and I can keep doing it.

Shelby F. Thames, Ph.D.

1    A.    Sure.  Let's do it.  Steps 3, 4 and 5.

2    Q.    The water bath is step 3.  The NaOCl

3  shaker step is step 4.  And the distilled water

4  rinse, soak an hour, rinse is step 5.

5    A.    Okay.

6    Q.    So it's already been through all that, and

7  that material is still there?

8    A.    Yes, that's right.

9    Q.    So it would seem to me that, you know,

10  that material, it could be anything.  So how can you

11  be sure that it's not polypropylene?

12    A.    What do you mean "anything"?  This is an

13  explant that came out of a lady's body, and it's got

14  flesh all over it.  We've already identified it has

15  proteins.  What do you mean "anything"?

16    Q.    It could be protein.  It could

17  polypropylene.

18    A.    Well, that's not anything.

19    Q.    Well, that's my point, is that at this

20  point the analysis showed that there was Amide

21  groups, that there was --

22    A.    Well, these are Amide groups.  Look at

23  your FTIR, sir, of this material.

24    Q.    I understand the FTIR that you took, but I

25  don't know that you took it at this spot in B.  So

Shelby F. Thames, Ph.D.

1    that's my point, is that in B I see these

2    discolorations.  And the question I'm getting at is,

3    are you basing your opinion that these flakes are

4    protein based solely on the fact that you believe

5    those fibers are white and not blue?

6        A.   Well, I could base it solely on that fact,

7    but I haven't.  I've gone one step farther and run

8    FTIR --

9        Q.   But you didn't run FTIR on --

10            MR. HUTCHINSON:  Excuse me, Counsel.

11            MR. BOWMAN:  I'm going round and round

12       about it.

13            THE WITNESS:  Let me finish my answer,

14       if you would, please.

15   BY MR. BOWMAN:

16       Q.   I'm listening.

17       A.   Well, I can't hardly think of what I was

18   going to say now that we've had such a disruptive

19   session right there.

20            I could have used this solely as my only

21   proof that I needed to prove that this was not --

22   that these flakes are not Prolene.  I could have.

23   But in addition to that, we've done farther

24   analyses, and we've taken FTIR analyses, six of

25   them, and we found that we see proteins, and protein

Shelby F. Thames, Ph.D.

1    has been washed away in the cleaning process.  So

2    we've used both the FTIR supports that these are not

3    Prolene, as well as the color of these two, of these

4    flaking materials, which are, of course, proteins.

5    That's my answer and I'm sticking to it.

6         Q.   My follow-up question would be, did you

7    ever take an FTIR of the image that we see here in

8    32B?

9         A.   This is far greater than that, sir.  What

10   image are you talking about?

11        Q.   32B.

12        A.   32B.  Did I ever take an FTIR of the

13   image?  What image?

14        Q.   The image that we've been talking about

15   the past 20 minutes about --

16        A.   Yeah, we've been talking about it, and

17   I've been telling you that they are

18   microscopically-derived samples.  And you're looking

19   at -- this is certainly not a -- we would be taking

20   a spectra of -- we took a spectra of a portion of

21   this, not the entire thing.

22        Q.   So this isn't the whole mesh, right?  This

23   is just a photograph of where these flakes were

24   apparent; is that right?

25        A.   No.  It's a representative section of the

Shelby F. Thames, Ph.D.

1   mesh.  If you looked at the whole mesh, the entire

2   mesh would look the same way.  But it's a

3   representative section of the mesh.  And so,

4   therefore, we then take the photo microscope, run

5   FTIR, bam, take a spot, and here is the FTIR spectra

6   you see back over here that we've looked at.

7        Q.   Wouldn't it be more helpful, though, to

8   actually have an FTIR of where these flakes are?

9        A.   Sir, where the flakes are?  They're all

10  over.  Yeah, because that's why you get an FTIR

11  spectra over here showing proteins present.

12       Q.   Well, you took pictures of the FTIR where

13  you did -- before the clean mesh was done, but

14  there's no picture of the FTIR for any of these

15  other ones.  That's my question.

16            Wouldn't it have been more helpful for me,

17  from my perspective, to be able to look at this and

18  be convinced that that is not a Prolene and that is

19  protein itself?

20            MR. HUTCHINSON:  Object to form.

21       Counsel, you're talking about your

22       perspective.  The witness has no idea what

23       your perspective is.  So I object to form and

24       ask you to rephrase the question.

25  BY MR. BOWMAN:

Shelby F. Thames, Ph.D.

1       Q.   I'll rephrase the question.

2            Wouldn't this be better, scientifically,

3    if you could show to me or anyone that these flakes

4    are, in fact, protein and not polypropylene?

5            MR. HUTCHINSON:  Object to the form.

6       You can answer, Doctor.

7            THE WITNESS:  I have.  I've shown you

8       that those flakes are proteins and not

9       polypropylene.

10   BY MR. BOWMAN:

11      Q.   By telling me that you see something that

12   isn't blue.  You see something that is clear instead

13   of blue when it looks like it's blue from here?

14      A.   And I have also taken FTIR spectra to show

15   that proteins are still present on the surface of

16   this material.  And so we have proteins present and

17   the spectra of a protein.  So I've got proteins

18   present and I've got two materials that are

19   translucent, the same color; one is on a blue and

20   one is on a clear.  That's the only conclusion you

21   can draw if you're a scientist.

22      Q.   I understand.  But we already established

23   that you didn't take into account what the

24   peer-reviewed literature says about carbonyl shifts

25   with oxidized polypropylene.

Shelby F. Thames, Ph.D.

1      A.   That's not true.  That's not true.

2      Q.   That was your testimony earlier.

3      A.   That was not my testimony earlier.

4      Q.   As I recall --

5      A.   You were talking about shifts of 60 and

6   80, from one end of the spectra to the other.

7      Q.   That's right.

8      A.   Well, absolutely that does not occur.

9      Q.   What I asked you was did you research it,

10  and you said "no."  Isn't that right?

11           MR. HUTCHINSON:  No, no.  Dr. Thames, do

12       not answer that.

13           Counselor, you're badgering the witness.

14       That was absolutely not the question you asked.

15           MR. BOWMAN:  You know what?

16           MR. HUTCHINSON:  And I'm sorry, but it

17       was simply not.

18           MR. BOWMAN:  It's on the record.

19           MR. HUTCHINSON:  I know it is, so I ask

20       that you go back and read it.  But it's not

21       the question you asked, and you're asking him

22       about a question you didn't ask and testimony

23       that he didn't give.  It's completely

24       objectionable, and it's badgering the

25       witness, and I ask you to stop it right now.

Shelby F. Thames, Ph.D.

```
 1              MR. BOWMAN:  Whatever the question is

 2         pending, I will withdraw it.

 3              MR. HUTCHINSON:  Thank you.

 4    BY MR. BOWMAN:

 5         Q.   And I will ask you, Doctor, if there is

 6    support in the peer review for your opinion that

 7    these flakes are protein and not oxidized

 8    polypropylene?

 9         A.   Not that I'm aware of.  I don't think

10    anybody really realizes what's happening here.  I

11    think we're the only people that really understand

12    that formaldehyde reacts with proteins, and we've

13    talked about that.  None of your people seem to

14    understand that.  All of the chemistry was known in

15    1949.  Where are their documents that talk about

16    this?

17         Q.   I am not sure.

18         A.   I just question that, you know.  This is

19    something I would be thinking about.  Golly-bum, why

20    am I the only guy that knows this chemistry from

21    1949 is present.  It's available for everybody to

22    read.

23         Q.   With respect to your opinions about

24    Ms. Johnson, --

25         A.   Okay.
```

Shelby F. Thames, Ph.D.

1    Q.   -- we talked about everything, except for

2    the SEMs.  On the SEMs, there are SEMs that you took

3    for every stage of the cleaning process that you

4    performed on each of the three meshes explanted from

5    Ms. Johnson?

6    A.   That is correct.

7    Q.   And it appears that if we look at

8    figure 34, --

9    A.   Figure 34.  All right, sir.

10    Q.   -- there is a progression of the mesh

11    becoming -- the fibers of the mesh becoming more

12    visible as your cleaning process is undertaken; is

13    that correct?

14    A.   Well, the overt external flesh is being

15    removed, and now then we see the fibers on -- can

16    actually distinguish the fibers on the surface of

17    Prolene.  And by "the fibers," I mean the protein

18    fibers, the proteinaceous material on the surface of

19    Prolene.

20    Q.   Can you see extrusion lines in figure 5 or

21    figure 4?

22    A.   I can see them very clearly in SEM 05.

23    So, yes, they're there, because they are in the very

24    last step and it's very clear.

25    Q.   And it's your opinion that because the

Shelby F. Thames, Ph.D.

1   extrusion lines are there, there was no surface

2   degradation of the polymer taking place?

3       A.   That's one of the conclusions.  That's

4   another way.  The other was the fact that there were

5   no carbonyls by virtue of FTIR and the fact that the

6   translucent materials are proteins and not Prolene.

7       Q.   So, in total, based on the testing that

8   you've done and the analysis that you've done and

9   the fact that you can see extrusion lines, you are

10  led to the conclusion that no surface oxidization

11  took place on the Prolene that was implanted in

12  Ms. Johnson?

13          THE WITNESS:  Would you repeat that

14      question for me, ma'am?  I'm sorry to ask you

15      to do that, but it's pretty convoluted.

16   (COURT REPORTER READS BACK REQUESTED PORTION.)

17          THE WITNESS:  The answer to that is

18      "yes."

19  BY MR. BOWMAN:

20      Q.   And is that answer true for all three mesh

21  samples that you reviewed for Ms. Johnson?

22      A.   Yes.

23          MR. BOWMAN:  I have no further questions

24      about this case.

25              (CONCLUDED AT 5:11 P.M.)

Shelby F. Thames, Ph.D.

1              CERTIFICATE OF COURT REPORTER

2         I, Amy M. Key, CSR, and Notary Public in

3    and for the County of Lamar, State of Mississippi,

4    hereby certify that the foregoing pages, under

5    penalty of perjury, contain a true and correct

6    transcript of the testimony of the witness, as

7    taken by me at the time and place heretofore

8    stated, and later reduced to typewritten form by

9    computer-aided transcription under my supervision

10   and to the best of my skill and ability.

11        I further certify that I placed the witness

12   under oath to truthfully answer the questions in

13   this matter under the power vested in me by the

14   State of Mississippi.

15       I further certify that I am not in the employ

16   of or related to any counsel or party in this

17   matter, and have no interest, monetary or

18   otherwise, in the final outcome of the

19   proceedings.

20        Witness my signature and seal this the

21   _____ day of_____, 2016.

22

23        _____

          AMY M. KEY, CSR

24        My Commission Expires May 11, 2020

25

Shelby F. Thames, Ph.D.

```
 1            -  -  -  -  -  -

              E R R A T A

 2            -  -  -  -  -  -

 3

 4    PAGE  LINE  CHANGE

 5    ____  ____  _____

 6       REASON: _____

 7    ____  ____  _____

 8       REASON: _____

 9    ____  ____  _____

10       REASON: _____

11    ____  ____  _____

12       REASON: _____

13    ____  ____  _____

14       REASON: _____

15    ____  ____  _____

16       REASON: _____

17    ____  ____  _____

18       REASON: _____

19    ____  ____  _____

20       REASON: _____

21    ____  ____  _____

22       REASON: _____

23    ____  ____  _____

24       REASON: _____

25
```

Shelby F. Thames, Ph.D.

1

2          ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____, do

5    hereby certify that I have read the

6    foregoing pages, and that the same is

7    a correct transcription of the answers

8    given by me to the questions therein

9    propounded, except for the corrections or

10   changes in form or substance, if any,

11   noted in the attached Errata Sheet.

12

13

14    _____

15    SHELBY F. THAMES, PH.D.          DATE

16

17

18   Subscribed and sworn

     to before me this

19   _____ day of _____, 20____.

20   My commission expires:_____

21

      _____

22   Notary Public

23

24

25