Exhibit B

Mareeni Stanislaus, M.D.

```
 1              UNITED STATES DISTRICT COURT

 2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                   CHARLESTON DIVISION

 4

 5    IN RE:  ETHICON, INC. PELVIC    Master File No.

 6    REPAIR SYSTEM PRODUCTS          2:12-MD-02327

 7    LIABILITY LITIGATION            MDL No. 2327

 8    _____   JOSEPH R. GOODWIN

 9    THIS DOCUMENT RELATES TO:       U.S. DISTRICT JUDGE

10    All TVT-O Cases

11

12

13

14

15

16        VIDEOTAPED DEPOSITION OF EXPERT WITNESS

17              MAREENI STANISLAUS, M.D.

18              Paso Robles, California

19               Friday, July 15, 2016

20

21

22

23

24    Reported by: Ashala Tylor, CSR No. 2436, CLR, CRR, RPR

25    Job #136049
```

Mareeni Stanislaus, M.D.

```
 1              I N D E X
 2  WITNESS: MAREENI STANISLAUS, M.D.
 3  EXAMINATION                              PAGE
 4      By Mr. Jackson                      8, 150
 5      By Mr. Koopmann                       121
 6
 7  EXHIBITS
 8  NO.              DESCRIPTION             PAGE
 9  Exhibit 1     Expert report by Mareeni     12
                  Stanislaus, M.D., no Bates
10
    Exhibit 2     CV of Mareeni Stanislaus, M.D.,   12
11                no Bates
12  Exhibit 3     Document titled "Mareeni Stanislaus   12
                  Reliance List, in Addition to
13                Materials Referenced in Report,
                  MDL Wave 2," no Bates
14
    Exhibit 4     Notice of Video Deposition of    13
15                Deposition of Mareeni Stanislaus,
                  M.D., no Bates
16
    Exhibit 5     Binder titled "Dr. Stanislaus's    14
17                General TVT-O," no Bates
18  Exhibit 6-A   Binder titled "SUI Mesh Documents,   61
                  Binder 1"
19
    Exhibit 6-B   Binder titled "TVT Company    61
20                Documents"
21  Exhibit 6-C   Binder titled "TVT-O Company    61
                  Documents"
22
    Exhibit 6-D   Binder titled "TVT Medical    61
23                Literature"
24  Exhibit 6-E   Binder titled "TVT Company/FDA    61
                  Documents"
25
```

```
 1   E X H I B I T S (continued)
 2   NO.                DESCRIPTION                 PAGE
 3
     Exhibit 6-F  Binder titled "SUI Mesh Documents,   61
 4               Binder 2"
 5   Exhibit 6-G  Binder titled "TVT literature and    61
                 Position Statements"
 6
     Exhibit 7-A  Thumb Drive                          15
 7
     Exhibit 7-B  Thumb Drive                          15
 8
     Exhibit 8    Document entitled "Gynecare TVT       80
 9               Obturator System Tension-free
                 Support for Incontinence"; Bates
10               ETH.MESH.02340829 - 835
11   Exhibit 9    Document entitled "Randomized Trial  104
                 of Tension-Free Vaginal Tape and
12               Tension-Free Vaginal Tape-Obturator
                 for Urodynamic Stress Incontinence
13               in Women," Bates
                 ETH.MESH.00589602 - 607
14
     Exhibit 10   Email chain, Bates                  108
15               ETH.MESH.04094863 - 64
16   Exhibit 11   Document entitled "Mid-urethral     133
                 sling operations for stress urinary
17               incontinence in women (Review), The
                 Cochrane Collaboration, by Ford,
18               Rogerson, Cody and Ogah," no Bates
19   Exhibit 12   Document from "AUGS: Blogs:         138
                 Organization Lend their Support to
20               Mid-urethral Slings, Page 1 of 1,"
                 no Bates
21
     Exhibit 13   Document from AUGS titled "Advancing 142
22               Female Pelvic Medicine and
                 Reconstructive Surgery," no Bates
23
24
25
```

Mareeni Stanislaus, M.D.

```
 1   E X H I B I T S (continued)

 2   NO.                DESCRIPTION                    PAGE

 3   Exhibit 14   Document entitled "41st Annual      142

                  Meeting-Cape Town, South Africa

 4                August 4 - 5, 2016," no Bates

 5

 6

 7                  INFORMATION REQUESTED

 8                        (None)

 9                 QUESTIONS NOT ANSWERED

10                     Page 47, Line 6

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Mareeni Stanislaus, M.D.

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                   CHARLESTON DIVISION

 4

 5   IN RE:  ETHICON, INC. PELVIC   Master File No.

 6   REPAIR SYSTEM PRODUCTS          2:12-MD-02327

 7   LIABILITY LITIGATION           MDL No. 2327

 8   _____  JOSEPH R. GOODWIN

 9   THIS DOCUMENT RELATES TO:      U.S. DISTRICT JUDGE

10   All TVT-O Cases

11

12

13          The videotaped deposition of MAREENI STANISLAUS,

14   M.D., the expert witness, was taken at Courtyard Paso

15   Robles, 120 South Vine Street, Paso Robles, California,

16   on Friday, July 15, 2016, at 1:04 p.m., before Ashala

17   Tylor, CSR No. 2436, Certified Shorthand Reporter in and

18   for the State of California, RPR, CRR, CLR.

19

20

21

22

23

24

25
```

Mareeni Stanislaus, M.D.

```
 1                  A P P E A R N C E S

 2

 3   FOR THE PLAINTIFFS:

 4         WEXLER WALLACE LLP

           BY: TIM E. JACKSON, ESQ.

 5         55 West Monroe Street, Suite 3300

           Chicago, Illinois  60603

 6         312.346.2222

           tej@wexlerwallace.com

 7

 8   FOR DEFENDANTS:

 9         BOWMAN AND BROOKE LLP

           BY: BARRY J. KOOPMANN, ESQ.

10         150 South Fifth Street, Suite 3000

           Minneapolis, Minnesota  55402

11         612.339.8682

           barry.koopmann@bowmanandbrooke.com

12

13   Also Present:  Michael Brewer, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```

Mareeni Stanislaus, M.D.

```
 1                  Friday, July 15, 2016; 1:04 p.m.

 2                     Paso Robles, California

 3

 4            THE VIDEOGRAPHER:  Good afternoon.  We are on

 5    the record.  My name is Michael Brewer.  I'm a

 6    videographer for Golkow Technologies.

 7            Today's date is July 15th, 2016, and the time

 8    is 1:04 p.m.

 9            This video deposition is being held in

10    Paso Robles, California in the matter of Ethicon,

11    Incorporated Pelvic Repair System Products Liability

12    Litigation for the United States District Court,

13    Southern District of West Virginia at Charleston.  The

14    deponent is Dr. Mareeni Stanislaus.

15            At this time will counsel please identify

16    themselves and state whom they represent.

17            MR. JACKSON:  Tim Jackson from Wexler Wallace

18    on behalf of the Plaintiffs.

19            MR. KOOPMANN:  Barry Koopmann from Bowman and

20    Brooke on behalf of Ethicon and Johnson & Johnson.

21            THE VIDEOGRAPHER:  Thank you.  The court

22    reporter is Ashala Tylor and will now swear in the

23    witness.

24    ///

25    ///
```

Mareeni Stanislaus, M.D.

```
 1              MAREENI STANISLAUS, M.D.,

 2          having been first placed under oath,

 3        was examined and testified as follows:

 4          THE VIDEOGRAPHER:  You may begin.

 5

 6                    EXAMINATION

 7  BY MR. JACKSON:

 8      Q.   Doctor, could you please state and spell your

 9  name for the record?

10      A.   Mareeni Stanislaus.  I'm sorry.  Mareeni

11  Therese Stanislaus, M.D.

12      Q.   Could you please spell that for the record?

13      A.   Yes.  M-A-R-E-E-N-I, middle name

14  T-H-E-R-E-S-E, last name Stanislaus,

15  S-T-A-N-I-S-L-A-U-S.

16      Q.   Okay.  Thank you.

17           Doctor, I introduced myself to you before we

18  got on the record, but my name is Tim Jackson, and I'm

19  from a law firm called Wexler Wallace in Chicago.  And

20  you're here today to give testimony about your TVT-O

21  report in this case; is that correct?

22      A.   That is correct.

23      Q.   Okay.  And is there any reason you feel you

24  cannot testify fully and accurately today?

25      A.   No.
```

Mareeni Stanislaus, M.D.

1       Q.    If I ask something and it's not clear what I'm

2   asking, I'd just ask that you let me know that and I'll

3   do my best to rephrase the question so you understand

4   it.  Is that fair?

5       A.    Certainly.

6       Q.    Okay.  And, conversely, if I ask a question

7   and you answer it, is it fair to assume that you

8   understood the question?

9       A.    Yes.

10      Q.    Okay.  Have you ever had your deposition taken

11  before?

12      A.    Yes.

13      Q.    Okay.  And how many times?

14      A.    Approximately five.

15      Q.    When was the most recent?

16      A.    In relation to this case, two weeks ago.

17      Q.    Okay.  And was that for a plaintiff specific

18  report?

19      A.    Yes.

20      Q.    Okay.  And were there any other times in

21  relation to this case or just that one?

22      A.    Just that one.

23      Q.    Okay.

24      A.    There were three consecutive depositions that

25  day.

Mareeni Stanislaus, M.D.

```
 1         Q.   Okay.  So are you counting those three

 2    separate depositions in your total of five?

 3         A.   Yes.

 4         Q.   Okay.  So there were two other instances where

 5    you had your deposition taken?

 6         A.   Yes.

 7         Q.   Okay.  And what -- can you tell us what those

 8    two other instances were?

 9         A.   They were in regards to malpractice

10    litigation.

11         Q.   Okay.  And were you a defendant in those

12    cases?

13         A.   Yes.

14         Q.   Okay.  In both of them?

15         A.   Yes.

16         Q.   Okay.  And can you tell us what the dates of

17    those two cases were?

18         A.   They were subsequently dropped without

19    prejudice.  2002, I think, and perhaps 2007.

20         Q.   Okay.  Thank you.

21              And, Doctor, prior to this case, have you ever

22    been retained as an expert witness before?

23         A.   No.

24         Q.   Okay.  Doctor, what did you do to prepare for

25    your deposition today?
```

Mareeni Stanislaus, M.D.

1     A.   I reviewed textbooks.  I reviewed my reliance

2  materials.  I reviewed some of the literature and

3  reviewed my report.

4     Q.   Okay.  And when you say you reviewed

5  textbooks, would those be books that are listed on your

6  reliance materials?

7     A.   I believe so, yes.

8     Q.   Okay.

9     A.   And, I'm sorry, I also consulted with my

10  counsel.

11     Q.   Okay.  I'm sorry, Doctor.  When you say your

12  counsel, do you mean counsel for Ethicon?

13     A.   Counsel for Ethicon, yes.

14     Q.   And, Doctor, can you give me your best guess

15  of about how many hours you spent just preparing for the

16  deposition today aside from writing the report?

17     A.   Oh, four hours.

18     Q.   And aside from counsel, did you speak to

19  anyone else in regards to the deposition today prior to

20  the deposition?

21     A.   No.

22     Q.   Doctor, before we got on the record -- strike

23  that.

24          Before we got on the record we premarked as

25  Exhibit 1 this.  And can you please confirm that that is

Mareeni Stanislaus, M.D.

1  a true and accurate copy of the report you provided in

2  this case.

3                        (Exhibit 1 was marked for

4                        identification and attached hereto.)

5            (Pause while witness peruses document.)

6            THE WITNESS:  Yes.

7  BY MR. JACKSON:

8      Q.   Doctor, we've premarked as Exhibit 2 what I'll

9  represent is the CV that was provided along with your

10  report.

11                       (Exhibit 2 was marked for

12                       identification and attached hereto.)

13  BY MR. JACKSON:

14      Q.   Does that look like a reasonably accurate copy

15  of your CV?

16      A.   Yes.

17      Q.   Okay.  And, Doctor, what's been marked as

18  Exhibit 3 is the Mareeni Stanislaus reliance list in

19  addition to materials referenced in reports that were

20  provided with your report in this case.

21                       (Exhibit 3 was marked for

22                       identification and attached hereto.)

23  BY MR. JACKSON:

24      Q.   Does that look reasonably correct to you?

25  It's a very long document.  I'm not asking you to look

Mareeni Stanislaus, M.D.

```
 1   at every page.

 2        A.   I'm reading it --

 3             (Pause while witness peruses document.)

 4        Q.   Okay.  Doctor, Exhibit 4 is the Notice of

 5   Deposition for this case.  Have you seen that document

 6   before?

 7        A.   Yes, I have.

 8                       (Exhibit 4 was marked for

 9                       identification and attached hereto.)

10   BY MR. JACKSON:

11        Q.   Okay.  Doctor, that document asks you to bring

12   certain documents with you today.  You have those

13   documents; is that correct?

14        A.   Yes.  I'm not sure that the correct documents

15   were requested because these documents seem to refer to

16   patient information, which I don't have, but I did bring

17   all documents that I have related to my general report.

18        Q.   Okay.  And, just generally, can you tell us

19   what you brought with you today?

20        A.   My report, my reliance list, literature,

21   various articles.

22        Q.   Okay.  And, Doctor, I believe you have a

23   binder in front of you.  Can you tell us what that

24   specific binder is?

25        A.   That is my general report with the articles
```

Mareeni Stanislaus, M.D.

1    cited in my report.

2            MR. JACKSON:  Okay.  And could we go ahead and

3    mark that binder as Exhibit 5.

4                    (Exhibit 5 was marked for

5                    identification and attached hereto.)

6    BY MR. JACKSON:

7        Q.   Doctor, is it fair to say that -- I'm sorry.

8            Doctor, is it fair to say that all of the

9    footnotes from your report are contained in that binder?

10       A.   Yes.

11       Q.   Have you written or highlighted on any of the

12   documents in the binder or are they clean copies?

13       A.   They're clean copies.

14       Q.   Okay.  And, Doctor, aside from the binder

15   we've marked as Exhibit 5, you also brought a number of

16   other binders with you today, correct?

17       A.   Yes, I did.

18       Q.   And do those represent the reliance materials

19   you have in this case?

20       A.   Yes, they do.

21       Q.   Okay.  And would it be fair to say that the

22   other binders, aside from Exhibit 5, are the same as the

23   documents listed on Exhibit 3, the reliance list?

24       A.   Yes.  I'm not entirely sure if they're all in

25   there, but I think so.

Mareeni Stanislaus, M.D.

1        Q.    Okay.  Is it fair to say there wouldn't be any

2    new documents in the binders that are not on the

3    reliance list?

4        A.    Yes, that would be fair to say.

5        Q.    And I think what I'd like to do, if we could,

6    is mark all the other binders, aside from Exhibit 5, as

7    Exhibit 6 collectively.  And then when we're on a break,

8    I can look at those a little more carefully.

9             Doctor, did you also bring some thumb drives

10   with you today?

11       A.    Yes, I did.

12       Q.    Okay.  And what's on those thumb drives?

13       A.    The complete set of documents and articles

14   related to this case that I reviewed.  They principally

15   are the same as what is in these binders.

16             MR. JACKSON:  Could we mark the thumb drives

17   as Exhibit 7?

18                         (Exhibit 7-A was marked for

19                          identification and attached hereto.)

20                         (Exhibit 7-B was marked for

21                          identification and attached hereto.)

22   BY MR. JACKSON:

23       Q.    Doctor, when were you first contacted about

24   providing a report in this case?

25       A.    I don't remember the exact date, but I would

Mareeni Stanislaus, M.D.

1   say sometime in the last eight, nine months.

2        Q.    Sometimes in the last eight, nine months.

3   Could you be any more specific than that?  I mean, was

4   it, you know, was it the spring of 2016?

5        A.    It was probably the fall of 2015, yes.

6             MR. KOOPMANN:  Just make sure that he gets to

7   finish his question before you start answering so the

8   court reporter can take everything down.

9   BY MR. JACKSON:

10       Q.    So, Doctor, you were first contacted in the

11  fall of 2015, approximately, about providing a report in

12  this case; is that correct?

13       A.    That is correct.

14       Q.    And when did you begin working on that report?

15       A.    In April of 2016.

16       Q.    Doctor, when you say you started in April of

17  2016, what did you start working on in April of 2016?

18       A.    I started reviewing some literature regarding

19  the TVT-O.  Just refreshing my memory.

20       Q.    Okay.  So is it fair to say -- strike that.

21            Doctor, prior to April of 2016, had you

22  previously read literature on the TVT-O device?

23       A.    Yes, I had.

24       Q.    Okay.  And, Doctor, when did you submit your

25  report in this case, approximately?

Mareeni Stanislaus, M.D.

```
1        A.   It was June -- sorry.  This is July.  Forgive

2   me.  June -- I've forgotten the exact date, actually.

3        Q.   Doctor, is it fair to say you submitted your

4   report sometime --

5        A.   Yes, I --

6        Q.   -- in June of 2016?

7             THE REPORTER:  One at a time, please.

8        Q.   June of 2016?

9        A.   Agreed.

10        Q.   Thank you.  And, Doctor, at the time you

11   submitted your report in this case, do you know how much

12   time you'd spent preparing that report?

13        A.   Approximately 30 hours.

14        Q.   Doctor, have you submitted an invoice for your

15   time in this case?

16        A.   Yes, I have.

17        Q.   And is that information you brought with you

18   today?

19        A.   It was previously provided in the prior

20   deposition.

21             MR. KOOPMANN:  Mr. Jackson, just for the

22   record, I think it was in the Hoke deposition.

23             MR. JACKSON:  Thank you, Counsel.

24        Q.   Doctor, what is your hourly rate for expert

25   work in this case?
```

Mareeni Stanislaus, M.D.

```
 1        A.   $400 an hour.

 2        Q.   And is that for any work you do in this case?

 3        A.   Yes.

 4        Q.   And, Doctor, we have a copy of your CV, so I

 5   won't spend an inordinate time on that issue.

 6             Could you tell us when where you went to

 7   medial school?

 8        A.   I went to medical school at the University of

 9   California, San Diego.

10        Q.   Okay.  And, Doctor, where did you do your

11   undergrad?

12        A.   At Stanford.

13        Q.   Okay.  And you did a residency after medical

14   school?

15        A.   I did.

16        Q.   Where was that?

17        A.   My residency was at the Hospital of the

18   University of Pennsylvania.

19        Q.   And, Doctor, did you do a fellowship?

20        A.   I did not.

21        Q.   Doctor, what professional training do you have

22   post-residency?

23        A.   Just my residency.  And ongoing continuing

24   medical education courses.

25        Q.   And, Doctor, when did you complete your
```

Mareeni Stanislaus, M.D.

1    residency?

2        A.    In 1996, July.

3        Q.    And, Doctor, you mentioned continuing medical

4    education.   Is that the phrase you used?

5        A.    Yes.

6        Q.    What do you mean by that term?

7        A.    Attending courses sponsored by the various

8    organizations relevant to my specialty; reading

9    materials; maintaining my board certification.

10       Q.    Doctor, what board certification do you hold?

11       A.    The American Board of Obstetrics In

12   Gynecology.

13       Q.    So, Doctor, you are board certified in

14   obstetric -- obstetrics and gynecology; is that correct?

15       A.    That is correct.

16       Q.    Okay.   And, Doctor, is that certification done

17   on a state level or is it on the national level?

18       A.    The national level.

19       Q.    And, Doctor, does the American Board of

20   Obstetrics and Gynecology offer a board certification in

21   female pelvic health and reconstructive surgery?

22       A.    They did not at the time that I graduated

23   residency, but they do now.

24       Q.    Okay.   They do now.

25       A.    Uh-huh.

Mareeni Stanislaus, M.D.

1      Q.    And when did they begin offering that board

2  certification?

3      A.    I'm not aware of the exact date.  My

4  recollection is sometime around 2006, maybe.

5      Q.    Okay.  That's something you have not pursued,

6  though?

7      A.    No, I have not.

8      Q.    Okay.  Is it something you could pursue?

9      A.    At this point it would be very difficult for

10  me to pursue that.  No, so...

11      Q.    Okay.  Doctor, what does a board certification

12  in female pelvic health and reconstructive surgery

13  entail?

14           MR. KOOPMANN:  Object to the form.

15           THE WITNESS:  To be honest, I haven't reviewed

16  the exact requirements.  My understanding is that it

17  requires devoting greater than 50 percent of your

18  practice to female pelvic medicine and completing

19  fellowship training.  I don't remember if that training

20  requires two or three years post-residency.

21  BY MR. JACKSON:

22      Q.    Doctor, would it be fair to say that a

23  physician who had a board certification in female pelvic

24  health and reconstructive surgery has training and

25  education above and beyond what you, yourself, have?

Mareeni Stanislaus, M.D.

```
1        A.    That would not be fair to say.

2        Q.    And why not?

3        A.    It is a new specialty.  And at the time that I

4   completed my training I had the same training and,

5   perhaps, more experience, than many of the current

6   trainees in female pelvic medicine and reconstructive

7   surgery.

8        Q.    Okay.  Doctor, you completed your residency

9   20 years ago?

10       A.    Correct.

11       Q.    Okay.  And, Doctor, in that 20 years you could

12  have obtained a board certification in female pelvic

13  health and reconstructive surgery?

14            MR. KOOPMANN:  Object to form.

15            (Reporter clarification.)

16            MR. KOOPMANN:  Object to form.

17            THE WITNESS:  That is not something that I

18  would have required to practice my specialty.  But the

19  specific answer is, I suppose I could have.

20  BY MR. KOOPMANN:

21       Q.    Doctor, do you know how many -- I'm sorry.

22  Strike that.

23            Do you know about how many physicians in the

24  United States are board certified in female pelvic

25  health and reconstructive surgery?
```

Mareeni Stanislaus, M.D.

```
 1        A.    I do not.

 2        Q.    Do you have a sense of if it's more or less

 3  than a thousand?

 4        A.    My sense is that it's less than a thousand.

 5        Q.    Doctor, do you consider yourself an expert in

 6  female pelvic medicine and reconstructive surgery?

 7        A.    I certainly do.

 8        Q.    Doctor, have you performed research in your

 9  medical career regarding treatments for stress urinary

10  incontinence?

11        A.    I have not.

12        Q.    Doctor, have you performed any research in

13  your career regarding polypropylene mesh for the

14  treatment of stress urinary incontinence?

15        A.    I have not published research.  I have

16  examined my own outcomes.

17        Q.    Doctor, when you say you examined your own

18  outcomes, can you explain what you mean by that?

19        A.    I take care of my patients.  I follow them

20  intraoperatively and postoperatively to see how they're

21  doing.

22        Q.    Okay.  Doctor, have you authored any

23  publications in your medical career?

24        A.    No, I have not.

25        Q.    Doctor, have you ever served on a peer review
```

Mareeni Stanislaus, M.D.

1    board for a medical journal?

2        A.   No, I have not.

3        Q.   Doctor, have you ever directed a clinical

4    study regarding treatments for stress urinary

5    incontinence?

6        A.   No.

7        Q.   Doctor, have you ever directed any clinical

8    study regarding polypropylene mesh in any application?

9        A.   No.

10       Q.   Doctor, have you ever directed a clinical

11   study of any kind?

12       A.   Not as a principal director, no.

13       Q.   Other than as a principal director, have you

14   ever directed a clinical trial?

15       A.   I'm presently involved in facilitating some

16   clinical trials for a postpartum hemorrhage device.

17       Q.   Doctor, do you currently implant the TVT

18   obturator device?

19       A.   I do.

20       Q.   And, Doctor, when did you last implant a TVT

21   obturator device in a patient?

22       A.   I don't remember the exact date.  It's been

23   about six years.

24       Q.   So, Doctor, just so we're clear, when you say

25   you do currently implant the TVT obturator product but

Mareeni Stanislaus, M.D.

1   you haven't implanted one in six years, can you just

2   reconcile what that means?

3        A.   That means that I consider the TVT obturator

4   device in armamentarium of devices to be used for stress

5   incontinence.  In recent times, I have been preferring

6   to use a mini sling device, but in the appropriate

7   patients I would still use a TVT obturator.

8        Q.   When you say "the appropriate patients," can

9   you tell me what you mean by that?

10       A.   So I counsel my patients as to the

11  risks/benefits of any incontinence procedure.  I present

12  the potential morbidity to them and help them come to a

13  decision as to which procedure to perform.  Recently my

14  patients have been choosing to have the mini sling.

15       Q.   And, Doctor, when you say morbidity, what does

16  that mean?

17       A.   That means pain after surgery.  That means

18  recovery, loss of time from work, potential

19  intraoperative complications, needing to -- well,

20  voiding problems, things I discuss with any surgical

21  patient, uh-huh.

22       Q.   And so, Doctor, is it fair to say that

23  different -- different sling devices for the treatments

24  of stress urinary incontinence have different

25  morbidities associated with them?

Mareeni Stanislaus, M.D.

 1      A.   Different sling devices, that's a broad term.
 2   But, yes, because of pubovaginal slings have different
 3   morbidities than polypropylene, yes, that's true,
 4   uh-huh.
 5      Q.   I didn't ask a very good question.  Let me ask
 6   a better one.
 7           Doctor, does the TVT retropubic device have a
 8   different morbidity associated with it than the TVT
 9   obturator device?
10      A.   Yes, slightly.
11      Q.   When you say "slightly," what do you mean by
12   that?
13      A.   I think their overall morbidity is about the
14   same, but the particular location of, say, postoperative
15   pain might be slightly different that with the two
16   techniques.
17      Q.   Doctor, when you say their overall morbidities
18   are approximately the same, what's your basis for that
19   statement?
20      A.   That would be the -- review the literature,
21   multi-center randomized trials.
22      Q.   Doctor, have you reviewed some literature as
23   part of your work in this case that points out different
24   complications associated with the TVT retropubic device
25   versus the TVT obturator device?

Mareeni Stanislaus, M.D.

```
 1        A.   Yes.

 2        Q.   When you say the TVT retropubic device and the

 3   TVT obturator device have approximately the same

 4   morbidities associated with them, what does

 5   "approximately" mean in that context?

 6        A.   Within a few percentage points either way.

 7        Q.   Doctor, are you aware of any published

 8   literature where there have been statistically

 9   significant differences in complication rates between

10   the TVT retropubic device and the TVT obturator device?

11        A.   Yes.

12        Q.   Do you find those studies relevant and

13   reliable?

14             MR. KOOPMANN:  Object to form.

15             THE WITNESS:  It's hard to comment on some

16   studies.  I'd have to know which studies.  But in

17   reference to my statement, I would say that there --

18   when reviewing any study, it's important to note the

19   statistical significance and also the potential clinical

20   significance because to a particular patient a

21   particular morbidity may be more relevant, so...

22   BY MR. JACKSON:

23        Q.   Doctor, about how many TVT-O procedures have

24   you performed in your career?

25        A.   Approximately 150.
```

Mareeni Stanislaus, M.D.

1      Q.    And when did you start using the TVT

2   obturator?

3      A.    So I did not review my exact date of start,

4   but it was approximately 2004.

5      Q.    And, Doctor, I think you said you stopped

6   using it about six years ago?

7      A.    I have not stopped using it, but the last time

8   I used it was approximately six years ago.

9      Q.    I apologize.

10          Doctor, is it fair to say that you implanted

11   150 TVT-O devices between 2004 and 2010?

12      A.    Yes.

13      Q.    And, Doctor, how did you come to use the TVT

14   obturator device initially?

15      A.    I was introduced to it, I think, first by

16   reading some articles in the literature.  And I went to

17   a training course sponsored by Ethicon to further

18   understand the anatomy of the device and practice on a

19   cadaver.

20      Q.    So, Doctor, you read articles about the TVT

21   obturator device before using it in 2004; is that

22   correct?

23      A.    I do not recall whether they were specific to

24   the TVT obturator device, but they were relevant to the

25   technique, yes.

Mareeni Stanislaus, M.D.

1      Q.   Doctor, when was the first time you had any

2  interaction with Ethicon?

3      A.   Oh, I really can't remember.  I must have had

4  some interaction when I was a resident in the, you know,

5  early '90s.

6      Q.   Okay.  Doctor, prior to implanting the TVT

7  obturator in 2004, did you also implant the TVT

8  retropubic device?

9      A.   Yes, I did.

10     Q.   And prior to implanting the TVT retropubic

11  device, are there any other Ethicon devices you

12  implanted before the TVT retropubic?

13     A.   Before the TVT retropubic?  Sorry.  Ethicon

14  incontinence -- sorry, what was your question?  Repeat

15  it again.

16     Q.   Let me ask a better question.

17          Doctor, did you implant any Ethicon -- strike

18  that.

19          Doctor, did you use any Ethicon products for

20  any indication, not just stress urinary incontinence,

21  prior to using the TVT retropubic device?

22     A.   Yes.

23     Q.   And what devices would those be?

24     A.   So that is difficult for me to answer because

25  I didn't always pay attention to who the manufacturer

Mareeni Stanislaus, M.D.

1    was, but I suspect that I used some of the laparoscopic

2    equipment.  And also -- sorry -- I'm sure I used their

3    suture.

4        Q.   And, doctor, when you say "laparoscopic

5    equipment," that's not anything that's permanently

6    implanted, is it?

7        A.   Laparoscopic equipment, they may have made a

8    stapler that that would be permanently implanted.  The

9    staples remain.

10       Q.   Okay.  Doctor, when -- have you implanted both

11   mechanical cut and laser cut TVT obturator devices?

12       A.   To the best of my knowledge, yes.

13       Q.   Okay.  Doctor, when you're doing a TVT

14   obturator surgery, do you know whether it's a

15   mechanically cut or a laser cut product?

16       A.   I do know how to find out, but it's not

17   something that I specifically request one or the other.

18       Q.   Doctor, if you were to hold a mechanically cut

19   TVT obturator mesh in one hand and a laser cut TVT

20   obturator mesh in the hand and just visually looked at

21   them, could you tell a difference?

22       A.   Yes.

23       Q.   And how could you tell a difference?

24       A.   I haven't done this in some time, but I think

25   the edges are slightly different, the look to the edge.

Mareeni Stanislaus, M.D.

1      Q.   And can you be any more specific there?

2      A.   Not particularly.  They look quite similar.

3      Q.   Okay.  But you believe the edges might look a

4    little different?

5      A.   Yes.

6      Q.   Okay.  And so, Doctor, other than the TVT

7    obturator device, do you currently implant any other

8    Ethicon devices for stress urinary incontinence?

9      A.   Yes, the TVT-Exact.

10     Q.   And when was the last time you implanted a

11   TVT-Exact?

12     A.   Three months ago.

13     Q.   And about how many TVT-Exacts have you

14   implanted in your career?

15     A.   The actual Exact, not that many.  Probably 20.

16     Q.   Okay.  And, Doctor, other than the obturator

17   and the exact, are there any other Ethicon devices that

18   you currently implant?

19     A.   I have not used any lately, but, yes, the

20   Abbrevo.  That's it.

21     Q.   And, Doctor, when did you last implant an

22   Abbrevo?

23     A.   Gosh, more than six years ago.  Maybe eight

24   years ago.

25     Q.   And about how many Abbrevos have you

Mareeni Stanislaus, M.D.

```
 1   implanted?

 2       A.   Four, five.

 3       Q.   Okay.  Doctor, do you currently implant the

 4   retropubic TVT device?

 5       A.   Yes.

 6       Q.   You do.  Okay.  And when did you last implant

 7   a retropubic TVT device?

 8       A.   Forgive me.  I may be misspeaking.  I equate

 9   the TVT-Exact with the retropubic TVT device.  Are we

10   speaking of the same thing?

11       Q.   No.

12       A.   Okay.

13       Q.   Doctor, are you aware that there was a

14   retropubic TVT device prior to the launch of the

15   TVT-Exact?

16       A.   Yes, I am.

17       Q.   Okay.  And do you currently implant the

18   retropubic non-Exact TVT device?

19       A.   No, I do not.

20       Q.   You do not.  Have you ever implanted the

21   retropubic non-Exact TVT device?

22       A.   Yes, I have.

23       Q.   And when did you last implant the retropubic

24   non-Exact TVT device?

25       A.   Gosh, it would have been -- it's really quite
```

Mareeni Stanislaus, M.D.

```
 1    a guess.  Probably 2005.
 2         Q.   Doctor, when was the first time you ever
 3    worked with polypropylene mesh of any type?
 4         A.   I really don't remember the exact date.  It
 5    must have been sometime around 1997 or '8.
 6         Q.   And was that for an indication other than SUI
 7    repair?
 8         A.   Yes.
 9         Q.   What would that have been for?
10         A.   Abdominal sacral colpopexy.
11         Q.   Doctor, have you performed Burch procedures
12    for stress urinary incontinence repair?
13         A.   Yes, I have.
14         Q.   And when did you last perform a Burch
15    procedure for stress urinary incontinence repair?
16         A.   Approximately two years ago.
17         Q.   Doctor, would you agree that the Burch
18    procedure is within the standard of care for treating
19    stress urinary incontinence?
20         A.   Yes, it is within the standard of care.
21         Q.   And, Doctor, how many Burch procedures have
22    you performed in your career?
23         A.   Approximately 200.
24         Q.   Doctor, have you attended any Ethicon
25    training?
```

Mareeni Stanislaus, M.D.

```
 1        A.   Yes.
 2        Q.   Okay.  And was that training specific to
 3   stress urinary incontinence products?
 4        A.   Yes.
 5        Q.   Okay.  And which products did you specifically
 6   attend Ethicon training on?
 7        A.   I specifically attended training on the TVT
 8   obturator.  I attended training on Prolift.  And I may
 9   have also attended training on the TVT Secure.  I can't
10   remember if that was at the same time as the Prolift or
11   not.
12        Q.   And, Doctor, have you ever implanted the TVT
13   Secure?
14        A.   Yes.
15        Q.   You have.  And when did you last implant a TVT
16   Secure?
17        A.   It's been many years.  Perhaps 2011.
18        Q.   And, Doctor, the TVT obturator Ethicon
19   training you mentioned you attended, do you remember
20   approximately when that was?
21        A.   No.  It -- approximately 2004.
22        Q.   And do you remember where you attended that
23   training?
24        A.   I recall it was in Phoenix.
25        Q.   And, Doctor, just can you describe what the
```

Mareeni Stanislaus, M.D.

1   training entailed?

2       A.   It entailed morning of lectures and videos,

3   and then I think the afternoon was a cadaver lab

4   implanting the device.

5       Q.   And, Doctor, did you receive any sort of

6   certificate as a result of that training?

7       A.   I would have.  Yes, I did.

8       Q.   Doctor, I'm going to turn to your report,

9   which I think we marked as Exhibit 1.

10      A.   Okay.

11      Q.   And, Doctor, if you'd like to refer to the

12  report you brought with you or Exhibit 1, whichever you

13  prefer.

14      A.   Uh-huh.

15      Q.   Doctor, I'm just going to start on page 5.

16  Could you let me know when you're on page 5 of your

17  report?

18      A.   Yes, I'm on page 5.

19      Q.   And I'm -- this is a section called Clinical

20  Experience & Personal Experience with SUI Treatments; is

21  that correct?

22      A.   That is correct.

23      Q.   And, Doctor, what clinical experience are you

24  describing on this page?

25      A.   That's my care for patients.

Mareeni Stanislaus, M.D.

```
1        Q.   And, Doctor, I'm looking at a sentence, the
2   second sentence in the second paragraph.  It says, "I
3   learned the procedures after residency, due to the
4   ever-growing body of literature which supported their
5   efficacy in the setting of marked improvement and return
6   to normal function."
7             Did I read that correctly?
8        A.   Yes, you did.
9        Q.   What do you mean by that sentence?
10       A.   I mean that I chose to learn this technique
11  once I recognized through reading of the literature that
12  it was a technique that would provide great -- a great
13  boon to women in that they can return to work faster and
14  still have an effective procedure for their
15  incontinence.
16       Q.   And, Doctor, you mentioned the literature in
17  this sentence.
18       A.   Yes.
19       Q.   And I'm just curious, can you just explain to
20  me what the ever-growing body of literature means in
21  that context?
22       A.   At that time I typically read The Green
23  Journal and The Gray Journal, and some of the other
24  throw-away publications like Contemporary OB-GYN.  And
25  as I saw more and more information regarding the sling
```

Mareeni Stanislaus, M.D.

 1   procedures, I recognized that this was something I

 2   should learn to do.

 3        Q.   Okay.  So, Doctor, just so I'm clear, you're

 4   -- strike that.

 5             Doctor, are you saying that you -- due to the

 6   literature accumulating on the device, you were inspired

 7   to go out and start performing the device yourself?

 8        A.   That is what I'm saying.

 9        Q.   Okay.  And, Doctor, further down on page 5,

10   the first sentence of the last paragraph it says, "When

11   the TVT was first introduced, I waited until there was a

12   wealth of peer-reviewed data surrounding it before

13   adopting it into my practice, but I have been

14   overwhelmingly pleased with the results since I have

15   adopted it and other mid-urethral slings."

16             Did I read that correctly?

17        A.   Yes, you did.

18        Q.   And, Doctor, when you use the TVT in this

19   context, what are you referring to?

20        A.   In this context, I'm referring to the

21   polypropylene mid-urethral sling.

22        Q.   And when you say, "When the TVT was first

23   introduced," are you referring to a specific iteration

24   of the TVT or the entire family of TVT?

25        A.   In this particular sentence I suppose I would

Mareeni Stanislaus, M.D.

1    be referring to the first TVT, the retropubic.

2         Q.    Okay.  And that would be the non-Exact

3    retropubic?

4         A.    Correct, yes.

5         Q.    And, Doctor, you say you waited until there

6    was a wealth of peer-reviewed data surrounding it before

7    adopting it into your practice, correct?

8         A.    Yes, I did.

9         Q.    And so when did you adopt it into your

10   practice?

11        A.    The -- approximately 2002.

12        Q.    And, Doctor, when did the TVT retropubic --

13   I'm sorry, strike that.

14             Doctor, when was the retropubic TVT first

15   marketed in the United States?

16        A.    I think it was in 1998.

17        Q.    Okay.  And, so, Doctor, do you believe that

18   prior to 2002 there was inadequate data surrounding the

19   TVT retropubic?

20             MR. KOOPMANN:  Object to form.

21             THE WITNESS:  There was excellent data prior

22   to 2002.  I chose to be cautious and wait until it was

23   more widely accepted.

24   BY MR. JACKSON:

25        Q.    Okay.  Doctor, when you say there was

Mareeni Stanislaus, M.D.

1    excellent data surrounding the TVT retropubic prior to

2    2002, is there any specific data you're referring to as

3    excellent?

4         A.   Oh, well, I read the initial -- I think it was

5    an Omsten article.

6              Could you repeat your question?  You were

7    saying prior to 2002?

8         Q.   Let me back up, Doctor.  You state here

9    that -- strike that.

10             Doctor, you waited until 2002 to start using

11   the TVT retropubic device, correct?

12        A.   Correct.

13        Q.   And you state in your report you waited until

14   there was a wealth of peer-reviewed data.

15        A.   I did.

16        Q.   Okay.  And so do you believe that prior to

17   2002, there was a wealth of peer-reviewed data on the

18   TVT retropubic device?

19        A.   I do believe there was a wealth of

20   peer-reviewed data prior to 2002, yes.

21        Q.   So, Doctor, why did you wait until 2002 to

22   start using the TVT retropubic device?

23        A.   Because I had wonderful success with my Burch

24   procedures.  I didn't have a strong impetus to change.

25   But as I read the data and realized that women were

Mareeni Stanislaus, M.D.

1    doing better, I thought I better look into this a little

2    further.

3         Q.   Okay.  So is it fair to say that you wanted to

4    be cautious before you started using it?

5         A.   I typically am cautious, so, yes, it is fair

6    to say that.  However, part of my delay in adopting it

7    was I didn't have a need to adopt it due to my good

8    outcomes with the Burch.

9         Q.   Doctor, the next sentence on page 5 states, "I

10   routinely have patients approach me at the grocery store

11   and at social events with tears of gratitude in their

12   eyes for the improvement they have experienced and their

13   quality of life from the mesh sling procedure."

14             Did I read that correctly?

15        A.   Yes, you did.

16        Q.   And that must be very rewarding.

17        A.   It is.

18        Q.   And about how many times has that happened

19   where a patient approached you in a grocery store?

20        A.   Oh, 50.

21        Q.   And would those 50 patients who approached you

22   in a grocery store include multiple products that you've

23   implanted, not just the TVT obturator?

24        A.   Yes, they would include multiple products.

25        Q.   So, Doctor, the sentence that I just read from

Mareeni Stanislaus, M.D.

1    page 5 that begins, "I routinely have patients," does

2    that refer just to the TVT obturator or does it refer to

3    multiple products?

4         A.   It refers to polypropylene sling products

5    generally.

6         Q.   Doctor, can you definitively say that any of

7    those instances involved TVT obturator products?

8         A.   Yes, I can.

9         Q.   And how can you be sure?

10        A.   Well, during that particular time was when my

11   children were playing soccer, and I would see these moms

12   at the soccer field.  And at the period of time I was

13   using the TVT-O, I was using it almost exclusively.

14        Q.   And, Doctor, what -- during what time period

15   were you using the TVT-O almost exclusively?

16        A.   About 2004 to about 2009.

17        Q.   And, Doctor, do you recall the last time a

18   woman came up to you in the grocery store and shared a

19   positive experience with a TVT product with you?

20        A.   With any TVT product, not specifically the

21   TVT-O?

22        Q.   Correct.

23        A.   Oh, about a month ago.

24        Q.   And, Doctor, do you recall the last time a

25   woman came up to you in a grocery store and shared a

Mareeni Stanislaus, M.D.

```
1    positive experience with a TVT obturator device?

2        A.   I don't recall an exact date, no, or time.

3        Q.   And, Doctor, are these encounters with

4    patients in the grocery store part of the information

5    you've considered in reaching your opinion that the TVT

6    obturator device is safe and effective?

7        A.   It's part of it.  It's not the principal

8    source of my information.

9        Q.   But it's part of it?

10       A.   It's part of it, yes, uh-huh.

11       Q.   And, Doctor, do you intend to discuss at trial

12   any encounters you've had with patients in the grocery

13   store?

14       A.   Only if it's asked of me.  It's not the type

15   of information I typically volunteer.

16       Q.   But do you believe those encounters are

17   relevant to your opinion that the TVT-O device is safe

18   and effective?

19       A.   I suppose so, yes, uh-huh.

20       Q.   And would you like to talk about those

21   encounters at trial if you were allowed?

22       A.   Certainly.  I don't know, really.  As I said,

23   if asked, I will.  If I could state one other thing,

24   it's not really relevant to whether I consider the TVT-O

25   is safe and effective.  It's more relevant to the fact
```

Mareeni Stanislaus, M.D.

1    that I consider it to have a low morbidity and high

2    patient acceptance.

3         Q.   Okay.  Thank you, Doctor.

4              Can you explain how safety and low morbidity

5    are different concepts?  Because I think that's what you

6    said in your last answer.

7         A.   Yeah.  Well, safety would apply to

8    life-threatening or significantly life-altering events.

9    And effectiveness would apply to, you know, the -- how

10   well the device worked.  In terms of morbidity, there

11   are other less tangible factors, such as how quickly one

12   can walk around a room, whether one can return to work,

13   whether there's, you know, a need to have a catheter

14   placed that might prohibit you from going to the grocery

15   store yourself, you know, things like that.

16        Q.   Okay.  So, Doctor, are you offering an opinion

17   in this case that the TVT-O device is safe and

18   effective?

19        A.   Yes, I am.

20        Q.   Okay.  And, Doctor, are you offering any

21   opinions in this case regarding the morbidity associated

22   with the TVT obturator device?

23        A.   Yes, I am.

24        Q.   Okay.  And, Doctor, how do you believe your

25   opinions about the morbidity of the TVT obturator device

Mareeni Stanislaus, M.D.

1  and the safety of the TVT obturator device are

2  different?

3      A.   Well, my opinion is that the TVT device is

4  safe and effective.  My opinion is that the TVT-O has

5  low morbidity.  So they're not terribly different.

6      Q.   Okay.

7      A.   But it's a bit like comparing apples and

8  oranges.  It's hard for me to say they are exactly the

9  same opinion.

10     Q.   Okay.  Fair enough.

11          Doctor, if I could ask you to locate what we

12  marked as Exhibit 3, which is the list of -- the

13  reliance list.

14          Doctor, just generally, have you reviewed

15  every document on this list?

16     A.   I have looked at every document on this list,

17  yes.

18     Q.   Okay.  And, Doctor, about how much time did it

19  take you to look at every document on this list?

20     A.   A long time.  Several days.

21     Q.   Several days.  When you say "several days," do

22  you mean --

23     A.   I mean --

24     Q.   -- consecutively or working a certain number

25  of hours a day?

Mareeni Stanislaus, M.D.

```
1        A.    Working a certain number of hours a day.  I
2   would typically set aside one or two hours per day to do
3   so over the span of, perhaps, two weeks.
4        Q.    So what would be your best guess of how many
5   hours you spent reviewing these?
6        A.    My best guess is maybe 30 hours.
7        Q.    30 hours?
8        A.    Uh-huh.
9        Q.    Okay.  And that's just reviewing the
10  materials?
11       A.    Let's say 25 hours just reviewing materials.
12       Q.    Okay.  Doctor, do you have an active practice
13  right now?
14       A.    I do, yes.
15       Q.    Where do you currently work?
16       A.    In Templeton, California at the Pacific
17  Central Coast Health Centers.
18       Q.    And you work there as a
19  obstetrician/gynecologist, correct?
20       A.    I do.
21       Q.    And, Doctor, how long have you been in that
22  position?
23       A.    Almost two years.
24       Q.    And, Doctor, you said you reviewed all the
25  materials on this list, correct?
```

Mareeni Stanislaus, M.D.

1    A.   Correct.

2    Q.   And is it fair to say you did not discuss all

3  the materials on the list in your report?

4    A.   That is fair to say.

5    Q.   Okay.  So how did you go about choosing which

6  materials from this list would be discussed in your

7  report?

8    A.   I wanted to rely on the highest quality of

9  evidence.  So principally I chose from the systematic

10  reviews and meta-analyses.

11    Q.   Doctor, would you consider any published

12  peer-reviewed literature that discusses the TVT

13  obturator device as relevant to your opinions in this

14  case?

15    A.   Once again, it would depend on the quality of

16  the evidence.

17    Q.   And, Doctor, you read some Ethicon internal

18  documents that were provided to you, I assume?

19    A.   Yes, I did.

20    Q.   Okay.  And how did you determine which ones

21  you were going to list in your report?  Strike that.

22        Doctor, there are a few Ethicon documents

23  listed as footnotes in your report, correct?

24    A.   Yes.

25    Q.   How did you decide which of those to include

Mareeni Stanislaus, M.D.

```
1    in your report from the long list in your reliance
2    materials?
3         A.   If I might take a moment.  You're referring to
4    the Ethicon documents that I referenced?
5         Q.   Correct.
6         A.   It was just if it was relevant to my opinion,
7    it was just --
8         Q.   Well, Doctor, I'll represent to you that there
9    are, we'll say, over 100 Ethicon documents on your
10   reliance list.  And you --
11        A.   True.
12        Q.   -- only cited a very small fraction of that in
13   your report; is that fair?
14        A.   That's fair.
15        Q.   And how did you select just those very few?
16             MR. KOOPMANN:  Object to the form.
17             THE WITNESS:  I did not rely much on the
18   Ethicon company documents, to be honest, but there were
19   a few specific questions that I had addressed relating
20   to the type of material used.  And the only information
21   that I could find relevant to that was in the Ethicon
22   company documents.
23   BY MR. JACKSON:
24        Q.   Okay.  Doctor, how did you become involved in
25   this case in the fall of 2015?
```

Mareeni Stanislaus, M.D.

1        A.   I was contacted by Mr. Koopmann.

2        Q.   And at the time you were contacted by

3    Mr. Koopmann in the fall of 2015, did you believe that

4    the TVT-O device was safe and effective?

5        A.   Yes, I did.

6        Q.   And at the time you were first contacted by

7    Mr. Koopmann, did he explain that he wanted you to

8    provide a report stating that the TVT-O device was safe

9    and effective?

10             MR. KOOPMANN:  I object to the form of the

11   question.  I think that calls for communications between

12   myself and the witness which is privileged under the

13   rules.  So I'm going to instruct the witness not to

14   answer.

15   BY MR. JACKSON:

16       Q.   Okay.  I can ask a better question.  Doctor,

17   at the time -- strike that.

18             Doctor, is it fair to say that no matter --

19   Doctor, you said in the fall of 2015, when you were

20   first contacted in this case, you held the opinion that

21   the TVT-O device was safe and effective; is that

22   correct?

23       A.   That is correct.

24       Q.   And is it fair to say you didn't see or learn

25   anything that changed your mind?

Mareeni Stanislaus, M.D.

1      A.   Yes, that's fair to say.  If I may elaborate.

2  Reviewing some of the more recent meta-analyses further

3  reinforced that opinion.

4      Q.   So, Doctor, since you began work in this case,

5  have you done any research independently to determine

6  whether your initial view that the TVT-O device was safe

7  and effective was correct?

8      A.   Yes, I looked up -- up to date, I reviewed the

9  recent physician statements by my professional

10  societies.

11      Q.   Doctor, what professional societies are you a

12  member of?

13      A.   American College of OB-GYN, the American

14  Urogynecologic Society.

15      Q.   Doctor, is the American Urogynecologic Society

16  also known as AUGS?

17      A.   Yes.  AMA.

18      Q.   Doctor, how did you go about deciding what

19  information to include in your report in this case?

20      A.   I formulated my opinions.  And I looked

21  through some of the documents provided to me.  And I did

22  a literature search on my own, and looked to see what

23  seemed to reasonably support my -- the opinions that I

24  have stated.

25      Q.   So is it fair to say you had your opinions

Mareeni Stanislaus, M.D.

1    first and then you filled in the report with support for

2    those opinions?

3            MR. KOOPMANN:  Object to form.

4            THE WITNESS:  Having been in practice for

5    20 years and gone to medical school and residency as I

6    have had the opportunity to form some opinions, those

7    opinions would have been subject to change had I found

8    contrary information.  But, yes, I did have some

9    opinions before I started the report.

10   BY MR. JACKSON:

11       Q.   Doctor, you discussed the instructions for

12   use, or IFU, for the TVT obturator in your report,

13   correct?

14       A.   Correct.

15       Q.   How did you determine to discuss the TVT

16   obturator IFU in your report?

17       A.   Well, it has been a subject of question, I

18   think, in prior litigation so I thought it might be

19   relevant.

20       Q.   Okay.  And, Doctor, you discuss the background

21   of the TVT retropubic and the TVT obturator in your

22   report --

23       A.   Yes.

24       Q.   -- correct?

25            And you also discuss literature surrounding

Mareeni Stanislaus, M.D.

1    both those devices in your report?

2        A.    Yes.

3        Q.    Doctor, you discuss the IFU for the TVT

4    obturator in your report?

5        A.    Yes.

6        Q.    And, Doctor, you also discuss Ethicon's

7    training programs in your report?

8        A.    Yes.

9        Q.    And you discuss Ethicon's product brochures in

10   your report, correct?

11       A.    Yes, uh-huh.

12       Q.    Okay.  And are there any other sections in

13   your report that that I didn't just list?

14       A.    Everything is listed here.  There may be

15   something that you haven't mentioned.

16       Q.    Okay.  Well, how did you decide to include

17   those sections and not other sections?

18       A.    Well, I had a general outline that I felt

19   would be relevant, and then additional material in

20   discussion with counsel to see what might be relevant.

21       Q.    Okay.  And how did you come up with that

22   initial general outline?

23       A.    I asked counsel some questions.  I asked some

24   of my colleagues what generally goes in a expert report.

25       Q.    Okay.

Mareeni Stanislaus, M.D.

1      A.    Not relevant to this particular case, but...

2      Q.    Okay.  And, Doctor, if I can ask you to turn

3   back to Exhibit 3, the reliance list.

4      A.    Uh-huh.

5      Q.    And I took the liberty of tabbing a page to

6   streamline things.  If I could ask you to turn to that

7   tabbed page.

8      A.    Yes.

9      Q.    I had a few questions about some of the things

10   on this page.

11      A.    Okay.

12      Q.    Doctor, do you see just about halfway down the

13   page it says, "FDA 24-Hour Summary"?

14      A.    Yes.

15      Q.    Do you know what document that refers to?

16      A.    I would have to look in the binder.  No, I

17   don't remember.

18      Q.    Okay.

19      A.    Can I?

20      Q.    Well, not right now.

21      A.    Okay.

22      Q.    Let me ask, is it your understanding that

23   there's a document labeled in one of the binders called

24   FDA 24-Hour Summary?

25      A.    That would be my understanding.

Mareeni Stanislaus, M.D.

```
1          Q.   Okay.

2          A.   Uh-huh.

3          Q.   But sitting here, you're not sure what

4     document this refers to?

5          A.   No, I'm not.

6          Q.   Okay.  And, Doctor, a little further down it

7     says, "FDA Executive Summary."  Do you know specifically

8     what document that refers to?

9          A.   I do not.

10         Q.   Okay.  And, Doctor, the last item on the page

11    says "FDA Stress Urinary Incontinence."  Do you know

12    what document that refers to?

13         A.   I'm not certain, but I want to think that's

14    the document stating that the mid-urethral sling is an

15    acceptable treatment for stress urinary incontinence.

16         Q.   So, Doctor, it's your testimony that FDA

17    stress urinary incontinence is an FDA document saying

18    that mid-urethral slings are safe and effective?

19         A.   I had best look at it before I testify that's

20    definitely.  May I take the time to find it?

21         Q.   Why don't we do that on a break.  Why don't we

22    see if we can locate that document.

23         A.   All right.

24         Q.   I'll admit from my side looking at a document

25    that just says FDA stress urinary incontinence, it's
```

Mareeni Stanislaus, M.D.

1   very difficult to know what that document refers to; is

2   that fair?

3       A.   That's fair.

4       Q.   And, Doctor, the -- about half the documents

5   on this page start with the term "FDA"; is that correct?

6       A.   That is correct.

7       Q.   Okay.  And how did you determine which FDA

8   documents to include in this reliance list?

9       A.   Those were provided to me by counsel.

10      Q.   Okay.  And, Doctor, what significance, if any,

11  do these FDA documents have in your opinions in this

12  case?

13           MR. KOOPMANN:  Object to the form.

14           THE WITNESS:  Well, the specific document that

15  is most relevant, it was their press release stating

16  that mid-urethral slings are safe and effective.

17  BY MR. JACKSON:

18      Q.   And why is that the most significant?

19      A.   Because that's my understanding of my expert

20  opinion is that the TVT-O is safe and effective, and the

21  FDA agrees with me.

22      Q.   Doctor, do you believe that -- sorry.  Strike

23  that.

24           Doctor, do you believe that any statements the

25  FDA has made supporting the safety and efficacy of the

Mareeni Stanislaus, M.D.

1    TVT obturator device, do you, in fact, support the

2    safety and efficacy of the TVT obturator device?

3              (Reporter clarification.)

4         Q.   Doctor, do you believe that statements made by

5    the FDA supporting the safety and efficacy of the TVT

6    obturator device do, in fact, support the safety and

7    efficacy of the TVT obturator device?

8              MR. KOOPMANN:  Object to the form.

9              THE WITNESS:  They do support the safety.  But

10   the actual safety and effectiveness is -- my opinion is

11   derived from review of the literature more so than an

12   FDA statement.

13   BY MR. JACKSON:

14        Q.   Okay.  Doctor, did you consider any statements

15   made by the FDA in forming your opinion in this case?

16        A.   Well, yes, it's considered.  It's on my

17   reliance list, and I believe it supports it, yes.

18        Q.   Doctor, do you believe any statements made by

19   the FDA concerning the safety of the TVT obturator

20   device provide significant support for your opinions in

21   this case?

22             MR. KOOPMANN:  I'll object to the form.

23             THE WITNESS:  It was not my principal source

24   for forming my opinion, so it's hard for me to define

25   significant.  I -- it was part of my opinion, but of

Mareeni Stanislaus, M.D.

1    minimal significance.

2    BY MR. JACKSON:

3        Q.   And, Doctor, just generally in regards to the

4    drafting of your report in this case, was it something

5    where you sat down and wrote all 19 pages at once or did

6    you sort of work as you went along?

7        A.   I worked as I went along.

8        Q.   Okay.  And, Doctor, were you -- strike that.

9            Doctor, did you sort of go section by section

10   or just sort of -- how did you go about drafting your

11   report?

12       A.   Yes.  I started with the introduction and then

13   I worked section by section.  But I might have done a

14   few sections on the same day.

15       Q.   And, Doctor, are there any opinions you intend

16   to offer at trial about the TVT obturator device that

17   are not contained in this report?

18       A.   No.  My opinions are in this report.

19       Q.   Doctor, do you intend to offer any opinions at

20   trial about the TVT retropubic device?

21       A.   No.

22       Q.   Okay.  Doctor, would you agree with me that

23   you spend several pages in this report discussing the

24   TVT retropubic device?

25       A.   I agree, yes.

Mareeni Stanislaus, M.D.

1      Q.    Doctor, why do you discuss the TVT retropubic

2   device in your TVT obturator report?

3      A.    Because the TVT retropubic and the TVT

4   obturator, I generally feel, they're modifications of a

5   similar technique.

6      Q.    Doctor, how are the TVT retropubic device and

7   the TVT obturator device different?

8      A.    They employ a different mode of delivery, so

9   they -- the device is implanted in a different direction

10   in the body.

11      Q.    Is it fair to say they have a different

12   surgical technique?

13      A.    Yes, they do have a different surgical

14   technique, yes.

15      Q.    Doctor, do you intend to opine at trial that

16   mid-urethral slings are the gold standard for SUI

17   surgical treatment?

18      A.    I do, yes.

19      Q.    Okay.  And what is that based on?

20      A.    The overwhelming body of evidence stating

21   their effectiveness, and their common use by urologists

22   and gynecologists for the treatment of stress urinary

23   incontinence.  It is the principally performed

24   procedure.

25      Q.    Okay.  And, Doctor, do you intend to opine at

Mareeni Stanislaus, M.D.

1   trial that the TVT obturator device is the gold standard

2   for SUI surgical treatment?

3       A.   Only insofar as it is part of the class of

4   mid-urethral slings.

5       Q.   Doctor, is it fair to say you can't point to

6   any specific documents that refer to the TVT obturator

7   as the gold standard for SUI treatment?

8       A.   May I take one moment?  I think most of my

9   articles point to mid-urethral slings in general as

10  being the gold standard, but there may be one that

11  states the TVT-O.

12      Q.   If you don't mind, maybe you can look for that

13  over a break --

14      A.   All right.

15      Q.   -- and you can come back to that.

16           Doctor, why don't we say if you come across an

17  article that specifically refers to the TVT obturator as

18  the gold standard for SUI treatment, you'll make sure to

19  let me know while we're on the record today; is that

20  fair?

21      A.   That's fair.

22      Q.   Okay.  Doctor, if I could ask you to turn to

23  page 6 of your report.

24           Doctor, I'm just looking at the last sentence

25  on this page that says, "The TVT was introduced in the

Mareeni Stanislaus, M.D.

 1    U.S. in 1998, and soon became the gold standard for SUI

 2    surgical treatment."

 3              Did I read that correctly?

 4         A.   Yes, you did.

 5         Q.   And in this sentence when you say "TVT," are

 6    you just referring to the TVT retropubic non-Exact

 7    product?

 8         A.   Yes.

 9         Q.   Doctor, when did the TVT retropubic device

10    become the gold standard for stress urinary

11    incontinence?

12         A.   One cannot assign a specific date to that.

13         Q.   Doctor you say here, "It soon became the gold

14    standard after it was introduced in 1998."  Can you give

15    us an idea of what you mean by "soon" here?

16         A.   Oh, 2004.

17         Q.   So, Doctor, it's your testimony that in 2004

18    the TVT retropubic was the gold standard for SUI

19    treatment?

20         A.   It's my testimony that the mid-urethral

21    polypropylene sling became the gold standard in

22    approximately 2004.

23         Q.   Doctor, what is your definition of gold

24    standard?

25         A.   The procedure to which all others should be

Mareeni Stanislaus, M.D.

1  measured.

2      Q.   And, Doctor, do you intend to opine at trial

3  that the design of the TVT obturator device makes it

4  safe and effective?

5      A.   Yes.

6      Q.   Okay.  And, Doctor, do you have any experience

7  designing a medical device yourself?

8      A.   Yes.

9      Q.   And what experience is that?

10     A.   Consulting with engineers on development of a

11  product for a postpartum hemorrhage, and offering my

12  opinions through surgeries, feedback to companies in the

13  use of their products in the human body.

14     Q.   Okay.  And, Doctor, do you have any experience

15  designing a medical device for SUI treatment?

16     A.   Insofar that I offered feedback, yes.  I have

17  not tried to design a device for commercial use.  But in

18  my practice performing incontinence surgeries, there

19  have been times where I've had to modify present

20  instruments.  So, yes, I've designed things to help me

21  in my surgeries.

22     Q.   Doctor, just so I'm clear, when you say you've

23  designed things to help you in your surgeries, do you

24  just mean you've made modifications to devices for you

25  to use yourself?

Mareeni Stanislaus, M.D.

1      A.   Yes, uh-huh.

2      Q.   Doctor, have you designed any medical devices

3  for SUI repair that have been commercialized for others

4  to use?

5      A.   Not that I have brought to the commercial

6  production, no.

7      Q.   And, Doctor, have you ever designed a

8  polypropylene mesh device of any kind?

9      A.   Only insofar as I've provided feedback to the

10  reps that have introduced them to me, but, no, I have

11  not originally designed one, no.

12      Q.   Okay.  Doctor, the TVT obturator device is

13  inserted through something called the inside-out

14  approach; is that correct?

15      A.   Correct.

16      Q.   And do you intend to opine at trial that the

17  inside-out surgical technique is preferable to other

18  transobturator techniques?

19      A.   I would intend to opine at trial it is

20  preferable in my hands to other techniques, but as a

21  general statement I would not opine that.

22           MR. JACKSON:  Okay.  We have been going for a

23  little over an hour.  Why don't we take a break.

24           MR. KOOPMANN:  Sure.

25           THE VIDEOGRAPHER:  This marks the end of Disk

Mareeni Stanislaus, M.D.

1    1, Volume I, videotaped deposition of Dr. Mareeni

2    Stanislaus.  The time on the monitor the 2:23 p.m.

3              We are now off the record.

4              (Recess.)

5                        (Exhibit 6-A was marked for

6                        identification and attached hereto.)

7                        (Exhibit 6-B was marked for

8                        identification and attached hereto.)

9                        (Exhibit 6-C was marked for

10                       identification and attached hereto.)

11                       (Exhibit 6-D was marked for

12                       identification and attached hereto.)

13                       (Exhibit 6-E was marked for

14                       identification and attached hereto.)

15                       (Exhibit 6-F was marked for

16                       identification and attached hereto.)

17                       (Exhibit 6-G was marked for

18                       identification and attached hereto.)

19             THE VIDEOGRAPHER:  We are back on the record.

20   This marks the beginning of Disk 2, Volume I, in the

21   videotaped deposition of Dr. Mareeni Stanislaus.  The

22   time on the monitor is 2:36 p.m.  We're back on the

23   record.

24             MR. JACKSON:  While we were off the record we

25   marked as Exhibit 6-A through 6-G binders that

Mareeni Stanislaus, M.D.

```
 1    Dr. Stanislaus brought with her.

 2            6-A is titled "SUI Mesh Documents, Binder 1."

 3    6-B is titled "TVT Company Documents."  6-C is titled

 4    "TVT-O Company Documents."  6-D is titled "TVT Medical

 5    Literature."  6-E is titled "TVT Company/FDA Documents."

 6    6-F is titled "SUI Mesh Documents, Binder 2."  And 6-G

 7    is titled "TVT literature and Position Statements."

 8        Q.   Dr. Stanislaus, have you been able to locate

 9    anything indicating what the TVT stress urinary

10    incontinence document in the reliance list may be?

11        A.   I'm sorry.  Which one were you referring to?

12        Q.   I'm on the tabbed page, the reliance list.

13        A.   Yes.

14        Q.   The last document is entitled "FDA Stress

15    Urinary Incontinence."  Have you yet been able to

16    determine what that document refers to?

17        A.   No.

18        Q.   Okay.  Thank you.

19            Doctor, would you agree with me that it's

20    appropriate for a physician who is going to implant the

21    TVT-O device to have read the instructions for use prior

22    to implanting the device?

23        A.   At some point, yes, the instructions for use.

24        Q.   It doesn't need to be right before they

25    implant it.
```

Mareeni Stanislaus, M.D.

```
 1        A.   Yes.

 2        Q.   But would you agree they would need to have

 3   read it prior to implanting the device?

 4        A.   Yes.

 5        Q.   And, Doctor, have you personally read the

 6   TVT-O instructions for use prior to implanting the

 7   device?

 8        A.   Yes.

 9        Q.   And, Doctor, is it appropriate for a physician

10   to rely on those TVT-O instructions for use to provide a

11   list of known risks associated with the TVT-O device?

12        A.   No, it is not appropriate.

13        Q.   And why not?

14        A.   Because surgeons should rely on their training

15   to know how to perform a procedure, their training being

16   their training in medical school, residency, and in

17   practice.  They should also rely on discussions with

18   their colleagues and on literature reports to really

19   determine the way to perform a procedure.

20        Q.   Okay.  Doctor, would you agree with me that

21   the TVT-O IFU is one of many pieces of information a

22   physician should consider to determine the risks of the

23   TVT-O device?

24        A.   It is one of many, but it really should not be

25   the place you look for risks of a device.
```

Mareeni Stanislaus, M.D.

```
 1        Q.   Okay.  Doctor, do you believe the instructions

 2   for use for the TVT obturator is an important document?

 3             MR. KOOPMANN:  Object to the form.

 4             THE WITNESS:  Important is a very subjective

 5   thing, but yes.  I mean, it's an important document,

 6   sure.

 7   BY MR. JACKSON:

 8        Q.   Doctor, in your practice as someone who

 9   implants the TVT obturator device, do you consider the

10   TVT-O IFU an important tool in learning about risks?

11        A.   No.

12        Q.   Okay.  So, Doctor, why did you discuss the

13   TVT-O IFU in your report?

14             MR. KOOPMANN:  Object to the form.

15             THE WITNESS:  Because it was my understanding

16   that Plaintiffs' experts may refer to the IFU.  I

17   thought it would be an important thing to discuss.

18   BY MR. JACKSON:

19        Q.   But, Doctor, you don't independently think

20   it's an important thing to discuss?

21             MR. KOOPMANN:  Object to the form.

22             THE WITNESS:  Sorry.  To discuss in what

23   context?

24   BY MR. JACKSON:

25        Q.   Doctor, do you believe the instructions for
```

Mareeni Stanislaus, M.D.

```
 1    use for the TVT obturator is relevant to assessing the

 2    safety of the TVT obturator?

 3        A.   No, I don't actually believe that.

 4        Q.   Okay.  And, Doctor, is it your testimony that

 5    you only included a section on the TVT-O instructions

 6    for use in your report because you said you think

 7    Plaintiffs' experts think it's important?

 8        A.   Yes, that is why.  And I -- yes, that is why.

 9        Q.   Okay.

10        A.   Uh-huh.

11        Q.   Doctor, what opinions do you intend to offer

12    at trial about the TVT-O instructions for use?

13        A.   What I've outlined in my report.

14        Q.   And, generally, what is your opinion with

15    regard to the TVT-O IFU in this case?

16        A.   Well, that it's a document that's explains

17    what the device is and how it's to be used.

18        Q.   Do you hold an opinion in this case that the

19    TVT-O IFU is sufficient with regard to the information

20    that it provides about the TVT-O device?

21        A.   Yes.  It's an instructions for use document,

22    and it provides sufficient information on how to use it.

23        Q.   Doctor, do you believe it's a company's

24    response -- strike that.

25             Doctor, do you believe it's Ethicon's
```

Mareeni Stanislaus, M.D.

 1    responsibility to provide -- strike that.

 2          Doctor, do you believe it's Ethicon's

 3    responsibility to warn of the risks associated with the

 4    TVT-O device?

 5          A.    It is -- well, anyone that knows of a risk of

 6    a device has an ethical responsibility to report risks;

 7    so, in that sense, yes.  But I would suggest that they

 8    would need to limit it to risks that are specific to the

 9    device that they're making.

10          Q.    Okay.  Doctor, would you -- would you agree

11    with me that synthetic mesh carries additional risks

12    that are not present in other SUI treatments?

13          A.    Yes, there are different risks.

14          Q.    But the risks that come with polypropylene

15    mesh surgery that are not associated with autologous

16    fascial slings, for example.

17          A.    Yes.

18          Q.    What are some of those risks?

19          A.    Exposure of the polypropylene material.

20    That's the principal one.

21          Q.    Okay.  And, Doctor, would you agree that

22    polypropylene mesh because it's a synthetic material can

23    cause a foreign body response?

24          A.    Yes, any synthetic material will cause a

25    foreign body response as it is a foreign body.

Mareeni Stanislaus, M.D.

1        Q.    Doctor, just a minute ago you mentioned

2     polypropylene -- I'm sorry, Doctor, you mentioned just a

3     minute ago mesh exposure, correct?

4        A.    Yes.

5        Q.    And is your understanding that mesh exposure

6     and mesh erosion are two different concepts?

7        A.    I do use them differently for the most part.

8        Q.    Okay -- I'm sorry.

9              What's the difference in your understanding?

10       A.    Exposure is visibility of the mesh externally.

11    So exposure through the vaginal mucosa.  And erosion I

12    generally consider it to be eroding into an internal

13    organ, so -- such as the bladder or the urethra.

14       Q.    Okay.  Doctor, do you believe that the

15    implantation of the TVT device can cause chronic

16    inflammation?

17       A.    It's a, generally, a very rare event but

18    chronic inflammation can occur, yes.

19       Q.    Doctor, do you -- strike that.

20             Doctor, what's the difference between chronic

21    pain and transient pain following a surgery in your

22    practice?

23       A.    Oh, in my practice?  Chronic pain would be

24    pain that lasted beyond three months postoperatively.

25       Q.    Okay.  And is transient pain just normal

Mareeni Stanislaus, M.D.

1    postoperative pain?

2        A.    Transient pain is a pain of short duration

3    and, yes, that would typically be immediately related in

4    time to the surgery.  So postoperatively, yes.

5        Q.    Is it fair to say that transient pain resolves

6    and chronic pain continues for at least longer than

7    three months?

8        A.    Correct.  Yes, that would be fair to say.

9        Q.    And, Doctor, would you -- would you agree with

10   me that other physicians in your field would have a very

11   similar definition of chronic versus transient pain?

12       A.    I imagine so.  I haven't discussed it

13   specifically, but I imagine so, yes.

14       Q.    Okay.  Doctor, is there a significant

15   difference between chronic postoperative pain that may

16   last longer than three months and transient postsurgical

17   pain?

18       A.    Well, I mean by definition they're different

19   in length of time.  So, yes, there's a difference and

20   it's significant, sure.

21       Q.    Okay.  Doctor, you cite a lot of literature in

22   your report, correct?

23       A.    Yes, I do.

24       Q.    And, just generally, in your report do you

25   cite any literature that tracks chronic long-term pain

Mareeni Stanislaus, M.D.

1   following the TVT obturator?

2       A.    I do believe the meta-analysis discuss pain

3   outside the postop period, yes, so I do, uh-huh.

4       Q.    Can you name a study, for example, that you

5   believe tracks chronic long-term pain after the TVT-O

6   device?

7       A.    The Ford study and the Cochrane review.

8             (Reporter clarification.)

9       A.    The Ford study and the Cochrane review.  The

10  Angioli study as well.

11      Q.    Doctor, is there a randomized clinical trial

12  anywhere that has patient safety as a primary endpoint?

13      A.    Yes.

14      Q.    Can you give me an example of the study?

15      A.    The Angioli study.

16      Q.    And patient safety is a primary endpoint in

17  the Angioli study?

18      A.    Yes, it was one of the primary endpoints,

19  uh-huh.

20      Q.    Doctor, are there studies that track

21  dyspareunia, or painful sexual intercourse, as a primary

22  endpoint?

23      A.    I really would have to review my reliance

24  list.  I don't remember the specifics of the exact

25  primary endpoints of all these studies.  I think

Mareeni Stanislaus, M.D.

1    dyspareunia would be lumped into pain.  So insofar as it

2    was lumped in, yes, there are studies.

3          Q.   Are you aware of any studies that specifically

4    look at pain with intercourse or you think they'd just

5    all be lumped in with pain generally?

6          A.   I -- let me rephrase it.  I do think there is

7    a couple in here that specifically refer to dyspareunia,

8    yes.

9          Q.   And can you name any of those studies here?

10         A.   It would take me a moment to look through.  So

11   no.  If you give me a moment, I will look through and

12   show you.

13         Q.   Sure.

14              (Pause while witness peruses documents.)

15         A.   Specific to dyspareunia?

16         Q.   Doctor, I tell you what, is that something we

17   can come back to and you can maybe check on a break?

18   Would that be okay?

19         A.   Yes, that would be okay.

20         Q.   Doctor, would you agree with me that one or

21   more revision surgeries may be necessary to treat

22   adverse reactions after a TVT-O implant?

23         A.   Yes, revision surgery is sometimes necessary.

24         Q.   And sometimes that can be more than one

25   revision surgery?

Mareeni Stanislaus, M.D.

1      A.    Incredibly rarely.  I mean, TVT-O has the

2   lowest risk of requiring revision surgery of any

3   incontinence procedure.  But, yes, it can --

4      Q.    And what's --

5      A.    -- be done more than once.

6      Q.    I'm sorry.

7            And, Doctor, what's your basis for saying that

8   TVT-O has the lowest rate of complications?

9      A.    The Cochrane review suggested a -- that a less

10  than 3 percent risk of exposure --

11     Q.    Okay.

12     A.    -- and a low rate of urinary retention.  My

13  clinical experience between the retropubic and the

14  obturator is there's less retention with the obturator.

15  But, yes, there's literature showing that it's got a

16  very, very low complication rate and reoperation rate.

17     Q.    Okay.  And, Doctor, are you aware of any

18  literature showing that the TVT-O has higher rates of

19  complications than the 3 percent erosion rate you just

20  mentioned?

21     A.    Oh, yes, there are studies.  But, you know, I

22  tried to look at the high-quality studies.

23     Q.    Okay.  Doctor, is it your testimony that

24  studies that show a higher than 3 percent rate of

25  complications with the TVT-O are not high-quality

Mareeni Stanislaus, M.D.

```
 1   studies?

 2        A.   No, not -- no, that is not my testimony.  I am

 3   sure there are some studies that show a higher than

 4   3 percent rate.  But I believe the higher quality

 5   studies show approximately 3 percent or less rate.

 6        Q.   Doctor, do you believe that the entire TVT

 7   obturator can be removed after it's ingrown into a

 8   woman's tissues?

 9        A.   I -- I believe that would be exceedingly

10   difficult.  I suppose it's possible --

11        Q.   Okay.

12        A.   -- but not worth doing so.

13        Q.   Is it fair to say it might require aggressive

14   dissection to get an entire TVT obturator out after its

15   been ingrown?

16        A.   It would be fair to say that there is no

17   reason to ever aggressively dissect and remove an entire

18   TVT-O.  But if that was one's desire, yes, it would

19   require extensive dissection.

20        Q.   Doctor, have you personally performed surgery

21   to take TVT device -- I'm sorry.  Strike that.

22             Doctor, have you personally performed revision

23   procedures on TVT obturator devices?

24        A.   Yes, I have.

25        Q.   And about how many revision procedures have
```

Mareeni Stanislaus, M.D.

```
1   you performed on TVT obturator devices?

2        A.   Specific to the TVT-O, I don't remember

3   exactly.  Not very many.  Perhaps two or three.

4        Q.   And, Doctor, were those two or three instances

5   something where you were just trimming the mesh or were

6   they a more advanced removal procedure?

7        A.   Again, one would have to define advanced

8   removal.  One of them was trimming the mesh.  One of

9   them involved some dissection to remove most of the

10  visible -- sorry -- most of the mesh up to a distance of

11  a couple of centimeters either way.  So I suppose that's

12  extensive, uh-huh.

13       Q.   And, Doctor, have you ever removed a TVT

14  obturator in its entirety?

15       A.   No, I have not.

16       Q.   Do you know anyone who ever has?

17       A.   No, I do not.

18       Q.   Doctor, the way to manage complications with a

19  TVT-O device is typically to remove a portion of the

20  mesh; is that correct?

21            MR. KOOPMANN:  Object to form.

22            THE WITNESS:  Not necessarily, no.  It depends

23  on what the complication is.

24  BY MR. JACKSON:

25       Q.   Okay.  Doctor, if a patient has a mesh erosion
```

Mareeni Stanislaus, M.D.

1    or an exposure of the TVT-O device, is a way to manage

2    that complication to typically remove part of the

3    device?

4         A.    The first treatment you would use would be

5    estrogen cream to promote vaginal healing and

6    epithelialization.  But if that is not effective,

7    certainly portions of the mesh can be removed.

8    Typically, though, that can just be done in the office.

9         Q.    Okay.  And if a physician is removing a

10   portion of a TVT-O device, the physician has to make a

11   judgment call about how much of the device to remove,

12   correct?

13        A.    Every time a surgeon enters the operating room

14   we make multiple extensive judgment calls with every

15   step we make, with every cut we -- we perform.  So, yes,

16   absolutely.

17        Q.    Okay.  So you'd certainly agree that the

18   amount of mesh that a surgeon was removing is a judgment

19   call?

20        A.    Well, yes, as well as is the decision to

21   perform incontinence surgery in the first place, yeah,

22   sure.

23        Q.    And if a doctor decides to only remove a small

24   portion of a mesh, you're certainly not here to fault a

25   doctor for choosing how much mesh to remove, correct?

Mareeni Stanislaus, M.D.

1            MR. KOOPMANN:  Object to form.

2            THE WITNESS:  That's -- it seems a rather

3    hypothetical situation, but I don't think I was asked to

4    fault a physician for any of their specific decisions,

5    no.

6    BY MR. JACKSON:

7        Q.   Okay.  And, Doctor, do you specifically treat

8    patients for chronic pain following TVT obturator

9    surgery?

10       A.   Well, I have not had any patients with chronic

11   pain in -- following TVT obturator surgery in my

12   practice.  Would I be willing to treat them?  Certainly.

13       Q.   Okay.  And, Doctor, you mentioned that on two

14   or three occasions you have performed revision

15   procedures of TVT obturators; is that correct?

16       A.   Yes, that is correct.

17       Q.   And are those revision procedures something

18   you report to the FDA as adverse events?

19       A.   No, I did not report those.

20       Q.   And, Doctor, on the two or three TVT-O

21   revision procedures you've performed, did you perform

22   any tests on the mesh that was removed?

23       A.   I did not, no.  Well, other than, you know,

24   looking at it visually.  Certainly I had to look at

25   everything.  It was -- I imagine that the specimen was

Mareeni Stanislaus, M.D.

```
 1   sent to pathology.  I didn't send it away for any

 2   specific testing, if that's what you mean.

 3        Q.   Okay.  Are you aware of whether those

 4   specimens were sent to pathology or are you just

 5   guessing?

 6        A.   Specimens are always sent to pathology, so

 7   they would have been, yeah, uh-huh.

 8        Q.   And would you have reviewed those pathology

 9   reports?

10        A.   Yes.

11        Q.   Do you remember anything specific about those

12   pathology reports?

13        A.   They were unremarkable, so, no, I do not.

14        Q.   Doctor, are you aware of underreporting of

15   adverse events in your profession?

16             MR. KOOPMANN:  Object to form.

17             THE WITNESS:  Adverse events occur every day.

18   Not everything is reported.

19   BY MR. JACKSON:

20        Q.   Doctor, have you ever tested a TVT obturator

21   mesh for degradation?

22        A.   Yes, I've looked at it.  I've seen it when

23   I've had to go in on repeat procedures, sure.  It seems

24   to be very well intact when I've seen it in human

25   bodies, sure.
```

Mareeni Stanislaus, M.D.

1       Q.   And that's just based on your visual

2   inspection without any instruments; is that correct?

3       A.   My visual inspection, my palpation, and, of

4   course, you know, its -- its effectiveness in the body

5   over long-term.

6            I mean, I have patients now that I have been

7   seeing since 2002, and their meshes are still in place.

8   So presume they are still there working without

9   degradation.

10      Q.   And, Doctor, when you say you've tested a

11  TVT-O device for degradation, your concept for testing

12  there is you visually inspected it and not seen any

13  degradation, and the device is still working in the body

14  so there must not have been any degradation; is that

15  correct?

16      A.   Yes, it would be -- my personal testing of it

17  would be a clinical evaluation of the product over time,

18  yes.

19      Q.   Do you believe there's a clinical significance

20  to degradation?

21      A.   I don't really believe that it's occurring.

22  But if it were occurring, the clinical significance

23  would be the procedure would no longer work.

24      Q.   And so because the procedure's still working

25  there must not have been any degradation; is that

Mareeni Stanislaus, M.D.

```
 1   correct?

 2       A.   That's correct, yes.

 3       Q.   Okay.  Doctor, are you familiar with the

 4   chemical process of oxidative degradation, whether you

 5   agree with it or not?

 6       A.   I'm sure, uh-huh, yes.

 7       Q.   And, Doctor, have you ever looked at

 8   polypropylene mesh under a microscope?

 9       A.   No, I have not.  I've seen pictures of it

10   described, but, no, I haven't personally.

11       Q.   Doctor, have you ever asked a pathologist

12   about polypropylene degradation?

13       A.   No.  I speak with pathologists all the time,

14   but that hasn't really been a question that I would

15   think to ask.  Because the times I've removed

16   polypropylene, it looks perfectly intact and undegraded.

17   So, no, I have not specifically asked that question, no.

18       Q.   Doctor, are you aware of published

19   peer-reviewed scientific literature that suggests that

20   polypropylene mesh degrades in the body by oxidative

21   degradation?

22       A.   Yes, I am aware of literature that states that

23   polypropylene degrades.

24       Q.   And you've never -- is it fair to say you've

25   never asked a pathologist whether the polypropylene mesh
```

Mareeni Stanislaus, M.D.

```
 1    does, in fact, degrade inside the body?

 2         A.    As I said, I had no reason to ask a

 3    pathologist that question.  I'm aware of literature that

 4    states that it degrades, but I'm also aware of

 5    literature that states that it does not degrade.  It

 6    wasn't really clinically relevant to me to ask a

 7    pathologist whether it's degrading.

 8         Q.    Okay.  Doctor, do you know what type of

 9    polypropylene is in the Ethicon SUI products?

10         A.    Polypropylene.  I think there's only one type.

11         Q.    Okay.  It's the same?

12         A.    Right.

13         Q.    And do you know who manufactures the actual

14    polypropylene?  Not the mesh, the actual polypropylene.

15         A.    And, once again, that wasn't particularly

16    clinical relevant to me.  I did see somewhere in these

17    documents that it may have been manufactured by Sinoco.

18    But, again, I couldn't tell you with 100 percent

19    certainty that that's where it came from.

20         Q.    And, Doctor, do you know whether there are

21    antioxidants added to Ethicon's propylene?

22         A.    Oh, yes, there are, uh-huh.

23         Q.    And do you know whether pure polypropylene

24    without antioxidants can degrade?

25         A.    Gosh, I haven't ever used pure polypropylene
```

Mareeni Stanislaus, M.D.

1  without the antioxidants so I don't know.

2      Q.   Okay.  Doctor, have you ever performed any

3  independent studies to determine whether polypropylene

4  degrades?

5      A.   As I said, I've, you know, looked at the

6  material as I've used it, seen it in the body over time,

7  but I haven't published any papers, no.

8          MR. JACKSON:  If we could mark this Exhibit 8,

9  please.

10                  (Exhibit 8 was marked for

11                  identification and attached hereto.)

12  BY MR. JACKSON:

13      Q.   Doctor, I'm going to represent to you that

14  this is a version of the instructions for use for the

15  TVT obturator.  It says "2003" on the bottom of the

16  first page.

17      A.   Yes, it does.

18      Q.   I believe this version was in effect from 2003

19  to 2004.  This one is on your reliance list, I'll tell

20  you that.

21          Doctor, if I could ask you to turn to the page

22  of this document that says 5 in the middle of the

23  bottom.

24      A.   Okay.

25      Q.   And the number stamped at the bottom

Mareeni Stanislaus, M.D.

1    right-hand corner ends in 0834.  Are you on that page?

2         A.   Yes, I am.

3         Q.   Okay.  Doctor, do you see the section in the

4    middle that says "Contraindications"?

5         A.   Yes, I do.

6         Q.   And it says, "As with any suspension surgery,

7    this procedure should not be performed on pregnant

8    patients.  Additionally, because polypropylene mesh will

9    not stretch significantly, it should not be performed in

10   patients with future growth potential, including women

11   with plans for future pregnancy."

12             Did I read that correctly?

13        A.   Yes, you did.

14        Q.   Doctor, would you agree with me that this

15   version of the instructions for use doesn't say, for

16   example, that the TVT-O should not be used in obese

17   women?

18        A.   No, it does not say it should not be used.

19        Q.   It doesn't say it should not be used in women

20   who smoke?

21        A.   Why would it say that?  But, yes, no, it

22   doesn't say that.

23        Q.   And it doesn't say it should not be used in

24   women with weak connective tissue?

25        A.   Wouldn't that be terrible if we couldn't use

Mareeni Stanislaus, M.D.

1   it in any of those women.  They'd walk around leaking

2   urine all over the place.  But, no, it does not say

3   that.

4        Q.   Doctor, is it fair to assume that Ethicon

5   would have known that a certain -- a certain proportion

6   of the women implanted with the device would be obese?

7             MR. KOOPMANN:  Object to form.

8             THE WITNESS:  Well, insofar as the majority of

9   the U.S. population is trending towards obesity, and

10  that obesity is a risk factor for incontinence,

11  certainly this device should be expected to be used in

12  obese patients.

13  BY MR. JACKSON:

14       Q.   Fair enough.  And Ethicon did not say that

15  those women couldn't get this device, did they?

16       A.   No.  No, they didn't.

17       Q.   Okay.  And if Ethicon thought that those obese

18  women should not get the device, is that something they

19  would have put in their warning information?

20            MR. KOOPMANN:  Object to form.  Foundation.

21            THE WITNESS:  I don't really feel that Ethicon

22  should put such a statement in their IFU.  Whether they

23  would have, I -- I really don't know.  Well, they

24  didn't, so they -- they didn't.

25  BY MR. JACKSON:

Mareeni Stanislaus, M.D.

1    Q.   Sure.  And, Doctor, why don't you think such a

2    statement should have been put in the IFU?

3    A.   Well, because for the reasons I stated

4    earlier, that obesity is a huge risk factor for

5    incontinence because incontinence is an incredible

6    public health problem for women.

7         Surgical procedures need to be developed and

8    exist for these women.  The TVT-O device, in particular,

9    happens to be a much safer procedure for an obese woman

10   than other procedures.  So I think it might be

11   misleading to put in an IFU that it shouldn't be used in

12   an obese woman.

13   Q.   Doctor, the TVT obturator device is obviously

14   intended for women with stress urinary incontinence,

15   correct?

16   A.   That is correct.

17   Q.   As you said, many women with stress urinary

18   incontinence also have other comorbidities, correct?

19   A.   That is absolutely correct, yes.

20   Q.   And, Doctor, in your opinion, the TVT-O device

21   is a perfectly acceptable device for these women despite

22   their comorbidities, correct?

23        MR. KOOPMANN:  Object to form.

24        THE WITNESS:  In every situation a surgeon has

25   to consider the risks and benefits as they pertain to a

Mareeni Stanislaus, M.D.

```
 1   particular patient.  So in the correct patient, a TVT-O

 2   device is an acceptable device to use, yes.

 3   BY MR. JACKSON:

 4        Q.   Doctor, can you give me an example of

 5   comorbidity that you may see in a patient where you

 6   would choose not to implant the TVT-O device?

 7        A.   Prior radiation to the pelvis.

 8        Q.   Okay.  And why would prior radiation to the

 9   pelvis indicate you to not implant the TVT-O device?

10        A.   Because of poor tissue healing.

11        Q.   Okay.  And is that kind of common knowledge

12   that any surgeon would know?

13        A.   Yes.

14        Q.   Okay.  Doctor, do you see the first bullet

15   point on this same page 5 under Warnings and Precautions

16   where it says, "Do not use Gynecare TVT obturator

17   procedure for patients who are on anticoagulation

18   therapy"?

19        A.   I do.

20        Q.   And is it fair to say a surgeon would not want

21   to implant the TVT-O device on a patient who's on

22   Xarelto, for example?

23        A.   So a surgeon would not want to perform any

24   surgery on a patient that was on anti-coagulation,

25   including Xarelto.  So, yes, that's not just limited to
```

Mareeni Stanislaus, M.D.

1    the TVT-O.

2         Q.   But certainly including the TVT-O?

3         A.   Yes.

4         Q.   And that's because the patient could start

5    bleeding during the procedure, right?

6         A.   Absolutely, yes, uh-huh.

7         Q.   Okay.  And that is certainly common knowledge

8    among surgeons, correct?

9         A.   Yes, it is.

10        Q.   Okay.  Doctor, are you offering yourself as an

11   expert in what should and what should not be included in

12   the TVT obturator devices warnings?

13        A.   I am offering myself as an expert in -- in

14   that, yes.

15        Q.   So you feel like you're an expert in what

16   should and should not be in TVT-O warnings?

17        A.   Insofar as the warnings are directly related

18   to me as a surgeon, yes, I am an expert.

19        Q.   Doctor, if I can ask you to turn to the next

20   page of this document, which says page 6, in the middle.

21   The last four in the bottom right-hand corner are 0835.

22   Do you see the adverse reaction section?

23        A.   Yes.

24        Q.   Okay.  The second bullet point says,

25   "Transitory local irritation at the wound site and a

Mareeni Stanislaus, M.D.

```
 1    transitory foreign body response may occur.  These

 2    responses could result in extrusion, erosion, fistula

 3    formation and inflammation."

 4          Did I read that correctly?

 5    A.   Yes, you did.

 6          MR. KOOPMANN:  Object to the form.

 7    BY MR. JACKSON:

 8    Q.   And, Doctor, we discussed the definition of

 9    transitory to mean what would be typical postoperative

10    pain, correct?

11    A.    Correct.

12    Q.   And transitory pain is certainly different

13    from long-term chronic pain, correct?

14    A.   Yes.

15    Q.   And, Doctor, is there anywhere in this

16    warnings and precautions section or adverse reaction

17    section where it mentions long-term pain?

18    A.   So it does not specifically state long-term

19    pain, but they do mention puncture of nerves.  And it

20    also is common knowledge to any surgeon that any surgery

21    can result in a chronic long-term pain.  So perhaps not

22    necessary to state that.

23    Q.   Okay.  Whether you believe it's necessary or

24    not, would you agree there's no specific mention of

25    long-term or chronic pain?
```

Mareeni Stanislaus, M.D.

```
 1              MR. KOOPMANN:  Object to form.

 2              THE WITNESS:  Puncture of a nerve by inference

 3     suggests long-term chronic pain.  But, no, it does not

 4     specifically state chronic pain here.

 5     BY MR. JACKSON:

 6        Q.   Okay.  And, Doctor, is there any mention of

 7     acute pain?

 8        A.   Well, again, that -- it's common knowledge

 9     that all surgeries cause acute pain.  As I'm reading

10     this again now, transitory, local irritation equates to

11     pain in my definition.  So it does refer to transient

12     pain, yes.

13        Q.   Okay.  And is transient pain the same as acute

14     pain in your practice?

15        A.   Oh, yes, certainly.

16        Q.   Okay.  Doctor, would you agree with me that

17     there's no mention specifically of pain with intercourse

18     in the adverse reactions or the warnings and precautions

19     section of this document?

20        A.   And, once again, that's just simply a known

21     factor when you're performing surgery in the pelvis that

22     dyspareunia is a potential event.  So I don't know why

23     they would specifically put that in there, but I do not

24     see the specific word dyspareunia, no.

25        Q.   Doctor, your testimony is that pain with
```

Mareeni Stanislaus, M.D.

1    intercourse is known to pelvic surgeons who are going to

2    be implanting a mesh device?

3         A.   Yes, that is my testimony.

4         Q.   And so that it doesn't need to be included in

5    here because it's a known risk?

6         A.   Of pelvic surgery, yes.

7         Q.   Okay.  Doctor, do you know whether there was

8    ever any language in the TVT IFU prior to 2015 to the

9    effect that there may be more than one revision surgery

10   required after implantation?

11        A.   To my knowledge, prior to 2015, no.  But,

12   again, that is, you know, sort of common knowledge that

13   if one has an adverse event from a procedure, that

14   revision surgeries need to be done.  I mean, even

15   without using a tape I sometimes have to revise pelvic

16   surgery multiple times.

17        Q.   Doctor, this document mentions that the TVT-O

18   should not be implanted in patients who are on

19   anticoagulation therapy, correct?

20        A.   Correct.

21        Q.   We said that's common knowledge.

22        A.   Yes, that is correct.

23        Q.   It's fair to say there's some common knowledge

24   that was included by Ethicon in this document, correct?

25        A.   Yes, that is correct.  But, again, if they

Mareeni Stanislaus, M.D.

1   were to put in everything that's common knowledge, this

2   document would have to span years of training.  It would

3   probably be 25,000 pages long.  I don't think everything

4   I learned about common knowledge happened from a

5   one-page document.

6        Q.   Doctor, the TVT-O device is designed to be

7   implanted without tension, correct?

8        A.   Yes, that is correct.

9        Q.   Okay.  And, Doctor, when you're implanting a

10  TVT-O device, how do you determine whether there's any

11  tension on the device?

12       A.   I place a dilator between the urethra and the

13  tape.  And then as I'm removing the sheath, I make sure

14  that it doesn't move so that there's a little space

15  beneath the urethra.

16       Q.   Doctor, is it your understanding that Ethicon

17  teaches surgeons how to properly tension the TVT

18  obturator device?

19       A.   Well, yes, they did teach me in the lab, yes.

20       Q.   Doctor, when Ethicon taught you in your TVT

21  obturator training how to tension or test for tension in

22  the TVT obturator device, did they teach you how to

23  account for women who are built differently?

24       A.   I don't recall specifics regarding that.  So

25  when I say Ethicon, I mean these are surgeons hired by

Mareeni Stanislaus, M.D.

1  Ethicon to teach the procedure.  And over time, you

2  know, you consult with surgeons about tensioning.  And

3  in terms of implanting it in a specific anatomical type,

4  that is such an individual situation and decision, it

5  would really be not -- I don't really believe it would

6  be Ethicon's place to specifically teach that.  It would

7  depend on my own knowledge of anatomy.

8      Q.   Okay.  Doctor, do you see the section on this

9  page, page 6, that says "Actions"?

10      A.   Yes.

11      Q.   The last sentence of that paragraph says, "The

12  material is not absorbed nor is it subject to

13  degradation or weakening by the action of tissue

14  enzymes."

15          Do you see that?

16      A.   I do.

17      Q.   Okay.  And do you believe that's a true

18  statement?

19      A.   I do believe that's a true statement, yes.

20      Q.   Doctor, did you read any Ethicon documents

21  specifically dealing with dog studies and Prolene

22  sutures and degradation?

23      A.   Yes, I did.

24      Q.   And if Ethicon had documents that showed that

25  Prolene did, in fact, degrade, would this statement be

Mareeni Stanislaus, M.D.

1   untrue?

2       A.   Not necessary -- I mean, no, it depends on

3   what the clinical quality of the study was and how

4   relevant it is to use in this form.

5       Q.   Doctor, did you read any testimony of a

6   Dr. Barbolt, who's an Ethicon employee, in connection

7   with your work in this case?

8       A.   I'm not certain that -- that name is familiar,

9   but I'm not certain.

10      Q.   Do you recall reading anything an Ethicon

11  employee named Dr. Barbolt may have said about

12  degradation?

13      A.   Sorry, I don't recall.

14      Q.   Doctor, to your knowledge have any Ethicon

15  employees testified under oath that the polypropylene

16  mesh in the TVT obturator device does, in fact, degrade?

17      A.   That it does in fact degrade?

18      Q.   Yes.

19      A.   I -- so I, to my knowledge, I don't actually

20  know that.  But I'm not quite sure why that would be

21  relevant to my opinion.

22      Q.   Doctor, one of the opinions you hold in this

23  case is that the mesh in the TVT obturator device does

24  not degrade, correct?

25      A.   Correct.

Mareeni Stanislaus, M.D.

1      Q.   And you just said that you don't believe that

2   it's relevant whether an Ethicon employee stated that it

3   does degrade?

4      A.   Correct.  Well, I don't know who that employee

5   is.  I don't know what studies he reviewed or what was

6   the basis of his opinion.  I mean, I've worked with the

7   material.  I've seen it in the patient.  I've been

8   practicing 25 -- 24 years as a physician.  I've seen

9   Prolene.  That's been around that long.

10          My experience would dictate that it doesn't

11   degrade.  So, you know, yes, if that employee

12   specifically worked in that field and had done studies

13   and could show that to me, of course, that would be

14   relevant.  But I don't know who this employee is.

15      Q.   Doctor, if I could ask you to take out just

16   your report, which is Exhibit 1.  And if I could ask you

17   to turn to Page 15, please.

18          Doctor, I'm looking at a section entitled,

19   "Plaintiffs' Theories are not Supported by the Published

20   Medical Literature or My Experience."

21      A.   Yes.

22      Q.   Doctor, the second sentence says, "Nor have I

23   seen any evidence of Prolene mesh degradation in my

24   clinical practice.  I have not observed degradation of

25   the mesh in the instances in which I have implanted it."

Mareeni Stanislaus, M.D.

1          Did I read that correctly?

2          MR. KOOPMANN:  Object to form.

3          THE WITNESS:  Yes.

4   BY MR. JACKSON:

5      Q.   So, Doctor, is it your testimony that because

6   you have not seen mesh degradation when you're

7   implanting mesh that there must not be degradation?

8          MR. KOOPMANN:  Objection, Counsel.  You said

9   implanted," and it says "explanted."  And then your

10  follow-up question was based on your misreading of that

11  sentence.

12         MR. JACKSON:  That's my mistake.  I apologize.

13  Let me strike that.

14     Q.   Doctor, the second sentence of this paragraph

15  says, "Nor have I seen any evidence of Prolene mesh

16  degradation in my clinical practice.  I have not

17  observed degradation of the mesh in the instances in

18  which I have explanted it."

19         Did I read that correctly?

20     A.   Yes, you did.

21     Q.   Okay.  And is it your testimony that because

22  you have not observed degradation of explanted mesh in

23  the two to three instances you've explanted it, that it

24  must not be occurring?

25         MR. KOOPMANN:  Object to form.

Mareeni Stanislaus, M.D.

```
 1              THE WITNESS:  I have explanted different types

 2   of polypropylene mesh on more than two to three

 3   occasions.  I was referring specifically to two to three

 4   occasions of the TVT-O device.  I do believe my greater

 5   experience is relevant since the material is the same.

 6   And, yes, I am testifying that my -- that the fact that

 7   I have not observed degradation is the basis of my

 8   statement.

 9              There is also, however, data showing that

10   polypropylene does not degrade.  And there are published

11   articles that also support my clinical impression.

12   BY MR. JACKSON:

13       Q.   Doctor, you cite to a number of published

14   studies in your report, correct?

15       A.   I do, yes.

16       Q.   Are any of those studies specifically to laser

17   cut mesh?

18       A.   To be honest, I'm not certain that they're

19   specific to -- oh, yes, yes, there are.  There were some

20   studies with devices that were only made with the laser.

21   So I do think there are some in there specific to laser,

22   uh-huh.

23       Q.   Okay.  Doctor, would you agree with me that

24   there are -- well, strike that.

25              Doctor, are there any TVT-O specific studies
```

Mareeni Stanislaus, M.D.

```
 1   that you cite in your report that deal specifically with

 2   laser cut mesh?

 3        A.   I don't think so.

 4        Q.   Doctor, are you offering any opinions that

 5   there is a clinical significance -- clinically -- strike

 6   that.

 7             Doctor, are you offering an opinion that there

 8   is a clinical significance between mechanically cut mesh

 9   and laser cut mesh?

10        A.   No, I am not offering opinion that there is a

11   difference clinically.

12        Q.   Doctor, have you seen any Ethicon documents in

13   connection with your work in this case showing that the

14   mechanically cut mesh has a tendency to fray?

15        A.   I think there were some documents with reports

16   from other surgeons suggesting fraying, but I don't have

17   any papers specifically suggesting that it does fray or

18   confirmation that it does fray.

19        Q.   Have you seen documents showing that there is

20   particle loss where doctors are saying they believe this

21   is causing pain?

22        A.   Gosh, I did see documents suggesting particle

23   loss, but, no, not that it was causing pain.  Why would

24   it cause pain?  But I have not reviewed every document

25   given to Ethicon.
```

Mareeni Stanislaus, M.D.

1            We leave particles of Prolene in patients all

2    the time with Prolene suture and -- I mean, it's just a

3    commonly used material.

4        Q.   Okay.  And, Doctor, are you aware that

5    particle loss associated with the mechanical cut mesh

6    was a reason that Ethicon developed the laser cut mesh?

7        A.   My understanding was that they developed a

8    laser cut mesh for ease of production.  But I'm sure

9    that they were aware of particle loss.  I mean because

10   physicians wrote in about it.  But I don't see why they

11   would have used that as a reason.  So, no, I was not

12   aware.  Sorry.

13       Q.   Okay.  And, Doctor, do you know whether

14   Ethicon performed any studies to determine whether there

15   was or was not clinical significance to any particle

16   loss?

17       A.   I would imagine that study would be very

18   difficult to design.  But, no, I'm not aware of a

19   specific study.

20       Q.   And, Doctor, you mentioned that you have

21   implanted approximately 150 TVT obturator devices in

22   your career, correct?

23       A.   That is correct.

24       Q.   And do you have a sense of how that breaks

25   down between mechanically cut and laser cut mesh?

Mareeni Stanislaus, M.D.

```
 1         A.    Forgive me.  I do not.  They were fairly

 2   interchangeable to me.  I just used which device was

 3   presented to me.

 4         Q.    And, Doctor, to your knowledge, does Ethicon

 5   still sell both the laser cut and mechanically cut TVT

 6   obturator devices?

 7         A.    Yes, they do.

 8         Q.    Doctor, if I could ask you to turn to page 7

 9   of your report.  And at the top of this page it says,

10   "The TVT is a monofilament, large pore, (Type 1),

11   lightweight, Prolene polypropylene mesh sling that is

12   placed without tension under the mid-urethra."

13               Did I read that correctly?

14         A.    Yes, you did.

15         Q.    And is it fair to say you'd characterize the

16   TVT obturator mesh as macroporous?

17         A.    Yes.

18         Q.    Is macroporous safer than microporous mesh for

19   the T -- for the SUI indication?

20         A.    Yes.

21         Q.    And would you agree with me that smaller pore

22   microporous mesh is less desirable than macroporous mesh

23   for the SUI indication?

24               MR. KOOPMANN:  Object to form.

25               THE WITNESS:  I'm not aware of any currently
```

Mareeni Stanislaus, M.D.

1    available meshes for SUI that are microporous, but they

2    would be less desirable than a macroporous mesh.

3    BY MR. JACKSON:

4        Q.    Doctor, what support do you have for the

5    statement that the mesh in the TVT obturator is a large

6    pore mesh?

7        A.    There is a Amid classification that states

8    that any mesh, any pore size, greater than 75 microns is

9    macroporous.

10       Q.    And, Doctor, the Amid classification was

11   developed in the hernia application, correct?

12       A.    Yes, it was.

13       Q.    Doctor are you aware of any Ethicon documents

14   where Ethicon employees state that the Amid

15   classification is no longer valid?

16       A.    No, I was not aware of such a document.

17       Q.    Doctor, do you believe you've done enough due

18   diligence to offer the opinion that the TVT-O mesh is

19   macroporous?

20       A.    Yes.

21       Q.    And, Doctor, what have you done to determine

22   that the TVT-O mesh is macroporous?

23       A.    I've looked at it.  And at some point I've

24   measured it with a ruler.  That's what I would say.

25       Q.    And did you look at the mesh and measure it

Mareeni Stanislaus, M.D.

1    with a ruler as part of your work in this case or is

2    that something you would have done prior to becoming

3    involved in this case?

4        A.    It's something I would have done prior to

5    becoming involved in this case.

6        Q.    Okay.  And do you remember when you measured

7    the TVT mesh with a ruler how big the pore sizes were?

8        A.    I -- I probably do not remember what it was

9    from that date, but the pore size is 1300 -- 1379

10   microns.

11       Q.    And that's based on your measurements with a

12   ruler prior to becoming involved in this case?

13            MR. KOOPMANN:  Object to form.

14            THE WITNESS:  That statement is based on the

15   published pore size.  My recollection of measuring it

16   with a ruler is it was more than a thousand microns

17   because I was comparing different meshes at the time.

18            MR. JACKSON:  Why don't we take another break.

19            MR. KOOPMANN:  Sure.

20            THE VIDEOGRAPHER:  The time on the monitor is

21   3:36 p.m.  We are now off the record.

22            (Recess.)

23            THE VIDEOGRAPHER:  We are back on the record.

24   The time on the monitor is 3:47 p.m.

25   BY MR. JACKSON:

Mareeni Stanislaus, M.D.

1      Q.   Doctor, what percentage of your current

2  practice involves pelvic floor surgery?

3      A.   Approximately 40 percent.

4      Q.   And what comprises the remaining 60 percent of

5  your practice?

6      A.   Obstetrics and -- well, routine gynecology.

7      Q.   Doctor, on page 1 of your report, Exhibit 1,

8  you note in the education and training section that you

9  have a special interest in pelvic floor surgery; is that

10  correct?

11      A.   That is correct.

12      Q.   What does it mean you have a special interest

13  in pelvic floor surgery?

14      A.   Well, I enjoy taking care of these patients.

15  Women in this community seek me out for pelvic floor

16  procedures.  And I keep up on the literature and the

17  data in my field --

18      Q.   Okay.

19      A.   -- so...

20      Q.   And, Doctor, if one of your patients is going

21  to undergo sling surgery for stress urinary

22  incontinence, how do you choose between a retropubic

23  procedure and a transobturator procedure?

24      A.   I choose based on their prior surgical

25  history, their age and activity level, and sometimes

Mareeni Stanislaus, M.D.

1    factor into their urodynamic studies.

2           I counsel patients generally on both

3    techniques, though.  And I do allow their assessment of

4    what the potential adverse events are to help me guide

5    which approach I use.

6       Q.   Okay.  And how do the patients get information

7    on the relative adverse events of the retropubic versus

8    the transobturator approach?

9       A.   I discuss it with them verbally at one of

10   several consultations.  And I encourage them to look at

11   the different patient brochures, and to talk to other

12   women who have had incontinent surgery.

13      Q.   You certainly don't expect patients to keep

14   abreast of the most recent medical literature, do you?

15      A.   No, I do not.

16      Q.   Okay.  Does the TVT-O have adverse events

17   associated with it that are not associated with the

18   retropubic TVT device?

19      A.   Yes.

20      Q.   Such as?

21      A.   Such as groin pain.

22      Q.   And does the retropubic TVT have adverse

23   events associated with it that are not typically

24   associated with the obturator device?

25      A.   Yes.  Although, with that, it's more that the

Mareeni Stanislaus, M.D.

1    retropubic approach has a greater incidence of adverse

2    events than the obturator approach.

3        Q.   Okay.  Is it your understanding that the

4    retropubic approach has a higher percentage of bladder

5    perforations associated with it than the transobturator

6    approach?

7        A.   That is correct.

8        Q.   And is it your understanding that the TVT

9    obturator approach has a higher percentage of groin pain

10   associated with it than the retropubic TVT approach?

11       A.   That is my understanding, yes.

12       Q.   And, Doctor, are those examples of different

13   morbidities associated with the TVT obturator and the

14   TVT retropubic?

15       A.   Yes, they are examples, uh-huh.

16       Q.   Okay.  So is it fair to say that a higher

17   incidence of groin pain associated with the TVT

18   obturator device is a morbidity that the obturator

19   device has and the retropubic device does not have?

20       A.   Well, that is a true statement.  You know,

21   when counseling a patient you have to sort of weigh the

22   relative importance of different morbidities.  For

23   example, puncturing a bladder, or a bowel, or a major

24   blood vessel could be a more significant morbidity than,

25   say, a groin pain.

Mareeni Stanislaus, M.D.

1    Q.   Well, Doctor, for a patient that comes into

2  your office for a prospective SUI repair surgery, how do

3  they know whether groin pain or bladder perforation is a

4  greater concern?

5    A.   Principally from my counseling to them.  But

6  any reasonable person with a reasonable level of

7  education would understand that puncturing a -- another

8  organ is probably a more significant complication than

9  groin pain.  But, yeah, it would be from my discussion

10  with them.

11    Q.   Okay.

12    A.   Lead them in that direction, uh-huh.

13    Q.   Doctor, when you say that a bladder

14  perforation is a more significant complication than

15  groin pain -- is that what you said; is that correct?

16    A.   I did say that, yes.

17    Q.   Okay.  And do you believe that -- let me back

18  up.

19        Doctor, do you believe in that respect that

20  the TVT obturator is an improvement on the retropubic

21  TVT device?

22    A.   In that respect, yes, it is an improvement,

23  absolutely.

24    Q.   Doctor, how do you stay informed on the

25  relative advantages of the TVT retropubic and TVT

Mareeni Stanislaus, M.D.

```
 1   obturator products?

 2       A.   So there has been so much published data on

 3   both of them that I do feel both of them are safe.  But

 4   in terms of keeping up to date on what's coming out

 5   newly, I read The Green Journal, The Gray Journal, and I

 6   do watch for pronouncements by AUGS.

 7       Q.   And, Doctor, just briefly, when you say The

 8   Green Journal and The Gray Journal, what do those refer

 9   to?

10       A.   That's the Journal of the American College of

11   OB-GYN.  That's The Green Journal.  The Gray Journal is

12   AJOG, which is the American Journal of OB-GYN.

13       Q.   Thank you.

14            Can we mark this as an exhibit, please.  I

15   believe we are on 9.

16                     (Exhibit 9 was marked for

17                      identification and attached hereto.)

18   BY MR. JACKSON:

19       Q.   Doctor, did you discuss an article by Teo,

20   et al., in your report?

21       A.   I don't believe that I did.

22       Q.   Doctor, have you read the article that's been

23   marked as Exhibit 9?

24       A.   When was this from?  2011.

25       Q.   Doctor, are you familiar with this study?
```

Mareeni Stanislaus, M.D.

```
1        A.   I'm trying to remember if I would have read it

2   at the time.  I'm not familiar with it at the moment,

3   no.

4        Q.   Okay.  And, Doctor, this is from the Journal

5   of Urology.  Is that a peer-reviewed article -- I'm

6   sorry -- strike that.

7             Doctor, is the Journal of Urology a

8   peer-reviewed journal?

9        A.   Yes, it is, uh-huh.

10       Q.   Doctor, do you see on the first page under the

11  Results section where 127 women were randomized to

12  either the TVT retropubic or the TVT obturator device?

13       A.   Yes.

14       Q.   And, Doctor, do you see the second sentence

15  under the Results section that says, "The study was

16  stopped early due to excess leg pain in the tension-free

17  vaginal tape obturator group"?

18            Do you see that sentence?

19       A.   Sorry.  Where was that?

20       Q.   Under "Results" on the first page --

21       A.   Yes.

22       Q.   -- the second sentence.  It says the --

23       A.   Oh, yes, I do.

24       Q.   -- "study was" --

25       A.   Yes.
```

Mareeni Stanislaus, M.D.

```
1        Q.   Doctor, the second sentence under Results on

2   the first page says, "The study was stopped early due to

3   excess leg pain in the tension-free vaginal tape

4   obturator group."

5            Do you see that sentence?

6        A.   I do.

7        Q.   Okay.  And, Doctor, further down in that same

8   Results paragraph there's a sentence that says, "More

9   women complained of leg pain after receiving a

10  tension-free vaginal tape-operator (26.4% versus 1.7%,

11  p=0.0001.)"

12           Did I read that correctly?

13       A.   Yes, you did.

14       Q.   Okay.  So, Doctor, is it your understanding

15  that there was a statistically significant difference

16  between leg pain in the obturator group versus the

17  retropubic group in this study?

18       A.   Yes, there is a statistically significant

19  difference.  But as a clinician, it's very important to

20  differentiate between statistically significant and

21  clinically relevant, so...

22       Q.   Doctor, is it your understanding that this

23  study was stopped early because of the leg pain in the

24  TVT obturator group?

25       A.   That is what they state, yes.
```

Mareeni Stanislaus, M.D.

1      Q.   Okay.  Could that be an indication of clinical

2  significance in the TVT obturator group?

3           MR. KOOPMANN:  Object to the form.

4           THE WITNESS:  The authors decided to stop the

5  study because of leg pain.  But I would need to read

6  this more carefully to find out why they chose to study

7  it -- to stop it because of leg pain.

8           Having performed multiple TVT-O procedures,

9  the leg pain I've seen has been transitory and not

10 particularly troubling to the patients.  So it would

11 seem unusual that they would need to stop the study

12 based on that.

13          And it also would appear, you know, just by

14 the technique that you would expect greater leg pain

15 with a procedure that involves an exit point in the leg.

16 BY MR. JACKSON:

17     Q.   Okay.  Thank you.

18     A.   So...

19     Q.   And, Doctor, is it fair to say you were not

20 familiar with this study at the time of -- the time you

21 wrote your report in this case?

22          MR. KOOPMANN:  Object to form.

23          THE WITNESS:  Yes, that would be fair to say.

24          MR. JACKSON:  If we could mark this as

25 Exhibit 10.

Mareeni Stanislaus, M.D.

```
 1                        (Exhibit 10 was marked for

 2                        identification and attached hereto.)

 3   BY MR. JACKSON:

 4        Q.   Doctor, do you recall seeing this document

 5   which we marked as Exhibit 10 before?

 6        A.   I do think I've seen it before.

 7        Q.   I'll represent to you it is on your reliance

 8   list in this case.

 9        A.   Uh-huh.

10        Q.   Do you see at the bottom of this case it says

11   Meng Chen is the associate medical director at Ethicon?

12        A.   Yes, I do see that.

13        Q.   Have you ever met her?

14        A.   No, I have not.

15        Q.   Have you reviewed any documents authored by

16   Meng Chen in addition to this one?

17        A.   I do believe there are other documents, yes.

18        Q.   Okay.  And do you see that on January 29th,

19   2009 where Meng Chen is questioning whether or not the

20   general statement about transitory local irritation is

21   still sufficient?

22        A.   Yes.

23        Q.   And do you see what she says above that?

24   About an hour later, she tells Bryan, Lisa, "Pardon me,

25   from what I see each day, these patient experiences are
```

Mareeni Stanislaus, M.D.

```
 1   not 'transitory' at all"?

 2              MR. KOOPMANN:  Object to form.

 3              THE WITNESS:  Yes, I see that written here.

 4   BY MR. JACKSON:

 5        Q.   Okay.  And do you see she's talking about the

 6   TVT IFU on tape extrusion, exposure and erosion?

 7              MR. KOOPMANN:  Object to form.

 8              THE WITNESS:  Uh-huh.

 9   BY MR. JACKSON:

10        Q.   Doctor, was that a "yes"?

11        A.   Yes.

12        Q.   Doctor, are you aware that Meng Chen

13   recommended that the IFUs be updated to reflect the kind

14   of calls she was getting about permanent pain, and

15   chronic pain, and inability to have intercourse?

16        A.   Well, aware insofar as it's stated here, yes.

17        Q.   Doctor, do you disagree with the worldwide

18   medical director of Ethicon if she said that these

19   things needed to be changed to update what was

20   happening?

21              MR. KOOPMANN:  Object to form.

22              THE WITNESS:  I'm a surgeon that is not in her

23   position as the associate medical director.  She can

24   choose to put whatever information she feels necessary

25   in the IFU.  So I -- it really isn't my position to
```

Mareeni Stanislaus, M.D.

1    agree or disagree with her decisions there.

2    BY MR. JACKSON:

3        Q.    But, Doctor, aren't you holding yourself out

4    as an expert in this case as to what should and should

5    not be included in the TVT warning information?

6        A.    As the person to whom this IFU is directed,

7    yes, I am holding myself up as an expert.  So in that

8    situation, yes, I am disagreeing that it would be

9    necessary to put that information in an IFU.

10            Now, her situation is different.  She does not

11   have the experience with the product that I do and use

12   in clinical patients.  So she might have come to it from

13   a different standpoint.

14       Q.    Okay.  Doctor, do you know that Meng Chen does

15   not have the clinical experience implanting the TVT-O

16   that you do?

17       A.    Well, I have not reviewed her CV.  But as the

18   associate medical director for a large company, I can't

19   imagine she's seeing patients daily and performing these

20   surgeries daily.

21       Q.    Would you agree with me that Meng Chen is a

22   medical doctor?

23       A.    Yes, I would.

24       Q.    Okay.  And do you have any knowledge one way

25   or another on how many TVT obturator devices Meng Chen

Mareeni Stanislaus, M.D.

```
 1   has implanted?

 2        A.   No, I do not have direct knowledge, no.

 3        Q.   Doctor, do you believe that the IFU for the

 4   TVT obturator device should contain information on all

 5   known risks?

 6        A.   No, I do not agree.

 7        Q.   Doctor, if Ethicon is getting reports in

 8   post-market surveillance of permanent pain associated

 9   with the TVT-O device, does the I -- does the TVT IFU

10   need to be updated to include that information?

11        A.   No, it does not.

12        Q.   Doctor, would you agree -- I just want to make

13   sure we're clear -- that the IFU for the TVT-O is a

14   source of information that a physician may rely on?

15             MR. KOOPMANN:  Object to form.  Asked and

16   answered.

17             THE WITNESS:  Yes, it is a source.

18   BY MR. JACKSON:

19        Q.   Okay.  Doctor, if Ethicon were getting reports

20   of dyspareunia in post-market surveillance, do you

21   believe Ethicon had a right to update the IFU to include

22   that information?

23        A.   Ethicon has a right to update and put any

24   information they so choose.  But particularly with a

25   report of dyspareunia, I wouldn't feel that it was a
```

Mareeni Stanislaus, M.D.

1   responsibility.  As with any self-respecting pelvic

2   surgeon would know that operating in the pelvis carries

3   a risk of dyspareunia.  And I would expect that Ethicon

4   would get multiple complaints of dyspareunia since this

5   is a pelvic surgery technique.

6       Q.   Doctor, do you believe that Ethicon should

7   have included the risks of multiple revision surgeries

8   following the TVT-O procedure in the TVT-O IFU?

9       A.   Once again, this is a risk that a surgeon

10  should understand when performing pelvic surgery.  So,

11  yes, they have a right to put it in.  I don't think they

12  had a responsibility to put it in.

13      Q.   Doctor, is it your testimony that the risk of

14  multiple revision surgeries is a risk that's inherent

15  with any surgery?

16      A.   Yes, it is.

17      Q.   And that's common knowledge that any surgeon

18  would know?

19      A.   Yes, it is.  If I may state, particularly for

20  pelvic prolapse and incontinence, when you're actually

21  removing an organ the likelihood of needing to revise it

22  is small.

23      Q.   Doctor, if I could ask you to turn to page 11

24  of your report.

25      A.   Yes.

Mareeni Stanislaus, M.D.

1    Q.   Doctor, I'm sorry.  Let's, instead, go to --

2    let's go to Page 15 of your report.  I apologize.

3    A.   15?

4    Q.   Yes, 15.

5    A.   Yes.

6    Q.   And, Doctor, I'm looking at a section called

7    "Plaintiffs' Theories are not Supported by the Published

8    Medical Literature or My Experience."  Do you see that

9    section?

10   A.   I do.

11   Q.   And, Doctor, I'm looking at a sentence that's

12   about halfway down that paragraph that starts with, "The

13   excellent safety."  Do you see that sentence?

14   A.   Yes.

15   Q.   And it says, "The excellent safety and

16   efficacy reported in the medical literature discussed

17   above, even after 17 years after the procedure, is

18   inconsistent with the idea that mesh is degrading in

19   vivo."

20        Did I read that correctly?

21   A.   Yes, you did.

22   Q.   And, Doctor, what -- what study are you

23   referring to when you say "17 years"?

24   A.   The Cox study had information about that, yes.

25   Q.   And, Doctor, is it your testimony that the Cox

Mareeni Stanislaus, M.D.

1    study is the only 17-year study?

2        A.    No.  I should have this at my fingers, but,

3    honestly, it's just common knowledge that the TVTs have

4    published data regarding -- particularly the retropubic

5    data -- out to beyond 17 years, which specific study --

6    let me try to remember that.  It was -- I should have

7    cited it.

8        Q.    Does the Nielson study ring a bell as a study

9    that might have 17-year data?

10       A.    Yes, that -- yes, it does.

11       Q.    And just so we can wrap this up, Doctor, is it

12   your understanding that there's 17-year data for the

13   retropubic non-Exact TVT?

14       A.    Correct.

15       Q.    And, Doctor, for the TVT obturator device that

16   your report is in regards to, what is the longest term

17   study that you're aware of for the TVT obturator device?

18       A.    Eleven years, I think.

19       Q.    And do you know which study that is?

20       A.    I did not cite them appropriately.  No, I do

21   not remember.

22       Q.    Okay.

23       A.    But, again, the Cox study refers to both TVT

24   and TVT-O.  I can take the time to find it.

25       Q.    Doctor, is it your testimony that the mesh in

Mareeni Stanislaus, M.D.

1    the TVT-O device does not curl, rope or fray after

2    implantation?

3         A.   Yes, that is my testimony.

4         Q.   And what is your basis for that opinion?

5         A.   Well, in the few instances that I've seen it

6    in the body, and having made it to explant it, it was

7    not curled, roped or frayed.  It continues to be

8    effective.  And if it had roped, I would imagine it

9    would not be so.  There's also, you know, published

10   tensile strength data on how it behaves under normal

11   circumstances.

12        Q.   Doctor, if I could ask you to turn to page 18

13   of your report.

14        A.   Certainly.

15        Q.   And, Doctor, in the last paragraph on page 18

16   there's a sentence that says "In 2015," do you see that

17   sentence?

18        A.   Yes.

19        Q.   It says, "In 2015, Ethicon updated the adverse

20   reaction section of the TVT-O IFU to include some of

21   these risks."

22             Did I read that correctly?

23        A.   Yes, you did.

24        Q.   And, Doctor, what significance, if any, does

25   Ethicon's 2015 update to the TVT-O IFU have on your

Mareeni Stanislaus, M.D.

1    opinions?

2        A.    None.   I don't feel that it was significant.

3        Q.    And why don't you feel this IFU update was

4    significant?

5        A.    Because they added additional risks that

6    should be known to pelvic surgeons, and pelvic surgeons

7    should be implanting this device.

8        Q.    Doctor, on page 19 of your report, you include

9    a section on Ethicon's product brochures; is that

10   correct?

11       A.    Yes.

12       Q.    And, generally speaking, do you know whether

13   the TVT-O brochure always disclosed the risk of

14   dyspareunia?

15       A.    I don't believe it did initially.  I think it

16   does now, uh-huh.

17       Q.    And, Doctor, have you read the TVT-O brochure

18   prior to implanting the TVT-O device in patients?

19       A.    Yes.

20       Q.    Okay.  And, Doctor, have you also -- strike

21   that.

22             Doctor, have you provided a TVT-O brochure to

23   your patients for them to consider in evaluating whether

24   they'd like to have the TVT-O procedure?

25       A.    Yes, I have.

Mareeni Stanislaus, M.D.

1      Q.   Doctor, do you believe you're an expert in

2  what sort of warning information should be included in a

3  product brochure such as the TVT-O brochure?

4      A.   Yes, I use product brochures routinely,

5  uh-huh.

6      Q.   Okay.  Doctor, you cite a number of

7  meta-analyses in your report; is that correct?

8      A.   That is correct.

9      Q.   And, just generally, what is a meta-analysis?

10     A.   It's a compilation of high-quality evidence,

11  generally randomized controlled trials, put together to

12  form conclusions based on larger numbers than a single

13  trial could provide.

14     Q.   Okay.

15     A.   If I may elaborate.  They're not always

16  randomized controlled trials.  However, they include not

17  established criteria for what they're going to include,

18  but based on generally established criteria and

19  specifically established criteria by the authors.

20     Q.   Okay.  And, Doctor, these meta-analyses, as

21  you said, contain information from multiple clinical

22  trials, correct?

23     A.   That is correct.

24     Q.   And so any given meta-analyses might have

25  information from many different products in it; is that

Mareeni Stanislaus, M.D.

1    correct?

2        A.    Yes, that is correct.

3        Q.    Okay.  So, for example, I believe you cite a

4    2014 meta-analyses by an author named Schimpf,

5    S-C-H-I-M-P-F --

6        A.    Yes, I do, uh-huh.

7        Q.    -- correct?

8              And does that 2014 meta-analyses contain

9    information on many different products beyond just

10   Ethicon products?

11       A.    Yes, it does, uh-huh.

12       Q.    Doctor, do you know what other sling products

13   are included in the studies in that meta-analysis?

14       A.    I have it right here.  Yeah, they included

15   Monarc, and Optrics, the Aris and SPARC.

16       Q.    Doctor, those are all different mid-urethral

17   slings from different manufacturers other than Ethicon,

18   correct?

19       A.    Yes, that's correct.

20       Q.    And, Doctor, the Monarc sling you mentioned is

21   made by American Medical Systems; is that correct?

22       A.    Yes.

23       Q.    And I believe the Monarc sling is referred to

24   as a outside-in obturator approach; is that correct?

25       A.    Yes, it is, uh-huh.

Mareeni Stanislaus, M.D.

1          Q.    And Ethicon's TVT obturator device is referred

2    to as an inside-out obturator device?

3          A.    That is correct, yes.

4          Q.    And so, Doctor, the Monarc and the TVT

5    obturator have slightly different surgical approaches to

6    them; is that fair?

7          A.    Slightly different, yes, uh-huh.

8          Q.    And, Doctor, how can you use data from other

9    products to support the safety of the TVT obturator

10   product?

11         A.    It's essentially the same surgery.  You're

12   comparing a -- an approach to a problem.  So, you know,

13   an outside-in and an inside-out essentially performs the

14   same function as say, a Burch, but in a completely

15   different way.  So a Burch is completely different than

16   a Monarc or a TVT-O.  But a Monarc and a TVT-O enter the

17   same spaces.  They're similar enough that they should be

18   considered together.

19         Q.    Okay.  Doctor, I know the Schimpf

20   meta-analyses and others, they rate the randomized

21   controlled trials that they include; is that correct?

22         A.    Yes, that is correct.

23         Q.    And they might give them a grade of A, B, C,

24   D, for example; is that correct?

25         A.    Yes.

Mareeni Stanislaus, M.D.

1     Q.   And, Doctor, just generally, do you know how

2  one of these meta-analyses actually grades those

3  randomized controlled trials?

4          MR. KOOPMANN:  Object to form.

5          THE WITNESS:  It would take me some time to

6  specifically lay out exactly how they grade it, but they

7  grade it on data such as patient size, centers used,

8  numbers lost to follow up, data of that nature.

9  BY MR. JACKSON:

10    Q.   Doctor, is that part of the methodology of how

11 a meta-analyses chooses which data to include?

12    A.   It's part of the study design generally, yes,

13 uh-huh.

14    Q.   And is that something you discuss in your

15 report?

16    A.   For the specific literature I use.  I mean, I

17 discuss meta-analysis as being a high-quality data, but

18 I don't discuss the specific methodology used in each --

19    Q.   Okay.

20    A.   -- in each report that I pulled -- report that

21 I pulled or used.

22         MR. JACKSON:  I think that's all the questions

23 I have right now.  I may have a few on follow-up after

24 you.

25         MR. KOOPMANN:  Okay.

Mareeni Stanislaus, M.D.

```
 1                    EXAMINATION

 2   BY MR. KOOPMANN:

 3        Q.   Dr. Stanislaus, for the record my name is

 4   Barry Koopmann.  I'm representing Johnson & Johnson and

 5   Ethicon in this case.

 6             Do you practice evidence-based medicine?

 7        A.   Yes, I do.

 8        Q.   What is evidence-based medicine?

 9        A.   It's medicine based on literature analysis and

10   statistical analysis of the literature.

11        Q.   Is some evidence thought of as being more

12   powerful than other evidence?

13        A.   Yes.

14             MR. JACKSON:  Objection.  Form.

15   BY MR. KOOPMANN:

16        Q.   What are the highest levels of evidence?

17        A.   Meta-analysis and systematic reviews.

18        Q.   And what is the lowest level of evidence?

19             MR. JACKSON:  Objection.  Form.

20             MR. KOOPMANN:  What's the form objection?

21             MR. JACKSON:  That it's very vague.

22   BY MR. KOOPMANN:

23        Q.   Okay.  Go ahead.

24        A.   Observation, individual case reports.

25        Q.   And where do level 1 studies fall within that
```

Mareeni Stanislaus, M.D.

1    hierarchy of the different level of evidence within the

2    practice of evidence-based medicine?

3        A.    High.

4        Q.    And where do internal company documents, or

5    PowerPoint presentations, or emails, things like that,

6    fall on that hierarchy of evidence?

7        A.    Very low.

8        Q.    Does your TVT-O report that's marked as

9    Exhibit 1 contain your opinions regarding the safety and

10   efficacy of the TVT-O and the labeling for that device?

11       A.    Yes, it does.

12       Q.    And do you hold those opinions to a reasonable

13   degree of medical certainty?

14       A.    Yes, I do.

15       Q.    And are your opinions based, in part, on your

16   education, including your medical school, residency, and

17   continuing education?

18       A.    Definitely, they are, uh-huh.

19       Q.    Are your opinions also based on your clinical

20   training and experience?

21       A.    Yes.

22       Q.    Are your opinions also based on your review of

23   the peer-reviewed literature regarding the treatment of

24   incontinence?

25       A.    Yes.

Mareeni Stanislaus, M.D.

1      Q.   Are your opinions also based on position

2  statements issued by the relevant organizations that

3  pertain to your specialty?

4      A.   Yes, they are.

5      Q.   Are your opinions also based on the -- any

6  conversations you have with colleagues that are

7  gynecologists or urologists treating incontinence in

8  women?

9      A.   Yes, that does form the basis of my opinions.

10     Q.   Are all of the opinions that you've expressed

11  here today given within a reasonable degree of medical

12  certainty?

13     A.   Yes.

14     Q.   Are the complications that you've seen in your

15  practice consistent with the warnings listed in the

16  adverse reaction section of the IFU for the TVT-O?

17     A.   Consistent with if fewer than, but, yes,

18  consistently.

19     Q.   Is it basic medical and surgical knowledge

20  that postsurgical pain can be chronic or temporary?

21     A.   Yes, it is.

22     Q.   Is it basic surgical knowledge that if pain

23  with intercourse presents itself after any SUI surgery

24  that that pain could be temporary or permanent?

25     A.   Yes, that would be.

Mareeni Stanislaus, M.D.

1    Q.   Is it also basic surgical knowledge that when

2  an adverse reaction occurs, further surgery may be

3  required to correct that?

4    A.   Yes, that is known.

5    Q.   Even multiple surgeries?

6    A.   Yes, even multiple surgeries.

7    Q.   And that would be true for the Burch procedure

8  or pubovaginal sling procedures?

9    A.   Yes, that would be true for both of those as

10  well.  In fact -- yes, I've gone in multiple times on

11  pubovaginal sling procedures more so than I think I have

12  on the obturator.

13    Q.   Do you have many patients who you have

14  implanted with the TVT-O to treat their stress urinary

15  incontinence who experience no complications in

16  connection with that surgery?

17    A.   I'm sorry.  Could you repeat that?  Have I --

18    Q.   Sure.  Do you have many patients who you have

19  implanted with the TVT-O to treat their stress urinary

20  incontinence who have experienced no complications in

21  connection with that surgery?

22          MR. JACKSON:  Objection.  Form.

23          THE WITNESS:  Yes, I have.

24  BY MR. KOOPMANN:

25    Q.   And did you also have some patients who

Mareeni Stanislaus, M.D.

```
 1   experienced a complication?

 2        A.   Yes, I did.

 3        Q.   And when those patients experienced

 4   complications, did you treat those complications?

 5        A.   I did.

 6        Q.   Before you ever used the TVT device or TVT-O

 7   device back when you were in medical school, did you

 8   learn about basic fundamental risks of any surgery?

 9        A.   Yes, I did.

10        Q.   And did you also learn about basic fundamental

11   risks of any surgery during your residency?

12        A.   Yes, of course, I did.

13        Q.   And did you base your opinions regarding the

14   adequacy of the warnings in the TVT-O IFU on all of this

15   experience, education and training that we've discussed?

16        A.   Absolutely, yes.

17        Q.   Can you think of a single randomized

18   controlled trial that says that TVT-O mesh degraded or

19   was cytotoxic?

20             MR. JACKSON:  Objection.  Form.

21             THE WITNESS:  No, I cannot.

22   BY MR. KOOPMANN:

23        Q.   You've performed research in your career for

24   stress urinary incontinence as a part of your continuing

25   reading as a gynecologist and surgeon, correct?
```

Mareeni Stanislaus, M.D.

```
 1              MR. JACKSON:  Objection.  Form.

 2              THE WITNESS:  Yes, of course.

 3    BY MR. KOOPMANN:

 4       Q.   Okay.  And you testified earlier that you've

 5    treated 150 patients, approximately, with a TVT-O; is

 6    that right?

 7       A.   That is right.

 8       Q.   What has your experience been overall with the

 9    device in the course of treating those patients?

10       A.   My experience has been that the TVT-O device

11    is an extremely effective procedure for stress urinary

12    incontinence with a very, very low complication rate.

13       Q.   Mr. Jackson asked you a question earlier today

14    about whether you had seen any documents indicating that

15    some Ethicon employee had said the Amid classification

16    is no longer valid.  Do you remember that question?

17       A.   I do remember that question.

18       Q.   Just because one Ethicon employee says the

19    Amid classification is no longer valid, does that mean

20    the Amid classification is no longer valid?

21       A.   No, it does not mean that.

22       Q.   If one doctor, or a handful of doctors,

23    reported particle loss outside the context of a

24    scientific study that they thought was associated with

25    pain, what level of evidence would that be?
```

Mareeni Stanislaus, M.D.

```
 1        A.    Again, that would be a very low level of
 2   evidence.   And I think I mentioned that earlier when
 3   asked the question.
 4        Q.    Did you use Prolene suture before ever using
 5   the TVT or TVT-O devices?
 6        A.    Yes, I did.
 7        Q.    Can you give any estimate of how many times
 8   you think you've used Prolene suture in your career?
 9        A.    Many thousands.
10        Q.    There were some questions earlier from
11   Plaintiffs' counsel about the wealth of peer-reviewed
12   data on the TVT.   Do you remember those questions?
13        A.    Yes.
14        Q.    And that is the wealth of peer-reviewed data
15   that existed before you decided to start using it.
16        A.    That's correct.
17        Q.    Did that data also support your decision to
18   start using the TVT-O device?
19        A.    Yes, of course.
20        Q.    And why is that?
21        A.    Because it's basically a modification of a
22   surgical technique.   So knowing that the TVT was
23   effective and safe with extensive data allowed me to
24   consider an improvement in safety by performing the
25   TVT-O.
```

Mareeni Stanislaus, M.D.

```
 1        Q.   One of the documents that you have included in

 2    Exhibit 5 is a article by a lead author named Cox; is

 3    that right?

 4        A.   Yes, uh-huh.

 5        Q.   Would you turn to that article, please.

 6        A.   Okay.  Yes.

 7        Q.   If you will turn to the last page of that

 8    article before the citations start.  The last sentence

 9    of that article in the conclusion section, what do the

10    authors say?

11        A.   "Based on the literature a new gold standard

12    first-line surgical treatment for women with SUI is the

13    synthetic mid-urethral sling inserted through a

14    retropubic or transobturator approach."

15        Q.   Even if studies do not specifically track

16    dyspareunia or other complications as a primary

17    endpoint, do the studies nonetheless comment on

18    complications such as dyspareunia?

19        A.   Yes, they do.

20        Q.   Would removing all of the sutures used during

21    a Burch procedure potentially require aggressive

22    dissection?

23        A.   Definitely.

24        Q.   Would removing everything that was implanted

25    during autologous fascial sling procedure or pubovaginal
```

Mareeni Stanislaus, M.D.

```
 1    sling procedure using a xenograft or allograft material

 2    also potentially require aggressive dissection?

 3         A.   Absolutely.

 4         Q.   Are there other reasons that a mid-urethral

 5    sling procedure using a polypropylene mesh wouldn't work

 6    besides sling degradation?

 7         A.   Yes, yes.

 8         Q.   So just because a sling isn't working doesn't

 9    mean the sling has degraded?

10         A.   No.  That is absolutely true.

11         Q.   Would you agree that not all brands of meshes

12    are the same?

13         A.   Yes, I would agree with that.

14         Q.   In other words, Prolene is the product used in

15    the TVT family of slings, the mesh in those slings,

16    correct?

17         A.   That is correct.

18              MR. JACKSON:  Objection.  Form.

19    BY MR. KOOPMANN:

20         Q.   And Prolene is not used in other

21    manufacturers' mid-urethral slings, correct?

22              MR. JACKSON:  Objection.  Form.

23              THE WITNESS:  Correct.

24    BY MR. KOOPMANN:

25         Q.   Do you think it was necessary for Ethicon to
```

Mareeni Stanislaus, M.D.

1   warn about not using the TVT-O procedure for patients

2   who are on anticoagulation therapy?

3        A.   No, I do not think it was necessary.

4        Q.   Okay.  Why not?

5        A.   Because one should not perform surgery on

6   patients that are anticoagulated.  The bleeding risk is

7   too high.

8        Q.   Do you think that a company has an obligation

9   to warn of a risk of using a product if that risk is

10  commonly known by licensed users of that device?

11       A.   No, I don't think it's an obligation if it's

12  commonly known.

13       Q.   One of the studies you have included in

14  Exhibit 5 is a study by Schimpf, and you were asked a

15  few questions about that a little bit ago.  Would you,

16  please, pull it out.

17       A.   Yes.

18       Q.   In the first page of the Schimpf study, it

19  says that -- under the Study Design section it indicates

20  that the authors performed "a systematic review

21  including English-language randomized controlled trials

22  from 1990 through April 2013 with a minimum 12 months of

23  follow-up comparing a sling procedure for SUI to another

24  sling or Burch urethropexy"; is that right?

25       A.   Yes.

Mareeni Stanislaus, M.D.

1       Q.    And that included many studies dealing with

2   the TVT-O device; is that correct?

3       A.    Yes, it did.

4       Q.    And those are listed in Table 1 of the study;

5   is that accurate?

6       A.    That is accurate.

7       Q.    And if you go to Table 3 of that study, one of

8   the complications that is tracked in this study for

9   various incontinence procedures is dyspareunia; is that

10  right?

11      A.    That is right.

12      Q.    What was the rate of the dyspareunia seen with

13  the transobturator mid-urethral slings studied in this

14  particular paper?

15      A.    .16 percent.

16      Q.    What was the rate with pubovaginal slings?

17      A.    .99 percent.

18      Q.    They also track the rate of exposure for

19  various incontinence procedures; is that right?

20      A.    Yes.

21      Q.    What was the rate of exposure in the studies

22  that were analyzed for purposes of the Schimpf study

23  with respect to obturator procedures?

24      A.    2.2 percent.

25      Q.    And what was the rate of exposure for the

Mareeni Stanislaus, M.D.

 1   pubovaginal sling procedures?

 2        A.   5.4 percent.

 3        Q.   And is this a study that you reviewed and

 4   relied upon in forming your opinions regarding the

 5   safety and efficacy of the TVT-O?

 6        A.   Yes, it is a study I relied upon.

 7        Q.   What level of evidence is this considered?

 8        A.   Level 1.

 9        Q.   Another study that you reviewed and relied

10   upon is the Ford, Cochrane review from 2015; is that

11   correct?

12        A.   That is correct.

13        Q.   That's a rather large study, is that

14   correct --

15        A.   Yes.

16        Q.   -- in terms of the volume of number of pages?

17             MR. JACKSON:   Objection.   Form.

18             THE WITNESS:   Yes, it is.

19   BY MR. KOOPMANN:

20        Q.   Okay.   And you have a summary of that Cochrane

21   review in front of you; is that right?

22        A.   That is right.

23        Q.   I want to mark as the next exhibit an

24   excerpt -- excerpt from that study and ask you some

25   questions about those.

Mareeni Stanislaus, M.D.

1                    (Exhibit 11 was marked for

2                    identification and attached hereto.)

3     BY MR. KOOPMANN:

4          Q.   On the first page of the study where it's

5     below Abstract where it says "Selection Criteria" --

6          A.   Okay.

7          Q.   -- that indicates that the authors looked at

8     "randomized or quasi-randomized controlled trials

9     amongst women with SUI, USI or MUI, in which both trial

10    arms involve a MUS," or mid-urethral sling "operation";

11    is that right?

12         A.   That is right.

13         Q.   If you'll turn to the next page in the Main

14    Results section.  They indicate at the top that they

15    included 81 trials in this study that evaluated 12,113

16    women; is that correct?

17         A.   That is correct.

18         Q.   Is this high level evidence, this Ford,

19    Cochrane review?

20         A.   Yes, it is.

21         Q.   Is it better evidence than a study involving

22    100-some patients?

23         A.   Most definitely.

24         Q.   Would it, in fact, include studies like Teo,

25    that we went over earlier, if that Teo study met the

Mareeni Stanislaus, M.D.

1    inclusion criteria for this review?

2         A.   Yes, it would.

3         Q.   And in the authors' conclusions section on

4    that same page, it indicates "Mid-urethral sling

5    operations have been the most extensively researched

6    surgical treatment for stress urinary incontinence in

7    woman and have a good safety profile.  Irrespective of

8    the routes traversed, they are highly effective in the

9    short and medium term, and accruing evidence

10   demonstrates their effectiveness in the long-term.  This

11   review illustrates their positive impact on improving

12   the quality of life with women with SUI.  With the

13   exception of groin pain, fewer adverse events occur with

14   the employment of a transobturator approach."

15            Did I read that correctly?

16        A.   Yes, you did.

17        Q.   And does this support your opinions regarding

18   the safety and efficacy of the TVT-O device?

19        A.   Certainly, based on high quality data, yes.

20        Q.   If you'll turn to the next page in this -- in

21   these excerpts.  You should you see page 10.

22        A.   Yes.

23        Q.   In the right-hand column it indicates that,

24   "Type 1 meshes are macroporous monofilament meshes"; is

25   that right?

Mareeni Stanislaus, M.D.

```
 1        A.    That's right.

 2        Q.    And what type of mesh is the TVT-O mesh?

 3        A.    Type 1.

 4        Q.    And it indicates below those bullet points

 5   that, "Type 1 mesh has the highest biocompatibility with

 6   the least propensity for infection"; is that right?

 7        A.    Yes, that's right.

 8        Q.    And about six or seven lines below that it

 9   says, "Macroporous meshes (pore size in excess of 75

10   microns) easily allow macrophages, leukocytes,

11   fibroblasts, blood vessels and collagen to transverse

12   the pores; thus macroporous meshes promote tissue host

13   ingrowth with resultant biocompatibility and low risk of

14   infection"; is that right?

15        A.    That is right.

16        Q.    And in the next paragraph it says, "In

17   contrast, microporous meshes (pore size greater than 10

18   microns) allow bacteria to pass through and replicate,

19   but exclude macrophages"; is that right?

20        A.    That is right.

21        Q.    Then it says, "Multifilament tapes have

22   smaller pore sizes and are thus microporous"; is that

23   right?

24        A.    That is right.

25        Q.    Is the TVT-O mesh monofilament or is it
```

Mareeni Stanislaus, M.D.

1    multifilment?

2         A.    Monofilament.

3              THE VIDEOGRAPHER:  Excuse me, Counsel.  I need

4    to change the tape.

5              MR. KOOPMANN:  Okay.

6              THE VIDEOGRAPHER:  This marks the end of Disk

7    2, Volume I, in the videotaped deposition of Dr. Mareeni

8    Stanislaus.  The time on the monitor is 4:43 p.m., and

9    we are now off the record.

10             (Recess.)

11             THE VIDEOGRAPHER:  We're back on the record.

12   This marks the beginning of Disk 3, Volume I, in the

13   videotaped deposition of Dr. Mareeni Stanislaus.  The

14   time on the monitor is 4:48 p.m.

15             You may continue.

16   BY MR. KOOPMANN:

17        Q.    Doctor, do you have page 28 of the Ford,

18   Cochrane review excerpts in front of you?

19        A.    Yes, I do.

20        Q.    On page 28 it discusses the types and rate of

21   pain seen with transobturator versus retropubic

22   procedures; is that right?

23        A.    That's correct.

24        Q.    And it indicates in the right-hand column

25   that, "Both groin and suprapubic pain occurrence were

Mareeni Stanislaus, M.D.

```
 1    short-lasting, with most resolving within the first six

 2    months"; is that right?

 3        A.   That is right.

 4        Q.   And then if you'll turn to page 30 of

 5    Exhibit 11, please.  There's a section there discussing

 6    "Sexual Function Quality of Life Measures"; is that

 7    right?

 8        A.   That is right.

 9        Q.   And at the bottom of the left-hand column it

10    says, "In all the trials there was significant

11    improvement in sexual function from baseline scores

12    during the follow-up period that spanned 6 to 24 months.

13    There were no significant differences between the

14    groups."  Is that right?

15        A.   That is right.

16        Q.   And the two groups being retropubic slings and

17    obturator slings?

18        A.   Yes.

19        Q.   It then says, "A 24-month follow-up, rates of

20    superficial and deep dyspareunia were low, with no

21    difference between the groups."

22             Did I read that correctly?

23        A.   Yes, you did.

24        Q.   And does that information support your

25    opinions regarding the safety and efficacy of the TVT-O
```

Mareeni Stanislaus, M.D.

1   device?

2        A.   Definitely, yes.

3        Q.   I think one of the documents that you brought

4   along today is the AUGS SUFU updated physician

5   statement.

6        A.   Yes.

7        Q.   And you also have a statement by Douglas Hale,

8   M.D., on June 23rd, 2016 pertaining to that statement?

9        A.   No.

10            MR. KOOPMANN:  Let's mark a copy of that

11  Douglas Hale statement as Exhibit 12, please.

12                         (Exhibit 12 was marked for

13                          identification and attached hereto.)

14            MR. JACKSON:  Counsel, do you have one for me?

15            MR. KOOPMANN:  Just one second.

16  BY MR. KOOPMANN:

17       Q.   Dr. Stanislaus, would you take a moment to

18  review that, please.

19            (Pause while witness peruses document.)

20  BY MR. KOOPMANN:

21       Q.   Having read this statement we've marked as

22  Exhibit 13, does this refresh your recollection that you

23  have seen this statement in the last few weeks or --

24       A.   Oh, yes, yes.

25       Q.   Okay.  And this is a statement that

Mareeni Stanislaus, M.D.

1   accompanied a recent update to the AUGS SUFU position

2   statement?

3       A.   Yes.

4       Q.   And the AUGS SUFU position statement on mesh

5   mid-urethral slings for stress urinary incontinence is

6   something that you -- well, it's something that was

7   first published back in 2014, I think; is that right?

8       A.   That's correct, yes.

9       Q.   And that's a document that you've reviewed,

10  and relied upon, and cited and discussed in your TVT-O

11  general report; is that correct?

12      A.   That is correct.

13      Q.   And was this AUGS SUFU position statement

14  recently updated?

15      A.   Yes.

16      Q.   And that was after you issued your TVT-O

17  general report in this case?

18      A.   Correct, it was.

19      Q.   Is the updated AUGS SUFU position statement

20  also consistent with your opinions regarding the safety

21  and efficacy of the TVT-O device?

22      A.   Absolutely, yes.

23      Q.   And the -- one of the things that Dr. Hale

24  notes in Exhibit 12 is that he was happy to announce

25  that the societies contacted by AUGS undertook their own

Mareeni Stanislaus, M.D.

```
 1    thorough review of this document and responded with

 2    overwhelming support; is that correct?

 3         A.   That is correct.

 4         Q.   And he was indicating that he could now say

 5    that, in addition to AUGS and SUFU, other organizations

 6    supporting our position statement include A-C-O-G, or

 7    ACOG, SGS, AAGL, and AUA; is that correct?

 8         A.   That is correct.

 9         Q.   He went on to say, "Likewise, patient advocacy

10    groups, including NAFC and WHF, also added their support

11    of the document."  Is that correct?

12         A.   That is correct.

13         Q.   And the AAGL is the American Association of

14    Gynecological Laparoscopists; is that correct?

15         A.   Yes.

16         Q.   And I think you indicated earlier you're a

17    member of AUGS?

18         A.   I am.

19         Q.   The American Urogynecological Society?

20         A.   Yes.

21         Q.   Another organization that supports this

22    statement is the American College of Obstetricians and

23    Gynecologists?

24         A.   Yes.

25         Q.   Are you a member of that?
```

Mareeni Stanislaus, M.D.

```
1        A.    I am.

2        Q.    Another organization that supports this

3   statement is the National Association for Continence; is

4   that correct?

5        A.    That is correct.

6        Q.    And in the updated AUGS SUFU statement that

7   you have in front of you, that indicates on the third

8   page that the National Association for Continence is the

9   national private nonprofit 501(c)(3) organization

10  dedicated to improving the quality of life of people

11  with incontinence, voiding dysfunction, and related

12  pelvic disorders; is that correct?

13       A.    That is correct.

14       Q.    SGS is the Society of Gynecologic Surgeons; is

15  that right?

16       A.    That is right.

17       Q.    And they're a supporting organization of this

18  statement?

19       A.    Yes.

20       Q.    And, finally, the Womens Health Foundation is

21  a supporting organization of this statement; is that

22  correct?

23       A.    That is correct.

24       Q.    And that is a nonprofit organization dedicated

25  to improving the pelvic health and wellness of women and
```

Mareeni Stanislaus, M.D.

1    girls throughout -- I'm sorry -- through community based

2    programs and services research and events; is that

3    correct?

4         A.    That is correct.

5              MR. KOOPMANN:  Madam Court Reporter, could you

6    please mark this exhibit as Exhibit 14.  I'm sorry.

7    Before we that, then, could we mark the AUGS SUFU

8    statement as Exhibit 13?

9                        (Exhibit 13 was marked for

10                       identification and attached hereto.)

11             MR. JACKSON:  That's the updated AUGS SUFU

12   statement, correct?

13             (Reporter clarification.)

14             MR. KOOPMANN:  And counsel just corrected me.

15        Q.    But Exhibit 13 is the updated AUGS SUFU

16   position statement, correct?

17        A.    Correct.

18             MR. KOOPMANN:  Thank you, Counsel.

19                       (Exhibit 14 was marked for

20                       identification and attached hereto.)

21   BY MR. KOOPMANN:

22        Q.    Do you have Exhibit 14 is front of you,

23   Dr. Stanislaus?

24        A.    I do.

25        Q.    And is this an abstract of a couple articles

Mareeni Stanislaus, M.D.

1    that has just been published since you issued your TVT-O

2    general report?

3         A.   Yes.

4         Q.   And the abstract on the second page is

5    entitled, "The Myth: In Vivo Degradation of

6    Polypropylene meshes" by Ong, White and Thames.  Is that

7    correct?

8         A.   Yes.

9         Q.   And you've had a chance to review this

10   published abstract since issuing your TVT-O general

11   report?

12        A.   Yes, I have.

13        Q.   And what was the conclusion of the authors in

14   that particular abstract?

15        A.   They concluded that Prolene meshes did not

16   undergo meaningful or harmful degradation in vivo.

17        Q.   Does this abstract support your opinion that

18   the -- that clinically significant degradation of the

19   TVT-O does not occur?

20        A.   Yes, it does.

21        Q.   You were asked questions by Plaintiffs'

22   counsel earlier about Exhibit 10, which was an email

23   chain, including a couple emails from Dr. Meng Chen.

24        A.   Yes.

25        Q.   Do you recall those questions?

Mareeni Stanislaus, M.D.

1      A.   Yes.

2      Q.   Okay.  And you were asked about Ms. Chen's --

3  or Dr. Chen's statement that from what she sees each day

4  these patient experiences are not transitory at all.  Do

5  you remember that?

6      A.   I do remember that.

7      Q.   Does the TVT-O IFU say that patient

8  experiences of extrusion and erosion, fistula formation

9  or inflammation are transitory?

10      A.   No.

11      Q.   The Nilson study that was referenced earlier,

12  that had 17-year data on the TVT --

13      A.   Yes.

14      Q.   -- sling, that TVT sling use the same mesh as

15  what's used in the TVT-O; is that your understanding?

16      A.   That is my understanding, yes.

17      Q.   And you cited that TV -- that Nilson study in

18  your report?

19      A.   I did.

20      Q.   Do you have a study by a Dr. Athanasiuo in

21  your Exhibit 5.

22      A.   Yes.

23      Q.   And that study has seven years' data on the

24  TVT-O; is that correct?

25      A.   That is correct.

Mareeni Stanislaus, M.D.

1      Q.    You were asked some questions earlier about

2  the TVT family of products brochures and whether they

3  contained -- they all contained a warning of a risk of

4  dyspareunia.  Do you remember those questions?

5      A.    I do.

6      Q.    Did you counsel your patients about a risk of

7  dyspareunia even before you saw that in a TVT-O

8  brochure?

9      A.    Yes, I did.

10     Q.    How did you know to do that?

11     A.    As a pelvic surgeon, I know to counsel my

12  patients regarding dyspareunia because of my education

13  and training.

14     Q.    You were asked some questions earlier about

15  the Teo study that was marked Exhibit 9.  Do you have

16  that in front of you?

17     A.    Yes.

18     Q.    And this was a study that included a total of

19  127 women who were recruited for this study; is that

20  right?

21     A.    That is right.

22     Q.    If you'll turn to the second page, which is

23  actually numbered 1351 in the Journal.

24     A.    Uh-huh.

25     Q.    Do you see that page?

Mareeni Stanislaus, M.D.

```
1        A.   I do.

2        Q.   The bottom of the right-hand column in the

3   Results section, in the second paragraph there, it says,

4   "During recruitment a few studies were published showing

5   similar curates for the 2 procedures but a high

6   incidence of leg pain in patients after receiving a

7   transobturator tape.  After discussing these data at an

8   investigator meeting we decided to stop recruitment

9   before the full calculated sample was recruited since it

10  was deemed that clinical equipoise had been lost."

11            Is that correct?

12       A.   That is correct.

13       Q.   What is higher level evidence, the Teo study

14  or symptomatic reviews in meta-analyses like the

15  Schimpf, Ford, Tommaselli and Ogah systematic reviews

16  that you cited in your TVT-O general report?

17       A.   Of course the systematic reviews and the

18  meta-analyses cited.

19       Q.   And, in fact, do studies like the Schimpf,

20  Ford and Tommaselli and Ogah papers, the systematic

21  reviews and meta-analyses, and Cochrane reviews, take

22  into account studies like Teo in the course of their

23  systematic review and analysis of the literature?

24            MR. JACKSON:  Objection.  Asked and answered.

25            THE WITNESS:  Yes, they do.  In fact, it says
```

Mareeni Stanislaus, M.D.

```
 1   data on women already recruited would be a value in

 2   future systematic reviews in metanalysis in that paper.

 3   BY MR. KOOPMANN:

 4        Q.   You also cited some registry studies that

 5   discuss very large numbers of patients --

 6        A.   Yes.

 7        Q.   -- is that correct?

 8        A.   That is correct.

 9        Q.   And you've cited those and discussed them in

10   your TVT-O general report?

11        A.   I have.

12        Q.   One of those studies is a study by a Dr. Unger

13   and colleagues?

14        A.   Oh, yes, uh-huh.

15        Q.   Do you have that study in front of you in

16   Exhibit 5 or in -- or separately?

17        A.   I have it in Exhibit 5.

18        Q.   Do you have that in front of you now?

19        A.   Yes.

20        Q.   The Unger study was a case controlled study of

21   3,307 patients receiving a mid-urethral sling over a

22   10-year period to analyze indications and risk factors

23   necessitating revision surgery; is that right?

24        A.   That's right.

25        Q.   And the revision rate -- strike that.
```

Mareeni Stanislaus, M.D.

1           The revision rate was 2.7 percent for

2   retropubic and transobturator slings over that 10-year

3   period; is that right?

4       A.   That's what they reported, yes.

5       Q.   And the mesh erosion rate was 21.3 percent of

6   those 2.7 percent; is that correct?

7       A.   Yes.

8       Q.   And the vaginal pain or dyspareunia revision

9   rate, in other words, the rate at which women had to

10  have a sling revision due to vaginal pain or

11  dyspareunia, was 7.9 percent of the 2.7 percent,

12  correct?

13      A.   That is correct.

14      Q.   And another study that you reviewed and relied

15  on in forming your opinions was the Jonsson Funk

16  registry study from 2013; is that correct?

17      A.   That is correct.

18      Q.   And that study involved an analysis of a

19  population-based cohort of 188,454 commercially insured

20  women who underwent a sling procedure between 2001 and

21  2010; is that right?

22      A.   Yes.

23      Q.   In the nine-year cumulative risk of sling

24  revision removal in that patient population of 188,454

25  women was 3.7 percent; is that right?

Mareeni Stanislaus, M.D.

```
 1        A.    Absolutely, uh-huh.

 2        Q.    You also reviewed and relied on and cited in

 3   your TVT-O general report a study by a Dr. Welk --

 4        A.    Yes.

 5        Q.    -- in 2015; is that correct?

 6        A.    Yes.

 7        Q.    Would you, please, pull up that study?

 8        A.    Okay.

 9        Q.    This was a population-based retrospective

10   cohort study of all adult women undergoing synthetic

11   mesh surgery for SUI in Ontario, Canada from April 1st,

12   2002 through December 31st, 2012, right?

13        A.    That's right.

14        Q.    And that included 59,878 women; is that right?

15        A.    That is right.

16        Q.    And complications were treated in 1,307 of

17   those 59,887 women; is that correct?

18        A.    That's correct.

19        Q.    And that's a 2.2 percent complication rate; is

20   that right?

21        A.    Yes.

22        Q.    And the 10-year cumulative incidence of

23   complications was 3.29 percent; is that correct?

24        A.    Yes.

25        Q.    And that's a study that supports your opinions
```

Mareeni Stanislaus, M.D.

1    regarding the safety and efficacy of the TVT-O device?

2        A.    Yes, definitely.

3              MR. KOOPMANN:  Those are all the questions I

4    have for you.  Thank you, Dr. Stanislaus.

5              MR. JACKSON:  I have a few follow up.

6              Counsel, can I get a copy of Exhibit 13?  I

7    didn't get it.

8              MR. KOOPMANN:  Yes.  Which is that?

9              THE WITNESS:  That's the updated physician

10   statement.

11             MR. KOOPMANN:  So that -- that copy was just

12   included in her materials.  I don't know if I have an

13   identical copy to that, but I have --

14             MR. JACKSON:  Could we just go off the record

15   for a second?

16             THE VIDEOGRAPHER:  The time on the monitor is

17   5:05 p.m.  We're going off the record.

18             (Off the record discussion.)

19             THE VIDEOGRAPHER:  Going back on the record.

20   The time on the monitor is 5:06 p.m.

21

22                    FURTHER EXAMINATION

23   BY MR. JACKSON:

24       Q.    Doctor, could I ask you to take out

25   Exhibit 14, which is marked as Exhibit 14.

Mareeni Stanislaus, M.D.

1      A.    Yes.

2      Q.    And you were just asked some questions by

3  counsel about a study on the second page of this

4  Exhibit 14; is that correct?

5      A.    That is correct.

6      Q.    And the title of that study is "The myth:  In

7  Vivo Degradation of Polypropylene Meshes"; is that

8  correct?

9      A.    Yes.

10      Q.    Are you familiar with any of the authors of

11  this study?

12      A.    No.

13      Q.    Are you aware that Dr. Thames is currently a

14  expert for Ethicon in this litigation?

15      A.    I am, yes.

16      Q.    Okay.  And, Doctor, this study that you were

17  just asked about, what level of evidence is this?

18      A.    It's basic science evidence, but low level in

19  terms of the randomized controlled trial level.

20      Q.    So it's not level 1 evidence?

21      A.    No, it is not level 1 evidence.

22      Q.    Doctor, you were asked some questions about an

23  Exhibit 13, which is a AUGS SUFU position statement

24  update that has come out since your expert report in

25  this case; is that correct?

Mareeni Stanislaus, M.D.

```
1         A.    That is correct.

2         Q.    And, Doctor, on the first and second pages of

3    this document there's something that says,

4    "Justification for the Position Statement"; is that

5    correct?

6         A.    Yes.

7         Q.    And one of the things that's a justification

8    for this position statement is that the FDA has clearly

9    stated that polypropylene mid-urethral slings is safe

10   and effective for the treatment of SUI; is that correct?

11        A.    Yes, that's correct.

12        Q.    So, Doctor, is the fact that the FDA has

13   spoken on the safety of mid-urethral slings important to

14   your opinions in this case?

15             MR. KOOPMANN:  Object to form.

16             THE WITNESS:  It is important insofar as it

17   forms the basis for this justification, yes.

18   BY MR. JACKSON:

19        Q.    Okay.  Doctor, do you believe you could offer

20   the same opinions in this case without making reference

21   to AUGS or the FDA?

22        A.    Yes.

23        Q.    Doctor, do you believe statements made by AUGS

24   and the FDA are strong evidence that support your

25   opinions in this case?
```

Mareeni Stanislaus, M.D.

```
 1        A.    I do.

 2        Q.    And would you like to be able to talk about

 3   statements made by AUGS and the FDA at trial?

 4        A.    Yes, I would.

 5        Q.    Doctor, when counsel was asking you some

 6   questions a few moments ago, I believe you stated that

 7   you've implanted many thousand Prolene sutures in your

 8   career; is that correct?

 9        A.    That's correct.

10        Q.    Okay.  And aside from the Burch procedure,

11   what indications have you implanted Prolene sutures for?

12        A.    Oh, for sacrospinous ligament fixation,

13   multiple vaginal vault suspension procedures,

14   paravaginal defect repairs.  Oh, Prolene.  Probably used

15   some in repair of abdominal fascia.  And, sorry, I did

16   use some on the razin prorare procedures.  We used

17   Prolene then.

18        Q.    Okay.  Is that it?

19        A.    There may be others, but those are the

20   principal ones, yes.

21        Q.    Doctor, do you know when the Tommaselli study

22   was published?

23        A.    I have to look that up.  I think it was 2013.

24   Let me --

25        Q.    Doctor --
```

Mareeni Stanislaus, M.D.

1        A.    2015.  Yes, 2015.

2              MR. KOOPMANN:  Counsel, your time's up.

3              MR. JACKSON:  Okay.  I have no more questions.

4              THE WITNESS:  Okay.

5              THE VIDEOGRAPHER:  One moment, please.

6              This marks the end of Disk 3, Volume I, in the

7    videotaped deposition of Dr. Stanislaus.  The time on

8    the monitor is 5:12 p.m., and we are now off the record.

9              THE REPORTER:  Did you want a copy of this?

10             MR. KOOPMANN:  We have a standing order with

11   Golkow.

12             (At the time of 5:12 p.m. the deposition

13              was concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

Mareeni Stanislaus, M.D.

```
1                PENALTY OF PERJURY CERTIFICATE

2

3          I, MAREENI STANISLAUS, M.D., hereby declare I am

4    the witness in the within matter, that I have read the

5    foregoing transcript and know the contents thereof; that

6    I declare that the same is true to my knowledge, except

7    as to the matters which are therein stated upon my

8    information or belief, and as to those matters, I

9    believe them to be true.

10         I declare being aware of the penalties of

11   perjury, that the foregoing answers are true and

12   correct.

13

14

15

16         Executed on the _____ day of _____,

17   20___, at _____, _____.

18                    (CITY)                    (STATE)

19

20                 _____

21                    MAREENI STANISLAUS, M.D.

22

23

24

25
```

Mareeni Stanislaus, M.D.

```
 1                    - - - - - -
 2                  E R R A T A
 3                    - - - - - -
 4   PAGE LINE  CHANGE

 5   ____ ____ _____

        REASON: _____
 6
     PAGE LINE  CHANGE
 7   ____ ____ _____
 8      REASON: _____
 9   PAGE LINE  CHANGE

10   ____ ____ _____

        REASON: _____
11
     PAGE LINE  CHANGE
12   ____ ____ _____
13      REASON: _____
14   PAGE LINE  CHANGE

15   ____ ____ _____

        REASON: _____
16
     PAGE LINE  CHANGE
17   ____ ____ _____
18      REASON: _____
19   PAGE LINE  CHANGE

20   ____ ____ _____

21      REASON: _____
22   PAGE LINE  CHANGE

23   ____ ____ _____

        REASON: _____
24
25
```

Mareeni Stanislaus, M.D.

```
 1               CERTIFICATE OF REPORTER

 2        I, ASHALA TYLOR, CSR No. 2436, in and for the State

 3   of California, do hereby certify:

 4        That the foregoing proceedings were taken before me

 5   at the time and place herein set forth; that any

 6   witnesses in the foregoing proceedings, prior to

 7   testifying, were placed under oath; that a verbatim

 8   record of the proceedings were made by me using machine

 9   shorthand which was thereafter transcribed under my

10   direction; further that the foregoing is an accurate

11   transcription thereof.

12        That before the completion of the deposition, review

13   of the transcript was not requested.

14        I further certify that I am neither financially

15   interested in this action nor a relative or employee of

16   any attorney or any of the parties hereto.

17        In compliance with Section 8016 of the Business and

18   Professions Code, I certify under penalty of perjury

19   that I am a Certified Shorthand Reporter with California

20   License No. 2436 in full force and effect.

21   WITNESS my hand this 21st day of July, 2016.

22

23   _____

24        Ashala Tylor, CSR #2436, RPR, CRR, CLR

25
```